1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6  CORPORATION,                  )
                                 )  SAN JOSE, CALIFORNIA
7                PLAINTIFF,      )
                                 )  AUGUST 13, 2012
8           VS.                  )
                                 )  VOLUME 7
9  SAMSUNG ELECTRONICS CO.,      )
   LTD., A KOREAN BUSINESS       )  PAGES 1989-2320
10 ENTITY; SAMSUNG               )
   ELECTRONICS AMERICA,          )
11 INC., A NEW YORK              )
   CORPORATION; SAMSUNG          )
12 TELECOMMUNICATIONS            )
   AMERICA, LLC, A DELAWARE      )
13 LIMITED LIABILITY             )
   COMPANY,                      )
14                               )
                 DEFENDANTS.     )
15 _____

16            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17           UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                    CERTIFICATE NUMBER 9595
24

25

```
1      A P P E A R A N C E S:

2      FOR PLAINTIFF         MORRISON & FOERSTER
       APPLE:                   BY:  HAROLD J. MCELHINNY
3                                    MICHAEL A. JACOBS
                                     RACHEL KREVANS
4                               425 MARKET STREET
                                SAN FRANCISCO, CALIFORNIA  94105
5

6      FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
       APPLE:                 HALE AND DORR
7                             BY:  WILLIAM F. LEE
                              60 STATE STREET
8                             BOSTON, MASSACHUSETTS  02109

9                             BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11     FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                           OLIVER & HEDGES
12                         BY:  CHARLES K. VERHOEVEN
                           50 CALIFORNIA STREET, 22ND FLOOR
13                         SAN FRANCISCO, CALIFORNIA  94111

14                         BY:  VICTORIA F. MAROULIS
                                KEVIN P.B. JOHNSON
15                         555 TWIN DOLPHIN DRIVE
                           SUITE 560
16                         REDWOOD SHORES, CALIFORNIA  94065

17                         BY:  MICHAEL T. ZELLER
                                WILLIAM C. PRICE
18                         865 SOUTH FIGUEROA STREET
                           10TH FLOOR
19                         LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

1                    INDEX OF WITNESSES

2    PLAINTIFF'S

3    BORIS TEKSLER
          CROSS-EXAM BY MS. MAROULIS (RES.)  P. 2006
4         REDIRECT EXAM BY MR. MUELLER        P. 2009
          RECROSS-EXAM BY MS. MAROULIS        P. 2019
5         FURTHER REDIRECT EXAM               P. 2022

6    JUN WON LEE
          BY VIDEOTAPED DEPOSITION            P. 2023
7                                                2025

8    DONG HOON CHANG
          BY VIDEOTAPED DEPOSITION            P. 2026
9

10   TIMOTHY BENNER
          BY VIDEOTAPED DEPOSITION            P. 2028
11                                               2029

12   TIMOTHY SHEPPARD
          BY VIDEOTAPED DEPOSITION            P. 2030
13

14   TERRY MUSIKA
          DIRECT EXAM BY MS. KREVANS          P. 2031
15        CROSS-EXAM BY MR. PRICE             P. 2098
          REDIRECT EXAM BY MS. KREVANS        P. 2160
16        RECROSS-EXAM BY MR. PRICE           P. 2165
          FURTHER REDIRECT EXAM               P. 2171
17

18

19   DEFENDANT'S

20   BENJAMIN BEDERSON
          DIRECT EXAM BY MR. DEFRANCO         P. 2228
21        CROSS-EXAM BY MR. JACOBS            P. 2254
          REDIRECT EXAM BY MR. DEFRANCO       P. 2269
22

23   ADAM BOGUE
          DIRECT EXAM BY MR. JOHNSON          P. 2274
24        CROSS-EXAM BY MR. JACOBS            P. 2300

25

1                      INDEX OF EXHIBITS

2                                  MARKED        ADMITTED

3      PLAINTIFF'S

4      69 AND 89                                 2028
       28                                        2057
5      34                                        2079
       194                                       2082
6      25A-1                                     2094
       2227                                      2273
7      41.1 AND 41.2                             2273

8      DEFENDANT'S

9      572.003                                   2128
       518                                       2235
10     3951.001 AND 3951.002                     2235
       3951.010                                  2239
11     546                                       2240
       528                                       2245
12     518                                       2251
       3951.007 AND 3951.009                     2251
13     696                                       2277
       695                                       2281
14     661                                       2287
       3952.101                                  2287
15     662                                       2289
       3952.102                                  2291
16     713                                       2298

17

18     JOINT

19     1500                                      2041

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA                    AUGUST 13, 2012

2                    P R O C E E D I N G S

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5              THE COURT:  OKAY.  FOR THE JURY

6    INSTRUCTIONS, WOULD YOU PLEASE PROVIDE A MICROSOFT

7    WORD VERSION TO EITHER THE PROPOSED ORDER INBOX OR

8    TO LHK, CRD?

9              MS. MAROULIS:  YES, YOUR HONOR.

10             THE COURT:  AND WOULD YOU PLEASE ALSO

11   PROVIDE SIX HARD COPIES OF THE JOINT AND DISPUTED

12   JURY INSTRUCTIONS IN THREE-RING BINDERS, PLEASE?

13             MS. MAROULIS:  YES.

14             THE COURT:  ALL RIGHT.  THANK YOU.  CAN

15   YOU DO THAT TODAY, AT THE END OF THE DAY SO WE CAN

16   START WORKING ON THOSE?

17             ALL RIGHT.  THANK YOU.

18             WITH REGARD TO APPLE'S PROPOSED

19   REDACTIONS TO PX 2581, THAT'S APPROVED.

20             ON YOUR EXHIBIT LIST -- THANK YOU FOR

21   FILING THAT -- IT WAS A LITTLE BIT UNCLEAR -- I

22   MEAN, WE CAN TAKE THE PREFIXES OFF ONCE THE LIST IS

23   FINALIZED, BUT IT WOULD BE HELPFUL IF YOU LEFT THE

24   PREFIXES ON, BECAUSE THAT MORE EASILY MAPS ON TO MY

25   LIST, SO IF YOU WOULD KEEP, LIKE, PX OR DX OR SDX

```
 1    OR PDX.

 2              AND I WASN'T SURE ON NUMBER 3 AND 4 WHERE

 3    YOU JUST SAY APPLE AND SAMSUNG SMARTPHONES, APPLE

 4    AND SAMSUNG TABLETS, WHAT WERE THOSE?  BECAUSE I

 5    KNOW YOU HAVE THE JX ACTUAL PHONES, YOU KNOW,

 6    STARTING ON PAGE 6.

 7              MS. MAROULIS:  YOUR HONOR, THAT'S

 8    PROBABLY APPLE'S EXHIBIT, SO I'LL LET THEM HANDLE

 9    THAT.

10              MR. JACOBS:  I THINK WE'LL HAVE TO CHECK,

11    YOUR HONOR.

12              MS. KREVANS:  I THINK I KNOW THE ANSWER,

13    YOUR HONOR.  IF THOSE WERE PX 3 AND 4, THOSE ARE

14    PHOTO COMPILATIONS, ONE ARE ACCUSED DEVICES AND ONE

15    ARE APPLE PRODUCTS.  I'D HAVE TO LOOK THEM UP TO

16    MAKE SURE WHICH IS WHICH.

17              THE COURT:  ALL RIGHT.  IF YOU WOULD,

18    PLEASE, ON THIS EXHIBIT NUMBER INCLUDE THE

19    PREFIXES, THEN I CAN VERIFY IT, AND THEN WE CAN

20    ALWAYS TAKE THOSE OFF WHEN THIS GOES TO THE JURY.

21              AND WHEN CAN YOU UPDATE THESE LISTS?  THE

22    DEMONSTRATIVE LIST ONLY GOES THROUGH LAST TUESDAY

23    AND THE EXHIBIT LIST GOES THROUGH LAST THURSDAY.

24              MR. JACOBS:  YOUR HONOR, I THINK BY FIRST

25    THING TOMORROW MORNING WE COULD GET THAT DONE.
```

1           THE COURT:  OKAY.  THANK YOU.

2           MR. JACOBS:  I KNOW THE PARTIES HAVE --

3    UNDERSTAND THAT WE NEED TO BE SYNCHING THIS UP.

4           THE COURT:  EVERY DAY WOULD BE GREAT, IF

5    WE COULD HAVE JUST A NEW LIST TO MAKE SURE THERE'S

6    NO DISAGREEMENT ABOUT WHAT'S BEEN ADMITTED THAT

7    DAY.

8           OKAY.  SO WHY DON'T WE SAY -- CAN YOU

9    UPDATE THAT TOMORROW AT 8:00?

10          MR. JACOBS:  YES, YOUR HONOR.

11          THE COURT:  OKAY.  THANK YOU.

12          AND WHY DON'T WE JUST HAVE THAT DAILY?

13   SO WHATEVER'S BEEN ADMITTED THE PREVIOUS DAY, WE'LL

14   ALL BE IN AGREEMENT AND THERE'S NO PROBLEM.

15          AND WHEN CAN I HAVE THE JURY

16   INSTRUCTIONS?  CAN WE SAY BY 6:00 O'CLOCK TODAY?

17          MR. JACOBS:  YES, YOUR HONOR.

18          THE COURT:  OKAY.  THANK YOU.

19          OKAY.  NOW, WHAT'S -- WHAT -- FOR THE

20   ACTUAL EXHIBITS THAT ARE BEING SHOWN TO THE

21   WITNESSES, ARE YOU ALL THEN, ONCE THE WITNESS IS

22   LEAVING, KEEPING THOSE IN YOUR SEPARATE OFFICIAL

23   EXHIBIT CARTS?  OR --

24          MR. JACOBS:  WE'RE JUST TAKING THE

25   BINDERS BACK, YOUR HONOR.  ARE YOU -- ARE YOU --

```
 1    I'M NOT SURE I UNDERSTAND EXACTLY THE QUESTION.

 2              ARE YOU ASKING WHAT THE ACTUAL -- HOW DO

 3    WE MAKE SURE THE ACTUAL EXHIBITS SYNCH UP WITH YOUR

 4    SET?

 5              THE COURT:  YEAH.  I JUST -- SINCE THERE

 6    HAS BEEN THIS DISPUTE NOW ABOUT THE DEVICES, I JUST

 7    DON'T WANT THERE TO BE ANY DISPUTE ABOUT THE

 8    DOCUMENTS THAT THE WITNESS IS ACTUALLY TESTIFYING

 9    ABOUT, SO IT MAY BE BEST THAT WE TAKE THOSE AS

10    WELL.

11              I MEAN, THERE HASN'T BEEN ANY ISSUE SO

12    FAR, BUT JUST IN CASE, WOULD IT BE, YOU KNOW, IN AN

13    ABUNDANCE OF CAUTION FOR US TO DO THAT AS WELL, IN

14    ADDITION TO THE DEVICES?

15              MS. MAROULIS:  THAT'S FINE.  WE'LL SUBMIT

16    TO THE COURT THE PAPER EXHIBITS EVERY DAY AFTER

17    COURT.

18              MR. JACOBS:  I THINK THAT WHAT WE SHOULD

19    DO FIRST IS WE SHOULD LOOK AT THE EXHIBIT LIST AND

20    SYNCH UP NOT JUST THE LIST, BUT WHAT DOCUMENT IS

21    ASSOCIATED WITH THE LIST AND MAKE SURE THAT WE HAVE

22    AN AGREEMENT ON THAT, THAT WILL GO RETROSPECTIVELY.

23              AND THEN PROSPECTIVELY, IF YOU WOULD LIKE

24    THE WITNESS BINDERS TO BE LEFT WITH THE COURT, THAT

25    WOULD BE FINE.
```

1       THE COURT:  NOT THAT I WANT US TO

2   ACCUMULATE MORE BECAUSE WE'RE LIMITED ON SPACE, BUT

3   JUST IN THE EVENT THAT THERE'S ANY DISPUTE, IT

4   MIGHT BE BEST FOR US TO HAVE THAT.

5       I WOULD LIKE YOU ALL TO -- I'M HOPING

6   THAT EVIDENCE CONCLUDES BY FRIDAY AND THAT WE HAVE

7   OUR JURY INSTRUCTION CONFERENCE MONDAY AND THEN, AT

8   THE LATEST, THE JURY BE INSTRUCTED TUESDAY MORNING

9   AND HAVING THE CLOSINGS ON TUESDAY.

10      I THINK THAT'S REALISTIC BASED ON THE

11  NUMBER OF HOURS EACH PARTY HAS LEFT, UNLESS YOU

12  DISAGREE.

13      DOES THAT SOUND REALISTIC?

14      MR. JACOBS:  SOUNDS POSSIBLE, YOUR HONOR.

15      IT COULD BE THAT THERE'S SOME SPILL OVER

16  ON TO MONDAY AS WE CALCULATE IT DEPENDING ON HOW

17  FAST WE MOVE ALONG.

18      THE COURT:  EITHER WAY, I WOULD LIKE TO

19  HAVE CLOSINGS ON TUESDAY AND EITHER HAVE THE JURY

20  START DELIBERATING ON TUESDAY OR WEDNESDAY MORNING.

21      SO IN ORDER FOR US TO MEET THAT SCHEDULE,

22  YOU KNOW, WE'LL WORK ON THE JURY INSTRUCTIONS RIGHT

23  AWAY TO GET, HOPEFULLY, A DRAFT SET OF INSTRUCTIONS

24  WHICH YOU CAN THEN ARGUE, BUT AS CLOSE TO DONE AS

25  POSSIBLE BY MONDAY.

```
 1              BUT THEN I WOULD LIKE YOU ALL TO BE IN
 2    TOTAL AGREEMENT AS TO WHAT THE OFFICIAL SET OF
 3    EXHIBITS IS THAT ARE GOING TO THE JURY BECAUSE WE
 4    MAY NEED TO GIVE THEM THAT FULL SET BY TUESDAY.
 5              MR. JACOBS:  THAT MAKES SENSE, YOUR
 6    HONOR.
 7              THE COURT:  SO IF YOU WOULD, PLEASE,
 8    SINCE THUS FAR YOU'VE TAKEN THE EXHIBITS, IF YOU
 9    JUST COME TO AN AGREEMENT -- I MEAN, I DON'T THINK
10    THERE SHOULD BE, ON THE PAPER DOCUMENTS AS THERE IS
11    WITH THE PHONES, BUT IF YOU CAN JUST REACH AN
12    AGREEMENT AS TO WHAT'S COME IN THAT DAY, IF YOU ALL
13    HAVE ANY DISPUTES AS TO WHETHER THAT'S THE VERSION
14    THAT THE WITNESS LOOKED AT, LET ME KNOW.
15              MR. JACOBS:  YOU BET, YOUR HONOR.
16              THE COURT:  ALL RIGHT.  THEN WHAT ELSE?
17    I'VE RULED ON TWO SETS OF OBJECTIONS AS TO
18    MR. MUSIKA.
19              MS. MAROULIS:  YOUR HONOR --
20              THE COURT:  FRIDAY NIGHT AND SATURDAY
21    NIGHT.
22              MS. MAROULIS:  ONE BRIEF QUESTION.  IN
23    YOUR FRIDAY NIGHT ORDER, YOU ALLOWED APPLE TO ASK
24    ONE LEADING QUESTION, AND WE ASSUME THAT THEY CAN
25    ONLY ANSWER YES OR NO.  IS THAT RIGHT?
```

1              THE COURT:  ONLY YES OR NO.

2              MS. MAROULIS:  THANK YOU.

3              THE COURT:  SO WE HAVE MR. TEKSLER THIS

4     MORNING?

5              MS. MAROULIS:  YES.

6              MR. JACOBS:  A HOUSEKEEPING MATTER.

7              THE COURT:  YES.

8              MR. JACOBS:  WE MET CLOSE YESTERDAY UNDER

9     YOUR 10:30 DEADLINE FOR HIGH PRIORITY OBJECTIONS

10    AND RESPONSES.

11             DO WE NOW SHIFT TO THE 1:00 O'CLOCK

12    SCHEDULE FOR THE WEEK?  THAT WAS THE ORIGINAL

13    SCHEDULE WE SET FOR THOSE FILINGS.

14             THE COURT:  WELL, I WOULD -- I WOULD

15    PREFER GOING BACK TO 8:00, BUT IS THAT JUST NOT

16    DOABLE?

17             MR. JACOBS:  NOT DOABLE, YOUR HONOR.

18             THE COURT:  SO CAN WE COMPROMISE THEN AT

19    10:30?

20             MR. JACOBS:  JUST TO BE CLEAR, THIS IS

21    10:30 TODAY FOR WITNESSES TOMORROW?

22             THE COURT:  YES, CAN WE COMPROMISE AT

23    10:30?

24             MR. JACOBS:  UNDERSTOOD.

25             THE COURT:  BECAUSE AS IT IS, WE'RE

1    FILING OUR ORDERS AT 11:00 P.M., AND IF YOU DON'T

2    GIVE IT TO US UNTIL 1:00 AND WE DON'T SEE IT UNTIL

3    4:00, I'M NOT GOING TO GET TO IT UNTIL 2:00 O'CLOCK

4    IN THE MORNING.

5              I HAVE MUCH SMALLER RESOURCES THAN BOTH

6    SIDES DO, SO I NEED THAT TIME.  SO 10:30 FOR ANY

7    WITNESSES FOR TOMORROW, PLEASE.

8              MR. JACOBS:  AND THEN GOING FORWARD I

9    THINK --

10             THE COURT:  AND THEN GOING FORWARD, 10:30

11   EVERY MORNING FOR THE NEXT DAY'S WITNESSES.

12             MR. JACOBS:  OKAY.

13             THE COURT:  OKAY.  THAT'S -- ALL RIGHT.

14   THEN I BELIEVE WE HAVE --

15             MR. VERHOEVEN:  JUST ONE OTHER PROCEDURAL

16   ISSUE.

17             THE COURT:  YES?

18             MR. VERHOEVEN:  APPLE WILL LIKELY REST

19   THEIR CASE THIS MORNING, YOUR HONOR.

20             AS A MATTER OF PROCEDURE, WE NEED TO MAKE

21   A RULE 50 MOTION FOR JUDGMENT, AND I CONFERRED WITH

22   THE OTHER SIDE -- THIS IS MY USUAL PRACTICE ON THIS

23   TO AVOID DELAY -- IS I'LL ORALLY MAKE -- I'LL JUST

24   SAY, "YOUR HONOR, I MOVE UNDER RULE 50."  NOTHING

25   MORE.

1          AND THEN WE WOULD SUBMIT, AS SOON AS WE

2    CAN THEREAFTER, MAYBE IN A COUPLE OF DAYS, A BRIEF

3    THAT SETS OUT, FOR THE AVOIDANCE OF WAIVER AND

4    WHATNOT, THE ARGUMENTS THAT WE WANT TO PRESERVE ON

5    THAT MOTION, AND IF IT'S ACCEPTABLE TO YOUR HONOR,

6    I THINK THE OTHER SIDE WOULD AGREE THAT, AND

7    STIPULATE THAT FILING THAT BRIEF IN A DAY OR TWO

8    WOULD NOT CONSTITUTE A WAIVER.

9          SO WE WOULD SUGGEST THAT, YOUR HONOR.

10          MR. MCELHINNY:  OUR POSITION IS WHATEVER

11    WORKS FOR YOU WORKS FOR US, YOUR HONOR.

12          WE'RE A LITTLE WORRIED ABOUT GETTING BACK

13    LOADED HERE.  BUT IF -- IF YOU -- IF YOU ACCEPT

14    THEIR PROPOSAL, WE HAVE NO OBJECTION TO IT.

15          THE COURT:  SO THIS IS GOING -- AND THEN

16    I ASSUME YOU'RE GOING TO WANT TO FILE AN OPPOSITION

17    AND THEN YOU'RE GOING TO FILE A REPLY?

18          MR. VERHOEVEN:  THIS IS MOSTLY -- WE NEED

19    TO AVOID ANY ARGUMENTS OF WAIVER.  WE HAVE THESE

20    REQUIREMENTS THAT WE MAKE THESE IF WE WANT TO

21    PRESERVE THEM FOR LATER.

22          THE COURT:  I UNDERSTAND.

23          MR. MCELHINNY:  THERE'S AN INITIAL

24    QUESTION OF WHETHER YOUR HONOR WANTS BRIEFING ON A

25    J --

```
 1              THE COURT:  I DON'T.  I NORMALLY DON'T

 2    GET BRIEFING ON THIS.  IT'S USUALLY DONE PRETTY

 3    QUICKLY ORALLY.  WE'VE ALL SEEN THE SAME EVIDENCE.

 4              MR. VERHOEVEN:  THE ONLY REASON I REQUEST

 5    THAT WE DO IT IN WRITING IS SO THERE'S A CLEAR

 6    RECORD THAT WE HAVEN'T WAIVED SPECIFIC EVIDENCE.

 7              THERE'S A LOT OF THEORIES AND DOCUMENTS

 8    IN THIS CASE, AND WE WANT TO MAKE SURE WE PRESERVE

 9    OUR OBJECTIONS, YOUR HONOR.

10              MR. MCELHINNY:  THAT CAN USUALLY BE DONE

11    ORALLY.  IT'S UP TO YOU, YOUR HONOR.

12              MR. VERHOEVEN:  I WAS TOLD THAT THEY

13    DIDN'T OBJECT, AND NOW MR. MCELHINNY IS OBJECTING,

14    SO --

15              MR. MCELHINNY:  WELL --

16              THE COURT:  WELL, WHY DON'T WE DO THIS:

17    I'LL ALLOW YOU TO DO A THREE-PAGE BRIEF.  OKAY?

18    BECAUSE, I MEAN, WE'VE SEEN ALL THE SAME EVIDENCE.

19              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

20    THAT'S EXACTLY WHAT WE NEED, AND WE'LL JUST CHECK

21    OFF THE THINGS WE WANT TO MAKE SURE WE DIDN'T

22    WAIVE.

23              THE COURT:  OKAY.  NORMALLY I JUST DO

24    THIS ALL ORALLY.  I RULE ON IT ORALLY.  BUT I

25    ASSUME YOU WANT ME TO WAIT UNTIL I READ YOUR BRIEF,
```

1      RIGHT, BUT WE'LL KEEP GOING WITH THE TRIAL.

2               MR. VERHOEVEN:  EXACTLY, YOUR HONOR.

3               THE COURT:  DO YOU WANT TO DO A

4      THREE-PAGE RESPONSE?

5               MR. MCELHINNY:  IF -- NO MORE THAN.

6               THE COURT:  OH, YOU'RE DEFINITELY GETTING

7      NO MORE THAN.  I DON'T -- I'M SURPRISED YOU'RE EVEN

8      ASKING.

9               SO CAN WE WORK OUT A SCHEDULE FOR THAT?

10     WHEN WOULD YOU LIKE TO FILE THAT, MR. VERHOEVEN?

11               MR. VERHOEVEN:  WE COULD FILE THAT

12     TOMORROW, YOUR HONOR.

13               THE COURT:  OKAY.  SO TOMORROW IS THE

14     14TH.  IS THAT RIGHT?

15               OKAY.  THEN WHEN ARE YOU GOING TO FILE

16     YOUR THREE PAGES OR LESS?

17               MR. MCELHINNY:  THE DAY AFTER, YOUR

18     HONOR.

19               THE COURT:  OKAY.  SO THAT WOULD BE 8-15,

20     AND THEN NO REPLY.

21               MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.

22               THE COURT:  ALL RIGHT.  SO JUST ORALLY

23     MAKE YOUR RULE 50 MOTION.  I WON'T RULE ON IT.

24     I'LL TAKE CARE OF IT AFTER I SEE THE BRIEFS.  THAT

25     WAY WE DON'T HAVE TO DO ANY OF THIS IN FRONT OF THE

1    JURY AND THAT WAY WE DON'T LOSE ANY TIME DURING THE

2    DAY.

3              MR. MCELHINNY:  AND AS I DID AGREE WITH

4    MR. VERHOEVEN, WE WILL NOT RAISE WAIVER -- HIS

5    ARGUMENTS ARE GOING TO BE PRESERVED IN HIS MOTION,

6    WHATEVER IS IN HIS WRITTEN MOTION.

7              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  WHAT ELSE?

9    ANYTHING ELSE THAT WE SHOULD COVER?  I GUESS WE CAN

10   BRING OUR JURY IN A LITTLE EARLY.

11             MS. MAROULIS:  THE ONLY THING IS MY REAL

12   TIME DOESN'T WORK.

13             THE COURT:  MINE IS STUCK AS WELL.

14             (PAUSE IN PROCEEDINGS.)

15             MR. VERHOEVEN:  YOUR HONOR, THERE IS ONE

16   OTHER THING, BUT I THINK WE CAN ADDRESS IT AT A

17   LATER TIME.  MR. GOLDSTEIN, MY PARTNER, WOULD LIKE

18   US TO USE A COUPLE MINUTES OF OUR TIME TO ADDRESS

19   ONE OF THE OBJECTION RULINGS ON DR. YANG.

20             THE COURT:  DR. WHO, WHICH ONE?

21             MR. VERHOEVEN:  DR. YANG, BUT HE'S NOT

22   GOING TO BE UP FOR A LONG TIME, SO MY SUGGESTION IS

23   WE GET GOING AND FIND A SPOT CLOSER IN TIME.

24             THE COURT:  IS YOUR ORDER OF WITNESSES

25   SIMILAR, LARGELY, ACCORDING TO YOUR LIST?

1          MS. MAROULIS:  IT'S THE ONE WE FILED,

2     YESTERDAY, YOUR HONOR, AROUND NOON.

3          THE COURT:  OKAY.

4          MS. MAROULIS:  SO BASICALLY THREE PRIOR

5     ARTISTS, DEPOSITION DESIGNATIONS, AND THEN

6     MR. WILLIAMS AND MR. YANG.

7          THE COURT:  OKAY.  SO MR. PALTIAN,

8     MR. ZORN, MR. WILLIAMS, AND THEN MR. YANG, HE'LL BE

9     ON BEFORE?

10          MR. VERHOEVEN:  YES.

11          MS. MAROULIS:  BUT THE THREE OTHER

12     WITNESSES ARE GOING FIRST, BOGUE, FORLINES AND

13     BEDERSON BEFORE THE OTHERS.

14          THE COURT:  I'M SORRY.  GIVE ME YOUR

15     ORDER THEN.  PALTIAN, ZORN --

16          MS. MAROULIS:  NO, YOUR HONOR.  IT'S

17     BOGUE, FORLINES, BEDERSON, PALTIAN, ZORN, WILLIAMS,

18     AND YANG.

19          THE COURT:  OKAY.  THANK YOU.

20          ALL RIGHT.  MR. RIVERA, WOULD YOU PLEASE

21     BRING IN OUR JURY?

22          THE CLERK:  YES, YOUR HONOR.

23          (WHEREUPON, THE FOLLOWING PROCEEDINGS

24     WERE HELD IN THE PRESENCE OF THE JURY:)

25          THE COURT:  ALL RIGHT.  GOOD MORNING AND

1    WELCOME BACK.  THE TIME IS NOW 9:05.

2              GO AHEAD, PLEASE, WITH THE CROSS OF

3    MR. TEKSLER.

4              SIR, YOU ARE STILL UNDER OATH.

5                        **BORIS TEKSLER,**

6    BEING CALLED AS A WITNESS ON BEHALF OF THE

7    PLAINTIFF, HAVING BEEN PREVIOUSLY DULY SWORN, WAS

8    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

9              **CROSS-EXAMINATION (RESUMED)**

10   BY MS. MAROULIS:

11   Q    GOOD MORNING, MR. TEKSLER.

12   A    GOOD MORNING.

13   Q    WE'RE GOING TO CONTINUE WITH THE DISCUSSION OF

14   THE ROYALTIES THAT WE STARTED LAST WEEK.

15              DO YOU REMEMBER THAT?

16   A    I DO.

17   Q    LAST WEEK YOU TESTIFIED THAT NO ONE HAS EVER

18   PAID APPLE A ROYALTY OF $2.02 PER UNIT FOR THE '381

19   PATENT.  IS THAT STILL CORRECT?

20   A    YES, THAT'S CORRECT.  THERE'S NO LICENSE FOR

21   THE '381.

22   Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF

23   $2.02 FOR THE '163 PATENT; IS THAT CORRECT AS WELL?

24   A    YES, THAT'S CORRECT.

25   Q    NO ONE HAS EVER PAID APPLE A ROYALTY OF $3.10

1    FOR THE '916 PATENT AT ISSUE; IS THAT CORRECT?

2    A    YES, THAT'S CORRECT.

3    Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF

4    $24 DOLLARS PER UNIT FOR ANY OF THE DESIGN PATENTS

5    AT ISSUE IN THIS CASE; IS THAT RIGHT?

6    A    YES, THAT'S CORRECT.

7    Q    FURTHERMORE, NO ONE HAS EVER PAID APPLE A

8    ROYALTY OF $24 A UNIT FOR ALL FOUR DESIGN PATENTS

9    AT ISSUE IN THIS CASE; RIGHT?

10   A    YES, THAT'S CORRECT.

11   Q    AS A LICENSING PROFESSIONAL, SIR, ARE YOU

12   FAMILIAR WITH THE CONCEPT OF MARKING?

13   A    I AM.

14   Q    MARKING IS PUTTING THE PATENT OR REGISTERED

15   TRADE DRESS NUMBER ON YOUR PRODUCT; CORRECT?

16   A    THAT'S ONE INSTANCE, YES.

17   Q    AND THE PURPOSE OF THAT IS TO LET EVERYONE IN

18   THE MARKET KNOW THAT THE PATENTEE HAS RIGHTS TO A

19   PARTICULAR PATENT; RIGHT?

20   A    YES, I BELIEVE THAT'S CORRECT.

21   Q    AND IT IS CORRECT, SIR, THAT APPLE DOES NOT

22   MARK ITS IPHONES; RIGHT?

23   A    YES, I BELIEVE THAT'S CORRECT.

24   Q    IT'S ALSO CORRECT THAT APPLE DOES NOT MARK ITS

25   IPADS; IS THAT RIGHT?

1  A    THAT'S CORRECT.

2  Q    ISN'T IT CORRECT, SIR, THAT PRIOR TO THE

3  FILING OF THIS LAWSUIT, APPLE NEVER TOLD SAMSUNG

4  THAT IT WAS INFRINGING SPECIFIC DESIGN PATENTS BY

5  NUMBER?

6  A    WE TOLD THEM THAT THEY INFRINGED DESIGN

7  PATENTS OF OURS, BUT WE DIDN'T ALLOCATE THOSE

8  NUMBERS TO THEM, THAT'S CORRECT.

9            AS A MATTER OF FACT, SEVERAL OF THOSE

10  PATENTS HADN'T YET ISSUED.

11  Q    MR. TEKSLER, PLEASE ANSWER MY QUESTION.  IS IT

12  CORRECT THAT APPLE NEVER SPECIFIED ANY DESIGN

13  PATENTS TO SAMSUNG THAT IT ALLEGES IN THIS CASE

14  PRIOR TO THE LAWSUIT?

15  A    ANY ENUMERATED NUMBER?  IS THAT WHAT YOU'RE

16  SAYING?

17  Q    YES, MR. TEKSLER.

18  A    YES, I AGREE.

19            MS. MAROULIS:  OKAY.  I DON'T HAVE ANY

20  FURTHER QUESTIONS FOR YOU AT THIS TIME.

21            THE COURT:  OKAY.  THE TIME IS NOW 9:07.

22  IS THERE ANY REDIRECT?

23            MR. MUELLER:  PLEASE, YOUR HONOR.

24            THE COURT:  OKAY.  GO AHEAD, PLEASE.

25            MR. MUELLER:  MAY I PROCEED, YOUR HONOR?

```
1            THE COURT:  PLEASE, GO AHEAD.

2                REDIRECT EXAMINATION

3    BY MR. MUELLER:

4    Q    JUST A FEW QUESTIONS FOR YOU.  FIRST,

5    MS. MAROULIS ASKED YOU SOME QUESTIONS A MOMENT AGO

6    WITH RESPECT TO LICENSING OF APPLE'S PATENTS.

7            DO YOU HAVE THOSE PATENTS IN MIND?

8    A    I DO.

9    Q    THE '381, THE '163?

10   A    YES.

11   Q    THE '916?

12   A    YES.

13   Q    AND THE DESIGN PATENTS.

14   A    CORRECT.

15   Q    NOW, LET'S BE CLEAR.  HAS APPLE LICENSED ANY

16   OF THOSE PATENTS ON A STANDALONE BASIS AS

17   INDIVIDUAL PATENTS?

18   A    NO.

19            MS. MAROULIS:  OBJECTION.  LEADING.

20            THE COURT:  OVERRULED.

21            THE WITNESS:  SORRY.  NO, IT'S NOT OUR

22   CUSTOMARY PRACTICE TO ENUMERATE SPECIFIC DESIGN

23   PATENTS, OR SPECIFIC PATENT NUMBERS.

24            IN GENERAL, YOU COME UP WITH A PRETTY

25   BROAD CATEGORY OF PATENTS IN A CROSS-LICENSE.  THAT
```

1    WAY BOTH PARTIES KNOW THAT THEY HAVE SOME PEACE.

2    BY MR. MUELLER:

3    Q    NOW, MR. TEKSLER, LAST WEEK YOU EXPLAINED TO

4    THE JURY HOW APPLE TREATS DIFFERENT CATEGORIES

5    WITHIN ITS PATENT PORTFOLIO.

6              CAN YOU REMIND US, WHICH CATEGORY DO

7    THESE PATENTS FALL INTO?

8              MS. MAROULIS:  OBJECTION.  BEYOND THE

9    SCOPE OF CROSS.

10             MR. MUELLER:  YOUR HONOR, THESE ARE

11   EXACTLY THE PATENTS THAT MS. MAROULIS JUST ASKED

12   ABOUT.

13             THE COURT:  OVERRULED.

14             GO AHEAD.

15             THE WITNESS:  SO ALL THESE PATENTS ARE IN

16   APPLE'S UNIQUE USER EXPERIENCE AND NOT ONES THAT WE

17   WOULD LICENSE.

18   BY MR. MUELLER:

19   Q    NOW, MS. MAROULIS ASKED YOU SOME QUESTIONS

20   ABOUT THE LIMITED CIRCUMSTANCES IN WHICH APPLE HAS

21   LICENSED ITS DESIGN PATENTS.  THOSE WERE QUESTIONS

22   ASKED LAST FRIDAY.

23             DO YOU RECALL THAT?

24   A    I DO.

25             MS. MAROULIS:  OBJECTION.  ARGUMENTATIVE.

1              THE COURT:  OVERRULED.

2      BY MR. MUELLER:

3      Q    NOW, MR. TEKSLER, ARE YOU FAMILIAR WITH

4      APPLE'S LICENSE WITH MICROSOFT?

5      A    I AM.

6      Q    DOES THAT LICENSE COVER APPLE'S DESIGN

7      PATENTS?

8      A    IT DOES.

9      Q    CAN YOU EXPLAIN TO THE JURY THE FORM OF THE

10     LICENSE GRANT?

11     A    SURE.  SO APPLE AND MICROSOFT'S CROSS-LICENSE

12     DOES COVER THE DESIGN PATENTS.

13              HOWEVER, WE TOOK SPECIAL PROHIBITIONS FOR

14     BOTH PARTIES SO THAT THERE'S WHAT I TERM AN

15     ANTI-CLONING PROVISION IN THE AGREEMENT SO THAT WE

16     WOULDN'T COPY EACH OTHER'S PRODUCTS.

17              AND SO EVEN THOUGH THERE'S PEACE BETWEEN

18     THE COMPANIES WITH RESPECT TO THE PATENTS AS A

19     WHOLE, THERE'S A CLEAR ACKNOWLEDGMENT THAT THERE'S

20     NO COPYING WITH THIS ANTI-CLONING PROVISION.

21     Q    AND MR. TEKSLER, TO BE VERY CLEAR, WHAT RIGHTS

22     WERE NOT GIVEN TO MICROSOFT WITH RESPECT TO THESE

23     DESIGN PATENTS?

24              MS. MAROULIS:  OBJECTION.  LEADING,

25     BEYOND THE SCOPE OF CROSS.

1        THE COURT:  OVERRULED.

2        GO AHEAD.

3        THE WITNESS:  SORRY.  CAN YOU REPEAT THE

4    QUESTION?

5    BY MR. MUELLER:

6    Q    SURE.  WHAT RIGHTS WERE NOT GIVEN TO MICROSOFT

7    WITH RESPECT TO THESE DESIGN PATENTS?

8    A    SO THERE WAS NO RIGHT WITH RESPECT TO THESE

9    DESIGN PATENTS TO BUILD CLONE PRODUCTS OF ANY TYPE

10   IN THESE, AND THERE WAS A LIMITED CAPTURE

11   ASSOCIATED WITH THEM AS WELL.

12   Q    NOW, HOW DOES THIS PROVISION IN THE MICROSOFT

13   LICENSE COMPARE WITH HOW APPLE GENERALLY TREATS ITS

14   USER EXPERIENCE PATENT?

15   A    IT'S COMPLETELY CONSISTENT.  THESE ARE AREAS

16   THAT WE DO NOT WANT PEOPLE TO COPY US.

17   Q    NEXT TOPIC, IF WE CAN SHIFT GEARS AND FOCUS ON

18   PX 51, WHICH IS AN EXHIBIT THAT MS. MAROULIS ASKED

19   YOU ABOUT.  THIS IS FROM OCTOBER 5TH, 2010.

20        DO YOU RECALL MS. MAROULIS HIGHLIGHTED

21   CERTAIN LICENSE TERMS THAT APPLE PROPOSED?

22   A    YES.

23   Q    WHY WAS APPLE OFFERING THESE TERMS TO SAMSUNG?

24   A    WELL, WE WERE TRYING VERY HARD TO COME UP WITH

25   AN AMICABLE RESOLUTION WITH SAMSUNG, AND CONSISTENT

```
1    WITH OUR STRATEGY OF LICENSING, WHICH IS WE WANT TO

2    GET PROPERLY COMPENSATED FOR THAT WHICH THEY

3    INFRINGE; AND WE WANTED THEM TO RESPECT AND PROTECT

4    OUR UNIQUE USER EXPERIENCE.

5              AND THAT'S EXACTLY WHAT WE WERE TRYING TO

6    DO IN THIS PRESENTATION.

7    Q    LET'S PUT PAGE 13 ON THE SCREEN IF WE COULD,

8    PLEASE.

9              MR. TEKSLER, MY QUESTION IS, DID APPLE'S

10   OFFER TO SAMSUNG INCLUDE RIGHTS TO APPLE'S USER

11   EXPERIENCE PATENTS?

12   A    ABSOLUTELY NOT.  WE WERE VERY CLEAR IN THE

13   DISCUSSIONS WITH SAMSUNG THAT WE WEREN'T OFFERING

14   THEM A LICENSE TO EVERYTHING, AND WE SAID THAT WE

15   STILL HAD YET TO DISCUSS SOME VERY SPECIFIC, WHAT

16   WE SORT OF TERMED UNTOUCHABLES, IF YOU WILL.

17             AND IN RETURN, WHAT WE REALLY WANTED TO

18   DO AT THIS STAGE OF THE DISCUSSIONS WAS GET THEM TO

19   ACKNOWLEDGE THEY NEEDED A LICENSE AND TO STOP

20   COPYING AND TO PAY US APPROPRIATELY FOR THE RIGHTS

21   THAT THEY DO NEED.

22   Q    AND LET'S BE CLEAR.  WHAT WERE THE

23   UNTOUCHABLES?

24   A    THE UNTOUCHABLES WERE THE SPECIFIC PROPRIETARY

25   FEATURES THAT NEEDED TO BE ADDRESSED WHICH IS ON
```

1    ONE OF THESE SLIDES.

2    Q    WHAT TYPES OF PATENTS WERE THOSE, MR. TEKSLER?

3    A    THOSE WERE THE ONES THAT WE'VE TALKED ABOUT

4    TODAY AS THE APPLE UNIQUE USER EXPERIENCE PATENTS.

5    Q    WOULD THOSE INCLUDE THE ASSERTED PATENTS?

6    A    COMPLETELY.

7    Q    LAST TOPIC.  LET'S LOOK AT PX 52, WHICH IS THE

8    AUGUST 4TH, 2010 PRESENTATION.

9         NOW, DO YOU RECALL WHEN MS. MAROULIS

10   ASKED YOU SOME QUESTIONS ABOUT WHETHER THIS

11   PRESENTATION RAISED DESIGN ISSUES?

12   A    YES.

13   Q    LET'S TAKE A LOOK AT PAGE 17 IF WE COULD.

14        MR. TEKSLER, WHAT DO WE SEE HERE?

15   A    SO I THINK, AS I TESTIFIED EARLIER, THIS IS

16   WHAT WE WERE -- THIS IS A CHAPTER ENTITLED "SAMSUNG

17   COPYING IPHONE," AND WE TALKED ABOUT THE REMARKABLE

18   SIMILARITY OF THE TWO PRODUCTS, YOU KNOW, THAT WE

19   LOOKED AT THEM SIDE BY SIDE AND WE TALKED ABOUT THE

20   OVERALL DESIGN, WE TALKED ABOUT THE BEZEL, WE

21   TALKED ABOUT THE UNIQUE LAYOUT OF THE SCREEN --

22        MS. MAROULIS:  OBJECTION, YOUR HONOR.

23   THIS IS BEYOND YOUR HONOR'S RULING.

24        THE WITNESS IS NOT ALLOWED TO TESTIFY

25   ABOUT THE ACTUAL MEETING AND HE'S GOING BEYOND THE

```
1    EXHIBIT.
2              MR. MUELLER:  YOUR HONOR, I'M ASKING
3    ABOUT THE ACTUAL DOCUMENT, AND I CAN MAKE THAT
4    CLEAR IF YOU'D LIKE.
5              THE COURT:  WHY DON'T YOU CLARIFY THAT?
6              MR. MUELLER:  SURE.
7    Q    MR. TEKSLER, I JUST WANT TO MAKE SURE THAT
8    WE'RE FOCUSSED ON THIS PAGE OF THIS DOCUMENT, THE
9    AUGUST 4TH, 2010 PRESENTATION.
10             SO STICKING WITH THIS DOCUMENT, CAN YOU
11   EXPLAIN WHAT WE SEE HERE?
12   A    CERTAINLY.  SO THE TALKING POINTS THAT --
13             MS. MAROULIS:  OBJECTION.  LEADING, YOUR
14   HONOR.
15             MR. MUELLER:  MY QUESTION WAS, CAN YOU
16   EXPLAIN WHAT WE SEE?  THAT'S NOT LEADING.
17             THE COURT:  HE'S TALKING ABOUT TALKING
18   POINTS.  I'M GOING TO SUSTAIN THE OBJECTION.
19   BY MR. MUELLER:
20   Q    LET'S TURN THE PAGE TO PAGE 18.  WHAT DO WE
21   SEE HERE?
22             MS. MAROULIS:  OBJECTION, YOUR HONOR.
23             THE WITNESS:  THIS WAS ANOTHER PAGE THAT
24   I CREATED THAT TALKED ABOUT REMARKABLE SIMILARITY
25   OF THE OVERALL USER EXPERIENCE, AND WE TALKED
```

1    ABOUT, AGAIN --

2                MS. MAROULIS:  YOUR HONOR, I MOVE TO

3    STRIKE THAT.

4                THE COURT:  OKAY.  THE OBJECTION'S

5    OVERRULED.  OKAY.  THIS IS GETTING TOO DISRUPTIVE.

6                GO AHEAD.

7    BY MR. MUELLER:

8    Q    MR. TEKSLER, CAN YOU CONTINUE, PLEASE.

9    A    I'LL TRY TO CHOOSE MY WORDS CAREFULLY.

10               SO WHEN I CREATED THIS SLIDE, I TALKED

11   ABOUT THE, THE REMARKABLE SIMILARITY OF THE WAY THE

12   ICONS ARE ARRANGED, DOWN TO THE ICONS, WE TALKED

13   ABOUT THE KEYBOARD ARRANGEMENT --

14               THE COURT:  WAIT.  WHO IS HE TALKING TO?

15   HE WAS NOT AT THE MEETING, SO WHY DOES HE KEEP

16   SAYING "WE TALKED ABOUT"?  WHO IS HE TALKING TO?

17   I'VE ALREADY SAID HE CAN'T TESTIFY ABOUT THE

18   MEETING THAT HE DIDN'T ATTEND.

19               MR. MUELLER:  UNDERSTOOD.

20               THE COURT:  THIS NEEDS TO BE CLEANED THIS

21   UP.

22               MR. MUELLER:  ABSOLUTELY.

23   Q    MR. TEKSLER, LET'S BE VERY CLEAR.  I'M JUST

24   ASKING ABOUT WHAT DO WE SEE ON THIS PAGE OF THE

25   DOCUMENT?

1    A    YES.

2    Q    WHY DON'T YOU EXPLAIN WHAT WE SEE IN TERMS OF

3    THE ACTUAL IMAGES ON PAGE 18 OF THIS AUGUST 4TH

4    PRESENTATION?

5    A    YES, ABSOLUTELY.  SO THE FOUR-BY-FOUR GRID,

6    THE REMARKABLE SIMILARITY TO SAMSUNG'S PRODUCT; THE

7    CALENDAR, REMARKABLE SIMILARITY; AS WELL AS THE

8    FENCE AT THE BOTTOM; THE CLOCKS THAT ARE THERE; THE

9    NOTES APPLICATION SECTION AND THE KEYBOARD

10   ARRANGEMENT, ALL THOSE THINGS WERE WHAT I INTENDED

11   TO COMMUNICATE BY CREATING THIS SLIDE.

12   Q    AND FINALLY, IF YOU COULD LOOK AT PAGE 19, THE

13   VERY NEXT PAGE, WHAT DO WE SEE HERE?

14   A    SO WE --

15            MS. MAROULIS:  OBJECTION.  CALLS FOR

16   OPINION TESTIMONY.

17            THE COURT:  CALLS FOR WHAT?  I'M SORRY?

18            MS. MAROULIS:  OPINION.

19            MR. MUELLER:  HERE AGAIN I'M JUST ASKING

20   ABOUT A PAGE IN THE DOCUMENT THAT HE AUTHORED.

21            THE COURT:  ALL RIGHT.  OVERRULED.

22            THE WITNESS:  SO BACK TO APPLE'S USER

23   EXPERIENCE HERE, PART OF THAT IS THE OUT OF BOX

24   EXPERIENCE, AND THIS SLIDE WAS MEANT TO RELAY HOW

25   THE OUT OF BOX EXPERIENCE WAS INCREDIBLY SIMILAR,

1    YOU KNOW, FOR HOW THE PACKAGING WORKED ALL THE WAY

2    DOWN TO HOW THE BOX -- YOU KNOW, THE APPEARANCE OF

3    THE BOX, THE LACK OF MANUALS, THINGS OF THAT SORT.

4    BY MR. MUELLER:

5    Q    LAST QUESTION, MR. TEKSLER.  WHAT ULTIMATELY

6    HAPPENED WITH THESE COPYING ISSUES?

7              MS. MAROULIS:  OBJECTION.  CALLS FOR

8    SPECULATION.

9              THE COURT:  WHY DON'T YOU LAY A

10   FOUNDATION THAT HE KNOWS?

11             MR. MUELLER:  SURE.

12   Q    MR. TEKSLER, YOU WORKED ON THIS PRESENTATION

13   ON AUGUST 4TH; CORRECT?

14   A    YES.

15   Q    WERE YOU PARTY TO ADDITIONAL DISCUSSIONS WITH

16   SAMSUNG?

17   A    YES, ON SEVERAL OCCASIONS.

18   Q    I'LL REPEAT MY QUESTION.  WHAT ULTIMATELY

19   HAPPENED WITH THE COPYING ISSUES IDENTIFIED IN THIS

20   PRESENTATION?

21   A    SO --

22             MS. MAROULIS:  OBJECTION.  BEYOND THE

23   SCOPE OF CROSS.

24             MR. MUELLER:  YOUR HONOR, THESE ISSUES

25   WERE RAISED BY MS. MAROULIS, INCLUDING THE DESIGN

1    COPYING ISSUES SPECIFICALLY ON FRIDAY.

2            THE COURT:  I DON'T THINK SHE RAISED WHAT

3    HAPPENED BETWEEN THE PARTIES IN HER CROSS, SO IT'S

4    SUSTAINED.

5            MR. MUELLER:  NO FURTHER QUESTIONS.

6            THANK YOU, SIR.

7            THE COURT:  NOW, PX 51, I DON'T HAVE THAT

8    IN EITHER OF THE BINDERS.

9            MS. MAROULIS:  YOUR HONOR, I THINK

10   MR. MUELLER WAS REFERRING TO WHAT'S BEEN ENTERED

11   INTO EVIDENCE AS DX 568.

12           MR. MUELLER:  IT'S IDENTICAL.  THE

13   PARTIES HAD LISTED BOTH.

14           THE COURT:  ALL RIGHT.  THANK YOU.

15           MR. MUELLER:  THANK YOU.

16           THE COURT:  I'M SORRY.  LET ME GET THE

17   TIME.  IT'S 9:17.

18           GO AHEAD, PLEASE.

19                   **RECROSS-EXAMINATION**

20   BY MS. MAROULIS:

21   Q    MR. TEKSLER, MR. MUELLER SHOWED YOU SEVERAL

22   SLIDES OF THE PRESENTATION YOU PREPARED; IS THAT

23   CORRECT?

24   A    YES, THAT'S CORRECT.

25   Q    IN NONE OF THE SLIDES ARE THE WORDS "TRADE

1    DRESS" OR "DESIGN PATENT" EVER MENTIONED; CORRECT?

2    A    BY -- BY THOSE WORDS?

3    Q    YES.

4    A    I AGREE.

5    Q    AND YOU WERE NOT AT THE MEETING TO DETERMINE

6    WHETHER ANY WORDS LIKE THAT WERE USED WITH THE

7    PAGES THAT MR. MUELLER SHOWED YOU; CORRECT?

8    A    I WAS NOT AT THE MEETING.  I WAS AT THE

9    SUBSEQUENT MEETING.  I COULDN'T MAKE THE ORIGINAL

10   ONE, BUT I WAS IN THE OCTOBER MEETING.

11   Q    ALL RIGHT.  BUT YOU WERE NOT AT THE SEPTEMBER

12   MEETING; RIGHT?

13   A    I BELIEVE IT WAS AUGUST 4TH.

14   Q    I'M SORRY, AUGUST.

15   A    YES, I WAS NOT AT THE AUGUST 4TH MEETING.

16   Q    OKAY.  LET'S TURN TO DX 586 THAT YOU ALSO

17   REVIEWED WITH COUNSEL, AND LET'S SHOW DX 586, PAGE

18   13, PLEASE.

19           DO YOU SEE THE THIRD, OR THE FOURTH

20   OPTION ON THIS DOCUMENT IS "SOME SAMSUNG SMARTPHONE

21   PRODUCTS MAY NOT ADOPT THE DISTINCTIVE INDUSTRIAL

22   DESIGN."

23           IS THAT ONE OF THE OPTIONS DESCRIBED

24   HERE?

25   A    YES, THAT'S CORRECT.

1    Q    IS IT ALSO CORRECT THAT THERE WAS AN OPTION

2    THAT DID INCLUDE INDUSTRIAL DESIGN?

3    A    SO LET ME SPECIFY WHAT WE MEANT IN THIS, AND

4    THIS WAS CLARIFIED IN OTHER PARTS OF THIS

5    PRESENTATION AS WELL, WHICH IS WHAT WE WERE TALKING

6    ABOUT WAS THE OVERALL FORM FACTOR OF THE PHONE,

7    WHETHER IT WAS IN A COMPLETE TOUCHSCREEN PHONE OR

8    WAS IT A SMARTPHONE THAT HAD, LIKE, FOR EXAMPLE, A

9    FULL KEYBOARD, A PHYSICAL KEYBOARD ON IT, AND

10   THAT'S WHAT WE WERE RELATING TO.

11            SO IF YOU LOOK AT THE EXAMPLES, I THINK

12   IT CLARIFIES IT VERY NICELY THAT WHAT WE WERE

13   REFERRING TO WAS AN OVERALL TOUCHSCREEN PHONE.

14   Q    ISN'T IT TRUE, SIR, THAT ONE OF THE OPTIONS,

15   BASED ON THIS PRESENTATION, WAS ONE THAT INCLUDED

16   INDUSTRIAL DESIGN?

17   A    NOT IN TERMS OF DESIGN PATENTS, NO.  I

18   DISAGREE WITH THAT.

19   Q    ALL RIGHT.  PLEASE TURN TO PAGE 15 OF THE SAME

20   DOCUMENT.

21            DO YOU SEE, SIR, THAT THE PRESENTATION

22   OFFERED $30 PER UNIT FOR SMARTPHONE?

23   A    I DO.

24   Q    AND DO YOU SEE THAT THE PRESENTATION OFFERED

25   40 UNITS FOR A TABLET?  CORRECT?

1    A    $40 PER UNIT?

2    Q    YES.

3    A    YES, I AGREE.

4    Q    AND THIS WAS FOR THE ENTIRE PORTFOLIO, NOT

5    JUST ONE PATENT; RIGHT?

6    A    IT WAS NOT THE ENTIRE PORTFOLIO.  IT WAS WHAT

7    I'VE TERMED IN THIS AS THE CORE COMPUTING PATENTS.

8    IT NEVER INCLUDED APPLE'S UNIQUE USER EXPERIENCE

9    AND WE MADE THAT CLEAR.

10   Q    THIS WAS FOR MORE THAN JUST ONE PATENT.

11   THERE'S SEVEN PATENTS; CORRECT, SIR?

12   A    YES, THAT'S CORRECT.

13           MS. MAROULIS:  OKAY.  I HAVE NO FURTHER

14   QUESTIONS.

15           THE COURT:  ALL RIGHT.  THE TIME IS 9:20.

16           GO AHEAD, PLEASE.

17           MR. MUELLER:  ONE QUESTION, YOUR HONOR.

18            **FURTHER REDIRECT EXAMINATION**

19   BY MR. MUELLER:

20   Q    IF WE CAN GO BACK TO THAT SAME PAGE, PLEASE,

21   PAGE 15 OF THE OCTOBER PRESENTATION.

22           MR. TEKSLER, DID THIS OFFER INCLUDE ANY

23   OF THE PATENTS ASSERTED IN THIS CASE?

24   A    NO, IT DID NOT.

25           MR. MUELLER:  NOTHING FURTHER.  THANK

1    YOU.

2              THE COURT:  OKAY.  THE TIME IS NOW 9:20.

3    IS THIS WITNESS EXCUSED?

4              MR. MUELLER:  YES.

5              THE COURT:  SUBJECT TO RECALL OR NOT?

6              MR. MUELLER:  YES, SUBJECT TO RECALL.

7              THE COURT:  OKAY.  YOU'RE EXCUSED SUBJECT

8    TO RECALL.

9              ALL RIGHT.  PLEASE CALL YOUR NEXT

10   WITNESS.

11             MR. MCELHINNY:  YOUR HONOR, AS OUR NEXT

12   WITNESS, WE'RE GOING TO CALL BY DEPOSITION

13   JUN WON LEE, WHO'S THE DIRECTOR OF LICENSING FOR

14   SAMSUNG ELECTRONICS COMPANY.

15             THE COURT:  OKAY. GO AHEAD.  IT'S NOW

16   9:21.

17             MR. MCELHINNY:  CAN WE DIM THE LIGHTS?

18             THE COURT:  YES.

19             **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

20   **JUN WON LEE WAS PLAYED IN OPEN COURT OFF THE**

21   **RECORD.)**

22             MS. MAROULIS:  YOUR HONOR, DO YOU WANT US

23   TO PRESENT OUR COUNTER --

24             THE COURT:  ALL RIGHT.  THE TIME IS 9:28.

25             MR. MCELHINNY:  YOUR HONOR, I'LL NOTE FOR

```
 1    THE RECORD THAT WHAT WAS REFERRED TO IN THE

 2    DEPOSITION CLIP AS EXHIBIT 1 IS PLAINTIFF'S EXHIBIT

 3    52 IN EVIDENCE IN THIS CASE.

 4             THE COURT:  OKAY.

 5             MR. MCELHINNY:  AND, TWO, I WOULD LIKE TO

 6    OFFER FOR THE RECORD PLAINTIFF'S EXHIBIT 201,

 7    THAT'S THE TRANSCRIPT OF THE DEPOSITION CLIP THAT

 8    WAS JUST PLAYED SINCE THE REPORTER DOESN'T REPORT

 9    IT.

10             MS. MAROULIS:  YOUR HONOR, WE WEREN'T

11    NOTIFIED THAT APPLE WAS SEEKING TO INTRODUCE IT AS

12    AN EXHIBIT.  THE DEPOSITION WAS PLAYED.

13             MR. MCELHINNY:  THE COURT HAS THE -- THE

14    RECORD HAS TO HAVE A TRANSCRIPT OF WHAT WAS PLAYED.

15    OTHERWISE THERE'S NO RECORD OF IT.

16             MR. VERHOEVEN:  YOUR HONOR, THIS IS

17    MR. VERHOEVEN.

18             IN MY EXPERIENCE, YOUR HONOR,

19    TRANSCRIPTS -- THE TRIAL TRANSCRIPT, DEPOSITION

20    TRANSCRIPTS, DON'T GO TO THE JURY, AND SO WE WOULD

21    OBJECT TO MOVING IT INTO EVIDENCE.

22             THE COURT:  IT'S NOT GOING TO BE

23    ADMITTED.

24             MR. MCELHINNY:  YOUR HONOR, THEN WE WOULD

25    REQUEST PERMISSION TO LODGE IT SO THAT IT IS
```

```
 1    CONNECTED WITH THE RECORD, EVEN THOUGH IT WILL

 2    NOT --

 3              THE COURT:  THAT'S FINE.

 4              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 5              AT THIS TIME, YOUR HONOR, WE WOULD

 6    CALL -- OH, I'M SORRY.

 7              MS. MAROULIS:  YOUR HONOR, MAY WE PROCEED

 8    WITH THE COUNTER-DESIGNATIONS?

 9              THE COURT:  THAT'S FINE.  THE TIME IS NOW

10    9:29.  GO AHEAD, PLEASE.

11              (WHEREUPON, THE VIDEOTAPED DEPOSITION OF

12    JUN WON LEE WAS PLAYED IN OPEN COURT OFF THE

13    RECORD.)

14              THE COURT:  OKAY.  THE TIME IS 9:31.

15              DO YOU HAVE A PHOTO TO HAND OUT FOR THE

16    JURORS?

17              MR. MCELHINNY:  WE DO, YOUR HONOR.

18              THE CLERK:  I HAVE ONE RIGHT HERE.

19              THE COURT:  WE CAN DO THAT DURING THE

20    BREAK.  THAT'S FINE.  THANK YOU.

21              WHO IS YOUR NEXT WITNESS?

22              MR. MCELHINNY:  OUR NEXT WITNESS IS

23    MR. DONG HOON CHANG, WHO IS THE HEAD OF SAMSUNG'S

24    MOBILE DESIGN GROUP.  WE'RE CALLING HIM BY

25    DEPOSITION, YOUR HONOR.
```

1          THE COURT:  THAT'S FINE.  9:32.  GO

2     AHEAD.

3               **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

4     **DONG HOON CHANGE WAS PLAYED IN OPEN COURT OFF THE**

5     **RECORD.)**

6               THE COURT:  IT'S 9:35.

7               MR. MCELHINNY:  YOUR HONOR, AT THIS POINT

8     I WOULD ASK TO LODGE PLAINTIFF'S EXHIBIT 202, WHICH

9     IS A TRANSCRIPT OF MR. CHANG'S DEPOSITION.

10              THE COURT:  THAT'S FINE.

11              MS. MAROULIS:  SHORT

12    COUNTER-DESIGNATIONS, YOUR HONOR.  MAY WE PROCEED?

13              THE COURT:  YES, PLEASE.  IT'S 9:35.

14              GO AHEAD, PLEASE.

15              **(WHEREUPON, THE VIDEOTAPED DEPOSITION**

16    **DONG HOON CHANGE OF WAS PLAYED IN OPEN COURT OFF**

17    **THE RECORD.)**

18              THE COURT:  IS THAT IT?  OKAY.  IT'S

19    9:36.

20              GO AHEAD WITH YOUR NEXT WITNESS, PLEASE.

21              MR. MCELHINNY:  YOUR HONOR, AT THIS POINT

22    WE WOULD CALL TIMOTHY BENNER BY DEPOSITION.

23              MR. BENNER IS THE SENIOR MANAGER IN

24    CONSUMER INSIGHTS AND ANALYTICS FOR SAMSUNG

25    TELECOMMUNICATIONS AMERICA.

1          IN ADVANCE OF THE DEPOSITION, BASED ON

2     YOUR HONOR'S RULINGS, WE WOULD OFFER INTO EVIDENCE

3     PLAINTIFF'S EXHIBIT 69, WHICH IS THE J.D. POWER

4     2011 WIRELESS SMARTPHONE SATISFACTION STUDY; AND

5     PLAINTIFF'S EXHIBIT 89, WHICH IS A SAMSUNG Q1 '11

6     DEEP DIVE DOCUMENT, BOTH OF WHICH WILL BE REFERRED

7     TO IN THE TRANSCRIPT.

8          THE COURT:  ALL RIGHT.  ANY OBJECTION?

9          MS. MAROULIS:  YOUR HONOR, NO FURTHER

10    OBJECTION.

11         WE REQUEST A LIMITING INSTRUCTION AS TO

12    THE DEEP DIVE DOCUMENT.

13         THE COURT:  GIVE ME ONE SECOND, PLEASE.

14         (PAUSE IN PROCEEDINGS.)

15         THE COURT:  I DON'T SEE IN MY RULINGS ON

16    MR. BENNER'S EXHIBIT 69, 89 THE SPECIFIC -- WAIT

17    ONE SECOND.

18         OH, I SEE.  SO EXHIBIT 89, WHICH IS THE

19    DEEP DIVE DOCUMENT, MAY ONLY BE CONSIDERED FOR

20    PURPOSES OF SHOWING INTENT, WILLFULNESS, AND

21    KNOWLEDGE AND NOT FOR ANY OTHER PURPOSE.

22         MR. MCELHINNY:  ON THE PART OF SAMSUNG.

23         THE COURT:  ON THE PART OF SAMSUNG,

24    THAT'S CORRECT.

25         THE TIME IS 9:38.  GO AHEAD, PLEASE.

1          MR. MCELHINNY:  I'M SORRY.  CAN WE GET A

2     RULING ON THOSE TWO DOCUMENTS?

3          THE COURT:  YES, THEY'RE ADMITTED.

4          MR. MCELHINNY:  THANK YOU.

5          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

6          69 AND 89, HAVING BEEN PREVIOUSLY MARKED

7          FOR IDENTIFICATION, WERE ADMITTED INTO

8          EVIDENCE.)

9          **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

10    **TIMOTHY BENNER WAS PLAYED IN OPEN COURT OFF THE**

11    **RECORD.)**

12         THE COURT:  IS THAT IT FOR THE DEPO

13    DESIGNATIONS?

14         MR. MCELHINNY:  IT IS, YOUR HONOR.  I

15    WOULD NOTE FOR THE RECORD THAT THE EXHIBIT REFERRED

16    TO IN THE DEPOSITION AS EXHIBIT 1594 HAS BEEN

17    ADMITTED AS PLAINTIFF'S EXHIBIT 69; AND THE EXHIBIT

18    ADMITTED AS 1603 HAS BEEN ADMITTED AS PLAINTIFF'S

19    EXHIBIT 89.

20         THE COURT:  ALL RIGHT.  IT'S 9:43.

21         MR. MCELHINNY:  I'M SORRY, YOUR HONOR.  I

22    ALSO WANT TO LODGE FOR THE RECORD, PLEASE,

23    PLAINTIFF'S EXHIBIT 203, WHICH IS THE TRANSCRIPT OF

24    THE DEPOSITION WE JUST PLAYED.

25         THE COURT:  OKAY.  THAT CAN BE LODGED FOR

1    THE RECORD.

2           ALL RIGHT.

3           MS. MAROULIS:  YOUR HONOR, MAY WE PROCEED

4    WITH THE COUNTER-DESIGNATIONS?

5           THE COURT:  YES, PLEASE.  IT'S 9:43.  GO

6    AHEAD, PLEASE.

7           **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

8    **TIMOTHY BENNER WAS PLAYED IN OPEN COURT OFF THE**

9    **RECORD.)**

10          THE COURT:  IS THAT THE END?  IT'S 9:47.

11          MR. MCELHINNY:  IT IS, YOUR HONOR.  AT

12   THIS POINT, I WOULD LIKE TO LODGE PLAINTIFF'S

13   EXHIBIT 204, THE TRANSCRIPT.

14          THE COURT:  OF WHO?  I DIDN'T HEAR YOU.

15          MR. MCELHINNY:  204, YOUR HONOR, AS A

16   TRANSCRIPT OF MR. SHEPPARD'S DEPOSITION.  I'M

17   SORRY, MR. BENNER'S DEPOSITION.

18          THE COURT:  I THOUGHT THAT WAS 203 AND

19   YOU ALREADY LODGED IT.

20          MR. MCELHINNY:  I'M AHEAD OF MYSELF.

21          THE COURT:  THAT'S OKAY.

22          MR. MCELHINNY:  WE WILL CALL AS OUR NEXT

23   WITNESS TIMOTHY SHEPPARD, WHO IS THE LEAD FOR

24   SAMSUNG TECHNOLOGY AMERICA LOGISTICS TEAM.

25          THE COURT:  OKAY.  IT'S 9:48.  GO AHEAD.

1          **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

2     **TIMOTHY SHEPPARD WAS PLAYED IN OPEN COURT OFF THE**

3     **RECORD.)**

4          THE COURT:  ALL RIGHT.  IT'S 9:50.

5          MR. MCELHINNY:  THANK YOU, YOUR HONOR.

6     AT THIS POINT I WOULD LIKE TO LODGE PLAINTIFF'S

7     EXHIBIT 204, WHICH IS A TRANSCRIPT OF THE SHEPPARD

8     DEPOSITION.

9          THE COURT:  OKAY.  THAT'S LODGED, BUT NOT

10    ADMITTED.

11         DO YOU HAVE A COUNTER-DESIGNATION?

12         MS. MAROULIS:  NO, YOUR HONOR, THERE'S NO

13    ADDITIONAL TESTIMONY.

14         THE COURT:  OKAY.

15         MR. MCELHINNY:  AT THIS POINT I'D LIKE TO

16    TURN THE FLOOR BACK TO MY PARTNER, RACHEL KREVANS,

17    YOUR HONOR.

18         THE COURT:  OKAY.  IT'S 9:50.

19         CALL YOUR NEXT WITNESS, PLEASE.

20         MS. KREVANS:  YOUR HONOR, APPLE CALLS

21    TERRY MUSIKA.

22         (PAUSE IN PROCEEDINGS.)

23         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

24                   **TERRY MUSIKA,**

25    BEING CALLED AS A WITNESS ON BEHALF OF THE

1    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

2    EXAMINED AND TESTIFIED AS FOLLOWS:

3              THE WITNESS:  YES, I DO.

4              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

5              THE COURT:  OKAY.  IT'S 9:52.

6              GO AHEAD, PLEASE.

7              THE CLERK:  PLEASE STATE YOUR NAME AND

8    SPELL IT FOR THE RECORD.

9              THE WITNESS:  YES, MY NAME IS TERRY

10   MUSIKA, T-E-R-R-Y, M-U-S-I-K-A.

11                  **DIRECT EXAMINATION**

12   BY MS. KREVANS:

13   Q    GOOD MORNING, MR. MUSIKA.

14   A    GOOD MORNING.

15   Q    COULD YOU START BY TELLING THE JURY WHAT KIND

16   OF WORK DO YOU DO?

17   A    I'M A CERTIFIED PUBLIC ACCOUNTANT AND HAVE

18   BEEN FOR APPROXIMATELY JUST SHY OF 40 YEARS.

19            AND IN THAT CAPACITY, I HAVE, THROUGH

20   THAT 40 YEARS, I HAVE DONE AUDITING AND I'VE DONE

21   TESTIMONY SUCH AS THIS.  AND I'VE ALSO OWNED AND

22   OPERATED COMPANIES THAT I'VE HAD A SPECIFIC

23   INTEREST IN MYSELF, AS WELL AS DONE SOME WORK, AS I

24   THINK WE'LL TALK ABOUT, FOR THE COURTS.

25   Q    AND WHAT HAVE YOU BEEN ASKED TO DO, GENERALLY,

1    IN CONNECTION WITH THIS CASE?

2    A    MY ROLE AS THE FINANCIAL EXPERT WITNESS IS TO

3    MAKE AN ASSUMPTION THAT THE JURY, THE COURT, HAS

4    DECIDED THAT THE PATENTS OF APPLE'S ARE VALID AND

5    THE TRADE DRESS IS VALID AND THAT SAMSUNG HAS

6    INFRINGED.

7            THAT'S NOT PART OF MY OPINION.  THAT'S

8    JUST AN ASSUMPTION THAT I HAVE TO MAKE TO THEN MAKE

9    A DECISION, OR A CALCULATION AS TO THE AMOUNT OF

10   DAMAGES THAT SAMSUNG SHOULD PAY TO APPLE, ASSUMING

11   THEY ACTUALLY DID INFRINGE AND ASSUMING THAT

12   APPLE'S PATENTS ARE VALID.

13   Q    OKAY.  COULD WE SEE PDX 34B.1, PLEASE.

14            MR. MUSIKA, COULD YOU PLEASE WALK US

15   GENERALLY THROUGH THE COURSE OF YOUR VERY LENGTHY

16   CAREER?

17   A    YES, I'LL BE BRIEF.  INVOTEX IS THE MOST

18   RECENT EMPLOYER, AND I FOUNDED INVOTEX PROBABLY SIX

19   OR SEVEN YEARS AGO.  TODAY I'M A MANAGING DIRECTOR

20   THERE.

21            PRIOR TO THAT, RIGHT OUT OF GRADUATE

22   SCHOOL, I WENT TO WORK FOR ONE OF THE LARGE

23   INTERNATIONAL ACCOUNTING FIRMS, KPMG, IN

24   LOS ANGELES.

25            AFTER THAT I WAS RECRUITED TO GO TO WORK

1    FOR ANOTHER ONE OF THE OTHER LARGE INTERNATIONAL

2    ACCOUNTING FIRMS, WHICH IS TODAY

3    PRICEWATERHOUSECOOPERS, AND I WORKED IN THERE AS

4    BOTH AN AUDITOR AND A CONSULTANT IN THEIR NATIONAL

5    OFFICE DESIGNING AUDIT TESTS FOR THEM THAT THEY USE

6    NATIONWIDE, AND I WAS EVENTUALLY MADE INTO AUDIT

7    PARTNER.

8    Q    LET ME STOP YOU RIGHT THERE.  YOU SAID AFTER

9    GRADUATE SCHOOL.  TELL US ABOUT YOUR EDUCATION.

10   A    UNDERGRADUATE DEGREE IN HISTORY FROM INDIANA

11   UNIVERSITY.  I WAS A HISTORY TEACHER IN L.A. FOR A

12   FEW YEARS PRIOR TO GOING BACK TO GRADUATE SCHOOL.

13   THEN I GOT A MASTER'S IN PUBLIC FINANCE, SAME,

14   INDIANA UNIVERSITY IN BLOOMINGTON, INDIANA.

15   Q    OKAY.  YOU SAID YOU DID BOTH AUDITING AND

16   CONSULTING WORK AT KPMG AND PWC.  IS PWC

17   PRICEWATERHOUSECOOPERS?

18   A    YES, IT IS.

19   Q    OKAY.  COULD YOU EXPLAIN THE KINDS OF THINGS

20   YOU DID IN CONNECTION WITH THE AUDITING WORK THAT

21   YOU DID AT THESE TWO ACCOUNTING FIRMS?

22   A    OVER THE APPROXIMATELY TEN YEARS THAT I WAS

23   WITH BOTH AUDITING FIRMS, I DID A RANGE OF AUDITS.

24   I DID SMALL LOCAL GOVERNMENTS; I DID DESIGN WORK, I

25   ACTUALLY DESIGNED AN ACCOUNTING SYSTEM FOR THE CITY

```
1    AND COUNTY OF SAN FRANCISCO; I'VE DONE AUDITS OF

2    LARGE INTERNATIONAL COMPANIES; NONPROFITS.

3          SORT OF THE RANGE OF SMALL TO LARGE

4    PUBLIC AND PRIVATE COMPANIES.

5    Q    AND WHAT KIND OF CONSULTING WORK DID YOU DO?

6    A    MOST OF MY CONSULTING WORK WAS DESIGN WORK,

7    DESIGNING ACCOUNTING SYSTEMS AND IMPLEMENTING

8    ACCOUNTING SYSTEMS FOR STATE AND LOCAL GOVERNMENTS,

9    AS WELL AS PRIVATE ENTERPRISES.

10   Q    DID YOU, IN THE COURSE OF YOUR AUDITING

11   CONSULTING WORK, DO ANY WORK FOR COMPANIES WHERE

12   THE STRUCTURE OF THE COMPANY WAS A PARENT WHICH WAS

13   IN A COUNTRY OUTSIDE THE UNITED STATES WITH

14   SUBSIDIARIES IN THE UNITED STATES?

15   A    YES, BOTH WAYS.  I'VE DONE AUDITS OF COMPANIES

16   WHICH WERE DOMICILED IN THE UNITED STATES AND HAD

17   SUBSIDIARIES OR OPERATIONS AROUND THE WORLD; AND

18   I'VE DONE AUDITS OF COMPANIES WHICH WERE BASED IN

19   THE U.K. OR SOMEWHERE ELSE AROUND THE WORLD AND HAD

20   OPERATIONS IN THE U.S., MUCH LIKE APPLE AND

21   SAMSUNG.

22   Q    OKAY.  NOW, I'M GOING TO --

23          MR. PRICE:  IF I MIGHT MAKE A COMMENT?

24   THE REALTIME IS WORK NOT WORKING, JUST TO LET THE

25   COURT KNOW.
```

```
 1                THE COURT:  MINE IS NOT AS WELL.

 2                (PAUSE IN PROCEEDINGS.)

 3                THE COURT:  LET'S TRY TO FIX IT AT THE

 4     BREAK AT 10:30.  IS THAT ALL RIGHT?

 5                MR. PRICE:  FOR AN EXPERT, IT'S NICE TO

 6     SEE IT.

 7                THE COURT:  THAT'S FINE.  LET'S TAKE A

 8     BREAK.  IT'S 9:56.  WHY DON'T WE GO AHEAD AND MAYBE

 9     JUST TAKE A FIVE MINUTE BREAK NOW AND IF ANYONE

10     NEEDS TO USE THE REST ROOM OR ANYTHING.

11                AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T

12     DISCUSS THE CASE WITH ANYONE, AND PLEASE DON'T READ

13     ABOUT THE CASE.

14                (WHEREUPON, A RECESS WAS TAKEN.)

15                (WHEREUPON, THE FOLLOWING PROCEEDINGS

16     WERE HELD IN THE PRESENCE OF THE JURY:)

17                THE COURT:  OKAY.  WELCOME BACK.  SORRY

18     FOR YOUR TECHNICAL DIFFICULTIES HERE.

19                IF EVERYONE WOULD PLEASE TAKE A SEAT.

20                ALL RIGHT.  THE TIME IS NOW 10:07.

21     THAT'S GOING TO BE OUR BREAK FOR THE MORNING IF YOU

22     DON'T MIND.

23                GO AHEAD, PLEASE.

24     BY MS. KREVANS:

25     Q    MR. MUSIKA, COULD YOU TELL US ABOUT THE COURT
```

1    APPOINTED TRUSTEE EXPERIENCE YOU HAD.

2    A    YES.  FOR ABOUT THE LAST 20 YEARS, I HAVE BEEN

3    CALLED UPON BY VARIOUS COURTS, PRIMARILY THE

4    BANKRUPTCY, UNITED STATES BANKRUPTCY COURTS, TO

5    SERVE THE COURTS AS A COURT APPOINTED TRUSTEE.

6            SOMETIMES I'VE SERVED AS AN OPERATING

7    TRUSTEE WHERE THE COMPANY IS HAVING FINANCIAL

8    DIFFICULTY AND MANAGEMENT'S IN QUESTION, SO I'VE

9    BEEN CALLED IN TO RUN THE COMPANY FOR THE BENEFIT

10   OF THE CREDITORS.

11           AT TIMES I'VE BEEN CALLED IN AS A SPECIAL

12   EXAMINER BECAUSE THERE'S SOMETHING IN THE COMPANY

13   THAT'S, THAT'S -- THAT THE COURT IS HAVING

14   DIFFICULTY WITH AND THEY WANT AN INDEPENDENT

15   EXAMINER TO COME IN AND GIVE THE COURT AN OPINION.

16           I'VE ALSO SERVED AS A RECEIVER IN STATE

17   COURT.  IT'S VERY MUCH LIKE AN OPERATING TRUSTEE.

18           I'VE SERVED AS A LIQUIDATING TRUSTEE

19   WHERE I'VE TAKEN THE ASSETS AND LIQUIDATED THE

20   ASSETS, AGAIN, FOR THE BENEFIT OF THE CREDITORS.

21           AND I'VE ALSO SERVED AS A SPECIAL MASTER

22   IN COURT, IN SHAREHOLDER DISPUTES WHERE THE COURT

23   WANTS ITS OWN EXPERT, IN ESSENCE, TO ASSIST IN THE

24   EVALUATION.

25   Q    BRIEFLY, CAN YOU DESCRIBE WHAT YOU MEAN BY

1    INVESTIGATIONS ON THE FOURTH PORTION OF YOUR SLIDE?

2    A    YES.  OVER THE 40 YEARS I'VE WORKED NUMEROUS

3    TIMES FOR THE FEDERAL GOVERNMENT, VARIOUS AGENCIES

4    OF THE FEDERAL GOVERNMENT; I INVESTIGATED FRAUD FOR

5    THE FBI; I ANALYZED AND WORK WITH THE IRS IN

6    INVESTIGATIONS; I'VE WORKED FOR THE STATE

7    DEPARTMENT IN MULTI-INTERNATIONAL FRAUD CLAIMS

8    INVOLVING CONSTRUCTION CLAIMS IN EGYPT; I'VE WORKED

9    NUMEROUS TIMES WITHIN THE JUSTICE DEPARTMENT FOR

10   THE VARIOUS UNFORTUNATE SAVINGS AND LOAN CRISES

11   THAT THIS COUNTRY HAS HAD IN THE LAST 30 YEARS.

12   Q    DO YOU HAVE PRIOR EXPERIENCE DOING DAMAGE

13   ANALYSIS FOR INTELLECTUAL PROPERTY CASES LIKE THIS

14   ONE?

15   A    YES.

16   Q    HOW OFTEN HAVE YOU DONE THIS TYPE OF ANALYSIS?

17   A    I'VE BEEN INVOLVED IN MORE THAN 200

18   INTELLECTUAL PROPERTY CASES OVER THE LAST 25 YEARS.

19   Q    HAVE YOU BEEN INVOLVED BEFORE IN ANY CASES IN

20   WHICH SAMSUNG WAS A PARTY?

21   A    YES.

22   Q    ON WHICH SIDE?  SAMSUNG'S OR THE OTHER SIDE?

23   A    BOTH SIDE.  I'VE WORKED FOR AND AGAINST

24   SAMSUNG.

25            MS. KREVANS:  YOUR HONOR, WE WOULD TENDER

1    MR. MUSIKA AS AN ECONOMIC AND ACCOUNTING EXPERT IN

2    THE CALCULATION OF INTELLECTUAL PROPERTY DAMAGES.

3              THE COURT:  ANY OBJECTION?

4              MR. PRICE:  NO OBJECTION.

5              THE COURT:  ALL RIGHT.  SO CERTIFIED.

6              GO AHEAD, PLEASE.

7    BY MS. KREVANS:

8    Q    MR. MUSIKA, HAVE YOU FORMED ANY OPINIONS

9    REGARDING WHAT DAMAGES APPLE SHOULD RECEIVE IF THE

10   JURY FINDS THAT SAMSUNG VIOLATED APPLE'S

11   INTELLECTUAL PROPERTY RIGHTS?

12   A    YES.

13   Q    WHAT IS YOUR OVERALL OPINION?

14   A    MY OVERALL OPINION IS THAT THE DAMAGES THAT

15   APPLE SHOULD RECEIVE AS COMPENSATION FOR THE

16   ASSUMED INFRINGEMENT IS A RANGE OF DAMAGES BETWEEN

17   $2.5 BILLION, THAT'S $2,500,000,000, AND

18   $2,750,000,000.

19              SO SOMEWHERE IN THAT RANGE.

20   Q    OKAY.  LET'S START, TO HELP US UNDERSTAND YOUR

21   OPINION, WITH THE ECONOMIC BACKGROUND.

22              COULD YOU EXPLAIN HOW IT IS THAT A

23   COMPANY LIKE APPLE MIGHT BE INJURED WHEN A

24   COMPETITOR USES ITS INTELLECTUAL PROPERTY?

25   A    YES.  I HAVE A SERIES OF SLIDES THAT WILL HELP

1    ILLUSTRATE THIS.

2    Q    OKAY.  AND FOR THE RECORD, WE'RE LOOKING AT

3    PDX 34B.2.

4            WHAT HAVE YOU DEPICTED HERE, MR. MUSIKA?

5    A    THIS SLIDE, THE OVERALL SLIDE IS THE

6    MARKETPLACE.  SO IT'S -- IT'S -- IT SHOWS TWO ARCH

7    COMPETITORS, ON THE LEFT-HAND SIDE APPLE AND ON THE

8    RIGHT-HAND SIDE SAMSUNG, AND THEY BOTH COMPETE IN

9    THE MARKETPLACE FOR THE CUSTOMERS THAT ARE IN THE

10   MIDDLE.

11           AND OBVIOUSLY THEY'RE BOTH PROFIT SEEKING

12   ORGANIZATIONS AND THEY WOULD LIKE TO MAKE THE SALE

13   AND GAIN THE ECONOMIC BENEFIT, WHICH IS THE MONEY

14   IN BETWEEN.

15   Q    OKAY.  COULD WE SEE SLIDE 34B.3?

16   A    WELL, AS YOU SEE, AS THE -- I'M SORRY.

17   Q    LET'S GO TO B.4.

18   A    WELL, WHAT YOU SEE IS THAT, IS APPLE SEEKS TO

19   COMPETE WITH THE INTELLECTUAL PROPERTY, AND SAMSUNG

20   IS ASSUMED, AGAIN, TO USE THAT INTELLECTUAL

21   PROPERTY AND MAKES THE SALE AND SO THAT ECONOMIC

22   BENEFIT HAS SLID ACROSS TO SAMSUNG.

23           WHAT MY JOB, AS I INDICATED EARLIER, IS

24   TO DETERMINE HOW MUCH OF THAT GAIN THAT SAMSUNG HAS

25   MADE BY USING, ASSUMED USE OF THE INTELLECTUAL

1    PROPERTY, SHOULD GO BACK TO APPLE, AND THAT'S WHY

2    THAT MONEY SLIDES BACK ACROSS.

3    Q    OKAY.  FOR PURPOSES OF FORMING YOUR OPINIONS

4    IN THIS CASE, HAVE YOU DONE ANYTHING TO EVALUATE

5    SAMSUNG'S ACCUSED SMARTPHONE SALES AND SAMSUNG'S

6    ACCUSED TABLET SALES?

7    A    I HAVE.

8    Q    OKAY.  CAN WE SEE SLIDE 34B.6.

9         WHAT WAS YOUR OVERALL CONCLUSION ABOUT

10   THE VOLUME OF SAMSUNG'S ACCUSED SMARTPHONE AND

11   TABLET SALES AND THE REVENUES ASSOCIATED WITH THAT?

12   A    WELL, THE DAMAGE NUMBERS I'VE JUST GIVEN YOU

13   ARE VERY LARGE, AND THEY'RE VERY LARGE BECAUSE

14   WE'RE DEALING WITH A VERY LARGE QUANTITY OF SALES.

15        WHAT'S DEPICTED HERE IS THAT THE

16   COMBINATION OF SMARTPHONES AND TABLETS, OVER THE

17   TWO YEARS THAT'S AT ISSUE IN THIS CASE, SAMSUNG HAS

18   SOLD 22.7 MILLION INDIVIDUAL SMARTPHONES AND/OR

19   TABLETS.

20        THE AMOUNT THAT'S ASSOCIATED WITH THOSE

21   SALES IS $8,160,000,000.  THAT'S SAMSUNG'S NUMBER.

22   THAT'S JUST -- THAT'S THAT MONEY THAT SLID ACROSS.

23   IT WAS EQUAL TO $8,160,000,000.

24   Q    WHERE DID YOU GET THE INFORMATION THAT YOU

25   USED TO DERIVE THE 22 MILLION INFRINGING SALES AND

1    THE $8 BILLION OF REVENUE?

2    A    THAT'S AN IMPORTANT POINT.  THESE AREN'T MY

3    NUMBERS.  THESE ARE SAMSUNG'S NUMBERS.  THIS IS

4    ACTUALLY TAKEN DIRECTLY FROM SAMSUNG'S RECORDS.

5    Q    OKAY.  COULD WE LOOK AT JOINT EXHIBIT 1500,

6    PLEASE.  JUST LOOK AT THAT IN YOUR BINDER FOR A

7    MOMENT, MR. MUSIKA.

8              DO YOU HAVE -- IT SHOULD BE RIGHT AT THE

9    FRONT.

10   A    I'VE GOT IT.

11   Q    OKAY.  WHAT IS JOINT EXHIBIT 1500?

12   A    JOINT EXHIBIT 1500 IS AN EXHIBIT THAT HAS BEEN

13   JOINTLY SUBMITTED BY BOTH APPLE AND SAMSUNG AND

14   AGREED TO BY BOTH PARTIES, AND IT LISTS THOSE TOTAL

15   8 BILLION OF SALES --

16   Q    LET ME STOP YOU FOR A MOMENT BEFORE YOU TELL

17   US THE NUMBERS.

18              YOUR HONOR, WE WOULD MOVE THE ADMISSION

19   OF JOINT EXHIBIT 1500.

20              THE COURT:  ANY OBJECTION?

21              MR. PRICE:  NO OBJECTION.

22              THE COURT:  OKAY.  IT'S ADMITTED.

23              (WHEREUPON, JOINT EXHIBIT NUMBER 1500,

24              HAVING BEEN PREVIOUSLY MARKED FOR

25              IDENTIFICATION, WAS ADMITTED INTO

1          EVIDENCE.)

2          MS. KREVANS:  COULD WE SHOW THE JURY,

3     MR. LEE, JOINT EXHIBIT 1500.

4     Q    CAN YOU -- IN EXHIBIT 1500, CAN YOU SHOW US

5     WHERE YOU GOT THE 22 MILLION PHONE AND TABLET SALES

6     AND THE 8 BILLION REVENUE NUMBERS.

7     A    RIGHT.  I'D LIKE TO APOLOGIZE, FIRST, FOR THE

8     SMALL NUMBERS; AND SECONDLY, I'M GOING TO BE

9     ABBREVIATING A LOT OF NUMBERS FROM TIME TO TIME, SO

10    THAT COULD GET A LITTLE CONFUSING.  I WANT TO MAKE

11    SURE THAT I TRY TO POINT OUT WHEN I'M SAYING 2.4

12    BILLION OR MILLION SO I DON'T CONFUSE THE COURT.

13         SO YOUR PENDING QUESTION, IF WE WOULD GO

14    DOWN TO THE -- IN MOST SCHEDULES, IT ADDS ACROSS.

15    THESE ARE CALENDAR QUARTERS, AND THEN THAT FINAL

16    COLUMN ON THE RIGHT TOTALS DOWN.

17         SO THIS IS THE PORTION OF THE SALES THAT

18    RELATE TO THE SMARTPHONES, AND IF WE GO TO THE

19    BOTTOM THERE, SO THIS IS -- THIS IS A TRUNCATED --

20    OR IT'S A NUMBER THAT'S CUT OFF, SO THAT 21 IS

21    21,251,000 SMARTPHONE UNITS, AND THE NUMBER BELOW

22    IT WITH THE DOLLAR SIGN IS 7,516,000,000.

23         AND TO GET BACK TO OUR 22 MILLION AND OUR

24    $8 BILLION NUMBER, WE HAVE TO ADD PAGE 2, WHICH IS

25    THE TABLETS.

1        WE GO TO THE SAME SPOT, AND THERE'S THE

2   1,438 TABLETS, WE ADD THAT TO THE SMARTPHONE TO GET

3   TO THE $22 MILLION -- OR 22 MILLION UNITS, AND

4   THERE'S 644,000, WHICH WE ADD THAT BACK TO THE

5   SMARTPHONES, WE GET TO THE $8.1 BILLION.

6   Q    NOW, MR. MUSIKA, YOU SAID 644,000, THAT NUMBER

7   THERE IS -- BECAUSE IT'S MISSING ZEROS, IT'S

8   ACTUALLY WHAT?

9   A    MILLIONS.  SORRY.  I DID IT MYSELF.  I

10  APOLOGIZE.

11  Q    ALL RIGHT.  DOES THIS REPRESENT SALES JUST IN

12  THE UNITED STATES?

13  A    SALES OF TABLETS AND SMARTPHONES ONLY IN THE

14  UNITED STATES BY THE DEFENDANT SAMSUNG.

15  Q    OKAY.  HAVE YOU LOOKED AT INFORMATION ABOUT

16  HOW SAMSUNG'S SALES OF THE ACCUSED PRODUCTS IN THIS

17  CASE -- LET ME START OVER.

18        HAVE YOU LOOKED AT INFORMATION ABOUT HOW

19  SAMSUNG SALES OF SMARTPHONES AND TABLETS BEFORE THE

20  INTRODUCTION OF THE ACCUSED PRODUCTS IN THIS CASE

21  COMPARED TO SAMSUNG SALES OF SMARTPHONES AND

22  TABLETS AFTER THE INTRODUCTION OF THE ACCUSED

23  PRODUCTS?

24  A    YES.

25  Q    OKAY.  COULD WE SEE SLIDE 34B.9.  WHAT

1    INFORMATION IS SHOWN ON 34B.9, MR. MUSIKA?

2    A    THIS IS A GRAPH, AND ON THE VERTICAL AXIS,

3    IT'S THE MARKET SHARE PERCENT.  SO IT'S HOW MUCH OF

4    THE OVERALL SMARTPHONE MARKET DID SAMSUNG HAVE OVER

5    TIME, WHICH IS OUR HORIZONTAL X AXIS THERE.

6              AND THE SLIDE IS DIVIDED UP, AS YOU JUST

7    INDICATED, INTO TWO SEGMENTS.  ON THE LEFT-HAND

8    SIDE WITH THE BLUE IS THE TIME PERIOD FOR SAMSUNG

9    PRIOR TO THE INTRODUCTION OF THEIR FIRST ACCUSED

10   PHONE, AND WHAT WE CAN SEE THEN WITH THE

11   INTRODUCTION OF THE FIRST ACCUSED PHONE, THE RED

12   LINE, ON THE RIGHT-HAND SIDE IS THE PERIOD OF TIME

13   AFTERWARDS.

14   Q    AND HOW DO THE TWO PERIODS, THAT IS, BEFORE

15   AND AFTER, COMPARE TO ONE ANOTHER?

16   A    YES.  IT'S A RATHER DRAMATIC DEMONSTRATION OF

17   SAMSUNG WAS LOSING MARKET SHARE DURING THE PERIOD

18   PRIOR TO 2010, APPROXIMATELY JUNE OF 2010 WHEN THEY

19   INTRODUCED THE FIRST ACCUSED PHONE.

20             AFTER THEY INTRODUCED THE FIRST ACCUSED

21   PHONE, SAMSUNG'S MARKET SHARE TOOK AN ABRUPT UPWARD

22   SWING AND HAS CONTINUED TODAY TO ADVANCE

23   DRAMATICALLY IN INCREASES IN MARKET SHARE.

24   Q    WHERE DID THE INFORMATION THAT FORMS THIS

25   CHART COME FROM?

1    A    ONCE AGAIN, THIS ISN'T MY INFORMATION.  THIS

2    IS TAKEN NOT FROM APPLE OR FROM SAMSUNG IN THIS

3    CASE.  THIS IS TAKEN -- YOU CAN SEE PERHAPS RIGHT

4    DOWN THERE ON THE BOTTOM, SOURCE IDC WORLDWIDE

5    QUARTERLY.

6          IDC IS AN INDEPENDENT MARKETING

7    ORGANIZATION THAT BOTH APPLE AND SAMSUNG USE TO

8    HELP THEM IN DOING THEIR OWN MARKET RESEARCH.  SO

9    THIS IS AN INDEPENDENT STUDY AND ANALYSIS THAT WAS

10   DONE BY IDC.

11   Q    OKAY.  LET'S TURN TO THE SPECIFIC DAMAGES

12   REMEDIES THAT YOU EVALUATED IN THIS CASE.

13          WHAT KINDS OF REMEDIES DID YOU APPLY WITH

14   RESPECT TO THE VARIOUS INTELLECTUAL PROPERTY RIGHTS

15   THAT APPLE HAS ASSERTED IN THE CASE?

16   A    I CONSIDERED THREE DIFFERENT FORMS OF REMEDY

17   IN TOTAL AS IT RELATES TO THE DESIGN, AND THAT

18   WOULD BE THE DESIGN PATENT AND THE TRADE DRESS.  I

19   CONSIDERED TWO FORMS OF DAMAGE.

20   Q    WHAT WERE THOSE TWO FORMS?

21   A    ONE, ONE IS CALLED SAMSUNG'S PROFITS, AND THE

22   OTHER IS CALLED APPLE'S LOST PROFITS.

23          TO PUT IT IN REAL STRAIGHT TERMS, IT'S

24   EITHER WHAT SAMSUNG HAS GAINED OR IT'S WHAT APPLE

25   HAS LOST.

1           IN THE CASE OF SAMSUNG'S GAIN, THAT'S

2     SOMETIMES REFERRED TO AS AN UNJUST ENRICHMENT

3     BECAUSE THE PRESUMPTION IS THEY'VE MADE THAT GAIN,

4     THAT MONEY HAS SLID ACROSS THE SLIDE BECAUSE THEY

5     VIOLATED APPLE'S INTELLECTUAL PROPERTY.

6     Q    OKAY.  AND REMIND US AGAIN, WHICH TYPES OF

7     INTELLECTUAL PROPERTY RIGHTS DID YOU USE THIS KIND

8     OF ANALYSIS, THE SAMSUNG PROFIT OR APPLE'S LOST

9     PROFITS FOR?

10    A    I USED THEM BOTH, AND WE'RE GOING TO SEE THE

11    SITUATION -- THIS ISN'T DOUBLE COUNTING.  I USED

12    THEM BOTH FOR THE DESIGN PATENTS AND TRADE DRESS.

13    Q    OKAY.  WHAT KIND OF REMEDY DID YOU LOOK AT FOR

14    VIOLATIONS OF APPLE'S UTILITY PATENT RIGHTS?

15    A    DIFFERENT COMBINATION THERE.  LOST PROFITS

16    AGAIN, WHICH I'VE ALREADY DESCRIBED, THAT'S APPLE'S

17    LOSS.

18          BUT HERE I'VE CONSIDERED IN THE

19    ALTERNATIVE WHAT'S CALLED A REASONABLE ROYALTY.

20    Q    OKAY.  HOW DID YOU -- WHAT WAS YOUR BASIS FOR

21    APPLYING A DIFFERENT KIND OF REMEDY FOR SOME KINDS

22    OF PATENT RIGHTS THAN OTHERS?

23    A    IT'S MY UNDERSTANDING OF WHAT IS THE ACCEPTED

24    DAMAGE METHODOLOGY TO BE USED, DEPENDING ON THE

25    TYPE OF INTELLECTUAL PROPERTY.  SO THAT'S WHY WE

1    SEE A SLIGHT CHANGE IN THE UTILITY PATENTS VERSUS

2    THE DESIGN AND TRADE DRESS.

3    Q    OKAY.  COULD WE LOOK AT SLIDE 34B.75.

4             WHAT IS SHOWN ON SLIDE 34B.75,

5    MR. MUSIKA?

6             MR. PRICE:  YOUR HONOR, I OBJECT.  HE'S

7    NOT A LAWYER.  I OBJECT TO SHOWING HIM LAW.

8             THE COURT:  I'VE OVERRULED THAT OBJECTION

9    IN MY ORDER OF LAST NIGHT, SO I'LL STILL OVERRULE

10   IT.

11            THE WITNESS:  YES.  THIS IS THE DAMAGES

12   DESCRIPTION UNDER THE LAW FOR DESIGN PATENT

13   DAMAGES.

14   BY MS. KREVANS:

15   Q    AND IS THIS THE TEST YOU APPLIED, THAT IS,

16   THAT THE -- IF THE DEFENDANT DID INFRINGE, THEY'RE

17   FOUND LIABLE TO THE EXTENT OF TOTAL PROFIT?

18   A    RIGHT.  KEEPING IN MIND, AGAIN, I'M MAKING NO

19   DETERMINATION ON WHETHER THEY DID OR DIDN'T

20   INFRINGE.  I'M ACCEPTING THAT AS AN ASSUMPTION.

21            BUT, YES, HAVING DONE THAT, I'VE USED THE

22   TOTAL PROFITS, AGAIN, OF SAMSUNG.

23   Q    OKAY.  COULD WE SEE SLIDE 34B.76, WHICH IS

24   HEADED TRADE DRESS DAMAGES.

25            IS THIS THE TEST FOR DAMAGES THAT YOU

1    USED FOR TRADE DRESS VIOLATIONS?

2    A    YES.  AND, AGAIN, WE CAN SEE IN THE

3    ENUMERATION, ONE, DEFENDANT'S PROFITS, THAT WOULD

4    BE SAMSUNG AGAIN; AND DAMAGES SUSTAINED BY

5    PLAINTIFF, THAT WOULD BE LOST PROFITS; AND COSTS OF

6    THE ACTION.  I'M NOT GIVING ANY OPINION ON THAT

7    THIRD PIECE.

8    Q    AND IF WE COULD SEE SLIDE 34B.74.  THIS ONE IS

9    JUST HEADED PATENT DAMAGES.

10             WHAT IS THIS TEST?

11   A    YES.  AND THIS TEST BASICALLY SAYS THAT UNDER

12   A UTILITY PATENT, THE PATENTEE IS ENTITLED TO

13   DAMAGES ADEQUATE TO COMPENSATE FOR INFRINGEMENT,

14   BUT UNDER NO EVENT LESS THAN A REASONABLE ROYALTY.

15             SO THAT'S WHY YOU USE THOSE TWO FORMS,

16   LOST PROFITS OR, IN THE ALTERNATIVE, A REASONABLE

17   ROYALTY.

18   Q    OKAY.  YOU'VE TALKED, MR. MUSIKA, ABOUT THREE

19   DIFFERENT FORMS OF DAMAGES AND 22 MILLION PHONES

20   AND TABLETS.

21             DID YOU DO ANYTHING TO MAKE SURE THAT YOU

22   WERE NOT DOUBLE COUNTING THE DAMAGES FOR ANY ONE OF

23   THOSE PHONES AND TABLETS?

24   A    I DID.

25   Q    WHAT DID YOU DO?

1    A    WELL, IT'S -- IT'S -- IT'S EASY TO VISUALIZE,

2    BUT IT'S HARD TO IMAGINE.

3            BUT THE CALCULATION REALLY HAD TO BE DONE

4    ON A PHONE-BY-PHONE, TABLET-BY-TABLET BASIS.  EACH

5    PHONE, EACH TABLET DESERVES OR GETS ITS OWN DAMAGE,

6    AND SO THAT CALCULATION HAD TO BE DONE INDIVIDUALLY

7    ON EACH ONE OF THOSE PRODUCTS.

8    Q    AND HOW DID YOU DECIDE, FOR EACH ONE OF THOSE

9    PRODUCTS, WHICH OF THE THREE DIFFERENT KINDS OF

10   DAMAGES YOU DESCRIBED SHOULD BE ASSIGNED TO IT?

11   A    WELL, THERE WERE SEVERAL CRITERIA.  ONE WE

12   JUST WENT THROUGH, WHICH IS THE FORM OF DAMAGES.

13           ANOTHER WOULD BE THE TIME PERIOD IN

14   WHICH -- NOT ALL SALES OCCURRED AT THE SAME TIME.

15   THEY OCCURRED AT DIFFERENT TIMES.

16           AND NOT ALL THE INTELLECTUAL PROPERTY,

17   WHETHER IT WAS A UTILITY PATENT OR A DESIGN PATENT,

18   THEY DIDN'T ALL ISSUE AT ONCE.  SO THEY ISSUED AT

19   VARIOUS POINTS IN TIME.

20           SO IT'S REALLY THE INTERSECTION OF WHEN

21   SOMETHING WAS SOLD, WHICH FORM OF DAMAGES -- WHICH

22   FORM OF INTELLECTUAL PROPERTY IT IS ACCUSED OF, AND

23   THEN MAKING THAT CALCULATION ON, AGAIN, A

24   UNIT-BY-UNIT BASIS.

25   Q    OKAY.  COULD WE SEE SLIDE 34B.56.

1          WHAT HAVE YOU DEPICTED ON THIS SLIDE,

2    MR. MUSIKA?

3    A    I THINK THIS IS GOING TO HELP SHOW AND EXPLAIN

4    WHAT I WAS JUST BRIEFLY TRYING TO EXPLAIN.

5          I'VE GOT 22 PHONES AT THE TOP, AND THINK

6    OF THESE AS EITHER PHONES OR TABLETS, IT DOESN'T

7    MATTER.  BUT EACH ONE OF THOSE REPRESENTS A MILLION

8    UNITS TO TRY AND KEEP US ORIENTED ON THE 22 MILLION

9    TOTAL UNITS.

10          AND SO AS WE JUST WENT THROUGH, I HAVE

11   THREE FORMS OF DAMAGE.  EACH ONE OF THOSE PHONES,

12   EACH ONE OF THOSE 22 MILLION PHONES, HAS TO GO IN

13   ONE OF THOSE CATEGORIES, BUT NOT TWO CATEGORIES.

14   IF WE PUT IT IN TWO CATEGORIES, THEN WE'RE GOING TO

15   END UP WITH DOUBLE COUNTING.

16   Q    OKAY.  CAN YOU JUST WALK US THROUGH,

17   UNDERSTANDING THIS IS A SIMPLIFICATION, WALK US

18   THROUGH THE ALLOCATION THAT YOU MADE.

19   A    WELL, THE ALLOCATION THAT I MADE WAS I, I

20   FIRST -- I THINK THE NEXT SLIDE IS GOING TO SHOW

21   THE AMOUNT OF 17 MILLION UNITS SHOULD SLIDE DOWN,

22   AND I CALCULATED THEM AS SAMSUNG'S PROFITS.  THAT'S

23   THE UNJUST GAIN.  SO I'M USING THAT FORM OF DAMAGES

24   FOR APPROXIMATELY 17 MILLION OF THE TOTAL 22

25   MILLION.

1    Q    OKAY.  HOW MANY OF THE 5 MILLION LEFT DID YOU

2    PUT IN THE APPLE LOST PROFITS DAMAGES CATEGORY?

3    A    I PUT TWO INTO THE LOST PROFITS CATEGORY, SO

4    WE SHOULD HAVE TWO OF THOSE SLIDE DOWN, AND 2

5    MILLION, APPROXIMATELY, COME DOWN THERE.

6             AND THAT, OF COURSE, LEAVES THE 3

7    MILLION, AND YOU CAN OF COURSE GUESS WHERE THOSE

8    GO, DOWN TO THE REASONABLE ROYALTY.

9             AND WE CAN SEE VERY CLEARLY THAT NO

10   INDIVIDUAL PRODUCT HAS HAD MORE THAN ONE DAMAGE

11   CALCULATED ON IT.

12   Q    OKAY.  THAT LOOKED EASY.

13            CAN YOU DESCRIBE FOR THE JURY THE ACTUAL

14   AMOUNT OF EFFORT THAT IT TOOK TO MAKE THESE

15   ALLOCATIONS AND THEN MAKE THOSE ONE, ONE PHONE BY

16   ONE TABLET DAMAGES CALCULATIONS THAT YOU MADE.

17   A    IT -- I CAN ASSURE YOU, IT'S NOT ME SITTING AT

18   A DESK WITH A CALCULATOR DOING 22 MILLION

19   CALCULATIONS.

20            IN FACT, BECAUSE OF THE VARIOUS

21   COMBINATIONS, THERE ARE LITERALLY HUNDREDS OF

22   MILLIONS OF CALCULATIONS, AND SO THE ONLY WAY,

23   PRACTICALLY, TO DO THIS IS TO WRITE A COMPUTER

24   PROGRAM.

25            AND SO OVER THE LAST YEAR AND A HALF TO

1    TWO YEARS, I HAVE HAD A TEAM OF 20 PEOPLE,

2    ECONOMISTS, PROGRAMMERS, STATISTICIANS AND C.P.A.'S

3    DEVELOPING A MODEL THAT IS DYNAMIC ENOUGH TO TAKE

4    IN ALL 22 MILLION AND MAKE CHANGES AND ADJUSTMENTS,

5    SINCE THIS PROCESS WENT ON FOR A YEAR AND A HALF,

6    AS NEW PRODUCTS CAME IN AND WENT OUT.

7             AND ABOUT 7,000 TOTAL PROFESSIONAL HOURS

8    WERE DEDICATED TOWARDS THE CREATION AND OPERATION

9    OF THAT COMPUTER MODEL.

10   Q    THAT SOUNDS EXPENSIVE.  WAS IT EXPENSIVE?

11   A    IT WAS VERY EXPENSIVE.

12   Q    WHAT DID IT COST TOTAL FOR YOUR TEAM OF 23

13   PEOPLE?

14   A    20 PEOPLE, OVER MORE THAN A YEAR AND A HALF,

15   THAT 7,000 HOURS, WAS APPROXIMATELY $1,750,000.

16   Q    OKAY.  LET'S GO BACK TO THE FIRST CATEGORY YOU

17   TALKED ABOUT, THE SAMSUNG PROFIT CATEGORY.

18            ONCE YOU HAD ALLOCATED 17 MILLION PHONES

19   AND TABLETS TOTAL INTO THAT CATEGORY, WHAT WAS THE

20   NEXT STEP IN DETERMINING THE DAMAGES FOR THOSE 17

21   MILLION DEVICES?

22   A    WELL, IT'S, IT'S MAKING THE ACTUAL

23   CALCULATIONS.  IT'S FIGURING OUT HOW MUCH -- WE NOW

24   KNOW THE UNITS, BUT HOW MUCH DID SAMSUNG ACTUALLY

25   MAKE ON THOSE 17 MILLION?

1    Q    OKAY.  IF WE COULD SEE THE NEXT SLIDE.  WE'RE

2    SHOWING $2.241 BILLION HERE.

3              CAN YOU EXPLAIN TO THE JURY HOW YOU CAME

4    UP WITH THAT NUMBER IN CONCEPT?

5    A    IN CONCEPT, KEEP IN MIND THE 17 MILLION UNITS,

6    AGAIN, AND IT'S -- IT'S FIGURING OUT HOW MUCH DID

7    SAMSUNG ACTUALLY MAKE IN PROFIT ON EACH ONE OF

8    THOSE UNITS, AS SIMPLISTICALLY MULTIPLICATION.

9    IT'S THE UNITS TIMES THE PROFITS AND THAT GETS YOU

10   TO $2.2 BILLION.

11   Q    WHAT WAS THE SOURCE OF THE INFORMATION YOU

12   USED FOR THE PURPOSES OF MAKING THESE CALCULATIONS?

13   A    THESE NUMBERS ARE, IN THIS CASE ARE SAMSUNG'S

14   NUMBERS.  WHEN I'M TALKING ABOUT SAMSUNG'S PROFIT,

15   THESE ARE NUMBERS THAT COME DIRECTLY FROM SAMSUNG'S

16   FINANCIAL RECORDS.

17   Q    OKAY.  COULD WE SEE SLIDE 34B.15.

18             STARTING HERE -- I KNOW YOU HAVE A SERIES

19   OF SLIDES HERE, MR. MUSIKA.  CAN YOU WALK US

20   THROUGH THE NATURE OF THE CALCULATION YOU DID TO

21   ARRIVE AT THE $2.24 BILLION PROFIT NUMBER FOR THE

22   $17 MILLION PHONES -- 17 MILLION PHONES?

23   A    YES.  WELL, THERE'S THE $8.1 BILLION NUMBER

24   AGAIN -- PARDON ME -- AND HOPEFULLY WE CAN REMEMBER

25   THAT WAS THE TOTAL OF THE ACCUSED SALES.

1          BUT KEEPING IN MIND, I'M CALCULATING

2     THIS, THIS DAMAGE ONLY ON SAMSUNG'S PORTION.

3          SO THE FIRST THING I DO IS I HAVE TO

4     REDUCE THAT NUMBER FOR THE UNITS THAT, THAT OTHER 5

5     MILLION UNITS THAT WENT TO OTHER FORMS OF DAMAGE.

6     SO THAT'S THE FIRST DEDUCTION.  I THINK THAT'S THE

7     NEXT SLIDE.

8          AND I DEDUCT 1.749 BILLION BECAUSE I'M

9     GOING TO CALCULATE DAMAGES ON A REASONABLE ROYALTY

10    TO LOST PROFITS, AND THAT LEAVES ME $6,411,000,000.

11    Q    AND WHAT WAS THE NEXT STEP?

12    A    THE NEXT STEP IS WHAT WE ALL -- REGARDLESS OF

13    WHAT BUSINESS WE'RE IN, ALL OF US INCUR THE SAME

14    THING.  WE HAVE REVENUE BECAUSE WE MAKE A SALE, AND

15    WE HAVE EXPENSES.  NOBODY JUST GIVES US MONEY.  AND

16    SAMSUNG INCURRED EXPENSES TO GENERATE THAT

17    6,411,000,000, SO I HAD TO IDENTIFY HOW MUCH DID IT

18    COST SAMSUNG TO EARN OR GENERATE THAT

19    6,411,000,000.

20    Q    OKAY.  SO LET'S SEE THE NEXT SLIDE.

21    A    AND THERE YOU SEE -- THERE YOU SEE THE COST OF

22    GOODS SOLD, HOW MUCH DID IT COST, WHAT ARE THE

23    DIRECTLY ATTRIBUTABLE COSTS THAT SAMSUNG INCURRED,

24    AND THAT'S 4,170,000,000.

25          IF I SUBTRACT THAT FROM THAT PRIOR

1   NUMBER, THAT GETS US DOWN TO THE BOTTOM,

2   $2,241,000,000.

3   Q    OKAY.  HAVE YOU DONE THIS CALCULATION FOR EACH

4   OF THE DIFFERENT PRODUCTS ACCUSED OF VIOLATING ONE

5   OF APPLE'S DESIGN OR TRADE DRESS PATENT RIGHTS?

6   A    YES.

7   Q    COULD WE SEE SLIDE 34B.19?

8        WHAT IS DEPICTED HERE, MR. MUSIKA?

9   A    THIS IS JUST A, AN ADDITIONAL SLIDE TO HELP

10  THE COURT SEE THAT NOT ONLY DID I DO IT ON AN

11  INDIVIDUAL TABLET-BY-TABLET,

12  SMARTPHONE-BY-SMARTPHONE BASIS, BUT THOSE ARE BY

13  MODEL, TOO.

14       SO HERE IS THAT SAMSUNG'S PROFITS

15  DIVIDED, OR SHOWN BY MODEL, BOTH FOR TABLETS AND

16  SMARTPHONES.

17  Q    OKAY.  HAS SAMSUNG ALSO PROVIDED A CALCULATION

18  IN THIS CASE OF WHAT IT SAYS ARE ITS PROFITS ON

19  THIS SAME GROUP OF 17 MILLION DEVICES?

20  A    WELL, NOT TO CONFUSE ANYONE.  MY NUMBER THAT

21  I'VE JUST GIVEN YOU IS SAMSUNG'S NUMBER, TOO.

22       BUT I DEDUCTED CERTAIN COSTS AND SAMSUNG

23  WOULD -- WOULD AND HAS SAID THAT THEY'VE INCURRED

24  ADDITIONAL COSTS THAT SHOULD BE SUBTRACTED.

25       SO THERE'S NO DISPUTE ABOUT THE NUMBERS

1    THAT I'M USING.  IT'S JUST THAT THERE'S A DISPUTE

2    ABOUT HOW MUCH -- HOW MANY COSTS SHOULD BE INCLUDED

3    IN THE CALCULATION.

4    Q    COULD WE SEE PDX 34B.20.

5              WHAT HAVE YOU SHOWN ON THIS SLIDE,

6    MR. MUSIKA?

7    A    THERE'S NO MATH IN THIS SLIDE.  THERE'S JUST

8    THREE NUMBERS.  THE FIRST NUMBER IS THE FAVORITE

9    NUMBER, OR THE OLD NUMBER WE KNOW, THE 8.1 BILLION

10   TOTAL REVENUE.  SO THAT'S THE REVENUE AT ISSUE.

11             THE MIDDLE NUMBER IS MY NUMBER OF WHAT

12   THE UNJUST GAIN IS.  THAT'S THE SAME $2.2 BILLION

13   NUMBER.

14             BUT THE NUMBER ON THE RIGHT IS ANOTHER

15   SAMSUNG CALCULATION WHICH TAKES MY 2.2 BILLION AND

16   TAKES IT DOWN TO $1,086,000,000.

17   Q    AND WHAT IS -- SINCE YOU BOTH STARTED WITH THE

18   SAME NUMBERS FROM SAMSUNG'S RECORDS, WHAT IS THE

19   REASON FOR THE DIFFERENCE BETWEEN YOUR CALCULATION

20   OF TOTAL PROFITS ON THESE 17 MILLION PHONES AND

21   SAMSUNG'S CALCULATION OF TOTAL PROFITS ON THESE 17

22   MILLION PHONE?

23   A    WE'RE GOING TO SEE IT IN JUST A SECOND, BUT

24   IT'S REAL SIMPLE.  KEEP IN MIND I DEDUCTED COSTS

25   WHICH ARE DIRECTLY ATTRIBUTABLE.

1              SAMSUNG DEDUCTED THOSE COSTS AS WELL, BUT

2      THEY DEDUCTED ADDITIONAL COSTS WHICH I DID NOT

3      DEDUCT, AND WE'LL LOOK AT THOSE PRESENTLY.

4      Q    OKAY.  WHY DON'T WE LOOK AT EXHIBIT 28.  IT'S

5      IN YOUR BINDER.  AND COULD WE START SIMPLY BY YOU

6      IDENTIFYING WHAT EXHIBIT 28 IS.

7      A    EXHIBIT 28 IS A -- THIS IS A SCHEDULE THAT I

8      PREPARED USING SAMSUNG'S RECORDS, TRANSLATED

9      RECORDS, FOR SEC AND I USED IT FOR PURPOSES OF

10     LOOKING AT THE TYPES OF COSTS -- THIS WILL LIST ALL

11     THEIR COSTS FROM TOP TO BOTTOM, AND WE'LL SEE THE

12     KIND OF COSTS I DEDUCTED AND THE ADDITIONAL COSTS

13     THAT SAMSUNG DEDUCTED.

14             MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE

15     THE ADMISSION OF EXHIBIT PX 28.

16             MR. PRICE:  NO OBJECTION.

17             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

18             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19             28, HAVING BEEN PREVIOUSLY MARKED FOR

20             IDENTIFICATION, WAS ADMITTED INTO

21             EVIDENCE.)

22     BY MS. KREVANS:

23     Q    YOU SAY YOU PREPARED THIS.  WHAT WAS THE

24     SOURCE OF THESE NUMBERS?

25     A    SAMSUNG RECORDS.

1    Q    DID YOU CHANGE THE NUMBERS IN ANY WAY WHEN YOU

2    PREPARED THIS SCHEDULE?

3    A    THE NUMBERS ARE -- THEY'RE IMPORTANT, BUT

4    THEY'RE NOT THE NUMBERS.  THEY'RE THE NUMBERS FOR

5    THE OVERALL ENTITY.  SO IT HAS OTHER SALES OF

6    NON-ACCUSED ITEMS.

7         MY FOCUS IS REALLY MORE ON TERMS OF THE

8    TYPES OF ACCOUNTS, BUT I DIDN'T CHANGE THIS.  THIS

9    COMES DIRECTLY -- THIS IS THE TYPE OF ACCOUNTS AND

10   THE NUMBERS COME DIRECTLY FROM SAMSUNG.

11   Q    OKAY.  COULD WE JUST MAKE A LITTLE LARGER,

12   MR. LEE, THE TOP PORTION OF THIS DOWN THROUGH LINE,

13   GROSS SALES PROFIT PERCENTAGE.

14        WHAT'S DEPICTED HERE, MR. MUSIKA?

15   A    SAMSUNG'S RECORDS ARE, ARE THE SAME AS, IN

16   MANY OTHER SOPHISTICATED, SAME AS APPLE'S.  THEY'RE

17   PREPARED BASICALLY IN THE SAME FORMAT.

18        AND THE BASIC FORMAT OF A FINANCIAL

19   STATEMENT, OR A PROFIT AND LOSS STATEMENT, IS NO

20   DIFFERENT THAN OUR PERSONAL PROFIT AND LOSS

21   STATEMENTS.

22        WE START AT THE TOP WITH HOW MUCH DID WE

23   EARN, WHAT'S THE REVENUE?  AND THEN WE DEDUCT

24   EXPENSES.

25        STARTING AT THE TOP, THOSE EXPENSES ARE

1    DIRECTLY ATTRIBUTABLE.  AS YOU MOVE DOWN AND YOU

2    GET TO WHERE PEOPLE USUALLY REFER TO IT, THE BOTTOM

3    LINE, THOSE COSTS THAT ARE INCLUDED BECOME LESS AND

4    LESS SPECIFICALLY ASSOCIATED WITH THE REVENUE.

5            SO HERE WE SEE REVENUE, QUANTITY AT THE

6    TOP, AND THEN SALES IN TERMS OF TOTAL DOLLARS.

7    Q    AND I TAKE IT FROM WHAT YOU SAID A COUPLE

8    MINUTES AGO, WHERE IT SAYS SALES $30 BILLION, YOU

9    DIDN'T USE ALL 30 BILLION OF THOSE DOLLARS IN YOUR

10   CALCULATIONS?

11   A    NO.  AGAIN, THIS IS THEIR NUMBERS FROM THE SEC

12   MANUFACTURING ENTITY THAT HAS SALES OF OTHER ITEMS

13   IN THERE, SO I'VE ALREADY PULLED MY -- MY 8

14   BILLION, OR SAMSUNG'S 8 BILLION IS IN THAT $30

15   BILLION NUMBER IN THERE, BUT THERE ARE OTHER THINGS

16   IN THERE AND WE SHOULDN'T BE FOCUSSED ON THOSE

17   NUMBERS.

18   Q    OKAY.  YOU SEE AT THE BOTTOM PORTION OF THIS

19   EXHIBIT 28 THAT WE'RE LOOKING AT ON THE SCREEN

20   RIGHT NOW, THERE ARE TWO LINES THAT SAY "GROSS

21   SALES PROFIT" AND "GROSS SALES PROFIT PERCENTAGE."

22            WHAT ARE THOSE NUMBERS?

23   A    STANDARD ACCOUNTING TERMINOLOGY.  SALES MINUS

24   COST OF GOODS SOLD, THAT'S -- C.O.G.S. STANDS FOR

25   COST OF GOODS SOLD, AND THOSE ARE COSTS WHICH ARE

1    DIRECTLY ATTRIBUTABLE TO THE PRODUCTION AND/OR SALE

2    OF THE ACCUSED DEVICES.

3              AND THIS IS -- AGAIN, THIS ISN'T MY

4    CONSTRUCTION.  THIS IS REALLY GENERALLY ACCEPTED

5    ACCOUNTING PRINCIPALS AND THIS IS DIRECTLY FROM

6    THEIR STATEMENTS.

7              AND THAT GETS US, IF WE DEDUCT THE COST

8    OF GOODS SOLD FROM THE SALES, WE GET A GROSS PROFIT

9    NUMBER AND PERCENTAGE.

10   Q    AND WHAT'S THE GROSS PROFIT PERCENTAGE?

11   A    GROSS PROFIT PERCENTAGE IS, IN THIS STATEMENT

12   IS 39.2 PERCENT.

13   Q    WHAT WAS THE AVERAGE GROSS PROFIT AMOUNT THAT

14   YOU FOUND IN SAMSUNG'S FINANCIAL RECORDS FOR THE $8

15   BILLION IN SALES OF THE ACCUSED PRODUCTS IN THE

16   UNITED STATES?

17   A    ALL RIGHT.  THE ACCUSED PRODUCTS HAVE SLIGHTLY

18   LOWER GROSS PROFIT PERCENTAGE.  PER MY

19   RECOLLECTION, THE OVERALL GROSS PROFIT PERCENTAGE

20   ON JUST THE ACCUSED PRODUCTS WAS APPROXIMATELY 35.5

21   PERCENT.

22   Q    OKAY.  YOU SAID A COUPLE MINUTES AGO THAT IF

23   WE MOVE DOWN THIS SAME PAGE OF EXHIBIT 28, WE'RE

24   GOING TO SEE SOME OTHER KINDS OF EXPENSES.

25   A    YES.

1    Q    DO YOU BELIEVE THAT THOSE OTHER EXPENSES ARE

2    APPROPRIATE TO BE DEDUCTED IN CALCULATING SAMSUNG'S

3    TOTAL PROFITS FOR PURPOSES OF DAMAGES IN THIS CASE?

4    A    FIRST OF ALL, SAMSUNG DEDUCTS ALL THOSE OTHER

5    EXPENSES.  THEY WERE INCURRED.  I'M NOT DISPUTING

6    THEY WERE INCURRED.

7         BUT I DO NOT THINK IT IS APPROPRIATE TO

8    DEDUCT THOSE TO GET TO THE PROFIT NUMBER WHICH

9    WOULD REWARD APPLE FOR SAMSUNG'S UNJUST ENRICHMENT.

10         SO REALLY ALL THE EXPENSES BELOW THERE

11   ARE REALLY THE DISAGREEMENT.

12   Q    AND WHY DO YOU THINK THAT THOSE EXPENSES,

13   THOSE OTHER EXPENSES, ARE NOT PROPERLY DEDUCTED IN

14   CALCULATING SAMSUNG'S PROFITS?

15   A    I HAVE TWO VERY SPECIFIC REASONS.

16   Q    WHAT ARE THEY?

17   A    ONE REASON IS THAT THOSE COSTS, BY THEIR VERY

18   NATURE AND HOW THEY'VE BEEN PUT ON THIS FINANCIAL

19   STATEMENT, I KNOW, AS A C.P.A., THAT THEY ARE LESS

20   AND LESS DIRECTLY ASSOCIATED WITH THE PRODUCT AT

21   HAND.  SO I KNOW THAT BASED ON SAMSUNG'S OWN

22   REPRESENTATION.

23         SECONDLY, WHEN I TRIED TO INVESTIGATE HOW

24   THEY WOULD PERHAPS TRY TO ALLOCATE THESE -- AND

25   WHEN I SAY "TRY," DON'T MEAN THAT IN A NEGATIVE

1    WAY, BUT IF YOU HAD A NON-DIRECT COST, THE ONLY WAY

2    TO ASSIGN IT IS YOU HAVE TO DETERMINE SOME FORM OF

3    ALLOCATION, AND WHEN I LOOK FOR THE ALLOCATION

4    BASIS, THE RECORDS WERE UNRELIABLE.

5              SO FOR THOSE TWO PRIMARY REASONS, NO, I

6    DID NOT INCLUDE THEM.

7    Q    OKAY.  CAN YOU GIVE US AN EXAMPLE, FROM

8    SAMSUNG'S ACTUAL EXPENSE CATEGORIES, OF SOMETHING

9    THAT SAMSUNG INCLUDED IN ITS CALCULATION WHICH YOU

10   DID NOT INCLUDE AND EXPLAIN WHY YOU THOUGHT IT WAS

11   INAPPROPRIATE.

12   A    YES.  MAY I?

13   Q    PLEASE.

14   A    R&D IS A GOOD EXAMPLE.  R&D STANDS FOR

15   RESEARCH AND DEVELOPMENT, AND CERTAINLY SAMSUNG

16   ENGAGES IN RESEARCH AND DEVELOPMENT, AS DOES APPLE.

17             FROM AN ACCOUNTING STANDPOINT, IT'S

18   CALLED MATCHING.  WE WANT TO MATCH UP THE EXPENSES

19   WITH THE REVENUE.  WE DON'T WANT TO MATCH UP THE

20   EXPENSES FOR PRODUCT A AND SUBTRACT THEM FROM

21   PRODUCT B.

22             AND I KNOW, AGAIN, BASED ON MY OWN

23   ACCOUNTING EXPERIENCE, THAT THE RESEARCH AND

24   DEVELOPMENT COSTS, WHICH ARE INCURRED IN THE

25   CURRENT TIME PERIOD, RELATE TO FUTURE EVENTS, OR

1    FUTURE PRODUCTS, NOT TO THE CURRENT PRODUCTS.

2              AND SO, AGAIN, FOR ANOTHER REASON THERE,

3    IT IS A COST THAT'S NOT A COST THAT'S ASSOCIATED

4    WITH THESE ACCUSED PRODUCTS.

5    Q    OKAY.  LET'S TURN TO THE SECOND REASON THAT

6    YOU SAID YOU THOUGHT IT WAS INAPPROPRIATE TO

7    INCLUDE THESE OTHER CATEGORIES, AND THAT WAS THAT

8    YOU FOUND THE INFORMATION IN SOME WAYS TO BE

9    UNRELIABLE.

10   A    YES, I DID.

11   Q    WHAT LED TO THAT CONCLUSION?

12   A    AS AN AUDITOR FOR THAT FIRST 10, 12 YEARS OF

13   MY LIFE, AND REALLY DOING INVESTIGATIONS

14   AFTERWARDS, WE AS AUDITORS ARE TAUGHT TO, TO APPLY

15   SOMETHING CALLED PROFESSIONAL SKEPTICISM, EXERCISE

16   OUR PROFESSIONAL JUDGMENT.  WE SIMPLY DON'T TAKE

17   FROM OUR CLIENTS OR FROM PARTIES THAT ARE PRODUCING

18   FINANCIAL INFORMATION AND SAY, THAT MUST BE RIGHT.

19             WE GIVE IT -- IN SORT OF LAYMAN'S TERMS,

20   WE GIVE IT A SMELL TEST AND SAY, DOES THIS MAKE

21   SENSE?  AND IN AUDIT LINGO, AGAIN, ARE THERE

22   CERTAIN RED FLAGS?

23             AND I ENCOUNTERED A NUMBER OF RED FLAGS

24   WITH SAMSUNG'S DATA BELOW THE GROSS PROFIT LINE.

25   Q    OKAY.  COULD WE LOOK AT PDX 34B.23, PLEASE.

1          WHAT IS SET OUT IN YOUR SLIDE 23,

2     MR. MUSIKA?

3     A    WELL, I WAS GOING TO DO THIS PIECE BY PIECE.

4     AS A TEACHER, I DON'T LIKE PEOPLE READING AHEAD,

5     BUT -- GOOD.

6     Q    THANK YOU, MR. LEE.

7     A    SO, YES, THERE ARE FOUR RED FLAGS, AS YOU SAW.

8          IT WAS TAKEN AWAY, BUT THE FIRST ONE IS,

9     IS THE INFORMATION THAT I'M PRESENTED WITH, DOES

10    THAT TIE TO SOME RELIABLE SOURCE?  SOME OTHER

11    SOURCE, AN AUDITED FINANCIAL STATEMENT, A TAX

12    RETURN, SOMETHING ELSE THAT I KNOW SOMEBODY ELSE IS

13    LOOKING OVER THE COMPANY'S SHOULDER?

14    Q    AND WHAT DID YOU FIND WHEN YOU LOOKED AT THAT

15    ISSUE?

16    A    I'M NOT SAYING IT DIDN'T TIE, BUT NOBODY DID

17    TIE IT.  I COULDN'T TIE IT, AND SAMSUNG DIDN'T

18    RECONCILE OR TIE IT, EITHER.  SO I WAS LACKING WITH

19    THAT LEVEL OF COMFORT.

20    Q    WHAT WAS THE SECOND RED FLAG YOU LOOKED FOR?

21    A    THE SECOND ONE IS, IS THIS INFORMATION THAT'S

22    USED TO RUN THE BUSINESS?  WHEN WE SAY "ORDINARY

23    COURSE," THIS IS INFORMATION THEY USE EVERY DAY.

24    THIS ISN'T SOMETHING THAT'S PRODUCED FOR A SPECIAL

25    PURPOSE.

1          AND I FOUND THAT THAT'S NOT THE CASE.

2     AGAIN, IT MAY HAVE BEEN A NECESSITY, BUT

3     NONETHELESS, I DIDN'T GAIN THE ADDITIONAL COMFORT

4     OF SAYING, WELL, THIS IS A SCHEDULE THEY RAN THE

5     BUSINESS FOR THE LAST TWO YEARS WITH.

6          NO, THIS IS INFORMATION THEY PREPARED FOR

7     THE LITIGATION.

8     Q    WHAT WAS THE THIRD CATEGORY?

9     A    THE THIRD CATEGORY IS FREE OF ERRORS.  SO AS

10    YOU BEGIN TO LOOK AT THE INFORMATION THAT'S

11    PRODUCED TO YOU -- EVERYBODY MAKES MISTAKES.  I

12    MAKE MISTAKES.  WE ALL MAKE MISTAKES.  IT'S THE

13    FREQUENCY OF MISTAKES.

14          AND IN THE CASE OF SAMSUNG'S RECORDS,

15    THERE WERE -- FOR A COMPANY AS SOPHISTICATED AND

16    LARGE AS THEY ARE, THERE WAS TOO MANY MISTAKES.

17          WE WENT -- I WENT THROUGH EIGHT DIFFERENT

18    VERSIONS AT LEAST OF DATA THAT WAS PRODUCED AND

19    PULLED BACK BECAUSE OF INCORRECT TOTALS, BECAUSE IT

20    WAS MISSING UNITS, BECAUSE OF INTERNAL

21    INCONSISTENCIES.

22          AND AGAIN, I'M NOT SAYING THEY WERE

23    INTENTIONALLY DOING IT, BUT I DIDN'T GET THE

24    COMFORT OF SAYING, OH, AS I LOOK AT THIS DATA, IT

25    ALL KIND OF MAKES SENSE.

1    Q    WHAT WAS THE LAST CATEGORY THAT ACCOUNTANTS

2    LOOK FOR IN TERMS OF RED FLAGS?

3    A    THE PARTIES WHO WERE RESPONSIBLE FOR THE DATA,

4    DO THEY GIVE IT WILLINGLY OR DO THEY GIVE IT IN A

5    FORUM, A FAIR DISCLOSURE, OR IS THERE SOMETHING

6    ABOUT THE PRESENTATION THAT IS LESS THAN COMPLETE?

7    Q    AND WHAT DID YOU FIND ON THIS ISSUE?

8    A    I FOUND THAT IT WAS DIFFICULT TO GET THE

9    INFORMATION, AND ULTIMATELY THERE WERE MANY AREAS I

10   JUST COULDN'T GET AN EXPLANATION, SAMSUNG DIDN'T

11   PROVIDE AN EXPLANATION.

12   Q    MR. MUSIKA, HASN'T A MAGISTRATE JUDGE MANAGING

13   THE DISCOVERY PROCESS IN THIS CASE QUESTIONED THE

14   ACCURACY OF SAMSUNG'S FINANCIAL DATA?

15   A    YES.  IT WASN'T JUST ME.

16   Q    WHAT WAS THE OVERALL CONCLUSION YOU DREW FROM

17   THESE RED FLAGS?

18   A    I HAD TO STOP THE GROSS PROFIT LINE, ONE,

19   BECAUSE IT WAS DIRECTLY ATTRIBUTABLE; AND TWO,

20   BECAUSE ANY ALLOCATIONS OF THOSE LESS SPECIFIC

21   COSTS JUST DIDN'T HOLD UP BECAUSE THERE WASN'T

22   SUPPORT FOR IT AND WHAT I DID SEE WAS QUESTIONABLE.

23   Q    OKAY.  LET'S TURN TO THE ISSUE OF WHICH

24   DEFENDANT'S RECORDS YOU LOOKED AT.

25          WHO ARE THE DEFENDANTS IN THIS CASE?

```
1    A     I'M GOING TO USE THE ABBREVIATIONS.  I THINK

2    THE COURT'S USED THE ABBREVIATIONS ALL ALONG.

3    THERE ARE THREE DEFENDANTS, SEC, STA, AND SEA.

4    Q     AND WHOSE RECORDS DID YOU USE IN THE ANALYSIS

5    YOU DID FOR PURPOSES OF THE COMPETING DAMAGES?

6    A     I USED ALL THREE COMPANIES' RECORDS.

7    Q     WHY DID YOU USE THE RECORDS OF ALL THREE?

8    A     AGAIN, AS A C.P.A., I KNOW THAT IF YOU WANT TO

9    SEE A COMPLETE PICTURE OF ACTIVITY, YOU HAVE TO

10   LOOK AT THE CONSOLIDATED ENTITY.

11          THERE HAVE BEEN MANY, MANY, MANY

12   FINANCIAL PROBLEMS IN THIS COUNTRY BY SUBSIDIARIES

13   NOT REPORTING ON A CONSOLIDATED BASIS AND COMPANIES

14   PARKING TRANSACTIONS IN SUBSIDIARIES.

15          AGAIN, I'M NOT SAYING THAT SAMSUNG HAS

16   DONE THAT.

17          BUT TO GET THE FULL PICTURE, I WANT TO

18   LOOK AT THE CONSOLIDATED ENTITY.

19   Q     AND LET'S LOOK AT SLIDE 34B.24.

20          FIRST OF ALL, USING THIS SLIDE, CAN YOU

21   EXPLAIN TO THE JURY THE CORPORATE RELATIONSHIP

22   BETWEEN THE THREE ENTITIES YOU NAMED, SEC, SEA, AND

23   STA?

24   A     YES.  SEC, WHICH IS THE PARENT ORGANIZATION

25   LOCATED IN KOREA, OWNS 100 PERCENT OF SEA.  THEY
```

1    OWN AND CONTROL IT.  AS THE 100 PERCENT OWNER, THEY

2    GET TO DECIDE WHAT SEA DOES.

3              LIKE, SEA IS THE 100 PERCENT OWNER OF

4    STA.

5              SO WHAT WE HAVE IS A, A COMPLETELY OWNED

6    AND CONTROLLED GROUP OF COMPANIES UNDER THE CONTROL

7    AND OWNERSHIP OF SEC.

8    Q    NOW, YOU USED THE WORD "CONSOLIDATED" IN YOUR

9    ANSWER TO MY PREVIOUS QUESTION.  WHAT DO YOU MEAN

10   WHEN YOU SAY WE HAVE TO LOOK AT THESE RECORDS ON A

11   CONSOLIDATED BASIS?

12   A    WELL, IT'S NOT UNCOMMON FOR COMPANIES,

13   PARTICULARLY UNDER A COMMON CONTROL, TO HAVE

14   TRANSACTIONS WITH EACH OTHER.  AND WE JUST HEARD

15   SOME TESTIMONY IN HERE THAT WAS PLAYED ABOUT STA

16   AND SEA BUYING PRODUCT FROM SEC.  THAT'S WHAT

17   HAPPENS AND THAT'S WHAT YOU WOULD EXPECT TO HAPPEN.

18             BUT BECAUSE OF THE RELATED PARTY NATURE

19   OF IT, AGAIN, AND BECAUSE OF THE CONTROLLER'S --

20   THE CONTROL RELATIONSHIP THAT SEC HAS, YOU HAVE TO

21   LOOK AT THE CONSOLIDATED, YOU HAVE TO ADD THE THREE

22   TOGETHER BECAUSE YOU'RE NOT -- YOU'RE GOING TO GET

23   AN INCOMPLETE AND INACCURATE ECONOMIC PICTURE IF

24   YOU LOOK AT JUST ONE ENTITY AND NOT ALL THREE

25   TOGETHER.

 1    Q    OKAY.  COULD WE LOOK AT SLIDE 34B.70, AND I

 2   KNOW, AGAIN, THIS IS A SERIES OF SLIDES THAT YOU

 3   HAD PREPARED FOR YOU, MR. MUSIKA.

 4         CAN YOU WALK US THROUGH HERE AN

 5   EXPLANATION OF HOW THAT KIND OF INTERCOMPANY SALE

 6   AND TRANSFER THAT YOU JUST MENTIONED WORKS?

 7    A    YES.  THIS IS A REAL SIMPLE ANIMATION.  YOU'VE

 8   GOT THE UNITED STATES ON THE RIGHT AND KOREA ON THE

 9   LEFT AND YOU HAVE SEC BASED IN KOREA AND WE HAVE

10   STA AND SEA BASED IN THE UNITED STATES.

11         AND THERE'S OUR CONSUMERS, OUR

12   PURCHASERS, UP THERE SOMEWHERE OFF THE COAST OF

13   MAINE, I THINK.

14         AND WHAT HAPPENS IS THAT SEC SELLS THE

15   PRODUCT TO, WE'LL SAY, STA, AND THE PHONES MOVE

16   ACROSS THE PACIFIC AND LAND IN THE UNITED STATES.

17         STA, IN TURN, THEN SELLS THEM TO

18   UNITED STATES CUSTOMERS, AND THAT'S WHERE WE GET

19   THE $8.1 BILLION.

20    Q    LET ME JUST STOP YOU THERE FOR A SECOND.

21         THE FIRST STEP HERE, YOU SAID SEC MADE

22   THE PHONES AND THEN SOLD THEM TO THEIR SUBSIDIARY,

23   STA?

24    A    YES.

25    Q    WHO SET THE PRICE IN THAT SALE?

1    A    WELL, AS I THINK YOU JUST HEARD FROM THE

2    TESTIMONY PRIOR TO ME, TOO, SEC, AS THE CONTROLLING

3    ENTITY, SAYS -- ESTABLISHES HOW MUCH THEY'RE GOING

4    TO SELL IT TO THEIR SUBSIDIARY.

5    Q    OKAY.  THEN YOU SAID STA NOW HAS THE PHONES IN

6    THE UNITED STATES.  THEY SELL THEM TO CONSUMERS?

7    A    THAT'S CORRECT.

8    Q    WHO SETS THE PRICE AT WHICH STA SELLS PHONES

9    TO CONSUMERS?

10   A    SO WE DON'T CONFUSE ANYONE, WHEN WE SAY

11   "CONSUMERS," I THINK YOU ALL KNOW BY NOW, THE

12   CONSUMERS ARE THE CARRIERS.  MOST OF THE COMPANIES

13   SELL TO THE CARRIERS.

14   Q    "CARRIERS" MEANING PHONE COMPANIES?

15   A    YES.

16   Q    AND THAT'S A WHOLESALE PRICE TO PHONE

17   COMPANIES?

18   A    YES, YES.

19   Q    WHO SETS THE WHOLESALE PRICE AT WHICH STA

20   SELLS PHONES TO PHONE COMPANIES?

21   A    SEC, AGAIN, ESTABLISHES THAT PRICE.

22   Q    THE PARENT?

23   A    THE PARENT.

24   Q    THANKS.  CAN YOU CONTINUE THEN WITH YOUR

25   EXPLANATION?

```
1    A    SURE.  SO THE CARRIERS, CONSUMERS OR CARRIERS,
2    PAY STA FOR THE PURCHASE OF THOSE PHONES IN THE
3    UNITED STATES, AND I'M JUST GOING TO USE $100 AS A
4    REAL SIMPLE EXAMPLE.
5         $100 IS PAID TO STA, BUT -- THERE'S THE
6    $100, BUT STA HAS TO PAY ITS PARENT THE PRICE THAT
7    THE PARENT SAID WE WANT FROM YOU, AND WHAT HAPPENS
8    IS $97 IS PAID TO SEC.
9         NOW, THIS $97 AND THE $3 ARE
10   ILLUSTRATIVE, BUT THEY'RE REPRESENTATIVE OF THE
11   PERCENTAGES.  FOR EVERY DOLLAR THAT STA MAKES IN
12   THE U.S., IT'S REQUIRED, UNDER SEC'S CONTROL, TO
13   SEND 97 TO 98 PERCENT OF THAT BACK TO SEC.  THAT'S
14   THE ARRANGEMENT THAT'S IN PLACE.  ONLY 2 TO $3 OF
15   EVERY $100 SOLD STAYS IN THE UNITED STATES, STAYS
16   WITH STA.  THE REST MOVES BACK TO SEC.
17   Q    AND HOW DOES THAT AFFECT STA AND SEA, THE TWO
18   U.S. ENTITIES, HOW DOES THAT EFFECT THEIR FINANCIAL
19   STATEMENTS?
20   A    WELL, YOU CAN SEE, IF YOU'RE LOOKING FOR THE
21   ECONOMIC BENEFIT THAT'S ASSOCIATED WITH THIS ONE
22   SALE OF $100 AND YOU LOOKED ONLY AT STA, YOU WOULD
23   JUST SEE $3 OF PROFIT AND YOU WOULDN'T SEE THE $97
24   WHICH HAS BEEN TRANSFERRED BACK TO SEC.
25        SO YOU'VE GOT TO COMBINE OR CONSOLIDATE
```

1    THEM TO SEE THE ENTIRE BENEFIT.

2    Q    WHY DO COMPANIES -- STRIKE THAT.

3              IS THERE A LEGITIMATE REASON FOR

4    COMPANIES TO ARRANGE THEIR TRANSFER PRICING IN THIS

5    WAY?

6    A    YES.

7    Q    AND WHAT IS THAT REASON?

8    A    IT'S -- IT'S TAX STRATEGY.  BY MOVING $97 OVER

9    TO SEC, THAT $97 ESCAPES U.S. TAXES.  SO THE ONLY

10   $3 OR APPROXIMATELY $2 --

11             MR. PRICE:  I'M GOING TO OBJECT.  THIS IS

12   IRRELEVANT AND BEYOND THE SCOPE, AND MOTION IN

13   LIMINE.

14             MS. KREVANS:  YOUR HONOR, THIS IS EXACTLY

15   THE PORTION OF THE TESTIMONY THAT YOU HAD

16   PREVIOUSLY RULED HE CAN GIVE.

17             THE COURT:  WELL, I'M GOING TO STRIKE HIS

18   STATEMENT, THOUGH.  IT'S STRICKEN.

19             YOU'LL HAVE TO ASK HIM ANOTHER QUESTION.

20   BY MS. KREVANS:

21   Q    FOR PURPOSES OF DETERMINING TOTAL PROFITS IN

22   THIS CASE, WHOSE PROFITS DID YOU LOOK AT AS ACROSS

23   THE THREE COMPANIES, SEC, STA, AND SEA?

24   A    I COMBINED ALL THREE.

25   Q    OKAY.  AND EARLIER IN YOUR TESTIMONY YOU

1    MENTIONED THAT YOU HAD TO LOOK AT TIME PERIODS IN

2    CONNECTION WITH YOUR DAMAGE CALCULATION.  WHY IS

3    THAT?

4    A    I HAD TO LOOK AT TIME PERIODS BECAUSE, AS I

5    SAID, YOU NEED THE INTERSECTION.  NOT ALL THE

6    INTELLECTUAL PROPERTY IS ISSUED AT THE SAME TIME,

7    AND CERTAINLY NOT ALL THE SALES OF THE PRODUCTS

8    OCCUR AT THE SAME TIME.

9    Q    WHEN DID YOU START THE CALCULATION OF DAMAGES

10   FOR PURPOSES OF THE NUMBERS THAT YOU'VE EXPLAINED

11   TO THE JURY?

12   A    APPROXIMATELY JUNE OF 2010.

13   Q    DID YOU START DAMAGE ON ALL PATENTS IN JUNE OF

14   2010?

15   A    NO, BECAUSE IF -- THAT'S WHEN THE FIRST

16   ACCUSED SALE IS, AND IF -- IF THAT ACCUSED SALE

17   INFRINGED ONE PATENT, THEN THERE WOULD BE DAMAGES

18   ASSOCIATED WITH THAT ONE PATENT.

19           BUT IF PATENTS WERE ISSUED LATER, THEN

20   THE CALCULATION WOULD NOT HAVE OCCURRED EARLIER.

21   Q    NOW, WITH RESPECT TO YOUR CALCULATION OF

22   SAMSUNG'S PROFITS, IF THE JURY ULTIMATELY DECIDES

23   THAT DAMAGES CALCULATION SHOULD START AT A LATER

24   DATE THAN THE ONE YOU USED, HAVE YOU GIVEN THEM

25   ENOUGH INFORMATION THAT THEY COULD ADJUST THEIR

1    CALCULATION?

2    A    YES.

3    Q    AND WHERE IS THAT INFORMATION?

4    A    THE INFORMATION IS IN TWO PLACES.  ONE WOULD

5    BE THE JOINT EXHIBIT 1500, WHICH WE TALKED ABOUT A

6    LITTLE BIT EARLIER, WHICH REALLY IS THE SUM OF ALL

7    THE 22 MILLION UNITS AND THE $8 BILLION.  SO WE

8    HAVE -- YOU HAVE A CHRONOLOGICAL, BASICALLY -- YOU

9    REMEMBER HOW I TALKED ABOUT THAT BEING HARD TO READ

10   BECAUSE IT HAD INDIVIDUAL COLUMNS FOR EACH QUARTER?

11         SO IF THE DATE MOVES, YOU WOULD SIMPLY GO

12   IN ALONG THAT SCHEDULE AND SAY -- DRAW A LINE AND

13   SAY, WELL, OKAY, INFRINGEMENT IS NOT GOING TO START

14   IN JUNE OF 2010.  IT'S GOING TO START AT A LATER

15   DATE.  DRAW A LINE, AND ALL THE UNITS THAT WERE

16   SOLD BEFORE THEN WOULD COME OUT OF THE CALCULATION.

17   YOU WOULD MULTIPLY THAT REVENUE TIMES THE 35.5

18   PERCENT AND SUBTRACT THAT FROM THE $2.2 BILLION

19   NUMBER.

20   Q    LET'S TURN NOW TO YOUR SECOND CATEGORY OF

21   DAMAGES.  IF WE COULD PUT BACK UP SLIDE 34B.61, I

22   THINK IS WHERE WE ARE.  YOUR SECOND CATEGORY IS

23   APPLE'S LOST PROFITS.

24         AND IF WE COULD ADVANCE OUR SLIDE ONE

25   CLICK, MR. LEE.

1          WHAT NUMBER DID YOU CALCULATE FOR APPLE'S

2     LOST PROFITS FOR THE $2 MILLION DEVICES THAT YOU

3     ASSIGNED TO THAT CATEGORY?

4     A     TWO MILLION UNITS.

5     Q     SORRY.   TWO MILLION UNITS YOU ASSIGNED TO THAT

6     CATEGORY?

7     A     $488.8 MILLION.

8     Q     HOW DID YOU DETERMINE THAT THE AMOUNT OF

9     APPLE'S LOST PROFITS ON THESE 2 MILLION UNITS WAS

10    THIS, A LITTLE LESS THAN $500 MILLION?

11    A     I -- I APPLIED A FOUR-PART TEST TO SEE IF THE

12    UNITS ACTUALLY DID QUALIFY FOR LOST PROFITS.

13          LOST PROFITS IS, AGAIN, OUR SECOND AND

14    DIFFERENT TEST AND THE TEST IS DIFFERENT TO QUALIFY

15    FOR LOST PROFITS, SO I WENT THROUGH THIS FOUR TEST

16    TO SEE WHICH UNITS WOULD ACTUALLY QUALIFY.

17    Q     COULD WE SEE SLIDE 34B.32, PLEASE, MR. LEE.

18          WHAT WAS THE FIRST FACTOR YOU CONSIDERED

19    IN SEEING IF THESE 2 MILLION UNITS QUALIFIED FOR

20    LOST PROFITS?

21    A     THE PRESUMPTION HERE IS THAT APPLE WOULD HAVE

22    MADE THE SALE.  IF SAMSUNG DIDN'T, APPLE WOULD HAVE

23    MADE THE SALE.

24          SO FIRST I WANTED TO BE SURE THAT THERE

25    WAS ADEQUATE DEMAND FOR APPLE'S PRODUCT.  IF THERE

1    WAS NO DEMAND FOR IT, THEY CERTAINLY WOULDN'T MAKE

2    THE SALE.

3    Q    JUST SO WE'RE CLEAR, WHAT YOU'RE TRYING TO

4    TEST HERE IS WHEN SAMSUNG SOLD A PHONE, FOR

5    EXAMPLE, DID THEY REALLY TAKE THAT SALE AWAY FROM

6    APPLE, OR PERHAPS JUST FROM ANOTHER SUPPLIER OF

7    PHONES?

8    A    THAT'S CORRECT.

9    Q    AND WHEN YOU LOOKED AT DEMAND, WHAT DID YOU

10   FIND?

11   A    I FOUND THAT THERE WAS ADEQUATE EVIDENCE OF

12   DEMAND, AND I THINK THAT'S RATHER STRAIGHTFORWARD,

13   THAT APPLE'S IPHONES AND IPADS HAVE BEEN

14   TREMENDOUSLY SUCCESSFUL AND THERE IS A SIGNIFICANT

15   DEMAND IN THE MARKETPLACE FOR THEIR PRODUCTS.

16   Q    WHAT DO YOU MEAN BY DEMAND FOR APPLE'S

17   INTELLECTUAL PROPERTY?

18   A    WHAT I MEAN BY DEMAND FOR APPLE'S INTELLECTUAL

19   PROPERTY IS I LOOKED AT IT BOTH ON A, A PHONE,

20   IPHONE-BY-IPHONE BASIS AND TABLET BASIS, AND I

21   LOOKED AT THE INDIVIDUAL INTELLECTUAL PROPERTY AS

22   WELL.  SO WAS THERE DEMAND FOR THE FEATURES THAT

23   ARE INCLUDED IN THE UTILITY PATENTS?  WAS THERE

24   DEMAND FOR THE DESIGN THAT'S INCORPORATED INTO THE

25   DESIGN PATENTS AND THE TRADE DRESS?

1      Q    THE THIRD THING YOU'RE SHOWING UNDER EVIDENCE

2      OF DEMAND IS A CONJOINT SURVEY.  WHAT ARE YOU

3      REFERRING TO THERE?

4      A    WE HEARD LAST WEEK ABOUT DR. HAUSER'S CONJOINT

5      ANALYSIS AND, YES, I KNOW THAT DR. HAUSER HAS

6      ESTABLISHED THAT THERE WAS DEMAND FOR THE THREE

7      UTILITY PATENTS IN HIS CONJOINT ANALYSIS.  SO THAT

8      ADDED TO THE WEIGHT OF MY CONCLUSION.

9           MR. PRICE:  YOUR HONOR, I OBJECT TO HIM

10     GIVING AN OPINION ABOUT DR. HAUSER'S RESULTS.  HE

11     CAN SAY HE RELIED ON THEM, BUT HE CAN'T -- HE CAN'T

12     GIVE A SEAL OF APPROVAL.  THERE'S BEEN NO ANALYSIS.

13          MS. KREVANS:  YOUR HONOR, THIS IS

14     DIRECTLY FROM HIS REPORT.  HE REVIEWED THE REPORTS

15     OF DR. HAUSER'S ANALYSIS.  HE RELIED ON THEM.

16          THE ONLY PREVIOUS OBJECTION WE HAD ON

17     THIS WAS SAMSUNG WANTED AN OPPORTUNITY TO

18     CROSS-EXAMINE DR. HAUSER AND YOU GAVE THEM THAT

19     LAST WEEK.

20          MR. PRICE:  I HAVE NO OBJECTION TO HIM

21     SAYING HE RELIED ON IT.  HE'S NO EXPERT ON WHAT

22     DR. HAUSER DID, SO HE CAN'T GIVE A SEAL OF

23     APPROVAL.  HE CAN SAY "I RELIED ON IT."

24          THE COURT:  OVERRULED.

25          GO AHEAD.

```
 1                    THE WITNESS:  I ANSWERED ALREADY, SO I
 2       APOLOGIZE IF I WAS TOO QUICK.
 3       BY MS. KREVANS:
 4       Q    YES.  DID YOU LOOK AT ANY INTERNAL SAMSUNG
 5       DOCUMENTS IN EVALUATING THIS ISSUE OF DEMAND FOR
 6       APPLE PRODUCTS?
 7       A    YES.
 8       Q    COULD WE LOOK AT -- COULD YOU PLEASE TURN TO
 9       EXHIBIT 34 IN YOUR BINDER.  LET ME KNOW WHEN YOU'RE
10       THERE.
11       A    I AM THERE.
12       Q    IS EXHIBIT 34 A DOCUMENT YOU REVIEWED IN
13       CONNECTION WITH FORMING YOUR OPINIONS IN THIS CASE?
14       A    YES.
15       Q    IS IT A SAMSUNG DOCUMENT PRODUCED IN THIS
16       CASE?
17       A    IT IS.
18                    MS. KREVANS:  YOUR HONOR, WE MOVE THE
19       ADMISSION OF EXHIBIT 34.
20                    MR. PRICE:  OBJECTION.  NO FOUNDATION FOR
21       FROM THIS WITNESS.
22                    MS. KREVANS:  YOUR HONOR, THE WITNESS HAS
23       JUST ESTABLISHED THAT HE REVIEWED AND RELIED ON THE
24       DOCUMENT.  IT IS AN ADMISSION BY SAMSUNG.
25                    THE COURT:  IT'S ADMITTED.
```

```
1                    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

2                    34, HAVING BEEN PREVIOUSLY MARKED FOR

3                    IDENTIFICATION, WAS ADMITTED INTO

4                    EVIDENCE.)

5                    THE COURT:  GO AHEAD.

6      BY MS. KREVANS:

7      Q    WHAT IS EXHIBIT 34, MR. MUSIKA?

8      A    THIS IS A FEASIBILITY REVIEW OR ANALYSIS OF

9      THE SMARTPHONE MARKET BY SAMSUNG, BOTH IMPORTANTLY,

10     OR SIGNIFICANTLY TO ME, ON THE -- AT A TIME WHICH

11     IS DATED 9-2007 WHEN APPLE HAD FIRST ENTERED THE

12     MARKET WITH ITS SMARTPHONES.

13                   AND REMEMBER IN THAT GRAPHIC, THIS IS AT

14     THE BEGINNING OF THE BLUE PERIOD WHEN SAMSUNG WAS

15     GOING DOWN.

16     Q    COULD YOU PLEASE TURN TO PAGE 13 OF EXHIBIT

17     34.

18     A    I'M THERE.

19     Q    COULD YOU PLEASE DESCRIBE TO THE JURY WHAT

20     INFORMATION ON THIS PAGE AFFECTED YOUR ANALYSIS.

21     A    YES.  SO THE NUMBER 4 THERE IN THE MIDDLE, TO

22     ORIENT OURSELVES, "MOBILE PHONE TRENDS UP TO 2012,"

23     AND WHAT SAMSUNG DOES THEN IS SAY, IN THE MIDDLE

24     THERE, "OUR RESEARCH HAS IDENTIFIED FOUR KEY

25     FACTORS THAT WE EXPECT WILL SHAPE HANDSETS IN THE
```

1    COME FIVE YEARS," AND THAT CIRCLE -- NUMBER ONE,

2    THE APPLE IPHONE, THAT'S -- THAT'S THEIR DOCUMENT,

3    I DIDN'T CIRCLE THAT.  I HAVEN'T CHANGED THIS

4    DOCUMENT.  SO SAMSUNG HAS IDENTIFIED THE APPLE

5    IPHONE AS SOMETHING THAT'S GOING TO SHAPE THE NEXT

6    FIVE YEARS.

7    Q    AND THE DATE OF THIS DOCUMENT WAS SEPTEMBER

8    2007?

9    A    2007, YES.

10   Q    OKAY.  COULD YOU TURN TO PAGE 37 OF THIS

11   DOCUMENT.  AND LET ME KNOW AGAIN WHEN YOU'RE THERE.

12   A    I'M THERE.

13   Q    OKAY.  WHAT IS THIS PORTION OF EXHIBIT 34

14   DEPICTING?

15   A    LISTED AT THE TOP IS "IPHONE EFFECT ANALYSIS,"

16   SO WHAT EFFECT THE IPHONE IS EXPECTED TO HAVE.

17   Q    AND, AGAIN, IS THIS FROM SEPTEMBER 2007?

18   A    THIS ENTIRE DOCUMENT IS FROM THAT TIME PERIOD,

19   YES.

20   Q    OKAY.  COULD YOU TURN TO THE SECOND PAGE OF

21   THIS THREE-PAGE SECTION OF EXHIBIT 34 AND TELLS US

22   WHAT IS INDICATED ON THIS PAGE THAT YOU TOOK INTO

23   ACCOUNT IN YOUR OPINION?

24   A    YES.  THE BOX THAT'S SORT OF AT THE RIGHT, THE

25   TOP BOX, THAT'S CORRECT, IT SAYS "FACTORS THAT

1    COULD MAKE IPHONE A SUCCESS."

2              AND THEN THE FIRST BULLET UNDER THAT IS

3    "EASE AND INTUITIVE U/I," USER INTERFACE, "THAT

4    COVERS ALL USER CLASSES, INCLUDING MALE, FEMALE,

5    OLD AND YOUNG," AND THEN THE FIRST BULLET,

6    "BEAUTIFUL DESIGN."

7    Q    AND HOW DID THOSE, THESE PORTIONS OF THE

8    DOCUMENT EFFECT THE DEMAND FOR THE IPHONE?

9    A    WELL, THE FOCUS WAS ON IPHONE AND THE

10   IDENTIFICATION BY SAMSUNG OF IPHONE AS BEING A

11   DRIVER IN THE MARKETPLACE, SO OBVIOUSLY THAT'S

12   REPRESENTATIVE OF DEMAND FOR THE IPHONE, AND

13   IDENTIFYING BEAUTIFUL DESIGN AS BEING FURTHER -- OR

14   EVIDENCE OF, OF DEMAND FOR DESIGN.

15   Q    COULD YOU TURN TO EXHIBIT 194 IN YOUR BINDER,

16   PLEASE, MR. MUSIKA.

17   A    I'M THERE.

18   Q    WHAT IS -- STRIKE THAT.

19             IS EXHIBIT 194 A DOCUMENT THAT YOU

20   CONSIDERED AND RELIED UPON IN FORMING YOUR OPINIONS

21   ABOUT DEMAND FOR THE IPHONE?

22   A    YES.

23             MS. KREVANS:  YOUR HONOR, WE MOVE THE

24   ADMISSION OF EXHIBIT 194.

25             MR. PRICE:  SAME OBJECTIONS, YOUR HONOR.

1    FOUNDATION.

2             MS. KREVANS:  AGAIN, YOUR HONOR, WE'VE

3    LAID THE FOUNDATION AND IT'S A SAMSUNG ADMISSION.

4             THE COURT:  IT'S ADMITTED.

5             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

6             194, HAVING BEEN PREVIOUSLY MARKED FOR

7             IDENTIFICATION, WAS ADMITTED INTO

8             EVIDENCE.)

9    BY MS. KREVANS:

10   Q    WHAT IS EXHIBIT 194, MR. MUSIKA?

11   A    IT'S A, AN INTERNAL E-MAIL FROM SAMSUNG

12   EXECUTIVES TO OTHER SAMSUNG EXECUTIVES.

13   Q    AND THE DATE OF THIS DOCUMENT IS?

14   A    MARCH 2ND, 2010.

15   Q    AND WHO IS IT -- WHAT IS THE SUBJECT MATTER

16   INDICATING?

17   A    THE SUBJECT SAYS "TO UX," USER EXPERIENCE,

18   "EXECUTIVES."

19   Q    WHAT PART OF THIS MARCH 2ND, 2010 E-MAIL DID

20   YOU FIND RELEVANT TO THE DEMAND OPINIONS THAT YOU

21   FORMED?

22   A    GO DOWN ONE, TWO, THREE, FOUR, FIVE PARAGRAPHS

23   AND HIGHLIGHT THAT.  YES.

24             IT SAYS, "I AM NOT SAYING TO MAKE A UX

25   THAT IS EXACTLY IDENTICAL TO THE IPHONE, BUT I AM

1     SAYING TO LEARN THE WISDOM OF THE IPHONE AND

2     RECOGNIZE THE STANDARD OF THE INDUSTRY WHICH WAS

3     SET BY THEM ALREADY."

4     Q    LET'S TURN BACK TO YOUR SLIDE 34B.32, AND LOOK

5     AT THE SECOND FACTOR YOU CONSIDERED, WHICH WAS

6     MARKET ALTERNATIVES.

7             WHAT EVIDENCE DID YOU FIND WHEN YOU

8     LOOKED AT MARKET ALTERNATIVES?

9     A    UM --

10    Q    AND LET ME FIRST ASK YOU, WHAT DO YOU MEAN BY

11    "MARKET ALTERNATIVES"?

12    A    SO I THINK YOU PHRASED IT WELL, IS IF SAMSUNG

13    DIDN'T MAKE THE SALE, WOULD APPLE HAVE MADE THE

14    SALE?

15            SO IF, IF THERE WERE OTHER ALTERNATIVES

16    IN THE MARKETPLACE, THEN APPLE WOULDN'T MAKE EVERY

17    ONE OF THOSE 22 MILLION SALES.  OF COURSE I DIDN'T

18    CALCULATE LOST PROFITS ON THE 22 MILLION.  YOU MAY

19    RECALL IT WAS ONLY 2 MILLION.

20            PART OF THE REASON WAS BECAUSE ALTHOUGH

21    I'M NOT OFFERING AN OPINION THAT THERE ARE MARKET

22    ALTERNATIVES, I CONSERVATIVELY SAID, WELL, I'M JUST

23    GOING TO ASSUME AND ACCEPT THAT SAMSUNG'S OTHER

24    PRODUCTS AND THAT EVERY OTHER MARKET PARTICIPANT IS

25    A MARKET ALTERNATIVE.

1    Q    COULD YOU EXPLAIN TO US THE EVIDENCE THAT YOU

2    FOUND WHEN YOU LOOKED AT THIS QUESTION.

3    A    I DID TWO, TWO RESTRICTIONS.  ONE, I, I LOOKED

4    AT THE TIME PERIOD AND I TOOK THAT TWO YEARS,

5    BASICALLY THE TWO-YEAR TIME PERIOD OF 2010, 2011,

6    2012, AND I SHRUNK THAT -- SORRY -- I SHRUNK THAT

7    DOWN.  I ASSUMED THAT WITH EACH PATENT OR EACH

8    TRADE DRESS THAT SAMSUNG WOULD SIMPLY NOT LEAVE THE

9    MARKET, THAT THEY WOULD DO SOMETHING TO TRY TO GET

10   BACK INTO THE MARKET.

11          SO I LIMITED MY CALCULATIONS TO LOST

12   PROFITS TO ONLY A TIME PERIOD WHICH WOULD BE

13   ASSOCIATED WITH THE TIME SAMSUNG WOULD BE OUT OF

14   THE MARKET.

15          SO DEPENDING ON THE INTELLECTUAL

16   PROPERTY, IT WAS AS LITTLE AS ONLY ONE MONTH OR AS

17   HIGH AS EIGHT MONTHS, BUT NOT THE ENTIRE TIME

18   PERIOD.  SO THAT 22 MILLION SHRINKS DOWN TO EIGHT

19   MONTHS OR ONE MONTH, RIGHT, BASED ON THAT.

20          AND THERE WAS ONE OTHER THING.

21   Q    YES, THE MARKET SHARE ALLOCATION.  WHAT ARE

22   YOU REFERRING TO THERE?

23   A    MARKET SHARE ALLOCATION, THERE WAS A FURTHER

24   CUT.  ONCE I GOT IT DOWN TO JUST THAT TIME PERIOD,

25   THE SALES THAT WOULD HAVE BEEN MADE IN THAT TIME

1      PERIOD, THEN I DISTRIBUTED THOSE SALES TO ALL THE

2      MARKET PARTICIPANTS.

3             I ONLY PUT IN APPLE'S PILE THEIR MARKET

4      SHARE.  I GAVE BACK TO SAMSUNG THEIR MARKET SHARE.

5      I GAVE NOKIA THEIR MARKET SHARE.  I GAVE MOTOROLA

6      THEIR MARKET SHARE.

7             SO THAT CARVED IT DOWN FURTHER AND THAT'S

8      WHY I ONLY END UP WITH 2 MILLION OUT OF THAT 22

9      MILLION THAT QUALIFY FOR LOST PROFITS.

10     Q    WHAT WAS THE THIRD FACTOR YOU CONSIDERED IN

11     DETERMINING HOW MANY OF THE 22 MILLION UNITS

12     QUALIFIED FOR LOST PROFITS?

13     A    CAPACITY.  COULD APPLE -- DID THEY HAVE THE

14     FACILITIES TO ACTUALLY PRODUCE THIS AND SELL THIS?

15     Q    AND WHAT DID YOU FIND?

16     A    I FOUND THAT THEY DID.  THERE WERE -- THERE

17     WERE LIMITATIONS, AS -- BECAUSE THE DEMAND WAS SO

18     HIGH, FROM TIME TO TIME, APPLE DID HAVE

19     CONSTRAINTS.

20            BUT WITH RESPECT TO THIS 2 MILLION

21     INCREMENTAL UNITS OVER THE TWO YEAR TIME PERIOD,

22     APPLE, I CONCLUDED, DID HAVE THE ABILITY TO MAKE

23     THOSE SALES.

24     Q    WHEN YOU SAY "THE ABILITY TO MAKE THOSE

25     SALES," ARE YOU REFERRING TO MANUFACTURING

1    CAPACITY?

2    A    MANUFACTURING AND MARKETING CAPACITY.  IT

3    COULD BE EITHER OR BOTH.

4    Q    AND WHAT WAS THE FOURTH FACTOR YOU USED IN

5    DETERMINING WHETHER UNITS QUALIFIED FOR LOST

6    PROFITS REMEDY?

7    A    IT'S JUST A CALCULATION OF APPLE'S PROFITS,

8    AND I WAS ABLE TO CALCULATE HOW MUCH APPLE MAKES ON

9    EACH ONE OF ITS SMARTPHONES OR TABLETS.  AND ONCE

10   AGAIN, IT'S SIMPLE MULTIPLICATION, TIMES 2 MILLION

11   UNITS GAVE ME MY LOST PROFITS.

12   Q    LET'S GO BACK TO SLIDE 34B.62.  IF YOU HAD NOT

13   CONCLUDED THAT 2 MILLION OF THE DEVICES DID QUALIFY

14   FOR LOST PROFIT DAMAGES, WHAT WOULD HAVE CHANGED IN

15   YOUR ULTIMATE CONCLUSION?

16   A    WE WOULD JUST SLIDE THOSE PHONES UP BECAUSE

17   THEY'RE ENTITLED -- UNDER THE ASSUMPTION THAT

18   THEY'RE INFRINGING, THEY'RE GOING TO GET SOME FORM

19   OF DAMAGE.  SO I SLIDE IT UP TO SAMSUNG'S

20   PROFITS -- I'M NOT DOUBLE COUNTING -- AND THE

21   RESULT IS, I THINK WE CAN SHOW, WE DON'T HAVE ANY

22   LOST PROFITS, BUT THE INFRINGING PROFITS NOW GOES

23   UP TO $2.481 BILLION.

24   Q    LET'S GO BACK TO YOUR ORIGINAL APPROACH IN

25   WHICH YOU HAVE PHONES AND TABLETS IN ALL THREE

1    CATEGORIES, AND LET ME ASK YOU ABOUT THE LAST

2    CATEGORY, THE REASONABLE ROYALTY CATEGORY.

3              FIRST, COULD YOU EXPLAIN TO THE JURY IN

4    CONCEPT WHAT IS MEANT BY A REASONABLE ROYALTY?

5    A    YES.  I HAVE A SIMPLE LITTLE SLIDE THAT HELPS.

6    Q    34B.42, PLEASE.

7    A    YES.  A ROYALTY PAYMENT IS, IT'S JUST LIKE, AS

8    THE FIRST EXAMPLE, RENT.  SO IF YOU DECIDE TO RENT

9    OUT YOUR HOUSE OR IF YOU HAVE AN APARTMENT AND YOU

10   WANT TO RENT IT, THAT'S YOUR ASSET.  YOU OWN THAT.

11   IT'S A TANGIBLE ASSET.  IF SOMEBODY ELSE IS GOING

12   TO USE IT, YOU WANT TO BE PAID FOR IT.  SO THEY PAY

13   YOU RENT.

14   Q    LET ME STOP YOU RIGHT THERE.  UNDER YOUR REAL

15   ESTATE COLUMN ON THIS GRAPHIC, YOU HAVE WHAT LOOKS

16   LIKE A PICTURE OF TWO HANDS SHAKING.  WHY DO YOU

17   HAVE THAT THERE?

18   A    WELL, IN THE TWO EXAMPLES, REAL ESTATE AND

19   MINERAL RIGHTS, THE PARTIES GET TOGETHER AND

20   ACTUALLY AGREE.

21             BUT HERE, WITHIN THE CONTEXT OF THE

22   LITIGATION, THE REASON WE'RE ALL HERE,

23   UNFORTUNATELY, IS THE TWO PARTIES HAVEN'T AGREED.

24   THEY HAVEN'T SHOOK HANDS AND AGREED.  SO WE DON'T

25   HAVE AN AGREEMENT.

1   Q    AND WE SEE THE WORDS, UNDER PATENTS,

2   "HYPOTHETICAL NEGOTIATION."  WHAT DO YOU MEAN BY

3   THAT?

4   A    WELL, IT'S A -- IT'S CALLED A LEGAL FICTION.

5   THE PARTIES HAVEN'T -- IN FACT, APPLE HAS TAKEN THE

6   POSITION THAT THEY DON'T WANT A ROYALTY.  THEY

7   DON'T WANT TO LICENSE THEIR INTELLECTUAL PROPERTY.

8        BUT AS A FLOOR, REMEMBER THAT, THAT ONE

9   STATUTE THAT WE WERE READING, THAT'S A MINIMUM

10  AMOUNT OF DAMAGES FOR THE UTILITY PATENTS.

11       AND IT'S A LEGAL FICTION THAT I'M ASKING

12  TO TRY TO IDENTIFY WHAT AMOUNT WOULD OR SHOULD --

13  I'M SORRY -- WHAT AMOUNT SHOULD SAMSUNG PAY APPLE

14  FOR THE USE OF THEIR INTELLECTUAL PROPERTY, EVEN

15  THOUGH APPLE DOESN'T WANT IT?

16  Q    AND DID YOU REACH A CONCLUSION ON WHAT THE

17  RIGHT ROYALTY RATES SHOULD BE FROM THIS

18  HYPOTHETICAL NEGOTIATION?

19  A    YES.  I DID A NUMBER OF EVALUATION TECHNIQUES

20  AND I DID SOMETHING CALLED A GEORGIA PACIFIC

21  ANALYSIS, AND THEN I ULTIMATELY IDENTIFIED THE

22  RATES, THE ROYALTY RATES TO BE PAID TO APPLE FOR

23  ITS ASSET.

24  Q    WHAT METHODS DID YOU USE TO IDENTIFY THE RANGE

25  OF POTENTIAL VALUES FOR THIS HYPOTHETICALLY

1    NEGOTIATED LICENSE PAYMENT?

2    A    RIGHT.  I USED THREE VALUATION METHODS:  A

3    COST METHOD; AN INCOME METHOD; AND A MARKET METHOD.

4    Q    WHAT ARE EACH OF THOSE METHODS, JUST BRIEFLY?

5    A    I THINK, AGAIN, EASY REAL ESTATE, A MARKET IS

6    A COMPARABLE, SO IT'S A HOUSE DOWN THE STREET

7    THAT'S LIKE YOURS.  THAT'S A COMPARABLE.

8              IN THIS CASE IT WOULD BE A LICENSE.  ARE

9    THERE OTHER LICENSES THAT ARE LIKE THE LICENSE THEY

10   WOULD ENTER INTO?

11             COST WOULD BE HOW MUCH DID SAMSUNG OR

12   APPLE PAY TO DEVELOP IT OR DESIGN AROUND IT?

13             AND INCOME IS INCOME DRIVEN, HOW MUCH

14   REVENUE IS BEING PRODUCED BY SAMSUNG AND/OR APPLE

15   USING THESE PATENTS.

16             AND WE DISCOUNT THAT BACK AND CAPITALIZE

17   THAT.

18   Q    AND YOU MENTIONED SOMETHING CALLED THE

19   GEORGIA PACIFIC FACTORS.  WHAT ARE THOSE -- THOSE

20   OF US OLD ENOUGH TO REMEMBER KNOW THAT

21   GEORGIA PACIFIC WAS A LUMBAR AND PAPER COMPANY.

22   WHAT DOES THAT HAVE TO DO WITH THIS CASE?

23   A    I THINK THEY STILL ARE.  IT'S A CASE

24   REFERENCE.  GEORGIA PACIFIC WAS INVOLVED IN A

25   PATENT SUIT AND THE COURT IDENTIFIED 15 FACTORS,

1    QUESTIONS TO ASK TO TRY TO GUIDE THIS HYPOTHETICAL

2    NEGOTIATION.  AND NOT ALL 15 FACTORS WOULD

3    NECESSARILY APPLY, BUT I LOOKED AT ALL 15 FACTORS

4    AND APPLIED THEM TO GET TO MY FINAL RATE.

5    Q    CAN YOU GIVE US SOME EXAMPLES OF SOME OF THE

6    GEORGIA PACIFIC FACTORS THAT DID APPLY HERE AND

7    THAT YOU TOOK INTO ACCOUNT IN CALCULATING WHAT YOU

8    DETERMINED TO BE A REASONABLE ROYALTY HERE?

9    A    SURE.  FACTOR NUMBER 1 IS HAS THERE BEEN A

10   LICENSE OF THE INTELLECTUAL PROPERTY?  AND YOU JUST

11   HEARD THE EXCHANGE, NO, THERE HAS NOT BEEN A

12   LICENSE OF INTELLECTUAL PROPERTY, UTILITY, OR

13   DESIGN AND APPLE DOESN'T WANT TO LICENSE IT.

14        THE EXTENT OF BENEFIT, THERE'S ANOTHER

15   FACTOR, THE EXTENT OF BENEFIT OBTAINED BY THE

16   ACCUSED INFRINGER.  AND HERE WE'VE SEEN $8 BILLION

17   OF REVENUE AND $2.4 BILLION OF INCOME.  SO THAT IS

18   PART OF THE GEORGIA PACIFIC FACTORS.

19   Q    COULD WE SEE SLIDE 34B.51, PLEASE, MR. LEE.

20        COULD YOU EXPLAIN TO THE JURY THE

21   ULTIMATE CONCLUSION THAT YOU DREW ABOUT WHAT

22   REASONABLE ROYALTIES WOULD HAVE RESULTED FROM THIS

23   HYPOTHETICAL NEGOTIATION, TAKING INTO ACCOUNT THE

24   FACTORS THAT YOU MENTIONED.

25   A    SO I IDENTIFY AN INDIVIDUAL RATE FOR EACH OF

1    THE UTILITY PATENTS, $3.10, $2.02, $2.02 MULTIPLIED

2    BY EACH UNIT.

3            AND THEN FOR THE DESIGN ELEMENTS, THAT

4    BEING THE DESIGN PATENTS AND THE TRADE DRESS, I

5    LOOKED AT THOSE AS A GROUP, RECOGNIZING THAT APPLE

6    WOULD NOT, AND REALLY COULD NOT LICENSE THAT OUT.

7    YOU CAN'T TAKE YOUR IDENTITY, YOU CAN'T TAKE

8    BASICALLY WHAT YOU'VE BUILT YOUR COMPANY AROUND AND

9    LICENSE A PIECE OF THAT.

10           SO I DEVELOPED MY RATE THAT WOULD BE FOR

11   ONE OR ALL OF THE DESIGN PATENTS OR TRADE DRESS.

12   Q    WHY IS THE DESIGN NUMBER SO MUCH HIGHER THAN

13   THE OTHERS?

14   A    IT'S -- IT'S -- WELL, WE'VE BEEN HERE TWO

15   WEEKS, I GUESS, TWO AND A HALF WEEKS.  IT'S WHAT

16   APPLE HAS SAID -- AND ONE OF THE OTHER

17   GEORGIA PACIFIC FACTORS THAT I DIDN'T MENTION WAS,

18   I THINK IT'S FACTOR 2, IS THE DEGREE OF COMPETITION

19   OR HOW -- IS THIS SOMEONE THAT DIDN'T COMPETE

20   DIRECTLY?

21           THESE ARE TWO MAJOR COMPETITORS COMPETING

22   FOR $8 BILLION, AND APPLE HAS COME INTO THE MARKET

23   ON THE BASIS OF ITS DESIGN AND HAS INDICATED

24   REPEATEDLY THEY DON'T WANT TO LICENSE THEIR DESIGN,

25   AND THE DESIGNS ARE OF CRITICAL ECONOMIC IMPORTANCE

1    TO APPLE, AND THAT'S WHY YOU END UP WITH SUCH A

2    HIGH NUMBER.

3    Q    CAN YOU TELL US WHETHER OR NOT YOU TOOK

4    SAMSUNG'S PROFITS AND APPLE'S PROFITS INTO ACCOUNT

5    IN DETERMINING A HYPOTHETICAL REASONABLE ROYALTY?

6    A    YES.

7    Q    WHERE DID YOU GET THE NUMBERS THAT YOU USED

8    FOR THE APPLE PROFITS PORTION OF THAT CALCULATION?

9    A    FROM APPLE'S AUDITED FINANCIAL STATEMENTS.

10   Q    LET'S GO BACK TO YOUR SLIDE WITH THE THREE

11   CATEGORIES, 34B.65 NOW.  AND GO AHEAD AND PUT UP

12   THE REASONABLE ROYALTY NUMBER.

13   A    $21,240,000 FOR THOSE THREE MILLION UNITS.

14   Q    NOW, IF WE LOOK AT THE TOP TWO NUMBERS ON THIS

15   CHART, THE SAMSUNG PROFIT NUMBER AND THE APPLE LOST

16   PROFIT NUMBER, IS THAT $24 PER UNIT NUMBER WE SAW

17   FOR DESIGN PATENTS, IS THAT INCLUDED IN ANY OF THE

18   NUMBERS WE SEE THERE?

19   A    NO.

20   Q    WHY NOT?

21   A    BECAUSE I DIDN'T -- MAYBE I MISSED THE

22   QUESTION.  I'M NOT DOUBLE COUNTING.  I'M

23   CALCULATING THE REASONABLE ROYALTY ONLY ON THE

24   REMAINING PHONES FOR WHICH I DID NOT CALCULATE THE

25   LOST PROFIT OR INFRINGING PROFIT.

1    Q    OKAY.  IF, INSTEAD OF CALCULATING FOR THE 17

2    MILLION PHONES AND TABLETS IN THE TOP LINE AND THE

3    2 MILLION PHONES AND TABLETS IN THE MIDDLE LINE

4    SAMSUNG PROFITS AND APPLE'S LOST PROFITS, IF YOU

5    HAD JUST DONE A REASONABLE ROYALTY FOR ALL 22

6    MILLION UNITS, WHAT WOULD THAT NUMBER HAVE BEEN?

7    A    RIGHT.  THAT'S 500 -- IT'S APPROXIMATELY

8    540 --

9              MR. PRICE:  OBJECT TO THAT.  THAT'S

10   BEYOND THE SCOPE OF HIS REPORT.

11             MS. KREVANS:  YOUR HONOR, THIS IS IN THE

12   SUPPLEMENTAL EXPERT REPORT AT EXHIBIT 19-S IN THE

13   MIDDLE COLUMN.

14             THE COURT:  THAT'S OVERRULED.

15             GO AHEAD.

16             THE WITNESS:  IF YOU SLID ALL THE PHONES,

17   AS COUNSEL HAS SAID, OVER AND DOWN INTO REASONABLE

18   ROYALTY AND CALCULATED DAMAGES AGAIN AS A FLOOR, A

19   MINIMUM AMOUNT, NO LOST PROFITS, NO REASONABLE --

20   AND NO INFRINGER'S PROFITS, THE AMOUNT IS

21   APPROXIMATELY $540 MILLION, STANDALONE.

22   BY MR. KREVANS:

23   Q    LOOKING AT THE NUMBERS THE WAY YOU DID

24   CALCULATE THEM IN THE THREE SEPARATE BUCKETS, WHAT

25   IS THE TOTAL DAMAGES THAT YOU CALCULATED THAT YOU

1    BELIEVE SAMSUNG SHOULD PAY IN THIS CASE IF THE JURY

2    FINDS THAT APPLE'S INTELLECTUAL PROPERTY IS VALID

3    AND INFRINGED?

4    A    SUMMING THE THREE UP, THE TOTAL NUMBER COMES

5    TO $2,751,000,000.

6    Q    COULD YOU TURN TO EXHIBIT 25 IN YOUR BINDER.

7    I'M SORRY, THIS IS 25A-1.

8    A    YES.

9    Q    WHAT IS 25A-1, MR. MUSIKA?

10   A    THIS IS A SUMMARY OF SOME OF THE CALCULATIONS

11   THAT I'VE BEEN TALKING ABOUT THIS MORNING.

12   Q    AND WHO PREPARED EXHIBIT 25A-1?

13   A    MY TEAM UNDER MY DIRECTION.

14          MS. KREVANS:  YOUR HONOR, WE OFFER

15   EXHIBIT 25A-1.

16          MR. PRICE:  NO FURTHER OBJECTION.

17          THE COURT:  OKAY.  IT'S ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          25A-1, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22          MS. KREVANS:  OKAY.

23   Q    COULD YOU, JUST BRIEFLY, MR. MUSIKA, WALK THE

24   JURY THROUGH WHAT INFORMATION IS SET OUT ON EACH

25   PAGE OF EXHIBIT 25A-1?

1    A    YES.  SO I'LL USE MY BOOK, AND I ASSUME THAT

2    YOU'LL MOVE THE SCREEN AS I TALK.

3              SO PAGE 2 OF 16 IS JUST THE SUMMARY OF

4    DAMAGES, WHAT WE JUST LOOKED AT.

5              PAGE 3 OF 16 --

6    Q    LET ME STOP YOU FOR A MOMENT ON PAGE 3.  YOU

7    SEE AT THE BOTTOM THERE'S A NOTE?

8    A    YES.

9    Q    WHAT DOES THAT NOTE EXPLAIN?

10   A    THAT EXPLAINS THE, THE TIME PERIODS THAT WERE

11   USED FOR THE CALCULATION OF THE DAMAGES.

12   Q    AND WHAT DOES IT INDICATE THOSE TIME PERIODS

13   WERE?

14   A    IT INDICATES THAT THE TIME PERIODS THAT I USED

15   FOR THE REGISTERED TRADE DRESS WAS BASICALLY THE

16   START OF THE INFRINGING TIME PERIOD.

17   Q    THAT'S FOR THE UNREGISTERED TRADE DRESS?

18   A    UNREGISTERED TRADE DRESS.

19   Q    AND FOR THE REST?

20   A    AND FOR THE REST I USED AUGUST 4TH, 2010 AS

21   THE START DATE.

22   Q    THANK YOU.  COULD YOU CONTINUE EXPLAINING TO

23   THE JURY WHAT THE CONTENTS OF PX 25 ARE.

24   A    YES.  PAGE 3 OF 16 IS JUST THE MATRIX.  YOU

25   SEE THE PRODUCTS THERE ON THE LEFT AND ALL THE

1    FORMS OF INTELLECTUAL PROPERTY THAT HAVE BEEN

2    IDENTIFIED THERE, WHICH PRODUCTS ARE ACCUSED OF

3    INFRINGING WHICH OF THE INTELLECTUAL PROPERTY.

4            THE NEXT PAGE IS JUST A SUMMARY OF, A

5    MORE DETAILED SUMMARY BY PRODUCT OF THE FOLLOWING

6    PHONES THAT WE WENT THROUGH.  IT'S JUST DIFFERENT

7    CALCULATIONS.

8            THE SAME IS TRUE OF 5 OF 16.

9            6 OF 16 IS A LISTING OF PRODUCTS AND THE

10   CARRIERS THAT ARE ASSOCIATED WITH EACH PRODUCT.

11   Q    SO THE -- THIS IS JUST WHICH PHONE COMPANIES

12   ARE PROVIDING THEIR CUSTOMERS WITH WHICH SAMSUNG

13   PRODUCTS?

14   A    THAT'S CORRECT.

15   Q    THANK YOU.  AND YOU HAVE A SERIES OF PAGES

16   THAT ARE HEADED "MOR-FLO ANALYSIS."

17   A    THAT'S 7 THROUGH 12.

18   Q    WHAT ARE THOSE?

19   A    THAT'S THE MARKET SHARE ALLOCATIONS.  THAT'S

20   WHERE I LIMITED THE NUMBER OF PHONES THAT APPLE

21   WOULD GET BECAUSE I'VE ALLOCATED PERCENTAGES TO THE

22   OTHER MARKET PARTICIPANTS, AND THOSE ARE THOSE

23   CALCULATIONS.

24   Q    THAT TAKES US TO PAGE 13, AND WHAT IS SET OUT

25   ON PAGE 13?

1    A    PAGE 13 IS A STUDY DONE, I THINK IT WAS DONE

2    BY IBM, BUT IT WAS DONE BY SOMEONE ELSE WHICH

3    REALLY LOOKED AT THE PERCENTAGE OF USERS THAT WOULD

4    SWITCH CARRIERS, AND THAT WAS ANOTHER LIMITING

5    FACTOR THAT I USED.

6    Q    OKAY.  LET'S -- MR. LEE, DON'T SHOW IT IN

7    COURT, BUT JUST SHOW THE JURORS PAGES 14 AND 15.

8              YOUR HONOR, I'D NOTE FOR THE RECORD THAT

9    THESE TWO PAGES, PER A PRIOR ORDER OF THE COURT,

10   HAVE BEEN PERMITTED TO BE REDACTED AND FILED UNDER

11   SEAL AND WE HAVE PROVIDED BOTH THE REDACTED AND

12   UNREDACTED COPIES TO THE COURT.

13             AND MR. MUSIKA, CAN YOU TELL US WHAT

14   INFORMATION IS SET OUT ON PAGES 14 AND 15?

15   A    YES.  IT'S MY ANALYSIS THAT RELATES TO THE

16   CAPACITY FACTOR, DETERMINING WHETHER OR NOT THERE'S

17   SUFFICIENT CAPACITY.

18   Q    AND FINALLY, PAGE 16.

19   A    16 IS THE RATES THAT WE JUST LOOKED AT, AND IT

20   GIVES A LITTLE MORE DETAILS ABOUT THE THREE

21   VALUATION METHODOLOGIES I USED.

22   Q    JUST TO FINISH UP, MR. MUSIKA, COULD YOU

23   SUMMARIZE FOR THE JURY YOUR OVERALL DAMAGES OPINION

24   IN THIS CASE?

25   A    YES.  WHERE I BEGAN, THE DAMAGES ARE A RANGE

1    BETWEEN $2.5 BILLION AND AT THE HIGH END,

2    $2,750,000,000.

3    Q    AND WHAT IS THE DIFFERENCE BETWEEN THE BOTTOM

4    AND THE TOP OF THAT RANGE?

5    A    ONE ASSUMES -- YOU REMEMBER WE WERE SLIDING

6    THE PHONES, THAT WE BASICALLY -- THE LOWER END

7    NUMBER IS JUST ALL OF SAMSUNG'S UNJUST ENRICHMENT,

8    PLUS A REASONABLE ROYALTY.

9         THE HIGHER NUMBER WAS SAMSUNG'S UNJUST

10   ENRICHMENT, LOST PROFIT ON THOSE 2 MILLION, PLUS

11   THE REASONABLE ROYALTY.

12        MS. KREVANS:  THANK YOU.

13        NOTHING FURTHER, YOUR HONOR.

14        THE COURT:  ALL RIGHT.  THE TIME IS NOW

15   11:20.

16                    **CROSS-EXAMINATION**

17   BY MR. PRICE:

18   Q    GOOD MORNING, MR. MUSIKA.

19   A    GOOD MORNING.

20   Q    MY NAME IS BILL PRICE.

21        AND I WANTED TO ASK YOU, BEFORE WE GET

22   INTO YOUR METHODOLOGIES, YOU SAID YOU'VE DONE THIS

23   A NUMBER OF TIMES, THIS SORT OF ANALYSIS; CORRECT?

24   A    YES.

25   Q    AND YOU'VE DONE IT IN CONNECTION WITH

1    LITIGATION?

2    A    YES.

3    Q    AND I JUST WANT TO SEE HOW YOU APPROACH THAT

4    AS AN EXPERT.  IT'S YOUR UNDERSTANDING THAT YOU ARE

5    SUPPOSED TO KIND OF APPLY YOUR EXPERTISE IN A

6    NEUTRAL FASHION; CORRECT?

7    A    THAT'S CORRECT.

8    Q    YOU'RE NOT SUPPOSED TO FAVOR ONE PARTY OVER

9    THE OTHER; RIGHT?

10   A    THAT'S CORRECT.

11   Q    YOU'RE GOING TO GIVE THE SAME OPINION

12   REGARDLESS OF WHICH SIDE HIRES YOU?  THAT'S THE

13   IDEA?

14   A    THAT IS THE IDEA.

15   Q    AND IN THAT CONNECTION, YOU KNOW THAT IT WOULD

16   BE INAPPROPRIATE, THEN, FOR YOU AS AN EXPERT TO BE

17   AN ADVOCATE?  THAT IS, YOU'RE SUPPOSED TO BE

18   OBJECTIVE USING YOUR EXPERTISE?

19   A    I WOULD AGREE.

20   Q    AND -- NOW, WE LOOKED AT A LOT OF SLIDES.  I

21   ASSUME THAT YOU REVIEWED THOSE SLIDES BEFORE THEY

22   WERE PRESENTED TO THE JURY.

23   A    YES.

24   Q    AND EITHER YOU CREATED THEM OR, LIKE THE

25   PRESIDENTIAL ADS, YOU APPROVED OF THEM?

1    A    YES.

2    Q    AND WERE THERE ANY THAT YOU CREATED VERSUS

3    APPROVED, OR --

4    A    I DON'T MAKE THAT DISTINCTION, NO.

5    Q    OKAY.  AND IF WE COULD LOOK AT, FOR EXAMPLE, I

6    THINK IT WAS SLIDE 34B.2, AND I'M JUST WONDERING,

7    FOR EXAMPLE, WITH THIS SLIDE -- I'M NOT GETTING

8    ANYTHING OUT OF THIS.

9            OKAY.  SO ON THIS SLIDE, YOU SEE ON THE

10   RIGHT HERE THERE'S A SAMSUNG PHONE.  DO YOU SEE

11   THAT?

12   A    I DO.

13   Q    AND DID YOU SELECT THAT PICTURE?

14   A    THE INDIVIDUAL PHONE?

15   Q    YES.

16   A    NO.  I THINK THAT -- THIS -- THE SLIDE ITSELF

17   WAS CONSTRUCTED ORIGINALLY BY ME, BUT THERE'S A

18   TEAM OF, OF GRAPHICS PEOPLE THAT, THAT PUT IN THE

19   ICONS ULTIMATELY.  SO, NO, I DIDN'T SELECT THAT

20   PHONE.

21   Q    I JUST WANT TO -- YOUR UNDERSTANDING IS THAT

22   APPLE IS NOT CLAIMING THAT YOU HAVE TO USE HARD

23   KEYS ON A PHONE; RIGHT?

24   A    THAT IS NOT MY UNDERSTANDING, NO.

25   Q    AND IT'S YOUR UNDERSTANDING THAT APPLE IS NOT

1   CLAIMING THAT YOU CAN'T HAVE, YOU KNOW, A BIG

2   SCREEN ON A PHONE; RIGHT?

3   A    THAT IS CORRECT.

4   Q    AND THEY'RE NOT CLAIMING THAT YOU CAN'T HAVE

5   OVAL SPEAKER; RIGHT?

6   A    THAT IS MY UNDERSTANDING ALSO, YES.

7   Q    SO WHEN APPLE CAME OUT, YOUR UNDERSTANDING

8   WAS, WAS AT LEAST AS FAR AS THIS CASE IS CONCERNED,

9   THAT THERE'S NO CLAIM THAT A COMPETITOR COULDN'T

10  COME OUT WITH A, A PHONE THAT HAD VIRTUAL KEYS?  DO

11  YOU KNOW WHAT I'M TALKING ABOUT?

12  A    YES, I DO.

13  Q    THAT HAD A BIG SCREEN; RIGHT?

14  A    YES.

15  Q    OR AN OVAL SHAPED SPEAKER AT THE TOP; RIGHT?

16  A    YES.

17  Q    SO THEN WHEN YOU WENT TO YOUR AFTER -- AFTER

18  APPLE CAME OUT, I THINK YOU WENT TO SLIDE 34B.4, OR

19  ONE OF THESE, AND YOU SEE YOU CHOSE THIS PHONE ON

20  THE RIGHT --

21  A    YES.

22  Q    -- TO PUT IN THIS COMPARISON.

23          NOW, THERE ARE HOW MANY PHONES INVOLVED

24  IN THIS CASE?

25  A    OH, 28 OR SOMETHING LIKE THAT.  I DON'T

1    REMEMBER EXACTLY.

2    Q    WELL, I'M WONDERING, LIKE, WHY DIDN'T YOU

3    CHOOSE -- LET'S SEE IF I CAN FIND -- THIS IS

4    EXHIBIT 1011.  IT'S ALREADY IN EVIDENCE.  IT'S THE

5    CAPTIVATE.

6            YOU'VE SEEN THIS PHONE BEFORE?

7    A    I CAN'T SEE IT FROM HERE.

8    Q    OKAY.

9            MAY I APPROACH?

10           THE COURT:  PLEASE, GO AHEAD.

11   BY MR. PRICE:

12   Q    YOU'VE SEEN THAT PHONE BEFORE?

13   A    I BELIEVE I HAVE, YES.

14   Q    AND THAT PHONE, WITHOUT MY HANDS ON IT, LET'S

15   PUT UP SDX 3909.4, I THINK.

16           AND BY THE WAY, THIS PHONE, IN YOUR

17   CALCULATIONS, ACCOUNTS FOR ABOUT 36 PERCENT OF

18   APPLE'S LOST PROFITS; RIGHT?

19   A    I DON'T KNOW THE PERCENTAGE, BUT I'D HAVE TO

20   CALCULATE IT.

21   Q    WELL, DO YOU RECALL THAT THIS WAS ONE OF THE

22   PHONES THAT WAS A BIG PERCENTAGE OF YOUR LOST

23   PROFITS?  RIGHT?

24   A    IT LOOKS -- NOW THAT I HAVE THE NUMBER IN

25   FRONT OF ME, WHAT WAS YOUR REFERENCE?

1    Q    THIS IS ABOUT 36 PERCENT OF THE LOST PROFITS

2    CALCULATION?

3    A    THAT'S -- YES.  I THINK THAT'S CLOSE, YES.

4    I'LL AGREE WITH THAT.

5    Q    AND SO THIS PHONE, YOU KNOW, THAT ON THE FRONT

6    HAS -- THIS ISN'T A VERY CLEAR PICTURE.  ON THE

7    BOTTOM IT HAS THOSE SOFT TOUCH BUTTONS.  DO YOU SEE

8    THAT?

9    A    I SEE THAT, YES.

10   Q    AND IT HAS KIND OF WHAT LOOK LIKE SILVER ON

11   THE SIDE, BUT IT'S CURVED BLACK ON THE TOP AND

12   BOTTOM.  DO YOU SEE THAT?

13   A    YES, I DO.

14   Q    OF COURSE IT HAS SAMSUNG'S NAME ON IT.  IF YOU

15   TURN IT OVER, IT LOOKS LIKE THIS IS A CAP ALMOST ON

16   THE BACK, RIGHT, WHERE YOU CAN FEEL THE SURFACE GO

17   FROM, YOU KNOW, THESE BLACK PARTS AT THE TOP TO

18   THIS DIFFERENT MATERIAL HERE; CORRECT?

19   A    I GUESS SO.  IT IS WHAT IT IS.  HERE IT IS.

20   Q    OKAY.

21   A    THAT'S THE BACK OF IT.

22   Q    OKAY.  AND YOU CAN SEE --

23         MAY I APPROACH?

24   A    SURE.

25   Q    SORRY.  WHAT I'M SAYING IS THAT'S NOT A

1    CONTINUOUS PIECE THERE?  IT'S KIND OF BROKEN UP?

2    YOU'VE GOT THIS PIECE AROUND HERE AND THEN KIND OF

3    SEEMS TO HOLD IN THIS DIFFERENT TYPE BACK; RIGHT?

4    A    WELL, I'M NOT AN ENGINEER, BUT IT WOULD APPEAR

5    TO BE A DIFFERENT PIECE, YES.

6              MR. PRICE:  AND YOUR HONOR, IF I COULD

7    JUST GIVE THAT TO THE JURY?

8              THE COURT:  PLEASE, GO AHEAD.

9    BY MR. PRICE:

10   Q    BUT -- SO INSTEAD OF USING THIS PHONE, WHICH

11   WAS -- WHICH ACCOUNTS FOR ABOUT 36 PERCENT OF YOUR

12   LOST PROFITS FIGURE WHICH HAS THE DIFFERENT TEXTURE

13   AND ALL THAT, INSTEAD OF USING THAT PHONE, YOU

14   DECIDED, AS AN OBJECTIVE, NEUTRAL EXPERT, TO USE

15   THE FIGURE IN 34B.4.  WE CAN PUT THAT BACK.

16              IS THAT RIGHT?

17   A    YES.

18   Q    WAS THAT YOUR DECISION?  OR WAS THAT THE

19   ATTORNEYS' DECISION?

20   A    NO.  THAT WAS MY DECISION.

21   Q    ANOTHER PHONE YOU COULD HAVE USED -- WELL,

22   THERE ARE A NUMBER YOU COULD HAVE USED BECAUSE

23   THERE ARE A LOT OF PHONES; RIGHT?

24              YOU COULD HAVE USED THE DROID 1025.  IT'S

25   ALREADY IN EVIDENCE.  I THINK MS. KARE SAID THAT'S

1    THE ONE WITH THE CHIN.

2    A    YES.

3    Q    AND YOU CAN SEE THE CHIN EVEN FROM WHERE

4    YOU'RE SITTING; RIGHT?

5    A    WELL, NO.

6    Q    YOU CAN'T?

7    A    I DON'T DOUBT YOU.

8    Q    MS. KARE MUST HAVE BETTER EYES THAN YOU.

9          IF I CAN APPROACH, YOUR HONOR?

10         THE COURT:  PLEASE, GO AHEAD.

11   BY MR. PRICE:

12   Q    IT'S NOT QUITE A JAY LENO CHIN, BUT YOU CAN

13   SEE IT'S A DIFFERENT SHAPE?

14   A    YES, I SEE THAT.

15         MR. PRICE:  IF I MAY HAND THIS OUT, YOUR

16   HONOR?

17         THE COURT:  PLEASE, GO AHEAD.

18   BY MR. PRICE:

19   Q    AND THIS PHONE ACCOUNTS FOR ABOUT $126 MILLION

20   OF SAMSUNG'S PROFITS THAT YOU'RE SAYING THAT

21   SAMSUNG SHOULD GIVE TO APPLE?

22   A    WHICH ONE WAS THAT?

23   Q    THAT'S THE DROID.

24   A    DID YOU SAY 106 MILLION?

25   Q    I THINK I HAVE DOWN HERE 126 MILLION.

1    A    I'VE GOT 106 MILLION, SO --

2    Q    OKAY.  GIVE OR TAKE 20 MILLION.

3    A    RIGHT.

4    Q    I'LL HAVE SOMEONE CHECK THAT AND SEE IF

5    THERE'S A REASON WHY WE HAVE DIFFERENT NUMBERS.

6    A    WELL, HERE, I SEE THE 126 MILLION.  YOU'RE ON

7    THE OPTION IF IT'S ONLY INFRINGER'S PROFITS.  I WAS

8    LOOKING AT THE CALCULATION WHEN IT WAS LOST

9    PROFITS, INFRINGER'S PROFITS, PLUS REASONABLE

10   ROYALTY.  SO THIS IS A CASE WHERE BOTH OF OUR

11   NUMBERS ARE RIGHT DEPENDING ON WHICH OPTION.

12   Q    GREAT.  I LIKE BEING RIGHT.

13        NOW, IF WE CAN GO TO -- ANOTHER ONE YOU

14   SHOWED WAS YOU SHOWED SAMSUNG'S SMARTPHONE MARKET

15   SHARE, AND THAT WAS 34B.9, AND YOU SAID THIS WAS A

16   RATHER DRAMATIC UPTAKE IN SAMSUNG'S MARKET SHARE.

17        DO YOU REMEMBER THAT?

18   A    I DO.

19   Q    AND AGAIN, YOU PUT THIS PHONE UP HERE.  THERE

20   ARE A COUPLE PHONES THAT CAME OUT AROUND THAT TIME;

21   CORRECT?

22   A    YES, THAT'S RIGHT.

23   Q    INCLUDING THE CAPTIVATE, WHICH THE JURY IS

24   LOOKING AT; RIGHT?

25   A    I DON'T REMEMBER WHEN THE CAPTIVATE CAME OUT,

1    BUT I DO KNOW THAT THERE WERE MORE THAN ONE PHONE

2    THAT CAME OUT AROUND THAT TIME PERIOD.

3    Q    AND IT'S CORRECT THAT, BY THE WAY, THESE SALES

4    REFLECT BOTH ACCUSED AND NON-ACCUSED PHONES THAT

5    SAMSUNG SOLD?

6    A    THAT'S POSSIBLE.  THAT IS POSSIBLE.

7    Q    IN FACT, IF YOU LOOK AT THE FOURTH QUARTER,

8    FOR EXAMPLE, OF 2010, IT'S ONLY ABOUT 49 PERCENT OF

9    THIS GROWTH THAT IS DUE TO THE ACCUSED PHONES?

10   A    RUN THAT BY ME AGAIN.

11   Q    SURE.  BY THE FOURTH QUARTER OF 2010, FOR

12   EXAMPLE, ONLY ABOUT -- ONLY, LIKE, 48 PERCENT OF

13   THESE SALES ARE OF THE ACCUSED PHONES.

14   A    I -- I DON'T KNOW WHERE YOU'RE GETTING THAT

15   NUMBER.  I'M SORRY.  I DON'T KNOW THAT TO BE THE

16   CASE.

17   Q    OKAY.  SO BASICALLY YOU CAN'T TELL THE JURY

18   WHAT PERCENTAGE OF THIS IS ACCUSED PHONES, WHAT

19   PERCENTAGE IS NON-ACCUSED PHONES?

20   A    WHAT PERCENTAGE OF THEIR MARKET SHARE, YOU'RE

21   SAYING, I THINK IS YOUR QUESTION, AND THE ANSWER IS

22   NO, I CAN'T AS I SIT HERE.  I'D HAVE TO GO BACK AND

23   CALCULATE TO SEE WHICH NON-ACCUSED SMARTPHONES, AS

24   IDENTIFIED BY IDC, ARE IN THAT NUMBER.

25   Q    OKAY.

1   A    YOU'RE THROWING OUT A NUMBER.  I JUST DON'T

2   KNOW.

3   Q    AND YOU'VE GOT A SCALE HERE OF 0 TO 25

4   PERCENT, DO YOU SEE THAT, 0 TO 25?

5   A    I DO SEE THAT, YES.

6   Q    AND THE SCALE KIND OF AFFECTS VISUALLY HOW YOU

7   LOOK AT THIS; RIGHT?

8   A    WELL, THE -- THE PAPER DEFINES HOW BIG THE

9   SCALE CAN BE.  BUT, YES.

10  Q    SO THERE WAS ACTUALLY A CHART IN YOUR REPORT,

11  YOUR SUPPLEMENTAL REPORT, OF THE SMARTPHONE MARKET

12  SHARE; RIGHT?

13  A    YES, THERE WAS.

14  Q    AND IF WE COULD LOOK AT THAT, I THINK IT'S SDX

15  3909.59.  IT'S EXHIBIT 2583, CHART 11.  2583, CHART

16  11.

17       THIS IS YOUR SUPPLEMENTAL REPORT; RIGHT?

18  A    APPEARS TO BE, YES.

19  Q    AND IF WE CAN GO TO CHART 11, I BELIEVE IT IS.

20  HERE WE GO.

21       THIS IS YOUR CHART OF THE U.S. SMARTPHONE

22  MARKET SHARES, AND THERE YOU HAVE A SALE FROM 0 TO

23  100 PERCENT.  DO YOU SEE THAT?

24  A    YES.

25  Q    AND WHAT WE SAW EARLIER, WHICH WAS THE SAMSUNG

1    UNITS SHIPPED, AND SAMSUNG MARKET SHARE -- I'M

2    SORRY.  LOOK AT THE SAMSUNG MARKET SHARE.  THAT'S

3    THIS RED LINE HERE; CORRECT?

4    A    YES.

5    Q    OKAY.  AND SO YOU REFLECTED THAT ON A 25

6    PERCENT SCALE INSTEAD OF 100 PERCENT?

7    A    YES.

8    Q    AND WHAT WE HAVE HERE IN BLUE IS APPLE'S

9    SHARE; CORRECT?

10   A    WELL, IT'S -- YES, BUT THIS IS A DIFFERENT

11   TIME PERIOD.  I THINK WE NEED TO BE CLEAR ON THAT.

12   THIS STARTS IN 2010, AND REMEMBER THE OTHER CHART

13   STARTED IN 2007.

14   Q    RIGHT.  I'M LOOKING AT THE PART THAT STARTS

15   AFTER YOU SAY SAMSUNG WAS IN COMPETITION.

16   A    AGREED, AGREED.

17   Q    OKAY.  AND SO IF WE LOOK AT, AT -- THEN IF WE

18   LOOK AT APPLE'S SHARE, YOU SEE IT'S KIND OF -- I

19   MEAN, THEY'RE -- BY THE FOURTH QUARTER OF 2011,

20   THEY'RE CLOSE TO HALF OF ALL -- THEY HAVE ALMOST

21   HALF THE MARKET.

22        I'M SORRY.  APPLE HAS ABOUT HALF OF THE

23   MARKET AS OF THE FOURTH QUARTER OF 2011; RIGHT?

24   A    YES.

25   Q    AND YOU CAN SEE BASICALLY, IF WE THEN LOOK AT

1    UNITS SHIPPED -- BY THE WAY, NOW, ARE THESE UNITS

2    SHIPPED IN TERMS OF JUST MARKET SHARE AGAIN?  OR IS

3    THAT LOOKING AT THIS SIDE HERE?

4    A    NO.  I THINK THAT'S LOOKING AT THE RIGHT-HAND

5    AXIS, YES.

6    Q    OKAY.  AND YOU CAN SEE THE UNITS SHIPPED FOR

7    APPLE HAS REALLY EXPLODED; CORRECT?

8    A    YES.

9    Q    IN FACT, YOU KNOW THAT -- OR LOOKING AT THE

10   DOCUMENTS, THAT APPLE IS THE MOST PROFITABLE

11   COMPANY IN THE WORLD?

12   A    MOST PROFITABLE?

13   Q    YEAH, MOST PROFITABLE.

14   A    MOST VALUABLE.  I DON'T KNOW THAT IT'S THE

15   MOST PROFITABLE BECAUSE THAT TAKES IN A LOT OF

16   COMPANIES.  I MEAN, YOU CAN HAVE SOME SMALL

17   COMPANIES THAT ARE, THAT ARE BASICALLY PRINTING

18   MONEY.

19          SO I DON'T KNOW THAT THEY WOULD BE VIEWED

20   AS THE MOST PROFITABLE.  BUT THEY ARE CERTAINLY

21   VERY SUCCESSFUL AND VERY VALUABLE.

22   Q    AND BY THE WAY, YOU HAD TALKED TO THE JURY

23   ABOUT HOW THE MONEY GOES WHEN SAMSUNG SELLS PHONES,

24   THAT SEC MANUFACTURES THE PHONES AND THEN THEY'RE

25   SOLD TO A SUBSIDIARY WHO THEN SELLS TO CARRIERS.

```
1              DO YOU REMEMBER THAT?

2    A    I DO, YES.

3    Q    AND THEN A LOT OF THAT MONEY GOES BACK TO

4    KOREA; CORRECT?

5    A    97 TO 98 PERCENT OF IT GOES BACK, YES.

6    Q    AND YOU ALSO LOOKED AT U.S. COMPANIES THAT

7    SELL THINGS MANUFACTURED HERE, MAYBE AIRPLANES OR

8    STEEL OR WHATEVER, THAT ARE SOLD TO FOREIGN

9    COUNTRIES; RIGHT?

10   A    YES.

11   Q    AND MOST OF THAT COMES BACK HERE BECAUSE OUR

12   COMPANIES SOLD IT; RIGHT?

13   A    OUR COMPANIES ARE --

14   Q    IN THE U.S., LIKE THE STEEL COMPANIES?

15   A    DEPENDS ON THE ARRANGEMENT.  DEPENDS ON

16   WHETHER THEY'RE SELLING TO AN INDEPENDENT PARTY.

17   IT'LL DEPEND ON THE FACTS.

18            COULD THEY BE EXACTLY REVERSED?  SURE,

19   THEY COULD BE.

20   Q    OKAY.  AND THERE'S -- AND YOU WERE SAYING

21   THERE'S NOTHING INAPPROPRIATE ABOUT THAT; CORRECT?

22   A    NO, THERE'S NOTHING INAPPROPRIATE ABOUT IT,

23   NO.  OTHER THAN -- UNLESS YOU TRY IT AND DIVIDE IT

24   UP AND SAY, "WELL, NOW I ONLY WANT TO LOOK AT A

25   PIECE OF IT."  THAT'S INAPPROPRIATE.
```

1       BUT AS LONG AS YOU CONSOLIDATE THEM ALL,

2   I DON'T HAVE A PROBLEM WITH THAT.

3   Q    FROM AN ANALYTICAL PERSPECTIVE, YOU WANT TO

4   LOOK AT THE WHOLE THING IS WHAT YOU SAID?

5   A    NOT ANALYTICAL.  IF I WANT TO KNOW THE VALUE

6   OR WHAT BENEFITS SAMSUNG GAINED, YOU HAVE TO LOOK

7   AT THE CONSOLIDATED.  THAT'S MY ONLY POINT.  YOU

8   CAN'T DIVIDE IT UP AND LOOK AT A PIECE OF IT,

9   PARTICULARLY WHEN YOU HAVE CASH OR MONEY THAT'S

10  MOVING IN SUCH A DRAMATIC FASHION UNDER THE CONTROL

11  OF SEC.

12  Q    OKAY.  SO LET'S GO BACK TO YOUR CHART THEN, IF

13  WE CAN.

14       IS IT YOUR UNDERSTANDING THAT APPLE -- BY

15  THE WAY, APPLE COMES OUT, BASICALLY, WITH A NEW

16  PHONE ONCE EVERY COUPLE OF YEARS?

17  A    MIGHT BE A LITTLE BIT MORE FREQUENTLY THAN

18  THAT, BUT SOMETHING IN BETWEEN A YEAR AND TWO YEARS

19  I'D SAY.

20  Q    AND WHAT YOU'VE NOTICED IS THAT -- WHEN YOU

21  LOOK AT THE CHARTS IS THAT APPLE'S SALES

22  DRAMATICALLY SPIKE WHEN IT COMES OUT WITH A NEW

23  PHONE; CORRECT?

24  A    THAT'S CORRECT.

25  Q    BECAUSE ITS CUSTOMERS HAVEN'T -- THEY HAVE THE

1    OLD MODEL AND THEY WANT A NEW, PRETTIER ADVANCED

2    ONE; RIGHT?

3    A    THEY WAIT.  THAT'S CONSTANTLY -- CUSTOMERS

4    WILL WAIT BECAUSE THEY WANT -- THEY FIGURE, "IT'S

5    COMING OUT.  I'LL WAIT AND GET IT WHEN IT COMES

6    OUT."

7    Q    WHEREAS SAMSUNG COMES OUT WITH LOTS OF PHONES

8    PER YEAR?

9    A    CERTAINLY MORE THAN APPLE, YES, THAT'S TRUE.

10   Q    AND THE SPIKE IN -- WE'VE GOT, LIKE, IN 2011,

11   YOU'VE GOT SAMSUNG GOING UP -- AT THIS POINT WE'RE

12   TALKING ABOUT PHONES LIKE THE GALAXY S II; CORRECT?

13   A    I THINK THAT'S RIGHT.  AGAIN, I DON'T HAVE

14   COMMITTED TO MEMORY THE LAUNCH DATES OF EACH OF THE

15   PHONES.  THAT IS AN ACCUSED PHONE, AND I THINK IT

16   IS IN THE 2011 TIME PERIOD.

17   Q    OKAY.  SO IF YOU WANT TO SEE, YOU KNOW, WHAT

18   SAMSUNG IS ACTUALLY SELLING, HOW IT'S CREATING

19   THIS, THIS, THESE SALES, YOU'D WANT TO LOOK AT KIND

20   OF WHAT PHONES ARE ACTUALLY DRIVING THIS; RIGHT?

21   A    I DON'T UNDERSTAND THE QUESTION.  I'M SORRY.

22   Q    WELL, I MEAN, YOU'D WANT TO SEE, IN 2010 OR

23   2011 HERE, WHAT'S THE PHONE MIX THAT SAMSUNG HAS,

24   BECAUSE IT DOESN'T JUST HAVE ONE PHONE; RIGHT?

25   A    RIGHT.  BUT THE PURPOSE -- I'M NOT DISAGREEING

1    WITH THAT.  I'M JUST SAYING I DON'T UNDERSTAND THE

2    QUESTION.

3              THE PURPOSE OF THIS IS TO SHOW THE

4    SMARTPHONE MARKET SHARE.  IF YOU WANT TO KNOW HOW A

5    PARTICULAR PHONE IS DOING, YOU SHOULD LOOK TO THAT

6    PHONE AND BREAK IT DOWN.

7    Q    WELL, IF YOU WANT TO LOOK TO SEE WHETHER OR

8    NOT IT'S BECAUSE SAMSUNG DID SOMETHING WRONG, THAT

9    IS, WHETHER OR NOT A PARTICULAR PHONE WAS, WAS

10   SOMETHING THAT WAS DRIVING INJURY TO APPLE, YOU'D

11   HAVE TO LOOK AT THE PARTICULAR PHONE, LIKE THE

12   DROID, AND MAKE A DECISION AS TO WHETHER OR NOT IT

13   INFRINGED; RIGHT?

14   A    YES.  AGREED.

15   Q    NOW, LET ME ASK YOU A LITTLE BIT ABOUT YOUR

16   ASSUMPTIONS HERE.

17             AND I WANT TO START OUT WITH WHAT YOU

18   TOLD THE JURY AT THE END, THAT DAMAGES WERE

19   SOMEWHERE BETWEEN 2.5 AND 2.75 BILLION.

20   A    THAT'S CORRECT.

21   Q    OKAY.  SO LET ME UNDERSTAND THIS.  IF THE

22   JURORS LOOK AT THIS EVIDENCE -- AND LET ME GIVE YOU

23   A HYPOTHETICAL -- THEY SAY, "WELL, YOU KNOW, THE

24   DESIGN PATENTS, THE TRADEMARK, I DON'T THINK THEY

25   INFRINGE THAT.  I DON'T THINK THERE'S, YOU KNOW,

1    DECEPTION OR THAT PEOPLE WOULD BE CONFUSED.  AND

2    I'M LOOKING AT THESE, THESE UTILITY PATENTS AND I'M

3    GOING TO CONCLUDE, YOU KNOW, THEY DO THE BOUNCE

4    BACK THING, THEY DO THAT, AND I'M GOING TO FIND

5    THAT'S A VALID PATENT."

6              ARE YOU WITH ME SO FAR?

7              MS. KREVANS:  OBJECTION, YOUR HONOR.

8    THERE ARE NO TRADEMARKS AT ISSUE IN THIS CASE.

9              MR. PRICE:  I'M SORRY.  TRADE DRESS.  I

10   MISSPOKE.  I APOLOGIZE.

11   Q    SO IF YOU SUBSTITUTE "TRADE DRESS" AND THE

12   "TRADEMARK," ARE YOU WITH ME SO FAR?

13   A    I'M ALL RIGHT.  KEEP GOING.  SURE.

14   Q    OKAY.  SO THE JURORS FIND, AFTER ANALYZING

15   THIS THAT, WELL, YOU KNOW, SAMSUNG SHOULDN'T HAVE

16   USED THE BOUNCE BACK AND THAT'S VALID.  LET'S

17   ASSUME THAT'S WHAT THEY FIND, OKAY?

18              YOUR DAMAGES FOR THAT IS GOING TO BE A

19   LOT LESS THAN $2.5 BILLION WHICH YOU SAID WAS THE

20   SMALLEST NUMBER OF DAMAGES THAT SHOULD BE AWARDED;

21   RIGHT?

22   A    WELL, I DON'T KNOW THAT IT'S GOING TO BE A LOT

23   LESS, NO.

24   Q    SO YOU'RE SAYING THAT IF THE ONLY INFRINGEMENT

25   THAT EXISTS OF A VALID PATENT IS THE BOUNCE BACK,

```
 1    OKAY -- YOU KNOW WHICH ONE THAT IS; RIGHT?

 2    A    SO -- YES.  MAYBE I MISUNDERSTOOD YOUR

 3    QUESTION.  SO YOUR HYPOTHETICAL IS ONLY THAT?

 4    Q    ABSOLUTELY.

 5    A    YES.

 6    Q    YOU UNDERSTAND THE JURORS, YOU KNOW, MIGHT

 7    DECIDE THAT APPLE'S WRONG ON SOME OF THESE THINGS?

 8    A    THEY COULD DECIDE THAT.

 9    Q    "AND SO INSTEAD OF THROWING A COUPLE BILLION

10    THEIR WAY, I'M GOING TO LOOK AT IT ANALYTICALLY AND

11    DECIDE, YOU KNOW, WHAT DID -- WHAT DID SAMSUNG

12    ACTUALLY DO WRONG, IF ANYTHING?"

13              YOU UNDERSTAND STAND THEY MIGHT TAKE THAT

14    APPROACH?

15    A    I DO.

16    Q    OKAY.  AND IF THEY TAKE THAT APPROACH, I WANT

17    YOU TO ASSUME THAT THEY DECIDE, NO DESIGN PATENT

18    INFRINGEMENT OR THE DESIGN PATENTS AREN'T VALID OR

19    NO TRADE DRESS INFRINGEMENT BECAUSE, YOU KNOW, AN

20    ORDINARY OBSERVER IS NOT GOING TO BE CONFUSED AND

21    THERE'S NO DECEPTION, NO DECEIT.

22              BUT THEY DO LOOK AT THE UTILITIES AND

23    SAY, "YOU KNOW, THAT BOUNCE BACK, I THINK APPLE

24    OWNED THAT AND THEY HAD A VALID OWNERSHIP RIGHT TO

25    THAT AND SAMSUNG USES THAT."
```

1          OKAY?  SO UNDER THAT ASSUMPTION, ARE YOU

2     WITH ME?

3     A     I'M WITH YOU.

4     Q     OKAY.  YOUR DAMAGES AREN'T CLOSE TO 2 BILLION

5     OR 1 BILLION OR ANYTHING LIKE THAT, ARE THEY?

6     A     AGREED.

7     Q     NOW, HOW CAN THEY TELL?  HOW CAN THE JURORS

8     TELL THAT IF IT'S JUST -- ASSUME IT'S JUST A BOUNCE

9     BACK.  YOU HAVEN'T GIVEN THEM THE TOOLS TO BE ABLE

10    TO COME UP WITH A DAMAGES FIGURE FOR THAT?

11    A     I HAVE.

12    Q     AND YOU SAY THAT'S IN HERE?

13    A     YES, IT IS.

14    Q     YOU CAN GO IN AND LOOK AT IT AND POINT TO IT?

15    I'M SORRY.  BUT WE'LL GET BACK TO THAT.

16          BUT RIGHT NOW WHAT YOU'RE SAYING IS WHAT

17    YOU SAID EARLIER, WHICH IS THE MINIMUM DAMAGES

18    FIGURE, WHICH IS $2.4 BILLION -- I SHOULD HAVE

19    WRITTEN IT DOWN -- 2.5 BILLION?

20    A     THAT'S CORRECT.

21    Q     THAT'S ABSOLUTELY INCORRECT; RIGHT?  THAT'S

22    ABSOLUTELY INCORRECT?  THAT IS NOT THE MINIMUM

23    DAMAGES FIGURE THAT THIS JURY COULD AWARD IF IT

24    FOUND SOME INFRINGEMENT?

25    A     NO, I DISAGREE.

1    Q    OKAY.  SO DO YOU AGREE, THEN, THAT IF THIS

2    JURY FOUND THAT THE ONLY THING WRONG WAS THAT

3    SAMSUNG USED A BOUNCE BACK, YOU'RE SAYING THAT THAT

4    DAMAGE WOULD BE 2.5 BILLION?

5    A    NO.  I THINK YOU'RE MIXING IT UP, AND I'M

6    LISTENING TO YOUR QUESTIONS CAREFULLY.

7         WHEN I STARTED MY PRESENTATION, I SAID

8    THAT I ASSUMED THAT ALL PATENTS ARE VALID AND THAT

9    ALL PRODUCTS INFRINGE, AND UNDER THAT ASSUMPTION,

10   WHICH I'M GIVEN AS AN EXPERT, THE MINIMUM DAMAGES

11   ARE $2.5 BILLION AND THEY'RE NOT LESS THAN THAT IN

12   MY OPINION.

13        YOU HAVE A HYPOTHETICAL, AND I AGREED

14   WITH YOU, ON THAT HYPOTHETICAL, THE DAMAGES WOULD

15   BE LESS.

16        BUT THAT'S NOT MY OPINION.

17   Q    I WAS LOOKING AT THE TRANSCRIPT AND I WANTED

18   TO MAKE SURE THAT WE ALL UNDERSTOOD.  SO APPARENTLY

19   WHEN YOU TOLD THE JURY THAT THE MINIMUM DAMAGES

20   WERE 2.5 BILLION, THAT WAS ASSUMING THAT APPLE WAS

21   CORRECT ON EVERY PATENT, THAT THERE WAS

22   INFRINGEMENT ON EVERY PATENT AND THAT EVERY PATENT

23   WAS VALID?

24   A    YES.

25   Q    OKAY.  SO I'M JUST CURIOUS, WERE YOU ASKED BY,

1      BY APPLE TO PRESENT TO THE JURY, FOR EXAMPLE, WHAT

2      WOULD BE YOUR OPINION OF THE DAMAGES IF IT WAS JUST

3      A BOUNCE BACK INFRINGEMENT?

4      A    NO.

5      Q    HOW ABOUT IF IT WAS -- I'M TRYING TO THINK OF

6      THE PATENT NOW -- HIT TO ZOOM AND THEN HIT

7      SOMEWHERE ELSE TO CENTER AND ZOOM?

8      A    NO.

9      Q    I'VE GOT THE LIST HERE.  THERE'S THE ONE WHERE

10     YOU, YOU USE ONE FINGER FOR SCROLLING AND THEN

11     THERE'S A PARTICULAR METHOD BY WHICH YOU USE TWO

12     FINGERS TO ZOOM.

13     A    YOU MAY BE MIXING THE THREE UTILITY PATENTS

14     UP, BUT I'M FOLLOWING YOU, AND THE ANSWER IS STILL

15     NO, I DIDN'T DO -- I WASN'T ASKED TO MAKE THAT

16     CALCULATION.

17     Q    OKAY.  AND THESE -- THE LOST PROFITS THAT --

18     THE LOST PROFITS IS A BIG PERCENTAGE OF YOUR

19     NUMBERS; RIGHT?

20     A    NO, THEY'RE NOT.

21     Q    I'M SORRY.  YOU'RE ABSOLUTELY RIGHT.

22          THE INFRINGER'S PROFITS, SAMSUNG'S,

23     THAT'S A BIG PART OF THE NUMBER; RIGHT?

24     A    THAT'S CORRECT.

25     Q    AND, OF COURSE, YOU DON'T GET INFRINGER'S

1    PROFITS IF THERE'S -- IF THE PATENT THAT IS

2    INFRINGED IS A UTILITY PATENT; RIGHT?

3    A    THAT'S RIGHT.  THAT'S NOT ONE OF THE FORMS OF

4    DAMAGES UNDER A UTILITY PATENT, I AGREE.

5    Q    SO THOSE BIG NUMBERS ALL HAVE SOMETHING TO DO

6    WITH THE WAY THE PHONE OR THE TABLET LOOKS?

7    A    WELL, THE ONLY ADDITION, SO THE RECORD IS

8    CLEAR, IS REMEMBER THE SLIDING PHONES.  SO IF YOU

9    MOVE THOSE PHONES OUT OF INFRINGER'S PROFITS,

10   YOU'VE GOT TO PUT THEM INTO SOME COLUMN, LOST

11   PROFITS OR REASONABLE ROYALTY.

12        AND SO AT A MINIMUM, YOU WOULD MOVE THEM

13   ALL DOWN TO REASONABLE ROYALTY TO THE EXTENT THAT

14   THEY ALSO INFRINGED THE UTILITY PATENT.

15   Q    AND SO THAT'S, THAT'S WHAT I'M SAYING.  IT'S

16   ONLY -- YOU GET INFRINGER'S PROFITS ONLY IF THERE'S

17   SOME FINDING ABOUT BASICALLY HOW THESE PHONES LOOK?

18   A    RIGHT.

19   Q    THE DESIGN PATENT, THE DESIGN PATENT OR TRADE

20   DRESS INFRINGEMENT; RIGHT?

21   A    I'M AGREEING WITH YOU.  BUT ALL I'M SAYING IS

22   IT'S NOT LIKE YOU SUBTRACT IT.  YOU HAVE TO

23   SUBTRACT IT, BUT YET ADD IT BACK ON THE OTHER FORM.

24   Q    WELL, YOU DON'T ADD IT BACK IF THERE'S A

25   FINDING THAT, YOU KNOW, AN ORDINARY OBSERVER, FOR

1    EXAMPLE, IS NOT GOING TO BE CONFUSED OR THERE'S NOT

2    DECEIT OR THAT THE PATENT'S INVALID; RIGHT?

3    A   NO, YOU DO.  THAT'S WHAT'S KEY, BECAUSE THE

4    KEY TO THE CALCULATION IS EVERY PRODUCT -- THE

5    CALCULATION IS DONE ON AN INDIVIDUAL PRODUCT.  SO

6    IN YOUR HYPOTHETICAL, WE HAVE JUST A PHONE, AND

7    THAT PHONE INFRINGES THE UTILITY PATENTS AND IT

8    INFRINGES THE TRADE DRESS AND IT INFRINGES THE

9    DESIGN PATENTS.

10          I'M THINKING THAT YOUR HYPOTHETICAL --

11    AND ON THAT BASIS, THE CALCULATION WOULD BE

12    PRESUMABLY BASED ON THE INFRINGER'S PROFITS.

13          YOU SAY LET'S ASSUME THAT THEY DON'T

14    INFRINGE THE DESIGN PATENTS AND THE TRADE DRESS.

15    LET'S TAKE THAT AWAY.

16          WELL, WE STILL HAVE THE POTENTIAL OF LOST

17    PROFITS ON THE UTILITY AND, AT A MINIMUM, THE

18    REASONABLE ROYALTY.

19          SO WHEN YOU TAKE AWAY THE INFRINGER'S

20    PRODUCTS, YOU'VE TO RECALCULATE THE DAMAGES FOR

21    THAT PARTICULAR PHONE ON ONE OF THOSE OTHER BASES

22    THERE, ASSUMING IT INFRINGES ONE OF THE OTHER

23    UTILITY PATENTS.

24    Q   AND THAT'S WHAT YOU'RE SAYING.  ASSUMING

25    THERE'S SOME OTHER INFRINGEMENT, THERE'S GOING TO

1    BE SOME WAY TO CALCULATE IT?

2    A    YES.

3    Q    AND YOU'VE TOLD US THAT YOU WEREN'T ASKED TO

4    CALCULATE ASSUMING THAT, YOU KNOW, ONE OF THESE

5    PATENTS, UTILITY PATENTS WAS INFRINGED ONLY, OR, OR

6    A COMBINATION OF THE UTILITY PATENTS?

7    A    THE COMBINATION -- THAT'S WHY A MODEL WAS

8    REQUIRED -- IS ENDLESS.  THERE ARE REALLY HUNDREDS

9    OF THOUSANDS OF COMBINATIONS GIVEN THE NUMBER OF

10   PATENTS, ET CETERA.

11              AND NO, I WASN'T.  THE ANSWER IS NO, I

12   WASN'T.

13   Q    AND THE ONLY COMBINATIONS I'M TALKING ABOUT

14   ARE THE THREE UTILITY PATENTS.  OKAY?

15   A    YOU'RE RIGHT, I WAS NOT ASKED TO PRESENT THAT.

16   Q    SO THE ASSUMPTIONS, THEN, ARE WE TALKED ABOUT

17   EACH PATENT, DESIGN PATENT IS VALID AND INFRINGED.

18   THAT'S YOUR ASSUMPTION FOR YOUR DAMAGES; RIGHT?

19   A    YES.

20   Q    THAT ALL THE DIFFERENT PRODUCTS THAT APPLE

21   SAYS INFRINGE DO INFRINGE; CORRECT?

22   A    YES.

23   Q    THAT EACH OF THE UTILITY PATENTS IS VALID AND

24   WHATEVER APPLE SAYS INFRINGES INFRINGES; CORRECT?

25   A    UNTIL THE JURY SAYS IT, YES.

1    Q    THAT ALL OF APPLE'S TRADE DRESS IS VALID AND

2    EVERYTHING APPLE SAYS INFRINGES INFRINGES; CORRECT?

3    A    YES.

4    Q    AND IT'S GIVEN ALL THOSE ASSUMPTIONS THAT YOU

5    THEN HAVE THIS RANGE OF 2.5 BILLION TO 2.7 BILLION?

6    A    THAT'S CORRECT.

7    Q    SO LET'S TALK ABOUT, FOR EXAMPLE, THE BOUNCE

8    BACK.  ON YOUR LOST PROFITS, I THINK YOU'RE UP

9    AROUND, FOR TOTAL, YOU'RE UP AROUND 400 SOMETHING

10   MILLION?

11   A    488 MILLION.

12   Q    OKAY.  AND THAT OBVIOUSLY ISN'T LOST -- WOULD

13   NOT BE APPLE'S LOST PROFITS WITH RESPECT TO, SAY, A

14   BOUNCE BACK PATENT?

15   A    NOT EXCLUSIVELY, NO.  SAME QUESTION, SAME

16   ANSWER.

17   Q    IN FACT, YOUR ANALYSIS ON THAT, WHEN YOU

18   TALKED -- WHEN YOU THOUGHT IT WOULD TAKE -- IF

19   SAMSUNG WERE TOLD "YOU CAN'T DO THAT ON YOUR

20   PHONE," IT WOULD TAKE THEM A MONTH TO DESIGN AROUND

21   THAT AND DO SOMETHING ELSE?

22   A    AS ONE OF THOSE LIMITING CONDITIONS THAT I

23   TALKED ABOUT, YES, I LIMITED THE CALCULATION TO

24   JUST ONE MONTH OF LOST PROFITS FOR THAT.

25   Q    SO LET'S TALK ABOUT YOUR ANALYSIS ON -- YOU

1    SAID YOU DID ANALYSIS ON BUT-FOR; THAT IS, IF -- IF

2    SAMSUNG DIDN'T HAVE A FEATURE, WHAT WOULD HAPPEN?

3              AND FOR BUT-FOR, FOR LOST PROFITS, FOR

4    APPLE'S LOST PROFITS, OKAY, YOU'RE SAYING THAT IF

5    THE JURY FOUND INFRINGEMENT ON A UTILITY PATENT,

6    THEN YOU'VE GOT TO LOOK AT, OKAY, WHAT WOULD APPLE

7    HAVE MADE IF SAMSUNG DIDN'T HAVE THAT FEATURE;

8    RIGHT?

9    A    MADE?  WHAT --

10   Q    WOULD HAVE MADE.

11   A    ALL RIGHT.  I'LL SAY YES.  I'M NOT SURE WHAT

12   YOU MEAN, BUT I'LL SAY YES.

13             THEY'VE ALREADY MADE THEIR PRODUCTS.  THE

14   PRODUCTS ARE THE IPHONES IN YOUR HYPOTHETICAL, SO

15   IT WOULD BE THE IPHONE.  IT'S ALREADY MADE.

16   Q    OKAY.  AND I DIDN'T MEAN MANUFACTURE, BUT THE

17   PROFITS THEY WOULD HAVE EARNED?

18   A    OKAY.  THAT'S WHERE I WAS NOT SURE.

19   Q    AND WHEN YOU'RE DOING THAT, YOU'VE GOT TO ASK

20   YOURSELF, HERE'S A SAMSUNG CUSTOMER, THEY'VE GOT A

21   PHONE, ONE OF THE ACCUSED PHONES, THAT HAS BOUNCE

22   BACK.  NOW, IF BOUNCE BACK ISN'T IN THERE, ARE THEY

23   GOING TO LEAVE SAMSUNG TO GO TO APPLE BECAUSE OF

24   THAT ONE FEATURE?  THAT'S THE BUT-FOR ANALYSIS,

25   ISN'T IT?  THAT -- IS SOMEONE GOING TO SAY, "I

```
 1    BOUGHT THIS PHONE.  I LIKED IT.  WELL, DARN.  IT
 2    DOESN'T HAVE BOUNCE BACK ANYMORE.  I'M GOING TO GO
 3    BUY AN APPLE."
 4    A    WELL, THAT'S KIND OF A STATEMENT, BUT I'LL
 5    RESPOND TO IT AS A QUESTION.
 6    Q    TRUE.
 7    A    MY CALCULATION IS THAT THEY WOULD GO TO THEM
 8    BECAUSE, REMEMBER, I'VE ONLY TAKEN THE SALE AWAY
 9    FOR THE MONTH IT WOULD TAKE FOR SAMSUNG TO
10    BASICALLY REMOVE THE BOUNCE BACK.  THEY'RE GOT
11    TO -- THAT'S JUST A PHYSICAL FACT.  SAMSUNG, WITH
12    THE ASSUMPTION THAT THEY CAN'T USE IT, HAS TO TAKE
13    IT OUT OF THEIR PHONE.  THEY HAVE TO REDESIGN THE
14    PHONE.  THEY HAVE TO NEGOTIATE A DIFFERENT PRICE.
15    THEY NEED TO PUT THE MANUFACTURING FACILITY IN
16    PLACE.  I'VE ALLOWED, FOR EVERYTHING TO HAPPEN, ONE
17    MONTH AND ONLY ONE MONTH.
18          AND DURING THAT PERIOD OF TIME, YES, SOME
19    PORTION OF THE MARKET WOULD CHOOSE AN IPHONE
20    INSTEAD OF SAYING, "OH, WELL, I'M GOING TO WAIT OR
21    DO SOMETHING ELSE."
22    Q    WELL, FOR ONE THING, YOU WOULDN'T HAVE TO
23    START A MANUFACTURING FACILITY TO CHANGE THE BOUNCE
24    BACK.  THAT'S JUST A SOFTWARE UPGRADE, RIGHT?  PLUG
25    IT INTO YOUR COMPUTER AND IT WOULD BE CHANGED?
```

2126

```
1    A    FAIR ENOUGH, YES.

2    Q    OKAY.  AND MY QUESTION IS DIFFERENT.  WE KNOW

3    SOMETHING ABOUT THE PEOPLE WHO PURCHASE THE SAMSUNG

4    PHONES THAT WE DON'T KNOW ABOUT THE GENERAL PUBLIC,

5    WHICH IS THAT THEY CHOSE A SAMSUNG PHONE; RIGHT?

6    A    YES.

7    Q    OKAY.  SO IF THEY CHOSE A SAMSUNG PHONE, YOU

8    MIGHT WANT TO LOOK AS TO WHY THEY CHOSE THAT PHONE;

9    CORRECT?

10   A    I AGREE, AND I DID.

11   Q    AND IN CONNECTION WITH THAT, YOU'D WANT TO

12   ASK, OR FIND OUT, "OKAY, MR. PURCHASER, IF YOU

13   DIDN'T HAVE BOUNCE BACK, WOULD YOU NOT HAVE CHOSEN

14   THAT PHONE AND GONE SOMEWHERE ELSE?"  THAT'S WHAT

15   THE BUT-FOR CAUSATION IS.  IF NOT FOR WHAT SAMSUNG

16   WAS DOING, IT WOULD HAVE GONE TO APPLE INSTEAD;

17   RIGHT?

18   A    THAT'S CORRECT.

19   Q    AND THERE ARE HUNDREDS AND HUNDREDS OF

20   FEATURES ON A SAMSUNG SMARTPHONE; RIGHT?

21   A    YES.

22   Q    APPLE HAS DONE RESEARCH, ITSELF, ON WHY THE

23   PEOPLE WHO BUY SAMSUNG, OR ANDROID, WHY ARE THEY

24   ATTRACTED TO THAT PRODUCT INSTEAD OF OURS; RIGHT?

25   A    YES.
```

```
1    Q    AND YOU REVIEWED SOME OF THAT?

2    A    I DID.

3    Q    SO, FOR EXAMPLE, IF YOU LOOK AT EXHIBIT 572 --

4    A    THESE ARE IN YOUR BOOKS, COUNSEL?

5    Q    YES.  IF YOU NEED HELP FINDING IT, JUST LET ME

6    KNOW.

7    A    572.  OKAY, I'M THERE.

8    Q    AND FIRST LET ME ASK YOU, IS THIS A DOCUMENT

9    THAT YOU HAVE EVER SEEN?

10   A    I'VE SEEN A LOT OF APPLE SURVEYS, SO THAT'S

11   PROBABLY -- TO MOVE IT ALONG, THAT'S PROBABLY ONE

12   I'VE SEEN.  I'VE SEEN A LOT OF THEM.  IT LOOKS LIKE

13   IT.

14   Q    SO APPLE LOOKS AT THE MARKET TO SEE WHY ARE

15   PEOPLE CHOOSING OTHER PHONES?  WHY ARE THEY

16   CHOOSING OUR PHONE?  THINGS LIKE THAT?

17   A    YES.

18   Q    AND THIS LOOKS LIKE AN APPLE DOCUMENT TO YOU?

19   A    YES.

20        MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT

21   572 INTO EVIDENCE.

22        THE COURT:  IT'S ADMITTED.

23        MS. KREVANS:  YOUR HONOR, I WOULD REQUEST

24   THAT THIS DOCUMENT, BECAUSE IT'S A VERY SENSITIVE

25   DOCUMENT, THAT WHAT'S ADMITTED BE ONLY THE PAGES
```

```
 1    THAT ARE SHOWN.  THERE'S NO REASON TO ADMIT PAGES

 2    THAT ARE NOT SHOWN.

 3              MR. PRICE:  I HAVE NO PROBLEM WITH THAT.

 4              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 5              572.003, HAVING BEEN PREVIOUSLY MARKED

 6              FOR IDENTIFICATION, WAS ADMITTED INTO

 7              EVIDENCE.)

 8    BY MR. PRICE:

 9    Q    SO IF WE CAN LOOK AT 572.003, THAT'S A

10    SMARTPHONE MARKET STUDY.  DO YOU SEE THAT?

11    A    WHAT'S THE BATES PAGE?

12    Q    IT'S 572.003.

13    A    OH, THERE'S TWO DIFFERENT BATES RANGES HERE.

14    SORRY.

15    Q    IT'S AT THE TOP WHERE IT SAYS DEFENDANT'S

16    EXHIBIT NUMBER 572.003.

17    A    YES, I'M THERE.

18    Q    AND IF YOU LOOK AT THE SECOND PAGE, YOU SEE IT

19    SAYS "WHY THIS REPORT," AND IT TALKS ABOUT -- I'M

20    SORRY -- THAT'S 572.004, AND YOU SEE IT TALKS ABOUT

21    "FOCUS ON IPHONE AND ANDROID."

22              AND YOU UNDERSTAND WHAT ANDROID IS?

23    A    I DO.

24    Q    THAT'S A DIFFERENT OPERATING SYSTEM WHICH IS

25    OFFERED ON SAMSUNG AND OTHER PRODUCTS COMPARED TO
```

```
 1     APPLE'S OPERATING SYSTEM; CORRECT?

 2     A    NOT ALL SAMSUNG PRODUCTS, BUT SOME SAMSUNG

 3     PRODUCTS.  SORRY, SOME SAMSUNG PRODUCTS.

 4     Q    LET'S GO TO THE KEY AREAS WHERE YOU HAVE, YOU

 5     KNOW, SMARTPHONE PURCHASE DRIVERS, BRAND LOYALTY,

 6     DRIVERS OF ANDROID CONSIDERATION AND PURCHASE.

 7              DO YOU SEE THAT?

 8     A    YES.

 9     Q    OKAY.  AND IF WE LOOK AT 572.08 -- I'M

10     SORRY -- 077, YOU SEE THIS IS A SECTION THAT STARTS

11     "DRIVERS OF ANDROID CONSIDERATION AND PURCHASE."

12     DO YOU SEE THAT?

13     A    LET ME CATCH UP.

14     Q    IT'S AT THE TOP AGAIN, 572.077?

15     A    I GOT IT.  I'M THERE.

16     Q    AND IF WE GO TO PAGE 572.082.

17     A    YES.

18     Q    AND THESE ARE THE TOP REASONS FOR BUYING AN

19     ANDROID AMONG THOSE WHO CONSIDERED THE IPHONE.  DO

20     YOU SEE THAT?

21     A    I CAN'T READ THE FINE PRINT THERE, BUT, YES,

22     IT DOES SAY THAT.

23     Q    IT MIGHT BE EASIER IF YOU LOOK AT IT BLOWN UP,

24     BECAUSE, YEAH, THE WAY IT WAS --

25     A    I'M TRYING TO SEE WHAT THE LIGHT PRINT SAYS
```

1     DOWN IN THE LOWER LEFT-HAND CORNER.

2     Q    "NOTE 25 PERCENT OF RECENT ANDROID BUYERS

3     CONSIDERED AN IPHONE."

4              AND THIS IS, "FOR WHAT REASON DID YOU

5     DECIDE TO BUY AN ANDROID-BASED SMARTPHONE RATHER

6     THAN AN IPHONE?"

7     A    OKAY.

8     Q    AND IT'S GOT YOU WANT TO STAY WITH THE SERVICE

9     PROVIDER; RIGHT?

10    A    YES.

11    Q    AND THAT'S BECAUSE DURING THE ENTIRE TIME

12    PERIOD HERE, BY THE WAY, ONLY AT&T SOLD IPHONES

13    DURING THE DAMAGES PERIOD?

14    A    LET ME UNDERSTAND THIS SLIDE.  SO THIS SLIDE

15    REPRESENTS ONLY THOSE PORTIONS WHO -- ONLY THOSE

16    CUSTOMERS WHO HAVE ALREADY DECIDED TO STAY WITH

17    ANDROID, NOT FOR OTHERS?

18    Q    THESE ARE PEOPLE WHO CHOSE ANDROID RATHER THAN

19    CHOOSING AN IPHONE.  THAT IS, WHY DID THEY

20    CHOOSE --

21    A    YES, OKAY.  I'M WITH YOU.

22    Q    OKAY.  AND WE'VE GOT STAY WITH WIRELESS

23    SERVICE PROVIDER, AND I WAS ASKING YOU ABOUT AT&T.

24             DURING THE DAMAGES PERIOD YOU

25    CALCULATED --

1    A    YES.

2    Q    -- THE ONLY PLACE YOU COULD BUY AN IPHONE WAS

3    AT&T?

4    A    NO, THAT'S INCORRECT.

5    Q    AT WHAT POINT DID -- WAS THERE A PERIOD OF

6    TIME WHEN YOU COULD ONLY GET IT THROUGH AT&T?

7    A    THERE WAS A PERIOD OF TIME, NOT THE WHOLE

8    DAMAGE PERIOD OF TIME, BUT THERE WAS A PERIOD OF

9    TIME THAT YOU COULD ONLY GET AN IPHONE AT AT&T.

10            BUT AS THE DAMAGE PERIOD PROGRESSED,

11   OTHER CARRIERS DID CARRY THE IPHONE AS WELL.

12   Q    WHAT TIME PERIOD WAS IT WHERE YOU'VE GOT TO GO

13   TO AT&T?

14   A    FROM THE START OF IT, I CAN'T REMEMBER THE

15   EXACT CUT OFF, BUT I KNOW ANOTHER CARRIER CAME IN.

16            THROUGHOUT THE ENTIRE TIME PERIOD AT&T,

17   BUT THERE WAS A LIMITED PERIOD OF TIME THERE EARLY

18   ON.

19   Q    AND YOU SEE TRUSTED MODEL BRAND, PREFERRED

20   LARGE SCREEN; RIGHT?

21   A    YES.

22   Q    PREFERRED THE ANDROID MARKET FOR APPS, THAT

23   WAS ANOTHER REASON?

24   A    YES.

25   Q    AND IT GOES ON -- TURN-BY-TURN GPS NAVIGATION.

1    THERE WAS A PERIOD OF TIME WHEN ANDROID HAD THAT

2    AND APPLE DID NOT; CORRECT?

3    A    YES, MY UNDERSTANDING, YES.

4    Q    AND THIS KIND OF RUNS INTO THE NEWEST, COOLEST

5    THING, WANTED THE LATEST TECHNOLOGY; RIGHT?

6    A    THAT'S WHAT IT SAYS, YES.

7    Q    AND ANOTHER REASON PEOPLE MIGHT CHOOSE PHONES

8    IS PRICE; RIGHT?  HOW MUCH THEY COST?

9    A    AGREED.

10   Q    AND YOU ACTUALLY DID A CALCULATION -- BY THE

11   WAY, NOTHING IN HERE MENTIONS -- LET ME WITHDRAW

12   THAT.

13           LET'S GO BACK TO PRICE.  SORRY ABOUT

14   THAT.

15   A    THAT'S ALL RIGHT.

16   Q    MENTAL HICCOUGH.

17           YOU DID A CALCULATION WHICH COMPARED THE

18   AVERAGE IPHONE PRICE TO THE AVERAGE IPHONE PRICE;

19   RIGHT?

20   A    I KNOW THAT THERE'S A DIFFERENCE, YES.  I

21   MEAN, THERE'S MANY, MANY CALCULATIONS, BUT IT

22   DEPENDS AT WHAT POINT IN TIME, WHICH PHONES, ET

23   CETERA.  BUT, YES, I'M AWARE THAT THERE'S A

24   DIFFERENCE.

25   Q    AND YOU DID THAT CALCULATION AS PART OF YOUR,

1    YOUR ANALYSIS FOR APPLE PROFITS, RIGHT, WHAT

2    THEY'RE SELLING THESE PHONES FOR?

3    A    NO.  I DIDN'T NEED TO KNOW WHAT SAMSUNG WAS

4    SELLING FOR TO GET TO APPLE'S PROFITS PER SE.  I

5    NEEDED APPLE'S PROFITS ON THAT CALCULATION.

6    Q    LET'S SEE IF WE CAN -- CAN WE PUT UP 3909.046.

7           DO YOU REMEMBER IN YOUR REPORT, YOUR

8    SUPPLEMENTAL REPORT, YOU CALCULATED THE AVERAGE

9    IPHONE SELLING PRICE AT $656; RIGHT?

10   A    THAT LOOKS RIGHT, YES.

11   Q    AND YOU CALCULATED THE AVERAGE -- IF WE CAN GO

12   TO THE NEXT --

13   A    BEFORE YOU LEAVE -- WELL, YOU'RE STILL UP

14   THERE.  THIS WAS FOR A SPECIFIC POINT IN TIME.

15   Q    RIGHT.  YOU HAD TO DO IT FOR EVERY -- YOU DID

16   IT FOR EVERY QUARTER; RIGHT?

17   A    YES.

18   Q    AND IF YOU HAVE A PROBLEM WITH THE QUARTER I

19   CHOSE, JUST LET ME KNOW.

20           AND SO THIS IS FIRST QUARTER OF 2011, THE

21   AVERAGE SAMSUNG SELLING PRICE WAS $369 THAT YOU

22   CALCULATED?

23   A    WELL, I CALCULATED -- THOSE ARE ON TWO

24   DIFFERENT BASES.  THAT'S -- I'M SORRY.  APPLE'S

25   PRICE IS THE SALE TO THE CARRIER, AND SAMSUNG'S

1    PRICE IS A SALE TO THE CARRIER, BUT THE ULTIMATE

2    CONSUMER, OF COURSE, PAYS A DIFFERENT PRICE SINCE

3    THE CARRIER SUBSIDIZES.  SO THE REAL PRICE IS NOT

4    656.  IT'S SOMETHING DRAMATICALLY LESS THAT THE

5    CUSTOMER PAYS ULTIMATELY SINCE THE CARRIERS HAVE

6    SUBSIDIZED APPLE'S PRICE.

7    Q    WELL, AS AN ECONOMIST, YOU KNOW THAT THERE'S

8    NO SUCH THING AS A FREE LUNCH; RIGHT?

9    A    NO FREE LUNCH, RIGHT.

10   Q    AND SO WHAT HAPPENS IS WHEN YOU BUY -- IF YOU

11   WANTED TO BUY AN IPHONE FROM APPLE, FOR EXAMPLE, AS

12   OF A COUPLE WEEKS AGO -- I KNOW THERE WERE SOME BIG

13   REDUCTIONS LAST WEEK BECAUSE OF THE IPHONE BEING

14   OUT THERE, THE 5 -- BUT AS OF LAST WEEK, LIKE THE

15   CHEAPEST YOU COULD GET WAS OVER $300.

16   A    I MISSED THE LAST PART OF THAT.

17   Q    THE CHEAPEST YOU COULD GET WAS OVER $300 IF A

18   CONSUMER WANTED TO BUY IT FROM APPLE; RIGHT?

19   A    I DON'T KNOW THAT TO BE A FACT, BECAUSE AS YOU

20   SAY, IT DEPENDS ON THE SPEED OF PHONE, DEPENDS ON

21   THE CAPACITY OF THE PHONE, DEPENDS ON YOUR

22   CARRIER'S SUBSIDY, BECAUSE EVEN IF YOU WALK INTO AN

23   APPLE RETAIL STORE, IF YOU'RE RE-UPPING, THE

24   CARRIER WILL PAY THAT SUBSIDY TO APPLE, SO THAT

25   REDUCES YOUR PRICE THAT YOU HAVE TO PAY.  SO I

1    THINK WE'D HAVE TO LOOK AT A LOT OF CONSIDERATIONS.

2    Q    YEAH, BUT YOU PAY.  I MEAN, YOU HAVE TO DO A

3    TWO YEAR CONTRACT AND YOU'RE -- YOU'VE GOT CERTAIN

4    RIGHTS AND --

5    A    THAT'S TRUE FOR BOTH.

6    Q    SO WHAT I'M SAYING IS THAT ONE WAY OR ANOTHER,

7    THE CARRIER GETS A PROFIT, EVEN IF IT SELLS THE

8    PHONE TO THE CUSTOMER -- THE PHONE IS BASICALLY A

9    DOWN PAYMENT PRICE FOR A TWO YEAR PERIOD TO PAY

10   MONEY; RIGHT?

11   A    IF WE'RE TRYING TO MAKE -- I THINK WHAT YOU'RE

12   TRYING TO DO IS MAKE A PRICE COMPARISON.  YOU HAVE

13   TO LOOK AT ULTIMATELY WHAT THE RETAIL CUSTOMER

14   PAYS, AND YOU'RE ABSOLUTELY RIGHT.  WHAT THE

15   CARRIER IS DOING TO TRY AND MAKE ITS INCOME OFF THE

16   SERVICE IS TO OFFER A PHONE THAT'S COMPETITIVE, AND

17   IF THERE'S HIGH DEMAND FOR THE APPLE PHONE, IT'S

18   GOING TO DISCOUNT THAT PHONE SO THAT YOU WILL BUY

19   IT AND BUY THEIR SERVICE, AND THAT'S THE PRICE THAT

20   WE SHOULD BE COMPARING, NOT THE PRICE THAT APPLE

21   SELLS TO THE CARRIER.  IT'S WHAT BOTH -- THE

22   CARRIER SELLS BOTH OF THOSE PRODUCTS.

23            THE COURT:  IT'S 12:02 AND MS. SHORTRIDGE

24   HAS BEEN GOING ALMOST TWO YEARS SINCE WE TOOK OUR

25   BREAK SO EARLY, SO I THINK WE SHOULD TAKE A BREAK.

1          IT'S 12:02.  WE ARE NOW GOING TO BREAK

2      FOR LUNCH.

3          AGAIN, PLEASE KEEP AN OPEN MIND, DON'T

4      DISCUSS THE CASE WITH ANYONE AND DON'T READ ABOUT

5      OR RESEARCH THE CASE.  OKAY.  THANK YOU.

6          IF YOU WOULD, PLEASE, GO AHEAD AND LEAVE

7      YOUR JURY BOOKS IN THE JURY ROOM.

8          (WHEREUPON, THE FOLLOWING PROCEEDINGS

9      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

10          THE COURT:  ALL RIGHT.  THANK YOU ALL

11      VERY MUCH.  WE'LL SEE YOU 1:00 O'CLOCK.

12          MR. LEE:  YOUR HONOR, JUST ONE THING.  AS

13      THE NEW EXHIBITS ARE COMING IN FOR TOMORROW, I

14      THINK YOUR HONOR STILL HAS ON YOUR PLATE THE

15      WILLIAMS --

16          THE COURT:  I DO.

17          MR. LEE:  OKAY.

18          THE COURT:  I'LL TRY TO GET THAT OUT --

19      IT'LL DEFINITELY GO OUT TODAY.

20          MR. LEE:  OKAY.  THANK YOU.

21          THE COURT:  THANK YOU.

22          (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

23

24

25

1        **AFTERNOON SESSION**

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  OKAY.  THANK YOU.  PLEASE

5     TAKE A SEAT.

6              (WHEREUPON, THE FOLLOWING PROCEEDINGS

7     WERE HELD IN THE PRESENCE OF THE JURY:)

8              THE COURT:  ALL RIGHT.  PLEASE TAKE A

9     SEAT.

10             THE TIME IS NOW 1:00 O'CLOCK.  GO AHEAD,

11    PLEASE.

12             MR. PRICE:  THANK YOU.

13    Q    DR. MUSIKA, WE WERE TALKING ABOUT PRICES AND I

14    WANT TO ASK YOU ABOUT SOMETHING YOU SAID IN YOUR

15    DIRECT WHERE YOU SAID THAT YOU RELIED ON

16    DR. HAUSER.

17    A    YES.

18    Q    DID YOU TALK TO HIM FOR MORE THAN ONE AND A

19    HALF MINUTES?

20    A    YES.

21    Q    NOW, LET ME ASK YOU SOME SPECIFICS ABOUT YOUR,

22    YOUR METHODOLOGY, AND I'M GOING TO STICK ON APPLE'S

23    LOST PROFITS, OKAY?

24             AND IN PARTICULAR, I WANT TO ASK YOU

25    ABOUT -- OH, ONE THING.  YOU'RE NOT SEEKING ANY

```
1    LOST PROFITS AT ALL FOR THE ICON, OR THE DESIGN

2    PATENT D'305; CORRECT?

3    A    THAT'S THE SO-CALLED GUI PATENTS?

4    Q    SURE.

5    A    I'D HAVE TO LOOK, BUT THERE IS --

6    Q    THE ONE WITH THE ICONS.

7    A    YES, YES.

8    Q    OKAY.

9    A    YOU ARE CORRECT.

10   Q    AND SO LET'S LOOK AT -- WE SHOWED YOU THE

11   CAPTIVATE THIS MORNING, WHICH IS EXHIBIT 1011.  I

12   DON'T KNOW IF IT'S MADE ITS WAY BACK IN FRONT OF

13   YOU.

14   A    NO, IT'S NOT HERE.

15   Q    OH, IT'S RIGHT THERE.

16             YOUR HONOR, MAY I APPROACH?

17             THE COURT:  YES, PLEASE.

18   BY MR. PRICE:

19   Q    SO I WANT TO TALK TO YOU ABOUT YOUR

20   CALCULATION FOR LOST PROFITS OF THE CAPTIVATE.

21             YOUR RECORDS SHOW THIS WAS RELEASED IN

22   JULY 2010; CORRECT?

23   A    I DON'T REMEMBER.

24   Q    WELL, LET ME ASK YOU TO ASSUME THAT, THAT THE

25   RECORDS SHOW IT WAS RELEASED IN 2010.
```

1           NOW, TO GET SALES, OBVIOUSLY APPLE HAD TO

2      BE ABLE TO MAKE PRODUCT FOR SOMEONE WHO WAS GOING

3      TO LEAVE SAMSUNG AND BUY AN IPHONE; RIGHT?

4      A    YES.

5      Q    OKAY.  AND AS OF JULY 2010, THIS WAS ONE OF

6      SAMSUNG'S, YOU KNOW, LATEST AND GREATEST NEW

7      PHONES; RIGHT?  WHATEVER DATE IT CAME OUT?

8      A    YES.

9      Q    OKAY.  AND YOU -- AND BEFORE PREPARING YOUR

10     SUPPLEMENTAL REPORT, YOU READ THE DEPOSITION

11     TESTIMONY OF TONY BLEVINS; CORRECT?

12     A    I DID.

13     Q    MR. BLEVINS WAS PRESENTED AS A CORPORATE

14     REPRESENTATIVE ON THE ISSUE OF APPLE'S CAPACITY AND

15     ABILITY TO MANUFACTURE PHONES; CORRECT?

16     A    YES.

17     Q    AND MR. BLEVINS TESTIFIED THAT THERE WERE BACK

18     ORDERS FOR THE IPHONE 4 FROM JUNE THROUGH SEPTEMBER

19     2010.  DO YOU RECALL THAT?

20     A    YES.

21     Q    AND HE SAID THAT'S BECAUSE DEMAND EXCEEDED

22     THEIR ABILITY TO PRODUCE THEM DURING JUNE THROUGH

23     SEPTEMBER OF 2010; CORRECT?

24     A    YES.

25     Q    AND HE SPECIFICALLY SAID THAT IN ORDER TO TRY

1    TO INCREASE THE SUPPLY, HE CONTACTED COMPONENT

2    SUPPLIERS, TRIED TO EXPEDITE SHIPPING, AND THAT

3    NONETHELESS, HE WASN'T ABLE TO PROVIDE THE SUPPLY

4    BETWEEN JUNE AND SEPTEMBER OF 2010; CORRECT?

5    A    WELL, WHAT DO YOU MEAN BY -- WHEN YOU SAY HE

6    WASN'T ABLE TO PROVIDE SUPPLY?  THERE WERE --

7    Q    OF THE IPHONE 4.

8    A    THEY DID CERTAINLY PROVIDE SALES OF THE IPHONE

9    4.  I DON'T REMEMBER EXACTLY WHEN IT WAS LAUNCHED.

10          ARE YOU SAYING THERE WAS A DATE AT WHICH

11   THERE WERE NO IPHONE 4'S FOR SALE?

12   Q    LET ME ASK IT THIS WAY:  DID MR. BLEVINS

13   TESTIFY THAT APPLE DID EVERYTHING IT COULD TO

14   INCREASE THE SUPPLY OF THE IPHONE 4 FROM JUNE OF

15   2010 UNTIL ABOUT SEPTEMBER OF 2010 SO THAT THEY

16   COULD MEET DEMAND?

17   A    I DON'T REMEMBER HIS EXACT TESTIMONY, BUT

18   SOMETHING TO THAT EFFECT, YES.

19   Q    AND FROM ABOUT JUNE OF 2010 TO SEPTEMBER OF

20   2010, APPLE DID NOT HAVE EXCESS SUPPLY OF THE APPLE

21   IPHONE 4; CORRECT?

22   A    JUNE OF 2010 UNTIL WHEN?

23   Q    SEPTEMBER OF 2010.

24          ACTUALLY, LET ME REPHRASE THAT AND LOOK

25   AT THE NEXT QUESTION.

1              FROM JUNE 2010 UNTIL OCTOBER OF 2010,

2    APPLE DID NOT HAVE EXCESS SUPPLY OF THE IPHONE 4;

3    CORRECT?

4    A    I'M JUST LOOKING.

5    Q    IF YOU WANT TO LOOK AT HIS DEPOSITION

6    TESTIMONY, IT'S IN THE GREEN BINDER DATED APRIL 3,

7    2012.

8    A    OKAY.

9    Q    THAT'S THE TESTIMONY COLLECTION HERE.  IT

10   SHOULD BE THE LAST TAB THERE, PAGE 17, LINES 1

11   THROUGH 7.  DO YOU SEE THAT?

12   A    YES, I DO.

13   Q    SO BETWEEN JUNE OF 2010 THROUGH OCTOBER OF

14   2010, APPLE DID NOT HAVE EXCESS SUPPLY OF THE

15   IPHONE; CORRECT?

16   A    THAT'S CORRECT.

17   Q    IPHONE 4?

18   A    THAT'S CORRECT.

19   Q    SO IF WE LOOK AT YOUR -- AT THE CALCULATION

20   HERE, YOU CALCULATED THE PROFIT ON THIS PHONE -- IF

21   WE CAN PUT UP DEMONSTRATIVE 3909.4 -- AND WE CAN GO

22   THROUGH THIS TO 5, AND THEN -- WHAT NUMBERS ARE

23   THESE?  LET'S JUST KEEP GOING TO 49.  GO ON TO 50

24   AND JUST DO THE SUMMARY.  OKAY.  RIGHT THERE.

25              SO IN YOUR REPORT, EXHIBIT 17.2-S, YOU'VE

1    GOT SALES AND PROFITS FOR SALES FOR THE SAMSUNG

2    GALAXY S CAPTIVATE TOTALING ABOUT $199 MILLION.  DO

3    YOU SEE THAT?

4    A    I DO.

5    Q    AND THAT'S WHAT APPLE WOULD, YOU BELIEVE,

6    WOULD HAVE GOTTEN IN PROFITS BECAUSE IT WOULD HAVE

7    SOLD MORE PHONES; CORRECT?

8    A    I DON'T REMEMBER THE EXACT NUMBERS, BUT I

9    THINK THIS IS PROBABLY ACCURATE, YES.

10   Q    AND THIS IS A TIME WHEN APPLE COULDN'T EVEN

11   SERVICE ITS OWN CUSTOMERS FOR THE IPHONE 4;

12   CORRECT?

13   A    WELL, YES, WITH THE IPHONE 4.  THEY HAD

14   AVAILABLE IPHONES, BUT NOT THE IPHONE 4.

15   Q    SO APPLE COULDN'T SERVICE ITS OWN CUSTOMERS

16   FOR THE IPHONE 4, BUT IT COULD SERVICE THE

17   CUSTOMERS IT DIDN'T HAVE, THAT IT WOULD HAVE GOTTEN

18   FROM SAMSUNG DURING THAT SAME TIMEFRAME?

19   A    IPHONE 3'S, 3G, NOT IPHONE.

20   Q    OH.  SO NOW YOU'RE -- SO YOU'RE SAYING -- TO

21   GET TO YOUR $199 MILLION FIGURE HERE, YOU'RE SAYING

22   THAT CUSTOMERS WOULD HAVE GIVEN UP THEIR SAMSUNG,

23   FOR EXAMPLE, BECAUSE IT DIDN'T HAVE A BOUNCE, AND

24   GONE TO APPLE AND BOUGHT AN OLD MODEL THAT THE

25   WORLD -- WHEN THE WORLD WAS WAITING FOR THE IPHONE

1     4?

2     A    THERE'S A LOT IN THAT QUESTION.  I DON'T THINK

3     THE WHOLE WORLD WAS WAITING FOR IT.  I BOUGHT AN

4     IPHONE 4, FOR EXAMPLE, WHEN THE 4S CAME OUT BECAUSE

5     IT WAS CHEAPER AND I'M A LITTLE CHEAP MAYBE.  BUT

6     I -- I WENT AHEAD AND BOUGHT IT.

7            SO THERE CERTAINLY ARE PEOPLE OUT THERE

8     WHO BUY, AND APPLE CONTINUED TO SELL THE IPHONE 3

9     AND THE IPHONE 3G DURING THAT PERIOD OF TIME.

10           SO FACED WITH THAT OPTION, WOULD SOME

11    PERCENTAGE OF THE CONSUMERS HAVE PURCHASED THE

12    IPHONE 3 OR IPHONE 3G, PARTICULARLY SINCE IT WAS

13    CHEAPER?  YES, I THINK THEY WOULD HAVE.

14    Q    WELL, THIS PARTICULAR CONSUMER, YOU SAID,

15    BOUGHT THE CAPTIVATE, WHICH WAS SAMSUNG LATEST AND

16    GREATEST PHONE, THE NEXT NEW THING IN JULY THROUGH

17    OCTOBER OF 2010, AND YOU'RE SAYING THAT, TO THE

18    TUNE OF $199 MILLION, THEY WOULD HAVE GIVEN UP THAT

19    PHONE BECAUSE IT LACKED BOUNCE BACK AND BOUGHT, NOT

20    THE LATEST AND GREATEST, BUT A PHONE THAT WAS A

21    YEAR OLD AT APPLE WHEN APPLE COULDN'T MAKE THE

22    IPHONE 4, ANYMORE?

23    A    THAT'S SOMEWHAT OF A LARGE STATEMENT.  I

24    DIDN'T SAY EXCLUSIVELY BECAUSE OF THE BOUNCE.

25    Q    SO I WANT -- ANYWAY, THIS IS PART OF YOUR

1    ANALYSIS.  WE DIDN'T GO INTO MUCH DETAIL, BUT YOU

2    DID SOME ANALYSIS ON CAPACITY; RIGHT?

3    A    I DID.

4    Q    AND YOU HAD TO RELY ON MR. BLEVINS' TESTIMONY,

5    IN PART, BECAUSE OF THAT; CORRECT?

6    A    THAT'S CORRECT.

7    Q    AND MR. BLEVINS' TESTIMONY ABOUT THEIR

8    CAPACITY; RIGHT?

9    A    YES.

10   Q    AND HIS ANALYSIS ASSUMED THAT A WORKER -- THAT

11   ASSUMED 19 TO 20 HOUR WORKDAYS SIX DAYS A WEEK;

12   RIGHT?

13   A    SAY THAT AGAIN.  19 --

14   Q    HIS ANALYSIS FOR CAPACITY, THAT IS, ENOUGH

15   CAPACITY TO MAKE PHONES ASSUMED 19 TO 20 HOUR

16   WORKDAYS SIX DAYS A WEEK?

17   A    NOT FOR THE SAME WORKER.  THAT'S SHIFTS.

18   Q    THAT'S NOT THE SAME WORKER?

19   A    I DON'T THINK SO, NO.

20   Q    OKAY.  LET ME ASK YOU, AGAIN, A LITTLE BIT,

21   SINCE WE HAVEN'T GONE INTO MUCH DETAIL, I JUST WANT

22   TO HIGHLIGHT A FEW DETAILS.

23          FOR THE IPAD, IN DOING LOST PROFITS, YOU

24   DID A MARKET CALCULATION, AGAIN, TO TRY TO GIVE A

25   NUMBER AS TO HOW MANY PEOPLE WOULD LEAVE THE TABLET

```
1    AND GO TO THE IPAD; CORRECT?

2    A    YES.

3    Q    AND TO DO THAT, YOU HAD TO DO ANALYSIS AS TO

4    WHO HAD MARKET SHARE IN THAT MARKET, THE SAME

5    MARKET AS THE IPAD AND THE GALAXY --

6    A    YES.

7    Q    SO IF WE LOOK AT YOUR TESTIMONY AT 2582 OF

8    YOUR REPORT -- I'M SORRY, IT'S EXHIBIT 2582.  IT IS

9    AT 19, PAGE 19 --

10   A    I'M SORRY.  WHAT'S THE EXHIBIT NUMBER?

11   Q    IT'S 2582, THAT'S YOUR REPORT.  AND IF YOU GO

12   TO PAGE, I THINK IT'S 19, AND --

13   A    EXCUSE ME.  WOULD THAT BE IN THE GREEN BINDER?

14   Q    NO, THAT'S THE NORMAL BLACK BINDER, I THINK.

15   THAT'S DOCUMENTS.

16        DO YOU HAVE A COPY OF YOUR REPORT UP

17   THERE WITH YOU?  MAYBE YOUR COUNSEL MIGHT HAVE

18   GIVEN YOU YOUR OWN COPY.

19   A    NO, I DON'T.  I DON'T THINK IT'S IN HERE.

20   Q    IT IS THE BLUE BINDER I'M TOLD.

21   A    GREEN BINDER?

22   Q    BLUE.

23   A    BLUE?

24   Q    YES.

25   A    OKAY.  ALL RIGHT.  HERE WE GO.
```

```
1    Q    AND WHILE YOU'RE LOOKING, IF I CAN ASK THAT

2    THIS BE BLOWN UP, LINES 6 THROUGH 9.

3    A    ALL RIGHT, I'M THERE.

4    Q    AND DO YOU SEE, BARNES & NOBLE SOLD THE NOOK

5    COLOR AT THE TIME YOU DID YOUR ANALYSIS; CORRECT?

6    A    YES, FOR PART OF THE TIME.  NOT THE WHOLE

7    TIME.  FOR PART OF THE TIME.

8    Q    AND, IN FACT, DURING PART OF THE TIME THEY HAD

9    ABOUT 21 PERCENT OF THE MARKET, 21.9?

10   A    I DON'T REMEMBER EXACTLY WHAT THE MARKET SHARE

11   WAS.

12   Q    AND HERE YOU SAY, "FURTHER, WHILE THE

13   BARNES & NOBLE NOOK COLOR AND THE KINDLE FIRE HAVE

14   CHANGED THE DYNAMICS OF THE MARKET, THESE PRODUCTS

15   BY AND LARGE COMPETE IN A DIFFERENT SEGMENT OF THE

16   TABLET MARKET THAN SAMSUNG AND APPLE.  ACCORDINGLY,

17   I HAVE REMOVED THEIR CORRESPONDING UNITS FROM MY

18   ANALYSIS OF IDC'S MEDIA TABLET DATA."

19            DO YOU SEE THAT?

20   A    I DO.

21   Q    AND IDC, THAT'S THE SOURCE OF THE, OF A LOT OF

22   THE INFORMATION YOU GAVE US ON MARKET SHARE AND

23   THINGS LIKE THAT?

24   A    CORRECT.

25   Q    RIGHT?  AND WAS THIS -- DID YOU ALSO TALK WITH
```

1    MR. VAN LIERE AND MR. PORET?

2    A    I THINK I DID, BUT NOT ON THIS POINT, NO, NOT

3    THAT I CAN RECALL.

4    Q    SO YOU DIDN'T TALK ABOUT WHETHER IT WAS

5    APPROPRIATE -- WHETHER THE BARNES & NOBLE NOOK WAS

6    EVEN IN THE SAME MARKET AS THE IPHONE, IPAD, OR THE

7    GALAXY TAB?  YOU DIDN'T HAVE ANY DISCUSSIONS ABOUT

8    THAT?

9    A    NO.  IDC DIDN'T INCLUDE IT FOR THE ENTIRE TIME

10   AND CHANGED THEIR ANALYSIS MID-WAY THROUGH THE

11   DAMAGES PERIOD AND PUT IT IN.

12            BUT THEY -- "THEY" BEING IDC -- DIDN'T

13   HAVE THE E-READERS IN THE MARKET EARLIER.  SO TO

14   KEEP IT CONSISTENT, I TOOK THEM OUT OF A LATER

15   PERIOD.

16   Q    BY THE WAY, TAKING THEM OUT OF THE PERIOD IN

17   YOUR ANALYSIS WOULD INCREASE APPLE'S MARKET SHARE

18   AND WOULD INCREASE THE DAMAGES NUMBERS?

19   A    SLIGHTLY, YES, VERY SLIGHTLY.  BUT, YES, IT

20   WOULD.

21   Q    SO LET ME ASK YOU NOW ABOUT, ABOUT SOME OF THE

22   DOCUMENTS YOU WERE TALKING ABOUT.  AND IN

23   PARTICULAR, YOU WERE SHOWN EXHIBIT, I THINK IT'S

24   34, PX 34 --

25            THE COURT:  I'M SORRY.  LET ME STOP YOU

1      ONE SECOND.  IT'S 1:13.  I HAVE -- I'M SORRY.

2              WE'RE GOING TO HANDLE THE RULE 50 ORALLY.

3      I JUST WANTED TO GIVE EVERYONE NOTICE, OKAY?

4      BECAUSE IT'S NOT GOING TO BE BRIEFED.  I'VE SEEN

5      ALL THE MOTIONS THAT WERE FILED OVER LUNCH, AND I

6      AM NOT GOING TO TAKE ANY BRIEFS ON THAT.

7              GO AHEAD.

8              MR. PRICE:  OKAY.

9              THE COURT:  IT'S 1:14.  GO AHEAD.

10     BY MR. PRICE:

11     Q    SO LET'S LOOK AT -- AND YOU SEE THIS DOCUMENT

12     SAYS "FEASIBILITY REVIEW ON STANDALONE AP BUSINESS

13     FOR SMARTPHONE MARKET."  DO YOU SEE THAT?

14     A    I DO.

15     Q    NOW, YOU KNOW THAT SAMSUNG MAKES A LOT OF

16     THINGS, TV'S, OH, GOSH, A WHOLE LIST OF THINGS THAT

17     YOU SEE SAMSUNG'S NAME ON; RIGHT?

18     A    ABSOLUTELY.

19     Q    AND THEY MAKE COMPUTERS, THEY MAKE MEMORY

20     CHIPS; CORRECT?

21     A    ALL TRUE, YES.

22     Q    OKAY.  AND WHAT AP HERE REFERS TO IS AN

23     APPLIED PROCESSOR; RIGHT?

24     A    THAT'S MY UNDERSTANDING.

25     Q    SO THIS IS A REPORT THAT'S NOT DONE BY THE

1     AREA THAT MAKES AND MANUFACTURES THESE PHONES, BUT

2     BY THE AREA THAT MANUFACTURES PARTS TO BE SOLD TO

3     PEOPLE LIKE NOKIA, OTHER PHONE COMPANIES; RIGHT?

4     A    YES.  AT THE TIME SAMSUNG WASN'T REALLY IN THE

5     SMARTPHONE MARKET, SO I WOULD AGREE.

6     Q    OKAY.  SO -- I MEAN, SAMSUNG DID SELL PHONES;

7     RIGHT?

8     A    FEATURE PHONES, YES.

9     Q    BUT THIS ISN'T EVEN RELATED TO FEATURE PHONES.

10    THIS IS THE PART OF SAMSUNG'S BUSINESS THAT SELLS,

11    IN THIS CASE, A PROCESSOR, KIND OF THE BRAIN, YOU

12    KNOW, TO OTHER COMPANIES; RIGHT?

13    A    WELL, MY ANSWER WOULD BE YES TO OTHER

14    COMPANIES, BUT YES TO ITSELF AS WELL.  SO THE

15    CONSIDERATION WAS, WHAT'S THE FEASIBILITY OF THE

16    APPLICATION PROCESSOR IN THE SMARTPHONE MARKET, FOR

17    SAMSUNG AS WELL AS FOR ANYBODY ELSE WHO MIGHT BUY

18    IT FROM SAMSUNG.  SO I DON'T THINK IT'S ONE WAY OR

19    THE OTHER, I SUPPOSE.

20    Q    SO SAMSUNG WOULD MAKE THEM FOR THEMSELVES AND

21    FOR OTHERS?

22    A    YES.

23    Q    INCLUDING OTHERS THAT YOU MIGHT THINK ARE ITS

24    COMPETITORS?

25    A    INCLUDING?

1    Q    INCLUDING FOR OTHERS THAT YOU MIGHT THINK ARE

2    ITS COMPETITORS?

3    A    YES, YES.

4    Q    JUST AS THEY SOLD THINGS, HARDWARE TO APPLE

5    FOR THE IPHONE; CORRECT?

6    A    CORRECT.

7    Q    OKAY.  SO IF WE CAN GO TO -- I THINK YOU

8    LOOKED AT PAGE 34.37.  IT SAYS PAGE 37 ON IT.

9              AND THIS IS THE "IPHONE EFFECT ANALYSIS"?

10   A    YES.

11   Q    AND IT SAYS "PROMOTE POPULARIZATION OF

12   SMARTPHONES BY STRENGTHENING MULTIMEDIA FUNCTIONS

13   SUCH AS FULL BROWSING PLUS PMP."  RIGHT?

14   A    YES.

15   Q    YOU UNDERSTOOD WHAT SAMSUNG WAS TRYING TO DO

16   WAS TO PROMOTE AT LEAST THIS PART OF ITS BUSINESS

17   TO PROMOTE PEOPLE TO MAKE SMARTPHONES TO INCLUDE

18   FUNCTIONS THAT WOULD BE IN SAMSUNG'S PROCESSOR?

19   A    I AGREE.

20   Q    AND IT SAYS HERE, "STIMULATE ENHANCING AND

21   UPGRADING HW PERFORMANCE FOR OTHER COMPETITORS'

22   SMARTPHONE MULTIMEDIA FEATURES."  CORRECT?

23   A    CORRECT.

24   Q    AND WHAT IT'S SAYING THERE IS WE WANT OUR

25   COMPETITORS, YOU KNOW, TO UPGRADE THEIR HARDWARE

1    PERFORMANCE SO THAT WE CAN SELL THEM OUR, OUR

2    BRAIN, OUR PROCESSOR.

3    A    I'M SORRY.  I DIDN'T HEAR A QUESTION.

4    Q    OKAY.  ISN'T IT TRUE -- SOMETIMES THAT'S JUST

5    THE WAY I DO IT AT THE END THERE.  I'LL STRIKE

6    THAT.

7              ISN'T IT TRUE THAT YOUR UNDERSTANDING OF

8    THIS IS THAT SAMSUNG WANTED TO STIMULATE ITS

9    COMPETITORS TO UPGRADE THEIR HARDWARE SO THAT

10   SAMSUNG COULD SELL THOSE COMPETITORS ITS BRAIN, ITS

11   PROCESSOR?

12   A    THEY'RE STIMULATING THE DEMAND FOR

13   SMARTPHONES, THAT IS CORRECT.

14   Q    YEAH.  AND, AND IT'S SO THEY CAN, SAMSUNG CAN

15   SELL THE PROCESSOR; RIGHT?

16   A    YES.

17   Q    SO IT WANTS ITS COMPETITORS TO COME OUT WITH,

18   YOU KNOW, MULTIMEDIA FEATURES AND THINGS LIKE THAT;

19   RIGHT?

20   A    YES.

21   Q    AND SO WE GO DOWN HERE, "HW PORTION:  EASY TO

22   COPY."  DO YOU SEE THAT?

23   A    YES, I DO.

24   Q    ACTUALLY, WHAT I HAVE IN MY BOOK IS "EASE OF

25   IMITATION."  SO LET'S PUT UP WHAT THEY PUT UP,

1    WHICH IS A SLIGHTLY DIFFERENT TRANSLATION.

2              DO YOU HAVE THEIR VERSION?

3              COULD WE HAVE YOU GUYS PUT YOUR VERSION

4    UP IF WE SWITCH?  IT WAS EXHIBIT 34.37.

5              MR. MCELHINNY:  WHAT IS THAT NUMBER?

6              MR. PRICE:  THIS IS -- THIS IS WHAT'S IN

7    MY BOOK.

8              MR. MCELHINNY:  I'M SORRY.  FOR THE

9    RECORD, WHAT'S THE IDENTIFICATION NUMBER THAT

10   YOU'RE SHOWING?

11             MR. PRICE:  PLAINTIFF'S EXHIBIT NUMBER

12   34.37.  THAT WAS IN MY BOOK THAT YOU GAVE ME THIS

13   MORNING.

14             CAN WE SWITCH?  CAN WE SWITCH THE FEED TO

15   THEM?  CAN WE SWITCH TO THE ELMO?

16             MS. KREVANS:  HE'S PUTTING IT UP FOR YOU,

17   MR. PRICE.

18             MR. PRICE:  AH, THANK YOU.  OKAY.  THANK

19   YOU.  CAN YOU BLOW THAT UP A LITTLE BIT SO WE CAN

20   SEE IT BETTER?

21   Q   OKAY.  THIS SAYS "HW PORTION:  EASE OF

22   IMITATION."  AND YOU SEE IT SAYS TOUCHSCREEN, U/I,

23   DISPLAY/VIDEO RESOLUTION, VGA, WVGA, PERFORMANCE,

24   FLASH MEMORY, CAPACITY, MOTION PROXIMITY, LIGHT

25   SENSORS.  DO YOU SEE THAT?

1   A    I DO.

2   Q    YOU UNDERSTAND WHEN IT SAYS HW, THAT'S TALKING

3   ABOUT THE HARDWARE THAT YOU GET FROM SUPPLIERS;

4   RIGHT?

5   A    I UNDERSTAND HW TO STAND FOR HARDWARE, YES.

6   Q    THIS DOES NOT STAND FOR DESIGN, DOES IT, HW?

7   A    UM --

8   Q    IN YOUR UNDERSTANDING?

9   A    I DON'T HAVE AN UNDERSTANDING BEYOND WHAT IT

10  SAYS ON THE SCREEN THERE.

11  Q    RIGHT.  AND FROM WHAT IT SAYS ON THE SCREEN,

12  WHICH TALKS ABOUT COMPONENTS, LIKE THE TOUCHSCREEN,

13  U/I, THE VIDEO RESOLUTION, THE FLASH MEMORY AND ALL

14  THAT, WHAT THEY'RE TALKING ABOUT IS THEIR

15  COMPETITORS' HARDWARE PERFORMANCE SO THEY CAN SELL

16  THEIR MEMORY CHIPS; RIGHT?

17  A    AS A GENERAL POINT ABOUT THIS DOCUMENT, YES,

18  THAT -- I WOULD AGREE WITH YOU, THAT IS PART OF THE

19  CONSIDERATION, TO STIMULATE DEMAND FOR SMARTPHONES,

20  I DO AGREE WITH THAT.

21  Q    AND YOU WOULD AGREE THAT IT WOULD BE INCORRECT

22  AND MISLEADING TO SUGGEST THAT THIS IS SAYING THAT

23  SAMSUNG'S COMPETITORS SHOULD COPY APPLE'S IPHONE

24  DESIGNS?

25           LOOK AT ME, NOT OVER THERE, OKAY?  I'M

```
1     ASKING THE QUESTION, NOT YOUR COUNSEL.

2          YOU WOULD AGREE WITH ME, IT WOULD BE

3     MISLEADING AND IMPROPER TO SUGGEST THAT THIS IS

4     SAYING THAT, THAT THE IPHONE DESIGN THAT'S -- THAT

5     THEY HAVE A PATENT ON OR THE TRADE DRESS, SHOULD BE

6     COPIED?

7     A    I DON'T THINK I EVER SAID THAT, OR EVEN

8     TESTIFIED AT ALL CONCERNING THIS PARTICULAR PAGE.

9     Q    OKAY.  SO, SO -- AND YOU WOULDN'T TESTIFY TO

10    THAT BECAUSE THAT WOULD BE MISLEADING TO SUGGEST

11    THAT; RIGHT?

12    A    IT WOULD BE BEYOND MY ROLE HERE IN CALCULATING

13    DAMAGES TO TALK ABOUT WHETHER OR NOT SAMSUNG COPIED

14    OR NOT.  THAT'S JUST NOT MY ROLE IN THIS CASE ONE

15    WAY OR THE OTHER.

16    Q    WELL, YOU DON'T READ THIS AS SUGGESTING THAT,

17    THAT SAMSUNG OR ITS COMPETITORS COPY APPLE'S

18    DESIGNS?

19    A    IT'S NOT SOMETHING I'VE TESTIFIED TO, NOR DO I

20    FEEL COMFORTABLE TESTIFYING ONE WAY OR THE OTHER TO

21    IT.  IT'S JUST BEYOND THE SCOPE OF MY ROLE AND

22    EXPERTISE.  I'M NOT HERE TO TALK ABOUT WHETHER

23    THERE'S LIABILITY OR WHETHER THEY COPIED.

24    Q    BUT -- NO, NO.  BUT YOU PUT UP PAGES, YOU

25    INTERPRETED THEM, YOU READ THEM.  YOU CAN READ.
```

1          YOU DID THAT IN YOUR DIRECT; RIGHT?

2     A    I READ THE PAGES THAT HAD TO DO WITH DEMAND,

3     AND IN PARTICULAR HERE, DEMAND FOR THE IPHONE AND

4     DEMAND FOR A PARTICULAR DESIGN WHERE IT SAYS

5     DESIGN.

6          BUT I DIDN'T TAKE PAGES WHERE IT DOESN'T

7     SAY THAT AND SAY THAT THEY ARE EASY TO COPY THE

8     DESIGN.

9     Q    OKAY.  SO I'M JUST SAYING, AS SOMEONE WHO'S

10    READ A LOT OF THIS SORT OF STUFF, I MEAN, THESE

11    KINDS OF PRESENTATIONS, LOTS OF PRESENTATIONS THAT

12    APPLE AND SAMSUNG MADE, THAT DOESN'T HAVE ANYTHING

13    TO DO WITH DESIGN, DOES IT?  I MEAN, JUST, COME ON,

14    TELL US WHAT YOU THINK.

15    A    I THINK YOU'RE WORRIED ABOUT IT, THAT IT SAYS

16    EASY TO IMITATE OR COPY, AND YOU WANT ME TO SAY

17    SOMETHING ABOUT IT OR NOT AND I -- IT'S NOT WHAT I

18    WAS ASKED TO DO.  IT'S NOT MY ROLE IN THIS CASE.  I

19    DON'T HAVE ANY EXPERTISE ABOUT THAT.  I'M NOT A

20    LAWYER.  I'M NOT AN ENGINEER.  I'M NOT A DESIGN

21    EXPERT.  I'M A FINANCIAL EXPERT.

22    Q    WELL, ANOTHER DOCUMENT YOU LOOKED AT WAS 194,

23    AND THIS WAS DATED MARCH 2010.  AND I WANT TO ASK

24    YOU ABOUT THIS.

25          OBVIOUSLY THE IPHONE WAS PRETTY

1    SUCCESSFUL.

2    A    PRETTY?

3    Q    PRETTY SUCCESSFUL.

4    A    YES, IT WAS.  IS.

5    Q    AND APPLE BECAME, YOU KNOW, EARLY ON,

6    BASICALLY THE TOP SELLER IN THE SMARTPHONE MARKET?

7    A    THEY WERE FOR A WHILE, YES.

8    Q    AND YOU WOULD EXPECT COMPETITORS TO LOOK AT

9    EACH OTHER, THIS ONE IS DOING REALLY WELL, AND YOU

10   WOULD EXPECT THEM TO LOOK AT EACH OTHER'S PRODUCTS

11   AND EVALUATE THEM; RIGHT?

12   A    I WOULD.

13   Q    AND THINGS LIKE -- WE CAN GO TO, RIGHT HERE,

14   "THIS IS BEING INTERPRETED AS INSTRUCTION TO THINK

15   ABOUT AND DECIDE ALL MATTERS FROM THE PERSPECTIVE

16   OF THE USER (NOT SUPPLIERS OR PROVIDERS)."

17        DO YOU SEE THAT?

18   A    I DO.

19   Q    "THE MOST REPRESENTATIVE EXAMPLE IS OBVIOUSLY

20   THE IPHONE."

21        DO YOU SEE THAT?

22   A    YES.

23   Q    AT ONE POINT, THE MANUFACTURERS WERE MAKING

24   THEIR PHONES FOR THE VARIOUS CARRIERS, THE

25   CARRIER'S PHONE DESIGN AND THAT WAS A BIG PART OF

1    THE PROCESS; RIGHT?

2    A    YES.

3    Q    AND APPLE WENT TO AT&T AND APPLE, ONE OF THE

4    THINGS IT DID WAS TO MAKE ITS PHONES AND THINK

5    ABOUT -- KIND OF IGNORE WHAT THE CARRIERS WANTED

6    AND LOOK AT WHAT THE CONSUMER WANTED?  SOMEWHAT?

7    A    IS THAT -- THAT'S A QUESTION?

8    Q    YES.

9    A    IS THAT WHAT APPLE DID?

10   Q    YEAH.

11   A    I DON'T KNOW.  I DON'T THINK THEY IGNORED WHAT

12   THE CARRIERS WANTED.  I DON'T KNOW.

13   Q    AND YOU WOULD AGREE THAT ONE THING YOU SHOULD

14   DO AS A COMPETITOR IS LEARN FROM YOUR COMPETITION;

15   RIGHT?

16   A    THAT WOULD BE A GOOD THING, SURE.

17   Q    SO, FOR EXAMPLE, IF YOU DISCOVER YOUR

18   COMPETITION IS SELLING A LOT OF PHONES BY

19   INCREASING ITS SCREEN SIZE, THEN YOU MIGHT THINK,

20   "HEY, SHOULD WE INCREASE OUR SCREEN SIZE?"

21   A    WELL, UNLESS THAT COMPETITOR HAS INTELLECTUAL

22   PROPERTY PROTECTION ON THE SCREEN SIZE, THEN YOU

23   SHOULDN'T DO THAT.

24   Q    RIGHT.  UNLESS YOUR COMPETITOR HAS THE

25   EXCLUSIVE RIGHT TO PREVENT EVERYBODY ELSE FROM

```
 1    DOING IT WHO HASN'T LICENSED, THEN YOU WOULD WANT
 2    TO LOOK AT HOW WELL YOUR COMPETITOR IS DOING AND
 3    SAY, "HEY, CONSUMERS LIKE A BIGGER SCREEN.  I MIGHT
 4    DO A BIGGER SCREEN."  RIGHT?
 5    A    YES.
 6    Q    OR "CONSUMERS LIKE A SEVEN INCH AS OPPOSED TO
 7    A TEN INCH TABLET, MAYBE I SHOULD DO A SEVEN INCH
 8    TABLET."  RIGHT?
 9    A    YES.
10    Q    AND SAMSUNG DID THE SEVEN INCH TABLET?
11    A    THEY DID.
12    Q    AND YOU KNOW THAT IBM -- I'M SORRY -- THAT
13    APPLE INTERNALLY DISCUSSED, "MAYBE WE SHOULD DO A
14    SEVEN INCH TABLET"?
15    A    I DON'T HAVE A RECOLLECTION.  I DON'T
16    REMEMBER.
17    Q    OKAY.  AND IF WE CAN GO ON DOWN HERE TO THIS
18    PARAGRAPH, "IN THE END, WE MUST LEARN THROUGH THE
19    LESSONS OF THE IPHONE THAT JUST PROVIDING EVERY
20    GOOD FEATURE ISN'T THE WAY TO GO ABOUT IT.
21    ALTHOUGH EVERYONE WOULD AGREE WITH THIS, WE WOULD
22    FACE HUGE OBSTACLES."
23            AND IT GOES ON AT THE END, AT THE NEXT
24    PARAGRAPH, SAYING, "I'M NOT SAYING TO MAKE A UX" --
25    AND YOU UNDERSTAND THAT'S USER INTERFACE; RIGHT?
```

1    A    YES.

2    Q    -- "THAT IS EXACTLY IDENTICAL TO THE IPHONE,

3    BUT I AM SAYING TO LEARN THE WISDOM OF THE IPHONE

4    AND RECOGNIZE THE STANDARD OF THE INDUSTRY WHICH

5    WAS SET BY THEM ALREADY."

6              DO YOU SEE THAT?

7    A    I DO.

8    Q    OKAY.  AND THAT'S EXACTLY WHAT A COMPETITOR IS

9    SUPPOSED TO DO?  IT'S SUPPOSED TO LOOK AT WHAT ITS

10   COMPETITION DOES WELL AND TRY TO DO AS GOOD OR

11   BETTER, UNLESS IT'S PREVENTED BY SOME -- BY

12   SOMETHING FROM DOING THAT, LIKE UNLESS APPLE HAS

13   THE EXCLUSIVE RIGHT; RIGHT?

14   A    THAT'S CORRECT.

15   Q    FOR EXAMPLE, IF WE GO DOWN HERE TO NUMBER 4,

16   ONE OF THE THINGS HE SAYS IS "SHALL WE OFFER ALL OF

17   DELTA AS A FUNCTION, WHICH HAS MORE FUNCTIONALITY

18   THAN THE IPHONE?"

19              RIGHT?  DO YOU SEE THAT?

20   A    I DO.

21   Q    AND SO HE'S THINKING, SHOULD WE DO SOME OF

22   THESE THINGS?  RIGHT?  THAT'S WHAT COMPETITORS

23   SHOULD DO IN THE MARKET?

24   A    CAN DO, YES.

25              MR. PRICE:  JUST A SECOND, YOUR HONOR.

```
 1              (PAUSE IN PROCEEDINGS.)

 2              MR. PRICE:  YOUR HONOR, PASS THE WITNESS.

 3              THE COURT:  OKAY.  IT'S NOW 1:28.  ANY

 4     REDIRECT?

 5              MS. KREVANS:  YES, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  IT'S 1:28.  GO

 7     AHEAD, PLEASE.

 8                    REDIRECT EXAMINATION

 9     BY MS. KREVANS:

10     Q    LET ME START WITH A QUESTION WHERE MR. PRICE

11     ENDED UP.

12              CAN WE PUT BACK UP PLAINTIFF'S EXHIBIT

13     34.

14              AND HE WAS ASKING YOU ABOUT SOMETHING ON,

15     I THINK, PAGE 35 OF THIS EXHIBIT.

16              COULD YOU -- I'M SORRY, 37.  COULD YOU

17     TURN TO PAGE -- EXHIBIT 34, PAGE 38?

18              IS THIS THE PAGE THAT HAD THE INFORMATION

19     THAT YOU RELIED UPON, MR. MUSIKA?

20     A    YES.

21     Q    AND COULD YOU REMIND US SPECIFICALLY WHAT YOU

22     RELIED ON FROM THESE THREE PAGES ABOUT "IPHONE

23     EFFECT ANALYSIS" IN THE SAMSUNG DOCUMENT?

24              MR. PRICE:  OBJECT.  IT WAS ASKED AND

25     ANSWERED.
```

```
1            THE COURT:  I'M SORRY.  CAN YOU REPEAT

2     THE QUESTION?

3            (WHEREUPON, THE RECORD WAS READ BY THE

4     COURT REPORTER.)

5            THE COURT:  OVERRULED.

6            GO AHEAD, PLEASE.

7            THE WITNESS:  YES.  AS I WAS INDICATING,

8     I LOOKED AT THIS REPORT ANALYSIS BY SAMSUNG FOR

9     PURPOSES OF SUPPORT FOR DEMAND, WAS THERE DEMAND?

10           I'M NOT HERE TO TALK ABOUT COPYING.

11           AND HERE SPECIFICALLY, FACTORS THAT COULD

12    MAKE AN IPHONE A SUCCESS, EASY, INTUITIVE, USER

13    INTERFACE ON ALL CLASSES, AND THEN MORE

14    SPECIFICALLY, BEAUTIFUL DESIGN.

15           SO I WAS LOOKING FOR AND FOUND EVIDENCE

16    OF THE DESIGN ELEMENT BEING A FUNCTION OR A FACTOR

17    IN THE DEMAND.

18    BY MS. KREVANS:

19    Q    IN SAMSUNG'S OWN WORDS?

20    A    YES.

21    Q    OKAY.  LET'S LOOK AT ANOTHER THING THAT

22    MR. PRICE ASKED YOU ABOUT.

23           COULD WE PUT UP SAMSUNG'S SLIDE SDX

24    3909.053, PLEASE, MR. LEE.

25           DO YOU RECALL MR. PRICE ASKED YOU A
```

1    NUMBER OF QUESTIONS ABOUT CAPTIVATE SALES AND

2    APPLE'S CAPACITY ABOUT THIS SLIDE IN ASKING YOU

3    WHETHER THIS WAS $199 MILLION OUT OF YOUR LOST

4    PROFITS CALCULATION?

5    A    RIGHT.

6    Q    DO THE NUMBERS THAT MR. PRICE HAS SET FORTH ON

7    THIS SLIDE ADD UP TO $199 MILLION?

8    A    NO.  THAT'S -- I MEAN, JUST OFF THE TOP OF MY

9    HEAD, 30, 60, 80, 115, 120, 120,000.  120 MILLION.

10   SORRY.

11   Q    OKAY.  LET'S GO BACK TO A QUESTION THAT

12   MR. PRICE ASKED YOU EARLIER BEFORE LUNCH.

13        DO YOU RECALL -- I THINK THIS WAS BEFORE

14   LUNCH.  DO YOU RECALL HE WAS ASKING YOU ABOUT WHAT

15   WOULD HAPPEN IF THE JURY FOUND THAT SOME PATENTS

16   WERE, AND TRADE DRESS WERE NOT INFRINGED, BUT OTHER

17   PATENTS WERE INFRINGED?

18   A    YES.

19   Q    AND HE ASKED YOU WHETHER YOU HAD GIVEN THE

20   JURORS INFORMATION THAT WOULD LET THEM FIGURE OUT

21   WHAT WOULD BE THE APPROPRIATE ROYALTIES OR DAMAGES

22   IN THAT SITUATION.

23        YOU SAID THAT YOU HAD GIVEN THEM THE

24   TOOLS?

25   A    YES, THAT'S CORRECT.

1    Q    AND WHAT TOOLS DID YOU GIVE THE JURORS THAT

2    WOULD LET THEM FIGURE OUT ROYALTIES ON A

3    PATENT-BY-PATENT BASIS?

4    A    WELL, I'M GOING TO GIVE A BROAD -- A GENERAL

5    ANSWER AND THE COURT CAN ASK ME TO DO IT IN A MORE

6    DETAILED FASHION.

7         BUT I WOULD POINT THE JURORS TO PX 25A-1

8    BECAUSE I THINK THE INFORMATION THAT'S CONTAINED IN

9    THERE, WE WENT THROUGH IN SUMMARY, WOULD PERMIT

10   THEM TO ADJUST DATES AND ADJUST VOLUMES AND ADJUST

11   THEIR DAMAGES APPROPRIATELY BASED ON THE CHANGES

12   THAT HE WAS SUGGESTING.

13   Q    COULD YOU SHOW US THE LAST PAGE OF 25A-1,

14   MR. LEE.

15        WHAT IS THE INFORMATION THAT IS SET OUT

16   ON THE LAST PAGE OF EXHIBIT 25A-1?

17   A    IT IS A DETAILED SCHEDULE OF,

18   PATENT-BY-PATENT, THE ULTIMATE REASONABLE ROYALTY

19   RATES.  SO ON THE LEFT, FOR EXAMPLE, THE '381

20   PATENT, ITS ANALYSIS IN BETWEEN WOULD GO ALL THE

21   WAY TO THE RIGHT, THE ROYALTY IS $2.02 FOR THAT.

22        AND SO FORTH DOWN TO WHERE WE GET TO THE

23   DESIGN AS I HAD INDICATED.

24   Q    IF -- IF THE JURORS WANTED TO CALCULATE JUST A

25   ROYALTY NUMBER FOR ANY OF THE PATENTS THAT ARE SET

```
1    OUT ON THIS CHART, WOULD THEY NEED INFORMATION

2    BEYOND WHAT IS ON THIS PAGE?

3    A    WELL, THEY'D NEED UNITS, YES.

4    Q    AND WHERE WOULD THEY FIND THAT?

5    A    THEY WOULD FIND THAT -- THEY CAN DETERMINE

6    WHICH PRODUCTS WERE ACCUSED OF INFRINGING WHICH

7    PATENT UP ON PAGE 3 OF 16 IN 25A.

8    Q    OKAY.  SO SAME EXHIBIT, PAGE 3?

9    A    YES.

10   Q    OKAY.  AND THIS IS A CHART THAT TELLS US WHAT?

11   A    IT TELLS US, PRODUCT-BY-PRODUCT, WHICH PATENTS

12   ARE ACCUSED.  SO LET'S JUST USE AN EXAMPLE,

13   CAPTIVATE.  IF WE CAN BLOW THAT CAPTIVATE UP.  WE

14   CAN SEE THE CAPTIVATE IS ACCUSED OF INFRINGING THE

15   '163, THE '381, AND THE '915.  SO YOU WOULD

16   MULTIPLY THE RATE TIMES -- FOR EACH OF THOSE

17   UTILITY PATENTS.

18        IF WE MOVED ACROSS, WE WOULD SEE THAT

19   IT'S NOT ACCUSED OF INFRINGING ANY OF THE DESIGN

20   PATENTS EXCEPT THE '305.  AND IF YOU MOVE FURTHER

21   ACROSS, IT'S ACCUSED OF INFRINGING THREE OF THE

22   TRADE DRESS.

23        BUT AS WE REMEMBER FROM THE, FROM THE

24   ROYALTY RATE, WHETHER IT'S ONE OR ALL OF THEM, THAT

25   WOULD BE $24.
```

1           SO THEY KNOW, ONCE IT'S INFRINGING ONE OF

2      THOSE EITHER DESIGN PATENTS OR TRADE DRESS, IT'S

3      $24, AND THEN THE UNIT TIMES EACH OF THE UTILITY

4      PATENTS THAT ARE INFRINGED.

5      Q    AND WHERE IN THE INFORMATION THAT YOU'VE GIVEN

6      THE JURY WOULD THEY FIND THE NUMBER OF UNITS SOLD?

7      A    THE NUMBER OF UNITS SOLD, WE WOULD GO UP TO

8      THE JOINT EXHIBIT, 1500, AND REMEMBER WE KIND OF

9      STARTED THERE.  THAT'S THAT DETAILED -- THERE WE

10     GO -- AND THERE'S PRODUCT-BY-PRODUCT AND

11     PERIOD-BY-PERIOD BOTH IN UNITS AND IN DOLLARS.

12           MS. KREVANS:  NOTHING FURTHER, YOUR

13     HONOR.

14           THE COURT:  OKAY.  THE TIME IS 1:34.  ANY

15     RECROSS?

16                  **RECROSS-EXAMINATION**

17     BY MR. PRICE:

18     Q    SIR, I HEARD YOU SAY SOMETHING ABOUT $24, AND

19     THAT PART OF YOUR CALCULATION ASSUMES THAT THERE

20     HAS BEEN INFRINGEMENT OF A DESIGN PATENT FOR TRADE

21     DRESS.

22     A    ONE OR MORE, YES.

23     Q    OKAY.  SO IF WE'RE TALKING ABOUT JUST THE, FOR

24     EXAMPLE, THE '381 PATENT, YOU WOULDN'T BE USING

25     THAT NUMBER?

1    A    NO, YOU WOULD NOT.

2    Q    AND YOU SAID THAT YOU COULD GO FROM YOUR

3    ROYALTY, ASSUMING IT'S CORRECT, LOOKING AT THE

4    GRAPH AND THEN LOOKING AT 1500; IS THAT RIGHT?

5    A    YES.

6    Q    WELL, IS IT TRUE THAT -- FOR THE CAPTIVATE

7    HERE, FOR EXAMPLE, HAVE YOU MADE A FINDING THAT ALL

8    OF THE CAPTIVATE, OR YOU'RE ASSUMING THAT ALL OF

9    THE CAPTIVATE PHONES INFRINGE A CERTAIN CLAIM, A

10   CERTAIN PATENT?

11   A    WELL, DEPENDS ON THE TIMING OF THE PATENT

12   AGAIN.

13   Q    AND WHEN YOU LOOK AT THESE NUMBERS ON 1500, I

14   MEAN, THERE'S A CERTAIN TIMEFRAME, RIGHT, YEAH,

15   THAT YOU HAVE TO LOOK AT TO SEE WHETHER OR NOT

16   SOMETHING INFRINGES THE PATENT; RIGHT?

17   A    ABSOLUTELY RIGHT.

18   Q    AND HAVE YOU DONE THAT ON 1500?

19   A    I'M SORRY.  HAVE I DONE WHAT ON 1500?

20   Q    IDENTIFIED WHICH UNITS INFRINGE AND WHICH

21   DON'T?

22   A    ALL THESE UNITS INFRINGE.

23   Q    OKAY.  SO YOU'RE SAYING --

24   A    THESE ARE ALL ACCUSED -- THIS IS EQUAL TO THE

25   22 MILLION UNITS OF THE ACCUSED DEVICES AND THE $8

1    BILLION.  SO EVERY UNIT ON HERE IS INFRINGING.

2    Q    OKAY.  SO YOUR TESTIMONY IS THAT IF YOU LOOK

3    AT 1500, EVERY UNIT ON HERE IS INFRINGING AND ALL

4    YOU HAVE TO DO IS ADD THESE UP?  IS THAT WHAT

5    YOU'RE SAYING?

6    A    ADD WHAT UP?

7    Q    WELL, I ASSUME YOU'RE TALKING ABOUT ADDING UP

8    UNITS.  WHERE IT SAYS UNITS -- FOR EXAMPLE, UNDER

9    CAPTIVATE, IT HAS UNITS.  DO YOU SEE THAT?

10   A    I DO.

11   Q    AND YOU'RE SAYING YOU JUST HAVE TO ADD THOSE

12   UNITS UP AND THEY'RE ALL INFRINGING?

13   A    THEY ARE ALL INFRINGING --

14   Q    ALLEGEDLY?

15   A    I'M SORRY?

16   Q    I'M SORRY.  APPLE'S CLAIMED THEY INFRINGE?

17   A    YOU TRAILED OFF.

18   Q    THE IPAD -- YOU'RE ASSUMING THAT APPLE ALLEGES

19   THAT ALL OF THESE UNITS INFRINGE?

20   A    ONE OR MORE OF THE PATENTS OR TRADE DRESS,

21   YES.

22            MR. PRICE:  JUST ONE SECOND.

23            (PAUSE IN PROCEEDINGS.)

24   BY MR. PRICE:

25   Q    AND IS IT YOUR UNDERSTANDING THAT FOR THESE

1    PARTICULAR PATENTS, THAT THERE ARE DIFFERENT NOTICE

2    DATES FROM WHICH DAMAGES RUN?

3    A    YES.

4    Q    AND IS THAT REFLECTED ON THIS CHART, 1500, THE

5    DIFFERENT NOTICE DATES?

6    A    NO.

7    Q    AND WOULDN'T YOU HAVE TO APPLY THAT TO FIGURE

8    OUT WHAT THE DAMAGES SHOULD ACTUALLY BE?

9    A    WELL, YOU'RE ASSUMING THAT THERE ARE DIFFERENT

10   NOTICE DATES.

11   Q    AND WERE YOU ASKED -- THIS IS ANOTHER FACT YOU

12   WERE ASKED TO ASSUME, THAT THERE'S ONLY ONE NOTICE

13   DATE?

14   A    I'M -- THAT'S A LEGAL DETERMINATION AS TO WHAT

15   THE NOTICE DATE IS.

16        BUT THESE DAMAGES ARE BASED ON A SPECIFIC

17   NOTICE DATE, YES.

18   Q    OKAY.  WHAT DAMAGES -- WHAT NOTICE DATE ARE

19   THESE BASED ON?

20   A    THESE ARE BASED ON -- FOR THE TRADE DRESS, IT

21   WOULD BE AT THE TIME THAT THE TRADE DRESS -- FOR

22   THE UNREGISTERED TRADE DRESS, I'M SORRY, AT THE

23   TIME THE PRODUCTS WERE SOLD SINCE THE UNREGISTERED

24   TRADE DRESS WAS IN THE MARKET PRIOR TO THE LAUNCH

25   OF THE ACCUSED PRODUCTS.  SO THOSE WOULD BE FOR THE

1    ENTIRE PERIOD.

2                FOR ALL OTHER DEVICES THAT ARE IN HERE,

3    IT'S THE AUGUST 11TH OF 2010, I THINK -- I'D HAVE

4    TO GO RESEARCH, BUT I THINK IT'S AUGUST 11TH, 2010

5    IS THE NOTICE PERIOD.

6    Q    AND THAT'S REFLECTED ON YOUR CHART HOW?

7    A    IT'S REFLECTED IN HERE SOMEWHERE.  THAT'S THE

8    DATE, I BELIEVE, AT WHICH THE FIRST MEETING BETWEEN

9    APPLE AND SAMSUNG TOOK PLACE WHERE APPLE NOTIFIED

10   SAMSUNG OF THEIR COMPLAINT.

11   Q    AND IF WE COULD LOOK AT -- YOU WERE SHOWN PAGE

12   34.38, PLAINTIFF'S EXHIBIT, WHERE YOU'RE TALKING

13   ABOUT DEMAND.

14               AND I THINK THIS WAS BLOWN UP, SUCCESS

15   FACTORS FOR THE IPOD -- I'M SORRY -- FACTORS THAT

16   COULD MAKE IPHONE A SUCCESS.

17               DO YOU SEE THAT?

18   A    YES.

19   Q    AND DO YOU SEE HOW, WHERE IT TALKS ABOUT THE

20   INTUITIVE U/I; RIGHT?

21   A    YES.

22   Q    AND IT SAYS BEAUTIFUL DESIGN?

23   A    YES.

24   Q    AND THEN IT SAYS SEAMLESS INTEGRATION OF

25   HARDWARE.  AGAIN, HARDWARE IS NOT THE SAME AS

1    DESIGN, IS IT, AS IT'S BEING USED HERE?

2    A    I DON'T KNOW.

3    Q    BUT THAT'S ACTUALLY THE PART YOU WERE ASKED TO

4    LOOK AT.  YOU SAID YOU UNDERSTOOD WHAT YOU WERE

5    ASKED TO LOOK AT, SO I JUST -- LOOKING AT THIS, YOU

6    REALIZE THAT THIS DOCUMENT, GIVEN WHERE IT'S COMING

7    FROM, WHICH IS THE HARDWARE PART OF THE COMPANY

8    THAT MAKES THESE BRAINS, PROCESSORS, IT'S

9    DISTINGUISHING BETWEEN THE DESIGN AND THE HARDWARE?

10   IT'S DISTINGUISHING; RIGHT?

11   A    IT'S LISTED SEPARATELY, YES.

12   Q    SO THEY'RE TALKING ABOUT DIFFERENT THINGS?

13   A    I DON'T KNOW.

14              (PAUSE IN PROCEEDINGS.)

15              MR. PRICE:  MY BRAIN TRUST TELLS ME I'M

16   DONE.  THANK YOU.

17              THE WITNESS:  THANK YOU.

18              THE COURT:  ALL RIGHT.  THE TIME IS NOW

19   1:30.

20              IS THERE GOING TO BE ANY RE-REDIRECT OR

21   NO?

22              MS. KREVANS:  THERE IS VERY BRIEF, YOUR

23   HONOR.

24              THE COURT:  OKAY.  IT'S 1:40.  GO AHEAD,

25   PLEASE.

```
 1              MS. KREVANS:  MR. LEE, WOULD YOU PUT UP

 2    THAT SAME PAGE?  I THINK THAT WAS EXHIBIT 34 AT

 3    PAGE 38.

 4                 FURTHER REDIRECT EXAMINATION

 5    BY MS. KREVANS:

 6    Q    MY FIRST QUESTION IS A VERY QUICK ONE,

 7    MR. MUSIKA.  THE LINE OF -- THIS SAMSUNG DOCUMENT

 8    THAT MR. PRICE JUST POINTED YOU TO THAT STARTS WITH

 9    THE WORDS "SEAMLESS INTEGRATION OF HARDWARE," WHAT

10    DOES THE WHOLE LINE ACTUALLY SAY?

11    A    "SEAMLESS INTEGRATION OF HARDWARE, SW," WHICH

12    I UNDERSTAND TO BE SOFTWARE, "AND CONTENTS USING

13    ITUNES."

14    Q    OKAY.  AND COULD YOU GO BACK TO EXHIBIT 25A-1

15    IN YOUR BINDER?

16              AND MR. LEE, COULD YOU SHOW US THE SECOND

17    PAGE OF THAT EXHIBIT?

18              COULD YOU REMIND US WHAT'S SHOWN ON THIS

19    PAGE?

20    A    YES.  SO THIS IS THE DAMAGE SUMMARY, AND THIS

21    IS THE PAGE THAT SETS FORTH THE NOTICE THAT I WAS

22    RECITING.

23    Q    OKAY.  AND YOU WERE TRYING TO REMEMBER A DATE

24    JUST FROM MEMORY.  CAN YOU TELL US WHAT THIS PAGE,

25    WHAT THE ACTUAL DATE WAS IN AUGUST THAT YOU USED
```

1    FOR NOTICE FOR THINGS OTHER THAN UNREGISTERED TRADE

2    DRESS?

3    A    YES.  IT'S LISTED THERE.  IT IS AUGUST, BUT

4    IT'S AUGUST 4TH, 2010.  I THINK I PROBABLY SAID

5    AUGUST 11TH INCORRECTLY.  BUT IT'S AUGUST 4TH,

6    2010.

7              MS. KREVANS:  THANK YOU VERY MUCH.

8              THE COURT:  ALL RIGHT.  IT'S 1:42.  ANY

9    RE-RECROSS-EXAMINATION?

10             MR. PRICE:  NO, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  MAY THIS WITNESS

12   BE EXCUSED?

13             MS. KREVANS:  HE MAY SUBJECT TO RECALL,

14   YOUR HONOR.

15             THE COURT:  ALL RIGHT.  YOU'RE EXCUSED

16   SUBJECT TO RECALL.

17             THE WITNESS:  THANK YOU, YOUR HONOR.

18             MR. MCELHINNY:  YOUR HONOR, SUBJECT TO

19   STIPULATION AND ORDER OF THE COURT AS TO ORDER AND

20   PRODUCTION OF PROOF, WHICH RESERVES OUR CONTRACT,

21   ANTITRUST, UNFAIR COMPETITION AND DECLARATORY

22   JUDGMENT ACTIONS, SUBJECT TO THAT STIPULATION, WE

23   REST OUR CASE-IN-CHIEF.

24             THE COURT:  OKAY.  ALL RIGHT.

25             SO LADIES AND GENTLEMEN OF THE JURY, WE

1    HAVE TO TAKE CARE OF SOMETHING OUTSIDE YOUR

2    PRESENCE, SO I'M GOING TO EXCUSE YOU FOR NOW.

3              AGAIN, PLEASE KEEP AN OPEN MIND.  PLEASE

4    DON'T DISCUSS THE CASE WITH ANYONE AND PLEASE DON'T

5    DO ANY OF YOUR OWN RESEARCH.

6              YOU'RE FREE TO TAKE YOUR JURY BOOKS WITH

7    YOU INTO THE JURY ROOM.  OKAY?  THANK YOU.

8              (WHEREUPON, THE FOLLOWING PROCEEDINGS

9    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

10             THE COURT:  ALL RIGHT.  THANK YOU.  LET'S

11   GO AHEAD WITH THE RULE 50 MOTION, PLEASE.

12             GO AHEAD.

13             MR. ZELLER:  THANK YOU, YOUR HONOR.

14             SAMSUNG DOES MOVE UNDER RULE 50 AT THIS

15   TIME FOR APPLE'S FAILURE TO PROVE ITS CLAIMS, AND

16   WE BELIEVE THIS APPLIES TO EVERYTHING THAT APPLE

17   HAS ASSERTED IN THIS CASE.

18             FOR THE UTILITY PATENTS, APPLE HAS NOT

19   SUBMITTED EVIDENCE LIMITATION-BY-LIMITATION SHOWING

20   INFRINGEMENT.  THEY DIDN'T EVEN ATTEMPT TO DO THAT

21   WITH THEIR EXPERTS, AND WE BELIEVE THAT THAT ALONE

22   SHOWS -- ALSO, WE DID SHOW ON CROSS-EXAMINATION

23   THAT THESE WERE NOT INFRINGING.

24             THE SAME APPLIES FOR THE DESIGN PATENTS.

25   APPLE HAS FAILED TO PROVE INFRINGEMENT.

1          IT HAS ALSO FAILED TO TAKE INTO ACCOUNT

2     THE LACK OF FUNCTIONALITY, OR THE FUNCTIONALITY OF

3     THE DESIGNS.

4          AND ALSO ON TRADE DRESS, IT HAS FAILED TO

5     PROVE THAT TRADE DRESS IS FAMOUS AND THAT IT'S BEEN

6     INFRINGED AND THAT IT'S NOT FUNCTIONAL.

7          SO WE MOVE ON ALL THE ELEMENTS OF THE

8     CLAIMS, YOUR HONOR.

9          WITH RESPECT TO DAMAGES, THERE'S NO

10    APPORTIONMENT THAT'S BEEN ESTABLISHED.  THERE HAS

11    BEEN NO PRODUCT-BY-PRODUCT DAMAGES THAT HAVE BEEN

12    BROKEN OUT, AND WE BELIEVE THAT THAT'S INSUFFICIENT

13    AS A MATTER OF LAW.

14         THERE'S NO CAUSATION THAT'S BEEN PROVEN,

15    AND ALSO THEY HAVE -- EXCUSE ME -- ONLY HAD

16    DUPLICATIVE DAMAGES THAT THEY'VE ASSERTED.

17         AND SO FOR ALL THE SAME REASONS, WE

18    BELIEVE THE JUDGMENT IS ALSO WARRANTED ON DAMAGES.

19         EXCUSE ME.

20         THE COURT:  OKAY.

21         MR. ZELLER:  AND ALSO, WE MOVE ON THE

22    FAILURE TO PROVE WILLFUL INFRINGEMENT.

23         THE COURT:  ALL RIGHT.

24         MR. ZELLER:  AND THEN FINALLY, YOUR

25    HONOR, ALSO ON THE DAMAGES FRONT, JUST TO BE MORE

1    SPECIFIC, THERE WAS A FAILURE TO REALLY ACCOUNT FOR

2    REASONABLE ROYALTY, AND THEY ALSO FAILED TO PROVE

3    THAT THERE WAS SUFFICIENT DEMAND FOR, AND CAPACITY

4    FOR APPLE PRODUCTS.

5            THE COURT:  OKAY.  ANYTHING ELSE THAT

6    YOU'D LIKE TO STATE ON THE RECORD?

7            MR. ZELLER:  WELL, YOUR HONOR, WE WOULD,

8    OF COURSE, LIKE THE OPPORTUNITY TO OUTLINE THESE IN

9    WRITING.  I MEAN, THE COURT DID SAY WE WOULD DO

10   THAT EARLIER.

11           THE COURT:  I HAVE REVIEWED -- EVERY TIME

12   I CHECK OUR ECF, THERE ARE, LIKE, THREE OR FOUR

13   MORE MOTIONS THAT ARE FILED, AND I NEVER HAVE

14   BRIEFING ON RULE 50, NEVER.  NEVER, EVER.  I'VE

15   NEVER HAD BRIEFING ON RULE 50 BEFORE.

16           AND JUST IN TERMS OF KEEPING UP WITH ALL

17   OF THE MOTIONS THAT HAVE BEEN FILED, TO SAY NOW DO

18   ANOTHER ORDER ON RULE 50 WHEN I NEVER HAVE BRIEFING

19   ON RULE 50 MOTIONS, I'M SORRY, I JUST DON'T THINK I

20   CAN.

21           MR. ZELLER:  THIS IS, OF COURSE, AN

22   IMPORTANT MOTION, YOUR HONOR.

23           THE COURT:  UNDERSTOOD.

24           MR. ZELLER:  WE OBVIOUSLY WANT TO DO IT

25   FOR PRESERVATION PURPOSES, BUT THE COURT IS

1    OBVIOUSLY NOT INCLINED TO GRANT IT IN ANY EVENT, WE

2    WOULD ASK FOR THAT OPPORTUNITY.

3              OBVIOUSLY APPLE IS GOING TO ARGUE --

4    WE'RE TRYING TO MAKE OUR GROUNDS SUFFICIENTLY BROAD

5    AT THIS MOMENT MOVING ORALLY IN ORDER TO MAKE SURE

6    THAT WE'VE COVERED EVERYTHING.

7              BUT WE KNOW, OF COURSE, APPLE IS GOING TO

8    ARGUE LATER THERE'S SOME SORT OF PROCEDURAL

9    DEFAULT.

10             OBVIOUSLY OUR VIEW IS THEY HAVE NOT

11   PROVEN THEIR CASE, AND THEY HAVEN'T PROVEN IT AS TO

12   ANY OF THE ELEMENTS THAT ARE REQUIRED HERE.

13             THE COURT SAW THEIR WITNESSES.  THEY PUT

14   THEM UP, FOR EXAMPLE, AND THEY SAID "DID YOU DO A

15   SURVEY?"  "YES, I DID.  THIS IS WHAT IT SHOWED."

16             WE DON'T THINK THAT THAT IS, AS A MATTER

17   OF LAW, SUFFICIENT IN ORDER TO CARRY THEIR BURDEN,

18   AND WE WOULD BE ABLE TO OUTLINE THESE THINGS AND

19   PROVIDE CITATIONS AT LEAST TO THE EVIDENCE, YOUR

20   HONOR, THAT WE BELIEVE SUPPORTS THAT.

21             BUT --

22             THE COURT:  I'M UNDERSTANDING YOUR MOTION

23   TO BE MOVING ON ABSOLUTELY EVERY CLAIM THAT APPLE

24   HAS MADE THAT A REASONABLE JURY WOULD NOT HAVE

25   SUFFICIENT EVIDENCE TO RULE IN THEIR FAVOR.

1          SO I AM ASSUMING THAT YOU ARE, AND I HEAR

2     YOU, MOVING ON EVERY SINGLE CLAIM THAT APPLE HAS

3     MADE.

4          MR. ZELLER:  THAT IS CORRECT, YOUR HONOR.

5     CERTAINLY WE WILL -- WE DO MOVE ON THAT BASIS.

6          LET ME GIVE SOME SPECIFIC EXAMPLES, YOUR

7     HONOR.

8          FOR EXAMPLE, THEY INTRODUCED ABSOLUTELY

9     NO EVIDENCE WITH RESPECT TO PARTICULAR PHONES THAT

10    THEY CLAIM WERE SOLD IN THE UNITED STATES.  THERE

11    IS NO EVIDENCE, FOR EXAMPLE, AS TO THE GALAXY ACE,

12    WHICH IS JX 1030, THE GALAXY S I9000, JX 1007, OR

13    THE GALAXY S II I9100, WHICH IS JX 1032.  THERE'S

14    ZERO EVIDENCE THAT'S BEEN ADDUCED IN THIS CASE THAT

15    THOSE HAVE BEEN SOLD IN THE UNITED STATES.  THEY

16    REPRESENTED THAT THEY WERE.  THEY PROVIDED NO

17    EVIDENCE.

18         AND I CAN GO THROUGH A MUCH LONGER LIST

19    OF THESE KINDS OF PARTICULARS, YOUR HONOR.  WE HAD

20    UNDERSTOOD WE WERE GOING TO DO THIS IN WRITING, AND

21    SO WHEN THE COURT ASKED, IS THERE ANYTHING FURTHER

22    WE WANT TO SAY, THERE IS MUCH MORE WE WANT TO SAY.

23         BUT WE THINK THAT IT'S MORE EFFICIENT TO

24    SIMPLY PUT IT IN WRITING.  I CAN GO DOWN THIS LIST

25    AND I'M CERTAINLY HAPPY TO DO IT NOW.

1          THE COURT:  DO IT NOW.  I'LL GIVE YOU

2     FIVE MINUTES.  GO AHEAD.

3          MR. ZELLER:  YOUR HONOR, WITH ALL

4     RESPECT, FIVE MINUTES IS NOT ENOUGH WHERE SOMEONE

5     IS ASKING FOR TWO AND A HALF BILLION DOLLARS ON A

6     WHOLE HOST OF CLAIMS.

7          THE COURT:  WELL, WHY DON'T YOU HAVE

8     WHATEVER YOU HAVE.  GO AHEAD.  I'M GIVING YOU AN

9     OPPORTUNITY TO MAKE YOUR RECORD.  WHATEVER YOU

10    WOULD LIKE, GO AHEAD.

11         MR. ZELLER:  I MENTIONED THAT THERE WAS

12    NO EVIDENCE THAT WAS PROVIDED AS TO CERTAIN DEVICES

13    BEING SOLD IN THE UNITED STATES BY SAMSUNG.

14         IN ADDITION, APPLE PRESENTED NO EVIDENCE

15    THAT SHOWED THAT THE GEM, THE SAMSUNG GEM PHONE,

16    WHICH IS JX 1020, INFRINGES THE '381 PATENT.

17         AND, IN FACT, THAT WAS NEVER DISCLOSED IN

18    THEIR LOCAL PATENT CONTENTIONS AS REQUIRED.

19         THERE'S NO EVIDENCE OF ACTIVE INDUCEMENT

20    BY SAMSUNG IN THIS CASE.

21         ALL THAT HAS BEEN ADDUCED IN THIS CASE SO

22    FAR BY APPLE IS THAT SAMSUNG, THE PARENT, WAS

23    AWARE.

24         BUT THAT IS INSUFFICIENT AS A MATTER OF

25    LAW FOR ACTIVELY INDUCING INFRINGEMENT.

1           AS WE MENTIONED EARLIER, OF COURSE, THERE

2    IS NO EVIDENCE THAT APPLE HAS MET OR PROVEN

3    DECEPTIVE SIMILARITY IN THE CONTEXT OF PURCHASING

4    FOR THE DESIGN PATENTS AS REQUIRED.

5           AS A MATTER OF FACT, APPLE'S EXPERTS

6    ACKNOWLEDGED THAT THAT IS NOT THE ANALYSIS THAT

7    THEY DID.  THEY DIDN'T EVEN ATTEMPT TO APPLY THE

8    PROPER LEGAL STANDARD UNDER THE LAW.

9           IN FACT, THE ONLY WITNESS WHO TESTIFIED

10   ABOUT THE HARDWARE DESIGN PATENT SIMILARITIES WAS

11   PETER BRESSLER, AND HE SPECIFICALLY ACKNOWLEDGED

12   THAT IT WAS HIS UNDERSTANDING THAT IT WAS NOT

13   NECESSARY THAT THE SIMILARITY BE DECEPTIVE.

14          OF COURSE, THE COURT IS AWARE THAT UNDER

15   GORHAM, THE GORHAM STANDARD AS ARTICULATED BY THE

16   SUPREME COURT AND AS CONFIRMED BY EGYPTIAN GODDESS,

17   APPLE HAS TO PROVE THAT THERE -- THAT THE

18   SIMILARITY IS SUCH THAT IT WOULD DECEIVE THE

19   ORDINARY OBSERVER IN THE PURCHASING CONTEXT.

20          AND MR. BRESSLER ACKNOWLEDGED THAT THAT

21   WAS NOT THE STANDARD HE APPLIED.

22          IN FACT, AGAIN, HE WAS THE ONLY PERSON

23   WHO OFFERED ANY TESTIMONY ON THESE ALLEGED

24   SIMILARITIES.

25          APPLE DID, OF COURSE, OFFER VARIOUS

1    HEARSAY BLOG STATEMENTS AND PRESS REPORTS, BUT THE

2    COURT HAS SAID THAT THAT IS NOT ADMISSIBLE FOR THE

3    TRUTH, SO IT CANNOT BE RELIED UPON BY APPLE TO

4    PROVE A SUBSTANTIAL SIMILARITY.

5         ALSO, MR. BRESSLER ACKNOWLEDGED HE HAD NO

6    REAL WORLD EVIDENCE OF ANY KIND OF DECEPTION OR

7    SIMILARITIES BETWEEN THE DESIGNS.

8         IN ADDITION, THERE WERE DIFFERENCES THAT

9    WERE SHOWN WITH RESPECT TO THE PRODUCTS AT ISSUE

10   THAT ALSO SHOWED THAT THEY ARE NOT INFRINGED.  I

11   CAN RECITE AS MUCH AS THE COURT WOULD LIKE ON THAT,

12   BUT AN EXAMPLE WOULD BE WITH RESPECT TO THE GALAXY

13   10.1.

14        MR. STRINGER TESTIFIED THAT AN IMPORTANT

15   ASPECT OF THIS DESIGN WAS THAT IT WAS A SINGLE

16   VESSEL ON THE BACK.

17        WE DON'T MEET THAT LIMITATION.  WE DO NOT

18   PRACTICE THAT, AND THAT IS UNDISPUTED.  IT'S NOT A

19   SINGLE VESSEL WHEN YOU'RE TALKING ABOUT THE GALAXY

20   TAB 10.1.  IT IS A DIFFERENT DESIGN.

21        AND THERE HAS BEEN NO REBUTTAL TO THAT

22   POINT WHATSOEVER.

23        SAME THING WITH RESPECT TO THE HARDWARE

24   DESIGNS FOR WHAT WE AT LEAST SHORTHAND CALL THE

25   SMARTPHONES.

1          MR. STRINGER TESTIFIED THAT AN INTEGRAL

2     PART OF WHAT WAS NEW AND ORIGINAL ABOUT THOSE

3     DESIGNS WAS THAT THEY WERE FLAT.

4          SAMSUNG DOES NOT HAVE THAT SAME DESIGN,

5     AND AGAIN, THAT IS UNDISPUTED.

6          WITH RESPECT TO THE '305 DESIGN PATENTS,

7     ESSENTIALLY IT'S THE SAME STORY.

8          DR. KARE WAS THE WITNESS WHO TESTIFIED

9     ABOUT THAT DESIGN PATENT.  SHE DID NOT, AND DID NOT

10    EVEN ATTEMPT, TO APPLY THE GORHAM DECEPTION IN

11    PURCHASING STANDARD.

12         IN FACT, ALL SHE OFFERED AN OPINION ON

13    WAS ESSENTIALLY THAT SHE THOUGHT THE OVERALL

14    SIMILARITIES WERE THERE, WHICH IS NOT SUFFICIENT

15    UNDER GORHAM.

16         IN ADDITION, SHE ALSO ACKNOWLEDGED THAT

17    SHE PAID NO ATTENTION AND DID NOT FACTOR INTO HER

18    ANALYSIS ANY KIND OF FUNCTIONALITY.

19         AND OF COURSE THE COURT IS AWARE THAT

20    FUNCTIONALITY HAS TO BE FACTORED OUT OF ANY KIND OF

21    ANALYSIS UNDER RICHARDSON, THE FEDERAL CIRCUIT

22    DECISION IN RICHARDSON, IN ORDER TO FIND

23    INFRINGEMENT.

24         AND ALSO, DR. KARE DID NOT EVEN CONSIDER

25    PRIOR ART, SHE ADMITTED THAT AS WELL, WHICH, OF

1    COURSE, IS AN INTEGRAL PART OF THE GORHAM STANDARD

2    AS FURTHER ARTICULATED BY EGYPTIAN GODDESS, AND

3    AGAIN, THIS IS AN ADMISSION BY HER THAT SHE DID NOT

4    DO SO.

5              I'LL TALK A LITTLE BIT MORE ABOUT

6    DILUTION IN A MOMENT, BUT DR. WINER, FOR EXAMPLE,

7    ACKNOWLEDGED THAT THERE WAS NO EVIDENCE OF

8    DILUTION.

9              I MEAN, EVEN THOUGH WHAT APPLE WOULD

10   ARGUE IS THAT THE STANDARD IS LIKELIHOOD OF

11   DILUTION, THE FACT IS THAT THESE PHONES HAVE NOW

12   BEEN IN THE MARKET, THESE TABLETS, FOR A

13   CONSIDERABLE PERIOD OF TIME.  IF APPLE CANNOT

14   POINT, AT THIS STAGE, MONTHS AND YEARS LATER TO ANY

15   ACTUAL EVIDENCE OF LOSS, DILUTION, BLURRING AND THE

16   LIKE, IT IS OBVIOUSLY UNLIKELY AT THIS POINT.  THAT

17   IS THE ONLY ARGUMENT THEY HAVE, FRANKLY, ON

18   DILUTION.

19             I WOULD FURTHER SAY, YOUR HONOR, WITH

20   RESPECT TO THE TRADE DRESS DILUTION ARGUMENTS --

21   ACTUALLY, LET ME STEP BACK AND TALK ABOUT THE

22   INFRINGEMENT ARGUMENT THAT APPLE HAS MADE, WHICH

23   IS, OF COURSE, AT THIS POINT ONLY LIMITED TO THE,

24   TO AN ACCUSATION AGAINST THE GALAXY TAB 10.1.

25             AND ALSO, THIS WOULD APPLY EQUALLY TO

1     DILUTION.

2              BUT LET ME START WITH FUNCTIONALITY, YOUR

3     HONOR, WHICH IS THAT APPLE BEARS THE BURDEN OF

4     PROVING, WITH RESPECT TO THE UNREGISTERED TRADE

5     DRESS, THAT THAT TRADE DRESS IS NOT FUNCTIONAL.

6              IT HAS NOT DONE SO.  IT OFFERED NO

7     EVIDENCE TO SUBSTANTIATE THAT.

8              DR. BRESSLER ACKNOWLEDGED HE APPLIED A

9     STANDARD FOR NON-FUNCTIONALITY THAT WAS, NUMBER

10    ONE, INCOMPLETE; AND, NUMBER TWO, WRONG.

11             WHAT I WOULD ALSO SAY IN THIS REGARD,

12    YOUR HONOR, IS THAT WITH RESPECT TO TRADE DRESS --

13    AND THIS IS FROM LEATHERMAN, THE NINTH CIRCUIT

14    DECISION IN LEATHERMAN, IT SAYS, "FOR AN OVERALL

15    PRODUCT CONFIGURATION TO BE RECOGNIZED AS A

16    TRADEMARK, THE ENTIRE DESIGN MUST BE

17    NON-FUNCTIONAL."

18             THAT'S WHAT THEY HAVE TO PROVE.  YOU

19    CAN'T JUST SIMPLY PICK AND CHOOSE AMONG THIS

20    PRODUCT CONFIGURATION THAT THEY'RE CLAIMING AND

21    THEN JUST SORT OF WAVE THEIR HAND AND SAY IT'S NOT

22    FUNCTIONAL.

23             THEY MUST PROVE THAT THAT ENTIRE DESIGN

24    IS NOT FUNCTIONAL.  MR. BRESSLER ADMITTED THAT

25    PORTIONS OF THAT DESIGN AREN'T THAT FUNCTIONAL.

1           THAT, IN ITSELF, DEFEATS APPLE'S ABILITY

2     TO CARRY FORWARD THAT CLAIM.

3           AND THAT APPLIES EQUALLY TO DILUTION AS

4     WELL, BECAUSE AS THE COURT IS AWARE, WITH RESPECT

5     TO ITS UNREGISTERED TRADE DRESS, APPLE BEARS THE

6     BURDEN OF PROVING THAT BOTH WITH RESPECT TO THE,

7     THE INFRINGEMENT CLAIM, AS WELL AS THE DILUTION

8     CLAIM.

9           THEN, AS THE COURT IS ALSO AWARE WITH

10    RESPECT TO THE DILUTION CLAIM, ALL THAT THAT'S --

11    YOU KNOW, THAT ALSO NOW INCLUDES THE PHONES.

12          AND WE DON'T BELIEVE THAT THERE'S BEEN

13    ANY KIND OF EVIDENCE SHOWING THAT THERE'S A

14    LIKELIHOOD OF DILUTION AND, SIMILARITY, FOR

15    TRADEMARK INFRINGEMENT, NO EVIDENCE OF LIKELIHOOD

16    OF CONFUSION.

17          IN FACT, AGAIN, APPLE'S OWN EXPERTS

18    ACKNOWLEDGED THAT BY THE TIME PEOPLE ACTUALLY

19    COMPLETE THE PURCHASING PROCESS, BASED ON THE

20    INFORMATION THAT THEY HAVE AVAILABLE TO THEM, THEY

21    KNOW WHAT PHONE THEY ARE BUYING.

22          APPLE, OF COURSE, RECOGNIZING THAT THAT

23    IS FATAL TO THEIR CLAIMS, HAS TRIED TO ARGUE THAT

24    THERE'S POST-SALE CONFUSION, AND THAT'S REALLY ALL

25    THAT THEY'RE LEFT WITH.

1           BUT, NUMBER ONE, THAT IS NOT A THEORY

2   THAT WAS ASSERTED TIMELY IN THIS CASE.

3           NUMBER TWO, YOUR HONOR, COURTS HAVE MADE

4   VERY CLEAR THAT POST-SALE CONFUSION IS NOT PROPERLY

5   AVAILABLE IN INSTANCES WHERE PRODUCT CONFIGURATION

6   IS THE TRADE DRESS CLAIM, AND THAT MAKES SENSE,

7   YOUR HONOR, BECAUSE OTHERWISE WHAT YOU'RE SAYING IS

8   THAT A, A -- ONE COMPETITOR HAS AN EXCLUSIVE

9   MONOPOLISTIC RIGHT TO THE APPEARANCE OF A PRODUCT

10  FROM A DISTANCE, WHICH REALLY MAKES ABSOLUTELY NO

11  SENSE UNLESS WHAT YOU'RE TALKING ABOUT ARE OUTRIGHT

12  COUNTERFEITING CASES WHERE SOMETIMES COURTS HAVE

13  RECOGNIZED AN EXCEPTION.

14          BUT THE COURT WILL RECALL THAT WE HAD

15  EXTENSIVE BRIEFING ON THIS POINT, BUT PRODUCT

16  CONFIGURATION, AS IT'S BEEN ARTICULATED BY THE

17  SUPREME COURT AND THE NINTH CIRCUIT AND OTHER

18  COURTS OF APPEALS, IS A RED FLAG BECAUSE IT IS

19  DANGEROUS TO COMPETITION.

20          AND IT IS DANGEROUS TO COMPETITION

21  BECAUSE COMPETITORS, IF THEY'RE ALLOWED TO

22  MONOPOLIZE A PRODUCT FEATURE THAT HAS SOME

23  UTILITARIAN ADVANTAGES, THAT CAN HARM COMPETITION.

24          AND IT DOES NOT ADVANCE THE PURPOSES OF

25  THE LANHAM ACT IN DOING SO.  THE LANHAM ACT IS

1    SUPPOSED TO PROTECT SOURCE IDENTIFYING INFORMATION.

2    IT DOES NOT PROTECT IDEAS.  IT DOES NOT PROTECT

3    CONCEPTS.  IT DOES NOT PROTECT FUNCTIONAL OR

4    UTILITARIAN PRODUCT ASPECTS.

5              AND THAT MEANS IN A VERY, VERY BROAD

6    SENSE, BECAUSE, AGAIN, THE PURPOSE OF THE LANHAM

7    ACT IS EXTREMELY LIMITED, AND IN THIS PARTICULAR

8    INSTANCE, THE -- APPLE ACTUALLY MADE NO EFFORT TO

9    SHOW THAT THESE FEATURES OF TRADE DRESS WERE NOT

10   FUNCTIONAL.

11             LITERALLY THE ONLY THING THEY DID IS THEY

12   HAD MR. STRINGER CLAIM IN COMPLETELY CONCLUSORY

13   TERMS THEY'RE COMPLETELY AESTHETIC WHICH IS, A,

14   FALSE AND NOT EVEN CONSISTENT WITH THE TESTIMONY OF

15   MR. BRESSLER AND THE OTHER WITNESSES AND UTTERLY

16   IMPLAUSIBLE, BUT IN NO WAY CAN IT AMOUNT TO THE

17   SUBSTANTIAL EVIDENCE THAT THEY ARE REQUIRED ADDUCE

18   ON THIS ELEMENT.

19             FURTHERMORE, YOUR HONOR, THERE'S NO

20   EVIDENCE THAT THE TRADE DRESS, THE ACTUAL TRADE

21   DRESS THAT'S BEING ASSERTED HERE, IS FAMOUS.

22             THE COURT IS AWARE THAT THEY HAVE COME UP

23   WITH THIS CONSTRUCT, TO PUT IT KINDLY, THIS

24   IMAGINARY CONSTRUCT OF WHAT THEY THINK THEIR TRADE

25   DRESS IS.

```
1              IT IGNORES, IN FACT, WELL-SETTLED LAW
2      BECAUSE IT'S ACTUALLY THE OVERALL PRODUCT AS IT'S
3      PRESENTED TO THE MARKETPLACE.  THEY LITERALLY ARE
4      X'ING OUT AND COVERING UP KEY ASPECTS OF THAT TRADE
5      DRESS BECAUSE THEY, OF COURSE, KNOW THAT IF THEY
6      INCLUDE THAT IN THERE, THE TRADE DRESS CLAIMS, OF
7      COURSE, WOULD BE QUITE OBVIOUSLY FLAWED BECAUSE
8      THESE ARE ELEMENTS THAT SAMSUNG DOES NOT EVEN ARGUE
9      WERE USED.
10             BUT THERE IS NO EVIDENCE THAT THE GENERAL
11     CONSUMING PUBLIC, AS REQUIRED FOR TRADE DRESS FAME,
12     FOR DILUTION LEVEL FAME, IS RECOGNIZED WITHOUT SUCH
13     FEATURES AS THE HOME BUTTON OR THE APPLE LOGO.
14             AND, IN FACT, THE ONLY SURVEY THAT WAS
15     SUBMITTED IN THIS CASE, YOUR HONOR, THE COURT WILL
16     RECALL, THE COURT HAS LIMITED TO ITS PROPER PURPOSE
17     AS ONLY BEING EVIDENCE OF SECONDARY MEANING.
18             SECONDARY MEANING, OF COURSE, IS NOT
19     EQUIVALENT TO FAME.  FAME IS A MUCH, MUCH HIGHER
20     STANDARD AND HAS TO REACH THAT HOUSEHOLD
21     RECOGNITION AMONG THE ENTIRE CONSUMING PUBLIC OF
22     THE UNITED STATES.
23             AND THERE IS SIMPLY NO EVIDENCE THAT
24     WOULD ALLOW THAT BURDEN -- TO SHOW THAT THAT BURDEN
25     HAS BEEN MET BY APPLE.
```

1        I WOULD ALSO ADD, YOUR HONOR, THAT

2   THERE'S NO EVIDENCE OF ANY KIND OF BLURRING IN THIS

3   CASE.  AS I MENTIONED EARLIER, DR. WINER ACTUALLY

4   TESTIFIED TO THE OPPOSITE.  HE MENTIONED, AND

5   ACKNOWLEDGED, THAT EVEN AFTER ALL THIS TIME, THERE

6   IS -- THERE'S NO INDICATION THAT APPLE HAS LOST ANY

7   SALES, HAD ANY HARM TO ITS REPUTATION, OR OTHERWISE

8   SUFFERED FROM ANY DILUTION AFTER ALL THIS TIME.

9        AND THAT, OF COURSE, IS AN ESSENTIAL

10  ELEMENT.  THIS LIKELIHOOD OF DILUTION BY BLURRING

11  IS AN ESSENTIAL ELEMENT OF THE DILUTION CLAIMS AS

12  WELL.

13       TO ELABORATE A BIT MORE ON THE DAMAGES

14  FRONT, YOUR HONOR, AS I MENTIONED, AS A MATTER OF

15  LAW, THESE ARE JUST NOT -- THE DAMAGES FOUNDATION

16  THAT WAS ADDUCED HERE IS NOT SUFFICIENT.  IT'S NOT

17  SUFFICIENT FOR DISGORGEMENT OF PROFITS; IT'S NOT

18  SUFFICIENT FOR APPLE LOST PROFITS; IT'S NOT

19  SUFFICIENT FOR REASONABLE ROYALTY.

20       ONE THING I WOULD MENTION, YOUR HONOR, IS

21  THAT THERE'S NO EVIDENCE OF CAUSATION.  THERE'S NO

22  EVIDENCE OF CAUSATION WITH RESPECT TO APPLE'S LOST

23  SALES.  THERE'S NO EVIDENCE THAT IT HAD -- HAD

24  THERE BEEN -- WELL, ACTUALLY, LET ME TRY AND

25  REPHRASE THIS IN ANOTHER WAY.

```
 1              THERE'S NO EVIDENCE THAT CONSUMERS WOULD
 2    NOT HAVE PURCHASED THE ALTERNATIVES IN THE MARKET,
 3    NON-INFRINGING ALTERNATIVES OR NON-ACCUSED
 4    ALTERNATIVES IN THE MARKET AS OPPOSED TO APPLE
 5    PRODUCTS.
 6              THAT WAS NOT MENTIONED AT ALL IN THE
 7    ANALYSIS THAT YOU HEARD HERE TODAY.
 8              IN ADDITION, THERE HAS BEEN NO
 9    APPORTIONMENT FOR PURPOSES OF TRADE DRESS.  APPLE
10    DOES BEAR THAT BURDEN.  APPLE MUST SHOW WHAT AMOUNT
11    OF THE TRADE DRESS PROFITS ARE ATTRIBUTABLE TO THE
12    SO-CALLED INFRINGEMENT, AND PARTICULARLY HERE WHERE
13    WE'RE TALKING ABOUT, AS APPLE IS CLAIMING, A
14    LIMITED SET OF FEATURES THAT MAKE UP ITS TRADE
15    DRESS.
16              IT'S NOT SUFFICIENT TO SIMPLY GO IN AND
17    SAY, "WELL, WE THINK THAT YOU INFRINGE OUR TRADE
18    DRESS BECAUSE OF PARTICULAR ASPECTS OF IT," HAVING
19    A CLEAR FLAT SURFACE, FOR EXAMPLE, AND THEN JUST
20    SAYING, "SO PRESUMPTIVELY WE GET ALL THE PROFITS
21    THAT COME FROM THE SALE OF THOSE PRODUCTS."
22              AND APPLE HAS MADE NO EFFORT AT ALL TO
23    APPORTION THOSE, NOR, UNDER THE DESIGN AND PATENT
24    ACT OR THE DESIGN PATENT DAMAGES PROVISION, HAS
25    APPLE MADE ANY EFFORT TO LIMIT THE PROFITS IT'S
```

1    SEEKING TO THE ARTICLE TO WHICH THE DESIGN IS

2    APPLIED.

3              THAT'S THE PLAIN LANGUAGE OF THAT

4    STATUTE.  THEY ARE ACTING -- THEY ARE ASSUMING THAT

5    THE ARTICLE TO WHICH THE DESIGN IS APPLIED IS THE

6    ENTIRE PRODUCT, WHICH IS ERRONEOUS AS A MATTER OF

7    LAW.

8              THEY HAVE NOT FACTORED OUT, FOR EXAMPLE,

9    THE TECHNOLOGY AND WHAT DRIVES THOSE PROFITS.

10             THEY ARE SIMPLY ASKING FOR ALL OF THEM,

11   AND SO THAT'S INSUFFICIENT AS A MATTER OF LAW AS

12   WELL.

13             AND I THINK I MENTIONED IT, BUT JUST TO

14   BE CLEAR ON THIS, THEY HAVE ALSO FAILED TO SEPARATE

15   OUT INFRINGING VERSUS NON-INFRINGING PRODUCTS, OR

16   ACCUSED VERSUS NON-ACCUSED PRODUCTS.

17             THERE IS NO EVIDENCE FROM WHICH THE JURY

18   CAN MAKE A DETERMINATION FOR DAMAGES ON A

19   PRODUCT-BY-PRODUCT AND PATENT-BY-PATENT BASIS.

20   THEY ARE LITERALLY JUST SIMPLY SAYING, "I'M

21   ASSUMING THAT EVERYTHING IS INFRINGING AND THIS IS

22   THE NUMBER THAT SHOULD BE AWARDED."

23             BUT THAT IS NOT SUFFICIENT FOR PURPOSES

24   OF THE DAMAGES HERE.

25             ALSO, THERE IS -- THE DAMAGES ANALYSIS

1    THAT WAS OFFERED HERE TODAY IS CONTRARY TO THE

2    RECORD EVIDENCE AS WELL IN ANOTHER WAY, AND ALSO

3    APPLE HAS FAILED TO PROVE THIS AS WELL, WHICH IS

4    THE COURT KNOWS, OF COURSE, THAT THERE ARE NO

5    DAMAGES PRIOR TO NOTICE, AND THE NOTICE THAT'S

6    REQUIRED HERE HAS TO BE FOR THE SPECIFIC

7    INTELLECTUAL PROPERTY AT ISSUE.

8              THE COURT HAS HEARD TESTIMONY THAT DURING

9    THESE DISCUSSIONS, APPLE DID NOT CITE ANY SPECIFIC

10   DESIGN PATENTS, NO SPECIFIC TRADE DRESS, AND SO

11   THERE WAS NO NOTICE PRIOR TO THE TIME OF THE

12   PREFILING -- PRIOR TO THE FILING OF THIS, THIS

13   ACTION.

14             IN ADDITION, THERE'S BEEN NO MARKING.

15   THAT ALSO WAS ADMITTED HERE TODAY.

16             IN OTHER WORDS, THERE'S NO EVIDENCE OF

17   ACTUAL NOTICE, OTHER THAN WITH RESPECT TO THE '381,

18   AS TO ANY OF THE ASSERTED INTELLECTUAL PROPERTY IN

19   THIS CASE.  AND YOU HEARD THAT FROM MR. TEKSLER AS

20   A MATTER OF FACT.

21             AND, YET, APPLE'S DAMAGES EXPERT WAS

22   ESSENTIALLY ASKING FOR DAMAGES THAT FLY IN THE FACE

23   OF THOSE UNDISPUTED FACTS.

24             IF I MAY, YOUR HONOR?

25             THE COURT:  PLEASE, GO AHEAD.  AND I'M

1    GOING TO LET YOU HAVE THE REPLY AS WELL.

2              (DISCUSSION OFF THE RECORD BETWEEN

3    DEFENSE COUNSEL.)

4              MR. ZELLER:  THE ONLY OTHER THING, YOUR

5    HONOR, IS WE CAN PROVIDE MORE DETAIL ON THE UTILITY

6    FRONT, BUT I THINK THE COURT SEES THE GIST OF OUR

7    MOTION ON THAT.

8              THE COURT:  I DO.  I'M GOING TO GIVE YOU

9    AN OPPORTUNITY TO REPLY, SO IF YOU THINK OF

10   ANYTHING ELSE, PLEASE RAISE IT AT THAT TIME.

11             NOW, DOES ANYONE WANT TO RESPOND?

12             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

13             FIRST OF ALL, OF COURSE, THE STANDARD FOR

14   A RULE 50 MOTION IS THAT -- IT CAN ONLY BE GRANTED

15   IF NO REASONABLE JURY CAN FIND IN THE NON-MOVING

16   PARTY'S FAVOR.

17             CONFLICTING INTERESTS HAVE TO BE DRAWN,

18   CONFLICTING INFERENCES HAVE TO BE DRAWN IN OUR

19   FAVOR AT THIS POINT IN THE CASE.

20             AT THE OVERALL LEVEL, OBVIOUSLY WE

21   DISAGREE.  WE THINK WE HAVE PROVIDED DETAILED,

22   INCREDIBLY DETAILED EVIDENCE OF EACH OF OUR

23   INFRINGEMENT CLAIMS ON A CLAIM-BY CLAIM BASIS.

24             I SAT HERE WHILE BOTH DR. BALAKRISHNAN

25   AND DR. SINGH WENT THROUGH THE PATENT CLAIM

 1    LANGUAGE AND APPLIED IT TO THE ACCUSED DEVICES.

 2              THE COURT:  WHAT EVIDENCE HAVE YOU

 3    PROVIDED THAT ACE AND SOME OF THE OTHER SMARTPHONES

 4    WERE SOLD IN THE U.S.?

 5              MR. MCELHINNY:  ON THOSE THREE SPECIFIC

 6    PHONES, YOUR HONOR, THE EVIDENCE WAS THAT SAMSUNG'S

 7    WITNESS TESTIFIED THAT THEY WERE GLOBAL VERSIONS,

 8    SO IT'S -- THE REST OF THE VERSIONS THAT WE'RE

 9    TALKING ABOUT WERE DIRECTED TO THE UNITED STATES,

10    BUT THE TESTIMONY IS THAT THOSE, THREE OF THOSE

11    DEVICES WERE GLOBAL VERSIONS.

12              THE COURT:  AND WHO WAS THAT,

13    MR. DENISON, OR WHO WAS THAT?

14              MR. MCELHINNY:  THAT WAS MR. DENISON WHO

15    DESCRIBED THEM AS GLOBAL VERSIONS.

16              THE IMPLICATION IS THAT THEY WERE SOLD

17    AROUND THE GLOBE, AND THAT WOULD INCLUDE THE

18    UNITED STATES, AT LEAST THAT WOULD BE THE INFERENCE

19    AT THIS POINT UNTIL SOMEBODY COMES IN AND SAYS THAT

20    THEY WEREN'T ON THOSE THREE PARTICULAR PHONES.

21              THE COURT:  WAS THE GEM JX 1021 ONE OF

22    YOUR '381 PATENT SLIDES?  I THINK THAT IT WAS.  I

23    RECALL IT WAS, BUT --

24              MR. MCELHINNY:  IT WAS, YOUR HONOR.

25              THE COURT:  WHAT'S YOUR EVIDENCE OF

```
1     ACTIVE INDUCEMENT BY SEC?

2              MR. MCELHINNY:  ON ACTIVE INDUCEMENT, THE

3     TESTIMONY, AT LEAST TO DATE, IS THAT SEC SELLS

4     PHONES DIRECTLY -- WELL, FIRST OF ALL, WHAT WE GOT

5     THIS MORNING WERE THE ADMISSIONS THAT SEC WAS AWARE

6     OF THE PATENTS.  THEY KNEW ABOUT THE UTILITY

7     PATENTS.  THEY KNEW ABOUT THE DESIGN PATENTS.  THEY

8     CHOSE -- THE TESTIMONY IS THEY CHOSE NOT TO PAY ANY

9     ATTENTION TO THE DESIGN PATENTS BECAUSE THEY

10    THOUGHT THEIR PHONES DIDN'T LOOK THE SAME.  BUT THE

11    TESTIMONY WAS THAT THEY WERE AWARE OF THE DESIGN

12    ISSUES.

13             THERE WAS TESTIMONY ALSO FROM THE

14    LICENSING PERSON THAT THE DESIGN ISSUES HAD BEEN

15    SPECIFICALLY RAISED BY APPLE DURING THE INITIAL

16    CONVERSATIONS.

17             WE KNOW THAT SEC MANUFACTURES THE PHONES.

18    WE KNOW THAT SEC CONTROLS THE DESIGN OF THE PHONES.

19    WE KNOW THAT SEC COPIED.

20             SO THEY MADE THE INTERNAL CORPORATE

21    DECISIONS THAT THE PHONES THEY SOLD WOULD BE

22    KNOCK-OFFS OF THE APPLE PRODUCTS THAT THEY WERE

23    SELLING.

24             WE KNOW THAT SEC CONTROLS THE PRICE AT

25    WHICH THEY'RE SOLD, CONTROLS THE PRICE AT WHICH
```

```
 1    THEY'RE SOLD TO CARRIERS.

 2              AND IN ADDITION TO THAT, DIRECTS ITS

 3    SUBSIDIARIES IN THE UNITED STATES TO SELL THESE

 4    INFRINGING PRODUCTS, WE WOULD SAY KNOWING, BUT

 5    CERTAINLY WILLFULLY BLINDLY OF THE FACT THAT THEIR

 6    SALES INFRINGE APPLE'S PATENT.

 7              THE COURT:  WHAT'S YOUR RESPONSE TO FAME

 8    BEING A HIGHER STANDARD THAN SECONDARY MEANING?

 9              MR. MCELHINNY:  WE THINK -- WE THINK THAT

10    WE HAVE PROVED FAME.  THE EVIDENCE THAT WENT IN TO

11    SHOW FAME WERE THE DOCUMENTS, INCLUDING SAMSUNG'S

12    OWN DOCUMENTS.  WE JUST LOOKED AT ONE THAT WAS -- I

13    MEAN, WE JUST GOT THROUGH LOOKING AT A DOCUMENT

14    THAT WAS DATED NOVEMBER OF 2007 TALKING ABOUT THE

15    INFLUENCES THAT THE IPHONE WOULD HAVE, HOW IT WOULD

16    CHANGE THE NATURE OF THE SMARTPHONE MARKET,

17    INCLUDING BY ITS BEAUTIFUL DESIGN.

18              SO SAMSUNG'S OWN -- AND THAT WAS JUST ONE

19    OF THE DOCUMENTS.  SO WE HAVE A NUMBER OF SAMSUNG

20    DOCUMENTS.

21              IF YOU REMEMBER BACK TO THAT GRAVITY TANK

22    SURVEY THAT THEY DID OF THE POPULATION, THAT SHOWED

23    IT WAS A REVOLUTIONARY DESIGN, THAT PEOPLE

24    IMMEDIATELY IDENTIFIED IT, THAT THEY WERE BUYING

25    IT.  WE HAVE THE WORDS "THE WOW EFFECT" THAT WAS
```

```
1     INTRODUCED BY SAMSUNG -- BY APPLE.

2             ALL OF THESE DESIGNS, ALL OF WHICH

3     SAMSUNG'S EVIDENCE, NOT OURS, BUT SAMSUNG'S

4     EVIDENCE ATTRIBUTED DIRECTLY.

5             WE HAVE THE CHAIRMAN AND CHIEF EXECUTIVE

6     OFFICER OF SAMSUNG SAYING THAT THE IPHONE

7     ESTABLISHED THE STANDARD FOR HOW SMARTPHONES HAD TO

8     BE DESIGNED IN THE UNITED STATES.  THAT'S SIMPLY

9     ADMISSIONS.

10             IN ADDITION TO THAT, WE HAVE PUT IN,

11     OBVIOUSLY TO THE EXTENT WE WERE PERMITTED TO, WE

12     PUT IN THE AMOUNT OF ADVERTISING THAT APPLE HAD PUT

13     IN.

14             MR. SCHILLER TESTIFIED AT GREAT LENGTH

15     ABOUT WHAT IS UNIQUE ABOUT APPLE'S ADVERTISING IS

16     THIS "PRODUCT AS HERO" APPROACH IN WHICH THE

17     ADVERTISING, BY AND LARGE, IS DIRECTED TO THE TRADE

18     DRESS, THE PHYSICAL DESIGNS, THE BEAUTY OF THE

19     PRODUCTS ITSELF.

20             WE THEN ALSO HAVE A LARGE NUMBER OF

21     ARTICLES, REFERENCES TO MOVIES, REFERENCES TO

22     TELEVISION SHOWS, ALL OF WHICH MAKE THE APPLE

23     PRODUCT IMMEDIATELY IDENTIFIABLE.

24             THE COURT:  WHAT'S YOUR RESPONSE TO NO

25     ALLOCATION IN THE DAMAGES BETWEEN ALLEGEDLY
```

1    INFRINGING OR ACCUSED FEATURES VERSUS

2    NON-INFRINGING PRODUCTS VERSUS NON-INFRINGING --

3            MR. MCELHINNY:  I BELIEVE THE ONLY

4    EVIDENCE, THE ONLY CONTRARY EVIDENCE IN THE RECORD

5    THAT I HEARD -- AND YOUR HONOR OBVIOUSLY IS THE

6    JUDGE OF THIS, YOUR HONOR OBVIOUSLY IS THE JUDGE --

7    BUT THE ONLY EVIDENCE I HEARD WAS MR. PRICE'S

8    QUESTION.

9            WE JUST LISTENED TO MR. MUSIKA GO THROUGH

10   HIS SUMMARY AND POINT OUT THAT, AT A MINIMUM, ON

11   THE LAST PAGE A ROYALTY NUMBER IS BROKEN OUT FOR

12   EACH INDIVIDUAL PATENT.

13           IN ADDITION, THERE'S A CHART THAT SETS

14   OUT BY QUARTER, SO IF THERE'S ANY QUESTION ABOUT

15   WHEN INFRINGEMENT BEGAN, THE JURY CAN DETERMINE BY

16   QUARTER WHAT THE NUMBER OF ACCUSED DEVICES, OR

17   INFRINGING DEVICES WOULD BE, AND IT'S A MATTER OF

18   MULTIPLYING THAT AMOUNT AGAINST THE INDIVIDUAL

19   ROYALTY IN THE BACKGROUND FOR THE CALCULATION OF

20   THE ROYALTY THAT HAS BEEN MADE IN EVERY SINGLE

21   CASE.

22           SO MR. MUSIKA'S REPORT IS, AS HE

23   DESCRIBED IT, A MATRIX THAT WOULD PERMIT THE JURY

24   TO COME TO -- TO CALCULATE ANY OF THE THOUSANDS OF

25   PERMUTATIONS OR -- THAT, IN THEORY ARE POSSIBLE

1    HERE DEPENDING ON THE INDIVIDUAL PHONE AND THE

2    PATENT AND THE INDIVIDUAL NUMBERS ARE BROKEN OUT IN

3    EVERY CASE.

4              THE COURT:  WHAT'S YOUR RESPONSE TO THE

5    FACT THAT THERE'S, THERE'S THE ASSERTION THAT

6    THERE'S NO NOTICE OF THE TRADE DRESS OR DESIGN

7    PATENTS IN THAT AUGUST 4TH, 2010 MEETING UNTIL THIS

8    LAWSUIT WAS FILED AND UNTIL THE AMENDMENT IN THE

9    SUMMER OF 2011?

10             MR. MCELHINNY:  THE -- THE QUESTION, YOU

11   KNOW -- WELL, FIRST OF ALL, WE KNOW AS A MATTER OF

12   LAW THAT ACTUAL NOTICE DOES NOT REQUIRE THE

13   SPECIFIC NAMING OF PRODUCTS THAT ARE ACCUSED.

14             WE ALSO KNOW THAT, UNDER -- FIRST OF ALL,

15   THE COURTS HAVE TOLD US, THE SUPREME COURT HAS TOLD

16   US THAT THE QUESTION OF NOTICE IS A FACT INTENSIVE

17   DETERMINATION THAT TURNS ON THE PARTICULAR FACTS OF

18   EVERY CASE.

19             WE KNOW THAT THE SPECIFIC PATENT NUMBERS

20   ARE NOT REQUIRED IN ORDER TO GIVE ACTUAL NOTICE.

21   THAT'S THE CHICO MANUFACTURING COMPANY, 817 F.SUPP

22   979.

23             WE ALSO KNOW THAT IN THE CASE OF ONGOING

24   RELATIONSHIPS BETWEEN PARTIES THAT ARE IN A

25   CONTRACTUAL RELATIONSHIP, THE NOTICE REQUIREMENTS

1    ARE REDUCED.

2            SO THAT'S THE BACKGROUND.

3            BUT WE HAVE MR. TEKSLER'S TESTIMONY AND

4    WE HAVE HIS -- WELL, WE HAVE -- WE HAVE IT FROM

5    BOTH SIDES, YOUR HONOR.

6            WE PRODUCED MR. TEKSLER, WHO TESTIFIED

7    ABOUT THE DOCUMENT THAT HE PREPARED.  HE HAS NOT

8    YET -- BECAUSE OF THE WAY THE CASE HAS BEEN DIVIDED

9    UP, THIS IS PART OF THAT SEPARATION -- HE'S NOT YET

10   BEEN PERMITTED TO TESTIFY ABOUT WHAT HAPPENED AT

11   ANYTHING OTHER THAN THE FIRST MEETING.

12           BUT HE WAS PERMITTED TO TESTIFY ABOUT THE

13   DOCUMENT THAT WAS USED AT THE FIRST MEETING.  HE

14   POINTED OUT THAT THERE WAS AN INTENTIONAL CHAPTER

15   TO THE BACKGROUND OF THE DISCUSSION OF THE DESIGN

16   AND TRADE DRESS ISSUES THAT SHOWED THE PHONES NEXT

17   TO EACH OTHER.

18           AND THEN WE HAVE THE TESTIMONY FROM MR.,

19   I WANT TO SAY LEE, THE FIRST PERSON I PLAYED TODAY,

20   WHO WAS ON THE OTHER SIDE OF THOSE DISCUSSIONS WHO

21   TESTIFIED THAT HE WAS THERE, THAT SAMSUNG -- THAT

22   APPLE DID ACCUSE SAMSUNG BOTH OF INFRINGEMENT OF

23   UTILITY PATENTS, BUT ALSO OF COPYING THE DESIGNS OF

24   THEIR PRODUCTS.

25           AND HE TESTIFIED THAT THAT SPECIFICALLY

1    HAPPENED, THAT SAMSUNG LISTENED, BUT IT CHOSE NOT

2    TO DO ANYTHING ABOUT THAT.

3            SO I -- ACTUAL NOTICE IS, I THINK -- ONE,

4    IT'S GOING TO BE SUBJECT TO HOW YOUR HONOR

5    SPECIFICALLY INSTRUCTS THE JURY ULTIMATELY, BUT THE

6    FACTS RIGHT NOW CERTAINLY WOULD SUPPORT A VERDICT

7    IN OUR FAVOR THAT SAMSUNG HAD ABSOLUTE NOTICE GIVEN

8    THOSE FIRST MEETINGS AND THE DOCUMENTS THAT WERE

9    EXCHANGED.

10           THE COURT:  ALL RIGHT.  MR. ZELLER, WHAT

11   WOULD YOU -- I DON'T AGREE WITH YOU THAT THE GORHAM

12   TEST REQUIRES DECEPTION AT THE TIME OF PURCHASING.

13   I DON'T THINK THAT'S WHAT THE LAW IS.

14           IF I DISAGREE WITH YOU ON THAT, THEN

15   PERSUADE ME WHY A REASONABLE JURY WOULDN'T HAVE A

16   LEGALLY SUFFICIENT EVIDENTIARY BASIS TO FIND FOR

17   APPLE.

18           MR. ZELLER:  MAYBE LET ME CLARIFY ONE

19   THING, YOUR HONOR.  I DIDN'T SAY AT THE POINT OR

20   TIME OF THE PURCHASE.  IT'S IN THE PURCHASING

21   CONTEXT.  THE GORHAM STANDARD DOES SAY THAT THE

22   DECEPTION HAS TO BE IN THE PURCHASING CONTEXT SUCH

23   THAT THE ORDINARY OBSERVER THINKS THAT HE OR SHE IS

24   PURCHASING THE DESIGN THINKING IT'S THE OTHER.

25           THE COURT:  WELL, I GUESS I JUST DON'T

```
 1      AGREE THAT THAT'S WHAT THE LAW REQUIRES, THAT A
 2      PERSON ACTUALLY BE DECEIVED AT THE POINT OF
 3      PURCHASE INTO THINKING THAT THEY ARE BUYING AN
 4      ALLEGEDLY INFRINGING PRODUCT.
 5              MR. ZELLER:  I'M NOT --
 6              THE COURT:  I DON'T THINK THAT'S THE LAW
 7      AND I DON'T INTEND TO INSTRUCT THE JURY THAT THAT'S
 8      THE LAW.
 9              SO IF I DON'T AGREE WITH YOU ON THAT
10      POINT OF THE LAW, PERSUADE ME WHY OTHERWISE THERE'S
11      NOT A LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR A
12      JURY TO RULE IN APPLE'S FAVOR.
13              MR. ZELLER:  WELL, I THINK THE SHORT
14      ANSWER IS I'M NOT TRYING TO PERSUADE YOU THAT
15      THAT'S NOT THE LAW.
16              I THINK WHAT I'M SAYING, YOUR HONOR --
17      AND BEAR WITH ME AND I WILL GET THE EXACT
18      LANGUAGE -- BUT WHAT IT SAYS IS -- THIS IS THE
19      GORHAM TEST VERBATIM, "IF, IN THE EYE OF AN
20      ORDINARY OBSERVER, GIVING SUCH ATTENTION AS A
21      PURCHASER USUALLY GIVES TO DESIGNS, ARE
22      SUBSTANTIALLY THE SAME, IF THE RESEMBLANCE IS SUCH
23      AS TO DECEIVE SUCH AN OBSERVER, INDUCING HIM TO
24      PURCHASE ONE SUPPOSING IT TO BE THE OTHER, THE
25      FIRST ONE PATENTED IS INFRINGED BY THE OTHER."
```

1          THAT'S WHAT I REFER TO WHEN I TALK ABOUT

2     PURCHASING.

3          THE COURT:  I HEAR YOU, AND I THINK THERE

4     IS LAW THAT SAYS THAT.

5          BUT I THINK ALL THE SUBSEQUENT LAW SAYS

6     THAT THAT'S NOT THE TEST -- THE TEST IS NOT THAT

7     HIGH, THAT YOU ACTUALLY HAVE TO BE DECEIVED AT THE

8     TIME OF YOUR PURCHASING, THAT YOU HAVE TO BE

9     DECEIVED.  I DON'T THINK THAT'S THE LAW.

10         BUT ANYWAY, LET ME GIVE YOU AN

11    OPPORTUNITY TO RESPOND TO ANYTHING YOU WANT AS TO

12    WHAT MR. MCELHINNY STATED, AND IF YOU WANT TO MAKE

13    ANY OTHER NEW POINTS, TO DO SO.

14         MR. ZELLER:  YOUR HONOR, I WOULD JUST TO

15    THIS POINT, BECAUSE IT'S OBVIOUSLY AN IMPORTANT ONE

16    FROM OUR PERSPECTIVE.  THIS IS ALSO THE EXACT

17    VERBATIM LANGUAGE THAT THE FEDERAL CIRCUIT USED IN

18    EGYPTIAN GODDESS, WHICH IS THE LAST EN BANC

19    DECISION BY THE FEDERAL CIRCUIT ON DESIGN PATENTS.

20         IT SPECIFICALLY QUOTED THAT SAME LANGUAGE

21    THAT I HAVE JUST QUOTED.

22         THE COURT ALSO IS AWARE THAT EVEN -- THAT

23    WAS THE STANDARD THAT THIS COURT APPLIED, THIS

24    EXACT LANGUAGE THIS COURT APPLIED ON THE

25    PRELIMINARY INJUNCTION, AS WELL AS MOST RECENTLY IN

2203

```
 1      ITS ORDER ON CLAIM CONSTRUCTION.

 2                 SO I, I APOLOGIZE IF I'M -- IF WE'RE

 3      TALKING PAST EACH OTHER OR IF I'M MISUNDERSTANDING

 4      YOU.

 5                 BUT WHAT WE'RE ADVOCATING SIMPLY IS THAT

 6      THIS GORHAM TEST, THE LANGUAGE THAT I DESCRIBED

 7      WHICH WE THINK IS A BINDING LAW --

 8                 THE COURT:  OH, I REMEMBER WE HAD

 9      CONVERSATIONS ABOUT THIS VERY LAW AT THE

10      PRELIMINARY INJUNCTION HEARING BACK IN OCTOBER.

11                 I HEAR YOU, BUT I DON'T THINK THE TEST IS

12      ACTUAL DECEPTION IS WHAT I'M TRYING TO SAY.  I

13      DON'T THINK THAT'S THE REQUIREMENT.

14                 MR. ZELLER:  AND I THINK WE AGREE ON

15      THAT.  WE'RE NOT SAYING THAT APPLE HAS TO ADDUCE

16      EVIDENCE OF BUYERS WHO HAVE BEEN ACTUALLY DECEIVED.

17                 NOW, WE DO THINK THAT THAT'S A RELEVANT

18      PIECE OF EVIDENCE.

19                 THE COURT:  SURE, YEAH.

20                 MR. ZELLER:  THE FEDERAL CIRCUIT HAS

21      CERTAINLY CONSIDERED THAT.

22                 BUT I WANT TO BE VERY CLEAR, YOUR HONOR,

23      BECAUSE WE ARE NOT ADVOCATING THAT THEY NEED TO

24      PROVE ACTUAL CONFUSION, FOR EXAMPLE, OR ACTUAL

25      DECEPTION.
```

```
 1              BUT THE LACK OF IT IN THE REAL WORLD IS

 2    CERTAINLY A PERTINENT CONSIDERATION.

 3              BUT REALLY, TO THEN GO A STEP FURTHER,

 4    YOUR HONOR, TO PERHAPS PERSUADE YOU ON THIS POINT,

 5    WHAT OUR POINT IS ON THE RULE 50 MOTION IS THAT

 6    APPLE'S OWN EXPERTS, WHEN THEY CAME IN, DID NOT

 7    APPLY THIS STANDARD.  THEY DIDN'T APPLY THE, THE

 8    GORHAM DECEPTION STANDARD.

 9              JUDGE KARE -- EXCUSE ME -- DR. KARE, FOR

10    EXAMPLE, SAID ESSENTIALLY THAT SHE JUST THOUGHT

11    THAT THE OVERALL APPEARANCE WAS SIMILAR.  SHE NEVER

12    UTTERED THE WORDS -- SHE NEVER TALKED ABOUT EVEN

13    APPLYING THE GORHAM STANDARD.

14              MR. BRESSLER, IN FACT, EVEN WENT FURTHER.

15    MR. BRESSLER ACKNOWLEDGED THAT HE DID NOT APPLY

16    DECEPTIVE SIMILARITY AS THE STANDARD.  HE SAID HE

17    WAS INSTRUCTED BY COUNSEL THAT THAT WAS NOT

18    NECESSARY.

19              AND SO OUR POINT IS THAT UNDER THAT

20    STANDARD ADOPTED BY THIS COURT, THE FEDERAL

21    CIRCUIT, THE SUPREME COURT, THEIR OWN EXPERTS

22    FAILED TO APPLY IT AND THAT IS WHY WE'RE MOVING ON

23    THAT GROUND.

24              THE COURT:  OKAY.  IS THERE ANYTHING ELSE

25    THAT MR. MCELHINNY SAID THAT YOU WOULD LIKE TO
```

1    ADDRESS OR ANY OTHER BASIS FOR A RULE 50 MOTION

2    THAT YOU WANT TO STATE?

3            MR. ZELLER:  YES, YOUR HONOR.

4            WITH RESPECT TO -- I'LL JUST TAKE THEM IN

5    ORDER.

6            THE COURT:  OKAY.

7            MR. ZELLER:  WITH RESPECT TO THE GALAXY

8    ACE, THE GALAXY S I9000, AND THE GALAXY S II I9100,

9    MR. DENISON ACTUALLY TESTIFIED TO THE OPPOSITE OF

10   WHAT APPLE'S COUNSEL SAID.

11           MR. DENISON SPECIFICALLY TESTIFIED THAT

12   THOSE MODELS WERE NOT SOLD IN THE UNITED STATES.

13           AND I BELIEVE THIS IS THE CITATION FOR

14   IT, I'LL HAVE TO DOUBLE CHECK, BUT I BELIEVE YOU'LL

15   FIND IT AT PAGES 947 THROUGH 948 AND 961 OF AT

16   LEAST ONE VERSION OF THE TRANSCRIPT.

17           THE COURT:  LET ME SEE THAT, PLEASE.  WHO

18   HAS THAT?

19           AND WHAT'S YOUR RESPONSE TO THAT,

20   MR. MCELHINNY?

21           MR. MCELHINNY:  MY RECOLLECTION, I

22   BELIEVE THAT MR. DENISON SAID THOSE PRODUCTS WERE

23   NOT SOLD IN THE UNITED STATES BY STA, YOUR HONOR.

24           MR. VERHOEVEN:  WE'VE GOT IT HERE, YOUR

25   HONOR.  WE'LL GET IT.

```
1              THE COURT:  OKAY.  THANK YOU.

2              MR. VERHOEVEN:  WHAT'S THE PAGE NUMBER,

3    MR. ZELLER?

4              THE COURT:  947 TO 961.

5              MR. ZELLER:  947, 948, AND 961.

6              THE COURT:  SO, MR. MCELHINNY, WHO DID HE

7    SAY SOLD THEM, THEN?

8              MR. MCELHINNY:  HE SAID THEY WERE THE

9    GLOBAL VERSION, YOUR HONOR, AND HE SAID THAT HIS

10   PARTICULAR COMPANY DIDN'T SELL THEM.  THAT'S WHAT

11   THE EVIDENCE IS, I BELIEVE.

12             THE COURT:  CAN I SEE THE TRANSCRIPT,

13   PLEASE?  JUST HAND THAT TO MR. RIVERA.

14             MR. MCELHINNY:  THIS IS MY COPY, YOUR

15   HONOR.  I HAVEN'T HAD A CHANCE TO CHECK THIS.  I'M

16   JUST GIVING YOU MY COPY OF THE TRANSCRIPT.

17             THE COURT:  IT DOESN'T HAVE ANY NOTES ON

18   IT, DOES IT?

19             MR. MCELHINNY:  NO, YOUR HONOR, IT

20   DOESN'T.

21             THE COURT:  ALL RIGHT.

22             (PAUSE IN PROCEEDINGS.)

23             MR. ZELLER:  AND THE OPERATIVE PART OF

24   THIS, YOUR HONOR, THE CONTEXT BEGINS ON PAGE 947,

25   LINE 6, AND HERE HE'S TALKING ABOUT CERTAIN PHONES.
```

```
1               AND THEN THE MEAT OF THE TESTIMONY BEGINS
2     AT 947, LINE 25 THROUGH 948, LINE 13.
3               AND HE ACTUALLY ANSWERED A BROADER
4     QUESTION THAN APPLE'S COUNSEL HAS ASSERTED.  IN
5     TALKING ABOUT THAT, HE SAYS -- HE'S POINTING TO
6     THE -- COUNSEL IS POINTING HIM TO THESE PARTICULAR
7     THREE PHONES, AND HE SAYS, "THESE ARE THE LAST
8     THREE REMAINING PHONES AT ISSUE BASED ON MY
9     UNDERSTANDING.  THESE ARE GLOBAL, GLOBAL DEVICES.
10              "QUESTION:  ARE ANY OF THESE PHONES SOLD
11    BY ANY SAMSUNG ENTITY IN THE UNITED STATES?
12              "ANSWER:  NO, THEY'RE NOT."
13              AND, OF COURSE, EVEN IF IT WERE ONLY ONE
14    ENTITY, YOUR HONOR, WE'D STILL BE ENTITLED TO
15    JUDGMENT AS TO THAT ENTITY.
16              THE COURT:  ALL RIGHT.  MR. MCELHINNY,
17    WHAT'S YOUR RESPONSE?
18              MR. MCELHINNY:  MAY I POINT OUT THAT
19    THAT -- THAT'S DELFIG, YOUR HONOR.  THE QUOTE IS
20    DELFIG.
21              WHAT HE TESTIFIED WAS THEY WERE NOT SOLD
22    BY SAMSUNG ENTITIES IN THE UNITED STATES.  "IN THE
23    UNITED STATES" REFERS TO STA AND SEA, YOUR HONOR.
24              MR. ZELLER:  THE QUESTION WAS, "ARE ANY
25    OF THESE PHONES SOLD BY ANY SAMSUNG ENTITY IN THE
```

1    UNITED STATES?

2              "ANSWER:  NO, THEY'RE NOT.

3              MR. MCELHINNY:  WHICH LEAVES OPEN THE

4    POSSIBILITY THAT THEY'RE GLOBAL SOLD DIRECTLY BY

5    SEC.

6              MR. ZELLER:  I WOULD ALSO JUST POINT OUT,

7    OF COURSE, THAT RULE 50 REQUIRES APPLE TO PUT IN

8    EVIDENCE, NOT POSSIBILITY AT THIS POINT.

9              THEY'VE FAILED TO PROVE THAT ANY OF THE

10   NAMED DEFENDANTS IN THIS CASE SOLD ANY OF THESE

11   TELEPHONES AND THESE MOBILE PHONES IN THE

12   UNITED STATES.

13             THAT'S OBVIOUSLY A PREDICATE FOR

14   INFRINGEMENT, DAMAGES.  AND THIS IS THE SUM TOTAL

15   OF THE EVIDENCE ON THAT ISSUE.

16             (PAUSE IN PROCEEDINGS.)

17             THE COURT:  WHAT'S YOUR UNDERSTANDING OF

18   WHAT "GLOBAL" MEANS?

19             MR. ZELLER:  I THINK HE'S JUST SIMPLY

20   SAYING THAT THEY'RE SOLD IN MORE THAN ONE MARKET.

21             BUT HE'S ALSO SAYING THEY'RE NOT SOLD IN

22   THE UNITED STATES.  IT'S -- IN OTHER WORDS, IT'S --

23   "GLOBAL" MEANS NOT THE UNITED STATES.  THAT'S THE

24   POINT OF IT.

25             THE COURT:  DOES THAT MEAN SEC IS SELLING

```
1          THEM IN KOREA TO THE CARRIERS?

2                    MR. ZELLER:  NO, IT DOES NOT, YOUR HONOR.

3                    IT MEANS THAT THEY'RE NOT BEING SOLD FOR

4          THE U.S. MARKET.  THEY'RE NOT DESIGNED FOR THE U.S.

5          MARKET.  THEY'RE NOT BEING SOLD HERE.

6                    AND IF THEY WERE, YOUR HONOR, APPLE WOULD

7          BE ABLE TO PUT IN EVIDENCE FROM CARRIER SALES OR

8          ANY OTHER NUMBER OF SOURCES SHOWING THAT THEY WERE

9          SOLD, AND WE ARE AT THE CONCLUSION, APPLE HAS

10         RESTED, AND IT DID NOT PUT IN EVIDENCE ON THOSE

11         PHONES.

12                   MR. MCELHINNY:  AND TO BE CLEAR, YOUR

13         HONOR, EVEN IF YOU GAVE US A CHANCE TO REOPEN, WE

14         WOULD NOT CALL MR. ZELLER TO BE THE WITNESS ON THIS

15         ISSUE.  BUT WE HAVE --

16                   THE COURT:  WELL, I GUESS -- THIS IS MY

17         QUESTION.  SO THE FIRST QUESTION IS, "ALL RIGHT.

18         THESE ARE THE PHONES THAT ARE AT ISSUE IN THE CASE.

19                   "ANSWER:  YES.

20                   "QUESTION:  WHEN YOU SAY 'MAPPED OUT BY

21         CARRIER,' WHAT DO YOU MEAN BY THAT?

22                   "ANSWER:  I JUST MEAN THAT, YOU KNOW, FOR

23         INSTANCE, THE GALAXY S CAPTIVATE, WHICH IS RIGHT

24         NEXT TO AT&T, THAT PHONE IS SOLD FROM STA TO AT&T

25         AND NOT TO ANY OTHER CARRIER.  SO THAT'S TRUE OF
```

1      ALL OF THESE.

2                 "QUESTION:  WE'VE TAKEN A LOOK AT THOSE

3      PHONES, BUT FIRST I'D LIKE TO TURN TO THE NEXT

4      DEMONSTRATIVE EXHIBIT."

5                 WHAT'S 3585?

6                 MR. ZELLER:  IF WE CAN PULL THAT UP,

7      PLEASE, 3585.

8                 THE COURT:  I HAVE IT RIGHT HERE.

9                 MR. ZELLER:  WE HAVE IT ON THE SCREEN,

10     YOUR HONOR.

11                THE COURT:  OKAY.

12                MR. ZELLER:  SO THIS IS, FOR THE RECORD,

13     SDX 3585.  AND IT HAS THESE THREE BULLET POINTS,

14     THE THREE PHONES THAT WE'VE BEEN TALKING ABOUT, THE

15     GALAXY S I9000, GALAXY ACE, AND GALAXY S II I9100.

16                (PAUSE IN PROCEEDINGS.)

17                THE COURT:  ALL RIGHT.  WHAT ELSE DO YOU

18     HAVE, MR. ZELLER?

19                MR. ZELLER:  THEN WITH RESPECT TO THE --

20     ANOTHER ISSUE THAT HAS BEEN RAISED WHICH PERTAINS

21     TO THE GEM, AND APPLE'S COUNSEL REPRESENTED THEY

22     WERE DISCLOSED IN CONNECTION WITH THE LOCAL RULE

23     3-1 DISCLOSURES.  THAT'S NOT CORRECT.

24                AND, IN FACT, IN THE ROW IDENTIFYING THE

25     CLAIMS THAT APPLE ACCUSED THE GEM OF INFRINGING, IT

1    LISTED N/A FOR THE '381 PATENT.  AT NO TIME DID

2    APPLE MOVE TO -- FOR LEAVE TO AMEND ITS

3    INFRINGEMENT CONTENTIONS FOR THE GEM AS REQUIRED BY

4    THE LOCAL RULES.

5           THE COURT:  I DON'T REALLY THINK THAT'S A

6    RULE 50 ARGUMENT.  IF YOU WANTED TO EXCLUDE THIS,

7    THIS REALLY SHOULD HAVE BEEN AN OBJECTION TO ANY

8    SPECIFIC EVIDENCE.  YOU GOT ALL THEIR

9    DEMONSTRATIVES AND ALL THEIR EXHIBITS.

10          MR. ZELLER:  WE DID OBJECT, YOUR HONOR.

11          THE COURT:  WELL, I OVERRULED IT, SO I

12   DON'T THINK THAT'S A BASIS FOR A RULE 50.

13          BUT GO ON, PLEASE.

14          MR. ZELLER:  AND THEN WITH RESPECT TO THE

15   POINTS ABOUT FAME, YOUR HONOR, THE ONLY EVIDENCE

16   THAT APPLE'S COUNSEL POINTED TO DOES NOT ADDRESS

17   THE KEY POINT, WHICH IS CONSUMER RECOGNITION.

18          THE NINTH CIRCUIT HAS BEEN VERY CLEAR

19   THAT THE STANDARD IS A VERY HIGH ONE, AND IT HAS TO

20   BE THAT THE GENERAL CONSUMING PUBLIC RECOGNIZES THE

21   TRADEMARK OR TRADE DRESS.  IT HAS TO BE A HOUSEHOLD

22   NAME.

23          THE KINDS OF DOCUMENTS THAT APPLE'S

24   COUNSEL HAS POINTED TO ARE DOCUMENTS BY ENGINEERS

25   EXTOLLING THE ALLEGED VIRTUES OF CERTAIN FEATURES

2212

1    OR SAYING THAT THE IPHONE HAS INFLUENCE.

2              THOSE ARE NOT STATEMENTS DIRECTED TO

3    WHETHER OR NOT THERE IS U.S. CONSUMER RECOGNITION

4    THAT IS SUFFICIENTLY HIGH TO CONSTITUTE FAME, LET

5    ALONE FOR THE KIND OF --

6              THE COURT:  THAT ONE I THINK IS A WEAKER

7    ARGUMENT BASED ON EVEN THE DEPOSITION THAT CAME IN

8    TODAY ABOUT THE ADVERTISEMENTS BEING CONFUSED.

9              MR. ZELLER:  UM-HUM.

10             THE COURT:  THAT THEY THOUGHT A SAMSUNG

11   TABLET ADVERTISEMENT WAS AN IPAD ADVERTISEMENT.

12   THAT WAS A SAMSUNG WITNESS.  I'M LESS PERSUADED BY

13   THAT POINT.

14             MR. ZELLER:  IF I COULD ADDRESS THAT

15   SPECIFIC ARGUMENT, YOUR HONOR?

16             THE COURT:  YEAH, AND THE BEST BUY

17   ARGUMENT.  ANYWAY, I THINK THAT'S A WEAKER POINT.

18             I THINK YOU HAVE A STRONGER POINT ON THE

19   ACE AND THE I9000 AND THE I9100, BUT GO AHEAD.

20             MR. ZELLER:  IF I COULD ADDRESS THOSE TWO

21   DOCUMENTS BRIEFLY, YOUR HONOR?

22             THE COURT:  YEAH.

23             MR. ZELLER:  THE DEEP DIVE DOCUMENT THAT

24   WAS ACTUALLY DISCUSSED TODAY IS ABOUT THE TAB 7.0.

25   IT'S NOT AN ACCUSED DEVICE.  THE COURT WILL RECALL

1    THAT THAT'S THE ONE THAT A LIMITING INSTRUCTION HAS

2    BEEN GIVEN ON.  IT CAN'T BE USED FOR THE TRUTH OF

3    THE MATTER ASSERTED TO EVEN SHOW CONFUSION.  IT'S

4    ONLY FOR WILLFULNESS OR KNOWLEDGE.

5              AND ALSO, I WOULD SUBMIT THAT THAT IS --

6    THAT THAT STUDY DOES NOT SHOW THAT THE TRADE DRESS

7    THAT'S BEING ASSERTED HERE IS FAMOUS BECAUSE,

8    AGAIN, YOUR HONOR, APPLE IS NOT ASSERTING, TAKE A

9    LOOK AT OUR PRODUCT OVERALL AND IT'S FAMOUS.

10             WE WOULD PROBABLY HAVE A VERY, VERY

11   DIFFERENT DISCUSSION IF THAT'S WHAT APPLE WAS

12   ACTUALLY ASSERTING.

13             BUT APPLE HAS TAKEN THIS, THIS KIND OF

14   SELF-SERVING DEFINITION OF WHAT IT CLAIMS ITS TRADE

15   DRESS IS IN ORDER TO MAKE IT CLOSER TO SAMSUNG SO

16   IT CAN MAKE INFRINGEMENT AND DILUTION ARGUMENTS.

17             THE COURT:  I HEAR YOU, BUT THIS IS JUST

18   LEGAL SUFFICIENCY OF EVIDENCE, AND I THINK THAT HAS

19   BEEN MET.  SO I DON'T WANT TO WASTE A LOT OF TIME

20   ON THIS PARTICULAR ISSUE IF WE CAN.

21             MR. ZELLER:  I UNDERSTAND.  THANK YOU,

22   YOUR HONOR.

23             THE NEXT POINT, THEN, IS TALKING ABOUT

24   THE, THE DAMAGES.

25             AND ONE THING, YOUR HONOR, IF I HAVEN'T

1     MADE THIS CLEAR, IS WE ARE -- WE'RE ALSO MOVING ON

2     THE SAME GROUNDS AGAINST THE DAMAGES THEORIES AS WE

3     DID ON THE DAUBERT.  I DON'T NEED TO POINT -- I

4     DON'T NEED, AT THIS POINT, TO ELABORATE FURTHER ON

5     IT.  I THINK THAT WOULD BE ENOUGH.

6            BUT ONE THING I WOULD SAY IS THAT --

7     SPECIFICALLY IS THAT THERE'S STILL NO SHOWING THAT

8     THIS -- THAT THE JURY HAS SUFFICIENT INFORMATION TO

9     DETERMINE DAMAGES ON A PRODUCT-BY-PRODUCT BASIS,

10    AND THAT'S REALLY WHAT'S REQUIRED HERE.

11           ALL APPLE'S COUNSEL SAID IS, "WELL, THEY

12    CAN DETERMINE IT PATENT-BY-PATENT."

13           BUT THAT STILL IS NOT SUFFICIENT.

14           IT IS APPLE'S BURDEN TO PROVE THAT EVERY

15    DEVICE THEY'VE ACCUSED OF INFRINGING, THAT EVERY

16    SINGLE ONE, IN FACT, INFRINGES IT.

17           AND TO SIMPLY SAY THAT THEY CAN FIND THAT

18    ONE ACCUSED DEVICE INFRINGES THE '381, FOR EXAMPLE,

19    AND THEREFORE THEY CAN SIMPLY AWARD DAMAGES, OR

20    GIVE THAT KIND OF DAMAGES NUMBER THAT THEIR EXPERT

21    WAS TESTIFYING TO IS NOT SUFFICIENT.

22           THEY MADE NO EFFORT TO BREAK THIS DOWN ON

23    A PRODUCT-BY-PRODUCT BASIS AND THAT'S WHAT THEY'RE

24    REQUIRED TO DO.

25           DAMAGES ARE NOT A LOTTERY.  THEY AREN'T

1    JUST ALLOWED TO COME IN HERE AND SAY, "WELL, IF YOU

2    FIND THE '381 IS INFRINGED, GIVE US, YOU KNOW, X

3    HUNDRED MILLIONS OF DOLLARS."

4            IT HAS TO BE BROKEN DOWN ON A

5    PRODUCT-BY-PRODUCT AND PATENT-BY-PATENT BASIS, AND

6    THAT'S WHERE WE THINK THESE DAMAGES CALCULATIONS,

7    IN DIRECT RESPONSE TO APPLE'S COUNSEL'S STATEMENT,

8    FAIL.

9            WE THINK THEY FAIL IN A VARIETY OF OTHER

10   WAYS THAT WERE NOT ADDRESSED BY APPLE.  BUT WE JUST

11   DON'T THINK THAT EVEN PATENT-BY-PATENT IS

12   SUFFICIENT UNDER THE LAW.

13           THEN WITH RESPECT TO THE NOTICE ARGUMENT,

14   THE -- NUMBER ONE, APPLE'S COUNSEL ACTUALLY

15   MISSTATED THE LAW.  THE LAW IS EXACTLY THE

16   OPPOSITE.  THE LAW SPECIFICALLY REQUIRES THAT

17   SPECIFIC RIGHTS BE, BE ASSERTED OR THAT THEY, THAT

18   THEY COME TO THE ATTENTION OF THE DEFENDANT.

19           IT'S NOT ENOUGH JUST TO SAY, "I HAVE SOME

20   GENERAL RIGHTS."  IT DOES HAVE TO BE WITH RESPECT

21   TO A SPECIFIC PATENT, AND THERE'S BEEN NO SHOWING

22   OF THAT WITH RESPECT TO ANY PATENT OTHER THAN THE

23   '381, AND THERE'S BEEN NO SHOWING OF THAT AS TO

24   THE, THE TRADE DRESS REGISTRATIONS THAT ARE BEING

25   ASSERTED HERE.

```
1              AND ALSO, IT -- APPLE'S COUNSEL

2     INCORRECTLY RECITED MR. TEKSLER'S TESTIMONY.

3              MR. TEKSLER, THE COURT WILL RECALL, WAS

4     NOT AT THE MEETINGS.  HE HAS ZERO FOUNDATION TO

5     TESTIFY ABOUT WHAT WAS SUPPOSEDLY SAID TO SAMSUNG

6     AT THESE MEETINGS.

7              THE COURT:  WELL, HE WASN'T AT THE

8     AUGUST 4TH, 2010 MEETING, BUT HE DID SAY HE HAD

9     SUBSEQUENT CONVERSATIONS WITH SAMSUNG EMPLOYEES AS

10    THE DIRECTOR OF I.P. LICENSING.

11             MR. ZELLER:  BUT HE ALSO ACKNOWLEDGED

12    THAT HE NEVER IDENTIFIED SPECIFIC PATENTS OR

13    SPECIFIC RIGHTS IN THOSE OTHER MEETINGS.

14             THE ONLY THING HE HAD -- THE ONLY THING

15    HE WAS TRYING TO ASSERT WAS HE HAD CREATED THIS

16    DOCUMENT FOR THE FIRST MEETING, AND THEY WERE

17    PUTTING THOSE UP AND THEY -- THE COURT WILL RECALL

18    THAT THEY MADE QUITE A SHOWING FOR THE JURY OF

19    THESE PARTICULAR COMPARISONS AND THE LIKE TRYING TO

20    GET ACROSS THE SUPPOSED NOTICE.

21             BUT ON CROSS-EXAMINATION, HE ADMITTED

22    THAT, NUMBER ONE, HE WASN'T AT THAT MEETING; AND

23    NUMBER TWO, AT NO TIME DID HE HAVE ANY KNOWLEDGE

24    THAT SAMSUNG WAS PUT ON NOTICE AS TO THOSE SPECIFIC

25    RIGHTS.  AND THAT WAS HIS TESTIMONY.
```

1          THE COURT:  ALL RIGHT.  LET ME HEAR --

2     WE'VE BEEN ARGUING THIS RULE 50 MOTION FOR ALMOST

3     AN HOUR.  WE STARTED AT 1:42.  IT'S NOW 2:38.

4          LET ME HEAR -- I WANT TO HEAR FROM APPLE

5     ON THIS ISSUE OF THE ACE, I9000, I9100.  THE ONLY

6     TESTIMONY IS THAT THESE THREE PHONES ARE GLOBAL,

7     THEY'RE GLOBAL DEVICES, BUT THEN "ARE ANY OF THESE

8     PRODUCTS SOLD BY ANY SAMSUNG ENTITY IN THE U.S.?"

9          "NO, THEY'RE NOT."

10          SO TELL ME WHY I SHOULDN'T GRANT

11    SAMSUNG'S RULE 50 MOTION AS TO THOSE THREE

12    PRODUCTS.

13          MR. MCELHINNY:  THE QUESTION IS WHETHER

14    OR NOT THIS JURY CAN INFER FROM TESTIMONY THAT THIS

15    WAS A GLOBAL PRODUCT, THAT IT WAS SOLD IN THE

16    UNITED STATES, "GLOBAL" MEANING ACROSS THE GLOBE.

17          AND THAT IS THE TESTIMONY.

18          THE CONTRARY TESTIMONY TO THAT, OR THE

19    QUALIFICATION ON THAT, IS NOT -- IT DOESN'T COVER

20    ALL THE SAMSUNG ENTITIES.

21          THE COURT:  WELL, IT SAYS "ANY SAMSUNG

22    ENTITIES."

23          MR. MCELHINNY:  "IN THE UNITED STATES,"

24    YOUR HONOR, "ANY SAMSUNG" -- AND THERE ARE ONLY

25    TWO -- ONLY TWO OF THE THREE ENTITIES ARE IN THE

```
 1    UNITED STATES.

 2              THE COMPANY THAT SELLS GLOBALLY --

 3              THE COURT:  OH, I SEE WHAT YOU'RE SAYING.

 4    YOU'RE SAYING THE "ANY SAMSUNG ENTITY IN THE U.S."

 5    REFERS TO THE TWO U.S. SUBSIDIARIES AND NOT TO --

 6              MR. MCELHINNY:  IT DOES, BECAUSE THE

 7    REST --

 8              THE COURT:  I SEE.

 9              MR. MCELHINNY:  BECAUSE THE REST OF THE

10    TESTIMONY, WHICH IS CONSISTENT, IS THAT GLOBAL --

11    THAT NEITHER OF THE TWO U.S. ENTITIES ARE

12    RESPONSIBLE FOR GLOBAL SALES.

13              THE COURT:  OH.  ALL RIGHT.

14              MR. ZELLER:  IF I MAY, YOUR HONOR?

15              THERE'S STILL NO EVIDENCE THAT IT'S BEEN

16    SOLD BY ANYBODY.  WE'VE BEEN PARSING AS TO WHETHER

17    IT CONCLUSIVELY SHOWS THAT THEY DID NOT -- THEY'VE

18    NOW ADMITTED THAT AT LEAST IT SHOWS IT AS TO THE

19    TWO U.S. ENTITIES, SO JUDGMENT WOULD HAVE TO BE

20    ENTERED AS TO THOSE TWO ENTITIES FOR THAT REASON

21    ALONE.

22              BUT EVEN IF ONE WERE TO INTERPRET THIS --

23    AND THIS IS, I DON'T THINK IT'S A FAIR

24    INTERPRETATION -- BUT EVEN IF THEY DID INTERPRET

25    IT, IT WAS INTERPRETED TO MEAN THAT THEY WERE ONLY
```

1    THE U.S. ENTITIES.

2            THE FACT IS THAT APPLE HAS NO EVIDENCE

3    THAT ANY OF THOSE PHONES WERE SOLD BY SEC IN THE

4    UNITED STATES, EITHER.

5            IT WASN'T OUR BURDEN -- IN OTHER WORDS,

6    WHAT I'M TRYING TO SAY IS IT WASN'T OUR BURDEN TO

7    COME FORWARD AND NEGATE THE ELEMENTS.  THEY STILL

8    HAVE TO PROVE THEM, EVEN IF THAT DOESN'T NEGATE IT

9    AS TO THAT ONE ENTITY.

10            THE COURT:  I HEAR YOU.

11            OKAY.  ARE YOU CONCEDING, THEN, THAT STA

12    AND OTHER U.S. SUBSIDIARIES DO NOT SELL THE ACE,

13    THE I9000, AND THE I9100 IN THE UNITED STATES?

14            MR. MCELHINNY:  I AM CONCEDING THAT WE

15    HAVE NOT PUT ON ANY EVIDENCE OF THAT.

16            THE COURT:  ALL RIGHT.

17            MR. MCELHINNY:  OF THOSE TWO ENTITIES,

18    YOUR HONOR.

19            THE COURT:  ALL RIGHT.  SO I'M GRANTING

20    THE RULE 50 MOTION AS TO THE -- LET'S GET THE FULL

21    NAME.

22            CAN YOU, MR. ZELLER, GIVE ME THE FULL

23    NAME JUST SO I GET THE PRODUCT NAMES CORRECT,

24    PLEASE.

25            MR. ZELLER:  YES, YOUR HONOR.

1          THE COURT:  IS IT THE GALAXY ACE?

2          MR. ZELLER:  SO THE FIRST ONE IS THE

3     GALAXY ACE, AND THAT IS JX 1030.

4          THE COURT:  OKAY.

5          MR. ZELLER:  THE SECOND ONE IS THE

6     GALAXY S I9000 --

7          THE COURT:  OKAY.

8          MR. ZELLER:  -- WHICH IS JX 1007.

9          THE COURT:  OKAY.

10          MR. ZELLER:  AND THEN THE THIRD ONE IS

11     THE GALAXY S II I9100.

12          THE COURT:  AND THAT'S ROMAN NUMERAL II?

13          MR. ZELLER:  YEAH, SMALL -- IT'S

14     GALAXY S II, ROMAN NUMERAL II, THEN A SMALL I9100.

15          THE COURT:  OKAY.  SO THE -- IT'S

16     SMALL -- IT'S LOWER CASE ROMAN NUMERAL I.

17          MR. ZELLER:  CORRECT.

18          THE COURT:  TWO OF THEM, AND THEN I9100?

19          MR. ZELLER:  CORRECT.

20          THE COURT:  OKAY.

21          MR. ZELLER:  AND THEN THE LAST ONE IS

22     I9100, JX 1032.

23          THE COURT:  ALL RIGHT.  SO I'M GRANTING

24     SAMSUNG'S RULE 50 MOTION AS TO THESE THREE PRODUCTS

25     AS TO SAMSUNG TELECOMMUNICATIONS AMERICA LLC AND

1    SAMSUNG ELECTRONICS AMERICA, INC., BUT DENYING THE

2    MOTION AS TO SAMSUNG ELECTRONICS COMPANY LIMITED.

3           NOW, I AM NOT GOING TO COMMENT WORD FOR

4    WORD ON EACH OF THE ISSUES THAT HAS BEEN RAISED.

5    IT'S REALLY FOR THE JURY TO MAKE A DETERMINATION

6    AND -- SO ALL I'M GOING TO SAY IS THAT, YOU KNOW, I

7    HAVE REVIEWED ALL OF THE EXHIBITS THAT HAVE BEEN

8    ADMITTED INTO EVIDENCE AND HAVE HEARD ALL THE

9    TESTIMONY THAT'S BEEN GIVEN AND A RULE 50 MOTION

10   JUST REQUIRES THE COURT TO MAKE A DETERMINATION OF

11   WHETHER A REASONABLE JURY WOULD HAVE A LEGALLY

12   SUFFICIENT EVIDENTIARY BASIS TO FIND FOR APPLE, AND

13   IF NOT, AS A MATTER OF LAW, THAT ALL OF THESE

14   CLAIMS SHOULD BE TAKEN AWAY FROM THE PURVIEW OF THE

15   JURY AND JUDGMENT SHOULD BE ENTERED AS A MATTER OF

16   LAW IN FAVOR OF SAMSUNG.

17           THAT'S THE QUESTION THAT'S BEFORE THE

18   COURT, NOT -- IT'S JUST SIMPLY THOSE ISSUES.

19           AND BASED ON WHAT THIS COURT HAS SEEN IN

20   TERMS OF THE ADMITTED EXHIBITS AND THE TESTIMONY,

21   I'M DENYING THE MOTION, WITH THE EXCEPTION OF THOSE

22   THREE PRODUCTS AS TO SAMSUNG TELECOMMUNICATIONS

23   AMERICA, LLC AND SAMSUNG ELECTRONICS AMERICA, INC.

24   BECAUSE I DO FIND THAT A REASONABLE JURY WOULD HAVE

25   A LEGALLY SUFFICIENT EVIDENTIARY BASIS TO FIND FOR

2222

```
1    APPLE ON THE CLAIMS.

2              SO I'M DENYING THE MOTION FOR JUDGMENT AS

3    A MATTER OF LAW AND WILL LET THE JURY ULTIMATELY

4    DECIDE THESE QUESTIONS.

5              NOW, OBVIOUSLY WE COULD GO THROUGH ALL OF

6    THE EVIDENCE, BUT I DON'T THINK THAT'S NECESSARY

7    AND I DO NOT WANT ANY POTENTIAL TAINT OF THIS JURY

8    IF I GO THROUGH, YOU KNOW, WITNESS BY WITNESS OR

9    DOCUMENT BY DOCUMENT.

10             BUT OBVIOUSLY BASED ON EVERYTHING I'VE

11   SEEN, I THINK THAT THERE IS A LEGALLY SUFFICIENT

12   EVIDENTIARY BASIS FOR A REASONABLE JURY TO MAKE

13   THAT FINDING.

14             SO ANYTHING ELSE ON RULE 50?  IT'S NOW

15   2:45, SO WE'VE BEEN GOING A LITTLE OVER AN HOUR ON

16   THE ARGUMENT FOR THIS MOTION.

17             SHOULD WE JUST TAKE OUR BREAK NOW AND

18   THEN START WITH SAMSUNG'S CASE AFTER THE BREAK?

19   THAT MIGHT MAKE SENSE.

20             MR. VERHOEVEN:  I THINK IT DOES, YOUR

21   HONOR.

22             THE COURT:  OKAY.  SO IT'S NOW 2:46.

23   LET'S GO AHEAD AND TAKE A 15 MINUTE BREAK.

24             MR. VERHOEVEN:  I JUST WANTED TO APPRISE

25   THE COURT, I'VE INFORMED COUNSEL THAT, BECAUSE
```

2223

1    WE'VE GONE A LITTLE BIT LONGER THAN WE PROJECTED,

2    WE HAVE ACTUALLY THREE WITNESSES WE WERE GOING TO

3    TAKE OUT OF ORDER, THREE THIRD PARTY WITNESSES, WHO

4    HAVE TO LEAVE TODAY, AND NOW WE'RE NOT SURE WE'RE

5    GOING TO GET ALL THREE ON AND OFF, SO WE'RE --

6    THERE'S ONE THAT'S REALLY CRITICAL THAT HAS TO

7    LEAVE TODAY, AND I'VE INFORMED THEM ABOUT THIS.

8    THAT'S BEN BEDERSON.

9              THE COURT:  OKAY.

10             MR. VERHOEVEN:  AND WE HAD NOT LISTED

11   HIM -- WE HAD LISTED HIM AS THIRD IN ORDER COMING

12   UP.

13             THE COURT:  TELL ME WHO DO YOU WANT TO

14   CALL IN WHAT ORDER?

15             MR. VERHOEVEN:  JUST SO THE COURT KNOWS,

16   FIRST PROFESSOR BEN BEDERSON, HE'S THE LAUNCHTILE

17   PRIOR ART WITNESS.

18             THE COURT:  OKAY.  AND THEN WHO ELSE?

19             MR. VERHOEVEN:  AND THEN ADAM BOGUE,

20   DIAMONDTOUCH PRIOR ART WITNESS.

21             THE COURT:  OKAY.

22             MR. VERHOEVEN:  AND THEN CLIFF FORLINES,

23   ANOTHER DIAMONDTOUCH PRIOR ART WITNESS, YOUR HONOR.

24             THE COURT:  OKAY.

25             MR. VERHOEVEN:  SO I JUST WANT TO LET YOU

2224

1    KNOW WE'VE SWITCHED IT A LITTLE BIT BECAUSE OF THAT

2    ISSUE.

3              THE COURT:  THAT'S FINE.  ALL RIGHT.

4              AND THEN AFTER THAT, YOU'LL GO TO

5    MR. PALTIAN AND MR. ZORN?

6              MR. VERHOEVEN:  YES, YOUR HONOR.

7              THE COURT:  OKAY.  AND I DOUBT WE'LL GET

8    TO MR. WILLIAMS TODAY.

9              MR. VERHOEVEN:  I THINK THAT'S PROBABLY

10   RIGHT, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  SO I'LL GET THE

12   OBJECTIONS ON MR. WILLIAMS OUT TONIGHT, AS WELL AS

13   ALL OF THE OTHER OBJECTIONS TO THE OTHER WITNESSES.

14             I KNOW YOU WANTED TO MAKE A

15   RECONSIDERATION MOTION AS TO MR. YANG.  WHY DON'T

16   WE DO THAT AT THE END OF THE DAY.  IS THAT OKAY?

17             MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.

18   IT'LL JUST BE VERY SHORT.

19             THE COURT:  OKAY.  AND THEN I KNOW SOME

20   OTHER MOTIONS WERE FILED REGARDING ABSENT WITNESSES

21   AND STAYS OF SEALING AND WE'LL TRY TO GET THOSE OUT

22   TODAY.

23             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  THANK YOU.  LET'S

25   TAKE THE BREAK NOW.

1              (WHEREUPON, A RECESS WAS TAKEN.)

2              THE COURT:  ALL RIGHT.  THANK YOU.

3    PLEASE TAKE A SEAT.  LET'S BRING IN OUR JURY.

4              MR. JACOBS:  YOUR HONOR, BEFORE THEY COME

5    IN?

6              THE COURT:  YES?

7              MR. JACOBS:  THERE'S AN EXHIBIT ON THE

8    OTHER MATERIALS, ON THE LIST OF MATERIALS THAT

9    SAMSUNG INTENDS TO USE.  IT'S THE -- IT'S SDX

10   3951.011.

11             IT'S A DIFFERENT DEVICE FROM THE DEVICE

12   THAT'S ON THE EXHIBIT LIST FOR THIS -- RELEVANT TO

13   THIS WITNESS.  IF IT'S NOT GOING TO BE USED OR

14   COMING IN, THEN WE DON'T NEED TO DEAL WITH IT, BUT

15   I WOULD ASK BEFORE THE JURY COMES IN.

16             THE COURT:  3951, WHAT WERE THE LAST

17   THREE OR FOUR DIGITS?

18             MR. JACOBS:  .011.

19             THE COURT:  I DON'T HAVE THAT IN MINE.

20             MR. JACOBS:  TERRIFIC.  MAYBE IT WON'T

21   COME IN.

22             THE COURT:  MINE ENDS AT .010.

23             MR. DEFRANCO:  WE ACTUALLY HAVE A SLIDE

24   OF THIS THAT WE'RE GOING TO MOVE TO ENTER INTO

25   EVIDENCE, BUT NOT THE DEVICE ITSELF, SO WE DON'T

2226

1    NEED TO WORRY ABOUT IT BECOMING PART OF THE RECORD,

2    THE .011.

3              MR. JACOBS:  SAME OBJECTION, YOUR HONOR,

4    BUT I DON'T KNOW THAT I SEE THE SLIDE.

5              THE COURT:  I DON'T HAVE THE SLIDE,

6    EITHER.

7              MR. DEFRANCO:  THE SLIDE IS 3951.006.

8    IT'S JUST A PHOTOGRAPH OF THE SAME DEVICE.

9              MR. JACOBS:  WE WOULD OBJECT, YOUR HONOR.

10             THE COURT:  WHAT'S THE OBJECTION?

11             MR. JACOBS:  THE DEVICE IS NOT ON THE

12   EXHIBIT LIST.  THE PHOTO OF THE DEVICE SHOULD NOT

13   COME IN.

14             THE COURT:  IF THE DEVICE IS NOT ON THE

15   LIST, THEN IT'S EXCLUDED.

16             ALL RIGHT.  WHAT ELSE?

17             MR. JACOBS:  WE'RE READY, YOUR HONOR.

18             THE COURT:  OKAY.  THEN WOULD YOU PLEASE

19   BRING IN THE JURY?

20             THE CLERK:  YES, YOUR HONOR.

21             (WHEREUPON, THE FOLLOWING PROCEEDINGS

22   WERE HELD IN THE PRESENCE OF THE JURY:)

23             THE COURT:  THANK YOU FOR YOUR PATIENCE.

24   SORRY TO MAKE YOU WAIT SO LONG, BUT WE HAD TO TAKE

25   CARE OF SOMETHING.

1          IT'S 3:04.  PLEASE CALL YOUR FIRST

2     WITNESS.

3          MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

4          SAMSUNG, AS YOUR HONOR KNOW, HAS ALREADY,

5     BY AGREEMENT, CALLED ITS FIRST WITNESS OUT OF

6     ORDER, MR. JUSTIN DENISON.  HE WAS OUR FIRST

7     WITNESS.

8          WE HAVE THREE THIRD PARTY WITNESSES, YOUR

9     HONOR, THAT WE'RE GOING TO NEED TO CALL OUT OF

10    ORDER.

11         THE FIRST IS -- AND THIS IS THE ONE WE'RE

12    CALLING RIGHT NOW -- PROFESSOR BEN BEDERSON.

13         MR. DEFRANCO:  GOOD AFTERNOON, YOUR

14    HONOR.  ED DEFRANCO FOR SAMSUNG.  I'LL BE

15    PRESENTING THIS WITNESS.

16         THE COURT:  OKAY.  GOOD AFTERNOON.

17         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18              **BENJAMIN BEDERSON,**

19    BEING CALLED AS A WITNESS ON BEHALF OF THE

20    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

21    EXAMINED AND TESTIFIED AS FOLLOWS:

22         THE WITNESS:  YES.

23         THE CLERK:  PLEASE BE SEATED.

24         THE COURT:  IT'S 3:05.  GO AHEAD.

25         MR. DEFRANCO:  THANK YOU, YOUR HONOR.

1              **DIRECT EXAMINATION**

2     BY MR. DEFRANCO:

3     Q    GOOD AFTERNOON.  WOULD YOU PLEASE STATE YOUR

4     FULL NAME FOR THE RECORD?

5     A    YES.  I'M BENJAMIN BORIS BEDERSON.

6     Q    WHAT IS YOUR OCCUPATION?

7     A    I'M A PROFESSOR OF COMPUTER SCIENCE AT THE

8     UNIVERSITY OF MARYLAND.

9     Q    SIR, HOW LONG HAVE YOU BEEN A PROFESSOR AT THE

10    UNIVERSITY OF MARYLAND?

11    A    ABOUT 15 YEARS.  I GOT THERE IN 1998.

12    Q    WOULD YOU PLEASE JUST GIVE US A BRIEF

13    DESCRIPTION OF YOUR RESPONSIBILITIES AS A

14    PROFESSOR.

15    A    SURE.  I TEACH AND ADVISE GRADUATE STUDENTS,

16    PERFORM RESEARCH, AND HELP THE UNIVERSITY

17    COMMUNITY.

18    Q    AND DR. BEDERSON, GIVE US A BIT ABOUT YOUR

19    EDUCATIONAL BACKGROUND.

20    A    I HAVE THREE DEGREES IN COMPUTER SCIENCE,

21    ENDING WITH A PH.D. THAT I GOT FROM NEW YORK

22    UNIVERSITY IN 1992.

23    Q    APART FROM YOUR WORK AS A PROFESSOR AT THE

24    UNIVERSITY OF MARYLAND, ARE YOU AFFILIATED WITH ANY

25    COMPANIES?

1    A    YES.  I CO-FOUNDED A COMPANY CALLED ZUMOBI IN

2    SEATTLE THAT I'M CURRENTLY CHIEF SCIENTIST AT.  WE

3    MAKE MOBILE APPS AND ADS, ADVERTISEMENTS.

4    Q    YOU'RE HERE TO TESTIFY AS A FACT WITNESS.  DO

5    YOU UNDERSTAND THAT?

6    A    YES.

7    Q    AND HAVE YOU IN ANY WAY BEEN COMPENSATED FOR

8    YOUR TIME IN THE CASE?

9    A    YES.  NOT FOR MY TIME HERE TODAY, BUT FOR MY

10   TIME PREPARING, REVIEWING CODE, ATTENDING MY

11   DEPOSITION.  I GET PAID $450 AN HOUR, MY STANDARD

12   CONSULTING RATE, AND I'VE WORKED ABOUT 100 HOURS SO

13   FAR.

14   Q    OKAY.  LET'S SHIFT GEARS.  LET'S TALK ABOUT

15   YOUR SOFTWARE PROGRAM.  IT'S CALLED -- WHAT'S THE

16   NAME OF IT?

17   A    LAUNCHTILE.

18   Q    IN A SENTENCE OR TWO, PLEASE, DOCTOR, TELL US

19   WHAT LAUNCHTILE IS.

20   A    IT'S A MOBILE GRAPHICAL USER INTERFACE

21   APPLICATION TO LET PEOPLE ACCESS A LOT OF

22   INFORMATION ON A MOBILE DEVICE.

23   Q    OKAY.  WE'RE GOING TO LOOK AT SOME VIDEO OF

24   THE DEVICE ITSELF.  LET'S GIVE A LITTLE BIT OF

25   BACKGROUND FIRST.  OKAY?  ARE YOU WITH ME?

2230

```
1              DID OTHERS WORK WITH YOU ON THE

2      DEVELOPMENT OF LAUNCHTILE?

3      A    YES.  I WORKED ON -- WITH A FEW PEOPLE.  MY

4      PH.D. GRADUATE STUDENT, AMY KARLSON; RESEARCH

5      ASSISTANT, AARON CLAMAGE; AND THE WORK WAS DONE IN

6      COLLABORATION WITH MICROSOFT AND THEY SPONSORED THE

7      RESEARCH, THEY PAID FOR IT, SO I WORKED WITH

8      SOMEONE THERE NAMED JOHN SANGIOVANNI.

9      Q    GENERALLY, WHAT LED YOUR TEAM TO COME ABOUT TO

10     DEVELOP LAUNCHTILE?

11     A    WE WERE TRYING TO SOLVE TWO MAJOR PROBLEMS.

12     ONE WAS HOW TO FIT A LOT OF INFORMATION ON A SMALL

13     DEVICE; AND THE SECOND WAS TO DESIGN A USER

14     EXPERIENCE THAT PEOPLE COULD USE WITH JUST A SINGLE

15     HAND RATHER THAN TWO HANDS OR A STYLUS.

16     Q    DID YOU SOLVE THOSE PROBLEMS?

17     A    I BELIEVE WE DID.

18     Q    TELL US HOW YOU DID IT, PLEASE.

19     A    I HAD BEEN WORKED FOR ALMOST TEN YEARS AT THE

20     TIME ON AN INTERFACE APPROACH I CALLED ZOOMABLE

21     USER INTERFACES, AND WE APPLIED THAT TECHNIQUE TO

22     LAUNCHTILE.

23     Q    OKAY.  CAN YOU JUST GIVE US A SENTENCE OR TWO

24     ABOUT WHAT A ZOOMABLE USER INTERFACE IS.

25     A    SURE.  GENERALLY SPEAKING, IT'S AN INTERFACE
```

1    WHERE YOU PRESENT A BIG INFORMATION SPACE AND YOU

2    CAN ZOOM OUT TO GET SOME CONTEXT, AND ZOOM IN TO

3    LOOK A LITTLE CLOSER TO GET MORE DETAIL.

4    Q    OKAY.  WAS THIS THE FIRST TIME IN YOUR CAREER

5    THAT YOU WORKED WITH ZOOMABLE USER INTERFACES?

6    A    NO.  AS I SAID, I'VE BEEN DOING IT FOR A

7    WHILE.  I THINK I STARTED IN 1993.

8    Q    WHAT, WHAT TYPE OF DEVICE, IN VERY GENERAL

9    TERMS, WAS YOUR LAUNCHTILE PROGRAM DESIGNED TO RUN

10   ON?

11   A    IT WAS DESIGNED IN GENERAL TO WORK ON ANY KIND

12   OF MOBILE TOUCHSCREEN DEVICE.  IN PARTICULAR, WE

13   BUILT THIS, THIS PARTICULAR SOFTWARE TO RUN ON THE

14   MICROSOFT POCKET P.C. PLATFORM, AND WE WERE USING

15   OFTEN AN H-P IPAQ PDA.

16   Q    IS THAT WHAT THIS IS?

17   A    YES.

18   Q    YOU'VE HAD EXPERIENCE WITH THIS DEVICE, THE

19   H-P IPAQ, SIR?

20   A    YES.

21   Q    LET ME JUST NOTE, I'M HOLDING UP WHAT'S BEEN

22   MARKED AS DX EXHIBIT 518.  WE HAVE A SLIDE OF THIS

23   AND A VIDEO WE'RE GOING TO SHOW.

24        WHY DON'T WE PUT UP, RYAN, PLEASE, THE

25   SLIDE WHICH IS NUMBERED SDX 3951.001.

2232

```
 1              IS THIS THE SAME AS THE DEVICE I'M
 2     HOLDING UP, EXHIBIT 518, DX 518, DOCTOR?
 3     A    YES, IT IS.
 4     Q    DO US A FAVOR.  I WANT YOU TO NARRATE THE
 5     VIDEO.  OBVIOUSLY BEFORE WE START THE VIDEO AND
 6     NARRATE IT, CAN YOU JUST TELL US GENERALLY WHAT'S
 7     SHOWN ON THE SCREEN ON THE IPAQ DEVICE ITSELF?
 8     A    SURE.  THIS IS THE LAUNCHTILE APPLICATION, AND
 9     WHAT YOU'RE SEEING HERE IS WHAT WE CALLED AN
10     INTERACTIVE ZOOM SPACE.
11              IT IS A COLLECTION OF 36 TILES WHICH ARE,
12     YOU KNOW, INFORMATION SOURCES.  YOU CAN SEE ON THE
13     BOTTOM RIGHT THERE'S SOME STOCK TILES.  IN THE
14     MIDDLE, YOU MIGHT BE ABLE TO MAKE OUT THAT THERE'S
15     A LITTLE MAP, AND E-MAIL TILE, A CALENDAR, A PHONE.
16     THERE'S ALL KINDS OF INFORMATION SOURCES HERE.
17              AND THEN AS YOU'LL SEE IN THE VIDEO, YOU
18     WOULD -- YOU'LL BE ABLE TO SEE THAT YOU CAN ZOOM IN
19     AND OUT AND INTERACT WITH THESE FILES.
20     Q    LET'S SHOW THE VIDEO, AND WHY DON'T YOU
21     NARRATE IT FOR US AS IT PLAYS.  OKAY?
22              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
23     OPEN COURT OFF THE RECORD.)
24              THE WITNESS:  SURE.  SO FIRST YOU CAN SEE
25     SOMEONE TOUCH THE VIDEO.  IT ZOOMS INTO A REGION I
```

1    CALLED A ZONE.

2                 YOU ZOOM IN FURTHER TO AN APPLICATION

3    TILE.

4                 YOU CAN TOUCH THE BACK BUTTON.  IT'LL

5    ZOOM OUT TO THAT MIDDLE ZONE LEVEL, AND YOU CAN

6    ZOOM OUT FURTHER BACK TO WHERE YOU STARTED WITH

7    WORLD VIEW IN THE ZOOM SPACE.

8    BY MR. DEFRANCO:

9    Q    OKAY.  AND I THINK THERE'S ANOTHER SLIDE THAT

10   GOES ALONG WITH THIS.  THIS IS SDX 3951.003.  CAN

11   YOU DESCRIBE GENERALLY WHAT'S SHOWN ON THIS SLIDE?

12   A    SURE.  SO THIS IS SHOWING YOU WHAT WE SAW ON

13   THE VIDEO.  ON THE LEFT IS THAT WORLD VIEW WHERE WE

14   STARTED.  THIS THE ZOOM SPACE THAT CONTAINS ALL OF

15   THE TILES.

16                YOU CAN TAP ON ANY ONE OF THOSE LITTLE

17   GROUPS OF FOUR TILES CALLED A ZONE, AND IF YOU TAP

18   IN THAT MIDDLE GROUP, THAT MIDDLE ZONE, THAT TAKES

19   YOU TO THE ZONE VIEW WHERE FOUR TILES ARE SHOWN.

20   THERE'S MORE INFORMATION DISPLAYED ABOUT EACH ONE.

21                YOU CAN THEN TAP AGAIN AND IT'LL TAKE YOU

22   INTO THE APPLICATION VIEW.

23   Q    LET'S -- I WANT TO FOLLOW UP WITH A LITTLE

24   DETAIL ON SOME OF THE TERMS, SOME OF THE THINGS YOU

25   EXPLAINED TO US IN THIS DEVICE THAT USES

2234

1    LAUNCHTILE.  OKAY?

2    A    OKAY.

3    Q    YOU USED -- YOU TALKED ABOUT THE ZOOM SPACE

4    GENERALLY.  WHAT IS THE ZOOM SPACE AGAIN, PLEASE?

5    A    SO A ZOOM SPACE IS JUST A SINGLE COHERENT

6    COLLECTION OF TILES, IN THIS CASE 36 TILES, WHERE

7    YOU COULD ZOOM IN AND OUT TO OR, AS YOU'LL SEE,

8    OTHER WAYS TO ACCESS THE INFORMATION.

9    Q    OKAY.  NOW, THIS, THIS WAS A -- THE SOURCE

10   CODE -- THE CODE ON THIS, FOR LAUNCHTILE, THAT'S

11   SOMETHING THAT YOU ACTUALLY SUPERVISED?

12   A    YES.  I CREATED THE -- I SUPERVISED THE

13   DEVELOPMENT OF THIS APPLICATION.

14   Q    WITH THOSE FOLKS YOU MENTIONED EARLIER THIS

15   MORNING?

16   A    YES.

17   Q    AND FOR EACH ONE OF THOSE TILES, YOU GAVE US

18   SOME EXAMPLES EARLIER ABOUT E-MAIL APPLICATION, THE

19   ABILITY TO OBTAIN STOCK, I THINK I SAW NASCAR IN

20   THE CORNER.

21        WAS THERE ACTUALLY OPERATING CODE

22   UNDERLYING EACH ONE OF THOSE TILES IN THE

23   LAUNCHTILE PROGRAM AT THAT TIME?

24   A    SO, YOU KNOW, EVERY TILE FULLY WAS CAPABLE OF

25   BEING ZOOMED IN AND OUT OF AND NAVIGATING WITHIN

1    THE ZOOM SPACE, BUT THE TILES THEMSELVES, IF YOU

2    WENT ALL THE WAY INTO THE APPLICATION VIEW, NO,

3    MANY OF THEM -- MOST OF THEM WERE NOT IMPLEMENTED

4    BECAUSE THE GOAL WAS TO FOCUS NOT ON THE

5    INTERACTING WITH THE DETAILED DATA, BUT WAS TO

6    EXPERIENCE THE NAVIGATION.

7            MR. DEFRANCO:  YOUR HONOR, AT THE MOMENT,

8    BEFORE I FORGET, I'D LIKE TO MOVE IN DX 518 AND

9    SLIDES 3951.001, .002 AND .003.

10           THE COURT:  ANY OBJECTION?

11           MR. JACOBS:  OBJECT TO .003, YOUR HONOR.

12   IT CONTAINS ARGUMENTATIVE CONTENT ON IT RELATED TO

13   CLAIM INTERPRETATION AND THIS WITNESS IS NOT

14   QUALIFIED TO ARGUE THAT.

15           MR. DEFRANCO:  YOUR HONOR, I'LL REPRESENT

16   THE WITNESS IS NOT GOING TO -- THIS WAS A SLIDE

17   THAT WAS ALSO USED IN OPENING.  THAT'S WHY WE

18   WANTED TO USE IT FOR CONTINUITY.

19           BUT THE WITNESS --

20           THE COURT:  THE FIRST BOX AND THE SECOND

21   BOX SHOULDN'T BE ON THIS, SO THAT'S DENIED.

22           BUT DX 518 IS ADMITTED AND SDX 3951.001

23   AND .002 ARE BOTH ADMITTED.

24           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

25             518, 3951.001, 3951.002, HAVING BEEN

1              PREVIOUSLY MARKED FOR IDENTIFICATION,

2          WERE ADMITTED INTO EVIDENCE.)

3              MR. JACOBS:  JUST TO BE CLEAR, YOUR

4     HONOR, YOU SAID DENIED, BUT THE OBJECTION IS

5     SUSTAINED?

6              THE COURT:  YES, .003 IS NOT COMING INTO

7     EVIDENCE.

8     BY MR. DEFRANCO:

9     Q    LET'S TALK ABOUT -- YOU MENTIONED THE ZOOM

10    FUNCTIONALITY?

11             MR. JACOBS:  YOUR HONOR, CAN WE HAVE THAT

12    TAKEN DOWN?

13             THE COURT:  THAT'S FINE.

14    BY MR. DEFRANCO:

15    Q    ZOOM FUNCTIONALITY, DOCTOR, CAN YOU EXPLAIN

16    HOW THE APPEARANCE OF A TILE -- WHAT HAPPENED TO

17    THE APPEARANCE OF A TILE IN YOUR LAUNCHTILE PROGRAM

18    AS YOU WOULD ZOOM IN ON A TILE?

19    A    SURE.  SO AS YOU ZOOM IN, YOU GET MORE AND

20    MORE SPACE AVAILABLE FOR EACH TILE.  AND SO RATHER

21    THAN JUST PURELY GEOMETRICALLY MAKING THE TILES

22    LARGER, WE WOULD USE THE SPACE TO SHOW MORE

23    INFORMATION.

24             SO IN THE E-MAIL TILE, FOR EXAMPLE, WHEN

25    YOU ZOOMED OUT, IT WOULD JUST SAY SOMETHING LIKE 11

1    UNREAD, MEANING 11 UNREAD MESSAGES.  AND IF YOU

2    ZOOM IN FURTHER, IT WOULD SHOW SOME INFORMATION

3    ABOUT THE E-MAIL IN YOUR INBOX; AND THEN WHEN YOU

4    ZOOMED IN ALL THE WAY, THEN YOU GOT A FULL LIST OF

5    E-MAIL MESSAGES, WHO THEY'RE FROM AND THEIR

6    SUBJECTS AND SO ON.

7    Q    WAS THERE A REASON WHY YOU TEAM DECIDED TO

8    CHANGE THE APPEARANCE OF A TILE AS YOU ZOOMED IN ON

9    IT?

10   A    YEAH.  AS I SAID, USING PURE GEOMETRIC ZOOMING

11   WOULD HAVE WORKED, BUT THAT WAS VERY SIMPLE AND

12   WOULD NOT HAVE USED THE SCREEN SPACE VERY

13   EFFECTIVELY.

14          SO THE IDEA OF SHOWING DIFFERENT VISUAL

15   REPRESENTATIONS AS YOU GOT CLOSER WAS A NATURAL WAY

16   TO TAKE ADVANTAGE OF THE SPACE, AND ALSO THE KIND

17   OF THING I'D BEEN TALKING ABOUT IN MY RESEARCH FOR

18   TEN YEARS PREVIOUS.

19   Q    IS THERE A NAME FOR THAT TYPE OF ZOOMING?

20   A    YES.  WE CALLED IT SEMANTIC ZOOMING.

21   Q    AND AGAIN, THE DIFFERENCE BETWEEN GEOMETRIC

22   AND SEMANTIC ZOOMING?

23   A    SO GEOMETRIC IS PURE VISUAL SCALING.  YOU GET

24   CLOSER, IT GETS LARGER.

25          SEMANTIC ZOOMING IS AS IT GETS LARGER,

2238

1    YOU ADD MORE, OR YOU CAN CHANGE THE VISUAL

2    REPRESENTATION TO SHOW MORE RELATED INFORMATION.

3    Q    OKAY.  YOU SHOULD HAVE A BINDER OF EXHIBITS IN

4    FRONT OF YOU.  THERE'S AN ARTICLE I'D LIKE YOU TO

5    LOOK AT.

6              AND RYAN, IF YOU CAN PUT A SLIDE ON THE

7    SCREEN.  IT'S A SNIPPET FROM THE ARTICLE.  IT'S

8    3951.002.

9    A    SORRY.  IS THIS THE BIG BINDER OR LITTLE

10   BINDER?

11   Q    IT SHOULD BE IN THE BLACK BINDER RIGHT IN

12   FRONT OF YOU.

13   A    OKAY.

14   Q    NOW, DOCTOR, CAN YOU LOOK UP ON THE SCREEN FOR

15   A MOMENT AS YOU'RE FLIPPING?

16   A    YES, I SEE IT.

17   Q    SORRY ABOUT THAT.  YOU'RE THERE WITH ME IN THE

18   ARTICLE.

19              A SENTENCE OR TWO, PLEASE, WHAT ARE WE

20   LOOKING AT?  WHAT IS THIS ARTICLE?

21   A    SO THIS IS A PAPER I WROTE AT ANOTHER

22   CONFERENCE, I BELIEVE IT WAS IN 1994, DESCRIBING MY

23   WORK IN ZOOMABLE USER INTERFACES AT THE TIME.

24              AND IN PARTICULAR, I WAS DESCRIBING THIS

25   HIGHLIGHTED SECTION, SEMANTIC ZOOMING, JUST THE WAY

1       I WAS JUST DESCRIBING IT.

2       Q    THE YEAR, I'M SORRY, DID YOU GIVE US THE YEAR?

3       A    I THINK IT WAS 1994.

4       Q    AND IS THIS SEMANTIC VERSUS GEOMETRIC?  THIS

5       IS ABOUT WHICH TYPE?

6       A    THIS DESCRIBES SEMANTIC ZOOMING.

7                MR. DEFRANCO:  YOUR HONOR, I WOULD MOVE

8       FOR ADMISSION OF SLIDE 3951.002, AND EXHIBIT

9       546.002.

10               MR. JACOBS:  YOUR HONOR, I BELIEVE

11      COUNSEL HAS GOT A TYPO IN HIS OUTLINE.  IT'S

12      3951.010, WHICH IS AN EXAMPLE OF DX 546.  WE HAVE

13      NO OBJECTION TO DX 546, AND IF EXPANSIONS LIKE THIS

14      ARE COMING IN, WE HAVE NO OBJECTION TO THIS,

15      EITHER.

16               MR. DEFRANCO:  .010, YOUR HONOR, THAT'S

17      CORRECT.

18               THE COURT:  SO I WAS UNCLEAR.  YOU HAVE

19      NO OBJECTION TO 3951.010?

20               MR. JACOBS:  CORRECT, YOUR HONOR.

21               THE COURT:  OKAY.  THAT'S ADMITTED.

22               (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23               3951.010, HAVING BEEN PREVIOUSLY MARKED

24               FOR IDENTIFICATION, WAS ADMITTED INTO

25               EVIDENCE.)

2240

```
 1                    THE COURT:  GO AHEAD, PLEASE.  ARE YOU
 2      ALSO SEEKING THE ACTUAL UNDERLYING ARTICLE AS WELL?
 3                    MR. DEFRANCO:  YES, YOUR HONOR.  THAT'S
 4      DX 546.002.
 5                    THE COURT:  I JUST HAVE IT AS 546.
 6      THAT'S THE ACTUAL ARTICLE AS WELL.
 7                    MR. DEFRANCO:  YES, YOUR HONOR.
 8                    THE COURT:  AND NO OBJECTION TO THAT AS
 9      WELL, RIGHT?
10                    MR. JACOBS:  CORRECT, YOUR HONOR.
11                    THE COURT:  THAT'S ADMITTED.
12                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
13                    546, HAVING BEEN PREVIOUSLY MARKED FOR
14                    IDENTIFICATION, WAS ADMITTED INTO
15                    EVIDENCE.)
16      BY MR. DEFRANCO:
17      Q    SHIFT GEARS FOR A MOMENT, DOCTOR.  WE TALKED
18      ABOUT ZOOMING, MOVING AROUND WHAT YOU CALL THE ZOOM
19      SPACE.
20                    WERE THERE OTHER METHODS OF NAVIGATING
21      AROUND THE ZOOM SPACE IN YOUR LAUNCHTILE PROGRAM?
22      A    YES.  SO WHEN YOU ARE IN THAT MIDDLE ZOOM
23      LEVEL IN THE ZONE VIEW, YOU COULD ALSO WHAT I CALL
24      PAN FROM SIDE TO SIDE, FROM ONE ZONE TO ANOTHER BY
25      USING YOUR FINGERS TO DRAG ON THE SCREEN.
```

2241

1    Q    OKAY.  LET'S LOOK AT ANOTHER VIDEO.

2              RYAN, PLEASE, IF I HAVE THE NUMBER RIGHT,

3    SDX 3951.004.

4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6              THE WITNESS:  SO WHAT YOU'RE SEEING IN

7    THIS VIDEO IS YOU ZOOMED IN, AS WE DID BEFORE, TO

8    THE ZONE VIEW, AND NOW WE'LL DRAG WITH THE FINGER

9    AND WE'LL GO DIRECTLY TO THE NEXT ZONE IN THE

10   DIRECTION THAT YOU'RE DRAGGING THE FINGER.

11             SO WE WENT LEFT, UP, RIGHT, DOWN, AND WE

12   GO BACK TO WHERE WE STARTED.

13             THEN IF YOU DON'T DRAG YOUR FINGER

14   ENOUGH, IT'LL SNAP BACK TO THE ZONE THAT YOU WERE

15   IN BEFORE.  SO, AGAIN, YOU DRAG, YOU DON'T DRAG IT

16   ENOUGH, IT SNAPS BACK.

17             AND SIMILARLY, IF YOU DRAG UP, BUT YOU

18   DON'T DRAG FAR ENOUGH, IT'LL SNAP BACK.

19   BY MR. DEFRANCO:

20   Q    THAT SNAP BACK FEATURE, WAS THAT A FEATURE

21   THAT YOU AND YOUR TEAM INTENTIONALLY CODED OR

22   PROGRAMMED TO WORK IN THE LAUNCHTILE PROGRAM?

23   A    WELL, YEAH, OF COURSE.  IT WAS PART OF THE

24   SOFTWARE OF THE LAUNCHTILE.

25   Q    WHY DID YOU AND YOUR TEAM DO THAT?

1    A    WELL, THERE'S A FEW ADVANTAGES TO THIS KIND OF

2    INTERACTION.  A KEY ONE IS WE DON'T WANT A USER TO

3    GET STUCK BETWEEN ZONES.  I MEAN, THE SYSTEM IS

4    DESIGNED TO HAVE THESE NICE ZONE VIEWS.  YOU CAN

5    MOVE BETWEEN ZONES, BUT YOU WOULDN'T WANT TO BE

6    STUCK HALFWAY BETWEEN ONE.

7         ANOTHER REASON IS THAT USERS DON'T HAVE

8    HIGH PRECISION WHEN THEY'RE USING THIS KIND OF

9    DEVICE, SO IF YOU REQUIRE THEM TO MOVE THEIR FINGER

10   IN SUCH A WAY THAT THEY GOT PERFECT ALIGNMENT, THAT

11   WOULD BE PRETTY ANNOYING.

12        SO INSTEAD THIS WAY THEY ONLY HAVE TO GET

13   NEARBY AND THEN THE SYSTEM WILL TAKE THEM WHERE

14   THEY WANT TO GO.

15        THE OTHER THING IS THOSE TWO FEATURES

16   TOGETHER ENABLE PEOPLE TO EXPLORE AND THUS FIND NEW

17   CONTENT, AND IT ADDED UP TO BEING FUN.

18   Q    LET'S STEP BACK FOR A MOMENT, DOCTOR.  DO YOU

19   RECALL GENERALLY ABOUT HOW LONG IT TOOK FOR YOU AND

20   YOUR TEAM TO DEVELOP THE OVERALL LAUNCHTILE

21   PROGRAM?

22   A    YES.  WE DID IT IN THE SUMMER OF 2004.  SO IT

23   WAS APPROXIMATELY THREE MONTHS.

24   Q    AND WE LOOKED AT THIS H-P IPAQ DEVICE.  WERE

25   YOU ABLE TO VERIFY THE DATE OF THE SOFTWARE THAT'S

1   RUNNING ON THIS DEVICE THAT WAS SHOWN ON THE VIDEO

2   THAT WE PUT UP EARLIER?

3   A    YES.  IT'S NOVEMBER 9TH, 2004, WHICH I

4   VERIFIED BY LOOKING AT MY COMPUTER WHICH CONTAINED

5   THE CODE THAT ENDED UP ON THAT DEVICE.

6   Q    AND WHEN CODE WENT -- WHEN COMPUTER CODE IS

7   ACTUALLY RUNNING ON THE DEVICE, WHAT'S THE GENERAL

8   TERM FOR THAT TYPE OF CODE?

9   A    IT'S USUALLY CALLED EXECUTABLE CODE.

10  Q    AND THERE'S BEEN TALK IN THIS CASE ABOUT

11  SOURCE CODE.  CAN YOU TELL US THE DIFFERENCE

12  BETWEEN EXECUTABLE AND SOURCE CODE?

13  A    SO SOURCE CODE IS WHAT A HUMAN PROGRAMMER

14  WRITES.  HE GOES THROUGH A PROCESS TO CONVERT IT

15  INTO EXECUTABLE CODE, WHICH IS WHAT A COMPUTER CAN

16  EXECUTE.

17  Q    OKAY.  AND WAS THERE A LATER VERSION -- WELL,

18  YOU HAVE WHAT TYPE OF CODE FOR THIS DEVICE DATING

19  BACK TO NOVEMBER 9TH, 2004?  DO YOU HAVE EXCLUDABLE

20  OR SOURCE CODE?

21  A    EXCLUDABLE CODE FOR THAT PARTICULAR VERSION.

22  Q    OKAY.  WAS THERE A -- DID YOU AND YOUR TEAM

23  DEVELOP A LATER VERSION OF THIS CODE LATER ON IN

24  TIME?

25  A    YES, WE DID.

1   Q    AND WHAT WAS THE NAME OF THAT CODE?

2   A    AT THE TIME WE WERE PLANNING ON INTEGRATING

3   WITH IT WITH ANOTHER TECHNOLOGY CALLED XNAV.  WE

4   NEVER DID THAT INTEGRATION, BUT THE NAME STUCK.

5   Q    AND WAS THE XNAV SOURCE CODE EVER PROVIDED TO

6   A THIRD PARTY?

7   A    YES.  AS I MENTIONED, WE HAVE BEEN UNDER

8   CONTRACT WITH MICROSOFT, AND SO WE SUPPLIED THE

9   CODE TO MICROSOFT WHEN WE WERE FINISHED WITH THE

10  DEVELOPMENT.

11  Q    AND THE XNAV SOURCE CODE, JUST SO I'M CLEAR,

12  WAS THAT PREPARED BY THE TEAM THAT WAS WORKING

13  UNDER YOU?

14  A    YES.  SO AMY KARLSON STARTED THE DEVELOPMENT,

15  AARON CLAMAGE ENDED UP FINISHING THE DEVELOPMENT,

16  AND I WAS ADVISING AND WORKING WITH THEM CLOSELY

17  DURING THAT PROCESS.

18  Q    ADVISING AND SUPERVISING THAT WORK WHEN YOU

19  WERE AT THE UNIVERSITY OF MARYLAND; IS THAT

20  CORRECT?

21  A    YES.

22  Q    AND THE ACTUAL XNAV SOURCE CODE THAT'S BEEN

23  USED IN THIS CASE, WHERE DID THAT COME FROM, YOUR

24  OWN COMPUTER?

25  A    YES, I HAVE THAT.

1    Q    AND DO YOU HAVE PERSONAL KNOWLEDGE OF THE

2    OPERATION OF THAT SOURCE CODE?

3    A    YES, I DO.

4    Q    IS -- THERE SHOULD BE AN EXHIBIT FOLDER WITH

5    SOME SOURCE CODE PRINTED OUT UP THERE.  IT SHOULD

6    BE MARKED DX 528, IF I HAVE IT RIGHT.  SOMEBODY

7    WILL CORRECT ME IF I DON'T.

8    A    OKAY.

9    Q    IT SHOULD BE IN A FOLDER, IN A BROWN FOLDER.

10   A    OKAY.

11   Q    IS THAT THE XNAV SOURCE CODE?

12   A    YES, IT IS.

13            MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

14   EXHIBIT DX 528 INTO EVIDENCE.

15            THE COURT:  ANY OBJECTION?

16            MR. JACOBS:  NO OBJECTION.

17            THE COURT:  IT'S ADMITTED.

18            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19            528, HAVING BEEN PREVIOUSLY MARKED FOR

20            IDENTIFICATION, WAS ADMITTED INTO

21            EVIDENCE.)

22            MR. DEFRANCO:  THANK YOU.

23   Q    LET'S PUT UP A SLIDE THAT'S GOT A SNIPPET OF

24   THAT CODE.  I UNDERSTAND IT'S OKAY TO SHOW THIS ON

25   THE PUBLIC SCREEN.  IS THAT OKAY?

2246

```
 1    A    YES.

 2    Q    THIS IS, IF I HAVE IT RIGHT AGAIN, SDX

 3    3951.007.  IS THIS PART OF THE XNAV SOURCE CODE

 4    YOU'VE SEEN, DOCTOR?

 5    A    YES, IT IS.

 6    Q    AND TELL US A LITTLE BIT ABOUT THE ZONES AND

 7    THE WORLD VIEW THAT YOU DESCRIBED EARLIER, HOW

 8    THAT'S LAID OUT IN THE CODE JUST IN VERY GENERAL

 9    TERMS TO GIVE US AN OVERALL FEEL.

10          DO YOU UNDERSTAND WHAT I'M ASKING?

11    A    WITH RESPECT TO THIS CODE OR JUST IN GENERAL?

12    Q    WITH RESPECT TO THIS CODE.

13    A    ALL RIGHT.  SO THIS IS SHOWING THE CREATION OF

14    A PART OF THAT ZOOM SPACE.  IN PARTICULAR, IT'S

15    CREATING ONE OF THOSE ZONES, I CALLED THEM QUAD

16    TILES BECAUSE THE CODE -- THE ZONE HAD FOUR TILES,

17    SO WE CALLED THEM QUAD TILES.

18          THIS CODE HERE, I KNOW IT'S HARD TO READ

19    UP THERE, BUT IT WAS REPRESENTING THAT MIDDLE ZONE

20    IN THE MIDDLE COLUMN, SO WE CALLED IT THE MIDDLE

21    MIDDLE QUAD TILE.

22          AND THEN WHAT YOU SEE HERE IS FOUR

23    SECTIONS OF CODE THAT CREATE THE STRUCTURE OF THAT

24    ZONE.

25          SO WE FIRST SEE IT CREATING THE UPPER
```

2247

1    LEFT MAP TILE, AND THEN THE LOWER LEFT CALENDAR

2    TILE, THEN THE UPPER RIGHT IN BOX TILE, AND THEN

3    THE LOWER RIGHT PHONE TILE.

4    Q    NOW, SIR, I'D LIKE TO -- LET ME ASK, SO WE'RE

5    LOOKING NOW AT THE XNAV SOURCE CODE AGAIN; CORRECT?

6    A    YES.

7    Q    WE TALKED EARLIER ABOUT ZOOMING, SNAP BACK

8    FUNCTIONALITY IN LAUNCHTILE.  DO YOU REMEMBER THAT?

9    A    YES.

10   Q    WERE YOU ABLE TO COMPARE THOSE TWO

11   FUNCTIONALITIES IN THE TWO DIFFERENT PRODUCTS/CODE

12   THAT YOU LOOKED AT?

13   A    SO, YES, I -- I HAD THE TWO SYSTEMS,

14   LAUNCHTILE SYSTEM THAT YOU SAW AND XNAV, WHICH WAS

15   THE LATER SYSTEM RUNNING ON A DIFFERENT DEVICE, AND

16   I COMPARED THE ZOOMING AND THE SNAP BACK FEATURE

17   AND CONFIRMED THAT THE SNAP BACK FEATURE WORKED

18   IDENTICALLY ON BOTH THE ZOOMING FEATURE -- IT

19   WORKED ALMOST IDENTICALLY.  THERE WAS A SLIGHT

20   VISUAL CHANGE IN THE LATER XNAV AND THE WAY THE

21   BLUE DOTS WERE REPRESENTED.

22   Q    OKAY.  THANKS.

23        SHIFT GEARS MAYBE ONE MORE TIME.  LET'S

24   TALK ABOUT WHEN YOU TOLD, YOU AND YOUR TEAM TOLD

25   THE PUBLIC ABOUT LAUNCHTILE.  OKAY?

1    A    UM-HUM.

2    Q    YOU DID THAT AT SOME POINT.  CAN YOU TELL US

3    ABOUT IT?  WHEN WAS THE FIRST TIME YOU DID IT, AND

4    GIVE US A COUPLE OF SENTENCES ABOUT THE

5    CIRCUMSTANCES SURROUNDING THAT.  OKAY?

6    A    SURE.  SO AS I MENTIONED, WE DEVELOPED THE

7    CODE IN THE SUMMER OF 2004.  I KNOW WE COMPLETED IT

8    BY SEPTEMBER 2004 BECAUSE AT THAT POINT WE HAD

9    WRITTEN A PAPER AND SUBMITTED IT TO A CONFERENCE.

10            IT LATER GOT ACCEPTED TO THE CONFERENCE.

11   IT WAS CALLED THE CHI, COMPUTER HUMAN INTERACTION,

12   AND IT WAS EVENTUALLY PUBLISHED THERE IN APRIL OF

13   2005.

14   Q    OKAY.  AND HOW WAS YOUR PAPER AND LAUNCHTILE

15   RECEIVED AT THE CHI CONFERENCE?  CAN YOU TELL US?

16   A    WE GOT REALLY EXCELLENT FEEDBACK.  IN FACT, IT

17   WAS NOMINATED FOR A BEST PAPER AWARD, WHICH IS

18   GIVEN TO 5 PERCENT OF THE ACCEPTED PAPERS.  IN

19   FACT, NORMALLY ABOUT 20 PERCENT OF THE SUBMITTED

20   PAPERED GOT ACCEPTED, SO IT WAS PRETTY SELECTIVE.

21            AND THEN WE GOT REALLY EXCELLENT FEEDBACK

22   INFORMALLY DURING THE EVENT, DURING THE CONFERENCE.

23   Q    OKAY.  AND DID YOU ACTUALLY PRESENT LAUNCHTILE

24   ITSELF TO THE ATTENDEES AT THE CHI CONFERENCE?

25   A    YES.  IT WAS A BIG CONFERENCE, SOMETHING LIKE

1    2500 PEOPLE, AND SOME NUMBER OF THOSE -- I'M NOT

2    SURE EXACTLY HOW MANY, A FAIR NUMBER -- ATTENDED

3    OUR SESSION, WHICH WAS A FORMAL PRESENTATION.  I

4    THINK AMY KARLSON ACTUALLY DELIVERED, MY STUDENT,

5    DELIVERED THE PRESENTATION.  WE HAD POWERPOINT

6    SLIDES.  WE SHOWED A VIDEO.

7    Q    OKAY.  LET'S -- WE HAVE A VIDEO.  LET'S PLAY

8    THE VIDEO.  IF I REMEMBER IT RIGHT, THIS VIDEO HAS

9    SOUND.

10   A    YES.

11   Q    IS THAT RIGHT?  SO WE'LL JUST PLAY IT.  YOU

12   DON'T NEED TO NARRATE THIS VIDEO.

13            HOLD ON FOR ONE SECOND, PLEASE.

14            YOU RECOGNIZE THE COVER OF THIS VIDEO,

15   SIR?

16   A    YES, I BELIEVE THIS IS THE VIDEO WE ACTUALLY

17   PRESENTED AT THAT CONFERENCE.

18   Q    AGAIN, WHAT WAS THE DATE OF THAT?

19   A    APRIL 2005.

20   Q    OKAY.  LET'S PLAY THE VIDEO, PLEASE, RYAN.

21            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22   OPEN COURT OFF THE RECORD.)

23   BY MR. DEFRANCO:

24   Q    HAVING SEEN THAT, DOCTOR, DOES THAT CONFIRM,

25   OR NOT, THAT THAT'S THE VIDEO THAT WAS SHOWN AT THE

1    CHI CONFERENCE YOU TESTIFIED ABOUT IN APRIL OF

2    2005?

3    A    THAT IS THE SAME ONE.  THERE WAS SOME OTHER

4    PIECES, SOME OTHER PARTS, BUT THAT'S THE WHOLE

5    SEGMENT ON LAUNCHTILE.

6    Q    OTHER PARTS RELATED TO SOMETHING DIFFERENT

7    THAN LAUNCHTILE?

8    A    CORRECT.

9    Q    ALL RIGHT.  WE'RE NOT GOING TO TAKE THE TIME

10   TO SHOW THOSE.

11            YOUR HONOR, WE WOULD MOVE INTO EVIDENCE

12   THIS VIDEO, WHICH IS SDX 3951.009 AND THE PREVIOUS

13   SLIDE WHICH SHOWED SOME SOURCE CODE, WHICH IS SDX

14   3951.007.

15            THE COURT:  IS THIS DX 518 IS THE ACTUAL

16   VIDEO?  THAT'S WHAT I HAVE IN MY BINDER.  DO YOU

17   WANT THAT IN AS --

18            MR. DEFRANCO:  THAT'S THE DEVICE ITSELF,

19   YOUR HONOR.  THE VIDEO HAS THE SLIDE NUMBER IN THE

20   LOWER RIGHT-HAND CORNER.

21            THE COURT:  NO.  THIS IS MY DX 518.  IT'S

22   THE VIDEO.

23            MR. DEFRANCO:  IT'S BOTH.

24            THE COURT:  ALL RIGHT.  YOU WANT TO MOVE

25   IN 518?

```
 1              MR. DEFRANCO:  YES, YOUR HONOR.

 2              THE COURT:  OKAY.  THAT'S ADMITTED.

 3              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 4              518, HAVING BEEN PREVIOUSLY MARKED FOR

 5              IDENTIFICATION, WAS ADMITTED INTO

 6              EVIDENCE.)

 7              THE COURT:  AND THEN ALSO DX --

 8              MR. DEFRANCO:  3951.007.

 9              THE COURT:  I THINK THAT'S .009.

10              MR. DEFRANCO:  YES, .009 IS THE SLIDE

11    THAT GOES WITH THIS VIDEO.

12              THE COURT:  OH, AND YOU WANT TO MOVE IN

13    .007?

14              MR. DEFRANCO:  AND .007.

15              THE COURT:  THAT'S FINE.  THEY'RE BOTH

16    ADMITTED.

17              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

18              3951.007, 3951.009, HAVING BEEN

19              PREVIOUSLY MARKED FOR IDENTIFICATION,

20              WERE ADMITTED INTO EVIDENCE.)

21              THE COURT:  GO AHEAD, PLEASE.

22    BY MR. DEFRANCO:

23    Q    WE TALKED ABOUT THE CHI CONFERENCE, THE VIDEO

24    THAT WAS PRESENTED.

25              DID THERE COME A TIME WHEN THERE WAS YET
```

1    ANOTHER DEMONSTRATION OF LAUNCHTILE?

2    A    YES.  SO A MONTH LATER, MAY OF 2005, OUR LAB

3    AT THE UNIVERSITY OF MARYLAND HAD OUR CONFERENCE,

4    WE PUT ON AN ANNUAL CONFERENCE, ABOUT 2- OR 300

5    PEOPLE, AND THEY CAME AND WE SHOWED -- WE GAVE A

6    SIMILAR FORMAL PRESENTATION, AND THEN WE ALSO HAD A

7    DEMO TIME FOR A FEW HOURS WHERE WE WOULD HAVE

8    POSTERS, WE WOULD STAND AROUND THE POSTERS AND THE

9    ATTENDEES COULD WALK AROUND, TALK TO US, AND AMY

10   AND I WOULD HAND OUT THE DEVICES AND ENCOURAGE

11   PEOPLE TO ACTUALLY TRY OUT LAUNCHTILE THEMSELVES.

12   Q    OKAY.  AND THE LAUNCHTILE DEVICE AND THE CODE

13   THAT WAS LOADED AT THAT TIME, DID THAT HAVE THE

14   ZOOMING AND THE SNAP BACK FUNCTIONALITY THAT YOU

15   SHOWED US IN THE VIDEOS?

16   A    OH, YES, DEFINITELY.

17   Q    AND WERE PEOPLE -- YOU SAID PEOPLE COULD LOOK

18   AT THE DEVICE.  DID YOU LET PEOPLE TAKE THE DEVICE

19   AND PLAY WITH IT AND PLAY AROUND WITH THE

20   FUNCTIONALITY AT THAT TIME?

21   A    YES, THEY COULD DO WHATEVER THEY WANTED WITH

22   THE LAUNCHTILE.

23   Q    ANY RESTRICTIONS ON PEOPLE'S ABILITY TO DO

24   THAT WHO ATTENDED THAT CONFERENCE?

25   A    NO.

1    Q    SYMPOSIUM.  WAS THAT A SYMPOSIUM OR A

2    CONFERENCE?

3    A    WE CALLED IT A SYMPOSIUM.  IT WAS A

4    CONFERENCE.

5    Q    OKAY.  AND THEN JUST SUMMARIZE FOR US

6    REACTION.  HOW DID PEOPLE REACT TO THE LAUNCHTILE

7    FUNCTIONALITY THAT YOU SHOWED?

8    A    YOU KNOW, PEOPLE LOVED THIS STUFF.  AT THE

9    TIME WE WERE RUNNING ON THIS DEVICE, THIS MICROSOFT

10   POCKET P.C. DEVICE WHICH WAS DESIGNED FOR TWO HANDS

11   WHERE YOU'D USE A STYLUS TO SCROLL A TINY, TINY

12   LITTLE SCROLL BAR AND, TO BE HONEST, IT WAS KIND OF

13   FRUSTRATING.

14        SO WHEN WE WERE SHOWING THE FACT THAT YOU

15   COULD NAVIGATE THIS RICH INFORMATION SPACE CASUALLY

16   WITH ONE HAND, PEOPLE LIKED IT.

17   Q    AND JUST TO CONFIRM, DOCTOR, YOU'RE HERE AS A

18   FACT WITNESS, NOT AS AN EXPERT FOR SAMSUNG, IS THAT

19   CORRECT, IN THIS CASE?

20   A    THAT IS CORRECT.

21        MR. DEFRANCO:  THANK YOU VERY MUCH.

22        THE COURT:  ALL RIGHT.  THE TIME IS NOW

23   3:31.

24   ///

25   ///

1                          **CROSS-EXAMINATION**

2      BY MR. JACOBS:

3      Q     GOOD AFTERNOON, SIR.

4      A     GOOD AFTERNOON.

5      Q     NOW, YOU ARE SERVING AS AN EXPERT FOR -- IN A

6      DIFFERENT LAWSUIT AGAINST APPLE; CORRECT, SIR?

7      A     THAT IS CORRECT.

8      Q     AND YOU'VE OFFERED IN THAT CASE AN OPINION ON

9      BEHALF OF AN APPLE COMPETITOR; RIGHT?

10     A     THAT IS CORRECT.

11     Q     NOW, IN LAUNCHTILE AND XNAV, THERE ARE THREE

12     SEPARATE ZOOM LEVELS; TRUE?

13     A     THERE ARE -- YES, THERE ARE THREE ZOOM LEVELS

14     AND YOU MOVE BETWEEN THEM AS I SHOWED IN THE

15     VIDEOS.

16     Q     AND JUST TO GET THE NAMES OF THIS DOWN, IT'S

17     THE WORLD VIEW, THE ZONE VIEW, AND THE APPLICATION

18     VIEW; RIGHT?

19     A     THAT IS CORRECT.

20     Q     NOW, WHEN YOU'RE IN WORLD VIEW, YOU'RE LOOKING

21     AT THE WHOLE WORLD THAT EXISTS ON THAT -- IN

22     LAUNCHTILE; CORRECT?

23     A     THAT IS CORRECT.  YOU CAN SEE THE WHOLE ZOOM

24     SPACE, ALL 36 TILES.

25     Q     AND YOU CAN'T SCROLL AT ALL IN WORLD VIEW?

```
 1    A    NO.  IT WAS DESIGNED WITH A FIXED SET OF

 2    TILES, SO THERE WOULD BE NO REASON TO SCROLL.

 3    Q    NOW, WHEN YOU'RE IN ZONE VIEW, THAT'S THE

 4    MIDDLE LEVEL; RIGHT?

 5    A    THAT IS CORRECT.

 6    Q    YOU CAN SCROLL.  TRUE?

 7    A    YES, AS I SHOWED IN THE VIDEO, YOU CAN SCROLL

 8    OR PAN.  I USE THOSE WORDS INTERCHANGEABLY

 9    TYPICALLY.

10    Q    AND YOU DESCRIBED THE SNAP BACK FUNCTIONALITY

11    IN YOUR TESTIMONY A FEW MOMENT AGO.  DO YOU RECALL

12    THAT?

13    A    YES.

14    Q    AND THE WAY YOU IMPLEMENTED SNAP BACK WAS THAT

15    IF A USER HAS DRAGGED MORE THAN ONE-SIXTH OF A

16    SCREEN WIDTH, LAUNCHTILE WILL SNAP TO THE NEXT

17    ZONE.  TRUE, SIR?

18    A    YES, THAT SOUNDS RIGHT.  WHEN THE USER IS

19    DRAGGING THEIR FINGER, THERE'S A THRESHOLD, AND IF

20    THEY DRAG MORE THAN THAT THRESHOLD, IT SNAPS

21    FORWARD TO THE NEXT ZONE.

22         AND IF THEY'VE DRAGGED LESS THAN THAT

23    THRESHOLD, IT SNAPS BACK TO THE ZONE THEY STARTED

24    FROM.

25    Q    AND THE THRESHOLD IS THE ONE-SIXTH -- WE'LL
```

1   CALL IT THE ONE-SIXTH CONDITION.  TRUE, SIR?

2   A    YEAH, THE THRESHOLD IS ONE-SIXTH OF THE

3   DIMENSION OF THE SCREEN THAT YOU'RE DRAGGING.  SO

4   IF YOU'RE DRAGGING HORIZONTALLY, IT WOULD BE

5   ONE-SIXTH OF THE WIDTH.  IF YOU'RE DRAGGING

6   VERTICALLY, I BELIEVE IT WOULD BE ONE-SIXTH OF THE

7   HEIGHT.

8   Q    SO LAUNCHTILE CODE ACTUALLY CONTAINS

9   INSTRUCTIONS THAT MEASURE THE DISTANCE OF MOVEMENT

10  AND THEN PERFORM THAT SNAPPING ANIMATION DEPENDING

11  ON WHETHER THE ONE-SIXTH CONDITION IS SATISFIED.

12  TRUE, SIR?

13  A    I THINK THAT SOUNDS RIGHT, THAT THE -- THE

14  CONDITION IS BASED ON HOW FAR THE USER HAS DRAGGED.

15  Q    AND THE WAY IT WORKS, THOUGH, IS THAT IF

16  YOU'RE AT THE LAST TILE IN ANY PARTICULAR

17  DIRECTION, YOU CAN'T SCROLL PAST IT.  TRUE, SIR?

18  A    WE HAD TO MAKE SURE THAT THE USER ALWAYS HAD A

19  MECHANISM TO KNOW WHERE THEY WERE IN THE ZOOM SPACE

20  AND PROVIDED DIFFERENT MECHANISMS FOR ENSURING GOOD

21  EXPERIENCE AND AWARENESS.

22          SO WHEN -- THERE WAS -- WHEN YOU WERE AT

23  DIFFERENT ZONES, THERE WERE DIFFERENT INDICATORS

24  THAT TOLD YOU WHERE YOU WERE.  WE ACTUALLY HAD SOME

25  LITTLE BLUE DOTS, THESE LITTLE INDICATORS TO SHOW

1    YOU WHERE YOU WERE IN A ZONE THAT WAS AT THE EDGE

2    OF THE CONTENT, FAR EDGE, OR WHETHER YOU WERE IN

3    THE MIDDLE.

4              SO IF YOU WERE IN THE MIDDLE, YOU WOULD

5    SEE THAT YOU COULD GO FARTHER, YOU COULD GO FARTHER

6    AND SNAP BACK.

7              IF YOU WERE AT THE FAR EDGE, THERE WOULD

8    BE AN INDICATOR THAT YOU WERE AT THE FAR EDGE AND

9    THEN THERE WOULD BE NO NEED TO GO PAST THAT.

10   Q    OKAY.  SO WE'VE COVERED THREE DIFFERENT CASES

11   AND I'D LIKE TO SHOW A VIDEO NOW AND SEE IF WE CAN

12   EXPLAIN THIS TO THE JURY VIDEO -- VISUALLY.  CAN WE

13   SEE PDX 41.1, PLEASE.

14             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

15   OPEN COURT OFF THE RECORD.)

16   BY MR. JACOBS:

17   Q    SO WHAT ARE WE LOOKING AT IN THE FIRST MOMENTS

18   OF THIS VIDEO, DR. BEDERSON?  WHAT VIEW ARE WE IN?

19   WHAT VIEW ARE WE IN NOW?

20   A    NOW?

21   Q    YES.

22   A    THIS IS WHAT WE CALLED THE WORLD VIEW, THE

23   ZOOMED OUT VIEW.

24   Q    OKAY.  LET'S GO A FEW SECONDS INTO THAT.

25             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

1    OPEN COURT OFF THE RECORD.)

2    BY MR. JACOBS:

3    Q    AND AS YOU SEE IN THAT VIEW -- YOU CAN STOP

4    NOW -- YOU CAN'T SCROLL AT ALL; CORRECT?

5    A    THAT IS CORRECT.  AS I EXPLAINED, THERE WOULD

6    BE NO NEED FOR SCROLLING.

7    Q    OKAY.  AND NOW LET'S SHOW THE ONE-SIXTH OF A

8    SCREEN WIDTH CONDITION BEING SATISFIED OR NOT

9    SATISFIED AND WE'LL SEE THE SNAP BACK.

10              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11   OPEN COURT OFF THE RECORD.)

12   BY MR. JACOBS:

13   Q    NOW, ACTUALLY WE'RE AT THE -- WE WERE AT THE

14   EDGE JUST THEN, RIGHT, AND IT WOULDN'T GO ANY

15   FURTHER; CORRECT, SIR?

16   A    YOU WERE AT THE FAR OUTSIDE EDGE OF THE

17   CONTENT.

18   Q    SO YOU WOULDN'T PULL AWAY FROM THE EDGE AND

19   SHOW SPACE, IT WOULD JUST STOP SCROLLING; CORRECT,

20   SIR?

21   A    IF YOU CAN JUST STAY ON THAT VIDEO FRAME FOR

22   JUST A SECOND, IT'S A LITTLE HARD TO SEE IN BETWEEN

23   FRAMES, BUT YOU'LL SEE IN THAT SORT OF HOLE WHERE

24   THE BLUE DOT, THE BLUE BUTTON IS NOT.  ON THE RIGHT

25   SIDE THERE ARE THOSE FIXED LITTLE BLUE DOTS, THAT'S

1    AN INDICATOR THAT YOU CAN GO TO THE RIGHT.  AND ON

2    THE LEFT EDGE THERE AREN'T ANY INDICATORS.

3              SO YOU WOULD KNOW, THAT'S A VISUAL

4    INDICATION THAT YOU WOULD HAVE NO NEED TO GO TO THE

5    LEFT.  SO THAT WAS THE FEEDBACK THAT I WAS TALKING

6    ABOUT.

7    Q    SO LET'S GO BACK A FEW SECONDS IN THE VIDEO

8    AND JUST LOOK AT THAT AGAIN.

9              SO AT 11 SECONDS, WE'RE IN WHAT VIEW,

10   SIR?

11   A    THIS IS THE ZONE VIEW.

12   Q    OKAY.

13              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14   OPEN COURT OFF THE RECORD.)

15   BY MR. JACOBS:

16   Q    AND WE'RE AT THE LEFT EDGE, SO IT WOULDN'T GO

17   ANY FURTHER; CORRECT?

18   A    THE FAR LEFT EDGE, THE OUTSIDE EDGE OF THE

19   CONTENT.

20   Q    AND THAT'S TRUE AT EACH BOUNDARY; CORRECT?  IF

21   YOU'RE AT THE -- IF YOU'RE SHOWING ALL THE CONTENT

22   AT THE BOTTOM THAT YOU CAN SEE, IT WON'T SCROLL

23   UPWARDS ANY FURTHER; CORRECT, SIR?

24   A    IF YOU'RE AT THE BOTTOM-MOST, ONE OF THE

25   BOTTOM-MOST ZONES AND YOU TRY AND SCROLL UP, IT

1    WILL NOT SCROLL UP.

2    Q    AND THE SAME IS TRUE FOR RIGHT AND LEFT AND

3    TOP.  TRUE, SIR?

4    A    YES, ASSUMING YOU WOULD HAVE TO GO THROUGH ALL

5    FOUR EXAMPLES.

6    Q    NOW, LET'S TALK ABOUT THE APPLICATION TILES.

7            THE APPLICATION VIEW, THAT'S THE VIEW

8    WHERE YOU ACTUALLY HAVE TAPPED ON A TILE; CORRECT,

9    SIR?

10   A    SO THAT'S THE DEEPEST OF THE THREE ZOOM

11   LEVELS.  YOU HAVE A ZONE AND YOU TAP ON A TILE, IT

12   WILL BRING YOU INTO THE APPLICATION VIEW, I CALLED

13   IT.

14   Q    AND WHAT YOU WERE TRYING TO EXPLAIN -- YOU

15   WERE TRYING TO EXPLAIN THIS IDEA OF SEMANTIC

16   ZOOMING IN YOUR EXAMINATION BY SAMSUNG'S COUNSEL.

17   DO YOU RECALL THAT?

18   A    YES, I DO.

19   Q    AND THE IDEA WAS THAT WHEN YOU TAP ON AN

20   APPLICATION TILE AND GO DEEPER INTO IT, YOU

21   ACTUALLY SEE NEW CONTENT.  TRUE, SIR?

22   A    IT WAS THE SAME TILE AND YOU WOULD SEE MORE

23   INFORMATION ABOUT THAT TILE.

24   Q    AND WHEN YOU SAY MORE INFORMATION ABOUT THAT

25   TILE, ARE YOU SEEING AN ENLARGEMENT OF THE TILE?

1    HAS THE FONT GOTTEN BIGGER SO YOU CAN READ IT, OR

2    ARE YOU SEEING AN UNDERLYING LEVEL OF DETAILED

3    INFORMATION RELATED TO THAT TILE?

4    A    AS I EXPLAINED, THE WHOLE POINT OF SEMANTIC

5    ZOOMING WAS TO HAVE DIFFERENT VISUAL

6    REPRESENTATIONS AND TO SHOW MORE DETAILED

7    INFORMATION AS YOU GOT LARGER, AS IT WAS ZOOMED IN.

8    SO, YES, IT WOULD SHOW MORE DETAILED INFORMATION.

9    Q    SO LET'S TAKE A LOOK AT THAT.  LET'S TAKE A

10   LOOK AT PDX 41.2.

11          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

12   OPEN COURT OFF THE RECORD.)

13   BY MR. JACOBS:

14   Q    SO, IN FACT, WE TAPPED ON -- ON THIS -- PAUSE

15   IT, PLEASE.

16          WE TAPPED ON THAT PARTICULAR APPLICATION

17   TILE AND THERE WAS NO MORE INFORMATION TO BE SEEN

18   IN THAT PARTICULAR CASE; CORRECT, SIR?

19   A    YES.  AS I EXPLAINED, THE PRIMARY GOAL WAS TO

20   EXPLORE THIS ZOOM SPACE AND WE DIDN'T BOTHER TO

21   FILL OUT THE ACTUAL IMPLEMENTATION OF THE DEEPEST

22   LEVEL OF MANY OF THE TILES.

23   Q    AND THAT WAS FROM 5 SECONDS TO 12 SECONDS THAT

24   WE JUST SAW.  TRUE, SIR?

25   A    I DON'T REMEMBER EXACTLY WHERE YOU STARTED,

2262

1    BUT THAT SOUNDS ABOUT RIGHT.

2    Q    AND SO THE POINT THAT YOU'RE, THAT YOU WERE

3    DRIVING AT IS WHEN THIS THING WAS FULLY FLESHED

4    OUT, INSTEAD OF SEEING SOMETHING BLANK, YOU'D SEE

5    MORE INFORMATION ABOUT THAT PARTICULAR APPLICATION?

6    A    CORRECT.  I WOULD SAY MORE INFORMATION ABOUT

7    THAT TILE IS THE TERM WE USED, AS YOU SAW IN THE --

8    I THINK I SHOWED THAT IN THE E-MAIL TILE IN THE

9    VIDEO AND IN THE CONFERENCE VIDEO.

10   Q    LET'S TAKE A LOOK AT ANOTHER ONE.  LET'S TAKE

11   A LOOK AT THE CALENDAR APPLICATION.  THIS WOULD BE

12   PDX 41.2.  THAT'S WHAT WE JUST SAW, CORRECT, SIR,

13   WAS THAT CALENDAR?

14        I THINK YOU MAY HAVE TO GO BACK A LITTLE

15   BIT FURTHER.

16        SO IT WAS CALENDAR WE TAPPED ON THERE;

17   CORRECT, SIR?

18   A    YES.

19   Q    NOW LET'S GO TO PDX 41.1, AND LET'S LOOK AT

20   THE E-MAIL APPLICATION FOR A MINUTE.  SO LET'S GO

21   TO 27 SECONDS ON THAT, PLEASE.

22        (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

23   OPEN COURT OFF THE RECORD.)

24   BY MR. JACOBS:

25   Q    NOW, THIS SHOWS A DIFFERENT FUNCTIONALITY.

1    SAMSUNG'S COUNSEL DIDN'T ASK YOU ABOUT THIS IN YOUR

2    DIRECT EXAMINATION, BUT I WANT TO MAKE SURE THAT

3    THAT WAS INTENTIONAL, SO IF HE GETS UP AND SAYS

4    "BEYOND THE SCOPE OF DIRECT," I'LL KNOW WHETHER

5    THAT WAS TRUE OR NOT.

6              IN THE E-MAIL APPLICATION, THERE'S ALSO A

7    SNAP BACK KIND OF FUNCTIONALITY, AN AUTO CENTERING

8    FUNCTION.  TRUE, SIR?

9    A    YES, THERE IS.

10   Q    AND IN THAT AUTO CENTERING, YOU -- THE BLUE

11   HIGHLIGHTER WILL MOVE UP AND DOWN BETWEEN THE

12   E-MAIL HEADERS; CORRECT, SIR?

13   A    WELL, YOU ACTUALLY JUST, I THINK, COMBINED TWO

14   DIFFERENT FEATURES.  SO SINCE YOU ASKED ABOUT THAT,

15   I BETTER TRY AND EXPLAIN IT.

16             IF YOU DRAG THAT BLUE BUTTON WITH THE PEN

17   OR YOUR FINGER, WHAT YOU'LL SEE IS THAT BLUE

18   HIGHLIGHT LINE WILL MOVE WITH IT, AND WHEN YOU LET

19   GO, IT WILL ALIGN WITH THE NEAREST E-MAIL.

20   Q    SO LET'S --

21   A    I -- YOU DESCRIBED TWO DIFFERENT THINGS AND SO

22   I WANTED TO CLARIFY.  THAT WAS ONE OF THE FEATURES.

23             THE SECOND FEATURE IS THAT IF YOU DRAG

24   THE E-MAIL LIST TO THE END OF THE CONTENT, TO THE

25   END OF THE LIST, AND YOU DRAG IT PAST THE LAST

1    E-MAIL, BUT NOT TOO FAR PAST, THEN IT WILL SNAP

2    BACK IN A SIMILAR WAY TO WHAT YOU SAW WITH THE

3    ZONES.

4    Q    SO LET'S TAKE A LOOK AT THAT, SIR.

5             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

6    OPEN COURT OFF THE RECORD.)

7    BY MR. JACOBS:

8    Q    WE'RE AT 54 SECONDS ON THIS VIDEO, AND WE JUST

9    SAW IT AUTO CENTER.  CORRECT, SIR?

10   A    I THINK WE JUST SAW -- I THINK I PROBABLY

11   WOULD HAVE CALLED IT ALIGNING THE BLUE HIGHLIGHT

12   BAR WITH THE NEAREST E-MAIL, BUT --

13   Q    AND THAT'S WHAT THE CODE ACTUALLY DOES, RIGHT?

14   IT LOOKS FOR WHAT'S THE NEAREST E-MAIL HEADER AND

15   IT MOVES THE BLUE BAR TO THAT HEADER.  TRUE, SIR?

16   A    THAT'S CORRECT.

17   Q    AND NOW LET'S -- DO WE HAVE VIDEO THAT SHOWS

18   THE END?

19             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20   OPEN COURT OFF THE RECORD.)

21   BY MR. JACOBS:

22   Q    SO IT ACTUALLY GOES OFF INTO DESERT FOG,

23   DOESN'T IT, SIR, IN THIS VIDEO?

24   A    SO I THINK THIS DOES EXACTLY HOW I EXPLAINED

25   IT, WHICH IS IF YOU DRAG IT PAST THE END OF THE

1    E-MAIL LIST NOT TOO FAR, IT WILL SNAP BACK.  IF YOU

2    DRAG IT TOO FAR, THEN IT WILL JUST STAY THERE.

3    Q    AND THE DEFINITION OF "TOO FAR," SIR?

4    A    THERE'S A -- IT HAS TO DO WITH HOW THE CODE IS

5    IMPLEMENTED.  IT DEPENDS WHERE THE PARTICULAR -- I

6    MEAN, THERE'S A LOT OF DETAILS.  IT DEPENDS EXACTLY

7    WHERE THE BLUE HIGHLIGHT BAR IS.  IF THE BLUE

8    HIGHLIGHT BAR IS AT THE BOTTOM, THEN YOU CAN DRAG

9    IT UP TO ONE, THE HEIGHT OF ONE E-MAIL, WHICH IS

10   ABOUT 20 PIXELS.

11          IF THE BLUE BAR IS AT A DIFFERENT PLACE,

12   THEN YOU CAN DRAG IT 10 PIXELS IN ORDER TO SEE THE

13   SNAP BACK.

14   Q    SO IF YOU GO JUST ANOTHER COUPLE OF PIXELS, IT

15   WON'T SNAP BACK; TRUE, SIR?

16   A    SO AS I SAID, THERE'S A THRESHOLD.  IF YOU

17   DRAG IT LESS THAN THAT THRESHOLD, IT WILL SNAP

18   BACK.  IF YOU DRAG IT MORE THAN THAT THRESHOLD, IT

19   WILL NOT.

20   Q    SO WE CAN TAKE THAT DOWN NOW.

21          A COUPLE QUESTIONS ABOUT YOUR

22   SPONSORSHIP.  YOUR LAUNCHTILE WORK WAS SPONSORED BY

23   MICROSOFT.  TRUE, SIR?

24   A    MICROSOFT WAS SPONSORING MY RESEARCH IN

25   GENERAL ON ZOOMABLE USER INTERFACES IN MOBILE

1     DEVICES.  THAT COVERED A NUMBER OF THINGS, AND IT

2     INCLUDED THE DEVELOPMENT OF LAUNCHTILE.

3     Q     AND YOU WORKED WITH A MAN NAMED

4     JOHN SANGIOVANNI AT MICROSOFT?

5     A     THAT IS CORRECT.  I MENTIONED HIM BEFORE.

6     Q     AFTER COMPLETING THE CODE FOR LAUNCHTILE, YOU

7     TRANSMITTED IT TO MR. SANGIOVANNI; CORRECT, SIR?

8     A     AT MICROSOFT, CORRECT.

9     Q     AND YOU DID SO IN ENCRYPTED FORM?

10    A     YES.

11    Q     AND THAT WAS BECAUSE YOU UNDERSTOOD THAT YOU

12    WERE IN OBLIGATION TO KEEP LAUNCHTILE CONFIDENTIAL

13    AND ASKED MR. SANGIOVANNI WHEN YOU COULD DISCUSS IT

14    PUBLICLY.  TRUE, SIR?

15    A     SO THERE'S A 30-PAGE CONTRACT COVERING THE

16    AGREEMENT BETWEEN THE UNIVERSITY OF MARYLAND AND

17    MICROSOFT AND THERE'S A LOT OF DETAILS, BUT I THINK

18    WHAT YOU'RE GETTING AT IS PART OF THAT AGREEMENT IS

19    THAT MICROSOFT HAD RIGHTS TO THE SOFTWARE WE

20    DEVELOPED, AND AS PART OF THAT RIGHT, THEY HAD --

21    WE HAD AGREED THAT THEY WOULD HAVE SOME TIME TO

22    KEEP THINGS CONFIDENTIAL WHILE THEY CONSIDERED WHAT

23    THEY WERE GOING TO DO WITH IT, IF THEY WERE GOING

24    TO LOOK AT SOME I.P. ISSUES.

25            AFTER SOME TIME PERIOD HAD ELAPSED AND WE

1    HAD CLEARED THAT PROCESS, THEN THE UNIVERSITY OF

2    MARYLAND WAS FREE TO -- WE OWNED THE SOFTWARE.  WE

3    COULD DO WHATEVER WE WANTED WITH IT.

4              SO I BELIEVE AT THE TIME OF THAT E-MAIL,

5    I'M GUESSING I CAN -- I THINK -- I'M AWARE OF SOME

6    E-MAIL, MAYBE IT'S THE SAME ONE THAT YOU'RE

7    THINKING OF, THERE WAS SOME INTERACTION WHERE WE

8    WERE DISCUSSING WHETHER WE HAD GONE THROUGH THAT

9    PROCESS YET, WHETHER IT WAS YET TIME TO PUBLICLY

10   DISCLOSE IT OR NOT.

11             THERE WAS A TIME WHEN IT WASN'T PUBLICLY

12   DISCLOSED AND SO WE KEPT IT PRIVATE.

13             OBVIOUSLY BY THE TIME THE CONFERENCE

14   ROLLED AROUND, AND ACTUALLY QUITE A WHILE BEFORE

15   THEN, WE WERE FREE TO DO WHATEVER WE WANTED WITH

16   IT.  AND OF COURSE WE TALKED ABOUT IT AND SHOWED IT

17   TO EVERYONE WE COULD.  WE WERE QUITE PROUD OF IT.

18   Q    LET'S TALK ABOUT THAT, SIR.  YOU MENTIONED

19   THAT YOU PRESENTED LAUNCHTILE AT THE CHI

20   CONFERENCE.  YOUR PRESENTATION AT CHI DID NOT

21   INCLUDE A DEMONSTRATION OF THE DEVICE WITH THE

22   EXECUTABLE CODE LOADED ON IT; CORRECT?

23   A    THE PRESENTATION DIDN'T.  BUT I WAS AT THE

24   CONFERENCE FOR SIX DAYS.  THIS IS MY MAIN

25   PROFESSIONAL EVENT.  I GO TO THIS CONFERENCE EVERY

1    YEAR.  I'VE BEEN GOING SINCE 1995.

2              I'M A SOFTWARE DEVELOPER.  I MAKE USER

3    INTERFACES.  SO WHAT I WOULD DO, MY SORT OF

4    STANDARD PRACTICE IS I WOULD TRAP PEOPLE IN THE

5    HALLWAY AND SAY, "HEY, LOOK WHAT I'M DOING, LOOK AT

6    THIS COOL THING."  AND I WOULD SHOW THEM -- ONE

7    YEAR IT WAS MY LAPTOP SOFTWARE OUT OF MY LAPTOP.

8              THIS YEAR I WAS DEVELOPING LAUNCHTILE ON

9    A PDA, SO I WOULD HAND THEM THE PDA AND SAY, "HEY,

10   LOOK WHAT I'M DOING."

11             I'M PRETTY SURE AMY KARLSON DID THE SAME

12   THING.

13   Q    YOU ALSO HOSTED A SECOND PUBLIC PRESENTATION

14   AT A CONFERENCE HOSTED BY YOUR LAB.  YOU TALKED

15   ABOUT THAT IN YOUR DIRECT EXAMINATION.  TRUE, SIR?

16   A    YES.

17   Q    AND YOU DON'T RECALL ANY SPECIFIC

18   DEMONSTRATIONS YOU DID OF LAUNCHTILE AT THAT

19   SYMPOSIUM IN MAY OF 2005.  TRUE, SIR?

20   A    WELL, I REMEMBER SENDING --

21   Q    SIR, I'M ON A CLOCK.  DO YOU REMEMBER ANY

22   SPECIFIC DEMONSTRATION?

23   A    ARE YOU ASKING DO I REMEMBER THE INDIVIDUAL

24   PERSON OF THE 200 PEOPLE I DIDN'T KNOW WHICH ONES I

25   HANDED IT TO?  THE ANSWER IS NO, I DO NOT.

1    Q    AND DO YOU RECALL ANYTHING SPECIFICALLY BEING

2    DEMONSTRATED IN MAY OF 2005 THAT WASN'T IN THE

3    VIDEO THAT WE -- THAT THE JURY SAW IN YOUR DIRECT

4    EXAMINATION?

5    A    AS I SAID, PEOPLE -- WE GAVE THE DEVICES TO

6    PEOPLE.  THEY WERE ENCOURAGED TO TRY IT OUT AND USE

7    WHATEVER THEY WANTED TO.  I COULDN'T EVEN ALWAYS

8    SEE THE DEVICE AS THEY WERE USING IT.

9         SO DO I REMEMBER EXACTLY WHAT THEY DID?

10    NO, I DO NOT.

11    Q    ISN'T IT TRUE THAT YOU DON'T RECALL THE

12    SPECIFIC DETAILS OF WHAT WAS OR WAS NOT SHOWN TO

13    ANY SPECIFIC INDIVIDUAL?

14    A    YOU MEAN -- AS I SAID, I ENCOURAGED THEM TO

15    USE IT.  I DO NOT KNOW EXACTLY WHAT THEY DID.  I

16    DON'T KNOW WHERE THEY CLICKED.  I CERTAINLY DON'T

17    KNOW WHAT PIXEL THEY CLICKED ON AND HOW THEY

18    DRAGGED IT.  SO NO.

19         MR. JACOBS:  THANK YOU.  NO FURTHER

20    QUESTIONS.

21         THE COURT:  ALL RIGHT.  THE TIME IS 3:48.

22         GO AHEAD, PLEASE.

23                    **REDIRECT EXAMINATION**

24    BY MR. DEFRANCO:

25    Q    YOU WERE ASKED ABOUT A COUPLE OF E-MAILS,

 1     DOCTOR.  I THINK THERE MAY HAVE BEEN CONFUSION OR

 2     CONFLATING WHAT WAS IN THE TWO E-MAILS.  I WANT TO

 3     PUT ONE UP ON THE SCREEN THAT WAS MARKED AS A CROSS

 4     EXHIBIT, IT'S EXHIBIT 2227.

 5              IF WE CAN BLOW THAT UP, RYAN.

 6              YOU WERE ASKED ABOUT ENCRYPTION, SEND

 7     CODE TO MICROSOFT.  THEY ASKED YOU THAT IT BE

 8     ENCRYPTED; IS THAT RIGHT?  IS THIS THE E-MAIL

 9     YOU'RE TALKING ABOUT?

10     A    THAT'S THE ONE I WAS THINKING OF.

11     Q    WHAT'S THE DATE OF THAT E-MAIL?

12     A    OH, THIS IS LATER.  THIS IS AUGUST OF 2005.

13     SO THIS IS LONG AFTER WE HAD PUBLICLY DISCLOSED THE

14     INTERACTION.

15     Q    PUBLICLY DISCLOSED LAUNCHTILE?

16     A    CORRECT.

17     Q    EARLIER IN 2005; RIGHT?

18     A    YES.

19     Q    THIS LATER REQUEST BY MICROSOFT THAT YOU SEND

20     SOURCE CODE IN ENCRYPTION FORM, WAS THAT, IN YOUR

21     UNDERSTANDING, IN ANY WAY ATYPICAL FOR MICROSOFT'S

22     PRACTICE?

23     A    I'M NOT 100 PERCENT SURE, BUT I THINK THIS MAY

24     HAVE BEEN IN RESPONSE TO THEIR REQUEST.

25     Q    AND IN TERMS OF ENCRYPTION, DO YOU HAVE ANY

1    EXPERIENCE?

2    A    THE ENCRYPTION I THINK WAS IN RESPONSE TO

3    THEIR REQUEST.

4    Q    YOU WERE ASKED ABOUT AN EARLIER E-MAIL IN

5    SEPTEMBER '04.  DO YOU REMEMBER THAT?

6    A    YES, I BELIEVE THAT WAS ONE.

7    Q    AND YOU WERE ASKED, WAS THERE AN E-MAIL IN

8    THAT TIMEFRAME TO KEEP INFORMATION CONFIDENTIAL

9    ABOUT LAUNCHTILE; IS THAT CORRECT?

10   A    YES.

11   Q    BUT AFTER THAT E-MAIL -- WAS THAT REQUEST THAT

12   LAUNCHTILE NOT BE DISCLOSED PUBLICLY, WAS THAT

13   LIFTED, SIR?

14   A    YES.  AS I SAID, THERE WAS A PROCESS WE WENT

15   THROUGH.  WE WENT THROUGH IT, IT DIDN'T TAKE VERY

16   LONG, AND THEN WE WERE FREE TO DO WHATEVER WE

17   WANTED WITH ANY OF THE TECHNOLOGY.

18   Q    OKAY.  VERY BRIEFLY, YOU WERE ALSO SHOWN SOME

19   E-MAIL FUNCTIONALITY AND SHOWING THE WHITE SCREEN.

20            WHAT -- WAS THE E-MAIL FUNCTIONALITY, DID

21   YOU INTEND FOR THAT TO BE COMPLETED IN LAUNCHTILE

22   AT THIS POINT IN TIME?

23   A    NO.  IN FACT, THE E-MAIL APPLICATION WAS NOT

24   EVEN FULLY FUNCTIONAL.  YOU COULD NOT SEND OR

25   RECEIVE E-MAILS.  IT WAS REALLY JUST A

2272

1    DEMONSTRATION OF WHAT AN E-MAIL SYSTEM MIGHT FEEL

2    LIKE.  THE MAIN GOAL WAS TO SHOW THE ZOOMING AND

3    THE PANNING AND THE SNAPPING AND ALL THAT KIND OF

4    NAVIGATION.

5    Q    OKAY.  AND THEN BOUNCE BACK, YOU WERE ASKED

6    ABOUT BOUNCE BACK, SNAP BACK.  THE SNAP BACK

7    FUNCTIONALITY WAS USED IN LAUNCHTILE TO GO FROM

8    WHERE TO WHERE, SIR?

9    A    PRIMARILY FROM ZONE TO ZONE.

10   Q    WAS IT USED ONCE YOU GOT TO THE EDGE WHERE

11   THERE WERE NO MORE ZONES?

12   A    NO.  IT WAS NOT NECESSARY AT THAT POINT.

13   Q    DID YOU USE SOMETHING ELSE?

14   A    YES.  AS I EXPLAINED EARLIER, WE HAD THOSE

15   BLUE INDICATORS THAT GAVE THE USER INFORMATION SO

16   THEY KNEW THAT THERE WAS NO POINT IN GOING PAST

17   THERE.

18   Q    COULD YOU HAVE USED SNAP BACK AT THE EDGE, AND

19   IF SO, WHY DON'T YOU?

20        MR. JACOBS:  OBJECTION, YOUR HONOR.

21   LEADING AND ASKS FOR EXPERT TESTIMONY AND

22   HYPOTHETICAL.

23        THE COURT:  SUSTAINED.

24        MR. DEFRANCO:  THANK YOU VERY MUCH.

25        MR. JACOBS:  YOUR HONOR, VERY BRIEFLY.

1           THE COURT:  GO AHEAD.  THE TIME IS 351.

2           GO AHEAD.

3           MR. JACOBS:  I'D LIKE TO OFFER INTO

4    EVIDENCE 2227.

5           THE COURT:  ANY OBJECTION?

6           MR. DEFRANCO:  NO, YOUR HONOR, NO

7    OBJECTION.

8           THE COURT:  OKAY.

9           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10          2227, HAVING BEEN PREVIOUSLY MARKED FOR

11          IDENTIFICATION, WAS ADMITTED INTO

12          EVIDENCE.)

13          MR. JACOBS:  AND I'D LIKE TO OFFER INTO

14   EVIDENCE THE TWO VIDEOS WE SAW, PDX 41.1 AND PDX

15   41.2.

16          THE COURT:  THEY'RE ADMITTED.

17          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

18          41.1 AND 41.2, HAVING BEEN PREVIOUSLY

19          MARKED FOR IDENTIFICATION, WERE ADMITTED

20          INTO EVIDENCE.)

21          MR. JACOBS:  THANK YOU, YOUR HONOR.

22          THE COURT:  MAY THIS WITNESS BE

23   EXCUSED -- I'M SORRY.  GIVE ME THE NUMBER AGAIN OF

24   THE E-MAIL.

25          MR. JACOBS:  THAT WAS 2227.

2274

1            THE COURT:  ALL RIGHT.  MAY THIS WITNESS

2     BE EXCUSED OR IS IT SUBJECT TO RECALL?

3            MR. VERHOEVEN:  I THINK THE WITNESS MAY

4     BE EXCUSED.  HE'S A THIRD PARTY, YOUR HONOR.

5            THE COURT:  OKAY.  YOU ARE EXCUSED.

6            CALL YOUR NEXT WITNESS, PLEASE.

7            MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS

8     ADAM BOGUE.

9            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

10                      **ADAM BOGUE,**

11    BEING CALLED AS A WITNESS ON BEHALF OF THE

12    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

13    EXAMINED AND TESTIFIED AS FOLLOWS:

14            THE WITNESS:  I DO.

15            THE CLERK:  THANK YOU.  PLEASE BE SEATED.

16                 **DIRECT EXAMINATION**

17    BY MR. JOHNSON:

18    Q    GOOD AFTERNOON, MR. BOGUE.

19    A    GOOD AFTERNOON.

20    Q    DO YOU HAVE AN UNDERSTANDING OF WHY YOU'RE

21    BEING CALLED TO TESTIFY TODAY?

22    A    YES.  I'VE BEEN ASKED TO TALK ABOUT THE

23    DIAMONDTOUCH TABLE.

24    Q    BEFORE WE TALK ABOUT THE DIAMONDTOUCH, CAN YOU

25    PLEASE DESCRIBE FOR US, GIVE US A LITTLE BIT OF

1    BACKGROUND ON YOUR EDUCATION.

2    A    YES.  I HAVE AN UNDERGRADUATE DEGREE FROM

3    M.I.T. IN MATERIAL SCIENCE ENGINEERING; AND AN

4    M.B.A. FROM M.I.T. SLOAN SCHOOL OF BUSINESS.

5    Q    WHAT'S YOUR OCCUPATION?

6    A    I'M THE PRESIDENT OF CIRCLE TWELVE, A COMPANY

7    THAT I FOUNDED IN 2008, AND WE'RE THE MAKER OF THE

8    DIAMONDTOUCH TABLE.

9    Q    WHERE DID YOU WORK BEFORE CIRCLE TWELVE?

10   A    BEFORE CIRCLE TWELVE, I WAS AT MITSUBISHI

11   ELECTRIC RESEARCH LABS, OR MERL, AND MERL IS WHERE

12   DIAMONDTOUCH WAS FIRST INVENTED BACK IN 2001.

13   Q    WHERE IS MERL LOCATED?

14   A    201 BROADWAY IN CAMBRIDGE, MASSACHUSETTS.

15   Q    AND WHEN DID YOU START AT MERL?

16   A    IN 2000.

17   Q    NOW, WHEN YOU STARTED AT MERL, WHAT WERE YOUR

18   RESPONSIBILITIES?  WHAT WAS YOUR TITLE THERE?

19   A    I WAS THE VICE-PRESIDENT OF MARKETING AND

20   BUSINESS DEVELOPMENT, AND MY RESPONSIBILITIES WERE

21   TO FIND BUSINESS OPPORTUNITIES FOR THE TECHNOLOGY

22   THAT WAS DEVELOPED AT MERL BY THE RESEARCHERS

23   THERE.

24   Q    OKAY.  AND NOW YOU MENTIONED DIAMONDTOUCH.

25   CAN YOU TELL ME, WHAT WAS DIAMONDTOUCH, OR WHAT IS

1      DIAMONDTOUCH?

2      A    SO DIAMONDTOUCH IS A TABLETOP COMPUTER

3      INTERFACE THAT'S DESIGNED FOR SUPPORTING SMALL

4      GROUP, FACE-TO-FACE COLLABORATION.

5      Q    YOU HAVE A BINDER IN FRONT OF YOU, A BLACK

6      BINDER THAT HAS SOME EXHIBITS IN IT.  AND I'M GOING

7      TO ASK YOU, CAN YOU TURN TO DX 696, PLEASE?

8      A    SORRY.

9      Q    LET ME KNOW WHEN YOU GET THERE.

10     A    BLACK BINDER?

11     Q    IT SHOULD BE BLACK, A BLACK BINDER WITH THE

12     NUMBER 696.

13     A    696.  I'M SORRY.  I'M SORRY.  I GOT IT.

14     Q    ALL RIGHT.  AND IN PARTICULAR, I WANT TO

15     DIRECT YOUR ATTENTION TO PAGE 3, SO 696.003.

16     A    YES.

17     Q    DO YOU SEE A PHOTOGRAPH ON THAT PAGE IN THE

18     UPPER LEFT-HAND CORNER?

19     A    YES.  THIS IS A PHOTOGRAPH OF THE DIAMONDTOUCH

20     TABLE AS IT EXISTED IN THE LOBBY AT MITSUBISHI

21     ELECTRIC RESEARCH LABS.  THAT'S A PICTURE OF ME ON

22     THE LEFT THERE.

23              MR. JOHNSON:  YOUR HONOR, IF WE MAY, I'D

24     LIKE TO MOVE TO ADMIT EXHIBIT 696.

25              THE COURT:  ANY OBJECTION?

1          MR. JACOBS:  NO OBJECTION, YOUR HONOR.

2          THE COURT:  IT'S ADMITTED.

3          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

4          696, HAVING BEEN PREVIOUSLY MARKED FOR

5          IDENTIFICATION, WAS ADMITTED INTO

6          EVIDENCE.)

7          MR. JOHNSON:  IF WE MAY PUBLISH THIS TO

8   THE JURY?

9          THE COURT:  PLEASE, GO AHEAD.

10         MR. JOHNSON:  THANK YOU.

11  Q    SO YOU MENTIONED DIAMONDTOUCH IS A TABLE

12  TOUCHSCREEN.  CAN YOU TELL US WHAT YOU MEAN BY

13  THAT?

14  A    YES.  SO WHAT YOU'RE LOOKING AT THERE IN THE

15  PICTURE IS A TABLETOP TOUCHSCREEN.  IT'S A

16  RECTANGULAR TOUCHSCREEN, AND IT'S DESIGNED TO

17  SUPPORT SMALL GROUP FACE-TO-FACE COLLABORATION.  SO

18  THE FOUR PEOPLE SITTING AT THAT TABLE, WE CAN ALL

19  INTERACT USING MULTITOUCH GESTURES.

20         WHAT YOU DON'T SEE IN THE TABLE -- IN

21  THIS PICTURE IS ABOVE THERE'S A PROJECTOR AIMED

22  DOWN AND SO THE IMAGE IS PROJECTED FROM ABOVE, AND

23  BEHIND IT IS A P.C. AND TOGETHER THAT'S ALL

24  DIAMONDTOUCH.

25  Q    OKAY.  NOW, COULD DIAMONDTOUCH BE USED WITH A

1    SINGLE USER?

2    A    YES.  INDEED, I USE DIAMONDTOUCH IN MY

3    DAY-TO-DAY WORK AND HAVE SINCE 2004, 2005.  I DO

4    EVERYTHING ON IT.  IF YOU HAVE AN E-MAIL FROM ME,

5    IT COMES FROM THE DIAMONDTOUCH TABLE IN MY OFFICE.

6    Q    NOW, WHEN WAS DIAMONDTOUCH DEVELOPED?

7    A    IN 2001 AT MERL.

8    Q    WERE YOU INVOLVED IN THE DEVELOPMENT OF

9    DIAMONDTOUCH?

10   A    SO I WAS ON THE TEAM.  I DID SOME SOFTWARE

11   TESTING.

12           BUT MY PRINCIPAL RESPONSIBILITY WAS THE

13   BUSINESS DEVELOPMENT PERSON.  SO I WAS SHOWING

14   DIAMONDTOUCH TO PEOPLE OUTSIDE OF MERL.

15           WHEN WE HAD VISITORS THAT CAME TO MERL, I

16   WOULD DEMO THE DIAMONDTOUCH TABLE IN THE LOBBY

17   THERE.

18           I ALSO HAD A SYSTEM THAT I WOULD BRING ON

19   THE ROAD TO CUSTOMER SITES, AND I WENT TO A LOT OF

20   TRADE SHOWS AND OTHER PUBLIC EVENTS.

21   Q    OKAY.  NOW, CAN YOU RUN PROGRAMS ON

22   DIAMONDTOUCH?

23   A    YEAH.  IN FACT, ONE OF THE NICE THINGS ABOUT

24   DIAMONDTOUCH IS ANY WINDOWS SOFTWARE WORKS ON IT.

25           IN THIS TIME PERIOD WHEN THIS PHOTO WAS

```
 1     TAKEN, 2004/2005 TIMEFRAME, WE WERE DEVELOPING A

 2     LOT OF DEMONSTRATION APPLICATIONS TO ILLUSTRATE TO

 3     USERS WHAT YOU COULD DO WITH MULTITOUCH AND

 4     MULTIUSER TOUCH.  SO THERE WERE A LOT OF DEMOS

 5     SPECIFICALLY DESIGNED FOR DIAMONDTOUCH.

 6     Q    AND WHEN WAS THIS PHOTOGRAPH TAKEN?

 7     A    IN 2004.

 8     Q    HOW DO YOU KNOW THAT?

 9     A    WELL, I REMEMBER THE PHOTO BEING TAKEN.  ALSO,

10     LOOKING AT THE APPLICATION THERE, THAT'S FROM 2004.

11           I ALSO USE THIS AS A PRESS PIECE.  I

12     WOULD SEND THIS TO PEOPLE WHO ASKED ABOUT

13     DIAMONDTOUCH.

14     Q    WHAT TECHNOLOGY IS USED TO DETECT USER TOUCH

15     ON THE TOUCHSCREEN?

16     A    SO IT'S CAPACITIVE, VERY SIMILAR TO MOBILE

17     DEVICES TODAY.  THERE'S A GRID OF TRANSMITTERS IN

18     THE TOUCH SURFACE, AND WHEN YOU TOUCH IT, YOU'RE

19     CAPACITIVELY COUPLED TO THAT, THOSE SIGNALS.

20     Q    DID ANYBODY OUTSIDE OF MITSUBISHI USE

21     DIAMONDTOUCH?

22     A    YEAH.  SO WE -- IN THIS TIME PERIOD,

23     2003/2004, WE MADE ABOUT 100 OF THESE AND LENT OR

24     GAVE THEM AWAY TO MOSTLY UNIVERSITY RESEARCH GROUPS

25     AROUND THE WORLD, YOU KNOW, STANFORD, BERKELEY,
```

1    THEY ALL HAD DIAMONDTOUCH TABLES AND THEY WERE ALL

2    DEVELOPING APPLICATIONS FOR THEM.

3    Q    WHEN DID YOU FIRST START DEMONSTRATING

4    DIAMONDTOUCH SYSTEM TO PEOPLE OUTSIDE OF MERL?

5    A    THE FIRST TIME I SHOWED DIAMONDTOUCH OUTSIDE

6    OF MERL WAS IN THE SUMMER OF 2003.  I BROUGHT IT TO

7    APPLE HEADQUARTERS AND SHOWED IT TO THE HARDWARE

8    ENGINEERS THERE.

9    Q    AND WHO DID YOU FIRST DEMONSTRATE THE

10   DIAMONDTOUCH SCREEN SYSTEM TO?

11   A    SO IT WAS -- IT WAS A TEAM OF HARDWARE

12   ENGINEERS, AND I REMEMBER JOSH STRICKEN AND

13   STEVE HOTELLING, THOSE TWO NAMES STICK IN MY MIND.

14   THERE WERE OTHERS IN THE ROOM, I THINK MAYBE A HALF

15   A DOZEN.

16   Q    CAN I DIRECT YOUR ATTENTION TO EXHIBIT 695 IN

17   YOUR BINDER.  AND TELL ME -- BEFORE YOU PUT IT

18   UP -- DO YOU RECOGNIZE WHAT THAT IS, PLEASE?

19   A    YES.  THIS IS AN E-MAIL THAT -- IT'S FROM ME

20   AND IT'S TO STEVE HOTELLING FROM APPLE.  THIS IS

21   FROM 2003.

22            MR. JOHNSON:  YOUR HONOR, WE WOULD ASK

23   THAT THIS EXHIBIT 695 BE ADMITTED.

24            THE COURT:  IT'S ADMITTED.

25            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

```
 1              695, HAVING BEEN PREVIOUSLY MARKED FOR

 2              IDENTIFICATION, WAS ADMITTED INTO

 3              EVIDENCE.)

 4         MR. JOHNSON:  WILL YOU PUBLISH IT,

 5    PLEASE, RYAN?

 6    Q    NOW, DO YOU SEE THE DATE ON THIS E-MAIL

 7    THREAD?

 8    A    YES.  SO IT'S AN E-MAIL THREAD.  THE DATE AT

 9    THE TOP IS NOVEMBER 6TH, 2003.  THERE'S ANOTHER

10    ITEM IN THE THREAD BELOW, IT SAYS OCTOBER 23RD,

11    2003.  AND THEY BOTH ARE FOLLOW-UP E-MAILS TO THE

12    MEETING THAT I HAD PREVIOUS IN THE YEAR.

13    Q    AND WHERE DOES THIS E-MAIL COME FROM?

14    A    FROM MY FILES.

15    Q    NOW, DO THESE E-MAILS REFER TO THE MEETING AT

16    APPLE THAT YOU TALKED ABOUT EARLIER?

17    A    YEAH.  IT SAYS "A FEW MONTHS AGO, I MET YOU

18    AND JOSH."  AND SO, YES, IT REFERS TO THAT MEETING.

19    Q    OKAY.  NOW, WHEN YOU MET WITH APPLE TO SHOW

20    THE DIAMONDTOUCH SYSTEM, DID YOU REQUIRE APPLE TO

21    SIGN SOME SORT OF CONFIDENTIALITY AGREEMENT BEFORE

22    SHOWING THEM THE DIAMONDTOUCH SYSTEM?

23    A    NO.  IN FACT, I WAS ASKED TO SIGN AN AGREEMENT

24    THAT SAID ANYTHING THAT I SHOW SHOULD NOT BE

25    CONFIDENTIAL.
```

2282

```
 1    Q    AND WHO ASKED YOU TO SIGN THAT AGREEMENT?

 2    A    I WAS ASKED BY SOMEONE AT APPLE.

 3    Q    AND DID YOU SIGN THAT AGREEMENT?

 4    A    YES.

 5    Q    NOW, ARE YOU FAMILIAR OF A PROGRAM THAT RAN ON

 6    DIAMONDTOUCH CALLED FRACTAL ZOOM?

 7    A    YES.

 8    Q    AND WHAT'S THAT?

 9    A    SO FRACTAL ZOOM WAS ACTUALLY ONE OF THE CORE

10    DEMOS THAT I WOULD SHOW TO DEMONSTRATE THE

11    DIAMONDTOUCH TABLE AND THE MULTIUSER, MULTITOUCH

12    ASPECTS OF IT.

13              IT'S ACTUALLY, I THINK I -- I PREPARED A

14    VIDEO THAT MAYBE WE CAN SHOW.

15    Q    OKAY.

16              YOUR HONOR, MAY WE PLAY THE VIDEO?  IT'S

17    3952.101.

18              THE COURT:  GO AHEAD, PLEASE.

19              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20    OPEN COURT OFF THE RECORD.)

21    BY MR. JOHNSON:

22    Q    NOW, MR. BOGUE, CAN YOU EXPLAIN WHAT WE SEE

23    HERE?

24    A    YEAH.  THIS IS THE DIAMONDTOUCH.  YOU KIND OF

25    SEE A FRAME THERE, THAT RECTANGULAR SCREEN, THAT'S
```

1    THE DIAMONDTOUCH TABLE.

2    Q    THAT'S THE BLACK FRAME HERE?

3    A    YEAH.  AND THIS IS SOMETHING WE CALLED THE APP

4    LAUNCHER, SO APP LAUNCHER WAS SOMETHING THAT YOU

5    COULD HAVE APPS, AND IF YOU TOUCH ON THEM, THAT

6    WOULD LAUNCH THE APP.

7              THERE IS FOUR APPS ON THIS SCREEN, AND

8    THIS IS THE CORE SET OF DEMOS THAT I SHOWED IN THE

9    2004/2005 TIME FRAME.

10             AND THE ONE ON THE RIGHT THAT HE'S ABOUT

11   TO TOUCH ON IS, IS FRACTAL ZOOM.  I CALLED IT

12   MANDELBROT.  HE'S THE MATHEMATICIAN THAT SORT OF

13   DEVELOPED FRACTALS.  SORRY.

14   Q    DO FRACTAL ZOOM AND MANDELBROT REFER TO THE

15   SAME THING AS FAR AS DIAMONDTOUCH IS CONCERNED?

16   A    YES.

17   Q    SO WHAT DO WE SEE NEXT IN THE VIDEO?

18   A    OKAY.  SO WHEN HE TOUCHES ON THAT ICON -- I

19   DON'T KNOW IF YOU CAN RUN THIS.  OKAY.  SO THAT

20   LAUNCHED THE APPLICATION.

21             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22   OPEN COURT OFF THE RECORD.)

23             THE WITNESS:  YOU'LL SEE HERE THERE'S A

24   COPYRIGHT 2004, SO THAT'S WHEN FRACTAL ZOOM WAS

25   FIRST DEVELOPED.

1          AND IF WE KEEP RUNNING, THERE'S

2     INSTRUCTIONS ON HOW IT WORKS.

3          MR. JOHNSON:  AND CAN WE PAUSE IT HERE

4     JUST FOR A SECOND, PLEASE, RYAN?

5          THE WITNESS:  SO HERE IT TELLS YOU TWO

6     FINGERS TO ZOOM IN, TWO FINGERS TO ZOOM OUT, AND

7     ONE FINGER TO GRAB OR PULL THE IMAGE TO MOVE THE

8     IMAGE AROUND.

9     BY MR. JOHNSON:

10    Q    AND WHAT WAS BEING DESCRIBED THERE?

11    A    THIS IS -- THIS IS THE INSTRUCTIONS ON HOW TO

12    RUN THE DEMO.

13    Q    OKAY.  AND WHAT DO WE SEE NEXT IN THE VIDEO?

14    A    YOU'LL SEE SOMEBODY OPERATING IT.

15         MR. JOHNSON:  CAN WE PRESS PLAY.

16         (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17    OPEN COURT OFF THE RECORD.)

18         THE WITNESS:  SO THERE'S ONE FINGER, IT

19    MOVES.  AND NEXT YOU'LL SEE TWO FINGERS AND YOU CAN

20    ZOOM OUT OR ZOOM IN.

21         (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22    OPEN COURT OFF THE RECORD.)

23         THE WITNESS:  SO IT'S -- IT'S KIND OF

24    SIMPLE IN ITS OPERATION, BUT WHAT I LIKED ABOUT

25    FRACTAL ZOOM IS THAT IT WAS KIND OF EYE CATCHING

1    WHEN YOU SHOWED IT TO PEOPLE, AND ALSO IT

2    ILLUSTRATED THE MULTITOUCH ASPECTS OF THE HARDWARE.

3    BY MR. JOHNSON:

4    Q    AND WHEN WAS FRACTAL ZOOM FIRST DEMONSTRATED

5    TO PEOPLE?

6    A    SO IT WAS IN THE MID TO LATE 2004 TIME PERIOD.

7    WE LOADED IT INTO THE SYSTEM ON THE LOBBY IN MERL.

8    THAT'S THE FIRST PLACE WE ALWAYS SHOWED THINGS.  WE

9    KIND OF HAD A POLICY OF THE RESEARCHERS WOULD LOAD

10   IN THE LATEST NEW DEMOS ON TO THAT LOBBY MACHINE.

11            AND THEN AFTER THAT I STARTED BRINGING IT

12   ON THE ROAD ON THE TRAVELLING SYSTEM THAT I BROUGHT

13   OUT.

14   Q    HOW MANY TIMES WOULD YOU ESTIMATE THAT YOU'VE

15   PUBLICLY SHOWN FRACTAL ZOOM IN THE 2004/2005 TIME

16   FRAME?

17   A    IT WAS -- IT WAS LITERALLY THOUSANDS BECAUSE I

18   WAS ON THE ROAD A LOT AT TRADE SHOWS AND PUBLIC

19   EVENTS AND THIS WAS ONE OF THE CORE DEMOS THAT I

20   SHOWED.

21   Q    AND CAN YOU DESCRIBE FOR US WHERE IT WAS

22   PUBLICLY DEMONSTRATED.

23   A    YEAH.  SO THERE WAS NEXT BEST, WHICH WAS

24   SPONSORED BY WIRED MAGAZINE; THERE WAS GEOINT;

25   THERE WAS -- THAT WAS A TRADE SHOW, AFCEA WEST,

1    WHICH WAS IN SAN DIEGO; THERE WAS A CONFERENCE

2    CALLED SID, SOCIETY FOR INFORMATION DISPLAY, THAT

3    WAS IN BOSTON.

4              THERE WERE ALSO SOME INDIVIDUAL

5    DEMONSTRATIONS.  I BROUGHT IT TO THE NEW SCHOOL IN

6    NEW YORK CITY.  THERE WAS AN EVENT CALLED CWID,

7    SO -- AND I WAS ON THE ROAD A LOT SHOWING

8    DIAMONDTOUCH BACK IN THAT PERIOD OF TIME.

9    Q    AND THE CONFERENCES THAT YOU JUST REFERRED TO,

10   THE CWID, GEOINT, DID THOSE OCCUR -- WHAT YEAR DID

11   THOSE OCCUR IN WHEN YOU FIRST PUBLICLY DEMONSTRATED

12   FRACTAL ZOOM?

13   A    SO GEOINT WAS OCTOBER, NOVEMBER 2004.  AFCEA

14   WEST WAS JANUARY 2005.  SID WAS MAY 2005.

15   Q    OKAY.

16   A    I CAN KEEP GOING.

17   Q    SO WAS FRACTAL ZOOM OFFERED FOR SALE OR SOLD

18   AS PART OF THE DIAMONDTOUCH SYSTEM IN 2005?

19   A    SO WE -- WE DIDN'T SELL IT SEPARATELY.  IT WAS

20   INCLUDED IN THE PRODUCT.  SO IF YOU BOUGHT A

21   DIAMONDTOUCH TABLE, IT CAME WITH DEMONSTRATION

22   SOFTWARE AND THAT WAS, THAT WAS INCLUDED.

23              SO THIS, YES, THIS WAS INCLUDED IN THE

24   PRODUCT THAT WE SOLD.

25   Q    CAN I TURN YOUR ATTENTION TO DX 661 IN YOUR

1    BINDER, PLEASE.  AND CAN YOU TELL US WHAT THAT IS?

2    A    YES.  THIS IS A PRICE LIST FOR DIAMONDTOUCH

3    AND PRODUCT OPTIONS.  THIS IS -- I PREPARED THIS

4    PRICE LIST BACK IN OCTOBER 2000 -- OCTOBER 25TH,

5    2005.  I CAN SEE THE DATE IN THE LOWER RIGHT-HAND

6    CORNER.

7              MR. JOHNSON:  OKAY.  YOUR HONOR, WE'D ASK

8    THAT DX 661 BE MOVED INTO EVIDENCE.

9              MR. JACOBS:  NO OBJECTION.

10             THE COURT:  IT'S ADMITTED.

11             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12             661, HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15             MR. JOHNSON:  AND YOUR HONOR, I ALSO ASK

16   THAT SDX 3952.101, WHICH IS THE DIAMONDTOUCH VIDEO

17   WE JUST LOOKED AT, ALSO BE ADMITTED.

18             MR. JACOBS:  NO OBJECTION.

19             THE COURT:  IT'S ADMITTED.

20             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

21             3952.101, HAVING BEEN PREVIOUSLY MARKED

22             FOR IDENTIFICATION, WAS ADMITTED INTO

23             EVIDENCE.)

24   BY MR. JOHNSON:

25   Q    SO GOING TO THE PRICE LIST, MR. BOGUE, CAN YOU

1   TELL US WHAT THIS SHOWS?

2   A    WE HAD TWO DIFFERENT MODELS OF DIAMONDTOUCH,

3   DT81 AND DT107, SO BASICALLY TWO DIFFERENT SIZES.

4   WHAT THE PRICE LIST SHOWS IS WHAT'S INCLUDED IN THE

5   PRODUCT AND THE PRICE.

6   Q    OKAY.  NOW, HOW DO YOU KNOW THAT FRACTAL ZOOM

7   WAS INCLUDED IN THE PRICING STRUCTURE HERE?

8   A    OKAY.  SO THE LAST BULLET IN THE LIST OF

9   WHAT'S INCLUDED SAYS DT DEMONSTRATION SOFTWARE

10  APPLICATIONS, AND THAT REFERS TO THE -- THAT CORE

11  SET OF DEMOS THAT I HAD SHOWN.

12  Q    AND FRACTAL ZOOM WAS INCLUDED AS DT

13  DEMONSTRATION SOFTWARE?

14  A    THAT'S CORRECT.

15  Q    WHAT DID DT DEMONSTRATION SOFTWARE REFER TO?

16  A    SO IT INCLUDED THE APP LAUNCHER, THOSE FOUR

17  DEMOS, DT BOXES, DT LENS, MANDELBROT, AND

18  POP-A-BUBBLE, WHICH WAS A GAME.  AND THAT'S IN THE

19  OCTOBER 2005 TIME PERIOD.

20       WE HAD OTHER DEMOS THAT WERE ALSO

21  PROVIDED.

22  Q    WHAT'S THE DATE OF THIS PRICE LIST?

23  A    OCTOBER 25TH, 2005.

24  Q    AND HOW DO YOU KNOW THAT?

25  A    IT'S IN THE LOWER RIGHT-HAND CORNER.

1    Q    OKAY.  AND WHO CREATED THIS PRICE LIST?

2    A    I DID.

3    Q    DID YOU PROVIDE THE PRICE LIST TO ANYBODY IN

4    2005?

5    A    YES.  ANYONE WHO WANTED TO BUY A DIAMONDTOUCH

6    TABLE, I WOULD GIVE THEM THE PRICE LIST.

7    Q    OKAY.  LET'S LOOK AT EXHIBIT DX 662.

8    A    YES.

9    Q    CAN YOU TELL US WHAT THIS IS?

10   A    THIS IS A PURCHASE ORDER FROM SAIC.  THEY

11   BOUGHT A DIAMONDTOUCH TABLE.  THE DATE OF THIS

12   PURCHASE ORDER IS DECEMBER 12TH, 2005.

13            MR. JOHNSON:  YOUR HONOR, WE'D ASK THAT

14   DX 662 BE ADMITTED.

15            MR. JACOBS:  NO OBJECTION.

16            THE COURT:  IT'S ADMITTED.

17            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18            662, HAVING BEEN PREVIOUSLY MARKED FOR

19            IDENTIFICATION, WAS ADMITTED INTO

20            EVIDENCE.)

21   BY MR. JOHNSON:

22   Q    NOW, WAS THE PRICE LIST PROVIDED TO SAIC

23   BEFORE THIS PARTICULAR PURCHASE ORDER?

24   A    YES.  I GAVE THE PRICE LIST TO BILL GUNTHER,

25   WHO'S THE BUYER AT SAIC.

1    Q    WHAT DOES EXHIBIT 662 SHOW US?

2    A    SO THIS SHOWS THAT THEY PURCHASED A

3    DIAMONDTOUCH TABLE.  THERE'S THREE PAGES HERE.  THE

4    NEXT PAGE IS AN INVOICE, THAT'S THE INVOICE THAT WE

5    SENT AFTER WE SHIPPED.  AND THEN THE NEXT PAGE IS

6    THE CHECK THAT SHOWS THAT THEY PAID.

7    Q    OKAY.  WAS FRACTAL ZOOM INCLUDED AS PART OF

8    THIS PURCHASE ORDER?

9    A    IT WAS.  I REMEMBER THIS BECAUSE THIS WAS ONE

10   OF OUR FIRST SALES, AND I ACTUALLY TRAVELED TO

11   ARREST LINK TON VIRGINIA TO HELP SET THINGS UP AND

12   I MADE SURE THAT, THAT FRACTAL ZOOM AND THE OTHER

13   DEMOS WERE LOADED IN.

14   Q    WHAT IS SAIC?

15   A    SAIC IS A GOVERNMENT SYSTEMS INTEGRATOR, SO

16   THEY DO A LOT OF WORK WITH GOVERNMENT AGENCIES AND

17   MILITARY ORGANIZATIONS, SO A LOT OF THEIR CUSTOMERS

18   REQUIRE SECRET SECURITY CLEARANCES.

19        I BELIEVE THAT THEY WERE PLANNING TO USE

20   THE DIAMONDTOUCH TABLE FOR A MAPPING APPLICATION.

21   Q    AND NOW I WANT TO TALK ABOUT A DIFFERENT

22   APPLICATION CALLED TABLECLOTH.

23   A    YES.

24   Q    NOW, ARE YOU FAMILIAR WITH TABLECLOTH?

25   A    I AM.

2291

1      Q     AND WHAT IS TABLECLOTH?

2      A     SO TABLECLOTH IS AN APPLICATION THAT WAS

3      DESIGNED TO OPERATE ON THE DIAMONDTOUCH TABLE.  IT

4      WAS WRITTEN IN A LANGUAGE CALLED FLASH, WHICH A LOT

5      OF GAME DEVELOPERS USE.

6      Q     OKAY.  DID YOU PREPARE A VIDEO TO SHOW THE

7      JURY HOW TABLECLOTH WORKS?

8      A     YES.

9      Q     CAN WE PULL UP DX 3952.102?

10            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11     OPEN COURT OFF THE RECORD.)

12     BY MR. JOHNSON:

13     Q     AND MR. BOGUE, CAN YOU EXPLAIN TO US WHAT WE

14     SEE HERE?

15     A     YES.  SO YOU SEE AN IMAGE AND WITH ONE FINGER

16     YOU CAN KIND OF PULL THAT DOWN, AND THEN WHEN YOU

17     LET GO, IT SNAPS BACK.  IT'S ACTUALLY PRETTY

18     SIMPLE.

19            MR. JOHNSON:  NOW, YOUR HONOR, WE'D ASK

20     THAT 3952.102 BE MOVED INTO EVIDENCE.

21            THE COURT:  ANY OBJECTION?

22            MR. JACOBS:  NO, YOUR HONOR.

23            THE COURT:  IT'S ADMITTED.

24            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

25            3952.102, HAVING BEEN PREVIOUSLY MARKED

```
 1              FOR IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3     BY MR. JOHNSON:

 4     Q    DOES THIS VIDEO ACCURATELY SHOW THE OPERATION

 5     OF TABLECLOTH?

 6     A    YES.

 7     Q    AND HOW DID THE PROGRAM GET ITS NAME

 8     TABLECLOTH?

 9     A    SO THIS IS KIND OF LIKE A METAPHOR FOR IF

10     YOU'RE AT A TABLE AND YOU WANT TO PULL SOMETHING

11     CLOSER TO YOU, YOU CAN PULL THE TABLECLOTH AND THEN

12     GRAB THE SALT SHAKER AND THEN LET GO AND IT'LL SNAP

13     BACK.

14     Q    AND WHAT WAS THE --

15     A    AND I'LL POINT OUT THAT THIS DEMONSTRATION IS

16     VERY SIMPLE AND IT -- AND THE AUDIENCE FOR WHO WE

17     WOULD SHOW THIS TO IS FLASH DEVELOPERS.

18              SO WHAT WE WANTED TO DO WAS ILLUSTRATE

19     HOW EASY IT WAS TO WRITE AN APPLICATION USING FLASH

20     FOR THE DIAMONDTOUCH TABLE.

21     Q    NOW, CAN YOU ESTIMATE HOW MANY TIMES YOU'VE

22     DEMONSTRATED TABLECLOTH AND ITS SNAP BACK FEATURE

23     OVER THE YEARS?

24     A    SO, I MEAN, WE HAD THIS IN THE MERL LOBBY AND

25     IT WAS -- THERE WAS A SHORTCUT -- SO THIS RUNS IN
```

```
1     INTERNET EXPLORER AND WE HAD SHORTCUTTED OUR

2     INTERNET EXPLORER, SO ANYBODY COULD PLAY WITH IT.

3              WE DIDN'T KEEP RECORDS -- MERL DIDN'T

4     REQUIRE PEOPLE TO, TO SIGN IN OR ANYTHING, SO IT'S

5     HARD TO GIVE YOU A NUMBER ON THAT.

6              BUT I CAN TELL YOU THAT I PERSONALLY

7     SHOWED IT TO PEOPLE BOTH IN THE MERL LOBBY AND

8     ON -- AT TRADE SHOWS.

9     Q    OKAY.  WHEN WAS TABLECLOTH WITH SNAP BACK

10    FIRST DEMONSTRATED ON THE DIAMONDTOUCH SYSTEM?

11    A    SO IT -- AGAIN, IT WOULD HAVE BEEN IN THE

12    LOBBY BECAUSE OUR SORT OF POLICY WAS TO LOAD IN THE

13    LATEST SOFTWARE ON THE LOBBY MACHINE, THAT'S WHERE

14    WE START OUT, AND THEN WE STARTED BRINGING IT ON

15    THE ROAD.

16             I BELIEVE THAT THAT WAS JANUARY 2005 IS

17    WHEN THAT WAS DONE, WHEN DT FLASH, WHICH WAS THE

18    TABLECLOTH, WAS ONE OF SEVERAL APPLICATIONS THAT

19    WERE WRITTEN IN FLASH.

20             SOON AFTER THAT WE HAD SOME MEETINGS

21    OUTSIDE OF, OUTSIDE OF MERL.  I KNOW THAT I BROUGHT

22    IT TO THE NEW SCHOOL IN NEW YORK CITY LATER IN

23    JANUARY.

24    Q    DID YOU DEMONSTRATE TABLECLOTH AT ANY TRADE

25    SHOWS?
```

1    A    YES.  SO I REMEMBER SID, SOCIETY FOR

2    INFORMATION DISPLAY, WAS ONE OF THE FIRST TRADE

3    SHOWS THAT DIDN'T HAVE KIND OF A MILITARY AUDIENCE,

4    AND SO I WAS SHOWING DIFFERENT DEMOS THAN I

5    NORMALLY SHOWED, AND SO I STARTED SHOWING THE FLASH

6    THERE.

7    Q    NOW, WAS TABLECLOTH --

8    A    INCLUDING FLASH -- INCLUDING TABLECLOTH.

9    Q    WAS TABLECLOTH AVAILABLE TO CUSTOMERS AS WELL?

10   A    YES.  WE PROVIDED IT TO -- I'LL POINT OUT THAT

11   ANY DIAMONDTOUCH CUSTOMER OR USER WHO REQUESTED DT

12   FLASH, WHICH INCLUDES ALL THE DEMONSTRATIONS

13   THAT -- OF WHICH TABLECLOTH IS ONE OF THEM, ANYBODY

14   WHO ASKED FOR IT WOULD GET IT.

15         AND I KNOW A FEW PARTNER COMPANIES THAT

16   GOT IT IN EARLY, MID-2005.

17   Q    AND DT FLASH REFERRED TO, OR INCLUDED

18   TABLECLOTH, AND TABLECLOTH WAS WRITTEN IN FLASH?

19   A    YES.

20   Q    AS A SOFTWARE?

21   A    THAT'S EXACTLY RIGHT.

22   Q    OKAY.  SO WHAT WAS THE -- WHAT WAS THE

23   PURPOSE -- WE HEARD ABOUT THE LOBBY A COUPLE OF

24   TIMES AT MERL.

25         WHAT WAS THE PURPOSE OF PUTTING THE

1    DIAMONDTOUCH SYSTEM IN THE LOBBY AT MERL?

2    A    SO THAT WAS MY IDEA, AND I WANTED TO SHOWCASE

3    SOME OF THE INTERESTING THINGS AT MERL.  MERL WAS

4    KIND OF AN OPEN LAB AND HAD A LOT OF VISITORS AND I

5    THOUGHT IT MADE SENSE TO HAVE SOMETHING RIGHT THERE

6    IN THE LOBBY SO THAT, IN THE WAITING AREA WHEN

7    VISITORS ARRIVED, WE COULD SHOW THEM THINGS.  WE

8    WANTED TO SHOWCASE OUR WORK.

9    Q    WHO WAS ALLOWED IN THE MERL LOBBY BACK IN

10   2004/2005?

11   A    SO ANY VISITORS, AND WE HAD A LOT.  AGAIN, WE

12   HAD MANY PEOPLE FROM COMPANIES AND UNIVERSITIES,

13   FAMILY MEMBERS WOULD COME BY.  SO, YEAH, IT WAS --

14   IT WAS OPEN.

15   Q    DID PEOPLE NEED SOME SPECIAL PERMISSION TO USE

16   THE DIAMONDTOUCH SYSTEM IN THE LOBBY?

17   A    NO.  WE PUT IT IN THE LOBBY SO THAT PEOPLE

18   WOULD PLAY WITH IT.

19   Q    WAS A CARD KEY REQUIRED TO GET INTO THE LOBBY

20   IN 2005 OR EARLIER?

21   A    NO.  IT -- IN NORMAL BUSINESS HOURS, THE FRONT

22   DOORS WERE OPEN.  WE DID HAVE A RECEPTIONIST THERE,

23   BUT IT WAS OPEN.

24   Q    NOW, DID THERE COME A TIME WHEN A CARD KEY WAS

25   ADDED AFTER 2005?

1    A    YEAH.  THAT WAS LATER.

2    Q    WHEN WAS THAT?

3    A    I THINK IT WAS, LIKE, MID, LATE 2006.  IT

4    MIGHT HAVE EVEN BEEN 2007.

5           I KNOW THAT THERE WAS SOME RESISTANCE TO

6    WANTING TO DO THAT BECAUSE PEOPLE WERE WORRIED

7    ABOUT IT CHANGING THE CULTURE THERE BECAUSE WE HAD

8    THIS SORT OF OPEN LAB.  BUT EVENTUALLY WE DID ADD

9    THE CARD KEY.

10   Q    OKAY.  BACK IN 2004/2005, WERE ANY

11   CONFIDENTIALITY AGREEMENTS REQUIRED TO USE THE

12   DIAMONDTOUCH SYSTEM IN THE LOBBY?

13   A    NO.

14   Q    NOW, I HEARD A, A -- YOU REFER A COUPLE OF

15   TIMES TO THE NEW SCHOOL.

16          CAN YOU TELL US ABOUT THE DEMONSTRATION

17   THAT WAS MADE TO THE NEW SCHOOL.

18   A    YES.  SO WE HAD A PRETTY LONG DAY OF

19   DEMONSTRATIONS THERE.  IT WASN'T JUST ME.  THERE

20   WERE A COUPLE OF OTHER PEOPLE FROM MERL, AND WE

21   WERE SHOWING DIAMONDTOUCH AND THE DEMONSTRATIONS

22   THAT YOU SAW HERE, PLUS MANY OTHERS.

23          ONE OF THE PEOPLE WHO CAME TO VISIT WAS

24   THE PRESIDENT OF THE NEW SCHOOL AT THE TIME,

25   SENATOR BOB KERREY.  SO I REMEMBER THAT VERY WELL.

```
1              AND, YEAH, WE WERE TALKING ABOUT THE

2     POTENTIAL OF COLLABORATING WITH THEM WHERE WE WOULD

3     PROVIDE THIS DIAMONDTOUCH HARDWARE, THEY WOULD

4     WRITE SOME SOFTWARE, AND WE WOULD CREATE SOME SORT

5     OF INFORMATION SYSTEM THAT SENATORS IN WASHINGTON

6     D.C. COULD USE.

7     Q    DID YOU PARTICIPATE IN THE DEMONSTRATION TO

8     SENATOR KERREY IN THE NEW SCHOOL?

9     A    I DID.

10    Q    WHEN DID IT OCCUR?

11    A    THIS WAS IN JANUARY 2005.

12    Q    AND WHAT WAS SHOWN AT THIS DEMONSTRATION?

13    A    SO WE SHOWED THE CORE SET OF DEMOS.  I ALSO

14    SHOWED THE DT FLASH DEMOS BECAUSE THEY HAD A FLASH

15    DEVELOPER THERE.

16              AND THEN WE SHOWED A LOT OF OTHER

17    DEMONSTRATIONS THAT WERE WRITTEN IN A DIFFERENT

18    PROGRAMMING LANGUAGE CALLED JAVA.  AND SO, YEAH, WE

19    SHOWED A LOT OF DIFFERENT THINGS.

20    Q    WAS FRACTAL ZOOM SHOWN?

21    A    YEAH.  THAT WAS ONE OF THE CORE DEMOS THAT I

22    WOULD HAVE SHOWN FIRST.

23    Q    AND WAS TABLECLOTH SHOWN?

24    A    YES.

25    Q    NOW, CAN YOU LOOK AT EXHIBIT 713 IN YOUR
```

1    BINDER, AND TELL US IF YOU RECOGNIZE THAT DOCUMENT.

2    A    I DO.

3    Q    WHAT IS IT?

4    A    THIS IS AN E-MAIL FROM ALAN ESENTHER TO

5    CHIA SHEN AND ME.  THIS -- ALAN AND CHIA ARE BOTH

6    EMPLOYEES AT MERL.  AND THIS REFERS TO DT FLASH

7    DEMOS AND A MEETING WITH BOB KERREY.

8              MR. JOHNSON:  YOUR HONOR, WE ASKED THAT

9    DX 713 BE ADMITTED.

10             THE COURT:  ANY OBJECTION?

11             MR. JACOBS:  NO, YOUR HONOR.

12             THE COURT:  IT'S ADMITTED.

13             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14             713, HAVING BEEN PREVIOUSLY MARKED FOR

15             IDENTIFICATION, WAS ADMITTED INTO

16             EVIDENCE.)

17             MR. JOHNSON:  IF WE MAY PUBLISH IT TO THE

18    JURY?

19             THE COURT:  PLEASE.

20    BY MR. JOHNSON:

21    Q    WHAT, IF ANYTHING, DOES EXHIBIT 713 DESCRIBE

22    OR REMIND YOU ABOUT WHETHER TABLECLOTH WAS INCLUDED

23    IN THE DEMONSTRATION TO SENATOR KERREY?

24    A    WELL, THIS GIVES ME A GOOD SOLID DATE HERE FOR

25    WHEN DT FLASH DEMOS WERE AVAILABLE FOR THIS MEETING

1    TO BOB KERREY.

2    Q    NOW IS THAT?

3    A    SO THE DATE OF THE E-MAIL IS JANUARY 15TH,

4    2005.  IT'S ALSO REFERRING TO A, A PATH THERE -- I

5    DON'T KNOW IF YOU CAN SEE THAT.  IT SAYS

6    DISTRIBUTIONKERRY_1_18_15.  IT WAS KIND OF STANDARD

7    OPERATION AT MERL TO MAKE A FOLDER FOR A MEETING

8    THAT HAD THE DATE FOR THAT MEETING.  SO THIS WAS

9    THE FOLDER WHERE ALL THE STUFF THAT WE WANTED TO

10   SHOW AT THE NEW SCHOOL WOULD HAVE BEEN PLACED.

11   Q    OKAY.  AND YOU'RE LISTED AS ONE OF THE

12   RECIPIENTS?

13   A    YES.  I'M THE "TO," THE SECOND PERSON IN THE

14   "TO" FIELD THERE.

15   Q    WHERE DID THIS E-MAIL COME FROM?

16   A    FROM MY FILES.

17   Q    OKAY.  NOW, MR. BOGUE, ARE YOU APPEARING HERE

18   TODAY AS AN EXPERT ON BEHALF OF SAMSUNG?

19   A    NO.  I'M HIRE AS A FACT WITNESS.

20   Q    OKAY.  ARE YOU BEING COMPENSATED FOR YOUR TIME

21   HERE TODAY TO TESTIFY?

22   A    NO.  I'M HERE ON MY OWN TIME.

23   Q    HAVE YOU BEEN COMPENSATED FOR YOUR TIME

24   LEADING UP TO TODAY?

25   A    YES.  I HAVE BEEN COMPENSATED FOR THE TIME TO

1    DIG UP DOCUMENTS AND ANSWER QUESTIONS.

2    Q    AND AT WHAT RATE HAVE YOU BEEN COMPENSATED?

3    A    $400 AN HOUR.

4    Q    ABOUT HOW MUCH TIME HAVE YOU SPENT ON THIS?

5    A    ABOUT 40 HOURS I'VE BILLED SO FAR.

6         MR. JOHNSON:  THANK YOU VERY MUCH.  I'LL

7    PASS THE WITNESS.

8         THE COURT:  ALL RIGHT.  THE TIME IS NOW

9    4:21.  GO AHEAD, PLEASE.

10        MR. JOHNSON:  I'M SORRY, YOUR HONOR.  I

11   NEGLECTED TO MOVE IN, I'M TOLD, DX 713.

12        THE COURT:  I HAVE IT BEING ADMITTED.

13        MR. JOHNSON:  OKAY.

14        THE COURT:  OKAY.  THE TIME IS 4:21.

15        GO AHEAD, PLEASE.

16                    **CROSS-EXAMINATION**

17   BY MR. JACOBS:

18   Q    WHERE'S THE DEMONSTRATION TABLE, SIR?

19   A    I'M SORRY?

20   Q    WHERE'S THE DEMONSTRATION TABLE?  WHERE'S THE

21   TABLE THAT YOU'VE BEEN TALKING ABOUT?

22   A    IN THE MERL LOBBY.

23   Q    THE ONE THAT WAS IN THE MERL LOBBY IN THE

24   MID-2000S?

25   A    I SOLD THAT ACTUALLY TO QUINN, EMANUEL.

1    Q    YOU SOLD IT?

2    A    YES.

3    Q    TO QUINN, EMANUEL?

4    A    YES.

5    Q    IS IT ANYWHERE HERE IN THE COURTROOM THAT WE

6    COULD SEE IT TODAY?

7    A    NO.

8    Q    ARE YOU AWARE THAT WE ASKED FOR IT TO BE

9    DELIVERED?

10   A    I BELIEVE THAT THERE'S A DIFFERENT

11   DIAMONDTOUCH UNIT THAT IS HERE.

12   Q    IN THE COURTROOM?

13   A    IT'S NOT -- IT'S NOT IN THE MERL -- THAT'S NOT

14   THE ONE THAT WAS IN THE MERL LOBBY, THOUGH.

15   Q    OH.  THE ONE THAT YOU SOLD TO QUINN, EMANUEL

16   ISN'T AVAILABLE TO US TODAY?

17   A    SO I SOLD ONE TO QUINN, EMANUEL THAT WAS IN

18   THE MERL LOBBY, AND THAT'S IN WASHINGTON D.C. RIGHT

19   NOW.

20        AND THERE'S A SECOND ONE THAT I SOLD TO

21   QUINN, EMANUEL AND I BELIEVE THAT THAT IS SOMEWHERE

22   IN THE COURTROOM NEARBY.

23        MR. JOHNSON:  YOUR HONOR, I OBJECT TO

24   THIS LINE OF QUESTIONING.  WE HAVE -- WE HAVE IT

25   HERE WITH US.

```
1              MR. JACOBS:  COULD WE HAVE IT?

2              MR. JOHNSON:  IF YOU'D LIKE TO SEE IT.

3              MR. JACOBS:  WE ASKED FOR IT.

4              MR. JOHNSON:  SURE.  DO YOU WANT US TO

5    GET IT?

6              MR. JACOBS:  PLEASE.

7              (PAUSE IN PROCEEDINGS.)

8              MR. JACOBS:  YOUR HONOR, I DON'T WANT TO

9    BURDEN THE COURT'S FILES WITH THIS DEVICE, SO WHAT

10   I PROPOSE TO DO IS HAVE IT PHOTOGRAPHED AFTER COURT

11   TODAY AND OFFER PHOTOGRAPHS OF THE DEVICE INTO THE

12   COURT RECORD.  WOULD THAT BE ACCEPTABLE?

13             THE COURT:  THAT'S FINE.

14   BY MR. JACOBS:

15   Q    SO MR. BOGUE, WHAT HAVE WE GOT HERE?  I'M

16   HOLDING UP A MITSUBISHI THING ON A TRIPOD.  WHAT IS

17   THIS?

18   A    SO THAT'S A PROJECTOR AND IT'S ATTACHED TO A

19   TRIPOD.

20   Q    AND THIS IS PART OF THE DIAMONDTOUCH SYSTEM?

21   A    YES.

22   Q    SO THE IMAGE FOR DIAMONDTOUCH WOULD COME FROM

23   A PROJECTOR?

24   A    YES.

25   Q    AND THE PROJECTOR, IT LOOKS LIKE IT CAN ROTATE
```

1    ON THE TRIPOD.  SO CAN IT GO IN DIFFERENT

2    DIRECTIONS?

3    A    NO.  IT'S INTENDED TO AIM DOWN ON TO THE

4    SURFACE OF THE TABLE.

5    Q    CAN IT -- IN OPERATION, CAN IT PROJECT ON TO

6    THE WALL?

7    A    NO.  IT'S -- IT'S DESIGNED AS A TABLETOP

8    COMPUTER.

9    Q    SO IS THERE -- IN THE DEMONSTRATIONS YOU WERE

10   SHOWING OF THE SYSTEM, IT WASN'T EVER BEING

11   PROJECTED ON TO THE WALL?

12   A    NO.

13   Q    AND THIS IS THE -- WHAT ARE WE LOOKING AT

14   HERE, THIS WHITE OBJECT WITH THE GRAY BORDER?

15   A    SO THAT'S THE DIAMONDTOUCH -- YOU CAN SEE THE,

16   THE MITSUBISHI ELECTRIC LOGO THERE.  SO THAT'S A

17   DT81.

18   Q    AND WHAT ARE WE LOOKING AT?  WHAT'S THE

19   SURFACE, THIS WHITE SURFACE?

20   A    SO THAT'S THE TOUCHSCREEN.  THAT'S WHAT YOU

21   WOULD TOUCH.

22   Q    YOU CALL IT A SCREEN, BUT IT'S JUST PLAIN

23   WHITE.  RIGHT, SIR?

24   A    IT IS WHITE.

25   Q    IT'S A WHITE PLASTIC?

1    A    IT IS WHITE.

2    Q    IS IT A PLASTIC?

3    A    THE TOP SURFACE IS A POLYVINYL FILM, AND

4    BENEATH THAT IS THIS GRID THAT I WAS REFERRING TO

5    EARLIER.

6    Q    AND THE IMAGE IS PROJECTED ON TO THIS FROM THE

7    PROJECTOR THAT WE'RE LOOKING AT OVER HERE; IS THAT

8    TRUE, SIR?

9    A    THAT'S EXACTLY RIGHT.

10    Q    AND THE IDEA WAS THAT PEOPLE WOULD SIT AROUND

11    IT AT A TABLE AND THEY WOULD USE THEIR HANDS TO

12    MANIPULATE THE IMAGES; CORRECT?

13    A    YES.

14    Q    AND WE HAVE A PICTURE OF THAT, JUST TO GIVE

15    THE JURY A CLEAR VIEW.

16          CAN I HAVE PDX 46.1 UP, PLEASE.

17          SO THIS IS AN IMAGE FROM A PHOTOGRAPH

18    THAT APPEARS IN AN ARTICLE BY MERL, FIGURE 1,

19    "PROTOTYPICAL DIAMONDTOUCH SETUP, FRONT-PROJECTION

20    ON TO A TABLETOP SURFACE."

21          DO YOU SEE THAT, SIR?

22    A    YES.

23    Q    AND THAT IS, IN TACT, A PROTOTYPICAL

24    PROJECTION OF DIAMONDTOUCH; CORRECT, SIR?

25    A    IT IS.

1    Q    SO THE PROJECTOR IS OVERHEAD AND IT'S SHINING

2    DOWN ON THE TABLE AND THE TABLE IS THIS GRAY AND

3    WHITE OBJECT HERE; CORRECT, SIR?

4    A    IT IS.

5    Q    AND IN THE PRICE LIST, IF WE GO TO 662.002 --

6    IF WE GO TO 662, AND GO TO PAGE 2 OF IT.

7    A    THIS IS THE INVOICE THAT WE SENT TO SAIC.

8    Q    SORRY, YOU'RE CORRECT.  IT'S AN INVOICE, NOT A

9    PRICE LIST.

10        THERE'S A REFERENCE THERE TO A DRAFTING

11   TABLE.  DO YOU SEE THAT?

12   A    YES.

13   Q    AND THE DRAFTING TABLE IS A TABLE THAT WOULD

14   HOLD THE DIAMONDTOUCH SURFACE?

15   A    EXACTLY RIGHT.

16   Q    AND THEN THERE'S A REFERENCE IN THAT INVOICE

17   TO RECEIVER CHAIRS.

18   A    YES.

19   Q    CAN YOU EXPLAIN THE RECEIVER CHAIRS?

20   A    YES.  SO THE MAIN THING ABOUT THE DIAMONDTOUCH

21   TABLE THAT MAKES IT DIFFERENT THAN OTHER MULTITOUCH

22   SCREENS -- SO DIAMONDTOUCH WAS MULTITOUCH, BUT AN

23   INTERESTING THING ABOUT DIAMONDTOUCH WAS THAT IT

24   WAS MULTIUSER.  IT KNOWS WHO'S WHO.

25        THE WAY IT KNOWS WHO'S WHO IS WE WOULD

1    TAKE THE SIGNALS THAT ARE COMING FROM THE TOUCH

2    SURFACE AND, WHEN YOU TOUCH, YOU'RE COMPLETING A

3    CIRCUIT TO THE CHAIR THAT PEOPLE ARE SITTING IN,

4    AND EACH OF THE CHAIRS AROUND THE TABLE ARE

5    CONNECTED.  SO THAT'S HOW WE KNEW WHO'S WHO.

6           AND SO WHAT YOU'RE LOOKING AT HERE IS

7    SOME SPECIAL CHAIRS THAT WE DESIGNED FOR USE WITH

8    THE DIAMONDTOUCH TABLE.

9           THE DIAMONDTOUCH ALSO CAME WITH MATS THAT

10   ARE SORT OF LIKE ANTISTATIC MATS THAT YOU PUT IN

11   OUR OWN FURNITURE, SO LIKE IN THE LOBBY OF OUR

12   BUILDING, WE USED THOSE MATS AND KIND OF HID THEM

13   AWAY IN THE FURNITURE THAT WAS AROUND THE TABLE.

14   Q    SO ONE OF THE THINGS YOU WERE DEMONSTRATING

15   WITH APPLICATIONS LIKE MANDELBROT, OR FRACTAL

16   ZOOM -- THOSE ARE CHANGEABLE NAMES; CORRECT, SIR?

17   A    THAT'S CORRECT.

18   Q    -- WAS SORT OF THE MULTIUSER CAPABILITY;

19   CORRECT, SIR?

20   A    ACTUALLY, NO.  MANDELBROT WAS A SINGLE USER

21   APPLICATION.  SO MANDELBROT FOCUSSED ON MULTITOUCH,

22   BUT IT DOESN'T DISTINGUISH WHO'S WHO.

23           SO WE HAD SOME APPLICATIONS THAT TOOK

24   ADVANTAGE OF THE MULTITOUCH ASPECT OF DIAMONDTOUCH

25   AND OTHER APPLICATIONS THAT TOOK ADVANTAGE OF THE

1     MULTIUSER ASPECT OF DIAMONDTOUCH.

2     Q     NOW, ON MANDELBROT, FRACTAL ZOOM, THAT WAS

3     DEVELOPED AFTER YOU HELD THE MEETING WITH THE APPLE

4     REPRESENTATIVES; CORRECT, SIR?

5     A     CORRECT.

6     Q     SO YOU DIDN'T DEMONSTRATE MANDELBROT FRACTAL

7     ZOOM TO APPLE AT THAT MEETING?

8     A     THAT IS CORRECT.

9     Q     WITH RESPECT TO TABLECLOTH, TABLECLOTH WASN'T

10    ONE OF THE FOUR DEMOS IN THE STANDARD SET UP;

11    CORRECT, SIR?

12    A     WHAT DO YOU MEAN BY "SET UP"?

13    Q     WELL, THERE WAS AN APP LAUNCHER THAT YOU

14    SHOWED; CORRECT?

15    A     RIGHT.

16    Q     AND THAT APP LAUNCHER DIDN'T INCLUDE

17    TABLETOP -- TABLECLOTH; RIGHT?

18    A     RIGHT.  TABLECLOTH WAS LAUNCHED FROM A

19    SEPARATE SORT OF APP LAUNCHER THAT APPEARED IN AN

20    INTERNET EXPLORER WINDOW.

21          SO THERE WAS A SET OF ABOUT A DOZEN

22    LITTLE APPS THAT WOULD -- THAT YOU COULD TOUCH ON

23    AND LAUNCH AND THAT WAS THROUGH AN INTERNET

24    EXPLORER WINDOW.

25    Q     AND WHAT IS YOUR RECOLLECTION OF THE FIRST

1    DEMONSTRATION OF TABLECLOTH, SIR?

2    A    SO IT WOULD HAVE BEEN IN THE LOBBY AT MERL

3    BECAUSE THAT'S WHERE EVERYTHING STARTS.

4              AND THEN SOON AFTER THAT, I STARTED

5    SHOWING IT ON THE ROAD AND WE SHOWED IT AT THE NEW

6    SCHOOL IN NEW YORK CITY.

7    Q    AND YOU SUBMITTED A DECLARATION IN THIS CASE

8    BEFORE.  DO YOU RECALL THAT?

9    A    I DO.

10   Q    AND DO YOU RECALL STATING THERE THAT YOU

11   RECALL EXHIBITING THE TABLECLOTH APPLICATION TO

12   CUSTOMERS AS EARLY AS 2006?

13   A    YES.

14   Q    NOW, IF WE LOOK AT THE -- AT EXHIBIT 2288, DO

15   YOU SEE THERE'S --

16   A    I'M SORRY.

17   Q    -- YELLOW HIGHLIGHTING AROUND TABLECLOTH,

18   27.SWF?

19   A    YES.

20   Q    AND YOU REFERRED TO SWF?

21   A    THAT'S A SWIFT FILE.  YES, THAT'S A FLASH

22   FILE.

23   Q    AND DO YOU SEE THE DATE, THE LAST DATE

24   MODIFIED THERE IS JUNE 13TH, 2005?

25   A    I DO.

```
1    Q    AND YOU SHOWED TABLECLOTH AND YOU SHOWED THAT

2    VIDEO AND YOU CALLED THAT SNAPPING BACK.  DO YOU

3    RECALL THAT?

4    A    YES.

5    Q    CAN WE LOOK AT THAT VIDEO SLOWLY?

6         (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

7    OPEN COURT OFF THE RECORD.)

8    BY MR. JACOBS:

9    Q    CAN YOU NARRATE WHAT'S GOING ON, MR. BOGUE?

10   A    OKAY.  SO THAT'S A TOUCH DOWN AND PULLING IT

11   DOWN AND THEN AT SOME POINT THEY'LL LET GO -- YEAH.

12   THAT'S PRETTY MUCH IT.

13   Q    AND WHAT IS ACTUALLY HAPPENING ON THE SCREEN

14   AT THAT POINT, SIR?

15   A    SO THERE'S A FINGER TOUCHING DOWN AND MOVING

16   ALONG THE SCREEN, STILL MAKING CONTACT WITH THE

17   SCREEN, AND THEN THAT FINGER LIFTS UP.

18        AND WHAT THIS APPLICATION DOES IS

19   BASICALLY DRAG THAT IMAGE DOWN, AND THEN WHEN YOU

20   LET GO, IT SNAPS BACK.

21   Q    WELL, IT SNAPS BACK ALL THE WAY TO THE UPPER

22   IMAGE, DOESN'T IT, SIR?

23   A    THE UPPER IMAGE?  I'M SORRY.

24   Q    IT SNAPS BACK TO WHERE YOU STARTED, NOT TO THE

25   TOP OF THE SECOND PHOTOGRAPH; CORRECT, SIR?
```

1    A    SO IT -- YES, IT SNAPS BACK TO ITS ORIGINAL

2    POSITION.

3    Q    AND SO IT'S NOT SNAPPING BACK ON AN IMAGE BY

4    IMAGE BASIS, CORRECT, SIR?  IT'S JUST GOING ALL THE

5    WAY BACK TO WHERE YOU WERE WHEN YOU STARTED?

6              MR. JOHNSON:  OBJECTION.  COMPOUND.

7              THE COURT:  OVERRULED.

8              THE WITNESS:  I GUESS I ALWAYS SAW THIS

9    AS ONE IMAGE.

10   BY MR. JACOBS:

11   Q    WELL, IS IT ONE IMAGE, SIR?

12   A    YEAH, IT'S AN IMAGE OF THE DESKTOP.

13   Q    WELL, LET'S LOOK AT AGAIN SLOWLY.

14             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

15   OPEN COURT OFF THE RECORD.)

16             THE WITNESS:  ALL RIGHT.  SO THE IMAGE

17   REPEATS.  THERE'S -- IT'S -- THE DESKTOP, IT'S LIKE

18   A REPEATING DESKTOP.

19   BY MR. JACOBS:

20   Q    AND IT SCROLLS BACK TO THE FIRST IMAGE OF THE

21   DESKTOP; CORRECT, SIR?

22   A    RIGHT.  IT'S -- I MEAN, AGAIN, THE IDEA IS

23   THAT YOU, YOU PULL THE TABLECLOTH DOWN AND THEN IT

24   SNAPS BACK.

25             MR. JACOBS:  JUST A MINUTE, YOUR HONOR.

1          THE COURT:  IT'S ALMOST -- IT'S 4:33.

2     CAN WE CONTINUE TOMORROW?

3          MR. JACOBS:  YES, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  SO IT IS 4:33.

5          AND, AGAIN, I WANT TO THANK YOU FOR YOUR

6     SERVICE AND YOUR PATIENCE.  PLEASE KEEP AN OPEN

7     MIND.  PLEASE DON'T DISCUSS THE CASE OR DO ANY OF

8     YOUR OWN RESEARCH.

9          AND IF YOU WOULD PLEASE LEAVE YOUR

10    NOTEBOOKS IN THE JURY ROOM FOR THE EVENING.

11         WE'LL SEE YOU BACK HERE TOMORROW AT 9:00

12    O'CLOCK.  WE ARE GOING EVERY DAY THIS WEEK.  THANK

13    YOU.

14         (WHEREUPON, THE FOLLOWING PROCEEDINGS

15    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

16         THE COURT:  ALL RIGHT.  THE RECORD SHOULD

17    REFLECT THE JUROR VERSUS LEFT THE COURTROOM.

18         YOU ARE -- PLEASE, YOU CAN STEP DOWN.

19         THE WITNESS:  OKAY.

20         THE COURT:  DO WE HAVE THE PHOTOS FOR

21    MR. BOGUE?  DO THEY HAVE THEM OF MR. BEDERSON AS

22    WELL?

23         THE CLERK:  I DON'T BELIEVE I GOT THEM

24    FOR MR. BEDERSON.

25         THE COURT:  CAN WE GET -- WE'LL HOLE

                                                                    2312

1     PUNCH THESE, BUT IF YOU CAN HOLE PUNCH THEM GOING

2     FORWARD SO THEY CAN PUT THEM IN THEIR BINDER.

3               THE CLERK:  OF COURSE.

4               THE COURT:  SO I AM GOING TO ASK THAT IN

5     YOUR EXHIBIT LIST THAT YOU GO AHEAD AND INCLUDE THE

6     LIMITING INSTRUCTIONS.  IF YOU JUST PUT A COLUMN, I

7     THINK THAT WOULD BE HELPFUL FOR THE JURY.

8               OKAY.  AND THEN ULTIMATELY, I'D LIKE YOU

9     TO GIVE ME A WORD PERFECT OR WORD VERSION OF THIS

10    AND I CAN REVISE THE LIMITING INSTRUCTIONS.

11              I'VE BEEN KEEPING MY OWN RECORDS AS WELL

12    AS TO WHICH EXHIBITS HAVE BEEN COMING IN WITH

13    LIMITING INSTRUCTIONS.

14              NOW, I UNDERSTAND THERE IS A

15    RECONSIDERATION MOTION AS TO MR. YANG, SO IT'S

16    4:35.

17              GO AHEAD.

18              MR. GOLDSTEIN:  THANK YOU, YOUR HONOR.

19    MY NAME IS RYAN GOLDSTEIN ON BEHALF OF SAMSUNG.

20              WE WOULD LIKE YOU TO RECONSIDER, TO BE

21    HEARD ON RECONSIDERATION OF DX 645.

22              THE COURT:  OKAY.  LET ME --

23              MR. GOLDSTEIN:  THIS IS THE SOURCE CODE

24    EXHIBIT --

25              THE COURT:  OKAY.  ALL RIGHT.  GO AHEAD.

2313

```
 1                MR. GOLDSTEIN:  -- FOR DR. YANG.

 2                THE COURT:  I RECALL THAT ISSUE.  GO

 3      AHEAD.

 4                MR. GOLDSTEIN:  THANK YOU.  AS

 5      BACKGROUND, APPLE PRODUCED TWO GIGABYTES OF SOURCE

 6      CODE.  THAT'S BETWEEN 350 AND 500,000 PAGES.

 7                THE COURT:  YOU KNOW WHAT?  I'VE GONE

 8      THROUGH ALL THIS.  YOU SHOW ME WHERE THAT WAS

 9      DISCLOSED.  I DIDN'T SEE IT WAS -- THAT IT WAS

10      DISCLOSED IN HIS EXPERT REPORT.  SO IF YOU CAN

11      POINT TO ME WHERE IT IS, THEN WE CAN KIND OF SHORT

12      CIRCUIT THIS WHOLE THING.

13                MR. GOLDSTEIN:  SURE, YOUR HONOR.  IT'S

14      HIS EXPERT REPORT --

15                THE COURT:  I'VE SEEN THE EXPERT REPORT.

16      HE CITES TO 38 BATES RANGES FOR THE FIRST CLAIM

17      LIMITATION.

18                MR. GOLDSTEIN:  EXACTLY.

19                THE COURT:  ALL RIGHT.  I DON'T THINK

20      THAT'S SUFFICIENT.  IF YOU HAVE ANYTHING ELSE, LET

21      ME KNOW.

22                MR. GOLDSTEIN:  THIS IS 38 RANGE IS 216

23      PAGES.  DR. GIVARGIS THEIR EXPERT, KNOWS EXACTLY

24      WHAT THIS IS.  WE WENT FILE-BY-FILE.

25                I THINK THIS WOULD FOLLOW THE RULE THAT
```

1    WE HAD WITH DR. MUSIKA TODAY WHO HAD A RANGE OF

2    COMPETITIVE ANALYSIS DOCUMENTS.  IT'S A PARTY

3    ADMISSION.

4            THE COURT:  IT'S A FIRST CLAIM

5    LIMITATION.  IT'S ABOUT SEVERAL PARAGRAPHS AND HE

6    JUST CITES TO 38 BATES RANGES OF SOURCE CODE

7    WITHOUT DIFFERENTIATING WHAT IS WHAT.

8            AND THEN IN HIS DEPOSITION, HE WASN'T

9    ABLE TO RECALL WHICH BATES RANGE ASSOCIATED WITH

10   THE APPLET.

11           SO IF YOU CAN GIVE ME HIS DEPOSITION

12   TRANSCRIPT WHERE HE DOES SUDDENLY RECALL IT AND

13   THAT WAS DISCLOSED, THEN I'LL LET IT IN.

14           BUT OTHERWISE I THINK IT'S TOO LATE FOR

15   HIM TO COME TO TRIAL NOW AND SUDDENLY REMEMBER

16   SOMETHING THAT HE DIDN'T REMEMBER DURING HIS

17   DEPOSITION AND THAT WASN'T IN HIS EXPERT REPORT.

18           MR. GOLDSTEIN:  IF I COULD JUST EXPLAIN?

19   THE DEPOSITION, ONE PAGE WAS GIVEN TO HIM.  HE

20   SAID, "THERE'S THREE ELEMENTS IN THESE 200 PAGES.

21   IF I COULD SEE MORE CONTEXT, I COULD TAKE YOU

22   THROUGH WHERE THEY ARE" AND NONE WAS PROVIDED.

23           THE COURT:  THAT'S NOT SUFFICIENT

24   DISCLOSURE.  SO GIVE ME SOMETHING THAT, THAT IS A

25   DISCLOSURE OF WHAT HE'S GOING TO SAY AT TRIAL AND I

1    WILL LET IT IN.

2                BUT IF YOU CAN'T DO THAT, THIS OBJECTION

3    IS GOING TO BE REMAIN SUSTAINED.

4                MR. GOLDSTEIN:  WELL, YOUR HONOR, THEN I

5    WOULD, I WOULD SUGGEST THAT THE ONE, WE CAN SUBMIT

6    SOMETHING TONIGHT, BUT --

7                THE COURT:  NO.  I WANT YOU TO DO IT NOW.

8    I ALREADY LOOKED AT ALL OF THIS LAST NIGHT.  I

9    ISSUED A RULING ON THIS LAST NIGHT.

10               YOU ARE NOW ASKING FOR RECONSIDERATION.

11   YOU GAVE ME NOTICE THIS MORNING AT FIVE TO 9:00

12   THAT YOU WERE GOING TO ASK FOR RECONSIDERATION.

13   WHATEVER YOU HAVE, SHOW ME NOW.

14               MR. GOLDSTEIN:  OKAY.

15               THE COURT:  I'M NOT GOING TO HAVE YOU

16   FILING SOMETHING AT 10:30 AT NIGHT AND THEN I HAVE

17   TO SCRAMBLE.  SHOW ME WHAT YOU'VE GOT.

18               MR. GOLDSTEIN:  UNDERSTOOD.

19               THE COURT:  WHAT HAVE YOU GOT?  WHAT HAVE

20   YOU GOT?

21               MR. GOLDSTEIN:  I'VE GOT FOOTNOTE AND I

22   WOULD ASK THAT HE BE ALLOWED TO TESTIFY AT THE

23   LEVEL OF SPECIFICITY OF THE FOOTNOTE, TO SAY

24   "HERE'S THE FOOTNOTE, I LOOKED AT IT, AND THIS IS

25   MY TESTIMONY."

 1              AND THEY CAN CROSS-EXAMINE HIM ON THE

 2     WEIGHT IF THAT'S SUFFICIENT, OR IF HE IDENTIFIED IT

 3     ENOUGH.

 4              BUT HE DID IDENTIFY BATES RANGES AND HE

 5     SHOULD BE ALLOWED TO SAY "HERE'S SOURCE CODE.  IT

 6     WAS IN MY REPORT."

 7              THE COURT:  AND WHAT IS HE GOING TO SAY?

 8     HE'S GOING TO SAY "THIS IS SOURCE CODE FOR AN

 9     APPLET" WHEN THAT'S NOT WHAT HIS EXPERT REPORT

10     SAYS?

11              HIS EXPERT REPORT HAS A CLAIM LIMITATION

12     THAT'S ABOUT THIS BIG, AND THEN FOOTNOTES, 38 BATES

13     RANGES.  DOESN'T SAY "THAT IS THE APPLET."

14     DOESN'T -- SO IT'S JUST NOT CLEAR WHAT HE'S CITING

15     THAT FOR.

16              SO TELL ME EXACTLY WHAT HE'S GOING TO

17     SAY.

18              MR. GOLDSTEIN:  HE WOULD SAY "THIS IS

19     SOURCE CODE WHERE YOU SEE, WHERE THE -- WHERE

20     THERE'S A MUSIC BACKGROUND PLAY OBJECT WITH

21     APPLICATION MODULE WITH AN APPLET," AND THAT'S ALL

22     HE'LL SAY.

23              THAT'S THE LEVEL OF SPECIFICITY IN THE

24     REPORT AND THEY CAN CROSS HIM ON THE WEIGHT AS TO

25     WHETHER THAT'S ENOUGH TO SHOW THAT ELEMENT OR NOT.

```
 1                    THAT'S WHAT'S DISCLOSED AND THAT'S WHAT

 2        HE WOULD TESTIFY ABOUT.

 3                    THE COURT:  ALL RIGHT.  LET ME HEAR FROM

 4        APPLE.  LET ME HEAR FROM MR. LEE.

 5                    MR. LEE:  YOUR HONOR, THAT -- HE SHOULD

 6        NOT BE ALLOWED TO TESTIFY TO THAT.

 7                    AS YOUR HONOR SAID, HE HAS THIS LONG

 8        CLAIM LIMITATION, AND YOU WILL RECALL THAT YOU --

 9        THIS IS ONE OF THE TERMS YOU DID CONSTRUE, AND SO

10        THE APPLET HAS TO BE AN APPLICATION WITH AN

11        APPLICATION MODULE.

12                    SO TO KNOW WHAT THEIR INFRINGEMENT CASE

13        IS, YOU HAVE TO KNOW WHAT THE APPLET IS.  YOU HAVE

14        TO KNOW WHAT THE APPLICATION MODULE IS.

15                    HE, IN HIS REPORT, GROUPS EVERYTHING

16        TOGETHER, DROPS A FOOTNOTE WITH 33 DIFFERENT

17        SOFTWARE MODULES, AND SAYS "IT'S IN THERE."

18                    LAST NIGHT THEY REPRESENTED TO YOUR HONOR

19        THAT ALL WE HAD TO DO WAS ASK WHAT WAS THE APPLET

20        AND HE WOULD HAVE TOLD US.

21                    AS YOUR HONOR KNOWS FROM THE TEN PAGES WE

22        SUBMITTED, WE ASKED HIM 35 DIFFERENT WAYS, "JUST

23        TELL US WHAT THE APPLET IS.  TELL US WHAT THE

24        APPLICATION MODE IS."  THEY -- HE COULDN'T AND HE

25        WOULDN'T.
```

1          SO TO ALLOW HIM TO COME IN TODAY AND

2     SAY -- IT SOUNDS LIKE IT'S TWO OF TWO THINGS.  ONE

3     POSSIBILITY IS "HERE ARE THESE 32.  IT'S IN THERE

4     SOMEWHERE.  WE CAN'T TELL YOU QUITE WHERE.  WE'RE

5     NOT GOING TO TELL YOU QUITE WHERE.  BUT IT'S IN

6     THERE SOMEWHERE."

7          OR HE'S GOING TO GIVE US THE SPECIFICITY

8     HE DIDN'T BEFORE.

9          EITHER WAY, HE SHOULDN'T BE ALLOWED TO

10    TESTIFY TO IT.  YOUR HONOR HAS BEEN VERY CAREFUL TO

11    MAKE SURE THAT EITHER OF US, THE RULES APPLY TO

12    BOTH OF US, NO ONE IS HIDING THE BALL ON WHAT THE

13    CLAIM LIMITATION IS.

14         THIS IS A CLAIM LIMITATION THAT YOUR

15    HONOR HEARD ARGUMENT ON AND YOUR HONOR CONSTRUED.

16    IT HAS AT LEAST TWO SPECIFIC REQUIREMENTS, AN

17    APPLICATION, THE APPLET, WITHIN THE APPLICATION

18    MODULE.

19         HE WAS OBLIGATED TO ADD -- THEY HAVE THE

20    BURDEN OF PROOF.  HE WAS OBLIGATED TO SAY WHERE

21    THIS IS IN THE SOURCE CODE.

22         THEY HAVE THIS LONG FOOTNOTE, WE ASKED,

23    HE REFUSED TO IDENTIFY IT.

24         IT SHOULDN'T GO IN EITHER AS THIS 32

25    MODULE UNDIFFERENTIATED, NOR SHOULD HE BE ABLE TO

1    IDENTIFY WHERE IT IS RIGHT NOW.

2              LAST POINT IS THIS, YOUR HONOR.  AS YOUR

3    HONOR KNOWS FROM THE DEPOSITION TRANSCRIPT, WE

4    SPECIFICALLY SAID, "DOES THIS LONG FOOTNOTE INCLUDE

5    THINGS THAT ARE NOT THE APPLET?"

6              AND HE SAID, "YES, IT DOES."

7              "WHICH ONES AREN'T?"

8              "I CAN'T TELL YOU RIGHT NOW."

9              MR. GOLDSTEIN:  YOUR HONOR, IF I COULD BE

10   HEARD?

11             THERE'S A DIFFERENCE BETWEEN DISCLOSURE

12   AND CROSS-EXAMINATION.  IF HE ONLY SAYS WHAT HE

13   DISCLOSED, "I LOOKED AT THE SOURCE CODE," MR. LEE

14   IS FREE TO CROSS-EXAMINE HIM TO HIS HEART'S

15   CONTENT.  THAT GOES TO THE WEIGHT.

16             MR. LEE:  YOUR HONOR, IT DOESN'T GO TO

17   THE WEIGHT.  IT GOES TO DISCLOSURE.  THEY NEVER

18   TOLD US WHAT THE APPLET IS.  THEY NEVER SAID WHAT

19   THE APPLICATION MODULE IS.

20             HE SAID, "HERE'S 32 DIFFERENT BATES STAMP

21   RANGES," AND THE BEST HE COULD SAY AT HIS

22   DEPOSITION WAS "IT'S IN THERE SOMEWHERE."

23             EXPERTS IN THIS CASE HAVE BEEN PRECLUDED

24   FROM TESTIFYING WHEN THEY'RE ACTUALLY MORE FOCUSSED

25   THAN THAT.

```
 1                THIS IS -- IF HE GIVES THAT TESTIMONY
 2     TOMORROW, IT WOULD BE THE FIRST TIME WE'LL KNOW
 3     WHAT HE'S CLAIMING.
 4                THE COURT:  ALL RIGHT.  THE OBJECTION IS
 5     STILL SUSTAINED.
 6                OKAY.  IT'S 4:42.
 7                WHAT ELSE?  ANYTHING ELSE THAT WE NEED TO
 8     COVER TODAY?
 9                MR. JACOBS:  NOTHING FROM APPLE, YOUR
10     HONOR.
11                THE COURT:  OKAY.  ANYTHING ELSE?
12                MR. VERHOEVEN:  NO, YOUR HONOR.
13                MR. MCELHINNY:  CAN WE HAVE A TIME
14     ESTIMATE?
15                THE COURT:  OKAY.  I JUST NEED A MINUTE.
16                (PAUSE IN PROCEEDINGS.)
17                THE COURT:  OKAY.  APPLE HAS USED 14
18     HOURS AND 10 MINUTES, AND SAMSUNG HAS USED 14 HOURS
19     AND 58 MINUTES.
20                OKAY.  ALL RIGHT.  THANK YOU ALL VERY
21     MUCH.  I'LL SEE YOU TOMORROW MORNING.  THANK YOU.
22                MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
23                MR. MCELHINNY:  THANK YOU, YOUR HONOR.
24                (WHEREUPON, THE EVENING RECESS WAS
25     TAKEN.)
```

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8             I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/
                      _____
22                    LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
23

24                    DATED:  AUGUST 14, 2012

25