1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA     )  C-11-01846 LHK
6  CORPORATION,                 )
                                )  SAN JOSE, CALIFORNIA
7             PLAINTIFF,        )
                                )  AUGUST 15, 2012
8        VS.                    )
                                )  VOLUME 9
9  SAMSUNG ELECTRONICS CO.,     )
   LTD., A KOREAN BUSINESS      )  PAGES 2651-2965
10 ENTITY; SAMSUNG              )
   ELECTRONICS AMERICA,         )
11 INC., A NEW YORK             )
   CORPORATION; SAMSUNG         )
12 TELECOMMUNICATIONS           )
   AMERICA, LLC, A DELAWARE     )
13 LIMITED LIABILITY            )
   COMPANY,                     )
14                              )
              DEFENDANTS.       )
15 _____

16           TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24                         IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF         MORRISON & FOERSTER
      APPLE:                    BY:  HAROLD J. MCELHINNY
 3                                   MICHAEL A. JACOBS
                                     RACHEL KREVANS
 4                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                 HALE AND DORR
 7                           BY:  WILLIAM F. LEE
                             60 STATE STREET
 8                           BOSTON, MASSACHUSETTS  02109

 9                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                          OLIVER & HEDGES
12                        BY:  CHARLES K. VERHOEVEN
                               ALBERT P. BEDECARRE
13                        50 CALIFORNIA STREET, 22ND FLOOR
                          SAN FRANCISCO, CALIFORNIA  94111
14
                          BY:  VICTORIA F. MAROULIS
15                             KEVIN P.B. JOHNSON
                          555 TWIN DOLPHIN DRIVE
16                        SUITE 560
                          REDWOOD SHORES, CALIFORNIA  94065
17
                          BY:  MICHAEL T. ZELLER
18                             WILLIAM C. PRICE
                               JOHN B. QUINN
19                        865 SOUTH FIGUEROA STREET
                          10TH FLOOR
20                        LOS ANGELES, CALIFORNIA  90017

21    FOR INTERVENOR       RAM, OLSON,
      REUTERS:             CEREGHINO & KOPCZYNSKI
22                         BY:  KARL OLSON
                           555 MONTGOMERY STREET, SUITE 820
23                         SAN FRANCISCO, CALIFORNIA  94111

24
      INTERPRETERS:        JAMES YIM VICTORY
25                         ANN PARK
                           ALBERT KIM
```

INDEX OF WITNESSES

DEFENDANT'S

**MARKUS PALTIAN**
  VIDEO DEPOSITION PLAYED   P. 2670
                P. 2671


**ANDRE ZORN**
  VIDEO DEPOSITION PLAYED   P. 2671
                P. 2672

**TIM ARTHUR WILLIAMS**
  DIRECT EXAM BY MR. VERHOEVEN  P. 2676
  CROSS-EXAM BY MR. LEE     P. 2739

**JIN SOO KIM**
  DIRECT EXAM BY MR. QUINN    P. 2787
  CROSS-EXAM BY MR. MCELHINNY  P. 2821
  REDIRECT EXAM BY MR. QUINN   P. 2833

**RICHARD HOWARTH**
  DIRECT EXAM BY MR. PRICE    P. 2838
  CROSS-EXAM BY MR. MCELHINNY  P. 2842

**ANDRIES VAN DAM**
  DIRECT EXAM BY MR. JOHNSON   P. 2845
  CROSS-EXAM BY MS. KREVANS   P. 2873
  REDIRECT EXAM BY MR. JOHNSON  P. 2883
  RECROSS-EXAM BY MS. KREVANS  P. 2884

**STEPHEN GRAY**
  DIRECT EXAM BY MR. DEFRANCO  P. 2893
  CROSS-EXAM BY MR. JACOBS    P. 2924

1

<u>INDEX OF EXHIBITS</u>

2

|  | MARKED | ADMITTED |
|---|---|---|

3

<u>PLAINTIFF'S</u>

4

| 2011 | | 2669 |
|---|---|---|
| 43 | | 2828 |
| 42 | | 2829 |

5

6

7

8

9

10

<u>DEFENDANT'S</u>

11

| 636 | | 2673 |
|---|---|---|
| 635 | | 2674 |
| 1083 | | 2674 |
| 557 | | 2675 |
| 1073 | | 2682 |
| 3966.104 | 2697 | |
| 3966.105 | 2703 | |
| 3966.106 | 2705 | 2705 |
| 1070 | | 2711 |
| 107 | | 2721 |
| 3666.108 | | 2730 |
| 635-A & 635-B | | 2733 |
| 685 | | 2764 |
| 3973.009 | | 2804 |
| 684.001 | | 2820 |
| 3973.010 | | 2820 |
| 621-A | | 2837 |
| 2627 | | 2839 |
| 712 | | 2841 |
| 717 | | 2842 |
| 3964.015A | | 2860 |
| 2964.026 - 038 | | 2864 |
| 655 | | 2883 |
| 655 & 548 | | 2886 |
| 550 | | 2903 |
| 561 | | 2917 |
| 1081 | | 2920 |

25

```
 1    SAN JOSE, CALIFORNIA              AUGUST 15, 2012
 2                   P R O C E E D I N G S
 3              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 5              THE COURT:  GOOD MORNING.  SO I JUST
 6    FILED THE ORDER GRANTING IN PART AND DENYING IN
 7    PART THE PARTIES' MOTIONS TO STAY PENDING APPEAL.
 8              HOW QUICKLY CAN YOU GET YOUR MOTIONS FOR
 9    STAY FILED WITH THE FEDERAL CIRCUIT?
10              MS. MAROULIS:  WE CAN DO IT THIS WEEK,
11    YOUR HONOR.
12              THE COURT:  BECAUSE I DON'T -- I'M NOT
13    GRANTING AN INDEFINITE STAY.  IT'S ONLY UNTIL THE
14    CIRCUIT COURT GRANTS A STAY PENDING THEIR RULING ON
15    YOUR APPEAL.
16              MS. MAROULIS:  IF POSSIBLE, YOUR HONOR,
17    WE WOULD LIKE MONDAY.
18              MR. LEE:  I THINK THAT WOULD -- I AGREE.
19              THE COURT:  OKAY.  THAT'S FINE.  I DON'T
20    KNOW IF MR. OLSON IS HERE, IF HE WANTS TO OBJECT.
21              CAN YOU DO IT BY FRIDAY?  I MEAN, I'M
22    ASSUMING -- YOU'VE ALREADY FILED YOUR NOTICES, BUT
23    YOU HAVEN'T FILED YOUR ACTUAL APPEALS, IS THAT
24    RIGHT?  OR WHAT'S THE STATUS?
25
```

```
 1              MR. SELWYN:  APPLE HAS FILED ITS NOTICE,
 2     NOT ITS OPENING BRIEF.
 3              THE COURT:  I SEE.  WHEN ARE YOU GOING TO
 4     FILE YOUR OPENING BRIEF?
 5              MR. SELWYN:  WE'RE PREPARING TO FILE THAT
 6     THIS WEEK.
 7              THE COURT:  AND WHAT ABOUT FOR SAMSUNG?
 8              MS. MAROULIS:  WE'RE WORKING ON IT, YOUR
 9     HONOR.  IF WE NEED TO FILE IT ON FRIDAY, WE WILL.
10              THE COURT:  OKAY.  WOULD YOU PLEASE DO
11     THAT.  SO THE MOTIONS FOR STAY, PARTIES WILL FILE
12     WITH THE CIRCUIT COURT ON FRIDAY, WHICH IS, I
13     THINK, THE 17TH; IS THAT RIGHT?
14              MR. MCELHINNY:  YES, YOUR HONOR.
15              THE COURT:  AUGUST 17TH.
16              ALL RIGHT.  SO THAT'S THAT ISSUE.  I
17     REVIEWED THE REDACTIONS TO PX 78.  I APPROVED
18     THOSE.  THAT LOOKS FINE.
19              NOW, I'VE READ THE MOTION TO EXCLUDE
20     MR. CHAPMAN, I THINK IT'S MS. KIM, AND SONY RECORD
21     KEEPER.  IS APPLE GOING TO FILE A RESPONSE OR --
22     OR, I WAS GOING TO SAY, BASED ON WHAT SAMSUNG HAS
23     FILED, I'M LIKELY TO GRANT THE MOTION TO EXCLUDE.
24              CAN WE SAVE THE EXTRA STEP HERE?  DO YOU
25     REALLY NEED THESE PEOPLE?  I'M NOT SAYING YOU MAY
```

```
 1    NOT HAVE ALLEGATIONS TO COUNTER WHAT'S BEEN

 2    REPRESENTED.

 3              MR. SELWYN:  YOUR HONOR, WE'LL BE

 4    PREPARED TO FILE OUR BRIEF BY NOON.  I CAN ADDRESS

 5    IT ORALLY NOW IF YOU'D LIKE AS WELL.

 6              THE COURT:  NO, BECAUSE I WANT TO SEE

 7    ACTUAL DOCUMENTS.  I DON'T WANT ANY ATTORNEY

 8    REPRESENTATION ABOUT WHAT VARIOUS THINGS SAY.

 9    OKAY.

10              MR. SELWYN:  CERTAINLY.  WE CAN HAVE THAT

11    FILED BY NOON IF YOU NEED IT.

12              THE COURT:  BY NOON.  OKAY, WHAT'S THE

13    CHANCE THAT -- I'M ASSUMING -- HOW QUICKLY DO I

14    NEED TO RULE ON THIS?

15              IS THERE ANY CHANCE THAT ANY OF THESE

16    FOLKS WILL BE TESTIFYING TODAY?

17              MR. SELWYN:  NO.  I DON'T BELIEVE THEY'LL

18    ALL BE TESTIFYING TOMORROW.

19              THE COURT:  ALL RIGHT.  SO IF I GIVE YOU

20    A RULING AT THE END OF THE DAY, THAT WOULD BE

21    ENOUGH TIME?

22              MR. SELWYN:  CERTAINLY.

23              THE COURT:  ALL RIGHT.  FILE THAT,

24    PLEASE, NO LATER THAN NOON.  AND WE'LL FILE AN

25    ORDER TONIGHT.
```

```
 1              OKAY.  DID YOU TALK TO MS. KARE?

 2              MS. KREVANS:  MY COLLEAGUE, WHO TRIED TO

 3    GET IN TOUCH WITH HER TRIED AND COULDN'T GET HER

 4    LAST NIGHT.  WE'RE TRYING TO GET HER THIS MORNING.

 5    I FOUND OUT MORE PARTICULARS, YOUR HONOR.

 6              THE ISSUE IS SHE IS TAKING ONE SON

 7    BACK-TO-SCHOOL WHO DOESN'T LIVE HERE AND DOESN'T GO

 8    TO SCHOOL IN THE BAY AREA AND DRIVING DOWN TO SAN

 9    DIEGO TO PICK UP HER YOUNGEST CHILD FROM CAMP.  SHE

10    CAN'T PICK HIM UP UNTIL FRIDAY.  SO THAT'S PROBLEM.

11    WE'RE TRYING AGAIN, BUT THAT'S THE SPECIFICS OF IT.

12              THE COURT:  WELL, LET ME TELL YOU WHAT MY

13    CONCERN IS.  I HAVE A CRIMINAL CALENDAR NEXT

14    WEDNESDAY AND A CIVIL CALENDAR.  I ONLY HAVE SPEEDY

15    TRIAL EXCLUSIONS FOR MY DEFENDANTS IN MY CRIMINAL

16    CASES UNTIL NEXT WEDNESDAY, SO THAT'S NOT GOING TO

17    MOVE.  I'VE GOT OTHER CIVIL CASES WEDNESDAY.  I'VE

18    GOT SUMMARY JUDGMENT MOTIONS ON CASES THAT ARE SET

19    TO GO TO TRIAL IN SEPTEMBER ON THURSDAY.

20              SO I'M NOT -- YOU KNOW, I'VE MOVED ENOUGH

21    FOR THIS CASE.  I'M NOT GOING TO MOVE IT ANY MORE.

22              SO IF WE DON'T HAVE THE JURY START

23    DELIBERATING ON TUESDAY, EVERYTHING IS GOING TO

24    START GETTING PUSHED UNTIL FRIDAY AND WE'RE GOING

25    TO LOSE PEOPLE.  I'M GOING TO SAY IF SHE CAN'T MAKE
```

1    IT THIS WEEK, WE'RE GOING TO HAVE TO MOVE THE

2    EVIDENCE.  IF SHE CAN'T COME THIS WEEK, I'M SORRY,

3    WE'RE PUSHING FORWARD.  I'M ASSUMING, ARE YOU GOING

4    TO MAKE THE SAME REQUEST THAT THE CLOSING ALL HAVE

5    TO BE ON THE SAME DAY OR ARE YOU OKAY WITH THEM

6    BEING SPLIT UP.

7              MR. VERHOEVEN:  I BELIEVE THE CLOSING

8    WOULD BE THE SAME DAY, YOUR HONOR.

9              THE COURT:  SAME DAY.  WELL, THAT'S A

10   FOUR-HOUR STRETCH.  AND READING THESE JURY

11   INSTRUCTIONS IS GOING TO PUT EVERYONE IN A COMA AND

12   IT'S GOING TO TAKE AT LEAST -- I DON'T EVEN KNOW

13   THE FULL LENGTH, BUT IT'S PROBABLY GOING TO TAKE AT

14   LEAST AN HOUR AND A HALF.  SO IF WE WANT TO READ

15   THESE INSTRUCTIONS TO THE JURY, WHICH I HAVE TO DO,

16   AND GIVE ALL FOUR HOURS, THIS THING HAS GOT TO GO

17   TO CLOSING BY TUESDAY.

18              SO --

19              MS. KREVANS:  YOUR HONOR, SHE'S A SINGLE

20   PARENT.

21              THE COURT:  I'M SORRY.  I'M ALL FOR

22   FAMILY VALUES, BUT SHE NEEDS TO BE HERE.

23              MS. KREVANS:  SHE'S A SINGLE PARENT.

24   THERE'S ONLY SO MUCH SHE CAN DO.  WE ARE WORKING ON

25   IT.

```
 1              THE COURT:  OKAY.  NOW, ONE OTHER THING I
 2    WANT TO ASK BEFORE WE BRING IN OUR JURY IS I WOULD
 3    LIKE TO -- I'M GOING TO MAKE TWO MORE REQUESTS.
 4              ONE IS, IS THERE ANY FURTHER NARROWING OF
 5    THE CASE THAT CAN BE DONE BEFORE THIS GOES TO THE
 6    JURY?  AND I'M JUST -- I'M JUST THROWING IT OUT
 7    THERE.  I WANT YOU ALL TO THINK ABOUT IT, CONSULT
 8    WITH YOUR CLIENTS BECAUSE IT WOULD HELP A LOT WITH
 9    BOTH THE JURY INSTRUCTIONS AND THE VERDICT FORM AND
10    JUST WHAT THIS JURY HAS TO DEAL WITH IF THERE COULD
11    BE FURTHER STREAMLINING.
12              NOW THAT YOU'VE SEEN EVERYTHING THAT'S
13    COME IN, ONE THING THAT COMES TO MIND IS THOSE SAME
14    THREE PRODUCTS FOR WHICH I GRANTED THE RULE 30
15    MOTION AS TO SEC -- I MEAN, I WANT YOU ALL TO JUST
16    THINK ABOUT IT, OKAY?  BUT, I MEAN, IF YOU ALL WANT
17    TO KEEP OVERREACHING, THAT'S UP TO YOU.  BUT IF
18    NOT, I THINK IT WOULD BE BETTER TO STREAMLINE THIS
19    CASE.
20              SO CAN YOU ALL THINK ABOUT THAT, IF THERE
21    ARE OTHER NARROWING THAT COULD BE DONE DURING THIS
22    PROCESS BEFORE WE GET TO A VERDICT FORM?
23              MR. MCELHINNY:  YES, YOUR HONOR.
24              MR. VERHOEVEN:  YES, YOUR HONOR.
25              THE COURT:  OKAY.  THEN THE OTHER THING I
```

```
 1    AM GOING TO REQUEST, AND I'M JUST GIVING YOU A

 2    HEADS UP, I GREATLY APPRECIATE THAT AT MY REQUEST

 3    OR ORDER YOUR CEO'S MET IN PERSON WITH JUDGE SPERO

 4    FOR SEVERAL DAYS OVER THE LAST FEW MONTHS.

 5             BUT BEFORE THIS JURY STARTS DELIBERATING,

 6    I'M GOING TO MAKE ONE LAST REQUEST THAT THEY AT

 7    LEAST SPEAK BY PHONE ONE LAST TIME BECAUSE I SEE

 8    RISKS HERE FOR BOTH SIDES IF YOU GO TO A VERDICT OR

 9    IF IT HANGS, WHATEVER IS GOING TO HAPPEN.  AND I

10    THINK THAT IT'S AT LEAST WORTH ONE MORE CHANCE.

11             I DON'T MEAN TO WASTE THEIR TIME, AND I

12    APOLOGIZE IF I'M WASTING THEIR TIME, BUT WOULD YOU

13    ALL COMMIT TO ME THAT PERHAPS ONE MORE TIME, BEFORE

14    THIS JURY STARTS DELIBERATING, YOU'LL HAVE YOUR

15    CEO'S HAVE ONE LAST CONVERSATION?

16             MR. MCELHINNY:  YES, MA'AM.

17             THE COURT:  OKAY.  IS THAT --

18             MR. VERHOEVEN:  YES, YOUR HONOR.

19             THE COURT:  I MEAN, I --

20             MR. SEWALL:  YOUR HONOR, I'LL COMMIT ON

21    BEHALF OF APPLE.

22             THE COURT:  OKAY.  THANK YOU.  YOU KNOW,

23    IF WHAT YOU ALL HAVE WANTED IS TO RAISE AWARENESS

24    THAT YOU HAVE I.P. ON THESE DEVICES, MESSAGE

25    DELIVERED.  OKAY?
```

```
 1              IF WHAT YOU ALL HAVE WANTED IS SOME

 2    EXTERNAL VALUATIONS OF THE STRENGTH OF YOUR I.P., I

 3    THINK YOU'VE KIND OF GOTTEN THAT FROM TRIAL COURTS

 4    AND APPELLATE COURTS WORLDWIDE.

 5              SO IN MANY RESPECTS, MISSION

 6    ACCOMPLISHED.  IT'S TIME FOR PEACE.  OKAY.  SO I'M

 7    JUST GIVING YOU A HEADS UP, BECAUSE THIS JURY MAY

 8    START DELIBERATING WITHIN A WEEK, IF YOU COULD HAVE

 9    YOUR CEO'S HAVE ONE LAST CONVERSATION, I'D

10    APPRECIATE IT.

11              MR. VERHOEVEN:  YES, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  OKAY.  WHAT ELSE

13    DO WE NEED TO COVER?  ANYTHING ELSE?

14              MR. LEE:  YOUR HONOR, JUST A COUPLE OF

15    LOGISTICS.  I'D LIKE TO LODGE JUST THE TRANSCRIPT

16    PORTIONS FROM THE DEPOSITION CLIPS THAT WE SHOWED

17    YESTERDAY.

18              THE COURT:  OH, OKAY.

19              MR. LEE:  AND I'VE SHOWN THEM TO

20    MR. JOHNSON.

21              PX 211 WILL BE THE --

22              THE COURT:  YOU KNOW WHAT, THIS IS ON

23    YOUR TRIAL TIME.

24              MR. LEE:  OKAY.  I'LL DO IT QUICKLY.

25              THE COURT:  NO, NO.  WE'RE GOING TO DO
```

1    THIS WITH THE JURY.  IT'S GOING TO BE ON YOUR TRIAL

2    TIME.

3              MR. LEE:  OKAY.

4              THE COURT:  OKAY?  BECAUSE THIS IS

5    LODGING OF EXHIBITS.  AND IS EVERYONE'S CASE VIEW

6    WORKING?  BECAUSE MINE IS NOT WORKING AGAIN.

7              MS. MAROULIS:  YOUR HONOR, CAN I HAVE A

8    QUICK ADMINISTRATIVE QUESTION?

9              THE COURT:  YES, PLEASE,

10             MS. MAROULIS:  WE'VE BEEN LODGING THE

11   EXHIBITS IN CONNECTION WITH OUR OBJECTIONS, PER THE

12   COURT'S INSTRUCTIONS, BUT WE HAVEN'T BEEN FILING

13   THEM.

14             FOR PURPOSES OF THE APPELLATE RECORD, I

15   ASSUME THE PARTIES WILL BOTH WANT TO FILE THESE

16   EITHER REJECTED EXHIBITS OR OBJECTED TO.  WHEN

17   WOULD THE COURT LIKE US TO DO THAT AND HOW?

18             THE COURT:  I'M GOING TO DEFER TO YOU ALL

19   ON THAT.  WHEN WOULD YOU LIKE TO DO THAT?

20             MS. MAROULIS:  IF WE CAN DO IT BEFORE THE

21   END OF THE CASE BY AGREEMENT AND COME UP WITH A

22   LIST OF WHAT WAS OBJECTED TO AND SIMPLY BRING A

23   STACK TO YOU AND PUT IT IN FOR THE RECORD AS

24   REJECTED EXHIBITS OR OBJECTED TO EXHIBITS.

25             THE COURT:  THAT'S FINE.  I'M MOSTLY

```
 1    CONCERNED WITH THE ONES THAT ARE COMING IN.  I'LL

 2    FINE IF YOU WANT TO WORK IT OUT.

 3              MS. MAROULIS:  OKAY.  WE'LL MEET AND

 4    CONFER.

 5              THE COURT:  YOU WANT TO SAY BY NEXT

 6    TUESDAY, YOU'LL FILE ALL THE REJECTED EXHIBITS.

 7              MS. MAROULIS:  YES, YOUR HONOR.

 8              THE COURT:  OKAY.  WHAT ELSE?  ANYTHING

 9    ELSE?

10              MR. VERHOEVEN:  VERY BRIEFLY, YOUR HONOR,

11    THIS IS MR. VERHOEVEN.

12              YOU WILL RECALL THAT YESTERDAY THERE WAS

13    EXHIBIT 621, WHICH WAS THE VIDEO FROM ROGER FIDLER.

14              THE COURT:  YES.

15              MR. VERHOEVEN:  AND YOUR HONOR PERMITTED

16    ME TO PUT MR. SHERMAN ON THE STAND BEFORE APPLYING

17    THAT.

18              THE COURT:  UM-HUM.

19              MR. VERHOEVEN:  WE -- THAT'S A 13 -- OR A

20    15 -- I THINK ABOUT A 15-MINUTE VIDEO.

21              THE COURT:  OKAY.

22              MR. VERHOEVEN:  AND WE DON'T WANT TO USE

23    15 MINUTES OF OUR TIME.

24              THE COURT:  OKAY.

25              MR. VERHOEVEN:  SO WE'VE CREATED A
```

```
 1    FIVE-MINUTE SHORTENED VERSION OF THAT, 621-A, AND

 2    IF WE COULD JUST REPLACE THAT FOR 621, WHICH IS THE

 3    ADMITTED EXHIBIT.

 4              THE COURT:  OKAY.  HAS APPLE SEEN THE

 5    SHORTENED ONE?

 6              MR. MCELHINNY:  WE HAVE NOT.

 7              MR. VERHOEVEN:  MAYBE AT THE BREAK WE'LL

 8    SHOW IT TO THEM AND THEN GIVE IT TO YOU LATER.

 9              THE COURT:  PLEASE.  I ASSUME THERE'S NOT

10    GOING TO BE AN OBJECTION FOR IT TO BE SHOWN A

11    SHORTER TIME.  WHY DON'T YOU SEE IF HE CAN WORK IT

12    OUT.

13              MR. VERHOEVEN:  THANK YOU, YOUR HONOR

14    I'LL WAIT ON THAT.

15              THE COURT:  PLEASE, IF YOU WOULD.

16              OKAY.  ANYTHING ELSE THAT WE SHOULD

17    COVER?  ANYTHING ELSE?  OTHERWISE, I MEAN, IF OUR

18    JURY IS HERE, I'M OKAY WITH STARTING EARLY.

19              MR. VERHOEVEN:  I WAS JUST GOING TO TELL

20    YOU, YOUR HONOR, THERE IS A CLIPPED SOURCE CODE --

21    THERE YOU GO, INSIDE -- THAT NEEDS TO BE RETURNED

22    TO INTEL AT THE END OF THE DAY, SO WE KEPT IT

23    SEPARATE.  IS THAT RIGHT?

24              THE COURT:  OH, OKAY.  CAN YOU JUST

25    REMIND ME?  I CAN GIVE IT BACK TO YOU AT THE END OF
```

```
 1      THE DAY.

 2                MR. VERHOEVEN:  GREAT.

 3                THE COURT:  OKAY.

 4                MR. VERHOEVEN:  WE'LL HAVE ONE COPY FOR

 5      THE RECORD, BUT NOT MULTIPLE COPIES.

 6                THE COURT:  OKAY, GREAT.  THANK YOU.

 7                (WHEREUPON, THE FOLLOWING PROCEEDINGS

 8      WERE HELD IN THE PRESENCE OF THE JURY:)

 9                THE COURT:  ALL RIGHT.  GOOD MORNING.

10      WELCOME BACK.  PLEASE TAKE A SEAT.

11                DO WE HAVE THE NEW BINDERS FOR OUR

12      JURORS?

13                THE CLERK:  YES, YOUR HONOR.

14                THE COURT:  PERFECT.  YOU ALL HAVE YOUR

15      NEW BINDERS SO YOU'RE NOT SO CRAMPED ON SPACE.

16                ALL RIGHT.  TIME IS NOW 9:05.  GO AHEAD,

17      MR. LEE.

18                MR. LEE:  YOUR HONOR, WE WILL LODGE

19      PLAINTIFF'S EXHIBIT 211, 212, AND 213, WHICH IS THE

20      DEPOSITION CLIPS WE SHOWED FOR MR. YANG.  WE SHOWED

21      THEM TO MR. JOHNSON.

22                AND THEN I NEGLECTED TO OFFER PX 2011

23      YESTERDAY DURING THE COURSE OF MR. YANG.  I DID

24      OFFER THE NEXT ONE.

25                THE COURT:  OKAY.  CAN YOU TELL ME, WHAT
```

1    IS 211?

2              MR. LEE:  2011 WERE THE INFRINGEMENT

3    CONTENTIONS, EXHIBIT M, THAT --

4              THE COURT:  OH, OKAY.  I'M SORRY.  I

5    ALREADY HAVE THAT ON MY LIST.

6              MR. LEE:  YES.  I ACTUALLY THOUGHT I HAD

7    OFFERED IT, BUT I WENT BACK AND LOOKED AT THE

8    TRANSCRIPT AND I HADN'T.

9              THE COURT:  OKAY.  THE FIRST INFRINGEMENT

10   CONTENTION, I HAVE A PX 2030.

11             MR. LEE:  THAT WENT IN.

12             THE COURT:  I DON'T HAVE THAT AS BEING

13   ADMITTED.

14             MR. LEE:  I THINK WE REFERRED TO IT IN

15   THE TRANSCRIPT.  WE OFFER 2011 AND --

16             THE COURT:  I SEE.  2031 WAS ADMITTED

17   YESTERDAY.

18             MR. LEE:  YES.

19             THE COURT:  THOSE ARE INFRINGEMENT

20   CONTENTIONS.  I THINK THOSE ARE THE SEPTEMBER 2011

21   ONES.  THEN PX 2030, WHICH YOU DID SECOND, I DIDN'T

22   HAVE THAT.

23             MR. LEE:  I'M NOT OFFERING THAT.

24             THE COURT:  OKAY.

25             MR. LEE:  2011, WHICH WERE THE

```
 1    DISCLOSURES --
 2               THE COURT:  I'M SORRY, ONE SECOND.  IS
 3    YOUR PX 211 IS THE SAME PX 2031?  THOSE WERE THE
 4    INFRINGEMENT CONTENTIONS THAT WERE ADMITTED
 5    YESTERDAY.
 6               MR. LEE:  THE PX'S ARE PORTIONS OF THE
 7    SAME EXHIBIT, SO THAT PX 2031 IS ONE EXHIBIT TO THE
 8    INFRINGEMENT CONTENTIONS.  PX 2011 IS EXHIBIT M TO
 9    THE INFRINGEMENT CONTENTIONS.
10               THE COURT:  OKAY.  PX 211, OR 2011?
11               MR. LEE:  2011.
12               THE COURT:  2011, THAT IS AN EXHIBIT M?
13               MR. LEE:  YES, YOUR HONOR.
14               THE COURT:  AND YOU'RE MOVING THAT NOW?
15               MR. LEE:  YES.  I NEGLECTED TO MOVE IT
16    YESTERDAY.
17               THE COURT:  AND THOSE -- THAT'S AN
18    EXHIBIT TO PX 2031?
19               MR. LEE:  THEY'RE BOTH PARTS OF THE SAME
20    DOCUMENT, SEPARATE PARTS OF THE SAME DOCUMENT.
21               THE COURT:  I SEE.  IS THERE ANY
22    OBJECTION?
23               MR. VERHOEVEN:  NO OBJECTION.
24               THE COURT:  ALL RIGHT.  SO THAT'S
25    ADMITTED.  815.  AND WHAT IS PX 212?  OR 2012,
```

```
 1    RIGHT?  OR WHAT WAS --
 2              MR. LEE:  2012 I DID NOT OFFER.  JUST
 3    2011 AND 2031, I BELIEVE.
 4              THE COURT:  OKAY.  SO YOU'RE ONLY
 5    OFFERING ONE EXHIBIT RIGHT NOW, AND THAT'S 2011,
 6    WHICH IS EXHIBIT M TO THE INFRINGEMENT CONTENTIONS.
 7              MR. LEE:  YES.
 8              THE COURT:  OKAY.  THAT'S ADMITTED.
 9              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
10              2011, HAVING BEEN PREVIOUSLY MARKED FOR
11              IDENTIFICATION, WAS ADMITTED INTO
12              EVIDENCE.)
13              THE COURT:  ANYTHING ELSE?  I THOUGHT YOU
14    WERE LODGING SOMETHING.
15              MR. LEE:  NOTHING ELSE.
16              THE COURT:  SO WHAT IS THIS PX 2010 AND
17    2013?  WHAT IS THAT?
18              MR. LEE:  WE USED THEM.  THEY ARE ALSO
19    PORTIONS OF THE INFRINGEMENT CONTENTIONS, BUT I'M
20    NOT OFFERING THEM INTO EVIDENCE.
21              THE INFRINGEMENT CONTENTIONS, YOUR HONOR,
22    HAVE DIFFERENT EXHIBITS THAT ADDRESS DIFFERENT
23    ISSUES, SO WE BROKE THEM DOWN.
24              THE COURT:  I'M SORRY.  PX 2011 WAS
25    IDENTIFIED AND TESTIFIED TO BY DR. YANG YESTERDAY,
```

```
1     BUT IT WAS NOT ADMITTED AND THAT'S WHAT YOU WANTED
2     ADMITTED TODAY.
3               MR. LEE:  YES.
4               THE COURT:  AND THEN THE OTHERS ARE JUST
5     ONES THAT WERE USED YESTERDAY, BUT YOU'RE NOT
6     ADMITTING?
7               MR. LEE:  RIGHT, YES.
8               THE COURT:  OKAY.  THAT'S FINE.
9               MR. LEE:  THANK YOU.
10              ALL RIGHT.  ANYONE HAVE ANYTHING ELSE
11    THAT NEEDS TO BE LODGED OR CHANGED NO?
12              MR. VERHOEVEN:  NO, YOUR HONOR.
13              THE COURT:  OKAY.  IT'S 9:09.
14              MR. VERHOEVEN:  YOUR HONOR, OUR NEXT LIVE
15    WITNESS IS GOING TO BE DR. TIM WILLIAMS, BUT BEFORE
16    WE CALL HIM, WE HAVE DEPOSITION TRANSCRIPTS TO PLAY
17    FROM TWO INTEL EMPLOYEES.
18              THE FIRST ONE IS MARKUS PALTIAN,
19    P-A-L-T-I-A-N.
20              MAY WE PLAY THAT, YOUR HONOR?
21              THE COURT:  PLEASE, GO AHEAD.
22              (WHEREUPON, THE VIDEOTAPED DEPOSITION OF
23    MARKUS PALTIAN WAS PLAYED IN OPEN COURT OFF THE
24    RECORD.)
25              THE COURT:  CAN YOU INCREASE THE VOLUME,
```

```
 1    PLEASE.
 2                (WHEREUPON, THE VIDEOTAPED DEPOSITION OF
 3    MARKUS PALTIAN WAS PLAYED IN OPEN COURT OFF THE
 4    RECORD.)
 5                THE COURT:  IS THAT THE END?
 6                MR. VERHOEVEN:  YES, YOUR HONOR.
 7                THE COURT:  ALL RIGHT.  IT'S 9:17.
 8                MR. LEE:  YOUR HONOR, THERE'S A
 9    COUNTER-DESIGNATION, AND I'LL LODGE PX 208 RIGHT
10    NOW.
11                THE COURT:  ALL RIGHT.  PX 208.
12                (WHEREUPON, THE VIDEOTAPED DEPOSITION OF
13    MARKUS PALTIAN WAS PLAYED IN OPEN COURT OFF THE
14    RECORD.)
15                THE COURT:  IS THAT IT, MR. LEE.
16                MR. LEE:  THAT'S IT.
17                THE COURT:  ALL RIGHT.  IT'S 9:19.
18                MR. VERHOEVEN:  NEXT WE OFFER THE
19    DEPOSITION TESTIMONY OF ANDRE ZORN, Z-O-R-N.
20                THE COURT:  ALL RIGHT.  GO AHEAD.
21                (WHEREUPON, THE VIDEOTAPED DEPOSITION OF
22    ANDRE ZORN WAS PLAYED IN OPEN COURT OFF THE
23    RECORD.)
24                THE COURT:  MR. VERHOEVEN; THAT THE END?
25                MR. VERHOEVEN:  YES, YOUR HONOR.
```

```
 1            THE COURT:  OKAY.  IT'S 9:29.  MR. LEE?

 2            MR. LEE:  THERE'S A BRIEF COUNTER, AND

 3    WE'LL LODGE PLAINTIFF'S EXHIBIT 209, WHICH IS THE

 4    TRANSCRIPT OF THIS COUNTER.  GO AHEAD.  THANK YOU.

 5            (WHEREUPON, THE VIDEOTAPED DEPOSITION OF

 6    ANDRE ZORN WAS PLAYED IN OPEN COURT OFF THE

 7    RECORD.)

 8            MR. LEE:  THAT COMPLETES THE COUNTER,

 9    YOUR HONOR.

10            THE COURT:  OKAY.  IT'S 9:30.

11            MR. VERHOEVEN:  YOUR HONOR, AT THIS POINT

12    WE WOULD MOVE IN EXHIBIT 636, WHICH IS A

13    CONFIDENTIAL INTEL EXHIBIT, SO THIS SHOULD BE

14    TREATED UNDER SEAL.

15            THE COURT:  OKAY.  AND IS THAT THE STACK

16    THAT YOU TOLD ME ABOUT THAT NEEDS TO BE RETURNED?

17            MR. VERHOEVEN:  YES, YOUR HONOR.

18            THE COURT:  OKAY.  THAT'S --

19            MR. VERHOEVEN:  NO.  I'M SORRY.  THIS IS

20    THE 61X PRODUCT SPECIFICATION.  IT'S NOT SOURCE

21    CODE.

22            THE COURT:  OH, OKAY, ALL RIGHT.

23            MR. VERHOEVEN:  BUT IT'S UNDER YOUR

24    HONOR'S RULING, THAT'S UNDER SEAL.

25            THE COURT:  YES.  SO THAT'S DX 636.  ANY
```

2673

```
 1    OBJECTION, MR. LEE?

 2               MR. LEE:  I HAVE THE -- THE DESIGN SPEC

 3    OR THE SOURCE CODE?

 4               THE COURT:  THIS IS THE DESIGN PRODUCT

 5    SPEC.

 6               MR. LEE:  I THINK THAT'S DX 635.

 7               THE COURT:  NOT IN MY BINDER.

 8               MR. LEE:  I HAVE 636 AS DESIGN SPECS AND

 9    636 AS TO SOURCE CODE, BUT AS TO BOTH I HAVE NO

10    OBJECTION.

11               MR. VERHOEVEN:  AND I'D OFFER 635 AS THE

12    SOURCE CODE UNDER SEAL AS WELL.

13               THE COURT:  OKAY.

14               MR. LEE:  AND WE HAVE NO OBJECTION TO

15    EITHER.

16               THE COURT:  ALL RIGHT.  SO THIS IS

17    SEALED.  I'M TALKING ABOUT DX 636, WHICH IS THE

18    X-GOLD 616 AND LITTLE X PRODUCT SPEC IS UNDER SEAL,

19    AND IT IS ADMITTED.

20               (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

21                636, HAVING BEEN PREVIOUSLY MARKED FOR

22                IDENTIFICATION, WAS ADMITTED INTO

23                EVIDENCE.)

24               THE COURT:  AND THEN THE DX -- WHAT IS

25    THE NUMBER AGAIN FOR THE SOURCE CODE?
```

2674

```
1              MR. VERHOEVEN:  635.

2              THE COURT:  635, THAT'S ALSO INTEL, IT'S

3       ADMITTED.

4              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

5              635, HAVING BEEN PREVIOUSLY MARKED FOR

6              IDENTIFICATION, WAS ADMITTED INTO

7              EVIDENCE.)

8              THE COURT:  815.  IT'S UNDER SEAL.  AND

9       IT'S COMING IN UNDER THE DEPOSITION OF MR. ZORN.

10             OKAY.

11             MR. VERHOEVEN:  SAMSUNG OFFERS JOINT

12      EXHIBIT 1083, WHICH IS THE 3GPP SPECIFICATION,

13      25.214 VERSION 6.6.0.

14             THE COURT:  ALL RIGHT.  3GPP, TECHNICAL

15      SPEC; CORRECT?

16             MR. VERHOEVEN:  CORRECT.  25.214.

17             THE COURT:  ALL RIGHT.

18             MR. VERHOEVEN:  VERSION 6.6.0.

19             THE COURT:  NO OBJECTION, MR. LEE?

20             MR. LEE:  NO OBJECTION.

21             THE COURT:  THAT'S ADMITTED.

22             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23             1083, HAVING BEEN PREVIOUSLY MARKED FOR

24             IDENTIFICATION, WAS ADMITTED INTO

25             EVIDENCE.)
```

2675

```
1              THE COURT:  AND THAT'S NOT SEALED.

2              MR. VERHOEVEN:  CORRECT, YOUR HONOR.

3              THE COURT:  OKAY.  WHAT ELSE.

4              MR. VERHOEVEN:  FINALLY, SAMSUNG OFFERS

5    EXHIBIT 557, WHICH IS THE 3GPP TECHNICAL

6    SPECIFICATION, 25.322 VERSION 6.4.0.

7              THE COURT:  OKAY.  THAT'S PX 557, 3GPP.

8              AND JUST FOR THE JURY, 3GPP IS THIRD

9    GENERATION PARTNERSHIP PROJECT.

10             OKAY.  THAT'S NOT UNDER SEAL, CORRECT,

11   CONTAINS NO SOURCE CODE?

12             MR. VERHOEVEN:  CORRECT, YOUR HONOR.

13             THE COURT:  OKAY.  THAT'S ADMITTED.  I

14   ASSUME NO OBJECTION, MR. LEE?

15             MR. LEE:  NO OBJECTION.

16             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17             557, HAVING BEEN PREVIOUSLY MARKED FOR

18             IDENTIFICATION, WAS ADMITTED INTO

19             EVIDENCE.)

20             THE COURT:  OKAY.  WHAT ELSE?

21             MR. VERHOEVEN:  FINALLY, I'D LIKE TO

22   LODGE THE TRANSCRIPT OF MARKUS PALTIAN, WHICH WE

23   JUST WATCHED, AS DEFENDANT'S EXHIBIT 804; AND THE

24   TRANSCRIPT OF ANDRE ZORN, WHICH WE JUST WATCHED, IS

25   DEFENDANT'S EXHIBIT 803.
```

2676

```
 1              THE COURT:  OKAY.  THOSE ARE LODGED.

 2              ALL RIGHT.  NOW, DO YOU WANT ME TO RETURN

 3    THIS CODE NOW, OR --

 4              MR. VERHOEVEN:  LATER.

 5              THE COURT:  ALL RIGHT.  THEN CALL YOUR

 6    NEXT WITNESS, PLEASE.

 7              MR. VERHOEVEN:  SAMSUNG CALLS

 8    DR. TIM WILLIAMS.

 9              THE COURT:  ALL RIGHT.

10              THE CLERK:  MR. WILLIAMS, PLEASE RAISE

11    YOUR RIGHT HAND.

12                  TIM ARTHUR WILLIAMS,

13    BEING CALLED AS A WITNESS ON BEHALF OF THE

14    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

15    EXAMINED AND TESTIFIED AS FOLLOWS:

16              THE WITNESS:  I DO.

17              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18              THE COURT:  ALL RIGHT.  TIME IS NOW 9:34.

19    GO AHEAD, PLEASE.

20              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

21                  DIRECT EXAMINATION

22    BY MR. VERHOEVEN:

23    Q    GOOD MORNING, DR. WILLIAMS.

24    A    GOOD MORNING.

25    Q    PLEASE STATE YOUR FULL NAME FOR THE RECORD?
```

```
1    A    MY NAME IS TIM ARTHUR WILLIAMS.

2    Q    WHERE DO YOU RESIDE?

3    A    I LIVE HERE IN THE BAY AREA.  I LIVE IN

4    DANVILLE.

5    Q    NOW, YOU WERE RETAINED BY SAMSUNG TO PROVIDE

6    SOME OPINIONS ABOUT ITS HIGH SPEED DATA PATENTS; IS

7    THAT RIGHT?

8    A    YES, I WAS.

9    Q    BEFORE WE TALK ABOUT THE PATENTS, LET'S

10   SUMMARIZE YOUR RESUME.  IF WE COULD PUT UP SDX

11   3966.002.  THIS IS A SUMMARY OF YOUR RESUME, SIR?

12   A    YES, IT IS.

13   Q    CAN YOU SUMMARIZE FOR THE JURY YOUR

14   EDUCATIONAL BACKGROUND, STARTING WITH COLLEGE?

15   A    I GREW UP IN THE MIDWEST, I GREW UP IN

16   MICHIGAN AND WENT TO UNDERGRADUATE SCHOOL AT

17   MICHIGAN TECHNOLOGICAL UNIVERSITY, WHICH IS IN THE

18   UPPER PENINSULA OF MICHIGAN.

19         I GRADUATED WITH A BACHELOR'S OF SCIENCE

20   AND ELECTRICAL ENGINEERING.  AND CAME DOWN TO

21   CHICAGO TO START WORKING WITH MOTOROLA DESIGNING

22   COMMUNICATIONS EQUIPMENT WITH MOTOROLA.

23         IN 1979, I MOVED TO AUSTIN, TEXAS WITH

24   MOTOROLA AND BEGAN WORKING ON MY GRADUATE DEGREES,

25   AS WELL AS WORKING FULL TIME .
```

```
 1            SO I COMPLETED MY MASTER OF SCIENCE AND

 2     ELECTRICAL ENGINEERING, MY PH.D. IN ELECTRICAL

 3     ENGINEERING, AND MY M.B.A. AT THE UNIVERSITY OF

 4     TEXAS AT AUSTIN WHILE WORKING FULL TIME AT

 5     MOTOROLA.

 6            IN 1981, I HAD JUST FINISHED MY M.B.A.

 7     AND DECIDED I WANTED TO START UP A COMPANY, SO I

 8     PACKED UP THE WIFE AND KIDS AND MOVED OUT TO

 9     SILICON VALLEY.

10            MY FIRST START-UP COMPANY WAS FOCUSSED ON

11     TWO-WAY PAGER AND WE BUILT THE SUBSCRIBER DEVICES,

12     CHIPSETS AND PROTOCOLS FOR TWO-WAY PAGING, AND AT

13     THE TIME WE COMPETED WITH RESEARCH IN MOTION, WHICH

14     IS A COMPANY YOU MAY KNOW.

15            SIX YEARS LATER, WE WENT PUBLIC AND

16     ACTUALLY SOLD THAT COMPANY BEFORE WE WENT PUBLIC,

17     AND I WAS FORTUNATE ENOUGH TO BE ABLE TO RETIRE AT

18     THE AGE OF 42.

19            WELL, I'LL LET YOU IN ON A LITTLE SECRET.

20     RETIREMENT IS NOT ALL IT'S CRACKED UP TO BE AT AGE

21     42, AND AFTER ABOUT 6 MONTHS, I WAS EXTREMELY BORED

22     AND WANTED CHALLENGES IN MY LIFE.  SO I FORMED

23     ANOTHER COMPANY WHICH WAS FOCUSSED ON VOICE OVER

24     I.P., AND THIS COMPANY WAS SOLD TWO-AND-A-HALF

25     YEARS LATER TO INTEL CORPORATION, AND I RETIRED A
```

1    SECOND TIME.

2              WELL, THIS TIME I STARTED HANGING AROUND

3    BERKELEY AND STANFORD LOOKING FOR INTERESTING

4    PROJECTS, AND ULTIMATELY JOINED A COMPANY CALLED

5    ATHEROS COMMUNICATIONS.  AND ATHEROS COMMUNICATIONS

6    BUILT WIRELESS CHIPSETS, SO WI-FI, WE MAY KNOW THE

7    NAME WI-FI, AND THAT COMPANY ULTIMATELY WAS SOLD TO

8    QUALCOMM FOR $3.3 BILLION AND BECAME, I THINK, THE

9    FIFTH LARGEST SEMICONDUCTOR COMPANY IN THE WORLD.

10             SINCE, ALL TOLD, SINCE 1991, I'VE BEEN

11   INVOLVED IN ABOUT 20 START-UP COMPANIES, AND THE --

12   WHAT I SPEND THE BULK OF MY TIME ON NOW IS HELPING

13   OTHER PEOPLE GET THEIR COMPANIES STARTED, HELPING

14   THEM GET FUNDING, HELPING THEM GET ORGANIZED AND

15   HELPING THEM ACHIEVE THEIR DREAMS.

16   Q    DO YOU HAVE ANY PATENTS, SIR?

17   A    YES.  I HAVE 27 ISSUED U.S. PATENTS.

18   Q    CAN YOU SUMMARIZE WHAT, WHAT THE TECHNOLOGICAL

19   AREA IS OF THOSE PATENTS?

20   A    THESE PATENTS ARE ALL IN THE AREA OF

21   COMMUNICATION SYSTEMS.  THESE PATENTS ALL DEAL WITH

22   SOME ASPECT OF WIRELESS COMMUNICATIONS.

23             MR. VERHOEVEN:  YOUR HONOR, WE TENDER

24   DR. WILLIAMS AS AN EXPERT WITNESS IN THE AREA OF

25   WIRELESS NETWORKS AND COMMUNICATIONS.

```
1              THE COURT:  ANY OBJECTION?

2              MR. LEE:  NO OBJECTION.

3              THE COURT:  SO CERTIFIED.

4    BY MR. VERHOEVEN:

5    Q    HAVE YOU TESTIFIED IN COURT PROCEEDINGS

6    BEFORE, DR. WILLIAMS?

7    A    YES.  I'VE BEEN DOING EXPERT WITNESS WORK

8    SINCE 1999, AND I'VE BEEN A RETAINED EXPERT IN OVER

9    50 CASES SINCE THAT POINT IN TIME.

10             I'VE TESTIFIED MULTIPLE TIMES IN FEDERAL

11   COURT AND MULTIPLE TIMES AT THE ITC.

12   Q    HOW ABOUT -- YOU'VE BEEN RETAINED BY SAMSUNG

13   IN THIS CASE; CORRECT?

14   A    YES.

15   Q    AND WHAT'S YOUR RATE?

16   A    IT'S $550 AN HOUR, WHICH IS MY NORMAL RATE.

17   Q    DO YOU NEED THE MONEY, SIR?

18   A    NO, I DON'T.

19   Q    THEN WHY DO YOU DO IT?

20   A    WELL, I'M HERE BECAUSE I WANT A STRONG U.S.

21   ECONOMY FOR MY CHILDREN, AND I WANT A STRONG U.S.

22   PATENT SYSTEM FOR MY CHILDREN'S LEGACY.

23   Q    LET'S MOVE ON TO THE TWO PATENTS THAT YOU'RE

24   GOING TO TALK ABOUT TODAY, THE SAMSUNG HIGH SPEED

25   DATA PROCESSING PATENTS.  THE FIRST IS THE '516
```

```
 1    PATENT.

 2                    AND, YOUR HONOR, I'M JUST GOING TO PUT UP

 3    A BOARD, IF I MAY.

 4                    THE COURT:  GO AHEAD, PLEASE.  YOU WANT

 5    TO BRING THAT CLOSER?

 6                    MR. VERHOEVEN:  WELL, I'D LIKE -- CAN

 7    EVERYONE SEE THAT?

 8                    THE COURT:  THEY CAN SEE IT.

 9                    MR. VERHOEVEN:  I WANTED TO HAVE THE

10    SCREEN AS WELL.

11                    THE COURT:  THAT'S FINE.

12                    MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

13    Q    DO YOU HAVE A BINDER IN FRONT OF YOU, SIR?

14    A    YES.

15    Q    CAN YOU TURN TO EXHIBIT 1073?

16    A    YES.

17    Q    PUT THAT ON THE SCREEN, PLEASE.  SIR, CAN YOU

18    IDENTIFY WHAT IS EXHIBIT 1073?

19    A    THIS IS U.S. PATENT NUMBER 7,447,516.

20    Q    YOU UNDERSTAND THIS IS ONE OF THE TWO HIGH

21    SPEED DATA PATENTS THAT SAMSUNG IS ASSERTING

22    AGAINST APPLE IN THIS CASE?

23    A    YES, IT IS.

24                    MR. VERHOEVEN:  YOUR HONOR, I MOVE

25    EXHIBIT 1073 INTO EVIDENCE.
```

```
 1                THE COURT:  ANY OBJECTION.

 2                MR. LEE:  NO OBJECTION.

 3                THE COURT:  IT'S ADMITTED.

 4                (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 5                1073, HAVING BEEN PREVIOUSLY MARKED FOR

 6                IDENTIFICATION, WAS ADMITTED INTO

 7                EVIDENCE.)

 8      BY MR. VERHOEVEN:

 9      Q    ALL RIGHT.  CAN WE PUT UP SDX 3966.005.  IS

10      THIS A SLIDE YOU HAD PREPARED TO HELP ILLUSTRATE

11      THE '516 PATENT?

12      A    YES, IT IS.

13      Q    CAN YOU DESCRIBE FOR THE JURY GENERALLY WHAT

14      DOES THE '516 PATENT CONCERN?

15      A    WELL, IF WE LOOK AT THE TITLE OF THE PATENT,

16      THE LAST FEW WORDS ARE UPLINK SERVICE, AND IN

17      CELLULAR SYSTEMS, THERE ARE TWO PRIMARY DIRECTIONS.

18                THERE'S THE DOWNLINK DIRECTION OF SENDING

19      INFORMATION FROM THE INFRASTRUCTURE, OR THE

20      NETWORK, DOWN TO THE MOBILE STATION, AND THERE'S

21      THE UPLINK DIRECTION OF SENDING INFORMATION FROM

22      THE MOBILE STATION, OR THE CELL PHONE, UP INTO THE

23      NETWORK.

24                SO THIS PATENT DEALS WITH HOW THE MOBILE

25      STATION WILL ALLOCATE POWER, POWER FOR THE
```

2683

1    TRANSMISSION, IN ORDER TO COMMUNICATE THE TYPES OF

2    INFORMATION THAT IT NEEDS TO COMMUNICATE UP INTO

3    THE INFRASTRUCTURE.

4         AT SO AT ANY POINT IN TIME THE MOBILE

5    STATION HAS MULTIPLE TASKS OR MULTIPLE TYPES OF

6    INFORMATION IT NEEDS TO BRING UP INTO THE

7    INFRASTRUCTURE, AND THE INFORMATION IS CARRIED IN

8    WHAT WE CALL CHANNELS.  SO THERE ARE A VARIETY OF

9    CHANNELS THAT ARE TRANSMITTED BY MOBILE STATION AT

10   ANY POINT IN TIME.

11        IN THE CELLULAR SYSTEM, THE

12   INFRASTRUCTURE HANDS THE MOBILE A BUDGET FOR HOW

13   MUCH POWER IT CAN USE AT ANY POINT IN TIME.  SO

14   IT'S THE MOBILE'S TASK TO FIGURE OUT, WELL, I HAVE

15   THIS MUCH INFORMATION TO SEND, I HAVE TO GET MY

16   POWER UNDERNEATH THIS PARTICULAR BUDGETED AMOUNT,

17   SO HOW DO I ALLOCATE THE POWER BETWEEN THESE

18   MULTIPLE CHANNELS IN ORDER TO COMMUNICATE THAT

19   INFORMATION BACK INTO THE NETWORK?

20   Q    SO HERE ON THIS, I'M POINTING AT THE BIG

21   SCREEN HERE, THERE'S A VOICE DATA CHANNEL YOU

22   INDICATED.

23   A    YES.

24   Q    WHAT'S THAT?

25   A    SO THE VOICE DATA CHANNEL IS THE CHANNEL THAT

1    CARRIES YOUR VOICE.  SO IF YOU'RE HAVING A

2    CONVERSATION WITH YOUR MOTHER, THIS IS THE CHANNEL

3    THAT CARRIES YOUR VOICE INTO THE INFRASTRUCTURE.

4    Q    AND THEN IT SAYS, ENHANCED DATA CHANNEL, DO

5    YOU SEE THAT?

6    A    YES.

7    Q    DID YOU PREPARE A SLIDE TO HELP ILLUSTRATE

8    WHAT THE ENHANCED DATA CHANNEL IS?

9    A    YES.

10   Q    GO TO THE NEXT SLIDE, PLEASE.  GO AHEAD, SIR.

11   A    SO THE ENHANCED DATA CHANNEL IS THAT CHANNEL

12   THAT'S RESPONSIBLE FOR CARRYING THE DATA TRAFFIC UP

13   INTO THE INFRASTRUCTURE.

14        SO IF YOU'VE TAKEN A PICTURE WITH YOUR

15   MOBILE PHONE AND YOU WANT TO UPLOAD THAT, THAT'S

16   THE CHANNEL THAT'S CARRYING THAT PICTURE.  IF

17   YOU'VE TAKEN A VIDEO, THAT'S THE CHANNEL THAT'S

18   CARRYING THE VIDEO, MESSAGING, WEB SURFING, THAT

19   SORT OF STUFF IS ALL CARRIED ON THIS CHANNEL.

20   Q    DOES THE '516 PATENT RELATE TO CONTROLLING

21   POWER LEVELS?

22   A    YES.  IT DEALS WITH CONTROLLING POWER LEVELS

23   IN THE MOBILE STATION.

24   Q    WHAT DOES THIS SLIDE SHOW, SIR?

25   A    WHAT I'VE SHOWN HERE IS A DIAGRAM OF A SINGLE

2685

1     CELL BASE STATION IN A CELLULAR NETWORK.

2              AND IF WE LOOK AT THE U.S. CARRIERS, WE'D

3     SEE THOUSANDS OF THESE BASE STATIONS SPREAD OUT

4     THROUGHOUT THE UNITED STATES.

5              IN ANY PARTICULAR BASE STATION, IF YOU

6     LOOK AT IT AT ANY POINT IN TIME, IT'S DEALING WITH

7     A VARIETY OF NUMBER OF MOBILES THAT ARE ACCESSING

8     THE NETWORK IN THAT PARTICULAR CELL.

9              AND AT ANY POINT IN TIME, THERE CAN BE

10    MULTIPLE PHONE CALLS GOING THAT THAT CELL IS

11    HANDLING, MULTIPLE PICTURES BEING UPLOADED,

12    MULTIPLE VIDEOS BEING UPLOADED, MULTIPLE

13    INTERACTIONS WITH THE CELL, AS WELL AS SOME CELL

14    PHONES ARE JUST IN THE NETWORK WAITING FOR A CALL.

15             SO THE NETWORK HAS TO ORGANIZE HOW MUCH

16    POWER EACH OF THESE MOBILE STATIONS CAN TRANSMIT

17    WITH, AND THE MOBILE -- THE BASE STATION ACTUALLY

18    HANDS THE MOBILE A BUDGETED POWER AMOUNT THAT IT

19    CAN USE TO TRANSMIT.

20    Q    AND THIS NEXT SLIDE THAT YOU PREPARED, CAN YOU

21    EXPLAIN TO THE JURY WHAT YOU'RE ILLUSTRATING HERE?

22    A    WELL, AN ANALOGY HERE IS A CROWDED ROOM WITH A

23    LOT OF CONVERSATIONS GOING ON.  IF ONE PERSON IS

24    TALKING WAY TOO LOUD, THEY'RE GOING TO INTERFERE

25    WITH THEIR NEIGHBORS AND THE CONVERSATIONS OF THEIR

1    NEIGHBORS ARE GOING TO BE INTERFERED WITH.

2            SO THE BASE STATION IS CONTROLLING HOW

3    LOUD EACH OF THOSE CONVERSATIONS CAN OCCUR IN ORDER

4    TO GET THE MAXIMUM NUMBER OF PEOPLE TO CONVERSE AT

5    ANY ONE POINT IN TIME.

6    Q    SO HERE ON SLIDE SDX 3966.009, I TAKE IT WE

7    HAVE TWO FIGURES FROM THE '516 PATENT.  IS THAT

8    RIGHT?

9    A    YES.  THE ONE ON THE LEFT IS THE PRIOR ART OF

10   THE PROBLEM DESCRIBED BY THE '516, AND THE ONE ON

11   THE RIGHT IS THE SOLUTION, OR THE INVENTION BY THE

12   INVENTORS OF THE '516.

13   Q    AND HAVE YOU PREPARED A SIMPLIFIED

14   ILLUSTRATION TO WALK THROUGH THE PROBLEM AND

15   SOLUTION, SIR?

16   A    YES, I HAVE.

17   Q    THIS IS NOW SLIDE 10.  WHAT DOES THIS SLIDE

18   SHOW, SIR?

19   A    ON THE LEFT I'VE SHOWN A SIMPLIFIED VERSION OF

20   THE PROBLEM AND ON THE RIGHT A SIMPLIFIED VERSION

21   OF THE SOLUTION.

22            IF WE LOOK, WHAT I'VE SHOWN HERE IS TO

23   SCALE THE AMOUNT OF POWER THAT THE MOBILE WOULD

24   LIKE TO TRANSMIT THESE CHANNELS THAT IT'S

25   RESPONSIBLE FOR TRANSMITTING.

```
 1                  IN OTHER WORDS, IT WOULD LIKE TO TRANSMIT
 2     THESE CHANNELS WITH THIS MUCH POWER HERE.
 3                  HOWEVER, THE INFRASTRUCTURE IS ONLY GIVEN
 4     A BUDGETED AMOUNT OF POWER TO THE RED LINE.
 5     Q    AND THAT'S THAT PMAX, THAT'S POWER MAX; IS
 6     THAT RIGHT?
 7     A    YES, THAT'S THE POWER ALLOCATED TO THAT MOBILE
 8     BY THE STRUCTURE.
 9     Q    OKAY.  AND WHAT IS THE GREEN ENHANCED DATA
10     CHANNEL?  CAN YOU EXPLAIN THAT TO THE JURY?
11     A    THE ENHANCED DATA CHANNEL HERE SHOWN IN GREEN
12     IS THAT CHANNEL I WAS JUST TALKING ABOUT.  THAT'S
13     THE CHANNEL THAT'S CARRYING PICTURES UP INTO THE
14     INTERNET, IT'S CARRYING THE VIDEO, THINGS LIKE
15     THAT.
16     Q    AND THE YELLOW VOICE DATA CHANNEL, WHAT'S
17     THAT?
18     A    THE VOICE DATA CHANNEL IS THAT CHANNEL THAT'S
19     CARRYING YOUR VOICE, YOUR CONVERSATION WHEN YOU'RE
20     ON THE PHONE.
21     Q    SO THE ENHANCED DATA CHANNEL IS CALLED
22     E-DPDCH; IS THAT RIGHT?
23     A    YES, THAT'S THE TECHNICAL NAME FOR IT.
24     Q    AND THE VOICE CHANNEL IS CALLED DPDCH; IS THAT
25     CORRECT?
```

1      A    YES, THAT'S CORRECT.

2      Q    WHAT'S THE PROBLEM YOU'RE ILLUSTRATING HERE?

3      A    THE PROBLEM IS IN THE PRIOR ART, ALL THE POWER

4    WAS REDUCED TO EACH OF THE CHANNELS EQUALLY.  SO

5    WHAT HAPPENED WAS THE MOBILE WOULD SCALE ALL THE

6    POWERS DOWN TO JUST MEET THE BUDGETED AMOUNT.

7           AND WHAT HAPPENED WAS THE VOICE CHANNEL,

8    VOICE DATA CHANNEL WAS REDUCED IN POWER BECAUSE OF

9    THAT.  WELL, WHEN THE VOICE DATA CHANNEL GETS LOWER

10   IN POWER, IT GETS SOFTER IN ITS TRANSMISSIONS, SO

11   MORE ERRORS OCCUR, WHICH COULD LEAD TO DROPPED

12   CALLS OR BAD CELL PHONE CALLS.

13          AND SO WHAT THE INVENTORS DECIDED TO DO

14   WAS TAKE ADVANTAGE OF A CHARACTERISTIC OF THIS

15   CHANNEL THAT'S CODED IN GREEN, THE E-DPDCH CHANNEL,

16   AND THERE'S A UNIQUE CHARACTERISTIC ABOUT THIS

17   CHANNEL THAT ALLOWS FOR THE RETRANSMISSION OF

18   INFORMATION.

19          IN OTHER WORDS, IF INFORMATION IS LOST IN

20   THE TRANSMISSION FROM THE MOBILE TO BASE STATION,

21   THIS CHANNEL CAN REQUEST A RETRANSMISSION OF THAT

22   INFORMATION IN ORDER TO GET AN ACCURATE COPY.

23          SO THE INVENTORS REALIZED THAT GIVING

24   PRIORITY TO THE VOICE DATA CHANNEL IN TERMS OF ITS

25   POWER ALLOCATION WAS IMPORTANT AND MAINTAINING A

1    QUALITY CALL WAS AN IMPORTANT ASPECT OF THE

2    CELLULAR SYSTEM.

3              SO WHAT THEY DID IS THEY ALLOCATED THE

4    POWER REDUCTION TO THE ENHANCED DATA CHANNEL IN

5    ORDER TO MEET THE BUDGET.

6    Q    AND WHAT HAPPENS IN THE SOLUTION?  WHAT

7    HAPPENS TO THE VOICE DATA CHANNEL?

8    A    SO THE VOICE DATA CHANNEL IS -- HAS THE SAME

9    POWER AS IT DID BEFORE, WHICH LEADS TO A GREAT CALL

10   QUALITY.

11   Q    DO YOU CONSIDER THE '516 INVENTION TO BE AN

12   IMPORTANT INNOVATION?

13   A    ABSOLUTELY, FOR THREE REASONS.

14             NUMBER ONE IS THAT IT REDUCES THE AMOUNT

15   OF POWER THE MOBILE NEEDS TO TRANSMIT WITH SO IT

16   WILL LENGTHEN THE BATTERY LIFE OF THE MOBILE

17   DEVICE.

18             IT MAINTAINS CALL QUALITY, SO IT WILL

19   REDUCE THE NUMBER OF BAD CALLS OR DROPPED CALLS.

20             AND NUMBER THREE IS IT ALLOWS MORE PEOPLE

21   TO GET ONTO THE SITE OR NETWORK, WHICH REDUCES ALL

22   OF OUR COSTS OR SERVICE WHEN WE PAY THE OPERATORS

23   TO GET CELLULAR SERVICE.

24   Q    MR. FISHER, CAN WE GO TO SLIDE 16.

25             NOW, LET'S SWITCH TO THE ACCUSED APPLE

```
 1    PRODUCTS IN THIS CASE.
 2              WHAT ARE THE APPLE ACCUSED PRODUCTS?
 3    A    I LOOKED AT THE IPHONE 4 AND THE IPAD 2 3G.
 4    Q    AND WE HAVE HERE, YOU PULLED OUT THIS INFINEON
 5    PMB 9801 X-GOLD 616 BASEBAND PROCESSOR.  WHAT'S
 6    THAT?
 7    A    IF YOU LOOK AT THE IPHONE 4 AND THE IPAD 2,
 8    YOU SEE THAT THE CRITICAL COMPONENT TO GETTING
 9    THESE PRODUCTS ONTO THE CELLULAR NETWORK AND ONTO A
10    WIRELESS ENVIRONMENT IS A CHIP CALLED THE BASEBAND
11    PROCESSOR.  AND THIS IS A CHIP PRODUCED BY INTEL
12    AND THE PRODUCT NAME ON THE CHIP IS THE X-GOLD 616
13    THAT'S USED IN BOTH OF THESE PRODUCTS.
14    Q    THIS SAYS INFINEON.  IS THAT DIFFERENT FROM
15    INTEL?
16    A    YES.  INFINEON WAS PURCHASED BY INTEL.
17    Q    OKAY.  AND IS THIS CHIP IN BOTH OF THESE
18    PRODUCTS, THE IPHONE 4 AND IPAD 2 3G?
19    A    YES, IT IS.  IT'S THE THING THAT ENABLES THESE
20    PRODUCTS TO GAIN ACCESS TO THE CELLULAR NETWORK.
21    Q    OKAY.  NOW, I TAKE IT YOU ANALYZED THESE
22    ACCUSED PRODUCTS AGAINST THE CLAIMS OF THE -- THE
23    ASSERTED CLAIMS OF THE '516 PATENT?
24    A    YES.  I READ AND UNDERSTOOD THE '516 PATENT,
25    AND I LOOKED AT THE PRODUCT DOCUMENTATION AND THE
```

```
1     PRODUCT INFORMATION PRODUCED IN THIS CASE AND

2     DETERMINED WHETHER OR NOT THOSE PRODUCTS MEET EACH

3     AND EVERY CLAIM LIMITATION OF THE ASSERTED CLAIMS.

4     Q    NOW, I KNOW YOU'RE NOT A LAWYER, SIR, BUT WHAT

5     WAS THE, THE TEST YOU USED TO MEASURE INFRINGEMENT?

6     A    WHETHER EACH AND EVERY ELEMENT OF THE CLAIMS

7     WERE MET BY THE ACCUSED PRODUCTS.

8     Q    AND WHAT ANALYSIS DID YOU USE, APPLYING THAT

9     TEST?  WHAT DID YOU DO?  WHAT DID YOU LOOK AT?

10    A    I READ AND UNDERSTOOD THE, THE CLAIMS OF THE

11    PATENT, AND THEN I LOOKED AT THE MATERIALS IN THE

12    CASE.  I LOOKED AT A LOT OF THE MATERIALS IN THE

13    CASE, BUT I'M GOING TO TALK ABOUT FOUR TODAY.

14              THE FIRST IS THE 3GPP TECHNICAL STANDARD

15    THAT YOU JUST HEARD ABOUT;

16              THE SECOND IS THE TESTIMONY OF INTEL

17    SOFTWARE ENGINEER THAT YOU JUST HEARD THE

18    DEPOSITION OF;

19              THE THIRD IS AN INTERNAL ENGINEERING

20    DOCUMENTATION BY INTEL ABOUT THIS CHIP; AND,

21              THE FOURTH IS THE ACTUAL SOURCE CODE

22    THAT'S RUNNING ON THIS CHIP THAT PERFORMS THESE

23    OPERATIONS.

24    Q    ALL RIGHT.  WELL, LET'S START WITH THE FIRST,

25    THE 3GPP TECHNICAL SPECIFICATION.
```

```
 1              DIRECT YOUR ATTENTION TO EXHIBIT 1083 IN

 2    YOUR BINDER, AND LET ME PUT THAT UP ON THE SCREEN.

 3    THIS WAS JUST ADMITTED.  IT'S 3GPP TECHNICAL

 4    SPECIFICATION 25.214 VERSION 6.6.0.

 5              DID YOU ANALYZE THIS SPECIFICATION, SIR?

 6    A    YES, I DID.

 7    Q    WHAT DOES THIS STANDARD CONCERN?

 8    A    IF YOU LOOK AT THE THIRD LINE ON THE TITLE

 9    HERE, IT'S A PHYSICAL LAYER PROCEDURES FOR

10    FREQUENCY PROCEDURES DUPLEXES RELEASE 6.

11              THOSE ARE THOSE ASPECTS OF THE STANDARD

12    THAT DEAL WITH HOW IN THIS CASE THE MOBILE PHONE OR

13    USER EQUIPMENT IS GOING TO GET ACCESS TO THE

14    NETWORK.  SO IT TELLS YOU HOW THE USER EQUIPMENT

15    NEEDS TO ACT.

16    Q    MR. FISHER, CAN WE FURNISH TO PAGE 25 OF THE

17    STANDARD.  AND CAN WE ZOOM OUT, OR PULL OUT

18    5.1.2.6, THE FIRST TWO PARAGRAPHS.  PULL THAT DOWN

19    JUST A LITTLE BIT.  GET THE BOTTOM.

20              IS THIS ONE OF THE PARAGRAPHS THAT YOU

21    ANALYZED, SIR?

22    A    YES, IT IS.

23    Q    AND DID YOU RELY ON 5 .2 -- 5.2.1.6.

24    A    YES, IT IS.

25    Q    CAN YOU EXPLAIN TO THE JURY, WHAT DOES THIS
```

1    CONCERN?

2    A    THIS SECTION TALKS ABOUT A TEST, BASICALLY, A

3    TEST OF WHAT THE MOBILE STATION WOULD LIKELY

4    TRANSMIT IS GOING TO EXCEED THE BUDGETED AMOUNT OF

5    POWER THAT'S BEEN ALLOCATED, AND IF THAT TEST IS

6    PROVEN TO BE TRUE, THEN THIS PARAGRAPH DESCRIBES

7    WHAT THE MOBILE STATION NEEDS TO DO.

8              SO HERE IN THE SECOND PARAGRAPH, WE SEE

9    THAT IF THE TOTAL UE TRANSMIT POWER --

10   Q    LET ME INTERRUPT YOU FOR A SECOND.  UE IS

11   WHAT?

12   A    USER EQUIPMENT.  SO THIS WOULD BE IN APPLE'S

13   CASE THE IPHONE 4 OR THE IPAD 2.

14   Q    OKAY.  CONTINUE, SIR.

15   A    IF THE TOTAL UE TRANSMIT POWER WOULD EXCEED

16   THE MAXIMUM ALLOWED POWER IN VALUES, SO THAT'S THE

17   TEST --

18   Q    AND THAT MAXIMUM ALLOWED POWER IS LIKE THE

19   PMAX THAT WE LOOKED AT?

20   A    THAT'S THE BUDGETED AMOUNT OF POWER FOR THE

21   CHANNELS UNDER CONSIDERATION.

22   Q    OKAY.  GO AHEAD, SIR.

23   A    AND THEN, SO IF THAT TEST IS TRUE, THEN WHAT

24   SHOULD THE MOBILE STATION DO OR THE UE DO?  THE UE

25   SHALL FIRST REDUCE ALL THE E-DPDCH GAIN FACTORS.

```
 1          SO THESE ARE THE GAINS OF THE GREEN
 2   CHANNEL THAT I SHOWED YOU BEFORE, THAT CHANNEL THAT
 3   HAS THE SPECIFIC CHARACTERISTIC OF RETRANSMISSION
 4   BUILT INTO THE CHANNEL.
 5   Q    ALL RIGHT.  NOW, THE TWO ASSERTED CLAIMS FROM
 6   THE '516 PATENT ARE ON THIS BOARD HERE.  DO YOU SEE
 7   THE BOARD?
 8   A    YES.
 9   Q    CLAIM 15 AND THEN A DEPENDENT CLAIM 16.
10          CAN YOU DIRECT YOUR ATTENTION TO THE
11   ELEMENTS HERE, LET'S START WITH 15A, AND CAN YOU
12   TELL THE JURY, HOW DOES 15A COMPARE WITH THIS
13   CONNECTION WE HAVE ON THE SCREEN FROM THE 3GPP
14   SPECIFICATION?
15   A    WELL, 15A TALKS ABOUT TWO TYPES OF CHANNELS.
16   SO IT TALKS ABOUT A FIRST CHANNEL RIGHT HERE, AND
17   IT TALKS ABOUT A SECOND CHANNEL RIGHT THERE.
18          THE FIRST CHANNEL IS A CHANNEL THAT DOES
19   NOT SUPPORT HYBRID AUTOMATIC REPEAT REQUESTS.  SO
20   THAT'S TECHNICAL SPEAK FOR RETRANSMISSION, SO
21   THAT'S THE PARTICULAR PROCESS OF RETRANSMISSION.
22          SO THE FIRST CHANNEL IS A CHANNEL THAT
23   DOES NOT SUPPORT THIS RETRANSMISSION CAPABILITY.
24          AND THAT IS IN THE MOBILE STATION, THAT'S
25   THE DPDCH CHANNEL SHOWN RIGHT HERE .
```

1          AND THEN THE SECOND CHANNEL IS A CHANNEL

2     THAT DOES SUPPORT THIS RETRANSMISSION PROCESS, THIS

3     HARQ PROCESS, AND THAT CHANNEL IS SHOWN RIGHT HERE

4     IN THE E-DPDCH, AND THAT'S THE CHANNEL THAT'S GOING

5     TO GET REDUCED IF THAT DESIRED POWER EXCEEDS THE

6     BUDGETED AMOUNT.

7     Q    IF YOU LOOK AT THE NEXT ELEMENT OF CLAIM 15,

8     15B, HOW DOES THAT COMPARE WITH THE SECTION WE HAVE

9     UP ON THE SCREEN FROM THE SPECIFICATION, EXHIBIT

10    1083?

11    A    15B TALKS ABOUT THE DETERMINATION, SO IT IS

12    THE TEST THAT YOU CAN SEE HERE IN THE STANDARD.

13         AND THEN IT TALKS ABOUT SCALING DOWN THE

14    TRANSMIT POWER FOR THE SECOND CHANNEL, AND THAT'S

15    THE ECH CHANNEL, OR THE CHANNEL THAT DOES SUPPORT

16    THE HARQ PROCESS.

17         SO THE CLAIM READS DIRECTLY OFF THIS.

18    Q    LET'S GO TO ELEMENT 15C, WHICH IS THE NEXT ROW

19    DOWN.  HOW DOES THAT COMPARE?

20    A    15C TALKS ABOUT CHANNEL GENERATORS AND THESE

21    CHANNEL GENERATORS ARE ORGANIZING THE CHANNELS AND

22    PREPARING THEM TO BE TRANSMITTED ON THE RF CARRIER.

23         AND SO WE CAN SEE THAT THIS PARAGRAPH

24    DEALS WITH HOW THOSE CHANNELS ARE ORGANIZED AND

25    PREPARED TO BE TRANSMITTED ON THE RF CARRIER.

1    Q    AND ELEMENT 15D, A GAIN SCALING UNIT, AND IT

2    CONTINUES, HOW DOES THAT ELEMENT COMPARE WITH THE

3    STANDARD?

4    A    SO THE GAIN SCALING UNIT THIS CLAIM IS KIND OF

5    LIKE A MUSCLE TO ELEMENT 15B, WHICH IS THE

6    INTELLIGENCE.  15B IS MAKING THE DECISION.  15D IS

7    PERFORMING THE ACTUAL OPERATION.

8              AND SO IF WE LOOK AT THE END OF THIS

9    PARAGRAPH, IT SAYS THE -- THAT AFTER CALCULATION,

10   THE QUANTIZED VALUES MAY BE APPLIED, AND THAT IS

11   THE APPLICATION OF THESE GAINS, OR THE GAIN SCALE

12   OF THE CHANNELS.  SO THAT'S -- THAT'S ESSENTIALLY

13   SIZING THE CHANNEL TO THE RIGHT POWER LEVEL SO THAT

14   IT CAN BE TRANSMITTED.

15   Q    AND THEN IF WE CAN STAY ON THE SAME PAGE,

16   MR. FISHER -- WELL, BEFORE WE DO THAT, CAN WE

17   MARK -- OR CAN WE SAVE THIS, MR. FISHER, AND MARK

18   THIS AS THE NEXT DEMONSTRATIVE IN ORDER?

19             MR. LEE:  A HIGH LIGHTED EXHIBIT?

20             MR. VERHOEVEN:  YES.

21             MR. LEE:  I OBJECT TO THAT, YOUR HONOR,

22   EXHIBIT GOING IN.

23             MR. VERHOEVEN:  WE'VE BEEN DOING THIS IN

24   THE PAST.  IT'S A DEMONSTRATIVE.  YOUR HONOR HAS

25   BEEN ALLOWING DEMONSTRATIVE EXHIBITS.

```
 1              MR. LEE:  YOUR HONOR, I DON'T THINK WE'VE
 2     BEEN SENDING HIGHLIGHTED PORTIONS OF EXHIBITS.
 3              THE COURT:  I'LL ALLOW THIS IN, BUT I
 4     DON'T WANT TOO MANY OF THESE IN.  OKAY?
 5              MR. VERHOEVEN:  YES, YOUR HONOR.
 6              THE COURT:  ALL RIGHT.  SO WHAT NUMBER IS
 7     THIS?
 8              MR. VERHOEVEN:  104.
 9              THE COURT:  DX 104, OR YOU MEAN 3966.104?
10              MR. VERHOEVEN:  YES, YOUR HONOR, 3966.
11              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
12              3966.104 WAS MARKED FOR IDENTIFICATION.)
13              MR. VERHOEVEN:  MAY I PROCEED, YOUR
14     HONOR?
15              THE COURT:  YES.
16     BY MR. VERHOEVEN:
17     Q   IF WE CAN STAY ON THE SAME PAGE, BUT ZOOM IN
18     ON THE MIDDLE OF THE PAGE WITH THE PARAGRAPH,
19     MR. FISHER, THAT BEGINS ANY SCALING AND ANY
20     REDUCTION.
21              MR. FISHER, DID YOU REVIEW THIS PORTION
22     OF THE SPECIFICATION AS WELL?
23     A   I'M MR. WILLIAMS.
24     Q   I'M SORRY.
25     A   YES, I REVIEWED THIS PARAGRAPH, AND THIS
```

1    PARAGRAPH TALKS ABOUT HOW OFTEN THIS EVALUATION

2    PROCESS NEEDS TO HAPPEN.

3              AND SO WE JUST LOOKED AT AN EVALUATION

4    PROCESS AND A GAIN SCALING PROCESS.  THE QUESTION

5    IS, HOW FREQUENTLY DOES IT OCCUR?

6              AND THE STANDARD CALLS FOR THIS

7    EVALUATION PROCESS TO OCCUR ON A SLOT-BY-SLOT

8    BASIS, OR AT THE BEGINNING OF EVERY SLOT.

9              NOW, A SLOT IN THE 3GPP STANDARDS IS A

10   VERY WELL DEFINED POINT IN TIME.  IT'S A VERY WELL

11   DEFINED PERIOD OF TIME.

12   Q   NOW, HOW DOES THIS SECTION THAT WE'VE PULLED

13   OUT OF EXHIBIT 1083 COMPARE WITH THE ADDITIONAL

14   DEPENDENT CLAIM 16 WHICH ADDS THE ADDITIONAL

15   FEATURE THAT SAYS WHEREIN THE CONTROLLER SCALES THE

16   TRANSMIT POWER FACTOR FOR THE SECOND CHANNEL FROM

17   THE SLOT TO SLOT WHEN THE TOTAL TRANSMIT POWER

18   EXCEEDS THE MAXIMUM ALLOWED POWER.

19   A   YES.  CLAIM 16 TALKS ABOUT HOW OFTEN THIS

20   EVALUATION NEEDS TO HAPPEN, WHICH IS ON A

21   SLOT-BY-SLOT BASIS.  AND IF WE LOOK AT THE STANDARD

22   ON THE FIRST SENTENCE HERE, THAT ANY REDUCTION

23   SHOULD BE APPLIED OR CHANGED AT A SLOT BOUNDARY,

24   WHICH IS THE EXACT SAME TIME.

25              SO CLAIM 16 READS DIRECTLY ON TO THE

1    STANDARD.

2    Q    IN SUMMARY, BASED ON YOUR REVIEW OF THE 3GPP

3    STANDARD, EXHIBIT 1083, DID YOU FORM ANY

4    CONCLUSIONS WITH RESPECT TO WHETHER THE ACCUSED

5    PRODUCTS INFRINGE?

6    A    YES, I HAVE.  IT'S MY OPINION THAT APPLE'S

7    PRODUCTS INFRINGE CLAIM 15 AND 16 OF THE '516

8    PATENT BECAUSE APPLE STATES THAT THEY'RE COMPLIANT

9    WITH 3GPP, RELEASE 6.

10   Q    NOW, THE SECOND CATEGORY OF EVIDENCE I THINK

11   YOU MENTIONED WAS THE TESTIMONY FROM THE INTEL

12   EMPLOYEES WE JUST WATCHED; IS THAT RIGHT?

13   A    YES.

14   Q    CAN WE GO TO SLIDE 17, MR. FISHER.

15        WHY DID YOU PULL OUT THIS TESTIMONY FROM

16   MARKUS PALTIAN?

17   A    WELL, MR. PALTIAN IS THE INTEL SOFTWARE

18   ENGINEER THAT PROGRAMMED THE CHIPSET, THE BASEBAND

19   CHIPSET THAT WE LOOKED AT EARLIER.  HE PROGRAMMED

20   THAT BASEBAND CHIPSET TO PERFORM THE OPERATIONS OF

21   THIS STANDARD.

22        AND SO HE SAID THAT HE WROTE HIS CODE TO

23   BE COMPLIANT WITH THE STANDARD AND TO IMPLEMENT THE

24   E-DPDCH GAIN FACTOR SCALING BASED ON THIS TEST THAT

25   WE LOOKED AT.

1    Q    OKAY.  AND IF WE GO TO THE NEXT SLIDE, PLEASE.

2              WHAT ARE YOU SHOWING HERE FROM

3    MR. PALTIAN'S TESTIMONY?

4    A    MR. PALTIAN ALSO SAID THAT HE CHANGED THE

5    GAINS ON SLOT BOUNDARY, WHICH IS A SLOT-BY-SLOT

6    BASIS.

7              SO HE BASICALLY STATED THAT HE COMPLIED

8    WITH THE STANDARD IN CHANGING THE GAIN FACTORS ON

9    THE SLOT BOUNDARY, WHICH IS THE SUBJECT OF CLAIM

10   16.

11   Q    HOW DOES MR. PALTIAN'S TESTIMONY AFFECT YOUR

12   OPINIONS WITH RESPECT TO CLAIMS 15 AND 16?

13   A    IT FURTHER SUPPORTS MY OPINION OF INFRINGEMENT

14   BY APPLE'S PRODUCTS.

15   Q    I THINK THE THIRD CATEGORY OF EVIDENCE YOU

16   MENTIONED WAS INTEL TECHNICAL DOCUMENTATION; IS

17   THAT CORRECT?

18   A    YES.

19   Q    I'LL DIRECT YOUR -- I'LL DIRECT YOU TO EXHIBIT

20   636 IN YOUR BINDER.

21   A    YES.

22              MR. VERHOEVEN:  AND WE'RE GOING TO HAVE

23   TO GO CONFIDENTIAL ON THIS, YOUR HONOR, SO IT'LL

24   ONLY BE ON THE SMALL MONITORS?

25              THE COURT:  THAT'S FINE.

1    BY MR. VERHOEVEN:

2    Q    SO ARE WE LOOKING ON THE SMALL MONITORS.  SO

3    THIS THE FRONT PAGE OF EXHIBIT 636?

4    A    YES.  THIS IS INTEL INTERNAL ENGINEERING

5    DOCUMENTATION ABOUT THEIR BASEBAND PROCESSOR.  THE

6    PRODUCT NAME IS THE X-GOLD 616.

7              AND THIS IS THE DOCUMENT THAT WAS

8    INTENDED TO TEACH OTHER ENGINEERS ABOUT WHAT'S IN

9    THE CHIP.  THIS IS THE HARDWARE CHIP DOCUMENT.  SO

10   THIS DESCRIBES THE HARDWARE ASPECTS OF THE CHIP.

11   Q    CAN WE GO TO PAGE 269 OF THIS DOCUMENT.  AND

12   ZOOM OUT FIGURE 96.

13             WHAT DOES FIGURE 96 SHOW, SIR?

14   A    WELL, IF YOU RECALL, I SAID THAT THE MOBILE

15   STATION NEEDS TO TRANSMIT MANY TYPES OF

16   INFORMATION.  THIS IS A DIAGRAM SHOWING THE MANY

17   TYPES OF INFORMATION THAT THE MOBILE NEEDS TO

18   TRANSMIT.  SO THERE'S A LOT OF CHANNELS THAT THE

19   MOBILE NEEDS TO TRANSMIT, AND IN ORDER TO TRANSMIT

20   THESE CHANNELS, IT NEEDS TO BRING ALL THESE

21   CHANNELS TOGETHER AND MULTIPLEX THEM TOGETHER DOWN

22   TO TWO STREAM ATTENTION OF INFORMATION.

23             SO YOU CAN SEE THE MULTIPLE SOURCES ON

24   THE LEFT AND THE TWO STREAMS OF INFORMATION ON THE

25   RIGHT WHICH WILL GO TO THE RF CARRIER.

1    Q    MR. FISHER, CAN WE ZOOM INTO THE TOP THREE

2    BOXES ON THE UPPER LEFT?

3            AND IF WE COULD HIGHLIGHT THE FIRST BOX

4    AND THE THIRD BOX IN RED.

5            DR. WILLIAMS, CAN YOU TELL THE JURY WHAT

6    IS THIS FIRST BOX AND WHAT IS THIS THIRD BOX?

7    A    THE THIRD BOX AND THE THIRD BOX ARE THE GAIN

8    SCALING UNITS OF THE CLAIM 15.  THESE ARE THE

9    THINGS THAT ADJUST THE AMOUNT OF POWER ALLOCATED TO

10   EACH OF THOSE CHANNELS.

11   Q    AND THEN IF YOU LOOK UP ABOVE THE TOP BOX TO

12   THE LEFT, WHAT DOES IT SAY AND WHAT IS IT?

13   A    THE ARROW COMING IN ON THE TOP BOX SAYS DPDCH,

14   WHICH IS THE FIRST BOX THAT WE LOOKED AT, AND

15   THAT'S THE CHANNEL THAT DOES NOT HAVE THIS HARQ

16   PROCESSOR, THIS RETRANSMISSION PROCESSOR.

17   Q    AND THEN WHAT'S THE INPUT ON THE LEFT TO THE

18   BOTTOM RED BOX?

19   A    THE BOTTOM BOX IS THE E-DPDCH CHANNEL.  THIS

20   IS THE ENHANCED DATA CHANNEL, THE CHANNEL THAT'S

21   CARRYING YOUR PICTURES AND YOUR VIDEO UP TO THE

22   INFRASTRUCTURE.

23           AND IN THIS CHANNEL, IT HAS THE RE

24   TRANSMISSION PROCESS THAT -- IT HAS THE HARQ

25   PROCESS.  SO THIS IS CHANNEL, CHANNEL 2 FROM THE

1    CLAIM 15 OF THE '516.

2    Q    AND WHAT'S THE ARROW GOING INTO THE TOP OF

3    BOTH OF THOSE BOXES?

4    A    THESE ARE THE GAIN VALUES THAT ARE COMPUTED BY

5    THE BRAINS OF THE CHIPSET, THE MICRO CONTROLLER IN

6    DETERMINING ITS DECISION IN GAIN SCALING, AND WE'LL

7    LOOK AT THAT IN JUST A SECOND.

8              BUT THESE ARE THE GAIN VALUES THAT ALLOW

9    THE TWO CHANNELS TO BE SCALED BACK IN POWER TO

10   ACHIEVE A RELATIVE POWER AMOUNT FOR TRANSMISSION.

11   Q    SO LET'S GO BACK TO OUR -- WELL, BEFORE WE GO

12   TO THE BOARD, YOUR HONOR, I THINK I'LL ONLY DO THIS

13   ONE MORE TIME, BUT IF WE COULD MARK THIS AS

14   DEMONSTRATIVE SDX 3966.104.

15              CAN WE SAVE IT, MR. FISHER?

16              THE COURT:  104 WAS THE LAST ONE.

17              MR. VERHOEVEN:  105.

18              THE COURT:  ALL RIGHT.  GO AHEAD.

19              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

20              3966.105 WAS MARKED FOR IDENTIFICATION.)

21              MR. VERHOEVEN:  AND I'LL ONLY DO IT ONE

22   MORE TIME.

23   Q    NOW, LET'S TURN TO THE CLAIMS HERE AGAIN.

24              15A, HOW DOES 15A COMPARE WITH THIS

25   FIGURE WE'RE LOOKING AT FROM THE TECHNICAL

1    SPECIFICATION?

2    A   15A TALKS ABOUT A FIRST CHANNEL AND A SECOND

3    CHANNEL.  WE CLEARLY SEE A FIRST CHANNEL AND A

4    SECOND CHANNEL IN THIS DIAGRAM.  WE SEE THE

5    E-DPDCH, WHICH IS THE SECOND CHANNEL, AND THE

6    DPDCH, WHICH IS THE FIRST CHANNEL.

7    Q   MR. FISHER, CAN WE SAVE THIS, BECAUSE I WANT

8    TO COME BACK TO IT, BUT LET'S TURN TO PAGE 401 OF

9    THIS SAME EXHIBIT, 636.

10          AND IF WE COULD ZOOM IN ON THE FIGURE,

11    IT'S FIGURE 99.

12          DO YOU SEE THAT, SIR?

13    A   YES.

14    Q   DID YOU REVIEW FIGURE 99 IN FORMING YOUR

15    OPINION?

16    A   YES.  THIS IS ANOTHER FIGURE FROM THE INTEL

17    INTERNAL INFORMATION, AND THIS SHOWS THE BLOCK

18    DIAGRAM OF HOW THE TRANSMIT CHANNELS ARE FORMED AND

19    FLOW OF INFORMATION INTO THE TRANSMITTER.

20          AND IF WE LOOK AT THE LOWER LEFT-HAND

21    SIDE OF THIS DIAGRAM, WE SEE SOMETHING LABELED

22    LC MICRO.  THIS IS THE PROCESSOR THAT'S GOING TO BE

23    EXECUTING THE CODE THAT WE'RE GOING TO LOOK AT IN

24    JUST A MINUTE.

25    Q   SO GOING BACK TO THE BOARD HERE WITH THE CLAIM

```
1    ELEMENTS, HOW DOES ALMOST 15B COMPARE WITH WHAT
2    WE'RE LOOKING AT HERE?
3    A    WE'RE LOOKING AT THE CONTROLLER OF 15B, AND
4    THAT'S THE THING THAT WHEN I RUN THE SOFTWARE IS
5    GOING TO MAKE THIS DETERMINATION AND COMPUTE THESE
6    GAINS TO BE WRITTEN OUT TO THE HARDWARE THAT WE
7    JUST LOOKED AT.
8    Q    NOW, IF YOU LOOK AT ELEMENT 15C, FIRST AND
9    SECOND CHANNEL GENERATORS, DO YOU SEE THAT?
10   A    YES.
11   Q    HOW DOES THAT COMPARE WITH WHAT WE'RE LOOKING
12   AT ON THE SCREEN?
13   A    IF WE LOOK IN THE MIDDLE OF THE DIAGRAM, WE
14   SEE TX BIT PROCESSOR, AND WE SEE TX MOD, THESE ARE
15   TWO BOXES THAT FORM AND PREPARE THE CHANNELS FOR
16   TRANSMISSION ON THE I AND Q CHANNELS THAT WE SEE ON
17   THE RIGHT HERE, AND PREPARE THOSE FOR TRANSMISSION
18   OF THE RF.
19   Q    SO HOW DOES THIS FIGURE COMPARE WITH 15C?
20   A    DIRECTLY THIS IS IMPLEMENTING 15C.
21        MR. VERHOEVEN:  YOUR HONOR, THIS IS THE
22   LAST ONE.  IF I COULD MARK THIS, MR. FISHER, IF YOU
23   CAN SAVE THIS AND I CAN MARK THIS AS SDX 3966.106.
24        (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
25         3966.106 WAS MARKED FOR IDENTIFICATION.)
```

```
 1              THE COURT:  THAT'S FINE.  THAT'S
 2   ADMITTED.
 3              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
 4              3996.106, HAVING BEEN PREVIOUSLY MARKED
 5              FOR IDENTIFICATION, WAS ADMITTED INTO
 6              EVIDENCE.)
 7   BY MR. VERHOEVEN:
 8   Q    NOW, IF WE CAN GO BACK TO THE DEMONSTRATIVE
 9   105, WHICH IS DEMONSTRATIVE DEPICTION OF FIGURE 96,
10   AND LET'S LOOK BACK AT ELEMENT 15D, FIRST AND
11   SECOND CHANNEL GENERATORS FOR GENERATING FIRST AND
12   SECOND DATA FRAMES, ET CETERA.
13              HOW, IF AT ALL, DOES THAT ELEMENT COMPARE
14   WITH WHAT WE'RE LOOKING AT HERE?
15   A    WELL, 15C, WE LOOKED AT THE PROCESS IN THE
16   LAST DIAGRAM --
17   Q    I'M SORRY.  I MISSPOKE.  15 D?
18   A    15C IS ALSO SHOWN IN THE DIAGRAM.  THIS
19   DIAGRAM IS ORGANIZING THE CHANNELS FOR
20   TRANSMISSION.
21              IF WE LOOK AT 15D, THE GAIN SCALING UNIT,
22   THOSE ARE THE RED BOXES THAT WE SEE HERE.  THAT'S
23   THE MUSCLE THAT'S PERFORMING THAT GAIN SCALING
24   AFTER IT'S BEEN DECIDED BY THE MICRO CONTROLLER
25   WHAT IT NEEDS TO DO.
```

1    Q    SO SINCE I KIND OF SCREWED UP WITH MY

2    QUESTION, 15D READS A GAIN SCALING UNIT FOR

3    ADJUSTING THE TRANSMIT POWERS OF FIRST AND SECOND

4    CHANNELS AND IT GOES ON, THAT'S WHAT YOU'RE TALKING

5    ABOUT?

6    A    YES, I AM.

7    Q    AND WHERE IS THAT SHOWN HERE?

8    A    THAT'S SHOWN IN THE RED HIGHLIGHTING.

9    Q    CAN WE TURN TO PAGE 271 OF THE SPECIFICATION,

10   PLEASE.  AND THE TOP PART OF THE PAGE.  BLOW UP THE

11   PARAGRAPH THAT SAYS TO HANDLE THIS REQUIREMENT.

12   THIS ANOTHER PARAGRAPH YOU READ, SIR?

13   A    YES, THIS IS FROM THE INTERNAL ENGINEERING

14   DOCUMENTATION, AND WE SEE THAT IT SAYS IN THE

15   SECOND LINE THAT FIELDS, A REGISTER FIELDS ARE

16   PROGRAMMED AT EVERY DPCCH SLOT BOUNDARY, THAT IS

17   THE SLOT-BY-SLOT CHANGE IN THE GAIN VALUES THAT'S

18   THE SUBJECT OF CLAIM 16.

19   Q    AND CAN YOU ELABORATE HOW CLAIM 16 COMPARES TO

20   THIS PARAGRAPH?

21   A    CLAIM 16 TALKS ABOUT CHANGING THE GAINS ON

22   SLOT-BY-SLOT BASIS.  THIS PARAGRAPH TELLS THE

23   ENGINEERS THAT THEY'VE IMPLEMENTED A SYSTEM THAT

24   CHANGES THE GAINS ON A SLOT-BY-SLOT BASIS.

25   Q    BASED ON YOUR REVIEW -- WITHDRAWN.

```
1              DOES YOUR REVIEW OF THIS INTEL PRODUCT

2    SPECIFICATION, EXHIBIT 636, AFFECT YOUR OPINION,

3    SIR, ON WHETHER OR NOT CLAIMS 15 AND 16 ARE

4    INFRINGED BY THE ACCUSED PRODUCTS?

5    A    YES.  IT'S FURTHER EVIDENCE THAT THERE IS

6    INFRINGEMENT BY APPLE OF THESE TWO CLAIMS.

7    Q    NOW, LET'S GO TO YOUR LAST CATEGORY, WHICH WAS

8    THE INTEL SOURCE CODE.

9              WE HAVE IN, I THINK, A SEPARATE CLIP THE

10   RELEVANT INTEL SOURCE CODE HERE?

11   A    YES.

12   Q    THIS IS ALSO CONFIDENTIAL, SO IT WON'T BE ON

13   THE BIG SCREEN.

14             CAN YOU REVIEW -- DID YOU REVIEW THAT

15   SOURCE CODE, SIR?

16   A    YES.

17   Q    AND HAVE YOU PREPARED A DEMONSTRATIVE THAT

18   SUMMARIZES THIS CODE THAT YOU REVIEWED?

19   A    YES, I HAVE.

20   Q    IF WE PUT THAT UP, SLIDE 19, ONLY ON THE SMALL

21   SCREENS.

22             MR. LEE:  YOUR HONOR, THIS IS NOT IN THE

23   NOTEBOOKS THAT WE'VE BEEN GIVEN, AND I THINK YOUR

24   HONOR'S NOTEBOOK HAS TWO EXHIBITS 635.  THIS WAS MY

25   CONFUSION WHEN WE WERE GIVEN -- WHEN THINGS WERE
```

1    BEING OFFERED, BECAUSE YOU HAVE 635 AND ANOTHER 635

2    AND THEN 636.

3              THE COURT:  YES.

4              MR. VERHOEVEN:  YOUR HONOR, IN THE

5    INTEREST OF TIME, CAN WE CONFER OVER THE BREAK AND

6    CLEAR UP ANY CONFUSION ON THE EXHIBITS.

7              MR. LEE:  IF SOMETHING IS GOING TO GO

8    INTO EVIDENCE --

9              MR. VERHOEVEN:  IT'S ALREADY IN EVIDENCE.

10             THE COURT:  WELL, THERE IS AN INTEL

11   DESIGN DESCRIPTION THAT WAS PART OF, I THINK,

12   MR. ZORN'S DEPO EXCERPT THAT'S LABELED 635.  DX

13   635.  YOU WANT TO JUST CALL THE SOURCE CODE 635-A?

14             MR. VERHOEVEN:  SURE.

15             THE COURT:  ALL RIGHT.  LET'S DO THAT.

16   Q    SO DID YOU REVIEW THE SOURCE CODE 635-A?

17   A    YES, YES, I DID.

18   Q    OKAY.  DID YOU PREPARE A DEMONSTRATIVE TO HELP

19   SUMMARIZE WHERE YOU FOUND THE RELEVANT PORTIONS OF

20   THAT SOURCE CODE?

21   A    YES, I DID.

22   Q    IS THAT WHAT WE'RE LOOKING AT ON SLIDE 19,

23   SIR?

24   A    YES, IT IS.  THESE ARE SOME OF THE ROUTINES

25   FROM INTEL'S SOURCE CODE.  AND THE RFA SUBROUTINE

1     IS THE ORGANIZING SUBROUTINE.  IT ORGANIZES THE

2     SUBROUTINES THAT FOLLOW IN PERFORMING THIS

3     OPERATION.

4              THE ADDITIONAL GAIN SCALING CODE IS THE

5     CODE THAT MAKES THE DETERMINATION OF WHETHER THE

6     POWER IS LARGER THAN THE BUDGETED POWER AND MAKES

7     THE DECISION TO SCALE THE REST OF THE CHANNELS.

8              THE GREEN BOX, THE REDUCE E-DPDCH GAINS

9     CODE IS THAT CODE THAT ACTUALLY CALCULATES HOW MUCH

10    THE GAIN NEEDS TO BE ON THE ENHANCED DATA CHANNEL.

11             AND THE APPLY HARDWARE GAINS IS THAT

12    PIECE OF CODE THAT WRITES OUT TO THE HARDWARE WE

13    JUST LOOKED AT, WRITES OUT THE FINAL ANSWER SO THAT

14    THE HARDWARE CAN IMPLEMENT THOSE GAIN SCALES.

15    Q    AND HOW DID YOUR REVIEW OF THE SOURCE CODE

16    AFFECT YOUR OPINION OF THE CLAIMS 15 AND 16 IF AT

17    ALL?

18    A    IT FURTHER SUPPORTED MY OPINION OF

19    INFRINGEMENT BY APPLE'S PRODUCTS.

20    Q    DR. WILLIAMS, CAN YOU SUMMARIZE YOUR OPINIONS,

21    IN SUMMARY, WITH RESPECT TO WHETHER THE APPLE

22    ACCUSED PRODUCTS INFRINGE CLAIMS 15 AND 16 OF THE

23    '516 PATENT?

24    A    YES, IT'S MY OPINION THAT APPLE'S IPHONE 4 AND

25    IPAD 2 INFRINGE CLAIMS 15 AND 16 OF THE '516 PATENT

```
 1    BECAUSE OF THE EVIDENCE THAT I'VE JUST PRESENTED,

 2    THE COMPLIANCE WITH THE STANDARD, THE TESTIMONY OF

 3    INTEL SOFTWARE ENGINEER, INTEL'S ENGINEERING

 4    DOCUMENTATION AND REVIEW OF INTEL'S SOURCE CODE.

 5    Q    OKAY.  LET'S GO TO THE SECOND OF THE HIGH

 6    SPEED DATA PATENTS THAT SAMSUNG HAS ASSERTED, THE

 7    '941 PATENT.  I'LL DIRECT YOUR ATTENTION TO EXHIBIT

 8    1070 IN YOUR BINDER.  CAN YOU IDENTIFY THAT

 9    DOCUMENT?

10    A    YES.  THIS IS U.S. PATENT NUMBER 7,675,941.

11          MR. VERHOEVEN:  YOUR HONOR, WE MOVE

12    EXHIBIT 1070 INTO EVIDENCE.

13          THE COURT:  NO OBJECTION, RIGHT, MR. LEE?

14          MR. LEE:  NO OBJECTION, YOUR HONOR.

15          THE COURT:  IT'S ADMITTED.

16          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17           1070, HAVING BEEN PREVIOUSLY MARKED FOR

18           IDENTIFICATION, WAS ADMITTED INTO

19           EVIDENCE.)

20          MR. VERHOEVEN:  AND CAN WE PUT UP THE

21    SLIDE YOU'VE GOT TO ILLUSTRATE THIS.

22    Q    THIS IS SLIDE 20?

23    A    YES.

24    Q    AND PLEASE TELL THE JURY GENERALLY, WHAT DOES

25    THE '941 PATENT CONCERN?
```

1   A    THIS PATENT IS DEALING WITH THE EFFICIENT

2   TRANSMISSION OF INFORMATION FROM THE MOBILE TO THE

3   INFRASTRUCTURE.  SO IT'S TRYING TO CUT DOWN ON THE

4   AMOUNT OF PACKETS THAT ARE TRANSMITTED FROM THE

5   MOBILE STATION TO THE INFRASTRUCTURE.

6   Q    AND CAN YOU EXPLAIN TO THE JURY, WHAT IS A

7   PACKET?

8   A    A PACKET IS A CONTAINER FOR INFORMATION.  SO I

9   ALWAYS THINK OF A PACKET AS LIKE A FEDEX BOX.  A

10  FEDEX BOX HAS AN AREA INSIDE THAT YOU CAN PUT STUFF

11  INTO, AND THEN ON THE TOP OF THE BOX, THERE'S AN

12  ADDRESS AND MAYBE PACKING INSTRUCTIONS OR UNPACKING

13  INSTRUCTIONS FOR HOW TO UNPACK WHAT'S IN THE BOX.

14          SO THE HEADER IN THE PACKET IS THE

15  INSTRUCTIONS FOR HOW TO UNPACK THE PACKET.

16          AND THAT'S EQUIVALENT TO THE ADDRESS ON

17  THE FEDEX BOX.

18          AND THEN THE PAYLOAD IS -- IN A PACKET IS

19  WHERE THE INFORMATION GOES, THE USER'S INFORMATION

20  OR THE CONTENTS OF THE FEDEX BOX IS THE THING

21  YOU'RE TRYING TO SHIP.

22  Q    AND YOU PREPARED A DEMONSTRATIVE TO HELP SHOW

23  HOW DATA IS SENT WITH THESE PACKETS, RIGHT?

24  A    I DID.

25  Q    JUST TELL ME WHEN TO CLICK AND WALK THE JURY

1    THROUGH THESE DEMONSTRATIVES.

2    A    OKAY.  WHAT I HAVE, IF YOU LOOK ON THE LARGE

3    SCREEN HERE, WHAT I HAVE IS A BASE STATION ON THE

4    RIGHT-HAND SIDE, I HAVE A MOBILE DEVICE ON THE

5    RIGHT-HAND SIDE -- ON THE LEFT-HAND SIDE, AND THE

6    MOBILE DEVICE IS TAKING A VIDEO AND IT WANTS TO

7    SEND THAT VIDEO UP TO GRANDMA, AND SO THE FIRST

8    FRAME OF THAT VIDEO GETS PACKED INTO A CONTAINER,

9    INTO A PACKET, WHICH IS SHOWN HERE, AND ON THE TOP

10   OF THAT PACKET IS A HEADER, OR ADDRESSING

11   INFORMATION, THAT DETERMINES WHAT'S IN THE PACKET,

12   TELLS THE RECEIVER WHAT'S IN THE PACKET.

13           AND SO THAT THE GREEN PORTION IS THE

14   HEADER, AND THE HEADER HERE INDICATES THAT THIS IS

15   THE FIRST PACKET IN A SEQUENCE, AND INCLUDES THIS

16   E-BIT, WHICH WE'LL TALK ABOUT IN A MINUTE.

17   Q    CLICK?

18   A    AND THEN CLICK AGAIN.  NOW, THE NEXT THING

19   THAT HAPPENS IS THE SECOND PACKET IS SENT, THIS IS

20   THE SECOND FRAME ON THE VIDEO, AND WE SEE ON THE

21   HEADER THAT THIS IS NUMBERED 2 IN BINARY, AND WE

22   SEE THAT E IS ALSO ALLOWED IN THAT HEADER.

23           AND THEN CLICK AGAIN.

24           THE THIRD THING THAT HAPPENS IS THE THIRD

25   PACKET IS SENT, AND THIS IS INDICATED IN THE HEADER

1    BY THE NUMBER 3.  AND THEN THE E-BIT IS ALSO

2    INCLUDED.

3              SO WE'VE GOT THREE DIFFERENT FRAMES OF

4    INFORMATION THAT HAVE BEEN SENT FROM THE MOBILE

5    STATION TO THE INFRASTRUCTURE.

6    Q    LET'S TURN TO THE '941 FIGURES, THE NEXT

7    SLIDE.

8              IT LOOKS LIKE IT'S A -- YOU'VE TAKEN A

9    PICTURE OF FIGURE 3 THAT DEPICTS THE CONVENTIONAL

10   OR PRIOR ART AND FIGURE 5A AND 5B FROM THE PATENT

11   THAT DEPICTS THE SOLUTION; IS THAT RIGHT?

12   A    YES.

13   Q    AND DID YOU -- HAVE YOU PREPARED A

14   DEMONSTRATIVE TO HELP UNDERSTAND THE PROBLEM AND

15   SOLUTIONS DISCLOSED IN THE PATENT?

16   A    YES, I HAVE.

17   Q    GO AHEAD AND WALK THE JURY THROUGH IT.

18   A    WHAT I HAVE PREPARED IS A PICTURE AND WE NEED

19   TO PACK THAT PICTURE INTO A CONTAINER, A PACKET.

20             AND IN THIS CASE, THIS IS SHOWING THE

21   PRIOR ART PROBLEM OF HAVING A 8 BITE HEADER, SO

22   EACH BYTE IS 8 BITS, SO THAT'S 24 BITS OF

23   INFORMATION, JUST TO DESCRIBE WHAT'S IN THE PACKET.

24             AND SO WE'RE GOING TO PLACE THIS PIECE OF

25   INFORMATION INTO THE PACKET, AND WE CAN GO AHEAD

```
 1    AND CLICK.
 2              HOWEVER, IN THIS CASE, THE PACKET, OR THE
 3    BOX ISN'T BIG ENOUGH TO CONTAIN ALL THE INFORMATION
 4    THAT WE REALLY WANT TO SEND.
 5              SO WHAT WE NEED IS -- CLICK -- WE NEED A
 6    SECOND BOX.
 7              SO WE'RE GOING TO PLACE THE REST OF THAT
 8    INFORMATION IN THE SECOND BOX.
 9              SO NOTICE NOW WE'VE USED SIX BITES OF
10    HEADER INFORMATION AND WE'VE GENERATED WASTED SPACE
11    JUST TO SEND A SINGLE PICTURE.
12              SO IF YOU CLICK AGAIN.
13              SO THE INVENTORS INVENTED A PROCESS TO
14    ELIMINATE THIS THREE BITE HEADER AND REPLACE IT
15    WITH A SINGLE BITE HEADER BY USE OF THE ALTERNATIVE
16    E-BIT, WHICH IS SHOWN -- CAN YOU CLICK -- ONLY A
17    SINGLE BITE HEADER CAN BE USED TO REPLACE THESE,
18    AND NOW IF YOU CLICK AGAIN, WE CAN PLACE THE USER
19    INFORMATION INTO ITS OWN CONTAINER.
20              NOW, IF YOU LOOK, WE'VE SENT TWO PACKETS
21    ON THE LEFT AND ONE PACKET ON THE RIGHT, AND YOU
22    AND I PAY FOR PACKETS TO BE TRANSPORTED BY OUR
23    CELLULAR OPERATORS, SO THE CHECK WE WRITE TO THE
24    CELLULAR OPERATORS DEPENDS ON HOW MANY PACKETS WE
25    USE IN EACH MONTH.  SO IN THIS CASE WE'VE REDUCED
```

1    THE NUMBER OF PACKETS IN HALF.

2    Q    IS THE INVENTION AND THE PROBLEM SOLVED HERE

3    IN THE '941 PATENT, DOES IT HAVE A NAME?

4    A    YES.  IT'S CALLED THE ALTERNATIVE E-BIT

5    INTERPRETATION.

6    Q    ALL RIGHT.  NOW, LET'S GO TO SLIDE 32, PLEASE,

7    MR. FISHER.

8         ARE THESE THE TWO CLAIMS THAT SAMSUNG HAS

9    ASSERTED IN THIS CASE AGAINST APPLE IN THE '941

10   PATENT?

11   A    YES, THEY ARE.  CLAIM 10 TALKS ABOUT THE

12   TRANSMITTER AND APPARATUS FOR TRANSMITTING DATA,

13   AND CLAIM 15 TALKS ABOUT AN APPARATUS FOR RECEIVING

14   DATA.

15        SO CLAIM 10 IS HOW DO YOU PACK THE

16   INFORMATION INTO THE PACKET, AND CLAIM 15 IS HOW DO

17   YOU TAKE THE INFORMATION OUT OF THE PACKET.

18   Q    OKAY.  AND CAN WE GO TO SLIDE 16 AGAIN.

19        LET'S TURN TO THE ACCUSED APPLE PRODUCTS.

20   WHAT IS YOUR UNDERSTANDING OF THE ACCUSED APPLE

21   PRODUCTS HERE?

22   A    SO I LOOKED AT THE IPHONE 4 AND THE IPAD 2 AND

23   EACH OF THOSE PRODUCTS AGAIN HAS AN INTEL BASEBAND

24   PROCESSOR WITHIN THOSE PRODUCTS, AND IT'S THIS

25   BASEBAND PROCESSOR THAT IS PERFORMING THE

1    OPERATIONS OF -- THAT WE JUST LOOKED AT FOR, FOR

2    THIS BYTE MANIPULATION.

3    Q    AND HAVE YOU FORMED AN OPINION AS TO WHETHER

4    OR NOT THESE ACCUSED PRODUCTS INFRINGE CLAIMS 15 --

5    EXCUSE ME -- INFRINGE CLAIMS 10 AND 15 OF THE '941

6    PATENT?

7    A    YES, I'VE FORMED AN OPINION AND IT'S MY

8    OPINION THAT APPLES PRODUCTS DO INFRINGE THESE TWO

9    CLAIMS.

10   Q    AND WHAT DID YOU LOOK AT, WHAT EVIDENCE DID

11   YOU LOOK AT IN ANALYZING THE INFRINGEMENT ISSUE?

12   A    I LOOKED AT A LOT OF EVIDENCE IN THIS CASE

13   ABOUT THIS, BUT I'M GOING TO TALK ABOUT FOUR PIECES

14   OF EVIDENCE.

15            THE FIRST IS THE 3GPP STANDARD; THE

16   SECOND IS THE TESTIMONY OF INTEL SOFTWARE ENGINEER

17   WHO PROGRAMMED THESE FUNCTIONS INTO THEIR CHIP; THE

18   THIRD IS INTEL'S INTERNAL ENGINEERING

19   DOCUMENTATION; AND THE FOURTH IS THE SOFTWARE

20   ITSELF THAT'S PERFORMING THESE OPERATIONS.

21   Q    I'M GOING TO PUT ANOTHER BOARD UP.

22            THE COURT:  LET'S MARK THE BOARDS.

23            MR. VERHOEVEN:  YES, YOUR HONOR.  THE

24   FIRST BOARD WE USED -- I APOLOGIZE FOR NOT

25   MENTIONING IT.  THE FIRST BOARD WE USED WAS SDX

1    3966.101, AND THIS BOARD WE HAVE UP NOW, YOUR

2    HONOR, IS SDX 3966.102.

3              THE COURT:  OKAY.  THANK YOU.

4              MR. VERHOEVEN:  AND FOR THE RECORD, THERE

5    ARE -- THEY'RE SIMPLY A COPY OF THE CLAIM LANGUAGE.

6              THE COURT:  OKAY.  GO AHEAD, PLEASE.

7              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

8    Q   SO LET'S START WITH THE STANDARDS THAT YOU

9    REVIEWED.  EXHIBIT 557 IN EVIDENCE, IF YOU CAN TURN

10   TO THAT IN YOUR BINDER, AND WE HAVE IT ON THE

11   SCREEN HERE.

12             WHAT IS THIS THAT WE'RE LOOKING AT, SIR?

13   A    THIS IS THE 3GPP TECHNICAL STANDARD 25.322,

14   THIS IS VERSION 6 OF THAT STANDARD.  AND THIS IS

15   THE STANDARD THAT DEALS WITH THE RADIO LINK CONTROL

16   PROTOCOL, AND YOU HEARD MR. ZORN TALK ABOUT THAT IN

17   HIS VIDEO.

18             THIS IS RLC RELEASE 6.

19   Q   NOW, GO TO PAGE 13 OF THIS DOCUMENT,

20   MR. FISHER, AND BLOW UP THE ILLUSTRATION UNDER

21   4.2 -- OR 40 -- NO.  BLOW UP FIGURE 4.3.  WHAT ARE

22   WE LOOKING AT HERE, SIR?

23   A   SO WITHIN THE SPECIFICATION, THERE'S A BLOCK

24   DIAGRAM OF HOW THIS PROCESS NEEDS TO OCCUR, AND THE

25   BLOCK DIAGRAM SHOWS THE PROCESS OF CREATING A

1    PACKET ON THE LEFT-HAND SIDE AND THEN THE

2    TRANSMISSION AFTER THAT PACKET TO THE RECEIVER, AND

3    THEN THE PROCESS OF RECEIVING THE PACKET ON THE

4    RIGHT-HAND SIDE.

5              SO THIS IS THE WHOLE PROCESS OF

6    TRANSMITTING INFORMATION FROM THE MOBILE STATION TO

7    THE USER -- OR TO THE BASE STATION.

8    Q    NOW, CLAIM 10, I BELIEVE YOU SAID, IS THE

9    CLAIM THAT CONCERNS THE TRANSMITTING SITE; IS THAT

10   RIGHT?

11   A    YES, CLAIM 10 IS THE APPARATUS FOR

12   TRANSMITTING.

13   Q    LET'S BLOW UP THE LEFT-HAND SIDE, MR. FISHER.

14             NOW, WE HAVE THE BOARD UP HERE AGAIN, AND

15   LET'S GO THROUGH THE ELEMENTS.

16             ELEMENT 10A, HOW DOES THAT COMPARE WITH

17   WHAT WE'RE LOOKING AT ON THE SCREEN?

18   A    WE'RE LOOKING AT AN APPARATUS FOR TRANSMITTING

19   DATA IN A MOBILE COMMUNICATION SYSTEM, SO IT

20   COMPARES DIRECTLY.

21   Q    OKAY.  WHAT ABOUT 10(B), A TRANSMISSION

22   BUFFER, AND IT GOES ON.  CAN YOU EXPLAIN TO THE

23   JURY HOW, IF AT ALL, THAT COMPARES WITH WHAT WE'RE

24   LOOKING AT ON THE SCREEN?

25   A    10(B) HAS TWO PORTIONS OF THIS BLOCK DIAGRAM.

```
 1    THE FIRST IS THE TRANSMISSION BUFFER, WHICH IS

 2    SHOWN RIGHT HERE ON THE BLOCK DIAGRAM, AND

 3    DESCRIBED IN FURTHER DETAIL IN THE STANDARD.

 4    Q    AND THE SECOND?

 5    A    AND THE SECOND IS THE SEGMENTATION OF THE SDU,

 6    THIS IS SEGMENTING OR DIVIDING UP THE USER

 7    INFORMATION INTO PORTIONS THAT CAN BE PACKED INTO

 8    PACKETS, AND THAT SEGMENTATION PROCESS IS SHOWN

 9    RIGHT HERE.

10    Q    IF WE LOOK AT 10C, A HEADER INSERTER, HOW DOES

11    THAT COMPARE WITH WHAT WE'RE LOOKING AT HERE?

12    A    THE HEADER INSERTER IS SHOWN IN THE BLOCK

13    DIAGRAM HERE AND DESCRIBED IN GREATER DETAIL

14    THROUGHOUT THE STANDARD.

15    Q    NOW, IF WE SKIP DOWN TO 10F, A TRANSMITTER FOR

16    SENDING THE PDU'S TO A RECEIVER, DO YOU SEE THAT?

17    A    YES.

18    Q    HOW DOES THAT COMPARE WITH WHAT WE'RE LOOKING

19    AT IN THIS FIGURE?

20    A    WELL, THIS BLOCK DIAGRAM INVOLVES CREATING A

21    PACKET FOR TRANSMISSION, SO THAT WOULD BE THAT

22    CIRCLE THERE, AND THIS IS THE RADIO INTERFACE, SO

23    THIS IS THE TRANSMISSION AREA HERE.

24         MR. VERHOEVEN:  YOUR HONOR, I KNOW I SAID

25    I WOULD ONLY HAVE THREE THINGS TO SAVE, BUT I WOULD
```

```
1    REQUEST TO SAVE TWO, JUST TWO FOR THIS PATENT.

2              THE COURT:  THAT'S FINE.  THIS IS ONE OF

3    THEM.

4              MR. VERHOEVEN:  YES, YOUR HONOR.

5              THE COURT:  WHAT'S THE NUMBER, PLEASE?

6              MR. VERHOEVEN:  107.

7              THE COURT:  OKAY.

8              MR. VERHOEVEN:  AND MR. FISHER, COULD YOU

9    SAFE THIS IMAGE?

10             THE COURT:  I ASSUME SAME OBJECTION,

11   MR. LEE.

12             MR. LEE:  I JUST -- IF THAT'S THE RULE,

13   THEN WE'LL DO THE SAME.

14             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

15             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

16             107, HAVING BEEN PREVIOUSLY MARKED FOR

17             IDENTIFICATION, WAS ADMITTED INTO

18             EVIDENCE.)

19   BY MR. VERHOEVEN:

20   Q   LET'S GO TO ANOTHER PART OF THE STANDARD, PAGE

21   29, PLEASE, MR. FISHER.

22             AND IF WE CAN ZOOM IN ON SECTION 9.2.2.5.

23             WHAT ARE WE LOOKING AT HERE?

24   A   WE'RE LOOKING AT THE SECTION THAT DESCRIBES

25   THE ALTERNATIVE E-BIT INTERPRETATION, SO WE CAN SEE
```

```
 1    THAT ON THE LOWER PORTION OF THE SCREEN HERE.  THIS
 2    IS A SECTION ABOUT THE EXTENSION BIT, AND YOU SEE
 3    THAT ON THE SECTION NAME.
 4              AND SO THIS SECTION OF THE STANDARD
 5    DISCUSSES HOW THAT E-BIT THAT I SHOWED IN MY
 6    EXAMPLE IS SET IN ORDER TO, TO TELL THE RECEIVER
 7    WHAT'S IN THAT PACKET.
 8    Q    OKAY.  NOW, IF YOU WERE TO LOOK AT -- WE
 9    SKIPPED OVER 10D AND E WHEN WE WERE LOOKING AT
10    OTHER PAGE?
11    A    YES.
12    Q    LET'S LOOK AT 10D, A ONE-BIT FIELD SETTER FOR
13    SETTING THE ONE-BIT FIELD.  HOW DOES THAT COMPARE
14    WITH WHAT WE'RE LOOKING AT IN SECTION 9.2.2.5 ON
15    THE SCREEN?
16    A    THAT TALKS ABOUT SETTING THE ONE-BIT FIELD
17    SETTER FOR SETTING THE ONE-BIT FIELD.  THIS TABLE
18    IS THE FIELD IN THE INTERPRETATION.  SO THE
19    STANDARD DESCRIBES EXACTLY HOW TO SET THAT, THAT
20    BIT.
21    Q    AND IF WE CAN GO TO THE NEXT PAGE, PAGE 30,
22    AND LOOK AT SECTION 9.2.2.8.  WHAT IS THIS SECTION?
23    A    THIS SECTION SHOWS THE LENGTH INDICATOR FIELD,
24    WHICH IS THE LI FIELD.  AND THIS SHOWS THAT THE
25    LENGTH INDICATOR INSERTER, SHOWN RIGHT HERE IN 10E,
```

1    IS PRESENT IN THE STANDARD AND DESCRIBES -- IF WE

2    LOOK A FEW PAGES LATER, WE'LL SEE EXACTLY HOW

3    THAT'S SAID.

4    Q    SO THIS IS THE BEGINNING OF A SECTION THAT'S

5    SEVERAL PAGES?

6    A    YES.

7    Q    IF WE CAN GO TO PAGE 32, A FEW PAGES LATER.

8    AND ZOOM IN ON WHERE IT SAYS IN THE CASE WHERE THE

9    ALTERNATIVE E-BIT INTERPRETATION IS CONFIGURED?

10   A    YES.  HERE WE SEE THE VALUES THAT ARE PLACED

11   IN THE LENGTH INDICATOR FIELD TO INDICATE THE

12   LENGTH AND ESSENTIAL CONDITION FOR THE PACKETS WHEN

13   THE PACKETS ARE NEITHER THE FIRST PACKET NOR THE

14   LAST PACKET OF A SEQUENCE.

15   Q    NOW, IF WE LOOK AT THE ELEMENT 10E, THE ONE WE

16   HAVEN'T LOOKED AT YET, IT SAYS AN LI INSERTER, WHAT

17   IS LI?

18   A    THIS IS THE LENGTH INDICATOR INSERTER.

19   Q    AND WHAT ARE WE LOOKING AT HERE?

20   A    WE'RE LOOKING AT THE LENGTH INDICATOR

21   INSERTER.

22   Q    OKAY.  AND HOW DOES WHAT WE'RE LOOKING AT ON

23   THE SCREEN FROM THE SPECIFICATION COMPARE WITH

24   ELEMENT 10E?

25   A    IT COMPARES DIRECTLY.  IT DESCRIBES WHAT NEEDS

```
 1    TO HAPPEN IN ELEMENT 10E.

 2    Q    OKAY.  SO IN SUMMARY, WHAT -- WHAT DOES YOUR

 3    REVIEW OF THE SPECIFICATION TELL YOU ABOUT WHETHER

 4    APPLE INFRINGES THE ELEMENTS OF CLAIM 10?

 5    A    IT TELLS ME THAT APPLE'S PRODUCTS, BECAUSE

 6    THEY STATE THAT THEY'RE 3GPP RELEASE 6 COMPLIANT,

 7    IMPLEMENT EACH AND EVERY ELEMENT OF CLAIM 10.

 8              MR. VERHOEVEN:  YOUR HONOR, I'M GOING TO

 9    GO TO ANOTHER BOARD.

10              THE COURT:  ALL RIGHT.  AND THEN WE

11    SHOULD PROBABLY TAKE OUR BREAK SOON.  YOU CAN GO A

12    LITTLE BIT LONGER, BUT -- MAYBE ABOUT FIVE MINUTES.

13              MR. VERHOEVEN:  YEAH, LET ME.

14              THE COURT:  WHAT WOULD YOU PREFER?

15              MR. VERHOEVEN:  MAYBE WE SHOULD TAKE THE

16    BREAK, AND I CAN SHORTEN UP THE REST OF MY

17    EXAMINATION.

18              THE COURT:  ALL RIGHT.  IN CASE I WASN'T

19    CLEAR, THE DEMONSTRATIVES THAT HAVE BEEN ADMITTED

20    IN DR. WILLIAMS' SYSTEM ARE SDX 3966.104, 105, 106,

21    AND 107.

22              IT'S NOW 10:30.  WE ARE GOING TO TAKE OUR

23    MORNING BREAK FOR 15 MINUTES.  AGAIN, PLEASE KEEP

24    AN OPEN MIND.  DON'T DISCUSS THE CASE WITH ANYONE

25    AND PLEASE DON'T RESEARCH OR READ ABOUT THE CASE.
```

2725

```
 1                  SO THANK YOU.  YOU CAN LEAVE YOUR BOOKS
 2        ON YOUR CHAIR.
 3                  OKAY.  THANK YOU.
 4                  (WHEREUPON, THE FOLLOWING PROCEEDINGS
 5        WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 6                  THE COURT:  ALL RIGHT.  THE RECORD SHOULD
 7        REFLECT THE JUROR VERSUS LEFT THE COURTROOM.
 8                  PLEASE TAKE A SEAT.  AND YOU CAN STEP
 9        DOWN, DR. WILLIAMS.
10                  I JUST WANTED TO GIVE YOU JUST A BRIEF
11        INSIGHT INTO WHY I'M LETTING SOME DEMONSTRATIVES
12        IN.  BECAUSE THE VOLUME OF INFORMATION IS SO HIGH
13        AND BECAUSE SOME OF THESE DOCUMENTS ARE QUITE
14        DENSE, I WILL LET SOME DEMONSTRATIVES IN,
15        ESPECIALLY WHEN IT'S SORT OF ONE OF -- THAT 1006
16        SORT OF SUMMARY OF MULTIPLE DEVICES OR WHAT NOT.
17        BUT I DON'T WANT THIS TO GET OUT OF HAND.  IT IS
18        DEFINITELY EXCEEDING MY EXHIBIT LIMITES, BUT I
19        THINK WHERE IT MIGHT BE LEVEL TO THE JURY WHEN
20        THEY'RE DELIBERATING IS FINE.
21                  MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
22                  MR. LEE:  YOUR HONOR, I ASSUME
23        DEMONSTRATIVES ARE NOT SUBSTANTIVE EVIDENCE.
24        THEY'RE COMING IN ONLY TO THE EXTENT THAT THEY
25        ILLUSTRATE TESTIMONY, AND IT WILL BE THEIR
```

```
 1    RECOLLECTION OF THE WITNESS'S TESTIMONY, THEN THE

 2    DEMONSTRATIVES --

 3              THE COURT:  THAT'S FINE.  I MEAN, I WILL

 4    SAY, APPLE IS THE ONE THAT STARTED GETTING

 5    DEMONSTRATIVES IN.  BOTH -- MS. KREVANS STARTED THE

 6    TREND AND THEN MR. JACOBS, IN HIS DIRECT OF THESE

 7    EXHIBITS, MOVED IN A TON OF DEMONSTRATIVES.  OKAY?

 8              SO, I MEAN, LET'S BE TRUE TO HISTORY

 9    HERE.  THIS IS THE TREND THAT APPLE STARTED.  OKAY?

10              SO, SURE, IF YOU WANT TO INCLUDE THAT

11    INSTRUCTION, BY ALL MEANS, DO IT.  AND I HOPE WE

12    CAN GET SOME STIPULATION AS TO WHAT THE EXACT

13    LANGUAGE SHOULD BE.  BUT I'M OKAY WITH THAT.

14              MR. VERHOEVEN:  WE'LL WORK IT OUT, YOUR

15    HONOR.

16              THE COURT:  ALL RIGHT.  THEN THE OTHER

17    THING, AND THIS IS NOT A BIG POINT, BUT WHEN THE

18    JURY IS DELIBERATING, I'D LIKE TO ACTUALLY MOVE

19    THEM TO MY JURY ROOM WHICH IS MUCH, MUCH -- THIS IS

20    A TINY ROOM IN HERE WITH A HUGE TABLE.  I THINK THE

21    SPCA WILL COME AFTER US IF PEOPLE ARE LOCKED IN

22    THERE FOR DAYS ON END.

23              SO MY JURY ROOM IS MUCH, MUCH LARGER AND

24    IT'LL BE MORE COMFORTABLE.  SO IF THERE'S NO

25    OBJECTION, WHEN THEY START DELIBERATING, WE'LL BE
```

```
1    ON THE FOURTH FLOOR BECAUSE I HAVE NO CHAMBERS HERE

2    AND STAFF HERE AND IT'LL BE EASIER.

3              NOW, IF THERE ARE ANY NOTES OR ANY READ

4    BACK, WE'LL DO IT IN OPEN COURT AND WE'LL DO IT UP

5    HERE SO THAT EVERYONE CAN PARTICIPATE.

6              I ASSUME NO ONE HAS ANY OBJECTION TO

7    THAT, RIGHT?

8              MR. VERHOEVEN:  NO, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL

10   TAKE OUR BREAK NOW.

11             (WHEREUPON, A RECESS WAS TAKEN.)

12             THE COURT:  WHEN CAN YOU DO THE JOINT

13   JURY INSTRUCTION ON DEMONSTRATIVES?  CAN YOU FILE

14   THAT ON THURSDAY?

15             MR. VERHOEVEN:  SURE.

16             THE COURT:  IS THAT ALL RIGHT?  I'LL PUT

17   IT IN MY MISCELLANEOUS ORDER FOR TONIGHT.

18             (WHEREUPON, THE FOLLOWING PROCEEDINGS

19   WERE HELD IN THE PRESENCE OF THE JURY:)

20             THE COURT:  ALL RIGHT.  WELCOME BACK.

21   IT'S 10:51.  PLEASE GO AHEAD.

22             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

23   Q    DR. WILLIAMS, WHILE WE TOOK OUR BREAK, I PUT

24   UP ANOTHER BOARD.  THIS IS CLAIM 15 OF THE '941

25   PATENT.  AND FOR THE RECORD, THIS IS SDX 3966.103.
```

```
 1              NOW, MR. FISHER, IF WE CAN GO BACK TO
 2    EXHIBIT 577 ADMITTED INTO EVIDENCE, BACK TO PAGE
 3    13, AND TO FIGURE 3.3, WHICH WE WERE LOOKING AT
 4    BEFORE.
 5              NOW, DR. WILLIAMS, WE JUST WENT THROUGH
 6    THE TRANSMIT SIDE; RIGHT?
 7    A    YES, THE LEFT-HAND SIDE.
 8    Q    AND SO NOW LET'S GO THROUGH CLAIM 15 TALKS
 9    ABOUT RECEIVING SIDE; IS THAT RIGHT?
10    A    YES.
11    Q    AND IS THERE A RECEIVING SIDE ON THE
12    ILLUSTRATION OR ON THE FIGURE WE'RE LOOKING AT FROM
13    EXHIBIT 557?
14    A    YES, IT'S ON THE RIGHT-HAND SIDE.
15    Q    OKAY.  WE'VE BLOWN THAT UP.
16              NOW, LET'S WALK THROUGH CLAIM 15.  HOW
17    DOES CLAIM A COMPARE WITH WHAT WE'RE LOOKING AT ON
18    THE SCREEN?
19    A    WHAT WE'RE LOOKING AT ON THE SCREEN, WHICH IS
20    PART OF THE 3GPP TECHNICAL STANDARD, IS DESCRIBING
21    AN APPARATUS FOR RECEIVING DATA IN A MOBILE
22    COMMUNICATION SYSTEM.  SO IT COMPARES.
23    Q    AND THEN ELEMENT 15B, A RECEPTION BUFFER, DO
24    YOU SEE THAT?
25    A    YES.
```

```
 1     Q    HOW DOES THAT COMPARE WITH WHAT WE'RE LOOKING
 2     AT ON THE SCREEN?
 3     A    IF WE LOOK AT THE STANDARD, WE SEE RIGHT HERE
 4     THE RECEPTION BUFFER IS CALLED OUT IN THE STANDARD.
 5     Q    OKAY.  AND IF WE GO TO 15C, A REASSEMBLY
 6     CONTROLLER, AND IT GOES ON.  HOW DOES THAT ELEMENT
 7     COMPARE WITH WHAT WE'RE LOOKING AT?
 8     A    THE REASSEMBLY CONTROLLER IS THE GAINS FOR HOW
 9     THE PACKETS WILL BE UNPACKED IN THE RECEIVER, AND
10     THAT'S REALLY THIS WHOLE PROCESS DESCRIBED IN THE
11     STANDARD.  THERE ARE MANY MORE PARAGRAPHS BEHIND
12     THIS, BUT THIS IS THE DRAWING OF THAT, OF THE
13     REASSEMBLY CONTROLLER.
14     Q    MR. FISHER, CAN WE PUT A BOX AROUND THE WHOLE
15     STRUCTURE THERE THAT DR. WILLIAMS IS INDICATING.
16          AND THEN 15D, A HEADER AND LI REMOVER.
17     A    YES.  YOU CAN SEE IN THE STANDARD RIGHT HERE,
18     IT REMOVE RLC HEADER, THAT'S THE PROCESS OF
19     UNPACKING THE BOX OR LOOKING AT THE PACKING
20     INSTRUCTIONS TO FIGURE OUT HOW TO INTERPRET THE
21     INFORMATION IN THE PACKET.
22     Q    SO HOW DOES THAT COMPARE WITH ELEMENT 15D?
23     A    DIRECTLY.
24     Q    AND IF WE GO TO 15E, IT TALKS ABOUT A
25     REASSEMBLER, AND IT GOES ON.  DO YOU SEE THAT?
```

1    A    YES.

2    Q    AND HOW DOES THAT COMPARE WITH WHAT WE'RE

3    LOOKING AT ON THE SCREEN?

4    A    THE STANDARD CALLS FOR A REASSEMBLY PROCESS

5    SHOWN HERE AND DESCRIBED IN FURTHER DETAIL IN THE

6    SPECIFICATION, AND THAT COMPARES DIRECTLY WITH

7    ELEMENT 10E.

8    Q    MR. FISHER, COULD WE SAVE THIS IMAGE THAT WE

9    HAVE ON THE SCREEN AS DEMONSTRATIVE EXHIBIT

10   3666.108.

11          AND, YOUR HONOR, I MOVE THAT INTO

12   EVIDENCE.

13          THE COURT:  OKAY.  THAT'S ADMITTED.

14          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

15          3666.108, HAVING BEEN PREVIOUSLY MARKED

16          FOR IDENTIFICATION, WAS ADMITTED INTO

17          EVIDENCE.)

18   BY MR. VERHOEVEN:

19   Q    BASED ON YOUR REVIEW OF THE TECHNICAL

20   SPECIFICATION, DO YOU HAVE AN OPINION AS TO WHETHER

21   THE ACCUSED PRODUCTS INFRINGE THE ELEMENTS OF CLAIM

22   15?

23   A    YES, IT'S MY OPINION THAT APPLE'S IPHONE 4 AND

24   IPAD 2 INFRINGE CLAIM 15 OF THE '941 PATENT BECAUSE

25   APPLE STATES THAT THEY'RE COMPLIANT WITH 3GPP

1    RELEASE 6 STANDARD, WHICH IS THE DOCUMENT WE'RE

2    LOOKING AT.

3    Q    NOW, YOU ALSO REFERRED TO THE TESTIMONY OF

4    MR. ZORN FROM INTEL; IS THAT RIGHT?

5    A    I DID.

6    Q    CAN WE GO TO SLIDE 33.

7          WHAT ARE YOU ILLUSTRATING HERE FROM THE

8    TESTIMONY YOU JUST LOOKED AT FROM MR. ZORN?

9    A    MR. ZORN IS THE INTEL SOFTWARE ENGINEER WHO

10   PROGRAMMED THE RLC HEADER.  WE HEARD HIM SAY THAT

11   ON THE DEPOSITION THIS MORNING.

12         AND HE STATES THAT HE HAS IMPLEMENTED THE

13   ALTERNATIVE E-BIT INTERPRETATION AS A REQUIRED

14   FUNCTION, THAT THE SYSTEM WOULDN'T WORK WITHOUT IT,

15   THAT HE NEEDED TO IMPLEMENT THAT, AND THESE

16   INTERPRETATIONS ARE IMPLEMENTED IN THE X-GOLD 616.

17   Q    SO HOW DOES THIS AFFECT YOUR ANALYSIS?

18   A    THIS FURTHER SUPPORTS MY OPINION OF

19   INFRINGEMENT BY APPLE OF THE '941 PATENT, CLAIM 15.

20   Q    I'LL DIRECT YOUR ATTENTION TO EXHIBIT 635, IN

21   PARTICULAR THE UMTC, RLC DESIGN SPECIFICATION.

22   IT'S IN EVIDENCE.

23         THIS IS CONFIDENTIAL, IT CAN'T BE ON THE

24   BIG SCREEN, MR. FISHER.

25         WHAT IS THIS?

1    A    THIS DOCUMENT IS INTEL'S INTERNAL ENGINEERING

2    DOCUMENTATION ABOUT THE SOFTWARE FIELDS USED IN ITS

3    BASEBAND PROCESSOR, WHICH IS USED IN THE APPLE

4    PRODUCT.

5    Q    LET'S GO TO PAGE 20, MR. FISHER, AND ZOOM IN

6    AT THE TABLE AT THE BOTTOM OF THE PAGE.

7             THE TOP OF THIS TABLE SAYS CONFIGURATION

8    PARAMETERS FOR UM IN UL DIRECTION.

9    A    YES.

10   Q    WHAT DOES THAT MEAN?

11   A    THAT DOCUMENT IS ABOUT THE MOBILE UM AND UE,

12   UM MEANS USER MODE, THIS IS THE MODE OF THE PACKET

13   WE TALKED ABOUT HERE.  UL MEANS UPLINK DIRECTION

14   FROM THE MOBILE TO INFRASTRUCTURE.

15            AND IF WE LOOK DOWN FURTHER IN THE TABLE,

16   WE SEE THAT ALTERNATIVE E-BIT IS A SOFTWARE OPTION

17   FOR THE CODE, FOR THE INTEL CODE.

18            THE COURT:  ARE YOU MOVING THAT INTO

19   EVIDENCE?  I DON'T HAVE IT AS BEING ADMITTED

20   YESTERDAY.

21            MR. VERHOEVEN:  I WAS PART OF EXHIBIT

22   635, I BELIEVE, YOUR HONOR.

23            THE COURT:  NO.  NUMBER 635 IS THE SOURCE

24   CODE.

25            MR. VERHOEVEN:  I THINK 635 MIGHT HAVE

```
 1    BEEN BOTH THE SOURCE CODE AND THIS DOCUMENT, YOUR

 2    HONOR.

 3              BUT WHY DON'T WE, FOR CLARITY, CALL THIS

 4    635-B.  635-A WAS THE SOURCE CODE WE CALLED OUT,

 5    AND CAN WE CALL THIS 635-B.

 6              THE COURT:  ALL RIGHT.  ANY OBJECTION,

 7    MR. LEE?

 8              MR. LEE:  THERE'S NO OBJECTION.  I JUST

 9    NEED TO SORT OUT WHAT'S 635-A AND 635-B.  THERE'S

10    LIKE THREE 635'S NOW, BUT WE CAN DO THAT.

11              THE COURT:  UMTS RLC DETAIL DESIGN

12    DESCRIPTION, SPECIFICATION, THAT IS 635-B AND 635-A

13    IS THE INTEL SOURCE CODE.

14              MR. VERHOEVEN:  CORRECT, YOUR HONOR.

15              THE COURT:  OKAY.  THEY'RE BOTH ADMITTED.

16              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

17              635-A AND 635-B, HAVING BEEN PREVIOUSLY

18              MARKED FOR IDENTIFICATION, WERE ADMITTED

19              INTO EVIDENCE.)

20              THE COURT:  GO AHEAD.

21              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

22    REMIND ME, CAN YOU LOOK IN YOUR BINDER AT THIS

23    EXHIBIT, 635, AND TELL ME WHAT PAGE IS THIS ON,

24    JUST IN CASE THE JURORS WANT TO REFER TO THIS.

25              WELL, IN THE INTEREST OF TIME, I'LL
```

```
1     JUST -- I HAVE IT IN MY NOTES, IT'S PAGE 20.
2     Q     LET'S GO ON TO -- WELL, LET ME ASK YOU, HOW
3     DOES THIS TABLE AFFECT YOUR OPINION WITH RESPECT TO
4     INFRINGEMENT OF CLAIM 10?
5     A     THIS TABLE TELLS ME THAT INTEL'S INTERNAL
6     ENGINEERING DOCUMENTATION CALLS FOR THE SUPPORT OF
7     THE ALTERNATIVE E-BIT INTERPRETATION, WHICH IS PART
8     OF THE STANDARD, AND IS IMPLEMENTED IN INTEL'S
9     CHIPSET, WHICH IS PART OF APPLE'S TWO PRODUCTS.
10    Q     ALL RIGHT.  CAN WE GO TO PAGE 24 OF THE SAME
11    DOCUMENT, PLEASE.  IF WE CAN ZOOM IN ON THE SECOND
12    TABLE.  AND THE TOP OF THIS DOCUMENT SAYS
13    CONFIGURATION PARAMETERS FOR UM IN DL DIRECTION?
14    A     YES.
15    Q     WHAT IS DL?
16    A     DL IS THE DOWN LINK DIRECTION.  SO THIS IS
17    FROM THE INFRASTRUCTURE TO THE MOBILE STATION.  SO
18    THIS IS TALKING ABOUT WHEN THE MOBILE STATION IS
19    RECEIVING.  SO THIS WILL BE IMPORTANT TO CLAIM 15,
20    WHICH IS AN APPARATUS FOR RECEIVING.
21    Q     OKAY.  YOU REVIEWED THIS TABLE?
22    A     I DID.
23    Q     AND CAN YOU DESCRIBE WHAT IT IS THAT'S
24    RELEVANT OF THIS TABLE TO YOUR ANALYSIS?
25    A     RIGHT IN THE MIDDLE OF THIS TABLE IS AN
```

1    INDICATION THAT THE ALTERNATIVE E-BIT IS SUPPORTED

2    IN THE RECEIVER IN THE MOBILE STATION.

3    Q    OKAY.  FOR THE RECORD, AGAIN, THIS IS PAGE 24

4    OF 635-B.

5              AND HOW DOES THIS AFFECT YOUR ANALYSIS,

6    SIR?

7    A    THIS FURTHER SUPPORTS MY OPINION OF

8    INFRINGEMENT BY APPLE'S DEVICES OF CLAIM 15 OF THE

9    '941 PATENT.

10   Q    NOW, THE LAST CATEGORY OF EVIDENCE YOU

11   REVIEWED, I BELIEVE YOU MENTIONED THAT YOU WANTED

12   TO TALK ABOUT TODAY, WAS THE INTEL SOURCE CODE; IS

13   THAT RIGHT?

14   A    YES.

15   Q    AND FOR THE RECORD, THAT'S 635-A.

16             DO YOU HAVE THE PHYSICAL CODE?  CAN YOU

17   HOLD IT UP SO THE JURORS CAN SEE IT.

18   A    (INDICATING).

19   Q    THAT'S CONFIDENTIAL, SO WE CAN'T PUT IT ON THE

20   BIG SCREEN.  HAVE YOU PREPARED A DEMONSTRATIVE

21   WHERE YOU HIGHLIGHT THE RELEVANT PORTIONS OF THE

22   CODE THAT YOU'D LIKE TO DESCRIBE FOR THE JURY?

23   A    YES.

24   Q    DON'T PUT THIS ON THE SCREEN, PLEASE,

25   MR. FISH -- BLESS YOU -- DON'T PUT THIS ON THE BIG

1    SCREEN, MR. FISHER, BUT IF YOU CAN PUT IT ON THE

2    SMALL SCREEN, SLIDE 34.  IS THIS A DEMONSTRATIVE

3    YOU MADE?

4    A    YES, IT IS.  THIS DEMONSTRATIVE SHOWS BOTH THE

5    TRANSMITTER AND THE RECEIVER, SO CLAIM 10 AND CLAIM

6    15 SAMSUNG SMARTPHONE HERE.  AND THESE ARE SOME OF

7    THE SOFTWARE ROUTINES WITHIN INTEL'S CODE THAT

8    PERFORM THE OPERATIONS WE'RE TALKING ABOUT IN CLAIM

9    10 AND 15.

10        SO ON THE LEFT WE HAVE, IF YOU SEE THE,

11   URLC, WHICH IS THE CONTROLLER, WE SEE THE UPLINK

12   DIRECTION, WHICH MEANS IT'S A TRANSMITTER, WE HAVE

13   DELIVER PDU'S.  THIS PIECE OF CODE ORGANIZATIONS

14   THE PROCESS OF CREATING THOSE PACKETS THAT WE'RE

15   GOING TO SEND UP INTO THE INFRASTRUCTURE.

16        THE BLUE BOX SAYS BILLED THE PDU, THIS IS

17   THE PROCESS OF DETERMINING, WE'RE LOOKING AT THE

18   USER'S INFORMATION THAT NEEDS TO BE TRANSPORTED AND

19   FIGURE OUT WHAT KIND OF BOX IT NEEDS TO BE PUT IN

20   AND WHAT THE HEADERS NEED TO BE ON THAT BOX.

21        THEN THE GREEN BUBBLE IS BUILDING THE

22   ALTERNATIVE E-BIT INTERPRETATION.  IF THE CODE CAN

23   USE THE ALTERNATIVE E-BIT INTERPRETATION, IT WILL

24   PUT THIS ONE BYTE HEADER INTO THE FIELD FOR

25   TRANSMISSION.

1    Q    AND THAT'S RIGHT THERE IN THE CODE?

2    A    IT IS, YES.

3    Q    OKAY.  GO TO THE RECEIVER SIDE?

4    A    AND THEN THE RECEIVER SIDE, THE GRAY BOX, YOU

5    NOTICE THIS SAYS DL, THIS IS THE DOWNLINK.  SO THIS

6    IS THE RECEIVER.  THIS IS HANDLING THE RECEIVING OF

7    PACKETS.  SO THIS IS THE CODE THAT ORGANIZATIONS

8    THE PROCESS.

9         THE REASSEMBLED STORED PDU'S IS THE PIECE

10   OF CODE THAT EXAMINES EACH PACKET, FIGURES OUT THE

11   HEADER, WHAT THE USER INFORMATION THAT'S IN THAT

12   PACKET NEEDS TO BE, AND THEN THE REASSEMBLE START

13   END PDU IS THE PIECE OF CODE THAT REORGANIZATIONS

14   THE ENTIRE FILE THAT ORIGINALLY OCCURRED.

15        SO IF YOU REMEMBER BACK TO MY EXAMPLE OF

16   TRANSMITTING A VIDEO FILE, SO THIS IS THE PIECE OF

17   CODE THAT WILL RECREATE THE ORIGINAL VIDEO FILE

18   FROM ALL THOSE DIFFERENT PACKETS THAT WE SEND

19   ACROSS THE LINK.

20   Q    AND HOW DOES YOUR REVIEW OF THE SOFTWARE CODE

21   IN EXHIBIT 635-A INFORM YOUR ANALYSIS WITH RESPECT

22   TO INFRINGEMENT OF CLAIMS 10 AND 15 OF THE PATENT?

23   A    IT FURTHER SUPPORTS MY OPINION OF INFRINGEMENT

24   BY APPLE'S DEVICES OF THE '941 PATENT.

25   Q    DR. WILLIAMS, IN SUMMARY, CAN YOU SUMMARIZE

1    FOR THE JURY YOUR OPINIONS AND YOUR ANALYSIS?

2    A    SO I'VE PRESENTED HERE TODAY FOUR PIECES OF

3    EVIDENCE, THE FIRST BEING THE STANDARD, THE 3GPP

4    STANDARD;

5              THE SECOND BEING THE TESTIMONY OF INTEL'S

6    ENGINEER WHO PROGRAMMED THIS CODE INTO THE BASEBAND

7    PROCESSOR, AND, OF COURSE, THE BASEBAND PROCESSOR

8    IS USED IN APPLE'S PRODUCTS;

9              THE THIRD IS THE ENGINEERING

10   DOCUMENTATION OF INTEL ABOUT THEIR USE OF THIS

11   FEATURE; AND,

12             THE FOURTH IS THE ACTUAL CODE THAT'S

13   EXECUTED ON THAT BASEBAND PROCESS TO PERFORM THESE

14   OPERATIONS.

15   Q    AND BASED ON YOUR ANALYSIS OF ALL THAT

16   EVIDENCE, WHAT'S YOUR OPINION?

17   A    IT'S MY OPINION THAT APPLE IPHONE 4 AND IPAD 2

18   3G INFRINGE CLAIM '941, CLAIM -- PATENT '941,

19   CLAIMS 10 AND 15.

20   Q    THANK YOU, DR. WILLIAMS.  I PASS THE WITNESS

21   AT THIS POINT.

22             THE COURT:  OKAY.  IT'S 11:03.

23             MR. LEE, PLEASE GO AHEAD.

24             MR. LEE:  LET ME JUST MAKE SURE THE

25   NOTEBOOKS ARE PASSED OUT, YOUR HONOR.

```
 1                   YOUR HONOR, YOU SHOULD ALREADY HAVE THEM.

 2                   THE COURT:  I HAVE THEM.  THANK YOU.

 3                   MR. LEE:  MAY I PROCEED, YOUR HONOR?

 4                   THE COURT:  PLEASE, GO AHEAD.

 5                   IT'S 11:04.

 6                        CROSS-EXAMINATION

 7     BY MR. LEE:

 8     Q    I'M GOING TO LEAVE UP ON THE SCREEN SDX

 9     3966.104, WHICH IS THE DIAGRAM CONCERNING THE

10     SOURCE CODE THAT THE JURORS WERE JUST LOOKING AT.

11     DO YOU RECALL THAT?

12     A    YES.

13     Q    DO YOU SEE IT ON YOUR SCREEN?

14     A    YES.

15     Q    AND DO YOU SEE THE BOTTOM GREEN BOX ON THE

16     LEFT CALLED ALTERNATIVE E-BIT?  DO YOU SEE THAT?

17     A    YES, UM-HUM.

18     Q    AND THEN ON THE RIGHT-HAND SIDE, THERE'S

19     ALSO -- YOU REFER THE JURY TO THE SOURCE CODE;

20     CORRECT?

21     A    I DON'T UNDERSTAND THE QUESTION.

22     Q    LET'S SEE IF I CAN DO IT THIS WAY.  YOU REFER

23     THE JURY MULTIPLE TIMES THIS MORNING TO WHAT YOU

24     CALLED THE ALTERNATIVE E-BIT; CORRECT?

25     A    YES.
```

1    Q    YOU WERE REFERRING TO THE '941 PATENT;

2    CORRECT?

3    A    YES.

4    Q    DR. WILLIAMS, ISN'T IT TRUE THAT YOU HAD NEVER

5    HEARD OF THE ALTERNATIVE E-BIT INTERPRETATION UNTIL

6    THE LAWYERS IN THIS CASE CALLED YOU TO TESTIFY;

7    CORRECT?

8    A    YES.  BUT IT'S -- YES, BUT IT'S PART OF THE

9    STANDARD.

10   Q    DR. WILLIAMS --

11   A    -- AND I ASSUME IT'S BEEN THOROUGHLY VETTED BY

12   ENGINEERS FROM ALL OVER THE WORLD BEFORE GOING INTO

13   THE STANDARD.

14   Q    DR. WILLIAMS, MY QUESTION WAS NOT WHAT OTHER

15   ENGINEERS WOULD DO.  MY QUESTION IS YOU.

16          BEFORE THE LAWYERS CALLED YOU TO TESTIFY

17   IN THIS CASE, YOU HAD NEVER HEARD OF THE

18   ALTERNATIVE E-BIT INTERPRETATION; CORRECT?

19   A    CORRECT.  BUT I ASSUME IT'S IMPORTANT --

20   Q    NOW --

21   A    -- BECAUSE IT'S IN THE STANDARD.

22   Q    DR. WILLIAMS, I DIDN'T ASK YOU IF IT WAS

23   IMPORTANT.  I ASKED YOU IF YOU HAD HEARD OF IT.

24          NOW, YOU ASSUME IT'S IMPORTANT GIVEN WHAT

25   YOU HEARD AFTER THE LAWYERS CALLED YOU FOR THIS

1    CASE; CORRECT?

2    A    NO.

3    Q    OKAY.  NOW, DR. WILLIAMS, BEFORE THE '941

4    PATENT, AND I'M GOING TO COME BACK TO IT, BUT I

5    WANT TO USE YOUR STREAMING VIDEO EXAMPLE.  THE

6    JURORS CAN READ THAT PATENT FOREVER, AND THEY WON'T

7    FIND ANYTHING ABOUT STREAMING VIDEO, CORRECT?

8    A    NO.

9    Q    THAT PATENT REFERS TO MULTIPLE OCCASIONS VOICE

10   OVER I.P., CORRECT?

11   A    IT REFERS TO FIXED PACKET SIZES.  VOICE EVERY

12   I.P. IS AN EXAMPLE.

13   Q    THAT'S THE EXAMPLE THEY GIVE?

14   A    SO IT'S STREAMING VIDEO.

15   Q    DR. WILLIAMS, THE ONLY EXAMPLE THEY GIVE IS

16   VOICE OVER I.P.; CORRECT?

17   A    NO.  THE PATENT TALKS ABOUT A FIXED PACKET

18   SIZE WHICH IS USED BY BOTH VOICE OVER I.P. AND

19   THINGS LIKE STILL PICTURES AND VIDEO, THINGS LIKE

20   THAT.

21   Q    LET'S SEE IF I CAN ASK YOU A VERY PRECISE

22   QUESTION.  IF THIS JURY LOOKS AT THAT PATENT, WILL

23   THEY FIND A REFERENCE TO STREAMING VIDEO, YES OR

24   NO?

25   A    NO.  THEY'LL FIND A REFERENCE TO FIXED SIZE

```
 1    PACKETS.
 2    Q    OKAY.  NOW, THERE WAS A LOT OF -- I'M GOING TO
 3    COME BACK TO THE '941 PATENT, BUT I WANT TO BRING
 4    UP SDX 3966.016, ANOTHER ONE OF YOUR SLIDES.
 5            NOW, THIS IS THE SLIDE YOU USED TO
 6    DESCRIBE THE ACCUSED PRODUCTS; CORRECT?
 7    A    YES.
 8    Q    AND YOU PULLED OUT THE CHIP, AND IT SAYS
 9    INFINEON, BUT WE KNOW IT'S AN INTEL CHIP; CORRECT?
10    A    YES.
11    Q    AND YOU KNOW THAT TODAY, WHEN THE CHIP, WHEN
12    YOU LOOK AT THE CHIP IN THOSE FOUR PRODUCTS, THE
13    IPHONE 2 AND THE IPHONE 4, IT'S JUST A BLACK CHIP
14    WITH NO LABEL; CORRECT?
15    A    NO.
16    Q    YOU DON'T KNOW ONE WAY OR ANOTHER?
17    A    I HAVEN'T PHYSICALLY EXAMINED THE IPHONE 4 AND
18    THE IPAD 2.
19    Q    OKAY.  BUT YOU DO KNOW THAT IF YOU TOOK THE
20    IPHONE 4 AND THE IPAD 2, YOUR TWO ACCUSED PRODUCTS,
21    AND YOU OPENED IT UP, YOU WOULDN'T SEE THAT
22    INFINEON CHIP; CORRECT?
23    A    IT'S MY UNDERSTANDING THAT APPLE HAS STATED
24    THAT THEY USE THIS CHIP.
25    Q    DR. WILLIAMS, IF YOU OPENED UP THE DEVICE,
```

1    WOULD YOU FIND THE CHIP THAT'S ON YOUR

2    DEMONSTRATIVE, YES OR NO?

3    A    THE -- YES.

4    Q    NOW, DR. WILLIAMS, THERE'S BEEN A LOT OF TALK

5    ABOUT INTEL TODAY; CORRECT?

6    A    YES.

7    Q    AND A LOT OF TALK ABOUT THE INTEL CHIP;

8    CORRECT?

9    A    YES.

10   Q    AND YOUR BASIS FOR URGING THIS JURY TO FIND

11   THAT THE '516 AND THE '941 PATENTS ARE INFRINGED IS

12   ALL BASED UPON THE INTEL BASEBAND PROCESSOR;

13   CORRECT?

14   A    AND APPLE'S ASSERTION THAT THEY SUPPORT 3GPP,

15   RELEASE 6.

16   Q    ALL OF THE STEPS OF THE ASSERTED CLAIMS ARE

17   PERFORMED IN THE BASEBAND PROCESSOR, CORRECT OR NOT

18   CORRECT?

19   A    IN THE EXAMPLE I GAVE, YES.

20   Q    ALL RIGHT.  ACTUALLY, IN ALL THE EXAMPLES YOU

21   GAVE TODAY, ALL OF THE FUNCTIONALITY FOR THE '516

22   AND THE '941 PATENT ARE PERFORMED IN THE INTEL

23   BASEBAND PROCESSOR; CORRECT?

24   A    NO.  ANY --

25   Q    LET'S SEE.

1    A     WHAT I MEANT IS THE STANDARD -- THEY CAN

2    IMPLEMENT THE STANDARD WITH WHATEVER THEY WANT.  IN

3    THIS CASE, APPLE IS USING THE INTEL CHIP TO

4    IMPLEMENT THE STANDARD.

5    Q     LET'S SEE WHAT YOU SAID IN YOUR DEPOSITION.

6    VOLUME 3, TAB 32 OF THE NOTEBOOKS BEFORE YOU,

7    DR. WILLIAMS.  DO YOU HAVE IT BEFORE YOU,

8    DR. WILLIAMS?

9    A     I DO.

10   Q     PAGE 98.  CAN WE HAVE IT ON THE SCREEN.

11          NOW, WE'RE REFERRING TO THE '516 PATENT

12   HERE, AND THE QUESTION WAS, "SO UNDER -- GIVEN YOUR

13   UNDERSTANDING, YOUR USE OF THE TERM 'TRANSMITTING'

14   FOR THIS PATENT, IS ALL -- ARE ALL THE STEPS OF THE

15   ASSERTED CLAIMS PERFORMED IN THE BASEBAND

16   PROCESSORS?

17          "ANSWER:  TO MY UNDERSTANDING, YES."

18          WERE YOU ASKED THAT QUESTION AND DID YOU

19   GIVE THAT ANSWER.

20   A     YES, I WAS ASKED THAT QUESTION AND, YES, I

21   GAVE THAT ANSWER.  AND IF YOU READ FURTHER, IT

22   TALKS ABOUT MORE SPECIFICALLY, THAT WOULD BE THE

23   INTEL X 616 GOLD BASEBAND PROCESSORS, IS THAT

24   RIGHT?  YES.

25   Q     ALL INTEL, RIGHT?

1    A    YES.

2    Q    ALL RIGHT.  NOW --

3    A    HOWEVER, YOU CAN IMPLEMENT THE STANDARD WITH

4    WHATEVER TECHNOLOGY YOU WANT.

5    Q    HAS APPLE IMPLEMENTED THE STANDARD WITH

6    ANYTHING OTHER THAN THE INTEL BASEBAND PROCESSOR?

7    A    FOR THESE ACCUSED PRODUCTS?

8    Q    YES.

9    A    NO.

10   Q    ALL RIGHT.  NOW, THIS BASEBAND PROCESSOR WAS

11   DESIGNED BY INTEL; CORRECT?

12   A    YES.

13   Q    INTEL HAS THE BASEBAND PROCESSOR BUILT IN;

14   CORRECT?

15   A    WHAT DO YOU MEAN?

16   Q    IT'S THE -- INTEL IS THE ONE THAT HAS THAT

17   BASEBAND PROCESSOR MANUFACTURED; CORRECT?

18   A    YES.

19   Q    INTEL IS THE ONE WHO SELLS THAT BASEBAND

20   PROCESSOR TO APPLE; CORRECT?

21   A    THAT'S MY UNDERSTANDING.

22   Q    THE APPLE ENGINEERS HAVE NOTHING TO DO WITH

23   DESIGNING THAT BASEBAND PROCESSOR; CORRECT?

24   A    THAT'S MY UNDERSTANDING.

25   Q    THE APPLE ENGINEERS -- YOU HAVE NO EVIDENCE

1    THAT APPLE OR ANY OF ITS ENGINEERS KNEW OF EITHER

2    THE '516 OR THE '941 PATENT; CORRECT?

3    A    CORRECT.

4    Q    AND YOU HAVE NO EVIDENCE THAT THE INTEL

5    ENGINEERS KNEW ABOUT THE '516 OR THE '941 PATENTS;

6    CORRECT?

7    A    I HAVE DIRECT EVIDENCE THAT THEY KNEW ABOUT

8    THE STANDARDS AND STUDIED THE STANDARDS

9    SPECIFICALLY.

10   Q    I ASKED YOU ABOUT THE PATENTS, SIR.  DO YOU

11   HAVE ANY EVIDENCE THAT THEY KNEW ABOUT THE '516

12   PATENT?

13   A    WELL, THEY KNEW OF THE SUBJECT MATTER OF THE

14   PATENT BECAUSE THEY IMPLEMENTED THE STANDARDS.

15   Q    DR. WILLIAMS, DO YOU HAVE ANY EVIDENCE THAT

16   THEY KNEW ABOUT THE PATENT?

17   A    NO.

18   Q    ALL RIGHT.  AND THE SAME IS TRUE FOR THE '941?

19   YOU HAVE ACTUALLY NO EVIDENCE THAT THEY KNEW OF THE

20   '941 PATENT; CORRECT?

21   A    SAME ANSWER.  THEY KNEW ABOUT THE STANDARD.

22   THEY UNDERSTOOD THE STANDARD.

23   Q    DR. WILLIAMS, SAME QUESTION.  DID THEY KNOW

24   ABOUT THE PATENT?

25   A    I HAVE NO EVIDENCE.

```
 1    Q    OKAY.  NOW, NO ONE HAS ACCUSED MR. PALTIAN OF

 2    COPYING THE '516 PATENT, HAVE THEY?

 3    A    I'M NOT AWARE OF ANY INFORMATION ABOUT THAT.

 4    Q    NO ONE HAS ACCUSED MR. ZORN OF COPYING THE

 5    '941 PATENT, HAVE THEY?

 6    A    I'M NOT AWARE OF ANY INFORMATION REGARDING

 7    THAT.

 8    Q    AND, IN FACT, YOU KNOW THAT SAMSUNG HAS NOT

 9    ACCUSED APPLE -- INTEL, WHO MAKES THE CHIP AND

10    SELLS THE CHIP, OF INFRINGING THE PATENT; CORRECT?

11    A    I'M NOT AWARE OF ANY INFORMATION EITHER FOR OR

12    AGAINST THAT.

13    Q    RIGHT.  SO ONE COMPANY MAKES THE -- DESIGNS

14    THE CHIP, HAS THE CHIP MADE, SELLS THE CHIP, BUT IT

15    HASN'T BEEN ACCUSED OF INFRINGING; CORRECT?

16              MR. VERHOEVEN:  OBJECTION.  LACKS

17    FOUNDATION.  THE WITNESS HAS ALREADY SAID HE DIDN'T

18    KNOW.

19              THE WITNESS:  I DON'T KNOW.

20    BY MR. LEE:

21    Q    YOU DON'T KNOW ONE WAY OR ANOTHER?

22    A    NO INFORMATION.

23    Q    DID YOU KNOW THAT INTEL HAS -- AND SAMSUNG

24    HAVE A CROSS-LICENSE?

25    A    NO.
```

1    Q    DID YOU KNOW THAT INTEL AND SAMSUNG HAVE AN

2    AGREEMENT THAT PERMITS INTEL TO SELL CHIPS TO FOLKS

3    LIKE APPLE?

4    A    NO.

5    Q    NO ONE TOLD YOU THAT, SIR?

6    A    NO.

7    Q    DID YOU ASK?

8    A    THAT'S NOT IMPORTANT TO MY ANALYSIS.

9    Q    SO WHEN YOU WERE DOING ALL THIS WORK TO

10   ANALYZE WHAT WAS GOING ON AT INTEL, YOU DIDN'T ASK;

11   CORRECT?

12   A    I'M LOOKING AT THE ACCUSED PRODUCTS.  I'M NOT

13   LOOKING AT WHAT INTEL IS DOING.

14   Q    AND WHAT YOU LOOKED AT IN THE ACCUSED PRODUCT

15   WAS THE INTEL BASEBAND PROCESSORS; CORRECT?

16   A    THE CHIP THAT APPLE PURCHASES, YES.

17   Q    RIGHT.  FOR ABOUT $10 A CHIP; CORRECT?

18   A    I HAVE NO IDEA.

19   Q    AND YOU KNOW, DO YOU NOT, THAT FOR THE

20   PURCHASE OF THAT $10 CHIP FROM INTEL, DESIGNED BY

21   INTEL AND SOLD BY INTEL, SAMSUNG IS REQUESTING $350

22   MILLION IN DAMAGES?  DID YOU KNOW THAT?

23   A    NO, I DIDN'T.

24   Q    OKAY.  SO LET'S TALK A LITTLE BIT ABOUT YOUR

25   INVESTIGATION.

 1            YOU TOLD US WHAT THE INVENTIONS WERE.  IN

 2     CONDUCTING YOUR INVESTIGATION, YOU ISSUED SOME

 3     EXPERT REPORTS; CORRECT?

 4     A    CORRECT.

 5     Q    AS OF THE TIME YOU ISSUED THOSE EXPERT

 6     REPORTS, HAD YOU TALKED TO ANY OF THE EIGHT NAMED

 7     INVENTORS FOR THE PATENTS?

 8     A    NO.

 9     Q    SO WHEN YOU ARE TELLING THE JURY WHAT THE

10     INVENTIONS WERE, YOU WERE DOING IT NOT BASED ON

11     WHAT THEY HAD TOLD YOU; CORRECT?

12     A    CORRECT.  I'M BASED ON -- IT WAS BASED ON

13     SOMEONE WITH 35 YEARS OF TELECOMMUNICATIONS SYSTEMS

14     ENGINEERING READING THE INFORMATION AND EXPLAINING

15     THAT TO A JURY.

16     Q    ALL RIGHT.  AND IN THAT 35 YEARS OF

17     TELECOMMUNICATIONS EXPERIENCE, YOU HAD NEVER HEARD

18     OF THE ALTERNATE E-BIT; CORRECT?

19     A    I'VE HEARD OF THE STANDARDS MANY, MANY TIMES.

20     Q    DR. WILLIAMS, THAT WASN'T MY QUESTION.  IN

21     YOUR 35 YEARS OF EXPERIENCE, YOU'D NEVER HEARD OF

22     THE ALTERNATIVE E-BIT; CORRECT?

23     A    CORRECT, BUT I'VE HEARD OF THE STANDARDS MANY,

24     MANY TIMES.

25     Q    NOW, DR. WILLIAM, I WANT TO TALK TO YOU ABOUT

1    THE INVENTORS.  YOU DID READ THEIR DEPOSITIONS;

2    CORRECT?

3    A    YES.

4    Q    YOU DO KNOW THERE ARE EIGHT OF THEM; CORRECT?

5    A    YES.

6    Q    YOU DO KNOW THAT SEVEN OF THEM ARE STILL

7    EMPLOYED BY SAMSUNG; CORRECT?

8    A    I DON'T RECALL.

9    Q    WELL, YOU DO KNOW THAT THEY ARE ALL SOMETHING

10   CALLED STANDARDS ENGINEERS; CORRECT?

11   A    YES.

12   Q    THEY'RE ENGINEERS WHO DON'T DESIGN PRODUCTS;

13   CORRECT?

14   A    THEY'RE ENGINEERS WHO ARE RESPONSIBLE FOR

15   INTERFACING TO THE STANDARDS ORGANIZATIONS.

16   Q    AND THEY DON'T DESIGN AND MAKE PRODUCTS;

17   CORRECT?

18   A    I THINK THEY AFFECTIVELY DESIGN PRODUCTS, YES.

19   Q    DR. WILLIAMS, DID YOU IDENTIFY A SINGLE

20   PRODUCT THAT WAS EVER DESIGNED OR MADE ANY OF THE

21   EIGHT INVENTORS OF THESE TWO PATENTS, A SINGLE

22   PRODUCT ANYWHERE ON THE FACE OF THE EARTH?

23   A    I'M NOT AWARE OF THAT INFORMATION.

24   Q    IN FACT, NONE OF THESE EIGHT INVENTORS HAS

25   EVER DESIGNED EVEN A COMPONENT OF A PRODUCT THAT

1    MADE IT TO MARKET; CORRECT?

2    A    I'M NOT SURE THAT'S A FAIR STATEMENT.

3    Q    WELL, LET'S DO IT THIS WAY.  WHAT THIS GROUP

4    OF EIGHT ENGINEERS DOES, THEY'RE CALLED STANDARDS

5    ENGINEERS FOR A REASON; CORRECT?

6    A    YES.

7    Q    WHAT THEY DO IS THEY GO TO THE STANDARDS

8    MEETINGS; CORRECT?

9    A    I ASSUME.

10   Q    RIGHT.  AND WHAT THEY DO IS THEY TRY TO GET

11   PATENTS ON WHAT'S GOING ON AT THE STANDARDS

12   MEETINGS; CORRECT?

13            MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

14   THIS IS NOW GOING INTO THE, JUST LIKE BEFORE, WE

15   HAVE BURDENS OF PROOF HERE AND MR. LEE IS TRYING TO

16   GO INTO THE FRAND ISSUES, WHICH IS BEYOND THE SCOPE

17   OF THIS WITNESS'S TESTIMONY.

18            THE COURT:  OVERRULED.  HE'S TESTIFIED

19   EXTENSIVELY ABOUT STANDARDS.  GO AHEAD.

20   BY MR. LEE:

21   Q    DO YOU HAVE THE QUESTION IN MIND?

22   A    NO.

23   Q    THESE STANDARDS ENGINEERS -- THEY'RE CALLED

24   STANDARDS ENGINEERS FOR A REASON; CORRECT?

25   A    I BELIEVE SO, YES.

```
1    Q    AT SAMSUNG, THEIR JOB IS TO GO TO STANDARDS

2    MEETINGS TO SEE WHAT'S GOING ON AT THE STANDARDS

3    MEETINGS AND THEN TO TRY TO GET PATENTS ON WHAT'S

4    GOING ON AT THE STANDARDS; CORRECT?

5    A    I DON'T KNOW WHETHER THAT'S TRUE OR FALSE.

6    Q    DID YOU READ MR. VAN LIESHOUT'S DEPOSITION?

7    A    YES.

8    Q    DID YOU KNOW WHAT HE SAID ON THE TOPIC?

9    A    I DON'T RECALL.

10   Q    DID HE SAY THAT HIS JOB WAS TO GO TO THE

11   STANDARDS MEETINGS AND GET PATENTS ON WHAT WAS

12   GOING ON AT THE STANDARDS MEETING?

13   A    DON'T RECALL.

14   Q    DID HE SAY THAT SAMSUNG SETS TARGETS FOR THE

15   NUMBER OF PATENTS THAT ENDS UP IN A STANDARD?

16   A    YES, I BELIEVE HE SAID THAT.

17   Q    ALL RIGHT.  DID HE SAY THAT THEIR COMPENSATION

18   IS BASED ON HOW MANY PATENTS THEY GET INTO THE

19   STANDARD?

20   A    I DON'T RECALL THAT.

21   Q    NOW, DR. WILLIAMS, YOU MAY NOT KNOW THIS, BUT

22   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY,

23   ARE THEY GOING TO HEAR FROM ANY OF THESE EIGHT

24   INVENTORS?

25   A    I DON'T KNOW.
```

1    Q    AND DO YOU KNOW IF ANY OF THE EIGHT INVENTORS

2    WERE IN SAN JOSE AT ANY TIME DURING THIS TRIAL?

3    A    YES.

4    Q    AT LEAST TWO OF THEM; CORRECT?

5    A    I ONLY KNOW OF ONE.

6    Q    WHICH ONE DO YOU KNOW ABOUT?

7    A    MR. VAN LIESHOUT.

8    Q    THE VERY PERSON I JUST REFERRED TO WAS SOMEONE

9    WHO WAS IN SAN JOSE AND COULD HAVE TESTIFIED;

10   RIGHT?

11   A    I DON'T KNOW.

12   Q    NOW, AGAIN, WE DO KNOW THAT THE JURY IS GOING

13   TO HEAR FROM YOU ON BEHALF OF SAMSUNG ON THESE

14   PATENTS; CORRECT?

15   A    YES.

16   Q    THEY HAVE?

17   A    YES, THEY HAVE.

18   Q    SO LET'S TALK A LITTLE BIT ABOUT YOUR

19   BACKGROUND.  YOU SAID THAT YOU'VE BEEN AN EXPERT IN

20   50 DIFFERENT CASES; CORRECT?

21   A    I'VE BEEN RETAINED 50 TIMES, YES.

22   Q    IN THE LAST 4 YEARS ALONE, YOU'VE BEEN AN

23   EXPERT IN 28 DIFFERENT CASES; CORRECT?

24   A    APPROXIMATELY.

25   Q    NOW, YOU SAID YOUR FEE, YOUR HOURLY FEE IS

```
1     $550 AN HOUR?

2     A     YES.

3     Q     HOW MANY HOURS HAVE YOU WORKED IN THIS CASE?

4     A     DON'T KNOW.

5     Q     YOU DON'T KNOW?  CAN YOU GIVE ME A BALLPARK?

6     ONE HUNDRED?  TWO HUNDRED?  THREE HUNDRED?  FOUR

7     HUNDRED?

8     A     I WOULD BE GUESSING.

9     Q     OKAY.  YOU JUST HAVE NO IDEA?

10    A     NO.  I DON'T REALLY PAY MUCH ATTENTION TO

11    THAT.

12    Q     WELL, BUT YOU DO KNOW THAT LAST YEAR YOU MADE

13    A MILLION DOLLARS TESTIFYING FOR LAW FIRMS, DIDN'T

14    YOU?

15    A     YES.

16    Q     AND THE YEAR BEFORE, YOU MADE A MILLION

17    DOLLARS TESTIFYING FOR LAW FIRMS, DIDN'T YOU?

18    A     YES.

19    Q     NOW, THIS ISN'T THE FIRST TIME YOU'VE

20    TESTIFIED AGAINST APPLE; CORRECT?

21    A     CORRECT.

22    Q     YOU TESTIFIED FOR A COMPANY CALLED MMI AGAINST

23    APPLE; CORRECT?

24    A     IN DEPOSITION, YES.

25    Q     YOU TESTIFIED FOR MOTOROLA AGAINST APPLE;
```

1    CORRECT?

2    A    IN DEPOSITION, YES.

3    Q    YOU TESTIFED ACTUALLY TWICE, IN ONE CASE THAT

4    WAS IN ILLINOIS AND ONE CASE THAT WAS IN FLORIDA;

5    CORRECT?

6    A    BY DEPOSITION, OR BY EXPERT REPORT.  IN ONE

7    CASE AND BY DEPOSITION IN ONE CASE.

8    Q    AND YOU TESTIFIED FOR A COMPANY CALLED HTC

9    THREE TIMES AGAINST APPLE; CORRECT?

10   A    YES.

11   Q    ALL RIGHT.  NOW, ONE OF THE COMPANIES YOU WERE

12   INVOLVED WITH IS A COMPANY CALLED SIBEAM,

13   S-I-B-E-A-M, IS THAT CORRECT?

14   A    COULD I HAVE THE QUESTION AGAIN, PLEASE?

15   Q    SURE.  ONE OF THE COMPANIES THAT YOU FOUNDED

16   WAS CALLED SIBEAM; CORRECT?

17   A    CORRECT.

18   Q    YOU WERE THE CEO OF SIBEAM FROM -- UNTIL 2006;

19   CORRECT?

20   A    YES.

21   Q    NOW, AFTER 2006 AND UNTIL 2011, YOU CONTINUED

22   TO HAVE A SHAREHOLDER INTEREST IN SIBEAM; CORRECT?

23   A    UNTIL IT WAS SOLD LAST YEAR, SO YES.

24   Q    OKAY.  NOW, IN 2008, SAMSUNG AND PANASONIC PUT

25   $40 MILLION INTO SIBEAM, DIDN'T THEY?

1    A    DON'T KNOW.

2    Q    YOU DON'T KNOW?

3    A    I WAS NOT INVOLVED IN THE COMPANY.  I WAS ONLY

4    A SHAREHOLDER OF THE COMPANY.

5    Q    YOU WERE A SHAREHOLDER.  CAN YOU TELL US, SIR,

6    WHETHER THE DAILY DEAL BOOK REPORTED ON

7    DECEMBER 2ND, 2008, IN A PUBLIC ARTICLE, THAT

8    PANASONIC AND SAMSUNG HAD PONIED UP $40 MILLION FOR

9    THE COMPANY IN WHICH YOU WERE A FOUNDER?

10   A    I DON'T KNOW.  I WASN'T INVOLVED IN THE

11   COMPANY AT THAT POINT IN TIME.

12   Q    OKAY.

13   A    I WAS JUST A SHAREHOLDER.

14   Q    NOW, LAST QUESTION ABOUT YOUR BACKGROUND.

15        DID YOU MAKE ANY EFFORT TO DETERMINE

16   WHETHER ANY OF THE NAMED INVENTORS' DOCUMENTS HAD

17   BEEN DISCARDED OR DESTROYED IN YOUR INVESTIGATION?

18   A    NO.

19   Q    NOW LET'S GO TO THE STANDARDS.

20        YOU TALKED REPEATEDLY TODAY ABOUT THE

21   STANDARDS; CORRECT?

22   A    YES.

23   Q    ACTUALLY, YOU HAD SOME INVOLVEMENT WITH THE

24   3GPP STANDARDS; CORRECT?

25   A    NO, NOT CORRECT.

1    Q    WELL, YOU WORKED ON SOMETHING CALLED SMS AND

2    PAGING PROTOCOLS THROUGH SOMETHING CALLED THE TIA

3    WORKING GROUP; CORRECT?

4    A    CORRECT.

5    Q    AND THE TIA WORKING GROUP WAS FOR 3GPP;

6    CORRECT?

7    A    NO, NOT CORRECT.

8    Q    LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

9    VOLUME 3, TAB 32, LINE 3.

10              THE COURT:  WHAT'S THE PAGE NUMBER?

11              MR. LEE:  I'M SORRY.  83, YOUR HONOR,

12   LINE 2 TO 5.

13              "QUESTION:  OKAY.  THE -- DID YOU EVER

14   PARTICIPATE IN ANY STANDARDS GROUPS UNDER THE

15   AUSPICES OF ETSI OR 3GPP?

16              "ANSWER:  WELL, THE -- THE SMS AND PAGING

17   PROTOCOLS WAS A TIA WORKING GROUP FOR 3GPP, SO,

18   YES."

19   Q    WERE YOU ASKED THAT QUESTION AND DID YOU GIVE

20   THAT ANSWER?

21   A    YES, I DID.  HOWEVER, THE TIA IS NOT PART OF

22   ETSI OR 3GPP.  THE TIA IS AN INDEPENDENT

23   ORGANIZATION FROM THOSE TWO STANDARD SETTINGS

24   BODIES, AND THE SMS AND PAGING PROTOCOLS THAT I'VE

25   WORKED IN TIA, IT'S MY BELIEF THAT THEY WERE

1    ADOPTED BY ETSI AND 3GPP.

2    Q    SO YOU WERE FAMILIAR WITH THE DISCLOSURE

3    REQUIREMENTS THAT ARE APPLICABLE TO 3GPP WORKING

4    GROUPS; CORRECT?

5    A    MY ANSWER TO THAT QUESTION WAS IN REGARDS TO

6    TIA WORKING GROUPS.

7    Q    WELL, THE ANSWER -- THE QUESTION WAS, SIR,

8    "AND SO YOU ARE FAMILIAR WITH THE 3G -- WELL, WITH

9    THE DISCLOSURE REQUIREMENTS THAT ARE APPLICABLE TO

10   3GPP WORKING GROUPS?"

11            CORRECT?

12   A    AND MY ANSWER WAS IN REGARDS TO TIA, WHICH IS

13   NOT PART OF ETSI OR 3GPP.

14   Q    AND YOUR RECOLLECTION OF THE REQUIREMENTS OF

15   WHATEVER GROUP YOU WERE REFERRING TO WAS THAT

16   PARTICIPANTS WERE REQUIRED TO DISCLOSE INTELLECTUAL

17   PROPERTY RIGHTS THAT THEY CONSIDERED ESSENTIAL OR

18   IMPORTANT TO THE STANDARD; CORRECT?

19            MR. VERHOEVEN:  YOUR HONOR, THIS IS

20   BEYOND THE SCOPE AND WE'RE STARTING TO TRY A FRAND

21   CASE IN THE MIDDLE OF OUR CASE AND THAT'S --

22            THE COURT:  OVERRULED.  OVERRULED.

23            GO AHEAD.

24   BY MR. LEE:

25   Q    ISN'T THAT RIGHT, DR. WILLIAMS?

1    A    CAN I HAVE THE QUESTION AGAIN, PLEASE.

2    Q    SURE.  WE CAN TAKE THIS DOWN RIGHT NOW.  WE'LL

3    COME BACK TO IT IF WE NEED TO.

4          YOU UNDERSTAND FROM YOUR PARTICIPATION IN

5    THE STANDARDS SETTING PROCESS, THE ONE YOU WERE

6    INVOLVED IN, THAT PARTICIPATION IN THE STANDARDS

7    SETTING PROCESS IS REQUIRED TO DISCLOSE

8    INTELLECTUAL PROPERTY RIGHTS THAT IT CONSIDERS

9    ESSENTIAL OR IMPORTANT TO THE STANDARD; CORRECT?

10   A    YES, THAT'S CORRECT.

11   Q    AND YOU ALSO UNDERSTAND THAT THE REASON THAT

12   YOU HAVE AN OBLIGATION TO DISCLOSE IS SO THAT THE

13   FOLKS WORKING TOGETHER WON'T VOTE ON SOMETHING AND

14   LATER DISCOVER THAT SOMEONE HAS A PATENT; CORRECT?

15   A    FOR STANDARDS SETTING ORGANIZATIONS THAT HAVE

16   FORMAL VOTES.  TIA, AT THE TIME I WAS WORKING IN

17   TIA HAD A FORMAL VOTING PROCESS WHICH WAS MANY,

18   SOMETIMES YEARS BEHIND THE CONTRIBUTIONS THAT CAME

19   INTO THE WORKING GROUP.

20          AND SO THIS VOTING PROCESS WAS A, A PAPER

21   BALLOT VOTING THE STANDARD TO BE MOVED INTO A

22   STANDARD, A FORMAL STANDARD.

23   Q    SO LET'S SEE --

24   A    SO THE VOTING PROCESS IS NOT A CONSENSUS BASED

25   PROCESS.

```
1    Q    OKAY.  BUT YOU WOULD AGREE, HOWEVER, THE

2    PROCESS IS DONE -- AND I'LL TAKE VOTING -- THE

3    PEOPLE HAVE VOTING AND VOTING ON A STANDARD, THEY

4    SURE AS SHOOTING WANT TO KNOW WHETHER SOMEONE HAS

5    GOT A PATENT OUT THERE THEY'RE GOING TO LATER CLAIM

6    COVERS THE STANDARD; RIGHT?

7    A    WELL, THE TIA, AS A VOTING ORGANIZATION, EACH

8    COMPANY HAD ONE VOTE.  SO MOTOROLA HAD ONE VOTE IN

9    THE ORGANIZATION.  IT WASN'T BASED ON THE NUMBER OF

10   PEOPLE WHO CAME TO THE ORGANIZATION OR TO THE

11   WORKING GROUP COMMITTEE MEETINGS.

12   Q    LET'S SEE WHAT YOU SAID IN YOUR DEPOSITION.

13            VOLUME 3, PAGE 85, LINE 3 TO 10.

14            "QUESTION:  AT THE -- WHEN YOU WORKED ON

15   WORKING GROUPS IN THESE VARIOUS STANDARD SETTING

16   ORGANIZATIONS, DID YOU CONSIDER IT IMPORTANT IN --

17   IN CRAFTING A PROPOSAL TO UNDERSTAND WHETHER AND TO

18   WHAT EXTENT A GIVEN PROPOSAL OR ALTERNATIVE WAS THE

19   SUBJECT OF A PATENT BY -- BY SOME PARTY?"

20            AND YOUR ANSWER WAS YES; CORRECT?

21   A    YES, THAT'S CORRECT.

22   Q    NOW, DR. WILLIAMS, JUST SO THE JURORS

23   UNDERSTAND, YOU HAD A CHANCE TO READ THIS

24   TRANSCRIPT AFTER YOUR DEPOSITION AND MAKE

25   CORRECTIONS; RIGHT?
```

1    A    YES.

2    Q    AND YOU DIDN'T CHANGE ANY OF THE ANSWERS I'VE

3    JUST SHOWN YOU; CORRECT?

4    A    I HAD NO REASON TO.

5    Q    ALL RIGHT.  SO LET'S ASK YOU A COUPLE

6    QUESTIONS ABOUT THE EXHIBITS MR. VERHOEVEN SHOWED

7    YOU.

8              LET'S SEE THE '516 PATENT, WHICH IS JX

9    1073.

10             DO YOU RECOGNIZE THIS, SIR?

11   A    YES.

12   Q    SO LET'S HELP THE COURT AND THE JURORS WITH

13   THE CHRONOLOGY.

14             DO YOU SEE THE PATENT?  CAN WE BLOW UP

15   THE FILED.  DO YOU SEE THE FILING DATE?

16   A    YES.

17   Q    JUNE 9TH, 2005.

18             THEN THERE'S SOMETHING CALLED FOREIGN

19   APPLICATION PRIORITY DATA.  DO YOU SEE THAT?

20   A    YES.

21   Q    AND THE EARLIEST DATE IS JUNE 9, 2004; RIGHT?

22   A    YES.

23   Q    SO THIS IS THE '516 PATENT, AND THE FIRST

24   APPLICATION WAS FILED ON JUNE 9TH, 2004; CORRECT?

25   A    THAT'S HOW I INTERPRET THAT, YES.

1    Q    RIGHT.  SO NOW THIS STANDARD THAT YOU TALKED

2    TO THE JURY ABOUT TODAY, LET'S LOOK AT HOW IT CAME

3    ABOUT.

4            WOULD YOU TURN TO TAB 18 IN VOLUME 2 OF

5    YOUR NOTEBOOK.

6    A    I'M SORRY.  WHAT TAB?

7    Q    TAB 18 IN YOUR NOTEBOOK, VOLUME 2.  IT'S PDX

8    685.

9    A    YES.

10   Q    NOW, DR. WILLIAMS, BEFORE YOU CAME AND TOLD

11   THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR

12   OPINIONS, YOU STUDIED HOW THE STANDARD CAME ABOUT;

13   CORRECT?

14   A    I DID.

15   Q    OKAY.  NOW, YOU RECOGNIZED THAT DEFENSE

16   EXHIBIT 685 IS A PROPOSAL MADE BY SAMSUNG ON

17   AUGUST 20, 2004; CORRECT?

18   A    YES, THIS IS THE SECOND OF TWO PROPOSALS.

19           MR. LEE:  ALL RIGHT.  WE OFFER DX 685,

20   YOUR HONOR.

21           THE COURT:  I'M GOING TO ALLOW A LITTLE

22   BIT OF QUESTIONING TO THIS, BUT YOU ARE GETTING

23   INTO YOUR FRAND CASE, YOU NEED TO WAIT.

24           SO I THOUGHT THIS WAS MORE DIRECTLY

25   INVOLVED IN HIS INDIVIDUAL INVOLVEMENT, WHICH I

1    UNDERSTOOD TO BE IMPEACHMENT.  BUT IF YOU'RE

2    GETTING INTO SAMSUNG'S STANDARD SETTING BEHAVIOR --

3              MR. LEE:  I'M ONLY GOING TO ASK ABOUT

4    DOCUMENTS THAT HE TESTIFIED ON DIRECT, YOUR HONOR.

5              MR. VERHOEVEN:  YOUR HONOR, HE JUST SAID

6    HE'S GOING INTO THE WHOLE CHRONOLOGY, WHICH IS

7    THEIR WHOLE FRAND DEFENSE, SO WE OBJECT AS BEYOND

8    THE SCOPE.

9              MR. LEE:  YOUR HONOR, I'M GOING TO ASK

10   HIM ABOUT THE DOCUMENTS HE JUST SAID HE STUDIED ON

11   THE SPECIFIC PORTION OF THE SPECIFICATION HE

12   TESTIFIED ABOUT.

13             THE COURT:  I'LL ALLOW LIMITED QUESTIONS,

14   A FEW LIMITED QUESTIONS, BUT OTHERWISE YOU NEED TO

15   MOVE ON TO SOMETHING ELSE.

16   BY MR. LEE:

17   Q    NOW, YOU UNDERSTAND, DR. WILLIAMS, THAT

18   THERE'S SOME OTHER CLAIMS IN THIS CASE THAT WE'RE

19   GOING TO GET TO A LITTLE LATER, AND I'M NOT GOING

20   TO ASK YOU ABOUT THOSE RIGHT NOW.

21             MY QUESTION JUST IS THIS:  IS THIS A

22   SAMSUNG PROPOSAL THAT YOU SAW DURING THE COURSE OF

23   YOUR PREPARATION FOR THIS CASE?

24   A    YES, IT IS.

25             MR. LEE:  SO WE OFFER IT, YOUR HONOR.

```
 1              THE COURT:  I'M WAITING FOR

 2     MR. VERHOEVEN.

 3              MR. VERHOEVEN:  NO OBJECTION.

 4              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

 5              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 6              685, HAVING BEEN PREVIOUSLY MARKED FOR

 7              IDENTIFICATION, WAS ADMITTED INTO

 8              EVIDENCE.)

 9              THE COURT:  WHAT IS THIS, THIS IS DX 685?

10              MR. LEE:  YES, DX 685, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  GO AHEAD.

12     BY MR. LEE:

13     Q    NOW, LET'S TURN, IF WE COULD, TO THE '516

14     PATENT.  AND I'M GOING TO GO THROUGH THE CLAIM

15     LANGUAGE A LITTLE BIT MORE SLOWLY.

16              YOU UNDERSTAND, DO YOU NOT, THAT IT'S THE

17     CLAIM LANGUAGE THAT GOVERNS THE JURY'S INQUIRY;

18     CORRECT?

19     A    YES.

20     Q    YOU UNDERSTAND THAT YOUR CLAIM IS THAT THE

21     CLAIM IS LITERALLY INFRINGED; CORRECT?

22     A    CORRECT.

23     Q    AND YOU UNDERSTAND THAT EACH AND EVERY

24     LIMITATION HAS TO BE --

25              MR. VERHOEVEN:  YOUR HONOR, AT THIS POINT
```

```
 1    OF ORDER, WE'VE NEVER SEEN THIS DEMONSTRATIVE

 2    BEFORE.  IT WAS SUPPOSED TO BE DISCLOSED.

 3          MR. LEE:  THAT'S THE CLAIM.  I THOUGHT WE

 4    DISCLOSED IT.  IT'S JUST THE CLAIM.

 5          IN FACT, I DIDN'T SEE THAT BEFORE TODAY,

 6    EITHER.

 7          (DISCUSSION OFF THE RECORD.)

 8          MR. VERHOEVEN:  I'M SORRY, YOUR HONOR.

 9          THE COURT:  WHAT'S THE NUMBER?  WHAT'S

10    THE NUMBER?

11          MR. LEE:  IT IS GOING TO BE PDX 57.1.

12          THE COURT:  57.1, OKAY, GO AHEAD.

13          MR. LEE:  AND IT'S FROM JX 107.

14    Q    NOW, YOU RECOGNIZE CLAIM 15, DO YOU NOT?

15    A    YES.

16    Q    THIS IS THE CLAIM THAT YOU TALKED ABOUT

17    EARLIER TODAY; CORRECT?

18    A    YES.

19    Q    CAN I HAVE A MARKER?  NOW, DR. WILLIAMS, I

20    WANT TO FOCUS YOU ON THE CLAIM.

21          THE CLAIM REFERS TO A FIRST CHANNEL, AND

22    I'M GOING TO PUT A 1 ABOVE IT.  DO YOU SEE THAT?

23    A    YES.

24    Q    AND IT REFERS TO A SECOND CHANNEL.  DO YOU SEE

25    THAT?
```

```
 1    A    YES.

 2    Q    AND THE CLAIM SAYS, IF WE MOVE DOWN, AND THE

 3    JURORS WILL BE LOOKING AT THIS, IT SAYS "A

 4    CONTROLLER FOR DETERMINING TRANSMIT POWER FACTORS

 5    FOR THE CHANNELS, DETERMINING IF TOTAL TRANSMIT

 6    POWER REQUIRED FOR TRANSMISSION OF THE CHANNELS

 7    EXCEEDS THE MAXIMUM ALLOWED."

 8              DO YOU SEE THAT?

 9    A    YES.

10    Q    NOW, YOU UNDERSTAND THAT HER HONOR HAS SAID IN

11    THE NOTEBOOKS THAT THE JURORS HAVE THAT THIS CLAIM

12    GETS ITS PLAIN AND ORDINARY MEANING?

13    A    YES.

14    Q    NOW, THERE'S A REFERENCE TO A FIRST CHANNEL, A

15    SECOND CHANNEL, AND THEN THERE IS THE PHRASE "THE

16    CHANNELS."

17              DO YOU SEE THAT?

18    A    YES.

19    Q    NOW, THAT PHRASE, "THE CHANNELS," REFERS TO

20    THE FIRST CHANNEL; CORRECT?

21    A    IT REFERS TO THE FIRST AND THE SECOND CHANNEL.

22    Q    JUST THOSE TWO?

23    A    YES.

24    Q    OKAY.  SO THAT THE TOTAL TRANSMIT POWER, FOR

25    THIS CLAIM TO BE INFRINGED, HAS TO BE THE TOTAL OF
```

```
 1   THE FIRST CHANNEL PLUS THE SECOND CHANNEL; CORRECT?

 2   A    WELL, YOU'RE READING THE CLAIM WRONG.

 3   Q    WELL, I'M --

 4   A    THE CLAIM SAYS -- SORRY.  THE CLAIM SAYS THE

 5   TOTAL TRANSMIT POWER REQUIRED FOR TRANSMISSION OF

 6   THE CHANNELS.

 7   Q    RIGHT.

 8   A    SO WE'RE TALKING ABOUT THE TRANSMIT POWER

 9   REQUIRED TO TRANSMIT THE FIRST AND THE SECOND

10   CHANNEL.

11   Q    RIGHT.  AND THE ONLY CHANNELS REFERRED TO ARE

12   THE FIRST CHANNEL AND THE SECOND CHANNEL; CORRECT?

13   A    REFERRED TO WHERE?

14   Q    IN THE CLAIM?

15   A    IN THIS CLAIM.

16   Q    YES.

17   A    THEY CAN BE A FIRST CHANNEL AND A SECOND

18   CHANNEL.  THAT FIRST CHANNEL THAT DOES NOT SUPPORT

19   HARQ AND A SECOND CHANNEL THAT DOES SUPPORT HARQ.

20   Q    THERE'S NOTHING IN THE CLAIM ABOUT THE CONTROL

21   CHANNELS, IS THERE?

22   A    YES.

23   Q    OKAY.  WOULD YOU POINT US TO THE WORDS THAT

24   SAY, "CONTROL CHANNEL"?

25   A    CONTROL CHANNEL IS A CHANNEL WHICH DOES NOT
```

```
1     SUPPORT HARQ, SO IT WOULD BE AN EXAMPLE OF A FIRST

2     CHANNEL.

3     Q     SO HOW MANY SECOND CHANNELS ARE THERE IN THIS

4     SPECIFICATION IN THE 3GPP SPEC?  IS THERE ONE?  IS

5     THERE TWO?  IS THERE THREE?  IS THERE FOUR?

6     A     THERE'S ONE TO MANY.

7     Q     THERE'S ONE TO MANY.  OKAY.  AND THAT'S WHAT

8     YOU INTENDED TO COMMUNICATE TO THE JURY TODAY, THAT

9     THERE'S A FIRST CHANNEL THAT SUPPORTS HARQ, AND

10    THEN THERE'S MANY CHANNELS THAT DON'T SUPPORT HARQ;

11    CORRECT?

12    A     NO.  IN MY EXAMPLE INFRINGEMENT TO THE JURY

13    TODAY, I'M POINTING TO ONLY THE DPDCH CHANNEL AS

14    BEING A CHANNEL WHICH DOES NOT SUPPORT HARQ.

15    Q     OKAY.

16    A     THERE ARE MANY OTHER EXAMPLES OF CHANNELS THAT

17    DO NOT SUPPORT HARQ, INCLUDING A COLLECTION OF

18    CHANNELS THAT DO NOT SUPPORT HARQ.

19    Q     OKAY.  SO LET'S GET FOR THE JURY IT CORRECTLY.

20    THE FIRST CHANNEL IS WHAT CHANNEL?

21    A     WELL, THERE --

22    Q     GIVE ME THE ACRONYM?

23    A     THERE ARE MANY INFRINGING CASES --

24    Q     GIVE ME THE --

25    A     WITHIN -- SORRY LET ME FINISH.
```

2769

```
1    Q    GIVE ME THE ONE YOU TALKED ABOUT TODAY?

2    A    COULD I PLEASE FINISH?

3    Q    SURE.

4    A    THERE ARE MANY INFRINGING CASES WITHIN THE

5    STANDARD.  ONE INFRINGING CASE IS THE CASE I'VE

6    PRESENTED TODAY IN WHICH THE CHANNEL THAT DOES NOT

7    SUPPORT HARQ IS DPDCH.

8    Q    ALL RIGHT.  THE CHANNEL THAT DOESN'T SUPPORT

9    HARQ IS DPDCH.

10              AND WHAT'S THE CHANNEL THAT DOES SUPPORT

11   HARQ?

12   A    E-DPDCH.

13   Q    E --

14   A    YOU'VE WRITTEN IT IN THE WRONG PLACE.

15   Q    OKAY.  THE ONE THAT DOES SUPPORT -- YOU'RE

16   RIGHT.  SO IT'S DPDCH AND THAT DOESN'T SUPPORT

17   HARQ, AND THE ONE THAT SUPPORTS HARQ IS E-DPDCH.

18   CORRECT?

19   A    THAT WAS MY EXAMPLE FOR THE COURT TODAY.

20   Q    OKAY.  AND ISN'T IT TRUE, SIR, THAT IF YOU

21   LOOK AT THE STANDARD AND YOU LOOK AT THE INTEL

22   SOURCE CODE AND YOU LOOK AT WHAT INTEL DOES, THEY

23   NEVER TOTALLED THOSE TWO ALONE AND COMPARED THEM TO

24   A MAXIMUM POWER LEVEL, DO THEY?

25   A    THEY LOOK AT THE POWER ALLOCATED TO THOSE TWO
```

```
 1    CHANNELS AND DETERMINE THE POWER ALLOCATION BASED
 2    ON THE TRANSMIT POWER REQUIRED TO TRANSMIT THOSE
 3    CHANNELS AND THE, THE MAXIMUM AMOUNT OF POWER
 4    REMAINING FOR THOSE CHANNELS.
 5    Q    DR. WILLIAMS, I ASKED A DIFFERENT QUESTION.
 6    THE CLAIM SAYS FIRST CHANNEL, SECOND CHANNEL,
 7    YOU'VE IDENTIFIED FOR US WHAT THOSE TWO ARE.
 8              THE CLAIM SAYS, CONTROLLER FOR
 9    DETERMINING TRANSMIT POWER FACTORS FOR THE
10    CHANNELS, DETERMINING IF THE TOTAL TRANSMIT POWER
11    REQUIRES.  DO YOU SEE THAT?
12    A    SORRY.  YOU READ THAT WRONG.
13    Q    ALL RIGHT.  BUT YOU CAN SEE IT; CORRECT?
14    A    CAN YOU REREAD IT?
15    Q    CAN YOU SEE IT?  I CAN READ IT, SURE.  A
16    CONTROLLER FOR DETERMINING TRANSMIT POWER FACTORS
17    FOR THE CHANNELS DETERMINING IF TOTAL TRANSMIT
18    POWER REQUIRED FOR TRANSMISSION OF THE CHANNELS
19    EXCEEDS THE MAXIMUM ALLOWED POWER.
20              DO YOU SEE THAT?
21    A    SO WE'RE TALKING ABOUT TRANSMISSION POWER
22    REQUIRED FOR TRANSMISSION OF THE CHANNELS AND THE
23    CHANNELS IN MY EXAMPLE TODAY WAS THE FIRST CHANNEL
24    AND THE SECOND CHANNEL DPDCH AND E-DPDCH, AND
25    THAT'S COMPARED TO THE AMOUNT OF POWER AVAILABLE TO
```

1    THOSE CHANNELS.

2    Q    SO IT'S YOUR TESTIMONY THAT WHEN SOMEONE

3    IMPLEMENTS THE STANDARD IN INTEL SOURCE CODE, THAT

4    TOTALS THOSE TWO CHANNELS AND COMPARES IT TO A

5    MAXIMUM.  YES OR NO?

6    A    I DON'T UNDERSTAND THE QUESTION.

7    Q    DOES THE INTEL SOURCE CODE TAKE YOUR FIRST

8    CHANNEL AND THE SECOND CHANNEL, TOTAL THEM UP, AND

9    COMPARE THEM TO A MAXIMUM?  YES OR NO?

10   A    THE CHANNELS ARE THE -- THE POWER OF THE

11   CHANNELS ARE COMPARED TO AN ALLOWED AMOUNT OF POWER

12   FOR THOSE CHANNELS, YES.

13   Q    DR. WILLIAMS, THAT WASN'T MY QUESTION.

14   A    I DON'T HAVE --

15   Q    MY QUESTION WAS --

16   A    I DON'T KNOW ANY MORE CLEARLY HOW TO STATE

17   THIS.

18   Q    THAT MAY BE MY RESPONSIBILITY.  I'LL TRY TO

19   STATE IT MORE CLEARLY.

20           DOES THE INTEL SOURCE CODE EVER TAKE THE

21   FIRST CHANNEL, TOTAL IT UP WITH THE SECOND CHANNEL,

22   AND COMPARE IT TO A MAXIMUM?  YES OR NO?

23   A    IT COMPARES THE POWER FOR THOSE TWO CHANNELS

24   TO THE POWER THAT IS AVAILABLE FOR THOSE TWO

25   CHANNELS.

2772

```
1    Q    ALL RIGHT.

2    A    AND DETERMINES AN ALLOCATION OF POWER FOR

3    THOSE CHANNELS.

4    Q    SO YOUR ANSWER IS --

5    A    I DON'T KNOW HOW TO ANY MORE CLEARLY SAY THAT.

6    Q    OKAY.  NOW, YOU UNDERSTAND THAT THERE'S A

7    PROFESSOR NAMED PROFESSOR KIM FROM CARNEGIE MELLON

8    WHO IS TESTIFYING ON THIS PATENT; CORRECT?

9    A    YES.

10   Q    AND HE SAYS, AND HAS SAID, THAT THE INTEL

11   SOURCE CODE IN THE STANDARD NEVER TAKES JUST THOSE

12   TWO CHANNELS AND TOTALS THEM UP; CORRECT?

13   A    THOSE TWO CHANNELS ARE THE POWER -- THE POWER

14   ALLOCATED TO THOSE TWO CHANNELS ARE DETERMINED BY

15   THE PROCESS THAT WE'RE TALKING ABOUT.

16   Q    DR. WILLIAM, I JUST ASKED YOU, ARE THEY EVER

17   TOTALLED UP, JUST THE TWO OF THEM?

18   A    YES.

19   Q    ALL RIGHT.

20   A    THEY'RE TOTALLED TOGETHER IN ORDER TO COMPARE

21   AGAINST AN AMOUNT OF POWER THAT IS ALLOCATED TO

22   THOSE TWO CHANNELS.

23   Q    AND YOUR BEST TESTIMONY IS THAT'S WHAT THE

24   SPECIFICATION SAYS; CORRECT?

25   A    THE 3GPP SPECIFICATION OR THE INTEL
```

1    SPECIFICATION.

2    Q    ISN'T IT TRUE THAT 3GPP SPECIFICATION AND

3    INTEL SPECIFICATION ACTUALLY TOTALS UP FIVE

4    CHANNELS AND COMPARES THEM TO THE MAXIMUM POWER

5    LEVEL?  CORRECT OR NOT CORRECT?

6    A    WELL, OF COURSE THERE ARE OTHER CHANNELS THAT

7    THE MOBILE IS RESPONSIBLE FOR TRANSMITTING.

8    HOWEVER, THE CHANNELS THAT WE'RE TALKING ABOUT IN

9    THIS CLAIM ARE TOTALED IN COMPARED TO AN AMOUNT OF

10   POWER THAT IS ALLOCATED TO THOSE CHANNELS.

11   Q    CAN I HAVE JX 103 AT PAGE 25, PLEASE, ON THE

12   SCREEN JX 1083 -- RIGHT.  THE SPECIFICATION.

13              CAN I HAVE PAGE 25, PLEASE.

14              ACTUALLY, CAN I GO TO PAGE 26, OR 25, AND

15   TO SECTION -- THE SECOND PARAGRAPH.  CAN WE HAVE

16   THAT BLOWN UP.  WHEN E-DPDCH IS CONFIGURED, IF THE

17   TOTAL TRANSMIT POWER, AFTER APPLYING DPDCH POWER

18   ADJUSTMENTS AND GAIN FACTORS WOULD EXCEED THE

19   MAXIMUM ALLOWED VALUE, THE UE SHALL -- DO YOU SEE

20   THAT?

21   A    YES, BUT YOU READ THAT WRONG.

22   Q    OKAY.  BUT YOU SEE IT; CORRECT?

23   A    YES.

24   Q    AND FOR THE STANDARD, WHAT HAS BEEN SUMMED UP

25   IS FIVE DIFFERENT CHANNELS; CORRECT?

1   A      THE CLAIM THEY'RE TALKING ABOUT --

2   Q      DOCTOR?

3   A      IN THE '516 IS BROADER THAN THE SPECIFICATION,

4   AND SO A DEVICE WHICH IMPLEMENTS THE SPECIFICATION

5   WILL IMPLEMENT THE CLAIM.

6   Q      DR. WILLIAMS, MY QUESTION WAS DIFFERENT.  THE

7   SPECIFICATION, THE 3GPP SPECIFICATION, SAYS WE'RE

8   GOING TO SUM UP FIVE CHANNELS, E-DPDCH, E-DPCCH,

9   DPDCH, DPDCCH, HSDPCCH, WE'RE GOING TO SUM ALL OF

10   THEM UP, NOT JUST TWO; CORRECT?

11   A      THE -- AGAIN, THE CLAIM IN THE PATENT IS

12   BROADER THAN THE IMPLEMENTATION OF THE STANDARD,

13   AND THE STANDARD DOES CONSIDER THE TRANSMISSION OF

14   THE FIRST CHANNEL AND THE SECOND CHANNEL AS I'VE

15   INDICATED AND COMPARE THAT TO THE MAXIMUM ALLOWED

16   POWER FOR THOSE CHANNELS ONCE CONSIDERED THE

17   CONTROL CHANNELS THAT YOU JUST RAMBLED OFF.

18   Q      DR. WILLIAMS, MY QUESTION IS DIFFERENT.  DOES

19   THE STANDARD TOTAL FIVE CHANNELS OR NOT?

20   A      I THINK I JUST ANSWERED THAT.

21   Q      IS IT YES OR NO?

22   A      THE STANDARD TOTALS -- THE CONSIDER IS THE

23   TRANSMIT POWER OF THE CHANNELS TO BE TRANSMITTED

24   AND IT ALLOCATES POWER BETWEEN THOSE CHANNELS.

25   Q      ALL RIGHT.  AND YOU KNOW THAT PROFESSOR KIM

1    SAYS THE STANDARD TOTALS FIVE CHANNELS; CORRECT?

2    A    THAT'S HIS OPINION.

3    Q    ALL RIGHT.  NOW, LET'S TURN TO THE '941

4    PATENT -- NOW, THIS IS THE ALTERNATIVE E -- THIS IS

5    THE '941 PATENT -- YOUR HONOR, THIS IS PDX 5.2,

6    WHICH IS FROM JX 1070?

7              THE COURT:  IS IT 57.2.

8              MR. LEE:  YES, YOUR HONOR.

9              THE COURT:  OKAY.

10             MR. LEE:  WHICH IS JUST THE CLAIM.

11   Q    NOW, DR. WILLIAMS, I'M GOING TO PUT THE CLAIM

12   UP HERE, BUT I WANT TO AGAIN GO A LITTLE BIT SLOWLY

13   THROUGH A COUPLE OF CONCEPTS.

14             THE CLAIM REFERS TO SDU'S AND PDU'S;

15   CORRECT?

16   A    YES.

17   Q    NOW, THERE'S AN SDU AND A PDU IN THE VERY

18   FIRST PARAGRAPH OF THE CLAIM; CORRECT?

19   A    YES.

20   Q    NOW, THEY'RE DIFFERENT THINGS, ARE THEY NOT?

21   A    YES.  AN SDU IS THE USER INFORMATION TO BE

22   TRANSMITTED.  A PDU IS THE PACKET OR THE CONTAINER.

23   Q    CAN WE HAVE PDX 48.1 ON THE SCREEN.

24             NOW, AS YOU DESCRIBED TO THE JURY ON YOUR

25   DIRECT TESTIMONY, AN SDU CAN BE BIGGER THAN A PDU

1    AND NEEDS TO BE DIVIDED INTO SMALLER CHUNKS;

2    CORRECT?

3    A    YES, THAT'S A PROCESS CALLED SEGMENTATION.

4    Q    ALL RIGHT.  NOW, THERE ARE DIFFERENT

5    POSSIBILITIES.  FOR INSTANCE, YOU CAN HAVE AN SDU

6    THAT IS SMALLER THAN THE PDU; CORRECT?

7    A    YES.

8    Q    AND IF YOU HAVE AN SDU THAT'S SMALLER THAN THE

9    PDU, YOU CAN PAD THE PDU.  THAT'S ONE ALTERNATIVE;

10   CORRECT?

11   A    THAT'S ONE OF THE ALTERNATIVES, YES.

12   Q    CAN WE GO TO PDX 48.3.  SO THIS WOULD SHOW A

13   PDU WITH SOME DATA WHICH IS THE SMILEY FACE.  IT

14   DOESN'T OCCUPY THE ENTIRE PDU, SO YOU PAD IT;

15   CORRECT?

16   A    CORRECT.

17   Q    NOW, ANOTHER POSSIBILITY IS THAT YOU HAVE A

18   COUPLE SDU'S, AND THERE'S ROOM ENOUGH IN THAT PDU

19   FOR BOTH OF THEM, CORRECT?

20   A    CORRECT.

21   Q    AND YOU PUT THEM TOGETHER AND THAT'S CALLED

22   CONCATENATION; CORRECT?

23   A    YES.

24   Q    SO CAN WE HAVE DPD 48.4.  THAT WOULD BE

25   CONCATENATION, TWO PIECES OF WORDS TOGETHER IN ONE

2777

```
1    PDU; CORRECT?

2    A    YES.

3    Q    AND THERE'S A THIRD POSSIBILITY, AND THAT

4    THIRD POSSIBILITY IS THAT THE SDU FITS EXACTLY

5    WITHIN THE PDU; CORRECT?

6    A    YES.

7    Q    COULD I HAVE PDX 48.2.

8              AND THIS WOULD BE AN EXACT FIT; CORRECT?

9    A    YES.

10   Q    NOW, AS THE PATENT TELL US FOR VOICE OVER

11   I.P., HAVING EXACT FITS IS QUITE COMMON; CORRECT?

12   THAT'S WHAT THE PATENT SAYS?

13   A    IT SAYS FOR PREDICTABLE PACKET SIZES, YOU CAN

14   ADJUST THE PDU TO MATCH THAT TYPICAL PACKET SIZE,

15   YES.

16   Q    AND IT SPECIFICALLY SAYS THIS IS SOMETHING

17   THAT WORKS PARTICULARLY WELL FOR VOICE OVER I.P.;

18   CORRECT?

19   A    VOICE OVER I.P. IS ONE EXAMPLE OF A TYPE OF

20   USER INFORMATION THAT IS TRANSPORTED IN PDU'S.

21   Q    AND THAT'S WHAT THE PATENT SAYS; CORRECT?

22   A    I DON'T UNDERSTAND THE QUESTION.

23   Q    LET SEE IF I CAN ASK IT DIFFERENTLY.

24             DR. WILLIAMS, WHEN YOU HAVE STREAMING

25   VIDEO AND YOU HAVE TO BREAK THE SDU DOWN INTO
```

```
1    DIFFERENT PACKETS, YOU HAVE TO DO THAT, THAT'S WHAT

2    YOU SHOWED THE JURY; CORRECT?

3    A    SURE, SURE.

4    Q    ACTUALLY, THE SYSTEM OF THE '941 PATENT WOULD

5    CREATE MORE OVERHEAD RATHER THAN LESS; IS THAT

6    TRUE?

7    A    I DON'T KNOW THAT TO BE TRUE.

8    Q    YOU DON'T KNOW ONE WAY OR ANOTHER?

9    A    NO.  I DON'T KNOW THAT TO BE TRUE.

10   Q    OKAY.

11   A    SO I WOULD SAY NO TO YOUR QUESTION.

12   Q    ALL RIGHT.  NOW, DO YOU AGREE WITH ME THAT

13   THERE'S A DIFFERENCE IN THE WORDS OF THE '941

14   PATENT AND THE 3GPP STANDARD; CORRECT?

15   A    NOT PER PROPER CLAIM INTERPRETATION.

16   Q    THAT'S WHAT I WANT TO GET TO.

17        YOU UNDERSTAND HER HONOR HAS SAID THAT

18   THE PROPER CLAIM INTERPRETATION IS THE PLAIN AND

19   ORDINARY MEANING; CORRECT?

20   A    YES.

21   Q    NOW, I WANT TO TEST YOUR PLAIN AND ORDINARY

22   MEANING, BECAUSE AS YOU TOLD US AT YOUR DEPOSITION,

23   THERE IS A PHRASE TWICE IN THE CLAIM, "AN ENTIRE

24   SDU," WHICH IS IN THE SECOND PARAGRAPH AND THE

25   THIRD PARAGRAPH; CORRECT?
```

 1    A    YES.

 2    Q    AND YOU SAY THAT THE PLAIN AND ORDINARY

 3    MEANING IS THAT THIS MEANS ONLY AN ENTIRE SDU;

 4    CORRECT?

 5    A    YES, BECAUSE THE CLAIM INTERPRETATION LAW --

 6    Q    I --

 7    A    -- THE CLAIM HAS TO BE READ INTO -- READ IN

 8    CONTEXT OF THE SPECIFICATION OF WHAT THE INVENTORS

 9    INVENTED, AND AS WE SAW WITH THE DEPOSITION

10    TESTIMONY OF THE INVENTORS, THE INVENTORS ALL SAID

11    THAT THEY INVENTED AN INVENTION WHICH ONLY CONTAINS

12    AN SDU IN THE DATA FIELD.

13          AND ALSO IN THE SPECIFICATION, IF YOU

14    DON'T READ IT AS ONLY, THE INVENTION WOULD NOT

15    PROPERLY FUNCTION.

16    Q    THAT'S WHAT THE INVENTORS SAID, YOU THOUGHT?

17    CAN I HAVE MR. VAN LIERE'S DEPOSITION, VOLUME 3,

18    TAB 38 AT PAGE 28?  CAN WE HAVE THAT ON THE SCREEN?

19    AND WE'LL SHOW YOU THE QUESTION AND THE ANSWER.

20          YOU REVIEWED HIS DEPOSITION, DID YOU NOT?

21    A    YES.

22    Q    AND THE FACT IS, IS IT NOT, THAT HE TESTIFIED

23    THAT YOU DON'T NEED AN EXACT FIT, IT WOULD BE OKAY

24    IF THERE WAS CONCATENATION; RIGHT?

25    A    I DON'T KNOW IF THAT'S TRUE.

```
 1     Q    WELL, LET'S LOOK AT LINES 14 TO 21.  "IF AM
 2     ENTIRE SDU IS CONTAINED IN THE DATA FIELD OF A PDU,
 3     BUT DOESN'T COMPLETELY FILL THE DATA FIELD, A NEW
 4     SDU COULD ALSO -- COULD BEGIN IN THAT DATA FIELD;
 5     CORRECT?"
 6               SAME OBJECTION.
 7               "ANSWER:  YES, THAT IS MY UNDERSTANDING,
 8     THERE COULD BE CONCATENATION IN THE RLC PROTOCOL."
 9               DO YOU SEE HIS TESTIMONY?
10     A    YES.
11     Q    OKAY.
12     A    AND THAT'S EXACTLY THE CASE THAT HE JUST
13     BROUGHT UP.  HE'S NOT TALKING ABOUT HIS INVENTION
14     HERE.
15     Q    OH, HE'S JUST TALKING ABOUT AN ENTIRE SDU?
16     A    NO.  HE'S TALKING ABOUT THE PROCESS FOR
17     CREATING PACKETS FOR TRANSMISSION.  HE'S TALKING
18     ABOUT EXACTLY THE CASE YOU JUST TALKED ABOUT.  HE'S
19     NOT TALKING ABOUT HIS INVENTION.
20     Q    SO YOUR VIEW IS THAT ONLY AN ENTIRE SDU
21     REQUIRES AN EXACT FIT; CORRECT?
22     A     THAT'S MY INTERPRETATION, AND THAT WOULD BE AN
23     INTERPRETATION OF ONE OF ORDINARY SKILL IN THE ART
24     READING THE SPECIFICATION AND UNDERSTANDING THE
25     TEACHINGS OF THE SPECIFICATION.
```

1    Q    AND --

2    A    AND IF IT WERE NOT ONLY AN ENTIRE SDU, THIS

3    INVENTION WOULD NOT FUNCTION.  IT WOULD NOT

4    CORRECTLY IMPLEMENT THE INTENDED PURPOSE.

5    Q    DR. WILLIAMS, LET ME FOLLOW UP ON THAT WITH

6    TWO QUESTIONS.

7              IF THE JURY FINDS -- IF THE JURY

8    DETERMINES THE PLAIN AND ORDINARY MEANING IS NOT

9    ONLY AN ENTIRE SDU, YOU HAVE NO OPINION ON

10   INFRINGEMENT; CORRECT?

11   A    I HAVE AN OPINION THAT THIS CLAIM, WHEN

12   PROPERLY INTERPRETED BY THE LEGAL STANDARDS THAT

13   I'M GIVEN IS THAT ONLY AN ENTIRE SDU CAN BE

14   PROVIDED IN THE DATA FIELD, AND IN THE WORDS OF

15   3GPP SPECIFICATION, IT'S AN SDU WITHOUT

16   SEGMENTATION, CONCATENATION OR PADDING.  AND THESE

17   ARE IDENTICAL IDEAS.

18   Q    LET'S SEE WHAT YOU SAID UNDER OATH WHEN YOU

19   WERE ASKED THAT QUESTION AT YOUR DEPOSITION.

20             PAGE 222, LINE 15 TO 21.  "IF THE TERM

21   'ENTIRE SDU' DOES NOT MEAN ONLY AN ENTIRE SDU,

22   WOULD YOU AGREE THAT THE CLAIMS ARE NOT INFRINGED

23   BY THE USE OF TS 25.322 AS -- AS IMPLEMENTED IN

24   RELEASE 6?"

25             AND YOUR ANSWER WAS "I HAVE NOT

1    CONSIDERED THAT OPTION," CORRECT?

2    A    YES, AND I WILL POINT OUT THAT I'M ALSO UNDER

3    OATH TODAY, AS WELL AS IN MY DEPOSITION, AND I

4    DON'T SEE HOW THIS ANSWER SUPPORTS YOUR HYPOTHESIS.

5    Q    WELL, YOU KNOW, DR. WILLIAMS, THAT'S WHAT

6    THESE NINE FOLKS ARE FOR IS TO DECIDE WHETHER THAT

7    ANSWER IS CONSISTENT WITH YOUR TESTIMONY TODAY.

8         BUT THAT'S YOUR TESTIMONY AT THE TIME,

9    YOU HAVEN'T CONSIDERED THAT; CORRECT?  CORRECT?

10   A    I'M SORRY.  THE QUESTION?

11   Q    THAT WAS YOUR TESTIMONY AT THE TIME; CORRECT?

12   A    THIS WAS AN ACCURATE REFLECTION OF MY

13   TESTIMONY, YES.

14   Q    ALL RIGHT.  LAST COUPLE OF QUESTIONS.  TURN,

15   IF YOU WOULD, TO VOLUME 1, TAB 2, WHICH IS JX 1060,

16   AND DO YOU RECOGNIZE, THIS IS THE FILE HISTORY FOR

17   THE PATENT; CORRECT?

18   A    YES.

19   Q    YOU REVIEWED THE FILE HISTORY; CORRECT?

20   A    YES.

21   Q    IN THE FILE HISTORY, THE PATENT OFFICE

22   REJECTED THE CLAIMS MORE THAN ONCE; CORRECT?

23   A    YES.

24   Q    TURN, IF YOU WOULD, TO PAGE 28 TO 29.  LET'S

25   PUT IT ON THE SCREEN.

1          AND YOU RECALL THAT WHAT HAPPENED -- CAN

2     I HAVE THE PARAGRAPH, "JIANG DISCLOSES" AT THE

3     BOTTOM.

4          AND WHAT HAPPENS, SO THE JURY

5     UNDERSTANDS, IS THE PATENT OFFICE REJECTED THESE

6     CLAIMS AND SAID THERE'S A PIECE OF PRIOR ART HERE

7     BY JIANG.  YOU REMEMBER THAT, DON'T YOU?

8     A    NO.

9     Q    YOU DON'T REMEMBER THAT?

10    A    I DON'T REMEMBER THAT THEY REJECTED OVER

11    JIANG.

12    Q    BUT YOU DO REMEMBER THAT FOR WHATEVER REASON,

13    SAMSUNG DECIDED TO TELL THE PATENT OFFICE THAT

14    JIANG WAS DIFFERENT; CORRECT?

15    A    BUT I DON'T RECALL THE PATENT OFFICE REJECTING

16    THE CLAIM OVER JIANG.

17    Q    DIFFERENT QUESTION.  YOU RECALL THAT SAMSUNG

18    TOLD THE PATENT OFFICE THAT JIANG WAS DIFFERENT;

19    CORRECT?

20         MR. VERHOEVEN:  OBJECTION.  LACKS

21    FOUNDATION.

22         THE WITNESS:  I DON'T UNDERSTAND.

23         THE COURT:  OVERRULED.

24         THE WITNESS:  I DON'T UNDERSTAND THE

25    QUESTION.

```
1    BY MR. LEE:

2    Q    NOW, DO YOU SEE THE SENTENCE THAT SAYS, "THE

3    APPLICANTS, HOWEVER, RECITE RECEIVING THE PROTOCOL

4    DATA UNIT, PDU, FROM A TRANSMITTER AND DETECTING

5    SEQUENCE NUMBER, SN FIELD, AND A ONE-BIT FIELD

6    INDICATING WHETHER THE PDU CONTAINS AN ENTIRE

7    SERVICE DATA UNIT IN ITS DATA FIELD FROM THE

8    HEADER."

9              DO YOU SEE THAT?

10   A    YES.

11   Q    ACCORDINGLY, THE EXTENSION BIT 55A OF JIANG

12   DOES NOT INDICATE WHETHER THE PDU CONTAINS AN

13   ENTIRE SDU IN ITS DATA FIELD FROM THE HEADER.

14             HAVE I READ THAT CORRECTLY?

15   A    YOU HAVE.

16   Q    WHAT SAMSUNG TOLD THE PATENT OFFICE IS EXACTLY

17   THE OPPOSITE OF WHAT YOU'VE TOLD THE JURY.  THEY'VE

18   SAID THAT SOMEONE WHO'S GOT AN EXACT FIT IS

19   DIFFERENT FROM THEIR PATENT; CORRECT?

20   A    NO.

21             MR. LEE:  ALL RIGHT.  NOTHING FURTHER,

22   YOUR HONOR.

23             THE COURT:  ALL RIGHT.  THE TIME IS NOW

24   11:54.  GO AHEAD WITH REDIRECT, PLEASE.  WE'LL GO

25   UNTIL NOON.
```

```
1              MR. VERHOEVEN:  NO REDIRECT.

2              THE COURT:  NO REDIRECT?  OKAY.  MAY THIS

3    WITNESS BE EXCUSED AND IS HE SUBJECT TO RECALL?

4              MR. LEE:  SUBJECT TO RECALL.

5              MR. VERHOEVEN:  SUBJECT TO RECALL.

6              THE COURT:  OKAY.  YOU ARE EXCUSED

7    SUBJECT TO RECALL.

8              LET'S GO AHEAD AND START YOUR NEXT

9    WITNESS, PLEASE.

10             MR. QUINN:  YOUR HONOR, SAMSUNG CALLS JIN

11   SOO KIM.

12             THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

13   11:54.

14             MR. QUINN:  AND, YOUR HONOR, THIS WITNESS

15   WILL BE TESTIFYING AGAIN THROUGH INTERPRETERS.

16             THE COURT:  OKAY.  SO WHEN -- ALL RIGHT.

17   I'M NOT COUNTING THIS TOWARDS YOUR TIME.  CAN WE

18   GET THE CHAIRS SET UP, PLEASE.

19             (PAUSE IN PROCEEDINGS.)

20             THE COURT:  WE MAY NOT GET VERY FAR, BUT

21   LET'S GO AHEAD AND GET STARTED.

22             (PAUSE IN PROCEEDINGS.)

23             THE COURT:  I'M GOING TO JUST ASK THE

24   PARTIES, I DON'T THINK WE NEED TO RESWEAR THE

25   INTERPRETERS, BUT I DEFER TO YOU ALL.
```

```
 1              MR. QUINN:  I WOULDN'T THINK SO, YOUR

 2   HONOR.

 3              MR. MCELHINNY:  AND THE INTERPRETERS ARE

 4   SWORN, YOUR HONOR.

 5              THE COURT:  THEY ARE ALREADY SWORN.  IT'S

 6   THE SAME INTERPRETERS.

 7              MR. VERHOEVEN:  YOUR HONOR, JUST SO IT

 8   DOESN'T GET MISPLACED ACCIDENTALLY, I'D LIKE TO

 9   RETRIEVE THAT SOURCE CODE FROM YOU.

10              MR. LEE:  AND I'M GOING TO RETURN MINE

11   NOW.

12              THE COURT:  OKAY.  THAT WAS WITH PALTIAN

13   AND ZORN; RIGHT?

14              ALL RIGHT.  WHY DON'T THE INTERPRETERS

15   JUST RESTATE THEIR NAMES FOR THE RECORD SO IT'S

16   CLEAR.  WHO IS THE PRIMARY AND THEN WHO ARE THE TWO

17   CHECK INTERPRETERS, PLEASE.

18              THE INTERPRETER:  THE PRIMARY

19   INTERPRETER, JAMES VICTORY.

20              THE INTERPRETER:  AND ANN PARK, ONE OF

21   THE CHECK INTERPRETERS.

22              THE INTERPRETER:  ALBERT S. KIM, CHECK

23   INTERPRETER.

24              THE COURT:  ALL RIGHT.  THANK YOU.

25              THE CLERK:  MR. KIM, PLEASE STAND AND
```

1    RAISE YOUR RIGHT HAND.

2                    **JIN SOO KIM,**

3    BEING CALLED AS A WITNESS ON BEHALF OF THE

4    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

5    EXAMINED AND TESTIFIED AS FOLLOWS:

6              THE WITNESS:  YES.

7              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

8              THE COURT:  ALL RIGHT.  TIME IS NOW

9    11:57.  GO AHEAD.  WE'LL JUST GO FOR A FEW MINUTES.

10             MR. QUINN:  OKAY.  THANK YOU, YOUR HONOR.

11   GOOD MORNING, LADIES AND GENTLEMEN.

12                   **DIRECT EXAMINATION**

13   BY MR. QUINN:

14   Q    GOOD MORNING, MR. KIM.  WOULD YOU PLEASE STATE

15   YOUR FULL NAME FOR THE RECORD.

16   A    MY NAME IS JIN SOO KIM.

17   Q    BY WHOM ARE YOU EMPLOYED?

18   A    THAT WOULD BE SAMSUNG ELECTRONICS.

19   Q    AND YOU WORK IN SEOUL, KOREA?

20   A    YES, THAT IS CORRECT.

21   Q    HOW LONG HAVE YOU WORKED FOR SAMSUNG?

22   A    I HAVE WORKED AT SAMSUNG FOR TEN YEARS.

23   Q    AND WHAT IS YOUR POSITION THERE?

24   A    I AM A PRINCIPAL ENGINEER -- STRIKE THAT.  I'M

25   A PRINCIPAL DESIGNER.

1    Q    AND WHAT KINDS OF THINGS DO YOU DESIGN?

2    A    I DESIGN MOBILE DEVICES, WHICH WOULD INCLUDE

3    THE MOBILE PHONES AND TABLETS.

4    Q    DOES THAT INCLUDE THE DESIGN, THE OUTSIDE, THE

5    EXTERIOR APPEARANCE OF THE DEVICE?

6    A    THAT'S CORRECT.  THAT'S WHAT I DO.  I WOULD BE

7    DOING INDUSTRIAL DESIGN, WHICH WOULD BE FOR THE

8    OUTER EXTERIORS.

9    Q    AND DO YOU HAVE A COLLEGE DEGREE?

10   A    YES, THAT'S TRUE.  I HAVE A BACHELOR'S IN

11   INDUSTRIAL DESIGNING.

12   Q    DID YOU WORK AT ANOTHER COMPANY BEFORE YOU

13   WORKED FOR SAMSUNG?

14   A    YES, I DID, AT HYUNDAI AUTOMOBILES.

15   Q    OKAY.  WHEN --

16   A    OR HYUNDAI MOTOR COMPANY.

17   Q    AND DID YOU JOIN HYUNDAI RIGHT AFTER COLLEGE?

18   A    YES, THAT IS CORRECT.

19   Q    AND WHAT TYPE OF WORK DID YOU DO AT HYUNDAI?

20   A    I DESIGNED EXTERIORS OF AUTOMOBILES.

21   Q    AND CAN YOU TELL US, IN THE DESIGN FIELD IN

22   KOREA, ARE THERE ANY MORE PRESTIGIOUS COMPANIES TO

23   WORK AT THAN HYUNDAI AND SAMSUNG?

24   A    THE MOST PRESTIGIOUS WOULD BE WITH SAMSUNG

25   ELECTRONICS, AND HYUNDAI MOTOR COMPANY IN KOREA.

```
 1    Q    HAVE YOU RECEIVED A RECOGNITION FROM ANY

 2   GLOBAL DESIGN ORGANIZATIONS FOR YOUR DESIGN WORK?

 3   A    THERE IS AN AWARD GIVEN AS A RED DOT DESIGN

 4   AWARD BY I.F. IN --

 5              THE INTERPRETER:  THE INTERPRETER

 6   CORRECTION.  FROM THE TOP.

 7              THE WITNESS:  THERE IS I.F. AWARD, AND

 8   ALSO RED DOT AWARD GIVEN IN GERMANY, AND I HAVE

 9   RECEIVED THOSE AWARDS AS THE BEST.

10   BY MR. QUINN:

11   Q    ARE THOSE TWO SEPARATE DESIGN ORGANIZATIONS,

12   THE RED DOT AND THE I.F.?

13   A    THAT'S CORRECT.  THESE ARE AWARDED IN

14   DIFFERENT AREAS.

15   Q    AND CAN YOU TELL US WHETHER, IN YOUR

16   PROFESSION OF INDUSTRIAL DESIGN, THESE ARE THE MOST

17   PRESTIGIOUS GLOBAL AWARDS?

18   A    THAT IS CORRECT.

19              THE COURT:  IT'S 12:02.  CAN WE GO

20   AHEAD --

21              MR. QUINN:  ONE LAST QUESTION, YOUR

22   HONOR.

23              THE COURT:  PLEASE, GO AHEAD.

24   BY MR. QUINN:

25   Q    WHAT IS IT THAT YOU ENJOY ABOUT BEING AN
```

```
1    INDUSTRIAL DESIGNER?
2    A    WELL, I REALLY ENJOY WHAT I DO AS A DESIGNER,
3    AND I'M PROUD OF WHAT I DO.  AND MY UNDERSTANDING
4    IS THAT THERE'S ABOUT 300 MILLION PEOPLE GLOBALLY
5    WHO ARE USING MOBILE PHONES AND OTHER DEVICES THAT
6    I HAVE DESIGNED, AND I'M PROUD OF THAT.
7              MR. QUINN:  THANK YOU, YOUR HONOR.
8              THE COURT:  ALL RIGHT.  IT IS 12:03.  WE
9    ARE NOW GOING TO BREAK FOR LUNCH.
10             AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T
11   DISCUSS THE CASE WITH ANYONE AND PLEASE DON'T READ
12   ABOUT THE CASE OR DO ANY OF YOUR OWN RESEARCH.
13             IF YOU WOULD JUST PLEASE LEAVE YOUR JUROR
14   NOTEBOOKS IN THE ROOM, AND WE'LL SEE YOU BACK AT
15   1:00.
16             OKAY?  THANK YOU.
17             (WHEREUPON, THE FOLLOWING PROCEEDINGS
18   WERE HELD OUT OF THE PRESENCE OF THE JURY:)
19             THE COURT:  OKAY.  I'M JUST GOING TO GIVE
20   YOU TIME TOTALS.  APPLE, 17 HOURS, 3 MINUTES;
21   SAMSUNG 20 HOURS AND 14 MINUTES.
22             OKAY.  ALL RIGHT.  THANK YOU.  I'LL SEE
23   YOU BACK AT 1:00.  THANK YOU.
24             (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)
25             THE COURT:  EXCUSE ME.  SOMEONE FROM THE
```

1    MEDIA HAS REQUESTED COPIES.  CAN YOU ALL LEAVE

2    PERHAPS THE WITNESS PHOTOS IN THE ATTORNEY'S

3    LOUNGE, OR DO YOU HAVE ANY PROBLEMS WITH THAT?

4             MR. VERHOEVEN:  I DON'T KNOW IF THESE

5    WITNESSES KNOW THEIR PICTURES ARE GOING TO BE

6    PUBLISHED ALL OVER THE PLACE.

7             MR. MCELHINNY:  YEAH.  THERE'S NO

8    PHOTOGRAPHY ALLOWED IN THE COURTROOM, YOUR HONOR.

9    NOW WE'RE DEALING WITH INDIVIDUALS.

10             MR. VERHOEVEN:  CAN WE CONFER ON IT.

11             THE COURT:  CAN YOU CONFER ON THAT AND

12    LET ME KNOW AFTER LUNCH?

13             (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2                    (WHEREUPON, THE FOLLOWING PROCEEDINGS

3          WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4                    THE COURT:  OKAY.  WELCOME BACK.

5                    MR. MCELHINNY:  YOUR HONOR, BEFORE THE

6          JURY COMES IN, CAN I CALL YOUR ATTENTION TO AN

7          EVIDENTIARY MATTER?

8                    THE COURT:  OKAY, WHAT'S THAT?

9                    MR. MCELHINNY:  IF YOU LOOK IN SAMSUNG

10         EXHIBITS, TAB 684.

11                   THE COURT:  OKAY.

12                   MR. MCELHINNY:  YOU WILL SEE THERE

13         EXHIBITS -- THE FIRST PAGE OF SAMSUNG'S EXHIBITS,

14         684, YOUR HONOR MAY REMEMBER THE HISTORY OF THIS,

15         THIS WAS USED WITH MR. DENISON OVER OUR OBJECTION,

16         BUT IT WAS NOT ALLOWED IN EVIDENCE BECAUSE

17         MR. DENISON COULD NOT AUTHENTICATE THE UPPER

18         LEFT-HAND CORNER.

19                   I'M REFRESHING YOUR RECOLLECTION OF WHERE

20         WE WERE.

21                   THE COURT:  OKAY.

22                   MR. MCELHINNY:  YESTERDAY AFTERNOON,

23         AFTER THE OBJECTIONS HAD BEEN BRIEFED, SAMSUNG

24         SERVED ON US THE NEXT THREE PAGES, WHICH THEY TOLD

25         US WERE SLIGHT CHANGES TO 684.

1          BUT AS YOU WILL SEE, WHAT THEY DO, YOUR

2    HONOR, IS THEY REDUCE THE NUMBER OF PHONES IN ORDER

3    TO EMPHASIZE THE INDEPENDENT DEVELOPMENT OF PHONES,

4    AND ALSO TO EMPHASIZE THE PHONES THAT WERE

5    EXPRESSLY STRICKEN BY JUDGE GREWAL'S ORDER.

6          THE COURT:  LIKE WHAT?

7          MR. MCELHINNY:  LIKE THE SLIDE DESIGN --

8    THE SLIDE, THE WRAP, AND THE CARD 3 WERE PART OF

9    THE MPCP DOCUMENT WHICH YOUR HONOR HAS RULED OUT

10   ABOUT FIVE TIMES.

11         SO THIS WAS GOING TO BE, WE THINK, THE

12   H.S. PARK TESTIMONY, AND NOW, BY CHANGING THESE

13   SLIDES AND EMPHASIZING THIS --

14         THE COURT:  WHAT IS THAT MPCP TESTIMONY?

15         MR. MCELHINNY:  IT'S THE DOCUMENT THAT

16   PURPORTS TO SHOW THE HISTORY THAT LEADS UP THE CUE

17   BALL DOCUMENT, THAT PURPORTS TO SHOW THE HISTORY

18   THAT LEADS UP THE F700.

19         THE COURT:  LET ME SEE SOMETHING FROM

20   JUDGE GREWAL'S ORDER THAT PRECLUDED THIS SLIDE.

21         OKAY.  WHAT WAS DISCLOSED TO YOU?

22   BECAUSE I'M NOT GOING ALLOW ANYTHING THAT WAS NOT

23   DISCLOSED.  WE DON'T HAVE TIME FOR THIS.

24         MR. MCELHINNY:  THE FIRST PAGE WAS

25   DISCLOSED.

```
1              THE COURT:  DID YOU OBJECT OR NOT?

2              MR. MCELHINNY:  IT WAS NOT ONE OF OUR

3    HIGH PRIORITY OBJECTIONS.

4              MR. BEDECARRE:  YOUR HONOR, THIS IS

5    ALBERT BEDECARRE FOR SAMSUNG.

6              THE MPCP DOCUMENT WAS NEVER STRICKEN BY

7    JUDGE GREWAL.  THE DOCUMENT THAT MR. MCELHINNY HAS

8    IS CALLED THE IRENE DOCUMENT.  THAT DOCUMENT WAS IN

9    SOME OF THE EXPERT REPORTS THAT WERE STRICKEN.

10             THE MPCP DOCUMENTS ARE DIFFERENT, AND

11   THEY WERE NEVER AFFECTED BY HIS ORDER.

12             THE COURT:  ALL RIGHT.  THIS IS COUNTING

13   TOWARDS BOTH OF YOUR TRIAL TIME.  I WILL DETERMINE

14   AT THE END OF THE DISPUTE HOW THE APPLICATION WILL

15   EXACTLY BE DONE.

16             BUT IT'S 1:0 -- WE STARTED AT 1:03.

17             MR. MCELHINNY:  I WANT TO MAKE A VERY

18   SIMPLE POINT YOUR HONOR.

19             THE COURT:  1:03.  GO AHEAD.  I'VE GOT

20   ALL THE REPORTS HERE.  WHOSE WAS IT STRICKEN FROM?

21             MR. MCELHINNY:  IT WAS STRICKEN FROM

22   SHERMAN'S REPORT, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  TELL ME WHICH

24   PAGE NUMBER, PLEASE.

25             MR. MCELHINNY:  PAGE 40.
```

```
 1                 THE COURT:  REMEMBER, I'M NOT GIVING ANY
 2      EXTENSIONS ON TIME.
 3                 OKAY.  I SEE THAT PART WAS STRICKEN, BUT
 4      I DON'T SEE WHERE THAT SAYS THAT INCLUDES THE SLIDE
 5      OR THE WRAP.  WHERE DOES IT SAY THAT?  I'M LOOKING
 6      AT PAGE 40.  I'VE GOT IT.
 7                 MR. BEDECARRE:  YOUR HONOR, THEY WON'T BE
 8      FOUND IN THE MPCP DOCUMENTS.
 9                 THE COURT:  WHAT IS THE MPCP DOCUMENT?
10      WHAT IS THAT DOCUMENT?  TELL ME WHAT THAT IS.  DO
11      YOU HAVE IT?
12                 MR. BEDECARRE:  I'LL GET THE EXHIBIT.
13                 THE COURT:  PLEASE, IF YOU WOULD.
14                 CAN YOU GIVE ME AN EXHIBIT NUMBER?
15                 MR. MCELHINNY:  YES, YOUR HONOR.
16                 THE COURT:  I NEED TO FIND IT.  JUST GIVE
17      ME THE EXHIBIT NUMBER.
18                 MR. MCELHINNY:  625, YOUR HONOR.
19                 THE COURT:  PLAINTIFF'S EXHIBITS, OR
20      DEFENDANT'S?
21                 MR. MCELHINNY:  DEFENDANT'S EXHIBIT
22      NUMBER 625, 596, AND 622.
23                 THE COURT:  596 IS THE SAMSUNG BATES
24      NUMBER?  WHAT IS THAT?
25                 MR. MCELHINNY:  THAT'S THE EXHIBIT
```

```
1    NUMBER, YOUR HONOR.

2              THE COURT:  OKAY.  I HAVE THE 625 AND THE

3    596.

4              MR. BEDECARRE:  AND YOU WILL NOT SEE THE

5    IMAGES THAT ARE STRICKEN BY JUDGE GREWAL, YOUR

6    HONOR.

7              THE COURT:  596 IS BLANK.  OH, HERE IT

8    IS.  OKAY.  SO WHAT ABOUT THESE?

9              MR. MCELHINNY:  THESE ARE THE PRIOR

10   DEVELOPMENT DOCUMENTS THAT YOUR HONOR HAS RULED

11   IRRELEVANT.

12             THE COURT:  WHERE?  I HAVE ALL MY ORDERS

13   HERE.  TELL ME WHICH ONE.  GIVE ME THE ECF NUMBER.

14             MR. MCELHINNY:  IN THE ORDER DETERMINING

15   THAT H.S. PARK COULD NOT TESTIFY.

16             THE COURT:  OKAY.  HANG ON.

17             MR. BEDECARRE:  SO, YOUR HONOR, ON PAGE

18   40 OF THE SHERMAN REPORT, THERE ARE TWO PICTURES OF

19   THE IRENE DOCUMENT.

20             THE COURT:  OKAY.  I'M SORRY.  CAN YOU

21   GIVE ME ONE MINUTE, PLEASE?

22             MR. BEDECARRE:  YEAH.

23             THE COURT:  I'M LOOKING AT ECF NUMBER

24   1690, WHICH IS THE ORDER ON HYOUNG SHIN PARK, AND I

25   DON'T SEE IT DISCUSSING ANYTHING OTHER THAN THE
```

1    F700 AND THE KR'985 PATENT.

2              SO YOU TELL ME WHERE --

3              MR. MCELHINNY:  THE F700 WAS PART OF THIS

4    CUE BALL PROJECT, YOUR HONOR, WHICH IS THE PRIOR

5    DEVELOPMENT HISTORY, AND THE REASON IT'S STRICKEN

6    IS BECAUSE THE PRIOR DEVELOPMENT HISTORY WAS

7    STRICKEN.

8              MR. BEDECARRE:  YOUR HONOR --

9              THE COURT:  WHAT IS THIS ON PAGE 40 OF

10   MR. SHERMAN'S REPORT, THIS SAM NDCA 321457 THROUGH

11   1656?  IS THAT THE INDEPENDENT DEVELOPMENT HISTORY?

12             MR. MCELHINNY:  IT IS, YOUR HONOR, AND

13   IT'S A PART OF THE MPCP U/I, GUI PROPOSAL CALLED

14   TOUCHING SKY.

15             MR. BEDECARRE:  YOUR HONOR, ON PAGE 40,

16   THAT'S A DOCUMENT WHICH -- I'LL ASK MR. MCELHINNY

17   TO TELL ME THE EXHIBIT NUMBER OF THE IRENE DOCUMENT

18   OR TOUCHING SKY DOCUMENT.

19             BUT EXHIBITS 596 AND 522 DO NOT CONTAIN

20   THE IMAGES THAT APPEAR ON PAGE 40 AND WERE STRICKEN

21   BY JUDGE GREWAL.

22             THE COURT:  WHAT, WHAT -- WHICH ONE IS

23   TOUCHING SKY?  596 OR 625?

24             MR. MCELHINNY:  NO.  59 -- TOUCHING SKY

25   WAS NOT MARKED AS AN EXHIBIT, YOUR HONOR.

```
 1            THE COURT:  I DON'T SEE ANY OF THESE

 2   IMAGES ON PAGE 40.

 3            MR. MCELHINNY:  YOUR HONOR --

 4            THE COURT:  AND YOU TOLD ME TO LOOK AT

 5   596 AND 625 AND I -- AND SO WHAT?  I'M LOOKING AT

 6   THEM.  SO WHAT?

 7            MR. MCELHINNY:  IF YOU LOOK ON PAGE -- OF

 8   EXHIBIT 625.

 9            THE COURT:  OKAY.

10            MR. MCELHINNY:  AT PAGE .12, THAT IS THE

11   SLIDE PHONE, YOUR HONOR.

12            THE COURT:  OKAY.  AND WHAT?

13            MR. BEDECARRE:  AND YOU WILL NOT FIND

14   THAT STRICKEN IN ANY ORDER BY JUDGE GREWAL, YOUR

15   HONOR.

16            THE COURT:  I DON'T SEE IT IN

17   MR. SHERMAN'S REPORT.

18            MR. MCELHINNY:  YOUR HONOR, BECAUSE --

19   BECAUSE THE -- THE HISTORY HERE IS THAT BECAUSE THE

20   PRIOR DEVELOPMENT WAS NOT DISCLOSED, THE PART THEY

21   USED IN MR. SHERMAN'S REPORT WAS STRICKEN.

22            YOUR HONOR HAS SINCE STRICKEN -- YOU

23   STRUCK OPENING SLIDES 11 THROUGH 16, WHICH INCLUDE

24   THE PICTURE OF THE SLIDE PHONE.

25            YOUR HONOR, WHAT I WOULD LIKE TO REST MY
```

```
 1    OBJECTION ON, BECAUSE I DON'T HAVE THE TIME FOR

 2    THIS, IS SIMPLY THE FACT THAT THE LAST THREE PAGES

 3    WERE DISCLOSED TO US AFTER THE DISCLOSURE DATE,

 4    AFTER WE BRIEFED THE HPO'S AND WE DIDN'T HAVE A

 5    CHANCE TO BRING THIS TO YOUR ATTENTION IN AN

 6    ORDERLY FASHION WHEN WE CITED ALL THE DOCUMENTS.

 7              THE COURT:  SO YOU'RE WITHDRAWING YOUR

 8    OBJECTION TO THE FIRST ONE, 684?

 9              MR. MCELHINNY:  WE HAVE NEVER OBJECTED TO

10    THAT.  I'M -- THAT WAS DISCLOSED.  I'M NOT

11    OBJECTING TO THAT.  I'M OBJECTING TO THE

12    VARIATIONS, THE THREE VARIATIONS --

13              THE COURT:  THE A, B, AND C?

14              MR. MCELHINNY:  YES, YOUR HONOR, THAT

15    WERE DISCLOSED TO US AT 4:00 O'CLOCK YESTERDAY

16    AFTERNOON.

17              THE COURT:  ALL RIGHT.  WELL --

18              MR. BEDECARRE:  AND, AGAIN, YOUR HONOR,

19    MR. SHERMAN'S REPORT, WHICH HE POINTED YOU TO, HAS

20    IMAGES FROM A DIFFERENT DOCUMENT.

21              THE COURT:  NO, NO, NO.  I SET A

22    PROCEDURE FOR ORDERLY OBJECTIONS AND YOU SHOULD

23    HAVE DISCLOSED A, B, AND C SO THAT THEY COULD HAVE

24    BE OBJECTED TO IT IN A TIMELY MANNER.

25              MR. QUINN:  YOUR HONOR, B WAS DISCLOSED
```

```
 1    IN A TIMELY MANNER.

 2              684.001B, THAT'S THE SLIDE THAT WE USED

 3    IN OPENING.  IT'S THE SLIDE WE USED WITH

 4    MR. DENISON.  ALTHOUGH THE JURY DIDN'T SEE IT, THE

 5    COURT SAID IF HE CAN'T IDENTIFY ALL THE PHONES, THE

 6    JURY IS NOT GOING TO SEE IT.  THIS WITNESS CAN

 7    IDENTIFY THE PHONES --

 8              THE COURT:  I DISAGREE WITH YOU.  I

 9    THINK, AND YOU CAN CORRECT ME IF I'M WRONG, I

10    BELIEVE WHAT MR. DENISON SAW WAS 684.001.  I DON'T

11    THINK HE SAW 001B.  I DON'T REMEMBER SEEING 001B.

12              MR. QUINN:  WE RESEARCHED THAT, YOUR

13    HONOR, BECAUSE I HAD THE SAME QUESTION AND WANTED

14    TO BE CERTAIN OF IT.

15              THE COURT:  OKAY.  LET ME SEE THE

16    TRANSCRIPT.  LET ME SEE THE TRANSCRIPT.  THIS IS

17    ALL TIME THAT'S BEING BILLED TO YOU BOTH 50/50.

18    SHOW ME THE TRANSCRIPT OF THAT DATE, PLEASE.  AND

19    LET ME SEE WHERE IN -- JUST SHOW ME, TAB FOR ME

20    WHERE IT SAYS THAT THIS PARTICULAR EXHIBIT WAS

21    REVIEWED.

22              MR. QUINN:  SINCE THERE'S NO OBJECTION,

23    YOUR HONOR, TO 681.001, TO SAVE TIME, WE'LL JUST

24    USE THAT.

25              THE COURT:  WHICH ONE?
```

2801

```
 1              MR. QUINN:  MY UNDERSTANDING IS 684.001.

 2              THE COURT:  ALL RIGHT.

 3              MR. MCELHINNY:  I'M SORRY, YOUR HONOR.

 4    THE SLIDE THAT WAS DISCLOSED IS THE -- THAT'S

 5    RIGHT.  I'M SORRY.

 6              THE COURT:  ALL RIGHT.  SO ARE WE IN

 7    AGREEMENT AS TO WHICH ONE IS GOING IN?

 8              MR. MCELHINNY:  WE'RE IN AGREEMENT, YOUR

 9    HONOR, AS TO WHICH ONE CAN BE USED.  WHETHER OR NOT

10    THIS WITNESS CAN HELP US WITH THIS DOCUMENT IS YET

11    TO BE SEEN.

12              THE COURT:  ALL RIGHT.  THAT'S 684.001;

13    CORRECT?

14              MR. MCELHINNY:  YES, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  1:14.  YOU'RE

16    GETTING BILLED FOR THAT 50/50.  THAT'S GOING TO BE

17    SIX MINUTES EACH.

18              ALL RIGHT.  PLEASE BRING IN OUR JURY.

19              (WHEREUPON, THE FOLLOWING PROCEEDINGS

20    WERE HELD IN THE PRESENCE OF THE JURY:)

21              THE COURT:  ALL RIGHT.  WELCOME BACK.

22    PLEASE TAKE A SEAT.  THE TIME IS NOW 1:15.

23              PLEASE GO AHEAD.

24              MR. QUINN:  THANK YOU, YOUR HONOR.

25    Q    IF THE WITNESS COULD PLEASE RECEIVE EXHIBITS,
```

```
1    GALAXY TAB EXHIBIT, JOINT EXHIBIT 1037 AND 1038.

2              AND LET ME ASK YOU, MR. KIM, IF YOU WERE

3    INVOLVED IN DESIGNING THE GALAXY TAB.

4              MR. MCELHINNY:  MAY I SEE THOSE, PLEASE?

5              MR. QUINN:  I THINK THEY'RE BOTH IN

6    EVIDENCE.

7              MR. MCELHINNY:  BUT WE HAVE A PROCEDURE,

8    MR. QUINN, YOU HAVEN'T BEEN HERE -- WE HAVE A

9    PROCEDURE.  WE'VE HAD MISTAKES BEFORE.

10             MR. QUINN:  WOULD YOU LIKE TO COME UP OR

11   SHALL I BRING THEM TO YOU?

12             MR. MCELHINNY:  AS YOU -- I DON'T WANT TO

13   INTERRUPT YOU.

14             THANK YOU.

15             MR. QUINN:  WE HAVE SOME OTHER PHONES.

16   PERHAPS YOU COULD SHOW THEM TO COUNSEL.

17   Q    SO KIM -- MR. KIM, MY QUESTION IS WHETHER YOU

18   WERE THE PERSON INVOLVED IN DESIGNING THESE TWO

19   TABLETS.

20   A    THAT IS CORRECT.

21   Q    AND WHAT IS THE DIFFERENCE, IF YOU CAN TELL

22   THE JURY, BETWEEN THOSE TWO GALAXY TAB 10.1'S?

23   A    ONE IS A SIMPLE WI-FI VERSION.  THE OTHER ONE

24   IS A 4G LTE VERSION.

25   Q    WHEN DID SAMSUNG BEGIN WORKING ON THE GALAXY
```

1   TAB 10.1 PROJECT?

2   A    THAT WOULD BE OCTOBER 2009.

3   Q    AND WHEN DID YOU PERSONALLY BEGIN WORKING ON

4   THAT PROJECT?

5   A    THE SAME TIME, OCTOBER OF 2009.

6   Q    AND CAN YOU TELL US WHETHER THAT WAS BEFORE OR

7   AFTER APPLE ANNOUNCED THE IPAD.

8   A    THAT WOULD BE BEFORE.

9   Q    AND DO YOU RECALL WHEN THE IPAD WAS ANNOUNCED?

10  A    END OF JANUARY OF 2010.  THAT'S MY

11  UNDERSTANDING.

12  Q    AND DO YOU HAVE ANY DOCUMENTS THAT REFLECT

13  THAT YOU WERE WORKING ON THE GALAXY TAB 10.1 BEFORE

14  APPLE ANNOUNCED THE IPAD?

15  A    YES, I DO.

16  Q    AND WHAT IS YOUR RECOLLECTION OF ANY DOCUMENTS

17  THAT WOULD REFLECT THAT, THAT YOU WERE WORKING ON

18  THAT?

19          THE INTERPRETER:  YOUR HONOR, MAY THE

20  WITNESS REPEAT HIS ANSWER?

21          THE WITNESS:  YES, I RECEIVED THE

22  PACKAGING REVIEW DOCUMENTS FROM THE DEVELOPMENT

23  OFFICE, WHICH WAS IN THE FORM OF AN E-MAIL.

24  BY MR. QUINN:

25  Q    AND IF WE COULD LOOK AT SDX 3973.009.  IF THAT

1    COULD BE DISPLAYED ON THE SCREEN?

2              AND THIS IS THE KOREAN LANGUAGE VERSION.

3              DO WE HAVE THE ENGLISH LANGUAGE VERSION?

4    IS THIS THE DOCUMENT THAT YOU'RE REFERRING TO?

5    A    YES, THAT'S CORRECT.

6    Q    AND WHAT IS THE DATE OF THAT DOCUMENT?

7    A    THAT WOULD BE JANUARY 6TH, 2010.

8    Q    AND IN TERMS OF THE CONTENT OF THIS DOCUMENT,

9    WHAT DOES IT SAY?

10   A    THIS IS A, THE OVERALL REVIEW OF THE SIZES

11   CONCERNING THE GALAXY TAB 10.1, BASICALLY

12   DISCUSSING THE DISPLAY SIZE, AND ALSO THE BORDER

13   AREA SIZE.

14   Q    AND IS THIS DATED BEFORE APPLE ANNOUNCED THE

15   IPAD?

16   A    YES, THAT'S CORRECT.

17             MR. QUINN:  WE'D OFFER THIS IN EVIDENCE,

18   YOUR HONOR.

19             THE COURT:  ANY OBJECTION?

20             MR. MCELHINNY:  NO OBJECTION?

21             THE COURT:  IT'S ADMITTED.

22             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23             3973.009, HAVING BEEN PREVIOUSLY MARKED

24             FOR IDENTIFICATION, WAS ADMITTED INTO

25             EVIDENCE.)

```
1    BY MR. QUINN:

2    Q    LET'S TALK ABOUT THE BASIC DESIGN PRINCIPLES

3    THAT WENT INTO DESIGNING THE GALAXY TAB.

4              AND WHAT WAS THE MOST IMPORTANT INITIAL

5    CONSIDERATION?

6    A    THE MOST IMPORTANT THING AT THE TIME WAS TO

7    PROVIDE FOR THE BIGGEST ROOM OR THE LARGEST ROOM

8    FOR THE DISPLAY WITHIN AN EXTERIOR THAT IS AS SMALL

9    AS POSSIBLE.

10   Q    AND WHAT SIZE DID YOU ARRIVE AT FOR THE SIZE

11   OF THE DISPLAY?

12   A    WHEN YOU DETERMINE THE SIZE OF A DISPLAY, YOU

13   WOULD HAVE TO CONSIDER THE ECONOMIC ASPECTS OF IT.

14   YOU WANT TO MAKE SURE THAT THERE WOULD BE THE

15   LARGEST AVAILABLE NUMBER OF THE GLASSES WHEN YOU

16   CUT THE BIGGER GLASS, AND ALSO THERE HAS TO BE

17   EFFICIENCY OR PRODUCTIVITY ASPECT TO IT.

18   Q    HOW DID YOU ARRIVE AT THE SIZE OF 10.1 INCHES?

19   THAT SOUNDS LIKE KIND OF AN ODD NUMBER TO CHOOSE.

20   A    PRODUCTIVITY-WISE, AND ALSO THE ECONOMIC

21   EFFICIENCY-WISE, WHEN IT COMES TO MANUFACTURING

22   CAPABILITIES WHICH WERE CONCERNED, WE FELT IT WAS

23   BETTER PERHAPS INCREASING IT BY POINT ONE INCH OF

24   THIS UNIT.

25              THE INTERPRETER:  AFTER HAVING CHECKED,
```

1    YOUR HONOR, WITH THE CHECKERS, RATHER THAN

2    PRODUCTIVITY, IT SHOULD BE MANUFACTURABILITY.

3    BY MR. QUINN:

4    Q    IF YOU HAD INCREASED IT BY ONE INCH, HOW WOULD

5    THAT HAVE AFFECTED THE MANUFACTURABILITY?

6    A    WELL, WE START WITH A MOTHER GLASS, AND IF YOU

7    WERE TO INCREASE THE DISPLAY SIZE OR THE GLASS TO

8    BE CUT BY EVEN 0.1 INCH, IT WOULD MEAN THAT INSTEAD

9    OF HAVING 50 GLASSES THAT COULD BE CUT OUT FROM THE

10   MOTHER GLASS, YOU WOULD END UP WITH 30 TO 35 UNITS

11   ONLY.

12   Q    WHAT WAS THE SECOND PRINCIPAL CONSIDERATION

13   ARRIVING AT THE DESIGN OF THE GALAXY TABLET?

14             MAY I APPROACH THE WITNESS, YOUR HONOR?

15             THE COURT:  PLEASE, GO AHEAD.

16             THE WITNESS:  THE -- THE SECOND THING I

17   HAD CONSIDERED WAS WHETHER THEY WANT TO HAVE THE

18   DISPLAY ON A MORE HORIZONTAL BASIS OR THE VERTICAL

19   BASIS.

20             MR. QUINN:  I'M HANDING THE WITNESS, YOUR

21   HONOR, AN IPAD, EXHIBIT 1004 IN EVIDENCE.

22   Q    AND CAN YOU EXPLAIN TO US WHAT THE DIFFERENCE

23   IN ORIENTATION, WHAT YOU MEAN BY "ORIENTATION"?

24             MR. MCELHINNY:  YOUR HONOR, OBJECTION.

25   THIS IS THE NON-INFRINGEMENT COMPARISONS.  THIS

```
 1    WITNESS IS NOT AN EXPERT.  HE'S NOT BEEN DISCLOSED
 2    AS AN EXPERT.
 3              MR. QUINN:  I'M JUST ASKING HIM TO
 4    EXPLAIN WHAT HE MEANS BY ORIENTATION, YOUR HONOR.
 5              THE COURT:  I'M GOING TO SUSTAIN THE
 6    OBJECTION.
 7              GO AHEAD WITH YOUR NEXT QUESTION, PLEASE.
 8    BY MR. QUINN:
 9    Q    YOU REFERRED TO PORTRAIT AND LANDSCAPE.  CAN
10    YOU EXPLAIN THE DIFFERENCE?
11              MR. MCELHINNY:  COULD SOMEONE EXPLAIN TO
12    THE WITNESS THAT HE'S NOT SUPPOSED TO BE HOLDING UP
13    THE TWO DEVICES?
14              MR. QUINN:  IS THAT THE COURT'S RULING,
15    THAT HE SHOULD NOT HOLD THE TWO DEVICES?
16              THE COURT:  WELL, MY RULING WAS THAT HE'S
17    NOT TO TESTIFY ON INVALIDITY OR NON-INFRINGEMENT.
18              SO, YES.
19              MR. QUINN:  ALL RIGHT.
20    Q    SO WOULD YOU PUT DOWN THE IPAD, PLEASE.
21              COULD YOU EXPLAIN THE DIFFERENCE BETWEEN
22    LANDSCAPE AND PORTRAIT ORIENTATION?
23    A    WELL, WHEN YOU LOOK AT THESE DEVICES, THERE'S
24    THE HARDWARE PART AND THEN THERE ARE PARTS THAT ARE
25    UNSEEN, OR NOT SEEN.  FOR EXAMPLE, WE WOULD HAVE TO
```

1    DECIDE WHERE WE WANT TO PUT THE PLACE, THE 30 PIN

2    CONNECTOR, AND ALSO THERE'S A CAMERA HERE WHICH

3    WOULD TAKE A SHOT OF THE FRONT VIEW, AND ALSO

4    THERE'S ANOTHER CAMERA FOR A REAR, REAR VIEWS.

5            AND ALSO, WE HAVE TO CONSIDER THE

6    PLACEMENT OF THE EAR DUCTS AND THE SPEAKERS.  SO

7    ALL THESE PLACEMENTS WOULD BE A BEARING ON WHETHER

8    THE ORIENTATION SHOULD BE VERTICAL OR HORIZONTAL.

9            SO AS DESIGNERS WE WOULD HAVE TO CONSIDER

10   ALL THESE THINGS.

11   Q    IN THE CASE OF THE GALAXY TAB, WHAT DECISION

12   WAS MADE IN TERMS OF ORIENTATION, LANDSCAPE OR

13   PORTRAIT?

14   A    WELL, WE HAVE VARIOUS FEATURES, SUCH AS THE

15   MULTIMEDIA PLAYER AND ALSO THE CAMERA AND ALSO

16   MOVING PICTURE, CAMCORDER, THINGS LIKE THAT, AS

17   WELL AS TV.

18           SO WE HAD TO CONSIDER ALL THOSE THINGS,

19   AND WE HAD TO DECIDE, SINCE WE WERE EMPLOYING A

20   LANDSCAPE ALREADY ANYWAY, THAT THE GALAXY TAB

21   SHOULD ALSO BE LANDSCAPE ORIENTED.

22   Q    OKAY.  IN TALKING ABOUT THE DESIGN OF THE

23   GALAXY, WE TALKED ABOUT SCREEN SIZE AND

24   ORIENTATION.

25           WAS THERE A THIRD FACTOR -- SIGNIFICANT

```
1    DESIGN DECISION THAT YOU HAD TO MAKE?
2    A    AND ALSO WE HAD TO CONSIDER THE DISPLAY THAT
3    YOU -- ONE WOULD ENCOUNTER FROM THE FRONT, MORE OF
4    A FRONTAL DISPLAY.
5             AND ALSO, WE HAD TO CONSIDER THE
6    PACKAGING ITSELF.
7             SO WE HAD TO DECIDE WHETHER WE WANT TO
8    REDUCE THE IMAGING AREA, OR THE DISPLAY AREA, AND
9    THEREBY PERHAPS INCREASING THE THICKNESS, OR
10   DECREASE THE THICKNESS AND PERHAPS HAVE THE
11   VERTICAL AND THE HORIZONTAL PART IMAGE SHOWING
12   SMALLER.
13   Q    SO IS IT TRUE THAT YOU COULD --
14            THE INTERPRETER:  I'M SORRY, COUNSEL.
15            (DISCUSSION OFF RECORD BETWEEN
16   INTERPRETERS.)
17            THE WITNESS:  LET ME SAY, YES, WHEN WE
18   TALK ABOUT THE FRONT DISPLAY PART, WE HAVE TO
19   CONSIDER THE FACTORS, INCLUDING RELATING TO THE
20   COMPONENTS.  SO WHETHER WE ARE GOING TO DECREASE
21   THE HORIZONTAL AND THE VERTICAL SIZE, MEANING THE
22   LANDSCAPE ORIENTATION AND THE VERTICAL ORIENTATION
23   OF IT, OR -- IF THAT'S THE CASE, WE HAVE TO
24   INCREASE THE THICKNESS.
25            AND ON THE OTHER HAND, IF YOU WANT TO
```

```
 1    DECREASE THE THICKNESS, WE HAVE TO DECREASE THE
 2    HORIZONTAL AND THE VERTICAL SIZE OF IT.
 3    BY MR. QUINN:
 4    Q    IN DEVELOPING --
 5          MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.
 6    IT DOESN'T MATTER, BUT WE HAVE AN OFFICIAL
 7    TRANSLATOR.  WE HAVE TWO CHECK TRANSLATORS.  THAT
 8    WAS SAMSUNG'S TRANSLATOR.  IS THAT THE OFFICIAL
 9    TRANSLATION?  I THOUGHT WE WERE GOING TO GET IT
10    FROM THE OFFICIAL TRANSLATOR.
11          MR. QUINN:  I HAD UNDERSTOOD THE OFFICIAL
12    TRANSLATOR INVITED THE -- WHAT WE JUST HEARD.
13          THE COURT:  WAS THAT A CONSENSUS AMONGST
14    THE THREE OF YOU, OR NOT?
15          THE INTERPRETER:  WE DON'T INTEND TO
16    OFFER INTERPRETATION BY COMMITTEE BUT FIRST --
17          (DISCUSSION OFFER THE RECORD BETWEEN
18    INTERPRETERS.)
19          THE INTERPRETER:  YOUR HONOR, AFTER
20    HAVING CONFIRMED WITH THE CHECK INTERPRETERS, THE
21    MAIN INTERPRETER STANDS CORRECTED AND THE CHECKER'S
22    RENDITION SHOULD STAND.
23          THE COURT:  OKAY.
24          MR. QUINN:  I'M SORRY.  I DIDN'T HEAR,
25    YOUR HONOR.
```

```
 1            THE COURT:  HE IS ACCEPTING THE
 2   INTERPRETATION OR THE TRANSLATION OF THE CHECK
 3   INTERPRETER.
 4            MR. QUINN:  OKAY.  THANK YOU, YOUR HONOR.
 5            THE INTERPRETER:  IN THAT REGARD, THIS IS
 6   ALBERT KIM.  I'M SORRY, BUT THIS INTERPRETER'S
 7   RENDITION, I DIDN'T WANT IT TO GET TOO MESSY.  I
 8   THINK SOMETIMES TO RE-ELICIT THE TESTIMONY, THIS IS
 9   WHAT I BELIEVE I RECALL.
10            MR. QUINN:  YOUR HONOR, THE OFFICIAL
11   TRANSLATOR HAS ALREADY ADOPTED A TRANSLATION.  THIS
12   IS COMING OUT OF MY TIME PRESUMABLY.  WE ALREADY
13   HAVE AN OFFICIAL ADOPTED TRANSLATION.
14            MR. MCELHINNY:  I ACCEPT THE OFFICIAL
15   TRANSLATOR, YOUR HONOR.
16            THE COURT:  OKAY.  WE'RE FINE.  THANK
17   YOU.
18            MR. QUINN:  THANK YOU, YOUR HONOR.
19   Q    OKAY.  IN TERMS OF THIS TRADEOFF THAT YOU
20   DESCRIBED ABOUT STRETCHING THE SCREEN SIZE AND
21   AFFECTING THE THICKNESS, IN DEVELOPING THE GALAXY
22   TAB, WHAT DID YOU DECIDE TO DO?
23   A    OF COURSE THERE WAS THE VERY IMPORTANT
24   DECISION AS TO THE VERTICAL AND THE HORIZONTAL SIZE
25   AND THE THICKNESS.
```

```
1              ALSO, WHAT WAS IMPORTANT TO US WAS THE

2    FEELING THAT YOU WOULD HAVE ONCE YOU HOLD THE

3    DEVICE IN YOUR HAND.  SO YOU HAD TO CONSIDER

4    WHETHER HOLDING THE DEVICE IN YOUR HAND WOULD

5    RENDER A PERSON TO FEEL AS IF IT'S QUITE

6    COMFORTABLE OR NOT.

7    Q    BUT IN TERMS OF THIS TRADEOFF IN DEVELOPING

8    THE TABLET, WHAT DID YOU DECIDE TO DO INITIALLY IN

9    TERMS OF HAVING A THICKER OR THINNER TABLET?

10   A    OF COURSE WE START WITH THE SCHEDULING WHEN IT

11   COMES TO DEVELOPMENT, AND AS WE WORK THROUGH THE

12   SCHEDULES, SOMETIMES THE DESIGNS WOULDN'T

13   NECESSARILY HAVE TO BE CHANGED ALONG THE WAY.

14              AND, FOR EXAMPLE, INTERNALLY, WITHIN

15   THESE DEVICES, WE HAVE TO DECIDE HOW WE WANT TO

16   HAVE THE LAYOUT OF THE COMPONENTS INTERNALLY.

17   WOULD YOU WANT TO STACK THEM OR DO YOU WANT TO HAVE

18   THEM SITTING NEXT TO ONE ANOTHER?

19   Q    ALL RIGHT.  DID YOU PREPARE PROTOTYPES OF A

20   THICKER VERSION AND A THINNER VERSION?

21   A    YES, WE HAD DESIGN MOCKUPS.

22   Q    AND DO YOU HAVE THOSE WITH YOU TODAY OF THE

23   THINNER ONE AND THE THICKER ONE?

24   A    YES, I HAVE THEM.

25   Q    ALL RIGHT.  DID YOU DECIDE INITIALLY, THE
```

2813

```
 1    INITIAL DECISION, THAT YOU COULD MAKE THE THINNER
 2    VERSION?
 3    A    NO, I DID NOT.  THAT'S BECAUSE THE COMPONENTS,
 4    THEY COULD NOT BE DEVELOPED AS FAST AS THE SCHEDULE
 5    HAD ASKED -- HAD REQUIRED.
 6    Q    ALL RIGHT.  WHEN DID SAMSUNG FIRST DISCLOSE TO
 7    THE WORLD THE GALAXY 10.1 TAB DESIGN?
 8    A    IT WAS AT THE MOBILE WORLD CONGRESS, WHICH WAS
 9    HELD ON -- IN FEBRUARY OF 2011.
10    Q    AND AT THAT TIME, THE DESIGN THAT WAS
11    DISCLOSED, WAS THAT THE THICKER ONE OR THE THINNER
12    ONE?
13    A    THE THICKER ONE.
14    Q    AND DID SAMSUNG ULTIMATELY SELL THAT THICKER
15    VERSION IN THE UNITED STATES?
16    A    NO.
17    Q    WHY NOT?
18    A    AT THE MOBILE WORLD CONGRESS, THERE HAD BEEN
19    ABOUT 80 COMPETITORS WHICH HAVE ANNOUNCED THEIR OWN
20    TABLETS.
21              AND AT THE TIME WHEN WE HAD COMPARED OUR
22    SAMSUNG TABLET TO THOSE TABLETS, WE FELT THAT WE
23    DID NOT HAVE MUCH BETTER OF A COMPETITIVENESS OVER
24    THESE OTHER PRODUCTS.
25              SO WE DECIDED THAT WE SHOULD REDESIGN.
```

1    Q    AND SO WHAT DID SAMSUNG DO AS A RESULT OF

2    SEEING THESE OTHER 80 COMPETITIVE TABLETS AT THE

3    MOBILE WORLD CONGRESS?

4    A    WE HAVE DECIDED THAT WE WILL PRODUCE THE

5    LIGHTEST AND THINNEST TABLET IN THE WORLD AND SELL

6    SUCH.

7    Q    AND DID THAT DEVELOPMENT EFFORT TO MAKE THE

8    LIGHTEST AND THINNEST TABLET IN THE WORLD, DID THAT

9    BEGIN BEFORE OR AFTER APPLE ANNOUNCED THE IPAD 2?

10   A    IT WOULD BE BEFORE.

11   Q    AND DO YOU RECALL WHEN THE IPAD 2 WAS

12   ANNOUNCED TO THE WORLD?

13   A    MY UNDERSTANDING IS MARCH, AROUND MARCH OF

14   2011.

15   Q    AND AS A RESULT OF THE ANNOUNCEMENT OF THE

16   IPAD 2, DID SAMSUNG MAKE ANY CHANGES IN YOUR GALAXY

17   TAB PROJECT THAT YOU THEN WERE REDOING AFTER THE

18   WORLD MOBILE CONFERENCE?

19   A    NO.  WE WERE ALREADY CONTINUALLY PURSUING THE

20   THINNEST TABLET IN THE WORLD.

21   Q    AND AS A RESULT, DID THE IPAD 2, WAS THAT

22   THINNER OR THICKER THAN WHAT YOU WERE THEN

23   DEVELOPING INTERNALLY?

24   A    THINNER.

25   Q    AND DID THE TABLET THAT -- DO YOU KNOW WHETHER

1    OR NOT THE TABLET THAT SAMSUNG ULTIMATELY BROUGHT

2    TO MARKET, THE GALAXY TAB 10.1, WAS THINNER OR

3    THICKER THAN THE IPAD 2?

4    A    THINNER.

5    Q    AND DID YOU THINK -- DID IT OCCUR TO YOU THAT

6    THERE WAS ANYTHING INAPPROPRIATE, IN SEEING THE

7    IPAD 2 AND THEN TRYING TO MAKE SOMETHING THINNER

8    THAN THAT?

9              MR. MCELHINNY:  HE'S LEADING, YOUR HONOR.

10             THE COURT:  SUSTAINED.

11   BY MR. QUINN:

12   Q    ALL THE -- DID YOU CONSIDER ANY -- ANY --

13   WE'VE HEARD ABOUT THE SMOOTH GLASS SURFACE ON THE

14   GALAXY TAB.

15             DID YOU EVER CONSIDER A SURFACE OTHER

16   THAN A SMOOTH GLASS SURFACE?

17   A    WE HAVE NOT.

18   Q    WHY NOT?

19   A    WE HAVE NOT.  SAMSUNG DOES NOT PRODUCE

20   REINFORCED GLASSES.  WE WOULD HAVE TO IMPORT SUCH

21   FROM CORNING OF THE U.S. OR SOME OTHER JAPANESE

22   COMPANIES.

23             AND IF YOU WERE TO HAVE A CURVATURE OR

24   DIMPLED WITHIN OR ON THE SURFACE OF THE GLASSES,

25   THEN THIS COULD LEAD TO ERROR BECAUSE -- DUE TO

1    SUCH IMPERFECTIONS, A USER MAY BE PRESSING A

2    CERTAIN SPOT BUT A DIFFERENT SPOT MAY RESPOND.

3    Q    AND IN TERMS OF THE BEZEL, WHAT CONSIDERATIONS

4    WENT INTO DESIGNING THE BEZEL AROUND THE GALAXY

5    TAB?

6    A    WELL, THE BEZEL OF THESE DEVICES, IT'S

7    REALLY -- IT ACTS LIKE A BUMPER, SAY, ON A CAR.  IT

8    IS TO PROTECT THE DEVICE, AND SO REALLY IT'S FOR

9    THE USER.

10            SO WITHOUT A FRAME, WHICH I THINK OF IT

11   AS PROVIDING A FENCE OR A FENCING MECHANISM, IF YOU

12   DIDN'T HAVE SUCH FRAME, YOU WOULD HAVE THE

13   REINFORCED GLASS THAT COMES DIRECTLY IN CONTACT

14   WITH THE USER, PERHAPS THE USER'S HAND, AND IF THE

15   GLASS WERE SOMEHOW SHATTERED OR ABSORBS SOME SORT

16   OF A SHOCK, THEN THIS COULD INFLICT A DEEP WOUND ON

17   THE USER'S HAND.

18            AND ALSO, IF IT DROPS, SO IT COULD

19   SHATTER.  SO THAT'S WHY THE FRAME HAS TO BE THERE,

20   IN ORDER TO PROTECT THE USER, AND ALSO TO MAKE SURE

21   THAT THE SECONDARY DAMAGES DO NOT OCCUR, DAMAGES TO

22   THE REINFORCED GLASS.

23   Q    AND CAN YOU DESCRIBE THE SHAPE OF THE EDGE AND

24   THE REASONS WHY YOU DESIGNED THE EDGE THE WAY YOU

25   DID.

1    A    WELL, LOOKING AT THE BACK SIDE, THE EDGE,

2    WELL, YOU WANT TO MAKE SURE THAT WHEN A USER HOLDS

3    THE DEVICE THAT THE LARGEST AREA THAT A USER'S HAND

4    WOULD COME IN CONTACT WITH THE BACK SIDE OF THE

5    DEVICE, AND ALSO YOU WANT TO MAKE IT SO THAT THE

6    USER WOULD HAVE AN EASIER TIME, OR IT WOULD BE

7    EASIER FOR THE USER TO PICK UP THE DEVICE, WHETHER

8    IT'S LAYING ON THE FRONT OR ON THE BACK SIDE.

9    Q    ALL RIGHT.  YOU SHOULD HAVE SOME PHONES UP

10   THERE, SOME SMARTPHONES BEFORE YOU, MR. KIM.

11         THESE ARE ALL IN EVIDENCE, THE DROID

12   CHARGE, JOINT EXHIBIT 1025; THE GALAXY S EPIC 4G

13   SLIDE, JOINT EXHIBIT 1012; THE GALAXY S II, AT&T,

14   JOINT EXHIBIT 1031; THE GALAXY S II SKYROCKET,

15   JOINT EXHIBIT 1035; AND THE GALAXY S II EPIC 4G

16   TOUCH, JOINT EXHIBIT 1034.

17         AND MY QUESTION TO YOU, MR. KIM, IS

18   WHETHER YOU'RE THE INDIVIDUAL WHO DESIGNED ALL OF

19   THESE ACCUSED PHONES?

20   A    YES, I AM.

21   Q    AND WE DON'T HAVE TIME TO GO THROUGH ALL OF

22   THEM, BUT IN EACH CASE, IS THE DESIGN OF THE PHONE

23   DIFFERENT?

24   A    THAT IS CORRECT, THESE DESIGNS ARE DIFFERENT.

25   Q    AND WHY ARE THE DESIGNS OF EACH OF THESE

1    PHONES DIFFERENT?  IN OTHER WORDS, WHY DO YOU

2    DESIGN MULTIPLE PHONES WHICH ARE DIFFERENT?

3    A    WELL, FOR STARTERS, YOU WOULD HAVE DIFFERENT

4    SCREEN SIZES OF EACH DEVICE.

5            AND ALSO SOMETHING CALLED A FORM FACTOR,

6    SUCH AS WHETHER THE PHONE IS A SLIDE PHONE OR

7    SOMETHING THAT IS A FULL TOUCH PHONE.

8            AND ALSO, THE FACTORS SUCH AS WHETHER

9    THERE ARE KEYS ON THE FRONT OR NOT.

10            ALL THESE THINGS WOULD HAVE A

11    DETERMINATION, DETERMINING EFFECT.

12    Q    IF WE COULD PUT UP ON THE SMALL SCREEN THE

13    EXHIBIT 684.001, JUST ON THE SMALL SCREEN AT THIS

14    POINT.  AND, MR. KIM, I'M GOING TO CALL YOUR

15    ATTENTION TO THE IMAGES OF PHONES IN THE UPPER LEFT

16    OF THIS EXHIBIT UNDER BAR TYPE TOUCHSCREEN DISPLAY.

17            DO YOU SEE THAT?

18    A    YEAH, I CAN SEE THOSE.

19    Q    AND JUST FOCUSSING ON THOSE IN THAT UPPER

20    QUARTER OF THE EXHIBIT, ARE THERE ANY OF THOSE THAT

21    YOU CANNOT IDENTIFY AS BEING TRUE AND CORRECT

22    IMAGES OF SAMSUNG PHONES OR MOCKUPS THAT EXISTED IN

23    2006?

24            SO AT THIS POINT I'M ASKING THAT IF THERE

25    ARE ANY THAT YOU CANNOT IDENTIFY AS BEING SAMSUNG

1    PHONES OR MOCKUPS THAT WERE IN EXISTENCE IN 2006.

2    A    NO SUCH HERE.

3    Q    OKAY.

4         YOUR HONOR, WE'D NOW MOVE THIS INTO

5    EVIDENCE.  MR. DENISON TESTIFIED AS TO THE BALANCE

6    OF THIS EXHIBIT, THAT THEY WERE TRUE AND CORRECT

7    IMAGES OF SAMSUNG DEVICES THAT EXISTED AS OF THE

8    DATES INDICATED AND I'D REQUEST PERMISSION TO

9    DISPLAY IT.

10        MR. MCELHINNY:  OBJECTION, YOUR HONOR.

11   AS YOU MAY RECALL WITH MR. DENISON, THE PROBLEM WAS

12   NOT THAT HE COULDN'T IDENTIFY THE PICTURES, BUT

13   THAT HE HAD NO SUBSTANTIVE EXPERIENCE OR KNOWLEDGE

14   ABOUT THE PHONES THEMSELVES, AND WE DON'T HAVE THAT

15   FOUNDATION FROM THIS WITNESS.

16        MR. QUINN:  I DON'T BELIEVE THAT WAS THE

17   ISSUE, YOUR HONOR.  I'VE LAID A FOUNDATION THAT

18   THESE ARE, IN FACT, TRUE AND CORRECT IMAGES OF

19   SAMSUNG PRODUCTS AND MOCKUPS THAT EXISTED AS OF THE

20   DATES INDICATED.

21        MR. MCELHINNY:  BUT THE ISSUE, YOUR

22   HONOR, IS RELEVANCE.  BECAUSE OF THE RULINGS OF

23   THIS COURT ABOUT INDEPENDENT DEVELOPMENT AND THE

24   HISTORICAL AND THE FAILURE TO DISCLOSE THAT, THE

25   QUESTION IS WHAT SUBSTANTIVE TESTIMONY CAN BE GIVEN

1    ABOUT THIS.

2              AND THIS WITNESS, SO FAR, CAN'T GIVE ANY

3    ABOUT IT.

4              THE COURT:  OVERRULED.  GO AHEAD.

5              IT'S ADMITTED.

6              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

7              684.001, HAVING BEEN PREVIOUSLY MARKED

8              FOR IDENTIFICATION, WAS ADMITTED INTO

9              EVIDENCE.)

10             MR. QUINN:  IF WE CAN DISPLAY THAT ON THE

11   SCREEN?

12             THE COURT:  GO AHEAD, PLEASE.

13             MR. QUINN:  I'D ALSO MOVE INTO EVIDENCE,

14   YOUR HONOR, THE ENGLISH VERSION OF THE E-MAIL THAT

15   WAS REFERRED TO, IT'S SDX -- SD 73.010.

16             THE COURT:  3973.

17             MR. QUINN:  YES.

18             THE COURT:  ANY OBJECTION?

19             MR. MCELHINNY:  NO OBJECTION.

20             THE COURT:  THAT'S ADMITTED.

21             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

22             3973.010, HAVING BEEN PREVIOUSLY MARKED

23             FOR IDENTIFICATION, WAS ADMITTED INTO

24             EVIDENCE.)

25   BY MR. QUINN:

```
 1    Q    AND, FINALLY, MR. KIM, IN DOING THE WORK THAT
 2    YOU DID IN DESIGNING TABLETS FOR SAMSUNG AND
 3    SMARTPHONES FOR SAMSUNG, AT ANY TIME DID YOU COPY
 4    THE WORK OF ANY OTHER SMARTPHONE MANUFACTURER?
 5    A    I HAVE NOT.
 6              MR. QUINN:  NOTHING FURTHER.
 7              THE COURT:  ALL RIGHT.  IT'S NOW 1:52.
 8                      CROSS-EXAMINATION
 9    BY MR. MCELHINNY:
10    Q    GOOD AFTERNOON, MR. KIM.  MY NAME IS HAROLD
11    MCELHINNY.  WE HAVE NOT MET BEFORE, CORRECT?
12    A    THAT'S CORRECT.
13    Q    IF I AM CORRECT, YOU WILL HAVE A WHITE BINDER
14    THERE IN FRONT OF YOU THAT WILL HAVE SOME DOCUMENTS
15    IN IT.
16    A    YES, THERE IS.
17    Q    THANK YOU.  SIR, I'D LIKE TO ESTABLISH SOME
18    CONTEXT FIRST FOR THE JURY IF WE CAN AND REACH SOME
19    AGREEMENT HERE.
20              WOULD YOU TELL US AGAIN WHAT YOUR TITLE
21    IS.
22    A    I AM A PRINCIPAL DESIGNER.
23    Q    THANK YOU.  AND TO WHOM DO YOU REPORT,
24    MR. KIM, IN THE HIERARCHY AT SAMSUNG?
25    A    TO THE VICE-PRESIDENT.
```

```
 1    Q    AND WHAT'S THAT GENTLEMAN'S NAME?

 2    A    SUK KEUN KIM, VICE-PRESIDENT.

 3            THE INTERPRETER:  S-U-K, K-E-U-N, K-I-M,

 4    SPELLING BY THE INTERPRETER.

 5    BY MR. MCELHINNY:

 6    Q    IS IT CORRECT THAT THAT MR. KIM REPORTS TO

 7    DONG HOON CHANG?

 8    A    CAN YOU GIVE ME THE NAME OF THE SUPERIOR ONE

 9    MORE TIME, PLEASE.

10    Q    I'M SURE I'M PRONOUNCING IT INCORRECTLY.  I'VE

11    GOT DONG HOON CHANGE, OR CHANG?

12    A    THAT IS CORRECT.

13    Q    AND HE IS THE SENIOR VICE-PRESIDENT AND THE

14    HEAD OF THE MOBILE DESIGN GROUP.  CORRECT?

15    A    THAT IS CORRECT.  HE IS THE SENIOR

16    VICE-PRESIDENT.

17    Q    AND THE JURY MAY RECALL THAT WE SAW A

18    DEPOSITION EXCERPT FROM MR. CHANG EARLIER IN THE

19    CASE.

20            AND MR. CHANG THEN REPORTS TO A GENTLEMAN

21    WHOSE NAME IS WONG PYO HONG; IS THAT CORRECT?

22    A    YES, THAT'S CORRECT.

23    Q    SO DO I HAVE CORRECT THAT YOU'RE ABOUT FOUR

24    LEVELS DOWN IN THE HIERARCHY OF THE DESIGN GROUP?

25    A    YES, THAT IS CORRECT.
```

1    Q    ALL RIGHT.  SOME OTHER TERMINOLOGY, PLEASE.

2    YOU MENTIONED THAT YOU WORK ON THE TABLET DESIGNS

3    AT SAMSUNG.  THOSE TABLET DESIGNS HAD CODE NAMES

4    WHILE YOU WERE WORKING ON THEM; IS THAT CORRECT?

5    A    YES, THERE ARE.

6    Q    AND THE FIRST ONE YOU WORKED ON IS CALLED P,

7    AS IN PETER, P1; IS THAT CORRECT?

8    A    ALMOST SIMULTANEOUSLY, ALONG WITH P3.

9    Q    YOU WORKED ON A DESIGN CALLED THE P1; IS THAT

10   CORRECT?

11   A    YES, THAT IS CORRECT.

12   Q    AND THAT WAS EVENTUALLY RELEASED AS THE GALAXY

13   7.0 TAB; CORRECT?

14   A    YES, THAT IS CORRECT.

15   Q    WAS THERE A P2?

16   A    YES.  IN THE INTERNAL DEVELOPMENT PROJECT

17   THERE WAS.

18   Q    BUT IT WAS NEVER RELEASED AS A PRODUCT;

19   CORRECT?

20   A    THAT IS CORRECT.

21   Q    AND THEN IN -- WHEN YOU WERE TALKING TO YOUR

22   COUNSEL THIS MORNING, YOU TALKED ABOUT THE P3.  DO

23   YOU REMEMBER THAT?

24   A    YES.

25   Q    AND THE P3 WAS ULTIMATELY RELEASED AS THE

```
1    GALAXY 10.0 TAB; CORRECT?  I'M SORRY, 10.1 TAB.

2    A    THAT IS CORRECT.

3    Q    BUT THE P3 WAS NEVER RELEASED INTO THE

4    UNITED STATES, WAS IT?

5    A    THAT IS CORRECT, IT WAS NOT RELEASED.

6    Q    THE FIRST ONE THAT WAS RELEASED INTO THE

7    UNITED STATES, OF THE 10 SERIES, WAS THE GALAXY --

8    WAS WHAT YOU CALLED THE P4; ISN'T THAT RIGHT?

9    A    YES, THAT IS CORRECT.

10   Q    NOW, YOU MENTIONED THE FIRST TIME THAT YOUR

11   DESIGN WAS SHOWN TO THE PUBLIC, AND YOU MENTIONED

12   SOMETHING CALLED THE MOBILE WORLD CONGRESS; IS THAT

13   RIGHT?

14   A    YES, I RECALL.

15   Q    AND THAT'S A BIG ELECTRONICS SHOW THAT'S HELD

16   IN BARCELONA EACH YEAR?

17   A    YES, THAT IS CORRECT.

18   Q    AND YOU TOLD THIS JURY TWO SECONDS AGO THAT

19   THE FIRST TIME THAT THE TAB 10.4 WAS SHOWN WAS AT

20   THE SHOW IN 2011; IS THAT RIGHT?

21        LET ME ASK THAT QUESTION AGAIN.  THE

22   FIRST TIME THAT THE GALAXY TAB 10.1 WAS SHOWN WAS

23   AT THE MOBILE WORLD CONGRESS IN 2011; CORRECT?

24   A    YES, THAT IS CORRECT.

25   Q    BUT, IN FACT, SAMSUNG SHOWED THE P1, THE
```

```
1    GALAXY 7, A YEAR BEFORE AT THE MOBILE WORLD

2    CONGRESS IN 2010, DIDN'T IT?

3    A    I DON'T HAVE AN EXACT RECOLLECTION ON THAT,

4    BECAUSE I HAD ATTENDED 2011 MOBILE WORLD CONGRESS,

5    BUT I DID NOT ATTEND 2010.

6    Q    SO AS YOU SIT HERE TODAY ANSWERING MY

7    QUESTIONS, YOU DON'T REMEMBER THAT THE GALAXY, THAT

8    YOUR INITIAL DESIGN WAS RELEASED A YEAR EARLIER?

9    YOU DON'T REMEMBER THAT?

10   A    I DO RECALL THE DESIGN, BUT I DON'T RECALL THE

11   EXACT DETAILS.

12   Q    ISN'T IT TRUE, SIR, THAT IMMEDIATELY AFTER

13   YOUR INITIAL DESIGN, THE P1 WAS RELEASED, THAT

14   THERE WAS A MEETING BETWEEN GOOGLE AND SAMSUNG AND

15   GOOGLE TOLD SAMSUNG THAT YOUR DESIGN LOOKED TOO

16   MUCH LIKE THE IPAD?

17   A    DURING THE COURSE OF MY WORK, I HAD NOT

18   RECEIVED ANY E-MAILS THAT WOULD INDICATE AS SUCH.

19   Q    SIR, I'LL ASK YOU ABOUT E-MAILS IN A MINUTE,

20   BUT THAT WASN'T WHAT I ASKED YOU.

21        ISN'T IT TRUE THAT GOOGLE TOLD SAMSUNG

22   THAT YOUR DESIGN LOOKED TOO MUCH LIKE THE IPAD?

23   A    I HAVE NOT RECEIVED ANY FEEDBACKS ON THAT

24   DIRECTLY.

25   Q    YOU HAVEN'T RECEIVED IT DIRECTLY, SIR ?
```

```
 1    A    THAT'S CORRECT.

 2    Q    HOW DID YOU RECEIVE THAT FEEDBACK, SIR?

 3              MR. QUINN:  ASSUMES FACTS NOT IN

 4    EVIDENCE, YOUR HONOR.

 5              THE COURT:  OVERRULED.

 6              THE WITNESS:  I LOOKED AT THE FILES

 7    YESTERDAY, SO IN PREPARATION FOR TODAY'S TESTIMONY,

 8    I LOOKED AT THESE DOCUMENTS FOR THE FIRST TIME.

 9    BY MR. MCELHINNY:

10    Q    SIR, ISN'T IT A FACT THAT GOOGLE ASKED SAMSUNG

11    TO CHANGE YOUR DESIGN SO THAT IT WOULD NOT LOOK

12    LIKE THE IPAD?

13    A    WHETHER THAT IS A FACT OR NOT, I CANNOT

14    CONFIRM THAT FOR YOU.  AND ALSO, WHETHER SUCH

15    STATEMENT, IF IT WAS MADE, WAS WHETHER IT WAS THE

16    OFFICIAL POSITION OF GOOGLE OR PERHAPS SOMETHING

17    SPOKEN BY SOMEONE WHO WAS ON A -- IN A, MORE OF A

18    WORKING LEVEL OR BY SOMEBODY WHO WAS IN A POSITION

19    TO MAKE DECISIONS.  I DON'T KNOW THESE THINGS.

20    Q    SIR, WOULD YOU OPEN YOUR WHITE BINDER, PLEASE,

21    TO PX EXHIBIT 43, 43.

22              SIR, YOU'LL FIND THE ENGLISH LANGUAGE IS

23    ON TOP, BUT THE KOREAN IS BEHIND IT IF YOU WOULD

24    LIKE TO LOOK AT THE ORIGINAL VERSION.

25              DO YOU SEE, SIR, THAT THIS IS AN E-MAIL
```

2827

```
1    FROM A PERSON BY THE NAME OF KI HYUN SEO.

2    A    YES, I RECOGNIZE IT AS SUCH.

3    Q    AND DO YOU SEE THE DATE OF IT IS FEBRUARY

4    23RD, 2010?

5    A    IS IT NOT FEBRUARY 22ND?  AM I WRONG?

6    Q    YOU'RE RIGHT, SIR.  I'M SORRY.  I'M LOOKING AT

7    A DIFFERENT DATE.  FEBRUARY 22ND, 2010.

8              AND DO YOU SEE THAT THE TITLE OF THE

9    DOCUMENT IS "TEAM LEADER'S DIRECTIVES AT THE

10   EXECUTIVES MEETING OF 2/22"?

11   A    YES, I SEE IT.

12   Q    SIR, AND IF YOU SEE THE LIST OF APPROXIMATELY

13   30 OR 40 PEOPLE THAT THIS WAS SENT TO?  DO YOU SEE

14   THAT THERE WERE A LARGE NUMBER OF NAMES THAT THIS

15   WAS SENT TO?

16   A    YES, I SEE IT.

17   Q    AND DO YOU SEE THE SECTION THAT BEGINS WITH

18   CARBON COPY, DO YOU SEE THE FIRST NAME THERE IS

19   W.P. HONG?

20   A    YES, I SEE IT.

21   Q    THAT'S THE SAME PERSON YOU JUST IDENTIFIED AS

22   THE HEAD OF THE DESIGN GROUP AT SAMSUNG; CORRECT?

23   A    NO.  HE WOULD BE THE TEAM LEADER.

24   Q    AND DO YOU SEE THE NAME D.H. CHANG AFTER HIM?

25   A    YES, I SEE IT.
```

1   Q    HE'S THE PERSON WHO'S TWO LEVELS ABOVE YOU IN

2   THE ORGANIZATION; CORRECT?

3   A    THAT IS CORRECT.

4           MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

5   PX 43 IN.

6           MR. QUINN:  OBJECTION, RELEVANCE, YOUR

7   HONOR.  THIS RELATES TO THE KEY --

8           THE COURT:  OVERRULED.

9           MR. QUINN:  THAT'S NOT AT ISSUE IN THIS

10  CASE.

11          THE COURT:  THAT'S ADMITTED.

12          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER PX

13          43, HAVING BEEN PREVIOUSLY MARKED FOR

14          IDENTIFICATION, WAS ADMITTED INTO

15          EVIDENCE.)

16          MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17  Q    BEFORE I LOOK AT THAT, BEFORE I LOOK AT THAT,

18  SIR, WOULD YOU OPEN YOUR BINDER, I WANT TO DEAL

19  WITH MR. QUINN'S ISSUE HERE, WOULD YOU OPEN YOUR

20  BINDER TO PLAINTIFF'S EXHIBIT 42.

21  A    IS THIS IT?

22  Q    YES, SIR, THAT'S IT.  AND IT SHOULD BE THE

23  KOREAN ON THE NEXT PAGE.

24  A    IS THAT FOUND IN MY BINDER HERE?

25  Q    IT SHOULD BE RIGHT BEHIND TAB 42, SIR.  IT'S

1    THE FIRST DOCUMENT IN MINE, PX 42.  IT'S IN THE

2    WHITE BINDER, SIR.

3    A    YES, I'M LOOKING AT IT.

4    Q    SIR, DO YOU SEE THERE AN E-MAIL THAT'S DATED

5    FEBRUARY 16TH, 2010?

6    A    YES, THAT'S CORRECT.

7    Q    FROM A PERSON NAMED HYUN KIM, DO YOU SEE THAT?

8    A    YES, I SEE IT.

9    Q    HYUN KIM IS DESIGNATED HERE AS A SENIOR

10   DESIGNER AT SAMSUNG?

11   A    I HAVE NOT SEEN THIS PERSON BEFORE.

12   Q    SIR, MY QUESTION IS, DOES HIS TITLE ON THE

13   E-MAIL SAY THAT HE IS A SENIOR DESIGNER AT SAMSUNG?

14   A    YES, THAT'S HOW IT'S WRITTEN.

15              MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

16   EXHIBIT, PLAINTIFF'S EXHIBIT 42.

17              MR. QUINN:  OBJECTION.  RELEVANCE,

18   RELATES TO P1, P3, NEITHER OF WHICH ARE AT ISSUE IN

19   THIS CASE.

20              THE COURT:  THAT'S OVERRULED.

21              GO AHEAD.  IT'S ADMITTED.

22              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23              42, HAVING BEEN PREVIOUSLY MARKED FOR

24              IDENTIFICATION, WAS ADMITTED INTO

25              EVIDENCE.)

```
 1    BY MR. MCELHINNY:

 2    Q    NOW LET'S LOOK AT THESE DOCUMENTS, SIR.

 3              EXHIBIT 42, ON FEBRUARY 16TH, 2010,

 4    ACCORDING TO THIS, THERE WAS A MEETING BETWEEN

 5    GOOGLE AND A SAMSUNG SENIOR DESIGNER CHO.  DO YOU

 6    SEE THAT?

 7    A    YES.

 8    Q    AND THERE'S AN ENTRY THERE TALKING ABOUT P1

 9    AND P3.

10    A    YES.

11    Q    AND THE QUOTE IS, "SINCE IT IS TOO SIMILAR TO

12    APPLE, MAKE IT NOTICEABLY DIFFERENT, STARTING WITH

13    THE FRONT SIDE."

14              DO YOU SEE THAT?

15    A    YES, THAT'S HERE, YES.

16    Q    AND THEN, SIR, IF YOU LOOK AT PX 43., IF YOU

17    LOOK AT THE SECOND PAGE AT BULLET POINT NUMBER 6.

18    THIS IS THE MINUTES OF THE TEAM LEADER'S DIRECTIVES

19    AT THE EXECUTIVE MEETING.

20              DO YOU SEE THAT?

21    A    YES, THAT'S CORRECT.

22    Q    AND THE FIRST ENTRY SAYS, "RESPOND TO THE

23    ISSUE OF DESIGN SIMILARITY FOR THE S SERIES."

24              DO YOU SEE THAT?

25    A    YES, THERE IS A MENTION THAT THE CMF SHOULD BE
```

1    CHANGED.

2    Q    AND THE S SERIES, SO WE ALL UNDERSTAND IT, IS

3    THE GALAXY S SERIES OF PHONES.  THAT'S WHAT THEY'RE

4    TALKING ABOUT HERE WHERE THEY'RE TALKING ABOUT

5    DESIGN SIMILARITY?

6    A    YES, THAT IS CORRECT.

7    Q    AND THEN FURTHER DOWN, IT SAYS, "GOOGLE IS

8    DEMANDING DISTINGUISHABLE DESIGN VIS-À-VIS THE IPAD

9    FOR THE P3."

10            DO YOU SEE THAT?

11   A    I SEE IT.  BUT THIS IS ABOUT THE FRONTAL

12   DIFFERENTIATION AND THERE IS A FAMOUS ARCHITECT IN

13   THE U.S. WHO HAD SAID THAT FORM FOLLOWS FUNCTION,

14   SO THE FUNCTION IS MORE IMPORTANT WHEN IT COMES TO

15   THE FRONTAL SIZE.

16   Q    AND THE DECISION THAT THE TEAM EXECUTIVES MADE

17   AT THIS MEETING WAS TO MAINTAIN THE CURRENT DESIGN.

18            DO YOU SEE THAT?

19   A    YES, THAT IS CORRECT.

20   Q    IN FACT --

21   A    YES.  HOWEVER, THE TIME PERIOD HERE CONCERNED,

22   THIS WOULD BE AFTER THE CONCLUSION OF MWC, AND THIS

23   IS WHEN WE HAD ALREADY DECIDED THAT WE WOULD

24   PRODUCE THE THINNEST DEVICE IN THE WORLD.

25   Q    AND LET'S MAKE SURE OF YOUR TESTIMONY.

1          DESPITE THIS TEAM LEADER'S MEETING, THE

2     DISCUSSION ABOUT GOOGLE AND THE DECISION, YOU HAVE

3     TESTIFIED HERE UNDER OATH THAT NOT ONE OF YOUR

4     SUPERVISORS EVER MENTIONED THIS ISSUE TO YOU?  IS

5     THAT YOUR TESTIMONY?

6          MR. QUINN:  YOUR HONOR, ASSUMES FACTS NOT

7     IN EVIDENCE.  THERE'S NO FOUNDATION THAT'S BEEN

8     LAID THAT HE WAS AT THE MEETING OR THAT HE HAS ANY

9     KNOWLEDGE OF THIS.  HE'S BEING QUESTIONED ABOUT A

10    DOCUMENT HE HASN'T EVEN LAID A FOUNDATION HE'S EVEN

11    SEEN.

12          THE COURT:  OVERRULED.

13          THE WITNESS:  I DIDN'T QUITE CATCH THAT.

14    COULD YOU ASK ME THE QUESTION AGAIN, PLEASE.

15    BY MR. MCELHINNY:

16    Q    IS IT YOUR TESTIMONY, UNDER OATH, THAT NO

17    SUPERVISOR OF YOURS EVER MENTIONED TO YOU THE

18    DISCUSSION WITH GOOGLE?

19    A    THAT IS CORRECT.

20    Q    SIR, IN FACT, YOU THEN WENT ON TO USE THE

21    DESIGN OF THE GALAXY TAB AS YOUR INSPIRATION WHEN

22    YOU DESIGNED THE GALAXY ACE PHONE; ISN'T THAT TRUE?

23          THE INTERPRETER:  COUNSEL, WAS THAT ACE

24    PHONE?

25          MR. MCELHINNY:  ACE, GALAXY CASE.

```
 1                THE WITNESS:  YES, THAT IS CORRECT.
 2     BY MR. MCELHINNY:
 3     Q    SIR, DO YOU KNOW A GENTLEMAN BY THE NAME OF
 4     MINHYOUK LEE?
 5     A    YES, I DO.
 6     Q    HE WAS THE ORIGINAL DESIGNER OF THE GALAXY
 7     PHONES, WASN'T HE?
 8     A    THAT'S CORRECT.  HE DESIGNED THE GALAXY S I.
 9     Q    HAVE YOU SEEN MR. LEE SINCE YOU'VE BEEN HERE
10     IN SAN JOSE?
11     A    YES, I HAVE.
12     Q    IS HE GOING TO COME AND TESTIFY TO THIS JURY?
13     A    I DON'T KNOW THAT.
14                MR. MCELHINNY:  MR. KIM, THANK YOU VERY
15     MUCH FOR YOUR TIME.
16                THE COURT:  ALL RIGHT.  THE TIME IS NOW
17     2:17.  PLEASE GO AHEAD.
18                MR. QUINN:  IF WE COULD PUT UP ON THE
19     SCREEN PLAINTIFF'S EXHIBIT 43.
20                    REDIRECT EXAMINATION
21     BY MR. QUINN:
22     Q    AND LOOK AT THE PAGE -- THE SECOND PAGE, BATES
23     NUMBER 857 THAT COUNSEL WAS JUST ASKING YOU ABOUT.
24                AND IF WE CAN BLOW UP THAT 6, RESPOND TO
25     THE ISSUE.
```

1          "GOOGLE IS DEMANDING DISTINGUISHABLE

2    DESIGN VISIT APPARENTLY VISIT THE IPAD FOR THE P3."

3    DO YOU SEE THAT, THAT COUNSEL ASKED YOU ABOUT?

4    A    YES.

5    Q    THAT'S THE TABLET THAT WAS NEVER SOLD IN THE

6    UNITED STATES; CORRECT?

7    A    THAT'S CORRECT.  THE P3 WAS NOT SOLD.

8    Q    THAT TABLET IS NOT AT ISSUE IN THIS CASE, IS

9    IT?

10   A    THAT IS CORRECT.

11   Q    IF WE COULD LOOK AT EXHIBIT 42, THE OTHER

12   DOCUMENT THAT COUNSEL SHOWED YOU, AND IF WE CAN

13   ENLARGE THAT P1, P3 LANGUAGE THERE.

14          I THINK YOU TOLD US THE P1 IS THE GALAXY

15   7.0.

16   A    YES, THAT'S CORRECT.

17   Q    IS THAT -- IS THAT TABLET AT ISSUE IN THIS

18   CASE?

19          MR. MCELHINNY:  YOUR HONOR, THERE'S NO

20   WAY THIS WITNESS WOULD KNOW THAT CORRECTLY.

21          MR. QUINN:  YOUR HONOR, I THINK WE CAN

22   GET A STIPULATION ON THAT, YOUR HONOR.

23          THE COURT:  OVERRULED.

24          GO AHEAD, PLEASE.

25   BY MR. QUINN:

```
1    Q    SIR --
2    A    THAT'S NOT WHAT I HEARD.
3    Q    THE GALAXY 7.0 IS NOT ANYTHING THIS JURY NEEDS
4    TO MAKE ANY DECISION ABOUT; ISN'T THAT TRUE?
5              MR. MCELHINNY:  YOUR HONOR, THAT'S JUST
6    FACTUALLY WRONG.  IT'S AN ACCUSED DEVICE IN THE
7    CASE.  THAT'S WHY I'M HAVING THIS PROBLEM.
8              MR. QUINN:  MAYBE I CAN GET A
9    CLARIFICATION FROM COUNSEL, YOUR HONOR.  IS HE
10   SAYING IT'S ACCUSED FOR DESIGN?
11             MR. MCELHINNY:  WHAT COUNSEL IS SAYING,
12   YOUR HONOR, IS THIS WITNESS HAS NO IDEA WHAT'S AT
13   ISSUE.
14   BY MR. QUINN:
15   Q    SIR, IS IT YOUR UNDERSTANDING THAT THERE ARE
16   ANY DESIGN CLAIMS REGARDING THE GALAXY 7.0 PRODUCT?
17   A    NO.
18   Q    SO THE ONLY DOCUMENTS THAT COUNSEL SHOWED YOU
19   ARE REGARDING THE DESIGN OF DOCUMENTS THAT HAVE
20   NOTHING TO DO WITH THIS CASE; CORRECT?
21   A    YES, THAT'S CORRECT.
22             MR. QUINN:  NOTHING FURTHER.
23             THE COURT:  ALL RIGHT.  IT'S 2:20.  IS
24   THERE ANY REDIRECT?
25             MR. MCELHINNY:  NONE FOR ME, YOUR HONOR.
```

```
 1              THE COURT:  ALL RIGHT.  MAY THIS WITNESS
 2   BE EXCUSED, AND IS HE SUBJECT TO RECALL?
 3              MR. MCELHINNY:  WE WON'T NEED HIM.
 4              MR. QUINN:  WE DON'T NEED HIM, YOUR
 5   HONOR.
 6              THE COURT:  ALL RIGHT.  THEN YOU ARE
 7   EXCUSED.
 8              OKAY.  CALL YOUR NEXT WITNESS, PLEASE.
 9              MR. VERHOEVEN:  YOUR HONOR, NEXT, AS
10   YOU'LL RECALL YESTERDAY, WE PLAYED THE DEPOSITION
11   DESIGNATIONS OF MR. FIDLER.
12              THE COURT:  OKAY.
13              MR. VERHOEVEN:  AND AUTHENTICATED HIS
14   PRESENTATION, AND YOUR HONOR SUGGESTED THAT -- WE
15   MOVED IT IN, AND YOUR HONOR SUGGESTED WE PLAY IT.
16   WE HAVE A SHORTENED VERSION OF THAT, WHICH IS DX
17   621-A, YOUR HONOR.
18              THE COURT:  OKAY.
19              MR. VERHOEVEN:  AND WE'VE ALLOWED COUNSEL
20   FOR APPLE TO REVIEW IT, AND WE'RE READY TO PLAY IT.
21              THE COURT:  OKAY.  GO AHEAD, PLEASE.
22              COULD YOU DIM THE LIGHTS PLEASE,
23   MR. RIVERA.
24              THIS IS 621-A; CORRECT?
25              MR. VERHOEVEN:  CORRECT, YOUR HONOR.
```

```
 1              THE COURT:  OKAY.  THANK YOU.
 2              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
 3      OPEN COURT OFF THE RECORD.)
 4              THE COURT:  ALL RIGHT.
 5              MR. VERHOEVEN:  FOR THE RECORD, THAT'S
 6      621-A.  IS THAT ADMITTED, YOUR HONOR?
 7              THE COURT:  IT'S BEEN ADMITTED, YES.
 8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
 9              621-A, HAVING BEEN PREVIOUSLY MARKED FOR
10              IDENTIFICATION, WAS ADMITTED INTO
11              EVIDENCE.)
12              MR. VERHOEVEN:  OKAY.  THANK YOU.
13              THE COURT:  ALL RIGHT.  IT'S 2:26.
14      CALL YOUR NEXT WITNESS, PLEASE.
15              MR. PRICE:  WE CALL RICHARD HOWARTH.
16              THE COURT:  OKAY.
17              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
18                        RICHARD HOWARTH,
19      BEING CALLED AS A WITNESS ON BEHALF OF THE
20      DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS
21      EXAMINED AND TESTIFIED AS FOLLOWS:
22              THE WITNESS:  I DO.
23              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
24              THE COURT:  ALL RIGHT.  TIME IS NOW 2:27.
25      GO AHEAD, PLEASE.
```

1                     **DIRECT EXAMINATION**

2      BY MR. PRICE:

3      Q    MR. HOWARTH, YOU'RE AN INDUSTRIAL DESIGNER AT

4      APPLE; CORRECT?

5      A    THAT'S RIGHT.

6      Q    AND YOU WERE A LEAD DESIGNER ALONG WITH CHRIS

7      STRINGER ON THE ORIGINAL IPHONE PROJECT; CORRECT?

8      A    SURE.

9      Q    AND I'D LIKE YOU TO LOOK IN YOUR BINDER,

10     THERE'S AN EXHIBIT DX 2627.  DO YOU SEE THAT?

11     A    YES.

12     Q    AND DO YOU SEE THIS IS AN APPLE 3G SM CONGRESS

13     TRADE SHOW REPORT.  CORRECT?

14     A    JUST GIVE ME A SECOND.

15     Q    ARE YOU LOOKING AT EACH PAGE ONE BY ONE?

16     A    YEAH, I'M TRYING TO GET AN IDEA WHAT IT IS.

17     Q    LET ME ASK YOU, THE PAGE SAYS -- IT HAS AN

18     APPLE LOGO ON IT, AND AT THE BOTTOM IT HAS BATES

19     NUMBERS THAT BEGIN WITH A-P-L, APPLE, CORRECT?

20     A    SURE.

21              MR. PRICE:  YOUR HONOR, MOVE 2627 INTO

22     EVIDENCE.

23              MR. MCELHINNY:  YOUR HONOR, WE OBJECT TO

24     THIS DOCUMENT.  IT'S NOT ON THE ORIGINAL LIST OF

25     200.  IT'S OUT OF LIMIT.

```
 1              MR. PRICE:  IT WAS NOT ON THE LIST,
 2    BECAUSE IT WAS JUST DISCOVERED.
 3              THE COURT:  I'M GOING ALLOW IT, BUT
 4    YOU'RE DOING TRANSLATION OF A DOCUMENT TO HAVE TO
 5    SUBTRACT ANOTHER ONE.  OKAY.
 6              MR. PRICE:  SURE.
 7              THE COURT:  IT'S ADMITTED.
 8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
 9              2627, HAVING BEEN PREVIOUSLY MARKED FOR
10              IDENTIFICATION, WAS ADMITTED INTO
11              EVIDENCE.)
12    BY MR. PRICE:
13    Q    LOOK AT THE FIRST PAGE, THIS IS ITSELF REPORT,
14    CORRECT, FIRST PAGE, RIGHT?
15    A    YES.
16    Q    LOOK AT PAGE 25 THROUGH 26.  ONE OF THE THINGS
17    THIS DOES IS COMPARE PRODUCTS, COMPARE THE PRODUCTS
18    SUCH AS THE F700 ON PAGE 26; CORRECT?  DO YOU SEE
19    THAT?
20    A    JUST GIVE ME A SECOND.
21              MR. PRICE:  YOUR HONOR, I BELIEVE THERE'S
22    A LIMITING INSTRUCTION YOU WERE GOING TO GIVE ON
23    THIS DOCUMENT, ONE BEING THAT THE DATE IS WRONG.
24              CAN WE GO TO THE FIRST PAGE AND SHOW
25    THAT.
```

```
1              THE COURT:  YES, GIVE ME A SEC.  I
2    THOUGHT MR. LUCENTE WAS THE NEXT WITNESS.  SO I'VE
3    GOT STUFF READY FOR HIM.  GIVE ME ONE SECOND.
4              (PAUSE IN PROCEEDINGS.)
5              THE COURT:  YES, YOU MAY NOT CONSIDER THE
6    F700 AS EVIDENCE OF INVALIDITY OR NON-INFRINGEMENT.
7              YOU MAY ONLY CONSIDER THE F700 FOR
8    ALTERNATIVE DESIGN AND FUNCTIONALITY.
9              MR. MCELHINNY:  I'M SORRY, YOUR HONOR.
10   ALSO THERE WAS AN INSTRUCTION ABOUT THE INCORRECT
11   DATE.
12             THE COURT:  YES, THAT IS CORRECT.  THE
13   DATE OF THIS DOCUMENT IS 2006, BUT THAT'S ACTUALLY
14   AN INCORRECT DATE.  THE CORRECT DATE IS 2007.
15   BY MR. PRICE:
16   Q    AND IF WE LOOK AT PAGE 42, 43, YOU'VE SEEN
17   THESE, RIGHT?
18   A    YES.
19   Q    I'D LIKE YOU TO LOOK, IF YOU WOULD, AT EXHIBIT
20   712 IN YOUR BINDER.
21   A    OKAY.
22   Q    AND YOU SEE THIS IS AN APPLE INTERNAL
23   DOCUMENT, APPLE BATES STAMPS AT THE BOTTOM.  IT IS
24   FEBRUARY 25, 2001 CONCERNING COMPREHENSIVE LIST FOR
25   CURRENT AND FUTURE FLAGSHIP PHONES.  DO YOU SEE
```

1      THAT?

2      A    DID YOU SAY 2001?

3      Q    I SAID 712, FEBRUARY 25, 2011.  SORRY.

4      A    OKAY.

5      Q    DO YOU SEE THAT?

6      A    SURE.

7              MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT

8      712 INTO EVIDENCE.

9              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  712 IS ADMITTED.

11             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12             712, HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15     BY MR. PRICE:

16     Q    AND IF YOU WOULD LOOK NOW AT EXHIBIT 717.  AND

17     DO YOU SEE THAT IS A DOCUMENT WITHIN APPLE DATED

18     FEBRUARY 11TH, 2012, APPLE BATES STAMP CONCERNING

19     THE SAMSUNG GALAXY TAB 10.1 TAKE-APART.  DO YOU SEE

20     THAT?

21     A    YES.

22             MR. PRICE:  YOUR HONOR, I MOVE 717 INTO

23     EVIDENCE.

24             THE COURT:  NO OBJECTION?

25             MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

2842

```
 1              THE COURT:  IT'S ADMITTED.

 2              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 3              717, HAVING BEEN PREVIOUSLY MARKED FOR

 4              IDENTIFICATION, WAS ADMITTED INTO

 5              EVIDENCE.)

 6    BY MR. PRICE:

 7    Q    AND IF YOU COULD LOOK AT PAGE 10 OF THE

 8    DOCUMENT, DO YOU SEE THERE ARE VARIOUS PHOTOS

 9    SHOWING THE TAKE-APART OF THE GALAXY TABLET;

10    CORRECT?

11    A    THEY LOOK LIKE, YEAH, A BUNCH OF COMPONENTS.

12              MR. PRICE:  OKAY.  NO FURTHER QUESTIONS.

13              THE COURT:  ALL RIGHT.  TIME IS NOW 2:33.

14              IS THERE ANY CROSS?

15                      CROSS-EXAMINATION

16    BY MR. MCELHINNY:

17    Q    COULD YOU PUT ON THE SCREEN, PLEASE,

18    DEFENDANT'S EXHIBIT 562, WHICH IS IN EVIDENCE, YOUR

19    HONOR.

20              THE COURT:  OKAY.

21    BY MR. MCELHINNY:

22    Q    MR. HOWARTH, IS THIS AN E-MAIL THAT YOU SENT

23    ON MARCH 8TH, 2006?

24              MR. PRICE:  YOUR HONOR, THIS EXCEEDS THE

25    SCOPE OF THE DIRECT.
```

1           THE WITNESS:  YES.

2           MR. PRICE:  IT CONCERNS THE CHAPPY.

3           THE COURT:  IT DOES EXCEED THE SCOPE OF

4    THE DIRECT.

5           MR. MCELHINNY:  YOUR HONOR, IT DOES.  I

6    WILL CONCEDE THAT.  THERE'S BEEN A BUNCH OF

7    TESTIMONY ABOUT A PICTURE THAT'S BEEN ATTACHED TO

8    THIS, AND MR. HOWARTH IS THE AUTHOR OF THE PICTURE.

9    HE'S HERE.  I JUST WANT HIM TO IDENTIFY WHAT'S IN

10   THE PICTURE.  I'M NOT GOING TO GO INTO ANYTHING

11   OTHER THAN WHAT'S IN THE PICTURE.  CAN WE SEE THE

12   PICTURE.  CAN WE SEE THE PICTURE.

13          MR. PRICE:  I'VE ALSO BEEN INFORMED,

14   THOUGH I HAVEN'T BEEN HERE THE LAST COUPLE OF DAYS,

15   THAT THERE'S NOT BEEN, QUOTE, A BUNCH OF TESTIMONY

16   ABOUT THE PICTURES.  BEYOND THE SCOPE.

17          THE COURT:  I THINK IT IS BEYOND THE

18   SCOPE OF THE DIRECT.

19          MR. MCELHINNY:  THANK YOU, YOUR HONOR.  I

20   HAVE NO FURTHER QUESTIONS.

21          THE COURT:  ALL RIGHT.  MAY THIS WITNESS

22   BE EXCUSED?  IS IT SUBJECT TO RECALL OR NOT?  ARE

23   YOU GOING TO CALL HIM IN YOUR CASE, OR WHAT'S

24   HAPPENING?

25          MR. MCELHINNY:  HE'S EXCUSED, YOUR HONOR.

```
1               THE COURT:  OKAY.  ALL RIGHT.

2               MR. VERHOEVEN:  HE'S EXCUSED.

3               THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.

4          OKAY.  CALL YOUR NEXT WITNESS, PLEASE.

5          IT IS NOW 2:35.  WHO'S YOUR NEXT WITNESS?

6               MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS

7    PROFESSOR ANDRIES VAN DAM.

8               THE COURT:  OKAY.  CAN I ASK, THIS IS NOT

9    THE WITNESS I WAS TOLD, SO CAN I FIND OUT --

10              MR. VERHOEVEN:  YOUR HONOR, I APOLOGIZE

11   FOR THAT.

12              THE COURT:  IT'S NOT A PROBLEM.

13              MR. VERHOEVEN:  WE'RE JUST TRYING TO

14   BALANCE THE TIME FOR TODAY.

15              THE COURT:  NO PROBLEM.

16              MR. VERHOEVEN:  SO WE'VE SKIPPED OVER

17   MR. LUCENTE.  I APOLOGIZE FOR NOT INFORMING, YOU

18   YOUR HONOR.

19              THE COURT:  OH, NO, IT'S NOT A PROBLEM AT

20   ALL.

21              MR. VERHOEVEN:  AND THEN THE WITNESS

22   AFTER THIS ONE WILL BE STEPHEN GRAY, YOUR HONOR.

23   SO WE'RE GOING TO GO DIRECTLY FROM THE CURRENT

24   WITNESS TO MR. GRAY.

25              THE COURT:  OKAY.
```

2845

```
1            MR. VERHOEVEN:  AND THAT SHOULD CLOSE OUT
2    THE DAY I THINK, YOUR HONOR.
3            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.
4    SO MR. VAN DAM AND THEN MR. GRAY.
5            MR. VERHOEVEN:  YES, YOUR HONOR.
6            THE COURT:  ALL RIGHT.  THANK YOU.
7            DO YOU HAVE PICTURES OF THE WITNESSES?
8    IF NOT, WE'LL GET THEM LATER.  NO PROBLEM.
9            MR. JOHNSON:  GOOD AFTERNOON, LADIES AND
10   GENTLEMEN.
11           THE CLERK:  PLEASE STAND AND RAISE YOUR
12   RIGHT HAND.
13                   ANDRIES VAN DAM,
14   BEING CALLED AS A WITNESS ON BEHALF OF THE
15   DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS
16   EXAMINED AND TESTIFIED AS FOLLOWS:
17           THE WITNESS:  I DO.
18           THE CLERK:  THANK YOU.  PLEASE BE SEATED.
19           THE COURT:  ALL RIGHT.  TIME IS NOW 2:36.
20   GO AHEAD, PLEASE.
21                 DIRECT EXAMINATION
22   BY MR. JOHNSON:
23   Q   GOOD AFTERNOON, PROFESSOR VAN DAM.  COULD YOU
24   PLEASE STATE YOUR FULL NAME FOR THE RECORD?
25   A   GOOD AFTERNOON.  I'M ANDRIES VAN DAM.
```

1    Q    WHAT ARE YOU HERE TO TESTIFY ABOUT TODAY?

2    A    I'M HERE TO TESTIFY ABOUT THE INVALIDITY OF

3    APPLE'S '381 PATENT, THE SO-CALLED SNAP-BACK

4    PATENT.

5    Q    OKAY.  HAVE YOU PREPARED SOME SLIDES WITH

6    RESPECT TO YOUR TESTIMONY TODAY?

7    A    I HAVE.

8    Q    AND CAN YOU JUST GENERALLY, FOR PURPOSES OF

9    THE JURY, DESCRIBE YOUR TESTIMONY.

10   A    YES.  IT'S DIRECTED TOWARDS THE INVALIDITY OF

11   '381 ON THE BASIS OF PRIOR ART, WHICH ANTICIPATES

12   EACH AND EVERY ELEMENT OF CLAIM '381.

13            IN OTHER WORDS, APPLE WAS NOT THE FIRST

14   TO INVENT THE SNAP-BACK AND HERE ARE THE TWO

15   PARTICULAR PIECES THAT I'LL BE TALKING ABOUT,

16   TABLECLOTH RUNNING ON DIAMONDTOUCH AND LAUNCHTILE,

17   AND BOTH OF THESE HAVE BEEN DISCUSSED BY FACT

18   WITNESSES WHO WERE IN COURT ON MONDAY AND TUESDAY.

19   Q    WHAT'S TABLECLOTH?

20   A    TABLECLOTH IS A SIMPLE DEMONSTRATION PROGRAM

21   THAT SHOWS TWO IDENTICAL IMAGES, ESSENTIALLY

22   PHOTOGRAPHS OF A DESKTOP SCREEN, AND ONE CAN SCROLL

23   THEM UNTIL ONE GOES BEYOND THE EDGE.

24            AND YOU THEN SEE A BIT OF WHITE AREA

25   BEYOND THE EDGE.  THE FINGER IS LIFTED AND THAT

1    DOCUMENT WILL SNAP BACK SO THAT THERE IS NO LONGER

2    ANY AREA BEYOND THE EDGE.

3    Q    AND WHAT'S LAUNCHTILE?

4    A    LAUNCHTILE WAS EXPLAINED BY DR. BEDERSON, AND

5    IT IS A PROGRAM THAT LETS YOU ZOOM IN ON A ZONE OF

6    FOUR TILES WITHIN A 36 TILE SET OF TILES.

7         AND THEN YOU CAN SCROLL THAT ZONE IN THE

8    ADJACENT ZONE.

9         SO, AGAIN, YOU GO BEYOND THE EDGE, LIFT

10   YOUR FINGER, AND THAT ELECTRONIC DOCUMENT WILL SNAP

11   BACK SO THAT THERE IS NO LONGER ANY AREA BEYOND THE

12   EDGE.

13   Q    LET'S STEP BACK A LITTLE BIT, PROFESSOR

14   VAN DAM.

15        CAN YOU PLEASE DESCRIBE FOR US WHAT YOUR

16   CURRENT OCCUPATION IS AND HOW LONG HAVE YOU HAD IT?

17   A    YES, I'VE BEEN A FACULTY MEMBER AT BROWN

18   UNIVERSITY, ONE OF THE IVY LEAGUE SCHOOLS SINCE

19   1965, AND I HOLD AN ENDOWED CHAIRED, WHICH IS THE

20   THOMAS J. WATSON, JR., UNIVERSITY CHAIR IN

21   TECHNOLOGY AND EDUCATION.  AND I'M ALSO A FULL

22   PROFESSOR OF COMPUTER SCIENCE.  I WAS THE

23   CO-FOUNDER AND THE FIRST CHAIRMAN OF OUR COMPUTER

24   SCIENCE DEPARTMENT.

25   Q    HAVE YOU DONE ANY WORK AT BROWN INVOLVING

1    INTELLECTUAL PROPERTY OR PATENT RIGHT ITSELF?

2    A    YES, I HAVE.  AS BROWN'S FIRST VICE-PRESIDENT

3    FOR RESEARCH, I HELD MULTIPLE OFFICES, ONE OF WHICH

4    WAS TECHNOLOGY TRANSFER OFFICE, AND PART OF MY DUTY

5    THERE WAS TO COMPLETELY OVERALL THE PRETTY OBSOLETE

6    PATENT AND INVENTION POLICY, AND WHICH I DID, AND

7    IT IS STILL THE CURRENT POLICY AT BROWN.

8    Q    CAN YOU BRIEFLY DESCRIBE YOUR EDUCATION,

9    PLEASE?

10   A    YES.  I RECEIVED MY UNDERGRADUATE DEGREE IN

11   ENGINEERING SCIENCES FROM SWARTHMORE COLLEGE IN

12   PENNSYLVANIA IN 1960, AND I GOT MY MASTER'S AND MY

13   PH.D. AT THE UNIVERSITY OF PENNSYLVANIA, ALSO

14   CLEARLY IN PENNSYLVANIA, AND I HAVE THE DISTINCTION

15   OF HAVING THE SECOND PH.D. IN COMPUTER SCIENCE IN

16   THE COUNTRY.

17   Q    WHO WAS THE FIRST PERSON IN THE U.S. TO

18   RECEIVE A PH.D. IN COMPUTER SCIENCE?

19   A    MY ROOMMATE, WHO WAS A YEAR AHEAD OF ME,

20   RICHARD WEXELBLAT.

21   Q    IS THERE A PARTICULAR AREA OF COMPUTER SCIENCE

22   THAT YOU'VE FOCUSSED ON?

23   A    YES.  COMPUTER GRAPHICS AND SYSTEMS FOR

24   CREATING AND VIEWING ELECTRONIC DOCUMENTS HAVE BEEN

25   THE CONSISTENT THREAD OF MY RESEARCH SINCE THE

1    60'S.

2              BUT FOR THE LAST COUPLE OF DECADES I'VE

3    FOCUSSED MORE AND MORE ON HUMAN/COMPUTER

4    INTERACTIONS, NOVEL USER INTERFACE, AND MORE

5    SPECIFICALLY FOR MORE THAN A DECADE I'VE CHOSEN TO

6    WORK ON PEN AND TOUCH COMPUTING.

7              AND BY PEN COMPUTING, I MEAN WRITING ON

8    SOME TOUCHSCREEN SURFACE, WHETHER IT'S A SMARTPHONE

9    OR IN OUR LAB WE HAVE A 60-INCH INTERACTIVE WHITE

10   BOARD, ALSO A TOUCHSCREEN DISPLAY.

11             SO EITHER WRITING ON IT WITH A STYLUS OR

12   A PEN OR USING MY FINGERS TO MANIPULATE THE

13   INFORMATION.

14   Q    PROFESSOR VAN DAM, HAVE YOU WRITTEN ANY BOOKS?

15   A    I HAVE, NINE COAUTHORED BOOKS, AND PROBABLY

16   BEST KNOWN ARE TWO THAT ARE CALLED THE STANDARD

17   REFERENCE WORKS IN COMPUTER GRAPHICS, AND I'M

18   PLEASED TO SAY THAT AFTER SEVEN YEARS OF VERY HARD

19   WORK, WE SHIPPED THE LATEST VERSION, WHICH IS A

20   COMPLETE NEW BOOK, 1500-SOME PAGES TO THE PUBLISHER

21   JUST LAST WEEK.

22   Q    AS PART OF YOUR JOB AS PROFESSOR AT BROWN, DO

23   YOU REGULARLY SUPERVISE STUDENTS AND GRADUATE

24   STUDENTS?

25   A    SURE DO.

1    Q    HAVE ANY OF YOUR STUDENTS HAD ANY IMPACT IN

2    THE FIELD OF COMPUTING?

3    A    YES.  I'M VERY PROUD OF THEM.  ACTUALLY, MY

4    PROUDEST LEGACY IS AN AWARD THAT 40-PLUS STUDENTS

5    THAT I WORK WITH CLOSELY WHO HAVE GONE ON TO BE

6    EDUCATORS THEMSELVES, INCLUDING EIGHT DEPARTMENT

7    CHAIRS AT SUCH TOP RANKED UNIVERSITIES AS M.I.T.

8    AND PRINCETON AND UNIVERSITY OF WASHINGTON.

9         ALSO, A NUMBER HAVE MADE THEIR MARK IN

10   INDUSTRY.  FOR EXAMPLE, ONE OF THE FOUNDING MEMBERS

11   OF MICROSOFT, TWO VICE-PRESIDENTS OF LARGE

12   DIVISIONS AT THAT COMPANY, THE -- ONE OF THE

13   ORIGINAL INVENTORS OF THE APPLE MACINTOSH IN 1984

14   AND BEYOND, THE CURRENT DIRECTOR OF RESEARCH AT

15   GOOGLE, AND THE CHIEF ARCHITECT OF INTEL, 86

16   PROCESSOR LINE, WHO'S AN INTEL FELLOW NOW.

17   Q    AND HAVE YOU RECEIVED ANY RECOGNITION FOR YOUR

18   CONTRIBUTIONS TO THE FIELD OF COMPUTER SCIENCE?

19   A    YES, I HAVE.  I'VE GOTTEN AWARDS FROM MULTIPLE

20   PROFESSIONAL SOCIETIES, BOTH FOR TEACHING AND FOR

21   RESEARCH, AND I ALSO HAVE FOUR HONORARY DOCTORATES,

22   THESE OF THOSE WERE FROM THE TOP TECHNICAL

23   UNIVERSITIES IN THEIR RESPECTIVE COUNTRIES.

24        MR. JOHNSON:  YOUR HONOR, WE TENDER

25   PROFESSOR VAN DAM AS AN EXPERT IN THE FIELD OF

```
 1   COMPUTER SCIENCE, COMPUTER GRAPHICS, AND GRAPHICAL

 2   USER INTERFACES.

 3              MS. KREVANS:  NO OBJECTION, YOUR HONOR.

 4              THE COURT:  SO CERTIFIED.  GO AHEAD,

 5   PLEASE.

 6              MR. JOHNSON:  THANK YOU, YOUR HONOR.

 7   Q    PROFESSOR VAN DAM, DO YOU WORK FOR EITHER OF

 8   THE PARTIES IN THIS CASE, SAMSUNG OR APPLE?

 9   A    I DO NOT.

10   Q    ARE YOU BEING COMPENSATED IN CONNECTION WITH

11   YOUR WORK IN THIS CASE?

12   A    YES, I AM.

13   Q    WHAT'S YOUR HOURLY RATE?

14   A    THE SAME RATE IT'S BEEN FOR SEVERAL DECADES,

15   WHICH IS A THOUSAND DOLLARS ON HOUR.

16   Q    AND HOW MANY HOURS HAVE YOU SPENT ON THIS CASE

17   THUS FAR?

18   A    UNTIL TODAY, APPROXIMATELY 460 HOURS.

19   Q    NOW, HOW DID YOU DECIDE TO TAKE ON THIS

20   MATTER?

21   A    WELL, WHEN SAMSUNG'S COUNSEL FIRST CALLED ME,

22   I DID WHAT I ALWAYS DO, WHICH IS TO SAY SEND ME THE

23   PATENT AND LET ME TAKE A LOOK AT IT.

24              SO I DID AND I DETERMINED RELATIVELY

25   QUICKLY THAT I WAS QUITE FAMILIAR WITH SNAPPING
```

```
1    BEHAVIOR.  IN FACT, I HAD TAUGHT IT TO MY SOPHOMORE
2    INTRODUCTORY GRAPHICS COURSE FOR AT LEAST A DECADE
3    IN THE '60S AND '70S.
4             SO I THOUGHT THAT I WOULD BE ON THE RIGHT
5    SIDE OF THIS DISPUTE, WHICH IS MY PRIMARY CRITERIA.
6    Q    HOW MANY TIMES HAVE YOU TESTIFIED AS AN EXPERT
7    WITNESS?
8    A    I'VE BEEN IN COURT TWICE BEFORE, ONCE RECENTLY
9    AND ANOTHER, SOME SAMSUNG VERSUS APPLE DISPUTE, AND
10   THEN IN THE LATE '90S IN A TRADE SECRET CASE.
11   Q    HOW MANY TIMES HAVE YOU BEEN ENGAGED AS AN
12   EXPERT CONSULTANT IN LITIGATION?
13   A    A COUPLE MORE TIMES AS A CONSULTANT.
14   Q    HOW MANY TIMES HAVE YOU BEEN ASKED TO WORK AS
15   AN EXPERT WITNESS IN LITIGATION?
16   A    MANY, MANY TIMES.  DOZENS OF TIMES OVER MY 47
17   YEARS.
18   Q    AND WHY HAVE YOU NOT TAKEN ON MORE CASES?
19   A    WELL, I'M A FULL TIME FACULTY MEMBER, AND,
20   FRANKLY, I MUCH PREFER DOING TEACHING AND RESEARCH
21   TO LEGAL WORK.  AND THERE ISN'T ENOUGH TIME TO DO
22   ALL OF THAT AT THE SAME TIME.
23   Q    NOW, IS YOUR COMPENSATION IN ANY WAY
24   CONTINGENT UPON THE OUTCOME OR YOUR TESTIMONY IN
25   THIS CASE?
```

```
1    A    CERTAINLY NOT.

2    Q    OKAY.  CAN YOU BRIEFLY DESCRIBE, PLEASE, YOUR

3    UNDERSTANDING OF HOW A PATENT CLAIM CAN BE

4    INVALIDATED BY PRIOR ART?

5    A    YES.  THERE ARE TWO PRINCIPAL WAYS.  ONE IS

6    CALLED BY ANTICIPATION, AND YOU HAVE THAT CASE WHEN

7    YOU CAN FIND A PIECE OF PRIOR ART WHICH DISCLOSES

8    EACH AND EVERY LIMITATION OF EACH AND EVERY ELEMENT

9    OF THE DISPUTED CLAIM.

10           AND THE SECOND MECHANISM IS CALLED

11   OBVIOUSLY, AND YOU CAN USE THAT WHEN YOU CAN FIND

12   MULTIPLE PIECES OF PRIOR ART WHICH TOGETHER

13   DISCLOSE EVERY ELEMENT OF THE DISPUTED CLAIM.

14           AND THEN THERE'S EVEN A SPECIAL CASE OF

15   OBVIOUSNESS WHERE YOU CAN FIND EVERYTHING YOU NEED,

16   EVERY ELEMENT, IN A SINGLE REFERENCE, BUT THERE MAY

17   BE A COUPLE OF THINGS MISSING, BUT IF THOSE

18   ELEMENTS WOULD BE OBVIOUS TO A PRACTITIONER, A

19   PERSON OF ORDINARY SKILL IN THE ART, THEN YOU CAN

20   USE OBVIOUSNESS THERE AS WELL.

21   Q    PROFESSOR VAN DAM, YOU HAVE SOME BINDERS IN

22   FRONT OF YOU, AT LEAST ONE THAT HAS EXHIBIT 1045 IN

23   IT.

24   A    YES, I WILL LOOK FOR IT.

25   Q    HOPEFULLY THAT'S THE '381 PATENT.
```

1    A    YES, IT IS.

2    Q    OKAY.  HAVE YOU -- YOU'VE REVIEWED THIS PATENT

3    BEFORE; RIGHT?

4    A    EXTENSIVELY.

5    Q    AND HAVE YOU PREPARED SLIDES IN PREPARATION

6    FOR YOUR TESTIMONY TODAY?

7    A    I DID.

8    Q    CAN YOU GENERALLY DESCRIBE FOR US, WHAT IS THE

9    '381 PATENT DIRECTED TO?

10   A    IT DESCRIBES WHAT HAPPENS WHEN AN APPLICATION

11   ALLOWS A USER TO OVER SCROLL, THAT IS, TO GO BEYOND

12   THE EDGE OF AN ELECTRONIC DOCUMENT.  IT DESCRIBES

13   THAT YOU THEN HAVE TO SEE SOMETHING THAT'S NOT PART

14   OF THE ELECTRONIC DOCUMENT, THE AREA BEYOND THE

15   EDGE.

16            AND THEN WHEN YOU LIFT YOUR FINGER, THEN

17   THE DOCUMENT CORRECTS ITSELF BY SNAPPING BACK.

18   Q    CAN YOU DESCRIBE FOR US HOW CLAIM 19, WHICH IS

19   THE ASSERTED CLAIM IN THE '381 PATENT, IS MET BY

20   EACH AND EVERY -- EACH AND EVERY LIMITATION OF IT

21   AS DISCLOSED IN THE PRIOR ART?

22   A    YES, I CAN DO THAT.

23            AND THE ANALYSIS HAS TO START BY FIRST

24   DESCRIBING WHAT THE ELECTRONIC DOCUMENT IS THAT I

25   WANT TO USE FOR MY ANALYSIS.

1   Q    AND LET'S START WITH TABLECLOTH.

2   A    FINE.  IN THE CASE OF TABLECLOTH, THERE ARE

3   TWO IDENTICAL PHOTOGRAPHS OR IMAGES STORED IN

4   MEMORY TOGETHER, AND THINK OF THIS AS TWO IDENTICAL

5   PHOTOGRAPHS IN A FAMILY ALBUM.  IT'S A VERY SIMPLE

6   LITTLE PROGRAM, SO DON'T THINK OF IT AS A FULL

7   FEATURE APPLICATION.

8           SO WE HAVE THESE TWO IMAGES TOGETHER, AND

9   THAT IS OUR ELECTRONIC DOCUMENT.

10          AND IT SO, I SHOULD MENTION, BY THE

11   COURT'S CONSTRUCTION, WHICH HOLDS THAT AN

12   ELECTRONIC DOCUMENT IS A DOCUMENT THAT IS STORED IN

13   DIGITAL FORMAT AND IT SPECIFICALLY HAS NO OTHER

14   LIMITATIONS, AND DOES NOT, FOR -- AND IT SAYS

15   SPECIFICALLY ALSO THAT THAT CAN EITHER BE IN A

16   SINGLE FILE OR IN MULTIPLE FILES.  SO IT'S QUITE

17   GENERAL AND ALLOWS THIS PARTICULAR CASE.

18   Q    ARE YOU REFERRING TO THE COURT'S CONSTRUCTION

19   OF ELECTRONIC DOCUMENT?

20   A    YES, I AM.

21   Q    OKAY.  WHAT IS THE ELECTRONIC DOCUMENT IN

22   TABLECLOTH?

23   A    IT'S THESE TWO IMAGES TOGETHER.

24   Q    NOW, DID YOU PREPARE A VIDEO OF HOW TABLECLOTH

25   OPERATES?

```
1   A    YES, I DID.

2   Q    CAN YOU PLEASE WALK US THROUGH IT?

3   A    YEAH.  THE FIRST THING TO NOTICE IS THAT WE

4   CAN'T HAVE THIS ENTIRE DOCUMENT IN VIEW AT ONCE, SO

5   WE'RE ONLY ALLOWED TO SEE ESSENTIALLY ONE IMAGE

6   WORTH.

7        BUT AS WE SCROLL, INEVITABLY WHAT WE SEE

8   AND VIEW IS GOING TO CHANGE, AND WE'LL GET

9   COMBINATIONS OF BOTH IMAGES UNTIL EVENTUALLY WE'LL

10  SCROLL OFF THE EDGE, SEE THE WHITE AREA BEYOND THE

11  EDGE, AND THEN YOU'LL SEE THE SNAP BACK AS THE USER

12  LIFTS THE FINGER.

13       SO HERE WE START WITH AN OVERVIEW OF THE

14  MITSUBISHI DEVICE THAT IS OUR TOUCHSCREEN DISPLAY.

15  YOU'LL NOTICE THAT IT HAS THE BLACK BEZEL.  THERE'S

16  THE MITSUBISHI LOGO, SOME FAMILIAR ICONS, THE TASK

17  BAR, THE START.

18       AND THIS THING IS AN INTERNET EXPLORER

19  APPLICATION WINDOW IN WHICH THE TABLECLOTH

20  APPLICATION RUNS.

21       SO WHAT I'D LIKE TO DO IS ZOOM IN ON THIS

22  SO WE CAN GET A BETTER VIEW OF THE APPLICATION

23  WINDOW, AND --

24  Q    AND WHAT DO WE SEE HERE?

25  A    WELL, WE'RE NOW ZOOMED IN AND READY TO START
```

```
1    OUR DEMONSTRATION, AND YOU'LL SEE A FINGER APPEAR,

2    YOU'LL SEE THE SCROLLING ACTION, THE AREA BEYOND

3    THE EDGE, AND THEN THE SNAP BACK.

4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6              THE WITNESS:  SO START SCROLLING, YOU SEE

7    PORTIONS OF TOP AND BOTTOM IMAGE, MORE OF THE

8    BOTTOM IMAGE COMES INTO VIEW, EVENTUALLY WE REACH

9    THE EDGE OF THE BOTTOM IMAGE RIGHT THERE, AND NOW

10   WE GO BEYOND, SEE THE AREA BEYOND THE EDGE, LIFT

11   THE FINGER, AND SNAP BACK.

12   Q    CAN YOU EXPLAIN HOW TABLECLOTH ANTICIPATES

13   EACH AND EVERY LIMITATION IN CLAIM 19?

14   A    I CAN DO THAT.

15   Q    PLEASE DO SO.

16   A    IN ORDER TO PERFORM THAT ANALYSIS, WE HAVE TO

17   READ THE CLAIM LANGUAGE LIMITATION BY LIMITATION,

18   AND WE START AT THE VERY TOP SAYING IT MUST BE A

19   DEVICE WITH MULTIPLE COMPONENTS.  WHAT ARE THEY?  A

20   TOUCHSCREEN DISPLAY.  YOU SAW THE FINGER TOUCHING

21   THE SCREEN AND SCROLLING THE DOCUMENT, TRANSLATING

22   THE DOCUMENT.  SO THAT IS A TOUCHSCREEN DISPLAY.

23              THERE ARE MULTIPLE PROCESSORS IN THE IBM

24   LAPTOP P.C. THAT IS DRIVING THE SYSTEM.

25              THEY, OF COURSE, HAVE MEMORY.  IT'S
```

1    ABSOLUTELY A VANILLA P.C.

2              AND WE STORE PROGRAMS IN THAT MEMORY AND

3    THE PURPOSE, OF COURSE, IS TO EXECUTE THE PROGRAMS

4    AND EACH PROGRAM IS A SEQUENCE, OR A COLLECTION OF

5    SEQUENCES OF INSTRUCTION.

6              AND, IN FACT, THE WHOLE REST OF THE

7    PATENT IS AN ELABORATION OF WHAT EACH OF THAT GROUP

8    OF INSTRUCTIONS HAS TO DO IN ORDER TO PERFORM FIRST

9    THE SCROLLING, THEN GOING BEYOND THE EDGE, AND THEN

10   SNAPPING BACK.

11   Q    SO WE'VE MET ALL OF THE LIMITATIONS IN THIS

12   CHECKLIST.

13             BY THE WAY, WHAT ARE THE COMPONENTS OF

14   THE DIAMONDTOUCH THAT ARE NOT SHOWN ON THE IMAGE ON

15   THE RIGHT?  YOU MENTIONED A P.C., FOR EXAMPLE.

16   A    WELL, IT'S NOT IN THE IMAGE BECAUSE I

17   CONCENTRATED ON THE SCREEN WHERE THE ACTION TAKES

18   PLACE.  THE LAPTOP IS ON THE SIDE.  THE PROJECTOR

19   THAT IS PRODUCING THIS DISPLAY IS ABOVE THE

20   DISPLAY.  I DIDN'T SHOW YOU THE TABLE, THE CHAIRS,

21   OR THE CAPACITIVE CONNECTION THAT WAS MENTIONED BY

22   MR. BOGUE AND DR. FORLINES.

23             THE COURT:  LET ME ASK, MR. JOHNSON -- WE

24   SHOULD PROBABLY TAKE OUR BREAK.

25             MR. JOHNSON:  THAT'S FINE, YOUR HONOR.

```
 1              THE COURT:  WE CAN GO A LITTLE BIT
 2     LONGER, BUT I DON'T WANT OUR COURT REPORTERS TO
 3     HAVE TO GO TWO HOURS STRAIGHT.  THEY'VE BEEN GOING
 4     SINCE 1:03.
 5              MR. JOHNSON:  THIS IS A PERFECT PLACE.
 6              THE COURT:  IS THIS A GOOD PLACE.  OKAY.
 7     IT'S NOW 2:52.  WE'LL TAKE A 15-MINUTE BREAK.  SAME
 8     ADMONITION, PLEASE KEEP AN OPEN MIND, DON'T DISCUSS
 9     THE CASE WITH ANYONE.  PLEASE DON'T READ ABOUT THE
10     CASE OR DO ANY RESEARCH.  YOU CAN LEAVE YOUR
11     BINDERS ON YOUR CHAIRS, AND WE'LL SEE YOU BACK IN
12     15 MINUTES.  THANK YOU.
13              (WHEREUPON, THE FOLLOWING PROCEEDINGS
14     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
15              THE COURT:  ALL RIGHT.  THANK YOU.
16              (WHEREUPON, A RECESS WAS TAKEN.)
17              (WHEREUPON, THE FOLLOWING PROCEEDINGS
18     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
19              THE COURT:  ALL RIGHT.  WELCOME BACK,
20     PLEASE TAKE A SEAT.
21              IF YOU WOULD PLEASE BRING OUR JURY BACK.
22              (WHEREUPON, THE FOLLOWING PROCEEDINGS
23     WERE HELD IN THE PRESENCE OF THE JURY:)
24              THE COURT:  OKAY.  PLEASE TAKE A SEAT.
25     WELCOME BACK.
```

```
1              IT IS 3:07.  GO AHEAD, PLEASE.
2              MR. JOHNSON:  THANK YOU, YOUR HONOR.
3              YOUR HONOR, I'D LIKE TO START BY MOVING
4    IN SDX 3964.15, WHICH IS THE VIDEO WE JUST WATCHED.
5              MS. KREVANS:  NO OBJECTION, YOUR HONOR.
6              THE COURT:  ALL RIGHT.  3964.015, NOT A,
7    JUST 015.
8              MR. JOHNSON:  THE VIDEO.
9              THE COURT:  WHAT WAS THE NUMBER FOR THAT?
10             MR. JOHNSON:  IT SHOULD BE .015A.
11             THE COURT:  IT IS A, OKAY.
12             MR. JOHNSON:  YES.
13             THE COURT:  THANK YOU.  THAT'S ADMITTED.
14             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
15             3964.015A, HAVING BEEN PREVIOUSLY MARKED
16             FOR IDENTIFICATION, WAS ADMITTED INTO
17             EVIDENCE.)
18   BY MR. JOHNSON:
19   Q    PROFESSOR VAN DAM, CAN YOU SHOW US HOW
20   TABLECLOTH MEETS THE NEXT LIMITATION OF CLAIM 19?
21   A    SURE.  IT'S A VERY SHORT ELEMENT, AND IT SAYS
22   THAT YOU MUST HAVE INSTRUCTIONS FOR DISPLAYING A
23   FIRST PORTION OF AN ELECTRONIC DOCUMENT.
24             IT DOESN'T TELL YOU HOW YOU ARRIVE AT
25   THAT FIRST PORTION.  SO LET'S ZOOM IN AGAIN AND NOW
```

```
 1    WE'LL SEE A BIT OF SCROLLING, AND THEN SOMEWHERE
 2    WE'LL STOP AND SAY THAT'S OUR FIRST PORTION AND
 3    ANNOTATE IT AS SUCH.
 4    Q    OKAY.  WHAT ABOUT THE NEXT LIMITATION,
 5    INSTRUCTIONS FOR TRANSLATING?
 6    A    SO HERE WE'VE TRANSLATED JUST A LITTLE BIT
 7    MORE, SHOWING THAT THERE ARE INSTRUCTIONS FOR
 8    TRANSLATING.
 9         AND THAT TRANSLATION DIRECTION IS CALLED
10    THE FIRST DIRECTION, THE UPWARD DIRECTION IN THE
11    CASE OF TABLECLOTH AND IN THIS DEMONSTRATION.
12         NOW, WHEN YOU SCROLL, INEVITABLY YOU'RE
13    GOING TO DISPLAY A DIFFERENT PORTION OF THE
14    ELECTRONIC DOCUMENT.  AND THAT IS CALLED THE SECOND
15    PORTION IN THE CLAIM LANGUAGE.
16         NOW, I WANT TO POINT OUT THAT THIS
17    DISCUSSION OF FIRST PORTION, SECOND PORTION, AND
18    YOU'LL SOON SEE A THIRD AND FOURTH IS THE PATENT'S
19    WAY OF TEXTUALLY DESCRIBING WHAT YOU'RE GOING TO
20    SEE VISUALLY.  IT IS NOT, IN FACT, A SEPARATE
21    DESIGN FEATURE.  IT'S A CONSEQUENCE OF THE
22    SCROLLING MOTION.
23         SO WHAT ELSE IS REQUIRED?  WELL, BECAUSE
24    YOU'RE SCROLLING, YOU'RE GOING TO SEE A DIFFERENT
25    PORTION, AND, THEREFORE, THE SECOND PORTION WILL BE
```

1    DIFFERENT FROM THE FIRST PORTION.

2              AND YOU CAN CLEARLY SEE THAT, FOR

3    EXAMPLE, IF YOU LOOK AT THE AMOUNT OF SKY IN THE

4    SECOND PORTION VERSUS THE AMOUNT IN THE FIRST

5    PORTION.

6              SO WE CAN CHECK OFF THAT ENTIRE ELEMENT.

7    Q    OKAY.  CAN YOU SHOW US HOW TABLECLOTH MEETS

8    THE NEXT LIMITATION OF THE CLAIM.

9    A    SURE.  SO IN THE CASE WE'RE GOING TO SCROLL,

10   AS WE'VE SEEN BEFORE, UNTIL WE REACH THE EDGE AND

11   THEN SCROLL A LITTLE BIT MORE TO OVER SCROLL, SO GO

12   BEYOND THE EDGE, AT WHICH POINT WE HAVE TO SEE

13   SOMETHING NOT PART OF THE ELECTRONIC DOCUMENT,

14   WHICH THE PATENT CALLS AREA BEYOND THE EDGE.

15             NEXT, AGAIN, INEVITABLY BECAUSE OF THE

16   SCROLLING ACTION, WE'LL SEE YET A DIFFERENT PORTION

17   OF THE ELECTRONIC DOCUMENT CALLED THE THIRD

18   PORTION, AND THE PATENT DESCRIBES THAT, AGAIN,

19   INEVITABLY, THAT THE PORTION HAS TO BE SMALLER THAN

20   THE FIRST PORTION, NOT JUST DIFFERENT, BUT SMALLER.

21             WHY?  WELL, BECAUSE WE HAVE TO MAKE ROOM

22   FOR THE AREA BEYOND THE EDGE AND THUS THE RED

23   RECTANGLE IS SMALLER THAN THE ORANGE RECTANGLE.

24   THE IMAGE IS JUST SMALLER.

25   Q    AND CAN YOU DESCRIBE FOR US HOW TABLECLOTH

1    MEETS THE NEXT LIMITATION AS DESCRIBED IN CLAIM 34?

2    A    SO THE NEXT ELEMENT IS GOING TO BE SHOWN HERE,

3    AND THIS IS SETTING US UP FOR THE SNAP-BACK.  WHAT

4    IS THE SNAP-BACK?  IT MEANS TRANSLATING IN ANOTHER

5    DIRECTION, A SECOND DIRECTION, HERE THE OPPOSITE

6    DIRECTION GOING DOWNWARD.

7         AND WHAT ARE YOU TRYING TO ACCOMPLISH?

8    WELL, YOU'RE TRYING TO GET RID OF THAT AREA BEYOND

9    THE EDGE, AND WHEN YOU DO, YOU SNAP BACK.

10        NOW, ADDITIONALLY, BECAUSE YOU'RE LOOKING

11   AT YET A DIFFERENT PORTION OF THE ELECTRONIC

12   DOCUMENT, YOU'RE GOING TO SEE A FOURTH PORTION AND

13   THE PATENT REQUIRES THAT IT BE DIFFERENT FROM WHERE

14   YOU STARTED THE ANALYSIS.

15        AND JUST TO REMIND YOU, WE HAVE --

16   WHOOPS -- A COMBINATION OF TWO IMAGES IN THE FIRST

17   PORTION OVER HERE AND A SINGLE IMAGE ON THE RIGHT

18   AS OUR FOURTH PORTION.

19        AND THAT COMPLETES THE LAST ELEMENT, AND

20   SO WE'VE SHOWN THAT ALL OF THE ELEMENTS OF CLAIM 19

21   ARE FOUND IN TABLECLOTH.

22        MR. JOHNSON:  YOUR HONOR, WE ASK THAT SDX

23   3964.026 THROUGH 38, THAT THOSE SLIDES THAT

24   PROFESSOR VAN DAM JUST REFERRED TO BE ADMITTED.

25        MS. KREVANS:  NO OBJECTION.

```
 1              THE COURT:  I'M SORRY.  GIVE ME THAT
 2    BATES RANGE AGAIN.
 3              MR. JOHNSON:  IT'S 3964.026 THROUGH .038.
 4              THE COURT:  OKAY.  AND NO ONE WILL BE
 5    ABLE TO GET ANY DEMONSTRATIVES ADMITTED IN THEIR
 6    REBUTTAL CASES BECAUSE THIS IS FAR EXCEEDING ALL
 7    THE EXHIBIT LIMITS.  OKAY?
 8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS
 9              3964.026 - .038, HAVING BEEN PREVIOUSLY
10              MARKED FOR IDENTIFICATION, WERE ADMITTED
11              INTO EVIDENCE.)
12    BY MR. JOHNSON:
13    Q    PROFESSOR VAN DAM, WHEN IS YOUR UNDERSTANDING
14    OF WHEN TABLECLOTH WAS CREATED?
15    A    IT WAS CREATED, AS DR. FORLINES TESTIFIED, BY
16    HIS COLLEAGUE AT MITSUBISHI ELECTRIC RESEARCH LAB
17    DURING THE HOLIDAY WINTER VACATION, AND IT WAS THUS
18    AVAILABLE EARLY IN JANUARY, MID-JANUARY IT WAS
19    SHOWN TO THE PUBLIC AT THE NEW SCHOOL FOR SOCIAL
20    RESEARCH, AND I UNDERSTAND FROM HIS TESTIMONY THAT
21    ONE OF THE ATTENDEES WAS SENATOR KERREY.
22    Q    WHAT YEAR WAS THAT?
23    A    THAT WAS 2005.
24    Q    OKAY.  LET'S TURN OUR ATTENTION TO LAUNCHTILE.
25              NOW, CAN YOU TAKE US THROUGH A DISCUSSION
```

1     OF HOW LAUNCHTILE MEETS EACH AND EVERY LIMITATION

2     OF CLAIM 19?

3     A    I WILL.  HERE WE SEE THE DEVICE THAT

4     DR. BEDERSON DEMONSTRATED ALREADY.  IT'S AN ARRAY

5     OF 36 TILES, EACH OF WHICH IS MEANT, IN THIS

6     PROTOTYPE, EVENTUAL TO LAUNCH AN APPLICATION.

7              AND, AGAIN, THE FIRST THING WE HAVE TO DO

8     IS IDENTIFY WHAT OUR ELECTRONIC DOCUMENT IS GOING

9     TO BE.

10             BY THE COURT'S CONSTRUCTION, IT CAN BE

11    ANYTHING THAT HAS A DIGITAL REPRESENTATION.  I

12    COULD PICK A SINGLE TILE.  I COULD PICK TWO, FOUR,

13    EIGHT OR THE ENTIRE SET OF TILES.

14             FOR THE PURPOSES OF MY INVALIDITY

15    ANALYSIS, I PICKED TWO ADJACENT ZONES.  I'LL ZOOM

16    IN TO MAKE THOSE SHOW UP.

17             AND THE TWO ZONES I'LL PICK ARE THE

18    LEFT-MOST ONES.

19             SO THERE IT IS.  IT'S KIND OF SMALL, SO

20    LET ME GO IN A LITTLE BIT.  AND TO ILLUSTRATE WHAT

21    I MEAN BY THE ELECTRONIC DOCUMENT, I'M GOING TO

22    SHOW YOU A SCHEMATIC OF THOSE TWO ZONES OF FOUR

23    TILES EACH, TOGETHER, AS YOU CAN THINK OF THEM AS

24    TWO PHOTOGRAPHS OR EIGHT PHOTOGRAPHS.  IT'S OUR

25    ELECTRONIC DOCUMENT, AND THAT'S HOW WE'RE GOING TO

```
 1    DO OUR ANALYSIS.  WE'RE GOING TO START IN THE LEFT
 2    ZONE, THE LEFT-MOST PART OVER HERE, AND WE'RE GOING
 3    TO SEE THE DOCUMENTS SCROLL IN THE LEFT DIRECTION.
 4              EVENTUALLY WE'RE GOING TO COME TO THE
 5    EDGE OVER HERE.
 6    Q    WHY DOES THE AREA BEYOND THE EDGE?
 7    A    WELL, HERE IT IS ANYTHING THAT IS NOT PART OF
 8    THE ELECTRONIC DOCUMENT, SO IT'S WHATEVER LIES
 9    OUTSIDE THAT WHITE BOX DESIGNATING THE ELECTRONIC
10    DOCUMENT.
11    Q    HAVE YOU PREPARED A VIDEO THAT DESCRIBES HOW
12    THIS PARTICULAR DEVICE MEETS THE LIMITATIONS?
13    A    I HAVE, YES.
14    Q    AND CAN YOU EXPLAIN WHAT WE SEE?
15    A    SO --
16    Q    AND WE'RE LOOKING AT 3964.043 AT THIS POINT.
17    A    WE START OFF BY HAVING ONLY A PORTION IN VIEW,
18    JUST AS IN THE CASE OF TABLECLOTH.  MOTION IN
19    LIMINE ELECTRONIC DOCUMENTS ARE TOO MUCH TO BE SEEN
20    IN THEIR ENTIRETY IN WHATEVER DISPLAY YOU USE,
21    WHETHER IT'S A SMARTPHONE OR EVEN A VERY LARGE
22    INTERACTIVE WHITE BOARD.
23              SO THIS IS THE AMOUNT THAT WE CAN SEE ON
24    THIS LITTLE HANDHELD DEVICE, AND EVENTUALLY WE'RE
25    GOING TO SCROLL TO THE LEFT UNTIL WE -- SORRY.  MY
```

```
1     HAND IS SHAKY.  LET'S START AGAIN.
2               THERE'S THE EDGE.  AND THERE'S THE AREA
3     BEYOND THE EDGE.
4               AND IN THIS CASE IT'S NOT THE WHITE THAT
5     YOU SAW BEFORE WITH TABLECLOTH.  AS I HAD ANSWERED
6     EARLIER, IT'S WHATEVER IS SHOWN OUTSIDE THE
7     ELECTRONIC DOCUMENT.  THE FACT THAT IT HAPPENS TO
8     BE PART OF SOME OTHER ELECTRONIC DOCUMENT OR SOME
9     OTHER PIECE OF INFORMATION IS ABSOLUTELY
10    IMMATERIAL.  THE PATENT DOESN'T SPECIFY WHAT YOU
11    NEED TO SEE OUTSIDE THE EDGE.
12              SO LET ME START THE ANALYSIS.
13              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
14    OPEN COURT OFF THE RECORD.)
15              THE WITNESS:  AND WE'LL TAP ON THAT TILE
16    TO BRING THAT LEFT-MOST ZONE INTO VIEW.  I'M GOING
17    TO SCROLL TO THE LEFT AND YOU WILL SEE THE MAP OF
18    SEATTLE, A MAIL FILE, THERE'S THE EDGE COMING INTO
19    VIEW, THERE'S THE AREA BEYOND THE EDGE, AND YOU SAW
20    THE FINGER LIFT OFF AND THE DOCUMENT SNAP BACK.
21    Q    SO CAN YOU WALK US THROUGH THE CLAIM AND
22    EXPLAIN TO THE JURY HOW LAUNCHTILE MEETS EACH AND
23    EVERY LIMITATION OF CLAIM 19?
24    A    I CAN AND WILL.
25              SO, AGAIN, WE HAVE TO DO THIS SOMEWHAT
```

1    TEDIOUS ANALYSIS.  PLEASE BEAR WITH ME.

2            WE START WITH A DEVICE, IT'S OUR COMPAQ

3    IPAQ, AND IT CLEARLY HAS A TOUCHSCREEN DISPLAY.  IT

4    HAS A PROCESSOR INSIDE WHICH HAS MEMORY WHICH

5    STORES THE LAUNCHTILE PROGRAM, AMONG OTHERS.

6            AND THE PURPOSE OF THE PROCESSOR IS TO

7    EXECUTE THOSE PROGRAMS.  THE PROGRAMS CONSIST OF

8    SEQUENCES OF INSTRUCTIONS, AND AGAIN WE WILL

9    ENUMERATE EACH SET OF INSTRUCTIONS THAT

10   ACCOMPLISHES EACH OF THE INDIVIDUAL ELEMENTS OF

11   THIS CLAIM.

12   Q    SO HOW DOES LAUNCHTILE MEET THE NEXT

13   LIMITATION OF CLAIM 19?

14   A    SO LET'S LOOK AT IT.  WE'VE TALKED ABOUT WHAT

15   OUR ELECTRONIC DOCUMENT IS IN OUR ANALYSIS.  IT'S

16   THE LEFT ZONE AND ITS NEIGHBOR.

17           AND NEXT WE'RE GOING TO PICK OUR LEFT

18   ZONE, BRING IT INTO VIEW BY ZOOMING AS DR. BEDERSON

19   EXPLAINED, AND WE'LL CALL THAT OUR FIRST PORTION.

20   Q    HOW DOES LAUNCHTILE MEET THE NEXT LIMITATION?

21   A    SO THERE MUST BE INSTRUCTIONS FOR TRANSLATING,

22   WE'RE TRANSLATING HERE, RECALLING THE DIRECTION IN

23   WHICH WE TRANSLATE THE FIRST DIRECTION.

24           AND INEVITABLY, AGAIN, BECAUSE WE'RE

25   SCROLLING, WE'RE GOING TO SEE SOMETHING DIFFERENT.

1    THIS TIME YOU'LL SEE A MIXTURE OF TWO ZONES.

2    YOU'LL SEE THE LEFT ZONE CONTRIBUTED EBAY, THE

3    RIGHT ZONE CONTRIBUTED A MAP OF SEATTLE.

4            WE'RE GOING TO KEEP SCROLLING, BUT FIRST

5    WE HAVE TO NOTE TEXTUALLY THAT THE SECOND PORTION,

6    OF COURSE, IS DIFFERENT FROM THE FIRST PORTION

7    BECAUSE WE'VE BEEN SCROLLING.

8            AND THAT COMPLETES OUR ANALYSIS OF THAT

9    ELEMENT.

10   Q    SO IF WE -- IF WE LOOK AT THE NEXT LIMITATION,

11   THE INSTRUCTIONS FOR DISPLAYING AN AREA BEYOND THE

12   EDGE, CAN YOU DESCRIBE FOR US HOW LAUNCHTILE MEETS

13   THAT LIMITATION, PLEASE?

14   A    YES.  SO WE KEEP SCROLLING WE'LL ENCOUNTER THE

15   EDGE.  YOU SAW IT IN DARK GREEN AND THE AREA

16   BEYOND, AS I SAID EARLIER, IS SIMPLY A PEEK INTO

17   THE NEIGHBORING ZONES.

18           IT IS CLEARLY NOT PART OF THIS ELECTRONIC

19   DOCUMENT.  IT'S VISUALLY DISTINCT.

20           AND LET'S SEE WHAT ADDITIONAL

21   REQUIREMENTS THERE ARE.

22           OF COURSE WE'RE GOING TO SEE A DIFFERENT

23   PORTION, WHICH IS CALLED THE THIRD PORTION, AND AS

24   BEFORE, BECAUSE WE HAVE TO MAKE ROOM FOR THE AREA

25   BEYOND THE EDGE, IT IS GOING TO BE SMALLER THAN THE

```
1    FIRST PORTION.  YOU JUST COMPARE THE RECTANGLES.
2              AND I'M SORRY, I BEAT YOU TO THE
3    QUESTION.
4    Q    LET ME ASK YOU ABOUT THE NEXT LIMITATION.
5    IT'S INSTRUCTIONS FOR TRANSLATING IN A SECOND
6    DIRECTION.
7              HOW DOES LAUNCHTILE MEET THAT LIMITATION?
8    A    OKAY.  SO NOW WE'RE GOING TO ACTUALLY HAVE THE
9    SNAP BACK BECAUSE THE USER WILL LIFT THEIR FINGER.
10   AND THAT MEANS MOVING IN THE OPPOSITE DIRECTION TO
11   CORRECT THE OVER SCROLL, AND THAT IS NOW MOVING TO
12   THE RIGHT.  AND THE OBJECT IS TO GET RID OF THE
13   AREA BEYOND THE EDGE.  THAT'S THE CORRECTION.
14             AND WE SEE THAT THAT HAS BEEN
15   ACCOMPLISHED HERE.
16             ADDITIONALLY, WE REQUIRE THAT THAT FOURTH
17   PORTION BE DIFFERENT FROM THE FIRST, AND IT CLEARLY
18   IS.  WE STARTED WITH EBAY IN THE LEFT ZONE AND WE
19   HAVE SEATTLE IN THE RIGHT ZONE.
20             AND THAT COMPLETES MY ANALYSIS OF THAT
21   ELEMENT, AND, THEREFORE, ALL THE ELEMENTS OF CLAIM
22   19.
23             MR. JOHNSON:  YOUR HONOR, WE ASK THAT WE
24   MOVE INTO EVIDENCE SDX 39 --
25             THE COURT:  WE'RE GOING TO HAVE A
```

1    CONVERSATION ABOUT DEMONSTRATIVES LATER.  I THINK

2    I'M GOING TO STRIKE ALL OF THEM FROM THE EXHIBIT

3    LIST, ALL OF THEM FOR BOTH SIDES BECAUSE THEY'RE

4    LARGELY ARGUMENT OF THE ATTORNEYS OF CLAIM

5    CONSTRUCTION FOR BOTH SIDES, SO THEY'RE ALL

6    PROBABLY GOING TO BE TAKEN OFF THE EXHIBIT LIST.

7    THEY WILL NOT GO TO THE JURY.  OKAY?

8    BY MR. JOHNSON:

9    Q    PROFESSOR VAN DAM, WHAT'S YOUR UNDERSTANDING

10   AS TO WHEN LAUNCHTILE WAS CREATED?

11   A    LAUNCHTILE WAS CREATED BY DR. BEDERSON'S

12   TESTIMONY IN 2004.  IT WAS SUBMITTED TO A

13   CONFERENCE WHERE IT WAS SHOWN IN 2005.  SO 2004 IS

14   THE DATE.

15   Q    DO YOU KNOW -- DID THE UNITED STATES PATENT

16   OFFICE CONSIDER LAUNCHTILE OR TABLECLOTH WHILE THEY

17   WERE EXAMINING APPLE'S '381 PATENT?

18   A    NO, THEY DID NOT.

19   Q    AND HOW DO YOU KNOW THAT?

20   A    BECAUSE I EXAMINED THE PROSECUTION HISTORY AND

21   THERE IS NO MENTION OF THESE TWO PARTICULAR PIECES

22   OF PRIOR ART.  AND, FURTHERMORE, THERE'S A

23   REQUIREMENT THAT WHEN THE PATENT ISSUES, THAT IN

24   THE LIST OF REFERENCES ON THE FRONT PAGE, YOU

25   INCLUDE EVERY SINGLE REFERENCE THAT THE EXAMINER

```
 1    CONSIDERED.  IT DOESN'T APPEAR THERE.

 2    Q    WHY IS THIS SIGNIFICANT?

 3    A    WELL, IT'S SIGNIFICANT BECAUSE IT MEANS THAT

 4    THE PATENT EXAMINER DIDN'T HAVE THE BENEFIT OF

 5    KNOWING ABOUT THIS PRIOR ART.  HAD HE HAD IT, HE

 6    WOULD HAVE NOT BEEN ABLE TO DECLARE THIS PATENT

 7    VALID, NOT TO GRANT IT.

 8           MS. KREVANS:  OBJECTION, YOUR HONOR.  THE

 9    LAST PORTION OF THE TESTIMONY WAS A CONCLUSION FROM

10    THE WITNESS AND SPECULATION ABOUT THE CONDUCT OF

11    THE PATENT OFFICE.

12           THE COURT:  OVERRULED.

13           GO AHEAD.

14    BY MR. JOHNSON:

15    Q    PROFESSOR VAN DAM, IN YOUR OPINION -- LET ME

16    STRIKE THAT.

17           WHAT'S YOUR OPINION ABOUT WHETHER CLAIM

18    19 OF THE '381 PATENT IS OBVIOUS TO A PERSON OF

19    ORDINARY SKILL IN THE ART IN LIGHT OF THE

20    TABLECLOTH PROGRAM RUNNING ON DIAMONDTOUCH?

21    A    WELL, IT'S NOT ONLY ANTICIPATORY, TABLECLOTH,

22    BUT IT'S ALSO OBVIOUS AFTER YOU'VE WATCHED IT AND

23    YOU'RE A PRACTITIONER, A PERSON OF ORDINARY SKILL

24    IN THE ART.  YOU UNDERSTAND THE ADVANTAGE OF THIS

25    SNAPPING BACK BEHAVIOR.
```

```
 1              SO I BELIEVE IT ALSO MEETS THE CRITERIA

 2    OF BEING OBVIOUS.

 3    Q    AND WHAT'S YOUR OPINION ABOUT WHETHER CLAIM 19

 4    OF THE '381 PATENT IS OBVIOUS IN LIGHT OF

 5    LAUNCHTILE?

 6    A    IT IS EQUALLY OBVIOUS BECAUSE, AGAIN, YOU CAN

 7    SEE EVERY ELEMENT THERE.  YOU CAN SEE IT VISUALLY

 8    AND THROUGH MY ANALYSIS, I'VE SHOWN THAT IT'S ALL

 9    THERE.

10              MR. JOHNSON:  YOUR HONOR, NO FURTHER

11    QUESTIONS.

12              THE COURT:  OKAY.  TIME IS NOW 3:23.

13    PLEASE GO AHEAD.

14              MS. KREVANS:  YOUR HONOR, COULD WE JUST

15    HAVE A MOMENT TO BRING OUT THE DIAMONDTOUCH?  WE

16    WANTED TO SET IT UP AT THE BREAK, BUT MR. JOHNSON

17    FELT IT WOULD OBSTRUCT HIS EXAMINATION.  WE HAVE IT

18    HERE, AND WE'LL BRING IT OUT.

19              (PAUSE IN PROCEEDINGS.)

20              THE COURT:  3:25.  GO AHEAD.

21              MS. KREVANS:  THANK YOU, YOUR HONOR.

22                       CROSS-EXAMINATION

23    BY MS. KREVANS:

24    Q    GOOD AFTERNOON, DR. VAN DAM.

25    A    GOOD AFTERNOON, MA'AM.
```

```
1    Q    CAN YOU SEE EVERYTHING THAT WE'VE SET UP HERE
2    OKAY?
3    A    I SURE CAN.
4    Q    OKAY.  NOW, LET ME JUST ASK YOU A COUPLE OF
5    PRELIMINARY QUESTIONS.
6             IN FORMING THE OPINIONS THAT YOU HAVE
7    PRESENTED IN THIS CASE, THAT YOU PUT IN YOUR EXPERT
8    REPORT, YOU DIDN'T REVIEW ANY SOURCE CODE; RIGHT?
9    A    I DID NOT SPECIFICALLY REVIEW SOURCE CODE.  AT
10   SOME TIME DURING THE COURSE OF THIS LONG HISTORY, I
11   DID LOOK AT THE SNAP-BACK FUNCTION, IN PARTICULAR I
12   SAW IT PLAYED ON THE SCREEN DURING DR. FORLINES'S
13   TESTIMONY.
14   Q    BUT YOUR OPINIONS DON'T RELY IN ANY WAY ON
15   SOURCE CODE BECAUSE YOU FORMED THEM BEFORE YOU HAD
16   SEEN ANY; RIGHT?
17   A    MY OPINIONS RELY IN PARTICULAR ON WHAT I WAS
18   TOLD ABOUT THE SOURCE CODE BY THE FACT WITNESSES.
19   Q    DO YOU HAVE YOUR DEPOSITION IN A BINDER IN
20   FRONT OF YOU UP THERE, DR. VAN DAM?
21   A    I'M SURE I DO.  COULD YOU TAKE ME TO IT,
22   MA'AM?
23   Q    LOOK FOR A TAB THAT SAYS 5-2-12 DEPOSITION.
24   IT SHOULD HAVE YOUR NAME ON IT AS WELL.
25             AND COULD YOU TURN TO --
```

```
1    A    EXCUSE ME.  I'M NOT THERE YET.

2    Q    -- 6.

3              MR. JOHNSON:  WHICH PAGE?

4              MS. KREVANS:  PAGE 6.

5    Q    LET ME KNOW WHEN YOU'RE THERE, DR. VAN DAM?

6    A    YES.

7    Q    OKAY.  PAGE 6, LINE 17 TO 19.

8              "QUESTION:  YOU ARE NOT RELYING ON ANY

9    SOURCE CODE IN CONNECTION WITH THIS CASE; IS THAT

10   RIGHT?

11             "ANSWER:  THAT IS RIGHT."

12             WERE YOU ASKED THAT QUESTION AND DID YOU

13   GIVE THAT ANSWER, DR. VAN DAM?

14   A    I WAS.

15   Q    OKAY.  NOW, JUST A LITTLE WHILE AGO WHEN

16   MR. JOHNSON WAS ASKING YOU ABOUT TABLECLOTH, YOU

17   WALKED THROUGH SORT OF A LITTLE ANIMATION AND YOU

18   SAID WHEN THE PERSON LIFTS THEIR FINGER BACK OFF

19   THE SCREEN, THE IMAGE SNAPS BACK SO THAT THERE'S

20   LONGER -- NO LONGER ANY AREA BEYOND THE EDGE.

21             DO YOU RECALL THAT TESTIMONY?

22   A    I DO.

23   Q    NOW, IN FACT, WHERE THE IMAGE SNAPS BACK TO

24   WHEN THE PERSON LIFTS THEIR FINGER IS ALL THE WAY

25   BACK TO WHERE IT FIRST STARTED; RIGHT?
```

2876

```
 1    A    THAT'S THE HOME POSITION, CORRECT.

 2    Q    IT GOES ALL THE WAY BACK TO THE HOME POSITION?

 3    A    IT DOES.  BUT THERE IS NO REQUIREMENT IN THE

 4    PATENT ABOUT THE ENDING STATE.  IT SIMPLY SAYS THAT

 5    YOU MUST BE NO LONGER SHOWING AN AREA BEYOND THE

 6    EDGE.

 7    Q    MY QUESTION, DR. VAN DAM, WAS WHEN THE PERSON

 8    LIFTS THEIR FINGER UP, THE IMAGE GOES ALL THE WAY

 9    BACK TO HOME POSITION; CORRECT?

10    A    THAT'S CORRECT.

11    Q    NOW, LET'S LOOK AT -- ACTUALLY, FIRST LET'S

12    LOOK AT WHAT WE HAVE SET UP HERE, AND I KNOW IT'S

13    NOT FULLY SET UP IN WORKING ORDER, BUT YOU'RE QUITE

14    FAMILIAR WITH THIS DIAMONDTOUCH SYSTEM; RIGHT?

15    A    I'M FAMILIAR ON HOW TO OPERATE TABLECLOTH ON

16    IT.  I WOULDN'T WANT TO BE RESPONSIBLE FOR SETTING

17    IT UP.

18    Q    OKAY.  LET'S MAKE SURE WE KNOW WHAT THE

19    COMPONENTS ARE.

20         SO THE PIECE I'M PUTTING MY HAND ON RIGHT

21    NOW, THAT'S, IN EFFECT, THE TABLETOP THAT PEOPLE

22    USE WHEN THEY USE THE DIAMONDTOUCH SYSTEM; RIGHT?

23    A    IT IS THE SENSOR, AND ALSO THE SCREEN ON WHICH

24    THE INFORMATION IS DISPLAYED.

25    Q    OKAY.  LET'S COME BACK TO THE SENSOR PART.
```

1            NEXT AROUND THE TABLE WE HAVE A LAPTOP.

2    WE HAVEN'T CONNECTED IT UP, BUT THAT LAPTOP

3    REPRESENTS THE COMPUTER WHICH HAS ACTUALLY GOT THE

4    MEMORY AND THE PROCESSING POWER THAT YOU WERE

5    TALKING ABOUT WHEN YOU WALKED THROUGH THE CLAIM

6    WITH MR. JOHNSON; RIGHT?

7    A    INDEED.

8    Q    OKAY.  WITHOUT THE LAPTOP, THIS BIG RECTANGLE

9    HERE WITH THE GRAY BORDER DOES NOTHING?

10   A    CORRECT.

11   Q    AND THEN WE HAVE A CHAIR, I'M NOT GOING TO SIT

12   ON IT, IT LOOKS A LITTLE SMALL FOR ME.

13            I'VE GOT MY HAND RIGHT NOW ON A STAND

14   WITH A PROJECTOR; CORRECT?

15   A    CORRECT.

16   Q    IF THE SYSTEM WERE FULLY SET UP, THE PROJECTOR

17   WOULD BE ABOVE THIS SIGNIFICANT SENSOR AND IT WOULD

18   POINT DOWN, RIGHT?

19   A    THAT'S RIGHT.

20   Q    SO IF THE PROJECTOR IS ON AND YOU WERE USING

21   THE SYSTEM AND THE PROJECTOR WAS AIMED DOWN AT THE

22   SENSOR, WHATEVER IMAGE YOU WANTED TO SEE WOULD BE

23   PROJECTED BY THE PROJECTOR DOWN ON TO THE WHITE

24   AREA WITH THE SENSOR?

25   A    YES, MA'AM.

```
 1    Q    OKAY.  LET'S TALK ABOUT THE SENSOR FOR A

 2    MOMENT.  LEST BACK UP AND USE SOME VOCABULARY THAT

 3    MAYBE PEOPLE ARE FAMILIAR WITH.

 4              DO YOU KNOW WHAT A TOUCH PAD IS?

 5    A    YES.

 6    Q    IN FACT, ON THE COMPUTER THAT'S ON THE TABLE

 7    THAT'S PART OF THE SYSTEM, THERE IS A TOUCH PAD;

 8    RIGHT?

 9    A    IF YOU HOLD IT UP -- YES, THERE'S A TINY TOUCH

10    PAD AT THE BOTTOM.

11    Q    AND I'VE GOT MY FINGER ON THE TOUCH PAD RIGHT

12    NOW?

13    A    THAT'S RIGHT.

14    Q    AND A TOUCH PAD IS AN AREA THAT'S ON MANY

15    LAPTOPS THAT LET YOU USE IT RATHER THAN A MOUSE TO

16    CONTROL WHERE THE CURSOR IS ON THE SCREEN; RIGHT?

17    A    ABSOLUTELY.

18    Q    AND YOU CAN USE IT TO CONTROL OTHER FUNCTIONS

19    AS WELL, RIGHT?

20    A    IN SOME SYSTEMS TOUCH PADS HAVE ADDITIONAL

21    FUNCTIONALITY, SUCH AS SCROLLING, FOR EXAMPLE.

22    Q    OR IN SOME COMPUTERS, AND I CAN'T REMEMBER

23    WHETHER THE THINK PAD IS ONE, YOU CAN TAP TWICE ON

24    THE TOUCH PAD AND THAT'S JUST LIKE CLICKING THE

25    MOUSE; RIGHT?
```

3879

```
1    A    I DON'T RECALL THAT FUNCTIONALITY, BUT I'M

2    SURE THERE ARE LAPTOPS THAT ALLOW THAT.

3    Q    OKAY.  ONE THING THE TOUCH PAD DOES FOR SURE

4    IS IT LETS YOU, BY MOVING YOUR FINGER AROUND THE

5    TOUCH PAD, YOU MOVE THE CURSOR AROUND ON THE

6    SCREEN?

7    A    ABSOLUTELY.

8    Q    OKAY.  SO THE TOUCH PAD IS A SENSOR THAT LETS

9    THE USER, BY TOUCHING THE PAD WITH THEIR FINGER,

10   BASICALLY SEND A MESSAGE TO THE BRAIN OF THE

11   COMPUTER AND TELL IT WHAT TO DO WITH WHAT'S

12   HAPPENING ON THE SCREEN?

13   A    WELL, THE TOUCH PAD DOESN'T DO IT.  ALL IT

14   DOES IS REPORT X, Y COORDINATES AND THEN IT'S UP TO

15   THE SYSTEM AND THE APPLICATION PROGRAM TO DECIDE

16   WHAT TO DO WITH THAT INFORMATION.

17   Q    AND IT'S ALL PROGRAMMED SO THAT THE SYSTEM

18   KNOWS IF THE USER MOVES THEIR FINGER IN A CERTAIN

19   WAY, A CERTAIN REACTION WILL HAPPEN ON THE SCREEN?

20   A    THAT'S A FUNCTION OF THE APPLICATION PROGRAM'S

21   INTERPRETATION OF THAT DATA, YES.

22   Q    OKAY.  SO THAT WAS A YES?

23   A    YES.

24   Q    OKAY.  NOW, IN A LAPTOP SYSTEM LIKE THIS, THE

25   TOUCH PAD AND THE SCREEN, THE MONITOR HERE THAT I'M
```

```
 1    HOLDING THE TOP PART OF THE LAPTOP, THEY'RE TWO

 2    SEPARATE THINGS; RIGHT?

 3    A    THAT'S RIGHT.

 4    Q    THE TOUCH PAD DOES NOT HAVE ANY KIND OF

 5    DISPLAY INTEGRATED INTO IT?

 6    A    THAT'S TRUE.

 7    Q    IT'S A SENSOR, BUT IT'S NOT A DISPLAY?

 8    A    THAT'S TRUE.

 9    Q    ALL RIGHT.  NOW, THIS TABLETOP PORTION OF THE

10    DIAMONDTOUCH DEVICE, CAN WE AGREE THAT IT'S A

11    SENSOR THE SAME WAY THE TOUCH PAD IS A SENSOR,

12    WHATEVER ELSE IT MIGHT DO?

13    A    IT IS AT LEAST A SENSOR.

14    Q    SO IF USERS PUT THEIR FINGERS OR THEIR HANDS

15    ON IT AND THEY MOVE IT AROUND, THEY CAN CONTROL,

16    SAY, THE CURSOR OF THE COMPUTER IN THE SAME WAY

17    THAT ONE MIGHT USING THAT VERY TINY TOUCH PAD THAT

18    WE SAW ON THE IBM THINK PAD?

19    A    YEAH.

20    Q    RIGHT?

21    A    THAT'S ONE WAY OF USING THAT.

22    Q    OKAY.  NOW, WHERE WE GET TO A DISPLAY HERE,

23    BECAUSE THIS, THIS BIG RECTANGULAR THING THAT I'M

24    PUTTING MY HAND ON RIGHT NOW, THE SENSOR, BY

25    ITSELF, IT CAN'T CREATE ANY KIND OF A DISPLAY;
```

1      RIGHT?

2      A    THAT'S TRUE.

3      Q    THE WAY THAT A DISPLAY COMES INTO DIAMONDTOUCH

4      IS FROM THE PROJECTOR?

5      A    THAT'S TRUE.

6      Q    OKAY.  YOU'VE BEEN AROUND FOR A COUPLE WEEKS

7      ON AND OFF DURING THE TRIAL, RIGHT, DR. VAN DAM?

8      A    YOU MEAN HOW MUCH TIME HAVE I SPENT HERE IN

9      BEAUTIFUL DOWNTOWN SAN JOSE?

10     Q    JUST DON'T FORGET, SAN JOSE IS THE LARGEST

11     PART OF THE BAY AREA, SO WE HAVE TO BE CAREFUL.

12            THE COURT:  CAREFUL HERE.

13     BY MS. KREVANS:

14     Q    SO YOU'VE BEEN HERE ON AND OFF, RIGHT?

15     A    YES, I HAVE.

16     Q    YOU KNOW THAT THIS TRIAL IS ABOUT IPHONES AND

17     IPADS AND A LOT OF DIFFERENT SMARTPHONES MADE BY

18     SAMSUNG, ALL OF WHICH HAVE TOUCHSCREENS; RIGHT?

19     A    THAT'S CORRECT.

20     Q    THE JURY HAS HEARD A LOT ABOUT TOUCHSCREENS.

21     YOU'VE PROBABLY HEARD SOME OF IT, RIGHT?

22     A    UM-HUM.

23     Q    ARE YOU TELLING THE JURY THAT THIS, THIS BIG

24     THING SITTING ON TOP OF THIS TABLE IS A

25     TOUCHSCREEN?

1    A    I SURE AM.  THAT'S A TOUCHSCREEN DISPLAY.

2    I'LL EXPLAIN WHY.

3    Q    JUST --

4    A    HEN THIS --

5    Q    I WAS ASKING YOU JUST A YES OR NO QUESTION,

6    DR. VAN DAM.  YOU KNOW WE'RE ON THE CLOCK HERE.

7              IT'S YOUR TESTIMONY THAT THIS DEVICE

8    SITTING HERE ON THE TABLE, THIS SENSOR, IS A

9    TOUCHSCREEN?  YES OR NO?

10   A    IT'S A TOUCHSCREEN DISPLAY WHEN PROPERLY

11   CONNECTED.

12   Q    THIS --

13   A    BY ITSELF, NO CONNECTIONS, IT IS JUST A

14   SENSOR.

15   Q    THANK YOU VERY MUCH.

16             NOTHING FURTHER, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  THE TIME IS NOW

18   3:33.  REDIRECT, PLEASE.

19             MR. JOHNSON:  YOUR HONOR, FIRST WE'D ASK

20   THAT DX 655 BE MOVED INTO EVIDENCE.  THIS IS THE

21   DIAMONDTOUCH SYSTEM THAT MS. KREVANS JUST REFERRED

22   TO RIGHT HERE.

23             MS. KREVANS:  NO OBJECTION, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  I'M SORRY, WHAT'S

25   THAT NUMBER AGAIN, 653?

```
 1                 MR. JOHNSON:  DX 655.

 2                 THE COURT:  OKAY.  THAT'S ADMITTED.

 3                 (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 4                 655, HAVING BEEN PREVIOUSLY MARKED FOR

 5                 IDENTIFICATION, WAS ADMITTED INTO

 6                 EVIDENCE.)

 7                      REDIRECT EXAMINATION

 8     BY MR. JOHNSON:

 9     Q    JUST ONE QUESTION, PROFESSOR VAN DAM.  IS --

10     YOU WERE ABOUT TO EXPLAIN PART OF YOUR ANSWER.  IS

11     THE DIAMONDTOUCH SYSTEM, RUNNING TABLECLOTH, A

12     TOUCHSCREEN DISPLAY?

13     A    ABSOLUTELY.  YOU SAW ME MANIPULATE INFORMATION

14     DISPLAYED ON THE SCREEN WITH MY FINGERS.  I TOUCHED

15     THE SCREEN.  IT REACTS APPROPRIATELY.  AND WHATEVER

16     DEVICE TECHNOLOGY IS USED IS COMPLETELY IRRELEVANT.

17     THE PATENT DOES NOT TELL YOU HOW YOU IMPLEMENT THE

18     TOUCHSCREEN DISPLAY.  IT TALKS ABOUT THE BEHAVIOR

19     OF THE USER INTERFACE AND IN EVERY WAY THAT IS A

20     TOUCHSCREEN DISPLAY.

21                 IF I WENT UP TO THAT SCREEN OVER THERE

22     AND IF IT HAD A LITTLE ADDITIONAL HARDWARE AND I

23     WAS ABLE TO MANIPULATE THE INFORMATION ON THAT

24     SCREEN, YOU WOULD HAVE TO CALL IT A TOUCHSCREEN

25     DISPLAY.  YOU MANIPULATE THE INFORMATION SHOWING ON
```

1884

1    THE SCREEN BY TOUCH, COMMON SENSE.

2            MR. JOHNSON:  NO FURTHER QUESTIONS, YOUR

3    HONOR.

4            THE COURT:  ALL RIGHT.

5            MS. KREVANS:  I HAVE ONE MORE, YOUR

6    HONOR, UNFORTUNATELY.

7            THE COURT:  OKAY.  IT'S 3:35.  GO AHEAD.

8                   **RECROSS-EXAMINATION**

9    BY MS. KREVANS:

10   Q    DR. VAN DAM, YOU SEE THE PROTECTOR HERE, THE

11   DIAMONDTOUCH SYSTEM, IS ON A STAND THAT HAS VARIOUS

12   SWIVELS AND THINGS SO THAT IT CAN POINT WHEREVER

13   YOU WANT TO POINT IT?

14   A    YES, MA'AM.

15   Q    I CAN TURN THIS AROUND AND IF WE HOOK THIS UP,

16   I CAN POINT THE PROJECTOR AT THE SCREEN THAT YOU

17   WERE JUST DIRECTING THE JURY TO, THE ONE WAY ACROSS

18   THE ROOM, AND IF WE HOOK THIS SYSTEM UP, WHEN A

19   PERSON MOVES THEIR HAND AROUND ON THE SENSOR HERE

20   ON THE TABLE, THE IMAGE THEY WOULD BE IMPACTING

21   WOULD BE THE ONE PROJECTED ON THE SCREEN?

22   A    CORRECT.  BUT THAT'S A COMPLETELY

23   INAPPROPRIATE WAY OF OPERATING THE SYSTEM.  IT'S

24   NOT DESIGNED FOR THAT.

25   Q    THE ANSWER TO MY QUESTION WAS YES, RIGHT

1    DR. VAN DAM?

2    A    WOULD YOU REPEAT IT JUST TO MAKE SURE.

3    Q    IF I HOOK THE WHOLE SYSTEM UP?

4    A    YES.

5    Q    AND I POINTED THIS PROJECTOR ACROSS THE ROOM

6    AT THAT SCREEN ON THE FAR END OF THE COURTROOM

7    RATHER THAN POINTING IT DOWN AT THE SENSOR SITTING

8    HERE ON THE TABLE, WHEN A PERSON, SAY, YOU DOING A

9    DEMO, MOVED YOUR FINGER ON THE SENSOR ON THE TABLE,

10   THE IMAGE THAT WOULD BE DISPLAYED AND THAT WOULD

11   REACT TO YOUR FINGER MOVEMENTS WOULD BE THE IMAGE

12   ON THE SCREEN ACROSS THE COURTROOM; RIGHT?

13   A    THAT'S TRUE.

14            MS. KREVANS:  THANK YOU.

15            THE COURT:  ALL RIGHT.  MAY THIS -- IT IS

16   3:36.  MAY THIS WITNESS BE EXCUSED AND IS IT

17   SUBJECT TO RECALL?

18            MR. JOHNSON:  HE MAY BE EXCUSED AND HE'S

19   NOT SUBJECT TO RECALL, YOUR HONOR.

20            AND THERE WAS ONE OTHER EXHIBIT, DX 548,

21   I GUESS THIS HAS TWO EXHIBIT NUMBERS, 655 AND 548.

22            THE COURT:  OKAY.  I'M SORRY, DX 558?

23            MR. JOHNSON:  548.

24            THE COURT:  AND WHAT IS THAT?

25            MR. JOHNSON:  THAT'S PART OF THE

```
1    DIAMONDTOUCH SYSTEM.  IT HAS TWO NUMBERS FOR SOME
2    REASON.
3              THE COURT:  OKAY.  THAT'S ADMITTED.
4              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS
5              655 AND 548, HAVING BEEN PREVIOUSLY
6              MARKED FOR IDENTIFICATION, WERE ADMITTED
7              INTO EVIDENCE.)
8              MR. JOHNSON:  THANK YOU, YOUR HONOR.
9              THE COURT:  OKAY.  YOU ARE EXCUSED.
10             THE WITNESS:  THANK YOU.
11             THE COURT:  ALL RIGHT.  CALL YOUR NEXT
12   WITNESS, PLEASE.
13             MR. VERHOEVEN:  YOUR HONOR, WE NEED JUST
14   A MOMENT FOR THEM TO TAKE DOWN THE TABLE WITHOUT
15   BEING CHARGED.
16             THE COURT:  OKAY.  THAT'S FINE.  THAT'S
17   FINE.
18             ALL RIGHT.  WHILE THEY'RE DOING THAT, I'M
19   GOING TO GIVE A LITTLE -- WE NEED TO DO A LITTLE
20   HOUSEKEEPING WITH OUR JURY, SO I'M JUST TELLING YOU
21   ABOUT LOGISTICS ABOUT WHAT'S GOING TO HAPPEN NEXT
22   WEEK.
23             SO AT THE BEGINNING OF THIS CASE, I HAD
24   GIVEN EACH SIDE ONE-AND-A-HALF HOURS TO DO AN
25   OPENING STATEMENT.  AFTER THAT, I GAVE THEM EACH 25
```

2887

```
 1    HOURS TO PRESENT THEIR EVIDENCE.

 2            WE ARE NOW AT THE POINT WHERE WE'VE BEEN

 3    KEEPING TIME -- WE'RE NOW AT THE POINT WHERE THE

 4    PARTIES HAVE ALMOST, I HAVEN'T DONE BY MOST RECENT

 5    CALCULATION, BUT ABOUT LESS THAN TEN HOURS LEFT,

 6    COMBINED, ALMOST ABOUT TEN HOURS.

 7            SO WE SHOULD BE ABLE TO GET ALL THE

 8    EVIDENCE IN THIS WEEK BECAUSE WE HAVE ABOUT FIVE TO

 9    FIVE AND A HALF HOURS A DAY, AND WE STILL HAVE

10    ANOTHER MAYBE 15 MINUTES TODAY.  THINGS COULD

11    CHANGE, THINGS COME UP AS YOU SAW EARLIER IN THE

12    WEEK.  SOMETIMES WE HAVE TO TAKE BREAKS AND HAVE

13    DISCUSSIONS OUTSIDE YOUR PRESENCE.

14            BUT IT IS POSSIBLE THAT NEXT MONDAY YOU

15    MAY GET THE DAY OFF BECAUSE WE NEED TO TAKE CARE OF

16    SOME THINGS BEFORE CLOSING.

17            NOW, I HAVE GIVEN EACH SIDE TWO HOURS FOR

18    CLOSING, SO THAT'S GOING TO TAKE A WHOLE DAY.

19            AND I ALSO NEED TO READ YOU THE FINAL

20    JURY INSTRUCTIONS, WHICH ARE GOING TO BE WAY LONGER

21    THAN THE PRELIMINARY INSTRUCTIONS THAT I GAVE YOU.

22            THE PRELIMINARY INSTRUCTIONS TOOK, WHAT,

23    ABOUT 20, 25 MINUTES TO READ.  I SUSPECT THAT

24    READING -- YOU'LL GET MAYBE AROUND 100 PAGES OF

25    JURY INSTRUCTIONS.  SO IT'S PROBABLY GOING TO TAKE
```

```
 1    ABOUT AN HOUR AND A HALF TO READ IT TO YOU.

 2            SO I MAY NEED, ON TUESDAY, FOR YOU TO BE

 3    WILLING TO STAY A LITTLE BIT LONGER, IF THAT'S

 4    OKAY, FOR US TO GET IN THE FULL READING OF THE JURY

 5    INSTRUCTIONS, YOU'LL HAVE A HARD COPY, THREE-HOLE

 6    PUNCHED TO PUT IN YOUR BINDERS, AND THEN TO HAVE

 7    FOUR HOURS OF ARGUMENT BY THE PARTIES.

 8            SO THAT -- IT COULD BE A DAY THAT'S GOING

 9    TO BE MAYBE FIVE AND A HALF TO SIX HOURS.  IS THAT

10    OKAY WITH YOU?

11            OKAY.  SO AS SOON AS THAT IS ALL DONE --

12    AND WE'LL HAVE, AS THINGS GO ALONG TOMORROW AND

13    FRIDAY, I'LL HAVE A BETTER SENSE OF THE SCHEDULE.

14    BUT I WANTED TO JUST GIVE YOU A HEADS UP THAT YOU

15    MAY NEED TO STAY SLIGHTLY LONGER ON TUESDAY FOR

16    YOUR OWN PLANNING PURPOSES, AND THEN AFTER THAT,

17    AFTER CLOSINGS, THEN YOU ALL WILL DELIBERATE AND

18    YOU TAKE AS MUCH TIME AS YOU NEED ON THAT.

19            AND THAT WILL JUST HOPEFULLY START

20    WEDNESDAY, THURSDAY, FRIDAY, AS MUCH TIME AS YOU

21    NEED.  OKAY?

22            AND MOST LIKELY WHAT WE WILL DO IS WHEN

23    YOU DELIBERATE, I'M GOING TO TAKE YOU DOWN TO MY

24    JURY ROOM, WHICH IS ON THE FOURTH FLOOR.  IT'S A

25    MUCH BIGGER ROOM, BECAUSE THIS ONE IS -- I SEE
```

2889

```
1    YOU'RE SMILING.

2                THIS ONE IS VERY TIGHT.  THE ONE THAT I

3    HAVE IS MUCH BIGGER, AND IT WILL BE CLOSER TO MY

4    CHAMBERS, SO IF THINGS COME UP, IF YOU HAVE ANY

5    NOTES, THEN WE'LL COME BACK UP HERE SO THAT

6    EVERYONE CAN BE PRESENT.

7                SO YOU'LL HAVE TO DO A BIT OF TRAVELLING

8    TO GET UP HERE IF YOU NEED TO READ BACK ANY -- HAVE

9    ANY TRANSCRIPT READ BACK OR ANY QUESTION COMES UP.

10               I NEED TO ANSWER YOUR QUESTION, I MAY

11   NEED TO ANSWER YOUR QUESTION WITH THE ATTORNEYS

12   PRESENT, AND WE'LL JUST DO IT ALL IN HERE.

13               AND YOU'LL GET FURTHER INSTRUCTION ON ALL

14   OF THIS WHEN WE GO TO THE FINAL JURY INSTRUCTIONS,

15   BUT I JUST WANTED TO GIVE YOU A HEADS UP AS TO WHAT

16   WILL POTENTIALLY BE THE SCHEDULE OVER THE REST OF

17   THIS WEEK AND NEXT WEEK.

18               OKAY.  ALL RIGHT.

19               IS YOUR NEXT WITNESS READY?

20               MR. DEFRANCO:  YES, YOUR HONOR.  THE NEXT

21   WITNESS IS STEPHEN GRAY.

22               THE COURT:  ALL RIGHT.  TIME IS NOW 3:41.

23   GO AHEAD.

24               MR. LEE:  YOUR HONOR, THERE'S A QUESTION.

25               JUROR:  EXCUSE ME.  MAY I PLEASE TAKE A
```

```
 1      QUICK BIO BREAK?

 2              THE COURT:  OH, YES, OKAY.  LET'S TAKE A

 3      QUICK FIVE-MINUTE BREAK.  GO AHEAD, PLEASE.

 4              MS. MAROULIS:  THIS MORNING DURING

 5      MR. WILLIAMS' TESTIMONY, THERE WERE TWO

 6      DEMONSTRATIVES THAT HAD EXCERPTS OF THIRD PARTY

 7      SOURCE CODE.  THEY ARE SDX 3966.105 AND SDX

 8      3966.106, AND WE ASK THAT THEY BE SEALED IN THE

 9      SAME WAY THE SOURCE CODE IS SEALED.

10              OBJECTION?

11              MR. LEE:  WE AGREE.

12              THE COURT:  OKAY.  105 AND 106.

13              AND AS I SAID, I WANT YOU ALL TO PLEASE

14      REDO THE EXHIBIT LIST TAKING OFF ALL THE

15      DEMONSTRATIVES, AND THEN THAT CAN BE ADDED TO THE

16      LIST OF DEMONSTRATIVES THAT WE'RE KEEPING JUST FOR

17      THE RECORD FOR APPEAL.  OKAY?

18              MR. JACOBS:  YOUR HONOR, IS THIS THE

19      POINT, THE TIME TO DISCUSS THAT?  YOU SAID YOU

20      WOULD BE RAISING THIS.

21              THE COURT:  IF YOU'D LIKE TO, GO AHEAD.

22              MR. JACOBS:  THE ONLY PART THAT I WANTED

23      TO RAISE WAS THIS.

24              IN SOME CASES, AND I THINK THIS IS WHAT I

25      WAS MOST INTERESTED IN, WHAT WE PUT IN THAT MAY
```

```
 1    HAVE HAD A D LABEL ON IT, AS IN DX, WERE VIDEOS

 2    THAT HAD BEEN TAKEN OF THE DEVICES.

 3              AND THIS WOULD GO FOR BOTH SIDES.  IF

 4    THERE ARE ACTUAL VIDEOS OF THE DEVICES IN

 5    OPERATION, THAT STRIKES ME AS OF A DIFFERENT

 6    CHARACTER THAN ARGUMENTATIVE SLIDES.

 7              THE COURT:  WELL, YOU'LL HAVE TO TALK AND

 8    SEE IF YOU CAN WORK OUT SOME TYPE OF STIPULATION,

 9    BUT ALL THE REST THAT'S JUST TEXT AND ARGUMENTATIVE

10    SLIDES GOING THROUGH THE DIFFERENT CLAIM ELEMENTS,

11    THAT'S ALL OUT, AND I WOULD PREFER JUST TO HAVE A

12    CLEAN, NO DEMONSTRATIVE POLICY.

13              BUT IF YOU ALL CAN COME TO AN AGREEMENT

14    ON VIDEOS -- I MEAN, VIDEO WOULD BE PROBABLY THE

15    MOST -- THAT WOULD BE THE ONE THING THAT I MAY MAKE

16    AN EXCEPTION FOR.  SEE IF YOU CAN WORK IT OUT,

17    PLEASE.

18              MR. JACOBS:  THANK YOU, YOUR HONOR.

19              MR. VERHOEVEN:  WE WILL TALK ABOUT IT.

20              THE COURT:  OKAY.  THANK YOU.

21              (WHEREUPON, A RECESS WAS TAKEN.)

22              THE COURT:  I'M GOING TO ASK IF HE CAN

23    JUST REVIEW THE OVERHEAD SCREEN.

24              LET ME ASK, WITH REGARD TO MR. GRAY, WILL

25    THERE BE ANY EXHIBITS THAT, THAT CANNOT BE REVIEWED
```

1    ON THE SCREEN THAT NEED TO BE REVIEWED ON THE

2    MONITORS?

3            MR. DEFRANCO:  NO, YOUR HONOR.

4            THE COURT:  OKAY.  UNFORTUNATELY, THE

5    MONITOR FOR JUROR NUMBER 9 IS APPARENTLY NOT

6    WORKING RIGHT NOW, AND RATHER THAN HOLD UP

7    EVERYTHING, I'D LIKE TO KEEP GOING, AND WE'LL HAVE

8    IT -- TRY TO HAVE IT FIXED TONIGHT.

9            OKAY.  ALL RIGHT.  IF WE CAN PLEASE BE

10   BACK IN ORDER.

11           (WHEREUPON, THE FOLLOWING PROCEEDINGS

12   WERE HELD IN THE PRESENCE OF THE JURY:)

13           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

14                   **STEPHEN GRAY,**

15   BEING CALLED AS A WITNESS ON BEHALF OF THE

16   DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

17   EXAMINED AND TESTIFIED AS FOLLOWS:

18           THE WITNESS:  I DO.

19           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

20           THE COURT:  OKAY.  JUROR NUMBER 9,

21   UNFORTUNATELY, YOUR MONITOR IS APPARENTLY NOT

22   WORKING NOW.

23           JUROR:  I CAN USE THE ONE RIGHT HERE.

24           THE COURT:  OKAY, ALL RIGHT.  FINE.

25   WE'RE GOING TO TRY TO HAVE THAT FIXED TONIGHT.

```
 1    GREAT, THANK YOU.  YOU CAN USE THE OTHER MONITOR

 2    NEXT TO YOUR CHAIR.

 3              ALL RIGHT.  IT'S 3:47.  PLEASE GO AHEAD,

 4    MR. DEFRANCO.
```

**DIRECT EXAMINATION**

```
 6    BY MR. DEFRANCO:

 7    Q    WOULD YOU PLEASE STATE YOUR FULL NAME AND

 8    CURRENT OCCUPATION FOR THE RECORD.

 9    A    MY NAME IS STEPHEN GRAY, AND I'M A CONSULTANT.

10    Q    YOUR EDUCATIONAL BACKGROUND, PLEASE, MR. GRAY.

11    A    I GRADUATED IN 1973 FROM CAL POLY SAN LUIS

12    OBISPO WITH A DEGREE IN ECONOMICS.

13    Q    IN A SENTENCE OR TWO, WHAT DO YOU DO

14    CURRENTLY?

15    A    MY CONSULTING PRACTICE PRIMARILY FOCUSES ON

16    HIGH TECHNOLOGY SOFTWARE RELATED MATTERS FOR

17    CORPORATIONS, AND I DO SPEND SOME TIME DOING

18    LITIGATION SUPPORT.

19    Q    NOW, PLEASE TELL THE JURY, IN A FEW SENTENCES,

20    SOME OF YOUR EXPERIENCE WITH GRAPHICAL USER

21    INTERFACES?

22    A    SO MY, MY -- I'VE BEEN DESIGNING AND

23    DEVELOPING SYSTEMS OVER 30 YEARS, SINCE I GOT OUT

24    OF COLLEGE.  MANY OF THEM HAVE USER INTERFACE

25    ISSUES THAT ARISE THAT ARE VERY IMPORTANT, CRITICAL
```

1    ISSUES.

2              FOR EXAMPLE, WHEN I WAS CHIEF TECHNOLOGY

3    OFFICER FOR NTN COMMUNICATIONS, WE BROADCAST ONLINE

4    GAMES ACROSS THE -- ACROSS NORTH AMERICA, AND USER

5    INTERFACE IS A CRITICAL ISSUE IN REGARD TO THAT SO

6    THE ANSWERS TO THE GAMES CAN BE PROPERLY ACCOUNTED

7    FOR.

8              WHEN I WAS CHIEF TECHNOLOGY OFFICER FOR

9    NET WORLD EXCHANGE, IT WAS AN E-COMMERCE SYSTEM, SO

10   IN OTHER WORDS, TRANSACTIONS WERE BEING PERFORMED

11   ONLINE ON WEB-BASED SYSTEMS.  AND, AGAIN, USER

12   INTERFACE BECOMES VERY CRITICAL.  SOMEONE IS

13   PURCHASING SOMETHING, THEY'RE SPENDING MONEY,

14   THAT'S CRITICAL.

15   Q    AND PLEASE GIVE US --

16   A    ONE MORE.  I ALSO WORKED FOR XEROX CORPORATION

17   WHERE I PARTICIPATED IN THE DESIGN AND DEVELOPMENT

18   OF A USER INTERFACE FOR CONTROLLING COPIERS AND

19   ELECTRONIC PRINTERS, ELECTRONIC REPROGRAPHIC

20   DEVICES.  AND ONE OF THOSE WAS AS A TOUCHSCREEN

21   DISPLAY.

22   Q    SOME EXAMPLES OF COMPUTER PROGRAMMING

23   LANGUAGES YOU'VE WORKED WITH OVER THE YEARS?

24   A    WELL, I'VE PROGRAMMED IN EARLY C, C++, C

25   SHARP, JAVA, RPG AND COBALT, WHICH ARE -- THAT

1    TELLS YOU HOW LONG I'VE BEEN DOING THIS.  VARIOUS

2    ASSEMBLY LEVEL LANGUAGES, A VARIETY OF DIFFERENT

3    COMPUTING LANGUAGES.

4    Q    AND, SIR, YOU'RE HERE AS SAMSUNG'S TECHNICAL

5    EXPERT ON THE '915 AND '163 PATENTS; IS THAT

6    CORRECT?

7    A    THAT'S CORRECT.

8    Q    HAVE YOU WORKED BEFORE AS A TECHNICAL EXPERT

9    IN YOUR CAREER?

10   A    I HAVE.

11         MR. DEFRANCO:  YOUR HONOR, AT THIS POINT

12   WE WOULD OFFER MR. GRAY AS AN EXPERT IN SOFTWARE

13   PROGRAMMING AND USER INTERFACE.

14         THE COURT:  ANY OBJECTION?

15         MR. JACOBS:  NO OBJECTION.

16         THE COURT:  SO CERTIFIED.

17   BY MR. DEFRANCO:

18   Q    BRIEFLY, SIR, WOULD YOU GIVE US SOME EXAMPLES

19   OF SOME OF THE MATERIALS THAT YOU LOOKED AT IN YOUR

20   WORK IN THIS CASE?

21   A    I REVIEWED THE PATENTS; I REVIEWED THE FILE

22   HISTORY, AND WHAT BY "FILE HISTORY" WHAT I MEAN IS

23   THE COMMUNICATION BETWEEN THE PATENT OFFICE AND THE

24   APPLICANT WHEN THEY'RE GETTING THEIR PATENT

25   APPROVED.

1      I'VE STUDIED THE REPORTS OF THE EXPERTS

2   IN THIS MATTER, I'VE STUDIED DEPOSITIONS AND A

3   VARIETY OF OTHER DOCUMENTS THAT ARE RELATED TO THE

4   MATTER.

5   Q    OKAY.  WE'RE GOING TO TAKE THE PATENTS ONE AT

6   A TIME STARTING WITH THE '915.  WE'RE GOING TO USE

7   SOME SLIDES, DEMONSTRATIVES AS HAS BEEN DONE IN THE

8   CASE.

9      THIS IS THE '915 PATENT.  CAN YOU REMIND

10   US IN A SENTENCE WHAT THE '915 PATENT IS ABOUT?

11   A    SO THE '915 IS THE SCROLL WITH ONE FINGER,

12   ZOOM WITH TWO FINGERS.  THAT'S THE '915.

13   Q    AND THE FILING DATE OF THAT PATENT, SIR?

14   A    THAT PATENT WAS FILED ON JANUARY 7TH, 2007.

15   Q    AND THIS IS THE PATENT IN WHICH APPLE IS

16   ASSERTING CLAIM 8; IS THAT CORRECT?

17   A    THAT'S CORRECT, CLAIM 8.

18   Q    ALL RIGHT.  LET'S -- YOU DESCRIBED WHAT THE

19   PATENT IS ABOUT GENERALLY.  IS THAT WHAT'S DEPICTED

20   HERE?

21   A    EXACTLY.  THERE'S A LITTLE ANIMATION THAT

22   COMES FROM THE PATENT ITSELF.  ON THE LEFT-HAND

23   SIDE WE SEE A SCROLL OPERATION, ONE FINGER MOVING

24   THE, THE IMAGE ACROSS THE SCREEN THE VIEW OF THE

25   IMAGE ACROSS THE SCREEN.

```
 1              IT DOESN'T SEEM TO BE PERFORMING.
 2   THERE'S A LITTLE BUG HERE IT LOOKS LIKE.  THERE WE
 3   GO.
 4              SO THAT'S THE SCROLLING OPERATION, SINGLE
 5   FINGER SCROLLING OPERATION.
 6              ON THE RIGHT-HAND SIDE IS WHAT'S REFERRED
 7   TO AS THE GESTURE OPERATION.  THE GESTURE
 8   OPERATION, FOR EXAMPLE, IS A MULTIPOINT GESTURE
 9   OPERATION AND ALLOWS, FOR EXAMPLE, SCALE IN AND OUT
10   FOR A PARTICULAR OBJECT.  SO THAT'S THE MULTIPOINT
11   GESTURE OPERATION.
12   Q   OKAY.  AND WE ARE, WE'RE GOING TO TALK A BIT
13   ABOUT CLAIM 8.  JUST IN A SENTENCE, TELL US WHAT
14   YOU, WHAT PRIOR ART YOU LOOKED AT?
15   A   SO THE PRIOR ART THAT YOU SEE HERE ON THE
16   LEFT-HAND SIDE OF THE SCREEN, THE BLUE BACKGROUND
17   IS THE PRIOR ART I INTEND TO TALK ABOUT TODAY.  ALL
18   OF THAT ART WAS FILED SOMETIME PRIOR TO THE
19   APPLICATION IN JANUARY 2007 OF THE '915 PATENT.
20   Q   AND YOUR UNDERSTANDING WAS ANY OF THAT ART
21   BEFORE THE PATENT OFFICE DURING PROSECUTION OF WHAT
22   BECAME THE '915 PATENT?
23   A   I DON'T BELIEVE SO, NO.
24   Q   OKAY.  LET'S START WITH DIAMONDTOUCH RUNNING
25   FRACTAL ZOOM, OKAY?  DOES THAT MAKE SENSE?
```

1      A     SURE.

2      Q     I'D LIKE TO WALK THROUGH THE CLAIM ELEMENTS.

3             BY THE WAY, WERE YOU IN THE COURTROOM

4      WHEN THESE FACT WITNESSES TESTIFIED, MR. BOGUE AND

5      MR. FORLINES?

6      A     YES, I WAS.

7      Q     OKAY.  IN A SENTENCE -- I THINK WE'VE HEARD A

8      BIT ABOUT THE SYSTEM, ENOUGH SO THAT WE CAN JUST GO

9      TO THE CLAIM AND COMPARE IT TO THE DEVICE ITSELF.

10            ARE YOU WITH ME?

11     A     SURE.

12     Q     WHY DON'T WE WALK THROUGH THAT ONE LIMITATION

13     IN THE CLAIM AT A TIME AND YOU CAN TELL US WHERE IN

14     THE CLAIM IT'S FOUND.

15     A     SO CLAIM 8 REQUIRES MANUFACTURE READABLE

16     STORAGE, AND, AGAIN, THAT'S MEMORY THAT CONTAINS

17     INSTRUCTIONS THAT CAUSE THE COMPUTER, IN THIS CASE

18     THE DIAMONDTOUCH SYSTEM, TO PERFORM ITS OPERATIONS.

19            ONE OF THOSE OPERATIONS IS RECEIVING USER

20     INPUT IN THE FORM -- I SHOULD SAY RECEIVING USER

21     INPUT ON A TOUCH SENSITIVE DISPLAY THAT IS

22     INTEGRATED WITH THE DATA PROCESSING SYSTEM.

23            SO AS THE PREVIOUS WITNESS SPOKE ABOUT,

24     THAT'S THE WAY THAT THE DIAMONDTOUCH SYSTEM WORKS.

25     IT'S A COMPUTER SYSTEM THAT HAS A TOUCH SENSITIVE

```
1    DISPLAY THAT ALLOWS FOR CAPTURING OF THE INPUT

2    POINTS.

3    Q    LET'S GO TO THE NEXT LIMITATION, CREATING AN

4    EVENT OBJECT.  CAN YOU DESCRIBE THAT FOR US,

5    PLEASE, WHERE IT'S IN THE REFERENCE, SIR?

6    A    SURE.  SO CREATING AN EVENT OBJECT IN THE DT,

7    THE DIAMONDTOUCH SYSTEM IS SHOWN, IS ILLUSTRATED BY

8    THIS PIECE OF CODE.  THIS PIECE OF CODE IDENTIFIES

9    AN OBJECT KNOWN AS THE DTLIBINPUTTFRAME.  THAT

10   STANDS FOR DIAMONDTOUCH LIBRARY INPUT TOUCH FRAME.

11            AND WHAT IT CONTAINS IS THE TOUCH

12   INFORMATION THAT WHEN THE USERS TOUCH THE SCREEN,

13   THIS IS THE OBJECT THAT CONTAINS THAT INFORMATION.

14            THE DTLIBINPUTTFRAME EVENT OBJECT

15   INCLUDES, FOR EXAMPLE, INFORMATION LIKE THE NUMBER

16   OF TOUCHES THAT THE USER HAD ON THE SCREEN, WHERE

17   THE TOUCHES STARTED AND WHERE THEY ENDED.  THAT'S

18   THE REFERENCE THERE AT THE XY POSITION, AND TIME

19   REFERENCES TO CERTAIN ASPECTS OF THOSE, OF THAT

20   TOUCH.

21            SO THAT'S THE ELEMENT.  THAT'S THE

22   OBJECT.

23   Q    OKAY.  LET'S GO TO THE NEXT ELEMENT, SIR.

24   COULD YOU PLEASE DESCRIBE FOR US WHERE THAT IS?

25   A    SO THE NEXT ELEMENT IS DETERMINING WHETHER OR
```

```
 1    NOT WE HAVE DONE A, USE A -- OR INTENDING TO DO A

 2    SCROLL OR A GESTURE OPERATION BY DISTINGUISHING

 3    BETWEEN A SINGLE INPUT POINT WHICH IS TOUCHED ON

 4    THE INPUT DISPLAY OR MULTIPLE INPUT POINTS.

 5           IF IT IS A SINGLE INPUT POINT, IT'S A

 6    SCROLL OPERATION.  IF IT'S MULTIPLE INPUT POINTS,

 7    WE'RE TALKING ABOUT A GESTURE IN THE WAY IT'S

 8    REFERRED TO IN THE '915 PATENT, AND THE GESTURE

 9    WOULD BE, FOR EXAMPLE, A SCALING OPERATION.

10           SO, SO THERE'S ONE FINGER FOR SCROLL, TWO

11    FINGERS FOR GESTURES, AND THAT'S THE DISTINGUISHING

12    ASPECT HERE.  SO THAT CLAIM IS MET.

13    Q    OKAY.

14    A    I'M SORRY.  I SHOULD MENTION, THE SPLASH

15    SCREEN THAT'S SHOWN HERE, THE SPLASH SCREEN THAT IS

16    UP THERE INDICATES THE ACTUAL MANNER IN WHICH THE

17    DEVICES OPERATE.

18    Q    OKAY.  LET'S GO TO THE NEXT LIMITATION,

19    PLEASE.

20    A    SO THE NEXT LIMITATION HAS TO DO WITH ISSUING

21    A SCROLL OR GESTURE CALL BASED ON INVOKING THE

22    SCROLL OR GESTURE OPERATION.  AGAIN, THIS IS A

23    FRAGMENT OF CODE.  THIS IS FROM A, A PIECE OF CODE

24    CALLED THE FRACTAL ZOOM APP, WHICH IS AN

25    APPLICATION THAT WAS REFERRED TO THE OTHER DAY WHEN
```

1    DR. FORLINES TALKED ABOUT THE DEVICE.

2            THE FRACTAL ZOOM, THIS PARTICULAR METHOD

3    IS ONE CALLED TOUCH DETECTED.  THE TOUCH DETECTED

4    METHOD DOES PROCESSING, BUT BY THE TIME IT GETS

5    HERE, IT DETERMINES WHETHER OR NOT THE M CURRENT

6    MODE IS EQUAL TO MODE ZOOM OR M CURRENT MODE IS

7    EQUAL TO MODE PAN.

8            BASED UPON THAT, THE SYSTEM PERFORMS

9    DIFFERENT OPERATIONS, ONE THAT CREATES A SCALING

10   FACTOR, THE OTHER ONE DOES NOT CREATE A SCALING

11   FACTOR.

12           BUT IN ANY EVENT, THE RESPONSE IS TO --

13   THE RESPONSE IS TO REPAINT THE SCREEN BASED UPON

14   THE OPERATIONS WHICH ARE DEFINED IN THE TOUCH

15   DETECTIVE.

16   Q    OKAY.  THE LAST LIMITATION, SIR, PLEASE?

17   A    THE LAST LIMITATION IS ACTUALLY HOW THE SCREEN

18   IS ALTERED BY VIRTUE OF THE FACT THAT THE USER HAS

19   DONE IT.  SO HERE YOU SEE THE SCROLL THAT'S BEING

20   OPERATED ON, SCROLL UP AND SCROLL DOWN, SO THAT

21   CLAIM LIMITATION IS MET.

22   Q    OKAY.  AND THEN WE TAKE YOU TO?

23   A    AND HERE'S THE TWO FINGER GESTURE.  WE'RE

24   ZOOMING IN AND THEN A TWO FINGER GESTURE WHILE

25   WE'RE -- ACTUALLY, IT'S THE OPPOSITE, ZOOMING OUT

1    AND ZOOMING IN.  SO THAT LIMITATION IS ALSO MET.

2    Q    AND THAT LIMITATION FOR THE RECORD IS

3    RESPONDING TO AT LEAST ONE GESTURE CALL.  DO YOU

4    SEE THAT, SIR?

5    A    THAT'S CORRECT.

6    Q    ALL RIGHT.  LET'S TURN TO THE SECOND REFERENCE

7    YOU ANALYZED.  WOULD YOU GIVE US A SENTENCE OR TWO

8    ABOUT THE NOMURA REFERENCE, PLEASE, SIR?

9    A    SO THE NOMURA REFERENCE IS A JAPANESE PATENT.

10   IT WAS FILED NOVEMBER OF 1998.  AND THE PATENT

11   TALKS ABOUT AN ELECTRONIC OR PORTABLE INFORMATION

12   DEVICE, A PORTABLE DEVICE THAT IS USED FOR A MAP

13   APPLICATION.

14            AND ONE OF THE -- SEVERAL OF THE

15   FUNCTIONS THAT ARE PERFORMED IN THE MAP APPLICATION

16   RELATE TO ENLARGEMENT, WHICH IS SCALING, REDUCTION,

17   WHICH IS ALSO SCALING, AND THEN SCROLLING.

18            SO IT'S A, A PATENT APPLICATION THAT

19   IDENTIFIES A MAPPING APPLICATION AND AN E-BOOK, AN

20   ACTUAL DEVICE, THAT PERFORMS THOSE OPERATIONS.

21   Q    SIR, IS THAT IN THE BINDER IN FRONT OF YOU AS

22   EXHIBIT DX 550?

23   A    DX 550, YES, THAT'S THE REFERENCE I'M

24   REFERRING TO.

25            MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

```
 1    FOR ADMISSION OF EXHIBIT DX 550, THE NOMURA

 2    PREFERENCE.

 3              MR. JACOBS:  OBJECTION, YOUR HONOR.

 4    REFERENCE TO COUNSEL'S CHARACTERIZATION OF IT AS A

 5    PATH.  IT'S AN UNEXAMINED PATENT APPLICATION.

 6              MR. DEFRANCO:  THAT'S CORRECT, YOUR

 7    HONOR, IT'S AN UNEXAMINED PATENT APPLICATION FOR

 8    THE RECORD.

 9              THE COURT:  IT'S ADMITTED.

10              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

11              550, HAVING BEEN PREVIOUSLY MARKED FOR

12              IDENTIFICATION, WAS ADMITTED INTO

13              EVIDENCE.)

14    BY MR. DEFRANCO:

15    Q    LET'S DO THE SAME THING, MR. GRAY.  LET'S WALK

16    THROUGH THE LIMITATIONS IN THE CLAIM AND IF YOU

17    COULD COMPARE THEM TO THE DISCLOSURE IN THE NOMURA

18    REFERENCE.  ARE YOU WITH ME?

19    A    I'M WITH YOU.  SO, AGAIN, THIS IS A LITTLE

20    DEMONSTRATION.  HERE IS THE SCROLL, THE SINGLE

21    FINGER SCROLL, AN ANIMATION THAT SHOWS MOVING THE

22    MAP ACROSS THE ELECTRONIC BOOK.  AND THEN THE OTHER

23    ONE WAS A PINCH.

24    Q    NO NEED TO RUSH YOU.  LET'S START WITH THE

25    CLAIM ELEMENTS.  OKAY.
```

3904

```
 1     A     FAIR ENOUGH.  SO THE FIRST PART OF CLAIM 8 IS

 2     AGAIN THE MANUFACTURE READABLE STORAGE MEDIUM.

 3     FIGURE 2 FROM THE PATENT SHOWS AN INSTRUCTION

 4     STORAGE MEDIUM THERE, THAT'S THE BOX THAT I'VE

 5     HIGHLIGHTED IN YELLOW.  THAT FEEDS THE PROCESSING

 6     UNIT, AND THE INFORMATION STORAGE MEDIUM CONTAINS

 7     DATA AND INSTRUCTIONS WHICH ARE USED BY THE E-BOOK

 8     IN PERFORMANCE OF ITS APPLICATION.  SO THAT CLAIM

 9     ELEMENT IS MET.

10           THE FINGER MOVEMENT DETECTOR, WHICH IS

11     NUMBER -- WHICH IS ELEMENT 10 OF FIGURE 2, SHOWS --

12     IS THE RECEIVER OF THE INPUTS FROM THE TOUCH

13     SENSITIVE SCREEN THAT THE USER OPERATING ON, ON THE

14     DEVICE.

15           SO THE FINGER MOVEMENT DETECTOR CREATES A

16     FINGER MOVEMENT HISTORY.  THAT HISTORY IS --

17     RECORDS WHAT THE MOVEMENTS WERE ON THE SCREEN.

18     Q     AND THAT --

19     A     SO THAT LIMITATION IS ALSO MET.

20     Q     THAT MEETS THE RECEIVING A USER INPUT

21     LIMITATION?

22     A     CORRECT.

23     Q     OKAY.  LET'S TURN TO THE NEXT LIMITATION,

24     WHICH IS CREATING AN EVENT OBJECT IN RESPONSE TO

25     THE USER INPUT.
```

1          WHERE IS THAT IN NOMURA, SIR?

2     A     SO AS I JUST MENTIONED, THE UNIT THAT RECEIVES

3     THE USER INPUTS STORES THAT INFORMATION IN THE

4     MOVEMENT HISTORY, AND THE MOVEMENT HISTORY, A

5     FINGER MOVEMENT HISTORY IN NOMURA IS THE '915'S

6     VERSION OF THE EVENT OBJECT.

7     Q     OKAY.  HOW ABOUT THE NEXT LIMITATION,

8     DETERMINING WHETHER AN EVENT OBJECT INVOKES A

9     SCROLL OR GESTURE ELEMENT?

10    A     SO ELEMENT 30, THE OPERATING CONTENTS

11    DETERMINATION UNIT, IS WHAT MAKES A DETERMINATION

12    AS -- USING THE FINGER HISTORY TO DETERMINE WHETHER

13    OR NOT -- WHAT KIND OF MOTION IS BEING PROSCRIBED,

14    WHETHER IT IS A SCROLL OR A GESTURE OPERATION.

15          SO YOU CAN SEE HERE THE GESTURE OPERATION

16    MOVES ONE FINGER, THE UNIT DETERMINES THAT A MAP

17    SCROLLING OPERATION IS INPUT, AND THEN USING TWO

18    FINGERS, IT SHOWS THAT IT WAS, IT WAS EITHER DOING

19    A SCALE, A SCALE IN OR A SCALE OUT.

20    Q     OKAY.

21    A     SO USING TWO FINGERS TO PERFORM.

22    Q     ALL RIGHT.  CAN WE GO TO THE NEXT LIMITATION,

23    SIR?

24    A     SO THE, THE MAP OPERATIONS PROCESSING UNIT

25    CONTAINS A SERIES OF ELEMENTS AS WELL.  THE

```
1    REQUIREMENT -- OR THE CLAIM ELEMENT HERE SAYS
2    ISSUING AT LEAST ONE SCROLL OR GESTURE CALL BASED
3    ON INVOKING THE SCROLL OR GESTURE OPERATION.
4              SO WE CAN SEE HERE THAT ELEMENT 48, THE
5    SCROLL PROCESSING UNIT, IS ACTUALLY THE UNIT THAT
6    MAKES -- THAT IS FED BY THE OPERATING CONTENTS OF
7    THE DETERMINATION UNIT, AND THEN CREATES THE --
8    PERFORMS WHAT NEEDS TO BE DONE IN TERMS OF A
9    SCROLL.
10   Q    OKAY.  ALL RIGHT.  AND THE NEXT LIMITATION,
11   SIR, WOULD YOU TAKE US THROUGH THAT?
12   A    CAN WE GO BACK A SLIDE.  THERE'S A COUPLE OF
13   OTHER UNITS ON HERE, TOO, THAT AREN'T HIGHLIGHTED,
14   BUT THE COMPRESSION PROCESSING UNIT 42 AND
15   COMPRESSION PROCESSING UNIT 44 ARE THE UNITS THAT
16   PERFORM THE SCROLLING OPERATION, YEAH, THE
17   SCROLLING -- I'M SORRY, THE SCALING OPERATION.  I
18   MISSPOKE.
19             SO, YEAH, SO THAT LIMITATION HAS BEEN
20   MET.
21   Q    OKAY.  GREAT.  LET'S TURN TO THE NEXT ONE,
22   SIR.  CAN YOU TAKE US THROUGH THAT LIMITATION,
23   PLEASE?
24   A    SO BASED UPON WHAT THE MAP OPERATIONS
25   PROCESSING UNIT HAS DONE, THE IMAGE GENERATION UNIT
```

```
 1    RECEIVES THAT, THAT INPUT AND PERFORMS -- SENDS IT
 2    TO THE DISPLAY UNIT, WHICH THEN UPDATES THE DISPLAY
 3    ON THE E-BOOK ITSELF.
 4    Q    OKAY.  I THINK THERE'S A LITTLE MOTION.
 5    A    SO THERE'S A SCROLL BAR THAT SHOWS, THAT
 6    DEMONSTRATES THE SCROLL OPERATION.  SO THAT
 7    LIMITATION IS MET.
 8    Q    OKAY.  AND LET'S FINISH THE LAST SLIDE WITH
 9    RESPECT TO NOMURA.
10    A    SO, AGAIN, SIMILARLY TO THE WAY THAT THE
11    SCROLL OPERATION WAS, WAS MET, THE SYSTEM ALSO
12    RESPONDS TO A GESTURE CALL BY PASSING THE
13    INFORMATION TO THE IMAGE GENERATION UNIT WHICH GOES
14    TO THE DISPLAY UNIT WHICH UPDATES THE E-BOOK.
15    Q    OKAY.  NOW, IN YOUR OPINION, SIR, WITH
16    RESPECT -- ARE ALL THE LIMITATIONS OF CLAIM 8 OF
17    THE 195 -- '915 PATENT FOUND IN NOMURA?
18    A    YES, THEY ARE.
19    Q    AND WHAT DOES THAT LEAD YOU TO CONCLUDE?
20    A    WHAT THAT MEANS IS BY VIRTUE OF THE FACT THAT
21    ALL OF THE CLAIM LIMITATIONS ARE COVERED BY NOMURA,
22    OR THAT IT ANTICIPATES OR RENDERS OBVIOUS, OR
23    INVALIDATES, RATHER, THE '915 PATENT BY WHAT'S
24    REFERRED TO AS ANTICIPATION, MEANING THAT ONE
25    SOURCE ENCOMPASSES ALL OF THE CLAIM ELEMENTS.
```

1    Q    AND WHAT CONCLUSION, SIR, JUST TO MAKE SURE I

2    DIDN'T MISS IT, WHAT WAS YOUR CONCLUSION WITH

3    RESPECT TO DIAMONDTOUCH RUNNING FRACTAL ZOOM

4    COMPARED TO CLAIM 8 OF THE '915 PATENT?

5    A    LIKE NOMURA, DIAMONDTOUCH COVERS ALL OF THE

6    CLAIM ELEMENTS OF CLAIM 8, AND, THEREFORE,

7    INVALIDATES CLAIM 8 AS WELL.

8    Q    I JUST WANT TO SPEND A MOMENT ON A THIRD

9    REFERENCE, IF I HAVE SUCCESS BRINGING IT UP HERE

10   HERE.

11          JUST A SENTENCE OR TWO, SIR, ABOUT WHAT

12   THE HAN SYSTEM WAS?

13   A    SURE.  JEFFERSON HAN WAS A RESEARCH SCIENTIST

14   AT NEW YORK UNIVERSITY AND HE CREATED A DEVICE, NOT

15   ENTIRELY DISSIMILAR FROM THE DIAMONDTOUCH SYSTEM,

16   BUT IT'S A USER INTERFACE, LARGE SCALE USER

17   INTERFACE THAT RESPONDS TO TOUCH INPUT.  AND

18   THERE'S A, A FILM HERE THAT SHOWS EXACTLY WHAT THAT

19   SYSTEM DOES.

20   Q    OKAY.  AND I THINK JUST TO BRING IT BACK TO

21   MIND, LET'S SHOW A VERY SHORT PORTION OF THE HAN

22   VIDEO.

23          CAN YOU PUT THAT UP, PLEASE.

24          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)

```
 1              MR. DEFRANCO:  OKAY.

 2              THE COURT:  WHAT'S THE NUMBER ON THAT

 3     VIDEO, PLEASE?

 4              MR. DEFRANCO:  YOUR HONOR, WE WOULD OFFER

 5     THAT INTO EVIDENCE.  THAT IS GOING TO BE EXHIBIT DX

 6     556.

 7              THE COURT:  ALL RIGHT.  THAT'LL BE

 8     PENDING THE STIPULATION.  OKAY.  SO IT'S NOT

 9     ADMITTED RIGHT NOW UNLESS THERE'S A STIPULATION ON

10     THE VIDEO.  SO I'LL HOLD THAT.

11              MR. DEFRANCO:  YES, YOUR HONOR.

12              THE COURT:  GO AHEAD, PLEASE.

13     BY MR. DEFRANCO:

14     Q    BRIEFLY, CAN YOU WALK THROUGH CLAIM 8 OF THE

15     '915 PATENT WITH RESPECT TO THE HAN VIDEO, SIR?

16     A    SO THE HAN DEMONSTRATION SHOWS A MACHINE

17     READABLE -- A COMPUTER THAT HAS INSTRUCTIONS IN IT

18     THAT PERFORM VARIOUS OPERATIONS.  IT'S SHOWN IT

19     RECEIVES INPUTS, AS YOU CAN SEE WHEN HE WAS

20     DEMONSTRATING THE SYSTEM, IT RECEIVES INPUTS IN THE

21     FORM OF SINGLE INPUT SCROLLS, MULTI INPUT ZOOMING

22     OPERATIONS.  IT CREATES -- IT DETERMINES WHETHER OR

23     NOT THE EVENT OBJECT INVOKES A SCROLL BECAUSE IT

24     RECORDS THOSE EVENTS IN AN EVENT OBJECT.  IT

25     DETERMINES BY DISTINGUISHING WHETHER IT'S A SINGLE
```

1    POINT OR MULTIPOINT.

2           IT THEN ISSUES A SCROLL OR GESTURE CALL

3    BASED ON THE DETERMINATION IT MADE AND THEN UPDATES

4    THE SCREEN TO REFLECT WHAT THE USER HAD DONE WITH

5    THE SINGLE OR MULTITOUCH INPUTS.

6    Q    OKAY.  LET'S TALK ABOUT NON-INFRINGEMENT,

7    INFRINGEMENT ISSUES FOR JUST A MOMENT.

8           CAN YOU TELL US WHAT CLAIM ELEMENT D IS

9    ABOUT AGAIN IN THIS CLAIM.

10   A    SO CLAIM ELEMENT D HAS TO DO WITH DETERMINING

11   WHETHER THE EVENT OBJECT INVOKES A SCROLL BY

12   DISTINGUISH -- OR A GESTURE BY DISTINGUISHING

13   BETWEEN ONE POINT OR MULTIPOINT.

14          AND IT'S -- THE EVENT OBJECT IS --

15   INVOKES THE SCROLL OR GESTURE OPERATION.  THERE'S

16   AN INVOCATION OF THE SCROLL OR GESTURE OPERATION BY

17   THE EVENT OBJECT.

18   Q    WHAT IS YOUR UNDERSTANDING OF THE DEFINITION

19   OF INVOKE AS IT'S TO BE USED IN THIS CASE?

20   A    SO INVOKE, AS I UNDERSTAND IT, HAS COME TO

21   MEAN TO CAUSE, AND I UNDERSTAND THAT'S THE COURT'S

22   CONSTRUCTION FOR THE TERM "INVOKE."

23   Q    OKAY.  AND --

24          MR. JACOBS:  YOUR HONOR, THAT'S AN

25   INCOMPLETE RECITATION OF THE COURT'S CLAIM

```
1    CONSTRUCTION.
2             THE COURT:  OVERRULED.  YOU'LL HAVE A
3    CHANCE ON CROSS.
4             GO AHEAD.
5    BY MR. DEFRANCO:
6    Q    OKAY.  IN YOUR OPINION, DO THE ACCUSED
7    PRODUCTS HAVE THAT FEATURE, SIR?
8    A    NO.  THE ACCUSED PRODUCTS, I THINK THERE'S A
9    SLIDE ON THIS, BUT THE ACCUSED PRODUCTS OPERATE
10   MORE ALONG THE LINES LIKE THIS.
11            WE HEARD THE OTHER DAY DR. SINGH TALK
12   ABOUT THE WEB VIEW OBJECT AND THAT THE WEB VIEW
13   OBJECT RELIED -- USES THE DATA THAT IS STORED IN
14   THE MOTION EVENT OBJECT TO MAKE A DETERMINATION AS
15   TO WHETHER ONE TOUCH OR MULTIPLE TOUCHES HAD
16   OCCURRED.
17            AND IF ONE USES -- IT TAKES A DIFFERENT
18   PATH THROUGH THE CODE, IN ORDER TO SEE IF ONE TOUCH
19   OR MULTITOUCH HAD BEEN USED.
20            THE POINT IS THAT THE MOTION EVENT OBJECT
21   IS NOT THE CAUSER OF THIS DETERMINATION AS TO
22   WHETHER OR NOT ONE TOUCH OR MULTIPLE TOUCHES HAVE
23   OCCURRED.
24            THE MOTION OF THAT OBJECT THAT CONTAINS
25   THE DATA, WHICH IS THEN USED BY THE WEB VIEW OBJECT
```

```
 1    IN ORDER TO MAKE THE DETERMINATION.

 2    Q    OKAY.  AND THEN THERE'S BEEN SOME TALK ABOUT

 3    TWO FINGER SCROLLING.  WOULD YOU TELL US WHAT

 4    YOU'VE CONCLUDED WITH RESPECT TO TWO-FINGER

 5    SCROLLING IN SOME OF THE SAMSUNG PRODUCTS THAT YOU

 6    ANALYZED?

 7    A    SO ON SOME OF THE SAMSUNG PRODUCTS THAT I HAD

 8    THE OPPORTUNITY, THAT I'VE ANALYZED, WHICH ARE THE

 9    ACCUSED PRODUCTS IN THIS MATTER, THE PRODUCTS DO

10    PERFORM MULTIPOINT SCROLLING, IN OTHER WORDS, BEING

11    ABLE TO SCROLL A DEVICE USING MULTIPLE POINTS.

12            AGAIN, THE PATENT CALLS FOR

13    DISTINGUISHING BETWEEN A MULTIPOINT SCROLL AND A

14    SINGLE -- I MEAN, A MULTIPOINT SCALE AND A SINGLE

15    POINT SCROLL.

16            WHAT I WAS ABLE -- WHAT I'VE OBSERVED IS

17    THAT SOME OF THE DEVICES DO PERFORM MULTIPOINT

18    SCROLLING WHICH, AGAIN, IS CONTRARY TO THE WAY THE

19    PATENT, THE WAY THE PATENT CLAIMS OPERATE.

20    Q    OKAY.  LET'S SHIFT GEARS NOW AND LET'S TALK

21    ABOUT THE '163 PATENT, OKAY?

22    A    SURE.

23    Q    I WANT TO MOVE AHEAD A LITTLE BIT.  I KNOW

24    THIS IS INTRODUCTORY SLIDE.  YOU'VE GOT THE SAME

25    PRIOR ART?
```

1    A    AGAIN, SAME PRIOR ART, YES, TO THE RIGHT.

2    Q    THERE'S BEEN QUITE A BIT OF DISCUSSION OF

3    LAUNCHTILE IN THIS CASE.  I THINK WE'VE HEARD

4    ENOUGH ABOUT THAT.  SO WHY DON'T WE GO STRAIGHT TO

5    THE ASSERTED CLAIM IN THE '163 PATENT.  THAT'S

6    CLAIM 50, IS THAT RIGHT, SIR?

7    A    CLAIM 50 IS THE ASSERTED CLAIM IN THE '163

8    PATENT.

9    Q    WHY DON'T WE DO THIS.  WHY DON'T WE -- LET'S

10   START WITH THE FIRST ELEMENT AND I WILL MOVE

11   THROUGH THE SLIDES AS YOU DESCRIBE WHERE YOU

12   BELIEVE THE ELEMENT AT ISSUE IS FOUND IN CLAIM 50.

13   ARE YOU WITH ME?

14   A    OKAY.  SO THE FIRST ELEMENT IS OF -- DESCRIBES

15   A PORTABLE ELECTRONIC DEVICE WHICH THE LAUNCHTILE

16   SYSTEM RUNNING ON THIS HEWLETT-PACKARD IPAQ

17   HANDHELD UNIT PERFORMS.  IT'S A CROSS -- IT'S WITH

18   A PROCESSOR, A TOUCH SENSITIVE SCREEN, MEMORY, AND

19   A SERIES OF PROGRAMS AND THOSE PROGRAMS CONTAIN

20   INSTRUCTIONS WHICH ALLOW THE PROGRAM TO DO WHAT

21   IT'S SUPPOSED TO DO.  SO THAT CLAIM ELEMENT IS MET.

22         SO THE SECOND PART OF CLAIM 50 SAYS

23   DISPLAYING AT LEAST A PORTION OF A STRUCTURED

24   ELECTRONIC DOCUMENT.

25         WHAT'S REFERRED TO THERE, IN LAUNCHTILE,

1    THE STRUCTURED ELECTRONIC DOCUMENT IS WHAT

2    DR. BEDERSON REFERRED TO AS THE INTERACTIVE ZOOM

3    SPACE.  THAT INTERACTIVE ZOOM SPACE IS THAT

4    COLLECTION OF 36 TILES THAT DR. BEDERSON TALKED

5    ABOUT, AND THOSE 36 TILES ARE AN INTERACTIVE ZOOM

6    SPACE THAT IS THE STRUCTURED ELECTRONIC DOCUMENT OF

7    THE REQUIREMENT.

8         IF YOU SEE HERE, WHAT IT ALLOWS IS FOR

9    THE IDENTIFICATION OF A FIRST BOX IN THAT -- IN A

10   PLURALITY OF BOXES OF CONTENT.

11   Q    OKAY.  AND THE NEXT LIMITATION, SIR?

12   A    SO THE -- THE PATENT REQUIRES THAT THE SYSTEM

13   BE ABLE TO DETECT A FIRST GESTURE AT THE LOCATION

14   DISPLAYED ON THE -- AT A LOCATION DISPLAYED ON THE

15   STRUCTURED ELECTRONIC DOCUMENT FOR DETERMINING A

16   FIRST BOX IN THE PLURALITY OF BOXES LOCATED AT THAT

17   LOCATION.

18        SO, IN OTHER WORDS, AS YOU CAN SEE HERE,

19   THE USER IS ABOUT TO SELECT AN AREA WITHIN THAT BOX

20   OF FOUR, BECAUSE THAT'S THE WAY THAT THE LAUNCHTILE

21   IS ORGANIZED IS A SERIES OF QUAD TILES, OR

22   TWO-BY-TWO ELEMENTS, AND WHEN THAT HAPPENS, THE

23   STRUCTURED ELECTRONIC DOCUMENT, OR THE INTERACTIVE

24   ZOOM SPACE, IS TRANSLATED AND ENLARGED, AND WE'LL

25   SEE THAT IN THE NEXT CLAIM ELEMENT.  THIS MEANS

1    THIS ONE HAS BEEN MET.

2              SO HERE WE SEE THE STRUCTURED ELECTRONIC

3    DOCUMENT, THE INTERACTIVE ZOOM SPACE IS NOW

4    TRANSLATED, MEANING SCROLLED, AND ENLARGED OR

5    CENTERED, CENTERED AND ENLARGED SO THAT WE ENLARGE

6    THAT, THAT FIRST BOX OF CONTENT WITHIN THAT

7    STRUCTURED ELECTRONIC DOCUMENT.

8              AND THAT'S WHAT'S SHOWN HERE.  THE

9    FOUR -- THAT QUAD TILE, THOSE FOUR TILES, ARE NOW

10   SELECTED AND ENLARGED.  SO THAT CLAIM ELEMENT IS

11   MET.

12   Q    AND THE NEXT LIMITATION, SIR?

13   A    SO THE NEXT LIMITATION, THIS IS AN IMPORTANT

14   ONE, THE NEXT LIMITATION IS AFTER THE FIRST BOX IS

15   ENLARGED, DETECTING A SECOND BOX WHICH IS NOT THAT

16   FIRST BOX.

17             AND THAT SECOND GESTURE NOW, YOU CAN SEE

18   IT BEING DONE HERE, THE USER IS SELECTING THAT

19   SECOND BOX OTHER THAN THE FIRST BOX.

20             AND SO THE -- ONCE THE FIRST BOX HAS BEEN

21   ENLARGED, NOW I'M SELECTING A SECOND BOX, WHICH IS

22   THIS UPPER LEFT-HAND QUADRANT HERE.  SO THAT

23   ELEMENT IS MET.

24   Q    OKAY.  AND THEN FINALLY THE LAST LIMITATION,

25   SIR?

2916

```
 1     A     AND THEN TRANSLATING AND ENLARGING, SO WHAT

 2     HAPPENS IS THE SELECTION OF THAT SECOND BOX ALLOWS

 3     FOR IT, FOR THE UNIT TO BE TRANSLATED AND CENTERED

 4     ON THE DISPLAY SCREEN, AND THAT'S WHAT THE LAST

 5     CLAIM ELEMENT MEANS, SO THAT THE SECOND BOX IS

 6     CENTERED AND TRANSLATED.

 7              SO, ONCE AGAIN, I'VE GONE FROM THE

 8     STRUCTURED ELECTRONIC DOCUMENT, AND I SELECTED A

 9     SPACE WITHIN THE STRUCTURED ELECTRONIC DOCUMENT,

10     AND THEN A FINER SPACE WITHIN THE STRUCTURED

11     ELECTRONIC DOCUMENT THAT ORIGINATED WITH THE TILES

12     OF 36.

13     Q    AND, SIR, HAVE YOU ALSO LOOKED AT AND ANALYZED

14     WHAT'S KNOWN AS XNAV RUNNING ON THE IPAQ AND THE

15     SOURCE CODE?

16     A    I HAVE.  I HAVE.

17     Q    AND GENERALLY, CAN YOU TELL US, WHAT'S YOUR

18     CONCLUSION AS TO WHETHER LAUNCHTILE AND XNAV ON THE

19     IPAQ INVALIDATE CLAIM 50 OF THE '163 PATENT?

20     A    SO XNAV IS A PRODUCT THAT IS DERIVED FROM

21     LAUNCHTILE.  WE'VE SEEN THE SOURCE CODE FOR XNAV.

22     IT RUNS ON A DIFFERENT SET OF HARDWARE, A SONY

23     DEVICE THAT'S A DIFFERENT SET OF HARDWARE.  I'VE

24     OPERATED IT.

25              AND IT PERFORMS ESSENTIALLY IDENTICAL
```

1     FUNCTIONS TO THE LAUNCHTILE SYSTEM.

2              SO IT TOO INVALIDATES.

3     Q    ALL RIGHT.  I'D LIKE TO MOVE ON TO ANOTHER

4     REFERENCE NOW, AND WE HAVE A -- I'VE ASKED THAT A

5     SUMMARY SLIDE BE PREPARED.  THIS IS THE AGNETTA

6     PATENT.  IT'S THE '632 PATENT.  DO YOU SEE THAT

7     PATENT IN YOUR BINDER THERE, SIR?  YOU SHOULD HAVE

8     AS EXHIBIT 561 SOME DOCUMENTATION RELATING TO

9     AGNETTA.  DO YOU SEE THAT?

10    A    I DO.

11    Q    AND THERE'S A -- IS THERE A PROVISIONAL

12    APPLICATION IN THE FRONT OF EXHIBIT 561 AND IT'S

13    THE '632 PATENT ITSELF IN THE BACK?

14    A    THERE IS A PROVISIONAL APPLICATION, YES.

15             MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

16    FOR EXHIBIT DX 561 INTO THE RECORD.

17             MR. JACOBS:  NO OBJECTION, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

19             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

20             561, HAVING BEEN PREVIOUSLY MARKED FOR

21             IDENTIFICATION, WAS ADMITTED INTO

22             EVIDENCE.)

23             MR. DEFRANCO:  OKAY.  WHAT YOU WANT TO DO

24    SIR, RATHER THAN WALKING THROUGH -- BY THE WAY, IS

25    THIS SOMEWHAT -- IN THE CONSTRUCT OF WHAT'S SHOWN

```
 1    IN THIS PATENT, IS IT SIMILAR SOMEWHAT TO

 2    LAUNCHTILE?

 3    A     IT IS SIMILAR TO LAUNCHTILE.  THE -- THIS

 4    CONFIGURATION --

 5    Q     AND LET ME JUST JUMP IN --

 6    A     SURE.

 7    Q     -- IN THE INTEREST OF TIME.  WHAT I'VE DONE

 8    HERE IS WE PUT THE CLAIMS SIDE BY SIDE WITH ONE

 9    FIGURE FROM THAT PATENT, AND RATHER THAN TAKE YOU

10    THROUGH EACH ELEMENT ONE SLIDE AT A TIME, COULD YOU

11    JUST DESCRIBE FOR US GENERALLY WHERE IN YOUR

12    OPINION THE LIMITATIONS IN CLAIM 50 OF THE '163

13    PATENT ARE FOUND IN THE AGNETTA REFERENCE, SIR?

14    A     SURE.  SO THE AGNETTA REFERENCE AGAIN IS

15    DIRECTED TO A PORTABLE ELECTRONIC DOCUMENT WITH

16    MEMORY AND PROCESSORS AND COMPUTER INSTRUCTIONS.

17    SO 50A AND 50B ARE MET.

18          50C IS MET BECAUSE WHAT IT DOES --

19    BECAUSE THE STRUCTURED ELECTRONIC DOCUMENT WAS

20    SIMILAR TO LAUNCHTILE IS WHAT IS REFERRED TO HERE

21    AS A TILE SPACE WHICH, AGAIN, PROVIDES INSIGHT INTO

22    THE INFORMATION AND CONTENT THAT IS ON THE

23    PARTICULAR ELECTRONIC DEVICE.

24          THE USER CAN SELECT ANY OF THOSE TILES.

25    ONCE THOSE TILES -- ANY TILE THAT IS SELECTED IS
```

1    ENLARGED AND CENTERED, SO THAT MEANS THAT CLAIM 50D

2    AND E ARE MET, AND F FOR THAT MATTER.

3              AND IN ADDITION, ONCE THAT -- ONCE THE

4    TILE HAS BEEN ENLARGED AND CENTERED, THE ADJACENT

5    TILES AROUND IT ARE AVAILABLE, THE USER THEN HAS

6    THE OPPORTUNITY TO SELECT THOSE ADJACENT TILES,

7    WHICH THAT TILE WILL NOW BE CENTERED AND ENLARGED

8    AS WELL.  SO MUCH LIKE LAUNCHTILE, THE AGNETTA

9    PATENT PERFORMS THE SAME OPERATIONS AND SAME

10   FUNCTIONS.

11   Q    AND WHAT IS YOUR YOUR OPINION OF THE VALIDITY

12   OF CLAIM 50 OF THE '163 PATENT IN VIEW OF THE

13   AGNETTA REFERENCE, SIR?

14   A    I BELIEVE THE AGNETTA REFERENCE INVALIDATES

15   CLAIM 50 BECAUSE IT MEETS ALL THE CLAIM

16   LIMITATIONS.

17   Q    WE HAVE ONE MORE TO DO, THE ROBBINS PATENT.

18   IT SHOULD BE IN YOUR BINDER AGAIN.  IT'S '349

19   PATENT.  DO YOU SEE THAT THERE, SIR?  IT'S EXHIBIT

20   DX 1081.

21             AND, RYAN, WHILE WE'RE DOING THAT, CAN

22   YOU PLEASE PUT UP THE SUMMARY SLIDE FOR THAT

23   REFERENCE.

24   A    I DO.  I SEE EXHIBIT 1081 AND IT IS THE '349

25   OR ROBBINS PATENT.

1    Q    IS THAT THE ROBBINS PATENT THAT YOU ANALYZED

2    IN YOUR WORK IN THIS CASE?

3    A    IT IS.

4         MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

5    EXHIBIT DX 1081 INTO EVIDENCE, PLEASE.

6         THE COURT:  ANY OBJECTION?

7         MR. JACOBS:  IS THAT THE PATENT?

8         THE COURT:  YES, IT IS.

9         MR. JACOBS:  NO OBJECTION.

10        THE COURT:  IT'S ADMITTED.

11        (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12         1081, HAVING BEEN PREVIOUSLY MARKED FOR

13         IDENTIFICATION, WAS ADMITTED INTO

14         EVIDENCE.)

15        THE COURT:  GO AHEAD, PLEASE.

16   BY MR. DEFRANCO:

17   Q    MR. GRAY, ONE MORE TIME.  WE'RE ALMOST DONE.

18   WOULD YOU PLEASE DO THE SAME.  TAKE US THROUGH EACH

19   ELEMENT IN CLAIM 50 OF THE '163 PATENT AND TELL US

20   WHERE IN YOUR OPINION THAT IS FOUND IN THE ROBBINS

21   '349 PRIOR ART PATENT.

22   A    SO THE ROBBINS PATENT, AGAIN, IS A ZOOM

23   PATENT.  IT IS DIRECTED TO PORTABLE ELECTRONIC

24   DEVICES.  AGAIN, THERE'S A MAP APPLICATION

25   UNDERNEATH IT.  THE ROBBINS PATENT AGAIN BEING

```
1    DIRECTED TO A PORTABLE ELECTRONIC DOCUMENT HAS

2    PROCESSOR AND A TOUCHSCREEN AND A VARIETY -- AND

3    MEMORY AND INSTRUCTIONS THAT PERFORM VARIOUS

4    OPERATIONS.

5              IN THIS PARTICULAR CASE, WHAT HAPPENS IS,

6    IN THIS EXAMPLE THAT'S SHOWN HERE, THE SCREEN IS

7    DIVIDED INTO THREE-BY-THREE MATRIX THAT OVERLAPS,

8    AND WE'LL TALK A LITTLE BIT ABOUT WHY THAT

9    OVERLAPS.

10             THE USER THEN CAN SELECT ANY OF THOSE

11   SEGMENTS AND THOSE SEGMENTS THEN BECOME CENTERED

12   AND ENLARGED ON THE DISPLAY SCREEN.

13             IF YOU NOTICE ON THE -- IF YOU TAKE THE

14   UPPER RIGHT-HAND SEGMENT, THERE'S A SMALL RECTANGLE

15   TO THE LEFT-HAND SIDE OF THAT SEGMENT.  THE

16   SELECTION OF THAT SEGMENT NOW ALLOWS THE, THE USER

17   INTERFACE TO MOVE TO THE ADJACENT SEGMENT AND HAVE

18   THAT BE CENTERED AND ENLARGED AS WELL.

19             SO THE PATENT MEETS THE LIMITATIONS OF

20   THE FIRST PART OF 50A AND B BECAUSE IT IS A

21   STRUCTURED -- IT'S A PORTABLE ELECTRONIC DEVICE.

22   IT ALLOWS FOR THE ENLARGEMENT OF THE DOCUMENTS,

23   THAT'S 50C.  IT ALLOWS FOR SELECTION OF THE SECOND,

24   A SECOND SPACE, AND THEN THE ENLARGEMENT AND

25   CENTERING OF THAT.  SO IT MEETS ALL THE LIMITATIONS
```

1   OF THE CLAIM AS WELL.

2   Q    AND, IN YOUR VIEW, IS CLAIM 50 INVALID IN VIEW

3   OF THIS REFERENCE?

4   A    AGAIN, ROBBINS AS WELL, THIS CLAIM COVERS ALL

5   OF THE CLAIM LIMITATIONS OF '163, CLAIM 50, AND

6   CONSEQUENTLY IS -- INVALIDATES IT AS WELL.

7   Q    SHIFTING GEARS BRIEFLY TO INFRINGEMENT,

8   NON-INFRINGEMENT ISSUE, YOU'VE HEARD THE TERM

9   "SUBSTANTIALLY CENTERED."  IS THAT CORRECT?

10  A    RIGHT.  ONE OF THE CLAIM ELEMENTS HERE, 50F,

11  FOR EXAMPLE, REFERS TO SOMETHING BEING

12  SUBSTANTIALLY CENTERED.

13  Q    AND WHAT IS YOUR VIEW ON THAT, SIR?

14  A    IN MY OPINION, THE TERM "SUBSTANTIALLY

15  CENTERED" IS AN AMBIGUOUS TERM.  I -- PART OF WHAT

16  A PATENT DOES IS PROVIDE INFORMATION TO AN ENGINEER

17  TO ALLOW THEM TO UNDERSTAND THE SCOPE OF THE PATENT

18  SO THAT THEY CAN AVOID INFRINGING THE PATENT.

19          I DON'T KNOW WHEN SOMETHING IS

20  SUBSTANTIALLY CENTER.  I KNOW WHEN SOMETHING IS

21  FULLY CENTERED OR NOT CENTERED, BUT "SUBSTANTIALLY

22  CENTERED" IS AMBIGUOUS.

23          HOW WOULD A PATENT -- HOW WOULD AN

24  ENGINEER UNDERSTAND HOW TO MAKE SOMETHING

25  SUBSTANTIALLY CENTERED OR NOT?  SO IN MY OPINION,

1    "SUBSTANTIALLY CENTERED" IS AN AMBIGUOUS TERM.

2    Q    AND, FINALLY, SIR, WITH RESPECT TO ELEMENT E,

3    DETERMINING A FIRST BOX IN THE PLURALITY OF BOXES

4    AT THE LOCATION OF THE FIRST GESTURE, CAN YOU GIVE

5    US YOUR OPINION AS IT RELATES TO INFRINGEMENT ON

6    THAT ELEMENT?

7    A    AGAIN, 50E TALKS ABOUT IDENTIFYING A BOX IN

8    PLURALITY OF BOXES AT THE LOCATION OF THE FIRST

9    GESTURE.

10        WHAT THAT SEEMS TO INTEND, AT LEAST THE

11   WAY I READ THIS CLAIM THE FIRST TIME I READ IT, WAS

12   THAT THERE ARE A PLURALITY OF BOXES.

13        IF YOU THINK ABOUT NESTED BOXES WHERE

14   THERE ARE MULTIPLE BOXES THAT ARE NESTED AND THE

15   USER SELECTS A BOX OR A SPACE, SOME LOCATION WITHIN

16   THAT NESTED BOX, WHAT HAPPENS IS THE SYSTEM WOULD

17   THEN NEED TO DETERMINE WHICH ONE OF THOSE NESTED

18   BOXES THE USER WAS ACTUALLY INTENDING TO HAVE

19   CENTERED AND ENLARGED.

20        SIMILARLY TO THE WAY LAUNCHTILE WORKS.

21   IF YOU RECALL LAUNCHTILE, YOU CAN SELECT ANY ONE OF

22   THE FOUR IN THE QUAD TILES AND THAT WHOLE QUAD TILE

23   GETS ENLARGED AND CENTERED.

24        AGAIN, I'M NOT SEEING ANY EVIDENCE AT ALL

25   SUPPLIED, OR ANYTHING IN ANY OF THE REPORTS THAT

```
1    INDICATE HOW THE ACCUSED PRODUCTS MEET THE

2    LIMITATION OF SELECTING A -- SOMETHING IN A

3    PLURALITY OF BOXES.  SO, AGAIN, I'M NOT SEEING IT.

4              MR. DEFRANCO:  MY TIME IS UP.  THANK YOU,

5    SIR.

6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

7    4:20.  GO AHEAD, PLEASE, WITH ANY CROSS.

8                     CROSS-EXAMINATION

9    BY MR. JACOBS:

10   Q    GOOD AFTERNOON, MR. GRAY.

11   A    GOOD AFTERNOON.

12   Q    NOW, YOUR TESTIMONY ON THE SUBJECT OF

13   INVALIDITY WAS PREMISED ON THE IDEA OF

14   ANTICIPATION; CORRECT, SIR?

15   A    THAT'S CORRECT.

16   Q    AND ANTICIPATION IS ALL YOU SPOKE TO; CORRECT?

17   A    THAT'S CORRECT.

18   Q    AND ANTICIPATION REQUIRES THAT EVERY ELEMENT,

19   THE JURY HAS HEARD THIS MANTRA, EVERY ELEMENT OF

20   THE CLAIM BE PRESENT IN THE PROPOSED INVALIDATING

21   REFERENCE; CORRECT, SIR?

22   A    THAT'S CORRECT.

23   Q    AND SO IF THE JURY --

24   A    WELL, WITH A POSSIBLE EXCEPTION THERE.  IT IS

25   EITHER -- IT IS EITHER COVERED OR IS INHERENTLY IN
```

1    THE REFERENCE.

2    Q    AND SO IF THE JURY FINDS THAT IN -- WHEN IT

3    COMES TO INVALIDITY, IF ANY ELEMENT OF THE CLAIM IS

4    NOT PRESENT IN THE PROPOSED INVALIDATING REFERENCE,

5    THEN YOUR OPINION SHOULD BE REJECTED; CORRECT, SIR?

6    A    AGAIN, WITH THE PROVISO THAT IF IT IS AN

7    ELEMENT THAT IS INHERENT OR IMPLIED, THAT'S MY

8    UNDERSTANDING.

9    Q    OTHERWISE YOU AGREE WITH ME, YOUR OPINION

10   RISES AND FALLS ON THE IDEA OF -- THERE'S NO CLOSE

11   HERE, YOU EITHER GOT IT, EVERY ELEMENT IS PRESENT,

12   OR YOU DON'T.  CORRECT, SIR?

13   A    EITHER EVERY ELEMENT IS PRESENT OR IT IS

14   INHERENT AS IS REQUIRED.

15   Q    NOW, I LISTENED CAREFULLY TO THE ANSWER TO THE

16   QUESTION ABOUT YOUR ROLE IN LITIGATION SUPPORT OVER

17   THE LAST COUPLE YEARS, AND YOU SAID YOU SPENT SOME

18   TIME DOING LITIGATION SUPPORT.

19           WHAT DID YOU MEAN BY "SOME TIME," SIR?

20   A    WELL, ACTUALLY SINCE, STARTING IN 1984, I DID

21   SOME LITIGATION SUPPORT, AND THROUGHOUT MY CAREER

22   AS AN ENGINEER, I PERIODICALLY DID LITIGATION

23   SUPPORT ASSIGNMENTS.  SO IT'S BEEN OVER A LONG

24   TIME, SINCE 1984.

25   Q    BUT OVER THE LAST COUPLE OF YEARS, ALMOST ALL

1    OF YOUR TIME HAS BEEN SPENT DOING LITIGATION

2    SUPPORT; CORRECT, SIR?

3    A    I THINK OVER THE LAST FEW YEARS THE MAJORITY

4    OF MY CONSULTING WORK HAS BEEN WITH RESPECT TO

5    LITIGATION SUPPORT, YES.

6    Q    AND IN THIS PARTICULAR CASE -- AGAIN, THE JURY

7    HAS HEARD A LOT ABOUT EXPERT COMPENSATION -- YOU'VE

8    MADE ABOUT $200,000; CORRECT, SIR?

9    A    I THINK THAT SOUNDS HIGH, BUT IT COULD BE.  I

10   DON'T KNOW THE EXACT NUMBER, BUT IT MAY BE.

11   Q    AND YOUR BACKGROUND, SIR, IS IN ECONOMICS;

12   CORRECT?  THAT WAS YOUR UNDERGRADUATE DEGREE?

13   A    THAT'S CORRECT.

14   Q    NO FORMAL TRAINING IN THE SENSE OF ADVANCED

15   DEGREES IN COMPUTER SCIENCE OR ENGINEERING?

16   A    THAT'S CORRECT.

17   Q    AND YOU NEVER TOOK A COURSE IN OBJECT ORIENTED

18   PROGRAMMING?

19   A    THAT'S A QUESTION?  YES, I HAVE NOT TAKEN ANY

20   FORMAL COURSES IN OBJECT ORIENTATION.  I'M AN

21   ENGINEER.  I WAS WORKING, DOING THE WORK, BUT, YES,

22   I'VE NOT TAKEN ANY OBJECT ORIENTED COURSES.

23   Q    AND SINCE THE DATE OF THE INTRODUCTION OF THE

24   IPHONE, JUST TO PICK A POINT IN TIME, YOU HAVEN'T

25   DONE ANY PROGRAMMING FOR TOUCH SENSITIVE DEVICES?

1    A    NO, I HAVE NOT SINCE 2007.  IS THAT WHAT --

2    Q    YES, SORRY.  WE ALL KNOW IN THIS TRIAL THAT

3    DATE?

4    A    SORRY.  I THOUGHT IT WAS 2007, BUT I WASN'T

5    SURE.

6    Q    AND YOUR PROGRAMMING EXPERIENCE FOR WRITING

7    CODE FOR A SENSITIVE DEVICE, THAT WAS ACTUALLY FOR

8    A PHOTOCOPIER; CORRECT, SIR?

9    A    IT WAS FOR AN ELECTRONIC REPROGRAPHICS

10   SYSTEMS, SO PHOTOCOPIES AND PRINTERS AND SO ON,

11   SCANNERS.

12   Q    NOW, I WOULD LIKE TO TALK TO YOU ABOUT A

13   COUPLE OF THE REFERENCES THAT YOU DISCUSSED.

14        YOU REFERRED TO THE NOMURA REFERENCE.

15   THAT WAS THAT JAPANESE UNEXAMINED PATENT

16   APPLICATION.  DO YOU RECALL THAT, SIR?

17   A    I DO.

18   Q    AND AGAIN, I LISTENED CAREFULLY TO THE WAY YOU

19   SAID IT.  ON THE QUESTION OF AN EVENT OBJECT, YOU

20   POINTED TO SOMETHING AND YOU SAID THAT WAS THE '915

21   VERSION OF THE EVENT OBJECT.

22        DO YOU RECALL THAT TESTIMONY, SIR?

23   A    I DO.

24   Q    NOW, IN FACT, WHEN YOU SUBMITTED AN EXPERT

25   REPORT IN THIS MATTER, YOU COULD NOT FIND AN EVENT

1    OBJECT IN THE NOMURA REFERENCE; CORRECT, SIR?

2    A    WELL, WHEN I SUBMITTED MY EXPERT REPORT, THE

3    IDEA OF THE -- WELL, SO LET ME SAY IT DIFFERENTLY.

4         WHAT HAS BECOME, AS PART OF THIS

5    PROCEEDING AND MY UNDERSTANDING OF WHAT THE EVENT

6    OBJECT IS, HAS CHANGED SINCE I SUBMITTED MY EXPERT

7    REPORT.  IT NOW HAS A MEANING THAT MEETS THE

8    REQUIREMENTS IN THE NOMURA REFERENCE.

9    Q    AT THE TIME YOU SUBMITTED YOUR REPORT, YOU

10   COULD NOT FIND AN EVENT OBJECT; CORRECT, SIR?

11   A    I WAS NOT -- I DID NOT HAVE ACCESS TO THE

12   SOURCE CODE FOR NOMURA.  SO, YES, I COULD NOT.

13   Q    WELL, NOMURA IS WHAT NOMURA IS, RIGHT, SIR?

14   IT'S A PATENT AND IT DISCLOSES WHAT IT DISCLOSES?

15   A    THAT'S CORRECT.

16   Q    SO IF IT DOESN'T DISCLOSE SOMETHING, IT'S NOT

17   DISCLOSED.  CORRECT, SIR?

18   A    WELL --

19   Q    SORRY.  I'M -- I'VE ONLY GOT A COUPLE MINUTES.

20   IF YOU CAN'T ANSWER YES OR NO, WOULD YOU MIND JUST

21   SAYING I CAN'T ANSWER THAT YES OR NO, AND THEN I

22   GET TO DECIDE WHAT TO DO NEXT.  WILL THAT WORK FOR

23   YOU ?

24   A    SURE.  ASK ME THE QUESTION AGAIN.

25   Q    OKAY.  NOMURA DISCLOSES WHAT NOMURA DISCLOSES,

```
 1    AND YOU DIDN'T FIND AN EVENT OBJECT THERE; CORRECT,

 2    SIR?

 3    A    I THINK THAT INHERENTLY THERE'S AN EVENT

 4    OBJECT THERE IN NOMURA, YES.

 5    Q    INHERENTLY AN EVENT OBJECT?

 6    A    AS THAT'S BEEN USED IN THIS PROCEEDING, YES.

 7    Q    AND INHERENCY, THAT MEANS THERE'S NO CHOICE

 8    BUT TO FIND AN EVENT OBJECT IN NOMURA, CORRECT,

 9    SIR?

10    A    YES, IT'S EITHER NECESSARY OR IMPLIED, YES.

11    Q    AND AN EVENT OBJECT IS A FEATURE OF OBJECT

12    ORIENTED PROGRAMMING, ISN'T IT, SIR?

13    A    NOT NECESSARILY.

14    Q    WAS NOMURA, DID NOMURA DISCLOSE USING OBJECT

15    ORIENTED PROGRAMMING?

16    A    MY RECOLLECTION OF THE PATENT WAS THAT IT DID

17    NOT.  BUT THAT'S NOT THE ONLY WAY YOU CAN CREATE

18    OBJECTS, OF COURSE.

19    Q    JUST TO BE CLEAR ON WHAT I WAS REFERRING TO SO

20    THE JURY CAN SEE WHAT YOU SAID IN YOUR REPORT, CAN

21    WE HAVE THE GRAY INVALIDITY REPORT, APPENDIX 5, THE

22    CLAIM CHART, PLEASE, AT PAGE 3.

23           NOW, YOU ANALYZED CLAIM 1 AND THEN IN

24    CLAIM 8, YOU JUST REFERRED BACK TO CLAIM 1.  DO YOU

25    RECALL THAT, SIR?
```

```
1    A    I BELIEVE THAT'S ACCURATE, YES.

2    Q    AND YOU REFERRED TO IT AS YOSUHIRO, BUT THAT'S

3    NOMURA; CORRECT, SIR?

4    A    THAT'S TRUE.

5    Q    YOU DIDN'T SAY I SEE AN EVENT OBJECT.  YOU

6    SAID TO THE EXTENT YOSUHIRO DOES NOT DISCLOSE

7    CREATING AN EVENT OBJECT IN RESPONSE TO THE USER

8    INPUT, DATA REGARDING THE USER INPUT EVENT MUST BE

9    PRESERVED IN ORDER FOR SUBSEQUENT PROCESSING TO

10   OCCUR.  THEREFORE, INHERENTLY, YOSUHIRO HAD TO

11   STORE THE USER INPUT DATA IN AN EVENT OBJECT OR

12   OTHER SIMILAR STRUCTURE.  DO YOU RECALL THAT, SIR?

13   A    I DO.

14   Q    THAT IS WHAT YOU WROTE IN YOUR REPORT?

15   A    THAT IS IN MY REPORT.

16   Q    AND YOU STAND BY WHAT YOU WROTE IN YOUR

17   REPORT?

18   A    I DO.

19   Q    NOW, WE TALKED A LITTLE ABOUT BIT INVOKES, YOU

20   TALKED A LITTLE BIT ABOUT INVOKES WITH YOUR COUNSEL

21   ON DIRECT EXAMINATION.

22          DO YOU UNDERSTAND THAT INVOKE -- THAT IN

23   ORDER FOR THE EVENT OBJECT TO INVOKE, IT MUST

24   DIRECTLY CAUSE SOMETHING TO OCCUR?

25   A    I BELIEVE THAT IN ORDER FOR -- MY READING OF
```

```
 1    THE PATENT IS THAT IN ORDER FOR THE EVENT OBJECT TO

 2    INVOKE, IT WOULD BE INVOKING A METHOD WHICH WOULD

 3    INVOKE THE SCROLL OR GESTURE OPERATION.

 4    Q    ISN'T IT TRUE, SIR, THAT UNDER THE COURT'S

 5    CLAIM CONSTRUCTION, THERE'S NO REQUIREMENT THAT THE

 6    EVENT OBJECT DIRECTLY CAUSE THE SCROLLING OR

 7    GESTURING TO OCCUR?

 8    A    YOU MENTIONED THAT I DIDN'T -- I GAVE AN

 9    INCOMPLETE ANSWER TO THE CONSTRUCTION, SO THERE MAY

10    BE MORE TO THE CONSTRUCTION THAN I'M AWARE OF AT

11    THE MOMENT.

12    Q    SO YOU'RE JUST NOT SURE?

13    A    NOT SURE.

14    Q    YOU DO AGREE THAT THE DATA IN THE MOTION EVENT

15    OBJECT IN THE GALAXY CODE, IN THE SAMSUNG CODE, IN

16    THE GALAXY DEVICES THAT WE LOOKED AT, THAT THAT

17    DATA IS USED TO DETERMINE WHETHER TO SCROLL OR

18    SCALE; CORRECT?

19    A    YES, THE WEB VIEW OBJECT USES THE DATA AND THE

20    EVENT OBJECT TO DETERMINE WHETHER TO SCROLL OR

21    SCALE.

22    Q    NOW, YOU TALKED ABOUT TWO-FINGER SCROLLING

23    VERY BRIEFLY AND SAID THAT SOME OF THE ACCUSED

24    DEVICES USE TWO-FINGER SCROLLING, AND, THEREFORE,

25    YOU THINK THEY DON'T INFRINGE.  DO YOU RECALL THAT
```

1    TESTIMONY?

2    A    THAT'S CORRECT, I DID.  I DIDN'T.

3    Q    YOU DIDN'T SPECIFY THE DEVICES; CORRECT, SIR?

4    A    I DIDN'T TALK ABOUT THE DEVICES HERE, NO.

5    Q    NOW, LET'S TALK ABOUT LAUNCHTILE.  THE JURY

6    HAS HEARD A LOT ABOUT THE LAUNCHTILE REFERENCE.

7    THEY'VE SEEN IT.  IT'S IN VIDEOS.

8            YOUR TESTIMONY ON INVALIDITY FOR

9    LAUNCHTILE TURNS ON THE JURY AGREEING WITH YOU ON

10   THE FOLLOWING PROPOSITION:  THAT WHEN YOU CLICK ON

11   AN ICON, WHICH YOU CLICK ON A TILE ON LAUNCHTILE

12   AND THE APPLICATION ITSELF COMES UP, THAT'S AN

13   ENLARGEMENT OF THE CONTENT IN THE TILE; CORRECT,

14   SIR?

15   A    NO, THAT'S NOT MY -- THAT'S NOT MY

16   UNDERSTANDING.  THAT'S NOT MY UNDERSTANDING OF HOW

17   THAT INTERACTIVE ZOOM SPACE WORKS.

18           THE INTERACTIVE ZOOM SPACE IS A SERIES OF

19   TILES THAT ARE VIEWS INTO THE CONTENTS IN THE

20   APPLICATIONS THAT EXIST ON THE DEVICE ITSELF.

21           SO BY SELECTING ONE OF THOSE TILES, WHAT

22   YOU'RE DOING IS SELECTING AN AREA OF INTEREST IN

23   THAT INTERACTIVE ZOOM SPACE, THE STRUCTURED

24   ELECTRONIC DOCUMENT, AND CENTERING AND ENLARGING

25   THAT SPACE.

1          SO, FOR EXAMPLE, IN THE CASE OF AN

2     ELECTRONIC MAIL TILE, THE MAIL TILE, THE WORLD VIEW

3     SAYS THAT THERE'S 11 E-MAIL MESSAGES.

4          THE NEXT LEVEL DOWN SHOWS MORE OF THE

5     DETAIL, AND THE NEXT LEVEL DOWN SHOWS EVEN MORE.

6          BUT IT'S THE SAME DATA JUST BY VIRTUE OF

7     THE FACT THAT THE DISPLAY IS NOW LARGER, YOU CAN

8     DISPLAY MORE INFORMATION.

9     Q    WELL, YOU AGREE THAT IT'S NOT A MAGNIFICATION.

10    TRUE, SIR?

11    A    IT IS NOT -- IT'S A SEMANTIC ZOOMING I THINK

12    IS WHAT DR. BEDERSON REFERRED TO IT AS.

13    Q    YOU NEVER HEARD OF THAT TERM UNTIL YOU GOT

14    INVOLVED IN THIS LAWSUIT, CORRECT, SIR?

15    A    I'VE USED A SIMILAR CONCEPT, NOT THAT TERM,

16    SEMANTIC ZOOMING, BUT I'VE USED A SIMILAR CONCEPT

17    VERY FREQUENTLY.

18    Q    BUT IT IS TRUE THAT IT'S NOT A MAGNIFICATION.

19    TRUE, SIR?

20    A    IT'S NOT A SIMPLE MAGNIFICATION.

21    Q    AND IN THE JURY THINKS THAT ENLARGING MEANS

22    MAGNIFYING RATHER THAN GETTING INTO THE APPLICATION

23    AND SEEING AN UNDERLYING LEVEL OF APPLICATION DATA,

24    THEN YOUR OPINION FALLS; CORRECT, SIR?

25    A    I THINK I WOULD LEAVE THAT UP TO THE JURY.

1    Q    BUT YOU AGREE THAT WHAT IS GOING ON IN

2    LAUNCHTILE IS NOT A MAGNIFICATION OF THE DATA THAT

3    IS MADE BIGGER?  CORRECT?

4    A    I WOULD AGREE THAT IT'S NOT A SIMPLE

5    MAGNIFICATION OF THE DATA.

6    Q    ARE YOU ADDING A QUALIFIER, SIR?  ARE YOU

7    ADDING "SIMPLE"?

8    A    I DID.

9    Q    LET'S LOOK AT WHAT YOU SAID AT YOUR

10   DEPOSITION, BECAUSE AT YOUR DEPOSITION YOU WERE

11   LESS EQUIVOCAL.

12               CAN WE HAVE PAGE 209, LINES 12 TO 15.

13               AND YOU SEE YOU WERE ASKED, IT'S

14   DIFFERENT CONTENT.  IT'S NOT SIMPLY AN ENLARGING OF

15   THE IMAGES THAT ARE SHOWN IN THE TILE IN THE WORLD

16   VIEW; IT IS LOOKING AT DIFFERENT DATA AND

17   DISPLAYING DIFFERENT DATA RATHER THAN DISPLAYING

18   THE SAME THING IN A LARGER FONT SIZE OR A LARGER

19   IMAGE.  RIGHT.

20               AND THEN YOU SAID, LET ME AGREE THAT IT

21   IS NOT A MAGNIFICATION OF WHAT'S IN THE UPPER

22   RIGHT-HAND CORNER OF THE FIRST BOX OF THE WORLD

23   VIEW.  IT IS NOT A MAGNIFICATION.  THE UPPER

24   RIGHT-HAND CORNER OF THE ZONE VIEW IS NOT A

25   MAGNIFICATION OF THE ORIGINAL.  THAT'S ACCURATE.

```
 1                DID YOU GIVE THAT ANSWER IN RESPONSE TO
 2      THAT QUESTION, SIR?
 3      A    YES.
 4      Q    AND DO YOU STAND BY THAT TESTIMONY?
 5      A    YES.
 6                MR. DEFRANCO:  NO FURTHER QUESTIONS.
 7                THE COURT:  ALL RIGHT.  IT IS 4:32.  WE
 8      WON'T DO ANY REDIRECT TODAY, BUT WILL YOU WANT
 9      SOME, MR. DEFRANCO, OR NOT?
10                MR. DEFRANCO:  NO, YOUR HONOR.
11                THE COURT:  OKAY.  SO MAY THIS WITNESS BE
12      EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?
13                MR. DEFRANCO:  IT'S NOT, YOUR HONOR.  HE
14      IS NOT.
15                THE COURT:  OKAY.  YOU AGREE WITH THAT,
16      NOT SUBJECT TO RECALL?
17                MR. JACOBS:  YES, YOUR HONOR.
18                THE COURT:  ALL RIGHT.  THEN YOU MAY BE
19      EXCUSED.
20                THE WITNESS:  THANK YOU.
21                THE COURT:  ALL RIGHT.  SO WE ARE DONE
22      FOR THE DAY.  AND, AGAIN, SORRY TO KEEP REPEATING
23      THIS, PLEASE KEEP AN OPEN MIND, PLEASE DON'T
24      DISCUSS THE CASE WITH ANYONE, PLEASE DON'T READ
25      ABOUT THE CASE OR DO ANY OF YOUR OWN RESEARCH.  IF
```

```
1    YOU WOULD PLEASE LEAVE YOUR NOTEBOOKS IN THE JURY

2    ROOM.

3                 WE'LL SEE YOU TOMORROW MORNING AT

4    9:00 A.M.  OKAY.  THANK YOU.

5                 (WHEREUPON, THE FOLLOWING PROCEEDINGS

6    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

7                 THE COURT:  OKAY.  LET'S DO -- PLEASE

8    TAKE A SEAT.  LET'S DO A COUPLE OF HOUSEKEEPING

9    THINGS.  FIRST I JUST WANT TO MAKE SURE THE

10   TRANSCRIPT WAS CORRECTED.  AT 1:52, THAT WAS THE

11   ENDING OF THE DIRECT OF THE JIN SOO KIM OF MR. KIM.

12   THE TRANSCRIPT SAID I HAD SAID IT WAS 1:53.  WAS

13   THAT CORRECTED OR NOT?

14                THE REPORTER:  IT WAS CORRECTED.

15                THE COURT:  ALL RIGHT.  SO I HAVE TWO

16   SEALING MOTIONS, AT LEAST TWO, THERE'S ONE RIPE

17   ADVERSE INFERENCE MOTION.  THE OTHER ONE IS NOT YET

18   RIPE.  I HAVE THE ORDER TO EXCLUDE CHAPMAN, KIM,

19   AND SONY, AND THEN I HAVE YOUR OBJECTIONS ON 11

20   WITNESSES FOR TOMORROW.

21                IS THAT THE UNIVERSE?  OR IS THERE MORE

22   THAT'S PENDING.  I DIDN'T LOOK AT THE DAR OR ECF

23   OVER LUNCH TIME, SO I DON'T KNOW IF THERE ARE MORE

24   MOTIONS FILED.

25                MS. MAROULIS:  THERE ARE A COUPLE THINGS
```

1    FROM THIRD PETITIONS ON SEALING, BUT THEY SEEM MORE

2    LIKE STATEMENTS THAN REQUESTS.

3              THE COURT:  ARE THEY ABOUT EXHIBITS FOR

4    THE TRIAL?

5              MS. MAROULIS:  THEY'RE EXHIBITS FOR THE

6    TRIAL, 630, WHICH WE'LL USE TOMORROW FOR THE

7    WITNESS.  BUT IT LOOKS LIKE THEY'RE JUST MAKING

8    STATEMENTS.  I LOOKED ONLINE AND THEY'RE NOT

9    SEEKING COURT RELIEF.

10             THE COURT:  OKAY.

11             MS. MAROULIS:  AND WE'LL BE FILING

12   ANOTHER SET OF OBJECTIONS TOMORROW MORNING, YOUR

13   HONOR, FOR A SERIES OF WITNESSES DISCLOSED TODAY.

14   SO IT'S NOT FILED YET, BUT IT'S COMING.

15             THE COURT:  OKAY.  LET ME ASK, WHO -- IS

16   THERE ANY CHANCE THAT WE CAN REDUCE -- YOU KNOW, IT

17   DOESN'T MATTER, BUT IF IT'S POSSIBLE, IF YOU KNOW

18   FOR CERTAIN THAT THE 11 FOLKS WHO HAVE BEEN

19   DESIGNATED ALL FOR TOMORROW ARE NOT GOING TO GO ON

20   FOR TOMORROW OR NOT GOING TO BE CALLED AT ALL, CAN

21   YOU LET ME KNOW THAT?  BECAUSE THEN THAT WOULD MOOT

22   THE OBJECTIONS FOR THOSE WITNESSES.

23             NOW, OBVIOUSLY I HAVEN'T RULED ON

24   CHAPMAN, KIM AND SONY, SO THAT MAY OR MAY NOT

25   OBVIATE THE OBJECTIONS.

```
 1              MR. LEE:  IN TERMS OF WHAT'S GOING TO
 2    HAPPEN TOMORROW, IT WILL HELP US KNOW IF SAMSUNG IS
 3    GOING TO REST TOMORROW, SO WE'LL COME PREPARED TO
 4    TALK ABOUT JMOL'S, BUT THEN WE'LL THEN KNOW WHO'S
 5    GOING TO TESTIFY TOMORROW.
 6              THE COURT:  LET ME GIVE YOU THE TIME
 7    ESTIMATES, BECAUSE I THINK RESTING HAS TO HAPPEN
 8    TOMORROW.
 9              APPLE HAS USED 18 HOURS AND 1 MINUTE; AND
10    SAMSUNG HAS USED 22 HOURS AND 25 MINUTES.  SO THEY
11    HAVE 2 HOURS AND 35 MINUTES LEFT.  AND I'M NOT
12    GRANTING ANY EXTENSIONS.
13              SO TOTAL COMBINING OF THE PARTIES, YOU
14    HAVE ROUGHLY SIX-AND-A-HALF HOURS LEFT.  SO THIS
15    CASE, THE EVIDENCE IS CONCLUDING THIS WEEK.  ALL
16    RIGHT?  I AM NOT EXTENDING IT TO MONDAY FOR
17    MS. KARE BECAUSE WE HAVE TOO MUCH TO DO ON MONDAY
18    AND I WON'T -- WE'LL TALK ABOUT THAT LATER.
19              SO LET ME HEAR, AND OBVIOUSLY YOU HAVE
20    UNTIL 7:00 O'CLOCK TO CHANGE YOUR MIND, BUT AT THIS
21    POINT, IS YOUR LIST STILL THE CORRECT LIST,
22    MR. VERHOEVEN, OR DO YOU HAVE DIFFERENT THOUGHTS?
23              MR. VERHOEVEN:  CAN I HAVE JUST ONE
24    SECOND, YOUR HONOR.
25              THE COURT:  SURE.
```

2939

```
 1              MR. VERHOEVEN:  YOUR HONOR, THERE'S -- WE
 2    NEED UNTIL 7:00 TO EVALUATE SOME OF THE DEPO
 3    DESIGNATIONS, WHETHER WE HAVE TIME FOR THOSE.
 4              THE COURT:  OKAY.
 5              MR. VERHOEVEN:  IN TERMS OF LIVE
 6    WITNESSES?
 7              THE COURT:  YES.
 8              MR. VERHOEVEN:  WELL, FIRST TO ANSWER
 9    YOUR QUESTION, OF COURSE WE'RE GOING TO END
10    TOMORROW --
11              THE COURT:  OKAY.
12              MR. VERHOEVEN:  -- WITH OUR
13    CASE-IN-CHIEF.
14              THE COURT:  OKAY.
15              MR. VERHOEVEN:  AND PASS TO THEIR
16    CASE-IN-CHIEF.
17              TURN TO LIVE WITNESSES, MR. SUKUMAR,
18    S-U-K-U-M-A-R.
19              THE COURT:  OKAY.
20              MR. VERHOEVEN:  O'BRIEN.
21              THE COURT:  YES.
22              MR. VERHOEVEN:  TEECE, WAGNER.
23              THE COURT:  OKAY.
24              MR. VERHOEVEN:  AND THAT'LL BE IT.  AND
25    THERE ARE SOME DEPO DESIGNATIONS WHICH ARE STILL --
```

```
 1              THE COURT:  YOU'RE THINKING ABOUT.

 2              MR. VERHOEVEN:  TRYING TO FIGURE OUT IF

 3    WE HAVE TIME.

 4              THE COURT:  OKAY.  OTHER THAN

 5    MR. NISHIBORI, ANY OTHERS THAT, OF DEPO

 6    DESIGNATIONS.

 7              MR. VERHOEVEN:  WELL, THE ONES WE'RE

 8    STILL CONSIDERING ARE MR. LUTTON, JOSWIAK, KIM.

 9              THE COURT:  OKAY.  --

10              MR. VERHOEVEN:  I MISSPOKE.  FOR THE

11    DEPOS, WE STILL HAVE UNDER CONSIDERATION ARE

12    NISHIBORI, LUTTON, JOSWIAK, SHEPPARD, AND WE STILL

13    HAVE TO MAKE A DECISION ON APPLE LIVE WITNESS

14    BECAUSE I THINK THEY NEED, THEY'RE INSISTING IT BE

15    LIVE IS EMILIE KIM.

16              WE JUST NEED TO GO BACK AND RECALCULATE

17    THE TIME AND FIGURE IT OUT, YOUR HONOR.

18              THE COURT:  OKAY.  SO THE POTENTIAL DEPO

19    DESIGNATIONS ARE NISHIBORI, LUTTON, SHEPPARD, AND

20    THERE WAS ONE MORE THAT I MISSED.

21              MR. VERHOEVEN:  JOSWIAK.

22              THE COURT:  OKAY.  JOSWIAK.

23              MR. VERHOEVEN:  YEAH, J-O-S-W-I-A-K.

24              THE COURT:  OKAY.

25              MR. VERHOEVEN:  DID I GET IT WRONG AGAIN?
```

```
 1     I'M GOING TO LET MS. MAROULIS SPEAK BECAUSE SHE

 2     KNOWS THIS BETTER THAN I DO, YOUR HONOR.

 3               THE COURT:  OKAY.

 4               MS. MAROULIS:  I'M SORRY, YOUR HONOR,

 5     JUST TO GO OVER THE LIST, WE'RE GOING TO START WITH

 6     DR. SUKUMAR, CONTINUE ON TO DR. O'BRIEN.

 7               THE COURT:  OKAY.

 8               MS. MAROULIS:  MR. TEECE, THEN WE MAY OR

 9     MAY NOT PLAY DEPOSITIONS OF MR. LUTTON AND

10     MR. JOSWIAK.

11               THE COURT:  ALL RIGHT.

12               MS. MAROULIS:  RIGHT NOW WE HAVE ON OUR

13     LIST AS AN ADVERSE WITNESS EMILIE KIM OF APPLE, AND

14     WE'RE TRYING TO DETERMINE WHETHER WE NEED TO CALL

15     HER LIVE OR NOT, AS WELL AS TIMOTHY SHEPPARD OF

16     SAMSUNG, AND FINALLY MICHAEL WAGNER, OUR DAMAGES

17     EXPERT.

18               MR. MCELHINNY:  MAY I INQUIRE, YOUR

19     HONOR?

20               THE COURT:  GO AHEAD.

21               MR. MCELHINNY:  TIMOTHY SHEPPARD,

22     MR. VERHOEVEN SAID HE MIGHT BE BY DEPOSITION.

23     TIMOTHY SHEPPARD IS AN EMPLOYEE OF SAMSUNG, SO I

24     ASSUME THEY'RE --

25
```

```
 1              MS. MAROULIS:  I JUST MENTIONED THAT HE'S
 2    GOING TO COME LIVE.
 3              MR. VERHOEVEN:  THAT'S WHY I TURNED IT
 4    OVER TO MS. MAROULIS.
 5              THE COURT:  ALL RIGHT.  SO MS. KIM MAY OR
 6    MAY NOT BE LIVE, MR. SHEPPARD WILL BE LIVE IF HE
 7    COMES.
 8              MS. MAROULIS:  THAT'S CORRECT.
 9              THE COURT:  MR. WAGNER WILL BE LIVE?
10              MS. MAROULIS:  YES, YOUR HONOR.
11              MR. VERHOEVEN:  YES.
12              THE COURT:  BUT HE'S MAYBE.
13              MR. VERHOEVEN:  NO, HE'S DEFINITE.
14              THE COURT:  OKAY.  HE'S DEFINITE.  SO THE
15    ONLY MAYBES ARE NISHIBORI, LUTTON AND JOSWIAK.
16              MS. MAROULIS:  JOSWIAK, CORRECT, YOUR
17    HONOR.
18              THE COURT:  OKAY.  NOW --
19              MR. MCELHINNY:  TO BE CLEAR, EMILIE KIM
20    WILL TESTIFY, YOUR HONOR.  EITHER THEY'RE GOING TO
21    CALL HER OR WE'RE GOING TO CALL HER.  SO IN TERMS
22    OF THE OBJECTIONS --
23              MR. VERHOEVEN:  WE'RE GOING TO --
24              MR. MCELHINNY:  IN TERMS OF THE
25    OBJECTIONS THAT ARE EXCHANGED, SHE IS ON THE LIST.
```

8943

```
 1                THE COURT:  OKAY.  BUT IF SHE IS NOT IN
 2    SAMSUNG'S CASE, WILL SHE BE IN YOUR CASE TOMORROW?
 3                MR. SELWYN:  YES, YOUR HONOR, SHE'LL BE
 4    IN OUR CASE TOMORROW.  THEY CAN THEN CROSS-EXAMINE
 5    HER.
 6                THE COURT:  SO WHAT -- TELL ME WHAT
 7    YOUR --
 8                MR. MCELHINNY:  IF THEY HAVE TIME.
 9                THE COURT:  I HAVE THE LIST THAT YOU
10    FILED LAST NIGHT.
11                WHAT IS YOUR -- MR. SELWYN, WHAT IS YOUR
12    LIST?  IS IT STILL THIS ORDER, BLEVINS --
13                MR. LEE:  I HAVE IT, YOUR HONOR.
14                MR. SELWYN:  THAT'S CORRECT, YOUR HONOR.
15                THE COURT:  NOW, KIM, IS SHE THE SUBJECT
16    OF THE MOTION TO EXCLUDE?
17                MR. LEE:  THIS IS THE SAME EMILIE KIM.
18                THE COURT:  OKAY.  IT'S THE SAME, AND
19    THEN CHAPMAN IS ALSO ON THAT LIST.
20                MS. MAROULIS:  THAT'S CORRECT, YOUR
21    HONOR.
22                THE COURT:  AND THEN DOURISH, SRIVASTAVA,
23    GIVARGIS, AND THEN DZUBAN IS THE SONY THAT'S ALSO
24    PART OF THE MOTION TO EXCLUDE.  IS THAT STILL YOUR
25    LIST?
```

```
 1              MR. LEE:  YES.  CAN I GET CLARIFICATION,

 2   YOUR HONOR?  I THINK YOU GAVE US TWO DIFFERENT

 3   NUMBERS FOR APPLE.  I THINK THE TIME WE HAVE LEFT

 4   IS 6 HOURS AND 59 MINUTES.

 5              THE COURT:  YOU'VE USED 18 HOURS AND 1

 6   MINUTE, SO WHAT DOES THAT WORK OUT?

 7              MR. LEE:  I THINK 16:59

 8              MR. VERHOEVEN:  SIXTEEN?

 9              MR. MCELHINNY:  THAT'S SEVEN HOURS WHERE

10   I COME FROM, YOUR HONOR.

11              MR. LEE:  WHY, YEAH, CLOSE TO SEVEN

12   HOURS.

13              THE COURT:  CLOSE ENOUGH.

14              MR. VERHOEVEN:  I HAVE ONE MORE THING,

15   YOUR HONOR.

16              THE COURT:  YES.

17              MR. VERHOEVEN:  AND I JUST WANT TO WARN

18   YOU, I THINK THERE'S GOING TO BE A TIDAL WAVE

19   COMING YOUR WAY IN TERMS OF OBJECTIONS BECAUSE WE

20   GOT A DISCLOSURE OF 21 REBUTTAL WITNESSES FROM

21   APPLE THAT WE'RE GOING TO HAVE TO PUT IN THE

22   MACHINERY THAT'S COMING YOUR WAY, AND I CAN'T

23   IMAGINE THAT THEY'RE -- THAT THEY WOULD, EVEN IF

24   THEY HAVE THE TIME, THAT THERE WOULD BE 21

25   WITNESSES THAT WOULD BE APPROPRIATE FOR REBUTTAL.
```

```
 1              BUT I JUST WANT TO LET YOU KNOW SO THAT
 2     YOU KNOW WHAT'S COMING YOUR WAY.  IT'S GOING TO --
 3     WE HAVE TO RESPOND TO THESE UNDER THE PROCEDURES
 4     AND SO IT'S GOING TO BE A BIG --
 5              THE COURT:  CAN THAT BE NARROWED, PLEASE.
 6              MR. MCELHINNY:  YOUR HONOR, ONE, I ENJOY
 7     HEARING MR. VERHOEVEN RAISED THE SAME ISSUE I TRIED
 8     UNSUCCESSFULLY TO RAISE YESTERDAY.
 9              BUT WE HAD TO DESIGNATE THE WITNESSES IN
10     ADVANCE OF THE HEARING WHAT THE CASE WAS.  FOR
11     EXAMPLE, THEY APPARENTLY DROPPED LUCENTE TODAY,
12     WHICH WE'LL HAVE TO DEAL WITH THAT.  SO BECAUSE OF
13     THE DESIGNATION, WE HAD TO DESIGNATE.  WE WILL
14     NARROW IT.
15              THE COURT:  OKAY.  SO AT 7:00 O'CLOCK
16     TONIGHT, YOU WILL DO A NARROWER LIST.
17              MR. MCELHINNY:  7:00 O'CLOCK TONIGHT WE
18     HAVE TO DESIGNATE EVERYBODY THAT WE'RE CALLING FOR
19     FRIDAY.
20              MS. MAROULIS:  SO WILL YOU NARROW
21     EVERYBODY ELSE?  DO WE NEED TO BRIEF THAT?  THAT'S
22     OUR QUESTION, YOUR HONOR.
23              MR. MCELHINNY:  YES, WE'RE GOING TO
24     NARROW THE LIST, YOUR HONOR.
25              THE COURT:  YOU'RE GOING TO NARROW THE
```

```
 1   LIST.
 2               MR. VERHOEVEN:  I JUST HEARD THEM, I
 3   HEARD MS. KREVANS SAY THEY'RE ONLY GOING TO HAVE TO
 4   DESIGNATE SEVEN.  IF THEY'RE CALLING WITNESSES ON
 5   FRIDAY, UNDER THE RULE, TWO DAYS NOTICE, WE NEED --
 6   WE'RE ENTITLED TO KNOW THAT.
 7               MR. MCELHINNY:  MR. VERHOEVEN WOULD BE
 8   BETTER OFF NOT LISTENING TO INTERNAL CONVERSATIONS
 9   ON OUR SIDE.  I'M SPEAKING FOR THE PARTY.
10               THE COURT:  THAT'S NOT NECESSARY.  LET'S
11   NOT GO THERE.  WE'RE ALL TIRED.
12               MR. MCELHINNY:  I'M SPEAKING FOR THE
13   PARTY, AND WE WILL NARROW THE LIST.  THAT'S WHAT I
14   SAID.
15               THE COURT:  AND OBVIOUSLY WE NEED
16   EVERYONE WHO'S GOING TO BE CALLED ON THURSDAY AND
17   FRIDAY.
18               MR. VERHOEVEN:  IS THAT GOING TO SOLVE
19   THE OBJECTION ISSUE, VICKY?
20               MS. MAROULIS:  YOUR HONOR, IT IS SIMPLY
21   WHAT WE'RE TRYING TO SAY IS THEY DESIGNATED 24
22   WITNESSES, 21 WITNESSES, 7 DEPO DESIGNATIONS AND 14
23   LIVE, SO YOUR HONOR WILL GET THE BRIEFS, THAT'S
24   ABOUT 140 PAGES LONG.  I JUST WANTED TO PUT IT OUT
25   THERE, BECAUSE WE GET THREE PAGES OF OBJECTIONS PER
```

```
 1    EACH AND IT'S GOING TO BE A LOT OF BRIEFING FOR THE
 2    COURT.  SO IF THERE'S ANYTHING THE COURT WANTS US
 3    TO DO THAT'S DIFFERENT, PLEASE LET US KNOW.
 4              THE COURT:  PLEASE DON'T DO THIS TO ME.
 5    PLEASE.  WHAT --
 6              MR. MCELHINNY:  WE WILL -- WE WILL.
 7              THE COURT:  PLEASE.  I -- YOU KNOW, I CRY
 8    UNCLE.  IT'S ENOUGH.  I MEAN.
 9              MR. MCELHINNY:  YOUR HONOR.
10              THE COURT:  PLEASE.
11              MR. MCELHINNY:  WE WILL DO WHAT'S
12    NECESSARY TO MAKE SURE THAT DOESN'T HAPPEN TO YOU.
13              THE COURT:  OKAY.  BECAUSE, AS I SAID,
14    I'VE GOT MINIMUM 2 SEALING MOTIONS, 2 ADVERSE
15    INFERENCE MOTIONS, AN EXCLUSION MOTION AND
16    OBJECTIONS ON AT LEAST 11 WITNESSES THAT I HAVE TO
17    GIVE YOU AN ORDER ON TONIGHT.
18              SO PLEASE.  AND I ALSO AT SOME POINT HAVE
19    TO WORK ON THE JURY INSTRUCTIONS.  SO CAN WE TALK
20    ABOUT THAT.
21              THIS IS MY PLAN.  I WOULD LIKE TO TRY TO
22    FILE, AFTER REVIEWING AND RULING ON YOUR DISPUTED
23    JURY INSTRUCTIONS, JURY INSTRUCTIONS ON SUNDAY.
24    AND THEN GIVE YOU AN OPPORTUNITY ON MONDAY TO NOT
25    REARGUE WHAT'S ALREADY BEEN ARGUED IN THE PAPERS,
```

8948

```
 1    PLEASE.  I'M GOING TO HAVE TO FIGURE SOMETHING OUT.

 2    EITHER I'M GOING TO HAVE TO THREATEN TO DEDUCT TIME

 3    FROM YOUR CLOSING ARGUMENTS OR SOMETHING.  THAT

 4    SEEMS TO BE THE ONLY THING THAT MOTIVATES FOLKS.

 5              BUT I MEAN, SERIOUSLY, I DON'T WANT YOU

 6    TO REARGUE ANYTHING THAT'S ALREADY BEEN ARGUED IN

 7    YOUR PAPERS.

 8              WHAT I WOULD WANT FOR THE MONDAY JURY

 9    INSTRUCTION CONFERENCE WOULD BE IF THERE IS, YOU

10    KNOW, LIKE WE FOUND SOME ACTUAL ERRORS IN THE

11    PRELIMINARY INSTRUCTIONS, LIKE THERE WAS A PATENT

12    NUMBER THAT WAS WRONG OR SOMETHING LIKE THAT.  OR

13    ON, JUST LIKE YOUR HIGHEST PRIORITY, WE'LL WORK OUT

14    SOMETHING LIKE YOUR HIGHEST PRIORITY JURY

15    INSTRUCTIONS HAVING LIMITED ORAL ARGUMENT ON THOSE.

16              MR. VERHOEVEN:  THAT'S WHAT I WAS GOING

17    TO SUGGEST.

18              THE COURT:  BUT YOU ALL FILED OVER 300

19    PAGES.  WE ARE NOT GOING TO HAVE A HEARING ON 300

20    PAGES OF DISPUTES.  WE DON'T HAVE TIME.

21              MR. VERHOEVEN:  I WOULD SUGGEST A SIMILAR

22    HIGH PRIORITY.  YOU, YOUR HONOR, OBVIOUSLY CAN

23    DECIDE HOW MUCH, BUT.

24              THE COURT:  OKAY.

25              MR. VERHOEVEN:  I'M A LITTLE BIT
```

8949

```
 1    CONCERNED THERE MIGHT BE ONE THAT SOMEHOW WE MISSED
 2    EACH OTHER IN THE BRIEFING OR SOMETHING AND IT'S
 3    REALLY IMPORTANT AND WE HAVE THE ABILITY TO TAKE A
 4    LIMITED NUMBER AND JUST SAY THREE OR FOUR OR
 5    HOWEVER MANY YOUR HONOR SAYS.
 6              THE COURT:  UM-HUM.
 7              MR. VERHOEVEN:  JUST SO THAT WE HAVE AN
 8    OPPORTUNITY TO PRESENT SOME ORAL, MAYBE PRESENT
 9    SOME CONTEXT OR SOMETHING'S HAPPENED IN THE CASE
10    THAT WE WANT TO PROVIDE AN ADDITIONAL EXPLANATION.
11    BUT IT WOULD BE LIMITED TO HPO'S.
12              THE COURT:  LET ME HEAR FROM YOU ALL.  I
13    CAN'T TELL YOU WHAT TIME ON SUNDAY I'M GOING TO BE
14    ABLE TO GET THIS FILED.
15              YOU ALL FILED 300 PAGES WORTH OF
16    INSTRUCTIONS.  I'LL TRY TO GET IT DONE AS QUICKLY
17    AS POSSIBLE ON SUNDAY.  BUT THEN DO YOU WANT TO
18    JUST HAVE ORAL ARGUMENT ON MONDAY ON YOUR HIGH
19    PRIORITY OBJECTIONS?  WHAT TIME SHOULD WE DO THAT?
20              THE OTHER THING WE NEED TO HAVE FINALIZED
21    BY MONDAY IS ALL OF THE EXHIBITS THAT ARE GOING
22    BACK TO THE JURY ROOM.  ARE THERE -- I KNOW WE'VE
23    HAD FIGHTS ON THE PHONES.  SO THERE -- DO YOU
24    ANTICIPATE MUCH DISPUTE AS TO WHAT GOES BACK IN THE
25    JURY ROOM BY WAY OF EVIDENCE?  YOU KNOW, I'VE
```

```
 1     DECIDED I'M NOT GOING TO LET ANY DEMONSTRATIVES IN,

 2     EVEN VIDEOS, BECAUSE WE'RE GOING TO GET INTO ALL

 3     THESE DISPUTES ABOUT THE VIDEOS, HAVE CLAIM

 4     CONSTRUCTION AND HAVE ATTORNEY ARGUMENT ON

 5     INFRINGEMENT, ON INVALIDITY.  WE JUST DON'T HAVE

 6     TIME AND I DON'T THINK THAT'S PRODUCTIVE.  SO NO

 7     VIDEOS, NO DEMONSTRATIVES, PERIOD, DON'T EVEN WORRY

 8     ABOUT IT.

 9              MR. VERHOEVEN:  THERE'S JUST ONE THING

10     THAT, JUST TO CLARIFY.

11              THE COURT:  YEAH.

12              MR. VERHOEVEN:  WITH RESPECT TO A VIDEO

13     THAT WAS A PIECE OF EVIDENCE, LIKE THE PRESENTATION

14     THAT WAS MADE BY MR. FIDLER THAT DEMONSTRATES --

15              THE COURT:  OH, IF IT'S -- IF IT'S --

16     OKAY.  I WOULD --

17              MR. VERHOEVEN:  DO YOU UNDERSTAND THAT?

18              THE COURT:  THAT'S ACTUALLY EVIDENCE

19     THAT'S BEEN ADMITTED.

20              WHAT I MEAN IS A DEMONSTRATIVE THAT HAD

21     BEEN CREATED BY THE ATTORNEYS IN THIS CASE THIS

22     CASE.

23              MR. VERHOEVEN:  CREATED BY THE LAWYERS,

24     GOT IT.

25              THE COURT:  ANY DEMONSTRATIVE CREATED BY
```

```
 1    ATTORNEYS IN THIS CASE TO MAKE INVALIDITY,

 2    NON-INFRINGEMENT, WHATEVER ARGUMENTS, NOT COMING

 3    IN.  OKAY?  THE JURORS WILL HAVE THE ACTUAL PHONES.

 4    THEY CAN TAKE A LOOK AT HOW IT OPERATES.  SO NO

 5    DEMONSTRATIVES, PERIOD.

 6              MR. JACOBS:  ON THE JURY INSTRUCTIONS, A

 7    COUPLE OF POINTS.

 8              THE COURT:  YES.

 9              MR. JACOBS:  NUMBER ONE, I'M NOT SURE HOW

10    YOU WANT TO TRY AND ORGANIZE THIS FOR YOURS, BUT

11    THE CASE IS ALREADY NARROWER THAN IT WAS A DAY AGO

12    BY VIRTUE OF DEFENSES THAT HAVE BEEN DROPPED OR NOT

13    PURSUED, AND I THINK AS THE COURT GOES THROUGH THE,

14    THE DEFENSES, BY THE TIME THE CASE IS OVER, SOME OF

15    THOSE INSTRUCTIONS MAY WELL DROP OUT.

16              AND SO YOUR HONOR MAY JUST WANT TO FIGURE

17    THAT OUT OR YOU MAY WANT US TO FLAG FOR YOU WHERE

18    WE THINK A PARTY HAS NOT PUT ON EVIDENCE THAT

19    ADDRESSES ONE OF THE, ONE OF THE INSTRUCTIONS.  SO

20    THAT'S ISSUE NUMBER ONE.

21              ISSUE NUMBER TWO, WE JUST NEED AN

22    OPPORTUNITY TO OBJECT ON THE RECORD SO THAT THE

23    RECORD IS PRESERVED.  AGAIN, WHATEVER PROCESS YOU

24    DESIGN FOR THAT --

25              THE COURT:  OKAY.  BUT YOU'VE ALREADY
```

1   FILED MULTIPLE DISPUTED AND JOINT JURY

2   INSTRUCTIONS.  I THINK THAT'S ENOUGH OF A RECORD

3   FOR YOU ON APPEAL.  I DON'T KNOW THERE'S ANYTHING

4   THAT SAYS YOU HAVE TO DO IT THREE, FOUR TIMES.

5            IS THERE ANYTHING THAT I CAN PUT ON THE

6   RECORD THAT ALL OF YOUR PREVIOUS OBJECTIONS ARE

7   PRESERVED.  I WILL ISSUE AN ORDER.  BUT, NO, I'M

8   NOT GOING TO HAVE YOU FILE ON SUNDAY NIGHT AT

9   2:00 A.M. 200 PAGES OBJECTING TO ALL OF MY

10  INSTRUCTIONS.

11           THERE IS ENOUGH OF A RECORD HERE.  YOU

12  JUST TELL ME WHAT YOU WANT ME TO FILE THAT SAYS ALL

13  THE PARTIES' OBJECTIONS ARE PRESERVED.  WE'RE NOT

14  GOING TO KEEP DOING THIS FOUR, FIVE, SIX TIMES.

15           MR. MCELHINNY:  I THINK -- I UNDERSTAND

16  YOUR HONOR'S POINT, AND I'M -- AGAIN, I'M NOT

17  REALLY ARGUING IT.  BUT I THINK THE APPELLATE

18  COURTS, AND PARTICULARLY THE FEDERAL CIRCUIT, HAVE

19  BEEN PRETTY TIGHT ON RULE 51 COMPLIANCE, AND WE

20  HAVEN'T SEEN YOUR INSTRUCTIONS YET.

21           AND I THINK -- YOU KNOW, MY APPELLATE

22  EXPERTS ARE GOING TO TELL ME THAT IN ORDER TO

23  PRESERVE OUR RECORD TO YOUR OBJECTIONS, WE HAVE TO

24  CALL TO YOUR ATTENTION THE SPECIFIC INSTRUCTION

25  THAT YOU ARE MAKING AND WHY IT IS ERRONEOUS.

```
 1              AND WE CAN DO THAT IN WRITTEN FORM, WE

 2      CAN -- I MEAN, AND I UNDERSTAND YOUR HONOR DOESN'T

 3      WANT ARGUMENT ON ALL OF THOSE THINGS, BUT I

 4      BELIEVE -- WE'LL HEAR TOMORROW AFTER YOU'VE THOUGHT

 5      ABOUT THIS, BUT I BELIEVE THAT THE RULE REQUIRES US

 6      TO DO THAT AND REQUIRES THE COURT TO GIVE US THE

 7      OPPORTUNITY TO DO THAT.

 8              MR. VERHOEVEN:  YOUR HONOR, MY SUGGESTION

 9      IS WE -- THIS IS THE FIRST I'VE HEARD OF THIS

10      AGAIN.  SO I SUGGEST WE LOOK AT THAT AND ADVISE THE

11      COURT TOMORROW, AND WE CAN LOOK AT IT, TOO,

12      INDEPENDENTLY AND IF WE BOTH THINK THAT'S THE CASE,

13      WE'LL PROVIDE YOU WITH THE CASE LAW OR WHATNOT.

14              ANOTHER OPTION MIGHT BE A PROFFER THAT

15      COULD JUST BE LODGED SO THAT IT WOULDN'T TAKE UP

16      THE COURT'S TIME, WHICH IS SOMETIMES COMMONLY DONE.

17              THE COURT:  I DON'T SEE WHY YOU CAN'T

18      INCORPORATE THE OBJECTIONS THAT YOU'VE MADE NOW,

19      WHAT, TWO, THREE TIMES, WHY YOU CAN'T INCORPORATE

20      AND SAY ON THAT BASIS, WE'RE OBJECTING TO THESE

21      INSTRUCTIONS.

22              MR. MCELHINNY:  I THINK -- I THINK I'M

23      REQUIRED TO OFFER TO COMPLY WITH THE RULE, YOUR

24      HONOR, AND WHETHER YOU WILL PERMIT US TO DO THAT OR

25      NOT IS GOING TO BE UP TO YOU.
```

```
 1              THE COURT:  SO WHAT'S YOUR SUGGESTION?

 2    IF I GET THESE FILED ON SUNDAY, YOU'RE GOING TO HIT

 3    ME WITH, WHAT, 200 OR 300 PAGES ON MONDAY MORNING

 4    AND THEN WE'RE SUPPOSED TO HAVE A HEARING ON MONDAY

 5    AND I'M SUPPOSED TO READ THESE TO A JURY ON TUESDAY

 6    MORNING?

 7              MR. MCELHINNY:  I DON'T WANT TO GET IN

 8    TROUBLE HERE.  THAT'S NOT MY GOAL.  I MEAN, AS YOUR

 9    HONOR KNOWS, THE RULE REQUIRES US TO RAISE THIS

10    AFTER YOU HAVE READ THE INSTRUCTIONS TO THE JURY

11    AND BEFORE THEY BEGIN TO DELIBERATE.  THAT'S WHAT

12    THE RULE TECHNICALLY REQUIRES.

13              IT GIVES YOU AUTHORITY AND POWER TO

14    CHANGE HOW THAT HAPPENS.  BUT I DO BELIEVE THAT

15    IT'S MY UNDERSTANDING --

16              THE COURT:  WELL, I DON'T KNOW ANYONE WHO

17    DOES IT THAT WAY.  YOU GET INPUT ON THE JURY

18    INSTRUCTIONS BEFORE YOU ACTUALLY READ THEM TO THE

19    JURY.

20              MR. MCELHINNY:  WE DO, YOUR HONOR.  BUT

21    AT THE END OF THE DAY, ONCE YOU HAVE MADE YOUR

22    DETERMINATION WHAT INSTRUCTIONS YOU'RE GOING TO

23    GIVE, I BELIEVE WE HAVE TO PRESERVE OUR, OUR CLAIMS

24    OF ERROR, YOUR HONOR.

25              I'M REFERRING, YOUR HONOR, TO RULE 51C.
```

```
 1                THE COURT:  I KNOW.  I'M LOOKING AT IT.

 2                (PAUSE IN PROCEEDINGS.)

 3                MR. MCELHINNY:  MAY I JUST MAKE A

 4      SUGGESTION?

 5                THE COURT:  WHAT'S THAT?

 6                MR. MCELHINNY:  HOPEFULLY A HELPFUL ONE.

 7      WHY DON'T WE TALK TO SAMSUNG ABOUT HOW THEY WANT TO

 8      DO THIS, BECAUSE I THINK IF WE COULD REACH A

 9      STIPULATION ON HOW TO DO THIS, AN AGREEMENT,

10      ABIDING BY THAT PROCESS WOULD PRESERVE EVERYBODY'S

11      OBJECTIONS AND WE COULD OFFER IT TO YOUR HONOR AND

12      SEE IF IT WORKS FOR YOUR HONOR.

13                THE COURT:  I WOULD -- I WOULD APPRECIATE

14      THAT, BECAUSE, I MEAN, WE'RE GETTING ORDERS OUT AS

15      QUICKLY AS WE CAN.  WE GOT SIX ORDERS OUT ON MONDAY

16      NIGHT.  THERE IS JUST A HUMAN LIMIT TO WHAT, YOU

17      KNOW, A RAG TAG TEAM CAN DO COMPARED TO YOUR

18      LEGIONS OF LAWYERS.

19                AND SO, YOU KNOW, IF YOU WANT, FINE, THEN

20      YOU KNOW WHAT, LET'S DO THIS LEISURELY, I'M GOING

21      TO JUST POSTPONE ANY DELIBERATION, LET'S TAKE A

22      WEEK OR TWO TO FIGURE OUT THESE JURY INSTRUCTIONS

23      AND BRIEF IT AS MUCH AS YOU WANT.  MAYBE IN A WEEK

24      OR TWO I'LL HAVE TIME TO FINALIZE THE JURY

25      INSTRUCTIONS, AND WE'LL HAVE THE JURY DELIBERATE IN
```

6956

```
1    A WEEK OR TWO.
2              YOU KNOW, I'M TRYING TO DO THIS AS
3    EXPEDITIOUSLY AS HUMANLY POSSIBLE WITH THE
4    RESOURCES THAT I HAVE AND YOU ALL KEEP BRIEFING AND
5    KEEP BRIEFING THE SAME ISSUES.
6              YOU'VE ALREADY BRIEFED YOUR OBJECTIONS TO
7    THESE JURY INSTRUCTIONS A MINIMUM OF TWICE.  A
8    MINIMUM OF TWICE.  AND NOW YOU'RE SAYING YOU NEED
9    THREE OR FOUR.  THAT'S WHAT I'M HEARING.
10             SO I'M ASSUMING THAT WHATEVER OBJECTIONS
11   OR INSTRUCTIONS APPLE IS NOW SAYING ARE NO LONGER
12   RELEVANT BECAUSE THE DEFENSES HAVE BEEN WAIVED ARE
13   GOING TO BE OBJECTED TO BY SAMSUNG AND VICE-VERSA;
14   IS THAT CORRECT?
15             MR. JACOBS:  THAT WOULD BE ONE --
16             THE COURT:  WHAT ARE YOU TALKING ABOUT?
17             MR. JACOBS:  THAT WOULD BE ONE POTENTIAL
18   PROCESS.  I WAS REALLY THINKING OF TRYING TO TRIPLE
19   THE AMOUNT OF TIME THE JURY HAS TO SPEND LISTENING
20   TO THESE IF THERE REALLY ISN'T A DEFENSE THAT'S
21   BEEN DEVELOPED BY A PARTY.
22             THE COURT:  OKAY.  SO CAN YOU TELL ME,
23   LIKE, WHAT DO YOU HAVE IN MIND?
24             MR. JACOBS:  WELL, WE JUST HEARD, FOR
25   EXAMPLE, THAT THERE'S NO OBVIOUSNESS DEFENSE ON
```

```
 1    SEVERAL OF THESE PATENTS.  THAT'S WHAT COMES TO

 2    MIND FROM THE TESTIMONY WE JUST HEARD.

 3            NOW, WHETHER WHEN WE TRACE THROUGH THE

 4    INSTRUCTIONS THAT WILL APPLY ACROSS THE BOARD, I

 5    THINK WE'D HAVE TO SIT DOWN AND FIGURE THAT OUT.

 6            THE COURT:  WELL, I HAVEN'T LOOKED AT THE

 7    DRAFT INSTRUCTIONS THAT YOU ALL FILED ON MONDAY.

 8            DOES IT HAVE, FOR EXAMPLE, ANY

 9    OBVIOUSNESS INSTRUCTION ACTUALLY IDENTIFYING

10    SPECIFIC PATENTS OR NOT?

11            MR. JACOBS:  I DON'T RECALL.

12            MS. MAROULIS:  YOUR HONOR, I THINK

13    THERE'S A GENERAL INSTRUCTION FROM THE NORTHERN

14    DISTRICT OF CALIFORNIA MODEL.

15            THE COURT:  SO IF IT'S A GENERAL

16    INSTRUCTION ON THE LAW, WHY DOES IT MATTER?

17            MR. JACOBS:  AND MAYBE THAT'LL BE THE END

18    OF THIS, YOUR HONOR.  I DO HAVE THE IMPRESSION,

19    HAVING GONE THROUGH THE INSTRUCTIONS THE OTHER DAY

20    OF JUST MAKING A MENTAL NOTE THAT, GEE, I WONDER IF

21    THAT ONE WILL NEED TO BE GIVEN.  I DON'T HAVE

22    ANYTHING SPECIFIC FOR YOUR HONOR, AND IF IT TURNS

23    OUT I'M WRONG, THEN I'M WRONG.

24            THE COURT:  WHEN WILL YOU KNOW WHETHER

25    YOU BELIEVE THAT CERTAIN ONES ARE NOW MOOT OR
```

```
 1    OBSOLETE AND NO LONGER NECESSARY?

 2              MR. JACOBS:  I THINK WE WILL KNOW BY THE

 3    CLOSE OF EVIDENCE, THAT SOUNDS LIKE AN OBVIOUS.

 4              THE COURT:  THAT'S WHY IT'S GOT TO BE

 5    FRIDAY.  IT CANNOT BE MONDAY.  OKAY.  IT CANNOT BE

 6    MONDAY.

 7              MR. JACOBS:  IS MAYBE --

 8              THE COURT:  WE ARE NOT WAITING FOR

 9    MS. KARE UNTIL MONDAY.

10              MR. JACOBS:  NO, WE UNDERSTAND THAT, YOUR

11    HONOR.  WE'VE WORKED THAT OUT.

12              THE COURT:  OKAY.

13              MR. JACOBS:  MY SUGGESTION WOULD BE THAT

14    ON SATURDAY --

15              THE COURT:  THAT'S.  I'M SORRY, THAT'S

16    JUST NOT ENOUGH TIME.

17              MR. JACOBS:  WE'D LIKE TO GIVE YOU WHICH

18    ONES WE DON'T THINK YOU NEED TO GIVE.  THAT'S ALL

19    WE WOULD BE DOING.

20              MR. VERHOEVEN:  YOUR HONOR, I KNOW I

21    SOUND LIKE A BROKEN RECORD, BUT I THOUGHT THAT I

22    HEARD MR. MCELHINNY TRYING TO AGREE THAT MAYBE THEY

23    SHOULD MEET AND CONFER WITH US ABOUT THIS PROCEDURE

24    AND I THINK THAT'S THE BEST THING TO DO AND COME

25    BACK TOMORROW.  WE'LL RESEARCH THE LAW AND FIGURE
```

8959

```
 1    OUT WHETHER WE AGREE THAT THIS -- THAT ANOTHER

 2    POUND OF PAPER NEEDS TO BE FILED AND SEE IF WE

 3    CAN'T COME UP WITH SOMETHING THAT WOULD BE USEFUL

 4    TO THE COURT RATHER THAN HEARING ALL THIS STUFF FOR

 5    THE FIRST TIME.

 6             THE COURT:  OKAY.  I WOULD APPRECIATE

 7    THAT.  MY GUESS IS THAT IF ONE SIDE SAYS A DEFENSE

 8    OR SOMETHING HAS BEEN WAIVED, THERE'S NOT GOING TO

 9    BE AGREEMENT ON THE OTHER SIDE.  SO WE'RE GOING TO

10    HAVE A WHOLE OTHER DISPUTE.  MAYBE THAT'S ONE OF

11    YOUR PRIORITY OBJECTIONS THAT YOU GIVE ON MONDAY.

12    SO -- ALL RIGHT.  LET'S THINK ABOUT EXHIBITS.

13             HAVE YOU HAD ANY -- OTHER THAN WHAT WE'VE

14    SEEN ABOUT THE SURREAL THINGS WE'VE SEEN ABOUT THE

15    PHONE-GATE, OR WHATEVER YOU WANT TO CALL IT, HAVE

16    YOU HAD ANY FURTHER DISPUTES ABOUT WHAT EXHIBITS

17    HAVE BEEN ADMITTED?  OR HAS THERE LARGELY BEEN

18    AGREEMENT AS TO THAT?

19             MR. VERHOEVEN:  MS. MAROULIS SHOULD SPEAK

20    TO THIS.

21             THE COURT:  YES.

22             MS. MAROULIS:  YES, YOUR HONOR, WE'VE

23    BEEN WORKING ON THE DAILY ADMITTED LIST AND IT'S

24    LARGELY FINE.

25             THE DISPUTES ARE IN THE AREA OF LIMITING
```

```
 1    INSTRUCTIONS, BUT WE'RE NARROWING IT DOWN BECAUSE
 2    PEOPLE ARE DISAGREEING AS TO WHEN AND WHAT SHOULD
 3    BE GIVEN.
 4          THE COURT:  AND LIMITING INSTRUCTIONS, I
 5    HAVE MY OWN RECORD ON THAT AND HOPEFULLY CAN
 6    RESOLVE THAT DISPUTE AND HOPEFULLY THE TRANSCRIPT
 7    RESOLVES THAT DISPUTE.
 8          OKAY, GOOD, BECAUSE BY MONDAY WE NEED TO
 9    NOT ONLY RESOLVE THE JURY INSTRUCTIONS, BUT RESOLVE
10    ANY DISPUTES OVER EXHIBITS.
11          MS. MAROULIS:  DOES THE COURT WANT THEM
12    IN BINDERS OR RED WELLS FOR THE JURY?
13          THE COURT:  WHAT DO YOU THINK WOULD BE --
14    PROBABLY BINDERS I'M THINKING.
15          MS. MAROULIS:  BINDERS FOR THE PAPER
16    COPIES AND RED WELLS FOR THE PHYSICAL EXHIBITS.
17          THE COURT:  THAT'S FINE.  OKAY.  SO THEN
18    WE'LL FIGURE OUT WHAT TIME DO WE NEED TO MEET ON
19    MONDAY TO GET BOTH EXHIBITS COMPLETELY, YOU KNOW, I
20    WANT TO MAKE SURE EVERYBODY IS IN AGREEMENT, AND
21    ALSO JURY INSTRUCTIONS?  IDEALLY WHAT I'D LIKE TO
22    DO IS HAVE THE ARGUMENT, MAKE WHATEVER REVISIONS,
23    AND THEN WHEN I HAVE A FINAL VERSION, MAYBE I'LL
24    JUST -- I'D LIKE TO HAVE EVERYONE READ THE FINAL
25    VERSION AND CATCH ANY ERRORS, TYPOS, WHATEVER.
```

```
 1                SO WHY DON'T YOU TALK ABOUT WHAT TIME IT

 2     MAKES SENSE, PERHAPS WE SHOULD HAVE OUR MEETING IN

 3     THE MORNING SO THAT WE CAN TURN AROUND ANOTHER

 4     DRAFT, SEND THAT, YOU KNOW, REVISED DRAFT BACK TO

 5     YOU, AND YOU CAN GIVE FURTHER COMMENT BECAUSE

 6     THERE'S PROBABLY GOING TO BE INADVERTENT ERRORS IN

 7     THERE THAT I WANT YOU ALL TO CATCH.

 8                MR. VERHOEVEN:  THAT SOUND GOOD.

 9                THE COURT:  OKAY.  SO WE'LL FIGURE OUT

10     WHAT TIME TOMORROW WE SHOULD MEET.

11                MR. LEE, WERE YOU GOING TO SAY SOMETHING?

12                MR. LEE:  ONE SORT OF RELATED QUESTION.

13     DO YOU WANT US TO SET A TIME TO EXCHANGE

14     DEMONSTRATIVES FOR CLOSING SO THAT WE CAN HAVE OUT,

15     BEFORE TUESDAY, ANY ISSUES WITH YOUR HONOR IF THERE

16     ARE ANY.

17                THE COURT:  THAT'S TRUE.

18                MR. VERHOEVEN:  MY SUGGESTION IS WE MEET

19     AND CONFER AND REPORT BACK ON OUR VIEWS ON THAT

20     TOMORROW, YOUR HONOR.

21                THE COURT:  OKAY.

22                MR. VERHOEVEN:  SEE IF WE CAN'T WORK IT

23     OUT AMONGST OURSELVES.

24                MR. LEE:  WE HAVE TO ALLOW YOU ENOUGH

25     TIME IF THERE ARE ANY DISPUTES --
```

```
 1              THE COURT:  I KNOW, AND IT'S GOING TO BE
 2    A PRETTY IMPACTED FEW DAYS JUST FOR THE JURY
 3    INSTRUCTIONS.  IT'S GOING TO BE TIME CONSUMING.  SO
 4    AS MUCH TIME AS YOU CAN GIVE ME UNDERSTANDING THAT
 5    MONDAY IS GOING TO BE PRETTY FULL TRYING TO
 6    FINALIZE THE JURY INSTRUCTIONS.
 7              MR. LEE:  WE'LL TRY TO WORK SOMETHING
 8    OUT.
 9              WHAT ELSE DO WE NEED TO SORT OF PLAN
10    AHEAD ON?  ANYTHING ELSE?
11              MR. VERHOEVEN:  I DON'T HAVE ANYTHING
12    ELSE ON THAT FRONT, BUT I DID WANT TO DELIVER TO
13    THE COURT THE -- I UNDERSTAND THERE'S AN ISSUE
14    ABOUT WHETHER THIS COMES IN OR NOT, BUT THE SCREEN
15    SHOTS THAT I SAVED AND MARKED, I THINK THE COURT
16    SHOULD HAVE THAT FOR THE RECORD.
17              THE COURT:  THANK YOU.  I'M NOT GOING TO
18    ADMIT THAT.
19              MR. VERHOEVEN:  I JUST WANTED TO GIVE IT
20    TO YOU.
21              THE COURT:  YES, I DO WANT TO KEEP IT AS
22    PART OF THE RECORD.
23              MR. VERHOEVEN:  WHAT I'VE DONE IS I PUT A
24    POST-IT.  TWO OF THESE ARE SEALED, ARE DOCUMENT
25    THAT ARE SEALED.
```

```
 1              THE COURT:  YES, WE'LL LODGE THAT.

 2              MR. VERHOEVEN:  HOW MANY COPIES, YOUR

 3    HONOR?

 4              THE COURT:  LET ME ASK MR. RIVERA.

 5              THE CLERK:  I THINK WE'VE BEEN KEEPING

 6    TWO.

 7              MR. VERHOEVEN:  TWO COPIES, AND I'LL

 8    DELIVER ONE TO OPPOSING COUNSEL.

 9              THE COURT:  THANK YOU.  AND DO WE HAVE

10    THE PHOTOS NOW OF HOWARTH AND WHOEVER THE LAST --

11              THE CLERK:  WE NEED HOWARTH, VAN DAM.

12              THE COURT:  HOWARTH, VAN DAM, AND GRAY.

13              THE CLERK:  WE JUST NEED HOWARTH AND

14    VAN DAM.

15              THE COURT:  YEAH, HOWARTH AND VAN DAM, DO

16    YOU HAVE THOSE?  OTHERWISE IF YOU COULD GIVE THEM

17    TO US TOMORROW -- OH.

18              MR. JOHNSON:  I THINK THE ONLY ONE WE'RE

19    MISSING IS PROFESSOR VAN DAM, AND WE WILL --

20              THE COURT:  OKAY.  JUST TOMORROW, PLEASE.

21              AND THEN MR. RIVERA WILL PASS THOSE OUT

22    TO THE JURY TOMORROW MORNING.

23              THE CLERK:  YES, YOUR HONOR.

24              THE COURT:  ALL RIGHT.  WHAT ELSE?

25    ANYTHING ELSE?
```

1          MR. MCELHINNY:  YOUR HONOR HAS BEEN

2    MENTIONING JURY INSTRUCTIONS.  THERE'S THE QUESTION

3    ON OUR HAND IF YOU'RE USING THAT AS SHORTHAND FOR

4    JURY INSTRUCTIONS AND VERDICT FORM.

5          THE COURT:  YEAH, I KNOW.  I GUESS WE

6    SHOULD PROBABLY MAKE THAT THE SAME PROCESS.  I'M

7    ASSUMING I NEED TO REALLY GET THE JURY INSTRUCTIONS

8    WORKED OUT FIRST BEFORE I CAN FINALIZE THE VERDICT

9    FORM, BUT I'LL TRY TO ALSO FILE THAT ON SUNDAY, AND

10   IF YOU ALL CAN WORK OUT A MECHANISM TO -- SOME

11   LIMITED, I'M JUST THINKING IF IT WOULD BE HELPFUL

12   TO HAVE SOME LIMITED OF A FILING IN ADDITION TO THE

13   ORAL ARGUMENT, BUT IT WOULD HAVE TO BE REALLY,

14   REALLY LIMITED, WHETHER THAT WOULD BE HELPFUL OR

15   NOT.

16          LET ME THINK ABOUT THAT AND IF YOU ALL,

17   TOO, WOULD -- I WOULD GREATLY APPRECIATE IT IF YOU

18   WOULD -- IF IT'S LARGELY GOING TO BE A REPEAT OF

19   THE ARGUMENTS THAT WERE IN THE PREVIOUS DISPUTED

20   JURY INSTRUCTIONS OR THE DISPUTED INSTRUCTIONS THAT

21   YOU FILED ON MONDAY, IT'S NOT GOING TO BE HELPFUL.

22   SO -- OKAY.  WHAT ELSE?  ANYTHING ELSE FOR TODAY?

23          MR. VERHOEVEN:  NOTHING FOR SAMSUNG, YOUR

24   HONOR.

25          MR. MCELHINNY:  NOTHING FOR APPLE, YOUR

1    HONOR.   THANK YOU.

2                THE COURT:   OKAY.   ALL RIGHT.   THANK YOU

3    ALL.

4                (WHEREUPON, THE EVENING RECESS WAS

5    TAKEN.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6            WE, THE UNDERSIGNED OFFICIAL COURT

7   REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

8   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

9   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT,

12  CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

13  CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

14  SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

15  HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16  TRANSCRIPTION TO THE BEST OF OUR ABILITY.

17

18                        /S/
                          _____
19                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
20

21                        /S/
                          _____
22                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074
23

24
                          DATED:  AUGUST 15, 2012
25