1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6  CORPORATION,                )
                               )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,      )
                               )  AUGUST 16, 2012
8         VS.                  )
                               )  VOLUME 10
9  SAMSUNG ELECTRONICS CO.,    )
   LTD., A KOREAN BUSINESS     )  PAGES 2966-3386
10 ENTITY; SAMSUNG             )
   ELECTRONICS AMERICA,        )
11 INC., A NEW YORK            )
   CORPORATION; SAMSUNG        )
12 TELECOMMUNICATIONS          )
   AMERICA, LLC, A DELAWARE    )
13 LIMITED LIABILITY           )
   COMPANY,                    )
14                             )
              DEFENDANTS.      )
15 _____

16         TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE LUCY H. KOH
17        UNITED STATES DISTRICT JUDGE

18

19

20         APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24                         IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
 3                                MICHAEL A. JACOBS
                                  RACHEL KREVANS
 4                           425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:              HALE AND DORR
 7                        BY:  WILLIAM F. LEE
                          60 STATE STREET
 8                        BOSTON, MASSACHUSETTS  02109

 9                        BY:  MARK D. SELWYN
                          950 PAGE MILL ROAD
10                        PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                           OLIVER & HEDGES
12                         BY:  CHARLES K. VERHOEVEN
                           50 CALIFORNIA STREET, 22ND FLOOR
13                         SAN FRANCISCO, CALIFORNIA  94111

14                         BY:  VICTORIA F. MAROULIS
                                KEVIN P.B. JOHNSON
15                         555 TWIN DOLPHIN DRIVE
                           SUITE 560
16                         REDWOOD SHORES, CALIFORNIA  94065

17                         BY:  MICHAEL T. ZELLER
                                WILLIAM C. PRICE
18                         865 SOUTH FIGUEROA STREET
                           10TH FLOOR
19                         LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

```
1                    INDEX OF WITNESSES

2       DEFENDANT'S

3       TIMOTHY SHEPPARD
             DIRECT EXAM BY MR. PRICE          P. 3001
4            CROSS-EXAM BY MR. JACOBS          P. 3012

5       MICHAEL WAGNER
             DIRECT EXAM BY MR. PRICE          P. 3018
6            CROSS-EXAM BY MR. JACOBS          P. 3057
             REDIRECT EXAM BY MR. PRICE        P. 3073
7
        RAMAMIRTHAM SUKUMAR
8            DIRECT EXAM BY MS. MAROULIS       P. 3092
             CROSS-EXAM BY MR. SELWYN          P. 3095
9
        VINCENT O'BRIEN
10           DIRECT EXAM BY MS. MAROULIS       P. 3101
             CROSS-EXAM BY MR. SELWYN          P. 3113
11
        DAVID TEECE
12           DIRECT EXAM BY MS. MAROULIS       P. 3123
             CROSS-EXAM BY MR. MUELLER         P. 3141
13

14      PLAINTIFF'S REBUTTAL:

15      TONY BLEVINS
             DIRECT EXAM BY MR. LEE            P. 3164
16
        EMILIE KIM
17           DIRECT EXAM BY MR. SELWYN         P. 3173
             CROSS-EXAM BY MR. JOHNSON         P. 3185
18
        PAUL DOURISH
19           DIRECT EXAM BY MR. SELWYN         P. 3188

20      TONY GIVARGIS
             DIRECT EXAM BY MR. SELWYN         P. 3220
21
        MANI SRIVASTAVA
22           DIRECT EXAM BY MR. SELWYN         P. 3287
             CROSS-EXAM BY MR. JOHNSON         P. 3317
23           REDIRECT EXAM BY MR. SELWYN       P. 3320

24      HYONG KIM
             DIRECT EXAM BY MR. LEE            P. 3322
25
```

1                        INDEX OF EXHIBITS

2                                   MARKED          ADMITTED

3     PLAINTIFF'S

4     180                                           3016
      186                                           3067
5     195                                           3070
      35                                            3071
6     80                                            3144
      121                                           3203
7     112                                           3206
      125                                           3234
8     117                                           3235
      116                                           3236
9     91                                            3246
      119                                           3307
10    118                                           3308
      120                                           3309
11

12

13    DEFENDANT'S

14

15    676                                           3004
      753                                           3008
      754.502, PAGE 2                               3026
16    781                                           3032
      1018                                          3037
17    69                                            3043
      78                                            3169
18    647                                           3185
      648                                           3186
19

20

21

22

23

24

25

1

2

SAN JOSE, CALIFORNIA                    AUGUST 16, 2012

3                 P R O C E E D I N G S

4            (WHEREUPON, THE FOLLOWING PROCEEDINGS

5     WERE HELD OUT OF THE PRESENCE OF THE JURY:

6            THE COURT:  A COUPLE OF ISSUES.  THE

7     PROFFER OF MR. WAGNER ON HYPOTHETICAL DESIGN

8     AROUND, THAT LOOKS FINE.  APPLE'S OBJECTION IS

9     OVERRULED.

10            WITH REGARD TO SAMSUNG'S PROPOSED

11     REDACTIONS TO DX 630 AND 631, 631 LOOKS FINE, BUT

12     ON 630, SOME OF THE TERMS OF THE LICENSE WERE

13     REDACTED, THE DURATION, AND THAT SHOULD BE

14     UNREDACTED.

15            MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

16     WE'LL GO WITH APPLE'S PROPOSED REDACTIONS, THE ONES

17     IN THE LAST COLUMN.

18            THE COURT:  ALL RIGHT.

19            MS. MAROULIS:  AND WITH THAT, YOUR HONOR,

20     PERMIT ME FOR A SECOND, WHEN WE SHOW 631 AND 630 TO

21     THE JURY, ONLY THE COURT, THE JURY AND THE WITNESS

22     WILL SEE THE FULL VERSION, AND THEN THE PUBLIC AND

23     OTHERS WILL BE GIVEN THE REDACTED VERSION.

24            THE COURT:  THAT'S FINE.

25            OKAY.  WITH REGARD TO THE EXHIBITS, HOW

```
 1    DO YOU ALL PLAN TO DO THAT?  ARE YOU GOING TO AGREE

 2    ON -- ARE YOU GOING TO TAKE WHAT'S BEEN USED WITH

 3    THE WITNESSES OR ARE YOU JUST GOING TO COME UP WITH

 4    YOUR OWN NEW SET AND BRING THAT?  DO YOU KNOW WHAT

 5    I'M SAYING?  I'D LIKE ONE COMPLETE SET OF

 6    EVERYTHING IN THE BINDERS.

 7            ARE YOU GOING TO BASICALLY MAKE A NEW ONE

 8    THAT YOU STIPULATE TO, OR WHAT'S THE PROCESS?

 9            MS. MAROULIS:  WE'LL WORK TOGETHER.

10    MR. JACOBS, AND I JUST DISCUSSED THAT BEFORE THE

11    HEARING STARTED.  WE'LL GET TOGETHER, FIGURE OUT A

12    SET, AND GIVE THE COURT ONE COMBINED SET.

13            THE COURT:  OKAY.  AND WHEN, WHEN --

14            MR. JACOBS:  WE THOUGHT WE WOULD GET OUR

15    TEAMS TOGETHER ON SATURDAY TO GO OVER THE EXHIBITS

16    ONE BY ONE AND THEN REPORT BACK TO THE COURT.

17            DOES THAT WORK FOR YOU?

18            THE COURT:  THAT'S FINE.  I GUESS IF

19    THERE ARE ANY DISPUTES, WE'D NEED TO RESOLVE THEM

20    ON MONDAY, SO THEN DO YOU WANT TO JUST BRING THE

21    SET IN ON MONDAY, OR WHAT WOULD YOU PREFER?

22            MS. MAROULIS:  YES, YOUR HONOR, WE'LL DO

23    THAT.

24            MR. JACOBS:  THAT'S FINE.

25            THE COURT:  SO THEN WE'LL DO JOINT
```

```
1    EXHIBITS AND JURY INSTRUCTION CONFERENCE ON MONDAY.
2             MS. MAROULIS:  THANK YOU.
3             THE COURT:  OKAY.  ON THE EXHIBIT LIST,
4    THANK YOU FOR FILING A NEW ONE.  FOR E-MAILS, CAN
5    YOU PUT DATES OF THE E-MAILS ON THERE, PLEASE?
6             MS. MAROULIS:  YES.
7             THE COURT:  OKAY.  WHAT DID YOU ALL
8    DECIDE AS TO THE PHOTOGRAPHS OF YOUR WITNESSES?
9             THERE WAS THAT REQUEST FROM I THINK IT
10   WAS EE TIMES, WAS THAT IT, MR. RIVERA?
11            THE CLERK:  EE TIMES, YES, YOUR HONOR.
12            THE COURT:  FOR THE WITNESS PHOTOS, WHAT
13   DID YOU ALL DECIDE?
14            MR. JACOBS:  OUR THOUGHT, YOUR HONOR, WAS
15   IT'S UP TO THE WITNESSES.  IT'S THEIR EXPECTATIONS
16   THAT WE WERE MOST CONCERNED ABOUT.  PEOPLE COME AND
17   TESTIFY, THEY KNOW THE GROUND RULES ARE THAT
18   THERE'S NO PHOTOGRAPHS IN THE COURTROOM, AT MOST
19   THEY WILL BE DRAWN MOST EXCELLENTLY BY THE
20   COURTROOM ARTIST.
21            SO IF THERE WERE SUCH A REQUEST THAT YOUR
22   HONOR WISHED US TO EXECUTE ON, WE WOULD GO BACK AND
23   TO THE WITNESSES AND ASK THEM IF THEY HAVE PROBLEMS
24   WITH THEIR PHOTOGRAPHS BEING PROVIDED TO THE MEDIA.
25            THE COURT:  OKAY.  I WOULD LIKE US TO NOT
```

```
1    BE THE INTERMEDIARY, SO CAN WE JUST TELL THE

2    JOURNALIST THAT HE SHOULD CONTACT THE PARTIES

3    DIRECTLY TO SEE IF ANY OF YOUR WITNESSES ARE

4    WILLING TO HAVE THEIR PHOTO PROVIDED?

5              MR. JACOBS:  THAT'S PERFECT, YOUR HONOR.

6              THE COURT:  IS THAT OKAY?

7              MR. JOHNSON:  THAT'S FINE, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  SO THAT'S WHAT

9    WE'LL DO.

10             AND I THINK THAT'S FAIR, BECAUSE THERE IS

11   NO PHOTOGRAPHING IN THE COURTHOUSE AND, YOU KNOW,

12   FOLKS ARE FREE TO SEE THE WITNESSES HERE IN THE

13   CEREMONIAL COURTROOM, AND ALSO THE OVERFLOW ROOM

14   HAS A VIDEO OF THE WITNESSES AS THEY'RE TESTIFYING.

15             SO, YOU KNOW, BASED ON OUR SPACE

16   CONSTRAINTS, WE'VE DONE WHAT WE CAN TO ALLOW AS

17   MANY PEOPLE AS POSSIBLE TO SEE THE WITNESSES AND

18   THEN IT'S REALLY UP TO THE WITNESSES THEMSELVES.

19             OKAY.  WITH REGARD TO THE JURY

20   INSTRUCTIONS, ARE YOU STILL MEETING AND CONFERRING

21   ON A PROCESS, OR -- DO YOU WANT TO DISCUSS IT NOW?

22   I HAVE ALSO SOME THOUGHTS ABOUT WHAT WOULD BE MOST

23   HELPFUL.

24             THERE ARE CERTAIN INSTRUCTIONS THAT WERE

25   PROPOSED THAT MAY NO LONGER BE NECESSARY AND THAT
```

 1    WOULD BE HELPFUL, AND I'LL JUST GIVE YOU TWO

 2    EXAMPLES ON THE DESIGN PATENTS.

 3            ONE IS INSTRUCTION NUMBER 37 ON STATUTORY

 4    BARS.  I THINK WHAT WOULD BE HELPFUL IS -- AND

 5    MAYBE WE CAN DO THIS ON A ROLLING BASIS, IF I COULD

 6    FILE A LIST OF WHAT THINGS WE NEED TO KNOW WHAT

 7    EVIDENCE HAS BEEN INTRODUCED INTO THE RECORD TO

 8    SUPPORT THE GIVING OF THIS INSTRUCTION, AND THEN

 9    WHOEVER IT IS THAT WANTS THAT INSTRUCTION CAN GIVE

10    CITATIONS EITHER TO THE TRIAL TRANSCRIPTS OR TO

11    SPECIFIC EXHIBITS THAT SUPPORT THE GIVING AFTER

12    THAT INSTRUCTION.

13            SO JUST RIGHT OFF THE BAT, INSTRUCTION

14    NUMBER 37 ON STATUTORY BARS; INSTRUCTION NUMBER 36

15    ON THE DATE OF THE INVENTION OF THE DESIGN PATENT

16    BEING SOMETHING OTHER THAN THE FILING OF THE PATENT

17    APPLICATION.

18            SO I THINK 37 GOES TO SAMSUNG, 36 GOES TO

19    APPLE.

20            CAN YOU FILE, BY TIME -- I REALLY DON'T

21    RECALL ANYTHING COMING IN AS TO EITHER OF THESE

22    INSTRUCTIONS, AND I'M INCLINED NOT TO GIVE THEM.

23            BUT YOU CAN PERSUADE ME OTHERWISE IF YOU

24    CAN POINT TO SOMETHING THAT HAS COME IN THAT WOULD

25    BE RELEVANT TO THESE TWO.

 1              SO CAN YOU FILE THAT BY -- WHAT TIME CAN

 2     YOU FILE THAT BY?  AND I DON'T REALLY NEED ANY

 3     ARGUMENT.  I JUST NEED, YOU KNOW, JULY 31, PAGE 7,

 4     LINES WHATEVER TO WHATEVER, EXHIBIT, YOU KNOW, PX,

 5     DX, WHATEVER.  THAT'S ALL.

 6              MR. JACOBS:  WITH THIS ADVANCED NOTICE,

 7     YOUR HONOR, WE CAN DO IT AT ANY TIME LATE TONIGHT

 8     OR EARLY TOMORROW MORNING, WHATEVER YOU LIKE.

 9              THE COURT:  OKAY.  CAN WE SAY TOMORROW

10     MORNING, AND WHAT WE CAN DO IS CONTINUE TO GIVE YOU

11     ALL NOTICE AS TO -- I THINK THAT WOULD BE -- I

12     MEAN, YOU'VE LAID OUT ALL OF YOUR PROPOSALS FOR

13     CHANGES THAT YOU WANT AND YOUR REASONS, SO I THINK

14     THAT'S COMPREHENSIVELY BRIEFED.

15              I THINK THE HARDER QUESTION IS GOING TO

16     BE, IS THIS REALLY AN INSTRUCTION THAT WE NEED TO

17     GIVE OR DOES IT NOW NEED TO BE TWEAKED BECAUSE THE

18     EVIDENCE CAME IN DIFFERENTLY OR DIDN'T COME IN.

19              SO WE CAN, ON THIS SORT OF ROLLING BASIS,

20     DO THAT AND ASK YOU TO THEN FILE A RESPONSE, AND IT

21     COULD BE THAT ULTIMATELY THESE ARE JUST ONES THAT

22     WILL BE WITHDRAWN.

23              I'M ALSO HAPPY IF YOU LET ME KNOW YOU'RE

24     WITHDRAWING THE PROPOSAL AS WELL.

25              SO WHY DON'T, AT LEAST FOR THESE TWO, CAN

```
 1    YOU FILE SOMETHING BY 8:00 O'CLOCK TOMORROW,

 2    PLEASE.

 3              MR. JACOBS:  YES, YOUR HONOR.

 4              THE COURT:  WHAT ELSE COMES TO MIND?  YOU

 5    ALL KNOW THESE CASES BETTER THAN I DO.  WHAT ELSE

 6    COMES TO MIND AS TO EITHER SOMETHING YOU'VE

 7    PROPOSED THAT YOU'RE NOW SORT OF NOT PURSUING, OR

 8    YOU THINK THE OTHER SIDE PROPOSED AND DOESN'T

 9    APPEAR TO BE PURSUING ANYMORE?  THAT'S KIND OF

10    ALONG THE LINES OF THESE, YOU KNOW, THE STATUTORY

11    BAR AND TRYING TO MOVE UP THE PRIORITY DATE ON THE

12    DESIGN PATENTS.

13              ANYTHING ELSE THAT YOU CAN THINK OF?

14              MR. JACOBS:  I FLAGGED A FEW YESTERDAY.

15              THE COURT:  AND I FORGET WHAT THEY WERE.

16              MR. JACOBS:  BUT SOME OF THE SERVICES

17    HAVE EFFECTIVELY BEEN ABANDONED BY SAMSUNG.

18    OBVIOUSNESS -- WE -- THERE ARE A COUPLE OF THINGS

19    THAT ARE -- LET ME JUST STEP BACK FOR A MINUTE.

20              THERE ARE A COUPLE THINGS GOING ON HERE.

21    ONE IS WHAT INSTRUCTION DO YOU ISSUE; THE SECOND IS

22    THE NEXT ROUND OF JMOL'S; THE THIRD IS ANY MOTION

23    TO STRIKE ANY EVIDENCE --

24              THE COURT:  THAT'S WHY I'M HOPING YOU ALL

25    WILL SETTLE BEFORE THE JMOL'S.  I'M PATHOLOGICALLY
```

```
 1    OPTIMISTIC THAT THIS WILL SETTLE.
 2            MR. JACOBS:  AND THEN I THINK WE GOT AN
 3    ORDER FROM YOUR HONOR LAST NIGHT SUGGESTING THAT WE
 4    ACCEPTED YOU SOMETHING SATURDAY MORNING ON
 5    INSTRUCTIONS.
 6            THE COURT:  WELL, I WANTED TO KNOW, YOU
 7    KNOW, AFTER ALL THE EVIDENCE IS IN BY THE END OF
 8    FRIDAY, WHICH WE SHOULD BE ABLE TO DO IT, I WANTED
 9    TO GET BOTH OF YOUR ASSESSMENT OF WHAT YOU THINK IS
10    NO LONGER IN THE CASE BASED ON WHAT YOU FEEL THE
11    OTHER SIDE HAS WAIVED OR ABANDONED OR WHAT YOU'RE
12    NO LONGER INTERESTED IN PURSUING.
13            WHAT ABOUT, DID YOU ALL TALK ABOUT
14    NARROWING THE CASE?  ANY FURTHER NARROWING OF --
15            MR. JACOBS:  WE NEED TO HAVE SOME MORE
16    INTERNAL DISCUSSIONS ON THAT, YOUR HONOR.
17            THE COURT:  OKAY.  WELL, I'M ALSO HOPING
18    THAT THERE COULD BE SOME HORSE TRADING GOING ON
19    BETWEEN THE PARTIES.  I MEAN, ARE THERE SOME THINGS
20    THAT -- SOME TRADES THAT CAN BE MADE HERE?  I MEAN,
21    NOW IS THE TIME BECAUSE OTHERWISE WE'RE GOING TO BE
22    DOING ALL THESE JURY INSTRUCTIONS FOR CLAIMS THAT
23    ARE GOING TO GO AWAY.
24            CAN WE SET A TIME BY WHICH YOU ALL WILL
25    HAVE -- YOU KNOW, I WANT TO FORCE A DECISION.  IF
```

```
 1    ANYTHING IS GOING TO GET DROPPED OUT, WE NEED TO

 2    DROP IT OUT NOW.

 3              MR. JACOBS:  HOW ABOUT BY THE TIME OF

 4    THAT FILING YOU ASKED US TO MAKE?

 5              THE COURT:  BY SATURDAY MORNING?

 6              MR. JOHNSON:  THAT'S FINE, YOUR HONOR.

 7              THE COURT:  OKAY.  SO BY SATURDAY

 8    MORNING, WHICH IS, WHAT, THE 18TH -- OKAY.  SO BY

 9    THE 18TH OF AUGUST AT 8:00 A.M., I WOULD LIKE A

10    STATEMENT THAT YOU'VE MET AND CONFERRED AND EITHER

11    THERE HAS BEEN SOME SUCCESSFUL HORSE TRADING AND

12    YOU'VE BEEN ABLE TO NARROW THE CASE A LITTLE

13    FURTHER, OR NOT.

14              NOW, LET ME GO BACK TO YOUR JOINT,

15    MR. JACOBS.  SO YOUR INSTRUCTIONS, THOUGH, NEITHER

16    SIDE HAS WANTED SUPER DETAILED INSTRUCTIONS ON

17    OBVIOUSNESS AS TO THIS PATENT BASED ON THIS PRIOR

18    ART.

19              SO WHAT DOES IT MATTER?  IF THERE ARE

20    GOING TO BE SOME OBVIOUSNESS DEFENSES TO SOME

21    PATENTS, DOES IT MATTER THAT, YOU KNOW, ONE SIDE IS

22    GOING FOR ANTICIPATION AND NOT GOING ON

23    OBVIOUSNESS?

24              MR. JACOBS:  SO THE REASON I LINKED THE

25    TWO IS SUPPOSE WE PERSUADED YOUR HONOR THAT WE
```

1    SHOULD BE GIVEN A JMOL ON THEIR OBVIOUSNESS DEFENSE

2    ON UTILITY PATENTS BECAUSE THEY DIDN'T PUT IN ANY

3    EVIDENCE ON OBVIOUSNESS.

4            AND THEN I THINK YOUR HONOR WOULD TELL

5    THE JURY THAT AS TO THE APPLE UTILITY PATENTS,

6    THERE IS NO DEFENSE OF OBVIOUSNESS.

7            SIMILARLY IF WE WERE TO PREVAIL ON A JMOL

8    THAT, FOR EXAMPLE, A NON-INFRINGEMENT ARGUMENT WAS

9    CONSISTENT WITH THE COURT'S CLAIM CONSTRUCTION,

10   THEN I THINK WE WOULD EXPECT THAT THE COURT WOULD,

11   IN INSTRUCTING THE JURY, ADD SOME LANGUAGE TO THE

12   INSTRUCTION THAT SAYS THERE IS NO NON-INFRINGEMENT

13   DEFENSE OF THIS NATURE BECAUSE IT'S INCONSISTENT

14   WITH THE CLAIM CONSTRUCTION.

15           THAT WOULD BE THE -- IF WE WERE TO WALK

16   BACK FROM THE PRE-DELIBERATION JMOL'S THAT THE

17   COURT WOULD GRANT, CONCEIVABLY GRANT, THAT WOULD --

18   THAT WOULD BE EXPRESSED IN THE JURY INSTRUCTIONS IN

19   THAT WAY.

20           SO WHEN YOU ASKED -- SO THAT YOU'RE NOW

21   ASKING US THE QUESTION FROM THE STANDPOINT OF THE

22   JURY INSTRUCTIONS.  IT'S REALLY, IN A WAY, THE SAME

23   QUESTION.  WE'RE GOING TO BE ADVISING YOU THAT

24   THERE IS NO EVIDENCE TO SUPPORT AN INSTRUCTION ON A

25   PARTICULAR POINT.  THAT IS, IN A SENSE, ASKING FOR

```
 1    A JMOL ON A DEFENSE.

 2             AND WE CAN DO IT WHATEVER WAY THE COURT

 3    WANTS.

 4             THE COURT:  SO YOU'RE SAYING YOU'RE GOING

 5    TO DO THAT TODAY AFTER SAMSUNG RESTS?

 6             MR. JACOBS:  WE WOULD DO THAT AFTER

 7    SAMSUNG RESTS, THAT'S CORRECT.

 8             WE WOULD ALSO DO IT, THE RULE -- THE

 9    PRE-DELIBERATION JMOL IS YET ANOTHER STEP.

10             THE COURT:  AND WHAT, WHAT DO YOU -- HAVE

11    YOU ALL TALKED ABOUT WHEN THAT TIMING IS GOING TO

12    BE?

13             MR. JACOBS:  NO.  BUT I WOULD IMAGINE --

14             THE COURT:  WE'RE RUNNING OUT OF TIME.

15    WE NEED TO START SCHEDULING BETWEEN TODAY AND NEXT

16    TUESDAY NOW BECAUSE WE'RE RUNNING OUT OF TIME.  SO

17    WHAT -- DO YOU WANT DO THAT ON MONDAY AFTER

18    EVERYONE'S BEEN ABLE TO FOCUS --

19             MR. JACOBS:  MONDAY WOULD BE FINE, YOUR

20    HONOR.

21             OR WE COULD ALSO DO IT, DEPENDING ON HOW

22    THE SCHEDULE GOES, WE COULD ALSO DO IT AT THE CLOSE

23    OF EVIDENCE TOMORROW.

24             THE COURT:  WELL, I THINK WHAT YOU FILE

25    ON SATURDAY MORNING MIGHT BE LARGELY SIMILAR IF
```

```
 1    YOU'RE NOW SAYING -- AND I THINK IT WOULD BE

 2    HELPFUL FOR THE END OF THE CASE JMOL'S FOR YOU ALL

 3    TO DO A LITTLE BIT OF BRIEFING ON THAT.

 4            BUT SAME THING OF GIVE THE OTHER SIDE AN

 5    OPPORTUNITY TO CITE TO TRIAL TRANSCRIPTS AND

 6    EXHIBITS WHERE EVIDENCE WAS PRESENTED ON THAT

 7    POINT.

 8            SO LET'S FIGURE OUT WHAT'S THE SCHEDULE

 9    FOR THAT GOING TO BE?  SO IF WE DO -- I THINK I

10    WOULD PREFER TO DO THE POST -- THE POST-EVIDENCE

11    JMOL ON MONDAY.

12            NOW, YOU'RE -- LET ME HEAR, YOU KNOW, AT

13    LEAST WITH -- I GUESS WAS IT MR. GRAY?

14            MR. JACOBS:  YES.

15            THE COURT:  I THINK I DID HEAR ALL

16    ANTICIPATION DEFENSES AND NOT OBVIOUSNESS.  IS

17    THAT -- WHAT'S YOUR POSITION ON THAT?  I MEAN, HE

18    WENT THROUGH AND SAID EVERY, YOU KNOW, NOMURA,

19    LAUNCHTILE, THESE ARE ALL -- YOU KNOW, EVERY CLAIM

20    LIMITATION, ANTICIPATION, ANTICIPATION,

21    ANTICIPATION.  SO CAN I HEAR, WHAT IS YOUR VIEW ON

22    THAT?

23            MR. JOHNSON:  I NEED TO CHECK THE

24    TRANSCRIPT ON THAT.

25            THE COURT:  OH, THAT WAS MR. DEFRANCO.
```

```
 1        MR. JOHNSON:  PROFESSOR VAN DAM DID TALK

 2   ABOUT OBVIOUSNESS.  SO WITH RESPECT TO THE '381

 3   PATENT, WE THINK THERE'S MORE THAN SUFFICIENT

 4   EVIDENCE WITH RESPECT TO OBVIOUSNESS ON THAT.  BUT

 5   I'LL CONFER WITH MR. DEFRANCO AND REPORT BACK.

 6        THE COURT:  PLEASE.  ALL RIGHT.  SO LET'S

 7   FIGURE OUT, FOR THE POST-EVIDENCE JMOL MOTIONS ON

 8   MONDAY, I WOULD LIKE -- LET ME HEAR FROM YOU ALL AS

 9   TO WHAT DATE -- YOU KNOW, I WOULD LIKE BASICALLY

10   THE MOVING PARTY TO PRESENT, IN TWO PAGES, DO IT IN

11   TWO PAGES OF JUST LAYING OUT WHAT YOU THINK WAS

12   ESSENTIALLY CONCEDED AND THEN GIVE THE OTHER SIDE

13   AN OPPORTUNITY TO -- AND I JUST WANT CITES TO TRIAL

14   TRANSCRIPTS AND EXHIBITS -- WHAT YOU FEEL LIKE HAS

15   BEEN ADDRESSED AND ESTABLISHED AND MADE A LEGALLY

16   SUFFICIENT EVIDENTIARY BASIS FOR RULING IN YOUR

17   FAVOR, FOR A FINDING IN YOUR FAVOR BY THE JURY.

18        SO WHEN CAN THAT TWO-PAGER BE FILED?

19   OBVIOUSLY THE SOONER THE BETTER FOR US, BECAUSE I'M

20   TRYING TO GET THE INSTRUCTIONS FILED ON SUNDAY.  SO

21   WHAT --

22        MR. JACOBS:  SO WE HAVE THE 8:00 A.M. ON

23   SATURDAY FILING.

24        THE COURT:  YEAH.

25        MR. JACOBS:  WHICH PARALLELS THIS IN MANY
```

1    WAYS.  SO MY PROPOSAL WOULD BE THAT WE FILE IT

2    EITHER FRIDAY EVENING, SAY 8:00 P.M. AFTER THE

3    CLOSE OF EVIDENCE, AND THEN FOLLOW THAT WITH THE

4    8:00 A.M. FILING OF THE JURY INSTRUCTIONS ON

5    SATURDAY MORNING, OR FILE THEM TOGETHER, WHATEVER

6    THE COURT'S PREFERENCE IS.

7              AND THEN THE PARTIES COULD RESPOND -- I

8    THINK WE COULD RESPOND BY SUNDAY MORNING.

9              THE COURT:  ALL RIGHT.  LET ME HEAR, IS

10   FRIDAY AT 8:00 P.M. DOABLE?

11             MR. VERHOEVEN:  IT IS, YES, FOR SAMSUNG,

12   YOUR HONOR.

13             THE COURT:  IT IS?  OKAY.

14             SO THEN FRIDAY, WHICH IS THE 17TH AT 8:00

15   P.M., JUST A TWO-PAGER JUST LAYING OUT WHAT YOU

16   FEEL THE OTHER SIDE HAS CONCEDED.

17             MR. VERHOEVEN:  AND THIS WOULD BE ALSO

18   FOR SAMSUNG'S MOTION AS TO THE FRAND DEFENSE AND

19   WHATNOT?

20             THE COURT:  THIS IS EVERYTHING.

21             MR. VERHOEVEN:  AND JUST FOR THE RECORD,

22   FOR BOTH SIDES, I THINK WE ALL AGREE THAT THAT --

23   THAT EVERYONE STIPULATES THAT THERE WILL BE NO

24   WAIVER THROUGH THIS PROCESS.

25             MR. JACOBS:  WE'RE NOT SURE WHAT WAIVER

```
 1    MR. VERHOEVEN IS TALKING ABOUT.

 2            MR. VERHOEVEN:  IN OTHER WORDS, WE DON'T

 3    HAVE TO STAND UP AND SAY WE MOVE AT THE END, WE CAN

 4    MOVE THIS PROCESS AND THERE WILL BE NO WAIVER THAT

 5    WE DIDN'T STAND UP AND IMMEDIATELY MAKE THE MOTION

 6    IN THE COURTROOM.

 7            THE COURT:  I THINK THIS WOULD BE YOUR

 8    MOTION.  YOU CAN STYLE IT AS THIS IS YOUR MOTION

 9    FOR JUDGMENT AS A MATTER OF LAW.

10            MR. VERHOEVEN:  BELTS AND SUSPENDERS,

11    YOUR HONOR, I'M SAYING THERE'S THAT AGREEMENT THAT

12    THIS DOESN'T WAIVE THE PROCEDURE.

13            THE COURT:  YES.

14            MR. JACOBS:  I THINK I WOULD SAY YOU'RE

15    RESERVING THE POST-EVIDENCE RULE 50 MOTION TO THIS

16    PROCESS.

17            THE COURT:  IS THAT SATISFACTORY TO YOU?

18            MR. VERHOEVEN:  THAT'S FINE.  I JUST WANT

19    TO MAKE SURE, AND I DON'T THINK THERE WILL BE IN

20    ISSUE, BUT THAT THERE'S NO ONE ARGUING THAT WE

21    DIDN'T -- THAT WE WAIVED, WE DIDN'T STAND UP AND

22    FORMALLY MOVE AT THE END OF THE EVIDENCE.

23            MR. JACOBS:  THAT'S FINE, YOUR HONOR.

24            THE COURT:  OKAY.  ALL RIGHT.

25            MR. JACOBS:  AND THEN CAN I JUST --
```

```
1    BECAUSE THIS IS A PRE -- THIS IS ONE OF THOSE
2    MANDATORY STEPS AND THERE ARE A LOT OF ISSUES --
3              THE COURT:  YES.
4              MR. JACOBS:  I THINK WE GET THE IDEA THAT
5    THIS IS NOT SUPPOSED TO BE ARGUMENTATIVE, IT'S A
6    HEADLINE, THERE'S NO EVIDENCE OF THIS, THERE'S NO
7    EVIDENCE ON THIS ISSUE.
8              THE COURT:  YEAH.
9              MR. JACOBS:  BUT I THINK TWO PAGES MAY --
10             THE COURT:  THAT'S TOO SHORT?
11             MR. JACOBS:  YES.
12             THE COURT:  OKAY, THAT'S FINE.  THIS IS
13   WHAT I WOULD -- MAYBE IN ADDITION TO SAYING, YOU
14   KNOW, NO EVIDENCE OF THIS, IT MIGHT BE GOOD TO AT
15   LEAST PINPOINT WHERE THIS WOULD HAVE COME OUT,
16   WHICH WITNESS WOULD HAVE ADDRESSED THIS ISSUE, OR
17   WHICH -- EITHER A WITNESS DIDN'T TESTIFY OR A
18   WITNESS WHO DID TESTIFY FAILED TO ADDRESS X, Y, Z
19   TOPIC OR FAILED TO TAKE X, Y, Z POSITION.
20             MR. JACOBS:  I THINK THAT WOULD BE
21   HELPFUL TO THE COURT.
22             THE COURT:  BUT I NEED A PAGE LIMIT IN
23   THIS CASE BECAUSE OTHERWISE --
24             MR. JACOBS:  HOW ABOUT FIVE PAGES, YOUR
25   HONOR?  I THINK WE GET THE SPIRIT OF WHAT YOU WANT
```

2986

```
 1      IN TERMS OF THE BRIEFING.

 2                  THE COURT:  DOES THAT SOUND OKAY?

 3                  MR. VERHOEVEN:  THAT'S ACCEPTABLE.

 4                  THE COURT:  OKAY.  SO FIVE PAGES, IT'S

 5      GOING TO BE FILED BY -- DOES 8:00 O'CLOCK GIVE YOU

 6      ENOUGH TIME?  8:00 O'CLOCK?

 7                  MR. VERHOEVEN:  SUNDAY?

 8                  THE COURT:  NO, THIS IS ACTUALLY FRIDAY

 9      NIGHT.

10                  MR. VERHOEVEN:  HOW ABOUT SATURDAY

11      MORNING -- WE'LL JUST BE GETTING OUT OF COURT ON

12      FRIDAY, SO I WOULD SUGGEST 8:00 A.M. SATURDAY

13      MORNING AND THEN RESPONSE 8:00 A.M. SUNDAY MORNING,

14      YOUR HONOR.

15                  AND I'M ASSUMING THAT WE WOULD HAVE

16      ARGUMENT ON THAT, YOUR HONOR?

17                  THE COURT:  ON MONDAY.  MONDAY.

18                  OKAY.  SO -- ALL RIGHT.  SO FILE YOUR

19      FIVE-PAGE JMOL MOTIONS ON SATURDAY, AUGUST THE --

20      IS THAT THE 18TH; CORRECT?

21                  THE CLERK:  YES, YOUR HONOR.

22                  THE COURT:  THANK YOU.  AT 8:00 A.M.,

23      FIVE PAGES IN LENGTH; SUNDAY AT 8:00 A.M. FILE YOUR

24      JMOL OPPOSITIONS, AND REALLY JUST CITES, CITES TO

25      EVIDENCE.
```

```
1              SO TELL ME WHAT YOU THINK THE PAGE LIMIT

2       SHOULD BE ON THAT.  IT JUST NEEDS TO BE DOABLE,

3       BECAUSE IF IT'S GOING TO BE LIKE ONE OF THESE --

4              MR. VERHOEVEN:  FIVE PAGES.

5              THE COURT:  FIVE PAGES?

6              MR. JACOBS:  I THINK LET'S MAKE IT A

7       LITTLE LONGER, BUT JUST TO BE HELPFUL TO THE COURT,

8       WHAT I WOULD SUGGEST IS WE DO THE PIN CITES WITH

9       PARENTHETICALS AS TO WHAT TESTIMONY WE'RE TALKING

10      ABOUT, AND THEN THE COURT WILL BE ABLE TO SEE WHY

11      WE WERE CITING THAT PARTICULAR PORTION.

12             BUT IF WE ARE -- IF WE CONFINE OURSELVES

13      TO THAT FORM OF ARGUMENT, THE PAGE LIMIT WILL BE

14      LESS OF AN ISSUE, BUT I WOULD JUST SAY EIGHT PAGES

15      SO NOBODY IS OVERLY --

16             MR. VERHOEVEN:  THAT'S FINE WITH ME, YOUR

17      HONOR.

18             THE COURT:  OKAY.  BUT I DON'T WANT IT TO

19      BE A SORT OF NIGHTMARE INTERROGATORY RESPONSE WHERE

20      YOU'RE JUST GIVING ME PAGES AND PAGES OF BATES

21      NUMBERS BECAUSE WE WON'T HAVE THE RESOURCES TO GO

22      THROUGH ALL OF THAT.  SO YOUR ARGUMENT WILL BE

23      LOST.

24             OKAY.  SO EIGHT PAGES ON SUNDAY, THAT

25      WILL BE ARGUED ON MONDAY.
```

1          HOW MANY INSTRUCTIONS DO YOU THINK ARE

2     AFFECTED BY THIS ISSUE OF WAIVER OR AN ARGUMENT,

3     ESSENTIALLY, BEING WITHDRAWN OR ABANDONED?  IS THIS

4     A LOT OR IS IT GOING TO BE PRETTY MARGINAL?

5               MR. JACOBS:  I THINK IT'S A FEW, YOUR

6     HONOR.  BUT, HONESTLY, WHEN I GOT YOUR ORDER LAST

7     NIGHT SAYING DO THIS ON SATURDAY MORNING, I PUT

8     THIS ON THE "THINK ABOUT THIS" IN TIME FOR SATURDAY

9     MORNING.  SO I'M NOT FULLY PREPARED ON THIS.

10              THE COURT:  OKAY.

11              MR. JACOBS:  I THINK THE OTHER ASPECT OF

12    THIS THAT I SHOULD JUST FLAG FOR YOUR HONOR IS

13    THIS:  THE COURT SAID FOLLOW THE NORTHERN DISTRICT

14    MODEL AND THE NINTH CIRCUIT MODEL.

15              WHAT I DON'T -- WHAT WE COULDN'T TELL

16    FROM THE COURT'S DIRECTION ON THAT IS WHETHER THE

17    COURT NOW PLANS TO TRY AND CREATE SOMETHING THAT

18    HAS MORE OF A NARRATIVE FLOW FOR THE JURY OR JUST

19    STICK WITH THE MODEL INSTRUCTIONS.

20              AND THAT WAS ONE OF THE THINGS THAT WAS

21    WORRYING ME ABOUT THIS ISSUE WAS THAT IF THE COURT

22    WAS GOING TO DO MORE OF A NARRATIVE SET OF

23    INSTRUCTIONS, A LITTLE EASIER ON THE EARS, THEN

24    TAKING OUT INSTRUCTIONS MIGHT AFFECT THAT.

25              THE COURT:  NO.  I THINK ON THE TRADE

```
 1    DRESS, I'M PRETTY MUCH GOING TO GO WITH THE NINTH

 2    CIRCUIT MODEL INSTRUCTIONS.

 3              ON THE UTILITY PATENTS, I MEAN, I KNOW

 4    THAT YOU ALL STIPULATED TO -- YOU KNOW, WHATEVER

 5    YOU ALL STIPULATED TO WILL BE USED.

 6              BUT OTHERWISE I'LL -- I MEAN, WHERE EVER

 7    THERE'S A MODEL INSTRUCTION, I'M GOING TO USE THE

 8    MODEL INSTRUCTION, AND I'M NOT GOING TO USE SOME

 9    FRANKENSTEIN HYBRID THAT HAS THE MODEL WITH, LIKE,

10    20 OTHER CASE CITES WHERE IT'S BEEN TWEAKED SO MANY

11    TIMES.  I'M JUST GOING TO GO WITH THE MODEL IF

12    THERE'S A MODEL.

13              THE PROBLEM IS THAT THERE ISN'T A MODEL

14    FOR SOME OF THESE AND THAT'S, I THINK, GOING TO BE

15    THE MOST WORK.

16              SO BY 8:00 A.M. ON FRIDAY, YOU'LL FILE ON

17    THESE TWO ISSUES --

18              MR. VERHOEVEN:  I THINK YOU MEAN

19    SATURDAY, YOUR HONOR.

20              THE COURT:  OH, I'M SORRY.  LET ME

21    CLARIFY.

22              ON INSTRUCTION NUMBERS 36 AND 37.

23              MR. VERHOEVEN:  OH, OKAY.

24              THE COURT:  YEAH, THAT'LL BE TOMORROW

25    MORNING.
```

```
 1              AND THEN IT WOULD BE HELPFUL IF WE COULD

 2     DO THIS ON A ROLLING BASIS.  IF THERE ARE OTHERS AS

 3     WE IDENTIFY ONES THAT LOOK LIKE THEY MAY NO LONGER

 4     BE RELEVANT, WHAT WOULD BE A REASONABLE TIME FRAME

 5     FOR YOU ALL TO, LIKE -- I ASSUME PROBABLY BY THE

 6     END OF THE DAY I'LL HAVE SOME MORE.

 7              SO WHAT IS A REASONABLE TIME FRAME?  CAN

 8     YOU DO THAT ALSO BY MAYBE TOMORROW?  IF I GIVE YOU

 9     A LIST AT THE END OF THE DAY TODAY, COULD YOU DO IT

10     BY TOMORROW NOON OR TOMORROW 1:00 O'CLOCK?

11              MR. JACOBS:  WE WERE THINKING TOMORROW

12     AFTERNOON, YOUR HONOR, MAYBE 20 HOURS, 22 HOURS

13     AFTER WE GET IT FROM YOU.

14              THE COURT:  IS THAT OKAY?

15              MR. VERHOEVEN:  YES, YOUR HONOR.

16              THE COURT:  WHY DON'T WE DO THAT?  SO

17     WE'LL -- AND WE'LL PROBABLY JUST DO IT ON A ROLLING

18     BASIS JUST TO GIVE YOU TIME AND GIVE US TIME WITH

19     THESE.  OKAY?

20              WHAT ELSE?

21              MS. MAROULIS:  YOUR HONOR, BRIEFLY, LAST

22     NIGHT THE ORDER SUSTAINING OBJECTIONS TO DEPOSITION

23     TESTIMONY OF MR. LUTTON, SO WE WILL NOT BE PLAYING

24     THAT.

25              THE COURT:  OKAY.
```

1          MS. MAROULIS:  THAT'S A CHANGE TO OUR

2     TRIAL LIST.  HOWEVER, WE DO NEED TO READ IN

3     RESPONSE TO INTERROGATORY 13, WHICH THE COURT

4     SUGGESTED.

5          THE COURT:  YES.

6          MS. MAROULIS:  AND AS A POINT OF

7     CLARIFICATION, THEIR INTERROGATORY RESPONSE ON THE

8     33(D) CITES TO THE BATES RANGE OF EXHIBIT 531.  MAY

9     WE INTRODUCE AND MOVE INTO EVIDENCE EXHIBIT 531

10    THAT WAS PREVIOUSLY SUSTAINED?

11         THE COURT:  WHAT IS 531?  IS THAT THE

12    PRESENTATION?

13         MS. MAROULIS:  THAT'S THE PRESENTATION.

14         MR. MUELLER:  THAT'S EXACTLY WHAT YOUR

15    HONOR SAID THEY COULDN'T DO.

16         THE COURT:  LET'S DO INTERROGATORY

17    KNOWLEDGE AND NOTICE ON, WHAT, SEPTEMBER --

18         MS. MAROULIS:  IT'S SEPTEMBER 9, 2010.

19    BUT DO WE NOT GET TO READ THE PORTION WITH THE

20    BATES RANGE OR MOVE IT INTO EVIDENCE?

21         THE COURT:  YOU CAN READ THE BATES RANGE

22    IN, BUT IF I'VE ALREADY RULED THAT THE DOCUMENT

23    ITSELF IS OUT, THEN I'M NOT GOING TO INTRODUCE THE

24    DOCUMENT.

25         MR. MUELLER:  THANK YOU, YOUR HONOR.

```
 1              THE COURT:  THE WHOLE RESPONSE CAN GO IN.

 2              MR. JOHNSON:  AND, YOUR HONOR, THE

 3    INTERROGATORY REFERS TO A BUNCH OF OTHER PATENTS

 4    THAT ARE NOT INVOLVED IN THE LAWSUIT, SO PERHAPS WE

 5    CAN JUST REACH AGREEMENT DURING A BREAK WITH APPLE,

 6    REACH A STIPULATION, AND WE CAN READ A SENTENCE

 7    THAT BASICALLY AFFECTS THE ONE PATENT THAT WE HAVE

 8    IN MIND.

 9              MR. LEE:  WE'LL TALK AT THE BREAK.

10              THE COURT:  THAT PROBABLY WOULD BE

11    EASIER.  JUST DO A STIPULATION THAT, YOU KNOW,

12    APPLE STIPULATES THAT IT GOT NOTICE OF BLAH, BLAH,

13    BLAH ON SUCH AND SUCH A DATE.  THAT WOULD BE

14    CLEANER.  OKAY.

15              MR. LEE:  YOUR HONOR, JUST ONE SCHEDULING

16    THING.  WE HAD HAD DR. SRIVASTAVA FOLLOW -- BEFORE

17    MR. GIVARGIS.  FOR SCHEDULING PURPOSES, WE'RE GOING

18    TO FLIP THEM.

19              THE COURT:  YOU DIDN'T FILE A NEW LIST.

20    IS THAT T BECAUSE YOUR LIST IS THE SAME?

21              MR. LEE:  YES.

22              THE COURT:  OKAY.  GIVE ME ONE SECOND.

23    YOU ARE SWITCHING --

24              MR. LEE:  AFTER SAMSUNG RESTS --

25              THE COURT:  OKAY.
```

```
 1              MR. LEE:  AND I HAD GIVEN YOU A LIST
 2    YESTERDAY.  SO IT WOULD BE --
 3              THE COURT:  BLEVINS, KIM, DOURISH,
 4    GIVARGIS, AND MR. SRIVASTAVA.
 5              MR. LEE:  YES.
 6              THE COURT:  AND I ASSUME YOU'RE GOING TO
 7    WANT TO DO A JMOL MOTION, OR RULE 50 MOTION, OR
 8    NOT?
 9              MR. LEE:  I THINK PROBABLY, GIVEN WHAT
10    WE'RE DOING HERE, THIS WEEKEND, WHAT I'LL DO IS
11    WHEN THEY REST, I'LL STATE THE GROUNDS VERY QUICKLY
12    AND AS SPECIFICALLY AS I CAN, BUT THEN WE'LL
13    RESERVE IT FOR, IF THAT'S ALL RIGHT WITH YOUR
14    HONOR, AND WITH SAMSUNG, THEN WE'LL ADDRESS IT OVER
15    THE WEEKEND AS WELL.
16              THE COURT:  NO.  I THINK I'M GOING TO
17    RULE ON IT.  I'M NOT -- I'M NOT LIKELY TO GRANT IT
18    ON ANYTHING, SO LET'S JUST RIP OFF THE BAND-AID NOW
19    AND KEEP GOING.
20              MR. LEE:  OKAY.
21              THE COURT:  OKAY?
22              MR. LEE:  YEAH.
23              THE COURT:  OKAY.
24              MR. PRICE:  YOUR HONOR, A COUPLE THINGS
25    ON THE FIRST TWO WITNESSES.
```

2994

```
 1              THE COURT:  YES.
 2              MR. PRICE:  MR. STEVENS, IN YOUR ORDER
 3    LAST NIGHT, YOU TALKED ABOUT NOT BEING ABLE TO
 4    TESTIFY ABOUT A PARTICULAR DEMONSTRATIVE BECAUSE HE
 5    HASN'T ESTABLISHED THE PERSONAL KNOWLEDGE, AND JUST
 6    A COUPLE OF THINGS.
 7              ONE, THE FACT THAT HE WAS A 30(B)(6),
 8    THAT'S JUST AN INTERROGATORY.  IT HAS NO BEARING AT
 9    ALL ON WHETHER HE SHOULD BE ABLE TO TESTIFY.  HE
10    WASN'T THE 30(B)(6) ON SEC.
11              THE COURT:  YOU KNOW, THIS IS
12    RECONSIDERATION.  I'M GOING TO HAVE TO TIME IT.
13              MR. PRICE:  WELL, LET ME JUST CLARIFY.
14              THE COURT:  IT'S 9:00 O'CLOCK.
15              MR. PRICE:  LET ME CLARIFY, HE CAN LAY
16    THE FOUNDATION FOR WHATEVER KNOWLEDGE HE HAS.
17              THE COURT:  NO.  MY CONCERN WAS THAT HE,
18    HE SAID THAT HE DIDN'T HAVE PERSONAL KNOWLEDGE OF
19    ANY FINANCIAL DOCUMENTS CREATED AT SEC, AND THAT'S
20    WHAT THIS IS, THIS IS AN SEC OPERATING EXPENSE
21    DOCUMENT.  THAT WAS MY CONCERN.
22              MR. PRICE:  I'M NOT GOING TO HAVE HIM
23    TESTIFY ABOUT WHAT KIND OF DOCUMENTS ARE CREATED
24    THERE, BUT HE DOES HAVE PERSONAL KNOWLEDGE OF HOW
25    DOCUMENTS ARE CREATED THERE BECAUSE HE WAS TRAINED.
```

```
 1              THE COURT:  THAT'S -- I'M NOT PERSUADED
 2    BY THAT.
 3              MR. PRICE:  IT'S A DIFFERENT -- HE
 4    DOESN'T KNOW DAY TO DAY WHAT HE LOOKED AT.  WHAT HE
 5    KNOWS IS HOW THE SYSTEM WORKS, BECAUSE --
 6              THE COURT:  HE SAID HE DIDN'T HAVE
 7    PERSONAL KNOWLEDGE AS TO HOW THE FINANCIAL
 8    DOCUMENTS ARE CREATED AT SEC.
 9              MR. PRICE:  HE SAID HE DOESN'T KNOW HOW
10    THEY'RE PREPARED, THAT'S TRUE.
11              THE COURT:  I THINK THAT'S THE SAME
12    THING.  SO MY RULING IS STILL THE SAME.
13              MR. PRICE:  I'D ASK YOU TO LISTEN TO THE
14    QUESTIONS AND SUSTAIN THEM IF YOU THINK THAT --
15              THE COURT:  HE SAID HE HAS KNOWLEDGE
16    GENERALLY ABOUT HOW THINGS ARE DONE.
17              MR. PRICE:  RIGHT, THAT'S WHAT I'M
18    TALKING ABOUT.
19              THE COURT:  THAT'S FINE.  BUT IT CAN'T
20    APPLY TO THIS DOCUMENT BECAUSE HE SAID HE DOESN'T
21    HAVE PERSONAL KNOWLEDGE AS TO HOW FINANCIAL
22    DOCUMENTS ARE CREATED AT SEC.  THE DOCUMENT FROM
23    WHAT I UNDERSTAND IS BROADER THAN SEC, AND THAT'S
24    FINE.
25              MR. PRICE:  OKAY.
```

```
1              THE COURT:  BUT IF IT'S SEC EXCLUSIVELY,

2       I DON'T THINK HE HAS PERSONAL KNOWLEDGE, AND I'M

3       STILL SUSTAINING THE OBJECTION.

4              MR. JACOBS:  YOUR HONOR, I THINK HE JUST

5       BACK DOORED YOUR ORDER?

6              THE COURT:  WHAT?

7              MR. JACOBS:  HE MADE AN END RUN AROUND

8       YOUR ORDER.  YOUR ORDER IS HE CAN'T SPEAK TO SEC,

9       AND FOR HIM TO SPEAK TO THE CONSOLIDATED FINANCIALS

10      IS TO SPEAK TO THE SEC.

11             THE COURT:  YOU HAD NO OBJECTION TO THE

12      DOCUMENT THAT PRECEDED THE ONE YOU OBJECTED TO THAT

13      WAS ABOUT THE THREE DIFFERENT ENTITIES.

14             MR. JACOBS:  THAT'S AS TO STA, YOUR

15      HONOR.  HE CAN SPEAK TO STA FINANCIALS.

16             MR. PRICE:  THEY DIDN'T OBJECT TO THE

17      CONSOLIDATED, EITHER.

18             THE COURT:  BUT IN HIS DEPOSITION, HE DID

19      SAY HE GENERALLY KNOWS HOW THINGS ARE DONE.  I

20      AGREE, I'M SUSTAINING AN OBJECTION TO ANY SEC

21      CREATED FINANCIAL DOCUMENT BECAUSE HE SAID HE HAS

22      NO PERSONAL KNOWLEDGE AS TO THAT.

23             MR. JACOBS:  TERRIFIC.

24             THE COURT:  BUT HE DID SAY I KNOW WHAT

25      THE GENERAL PRACTICE IS.  SO I'M GOING TO ALLOW
```

```
 1    THAT.
 2              MR. JACOBS:  "CREATED" IS THE OPERATIVE
 3    WORD.  I THINK THAT PREVENTS AN END RUN AROUND YOUR
 4    ORDER.
 5              MR. PRICE:  JUST A CLARIFICATION ON
 6    MR. WAGNER.  YOU SAID YOU OVERRULED THE OBJECTION.
 7    AND THAT CONCERNS THE OBJECTION OF HIM RELYING ON
 8    SAMSUNG EMPLOYEES AS MR. MUSIKA RELIED ON --
 9              THE COURT:  WHAT'S YOUR VIEW ON THE
10    PROFFER THAT WAS FILED THIS MORNING?
11              MR. JACOBS:  OUR VIEW ON THE PROFFER IS
12    THAT JUDGE GREWAL'S ORDER -- THERE WAS A DISCUSSION
13    BEFORE JUDGE GREWAL ABOUT WHETHER THERE WAS AN
14    EXCEPTION FOR HYPOTHETICAL DESIGN AROUNDS.
15              THEN THE ORDER ISSUES FROM JUDGE GREWAL
16    AND THE ORDER SAYS NO IF'S, AND'S, OR BUT'S,
17    THERE'S ONLY ONE EXCEPTION.  MY ORDER DOESN'T APPLY
18    TO INJUNCTION PROCEEDINGS.  SO OUR INTERPRETATION
19    OF THAT ORDER WAS HE SAYING YOU KNOW WHAT, I
20    THOUGHT ABOUT THIS HYPOTHETICAL ISSUE, THAT LOOKS
21    LIKE AN END RUN AROUND THE FORCE OF MY ORDER.
22              MS. MAROULIS:  YOUR HONOR.
23              THE COURT:  WELL, MR. WAGNER HAS SEVERAL
24    BASES, OBVIOUSLY HE CAN RELY ON MR. MUSIKA.
25    OBVIOUSLY HE CAN RELY ON THE TECHNICAL EXPERTS,
```

```
 1    MR. JOHNSON AND MR. GRAY.

 2              ARE YOU OBJECTING TO WAGE RATES?

 3              MR. JACOBS:  I'M SORRY.

 4              THE COURT:  HE SPOKE WITH SAMSUNG HR

 5    ABOUT WAGE RATES.

 6              MR. JACOBS:  NO, YOUR HONOR.  WAGE RATES

 7    ON A STAND-ALONE BASIS ISN'T THE ISSUE.  THE

 8    QUESTION WAS IN LIGHT OF JUDGE GREWAL'S ORDER AND

 9    YOUR HONOR'S AFFIRMANCE OF THAT, THEY SHOULD BE

10    ABLE TO TALK ABOUT HYPOTHETICAL DESIGN AROUNDS,

11    AND --

12              THE COURT:  WELL, I'M SAYING THEY CAN.

13              MR. JACOBS:  OKAY.

14              THE COURT:  BASED ON MR. MUSIKA, BASED ON

15    JOHNSON AND GRAY, BASED ON THE HR PERSON WHO TALKED

16    ABOUT WAGE RATES, I THINK THAT'S ALL FINE.

17              I GUESS THE ONLY QUESTION IS THE

18    CONVERSATION WITH THE TWO ENGINEERS.  I DON'T KNOW

19    WHAT THE BASIS OF THEIR INFORMATION WAS.  THAT'S --

20    I MEAN, EVERYTHING ELSE IS FINE.  YOU WANT TO

21    ADDRESS THESE TWO ENGINEERS SOLELY?

22              MR. JACOBS:  IS THAT TO ME, YOUR HONOR.

23              THE COURT:  YEAH.

24              MR. JACOBS:  I THINK THAT'S INEXTRICABLY

25    LINKED WITH THE NON-PRODUCTION OF THE SOURCE CODE
```

2999

```
 1    AND SHOULD NOT BE A BASIS FOR THIS TESTIMONY.
 2              THE COURT:  WELL, I GUESS I JUST NEED A
 3    LITTLE BIT MORE INFORMATION ON EXACTLY WHAT THEY
 4    SAID.  I MEAN, WHEN THEY SAID HYPOTHETICAL DESIGN
 5    AROUND OF THESE SPECIFIC PATENTS, IT SOUNDS LESS
 6    HYPOTHETICAL.
 7              MR. PRICE:  IT'S THE SAME THING WHICH
 8    MR. MUSIKA DID FOR HIS DAMAGE CALCULATION.  HE
 9    TALKED TO APPLE'S FOLKS AND SAID HOW LONG WOULD IT
10    TAKE TO DESIGN AROUND THIS PATENT.  THAT WAS THE
11    BASIS OF HIS DAMAGES.  SO --
12              THE COURT:  RIGHT, WELL, THEN I THINK
13    THAT IS GETTING INTO JUDGE GREWAL'S ORDER.  SO I'M
14    GOING TO STRIKE IT AS TO J. PARK AND SUN-YOUNG YI,
15    BUT EVERYTHING ELSE IS FINE, JOHNSON, RELIANCE ON
16    GRAY, RELIANCE ON MUSIKA, RELIANCE ON THE HR
17    PERSON, THAT'S ALL FINE.
18              MR. PRICE:  YOUR HONOR, JUST FOR THE TIME
19    THAT IT WOULD TAKE FOR THE DESIGN AROUND, HE DID NO
20    MORE THAN WHAT MR. MUSIKA DID.  IT WAS FOR THE
21    SOURCE CODE.  AND IT'S NOT BASED ON THE ACTUAL
22    DESIGN AROUND.
23              MR. JACOBS:  YOUR HONOR, HAVING NOT
24    PRODUCED THE DESIGN AROUND, WHICH WOULD BE A -- THE
25    RELEVANT CODE WHICH WOULD BE A FACTUAL WAY FOR US
```

3000

1    TO CHALLENGE A POSITED DESIGN AROUND ON THE PART OF

2    THE SAMSUNG EMPLOYEES, THEY SHOULD NOT BE ABLE TO

3    SAY, WELL, I CAN IMAGINE DESIGNING AROUND IN A

4    MONTH.

5              MR. PRICE:  BUT THERE'S BASICALLY

6    AGREEMENT ON THE TIME FRAMES, TOO.

7              THE COURT:  WELL, IT LOOKS LIKE THE ONLY

8    DISAGREEMENT IS ON THE LAST ONE, RIGHT, SIX MONTHS

9    VERSUS FOUR WEEKS?

10             MR. PRICE:  YES.

11             THE COURT:  THE OTHERS LOOK FAIRLY IN THE

12   SAME BALLPARK.

13             MR. PRICE:  AND THAT DOES MAKE A

14   DIFFERENCE IN THE DAMAGES, BUT IT HAS NOTHING TO DO

15   WITH AN ACTUAL DESIGN AROUND IN THE SOURCE CODE.

16   IT'S JUST ENGINEERS SAYING WE BELIEVE THIS IS HOW

17   LONG IT WOULD TAKE, JUST AS APPLE'S DID.

18             THE COURT:  I'M GOING TO ALLOW IT IN.

19             ALL RIGHT.  9:07 THOUGH.

20             MR. PRICE:  YOUR HONOR, THIS IS

21   CLARIFICATION.  IT WAS NOT -- IT REALLY WAS

22   CLARIFICATION.  I DIDN'T KNOW WHAT YOU MEANT.

23             THE COURT:  ALL RIGHT, FINE.

24             OKAY.  ARE WE READY TO GO?

25             MR. PRICE:  WE ARE, YES.

3001

```
 1              THE COURT:  OKAY.  CAN WE PLEASE BRING IN
 2    OUR JURY?
 3              THE CLERK:  YES, YOUR HONOR.
 4              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 5    WERE HELD IN THE PRESENCE OF THE JURY:)
 6              THE COURT:  ALL RIGHT.  GOOD MORNING AND
 7    WELCOME BACK.  PLEASE TAKE A SEAT.
 8              CALL YOUR NEXT WITNESS, PLEASE.
 9              MR. PRICE:  YOUR HONOR, WE CALL TIM
10    SHEPPARD.
11              THE COURT:  ALL RIGHT.  SIR, IF YOU WOULD
12    COME FORWARD.
13              THE CLERK:  MR. SHEPPARD, PLEASE RAISE
14    YOUR RIGHT HAND.
15                        TIM SHEPPARD,
16    BEING CALLED AS A WITNESS ON BEHALF OF THE
17    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS
18    EXAMINED AND TESTIFIED AS FOLLOWS:
19              THE WITNESS:  I SWEAR.
20              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
21              THE COURT:  ALL RIGHT.  IT'S 9:08.  GO
22    AHEAD, PLEASE.
23                    DIRECT EXAMINATION
24    BY MR. PRICE:
25    Q    MR. SHEPPARD, PLEASE TELL US WHO YOU WORK
```

```
 1      WITH.

 2      A    I WORK FOR THE SAMSUNG TELECOMMUNICATIONS

 3      AMERICA.

 4      Q    AND WHAT'S YOUR POSITION?

 5      A    I'M THE VICE-PRESIDENT OF FINANCE AND

 6      OPERATIONS.

 7      Q    NOW, AS THE VICE-PRESIDENT OF FINANCE AND

 8      OPERATIONS, ARE YOU FAMILIAR WITH THE ACCOUNTING

 9      SYSTEMS PROCEDURES AT SAMSUNG TELECOMMUNICATIONS

10      AMERICA, SAMSUNG ELECTRONICS AMERICA, AND SAMSUNG

11      ELECTRONICS CORPORATION?

12      A    YES.

13              MR. JACOBS:  YOUR HONOR, COMPOUND AND

14      DIRECTLY IN VIOLATION OF YOUR ORDER.

15              MR. PRICE:  THIS IS JUST WHAT WE TALKED

16      ABOUT, I'M GOING TO LAY THE FOUNDATION.

17              THE COURT:  ALL RIGHT.  LAY THE

18      FOUNDATION.  GO AHEAD, PLEASE.

19      BY MR. PRICE:

20      Q    THE ANSWER WAS YES, I BELIEVE.  TELL ME, HOW

21      ARE YOU FAMILIAR WITH THE SYSTEMS?

22      A    WE IMPLEMENTED A GLOBAL SYSTEM IN 2009 WHERE

23      WE TOOK ONE INSTANCE OF OUR STANDARD ACCOUNTING

24      PROCESSES AND PUT IN ONE SYSTEM.

25              IN 2010, WE ADOPTED A GLOBAL ACCOUNTING
```

1   STANDARD CALLED IFRS, AND THAT WAS IMPLEMENTED

2   GLOBALLY.  IT'S A VERY COMMONLY USED ACCOUNTING

3   STANDARD.

4   Q    AND SO IS THAT SORT OF THE EQUIVALENT OF WHAT

5   WE CALL GAAP HERE, INTERNATIONAL EQUIVALENT?

6   A    IT IS.  THERE'S ADDITIONALLY AN ADDITIONAL

7   PROCESS WHERE YOU'RE WORKING TOGETHER TO CREATE

8   COMMON ACCOUNTING STANDARDS.

9          SO ALMOST ALL U.S. ACCOUNTING STANDARDS

10  NOW IN THE LAST YEAR OR SO ACTUALLY ALSO CONFORM

11  WITH IFRS.

12  Q    IS THERE A SYSTEM IN THIS ACCOUNTING TESTIMONY

13  USED CALLED S.A.P.?

14  A    YES.

15  Q    COULD YOU TELL US WHAT THAT IS?

16  A    S.A.P. IS A VERY COMMONLY -- A VERY POPULAR

17  ACCOUNTING SYSTEM MADE BY A GERMAN COMPANY CALLED

18  S.A.P.

19  Q    HOW IS IT IMPLEMENTED IN SAMSUNG?  WHAT IS THE

20  S.A.P. OVERALL SYSTEM?

21  A    THE S.A.P. IS AN ACCOUNTING SYSTEM THAT'S USED

22  TO DOCUMENT ALL YOUR FINANCIAL TRANSACTIONS, SO WE

23  USE IT FOR RECORDING YOUR SALES, YOUR EXPENSES, ALL

24  YOUR EMPLOYEE COSTS, EVERYTHING YOU POSSIBLY DO

25  FROM A FINANCIAL POINT OF VIEW.

3004

1    Q    AND ARE THOSE INPUT THROUGHOUT THE YEAR?

2    A    THEY'RE INPUTTED DAY TO DAY AND MINUTE TO

3    MINUTE.

4    Q    AND TO GET INFORMATION OUT OF THAT TESTIMONY,

5    HOW DO YOU DO THAT?

6    A    THERE'S A COUPLE WAYS TO DO IT.  THERE'S ONE

7    WAY YOU CAN LOOK UP SPECIFIC TRANSACTIONS ON LINE.

8    YOU CAN SIT AT YOUR COMPUTER AND LOG IN TO S.A.P.

9    AND SAY I WANT TO SEE X AMOUNT OF DATA.

10          IF YOU WANT TO DO A DEEPER ANALYSIS, YOU

11   MAY -- AND THIS IS A STANDARD FUNCTIONALITY IN

12   ALMOST ALL ACCOUNTING SYSTEMS, YOU CAN ACTUALLY

13   SAY, OKAY, EXTRACT A CERTAIN LARGER AMOUNT OF DATA

14   THAT WILL IMPORT DIRECTLY INTO EXCEL AND THEN YOU

15   CAN STUDY A LARGER SET OF DATA.

16   Q    IF YOU LOOK AT EXHIBIT 676, YOU SEE IT LOOKS

17   LIKE AN EXCEL SPREADSHEET.

18          I THINK THERE'S A STIPULATION AS TO THIS,

19   YOUR HONOR, AND I MOVE 676 INTO EVIDENCE.

20          THE COURT:  ANY OBJECTION?

21          MR. JACOBS:  NO OBJECTION, YOUR HONOR.

22          THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

23          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

24          676, HAVING BEEN PREVIOUSLY MARKED FOR

25          IDENTIFICATION, WAS ADMITTED INTO

```
 1              EVIDENCE.)

 2    BY MR. PRICE:

 3    Q    AND WERE YOU INVOLVED IN THE PREPARATION OF

 4    THIS?

 5    A    YES, I WAS.

 6    Q    AND WHERE IS THE DATA -- WHERE DOES THE DATA

 7    IN EXHIBIT 676 COME FROM?

 8    A    THIS COMES FROM THE S.A.P. SYSTEM THAT WE JUST

 9    DISCUSSED.

10    Q    NOW, IN THE S.A.P. SYSTEM, IF YOU DON'T ASK

11    FOR THE RIGHT MODEL OR WILL YOU GET THAT MODEL

12    INFORMATION?

13    A    THE WAY THIS DATA CAME FROM THE S.A.P. SYSTEM,

14    YOU ACTUALLY HAVE TO EXTRACT THE DATA MODEL BY

15    MODEL, MONTH BY MONTH TO PULL THE DATA.  AND THEN

16    THAT WAS PUT INTO THE SPREADSHEET AND THIS

17    SPREADSHEET SHOWS DATA MONTH BY MONTH FROM LEFT TO

18    RIGHT.  IT'S A LITTLE HARD TO SEE.  IT'S QUITE

19    SMALL.

20    Q    NOW, WHAT WAS YOUR INVOLVEMENT IN PREPARING

21    THIS?

22    A    MY INVOLVEMENT WAS TWO-FOLD.  ONE WAS I SPENT

23    TIME MATCHING MY TEAMS IN THE U.S. EXTRACTED DATA

24    FOR THE TOP PART, WHICH IS FOR SAMSUNG

25    TELECOMMUNICATIONS AMERICA, STA.
```

```
 1              AND THEN IN THE BOTTOM SECTION, THERE'S

 2    DATA THAT CAME FROM -- THAT SHOWS THE MANUFACTURING

 3    COSTS FOR PRODUCING PRODUCTS.

 4              I ACTUALLY WENT TO KOREA AND MET WITH THE

 5    GENTLEMAN THAT PRODUCED THIS DATA AND WE HAD

 6    SEVERAL INTERACTIONS OVER A LONG PERIOD, SO I

 7    UNDERSTOOD EXACTLY HOW THIS DATA WAS PRODUCED.

 8    Q    SO LET ME ASK YOU --

 9              MR. JACOBS:  YOUR HONOR, ON THE

10    FOUNDATION POINT, I THINK THE WITNESS HAS JUST

11    TESTIFIED TO LACK OF PERSONAL KNOWLEDGE.

12              MR. PRICE:  I -- WELL, I'M NOT GOING TO

13    INTO THE QUESTIONS --

14              THE COURT:  WHAT'S YOUR OBJECTION?

15    WHAT'S THE SPECIFIC OBJECTION?

16              MR. JACOBS:  THE OBJECTION IS TO THE

17    WITNESS TESTIFYING TO SEC DATA AS A SOURCE OF THE

18    DATA PURSUANT TO THE COURT'S ORDER.

19              THE COURT:  BUT YOU HAVEN'T HAD -- ARE

20    YOU OBJECTING TO THE SEC PORTION OF DX 676?

21              MR. JACOBS:  AND HIS TESTIMONY ON IT.

22    YES, AND HIS TESTIMONY ON IT.

23              THE COURT:  BUT YOU HAD NO OBJECTION TO

24    THE ADMISSION OF 676.

25              MR. PRICE:  I HAVE NO -- I HAVE NOT ASKED
```

1    HIM QUESTIONS ABOUT THE SPECIFICS, JUST PROCEDURE.

2              MR. JACOBS:  HIS TESTIMONY ON IT LACKS

3    FOUNDATION, YOUR HONOR.

4              THE COURT:  WELL, 676 IS IN.  I WILL

5    SUSTAIN ANY OBJECTION AS TO MR. SHEPPARD TESTIFYING

6    ABOUT SEC CREATED FINANCIAL DATA BECAUSE HE DOESN'T

7    HAVE PERSONAL KNOWLEDGE.

8    BY MR. PRICE:

9    Q    AND TO BE CLEAR, YOU KNOW THE PROCEDURE THAT'S

10   USED TO EXTRACT THE DATA, YOU AREN'T INVOLVED IN

11   THAT YOURSELF?

12   A    CORRECT.

13   Q    AND IF WE COULD -- AND BY THE WAY, YOU SAID

14   YOU WERE INVOLVED IN THE PREPARATION OF THIS.  WERE

15   THERE EARLIER VERSIONS OF 676?

16   A    I BELIEVE SO.  HANG ON.  LET ME JUST CHECK ONE

17   THING.  THE LATEST VERSION SHOULD GO THROUGH Q2,

18   2012, SO THE DATA GOES FROM, I BELIEVE, MIDDLE OF

19   2010 THROUGH Q2, 2012.

20             SO I BELIEVE THIS IS THE MOST RECENT ONE

21   WHICH IS USED I THINK IN JULY.

22   Q    AND THERE WERE SOME FITS AND STARTS WHEN YOU

23   FIRST STARTED PUTTING THIS TOGETHER?

24   A    YES.  I BELIEVE THIS IS THE NINTH VERSION.

25   Q    AND DOES THIS REFLECT REVENUE, COSTS OF THE

```
1     GOODS SOLD, AND OPERATING EXPENSES?

2     A    IT DOES.

3     Q    AND IF WE COULD LOOK AT EXHIBIT 753?

4     A    YES.

5     Q    AND DO YOU RECOGNIZE THIS AS SAMSUNG

6     ELECTRONICS CONSOLIDATED FINANCIAL STATEMENT?

7     A    I DO.

8          MR. PRICE:  MOVE 753 INTO EVIDENCE, YOUR

9     HONOR.

10         THE COURT:  ANY OBJECTION?

11         MR. JACOBS:  NO, YOUR HONOR.

12         THE COURT:  IT'S ADMITTED.

13         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14         753, HAVING BEEN PREVIOUSLY MARKED FOR

15         IDENTIFICATION, WAS ADMITTED INTO

16         EVIDENCE.)

17         MR. PRICE:  CAN WE SHOW THE FIRST PAGE.

18    THIS IS THE FINANCIAL STATEMENTS.

19    Q    AND THE SECOND PAGE -- ARE THESE FINANCIAL

20    STATEMENTS AUDITED?

21    A    YES, THEY ARE, AND DISCOVERY IMPORTANT FOR

22    SAMSUNG TO HAVE AUDITED FINANCIALS.  THE STOCK OF

23    THE COMPANY IS TRADED ON THREE GLOBAL EXCHANGES,

24    LONDON, SEOUL, AND LUXEMBURG.

25    Q    AND IF YOU COULD LOOK AT 753.0 -- AND BY THE
```

1    WAY, IT'S AUDITED BY PRICEWATERHOUSECOOPERS, PWC?

2    A    CORRECT.

3    Q    IF YOU CAN LOOK AT 753.076, AND IF WE LOOK AT

4    31 SEGMENT INFORMATION.

5    A    PAGE 75?

6    Q    YEAH, PAGE 75.  AT THE TOP IT SAYS 753.076.

7    THESE ARE SOME FINANCIAL NUMBERS AT THE SEGMENT

8    LEVEL OF SAMSUNG; CORRECT?

9    A    CORRECT.

10   Q    AND THERE'S A SECTION THERE THAT SAYS

11   TELECOMMUNICATIONS.  WHAT SEGMENT IS THAT?

12   A    THAT'S THE DIVISION THAT INCLUDES THE MOBILE

13   DIVISION.  IT ALSO INCLUDES NETWORK DIVISION.

14   Q    OKAY.

15   A    SO ANYTHING TELECOMMUNICATIONS.

16   Q    AND THAT WOULD INCLUDE ALL OF THE MOBILE HAND

17   PHONES OR SMARTPHONES THAT ARE BEING TALKED ABOUT

18   IN THIS TRIAL?

19   A    YES.

20   Q    AND IF WE LOOK -- THERE'S A SECTION THERE THAT

21   SAYS REVENUE FROM EXTERNAL CUSTOMERS, AND THIS IS

22   IN KOREAN WON.  DO YOU SEE THAT?

23   A    YES.

24   Q    AND IS THAT REVENUE FROM THE CARRIERS, PEOPLE

25   THAT YOU SELL THE PHONES TO?

```
1    A    SURE, PEOPLE LIKE VERIZON AND AT&T.

2    Q    AS WELL AS OTHER PEOPLE?

3    A    YEAH, THIS IS APPROXIMATELY 40 CARRIERS.

4    Q    AND THEN WE HAVE, AT THE BOTTOM THERE,

5    OPERATING PROFIT AND LOSS.  AND WE'LL HAVE SOMEONE

6    ELSE TALK ABOUT EXACTLY WHAT OPERATING PROFIT

7    MEANS, BUT YOU SEE THAT NUMBER THERE UNDER

8    OPERATING PROFIT AND LOSS?

9    A    THE NUMBER THAT BEGINS WITH 8?

10   Q    YES.

11   A    YES.

12   Q    OKAY.  SO IF YOU LOOK AT THAT NUMBER AND THE

13   REVENUE, WHAT'S THE OPERATING MARGIN FOR THE

14   SEGMENT IN WHICH THESE PHONES ARE SOLD?

15   A    I THINK, IF WE'RE LOOKING AT 2011, I THINK

16   THAT NUMBER IS, WITHOUT A CALCULATOR, IT'S ABOUT 15

17   PERCENT.

18   Q    15 PERCENT OPERATING MARGIN?

19   A    YEAH.

20   Q    AND FOR THE COMPANY AS A WHOLE, IF WE LOOK AT

21   THAT, WHICH IS AT PAGE 2, WHAT'S THE OPERATING

22   MARGIN FOR THE COMPANY AS A WHOLE?

23   A    YOU CAN ALSO SEE IT ON THE RIGHT-LAND SIDE OF

24   THIS PAGE.  THERE'S A CONSOLIDATED NUMBER.  BUT THE

25   NUMBER IS APPROXIMATELY 10 PERCENT FOR THE WHOLE
```

```
 1    COMPANY.

 2    Q     AND IF YOU LOOK AT EXHIBIT --

 3    A     WHICH IS THE 16 MILLION DIVIDED BY 165.

 4    Q     SO THE ENTIRE COMPANY, ABOUT 10 PERCENT, AND

 5    THE TELECOMMUNICATIONS FOR THE HANDSETS WHERE SOLD,

 6    THE OPERATING MARGIN IS ABOUT 15 FOR THAT YEAR?

 7    A     FOR THAT YEAR, YEAH.

 8    Q     AND DOES THAT VARY MUCH?

 9    A     YEAH, I THINK THE YEAR BEFORE IT WAS LOWER,

10    MAYBE 12.  BUT SOMEWHERE AROUND 10 TO 12 PERCENT

11    HAS BEEN HISTORICAL NORMAL.

12    Q     AND IF YOU LOOK AT 3960.003, THIS IS JUST SOME

13    OPERATING EXPENSE CATEGORIES FOR STA AND SEA.  ARE

14    THESE THE KIND OF OPERATING EXPENSES THAT YOU WOULD

15    SEE AT STA AND -- AT THE TOP THERE, AND SEA.

16              MR. JACOBS:  YOUR HONOR, OBJECTION.  THIS

17    IS SHOWING SEC.

18              THE COURT:  YES, THIS WAS SUSTAINED.  IS

19    THAT UP?  I SUSTAINED THAT.  WHY IS THAT UP?

20              MR. PRICE:  I ASKED FOR STA AND SEA.

21              THE COURT:  OKAY.  BUT WHY WAS THE SEC

22    ONE ON THE SCREEN?  I SUSTAINED THE OBJECTION.

23              MR. PRICE:  AND YOU DID, I'M NOT GOING

24    THERE.  THAT WAS A MISTAKE.

25              THE COURT:  OKAY.
```

3012

```
1              MR. PRICE:  THAT'S WHY I WAS CONFUSED.  I

2    KEPT LOOKING FOR STA.

3    Q    THESE ARE THE KIND OF EXPENSES THAT YOU HAVE

4    IN THOSE ENTITIES, OPERATING EXPENSES?

5    A    YES, THEY ARE.  AND THEY ACTUALLY MATCH THESE

6    CATEGORIES, THEY ALIGN QUITE WELL WITH THE INCOME

7    STATEMENT FROM THE SEC FINANCIALS ON PAGE 4.  SO WE

8    CAN GO INTO MORE DETAIL IF YOU WANT TO, BUT --

9    Q    I WOULD LOVE TO, BUT I'M ON THE CLOCK.

10             NO FURTHER QUESTIONS.

11   A    OKAY.  I UNDERSTAND.

12             THE COURT:  IT'S 9:19.

13                    CROSS-EXAMINATION

14   BY MR. JACOBS:

15   Q    NINE VERSIONS, SIR?

16   A    I BELIEVE IT WAS NINE.

17   Q    NINE VERSIONS THAT SAMSUNG PRODUCED IN THE

18   COURSE OF THIS LITIGATION TO ENABLE APPLE'S EXPERT

19   TO ANALYZE THE PROFITABILITY ON THE ACCUSED PHONES?

20   SIR?

21   A    I'M SORRY?

22   Q    NINE VERSIONS OF THE DOCUMENTATION THAT

23   SAMSUNG PRODUCED DURING THE LITIGATION TO ENABLE

24   APPLE'S EXPERT TO ANALYZE THE QUESTION OF

25   PROFITABILITY ON THE SAMSUNG ACCUSED PHONES?
```

3013

```
 1    A    I BELIEVE THE -- PROBABLY THE EASIEST WAY TO

 2    ANSWER THAT IF YOU KIND OF WALK BACKWARDS --

 3    Q    I'M SORRY, SIR.  WERE THERE NINE VERSIONS OF

 4    THE DOCUMENTATION THAT SAMSUNG PRODUCED DURING THE

 5    LITIGATION?

 6    A    I AGREE THAT -- I DID SAY, YES, THERE WERE

 7    NINE VERSIONS.

 8    Q    AND THAT'S BECAUSE PREVIOUS VERSIONS WERE

 9    RIDDLED WITH ERRORS; ISN'T THAT TRUE, SIR?

10    A    SOME HAD SOME -- THERE WAS ACTUALLY KIND OF

11    TWO ISSUES HERE, I THINK.  SO THREE -- LET ME TAKE

12    THAT BACK.

13    Q    I'M SORRY, SIR.  CAN YOU ANSWER YES OR NO?

14    A    I'D RATHER WALK THROUGH THE NINE VERSIONS.

15    Q    THAT I DIDN'T ASK YOU TO DO, SIR.  CAN YOU

16    ANSWER WHETHER THERE WERE -- THE REASON THERE WERE

17    NINE VERSIONS IS THAT PREVIOUS VERSIONS HAD MANY

18    ERRORS IN THEM?

19    A    OH, THAT'S A STRAIGHTFORWARD ANSWER.  THAT'S

20    NOT THE REASON FOR NINE VERSIONS, NO.

21    Q    IT'S NOT BECAUSE THEY HAD MANY ERRORS?

22    A    NO, SIR.  I THINK THE JULY VERSION WAS ASKED

23    FOR AND AGREED TO BY BOTH PARTIES TO PRODUCE THE Q2

24    DATA.  THE VERSION BEFORE WAS UPDATED TO INCLUDE Q1

25    2012 DATA.
```

1        SO THE LAST TWO VERSIONS ALONE WERE

2   AGREED TO UPDATE MORE RECENT FINANCIAL DATA.

3   Q    THAT'S A USEFUL CLARIFICATION.  THE PREVIOUS

4   SEVEN VERSIONS, THE REASON THERE WAS A VERSION 2 AS

5   AGAINST A VERSION 1, THE REASON THAT THERE WAS A

6   VERSION 2 IS BECAUSE VERSION 1 HAD ERRORS; CORRECT,

7   SIR?

8   A    NO.  THE VERSION 2 WAS A REQUEST TO EXPLAIN

9   ONE OF THE SPECIFIC PRODUCTS TO SHOW WHICH THREE

10  CARRIERS THE PRODUCT WAS SOLD TO, THE TOTAL VALUE

11  FOR THAT PARTICULAR PRODUCT DIDN'T CHANGE AT ALL.

12  I DON'T THINK THERE WAS ANY CLARIFICATION ON THAT

13  OTHER THAN AN EXPLANATION TO SAY WHICH CARRIERS DID

14  YOU SELL THAT TO.

15  Q    COULD WE SEE YOUR DEPOSITION TRANSCRIPT,

16  PLEASE, AT PAGE 168, LINE 18 TO 22, THE MARCH 30TH,

17  2012 DEPOSITION.  QUESTION AT LINE 18.

18        "WELL, FOR EXAMPLE, THERE WAS ONE WE

19  DIDN'T TALK ABOUT WHERE YOU HAD TO FIX THE EXHIBIT

20  SO THAT THE SPREADSHEETS WOULD ADD ACROSS.

21        "DO YOU REMEMBER THAT?

22        "ANSWER:  YES."

23        DID YOU GIVE THAT TESTIMONY IN RESPONSE

24  TO THAT QUESTION, SIR?

25        MR. PRICE:  I OBJECT.  THAT'S NOT

1    IMPEACHING BECAUSE IT DOESN'T RELATE TO THE VERSION

2    HE WAS ASKING ABOUT.

3              THE WITNESS:  I BELIEVE THIS WAS --

4              MR. PRICE:  HE ASKED ABOUT THE VERSIONS.

5              THE COURT:  WHAT -- OVERRULED.  GO AHEAD.

6    BY MR. JACOBS:

7    Q    YOU DID GIVE THAT ANSWER TO THAT QUESTION,

8    CORRECT, SIR?  JUST A YES OR NO AGAIN.  I'M SORRY,

9    SIR?

10   A    I'M TRYING TO CLARIFY WHICH VERSION OF THE

11   SPREADSHEET YOU'RE ASKING ABOUT.

12   Q    THERE WERE ERRORS IN VERSIONS OF THE

13   SPREADSHEET THAT YOU PRODUCED TO APPLE DURING THE

14   COURSE OF THIS LITIGATION; CORRECT, SIR?

15   A    I THINK SO.  I THINK THIS IS THE -- THEY'RE

16   REFERRING TO THE FOURTH VERSION THAT HAD AN ERROR

17   IN ONE ROW THAT DIDN'T SUM UP TO THE TOTAL OF

18   ANYTHING.  SO IT DIDN'T ACTUALLY IMPACT THE TOTALS

19   ON THE SPREADSHEET AT ALL, BUT IT DID LOOK ODD WHEN

20   YOU LOOKED AT THE ONE PAGE FOR THE PRODUCTS.

21   Q    CAN YOU TAKE A LOOK AT EXHIBIT 180 IN YOUR

22   BINDER, PLEASE.

23   A    WHICH BINDER IS IT IN?

24   Q    IT SHOULD BE THE CROSS-EXAMINATION BINDER?

25   A    I HAVE TWO.

```
 1    Q    DO YOU HAVE IT, SIR?

 2    A    I HAVE TWO BINDERS.  WHICH ONE WOULD IT BE?

 3    Q    IT SHOULD BE MARKED ON THE TAB.

 4    A    WHICH ONE AGAIN?

 5    Q    180.

 6    A    180?

 7    Q    YES.

 8    A    I HAVE IT.  SORRY.  I'VE GOT IT.  THERE'S MANY

 9    TABS.

10    Q    DO YOU SEE IT, SIR?

11    A    YES.

12    Q    IS THAT ONE OF THE SPREADSHEETS THAT SAMSUNG

13    PRODUCED DURING THE COURSE OF THIS LITIGATION?  DO

14    YOU SEE THE SAM, NDCA AT THE BOTTOM, SIR?

15    A    I DO.

16    Q    AND IT IS ONE OF THE SPREADSHEETS; CORRECT,

17    SIR?

18    A    I'M TRYING TO UNDERSTAND WHICH SPREADSHEET IT

19    IS.  YES, IT IS.

20         MR. JACOBS:  YOUR HONOR, WE MOVE 180 INTO

21    EVIDENCE.

22         THE COURT:  ANY OBJECTION?

23         MR. PRICE:  NO OBJECTION.

24         THE COURT:  IT'S ADMITTED.

25         (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
```

```
 1              180, HAVING BEEN PREVIOUSLY MARKED FOR

 2              IDENTIFICATION, WAS ADMITTED INTO

 3              EVIDENCE.)

 4          MR. JACOBS:  NO FURTHER QUESTIONS, SIR.

 5          THE COURT:  ALL RIGHT.  ANY REDIRECT?

 6    IT'S 9:25.

 7          MR. PRICE:  NO, YOUR HONOR.

 8          THE COURT:  MAY THIS WITNESS BE EXCUSED

 9    AND IT IS SUBJECT TO RECALL OR NOT?

10          MR. PRICE:  NO RECALL, YOUR HONOR.

11          MR. JACOBS:  NO RECALL FROM US.

12          THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.

13          ALL RIGHT.  CALL YOUR NEXT WITNESS,

14    PLEASE.

15          MR. PRICE:  CALL MICHAEL WAGNER.

16          THE CLERK:  PLEASE RAISE YOUR RIGHT.

17                   MICHAEL WAGNER,

18    BEING CALLED AS A WITNESS ON BEHALF OF THE

19    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

20    EXAMINED AND TESTIFIED AS FOLLOWS:

21          THE WITNESS:  I DO.

22          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

23          THE COURT:  ALL RIGHT.  TIME IS NOW 9:27.

24    GO AHEAD, PLEASE.

25    /   /   /
```

3018

1    /   /   /

2                    **DIRECT EXAMINATION**

3    BY MR. PRICE:

4    Q    MR. WAGNER, YOU'VE BEEN HIRED AS AN EXPERT IN

5    THIS CASE?

6    A    I HAVE.

7    Q    AND YOU'RE MY LEAST FAVORITE EXPERT.  YOU'RE

8    TESTIFYING ABOUT WHAT HAPPENS IF APPLE IS RIGHT AND

9    SAMSUNG IS WRONG ABOUT INFRINGEMENT STUFF; RIGHT?

10   A    AT LEAST AS TO THE VALUE OF THESE PATENTS,

11   YES.

12   Q    COULD YOU TELL US WHAT YOUR ASSIGNMENT WAS?

13   A    MY ASSIGNMENT WAS TWO-FOLD.  FIRST WAS TO

14   REVIEW THE REPORTS OF MR. MUSIKA, THE DAMAGE EXPERT

15   FOR APPLE, AND DETERMINE WHETHER I HAD ANY

16   CRITICISMS WITH HIS OPINIONS OR BASIS FOR OPINIONS.

17             AND THEN I ALSO WAS ASKED TO DO AN

18   INDEPENDENT CALCULATION OF DAMAGES IF LIABILITY IS

19   ESTABLISHED.

20   Q    COULD YOU EXPLAIN TO THE JURY WHY YOU BELIEVE

21   YOU'RE QUALIFIED?

22   A    STARTING WITH MY EDUCATION, I HAVE A

23   BACHELOR'S OF SCIENCE IN ENGINEERS FROM SANTA CLARA

24   UNIVERSITY WHICH I RECEIVED IN 1969.

25             I HAVE A MASTER'S IN BUSINESS

```
 1      ADMINISTRATION FROM UCLA WHICH I RECEIVED IN 1971,

 2      AND A JURIS DOCTORATE DEGREE FROM LOYOLA UNIVERSITY

 3      SCHOOL OF LAW IN LOS ANGELES, WHICH I RECEIVED IN

 4      1975.

 5               THE LAST 36 YEARS I HAVE BEEN PRACTICING

 6      IN THIS AREA OF CALCULATING DAMAGES IN COMMERCIAL

 7      LITIGATION.

 8               I WAS A PARTNER AT PRICEWATERHOUSE.  I

 9      WAS PARTNERS IN OTHER MAJOR FIRMS THAT DO THIS TYPE

10      OF WORK, PUBLICLY TRADED MANAGEMENT CONSULTING

11      FIRMS LIKE CHARLES RIVERS ASSOCIATES, AND ALSO

12      LITINOMICS, INCORPORATED, WHICH WAS THE LARGEST

13      PRIVATELY HELD FINANCIAL CONSULTING FIRM.  IT

14      SPECIALIZES IN VALUING INTELLECTUAL PROPERTY.

15               I'M A CERTIFIED PUBLIC ACCOUNTANT IN THE

16      STATE OF CALIFORNIA, AND THOSE ARE MY BASIC

17      QUALIFICATIONS.

18      Q    ARE YOU A MEMBER OF ANY ASSOCIATIONS AND HAVE

19      ANY LEADERSHIP POSITIONS IN THOSE ASSOCIATIONS?

20      A    THE ONES THAT ARE RELEVANT HERE ARE

21      PRINCIPALLY THE AMERICAN INSTITUTE OF CERTIFIED

22      PUBLIC ACCOUNTS, WHICH BASICALLY GOVERNS THE

23      ACTIVITIES OF C.P.A.'S IN OUR COUNTRY, AND I'VE

24      SERVED A NUMBER OF LEADERSHIP ROLES IN THAT

25      ORGANIZATION.
```

1           PROBABLY THE MOST IMPORTANT IS THE

2    PRACTICE STANDARDS COMMITTEE FOR THE MANAGEMENT

3    CONSULTING DIVISION, AND I WAS ON THE COMMITTEE

4    WHEN WE SET THE STANDARDS FOR C.P.A.'S THAT DO THE

5    WORK THAT I'M DOING HERE AND LIKE MR. MUSIKA DID

6    WHEN HE TESTIFIED.

7           I ALSO SERVED ON THE INAUGURAL COMMITTEE

8    THAT SET THE STANDARDS TO HAVE A CERTIFICATE IN

9    FINANCIAL FORENSICS.  IT'S CALLED ACFF.  I WAS

10   NUMBER 23 IN THE COUNTRY TO GET THAT DESIGNATION.

11   THERE'S NOW OVER 5,000 C.P.A.'S WHO DO WORK IN THE

12   FORENSICS AREA IN LITIGATION.

13          AND I WAS THE PERSON WHO WAS ON THAT

14   COMMITTEE TO HELP SET THE STANDARD AND THE

15   QUALIFICATIONS YOU NEEDED TO GET THAT CREDENTIAL.

16          I WAS THE CO-EDITOR OF THE C.P.A. EXPERT

17   FOR A NUMBER OF YEARS, WHICH IS THE QUARTERLY

18   PUBLICATION FOR C.P.A.'S WHO EITHER DO BUSINESS

19   VALUATION OR LITIGATION SERVICES.

20          I SERVED ON THE LITIGATION SERVICES FOR

21   THE COMMITTEE FOR THE C.P.A., AND I WAS ALSO ON THE

22   AGENDA FOR THE NATIONAL COMMITTEE CONFERENCE FOR

23   FIVE YEARS.

24   Q    AND DO YOU HAVE ANY PUBLICATIONS IN THE AREA?

25   A    I HAVE 25 PROFESSIONAL PUBLICATIONS, 8 OF THEM

1    DEAL DIRECTLY WITH THE CALCULATION OF PATENT

2    DAMAGES.

3    Q    NOW, I'D LIKE FIRST TO TURN TO YOUR OPINION --

4              OH, I'M SORRY, YOUR HONOR.  FIRST WE'D

5    OFFER MR. WAGNER AS AN EXPERT.

6              MR. JACOBS:  NO OBJECTION, YOUR HONOR.

7              THE COURT:  SO CERTIFIED.

8    BY MR. PRICE:

9    Q    FIRST I'D LIKE TO LOOK AT YOUR OPINION AS TO

10   MR. MUSIKA'S OPINION AND YOUR COMMENTS.  AND

11   MR. MUSIKA GAVE AN OPINION AS TO WHAT HE SAID

12   SAMSUNG'S TOTAL PROFITS WERE IN THE EVENT THAT THE

13   JURY FINDS THAT ALL THE DESIGN AND TRADE DRESS

14   ALLEGATIONS GO APPLE'S WAY.

15             WHAT'S YOUR VIEW AS TO HIS OPINION OF

16   SAMSUNG'S TOTAL PROFIT?

17   A    THAT HIS CALCULATION OF THE TOTAL PROFITS DID

18   NOT INCLUDE ALL OF THE COSTS IN ORDER TO DETERMINE

19   TOTAL PROFITS.

20   Q    SO LET'S GO INTO THAT.  IF YOU COULD EXPLAIN

21   THAT.  AND IF YOU CAN PUT UP SLIDE 3965.004, AND

22   MAYBE YOU CAN EXPLAIN TO THE JURY WHAT YOUR VIEW OF

23   TOTAL PROFITS IS?

24   A    TOTAL PROFITS IS THE DIFFERENCE, IT'S THE

25   DIFFERENCE BETWEEN ALL THE REVENUES THAT ARE

1    BROUGHT INTO THE COMPANY AS A RESULT OF THE

2    ALLEGEDLY INFRINGING PRODUCTS, LESS ALL OF THE

3    COSTS IN ORDER TO MAKE THOSE PRODUCTS AND SELL

4    THOSE PRODUCTS.

5              AND YOU SUBTRACT THE COST OF REVENUES AND

6    YOU GET TOTAL PROFITS.

7    Q    NOW, LET'S TALK AND FOCUS ON THEIR TOTAL COST

8    AREA, AND IF WE COULD PUT UP 3965.005.

9              AND PERHAPS YOU CAN EXPLAIN TO US WHAT

10   YOU INCLUDE IN TOTAL COSTS?

11   A    THE COSTS THAT I BELIEVE ARE APPROPRIATE ARE

12   THE COST OF GOODS SOLD, WHICH ARE THE COSTS TO

13   ACTUALLY MANUFACTURE THE INFRINGING OR ALLEGEDLY

14   INFRINGING SMARTPHONES AND TABLETS BUT ALSO THE

15   OPERATING EXPENSES THAT ARE NECESSARY TO SELL THOSE

16   PHONES.

17             YOU CAN'T SELL A PHONE JUST BECAUSE

18   YOU'VE MADE IT.  YOU HAVE TO MARKET IT, YOU'VE GOT

19   TO SELL IT, YOU HAVE TO HAVE DEVELOPED IT

20   ORIGINALLY TO ACTUALLY MAKE IT INTO A PRODUCT, AND

21   THEN YOU HAVE TO HAVE AN UMBRELLA ORGANIZATION THAT

22   ORGANIZES ALL OF THOSE ACTIVITIES.

23   Q    SO PERHAPS YOU CAN EXPLAIN THEN THE OPERATING

24   EXPENSES THAT YOU HAVE HERE, SALES EXPENSES,

25   MARKING, ET CETERA, SO THE JURY CAN HAVE AN

1    UNDERSTANDING AS TO WHAT THE NATURE IS OF THOSE

2    EXPENSES?

3    A    STARTING WITH THE FIRST ONE, SALES EXPENSE, AS

4    YOU JUST HEARD, THERE ARE 40 CARRIERS WHO ARE

5    CUSTOMERS FOR THOSE PRODUCTS IN THE UNITED STATES.

6            SAMSUNG HAS TO SEND PEOPLE OUT TO THOSE

7    CARRIERS.  THERE ARE ALL KINDS OF COMPETITORS FOR

8    THE LIMITED SALE SPACE IN THE CARRIER STORES.

9            SO SAMSUNG HAS TO ACTIVELY GET IN THERE

10   AND TELL THESE CARRIERS WHY THEY SHOULD BE CARRYING

11   THEIR PHONES VERSUS APPLE PHONE OR HTC PHONE OR LG

12   PHONE.  SO THOSE ARE SELLING EXPENSES.

13   Q    IS IT YOUR UNDERSTANDING THAT IT IS CUSTOMARY

14   THAT SAMSUNG WOULD HAVE AN EMPLOYEE THAT'S DEVOTED

15   TO ONE PHONE, LIKE THE DROID CHARGE?

16   A    NO.  NORMALLY THEY'RE SELLING A WHOLE PRODUCT

17   LINE FOR THE COMPANY.

18   Q    AND SO HOW ARE EXPENSES THEN ALLOCATED FOR A

19   SALESMAN LIKE THAT?

20   A    WELL, IF YOU WANT TO ALLOCATE TO A PARTICULAR

21   PRODUCT, YOU'D HAVE TO ALLOCATE THAT TIME BECAUSE

22   THAT SALESPERSON DOESN'T ONLY JUST SELL, SAY, AN

23   EPIC 4G.  THEY MAY BE SELLING MANY OF THE OTHER

24   MODELS THAT ARE NOT ACCUSED IN THIS CASE AND YOU

25   HAVE TO ALLOCATE IT BASED ON EITHER TIME OR SOME

1    REASONABLE BASIS LIKE REVENUES.

2    Q    AND IF YOU COULD EXPLAIN THE MARKETING AND THE

3    R&D EXPENSES IN GENERAL, AND ADMINISTRATIVE?

4    A    MARKETING AND GENERAL, YOU AGAIN HAVE TO GET

5    CUSTOMERS AWARE THAT YOU HAVE A PRODUCT.  IT'S

6    MAINLY TV ADVERTISING, BILLBOARDS, MAGAZINE ADS,

7    THAT TYPE OF INFORMATION.

8         AND I'VE BEEN WATCHING THE OLYMPICS, OR I

9    DID, AND EVERY CITE I WOULD SEE THREE DIFFERENT

10   SAMSUNG ADS BEING RUN PROMOTING THEIR GALAXY

11   PHONES.  THAT COST MONEY, A LOT OF MONEY.  THAT

12   COST IS NECESSARY TO BE SUCCESSFUL IN THE

13   MARKETPLACE.

14        AND R&D, YOU HAVE TO DEVELOP THIS VERY

15   COMPLICATED TECHNOLOGY PRODUCT.  THESE ARE THE MOST

16   COMPLICATED CONSUMER PRODUCTS IN THE MARKETPLACE.

17   THERE'S ALL KINDS OF EFFORTS TO DEVELOP THE RIGHT

18   CHIPS, THE RIGHT INTEGRATED CIRCUITS, DETERMINE

19   WHAT FEATURES GO INTO IT, ALL OF THOSE THINGS TAKE

20   A LOT OF TIME AND EXPENSE TO DO AND THOSE COSTS ARE

21   NECESSARY OR YOU'D NEVER SELL A PHONE.

22        AND, FINALLY, GENERAL ADMINISTRATIVE IS

23   YOU, AGAIN, YOU NEED AN ORGANIZATION THAT CAN

24   MANAGE ALL OF THESE ACTIVITIES IN ORDER TO SELL A

25   PHONE.

1    Q    LET ME ASK YOU, DID MR. MUSIKA, IN HIS

2    CALCULATIONS, DEDUCT THESE EXPENSES, SALES,

3    MARKETING, R&D?

4    A    NOT ONE PENNY.

5    Q    SO NOT A PENNY OF ADVERTISING?

6    A    NO.

7    Q    NOT A PENNY OF RESEARCH AND DEVELOPMENT?

8    A    NO.

9    Q    LET ME ASK YOU, YOU'VE SEEN APPLE'S 10-K'S,

10   THEIR FINANCIALS?

11   A    I HAVE.

12   Q    AND DO THEY DEDUCT THESE EXPENSES ON THEIR

13   FINANCIALS?

14   A    THEY CERTAINLY DO.

15   Q    IF WE COULD LOOK AT EXHIBIT 754.502.  754 IS A

16   NUMBER OF, A NUMBER OF FORM 10-K'S, AND I'M GOING

17   TO CALL YOUR ATTENTION TO ACTUALLY 754.501, OR 502.

18   A    THERE'S A REASON I COULDN'T FIND IT.  IT WAS

19   ON THE FLOOR.

20        I'VE GOT IT.

21   Q    DO YOU SEE THIS IS APPLE'S 10-K FOR THE PERIOD

22   ENDING SEPTEMBER 24, 2011?

23   A    CORRECT.

24        MR. PRICE:  AND, YOUR HONOR, I'LL MOVE

25   PAGE 2 INTO EVIDENCE.

```
 1                    THE COURT:  OKAY.  NO OBJECTION; RIGHT?
 2        IT'S ADMITTED.
 3                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
 4                    754.502, PAGE 2, HAVING BEEN PREVIOUSLY
 5                    MARKED FOR IDENTIFICATION, WAS ADMITTED
 6                    INTO EVIDENCE.)
 7        BY MR. PRICE:
 8        Q    IF WE CAN LOOK AT 754.545, IS THIS APPLE'S
 9        CONSOLIDATED STATEMENTS OF OPERATIONS?
10        A    IT IS.
11        Q    AND IF WE CAN BLOW THAT UP.
12                    COULD YOU EXPLAIN TO THE JURY WHAT YOU'RE
13        TALKING ABOUT IN DEDUCTING THE OPERATING EXPENSES
14        FROM INCOME TO GET TOTAL PROFIT?
15        A    WELL, IT STARTS AT NET SALES, WHICH ARE THE
16        REVENUES, AND THEN IT SUBTRACTS COST OF GOODS SOLD
17        TO GET GROSS MARGIN, AND THAT IS WHAT IS GROSS
18        MARGIN, WHICH MR. MUSIKA CALLED TOTAL PROFIT, WHICH
19        IS NOT TOTAL PROFIT.
20                    THEN YOU HAVE THE LINES THE OPERATING
21        EXPENSES WHICH THEY HAVE COLLAPSED INTO TWO GENERAL
22        CATEGORIES, RESEARCH AND DEVELOPMENT, AND THEN
23        SELLING, GENERAL AND ADMINISTRATIVE, AND YOU
24        SUBTRACT THOSE COSTS AND YOU GET TOTAL OPERATING
25        EXPENSES AND TOTAL OPERATING INCOME.
```

```
 1              AND THAT IS WHERE YOU GET THE TOTAL

 2    PROFITS FROM THEIR OPERATIONS.

 3    Q    AND IF YOU GO BELOW THAT, IT HAS COME FROM

 4    PROVISIONS OR INCOME TAXES.  IS APPLE TAXED ON THE,

 5    THE GROSS MARGIN?

 6    A    NO.  THEY'RE TAXED ON THEIR PROFIT BEFORE

 7    TAXES WHICH SUBTRACTS ALL APPROPRIATE EXPENSES.

 8    Q    AND THIS HAS ADDITIONAL SUBTRACTION, OTHER

 9    INCOME AND EXPENSE, WHAT IS THAT RELATED TO?

10    A    THAT NORMALLY IS INTEREST INCOME OR INTEREST

11    EXPENSE IF THEY BORROWED MONEY IN ORDER TO DO THEIR

12    BUSINESS.

13    Q    AND YOU ALSO LOOKED AT SAMSUNG'S AUDITED

14    CONSOLIDATED FINANCIALS?

15    A    I HAVE.  THEY DO EXACTLY THE SAME THING.

16              THE COURT:  CAN I AND HAVE A QUICK

17    CLARIFICATION.  YOU MOVED PAGE 2 INTO EVIDENCE.  DO

18    YOU WANT THIS PAGE?

19              MR. PRICE:  YES, YOUR HONOR.

20              THE COURT:  PAGE 2 IS A SUMMARY.

21              MR. JACOBS:  YOUR HONOR, WE SHOULD HAVE

22    THE WHOLE THING IN.

23              THE COURT:  YOU'LL HAVE TO MOVE IT IN

24    YOUR CASE.  LET ME HEAR WHAT MR. PRICE WANTS.

25              MR. PRICE:  YES, PAGE 545.
```

```
 1                THE COURT:  OKAY.  THAT'S THE ONLY PAGE,
 2      RIGHT.
 3                MR. PRICE:  AND IF WE CAN FIGURE OUT THE
 4      BATES RANGE OF THE WHOLE DOCUMENT, I HAVE NO
 5      OBJECTION.
 6      BY MR. PRICE:
 7      Q    NOW, IF YOU'D LOOK AT EXHIBIT 676, WHICH WAS
 8      JUST ADMITTED INTO EVIDENCE, THAT'S THAT
 9      SPREADSHEET, DID YOU LOOK AT -- DID YOU LOOK AT A
10      SPREADSHEET -- THAT WAS JUST TESTIMONY ABOUT
11      SAMSUNG SPREADSHEET THAT HAD THE, THE INCOME,
12      COSTS, ET CETERA, OF THE PRODUCTS THAT ARE AT ISSUE
13      HERE.
14      A    I DID.
15      Q    AND DID YOU -- FIRST OF ALL, LET ME ASK YOU,
16      IS -- YOU'VE READ MR. MUSIKA'S REPORT?
17      A    I HAVE.
18      Q    WAS THIS THE SAME SPREADSHEET THAT HE WAS
19      USING?
20      A    HE USED A SIMILAR ONE, BUT THE NUMBERS THAT HE
21      SELECTED HAVE THE SAME NUMBERS THAT THIS ONE HAS.
22      Q    YOU SAID THEY HAVE THE SAME NUMBERS.  IS IT
23      THE SPREADSHEET THAT YOU GET THE NUMBER FOR INCOME
24      ON THESE PRODUCTS?
25      A    FOR REVENUE AND COSTS OF GOODS SOLD.
```

1    Q    I'M SORRY.  SO FOR REVENUE, THAT CAME FROM

2    THIS; CORRECT?

3    A    YES.

4    Q    AND YOU -- YOU SAID MR. MUSIKA DEDUCTED COSTS

5    OF GOODS SOLD.  WAS THAT OBTAINED FROM THIS SAME

6    DOCUMENT?

7    A    IT WOULD BE THE SAME NUMBERS, YES.

8    Q    AND DO YOU ALSO GET OPERATING EXPENSES FROM

9    THIS DOCUMENT?

10   A    YOU DO.

11   Q    AND DID MR. MUSIKA USE ANY OF THOSE OPERATING

12   EXPENSES FROM THIS DOCUMENT?

13   A    HE DID NOT.

14   Q    NOW, DID YOU, IN YOUR PROFESSIONAL OPINION,

15   FIND THE INFORMATION IN THIS TO BE RELIABLE?

16   A    I DID.

17   Q    AND IF WE CAN PUT UP EXHIBIT 3965.008, PERHAPS

18   YOU CAN EXPLAIN WHY USING THIS?

19   A    WELL, THE FIRST THING I FOUND IS THIS IS VERY

20   DETAILED FINANCIAL INFORMATION.  COMPANIES DON'T

21   PROVIDE THIS TYPE OF INFORMATION IN THEIR AUDITED

22   FINANCIAL STATEMENTS.  THEY DON'T GIVE YOU

23   MONTH-BY-MONTH COST INFORMATION FOR INDIVIDUAL

24   PRODUCTS THEY SELL.  SO YOU CAN'T TIE THIS TO AN

25   AUDITED FINANCIAL STATEMENT.

```
 1              BUT IT COMES FROM A RELIABLE ACTING
 2    SYSTEM, AND THAT IS THIS S.A.P. SYSTEM.  S.A.P. IS
 3    THE LARGEST PROVIDER OF SOFTWARE IN THE WORLD TO
 4    BUSINESSES.  THEY HAVE MORE ACCOUNTING SOFTWARE IN
 5    THE MAJOR COMPANIES IN THE WORLD.  IT HAS
 6    INTEGRITY.
 7              PRICEWATERHOUSECOOPERS, A FIRM I USED TO
 8    BE A PARTNER IN, AND SO DOES MR. MUSIKA, RELIED ON
 9    THAT DATA TO PROVIDE THE FINANCIAL STATEMENTS.  SO
10    IT COMES FROM A RELIABLE SOURCE.
11              AND AS FAR AS THE METHODS OF ALLOCATION,
12    THEY ARE TYPICAL THAT I SEE AT COMPANIES OVER MY
13    CAREER.  THEY USE THE SAME GENERAL METHODOLOGY THAT
14    APPLE USES TO ALLOCATE COMMON COSTS.  SO I HAVE NO
15    PROBLEM WITH THE WAY THEY ALLOCATED COSTS.
16              AND THEN, FINALLY, THE RESULTS OF THIS
17    ANALYSIS ARE CONSISTENT WITH SAMSUNG'S FINANCIAL
18    STATEMENTS IN GENERAL.
19    Q    NOW, THIS SPREADSHEET GOES OVER 115 PAGES?
20    A    IT'S 115 PAGES THAT YOU CAN'T EVEN READ
21    BECAUSE IT'S SO COMPRESSED.  IF YOU REALLY WANTED
22    TO MAKE IT READABLE, IT WOULD PROBABLY BE A COUPLE
23    HUNDRED PAGES OR MORE THAN THAT.
24    Q    AND WHICH YOU SAID THAT THE METHOD OF
25    ALLOCATION IS SIMILAR TO WHAT APPLE DOES, HOW DOES
```

```
 1    APPLE ALLOCATE ITS OPERATING COSTS?

 2    A    WHEN THEY CAN DIRECTLY ATTRIBUTE IT TO A

 3    PRODUCT LINE, THEY DON'T EVER ALLOCATE TO A

 4    PRODUCT, LIKE ONE OF THEIR MODELS BUT THEY DO HAVE

 5    PRODUCT LINE FINANCIALS FOR THE IPHONE AND FOR THE

 6    IPAD.

 7           BUT WHEN THEY ALLOCATE TO THOSE PRODUCT

 8    LINE FINANCIALS, IF THEY CAN DIRECTLY ATTRIBUTE,

 9    SAY, R&D ENGINEER ONLY WORKED ON THE IPAD, THEY

10    DIRECTLY ATTRIBUTE IT TO IT.

11           IF IT'S AN ENGINEER THAT HAS COMMON

12    TASKS, THEY WOULD HAVE SOME TYPE OF ALLOCATION

13    BASED ON EITHER TIME OR SPACE OR SOME OTHER DRIVER

14    OF, MEASURE OF THAT ACTIVITY.  AND IF THEY CAN'T DO

15    ANY OF THOSE THINGS, THEY USE REVENUE, AND THAT'S

16    EXACTLY WHAT SAMSUNG DOES AS WELL.

17    Q    SO NOW USING THE OPERATING COSTS AND

18    SUBTRACTING THEM FROM THE REVENUE TO GET THE

19    OPERATING INCOME, DID YOU MAKE A CALCULATION AS TO

20    WHAT SAMSUNG'S TOTAL PROFITS WERE ON THE PHONES

21    THAT ARE AT ISSUE HERE?

22    A    I DID FOR A NUMBER OF DIFFERENT PERIODS OF

23    TIME.

24    Q    AND IF YOU LOOK AT EXHIBIT 781, IS THAT A

25    SUMMARY OF YOUR CALCULATIONS WHICH, DEPENDING UPON
```

```
1    THE DATE OF NOTICE --
2    A    YES.
3              MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT
4    781 INTO EVIDENCE.
5              THE COURT:  ANY OBJECTION?
6              MR. JACOBS:  NO OBJECTION, YOUR HONOR.
7              THE COURT:  IT'S ADMITTED.
8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
9              781, HAVING BEEN PREVIOUSLY MARKED FOR
10             IDENTIFICATION, WAS ADMITTED INTO
11             EVIDENCE.)
12   BY MR. PRICE:
13   Q    AND IF WE LOOK AT THE FIRST PAGE, AND WE DO
14   HAVE A -- IF YOU ADD UP ALL THIS, WE COME TO ABOUT
15   518 MILLION.  DO YOU SEE THAT?
16   A    I ROUNDED 519, BUT YES.
17   Q    OKAY, 519.  AND THERE ARE THE EARLIEST DATES
18   OF NOTICE HERE, AND I JUST WANT TO SEE WHAT WE'RE
19   TALKING ABOUT.  YOU WERE ASKED TO ASSUME CERTAIN
20   THINGS ABOUT DATES OF NOTICE; CORRECT?
21   A    YES.  I HAVE NO INFORMATION AS TO WHEN ACTUAL
22   NOTICE OCCURRED.  I WAS TOLD TO USE THESE DATES.
23   APRIL 15TH, 2011 IS THE DATE OF THE FILING OF THE
24   COMPLAINT.  AND THERE ARE A COUPLE PRODUCTS THAT
25   ARE JUNE 16TH, 2011, AND THAT'S BASED ON FILING OF
```

1    THE AMENDED COMPLAINT.

2    Q    SO IF WE CAN PUT UP, AND MAKE THIS A LITTLE

3    CLEARER, SDX 3965.009.

4         SO THIS TAKES THAT SAME THING AND PUTS

5    COMPLAINT OR AMENDED COMPLAINT?

6    A    IT DOES.

7    Q    THERE ARE A FEW THAT SAY NOT ACCUSED.  WHAT'S

8    THAT RELATE TO?

9    A    THAT THESE PARTICULAR PRODUCTS ARE ACCUSED OF

10   OTHER PATENT INFRINGEMENT IN THIS CASE, THE UTILITY

11   PATENTS, BUT THEY'RE NOT ACCUSED OF DESIGN PATENTS

12   OR TRADE DRESS INFRINGEMENT.

13        AND IT'S ONLY PATENTS THAT ARE ACCUSED OF

14   EITHER THE TRADE DRESS INFRINGEMENT OR DESIGN

15   PATENT INFRINGEMENT WHERE YOU CAN ASK FOR SAMSUNG'S

16   PROFITS.

17   Q    OKAY.  AND SO WHEN YOU DO ALL YOUR ADDITION

18   HERE, GIVEN THESE DATES OF NOTICE, IF YOU CAN BLOW

19   THAT UP, YOU COME UP TO 518,706,851; CORRECT?

20   A    I DO.  THAT'S THROUGH JUNE 30TH, 2012.

21   Q    UNLIKE ME, DID YOU CHECK THE MATH?

22   A    I DID CHECK THIS MATH.

23   Q    NOW, YOU ALSO GIVE OTHER NUMBERS DEPENDING

24   UPON OTHER DATES OF NOTICE IN CASE THE JURY WANTS

25   TO LOOK AT THAT, RIGHT, IN EXHIBIT 781?

```
 1    A    I DID.

 2    Q    SO IF THERE'S A CONCLUSION THAT THERE WAS

 3    NOTICE ON AN EARLIER DATE, THEY COULD USE THOSE

 4    OTHER CHARTS?

 5    A    THEY COULD, OR THEY COULD COMBINE THEM IF THEY

 6    FIND SOMETHING DIFFERENT THAN THE THREE SCENARIOS

 7    THAT I HAVE DERIVED IN THE SCHEDULE.

 8    Q    NOW, LET'S SWITCH FROM SAMSUNG'S TOTAL PROFIT

 9    TO THE ISSUE OF LOST PROFITS.

10              AND MR. MUSIKA GAVE AN OPINION ON WHAT

11    LOST PROFITS WOULD BE IN THIS CASE.

12              DO YOU HAVE CRITICISMS OF HIS ANALYSIS OF

13    LOST PROFITS, THAT IS, THE PROFITS APPLE LOST?

14    A    I DO.

15    Q    AND IF WE CAN PUT UP SDX 3965.010.  AND WE

16    HAVE HERE THE ACCUSED FEATURES WERE REMOVED FROM

17    SAMSUNG'S PRODUCTS, AND WE HAVE APPLE WOULD NOT

18    HAVE MADE ADDITIONAL SALES.

19              SO LET ME ASK YOU, MR. MUSIKA WAS TALKING

20    ABOUT A BUT-FOR WORLD WHERE, WHERE SAMSUNG PRODUCTS

21    DID NOT HAVE THE ACCUSED FEATURES.

22              OKAY.  DO YOU HAVE ANY CRITICISMS OF HIS

23    ANALYSIS OF THAT BUT-FOR WORLD?

24    A    I DO, AND I DON'T BELIEVE THAT HE REALLY DID

25    ANALYZE A PROBLEM BUT-FOR WORLD.  THE WORLD THAT WE
```

```
 1    HAVE TO FIGURE OUT WHAT WOULD HAVE HAPPENED IS A
 2    WORLD WHERE SAMSUNG IS STILL GOING TO COMPETE
 3    VIGOROUSLY IN THIS MARKETPLACE.
 4              THE ONLY THING IS THEY'RE NOT GOING TO
 5    HAVE THE FEATURES ENABLED BY THE UTILITY PATENTS,
 6    AND THEY'RE GOING TO HAVE DESIGNS THAT DO NOT
 7    INFRINGE THE DESIGN PATENTS OR THE TRADE DRESS.
 8              AND WE HAVE TO FIGURE OUT WHAT WOULD HAVE
 9    HAPPENED IN THAT WORLD.  I DON'T THINK MR. MUSIKA
10    PROPERLY ADDRESSED THAT WORLD.
11    Q    SO LET'S TALK ABOUT THAT.  AND IF WE GO TO THE
12    NEXT SLIDE, WE'VE GOT THE PATENTS CAN BE DESIGNED
13    AROUND.
14              WHAT DO YOU MEAN BY THAT?
15    A    HE EVEN ADMITS THAT THESE PATENTS CAN BE
16    DESIGNED AROUND.  HE HAS ESTIMATES, SOME WE
17    ACTUALLY AGREE ON, SOME I THINK HIS PERIODS ARE
18    LONGER BASED ON THE INFORMATION I RECEIVED THAT IT
19    WOULD HAVE TAKEN.
20              BUT HE HAS ONE CRITICAL ASSUMPTION IN HIS
21    DESIGN-AROUND ANALYSIS.  HE ASSUMES SAMSUNG WOULD
22    JUST EXIT THE MARKET, THEY WOULDN'T HAVE ANY
23    PRODUCT TO SELL IN THAT DESIGN-AROUND PERIOD.
24              I DON'T THINK THAT'S REASONABLE.  I THINK
25    SAMSUNG WOULD HAVE STAYED IN THE MARKETPLACE, THEY
```

```
1    MAY NOT HAVE HAD CERTAIN FEATURES WHICH, A MONTH
2    LATER, THEY UPDATED AND PUT INTO THEIR PHONES, BUT
3    THEY WOULD STILL BE IN THE MARKETPLACE COMPETING
4    WITH THEIR PRODUCTS.
5    Q    AND FOR THE DESIGN AROUND, COULD YOU TELL US
6    WHAT THAT IS, WHAT IS A DESIGN AROUND?
7    A    A DESIGN AROUND IS EITHER YOU JUST DESIGN OUT
8    THE INFRINGING FEATURE IF IT'S NOT A FEATURE THAT'S
9    REALLY IMPORTANT TO THE CUSTOMERS OR YOU FIND
10   ANOTHER WAY OF DOING IT.
11          AS AN EXAMPLE, BOUNCE BACK, THAT GIVES
12   YOU NO INDICATION THAT YOU'RE AT THE END OF AN
13   ELECTRONIC DOCUMENT.  THERE'S OTHER WAYS TO NOTIFY
14   YOU OF DOING THAT.  SO THEY MAY JUST USE SOME OTHER
15   METHOD TO NOTIFY YOU THAT YOU'RE AT THE END OF A
16   FILE.
17   Q    LET ME ASK YOU SPECIFICALLY ABOUT THE DESIGN
18   AROUND ON APPLE SPECIFIC DESIGNS ON THEIR PATENTS.
19          WOULD THERE BE DESIGN AROUNDS FOR THAT AS
20   WELL?
21   A    WELL, CERTAINLY.  SAMSUNG HAS MANY PHONES,
22   SMARTPHONES IN THE MARKETPLACE THAT AREN'T ACCUSED
23   OF ANY TRADE DRESS OR DESIGN PATENT INFRINGEMENT.
24          THEY COULD HAVE JUST MOVED TO THOSE
25   DESIGNS.  THEY'VE ALREADY CREATED THEM.  THEY
```

```
 1    EXIST.

 2              SAMSUNG CURRENTLY HAS 103 MODELS IN THE

 3    UNITED STATES.  THEY COME OUT WITH MORE THAN ONE A

 4    WEEK.  THEY COULD HAVE COME OUT WITH JUST A

 5    DIFFERENT PACKAGE TO PUT THEIR TECHNOLOGY INTO.

 6    Q    SO, FOR EXAMPLE, I'M GOING TO SHOW YOU EXHIBIT

 7    1018 FOR IDENTIFICATION, WHICH APPEARS TO BE A

 8    NEXUS S.  DO YOU HAVE THAT IN FRONT OF YOU?

 9    A    I DO.

10    Q    AND DO YOU RECOGNIZE THAT AS A GALAXY NEXUS S?

11    A    I DO.

12              MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 1018

13    INTO EVIDENCE.

14              THE COURT:  OKAY.  NO OBJECTION, RIGHT?

15    IT'S ADMITTED.

16              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17              1018, HAVING BEEN PREVIOUSLY MARKED FOR

18              IDENTIFICATION, WAS ADMITTED INTO

19              EVIDENCE.)

20              THE COURT:  GO AHEAD.

21    BY MR. PRICE:

22    Q    SO, FOR EXAMPLE, THIS IS NOT AN ACCUSED PHONE.

23    THIS THE KIND OF DESIGN THAT SAMSUNG COULD GO TO?

24    A    RIGHT.  THEY'VE ACTUALLY DESIGNED THIS PHONE

25    AND THIS PHONE DOES NOT INFRINGE ANY OF WHAT'S
```

1    BEING ALLEGED IN THIS CASE AS FAR AS PATENTS OR

2    TRADE DRESS.  THEY COULD HAVE USED THIS DESIGN FOR

3    THE INFRINGING PHONES.

4    Q    SO, FOR EXAMPLE, SUPPOSE THE JURY CONCLUDES

5    THAT SOME PHONES WOULD INFRINGE -- THIS IS WHY I

6    HATE TO HAVE YOU UP HERE, I HAVE TO ASSUME THESE

7    THINGS -- BUT ASSUME THAT SOME PHONES INFRINGE AND

8    OTHERS DON'T, FOR EXAMPLE, THE DROID, WHICH IS

9    1025, OR THE CAPTIVATE -- I'M SORRY, THE CAPTIVATE,

10   WHICH IS -- YEAH, DROID WHICH IS 1025 WHICH IS

11   CAPTIVATE, WHICH IS 1011, WHICH THE JURY HAS SEEN A

12   NUMBER OF TIMES.

13          SO, FOR EXAMPLE, IF THEY DECIDE THOSE

14   HARD CASE DESIGNS ARE NOT INFRINGED, BUT OTHERS

15   ARE, HOW WOULD THAT AFFECT YOUR OPINION ON WHETHER

16   OR NOT THERE ARE DESIGN AROUNDS?

17   A    WELL, THESE THEN WOULD BE COMMERCIALLY

18   ACCEPTABLE ALTERNATIVES, DESIGNS THAT COULD HAVE

19   BEEN USED INSTEAD OF THE INFRINGING DESIGNS.

20   Q    NOW, CONTINUING IN THIS BUT-FOR WORLD, IF WE

21   CAN GO TO THE NEXT SLIDE, YOU HAVE ABSENCE OF THESE

22   FEATURES WOULD NOT DRIVE CUSTOMERS TO APPLE.  IS

23   THAT YOUR OPINION?

24   A    BASED ON THE EVIDENCE I REVIEWED, THAT IS

25   CORRECT.

1     Q    OKAY.  AND COULD YOU EXPLAIN TO THE JURY

2     WHAT'S THE BASIS OF THE OPINION THAT, THAT A

3     CUSTOMER WHO HAD BOUGHT A SAMSUNG OR AN ANDROID

4     WOULD NOT GO TO APPLE IN THE ABSENCE OF THESE

5     FEATURES?

6     A    WELL, DURING THIS PERIOD OF TIME, J.D. POWERS

7     AND ASSOCIATES DID AN INDEPENDENT STUDY OF CUSTOMER

8     SATISFACTION FOR THE SMARTPHONE INDUSTRY IN 2011,

9     AND THEY LOOK AT ALL THE DIFFERENT FEATURES THAT

10    CONSUMERS THINK ARE IMPORTANT.

11         AND THEY HAD 25 DIFFERENT FEATURES,

12    INCLUDING THE 5 BASIC BUCKETS.  ONE BUCKET IS

13    ACTUALLY PHYSICAL DESIGN, WHICH IS RELATED TO THE

14    PATENTS IN SUIT.

15         THERE'S A LOT MORE IN THERE BESIDES JUST

16    THE PATENTS IN SUIT.  AND WHEN YOU LOOK AT THAT,

17    AND THEY'VE PUT AN APPLE AGAINST ALL THE MAJOR

18    COMPETITORS, APPLE REMAINED NUMBER ONE IN PHYSICAL

19    DESIGN IN THEIR STYLE OF THEIR PHONES DURING THIS

20    TIME PERIOD.

21         SAMSUNG ACTUALLY RATED BELOW THE INDUSTRY

22    AVERAGE, SO IF YOU FIND THAT SAMSUNG INFRINGED THE

23    DESIGN PATENTS THAT ARE IN THIS CASE, THAT IS NOT

24    ACTUALLY THE MOST IMPORTANT DESIGN ELEMENT THAT

25    APPLE HAS, AND THEY HAVE MANY OTHER DESIGN PATENTS

3040

```
1    THAT ARE NOT ASSERTED IN THIS CASE.  SO THAT TELLS

2    ME THAT WHAT THE SPECIFIC DESIGN THAT'S AT ISSUE IN

3    THIS CASE ISN'T WHAT'S DRIVING DEMAND OR DRIVING

4    CUSTOMERS FROM SAMSUNG TO APPLE IF SAMSUNG DIDN'T

5    HAVE THESE FINE FEATURES.

6    Q    IF YOU'RE CHOOSING -- IF THE BEST DESIGN IS

7    IMPORTANT TO YOU, APPLE RATED HIGHER?

8    A    THEY RANKED HIGHER DURING THIS TIME PERIOD.

9    Q    OKAY.  LET'S TALK, THEN, ABOUT THIS GROUP OF

10   PEOPLE WHO BOUGHT THE SAMSUNG PHONES THAT ARE

11   ALLEGED TO BE INFRINGED.

12          WHAT DID THE DATA TELL YOU AS TO THAT

13   GROUP OF PEOPLE AS OPPOSED TO THE OVERALL

14   POPULATION WOULD SWITCH TO AN APPLE PHONE?

15   A    THAT'S A GOOD QUESTION.  THAT'S THE CONSUMERS

16   WE HAVE TO TRY TO UNDERSTAND WHAT THEIR BEHAVIOR

17   WOULD HAVE BEEN.  WE KNOW IN THE REAL WORLD THEY

18   ACTUALLY CHOSE AN ANDROID PHONE AND A SAMSUNG PHONE

19   ON THAT PLATFORM INSTEAD OF GOING TO APPLE.

20          SO YOU HAD TO LOOK AT THEIR BEHAVIOR AND

21   WHAT THEY NEED AND WANT AND DESIRE IN THEIR PHONES.

22   Q    AND IF YOU LOOK AT EXHIBIT 572, WHICH IS IN

23   EVIDENCE, PARTICULARLY PAGE 82, DID APPLE DO

24   STUDIES OF ANDROID PURCHASERS TO SEE WHAT WAS

25   IMPORTANT TO THEM?
```

1    A    THEY DO.

2    Q    IF YOU CAN PUT 572.082 AND BLOW THAT UP, AND

3    WHAT PERCENTAGE OF SAMPLE PURCHASERS, BEING AN

4    ANDROID PHONES DIDN'T CONSIDER APPLE?

5    A    75 PERCENT.  THE VAST MAJORITY DIDN'T THINK

6    ABOUT APPLE AS A REALISTIC ALTERNATIVE WHEN THEY

7    MADE THEIR DECISION.

8    Q    YOU SEE HERE THAT TALKS ABOUT 25 PERCENT

9    CONSIDERED AN IPHONE?

10   A    THAT'S CORRECT.

11   Q    AND OF THOSE TWO, WHO EVEN CONSIDERED AN

12   IPHONE, YOU KNOW, WHAT KIND OF FEATURES WERE

13   IMPORTANT TO THEM?

14   A    WELL, IT'S THE FEATURES THAT ARE LISTED IN THE

15   REST OF THIS CHART, AND NONE OF THEM HAVE ANYTHING

16   TO DO WITH DESIGN.

17          THEY HAVE TO DO WITH FUNCTIONALITY AND

18   CARRIERS AND THINGS LIKE THAT AND BRAND, NOTHING TO

19   DO WITH THE PHYSICAL APPEARANCE OF THE PHONE THAT

20   THEY BOUGHT.

21   Q    FOR EXAMPLE, PREFERRED LARGER SCREEN, THAT WAS

22   ONE OF THE ITEMS; RIGHT?

23   A    THEY WOULD, YES.

24   Q    THIS GPS NAVIGATION, WAS THAT SOMETHING WHICH

25   APPLE HAD AT THE TIME?

1    A    WELL, AT SOME POINT THEY DID NOT.  EVENTUALLY

2    THEY DID GET IT.  BUT, AGAIN, THE ANDROID PROVIDERS

3    HAD AN ADVANTAGE DURING SOME PARTS OF THIS PERIOD

4    OF TIME THAT WE'RE TALKING ABOUT BECAUSE THEY COULD

5    OFFER THAT FUNCTIONALITY.

6    Q    MR. WAGNER, IN THIS CASE, HAVE YOU SEEN ANY

7    ANALYSIS, ANY STUDY DONE THAT ASKED WHAT ANDROID OR

8    SAMSUNG PHONE OWNERS WOULD DO IF THEY DIDN'T HAVE

9    CERTAIN FEATURES IN THEIR PHONE, THAT IS, WHETHER

10   OR NOT THEY WOULD LEAVE SAMSUNG OR ANDROID FOR

11   APPLE BECAUSE OF THESE SPECIFIC FEATURES?

12   A    NO.  AND THAT TYPE OF STUDY COULD HAVE BEEN

13   DONE, BUT NO ONE HAS ASKED THAT QUESTION IN THIS

14   CASE.  NO ONE HAS GIVEN EITHER MR. MUSIKA OR MYSELF

15   THE INFORMATION WE WOULD NEED TO REALLY DETERMINE

16   DAMAGES.

17   Q    BY THE WAY, WHEN YOU'RE TALKING ABOUT J.D.

18   POWERS STUDY, WERE YOU TALKING ABOUT EXHIBIT 69?

19   A    IF THAT'S THE MARCH 2011 STUDY, YES.  I CAN'T

20   FIND IT IN THESE BINDERS.

21   Q    OKAY.

22        YOUR HONOR, I MOVE EXHIBIT 69 INTO

23   EVIDENCE.  IT'S THE FIRST PAGE OF THE J.D. POWERS

24   STUDY.

25        THE COURT:  SURE.  ANY OBJECTION?

```
1              MR. JACOBS:  NO, YOUR HONOR.

2              THE COURT:  IT'S ADMITTED.

3              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

4              69, HAVING BEEN PREVIOUSLY MARKED FOR

5              IDENTIFICATION, WAS ADMITTED INTO

6              EVIDENCE.)

7    BY MR. PRICE:

8    Q    NOW, YOU SAW MR. MUSIKA ALSO PRESENTED A

9    CHART, IF YOU CAN LOOK AT FLOOR B9, WHICH SHOWED

10   SAMSUNG'S MARKET SHARE, AND IT KIND OF SHOWED IT

11   INCREASING AND IT SHOWED PHONES, GALAXY S PHONES.

12             DO YOU AGREE OR DISAGREE WITH THE

13   SUGGESTION BY MR. MUSIKA THAT SAMSUNG'S MARKET

14   SHARE INCREASED BECAUSE OF ANYTHING TO DO WITH THE

15   PATENTS OR -- AT ISSUE IN THIS CASE?

16   A    NO.  THIS DOESN'T TELL YOU ANYTHING ABOUT WHY

17   THAT RED BAR IS GOING UP DURING THAT TIME PERIOD,

18   AND TO MAKE THIS EVEN RELEVANT TO THE CASE, YOU

19   NEED TO UNDERSTAND THAT.

20             AND MR. MUSIKA DID NO ANALYSIS ABOUT WHY

21   SAMSUNG'S MARKET SHARE INCREASED.  HE GIVES THIS

22   IMPRESSION IT'S BECAUSE THEY INTRODUCED THIS ONE

23   PHONE.  THERE'S A LOT MORE TO THE STORY.

24   Q    SUCH AS?

25   A    WELL, FIRST OFF, YOU SHOULDN'T EVEN HAVE THE
```

```
1    LINE THAT HE DREW.  YOU SHOULD HAVE THE LINE OF THE
2    INFRINGING PHONES RATHER THAN ALL OF THEIR PHONES.
3    THIS IS MISLEADING.  THIS ISN'T ACTUALLY WHAT WOULD
4    BE CAUSED BY WHAT'S ALLEGED IN THIS CASE.  THERE'S
5    MORE INFORMATION HERE THAN YOU SHOULD HAVE.  SO
6    THAT'S THE FIRST PROBLEM.
7             THE SECOND PROBLEM IS HE IGNORES THE FACT
8    THAT SAMSUNG IS DRIVING TECHNOLOGY IN THIS SPACE.
9    THEY'RE KNOWN AS HAVING THE FASTEST PROCESSOR, THE
10   BRIGHTEST SCREENS, THEY HAVE ALL KINDS OF
11   FUNCTIONALITY.  THEY LED IN 3G AND 4G.  THAT'S WHY
12   THEY'RE DOING WELL.  IT HAS NOTHING TO DO WITH
13   WHAT'S AT ISSUE IN THIS CASE.
14   Q    AND WHEN YOU LOOK AT THE CHART THAT WAS
15   ACTUALLY IN MR. MUSIKA'S REPORT, AND IF WE CAN KIND
16   OF GO TO THAT FROM HERE USING, I THINK IT'S 39 --
17   3909.59, LET'S SHOW THE FULL INFORMATION.  3909.59.
18             SO IF WE CHANGE THE SCALE AND SHOW THIS
19   OTHER DATA, WHAT IS THIS OTHER DATA?
20   A    THE OTHER DATA IS WHAT'S HAPPENING TO APPLE'S
21   MARKET SHARE DURING THE SAME TIME PERIOD.
22   Q    AND WE DO SEE PEAKS IN APPLE'S MARKET DATA.
23   WHAT'S THAT A RESULT OF?
24   A    SOME OF IT HAS TO DO WITH SEASONALITY, BUT THE
25   MAIN THING IS WHEN DOES APPLE INTRODUCE A NEW
```

1    PRODUCT?  UNLIKE SAMSUNG WHO INTRODUCED A NEW

2    SMARTPHONE FOR A PARTICULAR SUBNET OF MARKET ALMOST

3    WEEKLY, APPLE ONLY INTRODUCED A NEW PRODUCT ONCE A

4    YEAR, THE PHONE IS HERE, AND YOU HAVE TO WAIT A

5    YEAR.

6              THAT'S WHY THERE'S THIS INCREDIBLE SPIKE

7    THAT GOES UP AT THE END, BUT THEY'RE NOT INCREASING

8    MARKET SHARE DURING MOST OF THIS PERIOD BECAUSE

9    THEY HAVE NOTHING NEW TO SELL.

10   Q    LET'S GO BACK TO 3965.010.  IF WE CAN JUST PUT

11   UP THE FULL CHART NOW.  WE KIND OF TALKED ABOUT

12   GROUPS OF FEATURES DRIVING DEMAND.  WE HAVE A

13   SECTION HERE, APPLE LACKED CAPACITY, HOW DOES THAT

14   EFFECT YOUR OPINION?

15   A    I DIDN'T TALK ABOUT GROUPS OF FEATURES DRIVE

16   DEMAND.

17   Q    I'M SORRY.  TALK.

18   A    AGAIN, THIS IS A VERY COMPLICATED DECISION

19   PROCESS TO BUY THESE PHONES.  THERE ISN'T ONE

20   FEATURE THAT DRIVES DEMAND.  I DO AGREE THAT DESIGN

21   IS ONE OF THE FACTORS THAT YOU SHOULD CONSIDER.

22             BUT WHAT YOU'RE REALLY BUYING IS

23   TECHNOLOGY.  YOU'RE NOT BUYING A PHYSICAL DESIGN.

24   I'VE NEVER SEEN A PRODUCT THAT HAS MORE TECHNOLOGY

25   IN IT THAN A SMARTPHONE.

```
 1              AND SO THAT'S WHAT YOU'RE LOOKING AT.
 2    AND PEOPLE BUY PHONES BECAUSE OF THE INTERNET
 3    CAPABILITY, THEY CAN DO THEIR WEB BROWSING, THEY
 4    WANT IT FAST.  SAMSUNG HAS GREAT PROCESSORS TO DO
 5    THAT.
 6              THEY WANT TO DO E-MAIL, THEY WANT TO TAKE
 7    PICTURES WITH A CAMERA, THEY WANT TO DOWNLOAD GAMES
 8    IF THEY REALLY WANT TO MAKE THE DEVICE FUN FOR
 9    THEM.  IT'S A MULTIFUNCTIONAL DEVICE.  THAT'S WHAT
10    THEY'RE BUYING, NOT JUST DESIGN.
11    Q    AND YOU HAVE APPLE LACKED CAPACITY.  WHAT'S
12    THAT REFERRING TO?
13    A    WELL, DURING CONCERN PERIODS OF MR. MUSIKA
14    LOST DAMAGES STUDY, APPLE COULDN'T SELL ONE MORE OF
15    THEIR PRODUCT THAN THEY ACTUALLY SOLD BECAUSE THEIR
16    CAPACITY WAS STRAINED.
17              WHEN THE IPHONE 4 CAME OUT, YOU SAW THAT
18    SPIKE, WHAT WAS HAPPENING WAS THEY COULDN'T MEET
19    THE DEMAND THEY HAD IN THE REAL WORLD.  THEY
20    COULDN'T HAVE SOLD ANOTHER 2 MILLION UNITS IN THIS
21    PERIOD.  THEY COULD NOT HAVE DONE IT.  AND THERE'S
22    PLENTY OF DOCUMENTATION BOTH FROM APPLE AND THE
23    PRESS THAT INDICATED THAT.  AND THAT WAS BETWEEN
24    JUNE OF 2010 AND SEPTEMBER OF 2010.
25              AND AS FAR AS THE TABLETS, AGAIN, WHEN
```

1    THEY INTRODUCED THE IPAD 2, THEY COULD NOT SELL

2    ENOUGH PRODUCT.  TIM COOK, THEIR CEO, TO PUBLIC

3    INVESTORS STATED WE HAVE THE MOTHER OF ALL

4    BACKLOGS.  HOW COULD THEY HAVE SOLD ANOTHER IPAD 2

5    DURING THIS DAMAGES PERIOD?  THEY COULDN'T EVEN

6    MEET THE DEMAND WITH THE COMPETITION WITH SAMSUNG.

7    SO THERE SHOULD BE NO LOST PROFITS DURING THAT

8    PERIOD OF TIME.

9    Q    NOW, LET ME ASK YOU TO ASSUME THAT THERE WOULD

10   BE CUSTOMERS THAT WOULD SAY, I DON'T HAVE

11   BOUNCEBACK, I'M GOING TO SWITCH TO AN APPLE.

12            DO YOU HAVE ANY DISAGREEMENTS WITH

13   MR. MUSIKA'S CALCULATIONS OF THE WAY HE DID PROFITS

14   FOR APPLE, ASSUMING THERE WAS A SWITCH?

15   A    I DO.  I THINK HE'S OVERSTATED THE ACTUAL

16   PROFITS THAT WOULD HAVE BEEN EARNED.

17   Q    AND IF WE CAN LOOK AT 3965.011.  AND THE FIRST

18   POINT HERE, IT SAYS, USES WORLDWIDE PRICES INSTEAD

19   OF U.S. PRICES?

20   A    WHAT I'M TALKING ABOUT IS APPLE DOESN'T

21   PRODUCE THE INFORMATION ON A PERIODIC BASIS THAT

22   YOU WOULD NEED TO DO THE CALCULATIONS IN THIS CASE.

23   THIS CASE IS ABOUT THE U.S. MARKET.  APPLE ONLY

24   PRODUCES INFORMATION ON A PRODUCT LINE BASIS ON

25   WORLDWIDE SALES, BUT IT DOES PRODUCE INFORMATION TO

```
 1   THEIR MANAGEMENT AS TO U.S. PRICES, U.S. UNITS,

 2   WORLDWIDE PRICES AND WORLDWIDE UNITS.

 3              AND MR. MUSIKA USED THE WORLDWIDE PRICES

 4   INSTEAD OF U.S. PRICES, AND THEY ARE HIGHER THAN

 5   U.S. PRICES.  THAT OVERSTATES HIS DAMAGE CLAIM IN

 6   THE U.S.

 7   Q    SO IF WE CAN LOOK AT 3965.013, AND COULD YOU

 8   TELL US WHAT WE'RE LOOKING AT HERE?

 9   A    WELL, THE TOP PART OF IT IS INFORMATION

10   STRAIGHT OUT OF THE WORK PAPERS THAT SUPPORT

11   MR. MUSIKA'S CALCULATIONS, AND THE BOTTOM PART I'VE

12   GIVEN YOU THE INFORMATION THAT'S THE AVERAGE PRICES

13   IN THE U.S. VERSUS WORLDWIDE FOR THE IPHONE DURING

14   2010 AND 2011.

15              AND YOU CAN SEE IN 2010, THE WORLDWIDE

16   AVERAGE PRICE IS $630.82.  FOR THE U.S. IN THIS

17   PERIOD, IT'S ONLY $567.78.

18              AND IN 2011, THE WORLDWIDE PRICE IS

19   $651.32.  WHERE IN THE U.S., THE AVERAGE PRICE IS

20   ONLY $615.87.  HE SHOULD HAVE USED U.S. PRICES.

21   Q    AND BY USING THE HIGHER SELLING PRICE, YOU GET

22   MORE PROFITS?

23   A    CORRECT, YOU HAVE A HIGHER PROFIT MARGIN.

24   Q    AND DID HE HAVE THE INFORMATION WHERE HE COULD

25   HAVE CALCULATED THE U.S. AVERAGE PRICE AS OPPOSED
```

1    TO WORLDWIDE?

2    A    HE DID.  I GOT THIS INFORMATION RIGHT OUT OF

3    HIS WORK PAPERS.  HE HAD THE INFORMATION.

4    Q    NOW, IF WE GO BACK TO 3965.011, ALSO GO TO THE

5    NEXT ONE, WE HAVE GOT FAILS TO ADJUST FOR APPLE'S

6    HIGHER PRICES.  WHAT ARE YOU TALKING ABOUT HERE?

7    A    WHAT I'M TALKING ABOUT IS A FUNDAMENTAL

8    ECONOMIC PRINCIPAL.  IF YOU TOOK ECON IN COLLEGE,

9    ECON 101, THE FIRST THING YOU LEARN IS THE HIGHER

10   THE PRICE, THE LOWER QUANTITY YOU SELL.  IT'S THE

11   BASIC LAW OF DEMAND.  THERE'S A THING CALLED PRICE

12   ELASTICITY.  IF YOU RAISE YOUR PRICE, YOU'RE GOING

13   TO SELL FEWER UNITS.

14        HE HAS USED APPLE'S PRICES, HIGHER PRICES

15   THAN SAMSUNG'S PRICES AND ASSUMED THERE WILL BE NO

16   PRICE ELASTICITY, AND THESE CUSTOMERS IN THE REAL

17   WORLD WHO PAY A LOWER PRICE FOR SAMSUNG PHONES WHEN

18   THEY SWITCH WOULD PAY A HIGHER PRICE FOR APPLE.

19   NOT EVERYONE WOULD BE WILLING TO DO THAT, AND HE

20   DID NOT CONSIDER THAT FACT.

21   Q    YOU WERE HERE WHEN HE TESTIFIED; CORRECT?

22   A    I WAS.

23   Q    AND THERE WAS SOME DISCUSSION ABOUT WHAT A

24   CONSUMER WOULD ACTUALLY PAY FOR AN IPHONE VERSUS

25   SAMSUNG PHONES, AND I'M GOING TO PLACE UP FOR YOU

```
 1   WHAT IS NOW IN EVIDENCE AS 69.24, WHICH IS FROM

 2   THAT J.D. POWERS STUDY.  AND IF YOU BLOW UP THE

 3   BOTTOM.

 4           COULD YOU TELL US WHAT THIS SHOWS ON THE

 5   BOTTOM OF THE PAGE?

 6   A   WHAT THIS SHOWS IS THE ACTUAL CONSUMER, AFTER

 7   THE SUBSIDY OF THE CARRIERS.  ON AVERAGE WHEN J.D.

 8   POWERS STUDIED, THE AVERAGE APPLE CUSTOMER PAID

 9   $206.

10           IF YOU GO OVER TO THE LAST BAR, OR SECOND

11   TO LAST BAR ON THE RIGHT, THE SAMSUNG AVERAGE

12   CUSTOMER ONLY PAID $139.  THAT'S A BIG DIFFERENCE

13   TO MOST CONSUMERS.

14           AND WHAT MR. MUSIKA IS TELLING YOU IS

15   THAT IN THIS BUT-FOR WORLD, THESE PEOPLE THAT PAID

16   AN AVERAGE PAID $139 WOULD BE WILLING TO PAY $206

17   WITHOUT ANY REDUCTION IN QUANTITY.  THAT IS NOT

18   REASONABLE.

19   Q   NOW, LET ME ASK YOU ABOUT THE IPAD.  IS THERE

20   ANY CARRIER SUBSIDY FOR THE IPAD VERSUS THE GALAXY

21   TAB?

22   A   NO, THERE IS NOT.

23   Q   IS THERE A PRICE DIFFERENCE BETWEEN THOSE TWO?

24   A   WELL, PARTICULARLY FOR THE DAMAGE PERIOD FOR

25   LOST PROFITS BETWEEN THE SEVEN INCH PRODUCT THAT
```

1    SAMSUNG WAS SELLING AND THE PRODUCT THAT IS

2    ALLEGEDLY GOING TO BE NOW SOLD IN THE BUT-FOR

3    WORLD, APPLE'S IPAD, THERE'S ABOUT A $240 PRICE

4    DIFFERENCE FOR EACH OF THOSE.

5    Q    LET ME ASK YOU, MR. MUSIKA ASSUMES THAT SOME

6    PEOPLE WOULD SWITCH FROM SAMSUNG SEVEN INCH TABLET

7    TO APPLE'S TEN INCH TABLET IF THESE FEATURES WERE

8    TAKEN AWAY.

9    A    HE DOES.

10   Q    AND WHAT'S YOUR OPINION ABOUT THAT?

11   A    WELL, THERE ARE SOME PEOPLE THAT ACTUALLY BUY

12   A PRODUCT BECAUSE OF ITS SIZE.  THEY WANT A SEVEN

13   INCH TABLET.  APPLE IN THIS TIME PERIOD DID NOT

14   OFFER THAT, ALTHOUGH ON THE ANDROID PLATFORM, THERE

15   WERE OTHER SEVEN INCH ALTERNATIVES.

16   Q    SO WHAT WOULD THAT SUGGEST?

17   A    IT WOULD SUGGEST IF SAMSUNG COULD NOT MAKE

18   THESE SALES THAT SOMEONE ELSE WOULD PICK IT UP.  IT

19   WOULDN'T HAVE BEEN APPLE, AT A LOWER PRICE AND THE

20   SIZE THE CUSTOMER WANTED.

21   Q    I WANT TO SWITCH TO ANOTHER TOPIC NOW -- AND

22   BY THE WAY, THE EFFECT OF THE PRICE, THE EXCESS

23   PRICE, WHAT EFFECT DOES THAT HAVE ON YOUR

24   CALCULATIONS ON WHAT LOST PROFITS ONE?

25   A    THE AVERAGE IS 16 TO 19 PERCENT, BUT THERE'S

1    ANOTHER MISTAKE THAT I THINK HE MADE, AND THIS IS

2    JUST A JUDGMENT, THAT HE DIDN'T INCLUDE ANY

3    INCREMENTAL MARKETING EXPENSES FOR APPLE TO SELL

4    THESE ADDITIONAL PRODUCTS.  I THINK THERE WOULD

5    HAVE BEEN MORE MARKETING EXPENSE.  A LOT OF THESE

6    CUSTOMERS WERE CARRIERS THAT DIDN'T CARRY THE

7    IPHONE.  SO YOU HAVE TO GET TO THOSE CUSTOMERS AND

8    NOW WE ADD ANOTHER 3 PERCENT.  OVERALL, I THINK

9    HE'S OVERSTATED HIS PROFIT MARGIN BY ABOUT 20

10   PERCENT.

11   Q    AND THAT ASSUMES PEOPLE WOULD HAVE ACTUALLY

12   GONE TO APPLE BECAUSE OF THESE?

13   A    THOSE ARE FOR THE CUSTOMERS WHO WOULD ACTUALLY

14   GO TO APPLE.

15   Q    AND NOW I WANT TO TALK ABOUT A REASONABLE

16   ROYALTY CALCULATION WHICH RELIES ON THIS

17   HYPOTHETICAL NEGOTIATION, AND MR. MUSIKA SAID THAT

18   HE GAVE A REASONABLE ROYALTY NUMBER OF $24 FOR, I

19   THINK, THE DESIGN AND DO YOU HAVE ANY COMMENTS ON

20   THAT?

21   A    YEAH.  I THINK THAT WAY OVERSTATES WHAT SHOULD

22   BE PAID, AND THE MAIN REASON IS THE METHODOLOGY HE

23   USED TO GET THAT.  IT'S BASICALLY HIS MEASURE OF

24   THE TOTAL BRAND VALUE OF APPLE IN THE PRODUCT THAT

25   IS THEY SELL.  SAMSUNG DIDN'T TAKE THE WHOLE BRAND

```
 1   VALUE OF APPLE.  THEY TOOK SOME SPECIFIC LIMITED

 2   DESIGN PATENTS.  BRAND VALUE INCLUDES A LOT MORE

 3   THAN DESIGN.  IT INCLUDES TRADEMARKS, IT INCLUDES

 4   EVERYTHING THAT MAKES YOU ATTRACTED TO APPLE.

 5   THEIR LOGO, THE LITTLE APPLE WITH THE BITE, THEIR

 6   NAME, ALL THAT IS IN THAT BRAND VALUE.

 7             AND THAT IS JUST A WAY OVERSTATEMENT OF

 8   WHAT'S BEING -- WHAT'S ALLEGEDLY TAKEN IN THIS

 9   CASE.  SO I THINK THAT DRAMATICALLY OVERSTATES THE

10   VALUE OF ANY DESIGN THAT SAMSUNG ALLEGEDLY TOOK IN

11   THIS CASE.

12   Q    IN OTHER WORDS, $24 HE USES, ASSUMING THERE IS

13   INFRINGEMENT, THAT WOULD INCLUDE BEING ABLE TO USE

14   THE BITTEN APPLE AND THE APPLE NAME AND EVERYTHING

15   APPLE?

16   A    AND ALL THE OTHER DESIGN PATENTS AND TRADE

17   DRESS AND TRADEMARKS THAT APPLE HAS.

18   Q    NOW, DID YOU DO A CALCULATION OF WHAT YOU

19   THOUGHT WAS A REASONABLE ROYALTY?

20   A    I DID.

21   Q    AND WHAT WAS THAT BASED ON?

22   A    THAT WAS BASED ON MY INTERVIEW OF ENGINEERS AT

23   SAMSUNG AND PEOPLE IN HUMAN RESOURCES TO GIVE ME

24   ESTIMATES AS TO THE TIME TO DESIGN AROUND AND ALSO

25   THE COST OF THOSE ENGINEERS.
```

1    Q    AND 3965.016, THIS IS ON THE HYPOTHETICAL

2    NEGOTIATION, WE'RE TALKING ABOUT GEORGIA PACIFIC

3    FACTORS AND WHAT'S THE KEY FACT THAT YOU FOCUSSED

4    ON?

5    A    THE KEY THAT I FOCUSSED ON, AFTER MY ANALYSIS,

6    IS WHAT IS THE NEXT BEST ALTERNATIVE TO SAMSUNG?

7    HERE'S APPLE COMING IN AND SAYING WE WANT HUNDREDS

8    OF MILLIONS OF DOLLARS FROM YOU.  THEY WOULD PAY

9    THAT IF THAT WAS THEIR ONLY CHOICE.

10            BUT IF THEY HAVE A CHOICE, THEY WOULD GO

11   BACK TO APPLE AND SAY TO THE NEGOTIATING TABLE AND

12   SAY YOU'RE ASKING TOO MUCH, BECAUSE IF YOU ASK THAT

13   MUCH, I'M GOING TO CHANGE MY PRODUCT AND I WILL NOT

14   PRACTICE YOUR PATENTS AND YOU GET A ZERO IS WHAT

15   YOU GET.

16            AND THE COST OF ME DOING THAT IS THE MOST

17   THAT I WOULD BE WILLING TO PAY YOU.  THAT'S WHAT

18   HAPPENS IN THE REAL WORLD.  THAT'S WHAT SHOULD

19   HAPPEN IN THIS HYPOTHETICAL NEGOTIATION.

20   Q    DID YOU THEN ESTIMATE SAMSUNG'S COSTS TO

21   DESIGN AROUND?  AND WE CAN LOOK AT CHART 3965.020.

22            COULD YOU EXPLAIN TO US WHAT THIS SHOWS?

23   A    YEAH, THIS IS JUST THE RESULT OF THE

24   INFORMATION I RECEIVED FROM SAMSUNG ABOUT THE

25   AMOUNT OF TIME IT WOULD TAKE TO DESIGN AROUND THESE

1    THREE UTILITY PATENTS, RANKING FROM TWO WEEKS AND

2    TWO DAYS FOR THE '163 PATENT TO FOUR WEEKS AND

3    THREE DAYS FOR THE '381 PATENT, AND I'VE GOT THIS

4    FROM A NUMBER OF ENGINEERS AND DESIGNERS THAT WOULD

5    TAKE AND WHAT SAMSUNG PAYS THESE PEOPLE AT A FULLY

6    BURDENED RATE AND THEN MULTIPLIED THESE HOURS TIMES

7    THAT RATE TO GIVE THE FIGURES IN THE RIGHT-HAND

8    COLUMN.

9    Q    AND THEN THE TOTAL AMOUNT WOULD BE 27,300 FOR

10   THE DESIGN AROUND COSTS?

11   A    THAT'S CORRECT, FOR THESE THREE UTILITY

12   PATENTS.

13   Q    BY THE WAY, DID MR. MUSIKA USE THE SAME

14   METHODOLOGY IN CALCULATING HIS TIME FOR DESIGN

15   AROUND?

16   A    YES, HE DIDN'T USE IT FOR LOST PROFITS, I MEAN

17   FOR REASONABLE ROYALTY.  HE USED IT FOR LOST

18   PROFITS.  BUT HE DID EXACTLY THE SAME THING I DID.

19   HE TALKED TO APPLE ENGINEERS TO FIGURE OUT HOW LONG

20   IT WOULD TAKE.  HE NEVER COSTED IT OUT BECAUSE HE

21   DIDN'T USE IT FOR HIS REASONABLE ROYALTY

22   CALCULATION.

23   Q    AND HERE ON THE '915, THE '381, YOU HAVE FOUR

24   WEEKS, FOUR WEEKS AND THREE DAYS.  WAS THERE ANY

25   DISAGREEMENT BETWEEN YOU AND MR. MUSIKA AS TO THE

3056

1    DESIGN-AROUND TIMES FOR THOSE?

2    A    WELL, NOT FOR THE '381, BUT THERE WAS FOR THE

3    '915.  I BELIEVE HE WAS TOLD THAT WOULD TAKE ABOUT

4    SIX TO EIGHT MONTHS.

5    Q    YOU HAVE FOUR WEEKS AND THREE DAYS, OR TWO

6    DAYS.  THAT'S KIND OF PRECISE.  WHAT'S THAT ABOUT?

7    A    COULD YOU REPEAT YOUR QUESTION.

8    Q    WHY IS THAT SO PRECISE, FOUR WEEKS AND THREE

9    DAYS, FOUR WEEKS AND TWO DAYS?

10   A    I ASKED THEM TO GIVE ME A PRECISE ESTIMATE,

11   THIS IS MY INSTRUCTION TO THEM, IF YOU'RE GOING TO

12   BE OUT OF THE MARKET AND THERE WOULD BE A PROBLEM

13   SELLING THE PRODUCTS, PUT YOUR BEST PEOPLE ON THIS

14   PRODUCT, WHAT TIME WOULD IT TAKE YOU TO DO IT AND

15   THESE ARE THE ESTIMATES I GOT.

16   Q    AND THESE ARE BASICALLY SOFTWARE CHANGES;

17   CORRECT?

18   A    CORRECT.

19   Q    SO, MR. WAGNER, GETTING BACK, DID YOU SEE

20   EVIDENCE IN THIS CASE FOR THE BUT-FOR SCENARIO THAT

21   IF A SAMSUNG PHONE DID NOT HAVE FEATURES THAT ARE

22   ACCUSED IN THIS CASE THAT CUSTOMERS WOULD GO FROM

23   THE ANDROID PLATFORM TO IPHONE BECAUSE OF THE

24   FEATURES?

25   A    I DID NOT.

```
1            MR. PRICE:  ONE SECOND.

2            NO FURTHER QUESTIONS.

3            THE COURT:  ALL RIGHT.  THE TIME IS

4    10:09.  GO AHEAD, PLEASE.

5                    CROSS-EXAMINATION

6    BY MR. JACOBS:

7    Q    LET'S JUST START, MR. WAGNER, WHERE MR. PRICE

8    LEFT OFF.  WE'RE NOT JUST TALKING ABOUT PEOPLE

9    LEAVING SAMSUNG; CORRECT, SIR?

10   A    WELL, IT'S LEAVING SAMSUNG AND THEN WHERE DO

11   THEY GO.  I AGREE WITH THAT.

12   Q    BUT WE'RE ALSO TALKING ABOUT FIRST-IME BUYERS;

13   CORRECT, SIR?

14   A    I DON'T THINK SO.

15   Q    YOU DON'T THING WE'RE EVER TALKING IN THIS

16   CASE WHEN YOU TALK ABOUT LOST PROFITS, FOR EXAMPLE,

17   YOU'RE NOT TALKING ABOUT SOMEBODY ENTERING THE

18   SMARTPHONE MARKET FOR THE FIRST TIME AND MAKING A

19   CHOICE?

20   A    I'M SORRY.  YEAH, I BELIEVE IT'S PROBABLY SOME

21   OF THESE 2 MILLION PURCHASERS, THIS WAS THE FIRST

22   TIME THEY BOUGHT A SMARTPHONE FROM SAMSUNG.  I'M

23   SORRY, I AGREE WITH YOU.

24   Q    WHEN WE TALK ABOUT LEAVING SAMSUNG AND TRYING

25   TO EXTRACT SOMEBODY FROM THE SAMSUNG OR ANDROID
```

3058

```
 1    CUSTOMER BASE AND DRAW THEM TO APPLE, THAT'S A MUCH
 2    TOUGHER PROPOSITION THAN HAVING SOMEONE ENTER THE
 3    STORE, MAKE A CHOICE OVER HERE, THIS BEAUTIFUL
 4    APPLE PRODUCT AND MAYBE A SAMSUNG PRODUCT THAT'S
 5    NOT SO BEAUTIFUL, THAT'S A DIFFERENT SCENARIO,
 6    ISN'T IT, SIR?
 7    A    I AGREE WITH THAT.
 8    Q    NOW, LET'S TALK ABOUT THE DATA THAT YOU RELIED
 9    ON FOR YOUR CALCULATIONS.  IT'S TRUE, SIR, THAT YOU
10    HAD A LOT OF DIFFICULTY GETTING INFORMATION FROM
11    SAMSUNG?
12    A    THAT'S TRUE.
13    Q    IN FACT, THE WHOLE PROCESS OF GETTING
14    INFORMATION FROM SAMSUNG FOR YOU TO DO YOUR WORK ON
15    THE CASE YOU RECALL AS BEING VERY DIFFICULT?
16    A    I AGREE WITH THAT.  I SAID THAT AT MY
17    DEPOSITION, AND I'LL SAY IT AGAIN TODAY.
18    Q    NOW, YOU'RE THE EXPERT THAT SAMSUNG HAS
19    RETAINED TO TRY AND HELP IT DO A CALCULATION THAT
20    WILL REDUCE THE DAMAGES; CORRECT, SIR?
21    A    THAT'S THEIR -- THAT WOULD BE IN THEIR BEST
22    INTERESTS, YES.
23    Q    AND EVEN AS TO YOU, SAMSUNG'S RETAINED EXPERT,
24    YOU HAD DIFFICULTY GETTING INFORMATION FROM
25    SAMSUNG; CORRECT, SIR?
```

1    A    FOR THE THIRD TIME, YES.

2    Q    NOW, YOU HAD TO FILE A CORRECTED VERSION OF

3    YOUR INITIAL EXPERT REPORT ON APRIL 20, 2012; TRUE,

4    SIR?

5    A    I DID, THAT WAS BEFORE I DID MY INITIAL

6    REPORT.

7    Q    AND THAT'S BECAUSE THERE WAS KIND OF A MAD

8    RUSH AT THE END TO GET THE DATA THAT YOU NEEDED TO

9    EVEN TO PREPARE A REPORT; CORRECT, SIR?

10   A    YEAH, I DIDN'T KNOW WHAT I WAS REBUTTING UNTIL

11   THREE WEEKS BEFORE MY REPORT WAS DUE BASED ON THE

12   SCHEDULE OF THIS CASE.  I HAD THREE WEEKS TO DO ALL

13   MY WORK.

14        THIS IS AN ENORMOUS AMOUNT OF WORK TO DO

15   IN THREE WEEKS, AND, YES, MY STAFF WAS PRESSED TO

16   GET EVERYTHING DONE AND EVERYTHING CHECKED AND WE

17   MADE SOME, I WOULD SAY, MECHANICAL ERRORS IN THE

18   INITIAL REPORT.

19   Q    I THINK YOUR STAFF DID A TERRIFIC JOB, SIR.  I

20   WAS REALLY TALKING ABOUT DATA FROM SAMSUNG.

21   A    I'M SORRY.

22   Q    THE DATA FROM SAMSUNG CAME IN LATE, DIDN'T IT,

23   SIR?

24   A    YEAH, BUT I DIDN'T ASK FOR IT UNTIL I

25   UNDERSTOOD WHAT I WAS ADDRESSING.  IT'S NOT LIKE I

3060

```
1     STARTED MY ENGAGEMENT IN JANUARY OF 2011.  I DIDN'T
2     REALLY START MY WORK IN EARNEST UNTIL MARCH 22ND,
3     WHEN MR. MUSIKA TOLD ME WHAT I HAD TO ADDRESS.  IT
4     WAS STILL COMPRESSED IN THAT THREE-WEEK TIME
5     PERIOD.
6     Q    BUT YOU'RE AWARE THAT WELL BEFORE THAT REPORT
7     HAD COME IN, BECAUSE AFTER ALL, MR. MUSIKA HAS TO
8     LOOK AT SAMSUNG DATA, TOO, DOESN'T HE, SIR?
9     A    HE DOES.
10    Q    SO THE DATA THAT SAMSUNG HAS TO PRODUCE, IT'S
11    NOT JUST BEING PRODUCED AFTER MR. MUSIKA'S REPORT
12    COMES IN, IS IT, SIR?
13    A    YOU'RE CORRECT.
14    Q    SO THERE'S MONTHS FOR SAMSUNG TO GATHER THE
15    INFORMATION NECESSARY FOR BOTH MR. MUSIKA AND YOU
16    TO DO YOUR WORK AND THAT DATA CAME IN VERY LATE,
17    DIDN'T IT, SIR?
18    A    TO YOUR COMPOUND QUESTION, YES, AND YES.
19    Q    AND IN PARTICULAR THERE'S THIS DATA CALLED TAB
20    6 DATA; IS THAT TRUE, SIR?
21    A    YES, THAT'S THE U.S. FINANCIAL STATEMENT.
22    Q    AND YOU DIDN'T RECEIVE THAT DATA UNTIL VERY
23    LATE, ISN'T THAT TRUE, SIR?
24    A    I THINK IT WAS THE NIGHT BEFORE MY REPORT WAS
25    DUE.
```

3061

1    Q    NOW, LET'S TALK ABOUT THE ALLOCATION

2    SPREADSHEETS THAT YOU WERE DISCUSSING WITH

3    SAMSUNG'S COUNSEL.  THESE ARE THE SPREADSHEETS THAT

4    PURPORT TO SHOW INDIRECT COSTS ALLOCATED TO

5    PRODUCTS; TRUE, SIR?

6    A    THAT'S TRUE.

7    Q    NOW, THOSE SPREADSHEETS, THEY WERE CREATED

8    SOLELY FOR PURPOSES OF THIS LITIGATION.  TRUE, SIR?

9    A    THEY WERE, BECAUSE THIS TYPE OF INFORMATION IS

10   NEVER PRODUCED IN THE NORMAL COURSE OF BUSINESS.

11   Q    AND ON THIS INFORMATION, THIS PARTICULAR

12   INFORMATION, THIS ALLOCATION OF COST DATA TO

13   PRODUCTS, YOU AND YOUR STAFF MADE NO INDEPENDENT

14   EFFORT TO DETERMINE THAT THAT INFORMATION WAS A

15   DIRECT EXTRACT FROM THE S.A.P. SYSTEM.  TRUE, SIR?

16   A    THAT IS TRUE.  I RELIED UPON MY CLIENT.

17   Q    AND YOU WERE NOT ABLE OR CHOSE -- ACTUALLY,

18   I'LL JUST ASK IT.  YOU DID NOT TIE THOSE

19   SPREADSHEETS TO INTERNAL REPORTS PROVIDED TO

20   MANAGEMENT.  TRUE, SIR?

21   A    I COULDN'T.  YOU'RE ASKING ME TO DO SOMETHING

22   THAT'S IMPOSSIBLE.  THEY NEVER PRODUCED THIS TYPE

23   OF REPORT TO MANAGEMENT, SO YOU COULDN'T MAKE THE

24   TYPE OF COMPARISON YOU ASKED ME TO MAKE.

25   Q    YOU COULD SEE IT SUMMED UP, ALLOCATED, AND

1    UNALLOCATED COST.  YOU COULD HAVE DONE THAT

2    ANALYSIS, TRUE, SIR?

3    A    NOT PRODUCT BY PRODUCT THAT WAS IN THAT

4    REPORT, NO, BECAUSE THAT'S NEVER BEEN PRODUCED

5    EVER, IN THE HISTORY OF SAMSUNG, BEFORE THIS CASE.

6    BUT THEY NEEDED TO DO IT FOR PURPOSES OF THIS CASE.

7    Q    LET ME JUST ASK YOU, SIR, ONCE AGAIN, WHETHER

8    OR NOT YOU THOUGHT IT WAS APPROPRIATE OR NECESSARY,

9    DID YOU OR YOUR STAFF TAKE ANY ACTION TO TRY TO TIE

10   THE INFORMATION THAT YOU HAD RECEIVED AND THAT YOU

11   WERE RELYING ON TO OTHER INTERNAL FINANCIAL

12   DOCUMENTS, SUCH AS INTERNAL REPORTS TO MANAGEMENT?

13   A    NO.  I DIDN'T DO THAT.

14   Q    AND THE SAME ANSWER WITH RESPECT TO ANY

15   EXTERNAL REPORTING.  TRUE, SIR?

16   A    THAT'S TRUE.

17   Q    AND WITH RESPECT TO SAMSUNG'S ALLOCATIONS OF

18   COSTS TO PRODUCTS, YOU MADE NO INDEPENDENT EFFORT

19   TO CHECK ANY MANUALS OR PROCEDURES TO SEE HOW THAT

20   WAS DONE?

21   A    I DID NOT LOOK AT THEIR CONTROLLER'S PROCEDURE

22   MANUAL, THAT IS CORRECT.

23   Q    YOU DIDN'T CHECK THAT THE ALLOCATIONS WERE

24   EXECUTED PROPERLY?

25   A    THAT'S TRUE.  I RELIED UPON MY CLIENT.

1    Q    OR THAT THE ALLOCATIONS WERE CONSISTENTLY

2    APPLIED?

3    A    I KNEW BASED ON READING DEPOSITION TESTIMONY

4    AND READING THE DECLARATION OF MR. SHEPPARD AND THE

5    TESTIMONY HE JUST GAVE IS THAT THEY PREPARE THEIR

6    FINANCIAL INFORMATION IN ACCORDANCE WITH

7    INTERNATIONAL FINANCIAL REPORTING STANDARDS, AND

8    GAAP, AND I KNOW THOSE REQUIRE CONSISTENT

9    APPLICATIONS.  SO I WOULD KNOW THEY WOULD DO THAT.

10   I WOULDN'T HAVE TO CHECK.

11   Q    BUT THIS ISN'T THOSE -- THAT IS THE -- WE'RE

12   NOT TALKING ABOUT THE GAAP ACTING OR IFRS

13   ACCOUNTING DOCUMENTS.  WE'RE TALKING ABOUT

14   DOCUMENTS SPECIFICALLY CREATED FOR THIS LITIGATION.

15   TRUE, SIR?

16   A    THAT'S TRUE, YES.

17   Q    AND YOU DID NO INDEPENDENT CHECK OF WHETHER

18   THOSE ALLOCATIONS, THE ALLOCATIONS OF COSTS TO

19   PRODUCTS WERE CONSISTENTLY APPLIED?

20   A    THAT'S TRUE.

21   Q    AND YOU UNDERSTAND THAT THE JURY MAY HEAR AN

22   INSTRUCTION ON THIS QUESTION ABOUT HOW COSTS HAVE

23   TO BE ALLOCATED.  TRUE, SIR?

24   A    YOU'RE TELLING ME SOMETHING I DON'T KNOW, BUT

25   I GUESS THAT COULD HAPPEN, YES.

1    Q    NOW, FROM THE ACCOUNTING PERSPECTIVE, YOU HAVE

2    NO REASON TO BELIEVE THAT APPLE'S DAMAGES AWARD

3    SHOULD BE LIMITED TO ONLY THE PROFITS AT STA AND

4    SEA; CORRECT, SIR?

5    A    CLEARLY NOT.  YOU HAVE -- THAT'S AN

6    ALTERNATIVE REVENUE.  YOU HAVE OTHER REMEDIES.

7    Q    NOW, YOU DID AN ALTERNATIVE CALCULATION AND

8    YOU DISCUSSED IT WITH SAMSUNG'S CALCULATION, AND

9    JUST TO CLARIFY, WE'VE GOT THREE BUCKETS HERE.

10   WE'VE GOT SAMSUNG'S PROFITS, WE'VE GOT APPLE'S LOST

11   PROFITS AND WE'VE GOT REASONABLE ROYALTY.  TRUE,

12   SIR?

13   A    THAT'S TRUE.

14   Q    AND YOU DID AN ALTERNATIVE CALCULATION OF

15   SAMSUNG'S PROFITS, OR WHAT MR. MUSIKA CALLED

16   SAMSUNG'S UNJUST ENRICHMENT.  TRUE, SIR?

17   A    I DID.

18   Q    AND THAT ALTERNATIVE CALCULATION WAS $519

19   MILLION.  IS THAT TRUE, SIR?

20   A    ROUNDING THE MILLIONS, THAT IS CORRECT.

21   Q    AND ONE OF THE KEY ASSUMPTIONS THERE IS THE

22   START DATE BASED ON -- ON YOUR CHART WHEN THE

23   COMPLAINT WAS FILED FOR MOST OF THE PRODUCTS.

24   TRUE, SIR?

25   A    THAT'S TRUE.

1    Q    AND THE OTHER KEY ASSUMPTION IS THAT YOUR

2    ASSESSMENT OF SAMSUNG'S PROFITS ATTRIBUTABLE TO THE

3    INFRINGING PRODUCTS IS CORRECT.  TRUE, SIR?

4    A    I AGREE WITH THAT.

5    Q    AND JUST TO MAKE THIS KIND OF EASY FOR THE

6    JURY, YOUR CALCULATION OF SAMSUNG'S -- OF SAMSUNG'S

7    PROFITS WAS WHAT PERCENT?

8    A    FOR THAT CALCULATION, IT'S ABOUT 12 PERCENT.

9    Q    AND WHETHER MR. MUSIKA'S CALCULATION OF

10   SAMSUNG'S PROFITS, THE PERCENTAGE, THE

11   CORRESPONDING PERCENTAGE, WAS ABOUT 35.9 PERCENT.

12   IS THAT TRUE, SIR?

13   A    I THOUGHT IT WAS 35.5, BUT YOU MAY BE RIGHT.

14   Q    I'LL TAKE 35.5.  IF YOU APPLY MR. MUSIKA'S

15   CALCULATION OF SAMSUNG'S PROFITABILITY TO ALL THE

16   OTHER INFORMATION ON WHICH YOU REPLIED FOR YOUR

17   $519 MILLION CALCULATION, WHAT NUMBER DO YOU GET?

18   A    I HAVEN'T MADE THE CALCULATION.  IF YOU MADE

19   THE CALCULATION, AND FOR ONCE YOU GUYS DO IT RIGHT,

20   BECAUSE YOU GUYS ALWAYS SEEM TO DO IT WRONG -- I'M

21   SORRY.  IN MR. SHEPPARD'S DEPOSITION, WHEN YOU

22   TRIED TO RECREATE HIS INFORMATION, YOU MADE A $900

23   MILLION MISTAKE.

24        MR. JACOBS:  I'M SORRY, YOUR HONOR.  I

25   MOVE TO STRIKE.

```
 1    Q    I'M ASKING YOU FOR A SIMPLE CALCULATION, SIR.

 2    A    I'VE TOLD YOU I'VE NOT DONE IT.  TELL ME WHAT

 3    THE NUMBERS ARE, AND IF IT'S RIGHT I'LL AGREE WITH

 4    YOUR NUMBERS.

 5    Q    IF MR. MUSIKA'S CALCULATION OF SAMSUNG'S

 6    PROFITABILITY IS ABOUT 35.5 PERCENT AND YOUR

 7    CALCULATION IS 12-PLUS PERCENT, IF YOU TAKE YOUR

 8    500 MILLION PLUS NUMBER, YOU WOULD MULTIPLY IT BY

 9    ABOUT TWO AND A HALF TIMES TO COME UP WITH THE

10    CORRESPONDING CALCULATION USING MR. MUSIKA'S

11    PROFITABILITY ANALYSIS AND YOUR START DATES, TRUE,

12    SIR?

13    A    I THINK IT WOULD BE CLOSER TO THREE THAN TWO

14    AND A HALF, BUT YES.

15    Q    APPROXIMATELY $1.396 BILLION; TRUE, SIR?

16    A    I WOULD BELIEVE THAT'S THE CORRECT NUMBER.

17    Q    NOW, I JUST WANT TO BE SURE THAT THE TESTIMONY

18    ON THIS WAS CLEAR.

19         FOR THE REASONABLE ROYALTY ANALYSIS, YOUR

20    ASSESSMENT IS -- WE'RE NOT SUPPOSED TO ADD 0'S TO

21    THAT, ARE WE, SIR?  IT'S LITERALLY IN THE THOUSANDS

22    OF DOLLARS?

23    A    IT IS.  THESE ARE JUST SOFTWARE CHANGES.

24    Q    NOW, YOU ANALYZED SAMSUNG INTERNAL DOCUMENTS

25    TO DETERMINE WHETHER THERE WAS, IN FACT, DEMAND FOR
```

2067

```
1    THE PATENTED FEATURES.  TRUE, SIR?

2    A    I DID.

3    Q    AND ONE OF THOSE DOCUMENTS WAS AN E-MAIL DATED

4    2000 -- FROM 2010 THAT TALKED ABOUT BROWSER

5    SCROLLING AND THE LATEX EFFECT.  TRUE, SIR?

6    A    I REMEMBER THAT DOCUMENT.

7    Q    CAN WE SEE -- CAN YOU LOOK AT PLAINTIFF'S

8    EXHIBIT 186, PLEASE, IN YOUR BINDER.  AND CAN WE --

9    YOUR HONOR, I OFFER 186 INTO EVIDENCE.

10            THE COURT:  ANY OBJECTION?

11            MR. PRICE:  NO FOUNDATION, YOUR HONOR.

12            MR. JACOBS:  I'VE JUST LAID IT, YOUR

13   HONOR.

14            THE COURT:  ADMITTED.

15            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16            186, HAVING BEEN PREVIOUSLY MARKED FOR

17            IDENTIFICATION, WAS ADMITTED INTO

18            EVIDENCE.)

19            THE COURT:  GO AHEAD.

20            MR. JACOBS:  AND CAN WE HIGHLIGHT

21   PARAGRAPH 2.

22   Q    AND DO YOU SEE IN THIS E-MAIL, SAMSUNG IS

23   DISCUSSING THE FACT THAT THEY HAVE LEFT OUT THE

24   LATEX EFFECT OF HAVING THE SCREEN FOLLOW ALONG AND

25   THEN RETURNING WHEN YOU'RE MOVING PAST THE EDGE?
```

```
 1    DO YOU SEE THAT, SIR?

 2    A    I DO.

 3    Q    AND IT SAYS -- AND THEN YOU SEE IT SAYS,

 4    "REFER TO THE IPAD."

 5              DO YOU SEE THAT, SIR?

 6    A    I DO.

 7    Q    AND YOUR TESTIMONY IS THAT THE REASONABLE

 8    ROYALTY ON THE '381 RUBBER BANDING PATENT IS IN THE

 9    THOUSANDS OF DOLLARS?

10    A    IT'S ABOUT $10,000.  I THINK IT'S 11,000.

11    Q    LET'S LOOK AT ANOTHER DOCUMENT THAT YOU LOOKED

12    AT.  IT'S PX 195 IN YOUR BINDER.  YOU LOOKED AT

13    THIS DOCUMENT IN DOING YOUR WORK.  TRUE, SIR?

14    A    I'LL LOOK AT IT ON THE SCREEN BECAUSE I DON'T

15    HAVE ANY OF THESE DOCUMENTS IN FRONT OF ME.

16    Q    I'M SORRY.  TAKE A LOOK AT THE SCREEN, SIR?

17    A    I'M LOOKING, AND I DON'T THINK IT'S SUPPOSED

18    TO BE NUMERICAL SEQUENCE, AND I DON'T SEE 195 OR

19    THE LAST ONE YOU GAVE ME.

20    Q    THE WHITE BINDER, SIR?

21    A    I DON'T HAVE A WHITE BINDER.

22              MR. JACOBS:  MAY I APPROACH, YOUR HONOR.

23              THE COURT:  PLEASE, GO AHEAD.

24              THE WITNESS:  I'M SORRY.  IT WAS ON THE

25    FLOOR.  MY APOLOGIES.
```

2069

BY MR. JACOBS:

Q    WE'RE ALL MOVING QUICKLY, SIR.

A    I KNOW.

Q    OKAY.  PLEASE LOOK AT 195.

A    I'M THERE.

Q    DID YOU EXAMINE THIS DOCUMENT IN THE COURSE OF

YOUR WORK?

A    I'M NOT RECALLING SEEING IT, NO.

Q    YOU HAVE A PORTION OF YOUR REPORT WHERE YOU

LIST THE BATES RANGES OF SAMSUNG DOCUMENTS THAT YOU

LOOKED AT.  I'LL REPRESENT TO YOU, SIR, THAT THIS

EXHIBIT IS LISTED IN THAT APPENDIX TO YOUR REPORT.

A    WELL, I'LL TELL YOU WHAT I DID IS WE PRODUCED

TO YOU EVERY DOCUMENT THAT EITHER I OR MY STAFF

LOOKED AT, AND THAT'S WHAT WE CALL DOUR DOCUMENTS

CONSIDERED LIST.

        THE DOCUMENTS THAT I RELIED UPON FOR MY

OPINION ARE FOOTNOTED IN 14 VOLUMES THAT ARE

ATTACHED TO MY REPORT.  UNLESS THIS WAS FOOTNOTED,

I CAN TELL YOU MIKE WAGNER DID NOT LOOK AT IT.

Q    BUT YOUR STAFF SUBMITTED AN APPENDIX WITH YOUR

REPORT OF ALL DOCUMENTS THAT YOU AND YOUR STAFF

LOOKED AT; IS THAT TRUE, SIR?

A    THAT'S WHY I'M CERTAIN THAT WE RECEIVED THIS

INFORMATION.

2070

```
 1              MR. JACOBS:  WE MOVE 195 INTO EVIDENCE,

 2   YOUR HONOR.

 3              MR. PRICE:  SAME OBJECTION, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

 5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 6              195, HAVING BEEN PREVIOUSLY MARKED FOR

 7              IDENTIFICATION, WAS ADMITTED INTO

 8              EVIDENCE.)

 9   BY MR. JACOBS:

10   Q    SO THIS IS EXHIBIT 195, AND DO YOU SEE IT SAYS

11   "WITH REGARDS TO BOUNCE, WE USE THE MASS SPRING

12   DAMPER MODEL AND OBTAINED THE BOUNCE EFFECT THAT IS

13   SIMILAR TO THE IPAD."

14              DO YOU SEE THAT, SIR?

15   A    I DO.

16   Q    AND THEN IF YOU LOOK ON THE NEXT PAGE, WHICH

17   IS ACTUALLY A PREVIOUS E-MAIL IN THE STRING,

18   ACTUALLY 606, MR. LEE.

19   A    TWO PAGES.

20   Q    DO YOU SEE THERE'S A DISCUSSION ABOUT, AMONG

21   THE SAMSUNG ENGINEERS IN OCTOBER OF 2010 ABOUT HOW

22   COMPARED TO OUR COMPETITOR'S PRODUCT, YOU KNOW WELL

23   WHICH ONE, AND THEN SOME SYMBOL, IT IS STILL NOT

24   SATISFACTORY.

25              DO YOU SEE THAT, SIR?
```

1    A    I DO.

2    Q    AND SO THE SAMSUNG ENGINEERS ARE TALKING AMONG

3    THEMSELVES ABOUT HOW TO GET THE BOUNCE EFFECT IN

4    THE SAMSUNG PRODUCTS TO BE BETTER AND EQUAL TO THE

5    APPLE PRODUCTS.  TRUE, SIR?

6    A    I BELIEVE THAT'S A REASONABLE INTERPRETATION.

7    Q    AND THEN ONE MORE, SIR.  WE'RE GOING TO TAKE A

8    LOOK AT EXHIBIT 35.  DO YOU SEE THAT ONE, SIR?

9    A    I DO.

10   Q    AND THAT'S ABOUT ICONS; TRUE, SIR?

11   A    IT IS.

12   Q    AND YOU LOOKED AT THAT DOCUMENT, OR YOU OR

13   YOUR STAFF LOOKED AT THAT DOCUMENT?

14   A    IF SOMEONE AT MY FIRM DID, IT WAS MY STAFF.

15            MR. JACOBS:  I OFFER IT INTO EVIDENCE,

16   YOUR HONOR.

17            MR. PRICE:  SAME OBJECTION.

18            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

19            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20            35, HAVING BEEN PREVIOUSLY MARKED FOR

21            IDENTIFICATION, WAS ADMITTED INTO

22            EVIDENCE.)

23            MR. JACOBS:  CAN WE HAVE 35 UP, PLEASE.

24   Q    35 IS PASSING ON SOME COMMENTS FROM AT&T ABOUT

25   SAMSUNG'S ICONS.  DO YOU SEE THAT, SIR?

2072

```
1    A     I HAVEN'T HAD A CHANCE TO READ IT, BUT I'M
2    ASSUMING THAT'S WHAT THIS ADDRESSES.
3    Q     IT SAYS, "IN ADDITION TO THIS, WE ALSO WANTED
4    TO SHARE SOME FEEDBACK COMPARING ICONS WE HAVE
5    IMPLEMENTED PROPOSED FOR ETERNITY/GENIE VERSUS
6    IPHONE."  DO YOU SEE THAT?
7    A     I DO.
8    Q     AT&T COMMENTS REGARDING OUR PROPOSED ICONS
9    THAT THEY APPEAR VERY CARTOONISH, ANIMATED, WHICH
10   IS EQUAL IF WE'RE TARGETING A MORE YOUTHFUL TWEEN
11   AUDIENCE, ICONS ARE COLORFUL, VIBRANT, HOWEVER,
12   THEY ARE IN CONTAINED SQUARE WHICH APPEAR MORE
13   ORGANIZED AND CONSISTENT.
14             DO YOU SEE THAT, SIR?
15   A     I DO.
16   Q     AND YOUR TESTIMONY IS THAT THERE IS NO
17   REASONABLE ROYALTY VALUE THAT CAN BE ATTRIBUTED TO
18   APPLE'S ICON DESIGNS?
19   A     NO, I DIDN'T SAY NO.  YOU CAN DESIGN AROUND
20   THESE AND GET A SIMILAR PRODUCT WITH SIMILAR
21   FEATURES AND THAT'S THE MOST YOU WOULD PAY IS WHAT
22   MY OPINION IS.
23             MR. JACOBS:  THANK YOU VERY MUCH, SIR.
24             THE COURT:  ALL RIGHT.  THE TIME IS NOW
25   10:25.
```

```
1              MR. PRICE:  YES.

2              THE COURT:  OKAY.  GO AHEAD.

3                   REDIRECT EXAMINATION

4    BY MR. PRICE:

5    Q    YOU WERE TALKING ABOUT PERCENTAGE OF YOUR

6    CALCULATIONS COMPARED TO MR. MUSIKA'S CALCULATIONS,

7    AND I'D LIKE TO PUT, IF WE CAN, THE SAMSUNG

8    FINANCIALS.

9              IF WE CAN PUT UP -- MAYBE WE CAN DO THIS

10   BY MEMORY.  YOU WERE HERE WHEN MR. SHEPPARD

11   TESTIFIED?

12   A    I WAS.

13   Q    AND YOU SAW HE TALKED ABOUT THE SAMSUNG

14   CONSOLIDATED FINANCIALS.  DO YOU REMEMBER THAT?

15   A    I DO.

16   Q    AND SAMSUNG CONSOLIDATED, COULD YOU EXPLAIN TO

17   US, IS THAT THE COMBINATION OF EVERYTHING?

18   A    THAT'S EVERYTHING.  IT'S ROLLED UP INTO THEIR

19   TOTAL COMPANY'S FINANCIALS OR BUSINESS SEGMENT,

20   WHICH WAS ALSO SHOWN.

21   Q    AND FROM THAT, YOU COULD GET THE PERCENTAGE OF

22   OPERATING PROFIT COMPARED TO REVENUES; CORRECT?

23   A    YOU COULD.

24   Q    OKAY.  AND YOU HEARD MR. SHEPPARD TESTIFY AS

25   TO WHAT THAT PERCENTAGE WAS IN 2011?
```

1    A    IT WAS 15 PERCENT, AND IT WAS 11 PERCENT IN

2    2010.

3    Q    OKAY.  AND ALSO ON THAT SAMSUNG FINANCIAL, IT

4    WENT DOWN TO THE LEVEL OF THE OPERATING SEGMENT

5    TELECOMMUNICATIONS IN WHICH THESE PHONES ARE SOLD;

6    CORRECT?

7    A    YES.

8    Q    AND FROM THAT SEGMENT, YOU COULD ALSO GET

9    REVENUE FROM THE EXTERNAL CUSTOMERS AND YOU COULD

10   COMPARE THAT TO THE OVERALL REVENUE; CORRECT?

11   A    YOU CAN, AND THAT'S WHAT WE JUST DID.

12   Q    AND WHAT WAS THAT -- OKAY.  WHAT YOU GAVE US

13   WAS THE -- WAS THAT SEGMENT OF PROFIT MARGIN?

14   A    CORRECT, YES.

15   Q    15 PERCENT.  AND IF YOU WENT UP TO THE ENTIRE

16   COMPANY AND COMPARED REVENUE TO OPERATING INCOME,

17   WHAT PERCENTAGE WAS THAT?

18   A    THAT'S 10 PERCENT FOR THE OVERALL COMPANY.

19   Q    OKAY.  SO 10 PERCENT FOR THE COMPANY, IT'S 15

20   PERCENT FOR THE, FOR TELECOMMUNICATIONS WITH THOSE

21   PHONES ARE SOLD, RIGHT?

22   A    11 TO 15 PERCENT.

23   Q    AND WHAT YOU DID, USING MORE DETAILED

24   INFORMATION, WAS TRY TO ARRIVE AT THE OPERATING

25   INCOME FOR THESE SPECIFIC PHONES?

1    A    THAT'S TRUE.

2    Q    OKAY.  AND WHAT PERCENTAGE DID YOU HAVE FOR

3    THAT?

4    A    FOR THE -- THE CALCULATION THAT I SHOWED TO

5    THE JURY, 12 PERCENT.

6    Q    OKAY.  AND SO LOOKING AT SAMSUNG'S AUDITED

7    FINANCIALS, WHAT DOES THAT TELL YOU ABOUT YOUR

8    CALCULATION OF THE OPERATING NUMBER?

9    A    WELL, WHEN I LOOK AT ALL THREE PIECES OF

10   INFORMATION, MINE APPEARS TO BE REASONABLE, AND IT

11   APPEARS THAT TELECOMMUNICATIONS IS A MORE

12   PROFITABLE BUSINESS TO SAMSUNG THAN A LOT OF THEIR

13   OTHER BUSINESSES.

14   Q    AND WHAT DOES THAT TELL YOU ABOUT MR. MUSIKA'S

15   MUCH, MUCH, MUCH HIGHER NUMBER?

16   A    WELL, HE'S ONLY LOOKING AT GROSS MARGIN.  I

17   WOULD EXPECT THAT TO BE MUCH LARGER.

18             MR. PRICE:  THANK YOU.

19             THE COURT:  ALL RIGHT.  THE TIME IS NOW

20   10:28.  IS THERE ANY REDIRECT?

21             MR. JACOBS:  NO, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  MAY THIS WITNESS

23   BE EXCUSED AND IS IT SUBJECT TO RECALL?

24             MR. JACOBS:  NO RECALL FROM US, YOUR

25   HONOR.

```
 1                THE COURT:  OKAY.  WHAT ABOUT YOU?

 2                MR. PRICE:  POSSIBLE RECALL, BUT I DOUBT

 3     IT.

 4                THE COURT:  I'LL GO AHEAD AND SAY SUBJECT

 5     TO RECALL JUST IN CASE.  YOU ARE EXCUSED.

 6                THE WITNESS:  THANK YOU, YOUR HONOR.

 7                THE COURT:  SHOULD WE TAKE OUR BREAK NOW.

 8     IT'S 10:29.

 9                MR. JACOBS:  YES, YOUR HONOR.

10                THE COURT:  OKAY.  WHY DON'T WE DO THAT.

11     PLEASE KEEP AN OPEN MIND, PLEASE DON'T DISCUSS THE

12     CASE WITH ANYONE AND PLEASE DON'T READ ABOUT THE

13     CASE OR DO ANY OF YOUR OWN RESEARCH.  OKAY.  THANK

14     YOU.  WE'LL JUST TAKE A 15-MINUTE BREAK.

15                YOU CAN LEAVE YOUR NOTEBOOKS ON YOUR

16     CHAIRS, AND MR. RIVERA WILL PASS OUT THE PHOTOS OF

17     OUR LAST TWO WITNESSES AND JUST LEAVE THEM ON YOUR

18     BOOKS, OKAY, ON YOUR CHAIR.  THANK YOU.

19                AND THEN WE HAVE THE COKE ZERO AND

20     REGULAR COKE AND POTATO CHIPS THAT WERE REQUESTED.

21                (WHEREUPON, THE FOLLOWING PROCEEDINGS

22     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

23                THE COURT:  ALL RIGHT.  THE RECORD SHOULD

24     REFLECT THE JURORS HAVE LEFT THE COURTROOM.  I JUST

25     HAVE ONE REQUEST.
```

```
 1          MY 3965.020 WAS DIFFERENT THAN THE ONE
 2   THAT WAS ON THE SCREEN, SO I JUST WANT TO MAKE SURE
 3   WE GET THE ONE THAT WAS ON THE SCREEN THAT WAS
 4   ADMITTED -- IT WASN'T ADMITTED, BUT AT LEAST IT WAS
 5   SHOWN.
 6          MR. PRICE:  FOR THE RECORD, YES, WE'LL
 7   LODGE IT.
 8          THE COURT:  OKAY.  AND CAN YOU GIVE ME A
 9   NEW ONE, TOO, JUST FOR MY OWN.
10          MR. PRICE:  YES.
11          THE COURT:  I'M TRYING TO KEEP A SET OF
12   EVERYTHING AS WELL.
13          MR. PRICE:  WE WILL.
14          THE COURT:  THE ONLY THING THAT WAS
15   DIFFERENT WAS THE TIME FOR THE DESIGN AROUND ON
16   '163 AND '915.
17          MR. PRICE:  I THINK THEY WERE MISMATCHED.
18          THE COURT:  YES.  WELL, ONE HAD FOUR
19   WEEKS, TWO WEEKS, TWO DAYS AND THE OTHER ONE WAS
20   FOUR WEEKS, TWO DAYS.  CAN I GET THE NEW ONE FOR MY
21   OWN SET?
22          MR. PRICE:  YES.
23          THE COURT:  ALL RIGHT.  LET'S TAKE OUR
24   BREAK NOW.  THANK YOU.
25          (WHEREUPON, A RECESS WAS TAKEN.)
```

```
 1                    (WHEREUPON, THE FOLLOWING PROCEEDINGS

 2      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 3                    THE COURT:  ALL RIGHT.  WELCOME BACK.  GO

 4      AHEAD AND PLEASE TAKE A SEAT.  LET ME TAKE CARE OF

 5      ONE HOUSEKEEPING MATTER.

 6                    SO THIS MORNING 75 PAGES OF OBJECTIONS

 7      AND RESPONSES TO 22 WITNESSES WAS FILED BY THE

 8      PARTIES.

 9                    WE HAVE BASICALLY ABOUT EIGHT HOURS LEFT.

10      I THINK WE'LL DO ANOTHER FOUR TODAY.  YOU HAVE FOUR

11      HOURS TOMORROW.  COME ON.  YOU'RE NOT GOING TO CALL

12      22 WITNESSES.  THE 22 WITNESSES DOESN'T EVEN

13      INCLUDE THE THREE SAMSUNG WITNESSES AND THE 6 APPLE

14      WITNESSES THAT YOU REALLY HAVE ON YOUR LIST.

15                    SO ARE YOU REALLY GOING TO CALL 22

16      WITNESSES IN 4 HOURS TOMORROW?  NOW, IT LOOKS LIKE

17      YOU ALL DON'T EVEN HAVE OBJECTIONS TO THE SAME

18      PEOPLE, I DON'T KNOW IF YOU DON'T HAVE ANY

19      OBJECTIONS, WHETHER THERE WAS SOME MISCOMMUNICATION

20      BETWEEN THE PARTIES.

21                    WHAT'S GOING ON?

22                    MR. SELWYN:  YOUR HONOR, DO I KNOW THAT

23      FOR APPLE, THERE WERE A NUMBER OF WITNESSES FOR

24      WHICH WE LODGED NO OBJECTIONS?  WE TRIED TO KEEP IT

25      TO A MINIMUM.  SO, THEREFORE, FOR A NUMBER OF THEM,
```

2079

```
 1    YOU WILL NOT FIND OBJECTIONS.

 2              THE COURT:  NO.  YOU LODGED OBJECTIONS

 3    AND RESPONSES TO 22 WITNESSES.  SAMSUNG RESPONDED

 4    AND OBJECTED TO 16.  SO, IN FACT, YOU OVER-OBJECTED

 5    TO SIX.

 6              MR. SELWYN:  FOR EACH OF THE WITNESSES,

 7    THE PARTIES WOULD HAVE AS MANY AS TWO HIGH PRIORITY

 8    OBJECTIONS.

 9              THE COURT:  NO, YOU OBJECTED TO AGNETTA.

10    SAMSUNG DID NOT HAVE ANY OBJECTIONS OR RESPONSES TO

11    AGNETTA, TO DONALDSON, TO KIM, TO KNIGHTLY,

12    WILLIAMS, OR YANG.

13              SAMSUNG HAD NO OBJECTIONS OR RESPONSES TO

14    THOSE SIX WITNESSES AND APPLE DID.

15              WHY IS THAT?  AGNETTA, DONALDSON, KIM,

16    KNIGHTLY, WILLIAMS AND YANG.

17              MR. SELWYN:  I BELIEVE THAT WAS OUR

18    OBJECTIONS TO CROSS-EXHIBITS IDENTIFIED FOR THOSE

19    WITNESSES.

20              THE COURT:  AND THOSE ARE DIFFERENT THAN

21    THE ONES I'VE ALREADY RULED ON?  BECAUSE I'VE

22    ALREADY RULED ON AGNETTA, WILLIAMS, YANG, I DON'T

23    RECALL KNIGHTLY, AND I'M NOT SURE WHICH ONE, IS IF

24    THIS IS KIM OR EMILIE KIM OR SOMEBODY ELSE.

25              MR. SELWYN:  THAT'S AN EXPERT.
```

2080

```
 1              THE COURT:  OH, THE ONE FROM CARNEGIE
 2    MELLON.
 3              MR. SELWYN:  YES.
 4              MR. LEE:  AND WILLIAMS AND YANG ARE
 5    DISCLOSED FROM THEIR LAST LIST, AND THAT'S WHY
 6    THERE ARE NEW WITNESSES.
 7              MS. MAROULIS:  YOUR HONOR, THE REASON FOR
 8    AGNETTA IS WE DECIDED NOT TO PLAY IN THE INTEREST
 9    OF TIME, SO APPLE DECIDED TO GO AHEAD AND DESIGNATE
10    IN THEIR CASE.  AND THAT'S WHY YOU SEE THAT, BUT WE
11    DON'T HAVE TIME.
12              THE COURT:  WHAT ABOUT DONALDSON?  COME
13    ON.  THIS IS NOT REALISTIC.  WITH THE NINE
14    WITNESSES THAT YOU HAVE SET TODAY, THIS IS AN
15    UNREALISTIC LIST FOR TOMORROW.  OKAY.  COME ON.
16    COME ON.
17              MR. LEE:  YOUR HONOR --
18              THE COURT:  I'M GOING TO START DEDUCTING
19    FROM YOUR CLOSING ARGUMENT TIME.  THIS IS
20    RIDICULOUS.  SO 75 PAGES WHEN WE HAVE TO DO JURY
21    INSTRUCTIONS AND VERDICT FORM AND YOUR ADVERSE
22    INFERENCE MOTIONS, AND I COUNTED UP YESTERDAY THERE
23    ARE ACTUALLY SIX OR SEVEN MOTIONS TO SEAL INTEL OR
24    IBM JUST FILED MOTION FOR CLARIFICATION LAST NIGHT.
25              I MEAN, COME ON.
```

```
 1            MR. LEE:  YOUR HONOR, I DON'T KNOW

 2    ANYTHING ABOUT INTEL --

 3            THE COURT:  I HAVE PAGES SEVENTY-FIVE

 4    PAGES.  YOU WANT ME TO DO AN ORDER ON 75 PAGES

 5    TONIGHT WHEN, UNLESS YOU'RE SMOKING CRACK, YOU KNOW

 6    THAT THESE WITNESSES ARE NOT GOING TO BE CALLED.

 7            WHY ARE YOU DOING THIS?  YOU'VE GOT NINE

 8    WITNESSES.  YOU'VE GOT EIGHT HOURS LEFT.  WHY ARE

 9    YOU DOING THIS?  WHO IS REALLY GOING TO BE CALLING

10    ALL THESE WITNESSES WHEN YOU'RE GOING TO HAVE LESS

11    THAN 4 HOURS TOMORROW.

12            MR. LEE:  YOUR HONOR, FIRST, I'M NOT

13    SMOKING CRACK.  I CAN PROMISE YOU THAT.

14            THE SECOND THING IS THIS.  WE HAVE --

15    WE'RE STARTING OUR ENTIRE RESPONSE TO THEIR

16    OFFENSIVE CASE SOME TIME BEFORE 12:00 O'CLOCK

17    TODAY., AND PUTTING ON OUR AFFIRMATIVE CASE.

18            WE HAVE IT TIMED OUT SO THAT THE

19    WITNESSES THAT WE'RE GOING TO CALL, THERE -- FOR

20    INSTANCE, THERE ARE 4 OR 5 DEPOSITIONS THAT ARE

21    GOING TO TAKE, IN TOTAL, 15 MINUTES.

22            THERE ARE A SERIES OF WITNESSES THAT ARE

23    ONLY GOING TO TAKE TEN MINUTES.  MR. BLEVINS IS

24    ONE, HE IS ONLY FIVE.  WE HAVE IT TIMED OUT SO THAT

25    IN THE 7 HOURS, 6 HOURS AND 59 MINUTES THAT YOU
```

```
 1    LEFT US --
 2              THE COURT:  YOU HAVE 6 HOURS AND 36
 3    MINUTES LEFT.
 4              MR. LEE:  YEAH, THE 6 HOURS AND 59
 5    MINUTES THAT WE HAD YESTERDAY, THAT WE WOULD GET IT
 6    DONE WITH 15 OR 20 MINUTES TO SPARE.
 7              IF WE'RE OFF, WE'RE OFF.
 8              THE COURT:  SO YOU'RE GOING TO GET
 9    THROUGH ALL SIX OF YOUR WITNESSES TODAY AFTER
10    SAMSUNG GETS THROUGH ALL THREE OF THEIR WITNESSES?
11              MR. LEE:  WE SHOULD BE ABLE TO GET --
12    GIVEN HOW MUCH TIME SAMSUNG HAS LEFT TO CROSS THEM,
13    YOUR HONOR, WE SHOULD BE ABLE TO GET THROUGH THOSE
14    WITNESSES TODAY.
15              THE COURT:  THIS IS NOT -- THIS IS NOT --
16    COME ON.  SO 22 WITNESSES WHEN YOU'RE GOING TO HAVE
17    MAYBE 4 HOURS LEFT TOMORROW?
18              MR. LEE:  THEY'RE NOT ALL OUR WITNESSES.
19    SOME OF THEM ARE THEIRS, YOUR HONOR.
20              THE COURT:  OKAY.  WELL, SAMSUNG AT THIS
21    POINT HAS AN HOUR AND 35 MINUTES LEFT.  THEY HAVE
22    TO GET THREE DAMAGES EXPERTS ON.
23              SO HOW MANY WITNESSES HAVE YOU DESIGNATED
24    FOR YOUR REBUTTAL CASE IN THE HOUR AND 36 MINUTES
25    YOU HAVE -- NO, HOUR AND 35 MINUTES, EXCUSE ME, YOU
```

```
 1    HAVE LEFT WHEN YOU'VE GOT THREE DAMAGES EXPERTS

 2    THAT YOU'VE GOT TO GET ON IN YOUR CASE.

 3               MR. VERHOEVEN:  YOUR HONOR --

 4               THE COURT:  IS THIS REALISTIC.

 5               MR. VERHOEVEN:  YOUR HONOR, WE HAVE TWO.

 6    WE MAY HAVE HAD THREE, BUT WE'VE NARROWED IT DOWN

 7    TO TWO BECAUSE OF TODAY FOR OUR REBUTTAL CASE.

 8               THE COURT:  YOU HAVE WILLIAMS AND YANG.

 9               MR. VERHOEVEN:  YES.

10               THE COURT:  SO ALL OF THOSE OTHER 20

11    WITNESSES ARE APPLE WITNESSES THAT YOU'RE GOING TO

12    GET ON IN THE LESS THAN 4 HOURS THAT YOU HAVE LEFT

13    TOMORROW.

14               MR. LEE:  YOUR HONOR, I DON'T HAVE -- CAN

15    I BORROW THAT LIST FOR A SECOND?

16               THE COURT:  WELL, I'M GOING TO GIVE YOU

17    THE 75 PAGES OF BRIEFING THE PARTIES FILED AT 10:30

18    WANTING OBJECTIONS TO BE RULED ON FOR 22 WITNESSES

19    WHEN WE HAVE LESS THAN A FULL DAY OF TRIAL LEFT FOR

20    TOMORROW.

21               MR. LEE:  YOUR HONOR, AS I LOOK AT THE

22    LIST, THERE ARE A NUMBER OF THESE PEOPLE WHO WILL

23    TESTIFY TODAY.  THERE ARE --

24               THE COURT:  OKAY.  THIS IS THE LIST.

25    AGNETTA.
```

```
 1              MR. LEE:  THAT'S THEIRS.

 2              THE COURT:  BALAKRISHNAN, BRESSLER,

 3    DONALDSON, HONG, KARE, KIM, KNIGHTLY, LEE, MUSIKA,

 4    ORDOVER, ROSENBROCK, ROSSI, SINGH, STRINGER, TEECE,

 5    TEKSLER, WALKER, WILLIAMS, YANG, AND YEO.

 6              MR. LEE:  SO ABOUT FOUR OR FIVE OF THEM

 7    ARE THEIRS.

 8              THE COURT:  THEY SAID THAT WILLIAMS AND

 9    YANG ARE THEIRS.

10              MR. LEE:  AGNETTA IS ON THEIR LIST.  NO,

11    AGNETTA IS OFF THE LIST, I'M FINDING IT OUT.

12              THE COURT:  I UNDERSTOOD MS. MAROULIS

13    SAID THAT APPLE HAS NOW DESIGNATED AGNETTA AS A

14    WITNESS IN YOUR CASE.

15              MR. LEE:  A VERY BRIEF DEPOSITION THAT

16    WILL BE IN 15 MINUTES I TOLD YOU ABOUT.

17              YOUR HONOR, WE HAVE TIMED OUT THESE

18    DEPOSITION EXCERPTS.  THERE ARE 6 -- 5 OR 6 OF THEM

19    THAT WILL TAKE 15 MINUTES, AT LEAST ON OUR CLOCK,

20    BUT THERE ARE IMPORTANT PARTS OF THE FRAND CASE

21    WE'VE BEEN WAITING TO PRESENT.

22              THE COURT:  YOU'RE TELLING ME YOU'RE

23    GOING TO GET 22 WITNESSES IN WHEN NONE OF THESE

24    PEOPLE, FROM WHAT I CAN TELL, MAYBE WITH THE

25    EXCEPTION OF MS. KIM, I DON'T KNOW -- YOU SAID
```

1    THAT'S THE PROFESSOR FROM CARNEGIE MELLON.

2            NONE OF THESE, OTHER THAN I'M GOING TO

3    TAKE OUT WILLIAMS AND YANG, WHO ARE THE SAMSUNG

4    REBUTTAL WITNESSES, THESE 20 WITNESSES ARE ON TOP

5    OF TONY BLEVINS, EMILIE KIM, PAUL DOURISH, MANI

6    SRIVASTAVA, TONY GIVARGIS, AND DAN DZUBAN.

7            SO IT'S GOING TO BE 28 WITNESSES IN THE,

8    WHAT, 28 WITNESSES IN THE 6 HOURS AND 36 MINUTES

9    YOU HAVE LEFT AND YOU ALSO NEED TO CROSS 3 DAMAGES

10   EXPERTS ON SAMSUNG'S SIDE.

11           MR. LEE:  YOUR HONOR, IF I COULD?  THE

12   WITNESSES WHO WE'RE GOING TO CALL ARE THE ONES I

13   GAVE YOU THIS MORNING.  WE ARE GOING TO CALL

14   MR. DONALDSON TOMORROW, MR. KIM TOMORROW,

15   MR. KNIGHTLY TOMORROW.  THERE WILL BE SOME

16   DEPOSITION DESIGNATIONS.  THESE OTHER PEOPLE WERE

17   DISCLOSED AS PART OF THE REBUTTAL CASE ON THE APPLE

18   OFFENSIVE CASE.

19           UNTIL SAMSUNG RESTS, WE HAVE NO IDEA

20   WHICH ONES THAT MR. MCELHINNY AND MR. JACOBS AND

21   MS. KREVANS WILL CALL, AND WE HAD TO DISCLOSE THEM

22   BEFORE.  WE HAD TO DISCLOSE THEM TWO DAYS AGO.

23           THE COURT:  OKAY.  YOU KNOW, SUKUMAR,

24   RICE, TEECE IS LICENSING, O'BRIEN, DAMAGES.  OKAY.

25           SO WHAT MORE DO YOU NEED TO KNOW ABOUT

```
 1    WHETHER THEY'RE GOING TO PUT ON ANYONE ON ANYTHING

 2    TECHNICAL OR ANY -- IT'S NOT -- YOU KNOW WHO

 3    SUKUMAR, O'BRIEN, AND TEECE ARE.  WE ALL KNOW WHO

 4    THESE PEOPLE ARE.

 5              MR. JACOBS:  YOUR HONOR --

 6              THE COURT:  SO WHO DO YOU NEED ON THIS

 7    LIST?  I'M NOT GOING TO BE RUNNING AROUND TRYING TO

 8    GET THROUGH 75 PAGES OF BRIEFING ON PEOPLE THAT WE

 9    ALL KNOW ARE NOT TESTIFYING IN THIS TRIAL.

10              MR. JACOBS:  SO LET'S DISTINGUISH TWO

11    THINGS.  ONE IS HOW WE'RE GOING TO MANAGE THE

12    TIME --

13              THE COURT:  I'M CAUGHT -- I'M KILLING

14    TIME BECAUSE WE'RE WASTING THE JURY'S TIME BECAUSE

15    YOU ALL ARE BEING UNREASONABLE.  ALL RIGHT.  IT'S

16    10:50.  APPLE'S TIME.  GO AHEAD.

17              MR. JACOBS:  WE WOULD WAIVE THE -- WE

18    WOULD WAIVE THE HIGH PRIORITY OBJECTIONS, YOUR

19    HONOR.  WE'D RATHER JUST GET OUR WITNESSES ON AND

20    OFF.  WE DIDN'T MEAN TO BURDEN THE COURT.

21              THE COURT:  YOU FILED 75 PAGES OF

22    BRIEFING.

23              MR. LEE:  BECAUSE WE HAD TO.

24              THE COURT:  I'M SUPPOSED TO RULE ON

25    OBJECTIONS TO 22 WITNESSES TONIGHT IN ADDITION TO
```

```
1    GETTING THE JURY INSTRUCTION AND THE VERDICT FORM
2    AND ALL THE OTHER MOTIONS THAT THIRD PARTIES AND
3    THE PARTIES IN THIS CASE HAVE FILED.  OKAY.  SO
4    WHAT ARE YOU TALKING ABOUT YOU DON'T WAND TO BURDEN
5    THE COURT?
6              MR. JACOBS:  I'M SAYING WE'LL WAIVE OUR
7    HIGH PRIORITY OBJECTIONS.
8              THE COURT:  SO WHAT, SO WE'RE GOING TO
9    FIGHT THIS OUT WITH THE JURY AND YOU'RE GOING TO
10   MAKE ALL THESE TIMELINESS DISCLOSURE OBJECTIONS,
11   AND I WON'T HAVE TIME TO LOOK IT UP.
12             MR. LEE:  NO.
13             THE COURT:  INTERROGATORY OR EXPERT
14   REPORT OR WHATEVER IT IS.  I MEAN, COME ON.  WHO
15   ARE YOU REALLY GOING TO CALL FROM THIS LIST.
16   YOU'VE GOT SIX-AND-A-HALF HOURS LEFT.
17             MR. JACOBS:  AND, YOUR HONOR, WE HAVE A
18   CHART, AND IT'S ALL TIMED OUT.  IT MAY BE THAT
19   WE'RE OFF BY A MINUTE OR TWO.  THIS MORNING WE WERE
20   DONE ON OUR TIME ALLOCATIONS.  I WAS A MINUTE OVER.
21             THE COURT:  SO YOU REALLY THINK YOU'RE
22   GOING TO GET 20 WITNESSES ON TOMORROW SEPARATE FROM
23   THE 9 THAT WE ALREADY KNOW ABOUT.
24             MR. JACOBS:  YES.
25             MR. LEE:  AND, YOUR HONOR, I THINK AT THE
```

2088

```
 1    END OF THE PRESENTATION BY MR. O'BRIEN, SUKUMAR AND

 2    TEECE, THE QUESTION OF WHETHER WE'RE GOING TO NEED

 3    MR. ROSSI OR MR. TEKSLER WILL BECOME CLEAR.  WE'LL

 4    TELL YOU RIGHT AWAY, BUT THESE ARE DISCLOSURES WE

 5    HAD TO MAKE UNDER YOUR PROCEDURES AND WE MADE THEM.

 6    AND WE'LL WITHDRAW THEM.

 7            THE COURT:  SO WHO ELSE IS QUESTIONABLE

 8    OTHER THAN ROSSI AND TEKSLER.

 9            MR. JACOBS:  YOUR HONOR, IN LIGHT OF THE,

10    OF WHAT HAPPENED THIS MORNING, WE WILL NOT CALL

11    MR. STRINGER AS A REBUTTAL WITNESS.

12            THE COURT:  OKAY.  WHAT ELSE?

13            MR. LEE:  AND WE WILL LET YOU KNOW ABOUT

14    MR. TEKSLER AND MR. ROSSI AS SOON AS THEY REST.

15            THE COURT:  ALL RIGHT.

16            MR. LEE:  AND MR. AGNETTA IS OUT.

17            THE COURT:  SO I AM NOT GOING TO HAVE

18    ANYONE RUNNING AROUND LOOKING UP ON OBJECTIONS IN

19    RESPONSES TO STRINGER.

20            MR. JACOBS:  CORRECT, YOUR HONOR.

21            MR. LEE:  AND I WOULD HOLD ON ROSSI AND

22    TEKSLER, AND WE WILL LET YOU KNOW AS SOON AS THEY

23    REST, WHICH SHOULD BE IN THE NEXT HOUR.

24            THE COURT:  WHO ELSE?  THERE'S GOT TO BE

25    MORE PEOPLE IN THIS CATEGORY.  I'M NOT CONVINCED
```

```
 1    THAT WE'RE GOING TO HAVE 29 WITNESSES IN LESS THAN

 2    EIGHT HOURS.

 3                MR. VERHOEVEN:  WHILE THEY'RE LOOKING,

 4    YOUR HONOR, THERE'S -- ON THAT LIST I BELIEVE IS

 5    DR. KARE AND THEY'RE CHARACTERIZING HER AS A

 6    REBUTTAL WITNESS, BUT THERE'S NOT -- IT'S NOT

 7    PROPER REBUTTAL, SO WE WOULD OBJECT TO THAT WITNESS

 8    BECAUSE THIS IS SUPPOSED TO BE REBUTTAL AND THERE'S

 9    NOTHING FOR HER TO REBUT.

10                THE COURT:  WELL, THERE HAS BEEN

11    TESTIMONY ON THE ICONS.

12                MR. JACOBS:  EXACTLY, YOUR HONOR.

13                THE COURT:  SO I DISAGREE WITH THAT.

14                BUT WHO ELSE?  WHO ELSE IS NOT REALLY --

15    WHO ELSE IS BORDERLINE, BECAUSE I KNOW THERE ARE

16    MORE BORDERLINE PEOPLE ON THIS LIST OTHER THAN

17    STRINGER, TEKSLER, AND ROSSI.

18                MR. JACOBS:  AGNETTA IS A VERY SHORT

19    DEPOSITION CLIP, YOUR HONOR, BUT IT GOES TO ONE OF

20    THEIR PRIOR ART WITNESSES.

21                MR. LEE:  THE LIVE WITNESSES, YOUR HONOR,

22    MR. DONALDSON, PROFESSOR KIM, PROFESSOR KNIGHTLY,

23    MR. MUSIKA, PROFESSOR ORDOVER.

24                THE COURT:  YOU SAID MUSIKA AND WHO ELSE

25    IS LIVE?  ORDOVER?
```

```
 1              MR. LEE:  ORDOVER.

 2              THE COURT:  HE'S LIVE, OR SHE'S LIVE.

 3              MR. LEE:  HE IS LIVE.

 4              THE COURT:  OKAY.

 5              MR. LEE:  MR. WALKER IS LIVE.

 6    BALAKRISHNAN IS LIVE, BRESSLER IS LIVE, KARE IS

 7    LIVE, AND SINGH IS LIVE.

 8              THE COURT:  OKAY.  I'M GOING TO WANT A

 9    PROPER --

10              MR. LEE:  YOUR HONOR, THESE ARE YOURS.

11              THE COURT:  I'M GOING TO THINK OF AIR

12    PROPER REMEDY.  IF IT TURNS OUT THAT I WILL NOT DO

13    75 PAGES OF OBJECTIONS FOR PEOPLE WHO ARE NOT

14    REALISTICALLY EXPECTED TO BE CALLED, THEN I'M GOING

15    TO THINK ABOUT THE PROPER TAX FOR THAT.

16              ALL RIGHT.  BRING OUT OUR JURY, PLEASE.

17              THE CLERK:  YES, YOUR HONOR.

18              (WHEREUPON, THE FOLLOWING PROCEEDINGS

19    WERE HELD IN THE PRESENCE OF THE JURY:)

20              THE COURT:  ALL RIGHT.  WELCOME BACK.

21              CALL YOUR NEXT WITNESS, PLEASE.

22              MR. JOHNSON:  YOUR HONOR, WE'RE GOING TO

23    START BY READING AN INTERROGATORY AND RESPONSE INTO

24    THE RECORD THAT THE PARTIES HAVE AGREED TO.

25              THE COURT:  GO AHEAD, PLEASE.  GIVE ME
```

1    ONE QUICK SECOND.  ALL RIGHT.  THANK YOU.  IT'S

2    11:00 O'CLOCK.  GO AHEAD, PLEASE.

3              MR. JOHNSON:  THANK YOU.  DURING THE

4    COURSE OF DISCOVERY, SAMSUNG SERVED THE FOLLOWING

5    INTERROGATORY.  IT SAYS, QUOTE, "SEPARATELY FOR

6    EACH OF THE SAMSUNG PATENTS IN SUIT, IDENTIFY THE

7    DATE APPLE FIRST BECAME AWARE OF EACH PATENT, THE

8    PERSONS AT APPLE WHO FIRST BECAME AWARE OF EACH

9    PATENT, AND THE DETAILED CIRCUMSTANCES BY WHICH

10   EACH PERSON BECAME AWARE OF EACH PATENT."

11             AND THE RESPONSE:  "CONSISTENT WITH ITS

12   RESPONSE TO INTERROGATORY 13, APPLE STIPULATES THAT

13   DURING A MEETING BETWEEN APPLE AND SAMSUNG

14   REPRESENTATIVES ON SEPTEMBER 9TH, 2010, SAMSUNG

15   LISTED THE FOLLOWING SAMSUNG PATENTS IN SUIT IN A

16   POWERPOINT PRESENTATION:  U.S. PATENT NUMBERS

17   7,447,516; 7,577,460; AND 7,675,941."

18             THANK YOU, YOUR HONOR.

19             THE COURT:  OKAY.  THANK YOU.  GO AHEAD

20   AND CALL YOUR NEXT WITNESS, PLEASE.

21             MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS

22   DR. RAMAMIRTHAM SUKUMAR.

23             THE COURT:  OKAY.

24             THE CLERK:  MR. SUKUMAR, PLEASE RAISE

25   YOUR RIGHT HAND.

1     /   /   /

2                     **RAMAMIRTHAM SUKUMAR,**

3     BEING CALLED AS A WITNESS ON BEHALF OF THE

4     DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

5     EXAMINED AND TESTIFIED AS FOLLOWS:

6                THE WITNESS:  YES, I DO.

7                THE CLERK:  THANK YOU.  PLEASE BE SEATED.

8                     **DIRECT EXAMINATION**

9     BY MS. MAROULIS:

10    Q    GOOD MORNING, DURING SUKUMAR.  CAN YOU PLEASE

11    SELL TELL THE JURY WHAT YOU DO OR TO A LIVING?

12    A    I'M CHIEF EXECUTIVE OFFICER FOR OPTIMAL

13    STRATEGICS GROUP.

14    Q    WHAT DOES OPTIMAL STRATEGICS GROUP DO?

15    A    THIS IS A COMPANY THAT DOES MARKET RESEARCH

16    SURVEYS, MARKETING AND STRATEGY CONSULTING.

17    Q    WHAT IS YOUR FIELD OF EXPERTISE?

18    A    I -- MY AREA OF EXPERTISE IS IN MARKET

19    RESEARCH AND DOING SURVEYS AND MARKETING AND

20    STRATEGY.

21    Q    HOW MANY SURVEYS HAVE YOU DONE IN YOUR CAREER?

22    A    IN THE LAST FIVE YEARS, I'VE DONE MORE THAN

23    300 SURVEYS.

24    Q    WHAT IS YOUR FORMAL EDUCATION, SIR?

25    A    I RECEIVED A PH.D. IN MARKING AND STATISTICS

1    FROM THE UNIVERSITY OF PITTSBURGH IN 1990, AND

2    SINCE 1995, I'VE BEEN INVOLVED IN SURVEY RESEARCH.

3    Q    HAVE YOU TAUGHT AT ANY UNIVERSITIES?

4    A    I'VE TAUGHT AT SEVERAL, UNIVERSITY OF HOUSTON,

5    RICE UNIVERSITY, THUNDERBIRD, WHICH IS A BUSINESS

6    SCHOOL IN PHOENIX, UNIVERSITY OF MARYLAND, COLLEGE

7    PARK, AND AT RUTGERS.

8         MS. MAROULIS:  YOUR HONOR, WE TENDER

9    DR. SUKUMAR AS AN EXPERT IN CONSUMER MARKETING

10   RESEARCH.

11        MR. SELWYN:  NO OBJECTION.

12        THE COURT:  NO OBJECTION.  SO CERTIFIED.

13   BY MS. MAROULIS:

14   Q    SIR, WHAT ASSIGNMENT DID YOU RECEIVE IN THIS

15   CASE?

16   A    I WAS ASKED BY COUNSEL AND BY DR. VINCE

17   O'BRIEN TO CONDUCT A USAGE STUDY ON THREE SAMSUNG

18   PATENTS AND ALSO TO UNDERSTAND THE WILLINGNESS TO

19   PAY OR WHAT WE CALL MARKET VALUE OF THESE

20   ATTRIBUTES IN THE PATENTS.

21   Q    LET'S TAKE A LOOK AT SDX 3925 ON THE SCREEN

22   AND IN YOUR BINDER.

23        DOES THIS SLIDE REPRESENT THE SUMMARY OF

24   YOUR ANALYSIS?

25   A    THIS SLIDE REPRESENTS ANALYSIS FROM THE

1    CONSUMER RESEARCH THAT WE HAD DONE.

2    Q    CAN YOU PLEASE SUMMARIZE FOR THE JURY WHAT

3    THIS SLIDE REPRESENTS?

4    A    IT ESSENTIALLY SAYS THAT 63.9 PERCENT OF

5    IPHONE USERS USE THE E-MAIL PHOTO FEATURE; 54.9

6    PERCENT OF THE IPAD USERS USE THE E-MAIL PHOTO

7    FEATURE; AND 43.9 PERCENT OF THE IPOD TOUCH USERS

8    USE THE E-MAIL PHOTO FEATURE.

9              SIMILARLY ON LINE 4 THERE, 42 PERCENT OF

10   THE IPHONE USERS IS THE PHOTO GALLERY BOOKMARK; 50

11   PERCENT OF THE IPAD USERS USE THE PHOTO GALLERY

12   BOOKMARK; AND 38.1 PERCENT OF THE IPOD TOUCH USERS

13   USE THE PHOTO GALLERY BOOKMARK.

14             THE MUSIC IN BACKGROUND FEATURE, 65.4

15   PERCENT OF THE CONSUMER THAT IS WE SURVEYED USE THE

16   MUSIC IN BACKGROUND FEATURE.

17   Q    CAN YOU BRIEFLY DESCRIBE FOR US HOW THE SURVEY

18   WAS CONDUCTED?

19   A    FIRST, THE SURVEY WAS DESIGNED, TO DESIGN THE

20   SURVEY, WE HAD CONVERSATIONS WITH COUNSEL AND

21   FOLLOWING THAT, WE CONDUCTED A PILOT TEST.  THE

22   PURPOSE OF THE PILOT TEST IS TO MAKE SURE THAT

23   CONSUMERS WERE TAKING THIS SURVEY AND UNDERSTOOD

24   THE SURVEY, UNDERSTAND THE FEATURES DESCRIBED IN

25   THE SURVEY.

1           AFTER THAT PILOT TEST IS DONE, WE

2     RELEASED THE SURVEY TO A LARGE SAMPLE OF

3     INDIVIDUALS IN THE U.S. POPULATION.

4           SO THIS SAMPLE HAS TO BE REPRESENTATIVE

5     OF THE U.S. POPULATION.  THEY GO THROUGH THE SURVEY

6     TO TAKE EVERY QUESTION, IF THEY MEET THE CRITERIA

7     TO PARTICIPATE IN THE SURVEY, THEY GET TO TAKE THE

8     REST OF THE SURVEY, THE MAIN PART, THE MAIN BODY OF

9     THE SURVEY.  THEY COMPLETE THE SURVEY.  THE RESULTS

10    OBTAINED AND THEN THE RESULTS ARE ANALYZED FROM

11    THERE.

12    Q    THANK YOU, DR. SUKUMAR.  DID YOU PROVIDE THOSE

13    RESULTS TO DR. O'BRIEN FOR HIS ANALYSIS?

14    A    YES, I DO.

15           MS. MAROULIS:  I PASS THE WITNESS.

16           THE COURT:  ALL RIGHT.  11:05.  GO AHEAD,

17    PLEASE.

18                    **CROSS-EXAMINATION**

19    BY MR. SELWYN:

20    Q    GOOD MORNING, DR. SUKUMAR.

21    A    GOOD MORNING.

22    Q    DR. SUKUMAR, YOU HAVEN'T TOLD THE JURY ANY OF

23    THE ACTUAL QUESTIONS YOU ASKED THE SURVEY

24    RESPONDENTS; CORRECT?

25    A    WELL, I HAVEN'T BEEN ASKED THAT, SO OBVIOUSLY

2096

1    I HAVEN'T TOLD THEM THE SPECIFICS.

2    Q    AND WOULD YOU AGREE WITH ME THAT YOU TRIED AS

3    BEST YOU COULD TO ACCURATELY DESCRIBE IN THE SURVEY

4    THE FEATURES THAT SAMSUNG CLAIMS TO BE COVERED BY

5    ITS PATENTS?

6    A    I'M NOT A PATENT ATTORNEY, SO I WOULD SAY I

7    HAVE TO RELY ON THE DESCRIPTIONS OF THESE FEATURES,

8    AND I DID WHAT I THINK IS THE MOST APPROPRIATE.

9    Q    FAIR ENOUGH.  BUT IT WAS IMPORTANT TO YOUR

10   SURVEY THAT THE QUESTIONS ACCURATELY DESCRIBE THE

11   FEATURES AS COUNSEL HAS DESCRIBED THEM; CORRECT?

12   A    IT'S, IT'S MORE IMPORTANT THAT THE QUESTIONS

13   BE UNDERSTOOD APPROPRIATELY BY THE CONSUMERS WHO

14   WERE TAKING THE SURVEY.

15   Q    NOW, YOU DIDN'T READ ANY OF THE PATENTS IN

16   THIS CASE; CORRECT?

17   A    I MENTIONED THAT I'M NOT A PATENT EXPERT.

18   Q    AND ONE OF THE FEATURES THAT YOU SURVEYED IS

19   WHAT YOU DESCRIBED AS E-MAIL PHOTO; CORRECT?

20   A    THAT'S CORRECT.

21   Q    NOW, ARE YOU CONFIDENT THAT YOU DESCRIBED THIS

22   FEATURE TO SURVEY RESPONDENTS IN A WAY THAT'S

23   FAITHFUL TO HOW SAMSUNG HAS DESCRIBED THIS FEATURE

24   TO THE JURY?

25   A    I BELIEVE SO.

```
 1    Q    AND ARE YOU AS CONFIDENT IN THE WAY YOU

 2    DESCRIBED E-MAIL PHOTO AS YOU ARE IN THE WAY THAT

 3    YOU DESCRIBED ALL THE FEATURES THAT YOU SURVEYED?

 4    A    YES, I AM.

 5    Q    SO LET'S LOOK AT HOW YOU DESCRIBED THE E-MAIL

 6    PHOTO FEATURE TO SURVEY RESPONDENTS.  CAN WE HAVE

 7    PAGE 31 OF YOUR SURVEY ON THE SCREEN?

 8            MS. MAROULIS:  COUNSEL, WHAT ARE YOU

 9    REFERRING TO?  WHAT EXHIBIT?

10            MR. SELWYN:  SURE.  IN THE BINDER AT TAB

11    1, PAGE 31, IT'S EXHIBIT G TO DR. SUKUMAR'S REPORT.

12    Q    SO YOU DESCRIBED THE SURVEY, AND THE E-MAIL

13    PHOTO FEATURE AS, QUOTE, HE ABILITY TO TAKE A PHOTO

14    ON THE IPHONE AND SEND ANY OF THE PICTURES STORED

15    ON THE IPHONE IN THE BODY OF AN E-MAIL, AS OPPOSED

16    TO ATTACHING THE PHOTO TO THE E-MAIL WHICH THEN HAS

17    TO BE SEPARATELY OPENED.

18            CORRECT?

19            MS. MAROULIS:  COUNSEL, MAY I APPROACH TO

20    HELP THE WITNESS WITH THE BINDER WHICH IS ON THE

21    FLOOR?

22            MR. SELWYN:  CERTAINLY.  I APOLOGIZE,

23    SIR.

24    Q    IT'S TAB 1, PAGE 31 OF YOUR REPORT, AND IT'S

25    ON THE SCREEN.
```

1    A    YES.

2    Q    THAT'S HOW YOU DESCRIBED THE E-MAIL PHOTO

3    FEATURE TO THOSE WHO COMPLETED THE SURVEY; RIGHT?

4    A    THAT'S CORRECT.

5    Q    NOW, LET'S LOOK AT HOW MR. VERHOEVEN DESCRIBED

6    THIS PATENT IN HIS OPENING, IF WE CAN.  CAN WE HAVE

7    SAMSUNG'S OPENING SLIDE 145.

8         MS. MAROULIS:  OBJECTION, ARGUMENTATIVE.

9    NO FOUNDATION.

10        THE COURT:  OVERRULED.  GO AHEAD.

11   BY MR. SELWYN:

12   Q    DID SAMSUNG'S COUNSEL EVER DESCRIBE THE E-MAIL

13   PHOTO FEATURE TO YOU AS INVOLVING THREE FUNCTIONS?

14   A    NO.

15   Q    YOUR SURVEY DID NOT DESCRIBE THE E-MAIL PHOTO

16   FEATURE AS INVOLVING SENDING AN E-MAIL WITH A

17   MESSAGE ONLY; CORRECT?

18   A    THAT'S CORRECT.

19   Q    YOUR SURVEY DID NOT DESCRIBE THE E-MAIL PHOTO

20   FEATURE AS INVOLVING GRAPHICALLY GOING THROUGH

21   PHOTOS; CORRECT?

22   A    THAT'S CORRECT.

23   Q    NOW, TO MEASURE CUSTOMER USAGE, YOUR SURVEY

24   ASKED A SINGLE QUESTION FOR EACH FEATURE; CORRECT?

25   A    THAT'S CORRECT.

2099

1    Q    AND IF YOU LOOK BACK AT PAGE 31 -- WITH WE

2    HAVE THAT BACK ON THE SCREEN -- ACTUALLY, LET'S GO

3    TO PAGE 32 OF YOUR REPORT.  DO YOU SEE ON PAGE 32,

4    THERE'S A COPY OF THE QUESTION THAT YOU ASKED THE

5    SURVEY RESPONDENTS, HAVE YOU USED THE PHOTO GALLERY

6    BOOKMARK FEATURE ON YOUR IPHONE?  DID YOU ASK THAT

7    QUESTION OF THEM?

8    A    YES.

9    Q    AND THAT QUESTION DOESN'T TELL YOU ANYTHING

10   ABOUT HOW OFTEN THE SURVEY RESPONDENTS USE THE

11   FEATURE; CORRECT?

12   A    WELL, THAT WAS NOT THE INTENT OF THIS

13   QUESTION.  THE INTENT OF THIS QUESTION WAS

14   LITERALLY TO SEE IF THEY EVER USED IT EVEN ONCE TO

15   EXPERIENCE WITH THE FEATURE ONE WOULD EXPECT TO GET

16   AT WHAT WE NEED TO KNOW, WHICH IS DID THEY EVER USE

17   THE FEATURE ITSELF.

18   Q    LET'S BE CLEAR, IF SOMEBODY BOUGHT THE PHONE,

19   USE THE FEATURE ONCE, NEVER USED IT AGAIN, THEY

20   WOULD ANSWER YES TO THAT QUESTION; CORRECT?

21   A    YES.

22   Q    AND THE RESULTS OF THE USAGE QUESTION DON'T

23   TELL US ANYTHING ABOUT THE VALUE OF THE FEATURE TO

24   SURVEY RESPONDENTS; CORRECT?

25   A    THAT WAS PART OF THE CONJOINT EXERCISE.  IF

2100

```
1    YOU EXPERIENCED IT AND YOU USED IT, YOU SHOULD BE

2    ABLE TO VALUE IT CORRECTLY.

3    Q    BUT, SIR, THE ANSWER TO THE QUESTION ON USAGE

4    DOESN'T TELL YOU ANYTHING ABOUT THE VALUE; CORRECT?

5    A    NOT DIRECTLY IN THIS QUESTION.

6             MR. SELWYN:  THANK YOU.  NO FURTHER

7    QUESTIONS.

8             THE COURT:  ALL RIGHT.  THE TIME IS NOW

9    11:10.  GO AHEAD, PLEASE.

10            MS. MAROULIS:  NO REDIRECT, YOUR HONOR.

11            SAMSUNG NOW CALLS DR. VINCE O'BRIEN TO

12   THE STAND.

13            THE COURT:  OKAY.  MAY THIS WITNESS BE

14   EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?

15            MS. MAROULIS:  HE IS EXCUSED AND HE IS

16   NOT SUBJECT TO RECALL.

17            THE COURT:  OKAY.  ALL RIGHT.  YOU ARE

18   EXCUSED.

19            THE WITNESS:  THANK YOU.

20            THE COURT:  MR. O'BRIEN, PLEASE STAND AND

21   RAISE YOUR RIGHT HAND.

22                    VINCENT O'BRIEN,

23   BEING CALLED AS A WITNESS ON BEHALF OF THE

24   DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

25   EXAMINED AND TESTIFIED AS FOLLOWS:
```

1           THE WITNESS:  I DO.

2           THE CLERK:  THANK YOU.

3                    **DIRECT EXAMINATION**

4    BY MS. MAROULIS:

5    Q    GOOD MORNING, DR. O'BRIEN.  CAN YOU PLEASE

6    TELL THE JURY WHAT YOU DO FOR A LIVING?

7           THE COURT:  IT'S 11:11.

8           THE WITNESS:  I DO ECONOMIC ANALYSIS AND

9    ECONOMIC DAMAGES FOR COMPANIES WHO ARE INVOLVED IN

10   LITIGATION OR REGULATORY MATTERS.

11   BY MS. MAROULIS:

12   Q    WHAT IS YOUR EDUCATIONAL BACKGROUND, SIR?

13   A    I HAVE A BACHELOR'S OF SCIENCE IN ELECTRICAL

14   ENGINEERING FROM THE UNIVERSITY OF ILLINOIS WITH

15   HIGH HONORS.

16           I HAVE A MASTER'S AND A DOCTORATE IN

17   BUSINESS ADMINISTRATION FROM HARVARD.

18   Q    CAN YOU VERY BRIEFLY SUMMARIZE YOUR EMPLOYMENT

19   EXPERIENCE.

20   A    YES.  I WORKED AT, DURING THE MASTER'S AND

21   DOCTORATES, I WORKED FOR MCDONNELL DOUGLAS IN THEIR

22   SPACE DIVISION IN HUNTINGTON, CALIFORNIA WHILE WE

23   WERE PUTTING A MAN ON THE MOON.

24           WHILE I WAS GETTING MY DOCTORATE, I

25   WORKED AS A RESEARCH FELLOW FOR HARVARD WHERE I

1    WROTE CASES AND I TAUGHT A FEW CLASSES.

2            AFTER THAT I WENT TO WORK AS A CORPORATE

3    ECONOMIST FOR BETHLEHEM STEEL CORPORATION IN

4    BETHLEHEM, PENNSYLVANIA WHERE I FORECAST THE U.S.

5    ECONOMY AND THE DEMAND FOR STEEL IN THE U.S.

6    ECONOMY.

7            AFTER THAT, I WENT TO WORK WITH SOME

8    PROFESSORS IN BOSTON THAT I HAD BEEN A STUDENT

9    UNDER AND WAS SENT TO SAN FRANCISCO ON A BIG

10   ANTITRUST CASE TO DO LITIGATION WORK.

11           AND I'VE BEEN DOING THE SAME EVER SINCE.

12   THAT WAS BACK AROUND 1979.  AND I'VE BEEN DOING IT

13   IN LARGE FIRMS AND IN FIRMS I FOUNDED AND WAS THE

14   PRINCIPAL OF.

15   Q    SIR, HAVE YOU BEEN PUBLISHED IN THE FIELD OF

16   ECONOMIC ANALYSIS?

17   A    I PUBLISHED A NUMBER OF THINGS ON AN

18   ECONOMIC -- IN PARTICULAR, ECONOMIC DAMAGES,

19   INCLUDING A -- THE CHAPTER ON PATENT INFRINGEMENT

20   DAMAGES IN THE LITIGATION SERVICES HANDBOOK, WHICH

21   IS THE LEADING GUIDE FOR PRACTITIONERS IN THIS

22   AREA.

23   Q    HOW MANY TIMES HAVE YOU TESTIFIED AS AN EXPERT

24   IN ECONOMIC ANALYSIS IN U.S. AND OTHER COURTS?

25   A    IN U.S. COURTS AND COURTS OVERSEAS, I'VE

1    TESTIFIED AT LEAST 66 TIMES.

2    Q    HAVE YOU TESTIFIED IN ANY OTHER IMPORTANT

3    PROCEEDINGS?

4    A    YES, I'VE TESTIFIED BEFORE REGULATORY AGENCIES

5    OF THE VARIOUS STATES.  I'VE TESTIFIED BEFORE

6    COMMITTEES OF THE UNITED STATES HOUSE, AND THE

7    UNITED STATES SENATE.

8    Q    AND HAVE YOU WORKED FOR ANY BRANCHS OF

9    GOVERNMENT?

10   A    YES.  I HAVE WORKED, BEEN RETAINED BY THE U.S.

11   DEPARTMENT OF JUSTICE IN A COUPLE MATTERS, AND I'VE

12   BEEN RETAINED BY THE STATE OF CALIFORNIA IN SOME

13   MATTERS AS WELL, TO DO ECONOMIC ANALYSIS.

14           MS. MAROULIS:  YOUR HONOR, WE TENDER

15   DR. VINCE O'BRIEN AS AN EXPERT IN ECONOMIC ANALYSIS

16   AND COMPUTATION OF DAMAGES.

17           MR. SELWYN:  NO OBJECTION.

18           THE COURT:  SO CERTIFIED.  GO AHEAD.

19   BY MS. MAROULIS:

20   Q    DR. O'BRIEN, WHAT WAS YOUR ASSIGNMENT IN THIS

21   CASE?

22   A    I WAS ASKED TO CALCULATE DAMAGES, IF ANY, FOR

23   APPLE'S INFRINGEMENT OF THE SAMSUNG THREE FEATURED

24   PATENTS THAT ARE EMBEDDED IN THE APPLE PRODUCTS.

25   Q    WHAT TYPE OF DAMAGES DID YOU CALCULATE?

```
1    A    I DETERMINED THERE WERE NO LOST PROFITS, SO

2    THAT MEANS FOR A PATENT HOLDER THAT THEY'RE

3    ENTITLED TO ANY REASONABLE ROYALTY FOR THE USE OF

4    THEIR INVENTION.

5    Q    WHAT IS THE AMOUNT OF THE REASONABLE ROYALTY

6    YOU CALCULATED IN THAT PART OF YOUR ANALYSIS?

7    A    ROUNDING OFF, 22.8 MILLION, THAT'S MILLION,

8    DOLLARS.

9    Q    LET'S TAKE A LOOK AT SDX 3956.004.  WHAT DOES

10   THIS CHART REPRESENT?

11   A    THIS -- THE FIRST THING I HAD TO DO WAS TO

12   DETERMINE WHICH PRODUCTS INFRINGE WHICH PATENTS,

13   AND I GOT THAT FROM THE PLEADINGS IN THIS CASE.

14            FOR EXAMPLE, WE HAVE DOWN ON THE

15   LEFT-HAND SIDE HERE -- THERE IT IS, THE PATENT,

16   ACROSS THE TOP, WE HAVE THE DEVICES.  AND A

17   CHECKMARK MEANS THAT THAT PATENT, THAT DEVICE IS

18   ALLEGED TO INFRINGE THAT PARTICULAR PATENT.

19   Q    SO, FOR EXAMPLE, FOR '460 PATENT, PLEASE READ

20   INTO THE RECORD THE PRODUCTS YOU ANALYZED TO

21   DETERMINE DAMAGES?

22   A    YES.  THE ALLEGED INFRINGING PRODUCTS ARE THE

23   IPHONE 3G, 3GS, 4, THE IPAD 2, AND THE FOURTH

24   GENERATION OF THE IPAD TOUCH.

25            FOR THE '893, THE PHOTO GALLERY BOOKMARK
```

1    PATENT, THE ALLEGED INFRINGING DEVICES ARE THE 3GS,

2    THE 4, ON THE IPHONE, THE IPAD 2, AND THE IPOD

3    TOUCH FOURTH GENERATION.

4         AND FOR THE '711 MUSIC IN THE BACKGROUND

5    WITH AN INDICATOR, THE ORIGINAL IPHONE, THE 3G, THE

6    3GS, AND THE 4 IPHONE ARE THE DEVICES THAT ARE

7    ALLEGED TO HAVE INFRINGED.

8    Q    LOOKING AT THESE PRODUCTS, HOW DID YOU

9    DETERMINE THE BASE OF YOUR CALCULATION OF

10   REASONABLE ROYALTY DAMAGES?

11   A    I'M SORRY.

12   Q    HOW DID YOU DETERMINE THE BASE OF THE

13   CALCULATION OF YOUR REASONABLE ROYALTY DAMAGES?

14   A    DID YOU SAY THE DATE?

15   Q    THE BASE, BASE, THE ROYALTY BASE.

16   A    OH, THE ROYALTY BASE.  THAT I GOT FROM THE

17   RECORDS OF APPLE.

18   Q    AND HOW -- WHAT TEST DID YOU USE TO DETERMINE

19   THE REASONABLE ROYALTY IN THIS CASE?

20   A    I USED A SERIES OF FACTORS THAT REFERS TO

21   OUTLINED IN A CASE CALLED GEORGIA PACIFIC.  THERE

22   WERE 15 OF THESE FACTORS.

23   Q    LET'S TAKE A LOOK AT 3956.006.  ARE THESE THE

24   FACTORS THAT YOU LOOKED AT, THE GEORGIA PACIFIC

25   ANALYSIS?

2106

1    A    YES, THESE ARE THE 15 FACTORS.

2    Q    AND IS IT COMMON THAT NOT EVERY SINGLE FACTOR

3    APPLIES IN YOUR ANALYSIS?

4    A    RIGHT.  IN EVERY -- IT'S NOT EVEN EXPECTED

5    THAT EVERY FACTOR WOULD APPLY IN EVERY CASE.

6    Q    LET'S TALK ABOUT FACTOR NUMBER 2.  DID YOU

7    CONSIDER THAT FACTOR?

8    A    YES.  I TRIED -- AT LEAST I TRIED TO CONSIDER

9    THAT FACTOR.

10   Q    WHAT IS FACTOR NUMBER 2?

11   A    FACTOR 2 IS ANY RATES THAT APPLE MIGHT PAY TO

12   OTHERS TO LICENSE PATENTS IN THIS FIELD.

13            UNFORTUNATELY, THOUGH, THE PRODUCTION

14   REALLY WASN'T FORTHCOMING OR RELIABLE AND I HAD

15   TO -- I WASN'T ABLE TO DO MUCH WITH THAT.

16   Q    HOW MANY VERSIONS OF THE ROYALTY CHART DID

17   APPLE PRODUCE TO YOU IN THIS CASE FOR YOU TO

18   CONSIDER?

19   A    YOU KNOW, THERE WAS ONE IMPORTANT CHART THAT

20   LISTED ALL OF THE ROYALTIES IT ACTUALLY PAID.

21   THERE WERE EIGHT DIFFERENT VERSIONS OF THEM

22   PRODUCED OVER A COUPLE MONTHS THAT -- THE LAST

23   VERSION WAS PRODUCED A DAY BEFORE MY REPORT WAS DUE

24   AND IT INCLUDED ROUGHLY SEVEN TIMES MORE ROYALTIES

25   THAN THE FIRST ONE I HAD.

1              SO, YOU KNOW, IT WAS QUITE DIFFERENT THAN

2    WHAT WE HAD SEEN BEFORE.

3              AND THERE WERE THINGS ON THERE THAT, YOU

4    KNOW, PAYMENTS SHOWN ON THERE TO PEOPLE WHO WE DID

5    NOT HAVE THE LICENSES FOR, AND THERE WERE PAYMENTS

6    ON THERE THAT LOOKED LIKE RUNNING ROYALTIES WHEN

7    THE LICENSES THEMSELVES WERE LUMP SUM.

8              SO IF -- TO MY OPINION, IT WAS

9    INCONSISTENT, INCOMPLETE, AND UNRELIABLE.

10   Q    WERE YOU ABLE TO GLEAN ANYTHING USEFUL AT ALL

11   FROM APPLE'S FINANCIAL PRODUCTION?

12   A    YES.  I MEAN, I COULD ADD UP WHAT THEY DID

13   PRODUCE, AND IT SHOWED THAT APPLE HAS PAID A LOT OF

14   ROYALTIES, $1.4 BILLION IN ROYALTIES TO AT LEAST

15   90-SOME COMPANIES FOR THE USE OF THEIR PATENTS AND

16   OTHER INTELLECTUAL PROPERTY.

17   Q    DR. O'BRIEN, TURNING YOUR ATTENTION FROM

18   APPLE'S LICENSES TO SAMSUNG PATENTS, DID YOU

19   CONSIDER THE BENEFIT OF VALUE CONFERRED BY SAMSUNG

20   FEATURE PATENTS?

21   A    YES, THAT'S NUMBER 9 AND 10 ON THIS LIST.  AND

22   THIS IS WHERE REALLY THE VALUE OF ANY PATENT COMES

23   FROM, AND IN THIS CASE IT'S REALLY FROM THE

24   CONSUMER .

25              WHAT IS THE CONSUMER WILLING TO PAY FOR A

1    PARTICULAR FEATURE OR HOW MUCH ARE THEY WILLING TO

2    VALUE THAT FEATURE?

3          SO I LOOKED AT THAT.

4    Q    AND HOW DID YOU LOOK AT THAT?

5    A    WELL, WE'RE FORTUNATE HERE IN THAT THE

6    FEATURES ENABLED BY THESE PATENTS ARE VERY SIMILAR

7    TO THE APPLICATIONS THAT APPLE SELLS ON ITS ITUNES

8    STORES FOR PEOPLE TO DOWNLOAD.  A LOT OF THOSE

9    THINGS ARE, YOU DOWNLOAD IT, AND IT GETS TO DO ONE

10   MORE THING OR DO ONE MORE THING NICELY.

11         SO I LOOKED AT THE APPLICATIONS THAT, YOU

12   KNOW, WHAT THEY SOLD FOR IN THE MARKETPLACE.

13   Q    WHAT WAS THE PRICE POINT THAT YOU TOOK FOR

14   YOUR ANALYSIS?

15   A    WELL, I -- THE AVERAGE APPLICATION IS

16   PURCHASED AT A DOLLAR 44 ACCORDING TO SOME DATA I

17   LOOKED AT.  APPLE PRICES, AND THESE ARE APPLE'S

18   PRICES, STARTING AT 99 CENTS, THEY GO TO 1.99 ALL

19   THE WAY UP TO $30.  I CHOSE THE MINIMUM NUMBER, THE

20   99 CENTS NUMBER.

21   Q    WHY DID YOU CHOOSE THE MINIMUM NUMBER?

22   A    WELL, FIRST, THERE ARE A LOFT APPLICATIONS

23   SOLD FOR THAT THAT DO, INDEED, HAVE -- ENABLE

24   FEATURES ON THE PHONE AND ENHANCEMENTS TO THE PHONE

25   OR THE IPAD.

2109

```
 1              AND, TWO, I WANTED TO BE CONSERVATIVE.  I
 2   WANTED TO START WITH THE LOWEST NUMBER I COULD
 3   START WITH.
 4   Q    OKAY.  SIR, TURNING YOUR ATTENTION TO FACTOR
 5   12, THE PORTION OF THE PROFIT OR SELLING PRICE, HOW
 6   DID THIS FACTOR AFFECT YOUR ROYALTY ANALYSIS?
 7   A    THIS IS ANOTHER IMPORTANT THING BECAUSE OF THE
 8   99 CENTS VALUE THAT THE CONSUMERS WOULD PLACE ON
 9   THE APPLICATION, SOME OF THAT SHOULD GO TO SAMSUNG
10   AND SOME SHOULD GO TO APPLE.
11              WELL, APPLE, WHEN IT WORKS WITH THE
12   DEVELOPER OF AN APPLICATION, THEY GIVE 70 PERCENT
13   TO THE DEVELOPER AND THEY KEEP 30 PERCENT.
14              BUT I LOOKED AT THIS, AND I SAID, WELL,
15   APPLE IS JUST GOING TO HAVE THE PATENT.  THEY'RE
16   GOING TO HAVE TO WRITE THE CODE, IMPLEMENT IT ON
17   THE DEVICE, THEY'RE GOING TO HAVE TO MAINTAIN IT
18   AFTERWARDS.  SO THEY'RE MORE LIKE THE DEVELOPER.
19              SO I GAVE 70 PERCENT OF THE 99 CENTS TO
20   APPLE AND THEN THAT LEFT 30 PERCENT OF THE 99 CENTS
21   AVAILABLE TO SAMSUNG.
22   Q    DR. O'BRIEN, THE 14 FACTORS, THE OPINIONS OF
23   OTHER EXPERTS, DID YOU CONSULT OR COLLABORATE WITH
24   OTHER EXPERTS IN THE CASE TO PRODUCE YOUR ANALYSIS?
25   A    YES, I DID.  I TALKED AT LENGTH WITH DR. YANG,
```

1    WHO HAS TESTIFIED ON THE TECHNICAL DESCRIPTIONS IN

2    THE PATENTS HERE EARLIER FOR SAMSUNG; AND I TALKED

3    AND RELIED UPON SOME WORK DONE BY DR. SUKUMAR, WHO

4    JUST TESTIFIED.

5    Q    LET'S TAKE A LOOK AT SDX 3956.008.  DOES THIS

6    SLIDE REPRESENT THE USAGE DATA THAT YOU OBTAINED

7    FROM DR. SUKUMAR?

8    A    RIGHT.  I HAD DR. SUKUMAR DO A SURVEY AND

9    THESE ARE THE PERCENTAGE OF USE, ACTUAL USE OF THE

10   FEATURE THAT IS ENABLED BY THE PATENT ON THE LEFT.

11   Q    OKAY.  TURNING NOW TO FACTOR 15 OF THE

12   HYPOTHETICAL NEGOTIATION, HOW DID YOU BRING ALL OF

13   THESE DIFFERENT FACTORS TOGETHER?

14   A    FACTOR 15 IS THE HYPOTHETICAL NEGOTIATION

15   WHERE YOU CAN IMAGINE THE PARTIES SITTING DOWN BACK

16   AT THE FIRST INFRINGEMENT AND NEGOTIATING A

17   LICENSE, AND THIS IS THE KIND OF INFORMATION THAT

18   THEY WOULD HAVE.

19          SO I PULLED THAT TOGETHER, I BASICALLY

20   TOOK THE 99 CENTS, MULTIPLIED BY THE 30 PERCENT,

21   AND THEN I ADJUSTED THAT DOWNWARD TO TAKE INTO

22   ACCOUNT THAT NOT EVERYBODY USED THE FEATURE BY THE

23   PERCENTAGES WE JUST SAW.

24   Q    LET'S TAKE A LOOK AT SDX 3956.022.  DOES THAT

25   SLIDE REPRESENT THE ANALYSIS YOU JUST TESTIFIED

1    ABOUT?

2    A    YES, THAT'S THE FORMULA I USED FOR EACH

3    ALLEGED INFRINGING DEVICE ON EACH PATENT.

4    Q    AND WHAT ROYALTY RATE DID YOU ARRIVE AT USING

5    THIS FORMULA?

6    A    I ARRANGED AT A RATE FROM 11 CENTS TO 19 CENTS

7    PER DEVICE SOLD.

8    Q    LET'S TAKE A LOOK AT SDX 3956.13.  DOES THIS

9    SLIDE SUMMARIZE THE ROYALTY RATES THAT YOU CAME UP

10   WITH IN YOUR ANALYSIS?

11   A    YES.  THE DEVICES ARE LISTED AT THE TOP AND

12   THE PATENTS ON THE LEFT AND, FOR EXAMPLE, THE

13   IPHONE FOR USE OF THE E-MAIL PHOTO PATENT IS 19

14   CENTS PER IPHONE SOLD.

15   Q    CAN YOU READ THE REST OF THE NUMBERS IN,

16   PLEASE?

17   A    SURE, IF YOU'D LIKE.

18          FOR THE '460 PATENT, THE IPHONE IS 19

19   CENTS, THE IPAD IS 16 CENTS, THE IPOD IS 13 CENTS.

20          FOR THE '893, THE PHOTO GALLERY BOOKMARK,

21   THE IPHONE IS 12 CENTS; THE IPAD IS 15 CENTS; THE

22   IPAD IS 11 -- THE IPOD, EXCUSE ME, IS 11 CENTS.

23          AND FOR THE '711, MUSIC IN THE BACKGROUND

24   WITH AN INDICATOR, IT'S -- THE IPHONE IS 19 CENTS.

25   Q    OKAY, SIR.  LET'S TURN TO EXHIBIT SDX 3956.016

1    IN YOUR BINDER.

2              DOES THIS SLIDE REPRESENT YOUR

3    CALCULATIONS APPLYING THE ROYALTY RATE TO THE

4    ROYALTY BASE THAT YOU CALCULATED?

5    A    RIGHT.  WHEN I ADDED UP ALL OF THE UNITS

6    ACTUALLY SOLD AND MULTIPLIED BY THOSE CENTS NUMBER

7    THAT IS WE JUST LOOKED AT, THESE ARE THE TOTAL

8    DAMAGES I GET.

9    Q    AND SIR, CAN YOU READ THEM INTO THE RECORD AS

10   TO EACH OF THE PATENTS?

11   A    SURE.  FOR THE '460 E-MAIL PHOTO, THE IPHONE

12   IS $8,848,598; THE IPAD IS 3,056,693 CENTS; THE

13   IPOD IS $2,734,076.

14             FOR THE '893 PHOTO GALLERY BOOKMARK, IT'S

15   $1,964,627; IPAD, $2,001,390; THE IPOD, $1,179,095.

16             FOR THE '711, MUSIC IN THE BACKGROUND,

17   IT'S $3,059,205.

18             THE TOTAL IS IN THE LOWER RIGHT-HAND

19   COLUMN, THAT ADDS UP TO 22,843,684.

20   Q    SIR, YOUR CALCULATIONS OF ROYALTIES ARE

21   PENNIES ON THE DOLLAR; RIGHT?

22   A    YEAH.

23   Q    WHY SO LOW?

24   A    WELL, THESE ARE NICE FEATURES, THEY'RE

25   ACTUALLY DESIRABLE FEATURES FOR APPLE AND APPLE HAS

1    INDICATED THAT MUCH.  BUT THEY'RE ONE OF MANY

2    FEATURES ON THE PHONE, AND THERE ARE A LOT OF

3    THINGS THAT PEOPLE BUY THESE PHONES FOR, AND THE

4    TOTAL AMOUNT 22 MILLION FALLS WITHIN THE RANGE, AT

5    LEAST OF THE DATA WE'VE GOT, OF WHAT THEY'RE PAYING

6    TO OTHER PEOPLE.  SO THESE ARE TYPICAL.

7              MS. MAROULIS:  THANK YOU, DR. O'BRIEN.  I

8    PASS THE WITNESS.

9              THE COURT:  OKAY.  TIME IS NOW 11:25.  GO

10   AHEAD, PLEASE.

11                    **CROSS-EXAMINATION**

12   BY MR. SELWYN:

13   Q    DR. O'BRIEN, GOOD MORNING, SIR.

14   A    GOOD MORNING.

15   Q    DR. O'BRIEN, ONE OF THE GEORGIA PACIFIC

16   FACTORS FOR DETERMINING A REASONABLE ROYALTY IS

17   WHETHER THE PATENTEE, HERE SAMSUNG, PRACTICES THE

18   ASSERTED PATENTS; CORRECT?

19   A    THAT'S ONE OF THE FACTORS, YES.

20   Q    AND YOU DON'T HAVE ANY IDEA WHETHER SAMSUNG

21   PRACTICES ANY OF THE ASSERTED PATENTS; CORRECT?

22   A    WELL, IT'S -- I UNDERSTAND THAT THEY DON'T

23   PRACTICE SOME OF THEM.

24   Q    WELL, YOU DIDN'T MAKE ANY INVESTIGATION;

25   CORRECT?

```
 1    A    NO.

 2    Q    IN FACT, AS OF THE TIME YOU SIGNED YOUR

 3    REPORT, YOU HAD NEVER USED A SAMSUNG SMARTPHONE;

 4    CORRECT?

 5    A    CORRECT.  I DIDN'T LOOK AT THAT BECAUSE THE --

 6    Q    SIR, THE ANSWER IS CORRECT?

 7    A    THAT'S A FACTOR --

 8    Q    TO MY QUESTION?

 9    A    I'M SORRY.  I'M TRYING TO EXPLAIN.

10    Q    YOUR COUNSEL CAN ASK YOU QUESTIONS TO EXPLAIN.

11         NOW, IN REACHING YOUR CONCLUSIONS, SIR,

12    YOU CONSIDERED THE TESTIMONY OF MR. PENDLETON OF

13    SAMSUNG; CORRECT?

14    A    YES.

15    Q    HE'S SAMSUNG'S CHIEF MARKETING OFFICER FOR

16    SAMSUNG MOBILE PRODUCTS; CORRECT?

17    A    I BELIEVE SO.

18    Q    FAIR TO SAY HE KNOWS MORE ABOUT MARKETING OF

19    SAMSUNG PRODUCTS THAN YOU DO, SIR?

20    A    I WOULD THINK SO.

21    Q    IS IT CORRECT THAT HE TESTIFIED THAT THE

22    FEATURES OF THE THREE PATENTS ON WHICH YOU'RE

23    OFFERING A DAMAGES OPINION DON'T SEEM THAT

24    IMPORTANT AND THERE WOULD BE NO VALUE TO

25    ADVERTISING THOSE FEATURES, CORRECT?
```

```
 1              MS. MAROULIS:  OBJECTION, MISSTATEMENT.

 2              THE COURT:  OVERRULED.

 3              THE WITNESS:  I'M NOT SURE WHAT HE SAID.

 4     BY MR. SELWYN:

 5     Q    CAN WE HAVE YOUR DEPOSITION, PLEASE, PAGE 224,

 6     LINES 12 TO 19.  IT'S IN YOUR BINDER, SIR, AT TAB

 7     2?

 8     A    YOU MEAN ONE OF THE WHITE BINDERS.

 9     Q    IT SHOULD BE THE FIRST ONE.  VOLUME 1, TAB 2,

10     AND IF YOU TURN, PLEASE, SIR TO PAGE 224 AND IT'S

11     ON THE SCREEN.

12              BRING UP 12 THROUGH 19, PLEASE, ON THE

13     SCREEN.

14              WERE YOU ASKED THIS QUESTION AND GIVE

15     THIS ANSWER:

16              "QUESTION:  AND DID YOU REVIEW

17     MR. PENDLETON'S TESTIMONY THAT SAMSUNG DOES NOT

18     CONDUCT MARKETING RESEARCH OR MARKETING CAMPAIGNS

19     CONCERNING THE FUNCTIONALITY OF THE FIVE FEATURE

20     PATENTS BECAUSE SUCH MARKETING WOULD NOT BE

21     WARRANTED BECAUSE THE FEATURES DON'T SEEM THAT

22     IMPORTANT AND THERE WOULD BE NO VALUE TO

23     ADVERTISING THOSE FEATURES?

24              "ANSWER:  YES, I DID."

25              WERE YOU ASKED THAT QUESTION AND DID YOU
```

1    GIVE THAT ANSWER?

2    A    YES.

3           MS. MAROULIS:  OBJECTION, NOT PROPER

4    IMPEACHMENT.

5           THE COURT:  OVERRULED.

6    BY MR. SELWYN:

7    Q    I WANT TO ASK YOU SOME QUESTIONS ABOUT EACH

8    COMPONENT OF YOUR ROYALTY FORMULA, IF I MAY.

9           YOU REVIEWED MORE THAN 50 APPLE AND

10   SAMSUNG LICENSE AGREEMENTS IN CONNECTION WITH YOUR

11   WORK IN THIS CASE; RIGHT?

12   A    YEAH.  ROUGHLY 30 APPLE LICENSES, YEAH.

13   Q    AND WOULD YOU AGREE WITH ME, SIR, THAT NONE OF

14   THEM INCLUDED IN THE ROYALTY FORMULA THE PRICE OF

15   AN APP AS AN ELEMENT?

16   A    THEY WOULDN'T DO THAT, NO.

17   Q    WOULD YOU AGREE WITH ME, SIR, THAT NONE OF

18   THEM INCLUDED A ROYALTY FORMULA THAT USED A

19   CUSTOMER USAGE PERCENTAGE AS AN ELEMENT?

20   A    NO.  THIS IS THE KIND OF THING YOU WOULDN'T

21   HAVE IN A FORMULA.  IT'S WHAT YOU WOULD HAVE IN A

22   NEGOTIATION WHEN PEOPLE TALK BACK AND FORTH.  BUT

23   IN A PATENT, OR IN A LICENSE, YOU WOULDN'T PUT A

24   FORMULA LIKE THAT IN THERE.

25   Q    LET ME ASK YOU ABOUT THAT.  IN REACHING YOUR

1    ROYALTY OPINION, DID YOU SPEAK WITH ANYONE AT

2    SAMSUNG ABOUT ITS LICENSING PRACTICES OR POLICIES?

3    A    NO.

4    Q    SO YOU DIDN'T ASK ANYONE AT SAMSUNG WHETHER

5    YOUR FORMULA MADE ANY REAL WORLD SENSE; CORRECT?

6    A    I DIDN'T ASK -- I DIDN'T TALK TO THEM -- THE

7    HYPOTHETICAL, YOU'RE SUPPOSED TO ENVISION THAT THE

8    PARTIES ARE SIMILAR TO THE PARTIES IN THE

9    LITIGATION, BUT NOT THE SAME PARTIES.

10            SO I DIDN'T TALK TO THEM.

11   Q    YOU DIDN'T ASK ANYBODY AT SAMSUNG ABOUT ANY

12   LICENSE NEGOTIATION THAT THEY HAD EVER DONE;

13   CORRECT?

14   A    NO.

15   Q    NOW, LET ME ASK YOU A LITTLE BIT ABOUT THE

16   FIRST ELEMENT OF YOUR FORMULA, THE PRICE OF AN APP.

17            ONE OF DEPOSITIONS YOU REVIEWED WAS THAT

18   OF MR. JUN WON LEE; CORRECT?

19   A    YES.

20   Q    SAMSUNG'S DIRECTOR OF LICENSING; CORRECT?

21   A    YES.

22   Q    FAIR TO SAY THAT MR. LEE KNOWS MORE ABOUT

23   SAMSUNG'S LICENSING PRACTICES THAN YOU DO?

24   A    YES.

25   Q    AND HE TESTIFIED INDEED THAT SAMSUNG HAD NEVER

1    CONSIDERED, NEVER CONSIDERED USING THE PRICE OF AN

2    APP AS A FACTOR IN DETERMINING A ROYALTY?

3    A    WELL, HE SAID IT HAD NEVER COME UP, THAT THEY

4    HAD NEVER DONE A LICENSE FOR A SINGLE PATENT THAT

5    WOULD BE LIKE AN APP.  HE SAID THAT THEY HAD ALWAYS

6    DONE CROSS-LICENSES FOR PORTFOLIOS.

7    Q    LET ME ASK YOU ABOUT YOUR SECOND ELEMENT, THIS

8    30/70 SPLIT.  YOU CAN'T IDENTIFY ANY PATENT LICENSE

9    NEGOTIATIONS WHERE THE LICENSOR AND LICENSEE AGREED

10   TO SUCH A SPLIT; CORRECT?

11   A    NO.

12   Q    NOW LET'S TURN TO THE 30 ELEMENT OF YOUR

13   FORMULA, PLEASE?

14   A    I MEAN, THAT INFORMATION WOULDN'T BE AVAILABLE

15   TO ME, SO I COULDN'T.

16   Q    WELL, YOU DIDN'T ASK.  YOU DIDN'T SPEAK WITH

17   ANYBODY AT SAMSUNG; CORRECT?

18   A    NO.  I'VE SPOKEN TO OTHER PEOPLE AND THEY

19   OFTEN TALK ABOUT PERCENTAGE SPLIT.  THAT'S PRETTY

20   COMMON.  I JUST USED APPLE'S OWN DATA OF 70/30 WHEN

21   I DECIDED MY SPLIT, AND I GAVE THE MAJORITY TO

22   APPLE.

23   Q    LET ME ASK YOU ABOUT THE THIRD ELEMENT OF YOUR

24   FORMULA, THAT'S THE USAGE FORMULA; CORRECT?

25   A    YES.

1    Q    AND YOU WERE IN THE COURTROOM A FEW MOMENTS

2    AGO WHEN DR. SUKUMAR TESTIFIED; CORRECT?

3    A    YES, I WAS.

4    Q    YOU DIDN'T INDEPENDENTLY VERIFY ANY OF HIS

5    USAGE RESULTS; CORRECT?

6    A    NO.  I RELIED UPON DR. SUKUMAR'S SURVEY.

7    Q    AND YOU MADE NO ATTEMPT TO DETERMINE WHETHER

8    HIS RESULTS ARE OF SUFFICIENT ACCURACY; CORRECT?

9    A    I WORKED WITH HIM CAREFULLY IN FORMULATING THE

10   QUESTIONS.  I TALKED WITH HIM AFTER HE DID THE

11   PILOT SURVEY, AND I LOOKED AT HIS FINAL RESULTS,

12   INCLUDING HIS CONFIDENCE STATISTICS, AND I DID DO

13   THAT.

14   Q    SIR, CAN YOU ANSWER MY QUESTION.  MY QUESTION

15   IS --

16   A    I'M SORRY, WHAT WAS IT?

17   Q    YOU HAVE MADE NO ATTEMPT TO DETERMINE WHETHER

18   DR. SUKUMAR'S RESULTS ARE OF SUFFICIENT ACCURACY,

19   CORRECT?

20   A    I THOUGHT THAT I -- I LEARNED THAT WE WANT

21   ABOUT IT THE PROPER WAY.  THAT GOES TO ACCURACY, I

22   BELIEVE.

23   Q    LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

24   CAN WE HAVE DR. O'BRIEN'S DEPOSITION AT 117, LINES

25   7 THROUGH 12.  WERE YOU ASKED THIS QUESTION AND DID

1      YOU GIVE THIS ANSWER, SIR:

2              "QUESTION:  SO AM I CORRECT THAT YOU'VE

3      MADE NO ATTEMPT TO DETERMINE WHETHER DR. SUKUMAR'S

4      RESULTS ARE OF SUFFICIENT ACCURACY?

5              "ANSWER:  I'VE MADE NO INDEPENDENT TEST

6      OR ANALYSIS OF THAT QUESTION."

7              WERE YOU ASKED THAT QUESTION AND DID YOU

8      GIVE THAT ANSWER?

9      A    YES, AND THE ANSWER SAID INDEPENDENT TEST.  I

10     WORKED WITH HIM ON THAT ISSUE.  I DIDN'T DO A

11     SEPARATE INDEPENDENT TEST BECAUSE HE'S THE EXPERT

12     ON SURVEY.

13     Q    LET ME ASK YOU THIS, SIR.  WOULD YOU AGREE

14     WITH ME THAT WITHOUT DR. SUKUMAR'S SURVEY RESULTS,

15     IF YOU WERE TO DETERMINE THAT DR. SUKUMAR ASKED THE

16     WRONG QUESTIONS OF THE RESPONDENTS AND THAT THE

17     RESULTS ARE NOT RELIABLE, IF YOU DIDN'T ASK THAT,

18     YOU WOULDN'T BE ABLE TO CALCULATE REASONABLE

19     ROYALTY DAMAGES; CORRECT?

20     A    WELL, I THINK THE JURY WOULD BE ABLE TO,

21     CORRECT.

22     Q    BUT YOU DIDN'T, CORRECT?

23     A    PARDON.

24     Q    BUT DID YOU NOT, CORRECT?

25     A    I DID NOT WHAT?

1    Q    YOUR ROYALTY FORMULA RELIES AS A COMPONENT ON

2    USAGE, CORRECT?

3    A    RIGHT.  THE JURY WOULD HAVE TO TAKE THE 30

4    CENTS BASICALLY THAT SAMSUNG WOULD HAVE AND DECIDE

5    HOW MUCH THAT WOULD TRANSLATE INTO A ROYALTY RATE

6    PER UNIT.

7    Q    LAST SUBJECT, SIR.  YOUR OPENING REPORT, THAT

8    REPORT CONTAINED A SIGNIFICANT MISTAKE, DIDN'T IT?

9    A    IT WAS A MISTAKE, YES.  THERE WAS A -- FOR

10   THOSE WHO USE EXCEL, THERE HAD BEEN A CELL

11   REFERENCE THAT WAS OFF.

12   Q    WELL, IT WASN'T JUST OFF.  YOU MADE A $3.9

13   MILLION CALCULATION ERROR, DIDN'T YOU?

14   A    NO.  IT WAS A CELL REFERENCE THAT WAS OFF.

15   THAT DID ADD UP TO $3.9 MILLION, YES.  ANYONE WHO'S

16   USED EXCEL KNOWS IT'S VERY EASY TO DO THAT.

17   NORMALLY WE WOULD AUDIT THESE.  BUT WE GOT THIS

18   MAJOR PRODUCTION ON LICENSING THE DAY BEFORE MY

19   REPORT WAS DUE.  THAT'S NORMALLY WHEN WE WILL BE

20   AUDITING THESE THINGS.

21        BUT THEIR PRODUCTION KEPT US FROM PUTTING

22   SOMEONE ON THAT AND AUDITING THAT.  SO IT CAME IN,

23   THE ERROR WAS POINTED OUT BY MR. MUSIKA, WE

24   CORRECTED IT BEFORE MY DEPOSITION, I WALKED IN AND

25   GAVE THEM A CHART, WHICH IS OUR STANDARD PRACTICE.

1    IF THERE'S ANYTHING LIKE THAT, WE'LL FIX IT.

2    Q    SIR, THE ERROR OCCURRED BECAUSE YOU DID NOT

3    PERFORM YOUR USUAL QUALITY CONTROL PROCEDURES FOR

4    THE REPORT; CORRECT?

5    A    RIGHT.  WE WERE UNABLE TO DO THAT BECAUSE OF

6    THE LATE PRODUCTION OF APPLE.

7    Q    WELL, ISN'T IT TRUE, SIR, THAT THE REASON YOU

8    DID NOT CONDUCT YOUR USUAL QUALITY CONTROL

9    PROCEDURE IS BECAUSE YOU RAN OUT OF TIME AND HAD

10    OTHER COMMITMENTS?

11    A    THAT'S THE -- THAT'S EXACTLY WHAT I JUST SAID.

12            MR. SELWYN:  THANK YOU, SIR.  NO FURTHER

13    QUESTIONS.

14            THE COURT:  ALL RIGHT.  THE TIME IS 1133.

15    ANY REDIRECT.

16            MS. MAROULIS:  NO REDIRECT.  YOUR HONOR,

17    WE CALL DR. DAVID TEECE AS OUR NEXT WITNESS.

18            THE COURT:  ALL RIGHT.  HE'S EXCUSED NOT

19    SUBJECT TO RECALL.

20            MS. MAROULIS:  CORRECT, NOT SUBJECT TO

21    RECALL.

22            THE COURT:  OKAY.  YOU'RE EXCUSED.

23            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

24            **DAVID TEECE,**

25    BEING CALLED AS A WITNESS ON BEHALF OF THE

```
1    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

2    EXAMINED AND TESTIFIED AS FOLLOWS:

3              THE WITNESS:  I DO.

4              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

5              THE COURT:  TIME IS NOW 11:34.  GO AHEAD,

6    PLEASE.

7              THE CLERK:  PLEASE STATE JURY FULL NAME

8    AND SPELL IT FOR THE RECORD.
```

**DIRECT EXAMINATION**

```
10   BY MS. MAROULIS:

11   Q    GOOD MORNING, DR. TEECE.  CAN YOU STATE YOUR

12   FULL NAME FOR THE RECORD?

13   A    YES, DAVID JOHN TEECE.

14   Q    CAN YOU PLEASE TELL THE JURY WHAT YOU DO FOR A

15   LIVING?

16   A    I'M A CHAIRED PROFESSOR AT THE UNIVERSITY OF

17   CALIFORNIA AT BERKELEY WHERE I ALSO DIRECT THE

18   INSTITUTE FOR INNOVATION, AND I'M ALSO CHAIRMAN OF

19   THE BERKELEY RESEARCH GROUP.

20   Q    WHAT ARE THE SUBJECTS OF YOUR TEACHING AND

21   RESEARCH?

22   A    PRIMARY FOCUS IS ON INNOVATION AND

23   TECHNOLOGICAL CHANGE.  BIG EMPHASIS ON LICENSING

24   AND PUBLIC POLICY, INCLUDING COMPETITION POLICY.

25   Q    COULD YOU PLEASE SUMMARIZE BRIEFLY YOUR FORMAL
```

1    EDUCATION?

2    A     YES.  I HAVE A PH.D. IN ECONOMICS FROM THE

3    UNIVERSITY OF PENNSYLVANIA.  I TAUGHT AT STANFORD

4    FOR FIVE YEARS, AND CAME TO BERKELEY IN '82, AND

5    I'VE BEEN AN ACTIVE SCHOLAR.

6    Q     HAVE YOU PUBLISHED ANY PUBLICATIONS IN YOUR

7    FIELD?

8    A     YES.  I HAVE OVER 200 ARTICLES AND MORE THAN A

9    DOZEN BOOKS, MANY OF WHICH FOCUS ON INNOVATION,

10   TECHNOLOGICAL CHANGE, AND COMPETITION, HOW FIRMS

11   BUILD COMPETITIVE ADVANTAGE IN A CHANGING GLOBAL

12   ECONOMY.

13   Q     SIR, HAVE YOU PREVIOUSLY SERVED AS AN EXPERT

14   IN THE FIELD OF ECONOMIC ANALYSIS AND COMPUTATION

15   OF DAMAGES?

16   A     YES, I HAVE.

17   Q     HOW MANY TIMES APPROXIMATELY?

18   A     OH, AT LEAST 50.

19              MS. MAROULIS:  YOUR HONOR, I TENDER

20   DR. TEECE AS AN EXPERT IN ECONOMIC ANALYSIS AND

21   COMPUTATION OF PATENT DAMAGES.

22              MR. MUELLER:  NO OBJECTION.

23              THE COURT:  OKAY.  SO CERTIFIED.

24   BY MS. MAROULIS:

25   Q     DR. TEECE, WHAT WAS YOUR ASSIGNMENT IN THIS

1    CASE?

2    A    I WAS ASKED TO COMPUTE THE REASONABLE ROYALTY

3    DAMAGES DUE SAMSUNG FROM APPLE FOR USE OF ITS UMTS

4    PATENTS.

5    Q    AND THOSE ARE '941 AND '516 PATENTS?

6    A    THAT IS CORRECT.

7    Q    HAVE YOU PREPARED A SLIDE TO SUMMARIZE YOUR

8    CALCULATION?

9    A    I HAVE.

10   Q    LET'S TAKE A LOOK AT SDX 3963.005.

11            DR. TEECE, WHAT DOES THIS SLIDE

12   ILLUSTRATE?

13   A    THE HIGHLIGHTED YELLOW IS THE REASONABLE

14   ROYALTY RATES THAT I HAVE DETERMINED ARE

15   APPLICABLE.  IT'S A RANGE.  AT A MINIMUM END IT'S 2

16   PERCENT.  AT THE UPPER END IS 2.75 PERCENT OF NET

17   SALES.

18            ON THE LEFT I HAVE THE INFRINGING SALES

19   OF IPHONES AND IPADS, 12.23 BILLION OF IPHONES, AND

20   2.29 BILLION OF IPADS.

21            AND THAT LEADS ME TO A TOTAL DAMAGES

22   NUMBER ON THE FAR RIGHT WHICH RANGES FROM, AT THE

23   LOW END, 290 MILLION, AT THE RIGHT HAND, 399

24   MILLION.

25   Q    SIR, HOW DO YOU CALCULATE THESE REASONABLE

1    ROYALTY AMOUNTS THAT ARE LISTED ON THIS CHART?

2    A    WELL, I -- SINCE THERE WAS NO LICENSE ENTERED

3    INTO BETWEEN APPLE AND SAMSUNG, I HAD TO GO THROUGH

4    AN EXERCISE TO FIGURE OUT WHAT THEY MIGHT HAVE

5    AGREED UPON IF THERE WAS A NEGOTIATION BACK AT

6    ABOUT THE TIME OF FIRST INFRINGEMENT.

7         SO I SET UP SOMETHING CALLED THE

8    HYPOTHETICAL NEGOTIATION AS A FRAMEWORK FOR

9    DETERMINING WHAT THE REASONABLE ROYALTIES BASE

10   WOULD BE.

11   Q    AND WHAT IS THE BASE THAT YOU HAVE USED FOR

12   THE PURPOSES OF THIS ANALYSIS.

13   A    YES, THE ROYALTY BASE, BECAUSE IF YOU HAVE A

14   RATE, IT'S NO GOOD TO YOU WITHOUT A BASE, THE BASE

15   IS THE NET SALES OF THE INFRINGING PRODUCTS, AND

16   THE NET SALES ARE BASICALLY THE SALES NUMBERS MINUS

17   A FEW RETURNS.  SO IT'S BASICALLY THE SALES OR

18   REVENUE NUMBERS FOR THE PRODUCTS IN QUESTION.

19   Q    WHAT PERIOD OF TIME DID YOU ASSUME FOR THE

20   PURPOSES OF THIS ANALYSIS IN CALCULATING THE

21   ROYALTY BASE?

22   A    THE DATES ARE AT THE TOP THERE FOR.  FOR THE

23   IPHONE, IT WAS POST SEPTEMBER 9TH, 2010.  FOR THE

24   IPADS, IT WAS POST APRIL 27TH, 2011.

25   Q    SIR, LET'S TAKE THESE COMPONENTS ONE AT A

1    TIME.

2              TURNING TO THE ROYALTY BASE, HOW DID YOU

3    DETERMINE THE NET SALES PRICE OF A PRODUCT WAS THE

4    APPROPRIATE ROYALTY BASE?

5    A    WELL, I LOOKED AT TWO THINGS.  ONE IS INDUSTRY

6    PRACTICE.  IT'S VERY COMMON TO STATE A LICENSE AS A

7    PERIOD OF TIME OF THE SALES PRICE OF THE PRODUCT.

8              SECONDLY, IN THIS CASE I LOOKED AT UMTS

9    TECHNOLOGY AND HOW IT IMPACTED SALES OF THE PRODUCT

10   AND TOOK THAT INTO ACCOUNT AS WELL.

11   Q    DID YOU PREPARE ANY SLIDES TO ILLUSTRATE THE

12   VALUE CONFERRED BY THE UMTS TECHNOLOGY?

13   A    I DID.

14   Q    LET'S TAKE A LOOK AT SDX 3963.006, PLEASE.

15             CAN YOU PLEASE DESCRIBE FOR THE JURY WHAT

16   THESE SLIDES ILLUSTRATE.

17   A    YES.  I TRIED TO GET A CONTROL OR AN

18   EXPERIMENT AFTER EXPERIMENT, IF YOU WILL, FOR

19   WHAT'S REALLY THE VALUE OF UMTS TECHNOLOGIES

20   EMBEDDED IN THE APPLE PRODUCTS.

21             AND FORTUNATELY THE IPOD TOUCH IS A

22   PRODUCT IN THE MARKET THAT HAS MOST OF THE FEATURES

23   IN THE IPHONE BUT WITHOUT THE PHONE FEATURE AND

24   WITHOUT THE CONNECTIVITY ASSOCIATED WITH UMTS

25   TECHNOLOGY.

```
 1              AND AS YOU CAN SEE, THERE'S A SIGNIFICANT

 2    PRICE PREMIUM BETWEEN THE IPOD AND THE IPHONE.  IN

 3    FACT, FOR THE TWO DIFFERENT MODELS I LOOKED AT,

 4    IT'S EXACTLY 400, THAT'S APPLE'S PRICING, THAT'S

 5    NOT TAKING INTO ACCOUNT ANY SERVICE DISCOUNTS OR

 6    DISCOUNTS YOU MAY GET THROUGH A SERVICE PROVIDER.

 7              BUT THERE'S A VERY SUBSTANTIAL PRICE

 8    PREMIUM ASSOCIATED WITH THE UMTS TECHNOLOGY WHICH I

 9    THINK IS WELL CAPTURED BY LOOKING AT THAT PRICE

10    DIFFERENTIAL.

11    Q    AND HAVE YOU PREPARED ANY ADDITIONAL SLIDES

12    WITH RESPECT TO THE IPAD PRODUCT?

13    A    YES.  SO I'VE DONE A SIMILAR COMPARISON WITH

14    RESPECT TO THE IPAD.

15    Q    LET'S TAKE A LOOK AT 3963.07.

16    A    YES.  THE PRICE DIFFERENCE IS NOT QUITE AS

17    GREAT, BUT IF YOU LOOK AT AN IPAD THAT'S JUST GOT

18    THE WI-FI FEATURES OR THE ONE WITH UMTS, THEN

19    THERE'S A $177 OR $180 DIFFERENCE IN PRICE BY

20    HAVING THAT EXTRA FUNCTIONALITY ASSOCIATED WITH THE

21    UMTS TECHNOLOGY.

22    Q    THANK YOU, SIR.

23              TURNING NOW TO ROYALTY RATES, HOW DID YOU

24    DETERMINE THAT THE ROYALTY RATES SHOULD BE BETWEEN

25    2 PERCENT AND TWO AND THREE QUARTERS PERCENT?
```

1    A    AS AN ECONOMIST, I LIKE TO LOOK AT MARKET

2    TRANSACTIONS.  THAT'S USUALLY THE BEST MEASURE OF

3    VALUE.  SO I LOOKED AT LICENSING AGREEMENTS THAT I

4    FOUND IN THE RECORD OF THE CASE TO SEE WHAT I COULD

5    GLEAN FROM THOSE IN TERMS OF WHAT A REASONABLE

6    ROYALTY MIGHT BE.

7    Q    SIR, I'M NOW GOING TO TURN YOUR ATTENTION TO

8    AN EXHIBIT THAT IS ONLY GOING TO BE SHOWN TO THE

9    JURY AND THE COURT AND YOURSELF.  IT HAS HIGHLY

10   CONFIDENTIAL INFORMATION OF THIRD PARTIES.

11             PLEASE TURN TO EXHIBIT DX 630 IN YOUR

12   BINDER.

13   A    OKAY.

14   Q    WHAT IS EXHIBIT DX 630?

15   A    I'M THERE.

16   Q    HAVE YOU PREPARED THIS EXHIBIT?

17   A    I HAVE.

18   Q    WHAT DOES IT SUMMARIZE?

19   A    IT SUMMARIZES THE NUMBER OF LICENSING

20   AGREEMENTS, IN THIS CASE I'M LOOKING AT THE SAMSUNG

21   LICENSING AGREEMENTS THAT I WAS ABLE TO FIND

22   INFORMATION ON, THAT I COULD ACTUALLY GET AHOLD OF

23   THE LICENSE AGREEMENT AND DISTILL CERTAIN

24   INFORMATION FROM IT.

25             MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT

1    DX 630 INTO EVIDENCE.

2              THE COURT:  ANY OBJECTION?

3              MR. MUELLER:  NO OBJECTION.

4              THE COURT:  IT'S ADMITTED.

5              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

6              630, HAVING BEEN PREVIOUSLY MARKED FOR

7              IDENTIFICATION, WAS ADMITTED INTO

8              EVIDENCE.)

9    BY MS. MAROULIS:

10   Q    SIR, TURNING YOUR ATTENTION TO ROW 12 OF

11   CONFIDENTIAL EXHIBIT DX 630, HAVE YOU CONSIDERED

12   THIS LICENSE THAT I'M POINTING YOU TO IN YOUR

13   ANALYSIS?

14   A    YES, I HAVE.

15   Q    WHEN DID THE PARTIES ENTER INTO THIS LICENSE?

16   A    THIS ONE WAS ENTERED INTO IN 2004.

17   Q    WHAT IS BEING LICENSED HERE?

18   A    A NUMBER OF TECHNOLOGIES, INCLUDING UMTS

19   TECHNOLOGY.

20   Q    AND WHERE DID THE JURY FIND THE FINANCIAL

21   TERMS OF THE AGREEMENT?

22   A    IN THE COLUMN SECOND FROM THE RIGHT.

23   Q    OKAY.  DID THOSE TERMS SUPPORT YOUR CONCLUSION

24   THAT THE NET SALE PRICE IS THE APPROPRIATE ROYALTY

25   BASE FOR ASSESSING REASONABLE ROYALTY?

```
 1    A    YES, IT DOES.  IT'S --

 2    Q    IT SUPPORT --

 3    A    UNDER THE PAYMENTS SECTION THERE, YES, YOU CAN

 4    HIGHLIGHT IT ON THE TOP LINE, BUT IT'S A PERIOD OF

 5    TIME OF NET SELLING PRICE THAT IS IDENTIFIED THERE

 6    THAT GIVES ME A CLUE, AT LEAST WITH RESPECT TO THAT

 7    PARTICULAR PROVIDER OF UMTS TECHNOLOGY, AS TO WHAT

 8    A REASONABLE ROYALTY RATE IS.  IT'S EXPRESSED AS A

 9    PERIOD OF TIME OF NET SALES.

10    Q    AND DOES IT SUPPORT YOUR ROYALTY RATE AS WELL?

11    A    YES.  IT'S ABOVE THE ROYALTY RATE RANGE THAT I

12    HAVE CHOSEN, BUT IT CERTAINLY IS CONSISTENT WITH

13    THE HIGH END OF IT.

14    Q    PLEASE TAKE A LOOK AT ROW 29 OF DX 630.  HAVE

15    YOU CONSIDERED THIS LICENSE IN SUPPORTING YOUR

16    ANALYSIS?

17    A    YES, I HAVE.

18    Q    HOW DOES THIS LICENSE SUPPORT YOUR

19    DETERMINATION OF ROYALTY BASE AND ROYALTY RATE?

20    A    WELL, ONCE AGAIN, IF YOU LOOK AT THE PAYMENTS

21    SECTION, THERE IS A REASONABLE -- OR THERE IS A

22    ROYALTY RATE AS A PERIOD OF TIME OF SALES IT'S

23    SPECIFIED.

24            MAYBE YOU CAN HIGHLIGHT THAT.  AND IT IS

25    WITHIN THE RANGE, THERE'S A NUMBER IN THE MIDDLE,
```

```
 1    THERE'S A PERCENTAGE.  IT'S A PERCENTAGE OF NET
 2    SALES.  THERE'S A NUMBER THERE THAT IS WITHIN MY
 3    RANGE THAT I DESCRIBED EARLIER TO THE JURY.
 4    Q    OKAY.  YOU CAN TAKE DOWN THE EXHIBIT.
 5              DOES THIS EXHIBIT SET FORTH THE ROYALTY
 6    RATE FOR SAMSUNG'S ESSENTIAL PATENTS?
 7    A    NO, IT DOESN'T.  THESE ARE WHAT SAMSUNG HAS
 8    PAID FOR THE USE OF OTHER PEOPLE'S TS TECHNOLOGY,
 9    SO IT'S NOT IDEAL, BUT I THINK IT'S INDICATIVE.
10    Q    CAN YOU DESCRIBE HOW IT'S NONETHELESS RELEVANT
11    TO YOUR ANALYSIS?
12    A    HOW IT IS RELEVANT TO MY ANALYSIS?
13    Q    YES.
14    A    YES, I MEAN, THERE'S A GENERAL MARKETPLACE OUT
15    THERE FOR TECHNOLOGY, AND WHETHER YOU'RE THE BUYER
16    OR THE SELLER FOR UMTS TECHNOLOGY, THEY TEND TO GO
17    DOWN IN APPROXIMATELY THE SAME RANGE.
18    Q    SO HOW MANY SAMSUNG CROSS-LICENSES HAVE YOU
19    ANALYZED IN THIS CASE?
20    A    WELL, I WAS ABLE TO GET SOME INFORMATION ON
21    TWO SAMSUNG CROSS-LICENSES WHERE SAMSUNG WAS
22    LICENSING OUT ITS UMTS TECHNOLOGY.  THE ONES I
23    LOOKED AT, THOSE WERE LICENSING IN.  BUT I WAS ABLE
24    TO GET INFORMATION ON TWO LICENSES WHERE SAMSUNG
25    WAS LICENSING OUT ITS UMTS.
```

1    Q    WE'RE GOING TO SHOW TO THE JURY NOW THE

2    CONFIDENTIAL DEMONSTRATIVE 3963.019.  ONCE THE JURY

3    SEES THAT, AND WE CANNOT SHOW IT TO THE REST OF THE

4    WORLD, CAN YOU PLEASE EXPLAIN THIS SLIDE TO THE

5    JURY?

6    A    YES.  THE FIRST POINT I'VE GOT TO GET ACROSS

7    IS THAT MOST LICENSES ARE, IN FACT, CROSS-LICENSES,

8    BY WHICH I MEAN ONE PARTY WILL LICENSE OUT

9    TECHNOLOGY AND THEY WILL LICENSE BACK IN

10   TECHNOLOGY.

11            MONEY IS USED AS A BALANCING PAYMENT, BUT

12   THE PRIMARY CONSIDERATION IN GOING BACK AND FORTH

13   ISN'T MONEY.  IT'S INTELLECTUAL PROPERTY RIGHTS.

14   IT'S CALLED A CROSS-LICENSE.

15            SO THE CHALLENGE HERE IS FOR ME TO FIGURE

16   OUT, BECAUSE I'M LOOKING AT CALCULATING DAMAGES,

17   WHAT APPLE WOULD PAY SAMSUNG FOR ONE LICENSE, I'VE

18   GOT TO TRY AND FIGURE OUT FROM THE CROSS-LICENSE

19   WHAT THE VALUE OF THE ONE-WAY LICENSE WOULD BE.  SO

20   THERE'S A SIMPLE EQUATION HERE.

21   Q    SIR, IF I MAY REMIND YOU NOT TO MENTION THE

22   NUMBERS PUBLICLY?

23   A    OKAY.

24   Q    THERE'S SOME THIRD PARTIES IN THE AUDIENCE?

25   A    OKAY.

1    Q    GO AHEAD.

2    A    BASICALLY IF I KNOW THE ROYALTY BASE, WHICH I

3    DO IN THIS CASE, AND IF I KNOW WHAT THE STANDARD

4    ROYALTY RATE IS FOR THE OTHER PARTY, I CAN ESTIMATE

5    WHAT SAMSUNG'S RATE IS IF I ALSO KNOW WHAT THE

6    BALANCING PAYMENT IS.

7            SO IN THIS CASE, I'VE JUST SET UP THE

8    PROBLEM.  I'M TRYING TO FIGURE OUT WHAT SAMSUNG'S

9    IMPLIED RATE IS, AND THAT'S A SIMPLE EQUATION THAT

10   I LOOKED AT, AND THE NEXT SLIDE GIVES THE ANSWER.

11   Q    LET'S TAKE A LOOK AT THE NEXT CONFIDENTIAL

12   SLIDE, 3963.020.  DOES THIS SLIDE SHOW THE ROYALTY

13   RATE THAT YOU ANALYZED?

14   A    YES, THAT IS THE IMPLIED OR ESTIMATED RATE

15   THAT I GET FROM THAT PIECE OF ANALYSIS, THREE

16   PERCENTAGE POINTS OF NET SALES, WHICH IS SLIGHTLY

17   ABOVE MY RANGE OF 2 TO 2.75.

18   Q    IS THIS NUMBER CONSISTENT WITH THE INDUSTRY

19   LICENSES YOU LOOKED AT EARLIER?

20   A    IT IS.

21   Q    SIR, HAVE YOU PREPARED A SLIDE SHOWING WHAT

22   SAMSUNG PROVIDED TO THE -- IN THE CROSS-LICENSE TO

23   THE OTHER SIDE?

24   A    YES.

25   Q    AND IS THAT THE SLIDE, CONFIDENTIAL SLIDE

1     3963.022?

2     A    YES.

3     Q    CAN YOU PLEASE EXPLAIN TO THE JURY WHAT YOU

4     EXPRESSED IN THIS SLIDE WITHOUT MENTIONING THE

5     NUMBERS?

6     A    YES, THIS ANALYTICAL FRAMEWORK ALSO ENABLES ME

7     TO VALUE THE LICENSING RIGHTS THAT ARE TRADED AND

8     TO SHOW IT IN COMPARISON TO THE BALANCING PAYMENTS.

9           AND AS YOU CAN SEE, THE PAYMENT IN KIND,

10    IF YOU WILL, OF INTELLECTUAL PROPERTY RIGHTS IS WAY

11    GREATER THAN THE BALANCING PAYMENTS.

12          SO I OFTEN SPEAK OF THE BALANCING

13    PAYMENT, THE CASH AMOUNT THAT TRADES HANDS HERE AS

14    JUST THE TIP OF THE ICEBERG.

15          MY CHALLENGE, OF COURSE, HERE IS TO

16    FIGURE OUT THE VALUE OF THE ICEBERG, NOT JUST THE

17    TIP.

18    Q    WHAT IS THE PRIMARY VALUE THAT SAMSUNG WAS

19    PROVIDING TO ITS COUNTER PARTIES IN ITS LICENSING

20    AGREEMENT?

21    A    THE PRIMARY VALUE IN A CROSS-LICENSE, AND

22    CERTAINLY IN THE CASE OF SAMSUNG'S CROSS-LICENSES,

23    I BELIEVE WAS THE LICENSING RIGHT.

24    Q    AND HOW DOES THE BALANCING RATE COMPARE TO THE

25    VALUE OF THE PATENT RIGHTS PROVIDED BY SAMSUNG?

```
1    A    IT'S LOW IN COMPARISON.

2    Q    DID YOU PREPARE, SIR, EXHIBIT DX 631 TO

3    EXPLAIN YOUR ANALYSIS?

4    A    YES.

5    Q    CAN YOU PLEASE CONFIRM IN YOUR BINDER THAT DX

6    631, CONFIDENTIAL EXHIBIT, IS WHAT YOU PREPARED.

7    A    YES.

8              MS. MAROULIS:  YOUR HONOR, WE MOVE DX 631

9    UNDER SEAL, REDACTED, INTO EVIDENCE.

10             THE COURT:  ANY OBJECTION?

11             MR. MUELLER:  NO OBJECTION, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

13             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14             631, HAVING BEEN PREVIOUSLY MARKED FOR

15             IDENTIFICATION, WAS ADMITTED INTO

16             EVIDENCE.)

17   BY MS. MAROULIS:

18   Q    SIR, DID YOU PREPARE ANOTHER SLIDE TO

19   ILLUSTRATE A DIFFERENT CROSS-LICENSE AT 3963.024?

20   A    I DID.

21   Q    LET'S TAKE A LOOK, JUST FOR THE JURY, AT THIS

22   SLIDE.  CAN YOU PLEASE EXPLAIN, WITHOUT REFERENCE

23   TO THE NUMBERS, WHAT IS DEPICTED THERE?

24   A    YES.  THIS IS A CROSS-LICENSE WITH ANOTHER

25   PARTY WHERE I WAS LIKEWISE ABLE TO DETERMINE THE
```

```
1    ROYALTY BASE, AND I WAS ALSO ABLE TO DETERMINE THE
2    STANDARD RATE FOR THE OTHER PARTY, AS WELL AS THE
3    BALANCING PAYMENT, AND TOOK IN MATHEMATICALLY FOR
4    THIS TO GET AN ESTIMATE OF SAMSUNG'S RIGHT RATE.
5    Q    LET'S TURN TO THE NEXT CONTENTION SLIDE.  IS
6    THAT THE ROYALTY RATES THAT YOU ANALYZED?
7    A    YES.  YOU NEED TO CHANGE THE SLIDE THERE, I
8    THINK.
9    Q    IT'S 3963.021.  IT'S 025.  I'M SORRY.
10   A    YES.  SO THE ESTIMATED RATE THERE IS 1.74,
11   WHICH IS SLIGHTLY BELOW THE LOW END OF MY 2 TO 2.75
12   RANGE.
13   Q    OKAY.  THANK YOU, RYAN.
14        WE CAN TAKE THOSE DOWN.
15        DR. TEECE, HOW DID YOU ACCOUNT FOR THE
16   FACT THAT THERE ARE TWO PATENTS AT ISSUE HERE AND
17   THESE AGREEMENTS COVER MORE THAN TWO PATENTS?
18   A    YES, I'M COGNIZANT OF THE FACT THAT THIS
19   HYPOTHETICAL LICENSE WOULD BE FOR TWO PATENTS, AND
20   TYPICALLY WITH A CROSS-LICENSE, YOU'RE LICENSING A
21   MUCH LARGER PORTFOLIO.  BUT WHAT STUDIES SHOW IS
22   THAT THE VOLUME OF ANY PORTFOLIO, OR GROUPING OF
23   LICENSES USUALLY COMES DOWN TO THE VALUE OF ONE,
24   TWO, OR THREE OR A HANDFUL SO THAT A SMALL
25   PERCENTAGE OF THE PATENTS IN A LICENSE ARE REALLY
```

1    WHAT DRIVES VALUE IN MOST INSTANCES.

2    Q    LET'S TAKE A LOOK AT SLIDE 3963.027.  DOES

3    THIS SLIDE SUMMARIZE WHAT YOU JUST EXPLAINED ABOUT

4    THE VALUE?

5    A    YES.  WHAT I'M DOING IN THIS CHART IS LOOKING

6    AT SOME WHAT ARE CALLED PLUS FACTORS OR MINUS

7    FACTORS, THINGS THAT WOULD TEND TO PRESS THE RATE

8    DOWNWARDS OR RAISE IT UPWARDS.

9         AND IF I BEGIN AT THE BOTTOM THERE, I'M

10   COMPARING A BENCHMARK OF A MARKETPLACE LICENSE AND

11   I'M SAYING, OKAY, HOW DOES THAT INFORM ME WITH

12   RESPECT TO WHAT THE DAMAGES RATE WOULD BE HERE,

13   WHAT THE REASONABLE ROYALTY RATE WOULD BE AND I'M

14   SAYING SINCE THIS IS NOT A FULL PORTFOLIO, THIS

15   WOULD BE SOME DISCOUNT.  THAT'S WHY THERE'S THE RED

16   MINUS SIGN.  BUT AT THE SAME TIME THERE'S TWO

17   OFFSETS FACTORS THAT I THINK FULLY ACCOUNT FOR THAT

18   DISCOUNT OR ESSENTIALLY NEUTRALIZE IT.

19   Q    THANK YOU, SIR.  YOU HEARD DR. O'BRIEN HERE

20   TESTIFYING ABOUT GEORGIA PACIFIC ANALYSIS.  DID YOU

21   DO ONE AS WELL?

22   A    I DID.  BUT CAN I FIRST EXPLAIN THESE OTHER

23   FACTORS.

24   Q    YES, GO AHEAD.

25   A    OKAY.  THE OTHER FACTORS, HERE I'M REQUIRED TO

```
 1    ASSUME THE PATENTS ARE VALID AND INFRINGED.

 2    TECHNICALLY WHEN THERE'S A MARKET TRANSACTION, YOU

 3    DON'T KNOW FOR SURE IF THE PATENTS ARE VALID AND

 4    INFRINGED, SO LICENSES, WHAT YOU OBSERVE IN THE

 5    BUSINESS WORLD ARE DISCOUNTED RATES BECAUSE YOU'RE

 6    UNCLEAR ABOUT VALIDITY AND INFRINGEMENT.

 7              HERE IN THE COURTROOM, WE KNOW THE

 8    ANSWER.  SO THAT WOULD BE A PLUS FACTOR.

 9              AND THEN ALSO THE LICENSING QUESTION

10    WOULD BE A U.S. ONLY LICENSE, AND THEY TYPICALLY

11    COMMAND A PREMIUM OVER A WORLDWIDE LICENSE BECAUSE

12    THE ROYALTY BASE WILL BE SMALLER.

13    Q    THANK YOU, SIR.  TURNING TO MY QUESTION OF

14    GEORGIA PACIFIC ANALYSIS, DID YOU CONDUCT ONE AS

15    WELL?

16    A    YES, I DID.

17    Q    AND DID CONDUCTING GEORGIA PACIFIC ANALYSIS

18    CONFIRM YOUR FINDINGS THROUGH THE MARKET DATA

19    RESEARCH THAT YOU PERFORMED?

20    A    YES, THE GENERAL FRAMEWORK I'M USING IS

21    GEORGIA PACIFIC, BUT I DID LOOK AT SOME OTHER

22    FACTORS SUGGESTED IN THE FRAMEWORK, AND I DO

23    BELIEVE THAT THEY'RE CONFIRMATORY.

24    Q    CAN YOU GIVE US A FEW FACTORS THAT YOU LOOKED

25    AT AND BRIEFLY SUMMARIZE THEM FOR THE JURY?
```

1    A    ONE THING YOU'RE ASKED TO LOOK IS WHETHER

2    THERE ARE ANY CONVOYED SALES, WHETHER THERE'S

3    PROFITABILITY ATTACHED TO THE PRODUCTS IN QUESTION,

4    AND I THINK IT'S WELL KNOWN THAT THE IPHONE AND THE

5    IPOD ARE VERY PROFITABLE PRODUCTS.

6         IT'S WELL KNOWN THAT THERE'S PASS

7    THROUGH, OR THAT SUCCESS WITH THE IPHONE AND THE

8    IPAD, SALES FROM THE ITUNES AND THE APP STORE AND

9    SO ON AND SO FORTH.

10        SO I THINK THERE ARE SOME OTHER PLUS

11   FACTORS IN GEORGIA PACIFIC.  SO I TOOK COMFORT FROM

12   THOSE OTHER FACTORS.

13        CRITICALLY, GEORGIA PACIFIC REQUIRES YOU

14   TO ASK THIS FUNDAMENTAL QUESTION, WHAT WOULD BE THE

15   REASONABLE ROYALTY IN A HYPOTHETICAL NEGOTIATION IF

16   THE PARTIES HAD ACTUALLY NEGOTIATED RATHER THAN

17   INFRINGED, AND THAT IS THE LINCHPIN OF MY ANALYSIS.

18   Q    SIR, TO SUMMARIZE, WHAT ARE THE DAMAGES THAT

19   APPLE WILL OWE TO SAMSUNG IF IT IS FOUND TO

20   INFRINGE SAMSUNG'S STANDARDS PATENTS?

21   A    IF YOU GO BACK TO MY FIRST SLIDE.

22   Q    3963.005?

23   A    YEAH.  AND I'VE GIVEN A RANGE THERE FROM 290

24   MILLION TO 300 MILLION.

25        MS. MAROULIS:  THANK YOU, SIR.  I PASS

1    THE WITNESS.

2              THE COURT:   OKAY.   IT IS NOW 11:54.   GO

3    AHEAD, PLEASE.

4                      **CROSS-EXAMINATION**

5    BY MR. MUELLER:

6    Q    GOOD MORNING, DR. TEECE.

7    A    GOOD MORNING.

8    Q    MY NAME IS JOE MUELLER.   I'M GOING TO ASK YOU

9    A FEW QUESTIONS.

10   A    CERTAINLY.

11   Q    THE FIRST QUESTION IS YOU HAVE NEVER

12   NEGOTIATED A PATENT LICENSE AS A PRINCIPAL

13   NEGOTIATOR; CORRECT?

14   A    THAT'S CORRECT.

15   Q    NOW, YOU'RE HERE TODAY TO DISCUSS TWO PATENTS;

16   CORRECT?

17   A    YES.

18   Q    I NOTICED DURING YOUR DIRECT EXAMINATION YOU

19   DIDN'T USE THE WORD "FRAND;" CORRECT?

20   A    CORRECT.

21   Q    YOU KNOW WHAT THAT WORD MEANS?

22   A    YES, I DO.

23   Q    IT MEANS FAIR, REASONABLE, AND

24   NON-DISCRIMINATORY LICENSING; CORRECT?

25   A    THAT'S RIGHT.

1    Q    IS THAT RIGHT?

2    A    THAT'S RIGHT.  THE MIDDLE WORD, THE SECOND

3    LETTER IS R, REASONABLE, WHICH IS WHAT I'VE DONE.

4    Q    AND FRAND PATENTS ARE A SPECIAL CATEGORY OF

5    PATENTS; CORRECT?

6    A    WELL, FRAND LICENSING ARRANGEMENTS ARE -- CAN

7    BE, YES.

8    Q    AND COMPANIES MAKE FRAND COMMITMENTS AS PART

9    OF A SPECIAL PROCESS CALLED STANDARDS SETTING;

10   CORRECT.

11   A    THAT'S CORRECT.

12            MS. MAROULIS:  OBJECTION, YOUR HONOR.

13   THIS IS A DIFFERENT PART OF THE CASE THAT HASN'T

14   STARTED YET.

15            MR. MUELLER:  YOUR HONOR, IT'S NOT.

16   THESE ARE TWO FRAND PATENTS, THE EXACT ISSUE HE

17   TESTIFIED ON.

18            THE COURT:  I'LL ALLOW LIMITED

19   QUESTIONING, BUT THIS SHOULD BE SAVED FOR YOUR

20   CASE.

21   BY MR. MUELLER:

22   Q    DR. TEECE, LET'S BE CLEAR.  YOU'RE HERE TO

23   TESTIFY ON TWO PATENTS; CORRECT?

24   A    CORRECT.

25   Q    AND SAMSUNG HAS MADE A FRAND COMMITMENT FOR

```
 1    BOTH; CORRECT?

 2    A    A COMMITMENT TO LICENSE ON REASONABLE TERMS,

 3    THAT'S CORRECT.

 4    Q    AND THAT FRAND COMMITMENT MUST BE CONSIDERED

 5    AS PART OF ANALYZING DAMAGES FOR THOSE TWO PATENTS;

 6    CORRECT?

 7    A    YES.

 8    Q    SO THE FRAND COMMITMENT IS PRECISELY RELEVANT

 9    TO THE ISSUES YOU JUST TESTIFIED ABOUT; CORRECT?

10    A    IN PARTICULAR WHAT FRAND DOES IS REQUIRE YOU

11    TO LICENSE, SO, YES, I'M ACTUALLY VALUING A

12    LICENSE.  I'M ASSUMING THAT THERE'S A LICENSE.

13    Q    BUT, SIR, YOU AGREE IT'S RELEVANT; CORRECT?

14    A    YES.

15    Q    AND YOU DIDN'T MENTION IT; CORRECT?

16    A    I -- I MENTIONED THE WORD REASONABLE, WHICH IS

17    THE SAME AS IN THE FRAND CONCEPT IN MY VIEW.

18    Q    SIR, YOU DIDN'T USE THE WORD FRAND?

19    A    CORRECT.

20    Q    NOW, YOU'RE NOT HERE TO DISCUSS DESIGN

21    PATENTS; CORRECT?

22    A    CORRECT.

23    Q    YOU'RE NOT HERE TO DISCUSS TRADE DRESS;

24    CORRECT?

25    A    CORRECT.
```

```
 1    Q    LET'S TURN IN YOUR BINDER, IF WE COULD, TO PX
 2    80, WHICH I BELIEVE IS TAB 5.
 3              MS. MAROULIS:  COUNSEL, CAN I HAVE A
 4    BINDER.
 5              MR. MUELLER:  I'M SORRY.  I THOUGHT YOU
 6    HAD IT.
 7              THE WITNESS:  OKAY.
 8    BY MR. MUELLER:
 9    Q    YOU'VE SEEN THIS BEFORE; CORRECT?
10    A    YES.
11    Q    THIS IS A LETTER FROM SAMSUNG TO APPLE;
12    CORRECT?
13    A    YES.
14    Q    DATED JULY 25TH, 2011; CORRECT?
15    A    THAT'S RIGHT.
16              MR. MUELLER:  YOUR HONOR, I OFFER IT.
17              THE COURT:  ANY OBJECTION?
18              MS. MAROULIS:  AGAIN, SAME OBJECTION,
19    THIS IS A DIFFERENT PART OF THE CASE.
20              THE COURT:  IT'S ADMITTED.
21              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
22              80, HAVING BEEN PREVIOUSLY MARKED FOR
23              IDENTIFICATION, WAS ADMITTED INTO
24              EVIDENCE.)
25    BY MR. MUELLER:
```

```
1     Q    DR. TEECE, IN THIS LETTER, SAMSUNG, WHICH

2    WE'LL PUT ON THE SCREEN, SAMSUNG PROPOSED TERMS, OR

3    REQUESTED TERMS FROM APPLE FOR ITS FRAND PATENT

4    PORTFOLIO FOR UMTS; CORRECT?

5     A    YES.

6     Q    AND THAT'S OFFERED COVERING THE ENTIRE

7    PORTFOLIO; CORRECT?

8     A    OF THE UMTS, QUESTION.

9     Q    AND YOU'VE ESTIMATED THAT PORTFOLIO AS 86

10   PATENTS; CORRECT?

11    A    SOMETHING IN THAT ORDER, YES.

12    Q    AND SAMSUNG PROPOSED TO APPLE A 2.4 PERCENT

13   ROYALTY; CORRECT?

14    A    THAT'S RIGHT.

15    Q    FOR THE ENTIRE PORTFOLIO; CORRECT?

16    A    YES.

17    Q    AND YOU'RE HERE TODAY ON TWO; CORRECT?

18    A    YES, ON A GEORGIA PACIFIC ANALYSIS, I WANT TO

19   BE CLEAR, IT'S NOT QUITE FRAND, BECAUSE WITH FRAND

20   YOU DON'T KNOW FOR SURE IF THE PATENTS ARE VALID

21   AND INFRINGED; WITH GEORGIA PACIFIC, YOU DO.

22    Q    SIR, SAMSUNG MADE FRAND COMMITMENTS FOR THE

23   VERY TWO PATENTS THAT YOU'RE HERE TODAY TO TALK

24   ABOUT; CORRECT?

25    A    CORRECT.
```

1    Q    AND THOSE TWO PATENTS ARE WITHIN THE SCOPE OF

2    THE PORTFOLIO PROPOSED THAT SAMSUNG MADE; CORRECT?

3    A    THAT IS RIGHT.

4    Q    ALONG WITH 84 OTHERS; CORRECT?

5    A    THAT IS RIGHT.

6    Q    THIS LETTER WAS SENT IN JULY OF 2011; CORRECT?

7    A    YES.

8    Q    THAT'S THE FIRST TIME YOU'VE SEEN SAMSUNG

9    PROPOSE TERMS FOR ITS UMTS PATENT TO SAMSUNG;

10   CORRECT?

11   A    THAT'S RIGHT.

12   Q    NOT IN 2010; CORRECT?

13   A    CORRECT, YES.

14   Q    NOT IN 2009; CORRECT?

15   A    THAT IS CORRECT.

16   Q    NOT IN 2008; CORRECT?

17   A    THAT IS CORRECT.

18   Q    NOT IN 2007; CORRECT?

19   A    CORRECT.

20   Q    FIRST TIME WAS JULY OF 2011; CORRECT?

21   A    I BELIEVE SO.

22   Q    AFTER THIS LITIGATION BEGAN; CORRECT?

23   A    YES.

24          MR. MUELLER:  YOUR HONOR, THIS MIGHT BE A

25   GOOD TIME TO BREAK FOR LUNCH.

147

```
 1              THE COURT:  ARE YOU DONE OR DO YOU --

 2              MR. MUELLER:  I WANT TO CHANGE SUBJECTS.

 3    I HAVE ABOUT TEN MORE MINUTES.

 4              THE COURT:  OH.  WHY DON'T YOU GO ANOTHER

 5    MINUTE OR TWO.

 6              MR. MUELLER:  SURE.

 7    Q    NOW, YOU HAVE NO INFORMATION AS TO HOW THE

 8    SAMSUNG 2.4 PERCENT WAS CALCULATED; CORRECT?

 9    A    YOU MEAN THE -- THIS NUMBER MENTIONED IN 24

10    LETTER HERE?

11    Q    THAT'S EXACTLY RIGHT, SIR?

12    A    THAT'S CORRECT.

13    Q    AND SAMSUNG HAS NEVER HAD A PUBLISHED UMTS

14    RATE; CORRECT?

15    A    I THINK THAT'S RIGHT.

16    Q    YOU DON'T KNOW WHETHER SAMSUNG OFFERED ANYONE

17    ELSE, OR REQUESTED FROM ANYONE ELSE, 2.4 PERCENT;

18    CORRECT?

19    A    I DON'T KNOW FOR SURE.

20    Q    YOU DON'T KNOW, YOU'VE SEEN NO EVIDENCE TO

21    SUGGEST THAT SAMSUNG HAS ASKED ANY OTHER COMPANY,

22    BESIDES APPLE, FOR THIS 2.4 PERCENT ROYALTY;

23    CORRECT?

24    A    THAT'S CORRECT.

25    Q    IN FACT, ASIDE FROM THIS LETTER, YOU HAVEN'T
```

1    SEEN A SHRED OF PAPER CONNECTING THE 2.4 PERCENT

2    ROYALTY TO THE SAMSUNG UMTS FRAND PORTFOLIO;

3    CORRECT?

4    A    I DON'T THINK SO.

5    Q    YOU DON'T THINK YOU HAVE; CORRECT?

6    A    WHEN YOU SAY CONNECTING IT TO THE PORTFOLIO,

7    WHAT DO YOU MEAN BY THAT?

8    Q    YOU'VE SEEN NOT A SHRED OF PAPER FROM SAMSUNG

9    FILES CONNECTING THE 2.4 PERCENT; CORRECT?

10            MS. MAROULIS:  OBJECTION, VAGUE.

11            THE WITNESS:  I'M NOT QUITE SURE WHAT YOU

12    MEAN.

13    BY MR MUELLER:

14    Q    SIR, HAVE YOU EVER SEEN A DOCUMENT FROM

15    SAMSUNG THAT SAYS OUR PORTFOLIO IS WORTH 2.4

16    PERCENT?

17    A    NO.

18    Q    WHAT YOU DID IN THIS CASE YOU LOOKED AT THE

19    SAMSUNG LICENSES; CORRECT?

20    A    YES.

21    Q    AND YOU APPLIED THAT EQUATION WHICH YOU SHOWED

22    THE JURY ON THEIR SCREENS; CORRECT?

23    A    I DID.

24    Q    AND USING THAT EQUATION, YOU ATTEMPTED TO

25    ESTIMATE HOW MUCH SAMSUNG LICENSE RIGHTS THAT IT

1    HAD CONVEYED WERE WORTH; CORRECT?

2    A    YES.

3    Q    NOW, YOU NEVER CHECKED WITH SAMSUNG TO SEE IF

4    THAT WAS ACTUALLY CONSISTENT WITH THE REAL

5    NEGOTIATIONS; CORRECT?

6    A    CORRECT.

7    Q    USING YOUR EQUATION, YOU DERIVED NUMBERS, YOU

8    SHOWED THEM TO THE JURY ON THEIR SCREENS FOR WHAT

9    THE MONETARY VALUE OF THOSE LICENSES WAS; CORRECT?

10   A    WHEN YOU SAY, "THE MONETARY VALUE," IF YOU HAD

11   TO CONVERT A CROSS-LICENSE INTO A UNILATERAL

12   LICENSE, YES, I'VE DERIVED A REASONABLE ROYALTY

13   RATE.

14   Q    WE CAN AGREE ON THIS --

15            THE COURT:  IT'S 12:01.  LET'S GO AHEAD.

16            MR. MUELLER:  NO PROBLEM, YOUR HONOR.

17            THE COURT:  12:01.  WE'RE GOING TO BREAK

18   FOR LUNCH FOR ONE HOUR.  PLEASE DO NOT TALK TO

19   ANYONE, PLEASE KEEP AN OPEN MIND, AND DO NOT DO ANY

20   RESEARCH ABOUT THE CASE.  OKAY.  THANK YOU.  PLEASE

21   LEAVE YOUR BINDERS IN THE JURY ROOM.

22            (WHEREUPON, THE FOLLOWING PROCEEDINGS

23   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

24            THE COURT:  ALL RIGHT.  THANK YOU ALL.

25   WE'LL SEE YOU BACK AT 1:00 O'CLOCK.

2150

1

2                          **AFTERNOON SESSION**

3                     (WHEREUPON, THE FOLLOWING PROCEEDINGS

4        WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5                     MS. MAROULIS:  YOUR HONOR, CAN WE RAISE

6        TWO ISSUES?

7                     THE COURT:  YES, WHAT'S THAT?

8                     MS. MAROULIS:  WE WOULD LIKE TO LODGE

9        SOME DEPOSITION CLIPS THAT WERE PLAYED PREVIOUSLY,

10       AND I GAVE THEM TO COUNSEL FOR APPLE AND THEY'RE

11       CHECKING TO MAKE SURE THAT THEIR RECORDS ARE THE

12       SAME.

13                    THE COURT:  OKAY.  JUST REMIND ME,

14       PLEASE, IN CASE I FORGET.

15                    MS. MAROULIS:  AND ONE MORE THING, YOUR

16       HONOR.

17                    WE UNDERSTAND, FOR APPELLATE PURPOSES, WE

18       NEED TO SUBMIT, AT THE END OF THE CASE, OFFERS OF

19       PROOF OF THE EVIDENCE THAT WE WERE UNABLE TO PUT

20       IN.  IF WE CAN THAT BY TUESDAY, THE SAME AS WE WERE

21       DOING BEFORE.

22                    THE COURT:  THAT'S FINE.  TUESDAY IS THE

23       21ST.

24                    MS. MAROULIS:  THANK YOU, YOUR HONOR.

25                    THE COURT:  THAT'S PERFECTLY FINE.  I'LL

```
1    ADD THAT TO MY -- TELL ME WHAT THIS IS AGAIN,
2    PLEASE.  I'LL PUT IT IN MY MISCELLANEOUS ORDER FOR
3    TONIGHT.
4              MS. MAROULIS:  IT'S OFFERS OF PROOF ON
5    EVIDENCE THAT WE WERE UNABLE TO PRESENT.
6              MR. LEE:  I'M SORRY.  CAN I ASK, IS THIS
7    EVIDENCE THAT WAS EXCLUDED AND THIS IS AN OFFER OF
8    PROOF ON EXCLUDED EVIDENCE, OR OTHER EVIDENCE?  I
9    WASN'T UNCLEAR.
10             THE COURT:  NO.  THE EXCLUDED ONES THEY
11   WERE ALREADY GOING TO FILE ON TUESDAY.
12             MS. MAROULIS:  CORRECT.
13             THE COURT:  SO WHAT IS IT THAT'S
14   DIFFERENT FROM WHAT YOU WERE ALREADY GOING TO FILE
15   ON TUESDAY?
16             MS. MAROULIS:  YES, YOUR HONOR.  IT'S TWO
17   BATCHES, ONE IS EXCLUDED EVIDENCE, AND ONE IS THERE
18   WERE SEVERAL WITNESSES WE WERE GOING TO CALL BUT WE
19   WERE NOT ABLE TO DUE TO TIME CONSTRAINTS.  WE'LL
20   PUT IN VERY SHORT PARAGRAPH ON WHAT IT IS.
21             THE COURT:  ALL RIGHT.  DO YOU HAVE ANY
22   OBJECTION TO THAT?
23             MR. LEE:  NOT AS A PROFFER.  I'M NOT SURE
24   WHAT THE ISSUE IS RELEVANT TO.  BUT IF YOU WERE
25   WANTING TO DO IT AS A PROFFER --
```

```
 1              MS. MAROULIS:  WE'LL FILE IT AS A PROFFER
 2     FOR APPELLATE PURPOSES.
 3              THE COURT:  I THINK IN RE: CATS, I WILL
 4     BE UPHELD FOR TIME LIMITS.  I'M NOT CONCERNED.
 5              MR. LEE:  WE'RE NOT, EITHER.
 6              MS. MAROULIS:  THANK YOU.
 7              THE COURT:  THANK YOU VERY MUCH.  PLEASE
 8     TAKE A SEAT.  OKAY.
 9              (WHEREUPON, THE FOLLOWING PROCEEDINGS
10     WERE HELD IN THE PRESENCE OF THE JURY:)
11              THE COURT:  PLEASE TAKE A SEAT.  IT'S
12     1:05.
13              MR. MUELLER:  MAY I PROCEED, YOUR HONOR?
14              THE COURT:  PLEASE, GO AHEAD.
15     BY MR. MUELLER:
16     Q    GOOD AFTERNOON, DR. TEECE.
17     A    GOOD AFTERNOON.
18     Q    DR. TEECE, FOR YOUR WORK ON THIS CASE YOU
19     LOOKED AT OVER 30 SAMSUNG LICENSES; IS THAT
20     CORRECT?
21     A    THAT'S CORRECT.
22     Q    AND AS YOU EXPLAINED TO THE JURY, YOU APPLIED
23     YOUR EQUATIONS TO TWO; CORRECT?
24     A    THAT IS CORRECT.
25     Q    NOW, OUT OF ALL THOSE OVER 30 LICENSES, WE CAN
```

1    AGREE ON THIS:  NO ONE HAS PAID SAMSUNG A PENNY IN

2    MONEY PAYMENTS FOR ITS FRAND PATENTS; CORRECT?

3    A    MOST OF THEM ARE CROSS-LICENCES, SO THE

4    PAYMENT IS INCOMING IN OTHER INTELLECTUAL PROPERTY

5    RIGHTS.

6    Q    BUT, SIR, IN TERMS OF MONEY PAYMENTS, NO ONE

7    HAS PAID SAMSUNG A PENNY?

8    A    THAT'S CORRECT.

9    Q    NOW, YOU SHOWED THE JURY A SLIDE EARLIER IN

10   WHICH YOU ATTEMPTED TO PUT A VALUE ON UMTS.  DO YOU

11   RECALL THAT?

12   A    WHICH ONE HAVE YOU GOT IN MIND?

13   Q    SURE.  IF YOU CAN PUT UP SDX 3963.006.

14         DO YOU RECALL THIS DOCUMENT?

15   A    YES.

16   Q    AND ALSO 007?

17   A    THAT'S RIGHT.

18   Q    AND IN THESE TWO SLIDES, YOU ATTEMPTED TO

19   DETERMINE THE PREMIUM, AS YOU PUT IT, FOR UMTS;

20   CORRECT?

21   A    YES, TO GIVE SOME INSIGHT INTO THAT.

22   Q    AND UMTS IS A STANDARD; CORRECT?

23   A    YES.

24   Q    NOW, UMTS WAS DEVELOPED BY DOZENS OF

25   COMPANIES; CORRECT?

```
 1     A     THAT'S CORRECT.

 2     Q     AND THOSE COMPANIES HAVE DECLARED THOUSANDS OF

 3     PATENTS THAT ARE ESSENTIAL TO UMTS; CORRECT?

 4     A     YES.  THERE'S A LOT OF PATENTS THERE.

 5     Q     YOU'RE HERE ON TWO; CORRECT?

 6     A     YES, THAT'S RIGHT.

 7     Q     NOW, FROM A TECHNICAL PERSPECTIVE, YOU HAVE NO

 8     IDEA HOW VALUABLE THOSE TWO ARE; CORRECT?

 9     A     I UNDERSTAND FROM THE TECHNICAL EXPERTS THAT

10     THEY'RE IMPORTANT, AND, IN FACT, I'VE CALCULATED

11     WHAT I THINK A REASONABLE ROYALTY RATE IS FOR THEM.

12     Q     BUT YOU YOURSELF DON'T KNOW HOW VALUABLE THEY

13     ARE; CORRECT?

14     A     I'M NOT A TECHNICAL EXPERT.

15     Q     AND YOU HAVE NO IDEA IF THEY'RE A BIG PART OF

16     UMTS; CORRECT?

17     A     I UNDERSTAND THAT THEY ARE AT LEAST DECLARED

18     ESSENTIAL.

19     Q     NOW, DECLARED ESSENTIAL MEANS DECLARED BY THE

20     OWNER; CORRECT?

21     A     THAT'S RIGHT.

22     Q     IN THIS CASE DECLARED BY SAMSUNG; CORRECT?

23     A     THAT'S CORRECT.

24     Q     NO ONE HAS TESTED THAT PROPOSITION WHETHER

25     THEY'RE TRULY ESSENTIAL UNTIL THE LADIES AND
```

1    GENTLEMEN OF THE JURY DO; CORRECT?

2    A    I DON'T UNDERSTAND THAT ANYONE HAS SUBMITTED

3    AROUND THEM.  AS FAR AS I KNOW, THERE'S NO EVIDENCE

4    OF WORK AROUND.

5    Q    SIR, MY QUESTION WAS, NO ONE HAS MADE A

6    DETERMINATION AS TO WHETHER THESE TWO PATENTS ARE,

7    IN FACT, ESSENTIAL UNTIL THE JURY DOES; CORRECT?

8    A    AND THAT WILL BE CORRECT.

9    Q    AND YOU DON'T KNOW ONE WAY OR THE OTHER IF

10   THEY'RE ESSENTIAL; CORRECT?

11   A    THEY'RE DECLARED ESSENTIAL.

12   Q    SIR, YOU DON'T KNOW YOURSELF IF THEY'RE TRULY

13   ESSENTIAL?

14   A    THAT IS RIGHT.

15   Q    NOW, APPLE BROUGHT, TO SPEAK TO THE JURY,

16   THEIR DIRECTOR OF LICENSING AND HIS NAME IS

17   BORIS TEKSLER; RIGHT?

18   A    I BELIEVE SO.

19   Q    AND SAMSUNG HAS ITS OWN LICENSING EXECUTIVES;

20   CORRECT?

21   A    THAT'S RIGHT.

22   Q    NOT ONE OF THEM HAS SAID A WORD TO THIS JURY;

23   CORRECT?

24   A    I HAVEN'T MONITORED EVERYTHING.  I DON'T KNOW

25   FOR SURE.

1    Q     YOU'VE SEEN NO EVIDENCE OF THAT; CORRECT?

2    A     THAT'S RIGHT.

3    Q     AND YOU YOURSELF HAVE SAID NOT A WORD TO THEM

4    EITHER; CORRECT?

5    A     THAT IS CORRECT.

6    Q     NOW, LET'S TURN ON THE ELMO, IF WE COULD.

7            SIR, WE LOOKED AT THE SAMSUNG PORTFOLIO,

8    REQUEST TO APPLE FROM JULY OF 2011; CORRECT?

9    A     THAT'S RIGHT.

10   Q     AND BASED ON YOUR ESTIMATE, THAT COVERED A

11   PORTFOLIO OF 86 PATENTS; CORRECT?

12   A     I BELIEVE THAT'S RIGHT.

13   Q     SO I'M GOING TO WRITE THE NUMBER 86.  NOW,

14   THAT 86 INCLUDED THE TWO IN THIS CASE; CORRECT?

15   A     THAT'S RIGHT.

16   Q     SO I'M GOING TO WRITE 84 PLUS 2.

17            NOW, IN RETURN, SAMSUNG REQUESTED 2.4

18   PERCENT OF THE ENTIRE PRICE OF EACH IPHONE AND IPAD

19   COVERED BY THE PROPOSAL; CORRECT?

20   A     THAT WAS AN OPENING POSITION, YES.

21   Q     WHEN YOU SAY IT WAS AN OPENING POSITION, THAT

22   WAS THE ONLY POSITION THAT SAMSUNG HAS TAKEN;

23   CORRECT?

24   A     WELL, THEN THERE'S NEGOTIATION IN MY

25   UNDERSTANDING.  BUT THERE ALWAYS HAS TO BE A

1    STARTING PLACE.

2    Q    SIR, THERE'S NEVER BEEN ANOTHER OFFER;

3    CORRECT?

4    A    THAT'S MY UNDERSTANDING.

5    Q    2.4 PERCENT OF THE SALES PRICE OF THE ENTIRE

6    DEVICE; CORRECT?

7    A    YES, NET SALES PRICE.

8    Q    FOR 86 PATENTS, INCLUDING THESE TWO; CORRECT?

9    A    YES.

10   Q    AND IN THIS CASE, YOU'RE HERE ON ONLY TWO;

11   CORRECT?

12   A    THAT'S RIGHT.

13   Q    YET, YOU'VE TOLD THIS JURY THE APPROPRIATE

14   ROYALTY IS 2.4 PERCENT; CORRECT?

15   A    IT'S A RANGE BETWEEN, FOR DAMAGES PURPOSES,

16   WHICH WHAT I'M LOOKING AT, BETWEEN 2 AND 2.75.

17   Q    FAIR ENOUGH.  2 TO 2.75; CORRECT?

18   A    FOR PATENTS PROVEN TO BE VALID AND INFRINGED,

19   YES.

20   Q    ON THE HIGH END, THAT'S ACTUALLY HIGHER THAN

21   THE PORTFOLIO RATE THAT SAMSUNG PROPOSED; CORRECT?

22   A    ON THE HIGH END, CORRECT.

23   Q    NOW, YOU'VE ACTUALLY SAID THAT IF THIS JURY

24   FINDS ONLY ONE PATENT, ONE PATENT TO BE TRULY

25   ESSENTIAL, THE RATE WOULD BE THE SAME; CORRECT?

1    A    YES.  THAT'S OFTEN THE CASE BECAUSE, AS I

2    SAID, THE VOLUME OF THE PORTFOLIO IS VERY MUCH A

3    FUNCTION OF ONE OR TWO IMPORTANT PATENTS.

4    Q    AND BOTH SAMSUNG'S ORIGINAL PORTFOLIO PROPOSAL

5    AND YOUR OPINION TODAY IS BASED ON THE ENTIRE PRICE

6    OF THE DEVICE; CORRECT?

7    A    WELL, IT REFERENCES THE ENTIRE PRICE.  IT

8    TAKES THAT INTO ACCOUNT.  IF IT WAS A SMALLER

9    NUMBER, THEN YOU WOULD USE A HIGHER ROYALTY RATE.

10   Q    BUT YOU'RE SAYING 2 TO 2.75 PERCENT OF THE

11   ENTIRE PRICE; CORRECT?

12   A    YES.

13   Q    NOT JUST THE PRICE OF THE BASEBAND PROCESSOR;

14   CORRECT?

15   A    THAT IS CORRECT.

16   Q    AND YOU UNDERSTAND THAT ONLY COSTS TEN BUCKS;

17   CORRECT?

18   A    IF YOU DON'T COUNT THE I.P. IN IT, WHICH IS A

19   BIG ERROR IN MY VIEW, BUT IF YOU LEAVE THE I.P.

20   ALONGSIDE --

21   Q    SIR, APPLE PAYS ABOUT TEN BUCKS; RIGHT?

22   A    NO.  THEY PAY A LOT MORE BECAUSE IT HAS PAY

23   MILLIONS OF DOLLARS TO GET ACCESS TO OTHER PEOPLE'S

24   TECHNOLOGY.

25   Q    WE'LL SOON HEAR FROM AN APPLE WITNESS NAMED

1    TONY BLEVINS WHO'S GOING TO EXPLAIN THAT TO THE

2    JURY.

3              FOR RIGHT NOW, SIR, YOUR OPINION OF 2 TO

4    2.75 OF THE ENTIRE PRICE IS WHAT YOU'RE

5    RECOMMENDING TO THIS JURY FOR EVEN JUST ONE PATENT;

6    CORRECT?

7    A    YES.

8    Q    NOW, IF WE COMPARE THAT TO THE ORIGINAL

9    PORTFOLIO REQUEST, THE NUMBER OF PATENTS HAS GONE

10   DOWN; CORRECT?

11   A    YES.

12   Q    WE'VE GONE FROM 86 TO 1; CORRECT?

13   A    YES.

14   Q    AND 85 HAVE BEEN TAKEN AWAY; CORRECT?

15   A    YES.

16   Q    YET, ON THE HIGH END, YOUR ROYALTY WENT UP;

17   CORRECT?

18   A    WENT UP FROM WHAT?

19   Q    2.4 PERCENT IS LESS THAN 2.7; CORRECT?

20   A    YES, I CERTAINLY AGREE WITH THAT.

21   Q    SO YOUR OPINION -- UNDER YOUR OPINION, APPLE

22   WOULD BE PAYING MORE FOR 85 FEWER PATENTS; CORRECT?

23   A    IF IT WAS PAYING AT THE HIGH END.  IF IT WAS

24   PAYING AT THE LOW END, IT WOULD BE PAYING LESS.

25   Q    SIR, ON THE HIGH END, APPLE WOULD BE PAYING

2160

1    MORE IN ROYALTIES FOR 85 FEWER PATENTS; CORRECT?

2    A    I ALREADY SAID YES.

3    Q    AND THAT'S YOUR BEST JUDGMENT AS TO WHAT'S

4    FAIR AND REASONABLE; CORRECT?

5    A    GIVEN THAT WE'RE TALKING ABOUT PATENTS THAT

6    ARE PROVEN TO BE VALID AND INFRINGED, THEY'RE NOT

7    JUST ORDINARY PATENTS.  THEY'RE ONES PROVEN VALID

8    AND INFRINGED FOR A U.S. ONLY LICENSE, WHICH

9    COMMANDS A PREMIUM.

10   Q    SIR, THAT'S YOUR BEST JUDGMENT; CORRECT?

11   A    IT IS.

12             MR. MUELLER:  NO FURTHER QUESTIONS.

13             THE COURT:  ALL RIGHT.

14             MS. MAROULIS:  NO REDIRECT, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  TIME IS NOW 1:13.

16             ALL RIGHT.  IS THIS WITNESS EXCUSED AND

17   IS IT SUBJECT TO RECALL OR NOT?

18             MS. MAROULIS:  HE'S SUBJECT TO RECALL.

19             THE COURT:  OH, OKAY.

20             MR. MUELLER:  YES.

21             THE COURT:  OH, OKAY.  THEN YOU ARE

22   EXCUSED SUBJECT TO RECALL.

23             THE WITNESS:  THANK YOU.

24             MR. VERHOEVEN:  YOUR HONOR, AT THIS POINT

25   THE SAMSUNG ENTITIES REST WITH THREE RESERVATIONS.

1    EXCUSE ME, YOUR HONOR.

2              THE FIRST IS THERE'S AN AGREEMENT BETWEEN

3    THE PARTIES WITH RESPECT TO EMILIE KIM THAT OUR

4    AFFIRMATIVE QUESTIONS WILL BE HANDLED IN THEIR

5    REBUTTAL CASE.

6              THE COURT:  OKAY.

7              MR. VERHOEVEN:  SECONDLY, THE EXHIBITS

8    WE'RE AGREEING TO, WE'LL WORK ON THOSE AND CLARIFY

9    THOSE, THE DEMONSTRATIVE ISSUES AND THESE OTHER

10   THINGS AND CLEANING UP THE EXHIBIT ISSUES THAT

11   WE'RE STILL GOING TO BE DOING.

12             THE COURT:  OKAY.

13             MR. VERHOEVEN:  AND, OF COURSE, THE THIRD

14   RESERVATION IS OUR REBUTTAL TO THE CASE THEY'RE

15   GOING TO PRESENT.

16             THE COURT:  RIGHT, WHICH YOU'LL HAVE A

17   CHANCE TO DO.

18             MR. VERHOEVEN:  OTHERWISE, WITH THOSE

19   RESERVATIONS, WE REST OUR CASE.

20             THE COURT:  OKAY.  NOW, I ASSUME NOW

21   YOU'D LIKE TO HAVE OUR DISCUSSION; CORRECT?

22             MR. LEE:  WE CAN, OR --

23             MR. VERHOEVEN:  WE CONFERRED.

24             THE COURT:  WHAT WOULD YOU LIKE TO DO?

25             MR. VERHOEVEN:  YOUR HONOR, THE PROCESS

1    THAT WE DISCUSSED EARLIER THIS MORNING ABOUT

2    SUBMITTING THE WRITINGS AND --

3             MR. LEE:  WE CAN DO WHATEVER YOUR HONOR

4    WANTS.  WE CAN DO IT NOW.  IF -- GIVEN YOUR HONOR'S

5    INCLINATION, WE COULD ACTUALLY USE THE JURY'S TIME

6    TO PROCEED WITH THE EVIDENCE AND DO IT AT 4:30 OR

7    WE COULD DO IT IN THE SATURDAY FILING.

8             THE COURT:  WE CAN DO IT AT 4:30.

9             MR. VERHOEVEN:  WE CAN -- YES, WE CAN.

10            THE COURT:  LET'S DO IT AT 4:30.  I WILL

11   NOTE IN THE RECORD THAT YOU'VE MADE YOUR MOTION.

12   WE'LL JUST ARGUE IT AT 4:30.

13            MR. MCELHINNY:  AND THAT'S FOR BOTH --

14   BOTH SIDES OF THE APPLE CASE, YOUR HONOR.  I HAVE

15   MOTIONS TO MAKE AS WELL AT 4:30.  YOU CAN HEAR THEM

16   AT 4:30.

17            THE COURT:  OH, I SEE.  OKAY.  YOU BOTH

18   ARE MAKING MOTIONS?

19            MR. MCELHINNY:  YES, YOUR HONOR.

20            THE COURT:  OKAY.  WE'LL HANDLE THAT AT

21   4:30.

22            ALL RIGHT.  IT'S NOW 1:15.

23            MR. LEE:  I JUST NEED TO GET THE WITNESS,

24   YOUR HONOR.  HE'S OUTSIDE THE ROOM.

25            THE COURT:  OH, OKAY.

```
1              MR. LEE:  YOUR HONOR, YOU GOT THE MESSAGE
2      ON THE WITNESSES.
3              THE COURT:  I DID.  DOES SAMSUNG HAVE
4      THAT MESSAGE?
5              MR. LEE:  YES.
6              THE COURT:  OKAY.  LET ME ASK, IS
7      MR. TEECE GOING TO BE CALLED AGAIN, BECAUSE HE IS
8      STILL ON THAT LIST AND THE OBJECTIONS WERE TO HIS
9      DIRECT BY SAMSUNG, WHICH --
10             MS. MAROULIS:  YES, YOUR HONOR.  WE -- IT
11     DEPENDS ON HOW MUCH TIME WE HAVE.  WE MAY NOT BE
12     ABLE TO CALL HIM.
13             THE COURT:  OH, SO HE'S A REBUTTAL?
14             MS. MAROULIS:  YEAH.  HE HAS A SECOND
15     SUBJECT WHERE HE'S REBUTTING.
16             THE COURT:  OH, OKAY.  SO YOURS -- ALL
17     RIGHT.  SO HE'S STILL ON THE LIST THEN.
18             MS. MAROULIS:  YES.
19             THE COURT:  OKAY.
20             MR. LEE:  AND I THINK NOT ON THAT LIST
21     WAS -- THERE WAS A SONY WITNESS, BUT I THINK THAT'S
22     BEEN ELIMINATED BECAUSE OF YOUR HONOR'S RULING LAST
23     NIGHT, SO THAT TAKES YET ANOTHER ONE OFF.
24             THE COURT:  I DON'T THINK HE WAS ON THIS
25     LIST.
```

```
1              MR. LEE:  HE'S NOT ON THAT LIST.

2              THE COURT:  BECAUSE HE'S TESTIFYING

3      TODAY.

4              MR. LEE:  HE'S NOT GOING TO TESTIFY.  I

5      THINK YOUR HONOR'S RULING HAS ELIMINATED THE NEED

6      FOR THAT.

7              THE COURT:  OH, OKAY.  ALL RIGHT.

8              MR. LEE:  YOUR HONOR, APPLE CALLS TONY

9      BLEVINS.

10             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

11                        TONY BLEVINS,

12     BEING CALLED AS A WITNESS ON BEHALF OF THE

13     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

14     EXAMINED AND TESTIFIED AS FOLLOWS:

15             THE WITNESS:  YES, I DO.

16             THE CLERK:  THANK YOU.  PLEASE STATE YOUR

17     FULL NAME FOR THE RECORD.

18             THE COURT:  TIME IS NOW 1:17.  GO AHEAD.

19             THE WITNESS:  MY NAME IS TONY JACKSON

20     BLEVINS.

21                    DIRECT EXAMINATION

22     BY MR. LEE:

23     Q    GOOD AFTERNOON, MR. BLEVINS.

24     A    GOOD AFTERNOON.

25     Q    WHAT IS YOUR CURRENT POSITION?
```

2165

1    A    VICE-PRESIDENT OF PROCUREMENT AT APPLE.

2    Q    WHEN DID YOU JOIN APPLE?

3    A    I JOINED APPLE IN AUGUST OF 2000, SO

4    APPROXIMATELY 12 YEARS.

5    Q    SINCE JOINING APPLE, WHAT POSITIONS HAVE YOU

6    HELD?

7    A    I JOINED APPLE AS DIRECTOR OF CORPORATE

8    PROCUREMENT.  I BECAME ONE OF THE INAUGURAL MEMBERS

9    OF OUR IPOD TEAM IN 2001.  I WAS RESPONSIBLE FOR

10   GLOBAL LOGISTICS AND TRANSPORTATION EFFECTIVE

11   AROUND 2005 WHERE I WAS PROMOTED TO SENIOR DIRECTOR

12   OF OPERATIONS.  AND THEN FINALLY I WAS PROMOTED TO

13   VICE-PRESIDENT OF PROCUREMENT ABOUT OCTOBER OF LAST

14   YEAR.

15   Q    WHAT ARE YOUR CURRENT RESPONSIBILITIES?

16   A    MY RESPONSIBILITIES ARE ACQUIRING NECESSARY

17   COMPONENTS, MATERIALS AND MANUFACTURING SERVICES

18   NEEDED TO BUILD CERTAIN APPLE PRODUCTS WHICH

19   INCLUDE IPODS, IPADS, AND IPHONES.

20   Q    HOW MANY PEOPLE REPORT TO YOU?

21   A    THERE ARE CURRENTLY APPROXIMATELY 300 PEOPLE

22   IN MY ORGANIZATION.

23              YOUR HONOR, MAY I APPROACH?

24              THE COURT:  YES, PLEASE.

25   BY MR. LEE:

```
1    Q    LET ME SHOW YOU WHAT'S BEEN MARKED AS PDX 59,

2    AND WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE

3    JURY JUST WHAT THIS IS?

4    A    THIS IS AN IPHONE 4.

5    Q    NOW, DO YOU KNOW WHAT A BASEBAND PROCESSOR IS?

6    A    YES, I DO.

7    Q    WHAT DOES THE BASEBAND PROCESSOR DO IN THE

8    APPLE PRODUCTS?

9    A    IN SIMPLEST TERMS, THE BASEBAND PROCESSOR IS A

10   DEVICE THAT COMMUNICATES WITH CELLULAR NETWORKS.

11   Q    WHICH APPLE PRODUCTS USE BASEBAND PROCESSORS?

12   A    ALL OF OUR IPHONES USE BASEBAND PROCESSORS AND

13   CERTAIN MODELS OF OUR IPADS, THOSE THAT HAVE

14   CELLULAR CONNECTIVITY.

15   Q    DOES APPLE ACQUIRE ITS BASEBAND PROCESSORS

16   FROM OTHER COMPANIES?

17   A    YES, WE DO.

18   Q    FOR THE IPHONE 3G, THE IPHONE 3GS, THE IPHONE

19   4, THE IPAD AND THE IPAD 2, WHO SELLS YOU THE

20   BASEBAND PROCESSORS THAT APPLE USES?

21   A    IN EACH OF THOSE --

22        MR. PRICE:  OBJECTION, VAGUE AS TO TIME.

23        THE COURT:  ALL RIGHT.  WOULD YOU --

24   SUSTAINED.

25   BY MR. LEE:
```

1    Q    WHO -- I'D LIKE YOU TO FOCUS ON THE PERIOD

2    FROM TODAY.  WHO SELLS THE BASEBAND PROCESSORS TO

3    APPLE TODAY?

4    A    AS OF TODAY, WE HAVE TWO SUPPLIERS FOR

5    BASEBAND PROCESSOR.  THEY ARE INTEL AND QUALCOMM.

6    Q    AND FOR THE IPHONE 3G, THE IPHONE 3GS, THE

7    IPHONE 4, THE IPAD AND THE IPAD 2, WHO HAS PROVIDED

8    YOU BASEBAND PROCESSOR?

9    A    IN EACH OF THOSE CASES, INTEL HAS BEEN OUR

10   ONLY PROVIDER.

11   Q    IF YOU TOOK THE PDX 59 APART, WOULD YOU FIND

12   THIS MOTHERBOARD, PDX 60?

13   A    THAT IS CORRECT.

14   Q    IF I MAY APPROACH?

15   A    THAT IS THE MAJOR LOGIC BOARD FOR THE IPHONE

16   4.

17   Q    AND IF YOU COULD IDENTIFY FOR THE LADIES AND

18   GENTLEMEN JUST WHERE THEY WOULD FIND THE BASEBAND

19   PROCESSOR.  MAYBE YOU CAN HOLD IT UP, AND THEN IF

20   THERE'S SOMETHING THAT WOULD HELP IDENTIFY IT?

21   A    THE BASEBAND PROCESSOR IS ESSENTIALLY HERE

22   (INDICATING).

23            MR. LEE:  MAY I PUBLISH THIS TO THE JURY,

24   YOUR HONOR.

25            THE COURT:  ANY OBJECTION?

1           MR. PRICE:  NO OBJECTION.

2           THE COURT:  ALL RIGHT.  THEY'RE BOTH

3    ADMITTED.

4           IS PDX 59 ALREADY ADMITTED?

5           MR. LEE:  PDX 59 IS A DEMONSTRATIVE, YOUR

6    HONOR.  WE'D OFFER IT NOW.  THEY'RE BOTH

7    DEMONSTRATIVES ONLY.

8           THE COURT:  THEY'RE NOT COMING IN.  OKAY.

9    GO AHEAD.

10   BY MR. LEE:

11   Q    WHILE THAT'S BEING PASSED AROUND, MR. BLEVINS,

12   HOW MANY PARTS ARE THERE IN THE IPHONE?

13   A    IT DEPENDS ON THE MODEL, BUT THERE ARE AROUND

14   850 TO 900 PARTS ON THE MAJOR LOGIC BOARD, AND THEN

15   THERE'S AN ADDITIONAL 100 PARTS THAT ARE REQUIRED

16   FOR ASSEMBLY.  SO 900 TO 1,000 PARTS TOTAL.

17   Q    AND HOW MUCH DOES THAT BASEBAND PROCESSOR THAT

18   IS IN THE IPHONE COST?

19   A    THE PRICE ACTUALLY VARIED BY QUARTER, BUT AS A

20   ROUGH NUMBER TO USE AS A WEIGHTED AVERAGE, ABOUT 12

21   U.S. DOLLARS EACH FOR THE CHIPSET.

22   Q    AND THAT'S WHAT YOU PAY INTEL?

23   A    THAT IS CORRECT.

24   Q    WHERE IS INTEL BASED?

25   A    THEY ARE BASED IN SANTA CLARA, CALIFORNIA.

```
 1    Q    TURN, IF YOU WOULD, IN YOUR BINDER TO

 2    PLAINTIFF'S EXHIBIT 78.  DO YOU HAVE THAT?

 3    A    YES, I DO.

 4    Q    CAN YOU TELL US WHAT IS IN PLAINTIFF'S EXHIBIT

 5    78?

 6    A    THIS IS A VERY TYPICAL INVOICE THAT APPLE

 7    WOULD ISSUE TO APPLE -- OR THAT INTEL WOULD ISSUE

 8    TO APPLE FOR PARTS.

 9              MR. LEE:  YOUR HONOR, WE OFFER

10    PLAINTIFF'S EXHIBIT 78.

11              THE COURT:  ANY OBJECTION?

12              MR. PRICE:  NO OBJECTION.

13              THE COURT:  IT'S ADMITTED.

14              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

15              78, HAVING BEEN PREVIOUSLY MARKED FOR

16              IDENTIFICATION, WAS ADMITTED INTO

17              EVIDENCE.)

18    BY MR. LEE:

19    Q    DO YOU SEE THE REFERENCE TO INTEL AMERICAS?

20    A    YES.

21    Q    WHAT IS INTEL AMERICAS.

22              MR. PRICE:  LACK OF FOUNDATION.

23    BY MR. LEE:

24    Q    DO YOU KNOW WHAT INTEL AMERICAS IS?

25    A    YES, I DO.
```

```
 1     Q     WHAT IS INTEL AMERICAS?

 2     A     INTEL AMERICAS IS A SALES SUBSIDIARY OF INTEL

 3     WHOSE FUNCTION IT IS TO SEND INVOICES AND COLLECT

 4     PAYMENTS FOR INTEL PRODUCTS.

 5     Q     AND DO THE INVOICES IN EXHIBIT 78, ARE THEY

 6     REPRESENTATIVE OF THE INVOICES THAT APPLE RECEIVES

 7     FROM INTEL AMERICAS?

 8               MR. PRICE:  OBJECTION, LEADING.

 9               THE WITNESS:  THESE INVOICES.

10               THE COURT:  OVERRULED.

11               THE WITNESS:  ARE VERY TYPICAL?

12     BY MR. LEE:

13     Q     LET'S FOCUS JUST ON THE FIRST PAGE OF THE

14     INVOICE.  WHO DOES IT SHOW AS BEING BILLED FOR THE

15     SHIP ITSELF?

16     A     APPLE.

17     Q     AND WHERE DOES IT SHOW THE CHIPS ARE BEING

18     SOLD?

19     A     APPLE.

20     Q     AND DOES IT SHOW WHERE APPLE MUST SEND PAYMENT

21     FOR THE CHIPS?

22     A     YES.

23     Q     LET ME DIRECT YOUR ATTENTION TO THE COLUMN

24     THAT SAYS INTEL PRODUCT.  INTEL PRODUCT.  WHAT IS

25     THE PRODUCT THAT'S BEING --
```

```
 1    A    THE TRADE NAME INTEL USES FOR THIS CHIPSET IS

 2    PMB 8878, SO THIS IS A REFERENCE TO THAT PARTICULAR

 3    PRODUCT.

 4    Q    AND LOOKING AT THE INVOICE, CAN YOU TELL US

 5    THE PRICE OF THE BASEBAND PROCESSOR?

 6    A    IN THIS PARTICULAR CASE, WE WERE CHARGED 9.09

 7    EACH FOR 30,000 UNITS.

 8    Q    WOULD YOU TURN TO THE FOURTH PAGE OF EXHIBIT

 9    78, WHICH HAS THE BATES STAMP NUMBERING 3908 IN THE

10    RIGHT-HAND COLUMN.  DO YOU HAVE THAT?

11    A    YES, I DO.

12    Q    DOES THAT FOLLOW THE SAME FORMAT AS THE PAGE

13    THE JURORS JUST LOOKED AT?

14    A    IT DOES FOLLOW THE SAME FORMAT, YES.

15    Q    WHAT IS THE INTEL PRODUCT THAT IS SOLD TO

16    APPLE?

17    A    IN THIS CASE IT'S THE INTEL PRODUCT THAT THEY

18    CALL PMB 9801.

19    Q    WHAT WAS THE PRICE THAT YOU PAID TO INTEL?

20    A    IN THIS CASE THE PRICE FOR THAT PARTICULAR

21    ASIC WAS 6.78 EACH.

22              MR. LEE:  NOTHING FURTHER, YOUR HONOR,

23    AND I'LL RETRIEVE THE --

24              THE COURT:  THE DEMONSTRATIVES.

25              MR. LEE:  YES.
```

172

```
 1                THE COURT:  ALL RIGHT.  1:23.  GO AHEAD,
 2     PLEASE.
 3                MR. PRICE:  NO QUESTIONS.
 4                THE COURT:  OKAY.  MAY THIS WITNESS BE
 5     EXCUSED.
 6                MR. LEE:  THIS WITNESS MAY BE EXCUSED.  I
 7     DON'T THINK SUBJECT TO RECALL.
 8                THE COURT:  SUBJECT TO RECALL OR NOT.
 9                MR. LEE:  NO, NOT SUBJECT TO RECALL.
10                THE COURT:  THEN HE MAY BE EXCUSED.
11                MR. LEE:  YOUR HONOR, APPLE CALLS EMILIE
12     KIM AS ITS NEXT WITNESS.  AND, YOUR HONOR,
13     MR. SELWYN WILL PRESENT MS. KIM.
14                THE COURT:  I'M SORRY.
15                MR. LEE:  MR. SELWYN WILL PRESENT
16     MS. KIM.
17                THE COURT:  OH, OKAY.
18                THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
19                         EMILIE KIM,
20     BEING CALLED AS A WITNESS ON BEHALF OF THE
21     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS
22     EXAMINED AND TESTIFIED AS FOLLOWS:
23                THE WITNESS:  YES.
24                THE CLERK:  THANK YOU.  PLEASE BE SEATED.
25                PLEASE STATE YOUR FULL NAME.
```

1          THE COURT:  THE TIME IS NOW 1:25.

2          GO AHEAD.

3                    **DIRECT EXAMINATION**

4     BY MR. SELWYN:

5     Q    GOOD AFTERNOON.  COULD YOU PLEASE INTRODUCE

6     YOURSELF TO THE JURY AND TELL US WHERE YOU WORK.

7     A    MY NAME IS EMILIE KIM, AND I WORK AT A

8     START-UP CALLED PATH.

9     Q    MS. KIM, IF YOU WOULDN'T MIND MOVING A LITTLE

10    CLOSER TO THE MICROPHONE.

11              WHAT KIND OF A COMPANY IS PATH?

12    A    PATH IS AN INTERNET SOCIAL NETWORKING

13    START-UP.

14    Q    WHERE DID YOU WORK BEFORE PATH?

15    A    I WORKED AT APPLE.

16    Q    WHEN DID YOU WORK AT APPLE?

17    A    I STARTED FULL TIME IN 2005.

18    Q    WHEN DID YOU LEAVE APPLE?

19    A    LAST MONTH.

20    Q    CAN YOU TELL US A LITTLE BIT ABOUT WHY YOU

21    DECIDED TO LEAVE?

22    A    I HAD THE OPPORTUNITY TO WORK AT A START-UP.

23    Q    CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

24    BACKGROUND FOR THE JURY?

25    A    I RECEIVED MY BACHELOR'S OF SCIENCE IN

1    ELECTRICAL ENGINEERING AND COMPUTER SCIENCE FROM

2    THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY IN 2005;

3    AND I ALSO RECEIVED MY MASTER'S OF ENGINEERING,

4    ALSO IN ELECTRICAL ENGINEERING AND COMPUTER

5    SCIENCE, FROM M.I.T. IN 2009.

6    Q    TELL US A LITTLE BIT ABOUT WHAT YOU DID AT

7    APPLE.

8    A    I WAS A SOFTWARE ENGINEER.

9    Q    IN WHAT GROUP?

10   A    I STARTED OUT IN THE DEVELOPER TOOLS

11   ORGANIZATION, AND THEN I MOVED TO THE IOS

12   ORGANIZATION.

13   Q    AND WHEN YOU WERE IN THE IOS ORGANIZATION,

14   WHAT TEAMS OR PROJECTS DID YOU WORK ON?

15   A    I WORKED ON THE PHOTOS AND CAMERA APP.

16   Q    WHAT IS AN APP?

17   A    AN APP IS SHORT FOR APPLICATION.  IT'S KIND OF

18   LIKE A COMPUTER PROGRAM.

19   Q    CAN YOU GIVE US SOME EXAMPLES OF AN APP?

20   A    SURE.  ONE EXAMPLE WOULD BE LIKE A WEATHER

21   APP, WHICH TELLS YOU THE WEATHER FOR A GIVEN

22   LOCATION.

23            ANOTHER EXAMPLE MIGHT BE A STOCK APP

24   WHICH GIVES YOU STOCK INFORMATION.

25   Q    NOW, CAN USERS ADD APPS TO APPLE PRODUCTS?

2175

1    A    YES, USERS CAN DOWNLOAD APPS FROM THE APPLE

2    APP STORE.

3    Q    AND CAN USERS DELETE APPS FROM THEIR APPLE

4    PRODUCTS?

5    A    YES, THE USERS CAN DELETE APPS THAT THEY GOT

6    FROM THE APP STORE.

7    Q    LET ME ASK YOU A LITTLE BIT ABOUT THE TWO APPS

8    ON WHICH YOU WORKED.

9         WHAT IS THE CAMERA APP?

10   A    THE CAMERA APP ALLOW USERS TO TAKE PHOTOS AND

11   VIDEOS, AS WELL AS VIEW THE PHOTOS AND VIDEOS THAT

12   THEY HAVE PREVIOUSLY TAKEN WITH THE CAMERA APP, AND

13   SHARE THOSE PHOTOS AND VIDEOS.

14   Q    AND WHAT IS THE PHOTOS APP?

15   A    THE PHOTOS APP ALLOWS THE USER TO VIEW PHOTOS

16   AND VIDEOS, AS WELL AS EDIT AND SHARE PHOTOS AND

17   VIDEOS.

18   Q    AND TELL US HOW LONG YOU WORKED ON THE CAMERA

19   AND PHOTOS APP.

20   A    I WORKED FOR ABOUT THREE YEARS ON THE PHOTOS

21   AND CAMERA APP.

22   Q    DURING THOSE THREE YEARS, DID YOU HAVE ANY

23   ROLE IN WRITING CODE FOR THOSE APPS?

24   A    YES.

25   Q    ROUGHLY HOW MANY LINES OF CODE ARE ASSOCIATED

```
 1    WITH THE CAMERA AND PHOTOS APP?

 2    A    A COUPLE HUNDRED THOUSAND LINES OF CODE.

 3    Q    DOES THE PHOTOS APP ALLOW USERS TO SHARE

 4    PHOTOS?

 5    A    YES.

 6    Q    HOW?

 7    A    ONE EXAMPLE IS THROUGH E-MAIL.

 8    Q    AND DOES THE CAMERA APP ALSO ALLOW USERS TO

 9    SHARE PHOTOS?

10    A    YES.

11    Q    HAVE YOU PREPARED A VIDEO TO SHOW HOW THE

12    PHOTOS APP ALLOWS USERS TO SHARE PHOTOS?

13    A    YES.

14    Q    CAN WE HAVE PDX 53.10 ON THE SCREEN.

15              AND AS WE PLAY THE VIDEO, CAN YOU

16    DESCRIBE WHAT WE'RE SEEING?

17    A    SURE.  THIS IS AN IPHONE 4.  I'VE LAUNCHED THE

18    PHOTOS APP.  AND YOU'LL SEE A LIST OF PHOTO ALBUMS.

19    I'M SELECTING THE VACATION PHOTO ALBUM AND I'M

20    SELECTING THIS PHOTO.

21              NOW, THERE'S A SHARE BUTTON AT THE BOTTOM

22    WHICH I'VE TAPPED AND NOW I'M TAPPING THE E-MAIL

23    PHOTO BUTTON, AND YOU CAN SEE THAT A MAIL SHEET

24    COMES UP AND THE PHOTO IS NOW ATTACHED TO THE

25    E-MAIL.
```

1    Q    CAN USERS RUN MULTIPLE APPS AT THE SAME TIME

2    ON APPLE PRODUCTS?

3    A    YES.  THAT'S A FEATURE CALLED MULTITASKING.

4    Q    AND WHAT IS MULTITASKING?

5    A    MULTITASKING MEANS YOU CAN SEND APPS TO THE

6    BACKGROUND AND THEY KIND OF SIT THERE IN A FROZEN

7    STATE WHILE THE USER INTERACTS WITH A DIFFERENT APP

8    IN THE FOREGROUND.

9    Q    LET'S SAY THE USER IS VIEWING A PICTURE OF A

10   TREE IN A PHOTOS APP.  IF A USER THEN WANTS TO TAKE

11   A PICTURE, WHAT DOES SHE HAVE TO DO?

12   A    THE USER WOULD SEND THE PHOTOS APP TO THE

13   BACKGROUND AND THEN LAUNCH USE THE CAMERA APP.

14   Q    HAVE YOU ALSO PREPARED A VIDEO DEMONSTRATING

15   THAT FUNCTION?

16   A    YES.

17   Q    CAN WE HAVE PLEASE PDX 53.2.

18            AND AGAIN, CAN YOU DESCRIBE WHAT THIS IS?

19   A    SURE.  YOU CAN SEE HERE I'VE SELECTED A PHOTO

20   OF TREES AND I'VE SENT THAT TO THE BACKGROUND AND

21   I'VE LAUNCHED THE CAMERA APP AND CAN NOW TAKE A

22   PICTURE.

23   Q    WHAT HAPPENS TO THE PHOTOS APP WHEN THE CAMERA

24   APP IS LAUNCHED?

25   A    THE PHOTOS APP GOES INTO THE BACKGROUND AND IS

1    BASICALLY IN A FROZEN STATE WHILE THE CAMERA APP IS

2    LAUNCHED.

3    Q    WHAT DO YOU MEAN BY "A FROZEN STATE"?

4    A    BY FROZEN STATE I MEAN IT'S STILL PRESENT IN

5    MEMORY, BUT THE CODE ISN'T EXECUTING.  THE USER

6    CAN'T INTERACT WITH THAT APP.

7    Q    AND THEN WHAT HAPPENS TO THE APP WHEN IT

8    RETURNS TO THE FOREGROUND?

9    A    WHEN IT RETURNS TO THE FOREGROUND, THE APP

10   BASICALLY BECOMES UNFROZEN AND THE USER CAN START

11   INTERACTING WITH THE APP AGAIN.

12   Q    ARE THERE CIRCUMSTANCES UNDER WHICH THE APP

13   WILL NOT RETURN TO THE FOREGROUND FROM THE FROZEN

14   STATE?

15   A    YES.

16   Q    TELL US WHEN.

17   A    ONE EXAMPLE WILL BE IF THE DEVICE IS RUNNING

18   LOW ON MEMORY, THEN THE DEVICE WILL AUTOMATICALLY

19   GO THROUGH AND KILL APPLICATIONS IN THE BACKGROUND

20   TO FREE UP MEMORY FOR THE APP THAT THE USER IS

21   CURRENTLY USING.

22   Q    TO TAKE THE EXAMPLE THAT YOU JUST SHOWED THE

23   JURY, IF THE USER LEAVES THE PHOTOS APP TO TAKE A

24   PICTURE AND THEN RETURNS TO THE PHOTOS APP, WILL

25   THE USER ALWAYS RETURN TO THE SAME IMAGE?

```
1    A    NO, NOT ALWAYS.

2    Q    WHY NOT?

3    A    FOR EXAMPLE, WITH THAT MEMORY SITUATION THAT I

4    DESCRIBED, IF THE PHOTOS APP IS KILLED WHILE THE

5    CAMERA APP IS UP AND RUNNING, THEN THE USER WILL

6    NOT RETURN TO THAT PICTURE OF THE TREES.

7    Q    HAVE YOU ALSO PREPARED A VIDEO OF THAT?

8    A    YES.

9    Q    CAN WE PLEASE HAVE PDX 53.3.

10         AND DESCRIBE WHAT WE'RE SEEING AS WE RUN

11   THE VIDEO.

12   A    SURE.  SO HERE YOU CAN SEE AT THE END OF THE

13   PREVIOUS VIDEO, I LAUNCHED THE CAMERA APP, AND

14   AFTER PREVIOUSLY SELECTING A PHOTO OF THE TREES IN

15   THE PHOTOS APP, AND NOW I'M GOING TO LAUNCH THREE

16   VIDEO GAMES ON THIS IPAD.

17         THE SEQUENCES HAVE BEEN SHORTENED, THE

18   FLASH SCREENS ARE QUITE LONG FOR THE VIDEO GAMES.

19         BUT THEN AFTER THE THIRD GAME, I'VE

20   LAUNCHED THE CAMERA APP AGAIN AND THEN NOW I'M

21   GOING TO TAKE A PICTURE OF THIS USB CABLE.

22         SO I'VE TAKEN A PICTURE OF THE USB CABLE

23   IN THE CAMERA APP.

24         AND THEN NOW I'M SENDING THE CAMERA APP

25   TO THE BACKGROUND, AND NOW WHEN I LAUNCH THE PHOTOS
```

1   APP, YOU'LL RECALL I WAS SEEING A PICTURE OF THE

2   TREES, AND NOW THAT PICTURE IS NO LONGER VISIBLE.

3   Q    WHY DIDN'T YOU RETURN TO THE PICTURE OF THE

4   TREES?

5   A    IN THIS CASE, THE APP WAS RUNNING LOW ON

6   MEMORY AS THE VIDEO GAMES WERE BEING LAUNCHED, SO

7   THE PHOTOS APP WAS KILLED IN THE BACKGROUND.

8   Q    ARE THERE ANY OTHER EVENTS THAT WOULD CAUSE

9   THE APPLE PRODUCTS TO NOT RETURN TO THE LAST VIEWED

10  IMAGE?

11  A    YES.  FOR EXAMPLE, THE USER COULD POWER OFF

12  THE DEVICE OR THE DEVICE COULD RUN OUT OF BATTERY,

13  AND IN THAT CASE THE PHOTOS APP WOULD NOT RETURN TO

14  THE PICTURE OF THE TREES.

15           ALSO, FOR EXAMPLE, IF THE USER HAD SYNCED

16  THAT PHOTO THROUGH ITUNES AND THEN, WHILE THE

17  PHOTOS APP WAS IN THE BACKGROUND, DECIDED TO UNSYNC

18  THAT PHOTO, THE PICTURE WOULD NO LONGER BE THERE.

19  Q    DOES THE IPHONE HAVE ANY FEATURES OR FUNCTIONS

20  REFERRED TO AS A MODE?

21  A    YES.

22  Q    CAN YOU GIVE US AN EXAMPLE?

23  A    SURE.  ONE EXAMPLE IS AIRPLANE MODE.  WHEN THE

24  USER GET ON AN AIRPLANE, THEY CAN TURN ON THE

25  AIRPLANE MODE, WHICH TURNS OFF THE CELLULAR

2181

```
 1    SIGNALS.

 2    Q    WHAT IS THE DIFFERENCE BETWEEN AN APP AND A

 3    MODE?

 4    A    AN APP IS LIKE AN IMMERSIVE ENVIRONMENT FOR

 5    THE USER.  THEY CAN INTERACT WITH AN APP AND DO

 6    LOTS OF DIFFERENT THINGS, AND AN APP CAN EVEN

 7    CONTAIN MODES, WHEREAS A MODE IS ESSENTIALLY KIND

 8    OF LIKE A STATE.

 9    Q    LET'S RETURN TO THE TOPIC OF VIEWING PHOTOS.

10    CAN YOU REMIND US HOW THE USER MAY VIEW PHOTOS FROM

11    THE PHOTOS APP?

12    A    SURE.  THE USER CAN SELECT A PHOTO ALBUM ON

13    THEIR DEVICE, AND THEY'RE PRESENTED WITH A

14    THUMBNAIL GRID OF PHOTOS.  THEY CAN THEN SELECT ONE

15    OF THE PHOTOS AND VIEW IT IN FULL SCREEN.

16    Q    AND WHEN A USER IS VIEWING A PHOTO IN FULL

17    SCREEN IN THE PHOTOS APP, CAN SHE THEN VIEW OTHER

18    PHOTOS IN THE ALBUM?

19    A    YES.

20    Q    HOW?

21    A    IN IOS 4, THERE ARE ARROW BUTTONS THAT THE

22    USER CAN USE TO NAVIGATE TO OTHER PHOTOS IN THE

23    ALBUM, AS WELL AS SELECTING OTHER PHOTOS IN THE

24    ALBUM.

25    Q    HAS THE WAY IN WHICH THE USER CAN VIEW THE
```

1    PREVIOUS AND NEXT PHOTOS IN APPLE PRODUCTS CHANGED

2    BETWEEN THE VERSION OF IOS CALLED IOS 4 AND THE

3    VERSION CALLED IOS 5?

4    A    YES.  IN IOS 5, THE ARROW BUTTONS ARE NO

5    LONGER PRESENT.

6    Q    AND HAVE YOU PREPARED A VIDEO TO DEMONSTRATE

7    THIS?

8    A    YES.

9    Q    CAN WE HAVE PDX 53.6, PLEASE.

10   A    HERE I'VE LAUNCHED THE PHOTOS APP AND I'VE

11   SELECTED THE PHOTO ALBUM CALLED VACATION AND I'VE

12   SELECTED A PHOTO, AND NOW YOU CAN SEE I TAPPED THE

13   BACK ARROW BUTTON TO GO TO THE PREVIOUS PHOTO AND

14   THE NEXT ARROW TO GO BACK TO MY FIRST PHOTO.

15   Q    AND WHAT CHANGES WERE MADE FROM IOS 4 TO IOS 5

16   FOR THIS FEATURE?

17   A    IN IOS 5 THOSE ARROW BUTTONS WERE REMOVED.

18   Q    DO THE PHOTOS AND CAMERA APPS LOOK DIFFERENT

19   WHEN THEY MOVE BETWEEN PHOTOS IN THE OLDER LEFT AND

20   RIGHT ARROW SYSTEM AS COMPARED WITH THE SWIPING

21   SYSTEM?

22   A    YES.  WHEN THE USER USES THE ARROW BUTTONS TO

23   NAVIGATE BETWEEN PHOTOS, THE OLD PHOTO INSTANTLY

24   DISAPPEARS AS THE NEW PHOTO INSTANTLY APPEARS IN

25   ITS PLACE.

1          SO WHEN THE USER SWIPES THROUGH THE

2     PHOTOS -- WHEN THE USER SWIPES BETWEEN PHOTOS, THE

3     OLD PHOTO ANIMATES OFF SCREEN AS THE NEW PHOTO

4     ANIMATES ON SCREEN AT THE SAME TIME.

5     Q    COULD WE HAVE PDX 53.7?  AS WE PLAY THIS

6     VIDEO, CAN YOU EXPLAIN WHAT WE'RE SEEING?

7     A    SURE.  HERE YOU CAN SEE I'VE SELECTED THIS

8     PICTURE AND NOW I'M SWIPING BACK TO LOOK AT THE

9     PREVIOUS PICTURE AND SWIPING TO LOOK BACK AT THE

10    FIRST PICTURE AGAIN.

11    Q    LAST TOPIC.  LET'S TURN TO THE TOPIC OF

12    E-MAILING PHOTOS.

13          SUPPOSE A USER WANTS TO E-MAIL ONE OF HER

14    PHOTOS TO A FRIEND.  HOW DOES SHE DO THAT?

15    A    THE USER WOULD SELECT THE PHOTO THAT SHE WANTS

16    TO E-MAIL AND THEN TAP THE SHARE BUTTON, TAP THE

17    E-MAIL PHOTO BUTTON, AND THEN A MAIL SHEET WILL

18    COME UP WITH THE PHOTO ATTACHED TO THE E-MAIL AND

19    SHE CAN BEGIN WRITING HER E-MAIL.

20    Q    AFTER A USER HAS SELECTED A PHOTO AND STARTS

21    WRITING THE E-MAIL, CAN THE USER THEN SELECT OTHER

22    PHOTOS TO E-MAIL?

23    A    NO, NOT WITHOUT LEAVING THE E-MAIL.

24    Q    CAN THE USER SCROLL THROUGH OTHER PHOTOS TO

25    SEE IF THERE MIGHT BE OTHER PHOTOS THAT SHE WANTS

1    TO SEND IN THE SAME E-MAIL?

2    A    NO, NOT WITHOUT LEAVING THE E-MAIL.

3    Q    AND HAVE YOU PREPARED A VIDEO TO HELP

4    DEMONSTRATE THIS AS WELL?

5    A    YES.

6    Q    CAN WE PLEASE HAVE PDX 53.9.

7              PLEASE EXPLAIN.

8    A    SO HERE I'M LAUNCHING THE PHOTOS APP, AND THEN

9    A LIST OF PHOTO ALBUMS ON THE DEVICE WILL APPEAR.

10             I'VE SELECTED THE VACATION PHOTO ALBUM

11   AND NOW I'VE SELECTED A PHOTO.  I'M TAPPING THE

12   SHARE BUTTON AT THE BOTTOM, AND NOW THE E-MAIL

13   PHOTO BUTTON, AND YOU CAN SEE THE MAIL SHEET COMING

14   UP WITH THE PHOTO ATTACHED TO THE E-MAIL.

15             AND NOW YOU CAN SEE I'M TRYING TO

16   NAVIGATE TO OTHER PHOTOS, BUT I CAN'T.  I'M STUCK

17   IN THE E-MAIL.

18   Q    IN THE CAMERA APP, WOULD A USER BE ABLE TO

19   SELECT OTHER PHOTOS AFTER CHOOSING TO E-MAIL A

20   PHOTO?

21   A    NO.  IT BEHAVES THE SAME AS THE PHOTOS APP.

22             MR. SELWYN:  THANK YOU, MS. KIM.

23             NO FURTHER QUESTIONS.

24             THE COURT:  ALL RIGHT.  IT'S 1:30.

25             ANY CROSS?

```
 1              GO AHEAD, PLEASE.
 2              MR. JOHNSON:  THANK YOU, YOUR HONOR.
 3                    CROSS-EXAMINATION
 4    BY MR. JOHNSON:
 5    Q    GOOD AFTERNOON, MS. KIM.  I'M KEVIN JOHNSON.
 6    JUST A COUPLE OF QUESTIONS.
 7              BEFORE SELLING ITS IPHONES, IPADS, AND
 8    IPOD TOUCHES TO THE PUBLIC, APPLE TESTS THOSE
 9    PRODUCTS TO MAKE SURE THAT A USER CAN SEND AN
10    E-MAIL, E-MAIL A PHOTO, AND ACTUALLY SCROLL THROUGH
11    THE PHOTOS; RIGHT?
12    A    YES.
13    Q    LET ME -- YOU SHOULD HAVE A BINDER IN FRONT OF
14    YOU THAT'S BLACK.  I WANT TO DIRECT YOUR ATTENTION
15    TO DX 647.
16              YOU RECOGNIZE THIS; RIGHT?  LET ME JUST
17    ASK YOU, WHAT IS THIS?
18    A    I RECOGNIZE THIS KIND OF E-MAIL, AND IT LOOKS
19    LIKE A -- THE REPORT FOR QUICK LOOK TESTS.
20              MR. JOHNSON:  YOUR HONOR, WE MOVE FOR
21    ADMISSION OF DX 647.
22              MR. SELWYN:  NO OBJECTION.
23              THE COURT:  NO OBJECTION.  OKAY.  647 IS
24    ADMITTED.
25              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
```

```
1              647, HAVING BEEN PREVIOUSLY MARKED FOR
2              IDENTIFICATION, WAS ADMITTED INTO
3              EVIDENCE.)
4    BY MR. JOHNSON:
5    Q    AND, MS. KIM, CAN YOU ALSO LOOK AT EXHIBIT
6    648, PLEASE?  AND WHAT'S THIS, PLEASE?
7    A    THIS ALSO LOOKS LIKE A KIND OF E-MAIL FOR A
8    QUICK LOOK REPORTS.
9              MR. JOHNSON:  YOUR HONOR, WE'D ASK THAT
10   EXHIBIT 648 BE MOVED IN EVIDENCE.
11             THE COURT:  ANY OBJECTION?
12             MR. SELWYN:  NO OBJECTION.
13             THE COURT:  IT'S ADMITTED.
14             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
15             648, HAVING BEEN PREVIOUSLY MARKED FOR
16             IDENTIFICATION, WAS ADMITTED INTO
17             EVIDENCE.)
18   BY MR. JOHNSON:
19   Q    MS. KIM, DURING THE VIDEO THAT WE SAW, YOU
20   SHOWED AN INSTANCE FOR THE IPOD AND I THINK THE
21   IPAD WHERE, AFTER YOU'D TAKEN A PHOTO, IT DIDN'T
22   RETURN TO THE SAME PHOTO IN THE GALLERY.  DO YOU
23   REMEMBER THAT?
24   A    YES.
25   Q    NOW, THERE ARE PLENTY OF INSTANCES WHERE IT
```

187

```
1    DOES RETURN TO THE SAME PHOTO; RIGHT?

2    A    IT CAN RETURN TO THE SAME PHOTO.

3    Q    AND YOU'RE AWARE THAT IT DOES; RIGHT?

4    A    IN SOME CASES, YES.

5              MR. JOHNSON:  OKAY.  THANK YOU VERY MUCH.

6              NO FURTHER QUESTIONS, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  1:38.

8              IS THERE ANY REDIRECT?

9              MR. SELWYN:  NO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  MAY THIS WITNESS

11   BE EXCUSED, AND IS IT SUBJECT TO RECALL OR NOT?

12             MR. LEE:  I THINK --

13             MR. SELWYN:  SHE MAY BE EXCUSED AND IS

14   NOT SUBJECT TO RECALL.

15             THE COURT:  DO YOU AGREE WITH THAT?

16             MR. JOHNSON:  YES, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  THEN YOU MAY BE

18   EXCUSED.

19             MR. LEE:  YOUR HONOR, APPLE NOW CALLS

20   PROFESSOR DOURISH, WHO I THINK IS NEXT ON THE LIST

21   WE GAVE YOUR HONOR.

22             THE COURT:  OKAY.  GO AHEAD, PLEASE.

23             MR. LEE:  MR. SELWYN IS GOING TO DO THE

24   HONORS AGAIN, YOUR HONOR.

25             THE COURT:  OKAY.
```

```
 1              THE CLERK:  MR. DOURISH, PLEASE STAND AND
 2    RAISE YOUR RIGHT HAND.
 3                      PAUL DOURISH,
 4    BEING CALLED AS A WITNESS ON BEHALF OF THE
 5    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS
 6    EXAMINED AND TESTIFIED AS FOLLOWS:
 7              THE WITNESS:  I DO.
 8              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
 9              THE COURT:  TIME IS 1:38.
10              GO AHEAD, PLEASE.  1:39.  GO AHEAD.
11                    DIRECT EXAMINATION
12    BY MR. SELWYN:
13    Q    GOOD AFTERNOON, SIR.  WOULD YOU PLEASE
14    INTRODUCE YOURSELF TO THE JURY AND TELL US WHERE
15    YOU WORK?
16    A    MY NAME IS PAUL DOURISH.  I'M A PROFESSOR IN
17    THE SCHOOL OF INFORMATION AND COMPUTER SCIENCES AT
18    UNIVERSITY OF CALIFORNIA IRVINE.
19    Q    AND PROFESSOR DOURISH, IF YOU COULD MOVE A
20    LITTLE BIT CLOSER TO YOUR MICROPHONE, THAT WOULD BE
21    GREAT.  THANK YOU.
22              HAVE YOU BEEN RETAINED AS AN EXPERT BY
23    APPLE IN THIS CASE?
24    A    I HAVE.
25    Q    FOR WHICH PATENT HAVE YOU BEEN ASKED TO OFFER
```

1    OPINIONS?

2    A    THE '893 PATENT.

3    Q    WOULD YOU PLEASE SUMMARIZE YOUR EDUCATIONAL

4    BACKGROUND FOR THE JURY?

5    A    I RECEIVED A BACHELOR OF SCIENCE WITH HONORS

6    IN ARTIFICIAL INTELLIGENCE AND COMPUTER SCIENCE

7    FROM THE UNIVERSITY OF EDINBURGH IN 1989, AND A

8    PH.D. IN COMPUTER SCIENCE FROM THE UNIVERSITY OF

9    LONDON IN 1996.

10   Q    WHAT DID YOU DO AFTER YOU EARNED YOUR PH.D.?

11   A    THEN I MOVED TO CALIFORNIA TO TAKE UP A

12   POSITION WITH APPLE.

13   Q    WHAT TYPE OF WORK DID YOU DO AT APPLE?

14   A    I WORKED IN APPLE RESEARCH LABS WHERE WE

15   CONDUCTED ADVANCED RESEARCH INTO SOFTWARE

16   ARCHITECTURES FOR USER INTERFACES AND INTERACTIVE

17   SYSTEMS.

18   Q    HOW LONG DID YOU WORK AT APPLE?

19   A    I WAS THERE FOR APPROXIMATELY ONE YEAR.

20   Q    WHAT DID YOU DO NEXT?

21   A    THEN I MOVED UP THE ROAD TO PALO ALTO TO A

22   RESEARCH POSITION AT XEROX PARK.

23   Q    WHAT IS XEROX PARK?

24   A    XEROX PARK IS AN ADVANCED RESEARCH LABORATORY

25   OWNED BY THE XEROX CORPORATION.  IT'S ONE OF THE

1    PREEMINENT COMPUTER SCIENCE RESEARCH LABS IN THE

2    WORLD.

3    Q    WHEN DID YOU JOIN THE FACULTY AT THE

4    UNIVERSITY OF CALIFORNIA AT IRVINE?

5    A    I JOINED U.C. IRVINE IN 2000 AS AN ASSISTANT

6    PROFESSOR; I WAS PROMOTED TO ASSOCIATE PROFESSOR

7    WITH TENURE IN 2002; AND THEN FULL PROFESSOR IN

8    2006.

9    Q    WHAT HAS BEEN THE FOCUS OF YOUR RESEARCH AT

10   THE UNIVERSITY?

11   A    I WORKED ON A WIDE VARIETY OF THINGS, BUT MY

12   PRIMARY RESEARCH IS AROUND THE USER EXPERIENCE

13   ASSOCIATED WITH MOBILE AND UBIQUITOUS COMPUTING,

14   INCLUDING SOME WORK SPECIFICALLY FOCUSSED ON HOW

15   PEOPLE CAN CAPTURE AND SHARE DIGITAL IMAGES ON

16   MOBILE PHONES.

17   Q    HAVE YOU AUTHORED ANY BOOKS OR ACADEMIC

18   PUBLICATIONS OVER THE COURSE OF YOUR CAREER?

19   A    I'VE PUBLISHED OVER 100 PAPERS IN PEER

20   REVIEWED CONFERENCES AND JOURNALS, CONTRIBUTED

21   SEVERAL BOOK CHAPTERS, AND WRITTEN TWO BOOKS.

22   Q    AND ARE YOU A NAMED INVENTOR ON ANY PATENTS?

23   A    I'M AN INVENTORY ON 19 PATENTS FROM MY TIME AT

24   XEROX.

25   Q    HAVE YOU EVER TESTIFIED IN COURT BEFORE ?

```
1    A    NO, NEVER.

2    Q    HOW MANY YEARS HAVE YOU BEEN STUDYING,

3    TEACHING, AND WORKING IN THE FIELD OF USER

4    INTERFACE TECHNOLOGY?

5    A    OVER 20 YEARS.

6              MR. SELWYN:  YOUR HONOR, WE OFFER

7    DR. DOURISH AS AN EXPERT IN THE FIELD OF USER

8    INTERFACE TECHNOLOGY FOR COMPUTER-BASED EMBEDDED

9    SYSTEMS.

10             MR. JOHNSON:  NO OBJECTION.

11             THE COURT:  ALL RIGHT.  SO HE'S SO

12   CERTIFIED.

13   BY MR. SELWYN:

14   Q    ARE YOU BEING PAID FOR YOUR WORK IN THIS CASE?

15   A    I AM.

16   Q    AT WHAT RATE?

17   A    AT $400 AN HOUR.

18   Q    APPROXIMATELY HOW MANY HOURS HAVE YOU WORKED

19   ON THIS MATTER?

20   A    OVER 200 HOURS.

21   Q    WHAT ISSUES HAVE YOU BEEN ASKED TO CONSIDER IN

22   THIS CASE?

23   A    I WAS ASKED TO CONSIDER THE VALIDITY OF CLAIM

24   10 OF THE '893 PATENT AND WHETHER PARTICULAR APPLE

25   PRODUCTS MIGHT INFRINGE.
```

1    Q    WHAT MATERIALS DID YOU CONSIDER IN REACHING

2    YOUR OPINION?

3    A    I LOOKED AT THE '893 PATENT ITSELF AND ITS

4    PROSECUTION HISTORY; AT A NUMBER OF PIECES OF

5    RELATED PRIOR ART; I HAVE LOOKED AT THE DEPOSITION

6    TESTIMONY OF MS. KIM AND OTHER APPLE ENGINEERS;

7    ALSO THE EXPERT REPORTS OF WOODWARD YANG.

8              I'VE ALSO REVIEWED SOURCE CODE AND

9    EXAMINED THE APPLE PRODUCTS THEMSELVES.

10   Q    AND JUST VERY BRIEFLY, WHAT CONCLUSIONS DID

11   YOU REACH REGARDING WHETHER THE ACCUSED APPLE

12   PRODUCTS INFRINGE CLAIM 10 AND WHETHER CLAIM 10 IS

13   VALID?

14   A    THE APPLE PRODUCTS DO NOT INFRINGE CLAIM 10

15   AND CLAIM 10 IS NOT VALID.

16   Q    LET ME ASK YOU SOME QUESTIONS ABOUT THE

17   TECHNOLOGY DESCRIBED IN THE '893 PATENT.

18              FIRST, CAN YOU EXPLAIN TO US WHAT A

19   DIGITAL IMAGE PROCESSING APPARATUS IS?

20   A    IN TERMS OF THE '893 PATENT, A DIGITAL IMAGE

21   PROCESSING APPARATUS IS ANY APPARATUS THAT CAN

22   CAPTURE AND DISPLAY AND STORE IMAGES IN A DIGITAL

23   FORMAT.

24   Q    AND WHAT EXAMPLES OF A DIGITAL IMAGING

25   PROCESS -- PARDON ME.

```
 1              WHAT EXAMPLES OF A DIGITAL IMAGE

 2    PROCESSING APPARATUS DOES THE PATENT PROVIDE?

 3    A    TWO.  A DIGITAL CAMERA AND A CAMERA PHONE.

 4    Q    AND DOES THE PATENT CLAIM TO HAVE INVENTED THE

 5    FIRST DIGITAL CAMERA OR CAMERA PHONE?

 6    A    NO.  THEY WERE BOTH WELL KNOWN AT THE TIME.

 7    Q    AND DOES THE PATENT DISCUSS PRIOR ART FOR

 8    DIGITAL CAMERAS THAT EXISTED BEFORE THE PATENT WAS

 9    FILED?

10    A    YES.  THE BACKGROUND SECTION OF THE PATENT

11    DESCRIBES PRIOR ART DIGITAL CAMERAS.

12    Q    CAN WE PLEASE HAVE COLUMN 1, LINES 37 THROUGH

13    38 OF THE '893 PATENT ON THE SCREEN.

14              DO YOU SEE THERE THAT THE '893 PATENT

15    REFERS TO A REPRODUCING MODE OR STORAGE IMAGE

16    DISPLAY MODE FOR THE CONVENTION DIGITAL CAMERA?

17    A    YES.

18    Q    WHAT IS A MODE?

19    A    A MODE IS A DISTINCT SET OF OPERATIONS OR

20    SETTING OF A DEVICE OR AN APPLICATION.  SO IT'S A

21    WAY YOU CAN CHOOSE WHICH PART OF THE FUNCTIONALITY

22    YOU WANT TO MAKE USE OF.

23    Q    HOW MANY DIFFERENT MODES CAN A DEVICE BE IN

24    ANY ONE TIME?

25    A    MODES OCCUR IN SETS AND THEY'RE NORMALLY
```

1    MUTUALLY EXCLUSIVE, WHICH MEANS YOU CAN ONLY BE IN

2    ONE MODE AT A TIME.

3    Q    LET'S LOOK IF WE CAN AT PDX 42.4.  CAN YOU

4    EXPLAIN WHAT'S SHOWN HERE, PLEASE?

5    A    SO THIS IS A GRAPHIC OF AN AM/FM RADIO AND IT

6    EMBODIES THIS IDEA OF MODES.  SO THE AM/FM RADIO

7    HAS TWO MODES HERE.  IT HAS AN FM MODE, SO YOU CAN

8    CHOOSE A STATION IN THE FM BAND.  IT HAS AN AM MODE

9    SO YOU CAN CHOOSE A STATION IN AM BAND.

10            BUT IT CAN ONLY BE IN ONE OF THOSE MODES

11   AT A TIME.

12   Q    LET'S LOOK BACK AT THE PATENT, COLUMN 1, LINES

13   37 AND 38.

14            DO YOU SEE THE REFERENCE TO A REPRODUCING

15   MODE OR A STORED IMAGE DISPLAY MODE?

16   A    YES.

17   Q    WHAT ARE THEY?

18   A    IN TERMS OF THE PATENT, THOSE ARE A MODE IN

19   WHICH IT WILL DISPLAY AN IMAGE THAT'S BEEN STORED

20   ON IT.

21   Q    AND IF WE GO DOWN TO LINE 48, DO YOU SEE THE

22   PATENT REFERS TO A PHOTOGRAPHING MODE?

23   A    YES.

24   Q    WHAT IS THAT?

25   A    THAT'S A MODE IN WHICH THE DIGITAL IMAGE

```
1    PROCESSING APPARATUS CAN CAPTURE NEW IMAGES.

2    Q    LET'S LOOK AT FIGURE 1 OF THE PATENT, PLEASE.

3    WHAT IS SHOWN HERE?

4    A    SO THIS IS A DIGITAL IMAGE PROCESSING

5    APPARATUS, OR THE BACK OF THE DIGITAL CAMERA THAT

6    EMBODIES THE INVENTION OF THE '893 PATENT.

7    Q    DOES THE DIGITAL CAMERA SHOWN IN FIGURE 1 HAVE

8    ANY FEATURE RELATES TO A PHOTOGRAPHING MODE?

9    A    YES --

10              MR. JOHNSON:  OBJECTION, LEADING.

11              THE COURT:  OVERRULED.

12              THE WITNESS:  YES.  IN FACT, IT HAS

13   SEVERAL PHOTOGRAPHING MODES.  IT HAS A NIGHT

14   PHOTOGRAPHING MODE, A PORTRAIT PHOTOGRAPHING MODE,

15   A PROGRAM PHOTOGRAPHING MODE, AND I BELIEVE IT'S

16   CALLED THE SIMPLE PHOTOGRAPHING MODE.

17              AND YOU CAN SELECT AMONGST THOSE USING A

18   THING CALLED A MODE DIAL THAT'S PRESENTED AT THE

19   TOP OF THAT FIGURE AND LABELED AS 14.

20   BY MR. SELWYN:

21   Q    WHAT IS A GENERAL PURPOSE COMPUTING DEVICE?

22   A    A GENERAL PURPOSE COMPUTING DEVICE IS ONE THAT

23   IS POWERFUL ENOUGH TO BE ABLE TO RUN ANY KIND OF

24   APPLICATION YOU WANT TO INSTALL.

25              SO YOU CAN DOWNLOAD AND INSTALL SOFTWARE
```

196

```
 1    PROGRAMS THAT CAN EXTEND THE FUNCTIONALITY OF THE

 2    DEVICE BY LETTING IT DO THINGS THAT IT HADN'T

 3    NECESSARILY BEEN DESIGNED INTO IT OR CONCEIVED OF

 4    WHEN IT WAS DESIGNED.

 5    Q    AND COULD YOU GIVE THE JURY A FEW EXAMPLES OF

 6    A GENERAL PURPOSE COMPUTING DEVICE?

 7    A    SURE.  YOUR TYPICAL DESKTOP COMPUTER WOULD BE

 8    A GENERAL PURPOSE COMPUTING DEVICE BECAUSE YOU CAN

 9    INSTALL APPS ON IT.  ALSO A LAPTOP OR A SMARTPHONE.

10    Q    ARE CONVENTIONAL DIGITAL CAMERAS A TYPE OF

11    COMPUTING DEVICE?

12    A    CONVENTIONAL DIGITAL CAMERAS ARE NOT.  THEY

13    DON'T HAVE ENOUGH CAPACITY TO BE ABLE TO RUN

14    APPLICATIONS.

15    Q    WHAT IS AN APPLICATION?

16    A    SO AN APPLICATION IS A PIECE OF SOFTWARE, A

17    SOFTWARE PROGRAM THAT YOU CAN INSTALL ON TO A

18    GENERAL PURPOSE COMPUTING DEVICE, AND THAT ALLOWS

19    USERS TO EXECUTE DIFFERENT KINDS OF FUNCTIONS.

20    Q    IS AN APP THE SAME OR DIFFERENT FROM A MODE?

21    A    OH, APPS ARE QUITE DIFFERENT FROM MODES.

22         SO AS I SAID, A MODE IS A DISTINCT STATE

23    OF OPERATION OR A SETTING OF A DEVICE OR AN

24    APPLICATION, SO IT'S USED TO CHOOSE AMONGST

25    PREDEFINED FUNCTIONALITY THAT'S ALREADY
```

```
 1    INCORPORATED INTO THE DEVICE OR THE APPLICATION

 2    THAT IT'S A MODE OF.

 3              AN APPLICATION, ON THE OTHER HAND, SORT

 4    OF EXTENDS THE FUNCTIONALITY AND LETS YOU DO NEW

 5    THINGS.  SO THEY'RE QUITE DIFFERENT.

 6    Q    LET'S LOOK, IF WE COULD, AT SLIDE PDX 42.5.

 7    WHAT DO WE SEE ON THIS SLIDE?

 8    A    THIS SHOWS TWO OF THE APPLE DEVICES IN

 9    QUESTION THAT I WAS ASKED TO EXAMINE WITH RESPECT

10    TO '893, AN IPHONE 3GS AND AN IPHONE 4.

11              AND IN PARTICULAR WHAT'S HIGHLIGHTED HERE

12    IN RED ARE THE SWITCHES ON THE SIDES OF THOSE

13    DEVICES THAT ALLOW YOU TO SWITCH BETWEEN A SILENT

14    MODE AND NON-SILENT MODE.

15    Q    NOW THAT WE'VE COVERED SOME OF THE TECHNOLOGY

16    BACKGROUND, LET'S TURN, IF WE COULD, TO YOUR

17    NON-INFRINGEMENT OPINION.

18              CAN YOU REMIND US WHICH APPLE PRODUCTS

19    SAMSUNG HAS ACCUSED OF INFRINGING CLAIM 10?

20    A    THERE ARE FOUR, SO THE IPHONE 3GS AND IPHONE 4

21    THAT ARE ILLUSTRATED THERE, ALSO THE FOURTH

22    GENERATION IPOD TOUCH, AND THE IPAD 2.

23    Q    WHAT IS YOUR OPINION REGARDING WHETHER THESE

24    APPLE PRODUCTS INFRINGE CLAIM 10?

25    A    THEY DO NOT INFRINGE CLAIM 10.
```

1    Q    ARE THERE ANY DIFFERENCES AMONG THE FOUR APPLE

2    PRODUCTS THAT ARE RELEVANT TO YOUR NON-INFRINGEMENT

3    ANALYSIS?

4    A    NO.

5    Q    WHAT IS THE CAMERA APP?

6    A    THE CAMERA APP IS AN APPLICATION THAT RUNS ON

7    THE APPLE DEVICES AND SO IT'S A PIECE OF SOFTWARE

8    THAT CONTROLS THE CAMERA HARDWARE THAT'S

9    INCORPORATED INTO THE DEVICES, AND IT ALLOWS A USER

10   TO TAKE PHOTOGRAPHS.

11   Q    WHAT IS THE PHOTOS APP?

12   A    THE PHOTOS APP IS A SEPARATE PROGRAM THAT ALSO

13   RUNS ON THOSE DEVICES AND IT ALLOWS USERS TO VIEW

14   PHOTOGRAPHS THAT HAVE BEEN STORED ON THE DEVICE.

15   Q    I WANT TO FOCUS YOUR ATTENTION NOW ON THE

16   CLAIM LANGUAGE.  IF WE CAN HAVE CLAIM 10 ON THE

17   SCREEN AND IN PARTICULAR THE LIMITATION THAT BEGINS

18   CONTROLLER CONNECTED.

19        CAN YOU EXPLAIN TO THE JURY IN GENERAL

20   TERMS WHAT THIS LIMITATION INVOLVES?

21   A    SO THIS LIMITATION SAYS THAT THE CONTROLLER,

22   WHICH IS ESSENTIALLY THE BRAINS OF THE DIGITAL

23   IMAGE PROCESSING APPARATUS, CAN OPERATE IN TWO

24   SEPARATE MODES, THE PHOTOGRAPHING MODE THAT WE

25   DISCUSSED IN WHICH NEW PHOTOGRAPHS CAN BE TAKEN AND

1    STORED, AND ALSO A STORED IMAGE DISPLAY MODE IN

2    WHICH IMAGES THAT HAVE ALREADY BEEN STORED IN THE

3    DEVICE CAN BE DISPLAYED ON ITS SCREEN.

4    Q    DO THE ACCUSED APPLE PRODUCTS HAVE THE CLAIMED

5    PHOTOGRAPHING MODE?

6    A    NO.

7    Q    WHY NOT?

8    A    WELL, THE -- THE APPLE PRODUCTS HAVE A CAMERA

9    APP THAT PROVIDES THE FUNCTIONALITY THAT LETS YOU

10   TAKE PICTURES.  IT DOESN'T HAVE A MODE.

11   Q    DO THE ACCUSED APPLE PRODUCTS HAVE THE CLAIMED

12   STORED IMAGE DISPLAY MODE?

13   A    NO, THEY DO NOT.

14   Q    AND, AGAIN, WHY NOT?

15   A    AGAIN, FOR THE SAME REASON.  THEY HAVE A

16   PHOTOS APP THAT ALLOWS YOU TO VIEW PHOTOGRAPHS THAT

17   HAVE BEEN STORED, BUT THE DEVICES DON'T HAVE A

18   STORED IMAGE DISPLAY MODE.

19   Q    NOW I WANT TO GO DOWN TO THE NEXT LIMITATION

20   THAT BEGINS WHEREUPON THE USER, AND LET ME FIRST

21   FOCUS YOUR ATTENTION ON THE TERM MODE SWITCHING

22   OPERATION.

23        IN GENERAL TERMS, CAN YOU EXPLAIN TO US

24   WHAT THIS WHEREIN LIMITATION INVOLVES?

25   A    SO THIS SAYS FIRST THAT YOU SHOULD BE ABLE

1    TO -- THIS SAYS THAT YOU SHOULD BE ABLE TO SWITCH

2    FROM THE STORED IMAGE DISPLAY MODE TO THE

3    PHOTOGRAPHING MODE AND THEN BACK AGAIN WITH THE

4    MODE SWITCHING OPERATION.

5    Q    DO THE ACCUSED APPLE PRODUCTS ALLOW A USER TO

6    SWITCH BETWEEN THE CAMERA APP AND PHOTO APP?

7    A    YES, THEY DO.

8    Q    DOES THE SWITCHING ABILITY SATISFY THE MODE

9    SWITCHING OPERATION?

10   A    NO, IT DOES NOT BECAUSE, AGAIN, THE APPS AND

11   MODES ARE DIFFERENT, SO SWITCHING AMONGST APPS IS

12   NOT THE SAME AS SWITCHING AMONGST MODES.

13   Q    LET'S TURN TO THE PART OF THAT WHEREIN CLAUSE

14   THAT HAS THE WORDS IRRESPECTIVE OF THE DURATION.

15   CAN YOU HIGHLIGHT THAT?

16          WHAT DOES THAT INVOLVE?

17   A    SO THIS SAYS THAT WHEN YOU PERFORM THAT MODE

18   SWITCHING OPERATION, AND IN PARTICULAR WHEN YOU GO

19   FROM THE STORED IMAGE DISPLAY MODE TO THE

20   PHOTOGRAPHING MODE AND BACK AGAIN, YOU WILL ALWAYS

21   BE PRESENTED WITH EXACTLY THE SAME IMAGE, AND

22   THAT'S THE IMAGE THAT YOU WERE LAST LOOKING AT, THE

23   IMAGE YOU WERE LOOKING AT IN THE STORED IMAGE

24   DISPLAY MODE BEFORE YOU SWITCHED AWAY.

25   Q    DO THE ACCUSED PRODUCTS SATISFY IRRESPECTIVE

1    OF THE DURATION REQUIREMENT?

2    A    NO, THEY DON'T.

3    Q    WHY NOT?

4    A    THERE ARE A NUMBER OF CIRCUMSTANCES UNDER

5    WHICH WHEN YOU SWITCH FROM THE CAMERAS APP TO THE

6    PHOTO APP YOU ARE NOT GOING TO BE PRESENTED WITH

7    THE SAME IMAGE THAT YOU WERE VIEWING BEFORE YOU

8    LEFT.

9    Q    CAN YOU GIVE THE JURY SOME EXAMPLES?

10   A    WELL, ONE OF THOSE CIRCUMSTANCES IS WHEN THE

11   OPERATING SYSTEM HAS CLOSED DOWN THE APPLICATION,

12   TERMINATED THE APPLICATION SINCE YOU WERE LAST

13   THERE, IN THIS CASE TERMINATED THE PHOTOS

14   APPLICATION.

15           ALTHOUGH THE PRODUCTS ARE, ARE POWERFUL

16   ENOUGH TO RUN APPLICATIONS, THEY DON'T -- THEY

17   DON'T HAVE INFINITE CAPACITY.  THEY ONLY HAVE SO

18   MUCH MEMORY AND SO MUCH PROCESSOR TIME.

19           AND SO THE OPERATING SYSTEM MIGHT CHOOSE

20   TO CLOSE DOWN SOME APPLICATIONS THAT AREN'T

21   CURRENTLY ACTIVE IN THE FOREGROUND ON THE SCREEN IN

22   ORDER TO FREE UP RESOURCES THAT CAN BE USED BY

23   APPLICATIONS THAT YOU'RE USING RIGHT NOW.

24           SO YOU MIGHT HAVE THE CIRCUMSTANCE IN

25   WHICH, SINCE YOU WERE LAST USING THE PHOTOS APP, IT

1   HAD BEEN TERMINATED BY THE OPERATING SYSTEM, AND IF

2   THAT WERE TO HAPPEN, THEN YOU WOULDN'T BE ABLE TO

3   SEE THE LAST VIEWED -- THE LAST VIEWED IMAGE IS

4   THE -- IS NOT THE ONE THAT YOU WOULD SEE WHEN YOU

5   WENT BACK IN.  IT WOULDN'T BE THERE.

6   Q    ARE THERE ANY OTHER EXAMPLES?

7   A    YES.  ANOTHER EXAMPLE WOULD BE IF YOU WERE TO

8   SYNC YOUR DEVICE WITH ITUNES, THAT CAN CAUSE

9   PHOTOGRAPHS TO BE DELETED, INCLUDING PERHAPS THE

10  PHOTOGRAPH THAT YOU WERE LAST VIEWING.

11          AND IF THAT WERE TO HAPPEN, THEN CLEARLY,

12  SINCE THE PHOTOGRAPH IS NO LONGER THERE, WHEN YOU

13  RETURN TO THE PHOTOS APP, YOU WOULDN'T -- THEY

14  WOULDN'T BE THERE TO BE PRESENTED TO YOU.

15  Q    HAVE YOU REVIEWED APPLE'S SOURCE CODE IN

16  REACHING YOUR NON-INFRINGEMENT OPINION?

17  A    I HAVE, YES.

18  Q    HOW MUCH TIME DID YOU SPEND DOING THAT?

19  A    PROBABLY 18 HOURS.

20  Q    IF YOU WOULD, SIR, PLEASE TURN TO TAB 2 IN

21  YOUR BINDER, WHICH IS PX 121.  WHAT IS PX 121?

22  A    THIS IS -- THIS IS A REFERENCE TO THE SOURCE

23  CODE THAT I REVIEWED.

24          MR. SELWYN:  YOUR HONOR, I OFFER PX 121.

25          THE COURT:  ANY OBJECTION?

```
 1              MR. JOHNSON:  NO, YOUR HONOR.

 2              THE COURT:  IT'S ADMITTED.

 3              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 4              121, HAVING BEEN PREVIOUSLY MARKED FOR

 5              IDENTIFICATION, WAS ADMITTED INTO

 6              EVIDENCE.)

 7    BY MR. SELWYN:

 8    Q    WHAT DID YOU LEARN ABOUT THE OPERATION OF THE

 9    CAMERAS APP AND THE PHOTOS APP WHEN YOU WERE

10    REVIEWING THE SOURCE CODE?

11    A    I FOUND PLACES IN THE SOURCE CODE WHERE IT

12    REFERS TO CIRCUMSTANCES I JUST DESCRIBED, FOR

13    EXAMPLE, A CIRCUMSTANCE UNDER WHICH WHEN YOU RETURN

14    TO THE PHOTOS APP, THE PHOTO YOU WANTED TO VIEW IS

15    NO LONGER AVAILABLE BECAUSE IT'S BEEN REMOVED

16    THROUGH A SYNCHING OPERATION.

17    Q    CAN WE HAVE, PLEASE, PDX 42.6 ON THE

18    NON-PUBLIC SCREENS.  THIS IS APPLE SOURCE CODE.

19              CAN YOU EXPLAIN WHAT THIS DEMONSTRATIVE

20    SHOWS?

21    A    SO WHAT WE'RE SEEING HERE ARE FOUR BRIEF

22    EXCERPTS OF CODE THAT ARE WRITTEN IN THE OBJECTIVE

23    C PROGRAMMING LANGUAGE IN WHICH APPS ON THE, ON THE

24    IPHONE AND APPLE PRODUCTS ARE WRITTEN.

25              AND THIS IS CODE THAT SPECIFICALLY
```

1    RESPONDS TO THE EVENTS THAT ARE INDICATING THAT A

2    PHOTOGRAPH ALBUM THAT YOU'RE REVIEWING IN THE

3    PHOTOS APP HAS BEEN CHANGED IN SOME WAY.

4         SO THE VERY TOP SNIPPET SHOWS YOU THAT

5    THIS IS A MESSAGE CALLED ALBUM DID CHANGE, WHICH IS

6    THE MESSAGE THAT IS SENT TO THE SOFTWARE TO SAY,

7    HEY, THE ALBUM'S CHANGED, YOU NEED TO DO SOMETHING.

8         WE CAN SEE IN THE SECOND SNIPPET ONE OF

9    THE WAYS IT RESPONDS TO THAT IS IT SENDS A MESSAGE

10   TO ITSELF, WHICH IS CALLED PROCESS ALBUM CHANGE

11   WITH ITEMS, SO THAT MEANS, OKAY, NOW WE HAVE TO

12   PROCESS THIS CIRCUMSTANCE THAT'S ARISEN THAT AN

13   ALBUM HAS CHANGED.

14        WE SEE THAT IN THE FOURTH SEGMENT, HERE'S

15   THE PART OF THE CODE WHERE IT SAYS I'M NOW GOING TO

16   PROCESS THIS ALBUM DID CHANGE WITH ITEMS EVENT.

17        AND YOU CAN SEE A COMMENT, THAT'S THE

18   THING MARKED WITH TWO SLASHES THAT A PROGRAMMER HAS

19   ADDED, WHICH SAYS THIS HANDLE IS ADDED AND DELETED

20   PHOTOS.

21        SO THIS IS THE PLACE IN THE CODE WHERE IT

22   RESPONDS TO ADDED AND DELETED PHOTOS.

23        AND THEN PART OF THE CODE THAT IMPLEMENTS

24   THAT METHOD IS IN THE FOURTH SEGMENT, AND SO

25   THERE'S TWO LINES HERE, THE FIRST ONE SAYS, I

1    BETTER UPDATE MY INDEXES TO RESPOND TO THE FACT

2    THIS HAS CHANGED, I'M GOING TO UPDATE MY POINTERS

3    THAT TELL ME WHAT PHOTOGRAPH I'M LOOKING AT.

4            AND THEN IF YOU LOOK DOWN AT THE END, IT

5    SAYS, IF CURRENT INDEX EQUALS NOT FOUND, SO THAT

6    MEANS IF THE PHOTOGRAPH I WAS LOOKING AT CURRENTLY

7    IS NO LONGER AVAILABLE, THEN IT SAYS SET CURRENT

8    INDEX TO ZERO.

9            SO THIS IS A CIRCUMSTANCE THAT I NEED TO

10   DO SOMETHING ABOUT THE PHOTOGRAPH THAT I WOULD

11   OTHERWISE PUT ON THE SCREEN, IT'S NOT HERE ANYMORE.

12   Q    SO CAN YOU SUMMARIZE FOR THE JURY THE REASONS

13   THAT YOU CONCLUDED THAT THE APPLE PRODUCTS DO NOT

14   INFRINGE CLAIM 10?

15   A    SO THERE ARE THREE REASONS.  THE FIRST REASON

16   IS THE APPLE PRODUCTS DON'T HAVE A REPRODUCING MODE

17   AND THUS -- SORRY, A STORED IMAGE DISPLAY MODE AND

18   A PHOTOGRAPHING MODE IN THE TERMS OF CLAIM 10.

19           THE SECOND OF CONSEQUENCE IS WE DON'T

20   HAVE A MODE SWITCHING OPERATION BETWEEN THOSE

21   MODES.

22           AND THE THIRD IS THAT THE APPLE PRODUCTS

23   DO NOT ALWAYS PRESENT THE MOST RECENTLY VIEWED

24   IMAGE, IRRESPECTIVE OF THE DURATION.

25   Q    LET'S TURN TO YOUR INVALIDITY OPINION.  WHAT

1    IS YOUR OPINION REGARDING WHETHER CLAIM 10 IS

2    VALID?

3    A    CLAIM 10 IS NOT VALID ON THE BASIS OF A PRIOR

4    PATENT TO LG ELECTRONICS.

5    Q    COULD YOU PLEASE TURN, SIR, TO TAB 3 IN YOUR

6    BINDER WHERE YOU'LL FIND PX 112.  CAN YOU TELL US

7    WHAT THAT DOCUMENT IS?

8    A    SO THIS IS THE ENGLISH TRANSLATION OF A KOREAN

9    PATENT ISSUED TO LG ELECTRONICS.

10   Q    WHEN WAS THAT PATENT PUBLISHED?

11   A    FEBRUARY OF 2004.

12           MR. SELWYN:  YOUR HONOR, I OFFER PX 112.

13           THE COURT:  ANY OBJECTION?

14           MR. JOHNSON:  I'M SORRY.  NO OBJECTION.

15           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

16           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

17           112, HAVING BEEN PREVIOUSLY MARKED FOR

18           IDENTIFICATION, WAS ADMITTED INTO

19           EVIDENCE.)

20   BY MR. SELWYN:

21   Q    WAS THE LG PATENT BEFORE THE U.S. PATENT

22   OFFICE DURING THE PROSECUTION OF THE '893 PATENT?

23   A    NO, IT WASN'T.

24   Q    HOW DO YOU KNOW?

25   A    WELL, FIRST I REVIEWED THE PROSECUTION

1    HISTORY, WHICH IS WHAT SHOWS WHAT PATENTS WERE

2    BEING LOOKED AT WHEN THE '893 PATENT WAS EXAMINED,

3    AND THE LG PATENT DOES NOT APPEAR THERE.

4    Q    DID YOU COMPARE THE LG PATENT TO CLAIM 10 OF

5    THE '893 PATENT?

6    A    YES, I DID.

7    Q    WHAT IS THE SUBJECT MATTER OF THE LG PATENT?

8    A    SO THE LG PATENT IS AN INVENTION FOR CAMERA

9    PHONES, AND IN PARTICULAR IT'S FOCUSSED ON FINDING

10   CONVENIENT WAYS TO LET PEOPLE LOOK AT THE

11   PHOTOGRAPHS THAT THEY HAVE STORED ON THEIR CAMERA

12   PHONE.

13   Q    AND YOU'LL SEE WE HAVE THE ABSTRACT ON THE

14   SCREEN.  WHAT DOES THE ABSTRACT OF THE LG PATENT

15   TELL US ABOUT THE SUBJECT MATTER OF THE PATENT?

16   A    SO THOSE FIRST TWO LINES OF THE ABSTRACT

17   CAPTURE IT VERY NICELY.  IT SAYS THIS INVENTION

18   CONCERNS A MOBILE PHONE WITH CAMERA FUNCTIONALITY,

19   AND IT SAYS IT'S PARTICULARLY CONCERNED WITH A WAY

20   TO DISPLAY PHOTOS THAT'S BEEN DESIGNED FOR

21   CONVENIENT AND SPEEDY VIEW OF PHOTOS.

22   Q    WHAT DOES IT SAY ABOUT WHICH PHOTO IS

23   DISPLAYED TO THE USER?

24   A    IT EXPLAINS THERE'S A NUMBER OF CHOICES YOU

25   CAN MAKE, AND ONE OF THOSE CHOICES WOULD BE TO

1    DISPLAY FIRST ON ENTERING THE STORED IMAGE DISPLAY

2    MODE THE PHOTOGRAPH THAT WAS MOST RECENTLY VIEWED.

3    Q    CAN WE HAVE, PLEASE, SLIDE PDX 42.8.

4         CAN YOU EXPLAIN WHAT THIS PORTION OF THE

5    PATENT SHOWS?

6    A    SO THIS IS A PARAGRAPH THAT'S BEEN TAKEN FROM

7    PAGE 4 OF THE KOREAN PATENT, AND THIS IS WHERE IT

8    EXPLAINS WHAT PHOTOGRAPH YOU MIGHT CHOOSE TO PUT ON

9    THE SCREEN AT FIRST WHEN YOU ENTER THE STORED IMAGE

10   DISPLAY MODE.

11        AND IT SAYS THE FIRST -- ACTUALLY IT SAYS

12   THE FIST, THAT A TYPO -- THE FIRST PHOTOGRAPH

13   DISPLAYED CAN SIMPLY BE THE ONE THAT'S BEEN STORED

14   THE LONGEST OR THE ONE THAT HAS THE EARLIEST STORED

15   NUMBER OR IT COULD BE -- I'LL START FROM THE

16   BEGINNING.

17        THE FIRST PHOTOGRAPH DISPLAYED CAN SIMPLY

18   BE THE ONE THAT'S BEEN STORED THE LONGEST OR THE

19   ONE HAVING THE EARLIEST STORED ADDRESS NUMBER, OR

20   IT COULD BE THAT THE VIEWS CAN START FROM THE

21   PHOTOGRAPH THAT WAS LAST VIEWED.

22   Q    LET'S BRING UP PDX 42.9, WHICH IS THE CLAIM

23   CHART THAT WE USE TO KEEP TRACK OF THE CLAIM AS WE

24   COMPARE IT AGAINST THE LG PATENTS, AND LET'S START

25   WITH THE PREAMBLE.

2209

1          DOES THE LG PATENT DISCLOSE, QUOTE, "A

2     DIGITAL IMAGE PROCESSING APPARATUS"?

3     A     IT DOES, YES.

4     Q     WHY?

5     A     WELL, CAN WE LOOK ON THE NEXT SLIDE.  I

6     PREPARED A SLIDE THAT SHOULD SHOW US THIS.

7     Q     IS THIS SLIDE PDX 42.10?

8     A     SO THE VERY FIRST LINE HERE TELLS US IT'S

9     ABOUT A CAMERA PHONE, AND THAT'S A DIGITAL IMAGE

10    PROCESS APPARATUS, AND WE CAN SEE A DRAWING HERE

11    THAT SHOWS US A CAMERA PHONE AND THAT MEETS THE

12    CLAIM LANGUAGE.

13    Q     LET'S GO TO THE NEXT LIMITATION, AN OPTICAL

14    SYSTEM FOR RECEIVING A LIGHT REFLECTED FROM A

15    SUBJECT.

16          DOES THE LG PATENT HAVE THAT?

17    A     YES, IT DOES.

18    Q     CAN WE HAVE PDX 42.12 ON THE SCREEN?

19          CAN YOU EXPLAIN YOUR OPINION ABOUT THIS

20    LIMITATION?

21    A     SURE.  SO THIS TELLS US THAT THE INVENTION IS

22    DIRECTED TOWARDS DEVICES THAT HAVE CAMERAS,

23    EITHER -- CAMERAS ASSOCIATED WITH THEM AND

24    INTERNALLY CONNECTED TO THEM.

25          SO THAT LAST LINE SAYS MOBILE PHONES WITH

1    DETACHABLE CAMERA OR INTERNALLY INSTALLED CAMERAS

2    ARE ALREADY COMMERCIALIZED, AND A CAMERA CONTAINS

3    AN OPTICAL SYSTEM FOR RECEIVING LIGHT REFLECTED

4    FROM A SUBJECT.

5    Q    LET'S GO TO THE NEXT LIMITATION, WHICH BEGINS

6    A PHOTO ELECTRIC CONVERSION MODULE.  DO YOU SEE

7    THAT?

8    A    YES.

9    Q    DOES THE LG PATENT HAVE THAT?

10   A    IT DOES.

11   Q    CAN WE HAVE PDX 42.14.

12        AND CAN YOU EXPLAIN WHERE IN THE LG

13   PATENT WE CAN FIND THE LIMITATION DIRECTED TO A

14   PHOTO ELECTRIC CONVERSION MODULE?

15   A    SO WE FIND THAT ON THE SECOND OF THESE THREE

16   LINES.  IT IS -- THESE ARE THE SAME LINES WE WERE

17   JUST LOOKING AT FROM PAGE 2 OF THE PATENT WHERE IT

18   SAYS THAT MOBILE PHONE CAN BE USED AS A DIGITAL

19   CAMERA BY MOUNTING AN IMAGE SENSOR RELATED MODULE

20   AND AN IMAGE SENSOR PHOTO ELECTRONIC CONVERSION

21   MODULE.

22   Q    LET'S LOOK AT THE NEXT LIMITATION.  IT SAYS A

23   RECORDING MEDIUM FOR STORING AN IMAGE DATA IN AN

24   IMAGE FILE.  WHAT IS THAT?

25   A    A RECORDING MEDIUM IS ANY TECHNOLOGY THAT CAN

1    RECORD AND STORE DIGITAL IMAGES, SO IT MIGHT BE

2    MEMORY OR A COMPACT FLASH CARD OR A HARD DRIVE.

3    Q    DOES THE LG PATENT DISCLOSE THAT LIMITATION?

4    A    YES.

5    Q    WHERE?

6    A    IF WE LOOK ON THE NEXT SLIDE, THERE ARE MANY

7    PLACES IN THE LG PATENT THAT TALK ABOUT THE

8    RECORDING MEDIUM, AND IN PARTICULAR THEY TALK ABOUT

9    MEMORY, SO IT SAYS EXPANDED MEMORY ON THAT VERY

10   FIRST LINE THERE.

11         AND THEN IN THAT SECOND PARAGRAPH THAT

12   WE'VE GOT, IN THE FIRST SEGMENT IT SAYS PHOTOGRAPH

13   TAKEN BY THE USE OF THE AFOREMENTIONED CAMERA KEY

14   OR STORED IN THE MOBILE PHONE'S MEMORY.

15         SO HERE WE HAVE A RECORDING MEDIUM STORED

16   IMAGE.

17   Q    LET'S GO TO THE NEXT LIMITATION, A DISPLAY

18   SCREEN FOR DISPLAYING THE IMAGE DATA.  CAN WE FIND

19   THAT IN THE LG PATENT?

20   A    YES, WE CAN.

21   Q    CAN WE HAVE PDX 42.18.

22         CAN YOU EXPLAIN YOUR OPINION WITH RESPECT

23   TO THIS LIMITATION?

24   A    SO WE SEE IN DRAWING 1 HERE, HERE'S THE

25   ILLUSTRATION OF THE MOBILE PHONE AND THERE'S A VERY

```
 1     PROMINENT DISPLAY SCREEN.

 2             THE DISPLAY SCREEN IS ALSO MENTIONED IN

 3     THE TEXT HERE AND ON PAGE 2 AND ON PAGE 4 SUCH AS

 4     THE TEXT THAT SAYS AS ILLUSTRATED IN DRAWING 1,

 5     WHEN MOBILE PHONE IS FLIPPED OPEN, THE CAMERA IS

 6     COMPRISED OF A DISPLAY AREA.

 7     Q    DOES THE LG PATENT DISCLOSE A CONTROLLER?

 8     A    YES, IT DOES.

 9     Q    WHAT IS A CONTROLLER?

10     A    SO A CONTROLLER, AS I SAID A MINUTE AGO, IS

11     SORT OF THE BRAINS OF THE DIGITAL CAMERA, OR THE

12     MOBILE PHONE HERE.

13     Q    AND WHERE WOULD WE FIND THE CONTROLLER IN THE

14     LG PATENT?

15     A    IF WE, IF WE MOVE ON TO ANOTHER -- YES, THE

16     NEXT SLIDE.

17     Q    LET'S GO TO PDX 42.20?

18     A    YEAH.  SO WE FIND THAT RIGHT IN THAT FIRST

19     LINE THERE, ATTRIBUTED TO THE MOBILE PHONE'S

20     DISPLAY CAPABILITIES, INTERNAL PROCESSING

21     CAPABILITIES, EXPANDED MEMORY.  AND INTERNAL

22     PROCESSING CAPABILITIES, THOSE ARE THE CAPABILITIES

23     OF A CONTROL.

24     Q    LET'S PAUSE ON THIS LIMITATION BECAUSE IT

25     REQUIRES MORE THAN JUST A CONTROLLER.  IT SAYS A
```

1    CONTROLLER CONNECTED WITH THE PHOTOGRAPHIC

2    CONVERSION MODULE, PHOTO MEDIUM AND DISPLAY SCREEN.

3    DID YOU FIND THAT IN THE LG PATENT?

4    A    YES, THAT'S HERE IN THE LG PATENT.

5              SO THE CONTROLLER, AS I SAID, IS SORT OF

6    THE BRAINS OF THE IMAGE PROCESSING APPARATUS.  IT'S

7    THE PART THAT CONTROLS EVERYTHING ELSE AND MAKES IT

8    WORK.

9              IF THE CONTROLLER WERE NOT CONNECTED TO

10   AND IN COMMUNICATION WITH MEMORY AND IN

11   COMMUNICATION WITH A CONVERSION MODULE, IT WOULDN'T

12   BE ABLE TO TAKE A PHOTOGRAPH AT ALL.  SO THAT'S HOW

13   IT ALL WORKS.

14   Q    LET'S GO TO THE NEXT LIMITATION, WHICH BEGINS

15   A CONTROLLER BEING OPERATIVE.  WE'RE NOW ON

16   LIMITATION F.  IN YOUR OPINION, DOES THE LG PATENT

17   HAVE THAT LIMITATION?

18   A    YES, IT DOES.

19   Q    CAN WE HAVE THE NEXT DEMONSTRATIVE, PLEASE.

20   WHERE DOES THE LG PATENT DISCLOSE THAT LIMITATION?

21   A    SO THIS PATENT -- THIS LIMITATION IS THE ONE

22   THAT TALKS ABOUT THESE TWO MODES, THE PHOTOGRAPHING

23   MODE AND THE IMAGE DISPLAY MODE.

24              AND THE TEXT THAT WE HAVE HERE SHOWS US

25   THESE TWO MODES UNDER THE DIRECTION OF THE

```
1    CONTROLLER.

2             SO THE, THE FIRST TEXT FROM PAGE 2, IF

3    YOU LOOK AT THAT BOTTOM LINE, IT SAYS PHOTOGRAPHS

4    TAKEN BY USE OF THE AFOREMENTIONED CAMERA KEY ARE

5    STORED IN THE MOBILE PHONE'S MEMORY.  SO THAT'S

6    WHERE WE FIND THE PHOTOGRAPHING MODE.

7    Q    SO WHERE DOES THE LG PATENT DISCLOSE THE PHOTO

8    IMAGE DISPLAYED LIMITATION?

9    A    SO THE SECOND TEXT SEGMENT I PUT ON THE SLIDE

10   DISCLOSES THE STORED IMAGE DISPLAY MODE.  SO, FOR

11   INSTANCE, IF WE READ THAT BOTTOM PARAGRAPH, IT SAYS

12   SECOND SLIDE SHOW MENU IS SELECTED ON THE SCREEN

13   WITH THE SHORTCUT MENUS AND THE FIRST PHOTOGRAPH

14   STORED IN THE MEMORY IS IMMEDIATELY DISPLAYED ON

15   THE SCREEN.  SO THAT IS THE -- THAT'S THE STORED

16   IMAGE DISPLAY MODE THERE.

17   Q    AND IF WE CAN GO BACK TO OUR CLAIM CHART.  SO

18   WE'RE NOW AT THE LAST ELEMENT, ELEMENT G.  DOES THE

19   LG PATENT DISCLOSE THE MODE SWITCHING OPERATION OF

20   CLAIM 10?

21   A    YES, IT DOES.

22   Q    CAN WE HAVE THESE PDX 42.24 ON THE SCREEN?

23             CAN YOU EXPLAIN, WITH RESPECT TO THIS

24   SLIDE, WHERE YOU'LL FIND THE MODE SWITCHING

25   OPERATION?
```

1    A    SO ACTUALLY THE ILLUSTRATION HERE, FIGURE 3,

2    SHOWS US MODE SWITCHING.  IT SHOWS HOW WE START UP

3    THE IMAGE DISPLAY MODE, EITHER THE REGULAR VIEW

4    PHOTOGRAPH VERSION OR THE SLIDE SHOW VERSION.

5              AND IF WE LOOK AT THE TEXT, THAT FIRST

6    PARAGRAPH THERE, IT TELLS US HOW TO USE THE MENUS

7    IN ORDER TO SELECT THE VIEW PHOTOGRAPH MODE, AND

8    ONCE THE PHOTOGRAPHS HAVE BEEN SELECTED, IT SAYS

9    THEN THE CORRESPONDING PHOTOGRAPHS APPEAR ON THE

10   SCREEN.

11             SO WE'RE GETTING THE, THE SWITCHING INTO

12   THE STORED IMAGE DISPLAY MODE THERE.

13   Q    DOES THE LG PATENT DISCLOSE SHOWING THE MOST

14   RECENTLY VIEWED IMAGE BEING DISPLAYED WHEN THE USER

15   RETURNS TO THE STORED IMAGE DISPLAY MODE?

16   A    YES, IT DOES.

17   Q    WHERE CAN WE FIND THAT?

18   A    SO THE SECOND PARAGRAPH THAT I CONCLUDED FROM

19   PAGE 4, THE ONE THAT BEGINS NOW IF THE SEC, THAT

20   PARAGRAPH SHOWS US EXACTLY THIS.

21             SO THE TEXT TO LOOK AT IS THE TEXT IN THE

22   SECOND HALF OF THAT PARAGRAPH, THIS IS TEXT WE SAW

23   A MOMENT AGO WHERE IT SAYS A FIRST PHOTOGRAPH

24   DISPLAYED CAN SIMPLY BE THE ONE THAT'S BEEN STORED

25   THE LONGEST OR THE ONE HAVING THE EARLIEST STORED

1    ADDRESS NUMBER, OR IT COULD BE THAT VIEWING CAN

2    START FROM THE PHOTOGRAPH THAT WAS LAST VIEWED BY

3    THE VIEWER, SO THE LAST VIEWED IMAGE.

4    Q    THE LAST QUESTION WITH RESPECT TO THIS

5    LIMITATION.  DOES THE LG PATENT DISCLOSE

6    IRRESPECTIVE OF THE DURATION LIMITATION?

7    A    IT DISCLOSES IT UNDER DR. YANG'S

8    INTERPRETATION.

9    Q    CAN YOU EXPLAIN?

10   A    SO DR. YANG ARGUES THAT, THAT IRRESPECTIVE OF

11   THE DURATION MEANS THAT THERE'S NO DEPENDENCE ON

12   TIME.  THERE'S NO TIMER OR OTHER DEPENDENCE ON TIME

13   THAT WILL DETERMINE WHICH PHOTOGRAPH SHOULD BE

14   DISPLAYED WHEN YOU ENTER STORED IMAGE DISPLAY MODE.

15        AND THE PARAGRAPH I JUST READ IS THE ONE

16   THAT SHOWS HOW A DECISION WILL BE MADE ABOUT WHAT

17   PHOTOGRAPH SHOULD BE SHOWN, AND AS YOU CAN SEE,

18   THERE'S NO DEPENDENCE ON TIME IN THERE.

19        SO UNDER DR. YANG'S INTERPRETATION, THAT

20   DOES MEET, OR DISCLOSE IRRESPECTIVE OF THE

21   DURATION.

22   Q    TO SUMMARIZE, WHAT IS YOUR CONCLUSION

23   REGARDING THE LG PATENT?

24   A    THE LG PATENT DISCLOSES ALL THE LIMITATIONS OF

25   CLAIM 10.

1    Q    HAVE YOU FORMED ANY OPINION AS TO WHETHER

2    CLAIM 10 IS OBVIOUS?

3    A    YEAH.  YES.  MY OPINION IS THAT CLAIM 10, EVEN

4    IF WE DECIDED THAT THE LG PATENT DIDN'T DISCLOSE

5    ONE LIMITATION OR ANOTHER, IT STILL RENDERS THE

6    CLAIM 10 OBVIOUS TO SOMEBODY WHO WAS WORKING IN

7    THIS AREA AND DEVELOPING A SYSTEM OF THIS SORT.

8    Q    COULD YOU EXPLAIN YOUR OPINION, PLEASE?

9    A    WELL, THE LG PATENT MAKES CLEAR THAT DIGITAL

10   IMAGE PROCESSING APPARATUSES ALREADY EXISTED, LIKE

11   CAMERA PHONES.

12           AND IT MAKES CLEAR, TOO, THAT THEY HAVE

13   ALL THE COMPONENTS, THE OPTICAL SYSTEM AND THE

14   CONTROLLER AND YOUR RECORDING MEDIUM AND SO FORTH.

15           AND IT ALSO SHOWS US THAT YOU COULD --

16   AND YOU COULD HAVE BOTH A PHOTOGRAPHING MODE AND A

17   STORED IMAGE DISPLAY MODE IN THE SAME DEVICE AND

18   THAT WOULD BE SOMETHING THAT YOU WOULD WANT TO DO.

19           AND IN PARTICULAR, THAT THOSE TWO

20   FUNCTIONS MIGHT BE IMPLEMENTED USING MODES.

21           AND -- AND FURTHER, THROUGH THE

22   DISCUSSION OF MODE SWITCHING, IT MAKES CLEAR IF YOU

23   HAVE THOSE MODES, YOU HAVE TO BE ABLE TO SWITCH

24   AMONGST THEM, SWITCH FROM ONE TO THE OTHER AND

25   BACK.

1          AND, FINALLY, IT ALSO MAKES OBVIOUS THE

2     IDEA THAT THERE'S, WELL, ONLY A FINITE NUMBER OF

3     CHOICES YOU CAN MAKE FOR WHICH IMAGE SHOULD BE ON

4     THE SCREEN WHEN YOU RETURN TO THE PHOTOGRAPHING --

5     TO THE IMAGE DISPLAY MODE, AND THAT ONE AMONGST

6     THOSE CHOICES IS TO DISPLAY THE IMAGE THAT WAS LAST

7     VIEWED.

8          AND, YOU KNOW, IT ALSO TELLS US THAT

9     THERE'S, THERE'S NO PARTICULAR -- THAT THAT'S

10    ALWAYS A SENSIBLE CHOICE, THAT WE COULD ALWAYS, WE

11    SHOULD ALWAYS -- THAT'S ALWAYS ONE OF THE CHOICES

12    THAT WE MIGHT WANT TO MAKE ANY TIME THAT WE ENTERED

13    MODE.  SO IT REALLY SORT OF RENDERS ALL THE

14    ELEMENTS OF CLAIM 10 OBVIOUS.

15    Q    IN REACHING YOUR OBVIOUSNESS OPINION, DID YOU

16    CONSIDER WHETHER THERE EXISTS ANY SO-CALLED

17    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS?  AND

18    I'M REFERRING HERE TO THINGS LIKE COPYING,

19    COMMERCIAL SUCCESS, PRAISE IN THE INDUSTRY.

20    A    YES, I DID.

21    Q    AND DID YOU FIND ANY EVIDENCE OF ANY OF THOSE

22    FACTORS?

23    A    I FOUND NO EVIDENCE OF ANY OF THOSE SECONDARY

24    CONSIDERATIONS OF NON-OBVIOUSNESS, AND SAMSUNG

25    HASN'T PRESENTED ANY THAT ARE SORT OF TIED TO THE

```
 1   SPECIFIC LIMITATIONS OF CLAIM 10.
 2            MR. SELWYN:  THANK YOU.  NO FURTHER
 3   QUESTIONS.
 4            THE COURT:  ALL RIGHT.  TIME IS NOW 2:11.
 5            GO AHEAD, PLEASE.
 6            MR. JOHNSON:  YOUR HONOR, IN THE INTEREST
 7   OF TIME, NO QUESTIONS.
 8            THE COURT:  OH, OKAY.  ALL RIGHT.
 9            THEN IS THIS WITNESS EXCUSED AND IS IT
10   SUBJECT TO RECALL OR NOT?
11            MR. SELWYN:  HE IS EXCUSED.  HE IS
12   SUBJECT TO RECALL.
13            THE COURT:  HE IS SUBJECT TO RECALL.
14            OKAY.  YOU ARE EXCUSED SUBJECT TO RECALL.
15            THE WITNESS:  THANK YOU.
16            THE COURT:  ALL RIGHT.  CALL YOUR NEXT
17   WITNESS, PLEASE.
18            MR. LEE:  YOUR HONOR, APPLE CALLS
19   PROFESSOR GIVARGIS.  IF WE CAN JUST HAVE A MINUTE
20   TO SWAP THE NOTEBOOKS OUT.
21            THE COURT:  OKAY.  THAT'S FINE.  THAT'S
22   FINE.
23            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
24                    TONY GIVARGIS,
25   BEING CALLED AS A WITNESS ON BEHALF OF THE
```

```
 1    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 2    EXAMINED AND TESTIFIED AS FOLLOWS:

 3              THE WITNESS:  YES, I DO.

 4              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 5              THE COURT:  THE TIME IS 2:12.

 6              GO AHEAD, PLEASE.

 7              MR. SELWYN:  THANK YOU, YOUR HONOR.

 8                    DIRECT EXAMINATION

 9    BY MR. SELWYN:

10    Q    GOOD AFTERNOON, SIR.  COULD YOU PLEASE

11    INTRODUCE YOURSELF TO THE JURY?

12    A    GOOD AFTERNOON.  MY NAME IS TONY GIVARGIS.

13    Q    SIR, WHERE DO YOU WORK?

14    A    I WORK AT U.C. IRVINE.

15    Q    AND WHAT DO YOU DO AT U.C. IRVINE?

16    A    I AM A FULL PROFESSOR IN THE DEPARTMENT OF

17    COMPUTER SCIENCE.  I'M ALSO THE ASSOCIATE DEAN FOR

18    STUDENT AFFAIRS.

19    Q    HAVE YOU BEEN RETAINED BY APPLE AS AN EXPERT

20    IN THIS CASE?

21    A    YES.

22    Q    ON WHICH PATENT, PLEASE?

23    A    ON THE '711 PATENT.

24    Q    WOULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR

25    EDUCATIONAL BACKGROUND?
```

221

```
 1    A    YES.  I HOLD A B.S. IN COMPUTER SCIENCE THAT I
 2    GOT FROM U.C. RIVERSIDE.  I ALSO OBTAINED A
 3    DOCTORATE DEGREE IN COMPUTER SCIENCE FROM U.C.
 4    RIVERSIDE IN 2001.
 5    Q    WHAT POSITIONS HAVE YOU HELD OVER TIME AT THE
 6    UNIVERSITY?  TELL US A LITTLE BIT ABOUT WHAT YOU'VE
 7    DONE.
 8    A    YES.  WHEN I FIRST JOINED U.C. IRVINE, I WAS
 9    AN ASSISTANT PROFESSOR IN 2001.  I BECAME ASSOCIATE
10    PROFESSOR IN 2006, AND A FULL PROFESSOR IN 2009.
11              I'M ALSO CURRENTLY SERVING AS ASSOCIATE
12    DEAN FOR STUDENT AFFAIRS.
13    Q    WHAT DO YOU TEACH?
14    A    I TEACH COURSES RELATED TO EMBEDDED SYSTEMS.
15    Q    TELL US WHAT AN EMBEDDED SYSTEM IS.
16    A    THAT'S A DEVICE THAT, IN ADDITION TO HARDWARE
17    AND ELECTRICAL COMPONENTS, ALSO HAS A COMPUTER
18    INSIDE OF IT, AND THE COMPUTER RUNS THINGS LIKE
19    APPLICATIONS AND OPERATIONS OF THE PHONE, OF THE
20    DEVICE.
21    Q    WHAT IS THE FOCUS OF YOUR RESEARCH AT THE
22    UNIVERSITY?
23    A    I ALSO DO RESEARCH IN THE AREA OF EMBEDDED
24    SYSTEMS.
25    Q    AND LET ME ASK YOU TO BE A BIT MODEST.  HAVE
```

1    YOU WON ANY AWARDS?

2    A    YES, I HAVE WON AN AWARD, A COUPLE OF AWARDS

3    FOR MY TEACHING.  I HAVE WON A NUMBER OF AWARDS FOR

4    BEST PAPERS.  AND I HAVE ALSO WON A NUMBER OF

5    AWARDS IN THE FORM OF RESEARCH GRANTS FROM THE

6    NATIONAL SCIENCE FOUNDATION.

7    Q    ARE YOU AUTHORED ACADEMIC PUBLICATIONS IN THE

8    FIELD OF COMPUTER SCIENCE?

9    A    YES.  I HAVE OVER 70 PEER REVIEWED CONFERENCE

10   AND JOURNAL PUBLICATIONS.  I HAVE ALSO CO-AUTHORED

11   TWO TEXTBOOKS ON EMBEDDED SYSTEMS AS WELL.

12   Q    ARE ANY OF YOUR PUBLICATIONS RELEVANT TO THE

13   '711 PATENT THAT WE'RE TALKING ABOUT TODAY?

14   A    YES, MANY OF MY PUBLICATIONS WOULD BE RELEVANT

15   TO THE '711 PATENT BECAUSE THEY DEAL WITH EMBEDDED

16   DEVICES, SUCH AS CELL PHONES.

17            ONE IN PARTICULAR WAS CO-AUTHORED WITH MY

18   STUDENT, HARDER NICOLE, AND ALSO IS LISTED ON THE

19   FACE OF THE '711 PATENT.

20   Q    IF WE COULD PULL UP THE FRONT PAGE OF THE '711

21   PATENT, CAN YOU IDENTIFY FOR US WHICH PAPER IS

22   YOURS?

23   A    YES.  ACTUALLY, I THINK IT'S ON BACK.  THIS --

24   THIS PAGE ACTUALLY IS CALLED SYNTHESIS OF TIME

25   CONSTRAINTS, MULTITASKING IMBEDDED SOFTWARE.

223

1    Q    ARE YOU A NAMED INVENTOR ON ANY U.S. PATENTS?

2    A    YES.

3    Q    IN WHICH FIELDS ARE YOUR PATENT?

4    A    I'M AN INVENTOR ON TEN PATENTS AND THEY'RE

5    MOSTLY RELATED TO SOFTWARE AND SOFTWARE EMBEDDED

6    SYSTEMS OF VARIOUS DESIGNS.

7              MR. SELWYN:  YOUR HONOR, WE OFFER

8    DR. GIVARGIS AS AN EXPERT IN THE FIELD OF SOFTWARE

9    DESIGN AND EMBEDDED SYSTEMS.

10             THE COURT:  ANY OBJECTION?

11             MR. DEFRANCO:  NO, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  SO CERTIFIED.

13   BY MR. SELWYN:

14   Q    WHAT WAS YOUR ASSIGNMENT FOR THIS CASE?

15   A    I WAS ASKED TO OFFER AN EXPERT OPINION ON

16   WHETHER THE APPLE PRODUCTS INFRINGE THE '711

17   PATENT, AND ALSO IF THE '711 PATENT IS VALID.

18   Q    ARE YOU BEING PAID BY APPLE?

19   A    YES.

20   Q    WHAT IS YOUR HOURLY RATE?

21   A    IT'S $275 AN HOUR.

22   Q    AND APPROXIMATELY HOW MANY HOURS HAVE YOU

23   WORKED ON THE CASE TO DATE?

24   A    TO DATE, APPROXIMATELY 400 HOURS.

25   Q    IS THIS THE FIRST TIME THAT YOU'VE TESTIFIED

224

```
1    IN A COURTROOM?

2    A    YES.

3    Q    VERY BRIEFLY, WHAT OPINIONS DID YOU REACH ON

4    INFRINGEMENT AND VALIDITY OF THE '711 PATENT?

5    A    ON INFRINGEMENT, THE APPLE PRODUCTS DO NOT

6    INFRINGE THE '711 PATENT.  AND THE '711 PATENT,

7    CLAIM 9 IS INVALID.

8    Q    WHAT MATERIALS DID YOU CONSIDER IN REACHING

9    YOUR OPINIONS?

10   A    I REVIEWED THE PATENT ITSELF, THE FILE HISTORY

11   OF THE PATENT, AND ALL OF THE REFERENCES THAT I'VE

12   CITED IN MY REPORTS, INCLUDING THINGS SUCH AS

13   PUBLICATIONS AND SOURCE CODE REVIEW.

14   Q    AND AT A HIGH LEVEL, CAN YOU EXPLAIN TO THE

15   JURY WHAT THE SUBJECT MATTER OF THIS PATENT IS

16   ABOUT?

17   A    YES.  THE '711 PATENT DESCRIBES PORTABLE

18   MOBILE PHONE THAT IS CAPABLE OF PLAYING MUSIC,

19   CAPABLE OF MULTITASKING, AND ALSO ALLOWS YOU TO

20   LISTEN TO MUSIC WHILE OPERATING SOME OTHER FUNCTION

21   OF THE PHONE.

22   Q    BEFORE WE GET INTO THE DETAILS, LET ME ASK YOU

23   ABOUT SOME OF THE TECHNICAL CONCEPTS.

24        FIRST QUESTION.  WHAT IS MULTITASKING?

25   A    MULTITASKING IS THE ABILITY TO PERFORM
```

```
 1   MULTIPLE FUNCTIONS ON THE PHONE AT THE SAME TIME.
 2   Q    HOW LONG HAS MULTITASKING IN COMPUTER DEVICES
 3   EXISTED?
 4   A    MULTITASKING ON A COMPUTER DEVICE GOES BACK TO
 5   THE EARLY '60S, EARLY DAYS OF COMPUTING.
 6   Q    AND HOW ABOUT IF WE FOCUS ON MOBILE PHONES?
 7   HOW LONG HAVE MOBILE PHONES HAD MULTITASKING
 8   CAPABILITIES?
 9   A    SINCE THE LATE 90S.
10   Q    CAN WE HAVE CLAIM 9 ON THE SCREEN.  AND DO YOU
11   SEE THE TERM -- APPLET?
12   A    YES.
13   Q    CAN WE HIGHLIGHT THAT, PLEASE.  WHAT IS AN
14   APPLET?
15   A    THE COURT HAS OFFERED A DEFINITION FOR THE
16   TERM "APPLET."
17   Q    CAN WE HAVE THE COURT'S CLAIM CONSTRUCTION ON
18   THE SCREEN, PLEASE.  HOW HAS THE COURT DEFINED
19   APPLET AS USED IN CLAIM 9?
20   A    THE COURT HAS DEFINED AN APPLET TO MEAN AN
21   APPLICATION DESIGNED TO RUN WITHIN AN APPLICATION
22   MODULE.
23   Q    UNDER THE COURT'S DEFINITION, DOES IT MATTER
24   IF THE APPLET IS DESIGNED FOR A PARTICULAR
25   OPERATING SYSTEM?
```

1    A    NO, IT DOES NOT.

2    Q    WHAT DOES IT MEAN FOR AN APPLICATION TO RUN

3    WITHIN AN APPLICATION MODULE?

4    A    IT MEANS THAT THE APPLET, OR THIS APPLICATION

5    REQUIRES THE APPLICATION MODULE IN ORDER TO RUN.

6    IT REQUIRES THE APPLICATION MODULE TO PROVIDE ALL

7    OF THE RESOURCES NECESSARY TO RUN THE APPLET.

8    Q    OKAY.  CAN WE HAVE PDX 43.6 ON THE SCREEN.

9    NOW, CAN YOU EXPLAIN THE RELATIONSHIP APPLET AND

10   APPLICATION MODULE WITH RESPECT TO THIS

11   DEMONSTRATIVE?

12   A    YES.  HERE YOU SEE THE HARDWARE SYSTEM, AND AN

13   OPERATING SYSTEM OF THAT DEVICE, AND YOU SEE AN

14   APPLICATION MODULE, THAT'S RUN ON THIS DEVICE, AND

15   WITHIN IT YOU HAVE AN APPLET.  THE APPLET IS

16   RUNNING WITHIN THE APPLICATION MODULE.

17   Q    SO I WANT TO MAKE SURE THAT WE ALL UNDERSTAND

18   THE TERMS.  WHAT DO YOU MEAN BY HARDWARE?

19   A    BY HARDWARE, I MEAN THE PROCESSOR, THE

20   MEMORIES AND OTHER CHIPS THAT ARE ON THE LOGIC

21   BOARD OR THE MOTHERBOARD.  I BELIEVE THERE WAS A

22   LOGIC BOARD THAT WAS PASSED AROUND EARLIER.  SO

23   THAT WOULD BE THE HARDWARE.

24   Q    AND WHAT DO YOU MEAN BY OPERATING SYSTEM?

25   A    THE OPERATING SYSTEM IS A LAYER OF SOFTWARE

1    THAT ALLOWS AN APPLICATION TO RUN ON THE HARDWARE.

2    Q    CAN YOU GIVE US AN EXAMPLE?

3    A    A HARDWARE COULD BE MOBILE PHONE, SUCH AS AN

4    IPHONE, AND AN OPERATING SYSTEM COULD BE SOMETHING

5    LIKE THE IOS OPERATING SYSTEM.

6    Q    WHAT HAPPENS IF YOU TAKE THE APPLET OUT OF THE

7    APPLICATION MODULE?

8    A    IT WILL NOT RUN, AND AS THIS ILLUSTRATION

9    EMPHASIZES THAT POINT.  IF YOU TAKE THE APPLET

10   OUTSIDE OF THE APPLICATION MODULE, THE APPLET

11   CANNOT RUN.

12   Q    CAN YOU EXPLAIN WHY?

13   A    WELL, THE APPLICATION MODULE PROVIDES ALL OF

14   THE RESOURCES, ALL OF THE, THE ENVIRONMENT FOR THIS

15   APPLET TO RUN.

16         AND WITHOUT THE APPLICATION MODULE, THE

17   APPLET CANNOT GAIN ACCESS TO THE RESOURCES OF THE

18   DEVICE THROUGH THE HARDWARE.

19   Q    SO WE'RE GOING TO BE TALKING A LITTLE BIT MORE

20   ABOUT APPLETS, BUT I THINK IT'S NOW TIME TO DIVE

21   INTO YOUR NON-INFRINGEMENT OPINION.  CAN YOU REMIND

22   US WHAT APPLE PRODUCTS SAMSUNG ALLEGES INFRINGE THE

23   '711 PATENT?

24   A    YES, THE IPHONE 3G, THE IPHONE 3GS, THE IPHONE

25   4, AND THE IPOD TOUCH FOURTH GENERATION.

1    Q    AND LET'S LOOK AGAIN AT CLAIM 9 ON THE SCREEN.

2    CAN YOU GIVE US AN OVERVIEW OF WHAT CLAIM 9

3    DESCRIBES?

4    A    ROUGHLY SPEAKING, CLAIM 9 DESCRIBES A PORTABLE

5    POCKET SIZED MOBILE COMMUNICATION DEVICE THAT IS

6    CAPABLE OF PLAYING MP3 MUSIC, ITS CAPABLE OF

7    MULTITASKING, AND IT'S ALSO -- IT ALLOWS YOU TO

8    LISTEN TO MUSIC WHILE PERFORMING SOME OTHER

9    FUNCTION OF THE PHONE.  AND IT HAS TO DO THAT WITH

10   PARTICULAR PROGRAMMING STYLE CALLED APPLETS.

11   Q    WHAT IS THE BASIS FOR YOUR OPINION THAT THE

12   APPLE PRODUCTS DO NOT INFRINGE CLAIM 9?

13   A    THERE ARE TWO REASONS.  THE APPLE PRODUCTS

14   MAKE NO USE OF APPLETS.  THEY DO NOT USE APPLETS

15   FOR MUSIC PLAY BACK.

16         AND THE SECOND REASON IS THAT THE APPLE

17   PRODUCTS DO NOT HAVE AN MP3 MODE, WHICH IS REQUIRED

18   BY THE CLAIM LANGUAGE.

19   Q    OKAY.  LET ME ASK YOU ABOUT THE FIRST REASON

20   FOR YOUR NON-INFRINGEMENT OPINION RELATING TO

21   APPLET.

22         DID YOU APPLY THE COURT'S CLAIM

23   CONSTRUCTION OF APPLET IN YOUR ANALYSIS?

24   A    YES.

25   Q    DO THE APPLE DEVICES USE APPLETS FOR PLAYING

1    MUSIC?

2    A    THE APPLE PRODUCTS -- DEVICES DO NOT USE

3    APPLETS.  THEY USE STANDALONE APPLICATIONS FOR

4    MUSIC PLAYING.

5    Q    HOW DO YOU KNOW?

6    A    I'VE SPENT SEVERAL DAYS LOOKING AT THE SOURCE

7    CODE OF THE ACCUSED DEVICES.  IN ADDITION, I SPENT

8    ANOTHER DAY, AN EXTRA DAY SPECIFICALLY LOOKING AT

9    THE SOURCE CODE FILES THAT WERE LISTED, EVEN THOUGH

10   HE DID NOT POINT OUT THE APPLET WITHIN THAT CODE,

11   AND IN THE APPLE PRODUCTS, THERE'S ABSOLUTELY NO

12   USE OF APPLETS FOR THE PURPOSE OF MUSIC PLAY.

13   Q    BASED UPON YOUR REVIEW OF THE APPLE SOURCE

14   CODE AND OTHER MATERIALS THAT YOU REVIEWED, WHAT

15   DID YOU LEARN ABOUT THE ARCHITECTURE OF THE APPLE

16   CODE RELEVANT TO CLAIM 9?

17   A    WELL, THE ARCHITECTURE OF, OF THE -- AND I

18   BELIEVE IN THE NEXT SLIDE I HAVE A DEMONSTRATIVE

19   FOR THAT.

20   Q    CAN WE HAVE PDX 43.8.  GO AHEAD?

21   A    THE ARCHITECTURE OF THE APPLE PRODUCTS LOOKS

22   LIKE WHAT'S ILLUSTRATED IN THIS SLIDE.  THERE ARE

23   TWO APPLICATIONS, THE MUSIC APPLICATION, WHICH IS

24   RESPONSIBLE FOR MANAGING THE MUSIC LIBRARY, IT'S

25   RESPONSIBLE FOR ALLOWING TO BUILD PLAY LISTS --

```
 1              THE COURT:  CAN I ASK, CAN YOU KEEP IT
 2     DOWN?  I'VE BEEN HEARING THIS LOW HUM OF
 3     CONVERSATION.  KEEP IT DOWN.  IF YOU NEED TO TALK,
 4     STEP OUTSIDE, PLEASE.
 5              GO AHEAD.
 6              THE WITNESS:  AND IT'S BASICALLY THE
 7     MUSIC APP IS RESPONSIBLE FOR ALL THE FUNCTIONS THAT
 8     YOU APPLY TO MUSIC FILES.
 9              AND ANOTHER APPLICATION, ANOTHER
10     STANDALONE APPLICATION, THE MEDIA SERVER D, IS
11     RESPONSIBLE FOR ACTUALLY PLAY BACK OF MUSIC.
12              IN FACT, THE MEDIA SERVER D APPLICATION
13     IS RESPONSIBLE FOR ALL OF THE SOUND THAT COMES OUT
14     OF THE IPHONE DEVICE.
15              THE MEDIA SERVER, THE APPLICATION STARTS
16     RUNNING THE MOMENT YOU POWER UP THE DEVICE, AND IT
17     REMAINS RUNNING FOR THE ENTIRE DURATION THAT THE
18     DEVICE IS POWERED UP.  THESE APPLICATIONS DO
19     COMMUNICATE AND SEND MESSAGES.
20     BY MR. SELWYN:
21     Q    IS THE MUSIC APP AN APPLET?
22     A    THE MUSIC APP IS NOT AN APPLET.
23     Q    WHY NOT?
24     A    IT IS NOT AN APPLET BECAUSE IT'S NOT DESIGNED
25     TO RUN WITHIN AN APPLICATION MODULE.  IT'S A
```

1     STANDALONE APPLICATION THAT RUNS ON ITS OWN.

2     Q    IS MEDIA SERVER D AN APPLET?

3     A    NO.

4     Q    WHY NOT?

5     A    MEDIA SERVER D IS A STANDALONE APPLICATION,

6     AND IT IS NOT DESIGNED TO HAVE AN APPLET RUN WITHIN

7     IT.  THAT WOULDN'T BE POSSIBLE.

8     Q    IS MEDIA SERVER D AN APPLICATION MODULE?

9     A    MEDIA SERVER D IS NOT AN APPLICATION MODULE

10    FOR THE SAME REASON.  IT'S NOT DESIGNED TO HAVE AN

11    APPLET RUN WITHIN IT.

12    Q    HAVE YOU PREPARED A SLIDE TO HELP COMPARE THE

13    ARCHITECTURE OF THE APPLE CODE TO AN ARCHITECTURE

14    THAT USES APPLETS?

15    A    YES.

16    Q    CAN WE HAVE PDX 43.9, AND CAN YOU EXPLAIN YOUR

17    OPINION WITH RESPECT TO THIS SLIDE?

18    A    YES.  THESE ARE THE TWO, THE TWO

19    ARCHITECTURES, SOFTWARE ARCHITECTURES THAT WE'VE

20    BEEN TALKING ABOUT.

21              ON THE RIGHT WE HAVE THE APPLE

22    ARCHITECTURE WHERE YOU HAVE STANDALONE

23    APPLICATIONS, APPLICATIONS THAT RUN DIRECTLY ON THE

24    HARDWARE.

25              AND ON THE LEFT YOU HAVE THIS '711

1    ARCHITECTURE, WHICH IS AN APPLET RUNNING WITHIN AN

2    APPLICATION MODULE.

3         THESE TWO ARCHITECTURES ARE VERY

4    DIFFERENT, AND A PERSON WHO'S KNOWLEDGEABLE ABOUT

5    SOFTWARE SYSTEMS SHOULD BE ABLE TO, AS A MATTER OF

6    FACT, NOT OPINION, AND THE CODE AND BE ABLE TO TELL

7    IF A SYSTEM IS USING THE RIGHT ARCHITECTURE OR THE

8    LEFT ARCHITECTURE.

9    Q    I WANT TO TURN NOW TO THE SECOND REASON YOU

10   GAVE FOR NON-INFRINGEMENT.  CAN YOU REMIND US WHAT

11   THAT WAS?

12   A    YES.  THE SECOND REASON HAD TO DO WITH THE

13   APPLE PRODUCTS NOT HAVING AN MP3 MODE.

14   Q    LET'S TURN BACK TO THE CLAIM LANGUAGE.  WE

15   HAVE CLAIM 9 ON THE SCREEN.  WHAT REQUIREMENTS DOES

16   CLAIM 9 HAVE WITH RESPECT TO MP3 MODE?

17   A    CLAIM 9 HAS THREE PLACES WHERE IT REQUIRES AN

18   MP3 MODE.  IT REQUIRES THE ABILITY TO SELECT AN MP3

19   MODE, IT REQUIRES THE ABILITY TO PLAY MUSIC IN AN

20   MP3 MODE, AND IT ALSO HAS THE REQUIREMENT OF

21   SWITCHING FROM THE MP3 MODE TO A STANDBY MODE.

22   Q    NOW, WHAT IS AN MP3 MODE?

23   A    A MODE IS A STATE OF OPERATION OF THE DEVICE,

24   AS IT'S BEEN ALREADY TALKED ABOUT.

25         AND AN MP3 MODE IS A STATE OF THE DEVICE

1    WHERE THE DEVICE IS PLACING MP3.

2    Q    NOW, THE APPLE PRODUCTS PLAY MUSIC, DON'T

3    THEY?

4    A    YES.

5    Q    SO HOW DO THEY PLAY MUSIC WITHOUT USING AN MP3

6    MODE?

7    A    THEY USE APPLICATIONS FOR PLAYING MUSIC.  THEY

8    USE APPS.

9    Q    LET'S TURN NOW TO YOUR INVALIDITY OPINION.

10   AGAIN, REMIND US WHAT YOUR OPINION IS?

11   A    CLAIM 9 OF THE '711 PATENT IS NOT VALID.

12   Q    CAN YOU SUMMARIZE FOR US THE BASIS OF YOUR

13   OPINION?

14   A    YES.  CLAIM 9 OF THE '711 PATENT WOULD HAVE

15   BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE

16   ART PRIOR TO 2005 BECAUSE OF PRIOR ART, INCLUDING

17   SONY ERICSSON K700I DEVICE.

18   Q    SO TAKE US BACK, IF YOU COULD, TO 2005 FOR A

19   MOMENT.

20        WHAT WAS THE STATE OF THE ART FOR MOBILE

21   PHONES WITH MUSIC PLAYERS IN 2005?

22   A    PRIOR TO 2005, MOBILE PHONES COULD DO

23   MULTITASKING.  THEY COULD PLAY MUSIC.  AND THEY DID

24   ALLOW YOU TO PLAY MUSIC WHILE LISTENING TO PHONE --

25   TO LISTEN TO MUSIC WHILE OPERATING SOME OTHER

```
1      FUNCTION OF THE PHONE.

2      Q     LET ME HAND YOU WHAT'S BEEN MARKED AS --

3                  MAY I, YOUR HONOR?

4                  THE COURT:  YES, PLEASE, GO AHEAD.

5      BY MR. SELWYN:

6      Q     I'VE HANDED YOU WHAT'S BEEN MARKED AS PX 125.

7      DO YOU RECOGNIZE IT?

8      A     YES.

9      Q     WHAT IS IT?

10     A     THIS IS THE SONY ERICSSON K700I DEVICE THAT I

11     TALKED ABOUT.

12                 MR. SELWYN:  YOUR HONOR, I OFFER PX 125.

13                 THE COURT:  ANY OBJECTION?

14                 MR. DEFRANCO:  NO OBJECTION.

15                 THE COURT:  IT'S ADMITTED.

16                 (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

17                 125, HAVING BEEN PREVIOUSLY MARKED FOR

18                 IDENTIFICATION, WAS ADMITTED INTO

19                 EVIDENCE.)

20     BY MR. SELWYN:

21     Q     WHEN DID THE PX -- WHEN DID WHAT'S BEEN MARKED

22     AS PX 125 THE SONY K700I DEVICE GO ON SALE OR

23     BECOME PUBLICLY AVAILABLE?

24     A     IN 2004.

25     Q     HOW DO YOU KNOW?
```

```
1    A    FOR THREE REASONS.  THERE WERE A COUPLE OF

2    NEWS RELEASES BY SONY THAT TALKED ABOUT THE SONY

3    ERICSSON K700I, AND THE MANUAL OF THIS PHONE ALSO

4    MENTIONS THE DATE 2004.  AND ALSO SONY PROVIDED

5    SALES NUMBERS FOR 2004 THAT SHOWED SOME UNITS WERE

6    SOLD IN THE U.S. N 2004.

7    Q    AND TURN YOUR BINDER, PLEASE, TO TAB 3, WHICH

8    IS PX 117.

9    A    YES.

10   Q    AND WHAT ARE THOSE DOCUMENTS?

11   A    THESE ARE THE PRESS RELEASES THAT I TALKED

12   ABOUT.  THIS PARTICULAR PRESS RELEASE IS SONY

13   ERICSSON UNVEILING THE K700 CAMERA PHONE IN

14   MARCH OF 2004.

15   Q    AND IF YOU TURN TO THE -- TO THE THIRD PAGE OF

16   PX 117, WHAT DO YOU FIND?

17   A    THIS IS THE SECOND PRESS RELEASE.  THIS IS

18   ALSO FROM SONY ERICSSON WHEN THE K700 CAMERA PHONE

19   IN ATLANTA, IT SHOWCASES THE UNIT.

20            MR. SELWYN:  YOUR HONOR, I OFFER PX 117.

21            THE COURT:  ANY OBJECTION.

22            MR. DEFRANCO:  NO, YOUR HONOR.

23            THE COURT:  THAT'S ADMITTED.

24            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25             117, HAVING BEEN PREVIOUSLY MARKED FOR
```

1          IDENTIFICATION, WAS ADMITTED INTO

2          EVIDENCE.)

3    BY MR. SELWYN:

4    Q    WHAT IS THE DATE ON EACH OF THE PRESS

5    RELEASES?

6    A    ON THE ONE THAT'S BEING DISPLAYED NOW, IT SAYS

7    MARCH 21ST, 2004.

8    Q    NOW, IF YOU WOULD, PLEASE, SIR, TURN TO TAB 4

9    OF YOUR NOTEBOOK.  DO YOU RECOGNIZE THAT DOCUMENT?

10   A    YES.

11   Q    WHAT IS IT?

12   A    THIS IS THE OWNER'S MANUAL OF THE SONY

13   INTERROGATORY RESPONSE ERICSSON K700I PHONE.

14          MR. SELWYN:  YOUR HONOR, WE OFFER PX 116.

15          THE COURT:  ANY OBJECTION?

16          MR. JOHNSON:  NO, YOUR HONOR.

17          THE COURT:  IT'S ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          116, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22          MR. SELWYN:  IF WE CAN SHOW THE DATE OF

23   PUBLICATION ON THE SCREEN, PLEASE.

24   Q    WHAT IS THE DATE OF PUBLICATION SHOWN ON THIS?

25   A    I BELIEVE IT IS MARCH 2004.

```
 1    Q    NOW, SIR, IF YOU WOULD TURN TO TAB 5 IN YOUR

 2    NOTEBOOK.  CAN YOU TELL US WHAT THESE DOCUMENTS

 3    ARE.

 4    A    YES.  THIS IS THE SALES RECORD PROVIDED BY

 5    SONY.

 6              MR. SELWYN:  YOUR HONOR, WE OFFER PX 113.

 7              THE COURT:  THAT'S NOT THE AFFIDAVIT, IS

 8    IT?

 9              MR. SELWYN:  NO.

10              THE COURT:  THAT'S WHAT I SAW ON MY

11    SCREEN.  PX 113, WHAT IS THAT?

12              MR. SELWYN:  WE REMOVED THE AFFIDAVIT

13    FROM WHAT'S IN THE BINDER, AND WE'LL REPLACE THE

14    EXHIBIT TO REMOVE THE AFFIDAVIT.

15              THE COURT:  OKAY.  I SEE IT.  ANY

16    OBJECTION?

17              MR. DEFRANCO:  NO, YOUR HONOR.

18              THE COURT:  I'M GOING TO ADMIT IT.

19              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20              113, HAVING BEEN PREVIOUSLY MARKED FOR

21              IDENTIFICATION, WAS ADMITTED INTO

22              EVIDENCE.)

23    BY MR. SELWYN:

24    Q    WE HAVE UP ON THE SCREEN THE FIRST PAGE OF THE

25    DOCUMENT.  WHAT DOES THIS SHOW?
```

1    A    THIS SHOWS THAT THE K700I DEVICE WAS SOLD IN

2    2004.  IT SHOWS THE NUMBER OF UNITS SOLD IN 2004.

3    Q    AND YOU HAVE THE SONY K700I IN FRONT OF YOU,

4    RIGHT?

5    A    YES.

6            MR. SELWYN:  YOUR HONOR, MAY I PUBLISH

7    THAT TO THE JURY?

8            THE COURT:  GO AHEAD, PLEASE.

9    BY MR. SELWYN:

10   Q    CAN YOU BRIEFLY DESCRIBE THE FEATURES OF THE

11   SONY K700I?

12   A    THE SONY K700I IS A POCKET SIZED PHONE.  IT

13   DOES ALLOW YOU TO PERFORM MULTITASKING.  IT DOES

14   PLAY MP3 MUSIC AND IT ALLOWS YOU TO LISTEN TO MUSIC

15   WHILE OPERATING OTHER FUNCTIONS OF THE PHONE.

16   Q    WAS THE SONY K700I CONSIDERED BY THE PATENT

17   OFFICE WHEN REVIEWING THE APPLICATION FOR THE '711

18   PATENT?

19   A    NO.

20   Q    HOW DO YOU KNOW?

21   A    IT IS NOT LISTED ON THE '711 PATENT, AND IT IS

22   ALSO NOT IN THE FILE HISTORY.

23   Q    HAVE YOU PREPARED A VIDEO TO DEMONSTRATE THE

24   FEATURES OF THE SONY K700I?

25   A    YES.

239

1    Q    CAN WE HAVE, PLEASE, PX 43.11, AND WE'LL PLAY

2    THIS AND AS WE DO, WOULD YOU PLEASE NARRATE FOR US.

3              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

4    OPEN COURT OFF THE RECORD.)

5              THE WITNESS:  YES.  THIS IS A VIDEO I

6    MADE OF THE K700I PHONE.  I'M GOING TO SHOW YOU HOW

7    THIS DEVICE TEACHES OR DETERMINES MANY OF THE SPECS

8    AS DESCRIBED IN THE CLAIM 9 OF THE '711 PATENT.

9              I JUST POWERED IT UP AND THE UNIT IS NOW

10   ENTERING STANDBY MODE.

11             I'M GOING TO GO TO THE MENU SYSTEM TO

12   SELECT THE MUSIC PLAYER.  WE CAN SEE THAT THERE'S A

13   BOX AROUND THE MUSIC PLAYER ICON, AND I SELECT THAT

14   AND THE MUSIC PLAYER APPLICATION LAUNCHES.

15             I CAN SCROLL THROUGH A LIST OF SONGS,

16   SELECT A PARTICULAR SONG FOR PLAY BACK.  THE SONG

17   IS PLAYING.  I CAN GO THROUGH A NUMBER OF STEPS TO

18   GO BACK TO THE STANDBY MODE.  I WILL PRESS

19   MINIMIZE, AND I'LL GO BACK TO THE STANDBY MODE.

20             FROM THE STANDBY MODE, I CAN OPERATE ANY

21   NUMBER OF FUNCTIONS.  I'M GOING TO SHOW YOU THREE

22   DIFFERENT FUNCTIONS OF THE PHONE, CONTACTS, I'LL

23   SCROLL THROUGH A LIST OF CONTACTS.  I CAN DO THINGS

24   LIKE SEND A MESSAGE, VIEW SOMETHING AS A CONNECT,

25   EDIT THE CONTACT, I CAN DO THINGS LIKE SEND AN

1    E-MAIL.  THE MUSIC IS PLAYING, OF COURSE.

2             BACK TO THE STANDBY MODE.  AND FROM THE

3    STANDBY MODE, I CAN GO TO SOME OTHER FUNCTION, LIKE

4    CALENDAR.  NOTICE THAT NO MATTER WHAT FUNCTION OF

5    THE PHONE I'M OPERATING, THE MUSIC INDICATOR ON TOP

6    SHOWS THAT MUSIC IS PLAYING.

7             I CAN CHANGE THE VIEW OF THE CALENDAR.

8    BACK TO THE STANDBY MODE, AND STILL THE INDICATOR

9    THAT INDICATES MUSIC IS PLAYING IS DISPLAYED ON

10   TOP.

11            I'M GOING TO SHOW YOU ONE FINAL FUNCTION

12   OF THE PHONE.  I'LL SELECT THE STOP WATCH FUNCTION.

13   THAT IS GOING.

14            AND BACK TO THE STANDBY MODE.

15   Q    OKAY.  SO NOW I'D LIKE YOU TO COMPARE THE SONY

16   K700I AGAINST CLAIM 9, AND LET'S PUT UP CHECKLIST

17   OF THE ELEMENTS OF CLAIM 9 SO WE CAN KEEP TRACK OF

18   WHERE WE ARE.

19            CAN WE HAVE PDX 43.13.  SO LET'S START

20   WITH THE PREAMBLE, A MULTITASKING APPARATUS IN A

21   POCKET SIZED MOBILE COMMUNICATION DEVICE, INCLUDING

22   AN MP3 PLAYING CAPABILITY.  DOES THE SONY K700I

23   HAVE THOSE FUNCTIONS?

24   A    YES.  AND IF YOU WOULD GO TO THE NEXT SLIDE,

25   HERE I HAVE SCREEN SHOTS OF THE SAME VIDEO THAT I

```
 1    JUST PLAYED FOR YOU THAT SHOWS THAT THE SONY K700I

 2    IS A POCKET SIZED MOBILE COMMUNICATION DEVICE.  IT

 3    HAS MP3 PLAYING CAPABILITIES, AND IT'S ALSO

 4    MULTITASKING.  HE SHOWED YOU THREE DIFFERENT

 5    FUNCTIONS.

 6    Q    LET'S GO TO ELEMENT A.  ELEMENT A REQUIRES A

 7    CONTROLLER FOR PERFORMING CERTAIN FUNCTIONS.  DO

 8    YOU SEE THAT?

 9    A    YES.

10    Q    WHAT IS A CONTROLLER?

11    A    A CONTROLLER IS A PROCESSOR.  IT IS WHAT RUNS

12    THE APPLICATIONS.

13    Q    DOES THE SONY K700I HAVE A CONTROLLER?

14    A    YES.

15    Q    HOW DO YOU KNOW?

16    A    I TOOK ONE APART, LOOKED AT THE LOGIC BOARD.

17    IT HAS A PROCESSOR.

18    Q    ELEMENT A ALSO REQUIRES GENERATING A MUSIC

19    PLAYGROUND PLAY OBJECT WHERE IN THE BASIC

20    PLAYGROUND PLAY OBJECT HAS THE APPLICATION MODE.

21    DOES IT HAVE THAT ELEMENT?

22    A    YES, IN THIS SCREEN, YOU SEE THERE IS AN ICON

23    THAT REPRESENTS THE MUSIC PLAY, THE MUSIC PLAYER,

24    AND YOU SAW ME SELECT THAT, THAT IT STARTED PLAYING

25    MUSIC IN THE BACKGROUND.
```

242

1    Q    LET'S TURN NOW TO ELEMENT B.  CAN WE HAVE PDX

2    43.18.  DOES THE SONY K700I INCLUDE AT LEAST ONE

3    APPLET WITH CLAIMED FUNCTION?

4    A    I DON'T KNOW.  I COULD NOT DETERMINE THAT.

5    Q    WHY NOT?

6    A    TO DETERMINE THAT, I WOULD NEED TO LOOK AT THE

7    SOFTWARE OF THE SONY.

8    Q    SO WE'LL LEAVE THAT BOX BLANK, AND LET'S MOVE

9    ON TO THE NEXT ELEMENT.

10            PROVIDING AN INTERFACE FOR MUSIC PLAY BY

11   THE MUSIC PLAYGROUND PLAY OBJECT.  DOES THE SONY

12   K700I HAVE THAT ELEMENT?

13   A    YES, I ALREADY SHOWED IT HAS A MUSIC

14   BACKGROUND PLAY OBJECT, AND IT HAS BUTTONS THAT I

15   WAS PRESSING TO OPERATE THE USER INTERFACE.

16   Q    LET'S GO TO ELEMENT D.  SELECTING AN MP3 MODE

17   IN A POCKET SIZED MOBILE COMMUNICATION DEVICE USING

18   THE INTERFACE.  WHERE DO WE SEE THAT IN THE SONY

19   K700I?

20   A    YES, YOU SAW ME, BY CLICKING THE ICON, IT

21   LAUNCHED THIS APPLICATION FROM WHICH I COULD

22   ACTUALLY SELECT AN MP3 FILE AND FILE THAT FILE.  IT

23   DOES HAVE THIS ELEMENT.

24   Q    NEXT IS ELEMENT E, FOR SELECTING AND PLAYING A

25   MUSIC FILE IN THE POCKET SIZED MOBILE COMMUNICATION

1    DEVICE IN THE MP3 MODE.

2              DOES THE SONY K700I MEET THAT

3    REQUIREMENT?

4    A    YES, THOSE FILES ON THAT LIST, THEY'RE ALL MP3

5    FILES.  THAT'S INDICATED IN THE ZOOM FIGURE.  THE

6    SCREEN SHOT IS FROM THE VIDEO.  AND IT IS CAPABLE

7    OF PLAYING MP3 FILES.

8    Q    CAN WE HAVE PDX 43.20, ELEMENT F.  DOES THE

9    SONY K700I HAVE THE ELEMENT OF SWITCHING FROM THE

10   MP3 MODE TO A STANDBY MODE WHILE THE PLAYING OF THE

11   MUSIC FILE CONTINUES?

12   A    YES.  THESE SCREEN SHOTS FROM THE VIDEO SHOW

13   YOU THAT I WENT THROUGH A FEW, BUTTON PRESSES TO

14   MINIMIZE THE APPLICATION AND GO BACK TO THE STANDBY

15   MODE.

16   Q    LET'S GO TO ELEMENT G, SELECTING AND

17   PERFORMING AT LEAST ONE FUNCTION OF THE POCKET

18   SIZED MOBILE COMMUNICATION DEVICE FROM THE STANDBY

19   MODE WHILE THE PLAYING OF THE MUSIC FILE CONTINUES.

20             WHERE DO WE FIND THAT IN THE SONY K700I?

21   A    IN THE VIDEO I SHOWED YOU THREE DIFFERENT

22   FUNCTIONS, SCREEN SHOTS OF EACH ONE OF THOSE

23   FUNCTIONS WHILE THE MUSIC WAS PLAYING, AND THE SONY

24   K700 DOES ALLOW TO YOU DO THIS.

25   Q    CAN WE HAVE PDX 43.22.  DOES THE SONY K700I

244

```
1    HAVE A DISPLAY UNIT FOR DISPLAYING AN INDICATION
2    THAT THE MUSIC FILE IS BEING PLAYED IN THE STANDBY
3    MODE?
4    A    YES.  IN THE STANDBY MODE, I POINTED OUT THE
5    INDICATION.  IT'S ALSO ZOOMED IN THIS PICTURE.
6    THERE'S AN INDICATION AT THE TOP OF THE SCREEN THAT
7    SLOWS THAT THE MUSIC IS PLAYING.
8    Q    LAST ELEMENT, PDX 43.23.  DOES THE SONY K700I
9    CONTINUE TO DISPLAY THE INDICATION THAT THE MUSIC
10   FILE IS BEING PLAYED WHILE PERFORMING THE SELECTED
11   FUNCTION?
12   A    YES.  IN ALL THOSE THREE MODES, OR ALL THOSE
13   THREE APPLICATIONS THAT I SHOWED YOU, CALENDAR,
14   STOP WATCH, AND CONTACTS, THAT INDICATION ON TOP OF
15   THE SCREEN WAS THERE.
16   Q    LET'S RECAP FOR A MOMENT.  CAN WE HAVE PDX
17   43.24.  WE'VE CHECKED OFF EVERY ELEMENT FOR CLAIM 9
18   EXCEPT FOR THE APPLET ONE, RIGHT?
19   A    YES.
20   Q    IN YOUR OPINION, WOULD THE USE OF AN APPLET
21   HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN
22   THE ART IN 2005?
23   A    YES.
24   Q    WHY?
25   A    APPLETS WERE WELL KNOWN PRIOR TO 2005.  THEY
```

1    OFFERED A NUMBER OF ADVANTAGES THAT WOULD HAVE BEEN

2    VERY USEFUL TO TAKE, TO EMPLOY IN A CELL PHONE.

3    Q    WHAT ADVANTAGES?

4    A    THOSE WOULD BE, TWO EXAMPLES WOULD BE

5    PORTABILITY AND SECURITY.

6    Q    WHAT DO YOU MEAN BY SECURITY AND HOW DO

7    APPLETS HELP WITH THAT?

8    A    WELL, BY SECURITY, I MEAN BEING CAREFUL ABOUT

9    AN APPLICATION GAINING ACCESS TO AN APPLICATION

10   THAT'S POSSIBLY MALICIOUS OR BUGGING GAINING ACCESS

11   TO THE DATA STORED ON THE DEVICE, AND APPLETS HELP

12   BY THE FACT THAT THEY RUN WITHIN AN APPLICATION

13   MODULE, IT ALLOWS THE APPLICATION MODULE TO SERVE

14   AS A LAYER OF PROTECTION.  IT LIMITS THE ACCESS OF

15   THE APPLET TO THE DEVICE.

16   Q    DO YOU HAVE ANY OTHER BASIS FOR YOUR

17   CONCLUSION THAT IT WOULD HAVE BEEN OBVIOUS FOR A

18   PERSON OF ORDINARY SKILL TO USE AN APPLET FOR

19   BACKGROUND MUSIC PLAY IN A MOBILE PHONE?

20   A    YES, THERE'S A PATENT BY WONG, W-O-N-G, THAT

21   TEACHES THE USEFULNESS OF APPLETS FOR MOBILE

22   DEVICES.

23   Q    COULD YOU TURN TO TAB 6 IN YOUR BINDER.  DO

24   YOU RECOGNIZE -- WHICH IS PX 91.  DO YOU RECOGNIZE

25   THAT?

1    A    YES.

2    Q    WHAT IS IT?

3    A    THIS IS THE PATENT TO WONG.

4         MR. SELWYN:  YOUR HONOR, WE OFFER PX 91.

5         THE COURT:  ANY OBJECTION?

6         MR. DEFRANCO:  NO, YOUR HONOR.

7         THE COURT:  IT'S ADMITTED.

8         (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

9         91, HAVING BEEN PREVIOUSLY MARKED FOR

10        IDENTIFICATION, WAS ADMITTED INTO

11        EVIDENCE.)

12   BY MR. SELWYN:

13   Q    WHEN WAS THE WONG PATENT PUBLISHED?

14   A    THE DATE OF THE WONG PATENT IS OCTOBER 24TH,

15   2002.

16   Q    AND WAS THE WONG PATENT CONSIDERED BY THE

17   PATENT OFFICE DURING THE PROSECUTION OF THE '711

18   PATENT?

19   A    NO.

20   Q    WHAT DOES THE WONG PATENT DISCLOSE?

21   A    WELL, THE WONG PATENT TALKS ABOUT THE JAVA

22   MEDIA FRAMEWORK SPECIFICALLY INTENDED FOR MOBILE

23   PHONES, AND I HAVE A DEMONSTRATIVE FOR THAT IF WE

24   CAN GO TO THE NEXT SLIDE.

25   Q    CAN WE HAVE PDX 43.28.

2247

```
 1    A    YES.  IN THIS SLIDE WE SEE THAT IN PARAGRAPH 1

 2    OF THE WONG PATENT, IT TALKS ABOUT MULTIMEDIA

 3    FRAMEWORK INTENDED FOR MOBILE DEVICES, PARAGRAPH 2

 4    DESCRIBES THIS IN MORE DETAIL.  IT SPECIFICALLY

 5    TALKS ABOUT SMALLER PROGRAMS KNOWN AS APPLETS.

 6              AND IF YOU WERE TO GO TO THE NEXT SLIDE,

 7    YOU SEE THAT IT ALSO TALKS ABOUT THE JMF, THE JAVA

 8    MULTIMEDIA FRAMEWORK, IS CAPABLE OF FRAMEWORK AND

 9    MP3 AUDIO FILES.

10    Q    IN YOUR OPINION, WOULD A PERSON OF ORDINARY

11    SKILL IN THE ART IN 2005 HAVE BEEN MOTIVATED THAT

12    COMBINE THE TEACHINGS OF WONG WITH THE SONY K700I

13    DEVICE?

14    A    YES.  WONG DOES TALK ABOUT JAVA AS BEING A

15    VERY USEFUL ENVIRONMENT FOR MOBILE PHONES.  IT THEN

16    TALKS ABOUT THIS FRAMEWORK, THIS MULTIMEDIA

17    FRAMEWORK THAT ALLOWS YOU TO, IN ESSENCE, WRITE

18    APPLETS OR JAVA APPLICATIONS THAT RUN ON MOBILE

19    PHONES AND THAT ARE CAPABLE OF PLAYING WAVE FILES

20    OR MP3 FILES.  THAT WOULD HAVE BEEN EXACTLY THE

21    KIND OF THINGS WONG WOULD HAVE NEEDED IN A CELL

22    PHONE.

23    Q    LET'S SUM UP .  WHAT'S YOUR OPINION REGARDING

24    WHETHER THE SONY K700I WHEN COMBINED WITH THE WONG

25    PATENT, HOW THAT AFFECTS THIS PATENT?
```

248

1    A    THE COMBINATION OF THE SONY PHONE AND THE WONG

2    PATENT DO MAKE ALL OF THE CLAIM ELEMENTS OBVIOUS.

3              AND ALL OF THE LIMITATIONS OF THE CLAIM

4    WILL BE COVERED BY THESE TWO REFERENCES.

5    Q    DID YOU CONSIDER, AS PART OF YOUR OBVIOUSNESS

6    ANALYSIS, WHETHER THERE WERE ANY SO-CALLED

7    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS, WHICH

8    IS COMMERCIAL SUCCESS, PRAISE IN THE INDUSTRY, LONG

9    FELT NEED AND SUCH?

10   A    YES.

11   Q    AND WHAT DID YOU FIND?

12   A    I DID NOT FIND ANYTHING THAT WOULD HAVE BEEN,

13   THAT WOULD HAVE SUGGESTED THAT THE CLAIM 9 OF THE

14   '711 PATENT WOULD HAVE BEEN A COMMERCIAL SUCCESS.

15             MR. SELWYN:  NO FURTHER QUESTIONS.

16             THE COURT:  ALL RIGHT.  THE TIME IS NOW

17   2:43.  IS THERE GOING TO BE ANY CROSS?

18             MR. DEFRANCO:  DUE TO TIME CONSTRAINTS,

19   NO, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  IS THERE GOING TO

21   BE ANY REDIRECT, I ASSUME NOT.  THIS WITNESS IS

22   EXCUSED SUBJECT TO RECALL OR NOT.

23             MR. SELWYN:  SUBJECT TO RECALL.

24             THE COURT:  OKAY.  THEN YOU ARE EXCUSED

25   SUBJECT TO RECALL.

1          OKAY.  WE'RE GOING TO TAKE A 15-MINUTE

2     BREAK.

3          MR. SELWYN:  YOUR HONOR, ONE HOUSEKEEPING

4     MATTER.  I NEGLECTED TO MOVE INTO EVIDENCE WITH

5     RESPECT TO THE '893 PATENT, PX 112, WHICH IS THE LG

6     PATENT, AND PX 121, WHICH IS THE APPLE SOURCE CODE.

7          THE COURT:  OKAY.  PX 112 I ACTUALLY DID

8     ADMIT THAT.

9          MR. SELWYN:  OKAY.

10          THE COURT:  WHAT WAS THE OTHER NUMBER?

11          MR. SELWYN:  PX 121 WAS THE APPLE SOURCE

12     CODE.

13          THE COURT:  AND I ACTUALLY ADMITTED THAT.

14     THAT WAS JUST THE BATES NUMBERS OF RANGES OF CODE

15     THAT HE REVIEWED, RIGHT?

16          MR. SELWYN:  RIGHT.

17          THE COURT:  THAT WAS ADMITTED.

18          MR. SELWYN:  THANK YOU, YOUR HONOR.

19          THE COURT:  OKAY.  AGAIN, PLEASE KEEP AN

20     OPEN MIND AND DON'T DO ANY RESEARCH OR DISCUSS THE

21     CASE.  WE'LL TAKE A 15-MINUTE BREAK.  YOU CAN LEAVE

22     THE BINDERS ON YOUR CHAIRS.

23          THANK YOU.

24          (WHEREUPON, THE FOLLOWING PROCEEDINGS

25     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

```
1                THE COURT:  ALL RIGHT.  THE RECORD SHOULD
2      REFLECT THAT THE JURORS HAVE LEFT THE COURTROOM.
3      PLEASE TAKE A SEAT.  I WANT TO STATE SOMETHING ON
4      THE RECORD.
5                YOU KNOW, I AM NOT GOING TO ALLOW THE
6      PARTIES TO FILE AN OFFER OF PROOF THAT THEY WERE
7      UNABLE TO PRESENT ANY WITNESSES BECAUSE OF THE TIME
8      LIMITATIONS.
9                THIS IS ALL PART OF THE RECORD, BUT AS OF
10     AUGUST 6TH, IN APPLE'S AFFIRMATIVE CASE, APPLE HAD
11     USED 5 HOURS AND 42 MINUTES, SAMSUNG HAD USED 6
12     HOURS AND 27 MINUTES DURING ITS CROSS-EXAMINATION
13     OF APPLE'S WITNESSES.  BY AUGUST 7TH, APPLE HAD
14     USED 9 HOURS AND 9 MINUTES, SAMSUNG HAD USED 9
15     HOURS AND 1 MINUTE.
16               BY AUGUST 10TH, APPLE HAD USED 11 HOURS
17     AND 35 MINUTES, SAMSUNG HAD USED 12 HOURS AND 16
18     MINUTES TO CROSS APPLE'S WITNESSES AND APPLE'S
19     AFFIRMATIVE CASE.
20               AT THE CLOSE OF APPLE'S CASE, APPLE HAD
21     USED 13 HOURS AND 37 MINUTES AND SAMSUNG HAD USED
22     13 HOURS AND 50 MINUTES.  SO SAMSUNG MADE A
23     STRATEGIC DECISION TO SPEND MORE TIME TO
24     CROSS-EXAMINE APPLE WITNESSES DURING APPLE'S
25     AFFIRMATIVE CASE THAN APPLE USED TO PRESENT ITS
```

1    AFFIRMATIVE CASE.

2            SO I'M NOT GOING TO ALLOW THE PARTIES TO

3    FILE SOMETHING THAT SAYS THAT YOU WERE UNABLE TO

4    PRESENT WITNESSES BECAUSE I THINK YOU MADE A

5    STRATEGIC DECISION, I HAVE MADE VERY CLEAR THAT

6    THERE WOULD BE TIME LIMITS IN THIS CASE, NO

7    EXTENSIONS WOULD BE GRANTED, SO YOU HAD TO MAKE A

8    CALCULATION AND BE DISCIPLINED ABOUT HOW YOUR TIME

9    WAS SPENT.

10            SO I'M NOT GOING TO ALLOW THAT BRIEFING

11    AND ALL THE TIMES ARE AS PART OF THE RECORD, BUT

12    SAMSUNG MADE A CHOICE TO USE ALMOST 14 OF ITS 25

13    HOURS CROSS-EXAMINING APPLE'S WITNESSES DURING

14    APPLE'S CASE.

15            SO I MAKE A FINDING THAT I DO NOT THINK

16    IT IS APPROPRIATE THAT SAMSUNG WAS PREVENTED FROM

17    OFFERING MORE OF ITS OWN WITNESSES' TESTIMONY BY

18    THESE TIME LIMITS.

19            IT IS A RESULT OF APPLE'S CHOICE TO USE

20    14 HOURS OUT OF 25 HOURS THAT IT WAS ALLOTTED TO

21    CROSS-EXAMINE APPLE'S WITNESSES IN APPLE'S

22    AFFIRMATIVE CASE.

23            NOW, I MAKE THE FINDING THAT ANY

24    INABILITY OF APPLE -- OF SAMSUNG TO PRESENT MORE

25    WITNESSES WAS BECAUSE OF ITS OWN DECISIONS ABOUT

```
 1    ITS TIME ALLOCATION.

 2              NOW, WHAT ELSE?

 3              MR. LEE:  YOUR HONOR, AT THE PACE WE'RE

 4    GOING, WE'RE GOING TO EXHAUST OUR LIST OF SEVEN

 5    THAT WE DISCLOSED.

 6              THE COURT:  OKAY.

 7              MR. LEE:  SO WE WOULD --

 8              THE COURT:  SO WHAT HAPPENED WITH DZUBAN?

 9    AFTER I ISSUED MY ORDER, IT WAS NO LONGER NECESSARY

10    TO CALL THAT WITNESS?

11              MR. LEE:  YES.

12              SO I INFORMED MR. VERHOEVEN THAT IF WE

13    EXHAUST OUR LIST OF SEVEN, WHICH IT LOOKS LIKE WE

14    WILL --

15              THE COURT:  OKAY.

16              MR. LEE:  -- WE WILL HAVE -- PROFESSOR

17    KIM AND PROFESSOR KNIGHTLY, WHO ARE THE NEXT TWO IN

18    ORDER ON OUR LIST ARE READY TO GO.

19              THE COURT:  LET'S DO IT.

20              NOW, OKAY.  YOU TOLD ME THAT YOU ARE NOT

21    CALLING AGNETTA OR HONG OR ROSSI OR STRINGER OR

22    TEKSLER OR YEO.  IS THAT CORRECT?

23              MR. LEE:  CORRECT.

24              THE COURT:  ALL RIGHT.  SO WE ARE NOT

25    GOING TO ISSUE ANY RULINGS AS TO THOSE SIX
```

1    WITNESSES.

2              MR. LEE:  THERE MAY BE ONE MORE, YOUR

3    HONOR.

4              THE COURT:  THERE'S ONE MORE THAT YOU'RE

5    TAKING OFF?

6              MR. LEE:  THERE WAS ONE MORE, YOUR HONOR,

7    AND I WAS CONFUSED.  IT'S NOT ON THE LIST.  SO

8    THOSE ARE THE SIX.  THAT'S RIGHT.

9              THE COURT:  OKAY.  ARE THERE ANY MORE

10   THAT YOU'RE NOT GOING TO CALL THAT YOU KNOW NOW?

11             MR. LEE:  NO.

12             THE COURT:  OKAY.  ALL RIGHT.  SO WHO DID

13   YOU SAY?  SO DZUBAN, I DIDN'T SEE A STIPULATION AS

14   WELL, SO THERE'S NO CHALLENGE, THAT WE DON'T NEED A

15   SONY CUSTODIAN OF RECORD, IS THAT RIGHT?

16             MR. SELWYN:  YOUR HONOR JUST ADMITTED ALL

17   THE EVIDENCE WE WOULD HAVE PUT IN THROUGH THAT

18   WITNESS.

19             THE COURT:  OKAY.

20             MR. LEE:  SO WE'LL GO TO PROFESSOR

21   SRIVASTAVA.

22             THE COURT:  BECAUSE MY ORDER SAID THAT HE

23   STILL HAD TO TESTIFY UNLESS THERE WAS GOING TO BE A

24   STIPULATION, BUT I GUESS THERE WAS AN AGREEMENT OF

25   THE PARTIES THAT HE DIDN'T NEED TO BE HERE.  THAT'S

1254

```
1    FINE.
2              OKAY.  WHAT ABOUT SRIVASTAVA?  IS THAT
3    THE PERSON COMING OR NOT.
4              MR. LEE:  HE'S NEXT, AND THEN WE HAVE
5    PROFESSOR KIM AND PROFESSOR KNIGHTLY READY TO GO.
6    AND IF WE GET THROUGH ALL THREE OF THOSE, WHICH I
7    THINK WE MIGHT, THAT WILL LEAVE US WITH AT LEAST AT
8    OUR END, EIGHT LIVE WITNESSES TOMORROW AND THREE
9    SHORT ONES BY DEPOSITION, NO MORE THAN 15 MINUTES
10   TOTAL.
11             THE COURT:  ALL RIGHT.  GIVE ME THE LIST
12   AGAIN.  WHO IS -- WHO IS -- IT'S SRIVASTAVA AND WHO
13   ELSE?  KIM AND THEN KNIGHTLY?
14             MR. LEE:  YEAH.  KIM, KNIGHTLY, AND THEN
15   I THINK THAT WILL TAKE US TO THE END OF THE DAY,
16   BUT IF IT DOESN'T, DR. WALKER.
17             THE COURT:  OKAY.
18             MR. LEE:  MR. DONALDSON, PROFESSOR
19   ORDOVER.  THAT CERTAINLY WILL GET US UNTIL
20   TOMORROW.
21             THE COURT:  OKAY.  WE HAVE TO ARGUE THE
22   JMOL MOTIONS AT 4:30.  I WOULD LIKE A PREVIEW.  IS
23   IT MOSTLY JUST THE -- YOU'RE GOING TO ARGUE NO
24   OBVIOUSNESS DEFENSE WAS MADE AS TO CERTAIN OF THE
25   PATENTS OR WHAT.
```

```
 1          MR. LEE:  YOUR HONOR, THE WAY I THOUGHT I
 2    WOULD DO IT, IT MIGHT -- AND I HEARD WHAT YOUR
 3    HONOR SAID THIS MORNING ABOUT YOUR INCLINATION.  I
 4    THINK FOR EACH OF THE PATENTS, THERE ARE SOME
 5    DISCRETE ISSUES THAT ACTUALLY ARE APPROPRIATE FOR
 6    JMOL.  FOR INSTANCE, NO INDUCED INFRINGEMENT, NO
 7    CONTRIBUTORY INFRINGEMENT, NO DOCTRINE OF
 8    EQUIVALENTS, AND I THINK THOSE ARE ONES THAT YOUR
 9    HONOR COULD ACT ON.  FOR INSTANCE, ON THE FIVE
10    SAMSUNG PATENTS, I THINK THERE WAS A DOCTRINE OF
11    EQUIVALENTS OPINION OFFERED ONLY ON THE '460.
12          BUT ON THE OTHER FOUR PATENTS, WE WOULD
13    MOVE FOR JMOL ON THE DOCTRINE OF EQUIVALENTS.  ON
14    FOUR OF THE PATENTS, AT LEAST BY MY TAKE, THERE WAS
15    NO --
16          THE COURT:  OKAY.  I'M SORRY.  LET'S
17    BREAK IT UP.  LET ME HEAR FROM SAMSUNG.  WHAT'S
18    YOUR POSITION ON WHETHER YOU INTRODUCED ANY
19    EVIDENCE OF DOCTRINE OF EQUIVALENTS ON THE OTHER
20    FOUR PATENTS.
21          MR. GOLDSTEIN:  WITH RESPECT TO THE '893
22    AND '711, WE AGREE.  WITH RESPECT TO THE FEATURE
23    PATENTS.
24          THE COURT:  OKAY.
25          MR. GOLDSTEIN:  ON THE STANDARDS PATENTS,
```

1    I WOULD HAVE TO ASK.

2            MR. LEE:  OKAY.

3            THE COURT:  I'M SORRY, I COULDN'T HEAR

4    THE LAST PART.

5            MR. LEE:  I THINK THERE'S A DIFFERENT

6    QUINN LAWYER FOR THE '516 AND '941, THE DECLARED

7    ESSENTIAL PATENTS.

8            MR. GOLDSTEIN:  THAT'S RIGHT.

9            MR. LEE:  BUT I'M 100 PERCENT SURE THERE

10   WAS --

11           THE COURT:  GIVE ME THOSE LAST TWO, '941

12   AND WHAT WAS THE OTHER PATENT NUMBER.

13           MR. LEE:  I THINK, YOUR HONOR, '516,

14   '941, '711, AND --

15           THE COURT:  I HEARD ON THE '711 '893, I

16   HEARD THAT THERE WAS AGREEMENT.

17           MR. LEE:  RIGHT.

18           THE COURT:  SO IT WILL BE GRANTED AS TO

19   THAT.

20           MR. LEE:  I'M INFORMED, YOUR HONOR,

21   THERE'S AGREEMENT ON EVERYTHING BUT THE '460.

22           THE COURT:  OKAY.  SO THERE'S AN

23   AGREEMENT ON THAT.  OKAY.  THEN WHAT ELSE?

24           MR. LEE:  THEN, YOUR HONOR, THE OTHER

25   ONE --

```
1              THE COURT:  YOU SAID NO INDUCEMENT.

2              MR. LEE:  NO INDUCEMENT.

3              THE COURT:  AS TO WHICH PATENTS?

4              MR. LEE:  THERE ARE -- FOR THE '516.

5              THE COURT:  YEAH.

6              MR. LEE:  THE '941, THE '711, AND THE

7    '893, I THINK THERE WAS NO EVIDENCE OF INDUCED OR

8    CONTRIBUTORY INFRINGEMENT.

9              THE COURT:  OKAY.  WHAT'S SAMSUNG'S VIEW

10   ON THAT?  ARE YOU STILL PURSUING THOSE THEORIES OR

11   NOT?

12             MR. GOLDSTEIN:  NO, YOUR HONOR.  ONLY

13   WITH RESPECT TO THE '460.

14             THE COURT:  OKAY.  ALL RIGHT.  OKAY.

15             MR. LEE:  AND THEN, YOUR HONOR, AS A

16   PREVIEW FOR 4:30, I THINK THOSE ARE THE ONES THAT

17   WE --

18             THE COURT:  WELL, I WAS THINKING I WOULD

19   LIKE YOU TO GO AHEAD AND SAY IT NOW AND IF I NEED

20   TO DO ANY FURTHER RESEARCH, NOW IS MY TIME.

21             MR. LEE:  LET ME DO THIS.  I THINK, YOUR

22   HONOR, FOR ALL FIVE OF THE PATENTS, WHILE THERE WAS

23   EVIDENCE OF NOTICE AS A RESULT OF THE STIPULATION,

24   I DON'T THINK THAT THERE IS EVIDENCE SUFFICIENT TO

25   GO TO THE JURY ON WILLFULNESS FOR ANY OF THE FIVE.
```

```
1              THERE'S NOTHING OTHER THAN NOTICE.  AND
2    THERE'S NO EVIDENCE COPYING OR ANYTHING ELSE UNDER
3    SEAGATE THAT WOULD ALLOW THE WILLFULNESS ISSUE TO
4    GO TO THE JURY.
5              THE COURT:  LET ME HEAR FROM SAMSUNG ON
6    THAT.  I DISAGREE WITH YOU ON THAT.
7              MS. MAROULIS:  YOUR HONOR, WE DISAGREE AS
8    WELL.  WILLFULNESS IS A FACTUAL ISSUE FOR THE JURY
9    AND CERTAINLY THERE WAS NOT, AND NOT ONLY WAS THERE
10   PRE-SUIT NOTICE, BUT THERE WAS NOTICE IN THE SUIT,
11   PRE-SUIT NOTICE, AND POST-SUIT NOTICE IN THE FORM
12   OF INFRINGEMENT CONTENTIONS WHICH WERE INTRODUCED
13   THROUGH DR. YANG AND OTHERS.
14             THE COURT:  ALL RIGHT.  I'M DENYING THE
15   RULE 50 ON WILLFULNESS AS TO ALL FIVE PATENTS.
16   OKAY?
17             MR. LEE:  ALL RIGHT.  AND THEN, YOUR
18   HONOR.
19             THE COURT:  WHAT ELSE YOU GOT?
20             MR. LEE:  I EXPECT YOU'LL DENY THIS, BUT
21   JUST SO I CAN MAKE MY RECORD.
22             THE COURT:  GO AHEAD.
23             MR. LEE:  AND QUICKLY ON THE '516 PATENT,
24   WE WOULD MOVE FOR JMOL OF NO LITERAL INFRINGEMENT.
25   DR. WILLIAMS TESTIFIED HIS INTERPRETATION OF THE
```

1    CLAIM WAS ADDING A FIRST CHANNEL AND A SECOND

2    CHANNEL TO GET THE TOTAL TRANSMIT POWER, AND THERE

3    IS NO EVIDENCE THAT THE ACCUSED PRODUCTS FOR THE

4    STANDARD DOES THAT.

5                 FOR THE '941 PATENT, DR. WILLIAMS'

6    TESTIMONY WAS BASED ON HIS OPINION OR HIS

7    INTERPRETATION THAT ONE OF ORDINARY -- I'M SORRY,

8    THAT THE PLAIN MEANING OF AN ENTIRE SDU IS ONLY AN

9    ENTIRE SDU, THAT'S, WE SUBMIT, INCORRECT AS A

10   MATTER OF LAW.  HE HAS NO OPINION OTHERWISE.

11                ON THE '460 PATENT, TWO THINGS, YOUR

12   HONOR.  DR. YANG'S OPINION IS THAT THERE IS NO

13   ORDER OF STEPS TO THE FIVE STEPS OF THE '460

14   PATENT.  YET HE CONCEDED ON CROSS-EXAMINATION THAT

15   STEP A HAD TO PRECEDE STEP D, STEP B HAD TO PRECEDE

16   STEP E.

17                AND THAT IF STEP C, WHICH YOUR HONOR MAY

18   RECALL HAS THE LANGUAGE AN IMAGE IN STEP B AND

19   OTHER IMAGES IN STEP C, THAT IF THERE, IN FACT, WAS

20   AN ORDER, HE HAD NO OPINION.  AND FOR THAT REASON,

21   WE WOULD MOVE FOR JMOL ON THE '460.

22                ON THE '711, WE WOULD MOVE FOR JMOL ON

23   THE BASIS THAT DR. YANG'S UNSPECIFIC OPINION AS TO

24   WHAT AN APPLET IS -- AND I'M NOT GOING TO REVISIT

25   WHAT YOUR HONOR SAID BEFORE -- IS INSUFFICIENT FOR

1      ANY REASONABLE JUROR TO FIND THAT THERE IS, IN

2      FACT, AN APPLET IN THE ACCUSED PRODUCTS.

3              THE COURT:  OKAY.  AND YOU'RE NOT MOVING

4      AS TO THE '893, OR YOU ARE?

5              MR. LEE:  NO.  I THINK AS -- AS TO THE

6      '893, OUR JUDGMENT IS THAT THERE'S ENOUGH EVIDENCE

7      FOR THE JURY TO DECIDE THE ISSUES EXCEPT FOR

8      WILLFULNESS, AND INDUCED INFRINGEMENT.

9              THE COURT:  ALL RIGHT.

10             MR. LEE:  AND CONTRIBUTORY.

11             THE COURT:  ALL RIGHT.  SO I'M --

12             MR. LEE:  YOUR HONOR, THE LATTER --

13     MR. MCELHINNY REMINDS ME, AS TO THE LATTER ON THE

14     '893, IT WOULD BE SUBJECT TO THE MOTION THAT WE

15     WOULD MAKE AT THE END OF ALL THE EVIDENCE, BUT FOR

16     NOW, THOSE ARE OUR POSITIONS.

17             THE COURT:  OKAY.  SO THIS IS MY RULING

18     ON THE RULE 50 MOTION.  THE MOTION IS DENIED WITH

19     REGARD TO INFRINGEMENT OF THE '516, '941, '460, AND

20     '711.  I THINK SAMSUNG HAS PRESENTED SUFFICIENT

21     EVIDENTIARY BASIS FOR A REASONABLE JURY TO FIND IN

22     THEIR FAVOR.  I'M DENYING AS TO WILLFULNESS ON ALL

23     FIVE PATENTS.

24             NO MOTION WAS MADE AS TO INDUCEMENT OR

25     CONTRIBUTORY INFRINGEMENT OR DOCTRINE OF

2261

```
1    EQUIVALENTS ON THE '460, RIGHT?  YOU DIDN'T MAKE A

2    RULE 50 MOTION?

3              MR. LEE:  I ACTUALLY -- YOUR HONOR, I MAY

4    HAVE MISSPOKE.  BUT THERE IS A MOTION BOTH, AS TO

5    BOTH.  I THINK THE FAIR READING OF THE RECORD IS

6    THAT SAMSUNG DID OFFER EVIDENCE ON AN ACT OF DIRECT

7    INFRINGEMENT.  BUT AS TO INDUCED INFRINGEMENT,

8    OTHER THAN PUTTING IN AN APPLE USER'S MANUAL,

9    THERE'S NO EVIDENCE THAT WOULD SATISFY DSU AND THE

10   SPECIFIC INTENT REQUIREMENT, THERE'S NO EVIDENCE OF

11   SPECIFIC CONTRIBUTORY INFRINGEMENT ON THAT PATENT.

12             THE COURT:  OKAY.  LET ME JUST -- MY

13   NOTES ARE REALLY MESSY HERE.  SO YOU ARE MAKING A

14   RULE 50 MOTION AS TO THE '460 ON INDUCEMENT AND

15   CONTRIBUTORY INFRINGEMENT?

16             MR. LEE:  I AM, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  THAT'S DENIED.  I

18   DO THINK THAT SAMSUNG HAS PRESENTED A LEGALLY

19   SUFFICIENT EVIDENTIARY BASIS FOR A REASONABLE JURY

20   TO RULE IN THEIR FAVOR.

21             YOU'RE NOT MAKING A D.O.E. CLAIM, BUT YOU

22   ARE MOVING FOR JUDGMENT AS A MATTER OF LAW WITH

23   REGARD TO THE DOCTRINE OF EQUIVALENTS AS TO THE

24   '893, '711, '941, AND '516 PATENTS.  SAMSUNG

25   CONCEDES THE POINT THAT THAT RULE 11 MOTION IS
```

2262

```
 1    GRANTED.
 2              AND WITH REGARD TO YOUR MOTION REGARDING
 3    CONTRIBUTORY INFRINGEMENT AND INDUCEMENT OF
 4    INFRINGEMENT AS TO THE '516, '941, '711, '893,
 5    THAT'S CONCEDED AS WELL BY SAMSUNG, SO YOUR MOTION
 6    IS GRANTED.
 7              OKAY.  DOES THAT TAKE CARE OF YOUR --
 8              MR. LEE:  I THINK, YOUR HONOR --
 9              THE COURT:  -- RULE 50?
10              MR. LEE:  I THINK AS TO THE FOUR 60 --
11              MR. GOLDSTEIN:  THAT'S CORRECT.
12              THE COURT:  I'M SORRY.  SAY THAT AGAIN.
13              MR. LEE:  AS TO THE '460 PATENT, YOUR
14    HONOR, WE'RE ALSO IN AGREEMENT THAT THERE SHOULD BE
15    JMOL OF NO CONTRIBUTORY INFRINGEMENT.
16              THE COURT:  ON THE '460, I DENIED YOUR
17    JMOL ON INDUCEMENT.
18              MR. LEE:  ON INDUCEMENT, RIGHT.
19              THE COURT:  OKAY.
20              MR. LEE:  BUT THERE IS NO -- THERE'S
21    AGREEMENT THAT THE JMOL SHOULD ENTER ON
22    CONTRIBUTORY.
23              THE COURT:  I SEE.  SAMSUNG'S CONCEDING
24    THAT POINT?
25              MR. LEE:  I BELIEVE SO.
```

```
 1              MR. GOLDSTEIN:  YES.

 2              THE COURT:  OKAY.  ALL RIGHT.  SO THE

 3     RULE 50 IS GRANTED.  LET ME JUST MAKE SURE, BECAUSE

 4     I'VE GOT TO DO AN ORDER.

 5              RULE 50 IS GRANTED AS TO BOTH

 6     CONTRIBUTORY INFRINGEMENT AND INDUCEMENT ON THE

 7     '516, '941, '711, AND '893.

 8              IT IS GRANTED AS TO CONTRIBUTORY

 9     INFRINGEMENT ON THE '460, DENIED AS TO INDUCEMENT.

10              AND IT'S GRANTED AS TO THE DOCTRINE OF

11     EQUIVALENTS FOR THE '893, '711, '941, AND '516.

12              IT'S DENIED AS TO WILLFULNESS AS TO ALL

13     FIVE PATENTS, AND IT'S DENIED AS TO LITERAL

14     INFRINGEMENT.  IT'S DENIED AS TO LITERAL

15     INFRINGEMENT AS TO THE '516, '941, '460, AND '711.

16              IS THAT ACCURATELY STATED?

17              MR. LEE:  THAT IS.  YOUR HONOR, IF I CAN

18     ADD ONE SENTENCE, ONLY BECAUSE I THINK I HAVE TO

19     MAKE MY RECORD.

20              ON THE WILLFULNESS ISSUE, IT'S OUR

21     POSITION THAT NOTICE IS NOT ENOUGH, BUT I

22     UNDERSTAND YOUR HONOR'S RULING.

23              THE COURT:  OKAY.  I THINK ON THE RECORD

24     THERE'S MORE THAN NOTICE, BUT WE MIGHT DISAGREE ON

25     THAT POINT.
```

```
 1                OKAY.  AND YOU DID NOT MAKE A RULE 50

 2     MOTION ON THE ISSUE OF LITERAL INFRINGEMENT AS TO

 3     THE '893 AT THIS TIME.

 4                MR. LEE:  AT THIS TIME.

 5                THE COURT:  GOT IT.

 6                MR. LEE:  CORRECT, YOUR HONOR.

 7                THE COURT:  OKAY.  LET'S GET THESE OUT OF

 8     THE WAY.  ALL RIGHT.  WHAT YOU GOT, MR. MCELHINNY?

 9                MR. MCELHINNY:  IS THIS A PREVIEW, YOUR

10     HONOR, OR AM I GOING TO --

11                THE COURT:  THIS IS IT.  UNLESS I NEED TO

12     THINK ABOUT IT, IN WHICH CASE I'M GOING TO HAVE TO

13     TAKE IT UNDER SUBMISSION.

14                MR. MCELHINNY:  SO I'M CLEAR ON THE

15     PROCESS, WE ARE GOING TO MAKE A MORE FORMAL RULE 50

16     MOTION AT THE CLOSE OF THE EVIDENCE.

17                THE COURT:  UNDERSTOOD.

18                MR. MCELHINNY:  BUT I WANTED TO MAKE A

19     TARGETED MOTION FOR YOUR HONOR.

20                THE COURT:  GO AHEAD.

21                MR. MCELHINNY:  THE FIRST HE ONE IS A

22     MOTION TO STRIKE, AND WE WANT TO STRIKE THE

23     TESTIMONY OF SAMSUNG'S EXPERT ITAY SHERMAN.

24                MR. SHERMAN TESTIFIED ON OBVIOUSNESS,

25     PURPORTED TO TESTIFY ON OBVIOUSNESS OF THE APPLE
```

1    DESIGN PATENTS, BUT IN HIS TESTIMONY, HE DID NOT

2    USE THE LEGAL STANDARD THAT IS REQUIRED.  HE DID

3    NOT IDENTIFY ANY PRIMARY REFERENCE, HE NEVER

4    IDENTIFIED A SECONDARY REFERENCE.  AND AS TO THE

5    PHONES, HE NEVER TESTIFIED THAT ANY PERSON OF

6    ORDINARY SKILL WOULD BE MOTIVATED TO COMBINE ANY

7    TWO REFERENCES.

8              HE ALSO USED, AS ALLEGED PRIOR ART, THE

9    FIDLER TABLET, THE LG -- THE FIDLER TABLET, WHICH

10   THE FEDERAL CIRCUIT HAS ALREADY RULED CANNOT BE

11   HELD AS A PREFERENCE.  HE RELIED ON THE LG PRADA,

12   WHICH THERE IS NO PRIOR -- THERE IS NO EVIDENCE

13   THAT IT IS PRIOR ART.  IT'S NEVER BEEN SOLD IN THE

14   UNITED STATES.

15             AND HE RELIED ON THE KOREAN D'547 PATENT,

16   WHICH IS NOT PRIOR ART.

17             AND IF LEFT --

18             THE COURT:  WHY IS THE KOREAN PATENT NOT

19   PRIOR ART?

20             MR. MCELHINNY:  IT'S NOT PRIOR ART

21   BECAUSE IT WAS PUBLISHED LESS THAN A YEAR BEFORE

22   THE CRITICAL DATE OF THE PATENTS AT ISSUE.

23             THE COURT:  AND GIVE ME THAT NUMBER

24   AGAIN.  D'547?

25             MR. MCELHINNY:  D'547.

```
 1              THE COURT:  LESS THAN A YEAR BEFORE
 2    CRITICAL DATE.
 3              NOW, ARE YOU SAYING THE CRITICAL DATE IS
 4    SOME EARLIER DATE THAT I DON'T THINK YOU PROVED OR
 5    YOU'RE SAYING THE CRITICAL DATE IS THE PATENT
 6    APPLICATION DATE.
 7              MR. MCELHINNY:  WE ARE SAYING THAT IN THE
 8    TESTIMONY OF CHRIS STRINGER, AS CORROBORATED BY THE
 9    APPLE CAD DIRECTORY, CAD DIRECTORY, APPLE'S DESIGN
10    WAS COMPLETED BY APRIL OF 2006.  THAT ACTUALLY WILL
11    TIE TO ONE OF THE THINGS WE HAVE TO FILE WITH YOUR
12    HONOR TOMORROW MORNING.
13              THE COURT:  OKAY.
14              MR. MCELHINNY:  BUT THE OVERALL GIST OF
15    THIS MOTION IS THAT WHILE HE TESTIFIED AT GREAT
16    LENGTH, HE NEVER APPLIED THE TESTS THAT THE FEDERAL
17    CIRCUIT REQUIRED HIM TO APPLY.
18              IN THIS CASE, THE FEDERAL CIRCUIT HAS
19    TOLD US THAT THE PROPER APPROACH IS TO IDENTIFY A
20    PRIMARY REFERENCE, A SECONDARY REFERENCES, AND THEN
21    TESTIFY WHAT A PERSON OF ORDINARY SKILL WOULD BE
22    MOTIVATED TO COMBINE THOSE, AND HE NEVER MENTIONED
23    ANY OF THOSE WORDS.
24              THE COURT:  ALL RIGHT.  THAT'S THE EXTENT
25    OF YOUR MOTION.
```

2267

1          MR. MCELHINNY:  THAT'S THE MOTION TO

2     STRIKE, YOUR HONOR.  I HAVE SOME RULE 50 -- DO YOU

3     WANT THE WHOLE LIST?

4          THE COURT:  YES, GO AHEAD.

5          MR. MCELHINNY:  OKAY.  WE ARE MOVING FOR

6     A JMOL OF INFRINGEMENT UNDER THE D'087 PATENT.  I

7     CAN GIVE YOU THE LIST, YOUR HONOR, IT'S ONE, TWO,

8     THREE, FOUR -- FIVE SPECIFIC MODELS.  AND THAT IS

9     BASED ON THE FACT THAT NO EVIDENCE OF

10    NON-INFRINGEMENT WAS PRESENTED.  TO REMIND YOUR

11    HONOR --

12         THE COURT:  WHAT ARE THOSE?

13         MR. MCELHINNY:  THE MODELS ARE THE

14    GALAXY S I9000, THE GALAXY S II AT&T, THE

15    GALAXY S II I9000, THE GALAXY S II EPIC 4G TOUCH,

16    AND THE GALAXY S II SKYROCKET.

17         TO REMIND YOUR HONOR OF THE HISTORY HERE,

18    FOR LATE DISCLOSURE REASONS, SAMSUNG WAS RESTRICTED

19    TO NON-INFRINGEMENT TESTIMONY TO JUST THREE MODELS,

20    AND SO THEY PRESENTED NO EVIDENCE WHATSOEVER THAT

21    ANY OF THOSE MODELS -- THAT DENIED INFRINGEMENT

22    THAT WE PROVED IN OUR CASE IN CHIEF.

23         DO YOU WANT ME TO MOVE ON TO MY NEXT ONE?

24         THE COURT:  WHAT'S YOUR NEXT ONE?

25         MR. MCELHINNY:  INFRINGEMENT OF THE D'677

```
1    BY THE FASCINATE, THE GALAXY ACE, THE GALAXY S II

2    AT&T, THE GALAXY S II I9000, I9000, THE GALAXY S II

3    -- I CAN'T READ MY OWN HANDWRITING -- T-MOBILE, THE

4    GALAXY S II SKYROCKET, THE GALAXY S SHOWCASE, AND

5    THE GALAXY MEMORIZE, AND THAT'S ON THE SAME BASIS

6    AS THE FORMER.  ALL OF THEIR NON-INFRINGEMENT

7    EVIDENCE WAS LIMITED TO THE THREE MODELS THAT THEY

8    WERE ALLOWED TO PUT IN EVIDENCE.

9              THE COURT:  WAIT.  THE I9000 WAS SUBJECT

10   TO THE, TO MY RULE 50 ORDER?

11             MR. MCELHINNY:  IT IS, YOUR HONOR.

12             THE COURT:  SO YOU'RE STUCK WITH

13   INDUCEMENT, RIGHT?

14             MR. MCELHINNY:  WE ARE STUCK --

15             THE COURT:  BY SEC?

16             MR. MCELHINNY:  NO, NO, YOUR HONOR.  SEC

17   HAS SOLD DIRECTLY INTO THE UNITED STATES.  THERE IS

18   EVIDENCE THAT SEC SELLS DIRECTLY TO ITS SUBSIDIARY,

19   SHIPS INTO THE UNITED STATES.  THAT'S DIRECT

20   INFRINGEMENT.

21             THE COURT:  ALL RIGHT.  WHAT'S YOUR OTHER

22   MOTION?

23             MR. MCELHINNY:  WE WOULD MAKE A MOTION

24   THAT THE D'087 AND THE D'677 ARE NOT INVALID FOR

25   FUNCTIONALITY REASONS AND WE DO THAT ON TWO BASES.
```

```
 1              THERE WAS NO TESTIMONY AT ANY TIME BY ANY

 2    WITNESS THAT THE OVERALL DESIGNS AS SET FORTH IN

 3    THOSE PATENTS WAS DICTATED BY FUNCTION.  AND THERE

 4    WAS NO EXPERT TESTIMONY PRESENTED AT ALL ON THE

 5    FUNCTIONALITY ISSUE.

 6              THE COURT:  WHAT ELSE?  ANYTHING ELSE?

 7              MR. MCELHINNY:  YES, YOUR HONOR.  I'M

 8    SORRY.  THERE'S A LIST HERE.  WE MOVE FOR JUDGMENT

 9    AS A MATTER OF LAW THAT THE '381 PATENT, THE RUBBER

10    BANDING PATENT WAS INFRINGED.  THERE WAS NO

11    NON-INFRINGEMENT TESTIMONY PRESENTED AT ALL, NO

12    EXPERT OPINED ON NON-INFRINGEMENT.

13              THE COURT:  WHAT ELSE?

14              MR. MCELHINNY:  WE MOVE THAT THE '381

15    PATENT WAS -- WAS NOT PROVEN NOT INVALID BY CLEAR

16    AND CONVINCING EVIDENCE.  PROFESSOR VAN DAM SPOKE

17    TO THE PATENT, BUT HE DID NOT TESTIFY ABOUT THE

18    REQUIREMENT THAT A DEVICE RESPOND, QUOTE, IN

19    RESPONSE TO THE EDGE OF THE ELECTRONIC DOCUMENT

20    BEING REACHED."

21              THE COURT:  ALL RIGHT.  THAT'S DENIED.

22    WHAT ELSE?

23              MR. MCELHINNY:  ON THE '163, YOUR HONOR,

24    WHICH IS THE DOUBLE TAP TO ZOOM, WE MOVE FOR JMOL

25    OF INFRINGEMENT ON THE GROUND THAT THERE WAS NO
```

1    CONTRARY TESTIMONY.  MR. GRAY TESTIFIED, BUT HE DID

2    NOT TESTIFY TO ANY EXTENT THAT THE SAMSUNG DEVICES

3    DID NOT PERFORM THE '163 PATENT.

4              THE COURT:  WHAT ELSE?  IS THAT IT?

5              MR. MCELHINNY:  NO, YOUR HONOR.  I'M

6    SORRY.  WE MOVE FOR JUDGMENT AS A MATTER OF LAW

7    THAT THE '163 PATENT IS NOT INDEFINITE.  THERE WAS

8    AN ARGUMENT MADE BY MR. GRAY TO THE JURY ABOUT

9    CERTAIN LANGUAGE BEING AMBIGUITY, AMBIGUOUS, AND

10   YOUR HONOR HAS ALREADY CONSTRUED THE PATENT.  IT

11   WOULD BE INAPPROPRIATE TO SUBMIT THE QUESTION OF

12   DEFINITENESS TO THE JURY.

13             WE MOVE FOR JUDGMENT AS A MATTER OF LAW

14   THAT THE '915 PATENT WAS INFRINGED.  THERE WAS

15   TESTIMONY ABOUT THE POSSIBILITY, WHICH WE DENIED,

16   BUT IT'S A DISPUTED QUESTION OF FACT, ABOUT WHETHER

17   OR NOT IT IS POSSIBLE IN A SAMSUNG DEVICE TO SCROLL

18   USING TWO FINGERS SIMULTANEOUSLY, BUT NO SPECIFIC

19   ACCUSED DEVICE, SAMSUNG DEVICE WAS EVER IDENTIFIED,

20   DESPITE THE QUESTION, THAT PERFORMED -- THAT

21   ALLEGEDLY PERFORMS THIS TWO FINGER SCROLL FUNCTION.

22             SO NO TESTIMONY WAS EVER GIVEN THAT ANY

23   OF THE ACCUSED DEVICES DOES NOT INFRINGE THE

24   PATENT.

25             WE MOVE FOR JUDGMENT AS A MATTER OF LAW

1    THAT THE '915 PATENT IS NOT OBVIOUS ON THE GROUNDS

2    THAT MR. GRAY MADE IT CLEAR THAT HE DID NOT HAVE

3    ANY OBVIOUSNESS TESTIMONY TO SUPPORT ANY

4    OBVIOUSNESS DEFENSE.

5             AND, FINALLY, WE MOVE THAT NONE OF OUR

6    TRADE DRESS ALLEGATIONS IS INVALID FOR

7    FUNCTIONALITY.  THE EVIDENCE IS UNCONTESTED THAT

8    THERE ARE NUMEROUS ALTERNATIVE DESIGNS AVAILABLE.

9    BUT MORE IMPORTANTLY, NO WITNESS TESTIFIED THAT THE

10   OVERALL DESIGN, THAT THE DESIGN AS A WHOLE WAS

11   FUNCTIONAL.

12            THE COURT:  WELL, THAT'S DENIED.  I THINK

13   MR. JIN SOO KIM TALKED ABOUT THE FUNCTIONALITY OF

14   THE, OF THE GALAXY TABS AND SINCE ALL REASONABLE

15   INFERENCES HAVE TO BE DRAWN IN FAVOR OF THE

16   NON-MOVING PARTY, THAT'S DENIED.

17            MR. MCELHINNY:  IF I COULD JUST -- OKAY.

18            THE COURT:  YEAH.

19            MR. MCELHINNY:  AS WE HEARD HIS

20   TESTIMONY, HE WAS ASKED QUESTIONS ON AN

21   ELEMENT-BY-ELEMENT BASIS.

22            THE COURT:  RIGHT, BUT THE JURY CAN INFER

23   THE WHOLE OVERALL -- I UNDERSTAND.

24            MR. MCELHINNY:  YES, YOUR HONOR.  YOU

25   UNDERSTAND OUR MOTION.

```
 1              THE COURT:  I UNDERSTAND.  BUT THAT ONE
 2   IS DENIED.
 3              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
 4              THE COURT:  ALL RIGHT.  LET ME -- LET'S
 5   DO THE EASIER ONES FIRST.
 6              LET ME HEAR -- MAYBE WE SHOULD GO THROUGH
 7   THE LIST HERE.  HOW ABOUT ON MR. SHERMAN, DO YOU
 8   WANT TO RESPOND TO THAT, PLEASE?
 9              MR. ZELLER:  YES, YOUR HONOR.  AND JUST
10   FOR THE RECORD, SAMSUNG DOES MAKE A CROSS-MOTION
11   FOR, UNDER RULE 50.
12              THE COURT:  OKAY.
13              MR. ZELLER:  INVALIDITY AS TO THE DESIGN
14   PATENTS AND APPLE'S ASSERTED TRADE DRESS.
15              THE COURT:  OKAY.
16              MR. ZELLER:  WE ALSO RENEW OUR SAME
17   GROUNDS EARLIER FOR RECORD PRESERVATION PURPOSES AS
18   WE HAD ASSERTED EARLY ON IN THE RULE 50 MOTION.  WE
19   OBVIOUSLY DON'T INTEND TO REHASH THAT, BUT JUST FOR
20   PURPOSES OF PRESERVATION OF THE RECORD, YOUR HONOR.
21              THE COURT:  THAT'S FINE.  YOU'RE RENEWING
22   YOUR PREVIOUS RULE 50.
23              MR. ZELLER:  CORRECT, AS WELL AS
24   EXPANDING TO INCLUDE INVALIDITY.
25              MR. MCELHINNY:  I MAY JUST --
```

```
 1                THE COURT:  YOU'RE MOVING ON INVALIDITY

 2    OF TRADE DRESS AND DESIGN PATENTS.

 3                MR. MCELHINNY:  MAY I NOTE FOR THE RECORD

 4    THAT HE CAN'T MAKE A JMOL ON INVALIDITY ISSUES.  WE

 5    HAVEN'T HAD A CHANCE TO PRESENT OUR CASE.

 6                THE COURT:  THAT'S A GOOD POINT.  I MEAN,

 7    THIS IS NOW THEIR --

 8                MR. MCELHINNY:  IT'S A PROCEDURAL ISSUE.

 9                MR. ZELLER:  JUST TO BE CLEAR, TO BE MORE

10    PRECISE ABOUT IT, APPLE BEARS THE BURDEN OF PROOF

11    ON CERTAIN ASPECTS OF TRADE DRESS.  FOR THE

12    UNREGISTERED TRADE DRESS, APPLE BEARS THE BURDEN OF

13    PROVING NON-FUNCTIONALITY.  SO THAT -- AGAIN,

14    THAT'S WHY WE'RE DOING IT OUT OF AN ABUNDANCE OF

15    CAUTION.  I DON'T WANT TO BELABOR IT.

16                WITH RESPECT TO THE SHERMAN MOTION, I

17    ASSUME THE COURT'S ASKING ABOUT THE MOTION TO

18    STRIKE.

19                THE COURT:  WELL, LET ME -- WITH REGARD

20    TO YOUR MOTION FOR A FINDING AS A MATTER OF LAW

21    THAT THE APPLE TRADE DRESS AND DESIGN PATENTS ARE

22    INVALID, I'M DENYING THAT.

23                I DO THINK THERE IS LEGALLY SUFFICIENT

24    EVIDENCE FOR A REASONABLE JURY TO FIND IN APPLE'S

25    FAVOR, SO THAT'S DENIED.
```

274

```
 1              AND YOUR RENEWED --
 2              MR. ZELLER:  THANK YOU, YOUR HONOR.
 3              THE COURT:  -- RULE 50 MOTION IS DENIED.
 4              YES, IF YOU COULD PLEASE GO TO THE MOTION
 5    TO STRIKE.
 6              MR. ZELLER:  I THINK THE ALLEGATION HAS
 7    TWO COMPONENTS TO IT, ONE IS THAT HE DID NOT
 8    ADDRESS THE LEVEL OF ORDINARY SKILL IN THE ART IN
 9    THE CONTEXT OF HIS OPINIONS, AND, IN FACT, HIS
10    TESTIMONY WAS VERY EXPLICIT.  WHEN IT WAS, WHEN IT
11    WAS PROVIDED, HE WAS VERY CLEAR, WHEN HE SAID THAT
12    IT WOULD BE OBVIOUS TO ONE OF ORDINARY SKILL IN THE
13    ART TO COMBINE THESE REFERENCES AND COME UP WITH
14    THE SAME DESIGN AS SHOWN IN THE DESIGN PATENTS.
15              SO HE ACTUALLY DID USE THOSE WORDS, EVEN
16    APART FROM THE FACT THAT OBVIOUSLY WE BRIEFED AND
17    ARGUED THIS IN THE DAUBERT CONTEXT, YOUR HONOR.
18    THERE'S NO REQUIREMENT --
19              THE COURT:  BUT LET ME ASK YOU A MORE
20    SPECIFIC QUESTION.
21              MR. ZELLER:  UM-HUM.
22              THE COURT:  WHAT DO YOU THINK ABOUT
23    APPLE'S ARGUMENT ON THE FIDLER TABLET?  I AGREE
24    WITH SAMSUNG ON THE FIDLER TABLET.  THE FEDERAL
25    CIRCUIT BASICALLY REVERSED ME ON THAT.  WHAT'S YOUR
```

275

```
 1    VIEW ON THAT ISSUE?

 2              MR. ZELLER:  WELL, YOUR HONOR, WE DON'T

 3    AGREE WITH THAT PERSPECTIVE.  LET ME START WITH

 4    THIS, YOUR HONOR.

 5              THE COURT:  UM-HUM.

 6              MR. ZELLER:  OBVIOUSLY THAT WAS IN THE

 7    CONTEXT OF THE PRELIMINARY INJUNCTION.

 8              THE COURT:  OKAY.

 9              MR. ZELLER:  AND WHAT WE'RE DEALING WITH

10    HERE IS, OF COURSE, WITH A JURY AND THE COURT HAS

11    PROPERLY, WE THINK, PREVIOUSLY OBSERVED THAT EVEN

12    AS TO THOSE RULINGS BY THE FEDERAL CIRCUIT AS IT

13    DEALS WITH ART, THAT WE'RE ENTITLED TO A JURY

14    DETERMINATION ON THOSE.

15              AND THE COURT HAS ACTUALLY SPOKEN

16    SPECIFICALLY TO THIS ISSUE PREVIOUSLY IN

17    CONNECTION, FOR EXAMPLE, WITH THE JP'638.

18              AND WE BELIEVE THAT THAT ALSO APPLIES

19    HERE.  THE JURY ULTIMATELY IS THE ONE THAT, THAT

20    GETS TO DECIDE ISSUES LIKE CREDIBILITY, THE COURT

21    IS NOW --

22              THE COURT:  LET ME ASK YOU A QUESTION.

23    WHAT EVIDENCE IS THERE THAT THE LG PRADA IS PRIOR

24    ART.  I KNOW THAT'S BEEN AN ISSUE IN DISPUTE, AND I

25    REALLY DON'T THINK EITHER SIDE HAS PUT ANY EVIDENCE
```

```
 1    IN ONE WAY OR THE OTHER ON THE DATE, OTHER THAN AN

 2    EXPERT WITNESS KIND OF ASSUMING IT.

 3              MR. ZELLER:  WELL, MR. SHERMAN DIDN'T

 4    ASSUME IT.  HE ACTUALLY TESTIFIED IT WAS FROM LATE

 5    2006.  HE DIDN'T SAY HOW HE KNEW THAT.

 6              MR. ZELLER:  HE DID, YOUR HONOR.  HE SAID

 7    HE SAW ANNOUNCEMENTS, HE SAW PRESS.  I CAN GET THAT

 8    TESTIMONY.  BUT HE DID REFERENCE THAT THERE WERE

 9    ARTICLES AND OTHER PUBLIC ANNOUNCEMENTS THAT HE

10    SAW.

11              WHAT I WOULD ALSO SAY, YOUR HONOR --

12              THE COURT:  YOU KNOW WHAT, LET ME DO

13    THIS.  I'M GOING TO HAVE TO -- I'LL GO BACK AND

14    LOOK AT THE SHERMAN TRANSCRIPT.  LET ME JUST -- CAN

15    YOU GIVE ME A POINT OR TWO ON SOME OF THESE OTHERS,

16    AND I'M GOING TO GO BACK AND HAVE TO LOOK AT THE

17    TESTIMONY, AND I DO WANT US TO TAKE OUR BREAK AND I

18    DO WANT THE JURY TO GET ANOTHER AT LEAST HOUR OF

19    TESTIMONY IN.

20              MR. ZELLER:  SURE.

21              THE COURT:  SO WHAT -- ON

22    NON-INFRINGEMENT, ON THESE FIVE DEVICES, AS FAR AS

23    THE '087.

24              MR. ZELLER:  IF I CAN BACK UP FOR JUST A

25    MOMENT, YOUR HONOR.  ONE OTHER POINT ON THE LG
```

1    PRADA AS PRIOR ART.  JUST TO REMIND THE COURT, THE

2    COURT ALSO PREVIOUSLY RULED, IN THIS PARTICULAR

3    CONTEXT, THAT A JURY WOULD BE ENTITLED TO

4    DISBELIEVE APPLE'S CLAIMED CONCEPTION DATE AND

5    SIMPLY GO OFF OF THE FILING DATE.

6            IT WAS MR. STRINGER AND THESE FILES, AS

7    APPLE'S COUNSEL POINTS OUT, THAT THEY'RE RELYING

8    UPON FOR, FOR AN EARLIER CONCEPTION AND REDUCTION

9    TO PRACTICE DATE, AND THE JURY IS ENTITLED TO

10   DISBELIEVE THAT.

11           BY THE WAY, I'D EVEN NOTE THAT THE CAD

12   FILES --

13           THE COURT:  CAN WE JUMP TO THE 80 -- I'LL

14   ALLOW MORE ARGUMENT ON THIS AT 4:30, I JUST KIND OF

15   WANT A PREVIEW AND THEN TAKE A BREAK AND WE'LL KEEP

16   GOING.

17           MR. ZELLER:  I'LL GO THROUGH IT BRIEF,

18   YOUR HONOR.

19           THE COURT:  SURE.

20           MR. ZELLER:  I THINK THIS IS TRUE OF ALL

21   OF THE NON-INFRINGEMENT ARGUMENTS.

22           THE COURT:  OKAY.

23           MR. ZELLER:  WHICH IS THE STANDARD, OF

24   COURSE, IS THE ORDINARY OBSERVER STANDARD UNDER

25   GORHAM, AND UNDER THE FEDERAL CIRCUIT BRAUN CASE,

```
 1    THE FEDERAL CIRCUIT HAS SAID THAT A JURY IS

 2    ENTITLED TO ESSENTIALLY ACT AS THE ORDINARY

 3    OBSERVER.  THEIR COLLECTIVE EXPERIENCE IS SUCH THAT

 4    THEY CAN ACT AS THE ORDINARY OBSERVER.

 5            THEY'RE ENTITLED TO COMPARE WHATEVER THEY

 6    WANT.  THEY CAN COMPARE, UNDER THE LAW, THEY CAN

 7    COMPARE THE DESIGN PATENTS TO OUR DEVICES, AS WELL

 8    AS, OF COURSE, THE CLAIMED COMMERCIAL EMBODIMENTS,

 9    SUCH AS THE IPHONE AND THE IPAD.

10            AND THEY'RE ENTITLED TO MAKE THEIR OWN

11    JUDGMENT AS TO WHETHER OR NOT THE ORDINARY OBSERVER

12    WOULD BE DECEIVED IN THE PURCHASING CONTEXT

13    THINKING THAT THEY'RE SUBSTANTIALLY THE SAME.

14            THE COURT:  OKAY.

15            MR. ZELLER:  SO REGARDLESS OF THE

16    FORMALLY AND TECHNICALITIES THAT APPLE WANTS TO

17    ARGUE ABOUT WHAT WE CAN AND CANNOT SAY.

18            THE COURT:  YEAH.

19            MR. ZELLER:  THE JURY IS THE ONE THAT

20    GETS TO MAKE THE DETERMINATION AS TO THE OVERALL

21    IMPRESSION THAT THEY MAKE AND THEY'RE FREE TO MAKE

22    THAT DETERMINATION.

23            THE COURT:  OKAY.  LET'S GO TO -- WHAT

24    ABOUT THE FUNCTIONALITY ON '087 AND '677, JUST

25    REMIND ME.
```

```
 1              MR. ZELLER:  I THINK YOUR HONOR HAS PUT

 2   IT EXACTLY RIGHT PREVIOUSLY.  WE PUT IN SUBSTANTIAL

 3   EVIDENCE, BOTH THROUGH OUR EXPERTS, OUR FACT

 4   WITNESSES, OUR DOCUMENTS, AND APPLE'S OWN WITNESSES

 5   ABOUT FUNCTIONALITY.  AND THE JURY IS CERTAINLY

 6   ENTITLED TO INFER FROM THAT THAT THE TOTALITY OF

 7   THESE ARE, IN FACT, DICTATED BY FUNCTION, ESSENTIAL

 8   TO THE USE AND PURPOSE.

 9              THE COURT:  AND DO YOU BELIEVE EXPERT

10   TESTIMONY HAS TO BE GIVEN ON THIS POINT?

11              MR. ZELLER:  I DO NOT, YOUR HONOR.  I

12   BELIEVE THAT BASED ON CERTAINLY THE FACTS THAT HAVE

13   BEEN ADDUCED HERE THAT THE JURY CAN DRAW THAT

14   CONCLUSION, PARTICULARLY GIVEN THE FACT THAT THESE

15   DESIGN PATENTS, YOU KNOW, AS THE COURT IS AWARE,

16   PRINCIPALLY CLAIM A RECTANGULAR DISPLAY.  THAT'S

17   THE OVERALL VISUAL IMPRESSION THAT'S GIVEN BY

18   THESE.

19              AND THERE'S -- THERE CAN'T BE A SERIOUS

20   DISPUTE THAT THAT ASPECT IS FUNCTIONALITY.

21              THE COURT:  I'M PROBABLY GOING TO DENY

22   THIS ONE, SO LET'S MOVE ON.

23              MR. ZELLER:  SURE.

24              THE COURT:  WHAT ABOUT, JUST WHAT'S YOUR

25   RESPONSE ON '381, NO NON-INFRINGEMENT TESTIMONY,
```

1    AND -- WELL, LET'S DO THAT ONE FIRST.

2            MR. ZELLER:  I'LL TURN THAT OVER TO

3    MR. JOHNSON.

4            MR. JOHNSON:  DR. BALAKRISHNAN, YOU

5    RECALL WHEN I CROSS-EXAMINED HIM AND TOOK HIM

6    THROUGH THE CLAIM LIMITATIONS, HE ADMITTED THAT

7    THERE'S THIS BEHAVIOR HOLD STILL THAT WE BELIEVE

8    DOESN'T MEET THE CLAIM LIMITATIONS.  THE CLAIM

9    LIMITATIONS TALK ABOUT BOUNCE BACK.  THERE IS A

10   DISPUTE, I THINK, BETWEEN THE PARTIES AS TO WHETHER

11   IT NEEDS TO ALWAYS BOUNCE BACK OR NOT.  IT'S A

12   CLAIM -- IT'S A CLAIM CONSTRUCTION ISSUE.  BUT THIS

13   IS, THIS IS AN ISSUE THAT IS, OUR NON-INFRINGEMENT

14   DEFENSE THAT CUTS ACROSS ALL THE PRODUCTS.

15           AND I -- HE ADMITTED ON THE STAND THAT

16   HOLD STILL, WHEN PRACTICING HOLD STILL DOESN'T

17   INFRINGE, SO I THINK THERE'S A REASONABLE BASIS FOR

18   THAT TO GO TO THE JURY.

19           THE COURT:  DID YOU HAVE VIDEO ON THE

20   HOLD STILL FOR ALL OF THE ACCUSED PRODUCTS?

21           MR. JOHNSON:  YES, WE DID.

22           THE COURT:  I'M PROBABLY GOING TO DENY

23   THAT ONE.

24           MR. MCELHINNY:  EXCUSE ME, YOUR HONOR,

25   THE HOLD STILL THAT THEY SHOWED ON THE VIDEO WAS

```
 1    NOT IDENTIFIED FOR A PARTICULAR PRODUCT AND IT WAS
 2    ONLY IN ONE APPLICATION.  THE SYSTEM WAS THAT
 3    SEVERAL APPLICATIONS INFRINGE AND THEY WERE NOT
 4    ABLE TO SHOW THE HOLD STILL IN ALL OF THE
 5    INFRINGING APPLICATIONS AND IT ONLY TAKES ONE.
 6            THE COURT:  ALL RIGHT.  DO YOU WANT TO
 7    RESPOND TO THAT?
 8            MR. JOHNSON:  I BELIEVE WE DID, YOUR
 9    HONOR.  WE CAN GO BACK AND LOOK, BUT --
10            THE COURT:  NO, I THINK IT WAS ONLY IN
11    ONE APPLICATION, THERE WAS AT LEAST ONE APPLICATION
12    WHERE MR. BALAKRISHNAN CLAIMED THAT HOLD STILL WAS
13    PRESENT.
14            MR. JOHNSON:  WELL, I CAN GO BACK AND
15    TAKE A LOOK WITH RESPECT TO IT.
16            THE COURT:  ALL RIGHT.  I'LL GO BACK AND
17    TAKE A LOOK AS WELL.
18            NOW, WHAT ABOUT, WERE THERE OR WERE THERE
19    NOT, I'M GOING TO HAVE TO GO BACK, VIDEO OF HOLD
20    STILL ON ALL THESE PRODUCTS OR JUST ONE?
21            MR. JOHNSON:  ALL OF THEM.
22            THE COURT:  OKAY.
23            MR. JOHNSON:  I PUT UP ALL THE SLIDES OF
24    THE FOUR BY FOUR.
25            THE COURT:  CAN WE GO TO DOUBLE TAP TO
```

```
 1    ZOOM.  DO YOU WANT TO RESPOND TO THE INDEFINITENESS

 2    AND NON-INFRINGEMENT ARGUMENT THAT MR. MCELHINNY

 3    JUST MADE?

 4              MR. DEFRANCO:  YES, YOUR HONOR.  DR. GRAY

 5    TESTIFIED DURING EXAMINATION THAT PLAINTIFFS DID

 6    NOT PUT IN SUFFICIENT PROOF TO SHOW THAT THE

 7    SUBSTANTIALLY CENTERED TERM WAS MET, AND AS YOU

 8    REMEMBER, THEIR EXPERT TESTIFIED THAT YOU COULD

 9    LINE UP 50 DIFFERENT PERSONS OF ORDINARY SKILL AND

10    YOU MIGHT GET A DIFFERENT ANSWER FROM EACH.  THERE

11    WAS NO CLEAR STANDARD.  SO THAT DIDN'T MEET HIS

12    BURDEN TO PROVE INFRINGEMENT WITH RESPECT TO THAT

13    CLAIM LIMITATION.

14              DR. GRAY ALSO SAID THAT DR. SINGH DID NOT

15    MEET HIS BURDEN WITH RESPECT TO THE REQUIREMENT

16    THAT A BOX BE DETERMINED FROM A PLURALITY OF BOXES.

17    HIS TESTIMONY ON THAT WAS CLEAR.  HE CERTAINLY DID

18    NOT CARRY HIS BURDEN AS TO WHAT THAT TERM WOULD

19    MEAN AND HOW THAT WOULD BE APPLIED AGAINST THE

20    ACCUSED PRODUCTS.

21              THE COURT:  OKAY.  WHAT ABOUT -- WHAT

22    ABOUT -- I'M NOT SURE, WAS THE INDEFINITENESS

23    ARGUMENT ABOUT THIS PLURALITY OF BOXES, OR --

24              MR. DEFRANCO:  THAT WAS -- YOU KNOW, THAT

25    WAS A SEPARATE ISSUE WITH RESPECT TO SUBSTANTIALLY
```

2283

```
 1    CENTERED, YOUR HONOR, THAT PLAINTIFF'S EXPERT WAS
 2    NOT ABLE TO CLEARLY ENUNCIATE WHAT THAT WOULD MEAN
 3    TO ONE OF ORDINARY SKILL IN THE ART, SO HE WAS NOT
 4    ABLE TO CLEARLY APPLY THAT AND MEET HIS BURDEN TO
 5    PROVE INFRINGEMENT GIVEN THAT HE WASN'T ABLE TO
 6    ESTABLISH --
 7              THE COURT:  IS THERE A PARTICULAR PART OF
 8    MR. GRAY'S TESTIMONY I SHOULD LOOK AT FOR THIS
 9    INDEFINITENESS ISSUE?
10              MR. DEFRANCO:  I WOULD LOOK, YOUR HONOR,
11    FOR EXAMPLE, TO THE TRIAL TRANSCRIPT AT 2922.
12              THE COURT:  OKAY.
13              MR. DEFRANCO:  PRETTY MUCH AT THE
14    BEGINNING OF THAT PAGE, AND IT CARRIES OVER TO THE
15    FOLLOWING PAGE OF THE TRANSCRIPT.
16              THE COURT:  OKAY.  THANK YOU.  ALL RIGHT.
17              MR. MCELHINNY:  MAY I JUST ADDRESS ONE
18    LITTLE ISSUE, YOUR HONOR?
19              THE COURT:  YEAH, THAT WAS IT FOR YOURS.
20    YOU DON'T HAVE ANY MORE RIGHT, MR. MCELHINNY?
21              MR. MCELHINNY:  I GAVE YOU MY COMPLETE
22    LIST.
23              THE COURT:  GOOD, OKAY.
24              MR. MCELHINNY:  JUST ON THAT ONE LAST
25    ISSUE ABOUT WHAT MR. GRAY SAID ABOUT OUR EXPERT,
```

1    YOUR HONOR HAS ALREADY DENIED JMOL FOR

2    NON-INFRINGEMENT.  YOUR HONOR MADE A RULING THAT WE

3    PRESENTED ENOUGH EVIDENCE TO GO TO THE JURY ON

4    INFRINGEMENT.

5              SAMSUNG CANNOT DEFEAT INFRINGEMENT BY

6    HAVING THEIR EXPERT DISAGREE WITH YOUR RULING.  IF

7    THEY WERE GOING TO PROVE NON-INFRINGEMENT, THEY HAD

8    TO BRING FORWARD AFFIRMATIVE TESTIMONY TO SAY THAT

9    THEIR DEVICE DID NOT PRACTICE THE CLAIM AND

10   MR. GRAY DID NOT DO THAT.  HE GAVE -- HE GAVE US --

11   HAD HE BEEN JUDGE, HE WOULD HAVE GRANTED THE JMOL

12   MOTION, BUT YOUR HONOR DID NOT.

13             MR. DEFRANCO:  WELL, THAT'S NOT EXACTLY

14   CORRECT, YOUR HONOR.  HE DID IT IN THE CONTEXT OF

15   HIS OWN NON-INFRINGEMENT ANALYSIS AND COMMENTED ON

16   APPLE'S EXPERT'S ANALYSIS.  THAT'S COMPLETELY

17   APPROPRIATE.

18             THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

19   THIS IS HELPFUL.

20             LET'S GO -- WHAT WERE YOU GOING TO SAY?

21             MR. MCELHINNY:  I'M SORRY.  I WAS

22   STANDING UP FOR YOUR HONOR.

23             THE COURT:  OKAY.  SO I WILL GIVE YOU

24   FURTHER -- WELL, LET ME TAKE A LOOK AT THIS AND IF

25   I NEED TO HEAR MORE FROM YOU, WE'LL TALK ABOUT IT

1    AT 4:30 AFTER OUR JURY LEAVES, UT THANK YOU.  I

2    APPRECIATE THE HEAD UP.  MY CASE VIEW WAS DOWN.  I

3    DON'T KNOW IF YOU ALL HAD CASE VIEW?  DID YOU HAVE

4    CASE VIEW?

5            MR. DEFRANCO:  I'M SORRY, YOUR HONOR, ONE

6    MORE THING THAT I -- MIGHT I ADD ONE MORE THING.

7            THE COURT:  PLEASE, GO AHEAD.

8            MR. DEFRANCO:  ALSO, DR. GRAY TESTIFIED,

9    YOU KNOW, AND THERE WAS QUESTIONING ABOUT

10   NON-INFRINGING AN INVALID PATENT.  OF COURSE THAT

11   PLAYS INTO OUR OPPOSITION TO THEIR JMOL AS WELL.

12           MR. MCELHINNY:  I'D JUST LIKE TO NOTE

13   THAT'S THE BEST THEY GOT, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  OKAY.  WHAT I'M

15   GOING TO DO IS -- DID YOU ALL PROVIDE THE HARD COPY

16   OF THE TRIAL TRANSCRIPTS.  I PUT THAT IN MY ORDER

17   LAST NIGHT.

18           MR. JACOBS:  LET US CHECK FOR THAT.

19           THE COURT:  OKAY.  WHAT I'D LIKE TO DO IS

20   WHEN WE COME BACK AT 4:30, IF YOU HAVE SPECIFIC

21   PAGES, I WANT TO LINE ALL THE BINDERS UP AND LOOK

22   AND CONFIRM FOR MYSELF.  IF THERE'S ANYTHING

23   OUTSTANDING.  OKAY?  ALL RIGHT.  IF YOU DIDN'T DO

24   IT, IF YOU COULD DO IT DURING THE BREAK, PLEASE.

25           MR. JACOBS:  YES, YOUR HONOR.

```
 1              THE COURT:  OKAY.  THANK YOU.

 2              MR. MCELHINNY:  WHAT TIME WOULD YOU LIKE

 3   US BACK, YOUR HONOR?

 4              THE COURT:  OH, BOY.  OUR JURY IS

 5   WAITING, HUH.  ALL RIGHT.  LET'S TAKE 15 MINUTE

 6   BREAK.

 7              (WHEREUPON, A RECESS WAS TAKEN.)

 8              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 9   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

10              THE COURT:  OKAY.  WELCOME BACK.  WOULD

11   YOU BRING IN OUR JURY, PLEASE.

12              THE CLERK:  YES, YOUR HONOR.

13              THE COURT:  THANK YOU.

14              (WHEREUPON, THE FOLLOWING PROCEEDINGS

15   WERE HELD IN THE PRESENCE OF THE JURY:)

16              THE COURT:  OKAY.  WELCOME BACK.  PLEASE

17   TAKE A SEAT AGAIN.

18                       MANI SRIVASTAVA,

19   BEING CALLED AS A WITNESS ON BEHALF OF THE

20   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

21   EXAMINED AND TESTIFIED AS FOLLOWS:

22              THE WITNESS:  YES, I DO.

23              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

24              THE COURT:  THE TIME IS NOW OFF ON THIS

25   ONE AS WELL, LEE-ANNE.  ALL RIGHT.  THE TIME IS
```

```
 1    OFF.  IT IS, THIS IS A LITTLE BIT FAST.  IT'S 3:49.
 2    GO AHEAD.  WE SHOULD DO THE TRANSCRIPT.
 3              COURT REPORTER:  IT'S 3:46.
 4              THE COURT:  OKAY.  GO AHEAD.
 5              MR. SELWYN:  THANK YOU, YOUR HONOR.
 6                    DIRECT EXAMINATION
 7    BY MR. SELWYN:
 8    Q    GOOD AFTERNOON.
 9    A    SO I'M --
10    Q    WOULD YOU PLEASE INTRODUCE YOURSELF AND TELL
11    US WHERE YOU WORK, SIR?
12    A    MY NAME IS MANI BHUSHAN SRIVASTAVA, AND I'M A
13    PROFESSOR AT UCLA.  THAT'S UNIVERSITY OF
14    CALIFORNIA, LOS ANGELES.
15    Q    AND IF YOU COULD JUST MOVE A LITTLE BIT CLOSER
16    TO YOUR MIKE.
17              WHAT DO YOU DO AT UCLA?
18    A    I'M A PROFESSOR IN ELECTRICAL ENGINEERING AND
19    COMPUTER SCIENCE DEPARTMENT.
20    Q    HAVE YOU BEEN RETAINED BY APPLE AS AN EXPERT
21    WITNESS IN THIS CASE?
22    A    YES, I HAVE BEEN.
23    Q    ON WHICH PATENT?
24    A    THE '460.
25    Q    IS THIS YOUR FIRST TIME TESTIFYING IN COURT?
```

1    A    YES, IT IS.

2    Q    CAN YOU TELL THE JURY A LITTLE BIT ABOUT YOUR

3    EDUCATIONAL BACKGROUND?

4    A    SURE.  I DID MY GRADUATE WORK AT ELECTRICAL

5    ENGINEERS AT INDIAN INSTITUTE OF TECHNOLOGY,

6    KHARAGPUR.

7         I MOVED IN 1985 TO THE BAY AREA TO U.C.

8    BERKELEY, MASTER AND PH.D., BOTH OF THEM IN

9    ELECTRICAL ENGINEER AND COMPUTER SCIENCE IN 1987

10   AND 1992 RESPECTIVELY.

11   Q    WHEN DID YOU JOIN UCLA?

12   A    EARLY 1997.

13   Q    WHAT POSITIONS HAVE YOU HELD AT THE

14   UNIVERSITY?

15   A    I STARTED OUT AS AN ASSISTANT PROFESSOR AND

16   OBTAINED MY TENURE IN 1998, THEN BECAME ASSOCIATE

17   PROFESSOR AND THEN IN 2003 I WAS PROMOTED TO FULL

18   PROFESSOR.  I ALSO SERVED AS VICE CHAIR OF

19   ELECTRICAL ENGINEERING DEPARTMENT.  THAT WAS FROM

20   2011 THROUGH 2011.

21   Q    WHAT HAS BEEN THE FOCUS OF YOUR RESEARCH AT

22   UCLA?

23   A    MY RESEARCH HAS ON MOBILE AND WIRELESS

24   COMPUTING AND COMMUNICATION SYSTEMS AND EMBEDDED

25   SYSTEMS.

```
 1              AS AN EXAMPLE, SOME OF MY RESEARCH HAS
 2   FOCUSSED ON PORTABLE WIRELESS TERMINALS FOR USE BY
 3   SOLDIERS IN THE U.S. ARMY, WHICH EXCHANGE
 4   MULTIMEDIA INFORMATION.
 5   Q    HAVE YOU AUTHORED ANY ACADEMIC BOOKS OR
 6   PUBLICATIONS?
 7   A    YES, I HAVE.
 8   Q    HOW MANY?
 9   A    APPROXIMATELY 250.
10   Q    AND TELL US A LITTLE BIT ABOUT ON WHAT
11   SUBJECTS THESE PUBLICATIONS HAVE BEEN ON?
12   A    YES, THEY HAVE BEEN ON MY RESEARCH IN MOBILE
13   AND WIRELESS COMPUTING SYSTEMS AND COMPUTING
14   SYSTEMS.
15   Q    DO YOU TEACH?
16   A    YES, I DO.
17   Q    WHAT SUBJECTS DO YOU TEACH?
18   A    AT THE GRADUATE LEVEL, I TEACH COURSES ON
19   MOBILE COMPUTING AND WIRELESS NETWORKS, EMBEDDED
20   SYSTEMS.  AT UNDERGRADUATE DIGITAL DESIGN AND
21   ROBOTICS SYSTEMS.
22   Q    HAVE YOU BEEN NAMED AS AN INVENTOR ON ANY
23   PATENTS?
24   A    YES.  I HAVE BEEN LISTED AS CO-INVENTOR ON
25   FIVE PATENTS.  THEY WERE FROM MY WORK AT BELL LABS
```

1290

```
1    PRIOR TO JOINING UCLA.

2    Q    HAVE YOU RECEIVED ANY AWARDS?

3    A    YES, I'VE BEEN FORTUNATE TO RECEIVE SOME, ONE

4    THAT I WAS PARTICULARLY PLEASED BY IS I WAS ELECTED

5    AS A FELLOW OF THE IEEE, THAT'S THE LEADING

6    PROFESSIONAL SOCIETY FOR ELECTRONICS AND ELECTRICAL

7    ENGINEERS.

8              ANOTHER ONE I WOULD MENTION IS I WAS

9    SELECTED AS THE HEAD IN CHIEF FOR IEEE TRANSACTIONS

10   ON MOBILE COMPUTING, WHICH IS THE LEADING JOURNAL

11   IN MOBILE COMPUTING.

12   Q    AND HOW MANY YEARS HAVE YOU BEEN ENGAGED AND

13   WORKED AND RESEARCHED AND TEACHING IN THE FIELD OF

14   MOBILE TECHNOLOGY?

15   A    ROUGHLY 22 YEARS.

16             MR. SELWYN:  WE OFFER DR. SRIVASTAVA AS

17   AN EXPERT IN THE FIELD OF MOBILE COMPUTING.

18             THE COURT:  ANY OBJECTION?

19             MR. JOHNSON:  NO, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  SO CERTIFIED.

21   BY MR. SELWYN:

22   Q    ARE YOU BEING PAID FOR YOUR TIME WORKING IN

23   THIS CASE?

24   A    YES, I AM.

25   Q    WHAT HOURLY RATE?
```

1    A    IT IS $425.

2    Q    AND APPROXIMATELY HOW MANY HOURS HAVE YOU

3    WORKED ON THIS CASE TO INDICT?

4    A    THUS FAR AROUND 225.

5    Q    WHAT WAS YOUR ASSIGNMENT IN THIS CASE?

6    A    I WAS ASKED TO PROVIDE MY EXPERT OPINION ON

7    WHETHER OR NOT THE '460 PATENT IS VALID, AS WELL AS

8    WHETHER CERTAIN APPLE PRODUCTS INFRINGE ON THAT

9    PATENT.

10   Q    WHAT MATERIALS DID YOU CONSIDER IN REACHING

11   YOUR OPINIONS?

12   A    WELL, OF COURSE THE '460 PATENT ITSELF, ITS

13   PROSECUTION HISTORY.  I ALSO EXAMINED THE PRIOR

14   ART, A FEW PATENTS, AS WELL AS VARIOUS DOCUMENTS

15   FROM BOTH SIDES, SUCH AS DEPOSITION TRANSCRIPT,

16   EXPERT REPORTS AND SUCH.

17        I ALSO EXAMINED CERTAIN APPLE SOURCE CODE

18   AS WELL.

19   Q    HAVE YOU REACHED AN OPINION AS TO WHETHER OR

20   NOT THE APPLE PRODUCTS INFRINGE THE '460 PATENT AND

21   WHETHER THAT PATENT IS VALID?

22   A    YES, I HAVE.

23   Q    WHAT IS YOUR OPINION?

24   A    THE '460 PATENT IS NOT VALID AND THE APPLE

25   PRODUCTS DO NOT INFRINGE ON THAT PATENT.

1    Q    CAN YOU TELL US, AT A HIGH LEVEL, WHAT THE

2    SUBJECT MATTER IS OF THE '460 PATENT?

3    A    THE '460 PATENT IS ABOUT A NETWORK CONSISTING

4    OF SEVERAL STEPS FOR A USER OF A DEVICE THAT HAS

5    BOTH PHONE AND CAMERA FUNCTIONS TO BE ABLE TO SEND

6    AN E-MAIL WITH A MESSAGE ONLY, AN E-MAIL WITH A

7    MESSAGE AND AN IMAGE, AS WELL AS TO SCROLL-THROUGH

8    IMAGES ON THE DEVICE.

9    Q    NOW, I'D LIKE, IF YOU COULD, TO ROLL BACK THE

10   CLOCK FOR US A LITTLE BIT TO THE TIME THAT SAMSUNG

11   APPLIED FOR THE '460 PATENT, FEBRUARY OF 1999.

12        WHAT TECHNOLOGIES EXISTED AS OF THAT TIME

13   RELEVANT NOT '460 PATENT?

14   A    THERE WERE THREE, A CELLULAR TELEPHONE,

15   DIGITAL PHOTOGRAPHING, AND MOBILE COMPUTER.

16   Q    BRIEFLY, WHAT WAS THE STATE OF CELL PHONE

17   TECHNOLOGY AS OF FEBRUARY 1999?

18   A    WELL, CELL PHONES EXISTED.  BY THAT TIME, THEY

19   HAD ADOPTED DIGITAL TECHNOLOGY, AND AS A RESULT,

20   BEYOND JUST MAKING PHONE CALLS, THEY COULD ALSO

21   HANDLE OTHER TYPES OF DATA.  SO, FOR EXAMPLE, WE

22   COULD SEND E-MAIL, WE COULD SEND TEXTS, WE COULD DO

23   OTHER FUNCTIONS.

24        MOREOVER, ON THE DEVICE ITSELF, YOU HAD

25   FUNCTIONS LIKE CALENDARING, CONTACT LIST, THAT SORT

1  OF THING.

2  Q    WHAT WAS THE STATE OF DIGITAL PHOTOGRAPHY AS

3  OF FEBRUARY 1999?

4  A    SO, AGAIN, DIGITAL CAMERAS EXISTED.  BENEFITS

5  OF IT WAS TAKING PHOTOS IN A DIGITAL FORM VERSUS

6  SIMPLY TAKING IMAGES.  A USER COULD ALSO EDIT THEM,

7  BROWSE THROUGH THEM, DO OTHER FUNCTIONS ON THEM,

8  E-MAIL THEM, FOR EXAMPLE.

9         MOREOVER, AS A RESULT OF DIGITAL

10 TECHNOLOGY, THE CAMERA MODELS THEMSELVES HAD BECOME

11 SMALL ENOUGH SO THAT THEY COULD BE INCORPORATED

12 INTO OTHER DEVICES, NOT JUST STAND ALONE.  FOR

13 EXAMPLE, THEY COULD BE PART OF A PHONE OR PDA,

14 THINGS LIKE THAT.

15 Q    WHAT WAS THE STATE OF PORTABLE COMPUTING AS OF

16 FEBRUARY 1999?

17 A    WELL, A VARIETY OF PORTABLE COMPUTERS EXISTED.

18 LAPTOPS, OBVIOUSLY.  IN MID-'90S, THERE WERE

19 PERSONAL DIGITAL ASSISTANTS WERE VERY POPULAR.

20 SOME OF YOU MAY RECALL A PALM PILOT, WHICH WAS VERY

21 POPULAR IN THE MID-'90S.

22         ESSENTIALLY ON THE SMALL COMPUTERS YOU

23 COULD DO A VARIETY OF FUNCTIONS WHICH WERE TYPICAL

24 OF COMPUTING, SEND AN E-MAIL, BROWSING THROUGH

25 DOCUMENTS, THINGS LIKE THAT.

1    Q    LET'S TURN TO THE PATENT.  CAN WE HAVE CLAIM 1

2    ON THE SCREEN.  CAN YOU GIVE US AN OVERVIEW OF WHAT

3    CLAIM 1 DESCRIBES?

4    A    SO CLAIM 1 DESCRIBES A SPECIFIC METHOD, WHICH

5    IS BASED ON THE USER MODES AND SUB-MODES, SO THAT A

6    USER OF THE DEVICE THAT IS BOTH PHONE AND CAMERA

7    FUNCTIONS IN THE PHONE, COULD DO, FOR INSTANCE,

8    SENDING E-MAIL WITH A MESSAGE ONLY, SEND AN E-MAIL

9    WITH JUST A MESSAGE AND AN IMAGE, AS WELL AS SCROLL

10   THROUGH IMAGES WHICH ARE ON THE DEVICE.

11   Q    WHAT IS A MODE AS USED IN THE PATENT?

12   A    SO A MODE IS A DISTINCT STATE OF OPERATION OR

13   SETTING FOR A DEVICE OR OF AN APPLICATION.  IT'S

14   BEST ILLUSTRATED BY AN EXAMPLE.

15        AS YOU CAN SEE, THIS CLAIM REFERS THE

16   PORTABLE PHONE MODE UNDER ELEMENT A AND HAS A

17   REFERENCE TO A CAMERA MODE UNDER ELEMENT B.

18        SO THESE ARE EXAMPLES OF MODES WHEN THE

19   DEVICE IS IN THE PORTABLE PHONE MODE, YOU HAVE

20   PHONE FUNCTIONS.  WHEN IT'S IN THE CAMERA ROAD, YOU

21   HAVE CAMERA RELATED FUNCTIONS AND THERE'S A SWITCH

22   WHEN THE USER MOVES THE DEVICE BETWEEN THE TWO

23   MODES.

24   Q    LET'S LOOK AT FIGURE 6 OF THE '460 PATENT ON

25   THE SCREEN.  WHAT MODES ARE SHOWN IN FIGURE 6?

1    A    YES.  SO I WOULD REQUEST THAT WE HIGHLIGHT A

2    COUPLE OF BOXES.  BOX 602, WHICH SHOWS THE PORTABLE

3    PHONE MODE, AND IF YOU COULD GO DOWN AND BOX 614

4    WHICH SHOWS THE CAMERA MODE.  AND YOU WILL SEE THAT

5    BOX 612 REFERS TO THE CAMERA ON A SWITCH THAT I

6    JUST MENTIONED WITHIN WHICH THE DEVICE MOVES FROM

7    ONE MODE TO THE OTHER.

8    Q    HOW DOES THE PATENT DESCRIBE THE PORTABLE

9    PHONE MODE?

10   A    IN THE PORTABLE PHONE MODE, THE PHONE RELATED

11   FUNCTIONS ARE DONE, SO RELATED TO RECEIVE PHONE

12   CALL, MAKE PHONE CALLS, THINGS LIKE THAT.

13   Q    CAN THE USER TAKE A PHOTO FROM THE PORTABLE

14   PHONE MODE OF THE '460 PATENT?

15   A    NO, HE CANNOT BECAUSE THE USER HAS TO TURN

16   THAT SWITCH ON, MOVE TO THE CAMERA MODE TO BE ABLE

17   TO DO THAT.

18   Q    WHAT DOES FIGURE 6 TELL US ABOUT THE CAMERA

19   MODE?

20   A    WELL, IN THE CAMERA MODE, IF YOU CAN GO DOWN

21   THE FIGURE A LITTLE BIT, IN THE CAMERA MODE, THE

22   CAMERA HAS TURNED ON AND THEN A CAMERA RELATED

23   FUNCTIONS, TAKING A PHOTO, BROWSING THROUGH THE

24   PHOTOS THAT WERE TAKEN, CAN BE PERFORMED.

25            AND, AGAIN, BECAUSE OF THE SWITCH IN THAT

1296

```
 1    MODE, THE USER CANNOT MAKE PHONE CALLS.  IT'S IN
 2    CAMERA MODE.
 3    Q    CAN THE DEVICE BE IN MORE THAN ONE MODE AT
 4    ONCE?
 5    A    NO, IT CANNOT.
 6    Q    HOW DO YOU KNOW?
 7    A    WELL, THAT SWITCH THAT I REFERRED TO, SO IN
 8    THIS FIGURE, YOU SEE THAT HOW WHEN THE USER TURNS
 9    THAT SWITCH ON, IT MOVES FROM PHONE TO CAMERA MODE.
10    THERE IS ANOTHER FIGURE IN THE PATENT, FIGURE 8,
11    WHETHER THE DEVICE HAPPENS WHEN THE USER TURNS THE
12    SWITCH OFF, IT RETURNS BACK TO THE PHONE MODE.
13    Q    OKAY.  LET'S TURN NOW TO YOUR NON-INFRINGEMENT
14    OPINION.  CAN YOU REMIND US FIRST WHAT THE ACCUSED
15    PRODUCTS ARE?
16    A    THERE ARE FIVE PRODUCTS.  THE IPHONE 3G, THE
17    IPHONE 3GS, THE IPHONE 4, THE IPOD TOUCH FOURTH
18    GENERATION, AND THE IPAD 2.
19    Q    COULD YOU GIVE US AN OVERVIEW OF THE REASONS
20    WHY YOU BELIEVE APPLE PRODUCTS DO NOT INFRINGE
21    CLAIM 1.
22    A    WELL, THERE ARE THREE REASONS:  FIRSTLY, APPLE
23    PRODUCTS ARE SIMPLY INCAPABLE OF PERFORMING THE
24    STEPS IN THE ORDER THAT THE CLAIM LANGUAGE OF THE
25    CLAIM REQUIRES;
```

1           SECONDLY, CURRENT APPLE PRODUCTS DO NOT

2    HAVE THE SCROLL KEY, WHICH IS MENTIONED IN ELEMENT

3    C OF THE CLAIM; AND,

4           FINALLY, APPLE PRODUCTS ORGANIZE THEIR

5    CAMERA AND PHONE FUNCTIONS USING A NEW WAY, APPS OR

6    APPLICATIONS, AS OPPOSED TO MODES THAT THE '460

7    PATENT USES.

8    Q    CAN WE HAVE PDX 52.2 BACK ON THE SCREEN, WHICH

9    IS CLAIM 1.

10          DO YOU HAVE AN OPINION WHETHER THE FIVE

11   ELEMENTS DESCRIBED IN CLAIM 1 MUST OCCUR IN A

12   CERTAIN ORDER?

13   A    YES, I DO.

14   Q    WHAT IS THAT?

15   A    WELL, ELEMENT A AND B MUST OCCUR IN ORDER, AND

16   ELEMENT B, C, AND E MUST OCCUR IN ORDER.

17   Q    NOW, I WANT TO GO THROUGH THIS SLOWLY WITH

18   YOU.

19          WHAT ORDER IS REQUIRED BETWEEN ELEMENTS A

20   AND D?

21   A    WELL, A MUST HAPPEN BEFORE D.

22   Q    WHY?

23   A    SO IF YOU LOOK AT ELEMENT A, THIS IS WHERE THE

24   USER STARTS TO COMPROMISE AN E-MAIL, JUST WITH THE

25   MESSAGE, AND ELEMENT D IS ABOUT THE TRANSMISSION OF

1    THAT E-MAIL.  SO OBVIOUSLY WE HAVE TO COMPROMISE IT

2    BEFORE THE E-MAIL CAN BE SENT, SO A HAS TO BE

3    BEFORE D.

4    Q    DOES DR. YANG AGREE WITH YOU ON THAT POINT?

5    A    YES, HE DOES.

6    Q    WHAT ORDER IS REQUIRED BETWEEN ELEMENTS B, C,

7    AND E?

8    A    ELEMENT B MUST HAPPEN BEFORE C AND C MUST

9    HAPPEN BEFORE E.

10   Q    WHY?

11   A    WELL, AN EXAMPLE.  ELEMENT B IS ABOUT THE USER

12   IS STARTING TO COMPOSE AN E-MAIL WHICH HAS THE

13   LATEST IMAGE IN IT TAKEN FROM THE CAMERA.  AND

14   ELEMENT E IS ABOUT SENDING THAT E-MAIL.  OBVIOUSLY

15   B HAS TO HAPPEN BEFORE E.

16        NOW, LET'S FOCUS ON C.  AND I WOULD

17   REQUEST THAT WE HIGHLIGHT A COUPLE OF PHRASES ON

18   HERE.  SO FIRSTLY, HIGHLIGHT THE PHRASE OTHER

19   IMAGES AND ELEMENT C, AND I WOULD ALSO LIKE THAT WE

20   HIGHLIGHT DISPLAY AN IMAGE.  SO CAN WE HIGHLIGHT AN

21   IMAGE IN ELEMENT B, TOWARD ATTENTION THE --

22   Q    SO JUST TO SLOW YOU DOWN A MOMENT, DOCTOR,

23   WE'RE HIGHLIGHTING DISPLAYING AN IMAGE IN ELEMENT

24   B; CORRECT?

25   A    THAT'S CORRECT.

```
 1    Q    AND WE'VE ALSO HIGHLIGHTED OTHER IMAGES IN

 2    ELEMENT C; IS THAT CORRECT?

 3    A    YES.

 4    Q    SO NOW WOULD YOU EXPLAIN TO US WHERE ELEMENT C

 5    FITS INTO THIS?

 6    A    RIGHT.  SO PLAIN MEANING OF OTHER IMAGES HAS

 7    TO BE WITH REFERENCE TO SOMETHING ELSE, WHICH YOU

 8    HAVE DONE PREVIOUSLY, AND THAT'S WHEN THAT'S

 9    CAPTURED.  SO CLEARLY LOGICALLY C HAS TO FOLLOW B.

10    OTHERWISE OTHER IMAGES WON'T MAKE ANY SENSE.

11          FURTHERMORE, C HAS TO BE BEFORE E, AND

12    THE REASON FOR THAT IS IF C IS STANDALONE, THAT

13    MEANS YOU ARE GOING TO BE BROWSING MOVING THROUGH

14    THESE IMAGES, BUT THAT WOULD HAVE NOTHING TO DO

15    WITH THE STATED PURPOSE OF THIS CLAIM, WHICH IS IN

16    THE VERY PREAMBLE, A DATA TRANSMISSION METHOD.

17          STEP C HAS TO HAVE SOMETHING TO DO WITH

18    DATA TRANSMISSION METHOD, SO THAT IMPLIES THAT C

19    HAS TO COME BEFORE E.

20    Q    LET ME ASK YOU NOW ABOUT THE APPLE PRODUCTS.

21    CAN THE APPLE PRODUCTS PERFORM THE ELEMENTS IN THE

22    ORDER REQUIRED BY CLAIM 1?

23    A    NO, THEY CANNOT.

24    Q    WHY NOT?

25    A    WELL, APPLE PRODUCTS SIMPLY CANNOT DO STEP C,
```

1    ELEMENT C AFTER ELEMENT B.

2    Q    CAN WE HAVE PDX 52.3 ON THE SCREEN, PLEASE.

3              CAN YOU USE PDX 52.3 TO EXPLAIN YOUR

4    OPINION THAT THE APPLE PRODUCTS CANNOT PERFORM THE

5    STEPS IN THE ORDER REQUIRED BY CLAIM 1?

6    A    YES.  SO WHAT YOU SEE ON THE SCREEN HERE IS

7    HOW THE SCREEN ON THE DEVICE LOOKS AFTER THE USER

8    HAS BEGUN TO COMPOSE AN E-MAIL IN WHICH THERE IS AN

9    IMAGE TO IT.

10             AND NORMALLY YOU DON'T SEE ANY SCROLL

11   KEYS HERE, BUT ACTUALLY THERE'S NO WAY YOU CAN

12   SCROLL THE IMAGES WHILE YOU ARE IN THIS VIEW.  SO

13   STEP C SIMPLY CAN'T BE PERFORMED.

14   Q    WERE YOU IN COURT WHEN DR. YANG TESTIFIED THAT

15   ELEMENT C COULD BE PERFORMED IN ANY ORDER AND AT

16   ANY TIME?

17   A    YES, I WAS.

18   Q    DO YOU AGREE WITH THAT?

19   A    NO, I DO NOT.

20   Q    WHY NOT?

21   A    AS I MENTIONED A SHORT WHILE AGO, IF STEP C IS

22   A STAND ALONE FUNCTION, OPERATION, THEN IT WOULD

23   HAVE NOTHING TO DO WITH DATA TRANSMISSION METHOD,

24   WHICH IS WHAT THIS CLAIM IS ABOUT.

25   Q    LET'S RETURN TO CLAIM 1 AND LET ME ASK YOU

```
 1     ABOUT THE SECOND BASIS OF YOUR NON-INFRINGEMENT

 2     OPINION?

 3     A    THE SECOND BASIS IS THAT CURRENT APPLE

 4     PRODUCTS DO NOT HAVE THE SCROLL KEYS.

 5     Q    WHY NOT?

 6     A    THEY USE NEWER, MORE SOPHISTICATED METHOD

 7     CALLED SWIPING.

 8     Q    CAN WE HAVE PDX 52.4 ON THE SCREEN, PLEASE.

 9     CAN YOU EXPLAIN THIS SLIDE, PLEASE.

10     A    YES.  SO THIS SHOWS PRECISELY THE POINT I JUST

11     MADE, THAT CURRENT APPLE PRODUCTS, AND THAT'S THE

12     MIDDLE COLUMN IN THIS FIGURE, THEY DO NOT HAVE

13     THOSE ARROW BUTTONS WHICH CORRESPOND TO THE SCROLL

14     KEYS.  THEY INSTEAD HAVE ONLY SWIPING.

15          I WOULD ALSO MENTION THAT IPAD 2 ACTUALLY

16     NEVER HAD THE ARROW BUTTONS, EVEN IN THE PREVIOUS

17     VERSION OF THE IOS OPERATING SYSTEM THAT RUNS ON

18     THESE DEVICES.

19     Q    DID YOU HEAR DR. YANG TESTIFY THAT SWIPING, IN

20     HIS OPINION, MEETS THE SCROLL KEY LIMITATION UNDER

21     SO THE SO-CALLED DOCTRINE OF EQUIVALENTS?

22     A    YES, I HEARD HIM SAY THAT.

23     Q    DO YOU AGREE WITH THAT?

24     A    NO, I DO NOT.

25     Q    CAN WE HAVE VIDEO 50 -- PARDON ME, PDX 53.6 ON
```

1    THE SCREEN.

2              AS WE PLAY THIS, CAN YOU EXPLAIN WHAT

3    WE'RE SEEING?

4    A    YES.  SO THIS IS A VIDEO WE ALSO SAW IN

5    MS. KIM'S TESTIMONY THAT SHOWS HOW USING THE LEFT

6    AND RIGHT ARROW, YOU CAN MOVE THROUGH THE PREVIOUS

7    OR NEXT IMAGE, AND THEY MAY MAKE CHANGES AS YOU

8    WILL NOTICE.

9    Q    NOW LET'S LOOK AT VIDEO PDX 53.7, AND AGAIN

10   CAN YOU EXPLAIN WHAT WE'RE SEEING?

11   A    IN THIS ONE YOU WILL SEE THE USER USING

12   SWIPING TO MOVE THE PREVIOUS IMAGE, AND THERE'S AN

13   IMAGE THAT GOES ON WHERE IT SLIDES AND IT DEPENDS

14   UPON THE WAY THE USER TOUCHES THE PICTURE, THE

15   SPEED AND THE DISTANCE OF THE MOVEMENT OF THE

16   FINGER.

17   Q    SO NOW I WANT TO PUT A LITTLE BIT MORE MEAT ON

18   THE BONES HERE OF HOW DO YOU COMPARE SWIPING WITH

19   SCROLL KEYS.  DOES SWIPING PERFORM SUBSTANTIALLY

20   THE SAME FUNCTION AS SCROLL KEYS?

21   A    NO, IT DOES NOT.  WE JUST SAW THAT SWIPING

22   PROVIDES ANIMATION AS THE USER IS MOVING, AND THE

23   PURPOSE BEHIND THAT IS TO GIVE THE USER A MORE

24   NATURAL PHYSICAL INTERFACE WITH THE DEVICE, AS

25   OPPOSED TO TAPPING ON THE KEYS.

1    Q    DOES SWIPING PERFORM IN SUBSTANTIALLY THE SAME

2    WAY AS SCROLL KEYS?

3    A    NO, IT DOES NOT.  TO PERFORM THAT ANIMATION,

4    THE UNDERLYING SOFTWARE, THE IOS SOFTWARE, HAS TO

5    DO THOSE FUNCTIONS CORRESPONDING TO THAT IMAGE.

6         AND MOREOVER, I ALSO EXAMINED THE SOURCE

7    CODE FOR THE OLDER APPLE DEVICES WHERE THEY ALSO

8    HAD THE ARROW KEYS, AND THE INTERACTION OF THE

9    APPLICATION WITH THE UNDERLYING OPERATING SYSTEM

10   WAS TOTALLY DIFFERENT.  IT INVOLVED A DIFFERENT SET

11   OF FUNCTIONS, METHODS TO DO THAT.  SO NO.

12   Q    HOW MUCH TIME DID YOU SPEND REVIEWING THE

13   SOURCE CODE?

14   A    ROUGHLY I WOULD SAY 12 TO 14 HOURS OVER TWO

15   DAYS THAT I WAS THERE.

16   Q    DOES SWIPING HAVE SUBSTANTIALLY THE SAME

17   RESULT AS SCROLL KEYS?

18   A    NO, IT DOESN'T.

19   Q    WHY?

20   A    IT CERTAINLY CAN MOVE TO THE NEXT OR PREVIOUS

21   IMAGE, BUT ALSO IF I CAN PUT UP ANOTHER VIDEO TO

22   SHOW --

23   Q    LET'S HAVE PDX 53.8 ON THE SCREEN.

24        CAN YOU EXPLAIN WHAT'S HAPPENING IN THIS

25   VIDEO?

```
 1    A    SO YOU WILL SEE THAT HERE THE USER SWIPES, BUT

 2    LOOKS AT THE NEXT PHOTO AND THEN CHANGES THEIR MIND

 3    AND THE PHOTO SNAPS BACK.

 4              AND THE IDEA IS THAT IF YOU'RE LOOKING

 5    FOR A PHOTO AND WHEN YOU REALIZE THE NEXT PHOTO IS

 6    NOT THE ONE YOU WANT, YOU CAN JUST CHANGE YOUR MIND

 7    AND SNAP BACK.

 8              WITH ARROWS YOU SIMPLY CANNOT DO IT.  IT

 9    WILL MOVE TO THE NEXT ONE.

10    Q    SO WE'VE TALKED ABOUT THE ORDER OF STEPS.

11    WE'VE TALKED ABOUT SCROLL KEYS.

12              NOW I WANT TO TURN TO THE THIRD BASIS FOR

13    YOUR NON-INFRINGEMENT OPINION.  CAN YOU REMIND US

14    WHAT THAT IS?

15    A    APPLE PRODUCTS ORGANIZE THEIR CAMERA AND PHONE

16    FUNCTIONS USING A TOTALLY NEW WAY OF APPS AS

17    OPPOSED TO THE MODES THAT THE '460 DEVICE USES.

18    Q    ARE APPS THE SAME THING OR DIFFERENT FROM

19    MODES?

20    A    THEY ARE DIFFERENT.

21    Q    HOW ARE THEY DIFFERENT?

22    A    WELL, APPS ARE STAND ALONE SOFTWARE PROGRAMS.

23    THEY PROVIDE THE USER SOME FUNCTIONS.  THEY PROVIDE

24    SEVERAL BENEFITS TO THE USER IN THAT THEY'RE

25    IMPLEMENTED DIFFERENTLY.
```

1    Q    CAN WE PUT PDX 52.2 SHOWING CLAIM 1 BACK ON

2    THE SCREEN.  ON THIS ISSUE OF APPS VERSUS MODES,

3    WHICH ELEMENTS OF CLAIM 1 HAVE YOU CONCLUDED ARE

4    MISSING FROM THE APPLE PRODUCTS?

5    A    WELL, APPLE PRODUCTS DO NOT HAVE THE PORTABLE

6    PHONE MODE; THEY DO NOT HAVE A CAMERA MODE; THEY DO

7    NOT HAVE THE FIRST E-MAIL TRANSMISSION SUB-MODE;

8    THEY DO NOT HAVE THE SECOND E-MAIL TRANSMISSION

9    SUB-MODE; THEY DO NOT HAVE THE DISPLAY SUB-MODE.

10   Q    WERE YOU PRESENT IN COURT WHEN DR. YANG

11   TESTIFIED THAT THE APPLE PRODUCTS HAVE MODES AS

12   CLAIMED IN THE '460 PATENT?

13   A    YES, I WAS.

14   Q    DO YOU AGREE OR DISAGREE WITH HIM ON THAT?

15   A    I DISAGREE.  THEY DO NOT HAVE THE MODES TALKED

16   ABOUT IN '460.

17   Q    DID YOU HEAR DR. YANG TESTIFY THAT IT IS

18   APPLE'S POSITION THAT THERE ARE NO MODES IN APPLE'S

19   PRODUCTS?

20   A    YES, I HEARD HIM SAY THAT.

21   Q    AND IS IT YOUR TESTIMONY THAT THERE ARE NO

22   MODES IN THE APPLE PRODUCTS?

23   A    NOT AT ALL.  THESE DEVICES DO HAVE MODES, JUST

24   NOT THE MODES THAT ARE DESCRIBED IN '460.  WE OFTEN

25   SEE THE LITTLE SWITCH ON THE SIDE OF PHONES, FOR

1   EXAMPLE, SILENT MODE OR TYPICALLY THEY PROVIDE YOU

2   WITH THINGS LIKE AIRPLANE MODE.

3          SO CERTAINLY IT HAS MODES, BUT NOT THE

4   ONES IN THE '460.

5   Q    NOW I WANT TO TURN TO YOUR INVALIDITY OPINION,

6   AND WE'RE GOING TO BE TALKING ABOUT A FEW DIFFERENT

7   REFERENCES, SO I WANT TO MAKE SURE WE GO THROUGH

8   THIS SLOWLY.

9          BRIEFLY, WHAT IS THE BASIS FOR YOUR

10  CONCLUSION THAT CLAIM 1 IS INVALID?

11  A    THE PRIOR ART I EXAMINED, AND SPECIFICALLY

12  THREE PRIOR ART PATENTS, THE SO-CALLED SUSO, HARRIS

13  AND YOSHIDA PATENTS WHICH, IN COMBINATION, MAKE

14  CLAIM 1 OF '460 OBVIOUS FOR SOMEONE OF SKILL IN THE

15  ART.

16  Q    WE'RE GOING TO TALK ABOUT EACH OF THOSE THREE

17  REFERENCES SEPARATELY, BUT BEFORE WE DO THAT, CAN

18  YOU TELL US HOW THOSE REFERENCES RELATE TO ONE

19  ANOTHER?

20  A    WELL, THERE ARE OTHER CAMERA PHONES ACTUALLY,

21  AND IN FACT, GREAT EXAMPLES OF THE THREE

22  TECHNOLOGIES I MENTIONED EARLIER, CELLULAR

23  TELEPHONE, DIGITAL CAMERA, AND MOBILE COMPUTING

24  WHILE THEY WERE CONVERGING PRIOR TO THE '460

25  PATENT.

```
1     Q     LET'S TURN NOW TO THAT PRIOR ART.  COULD YOU
2     LOOK IN YOUR BINDER AT TAB 3.  DO YOU RECOGNIZE
3     THAT?
4     A     YES, I DO.
5     Q     WHAT IS IT T?
6     A     THAT'S THE SUSO PATENT THAT I JUST MENTIONED.
7     Q     WHAT IS THE TITLE OF THAT PATENT?
8     A     IT READS "INFORMATION COMMUNICATION TERMINAL
9     DEVICE."
10              MR. SELWYN:  YOUR HONOR, WE OFFER PX 119,
11    THE SUSO PATENT.
12              THE COURT:  ANY OBJECTION?
13              MR. JOHNSON:  NO, YOUR HONOR.
14              THE COURT:  IT'S ADMITTED.
15              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
16              119, HAVING BEEN PREVIOUSLY MARKED FOR
17              IDENTIFICATION, WAS ADMITTED INTO
18              EVIDENCE.)
19              MR. SELWYN:  COULD WE HAVE FIGURES 8A AND
20    B FROM THE SUSO PATENT ON THE SCREEN.
21    Q     AND GENERALLY WHAT DOES THE SUSO PATENT
22    DESCRIBE?
23    A     WELL, IT DESCRIBES A CAMERA PHONE, AND YOU CAN
24    SEE FROM THIS FIGURE THAT IT HAS BOTH SORT OF A
25    PHONE FUNCTIONALITY AND IT HAS A CAMERA FUNCTION
```

1   WHERE YOU SEE THE IMAGE IN THE RIGHT-HAND VIEW.

2   Q    NOW TURN IN YOUR BINDER TO TAB 4.  CAN YOU

3   TELL US WHAT THAT DOCUMENT IS?

4   A    THAT'S THE HARRIS PATENT.

5            MR. SELWYN:  YOUR HONOR, WE OFFER THE

6   HARRIS PATENT, PX 118.

7            THE COURT:  ANY OBJECTION.

8            MR. JOHNSON:  NO OBJECTION.

9            THE COURT:  IT'S ADMITTED.

10           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

11           118, HAVING BEEN PREVIOUSLY MARKED FOR

12           IDENTIFICATION, WAS ADMITTED INTO

13           EVIDENCE.)

14           MR. SELWYN:  CAN WE SHOW FIGURE 8 FROM

15   THE HARRIS PATENT ON THE SCREEN?

16   Q    AND CAN YOU TELL US GENERALLY WHAT THE HARRIS

17   PATENT DESCRIBES?

18   A    IT TOO DESCRIBES A CAMERA PHONE.  YOU SEE A

19   CAMERA, BEING IN THE CAMERA MODE WHERE IT'S SHOWING

20   THE IMAGES.  THERE'S ALSO A LITTLE BUTTON WHICH IS

21   A SOFT KEY TO GO BACK TO THE PHONE FUNCTION.

22   Q    NOW TURN TO TAB 5 IN YOUR BINDER.  DO YOU

23   RECOGNIZE THAT DOCUMENT?

24   A    YES, I DO.

25   Q    WHAT IS IT?

1    A    THAT'S THE YOSHIDA PATENT THAT I MENTIONED.

2              MR. SELWYN:  YOUR HONOR, WE OFFER PX 120,

3    THE YOSHIDA PATENT.

4              THE COURT:  ANY OBJECTION?

5              MR. JOHNSON:  NO OBJECTION.

6              THE COURT:  IT'S ADMITTED.

7              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

8              120, HAVING BEEN PREVIOUSLY MARKED FOR

9              IDENTIFICATION, WAS ADMITTED INTO

10             EVIDENCE.)

11             MR. SELWYN:  CAN WE HAVE FIGURE 1.

12   Q    WHAT DOES THE YOSHIDA PATENT DESCRIBE?

13   A    THIS IS THE CAMERA PHONE.  IT HAS CAMERA,

14   PHONE, BOTH.

15   Q    BRIEFLY, CAN YOU DESCRIBE WHY YOU BELIEVE THE

16   YOSHIDA, SUSO AND HARRIS REFERENCES RENDER CLAIM 1

17   OBVIOUS?

18   A    THEY TOGETHER TEACH US EVERY ELEMENT OF THE

19   '460, CLAIM 1, AND THEREFORE WOULD HAVE BEEN

20   OBVIOUS FOR SOMEONE OF SKILL IN THE ART TO COMBINE

21   THEM.

22   Q    WHY WOULD ONE OF ORDINARY SKILL IN THE ART

23   HAVE COMBINED THOSE THREE PATENTS?

24   A    SO I ALREADY REFERRED TO HOW THE THREE

25   TECHNOLOGIES ARE CONVERGING, AND YOU CAN SEE THAT

1    ALL THESE THREE DEVICES, THE CLAIM DEVICES WITH

2    CAMERA AND PHONE FUNCTIONS.

3              THE MOTIVATION ALSO COMES FROM

4    CONVENIENCE FOR THE USER.  YOU DON'T WANT TO CARRY

5    TWO DIFFERENT CAMERA PHONES AND DIFFERENT

6    FUNCTIONS.

7              BY COMBINING THE THREE, YOU BASICALLY

8    GIVE A LOWER COST, MORE CONVENIENCE FOR THE USER.

9    Q    DID THE PATENT OFFICE CONSIDER ANY OF THESE

10   THREE REFERENCES WHEN IT ALLOWED THE '460 PATENT?

11   A    YES, THEY DID.

12   Q    WHICH ONES?

13   A    THE SUSO AND HARRIS PATENTS.

14   Q    SO LET'S WALK THROUGH CLAIM 1, AND I WANT TO

15   FIRST FOCUS ON THE TWO PATENTS THAT THE PATENT

16   OFFICE CONSIDERED, SUSO AND HARRIS.

17             CAN WE HAVE PDX 52.6 ON THE SCREEN.

18             DO SUSO OR HARRIS DESCRIBE THE PREAMBLE

19   OF CLAIM 1, WHICH BEGINS A DATA TRANSMITTING

20   METHOD?

21   A    YES, THEY DO.  IF YOU SEE SUSO ON THE

22   LEFT-HAND SIDE, FIGURE 8 FROM THE SUSO PATENT, AND

23   YOU SEE IT HAS BOTH PHONE AND CAMERA FUNCTIONS.

24             ON THE RIGHT-HAND SIDE, I WOULD ACTUALLY

25   REQUEST THAT WE HIGHLIGHT A FEW PHRASES, THE

```
 1    TELEPHONE MODE, WHICH IS IN THE MIDDLE, AND ALSO

 2    CAMERA MODE AT THE VERY BOTTOM.

 3              SO THE HARRIS PATENT ALSO DESCRIBES THE

 4    DEVICE WHICH HAS BOTH THESE FUNCTIONS.

 5    Q    CAN WE HAVE THE NEXT DEMONSTRATIVE, PDX 52.8.

 6              DO SUSO OR HARRIS DESCRIBE ELEMENT A OF

 7    CLAIM 1, ENTERING A FIRST E-MAIL TRANSMISSION

 8    SUB-MODE AND SO FORTH?

 9    A    YES, HARRIS DOES THAT.

10    Q    WHERE?

11    A    SO ON THIS SLIDE, WHAT YOU SEE IS A FIGURE,

12    FIGURE 11 FROM THE HARRIS PATENT, AND SOME TEXT

13    THAT I'VE DRAWN FROM THE HARRIS PATENT.

14              AND TO EXPLAIN, LET'S HIGHLIGHT A FEW

15    PHRASES.  RADIO TELEPHONE, RIGHT THERE; AND THEN IF

16    WE CAN GO DOWN A LITTLE BIT, PERSONAL DIGITAL

17    ASSISTANT MODE; AND FINALLY, STORED NOTE VIA

18    ELECTRONIC MAIL.

19              SO THIS IS A DEVICE TO MAKE PHONE CALLS

20    AND THEN FROM ANOTHER MODE YOU CAN SEND AN

21    ELECTRONIC MAIL.

22    Q    CAN WE GO BACK TO THE CLAIM LANGUAGE, PLEASE.

23              SO NOW WE'RE AT ELEMENT B.  ARE YOU

24    RELYING ON SUSO OR HARRIS FOR ELEMENT B?

25    A    NO, I'M RELYING ON YOSHIDA.
```

1    Q    OKAY.  SO WE'LL GET BACK TO YOSHIDA.

2              LET'S GO TO THE THIRD ELEMENT, ELEMENT C.

3              CAN WE HAVE PDX 52.10 ON THE SCREEN.

4              DO SUSO OR HARRIS DESCRIBE ELEMENT C OF

5    SEQUENTIALLY DISPLAYING OTHER IMAGED STORED IN A

6    MEMORY THROUGH THE USE OF SCROLL KEYS?

7    A    SUSO DOES THAT, AND AS YOU CAN SEE FROM THIS

8    FIGURE AND TEXT, I WOULD REQUEST WE HIGHLIGHT THE

9    PHRASE CURSOR/SCROLL, AND ALSO DRAW YOUR ATTENTION

10   TO THE LEFT AND RIGHT ARROW BUTTONS IN THE FIGURE.

11             SO IT HAS THE SCROLL KEYS USING WHICH THE

12   USER CAN MOVE BACK AND FORTH.

13   Q    LET'S TURN NOW TO ELEMENT D.

14             CAN WE HAVE PDX 52.12?

15             DO SUSO OR HARRIS DESCRIBE TRANSMITTING

16   THE ADDRESS OF THE OTHER PARTY AND A MESSAGE

17   RECEIVED THROUGH USER INTERFACE IN THE FIRST E-MAIL

18   TRANSMISSION SUB-MODE?

19   A    YES.  HARRIS DOES THAT, AND I WOULD REQUEST

20   HIGHLIGHTING SEND A NOTE VIA ELECTRONIC MAIL.  SO

21   THIS DEVICE IS CAPABLE OF SENDING ELECTRONIC MAIL

22   TO SOME RECIPIENT'S ADDRESS.

23             YOU WILL ALSO SEE THAT THE FIGURE ITSELF

24   VALIDATES THAT THOSE ARE SHOWN.  THERE'S A SEND

25   NOTE ELEMENT AS WELL.

1    Q    LET'S GO BACK NOW TO OUR CLAIM CHART.  SO WE

2    HAVE TWO ELEMENTS REMAINING, ELEMENTS B AND ELEMENT

3    E; CORRECT?

4    A    THAT IS CORRECT.

5    Q    SO LET'S TURN NOW TO THE YOSHIDA REFERENCE.

6    DID THE PATENT OFFICE CONSIDER YOSHIDA BEFORE IT

7    ALLOWED THE '460 PATENT?

8    A    NO, THEY DID NOT.

9    Q    SO LET'S START WITH ELEMENT B, WHICH WE

10   SKIPPED OVER BEFORE, WHICH AGAIN IS ENTERING A

11   SECOND E-MAIL TRANSMISSION SUB-MODE UPON REQUEST.

12             CAN WE HAVE PDX 52.14 ON THE SCREEN?

13             WHERE DOES YOSHIDA DISCLOSE ELEMENT B?

14   A    SO FIRST BEFORE EXPLANATION, I WILL EXPECT

15   ELEMENT B TO HAVE THAT, SO THIS SLIDE FOCUSES ON

16   THE FIRST PART OF THAT ELEMENT B.

17             AND WHAT WE HAVE IS FIGURE 4 AND SOME

18   TEXT.  THAT'S THE TEXT.  I WOULD REQUEST SOME

19   PHRASES BE HIGHLIGHTED.  SO THE PHRASE CAMERA MODE,

20   WHICH IS AT THE VERY TOP; I WOULD ALSO REQUEST

21   HIGHLIGHTING THE PLAYBACK FUNCTION, WHICH IS RIGHT

22   THERE; AND THEN FINALLY, ELECTRONIC MAIL.

23             AND WHAT THIS IS DESCRIBING IS A DEVICE

24   WHERE THE CAMERA MODE, YOU CAN GO INTO THIS

25   PLAYBACK FUNCTION WHERE YOU SEE THE IMAGES, AND

```
 1      THEN YOU CAN SEND THAT IMAGE BY ELECTRONIC MAIL.

 2              YOU WILL ALSO SEE THAT IN THE FIGURE

 3      UNDER THE VIEW MENU, YOU HAVE A MAIL THERE.

 4      Q    DOES YOSHIDA DISCLOSE DISPLAYING THE MOST

 5      RECENTLY CAPTURED IMAGE?

 6      A    YES, IT DOES.  IF WE CAN MOVE TO THE NEXT

 7      SLIDE?

 8              SO HERE WHAT WE HAVE IS FIGURE 10 FROM

 9      YOSHIDA AND A CORRESPONDING FIGURE.  AGAIN, TO HELP

10      EXPLAIN, I WOULD REQUEST HIGHLIGHTING A FEW PHRASES

11      UP HERE.

12              FIRST LET'S HIGHLIGHT AN IMAGE

13      IMMEDIATELY IT HAS BEEN PHOTOGRAPHED.  THAT WAS

14      LOST IN TRANSLATION, BUT THAT DESCRIBES A METHOD

15      FOR TAKING A PHOTO.

16              LET'S ALSO HIGHLIGHT, GOING FURTHER DOWN,

17      THE TRANSFER OF IMAGE INFORMATION BY THE USER OF

18      ELECTRONIC MAIL, SO LET'S HIGHLIGHT ELECTRONIC

19      MAIL.

20              SO WHAT THIS DESCRIBES IS A DEVICE WHERE

21      YOU ARE ABLE TO SEND AN E-MAIL IMAGE.  THE FIGURE

22      VALIDATES IT.

23              THE BOX AT THE VERY TOP, THAT DIAMOND

24      SHAPED BOX LABELED S551 TALKS ABOUT THE MOST

25      RECENTLY CAPTURED IMAGE, AND THE BOX AT THE VERY
```

1    BOTTOM IN THE MIDDLE BOX, S558, TALKS ABOUT THE

2    MAIL TRANSMISSION PROCESS, AND THIS MAIL THAT'S

3    BEING DISPLAYED ON THE SCREEN IS WHAT BOX S558

4    SHOWS.

5    Q    LET'S TURN NOW TO THE LAST ELEMENT OF THE

6    CLAIM.  DOES YOSHIDA DISCLOSE THE LAST TRANSMITTING

7    ELEMENT, ELEMENT E?

8    A    YES, IT DOES.

9    Q    CAN WE HAVE, PLEASE, PDX 52.17 ON THE SCREEN?

10            TELL US, PLEASE, WHERE DOES YOSHIDA

11    DISCLOSE THE LAST TRANSMITTING ELEMENT?

12    A    RIGHT.  SO I HAVE TAKEN TWO PIECES OF TEXT

13    FROM THE PATENT.  SO IN THAT TOP BOX, LET'S

14    HIGHLIGHT THE PHRASE THE ADDRESS OF THE MAIL, WHICH

15    IS IN THE MIDDLE LINE.

16            AND THEN NEXT ALSO, FROM THE BOTTOM TEXT,

17    LET'S HIGHLIGHT THE TEXT OF THE MAIL, WHICH IS

18    LINES TWO AND THREE, AND LET'S ALSO HIGHLIGHT

19    ATTACH AN IMAGE FILE, WHICH IS FOUR FROM THE

20    BOTTOM.

21            AND WHAT THIS IS DESCRIBING IS HOW THE

22    RECIPIENT'S ADDRESS IS SPECIFIED, AN E-MAIL IS

23    SENT, WHICH HAS A TEXT, ALONG WITH AN ATTACHED

24    IMAGE.

25    Q    IN REACHING YOUR INVALIDITY OPINION, DID YOU

1    CONSIDER ANY SECONDARY CONSIDERATIONS OF

2    NON-OBVIOUSNESS?

3    A    YES, I DID.

4    Q    DID YOU FIND ANY EVIDENCE WHETHER ANYONE

5    COPIED THE '460 PATENT?

6    A    NO.

7    Q    DID YOU SEE ANY EVIDENCE ONE WAY OR THE OTHER

8    ABOUT WHETHER THE '460 PATENT HAD ENJOYED

9    COMMERCIAL SUCCESS?

10   A    NO, I DID NOT FIND ANY.

11   Q    ARE YOU AWARE OF ANY EVIDENCE SHOWING THAT

12   ANYONE HAD TRIED AND FAILED TO MAKE THE METHODS AND

13   CLAIMS IN THE '460 PATENT?

14   A    NO, I'M NOT AWARE.

15   Q    AND ARE YOU AWARE OF ANY EVIDENCE THAT ANYONE

16   HAS EVER EXPRESSED ANY PRAISE OR CLAIM FOR THE '460

17   PATENT IN THE INDUSTRY?

18   A    NO.

19   Q    HOW DO THESE SECONDARY CONSIDERATIONS AFFECT

20   YOUR OPINION?

21   A    BY THE WAY -- FROM WHAT I STATED, THAT THE

22   '460 PATENT IS OBVIOUS IN LIGHT OF THE PRIOR ART.

23            MR. SELWYN:  THANK YOU.  NO FURTHER

24   QUESTIONS.

25            THE COURT:  ALL RIGHT.  THE TIME IS NOW

```
 1     4:20.  ANY CROSS?

 2              MR. JOHNSON:  YOUR HONOR, MAY I HAND OUT

 3     JUST A BINDER BRIEFLY?

 4              THE COURT:  PLEASE, GO AHEAD.

 5              MR. JOHNSON:  MAY I APPROACH?

 6              THE COURT:  PLEASE.

 7              GO AHEAD, PLEASE.  IT'S 4:20.

 8                      CROSS-EXAMINATION

 9     BY MR. JOHNSON:

10     Q    DR. SRIVASTAVA, THE ACCUSED APPLE PRODUCTS

11     HAVE A CAMERA MODE; RIGHT?

12     A    NOT THE CAMERA MODE DESCRIBED IN THE '460, NO.

13     Q    DO YOU REMEMBER YOU WERE DEPOSED IN THIS CASE?

14     A    YES.

15     Q    YOUR DEPOSITION TESTIMONY IS IN FRONT OF YOU

16     IN THE BINDER AT THE BACK.

17     A    YES.

18     Q    IF YOU COULD PULL UP PAGE 179, LINES 16 TO 21.

19     A    PAGE WHAT NUMBER?

20     Q    179, LINES 16 TO 21.

21     A    WHICH TAB FOR THAT, PLEASE?

22     Q    DEPOSITION.  IT'S AT THE BACK.

23     A    OKAY.  AND WHICH LINE TO YOU WANT ME TO GO TO?

24     Q    PAGE 179, LINES 16 TO 21.

25     A    PAGE 179.
```

1    Q    DO YOU SEE LINES 16 TO 21?

2    A    YES.

3    Q    THE QUESTION IS, "SO APPLE IS DESCRIBING THE

4    CAMERA FUNCTION WITHIN THE CAMERA APP AS HAVING A

5    CAMERA MODE; RIGHT?

6            "ANSWER:  THAT CAMERA APP HAVING A CAMERA

7    MODE.

8            "QUESTION:  RIGHT?"

9            YOUR ANSWER:  "YEAH."

10           DO YOU SEE THAT?

11   A    YEAH.

12   Q    WAS THAT YOUR TESTIMONY?

13   A    YES.

14   Q    YOU STAND BY THAT TESTIMONY; RIGHT?

15   A    ABSOLUTELY.

16   Q    NOW, YOU'D ALSO AGREE THAT THE ACCUSED APPLE

17   PRODUCTS HAVE A PHOTO BROWSING MODE; RIGHT?

18   A    YOU CAN BROWSE PHOTOS.

19   Q    THEY HAVE A PHOTO BROWSING MODE, SIR, DON'T

20   THEY?

21   A    AGAIN, IN THE PHOTO APP, YOU CAN BROWSE

22   PHOTOS.  THERE IS A SCREEN IMAGE.

23   Q    SIR, THEY HAVE A PHOTO BROWSING MODE, DON'T

24   THEY?

25   A    NO, I DON'T QUITE AGREE WITH YOU.

2319

```
 1    Q    OKAY.  LET ME TURN YOUR ATTENTION TO PAGE 146

 2    OF YOUR DEPOSITION, LINE 23 TO 147, LINE 1.

 3    A    146?

 4    Q    YES, PLEASE.  LINE 23.

 5    A    YES.

 6    Q    YOU SAY:  "I MEAN, WERE YOU TO TAP THAT IMAGE,

 7    THE CAMERA APP WOULD THEN -- WOULD THEN LET YOU

 8    SEQUENTIALLY SCROLL THROUGH THE PICTURES THAT ARE

 9    STORED IN MEMORY THAT HAVE BEEN TAKEN BY THE CAMERA

10    AND NOT DELETED.

11              "ANSWER:  YES, IF I WERE TO PRESS THAT

12    ICON, THEN SUBSEQUENTLY IN THE PHOTO BROWSING MODE,

13    I CAN."

14              THAT WAS YOUR TESTIMONY WHEN YOU WERE

15    DEPOSED; RIGHT?

16    A    YES.

17    Q    AND YOU STAND BY THAT TESTIMONY, DON'T YOU?

18    A    YES.

19    Q    NOW, THE SUSO AND HARRIS REFERENCES THAT YOU

20    TALKED ABOUT WITH RESPECT TO VALIDITY, THOSE WERE

21    CONSIDERED BY THE PATENT OFFICE, WEREN'T THEY?

22    A    THEY WERE, YES.

23    Q    AND THE PATENT OFFICE FOUND THEM TO BE

24    DIFFERENT FROM THE '460 PATENT; ISN'T THAT TRUE?

25    A    I'M NOT SURE WHAT YOU MEAN BY "DIFFERENT."
```

1    Q    THE '460 PATENT ISSUED OVER THE SUSO AND

2    HARRIS REFERENCES, DIDN'T IT?

3    A    THAT'S CORRECT.

4          MR. JOHNSON:  THANK YOU.  NO FURTHER

5    QUESTIONS.

6          THE COURT:  ALL RIGHT.  IT'S 4:23.

7          ANY REDIRECT?

8          MR. SELWYN:  VERY BRIEFLY.

9          THE COURT:  GO AHEAD, PLEASE.

10             **REDIRECT EXAMINATION**

11    BY MR. SELWYN:

12    Q    SIR, DOES ANY MODE IN THE CAMERA APP

13    CORRESPOND TO ANY OF THE MODES CLAIMED IN THE '460

14    PATENT?

15    A    NO, IT DOES NOT.

16    Q    WHY?

17    A    WELL, FIRST, THE CAMERA APP CAN RUN

18    CONCURRENTLY WITH OTHER APPS, WITH THE PHONE APP,

19    FOR EXAMPLE.

20          THE MODES IN THE '460 PATENT ARE -- YOU

21    CAN BE IN ONE OR THE OTHER, NOT AT THE SAME TIME.

22    SO THEY'RE DIFFERENT FROM MODES DESCRIBED THE '460.

23          MR. SELWYN:  THANK YOU.  NOTHING FURTHER.

24          THE COURT:  ALL RIGHT.  TIME IS NOW 4:23.

25          IS THIS WITNESS EXCUSED AND IS IT SUBJECT

1    TO RECALL?

2              MR. SELWYN:  THIS WITNESS IS EXCUSED, NOT

3    SUBJECT TO RECALL.

4              AND YOUR HONOR, I MISSPOKE BEFORE WITH

5    RESPECT TO OUR LAST TWO WITNESSES.  DR. DOURISH AND

6    DR. GIVARGIS, WE DON'T NEED THEM AGAIN.  THEY'RE

7    NOT SUBJECT TO RECALL BY US.

8              THE COURT:  OKAY.

9              MR. SELWYN:  SO THEY CAN BE EXCUSED.

10             THE COURT:  ALL RIGHT.  AND NOT SUBJECT

11   TO RECALL FROM SAMSUNG'S PERSPECTIVE AS WELL;

12   RIGHT?

13             MR. JOHNSON:  THAT'S CORRECT, YOUR HONOR.

14             THE COURT:  OKAY.  YOU ARE EXCUSED.

15             CALL YOUR NEXT WITNESS, PLEASE.

16             MR. LEE:  YOUR HONOR, APPLE CALLS

17   PROFESSOR HYONG KIM.

18             IF WE CAN JUST HAVE A MINUTE TO GET THE

19   BINDERS UP?

20             THE COURT:  GO AHEAD.

21             MR. LEE:  YOUR HONOR, JUST SO I KNOW WHEN

22   TO STOP, IS THIS CLOCK ON TIME WITH YOURS?

23             THE COURT:  UM, I HAVE 4:24.

24             MR. LEE:  OKAY.

25             THE COURT:  I DON'T KNOW IF THE JURORS

1    WANT TO GO AN EXTRA FIVE MINUTES TODAY.

2              MR. LEE:  ALL RIGHT.  I'LL TRY TO GO TEN.

3              THE COURT:  OKAY.

4              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

5                        **HYONG KIM,**

6    BEING CALLED AS A WITNESS ON BEHALF OF THE

7    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

8    EXAMINED AND TESTIFIED AS FOLLOWS:

9              THE WITNESS:  I DO.

10             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

11             THE COURT:  TIME IS 4:25.  GO AHEAD.

12                   **DIRECT EXAMINATION**

13   BY MR. LEE:

14   Q    WOULD YOU SIT UP AND TALK INTO THE MICROPHONE?

15             GOOD AFTERNOON, PROFESSOR KIM.  WOULD YOU

16   INTRODUCE YOURSELF TO THE JURY?

17   A    MY NAME IS HYONG KIM, AND I LIVE IN

18   PITTSBURGH, PENNSYLVANIA.

19   Q    HAVE YOU BEEN RETAINED BY APPLE AS AN EXPERT

20   WITNESS IN THIS CASE?

21   A    YES.

22   Q    LET ME PUT UP ON THE SCREEN PDX 35.1.  THIS

23   DESCRIBES YOUR BACKGROUND; CORRECT?

24   A    YES.

25   Q    WHERE DO YOU WORK TODAY?

```
 1    A    I WORK AT CARNEGIE MELLON UNIVERSITY.

 2    Q    WHAT IS YOUR POSITION AT CARNEGIE MELLON

 3    UNIVERSITY?

 4    A    I'M A PERKINS PROFESSOR OF ELECTRICAL AND

 5    COMPUTER ENGINEERING.

 6    Q    HOW LONG HAVE YOU BEEN AT CARNEGIE MELLON?

 7    A    TWENTY-THREE YEARS.

 8    Q    AND ARE YOU A FULL PROFESSOR?

 9    A    YES.

10    Q    WHEN DID YOU BECOME A FULL PROFESSOR?

11    A    1999.

12    Q    DO YOU TEACH AT CARNEGIE MELLON?

13    A    YES.

14    Q    WHAT DO YOU TEACH?

15    A    I TEACH UNDERGRADUATE COURSE IN

16    TELECOMMUNICATION NETWORKS, AND GRADUATE COURSES IN

17    NETWORK, ADVANCED NETWORKS.

18    Q    WHAT KIND OF RESEARCH HAVE YOU DONE?

19    A    I DO RESEARCH IN SWITCHING SYSTEMS, THAT'S THE

20    NETWORK SWITCHING SYSTEM, AND TELECOMMUNICATION

21    NETWORK, CONTROLLER MANAGEMENT AND WIRELESS NETWORK

22    AND RESOURCE ALLOCATIONS.

23    Q    OTHER THAN BEING A PROFESSOR, HAVE YOU HELD

24    ANY OTHER POSITIONS THE CARNEGIE MELLON?

25    A    YES.  I WAS DIRECTOR OF THE CYLAB KOREA FROM
```

1    2004 TO 2007.

2    Q    WHAT WAS CYLAB KOREA AT CARNEGIE MELLON?

3    A    IT WAS A RESEARCH INSTITUTE THAT WE CARRIED

4    OUT RESEARCH IN NETWORK SECURITY, AND IT WAS FUNDED

5    BY THE KOREAN GOVERNMENT.

6    Q    CAN YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND

7    FOR US?

8    A    I OBTAINED BACHELOR OF ENGINEERING FROM MCGILL

9    UNIVERSITY IN 1984, IT'S BEEN A WHILE, AND A

10   MASTER'S DEGREE AND PH.D. DEGREE FROM THE

11   UNIVERSITY OF TORONTO, 1987, AND 1990, ALL IN

12   ELECTRICAL ENGINEERING.

13   Q    HAVE YOU AUTHORED ANY SCIENTIFIC PUBLICATIONS?

14   A    YES.

15   Q    ABOUT HOW MANY?

16   A    OVER A HUNDRED.

17   Q    WOULD ANY BE IN PEER REVIEWED JOURNALS?

18   A    YES, THEY WERE ALL PEER REVIEWED.

19   Q    DO YOU HAVE ANY PATENTS?

20   A    YES.

21   Q    HOW MANY?

22   A    TWELVE.

23   Q    ARE ANY OF YOUR PATENTS LICENSED?

24   A    YES.  ONE OF THEM WAS LICENSED TO ADVANCED

25   MICRODEVICES AND SAMSUNG ELECTRONICS.

1    Q    TO SAMSUNG?

2    A    YES.

3    Q    NOW, HAVE YOU RECEIVED ANY FUNDING FOR YOUR

4    RESEARCH?

5    A    YES.

6    Q    WHAT GOVERNMENT AGENCIES HAVE SPONSORED YOUR

7    RESEARCH?

8    A    NATIONAL SCIENCE FOUNDATION AND THE DEPARTMENT

9    OF DEFENSE AND SO ON.

10   Q    HAVE ANY COMPANIES FUNDED YOUR RESEARCH?

11   A    YES.

12   Q    WHAT COMPANIES?

13   A    H-P, INTEL, CISCO, NORTEL, LG, SAMSUNG, AND SO

14   ON.

15   Q    SAMSUNG HAS FUNDED YOUR RESEARCH IN THE PAST?

16   A    YES, IN THE PAST.

17   Q    IN ADDITION TO BEING A PROFESSOR, DO YOU HAVE

18   ANY EXPERIENCE IN PRIVATE INDUSTRY?

19   A    YES.

20   Q    WHAT EXPERIENCE DO YOU HAVE?

21   A    I HAD TWO START-UP COMPANIES, ONE IS CALLED

22   SCALABLE NETWORKS, THAT WAS FOUNDED IN 1995, AND WE

23   DEVELOPED FAST ETHERNET SWITCHING SYSTEM.

24        AND IN THE YEAR 2000, I FOUNDED A COMPANY

25   CALLED ACCELIGHT NETWORKS, WHICH DEVELOPED OPTICAL

1    SWITCHING SYSTEMS.

2              MR. LEE:  YOUR HONOR, I OFFER PROFESSOR

3    KIM AS AN EXPERT IN WIRELESS COMMUNICATIONS AND

4    NETWORKS.

5              MR. VERHOEVEN:  NO OBJECTION.

6              THE COURT:  ALL RIGHT.  SO CERTIFIED.

7    BY MR. LEE:

8    Q    DR. -- PROFESSOR KIM, HAVE YOU EVER TESTIFIED

9    BEFORE?

10   A    NO.

11   Q    ARE YOU BEING COMPENSATED FOR YOUR TIME

12   WORKING ON THIS CASE?

13   A    YES.

14   Q    WHAT'S YOUR HOURLY RATE?

15   A    IT'S $450.

16   Q    AND HOW MANY HOURS HAVE YOU WORKED ON THIS

17   CASE SO FAR?

18   A    ABOUT 500 HOURS.

19   Q    WHAT OPINIONS HAVE YOU REACHED?

20   A    MY OPINION IS '516 PATENT IS INVALID AND THE

21   APPLE PRODUCT DOES NOT INFRINGE THAT PATENT.

22   Q    NOW, HAVE YOU HAD AN OPPORTUNITY TO READ

23   DR. WILLIAMS' DIRECT AND CROSS-EXAMINATION

24   YESTERDAY IN THIS COURTROOM?

25   A    YES, I READ THEM.

1    Q    YOU WERE NOT ABLE TO BE PRESENT; CORRECT?

2    A    NO, I WASN'T HERE.

3    Q    ALL RIGHT.  AT A VERY HIGH LEVEL, WHAT IS THE

4    '516 PATENT ABOUT?

5    A    THE '516 PATENT IS ABOUT A PARTICULAR OR

6    SPECIFIC WAY OF DOING THE POWER CONTROL IN WIRELESS

7    NETWORKS.

8    Q    SO LET'S SEE IF WE CAN EXPLAIN SOME OF THESE

9    CONCEPTS IN A LITTLE BIT MORE DETAIL.

10            CAN I HAVE PDX 35.2 ON THE SCREEN,

11    PLEASE?

12            DO YOU SEE PDX 35.2?

13    A    YES.

14    Q    CAN YOU EXPLAIN TO US WHAT'S SHOWN ON THIS

15    SLIDE?

16    A    SO IT'S SHOWING TWO ELEMENTS IN THE WIRELESS

17    NETWORK, ONE IS THE HANDSET OR THE MOBILE TERMINAL,

18    OR USER EQUIPMENT WE'LL CALL IT, THAT'S BASICALLY

19    YOUR CELL PHONE; AND THERE'S THE BASE STATION,

20    THAT'S THE ANTENNA WITH ROUND CIRCLES.  THAT'S THE

21    BASE STATION THAT'S CONNECTED TO THE NETWORK, FOR

22    INSTANCE, THE INTERNET OR TELECOMMUNICATION

23    NETWORK.

24    Q    WHAT ARE THE UPLINK AND DOWNLINK?

25    A    THE RED ARROW THAT YOU SEE THAT SAYS UPLINK

2328

1    CONSISTS OF CHANNELS THAT TRANSMIT DATA FROM YOUR

2    HANDSET TO THE BASE STATION.

3              AND THE DOWNLINK THAT YOU SEE, THE GRAY

4    ARROW THAT YOU SEE ON THE SLIDE CONSISTS OF A

5    CHANNEL THAT TRANSMIT DATA FROM BASE STATION TO THE

6    HANDSET.

7    Q    WHAT ARE CHANNELS?

8    A    CHANNELS IS, IS A PART OF THE SPECTRUM.  YOU

9    CAN THINK OF IT AS A PIPE WHERE YOU SEND THE DATA

10   THROUGH THE PARTICULAR PIPE, AND IN THIS CASE,

11   UPLINK WILL HAVE THAT PIPE THAT SENDS DATA FROM THE

12   HANDSET TO THE BASE STATION.

13   Q    ARE THERE DIFFERENT TYPES OF CHANNELS?

14   A    YES.

15   Q    WHAT TYPES OF CHANNELS?

16   A    BROADLY, THERE ARE TWO DIFFERENT TYPES.  ONE

17   IS A DATE CHANNEL AND ANOTHER ONE IS CONTROL

18   CHANNEL.

19   Q    WHAT IS A DATA CHANNEL?

20   A    DATA CHANNEL IS WHERE YOU SEND USER DATA OR

21   YOU GET THE DATA FROM THE INTERNET, FOR INSTANCE.

22             SO IF YOU ARE TO TALK ON THE PHONE OR

23   UPLOADING A PICTURE TO YOUR FACEBOOK, FOR INSTANCE,

24   IT WILL USE A DATA CHANNEL, UPLINK DATA CHANNEL TO

25   SEND THE CHANNEL TO THE NETWORK.

1    Q    WHAT IS A CONTROL CHANNEL?

2    A    SO CONTROL CHANNEL IS TO SET UP THE DATA

3    CHANNEL OR TEAR DOWN THE DATA CHANNEL AND MAINTAIN

4    THE DATA CHANNEL.

5    Q    DO YOU NEED POWER TO TRANSFER INFORMATION OVER

6    THE CHANNEL AS YOU'VE JUST DESCRIBED?

7    A    YES, YOU NEED POWER FOR EACH OF THOSE

8    CHANNELS.

9    Q    CAN A MOBILE PHONE, MY MOBILE PHONE, TRANSMIT

10   ANY AMOUNT OF POWER?

11   A    NO.  YOU WILL HAVE LIMITED POWER.

12   Q    WHAT DETERMINES THE LIMIT ON THE POWER IN MY

13   MOBILE PHONE DEVICE?

14   A    WELL, FIRST OF ALL, THE PHONE ITSELF WILL HAVE

15   A LIMIT.

16         BUT FROM THE WIRELESS NETWORK STANDPOINT,

17   THE NETWORK WILL DICTATE HOW MUCH POWER YOU CAN USE

18   TO TRANSMIT THOSE CHANNELS.

19   Q    SO THERE WILL BE A MAXIMUM POWER?

20   A    YES.

21   Q    AND IF YOU GET TO THE MAXIMUM OR EXCEED IT,

22   ARE THERE DIFFERENT WAYS TO REDUCE IT?

23   A    YES, THERE'S VARIOUS WAYS YOU CAN REDUCE IT.

24         ONE WAY IS NOT SEND ANYTHING THROUGH THE

25   CHANNEL, WHICH MEANS YOU'LL POWER DOWN ALL THE

1    CHANNELS.

2              ANOTHER WAY IS YOU COULD EQUALLY SCALE

3    DOWN CHANNELS TO THE MAXIMUM POWER.

4              OR YOU COULD SCALE DOWN IN A DIFFERENTIAL

5    FASHION SO THAT SOME OF THE CHANNELS WOULD SCALE

6    DOWN AND SOME WOULD NOT.

7    Q    DID YOU READ MY CROSS-EXAMINATION OF

8    DR. WILLIAMS WHERE I WAS ASKING HIM WHETHER TWO

9    CHANNELS WERE ADDED OR MORE CHANNELS WERE ADDED?

10   A    YES.

11   Q    ALL RIGHT.  SO LET'S SEE IF WE CAN HELP THE

12   JURY WITH THIS.  ARE YOU FAMILIAR WITH THE 3GPP

13   STANDARD?

14   A    YES.

15   Q    ARE YOU FAMILIAR WITH 3GPP RELEASE 6.6?

16   A    YES.

17   Q    COULD WE HAVE PDX 35.3 ON THE SCREEN?

18             NOW, 3GPP RELEASE 6.6 IS WHAT

19   DR. WILLIAMS WAS TALKING ABOUT; CORRECT?

20   A    YES.

21   Q    LET'S SEE IF WE CAN HELP THE JURY UNDERSTAND

22   JUST HOW MANY CHANNELS THERE ARE.

23             DO YOU SEE THIS DIAGRAM?

24   A    YES.

25   Q    ALL RIGHT.  HOW MANY CHANNELS ARE THERE?  OR

```
 1     WHAT DOES THAT DIAGRAM DEPICT?

 2     A    WELL, THIS DIAGRAM IS SHOWING YOU THE CHANNELS

 3     THAT YOU HAVE IN THE UPLINK.

 4     Q    AND HOW MANY ARE THERE?

 5     A    THERE ARE FIVE.

 6     Q    WHAT ARE THEY?  START WITH DPDCH AND TELL US

 7     WHAT THE FIVE CHANNELS ARE.

 8     A    SO THE FIRST DPDCH STANDS FOR DEDICATED

 9     PHYSICAL DATA CHANNEL.

10          AND THE SECOND ONE IS DEDICATED PHYSICAL

11     CONTROL CHANNEL, SO THAT'S THE CHANNEL USUALLY USED

12     TO TRANSMIT CHOICE.

13          SO THE ONES -- AS I SAID EARLIER, THE

14     FIRST ONE, DPDCH CHANNEL IS DATA CHANNEL WHERE YOUR

15     DATA WILL GO; AND DPCCH CHANNEL IS THE CONTROL

16     CHANNEL WHERE YOUR CONTROL INFORMATION WILL GO.

17     Q    WHAT IS THE THIRD CHANNEL?

18     A    THIRD CHANNEL IS HIGH SPEED DEDICATED PHYSICAL

19     CONTROL CHANNEL.  THAT IS THE CONTROL CHANNEL FOR

20     DATA THAT YOU ARE SENDING FROM NETWORK TO THE

21     MOBILE DEVICE, TO YOUR HANDSET.

22     Q    WHEN WAS THIS THIRD CHANNEL ADDED TO THE

23     STANDARD?

24     A    2002.

25     Q    WHAT ARE THE LAST TWO CHANNELS?
```

```
 1    A    LAST TWO CHANNEL IS THE E -- THE E-PDCH AND

 2    E-DPDCH, SO E STANDS FOR ENHANCED, THAT'S THE HIGH

 3    SPEED DATA CHANNEL E-DPDCH, AND THEN THE E-PDCH IS

 4    THE CONTROL CHANNEL FOR E-DPDCH, THE OTHER CHANNEL.

 5    Q    AND WHEN WERE THESE ENHANCED CHANNELS ADDED TO

 6    THE STANDARD?

 7    A    2002.

 8    Q    NOW E-DPDCH CHANNEL REFERS TO SOMETHING CALLED

 9    HARQ?

10    A    YES.

11    Q    WHAT IS HARQ IN GENERAL TERMS?

12    A    SO HARQ IS A PROTOCOL THAT YOU USE IN A

13    NETWORK TO CORRECT ERROR, OR WHEN THE DATA IS

14    TRANSMITTED AND THERE'S AN ERROR IN THE DATA, YOU

15    WILL USE A HARQ TO GET THE RIGHT DATA, AND THAT

16    HARQ STANDS FOR HYBRID AUTOMATIC REPEAT REQUEST.

17             MR. LEE:  YOUR HONOR, I THINK I'VE RUN MY

18    FIVE MINUTES OVER.

19             THE COURT:  OKAY.  IT'S NOW 4:35.

20             OKAY.  WE'RE GOING TO END FOR THE DAY.

21    WE HAVE, IN TERMS OF EVIDENCE FOR TOMORROW, LESS

22    THAN FIVE HOURS LEFT, SO WE WILL FINISH THE

23    EVIDENCE PORTION TOMORROW AND THEN I'LL HAVE A

24    BETTER UPDATE AT THE END OF TOMORROW ABOUT -- I

25    STILL THINK YOU'RE PROBABLY GOING TO HAVE MONDAY
```

2333

```
 1    OFF, AND THEN TUESDAY WILL STILL BE A LONG DAY OF

 2    READING THROUGH ALL THE JURY INSTRUCTIONS AND

 3    HAVING ALL FOUR HOURS OF CLOSING.

 4              OKAY?  ALL RIGHT.  SO THANK YOU FOR YOUR

 5    PATIENCE AND YOUR SERVICE.

 6              IF YOU WOULD LEAVE, PLEASE, YOUR JURY

 7    NOTEBOOKS IN THE JURY ROOM.

 8              AGAIN, PLEASE KEEP AN OPEN MIND, DON'T DO

 9    ANY RESEARCH, DON'T DISCUSS THE CASE WITH ANYONE,

10    DON'T READ ABOUT THE CASE.

11              ALL RIGHT.  THANK YOU.

12              (WHEREUPON, THE FOLLOWING PROCEEDINGS

13    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

14              THE COURT:  OKAY.  YOU MAY STEP DOWN.

15              OKAY.  SO LET ME GIVE YOU THE TIME TOTALS

16    FOR THE DAY.  OKAY.  APPLE HAS USED 21 HOURS AND 7

17    MINUTES, SO YOU HAVE 3 HOURS AND 53 MINUTES LEFT

18    FOR TOMORROW.

19              SAMSUNG HAS USED 24 HOURS AND 14 MINUTES,

20    SO YOU HAVE 46 MINUTES LEFT FOR TOMORROW.  SO WE

21    REALLY SHOULD BE ABLE TO FINISH.

22              SO WHY DON'T WE TAKE JUST A FIVE MINUTE

23    BREAK AND THEY'LL WE'LL COME BACK FOR THE REST OF

24    THE JMOL DISCUSSION.  OKAY?

25              ALL RIGHT.  THANK YOU.
```

2334

```
1              (WHEREUPON, A RECESS WAS TAKEN.)

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4              THE COURT:  OKAY.  ALL RIGHT.  OH, PLEASE

5    BE SEATED.

6              SO I HAD ALREADY RULED ON MR. LEE'S

7    MOTIONS BEFORE.  LET'S GO THROUGH MR. MCELHINNY'S

8    MOTIONS.

9              ON THE D'087, D'677 WITH REGARD TO THE

10   FIVE MODELS YOU IDENTIFIED FOR THE D'087 AND THE

11   EIGHT MODELS YOU IDENTIFIED FOR THE D'677, I AGREE

12   WITH, I THINK IT WAS MR. ZELLER WHO ARGUED THAT THE

13   JURORS CAN ACT AS ORDINARY OBSERVERS AND THAT'S

14   SUPPORTED BY CATALINA LIGHTING, 295 F.3D 1287.

15             SO THAT JMOL MOTION IS DENIED.

16             WITH REGARD TO WHETHER SUFFICIENT

17   EVIDENCE HAD BEEN PRESENTED WITH REGARD TO

18   INVALIDITY BECAUSE OF FUNCTIONALITY AS TO THE D'087

19   AND THE D'677, IN ADDITION TO THE FACT WITNESSES

20   WHO TESTIFIED, AT LEAST ONE OF WHOM I ALREADY

21   MENTIONED BEFORE, THAT WAS MR. JIN SOO KIM,

22   MR. SHERMAN DID PROVIDE TESTIMONY ON THAT.

23             THE COURT FINDS THAT THERE WOULD BE A

24   LEGALLY SUFFICIENT EVIDENTIARY BASIS FOR A

25   REASONABLE JURY TO FIND IN SAMSUNG'S FAVOR.
```

```
 1            WITH REGARD TO THE '163 DOUBLE TAP TO
 2   ZOOM, ON THE INDEFINITENESS ISSUE, I'M NOT CLEAR ON
 3   WHAT MR. MCELHINNY'S POSITION IS BECAUSE IT DOES
 4   LOOK LIKE THE EXPERT, MR. GRAY, MADE A VERY VALID
 5   INDEFINITENESS POINT ON SUBSTANTIALLY CENTERED, AND
 6   I'M DENYING BOTH THE JMOL MOTION AS TO
 7   INDEFINITENESS, AS WELL AS TO INFRINGEMENT.
 8            MR. MCELHINNY:  MAY I, JUST ON THE
 9   INDEFINITENESS?
10            THE COURT:  YEAH.
11            MR. MCELHINNY:  JUST TO MAKE MY POSITION
12   CLEAR, YOUR HONOR.
13            THE COURT:  SURE.
14            MR. MCELHINNY:  THERE ARE LEGION FEDERAL
15   CASES, FEDERAL AND CIRCUIT CASES THAT HOLD THAT THE
16   ISSUE OF INDEFINITENESS IS A QUESTION OF LAW FOR
17   THE COURT TO DETERMINE ON CLAIM CONSTRUCTION AND
18   NOT AN ISSUE TO BE SUBMITTED TO THE JURY.
19            SO MY POSITION ON THAT MOTION
20   SPECIFICALLY WAS THAT IT DOESN'T MATTER WHAT THEIR
21   EXPERT SAYS, THAT YOUR HONOR HAS ALREADY CONSTRUED
22   THE CLAIM, SUBMITTED A CLAIM CONSTRUCTION TO THE
23   JURY, AND THEN THE QUESTION OF INDEFINITENESS
24   SHOULD NOT GO TO THEM.
25            THE COURT:  WELL, WHAT -- WHAT -- I GUESS
```

```
 1    I'M UNCLEAR.  ARE YOU ASKING THAT HIS TESTIMONY ON

 2    PAGES 2922 THROUGH 2924 BE STRICKEN?  OR YOU'RE

 3    JUST SAYING DON'T ASK A QUESTION ON THIS ISSUE WITH

 4    REGARD -- ON THE VERDICT FORM?  OR THAT WE'RE TO

 5    GIVE A JURY INSTRUCTION THAT SAYS THAT THE JURY

 6    CANNOT TAKE SUBSTANTIALLY CENTERED BEING AN

 7    AMBIGUOUS TERM INTO ACCOUNT FOR EITHER VALIDITY OR

 8    INFRINGEMENT OF THE PATENT?  WHICH ONE IS YOUR --

 9              MR. MCELHINNY:  I WOULD BE SAYING --

10              THE COURT:  WHICH --

11              MR. MCELHINNY:  I THINK -- THE QUESTION

12    IS WHAT I'M SAYING, AND THEN THE QUESTION OF WHAT

13    ARE THE EFFECTS OF WHAT I'M SAYING?

14              WHAT I'M SAYING IS, AS A MATTER OF LAW,

15    THE CLAIM IS INDEFINITE.  THE TIME TO CHALLENGE THE

16    INDEFINITENESS WAS AT CLAIM CONSTRUCTION.  IT

17    DIDN'T HAPPEN.

18              SO CERTAINLY AS A RESULT OF THAT, I MEAN,

19    IF THEY WANT TO MAKE A JMOL ON THAT TO YOU AND LET

20    YOU DETERMINE IT, YOU GET TO DECIDE THAT, NOT THE

21    JURY IS WHAT I'M SAYING.

22              THE COURT:  OKAY.

23              MR. MCELHINNY:  SO AS A RESULT OF THAT,

24    AT A MINIMUM, THE QUESTION SHOULD NOT BE SUBMITTED

25    TO THE JURY.
```

```
 1              BUT IN LIGHT OF THE TESTIMONY AND IN
 2    LIGHT OF THE ATTEMPT TO INTRODUCE THAT ISSUE, WE'LL
 3    ALSO ASK YOUR HONOR TO INSTRUCT THE JURY THAT YOU
 4    ARE THE ONE WHO DECIDES WHETHER A CLAIM IS
 5    AMBIGUOUS AND YOU HAVE NOT DECIDED -- YOU HAVE
 6    DECIDED -- YOU HAVE NOT RULED THAT THIS ONE IS
 7    AMBIGUOUS.
 8              BUT THAT QUESTION IS FOR YOU AND NOT FOR
 9    THEM, AND THAT THEY ARE SUPPOSED TO APPLY THE PLAIN
10    AND ORDINARY MEANING OF THE TERM.
11              THE COURT:  ALL RIGHT.  LET ME -- DO YOU
12    WANT TO ADDRESS THAT?
13              MR. DEFRANCO:  YES, YOUR HONOR.
14              YOU KNOW, THE -- IT'S A LITTLE BIT, IT
15    SEEMS, OF SIDE-STEPPING THEIR FAILURE OF DR. SINGH
16    TO MEET HIS BURDEN TO ESTABLISH INFRINGEMENT.
17              HE WAS ASKED ON CROSS-EXAMINATION ABOUT
18    HIS ANALYSIS WITH RESPECT TO SUBSTANTIALLY
19    CENTERED.  WE HEARD TESTIMONY ABOUT THERE COULD BE
20    DIFFERENCES OF OPINIONS AMONG THOSE WHO ARE SKILLED
21    IN THE ART.  HE ADMITTED THERE WERE NO PARAMETERS
22    SET FORTH IN THE CLAIM OR IN THE PATENT.
23              IT UNDERCUT --
24              THE COURT:  BUT YOU AGREE THAT
25    INDEFINITENESS IS NOT AN ISSUE FOR THE JURY?
```

1          MR. DEFRANCO:  I'M NOT SAYING IT IS, YOUR

2     HONOR.

3          I'M SAYING THAT IT'S A FAILURE OF PROOF

4     ON HIS INFRINGEMENT ANALYSIS.  WHEN HE WAS ASKED

5     DIRECTLY ABOUT HIS APPLICATION OF THAT TERM, HIS

6     INTERPRETATION OF ONE SKILLED IN THE ART, HOW HE

7     APPLIED IT TO THE INFRINGEMENT ANALYSIS, THEY

8     DIDN'T MEET THEIR BURDEN.

9          SO THEY CAN'T GET AWAY FROM THAT BY

10    SAYING, WELL, NOW IT'S A CLAIM CONSTRUCTION

11    INDEFINITENESS ARGUMENT THAT WE SHOULD HAVE BROUGHT

12    UP BEFORE.

13         IT CAME OUT ON CROSS-EXAMINATION OF THEIR

14    OWN EXPERT THAT HE COULDN'T ESTABLISH INFRINGEMENT

15    BASED ON THE WORK THAT HE DID IN THE CASE.

16         THAT IS WHAT MR. GRAY WAS RESPONDING TO.

17    HE SAID EXACTLY THAT, YES, HE AGREED THAT ONE OF

18    SKILL IN THE ART COULD NOT DETERMINE WHETHER THIS

19    CLAIM IS PRACTICED OR NOT.

20         THE COURT:  WELL, I'M GOING TO DENY A

21    JMOL MOTION BASED ON -- THE JMOL MOTION FOR A

22    FINDING OF INFRINGEMENT, AND WHY DON'T YOU PROPOSE

23    A JURY INSTRUCTION ON THE INDEFINITENESS ISSUE.  I

24    THINK THAT IS APPROPRIATE.

25         MR. DEFRANCO:  THAT'S FINE, YOUR HONOR.

1    THANK YOU.

2              THE COURT:  CAN YOU ALL STIPULATE TO A

3    JURY INSTRUCTION ON INDEFINITENESS FOR THE '163?

4              MR. VERHOEVEN:  WE'LL USE THE MODEL.

5              MR. DEFRANCO:  YES, WE WOULD PROPOSE

6    USING THE MODEL, YOUR HONOR.  I DON'T THINK THERE

7    SHOULD BE ANY DISPUTE ON THIS.

8              THE COURT:  ALL RIGHT.  WELL, I MEAN,

9    THERE ARE A COUPLE OF DIFFERENT MODELS, YOU KNOW,

10   FED CIRCUIT BAR ASSOCIATION, NORTHERN DISTRICT OF

11   CALIFORNIA.  I MEAN, IF YOU'RE JUST GOING TO GIVE

12   ME CARTE BLANCHE TO PICK ONE THAT I LIKE, I'LL DO

13   IT.

14             MR. DEFRANCO:  WE'LL DO OUR BEST TO WORK

15   IT OUT --

16             THE COURT:  OKAY.

17             MR. DEFRANCO:  -- WITH THE OTHER SIDE,

18   YOUR HONOR.

19             THE COURT:  ALL RIGHT.

20             MR. MCELHINNY, DO YOU WANT TO BE HEARD?

21   I AGREE WITH YOU THAT INDEFINITENESS IS NOT A JURY

22   ISSUE.

23             I'M RULING AGAINST YOU ON YOUR

24   INFRINGEMENT JMOL.

25             BUT WHAT ABOUT JUST HANDLING IT BY WAY OF

```
 1    A JURY INSTRUCTION AND YOU CAN WORK WITH

 2    MR. DEFRANCO AND THE SAMSUNG TEAM ON SOME KIND OF

 3    PROPOSAL?

 4            MR. MCELHINNY:  YOUR HONOR, YOU HAVE

 5    ALREADY -- BECAUSE THE PARTIES HAVE TRIED TO DO

 6    THIS, MR. DEFRANCO MAY NOT BE AWARE OF THIS -- YOU

 7    ALREADY HAVE COMPETING INSTRUCTIONS AND OUR

 8    OBJECTION BECAUSE THEIR PROPOSED INSTRUCTION

 9    SUBMITS THE ISSUE TO THE JURY.

10            THE COURT:  ON THIS PARTICULAR ISSUE OF

11    THE '677?

12            MR. MCELHINNY:  ON THE ISSUE OF

13    INDEFINITENESS, YES, YOUR HONOR.

14            THE COURT:  OKAY.  NOT SPECIFICALLY -- DO

15    YOU WANT ONE SPECIFICALLY THAT CALLS OUT THIS

16    PATENT, THIS PARTICULAR TERM, THIS PARTICULAR

17    EXPERT'S TESTIMONY, OR DO YOU WANT JUST A GENERIC?

18            MR. MCELHINNY:  WE WOULD LIKE TO PROPOSE

19    A CURATIVE INSTRUCTION THAT WOULD REMOVE -- SO THE

20    JURY UNDERSTANDS WHO WILL BE DECIDING THAT ISSUE.

21            THE COURT:  OKAY.  SO WHEN IS THAT GOING

22    TO BE SUBMITTED?

23            MR. MCELHINNY:  TOMORROW, YOUR HONOR.

24            THE COURT:  OKAY.  WHAT -- CAN YOU DO

25    EITHER A JOINT OR A DISPUTED ONE?
```

```
1            MR. MCELHINNY:  WE WILL, YOUR HONOR.

2            MR. DEFRANCO:  WHY DON'T WE PUT SOMETHING

3    TOGETHER FOR YOUR HONOR?

4            THE COURT:  PLEASE, PLEASE.  AND I'M

5    GOING TO PUT A PAGE LIMIT ON IT.

6            BUT IF YOU WOULD, PLEASE, IF YOU DISAGREE

7    WITH THE OTHER SIDE'S, GIVE AN EXPLANATION OF WHY

8    YOURS SHOULD BE ADOPTED EITHER WAY.

9            WHAT TIME CAN YOU DO THAT?

10           MR. MCELHINNY:  1:00 O'CLOCK IN THE

11   AFTERNOON FOR US, YOUR HONOR.  WE CAN DO IT -- IF

12   THEY CAN DO IT, WE CAN DO IT BY 1:00.

13           THE COURT:  IS THAT OKAY, 1:00 O'CLOCK?

14           MR. DEFRANCO:  YES, YOUR HONOR.

15           THE COURT:  OKAY.  SO 1:00 O'CLOCK ON --

16   IS THAT THE 17TH -- ON THE QUESTION OF

17   SUBSTANTIALLY CENTERED, '163.

18           AND -- IT'S DR. GRAY, RIGHT?

19           MR. DEFRANCO:  MR. GRAY.

20           THE COURT:  OKAY, MR. GRAY'S TESTIMONY.

21           ALL RIGHT.  LET ME HEAR, AND I KNOW

22   MR. JOHNSON STARTED TO ADDRESS IT, WHAT WAS YOUR

23   RESPONSE ON THE '381, THAT THE HOLD STILL WAS ONLY

24   SHOWN IN, YOU KNOW, ONE OF THE THREE ACCUSED

25   APPLICATIONS AND THAT THAT'S NOT SUFFICIENT?
```

1          AND I DON'T RECALL ANY TESTIMONY THAT

2     IT'S ACTUALLY PRESENT IN ALL THREE APPLICATIONS.

3          MR. JOHNSON:  YES.  SO LET ME BACK UP A

4     SECOND.

5          THE COURT:  OKAY.

6          MR. JOHNSON:  BECAUSE WHAT WE HEARD WHEN

7     THEY MADE THEIR CASE, WHEN WE MOVED FOR JUDGMENT AS

8     A MATTER OF LAW AT THE END OF THEIR CASE AND IT WAS

9     DENIED, WAS DR. BALAKRISHNAN'S TESTIMONY THAT WE

10    THINK IS INSUFFICIENT FROM -- AS A MATTER OF LAW

11    BECAUSE HE DIDN'T GO THROUGH AN ELEMENT-BY-ELEMENT

12    ANALYSIS ON THE '381 PATENT AND COMPARE IT TO EACH

13    AND EVERY PRODUCT.

14         WHAT WE SAW UP THERE -- WE NEVER THE

15    WHOLE THING UP THERE AT ONCE.  WE NEVER SAW IT

16    COMPARED TO ALL THE ACCUSED PRODUCTS.

17         WHAT WE SAW WAS ONE PRODUCT THAT WAS UP

18    THERE.  HE ADMITTED THAT -- OR WHEN GOING

19    THROUGH -- EVEN IN HIS DIRECT TESTIMONY, HE ONLY

20    PUT IN THE SOURCE CODE ON GALLERY AND BROWSER.

21    THERE WAS NOTHING IN THERE FOR CONTACTS.

22         HE PUT UP THE VARIOUS PRODUCTS, DESCRIBED

23    SORT OF THEIR OPERATION, BUT DIDN'T DO THE

24    CLAIM-BY-CLAIM ANALYSIS THAT WE THINK IS REQUIRED.

25         THE COURT:  UM-HUM.

```
 1              MR. JOHNSON:  SO THERE'S AN INSUFFICIENCY

 2    OF PROOF FROM THE VERY BEGINNING THAT WE THINK THIS

 3    JURY OUGHT TO BE ABLE TO WEIGH AND DECIDE WHETHER

 4    THEY'VE MET THEIR BURDEN, WHETHER IT'S GALLERY,

 5    CONTACTS, OR ANY OTHER ALLEGATIONS WITH RESPECT TO

 6    THE '381.

 7              BUT IT GOES BEYOND THAT, BECAUSE I THEN

 8    TOOK HIM THROUGH AND HE ADMITTED THAT VERSIONS VARY

 9    FOR THESE PRODUCTS, AND AS WE SAW, THERE'S A

10    GALLERY TAB 7.0 THAT HAD HARD STILL AND HOLD STILL,

11    YOU KNOW, IF YOU REMEMBER THAT.

12              AND THERE WAS ANOTHER -- THERE WAS

13    ANOTHER VERSION OF THAT THAT DIDN'T HAVE THAT

14    PARTICULAR FUNCTIONALITY.

15              THE COURT:  UM-HUM.

16              MR. JOHNSON:  SO THESE PRODUCTS ALL VARY,

17    WHICH IS WHAT I'VE BEEN TRYING TO SAY FROM THE

18    BEGINNING, AND MANAGING WITHIN THE CONFINES OF THE

19    SOURCE CODE ISSUES.

20              THE COURT:  UM-HUM.

21              MR. JOHNSON:  HE ADMITTED IN HIS DIRECT

22    TESTIMONY -- AND THIS IS PAGE 1728 OF THE

23    TRANSCRIPT, LINES 19 TO 24 -- HE LOOKED AT FOUR

24    VERSIONS OF SOURCE CODE.

25              WE PRODUCED MORE THAN FOUR.  WE PRODUCED
```

1    ONE FOR EACH OF THE ACCUSED PRODUCTS.

2              WHEN I WAS CROSS-EXAMINING HIM, I ASKED

3    HIM IF HE LOOKED AT THE HOLD STILL SOURCE CODE AND

4    HE SAID HE HAD NOT LOOKED AT THE HOLD STILL SOURCE

5    CODE.

6              THE HOLD STILL IS IN THE GALLERY

7    APPLICATION.  IT'S NOT IN THE CONTEXT, PER SE, THAT

8    WE WENT THROUGH IT WITH HIM.

9              THE COURT:  UM-HUM.

10             MR. JOHNSON:  BUT IT'S THE SAME ISSUE AS

11   THERE.  HE -- IN HIS ANALYSIS, HE PROVIDED -- EVEN

12   AT BARE BOTTOM SORT OF ANALYSIS, HE PROVIDED ONLY

13   ANALYSIS WITH RESPECT TO THE FASCINATE, THE

14   GALAXY S II AND THE GALAXY S 4G.  THOSE WERE WHAT

15   WE SAW UP ON THE SCREEN.

16             HE DIDN'T WALK THROUGH AND COMPARE THAT

17   TO THE CLAIM LANGUAGE.

18             ULTIMATELY THIS JURY IS ENTITLED TO TAKE

19   THE PRODUCTS -- AND THOSE ARE DEMONSTRATIVES, YOUR

20   HONOR, WHICH YOUR HONOR HAS NOW SAID ARE NOT GOING

21   INTO THE JURY ROOM.

22             THIS JURY IS ENTITLED TO TAKE THE

23   PRODUCTS INTO THE JURY ROOM AND EVALUATE WHETHER

24   EACH AND EVERY ONE OF THESE LIMITATIONS IS MET BY

25   EACH AND EVERY ONE OF THE PRODUCTS THAT ARE AT

2345

```
 1    ISSUE.

 2              AND I'M HAPPY TO PROVIDE ADDITIONAL SITES

 3    THAT I THINK ARE HELPFUL OR LAY IT OUT IN A BRIEF,

 4    BUT WE THINK WE'VE MET OUR BURDEN WITH RESPECT TO

 5    NON-INFRINGEMENT FOR EACH OF THE ACCUSED PRODUCTS.

 6              THE COURT:  UM-HUM.

 7              MR. JOHNSON:  THEY HAVEN'T MET THEIR

 8    BURDEN ON INFRINGEMENT IS MY MAIN POINT.

 9              BUT WE'VE MORE THAN ESTABLISHED THAT

10    THERE ARE -- THAT A REASONABLE JURY COULD DIFFER ON

11    WHETHER THEY -- WHETHER THERE'S INFRINGEMENT OR NOT

12    ON THESE --

13              THE COURT:  UM-HUM.

14              MR. JOHNSON:  -- FOR EACH OF THE ACCUSED

15    PRODUCTS AND EACH OF THE ACCUSED APPLICATIONS

16    WITHIN THE PRODUCTS.

17              AND YOU MAY RECALL, EVEN AT SLIDE -- AT

18    1783 OF THE TRANSCRIPT, I ASKED DR. BALAKRISHNAN

19    ABOUT WHETHER THERE ARE VERSIONS OF THE BOUNCE THAT

20    DON'T INFRINGE AND HE SAID YES, THERE ARE VERSIONS

21    OF THE BOUNCE.

22              FOR EXAMPLE, WHEN YOU REACH THE BORDER,

23    YOU LIFT YOUR FINGER, AND IF IT BOUNCES BACK TO THE

24    CENTER, THAT DOESN'T INFRINGE.

25              AND THAT IS -- THAT'S ANOTHER ISSUE THAT
```

```
 1    THE JURY IS ENTITLED TO WEIGH WITH RESPECT TO EACH

 2    OF THESE APPLICATIONS BECAUSE THERE ARE BOUNCE

 3    FEATURES EVEN IN THE ACCUSED PRODUCTS THAT, EVEN

 4    UNDER THEIR THEORY, DON'T INFRINGE FOR EACH OF THE

 5    APPLICATIONS.

 6              AND THAT'S AT LINES 1 THROUGH 20 OF PAGE

 7    1783 OF THE TRANSCRIPT.

 8              THE COURT:  OKAY.  1783 -- EXCUSE ME --

 9    LINES 1 THROUGH 20?

10              MR. JOHNSON:  RIGHT, 1 TO 20.

11              THE COURT:  ALL RIGHT.  I'M NOT AS

12    PERSUADED BY THAT PARTICULAR EXCERPT.

13              MR. MCELHINNY:  MAY I --

14              THE COURT:  BUT LET ME HEAR FROM

15    MR. MCELHINNY.

16              WHY SHOULDN'T THIS GO TO THE JURY.

17              MR. JOHNSON:  THE POINT --

18              THE COURT:  I'M SUPPOSED TO DRAW ALL

19    INFERENCES IN FAVOR OF THE NON-MOVING PARTY, WHICH

20    IS WHAT I DID WHEN THE MOTION WAS MADE AGAINST YOUR

21    CASE, AND I THINK THIS SHOULD GO TO THE JURY.

22              MR. MCELHINNY:  I UNDERSTAND.  I

23    UNDERSTAND THE BURDEN I HAVE.  I UNDERSTAND HOW

24    THIS -- BUT IN THIS CASE --

25              THE COURT:  UM-HUM.
```

```
 1            MR. MCELHINNY:  -- I HOPE YOU UNDERSTAND
 2   THAT MR. JOHNSON DID NOT ANSWER YOUR QUESTION.  HE
 3   WANTED TO TALK ABOUT HIS JMOL.  HE WANTED TO TALK
 4   ABOUT WHETHER THE PROOF WAS SUFFICIENT AND REARGUE
 5   HIS JMOL.
 6            AND THEN HE GAVE YOU EXAMPLES OF
 7   SITUATIONS WHERE IT MIGHT NOT BOUNCE.
 8            BUT LET'S FIGURE OUT THE ISSUE.  WHAT
 9   DR. BALAKRISHNAN HAD TO PROVE WAS THAT THE BOUNCE
10   IS EXHIBITED IN EVERY ONE OF THESE DEVICES, AND HE
11   DID THAT.
12            THE FACT THAT IN SOME SITUATIONS IT MIGHT
13   NOT BOUNCE IS NOT A DEFENSE TO INFRINGEMENT.
14            AND THE KEY TESTIMONY, YOUR HONOR, IS AT
15   PAGE 1756 AND 1757 AND IT DEALS WITH BOTH ISSUES
16   THAT WE'VE TALKED ABOUT, ABOUT THE FACT THAT IT'S
17   ONLY IN THE GALLERY APPLICATION, IT'S NOT IN ALL
18   APPLICATIONS, AND EVEN IN THE DEVICES WHERE IT
19   SOMETIMES HAPPENS IN THE GALLERY, IT DOESN'T
20   ALWAYS -- IT DOESN'T USUALLY HAPPEN.  MORE
21   FREQUENTLY IT BOUNCES.  THE DEVICES ALWAYS
22   INFRINGE.
23            AND I, I WILL REFER YOU TO 1756 AND 1757.
24            THE COURT:  AND WHO IS THIS?  IS THIS
25   DR. BALAKRISHNAN?
```

2348

```
 1              MR. MCELHINNY:  THIS IS DR. BALAKRISHNAN.
 2   HE'S THE ONLY PERSON WHO TESTIFIED AT ALL ABOUT
 3   THIS ALLEGED DEFENSE.
 4              NOW, I WANT TO GIVE YOU A CHANCE TO READ
 5   THAT, BUT I WANT TO ANSWER YOUR QUESTION ABOUT WHY
 6   YOU SHOULD DO THIS.
 7              (PAUSE IN PROCEEDINGS.)
 8              THE COURT:  OKAY.  GO AHEAD.
 9              MR. MCELHINNY:  YOU SHOULD DO THIS FOR
10   THE REASONS THAT, THAT WE HAVE BEEN IN DIALOGUE
11   FROM THE VERY BEGINNING OF THIS, WHICH IS THIS IS A
12   COMPLEX CASE.  WE'RE LOOKING FOR WAYS TO MAKE IT
13   EASIER ON THE JURY.
14              YOU HAVE ASKED US IF THERE ARE ISSUES
15   THAT CAN BE WITHDRAWN, AND THIS IS AN ISSUE IN
16   WHICH THEY HAD AN OPPORTUNITY TO PUT ON A DEFENSE
17   IN THEIR CASE.  THEY DIDN'T CALL A SINGLE WITNESS.
18              THEIR ONLY SITUATION -- THEIR ONLY
19   ARGUMENT HERE IS THAT ON CROSS-EXAMINATION OF OUR
20   WITNESS THEY SOMEHOW PUT IN A DEFENSE AND, AS THIS
21   DIALOGUE SHOWS, THEY DID NOT.
22              AND SO WE, WE TAKE AN ISSUE AWAY FROM THE
23   JURY THAT THEY DON'T HAVE TO DECIDE.  WE MAKE IT
24   EASIER FOR THEM.
25              AND IT'S THE CORRECT ANSWER.  IT IS --
```

1    THERE -- TO HAVE THEM IN THERE TRYING TO GUESS

2    ABOUT SOMETHING IN WHICH THERE IS NO EVIDENCE,

3    THAT'S THE PURPOSE OF RULE 50.

4              MR. JOHNSON:  YOUR HONOR, I WANT TO GO

5    BACK.

6              HE ACCUSED 22 PRODUCTS.  HE WALKED

7    THROUGH DEMONSTRATIVES FOR ONE PRODUCT.  HE WAVED

8    HIS HAND AT 21 OTHER PRODUCTS, NEVER ON AN

9    ELEMENT-BY-ELEMENT BASIS.

10              WE ARGUED FROM THE BEGINNING THAT HE

11   DIDN'T CARRY HIS BURDEN IN ESTABLISHING, ON AN

12   ELEMENT-BY-ELEMENT BASIS, THAT ALL THE ACCUSED

13   PRODUCTS MEET THE LIMITATIONS, WHICH IS WHAT HE WAS

14   REQUIRED TO DO.

15              IT'S AN INSUFFICIENCY OF PROOF ASPECT,

16   FIRST AND FOREMOST, AND THEY DID NOT CARRY THEIR

17   BURDEN.

18              SECOND, ON CROSS-EXAMINATION, I ELICITED

19   KEY ADMISSIONS FROM HIM ABOUT THE FACT THAT THERE

20   ARE -- THAT THESE THINGS OPERATE DIFFERENTLY, AND

21   THEY DO OPERATE DIFFERENTLY.

22              THEY'RE DIFFERENT VERSIONS OF THE CODE,

23   CODE THAT WAS PRODUCED DURING THE COURSE OF

24   DISCOVERY, AND REASONABLE JURORS CAN DIFFER AS TO

25   WHETHER EACH AND EVERY ONE OF THESE APPLICATIONS

```
 1   WITHIN EACH ONE OF THESE 21 PRODUCTS INFRINGE THE
 2   CLAIM LIMITATION.
 3            THEY HAVEN'T CARRIED THEIR BURDEN.  HE
 4   ADMITTED DURING CROSS-EXAMINATION THAT CERTAIN KEY
 5   LIMITATIONS WERE MISSING.
 6            HOLD STILL IS, IN FACT, SOMETHING THAT'S
 7   PRESENT.  PUTTING ASIDE MR. MCELHINNY'S ARGUMENT,
 8   IT'S SOMETHING THAT'S PRESENT AND HE ADMITTED THAT
 9   HE DIDN'T CONSIDER IT.
10            I MEAN, WHETHER THE JURORS -- HOW THE
11   JURORS DECIDE THIS ISSUE ULTIMATELY IS A QUESTION
12   FOR THE JURORS AND THEY SHOULD BE PERMITTED TO LOOK
13   AT ALL THE PRODUCTS AND DO THEIR OWN ANALYSIS.
14            MR. MCELHINNY:  IN FAIRNESS, YOUR HONOR,
15   YOU HAVE HEARD ENOUGH ORAL ARGUMENTS TO KNOW THAT
16   MR. JOHNSON IS APPARENTLY ADDRESSING EVERYTHING
17   EXCEPT FOR THE QUESTION THAT YOU'RE THINKING ABOUT.
18   HE WANTS TO ARGUE HIS JMOL ABOUT WHETHER OR NOT YOU
19   CAN DO EXAMPLES, AND YOU CAN TALK ABOUT THAT.
20            BUT THE TESTIMONY IS HERE AND THIS IS ALL
21   THEY HAVE.  THIS WAS THEIR ENTIRE DEFENSE AND IT
22   FAILS BECAUSE IT DOESN'T GO TO EVERY APPLICATION,
23   AND IT DOESN'T ALWAYS HAPPEN.
24            MR. JOHNSON:  WHY DID HE NOT PUT UP
25   SOURCE CODE FOR THE CONTACTS?  WHY DID HE PUT UP A
```

```
1     DEMONSTRATIVE FOR ONLY THE GALLERY AND THE BROWSER?
2               HE DIDN'T MEET HIS BURDEN.  AND I
3     ELICITED IN CROSS-EXAMINATION THAT HE DIDN'T MEET
4     HIS BURDEN.
5               MR. VERHOEVEN:  YOUR HONOR, THIS IS
6     MR. VERHOEVEN.  CAN I JUST MAKE ONE POINT HERE TOO?
7               THE COURT:  PLEASE, GO AHEAD.
8               MR. VERHOEVEN:  I'M A LITTLE BIT
9     SURPRISED THAT WE'RE EVEN ARGUING THIS BECAUSE IT'S
10    THEIR BURDEN OF PROOF.
11              BUT BASICALLY IF YOU FOLLOW THE LOGIC OF
12    WHAT MR. MCELHINNY IS SAYING, HE'S SAYING THAT,
13    WELL, IN ORDER FOR YOU TO GRANT THIS, YOU WOULD
14    HAVE TO FIND THAT NO REASONABLE JUROR COULD FIND
15    THAT THEY HAVEN'T MET THEIR BURDEN OF PROOF ON 22
16    PRODUCTS WHERE, WITH RESPECT TO 21 OF THEM, THE
17    ONLY EVIDENCE IS INADMISSIBLE DEMONSTRATIVE VIDEOS
18    THAT WERE FLASHED BEFORE THE JURY'S EYES.
19              AND THE ONLY WAY, UNDER THE LAW, THAT YOU
20    CAN GRANT A JMOL IN THE SITUATION WHERE THEY HAVE
21    THE BURDEN OF PROOF WOULD BE TO FIND NO REASONABLE
22    JURY COULD FIND THEY FAILED TO MEET THAT BURDEN OF
23    PROOF AND SO, THEREFORE, WE'RE REQUIRED TO COME UP
24    WITH SOMETHING ELSE BEYOND THAT, EVEN SETTING ASIDE
25    THE ISSUES THAT MR. MCELHINNY IS RAISING.
```

```
1           AND THERE'S NO WAY THE EVIDENCE SUPPORTS,

2    GIVEN WHAT THE DIRECT TESTIMONY WAS, THE NOTION

3    THAT NO REASONABLE JURY -- AND YOU HAVE TO TAKE THE

4    INFERENCES IN OUR FAVOR, YOUR HONOR -- THAT NO

5    REASONABLE JURY COULD SAY, HEY, THAT WASN'T ENOUGH.

6           FLASHING VIDEOS OF 20 PHONES WITH NO

7    ELEMENT-BY-ELEMENT ANALYSIS, THE DEMONSTRATIVES

8    AREN'T EVEN IN EVIDENCE, THERE'S JUST -- IT'S NOT

9    EVEN A CLOSE QUESTION TO SAY TAKING INFERENCES IN

10   OUR FAVOR THAT NO REASONABLE JURY COULD FIND THEY

11   FAILED TO MEET THEIR BURDEN OF PROOF.

12          OF COURSE A REASONABLE JURY COULD FIND

13   THAT AND, THEREFORE, THE JMOL MUST BE DENIED.

14          THE COURT:  WELL, I'M DENYING THE JMOL ON

15   THAT ISSUE.  I ALREADY DENIED IT AS TO INVALIDITY.

16          LET'S TALK ABOUT THE TWO FINGER SCROLLING

17   SIMULTANEOUSLY ON THE '915.  I THINK THAT

18   MR. GRAY'S TESTIMONY AT -- I SHOULD TAB THIS -- AT

19   PAGE 2912, LINES 2 THROUGH 19 IS SUFFICIENT.  HE

20   DOES SAY THAT HE LOOKED AT ALL THE SAMSUNG ACCUSED

21   PRODUCTS AND FOUND THAT TO BE PRESENT.

22          NOW, WHAT HE SAID ON OBVIOUSNESS, I WILL

23   SAY, IS PRETTY DARN LEAN.  IT'S 2907, LINES 19

24   THROUGH 25.  BUT I'M, I'M INCLINED TO DENY THE

25   JMOL.
```

2353

```
 1              BUT THAT'S THE ONLY THING I COULD FIND ON

 2    OBVIOUSNESS AS TO THE '915, PAGE 2907, LINES 19

 3    THROUGH 25.

 4              IF THERE'S SOMETHING ELSE THAT I SHOULD

 5    BE LOOKING AT, MR. DEFRANCO, JUST LET ME KNOW.  I

 6    WANT TO KEEP TABS ON ALL THESE SECTIONS BECAUSE I

 7    KNOW IT'LL BE COMING UP FOR THE NEXT ROUND OF JMOL

 8    AND THE JURY INSTRUCTIONS AND WHATNOT.

 9              IS THERE ANYTHING ELSE I SHOULD BE

10    LOOKING AT OTHER THAN THAT SECTION?

11              MR. DEFRANCO:  NOT IN THE TRANSCRIPT,

12    YOUR HONOR, BUT I DID WANT TO CITE TWO CASES IF I

13    MIGHT JUST VERY BRIEFLY?

14              THE COURT:  PLEASE, GO AHEAD.

15              MR. DEFRANCO:  THIS IS PERFECT WEB AT 587

16    F.3D 1324, AND THE SITE IS AT 1329.

17              THE COURT:  I'M SORRY.  CAN YOU REPEAT

18    THAT ONE MORE TIME?  594 F.3D --

19              MR. DEFRANCO:  587 F.3D, 1324.

20              THE COURT:  OKAY.

21              MR. DEFRANCO:  AND I'M READING FROM 1329.

22              THE COURT:  OKAY.

23              MR. DEFRANCO:  AND IT SAYS, "THUS, THE

24    SUPREME COURT INSTRUCTED THAT FIND FACTORS MAY USE

25    COMMON SENSE IN ADDITION TO RECORD EVIDENCE."
```

1          IT GOES ON TO SAY, "NOR ARE EXPERT

2     OPINIONS ALWAYS A PREREQUISITE, FOR IN MANY PATENT

3     CASES EXPERT TESTIMONY WILL NOT BE NECESSARY

4     BECAUSE THE TECHNOLOGY WILL BE EASILY

5     UNDERSTANDABLE WITHOUT THE NEED FOR EXPERT

6     EXPLANATORY TESTIMONY."

7          AND IT GOES ON TO SAY THAT, IN THE

8     CONTEXT OF OBVIOUSNESS, "WE THEREFORE HOLD THAT

9     WHILE AN ANALYSIS OF AN OBVIOUSNESS ALWAYS DEPENDS

10    ON EVIDENCE THAT SUPPORTS THE REQUIRED GRAHAM

11    FACTUAL FINDING, IT MAY ALSO INCLUDE RECOURSE TO

12    LOGIC, JUDGMENT, AND COMMON SENSE AVAILABLE."

13         AND THEN THERE'S ANOTHER CASE, YOUR

14    HONOR.  IT'S SIMLINE AND THIS IS AT 211 WEST LAW

15    715233.

16         THE COURT:  715 --

17         MR. DEFRANCO:  233.  AND I'M READING FROM

18    246, I BELIEVE.

19         AGAIN IN THE CONTEXT OF OBVIOUSNESS, THIS

20    IS THE FEDERAL CIRCUIT SAYING, "THE OBVIOUSNESS

21    ANALYSIS MAY INCLUDE RECOURSE BY THE FACT FINDER,

22    AGAIN THE JURY, TO LOGIC, JUDGMENT, AND COMMON

23    SENSE AVAILABLE TO THE PERSON OF ORDINARY SKILL IN

24    THE ART THAT DOES NOT NECESSARILY REQUIRE

25    EXPLANATION IN ANY REFERENCE OR EXPERT OPINION.  BY

1    EXTENSION, EXPERT REPORTS, EVEN CREDIBLE EXPERT

2    REPORTS, ARE NOT REQUIRED WHERE THE UNDERLYING

3    FACTUAL CONSIDERATIONS ARE RESOLVED BY RESORT TO

4    COMMON SENSE.  HERE THE TECHNOLOGY IS EASILY

5    UNDERSTANDABLE, EVEN WITHOUT THE ASSISTANCE OF

6    EXPERT OPINION."

7              AND I THINK THE BACKDROP FOR THESE CASES,

8    YOUR HONOR, THE AMOUNT OF TIME IT WOULD TAKE FOR

9    EXPERTS TO GO THROUGH EVERY PERMUTATION AND SAY,

10   WELL, IF YOU DON'T FIND IT LITERALLY IN THE PRIOR

11   ART, THERE WOULD BE OBVIOUSNESS -- IT WOULD BE

12   OBVIOUS, ESPECIALLY IN THE CONTEXT WHEN WE'RE

13   DEALING WITH TECHNOLOGY THAT THE JURY CAN SEE FOR

14   THEMSELVES, THEY CAN MAKE THEIR OWN DETERMINATION

15   BASED ON THE EVIDENCE WHETHER ONE OF ORDINARY

16   SKILL, IF THEY WERE SITTING IN THEIR SHOES, THEY

17   WOULD BE ABLE TO COMBINE THE REFERENCES, OR WITHIN

18   A REFERENCE ITSELF FIND THAT THAT FEATURE, MINOR

19   DEVIATIONS THAT AN EXPERT SAY REMOVE THE PRIOR ART,

20   WHETHER THAT FEATURE WOULD HAVE BEEN OBVIOUS TO ONE

21   OF ORDINARY SKILL.

22              THAT'S EXACTLY WHAT THESE CASES ARE

23   SAYING, SO WE WOULD CITE THESE CASES IN ADDITION TO

24   THE TESTIMONY THAT YOUR HONOR MENTIONED.

25              THE COURT:  ALL RIGHT.  I'M DENYING THE

```
 1    JMOL ON THAT ISSUE.  SO I THINK I'VE DENIED THE

 2    JMOL AS TO EVERYTHING.

 3            LET'S GET TO THE MOTION TO STRIKE WHICH,

 4    UNFORTUNATELY, IS A LITTLE BIT TRICKIER.

 5            WITH REGARD TO THE LG PRADA, IT WAS, AS I

 6    REMEMBERED FROM THE TESTIMONY YESTERDAY, WHERE

 7    DR. SHERMAN THOUGHT THAT IT HAD BEEN SOLD IN 2006

 8    OR PRIOR TO 2006, BUT THERE'S NO CORROBORATION OF

 9    WHAT HE SAID.

10            SO MY ONLY CONCERN IS THAT WITHOUT ANY

11    CORROBORATION, I DON'T KNOW IF HIS, YOU KNOW, ONE

12    SENTENCE ANSWER WILL SUFFICIENTLY -- AND THIS HAS

13    BEEN A DISPUTE THAT'S BEEN GOING ON FOR QUITE SOME

14    TIME IN THIS CASE, WHETHER THAT'S PRIOR ART.

15            MR. ZELLER:  THERE IS SOME ADDITIONAL

16    CORROBORATION, YOUR HONOR.

17            THE COURT:  YEAH, WHERE IS IT?

18            MR. ZELLER:  JUST FOR RECORD PURPOSES,

19    MR. SHERMAN'S TESTIMONY WAS ALSO AS TO HIS PERSONAL

20    KNOWLEDGE WHEN HE SAID IT WAS LATE 2006.

21            BUT ALSO I WOULD DIRECT THE COURT TO TWO

22    ADDITIONAL PIECES OF EVIDENCE.

23            THE COURT:  OKAY.

24            MR. ZELLER:  AND JUST FOR TIME PERIOD

25    REFERENCE, THE D'677 FILING DATE IS NOVEMBER 18TH,
```

```
1    2008, AND THE D'087 FILING DATE IS JULY 30TH, 2007.
2              THE COURT:  OKAY.
3              MR. ZELLER:  THE COURT MAY RECALL THAT WE
4    PUT INTO EVIDENCE THE -- AND THIS WAS THROUGH
5    MR. HOWARTH -- THAT BARCELONA FAIR DOCUMENT THAT
6    THE PARTIES STIPULATED HAD A DATE OF FEBRUARY OF
7    2007.
8              THE COURT:  OKAY.  CAN I STOP YOU RIGHT
9    THERE, THOUGH?
10             WE DID GO BACK AND LOOK AT THE STRINGER
11   TESTIMONY AND HIS TESTIMONY IS CORROBORATED BY A
12   CAD, CAD DRAWING OF THE FRONT FACE OF THE BEZEL OF
13   THE PHONE, AND IT IS DATED APRIL 20TH OF 2006.
14             SO --
15             MR. ZELLER:  AND I CAN DEFINITELY ADDRESS
16   THAT, YOUR HONOR.
17             MR. MCELHINNY:  YOUR HONOR, CAN I JUST
18   INTERRUPT TO MAKE SURE WE'RE ADDRESSING THE CORRECT
19   ISSUE?
20             THE COURT:  WHAT ARE WE --
21             MR. MCELHINNY:  BECAUSE THE ARGUMENT HERE
22   IS THAT THE LG PRADA PHONE IS THE PRIOR ART.
23             THE COURT:  UM-HUM.
24             MR. MCELHINNY:  NOT ARTICLES.
25             MR. ZELLER:  IF I MAY, YOUR HONOR?  I
```

```
1    HADN'T ACTUALLY FINISHED.
2              MR. MCELHINNY:  SO WHAT THEY HAVE TO
3    PROVE TO GET IT IN AS PRIOR ART IS THEY HAVE TO
4    PROVE THAT THE PHYSICAL PHONE WAS MADE, USED, OR
5    SOLD IN THE UNITED STATES.
6              AND MR. SHERMAN, HIS TESTIMONY IS AT PAGE
7    2586, HE SIMPLY SAYS THE PHONE WAS DISCLOSED.  HE
8    DOESN'T TALK ABOUT WHERE.  HE DOESN'T -- MR. ZELLER
9    IS ABOUT TO TALK TO YOU ABOUT SOMETHING IN
10   BARCELONA.
11             NONE OF THAT MAKES ANY DIFFERENCE BECAUSE
12   THEY --
13             THE COURT:  LET ME LET MR. ZELLER --
14             MR. ZELLER:  IF I COULD --
15             THE COURT:  2586, THAT'S HIS -- YEAH, I
16   SEE THAT.
17             MR. ZELLER:  AND IF I CAN WALK THROUGH
18   THE EVIDENCE BEFORE PERHAPS ENGAGING IN MORE BACK
19   AND FORTH WITH COUNSEL.
20             DX 2627, WHICH WAS STIPULATED HAS A
21   FEBRUARY OF 2007 DATE, HAS IMAGES OF THE LG PRADA,
22   FOR EXAMPLE, AT .042.
23             THE COURT:  WAIT.  DX?
24             MR. ZELLER:  2627.  WE CAN ALSO PUT IT UP
25   ON THE SCREEN.
```

 1                THE COURT:  ONE SECOND, PLEASE.

 2                YOU KNOW, I DON'T HAVE THAT IN MY -- OH,

 3       THAT WAS ONE OF THE LATER ADDED ONES.

 4                MR. ZELLER:  YES, YOUR HONOR.  IT WAS

 5       INTRODUCED THROUGH MR. HOWARTH.  I THINK IT WAS

 6       YESTERDAY.  WE'RE PROBABLY ALL LOSING TRACK OF

 7       DAYS.

 8                THE COURT:  OKAY.

 9                MR. ZELLER:  BUT IT'S THIS ONE.  IF WE

10       CAN GO TO THE FIRST PAGE, PLEASE.

11                THE COURT:  GIVE ME ONE SECOND.  LET ME

12       FIND MY OWN VERSION.  IT'S 2627?

13                MR. ZELLER:  CORRECT, 2627.

14                THE COURT:  OKAY.

15                MR. ZELLER:  AND THE PARTIES ALL AGREE

16       THIS HAS A FEBRUARY 2007 DATE ON IT.

17                THE COURT:  OKAY.

18                MR. ZELLER:  THAT WAS STIPULATED TO.

19                AND THIS, FIRST OF ALL, BEATS THE FILING

20       DATES ON THE FACE OF THESE DESIGN PATENTS.

21                BUT EVEN IF IT DIDN'T, THE FACT IS THE

22       JURY COULD INFER THAT THERE WAS AN EARLIER DATE.

23                AND IT'S CERTAINLY NOT CORRECT THAT

24       SOMETHING THAT IS PUBLICLY DISCLOSED IN A FOREIGN

25       COUNTRY OR SOLD IN A FOREIGN COUNTRY CAN'T BE PRIOR

2360

```
 1    ART.  I'M UNAWARE OF ANY HOLDING FOR THAT.

 2              BUT I'LL GET TO A FURTHER POINT, YOUR

 3    HONOR, WHICH IS THAT THERE'S AN ADDITIONAL PIECE OF

 4    EVIDENCE THAT ACTUALLY TAKES US BACK TO JULY 6TH OF

 5    2006, AND WE ALREADY HAVE IN EVIDENCE EXHIBIT 727,

 6    WHICH IS THE KR'547 PIECE OF PRIOR ART.  THIS WAS

 7    PUBLISHED AS OF JULY 6TH, 2006.  THIS IS -- THIS IS

 8    THE CORRESPONDING DESIGN PATENT FOR THE PRADA, THE

 9    LG PRADA.

10              THE COURT:  I THINK IT DOES HAVE TO BE

11    SOLD IN THE U.S.  ISN'T THAT WHAT THE AMERICA

12    DEFENSE ACT CHANGED, THAT THINGS ARE NOW GOING TO

13    BE WORLDWIDE FOR PRIOR ART?  CORRECT ME IF I'M

14    WRONG.

15              MR. ZELLER:  WELL, NO.  THAT'S NOT MY

16    UNDERSTANDING OF THE LAW.  I CAN CERTAINLY FIND

17    SOME CASES.

18              I WASN'T PREPARED TO ADDRESS THAT.

19    MR. MCELHINNY HASN'T RAISED THAT AS BEING AN ISSUE.

20    HE WAS MORE ARGUING ABOUT DATES.

21              BUT I CAN CERTAINLY FIND AUTHORITY FOR

22    THAT.

23              BUT I WOULD ALSO SAY, YOUR HONOR, JUST TO

24    GO BACK TO APPLE'S OWN ARGUMENT --

25              THE COURT:  WHY DON'T WE PULL IT UP?
```

2361

```
 1    WHO'S GOT THE PATENT?  THIS IS EASILY -- WE CAN
 2    FIND THAT EASILY.
 3              MR. ZELLER:  I'M SORRY.  WHICH ONE?
 4              THE COURT:  WHO'S GOT, WHAT IS THAT,
 5    102 --
 6              MR. LEE:  102.
 7              MR. ZELLER:  102.
 8              THE COURT:  WE DON'T HAVE TO HAVE
 9    RESEARCH ON THIS ISSUE.  WE CAN PULL UP THE
10    STATUTE.  DOESN'T IT HAVE TO BE SOLD IN THE U.S.
11    WITHIN A YEAR OF THE PRIORITY DATE?
12              MR. ZELLER:  I'D HAVE TO GET THE
13    LANGUAGE, YOUR HONOR.
14              THE COURT:  DOES ANYONE HAVE 102(G),
15    PLEASE?  IT MAY NOT BE (G).  WHAT IS IT?
16              MR. LEE:  I THINK IT'S (A) OR (B).  (B),
17    I THINK.
18              THE COURT:  WELL, IF SOMEONE CAN GET
19    THAT.
20              MR. ZELLER:  AND IF I COULD JUST MAKE A
21    FACTUAL POINT, YOUR HONOR?
22              WE'LL GET THAT SECTION, BUT THE FACTUAL
23    POINT, YOUR HONOR, AS THE COURT WILL RECALL, IS
24    THAT APPLE ITSELF --
25              THE COURT:  I WANT TO -- YOU KNOW, I WANT
```

2362

```
 1    TO KNOW.  2627, IS THIS RELEVANT OR NOT?  IT'S
 2    BARCELONA.  SO I NEED TO KNOW.
 3              I THOUGHT EVEN THE PUBLICATION -- I MEAN,
 4    YOU ALL CAN CORRECT ME.  I MAY JUST BE WRONG.
 5              MR. VERHOEVEN:  YOUR HONOR, THIS IS
 6    MR. VERHOEVEN.
 7              A PUBLICATION, AS WE'RE LOOKING FOR THE
 8    REPORT --
 9              THE COURT:  SURE.  THERE IT IS.  THANK
10    YOU.
11              MR. VERHOEVEN:  I WAS GOING TO SAY, YOUR
12    HONOR, A PUBLICATION IS NOT SUBJECT TO THOSE
13    LIMITATIONS.  IT CAN BE ANYWHERE.
14              MR. ZELLER:  RIGHT.  102(A).  THE
15    INVENTION WAS KNOWN OR USED BY OTHERS IN THIS
16    COUNTRY, OR PATENTED OR DESCRIBED IN A PRINTED
17    PUBLICATION IN THIS OR A FOREIGN COUNTRY, BEFORE
18    THE INVENTION THEREOF BY THE APPLICANT FOR A
19    PATENT.
20              AND, YOUR HONOR, THE APPLE DOCUMENT
21    ITSELF THAT'S HERE IN EVIDENCE, THIS BARCELONA
22    DOCUMENT, GIVEN THAT IT'S IN APPLE'S POSSESSION,
23    ONE COULD CERTAINLY INFER THAT IN ITSELF IS A
24    PRINTED PUBLICATION DESCRIBING IT.
25              BUT CERTAINLY IT FALLS INTO THE CATEGORY
```

```
 1   OF THE INVENTION WAS KNOWN BY OTHERS IN THIS
 2   COUNTRY.
 3              SO THE JURY CAN CERTAINLY INFER FROM
 4   APPLE'S CREATION OF THIS DOCUMENT ITSELF THAT IT IS
 5   ONE OF THE PARTIES THAT KNEW OF THIS INVENTION
 6   ITSELF DIRECTLY.
 7              THE COURT:  UM-HUM.
 8              MR. MCELHINNY:  YOUR HONOR?
 9              THE COURT:  YEAH.
10              MR. MCELHINNY:  WE'RE CHANGING THE PRIOR
11   ART NOW.  THE PRIOR ART THAT WAS IDENTIFIED PRIOR
12   TO TRIAL, THE PRIOR ART THAT WAS IN THE EXPERT
13   REPORTS WAS THE PHONE ITSELF.
14              THE COURT:  RIGHT.
15              MR. MCELHINNY:  THAT'S THE PRIOR ART THAT
16   WAS SHOWN.  THAT'S THE PRIOR ART THAT WAS CLAIMED.
17   THAT'S THE PRIOR ART THAT'S IN THE CONTENTIONS.
18              AND THE PHONE ITSELF HAS TO BE USED IN
19   THE UNITED STATES.
20              AND WHAT THEY'RE TRYING TO DO NOW IS
21   CHANGE THEIR PRIOR ART DESIGNATION TO THIS OTHER
22   DOCUMENT.
23              BUT THE PHONE ITSELF WAS SHOWN TO THE
24   JURY.
25              MR. ZELLER:  THAT'S NOT CORRECT.  ALL
```

```
 1     WE'RE ARGUING ABOUT IS WHAT CORROBORATES THE DATE.

 2            THE COURT:  WELL, THE THING THAT EXISTED

 3     DURING ALL THOSE MOTIONS IN LIMINE WAS THE PHONE

 4     ITSELF.  WOULD YOU AGREE?

 5            THAT'S WHY THIS EXHIBIT HAS SUCH A LATE

 6     NUMBER, 2627, BECAUSE IT WAS ADDED LATE.  THERE WAS

 7     AN OBJECTION TO THIS AND I ALLOWED IT.  I THINK I

 8     JUST LET YOU SUBSTITUTE IN ANOTHER EXHIBIT.

 9            BUT THERE WAS AN OBJECTION FROM APPLE

10     THAT THIS WAS A LATE DISCLOSED DOCUMENT, BUT IT'S

11     AN APPLE DOCUMENT, SO I THINK IT'S AN ADMISSION.

12            MR. ZELLER:  AND I WOULD ALSO REMIND YOUR

13     HONOR, ON THE MOTION IN LIMINE, WE DID POINT TO THE

14     FACT THAT THERE WERE ARTICLES AND OTHER

15     PUBLICATIONS THAT SUPPORTED MR. SHERMAN'S OPINION.

16            THE COURT:  BUT NOT THIS ONE.

17            MR. ZELLER:  I UNDERSTAND.  BUT I'M JUST

18     POINTING OUT TO THE COURT THAT FOR PURPOSES OF THE

19     MOTION IN LIMINE, IT WASN'T SIMPLY AS THOUGH WE

20     JUST SIMPLY ASSERTED IT.

21            WE POINTED TO ARTICLES.  MR. SHERMAN DID

22     TRY AND LAY A FOUNDATION.

23            THE COURT:  OKAY.  WHICH ONES?  WHICH

24     ONES WERE THOSE?  WERE THOSE THE ONES THAT WERE

25     STRICKEN?
```

```
 1              MR. ZELLER:  NO, THEY WERE NOT STRICKEN,
 2    YOUR HONOR.  I BELIEVE THE OBJECTION WAS SIMPLY
 3    THAT HE WAS RELYING ON THESE ARTICLES TO
 4    SUBSTANTIATE HIS DATES.
 5              THE COURT:  OKAY.
 6              MR. ZELLER:  AND MR. VERHOEVEN LAID
 7    ADDITIONAL FOUNDATION WHERE HE SAID THAT HE
 8    ACTUALLY KNEW.
 9              I MEAN, MR. SHERMAN, OF COURSE, IS
10    SOMEBODY WHO'S BEEN IN THE INDUSTRY FOR MANY YEARS.
11              THE COURT:  BUT YOU'RE NOT RELYING ON THE
12    DOCUMENTS THAT YOU CLAIM.  YOU'RE RELYING ON THE
13    MOTION IN LIMINE.  I CERTAINLY, IN THE MOTION IN
14    LIMINE, DID NOT SEE THIS DOCUMENT.  I WOULD HAVE
15    REMEMBERED IT.
16              MR. ZELLER:  RIGHT.  YOUR HONOR, THE
17    ONLY --
18              THE COURT:  ARE YOU RELYING ON ANY OF THE
19    DOCUMENTS THAT YOU RELIED ON THE MOTION IN LIMINE?
20    I THOUGHT IT WAS THE PHONE.  LET ME CHECK MY NOTES.
21              MR. ZELLER:  I BELIEVE THAT MR. MCELHINNY
22    IS SIMPLY CONTINUING TO MIX AND MATCH ARGUMENTS
23    ONCE HE LOSES.
24              THE FACT IS THAT THIS STARTED OFF AS A
25    CONVERSATION ABOUT WHAT THE DATE WAS, WAS THERE
```

1    CORROBORATION FOR THE DATE?

2         WE HAVE DIRECT WITNESS TESTIMONY THAT

3    IT'S LATE 2006 FOR THE PHONE.  WE HAVE APPLE'S OWN

4    DOCUMENTS CORROBORATING THAT DATE.  THAT SHOULD BE

5    SUFFICIENT TO GO TO THE JURY.

6         I'M NOT NOW ARGUING THAT THERE IS SOME

7    SEPARATE PIECE OF PRIOR ART AS A RESULT OF THAT.

8    THE PHONE IS AND CONTINUES TO BE THE PRIOR ART.

9         BUT THERE IS EVIDENCE, RECORD EVIDENCE

10   THAT WOULD ALLOW THIS JURY TO FIND THAT THAT PHONE

11   WAS, IN FACT, PUBLIC, WAS KNOWN, UNDER 102(A), AS

12   OF LATE 2006, OR CERTAINLY BEFORE THE FILING DATES

13   FOR THE TWO DESIGN PATENTS AT ISSUE.

14        THE COURT:  ALL RIGHT.  THAT SOUNDS RIGHT

15   TO ME.

16        MR. MCELHINNY:  YOUR HONOR?

17        THE COURT:  YEAH.

18        MR. MCELHINNY:  AGAIN --

19        THE COURT:  WHAT WAS YOUR ISSUE ABOUT THE

20   EARLIER DATE?  IS THAT THE APRIL 20TH, 2006 DATE OR

21   NO?

22        MR. MCELHINNY:  NOW THAT WE'RE ON THE

23   PHONE, NOW THAT WE'VE GOTTEN BACK TO THE FACT THAT

24   WE'RE TALKING ABOUT THE PHONE, MR. SHERMAN DID NOT

25   TESTIFY BASED ON ANYTHING.  HE SIMPLY DID NOT SAY

1    THAT THAT PHONE WAS MADE, USED, OR AVAILABLE OR ON

2    SALE IN THE UNITED STATES.

3             ALL HE SAID, HIS TESTIMONY IS RIGHT

4    THERE, IS THE PHONE WAS DISCLOSED IN 2006.  THAT'S

5    ALL HE SAID.

6             AND THIS IS A MAN FROM ISRAEL.  I MEAN,

7    THERE WAS NO TYING THAT TO THE UNITED STATES.

8             THIS IS SOMETHING THEY HAVE TO PROVE BY

9    CLEAR AND CONVINCING EVIDENCE, AND THEY DON'T EVEN

10   HAVE -- THEY CAN'T FIND THE WORDS IN THE TRANSCRIPT

11   THAT THIS PHONE WAS FOR SALE IN THE UNITED STATES

12   BECAUSE NO ONE SAID THAT.

13             MR. ZELLER:  YOUR HONOR, I WOULD REMIND

14   THE COURT THAT APPLE --

15             THE COURT:  WELL, I'M -- I THINK THIS

16   ISSUE SHOULD GO TO THE JURY.  OKAY?

17             NOW, LET'S TALK ABOUT -- SO WHAT IS THE

18   ISSUE -- TELL ME WHAT WAS THE ISSUE YOU WERE

19   DRAWING ABOUT CHRIS STRINGER AND THE CAD DIRECTORY,

20   BECAUSE I OBVIOUSLY GOT IT WRONG THEN.

21             MR. ZELLER:  NO, YOUR HONOR.

22             THE COURT:  THAT'S MR. MCELHINNY'S ISSUE.

23             MR. ZELLER:  WE AGREE THAT MR. STRINGER

24   TESTIFIED IN NO CONCLUSORY WAY AS TO THIS 2006

25   CONCEPTION DATE.  HE DID UTTER THOSE WORDS.

```
 1              AND HE ALSO POINTED TO THESE CAD

 2    DRAWINGS.

 3              THE COURT:  OKAY.

 4              MR. ZELLER:  AND WHAT I WOULD SAY IN

 5    RESPONSE, YOUR HONOR, IS THAT, FIRST OF ALL, WITH

 6    RESPECT TO THE --

 7              THE COURT:  LOOK AT THE D'547.  THE

 8    KOREAN PATENT HAS A FILING DATE OF JULY 6TH, 2006,

 9    AND IF YOU'RE SAYING YOU AGREE TO THE APRIL 20TH,

10    2006 PRIORITY DATE, THEN THE KOREAN PATENT IS AFTER

11    THAT.  RIGHT?  SO WHY IS THAT STILL PRIOR ART?

12              MR. ZELLER:  WELL, BECAUSE, YOUR HONOR,

13    AS THE COURT HAS RULED PREVIOUSLY, THE JURY IS

14    ENTITLED TO DISREGARD, OR FIND NOT CREDIBLE,

15    MR. STRINGER'S TESTIMONY OF THE EARLIER CONCEPTION

16    DATE AND TO SIMPLY GO OFF OF THE FILING DATE.

17              MR. VERHOEVEN:  YOUR HONOR, LET ME --

18    YOUR HONOR, IT'S THEIR BURDEN OF PROOF IF THEY WANT

19    TO GO BACK BEFORE THE FILING DATE.  THERE'S

20    SPECIFIC LAW ON THAT.

21              THE COURT:  UM-HUM.

22              MR. VERHOEVEN:  AND SO THIS IS SORT OF

23    LIKE WHAT I WAS TALKING ABOUT WITH THE

24    NON-INFRINGEMENT ISSUE.

25              SO IT'S OUR BURDEN OF PROOF TO PROVE
```

1    INVALIDITY.

2              BUT IF THE PATENTEE WANTS TO GET A

3    PRIORITY DATE THAT PRECEDES THE FILING DATE, THE

4    SPECIFIC LAW ON THAT, THEY ACTUALLY HAVE TO PROVE

5    BY CLEAR AND CONVINCING EVIDENCE THAT THEY CAN GO

6    BACK AND THAT THEY WERE DILIGENT AND WHATNOT.

7              AND SO WITH RESPECT TO YOUR QUESTION ON

8    MR. STRINGER'S EVIDENCE, WE'RE ENTITLED, AGAIN, TO

9    GET THE BENEFIT OF ALL INFERENCES, AND CLEARLY A

10   REASONABLE JURY COULD FIND THAT MR. STRINGER DID

11   NOT CARRY THE DAY IN PROVING, BY CLEAR AND

12   CONVINCING EVIDENCE, THAT THEY MET THE STANDARD,

13   WHICH I'M GOING TO CONFESS I DON'T REMEMBER EVERY

14   SINGLE ELEMENT OF THE STANDARD, BUT I DO KNOW IT'S

15   THEIR BURDEN OF PROOF TO MOVE THAT DATE BACK.

16             THE COURT:  UM-HUM.

17             MR. VERHOEVEN:  AND SO CLEARLY A

18   REASONABLE JURY COULD FIND, HEY, THERE'S A --

19   THERE'S A -- THEY DIDN'T.

20             AND JUST AS CLEARLY, THERE'S A FACT ISSUE

21   HERE.  THIS IS A FACT ISSUE.

22             THE COURT:  ALL RIGHT.

23             MR. ZELLER:  AND I WOULD --

24             MR. LEE:  YOUR HONOR, MR. MCELHINNY ASKED

25   ME TO SAY ONE THING.

```
 1              THE COURT:  WHAT'S THAT?

 2              MR. LEE:  THE ISSUE THAT MR. VERHOEVEN

 3    JUST ADDRESSED IS ADDRESSED BY THE FEDERAL CIRCUIT

 4    IN A CASE CALLED POWER OASIS.  AND THE BURDENS

 5    ACTUALLY DON'T SHIFT THAT WAY.  I KNOW BECAUSE I

 6    ARGUED IT.  THAT IS A CASE THAT ADDRESSES THIS

 7    ISSUE.

 8              MR. ZELLER:  IF I MAY POINT OUT SOME

 9    SPECIFICS, YOUR HONOR?

10              THE COURT, IN DOCKET -- THIS IS 1563 AT

11    PAGE 6, ALREADY RULED THAT THE JURY CAN CHOOSE NOT

12    TO CREDIT MR. STRINGER'S TESTIMONY AS THE CREATION

13    DATE.  THAT'S NUMBER ONE IN TERMS OF THE LAW.

14              AND NUMBER TWO, THE ONLY -- EVEN WITH

15    REFERENCE TO THESE CAD DRAWINGS, THE ONLY THING

16    ACTUALLY TYING THE CAD DRAWINGS TO THE DATE THAT

17    APPLE IS CLAIMING FOR 2006 IS MR. STRINGER'S

18    TESTIMONY.

19              THE DOCUMENT ITSELF DOESN'T SHOW THE

20    CONNECTION BETWEEN THE CAD IMAGES AND THE DATES.

21              THE ONLY WAY THAT THE JURY COULD ACTUALLY

22    RELY ON THOSE CAD FILES WOULD BE TO CREDIT

23    MR. STRINGER'S TESTIMONY WHEN IT IS NOT REQUIRED TO

24    DO.

25              THE COURT:  THAT'S FINE.  LET'S NOT ARGUE
```

```
 1     THIS ANYMORE.  OKAY?  THAT'S DENIED.

 2               MR. ZELLER:  SURE.

 3               THE COURT:  OKAY.  NOW, I THINK THE

 4     FIDLER TABLET ACTUALLY RAISES THE TRICKIEST ISSUE

 5     ACTUALLY, BECAUSE, I MEAN, THE FEDERAL CIRCUIT

 6     WAS -- I MEAN, UNLIKE ON THE OTHER DESIGN PATENTS,

 7     THEY WERE PRETTY AFFIRMATIVE, PRETTY CLEAR.

 8               "AS A MATTER OF LAW, "WE HOLD THAT THE

 9     DISTRICT COURT ERRED IN FINDING THAT THE FIDLER

10     TABLET CREATED THE SAME VISUAL IMPRESSION AS THE

11     D'889 PATENT.  BASED ON THE DIFFERENCES BETWEEN THE

12     FIDLER TABLET AND THE D'889 DESIGN, WE HOLD THAT

13     THE FIDLER TABLET DOES NOT GIVE THE SAME VISUAL

14     IMPRESSION AS THE D'889 PATENT AND, THEREFORE, THE

15     DISTRICT COURT ERRED IN LOOKING TO FIDLER AS THE

16     PRIMARY REFERENCE AGAINST THE D'889 PATENT.

17               "WHEN THOSE VISUAL IMPRESSIONS ARE

18     COMPARED, IT BECOME APPARENT THAT THE FIDLER

19     REFERENCE, WITH OR WITHOUT THE TC1000, CANNOT SERVE

20     TO RENDER THE D'889 PATENT INVALID FOR

21     OBVIOUSNESS."

22               AND THEN IT SAYS, "IN THE ALTERNATIVE,

23     SAMSUNG URGES US TO CONSIDER SEVERAL OTHER TABLET

24     AND TABLET-LIKE DESIGNS AS SUITABLE PRIMARY

25     REFERENCES.  ALL OF THOSE REFERENCES CONSIST OF
```

1     RECTANGULAR DESIGNS WITH ROUNDED CORNERS DOMINATED

2     BY A DISPLAY AREA, BUT THOSE DESIGNS ALL SUFFER

3     FROM THE SAME PROBLEMS AS THE FIDLER REFERENCE."

4          IT GOES ON TO SAY, "THE OFFERED DESIGNS

5     DO NOT CREATE THE SAME VISUAL IMPRESSION AS APPLE'S

6     CLAIMED DESIGNED AND, THUS, DO NOT QUALIFY AS

7     PRIMARY REFERENCES.

8          "IN THE ABSENCE OF A QUALIFYING PRIMARY

9     REFERENCE, WE HOLD THAT THE DISTRICT COURT ERRED IN

10    CONCLUDING THAT THERE IS LIKELY TO BE A SUBSTANTIAL

11    QUESTION AS TO THE VALIDITY OF THE D'889 PATENT."

12         SO THIS, I THINK, IS THE HARDEST OF ALL

13    THE ISSUES THAT HAVE BEEN RAISED IN THAT IT KIND OF

14    LOOKS LIKE THE FEDERAL CIRCUIT WAS SORT OF SAYING,

15    AS A MATTER OF LAW, THEY DON'T THINK FIDLER CAN

16    SERVE AS A PRIMARY REFERENCE.

17         AND YOUR EXPERT YESTERDAY WAS DOING THE

18    SAME THING OF FIDLER PLUS TC1000.

19         SO, YOU KNOW, WE'VE LOOKED AT THE CASES

20    THAT YOU ALL HAVE CITED ON YOUR JURY INSTRUCTIONS

21    ON THIS POINT, THAT A PRELIMINARY INJUNCTION RULING

22    IS DIFFERENT AND SHOULDN'T BE BINDING.

23         BUT THIS IS A LITTLE BIT OF A TRICKIER

24    ISSUE BECAUSE THE FEDERAL CIRCUIT MAKES IT SEEM

25    LIKE, AS A MATTER OF LAW, THIS COMBINATION OF

1    FIDLER AND TC1000 CAN'T BE A PRIMARY AND SECONDARY

2    REFERENCE.

3              AND THIS IS REALLY THE ISSUE THAT GIVES

4    ME THE MOST TROUBLE OUT OF EVERYTHING WE'VE TALKED

5    ABOUT.  AND I'M SORRY TO MAKE EVERYONE GO SO LATE,

6    BUT THIS IS THE MOST TROUBLESOME ONE.

7              MR. ZELLER:  AND I UNDERSTAND THE COURT'S

8    CONCERN BASED ON THAT DECISION, AND I APPRECIATE

9    THE POINT.

10             WHAT I WOULD SAY IS THIS, YOUR HONOR.  OF

11   COURSE WE START WITH THE PREMISE, AND THE COURT

12   ITSELF HAS ACKNOWLEDGED, THAT PRELIMINARY

13   INJUNCTION RULINGS ARE NOT BINDING.

14             AND THEY'RE NOT EVEN BINDING AS TO LEGAL

15   ISSUES, CLAIM CONSTRUCTION AND THE LIKE.

16             WHAT I WOULD ALSO SAY, YOUR HONOR, IS WE

17   DO HAVE A DIFFERENT, FULLER FACTUAL RECORD.  WHAT

18   WE HAVE NOW IS LIVE TESTIMONY OF WITNESSES.  WE

19   HAVE LIVE TESTIMONY CONCERNING WHAT THE SKILL IN

20   THE ART IS.  WE HAVE THOSE KINDS OF ISSUES.

21             THE COURT:  BUT '889, YOU'RE STILL

22   RELYING ON FIDLER AND TC1000.  THAT'S MY CONCERN.

23             MR. ZELLER:  WELL, I UNDERSTAND.

24             THE COURT:  I MEAN, DESPITE THE

25   TESTIMONY, IT'S ULTIMATELY STILL THE OVERALL VISUAL

```
 1    IMPRESSION OF FIDLER, AND THAT HASN'T CHANGED AND,
 2    YOU KNOW, I -- I WENT YOUR WAY ON THE PRELIMINARY
 3    INJUNCTION, BUT, I MEAN, THE FEDERAL CIRCUIT WAS
 4    PRETTY CLEAR THAT THEY DON'T THINK THAT IF YOU HAVE
 5    AN EMBEDDED, YOU KNOW, DISPLAY IN A FRAME THAT THAT
 6    CREATES THE SAME VISUAL IMPRESSION, AND THEIR
 7    LANGUAGE IS VERY DEFINITIVE.
 8              I'M SORRY.  I'M VERY TIRED RIGHT NOW.
 9              BUT TELL ME, WHAT -- TELL ME HOW I MAKE
10    SENSE OF THIS FEDERAL CIRCUIT DECISION.
11              MR. ZELLER:  WELL, ONE THING IS WE DO
12    HAVE EVIDENCE OF RECORD, AND THIS IS -- THIS IS
13    DIFFERENT FROM WHAT WAS THERE ON THE PRELIMINARY
14    INJUNCTION.  THE VIDEOS HAVE BEEN PLAYED OF
15    MR. FIDLER'S TESTIMONY.
16              THE COURT:  I DON'T THINK THAT WOULD HAVE
17    CHANGED MY MIND THOUGH.
18              MR. ZELLER:  WELL, I THINK IT DOES IN
19    THIS RESPECT, YOUR HONOR.
20              THE COURT:  HOW'S THAT?
21              MR. ZELLER:  HE TESTIFIED THAT HE
22    ACTUALLY DID HAVE COMMUNICATIONS WITH APPLE.
23              HE ALSO TALKED ABOUT HOW WHAT HE --
24              THE COURT:  BUT THAT WOULDN'T CHANGE THE
25    VISUAL IMPRESSION THAT IT CREATES, RIGHT?  I MEAN,
```

1      THAT'S --

2                MR. ZELLER:  HE SAID THAT HIS -- WHAT HE

3      ENVISIONED WAS A FLAT TABLET.

4                THE COURT:  UM-HUM.

5                MR. ZELLER:  THAT IS WHAT HE SAID.  THAT

6      IS WHAT HE TESTIFIED TO.  HE SAID HE MADE

7      DRAWINGS --

8                THE COURT:  OKAY.

9                MR. ZELLER:  -- THAT HAD A FLAT SURFACE.

10               AND SO THAT, THAT'S THE KIND OF

11     ADDITIONAL FACTUAL EVIDENCE, RECORD, THAT WE NOW

12     HAVE IN FRONT OF THE JURY.

13               I WOULD ALSO POINT OUT, YOUR HONOR, THAT

14     SORT OF THE SAME POINT ABOUT CATALINA LIGHTING AND

15     BRAUN, WHICH IS THIS JURY IS ENTITLED, BECAUSE THEY

16     ARE A POOL OF ORDINARY OBSERVERS, THEY'RE ENTITLED

17     TO DRAW THEIR OWN INFERENCES, DRAW THEIR OWN

18     CONCLUSION.

19               AND, YOU KNOW, AND THERE'S A FULLER

20     FACTUAL RECORD AS WELL --

21               THE COURT:  YEAH.

22               MR. ZELLER:  -- ON THE --

23               THE COURT:  BUT IF I'M NOT PERSUADED BY

24     THE CASES THAT YOU CITED FOR YOUR JURY INSTRUCTION

25     ON THIS POINT, DO YOU HAVE ANYTHING ELSE THAT I CAN

```
 1    LOOK AT TO --
 2              MR. ZELLER:  YOU'RE TALKING ABOUT THE
 3    JURY -- I'M SORRY.  YOU'RE TALKING ABOUT THE CASES
 4    THAT DEAL WITH THE NON-BINDING EFFECT?
 5              THE COURT:  YEAH.  WHY THIS SHOULD STILL
 6    GO TO A JURY EVEN IF THERE'S BEEN A PRELIMINARY
 7    INJUNCTION RULING ON IT?  IS THERE ANYTHING THAT I
 8    CAN LOOK TO?
 9              MR. VERHOEVEN:  WE'LL TAKE A LOOK AT IT,
10    YOUR HONOR.
11              BUT I JUST WANT TO SAY, AND I'M SURE YOU
12    UNDERSTAND THIS --
13              THE COURT:  YEAH.
14              MR. VERHOEVEN:  -- THE STANDARD OF REVIEW
15    THAT THE FEDERAL CIRCUIT WAS ENGAGING IN WAS DE
16    NOVO REVIEW OF YOUR HONOR.
17              THE COURT:  UM-HUM.
18              MR. VERHOEVEN:  THE ISSUE, THE STANDARD
19    YOU'RE LOOKING AT --
20              THE COURT:  YEAH.
21              MR. VERHOEVEN:  -- IS YOU ARE THE
22    DECIDER.  YOU'RE THE DECIDER ON LIKELIHOOD OF
23    SUCCESS.  THAT'S THE STANDARD AND YOU ARE THE
24    DECIDER AND THEY ARE REVIEWING YOU DE NOVO.
25              THE STANDARD WE'RE LOOKING AT FOR A JMOL
```

1    IS --

2              THE COURT:  UM-HUM.

3              MR. VERHOEVEN:  -- ASSUMING EVERY

4    INFERENCE IN OUR FAVOR --

5              THE COURT:  UM-HUM.

6              MR. VERHOEVEN:  -- COULD ANY REASONABLE

7    JURY REACH THIS CONCLUSION?

8              AND I UNDERSTAND THE LANGUAGE IN THE

9    FEDERAL CIRCUIT'S OPINION SEEMS PRETTY MANDATORY,

10   SEEMS PRETTY UNQUALIFIED.

11             THE COURT:  IT SEEMS LIKE, AS A MATTER OF

12   LAW, THEY'RE SAYING THIS IS IT.

13             MR. VERHOEVEN:  BUT THEY DIDN'T SAY THAT.

14             THE COURT:  THEY SAID IT MORE SO HERE

15   THAN THEY DID ON THE PHONE DESIGN PATENTS.

16             MR. VERHOEVEN:  I WOULD SUBMIT, YOUR

17   HONOR, THAT THEIR STATEMENTS SHOULD BE TAKEN IN THE

18   CONTEXT THAT THEY'RE REVIEWING THIS COURT DE NOVO

19   AND THAT THIS COURT WAS THE DECIDER.

20             AND SO THERE WAS NO REASON, IN THEIR

21   OPINION, FOR THEM TO BE TALKING ABOUT WHAT A

22   REASONABLE JURY COULD OR COULDN'T DO.

23             THEY WERE ACTING AS A DECIDER, AS IF THEY

24   WERE THE DECIDER, AND THAT'S A DIFFERENT STANDARD,

25   YOUR HONOR, THAN IF THIS -- FOR EXAMPLE, YOUR

1     HONOR, IF THIS WENT TO THE JURY --

2              THE COURT:  YEAH.

3              MR. VERHOEVEN:  -- AND THE JURY -- AND

4     MR. ZELLER IS RIGHT, THERE'S ADDITIONAL -- THERE'S

5     ADDITIONAL EVIDENCE IN THE RECORD.

6              BUT IF THIS GOES TO THE JURY AND THE JURY

7     WERE TO SAY, "HEY, THE '889 IS INVALID," OKAY, AND

8     THEN YOU HAD A POST-TRIAL MOTION, YOUR STANDARD

9     WOULD NOT BE TO BE THE DECIDER.

10             YOUR STANDARD WOULD BE, COULD ANY

11    REASONABLE JUROR, JURY, HAVE MADE THESE FINDINGS?

12             THE COURT:  UM-HUM.

13             MR. VERHOEVEN:  AND I WOULD SUBMIT WITH

14    RESPECT, YOUR HONOR, IF YOU LOOK AT THE FEDERAL

15    CIRCUIT OPINION, IT DOESN'T TALK ABOUT THAT

16    STANDARD AT ALL.

17             AND WE ARE ENTITLED, UNDER THE SEVENTH

18    AMENDMENT, TO A JURY TRIAL ON THIS ISSUE.

19             THE COURT:  UM-HUM.

20             MR. VERHOEVEN:  YOU KNOW, IF THEY WANTED

21    TO MAKE A MOTION FOR SUMMARY JUDGMENT --

22             THE COURT:  UM-HUM.

23             MR. VERHOEVEN:  -- THEN THEY WOULD HAVE

24    HAD TO DO THAT AND THEY WOULD HAVE TO APPLY THAT

25    STANDARD AND YOU WOULD BE DOING THAT.

2379

```
 1              AND THAT'S -- AND SO IT'S A DIFFERENT --
 2     IT'S A WHOLE DIFFERENT PROCEDURAL FRAMEWORK.
 3              THE COURT:  YEAH.
 4              MR. VERHOEVEN:  AND, SURE, THEIR LANGUAGE
 5     WAS NOT SUPER QUALIFIED, BUT IT WAS IN THE CONTEXT,
 6     YOUR HONOR --
 7              THE COURT:  IT WAS NOT.
 8              MR. VERHOEVEN:  IT WAS IN THE CONTEXT,
 9     YOUR HONOR, OF REVIEWING THE DECIDER, WHICH WAS
10     YOU.
11              THE COURT:  YEAH.
12              MR. VERHOEVEN:  AND AFFORDING ZERO
13     DEFERENCE, WHICH IS THE STANDARD OF REVIEW ON A
14     PRELIMINARY INJUNCTION --
15              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.
16              MR. VERHOEVEN:  AND SO THERE -- EXCUSE
17     ME.
18              THEY'RE SAYING TO THE DISTRICT COURT,
19     THIS IS -- IF WE'RE THE DECIDER, THIS IS WHAT WE
20     DECIDE.
21              THAT IS COMPLETELY DIFFERENT THAN THE
22     STANDARD OF REVIEW -- IF WE HAD A JURY VERDICT AND
23     IT CAME UP TO THE APPEAL THAT WAY, THE STANDARD
24     THEY WOULD BE LOOKING AT WOULD NOT BE DE NOVO.  IT
25     WOULD BE, COULD ANY REASONABLE JURY HAVE FOUND
```

```
1    THIS?  AND IT WOULD BE ON A MUCH LARGER RECORD,
2    YOUR HONOR, AS WELL.
3              SO WE WOULD SUBMIT THAT, NOTWITHSTANDING
4    THESE STATEMENTS, WE'RE STILL ENTITLED TO A JURY
5    TRIAL.  THE SEVENTH AMENDMENT STILL APPLIES HERE.
6              THE COURT:  UM-HUM.
7              MR. VERHOEVEN:  AND IF YOU USE THE
8    REQUISITE STANDARDS HERE AND GIVE US THE INFERENCES
9    WE'RE ENTITLED TO --
10             THE COURT:  UM-HUM.
11             MR. VERHOEVEN:  -- IT'S NOT A QUESTION OF
12   HAVE WE PRESENTED EVIDENCE.  WE HAVE PRESENTED
13   EVIDENCE.
14             THE COURT:  UM-HUM.
15             MR. VERHOEVEN:  AND SO YOU HAVE TO GIVE
16   US, UNDER THE STANDARD, THE INFERENCE --
17             THE COURT:  UM-HUM.
18             MR. VERHOEVEN:  -- THAT THE JURORS BUY
19   OUR EVIDENCE AND OUR ARGUMENTS.
20             THE COURT:  UM-HUM.
21             MR. VERHOEVEN:  AND IF YOU DO THAT, I
22   WOULD SUBMIT WE'RE ENTITLED TO TAKE THIS TO THE
23   JURY.
24             MR. MCELHINNY:  MAY I MAKE TWO SMALL
25   POINTS?
```

```
 1              THE COURT:  VERY SMALL.
 2              MR. MCELHINNY:  THE STANDARD OF REVIEW OF
 3    A PRELIMINARY INJUNCTION, YOUR HONOR, IS ABUSE OF
 4    DISCRETION.  IT IS THE MOST DEFERENTIAL STANDARD OF
 5    REVIEW.
 6              I DON'T KNOW ON WHAT BASIS MR. VERHOEVEN
 7    COULD STAND HERE AND SAY IT'S DE NOVO.  IT'S ABUSE
 8    OF DISCRETION.
 9              AND TWO, THE LANGUAGE THAT YOU'RE
10    FOCUSSED ON -- AND THIS IS WHY IT'S SO KEY AND THIS
11    IS WHY IT'S TIED TO MY OVERALL MOTION, IS WHAT THEY
12    SAID WAS --
13              THE COURT:  I THINK THE REASONABLE WHY
14    YOU THOUGHT THAT WAS IT IS ABUSE OF DISCRETION, BUT
15    IT FELT LIKE DE NOVO.
16              MR. VERHOEVEN:  WELL, I DISAGREE THAT
17    ABUSE OF DISCRETION IS THE --
18              THE COURT:  IT FELT LIKE DE NOVO TO ME.
19              GO AHEAD.
20              MR. MCELHINNY:  AND WHAT THEY SAID WAS
21    THAT THE FIDLER TABLET -- THIS IS WHY THIS IS MY
22    LARGER OBJECTION TO MR. SHERMAN BECAUSE HIS
23    TESTIMONY HERE DOESN'T SAY WHAT'S A PRIMARY
24    REFERENCE AND WHAT'S A SECONDARY -- BUT WHAT THEY
25    SAID SO CLEARLY AT THE FEDERAL CIRCUIT IS THIS
```

```
 1      CANNOT BE A PRIMARY REFERENCE.

 2              AND IF IT CANNOT BE A PRIMARY REFERENCE,

 3      WHAT HE HAD IN HIS HEAD, WHAT HE WAS GOING TO DO IN

 4      THE FUTURE, WHAT ELSE YOU WOULD LOOK TO, THAT'S THE

 5      KEY TO THIS ANALYSIS.

 6              YOU HAVE TO HAVE -- YOU CAN'T DO ANYTHING

 7      IF YOU DON'T HAVE A PRIMARY REFERENCE.

 8              AND THE FEDERAL CIRCUIT SAID, AS YOUR

 9      HONOR SAID, THAT RESULT CAN'T CHANGE NO MATTER HOW

10      MANY LOWER COURTS OR JURIES LOOK AT IT.  THE

11      FEDERAL CIRCUIT HAS SAID THAT CANNOT BE A PRIMARY

12      REFERENCE.

13              THE COURT:  ALL RIGHT.  LET ME THINK

14      ABOUT THIS.  THIS IS THE ONE THAT, THAT GIVES ME

15      THE MOST PAUSE.

16              I'VE HAD POOR MS. SHORTRIDGE GOING ALL

17      DAY, SO I'D LIKE TO BRING THIS TO A CLOSE.  LET ME

18      THINK ABOUT THIS ONE FURTHER, PLEASE.

19              MR. ZELLER:  AND WE WOULD LIKE THE

20      OPPORTUNITY TO GO AND SEE IF WE CAN FIND SOME

21      ADDITIONAL CASES IN ADDITION TO WHAT WE'VE ALREADY

22      CITED.

23              THE COURT:  OKAY.

24              MR. ZELLER:  WE DON'T INTEND TO FLOOD THE

25      COURT WITH A BUNCH OF CITATIONS, BUT IF THERE'S
```

```
1    SOMETHING THAT --
2              THE COURT:  SURE.  CAN I PUT A PAGE
3    LIMIT?  CAN I GIVE YOU EACH ONE PAGE?
4              MR. VERHOEVEN:  YES.
5              THE COURT:  AND CAN YOU GIVE ME A TIME BY
6    WHICH YOU'LL FILE IT, BECAUSE I'D LIKE TO GIVE YOU
7    A DECISION TOMORROW MORNING.
8              I KNOW WE'RE ALL JUST EXHAUSTED.  WHAT
9    TIME?  WHAT TIME CAN YOU DO THAT.
10             MS. MAROULIS:  9:00 O'CLOCK?
11             THE COURT:  BECAUSE WE'LL NEED SOME TIME
12   ONCE YOU GIVE US SOME CITES TO ACTUALLY LOOK IT UP
13   AND WE'VE GOT TO DO YOUR 16 OBJECTIONS AND
14   EVERYTHING ELSE TONIGHT.
15             MR. VERHOEVEN:  WHAT'S THE LATEST YOU CAN
16   GET IT, YOUR HONOR?  IT'S 6:00 O'CLOCK ALREADY.
17             THE COURT:  I KNOW.  I'M SORRY.  CAN YOU
18   DO 8:00 O'CLOCK?  WOULD THAT BE ALL RIGHT?
19             MR. VERHOEVEN:  WE CAN TRY, YOUR HONOR.
20   THAT'S TWO HOURS.
21             THE COURT:  AND I JUST WANT ONE OR TWO
22   CITES OR SOMETHING.  THAT WOULD BE GREAT.
23             OKAY?  ALL RIGHT.  THANK YOU.  THANK YOU
24   ALL.
25             MS. MAROULIS:  YOUR HONOR, ONE QUICK
```

1    ISSUE.  AND I'M SORRY TO RAISE IT THIS LATE, BUT WE

2    KEPT VERY CLOSE COUNT OF THE TIME TODAY BECAUSE WE

3    ONLY HAVE THIS MUCH LEFT, AND WE HAVE 54 MINUTES.

4              AND I CAN RUN YOU THROUGH OUR WITNESS

5    COUNTS SO WE CAN COMPARE IT TO THE COURT'S.

6              THE COURT:  SURE.  THIS IS WHAT I HAVE

7    FOR TODAY.

8              I HAD MR. PRICE WITH SHEPARD, 9:08 TO

9    9:20, WHICH I COUNT AS 13 MINUTES.

10             MS. MAROULIS:  WE HAD 12.

11             THE COURT:  MR. WAGNER'S DIRECT 9:27 TO

12   10:09, AND I COUNTED IT AS 43 MINUTES; THE WAGNER

13   DIRECT BY MR. PRICE, 10:25 TO 10:28, I COUNT THAT

14   AS 4 MINUTES; THE SUKUMAR DIRECT BY MS. MAROULIS,

15   11:02 TO 11:05, I COUNT THAT AS 4 MINUTES; THE

16   O'BRIEN DIRECT BY MS. MAROULIS, 11:11 TO 11:25, I

17   COUNT THAT AS 15 MINUTES; THE TEECE DIRECT BY

18   MS. MAROULIS, 11:34 TO 11:54, I COUNT THAT AS 21

19   MINUTES; THE -- NEXT I HAVE THE KIM CROSS BY

20   MR. JOHNSON, 3 MINUTES.  LET ME SEE IF THAT ALSO

21   MATCHES UP.

22             AND THEN I DO A SEPARATE TALLY FOR EACH

23   PARTY.  SO I HAVE THE SHEPARD DIRECT WAS 13

24   MINUTES; THE WAGNER DIRECT WAS 43 MINUTES; THE

25   WAGNER REDIRECT WAS 4 MINUTES; THE READING OF THE

2385

```
 1      INTERROGATORY WAS 2 MINUTES; THE SUKUMAR DIRECT WAS

 2      4 MINUTES; THE O'BRIEN DIRECT WAS 15 MINUTES; THE

 3      TEECE DIRECT WAS 21 MINUTES; THE KIM CROSS WAS 3

 4      MINUTES; AND THE SRIVASTAVA CROSS WAS 4 MINUTES.

 5                  MS. MAROULIS:  SO YOUR HONOR, WE'RE OFF

 6      BY ONE MINUTE ON EACH OF THEM.

 7                  THE COURT:  ON EVERYTHING?

 8                  MS. MAROULIS:  YES.

 9                  THE COURT:  I COUNT THE MINUTES, SO IF

10      YOU'RE JUST SAYING -- LET ME GIVE YOU AN EXAMPLE.

11      OKAY.  I'LL GIVE YOU AN EXAMPLE.  THE SUKUMAR

12      DIRECT, 11:02 TO 11:05, IF YOU SAY 5 MINUS 2 IS 3,

13      I COUNT 2, 3, 4, 5.

14                  DO YOU SEE WHAT I'M SAYING?  I'M NOT JUST

15      COUNTING 5 MINUS 2 IS EQUAL TO 3.  I COUNT ALL THE

16      MINUTES THAT ARE USED, SO THAT MIGHT BE WHY WE'RE

17      COMING OFF A MINUTE.

18                  MR. VERHOEVEN:  WE'RE JUST USING A

19      STOPWATCH AND WE ACTUALLY COUNTED FROM THE MINUTE

20      YOU SAY THE TIME UNTIL THE MINUTE WE FINISH, AND

21      THAT'S WHAT WE'VE BEEN DOING.

22                  MR. LEE:  I THINK WE FIGURED OUT, YOUR

23      HONOR, THAT YOU'RE DOING WHAT YOU SAID.

24                  THE COURT:  I'VE BEEN DOING THIS THE

25      WHOLE WAY THROUGH.  YOU CAN LOOK AT MY RECORDS IF
```

2386

1    YOU WANT.  IF YOU USE THE MINUTE, IT COUNTS.

2              MR. JACOBS:  AND IT'S BEEN APPLIED

3    EQUALLY, YOUR HONOR.

4              THE COURT:  THE WAY I'VE BEEN DOING IT

5    THE WHOLE TIME.

6              BUT, I MEAN, I STILL HAVE -- YOU HAVE 46

7    MINUTES LEFT.  OKAY?

8              MS. MAROULIS:  THANK YOU, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  THANK YOU.  THANK

10   YOU EVERYBODY.

11             MR. ZELLER:  THANK YOU EVERYBODY.

12             (WHEREUPON, THE EVENING RECESS WAS

13   TAKEN.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT

8    REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

9    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

10   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

11   CERTIFY:

12          THAT THE FOREGOING TRANSCRIPT,

13   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

14   CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

15   SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

16   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

17   TRANSCRIPTION TO THE BEST OF OUR ABILITY.

18

19                    /S/
                 _____
20               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
21

22                    /S/
                 _____
23               IRENE RODRIGUEZ, CSR, CRR
                 CERTIFICATE NUMBER 8074
24

25               DATED:  AUGUST 16, 2012