1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
    CORPORATION,                )
                                )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,        )
                                )  AUGUST 17, 2012
8        VS.                     )
                                )  VOLUME 11
9   SAMSUNG ELECTRONICS CO.,     )
    LTD., A KOREAN BUSINESS      )  PAGES 3387-3711
10  ENTITY; SAMSUNG              )
    ELECTRONICS AMERICA,         )
11  INC., A NEW YORK             )
    CORPORATION; SAMSUNG         )
12  TELECOMMUNICATIONS           )
    AMERICA, LLC, A DELAWARE     )
13  LIMITED LIABILITY            )
    COMPANY,                     )
14                               )
               DEFENDANTS.       )
15  _____

16              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24                           IRENE RODRIGUEZ, CSR, CRR
                             CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
 3                                MICHAEL A. JACOBS
                                  RACHEL KREVANS
 4                           425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                 HALE AND DORR
 7                           BY:  WILLIAM F. LEE
                             60 STATE STREET
 8                           BOSTON, MASSACHUSETTS  02109

 9                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                             OLIVER & HEDGES
12                           BY:  CHARLES K. VERHOEVEN
                             50 CALIFORNIA STREET, 22ND FLOOR
13                           SAN FRANCISCO, CALIFORNIA  94111

14                           BY:  VICTORIA F. MAROULIS
                                  KEVIN P.B. JOHNSON
15                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
16                           REDWOOD SHORES, CALIFORNIA  94065

17                           BY:  MICHAEL T. ZELLER
                                  WILLIAM C. PRICE
18                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
19                           LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

<pre>
 1                    INDEX OF WITNESSES

 2     PLAINTIFF'S REBUTTAL

 3     HYONG KIM
            DIRECT EXAM BY MR. LEE (RES.)     P. 3414
 4          CROSS-EXAM BY MR. VERHOEVEN       P. 3432
            REDIRECT EXAM BY MR. LEE          P. 3434
 5     EDWARD KNIGHTLY
            DIRECT EXAM BY MR. MUELLER        P. 3435
 6          CROSS-EXAM BY MR. VERHOEVEN       P. 3462
            REDIRECT EXAM BY MR. MUELLER      P. 3464
 7     SUSAN KARE
            DIRECT EXAM BY MS. KREVANS        P. 3465
 8          CROSS-EXAM BY MR. VERHOEVEN       P. 3474
       MICHAEL WALKER
 9          DIRECT EXAM BY MR. MUELLER        P. 3477
            CROSS-EXAM BY MR. VERHOEVEN       P. 3516
10          REDIRECT EXAM BY MR. MUELLER      P. 3526
       RICHARD DONALDSON
11          DIRECT EXAM BY MR. MUELLER        P. 3531
       SEUNG-HO AHN
12          VIDEOTAPED DEPOSITION PLAYED      P. 3547
       JUN WON LEE
13          VIDEOTAPED DEPOSITION PLAYED      P. 3548
       JANUSZ ORDOVER
14          DIRECT EXAM BY MR. MUELLER        P. 3569
       PETER BRESSLER
15          DIRECT EXAM BY MS. KREVANS        P. 3589
            CROSS-EXAM BY MR. VERHOEVEN       P. 3608
16     KARAN SINGH
            DIRECT EXAM BY MR. JACOBS         P. 3614
17     RAVIN BALAKRISHNAN
            DIRECT EXAM BY MR. JACOBS         P. 3629
18
       DEFENDANT'S SURREBUTTAL
19
       DAVID TEECE
20          DIRECT EXAM BY MS. MAROULIS       P. 3643
            CROSS-EXAM BY MR. LEE             P. 3651
21
       TIM WILLIAMS
22          DIRECT EXAM BY MR. VERHOEVEN      P. 3656
            CROSS-EXAM BY MR. LEE             P. 3660
23
       WOODWARD YANG
24          DIRECT EXAM BY MR. VERHOEVEN      P. 3665
            CROSS-EXAM BY MR. LEE             P. 3670
25
</pre>

1                         INDEX OF EXHIBITS

2                                    MARKED          ADMITTED

3        PLAINTIFF'S

4        100                                          3425
         104                                          3431
5        1060                                         3450
         97                                           3454
6        2277                                         3469
         2278                                         3472
7        74                                           3486
         1085                                         3499
8        101                                          3501
         72                                           3502
9        84                                           3504
         122                                          3507
10       193                                          3510
         1084                                         3511
11       70                                           3512
         81                                           3541
12       1078                                         3603
         1048 & 1049                                  3628
13       1047                                         3636
         1066                                         3672
14

15

16

17       DEFENDANT'S

18       613                                          3519
         549                                          3522
19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                AUGUST 17, 2012

 2                    P R O C E E D I N G S

 3                 (WHEREUPON, THE FOLLOWING PROCEEDINGS

 4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 5                 THE COURT:  OKAY.  I HAVE A FEW ISSUES,

 6    AND I KNOW YOU ALL PROBABLY MAY HAVE SOME ISSUES AS

 7    WELL.

 8                 SO FOR THE TEECE OBJECTIONS, I'LL FILE

 9    THE RULINGS ON THOSE TODAY.  WE JUST DIDN'T HAVE

10    TIME TO DO THEM YESTERDAY.

11                 I'M ASSUMING IF WE CAN GET THOSE DONE BY

12    LUNCH, IS THAT ENOUGH TIME?

13                 MS. MAROULIS:  THAT SHOULD BE FINE, YOUR

14    HONOR.

15                 THE COURT:  ALL RIGHT.  AND ON THE -- ON

16    THE FIDLER TABLET, I'M GOING TO DENY THE RULE 50

17    MOTION.  THAT ISSUE SHOULD GO TO THE JURY.

18                 AND THEN, YOU KNOW, WHOEVER WANTS TO CAN

19    ALWAYS RENEW AND MAKE A RULE 50(B) MOTION DEPENDING

20    ON WHAT THE JURY VERDICT IS.

21                 LET ME ASK, I AM CURIOUS AS TO WHY APPLE

22    DIDN'T RAISE THIS ISSUE BEFORE, EITHER IN A SUMMARY

23    JUDGMENT MOTION OR A MOTION IN LIMINE OR HIGH

24    PRIORITY OBJECTION.

25                 WHY ARE WE NOT SEEING IT UNTIL NOW?  I
```

1    MEAN, IF YOU REALLY THOUGHT IT WAS THE LAW OF THE

2    CASE, THEN YOU WASTED ALL OF OUR TIME.  WHY DID YOU

3    WAIT?

4            MR. MCELHINNY:  YOUR HONOR, WE MADE

5    OBJECTIONS TO THE EVIDENCE THAT WERE OVERRULED.

6            THE COURT:  BUT YOU NEVER MADE IT ON THE

7    GROUNDS THAT YOU THOUGHT IT WAS ESSENTIALLY LEGAL

8    ERROR TO EVEN CONSIDER THE FIDLER TABLET AS A

9    PRIMARY REFERENCE.  THAT OBJECTION WAS NEVER IN THE

10   HIGH PRIORITY OBJECTIONS.

11           MR. MCELHINNY:  YOUR HONOR, WE TRIED TO

12   KEEP OUT ALL THE EVIDENCE OF THE FIDLER TABLET.

13           THE COURT:  THAT WAS NEVER AN ARGUMENT

14   THAT YOU MADE TO EXCLUDE IT.

15           MR. MCELHINNY:  WELL, WE DIDN'T -- WE

16   TRIED TO KEEP OUT THE EVIDENCE OF THE FIDLER

17   TABLET.  WHEN IT CAME IN -- WE DID THIS IN THE

18   NORMAL ORDER.  WE MOVED TO STRIKE THE ENTIRE

19   TESTIMONY OF THEIR EXPERT.

20           I MEAN, IT'S A TIMELY OBJECTION.

21           THE COURT:  WELL, I MEAN, IF YOU REALLY

22   THOUGHT AS A MATTER OF LAW THAT YOU WOULD WIN, WHY

23   DIDN'T YOU FILE A SUMMARY JUDGMENT MOTION?  WE

24   COULD HAVE HASHED THIS OUT MONTHS AGO, RIGHT?  THE

25   FEDERAL CIRCUIT'S DECISION WAS MAY 14TH.

 1          OR A MOTION IN LIMINE, RIGHT?  IF YOU

 2     REALLY THOUGHT IT WAS THE LAW OF THE CASE, THERE

 3     SHOULD HAVE BEEN A MOTION IN LIMINE AND WE COULD

 4     HAVE HASHED THIS OUT BACK IN JUNE.

 5          MR. MCELHINNY:  WE HAVE BEEN WORKING

 6     WITHIN THE CONSTRAINTS AND THE ORDER THAT THE JUDGE

 7     GAVE US IN TERMS OF WHAT THE MOTIONS IN LIMINE, THE

 8     TIMING --

 9          THE COURT:  I WOULD HAVE THOUGHT THIS

10     WOULD BE AN IMPORTANT ONE FOR YOU ALL TO INCLUDE IN

11     YOUR NINE OR TEN MOTIONS THAT YOU WERE ALLOWED TO

12     BRING, I MEAN, COMPARED TO SOME OF THE OTHER STUFF

13     YOU BROUGHT.

14          MR. MCELHINNY:  I HEAR YOU, YOUR HONOR.

15     I UNDERSTAND THAT.  BUT THAT -- WE THOUGHT THE

16     MOTIONS IN LIMINE THAT WE BROUGHT WERE IMPORTANT.

17     WE THOUGHT THEY WENT TO ISSUES THAT WERE NOT AS

18     CONCLUSIVE.  THE TIMING OF THIS -- I MEAN, IT'S --

19          THE COURT:  IT JUST SEEMS VERY STRANGE TO

20     ME THAT WE'RE JUST HEARING THIS NOW.  I MEAN, IF

21     YOU REALLY THOUGHT THE LAW WAS SO CLEARCUT, I WOULD

22     HAVE APPRECIATED HAD THIS BEEN BROUGHT UP SOONER.

23          MR. MCELHINNY:  I UNDERSTAND THAT, YOUR

24     HONOR.

25          THE COURT:  ALL RIGHT.  WELL -- OKAY.  I

```
1    WOULD LIKE YOU ALL TO DO ANOTHER ATTEMPT AT A

2    VERDICT FORM, YOU KNOW, JOINT, TO THE EXTENT YOU

3    CAN MAKE IT JOINT, AND THEN I GUESS DISPUTED WHERE

4    YOU DISAGREE, BECAUSE NOW THAT THE CASE HAS CHANGED

5    SOMEWHAT BASED ON WHAT'S BEEN ADMITTED AT TRIAL, IT

6    WOULD BE HELPFUL IF YOU ALL COULD MAKE ONE MORE CUT

7    OF CUSTOMIZING IT BASED ON EVIDENCE THAT'S COME IN.

8              AND IF YOU WOULD, PLEASE, FILE IT AND

9    ALSO E-MAIL A SOFT COPY TO THE LHK CRD E-MAIL SO

10   THAT WE CAN TAKE IT FROM THERE.

11             WHEN -- I THINK IT WOULD BE HELPFUL FOR

12   YOU ALL TO DO THIS AFTER YOU'VE HAD YOUR MEET AND

13   CONFER TO SEE IF YOU CAN NARROW THE CLAIMS IN THE

14   CASE.  SO WOULD NOON TOMORROW BE OKAY?  WOULD THAT

15   GIVE YOU ENOUGH TIME?  NOON TOMORROW?

16             MR. JACOBS:  NOON TOMORROW IS FINE, YOUR

17   HONOR.

18             MS. MAROULIS:  THAT'S FINE.

19             THE COURT:  OKAY.  AND, YOU KNOW, SAME

20   THING, IF YOU WOULD, PLEASE, IF IT'S JOINT WHERE

21   IT'S STIPULATED TO, AND WHEREVER YOU HAVE

22   DIFFERENCES, JUST MAKE IT CLEAR WHAT YOUR

23   DISAGREEMENTS ARE AND WHAT YOUR REASONS ARE.

24             BUT I REALLY DON'T WANT THIS TO BE LARGER

25   THAN 20 PAGES AT MOST.  IS THAT DOABLE?
```

1           MS. MAROULIS:  IS THAT A JOINT SUBMISSION

2    OF THE PARTIES?

3           THE COURT:  A JOINT SUBMISSION, PLEASE,

4    YES.

5           SO THAT'S AUGUST 18TH, NOON.

6           OKAY.  THIS WEEKEND I'LL FINALIZE THE

7    EXHIBIT LIST AND JUST -- I'M MOSTLY GOING TO WORK

8    ON THE ORDER ON THE LIMITING INSTRUCTIONS, SO WHEN

9    CAN YOU SEND ME A -- YOU KNOW, FILE A FINAL HARD

10   COPY, BUT ALSO IF YOU WOULD PLEASE E-MAIL ME A SOFT

11   COPY SO I CAN MAKE THE CHANGES DIRECTLY ON THE

12   LIMITING INSTRUCTIONS.

13          MS. MAROULIS:  CAN WE HAVE UNTIL THE END

14   OF TOMORROW, YOUR HONOR?  IS THAT SUFFICIENT?

15          THE COURT:  THAT'S FINE.  CAN WE SAY -- I

16   MEAN, WHAT TIME DO YOU NEED?

17          MS. MAROULIS:  8:00 P.M.?

18          THE COURT:  THAT'S FINE.  SO THAT'S 8:00

19   P.M., HARD AND SOFT COPY, PLEASE.

20          NOW, WITH THE JURY INSTRUCTIONS, ACTUALLY

21   THE RULE 20 HEARINGS HAVE ACTUALLY BEEN REALLY

22   HELPFUL IN THINKING ABOUT THE JURY INSTRUCTIONS.

23          BUT WHAT WOULD ALSO BE HELPFUL IS IF YOU

24   ALL COULD PROVIDE A SOFT COPY THAT'S RED LINED THAT

25   IDENTIFIES WHERE YOU DEVIATED FROM THE MODEL RULES,

```
 1    WHETHER IT'S NORTHERN DISTRICT OR NINTH CIRCUIT OR

 2    ABA OR WHATEVER.  IT JUST IS EXTRA TIME CONSUMING

 3    FOR US TO HAVE TO FIGURE OUT, YOU KNOW, WHERE YOU

 4    SAY MODEL RULE AND YOU CITE 20 CASES BELOW IT,

 5    EXACTLY WHICH PORTION IS WHICH.

 6             SO WHAT WOULD BE -- TELL ME WHAT'S A

 7    WORKABLE TIMEFRAME TO DO THAT.

 8             MR. JACOBS:  I THINK WE CAN GET THAT TO

 9    YOU BY TOMORROW MORNING, YOUR HONOR.  THAT'S

10    SOMETHING WE'VE BEEN WORKING ON INTERNALLY.

11             THE COURT:  OH, YOU HAVE?

12             MR. JOHNSON:  WE'VE BEEN DOING THE SAME

13    THING, SO TOMORROW MORNING SHOULD WORK.

14             THE COURT:  ALL RIGHT.  LET ME ASK, AND

15    PROBABLY THE ANSWER IS NO, BUT I'M GOING TO ASK

16    ANYWAY, DO YOU THINK -- I THINK YOU HAVE ABOUT 70

17    DISPUTED INSTRUCTIONS.

18             DO YOU THINK, BASED ON WHAT'S OCCURRED

19    OVER THE LAST THREE WEEKS, YOU'RE ANY CLOSER ON

20    PERHAPS AGREEING TO SOME OF THOSE 70?  OR NO?

21             IF IT'S -- I DON'T WANT TO WASTE YOUR

22    TIME AND MAKE YOU, YOU KNOW, TALK AGAIN.

23             ARE THERE ANY THAT -- YOU'RE SHAKING YOUR

24    HEAD NO.  OKAY.  NEVER MIND.

25             SO THEN I GUESS THOSE WOULD BE SEPARATE
```

```
 1    FILINGS TOMORROW, SEPARATE FILINGS OF JUST YOUR OWN
 2    PROPOSED DISPUTED INSTRUCTIONS AND YOUR OWN RED
 3    LINE OF WHERE YOU DEVIATE FROM THE MODEL.  OKAY?
 4          MR. JACOBS:  THAT WILL BE THE -- AND JUST
 5    TO BE CLEAR, IT WILL BE THE MODEL RULE ON WHICH WE
 6    BASED OUR PROPOSED INSTRUCTION THAT YOU WANT TO SEE
 7    THE DEVIATION FROM?
 8          THE COURT:  RIGHT.  I JUST WANT YOU TO
 9    RED LINE WHATEVER IS DIFFERENT FROM THE MODEL RULE,
10    AND ONLY FOR YOUR DISPUTED INSTRUCTIONS.
11          SO WHAT -- TELL ME A TIME THAT WE'LL --
12          MR. JACOBS:  WE CAN DO THAT BY 8:00 A.M.
13    TOMORROW.
14          MS. MAROULIS:  CAN WE HAVE A LITTLE BIT
15    LONGER BECAUSE SOME OF THEM DEVIATIONS -- 10:00
16    O'CLOCK?
17          THE COURT:  10:00 IN THE MORNING?
18          MS. MAROULIS:  10:00 O'CLOCK TOMORROW.
19          THE COURT:  THAT'S FINE.  THAT'S FINE.
20    THAT'S 8-18 AT 10:00 IN THE MORNING.
21          AND IF YOU WOULD PLEASE, BOTH OF YOU, YOU
22    KNOW, FILE A HARD COPY AND E-MAIL, PLEASE, A SOFT
23    COPY.
24          OKAY.  ON THE TRIAL TRANSCRIPTS, WOULD
25    YOU PLEASE PROVIDE THREE MORE COPIES?  THEY FIT
```

```
1    INTO ONE BINDER.  CAN YOU PROVIDE THREE MORE COPIES

2    AND INCLUDE YESTERDAY'S INSTRUCTIONS?

3                YESTERDAY APPLE PROVIDED US ONE.  CAN

4    SAMSUNG PROVIDE US TWO AND THEN APPLE PROVIDE US

5    ONE MORE?

6                MS. MAROULIS:  SURE, YOUR HONOR.  WE

7    PROVIDED ONE THIS MORNING.

8                THE COURT:  OH, DID YOU?  THEN CAN YOU

9    EACH PROVIDE ONE MORE, PLEASE?

10                AND, MS. MAROULIS, DOES THAT ONE GO

11    THROUGH YESTERDAY?

12                MS. MAROULIS:  I BELIEVE SO.

13                THE COURT:  PERFECT, PERFECT.  OKAY.

14    THEN CAN APPLE GIVE ME THE TRANSCRIPT FOR

15    YESTERDAY, PLEASE?

16                MR. JACOBS:  YOU BET, YOUR HONOR.

17                THE COURT:  AND THEN ONE MORE, AND THEN

18    I'D LIKE YOU TO INCLUDE THE TRANSCRIPT FROM TODAY.

19                SO -- ACTUALLY, IF YOU COULD, PLEASE, GO

20    AHEAD AND PROVIDE US ONE MORE TODAY THAT GOES

21    THROUGH YESTERDAY, AND THEN -- I GUESS PROBABLY

22    IT'S EASIER TO JUST E-MAIL US A SCRUNCHED VERSION

23    FOR FOR TODAY, IF YOU WOULD, PLEASE.  OKAY?

24                MS. MAROULIS:  YES, YOUR HONOR.

25                THE COURT:  OKAY.  AND THEN THE ONLY
```

```
1     OTHER THING IS DO WE HAVE ALL THE PHOTOS OF ALL THE

2     WITNESSES THAT HAVE COME IN THE LAST --

3               THE CLERK:  YOUR HONOR, I JUST NEED

4     HYONG KIM.

5               MS. MAROULIS:  YES FOR SAMSUNG, YOUR

6     HONOR.

7               THE COURT:  OKAY.  I DON'T HAVE ONE FOR

8     EMILIE KIM OR HYONG KIM OR -- WHO ELSE DID THEY

9     HAVE?  I DON'T THINK I HAVE ONE FOR MR. GIVARGIS.

10    OR DO WE HAVE THEM?

11              THE CLERK:  YES, YOUR HONOR.

12              THE COURT:  OH, OKAY.

13              THE CLERK:  WE'RE JUST MISSING HYONG KIM.

14              THE COURT:  OKAY.  DO YOU HAVE HYONG KIM

15    TODAY, MR. SELWYN OR MR. LEE?

16              MR. LEE:  WE HAVE -- HE'S HERE, AND I

17    THOUGHT WE HAD IT TAKEN YESTERDAY.  WE DID HAVE IT

18    TAKEN YESTERDAY, YOUR HONOR.

19              THE COURT:  OH, OKAY.  MAYBE WE HAVE IT

20    AND WE --

21              MR. LEE:  LET ME JUST CHECK, YOUR HONOR.

22              THE COURT:  OKAY.

23              MR. LEE:  YOUR HONOR, WE THOUGHT WE HAD

24    DONE IT, BUT OUT OF AN ABUNDANCE OF CAUTION, WE'LL

25    PRINT ADDITIONAL HARD COPIES.
```

```
 1              THE COURT:  OKAY.

 2              MR. LEE:  OKAY.

 3              THE COURT:  YES, BECAUSE I -- I ONLY

 4    HAVE -- I DON'T HAVE MR. BLEVINS EITHER, OR

 5    MR. DOURISH.  BLEVINS, DOURISH, AND GIVARGIS, AND

 6    KIM, I DON'T HAVE THOSE FOUR.  I DON'T KNOW WHAT

 7    THE JURY HAS.

 8              THE CLERK:  WE HAVE THOSE.  THEY WERE

 9    PROVIDED TO THEM.

10              THE COURT:  I'M SORRY?

11              THE CLERK:  THEY WERE PROVIDED TO THEM.

12    I JUST DON'T HAVE HYONG KIM.

13              THE COURT:  OKAY.  BUT I STILL DON'T HAVE

14    GIVARGIS OR DOURISH.

15              THE CLERK:  I'LL GIVE THOSE TO YOU.

16              THE COURT:  OR BLEVINS.

17              MR. LEE:  DO YOU HAVE THEM?

18              THE CLERK:  YES.

19              THE COURT:  SO THEN WE JUST NEED

20    MR. HYONG KIM THEN.

21              I DON'T THINK THE JURORS HAVE HIM,

22    EITHER; RIGHT?

23              THE CLERK:  NO, YOUR HONOR.

24              THE COURT:  OKAY.  WHAT ELSE DO WE NEED

25    TO --
```

1          MS. MAROULIS:  YOUR HONOR, WE HAVE

2     SEVERAL HOUSEKEEPING ITEMS THAT ARE JOINED.  THE

3     PARTIES WOULD LIKE TO PROPOSE THE FOLLOWING

4     SCHEDULE FOR THE EXCHANGE OF CLOSING

5     DEMONSTRATIVES.

6          THE COURT:  OKAY.

7          MS. MAROULIS:  WE'LL EXCHANGE THEM ON

8     MONDAY AT 5:00 P.M. AND THEN FILE OBJECTIONS ON

9     MONDAY AT 10:00 P.M.  IS THAT ACCEPTABLE TO THE

10    COURT?

11         THE COURT:  SO THEN I HAVE TO DO THEM

12    BETWEEN 11:00 P.M. AND 7:00 A.M.?  THAT'S NOT

13    IDEAL.  THAT'S NOT IDEAL.  CAN WE FIGURE SOMETHING

14    ELSE OUT?  I MEAN, IF YOU'RE ONLY FILING THEM AT

15    10:00 P.M., THEN YOU'RE BASICALLY GIVING ME

16    MIDNIGHT AND 2:00 A.M. TO WORK ON THEM.

17         CAN YOU ADVANCE BOTH OF THOSE TIMES.

18         MS. MAROULIS:  YOUR HONOR, CAN WE DO

19    MAYBE 2:00 P.M. FOR EXCHANGES AND THEN 6:00 P.M.

20    FOR OBJECTIONS?  IS THAT BETTER?

21         THE COURT:  CAN WE SAY -- WHAT ABOUT

22    11:00 A.M. AND 4:00 P.M.?  IS THAT OKAY?  IS THAT

23    ALL RIGHT?

24         MR. JACOBS:  YOUR HONOR, THE INTERPLAY

25    HERE IS BETWEEN GETTING THE JURY INSTRUCTIONS AND

```
1    GETTING THE CLOSING SLIDES DONE, AND SO --

2              THE COURT:  OH, I SEE.  YOU'RE SAYING YOU

3    MIGHT HAVE TO REVISE YOUR DEMONSTRATIVES BASED ON

4    THE INSTRUCTION.

5              MR. JACOBS:  THAT'S WHY WE DID IT --

6    THAT'S WHY WE PROPOSED THE SCHEDULE WE DID.  BUT I

7    SUPPOSE WHAT WE CAN DO IS EXCHANGE WHAT WE CAN

8    EXCHANGE AND THEN IF THERE ARE ANY LAST-MINUTE

9    CHANGES, THOSE CAN BE RAISED SEPARATELY.

10             THE COURT:  OKAY.  WELL, CAN YOU FILE

11   THEM BY 5:00 P.M., YOUR OBJECTIONS BY 5:00 P.M.,

12   AND I DON'T CARE WHEN YOU EXCHANGE THE LISTS.

13   WHATEVER WORKS FOR YOU ALL.

14             MS. MAROULIS:  YES, YOUR HONOR.

15             THE COURT:  OKAY.  SO WHAT TIME SHOULD WE

16   MEET ON MONDAY?  SO WE NEED TO DISCUSS ANY

17   DISAGREEMENTS YOU HAVE WITH THE LIMITING

18   INSTRUCTIONS, DISCUSS ANY DISAGREEMENTS YOU HAVE

19   ABOUT ACTUAL ADMITTED EVIDENCE, AND GO OVER THE

20   JURY INSTRUCTIONS AND THEN I WILL NEED TO HAVE YOU

21   COME BACK BECAUSE ONCE I MAKE THE REVISED SET, I

22   WANT YOU TO LOOK AT THAT AGAIN AND SORT OF APPROVE

23   THE FINAL VERSION.

24             SO I THINK WE'RE GOING TO HAVE TO MEET

25   TWICE.  SO WHAT -- WHAT TIME MAKES SENSE?  IF I
```

```
 1    DON'T FILE THE INSTRUCTIONS UNTIL SUNDAY EVENING,

 2    LET'S SAY -- IT'S HARD FOR ME TO SAY RIGHT NOW WHAT

 3    THE TIME WILL BE.  SHOULD WE MEET AT, LIKE, 11:00,

 4    OR WHAT -- IS THAT TOO LATE?  IS THAT TOO LATE FOR

 5    YOUR PREPARATION FOR CLOSINGS?

 6              MS. MAROULIS:  CAN WE DO IT A LITTLE BIT

 7    EARLIER, MAYBE 9:00 IN THE MORNING.

 8              THE COURT:  THAT'S FINE.  BUT THEN YOU'LL

 9    BE LOOKING AT THE INSTRUCTIONS OVERNIGHT.

10              MS. MAROULIS:  THAT'S FINE.

11              THE COURT:  I'LL TRY TO FILE IT AS SOON

12    AS POSSIBLE, BUT IT'S DIFFICULT.  WITH 70 DISPUTED

13    INSTRUCTIONS, I'M NOT SURE.

14              MS. MAROULIS:  10:00?

15              MR. JACOBS:  10:00 O'CLOCK WOULD BE GOOD,

16    YOUR HONOR.

17              THE COURT:  OKAY.  SO LET'S MEET AT

18    10:00, 10:00 A.M. ON MONDAY.  WHY DON'T WE DO THE

19    JURY INSTRUCTIONS FIRST, AND THAT WAY WE CAN WORK

20    ON REVISING THEM AS WE'RE GOING OVER THE EXHIBITS

21    AND THE EXHIBIT LIST.

22              OH, AND THE VERDICT FORM.  WE'LL DO JURY

23    INSTRUCTIONS FIRST, THEN THE VERDICT FORM, THEN THE

24    EXHIBITS AND EXHIBIT LIST.

25              WHAT ELSE DO WE NEED TO DO?  IS THERE
```

```
 1    ANYTHING ELSE I'M NOT --

 2              MS. MAROULIS:  THIS IS NOT FOR MONDAY,

 3    BUT THE PARTIES AGREED TO RELABEL THE EXHIBITS WITH

 4    A SMALLER VERSION OF THE LABEL THAT OFFICIAL TEXT,

 5    SO WE'RE GOING TO BE DOING THAT THIS WEEK END

 6    BEFORE THEY GO TO THE JURY, AND WE'LL FILE A

 7    STATEMENT ABOUT THAT TODAY.

 8              THE COURT:  OKAY.  AS LONG AS THERE'S A

 9    STIPULATION THAT EVERYONE BELIEVES THAT THESE ARE

10    THE AUTHENTIC EXHIBITS THAT ARE ADMITTED DURING THE

11    TRIAL, THAT'S COMPLETELY FINE.

12              MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

13    THAT'S IT FOR MY LIST.  AND THEN MR. PRICE WANTED

14    TO ADDRESS BRIEFLY THE SCOPE OF ONE OF THE

15    WITNESSES TODAY.

16              THE COURT:  OKAY.  GO AHEAD.

17              MR. PRICE:  YOUR HONOR, THIS IS WITH

18    RESPECT TO MR. MUSIKA.  WE RECEIVED THE EXCHANGE OF

19    WHAT THEY PLAN TO USE WITH HIM, AND, OF COURSE,

20    THEY HAVE DEMONSTRATIVES AND EXHIBITS CONCERNING

21    DR. O'BRIEN, WHICH MAKES SENSE BECAUSE HE WAS OUR

22    AFFIRMATIVE DAMAGES EXPERT AND, OF COURSE, THEY

23    NEED TO REBUT HIM.

24              BUT THEY ALSO INTEGRATED OR REFERENCED

25    ALL OF THE EXHIBITS WITH RESPECT TO MR. MUSIKA'S
```

```
 1    AFFIRMATIVE OPINION AND MR. WAGNER'S RESPONSE, AND

 2    THAT'S NOT PROPER REBUTTAL.

 3            MR. MUSIKA, WHEN HE TOOK THE STAND,

 4    ADDRESSED MR. WAGNER'S CRITICISMS OF HIM AND

 5    MR. WAGNER'S OPINION.  IF YOU RECALL, HE PUT UP

 6    THAT BILLION DOLLARS NUMBER.

 7            AND SO WE WOULD REQUEST, AND WE THINK

 8    IT'S PROPER, THAT MR. MUSIKA ADDRESS WHAT HE --

 9    WHAT MR. O'BRIEN'S OPINION, OR DR. O'BRIEN'S

10    OPINION, BUT THE EVIDENCE IS BASICALLY CLOSED AND

11    IT'S IMPROPER REBUTTAL TO GO BACK AND GET

12    MR. MUSIKA'S AFFIRMATIVE OPINION FOR APPLE'S CASE.

13            THE COURT:  WELL, I GUESS IF THEY'RE

14    RELYING ON THAT FOR REBUTTAL, IT'S DIFFICULT -- I

15    GUESS I'M UNCLEAR, YOU'RE SAYING HE SHOULD ONLY BE

16    ABLE TO RELY ON HIS REBUTTAL EXPERT REPORT?

17            MR. PRICE:  WELL, ONE, THAT WOULD

18    CERTAINLY BE TRUE.  BUT NO, I'M SAYING HE CAN --

19    THE SCOPE OF THE REBUTTAL IS HE SHOULD BE ABLE TO

20    RESPOND TO DR. O'BRIEN, WHO'S OUR AFFIRMATIVE

21    DAMAGES EXPERT, AND THERE'S BEEN NO REPLY AND OF

22    COURSE THEY NEED TO RESPOND TO THAT.

23            WHAT I'M SAYING IS THEY'RE NOT ENTITLED

24    TO --

25            THE COURT:  BUT DR. WAGNER ALSO TESTIFIED
```

```
 1   AS WELL IN YOUR DAMAGES CASE YESTERDAY, SO I GUESS
 2   I'M NOT CLEAR WHY MR. MUSIKA CAN'T REBUT THAT.
 3           MR. PRICE:  BECAUSE HE ALREADY HAS.  THAT
 4   IS, WHEN HE TOOK THE STAND, HIS OPINION EMBRACED
 5   HIS OPINION AND HIS CRITICISMS OF MR. WAGNER AS
 6   USUALLY HAPPENS.  AND THEN MR. WAGNER SAID, NO,
 7   THESE ARE MY CRITICISMS AND THEN GAVE HIS OPINION.
 8   THERE'S ALREADY BEEN CLASH ON THAT.
 9           WHAT THERE HASN'T BEEN IS A RESPONSE
10   TO --
11           THE COURT:  NO, BUT THIS IS REBUTTAL.  I
12   MEAN, THE CLASH DOESN'T MEAN THAT IN YOUR OPENING
13   CASE YOU DON'T HAVE -- I MEAN, THIS IS THE REBUTTAL
14   CASE FOR APPLE ON ITS AFFIRMATIVE CASE.  SO I
15   DON'T --
16           MR. PRICE:  IF THAT WERE THE LOGIC, YOUR
17   HONOR, MR. WAGNER COULD COME BACK AND SAY I NOW GET
18   TO RESPOND TO THE FIRST TIME TO MR. MUSIKA'S
19   CRITICISM OF MY REPORT, WHICH I DON'T THINK YOU'D
20   ALLOW, I'M NOT SURE WE'D HAVE TIME FOR IT ANYWAY,
21   BY I -- THIS WOULD BE -- THAT WOULD BE THE LOGICAL
22   EXTENT OF THAT.  AND I'VE NEVER HAD A COURT THAT'S
23   ALLOWED REBUTTAL TO THAT, TO THAT EXTENT AND THAT
24   WOULD BE THE LOGICAL EXTENT.
25           MR. VERHOEVEN:  IF I MIGHT JUST ADD TO
```

```
 1        THAT --
 2                THE COURT:  I'M JUST CONFUSED.
 3     MR. MUSIKA WAS APPLE'S DAMAGES EXPERT ON THEIR
 4     AFFIRMATIVE CASE.  THIS IS NOW REBUTTAL IN APPLE'S
 5     AFFIRMATIVE CASE.
 6                MS. KREVANS:  THAT'S EXACTLY RIGHT, YOUR
 7     HONOR, AND ALL WE INTEND TO DO, AND WE HAVE SAVED A
 8     LITTLE BIT OF TIME TO DO THIS, WHICH WE'RE ENTITLED
 9     TO DO IS TO BRING HIM BACK AND HAVE HIM BRIEFLY
10     RESPOND TO SOME SPECIFIC THINGS MR. WAGNER SAID ON
11     THE STAND.  EVERYTHING HE SAYS WILL BE DIRECTLY
12     RESPONSIVE TO WHAT WE HEARD FROM MR. WAGNER.  THIS
13     IS OUR REBUTTAL CASE IN APPLE VERSUS SAMSUNG, AND
14     WE'RE ENTITLED TO USE IT AS WE WANT TO.
15                THE COURT:  THAT'S OVERRULED.  OKAY.
16     WHAT ELSE DO WE HAVE?
17                MR. MCELHINNY:  ONE VERY TECHNICAL POINT,
18     YOUR HONOR.  AT THE CLOSE OF THE EVIDENCE
19     YESTERDAY, I MADE A MOTION TO STRIKE MR. SHERMAN'S
20     FOR USING THE WRONG APPROACH.  IN YOUR HONOR'S
21     MISCELLANEOUS ORDER LAST NIGHT, YOU DENIED SEVERAL
22     RULE 50 MOTIONS, BUT YOU DID NOT SPECIFICALLY DENY
23     MY MOTION TO STRIKE.
24                THE COURT:  OH, YOU KNOW, THAT'S BECAUSE
25     THE MOTION TO STRIKE WAS THE END OF THE RULE 50
```

3408

1    MOTION, AND IT WAS FOCUSSED ON THE KOREAN PATENT

2    AND THE LG PRADA, WHICH -- AND THEN I RESERVED THE

3    FIDLER ISSUE.

4              MR. MCELHINNY:  RIGHT.  BUT IT ALSO HAD

5    THIS LARGER ASPECT ABOUT NEVER TESTIFYING ABOUT A

6    PRIMARY REFERENCE FOR A SECONDARY REFERENCE USING

7    THE WRONG APPROACH.  I JUST NEED A RULING FOR THE

8    RECORD, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  WELL, THAT'S

10   DENIED, AND I WILL -- WHEN I DO THE ORDER ON FIDLER

11   TODAY, I WILL INCLUDE THAT.

12             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

13             THE COURT:  JUST SO THERE'S A DOCKET

14   ENTRY AND IT'S CLEAR --

15             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

16             THE COURT:  -- FOR THE FUTURE.

17             OKAY.  SO LET ME JUST MAKE -- THE MOTION

18   TO STRIKE ITAY SHERMAN'S TESTIMONY AND THE FIDLER

19   TABLET IS DENIED.

20             NOW, IN SAMSUNG'S FILING LAST NIGHT, THEY

21   SAID THEY'RE GOING TO GET THE MOCKUP, OR ONE OF THE

22   MOCKUPS IN THROUGH BRESSLER.  ARE YOU ALL GOING TO

23   OBJECT TO THAT?  DO WE NEED TO HASH THAT OUT NOW?

24   I'D RATHER DO IT NOW BEFORE WE BRING THE JURY IN.

25             MS. KREVANS:  I'M SORRY, YOUR HONOR.  IN

1    SAMSUNG'S FILING THEY SAID THAT THEY WERE GOING TO

2    ADMIT WHAT WITH MR. BRESSLER?

3              THE COURT:  I'LL JUST -- SO I DON'T

4    MISSTATE ANYTHING.

5              MS. KREVANS:  IT'S A MIRACLE, BUT I

6    ACTUALLY SLEPT LAST NIGHT, SO I MISSED SOME

7    MIDNIGHT FILINGS HERE.

8              THE COURT:  OKAY.  SO THEY FILED -- GIVE

9    ME ONE MINUTE.

10             (DISCUSSION OFF THE RECORD BETWEEN

11   COUNSEL.)

12             THE COURT:  THE FOOTNOTE 1 ON PAGE 2,

13   DOCKET ENTRY 1794, THE JURY WILL ALSO MAKE ITS

14   ULTIMATE DECISION WITH ACCESS TO A PHYSICAL REPLICA

15   OF THE 1994 FIDLER TABLET, JX 1078, WHICH SAMSUNG

16   INTENDS TO MOVE INTO EVIDENCE THROUGH MR. BRESSLER,

17   WHO COMMISSIONED IT TO BE MADE AND CAN LAY

18   FOUNDATION FOR IT AS AN ACCURATE FACSIMILE.

19             MS. KREVANS:  SUBJECT TO OUR PRIOR

20   OBJECTIONS ABOUT ANYTHING ABOUT FIDLER COMING IN,

21   YOUR HONOR, WE HAVE NO OBJECTION TO THE REPLICA.

22   IN FACT, WE WILL OFFER IT -- I WILL CUT THIS SHORT.

23             WE'LL OFFER IT THROUGH MR. BRESSLER IN

24   HIS DIRECT AND WE CAN, IF YOU WILL STIPULATE TO ITS

25   ADMISSION, THEN WE CAN MAKE IT QUICK AND SAVE SOME

1    TIME FOR THE JURY.

2              MR. ZELLER:  WE'D LIKE TO TAKE ONE LAST

3    LOOK AT IT JUST TO MAKE SURE.

4              MS. KREVANS:  SURE.

5              THE COURT:  DO YOU HAVE IT?

6              MS. KREVANS:  IT'S HERE IN COURT.

7              THE COURT:  ALL RIGHT.  WHY DON'T -- IT'S

8    NOT 9:00 YET, SO WHEREVER IT IS, CAN YOU SHOW IT TO

9    MR. ZELLER SO WE CAN AT LEAST TAKE CARE OF ONE

10   HOUSEKEEPING ISSUE.

11             THE COURT:  I WAS GOING TO ASK MR. LEE,

12   STILL NOT SMOKING CRACK TODAY, SIR?

13             MR. LEE:  YOUR HONOR.

14             MS. KREVANS:  YOUR HONOR, MR. LEE  --

15             MR. LEE:  MY 86-YEAR-OLD MOTHER E-MAILED

16   LAST NIGHT, FIRST SHE WANTED TO KNOW WHAT CRACK

17   WAS, AND WHEN I EXPLAINED IT, SHE WANTED TO KNOW IF

18   I HAD STOPPED.

19             (LAUGHTER.)

20             MR. LEE:  SO I'M GOOD WITH HER TODAY.

21             MR. MCELHINNY:  THE E-MAILS HAVE BEEN

22   COMING FAST, AND I GOT AN E-MAIL FROM MY DAUGHTER

23   WHO'S A PUBLIC DEFENDER IN WASHINGTON WHO SAID, AS

24   A GENERAL RULE, WHENEVER A JUDGE ASKS IF YOU'RE

25   SMOKING CRACK, THE ANSWER IS, NO, MA'AM.

```
1              THE COURT:  ARE YOU SATISFIED WITH THAT
2     ONE, MR. ZELLER?
3              MR. ZELLER:  YES, YOUR HONOR.
4              MS. KREVANS:  THEY'VE SEEN IT BEFORE.  WE
5     JUST HAVE TO FIGURE OUT WHAT THE YELLOW-ISH GREEN
6     STICKY ON THE BACK IS.
7              THE COURT:  ALL RIGHT.  ANYTHING ELSE?
8     OTHERWISE WE CAN --
9              MR. JACOBS:  YOUR HONOR, JUST TO FLAG, WE
10    CAN DISCUSS THIS LATER, AND MAYBE THIS WAS IMPLICIT
11    IN YOUR DISCUSSION OF WHAT'LL HAPPEN ON MONDAY, WE
12    HAVE TALKED, SAMSUNG AND US, ABOUT WHETHER WE CAN
13    FIGURE OUT A WAY TO AVOID INFORMAL OBJECTION
14    PROCEDURE FOR THE JURY INSTRUCTIONS AND WE HAVEN'T
15    COME UP WITH SOMETHING THAT WE'RE COMFORTABLE WITH.
16             SO WE WILL NEED -- WHEN WE GO THROUGH THE
17    PROPOSED INSTRUCTIONS, TO STATE ON THE RECORD OUR
18    OBJECTION TO THE PROPOSED INSTRUCTION AND GIVE
19    THE -- AS THE RULE WOULD HAVE IT, GIVE THE COURT AN
20    OPPORTUNITY TO HEAR THAT OBJECTION AND ADJUST.
21             THE COURT:  WELL, I WOULD PRESUME YOU'RE
22    GOING TO TAKE HOURS LISTING ALL OF YOUR OBJECTIONS
23    TO THE INSTRUCTIONS, RIGHT?
24             MR. JACOBS:  I DON'T KNOW THAT IT'LL
25    ACTUALLY TAKE THAT LONG.  WE'LL GO THROUGH THEM,
```

3412

```
1    WE'LL HAVE HAD THE ONES YOU PROPOSED, AND WHERE WE

2    THINK THAT THE PROPOSED INSTRUCTION DEPARTS AS A

3    MATTER OF LAW FROM THE INSTRUCTIONS THAT WE'VE

4    PROPOSED, WE'LL NOTE THAT ON THE RECORD AND STATE

5    THE BASIS BRIEFLY FOR WHY AND THE COURT WILL SAY SO

6    NOTED AND THEN WE'LL GO ON.

7              THE COURT:  I THINK THAT'S GOING TO TAKE

8    FOREVER.  WE'RE NOT GOING TO GET OUT OF HERE ON

9    MONDAY.

10             MS. MAROULIS:  YOUR HONOR, WE'RE STILL

11   CONTINUING TO LOOK FOR WAYS TO SHORT CIRCUIT THAT,

12   BUT WHAT MR. JACOBS IS SAYING IS WE HAVEN'T YET

13   COME UP WITH AN APPROPRIATE WAY TO DO THAT.  WE

14   MIGHT TODAY LATER.

15             THE COURT:  OKAY.  I'M JUST TRYING THIS

16   THINK OF -- I GUESS THIS IS JUST THINKING OUT LOUD.

17   WOULD IT BE BETTER TO HAVE YOU FILE SOMETHING, I

18   JUST PROBABLY WON'T HAVE TIME TO READ IT AND THINK

19   ABOUT IT BEFORE 10:00 A.M. ON MONDAY.  BUT WOULD

20   THAT SHORT CIRCUIT US NOT HAVING TO BE HERE FOR

21   HOURS AND HOURS AND HAVE US REARGUE WHAT YOU'VE

22   ALREADY FILED?  AND IF YOU DO THAT, I'M GOING TO

23   LIMIT YOU TO TEN PAGES BECAUSE I NEED TIME TO

24   ABSORB IT IF YOU REALLY WANT IT TO HAVE ANY EFFECT.

25             WHAT DO YOU WANT TO DO?
```

```
1                (PAUSE IN PROCEEDINGS.)

2                MR. JACOBS:  WE'LL TALK SOME MORE, YOUR

3     HONOR, AND TRY TO FIGURE OUT SOMETHING.  IT'S JUST

4     LOOKING AT THE CASE LAW, WE REALLY DON'T FIND

5     ANYTHING THAT GAVE US MUCH COMFORT HERE.  THE RULE

6     WAS AMENDED TO MAKE THIS REQUIREMENT EXPLICIT OF A

7     FORMAL OBJECTION ON THE RECORD WITH AN OPPORTUNITY

8     FOR THE COURT THEN TO ADJUST.

9                THE COURT:  AND TO EVERY SINGLE ONE?

10    BECAUSE YOU HAVE 70 DISPUTED INSTRUCTIONS, AND

11    THAT'S GOING TO -- I COULD PUT A TIME LIMIT ON IT,

12    BUT IS THAT GOING TO --

13               MR. JOHNSON:  YOUR HONOR, I THINK WE'RE

14    GOING TO BE ABLE TO REACH SOME SORT OF AGREEMENT IF

15    WE JUST GET A LITTLE BIT MORE TIME TO TALK, MAYBE

16    AT THE NEXT BREAK.

17               THE COURT:  OKAY, YEAH.  MAYBE BY THE END

18    OF THE DAY, CAN YOU TELL ME HOW YOU WANT TO PROCEED

19    ON MONDAY?

20               MR. JOHNSON:  YES.

21               THE COURT:  ALL RIGHT.  ARE WE GOOD, OR

22    DO WE NEED TO DO ANYTHING ELSE?  I THINK WE NEED TO

23    GIVE MS. SHORTRIDGE AND MS. RODRIGUEZ A HAND

24    BECAUSE THEY HAVE BEEN WORKING AROUND THE CLOCK.

25    AROUND THE CLOCK.  ALL RIGHT.  LET'S GO.
```

```
 1            MR. LEE:  YOUR HONOR, MIGHT I HAVE
 2    PROFESSOR KIM COME UP.
 3            THE COURT:  YES, PLEASE.  IF YOU WOULD --
 4    I DON'T KNOW WHERE HE IS.  HE CAN TAKE THE STAND,
 5    PLEASE.
 6            (WHEREUPON, THE FOLLOWING PROCEEDINGS
 7    WERE HELD IN THE PRESENCE OF THE JURY:)
 8            THE COURT:  ALL RIGHT.  GOOD MORNING.
 9    WELCOME BACK.  EVERYONE PLEASE TAKE A SEAT.
10            WE'RE GOING TO CONTINUE WITH THE DIRECT
11    EXAMINATION.
12            AND, SIR, YOU ARE SINGLE UNDER OATH.  GO
13    AHEAD, PLEASE.
14                        HYONG KIM,
15    BEING RECALLED AS A WITNESS ON BEHALF OF THE
16    PLAINTIFF, HAVING BEEN PREVIOUSLY SWORN, WAS
17    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:
18            MR. LEE:  COULD I HAVE '516 PATENT?
19            THE COURT:  TIME IS 9:05.
20                     DIRECT EXAMINATION
21    BY MR. LEE:
22    Q    PROFESSOR KIM, WHEN WE FINISHED YESTERDAY YOU
23    HAD IDENTIFIED THE FIVE UPLINK CHANNELS OF 3GPP
24    STANDARD, RELEASE 6.6.  DO YOU REMEMBER THAT?
25    A    YES.
```

1    Q    I'M TRYING TO GET US ALL BACK ON THE SAME

2    PAGE.  I THINK I ASKED YOU RIGHT BEFORE WE

3    FINISHED, WERE THE ENHANCED CHANNELS, THE ONES THAT

4    HAVE THE E BEFORE THEM, KNOWN BEFORE THE '516

5    PATENT?

6    A    YES.

7    Q    NOW, LET'S GO TO THE -- BEFORE I GO DIRECTLY

8    TO THE CLAIMS, LET ME ASK YOU ABOUT THE '516

9    PATENT.

10            IN SAMSUNG'S OPENING STATEMENT, SAMSUNG

11   STATED THAT THE '516 PATENT IS A CORE INNOVATION

12   AND ACHIEVED HIGH SPEED UPLINK COMMUNICATION.

13            DO YOU AGREE WITH THAT?

14   A    NO, I DON'T.

15   Q    WHY?

16   A    THE FUNCTION THAT CARRIES OUT THE HIGH SPEED

17   UPLINK CHANNEL IS DUE TO THE ENHANCED DATA CHANNEL

18   THAT YOU HAVE.  IT'S LIKE SIMILAR TO SAYING IF YOU

19   HAVE A SPORTS CAR, BECAUSE YOU HAVE A PARTICULAR

20   DESIGNER OF A BRAKE, THAT THE SPORT CAR GOES FAST.

21            WE ALL KNOW IT'S THE ENGINE THAT MAKES IT

22   HAPPEN.  SO SIMILARLY IN THIS UPLINK CHANNEL, WHAT

23   MAKES THE HIGH SPEED IS THE ENHANCED DATA CHANNEL,

24   NOT THE PARTICULAR WAY OF DOING POWER CONTROL.

25   Q    SO LET'S TALK ABOUT THE '516 PATENT .

```
 1              CAN I HAVE CLAIM 15 OF THE '516 PATENT,

 2   AND THIS IS WHAT THE JURY IS GOING TO BE ASKED TO

 3   CONSIDER.

 4              DO YOU SEE CLAIM 15 OF THE '516 PATENT?

 5   A    YES.

 6   Q    CAN YOU GIVE US A VERY BRIEF DESCRIPTION OF

 7   WHAT CLAIM 15 ACTUALLY DESCRIBES?

 8   A    THE CLAIM 15 TALKS ABOUT HOW YOU DO A POWER

 9   CONTROL METHOD WHEN YOU HAVE TWO CHANNELS, TWO

10   PARTICULAR CHANNELS.

11   Q    DOES THE CLAIM REFER TO A FIRST CHANNEL?

12   A    YES.

13   Q    WHAT DOES IT SAY ABOUT THAT CHANNEL?

14   A    IT SAYS THE FIRST CHANNEL DOES NOT SUPPORT

15   HARQ, OR HYBRID AUTOMATIC REPEAT REQUEST.

16   Q    AND WHAT DOES IT SAY ABOUT THE SECOND CHANNEL?

17   A    IT SAYS THE SECOND CHANNEL DOES SUPPORT HARQ.

18   Q    IS THERE ANY REFERENCE IN THE CLAIM TO CONTROL

19   CHANNELS?

20   A    NO.

21   Q    NOW, LET'S LOOK AT THE NEXT SECTION OF THE

22   CLAIM, WHICH BEGINS "A CONTROLLER FOR DETERMINING

23   TRANSMIT POWER FACTORS FOR THE CHANNELS,

24   DETERMINING IF TOTAL TRANSMIT POWER REQUIRED FOR

25   TRANSMISSION OF THE CHANNELS EXCEEDS THE MAXIMUM
```

1     ALLOWED POWER."

2              DO YOU SEE THAT?

3     A    YES.

4     Q    DO YOU SEE THE REFERENCE TO THE WORD "THE

5     CHANNELS"?

6     A    YES.

7     Q    AND YOU UNDERSTAND HER HONOR HAS SAID THAT

8     THESE TERMS, OR THESE CLAIMS GET THEIR PLAIN AND

9     ORDINARY MEANING?

10    A    YES.

11    Q    WHAT CHANNELS IS THE PHRASE "THE CHANNEL"

12    REFERRING TO?

13    A    THE CHANNEL IN THIS CLAIM IS REFERRING TO THE

14    FIRST CHANNEL AND THE SECOND CHANNEL.

15    Q    AND WHAT IS TOTAL TRANSMIT POWER AS THAT TERM

16    IS USED IN THE CLAIM?

17    A    THE TOTAL TRANSMIT POWER HERE IS REFERRING TO

18    TOTAL TRANSMIT POWER OF THE FIRST CHANNEL AND THE

19    SECOND CHANNEL.

20    Q    CAN I HAVE PDX 35.7 ON THE SCREEN, PLEASE.

21              CAN YOU USE PDX 35.7 AND EXPLAIN TO THE

22    LADIES AND GENTLEMEN OF THE JURY HOW A CLAIM

23    DESCRIBES DETERMINING A TOTAL TRANSMIT POWER AND

24    WHAT TO DO ABOUT IT?

25    A    WELL, ACCORDING TO THE CLAIM, THE WAY YOU

1    COMPUTE THE TOTAL TRANSMIT POWER IS ADDING THE

2    POWER OF THE FIRST CHANNEL AND THEN THE POWER OF

3    THE SECOND CHANNEL.

4    Q    ALL RIGHT.  NOW, USING THAT INTERPRETATION OF

5    THE CLAIM, YOU HAVE READ DR. WILLIAMS' TESTIMONY;

6    CORRECT?

7    A    YES.

8    Q    AND ON CROSS-EXAMINATION, DID HE IDENTIFY THE

9    FIRST AND SECOND CHANNELS?

10   A    YES.

11   Q    COULD I HAVE PDX 35.10 ON THE SCREEN.

12        AND USING 35.10, WOULD YOU EXPLAIN TO THE

13   MEMBERS OF THE JURY WHAT DR. WILLIAMS SAID WERE HIS

14   FIRST AND SECOND CHANNEL?

15   A    ACCORDING TO DR. WILLIAMS, THE FIRST CHANNEL

16   IS THE DPDCH, THAT'S THE DEDICATED PHYSICAL DATA

17   CHANNEL, AND THE SECOND CHANNEL IS ENHANCED DPDCH.

18   Q    ALL RIGHT.  LET'S TAKE DR. WILLIAMS AT HIS

19   WORD THAT THOSE ARE THE FIRST AND SECOND CHANNELS.

20        IF THOSE ARE THE FIRST AND SECOND

21   CHANNELS, DO YOU AGREE WITH HIS CONCLUSION THAT

22   APPLE'S PRODUCTS INFRINGE?

23   A    NO, I DON'T.

24   Q    WHY NOT?

25   A    BECAUSE APPLE PRODUCT DOES NOT OBTAIN THE

1    TOTAL TRANSMIT POWER BY ADDING TWO CHANNELS, BUT IT

2    ACTUALLY ADDS FIVE CHANNELS.

3    Q    DO THE APPLE PRODUCTS FOLLOW THE 3GPP

4    STANDARD?

5    A    YES.

6    Q    AND WHEN YOU READ DR. WILLIAMS' TESTIMONY, DID

7    YOU READ THE PART WHERE I ASKED HIM WHETHER YOU'RE

8    RUNNING ON TWO OR FIVE, DO YOU REMEMBER THAT?

9    A    VAGUELY, BUT YES.

10   Q    OKAY.  LET'S LOOK AT THE STANDARD THEN.

11              COULD I HAVE JX 1083 ON THE SCREEN.  IT'S

12   IN VOLUME 1, TAB 2 OF YOUR NOTEBOOK OR YOU CAN LOOK

13   AT IT ON THE SCREEN.

14              DO YOU SEE IT?

15   A    YES.

16   Q    CAN WE TURN TO PAGE 25.

17              AND THIS IS ALREADY IN EVIDENCE, YOUR

18   HONOR.

19              DO YOU SEE SECTION 5.1.2.6?

20   A    YES.

21   Q    LET'S BRING UP THE SECOND PARAGRAPH WHICH I

22   ASKED DR. WILLIAMS ABOUT.

23              DO YOU SEE THE REFERENCE TO TOTAL UE

24   TRANSMIT POWER?

25   A    YES.

```
 1    Q    WHAT IS TOTAL UE TRANSMIT POWER?

 2    A    THE UE STANDS FOR USER EQUIPMENT.  THAT WOULD

 3    BE THE CELL PHONE OR SMARTPHONE THAT YOU HAVE, AND

 4    THE TOTAL TRANSMIT POWER WOULD BE THE TOTAL AMOUNT

 5    OF POWER THAT WOULD BE TRANSMITTED.

 6    Q    AND IN THE STANDARD, HOW MANY CHANNELS ARE

 7    ADDED TO GET TOTAL TRANSMIT POWER?

 8    A    FIVE CHANNELS.

 9    Q    AND HOW DO YOU KNOW THAT?

10    A    BECAUSE THAT'S WHAT THE STANDARD DICTATES.

11    Q    DID YOU ALSO REVIEW THE TESTIMONY OF INTEL'S

12    ENGINEERS, ENGINEER MARKUS PALTIAN?

13    A    YES.

14    Q    WHAT DID HE SAY ABOUT THE NUMBER OF CHANNELS

15    THAT WERE ADDED IN THE INTEL BASEBAND PROCESSOR?

16    A    YES.  HE STATED THAT THE INTEL BASEBAND

17    PROCESSOR ADDED FIVE CHANNELS.

18    Q    SO IF WE GO PDX 35.11, COULD YOU USE THIS

19    DEMONSTRATIVE AND EXPLAIN TO THE JURY HOW THE 3GPP

20    STANDARD AND THE BASEBAND PROCESSOR THAT APPLE BUYS

21    FROM INTEL DETERMINES TOTAL TRANSMIT POWER?

22    A    SO IN 3GPP STANDARD, THE TOTAL TRANSMIT POWER

23    IS OBTAINED BY ADDING FIVE CHANNELS, THE FIVE

24    CHANNELS THAT I STATED IN THE UPLINK, SUCH AS THE

25    DPDCH, E-DPDCH, DPCCH, E-DPCCH, AND HS-DPCCH, SO
```

3421

```
1    YOU ADD UP THE FIVE CHANNELS AND OBTAIN THE TOTAL

2    TRANSMIT POWER.

3    Q    AND A BASEBAND PROCESSOR OR A PRODUCT THAT

4    ADDED UP THE FIVE CHANNELS TO DETERMINE TOTAL

5    TRANSMIT POWER, WOULD THEY INFRINGE THE CLAIM OF

6    THE PATENT?

7    A    NO.

8    Q    TURN, IF YOU WOULD, BRING UP PDX 35.14.  WOULD

9    YOU EXPLAIN TO US HOW THE STANDARD DIFFERS FROM

10   WHAT IS IN THE CLAIM OF THE PATENT?

11   A    THE CLAIM IN THE '516 PATENT ADDS TWO

12   CHANNELS, DPDCH AND E-DPDCH TO OBTAIN THE TOTAL

13   TRANSMIT POWER AS YOU SEE IT ON THE LEFT SIDE OF

14   THE FIGURE.

15            ACCORDING TO THE STANDARD, 3GPP STANDARD,

16   IT WILL ADD FIVE CHANNELS AS SHOWN ON THE RIGHT

17   SIDE OF THE SLIDE.  SO THEY ARE VERY DIFFERENT.

18   Q    NOW, COULD I HAVE PDX 35.15.

19            USING THIS EXAMPLE, CAN YOU EXPLAIN TO

20   THE JURY WHY THIS DIFFERENCE BETWEEN THE CLAIM AND

21   THE STANDARD CAN HAVE -- CAN MAKE A DIFFERENCE IN

22   OPERATION?

23   A    SO THIS IS AN EXAMPLE WHERE YOU HAVE TO

24   COMPARE THE TOTAL TRANSMIT POWER TO THE MAXIMUM

25   ALLOWED POWER.
```

3422

1          SO ON THE RIGHT SIDE, IF YOU ADD UP THE

2     FIVE CHANNELS, IN THIS EXAMPLE, IT'S SHOWING THAT

3     THE TOTAL TRANSMIT POWER IS EXCEEDED.  IT'S LARGER

4     THAN THE MAXIMUM ALLOWED POWER.

5          THEREFORE, ACCORDING TO THE STANDARD, IT

6     HAS TO REDUCE THE POWER OF THE E-DPDCH.

7          ON THE OTHER HAND, IF YOU LOOK AT THE

8     LEFT SIDE OF THE FIGURE, IF YOU'RE ADDING UP ONLY

9     TWO CHANNELS, YOU WILL NOT EXCEED THE MAXIMUM

10    ALLOWED POWER; THEREFORE, NO ACTION WOULD BE TAKEN.

11         SO TWO WILL FUNCTION VERY DIFFERENTLY.

12    Q    AND THAT'S THE BASIS FOR YOUR OPINION THAT

13    CLAIM 15 DOES NOT INFRINGE?

14    A    THAT'S CORRECT.

15    Q    SAMSUNG ALSO ASSERTS CLAIM 16.  DO YOU HAVE AN

16    OPINION AS TO WHETHER THAT'S INFRINGED?

17    A    NO, THAT'S NOT INFRINGED.

18    Q    AND FOR WHAT REASONS?

19    A    BECAUSE CLAIM 16 IS A DEPENDENT ON CLAIM 15,

20    SO FOR THE SAME REASON.

21    Q    NOW, LET'S TURN TO THE QUESTION OF VALIDITY.

22         HAVE YOU REVIEWED THE ISSUE OF VALIDITY?

23    A    YES.

24    Q    WHAT HAVE YOU CONCLUDED?

25    A    I CONCLUDED THAT THE PATENT'S INVALID.

```
1    Q    AND WHAT PRIOR ART DO YOU BASE YOUR

2    DETERMINATION ON?

3    A    SO I'M BASING MY OPINION ON THE PRIOR ART THAT

4    WAS STATED IN THE PATENT ITSELF, '516, AND THE

5    PATENT APPLICATION BY HATTA, H-A-T-T-A.

6    Q    LET'S LOOK AT THE FIRST PART, THE PRIOR ART

7    THAT'S DESCRIBED IN THE PATENT.

8              COULD WE HAVE SAMSUNG'S DEMONSTRATIVE SDX

9    3966.009 ON THE SCREEN.

10             NOW, THIS IS DR. WILLIAMS' DEMONSTRATIVE.

11   DO YOU SEE THAT?

12   A    YES.

13   Q    ON THE LEFT-HAND SIDE IS FIGURE 5 FROM THE

14   PATENT.  DO YOU SEE THAT?

15   A    YES.

16   Q    HOW DOES THE PATENT LABEL FIGURE 5?

17   A    IT SAYS PRIOR ART.

18   Q    AND WHAT DOES FIGURE 5 SHOW ABOUT THE PRIOR

19   ART?

20   A    FIGURE 5 IS SHOWING WHEN YOU HAVE THOSE

21   MULTIPLE CHANNEL, E-DPDCH, E-DPDCH, AND E-DPDCH

22   THAT EXCEEDS THE MAXIMUM POWER, AS YOU SEE IN THAT,

23   IN FIGURE 402, THAT IT WILL EQUALLY SCALE DOWN THE

24   POWER OF EACH CHANNEL.

25   Q    NOW, DOES FIGURE 5 DISCLOSE AN ENHANCED UPLINK
```

1      SERVICE?

2      A     YES.

3      Q     AND HOW DO YOU KNOW?

4      A     BECAUSE IT HAS AN E-DPDCH CHANNEL ON IT.

5      Q     DOES IT DISCLOSE THE USE OF CHANNELS

6      SUPPORTING HARQ?

7      A     YES.

8      Q     HOW DO YOU KNOW?

9      A     BECAUSE IT HAS THE E-DPDCH ON IT.

10     Q     DOES IT DISCLOSE THE USE OF CHANNELS NOT

11     SUPPORTING HARQ?

12     A     YES.

13     Q     AND I THINK YOU TOLD ME ALREADY, BUT ON THE

14     LEFT-HAND SIDE, FIGURE 5, WHAT'S THE SCALING

15     TECHNIQUE?  WHAT'S THE FORMULA FOR REDUCING THINGS?

16     A     SO YOU WOULD EQUALLY REDUCE POWER TO EACH

17     CHANNEL, SO THAT'S WHY WE CALL IT EQUAL SCALING.

18     SO THEY WILL BE REDUCING THE THREE CHANNELS EQUALLY

19     TO MEET THE MAXIMUM POWER.

20     Q     NOW, LET'S LOOK AT THE OTHER SIDE OF

21     DR. WILLIAMS' SLIDE WHERE HE DESCRIBES THE

22     SOLUTION.  DO YOU SEE THAT ON THE RIGHT?

23     A     YES.

24     Q     WHAT IS THE SOLUTION?  WHAT DOES HE SAY IS

25     DIFFERENT?

1    A    WELL, THE SOLUTION THAT HE SAYS IS INSTEAD OF

2    EQUALLY SCALING ALL THE CHANNELS, YOU WOULD ONLY

3    SCALE E-DPDCH CHANNEL AND MAINTAIN THE REST OF THE

4    CHANNEL POWER.

5    Q    SO INSTEAD OF REDUCING THEM ALL EQUALLY, YOU

6    JUST REDUCE ONE?

7    A    YES.

8    Q    OKAY.  NOW, LET'S TURN TO PX 100 IN YOUR

9    BINDER.  AND BEFORE IT'S PUT ON THE SCREEN, DO YOU

10   SEE IT?

11   A    YES.

12   Q    WHAT IS IT?

13   A    IT'S THE PATENT APPLICATION, JAPANESE PATENT

14   APPLICATION BY HATTA.

15            MR. LEE:  YOUR HONOR, WE OFFER PX 100.

16            THE COURT:  ANY OBJECTION?

17            MR. VERHOEVEN:  NO OBJECTION.

18            THE COURT:  IT'S ADMITTED.

19            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20            100, HAVING BEEN PREVIOUSLY MARKED FOR

21            IDENTIFICATION, WAS ADMITTED INTO

22            EVIDENCE.)

23   BY MR. LEE:

24   Q    WHEN WAS THE HATTA REFERENCE PUBLISHED?

25   A    JULY 5, 2002.

3426

1    Q    IS IT PRIOR ART TO THE '516 PATENT?

2    A    YES.

3    Q    DID THE PATENT OFFICE KNOW ABOUT HATTA?

4    A    NO.

5    Q    SO LET'S PUT UP PDX 35.16 AND COMPARE THE

6    FIGURES OF HATTA TO DR. WILLIAMS' PROBLEM AND

7    SOLUTION SLIDE.

8         DO YOU SEE I PUT DR. WILLIAMS' SLIDE AT

9    THE TOP?

10   A    YES.

11   Q    AND HATTA AT THE BOTTOM?

12   A    YES.

13   Q    SO LET'S FOCUS ON THE BOTTOM.  DO YOU SEE

14   FIGURES 8 AND 5 OF HATTA?

15   A    YES.

16   Q    WHAT DOES IT SHOW?

17   A    FIGURE 5 SHOWS THE UNEQUAL SCALING, JUST LIKE

18   THE PATENT '516 IS TALKING ABOUT.  WHAT HATTA

19   TEACHES HERE IS THAT YOU CLASSIFY CHANNELS INTO

20   DIFFERENT CLASSES, AND YOU WILL SCALE THEM

21   DIFFERENTLY.

22   Q    SO JUST SO THE RECORD IS CLEAR, FIGURE 8 OF

23   HATTA SCALES ON WHAT BASIS?  WHAT'S THE FORMULA?

24   A    YES, FIGURE 8 IS ON EQUAL SCALING, JUST LIKE

25   FIGURE 5 THAT YOU SAW.

1    Q    AND FIGURE 5 IS ON WHAT BASIS?

2    A    ON EQUAL SCALING.  FIGURE 5 IS UNEQUAL

3    SCALING.  FIGURE 8 WOULD BE EQUAL SCALING.

4    Q    AND DO YOU HAVE AN OPINION AS TO WHETHER THE

5    PRIOR ART DESCRIBED IN HATTA ITSELF DISCLOSES EACH

6    AND EVERY ELEMENT OF CLAIM 15 AND 16?

7    A    YES.

8    Q    DO YOU HAVE AN OPINION AS TO WHETHER IT WOULD

9    HAVE BEEN OBVIOUS TO ONE OF ORDINARY SCALE IN THE

10   ART TO COMBINE THESE TWO COMBINATIONS?

11   A    YES, IF YOU LOOK AT THE PRIOR ART, FIGURE 5,

12   AND THEN THE HATTA PATENT APPLICATION, IT'S QUITE

13   OBVIOUS.

14        IF YOU THINK ABOUT CHANNELS THAT YOU HAVE

15   IN 3GPP STANDARD, MULTIPLE CHANNELS YOU HAVE, YOU

16   COULD EASILY CLASSIFY THE CHANNEL WITH A HARQ AND A

17   CHANNEL WITHOUT THE HARQ.

18        SO HATTA TEACHES US THAT IF YOU CLASSIFY

19   DIFFERENTLY, YOU WOULD SCALE POWER OF THOSE

20   CHANNELS DIFFERENTLY.

21   Q    ALL RIGHT.  NOW, LET'S GO TO PDX 35.17, AND

22   I'M GOING TO VERY QUICKLY MOVE YOU THROUGH EACH OF

23   THE LIMITATIONS BECAUSE THAT'S ONE THING THAT WE'RE

24   OBLIGATED DO AND IF THEY EFFECT YOUR OPINION.

25        DO YOU SEE THE FIRST ELEMENT THAT STARTS

```
1    WITH AN APPARATUS FOR TRANSMITTING DATA?

2    A    YES.

3    Q    IS THAT PRESENT IN THE PRIOR ART YOU JUST

4    DESCRIBED?

5    A    YES.

6    Q    WHERE?

7    A    WE SAW THAT IN FIGURE 5 OF THE PRIOR ART

8    FIGURE.

9    Q    OF THE PATENT?

10   A    THE PATENT '516, YES.

11   Q    THE NEXT ELEMENT REFERS TO A CONTROLLER FOR

12   DETERMINING.  DO YOU SEE THAT?

13   A    YES.

14   Q    WHERE DO YOU FIND THAT IN THE PRIOR ART?

15   A    AGAIN, IN THE FIGURE 5 OF THE PATENT, '516.

16   Q    THE THIRD ELEMENT SAYS SCALING DOWN THE

17   TRANSMIT POWER.  WHERE DO YOU FIND THAT IN THE

18   PRIOR ART?

19   A    YOU FIND THAT IN THE HATTA PATENT APPLICATION.

20   Q    THE NEXT ELEMENT SAYS FIRST AND SECOND CHANNEL

21   GENERATORS.  DO YOU SEE THAT?

22   A    YES.

23   Q    AND WHERE IS THAT ELEMENT TAUGHT IN THE PRIOR

24   ART?

25   A    THAT WOULD BE IN FIGURE 4 AND FIGURE 5 OF THE
```

1    '516 PATENT, WHICH IS LABELED PRIOR ART.

2    Q    LET'S LOOK AT FIGURE 4 OF THE '516 PATENT JUST

3    FOR A SECOND.

4            THIS IS ALSO LABELED PRIOR ART IN THE

5    PATENT?

6    A    YES.

7    Q    HOW DOES IT TEACH THIS ELEMENT?

8    A    SO IT IS SHOWING THAT THE USE OF CHANNEL

9    CODING, AS YOU SEE IN '305, THE CODING BLOCK, AND

10   THEN THE MODULATOR '306, AND THEN AFTER THAT, YOU

11   WILL BE TRANSMITTING THE SIGNAL.

12   Q    LET'S LOOK AT THE LAST ELEMENT OF CLAIM 15,

13   WHICH IS A GAIN SCALING UNIT.  DO YOU SEE THAT?

14   A    YES.

15   Q    AND WHERE IS THAT IN THE PRIOR ART?

16   A    THAT WOULD BE IN, AGAIN, FIGURE 4 AND FIGURE 5

17   OF THE '516 PATENT.

18   Q    SO DO YOU FIND EACH AND EVERY ELEMENT OF CLAIM

19   15 IN THE PRIOR ART?

20   A    YES.

21   Q    LET'S LOOK BRIEFLY AT CLAIM 16, WHICH ADDS, AS

22   DR. WILLIAMS POINTED OUT, THIS SLOT TO SLOT.  DO

23   YOU SEE THAT?

24   A    YES.

25   Q    WHERE IS THAT ELEMENT TAUGHT IN THE PRIOR ART?

3430

```
1    A    THAT IS TAUGHT IN FIGURE 5 OF THE '516 PATENT.

2    Q    CAN I HAVE FIGURE 5 ON THE SCREEN, BECAUSE I

3    DON'T THINK WE'VE POINTED THIS OUT TO THE JURY

4    BEFORE.

5         WOULD YOU EXPLAIN TO THE JURY WHERE IN

6    THE DIAGRAM THE PATENT LABELS PRIOR ART YOU CAN

7    FIND SLOT TO SLOT?

8    A    SO IF YOU LOOK AT FIGURE 5, THERE'S A T1, T2

9    AND T3, THAT'S WHAT WE CALL SLOT IN WIRELESS

10   COMMUNICATIONS, AND THEN YOU SEE AS THE CHANGE IS

11   HAPPENING TO THE POWER, IT HAPPENS AT THE

12   SLOT-BY-SLOT BASIS AS YOU SEE HERE.

13   Q    NOW, LET ME TURN TO A RELATED CONCEPT.  THE

14   JURY WILL BE INSTRUCTED NEXT WEEK ON SOMETHING

15   CALLED SECONDARY CONSIDERATIONS OF OBVIOUSNESS.

16   THAT'S A LAWYER CONCEPT, BUT YOU'VE HEARD THEM

17   BEFORE?

18   A    YES.

19   Q    AND I JUST WANT TO ASK YOU ABOUT THOSE

20   CONCEPTS.  DID YOU FIND ANY EVIDENCE THAT ANYONE

21   HAD COPIED THE '516 PATENT?

22   A    NO.

23   Q    ANY EVIDENCE THAT PATENT HAD ENJOYED

24   COMMERCIAL SUCCESS?

25   A    NO.
```

3431

1    Q    ANY EVIDENCE THAT OTHERS HAD TRIED AND FAILED

2    TO MAKE THE INVENTION OF THE '516 PATENT?

3    A    NO.

4    Q    AND ANY PRAISE IN THE INDUSTRY WITH TECHNICAL

5    FIELDS FOR THE PATENT?

6    A    NO.

7    Q    NOW, LAST SUBJECT.  TURN, IF YOU WOULD, TO PX

8    104, WHICH IS VOLUME 2, TAB 8 OF YOUR NOTEBOOK.  DO

9    YOU SEE THIS?

10   A    YES.

11   Q    WHAT IS IT?

12   A    IT'S THE SAMSUNG PROPOSAL TO THE 3GPP STANDARD

13   BY ONE OF THE INVENTORS OF THE '516 PATENT.

14   Q    JUHO LEE?

15   A    YES.

16   Q    WHAT IS THE DATE OF THE DOCUMENT?

17   A    JUNE 18TH, 2004.

18            MR. LEE:  YOUR HONOR, WE OFFER PX 104.

19            THE COURT:  ANY OBJECTION?

20            MR. VERHOEVEN:  NO OBJECTION.

21            THE COURT:  IT'S ADMITTED.

22            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23            104, HAVING BEEN PREVIOUSLY MARKED FOR

24            IDENTIFICATION, WAS ADMITTED INTO

25            EVIDENCE.)

1    BY MR. LEE:

2    Q    AND IF YOU TURN TO PAGE 3 OF THE DOCUMENT, DO

3    YOU SEE ON PAGE 3 DIFFERENT ALTERNATIVE PROPOSAL TO

4    THE 3 -- FOR DEALING WITH THE POWER CONTROL ISSUE?

5    A    YES.

6    Q    AND WHAT ARE THEY?

7    A    SO THE FIRST ONE IT SAYS MUST SEND DATA OVER

8    THE ENHANCED CHANNEL, MEANING YOU POWER DOWN THE

9    ENTIRE CHANNEL.

10           SECOND ONE TALKS ABOUT REDUCING THE POWER

11   OF THE ENHANCED DATA CHANNEL.

12           AND THE THIRD ONE TALKS ABOUT SCALE DOWN

13   EQUALLY, TRANSMIT POWER OVER CHANNELS.

14           MR. LEE:  THANK YOU PROFESSOR KIM.

15           NOTHING FURTHER, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  TIME IS NOW 9:24.

17   GO AHEAD, PLEASE.

18                    **CROSS-EXAMINATION**

19   BY MR. VERHOEVEN:

20   Q    GOOD MORNING.

21   A    GOOD MORNING.

22   Q    MY NAME IS CHARLES VERHOEVEN.

23           YOU -- DID YOU SEE DR. WILLIAMS TESTIMONY

24   ON DIRECT AND CROSS?

25   A    YES.  I DIDN'T SEE IT.  I READ IT.

```
1    Q    YOU READ IT?

2    A    YES.

3    Q    AND YOU SAW HOW HE WENT THROUGH IN GREAT

4    DETAIL HOW THE CLAIMS READ ON THE INTEL

5    SPECIFICATION AND SOFTWARE?  DO YOU REMEMBER THAT?

6    A    YES.

7    Q    IN YOUR DIRECT EXAMINATION, YOU DIDN'T ADDRESS

8    ANY OF THE INTEL DOCUMENTS, DID YOU?  YES OR NO?

9    A    NO.

10   Q    AND YOU DIDN'T ADDRESS THE INTEL SOURCE CODE,

11   DID YOU?

12   A    NO.

13   Q    YOU DON'T DISPUTE THE ACCURACY OF

14   DR. WILLIAMS' DESCRIPTION OF HOW THOSE DOCUMENTS

15   SHOW THE OPERATION OF THE CHIP, DO YOU, SIR?

16   A    I DON'T QUITE UNDERSTAND YOUR QUESTION.

17   Q    COULD YOU READ THE QUESTION BACK, PLEASE.

18            (WHEREUPON, THE RECORD WAS READ BY THE

19   COURT REPORTER.)

20            THE WITNESS:  YEAH, I BELIEVE HE

21   DESCRIBED THAT --

22   BY MR. VERHOEVEN:

23   Q    YES OR NO, SIR?

24   A    WAIT.  I DON'T DISPUTE.

25            MR. VERHOEVEN:  THANK YOU.  NOTHING
```

1    FURTHER.

2           THE COURT:  ALL RIGHT.  TIME IS NOW 9:25.

3    ANY REDIRECT?

4                    **REDIRECT EXAMINATION**

5    BY MR. LEE:

6    Q    PROFESSOR KIM, DID YOU REVIEW THE TESTIMONY OF

7    THE INTEL ENGINEER WHERE HE SAID ALL CHANNELS ARE

8    TOTALLED UP IN THE INTEL BASEBAND PROCESSOR?

9    A    YES.

10          MR. LEE:  NOTHING FURTHER, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  MAY THIS WITNESS

12   BE EXCLUDED AND IT IF SO, IS HE SUBJECT TO RECALL?

13          MR. LEE:  HE IS, AND NOT SUBJECT TO

14   RECALL.

15          THE COURT:  DO YOU AGREE WITH THAT?

16          MR. VERHOEVEN:  YES, YOUR HONOR.

17          THE COURT:  ALL RIGHT.  YOU MAY BE

18   EXCUSED.

19          CALL YOUR NEXT WITNESS, PLEASE.

20          MR. LEE:  YOUR HONOR, APPLE CALLS

21   PROFESSOR KNIGHTLY.  AND MR. MUELLER WILL PRESENT

22   DR. KNIGHTLY.

23          THE COURT:  ALL RIGHT.  COME ON UP,

24   PLEASE.

25          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

3435

```
 1                         EDWARD KNIGHTLY,

 2     BEING CALLED AS A WITNESS ON BEHALF OF THE

 3     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 4     EXAMINED AND TESTIFIED AS FOLLOWS:

 5                 THE WITNESS:  I DO.

 6                 THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 7                 THE COURT:  ALL RIGHT.  THE TIME IS NOW

 8     9:26.  GO AHEAD.

 9                 THE CLERK:  IF YOU CAN PLEASE STATE YOUR

10     NAME AND SPELL IT FOR THE RECORD.

11                 THE WITNESS:  EDWARD WILLIAM KNIGHTLY.

12     E-D-W-A-R-D, WILLIAM, W-I-L-L-I-A-M, KNIGHTLY,

13     K-N-I-G-H-T-L-Y.

14                       DIRECT EXAMINATION

15     BY MR. MUELLER:

16     Q    GOOD MORNING, DR. KNIGHTLY.

17     A    GOOD MORNING.

18     Q    COULD YOU PLEASE INTRODUCE YOURSELF TO THE

19     JURY?

20     A    YES.  MY NAME IS EDWARD KNIGHTLY, AND I LIVE

21     IN HOUSTON, TEXAS.

22     Q    AND, SIR, IF YOU WOULD SIT UP JUST A BIT

23     TOWARDS THE MICROPHONE.  THANK YOU.

24                 DR. KNIGHTLY, HAVE YOU BEEN RETAINED BY

25     APPLE AS AN EXPERT WITNESS IN THIS CASE?
```

1    A    YES, I HAVE.

2    Q    LET'S START BY GOING OVER YOUR EDUCATIONAL

3    BACKGROUND IF WE COULD.

4    A    ALL RIGHT.

5    Q    COULD YOU PLEASE DESCRIBE IT FOR THE JURY?

6    A    SO I RECEIVED MY BACHELOR'S DEGREE IN 1991

7    FROM AUBURN UNIVERSITY AND MY MASTER AND PH.D. FROM

8    THE UNIVERSITY OF CALIFORNIA AT BERKELEY IN '92 AND

9    '96.

10   Q    DR. KNIGHTLY, WHERE DO YOU WORK?

11   A    I'M A PROFESSOR OF ELECTRICAL AND COMPUTER

12   ENGINEERING AT RICE UNIVERSITY IN HOUSTON.

13   Q    FOR HOW LONG HAVE YOU BEEN AT RICE UNIVERSITY?

14   A    SINCE '96.

15   Q    WHAT ARE YOUR DUTIES AT RICE?

16   A    I TEACH COURSES, GRADUATE AND UNDERGRADUATE

17   COURSES, I TEACH SENIOR LEVEL NETWORKING COURSES,

18   AND ADVANCED WIRELESS NETWORKING COURSES AT THE

19   GRADUATE LEVEL.

20        I ALSO TEACH PROJECT COURSES TO SENIORS

21   ON WIRELESS NETWORKING FOR UNDERSERVED REGIONS FOR

22   LOW COST WIRELESS, AND I ALSO RUN A RESEARCH GROUP

23   WITH GRADUATE STUDENTS AND ENGINEERS.

24   Q    COULD YOU PLEASE GIVE US AN OVERVIEW OF YOUR

25   RESEARCH?

3437

1    A    YES.  I HAVE TWO MAIN PROJECTS RIGHT NOW.  ONE

2    IS TERMED SUPER WI-FI WHERE WE'RE DEVELOPING

3    TECHNOLOGY TO MAKE WI-FI GO FILES INN TED OF TENS

4    OF FEET BY USING UHF BANDS, TV BANDS.

5              AND THE SECOND IS MULTI ANTENNA

6    TECHNOLOGY WHERE WE'RE DEVELOPING TECHNIQUES FOR

7    WI-FI TO BE ABLE TO GO TO MULTIPLE USERS

8    SIMULTANEOUSLY.

9    Q    DR. KNIGHTLY, DO YOU HAVE EXPERIENCE WITH REAL

10   LIFE WIRELESS NETWORKS?

11   A    YES.  WE -- SINCE 2003, WE'VE DESIGNED AND

12   OPERATE A WIRELESS NETWORK IN HOUSTON, TEXAS.  THE

13   NETWORK SERVES THOUSANDS OF USERS AND IT'S A

14   PLATFORM FOR US TO DEMONSTRATE OUR RESEARCH FOR

15   LOW-COST WIRELESS IN UNDERSERVED COMMUNITIES.

16   Q    WHAT IS THIS CALLED?

17   A    TECHNOLOGY FOR ALL WIRELESS.

18   Q    IN ADDITION TO TECHNOLOGY FOR ALL, HAVE YOU

19   BEEN INVOLVED IN ANY OTHER REAL LIFE WIRELESS

20   NETWORKS?

21   A    YES.  WE'RE IN THE DESIGN PROCESS FOR A SUPER

22   WI-FI DEPLOYMENT IN ARGENTINA, WHICH HAS MORE

23   AVAILABLE UHF FACT SPECTRUM.

24   Q    DR. KNIGHTLY, HAVE YOU AUTHORED ANY SCIENTIFIC

25   PUBLICATIONS?

1   A   YES, OVER 100 PAPERS AND REFEREED JOURNALS AND

2   RESEARCH CONFERENCES.

3   Q   AND HAVE YOU RECEIVED ANY AWARDS?

4   A   YES.  TWO AWARDS THAT ARE SHOWN ON THE SCREEN.

5   ONE IS IEEE FELLOW, AND THAT'S THE INSTITUTE OF

6   ELECTRICAL AND ELECTRONIC ENGINEERS.  THAT'S AN

7   AWARD GIVEN TO NO MORE THAN .1 PERCENT OF THE

8   MEMBERS IN ANY ONE YEAR; AND SLOAN FELLOW IS AN

9   AWARD FOR RESEARCH EXCELLENCE GIVEN TO 128

10  RESEARCHERS ACROSS ALL AREAS FROM CHEMISTRY TO

11  COMPUTER SCIENCE.

12          MR. MUELLER:  YOUR HONOR, I MOVE

13  DR. KNIGHTLY AS AN EXPERT IN WIRELESS COMMUNICATION

14  SYSTEMS AND NETWORKING PROTOCOLS.

15          THE COURT:  ANY OBJECTION?

16          MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  SO CERTIFIED.  GO AHEAD,

18  PLEASE.

19  BY MR. MUELLER:

20  Q   DR. KNIGHTLY, WHAT ISSUES WERE YOU ASKED TO

21  CONSIDER IN THIS CASE?

22  A   I WAS ASKED TO CONSIDER THE '941 PATENT AND

23  WHETHER OR NOT THE APPLE PRODUCTS INFRINGE, AND

24  ALSO VALIDITY.

25  Q   AND HAVE YOU REACHED ANY CONCLUSIONS?

1    A    YES, I HAVE.

2    Q    AND WHAT ARE THEY?

3    A    THAT IS THAT THE '941 PATENT IS INVALID IN

4    LIGHT OF PRIOR ART THAT I'LL BE DISCUSSING IN A FEW

5    MINUTES, AND ALSO THAT THE APPLE PRODUCTS DO NOT

6    INFRINGE.

7    Q    COULD YOU GIVE US AN OVERVIEW OF THE WORK THAT

8    YOU'VE DONE ON THIS CASE TO REACH THOSE

9    CONCLUSIONS?

10   A    YES.  I'VE REVIEWED THE PATENT APPLICATION,

11   THE FILE HISTORY, DOCUMENTS DESCRIBING INTEL SOURCE

12   CODE, DOCUMENTS DESCRIBING THE STANDARD, AND ALL

13   THAT EVIDENCE THAT I LISTED IN MY EXPERT REPORT.

14   Q    AND HOW MANY HOURS HAVE YOU BEEN WORKING ON

15   THE CASE?

16   A    APPROXIMATELY 300.

17   Q    HAVE YOU BEEN COMPENSATED FOR YOUR TIME?

18   A    YES, I'VE BEEN COMPENSATED AT MY STANDARD RATE

19   OF $475 AN HOUR FOR A TOTAL OF ABOUT $140,000.

20   Q    SIR, AT A HIGH LEVEL, WHAT IS THE SUBJECT OF

21   THE '941 PATENT?

22   A    SO '941 ADDRESSES SEGMENTATION AND REASSEMBLY

23   IN A WIRELESS NETWORK.

24   Q    AND IF YOU NEED TO REFER TO IT, THIS IS JOINT

25   EXHIBIT 1070 WHICH IS AT TAB 2 OF YOUR BINDER, AND

1    THAT'S THE '941 PATENT.

2            BEFORE WE GET INTO THE DETAILS, LET ME

3    ASK YOU A FEW TECHNICAL CONCEPTS.  AND LET ME BRING

4    UP PDX 36.2.  CAN YOU EXPLAIN TO THE JURY WHAT WE

5    SEE HERE?

6    A    SO THIS IS SHOWING A TRANSMITTER, THE USER

7    EQUIPMENT THAT YOU'VE HEARD ABOUT BEFORE, AND THIS

8    IS TRANSMITTING, IN THIS CASE IT'S AN IMAGE OR A

9    VIDEO FRAME.  AND WHEN THAT FRAME COMES FROM THE

10   APPLICATION, IT'S PUT INTO WHAT'S CALLED AN SDU, OR

11   A SERVICE DATA UNIT.

12           AND THEN IN MANY CASES THOSE FRAMES OR

13   IMAGES ARE TOO LARGE TO BE SENT OVER THE WIRELESS

14   NETWORK AS THEY ARE, SO THEY'VE GOT TO BE SEGMENTED

15   OR DIVIDED INTO PROTOCOL DATA UNITS OR PDU'S.

16           SO THAT WHAT'S SHOWN IS OVER THE WIRELESS

17   LINK IS THAT YOU'RE SEEING MANY PROTOCOL DATA UNITS

18   WITH, IN ESSENCE, PART OF THE IMAGE, AND THAT'S

19   SEGMENTATION; AND ON THE RECEIVER SIDE, THE WHOLE

20   PROCESS IS REVERSED WITH REASSEMBLY WHERE THE

21   RECEIVER PUTS IT ALL BACK TOGETHER.

22           MR. MUELLER:  YOUR HONOR, MAY I APPROACH

23   THE SCREEN, PLEASE?

24           THE COURT:  GO AHEAD.

25   BY MR. MUELLER:

3441

1    Q    JUST TO TAKE THAT IN PIECES, DR. KNIGHTLY, THE

2    ORIGINAL IMAGE IS A FLOWER.

3    A    YES.

4    Q    AND THAT FLOWER IS REPRESENTED IN SDU?

5    A    YES, THAT FLOWER COMES IN A UNIT FROM THE

6    HIGHER LAYERS AND WE'RE REFERRING TO THAT AS SDU.

7    Q    AND CAN YOU EXPLAIN TO US ONE MORE TIME THE

8    RELATIONSHIP BETWEEN THE SDU AND THESE PDU'S?

9    A    YES.  SO THE SDU'S, IF IT'S LARGER THAN THE

10   PDU, IS BROKEN UP INTO SEGMENTS.

11   Q    AND I'M SORRY, THE PROCESS OF BREAKING UP THE

12   SDU IS CALLED?

13   A    SEGMENTATION.

14   Q    LET'S TAKE A LOOK AT PDX 36.4.  WHAT DO WE SEE

15   HERE?

16   A    SO THIS IS A ZOOM IN OF ONE OF THOSE PDU'S.

17   ON THE LEFT YOU'RE SEEING AN SDU WITH THE --

18   REPRESENTING THE ENTIRE IMAGE AND THERE'S HEADER

19   INFORMATION ON TOP OF THAT.

20            AND THEN THAT'S SHOWING DIVIDING INTO

21   SOME OF THOSE PDU'S THAT I SHOWED GOING ACROSS THE

22   WIRELESS AIR.

23            AND THEN EACH OF THOSE HAS A HEADER, AND

24   THAT HEADER IS THE CONTROL INFORMATION THAT TELLS

25   THE RECEIVER HOW TO RECONSTRUCT EVERYTHING THAT THE

3442

```
 1    TRANSMITTER DID.

 2    Q    DR. KNIGHTLY, ARE THERE TIMES WHEN AN SDU DOES

 3    NOT NEED TO BE SEGMENTED?

 4    A    YES.  IF THE -- IF THE -- IF THE SDU IS

 5    SMALLER THAN THE PDU SIZE, THEN IT CAN BE FIT, OR

 6    SMALLER OR EQUAL, IT CAN BE FIT INTO A PDU AND

 7    DOESN'T GET SEGMENT THE.

 8    Q    LET'S GO TO 36.5, PLEASE.  WHAT DO WE SEE

 9    HERE?

10    A    SO HERE JUST SHOWING A SMALLER IMAGE THAT

11    WHERE THE ENTIRE SDU DID NOT FIT INTO THE PDU, SO

12    THE SMALLER IMAGE IS REPRESENTED BY AN EMOTICON.

13              SO IN THIS CASE, THE ENTIRE SDU

14    REPRESENTED NOW BY THE EMOTICON FITS INTO THE PDU

15    AND THERE'S EXTRA ROOM.  SO THIS EXTRA ROOM HAS, IS

16    JUST DUMMY BITS, WHEN IT'S REFERRED TO AS PADDING.

17    Q    WHEN YOU SAY SUMMARY BITS, YOU'RE REFERRING TO

18    THOSE ZEROS?

19    A    YES.

20    Q    AND THAT'S THE PADDING?

21    A    YES.

22    Q    LET'S GO TO THE NEXT SLIDE, PLEASE.  WHAT DO

23    WE SEE HERE, SIR?

24    A    THIS IS A CASE WHERE AN ENTIRE SDU FIT INTO

25    THE PDU, AND THEN RATHER THAN JUST SEND THOSE
```

1    PADDING BITS AND WASTE THOSE, THOSE BITS, NORMALLY

2    ANOTHER SDU, IF THE APPLICATION HAS ONE READY, WILL

3    BE SENT.  SO THAT IS CALLED CONCATENATION.

4    Q    AND EACH OF THOSE SMILEY FACES REPRESENTS

5    WHAT?

6    A    EACH REPRESENTS AN SDU.

7    Q    TWO SDU'S HERE?

8    A    YES.

9    Q    LET'S GO TO THE NEXT SLIDE, PLEASE.

10        WHAT DO WE SEE HERE?

11   A    SO THIS IS THE THIRD CASE WHERE AN ENTIRE SDU

12   FITS IN THE PDU AND IN THIS CASE IT EXACTLY FITS.

13   Q    REMIND US NOW, WE'VE SEEN THREE CASES.  COULD

14   YOU REPEAT WHAT THOSE THREE CASES ARE?

15   A    YES.  SO THE THREE CASES ARE WHEN THERE'S

16   PADDING, AND SO THAT MEANS THOSE DUMMY BITS WERE

17   SENT WHEN THERE'S CONCATENATION IS NOT SDU IS

18   STARTED AND THIS CASE HERE WHERE IT'S AN EXACT FIT.

19   THOSE ARE THE THREE CASES WHERE THE SDU FITS.

20   Q    DR. KNIGHTLY, HOW LONG HAVE THESE THREE CASES

21   BEEN KNOWN?

22   A    THESE CASES AND SEGMENTATION REASSEMBLY HAVE

23   BEEN AROUND FOR DECADES IN TEXTBOOKS.

24   Q    NOW, YOU DISCUSSED ABOUT THE CONCEPT OF A

25   HEADER, RIGHT?

1    A    YES.

2    Q    CAN YOU REMIND THE JURY WHAT THAT IS?

3    A    SO THE HEADER CONTAINS THE CONTROL INFORMATION

4    TO TELL THE RECEIVER WHAT TO DO.

5    Q    I WANT TO TALK NOW ABOUT THE CONCEPT OF AN

6    ALTERNATIVE E-BIT.  DO YOU HAVE THAT IN MIND?

7    A    YES.

8    Q    WHAT IS IT?

9    A    SO THERE ARE -- IN THE 3GPP STANDARD, THERE'S

10   AN E-BIT, WHICH STANDS FOR AN EXTENSION BIT, AND

11   THERE'S A SECOND WAY TO INTERPRET THAT E-BIT AND

12   THAT'S THE ALTERNATIVE E-BIT INTERPRETATION.  SO

13   DIFFERENT WAYS TO INTERPRET THE ALTERNATIVE BIT IN

14   THE STANDARD.

15   Q    IS THIS PART OF THE HEADER?

16   A    YES.

17   Q    YOU REFERRED TO SOMETHING CALLED 3GPP.  IS

18   THAT SOMETIMES CALLED UMTS?

19   A    YES.

20   Q    THAT'S THE STANDARD THAT WAS DEVELOPED BY A

21   GROUP CALLED ETSI AND OTHERS?

22   A    THAT'S CORRECT.

23   Q    DID YOU HEAR DR. WILLIAMS TESTIFY ON THE STAND

24   ABOUT THE ALTERNATIVE E-BIT?

25   A    YES, I DID.

1    Q    DID YOU HEAR HIM SAY THE ALTERNATIVE E-BIT CAN

2    REDUCE OVERHEAD?

3    A    YES, I HEARD THAT.

4    Q    DO YOU AGREE?

5    A    IN SOME CASES IT REDUCES OVERHEAD, AND THAT'S

6    THE ONE CASE OF THE EXACT MATCH.  BUT IN OTHER

7    CASES, WHEN THERE'S SEGMENTATION, IT ADDS OVERHEAD.

8    IT ADDS LIFE FOR EVERY INTERMEDIATE SEGMENT, SO IF

9    THERE'S A LARGE IMAGE OR VIDEO FRAME, IT CAN ADD

10   MANY, MANY BYTES PER SDU.

11   Q    SIR, LET'S TURN TO THE '941 PATENT AND I WANT

12   TO EXPLORE THE ISSUE OF WHETHER THIS PATENT COVERS

13   THE ALTERNATIVE E-BIT.  LET'S BRING UP 36.9 WHICH

14   SHOWS CLAIM 10 FROM THE PATENT.  LET ME SHOW YOU ON

15   THE THIRD CLAIM ELEMENT, WHICH IS HIGHLIGHTED.

16   WHAT DOES THIS DESCRIBE?

17   A    SO THIS IS A ONE BIT FIELD INDICATING WHETHER

18   OR NOT THERE'S AN ENTIRE SDU IN THE DATA FIELD.  SO

19   WITH A SINGLE BIT, YOU CAN EITHER BE -- THAT IT

20   DOES SOMETHING OR DOES NOT DO SOMETHING, SO THIS

21   IS -- THAT SOMETHING IN THIS CASE IS WHETHER

22   THERE'S AN ENTIRE SDU IN THE DATA FIELD.

23   Q    LET'S GO TO THE NEXT SLIDE, PLEASE.  THIS IS

24   CLAIM 15, AND PLEASE EXPLAIN TO US WHAT WE SEE IN

25   THE HIGHLIGHTED TEXT HERE?

```
 1    A    SO THIS IS THE RECEIVER SIDE CLAIM FOR THE

 2    REFEREE ASSEMBLING, AND SO THIS IS -- WHAT'S SHOWN

 3    FOR THESE REASSEMBLY CONTROLLER CHECKING THAT SAME

 4    ONE BIT FIELD.

 5    Q    AND IF YOU GO BACK TO THE PREVIOUS SLIDE FOR

 6    JUST A MOMENT.

 7              YOUR HONOR, MAY I APPROACH?

 8              THE COURT:  GO AHEAD, PLEASE.

 9    BY MR. MUELLER:

10    Q    AGAIN, JUST SO WE'RE CLEAR, THAT REQUIRES AN

11    ENTIRE SDU RIGHT?

12    A    THAT'S CORRECT.

13    Q    CLAIM 15 ALSO REQUIRED AN ENTIRE SDU?

14    A    YES.

15    Q    BOTH CLAIMS?

16    A    YES.

17    Q    WHAT IS THE PLANE AND ORDINARY MEANING OF THAT

18    CLAIM TERM?

19    A    THAT IT'S A WHOLE SDU, ONE THAT IS NOT

20    SEGMENTED.

21    Q    NOW, DR. WILLIAMS SAID THAT IN THE ALTERNATIVE

22    E-BIT IN THE UMTS STANDARD, THERE'S A ONE BIT

23    FIELD?

24    A    YES.

25    Q    DO YOU AGREE?
```

```
1      A     NO, I DON'T.

2      Q     WHY NOT?

3      A     BECAUSE THE TWO, THE ONE BIT FIELD OF UMTS HAS

4      A DIFFERENT FUNCTION THAN THE ONE BIT FIELD IN THE

5      '941.

6      Q     HAVE YOU PREPARED A DEMONSTRATIVE THAT

7      COMPARES THE TWO?

8      A     YES.

9      Q     LET'S TAKE A LOOK AT PDX 36.12, PLEASE.  AND

10     WHAT DOES THIS SHOW?

11     A     SO HERE YOU CAN SEE THE ONE BIT FIELD FOR THE

12     '941 VERSUS THE 3GPP.  SO BY, BY USING A SINGLE

13     BIT, IT'S CALLING OUT ONE CASE VERSUS NOT THAT

14     CASE.

15            SO YOU CAN SEE FROM THE '941 CLAIM ON

16     TOP, THE BIT IS WHETHER OR NOT THE PDU CONTAINS AN

17     ENTIRE SDU.

18            SO --

19     Q     AND LET'S JUST TAKE THIS IN PLEASE.  IF THE

20     BIT IS 0 IN THE '941 PATENT CLAIMS, WHAT DOES THAT

21     MEAN?

22     A     RIGHT.  SO THAT'S THE INDICATION WHERE AN

23     ENTIRE SDU IS CONTAINED WITHIN THE PDU, AND THAT

24     INCLUDES THOSE, THOSE THREE CASES THAT I DESCRIBED

25     EARLIER.  EACH OF THOSE HAS AN ENTIRE SDU IN THE
```

1    PDU.

2    Q    SO IF IT'S ZERO IN THE '941, IT CAN BE ANY OF

3    THOSE THREE?

4    A    CORRECT.

5    Q    WHAT IF IT'S ZERO IN THE UMTS OR 3GPP

6    STANDARD?

7    A    SO WITH THE ALTERNATIVE E-BIT, NOT THE NORMAL

8    E-BIT, WITH THE ALTERNATIVE E-BIT, THAT BIT, WHEN

9    IT'S SET TO ZERO, MEANS IT'S AN EXACT MATCH.

10             AND THE WAY THE STANDARD DEFINES AN EXACT

11   MATCH IS THE WORDS THERE, COMPLETE SDU THAT IS NOT

12   THOSE CASES ABOVE, IT'S NOT SEGMENTED AND IT'S NOT

13   CONCATENATED AND IT'S NOT PADDED.

14   Q    IT'S ALWAYS AN EXACT FIT IN THE STANDARD?

15   A    CORRECT.

16   Q    NOW, WHAT'S THE SIGNIFICANCE OF THIS

17   DIFFERENCE?

18   A    WELL, THE SIGNIFICANCE OF THE DIFFERENCE IS

19   THAT IF A SENDER AND A RECEIVER WERE TRYING TO --

20   ONE WAS USING THE '941 AND ONE WAS USING THE 3GPP,

21   THEY WOULD MISINTERPRET WHAT THAT BIT MEANT AND IT

22   WOULDN'T BE COMPATIBLE.

23   Q    LET'S PUT THAT INTO REAL LIFE TERMS.  IF A

24   USER HAD A WIRELESS DEVICE THAT USED THE '941 --

25   MAY I APPROACH? -- COULD IT COMMUNICATE WITH A

```
 1    WIRELESS DEVICE USING THE UMTS?

 2    A    IF IT WAS TRYING TO USE THE ALTERNATIVE E-BIT

 3    IN UMTS, THE RECEIVER WOULD BE CONFUSED WHEN IT GOT

 4    A ZERO AS TO WHICH CASE IT CORRESPONDED TO.

 5    Q    LET'S GO BACK TO PDX 36.9.  THIS IS CLAIM 10

 6    AGAIN.

 7              NOW, DID YOU HEAR DR. WILLIAMS SAY THAT

 8    IN HIS VIEW, THE CLAIM REQUIRES ONLY AN ENTIRE SDU?

 9    A    YES.

10    Q    AND DO YOU RECALL WHEN MR. LEE WROTE ONLY ON

11    THE BOARD HERE?

12    A    YES.

13    Q    AND DR. WILLIAMS SAID HE AGREED WITH THAT?

14    A    YES.

15    Q    DO YOU AGREE?

16    A    NO.

17    Q    WHY NOT?

18    A    WELL, THE "WORD" ONLY IS, IS NOT IN THE CLAIM,

19    SO -- AND ADDING THAT WORD "ONLY" CHANGES THE

20    MEANING OF THE CLAIM TO ACTUALLY INCLUDE THOSE

21    CASES THAT WE TALKED ABOUT WITH CONCATENATION AND

22    PADDING.

23    Q    HOW DO THE WORDS AN ENTIRE SDU BECOME A PART

24    OF THESE CLAIMS?

25    A    IN THE FILE HISTORY, YOU CAN SEE THAT THE
```

```
 1    PATENT OFFICE INITIALLY REJECTED THE SUBMITTED

 2    PATENT CLAIMS AND FORCED SAMSUNG TO ADD THAT WORD.

 3    Q    CAN YOU PLEASE TURN TO TAB 1 IN YOUR BINDER.

 4    THIS IS JX 1060.  SIR, WHAT IS THIS?

 5    A    SO THIS IS THE FILE HISTORY OF THE '941

 6    PATENT.

 7    Q    AND CAN YOU EXPLAIN TO THE JURY WHAT A FILE

 8    HISTORY IS?

 9    A    YES.  SO THE FILE HISTORY IS THE BACK AND

10    FORTH BETWEEN SAMSUNG AND THE PATENT OFFICE WHERE

11    IT CONTAINS THE INITIAL PATENT APPLICATION, IN THIS

12    CASE, THAT WAS REJECTED, SO THE CLAIMS WERE

13    AMENDED.  SO ALL OF THAT BACK AND FORTH GOES IN THE

14    FILE HISTORY.

15              MR. MUELLER:  YOUR HONOR, I OFFER IT.

16              THE COURT:  ANY OBJECTION?

17              MR. VERHOEVEN:  NO OBJECTION.

18              THE COURT:  IT'S ADMITTED.

19              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20              1060, HAVING BEEN PREVIOUSLY MARKED FOR

21              IDENTIFICATION, WAS ADMITTED INTO

22              EVIDENCE.)

23    BY MR. MUELLER:

24    Q    DR. KNIGHTLY, WHEN SAMSUNG FILED THE ORIGINAL

25    PATENT APPLICATION FOR THE '941 PATENT, DID CLAIMS
```

1    10 AND 15 MENTION AN ENTIRE SDU?

2    A    NO, THAT WAS NOT IN THE SUBMITTED CLAIM.

3    Q    WHAT DID THE PATENT OFFICE DO WITH THE

4    ORIGINAL CLAIMS?

5    A    WELL, THE PATENT OFFICE WROTE THAT THE CLAIMS

6    ARE OBVIOUS IN LIGHT OF A PRIOR ART REFERENCE,

7    JIANG, J-I-A-N-G.

8    Q    SO LET'S TURN TO PAGES 22 AND 23 OF THIS JOINT

9    EXHIBIT 1060.

10         AND I'D LIKE, IF YOU COULD, FOR YOU TO

11   EXPLAIN TO THE JURY WHAT WE SEE HERE?

12   A    SO HERE YOU'RE SEEING THE ORIGINAL CLAIM AND

13   THE WAY IT WAS AMENDED.  SO IF YOU CAN SCROLL DOWN

14   A LITTLE BIT TO CLAIM 10.  I GUESS IT'S ON TWO

15   PAGES.  SO YOU CAN SEE THE ORIGINAL LANGUAGE AND

16   THEN ADDED LANGUAGE IS UNDERLINED AND LANGUAGE

17   REMOVED IS STRUCK.

18         MR. MUELLER:  YOUR HONOR, AGAIN, MAY I

19   APPROACH, PLEASE.

20         THE COURT:  GO AHEAD.

21   BY MR. MUELLER:

22   Q    DR. KNIGHTLY, DO YOU SEE HERE WHERE IT SAYS

23   WHETHER THE PDU CONTAINS AN ENTIRE SDU IN THE DATE

24   TO FIELD?

25   A    YES.

1    Q    WHAT IS THAT?

2    A    BECAUSE IT'S UNDERLINED, THAT MEANS IT WAS

3    ADDED AFTER THE REJECTION OF OBVIOUSNESS OVER

4    JIANG.

5    Q    LET'S TURN TO PAGES 28 AND 29 OF THE SAME

6    DOCUMENT.  AND LET ME DIRECT YOUR ATTENTION TO THE

7    PARAGRAPH STARTS JIANG DISCLOSES.  DO YOU SEE THAT?

8    A    YES.

9    Q    WHAT DO WE SEE HERE?

10   A    YES.  SO IF YOU LOOK AT THE LAST SENTENCE

11   THERE, THE "MOREOVER," SO THEY'RE SAYING THAT

12   MOREOVER, YEAH, RIGHT THERE, MOREOVER, JIANG

13   DISCLOSES THAT IF A SINGLE SDU COMPLETELY FILLS AN

14   SDU ARRAY, SO THAT'S SAYING AN EXACT MATCH, THEN

15   THE EXTENSION BIT WOULD BE ZERO, THEREBY INDICATING

16   THAT NO LENGTH INDICATOR OR NO MORE HEADER

17   INFORMATION IS PRESENT.

18        SO THEY'RE BASICALLY SAYING THAT THAT'S

19   WHAT JIANG DOES, BUT SAMSUNG'S AMENDED CLAIM IS

20   DIFFERENT AND IF YOU LOOK IN THE TEXT ABOVE, THE

21   APPLICANTS RECITE, I THINK IT'S THE SAME PAGE,

22   YEAH, THE APPLICANTS, HOWEVER, RECITE THEN THEY'RE

23   SAYING THEY'RE RECITING A BIT FOR AN ENTIRE --

24   WHETHER OR NOT AN ENTIRE SDU IS IN THE DATA FIELD.

25   Q    HOW DOES SAMSUNG'S STATEMENT HERE TO THE

1   PATENT OFFICE RELATE TO YOUR UNDERSTANDING OF THE

2   CLAIM?

3   A    WELL, IT'S CRITICAL BECAUSE THEY'RE STATING

4   THAT THEY DO NOT HAVE A BIT THAT INDICATES AN EXACT

5   MATCH THAT A SINGLE SDU COMPLETELY FILLS.

6   Q    IN SUM, DR. KNIGHTLY, WHAT IS YOUR OPINION AS

7   TO WHETHER THE '941 PATENT COVERS THE ALTERNATIVE

8   E-BIT IN THE UMTS STANDARD?

9   A    MY OPINION IS THAT IT DOES NOT, THAT THE BITS

10  HAVE OTHER MEANINGS.

11  Q    LET'S TURN TO THE SUBJECT OF VALIDITY.  HAVE

12  YOU FORMED AN OPINION ON THAT SUBJECT?

13  A    YES, I HAVE.

14  Q    WHAT IS IT?

15  A    THAT THE '941 CLAIMS ARE INVALID OF PRIOR ART

16  REFERENCE THAT APPEARED ABOUT SEVEN YEARS EARLIER.

17  Q    WHICH REFERENCE?

18  A    AGARWAL.

19  Q    LET'S TAKE A LOOK AT TAB 5 IN YOUR BINDER.

20  THIS IS PX 97.  WHAT IS IT?

21  A    THIS IS A PATENT BY AGARWAL, PATENT '658, THAT

22  ALSO ADDRESSES SEGMENTATION REASSEMBLY.

23          MR. MUELLER:  YOUR HONOR, I OFFER IT.

24          THE COURT:  ANY OBJECTION?

25          MR. VERHOEVEN:  NO OBJECTION.

1          THE COURT:  IT'S ADMITTED.

2          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

3          97, HAVING BEEN PREVIOUSLY MARKED FOR

4          IDENTIFICATION, WAS ADMITTED INTO

5          EVIDENCE.)

6   BY MR. MUELLER:

7   Q    DR. KNIGHTLY, WHAT WAS THE FILING DATE FOR THE

8   AGARWAL PATENT?

9   A    JULY 15TH, 1998.

10  Q    IS AGARWAL PRIOR ART TO THE '941 PATENT?

11  A    YES, AS I MENTIONED, ABOUT SEVEN YEARS.

12  Q    NOW, DURING THE PROSECUTION OR THE REVIEW BY

13  THE PATENT OFFICE OF THE '941 PATENT, WAS AGARWAL

14  CONSIDERED?

15  A    NO, THE PATENT OFFICE DID NOT KNOW ABOUT THIS

16  REFERENCE.

17  Q    WHAT IS THE SUBJECT OF THE AGARWAL PATENT

18  GENERALLY?

19  A    AS YOU CAN SEE IN THE TITLE, IT'S ADDRESSING A

20  SEGMENTATION AND REASSEMBLY IN SATELLITE AND

21  WIRELESS NETWORKS.

22  Q    DOES AGARWAL DESCRIBE SEGMENTATION IN THE

23  SPECIFIC CONTEXT OF MOBILE COMMUNICATIONS?

24  A    YES, IT DOES.  IT ADDRESSES BOTH SATELLITE AND

25  INDUSTRIAL WIRELESS NETWORKS WHICH, OF COURSE, CAN

1    BE MOBILE.

2    Q    LET'S LOOK AT COLUMN 12, LINES 17 THROUGH 22.

3    AND IF WE CAN PUT THAT ON THE SCREEN, PLEASE.

4                LINES 17 THROUGH 22.  THANKS.

5                DR. KNIGHTLY, WHAT DO WE SEE HERE?

6    A    THIS IS A RECOGNITION BY THE INVENTORS OF THE

7    658 THAT, THAT IN WIRELESS NETWORKS, RESOURCES ARE

8    SCARCE, SO THERE'S A NEED TO MINIMIZE THE OVERHEAD

9    WHILE PERFORMING SEGMENTATION REASSEMBLY.

10   Q    LET'S BRING UP FIGURES 7A AND 7B AND LET'S

11   START WITH SEARCH A.

12               DR. KNIGHTLY, WHAT DO WE SEE HERE?

13   A    SO THIS IS ONE OF THE FIGURES IN THE PATENT

14   THAT'S USED THROUGHOUT THE TEXT, AND BASICALLY YOU

15   CAN SEE THAT YOU HAVE A USER FRAME ON THE LEFT THAT

16   WILL GET SEGMENTED, SO IT'S SHOWING THOSE TWO

17   SEGMENTS FOR THIS PARTICULAR EXAMPLE ON THE RIGHT,

18   ILLUSTRATING SEGMENTATION FUNCTION.

19   Q    AND WHAT DO WE SEE IN 7B?

20   A    7B GIVES AN EXAMPLE OF A SDU FORMAT THAT

21   AGARWAL USES AND THE HEADER INFORMATION SHOWN ON

22   THE TOP.

23   Q    DOES AGARWAL DISCLOSE A ONE BIT FIELD AS IN

24   THE '941?

25   A    YES.  SO IF YOU -- THE THIRD BIT OF THE FIELD,

```
 1    SO THE THIRD BOX FROM THE LEFT IS A BIT THAT

 2    INDICATES WHETHER OR NOT THERE'S AN ENTIRE SDU IN

 3    THE DATA FIELD.

 4    Q    DOES AGARWAL DISCLOSE A LENGTH INDICATOR?

 5    A    YES.  YOU CAN SEE THAT THERE'S A FIELD NAMED

 6    TOTAL LENGTH THAT'S UP ON TOP, AND THEN LENGTH

 7    INDICATOR, AS IN THE '941, ALSO CONTAIN CODE

 8    INFORMATION, FOR EXAMPLE, PREDEFINED CODES FOR A

 9    MIDDLE SEGMENT, AND THAT'S DONE IN THE TWO FIELDS

10    LABELS F AND L.

11    Q    DOES AGARWAL DISCLOSE A LENGTH INDICATOR WITH

12    A PREDEFINED VALUE?

13    A    YES.  SO IF F AND L ARE -- SO F MEANS FIRST, L

14    MEANS LAST, SO IF FL IS 00, IT'S NOT A FIRST, IT'S

15    NOT A LAST, THAT MEANS IT'S INTERMEDIATE.  SO

16    THAT'S A PREDEFINED VALUE FOR INTERMEDIATE.

17    Q    DR. KNIGHTLY, DO YOU SEE WHERE THERE'S AN

18    ACRONYM PKTSQNU?

19    A    YES.

20    Q    WHAT IS THAT?

21    A    THAT'S PACKET SEQUENCE NUMBER.

22    Q    LET'S TURN TO COLUMN 11, LINES 61 THROUGH 64,

23    AND IF WE COULD, COULD WE ALSO BRING UP FIGURE 11A

24    ALONG SIDE THOSE.

25              AGAIN, COLUMN 11, LINES 61 TO 64.
```

1    DR. KNIGHTLY, CAN YOU JUST MARK IT, CAN YOU EXPLAIN

2    THIS PASSAGE IN THAT FIGURE?

3    A    RIGHT.  SO THIS IS A FLOW CHART OF HOW THE

4    TRANSMITTER TAKES A CELL OR A PACKET FROM A HIGHER

5    LAYER AND DOES A CHECK AND SAYS, IS THIS PACKET A

6    MINIMUM SIZE?

7              AND IT GIVES AN EXAMPLE IN THE TEXT ABOUT

8    THAT MINIMUM BEING 53 BYTES.  SO IT LOOKS FOR IT

9    BEING EXACTLY 53 BYTES.

10              IF IT'S NOT, THEN IT -- IF IT'S NOT THE

11    MINIMUM, THEN IT HAS TO BE SEGMENTED BECAUSE IN

12    THAT CASE IT WOULD BE LARGER, SO IT'S GOT TO BE

13    SEGMENTED INTO MULTIPLE SEGMENTS.  IF IT IS THE

14    MINIMUM, THEN THERE'S NO SEGMENTATION AND THE

15    ENTIRE SDU DOES FIT AND SO THAT'S TRANSMITTED.

16    Q    DR. KNIGHTLY, HAVE YOU CONSIDERED WHETHER THIS

17    PATENT, THE AGARWAL REFERENCE, DISCLOSES EACH AND

18    EVERY LIMITATION OF CLAIMS 10 AND 15 OF THE '941?

19    A    YES, I HAVE CONSIDERED THAT AND IT DOES.

20    Q    I'M SORRY.  WHAT'S YOUR OPINION?

21    A    AND IT DOES.

22    Q    LET'S START WITH CLAIM 10, AND WE'LL WALK

23    THROUGH IT QUICKLY LIMITATION BY LIMITATION.

24              AND LET'S TURN TO PDX 36.15, PLEASE.

25              THE PREAMBLE STATES AN APPARATUS FOR

1    TRANSMITTING DATA IN A MOBILE COMMUNICATION SYSTEM.

2              IS THAT PRESENT IN AGARWAL?

3    A    YES, IT DOES.  AS I MENTIONED, IT'S WIRELESS

4    NETWORKS AND SATELLITE WIRELESS NETWORKS ARE

5    MOBILE.

6    Q    NEXT ELEMENT BEGINS A TRANSMISSION BUFFER FOR

7    RECEIVING AN SDU.

8              AND THEN IT CONTINUES.  IS THAT ELEMENT

9    DISCLOSED IN AGARWAL?

10   A    YES.  SO IT HAS THE BUFFERING AND WE SAW IN

11   THE FLOW CHART THAT IT WOULD SEE THAT AND THEN MAKE

12   THAT DETERMINATION THAT, YES OR NO WHETHER IT IS

13   SEGMENTED OR NOT.

14   Q    NEXT ELEMENT IS A TRANSMISSION BUFFER FOR

15   RECEIVING A SERVICE DATA UNIT.  IS THAT ELEMENT

16   PRESENT OR DISCLOSED IN AGARWAL?

17   A    THAT WAS THE ONE I WAS JUST REFERRING TO.

18   Q    I'M SORRY.  I MISSPOKE.  THE NEXT ONE IS A

19   HEADER INSERT?

20   A    YES.  SO THE HEADER INSERT WE JUST WENT

21   THROUGH EARLIER THE DIFFERENT PARTS OF THE HEADER,

22   THE SEQUENCE NUMBER, THE ONE BIT FIELD, LENGTH.

23   Q    NEXT ELEMENT IS A ONE BIT FIELD HEADER.  IS

24   THAT PRESENT IN AGARWAL?

25   A    YES.  SO THAT ONE BIT, THAT THIRD BIT OF THE

1    HEADER, THAT'S THE ONE BIT FIELD THAT'S SET TO

2    WHETHER OR NOT THERE'S AN ENTIRE SDU.

3    Q    AND THE NEXT LIMITATION IS A LENGTH INDICATOR

4    INSERTER.  IS THAT DISCLOSED IN AGARWAL?

5    A    YES.  WE ALSO DISCUSSED THAT, THAT LENGTH

6    INDICATOR, AS WELL AS THE PREDEFINED VALUES.

7    Q    FINAL ELEMENT OF CLAIM 10 IS A TRANSMITTER FOR

8    SENDING PDU'S TO RECEIVER.  IS THAT DISCLOSED IN

9    AGARWAL?

10   A    YES.  SO THE SYSTEM TRANSMITS OVER THE

11   WIRELESS NETWORK AFTER THOSE STEPS.

12   Q    LET'S TURN TO CLAIM 15 IF WE COULD.  THE

13   PREAMBLE SAYS, "AN APPARATUS FOR RECEIVING DATA IN

14   A MOBILE COMMUNICATIONS SYSTEM."  WE'LL PUT THIS ON

15   THE SCREEN.  IT'S PDX 36.22.  IS THAT PRESENT IN

16   AGARWAL, THE PREAMBLE LIMITATION?

17   A    YES.  SO FOR THE SAME REASON, IT'S THE -- IT'S

18   A MOBILE COMMUNICATION SYSTEM, YES.

19   Q    AND ARE THE OTHER LIMITATIONS LISTED HERE IN

20   PDX 36.22 PRESENT IN AGARWAL, AND COULD YOU EXPLAIN

21   BRIEFLY HOW, IF SO?

22   A    YES.  SO CLAIM 15 IS A RECEIVER SIDE ANALOG

23   FOR THE SENDER SIDE IN CLAIM 10.

24        SO AGARWAL ALSO DOES THE RECEIVER SIDE

25   AFTER IT'S SEGMENTED, PUTTING EVERYTHING BACK

1    TOGETHER AS IN THIS CLAIM.

2    Q    DR. KNIGHTLY, IN SUM, WHAT IS YOUR OPINION ON

3    THE VALIDITY OF THIS PATENT?

4    A    THAT THE '941 CLAIMS ARE INVALID IN LIGHT OF

5    AGARWAL.

6    Q    JUST A FEW MORE QUESTIONS.

7         LET'S TURN BACK TO THE ALTERNATIVE E-BIT

8    IN THE UMTS STANDARD, AND I WANT TO PUT THIS INTO

9    CONTEXT.

10        HOW LARGE IS THE UMTS STANDARD?

11   A    THOUSANDS OF PAGES OF DOCUMENTS.

12   Q    AND HOW MUCH OF THE STANDARD IS DEVOTED TO THE

13   ALTERNATIVE E-BIT?

14   A    ABOUT A PAGE.

15   Q    NOW, AT THE TIME THE ALTERNATIVE E-BIT WAS

16   ADOPTED BY THE UMTS WORKING GROUPS, WERE THERE

17   ALTERNATIVES?

18   A    YES, THERE WERE.

19   Q    WHAT WERE THEY?

20   A    WELL, ONE ALTERNATIVE IS OTHER HEADER

21   STRUCTURES, SUCH AS WHAT WE JUST SAW, THAT THERE

22   ARE OTHER WAYS TO, TO DEFINE HEADERS AS AGARWAL

23   DID.

24        AND THEN ANOTHER ALTERNATIVE IS TO USE

25   THE ORIGINAL E-BIT INTERPRETATION.

1    Q    NOW, FOR A PRODUCT LIKE THE IPHONE OR THE

2    IPAD, DO THOSE PRODUCTS CONTROL WHETHER THE E-BIT

3    IS USED?

4    A    NO, THEY DON'T.

5    Q    WHO DOES?

6    A    THE NETWORK SERVICE PROVIDER, SUCH AS AT&T,

7    DECIDES WHETHER OR NOT THE ALTERNATIVE E-BIT IS

8    USED BECAUSE IT'S AN OPTION TO THE PROVIDER WHETHER

9    TO USE THE NORMAL E-BIT OR TO TURN ON THIS OPTION

10   FOR ALTERNATIVE E-BIT.

11   Q    NOW, FOR THE PRODUCTS ACCUSED IN THIS CASE,

12   WHICH CARRIER IS THE RELEVANT CARRIER?

13   A    AT&T.

14   Q    HAVE YOU SEEN ANY EVIDENCE THAT AT&T USES THE

15   ALTERNATIVE E-BIT?

16   A    I'VE SEEN NO EVIDENCE THAT THEY EVER TURN IT

17   ON.

18   Q    FINALLY, JUST SO WE'RE CLEAR, WHAT IS YOUR

19   OPINION AS TO WHETHER OR NOT THE '941 PATENT COVERS

20   THE ALTERNATIVE E-BIT?

21   A    MY OPINION IS THAT IT DOES NOT.

22        MR. MUELLER:  NO FURTHER QUESTIONS.

23   THANK YOU.

24        THE COURT:  ALL RIGHT.  TIME IS NOW 9:54.

25   GO AHEAD, PLEASE.

1               **CROSS-EXAMINATION**

2    BY MR. VERHOEVEN:

3    Q    GOOD MORNING, DR. KNIGHTLY.

4    A    GOOD MORNING.

5    Q    IN YOUR DIRECT EXAMINATION -- LET ME BACK UP.

6    WERE YOU HERE FOR DR. WILLIAMS' TESTIMONY?

7    A    YES.

8    Q    OKAY.  AND YOU HEARD HIM TESTIFY EXTENSIVELY

9    ABOUT THE INTEL SPECIFICATION?

10   A    THE --

11   Q    YES?

12   A    INTEL SOURCE CODE.

13   Q    AND THE SOURCE CODE.  DO YOU REMEMBER HIM

14   TALKING ABOUT THE DOCUMENTS AND SOURCE CODE?  HE

15   WENT THROUGH IT IN GREAT DETAIL?

16   A    YES.

17   Q    IN YOUR EXAMINATION, YOU DIDN'T MENTION IT?

18   A    I REVIEWED SCORED, BUT I DIDN'T TALK ABOUT IT.

19   Q    YOU DIDN'T GO THROUGH IT, DID YOU?

20   A    NOT TODAY.

21   Q    YOU DON'T DISPUTE THE ACCURACY OF DR.

22   WILLIAMS' DESCRIPTIONS OF HOW THE INTEL CHIP WORKS,

23   DO YOU, SIR?

24   A    I AGREE WITH THE STEPS IN THE INTEL CODE, YES.

25   Q    SO CAN WE PUT UP PDX 36.9?  NOW, IN YOUR

1    DIRECT EXAMINATION, YOU FOCUSSED IN PART ON THIS

2    PHRASE AN ENTIRE SDU IN THE DATA FIELD.  DO YOU

3    REMEMBER THAT?

4    A    YES.

5    Q    NOW, SIR, ISN'T IT TRUE THAT SOMETIMES THE

6    APPLE ACCUSED PRODUCTS TRANSMIT AN ENTIRE SDU?  YES

7    OR NO, SIR?  SOMETIMES THEY DO THAT, DON'T THEY?

8    A    WHEN THEY'RE RUNNING THE, THE -- WELL, DO YOU

9    MEAN WITH OR WITHOUT THE 3G -- THE ALTERNATE E-BIT.

10   Q    CAN YOU ANSWER MY QUESTION?

11   A    WELL --

12   Q    ISN'T IT TRUE THAT SOMETIMES THE APPLE ACCUSED

13   PRODUCTS TRANSMIT AN ENTIRE SDU?  YES OR NO?

14   A    WITHOUT THE ALTERNATIVE E-BIT, DEFINITELY,

15   YES.

16   Q    AND SOMETIMES, IF YOU'RE INFRINGING, YOU'RE

17   STILL INFRINGING, ISN'T THAT TRUE?

18   A    OH, WELL, THERE ISN'T THAT BIT, SO THEY HAPPEN

19   TO HALF AN ENTIRE SDU, BUT NOT WITH THAT BIT.

20   Q    IF SOMETIMES THEY'RE TRANSMITTING AN ENTIRE

21   SDU, THEY'RE TRANSMITTING AN ENTIRE SDU; CORRECT?

22   A    YES, BUT NOT WITH THAT BIT INDICATED.

23   Q    AND IF YOU'RE INFRINGING SOMETIMES, YOU'RE

24   STILL INFRINGING; RIGHT?

25   A    THEY'RE NOT INFRINGING.

3464

1   Q    WOULD YOU AGREE WITH ME, SIR, AS A LEGAL

2   PRINCIPLE, IS IT YOUR UNDERSTANDING OF THE RULES OF

3   THE ROAD, THAT IF SOMETIMES YOU'RE INFRINGING,

4   YOU'RE STILL INFRINGING?

5   A    I BELIEVE THAT'S CORRECT.

6           MR. VERHOEVEN:  NO FURTHER QUESTIONS.

7           THE COURT:  THE TIME IS NOW 9:57.  GO

8   AHEAD.

9                   **REDIRECT EXAMINATION**

10  BY MR. MUELLER:

11  Q    DR. KNIGHTLY, DO THE APPLE PRODUCTS EVER

12  INFRINGE?

13  A    NO.

14  Q    WHY NOT?

15  A    BECAUSE THEY DON'T HAVE THE ONE BIT FIELD

16  THAT'S IN THE CLAIM.

17          MR. MUELLER:  THANK YOU.  NO FURTHER

18  QUESTIONS.

19          THE COURT:  ALL RIGHT.  MAY THIS WITNESS

20  BE EXCUSED AND IS IT SUBJECT TO RECALL?

21          MR. VERHOEVEN:  YES.

22          MR. LEE:  YES, NOT SUBJECT TO RECALL.

23          THE COURT:  NOT SUBJECT TO RECALL, RIGHT?

24          MR. LEE:  NOT SUBJECT TO RECALL.

25          THE COURT:  OKAY.  YOU ARE EXCUSED.

1           CALL YOUR NEXT WITNESS, PLEASE.

2           MS. KREVANS:  YOUR HONOR, APPLE CALLS

3    DR. SUSAN KARE.

4           THE COURT:  OKAY.

5           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

6                    **SUSAN KARE,**

7    BEING RECALLED AS A WITNESS ON BEHALF OF THE

8    PLAINTIFF, HAVING BEEN PREVIOUSLY SWORN, WAS

9    EXAMINED AND TESTIFIED AS FOLLOWS:

10          THE WITNESS:  YES.

11          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

12          THE COURT:  ALL RIGHT.  TIME IS 9:58.  GO

13   AHEAD, PLEASE.

14                 **DIRECT EXAMINATION**

15   BY MS. KREVANS:

16   Q    GOOD MORNING, DR. KARE.

17   A    GOOD MORNING.

18   Q    YOU HAVEN'T BEEN HERE FOR THE LAST FEW DAYS;

19   RIGHT?

20   A    NO.

21   Q    ARE YOU AWARE THAT A COUPLE OF DAYS AGO, A --

22   MS. WANG, WHO IS A DESIGNER FOR SAMSUNG, TESTIFIED

23   WITH RESPECT TO ICONS THAT IN PARTICULAR FOR TOUCH

24   PHONES, THE TOUCH AREA MUST BE DEFINED, AND SO

25   THAT'S WHY IN THE BACKGROUND WE HAVE ROUNDED

```
 1    SQUARES PLACED AND ALSO WE HAVE THE BACKGROUND BOX
 2    RIGHT BEHIND THE ICONS BECAUSE WITHOUT THOSE
 3    BACKGROUND ICONS, IT WOULD BE -- IT WOULD SEEM AS
 4    IF THE ICON ITSELF IS VERY SMALL AND ALSO IN ORDER
 5    TO GIVE SOME COLOR, OR BRING OUT THE COLOR OF THE
 6    BACKGROUND ICONS WERE NECESSARY, WHERE THE
 7    BACKGROUND BOXES WERE NECESSARY.
 8             HAVE YOU REVIEWED THAT TESTIMONY?
 9    A    YES.
10    Q    DO YOU AGREE WITH MS. WONG, THE SAMSUNG
11    DESIGNER?
12    A    NO.  100 PERCENT NO.
13    Q    AND WHY DO YOU DISAGREE?
14    A    BECAUSE ON A TOUCHSCREEN, WHAT'S IMPORTANT IS
15    THAT THERE'S A TARGET FOR YOUR FINGER, AND THAT
16    DOESN'T NEED TO BE ENCLOSED IN A FENCE.
17             IF YOU HAVE SOMETHING TO AIM AT, AND AT
18    TIMES IT MIGHT BE AN ADVANTAGE JUST TO HAVE MORE
19    SPACE SEPARATING THOSE TARGETS.
20             BUT IT'S AN OPTION, NOT A REQUIREMENT.
21    Q    SO JUST SO WE'RE CLEAR, CAN YOU TELL THE JURY
22    WHETHER, IN YOUR VIEW AS A DESIGNER, IT IS OR IS
23    NOT NECESSARY FOR ICONS, ON A TOUCHSCREEN ON A
24    SMARTPHONE, TO BE ENCLOSED IN A CONTAINER?
25    A    NO .
```

1    Q    IT'S NOT NECESSARY?

2    A    NOT NECESSARY.

3    Q    IF -- CAN YOU TELL US WHETHER OR NOT, IF A

4    DESIGNER CHOSE TO ENCLOSE ICONS IN A CONTAINER, THE

5    CONTAINER NECESSARILY HAS TO BE GENERALLY

6    RECTANGULAR IN SHAPE?

7    A    THAT IS NOT NECESSARY, NO.

8    Q    WHY IS THAT NOT NECESSARY?

9    A    BECAUSE IF YOU CHOOSE TO USE A CONTAINER,

10   WHICH I THINK FREQUENTLY IS A WAY, A METAPHOR FOR A

11   REAL WORLD BUTTON, WHICH COULD BE A GOOD THING THAT

12   PEOPLE ARE FAMILIAR WITH PRESSING A BUTTON, BUT

13   JUST LIKE IN THE WORLD, THERE'S ALL KINDS OF OVALS

14   AND SQUARES AND CIRCLES ON BLENDER AND TOASTERS AND

15   MICROWAVES.  ANY OF THOSE COULD BE RENDERED ON A

16   TOUCHSCREEN.

17   Q    SO YOU'RE SAYING THE METAPHORICAL BUTTON, IT

18   COULD BE IN A VARIETY OF SHAPES?

19   A    YES.

20   Q    AND IF THE DESIGNER OF A SCREEN FOR A

21   TOUCHSCREEN DISPLAY FOR A SMARTPHONE DID DECIDE TO

22   USE A CONTAINER OF SOME SHAPE OR OTHER, DOES IT

23   HAVE TO BE COLORED?

24   A    NO.  SOMETIMES BLACK AND WHITE IS STRONG AND

25   TERRIFIC.

3468

1   Q    OKAY.  LET'S TALK ABOUT ONE PARTICULAR ICON

2   FOR A MOMENT, THE PHONE ICON.

3              CAN YOU TELL US WHETHER OR NOT A DESIGNER

4   WHO'S DESIGNING A TOUCHSCREEN FOR A SMARTPHONE,

5   WHEN THEY GET TO THE PHONE ICON, HAS TO HAVE A

6   PICTURE OF A TELEPHONE HANDSET ON IT?

7   A    NO, NOT NECESSARY.

8   Q    WHAT OTHER KINDS OF THINGS COULD THEY DO?

9   A    WELL, IT COULD BE A PAD OF NUMBERS; IT COULD

10  BE A SHAPE OF A GENERIC PHONE; COULD BE -- I'M SURE

11  THERE'S EVEN THINGS THAT WE HAVEN'T USED THAT MIGHT

12  WORK THAT WOULD MEAN COMMUNICATE WITH A PHONE

13  BECAUSE IT'S REALLY ABOUT MAKING A CALL, NOT A

14  PARTICULAR PHYSICAL OBJECT.

15  Q    LET'S SAY THEY DID TRY TO USE, DECIDE TO USE A

16  PICTURE, SOME KIND OF GRAPHIC OF A HANDSET.  DOES

17  IT HAVE TO BE THAT RETRO STYLE YOU TALKED ABOUT

18  LAST TIME YOU WERE HERE?

19  A    I THINK IT COULD BE STYLIZED SO IT ISN'T SO

20  EXACTLY IN THE SHAPE OF THAT RETRO PHONE.

21  Q    AND DOES IT HAVE TO BE IN A PARTICULAR

22  POSITION IF YOU CHOSE TO USE A HANDSET?

23  A    IT DOESN'T HAVE TO BE.

24  Q    OKAY.  I'D LIKE TO SHOW YOU A SMARTPHONE

25  CALLED THE PANTECH HOTSHOT WHICH HAS BEEN MARKED AS

```
1     EXHIBIT PX 2277.

2              AND, YOUR HONOR, THIS IS A REBUTTAL

3     EXHIBIT, AND ALTHOUGH THESE WERE NOT SUBJECT TO THE

4     200 LIMIT, IN ORDER TO RESPECT THE LIMIT, WE'RE

5     INTERESTING TO TAKE AN EXHIBIT OFF OF OUR ORIGINAL

6     LIST, SO WE WON'T GO OVER 200 BY MARKING THIS.

7              THE COURT:  OKAY.

8     BY MS. KREVANS:

9     Q    OKAY.  WHAT ARE WE LOOKING AT RIGHT NOW ON THE

10    SCREEN, DR. KARE?

11    A    THIS IS A SMARTPHONE APPLICATION SCREEN

12    WITH -- IT'S INTERESTING BECAUSE THERE'S A MIX OF

13    ICON SHAPES.

14             AT THE TOP, THERE'S FOUR ROWS OF THREE

15    ICONS, AND AT THE BOTTOM, THERE'S FOUR ICONS.  SO

16    IT'S KIND OF A DIFFERENT GRID ON TOP AND BOTTOM.

17    Q    OKAY.

18             MS. KREVANS:  YOUR HONOR, WE WOULD MOVE

19    PX 2277, THE PANTECH HOTSHOT INTO EVIDENCE.

20             THE COURT:  ANY OBJECTION?

21             MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

22             THE COURT:  IT'S ADMITTED.

23             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

24             2277, HAVING BEEN PREVIOUSLY MARKED FOR

25             IDENTIFICATION, WAS ADMITTED INTO
```

```
 1              EVIDENCE.)

 2     BY MS. KREVANS:

 3     Q    DR. KARE, DOES THE SCREEN DISPLAY ON THE

 4     PANTECH HOTSHOT HAVE THE CONSISTENT ICON STYLE

 5     DESCRIBED BY MS. WONG?

 6     A    NO.

 7              MR. VERHOEVEN:  OBJECTION, LEADING.

 8              THE COURT:  SUSTAINED.

 9     BY MS. KREVANS:

10     Q    CAN YOU TELL US WHETHER OR NOT, DR. KARE, THE

11     SCREEN DISPLAY ON THE PANTECH HOTSHOT HAS THE

12     CONSISTENT ICON STYLE THAT MS. WONG TALKED ABOUT?

13              MR. VERHOEVEN:  SAME OBJECTION.

14              THE COURT:  OVERRULED.

15              THE WITNESS:  THE ICONS ON -- AT THE TOP

16     OF THIS SCREEN DON'T HAVE A CONSISTENT SHAPE.

17     THEY'RE -- THERE'S A MIX OF SHAPES.

18     BY MS. KREVANS:

19     Q    OKAY.

20     A    SO THEY'RE NOT IN CONTAINERS, AND, YOU KNOW,

21     THEY'RE ROUND, PUZZLE SHAPED.

22     Q    WHAT DO YOU SEE IN TERMS OF THE COLOR CHOICES

23     THAT HAVE BEEN MADE WITH RESPECT TO THE PANTECH

24     HOTSHOT?

25     A    YOU KNOW, THEY HAVE SOME PRIMARY COLORS AND
```

1    THEY'RE -- THE ICONS AT THE TOP HAVE COLORS, BUT

2    THE ICONS AT THE BOTTOM OF THE SCREEN WHERE THERE'S

3    THE FOUR IN A ROW ARE NOT COLOR, AND THEY'RE

4    TREATED DIFFERENTLY THAN THE ICONS AT THE TOP.

5    Q    OKAY.  LET ME ASK YOU, DR. KARE, I KNOW YOU'RE

6    LEANING INTO THE SCREEN SO YOU CAN SEE IT, IF YOU

7    CAN PULL THE MIKE A LITTLE CLOSER TO YOUR MOUTH SO

8    WE CAN ALL HEAR YOU, THAT WOULD BE GREAT.

9    A    SORRY.

10   Q    WHAT'S THE PHONE ICON ON THE PANTECH HOTSHOT?

11   A    IT'S LABELED KEYPAD AND IT'S A LITTLE GRID OF

12   NUMBERS.

13   Q    LET ME SHOW YOU ANOTHER SMARTPHONE.  THIS ONE

14   IS CALLED THE BLACKBERRY STORM.  IT'S BEEN MARKED

15   FOR IDENTIFICATION AS EXHIBIT PX 2278.

16         MR. VERHOEVEN:  YOUR HONOR, THIS IS

17   MR. VERHOEVEN.  YOU CAN'T SEE ME BECAUSE OF ALL THE

18   PEOPLE.

19         FOR THE RECORD, WE'RE SHOWING THESE

20   IMAGES AND I THINK THEY'RE NOT CASTING ANY

21   ASPERSIONS, BUT WE'RE GOING TO A SPECIFIC SCREEN ON

22   EACH OF THESE PHONES AND WE SHOULD PROBABLY PUT

23   WHAT SCREEN THEY'RE SHOWING IN THE RECORD.

24         MS. KREVANS:  YOUR HONOR, I THOUGHT I HAD

25   DONE THAT.

3472

```
1     Q    LET ME ASK, DR. KARE, ARE WE LOOKING AT THE

2     APPLICATIONS SCREENS OF EACH OF THOSE PHONES,

3     DR. KARE?

4     A    YES.

5               MS. KREVANS:  YOUR HONOR, WE WOULD

6     MOVE THIS EXHIBIT 2278.

7               WE WOULD MOVE 2278, WHICH IS THE

8     BLACKBERRY STORM INTO EVIDENCE, AND, AGAIN, WE WILL

9     TAKE ONE EXHIBIT OFF OF OUR ORIGINAL LIST TO MAKE

10    ROOM FOR THIS.

11              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

13              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14              2278, HAVING BEEN PREVIOUSLY MARKED FOR

15              IDENTIFICATION, WAS ADMITTED INTO

16              EVIDENCE.)

17    BY MS. KREVANS:

18    Q    CAN YOU TELL THE JURY, WITH RESPECT TO THE

19    BLACKBERRY STORM, DR. KARE, WHETHER OR NOT THIS

20    APPLICATION SCREEN DISPLAY HAS THE CONSISTENT ICON

21    STYLE DESCRIBED BY MS. WONG?

22    A    NO, IT DOESN'T.

23    Q    WHAT DOES IT HAVE?

24    A    IT HAS ALMOST MONOCHROMATIC ICONS WITH SOME

25    FLAT COLOR ACCENTS.
```

1           SO I THINK WHAT JUMPS OUT IS THE ICONS

2    ARE IRREGULAR SHAPED, THERE'S NOT MUCH COLOR,

3    THEY'RE ALL STYLIZED, SO THAT'S WHAT UNIFIES THOSE

4    ICONS.

5           THEY ARE ON REALLY SUBTLE BUTTON

6    BACKGROUNDS THAT ARE SHARP CORNERED RECTANGLES THAT

7    ABUTTED EACH OTHER WITH NO SPACE IN BETWEEN.

8    Q    OKAY.  GOING BACK TO THE HOTSHOT FOR A MOMENT,

9    ARE THERE CONTAINERS ON THE HOTSHOT SCREEN?

10   A    NO.

11   Q    OKAY.  LET ME SHOW YOU ONE MORE.

12   A    THEY'RE NOT CONSISTENT -- JUST TO BE REALLY

13   CLEAR, THERE'S NOT A CONSISTENT CONTAINER SHAPE.

14   Q    OKAY.  WHERE DO YOU SEE CONTAINERS?

15   A    THERE ARE A COUPLE ICONS, MY VERIZON AND MEDIA

16   CENTER, THAT ARE RECTANGULAR THAT LOOK MORE LIKE

17   BUTTONS.  BUT THAT'S NOT THE MAJORITY AND IT'S NOT

18   CONSISTENT.

19   Q    OKAY.  LET'S LOOK AT ONE MORE, AND THIS IS PX

20   158-A, WHICH IS IN EVIDENCE.

21           SO IF WE COULD SWITCH BACK, THOMAS, TO

22   YOUR SCREEN.

23           DR. KARE, CAN YOU TELL THE JURY WHETHER

24   OR NOT THE APPLICATION SCREENS OF THE BLACKBERRY

25   TORCH 9850, WHICH IS SHOWN ON 158-A, HAVE THE

1   CONSISTENT ICON STYLE TALKED ABOUT BY MS. WANG?

2   A    NO.

3   Q    DO THEY HAVE CONTAINERS?

4   A    NO.

5   Q    JUST LOOKING AT THESE TWO AND THINKING ABOUT

6   THE OTHER TWO THAT WE JUST SAW, THE PANTECH HOTSHOT

7   APPLICATION SCREEN AND THE BLACKBERRY STORM, DO ANY

8   OF THESE SCREEN DISPLAYS HAVE DESIGNS THAT ARE

9   SUBSTANTIALLY SIMILAR TO THE D'305 PATENT DESIGN

10  AND THE IPHONE HOME SCREEN?

11  A    NO.

12        MS. KREVANS:  NOTHING FURTHER, YOUR

13  HONOR.

14        THE COURT:  ALL RIGHT.  THE TIME IS

15  10:09.

16        GO AHEAD, PLEASE.

17              **CROSS-EXAMINATION**

18  BY MR. VERHOEVEN:

19  Q    GOOD MORNING, DR. KARE.  GOOD TO SEE YOU

20  AGAIN?

21  A    GOOD MORNING.

22  Q    NOW, ON YOUR DIRECT EXAMINATION THIS MORNING,

23  YOU REFERRED SEVERAL TIMES TO WHAT YOU FELT WAS

24  NECESSARY OR NOT NECESSARY.  DO YOU REMEMBER THAT?

25  A    YES.

```
 1    Q    BUT DIDN'T YOU TELL THIS JURY LAST WEEK THAT

 2    YOU DIDN'T INVESTIGATE THE FUNCTIONALITY OF ICONS

 3    AS PART OF YOUR EXPERT WORK?

 4    A    THE SCOPE OF WHAT I WAS ASKED TO DO FOR THIS

 5    PROJECT WAS OVERALL VISUAL IMPRESSION.

 6    Q    LET'S SEE WHAT YOU SAID ON THE 7TH OF AUGUST.

 7    CAN WE BRING UP TRIAL TRANSCRIPT FROM AUGUST 7TH,

 8    PAGE 1470, LINES 2 THROUGH -- 12 THROUGH 16.

 9              CAN YOU HIGHLIGHT THAT.

10              I BELIEVE I ASKED YOU, "IS IT FAIR TO SAY

11    THAT YOU DIDN'T INVESTIGATE THE FUNCTIONALITY OF

12    THE ICONS AND HOW THEY WORK AND HOW A USER WOULD

13    INTERACT WITH THEM AS PART OF YOUR ANALYSIS?"

14              AND I BELIEVE YOUR ANSWER WAS YES.

15              IS THAT RIGHT?

16    A    YES.

17    Q    YOU DIDN'T CONSIDER HOW THEY WORK, DID YOU?

18    A    NOT TO COMPARE WHETHER THERE WAS SUBSTANTIAL

19    VISUAL SIMILARITY.

20    Q    AND YOU DIDN'T COMPARE -- YOU DIDN'T CONSIDER,

21    AS PART OF YOUR ANALYSIS FOR YOUR EXPERT OPINION,

22    HOW A USER WOULD INTERACT WITH THOSE ICONS WAS PART

23    OF YOUR ANALYSIS, DID YOU?

24    A    NO.

25    Q    BUT NOW YOU'RE UP HERE TELLING US WHAT IS AND
```

```
 1    ISN'T NECESSARY FOR A USER?

 2    A    I WAS ASKED WHAT WAS -- WHAT WERE LIMITS OF

 3    THE VISUAL, VISUAL INCARNATION OF DIFFERENT ICONS

 4    AND HOW -- WHETHER THOSE ICONS HAVE TO LOOK A

 5    CERTAIN WAY.

 6    Q    WELL, IT'S FAIR TO SAY, DR. KARE, THAT AS PART

 7    OF WHAT YOU WERE RETAINED TO DO AND THE ANALYSIS

 8    YOU ACTUALLY DID, YOU DID NOT CONSIDER, FROM A

 9    FUNCTIONAL STANDPOINT, WHAT IS OR IS NOT NECESSARY

10    FOR THE USER; RIGHT?

11    A    RIGHT.

12              MR. VERHOEVEN:  THANK YOU.  NO FURTHER

13    QUESTIONS.

14              THE COURT:  ALL RIGHT.  THE TIME IS NOW

15    10:11.

16              IS THERE ANY REDIRECT, OR MAY THIS

17    WITNESS BE EXCUSED?  AND I ASSUME IT'S NOT SUBJECT

18    TO RECALL.

19              MS. KREVANS:  SHE MAY, AND SHE IS NOT,

20    YOUR HONOR.

21              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

22              MR. LEE:  YOUR HONOR, APPLE CALLS

23    DR. MICHAEL WALKER.

24              THE COURT:  OKAY.  IF YOU ALL WANT TO

25    STAND UP AND STRETCH WHILE WE'RE MOVING, PLEASE
```

```
1    FEEL FREE TO DO THAT.

2            THAT'S TO EVERYONE IF YOU WANT TO STAND

3    UP AND STRETCH A BIT.

4            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

5                    MICHAEL WALKER,

6    BEING CALLED AS A WITNESS ON BEHALF OF THE

7    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

8    EXAMINED AND TESTIFIED AS FOLLOWS:

9            THE WITNESS:  I DO.

10           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

11           THE COURT:  ALL RIGHT.  IT'S 10:12.  GO

12   AHEAD, PLEASE.

13                  DIRECT EXAMINATION

14   BY MR. MUELLER:

15   Q   GOOD MORNING, DR. WALKER.  COULD YOU PLEASE

16   INTRODUCE YOURSELF TO THE JURY BY TELLING THEM YOUR

17   NAME AND WHERE YOU LIVE?

18   A   GOOD MORNING.  MY NAME IS MICHAEL WALKER, AND

19   I LIVE IN NEWBURY IN THE UNITED KINGDOM.

20   Q   AND, DR. WALKER, IF YOU COULD SIT A LITTLE BIT

21   CLOSER TO THE MICROPHONE, PLEASE.

22           DR. WALKER, HAVE YOU BEEN RETAINED BY

23   APPLE AS AN EXPERT WITNESS IN THIS CASE?

24   A   YES, I HAVE.

25   Q   CAN YOU PLEASE SUMMARIZE YOUR EDUCATIONAL
```

1    BACKGROUND FOR THE JURY?

2    A    YES, I RECEIVED AN HONOR'S DEGREE IN

3    MATHEMATICS FROM THE UNIVERSITY OF LONDON; PH.D.

4    FROM THE SAME UNIVERSITY; AND A FEW YEARS LATER I

5    DID A FURTHER POST-DOCTORATE DEGREE AT THE

6    UNIVERSITY IN GERMANY.

7    Q    DR. WALKER, HAVE YOU EVER WORKED IN THE

8    TELECOMMUNICATIONS INDUSTRY?

9    A    YES, I HAVE, FOR ABOUT 25 YEARS.

10   Q    COULD YOU BRIEFLY REVIEW THE POSITIONS YOU'VE

11   HELD?

12   A    YES.  I STARTED IN THE TELECOMMUNICATIONS

13   INDUSTRY BY WORKING FOR RACAL ELECTRONICS.

14   Q    AND COULD YOU SPELL THAT?

15   A    R-A-C-A-L ELECTRONICS.  RACAL ELECTRONICS WAS

16   A LARGE COMMUNICATIONS COMPANY SPECIALIZING IN

17   MILITARY COMMUNICATIONS IN THE UK.

18           I THEN WENT ON TO WORK FOR VODOFONE AND

19   VODOFONE IS THE WORLD'S LARGEST MOBILE CELLULAR

20   OPERATOR.

21   Q    NOW, AT SOME POINT DID YOU LEAVE VODOFONE?

22   A    YES.  I LEFT VODOFONE IN 2009.  I RETIRED END

23   OF AUGUST 2009.

24   Q    AND WHERE DO YOU WORK TODAY?

25   A    TODAY I WORK AT KING'S COLLEGE, LONDON.

1    Q    WHAT IS YOUR POSITION AT KING'S COLLEGE?

2    A    AT KING'S COLLEGE I HEAD THE SCHOOL OF NATURAL

3    AND MATHEMATICAL LICENSES.

4    Q    WHAT ARE YOUR RESPONSIBILITIES, DR. WALKER, AS

5    HEAD OF SCHOOL?

6    A    TO DIRECT THE SCHOOL IN TERMS OF ITS RESEARCH

7    AND ITS TEACHING.

8    Q    DR. WALKER, ARE YOU FAMILIAR WITH THE CONCEPT

9    OF STANDARDS?

10    A    YES, I'M VERY FAMILIAR WITH STANDARDS.

11    Q    WHAT IS A STANDARD?

12    A    BASICALLY FOR A TECHNICAL STANDARD, IT IS A

13    COLLECTION OF SPECIFICATIONS WHICH, IF YOU BUILD A

14    PRODUCT CONFORMING PRECISELY TO THAT SET OF

15    SPECIFICATIONS, THEN IT WILL INTERWORK WITH ANY

16    OTHER PRODUCT BUILT BY ANY OTHER COMPANY THAT

17    CONFORMS AS WELL TO THAT SET OF SPECIFICATIONS.

18    Q    ARE YOU FAMILIAR WITH AN ORGANIZATION CALLED

19    THE EUROPEAN TELECOMMUNICATIONS STANDARD INSTITUTE,

20    OR ETSI?

21    A    YES, I'M VERY FAMILIAR WITH ETSI.

22    Q    WHAT IS ETSI?

23    A    IT'S A EASTERN BODY, IT'S ONE OF THREE

24    STANDARDS.  SO IT'S TASKED TO CREATE

25    TELECOMMUNICATIONS STANDARDS FOR EUROPE.

3480

```
1    Q    HAVE YOU BEEN PERSONALLY INVOLVED WITH ETSI?

2    A    YES, I'VE BEEN PERSONALLY INVOLVED WITH ETSI

3    SINCE IT BEGAN.

4    Q    WHEN DID IT BEGIN?

5    A    IN 1988.

6    Q    AND YOU'VE BEEN INVOLVED SINCE THE BEGINNING?

7    A    YES, I HAVE.

8    Q    CAN YOU GIVE US AN OVERVIEW OF THE LEADERSHIP

9    POSITIONS THAT YOU'VE HELD AT ETSI?

10   A    YES.  I'VE HELD LEADERSHIP POSITIONS AS

11   CHAIRMAN OF THREE TECHNICAL BODIES, BODIES

12   RESPONSIBLE FOR DEVELOPING TECHNICAL

13   SPECIFICATIONS, AND I WAS ALSO FOR THREE YEARS

14   CHAIRMAN OF THE ETSI BOARD.

15   Q    ARE YOU FAMILIAR WITH A DOCUMENT CALLED THE

16   ETSI INTELLECTUAL PROPERTY RIGHTS POLICY?

17   A    YES, I AM.  THAT'S THE ETSI I.P. POLICY.  IT'S

18   FUNDAMENTAL TO THE WORKING OF ETSI.

19   Q    AND HAVE YOU EVER HAD ANY PERSONAL INVOLVEMENT

20   IN ADMINISTERS THAT IPR POLICY?

21   A    YES. AS CHAIRMAN OF THE TECHNICAL BODY, YOU

22   ARE REQUIRED AT THE BEGINNING OF EVERY MEETING TO

23   DO WHAT'S CALLED A CALL FOR IPR'S, WHICH IS A

24   FUNDAMENTAL PART OF THE POLICY.  AND IT IS ASKING

25   THE PEOPLE PRESENT, THE PARTICIPANTS AT THE
```

1    MEETING, THAT IF THEIR COMPANIES HAVE IPR THAT IS

2    RELATED TO THE PROPOSALS THAT THEY'RE NOW MAKING TO

3    THE MEETING, THEN THEY SHOULD DECLARE THAT IPR.

4    Q    NOW, ARE PATENTS A FORM OF IPR?

5    A    PATENTS ARE A FORM OF IPR, YES.

6    Q    AND THE CALL FOR IPR WOULD APPLY TO PATENTS?

7    A    IT WOULD APPLY TO PATENTS AND PATENT

8    APPLICATIONS.

9    Q    DR. WALKER, HAVE YOU RECEIVED ANY HONORS OR

10   AWARDS FOR YOUR WORK IN THE TELECOMMUNICATIONS

11   FIELD?

12   A    YES.  I WAS APPOINTED AN OFFICER OF THE ORDER

13   OF THE BRITISH EMPIRE IN 2009.

14   Q    WHAT DOES IT MEAN TO BE APPOINTED AN OFFICER

15   OF THE ORDER OF THE BRITISH EMPIRE?

16   A    THAT'S AN HONOR CONFERRED BY THE MONARCH FOR

17   SERVICES TO THE NATION, AND IN MY CASE, IT WAS

18   SERVICES TO THE TELECOMMUNICATIONS INDUSTRY.

19            MR. MUELLER:  YOUR HONOR, AT THIS POINT I

20   OFFER DR. WALKER AS AN EXPERT IN THE FIELD OF

21   TELECOMMUNICATIONS STANDARDS AND IPR POLICY,

22   INCLUDING ETSI.

23            MR. VERHOEVEN:  NO FURTHER OBJECTION,

24   YOUR HONOR.

25            THE COURT:  ALL RIGHT.  HE'S SO

```
1     CERTIFIED.  GO AHEAD, PLEASE.

2     BY MR. MUELLER:

3     Q     DR. WALKER, WHAT STANDARDS HAS ETSI DEVELOPED

4     FOR WIRELESS COMMUNICATIONS?

5     A     SO FOR WIRELESS COMMUNICATIONS, ETSI HAS

6     DEVELOPED THE 3G -- THE GSM STANDARD, WHICH IS THE

7     SECOND GENERATION TECHNOLOGY USED BY THE MAJORITY

8     OF PEOPLE, SOMETHING LIKE 80 PERCENT OF TELEPHONE

9     USERS, MOBILE TELEPHONE USERS IN THE WORLD.  IT HAS

10    DEVELOPED SOME CORDLESS COMMUNICATION STANDARDS,

11    ONE IN PARTICULAR.  IT'S DEVELOPED THE UMTS

12    STANDARD.  AND IT'S NOW WORKING ON THE LTE AND THE

13    LTE ADVANCED STANDARDS.

14    Q     NOW, YOU MENTIONED THE UMTS STANDARD.  CAN YOU

15    GIVE US AN IDEA, HOW BIG IS THAT STANDARD?

16    A     I THINK SOMEONE DESCRIBED IT THIS MORNING.

17    IT'S SEVERAL THOUSANDS OF SPECIFICATIONS.  SO IF

18    YOU WERE TO PUT THEM IN BINDERS, EACH ABOUT A

19    CENTIMETER LONG, I THINK YOU'RE TALKING ABOUT 10

20    METERS OR SO OF SPECIFICATIONS.  SO 30 FEET OR SO.

21    IT'S A SIGNIFICANT PIECE OF WORK.

22    Q     AND HOW MANY COMPANIES WERE INVOLVED IN

23    CREATING THAT STANDARD?

24    A     OH, GOSH.  HUNDREDS OF COMPANIES.  EVERY --

25    PRETTY WELL EVERY TELECOMMUNICATIONS MANUFACTURERS,
```

```
 1    EVERY TELECOMMUNICATIONS OPERATOR, AND BY THE VAST

 2    MAJORITY OF TELECOMMUNICATIONS REGULATORS IN THE

 3    WORLD ARE INVOLVED IN THE CREATION OF THAT.

 4    Q    IS SAMSUNG A MEMBER OF ETSI?

 5    A    YES, SAMSUNG IS A MEMBER.

 6    Q    IS APPLE A MEMBER OF ETSI?

 7    A    APPLE ALSO IS A MEMBER.

 8    Q    NOW, ARE YOU FAMILIAR WITH SOMETHING CALLED A

 9    WORKING GROUP?

10    A    YES, I AM.

11    Q    CAN YOU DESCRIBE THE JURY THE ROLE OF A

12    WORKING GROUP AT ETSI?

13    A    LET ME EXPLAIN THAT.  WHEN ETSI DECIDES IT'S

14    GOING TO CREATE A STANDARD IN A PARTICULAR AREA,

15    THAT STANDARD WILL CONSIST OF AN OUTLINE OF MANY

16    SPECIFICATIONS, EACH DEALING WITH A DIFFERENT

17    ASPECT OF THE STANDARD.

18              SO IT WILL DIVIDE UP ALL THE

19    SPECIFICATIONS THAT NEED TO BE DONE INTO GROUPS AND

20    WORKING GROUPS WILL BE ASSIGNED TO COMPLETE THE

21    SPECIFICATION IN PARTICULAR AREAS.

22              SO A WORKING GROUP WILL BE CONSISTENT OF

23    A COLLECTION OF PEOPLE FROM DIFFERENT COMPANIES

24    THAT HAVE EXPERTISE IN THE PARTICULAR AREA AND THAT

25    PARTICULAR AREA WILL THEN REPRESENT A SET OF
```

1    SPECIFICATIONS THAT WILL MAKE UP THE STANDARD.

2    Q    WHEN THE WORKING GROUP'S WORK IS DONE, WHAT IS

3    THEIR END PRODUCT?

4    A    THEIR END PRODUCT IS, IS THE, THAT PART OF THE

5    STANDARD THAT THEY'RE RESPONSIBLE FOR.

6    Q    WHERE, SIR, IF AT ALL, DO PATENTS FIT IN THIS

7    PROCESS?

8    A    WELL, WHERE PATENTS FIT IN, IN THE FOLLOWING

9    WAY.  THE STANDARD IS DEVELOPED BY CONSENSUS, SO

10   THE PEOPLE THAT COME ALONG ARE WORKING IN THE

11   WORKING GROUPS, COMING FROM COMPANIES AND THEY'RE

12   BRINGING THE IDEAS THAT ARE BEING DEVELOPED WITHIN

13   THOSE COMPANIES TO CONTRIBUTE TO THE STANDARD.

14        NOW, WHEN THEY COME ALONG, THE COMPANY

15   MAY HAVE IPR ASSOCIATED WITH THE IDEAS THEY'RE

16   BRINGING ALONG.  SO THE PROPOSALS MADE CONTAIN IPR

17   THAT THE COMPANY HAS.

18   Q    DR. WALKER, ARE YOU FAMILIAR WITH THE CONCEPT

19   OF AN ESSENTIAL PATENT?

20   A    YES, I AM FAMILIAR WITH THAT.

21   Q    AND AT ETSI, WHAT DOES THAT MEAN?

22   A    THAT MEANS THAT AN ESSENTIAL PATENT OR

23   ESSENTIAL IPR MEANS THAT THERE IS IPR IN STANDARDS,

24   SO THE PATENT RELATED TO IPR IN THE STANDARD,

25   WHEREBY IT IS IMPOSSIBLE, TECHNICALLY IMPOSSIBLE TO

1    IMPLEMENT THE STANDARD WITHOUT INFRINGING OR USING

2    THAT IPR.  THERE'S NO WAY AROUND IT.  YOU WILL HAVE

3    TO USE THAT IPR IF YOU WANT TO DO A PRODUCT

4    CONFORMING TO THAT STANDARD.

5    Q    NOW, DOES ETSI AS AN ORGANIZATION MAKE

6    DETERMINATIONS AS TO WHICH PATENTS ARE ESSENTIAL

7    AND WHICH ARE NOT?

8    A    NO.  THE MEMBERSHIP MAKES THAT DETERMINATION.

9    THERE'S NO FORMAL PROCESS OF DETERMINING WHETHER A

10   PATENT OR WHETHER IT'S ESSENTIAL OR EVEN WHETHER

11   IT'S VALID.

12   Q    AND SO WHEN A PATENT IS DECLARED ESSENTIAL,

13   WHAT DOES THAT MEAN?

14   A    THAT MEANS THAT THE COMPANY CONCERNED HAS SAID

15   THIS PATENT READS ON TO THE STANDARD, OR THIS

16   PATENT APPLICATION READS ON TO THE STANDARD AND IT

17   IS READING ON AS IPR IN AN ESSENTIAL WAY, THAT IS

18   TO SAY, YOU CAN'T IMPLEMENT THE STANDARD WITHOUT

19   USING MY IPR.  AND THAT'S A TRUST.  THE MEMBERSHIP

20   BRINGS THOSE STATEMENTS TO ETSI ON A TRUST BASIS.

21   Q    AND IF A PATENT IS DECLARED ESSENTIAL, DOES

22   THAT MEAN IT NECESSARILY IS ESSENTIAL?

23   A    NO, NOT AT ALL.  IN FACT, THERE ARE PROBABLY

24   QUITE A LOT OF PATENTS THERE THAT AREN'T ESSENTIAL,

25   BECAUSE YOU ARE ENCOURAGED TO DECLARE ANY IPR THAT

3486

```
1    YOU BELIEVE MAY BECOME ESSENTIAL TO THE STANDARD,
2    WHICH SORT OF ENCOURAGES AN OVER DECLARATION.
3              SO THERE PROBABLY ARE PATENTS THAT HAVE
4    BEEN DECLARED THAT ARE NOT ESSENTIAL.
5    Q    LET'S TURN, IF WE COULD, SIR, TO TAB 1 OF YOUR
6    BINDER, WHICH IS PLAINTIFF'S EXHIBIT 74.
7              DO YOU RECOGNIZE THAT?
8    A    YES, I DO.  IT'S THE 1997 VERSION OF THE ETSI
9    IPR POLICY.
10             MR. MUELLER:  YOUR HONOR, I OFFER THIS AS
11   PLAINTIFF'S EXHIBIT 74.
12             THE COURT:  ANY OBJECTION?
13             MR. VERHOEVEN:  NO, YOUR HONOR.
14             THE COURT:  IT'S ADMITTED.
15             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
16             74, HAVING BEEN PREVIOUSLY MARKED FOR
17             IDENTIFICATION, WAS ADMITTED INTO
18             EVIDENCE.)
19   BY MR. MUELLER:
20   Q    DR. WALKER, THIS IS THE ETSI INTELLECTUAL
21   PROPERTY RIGHTS POLICY AS OF 1997.
22             DOES THIS POLICY EXPLAIN ITS OBJECTIVES?
23   A    YES, IT DOES.  AND IF YOU TURN THE PAGE IN
24   SECTION 3 OF THE POLICY --
25   Q    AND IF WE COULD BLOW UP CLAUSE 3, COULD YOU
```

1    EXPLAIN WHAT WE SEE?

2    A    YES.  IN GENERAL TERMS, THE OBJECTIVES OF THE

3    IPR POLICY ARE TO ENSURE THAT IPR THAT'S IN A

4    STANDARD CAN'T BE USED TO, OR SHOULDN'T BE USED TO

5    ACTUALLY PROHIBIT THE USE OF THAT STANDARD.

6         SO IT SHOULDN'T BE A BARRIER TO THE

7    ADOPTION OF THAT STANDARD.

8    Q    SIR, LET ME FOCUS YOUR ACTION, IF I COULD, ON

9    THE LAST SENTENCE IN SECTION 3.1.  DO YOU SEE WHERE

10   IT STATES, QUOTE, IN ACHIEVING THIS OBJECTIVE, THE

11   ETSI IPR POLICY SEEKS A BALANCE BETWEEN THE NEEDS

12   OF STANDARDIZATION FOR PUBLIC USE IN THE FIELD OF

13   TELECOMMUNICATIONS AND THE RIGHTS OF THE OWNERS OF

14   IPR'S.  DO YOU SEE THAT?

15   A    YES, I DO.

16   Q    HOW DOES THE ETSI IPR POLICY ATTEMPT TO

17   ACHIEVE THIS BALANCE?

18   A    IT ACHIEVES IT BY ENSURING THAT IF YOU HAVE

19   IPR IN THE POLICY AND YOU DECLARE -- IN THE

20   STANDARD AND YOU ASSERT THAT IPR IN THE STANDARD,

21   THEN YOU WILL GAIN -- YOU WILL BE -- YOU WILL HAVE

22   THE RIGHT TO ASK FOR ROYALTIES UNDER FRAND TERMS.

23         ON THE OTHER SIDE, IT REQUIRES DISCLOSURE

24   OF THE IPR SO THAT -- SO IF YOU -- IF YOU ARE GOING

25   TO IMPLEMENT THE STANDARD, THEN YOU KNOW THAT YOU

3488

1    CAN ACHIEVE, YOU CAN OBTAIN A ROYALTY TO THE IPR.

2    Q    LET'S TAKE A LOOK AT CLAUSE 6 FROM THE SAME

3    DOCUMENT, EXHIBIT 74.

4         AND, DR. WALKER, CAN YOU EXPLAIN WHAT WE

5    SEE HERE?

6    A    YES.  CLAUSE 6 IS THE FRAND TERMS, SO WHAT IT

7    ESSENTIALLY SAYS IS IF YOU HAVE IPR IN THE

8    STANDARD, THEN YOU SHOULD MAKE IT AVAILABLE TO

9    ANYBODY WHO WISHES TO IMPLEMENT THE STANDARD UNDER

10   FRAND TERMS.

11        THAT IS THE COMMITMENT THAT YOU AS A

12   MEMBER OF ETSI WILL MAKE.

13   Q    NOW, UNDER THIS FRAND PROVISION, WHAT DOES THE

14   PATENT OWNER GET?

15   A    WELL, THE PATENT OWNER GETS, IF HE HAS FRAND

16   ON IPR WHICH IS ESSENTIAL TO WORKING WITH THAT

17   STANDARD, THEN ANYBODY WHO WISHES TO IMPLEMENT THE

18   STANDARD IS REQUIRED TO COME AND GET A LICENSE

19   UNDER FRAND TERMS FROM THE OWNER OF THAT IPR.

20   Q    AND UNDER THIS FRAND BARGAIN, WHAT DOES THE

21   PATENT OWNER GIVE UP?

22   A    HE GIVES UP THE RIGHT TO DO ANYTHING ELSE WITH

23   THE IPR IN THE CONTEXT OF THAT STANDARD, OTHER THAN

24   TO LICENSE IT FOR PEOPLE TO BE ABLE TO USE IT AND

25   LICENSE IT UNDER FRAND TERMS.

1    Q    LET'S TURN TO CLAUSE 4, IF WE COULD, OF THE

2    SAME DOCUMENT.  AND DR. WALKER, WHAT DOES CLAUSE 4

3    DESCRIBE?

4    A    CLAUSE 4 IS THE OTHER PART OF THE POLICY, AND

5    THAT IS THE REQUIREMENT TO DISCLOSE THE IPR THAT

6    YOU HAVE IN YOUR -- IN THE STANDARD.

7    Q    AND IF I COULD FOCUS YOUR ATTENTION,

8    DR. WALKER, ON THE LAST SENTENCE IN SECTION 4.1,

9    WHICH STATES, QUOTE, "IN PARTICULAR, A MEMBER

10   SUBMITTING A TECHNICAL PROPOSAL FOR A STANDARD

11   SHALL, ON A BONA FIDE BASIS, DRAW THE ATTENTION OF

12   ETSI TO ANY OF THAT MEMBER'S IPR WHICH MIGHT BE

13   ESSENTIAL IF THAT PROPOSAL IS ADOPTED."

14        AND CAN YOU EXPLAIN TO THE JURY WHAT THAT

15   SENTENCE MEANS?

16   A    SO THAT, THAT'S PARTICULARLY RELATED TO THE,

17   TO THOSE ORGANIZATIONS OR PEOPLE THAT ARE COMING

18   ALONG AND ARE MAKING CONTRIBUTIONS AND THEY'RE

19   LAYING ON THE TABLE SOLUTIONS TO PROBLEMS.  AND

20   THEIR SOLUTIONS MAY HAVE IPR ASSOCIATED WITH THEM

21   THAT THEIR COMPANY HAS, AND WHAT THAT IS SAYING IS

22   IF YOUR PROPOSAL IS ADOPTED, YOU SHOULD DECLARE THE

23   IPR THAT YOU HAVE IN THAT PROPOSAL.

24   Q    WHAT IS THE PURPOSE OF THIS PROVISION, SIR?

25   A    SO THE PURPOSE OF THE PROVISION IS THAT, THAT

```
 1    YOU DO A PICTURE AT THE END OF THE DAY OF ALL OF

 2    THE IPR THAT IS READING ON TO THE STANDARD AND YOU

 3    HAVE THAT PICTURE BUILDING UP AS PROPOSALS ARE

 4    ADOPTED.

 5    Q    DR. WALKER, AS A FORMAL MATTER, HOW ARE THESE

 6    DISCLOSURES MADE?

 7    A    FORMALLY THE ORGANIZATIONS, THE COMPANIES CAN

 8    FILL IN A FORM DETAILING THE IPR THAT THEY HAVE,

 9    THE SPECIFICATION THAT IT READS ON, DOWN TO THE

10    DETAILED SECTION OF THE SPECIFICATION THAT IT READS

11    ON, AND THEN THEY SUBMIT THAT TO ETSI, AND THERE

12    HAVE BEEN THOUSANDS OF THESE DISCLOSES MADE.

13    Q    IN PIECES OF PAPER?

14    A    IN PIECES OF PAPER THAT ARE THEN RECORDED IN

15    THE ETSI DATABASE.  SO THEY'RE ELECTRICALLY

16    ACCESSIBLE.

17    Q    DO CERTAIN OF THESE DISCLOSURES REFER TO

18    PARTICULAR PATENTS OR PARTICULAR APPLICATIONS?

19    A    ALL OF THOSE DISCLOSURES REFER TO PARTICULAR

20    PATENTS, PATENT APPLICATIONS, AND SPECIFIC PARTS OF

21    THE STANDARD.

22    Q    NOW, SIR, ARE YOU ALSO FAMILIAR WITH SOMETHING

23    CALLED A GENERAL FRAND COMMITMENT?

24    A    YES, I AM FAMILIAR WITH THAT.

25    Q    AND CAN YOU EXPLAIN WHAT THAT IS?
```

1    A    YES.  THAT'S A COMMITMENT THAT THE ETSI ASKS

2    ITS MEMBERS IF THEY CAN COMMIT TO WHICH BASICALLY

3    SAYS -- IT'S ASKING THE MEMBERS TO SAY, LOOK, I

4    DON'T KNOW AT THE MOMENT WHAT IPR I MAY HAVE THAT

5    READS ON THIS STANDARD, BUT WHATEVER IT IS, I WILL

6    DEFINITELY LICENSE IT UNDER FRAND TERMS.

7          SO IT'S A COMMITMENT TO LICENSE WHATEVER

8    IPR YOU DO PUT INTO THE STANDARD.  IT MAY BE AT THE

9    END OF THE DAY YOU DON'T BRING ANY IPR INTO THE

10   STANDARD, BUT YOU ARE AT LEAST COMMITTING WHATEVER

11   YOU DO BRING, YOU WILL LICENSE UNDER FRAND TERMS.

12   Q    DR. WALKER, DOES MAKING THIS GENERAL FRAND

13   COMMITMENT SATISFY THE DISCLOSURE OBLIGATIONS OF

14   CLAUSE 4?

15   A    NO, IT DOESN'T ADDRESS THAT AT ALL.

16   Q    WHY NOT?

17   A    BECAUSE IT IS A GENERAL THING THAT SAYS IF I

18   BRING IPR TO THE TABLE, I WILL LICENSE IT.  IT

19   DOESN'T SAY ANYTHING ABOUT THE SPECIFICS OF THE

20   IPR, WHERE THE IPR PLAYS ONTO THE STANDARDS AT ALL.

21          MR. MUELLER:  YOUR HONOR, I'M ABOUT TO

22   SWITCH SUBJECTS.  THIS MIGHT BE A GOOD TIME FOR THE

23   MORNING BREAK.

24          THE COURT:  LET'S GO AHEAD AND TAKE A

25   BREAK.  IT'S ABOUT 10:28.  WE'VE BEEN GOING FOR

492

```
 1    ABOUT 8:30, SO I NEED TO GIVE MS. SHORTRIDGE A
 2    BREAK.  IT'S 10:28.  WE'LL TAKE A BREAK UNTIL
 3    10:45.
 4             SO, AGAIN, PLEASE KEEP AN OPEN MIND,
 5    DON'T DO ANY RESEARCH, PLEASE DON'T DISCUSS THE
 6    CASE WITH ANYONE.
 7             YOU CAN LEAVE YOUR NOTEBOOKS ON THE
 8    CHAIRS AND MR. RIVERA IS GOING TO PASS OUT THE
 9    PHOTOS OF THE LAST FEW WITNESSES, AND HE'LL LEAVE
10    IT ON YOUR CHAIRS.
11             OKAY.  THANK YOU FOR YOUR SERVICE AND
12    YOUR PATIENCE.
13             (WHEREUPON, THE FOLLOWING PROCEEDINGS
14    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
15             THE COURT:  ALL RIGHT.  THANK YOU
16    EVERYONE.  THE JURORS HAVE LEFT THE COURTROOM.
17             (WHEREUPON, A RECESS WAS TAKEN.)
18             (WHEREUPON, THE FOLLOWING PROCEEDINGS
19    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
20             MR. VERHOEVEN:  YOUR HONOR, ONE THING
21    REAL QUICK.
22             THE COURT:  OKAY.
23             MR. VERHOEVEN:  OUR STOPWATCH AND WHATNOT
24    DON'T EXACTLY SYNC UP WITH THE WAY YOU'RE KEEPING
25    TIME, SO I WAS GOING TO ASK IF YOU COULD JUST LET
```

3493

1    US KNOW WHAT WE HAVE 25 MINUTES LEFT.  WOULD THAT

2    BE OKAY?

3              THE COURT:  YEAH, SURE.  I WILL TELL YOU

4    YOUR TOTALS RIGHT NOW.  APPLE HAS USED UP 22 HOURS

5    AND 27 MINUTES, SO YOU HAVE ROUGHLY 2 AND A HALF

6    HOURS LEFT.  AND SAMSUNG HAS USED UP 24 HOUR AND 23

7    MINUTES.  SO YOU HAVE 37 MINUTES LEFT.

8              MR. VERHOEVEN:  IF YOU COULD JUST RAISE

9    YOUR HAND OR TELL US WHEN WE'RE AT 25 MINUTES?

10             THE COURT:  OKAY.  I WILL DO THAT.

11             I DON'T KNOW IF YOUR CASE VIEWS ARE

12   WORKING.  MINE STOPPED IN THE MORNING.  YOURS TOO,

13   OR NOT?

14             MR. VERHOEVEN:  OURS IS WORKING.

15             THE COURT:  I WAS TOLD THAT IT MIGHT BE

16   HELPFUL, IF YOU DON'T NEED YOUR CELL PHONE, IF YOU

17   COULD PLEASE TURN IT OFF, AND ALSO IF YOU'RE USING

18   A BLUE TOOTH MOUSE, ACTUALLY IF YOU DON'T NEED

19   THAT, THAT MIGHT BE HELPFUL.  I THINK THERE ARE TOO

20   MANY SIGNALS IN HERE AND EVERYTHING IS CUTTING OUT.

21             IF YOU WOULDN'T MIND -- OBVIOUSLY

22   JOURNALISTS NEED IT, BUT IF YOU WOULDN'T MIND

23   TURNING IT OFF, WE'D APPRECIATE IT.

24             ALL RIGHT.  ANYTHING ELSE?  NO?

25             OKAY.  MR. RIVERA, PLEASE BRING OUR JURY

```
 1    BACK.
 2              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 3    WERE HELD IN THE PRESENCE OF THE JURY:)
 4              THE COURT:  OKAY.  WELCOME BACK.  IT'S --
 5    PLEASE TAKE A SEAT.
 6              IT'S 10:50.  GO AHEAD, PLEASE.
 7              MR. MUELLER:  THANK YOU, YOUR HONOR.
 8    Q    DR. WALKER, LET'S GO BACK TO PLAINTIFF'S
 9    EXHIBIT 74 FOR JUST A MOMENT.  THIS IS THE 1997
10    ETSI POLICY; IS THAT RIGHT?
11    A    THAT'S CORRECT.
12    Q    NOW, YOU DISCUSSED BEFORE THE BREAK TWO
13    PROVISIONS THAT HELPED IMPLEMENT THE OBJECTIVE OF
14    THIS POLICY.  FIRST IS CLAUSE 6.  LET'S TAKE A LOOK
15    AT THAT, PLEASE?
16    A    THAT'S CORRECT.
17    Q    CAN YOU JUST REMIND THE JURY WHAT DOES FRAND
18    STAND FOR?
19    A    FAIR, REASONABLE AND NON-DISCRIMINATORY.
20    Q    AND THIS IS THE PROVISION FOR FRAND?
21    A    THAT IS THE PROVISION FOR FRAND, YES, THE
22    TERMS UNDER WHICH YOU WILL LICENSE YOUR IPR.
23    Q    NOW LET'S TURN TO CLAUSE 4.  THIS IS THE
24    DISCLOSURE PROVISION, DR. WALKER?
25    A    THIS IS THE DISCLOSURE PROVISION, CORRECT.
```

```
 1    Q    AND LET'S FOCUS AGAIN ON THAT LAST SENTENCE IN

 2    SECTION 4.1, STATING "IN PARTICULAR, A MEMBER

 3    SUBMITTING A TECHNICAL PROPOSAL FOR A STANDARD

 4    SHALL, ON A BONA FIDE BASIS, DRAW THE ATTENTION OF

 5    ETSI TO ANY OF THAT MEMBER'S IPR WHICH MIGHT BE

 6    ESSENTIAL IF THAT PROPOSAL IS ADOPTED."

 7           I JUST WANT TO ASK YOU A COUPLE OF

 8    QUESTIONS ABOUT THIS LANGUAGE.  MIGHT BE ESSENTIAL,

 9    WHAT DOES THAT MEAN?

10    A    THAT MEANS IT COULD BE ESSENTIAL.  IT HAS A

11    CHANCE OF BECOMING ESSENTIAL.

12    Q    DID IT REQUIRE ACTUAL ESSENTIALITY?

13    A    NO.

14    Q    IF THAT PROPOSAL IS ADOPTED, WHAT DOES THAT

15    MEAN IN TERMS OF TIMING?

16    A    FOR THIS TO HAVE A MEANING, THAT MEANS YOU

17    SHOULD MAKE THAT DISCLOSURE PRIOR TO ADOPTION

18    ACTUALLY HAPPENING.  AFTERWARDS, IT'S ALREADY

19    ADOPTED.

20    Q    AND COULD YOU EXPLAIN TO THE JURY, AS A

21    PROCESS MATTER, WHEN DOES ETSI MEET THE DECISION TO

22    ADOPT A STANDARD?

23    A    OKAY.  WE WILL GO THROUGH THIS IN SPECIFICS,

24    BUT THERE IS A WHOLE SEQUENCE OF EVENTS THAT LEADS

25    TO A POINT WHERE ETSI SAYS, "THIS PROPOSAL IS NOW
```

```
 1    FORMALLY ADOPTED INTO THE SPECIFICATION."

 2    Q    AND IF WE CAN PUT CLAUSE 4.1 UP ON THE SCREEN

 3    JUST ONE MORE TIME.

 4           WHAT DOES THAT LAST SENTENCE REQUIRE

 5    BEFORE ADOPTION BY MEMBERS MAKING PROPOSALS?

 6    A    SORRY.  COULD YOU REPEAT THAT AGAIN?

 7    Q    SURE.  YOU JUST DESCRIBED FOR THE JURY THE

 8    ADOPTION PROCESS.  WHAT DOES THAT RULE REQUIRE FOR

 9    MEMBERS MAKING PROPOSALS?

10    A    THAT IF YOU HAVE IPR THAT RELATES TO THAT

11    PROPOSAL, THEN BEFORE THAT PROPOSAL IS ADOPTED, OR

12    IF YOU BELIEVE IT'S GOING TO BE ADOPTED, THEN YOU

13    SHOULD DISCLOSE THAT IPR TO ETSI.

14    Q    NOW I WANT TO FOCUS ON THE TWO SAMSUNG PATENTS

15    IN THIS CASE THAT SAMSUNG HAS DECLARED ESSENTIAL TO

16    UMTS, THE '941 AND '516.

17           DR. WALKER, HAVE YOU CONDUCTED ANY

18    INVESTIGATION WITH RESPECT TO THOSE TWO PATENTS?

19    A    YES, I HAVE.

20    Q    CAN YOU EXPLAIN TO THE JURY WHAT YOU DID?

21    A    I LOOKED AT THE PROPOSAL THAT IS ETSI HAD,

22    THAT SAMSUNG HAD MADE TO 3GPP, THAT THEY RELATED TO

23    THESE PATENTS AND THEN I, I LOOKED AT THE PROPOSALS

24    WHEN THEY WERE CREATED, WHEN THEY WERE TRANSFORMED

25    INTO WHAT ARE CALLED CHANGING ADDRESS, THAT MEANS
```

```
 1    TO CHANGE EXISTING STATE OF THE STANDARD, WHEN THEY
 2    WERE ACCEPTED, WHEN THEY WERE PUBLISHED, AND WHAT
 3    DECLARATION SAMSUNG MADE WITH REGARD TO THE, THE
 4    PROPOSALS, THE IPR RELATED TO THOSE PROPOSALS AND
 5    HOW SAMSUNG RELATED THE PATENT APPLICATIONS AND THE
 6    PROPOSALS AND THEIR ADOPTION INTO THE STANDARD.
 7    Q    NOW, DR. WALKER, DID YOU UNDERTAKE ANY
 8    ANALYSIS AS TO WHETHER OR NOT THE PATENTS ARE TRULY
 9    ESSENTIAL TO UMTS?
10    A    NO, I DIDN'T DO THAT AT ALL.
11    Q    AND DID YOU UNDERTAKE ANY ANALYSIS INTO THE
12    VALIDITY OF THESE PATENTS?
13    A    NO, I DID NOT.
14    Q    THAT WAS THE SUBJECT OF DR. KIM AND DR.
15    KNIGHTLY'S TESTIMONY?
16    A    THAT IS CORRECT, AND I MERELY ACCEPTED THAT
17    THEY WERE ON THE BASIS OF SAMSUNG MAKING THAT CLAIM
18    WHEN IT DECLARED THE IPR.
19    Q    NOW, YOU FOCUSSED ON DISCLOSURE ISSUES.  DID
20    YOU REACH ANY CONCLUSIONS AS TO WHETHER SAMSUNG
21    TIMELY DISCLOSED THESE TWO PATENTS?
22    A    YES.  I BELIEVE IN BOTH CASES, I CONCLUDED IN
23    BOTH CASES THAT THEY DID NOT.
24    Q    LET'S START WITH THE '941 PATENT, AND PLEASE
25    TURN TO TAB 2, JOINT EXHIBIT 1070.  IS THIS THE
```

1   '941 PATENT?

2   A    THAT IS, YES.

3   Q    LET ME DIRECT YOUR ATTENTION TO THE UPPER LEFT

4   CORNER, UPPER LEFT OF THE FIRST PAGE WHERE IT LISTS

5   FOREIGN APPLICATION PRIORITY DATA.  DO YOU SEE

6   THAT?

7   A    YES, I SEE THAT.

8   Q    AND WHAT IS LISTED THERE, SIR?

9   A    SO WHAT IS LISTED THERE IS A PATENT

10  APPLICATION MADE IN KOREA ON THE 4TH OF MAY, 2005.

11  Q    AND SAMSUNG WAS CLAIMING PRIOR TO THAT

12  APPLICATION?

13  A    AND SAMSUNG, IN ITS PATENT APPLICATION IN THE

14  U.S., IS CLAIMING PRIORITY TO THAT APPLICATION,

15  YES.

16  Q    AND WHAT'S THE DATE ON THAT SCREEN

17  APPLICATION?

18  A    THE 4TH OF MAY, 2005.

19  Q    NOW, LET'S PUT UP PDX 45.2, WHICH IS A TIME

20  LINE, AND I'D LIKE YOU TO WALK US THROUGH THE

21  CHRONOLOGY STEP BY STEP, AND I'M GOING TO START

22  HERE WITH THE FILING OF KOREAN PATENT ON MAY 4TH,

23  2005.  OKAY?

24  A    CORRECT.

25  Q    LET'S TURN TO TAB 3, IF WE COULD, WHICH IS

1   JOINT EXHIBIT 1085.  WHAT IS THIS?

2   A    THIS IS A PROPOSAL MADE BY SAMSUNG TO A

3   WORKING GROUP MEETING AND THE WORKING GROUP IS

4   RECALLED RAN2, THE MEETING TOOK PLACE BETWEEN THE

5   9TH AND THE 13TH OF MAY 2005, IN ATHENS, AND THIS

6   IS A PROPOSAL FOR A CHANGE TO THE EXISTING VERSION

7   OF THE SPECIFICATION WHICH IS RELATED PRECISELY TO

8   THE PATENTS, THE PATENT THAT WE HAVE JUST LOOKED

9   AT.

10           MR. MUELLER:  YOUR HONOR, I OFFER JOINT

11   EXHIBIT 1085.

12           THE COURT:  ANY OBJECTION?

13           MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

14           THE COURT:  IT'S ADMITTED.

15           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16            1085, HAVING BEEN PREVIOUSLY MARKED FOR

17            IDENTIFICATION, WAS ADMITTED INTO

18            EVIDENCE.)

19   BY MR. MUELLER:

20   Q    AND DR. WALKER, REMIND US, WHAT WAS THE DATE?

21   A    THE DATE OF THIS, IT WAS SUBMITTED TO THE

22   MEETING WHICH TOOK PLACE BETWEEN THE 9TH AND THE

23   13TH OF MAY, 2005.

24   Q    PLEASE TURN TO TAB 4 OF YOUR BINDER, WHICH IS

25   PLAINTIFF'S EXHIBIT 101.

```
 1              WHAT IS THIS?
 2   A    THIS IS A CHANGE REQUEST WHICH IS RELATED TO
 3   THAT PROPOSAL.  I NEED TO EXPLAIN A LITTLE BIT WHAT
 4   A CHANGE REQUEST IS.
 5              AT THIS STAGE OF THE DEVELOPMENT OF THE
 6   SPECIFICATION, THEY ALREADY ARE STABLE.  WE WERE
 7   TALKING ABOUT VERSION 6 OF THE, RELEASE 6 OF THE
 8   SET OF SPECIFICATIONS.
 9              SO ANY CHANGE THAT YOU WANTED TO MAKE NOW
10   TO THE SPECIFICATION HAD TO BE SPELLED OUT IN GREAT
11   DETAIL.  IT WAS A WORD-FOR-WORD IDENTIFICATION OF
12   WHAT YOU WANTED TO CHANGE, AND THE PROCESS OF
13   GETTING THAT CHANGE AGREED WAS VERY FORMAL.  YOU
14   HAD TO CREATE A CHANGE REQUEST.  THAT CHANGE
15   REQUEST HAD TO BE AGREED BY THE WORKING GROUP.  IF
16   THE WORKING GROUP AGREED WITH IT, IT HAD TO GO TO A
17   PLENARY, AND THE PLENARY HAD TO AGREE.  SHALL I
18   EXPLAIN?
19              THE COURT:  PLENARY.
20              THE WITNESS:  SHALL I EXPLAIN?
21   BY MR. MUELLER:
22   Q    PLEASE DO.  IF YOU COULD, SIR, EXPLAIN THAT?
23   A    SO A PLENARY SESSION IS THE -- I TALKED ABOUT
24   THIS WORKING GROUP 1 OF THE ACCESS NETWORK GROUP
25   THAT WAS DEALING WITH THIS PROPOSAL, AND THERE ARE
```

3501

```
 1    A NUMBER OF WORKING GROUPS, ONE, TWO, THREE, FOUR,

 2    AND THEY ALL CAME TOGETHER IN THIS PLENARY SESSION

 3    WHICH WAS THE RAN, THE OVERALL RADIO ACCESS NETWORK

 4    BODY RESPONSIBLE FOR THE SPECIFICATIONS.  SO

 5    THEY'RE WORKING GROUPS THAT WERE PUTTING TOGETHER,

 6    AND IT WAS THAT BODY THAT WOULD FORMALLY SAY WE

 7    ACCEPT THIS CHANGE REQUEST, AND IT WILL THEN

 8    CAUSE -- CREATE A CHANGE IN THE SPECIFICATIONS.

 9              MR. MUELLER:  YOUR HONOR, I OFFER

10    PLAINTIFF'S EXHIBIT 101?

11              THE COURT:  ANY OBJECTION?

12              MR. VERHOEVEN:  NO OBJECTION.

13              THE COURT:  THAT'S ADMITTED.

14              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

15              101, HAVING BEEN PREVIOUSLY MARKED FOR

16              IDENTIFICATION, WAS ADMITTED INTO

17              EVIDENCE.)

18    BY MR. MUELLER:

19    Q   DR. WALKER, WHAT SPECIFICATION, WHAT UMTS

20    SPECIFICATION IN PARTICULAR DOES THIS CHANGE

21    REQUEST RELATE TO?

22    A   SO THIS RELATES TO A SPECIFICATION 322 IN THE

23    25 SERIES, AND THE 25 SERIES IS ABOUT THE RADIO

24    ACCESS NETWORK.

25              AND IT'S RELATING TO THE CURRENT VERSION
```

1    OF THAT SPECIFICATION, WHICH IS VERSION 6.3.  SO

2    IT'S LOOKING TO CHANGE VERSION 6.3.

3              AND THIS IS THE TEXT IN THIS DOCUMENT

4    DETAILING PRECISELY WITH WHAT THE CHANGE IS.

5    Q    WHAT DATE WAS THIS SUBMITTED?

6    A    THIS WAS SUBMITTED TO THE WORKING GROUP

7    SOMEWHERE IN BETWEEN THE 9TH AND THE 13TH OF MAY.

8    Q    SO LET'S ADD THE SAMSUNG PROPOSALS OF MAY

9    19TH -- MAY 9TH THROUGH 13TH TO OUR TIMELINE.

10             PLEASE TURN TO TAB 5, EXHIBIT 72.  WHAT

11   IS THIS?

12   A    THIS IS THE REPORT OF THE WORKING GROUP

13   MEETING THAT THAT CHANGE REQUEST WAS SUBMITTED TO.

14             MR. MUELLER:  YOUR HONOR, I OFFER IT,

15   PLAINTIFF'S EXHIBIT 72.

16             MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

17             THE COURT:  IT'S ADMITTED.

18             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19             72, HAVING BEEN PREVIOUSLY MARKED FOR

20             IDENTIFICATION, WAS ADMITTED INTO

21             EVIDENCE.)

22   BY MR. MUELLER:

23   Q    THIS REFLECTS A MEETING, DR. WALKER?

24   A    YES.  THIS IS THE REPORT ON THE -- THE

25   APPROVED MINUTES OF THE MEETING THAT WE HAVE JUST

1    BEEN DISCUSSING.

2    Q    NOW, DID ANY OF THE NAMED INVENTORS FROM

3    SAMSUNG'S '941 PATENT ATTEND THIS MEETING?

4    A    YES, THEY DID.  AT LEAST ONE OF THEM ATTENDED,

5    MR. VAN DER VELDE.

6    Q    LET ME DIRECT YOU TO PAGE 39, IF I COULD.  DO

7    YOU SEE WHERE IT LISTS A PROPOSAL BY SAMSUNG NEAR

8    THE TOP OF THE PAGE?

9    A    PAGE 39.

10   Q    PAGE 39, PLEASE, SIR.

11   A    YES, I DO.

12   Q    WHAT DOES THIS SHOW?

13   A    THE RT 05131, THIS IS THE CHANGE REQUEST THAT

14   WE HAVE JUST BEEN -- IDENTIFYING A CHANGE REQUEST

15   THAT WE HAVE JUST SEEN OR WHAT HAPPENED AT THE

16   MEETING.

17        THIS WAS A FAIRLY LENGTHY DISCUSSION.  IT

18   COULDN'T BE AGREED PRECISELY AT THAT MEETING, SO

19   THE PEOPLE THAT WERE DISCUSSING IT WERE ASKED TO

20   SETTLE THE MATTER OFFLINE WHILE USING WHAT'S CALLED

21   THE REFLECTOR, WHICH IS THE MEANS OF COMMUNICATION,

22   COMMUNICATING ELECTRONICALLY USED WITHIN ETSI.

23        THEY DID THAT, AND THEY WERE GIVEN UNTIL

24   THE 18TH OF MAY TO MAKE A DECISION AND ON THE 18TH

25   OF MAY, THEY DECIDED THAT THEY WOULD RECOMMEND THAT

3504

1    THE CHANGE REQUEST BE ACCEPTED.

2    Q    SO TO BE CLEAR, THE PROPOSAL WAS ACCEPTED ON

3    MAY 18TH, 2005?

4    A    SO IT WAS ACCEPTED BY THE WORKING GROUP ON THE

5    18TH OF MAY 2005.

6    Q    AND THAT'S THE SAMSUNG PROPOSAL?

7    A    AND THAT'S THE SAMSUNG CHANGE REQUEST, YES.

8    Q    LET'S PUT THAT ON OUR TIMELINE AS PDX 45.4.

9         AND LET'S TURN IF WE COULD, PLEASE, SIR,

10   TO TAB 6, PLAINTIFF'S EXHIBIT 84.  WHAT DO WE FIND

11   HERE?

12   A    SO IN -- UNDER THIS TAB WE FIND, FOR TWO OF

13   THE SERIES OF SPECIFICATION, THE LIST, AND IN

14   PARTICULAR HERE ON THE FIRST PAGE IT'S 25214.  THIS

15   IS THE HISTORY OF THE EVOLUTION OF THAT

16   SPECIFICATION THROUGH VARIOUS RELEASES AND THROUGH

17   VARIOUS VERSIONS.

18             MR. MUELLER:  YOUR HONOR, WE OFFER IT.

19             MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

20             THE COURT:  IT'S ADMITTED.

21             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

22             84, HAVING BEEN PREVIOUSLY MARKED FOR

23             IDENTIFICATION, WAS ADMITTED INTO

24             EVIDENCE.)

25   BY MR. MUELLER:

8505

1    Q    THIS TABLE REFERS TO A FREEZE MEETING IN THE

2    SECOND COLUMN.  WHAT IS THAT?

3    A    THAT'S THE MEETING AT WHICH THE CHANGE

4    REQUEST, ANYTHING THAT MODIFIED THE EXISTING

5    SPECIFICATION, WOULD TAKE PLACE.

6    Q    ON THE VERY NEXT PAGE, 84.5, LET ME DIRECT

7    YOUR ATTENTION TO AN ENTRY NOTATED REL-6, VERSION

8    6.4.0.

9              DO YOU SEE THAT, SIR?

10   A    YES, I DO.

11   Q    WHAT DOES IT REFER TO?

12   A    SO THIS REFERS TO THE RADIO PLENARY MEETING

13   NUMBER 26, AND THAT -- THAT APPROVED ALL THE CHANGE

14   REQUESTS THAT WERE MADE TO VERSION 6.3 OF THE 214

15   SPECIFICATION, AND THAT THEN BECAME VERSION 6.4.

16   THERE'S A DATE BESIDE THAT 6.4, AND THAT IS THE

17   AVAILABILITY DATE, AND THAT IS THE DATE THAT ETSI

18   CONSIDERS AS THE OFFICIAL PUBLICATION OF THAT

19   SPECIFICATION, THAT VERSION OF THE SPECIFICATION.

20   Q    AND WHAT DATE WAS THAT MEETING?

21   A    THAT MEETING WAS -- THE 5TH OF THE FIRST

22   2000 -- THE AVAILABILITY DATE WAS THE 5TH OF

23   JANUARY 2005.

24              BUT THE MEETING TOOK PLACE, IF YOU FLIP

25   OVER A COUPLE OF PAGES, BECAUSE WE'RE TALKING ABOUT

```
 1    MEETING NUMBER 26, SO MEETING NUMBER 26, THE

 2    PLENARY MEETING, THAT'S RECORDED -- I THINK THAT

 3    WAS THE QUEBEC MEETING, SO RECORDED ON PAGE 2 OF 3

 4    OF THE EXHIBIT, AND THAT TOOK PLACE BETWEEN THE 3RD

 5    AND -- THE 1ST AND THE 3RD OF JUNE 2005.

 6    Q    SO LET'S ADD THAT TO OUR TIMELINE AS PDX 45.5.

 7              AND, DR. WALKER, COULD YOU PLEASE EXPLAIN

 8    TO THE JURY THE SIGNIFICANCE OF THAT EVENT THAT

 9    OCCURRED ON JUNE 1ST THROUGH 3RD, 2005?

10    A    THAT WAS THE DATE AT WHICH THAT -- WHAT WAS AN

11    INITIAL PROPOSAL FROM SAMSUNG, WHICH WAS RELATED TO

12    THE PATENT THAT WE'RE LOOKING AT, WAS FORMALLY

13    ADOPTED INTO THE SPECIFICATION BY THE BODY

14    RESPONSIBLE FOR THE CHANGES AND THE EVOLUTION OF

15    THAT SPECIFICATION.

16    Q    AND, SIR --

17    A    IT IS NOW A PART OF THE SPECIFICATION WHICH

18    WILL BECOME THE STANDARD FOR UMTS.

19    Q    AND, SIR, FROM A DISCLOSURE PERSPECTIVE, WHAT

20    WAS SAMSUNG'S OBLIGATION AS OF THAT DATE?

21    A    THIS IS THE ADOPTION DATE, SO DISCLOSURE

22    SHOULD HAVE TAKEN PLACE BEFORE OR ON THAT ADOPTION

23    DATE.

24    Q    BY THAT DATE, HAD SAMSUNG DISCLOSED ANY MEMBER

25    OF THE '941 PATENT FAMILY?
```

6507

1    A    NO, IT HAD NOT.

2    Q    DID SAMSUNG LATER DISCLOSE ANY MEMBER?

3    A    OH, YES, IT DID.

4    Q    I'M SORRY, SIR.  WE HAD TALKED OVER?

5    A    YES, IT DID.

6    Q    WHEN?  LET'S TURN TO TAB 7, PLEASE,

7    PLAINTIFF'S EXHIBIT 122.  WHAT DO WE SEE HERE?

8    A    A RECORD, A SCREEN SHOT OF THE ETSI DATABASE

9    OF THE PATENT DISCLOSURE MADE BY -- SOME OF THE

10   PATENT DISCLOSURES MADE BY SAMSUNG.

11   Q    AND, DR. WALKER, IF YOU TURN TO THE PAGE

12   LABELS 122.44, DO YOU SEE THE APPLICATION FOR THE

13   '941 PATENT LISTED AT THE BOTTOM RIGHT-HAND SIDE?

14   A    YES, I DO.  IT'S THE LAST, IT'S THAT LAST ROW

15   OF THE TABLE.

16             MR. MUELLER:  YOUR HONOR, I OFFER

17   PLAINTIFF'S EXHIBIT 122.

18             MR. VERHOEVEN:  NO OBJECTION.

19             THE COURT:  THAT'S ADMITTED.

20             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

21             122, HAVING BEEN PREVIOUSLY MARKED FOR

22             IDENTIFICATION, WAS ADMITTED INTO

23             EVIDENCE.)

24   BY MR. MUELLER:

25   Q    DR. WALKER, WHAT WAS THE DATE OF THE SAMSUNG

```
 1    DISCLOSURE?
 2    A    SO THE -- I, PERHAPS, SHOULD JUST EXPLAIN WHAT
 3    THE DISCLOSURE SAYS.  THE DISCLOSURE, I THINK IT'S
 4    IMPORTANT TO NOTE, IT REFERENCES ON THE RIGHT-HAND
 5    SIDE THAT ON THE COLUMN THE APPLICATION, THE U.S.
 6    APPLICATION, THAT'S THE APPLICATION NUMBER.  THAT
 7    IS ALSO RELATED THEN TO, THROUGH THIS TO THE KOREAN
 8    APPLICATION, WHICH IS THE NUMBER IN THE FIFTH --
 9    THE SIXTH COLUMN.
10         IT IDENTIFIES THE SPECIFICATION TO WHICH
11    IT BELONGS, SO 322.  IT RELATES -- IT IDENTIFIES
12    THE PARAGRAPHS, THE DETAILED PARAGRAPHS OF THAT
13    SPECIFICATION, AND IT IDENTIFIES THE VERSION
14    NUMBER.
15         NOW, ACTUALLY, THE VERSION NUMBER IS
16    INCORRECT BECAUSE THIS WAS ACTUALLY, THE MINUTES OF
17    THE MEETING WAS ACTUALLY ADOPTED FOR VERSION 6.4,
18    ALTHOUGH IN HERE IT SAYS 6.9.
19    Q    NOW, DR. WALKER, IF YOU GO BACK A FEW PAGES TO
20    122.41, AND LET ME KNOW WHEN YOU'RE THERE?
21    A    I'M THERE.
22    Q    WHAT IS THE DATE THAT SAMSUNG MADE THIS
23    DISCLOSURE TO ETSI?
24    A    SO THIS DISCLOSURE WAS MADE, AS STATED HERE,
25    TO ETSI ON THE 7TH OF AUGUST, 2007.
```

1    Q    LET'S ADD THAT TO OUR CHRONOLOGY AS PDX 45.6.

2         DR. WALKER, WITH THE CHRONOLOGY THAT WE

3    SEE ON THE SCREEN, WHAT IS YOUR OPINION AS TO

4    WHETHER SAMSUNG COMPLIED WITH ITS DISCLOSURE

5    OBLIGATIONS WITH RESPECT TO THE '941 PATENT?

6    A    I DO NOT CONSIDER THAT THEY, THAT THEY DID

7    COMPLY WITH THE OBLIGATIONS THAT'S IN PARAGRAPH 4.1

8    OF THE ETSI POLICY.

9         THEY SHOULD HAVE DISCLOSED PRIOR TO THE

10   ADOPTION, WHICH WAS IN JUNE OF 2005.

11   Q    SIR, LET'S TURN TO THE '516 PATENT, IF WE

12   COULD.  IS THAT THE SECOND PATENT THAT YOU ANALYZED

13   IN THIS CASE?

14   A    THAT'S CORRECT.

15   Q    AND HAVE YOU UNDERTAKEN A SIMILAR

16   INVESTIGATION INTO THE EVENTS THAT LED TO THE

17   RELEVANT PROVISION OF ETSI'S UMTS SPECIFICATION?

18   A    YES, I DID.  THAT'S A MIRROR IMAGE OF THE

19   PREVIOUS INVESTIGATION.

20   Q    LET'S LOOK AT TAB 8 WHICH IS THE PATENT

21   ITSELF, JOINT EXHIBIT 1073.  DO YOU SEE THAT, SIR?

22   A    YES, I DO.

23   Q    LET'S PUT IT ON THE SCREEN AND COULD YOU

24   EXPLAIN TO THE JURY WHAT WE SEE IN THE FOREIGN

25   PRIORITY DATE FOR THIS PATENT?

6510

```
 1    A    YES.  SO THE FOREIGN APPLICATION PRIORITY DATE
 2    LISTS FIVE KOREAN PATENTS, PATENT APPLICATIONS THAT
 3    WERE MADE BETWEEN THE 9TH OF JUNE 2004 AND APRIL
 4    7TH, 2005.
 5             AND THEY'RE INCLUDED BY REFERENCE IN THIS
 6    U.S. PATENT.
 7    Q    SIR, YOU SAID YOU'VE DONE A SIMILAR
 8    INVESTIGATION INTO THE WORKING GROUP EVENTS?
 9    A    THAT IS CORRECT.
10    Q    AND TO TRY TO SHORTEN THIS UP A LITTLE BIT,
11    COULD YOU PLEASE LOOK THROUGH TABS 9, 10, AND 11
12    AND TELL US, AS A GROUP, WHAT THOSE DOCUMENTS ARE.
13    A    SO 9 IS THE, IS AN E-MAIL THAT COVERS A PAPER,
14    ONE OF A NUMBER OF PAPERS, PROPOSALS THAT SAMSUNG
15    THEN SUBMITTED TO A WORKING GROUP WHICH RELATES TO
16    THE STANDARD -- TO THE PATENT --
17    Q    PAUSE RIGHT THERE, SIR.  THAT'S PLAINTIFF'S
18    EXHIBIT 193?
19    A    THAT'S EXHIBIT 193.
20    Q    THE SAMSUNG PROPOSAL?
21    A    THAT'S CORRECT.
22             MR. MUELLER:  YOUR HONOR, I OFFER IT.
23             MR. VERHOEVEN:  NO OBJECTION.
24             THE COURT:  IT'S ADMITTED.
25             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
```

3511

```
 1                193, HAVING BEEN PREVIOUSLY MARKED FOR
 2                IDENTIFICATION, WAS ADMITTED INTO
 3                EVIDENCE.)
 4     BY MR. MUELLER:
 5     Q    TAB 10 IS JOINT EXHIBIT 1084.  CAN YOU BRIEFLY
 6     DESCRIBE WHAT WE FIND THERE?
 7     A    SO TAB 10 IS THE CHANGE REQUEST, WHICH IS NOW
 8     THE FORMAL FORMULATION OF THAT PROPOSAL MADE BY
 9     SAMSUNG.  NOW WITH A NUMBER OF OTHER COMPANIES
10     JOINING IN, CREATING THAT CHANGE REQUEST, FOUR OR
11     FIVE OTHERS.
12                THE CHANGE REQUEST IS TO DOCUMENT 214 IN
13     THE 25 SERIES, AND THE VERSION THAT IT WOULD AFFECT
14     IS THE 6.5 VERSION.
15                MR. MUELLER:  YOUR HONOR, I OFFER
16     PLAINTIFF'S EXHIBIT -- I'M SORRY, JOINT EXHIBIT
17     1084.
18                MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.
19                THE COURT:  IT'S ADMITTED.
20                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
21                1084, HAVING BEEN PREVIOUSLY MARKED FOR
22                IDENTIFICATION, WAS ADMITTED INTO
23                EVIDENCE.)
24     BY MR. MUELLER:
25     Q    TAB 11, DR. WALKER, WHAT DO WE FIND THERE?
```

```
 1    THIS IS PLAINTIFF'S EXHIBIT 70?

 2    A    IN THAT TAB WE FIND THE REPORT OF THE MEETING

 3    AND THAT CHANGE REQUEST WAS DISCUSSED AND SUBMITTED

 4    TO.

 5             MR. MUELLER:  YOUR HONOR, I OFFER

 6    PLAINTIFF'S EXHIBIT 70.

 7             MR. VERHOEVEN:  NO OBJECTION.

 8             THE COURT:  IT'S ADMITTED.

 9             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10             70, HAVING BEEN PREVIOUSLY MARKED FOR

11             IDENTIFICATION, WAS ADMITTED INTO

12             EVIDENCE.)

13    BY MR. MUELLER:

14    Q    PLEASE TURN IF YOU COULD, SIR, TO TAB 6, WHICH

15    IS PLAINTIFF'S EXHIBIT 84.

16             WHAT IS THIS?

17    A    SO TAB 6 IS THE, IS THE HISTORY OF THE, OF THE

18    SPECIFICATION WITH VARIOUS RELEASES.

19    Q    NOW IF WE COULD, IF WE CAN TURN TO TAB 7,

20    PLAINTIFF'S EXHIBIT 122.  CAN YOU PLEASE EXPLAIN

21    WHAT WE SEE THERE?

22    A    IN TAB 7 WE SEE THE IPR DISCLOSURE, A SERIES

23    OF IPR DISCLOSURES MADE BY SAMSUNG.

24             SO THESE ARE IMAGES FROM THE ETSI

25    WEBSITE.
```

6513

```
1    Q    LET'S TURN TO TAB 12, SIR.  WHAT DO WE FIND AT
2    TAB 12?
3    A    AT TAB 12 IN MY BINDER WE FIND THE SLIDE YOU
4    PUT UP ABOUT MY BACKGROUND AT THE VERY BEGINNING.
5    Q    I'M SORRY.  I HAVE THE TAB WRONG.
6         LET'S PUT UP PDX 45.12, IF WE CAN, AND
7    YOU WALKED THROUGH SOME DOCUMENTS FOR US.  COULD
8    YOU JUST BRIEFLY SUMMARIZE THE FULL CHRONOLOGY OF
9    THE EVENTS THAT YOU'VE INVESTIGATED.
10   A    SO THE FULL CHRONOLOGY IS THE ORIGINAL PATENT
11   APPLICATIONS, THE SCREEN AND U.S. PATENT
12   APPLICATION, THE FACT THAT THEY'RE RELATED.
13        THEN THE PROPOSAL MADE BY SAMSUNG THAT
14   RELATES TO THAT TO THE CHANGE, TO CREATE A CHANGE
15   IN THE CURRENT VERSION OF THE SPECIFICATION.
16        THE EMBODIMENT OF THAT PROPOSAL IN A
17   FORMAL CHANGE REQUEST, THE ADOPTION OF THAT CHANGE
18   REQUEST BY FIRST THE WORKING GROUP AND THEN THE
19   PLENARY OF THE RADIO ACCESS NETWORK AND WHEN IT
20   THEN FINALLY BECAME A CHANGE TO THE EXISTING
21   VERSION OF THE SPECIFICATION, WHICH WAS 6.4,
22   CREATED THE NEW 6.5.
23        AND THEN FINALLY THE DECLARATION -- THE
24   DISCLOSURE THAT SAMSUNG MADE OF THE IPR.
25        MR. MUELLER:  YOUR HONOR, MAY I APPROACH
```

6514

1    THE SCREEN?

2              THE COURT:  YES.

3    BY MR. MUELLER:

4    Q    SO, DR. WALKER, JUST SO WE'RE CLEAR, THIS

5    CHRONOLOGY STARTS WITH THE KOREAN APPLICATION THAT

6    SAMSUNG FILED?

7    A    THAT'S CORRECT.

8    Q    AND CONTINUES THROUGH PROPOSALS MADE BY

9    SAMSUNG TO ETSI?

10   A    THAT IS CORRECT.

11   Q    AND CAN YOU EXPLAIN TO THE JURY THE

12   SIGNIFICANCE OF THAT JUNE 1ST THROUGH 3RD, 2005

13   DATE?

14   A    SO THIS IS THE DATE AT WHICH THE PROPOSAL WAS

15   ADOPTED AND BECAME THEN A PART OF THE CURRENT -- OF

16   THE STANDARD OF THAT -- AT THAT POINT IN TIME.

17   Q    LET'S TURN BACK TO TAB 7 IN YOUR BINDER,

18   PLAINTIFF'S EXHIBIT 122.

19   A    YES.

20   Q    PLEASE TURN TO PAGE 122.32.

21   A    YES, I HAVE THAT PAGE.

22   Q    AND DO YOU SEE ANY REFERENCE ON THIS PAGE TO

23   THE U.S. APPLICATION THAT LED TO THE '516 PATENT?

24   A    YES, I DO.  THIS IS -- I'M LOOKING, CREATED

25   PAGE -- THIS IS THE SECOND COLUMN DOWN.

1    Q    AND, SIR, IS THIS THE DISCLOSURE THAT SAMSUNG

2    MADE --

3    A    SO THIS IS --

4    Q    I'M SORRY.  THIS IS THE DISCLOSURE THAT

5    SAMSUNG MADE TO ETSI?

6    A    THIS IS THE DISCLOSURE THAT SAMSUNG MADE TO

7    ETSI, AND AS YOU CAN SEE, IT IDENTIFIES THE U.S.

8    PATENT APPLICATION, '181, THE KOREAN APPLICATION,

9    423,000, THE PARTICULAR SPECIFICATION, THAT IT WAS

10   AFFECTING, '214, THE ACTUAL PARAGRAPHS THAT WERE

11   AFFECTED, IN THIS CASE JUST ONE, AND THE VERSION

12   THAT IT WAS NOW ADOPTED INTO.

13   Q    AND IF YOU GO BACK, SIR, TO THE PAGE ENDING,

14   IN THE BATES NUMBER AT THE BOTTOM, 9415, WHAT WAS

15   THE DATE ON WHICH THIS DISCLOSURE WAS MADE?

16   A    SO THE DATE ON WHICH THIS DISCLOSURE WAS MADE

17   WAS THE 16TH OF MAY, 2006.

18   Q    LET'S ADD THAT TO OUR TIMELINE AT PDX 43.12,

19   AND IF YOU LOOK AT THAT, HERE WE HAVE THE

20   DISCLOSURE ON MAY 16TH, 2006.  IS THAT CORRECT,

21   SIR?

22   A    THAT'S CORRECT.

23              MR. MUELLER:  YOUR HONOR, COULD MAY I

24   APPROACH ONE MORE TIME.

25              THE COURT:  GO AHEAD.

1    BY MR. MUELLER:

2    Q    DR. WALKER, HAVE YOU SEEN ANY EVIDENCE THAT

3    SAMSUNG DISCLOSED THIS PATENT NUMBER TO ETSI BEFORE

4    JUNE 1ST, 2005?

5    A    NONE WHATSOEVER.

6    Q    WHEN WAS THE DISCLOSURE MADE?

7    A    THE DISCLOSURE WAS MADE ON THE 16TH OF MAY,

8    2006.

9    Q    DR. WALKER, GIVEN THIS CHRONOLOGY, DO YOU HAVE

10   AN OPINION AS TO WHETHER SAMSUNG COMPLIED WITH ITS

11   DISCLOSURE OBLIGATIONS WITH RESPECT TO THE '516

12   PATENT?

13   A    MY OPINION IS THAT IT DID NOT COMPLY WITH THE

14   OBLIGATION BECAUSE IT SHOULD HAVE DISCLOSED BEFORE

15   ADOPTION.

16           MR. MUELLER:  THANK YOU, SIR.  I HAVE NO

17   FURTHER QUESTIONS.

18           THE COURT:  ALL RIGHT.  THE TIME IS NOW

19   11:16.

20           PLEASE GO AHEAD.  11:17.  GO AHEAD.

21           MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

22                   **CROSS-EXAMINATION**

23   BY MR. VERHOEVEN:

24   Q    GOOD MORNING, DR. WALKER.

25   A    GOOD MORNING.

3517

1    Q    AS YOU MAY HAVE NOTICED, WE'RE UNDER SOME

2    STRICT TIME LIMITS SO IF, AS I'M ASKING YOU

3    QUESTIONS, IF YOU CAN FAIRLY ANSWER YES OR NO, I'D

4    APPRECIATE YOU DOING THAT.  OKAY?

5    A    OKAY.

6    Q    NOW, SIR, ISN'T IT TRUE THAT TO FALL WITHIN

7    THE ETSI IPR POLICY, AN INTELLECTUAL PROPERTY RIGHT

8    NEEDS TO MEET ETSI'S DEFINITION OF IPR?

9    A    THAT IS CORRECT.

10   Q    CAN WE PUT UP SDX 3916, SLIDE 12.  AND THIS IS

11   THE DEFINITION I HAVE ON THE SCREEN THAT ETSI HAS

12   FOR IPR; RIGHT?

13   A    THAT'S CORRECT.

14   Q    AND IT SAYS, "IPR SHALL MEAN ANY INTELLECTUAL

15   PROPERTY RIGHT CONFERRED BY STATUTE LAW INCLUDING

16   APPLICATIONS THEREFORE OTHER THAN TRADEMARKS."

17        AND THEN IT CONTINUES, SIR, "FOR THE

18   AVOIDANCE OF DOUBT, RIGHTS RELATING TO GET-UP,

19   CONFIDENTIAL INFORMATION, TRADE SECRETS OR THE LIKE

20   ARE EXCLUDED FROM THE DEFINITION OF IPR."

21        DO YOU SEE THAT, SIR?

22   A    YES, I DO.

23   Q    NOW, SO ONE OF THE THINGS THAT'S EXCLUDED FROM

24   IPR IS CONFIDENTIAL INFORMATION; RIGHT?

25   A    THAT IS CORRECT.  IT'S NOT IPR.

3518

1    Q    AND IF WE CAN PUT UP PDX 45.6.  THIS IS YOUR

2    SLIDE.

3         YOU REFERRED TO THE SAMSUNG KOREAN PATENT

4    APPLICATION; RIGHT?

5    A    YES, I DID.

6    Q    BUT YOU DON'T -- YOU DIDN'T EVEN READ THAT

7    APPLICATION, DID YOU?

8    A    THAT IS CORRECT.

9    Q    YOU DON'T KNOW WHETHER IT'S CONFIDENTIAL, DO

10   YOU?

11   A    I DON'T KNOW WHETHER THEY MADE A CONFIDENTIAL

12   APPLICATION WITH REGARD TO THAT PATENT, NO.

13   Q    NOW, THE JURY, THEY SAW A VIDEO AT THE

14   BEGINNING OF THIS TRIAL THAT TALKED ABOUT THE

15   UNITED STATES, HOW WHEN YOU FILE PATENT

16   APPLICATIONS THEY'RE INITIALLY CONFIDENTIAL.

17        ISN'T IT TRUE, SIR, THAT THE SAME IS TRUE

18   IN THE KOREAN PATENT SYSTEM, THEY'RE CONFIDENTIAL?

19   A    I BELIEVE YOU CAN REQUEST THAT TO BE THE CASE,

20   YES.

21   Q    AND IF THEY'RE CONFIDENTIAL, IT'S NOT WITHIN

22   THE DEFINITION OF IPR AND THERE'S NO DUTY TO

23   DISCLOSE.  ISN'T THAT TRUE, SIR?

24   A    NO, BECAUSE YOU CAN'T USE IT THEN WITHIN THE

25   CONTEXT OF ETSI, BECAUSE IF YOU WISH TO --

3519

```
 1    Q    IT'S NOT IPR UNDER THE DEFINITION, IS IT, SIR?

 2    A    IT'S NOT IPR.

 3    Q    NOW, I'LL DIRECT YOUR ATTENTION TO EXHIBIT 613

 4    IN YOUR BINDER.  ARE YOU THERE?

 5    A    NO.  613?

 6    Q    613.

 7              MR. LEE:  HE'S LOOKING AT OUR BINDER.

 8              THE COURT:  IT'S THE BLACK --

 9              THE WITNESS:  I HAVE IT.  YES, THANK YOU.

10    BY MR. VERHOEVEN:

11    Q    OKAY.  YOU'VE SEEN THIS DOCUMENT BEFORE,

12    RIGHT?

13    A    YES, THE ETSI GUIDE ON IPR, YES.

14              MR. VERHOEVEN:  YOUR HONOR, WE MOVE

15    DEFENDANT'S EXHIBIT 613 INTO EVIDENCE.

16              MR. MUELLER:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19              613, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. VERHOEVEN:

23    Q    I'LL DIRECT YOUR ATTENTION TO PAGE 8.  HERE --

24    CAN WE PULL OUT THIS BOTTOM PORTION, SECTION 2.

25              THIS IS THE GUIDELINE; RIGHT?
```

```
 1    A    THAT IS CORRECT.

 2    Q    AND IT'S THE IMPORTANCE OF TIMELY DISCLOSURE

 3    OF ESSENTIAL IPR'S IS THE SECTION; RIGHT?

 4    A    THAT IS CORRECT.

 5    Q    AND NOTE 1, DEFINITIONS FOR TIMELINESS OR

 6    TIMELY CANNOT BE AGREED BECAUSE SUCH DEFINITIONS

 7    WOULD CONSTITUTE A CHANGE TO THE POLICY.

 8            DO YOU SEE THAT, SIR?  IS THAT WHAT THAT

 9    SAYS?

10    A    THAT IS CORRECT, THAT SAYS THAT.

11    Q    AND -- BUT THERE IS A DESCRIPTION OF

12    INTENTIONAL DELAY.  DO YOU SEE THAT, SIR?

13    A    YES, I DO SEE THAT.

14    Q    AN INTENTIONAL DELAY ARISES WHEN IT CAN BE

15    DEMONSTRATED THAT AN ETSI MEMBER HAS DELIBERATELY

16    WITHHELD IPR DISCLOSURES SIGNIFICANTLY BEYOND WHAT

17    WOULD BE EXPECTED FROM NORMAL CONSIDERATIONS OF

18    TIME LIMITS.

19            RIGHT?

20    A    THAT IS CORRECT.

21    Q    YOU'RE NOT OFFERING AN OPINION HERE TODAY THAT

22    SAMSUNG DELIBERATELY OR INTENTIONALLY DELAYED, ARE

23    YOU, SIR?

24    A    I HAVE NOT USED THOSE WORDS, NO.

25    Q    AND YOU'RE NOT OFFERING THAT OPINION, ARE YOU,
```

3521

```
 1    SIR?

 2    A     NO, I AM NOT.

 3    Q     NOW, YOU HAVE A TECHNICAL BACKGROUND, RIGHT?

 4    A     I DO HAVE A TECHNICAL BACKGROUND, YES.

 5    Q     A PH.D. IN MATHEMATICS?

 6    A     YES.

 7    Q     AND FROM 2001 TO 2009, YOU WERE GROUP RESEARCH

 8    AND DEVELOPMENT DIRECTOR FOR THE VODAFONE GROUP OF

 9    COMPANIES; RIGHT?

10    A     THAT IS CORRECT.

11    Q     AND YOU'VE BEEN INVOLVED IN ETSI SINCE 1988

12    THROUGH YOUR WORK AT VODAFONE; RIGHT?

13    A     THAT IS CORRECT.

14    Q     AND YOU STARTED OUT BY PARTICIPATING IN THESE

15    TECHNICAL WORKING GROUPS THAT YOU WERE TALKING

16    ABOUT.  DO YOU REMEMBER?

17    A     THAT'S CORRECT, YES.

18    Q     AND YOU WERE -- YOU WENT TO MANY OF THESE;

19    RIGHT?

20    A     YES, I DID.

21    Q     AND IN ALL OF THOSE MEETINGS WHERE YOU

22    ATTENDED AS A MEMBER OF THE WORKING GROUP, NEVER

23    ONCE DID ANYBODY RAISE THEIR HAND AND SAY, HEY,

24    I'VE GOT ESSENTIAL IPR.  CORRECT?

25    A     THAT IS CORRECT.
```

1    Q    NOW, ETSI ENCOURAGES COMPANIES LIKE SAMSUNG TO

2    MAKE A GENERAL IPR DECLARATION AS PART OF A CALL

3    FOR IPR'S; RIGHT?

4    A    THAT'S CORRECT, ALL COMPANIES ARE ASKED TO DO

5    THAT.

6    Q    AND, IN FACT, IN DECEMBER OF 1998, SAMSUNG

7    SUBMITTED A GENERAL IPR LICENSING DECLARATION TO

8    ETSI, DIDN'T IT?

9    A    THEY DID, YES, INDEED.

10   Q    TURN TO EXHIBIT 549.

11            CAN WE PUT THAT --

12            AND I WOULD MOVE THIS INTO EVIDENCE, YOUR

13   HONOR.

14            MR. MUELLER:  NO OBJECTION.

15            THE COURT:  IT'S ADMITTED.

16            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17            549, HAVING BEEN PREVIOUSLY MARKED FOR

18            IDENTIFICATION, WAS ADMITTED INTO

19            EVIDENCE.)

20            MR. VERHOEVEN:  CAN WE PUT IT ON THE

21   SCREEN.

22   Q    NOW, THIS IS DECEMBER 1998; RIGHT?

23   A    CORRECT.

24   Q    AND DO YOU SEE HERE IT SAYS SEC, THAT'S THE

25   SAMSUNG COMPANY WHO'S A DEFENDANT IN THIS CASE;

1    RIGHT?

2    A    YES.

3    Q    SEC IS PREPARED TO GRANT LICENSES TO ITS

4    SPECIAL IPR'S ON A FAIR, REASONABLE, AND

5    NON-DISCRIMINATORY BASIS IN ACCORDANCE WITH THE

6    TERMS AND CONDITIONS SET FORTH IN CLAUSE 6.1 OF THE

7    ETSI IPR POLICY.

8              DO YOU SEE THAT?

9    A    CORRECT.

10   Q    SO SAMSUNG SAID TO ALL THESE MEMBERS OF ETSI,

11   HEY, IF SOMETHING BECOMES ESSENTIAL IN THE FUTURE,

12   WE'RE LETTING YOU KNOW IN ADVANCE, WE WILL LICENSE

13   THAT ON FAIR, REASONABLE, AND NON-DISCRIMINATORY

14   TERMS.  ISN'T THAT WHAT THAT'S SAYING?

15   A    THAT IS CORRECT.  MANY COMPANIES DID THAT.

16   Q    NOW, LET'S GO BACK TO PDX 45.6.

17             NOW, YOU'VE GOT A TIME LINE HERE, SIR,

18   BUT YOU DIDN'T PUT ON THE TIMELINE THIS GENERAL

19   DECLARATION THAT SAMSUNG MADE; ISN'T THAT TRUE,

20   SIR?

21   A    THAT IS TRUE.  THIS TIMELINE RELATED TO

22   DISCLOSURE.

23   Q    SIR, IF YOU COULD PLEASE ANSWER MY QUESTION.

24   A    YES, I HAVE.

25   Q    YOU DIDN'T PUT IT ON THE TIMELINE, DID YOU?

```
 1    A    NO, I HAVE NOT.
 2    Q    IN FACT, THAT WOULD BE WAY BEFORE ANY OF THESE
 3    ITEMS ON THE TIMELINE; CORRECT?
 4    A    THAT IS CORRECT.  BUT IT'S NOT RELATED TO
 5    DISCLOSURE.  THESE ARE THE DISCLOSURE EVENTS.
 6    Q    NOW --
 7    A    YOU CITED CLAUSE 6.1.
 8    Q    NOW, SIR, SIR, I'M ON THE CLOCK.
 9         YOU WERE HERE TODAY.  YOU SAW THE
10    TESTIMONY OF DR. KIM; RIGHT?
11    A    I DID, YES.
12    Q    AND DR. KNIGHTLY?
13    A    YES, I DID.
14    Q    AND YOU HEARD BOTH OF THEM TESTIFY THAT THESE
15    TWO PATENTS, THE '941 AND THE '516 PATENTS, ARE NOT
16    ESSENTIAL.
17    A    YES, I DID.
18    Q    DIDN'T YOU, SIR?
19    A    I DID HEAR THEM SAY THAT.
20    Q    AND ISN'T IT TRUE IF A PATENT IS NOT
21    ESSENTIAL, AS APPLE'S OWN SWORN EXPERTS SAID, THEN
22    THERE'S ABSOLUTELY NO DISCLOSURE OBLIGATION, IS
23    THERE, SIR?
24    A    YOU ONLY HAVE TO BELIEVE IT LIKELY TO BE
25    ESSENTIAL.
```

```
 1      Q    NOW, YOU TALKED A LITTLE BIT ABOUT FRAND.

 2      ISN'T IT TRUE, SIR, YOU HAVE NO OPINION TO PRESENT

 3      TO THIS JURY WITH RESPECT TO WHETHER SAMSUNG HAS

 4      MADE A FRAND OFFER OR NOT?

 5      A    I'M DEALING WITH DISCLOSURE AT THE MOMENT,

 6      YES.

 7      Q    SO THE ANSWER IS YES?

 8      A    YES.

 9      Q    LET'S GO BACK TO THE IPR POLICY.  CAN WE PUT

10      UP SDX 3916.2.  ETSI HAS A SECTION 14 IN THE ETSI

11      IPR POLICY CALLED VIOLATION OF POLICY.  YES OR NO?

12      A    YES, IT HAS.

13      Q    IT SAYS, "ANY VIOLATION OF THE POLICY BY A

14      MEMBER SHALL BE DEEMED TO BE A BREACH BY THAT

15      MEMBER OF ITS OBLIGATIONS TO ETSI.  THE ETSI

16      GENERAL ASSEMBLY SHALL HAVE THE AUTHORITY TO DECIDE

17      THE ACTION TO BE TAKEN, IF ANY, AGAINST THE MEMBER

18      IN BREACH IN ACCORDANCE WITH ETSI STATUTES."

19             DO YOU SEE THAT, SIR?

20      A    YES, I DO.

21      Q    YOU HAVE NO OPINION AS TO WHETHER OR NOT,

22      UNDER SECTION 14, SAMSUNG VIOLATED THE ETSI POLICY;

23      CORRECT?

24      A    CORRECT.  AS FAR AS I KNOW, NO PROCESS HAS

25      TAKEN PLACE WITHIN ETSI TO DECIDE THAT.
```

1    Q    IF YOU CAN ANSWER ME YES OR NO ON THAT?

2    A    YES, I HAVE NO OPINION AS TO THE HYPOTHETICAL

3    QUESTION.

4    Q    YOU HAVE NO OPINION AS TO WHETHER OR NOT

5    SECTION 14 -- LET ME REPHRASE.  YOU HAVE NO OPINION

6    AS TO WHETHER OR NOT, UNDER SECTION 14, SAMSUNG

7    VIOLATED THE ETSI POLICY?

8    A    THAT'S CORRECT.  SECTION 14 DOESN'T MEAN --

9    Q    EXCUSE ME, SIR.  IS THAT A YES?

10   A    THAT IS A YES BECAUSE --

11            MR. VERHOEVEN:  THANK YOU, SIR.

12            YOUR HONOR, PASS THE WITNESS.

13            THE COURT:  ALL RIGHT.  THE TIME IS

14   11:27.  GO AHEAD, PLEASE.

15                   **REDIRECT EXAMINATION**

16   BY MR. MUELLER:

17   Q    TO YOUR KNOWLEDGE, HAS ETSI CONDUCTED ANY

18   INVESTIGATION INTO SAMSUNG'S DISCLOSURE PRACTICES?

19   A    NO, THEY HAVE NOT.

20            MR. MUELLER:  NOW -- MAY I APPROACH THE

21   WITNESS, YOUR HONOR?

22            THE COURT:  GO AHEAD, PLEASE.

23   BY MR. MUELLER:

24   Q    I'M HANDING YOU PLAINTIFF'S EXHIBIT 75.

25   MR. VERHOEVEN REFERRED YOU TO THE ETSI GUIDE.  IS

```
 1     THIS ANOTHER VERSION OF THAT GUIDE?

 2     A    I DIDN'T NOTICE THE ACTUAL VERSION THAT WAS

 3     PRESENTED, BUT THIS IS A VERSION, YES.

 4              MR. MUELLER:  YOUR HONOR, I OFFER IT.

 5              THE COURT:  ANY OBJECTION?

 6              MR. VERHOEVEN:  I'VE JUST BEEN HANDED

 7     THIS JUST NOW, YOUR HONOR.  I NEED TO CHECK TO SEE

 8     WHAT IT IS.  WE HAVE TO CHECK, YOUR HONOR.  WE

 9     DON'T BELIEVE THIS WAS DISCLOSED IN THE EXAMINATION

10     EXHIBITS.

11              MR. MUELLER:  YOUR HONOR, I'M RAISING IT

12     BECAUSE IT WAS RAISED ON CROSS AS A NEW SUBJECT.

13              MR. VERHOEVEN:  NO, THIS DOCUMENT WAS

14     NOT, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  MOVE ONTO

16     SOMETHING ELSE.

17              MR. MUELLER:  OKAY, THAT'S FINE.

18     Q    DR. WALKER, DOES A GENERAL DECLARATION SATISFY

19     THE SPECIFIC DISCLOSURE OBLIGATIONS UNDER CLAUSE 4.

20              MR. VERHOEVEN:  OBJECTION, LEADING.

21              THE COURT:  OVERRULED.

22     BY MR. MUELLER:

23     Q    YOU CAN ANSWER, SIR?

24     A    NO, IT DOESN'T BECAUSE IT DOESN'T ADDRESS

25     DISCLOSURE.
```

1    Q    NEXT SUBJECT, DR. WALKER.  MR. VERHOEVEN ASKED

2    YOU SOME QUESTIONS ABOUT CONFIDENTIALITY.  DO YOU

3    RECALL THAT?

4    A    YES, I DO.

5    Q    LET'S TAKE A LOOK AT THE ETSI IPR POLICY FROM

6    1997, WHICH YOU HAVE BEFORE YOU.  PLEASE TURN, IF

7    YOU COULD, SIR, TO PROVISION 10 AND LET'S PUT THAT

8    ON THE SCREEN.

9             SIR, WHAT DOES THIS PROVISION SAY?

10            MR. VERHOEVEN:  OBJECTION.  OUTSIDE OF

11   SCOPE OF THIS WITNESS'S REPORT.

12            MR. MUELLER:  YOUR HONOR, IT'S NOT.  IT

13   WAS DIRECTLY WITHIN THE SCOPE OF THE

14   CONFIDENTIALITY CROSS-EXAMINATION THAT WE JUST

15   HEARD ABOUT.

16            THE COURT:  OVERRULED.  GO AHEAD.

17            THE WITNESS:  WHAT THIS SAYS IS THAT IF

18   YOU HAVE INFORMATION THAT YOU BELIEVE IS

19   CONFIDENTIAL AND YOU WISH TO MAKE IT, CREATE A

20   PROPOSAL FROM IT AND BRING IT TO ETSI, THEN YOU

21   HAVE TO MARK IT AS CONFIDENTIAL.  IT HAS TO BE IN

22   WRITING.  YOU HAVE TO TAKE IT TO THE CHAIRMAN OF

23   THE, OF THE TECHNICAL GROUP.  HE HAS TO AGREE THAT

24   YOU CAN NOW SUBMIT IT TO THAT TECHNICAL BODY.  THE

25   TECHNICAL BODY WILL MAINTAIN CONFIDENTIALITY.  BUT

3529

1    THAT IS THE LIMIT.

2    BY MR. MUELLER:

3    Q    DR. WALKER, HAVE YOU SEEN ANY EVIDENCE THAT

4    SAMSUNG FOLLOWED THIS PROVISION?

5    A    ABSOLUTELY NOT.  ALL THEIR DOCUMENTS THAT I

6    HAVE SEEN, THEY WERE SUBMITTED WITHOUT ANY

7    CONFIDENTIAL MARKINGS WHATSOEVER.

8    Q    AND, DR. WALKER, YOU WALKED US THROUGH THE

9    WORKING GROUP MEETINGS.  WERE THOSE PUBLIC OR

10   CONFIDENTIAL MEETINGS?

11   A    ALL OF THOSE MEETINGS, 3GPP MEETINGS, ALL OF

12   THE REPORTS, ALL OF THE DOCUMENTATION IS PUBLIC.

13   Q    INCLUDING THE SAMSUNG PROPOSALS?

14   A    INCLUDING THE SAMSUNG PROPOSALS.

15   Q    LAST QUESTION, DR. WALKER.  IF WE LOOK AT

16   CLAUSE 4, MR. VERHOEVEN ASKED YOU SOME QUESTIONS

17   ABOUT THE WORD "TIMELY."

18        I WANT TO FOCUS YOUR ATTENTION ON THAT

19   SECOND SENTENCE, CLAUSE 4.1, "A MEMBER SUBMITTING A

20   TECHNICAL PROPOSAL FOR A STANDARD SHALL, ON A BONA

21   FIDE BASIS, DRAW THE ATTENTION OF ETSI TO ANY OF

22   THAT MEMBER'S IPR WHICH MIGHT BE ESSENTIAL IF THAT

23   PROPOSAL IS ADOPTED."

24        WHAT IS YOUR VIEW ON THE TIMING

25   REQUIREMENT OF THAT SENTENCE?

```
 1    A    THAT IF YOU BELIEVE THAT YOUR PROPOSAL
 2    CONTAINS IPR THAT MAY BE ESSENTIAL, THEN YOU SHOULD
 3    DISCLOSE IT BEFORE OR AT THE POINT OF WHICH THAT
 4    PROPOSAL IS ADOPTED.
 5    Q    AND, SIR, IN YOUR OPINION, DID SAMSUNG COMPLY
 6    WITH THAT PROPOSAL?
 7    A    IN NEITHER CASE DID THEY COMPLY WITH IT.
 8              MR. MUELLER:  I HAVE NOTHING FURTHER.
 9              THE COURT:  ALL RIGHT.  IT'S 11:30.  ANY
10    RECROSS.
11              MR. VERHOEVEN:  JUST ONE SECOND, YOUR
12    HONOR.
13              THE COURT:  OKAY.
14              (PAUSE IN PROCEEDINGS.)
15              MR. VERHOEVEN:  YOUR HONOR, IN THE
16    INTEREST OF TIME, I'M NOT GOING TO HAVE ANY FURTHER
17    EXAMINATION.
18              THE COURT:  ALL RIGHT.  MAY THIS WITNESS
19    BE EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?
20              MR. MUELLER:  NOT SUBJECT TO RECALL, YOUR
21    HONOR.
22              THE COURT:  OKAY.  YOU MAY BE EXCUSED.
23              CALL YOUR NEXT WITNESS, PLEASE.
24              MR. LEE:  YOUR HONOR, APPLE CALLS
25    MR. DONALDSON.
```

6351

```
 1              THE COURT:  OKAY.  IF ANYONE WANTS TO
 2     STAND UP AND STRETCH DURING THE TRANSITION TIME,
 3     PLEASE DO SO.
 4              DO WE HAVE PHOTOS OR ANYBODY.
 5              MR. MUELLER:  WE'VE TAKEN THEM, YOUR
 6     HONOR.  WE'LL PASS THEM UP OF THE I THINK THEY'RE
 7     BEING PRINTED.
 8              MR. LEE:  THERE THEY ARE, YOUR HONOR.
 9              THE COURT:  GO AHEAD AND PASS THEM OUT.
10              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
11                      RICHARD DONALDSON,
12     BEING CALLED AS A WITNESS ON BEHALF OF THE
13     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS
14     EXAMINED AND TESTIFIED AS FOLLOWS:
15              THE WITNESS:  I DO.
16              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
17              THE COURT:  CAN YOU PASS THE PHOTOGRAPHS.
18              I WANT PEOPLE TO WRITE NOTES ON THE
19     PHOTOS AND IF YOU GIVE THEM TO US LATE, THEY DON'T
20     GET TO WRITE NOTES ON THE PHOTOS.
21              MR. MUELLER:  SORRY, YOUR HONOR.
22                      DIRECT EXAMINATION
23     BY MR. MUELLER:
24     Q    GOOD MORNING, MR. DONALDSON.  COULD YOU PLEASE
25     INTRODUCE YOURSELF TO THE JURY.
```

6532

```
1     A     YES.  MY NAME IS RICHARD DONALDSON.

2               THE COURT:  TIME IS 11:32.

3               THE WITNESS:  I LIVE IN PLANO, TEXAS.

4     BY MR. MUELLER:

5     Q     HAVE YOU BEEN RETAINED BY APPLE AS AN EXPERT

6     WITNESS IN THIS CASE?

7     A     YES, SIR, I HAVE.

8     Q     COULD YOU BRIEFLY SUMMARIZE YOUR EDUCATION AND

9     PROFESSIONAL BACKGROUND?

10    A     YES.  I HAVE A DEGREE IN ELECTRICAL

11    ENGINEERING; I HAVE A LAW DEGREE FROM ST. LOUIS

12    UNIVERSITY; AND THEN I HAVE A MASTER'S OF LAW

13    DEGREE FROM GEORGE WASHINGTON UNIVERSITY WHERE I

14    SPECIALIZED IN PATENT AND TRADE REGULATION.

15    Q     WHAT IS YOUR PROFESSIONAL BACKGROUND, SIR?

16    A     YES, FROM MY WORK WITH RESPECT TO PATENTS, I

17    WENT TO WORK FOR TEXAS INSTRUMENTS IN 1969 AS A

18    PATENT ATTORNEY.  I WORKED THERE FOR 31 YEARS,

19    FOCUSSED MOST OF MY TIME AS THE CHIEF LICENSING

20    PERSON AT TEXAS INSTRUMENTS.

21              I BECAME GENERAL PATENT COUNSEL AND

22    RETIRED FROM TEXAS INSTRUMENTS IN 2000 AS GENERAL

23    PATENT COUNSEL AND SENIOR VICE PRESIDENT OF TEXAS

24    INSTRUMENTS.

25    Q     SIR, HOW MANY LICENSES HAVE YOU NEGOTIATED AS
```

1    A PRINCIPAL NEGOTIATOR?

2    A    THAT WOULD BE IN THE HUNDREDS.

3    Q    AND HAVE YOU NEGOTIATED LICENSES THAT COVER

4    SOMETHING KNOWN AS FAIR, REASONABLE, AND

5    NON-DISCRIMINATORY COMMITTED PATENTS, OR FRAND

6    PATENTS?

7    A    YES, SIR, I HAVE.

8    Q    CAN YOU EXPLAIN BRIEFLY?

9    A    MANY OF THE LICENSES, IN FACT, MOST OF THE

10   LICENSES THAT I NEGOTIATED WOULD INCLUDE PATENTS

11   RELATED TO FRAND.

12            I ALSO, SINCE RETIRING FROM TEXAS

13   INSTRUMENTS, HAVE BEEN IN LICENSING CONSULTING, AND

14   IN CONSULTING WITH OTHER COMPANIES.  I'VE ACTUALLY

15   DONE NEGOTIATIONS INVOLVING FRAND PATENTS.

16            AND I'VE ALSO SERVED AS A WITNESS, OR AS

17   AN EXPERT IN PATENT LITIGATION WHERE FRAND PATENTS

18   WERE ASSERTED.

19            MR. MUELLER:  YOUR HONOR, I OFFER

20   MR. DONALDSON AS AN EXPERT IN PATENT LICENSING,

21   INCLUDING FRAND PATENT LICENSING.

22            MS. MAROULIS:  NO OBJECTION.

23            THE COURT:  ALL RIGHT.  HE IS CERTIFIED.

24   GO AHEAD, PLEASE.

25   BY MR. MUELLER:

1    Q    MR. DONALDSON, CAN YOU BRIEFLY SUMMARIZE ANY

2    DIFFERENCES THAT, IN YOUR OPINION, DISTINGUISH

3    FRAND PATENTS FROM OTHER PATENTS?

4    A    YES, THERE ARE SEVERAL, MANY DISTINCTIONS, AND

5    I HAVE A SLIDE THAT --

6    Q    LET'S PUT IT UP.  PDX 49.2, PLEASE.  WHAT DO

7    WE SEE HERE?

8    A    THIS SLIDE SHOWS THREE AREAS OF MATERIAL

9    DIFFERENCES BETWEEN HOW YOU GO ABOUT LICENSES WHAT

10   YOUR RIGHTS ARE WITH RESPECT TO LICENSES PATENTS

11   THAT ARE SUBJECT TO FRAND OBLIGATIONS AND PATENTS

12   THAT ARE NOT SUBJECT TO THAT.

13   Q    FIRST ROW REFERS TO EXCLUSIVE USE.  CAN YOU

14   EXPLAIN?

15   A    WELL, YES.  THE FRAND PATENTS, AS EXPLAINED

16   EARLIER TODAY, THEY RELATE TO PATENTS THAT ARE

17   GENERATED WITH RESPECT TO AN INDUSTRY STANDARD,

18   SUCH AS UMTS.

19          AND ONE OF THE PURPOSES OF THAT STANDARD

20   IS WIDE DISTRIBUTION OR USE THROUGHOUT THE

21   INDUSTRY.

22          SO COMPANIES WHO OBTAIN PATENTS RELATING

23   TO THAT SPECIFICATION SIGN AN UNDERTAKING THAT THEY

24   WILL LICENSE IT TO ANYONE WHO WANTS A LICENSE

25   UNDERSTOOD IT, AND THAT MEANS THEY DO NOT HAVE

1    EXCLUSIVE USE.

2           WHEREAS IF YOU GO TO THE NON-FRAND

3    PATENTS, THAT'S ONE OF THE PRIMARY RIGHTS OF A

4    PATENT OWNER IS TO HAVE EXCLUSIVE USE OF THAT

5    PATENT.

6    Q    SECOND ROW REFERS TO FREEDOM TO DETERMINE

7    ROYALTY AMOUNT.  CAN YOU EXPLAIN TO THE JURY WHAT

8    THAT MEANS?

9    A    YES.  WITH RESPECT TO THESE FRAND PATENTS,

10   COMPANIES WHO OWN SUCH A PATENT ARE UNDER SOME

11   MATERIAL LIMITATIONS OR RESTRICTIONS OF WHAT WE CAN

12   DO WHEN THEY LICENSE THAT PATENT.

13          AND IN PARTICULAR, THEY ARE COMMITTING

14   THEMSELVES TO SAY THEY WILL LICENSE THESE PATENTS

15   UNDER FAIR, REASONABLE, EXAMINE NON-DISCRIMINATORY

16   TERMS, WHICH ARE VERY SIGNIFICANT LIMITATIONS.

17          WHEREAS IF YOU GO TO OTHER PATENTS, THERE

18   ARE NO RESTRICTIONS.  YOU CAN LICENSE AT WHATEVER

19   THE MARKET WILL BEAR.

20   Q    LAST ROW REFERS TO DISTINGUISHING PRODUCTS

21   FROM COMPETITORS.  CAN YOU EXPLAIN THAT, PLEASE?

22   A    WELL, AGAIN, WHEN YOU LOOK AT THE PATENTS THAT

23   RELATE TO THESE SPECIFICATIONS THAT ARE SUBJECT TO

24   THESE FRAND OBLIGATIONS, YOU HAVE MADE A COMMITMENT

25   AS A PATENT OWNER TO LICENSE IT TO ANYONE WHO WANTS

```
 1    A LICENSE.  SO YOU CANNOT DISTINGUISH ANY PRODUCT

 2    FROM ANOTHER PRODUCT BECAUSE THEY ALL HAVE A RIGHT

 3    TO USE ALL OF THE FRAND PATENTS.

 4            WHEREAS OTHER PATENTS, THESE ARE

 5    SOMETIMES SOME OF THE MOST IMPORTANT PATENTS THAT A

 6    COMPANY CAN OWN BECAUSE THEY COVER THE BELLS AND

 7    THE WHISTLES OF A PRODUCT.  THEY COVER FEATURES

 8    THAT WILL DISTINGUISH YOUR PRODUCT FROM A

 9    COMPETITOR'S PRODUCT.  AND YOU CAN KEEP THOSE

10    FEATURES JUST TO YOURS AND NOT LICENSE THEM AT ALL,

11    OR WHEN YOU DO LICENSE IT, YOU CAN GET

12    SUBSTANTIALLY HIGHER ROYALTIES, IN MY EXPERIENCE,

13    THAN WHAT YOU WOULD GET FROM A FRAND-RELATED

14    PATENT.

15    Q    SIR, IF YOU COULD TURN TO TAB 2 IN YOUR

16    BINDER, THIS IS PX 80, THE SAMSUNG PORTFOLIO

17    PROPOSAL THAT THE JURY HEARD ABOUT YESTERDAY FROM

18    DR. TEECE.

19            DO YOU HAVE AN OPINION AS TO WHETHER THIS

20    PORTFOLIO PROPOSAL MET SAMSUNG'S REQUIREMENTS OF

21    FRAND LICENSING?

22    A    YES, IN MY OPINION, IT DOES NOT MEET THE

23    REQUIREMENTS TO LICENSE UNDER FRAND TERMS.

24    Q    CAN YOU EXPLAIN WHY NOT, SIR?

25    A    BECAUSE THE ROYALTY BASE THAT IS USED AND THE
```

1    ROYALTY RATE THAT IS USED TO CALCULATE THE

2    ROYALTIES ARE NOT REASONABLE.  THEY'RE NOT FAIR AND

3    REASONABLE.

4    Q    AND JUST SO WE'RE CLEAR, WHEN YOU REFER TO THE

5    RATE AND THE BASE, ARE YOU REFERRING TO 2.4 PERCENT

6    OF THE PRICE OF EACH APPLE PRODUCT?

7    A    THAT IS CORRECT.

8    Q    AND THE RATE IS 2.4 PERCENT?

9    A    AND THE BASE IS THE ENTIRE PRICE, SELLING

10   PRICE OF ONE OF THE ACCUSED PRODUCTS, LIKE THE

11   IPHONE.

12   Q    NOW, LET'S FOCUS FIRST ON THE BASE.  DO YOU

13   HAVE AN OPINION AS TO WHETHER OR NOT THE BASE IN

14   THE SAMSUNG PROPOSAL COMPLIED WITH FRAND?

15   A    YES, I BELIEVE IT DOES NOT APPLY TO FRAND.

16   Q    AND WHY NOT, SIR?

17   A    BECAUSE IN LICENSING, WHEN YOU ARE LICENSING A

18   PATENT, YOU PRIMARILY, WHEN YOU SELECT THE ROYALTY

19   BASE, ARE LOOKING FOR SOMETHING THAT MOST CLOSELY

20   RELATES TO THE SCOPE OF THE PATENT.

21        HERE WE'RE TALKING ABOUT TWO PATENTS THAT

22   COVER UMTS, THEY COVER CELL PHONE APPLICATIONS.

23        THE IPHONE, OR THE IPOD THAT ARE ACCUSED,

24   THEY COVER MANY, MANY OTHER FEATURES.  IN FACT, THE

25   ONLY CAPABILITY, WHAT PROVIDES THE CAPABILITY IN

1    THESE PRODUCTS IS THE UMTS CHIPSET, OR THE BASEBAND

2    CONTROLLER, WHICH IS JUST ONE SMALL PART OF THE

3    PHONE.

4                AND THAT WOULD BE A MORE REASONABLE

5    BASIS, BECAUSE OTHERWISE YOU'RE OBTAINING ROYALTIES

6    ON VALUE COMPLETELY UNRELATED TO YOUR PATENT.

7    Q    NOW, SIR, WERE YOU HERE YESTERDAY FOR THE

8    TESTIMONY OF TONY BLEVINS FROM APPLE?

9    A    YES, I WAS.

10   Q    AND DID YOU HEAR HIM DISCUSS HOW MUCH APPLE

11   PAYS FOR THE BASEBAND PROCESSORS AND THE PRODUCTS

12   ACCUSED?

13   A    YES.  AS I RECALL HE TESTIFIED THAT APPLE

14   PURCHASES THESE BASEBAND CONTROLLER FROM INTEL AND

15   THE PRICE IS BETWEEN $6 AND $10 PER UNIT.

16   Q    HOW DOES THAT COMPARE TO THE ROYALTIES THAT

17   SAMSUNG WAS DEMANDING UNDER THIS PROPOSAL?

18   A    WELL, SAMSUNG IS APPLYING, IN THIS PROPOSAL A

19   ROYALTY OF 2.4 PERCENT TO A PRODUCT THAT SELLS FOR

20   $600, WHERE THE CAPABILITY TO DO THE CELL PHONE,

21   THE UMTS CHIPSET, SELLS FOR $6 TO $12.  I THINK $12

22   IS WHAT HE USED.

23   Q    AND DO YOU KNOW HOW MUCH THE SAMSUNG ROYALTY

24   WOULD TRANSLATE INTO IN DOLLARS AND CENTS?

25   A    YES, UNDER SAMSUNG'S PROPOSAL, IT WOULD BE

1    OVER $14 FOR EACH PRODUCT.

2    Q    AS COMPARED TO WHAT PRICE FOR THE BASEBAND?

3    A    BETWEEN $6 AND $12.

4    Q    NOW, WHAT DOES THE N-D IN FRAND STANDS FOR?

5    A    IT STANDS FOR NON-DISCRIMINATORY.

6    Q    WAS SAMSUNG PROPOSAL NON-DISCRIMINATORY?

7    A    NO, I BELIEVE IT IS DISCRIMINATORY.

8    Q    COULD YOU EXPLAIN?

9    A    SURE.  BECAUSE THE FUNCTIONALITY THAT THESE

10   PATENTS RELATE TO IS CELL PHONE CAPABILITY.  THAT'S

11   PROVIDED BY THE UMTS CHIP THAT SELLS FOR $6 TO $12.

12           SO IF A COMPANY, ONE COMPANY BUILDS JUST

13   A STANDARD CELL PHONE, SELLING FOR MAYBE $100, THEY

14   WOULD PAY 2.4 PERCENT UNDER THAT EXAMPLE, OR $2.04.

15           BUT IF YOU APPLY THE 2.4 PERCENT TO THE

16   ENTIRE PRICE OF AN APPLE SMARTPHONE, THAT'S $600,

17   THAT'S OVER $14 FOR CAPABILITIES AND

18   FUNCTIONALITIES UNRELATED TO THE CELL PHONE.

19   Q    AND YOU VIEW THAT AS DISCRIMINATORY?

20   A    YES, I CERTAINLY DO.

21   Q    NOW, LET'S SWITCH GEARS FOR A MOMENT.  I WANT

22   TO ASK YOU TO TURN TO TAB 3 IN YOUR BINDER.  THIS

23   IS A REDACTED VERSION OF A LICENSE AGREEMENT.  THE

24   JURY WILL HAVE THE FULL VERSION, BUT THE PUBLIC

25   WILL HAVE A REDACTED VERSION OF THIS AGREEMENT.

```
1                 DO YOU RECOGNIZE IT?

2    A    YES, I DO.

3    Q    WHAT IS IT?

4    A    THIS IS A LICENSE AGREEMENT BETWEEN SAMSUNG

5    AND INTEL THAT REALLY RELATES TO A BROAD RANGE OF

6    INTEGRATED CIRCUITS, BUT IT'S A LICENSE THAT WOULD

7    INCLUDE A BASEBAND CONTROLLER.

8    Q    BETWEEN INTEL?

9            MS. MAROULIS:  YOUR HONOR, OBJECTION WITH

10   REFERENCE TO PRIOR PRETRIAL ORDER AS TO THE SCOPE

11   OF MR. DONALDSON'S TESTIMONY.

12           MR. MUELLER:  YOUR HONOR, I'M GOING TO

13   ASK ONLY ABOUT MR. DONALDSON'S UNDERSTANDING AS TO

14   HOW PARTICULAR TERMS ARE COMMONLY UNDERSTOOD IN THE

15   ENTRY.  THAT'S PRECISELY WHAT YOU ALLOWED IN DOCKET

16   ENTRY 1157 ON JUNE 30TH.

17           THE COURT:  GO AHEAD.

18   Q    MR. DONALDSON, DO YOU HAVE PERSONAL EXPERIENCE

19   LICENSING IN THE SEMICONDUCTOR INDUSTRY?

20   A    YES.  MOST OF MY CAREER AT T.I. WAS DOING JUST

21   THAT.

22   Q    LET'S TAKE A LOOK AT SECTION 31(A)(1), WHICH

23   IS PART OF THE MATERIALS IN THIS LICENSE AGREEMENT.

24           AND, YOUR HONOR, BEFORE I DO, I OFFER

25   THIS.
```

3541

```
1              THE COURT:  ANY OBJECTION, MS. MAROULIS?

2              MS. MAROULIS:  NO OBJECTION OTHER THAN

3    STATED.

4              THE COURT:  IT'S ADMITTED.

5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

6              81, HAVING BEEN PREVIOUSLY MARKED FOR

7              IDENTIFICATION, WAS ADMITTED INTO

8              EVIDENCE.)

9    BY MR. MUELLER:

10   Q    THIS IS THE REDACTED VERSION.  I'M GOING TO

11   ASK YOU TO TURN TO THIS SECTION, WHICH IS SOMETHING

12   THE PUBLIC CAN SEE, AND DO YOU SEE WHERE IT SAYS

13   SUBJECT TO THE TERMS AND CONDITIONS OF THIS

14   AGREEMENT, SAMSUNG HERE BY GRANDS TO INTEL A

15   NONEXCLUSIVE, NON TRANSFERRABLE, ROYALTY-FREE

16   WORLDWIDE LICENSE, WITHOUT THE RIGHT TO SUBLICENSE,

17   UNDER SAMSUNG'S PATENTS TO MAKE, USE, SELL,

18   DIRECTLY OR INDIRECTLY, OFFER TO SELL, IMPORT, OR

19   OTHERWISE DISPOSE OF ALL INTEL LICENSED PRODUCTS.

20            DO YOU SEE THAT, SIR?

21   A    I DO.

22   Q    DO YOU SEE IT SAYS ROYALTY-FREE?

23   A    I DO.

24   Q    WHAT DOES THAT MEAN WITH RESPECT TO WHAT INTEL

25   OWED SAMSUNG IN TERMS OF MONEY?
```

3542

```
1            MS. MAROULIS:  OBJECTION, CALLS FOR LEGAL

2    CONCLUSION.

3            MR. MUELLER:  YOUR HONOR, AGAIN, I'M

4    ASKING ABOUT HOW SOMEONE IN THE INDUSTRY WOULD

5    UNDERSTAND THESE TERMS.

6            THE COURT:  OVERRULED.

7            GO AHEAD.

8            THE WITNESS:  I WAS INVOLVED IN

9    NEGOTIATING A NUMBER OF ROYALTY-FREE CROSS LICENSES

10   OF THIS NATURE, AND IT'S JUST WHAT IT SAYS.  WHAT

11   PEOPLE UNDERSTOOD, THAT NO MONEY CHANGES HANDS

12   BETWEEN THE PARTIES.

13   Q    NOW, YOU'VE REVIEWED OTHER SAMSUNG AGREEMENTS;

14   IS THAT RIGHT?

15   A    I HAVE.

16   Q    HAVE YOU SEEN ANY EVIDENCE THAT ANYONE HAS

17   PAID SAMSUNG MONEY FOR ITS UMTS PORTFOLIO?

18   A    NO, I HAVE NOT.

19   Q    LET'S FOCUS ON THIS PROVISION.  DO YOU SEE

20   WHERE IT SAYS MAKE, USE, SELL, DIRECTLY OR

21   INDIRECTLY.  CAN YOU EXPLAIN HOW THOSE TERMS ARE

22   COMMONLY UNDERSTOOD IN THE SEMICONDUCTOR INDUSTRY?

23            MS. MAROULIS:  OBJECTION.

24            THE COURT:  OVERRULED.

25            THE WITNESS:  THIS IS UNDERSTOOD AND USED
```

3543

```
1    TO DEFINE THE RIGHTS THAT A LICENSEE HAS WITH

2    RESPECT TO LICENSES THAT HE TAKES.

3           SO THESE ARE SEPARATE RIGHTS, AND THEY

4    CAN BE LICENSED SEPARATELY AND OFTEN ARE.  YOU HAVE

5    THE RIGHT TO MAKE, AS SPECIFIED HERE, YOU HAVE THE

6    RIGHT TO MAKE A PRODUCT USING THOSE PATENTS, THE

7    RIGHT TO USE IT, A SEPARATE RIGHT TO SELL, EITHER

8    DIRECTLY OR INDIRECTLY, AND OFFER TO SELL, IMPORT,

9    OR OTHERWISE DISPOSE THEM.  THEY'RE ALL SEPARATE

10   RIGHTS THAT CAN BE SEPARATELY LICENSED.

11   BY MR. MUELLER:

12   Q    CAN I FOCUS YOUR ATTENTION ON DIRECTLY OR

13   INDIRECTLY.  HOW IS THAT TERM UNDERSTOOD?

14   A    THIS IS OFTEN USED, IT RELATES TO THE RIGHT TO

15   SELL AND FOR LARGE COMPANIES THAT MIGHT HAVE A

16   NUMBER OF SUBSIDIARIES OR MIGHT MAKE PRODUCTS THAT

17   YOU WANT TO SELL THROUGH DISTRIBUTORS, THEY WANT TO

18   BE SURE THAT THE RIGHT TO SELL IS SUFFICIENTLY

19   BROAD TO ENTITLE THEM TO USE THESE DIFFERENT FORMS

20   OF DISTRIBUTION IN SELLING PRODUCTS.

21   Q    AND JUST SO WE'RE CLEAR, THESE ARE ALL RIGHTS

22   THAT SAMSUNG GAVE TO INTEL WITH RESPECT TO

23   SAMSUNG'S PATENTS?

24   A    THAT IS CORRECT.

25   Q    LET'S PUT THIS ASIDE AND GO BACK TO THE
```

3544

1    SAMSUNG PROPOSAL, PX 80.  WE DISCUSSED THE ROYALTY

2    BASE EARLIER, THE PRICE OF THE PHONE OR THE IPAD?

3    A    YES.

4    Q    NOW, I WANTED TO FOCUS ON THE RATE, 2.4

5    PERCENT.  DO YOU HAVE AN OPINION AS TO WHETHER THAT

6    RATE COMPLIED WITH FRAND?

7    A    YES, I HAVE AN OPINION AND I DO NOT BELIEVE

8    THAT IT DOES.

9    Q    WHY NOT?

10   A    WELL, WHEN YOU LOOK AT THE RATE AND COMBINE

11   THAT WITH THE BASE THAT IT'S APPLIED TO, AS I

12   MENTIONED EARLIER, THAT'S OVER $14 PER UNIT.  AND

13   UNDER THIS PROPOSAL, THIS WAS FOR THE ENTIRE

14   PORTFOLIO OF SAMSUNG'S UMTS PATENTS, PATENTS THAT

15   THEY SAY ARE USED IN PHONES THAT COMPLY WITH THE

16   UMTS.

17        WELL, SAMSUNG OWNS ABOUT -- THEIR PATENTS

18   CONSTITUTE ABOUT 5 PERCENT OF THE NEARLY 2,000

19   PATENTS THAT OTHER COMPANIES HAVE SAID COVER THIS

20   SAME SPECIFICATION.

21        SO IF OTHER COMPANIES CHOSE THE SAME

22   APPROACH AS SAMSUNG, IF THEY -- IF THIS WERE

23   DETERMINED THAT, YES, THIS IS A REASONABLE ROYALTY,

24   THEN THE TOTAL AMOUNT OF ROYALTY ON SOMETHING LIKE

25   AN IPHONE WOULD BE ABOUT 50 PERCENT .

```
 1              AND FROM A BUSINESS PERSPECTIVE, AND, YOU

 2     KNOW, THIS RATE IS SOMETHING THAT REASONABLE

 3     BUSINESS PEOPLE SHOULD BE WHAT THEY WOULD

 4     NEGOTIATE, THIS WOULD BE TOTALLY UNREASONABLE.

 5     IT'S NOT FAIR OR REASONABLE BECAUSE YOU COULD NOT

 6     BE SUCCESSFUL IN THE MARKET.

 7     Q    JUST A COUPLE FINAL QUESTIONS, SIR.  DID YOU

 8     UNDERTAKE ANY ANALYSIS IN THIS CASE AS TO WHETHER

 9     SAMSUNG HAS TRULY ESSENTIAL PATENTS FOR UMTS?

10     A    NO, I DID NOT.

11     Q    IS THAT A SUBJECT FOR THE TECHNICAL EXPERT

12     ITSELF?

13     A    IT IS.

14     Q    WERE YOU HERE YESTERDAY FOR PROFESSOR TEECE'S

15     TESTIMONY?

16     A    I WAS.

17     Q    THIS PROPOSAL LAST YEAR BY SAMSUNG COVERED THE

18     PORTFOLIO; IS THAT RIGHT?

19     A    THAT IS CORRECT.

20     Q    HOW MANY PATENTS WAS DR. TEECE HERE ON?

21     A    JUST TWO.

22     Q    AND WHAT WAS HIS VIEW ON WHAT A REASONABLE

23     ROYALTY IS?

24     A    WELL, HE HAD A RANGE THAT WOULD BE EVEN HIGHER

25     THAN WAS ASKED FOR, FOR THE ENTIRE PORTFOLIO FOR
```

3546

```
1    JUST TWO PATENTS.  IT WOULD BE, AT HIS UPPER RANGE,

2    HIGHER THAN THE $14 THAT -- FOR THE ENTIRE

3    PORTFOLIO.

4    Q    AND, SIR, IS DR. TEECE'S OPINION CONSISTENT

5    WITH FRAND?

6    A    ABSOLUTELY NOT.

7            MR. MUELLER:  NOTHING FURTHER.

8            THE COURT:  ALL RIGHT.  THE TIME IS

9    11:47.

10           MS. MAROULIS:  YOUR HONOR, IN THE

11   INTEREST OF TIME, NO CROSS.

12           THE COURT:  OKAY.  MAY THIS WITNESS BE

13   EXCUSED AND IS IT SUBJECT TO RECALL?

14           MR. MUELLER:  NOT SUBJECT TO RECALL.

15   THANK YOU, YOUR HONOR.

16           THE COURT:  OKAY.  THEN YOU ARE EXCUSED.

17   CALL YOUR NEXT WITNESS, PLEASE.

18           MR. LEE:  YOUR HONOR, THE NEXT THING

19   WE'RE GOING TO DO IS PLAY A DEPOSITION CLIP OF

20   MR. AHN, AND WE HAVE A BOARD THAT HAS HIS TITLE AND

21   NAME FOR THE JURY.

22           THE COURT:  OKAY.

23           MR. LEE:  AND IF I CAN JUST HAVE A

24   MINUTE, WE'RE TRYING TO -- WE'VE SHORTENED IT A

25   LITTLE, AND I WANT TO MAKE SURE I HAVE THE
```

3547

```
 1     SHORTENED VERSION.

 2               THE COURT:  OKAY.

 3               (PAUSE IN PROCEEDINGS.)

 4               MR. MUELLER:  YOUR HONOR, MAY I LODGE

 5     THIS.

 6               THE COURT:  YES, THAT IS THE --

 7               MR. MUELLER:  THIS IS THE AHN TESTIMONY.

 8               THE COURT:  OH, OKAY.  SO WHAT'S THE

 9     NUMBER?

10               MR. MUELLER:  THIS IS, I'M NOT SURE.

11     IT'S 218, PLAINTIFF'S EXHIBIT 218, YOUR HONOR.

12               THE COURT:  OKAY.  218.  ALL RIGHT.

13     THAT'S LODGED.

14               MR. MUELLER:  MAY I HAND IT UP, YOUR

15     HONOR.

16               THE COURT:  YES.

17               MR. LEE:  AND YOUR HONOR, WE JUST PUT UP

18     A PLACARD THAT SAYS THAT DR. AHN IS THE HEAD OF THE

19     I.P. CENTER OF SAMSUNG ELECTRONICS.  I THINK WE'RE

20     READY.

21               THE COURT:  11:48.  PLEASE GO.

22               **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

23     **SEUNG-HO AHN WAS PLAYED IN OPEN COURT OFF THE**

24     **RECORD.)**

25               MR. LEE:  YOUR HONOR, THAT COMPLETES THE
```

1    CLIP.  AND THE NEXT THING WE'LL DO IS SHOW ANOTHER

2    DEPOSITION CLIP OF MR. LEE FROM SAMSUNG.

3                 THE COURT:  OKAY.

4                 MR. LEE:  I'M GOING TO LODGE PX 219,

5    WHICH IS THE TRANSCRIPT OF THE CLIP.  IT'S FOR

6    MR. JUN, J-U-N, WON, W-O-N, LEE.

7                 THE COURT:  ALL RIGHT.  THE DEPO ENDED AT

8    11:54.  AND THIS IS PX 219?

9                 MR. LEE:  YES, YOUR HONOR.

10                THE COURT:  MS. MAROULIS, DO YOU ONE OUR

11   COPY?

12                MS. MAROULIS:  THAT'S FINE.  I KNOW WHAT

13   THEY PREVIOUSLY DESIGNATED.

14                THE COURT:  OKAY.  WHAT'S THE PROBLEM?

15   WHAT'S GOING ON HERE?

16                MR. LEE:  I JUST WANT TO MAKE SURE WE

17   HAVE THE RIGHT NAME.

18                THE COURT:  OH.

19                MR. LEE:  WHY DON'T WE PLAY THE CLIP.

20   THE NAME IS ON THE SCREEN ANYWAY.

21                THE COURT:  OKAY.  11:55.

22                **(WHEREUPON, THE VIDEOTAPED DEPOSITION OF**

23   **JUN WON LEE WAS PLAYED IN OPEN COURT OFF THE**

24   **RECORD.)**

25                THE COURT:  ALL RIGHT.  IT'S 12:04.

```
1              I THINK WE SHOULD PROBABLY TAKE OUR LUNCH
2      BREAK.
3              MR. LEE:  I AGREE.
4              THE COURT:  OKAY.  IT IS 12:04, AND WE
5      ACTUALLY -- I HAVE TO TALK WITH THE ATTORNEYS, BUT
6      YOU WILL PROBABLY BE LEAVING EARLY TODAY BECAUSE
7      WE'RE PROBABLY DOWN TO LESS THAN TWO HOURS OF TIME
8      LEFT.  OKAY?  JUST FOR YOUR OWN PLANNING FOR TODAY,
9      THERE COULD BE SOMETHING UNEXPECTED, BUT I THINK
10     YOU'LL BE LEAVING EARLY.
11             SO, AGAIN, PLEASE KEEP AN OPEN MIND.  DO
12     NOT DO ANY RESEARCH.  PLEASE DO NOT DISCUSS THE
13     CASE WITH ANYONE.  PLEASE DON'T READ ANYTHING ABOUT
14     THE CASE.
15             ALL RIGHT.  THANK YOU.
16             IF YOU WOULD GO AHEAD AND LEAVE YOUR
17     JUROR BOOKS IN THE JURY ROOM.
18             (WHEREUPON, THE FOLLOWING PROCEEDINGS
19     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
20             THE COURT:  OKAY.  PLEASE TAKE A SEAT.
21             THE RECORD SHOULD REFLECT THE JURORS HAVE
22     LEFT THE COURTROOM.
23             LET ME JUST GIVE YOU YOUR TIME LIMITS.
24     APPLE HAS USED 23 HOURS AND 31 MINUTES, SO YOU HAVE
25     AN HOUR AND 29 MINUTES LEFT.
```

1    SAMSUNG HAS USED 24 HOURS AND 34 MINUTES.

2    SO YOU HAVE 26 MINUTES LEFT.  SO I'M NOT GOING TO

3    GIVE YOU THE 25 MINUTE.  IT JUST MIGHT DISRUPT THE

4    PROCEEDINGS.

5           OKAY.  SO THAT'S IT FOR TIME.

6           LET ME ASK, ARE WE GOING TO HAVE ANOTHER

7    ROUND OF RULE 50 MOTIONS AFTER APPLE RESTS, OR HOW

8    DO YOU WANT TO PROCEED TODAY?

9           MR. VERHOEVEN:  WHATEVER YOUR HONOR

10   WANTS, BUT I THOUGHT THAT WHAT WE'D WORKED OUT WITH

11   THE PROCEDURE, WE COULD DEAL WITH THAT ON MONDAY,

12   AND THAT NO ONE WOULD ARGUE THAT THERE WILL BE A

13   WAIVER.

14          IF YOU WOULD LIKE THAT, TO DO IT ORALLY

15   ON MONDAY AND DO ANOTHER ONE ON MONDAY, WE CAN DO

16   THAT, TOO.

17          THE COURT:  WELL, HOW EXTENSIVE IS THE

18   ONE AFTER APPLE RESTS?  BECAUSE I DON'T WANT TO

19   REHASH, REALLY, ANYTHING THAT WE'VE ALREADY COVERED

20   IN THE FIRST TWO ROUNDS OF RULE 50 MOTION.  I'M

21   ASSUMING IT'S MORE GOING TO BE ON APPLE'S

22   AFFIRMATIVE DEFENSES.

23          MR. VERHOEVEN:  THAT'S RIGHT, YOUR HONOR.

24   WE MIGHT SAY SOMETHING LIKE "WE AGAIN ASSERT WHAT

25   WE ASSERTED PREVIOUSLY."

6351

```
1              THE COURT:  YES, THAT'S FINE.

2              MR. VERHOEVEN:  BUT WE WOULD FOCUS ON THE

3    NEW STUFF.

4              THE COURT:  ALL RIGHT.  SO I'M

5    ASSUMING -- I JUST THINK THE RULE 50 HEARINGS ARE

6    HELPING ME WITH THE JURY INSTRUCTIONS ACTUALLY.

7              MR. VERHOEVEN:  OKAY.

8              THE COURT:  SINCE YOU ALL KNOW THE CASE

9    FAR BETTER AND IT'S HELPFUL TO HEAR WHAT THE LEGAL

10   ISSUES ARE AND WHAT THE RELEVANT EVIDENCE IS.

11             CAN WE LIMIT THAT DISCUSSION TO -- WE

12   HAVE THE TIME BECAUSE, YOU KNOW, WE'RE BASICALLY

13   DOWN TO ABOUT TWO HOURS, A LITTLE LESS THAN TWO

14   HOURS.

15             MR. VERHOEVEN:  I THINK WE'LL TRY TO DO

16   WHAT MR. LEE DID YESTERDAY AND IF YOUR HONOR HAS

17   FURTHER QUESTIONS AND WANTS TO HEAR FROM THE OTHER

18   SIDE OR FROM US, THEN YOUR HONOR CAN BASICALLY

19   DICTATE HOW LONG IT WILL TAKE.

20             THE COURT:  OKAY.

21             WHAT WERE YOU GOING TO SAY?

22             MR. MCELHINNY:  ALL I WAS GOING TO SAY IS

23   WE'RE GLAD TO PARTICIPATE IN THAT, BUT WE ARE

24   RELYING ON THE ORDER THAT YOUR HONOR ISSUED LAST

25   NIGHT ABOUT SORT OF THE FINAL ROUND OF RULE 50
```

```
 1    MOTIONS.

 2              THE COURT:  OH, YEAH.  YOU'RE NOT WAIVING

 3    ANYTHING.

 4              MR. MCELHINNY:  THANK YOU.

 5              THE COURT:  I ASSUME THAT'S GOING TO BE

 6    MUCH MORE COMPREHENSIVE BECAUSE YOU'LL ACTUALLY BE

 7    ABLE TO CITE TO EVIDENCE.

 8              BUT THIS IS -- I JUST WOULD LIKE TO KEEP

 9    OUR PROCESS GOING.  SO LET'S PLAN ON, AFTER -- I

10    ASSUME YOU'RE NOT GOING TO CALL -- THERE WAS A

11    WITNESS I EXCLUDED, I THINK HE'S UP NEXT.  YOU'RE

12    NOT GOING TO CALL HIM, RIGHT?

13              MR. LEE:  I'M NOT CALLING ANYBODY YOU

14    EXCLUDED FOR SURE.

15              THE COURT:  BUT YOU'RE NOT CALLING

16    ROSENBROCK?

17              MR. LEE:  NO.

18              THE COURT:  SO WHO ELSE -- HE'S A NO.  SO

19    THEN YOU'RE GOING ORDOVER, BRESSLER, SINGH,

20    BALAKRISHNAN, AND MUSIKA?

21              MR. LEE:  YES.

22              THE COURT:  OKAY.  AND THEN YOU'RE GOING

23    TO REST?

24              MR. LEE:  YES.

25              THE COURT:  OKAY.  ALL RIGHT.
```

```
1              WELL, IT MAY BE THAT WE SHOULD TAKE OUR
2    BREAK AFTER YOU REST AND WE CAN HANDLE THE RULE 50,
3    HOPEFULLY, IN TEN MINUTES, AND THEN COME BACK AND
4    FINISH UP WITH SAMSUNG'S REBUTTAL CASE.
5              DOES THAT SOUND OKAY?
6              MR. VERHOEVEN:  IT SOUNDS FINE UNLESS
7    THERE'S GOING TO BE ANOTHER ROUND OF RULE 50 AFTER
8    REBUTTAL, IN WHICH CASE MAYBE WE SHOULD COMBINE
9    THEM.
10             THE COURT:  MAYBE THAT MAKES SENSE.
11             MR. JACOBS:  I THINK WE'RE GETTING A
12   LITTLE CONFUSED.
13             WE HAVE THE PROCESS THAT WILL START
14   TOMORROW WITH THE WRITTEN MOTIONS, AND THAT IS THE
15   PRE-DELIBERATION RULE 50(A) MOTION, AND UNLESS YOUR
16   HONOR REALLY WANTS TO HAVE SUCCESSIVE ORAL ROUNDS,
17   THAT'S WHAT WE'RE ALL LOOKING FORWARD TO IS I THINK
18   THE NEXT STEP.
19             THE COURT:  WELL, I WOULDN'T MIND A MINI
20   QUICK NOTES VERSION.
21             MR. VERHOEVEN:  I WOULD SUGGEST WE DO
22   THAT AT THE CLOSE, AT THE END RATHER THAN HAVE TWO
23   SESSIONS, YOUR HONOR.
24             THE COURT:  THAT'S FINE.
25             MR. LEE:  IT ALSO GETS THEM OUT EARLIER.
```

```
 1              THE COURT:  THAT'S FINE.  AND THEN THEY
 2     CAN BE OUT EARLIER ON FRIDAY AFTERNOON.
 3              SO WHY DON'T WE WAIT?  AFTER APPLE
 4     CLOSES, THEN I'LL JUST STATE THAT -- OR YOU WANT TO
 5     JUST ON THE RECORD NOW AND SAY YOU'RE MAKING YOUR
 6     RULE 50 MOTION AND WE'LL JUST ARGUE BOTH AFTER?
 7              MR. VERHOEVEN:  FINE.
 8              MR. LEE:  THAT'S FINE.
 9              THE COURT:  OKAY.  NOW, THERE WAS ONE
10     THING I ALSO WANTED TO CORRECT, AND THIS WAS A
11     WALKER EXHIBIT.
12              I DON'T HAVE PDX 45.13, WHICH WAS THE
13     LAST ONE SHOWN.  I HAVE PDX 45.12, WHICH HAS THE
14     MAY 16TH, 2006 DATE.
15              SO I JUST WANT TO MAKE SHOULD WHEN YOU
16     ALL FIGURE OUT WHAT DEMONSTRATIVES WERE SHOWN TO
17     THE JURY AND WHAT'S GOING TO BE IN THE COURT FILE
18     FOR APPEAL THAT YOU USE THE RIGHT ONE.
19              MR. MUELLER:  WE'LL CHECK ON THAT, YOUR
20     HONOR.
21              THE COURT:  DOES THAT MAKE SENSE?
22              MR. MUELLER:  THAT MAKES PERFECT SENSE.
23              THE COURT:  WHAT YOU SHOWED LOOKED LIKE
24     MY 45.12, BUT YOU HAD IT IN AS .13 AND I DON'T HAVE
25     A .13 IN MINE.
```

3555

1               MR. MUELLER:  I FORGET WHICH IS WHICH,

2     BUT WE'LL CHECK AND MAKE SURE TO GET THE RIGHT ONE.

3               THE COURT:  OKAY, YEAH.  IT'S JUST THE

4     ONE DOESN'T HAVE THE FINAL MAY 16TH, '06 DATE AND

5     THE OTHER ONE DOES.

6               SO MAKE SURE FOR THE RECORD THE RIGHT

7     SLIDES GO INTO THE FILE.

8               MR. MUELLER:  WE'LL DO.

9               THE COURT:  OKAY.  WHAT ELSE DO WE HAVE

10    TO COVER?

11              MR. JACOBS:  JUST KIND OF A HOUSEKEEPING

12    ITEM.

13              LET ME PUT IT ON YOUR RADAR SCREEN AND

14    WE'LL FIGURE OUT WHEN WE CAN DO IT.

15              THE COURT:  OKAY.

16              MR. JACOBS:  WE ARE VERY CLOSE TO A

17    STIPULATION ON THE CLEANING OF THE DEVICES AND THE

18    ATTACHMENT A SMALLER LABEL.  I THINK WE'RE FIGURING

19    OUT THE EXACT LIST OF DEVICES TO WHICH THE NEW

20    LABEL WILL BE APPLIED.

21              THE COURT:  OKAY.

22              MR. JACOBS:  SO THAT CAN BE DONE, MAYBE

23    EVEN A STIPULATION FINALIZED.

24              WE'LL START AT LUNCH OR WE'LL FIGURE

25    OUT,WHEN, AT THE COURT'S CONVENIENCE, TO

3556

1    ACCOMMODATE SAMSUNG'S DESIRE TO HAVE SMALLER LABELS

2    ON THE PHONES.

3             MR. VERHOEVEN:  I WOULD SAY WE MIGHT NEED

4    THE PHONES THIS AFTERNOON, SO I DON'T WANT TO HAVE

5    THEM OUT.

6             MR. JACOBS:  NO, NO.  THEY'RE NOT BEING

7    TAKEN AWAY.

8             WE HAVE A REQUEST, WHICH WE'VE ASKED

9    SAMSUNG TO ACCOMMODATE, AND THEY HAVEN'T HAD FULL

10   TIME TO DELIBERATE ON THIS, BUT I'D LIKE TO PUT IT

11   ON YOUR RADAR SCREEN SO IF WE NEED TO RERAISE IT,

12   YOU CAN START THINKING ABOUT IT.

13            WE'VE SAID FROM THE BEGINNING THE JURY

14   WOULD HAVE THE PHONES TO EXAMINE, AND IN ORDER TO

15   EXAMINE THE PHONES IN OPERATION, THEY NEED A LINK.

16            THE PHONES DON'T HAVE CELLULAR LINKS, BUT

17   THEY HAVE THE POTENTIAL FOR WI-FI LINKS, AND WE

18   WOULD LIKE THE JURY TO BE GIVEN A LITTLE CARD THAT

19   SAYS HOW TO GET WI-FI ACCESS.

20            AND ALSO TO BE ADVISED NOT TO ACCEPT

21   UPDATES TO THE PHONES.

22            SO WE'VE ASKED SAMSUNG TO CONSIDER THAT,

23   AND IF THEY REJECT IT, WE'LL BE ASKING YOU FOR THAT

24   PERMISSION.

25            MR. VERHOEVEN:  THIS IS THE FIRST I

557

```
 1    PERSONALLY HAVE HEARD OF IT.  I'M NOT SAYING OTHER

 2    PARTS OF THE TEAM HAVEN'T.

 3              BUT ONE THING TO FLAG, SINCE THAT'S

 4    MENTIONED, IS IF YOU HAVE THE THINGS TURNED ON WITH

 5    WI-FI THAT CONNECTS TO THE INTERNET, TECHNOLOGY

 6    THESE DAYS WILL SEND SOFTWARE UPDATES TO THOSE

 7    PHONES AND MAY CHANGE THE FUNCTIONALITY OF THOSE

 8    PHONES.

 9              SO I JUST NEED TO CONSIDER THAT BECAUSE

10    WE DON'T WANT ANY OVER-THE-AIR UPDATES.  THAT COULD

11    BE A REALLY BIG PROBLEM.

12              THE COURT:  RIGHT.

13              MR. VERHOEVEN:  ESPECIALLY BECAUSE SOME

14    OF THE, YOU KNOW -- WELL, WE CAN TALK ABOUT IT.

15              YOU KNOW, THERE'S SOME DESIGN AROUND

16    ACTIVITY THAT HAPPENS WITH OVER-THE-AIR UPDATES, SO

17    YOU DON'T WANT THAT TO GET IN THE PHONES.

18              THE COURT:  OKAY.  I HOPE YOU ALL CAN

19    WORK THIS OUT.

20              MR. VERHOEVEN:  YES.

21              MR. JACOBS:  AND IF WE CAN'T, THERE WILL

22    BE AN INTERPLAY WITH OTHER DECISIONS THAT YOU'RE

23    MAKING IS THAT SOME OF THE INFRINGEMENT THAT WE

24    DEMONSTRATED WAS BY VIDEO ON FUNCTIONS THAT REQUIRE

25    WI-FI ACCESS.
```

```
 1             SO, FOR EXAMPLE, FOR THE BROWSER

 2    APPLICATION, IF THE VIDEO -- IF THEY DON'T HAVE THE

 3    VIDEO, THEN THEY NEED TO BE ABLE TO USE THE PHONE.

 4             THE COURT:  OH, I SEE.  WELL, HOPEFULLY

 5    YOU ALL CAN WORK OUT SOME AGREEMENT.

 6             MR. VERHOEVEN:  IT WAS THEIR CHOICE TO

 7    PRESENT THE EVIDENCE THE WAY THEY CHOSE TO WITH

 8    DEMONSTRATIVES, YOUR HONOR.

 9             AND I'M VERY CONCERNED ABOUT OVER-THE-AIR

10    UPDATES.  THEY SHOULD BE, TOO, BECAUSE, FRANKLY,

11    THERE'S DESIGN AROUND IN OVER-THE-AIR UPDATES THAT

12    I THINK HAVE HAPPENED THAT IF THEY GET ON TO THOSE

13    PHONES, OR --

14             THE COURT:  WHAT DO THEY NEED THE WI-FI

15    FOR?  JUST BROWSER ACCESS?

16             MR. JACOBS:  THAT'S MY UNDERSTANDING,

17    YOUR HONOR.

18             AND THERE IS -- MR. VERHOEVEN IS

19    INCORRECT.  WE DID -- WE PRESENTED THAT EVIDENCE OF

20    INFRINGEMENT NOT THROUGH A PDX, BUT THROUGH A PX,

21    AND WE MOVED THOSE VIDEOS THAT OUR EXPERT HAD MADE

22    INTO EVIDENCE.  SO --

23             THE COURT:  WELL, WHY DON'T YOU ALL WORK

24    IT OUT?  IT SEEMS LIKE THERE SHOULD BE A SOLUTION

25    THERE IF IT ONLY HAS TO DO WITH THE BROWSER.
```

3559

1           OKAY.  SO WE'LL TAKE OUR BREAK AND I'LL

2    SEE YOU BACK AT 1:00 O'CLOCK.

3           MR. JACOBS:  THANK YOU, YOUR HONOR.

4           THE COURT:  THANK YOU.

5           (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3560

1                    **AFTERNOON SESSION**

2

3              THE COURT:  GOOD AFTERNOON.  I APOLOGIZE

4      FOR MY DELAY.  PLEASE TAKE A SEAT.

5              SO WE FILED THE TEECE OBJECTIONS.  I

6      DON'T KNOW IF YOU SAW THAT.

7              WE NEED A COUPLE OF THINGS ON THE JURY

8      INSTRUCTIONS, AND I'D LIKE YOU, IF YOU COULD,

9      PLEASE, TO GET YOUR TEAMS WORKING ON THEM.

10             BECAUSE THE ACCUSED PRODUCTS OF SAMSUNG'S

11     HAVE SO MANY DIFFERENT NAMES, IT'S BEEN VERY

12     DIFFICULT TO TRACK, SO IF WE COULD EITHER HAVE A

13     GLOSSARY OR SOMETHING THAT IDENTIFIES THE VARIOUS

14     NAMES OF THE ACCUSED PRODUCTS BY EXHIBIT NUMBER.

15             COULD WE HAVE THAT?

16             THE OTHER THING IS IT'S NOT CLEAR WHICH

17     APPLE UTILITY PATENTS ARE BEING ASSERTED AGAINST

18     WHICH SAMSUNG ACCUSED PRODUCTS.  SO WE NEED SOME

19     KIND OF A CHART ON THAT.

20             IT'S ALSO NOT CLEAR -- I HAD ALWAYS

21     THOUGHT THAT THERE WERE THREE TRADE DRESSES, ONE

22     REGISTERED ON THE PHONE, ONE UNREGISTERED ON THE

23     PHONE, AND ONE UNREGISTERED ON THE TABLET.

24             BUT IN THE -- I THINK IT'S EITHER IN THE

25     JURY INSTRUCTIONS OR THE VERDICT FORM, THERE'S SORT

6351

```
 1    OF A -- IT CREATES THE IMPRESSION THAT THERE ARE

 2    ACTUALLY FIVE AND NOT THREE TRADE DRESSES.

 3              WHAT'S THE SITUATION HERE?

 4              MR. JACOBS:  WE HAVE SEVERAL UNREGISTERED

 5    TRADE DRESSES, YOUR HONOR, ON THE IPHONES THAT WE

 6    ARTICULATED IN THE COMPLAINT AND IN THE MATERIALS

 7    THAT WERE PROVIDED TO THE COURT.

 8              THE COURT:  WELL, IT'S NOT CLEAR.

 9              AND THEN EITHER THE VERDICT FORM OR THE

10    JURY INSTRUCTION TALKS ABOUT THE IPAD TRADE DRESS

11    BEING DIFFERENT FROM THE IPAD 2 TRADE DRESS AND

12    IT'S NOT CLEAR.  SO I NEED -- I WOULD LIKE, I DON'T

13    KNOW IF YOU ALL COULD HAVE YOUR TEAMS FILE --

14    IDEALLY, IT'S A LITTLE BIT EASIER ON SAMSUNG'S

15    ACCUSED PATENTS THAN THE APPLE PRODUCTS, BECAUSE ON

16    THE APPLE ALLEGATIONS, IT'S REALLY NOT CLEAR WHICH

17    PRODUCT IS BEING ACCUSED OF WHICH TRADE DRESS.

18              MR. JACOBS:  THE CLEAREST EXHIBIT THAT

19    THE JURY WILL HAVE IS IN MR. MUSIKA'S REPORT, PX

20    25, AND THAT HAS THE MATRIX.

21              THE COURT:  OKAY.  BUT DOES THAT BREAK

22    DOWN ALL THE DIFFERENT TRADE DRESSES?

23              MR. JACOBS:  I'LL HAVE TO CHECK.

24              MS. KREVANS:  IT DOES, YOUR HONOR, IT'S

25    PX 25-A1 AT THE THIRD PAGE, AND IT HAS A COLUMN FOR
```

1    EACH PIECE OF I.P., INCLUDING THE FOUR TRADE

2    DRESSES, AND THEN A LINE THAT GOES ACROSS WITH THE

3    PRODUCTS.  WE HAVE IT ON THE SCREEN.

4              THE COURT:  TELL ME WHAT THE -- OKAY.

5    LET ME ASK IF YOU ALL COULD GIVE US, THEN, THE

6    CORRESPONDING EXHIBIT NUMBERS TO THOSE 28 DEVICES.

7              DO YOU -- IS THERE ANY DISAGREEMENT FROM

8    SAMSUNG AS TO THE CATEGORIZATION OF WHAT THESE

9    DIFFERENT PRODUCTS ARE?

10             MS. MAROULIS:  YOUR HONOR, WE'LL HAVE TO

11   REVIEW THE EXHIBIT AGAIN BECAUSE THERE WERE SOME

12   MOTIONS IN LIMINE IN BETWEEN, SO SOME PRODUCTS WERE

13   EXCLUDED FOR SOME PURPOSES.  SO WE WILL CHECK.

14             THE COURT:  OKAY.

15             MS. MAROULIS:  THERE WAS A RULE 50

16   GRANTED AT LEAST AS TO THE I9000.

17             THE COURT:  I KNOW.  SO WHAT WOULD BE

18   HELPFUL ACTUALLY IS IF YOU ALL COULD UPDATE THIS

19   CHART, THAT WOULD BE VERY HELPFUL.  JUST BECAUSE

20   THE JURY INSTRUCTIONS ARE VERY CONFUSING ON --

21             MS. MAROULIS:  AND, YOUR HONOR, I ASSUME

22   THAT WE'RE GOING TO HAVE A CHART THAT'S PART OF THE

23   JURY INSTRUCTIONS, THAT'S NOT USING MR. MUSIKA'S

24   CHART, BECAUSE WE DON'T WANT TO BE ADOPTING --

25             THE COURT:  IDEALLY, IF YOU COULD

6563

```
 1      STIPULATE TO SOMETHING, THAT WOULD BE HELPFUL.

 2              MR. JOHNSON:  I THINK WE'LL TRY AND REACH

 3      AGREEMENT WITH APPLE AND SEE IF WE CAN PUT

 4      SOMETHING TOGETHER.

 5              THE COURT:  THAT WOULD BE VERY HELPFUL

 6      BECAUSE RIGHT NOW, THE VERDICT FORM, TRADE DRESS IS

 7      ALL LUMPED TOGETHER, AND I AGREE WITH SAMSUNG'S

 8      OBJECTIONS THAT IT NEEDS TO BE MORE SPECIFIC

 9      BECAUSE, YOU KNOW, WE'RE NOT GOING TO KNOW WHAT THE

10      JURY IS FINDING UNLESS IT'S BROKEN DOWN.

11              SO HOW QUICKLY DO YOU THINK YOU CAN GET A

12      CHART LIKE THIS TOGETHER THAT'S UPDATED?

13              MS. KREVANS:  YOUR HONOR, I'M NOT -- I

14      DON'T WANT TO SPEAK TOO QUICKLY, BECAUSE I'M NOT

15      SURE WHAT WE MIGHT HEAR FROM SAMSUNG, BUT I DON'T

16      THINK THERE'S ANY REASON WE COULDN'T SUBMIT THIS

17      TOMORROW, AND WE COULD MAKE IT A LITTLE BIT BIGGER

18      BECAUSE IT'S A LITTLE SMALL.

19              THE COURT:  RIGHT, BUT I GRANTED RULE 50

20      ON AT LEAST THREE OF THESE, THE I9100, THE I9000 AS

21      TO THE TWO U.S. SUBSIDIARIES, AS WELL AS THE THIRD

22      COLUMN.  SO THAT NEEDS TO BE CLARIFIED.

23              AND I'M NOT REALLY EVEN CLEAR, IS IT EVEN

24      CLEAR WHICH ONES ARE SUBJECT TO INDUCEMENT CLAIMS

25      VERSUS CONTRIBUTORY CLAIMS VERSUS --
```

```
 1              MS. KREVANS:  THIS CHART DOES NOT CAPTURE
 2    THAT INFORMATION, YOUR HONOR, AND WITH RESPECT TO
 3    RULE 50, WHICH HAD TO DO WITH SOME ENTITIES, BUT
 4    NOT ALL HAVING THE INFRINGEMENT ALLEGATIONS
 5    DISMISSED AGAINST THEM, IT DOESN'T CAPTURE THAT
 6    INFORMATION.  IT'S SIMPLY A SUMMARY OF WHICH
 7    PRODUCTS ARE ACCUSED OF WHICH PIECE OF I.P.
 8              THE COURT:  THAT'S FINE FOR THE PURPOSES
 9    OF, YOU KNOW, THIS TYPE OF GRAPHIC.  BUT FOR THE
10    JURY INSTRUCTIONS AND THE VERDICT FORM, I WILL NEED
11    THAT INFORMATION SOMEHOW COLLATED IN AN EASILY
12    ACCESSIBLE FORM.
13              MR. JOHNSON:  AND I THINK WE CAN TRY AND
14    SUBMIT SOMETHING TOMORROW MORNING BY 10:00 O'CLOCK
15    BECAUSE I THINK IT'S GOING TO BE DONE IN CONNECTION
16    WITH THE WHOLE RED LINE PROCEDURE ANYWAY.
17              THE COURT:  OKAY.  THAT'S FOR CREATING A
18    CHART.  BUT IS THERE ANY -- DOES APPLE NOT HAVE
19    THIS INFORMATION READY AVAILABLE OF WHAT YOU'VE
20    ACCUSED OF WHAT?
21              MR. JACOBS:  THIS IS --
22              THE COURT:  I NEED TO KNOW LITERAL VERSUS
23    CONTRIBUTORY VERSUS INDUCEMENT.
24              MR. JACOBS:  THEY'RE ALL ACCUSED OF
25    DIRECT INFRINGEMENT, YOUR HONOR.  THE CLAIM AGAINST
```

3565

```
 1    SEC IS A CLAIM FOR BOTH INDUCED AND DIRECT

 2    INFRINGEMENT.

 3              THE COURT:  INDIRECT AND DIRECT, OKAY.

 4              MR. JACOBS:  INDUCED AND DIRECT, AND THE

 5    DIRECT INFRINGEMENT CLAIM IS NOT WITH STANDING

 6    THEIR ARGUMENT THAT IT'S FOB IN SEOUL, OR WHEREVER

 7    IT IS IN KOREA, IT'S STILL DIRECTED TO THE

 8    UNITED STATES, AND SO THERE'S A DIRECT INFRINGEMENT

 9    CLAIM AND THERE'S AN INDUCEMENT CLAIM AGAINST SEC

10    BECAUSE THEY INDUCED THEIR SUBSIDIARIES TO SELL

11    THESE INFRINGING PRODUCTS.

12              THE COURT:  OKAY.  IT'S A DIRECT

13    INFRINGEMENT CLAIM AS TO THE TWO U.S. SUBSIDIARIES.

14              MR. JACOBS:  CORRECT.

15              THE COURT:  AND ARE YOU -- DID YOU MAKE A

16    D.O.E. CLAIM AT ALL, OR THIS IS ALL LITERALLY

17    INFRINGEMENT.

18              MS. MAROULIS:  WE'RE DISPUTING WHETHER

19    THEY MADE A DEO CLAIM.

20              THE COURT:  THINGS LIKE THIS, I NEED TO

21    KNOW BECAUSE WE'RE DOWN TO THE WIRE TRYING TO GET

22    JURY INSTRUCTIONS AND A VERDICT FORM.

23              WHAT CAN I GET -- I WANT TO GET SOMETHING

24    AS SOON AS POSSIBLE AS TO EXACTLY WHAT'S BEING

25    ACCUSED OF WHAT SO THAT WE CAN, YOU KNOW, KEEP
```

```
1    GOING ON THE VERDICT FORM AND THE JURY

2    INSTRUCTIONS.

3              MR. JOHNSON:  YOUR HONOR, JUST TO POINT

4    OUT ONE OTHER ISSUE WITH THIS CHART, AS WE TALKED

5    ABOUT YESTERDAY, EVEN, FOR EXAMPLE, ON THE '381

6    PATENT, THIS CHART DOESN'T BREAK OUT WHAT

7    APPLICATION IS REALLY ACCUSED.  FOR EXAMPLE, IS IT

8    THE GALLERY APPLICATION?  IS IT THE BROWSER?  OR IS

9    IT THE CONTACTS LIST?  AND EACH ONE OF THESE

10   PRODUCTS, THEY ACCUSE DIFFERENT APPLICATIONS WITHIN

11   EACH PRODUCT.  SO EVEN MORE COMPLICATED THAN THIS

12   CHART.

13             MR. JACOBS:  YOUR HONOR, SAMSUNG COULD

14   SPIN THIS INTO AN INFINITELY COMPLICATED CHART IF

15   WE LET THEM.

16             WE'RE ACCUSING THE PHONE.  WE'RE ACCUSING

17   THE PHONE ON SEVERAL APPLICATIONS AND THAT SHOULD

18   BE SUFFICIENT.

19             THE COURT:  SO THERE ARE ONLY FOUR TRADE

20   DRESSES.  IS THAT RIGHT?  THREE ON THE PHONES AND

21   ONE ON THE TAB?

22             MR. JACOBS:  THAT'S CORRECT, YOUR HONOR.

23             THE COURT:  OKAY.  NOW, WHERE DO YOU

24   HAVE -- DO YOU HAVE A DESCRIPTION, OBVIOUSLY FOR

25   THE REGISTERED ONE, THAT'S FINE.  BUT FOR THE THREE
```

```
 1     UNREGISTERED ONES --

 2              MR. JACOBS:  THAT'S IN THE JURY BINDER,

 3     YOUR HONOR.  WE SUBMITTED THE TEXTUAL DESCRIPTION

 4     OF WHAT THAT TRADE DRESS, THOSE TRADE DRESSES ARE.

 5              THE COURT:  OKAY.  BUT IS IT JUST LIKE --

 6     YOU KNOW, WHAT I'VE SEEN SO FAR, IT'S BEEN A

 7     LUMPING OF THE PHONE TRADE DRESS AND A LUMPING OF

 8     THE TABLET TRADE DRESS.  HOW -- IS IT BROKEN DOWN

 9     BY THE SPECIFIC FOUR THAT YOU HAVE?

10              MR. JACOBS:  YES, YOUR HONOR.

11              THE COURT:  OKAY.  OKAY.  ALL RIGHT.

12     WELL, WHATEVER YOU CAN PROVIDE TO ME AS SOON AS

13     POSSIBLE WOULD BE MUCH APPRECIATED BECAUSE WE'RE

14     GOING TO BE WORKING TONIGHT AND ALL DAY TOMORROW ON

15     THE VERDICT FORM AND JURY INSTRUCTIONS.

16              IF YOU'RE TELLING ME YOU CAN'T GET THIS

17     CHART DONE UNTIL TOMORROW MORNING, THAT'S FINE.

18     BUT IF THERE'S ANY FURTHER CLARIFICATION YOU CAN

19     PROVIDE SOONER, THAT WOULD BE MUCH APPRECIATED.

20              MS. MAROULIS:  WE WILL TRY TO GET

21     TOGETHER WITH APPLE IN THE EVENING AND SEE IF WE

22     CAN TAKE THE CHART AND UPDATE IT PER THE

23     DEVELOPMENTS.

24              THE COURT:  OKAY.  BUT OTHERWISE PAGE 3

25     OF 16?  IS THAT RIGHT?  OKAY.
```

3568

```
 1              MR. JACOBS:  THANK YOU, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  THANK YOU.  ALL

 3     RIGHT.  LET'S GO AHEAD WITH YOUR NEXT WITNESS.

 4              MR. MUELLER:  BEFORE WE DO, WE HAVE A

 5     REVISED SET OF MICHAEL WALKER EXHIBITS.

 6              THE COURT:  OKAY.  AND YOU CORRECTED THAT

 7     LAST PAGE OR TWO?

 8              MR. MUELLER:  YES, AND I PROVIDED A SET

 9     TO MR. VERHOEVEN.

10              THE COURT:  ALL RIGHT.  THEN LET'S

11     PLEASE -- SO YOU'RE NOT GOING TO DO A.13.

12              MR. MUELLER:  THERE WAS A MISNUMBERING,

13     BUT IT HAS THE SLIDE YOU WERE REFERRING TO, THE

14     LAST EVENT.

15              THE COURT:  OKAY.  WELL, THIS IS WHAT I

16     HAD IN MY BINDER.  IT'S JUST THAT WHAT YOU HAD ON

17     THE SCREEN SAID .13.

18              MR. MUELLER:  I THINK THE NUMBERS WERE

19     MISNUMBERED, BUT WE CAN PUT THAT AS 13 IF THAT

20     WOULD BE HELPFUL.

21              THE COURT:  IT'S FINE.  AS LONG AS THE

22     RECORD IS CLEAR THAT WHAT YOU'VE GIVEN ME IS .12 IS

23     WHAT WAS REFERENCED AS .13 ON THE SCREEN, THAT'S

24     FINE.

25              MR. MUELLER:  IT IS.
```

```
1              THE COURT:  OKAY.  THAT'S FINE.

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3      WERE HELD IN THE PRESENCE OF THE JURY:)

4              THE COURT:  ALL RIGHT.  WELCOME BACK.

5              PLEASE TAKE A SEAT.

6              AND PLEASE CALL YOUR NEXT WITNESS.

7              MR. LEE:  YOUR HONOR, APPLE CALLS

8      PROFESSOR JANUSZ ORDOVER, AND I BELIEVE -- I HOPE

9      YOUR HONOR HAS A PICTURE.

10             THE COURT:  YES.

11             MR. LEE:  AND I THINK THE JURORS HAVE THE

12     PICTURE.

13             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

14                     JANUSZ ORDOVER,

15     BEING CALLED AS A WITNESS ON BEHALF OF THE

16     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

17     EXAMINED AND TESTIFIED AS FOLLOWS:

18             THE WITNESS:  YES.

19             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

20             THE COURT:  ALL RIGHT.  TIME IS 1:25.  GO

21     AHEAD, PLEASE.

22                   DIRECT EXAMINATION

23     BY MR. MUELLER:

24     Q    GOOD AFTERNOON, DR. ORDOVER.

25     A    GOOD AFTERNOON.
```

8570

1    Q    CAN YOU PLEASE TELL THE JURY WHO YOU ARE?

2    A    MY NAME IS JANUSZ ORDOVER AND I RESIDE AT 131

3    HEMLOCK HILL ROAD, NEW CANAAN, CONNECTICUT.

4    Q    DR. ORDOVER, HAVE YOU BEEN RETAINED BY APPLE

5    AS AN EXPERT WITNESS IN THIS CASE?

6    A    YES.

7    Q    LET'S PUT PDX 44.1 ON THE SCREEN.  AND CAN YOU

8    PLEASE SUMMARIZE YOUR EDUCATIONAL BACKGROUND?

9    A    WELL, THAT'S A SUMMARY OF IT, BUT I'LL POINT

10   OUT A COUPLE OF HIGHLIGHTS, I GUESS.  I RECEIVED A

11   PH.D. IN ECONOMICS WITH HIGHEST DISTINCTION FROM

12   COLUMBIA UNIVERSITY IN 1973, AND I HAVE BEEN AT

13   NEW YORK UNIVERSITY SINCE THEN, 39 YEARS OF

14   TEACHING AT NYU.

15        DURING THE PERIOD, I ALSO SERVED AS THE

16   DEPUTY ASSISTANT ATTORNEY GENERAL FOR ECONOMICS IN

17   THE DEPARTMENT OF JUSTICE, ANTITRUST DIVISION.

18   BASICALLY THAT'S THE POSITION OF A CHIEF ECONOMIST

19   IN THE ANTITRUST DIVISION, BUT ALSO IN THE JUSTICE

20   DEPARTMENT.

21   Q    DR. -- I'M SORRY.

22   A    OTHER ACTIVITIES I PERFORMED AS WELL THAT ARE

23   ON THIS DEMONSTRATIVE.

24   Q    WHEN YOU WERE WORKING FOR THE DEPARTMENT OF

25   JUSTICE, DID YOU CONSIDER ANY COMPETITION ECONOMICS

1    ISSUES?

2    A    THAT WAS MY JOB.  PRETTY MUCH AS THE CHIEF

3    ECONOMIST, DEPUTY ASSISTANT IN GENERAL FOR

4    ECONOMICS, I WAS RESPONSIBLE FOR FORMULATING THE

5    ECONOMICS POLICY OF THE DEPARTMENT, AND I WAS ALSO

6    RESPONSIBLE FOR DEALING WITH OTHER BRANCHS OF THE

7    GOVERNMENT, SUCH AS THE FEDERAL TRADE COMMISSION,

8    WHICH ALSO DEALS WITH COMPETITION ISSUES.  SO I WAS

9    IN THE MIDST OF ALL OF IT.

10   Q    DR. ORDOVER, DO YOU HAVE ANY EXPERIENCE

11   ANALYZING COMPETITION ECONOMICS IN THE WIRELESS

12   COMMUNICATION INDUSTRY?

13   A    WELL, I HAVE MANY YEARS OF EXPERIENCE IN THE

14   TELECOMMUNICATIONS INDUSTRY IN GENERAL.  IN FACT, I

15   WAS A RESEARCHER AT BELL LABORATORIES MANY YEARS

16   AGO WHEN THEY STILL EXISTED.

17          AND SINCE THAT TIME, I HAVE WORKED ON A

18   NUMBER OF MATTERS, INCLUDING ADVISING FEDERAL

19   COMMUNICATIONS COMMISSION, ADVERTISING MOBILE

20   CARRIERS IN THE UNITED STATES, AUSTRALIA, INDIA,

21   AND SO ON AND SO FORTH.

22          YES, THE ANSWER IS I'VE DONE PLENTY OF

23   WORK IN THE MOBILE SECTOR AND TELECOMMUNICATIONS

24   SECTOR.

25          MR. MUELLER:  YOUR HONOR, AT THIS POINT I

1      OFFER DR. ORDOVER AS AN EXPERT IN COMPETITION,

2      INCLUDING IN THE WIRELESS COMMUNICATION INDUSTRY.

3              MR. VERHOEVEN:  NO OBJECTION.

4              THE COURT:  SO CERTIFIED.  GO AHEAD,

5      PLEASE.

6      BY MR. MUELLER:

7      Q    DR. ORDOVER, ARE YOU FAMILIAR WITH THE ROLE OF

8      STANDARDS IN THE WIRELESS INDUSTRY?

9      A    YES, I'M QUITE FAMILIAR WITH THOSE, AND

10     PROFESSOR WALKER GAVE A VERY NICE DISCUSSION OF IT,

11     SO I WON'T BELABOR THE ISSUE.

12             BUT JUST TO RAISE THE ECONOMIC SIDE OF

13     THE CIRCUMSTANCE, FROM THE ECONOMICS PERSPECTIVE,

14     STANDARDS ARE BOTH A HUGE BENEFIT, AND ALSO A

15     POTENTIAL RISK.

16             ON THE BENEFIT SIDE, WE HAVE THE BENEFITS

17     OF SCALING ECONOMICS, WHICH IS THAT WHEN THE

18     STANDARD IS ESTABLISHED, FOR EXAMPLE, UMTS OR CDMA,

19     MANUFACTURERS OF HANDSETS WILL BE ASSURED THAT

20     THEIR HANDSET WILL WORK ON A PARTICULAR NETWORK FOR

21     WHICH IT IS DESIGNED, AS OPPOSED TO NEEDING TO

22     DESIGN SEPARATE HANDSETS FOR EVERY NETWORK ON WHICH

23     THOSE HANDSET CAN RIDE.  SO SCALE ECONOMIES MEAN

24     REDUCTION IN THE AVERAGE COST.  IF THE VOLUME GOES

25     UP, THERE'S A HUGE BENEFIT TO THE CONSUMERS.

6573

1    Q    SO LET'S PAUSE THERE.  THOSE ARE THE BENEFITS.

2    FROM AN ECONOMIC PERSPECTIVE, DOES STANDARD SETTING

3    PRESENT ANY RISKS?

4    A    YES.  IT PRESENTS A VARIETY OF RISKS, BUT

5    TODAY, BECAUSE OF SHORTNESS OF TIME AND THE SUBJECT

6    MATTER OF THIS LITIGATION, I'M JUST GOING TO

7    DISCUSS ONE OF THEM, AND THAT IS WHAT ECONOMISTS

8    REFER TO AS THE HOLD UP RISK, OR IT'S THE RISK OF

9    RENT EXTRACTION.

10        THERE ARE A VARIETY OF TERMS FOR THE SAME

11   CONCEPT, WHICH IS TO SAY THAT ONCE THE PARTICULAR

12   TECHNOLOGY IS ADOPTED IN A STANDARD, THE OWNER OF

13   THE TECHNOLOGY HAS INCREASED THE ABILITY TO OVER

14   PRICE IT TO THOSE WHO NEED IT RELATIVE TO WHAT THE

15   PRICE WOULD HAVE BEEN BEFORE THE STANDARD IS SET.

16        AND THAT'S A KEY CONCEPT THAT MOTIVATES

17   PRETTY MUCH ALL OF THE WORK THAT I HAVE DONE IN

18   THIS CASE.

19   Q    DR. ORDOVER, HAVE YOU PREPARED A DEMONSTRATIVE

20   TO HELP ILLUSTRATE THIS CONCEPT OF HOLD UP?

21   A    YES, IT'S A VERY SIMPLE EXAMPLE, BUT HOPEFULLY

22   IT WILL GET US ON THE SAME PLAYING FIELD.

23   Q    SO LET'S PUT UP PDX 44.2, AND COULD YOU

24   EXPLAIN WHAT WE SEE?

25   A    I THINK ACTUALLY THIS IS AN EXAMPLE THAT WAS

```
1    ALREADY IN THE RECORD.

2            WHAT I HAVE ILLUSTRATED ON IT IS THE

3    SITUATION FOR THE STANDARD IS DETERMINED, AND

4    HERE'S A STANDARD THAT DEALS WITH

5     THE CONNECTIVITY OF A DEVICE, A TOASTER, A

6    REFRIGERATOR, YOUR P.C. TO THE ELECTRICAL NETWORK.

7    SO IT'S THE EXACT ANALOG TO THE WAY THE MOBILE

8    HANDSETS COMMUNICATE WITH THE MOBILE NETWORK.

9    Q    LET ME JUST PAUSE YOU RIGHT THERE.

10   A    SURE.

11   Q    THE TOP OF THIS DEMONSTRATIVE, JUST SO THE

12   RECORD IS CLEAR, WE SEE THREE ELECTRICAL OUTLETS

13   AND THREE PLUGS, AND THAT'S LABELED PRE-STANDARD.

14           WHAT ARE YOU INTENDING TO SHOW THERE?

15   A    WHAT I'M INTENDING TO SHOW IS UNDER THAT --

16   THAT'S WHAT ALLUDED TO, AND THAT IS THAT BEFORE THE

17   STANDARD IS SET, HOMES CAN BE EQUIPPED WITH EITHER

18   ONE OF THOSE THREE ALTERNATIVE PLUGS.

19           AND THAT OBVIOUSLY MAKES IT HIGHLY

20   COMPETITIVE ENVIRONMENT FROM THE STANDPOINT OF

21   PEOPLE WHO OWN THE PLUG TECHNOLOGY BECAUSE THEY'RE

22   TRYING TO SELL THE TECHNOLOGY THEY HAVE TO TOASTER

23   MAKERS AND THE OTHER APPLIANCE MAKERS AND SO ON AND

24   SO FORTH.  IT'S A VERY COMPETING UNDER LICENSING

25   TERMS OF THE TECHNOLOGY TO THOSE WHO NEEDED IT.
```

```
 1            AND, HOWEVER, THERE'S A BIG INCONVENIENCE

 2    FOR THAT, BECAUSE IF YOU BUY A TOASTER AT SEARS AND

 3    YOU BRING IT HOME AND IT TURNS OUT THAT IT DOESN'T

 4    FIT THE PLUG.  WELL, YOU WASTED YOUR MONEY, OR AT

 5    LEAST YOUR TIME.

 6            SO THE STANDARD IS SET.

 7    Q   AND LET'S TALK ABOUT POST-STANDARD.  ON THE

 8    SCREEN WE HAVE THOSE SAME THREE PLUGS WITH A

 9    CHECKMARK NEXT TO ONE AND X'S NEXT TO THE OTHER.

10    WHAT DO YOU MEAN BY THAT?

11    A    WELL, WHAT I MEAN BY THAT, ONCE THE STANDARD

12    IS SET THROUGH WHATEVER MEANS, STANDARD SETTING

13    ORGANIZATIONS IN THE BUILDING TRADES, THEY WILL DO

14    THAT, THE TWO ALTERNATIVE TYPES OF PLUGS ARE NO

15    LONGER AVAILABLE FOR PURCHASE IN THE, LET'S SAY THE

16    UNITED STATES, BECAUSE THESE PLUGS NO LONGER WILL

17    FIT THE RECEPTACLES IN WHICH THEY WERE DESIGNED.

18            SOME OF THEM YOU CAN BUY IN EUROPE OR

19    CONTINENTAL EUROPE OR UK, BUT IN THE UNITED STATES

20    WE ARE DOWN TO THE PLUG DESIGN ON THE LEFT.

21            AND WHAT HAS HAPPENED IS WHATEVER

22    COMPETITION THERE MAY HAVE EXISTED BETWEEN THE

23    OWNERS OF THOSE TECHNOLOGIES TO GET THE TECHNOLOGY

24    INTO THE HANDS OF THE APPLIANCE SUPPLIERS, THAT

25    TECHNOLOGY IS NOW A MONOPOLIST IN THIS NARROW
```

1    MARKET OF THE TECHNOLOGY FOR CONNECTIVITY.

2    Q    AND, SIR, IF YOU COULD, HOW DOES THIS EXAMPLE

3    RELATE TO WHAT YOU DESCRIBED AS HOLD UP?

4    A    WELL, THE WAY THAT IT RELATES, AND AGAIN,

5    PRETTY MUCH STRAIGHTFORWARD TYPE OF CONNECTION THAT

6    I'M MAKING, AND THAT IS THAT IF THERE WAS

7    COMPETITION AND ONE OF THE -- THE GREEN PLUG

8    MANUFACTURER TRIED TO RAISE THE PRICE RELATIVE TO

9    WHAT THE RIVALS WERE CHARGING, WHICH WOULD LOSE

10   BUSINESS.

11          HOWEVER, NOW, IF THE PRICE -- IF THE

12   GREEN TECHNOLOGY GETS OVERPRICED, PEOPLE HAVE

13   NOWHERE TO GO BECAUSE YOU NEED TO HAVE THAT TYPE OF

14   PLUG-IN ORDER TO USE THE TOASTER.

15          THAT GIVES THE MANUFACTURER THE ABILITY,

16   INCREASED ABILITY TO MANIPULATE PRICE RELATIVE TO

17   THE PRE-STANDARD LEVEL.

18   Q    NOW, SIR, ARE YOU FAMILIAR WITH AN

19   ORGANIZATION CALLED THE EUROPEAN TELECOMMUNICATIONS

20   STANDARDS INSTITUTE, OR ETSI?

21   A    YES.

22   Q    AND ARE YOU FAMILIAR WITH THE ETSI

23   INTELLECTUAL PROPERTY RIGHTS POLICY?

24   A    YES, I AM.

25   Q    LET'S PUT UP PDX 44.3.  THIS QUOTES TWO

3577

```
 1    SECTIONS FROM THE ETSI IPR POLICY, CLAUSE 4 AND

 2    CLAUSE 6.

 3              ARE YOU FAMILIAR WITH THESE PROVISIONS?

 4    A    YES, THOSE WERE DISCUSSED ACTUALLY THIS

 5    MORNING EXTENSIVELY.

 6    Q    ARE THESE BINDING ON THE ETSI MEMBERSHIP?

 7    A    THAT'S MY UNDERSTANDING.

 8    Q    FIRST RULE RELATES TO DISCLOSURE OF

 9    INTELLECTUAL PROPERTY RIGHTS.  FROM AN ECONOMIC

10    PERSPECTIVE, WHAT IS THE PURPOSE OF THIS PROVISION?

11    A    WELL, I SEE THAT PROVISION AS BEING REALLY

12    DIRECTED TOWARDS INFORMING THE STANDARD SETTING

13    BODY WHAT KIND OF TECHNOLOGIES ARE AVAILABLE AND

14    WHAT KIND OF INTELLECTUAL PROPERTY RIGHTS ATTACH TO

15    THESE ALTERNATIVE TECHNOLOGIES.

16    Q    THE SECOND RULE, CLAUSE 6, IS WHAT DR. WALKER

17    REFERRED TO AS THE FRAND PROVISION; IS THAT RIGHT?

18    A    YES, THAT'S WHAT IT IS.

19    Q    WHAT ARE THE ECONOMIC IMPLICATIONS OF THE

20    FRAND PROVISION?

21    A    WELL, THAT, I THINK, IS A BIT AT THE HARD OF

22    THE HOLD UP, BECAUSE WHAT FRAND TRIES TO IMPLEMENT

23    IS THE KIND OF RESTRICTION THAT IS A COMPETITIVE

24    MARKET WOULD IMPOSE ON THE OWNER OF TECHNOLOGY ONCE

25    THE STANDARD IS DETERMINED.  ONCE IT'S FROZEN,
```

1    THERE IS NO CHOICE.  YOU HAVE TO USE THE TECHNOLOGY

2    THAT IS IN THE STANDARD AND THE FRAND PROVISIONS,

3    THEY REALLY TRY TO MIMIC WHAT THE MARKET,

4    COMPETITIVE MARKET WILL DELIVER.  THEY CANNOT

5    ALWAYS DO THAT, BUT THAT'S WHAT THEY TRY TO

6    ACCOMPLISH.

7    Q    NOW, SIR, WERE YOU HERE THIS MORNING FOR

8    DR. WALKER'S TESTIMONY REGARDING WHETHER SAMSUNG

9    COMPLIED WITH THE DISCLOSURE PROVISION, CLAUSE 4?

10   A    YES.

11   Q    AND WERE YOU HERE THIS MORNING FOR

12   MR. DONALDSON'S TESTIMONY REGARDING WHETHER SAMSUNG

13   COMPLIED WITH THE FRAND PROVISION, CLAUSE 6?

14   A    YES.

15   Q    NOW, THE LADIES AND GENTLEMEN OF THE JURY WILL

16   NEED TO DECIDE FOR THEMSELVES WHETHER THEY AGREE

17   WITH DR. WALKER AND MR. DONALDSON.

18        BUT FOR PURPOSES OF THE QUESTIONS I'M

19   ABOUT TO ASK YOU, I WANT YOU TO ASSUME THEY DO

20   AGREE.

21        DO YOU HAVE THAT IN MIND?

22   A    YES.

23   Q    IF DR. WALKER AND MR. DONALDSON ARE CORRECT,

24   WHAT ARE THE ECONOMIC CONSEQUENCES?

25   A    WELL, LET ME SUMMARIZE THEM AND SORT OF GO

1    THROUGH THE TILE.  I THINK THE FIRST CONCEPT WAS

2    THAT SAMSUNG'S CONDUCT DISTORTED THE DECISION

3    MAKING PROCESS AT ETSI.

4            SECOND, THAT DISTORTION HAS LED TO A

5    CHOICE OF TECHNOLOGY THAT MAY NOT HAVE BEEN CHOSEN

6    BUT FOR ITS CONDUCT.

7            NUMBER THREE, IT ENABLED SAMSUNG'S

8    TECHNOLOGY TO BE INTRODUCED, AT LEAST THEY CLAIM IT

9    HAS BEEN INTRODUCED, BECOME PART OF THE STANDARD.

10   THEY THINK OF THEMSELVES AS STANDARD ESSENTIAL

11   TECHNOLOGIES.

12           AS A FINAL STEP, BECAUSE THEY ARE NOW

13   STANDARD, PROCEED TO SELL STANDARD ESSENTIAL

14   TECHNOLOGIES FOR THESE TWO TYPES OF FEATURES THAT

15   UMTS IMPLEMENTS, THEY HAVE ACQUIRED WHAT I CALL THE

16   HOLDUP POWER, THE PATENT OWNER HOLDUP POWER, AND

17   THAT IS THE RISK THAT THE STANDARD SETTING CREATES,

18   AND THAT'S THE RISK THAT THE PROVISION 6.1 IS

19   SUPPOSED TO CONTROL.

20   Q    DR. ORDOVER, AS AN ECONOMIST, HOW DO YOU

21   MEASURE THE TYPES OF CONSEQUENCES THAT YOU'VE

22   DESCRIBED?

23   A    WELL, THE -- FIRST OF ALL, YOU CAN LOOK AT THE

24   CONSEQUENCES AN INCENTIVE TO INNOVATE, YOU CAN LOOK

25   AT THE CONSEQUENCES OF THE PRICING OF THE

1    TECHNOLOGY, WHICH IS CRITICAL INPUT INTO THE COST

2    OF MANUFACTURING THESE HANDSETS.

3            YOU CAN LOOK AT THE OVERALL PRICING IN

4    THE MARKETPLACE, AND IN PARTICULAR, THE QUESTION

5    BECOMES THAT OF WHETHER YOU HAVE SEEN AN EMERGENCE

6    OF MARKET POWER OR MONOPOLY POWER IN THE HANDS OF

7    THE FIRM THAT IS SUPPLYING THE TECHNOLOGY.

8    Q    NOW, SIR, ARE YOU FAMILIAR WITH A CONCEPT

9    CALLED A TECHNOLOGY MARKET?

10   A    YES, I AM.

11   Q    WHAT IS A TECHNOLOGY MARKET?

12   A    WELL, THE PLACE, THE SOURCE CODE FOR IT, THAT

13   IDEA; IN THE UNITED STATES DEPARTMENT OF JUSTICE

14   FEDERAL TRADE COMMISSION GUIDELINES FOR LICENSING

15   OF INTELLECTUAL PROPERTY.

16           AND THESE GUIDELINES DESCRIBE THE

17   TECHNOLOGY MARKET AS CONSISTING OF TECHNOLOGIES

18   THAT A REASONABLE GROUP SUBSTITUTES FOR EACH OTHER.

19   THEY DON'T HAVE TO BE PERFECT SUBSTITUTES, BUT THEY

20   HAVE TO BE GOOD ENOUGH SUBSTITUTES SO THAT IN THE

21   MARKETPLACE, IF ALL OF THEM ARE PRESENT, THEY WILL

22   PRESS DOWN ON THE PRICE OF THE TECHNOLOGY, WHICH IS

23   THE LICENSE PRICES.

24           GOING BACK TO THE PLUGS, THE TECHNOLOGY

25   MARKET WOULD CONSIST OF THE THREE TYPES OF PLUG

1    SOLUTIONS, BUT AFTER THE STANDARD IS SET, IT'S

2    GOING TO BE ONLY ONE TECHNOLOGY IN THE RELEVANT

3    MARKET.

4    Q    NOW, COULD YOU EXPLAIN TO THE JURY, PLEASE,

5    THE DIFFERENCE BETWEEN THE TECHNOLOGY MARKET ON THE

6    ONE HAND AND A PRODUCT MARKET ON THE OTHER?

7    A    YES.  JUST SOME OF THE EXAMPLES I'M GOING TO

8    USE THE ONE THAT I USE IN MY CLASS.  SO YOU MAY

9    HAVE A MARKET FOR TECHNOLOGIES TO MAKE JAM.  THAT

10   TECHNOLOGY MARKET IS BASICALLY, IN THE OLDEN DAYS

11   YOU WOULD TAKE THE CHERRIES AND YOU COULD COOK THEM

12   DOWN IN THE POT.  BUT THESE DAYS, OF COURSE THIS IS

13   NOT THE WAY JAM IS MADE.  AT THE SAME TIME, THERE

14   IS A DOWNSTREAM MARKET FOR JAM.  THERE ARE MANY

15   FIRMS PRODUCING JAM AND THEY COMPETE ON TOP OF THE

16   TECHNOLOGY WITH THEIR OWN INNOVATIONS.

17            SO IN THE TECHNOLOGY MARKET, WE HAVE

18   COMPETING JAM MAKING TECHNOLOGIES, AND ON THE LOWER

19   LEVEL, WHICH IS CALLED THE DOWNSTREAM MARKET IN

20   ECONOMICS, WE HAVE JAMS.

21            AND HOPEFULLY THERE'S A VIBRANT

22   COMPETITION UPSTREAM AND THE TECHNOLOGY MARKET AND

23   HOPEFULLY THERE IS VIBRANT COMPETITION IN THE

24   DOWNSTREAM MARKET, WHICH IS THE JAMS .

25   Q    NOW, SIR, FOR SAMSUNG'S '516 AND '941 PATENTS,

1    HAVE YOU ATTEMPTED TO DETERMINE RELEVANT TECHNOLOGY

2    MARKETS?

3    A    YES.  I THINK THERE WAS RELEVANT TESTIMONY BY

4    DRS. KIM AND KNIGHTLY WHICH DESCRIBE THE RELEVANT

5    TECHNOLOGIES AS CENTERING ON THE TECHNOLOGIES THAT

6    SAMSUNG SPONSORED INTO THE STANDARD, AND ALL THE

7    OTHER TECHNOLOGIES THAT COULD HAVE PERFORMED THE

8    FEATURES ON WHICH THOSE TECHNOLOGIES READ.

9    Q    NOW, ARE YOU REFERRING TO TECHNICAL

10   ALTERNATIVES?

11   A    YES, I AM REFERRING TO TECHNICAL ALTERNATIVES,

12   AND I'M REMINDING MYSELF, AND EVERYONE ELSE, THAT

13   THESE TECHNICAL ALTERNATIVES DO NOT HAVE TO BE

14   PERFECT SUBSTITUTES, BUT THEY HAVE TO BE GOOD

15   ENOUGH SUBSTITUTES THAT PRIOR TO STANDARDIZATION,

16   THEY COULD HAVE BEEN REASONABLE ALTERNATIVES FROM

17   THE STANDPOINT OF THE DESIGNER OF THE STANDARD.

18   Q    NOW, YOU WERE HERE FOR THE TESTIMONY OF

19   DR. KIM AND DR. KNIGHTLY?

20   A    YES.

21   Q    ON THE ISSUE OF TECHNICAL ALTERNATIVES, WE'RE

22   GOING TO LET THE JURY EVALUATE THE TESTIMONY OF

23   DR. KIM AND DR. KNIGHTLY AND I'M NOT GOING TO ASK

24   YOU ABOUT THOSE TECHNICAL ISSUES, OKAY?

25   A    OKAY.  THAT'S GOOD.

```
 1    Q    IF YOU COULD, THOUGH, THE TECHNOLOGY MARKETS

 2    THAT YOU'VE DESCRIBED, WHAT IS THE GEOGRAPHIC SCOPE

 3    OF THOSE MARKETS?

 4    A    I THINK IT'S COMMONLY RECOGNIZED, BY

 5    ECONOMISTS AND INTELLECTUAL PROPERTY LICENSES

 6    GUIDELINES THAT I REFERENCED ALREADY, THEY

 7    GENERALLY REFER TO TECHNOLOGY MARKETS AS BEING

 8    GLOBAL.

 9              NOW, WHAT IS A TECHNOLOGY MARKET?  WELL,

10    AS I SAID, IT'S A MARKET THAT CONSISTS OF THE

11    ALTERNATIVE TECHNOLOGIES FOR A PARTICULAR FEATURE,

12    AND IT'S QUITE CLEAR THAT THESE TECHNOLOGIES CAN BE

13    PROCURED FROM ANYWHERE IN THE WORLD.

14              THESE -- THESE ARE RECOGNIZED BY ETSI,

15    WHICH IS INVITING PARTICIPATION OF FIRMS LOCATED IN

16    EVERY CONCEIVABLE COUNTRY OF THE WORLD.  IT IS

17    NOT -- EVEN THOUGH IT'S A EUROPEAN ORGANIZATION, WE

18    KNOW THAT MEMBERS ARE GLOBAL FIRMS OR INTERNATIONAL

19    FIRMS.

20              AND, THEREFORE, I WOULD SAY THAT THE

21    TECHNOLOGY MARKET IS GLOBAL, UNLIKE THE MARKET FOR

22    HAIRCUTS.  IF YOU LIVE IN SAN JOSE, YOU'RE NOT

23    LIKELY GOING TO SPEND LOTS OF MONEY TO GO TO

24    SAN FRANCISCO FOR A HAIRCUT, ALTHOUGH SOME PEOPLE

25    HAVE BEEN KNOWN TO DO THAT.
```

```
 1              SO THE POINT I'M MAKING THAT HOW BROAD IS
 2    THE GEOGRAPHIC MARKET DEPENDS ON THE PRODUCT,
 3    DEPENDS ON THE -- ON HOW COSTLY IT IS TO GET IT
 4    FROM SOMEWHERE ELSE, WHETHER THE QUALITY AS IT
 5    TRAVELS LONG DISTANCES, NONE OF THAT HAPPENS TO
 6    TECHNOLOGY.  IT'S FREE TO TRANSPORT.  IT WAS AS
 7    GOOD AS IT WAS IN KOREA WHEN IT GOT TO THE
 8    UNITED STATES.
 9    Q    NOW, SIR, JUST TO WE'RE CLEAR, YOU'RE DEFINING
10    YOUR TECHNOLOGY MARKETS BY REFERENCE TO FEATURES IN
11    THE STANDARD?
12    A    YES, THE TECHNOLOGY MARKETS IN THIS CASE ARE
13    COEXTENSIVE, YOU CAN THINK OF IT THAT WAY, WITH THE
14    ACTUAL FEATURES THAT I'M DESCRIBING IN THOSE
15    RELEASES THAT PROFESSOR WALKER WALKED US THROUGH
16    THIS MORNING.
17    Q    NOW, DO YOU HAVE AN OPINION AS TO WHETHER
18    SAMSUNG ACQUIRED MONOPOLY POWER IN PARTICULAR
19    TECHNOLOGY MARKETS?
20    A    YES.  BUT BEFORE I EXPLAIN, LET ME STAND BACK
21    FOR A MOMENT AND MAKE A DISTINCTION BETWEEN MARKET
22    POWER AND MONOPOLY POWER.
23              MANY FIRMS HAVE MARKET POWER IN THE
24    ECONOMY.  WHAT DOES THAT MEAN?  THEY CAN MANIPULATE
25    THEIR PRICES UP AND DOWN A LITTLE BIT WITHOUT
```

1    GAINING ALL OF THE BUSINESS FROM EVERYBODY OR

2    LOSING ALL OF THE BUSINESS.

3           SO THE FACT THAT YOU CAN HAVE SOME

4    FLEXIBILITY IN YOUR PRICING IS DEFINED IN ECONOMICS

5    AS MARKET POWER.

6           WHAT DO I MEAN BY MONOPOLY POWER?  WELL,

7    MONOPOLY POWER IS SOMETHING GREATER THAN THAT, IT

8    IS THE ABILITY TO RAISE PROFITABLY, AND THAT'S THE

9    KEY THING, PROFITABLY THE PRICE ABOVE THE BENCHMARK

10   OR COMPETITIVE LEVEL WITHOUT LOSING THE BUSINESS

11   EITHER TO THE EXISTING FIRMS OR INVITING ENOUGH NEW

12   ENTRANTS TO TAKE THE BUSINESS AWAY FROM YOU.  SO IT

13   HAS TO BE A SIGNIFICANT INCREASE FOR A PERSISTENT

14   PERIOD.

15   Q    HAS SAMSUNG EXERCISED MONOPOLY POWER?

16   A    WELL, IT GAINED MONOPOLY PRESENCE IN THESE TWO

17   TECHNOLOGY MARKETS, AND I THINK AS WE HEARD FROM

18   MR. DONALDSON, IT HAS ACTED IN A WAY THAT, THAT

19   EVIDENCES THAT IT HAS GAINED MONOPOLY POWER BY

20   VIRTUE OF MAKING LICENSING DEMANDS TO SAMSUNG -- TO

21   APPLE, AND ONLY TO APPLE, ACTUALLY, THAT ARE

22   INCONSISTENT WITH THE FRAND PRINCIPLE.

23           THAT, TO ME, EVIDENCES THAT THEY'VE

24   GAINED MONOPOLY POWER BECAUSE NOBODY CAN NOW TAKE

25   THEM OUT OF THE STANDARD UP UNTIL SUCH TIME AS THE

```
 1    A NEW VERSION OF THE STAMPED IS DESIGNED.

 2    Q    SIR, ARE YOU OFFERING ANY OPINION WHETHER

 3    SAMSUNG HAS PATENTS THAT ARE TRULY ESSENTIAL TO

 4    UMTS?

 5    A    NO, I'M NOT.

 6    Q    FROM AN ECONOMIC STANDARD, DOES IT MATTER TO

 7    YOUR ANALYSIS?

 8    A    NO, IT DOES NOT.  AND THAT'S A DELICATE POINT.

 9    THE POINT IS THAT EVEN THOUGH IT IS NOT CLEAR

10    WHETHER ANY ONE OF THOSE PATENTS ACTUALLY IS

11    ESSENTIAL, WHETHER ANY ONE OF THOSE PATENTS IS

12    ACTUALLY VALID OR THAT ANY ONE OF THOSE PATENTS

13    ACTUALLY ARE INFRINGED, THE MERE PRESENCE IN THE

14    STANDARD CREATE ITSELF A VERY POTENT EFFECT ON HOW

15    PEOPLE ACT AND HOW THEY PERCEIVE THE FIRM'S ABILITY

16    TO CONTROL PRICE AND OVERCHARGE FOR THE TECHNOLOGY.

17         WHY?  BECAUSE IT'S HUMANLY IMPOSSIBLE FOR

18    ANYONE, BE IT SAMSUNG OR BE IT APPLE, TO GO TO EACH

19    AND EVERY FILM THAT OWNS THESE ESSENTIAL PATENTS

20    AND GET THEM.  THERE ARE NOW 1,800 OR SO ESSENTIAL

21    PATENTS IN THE CURRENT VERSION OF UMTS.  HOW ON

22    EARTH CAN YOU RUN YOUR BUSINESS IF YOU HAVE TO DO

23    THAT FROM ONE FIRM TO ANOTHER?  YOU WILL NEVER GET

24    GOING.

25         SO THE BEAUTY OF THE STANDARD IS THAT IT
```

1      MORE OR LESS TELLS YOU, UNDER FRAND, IF YOU WANT TO

2      IMPLEMENT THE STANDARD, YOU'RE GOING TO GET THE

3      TECHNOLOGY ON THESE FRAND RIGHTS.

4      Q    JUST A COUPLE MORE QUESTIONS.  IN YOUR OPINION

5      AS AN ECONOMIST, HAS SAMSUNG EXERCISED THE MONOPOLY

6      POWER YOU'VE DESCRIBED?

7      A    I THINK THIS IS JUST A REPEAT OF MY PRIOR

8      ANSWER, AND THAT IS THE FACT THAT IT HAS BEEN --

9      THAT IT CAN CHARGE, OR ATTEMPT TO CHARGE THE

10     NON-FRAND RATES TO SAMSUNG IS WHAT ECONOMISTS CALL

11     A DIRECT PROOF OF MARKET OR MONOPOLY POWER, AND IN

12     THIS PARTICULAR CASE, THERE IS AT LEAST --

13     MR. DONALDSON CONCLUDED THAT WHAT THEY ARE ASKING

14     FOR IS TOTALLY WAY OUT OF LINE WITH FRAND, WHAT

15     FRAND REQUEST WOULD BE, WHICH FRAND REQUEST IS, IN

16     FACT, MIMICKING, AS I PUT IT EARLIER TO YOU, IT

17     WOULD MIMIC THE COMPETITIVE MARKETPLACE AND ENABLE

18     SAMSUNG TO CHARGE FOR ITS TECHNOLOGIES.

19     Q    LAST QUESTION.  HAS APPLE BEEN HARMED?

20     A    YES.  WELL, FIRST OF ALL, APPLE HAS TO SPEND

21     MONEY DEFENDING ITS -- DEFENDING ITSELF IN COURTS

22     ON THESE PATENT ISSUES.

23           BUT TO ME, MORE IMPORTANTLY, I THINK, IS

24     THE FACT THAT IT'S POTENTIALLY FACING WHAT

25     PROFESSOR TEECE CHARACTERIZED AS A FRAND DEMAND FOR

3588

```
1    SOMETHING LIKE $350 MILLION FOR PAST USE OF THE

2    TECHNOLOGY, AND OBVIOUSLY FORWARD-LOOKING TAX PER

3    UNIT OF THE DEVICE GOING ALL THE WAY UP TO 14

4    SOMETHING DOLLARS BASED ON THE 2.4 PERCENT DEMANDED

5    LICENSE FEE.

6            MR. MUELLER:  THANK YOU, SIR.  I HAVE NO

7    FURTHER QUESTIONS.

8            THE COURT:  ALL RIGHT.  THE TIME IS NOW

9    1:47.  CROSS?

10           MR. VERHOEVEN:  IN THE INTEREST OF TIME,

11   NO CROSS, YOUR HONOR.

12           THE COURT:  ALL RIGHT.  MAY THIS WITNESS

13   BE EXCUSED AND IS IT SUBJECT TO RECALL MR. MUELLER

14   OR MR. LEE.

15           MR. MUELLER:  NO, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

17           THE WITNESS:  THANK YOU.

18           THE COURT:  PLEASE CALL YOUR NEXT

19   WITNESS.

20           MS. KREVANS:  WE JUST HAVE TO BRING SOME

21   DEVICES UP, YOUR HONOR.

22           THE COURT:  NO PROBLEM.  IF YOU'D LIKE TO

23   STAND UP AND STRETCH, NOW IS THE TIME TO DO IT,

24   PLEASE.

25           (PAUSE IN PROCEEDINGS.)
```

1          THE CLERK:  PLEASE STAND AND RAISE YOUR

2     RIGHT HAND.

3                    **PETER BRESSLER,**

4     BEING RECALLED AS A WITNESS ON BEHALF OF THE

5     PLAINTIFF, HAVING BEEN PREVIOUSLY SWORN, WAS

6     EXAMINED AND TESTIFIED AS FOLLOWS:

7          THE WITNESS:  YES, I DO.

8          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

9          THE COURT:  THE TIME IS 1:50.  GO AHEAD,

10    PLEASE.

11                 **DIRECT EXAMINATION**

12    BY MS. KREVANS:

13    Q    GOOD AFTERNOON, MR. BRESSLER.

14    A    GOOD AFTERNOON.

15    Q    WERE YOU HERE IN COURT ON TUESDAY TO HEAR

16    TESTIMONY FROM MR. SHERMAN, WHO WAS ONE OF THE

17    SAMSUNG WITNESSES?

18    A    YES.

19    Q    AND DO YOU RECALL THAT HE TESTIFIED THAT THE

20    APPLE IPHONE AND IPAD DESIGN PATENTS WERE INVALID?

21    A    YES.

22    Q    BECAUSE HE THOUGHT THEY WERE OBVIOUS.

23    A    YES.

24    Q    DO YOU AGREE WITH THOSE OPINIONS?

25    A    NO.

3590

1    Q    ALL RIGHT.  LET'S TALK ABOUT WHY.

2              FIRST A BACKGROUND QUESTION.  DO YOU HAVE

3    AN OPINION ABOUT THE DEFINITION OF WHO WOULD HAVE

4    BEEN A PERSON OF ORDINARY SKILL IN THE FIELD OF THE

5    APPLE DESIGN PATENTS IN THE TIME PERIOD THAT THE

6    PATENT WAS FILED?

7    A    YES.  I BELIEVE A PERSON OF ORDINARY SKILL

8    WOULD HAVE BEEN ONE WITH AT LEAST A BACHELOR'S

9    DEGREE IN INDUSTRIAL DESIGN OR PRODUCT DESIGN, AND

10   WOULD HAVE PRACTICED IN INDUSTRIAL DESIGN,

11   INCLUDING THE DESIGN OF ELECTRONIC PRODUCTS, FOR AT

12   LEAST TWO YEARS.

13   Q    LET'S LOOK AT SOME OF THE PATENTS AND DEVICES

14   THAT MR. SHERMAN TALKED ABOUT.

15             AND WHY DON'T WE START WITH THE JP'383

16   WHICH, FOR THE RECORD, WAS DX 728.  CAN WE PUT UP

17   SLIDE PDX 26.78.  DO YOU NEED YOUR GLASSES,

18   MR. BRESSLER?

19   A    YES.

20   Q    COULD YOU EXPLAIN TO THE JURY WHAT, IN YOUR

21   VIEW, ARE THE DIFFERENCES OF WHAT A PERSON OF

22   ORDINARY SKILL WOULD SEE BETWEEN THE DESIGN OF THE

23   JP'383 ON ONE HAND AND APPLE'S '087 AND '677

24   PATENTS ON THE OTHER HAND?

25   A    YES, A DESIGNER OF ORDINARY SKILL WOULD

1       NOTE -- I'LL TAKE THE '677 FIRST -- THAT THE FACE

2       OF --

3       Q    ACTUALLY, LET ME STOP YOU FOR A SECOND.

4       A    YES.

5       Q    THESE TWO FIGURES OUT OF THE '383 PATENT, CAN

6       YOU EXPLAIN TO US WHAT EACH OF THEM ARE, STARTING

7       WITH ONE ON THE LEFT?

8       A    OF COURSE.  THESE ARE FIGURES DIRECTLY FROM

9       THE '383 PATENT, AND THEY ARE ILLUSTRATIONS FROM

10      THE PATENT THAT SHOW THE CLEAR TRANSPARENT COVER

11      THAT IS CLAIMED IN THE PATENT, AND THE UNIT THAT

12      THAT COVER IS DESIGNED TO COVER ON THE RIGHT.

13      Q    OKAY.  ARE THERE SOME DRAWINGS IN THE PATENT

14      WHERE THE COVER AND THE DEVICE ARE ACTUALLY SHOWN

15      TOGETHER WITH THE DEVICE INSIDE THE COVER?

16      A    YES, MOST OF THE DRAWINGS ARE.

17      Q    OKAY.  HERE THEY'RE SEPARATE?

18      A    HERE THEY'RE SEPARATE, YES.

19      Q    COULD YOU, USING THESE DRAWINGS, EXPLAIN TO

20      THE JURY THE DIFFERENCES BETWEEN THE '383 DESIGN

21      AND THE '087 AND 677 DESIGNS?

22      A    YES.  IF I WERE TO START WITH THE '677, I

23      THINK ONE CAN SEE THAT THE FRONT FACE IS NOT

24      TRANSPARENT ALL THE WAY EDGE TO EDGE, ALL THE WAY

25      AROUND.

3592

1           I THINK ONE CAN SEE THAT THE FRONT FACE

2     IS NOT BLACK.

3           ONE CAN ALSO SEE THAT THERE IS NO SPEAKER

4     SLOT, AND IF ONE WERE TO BE LOOKING AT A FRONT

5     VIEW, ONE WOULD SEE THAT THE DESIGN IS NOT THE SAME

6     PROPORTION OF HEIGHT TO WIDTH AS THE '677.

7           PROGRESSING TO THE '087, THIS DEVICE HAS

8     NO BEZEL AND THERE ARE NO BORDERS ON EITHER SIDE OF

9     THIS ONE.

10    Q    THE DEVICE THAT IS SHOWN ON THE RIGHT, THE

11    LEFT-HAND SIDE OF THE CASE, DOES IT HAVE A, DOES IT

12    HAVE A FRONT FACE WHICH IS THE SAME MATERIAL ALL

13    THE WAY ACROSS EDGE TO EDGE?

14    A    NO, IT DOES NOT HAVE A CONTINUOUS TRANSPARENT

15    FRONT FACE.

16    Q    NOW, MR. SHERMAN TESTIFIED THAT HE THOUGHT,

17    LOOKING AT THESE DRAWINGS, THAT THE '383 PATENT'S

18    ELECTRONIC DEVICE HAD A BEZEL.  CAN YOU EXPLAIN WHY

19    YOU DISAGREE WITH THAT?

20    A    I DISAGREE WITH THAT BECAUSE THE TWO LINES

21    THAT YOU SEE, AND I'VE CREATED SOME EXAMPLES TO

22    ILLUSTRATE WHY I DISAGREE -- THE TWO LINES THAT YOU

23    SEE I BELIEVE REPRESENT THE ARTIST'S DESCRIPTION OF

24    HOW THE FRONT SURFACE CONNECTS TO A CURVE AND THEN

25    CONNECTS AGAIN TO THE SIDE OF THE TOP SURFACE.  SO

```
 1    IT'S ACTUALLY DESCRIBING THE SURFACE GOING TO THE

 2    SIDE.

 3    Q    OKAY.  JUST SO IT'S CLEAR WHAT YOU'RE TALKING

 4    ABOUT, MR. BRESSLER, I'M GOING TO GO OVER TO THE

 5    SCREEN.  I MAY NOT BE TALL ENOUGH FOR THIS?

 6    A    I CAN DO IT WITH A POINTER.

 7    Q    AM I POINTING TO THE TWO LINES YOU'RE TALKING

 8    ABOUT?

 9    A    THOSE ARE THE TWO LINES I'M TALKING ABOUT,

10    YES.

11    Q    LET'S -- COULD YOU SEE PDX 26.82?  WHAT IS

12    26.82, MR. BRESSLER?

13    A    THIS IS A VIEW, AGAIN, OF A FIGURE FROM THE

14    PATENT THAT SHOWS A SIDE VIEW OF THE DEVICE WITH

15    ITS COVER ON, SO I'VE INCLUDED ARROWS TO INDICATE

16    WHICH LINE IS THE LINE OF THE COVER AND WHICH LINE

17    IS THE LINE OF THE FRONT FACE OF THE DEVICE.

18    Q    COULD WE SEE 26.85.  WHAT ARE WE LOOKING AT

19    NOW, MR. BRESSLER?

20    A    WHAT WE'RE LOOKING AT NOW IS TWO DEPICTIONS.

21    ONE IS A FIGURE DIRECTLY FROM THE '087 --

22             MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO

23    THIS SLIDE.  IT'S MISLEADING.

24             MS. KREVANS:  YOUR HONOR, I THINK IF THE

25    WITNESS EXPLAINS THIS, HE CAN EXPLAIN EXACTLY WHAT
```

3594

```
1    WHAT IT IS AND WHY IT'S NOT MISLEADING.

2              THE COURT:  GO AHEAD.  IT'S OVERRULED.

3    BY MS. KREVANS:

4    Q    WHAT'S ON THE LEFT, MR. BRESSLER?

5    A    WHAT'S ON THE LEFT IS THE SIDE VIEW DEPICTING

6    CLEARLY THE VISUAL REPRESENTATION OF THE BEZEL THAT

7    IS ON THE FRONT OF THE '087 PATENT.

8    Q    WHAT'S ON THE RIGHT?

9    A    WHAT IS ON THE RIGHT IS THE SAME VIEW THAT I

10   SHOWED YOU JUST A MOMENT AGO.  HOWEVER, I'VE MOVED

11   THE COVER OFF THE FACE OF THE UNIT SO THAT YOU CAN

12   SEE THE LINES THAT DEPICT THE UNIT.

13   Q    SO LET'S JUST GO BACK --

14             MR. VERHOEVEN:  I OBJECT TO THAT QUESTION

15   AND ANSWER AS MISLEADING.  THE WITNESS IS

16   MANIPULATING THE IMAGE, YOUR HONOR.

17             THE COURT:  OVERRULED.

18             YOU WILL HAVE TIME TO CROSS.

19             GO AHEAD.

20   BY MS. KREVANS:

21   Q    LET'S GO BACK TO THE PREVIOUS SLIDE SO THIS IS

22   CLEAR TO THE JURY, MR. BRESSLER.  26.82, PLEASE.

23             COULD YOU EXPLAIN TO US HOW 26.82 RELATES

24   TO 26.85, THE SLIDE YOU JUST SHOWED?

25   A    YES.  AS YOU'LL RECALL FROM THE INITIAL SLIDE,
```

1    THERE ARE TWO PIECES.  ONE IS THE UNIT ITSELF,

2    WHICH YOU SEE THE ARROW POINTING TO A DEVICE.  THE

3    OTHER IS A TRANSPARENT COVER, WHICH THAT OUTSIDE

4    LINE REPRESENTS.

5    Q    LET'S GO BACK TO 26.85.  WHICH IS THE DEVICE,

6    WHICH IS THE COVER, MR. BRESSLER?

7    A    THE COVER IS THE PARALLEL LINES, SIMPLY MOVED

8    AWAY FROM THE SIDE VIEW OF THE DEVICE, SO THAT -- I

9    WISH I HAD A POINTER, THE -- THE -- THAT'S THE --

10   OKAY, THAT'S THE COVER.

11          THE RIGHT-HAND LINE ON THE DEVICE IS THE

12   FRONT FACE OF THE DEVICE, AS IT WAS IN THE SLIDE

13   BEFORE.

14          AND IF, IN FACT, IT HAD A BEZEL AS THE

15   '087 DOES, YOU WOULD SEE A SECOND LINE OFFSET TO

16   THE LEFT OF THAT RIGHT-HAND FACE, AND, THEREFORE,

17   AS A SIGNER OF ORDINARY SKILL IN THE ART, I READ

18   THIS AS NOT HAVING A BEZEL, BUT, IN FACT, HAVING A

19   CURVATURE THAT GOES FROM THE FRONT TO THE SIDE.

20          MS. KREVANS:  OKAY.  YOUR HONOR, MAY I

21   GIVE THE WITNESS A POINTER?

22          THE COURT:  THAT'S FINE.  GO AHEAD,

23   PLEASE.

24   BY MS. KREVANS:

25   Q    AND COULD WE PUT BACK UP SLIDE 26 -- PDX

3596

1      26.78.

2      A     THANK YOU.

3      Q     ON THE RIGHT SIDE OF 26.78, MR. BRESSLER, YOU

4      TOLD US THAT NOW WE'RE LOOKING AT JUST THE

5      ELECTRONIC DEVICE?

6      A     CORRECT.

7      Q     NO COVER?

8      A     CORRECT.

9      Q     COULD YOU EXPLAIN TO US WHAT THOSE TWO

10     PARALLEL LINES ON THE FRONT THAT YOU IDENTIFIED

11     EARLIER REPRESENT?

12     A     YES.  AND I'M GOING TO REST THE POINTER ON

13     HERE SO IT DOESN'T BOUNCE AROUND TOO MUCH.

14           THIS LINE, THE ONE THAT GOES DIRECTLY

15     AROUND THE FACE, AND THIS LINE, THE ONE THAT IS

16     OFFSET BEHIND IT -- I'M SORRY I'M BOUNCING --

17     OFFSET BEHIND IT ARE SHOWING THE EXTENTS OF THE

18     CURVATURE THAT GOES FROM THE SIDE TO THE FACE.

19           I CAN EVEN SHOW ANOTHER EXAMPLE THAT I

20     BROUGHT IF YOU WISH.

21     Q     OKAY.  WHAT ARE YOU HOLDING IN YOUR HAND,

22     MR. BRESSLER?

23     A     THIS IS A PENCIL CUP FROM MY OFFICE.

24           MR. VERHOEVEN:  YOUR HONOR, WE'VE NEVER

25     SEEN THIS BEFORE.

```
 1              MS. KREVANS:  WE DISCLOSED IT, YOUR
 2    HONOR, AS A DEMONSTRATIVE.
 3              MR. VERHOEVEN:  IT'S NOT IN HIS EXPERT
 4    REPORT OR IN DISCOVERY.
 5              MS. KREVANS:  IT JUST ILLUSTRATES A
 6    CURVE.  IF YOU WON'T ALLOW IT, I'LL MOVE ON.
 7              THE COURT:  ALL RIGHT.  MOVE ON, PLEASE.
 8    SUSTAINED.
 9    BY MS. KREVANS:
10    Q    COULD YOU TURN TO ANOTHER PIECE OF ART THAT
11    MR. SHERMAN TESTIFIED ABOUT, THE '638 PATENT.
12              AND COULD WE SEE PDX 26.87.
13    A    IF I MAY ABOUT THE LAST QUESTION?
14    Q    WE'RE GOING TO -- WE'RE ON A CLOCK,
15    MR. BRESSLER.
16    A    I'M SORRY.
17    Q    I ONLY HAVE SO MUCH TIME WITH YOU, SO WE HAVE
18    TO MAKE SURE WE COVER EVERYTHING.
19              ON THE JP 683 PATENT, 26.87, COULD YOU
20    PLEASE SUMMARIZE FOR THE JURY THE DIFFERENCES
21    BETWEEN THIS DESIGN AND THE '677 AND '087 PATENTS?
22    A    YES.  I BELIEVE THE '638 PATENT IS
23    SUBSTANTIALLY DIFFERENT FROM EITHER OF THOSE TWO
24    PATENTS MOST DRAMATICALLY BECAUSE THE FRONT FACE IS
25    NOT FLAT, WHICH CREATES AN EXTRAORDINARILY
```

3598

```
 1    DIFFERENT OVERALL IMPRESSION.

 2              IN ADDITION TO THAT, IT IS NOT DRAWN

 3    DEPICTING A TRANSPARENT FACE AROUND THE DISPLAY,

 4    NOR IS IT DEPICTING BLACK.

 5              THERE IS A SMALLER SPEAKER SLOT THAT IS

 6    UP AT THE VERY TOP EDGE, WHICH IS NOT CERTAINLY THE

 7    SAME.

 8              AND THE FRAME AROUND IT IS A TAPE PERKED

 9    ENCLOSURE THAT IS THINNER AT THE TOP AND AT THE

10    BOTTOM THAN IT IS PRESENTING WIDER WHERE THE

11    DISPLAY IS PROTRUDING FROM THE FRONT.

12    Q    CAN WE SEE 26.92.

13    A    THIS --

14    Q    WHAT IS THIS, MR. BRESSLER?

15    A    THIS, I THINK, MAKES A CLEARER UNDERSTANDING

16    OF THE SIDE, WHICH IS THE SIDE VIEW DIRECTLY FROM

17    THE PATENT COMPARED TO A SIDE VIEW FROM THE '087,

18    AND THESE ARE BOTH THE FRONT FACES FACING EACH

19    OTHER, I THINK YOU CAN SEE WHERE THE ARROWS ARE,

20    THAT THE FRONT FACE OF THE '638 VERY CLEARLY BENDS

21    BACK AWAY FROM THE DISPLAY TOWARD THE BACK OF THE

22    PHONE.

23    Q    DO YOU AGREE --

24    A    SO IT'S DEFINITELY NOT FLAT.

25    Q    DO YOU AGREE WITH MR. SHERMAN THAT THE FACT
```

1    THAT THE FRONT FACE OF THE '638 DESIGN THAT WE'RE

2    LOOKING AT IS NOT FLAT IS A RELATIVELY MINOR

3    DIFFERENCE?

4    A    NO.  I BELIEVE THE EFFORT THAT IT TAKES TO

5    DESIGN A PHONE TO HAVE THE PARTICULAR APPEARANCE,

6    THAT THAT RAISED DISPLAY WOULD PROVIDE, IS

7    SIGNIFICANTLY DIFFERENT FROM THAT OF A FULLY FLAT

8    FACE SURFACE AND NOT BE CHANGED LIGHTLY.

9    Q    COULD WE LOOK AT THE THIRD PATENT THAT

10   MR. SHERMAN TALKED ABOUT, THE KR'547, WHICH IS PDX

11   46.7.  AND COULD WE SEE SLIDE 26.94.

12          COULD YOU SUMMARIZE FOR THE JURY THE

13   DIFFERENCES THAT AN ORDINARY OBSERVER OR PERSON OF

14   ORDINARY SKILL WOULD SEE BETWEEN THE '547 PATENT

15   AND THE DESIGNS OF THE '087 AND '677 PATENTS?

16   A    YES.  YES, THIS IS A THREE-QUARTER ERICSSON

17   QUARTER VIEW FROM THE PATENT AND WHAT IT DEPICTS IS

18   THE FRONT FACE OF A DEVICE THAT IS NOT BLACK, IT IS

19   NOT SPECIFIED TO BE TRANSPARENT ANYWHERE BUT IN THE

20   DISPLAY.  THERE IS A -- IT HAPPENS TO HAVE A SQUARE

21   FORM FACTOR AND POINTIER CORNERS, BUT MORE TELLING

22   IS IT HAS CONCENTRIC RINGS THAT GO TO A BAND OR A

23   BELT LINE THAT GO AROUND IT, AND IT HAS A SMALLER

24   DISPLAY WHICH, THEREFORE, HAS WIDER BORDERS WHICH

25   PROVIDES A VERY DIFFERENT OVERALL IMPRESSION THAN

3600

```
1     THE BORDERS -- THAN THE NARROWER FIXED BORDERS AND

2     THE ALMOST FULL-FACED DISPLAY OF THE '677 AND THE

3     '087.

4     Q    LET'S TALK ABOUT THE LAST PHONE DESIGN THAT

5     MR. SHERMAN TALKED ABOUT.  HE TALKED ABOUT THIS ONE

6     ONLY WITH RESPECT TO THE '677, AND THAT IS THE LG

7     PRADA PHONE.  IT'S JX 1093, AND I THINK YOU HAVE IT

8     UP THERE.

9          IF WE CAN PUT UP 26.95, PLEASE, MR. LEE.

10    WE HAVE THE PICTURE, BUT YOU HAVE THE ACTUAL PHONE

11    THERE, MR. BRESSLER.  HOLD IT UP SO THE JURY CAN

12    SEE.  AND COULD YOU TELL THE JURY WHAT DIFFERENCES

13    AN ORDINARY PERSON IN THIS FIELD WOULD SEE BETWEEN

14    THE PRADA DESIGN AND THE '677 PATENT DESIGN?

15    A    I THINK THAT AN ORDINARY PERSON AND A DESIGNER

16    OF NORMAL SKILL WOULD NOTICE THAT THE LENGTH AND

17    WIDTH ARE IN DIFFERENT PROPORTION, I.E., IT'S

18    LONGER AND NARROWER.

19          THEY WOULD NOTICE THAT THE DISPLAY IS

20    SMALL WITH WIDER BORDERS AND THERE GIVES A

21    DIFFERENT ALL OVER IMPRESSION.  AND IT'S NOT

22    CENTERED.

23          AND THEN THEY WOULD NOTICE, PROBABLY

24    FIRST, THEY WOULD NOTICE THAT THERE'S A VERY LARGE

25    KEY TRAVERSING THE BOTTOM OF THE FACE, THEREFORE,
```

3601

```
 1    IT DOESN'T HAVE A CONTINUOUS SURFACE EDGE TO EDGE.

 2    Q    IN YOUR OPINION, DO ANY OF THE FOUR ITEMS WE

 3    JUST DISCUSSED, THESE FOUR PHONE DESIGNS, PROVIDE

 4    AN OVERALL APPEARANCE THAT IS BASICALLY THE SAME AS

 5    THE '087 OR '677 DESIGN?

 6    A    NO, I BELIEVE THEY DO NOT.

 7    Q    IN YOUR OPINION, ARE ANY OF THESE FOUR ITEMS A

 8    DESIGN THAT COULD BE CONSIDERED A PRIMARY

 9    REFERENCE, AS YOU UNDERSTAND THE TEST, FOR PURPOSES

10    OF ASSESSING OBVIOUSNESS OF THE '087 OR '677

11    PATENT?

12              MR. VERHOEVEN:  OBJECTION.  LEADING.

13              THE COURT:  OVERRULED.

14              GO AHEAD.

15              THE WITNESS:  NO.  I BELIEVE THAT THESE

16    ARE DIFFERENT ENOUGH FROM THE PATENTS THAT THEY

17    COULD NOT BE USED AS A PRIMARY REFERENCE IN AN

18    OBVIOUSNESS EVALUATION.

19    BY MS. KREVANS:

20    Q    IN YOUR OPINION, COULD ANY OF THESE FOUR PHONE

21    DESIGNS BE COMBINED WITH ANOTHER ONE OF THE FOUR,

22    UNDER THE PROPER LEGAL TEST, TO RENDER EITHER THE

23    '087 PATENT OR THE '677 PATENT OBVIOUS?

24    A    THE LEGAL TEST SUGGESTS YOU HAVE TO HAVE A

25    PRIMARY REFERENCE TO USE, AND AS A RESULT, YOU
```

```
 1    COULDN'T MIX THESE UP IF NONE OF THEM ARE PRIMARY
 2    REFERENCES.
 3              IN ADDITION TO THAT, THEY REALLY LOOK
 4    VERY DIFFERENT FROM EACH OTHER AND VERY DIFFERENT
 5    FROM THE PATENTS.
 6              SO THERE REALLY AREN'T ELEMENTS THAT
 7    WOULD SUGGEST, WITHOUT USING HINDSIGHT, HOW TO PUT
 8    THEM TOGETHER TO GET WHERE YOU WANT TO GO.
 9    Q    LET'S TURN TO THE IPAD THAT IS THE '889 PATENT
10    DESIGN.
11              DO YOU HAVE IN FRONT OF YOU PX 1078?
12    THAT IS THE FIDLER TABLET REPLICA.  DO YOU HAVE IT
13    THERE?
14    A    YES.
15    Q    COULD YOU TELL US WHAT PX 1078 IS,
16    MR. BRESSLER?
17    A    YES, THIS IS A DUPLICATE THAT I HAD CREATED OF
18    MR. FIDLER'S ORIGINAL TABLET, THE 1994 VERSION THAT
19    HE USED IN HIS VIDEOS THAT YOU'VE SEEN.
20    Q    IS THIS AN ACCURATE DUPLICATE OF THE ORIGINAL
21    MOCKUP THAT IS IN MR. FIDLER'S POSSESSION?
22    A    I WENT TO MISSOURI WITH A MODEL MAKER AND A
23    LASER SCANNER AND DIGITIZED THE SURFACE OF THIS
24    MODEL, PHOTOGRAPHED THEM, MEASURED THEM TO ASSURE
25    THAT WE COULD FABRICATE IT TO BE EXACTLY THE SAME,
```

6603

```
 1    RIGHT DOWN TO THE SCRATCHES AND THE PAINT.

 2            MS. KREVANS:  YOUR HONOR, WE WOULD MOVE

 3    PX 1078 INTO EVIDENCE, SUBJECT TO OUR PRIOR

 4    OBJECTIONS ON THIS TOPIC.

 5            THE COURT:  MR. VERHOEVEN?

 6            MR. VERHOEVEN:  YOUR HONOR, YES.  WE

 7    WOULD -- WE HAVE NO OBJECTION, BUT WOULD JUST NOTE

 8    THAT THIS IS HOW THE TABLET LOOKED AS OF THIS YEAR,

 9    NOT IN 1994.

10            OTHER THAN THAT CLARIFICATION, WE DON'T

11    OBJECT TO IT GOING INTO EVIDENCE.

12            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

13            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

14            1078, HAVING BEEN PREVIOUSLY MARKED FOR

15            IDENTIFICATION, WAS ADMITTED INTO

16            EVIDENCE.)

17    BY MS. KREVANS:

18    Q   COULD YOU HOLD THE REPLICA UP SO THE JURY CAN

19    SEE IT, AND COULD YOU EXPLAIN TO THE JURY WHAT

20    DIFFERENCES, IF ANY, YOU SEE BETWEEN THE DESIGN OF

21    THIS FIDLER TABLET MOCKUP AND THE '889 DESIGN.

22    A   I SEE THEM AS BEING VERY, VERY DIFFERENT.

23            RIGHT OFF THE BAT, YOU CAN SEE THAT THE

24    TRANSPARENT FRONT SURFACE DOES NOT GO EDGE TO EDGE

25    ALL THE WAY ACROSS THE FRONT TO MEET A NARROW RIM.
```

3604

```
1          YOU CAN SEE THAT THIS HAS A RAISED FRAME
2    AROUND THE DISPLAY THAT IS NOT OF EQUAL BORDER,
3    BECAUSE IT'S WIDER AT THE BOTTOM.
4          IF YOU LOOK AT THE EDGES OF IT, YOU CAN
5    SEE THAT IT HAS CUTOUTS FOR A STYLUS AND FOR MEMORY
6    CARDS THAT MAKE THAT DETAIL MUCH MORE COMPLEX THAN
7    THE '889.
8          AND IF YOU LOOK AT THE BACK AND SIDES,
9    YOU'LL SEE THAT THE BACK HAS A PANEL ON IT, SO IT
10   ISN'T COMPLETELY FLAT, AND IT DOESN'T CURVE UP
11   AROUND THE SIDES TO MEET AN EDGE.  IT CURVES ALL
12   THE WAY AROUND THE SIDES AND, THEREFORE, IT DOES
13   NOT, IN MY OPINION, LOOK BASICALLY THE SAME AS THE
14   '889 PATENT.
15          MS. KREVANS:  YOUR HONOR, MAY I SHOW THE
16   REPLICA TO THE JURY?
17          THE COURT:  THAT'S FINE.
18   BY MS. KREVANS:
19   Q    DO YOU HAVE THE TC1000, WHICH IS JX 1074 UP
20   THERE, MR. BRESSLER?
21   A    I DO.
22   Q    COULD YOU TELL THE JURY WHAT DIFFERENCES, IF
23   ANY, YOU BELIEVE A PERSON OF ORDINARY SKILL WOULD
24   SEE BETWEEN THE DESIGN OF THE COMPAQ TC1000 AND THE
25   '889 DESIGN, BRIEFLY ?
```

6605

1    A    AGAIN, I WOULD POINT OUT THAT THE TC1000 DOES

2    NOT HAVE A TRANSPARENT FACE THAT RUNS -- A

3    TRANSPARENT SURFACE THAT RUNS TOTALLY EDGE TO EDGE

4    ALL THE WAY ACROSS THE FACE TO A NARROW RIM.

5              I WOULD POINT OUT THAT THIS HAS MULTIPLE

6    BANDS AROUND THE DISPLAY THAT ARE NOT EQUAL.

7              I WOULD POINT OUT THAT THERE IS A RADIUS

8    OR CURVED FRAME AROUND THE EDGE THAT IS DIFFERENT

9    THAN THE '889 PATENT.

10             AND YOU'LL NOTICE THAT THERE IS A LOT OF

11   DETAIL AROUND THE SIDE AND DETAIL ON THE BACK THAT

12   ARE CLEARLY NOT DEPICTING WHAT'S IN THE '889

13   PATENT.

14   Q    OKAY.  IS, IN YOUR OPINION, EITHER THE FIDLER

15   OR THE TC1000 A PROPER PRIMARY REFERENCE WITH

16   RESPECT TO WHETHER THE '889 PATENT DESIGN IS

17   OBVIOUS?

18   A    I DO NOT BELIEVE EITHER OF THESE ARE PRIMARY

19   REFERENCES.

20   Q    IN YOUR OPINION, COULD YOU COMBINE, COULD A

21   PERSON OF ORDINARY SCHOOL PROPERLY COMBINE THE

22   FIDLER TABLET AND THE TC1000 YOU HAVE IN YOUR HAND

23   AND RENDER THE '889 PATENT OBVIOUS?

24   A    IT'S MY UNDERSTANDING UNDER THE TEST THAT IF

25   THEY DON'T QUALIFY AS A PRIMARY REFERENCE, THEN YOU

1    CAN'T COMBINE THEM.

2              BUT ON TOP OF THAT, THEY BOTH LOOK SO

3    DIFFERENT FROM ONE AUTO AND FROM THE PATENT THAT

4    I'M NOT SURE WHERE I WOULD START TO COMBINE THEM.

5    Q    COULD WE SEE PDX 26.96.  DO YOU RECALL

6    MR. SHERMAN TESTIFYING THAT HE FOUND THAT SEVEN

7    DESIGN FEATURES OF THE APPLE PATENTS WERE, IN HIS

8    WORD, FUNCTIONAL?

9    A    YES.

10   Q    I'VE SET THE SEVEN OF THEM OUT ON THIS SLIDE.

11   IN YOUR OPINION, ARE ANY OF THESE ELEMENTS OF ANY

12   OF THE APPLE DESIGN PATENTS DICTATED BY FUNCTION?

13   A    I DO NOT BELIEVE ANY OF THESE ARE DICTATED BY

14   FUNCTION AS THEY ARE REPRESENTED IN THE DESIGNS.

15   Q    BRIEFLY, AGAIN, CAN YOU TELL US WHY NOT?

16   A    BECAUSE THERE ARE ALTERNATIVE DESIGNS

17   AVAILABLE FOR EVERY ONE OF THESE ITEMS IN PRODUCTS

18   ON THE MARKET, AND, FRANKLY, IN PRIOR ART.

19   Q    OKAY.  I WANT YOU TO STEP BACK FOR A MOMENT,

20   MR. BRESSLER.  PUT YOURSELF BACK IN 2007.

21             WHAT WAS YOUR REACTION WHEN YOU FIRST SAW

22   THE DESIGN OF THE IPHONE IN 2007?

23             MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

24   THAT'S OUTSIDE OF SCOPE OF HIS REPORT.  THAT'S NOT

25   IN HIS REPORT AT ALL.

```
 1              MS. KREVANS:  YOUR HONOR, IT'S HIS

 2   ASSESSMENT OF THE DESIGN AS A DESIGNER.

 3              THE COURT:  OVERRULED.

 4              THE WITNESS:  I, FRANKLY, WAS SURPRISED

 5   AT HOW BEAUTIFUL OF A DESIGN I THOUGHT IT WAS, AND

 6   AS A DESIGNER, FRANKLY, WAS ENVIOUS THAT I HADN'T

 7   DESIGNED IT.

 8   BY MS. KREVANS:

 9   Q    DID YOU, IN CONNECTION WITH YOUR REPORT,

10   INVESTIGATE THE REACTION OF THE GENERAL PUBLIC AND

11   REVIEWERS OF PUBLIC IN THIS CASE DEVICES TO THE

12   DESIGN OF THE IPHONE WHEN IT CAME OUT IN 2007.

13   A    YES.

14              MR. VERHOEVEN:  OBJECTION, RELEVANCE.

15              MS. KREVANS:  SECONDARY CONSIDERATION,

16   YOUR HONOR.

17              THE COURT:  YOU HAD OVERRULED.

18              THE WITNESS:  I FOUND A LARGE NUMBER OF

19   MAGAZINE ARTICLES, PRINT ARTICLES, AWARDS THAT WERE

20   PRESENTED, A HUGE AMOUNT OF CLAIMS, YOU MIGHT EVEN

21   CALL A CLAIMER.

22   BY MS. KREVANS:

23   Q    AND HOW, IF AT ALL, MR. BRESSLER, DOES THAT

24   RELATE TO YOUR VIEW THAT THE DESIGNS OF THE IPHONE

25   PATENTS ARE NOT OBVIOUS?
```

3608

```
 1    A    IN MY EXPERIENCE AS A DESIGNER, A DESIGN

 2    COMING OUT DOESN'T HAVE THAT KIND OF IMPACT UNLESS

 3    IT'S TRULY UNIQUE AND NOT OBVIOUS.

 4              MS. KREVANS:  NOTHING FURTHER, YOUR

 5    HONOR.

 6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

 7    2:13.  GO AHEAD, PLEASE.

 8              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

 9              CAN WE PUT UP SDX 3927.001.

10                    CROSS-EXAMINATION

11    BY MR. VERHOEVEN:

12    Q    THIS IS A SLIDE WE LOOKED AT EARLIER WHEN I

13    WAS CROSS-EXAMINING YOU?

14              MS. KREVANS:  OBJECTION, YOUR HONOR.

15              MR. VERHOEVEN:  YOUR HONOR, IF WE'RE

16    GOING TO HAVE OBJECTIONS TO A SLIDE THAT'S ALREADY

17    BEEN USED AND TAKING MY TIME.

18              THE COURT:  GO AHEAD, OVERRULED.

19              MS. KREVANS:  YOUR HONOR, IF I MAY --

20              MR. VERHOEVEN:  CAN THIS GO OUT OF THEIR

21    TIME, YOUR HONOR.

22              THE COURT:  OVERRULED.  GO, PLEASE.

23              MR. VERHOEVEN:  THANK YOU.

24    Q    THIS IS A SLIDE I ASKED YOU ABOUT LAST TIME

25    YOU TESTIFIED; RIGHT?
```

1    A    CORRECT.

2    Q    AND ON THE LEFT WE HAVE THESE PRIOR ART

3    REFERENCES AND WE HAVE THE LG PRADA, DO YOU SEE

4    THAT?

5    A    I SEE THAT.

6    Q    ALL THESE PRIOR ART DEVICES HAVE A RECTANGULAR

7    SHAPE WITH ROUNDED CORNERS; RIGHT?

8    A    THAT'S WHAT I SAID LAST TIME, USE.

9    Q    THE USE OF A RECTANGULAR SHAPE WITH ROUNDED

10   CORNERS FOR AN ELECTRONIC DEVICE, THAT'S NOT

11   SOMETHING APPLE OWNS, IS IT, SIR?

12   A    THAT GENERAL DESCRIPTION CERTAINLY IS NOT.

13   THE SPECIFIC DESIGN THAT THEY PRODUCED IS.

14   Q    THAT ELEMENT IS NOT SOMETHING THAT APPLE OWNS,

15   IS IT, SIR?

16   A    I'M NOT SURE I UNDERSTAND THE QUESTION.

17   Q    RECTANGULAR SHAPE WITH ROUNDED CORNERS, DOES

18   APPLE OWN THAT?

19   A    APPLE OWNS A -- THE DESIGN OF THE PHONE WITH A

20   RECTANGULAR SHAPE AS DEPICTED IN THEIR PATENT WITH

21   ROUNDED CORNERS.

22   Q    CAN WE PLAY MR. BRESSLER'S APRIL 24TH, 2000

23   TELEPHONE DEPOSITION, PAGE 176, LINES 18 THROUGH

24   85.

25             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

```
 1    OPEN COURT OFF THE RECORD.)

 2    BY MR. VERHOEVEN:

 3    Q    AND THE USE OF A LARGE -- GO BACK TO THE

 4    SLIDE, PLEASE.  EACH OF THESE HAS A LARGE DISPLAY

 5    SCREEN; RIGHT?

 6    A    THEY'RE DIFFERENT SIZES.

 7    Q    BUT THEY'RE ALL LARGE DISPLAY SCREENS, AREN'T

 8    THEY, SIR?

 9    A    COMPARED TO WHAT?

10    Q    YOU DON'T CONCEDE THESE ARE LARGE DISPLAY

11    SCREENS?

12    A    I WOULD SAY SOME OF THEM ARE LARGE AND SOME OF

13    THEM ARE NOT, YES.

14    Q    WHICH ONE IS NOT LARGE?

15    A    THE 547 I DO NOT BELIEVE IS AS LARGE AS THE

16    '087.

17    Q    OKAY.  SO THESE THREE AT LEAST YOU'LL AGREE

18    ARE LARGE, THE JP'638, JP'383, AND THE LG PRADA?

19    A    THEY ARE LARGE RELATIVE TO THE DESIGNS THEY'RE

20    IN, YES.

21    Q    THE USE OF A LARGE DISPLAY SCREEN ON AN

22    ELECTRONIC DEVICE IS NOT SOMETHING THAT'S

23    PROPRIETARY TO APPLE, IS IT, SIR?

24    A    I'M SORRY.  THE WAY YOU'RE ASKING THAT

25    QUESTION IS NOT APPROPRIATE TO THE EVALUATION I
```

3611

1    DID.

2    Q    LET'S PLAY YOUR DEPOSITION, APRIL 24TH, 2012,

3    PAGE 177, LINES 1 THROUGH 5.

4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6    BY MR. VERHOEVEN:

7    Q    NOW, THAT WAS TRUE TESTIMONY WHEN YOU GAVE IT

8    AT YOUR DEPOSITION, WASN'T IT, SIR?

9    A    AS I UNDERSTAND THE QUESTIONS AT THE TIME,

10   YES.

11   Q    NOW, WHEN YOU'RE LOOKING AT THE '889 PATENT,

12   THE TABLET DESIGN PATENT -- ARE YOU WITH ME?

13   A    I AM.

14   Q    YOU NOTICED A LOT OF LITTLE DIFFERENCES;

15   RIGHT?

16   A    A LOT OF LITTLE DIFFERENCES OF WHAT?

17   Q    IN THE FIDLER TABLET VERSUS THE '889?

18   A    I THOUGHT THEY WERE SUBSTANTIAL DIFFERENCES.

19   Q    AND, IN FACT, WHEN YOU COMPARED THE '888 TO

20   THE INITIAL IPAD, IT WAS YOUR BELIEF IT'S NOT AN

21   EMBODIMENT, RIGHT?

22   A    BECAUSE OF THE SHAPE.

23   Q    SO YOU DIDN'T THINK IT WAS AN EMBODIMENT OF

24   THE '889 PATENT; RIGHT?

25   A    THAT REALLY HAS NOT BEEN PART OF MY

1    EVALUATION.

2    Q    IS THAT YOUR OPINION?

3    A    NO.

4    Q    OKAY.  LET'S PLAY FROM YOUR DEPOSITION, APRIL

5    24TH, 2012, PAGE 121, LINES 6 THROUGH 13.

6             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

7    OPEN COURT OFF THE RECORD.)

8             MR. VERHOEVEN:  I'LL JUST READ IT, BUT I

9    DON'T THINK THEY WOULD SEE THEM AS BEING

10   SUBSTANTIALLY THE SAME.

11   Q    YOU SAID THAT, RIGHT, IN ANSWER TO THAT

12   QUESTION AT YOUR DEPOSITION?

13   A    I DID.  AND I SAID THE WORD SIGNIFICANT

14   SIMILARITIES.

15   Q    BUT DID YOU NOT THINK THEY WERE SUBSTANTIALLY

16   THE SAME.  WAS THAT A MISTAKE AT YOUR DEPOSITION?

17   A    NO, THAT'S WHAT I SAID.

18   Q    OKAY.  AND YOU STAND BY IT?

19   A    I BELIEVE THAT THE BACK OF THE ORIGINAL IPAD

20   DOES NOT HAVE THE SAME SHAPES THAT THE '889

21   SUGGESTS.

22   Q    YOU AGREE THAT YOU APPLIED THE SAME TEST FOR

23   INVALIDITY AS YOU APPLY FOR INFRINGEMENT, YOU APPLY

24   THE ORDINARY OBSERVER TEST; RIGHT, SIR?

25   A    I APPLIED THE ORDINARY OBSERVER TEST, IF, IN

3613

1    FACT, I FOUND IN THE CONSTRUCTIONS THAT AS A

2    DESIGNER OF THE ORDINARY SKILL I FELT WERE CLOSE TO

3    OR PRIMARY REFERENCES FOR THE PATENTS, AND I --

4    Q    SO IF?

5    A    I DON'T BELIEVE ANY OF THEM ARE.

6    Q    IF LITTLE DETAILS LIKE THE BEZEL WIDTH OR THE

7    LOCATION OF THE SPEAKER ARE IMPORTANT FOR

8    INVALIDITY, THEY'RE JUST AS IMPORTANT FOR

9    NON-INFRINGEMENT, AREN'T THEY, SIR?

10   A    YES.  BUT I BELIEVE IT ALL COMES DOWN TO THE

11   OVERALL IMPRESSION.

12             MR. VERHOEVEN:  THANK YOU, SIR.

13             PASS THE WITNESS.

14             THE COURT:  ALL RIGHT.  2:18.

15             MS. KREVANS:  NO REDIRECT YOUR HONOR.

16             THE COURT:  ALL RIGHT.  IS THIS WITNESS

17   EXCUSED AND NOT SUBJECT TO RECALL.

18             MS. KREVANS:  HE IS EXCUSED AND NOT

19   SUBJECT TO RECALL.

20             THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

21             THE WITNESS:  THANK YOU.

22             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

23                       **KARAN SINGH,**

24   BEING CALLED AS A WITNESS ON BEHALF OF THE

25   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

```
1    EXAMINED AND TESTIFIED AS FOLLOWS:

2              THE WITNESS:  I DO.

3              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

4              MR. JACOBS:  YOUR HONOR, APPLE CALLS DR.

5    KARAN SINGH IN REBUTTAL.

6              THE COURT:  OKAY.  TIME IS 2:18.  GO

7    AHEAD, PLEASE.

8                    DIRECT EXAMINATION

9    BY MR. JACOBS:

10   Q    WELCOME BACK, DR. SINGH.  THE JURY HEARD

11   WEDNESDAY FROM A MR. GRAY ON BEHALF OF SAMSUNG THAT

12   LAUNCHTILE AND AGNETTA, A PATENT WITH AGNETTA AS

13   THE INVENTOR, EACH OF THEM SEPARATELY ANTICIPATE

14   CLAIM 50 OF THE '163 PATENT.

15             ARE YOU AWARE OF THAT TESTIMONY?

16   A    SURE.  I WAS IN COURT.  I READ HIS TRANSCRIPT.

17   I SAW THE SLIDES.

18   Q    DO YOU AGREE WITH MR. GRAY?

19   A    NO, I DO NOT.

20   Q    AND BEFORE WE GET INTO THE DETAILS, LET'S TAKE

21   KIND OF A HIGH LEVEL LOOK AT THIS.  ARE CLAIM 50 OF

22   THE '163 PATENT ON ONE HAND AND LAUNCHTILE AND

23   AGNETTA, THE REFERENCES MR. GRAY TALKED ABOUT, ARE

24   THEY EVEN DIRECTED TO THE SAME PROBLEM?

25   A    NO, NOT AT ALL.  ONE, THE '163 DEALS WITH
```

1    FACILITATING THE NAVIGATION AND READABILITY OF THE

2    STRUCTURED ELECTRONIC DOCUMENTS, LIKE WEB PAGES.

3    IF WE LOOK AT THE VIDEO OF THE '163 ON THE APPLE

4    IPHONE AGAIN, YOU SEE TAPPING ON BOXES.

5              AND THEN THIS ENTIRE DOCUMENT BEING

6    ENLARGED AND CENTERED TO IMPROVE THE READABILITY OF

7    THAT DOCUMENT.

8              LAUNCHTILE AND AGNETTA, ON THE OTHER

9    HAND, DEAL WITH A COMPLETELY DIFFERENT PROBLEM,

10   WHICH IS INTERACTING WITH AND LAUNCHING APPLICATION

11   ICONS, SORT OF LIKE THE APPLICATION ICONS FOR

12   LAUNCHING PROGRAMS THAT YOU SEE ON A COMPUTER DESK

13   TOP.

14   Q    SO DO LAUNCHTILE AND AGNETTA ENLARGE AND

15   TRANSLATE A STRUCTURED ELECTRONIC DOCUMENT?

16   A    NO, NOT AT ALL.  AND CERTAINLY NOT THE WAY THE

17   '163 TALKS ABOUT.  THEY ESSENTIALLY REPLACE THE

18   CONCEPT.  THEY PROVIDE DIFFERENT CONTENT.

19   Q    SO DO -- DOES LAUNCHTILE DISCLOSE INSTRUCTIONS

20   FOR DISPLAYING AT LEAST A PORTION OF A STRUCTURED

21   ELECTRONIC DOCUMENT?

22   A    UM --

23   Q    CAN WE HAVE PDX 29.29, PLEASE?

24   A    NO, THEY DON'T.  JUST LOOKING AT THE CLAIM

25   ELEMENTS OVER HERE, LAUNCHTILE, AND AGNETTA,

1616

```
 1    BASICALLY ARE A COLLECTION OF APPLICATION TILES.

 2    ARBITRARILY GROUPING THEY WILL TOGETHER AND CALLING

 3    THEM -- YOU CAN'T CONSTRUE THEM AS A SINGLE

 4    DOCUMENT AS SUCH.

 5    Q    AND DOES -- AND HOW ABOUT THOSE REFERENCES AS

 6    AGAINST ELEMENT H?  DO THEY HAVE INSTRUCTIONS FOR

 7    ENLARGING AND TRANSLATING?

 8    A    WELL, FIRSTLY --

 9           MR. DEFRANCO:  OBJECTION, YOUR HONOR.  I

10    KNOW TIME IS SHORT, BUT WE'RE LEADING.

11           MR. JACOBS:  THAT'S NOT LEADING, YOUR

12    HONOR.  I'M ASKING WHETHER THEY HAVE THAT.

13           THE COURT:  OVERRULED.  GO AHEAD.

14           THE WITNESS:  WELL, CLEARLY, THERE IS NO

15    STRUCTURED ELECTRONIC DOCUMENT, SO CLAIM H IS NOT

16    MET.

17           BUT EVEN IF YOU WILL ASSUME THAT THERE IS

18    SOME KIND OF A STRUCTURED ELECTRONIC DOCUMENT, AS

19    YOU WILL SEE IN THIS VIDEO, IF WE PLAY A VIDEO OF

20    THE LAUNCHTILE APPLICATION, THIS APPLICATION, YOU

21    LOOK AT THESE 36 TILES AND YOU CLICK ON THEM, IT

22    REPLACES THE CONTENT THAT YOU SEE OVER HERE WITH

23    THESE FOUR TILES THAT ARE COMPLETELY DIFFERENT.  IF

24    WE PLAY IT ONE MORE TIME, YOU FOCUS ON THE

25    TELEPHONE.  YOU SEE -- OOPS.  YOU FOCUS ON THE
```

1    TELEPHONE, YOU SEE JUST AN ICON, AND THEN YOU HAVE

2    A LIST OF MISSED CALLS AND SO ON.

3            SAME THING WITH THE E-MAIL APPLICATION.

4    THESE ARE COMPLETELY DIFFERENT PIECES OF CONTENT.

5    I'VE SEEN IT IN THE CODE.

6    Q    NOW LET'S TAKE A LOOK AT ELEMENT J, PDX 29.29

7    AGAIN, PLEASE.  AND DOES LAUNCHTILE HAVE THIS

8    ELEMENT IN RESPONSE TO DETECTING THE SECOND GESTURE

9    AGAIN TRANSLATING THE STRUCTURED ELECTRONIC

10   DOCUMENT?

11   A    ABSOLUTELY NOT.  AGAIN, THERE'S NO STRUCTURED

12   ELECTRONIC DOCUMENT.  BUT IF YOU WILL ZOOM IT,

13   WE'LL SEE IN THIS VIDEO -- NOW, GIVEN THOSE FOUR

14   TILES WHEN YOU CLICK, WHAT'S ACTUALLY HAPPENING IS

15   THAT WHOLE APPLICATION IS LAUNCHED.  THIS IS NOT

16   THE CONTENT.  THIS IS NOT THE DOCUMENT AT ALL.

17           THIS IS AN APPLICATION, NOW YOU CAN

18   INTERACT WITH THIS APPLICATION.  YOU CAN READ YOUR

19   E-MAILS.  YOU CAN RESPOND TO THEM.

20           IT'S IN NO WAY, YOU KNOW, THE ORIGINAL

21   STRUCTURED ELECTRONIC DOCUMENT, IF ANYTHING.

22           SO WE'RE REALLY TRYING TO SHOEHORN, YOU

23   KNOW, ONE PIECE OF FUNCTIONALITY INTO A SET OF

24   CLAIMS.

25   Q    LET'S TAKE A LOOK NOW, FOR JUST A MOMENT, AT

3618

```
 1    AGNETTA, THE 632 PATENT.  CAN WE HAVE FIGURE 3 OF
 2    561, PLEASE.  IT'S 561.14 THERE.  THERE WE GO.
 3    WHAT'S GOING ON IN AGNETTA.  CAN YOU COMPARE THAT
 4    TO LAUNCHTILE?
 5    A    WELL, AGNETTA IS SIMILAR, AS MR. GRAY HIMSELF
 6    TESTIFIED, THERE ARE APPLICATION TILES.  THE PATENT
 7    TALKS ABOUT A SET OF TILES, THERE'S THIS ACTIVE
 8    TILE THAT YOU SEE.  IF YOU LOOK AT THE PATENT
 9    SPECIFICATION, IT CLEARLY TALKS ABOUT A SET OF
10    TILES, NOT AN ELECTRONIC DOCUMENT IN ANY WAY.
11    THERE ARE A BUNCH OF INDEPENDENT TILES.  AND IT'S
12    ALL OVER THE PATENT.  SO CLEARLY ELEMENT E WHERE WE
13    HAVE A STRUCTURED ELECTRONIC DOCUMENT IS NOT MET.
14           IF YOU LOOK AT THE NEXT, THE SAME CLAIM
15    ELEMENT, I BELIEVE IT'S CLAIM ELEMENT H, SAME
16    THING.  YOU CAN -- YOU CAN CLICK AND CHOOSE TO MAKE
17    ONE OF THE TILES ACTIVE.
18           BUT YOU CLICK ON IT AND IT ENLARGES AND
19    CENTERS THAT TILE AS MR. GRAY HIMSELF TESTIFIED,
20    NOT THE ENTIRE STRUCTURED ELECTRONIC DOCUMENT AS
21    THE CLAIM OVER HERE REQUIRES.
22           AND IF YOU LOOK AT THE NEXT CLAIM
23    ELEMENT, CLAIM ELEMENT J, AGAIN, YOU CAN REPLACE
24    YOUR CURRENTLY ACTIVE TILE WITH A DIFFERENT TILE
25    THAT THEN BECOMES THE ACTIVE TILE.
```

```
 1              BUT THAT IS CERTAINLY NOT TRANSLATING ANY
 2    KIND OF STRUCTURED ELECTRONIC DOCUMENT AS THE, AS
 3    THE CLAIM LANGUAGE OVER HERE REQUIRES.
 4    Q     THANK YOU.  LET'S NOW TURN TO ANOTHER PRIOR
 5    ART REFERENCE THAT MR. GRAY TALKED ABOUT, THE
 6    ROBBINS '349 PATENT.  HE SAID THAT ANTICIPATES
 7    CLAIM 50 OF THE '163 PATENT.  IS THAT RIGHT?
 8    A     NO, THAT'S NOT RIGHT AT ALL.  MR. GRAY ONLY
 9    BREEZED THROUGH A SLIDE WITH AN IMAGE OF A MAP AND,
10    AND SOME CLAIM ELEMENTS.
11              ESSENTIALLY JUST LIKE LAUNCHTILE AND
12    AGNETTA, ROBBINS SOLVES A COMPLETELY DIFFERENT
13    PROBLEM.  WHAT IT TAKES IS AN ELECTRONIC DOCUMENT,
14    ANY ELECTRONIC DOCUMENT, WHETHER IT HAS ANY
15    STRUCTURE OR NOT IS IRRELEVANT.
16              WHAT IT DOES IS ON TOP OF THAT, IT
17    IMPOSES THIS ARBITRARY GRID STRUCTURE, THIS
18    SEGMENTATION.  IT IMPOSES THIS SEGMENTATION JUST
19    LIKE IF YOU LOOK AT THE MAPS IN AN ATLAS, THERE ARE
20    THESE NUMBERED INDICES THAT DEFINE SECTIONS OF A
21    MAP.
22              AND THEN IT USES THESE SEGMENTS TO
23    NAVIGATE THAT DOCUMENT, A COMPLETELY DIFFERENT
24    PROBLEM.
25              THE RESULT OF THAT IS THAT IF YOU LOOK AT
```

1    THE CLAIM ELEMENTS OF CLAIM 50 OF THE '163, YOU

2    WILL SEE THAT ALL THESE ELEMENTS THAT TALK ABOUT

3    BOXES, THEY CLEARLY ARE NOT MET BECAUSE A BOX OVER

4    HERE IS A PIECE OF STRUCTURE FROM A STRUCTURED

5    ELECTRONIC DOCUMENT.  IT IS INSIDE.  IT IS INHERENT

6    TO THAT STRUCTURED ELECTRONIC DOCUMENT.  IT'S NOT

7    SOME SQUARES OR GRID LINES THAT YOU MIGHT CHOOSE TO

8    DRAW ON TOP OF THEM.

9            AND SO SIMPLY JUST TAKING THAT, ALL THE

10   ELEMENTS FROM G TO J ARE JUST SIMPLY NOT MET.

11   Q    WOULD ANY OF THESE, LAUNCHTILE, AGNETTA, OR

12   ROBBINS MAKE CLAIM 50 OF THE '163 PATENT OBVIOUS?

13   A    NO, ABSOLUTELY NOT.  AS I'VE SAID, THEY'RE

14   ADDRESSING DIFFERENT PROBLEMS FROM FACILITATING THE

15   NAVIGATION AND READABILITY OF STRUCTURED ELECTRONIC

16   DOCUMENTS, THEY OPERATE DIFFERENT FUNCTIONALLY.

17   THEY DO NOT IN ANY WAY MAKE APPLE'S INVENTION

18   OBVIOUS.

19           AND BESIDES, MR. GRAY HAS OFFERED

20   ABSOLUTELY NO CLUE AS TO HOW OR WHY THEY MIGHT MAKE

21   IT OBVIOUS.

22   Q    NOW, TURNING TO THE INFRINGEMENT ISSUES THAT

23   MR. GRAY TALKED ABOUT, HE INSERTED THIS IDEA OF

24   NESTED BOXES .  DO YOU RECALL THAT TESTIMONY?

25   A    YES, I DO.  BUT HE DID NOT SAY THAT CLAIM 50

1    WAS -- THAT SAMSUNG DID NOT INFRINGE IT.

2    Q    WHAT DID YOU UNDERSTAND HIM TO BE KIND OF

3    TRYING TO HINT AT?

4    A    I GUESS HE WAS TRYING TO PLAY WITH SOME

5    AMBIGUITY OF WORDS --

6              MR. DEFRANCO:  OBJECTION, YOUR HONOR, AS

7    NOT PROPER REBUTTAL FOR INFRINGEMENT.

8              MR. JACOBS:  HE'S RESPONDING TO THE

9    TESTIMONY AT TRIAL, YOUR HONOR.

10             MR. DEFRANCO:  THAT DOESN'T MEAN IT'S

11   PROPER REBUTTAL.  WHEN THEY PUT ON THEIR CASE, WE

12   RESPONDED TO THEIR CASE.

13             THE COURT:  ALL RIGHT.  OVERRULED.  LET'S

14   KEEP THIS TRIAL GOING, OKAY?

15             THE WITNESS:  QUITE SIMPLY FOR THREE

16   REASONS.  YOU LOOK AT THIS PLURALITY OF BOX

17   CONTENT, ALL IT'S SAYING IS PLURALITY IS MORE THAN

18   ONE.  LATER IN THE CLAIMS THERE'S A FIRST BOX AND A

19   SECOND BOX AND SO THERE'S MORE THAN ONE BOX.  THESE

20   ARE DIFFERENT.  AND THE MAIN PATENT FIGURE ACTUALLY

21   SHOWS YOU MULTIPLE BOXES THAT ARE NEXT TO EACH

22   OTHER.  THEY'RE NOT NESTED.

23             BUT --

24   BY MR. JACOBS:

25   Q    LET'S PAUSE THERE.  LET'S TAKE A LOOK AT

3622

```
 1     1046.14, FIGURE 5C?

 2     A    YEAH, THIS IS THAT FIGURE.

 3     Q    ACTUALLY, 5A?

 4     A    THIS IS ACTUALLY 5A WHICH SHOWS A BUNCH OF

 5     BOXES.

 6     Q    LET'S GO TO .14, MR. LEE.

 7              THE COURT:  IS HE DOING NON-INFRINGEMENT?

 8              MR. DEFRANCO:  YES, YOUR HONOR, THIS IS

 9     COMPLETELY IMPROPER.

10              MR. JACOBS:  HE'S RESPONDING TO

11     MR. GRAY'S NESTED BOXES ARGUMENT.

12              MR. DEFRANCO:  THAT'S NOT REBUTTAL IS,

13     YOUR HONOR.

14              THE COURT:  THE REBUTTAL SHOULD ONLY BE

15     ON VALIDITY.

16              MR. JACOBS:  FINE, YOUR HONOR.

17              THE WITNESS:  FINE.

18     BY MR. JACOBS:

19     Q    LET'S TURN TO DIAMONDTOUCH AND THE '915

20     PATENT, SO WE'RE SWITCHING PATENTS NOW AND WE'RE

21     LOOKING AT DIAMONDTOUCH AND THE '915.

22              YOU HEARD MR. GRAY'S TESTIMONY THAT

23     DIAMONDTOUCH ANTICIPATES CLAIM 8 OF THE '915

24     PATENT?

25     A    SURE, HE TESTIFIED IT.  BUT HE ONLY
```

1    CONCLUSIVELY PROVED WITH HIS TRIAL TESTIMONY THAT

2    ELEMENT B, ONE -- THE CREATING AN EVENT OBJECT WAS

3    ACTUALLY, ACTUALLY PRESENT AND MET BY THE

4    DIAMONDTOUCH, ONE, ONE OUT OF SIX ELEMENTS.

5    Q    AND WHY DO YOU BELIEVE THAT THE OTHER ELEMENTS

6    ARE NOT PRESENT?

7    A    WELL, LET'S GO THROUGH THEM.  THE DIAMONDTOUCH

8    IS CERTAINLY NOT A TOUCH SENSITIVE DISPLAY THAT IS

9    INTEGRATED WITH A DATA PROCESSING SYSTEM.  IT'S NOT

10   EVEN A TOUCH SENSITIVE DISPLAY.  IT'S A PLASTIC

11   TOUCH SURFACE ON WHICH YOU CAN PROJECT SOME IMAGES.

12        AND IT'S NOT AN INTEGRATED -- IT'S

13   CERTAINLY NOT AN INTEGRATED DEVICE, AS IS, AS IS

14   DESCRIBED BY THE '915 PATENT.  THE '915 PATENT

15   INDICATES THAT IT SHOULD BE A SINGLE DEVICE.  THERE

16   ARE FIGURES IN THE PATENT, IF WE CAN LOOK AT A

17   COUPLE, THAT MAKE IT VERY CLEAR WHAT SORT OF A

18   DEVICE IT SHOULD BE.

19        THERE ARE EXAMPLES.

20   Q    CAN WE LOOK AT 1044.6, MR. LEE.

21   A    SO THERE -- THERE ARE EXAMPLES AND -- AND

22   1044.33.

23   Q    SO WHAT ARE THE EXAMPLES IN THE PATENT OF AN

24   INTEGRATED DEVICE OF THE SORT THAT YOU'RE

25   DESCRIBING?

```
 1    A    WELL, SMARTPHONES, TABLETS, THERE'S A GOOD

 2    ILLUSTRATIVE LIST.  YOU'RE LOOKING AT SOMETHING

 3    OVER HERE AND THAT'S CERTAINLY NOT THE

 4    DIAMONDTOUCH.  WE'VE ALL SEEN IT OVER HERE.  IT'S A

 5    COLLECTION OF A NUMBER OF DISTINCT DEVICES.

 6    Q    SO WHAT ABOUT ELEMENT C ON PDX 29.7.  IS THAT

 7    PRESENT IN DIAMONDTOUCH?

 8    A    NO, THAT'S NOT, EITHER.  AS WE HEARD IN

 9    MR. FORLINES TRIAL TESTIMONY, MR. FORLINES IS THE

10    AUTHOR OF THE FRACTAL ZOOM PROGRAM THAT MR. GRAY

11    USES.  IN THIS CASE, TWO FINGER SCALE THE OBJECT OR

12    PERFORM A GESTURE OPERATION, AND EVERYTHING ELSE

13    SCROLLS IT.  SO YOU PUT THREE FINGERS DOWN AND

14    IT'LL STRICTLY SCROLLS THE OBJECT.

15          CLAIM ELEMENT C SAYS ONE FINGER SCROLL,

16    TWO OR MORE SCALES IT, OR GESTURES.  YOU PUT THREE

17    FINGERS DOWN, THREE IS GREATER THAN TWO, IT SHOULD

18    SCALE.  IT SCROLLS.

19    Q    NOW, LET'S BRIEFLY TALK ABOUT E AND F AS IT

20    RELATES TO DIAMONDTOUCH.

21    A    WELL, THE OPERATIVE WORD HERE IS A VIEW

22    ASSOCIATED WITH THE EVENT OBJECT.  IN MY

23    INFRINGEMENT TESTIMONY, I CLEARLY POINTED OUT A

24    VIEW ON THAT CONTROLS A WEB BROWSER, HOW IT'S

25    ASSOCIATED WITH AN EVENT OBJECT.
```

1        MR. GRAY DID NOT DISCLOSE ANY KIND OF

2   VIEW OBJECT IN ANY WAY, OR THAT IT WAS ASSOCIATED

3   WITH THE DIAMONDTOUCH EVENT OBJECT.

4        SO I DON'T BELIEVE HE'S BORNE THE BURDEN

5   OF PROVING E OR F AT ALL.

6   Q    NOW, IF WE SUM UP, THEN, ON DIAMONDTOUCH, IS

7   DIAMONDTOUCH EVEN CLOSE TO THIS CLAIM?

8   A    NOT AT ALL.  IT MEETS ONE OF SIX CLAIM

9   ELEMENTS.

10  Q    LET'S TURN NOW TO NOMURA, WHICH WAS THE OTHER

11  REFERENCE THAT MR. GRAY SPENT A FEW MINUTES ON.

12        CAN YOU EXPLAIN WHY YOU -- WHAT YOUR VIEW

13  IS OF MR. GRAY'S TESTIMONY ABOUT THE NOMURA, THE

14  JAPANESE PATENT APPLICATION AND WHETHER IT

15  ANTICIPATES CLAIM 8 OF THE '915 PATENT?

16  A    WELL, IT WAS A PATENT APPLICATION.  THERE ARE

17  THREE VERY IMPORTANT ASPECTS OF CLAIM 8.  IF WE CAN

18  PUT CLAIM 8 UP AGAIN.

19        THERE'S EVENTS, OBJECTS AND VIEWS.  THE

20  NOMURA PATENT APPLICATION DISCLOSES ABSOLUTELY NONE

21  OF THEM.

22  Q    NOW, YOU MAY RECALL THAT MR. GRAY SAID THAT

23  THE EVENT OBJECT WAS INHERENT IN NOMURA.  DO YOU

24  AGREE WITH THAT TESTIMONY?

25  A    NO, ABSOLUTELY NOT .  ANY PERSON OF ORDINARY

1   SKILL THE IN ART WOULD KNOW THAT THERE ARE A NUMBER

2   OF VIABLE ALTERNATIVES TO THESE, THESE ARE

3   PROGRAMMING CONSTRUCTING THAT ARE IMPORTANT.  YOU

4   CAN EASILY REPLACE EVENTS WITH, WITH POLLING IN A

5   DEVICE.  YOU CAN -- PROCEDURAL PROGRAMMING AND

6   LANGUAGES CAN REPLACE OBJECTS, CAN BE USED INSTEAD

7   OF OBJECTS, AND YOU CAN HAVE A SINGLE BLOCK OF

8   DISPLAY LOGIC INSTEAD OF, INSTEAD OF VIEWS.

9         AND, IN FACT, THERE -- IF YOU READ

10   NOMURA, THERE IS LOTS OF EVIDENCE THAT WOULD MAKE

11   YOU BELIEVE THAT, IN FACT, THESE OTHER ALTERNATIVES

12   ARE PROBABLY THE BEST WAY TO IMPLEMENT SUCH, SUCH

13   AN INVENTION.

14   Q   SO DOES NOMURA -- IS THE DIFFERENCE, THE LACK

15   OF AN EVENT OBJECT IN NOMURA, IS THAT A SIGNIFICANT

16   DIFFERENCE OR A SMALL ONE?

17   A   ABSOLUTELY.  LOOK AT THE CLAIM ELEMENTS,

18   WHEREVER YOU SEE THE WORD EVENT, WHERE YOU SEE THE

19   WORD OBJECT, WHERE YOU SEE THE WORD VIEW, THOSE

20   ELEMENTS ARE NOT MET.  THAT'S A, B -- NO, NOT A.

21   SORRY.  B, C, E, AND F.

22   Q   SO ABSOLUTELY SIGNIFICANT OR NOT SIGNIFICANT,

23   SIR?

24   A   ABSOLUTELY SIGNIFICANT.

25   Q   VERY GOOD.  NOW LET ME JUST VERY BRIEFLY, THE

```
1     JEFFERSON HAN SYSTEM, DID MR. GRAY MAKE AN

2     INVALIDITY SHOWING ABOUT THE JEFFERSON HAN SYSTEM,

3     THE KIND OF THE DEVICE THE WITH HANDS --

4     A    MR. GRAY SHOWED A VIDEO.  HE SHOWED A VIDEO.

5     BY NOW I THINK WE'VE ALL SORT OF SEEN THAT FOUR OF

6     THE '915 PATENT, CLAIM 8, A CERTAIN AMOUNT OF RIGOR

7     IN TERMS OF CODE ANALYSIS IS NECESSARY.  THERE ARE

8     PROGRAMMING CONSTRUCTS HERE.

9              MR. GRAY SHOWED ABSOLUTELY NO CODE.  I

10    HAVE LOOKED AT THE CODE AND, I DID NOT FIND ANY OF

11    THOSE CLAIM -- THOSE CONSTRUCTS CONCLUSIVELY MET.

12             AND MR. GRAY SHOWED A VIDEO.  BY ITSELF,

13    THE VIDEO ACTUALLY DOESN'T TELL YOU ANYTHING ABOUT

14    THESE CLAIM ELEMENTS.

15             MR. DEFRANCO:  OBJECTION, YOUR HONOR.

16    OUTSIDE THE SCOPE.  THERE'S NO CODE IN DR. SINGH'S

17    REPORT.

18             MR. JACOBS:  CAN HE JUST FINISH THE

19    ANSWER, YOUR HONOR?  I THINK HE'S DONE.

20             THE COURT:  I'M GOING TO STRIKE THE

21    REFERENCE TO THE CODE.

22             BUT GO AHEAD.

23             THE WITNESS:  WELL, THE VIDEO BY ITSELF

24    DOES NOT -- CANNOT TELL YOU ANYTHING ABOUT EVENT

25    OBJECTS.  IT CANNOT TELL YOU ANYTHING ABOUT VIEWS.
```

1    IT CANNOT TELL YOU ANYTHING ABOUT A LOT OF THESE

2    ELEMENTS.

3            WHAT IT CAN TELL YOU ACTUALLY IS THAT ONE

4    OF THE ELEMENTS, A, IS ACTUALLY NOT MET.  IF YOU

5    LOOK AT THE VIDEO ITSELF, YOU CAN CLEARLY SEE THAT

6    HAN'S SYSTEM, LIKE THE DIAMONDTOUCH, IS NOT AN

7    INTEGRATED SYSTEM TOUCHSCREEN, COMPUTER TOUCHSCREEN

8    AT ALL.  THERE'S LED'S, THERE'S DISPLAYS, THERE'S

9    ALL KINDS OF STUFF.  AND HAN HAS ADMITTED TO THIS

10    IN DEPOSITION TESTIMONY.

11    BY MR. JACOBS:

12    Q    DO YOU SEE JX 1048 AND 1049 IN YOUR BINDER,

13    THE FILE HISTORIES FOR THE '915 AND THE '163

14    PATENT?

15    A    JX, CAN YOU TELL ME AGAIN.

16            MR. JACOBS:  YOUR HONOR, THESE ARE ON THE

17    JOINT EXHIBIT LIST.  THEY'RE THE FILE HISTORIES FOR

18    THE TWO PATENTS AND WE'D OFFER THEM.

19            THE COURT:  ANY OBJECTION?

20            MR. DEFRANCO:  NO, YOUR HONOR.

21            THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

22            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

23            1048 AND 1049, HAVING BEEN PREVIOUSLY

24            MARKED FOR IDENTIFICATION, WERE ADMITTED

25            INTO EVIDENCE.)

```
 1               MR. JACOBS:  THANK YOU VERY MUCH,

 2      DR. SINGH.

 3               THE COURT:  ALL RIGHT.  IT'S 2:37.

 4               MR. DEFRANCO:  NO QUESTIONS, YOUR HONOR.

 5               THE COURT:  ALL RIGHT.  IS THIS WITNESS

 6      EXCUSED NOT SUBJECT TO RECALL, RIGHT?

 7               MR. JACOBS:  YES, YOUR HONOR.

 8               THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

 9               MR. JACOBS:  YOUR HONOR, WE CALL

10      DR. RAVIN BALAKRISHNAN IN REBUTTAL.

11               THE COURT:  DO YOU WANT TO TAKE A QUICK

12      STAND UP EVERYONE?

13               THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

14                    RAVIN BALAKRISHNAN,

15      BEING CALLED AS A WITNESS ON BEHALF OF THE

16      PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

17      EXAMINED AND TESTIFIED AS FOLLOWS:

18               THE WITNESS:  I DO.

19               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

20               THE COURT:  ALL RIGHT.  238.  PLEASE GO

21      AHEAD.

22                    DIRECT EXAMINATION

23      BY MR. JACOBS:

24      Q    DR. BALAKRISHNAN, DID YOU REVIEW DR. VAN DAM'S

25      TESTIMONY ON THE '381 PATENT?
```

```
1    A    YES, I DID.

2    Q    DID HE EVEN TESTIFY ABOUT NON-INFRINGEMENT?

3    A    NO, HE DID NOT.

4    Q    DID YOU SEE ANY TESTIMONY FROM ANY WITNESS ON

5    THE SAMSUNG SIDE ABOUT NON-INFRINGEMENT?

6    A    NOT IN THIS TRIAL.

7             MR. JOHNSON:  YOUR HONOR, OBJECTION, YOUR

8    HONOR.

9    BY MR. JACOBS:

10   Q    TURNING TO THE PRIOR ART IN THIS CASE --

11            MR. JOHNSON:  I KNOW WE'RE TRYING TO GO

12   FAST.

13            THE COURT:  OBJECTION IS SUSTAINED.

14            MR. JOHNSON:  I ASK THAT HIS ANSWERS BE

15   STRUCK.

16            THE COURT:  IT'S STRICKEN.  GO AHEAD,

17   PLEASE.

18            MR. JOHNSON:  THANK YOU.

19   BY MR. JACOBS:

20   Q    TURNING TO THE ALLEGED PRIOR ART IN THIS CASE,

21   DID DR. VAN DAM TESTIFY ABOUT SOURCE CODE FOR

22   DIAMONDTOUCH OR LAUNCHTILE?

23   A    NO, HE DID NOT.

24   Q    DID YOU REVIEW THE SOURCE CODE FOR THOSE PRIOR

25   ART REFERENCES?
```

3631

1    A    YES, I DID.

2    Q    WHY DID YOU DO SO?

3    A    I DID THAT BECAUSE IN BOTH THOSE SYSTEMS,

4    DIAMONDTOUCH AND LAUNCHTILE, IT WAS NOT IMMEDIATELY

5    APPARENT TO ME THAT IT WAS MEETING ALL ELEMENTS OF

6    THE CLAIM OF CLAIM 19.

7    Q    LET'S HAVE CLAIM 19 UP ONE MORE TIME.  THE

8    JURY HAS PROBABLY GOT THIS SUBMITTED TO MEMORY.

9    BASED ON YOUR ANALYSIS, DO TABLECLOTH AND

10   LAUNCHTILE MEET THE LIMITATIONS OF CLAIM 19?

11   A    THEY DO NOT.

12   Q    LET'S FOCUS ON TABLECLOTH.  WHY DOES

13   TABLECLOTH NOT MEET THE LIMITATIONS OF CLAIM 19?

14   A    TABLECLOTH DOES NOT MEET THE LIMITATIONS FOR

15   CLAIM 19 FOR SEVERAL OF THE LIMITATIONS.

16   Q    CAN YOU GO THROUGH THOSE, PLEASE, QUICKLY?

17   A    SURE.  IN THE FIRST CASE, IT IS A -- THE

18   ELECTRONIC DOCUMENT THAT DR. VAN DAM POINTED TO IN

19   HIS DEMONSTRATION OF TABLECLOTH ACTUALLY CONSISTS

20   OF TWO IMAGES, AND IF YOU SEE THE VIDEO, YOU CAN

21   SEE THE TWO IMAGES OF THE SAME DESK TOP IMAGE BEING

22   REPEATED.  SO THAT'S NOT A SINGLE ELECTRONIC

23   DOCUMENT.

24   Q    CAN WE SEE SDX 3964.013, PLEASE.

25   A    AS YOU CAN SEE HERE, THIS IS A FIRST IMAGE.

6352

```
 1      IT'S A WINDOWS DESK TOP.  AND AS THE USER SCROLLS,
 2      ANOTHER -- WELL, NOW, YEAH, NOW ANOTHER COPY OF
 3      THAT IMAGE, IT'S A DIFFERENT IMAGE OF THAT WINDOWS
 4      DESK TOP SHOWS UP AND THEN IT SCROLLS BEYOND THAT,
 5      THAT SECOND IMAGE.
 6              SO IT IS ACTUALLY, AT BEST, TWO
 7      ELECTRONIC DOCUMENTS, NOT A SINGLE ELECTRONIC
 8      DOCUMENT.
 9              AND I LOOKED AT THE CODE TO CONFIRM THIS,
10      JUST TO MAKE SURE THAT THAT IS, INDEED, TRUE.
11      Q    CAN WE HAVE --
12      A    THAT IT ACTUALLY CONFIRMED THAT.
13      Q    CAN WE HAVE DX 655.001.  IS THIS THE CODE YOU
14      REVIEWED, SIR?
15      A    THIS IS THE, THE PAGE AND A HALF OF CODE THAT
16      MAKES UP THIS TABLECLOTH APPLICATION, AND I
17      REVIEWED THE WHOLE THING.  AND I'D LIKE TO POINT
18      YOU TO A FEW IMPORTANT POINTS.
19              THE FIRST ONE IS SOMEWHERE, I THINK IT'S
20      LINE 7 ONWARDS, YES, THOSE TWO LINES RIGHT THERE.
21      IF YOU CAN SEE THERE, WHAT IT'S DOING IS ADDING AN
22      OBSERVER, IN OTHER WORDS, A PIECE OF CODE THAT
23      LOOKS AT WHAT HAPPENS WHEN A PARTICULAR IMAGE IS
24      BEING INTERACTED WITH, AND YOU CAN SEE IT DOES THAT
25      FOR TWO DIFFERENT IMAGES.  THE FIRST ONE IS CALLED
```

1    IMAGE ONE UNDERSCORE MC AND THE SECOND ONE IS

2    CALLED IMAGE 2 UNDERSCORE MC.

3            SO INDEED THERE ARE TWO IMAGES IN THIS

4    TABLECLOTH APPLICATIONS AND IT'S ADDING

5    FUNCTIONALITY TO OBSERVE USER INPUT ON THOSE TWO

6    IMAGES.

7    Q    I'D LIKE TO SHOW YOU ONE OF DR. VAN DAM'S

8    PRESENTATION SLIDES.  CAN WE SEE 3694.034 DO YOU

9    RECALL THIS?

10   A    YES, I DO.

11   Q    WHAT'S NOTABLE ABOUT THE CLAIM THAT TABLECLOTH

12   ANTICIPATES THE '381 PATENT?

13   A    WHAT'S NOTABLE ABOUT THIS IN CONJUNCTION WITH

14   DR. VAN DAM'S TESTIMONY IS THAT HE HAS INDICATED

15   THAT THIS CLAIM ELEMENT IS MET.  BUT, IN FACT, HE

16   ONLY DISCUSSED THE FIRST HALF OF THIS CLAIM

17   ELEMENT.

18           THE SECOND HALF, WHICH STARTS WITH IN

19   RESPONSE TO IS ACTUALLY COVERED UP BY THE IMAGE AND

20   HE DIDN'T TALK ABOUT THAT SECOND HALF OF THE CLAIM

21   ELEMENT AT ALL AND THAT TURNS OUT TO BE AN

22   IMPORTANT PART OF THIS CLAIM.

23   Q    IN FACT, DOES TABLECLOTH ON THE DIAMONDTOUCH

24   HAVE INSTRUCTIONS THAT ACT IN RESPONSE TO THE EDGE

25   OF THE DOCUMENT BEING REACHED?

3634

```
 1    A    NO, THEY DO NOT.

 2    Q    WHAT INSTEAD DO THE TABLECLOTH INSTRUCTIONS

 3    DO?

 4    A    THE TABLECLOTH INSTRUCTIONS, THEY DO NOT DEAL

 5    WITH WHAT HAPPENS IN RESPONSE TO AN EDGE.  ALL THEY

 6    DO IS ANY TIME THE FINGER IS LIFTED OFF THE TABLE,

 7    IT JUST SIMPLY RECENTERS THE IMAGE.  IT JUST ALWAYS

 8    GOES UP, WHETHER OR NOT -- IT ALWAYS GOES BACK TO

 9    THE FIRST IMAGE, WHETHER OR NOT YOU'VE GONE PAST

10    THE EDGE.  AND I CONFIRMED THIS IN THE SOURCE CODE

11    AS WELL.

12    Q    AND WHAT ABOUT THE LIMITATION UNTIL THE AREA

13    BEYOND THE EDGE IS NO LONGER DISPLAYED.  DOES

14    TABLECLOTH MEET THAT LIMITATION?

15    A    NO, IT DOES NOT MEET THAT LIMITATION, FOR

16    ESSENTIALLY THE SAME REASON.  ONCE THE AREA BEYOND

17    THE EDGE IS NO LONGER DISPLAYED, IT DOESN'T STOP,

18    IT KEEPS GOING ALL THE WAY BACK TO THE ORIGINAL

19    FIRST IMAGE THAT WAS SHOWN.

20    Q    LET'S TURN TOE LAUNCHTILE.  CAN WE HAVE SDP

21    3964.045?  DOES LAUNCHTILE EMBODY THE ELEMENTS IN

22    RESPONSE TO THE EDGE OF THE ELECTRONIC DOCUMENT

23    BEING REACHED?

24    A    NO, IT DOES NOT.

25    Q    AND WHY DO YOU SAY THAT, SIR?
```

```
 1     A    FOR THE REASON THAT I LOOKED AT THE SOURCE

 2     CODE AND IN LAUNCHTILE, WHAT HAPPENS, EVERY TIME

 3     YOU RELEASE YOUR FINGER FROM THE DEVICE, FROM THE

 4     TOUCH PAD, IT SIMPLY GOES BACK, IT RECENTERS THE

 5     DOCUMENT TO THE CLOSER BLUE CIRCLE, AS I THINK

 6     DR. BEDERSON, WHO'S THE CREATOR OF THE LAUNCHTILE

 7     TESTIMONY TESTIFIED, THE TEST THAT IT DOES IS IT

 8     DETERMINES HOW FAR AWAY FROM THAT CENTER IT IS.  IF

 9     IT'S A SIXTH OF THE WAY OR LESS, IT GOES BACK TO

10     THAT ORIGINAL BLUE CIRCLE.

11           IF IT'S MORE THAN A SIXTH OF THE WAY, IT

12     GOES TO THE NEXT SET OF TILES.

13     Q    SO INSTEAD OF DETECTING THE EDGE OF THE

14     ELECTRONIC DOCUMENT, WHAT IS IT RESPONDING TO?

15     A    IT'S SIMPLY RESPONDING TO THE CENTER.  IT'S

16     REALLY A RECENTERING ALGORITHM.  IT DOESN'T

17     ACTUALLY CHECK THAT IT'S REACHED THE EDGE OF ANY

18     DOCUMENT.

19     Q    LET'S LOOK AT PDX 41.  DOES LAUNCHTILE SOLVE

20     THE FROZEN SCREEN PROPERTY?

21     A    NO, IT EMBODIES THE FROZEN SCREEN PROBLEM.

22     THAT OCCURS WHEN YOU HIT THE EDGE OF THE DOCUMENT

23     AND THE SCREEN JUST STOPS MOVING, AND IF YOU LOOK

24     AT LAUNCHTILE, IF WE CAN PLAY THIS VIDEO, YOU CAN

25     SEE YOU GO TO THE EDGE OF THE DOCUMENT, THE EDGE OF
```

3636

```
 1    THE TILES THERE, IT SIMPLY STOPS.  IT'S FROZEN.
 2    Q    AND DOES IT SOLVE THE DESERT FOG PROBLEM?
 3    A    NO, IT DOESN'T SOLVE THE DESERT FOG PROBLEM
 4    EITHER.  THAT'S ONE WHEN YOU CAN TAKE THE DOCUMENT
 5    COMPLETELY OFF THE SCREEN.  SO HERE IS THE E-MAIL
 6    APPLICATION OFF LAUNCHTILE, AND AS THE VIDEO WILL
 7    SHOW, YOU CAN SCROLL THE LIST OF E-MAILS COMPLETELY
 8    OFF THE SCREEN.
 9    Q    CAN YOU TAKE APPARENTLY A LOOK, PLEASE, AT JX
10    1047 IN YOUR BINDER.  THIS IS THE PROSECUTION
11    HISTORY FOR THE '381 PATENT?
12    A    OKAY.  YOU HAVE IT UP ON THE SCREEN.
13            MR. JACOBS:  CAN WE MOVE 1047 INTO
14    EVIDENCE, YOUR HONOR.
15            THE COURT:  ANY OBJECTION?
16            MR. JOHNSON:  NO, YOUR HONOR.
17            THE COURT:  IT'S ADMITTED.
18            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
19            1047, HAVING BEEN PREVIOUSLY MARKED FOR
20            IDENTIFICATION, WAS ADMITTED INTO
21            EVIDENCE.)
22    BY MR. JACOBS:
23    Q    IF YOU LOOK AT THE '381 PATENT AGAIN,
24    DR. BALAKRISHNAN, CAN YOU WALK US THREE THE RELATED
25    APPLICATION DATA ON THAT DOCUMENT.  THIS WOULD BE
```

```
1    JX 1045?

2    A    SURE.  THE PERTINENT ISSUE HERE IS THAT THE

3    PROVISIONAL APPLICATION WAS FILED, AND IN

4    PARTICULAR, THERE WAS ONE FILED IN JANUARY, JANUARY

5    2007, AND THAT'S THE ONE THAT IS OF INTEREST HERE

6    BECAUSE THE -- ALL THE FUNCTIONALITY IN CLAIM 9 WAS

7    DISCLOSED IN THAT EARLIER PROVISIONAL APPLICATION

8    AS THE FILE HISTORY SHOWS.

9    Q    DR. VAN DAM TESTIFIED THAT HE THOUGHT THE PTO

10   MADE A MISTAKE IN ISSUING THIS PATENT.  DO YOU

11   RECALL THAT TESTIMONY?

12   A    YES, I DO.

13   Q    HAS ANYONE ELSE MADE THAT ALLEGATION?

14   A    YES, SOME OTHER PARTIES MADE THAT ALLEGATION

15   AND REQUESTED A RE-EXAMINATION --

16            MR. JOHNSON:  OBJECTION, YOUR HONOR, THIS

17   GOES RIGHT TO YOUR HONOR'S RULING ON THE

18   RE-EXAMINATION PROCEEDINGS.

19            MR. JACOBS:  IT DOESN'T, YOUR HONOR.

20   THIS ONE WAS CONCLUDED.

21            MR. JOHNSON:  YOUR HONOR, SAME OBJECTION.

22            THE COURT:  SUSTAINED.  LET'S MOVE ON.

23            MR. JACOBS:  NO FURTHER QUESTIONS,

24   DR. BALAKRISHNAN.  THANK YOU.

25            THE WITNESS:  THANK YOU.
```

```
 1              THE COURT:  ALL RIGHT.  2:46.  ANY CROSS?
 2              MR. JOHNSON:  NO QUESTIONS, YOUR HONOR.
 3              THE COURT:  OKAY.  YOU ARE EXCUSED.  AND
 4    I ASSUME IT'S NOT SUBJECT TO RECALL; CORRECT?
 5              MR. JACOBS:  CAN WE JUST HAVE A MINUTE,
 6    YOUR HONOR?
 7              THE COURT:  YES.
 8              (PAUSE IN PROCEEDINGS.)
 9              MR. LEE:  YOUR HONOR, HE'S EXCUSED NOT
10    SUBJECT TO RECALL.
11              THE COURT:  HE IS EXCUSED AND NOT SUBJECT
12    TO RECALL.
13              YES.
14              MR. LEE:  AND IF WE CAN STOP FOR THE
15    AFTERNOON BREAK, WE CAN RESOLVE THE QUESTION THAT
16    WE WERE TALKING ABOUT OVER HERE DURING THE BREAK.
17              THE COURT:  ALL RIGHT.  APPLE HAS 16
18    MINUTES LEFT IN THIS CASE.
19              MR. MCELHINNY:  AND SIX MORE WITNESSES,
20    YOUR HONOR.  MAYBE LESS.
21              MR. LEE:  I HAVE A WAY TO DESCRIBE THAT,
22    YOUR HONOR.
23              THE COURT:  OKAY.  ALL RIGHT.  IT'S 2:47.
24    LET'S GO AHEAD AND TAKE OUR AFTERNOON BREAK.
25              I WILL JUST TELL YOU THAT APPLE HAS 16
```

```
 1    MINUTES LEFT.  I'LL RECONFIRM MY CALCULATIONS IN A
 2    MINUTE, AND SAMSUNG HAS 20 MINUTES LEFT.  SO WE ARE
 3    DEFINITELY GOING TO BE FINISHING AT LEAST THE
 4    EVIDENCE PORTION OF THIS TRIAL TODAY AND YOU'LL BE
 5    GOING HOME AS SOON AS WE DO.  OKAY?
 6              BUT THEN YOU ARE GOING TO HAVE THE DAY
 7    OFF ON MONDAY, BUT THEN TUESDAY MORNING, WE'LL DO
 8    THE JURY INSTRUCTIONS, CLOSINGS AND THEN YOU START
 9    DELIBERATING IF THERE'S TIME.  OKAY?  ALL RIGHT.
10    THANK YOU.
11              AGAIN, PLEASE KEEP AN OPEN MIND, DON'T
12    DISCUSS THE CASE WITH ANYONE, PLEASE DON'T READ OR
13    RESEARCH ABOUT THE CASE.  AND YOU CAN JUST LEAVE
14    YOUR JURY BOOKS ON YOUR CHAIR.  THANK YOU.
15              (WHEREUPON, THE FOLLOWING PROCEEDINGS
16    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
17              THE COURT:  OKAY.  PLEASE TAKE A SEAT.
18    I'M JUST CONFIRMING HOW MUCH TIME YOU HAVE, AND I
19    DO CONFIRM THAT IT'S 16 MINUTES.  OKAY.
20              MR. MCELHINNY:  THANK YOU, YOUR HONOR.
21              THE COURT:  NOW, IF YOU ASK A
22    NON-INFRINGEMENT QUESTION OF MR. MUSIKA, I'M GOING
23    TO HAVE TO SANCTION YOU, OKAY.  THAT'S IT.
24              ALL RIGHT.  WHAT ELSE?  LET'S TAKE OUR
25    BREAK NOW.  THANK YOU.
```

```
 1              (WHEREUPON, A RECESS WAS TAKEN.)

 2              THE COURT:  OKAY.  WELCOME BACK.  PLEASE

 3    TAKE A SEAT.

 4              APPARENTLY WE GOT A REQUEST, MR. RIVERA

 5    DID, FROM SOMEONE FROM THE MEDIA THAT IF THERE IS A

 6    VERDICT, THEY REQUESTED THAT WE DELAY AN HOUR SO

 7    THAT PEOPLE CAN SHOW UP.  I REALLY THINK THAT WOULD

 8    BE BURDENSOME.  I'M NOT SURE WHO MADE THAT REQUEST.

 9              THE WITNESS:  I DO.

10              THE COURT:  OKAY.  CAN IT BE LESS THAN AN

11    HOUR, BECAUSE THAT'S AN AWFULLY LONG TIME TO MAKE

12    THE JURY WAIT.

13              AUDIENCE:  THAT'S FINE.  ANY ADVANCED

14    NOTICE.

15              THE COURT:  WHAT WE WERE PLANING TO DO, I

16    DON'T KNOW WHAT'S THE BEST WAY TO STAY IN TOUCH

17    WITH PEOPLE, THE FIRST ONE TO MAKE SURE THAT THE

18    TEAMS, IF YOU PUT A LIST TOGETHER OF WHO YOU WANT

19    US TO CONTACT AS SOON AS THERE'S A JURY NOTE OR

20    SOMETHING, CAN YOU DO THAT WITH ALL YOUR BEST

21    CONTACT NUMBERS.

22              IT'LL TAKE SOME TIME FOR US JUST TO

23    ASSEMBLE EVERYBODY ANYWAY, I HOPE IT WON'T TAKE AN

24    HOUR, SO I'LL HAVE A LITTLE BIT OF NOTICE.  WHAT

25    SHOULD WE DO, JUST -- WE COULD E-FILE SOMETHING
```

6351

```
 1    SAYING WE RECEIVED JURY NOTE NUMBER 3.  WOULD THAT
 2    BE HELPFUL?  HE CAN ALSO DO A PHONE TREE.
 3              MR. MINTZ IS HERE FROM THE MERCURY NEWS.
 4    WE CAN NOTIFY AND HE CAN LET -- HE'S THE ONE THAT'S
 5    BASED IN THIS COURTHOUSE, IF HE CAN LET FOLKS KNOW,
 6    JUST IN CASE ECF MAY SOME DOWN, IT HAS IN THE PAST,
 7    AND THAT WAY WE CAN STILL COMMUNICATE WITH YOU.
 8              THE WITNESS:  E-MAIL ME.
 9              THE COURT:  WE DON'T WANT TO BE
10    RESPONSIBLE FOR E-MAILING EVERYBODY.  WE COULD LET
11    MR. MINTZ KNOW AND IF YOU ALL COULD WORK IT OUT.
12              THE WITNESS:  YES, WE'LL WORK ON IT,
13    JUDGE.
14              AUDIENCE:  IS BETTER THAN PHONE TREE.
15              THE COURT:  IS MS. PARKER-BROWN WILL BE
16    BACK NEXT WEEK, AND SHE'LL E-MAIL MR. MINTZ.  WE
17    CAN ALSO FILE THINGS ON ECF SINCE YOU'RE PROBABLY
18    ALSO GETTING ECF NOTICES, AND MAYBE IT WOULD BE
19    EASIER -- WE CAN JUST E-FILE WHEN THE JURY STARTED
20    EACH DAY AND WHEN THEY'VE LEFT, AND IF THERE'S EVER
21    A NOTE OR A VERDICT, WE'LL JUST DO A CLERK'S
22    NOTICE.
23              AUDIENCE:  THANK YOU VERY MUCH.
24              THE COURT:  YOU CAN FIND THAT, BETWEEN
25    THAT AND THE E-MAIL TREE, I THINK WE SHOULD BE
```

1    OKAY.

2              THE WITNESS:  THANK YOU.

3              THE COURT:  ALL RIGHT.  LET'S GO AHEAD

4    AND FINISH UP THEN.

5              (WHEREUPON, THE FOLLOWING PROCEEDINGS

6    WERE HELD IN THE PRESENCE OF THE JURY:)

7              THE COURT:  WELCOME BACK.  WE'RE IN OUR

8    LAST 36 MINUTES.

9              ALL RIGHT.  MR. LEE.

10             MR. LEE:  APPLE RESTS, YOUR HONOR.

11             THE COURT:  OH, OKAY.  ALL RIGHT.

12             MR. PRICE:  WE SAVED TIME FOR ME.

13             THE COURT:  ALL RIGHT.  THEN IT'S 3:07.

14   LET'S GO BACK THEN TO SAMSUNG.  WHO WOULD YOU LIKE

15   TO CALL?

16             MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS

17   DR. DAVID TEECE.

18             THE COURT:  YOU KNOW, JUST BELTS AND

19   SUSPENDERS, WE'RE GOING TO RESWEAR IN EVERYONE LIKE

20   WE DID WITH THE OTHER WITNESSES.  OKAY.

21             MS. MAROULIS:  YES.

22             THE COURT:  PLEASE RAISE YOUR RIGHT HAND.

23             **DAVID TEECE,**

24   BEING RECALLED AS A WITNESS ON BEHALF OF THE

25   DEFENDANTS, HAVING BEEN PREVIOUSLY SWORN, WAS

3643

```
 1    EXAMINED AND TESTIFIED AS FOLLOWS:

 2              THE WITNESS:  I DO.

 3              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 4              THE COURT:  ALL RIGHT.  TIME IS NOW 3:08,

 5    GO AHEAD, PLEASE WITH YOUR DIRECT.

 6                      DIRECT EXAMINATION

 7    BY MS. MAROULIS:

 8    Q    WELCOME BACK.  DO YOU AGREE WITH THE TESTIMONY

 9    OF DR. WALKER THAT DISCLOSURE TO ETSI AFTER THE

10    ADOPTION OF THE STANDARD IS UNTIMELY?

11    A    NO.  BASED ON WHAT I'VE OBSERVED FROM THE

12    PUBLIC DATABASE OF ETSI, I DON'T.

13    Q    HAVE YOU CONDUCTED AN EMPIRICAL STUDY OF HOW

14    THE PARTICIPANTS IN ETSI DISCLOSE THEIR IPR'S TO

15    ETSI?

16    A    I HAVE.

17    Q    LET'S TAKE A LOOK AT SDX 3975.006.  IS THIS

18    THE SLIDE THAT YOU PREPARED TO SUMMARIZE YOUR

19    FINDINGS?

20              MR. LEE:  YOUR HONOR, I OBJECT.  THIS WAS

21    EXCLUDED.

22              MS. MAROULIS:  YOUR HONOR, THE OBJECTION

23    WAS OVERRULED, I BELIEVE.

24              MR. LEE:  NO.  IT WAS SUSTAINED AS TO 06

25    AND THEY WERE ALLOWED TO SHOW WHAT WAS 01 TO 05
```

3644

```
 1    ONLY.
 2              THE COURT:  ALL RIGHT.  LET ME SEE.
 3              MS. MAROULIS:  YOUR HONOR, I'LL MOVE ON
 4    TO 05 WHILE IT'S BEING CHECKED BY MY LEAGUES.
 5              THE COURT:  OKAY.
 6    BY MS. MAROULIS:
 7    Q    LET'S TAKE A LOOK AT 3975.005.  WHAT DOES THIS
 8    SLIDE REPRESENT, MR. TEECE?
 9    A    THIS IS ONE YEAR, 2011, WHERE I WENT INTO THE
10    PUBLIC DATABASE THAT DR. WALKER REFERRED TO AND I
11    MEASURED IN DAYS THE TIME FROM THE ADOPTION OF THE
12    STANDARD TO THE DISCLOSURE BY THREE PARTIES HERE OF
13    INTELLECTUAL PROPERTY POTENTIAL AND AS YOU CAN SEE
14    FOR APPLE, THAT TIME LAPSE WAS ABOUT 250 DAYS ON
15    AVERAGE.
16              FOR HTC, IT WAS ABOUT 700 DAYS ON
17    AVERAGE.  AND FOR NOKIA, IT WAS ACTUALLY NORTH OF A
18    THOUSAND DAYS ON AVERAGE.  SO WE'RE NOT TALKING
19    DAYS, WE'RE ACTUALLY TALKING MONTHS AND YEARS.
20    Q    HAVE YOU ALSO STUDIED SUCH PARTICIPANTS AS
21    ERICSSON AND MOTOROLA FOR THE PURPOSE OF THIS
22    ANALYSIS?
23    A    YES.
24    Q    AND DID THEY EXHIBIT SIMILAR DELAYS?
25    A    YES.
```

6645

```
1    Q    DO YOU RECALL WHAT DELAYS THEY EXHIBITED ON

2    AVERAGE?

3    A    I DON'T RECALL THE NUMBER.  BUT WE'RE TALKING

4    WEEKS AND MONTHS AND SOMETIMES YEAR.

5    Q    DR. TEECE, HOW DOES THIS EMPIRICAL STUDY

6    EFFECT YOUR ANALYSIS OF THE TIME LIMITS OF THE

7    DISCLOSURE TO ETSI?

8    A    WELL, WITH RESPECT TO RULES, AS AN ECONOMIST,

9    I LOOK AT THE WAY PEOPLE BEHAVE.  THAT TELLS ME THE

10   MOST ABOUT WHAT THE RULES ARE.  AND THIS IS THE WAY

11   THAT PARTICIPANTS BEHAVE.  THEY DON'T DISCLOSE, OR

12   THEY DON'T CERTAINLY HARDLY EVER DISCLOSE BEFORE

13   THE PATENTS ARE ISSUES.

14        MR. LEE:  I OBJECT, YOUR HONOR.  THAT'S

15   BEYOND WHAT YOUR HONOR ALLOWED.  HE WAS ALLOWED TO

16   DISCUSS THE DELAYS.  THERE'S NO FOUNDATION FOR --

17        MS. MAROULIS:  YOUR HONOR, THERE WAS

18   OBJECTIONS TO TWO SPECIFIC EXHIBITS, BOTH WERE

19   OVERRULED BY YOUR ORDER.

20        THE COURT:  I KNOW.  THE OBJECTION SO

21   THIS SLIDE WAS OVERRULED.  SO.

22        MR. LEE:  RIGHT, AND I HAVEN'T OBJECTED

23   TO THAT THAT.  THIS TIME I BELIEVE HE'S GOING

24   BEYOND THIS NOW AND TALK ABOUT WHEN THEY DISCLOSE.

25   THESE SLIDES DON'T SHOW ANYTHING ABOUT DISCLOSURE.
```

```
1    NOW HE'S GIVING OPINION ON WHEN THEY DISCLOSE.

2    THERE'S NOTHING BEFORE THE COURT ABOUT THAT AND

3    THERE'S NOTHING --

4              THE COURT:  OVERRULED.  I'M GOING TO LET

5    YOU CROSS.  GO AHEAD, PLEASE.

6    BY MS. MAROULIS:

7    Q    DR. TEECE, HOW DOES THIS EMPIRICAL STUDY

8    AFFECT YOUR ANALYSIS.  FINISH YOUR ANSWER, PLEASE.

9    A    IT SHOWS THAT THE PRACTICE AT ETSI IS THAT

10   COMPANIES FREQUENTLY PROVIDE INFORMATION ABOUT

11   PATENTS CONSIDERABLY AFTER THE STANDARDS ARE

12   ISSUED.

13   Q    THANK YOU, DR. TEECE.  YOU HEARD MR. DONALDSON

14   TESTIFY ABOUT THE FRAND OFFER THAT SAMSUNG MADE TO

15   APPLE.  WERE YOU HERE?

16   A    I WAS.

17   Q    AND IN HIS OPINION, THE RATE THAT SAMSUNG

18   OFFERED TO APPLE WAS NOT FAIR AND REASONABLE.  DO

19   YOU AGREE WITH THAT OPINION?

20   A    NO, I DON'T.

21   Q    WHY DO YOU DISAGREE WITH MR. DONALDSON?

22   A    ONE, IT WAS IN THE RANGE OF RATES THAT I'VE

23   OBSERVED FROM OTHER COMPANIES; AND, TWO, THE LETTER

24   SPECIFICALLY WAS AN INVITATION TO CONSIDER A

25   CROSS-LICENSE, WHICH IF THAT NEGOTIATION HAD BEEN
```

6647

1    PURSUED, COULD HAVE RESULTED THAT THE RATE GOING

2    AWAY AND POSSIBLY JUST A BALANCING PAYMENT.

3    Q    WHAT TYPICALLY HAPPENS ONCE SUCH AN OFFER IS

4    MADE?

5    A    IT'S USUALLY RESPONDED TO.

6    Q    TO YOUR KNOWLEDGE, HAS APPLE EVER RESPONDED TO

7    SAMSUNG WITH A COUNTER OFFER OF ROYALTY RATES?

8    A    NOT TO MY KNOWLEDGE.

9    Q    DR. TEECE, MR. DONALDSON ALSO TESTIFIED THAT

10   THE BASE USED IN THE SAMSUNG OFFER LETTER WAS NOT

11   FRAND.

12        DO YOU AGREE WITH THAT CONCLUSION?

13   A    I DISAGREE WITH THAT CONCLUSION.

14   Q    WHY DO YOU DISAGREE WITH THAT CONCLUSION?

15   A    HE BELIEVED THE BASE SHOULD BE THE BASEBAND

16   CHIP AND I LOOKED AT ALL -- ALL THE LICENSES I

17   LOOKED AT, NOBODY ELSE USED THE BASEBAND CHIP.  IT

18   WAS REFERRING EITHER TO SET SALES OR SOME UNIT

19   SALES MEASURE.

20   Q    SIR, WHAT ARE YOU RELYING ON WHEN YOU SAY THAT

21   YOU LOOKED AT LICENSES AND HAVE NOT SEEN THE

22   BASEBAND CHIP USED AS A MEASURE OF BASE?

23   A    I LOOKED AT SAMSUNG'S LICENSES, NOKIA'S

24   LICENSES, AND A NUMBER OF OTHERS REPORTED IN THE

25   PUBLIC DATABASES.

1    Q    THANK YOU, SIR.

2         WHAT ABOUT -- YOU WERE HERE ALSO FOR

3    DR. ORDOVER'S PRESENTATION; CORRECT?

4    A    I WAS.

5    Q    WHAT IS YOUR OPINION WITH REGARD TO THE MARKET

6    DEFINITION PROPOSED BY DR. ORDOVER?

7    A    VERY UNUSUAL, HIS DEFINITION IS VERY UNUSUAL.

8         AND NOR DID HE DO WHAT AN ECONOMIST IS

9    SUPPOSED TO DO TO ESTABLISH A MARK, WHICH IS LOOK

10   FOR COMMERCIALLY VIABLE SUBSTITUTES.  HE WAS VERY

11   CLEAR IN HIS REPORT THAT HE ASSUMED THAT THERE WAS

12   SUBSTITUTES WHEN, IN FACT, ECONOMIC ANALYSIS

13   REQUIRES THAT YOU PROVE THAT THERE ARE SUBSTITUTES.

14   Q    WHAT IS THE RELEVANCE OF IDENTIFYING

15   SUBSTITUTES TO DEFINING THE MARKET?

16   A    YOU CANNOT DEFINE AN ANTITRUST MARKET, OR A

17   RELEVANT ANTITRUST MARKET WITHOUT DOING A CAREFUL

18   ECONOMIC ANALYSIS OF THE SUBSTITUTES THAT ARE

19   AVAILABLE.

20   Q    WHAT TYPE OF DATA DOES AN ECONOMIST ANALYZE TO

21   ESTABLISH THAT ONE TECHNOLOGY CAN SUBSTITUTE FOR

22   ANOTHER?

23   A    YOU LOOK AT COST DATA, PERFORMANCE DATA, YOU

24   WANT TO SHOW THAT ECONOMICALLY THESE VARIOUS

25   TECHNOLOGIES CAN BE SUBSTITUTED.  IT'S NOT ENOUGH

3649

```
1    FOR A TECHNICAL PERSON TO SAY MAYBE THEY WILL BE

2    TECHNICALLY SIMILAR.  THEY HAVE TO BE ECONOMICALLY

3    AND COMMERCIALLY SIMILAR.

4    Q    DID DR. ORDOVER LOOK AT THAT DATA IDENTIFIED

5    WHAT TECHNOLOGIES HE TALKED ABOUT AS SUBSTITUTE

6    ITSELF?

7    A    HE DID NOT.

8    Q    WHAT DATA DID HE LOOK?

9    A    HE LOOKED AT VARIOUS INFORMATION BY TECHNICAL

10   EXPERTS WHICH WAS COMPLETELY BEREFT OF ANY ECONOMIC

11   ANALYSIS.

12   Q    THEN HOW DOES HE GO ABOUT DEFINING THE MARKET

13   DEFINITION?

14   A    IN ESSENCE HE ASSUMES HIS MARKET BASED ON THE

15   SCOPE OF THE PATENT.

16   Q    IS THIS APPROACH CONSISTENT WITH ECONOMIC

17   PRINCIPLES AS YOU UNDERSTAND THEM?

18   A    IT IS NOT.

19   Q    WHAT ARE THE IMPLICATIONS OF ADOPTING THIS

20   MARKET DEFINITION PROPOSED BY DR. ORDOVER?

21   A    BASICALLY HE ASSUMES HIS RESULT, THAT THERE IS

22   MONOPOLY POWER BECAUSE HE HASN'T DONE THE

23   BACKGROUND WORK THAT'S NECESSARY TO ESTABLISH THAT

24   THERE ARE COMMERCIALLY VIABLE SUBSTITUTES.

25   Q    AND WHAT IS THE CONSEQUENCE OF THAT FOR THE
```

1    MARKET PARTICIPANTS IN THE STANDARD SETTING

2    ORGANIZATIONS?

3    A    IF THE DESIGNER'S CORRECT, EVERYBODY IS A

4    MONOPOLIST.  ANYBODY WITH A PATENT IS A MONOPOLIST

5    AND THERE'S THOUSANDS OF MONOPOLISTS OUT THERE

6    WHICH IS CLEARLY, IN MY VIEW, NOT CORRECT WHY.

7    Q    SIR, HAS SAMSUNG LICENSED ITS STANDARD

8    ESSENTIAL PATENTS TO OTHER COMPANIES?

9    A    I BELIEVE SO, YES.

10   Q    AND HAVE YOU TESTIFIED YESTERDAY REGARDING

11   SAMSUNG'S LICENSING OF THESE PATENTS TO OTHER

12   COMPANIES?

13   A    YES.

14   Q    IS IT CORRECT THAT EXHIBIT 630 CONTAINS THE

15   INFORMATION REGARDING THAT?

16   A    IT DOES.

17   Q    TO YOUR KNOWLEDGE, IS APPLE PAYING ANYTHING TO

18   SAMSUNG FOR SAMSUNG'S DECLARED ESSENTIAL PATENTS?

19   A    NOT TO MY KNOWLEDGE.

20            MS. MAROULIS:  ONE MINUTE, YOUR HONOR.

21            YOUR HONOR, THIS WITNESS CAN BE EXCUSED,

22   OR PASS THE WITNESS.

23            MR. LEE:  I'D LIKE TO ASK A FEW

24   QUESTIONS.

25            THE COURT:  ALL RIGHT.  3:16.  GO AHEAD.

1            **CROSS-EXAMINATION**

2    BY MR. LEE:

3    Q    DR. TEECE, I NOTICE YOU NEGLECTED TO TELL THE

4    JURY ABOUT YOUR EXPERIENCE WITH ETSI.  WHAT

5    POSITIONS HAVE YOU HELD AT ETSI?

6    A    I DIDN'T NEGLECT TO TELL THEM BECAUSE I HAVE

7    NOT HAD A POSITION AT ETSI.

8    Q    OH.  EVER?

9    A    THAT IS CORRECT.

10   Q    HAVE YOU EVER BEEN TO A 3GPP MEETING?

11   A    NO, I HAVE NOT.

12   Q    HAVE YOU EVER BEEN TO A 3GPP WORKING GROUP?

13   A    NOPE.

14   Q    HAVE YOU EVER SUBMITTED A PROPOSAL TO ETSI?

15   A    NOPE.

16   Q    SO UNLIKE DR. WALKER, WHO'S THE CHAIRMAN, YOU

17   HAVE NO EXPERIENCE WITH ETSI; CORRECT?

18   A    I'VE OBSERVED IN THE PUBLIC DATABASES THE

19   FILINGS OF VARIOUS COMPANIES.  I'VE DONE ANALYSIS

20   ON THE PUBLIC DATABASES.

21   Q    MY QUESTION WAS DIFFERENT, SIR.  OTHER THAN

22   GOING TO A PUBLIC DATABASE AND ANALYZING PUBLICLY

23   AVAILABLE INFORMATION, YOU HAVE NO EXPERIENCE WITH

24   ETSI, PERIOD?  RIGHT?

25   A    I HAVE NO DIRECT PARTICIPATORY EXPERIENCE.  I

1    STUDIED ETSI AS A SCHOLAR.

2    Q    OKAY.  NOW, SIR, YOU UNDERSTAND THAT IN THIS

3    CASE APPLE ALLEGES THAT SAMSUNG FAILED TO COMPLY

4    WITH ITS ETSI, WITH THE ETSI IPR POLICY; CORRECT?

5    A    YES.

6    Q    AND AS YOU TESTIFIED AT YOUR DEPOSITION, YOU

7    HAVE NO OPINION ON THAT ISSUE, DO YOU?

8         MS. MAROULIS:  OBJECTION.  MISLEADING.

9    BY MR. LEE:

10   Q    WELL, LET ME ASK IT THIS WAY:  DO YOU HAVE AN

11   OPINION ON THAT ISSUE?

12   A    I GAVE YOU AN OPINION WITH RESPECT TO WHAT I

13   OBSERVED AND THE BEHAVIOR OF THE PARTIES, AND SO I

14   INFER FROM THAT THAT THE -- THAT SINCE DELAYS ARE

15   UBIQUITOUS, THAT THE RULE CAN'T BE QUITE WHAT IT'S

16   BEING REPRESENTED BY DR. ORDOVER.

17   Q    LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

18   CAN I HAVE PAGE 427, LINES 7 TO 13.

19         I'M NOT SURE, I WANT YOU TO HELP ME WITH

20   THIS, WHAT YOU OBSERVED FROM UBIQUITOUS BEHAVIOR.

21   THE LADIES AND GENTLEMEN OF THE JURY HAVE TO

22   TIED --

23         MS. MAROULIS:  OBJECTION TO COUNSEL

24   TESTIFYING.

25         THE COURT:  OVERRULED.

1    BY MR. LEE:

2    Q    -- DOES SAMSUNG VIOLATE THE RULES, AND YOU

3    WERE ASKED, QUESTION, AND ARE YOU OFFERING ON

4    OPINION THAT IN REGARD TO ANY OR ALL OF THE 7

5    PATENTS HERE, SAMSUNG ON A BONE FIDE BASIS DREW THE

6    ATTENTION OF ETSI TO ANY OF ITS IPR WHICH MIGHT BE

7    SPECIAL TO ANY PROPOSAL THAT IT MADE.

8              "ANSWER:  NO.  AS I SAID BEFORE, MY

9    TESTIMONY WILL RELATE TO INDUSTRY PRACTICE."

10              MS. MAROULIS:  OBJECTION, NOT PROPER

11    IMPEACHMENT.  CONSISTENT WITH THE WITNESS'S

12    STATEMENT.

13              THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

14    BY MR. LEE:

15    Q    WERE YOU ASKED THAT QUESTION AND DID YOU GIVE

16    THAT ANSWER UNDER OATH, SIR?

17    A    I DID.

18    Q    ALL RIGHT.  NOW, I WANT TO ASK YOU ABOUT

19    SOMETHING ELSE YOU SAID TO THE LADIES AND GENTLEMEN

20    OF THE JURY, WHICH WAS THE QUESTION OF WHETHER

21    PEOPLE DISCLOSE THEIR IPR BEFORE A PROPOSAL WAS

22    ADOPTED.

23              IT'S TRUE, IS IT NOT, SIR, THAT YOU HAVE

24    NO EVIDENCE, AND YOU'RE NOT AWARE OF ANY SPECIFIC

25    INSTANCE WHERE SOMEONE MADE A PROPOSAL TO ETSI AND

1    FAILED TO DISCLOSE THEIR PATENTS UNTIL AFTER THE

2    PROPOSAL WAS ADOPTED; CORRECT?

3    A    CAN I HAVE THAT BACK, PLEASE.

4    Q    SURE.  I'LL BREAK IT DOWN FOR YOU.  I WANT TO

5    TAKE A SITUATION WHERE AN ETSI MEMBER IS MAKING A

6    PROPOSAL, YOU KNOW THAT CAN HAPPEN, CORRECT?

7    A    YES.

8    Q    I WANT YOU TO TAKE THE SITUATION WHERE THEY

9    HAVE A PATENT, OR A PATENT APPLICATION, DO YOU HAVE

10   THAT IN MIND?

11   A    YES.

12   Q    AND I WANT YOU TO TAKE THE SITUATION WHERE

13   THEY DON'T DISCLOSE IT UNTIL AFTER THE STANDARD HAS

14   BEEN ADOPTED.

15           DO YOU HAVE THAT IN MIND?

16   A    YES.

17   Q    NOW, THE FACT OF THE MATTER IS YOU DON'T KNOW

18   ONE WAY OR ANOTHER OF ANY SPECIFIC INSTANCES WHERE

19   SOMEONE MADE A PROPOSAL, DISCLOSED AND DISCLOSED

20   BEFORE IT WAS FIXED; CORRECT?

21   A    I DON'T HAVE SPECIFIC INFORMATION.  I'VE GOT

22   THE DATA THAT I REFERRED TO AND PRESENTED EARLIER.

23   Q    AND YOU HAVE NO SPECIFIC INSTANCES WHERE

24   PEOPLE, OTHER THAN SAMSUNG, MADE A PROPOSAL, HAD A

25   PATENT AND DIDN'T DISCLOSE UNTIL LATER; CORRECT?

3655

```
 1    A    I HAVE NO SPECIFIC INSTANCES.

 2    Q    AND, IN FACT, DR. TEECE, THE ONLY SPECIFIC

 3    INSTANCES YOU'VE LOOKED AT ARE THE ONES THAT DR.

 4    WALKER TESTIFIED ABOUT; CORRECT?

 5    A    IN TERMS OF SPECIFICS, YES, I'VE LOOKED --

 6    WHAT I SHOWED YOU WAS THE AGGREGATE DATA WHICH

 7    TELLS A COMPELLING STORY.

 8    Q    DR. TEECE, MY QUESTION WAS DIFFERENT.  I'M

 9    TRYING TO LOOK AT THE SPECIFIC QUESTION OF WHETHER

10    SOMEONE BROKE THE RULES.

11              DR. WALKER PUT TWO CHRONOLOGIES ON THE

12    BOARD FOR TWO PATENTS?

13    A    YES.

14    Q    YOU HAVE NO REASON TO DISAGREE WITH THOSE

15    CHRONOLOGIES; CORRECT?

16    A    CORRECT.

17              MR. LEE:  THANK YOU, SIR.  NOTHING

18    FURTHER.

19              THE COURT:  ALL RIGHT.  TIME IS NOW 3:21.

20    ANY REDIRECT?

21              MS. MAROULIS:  YOUR HONOR, NO REDIRECT.

22              BUT FOR THE RECORD, COUNSEL STATED THAT

23    THIS WAS EXCLUDED.  THIS EXHIBIT WAS NOT SUBJECT TO

24    YOUR ORDER.  THE RECORD SHOULD REFLECT THAT.

25              MR. LEE:  NO.  YOUR HONOR, CAN WE TAKE A
```

1    LOOK AT THIS?

2            MR. VERHOEVEN:  WE DON'T HAVE TIME.

3            THE COURT:  WE DON'T HAVE TIME.

4            MR. VERHOEVEN:  SAMSUNG RECALLS

5    DR. WILLIAMS.

6            THE CLERK:  RAISE YOUR RIGHT HAND,

7    PLEASE.

8                    **TIM WILLIAMS,**

9    BEING RECALLED AS A WITNESS ON BEHALF OF THE

10   DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS

11   EXAMINED AND TESTIFIED AS FOLLOWS:

12           THE WITNESS:  I DO.

13           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

14                **DIRECT EXAMINATION**

15   BY MR. VERHOEVEN:

16   Q    GOOD AFTERNOON, DR. WILLIAMS.

17           THE COURT:  TIME IS 321.  GO AHEAD,

18   PLEASE.

19           THE WITNESS:  GOOD AFTERNOON.

20   BY MR. VERHOEVEN:

21   Q    YOU HEARD DR. KIM AND DR. KNIGHTLY TESTIFY

22   WITH RESPECT TO VALIDITY OF THE '516 PATENT AND THE

23   '941 PATENT THIS MORNING?

24   A    YES, I DID.

25   Q    HE ALSO TESTIFIED ABOUT INFRINGEMENT.  YOU'VE

1    ALREADY PROVIDED YOUR OPINION ON THAT, SO I'M NOT

2    GOING TO ASK YOU ANY QUESTIONS ON INFRINGEMENT.

3    LET'S TALK ABOUT THE VALIDITY OPINIONS.  ON THE

4    '516 PATENT, DR. KIM, HE IDENTIFIED THE HATTA

5    REFERENCE.  CAN WE PUT UP PX 1002.  DO YOU REMEMBER

6    THE HATTA REFERENCE, SIR?

7    A    YES, I DO.

8    Q    DO YOU REMEMBER DR. KIM TESTIFIED IT WAS HIS

9    OPINION THAT THAT REFERENCE RENDERS THE '516 PATENT

10   OBVIOUS?

11   A    YES, I DO.

12   Q    DO YOU AGREE OR DISAGREE WITH HIS OPINION?

13   A    I DISAGREE FOR THREE REASONS.  THE FIRST IS

14   HATTA IS TALKING ABOUT THE POWER AMPLIFIER IN A

15   BASE STATION, NOT THE MOBILE DEVICE.

16        SO AS I SHOWED EARLIER THIS WEEK, IN THAT

17   GRAPHIC WITH THE BASE STATION AND MULTIPLE MOBILES,

18   THE BASE STATION WAS TALKING TO MULTIPLE MOBILES AT

19   ONE TIME.  THE MOBILE IS ONLY TALKING TO A SINGLE

20   BASE STATION AT A TIME.  SO IT'S AN ENTIRELY

21   DIFFERENT PROBLEM.

22        ALSO, WITHIN HATTA, THERE'S NO HARQ

23   CHANNEL.  THERE'S NO E-DPDCH CHANNEL.  AND ALSO IN

24   HATTA, IF WE LOOK AT DR. KIM'S SLIDE FROM EARLIER

25   TODAY.

3658

```
1    Q    CAN WE PUT UP PDX 35.16?

2    A    DR. KIM PUT UP THIS SLIDE, IF YOU LOOK ON THE

3    BOTTOM, THIS RED RECTANGLE IS ACTUALLY SCALING THE

4    VOICE CHANNEL.  THAT'S THE PROBLEM THAT THE '516

5    WAS SOLVING.  SO HATTA ACTUALLY IS CAUSING THE

6    PROBLEM THAT THE '516 SOLVES.

7    Q    NOW, DR. KIM REFERENCED PRIOR ART FIGURES FROM

8    THE '516 PATENTS, FIGURES 5 AND 6, AND SAID, WELL,

9    YOU COULD COMBINE THOSE AND GET THE INVENTION IF

10   YOU COMBINE THEM WITH HATTA.  DO YOU REMEMBER THAT?

11   A    YES.

12   Q    DO YOU AGREE WITH THAT OPINION?

13   A    ABSOLUTELY NOT.

14   Q    EXPLAIN TO THE JURY WHY?

15   A    HATTA IS DESCRIBING A PROBLEM.  FIGURES 4 AND

16   5 ARE DESCRIBING A PROBLEM.  IF YOU COMBINE TWO

17   PROBLEMS TOGETHER, YOU DON'T GET A SOLUTION.

18   Q    ALL RIGHT.  LET'S TURN QUICKLY TO THE '941

19   PATENT, DR. KNIGHTLY'S TESTIMONY, HE TESTIFIED AS

20   TO THE '658 PATENT, PX 97.1.  DO YOU REMEMBER THAT,

21   SIR?

22   A    YES.

23   Q    AND HE TESTIFIED THAT IN HIS OPINION, THE '658

24   PATENT ANTICIPATED THE '941 PATENT .  DO YOU

25   REMEMBER THAT TESTIMONY?
```

1     A    YES, I DO.

2     Q    DO YOU AGREE OR DISAGREE?

3     A    I DISAGREE.  AGARWAL IS ABOUT A FIXED

4  COMMUNICATION FACILITY THAT TALKS TO A SATELLITE.

5  SO AGARWAL IS ABOUT BIG SATELLITE ANTENNAS AND

6  CEMENT BUILDINGS AND AGARWAL WAS NOT ABOUT A MOBILE

7  COMMUNICATION SYSTEM.

8          ALSO, IF YOU LOOK AT THE PACKET

9  HEADERS --

10    Q    LET'S PUT UP PX 97.9 FIGURE 8A, BLOW IT UP.

11  HE SHOWED THIS DURING HIS TESTIMONY; RIGHT?

12    A    HE SHOWED PACKET HEADERS, YES.

13    Q    YEAH.

14    A    IF YOU LOOK AT THE PACKET HEADERS IN AGARWAL,

15  THERE'S NO ONE BIT FIELD, WHICH IS CALLED OUT IN

16  THE CLAIMS OF THE PATENT.  THERE'S NO SERIAL

17  NUMBER.  AND THERE'S NO LENGTH INDICATOR FIELD.

18    Q    SO IN YOUR OPINION, ARE EITHER OF THESE

19  PATENTS INVALIDATED BASED ON THE TESTIMONY YOU'VE

20  HEARD?

21    A    ABSOLUTELY NOT.

22          MR. VERHOEVEN:  THANK YOU, SIR.  NO

23  FURTHER QUESTIONS AT THIS TIME.

24          THE COURT:  ALL RIGHT.  TIME IS 3:25.

25  ANY CROSS?

3660

```
 1              MR. LEE:  CAN I HAVE PDX 35.16 ON THE

 2    SCREEN, PLEASE.

 3                       CROSS-EXAMINATION

 4    BY MR. LEE:

 5    Q    DR. WILLIAMS, YOUR SLIDE IS ON THE TOP HALF OF

 6    THIS PDX; CORRECT?

 7    A    CORRECT.

 8    Q    ON THE LEFT IT'S FIGURE 5 OF THE PATENT;

 9    CORRECT?

10    A    YES.

11    Q    IT'S LABELED PRIOR ART; CORRECT?

12    A    IT IS LABELED PRIOR ART.  HOWEVER, IF YOU READ

13    THE SPECIFICATION OF THE '516.

14    Q    DR. WILLIAMS, IS IT LABELED PRIOR ART?

15    A    HOWEVER, IF YOU READ THE SPECIFICATION OF THE

16    '516, THE SPECIFICATION CLEARLY IDENTIFIES THE

17    PRIOR ART ASPECT OF THIS DRAWING AS EQUAL SCALING

18    OF THE CHANNELS.

19    Q    DR. WILLIAMS, MR. VERHOEVEN ASKED OUR

20    WITNESSES RESPECTFULLY TO ANSWER YES OR NO.  I'M

21    GOING TO DO THE SAME TO YOU, ONLY BECAUSE WE'RE

22    NEAR THE END OF THE TRIAL.

23              MY QUESTION IS PRETTY SIMPLE.  IS IT

24    LABELED PRIOR ART?

25    A    IT'S LABELED PRIOR ART, BUT THE PRIOR ART
```

1    ASPECT OF THIS DRAWING IS THE EQUAL SCALING OF THE

2    CHANNELS.

3    Q    SO --

4    A    NOT THE EXTRUSION --

5    Q    JUST TELL THE LADIES AND GENTLEMEN OF THE

6    JURY, IS THIS FIGURE PRIOR ART OR NOT?

7    A    THIS FIGURE IS PRIOR ART WITH RESPECT TO THE

8    EQUAL SCALING OF THE CHANNELS, NOT THE INCLUSION OF

9    THE E-DPDCH CHANNEL THAT DR. KIM TALKED ABOUT THIS

10   MORNING.

11   Q    AND FIGURE 4, WHICH IS LABELED PRIOR ART, IS

12   NOT PRIOR ART EITHER?

13   A    LET'S LOOK AT IT.

14   Q    SURE.  FIGURE 4.  THAT SAYS PRIOR ART, TOO,

15   YES OR NO?

16   A    THIS SHOWS THE EQUAL SCALING WOULD BE

17   PERFORMED.

18   Q    DR. WILLIAMS, DOES IT SAY PRIOR ART OR NOT?

19   A    THE WORDS PRIOR ART ARE THERE.

20   Q    OKAY.

21   A    YES.

22   Q    AND THE PATENTEE, YOU KNOW THAT SAMSUNG WROTE

23   THOSE WORDS THERE; CORRECT?

24   A    YES.  BUT THE INVENTORS ALL TESTIFIED THAT

25   THEIR INVENTION WAS WITH REGARDS TO SCALING THE

1    HARQ CHANNEL OVER THE NON-HARQ CHANNEL.

2    Q    DR. WILLIAMS, THE '941 PATENT, THE OTHER

3    PATENT YOU TESTIFIED ABOUT JUST A MINUTE AGO?

4    A    YES.

5    Q    THAT'S THE ALTERNATIVE E-BIT PATENT; CORRECT?

6    A    YES.

7    Q    BUT YOU HAD NEVER HEARD OF UNTIL THE LAWYERS

8    CALLED YOU IN THIS CASE; CORRECT?

9    A    YES.  BUT IT'S PART OF THE STANDARD.

10   Q    ALL RIGHT.  NOW, YOU TOLD US THAT YOU BELIEVE

11   IN A STRONG PATENT SYSTEM; CORRECT?  DO YOU

12   REMEMBER THAT?

13   A    THAT'S WHAT I WOULD LIKE TO LEAVE AS A LEGACY

14   TO MY CHILDREN, YES.

15   Q    SURE.  THAT APPLIES TO APPLE'S PATENTS.

16         MR. VERHOEVEN:  OBJECTION.  BEYOND OF

17   SCOPE OF MY DIRECT EXAM.

18         THE COURT:  SUSTAINED.

19   BY MR. LEE:

20   Q    WE JUST TALKED ABOUT THE SAMSUNG PATENTS;

21   CORRECT?

22   A    I'M SORRY.

23   Q    YOU JUST TALKED ABOUT THE VALIDITY OF THE

24   SAMSUNG PATENTS?

25   A    I DID.

```
1    Q    CORRECT?

2    A    YES.

3    Q    AND BEYOND THE OPINIONS YOU'VE JUST OFFERED,

4    YOU'VE OFFERED NO OTHER OPINIONS ON THE VALIDITY OF

5    THE PATENTS; CORRECT?

6    A    NOT IN COURT TODAY.

7              MR. LEE:  THANK YOU.

8              THE COURT:  ALL RIGHT.  TIME IS 3:28.

9    ANY REDIRECT?

10             MR. VERHOEVEN:  NO.

11             THE COURT:  NO?  ALL RIGHT.  THE WITNESS

12   MAY BE EXCUSED.  ALL RIGHT.  APPLE HAS GOT SIX

13   MINUTES -- ACTUALLY YOU BOTH HAVE SIX MINUTES LEFT.

14             MR. JOHNSON:  I DON'T KNOW WHAT TO DO

15   WITH ALL THAT TIME.

16             THE COURT:  AND I WILL STOP YOU WHEN YOUR

17   TIME IS UP.  NO EXTENSIONS, OKAY?

18             MR. LEE:  YOU GO FIRST.

19             MR. JOHNSON:  I FEEL LIKE I HAVE A BATON.

20             THE COURT:  THE OLYMPIC TORCH IS BEING

21   PASSED.

22             MR. JOHNSON:  YOUR HONOR, SAMSUNG IS

23   GOING TO CALL DR. WOODWARD YANG AS OUR LAST

24   WITNESS, AND JUST WHILE HE'S TAKING THE STAND, I'M

25   GOING TO READ INTO THE RECORD REQUEST FOR ADMISSION
```

1    NUMBER 1966, WHICH WAS A --

2              THE COURT:  ALL RIGHT.  3:29.  THAT WILL

3    COUNT TOWARDS YOUR TIME.

4              MR. JOHNSON:  SO THE QUESTION WAS ASKED

5    OF APPLE, "ADMIT THAT HUNGFUJIN PRECISION

6    ELECTRONICS," A COMPANY LIMITED IN CHINA, "RECEIVES

7    INTEL BASEBAND PROCESSORS ON BEHALF OF APPLE."

8              APPLE'S RESPONSE:  "APPLE ADMITS REQUEST

9    NUMBER 1966."

10             THANK YOU.  DR. YANG --

11             THE COURT:  OH, LET ME STOP YOUR TIME,

12   3:29.  I'M STOPPING YOUR TIME.  WE'RE JUST

13   RESWEARING PEOPLE IN.  BELTS AND SUSPENDERS.

14             THE COURT:  PLEASE RAISE YOUR RIGHT HAND.

15                    **WOODWARD YANG,**

16   BEING RECALLED AS A WITNESS ON BEHALF OF THE

17   DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS

18   EXAMINED AND TESTIFIED AS FOLLOWS:

19             THE WITNESS:  YES, I DO.

20             THE COURT:  THANK YOU.  PLEASE BE SEATED.

21             ALL RIGHT.  IT'S 3:29, GO AHEAD, PLEASE

22   MUCH.

23             MR. JOHNSON:  BRIAN, CAN WE PUT UP PDX

24   42.4, PLEASE.

25   /   /   /

6665

1              **DIRECT EXAMINATION**

2    BY MR. JOHNSON:

3    Q    THIS WAS A DEMONSTRATIVE, DR. YANG, THAT WAS

4    USED WITH DR. DOURISH, AND I WANT TO ASK YOU, THEY

5    PUT UP A PICTURE OF THE AM/FM RADIO.  DO YOU THINK

6    THIS WAS A PROPER ANALOGY?

7    A    THIS IS AN IMPROPER ANALOGY.  THIS IS A VERY

8    SIMPLE DEVICE, IT HAS ONE FUNCTIONALITY, WHEREAS

9    THE PATENTS --

10              MR. LEE:  YOUR HONOR, I OBJECT.  THIS IS

11   INFRINGEMENT.

12              MR. JOHNSON:  NO, IT'S NOT.  IT'S IN THE

13   CONTEXT OF VALIDITY.

14              THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

15              THE WITNESS:  THIS SPEAKS SPECIFICALLY

16   TO -- THIS IS A VERY SIMPLE DEVICE, IT HAS ONE

17   FUNCTIONALITY, WHEREAS THE PATENTS ARE TALKING

18   ABOUT COMPLEX DEVICES.  THESE ARE DEVICES THAT ARE

19   CAMERAS, PHONES, MP3 PLAYERS TOGETHER.

20              SO WHEN YOU LOOK AT THEM, YOU NEED TO

21   CONSIDER THE MODE HAS MANY SWITCHES AND WHEN YOU

22   CONSIDER WHAT A MODE IS CALLED, YOU NEED TO

23   CONSIDER HOW ALL THOSE SWITCHES ARE SET.

24              SO, IN FACT, THE PATENTS ARE TALKING

25   ABOUT APPS OR APPLICATION PROGRAMS THAT RUN ON

```
 1    THESE DEVICES AND WHEN THOSE DEVICES RUN, THEY HAVE
 2    MODES.
 3    BY MR. JOHNSON:
 4    Q    DR. DOURISH ALSO TALKED ABOUT THE LG PATENT
 5    APPLICATION.  RYAN, CAN WE PLEASE PUT UP 42.24.
 6              DOES THE LG PATENT APPLICATION SATISFY
 7    THE LAST LIMITATION OF CLAIM 10 OF THE '893 PATENT,
 8    THE BOOKMARKING PATENT?
 9    A    NO, THIS PATENT APPLICATION DOES NOT SATISFY
10    THE LAST LIMITATION OF THE '893 PATENT.  THE LAST
11    LIMITATION OF THE '893 PATENT SPECIFICALLY SAYS YOU
12    HAVE TO GO FROM A DISPLAY MODE TO A CAMERA
13    PHOTOGRAPHING MODE BACK TO THE DISPLAY MODE TO SEE
14    THE BOOKMARK.
15              IN FACT, WHEN YOU READ THIS OVER HERE,
16    IT'S JUST TALKING ABOUT WHAT'S GOING ON BETWEEN
17    DIFFERENT DISPLAY MODES.  THERE IS NO TALK ABOUT
18    GOING FROM THE DISPLAY MODE TO A CAMERA MODE BACK
19    TO THE DISPLAY MODE.  THAT'S MUSIC.
20    Q    LET'S TALK ABOUT THE BACKGROUND MUSIC PATENT,
21    THE '711 PATENT.  APPLE'S EXPERT, DR. GIVARGIS,
22    SAID THE K700 PHONE RENDERS THE '711 PATENT OBVIOUS
23    AND IT WASN'T REVIEWED BY THE PATENT OFFICE.  DO
24    YOU AGREE?
25    A    I AGREE THAT THEY DIDN'T LOOK AT THE 700
```

1    PHONE.  BUT THE PATENT OFFICE ACTUALLY CONSIDERED A

2    MORE ADVANCED PHONE, WHICH IS CALLED THE K750, AND

3    THE PATENT OFFICE SPECIFICALLY HAD THE USER MANUAL

4    FOR THAT.

5              AND THE FUNCTIONALITIES AND CAPABILITIES

6    OF THE PHONE ARE EXACTLY THE SAME.  AND, IN FACT,

7    THE THING THAT'S MISSING FROM THE K750 AND K700 IS

8    THE IMPORTANT PART ABOUT A CONTROLLER GENERATING A

9    MUSIC BACKGROUND PLAY OBJECT.

10   Q    DO YOU AGREE WITH DR. GIVARGIS THAT THE WONG

11   PATENT PROVIDES MOTIVATION TO INCLUDE AN APPLET?

12   A    NO, NOT AT ALL.  THE WONG PATENT IS ACTUALLY

13   FROM SUN MICROSYSTEMS, THE PEOPLE WHO WROTE JAVA,

14   SO IT'S ALL ABOUT JAVA APPLICATIONS AND JAVA

15   APPLETS.

16             AND SPECIFICALLY THE PATENT OFFICE HAD

17   SEVERAL REFERENCES DISCUSSING JAVA APPLICATIONS AND

18   JAVA APPLETS IN THERE AS WELL, AND JAVA

19   APPLICATIONS AND JAVA APPLETS, AS WE KNOW, ARE

20   DIFFERENT FROM THE APPLET THAT WE HAVE IN THE '711

21   PATENT.

22             THE APPLET WE HAVE IN THE '711 PATENT, AS

23   WE KNOW THE COURT HAS DEFINED FOR US, IS AN

24   APPLICATION DESIGNED TO RUN WITHIN AN APPLICATION

25   MODULE.

1    Q    LET'S TALK ABOUT THE '460 PATENT.  IN LOOKING

2    AT THE VALIDITY OF THE '460 PATENT, WHAT'S YOUR

3    OPINION ABOUT WHETHER THE PATENT REQUIRES THAT THE

4    THREE CORE FUNCTIONS BE PERFORMED IN A CERTAIN

5    SEQUENCE?

6    A    THE THREE CORE FUNCTIONS, AS I EXPLAINED MANY

7    TIMESM CAN BE PERFORMED IN ANY ORDER.  AND IN

8    PARTICULAR, I BELIEVE THAT THERE WAS ACTUALLY CLAIM

9    1, IF I COULD HAVE THAT UP, I DON'T KNOW -- THERE

10   WAS THIS IMPLICATION THAT WHEN YOU LOOKED AT THE

11   SECOND E-MAIL MODE, YOU WOULD SEE AN IMAGE, AND THE

12   IDEA THAT AFTER YOU SAW THAT IMAGE, YOU HAVE TO

13   IMMEDIATELY SEQUENTIALLY SCROLL THROUGH THE IMAGES,

14   AND THERE'S AN IMPLICATION THAT C NEEDS TO

15   IMMEDIATELY FOLLOW B.

16            IN FACT, THAT'S NOT TRUE AT ALL.  IN

17   FACT, IF YOU LOOK AT THIS, AND YOU CAN SEE THAT

18   IMAGE AND YOU CAN SEE OTHER IMAGES OVER HERE.

19            YOU CAN ALSO IMAGINE THAT LOGICALLY THIS

20   COULD MAKE SENSE IF C WERE TO FOLLOW E OR IF C WERE

21   TO COME BEFORE B.

22            IN FACT, IF YOU LOOK AT THE PATENT

23   SPECIFICATION IN FIGURE 8, THE FLOW CHART THAT THEY

24   SHOW ACTUALLY SHOWS THE SCROLLING OF IMAGES

25   OCCURRING BEFORE ENTERING THE SECOND E-MAIL

1    TRANSMISSION MODE.

2    Q    NOW, DR. SRIVASTAVA, APPLE'S EXPERT, COMBINED

3    THREE DIFFERENT REFERENCES, THE SUSO, HARRIS, AND

4    YOSHIDA REFERENCE TO SAY THE '460 PATENT WAS

5    OBVIOUS.  DO YOU AGREE WITH HIS OPINION?

6    A    I ABSOLUTELY DISAGREE.  THE FIRST TWO PATENTS,

7    THE SUSO PATENT AND HARRIS PATENT ACTUALLY DO NOT

8    DISCLOSE A SECOND E-MAIL TRANSMISSION MODE WHERE

9    YOU CAN ACTUALLY SEE THE PICTURE AND COMPOSE A

10   MESSAGE THAT YOU WANT TO SEND.

11            AND THEN HE SAYS THAT THE YOSHIDA PATENT

12   ACTUALLY HAS THIS.  BUT IF YOU LOOK AT WHAT HE

13   DISPLAYED UP FOR THE YOSHIDA PATENT, HE'S -- IT'S

14   NOT DISPLAYING THE IMAGE.  IT'S ACTUALLY JUST

15   ATTACHING AN IMAGE FILE, SO THE IMAGE IS NOT

16   VISIBLE IN THE E-MAIL THAT YOU'RE SENDING.  SO THIS

17   IS NOT A SECOND E-MAIL TRANSMISSION MODE.

18            MR. JOHNSON:  YOUR HONOR, NO FURTHER

19   QUESTIONS.

20            THE COURT:  ALL RIGHT.  THE TIME IS

21   EXPIRED.  THANK YOU.

22            MR. JOHNSON:  I CROSSED THE FINISH LINE.

23            THE COURT:  YES, THAT'S LIGHT.

24            ALL RIGHT.  MR. LEE, YOU'VE GOT SIX

25   MINUTES.

6670

```
 1              MR. LEE:  I'M GOING TO TRY TO FOLLOW

 2     ACROSS THE FINISH LINE.

 3              THE COURT:  3:34.  GO AHEAD.

 4                   CROSS-EXAMINATION

 5     BY MR. LEE:

 6     Q    DR. YANG, LET'S GO A LITTLE BIT SLOW SO THE

 7     JURY GETS IT.  ON THE '711 PATENT, IS IT YOUR

 8     TESTIMONY TO THIS JURY THAT THE PATENT OFFICE

 9     ACTUALLY HAD A K700 PHONE?

10     A    NO.  I BELIEVE I SAID THEY HAD THE K750 USER

11     MANUAL.

12     Q    THEY DIDN'T HAVE ANY PHONE AT ALL; CORRECT?

13     A    THEY HAD THE K750 USER MANUAL, WHICH SHOWS THE

14     SAME FUNCTIONALITY AS THE K700 AND K750.

15     Q    DR. YANG, DID THEY HAVE THE PHONE OR NOT?

16     A    THEY HAD THE SAME USER MANUAL WHICH HAS THE

17     SAME FUNCTIONALITY AS THE K700.

18     Q    THAT'S A NO, RIGHT?  THEY DIDN'T HAVE THE

19     PHONE?

20     A    NO.

21     Q    OKAY.  NOW, TURN, IF YOU WOULD, IN YOUR BINDER

22     TO VOLUME 1, TAB 4.

23     A    VOLUME 1, TAB 4.  IT'S A WHITE BINDER?  OR --

24              MR. LEE:  WHITE BINDER?  WHITE BINDER,

25     YES.
```

3671

1    Q    AND YOU'LL FIND THE FILE HISTORY OF THE '460

2    PATENT?

3    A    OKAY.

4    Q    DO YOU SEE THAT?  YOU REVIEWED THAT; CORRECT?

5    A    YES.  I PRESUME THAT YOU'RE REPRESENTING THIS

6    CORRECTLY.  YOU DON'T WANT ME TO LOOK THROUGH

7    EVERYTHING.

8    Q    THAT'S JX 1066?

9    A    YES.

10              MR. LEE:  WE OFFER IT, YOUR HONOR.

11              THE COURT:  ANY OBJECTION?

12              MR. JOHNSON:  YOUR HONOR, I THINK IT'S

13   BEEN OFFERED FOR PURPOSES OF INFRINGEMENT THIS

14   MORNING.

15              MR. LEE:  NO, THIS IS -- THIS GOES TO THE

16   INVALIDITY TESTIMONY, THE FILE HISTORY.

17              THE COURT:  THE FILE HISTORY OF THE '460.

18   IT'S ADMITTED.

19              MR. LEE:  IT'S A JOINT EXHIBIT.

20              MR. JOHNSON:  I DIDN'T ASK ANY QUESTIONS

21   ABOUT THE FILE HISTORY.  IT'S OUTSIDE THE SCOPE,

22   YOUR HONOR.

23              MR. LEE:  THAT IS THE FILE HISTORY OF THE

24   PATENT THAT HE JUST GAVE INVALIDITY ON.

25              THE COURT:  IT'S ADMITTED.

6672

```
 1              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 2              1066, HAVING BEEN PREVIOUSLY MARKED FOR

 3              IDENTIFICATION, WAS ADMITTED INTO

 4              EVIDENCE.)

 5      BY MR. LEE:

 6      Q    NOW, JUST A COUPLE MORE QUESTIONS.  DR. YANG,

 7      YOU UNDERSTAND THAT THERE'S A CONCEPT CALLED

 8      SECONDARY CONSIDERATION; CORRECT?

 9      A    YES.

10      Q    SECONDARY CONSIDERATIONS ARE REAL WORLD THINGS

11      JURORS CAN LOOK AT TO FIGURE OUT IF THERE'S BEEN AN

12      INVENTION OR NOT; CORRECT?

13      A    YES.

14      Q    RIGHT.  SO ONE OF THE REAL WORLD THINGS YOU

15      CAN LOOK AT IS WHETHER A PRODUCT, BASED UPON THE

16      INVENTION, HAS BEEN COMMERCIALLY SUCCESSFUL;

17      CORRECT?

18      A    THAT IS A SECONDARY CONSIDERATION, YES.

19      Q    BUT WE KNOW FOR THE '893, THE '460 AND THE

20      '711 THAT AS FAR AS YOU KNOW, SAMSUNG TOOK THE

21      POSITION IN THIS CASE THAT IT HAD NO PRODUCT,

22      SUCCESSFUL OR OTHERWISE, THAT PRACTICED THESE

23      PATENTS; CORRECT?

24      A    COULD YOU REPEAT THE QUESTION AGAIN?  I THINK

25      IT'S VERY IMPORTANT.
```

3673

1    Q     SURE.

2    A     I THINK IT'S VERY IMPORTANT.

3    Q     DID YOU REMEMBER THE INFRINGEMENT CONTENTIONS

4    THAT YOU SAW AT THE BEGINNING OF YOUR EXAMINATION?

5    A     SOME OF THE DOCUMENTS I HAD SEEN BEFORE.  SOME

6    I HAD NOT.

7    Q     AND DO YOU REMEMBER SEEING WHAT SAMSUNG SAID

8    ABOUT WHETHER IT HAD PHONES THAT USED THESE

9    INVENTIONS?

10   A     WHICH INVENTIONS ARE YOU SPEAKING ABOUT?

11   Q     THE '460 AND THE '893.

12   A     AH, OKAY.  YES.

13   Q     AND THERE WERE NO SAMSUNG PHONES, SUCCESSFUL

14   OR OTHERWISE, THAT USED THOSE PATENTS AS SAMSUNG

15   DISCLOSED TO THIS COURT; CORRECT?

16   A     THAT PARTICULAR DOCUMENT WAS A SMALL SECTION

17   OF THE NUMBER OF PHONES THAT SAMSUNG PRODUCES.  AND

18   SO THEY SHOWED -- THEY DIDN'T SHOW THAT THEY WERE

19   USING THOSE INVENTIONS IN THOSE PARTICULAR PHONES.

20         BUT I HAVE NO IDEA ABOUT ALL THE OTHER

21   PHONES THAT SAMSUNG PRODUCTS.

22   Q     FAIR ENOUGH.  YOU HAVE NO IDEA ABOUT ALL THE

23   OTHER PHONES; CORRECT?

24   A     YES.

25         MR. LEE:  NOTHING FURTHER, YOUR HONOR.

```
1              THE COURT:  YOU HAVE ONE MINUTE.

2              MR. LEE:  I'M CEDING IT.

3              MR. PRICE:  TO US?

4              THE COURT:  THANK YOU VERY MUCH.  YOU'RE

5    EXCUSED.

6              AND WE ARE DONE WITH THE EVIDENCE PORTION

7    OF THIS TRIAL.  I'M GOING TO EXCUSE YOU FOR THE

8    DAY.  YOU HAVE MONDAY OFF.

9              WE WILL SEE YOU ON TUESDAY AT 9:00

10   O'CLOCK FOR JURY INSTRUCTIONS AND CLOSING AND THEN

11   YOU WILL START DELIBERATING.

12             SAME ADMONITION ALL THE TIME.  PLEASE

13   KEEP AN OPEN MIND.  PLEASE DO NOT RESEARCH THE

14   CASE, DO NOT READ ABOUT THE CASE, PLEASE DO NOT

15   DISCUSS THE CASE WITH ANYONE.  OKAY.  WE'LL SEE YOU

16   BACK HERE TUESDAY MORNING.  THANK YOU FOR YOUR

17   PATIENCE AND YOUR SERVICE.

18             (WHEREUPON, THE FOLLOWING PROCEEDINGS

19   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

20             THE COURT:  THE RECORD SHOULD REFLECT THE

21   JURORS HAVE LEFT THE COURTROOM.  DR. YANG, YOU MAY

22   STEP DOWN.

23             THE WITNESS:  THANK YOU.

24             THE COURT:  PLEASE TAKE A SEAT.  WHY

25   DON'T WE TAKE A FIVE MINUTE BREAK BEFORE WE HAVE
```

6675

```
 1     OUR RULE 50 CONFERENCE AND I ALSO WOULD LIKE TO

 2     KNOW IF YOU HAVE ANY MORE THOUGHTS ABOUT HOW YOU

 3     WANT TO HANDLE THE JURY INSTRUCTION OBJECTIONS.

 4     OKAY.  LET'S TAKE A FIVE MINUTE BREAK.  THANK YOU.

 5               (WHEREUPON, A RECESS WAS TAKEN.)

 6               (WHEREUPON, THE FOLLOWING PROCEEDINGS

 7     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 8               THE COURT:  OKAY.  LET'S COME BACK.  WITH

 9     REGARD TO CLEANING THE PHONES, AS LONG AS THERE'S A

10     STIPULATION OF THE PARTIES, IF YOU WANT TO TAKE

11     THEM OFF SITE AND BRING THEM BACK, THAT'S TOTALLY

12     FINE.  BUT I CAN'T LET EITHER PARTY COME BACK TO

13     CHAMBERS.  I DON'T THINK THAT WOULD BE APPROPRIATE.

14     SO IF YOU WANT TO TAKE IT OFF SITE, THAT'S FINE

15     WITH ME.

16               MR. JACOBS:  I THINK WE WOULD PREFER TO

17     KEEP EVERYTHING IN THE COURTROOM IF THAT'S THE

18     COURT'S PLAN, BUT WE'LL TRY TO WORK OUT A TIME ON

19     MONDAY.

20               THE COURT:  THAT'S FINE.  IF FOLKS WANT

21     TO CLEAN THEM NOW, THAT'S FINE, TOO.

22               MR. JACOBS:  WE'RE SUPERVISING, YOUR

23     HONOR.  SO IT'S A GROUP EFFORT.

24               THE COURT:  ALL RIGHT.  THAT'S FINE.

25               OKAY.  SO LET'S GO -- LET'S DO FIRST ANY
```

6676

```
 1    RULE 50 MOTIONS AFTER SAMSUNG'S DEFENSIVE CASE TO

 2    APPLE'S AFFIRMATIVE CASE AND SAMSUNG'S AFFIRMATIVE

 3    CASE.

 4             WHO WANTS TO MAKE A MOTION?  ANYBODY?

 5    OH, I'M SORRY.  WE ALREADY DID THAT.

 6             MS. MAROULIS:  I THOUGHT WE WERE GOING TO

 7    GO FOR THE WHOLE CASE, SO IT'S THE END OF THE CASE

 8    MOTION.

 9             THE COURT:  NO, I THINK WE SHOULD -- WE

10    SHOULD -- OKAY.  LET'S DO ANY RULE 50 MOTIONS AFTER

11    APPLE'S REBUTTAL CASE ON ITS AFFIRMATIVE CASE, AND

12    APPLE'S DEFENSIVE CASE TO SAMSUNG'S AFFIRMATIVE

13    CASE.

14             WHO WANTS TO MAKE A MOTION?

15             MS. MAROULIS:  YOUR HONOR, FIRST OF ALL,

16    SAMSUNG RENEWS ALL OF ITS PRIOR JMOL MOTIONS

17    PREVIOUSLY ARGUED.

18             THE COURT:  OKAY.

19             MS. MAROULIS:  IN ADDITION, WE MOVE ON

20    ALL OF OUR OFFENSIVE PATENTS, AND SPECIFICALLY WE

21    MOVE ON THE FACT THAT APPLE DID NOT ESTABLISH

22    ANTICIPATION OR OBVIOUSNESS OF ALL OF THE PATENTS

23    WE ASSERTED, WHICH IS FIVE OF THEM.

24             GOING THROUGH EACH PATENT SPECIFICALLY,

25    WHEN ON THE '460 PATENT, THERE WAS NO EVIDENCE OF
```

1    ANTICIPATION, SO THAT SHOULD BE A RULE 50 FINDING.

2            AND APPLE HAS NOT PRESENTED SUFFICIENT

3    EVIDENCE OF OBVIOUSNESS.

4            SAME THING WITH '893 PATENT, THERE'S NO

5    SUFFICIENT EVIDENCE OF ANTICIPATION OR OBVIOUSNESS.

6            WITH RESPECT TO '711 PATENT, NO EVIDENCE

7    AT ALL WAS PRESENTED AS TO ANTICIPATION AND NOT

8    SUFFICIENT EVIDENCE TO ESTABLISH OBVIOUSNESS.

9            MOVING ON TO THE STANDARDS PATENTS, WITH

10   RESPECT TO THE '516 PATENT, THERE WAS NO EVIDENCE

11   PRESENTED AT ALL FOR ANTICIPATION, AND APPLE CANNOT

12   AND DID NOT MEET THEIR BURDEN OF OBVIOUSNESS WITH

13   THE HATTA APPLICATION ALONE, OR IN COMBINATION WITH

14   VARIOUS FIGURES OF THE '516 PATENT.

15           WITH RESPECT TO THE '941 PATENT, APPLE

16   CANNOT AND DID NOT MEET THEIR BURDEN OF

17   ANTICIPATION OR OBVIOUSNESS BASED UPON THE AGARWAL

18   PRIOR ART, WHICH IS THE '658 PATENT.

19           IF YOUR HONOR WOULD PERMIT, WE WILL MOVE

20   TO OTHER OF APPLE'S DEFENSES, SPECIFICALLY APPLE

21   HAS NOT ESTABLISHED AND MET ITS BURDEN ON THE

22   DEFENSE OF EXHAUSTION.

23           THERE ARE TWO REASONS WHY THEY HAVE NOT

24   DONE SO.  FIRST OF ALL, THERE'S NOT BEEN NO

25   EVIDENCE THAT THE SALE IS AUTHORIZED AND TAKES

6678

1    PLACE IN THE UNITED STATES.  THE CASE LAW, SUCH AS

2    MINEBEA VERSUS PAPST, AND OTHER CASES, ESTABLISH

3    THAT THE AUTHORIZED SALE HAS TO HAPPEN IN THE

4    UNITED STATES.  THERE WAS NO SUCH EVIDENCE AND, IN

5    FACT, SAMSUNG ESTABLISHED BY REFERENCE TO THE

6    REQUEST FOR ADMISSION THAT THE DELIVERY OF CHIPS IS

7    TAKEN IN CHINA AND NOT IN THE UNITED STATES.

8         SECONDLY, THERE'S NO EVIDENCE, DIRECT OR

9    INDIRECT, THAT THE INTEL -- THAT INTEL CORPORATION

10   SUPPLIES THE CHIPS TO APPLE AND THERE IS NO

11   EVIDENCE THAT INTEL WAS AUTHORIZED AND COULD

12   UNDERGO OR EXTEND RIGHTS TO ANY OF ITS

13   SUBSIDIARIES.

14        FOR THOSE REASONS, WE RESPECTFULLY MOVE

15   FOR A RULE 50 ON EXHAUSTION.

16        WITH RESPECT TO APPLE'S ANTITRUST CLAIM,

17   THERE ARE FOUR OR FIVE SEPARATE GROUNDS WHICH WE'LL

18   BRIEF IN OUR SUBMISSION YOUR HONOR TOMORROW, BUT

19   WE'LL ENUMERATE THEM BRIEFLY.  APPLE FAILED TO

20   ESTABLISH INJURY.  IN FACT, THEY FAILED TO PRESENT

21   EVIDENCE OF AN ANTITRUST MARKET THROUGH THE VERY

22   INSUFFICIENT TESTIMONY OF DR. ORDOVER.  THERE WAS

23   NO EVIDENCE OF MONOPOLY POWER OR NO EVIDENCE OF

24   SAMSUNG RAISING PRICES.

25        FURTHERMORE, THERE WAS NO DAMAGES.  IF

6679

1    YOUR HONOR RECALLS, WE DISCUSSED THAT IN THE

2    CONTEXT OF THE SUMMARY JUDGMENT, AND AT THAT POINT

3    YOUR HONOR THOUGHT THAT APPLE STILL COULD GO TO THE

4    JURY AND PRESENT SOME EVIDENCE.  BUT WHAT WE SAW

5    HERE WAS THAT THERE WAS NO PROOF THAT THE ANTITRUST

6    AMOUNTED TO ANTICOMPETITIVE SCHEME OR SHAM

7    LITIGATION, WHICH ARE THE ONLY TWO LITIGATIONS

8    WHERE YOU CAN SEEK LITIGATION COSTS AS DAMAGES.

9            IN ADDITION TO THAT, THEY HAVEN'T

10   PRESENTED LITIGATION COSTS AT ALL.  SO ALL THE

11   CASES THAT THEY CITED TO YOUR HONOR AS PART OF THE

12   SUMMARY JUDGMENT, THEY HAVE NOT MET THEIR BURDEN

13   AND PROVEN IT BEFORE THE JURY.

14           AS IT STANDS HOW, THE JURY HAS NO TOOLS

15   TO ESTABLISH ANY DAMAGES ON THE ANTITRUST AND

16   DAMAGES IS AN INTEGRAL PART OF THE CLAIM.

17           APPLE FAILED TO PROFFER ANY EVIDENCE OF

18   ANTICOMPETITIVE CONDUCT.  WHILE THERE WAS SOME

19   EXPERT TESTIMONY ON THE SUBJECT OF THE 2.4 ROYALTY

20   RATE, THERE WAS NO TESTIMONY THAT SAMSUNG INTENDED

21   AT THE TIME IT WAS MEETING ITS FRAND OBLIGATIONS IN

22   DISCLOSURE IN 1998, 2006, AND 2007, THAT THERE WAS

23   NO GOOD FAILURE TO LICENSE.

24           IN FACT, BOTH THROUGH DR. TEECE'S

25   TESTIMONY AND EXHIBIT 630 THAT COMPILES LICENSES

6680

1    AND LICENSING HISTORY FROM THE INDUSTRY, THERE'S

2    SUFFICIENT EVIDENCE THAT THERE WAS NO

3    ANTICOMPETITIVE CONDUCT AT ALL.

4           MOVING ON FROM ANTITRUST AND EXHAUSTION

5    TO OTHER DEFENSES, APPLE FAILED TO MEET ITS BURDEN

6    ON WAIVER, UNCLEAN HANDS AND BREACH OF CONTRACT.

7           THERE WAS NO EVIDENCE OF ANY KIND THAT

8    THERE WAS A SPECIFIC, THAT THERE WAS ANY INTENT OR

9    ANY KIND OF MONOPOLISTIC SCHEME, WHICH IS WHAT THE

10   CASES OR THE SUBJECT REQUIRE.

11          AND THE ONLY EVIDENCE THAT THERE WAS, WAS

12   THAT SAMSUNG DISCLOSED ITS PATENTS TO ETSI AND THIS

13   WAS ALL FROM DR. TEECE'S TESTIMONY.  THE TIMING,

14   WHICH WAS NOT IN ANY WAY DIFFERENT FROM OTHER

15   INDUSTRY PARTICIPANTS.

16          SIMILARLY ON THE EQUITABLE ESTOPPEL,

17   THERE WAS NOT SUFFICIENT EVIDENCE TO SHOW THAT AND

18   THE DEFENSE SHOULD BE REJECTED.

19          IF YOUR HONOR WOULD LIKE ME TO COVER ANY

20   OF THOSE GROUNDS IN GREAT DETAIL, I CAN, BUT THAT'S

21   THE VERY SHORT VERSION SUMMARY OF THE -- OF OUR

22   OFFENSIVE MOTIONS ON RULE 50.

23          THE COURT:  LET ME ASK, I THOUGHT THAT IT

24   WAS ONLY THE EXHAUSTION, THE BREACH OF CONTRACT,

25   ANTITRUST THAT WERE BEING -- THAT A WAIVER WERE

 1    BEING CLAIMED HERE.

 2              I DON'T RECALL UNCLEAN HANDS OR EQUITABLE

 3    ESTOPPEL.  WHAT'S THE SITUATION WITH THAT?

 4              MS. MAROULIS:  I THINK APPLE IS STILL --

 5    THEY WERE ORIGINALLY CLAIMING EQUITABLE ESTOPPEL.

 6    WE HAD SOME DISCUSSIONS ABOUT JURY INSTRUCTIONS ON

 7    THAT.  IF THEY'RE WITHDRAWING THE CLAIM --

 8              MR. LEE:  THEY'RE BOTH IN THE PROPOSED

 9    JURY INSTRUCTIONS, YOUR HONOR.

10              MS. MAROULIS:  BUT WE BELIEVE IT SHOULD

11    NOT GO TO THE JURY BECAUSE IT SHOULD BE RULE 50'D

12    OUT.

13              THE COURT:  I SEE.

14              MS. MAROULIS:  AND IN PARTICULAR, IT

15    WOULD BE HELPFUL IF YOUR HONOR POINTED TO A

16    SPECIFIC ELEMENT THAT YOU WANT US TO BRIEF IN OUR

17    SUBMISSION TODAY WITH MORE DETAIL OR SUPPLY MORE

18    TRANSCRIPT CITES.

19              THE COURT:  WELL, LET ME HEAR FROM

20    MR. LEE, ARE YOU GOING TO CONCEDE ON, YOU KNOW, AT

21    LEAST SOME OF THE PATENTS, I DID ONLY HEAR AN

22    OBVIOUSNESS ARGUMENT AND NOT AN ANTICIPATION

23    ARGUMENT.  IF YOU'RE GOING TO CONCEDE IT, WE CAN

24    TAKE CARE OF IT RIGHT NOW.

25              MR. LEE:  THAT'S CORRECT, YOUR HONOR, ON

3682

1    THE '460 PATENT AND THE '516, THERE WAS ONLY AN

2    OBVIOUSNESS DEFENSE.

3              THE COURT:  OKAY.

4              MR. LEE:  SO THERE'S NO ANTICIPATION.

5              THE COURT:  ALL RIGHT.  AS TO '460 AND

6    '516?

7              MR. LEE:  RIGHT.  BUT AS TO ALL -- THE

8    OTHER THREE PATENTS, WE PRESENTED A LIMITATION BY

9    LIMITATION ANTICIPATION ANALYSIS AND AS TO ALL FIVE

10   WE PRESENTED OBVIOUSNESS TESTIMONY, LIMITATION BY

11   LIMITATION.

12             THE COURT:  OKAY.  WHY DON'T YOU --

13             MR. JOHNSON:  SORRY, MR. LEE.  '711, I

14   DON'T THINK YOU PRESENTED ANYTHING ON ANTICIPATION.

15             MR. LEE:  IT'S OBVIOUSNESS.  SO '711

16   ALSO, YOUR HONOR.  '460, '516, AND '711.

17             THE COURT:  ALL RIGHT.  NO ANTICIPATION

18   ON THE '460, THE '711, AND THE '516.

19             MR. LEE:  CORRECT.

20             THE COURT:  OKAY.  ALL RIGHT.  NOW, DO

21   YOU WANT TO ADDRESS, ON THIS EXHAUSTION ISSUE, I

22   KNOW YOU HAD THAT INTEL INVOICE THAT DID HAVE --

23             MR. LEE:  THERE'S ACTUALLY --

24             THE COURT:  ANY LESS --

25             MR. LEE:  THERE'S THIS IN THE REGULAR,

6683

1    YOUR HONOR.  FIRST, THE LICENSE AGREEMENT ITSELF

2    HAS GONE IN TODAY THROUGH MR. DONALDSON.

3              THE COURT:  UM-HUM.

4              MR. LEE:  IN ADDITION, MR. DONALDSON GAVE

5    THE TESTIMONY THAT YOU ALLOWED HIM TO GIVE ON HOW

6    ONE OF EXPERIENCE IN THE FIELD WOULD INTERPRET THE

7    LICENSE AGREEMENT.

8              MR. BLEVINS THEN TESTIFED, PUT THE

9    INVOICES IN AND TESTIFIED TO WHY THE INVOICES WERE

10   ISSUED FROM, WHERE THE PAYMENT WAS MADE TO.

11             THE COURT:  UM-HUM.

12             MR. LEE:  THE LOCATION OF THE BUYER, AND

13   ALL OF THAT IS RELEVANT TO THE QUESTION OF WHERE

14   THE SALE TOOK PLACE.  SO THERE'S -- I WOULD SAY

15   THIS ACTUALLY, THE ONLY THING THEY HAVE IS THE

16   POINT OF DELIVERY.

17             THE COURT:  UM-HUM.

18             MR. LEE:  EVERYTHING ELSE THAT'S IN THE

19   RECORD IS UNITED STATES-BASED.

20             AND MR. BLEVINS WASN'T CROSS-EXAMINED ON

21   THAT AT ALL.

22             SO THAT -- I THINK THAT IS MORE THAN

23   ENOUGH TO GO TO THE JURY ON THAT ISSUE.

24             THE COURT:  UM-HUM.

25             MR. LEE:  I THINK, AS YOUR HONOR KNOWS,

3684

1    IT'S NOT A SINGLE FACTOR THAT DETERMINES WHETHER

2    THERE'S A U.S. SALE OR NOT.

3              THE COURT:  UM-HUM.

4              MR. LEE:  SO I -- FOR THAT REASON, I

5    THINK THE RULE 50 MOTION ON EXHAUSTION SHOULD BE

6    DENIED.

7              AND I CAN ADDRESS THE OTHERS IF YOU WANT.

8              THE COURT:  AND THE LANGUAGE THAT

9    MR. MUELLER HAD MR. DONALDSON WALK THROUGH THE

10   AGREEMENT, IT DID HAVE RIGHTS GOING TO THE

11   SUBSIDIARIES; RIGHT?

12             MR. LEE:  YES.

13             THE COURT:  ALL RIGHT.  NOW, ON

14   ANTITRUST, ARE YOU GOING FOR ONE DOLLAR NOMINAL

15   DAMAGES.

16             MR. LEE:  NO, NO.  WE ACTUALLY PUT IN, IT

17   ENDED UP THAT EVERY SINGLE EXPERT PUT IN THEIR

18   HOURLY RATE AND NUMBER OF HOURS, BUT WE WERE GOING

19   TO PUT THOSE IN IN ANY EVENT, FOR THE STANDARD

20   ESSENTIAL EXPERTS THAT WE WOULD.  WE ARE SEEKING

21   NOMINAL DAMAGES, WE'VE PUT IN EVIDENCE OF ABOUT A

22   HALF A MILLION DOLLARS IN DAMAGES.

23             THE COURT:  SO WHO IS THAT?  DR. KIM?

24             MR. LEE:  DR. KIM AND DR. KNIGHTLY.

25             THE COURT:  SO THAT'S IT FOR WHAT YOU'RE

```
 1   REQUESTING AS ANTI --
 2              MR. LEE:  THAT'S IT.
 3              THE COURT:  IS THEIR FEES?
 4              MR. LEE:  YES.
 5              THE COURT:  I DON'T RECALL.  DID YOU ASK
 6   THEM HOW MANY HOURS THEY HAD WORKED ON THE CASE.
 7              MR. LEE:  I THINK WE ASKED BOTH OF THEM.
 8              THE COURT:  DID YOU?
 9              MR. LEE:  YES.
10              THE COURT:  OKAY.  ALL RIGHT.  ANYTHING
11   YOU WANT TO SAY ON THE OTHER WAIVER, UNCLEAN HANDS?
12   THE BREACH OF CONTRACT IS, WHAT, THE COMMITMENT TO
13   ETSI TO DISCLOSE THE IPR TIMELY.
14              MR. LEE:  YES.  AND BOTH DR. ORDOVER AND
15   DR. WALKER TALKED ABOUT HOW SAMSUNG AND APPLE ARE
16   BOTH MEMBERS, THEY ARE BOUND BY THE RULES OF THE
17   ORGANIZATIONS, THAT'S A BREACH OF CONTRACT CLAIM.
18              I THINK, YOUR HONOR, ALL OF THE ANTITRUST
19   WAIVER, ESTOPPEL ON THE UNENFORCEABILITY IS THE
20   SAME SET OF FACTS, AND AS DR. TEECE SAID AT THE
21   END, THEY DON'T CONTEST THE FACTS.  THEY DON'T
22   CONTEST THE FACT THAT THERE WAS AN APPLICATION
23   FILED IN KOREA, AT SOME TIME, IN ONE CASE WITHIN
24   DAYS, IN ONE CASE WITHIN 60 DAYS.
25              THE INVENTORS, AND THIS IS WHAT'S IN THE
```

1    RECORD NOW IN THE FORM OF A PROPOSAL, THE INVENTORS

2    ACTUALLY GO TO THE MEETING, MAKE A PROPOSAL, THE

3    EVIDENCE ESTABLISHES THAT AT EVERY MEETING THERE'S

4    A CALL FOR IPR, WE'RE NOT SAYING THE INVENTOR HAS

5    TO MAKE THE DISCLOSURE.

6              THEN THERE'S NO DISCLOSURE, SAMSUNG

7    CONTINUES TO PARTICIPATE, THE STANDARD GETS FROZEN,

8    AND THEN YEARS LATER, SEVERAL YEARS LATER, THE

9    PATENT IS DISCLOSED.

10             BUT THERE'S MORE THAN JUST A CHRONOLOGY,

11   BECAUSE AS THE TESTIMONY OF SAMSUNG'S OWN SENIOR

12   EXECUTIVES SHOW.  MR. LEE SAID DISCLOSING BEFORE

13   THE PROPOSAL WAS FROZEN WOULD BE STUPID, ALTHOUGH

14   THAT'S EXACTLY WHAT RULE 4.1 REQUIRES, AND DR. AHN

15   SAID HE KNEW OF NO EFFORTS THAT WERE MADE TO COMPLY

16   WITH FRAND.

17             AND THERE'S MORE THERE, YOUR HONOR, BUT

18   COLLECTIVELY, THAT IS ENOUGH TO -- COMPARED WITH

19   WHAT THE FEDERAL CIRCUIT HAS DONE IN BROADCOM AND

20   QUALCOMM TO BE A WAIVER, IT'S SUFFICIENT FOR

21   WAIVER, EQUITABLE ESTOPPEL, AND UNCLEAN HANDS.

22             AND WITH DR. ORDOVER'S TESTIMONY ABOUT

23   THE MARKET, WHICH YOUR HONOR HAS ADDRESSED IN

24   RULING ON A COUPLE OF MOTIONS TO DISMISS, THERE IS

25   PROOF, ALMOST UNREBUTTED, OF TECHNOLOGY MARKETS,

6687

1    CONDUCT, ANTICOMPETITIVE CONDUCT, TAKING CONTROL OF

2    THOSE TECHNOLOGY MARKETS, AN AFFECT ON THE

3    MARKETPLACE, AN AFFECT ON US, AND THEN DAMAGES,

4    MAYBE THE SMALLEST AMOUNT IN THE CASE, BUT STILL

5    DAMAGES.

6              THE COURT:  OKAY.  ALL RIGHT.  SO

7    MS. MAROULIS, I'M GOING TO DENY THE RULE 50 WITH

8    THE EXCEPTION TO ANTICIPATION AS TO THE '460, '711,

9    AND '516.

10             I'LL GIVE YOU ONE LAST CHANCE IF THERE'S

11   ANYTHING YOU WANT TO SORT OF SAY IN REBUTTAL TO

12   WHAT MR. LEE JUST SAID.

13             MS. MAROULIS:  SURE, YOUR HONOR.  A FEW

14   POINTS, AS TO THE EXHAUSTION.  I WANTED TO READ

15   INTO THE RECORD THE CASES THAT GOVERN THE FACT THAT

16   WHERE A SALE TAKES PLACE IS THE DISPOSITIVE FACTOR,

17   WHICH IS MINEBEA VERSUS PAPST, 444 F.SUPP 2D 68,

18   CORNELL RESEARCH FOUNDATION VERSUS HEWLETT-PACKARD,

19   AND I THINK THERE ARE ADDITIONAL CASES IN OUR JURY

20   INSTRUCTIONS AND WE'LL PUT IT IN THE ACTUAL

21   BRIEFING.

22             THE COURT:  UM-HUM.

23             MS. MAROULIS:  WITH RESPECT TO THE

24   ANTITRUST, I RETURN TO MY POINT THAT TO EVEN

25   ESTABLISH INJURY IN FACT AS PART OF THE LITIGATION

```
1    COSTS, YOU HAVE TO MEET ONE OF TWO CONDITIONS,

2    EITHER IT'S ANTICOMPETITIVE SCHEME, IT IS THE

3    RAMBUS VERSUS HYNIX CASE, OR SHAM LITIGATION, THE

4    HANDGARDS CASE.  THEY HAVEN'T ATTEMPTED TO

5    ESTABLISH ANY OF THOSE.  SO THE FACT THAT THEY

6    MIGHT HAVE COSTS IN THIS LITIGATION IS NOT

7    SUFFICIENT.  FOR LITIGATION TO BE THE BASIS OF

8    INJURY IN FACT, IT HAS TO BE ONE OF THOSE TWO

9    CONDITIONS AND THEY HAVEN'T MET EITHER OF THEM.

10             WITH RESPECT TO EXPERT TESTIMONY, IT'S --

11   I DO REMEMBER THEM ASKING SOME QUESTIONS TO EXPERTS

12   ABOUT PAYMENT, BUT THEY PUT NO DOCUMENTARY EVIDENCE

13   INTO THE RECORD AND THIS IS ONE OF THE LEAST

14   DOCUMENTED CLAIMS IN TERMS OF WHAT COSTS THEY

15   SUFFERED AT ALL.

16             AND, YOUR HONOR --

17             THE COURT:  BUT THEY COULD GET A NOMINAL

18   DAMAGE OF A DOLLAR.

19             MS. MAROULIS:  BUT THEY STILL HAVE TO

20   ESTABLISH INJURY, IN FACT, AND THEY HAVE NOT

21   ESTABLISHED THAT UNDER THE ANTITRUST LAW.

22             AND, YOUR HONOR, BEFORE I SIT DOWN, I

23   NEGLECTED TO MENTION TWO OTHER GROUNDS ON WHICH WE

24   NEED TO MOVE.

25             THE COURT:  OKAY.
```

 1          MS. MAROULIS:  WHICH IS APPLE DID NOT

 2    PRESENT ANY REBUTTAL EVIDENCE TO THE DAMAGES

 3    CALCULATIONS OF DR. O'BRIEN AND DR. TEECE.

 4          AND WITH RESPECT TO DR. O'BRIEN'S

 5    CALCULATION, THERE WAS NO WITNESS AT ALL, SO THAT

 6    SHOULD BE A RULE 50 MOTION FOR SURE.  WITH RESPECT

 7    TO DR. TEECE, THERE WAS ONLY MR. DONALDSON WHO

 8    GENERALLY CRITICIZED THE RATE, BUT HE DID NOT REBUT

 9    DAMAGES IN THE WAY DAMAGES CONSPIRATORS TYPICALLY

10    DO.  HE DIDN'T DO A GEORGIA PACIFIC ANALYSIS, OR AT

11    LEAST HE ACTUALLY DID IN HIS REPORT, BUT HE DIDN'T

12    TESTIFY ABOUT IT HERE.  SO WE HAVE NO REBUTTAL OF

13    ANY KIND TO THE TWO SAMSUNG DAMAGES EXPERTS THAT WE

14    PUT ON IN OUR CASE, THEREFORE, THE RULE 50 MOTION

15    WOULD BE APPROPRIATE AS TO BOTH OF THOSE.

16          THE COURT:  ALL RIGHT.

17          MR. LEE:  YOUR HONOR, I'LL BE BRIEF.  ON

18    THE ANTITRUST ISSUE THAT MS. MAROULIS JUST RAISED,

19    YOUR HONOR ACTUALLY RULED ON THAT AND CAME OUT

20    CONTRARY IN YOUR SECOND RULING ON THE MOTION TO

21    DISMISS IN TERMS OF WHAT CONSTITUTES A SECTION 2

22    SHERMAN ACT CLAIM IN THIS CONTEXT.

23          AS TO DAMAGES, I RESPECTFULLY DISAGREE.

24    MR. O'BRIEN WAS CROSS-EXAMINED BY MR. SELWYN,

25    CROSS-EXAMINED ON HIS BASES, AND WE'RE GOING TO BE

1    ABLE TO ARGUE TO THE JURY, MR. O'BRIEN SAID IT'S 29

2    MILLION DOLLARS FOR THESE PATENTS THAT HAVE NEVER

3    RESULTED IN A PRODUCT.  MR. WAGNER SAID IT'S $27

4    THOUSAND FOR THE APPLE PATENTS THAT GO TO THIS

5    NOMINALLY SUCCESSFUL PRODUCT.  WHO ARE YOU GOING TO

6    BELIEVE?

7              THE CROSS-EXAMINATION, PLUS MR. WAGNER'S

8    TESTIMONY ITSELF, IS ENOUGH TO CREATE A TRIABLE

9    ISSUE FOR THE JURY.

10             AND AS TO MR. TEECE, WHO JUST POINTED OUT

11   THE 2.4 PERCENT, MR. -- THE COMBINATION OF

12   MR. MUELLER'S CROSS-EXAMINATION WHERE HE SHOWED

13   THAT MR. TEECE'S ROYALTIES RATES WERE ONE PATENT AT

14   THE HIGH END IS ACTUALLY HIGHER THAN THE RATE THAT

15   SAMSUNG OFFERED FOR A PORTFOLIO OF 86 PATENTS, PLUS

16   MR. DONALDSON'S CRITICISM OF THE RATE, BOTH IN

17   TERMS OF RATE AND BASE IS SUFFICIENT TO CREATE AN

18   ISSUE FOR THE JURY.

19             THE COURT:  OKAY.  ALL THE MOTIONS ARE

20   DENIED WITH THE EXCEPTION OF ANTICIPATION TO '460,

21   '711 AND '516.  I DO FIND THERE IS A REASONABLE

22   BASIS FOR A REASONABLE JURY TO RULE IN REGARD TO

23   APPLE'S FAVOR WITH REGARD TO ALL THE ISSUES FOR

24   WHICH I'VE DENIED A RULE 50 MOTION.

25             ALL RIGHT.  LET'S GO TO, WE'RE NOW AT THE

6691

```
 1    END OF SAMSUNG'S REBUTTAL CASE.  WHO WANTS TO --
 2              MR. LEE:  YOUR HONOR, IF IT'S THE END OF
 3    SAMSUNG'S REBUTTAL CASE, WHICH IS REALLY THE END OF
 4    THE CASE, YOU HAVE A JOINT REQUEST IF WE COULD JUST
 5    DO THAT TOMORROW AS PART OF THE FILING.  SO THERE'S
 6    NOT GOING TO BE RULE 50 MOTIONS THAT GO TO ALL OF
 7    THE EVIDENCE.
 8              THE COURT:  WELL, BUT I WOULD LIKE --
 9    IT'S JUST HELPFUL IN WORKING ON THE JURY
10    INSTRUCTIONS AND THE VERDICT FORM TO GET A PREVIEW
11    OF WHAT YOUR ARGUMENTS ARE.  OBVIOUSLY I UNDERSTAND
12    YOU'RE PROBABLY GOING TO REPEAT WHAT'S LARGELY
13    ALREADY BEEN ARGUED AND IT'S GOING TO BE FULL WITH
14    CITATIONS.
15              BUT IF THERE ARE ANY NEW, SPECIFIC ISSUES
16    THAT WOULD HAVE BEEN APPROPRIATE TO RAISE MORE, YOU
17    KNOW, WITHIN THE SCOPE OF FOLLOWING SAMSUNG'S
18    REBUTTAL CASE, I'D LIKE TO AT LEAST HEAR WHAT YOU
19    HAVE TO SAY.  IS IT JUST THE SAME THINGS YOU'VE
20    ALREADY SAID?
21              MR. LEE:  I THINK FROM OUR PERSPECTIVE,
22    YOUR HONOR, IT WOULD BE BASICALLY THE MOTIONS THAT
23    WE MADE AT THE END OF SAMSUNG'S AFFIRMATIVE CASE
24    AND WE'D JUST BE MOVING -- WE'D BE MAKING THE SAME
25    MOTIONS AT THE END OF THEIR REBUTTAL CASE.
```

```
 1            THERE PROBABLY WILL BE SOME MOTIONS ON

 2     OUR END, EVEN ON THE ISSUES AS TO WHICH WE BEAR THE

 3     BURDEN OF PROOF.

 4            BUT THERE ARE ISSUES THAT SAMSUNG HAS

 5     RAISED, YOUR HONOR HAS DENIED THAT IT'S ENOUGH TO

 6     GO TO THE JURY, BUT I THINK WE HAVE TO MAKE A

 7     RECORD.  IN TERMS OF ANYTHING THAT'S NEW --

 8            THE COURT:  YES.

 9            MR. LEE:  THAT WOULD HELP YOU WITH THE

10     INSTRUCTIONS, I DON'T THINK THERE IS ANY.

11            THE COURT:  OKAY.  LET ME -- DO YOU AGREE

12     WITH THAT, MR. ZELLER OR MR. VERHOEVEN?

13            MR. VERHOEVEN:  YES.

14            MR. ZELLER:  JUST --

15            (DISCUSSION OFF THE RECORD BETWEEN

16     DEFENSE COUNSEL.)

17            MR. ZELLER:  WE THINK WE'RE ALL ON THE

18     SAME PAGE, YOUR HONOR, BUT TO MAKE IT EXPLICIT ON

19     THE RECORD, IT'S OUR UNDERSTANDING THAT WE ARE

20     PRESERVED AS TO THE REMAINDER OF GROUPS AS TO THE

21     INVALIDITY OF TRADE DRESS, VARIOUS TRADE DRESSES

22     THAT HAVE BEEN ASSERTED, AS WELL AS THE DESIGN

23     PATENTS.

24            THE COURT:  RIGHT.  I'M ASSUMING THAT IN

25     YOUR FILING ON SATURDAY MORNING YOU'RE GOING TO BE
```

3693

1    MAKING YOUR RULE 50 MOTION AS TO THE WHOLE CASE.

2              MR. VERHOEVEN:  THAT'S RIGHT, YOUR HONOR.

3    AND I AGREE WITH MR. LEE THAT THERE'S NOTHING NEW

4    TO BE RAISED TODAY.

5              THE COURT:  OKAY.

6              MR. VERHOEVEN:  THAT WE HAVEN'T -- EXCUSE

7    ME --THAT COUNSEL FOR APPLE HASN'T ALREADY RAISED.

8              THE COURT:  OKAY.  ALL RIGHT.  OKAY THEN.

9    WHAT ELSE?  OH, WHAT DID YOU ALL THINK ABOUT HOW WE

10   HANDLE YOUR PRESERVATION OF YOUR OBJECTIONS TO THE

11   JURY INSTRUCTIONS?

12             MR. JACOBS:  WE DIDN'T HAVE AS MUCH TIME

13   TO CONSULT ON THIS AS I THINK THE COURT WOULD HAVE

14   LIKED.  HERE'S MY PROPOSAL, WHICH I THINK WILL MEET

15   BOTH SEEDS NEEDS.

16             WORKING BACKWARDS, WE NEED AN OPPORTUNITY

17   TO OBJECT ON THE RECORD TO THE COURT'S PROPOSAL

18   FINAL JURY INSTRUCTIONS.  IF WHAT THE COURT ISSUES

19   ON SUNDAY NIGHT DON'T CHANGE AS A RESULT OF WHAT WE

20   DO ON MONDAY, THEN WHAT WE DO ON MONDAY IS THAT

21   OPPORTUNITY.

22             I HAVE A FEELING WHAT THE COURT HAS IN

23   MIND FOR MONDAY IS ACTUALLY SOMETHING OF A

24   DISCUSSION OF THE INSTRUCTIONS UNDER SOME GROUND

25   RULES THAT BOUND THAT DISCUSSION AND DON'T TURN IT

3694

```
1    INTO SOMETHING ENDLESS.

2              IF THAT'S THE CASE, WHAT WE WOULD PROPOSE

3    IS THAT WE OBJECT IN WRITING TO THE COURT'S FINAL

4    INSTRUCTIONS WHEN THOSE, WHEN THOSE COME OUT AND

5    BEFORE THEY'RE ACTUALLY GIVEN TO THE JURY.  WE'LL

6    HAVE TO SEE WHAT THAT ACTUAL MOMENT IS.

7              ON MONDAY, WE WOULD EACH PICK A NUMBER,

8    OR THE COURT WOULD PICK A NUMBER OF HIGH PRIORITY

9    OBJECTIONS THAT THE PARTIES COULD DISCUSS WITH THE

10   COURT, AND WE'D GET THROUGH THAT LIST UNTIL THE

11   COURT SAID, YOU KNOW WHAT, THIS IS ENOUGH.  AS LONG

12   AS WE HAVE THE OPPORTUNITY TO OBJECT ON THE RECORD

13   TO THE COURT'S FINAL INSTRUCTIONS, I BELIEVE WE

14   WILL HAVE PRESERVED ANY CLAIM OF INSTRUCTIONAL

15   ERROR.

16             THE COURT:  WELL, IF YOU'RE GOING TO FILE

17   SOMETHING, THEN I WOULD PREFER THAT YOU FILE IT

18   EARLY IN THE MORNING AND THAT I HAVE ALL MORNING TO

19   REVIEW IT AND THEN WE JUST MEET IN THE AFTERNOON

20   AND I CAN TELL YOU AT THAT POINT WHICH ONES I'M

21   ACTUALLY WAVERING OR UNCLEAR OR CONFUSED ABOUT.

22             AND WE CAN DISCUSS THOSE.

23             AND THEN THERE REALLY DOESN'T A NEED, IF

24   YOU'VE ALREADY PRESERVED YOUR OBJECTION IN WRITING,

25   FOR YOU TO REARGUE IT.  SO I'D LIKE TO DO IT THE
```

3695

1   WAY I DO MY HEARINGS, WHICH IS I JUST ASK WHAT I'M

2   INTERESTED IN AND I DON'T WANT YOUR SET

3   PRESENTATION, THE WAY I DO MY HEARINGS.  IS THAT

4   ACCEPTABLE OR NOT?

5            MR. JACOBS:  I THINK IT'S CLOSE.

6            THE COURT:  YOU DON'T GET TWO SHOTS, YOU

7   DON'T GET TO PUT IT IN WRITING AND THEN ARGUE IT.

8   WE DON'T HAVE TIME, UNLESS YOU WANT ME TO PUSH THIS

9   OFF A WEEK, WE DON'T HAVE TIME FOR YOU TO GET A

10   THIRD AND A FOURTH SHOT AT THIS.

11            I'M GIVING YOU A THIRD SHOT TO DO IT IN

12   WRITING AND WE'LL HAVE A HEARING, AND I'LL RUN IT

13   LIKE I RUN MY HEARINGS.  THERE'S SPECIFIC QUESTIONS

14   I WILL HAVE AND I'LL ASK YOU ABOUT.  BUT IF I'VE

15   ALREADY DECIDED AND YOU HAVE FOR THE THIRD TIME PUT

16   IT IN WRITING, THAT'S ENOUGH, OKAY.

17            MR. JACOBS:  SO THAT'S PERFECT.  WE'LL

18   OBJECT IN WRITING ON WHATEVER SCHEDULE YOU SET

19   BASED ON WHEN YOU, HOW MANY HOURS YOU GIVE US AFTER

20   YOU DELIVER YOUR INSTRUCTIONS TO US.  THAT WOULD

21   FORM THE BASIS FOR ANY DISCUSSION THAT YOU NEED,

22   YOU SET THE AGENDA FOR ON MONDAY, BUT THEN WE NEED

23   A CHANCE, JUST A PLACEHOLDER, YOUR HONOR, TO FILE A

24   SET OF OBJECTIONS TO THE FINAL SET OF INSTRUCTIONS.

25            THE COURT:  WELL, I NEED TO PUT A PAGE

1    LIMIT ON IT BECAUSE THERE'S NO WAY, IF YOU FILE,

2    YOU KNOW, YOUR LAST -- FIRST FILING WAS 400 PAGE.

3    THIS ONE IS 300 PAGES.  I WON'T BE ABLE TO ABSORB

4    THAT IN THE MORNING.

5             MR. JACOBS:  WE'RE TALKING ABOUT THE

6    MONDAY, THE --

7             THE COURT:  WHATEVER YOU FILE IN THE

8    MORNING, IT REALLY -- I MEAN, IF YOU WANT IT TO

9    HAVE ANY INFLUENCE ON FILING INSTRUCTIONS, IT NEEDS

10   TO BE COMPACT ENOUGH THAT I CAN DIGEST IT AND CASES

11   NEED TO BE REVIEWED AGAIN.

12            MR. JACOBS:  SURE.

13            THE COURT:  WHAT WOULD YOU LIKE TO DO?

14            MR. VERHOEVEN:  I AGREE WITH MR. JACOBS,

15   WE HAVEN'T HAD QUITE ENOUGH TIME TO MEET AND

16   CONFER, BUT THE IDEA THAT WE WOULD FILE A MASSIVE

17   DOCUMENT IN THE MIDDLE OF THE NIGHT WITH A WHOLE

18   BUNCH OF OBJECTIONS IS NOT GOING TO BE PRODUCTIVE

19   FOR MONDAY, I DON'T THINK, YOUR HONOR.

20            AS I SAID BEFORE, WHATEVER YOUR HONOR IS

21   WILLING TO GIVE US, BUT A NUMBER OF H-P-O'S,

22   PRIORITY OBJECTIONS, THAT WE COULD THEN PUT LIMIT

23   ON THE AMOUNT OF TIME THAT THERE'S GOING TO BE

24   ARGUMENT, SIMILAR TO THE EXHIBITS.

25            THE COURT:  BUT I NEED TO KNOW FOR YOUR

```
 1    RECORD, I'M SORRY TO INTERRUPT, BUT DO YOU NEED TO
 2    DO MORE OBJECTIONS THAN JUST HIGH PRIORITY ONES?
 3           MR. VERHOEVEN:  YEAH, BUT WHAT WE COULD
 4    DO, THIS IS JUST A FORMALITY.  I DON'T KNOW IF
 5    MR. JACOBS -- WE COULD PROBABLY COME BACK ON THE
 6    RECORD AND IN HALF AN HOUR READ, JUST READ, YOU
 7    KNOW, SO THAT WE CAN COVER OURSELVES FOR PURPOSES
 8    OF APPEAL, YOU KNOW, WE HAVEN'T HAD A CHANCE TO
 9    TALK ABOUT THIS, BUT RATHER THAN DO ANOTHER FILING,
10    WE CAN JUST COME BACK, I DON'T KNOW HOW LONG IT'LL
11    TAKE TO READ IT --
12           THE COURT:  LET ME ASK, DID YOU ALL DO
13    RESEARCH?  WHY DON'T YOU INCORPORATE BY REFERENCE
14    YOUR 700 PAGES OF OBJECTIONS YOU HAVE ALREADY
15    FILED.
16           I DON'T UNDERSTAND.  WHY CAN'T YOU JUST
17    SAY, WE INCORPORATE BY REFERENCE OUR 700 PAGES OF
18    OBJECTIONS THAT HAVE ALREADY BEEN FILED, AND HERE
19    IS JUST, YOU KNOW, 10 THAT WE FIND TO BE MOST
20    CRITICAL TO OUR CASE AND WE WANT TO TRY TO CONVINCE
21    YOU TO MAKE THE CHANGE OR SOMETHING LIKE THAT.
22           MR. VERHOEVEN:  RIGHT.  SO, YOUR HONOR, I
23    THINK THERE'S TWO THINGS THAT WE'RE JUGGLING.  ONE
24    IS HAVING A PRODUCTIVE JURY INSTRUCTION SESSION.
25           IN MY OPINION, A FILING THAT LISTS ALL OF
```

3698

```
 1    THE OBJECTIONS WILL NOT BE HELPFUL.  SO A LIMIT ON
 2    H-P-O'S, HOWEVER MANY YOU PICK, ALL THE OTHER ONES
 3    YOU RULE ON THE PAPERS.  ON THOSE H-P-O'S, WE'LL
 4    DECIDE WHAT WE REALLY CARE ABOUT AND THEN WE CAN
 5    ARGUE THOSE AT OUR INSTRUCTION CONFERENCE.  SO
 6    THAT'S THE FIRST TRANCHE.
 7              AND THEN WHAT I THINK WHAT MR. JACOBS IS
 8    TALKING ABOUT IS AFTER --
 9              THE COURT:  HE'S TALKING ABOUT ANOTHER
10    SEVERAL HUNDRED PAGES.
11              MR. JACOBS:  NO, NO.  I THINK WE'RE
12    TALKING ABOUT A CHART ACTUALLY, AGAIN, THE LAST
13    FILING WE WOULD MAKE AFTER THE COURT.
14              MR. VERHOEVEN:  AFTER YOU'VE RULED.
15              MR. JACOBS:  AFTER YOU'VE RULED, AFTER
16    YOU'VE DECIDED THESE ARE THE COURT'S INSTRUCTIONS,
17    WE WOULD FILE A CHART THAT JUST ENUMERATES THE
18    OBJECTIONS THAT WE ARE CARRYING FORWARD BECAUSE YOU
19    HAVE NOT RULED IN OUR FAVOR, AND THAT WOULD BE THE
20    DOCUMENT THEN THAT WE WOULD POINT TO, TO SAY THAT
21    WE HAD PRESERVED OUR OBJECTION TO YOUR FINAL SET OF
22    INSTRUCTIONS, AND WE WOULD NOT BE EXPECTING THE
23    COURT, IN PRACTICAL REALITY, WE WOULD NOT BE
24    EXPECTING THE COURT TO DO MUCH WITH THAT CHART.
25              THE COURT:  WELL, I NEED A PAGE LIMIT,
```

1    BECAUSE YOU'VE DISAGREED ON 70 OF YOUR

2    INSTRUCTIONS, SO I'M NOT GOING TO HAVE YOU ALL

3    FILING 200 PAGES ON MONDAY.

4           MR. JACOBS:  WELL, THIS IS THE -- I'M

5    TALKING ABOUT THE LAST FILING, AND WE'RE -- AND

6    WHATEVER YOU WANT ON THE FIRST FILING WE'LL DO,

7    WHATEVER YOU WOULD FIND HELPFUL TO GET YOU --

8           THE COURT:  OH, YOU'RE SAYING AFTER I'VE

9    FINALIZED THE INSTRUCTIONS, YOU'RE GOING TO LOB

10   IN --

11          MR. VERHOEVEN:  YEAH, THAT'S WHAT WE'RE

12   TALKING ABOUT HERE.  THERE'S TWO TRANCHES WHERE

13   INSTEAD OF A BIG ARGUMENT, WHERE I THINK H-P-O

14   WOULD BE USEFUL INSTEAD OF A THOUSAND OBJECTIONS,

15   THAT PROCEDURE HAS WORKED WELL ON FOCUSING THE

16   PARTIES OF WHAT THEY CARE ABOUT INSTEAD OF THREE

17   HOURS OF GOING THROUGH EVERY SINGLE INSTRUCTION, SO

18   I WOULD URGE THE COURT TO DO THAT FOR THE

19   CONFERENCE.

20          THEN AFTER YOUR HONOR ISSUES THE FINAL

21   SET, WHICH WILL BE LATER IN THE DAY, THAT'S A

22   SECOND THING WHICH IS JUST PRESERVATION OF OUR

23   APPEAL RIGHTS, AND WE DON'T NEED TO ARGUE ANYTHING,

24   WE DON'T NEED TO -- WE JUST NEED TO PUT SOMETHING

25   IN THE RECORD BECAUSE THE RULE SAYS YOU HAVE TO DO

3700

```
 1    THAT.  THAT'S THE ONLY THING.  SO THAT CAN BE DONE
 2    IN A VERY SHORT DOCUMENT, REALLY.  WE JUST HAVE TO
 3    IDENTIFY IT.
 4              MR. JACOBS:  WE HAVE TO ENUMERATE IN THE
 5    CHART THE ERROR WE'RE CLAIMING AND THE -- AND THE
 6    INSTRUCTION WE GAVE THAT IT WAS THE CORRECT
 7    INSTRUCTION, OR THAT WE PROFFERED.
 8              THE COURT:  OKAY.  I GUESS THAT SOUNDS
 9    FINE.  IN ADDITION TO YOUR HIGH PRIORITY ONES, I
10    THINK I'LL JUST HAVE SOME THAT I JUST NEED
11    CLARIFICATION, SO WE'LL NEED TO SPEND TIME ON THAT
12    AS WELL.
13              MR. VERHOEVEN:  OF COURSE.
14              MR. JACOBS:  AND WE'RE GETTING YOUR
15    ORDERS THAT SAY I NEED SOME HELP ON THIS, SO I
16    THINK WE HAVE ONE DUE --
17              THE COURT:  8:00 P.M. TONIGHT, YES.
18              MR. JACOBS:  YES.
19              THE COURT:  OKAY.  ALL RIGHT.  WELL, IF
20    YOU'RE GOING TO -- WHEN CAN YOU FILE?  I MEAN,
21    OBVIOUSLY IF WE CAN GET THE JURY INSTRUCTIONS DONE
22    BEFORE SUNDAY NIGHT, WE WILL -- BUT WHEN CAN YOU
23    FILE YOUR HIGH PRIORITY OBJECTIONS?  I THINK MAYBE
24    WE SHOULD MOVE THE HEARING TO LATER THAN 10:00 A.M.
25    JUST SO THAT WHATEVER YOU FILE CAN REALLY BE
```

```
 1    THOUGHTFULLY ENGAGED WITH AND NOT HURRIED.

 2              MS. MAROULIS:  YOUR HONOR, WOULD YOU LIKE

 3    TO DO THE HEARING AT 1:00 O'CLOCK AND HAVE THE

 4    FILING AT LIKE 8:00 OR 9:00 IN THE MORNING?

 5              THE COURT:  THAT WOULD BE OKAY.  I'M

 6    HOPING -- WILL THAT GIVE US ENOUGH TIME?  I MAY BE

 7    GIVING YOU THE FINAL FINAL INSTRUCTIONS MUCH LATER

 8    ON MONDAY NIGHT, WHICH IS GOING TO CUT IN ON YOUR

 9    TIME TO PREPARE FOR YOUR CLOSING.

10              MR. VERHOEVEN:  WHAT'S THE EARLIEST -- I

11    THINK 1:00 MIGHT BE TOO LATE, EVEN THOUGH I

12    SUGGESTED MS. MAROULIS SAY IT, SOMETHING LIKE MAYBE

13    11:00 O'CLOCK.

14              THE COURT:  YEAH, WE COULD DO THAT.  HOW

15    EARLY CAN YOU FILE YOUR HIGH PRIORITY OBJECTIONS?

16              MS. MAROULIS:  8:00 IN THE MORNING?

17              MR. JACOBS:  WE CAN DO WHATEVER YOU NEED

18    US TO DO, YOUR HONOR.  IT'S SOME HOURS AFTER WE GET

19    THE INSTRUCTIONS IN PRACTICAL REALITY TO DIGEST

20    WHAT YOU'VE DONE, PICK OUR HIGH PRIORITIES AND GIVE

21    YOU SOMETHING COGENT IN THE BRIEFING.

22              THE COURT:  WHAT TIME DID YOU FILE YOUR

23    RESPONSES TO 36 AND 37?  I DIDN'T GET THEM BEFORE

24    THIS MORNING.  I GOT SAMSUNG.

25              MS. MAROULIS:  IT WAS ABOUT 8:15 FOR US,
```

```
 1    OR 8:16.

 2              THE COURT:  I GOT SAMSUNG'S.

 3              MR. JACOBS:  WE WERE 10 MINUTES OFF, 12

 4    MINUTES OFF, SOMETHING LIKE THAT.

 5              THE COURT:  ALL RIGHT.

 6              MR. VERHOEVEN:  PERHAPS --

 7              THE COURT:  WELL, WHATEVER DEADLINE IS

 8    SET, I NEED IT TO BE OBSERVED BECAUSE I DIDN'T GET

 9    HERE UNTIL A LITTLE AFTER 8:30 AND I HAD NOT GOTTEN

10    APPLE'S.

11              MR. VERHOEVEN:  PERHAPS, YOUR HONOR, YOU

12    COULD EXERCISE YOUR DISCRETION AND WHEN YOU FIGURE

13    OUT WHEN YOU'RE GOING TO GET YOUR INSTRUCTIONS OUT,

14    YOU CAN PICK A REASONABLE TIME.

15              BUT THAT'S SORT OF AN UNKNOWN FACTOR.

16              THE COURT:  THAT'S TRUE.  I COULD -- AS

17    SOON AS WE GET THEM OUT, WE CAN PROPOSE A TIME.

18              MR. VERHOEVEN:  HOW MUCH TIME DO WE NEED?

19              THE COURT:  WE CAN E-MAIL YOU ALL AND SAY

20    IF WE CAN GET THEM OUT LET'S SAY BY 3:00 O'CLOCK IN

21    THE AFTERNOON.

22              MR. JACOBS:  DIFFERENT.

23              MR. VERHOEVEN:  THEN IT'LL BE A WHOLE

24    DIFFERENT SCENARIO.

25              THE COURT:  SO HOW MUCH TIME IN TERMS OF
```

3703

```
 1    HOURS?  TEN HOURS?

 2              MR. VERHOEVEN:  MR. JACOBS SUGGESTED TEN

 3    HOURS, WHICH IS GREAT FOR US, AS LONG AS IT WORKS

 4    LOGISTICALLY.  SO -- OBVIOUSLY IF IT DOESN'T COME

 5    OUT UNTIL MIDNIGHT ON SUNDAY, TEN HOURS -- WELL,

 6    THAT MIGHT WORK.  NO, IT WOULDN'T WORK BECAUSE WE'D

 7    BE FILING OUR H-P-O'S AT 10:00 IN THE MORNING AND

 8    YOU WOULDN'T HAVE ENOUGH TIME.  SO IT DEPENDS ON

 9    WHETHER YOUR HONOR GETS THEM OUT.  IF WE COULD GET

10    TEN HOURS, THAT WOULD BE GREAT.  IF THAT'S NOT

11    REASONABLE, WE WOULD ASK FOR A REASONABLE PERIOD OF

12    TIME.

13              THE COURT:  ALL RIGHT.  WHY DON'T WE DO

14    THIS, THEN.  I'LL -- AND I'M SORRY I DON'T HAVE A

15    GOOD ESTIMATE RIGHT NOW AS TO WHEN THOSE WILL BE

16    FILED, BUT I'LL TRY TO GIVE YOU TEN HOURS, AND WHAT

17    I THINK WHAT I WILL DO THEN, IF YOU'RE FLEXIBLE ALL

18    DAY ON MONDAY, MAYBE WHEN I FILE THEM, I CAN MAKE A

19    PROPOSAL, AND THEN -- AND WE'LL PUT THE PROPOSAL IN

20    THE INSTRUCTIONS AND YOU ALL CAN LET ME KNOW

21    WHETHER THAT'S GOING TO WORK FOR YOU OR NOT.

22              I WOULD LIKE -- BECAUSE I'M ASSUMING

23    YOU'RE ALSO GOING TO HAVE OBJECTIONS TO THE VERDICT

24    FORM, RIGHT?  OR NOT?

25              MR. VERHOEVEN:  POSSIBLY.
```

```
 1              THE COURT:  SO I THINK I WILL NEED AT

 2   LEAST TWO TO THREE HOUR, THREE PREFERABLY WITH YOUR

 3   HIGH PRIORITY OBJECTIONS TO THE JURY INSTRUCTIONS

 4   AND THE VERDICT FORMS.

 5              SO WHY DON'T WE PLAN ON MEETING AT NOON

 6   WITH THE IDEA OF -- WELL, HOPEFULLY YOU'LL FILE AT

 7   8:00 A.M. ON MONDAY YOUR OBJECTIONS AND THAT I WILL

 8   TRY TO GET YOU, AS EARLY AS POSSIBLE ON SUNDAY

 9   AFTERNOON, HOPEFULLY THE JURY INSTRUCTIONS AND

10   DRAFT VERDICT FORM, BUT IT MAY BE -- AND IF IT'S

11   LATER, WE'LL PUSH EVERYTHING BACK.

12              MR. JACOBS:  THANK YOU, YOUR HONOR.

13              THE COURT:  ALL RIGHT.

14              MR. VERHOEVEN:  AND JUST ONE THING ON THE

15   CHARGING CONFERENCE, YOUR HONOR.

16              WE'RE GOING TO HAVE A LOT OF THINGS IN

17   THE AIR WHEN WE'RE GETTING READY FOR CLOSINGS AND

18   WHATNOT.  SO I WONDER IF IT'S OKAY WITH THE COURT,

19   FOR EXAMPLE, MAYBE I WON'T BE ABLE TO BE THERE, I'M

20   NOT SURE, OR SOME PARTS OF OUR TEAM AREN'T THERE.

21              THE COURT:  THAT'S FINE.  WHATEVER YOU

22   NEED TO DO TO PREPARE FOR TUESDAY.

23              BUT LET'S PUT A LIMIT ON THE HIGH

24   PRIORITY OBJECTIONS.

25              SO I THINK PROBABLY -- A NUMERICAL LIMIT
```

1    IS BETTER THAN THE PAGE LIMIT.

2            MR. VERHOEVEN:  I THINK WE HAVE 70

3    DISPUTED INSTRUCTIONS, SO THAT'S THE UNIVERSE, AND

4    WHAT WE NEED IS A REASONABLE SUBSET OF THAT.

5            THE COURT:  CAN WE SAY FIVE EACH?  IS

6    THAT TOO SMALL?

7            MR. JACOBS:  SO 10 EACH WITH A 20-PAGE

8    PAGE LIMIT.

9            THE COURT:  SO 8 EACH WITH A 16-PAGE PAGE

10   LIMIT.

11           MR. JACOBS:  I THINK THAT'S WHAT'S CALLED

12   HORSE TRADING.

13           THE COURT:  YEAH.

14           MR. VERHOEVEN:  I'M SORRY, WHAT WAS THAT?

15           THE COURT:  SO 8 EACH, SO IT'LL BE 16

16   TOTAL, A PRETTY SIGNIFICANT CHUNK OUT OF THE 70,

17   AND YOU GET LIKE BASICALLY TWO PAGES HER OBJECTION,

18   16 PAGES.

19           MR. JACOBS:  AND I THINK -- WE WON'T TRY

20   AND MEET -- WE'LL FILE ON THE EIGHT THAT WE WANT

21   AND THE OTHER SIDE WILL RESPOND AND VICE-VERSA.

22   WE'LL COME INTO THE HEARING.

23           THE COURT:  TO ARGUE, YEAH.  I'M ASSUMING

24   IT'S LARGELY GOING TO BE THE SAME AS WHAT YOU'VE

25   ALREADY FILED, RIGHT?

3706

```
 1              MR. JACOBS:  IT SHOULD BE, YOUR HONOR.  I

 2    THINK WE'VE EXHAUSTIVELY RESEARCHED THESE.

 3              MS. MAROULIS:  WE MAY PICK DIFFERENT

 4    EIGHT.

 5              THE COURT:  RIGHT, BUT DO YOU ANTICIPATE

 6    NEW LEGAL ARGUMENTS ARISING?  BECAUSE YOU'VE

 7    ALREADY BRIEFED IT TWICE.  SO THERE WON'T BE ANY

 8    SURPRISES.

 9              MR. VERHOEVEN:  THESE WILL BE AN

10    INDICATION TO YOU OF THE ONES THAT WE'D LIKE TO

11    PRESENT ARGUMENT ON.  THAT'S THE WHOLE IDEA BEHIND

12    THE H-P-O PROCESS.

13              THE COURT:  NOW, THERE MAY BE SOME THAT

14    HAVE TECHNICAL ERRORS, LIKE THE PATENT NUMBER IS

15    OFF OR SOMETHING LIKE THAT.  YOU CAN JUST TELL ME

16    ORALLY AT THE HEARING.

17              MR. JACOBS:  OKAY.

18              THE COURT:  JUST TO CLEAN UP ANY

19    MISTAKES.  OKAY.  WHAT ELSE?  IS THERE IN THIS CASE

20    ELSE THAT WE NEED TO PLAN AHEAD ON?

21              SO IF WE NEED TO REACH YOU THIS WEEKEND,

22    EVERYONE, WE'LL JUST E-MAIL YOU?

23              ANYTHING ELSE?

24              MR. JACOBS:  WE'RE STILL GOING TO TRY TO

25    WORK OUT OUR DEAL ON THE PHONES.  AND WE MAY HAVE
```

1    TO DISCUSS THAT WITH YOU ON MONDAY FINALLY BECAUSE

2    THE JURY WILL START DELIBERATING ON TUESDAY.

3         THE COURT:  WHAT IS THE DROP-DEAD TIME

4    THAT YOU NEED TO HAVE EVERYTHING RESOLVED TO GET

5    YOUR CLOSINGS PREPARED?

6         MR. VERHOEVEN:  WELL, YOU KNOW, ONE THING

7    WE CAN DO, YOUR HONOR, IS AGREE THAT WE CAN MAKE

8    DEMONSTRATIVES WITH THE JURY INSTRUCTIONS AS LONG

9    AS THEY'RE JUST FAITHFULLY DEPICTING THEM, AND WE

10   WOULDN'T HAVE TO WORRY ABOUT THE DISCLOSURE

11   AGREEMENT WE HAVE FOR THOSE SLIDES.

12        SO IF THE INSTRUCTIONS DON'T COME OUT

13   UNTIL AFTER WE EXCHANGE OUR CLOSING SLIDES, THEN WE

14   COULD MODIFY THOSE SLIDES AND ADD SOME INSTRUCTIONS

15   AND WHATNOT.

16        MR. JACOBS:  THAT'S A GOOD IDEA, YOUR

17   HONOR, BECAUSE I THINK THAT'S THE PART THAT WILL BE

18   UNSTABLE THROUGH MONDAY.

19        THE COURT:  SO YOU'RE NOT GOING TO

20   PREVIEW ANY OBJECTIONS BEFORE YOUR PRESENTATIONS?

21        MR. JACOBS:  NO.  WE'LL FIGURE OUT A TIME

22   TO EXCHANGE ALL SLIDES EXCEPT THOSE THAT WOULD BE

23   DEPENDENT ON --

24        MR. VERHOEVEN:  EXACTLY.

25        MR. JACOBS:  THAT WOULD BE A REPRODUCTION

```
 1    OF THE INSTRUCTIONS.

 2              THE COURT:  OKAY.

 3              MR. VERHOEVEN:  BUT THE SOONER WE GET

 4    THEM, OBVIOUSLY THE BETTER, BECAUSE EVEN DOING

 5    THAT, ADJUSTING TAKES SOME TIME.

 6              THE COURT:  WELL, I'M HOPING THAT AFTER

 7    YOU GET IT ON SUNDAY, AT LEAST HOPEFULLY A BIG

 8    CHUNK WILL BE STABLE, BUT THE PROBLEM IS THE ONES

 9    THAT WILL MOVE ARE THE ONES THAT YOU PROBABLY CARE

10    ABOUT.

11              SO WHAT TIME WILL YOU GIVE ME YOUR

12    OBJECTIONS TO YOUR DEMONSTRATIVES?

13              MS. MAROULIS:  YOU WANTED IT BY 5:00

14    O'CLOCK ON MONDAY.

15              THE COURT:  THAT MIGHT HAVE TO MOVE NOW.

16              MR. VERHOEVEN:  THAT'S POSSIBLE, OR WHAT

17    WE COULD DO IS WE COULD DEAL WITH THOSE INDEPENDENT

18    OF THE INSTRUCTIONS AND THEN WE COULD HAVE ANOTHER

19    AGREEMENT THAT IF WE HAVE TO MODIFY SLIDES BECAUSE

20    WE LOST AN INSTRUCTION WE WERE HOPING TO WIN OR

21    WHATNOT, WE COULD HAVE A MUCH SMALLER TRANCHE THAT

22    WE COULD JUST EXCHANGE AND TRY TO WORK OUT AND THEN

23    PERHAPS THERE WOULD BE A HANDFUL, FOUR OR FIVE, WE

24    HAVE TO DEAL WITH IN THE MORNING.

25              THE COURT:  LET PUT A TIME LIMIT ON IT.
```

1    WHAT ABOUT LIKE 8:00 O'CLOCK OR 9:00 O'CLOCK?

2           MR. JACOBS:  ON MONDAY NIGHT.

3           THE COURT:  YEAH, SO IT'LL BE SET AT 5:00

4    O'CLOCK, AND THEN IF SOMETHING SHIFTS, IT'LL BE

5    8:00 O'CLOCK.

6           MR. VERHOEVEN:  I WOULD GREATLY PREFER

7    8:00 O'CLOCK INSTEAD OF 9:00.

8           THE COURT:  MAYBE WE SHOULD JUST SAY 8:00

9    -- NO, IF IT'S GOING TO COME IN BASICALLY, 5:00

10   O'CLOCK AND 8:00 O'CLOCK.

11          SO WHAT ELSE?  ANYTHING ELSE WE NEED TO

12   WORK OUT IN ANY OTHER HOUSEKEEPING.

13          MS. MAROULIS:  YOUR HONOR, WHAT TIME DO

14   YOU NEED US HERE ON TUESDAY, 8:30 OR 9:00?

15          THE COURT:  WE SHOULD SAY 8:30 JUST IN

16   CASE SOMETHING SUDDENLY COMES UP.  AND I'M SORRY

17   THAT I'VE MADE YOU ALL WAIT A NUMBER OF TIMES ON

18   SEVERAL TRIAL DAYS AND NOT COME OUT UNTIL 8:45, BUT

19   8:30 JUST IN CASE THERE'S ANY LAST-MINUTE ISSUE.

20          MR. JACOBS:  NO PROBLEM, YOUR HONOR.

21   WE'VE BEEN GETTING HERE EARLY JUST TO GET SETTLED

22   IN.

23          I THINK YOUR HONOR SAID THAT YOU WOULD BE

24   INSTRUCTING --

25          THE COURT:  BEFORE CLOSING, YES.  AND I'M

```
1    GOING TO GIVE THEM A HARD COPY SO THEY CAN FACT

2    CHECK YOU WHEN YOU'RE ARGUING.

3              YEAH.  SO WE'LL GIVE THEM A THREE-HOLE

4    PUNCHED COPY THEY CAN PUT IN THEIR JURY BINDERS.

5              ANYTHING ELSE?

6              MR. JACOBS:  YOUR HONOR, WE DISCUSSED THE

7    JURY BINDER EARLIER, AND I JUST WANTED TO MAKE SURE

8    THE JURY BINDER ITSELF IS LODGED AND IN THE RECORD,

9    THE MATERIALS THAT HAVE BEEN PROVIDED TO THEM.  CAN

10   WE --

11             THE CLERK:  IT IS, YOUR HONOR.

12             THE COURT:  IT HAS BEEN LODGED.

13             THE CLERK:  YES.

14             THE COURT:  OKAY.

15             (DISCUSSION OFF THE RECORD BETWEEN THE

16   COURT AND THE CLERK.)

17             THE COURT:  OKAY, YES.  YES, IT IS.

18   MR. RIVERA TELLS ME IT IS LODGED.

19             MR. JACOBS:  THANK YOU.

20             THE COURT:  WHAT ELSE?  ANYTHING ELSE?

21             MR. VERHOEVEN:  NOTHING FROM SAMSUNG,

22   YOUR HONOR.

23             MR. JACOBS:  NO, YOUR HONOR.

24             THE COURT:  OKAY.  THANK YOU.  SO WE'LL

25   GET YOU THE INSTRUCTIONS ON SUNDAY.
```

1          MR. VERHOEVEN:   THANK YOU, YOUR HONOR.

2          THE COURT:   THANK YOU.

3          MR. MCELHINNY:   THANK YOU, YOUR HONOR.

4          (WHEREUPON, THE EVENING RECESS WAS

5     TAKEN.)

1

2

3

4                        CERTIFICATE OF REPORTERS

5

6

7

8            WE, THE UNDERSIGNED OFFICIAL COURT

9     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

19

20                        /S/
                          _____
21                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
22

23                        /S/
                          _____
24                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074
25
                          DATED:  AUGUST 17, 2012