# EXHIBIT 9

# EXHIBIT 10

The LG KE850: touchable chocolate — Engadget

Engadget for Blackberry - get the app now!

AoI Tech.

| MAIL                                    You might also like: Engadget HD, Engadget Mobile and More

[                    ] SEARCH >

COMPUTEX 2012        E3 2012        NEXUS 7        MACBOOK PRO        THE NEW IPAD        ENGADGET DISTRO

# The LG KE850: touchable chocolate

*By Chris Ziegler* 🔊 *posted December 15th 2006 5:50PM*



Little is known about the KE850 from LG, but the folks over at International Forum Design must know a thing or two about it, seeing how they just hooked it up with a Product Design Award for 2007. And hey, with those hot Chocolate-esque looks -- though we have no proof this one'll actually be branded as a Chocolate -- who can blame them? The big draw here, of course, is a 400 x 240 touchscreen that takes the place of virtually every hard button you might find on a more traditional handset, save for Send, End, and a handful of keys on the sides. The posterior reveals a cam, though its specs remain a mystery. Does someone at LG (or iF) want to spill the beans for us?

[Via *Slashphone*]

**SOURCE** *Read*

36

1        0        0        0

*candybar, if, international forum design, InternationalForumDesign, ke850, lg, mobile, product design award, ProductDesignAward, touch, touchscreen*

LG **PRADA KE850**                                                        powered by

KEY SPECS        **REVIEWS · 0**        PRICES

| TYPE | OPERATING SYSTEM | SCREEN SIZE | INTERNAL MEMORY |
|---|---|---|---|
| Smartphone | Other - Linux-based | 3 inches | 8 MB |
| CAMERA | TALK TIME | DIMENSIONS | WEIGHT |
| 2 megapixels | 2G (up to 3 hours) | 3.9 x 2.1 x 0.5 in | 3 oz |

## FEATURED BREAKING


Boeing prepares to deliver United's 787 Dreamliner, we climb aboard for a tour (video)
*9 hours ago*


Editorial: HTC's departure from South Korea proves a tough fight for foreign brands
*10 hours ago*


Parrot Zik by Starck review: Is $400 worth it for the fanciest, techiest headphones around?
*12 hours ago*


Embracing geotagging: how to journal your trips (and contribute to Google Earth) with snapshots
*13 hours ago*


This Is the Modem World: Do You Smell That?
*1 day ago*

## FACEBOOK ACTIVITY

**High school senior kills cancer with nanotech, still can't legally drink**
5,337 people recommend this.

**HTC admits its bulky, quick-dying LTE phones kinda suck**
143 people recommend this.

**Star Trek: The Next Generation Season One Blu-ray beams down July 24th**
577 people recommend this.

**IDC: Android has a heady 59 percent of world smartphone share, iPhone still on the way up**
267 people recommend this.

Facebook social plugin



**DEFENDANT'S EXHIBIT NO. 2558.001**
United States District Court
Northern District of California
No. 11-CV-1846-LHK (PSG)
*Apple v. Samsung*
Date Admitted:_____ By: _____

# EXHIBIT 11

Volume 10

Pages 1621 - 1719

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

FILED
SEP 2 8 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

| | |
|---|---|
| UNIRAM TECHNOLOGY, INC., a California corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. C 04-1268 VRW ) |
| TAIWAN SEMICONDUCTOR MANUFACTURING COMPANY, LTD., a Taiwan corporation; and TSMC NORTH AMERICA, a California corporation, | ) ) ) ) |
| Defendants. | ) San Francisco, California ) Thursday ) September 20, 2007 ) 8:30 a.m. |

55986

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:              SUSMAN, GODFREY, LLP
                           1000 Louisiana Street
                           Suite 5100
                           Houston, Texas, 77002-5096
                    BY:    **MAX L. TRIBBLE, JR., ESQ.**
                           **JOSEPH S. GRINSTEIN, ESQ.**
                           **JOHN M. NEUKOM, ESQ.**


                           HEIM, PAYNE & CHORUSH, LLP
                           6710 Chase Tower
                           600 Travis
                           Houston, Texas 77002
                    BY:    **RUSSELL A. CHORUSH, ESQ.**
                           **ROBERT M. TUTTLE, ESQ.**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*

DEFENDANT'S EXHIBIT
NO. 2576.001
United States District Court
Northern District of California
No. 11-CV-1846-LHK (PSG)
*Apple v. Samsung*
Date Admitted:_____ By:



1   APPEARANCES:   (CONTINUED)

2

3   For Defendants:          Weil, Gotshal & Manges LLP
                             201 Redwood Shores Parkway
4                            Redwood Shores, California 94065
                   BY:   MATTHEW D. POWERS, ESQ.
5                        EDWARD R. REINES. ESQ.
                         PAUL T. EHRLICH, ESQ.
6                        STEFANI SMITH, ESQ.
                         BRANDON CONARD, ESQ.
7                        JACQUELINE HARLOW, ESQ.

8

9

10   Also Present:   Jeng-Jye Shau

11

12

13                        -  -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2     SEPTEMBER 20, 2007                              8:42 A.M.

 3

 4              (Proceedings held in open court, outside

 5               the presence and hearing of the jury.)

 6          THE COURT:  Very well.  Good morning, counsel.  I

 7     believe all jurors are present and ready to proceed.

 8          MR. POWERS:  Your Honor, when would you like us to

 9     read into the record the exhibit numbers corresponding to the

10     deposition excerpts that were played, but not entered into the

11     record?  We are going to rest today so we need to do it

12     sometime.

13          THE COURT:  We can do that after the evidence is in.

14          MR. POWERS:  In response to your question at the

15     close of evidence yesterday, the time is currently 19:25 for

16     UniRAM 17:01 for TSMC.

17          THE COURT:  Well, you are catching up.  All right.

18     Let bring in the jury.

19          MR. POWERS:  Your Honor, first up will be the Ed Chen

20     video that we discussed yesterday.

21              (Jury in at 8:44 a.m.)

22          THE COURT:  Good morning.  Has anything about the

23     case or anyone who has anything to do it with come to your

24     attention since we were together yesterday?

25              (Jurors respond negatively.)
```

1          THE COURT:  Fine.  Very well, Mr. Powers.  I think we

2   are ready for the next witness.

3          MR. POWERS:  Yes, your Honor.  The next witness is a

4   TSMC employee, Ed Chen, played by video from his deposition.

5          THE COURT:  Very well.

6   **WHEREUPON:**

7                            ED CHEN,

8   called as a witness for the Defendant herein, testified via

9   videotaped deposition played in open court in the presence and

10  hearing of the jury.

11         (Time noted:  8:47 a.m.)

12         MR. REINES:  Your Honor -- leave that on the screen

13  -- UniRAM is about to put on the screen an exhibit to which

14  there is an objection.  Everything else that's been played, we

15  don't have a problem with actual documents.

16         MR. TRIBBLE:  Which exhibit is it?

17         MR. REINES:  This is Trial Exhibit 165.  It's being

18  referenced in the deposition as Exhibit 437 and it's Trial

19  Exhibit 135.

20         MR. TRIBBLE:  We are just offering this for

21  illustrative purposes.  It's a demonstrative used in the

22  deposition.  We are not offering it into evidence, but it's a

23  demonstrative that goes with his testimony.

24         MR. REINES:  And what we are objecting to

25  specifically is exactly presenting that in this courtroom.

1    It's a lawyer's handwritten document.  This isn't even from the

2    time period.

3           THE COURT:  Could you hand it up?

4           MR. TRIBBLE:  Certainly, your Honor.

5           (Whereupon, document was tendered

6              to the Court.)

7           MR. TRIBBLE:  The witness has walked through these

8    and agrees that the substance in the boxes is accurate.

9           MR. REINES:  No.  Actually, that's exactly wrong.

10          MR. TRIBBLE:  There is a debate about that, I guess.

11          MR. REINES:  The witness says there is at least a few

12   mistakes that the lawyer made when the lawyer drafted it up.

13          THE COURT:  Well, is all of this included in the

14   excerpt of the deposition?

15          MR. REINES:  The two -- those two errors are, but the

16   incompleteness is not addressed at the time.  It's argument,

17   basically argument.

18          THE COURT:  All right.  Where is the written

19   transcript?

20          (Whereupon, document was tendered

21              to the Court.)

22          THE COURT:  And the portion that you just referred

23   to, Mr. Reines?

24          MR. TRIBBLE:  It begins at page 162, your Honor.

25          THE COURT:  Yes, but what's the portion that Mr.

1    Reines is referring to?

2         MR. REINES:  Your Honor, we have no objection to the

3    oral testimony about the document.  It's putting up the

4    illustrative that's argumentative, that's incomplete, and

5    that's got --

6         THE COURT:  Where is the statement of the witness

7    that this is incomplete?

8         MR. TRIBBLE:  It's discussed generally about whether

9    it's accurate or not between 162 and 169.  And I think if you

10   read the answer at page 168, line 17, that question and answer

11   will show that there is a pretty fair discussion of whether

12   it's complete or not.

13        THE COURT:  And all of that discussion is included in

14   the video excerpt, is it?

15        MR. TRIBBLE:  I believe so, your Honor.

16        MR. REINES:  Your Honor, I don't know if all of it

17   is, but in terms of incompleteness, we heard Dr. Hsu testify

18   that he proposed the 1T-X.  That's excluded from this.  That's

19   an example of the misleading nature of the document.

20        MR. TRIBBLE:  Mr. Chen didn't say in his

21   deposition --

22        MR. REINES:  We are going to have closing arguments

23   tomorrow.

24        THE COURT:  All right.  All right.  All right.  Let

25   me give the jury a break here.  No reason for you to get in the

 1   middle of all of this.

 2              (Jury out at 9:49 a.m.)

 3              (Brief pause.)

 4         **THE COURT:**  Well, it does appear from the written

 5   transcript that the witness noted the exception of two issues

 6   that he states are omissions from the exhibit, which is marked

 7   as Exhibit 437 in the deposition.  It appears to be Trial

 8   Exhibit 165, correct?

 9         **MR. TRIBBLE:**  Correct.

10         **MR. REINES:**  That's correct, your Honor.

11         **THE COURT:**  And what is the harm, if Mr. Tribble is

12   correct that all of this is included in the videotape excerpt,

13   of allowing this testimony before the jury together with the

14   demonstrative?  The jury will have the witness's testimony that

15   is as complete, except in the two respects noted, and be able

16   to consider the testimony together with the demonstrative.  So

17   what's the harm?

18         **MR. REINES:**  Fair question.  The answer is, first,

19   the concern isn't just with the inaccuracies, that it's

20   factually wrong in two parts.  It's the incompleteness.

21              We have an attorney drafting a narrative and saying,

22   "Are these elements of the narrative right," and going through

23   and paints a misleading picture.

24              If we go into depositions -- imagine the deposition

25   process if everyone can go in and pick five facts that they

1    think are right, couple them together, ask the witness, "Is

2    this right?  Is this right?  Is this right?"  And then put it

3    on a 10-by-15 screen in front of the jury.

4            THE COURT:  How is that different from a lawyer in

5    the course of examining a witness of putting up a chart to

6    illustrate the witness's testimony and ask the witness, "Is

7    this correct?  Is that correct?  Something else correct?"  And

8    the witness, "A is correct?  B is correct, but C is not

9    correct."  That happens in trials all the time.  How is this

10   different?

11           MR. REINES:  This is different because I don't think

12   you see a time line of this sort used in that fashion.  That,

13   to me, doesn't seem appropriate.  It's argumentative.  It's

14   extended.  It's paragraphs of statements, sentences of

15   statements by an attorney on a document.

16           It's not a situation where someone says, "Here is a

17   fact, is it true?  Here is a fact, is it true?"  It's a time

18   line with the implication being that this is a consistent time

19   line with all the data points.

20           THE COURT:  Specifically the --

21           MR. REINES:  The completeness --

22           THE COURT:  I'm sorry.

23           MR. REINES:  Sure.  I was going to say, the

24   completeness point is really not that it's factually

25   inaccurate, and the witness clarified that on the record.  It's

DEFENDANT'S EXHIBIT NO. 2576.009

1  that it gives the impression this is the time line, when we

2  know that it's not, and so that's argument.  Taking your facts

3  and arguing on a time line is classic attorney argument.

4          THE COURT:  Specifically, what is the incompleteness?

5          MR. REINES:  I think the primary one is that this was

6  proposed by Fu-Chieh Hsu, the 1T-X.  This is this particular

7  type of capacitator right here (indicating).

8          THE COURT:  You are talking about box two?

9          MR. REINES:  Immediately before the first box.  "In

10 mid-2000 Fu-Chieh proposed the 1T-X project."

11         Then the second box says, "H.M. proposed it's joint

12 development project to Fu-Chieh Hsu."

13         There is a document in which he's responding when he

14 says it.  He doesn't deny the fact, but it's totally

15 misleading.

16         And then in terms of the quote from the exclusivity

17 in the last box for April 2001, there is a whole contract with

18 a whole series of limitations about what that exclusivity is.

19         And then it's got -- and then look at the middle box

20 above February, 2001.  This is what Fu-Chieh Hsu requests from

21 Dennis Sinitsky, and we have another witness, Ed Chen,

22 validating that.

23         MR. TRIBBLE:  It's just like asking a leading

24 question, your Honor.  They had their opportunity to ask this

25 witness questions if they wanted to clarify any further.  He

1    certainly did a fine job himself of clarifying.

2         I'm trying to verify right now, your Honor, that

3    there aren't any -- I think that -- I think I may have found a

4    follow-up question that was omitted.  We can stop and read that

5    into the record, if Mr. Reines so desires, but you are

6    certainly allowed to lead an adverse witness and say, "What's

7    wrong with this chart?"

8         MR. REINES:  I mean, if we have depositions where

9    counsel prepared argumentative time lines and questions

10   witnesses and gets five data points agreed and everyone wants

11   to put them up on the screen, I mean, you know, this will be in

12   deposition taking an advanced course.  And it's misleading.

13        MR. TRIBBLE:  This is the only one we have, your

14   Honor.

15        MR. REINES:  Just because the fact that there is one

16   improper thing, doesn't make it proper.  I mean, the oral

17   testimony can come in.  We haven't objected.  That has the

18   facts.  They read facts in on that, and the jury can understand

19   from that.  They don't need the argument of a time line

20   compressed as though it's complete.

21        MR. TRIBBLE:  The way he asks the questions -- and

22   there is no objection to form, you know.  If he's asking what's

23   wrong with this box, if the jury can't see what's in the box,

24   they won't understand the question and answer.  And there was

25   no objection to the form of the question at the time.

DEFENDANT'S EXHIBIT NO. 2576.011

1        **MR. REINES:**  The objection is not to the form of the

2   question.  The objection is to the argumentative exhibit

3   purporting to be a complete time line of events that we know is

4   not complete, and it's not complete in a misleading way.

5        **THE COURT:**  Is all of the discussion on pages 168 and

6   169 in the video excerpt, Mr. Tribble?

7        **MR. TRIBBLE:**  We don't have Lines 5 --

8        **THE COURT:**  What page?

9        **MR. TRIBBLE:**  On 168, Lines 5 through 10, but it

10   doesn't add any substance.

11        We have all the rest of that page.  We have deleted

12   the objections.

13        **THE COURT:**  What about page 169?  We have

14   Mr. Chorush's statement, "I'm just not representing that it's

15   complete.  I don't think any of us are going to suggest that it

16   is."  Is that all included?

17        **MR. TRIBBLE:**  What line is that, your Honor?

18        **THE COURT:**  Line 1.

19        **MR. REINES:**  That is not included, your Honor.

20   Normally, we wouldn't include attorney colloquy.

21        **THE COURT:**  What about the question on Line 4?

22        **MR. TRIBBLE:**  The question on Line 4 on page  --

23   there is an answer there.

24        **THE COURT:**  Is the question -- where does it pick up,

25   on page 169?

1      MR. TRIBBLE:  Yes.  On page 169 we have Lines 4

2   through 7, Line 9, Lines 11 and 12.  That's -- that moves on to

3   the next one.

4          So we have all the testimony.  We just -- we omitted

5   Mr. Chorush's comment.

6      MR. REINES:  And that's an acknowledgement by counsel

7   that it's not complete.

8      THE COURT:  Well, but we also have a statement by the

9   witness to that effect.

10     MR. TRIBBLE:  With those corrections, it will be more

11  complete.

12     MR. REINES:  How is the witness supposed to be

13  synthesizing the entire evidence for a portion of time which is

14  one of the centerpieces of their allegation?

15     THE COURT:  But it's not unusual to show a witness a

16  demonstrative to illustrate his testimony and to ask him

17  whether or not the demonstrative is accurate.  That happens all

18  the time.  The objection will be overruled.

19     MR. REINES:  Your Honor, could we add in the

20  acknowledgment by counsel that it's not a complete document?

21  I think that will at least minimize the prejudice.  That's

22  specifically page 169, Lines 1 through 3.

23     THE COURT:  I think that's fire.

24     MR. TRIBBLE:  That's fine.

25     MR. REINES:  Thank you, your Honor.

1        THE COURT:  See if they are ready.

2        How much longer do we have on this videotape?

3        MR. TRIBBLE:  Less than 30 minutes, your Honor.

4        THE COURT:  Okay.

5        (Brief pause.)

6        (Jury in at 10:01 a.m.)

7        THE COURT:  All right.  We are going to carry on with

8    playing of the deposition of Mr. Chen.

9        (Playing of the videotaped deposition was

10        resumed in open court.)

11        MR. REINES:  Excuse me.  That was the portion that

12    was supposed to add the insert.  Did you want to read the

13    insert?

14        MR. TRIBBLE:  I don't have a transcript.

15        MR. REINES:  I'm happy to do it, your Honor.

16        THE COURT:  Very well.  This is a statement of

17    plaintiff's counsel in the course of the deposition, that's

18    being addressed in the course of the deposition.

19        MR. REINES:  (Reading)

20        "MR. CHORUSH:  I'm just not representing

21        it's complete.  I don't -- yeah.  I don't

22        think any of us are going to -- going to

23        suggest that it is."

24        THE COURT:  Is that clear, ladies and gentlemen?

25    That's referring to what was noted in the exhibit -- excuse me,

1    in the exhibit that's on the screen, 437, that's been marked

2    here as Plaintiff's Exhibit 165.   Okay?

3            Carry on, Mr. Tribble.

4            (Playing of the videotaped deposition was

5            resumed in open court.)

6            **MR. REINES:**   Your Honor.  I hate to object again, but

7    this is not even an exhibit that's being referenced.   We have

8    got the time line up --

9            **THE COURT:**   I think we discussed this, Mr. Reines.

10           **MR. REINES:**   This is not the exhibit being discussed.

11           (Playing of the videotaped deposition was

12           resumed in open court.)

13           (Whereupon there was a recess in the proceedings

14           from 10:35 until 10:55 a.m.)

15           **MR. TRIBBLE:**   Your Honor, I want to make you aware we

16   filed proposed jury instructions and a verdict form.

17           **THE COURT:**   All right.  Fine.

18           Very well.   The next witness?

19           **MR. REINES:**   Is damages expert for the defendants,

20   Terry Musika.

21           **THE COURT:**   Very well.

22                       TERRY MUSIKA,

23   called as a witness for the Defendant herein, having been first

24   duly sworn, was examined and testified as follows:

25           **THE WITNESS:**   Yes, I do.

1        THE CLERK:  Please have a seat.  State your name and

2   spell your last name, please.

3        THE WITNESS:  Terry L. Musika, spelled M-U-S-I-K-A.

4                    DIRECT EXAMINATION

5   BY MR. REINES:

6   Q.   Please describe your educational background?

7   A.   Presumably from college.  So undergraduate, I have an

8   undergraduate degree in history from Indiana University in

9   Bloomington, Indiana, and a graduate degree, a Master's in

10  Public Finance also from Indiana University.

11  Q.   Please describe your professional background?

12  A.   I taught school briefly for two years in between

13  undergraduate and graduate school in L.A. city schools.

14       Then I went back to graduate school and I started

15  then at one of the international accounting firms in Los

16  Angeles called Peat Marwick and Mitchell.

17       From there I moved to Boston to another one of the

18  large international accounting firms at the time, was called

19  Coopers & Lybrand.  Today it's referred to as Price Waterhouse

20  Coopers.  I was made a partner there.  And I transferred to the

21  Baltimore/Washington area then.

22       And I left there two years later and formed an

23  acquisition firm in which I and others from Coopers and Lybrand

24  acquired companies and ran these companies for -- for ourselves

25  and for our investors.

DEFENDANT'S EXHIBIT NO. 2576.016

1      Then started a consulting firm called Penta Advisory

2   Services, which I sold.

3      I then formed a proprietary database company called

4   Central Data Technologies, which I was the CEO and ran and sold

5   to some graduate students at M.I.T.

6      Then I formed my current firm, which is Invotex

7   Consulting, and I have been doing that for the last four years.

8   Q.   On how many different trials have you testified as a

9   damages expert?

10  A.   Total number of trials, actually in trial, would be

11  probably 50 to 75 actual trials.

12  Q.   Besides your trial experiences with damages issues, do you

13  have any real world experiences with licensing?

14  A.   Yes.  The company that I work for now, Invotex, we do

15  several things with intellectual property.

16      One, we do this kind of testimony and I do this

17  routinely.  I testified for The university of California in

18  some biotech patents and things like that.

19      We also have a division of the company which actually

20  owns and manages intellectual property.  So we work for

21  Harvard, for example, auditing licenses and we work for some

22  silicon chip manufacturers and we audit those licenses.

23      We also represent inventors and we seek to find

24  licensees for the inventor's property themselves, so we will

25  actually engage in the license for them.

DEFENDANT'S EXHIBIT NO. 2576.017

1      We will get financing for inventors and for companies

2  as well.  If they have got intellectual property and they want

3  -- they need money, capital, or they need a loan to further

4  develop it, we will represent them, value that property and

5  represent them to the banks as well.

6      So that's basically the experience involving

7  intellectual property beyond litigation.

8      MR. REINES:  Your Honor, at this point we would move

9  to qualify Mr. Musika as a damages expert in this matter?

10      MR. GRINSTEIN:  No objection to the proffer, your

11  Honor.

12      THE COURT:  Very well.  You may proceed.

13  BY MR. REINES:

14  Q.  What was your assignment?

15  A.  My assignment was to consider that there are two parties

16  in the lawsuit, UniRAM and TSMC, and that -- I was asked to

17  assume, for purposes of my role, that there was a trade secret

18  or trade secrets, as is the case in this case.  Assume that

19  those exist and assume that for purposes of my work that those

20  trade secrets had been misappropriated by UniRAM.

21      So I'm not involved in the legal side of it all.

22  Further --

23      THE COURT:  Misappropriated by UniRAM?

24      THE WITNESS:  By TSMC.  Sorry, your Honor.  Thank

25  you.

DEFENDANT'S EXHIBIT NO. 2576.018

1  A.   I was asked to -- after having made that assumption, to

2  determine the amount of damages that would be required assuming

3  that misappropriation occurred that would fairly compensate

4  UniRAM for the use by the defendant TSMC.

5       And I want to emphasize that again.  I believe that

6  that's a very clear description and one which is not in dispute

7  or not in disagreement with the opposing expert.  It's one in

8  which I was determining the damages that are -- that fairly

9  compensate UniRAM for the alleged misuse or use by TSMC.

10  BY MR. REINES:

11  Q.   By talking about the dollar values that may be appropriate

12  under -- for damages, are you implying that money should be

13  paid by TSMC to UniRAM?

14  A.   No.  There -- I'm not implying that.  That's a decision

15  that the Court has to make and that's not a decision that I'm

16  involved in at all.

17       But what I am critically involved in is making a

18  determination that, what is the appropriate value?  What are

19  the appropriate damages, assuming that the Court finds that

20  there actually is or there are trade secrets and that those

21  trade secrets have been misappropriated.  If there is not, then

22  my testimony is not necessary.

23  Q.   Okay.  And can you tell me what your conclusions are based

24  on your analysis in this matter?

25  A.   Yes.  This slide summarizes my conclusions.  What it shows

DEFENDANT'S EXHIBIT NO. 2576.019

```
 1    is, I believe, that in order to fairly compensate UniRAM for

 2    the assumption that the trade secrets existed and were taken,

 3    that a total damage amount of $2,571,446 should be paid if the

 4    Court decides there is a liability.

 5              And that has two components, which I'm sure we are

 6    going to discuss.

 7    Q.   Did you review Mr. McFarlane's opinions on this subjects?

 8    A.   Yes.  I also reviewed Mr. McFarlane's opinions and was

 9    asked to review those and comment on those.

10    Q.   Did you agree or disagree with Mr. McFarlane?

11    A.   There were some areas in which we agree on and there were

12    other areas in which we did not agree.

13    Q.   I would like to ask you:  What do you believe, based on

14    all the work you have done in this case, is the correct measure

15    of damages?

16    A.   The correct measure of damages is a reasonable royalty to

17    be paid by TSMC to UniRAM, assuming liability.

18    Q.   And can you explain how you came to the conclusion that a

19    reasonable royalty was the proper measure of damages?

20    A.   Yes.  This is a simple graph, table, which shows two

21    options, one in the left-hand box.  Assuming liability again,

22    there are two possible damage theories or methodologies.  One

23    is this actual loss.  It's the loss that UniRAM claims that

24    they lost as a result of this taking of their trade secrets.

25              If not that, then the law is -- or my understanding
```

DEFENDANT'S EXHIBIT NO. 2576.020

1   is is that the appropriate damage methodology is is that if

2   there cannot be proven that there was an actual loss on the

3   part of UniRAM's part, then it is an unjust enrichment on the

4   part of TSMC.  Either their loss or their gain.

5        And if neither of those two amounts can be proven,

6   then we move to the third box, which is a reasonable royalty.

7   It's in essence, it's a payment to be made by TSMC for the use

8   of these alleged trade secrets.

9        So that's an option, but it wouldn't be the

10  combination.  It's either one of those three.

11  Q.   Now was, in your view, UniRAM able to prove actual loss?

12  A.   No.  There has been no claim by UniRAM, by its expert Mr.

13  McFarlane or anyone else, that there has been any actual loss

14  by UniRAM, none whatsoever.

15  Q.   And what is the basis for your conclusion that UniRAM has

16  not proven any actual loss to them as a result of the alleged

17  misappropriation?

18  A.   There are three principal reasons why there has been no

19  claim by UniRAM for an actual loss.

20        One is, as we just heard in the testimony that

21  precede mine, is that there is no evidence that I'm aware of

22  that shows that the technology was converted in to an actual

23  successful design and something that was purchased.

24        Secondly, it was not reduced to or actually put into

25  a working silicon semiconductor chip.  That never happened.

1          And, third, there was never any sale of either a chip

2    or a license fee associated with the manufacturing of a chip

3    that included the trade secrets.

4          So, in summary, there was never any commercial --

5    never any commercial success.  It was a commercial failure in

6    the sense that there was no revenues or profits ever produced.

7    So you can't lost something if you never really ever made

8    anything.

9    Q.    Is this an area where you disagree with Mr. McFarlane?

10   A.    No.  Mr. McFarlane agrees on this point.  He has not

11   requested or stated that there is any claim for lost profits or

12   any actual loss that occurred.

13   Q.    And that brings to us unjust enrichment.  Let's move

14   through to the unjust enrichment question.

15         Was unjust enrichment shown in this case based on

16   your analysis of the record?

17   A.    No.  That was not provable either.  So that's that second

18   box in the left, the second part of the box in the left.

19         Was there an actual loss?  No.  Okay.  Was there an

20   unjust enrichment?  Can we prove unjust enrichment on the part

21   of TSMC?  And the answer to that is -- so first no there

22   (indicating).

23         Now we are down here (indicating).  No to that is my

24   opinion as well, not provable.

25   Q.    Now, did Mr. McFarlane have an opinion that unjust

1  enrichment was the proper measure of damages in this case?

2  A.    No.  He gave no such opinion.

3  Q.    And how come you believe unjust enrichment is not the

4  right measure of damages?

5  A.    Again, I have here three different reasons.  Again, they

6  need to be provable.

7        The issue here is -- is whether there is sufficient

8  proof in which to show that there was an unjust gain by TSMC.

9  And on the first point there is no evidence or insufficient

10 evidence to show that the combination of the trade secrets had

11 value.

12       Secondly, there was never any individual valuation of

13 the trade secrets.  There are 12 -- as I know you all know,

14 there are 12 individual trade secrets and the opinions that

15 have been given with respect to an amount of unjust enrichment

16 relates to all 12.  But if you were to find or if the Court was

17 to find, well, it's 6 of the 12, or 3 of the 12, or some

18 combination of the 12, there is no separate amount that's

19 identified for each of the individual.  So it's an

20 all-or-nothing sort of proposition.

21       And the third -- back to that prior slide if we

22 could -- there is no apportionment of the unjust enrichment.

23 So there is -- there is a statement -- an amount that's given

24 by the opposing side, by TSMC, as to the amount of profits that

25 -- I'm sorry, by UniRAM by the amount of profits that TSMC

DEFENDANT'S EXHIBIT NO. 2576.023

1   earned, but it's never apportioned.  It's never shown as to

2   what portion of it relates to the trade secrets versus

3   contributions that TSMC made itself to that.

4            For those three reasons is my opinion it hasn't been

5   proven.

6   Q.   Let's look first at value.  One of the things you stated

7   was that there was no evidence that the trade secret

8   combinations are valuable.

9            Is that something that UniRAM's expert, Professor

10  Sechen, said that convinced you of that?

11  A.   As Dr. Sechen said -- and here is the question:

12            "QUESTION:  And you have offered no opinions

13            on the commercial value of the trade

14            secrets?"

15            And he answers:

16            "ANSWER:  I was not asked to do that."

17  Q.   Now Mr. McFarlane testified that if you eliminated the

18  alleged trade secrets from the products, they wouldn't work

19  any more if you took them out.

20            Doesn't that effect your opinion that there's

21  value?

22  A.   I think the trade secrets as a -- as a formula, as a

23  combination, so there is a sequence.  It's like unlocking a

24  lock and you need four numbers in that.  And maybe UniRAM's is

25  one of those four numbers.  Possibly.  We will see.

DEFENDANT'S EXHIBIT NO. 2576.024

1           And if -- the other three are equally important, so

2    you need all.  You can't make the process.  You can't complete

3    or unlock the lock with just their number.  You need what TSMC

4    brings to it as well and, perhaps, others.

5           And so the fact that -- that there is one number

6    there in that combination and that the lock could not be

7    unlocked without their number, doesn't mean that there isn't

8    another way to accomplish that.  And it's my understanding from

9    the technical experts that have testified on the part of TSMC,

10   that there were alternatives.

11          It's, of course, their opinion that they don't --

12   they have not misappropriated the trade secrets, but that there

13   were alternatives in terms of other technology that could be

14   used, and was used, by other competitors to accomplish the same

15   functions.

16   Q.   Now, regarding the evidence of value of individual trade

17   secret combinations, did you find that?

18   A.   I did not find any evidence that anyone, Mr. McFarlane or

19   anyone else, provided an opinion concerning the individual

20   trade secrets.

21          And you have got up on the screen correctly the

22   question:

23          "QUESTION:  And in terms of which one of

24          those individual trade secrets are

25          fundamental, as you were calling it -- in

1          other words, the product wouldn't work if you

2          pulled it out -- you don't know which one of

3          those trade secrets are the ones that you are

4          calling fundamental, right?

5          "ANSWER:  (By Mr. McFarlane) Yeah.  I don't

6          think Dr. Sechen addressed that issue, and

7          I'm not qualified to, so I. . . "

8  Q.   Now, the third thing that you mentioned as to why you

9  didn't think unjust enrichment was an appropriate measure is no

10  evidence of apportionment.

11         First of all, why don't you describe why

12  apportionment is important to this analysis?

13  A.   It's the other numbers in the combination.  So if there

14  are five numbers in the combination, you need all five.  If

15  UniRAM is offering one, but there are four others, those four

16  others equally, and if not more, important.

17         And in this case what we just heard from the prior

18  witness, and I believe we have seen and heard and read from

19  other witnesses, is that there was no commercial success.

20  There was no actual loss.

21         UniRAM was not in a position to commercially exploit

22  for purposes of either making or designing.  They had been

23  unsuccessful.  Their avenues were cut off.

24         So they had a dependency, an economic dependency on

25  TSMC to actually bring their name, their recognition, their

1   fabrication facility, very important.  It's -- it's very

2   expensive to build a fabrication system, to operate a

3   fabrication system, and that simply didn't exist from the

4   standpoint of UniRAM.

5            So you need to apportion it.  You need to look at the

6   profits and you can't say, "well, you have made a lot of money

7   out of the sale of this.  I should be entitled to all of that."

8   Well, there are many other contributions.

9   Q.   Was that UniRAM's argument, you have made a lot of money

10  we are entitled to all of that, in terms of unjust enrichment

11  as to the opinion by Mr. McFarlane?

12  A.   Well, Mr. McFarlane's opinion was that -- which I think we

13  might get into.  His opinion was that he did not apportion it

14  at all.  His opinion was it wasn't his responsibility.  It was

15  the responsibility of the defendants to do that.

16           So I think he would agree that -- or has agreed that

17  he made no apportionment whatsoever.

18  Q.   Did you and Mr. McFarlane agree that not all of the profit

19  is attributable to UniRAM even if we assume trade secret

20  misappropriation?

21  A.   Yes, yes.

22  Q.   And is this one of the quotes that you believe supported

23  your opinion in that regard?

24  A.   Yes.  He answers:

25           "ANSWER:  I didn't address that through an

DEFENDANT'S EXHIBIT NO. 2576.027

1       apportionment analysis.  No."

2       He's answering the question, did he do an

3  apportionment?  No, he didn't.

4  Q.   What did you conclude regarding an unjust enrichment

5  analysis, as to whether it was proper to give the profits of

6  TSMC all to UniRAM?

7  A.   I concluded that that was incorrect.  It was incorrect

8  because it wasn't provable for the reasons that I have stated

9  earlier and in order to do such a calculation, you would have

10  to make the changes that I have talked about.

11  Q.   But what did you determine was the proper measure one more

12  time?  That was the reasonable royalty?

13  A.   Yes.  That box, again, the box on the left was their loss

14  or their gain.  If they are not provable or if they don't

15  exist, then a reasonable royalty.

16       So we say, no, there was no loss.  Nobody is even

17  suggesting there is a loss.  There is a dispute there.  I don't

18  believe the gain has been proven.

19       So that moves us into the third box.  The appropriate

20  measure of damages, then, should be a license fee.  Something

21  in -- an amount that's paid by TSMC over to UniRAM for the

22  lawful use of the intellectual property.

23  Q.   Now, did you agree in terms of what the calculation should

24  be for reasonable royalty with Mr. McFarlane's definition of

25  reasonable royalties?

DEFENDANT'S EXHIBIT NO. 2576.028

1  A.   Yes.   It's another agree of agreement.   I do agree with

2  Mr. McFarlane, and this is a quote from his trial transcript in

3  which he says -- and I believe this is correct:

4          "ANSWER:   As I understand it, a reasonable

5          royalty is a measure of damages that attempts

6          to compensate the plaintiff" --

7          And "compensate" is an important word, too.   It's

8  not -- there is no punishment.   It's to compensate.

9          "ANSWER:   -- "the plaintiff, the trade secret

10         owner, for the defendant's use of the trade

11         secrets."

12         That's all we are trying to do, just make a payment

13 to the plaintiff that fairly compensates the plaintiff for the

14 defendant's use made of the trade secrets.

15         I'm in absolute agreement.   It's a payment that is

16 fair.   That compensates them for the use, for the defendant's

17 use.   Those are key words that he uses that I endorse.

18 Q.   Now, do you agree that Mr. McFarlane applied that

19 definition when he performed his damages analysis in this case?

20 A.   That's where we depart.   Although I like his definition, I

21 follow it and he doesn't.

22 Q.   All right.   In terms of the defendant's use, you

23 emphasized that a few times, why is that -- why do you believe

24 that Mr. McFarlane didn't identify the proper party?

25 A.   Well, in order to establish this license payment that

1    should be made in the form of a reasonable royalty, Mr.

2    McFarlane and I both look at one way to did do this is a

3    hypothetical negotiation between the licensor in this case,

4    UniRAM, and the licensee, TSMC.  And -- that's the defendant.

5    And so that should be the hypothetical parties that are

6    negotiating the licenses.  That's what I do.

7         But what Mr. McFarlane does is he agrees that MoSys

8    is not a defendant, that MoSys is not a party to the

9    hypothetical negotiation, but he pulls out UniRAM and he puts

10   in MoSys in their place.  And that's a complete contradiction

11   to his definition of what a reasonable royalty is supposed to

12   be doing.

13   Q.   Let's go through the four points that you have as to why

14   you believe Mr. McFarlane identified the wrong party when it

15   identified MoSys instead of TSMC as the licensor -- excuse me

16   licensee?

17   A.   I think I just covered the first point.

18        The second point.  "TSMC does not benefit from the

19   MoSys revenue."  The construct -- which is not either Mr.

20   McFarlane's construct or mine.  It's what has used many, many

21   times before in many cases in terms of a hypothetical license.

22        And the reason it points to the defendant is that the

23   defendant, who is the hypothetical licensee, the party that's

24   in Mr. McFarlane's world, renting the house and having to pay

25   the rent, he takes the person that's renting the house out of

1    it and he pulls somebody else in.

2         Well, there is no way that TSMC can control the

3    revenues or the money that that person has.  How can TSMC pay

4    out of their own pocket a benefit that somebody else, in this

5    case MoSys, may have earned?

6         So it's not something that -- point number two is the

7    revenue that MoSys may have earned is not something that TSMC

8    can pay out of their pocket.

9         Secondly, TSMC cannot pay royalties out of MoSys's

10   proceeds.  So they don't control the revenue in the first

11   bullet point and they certainly don't control the income, if

12   any, that MoSys makes.

13        And the third point is that UniRAM is not entitled to

14   royalties on MoSys revenues because MoSys has full permission

15   to use UniRAM's technology.

16        Importantly, MoSys has already received permission to

17   use the technology through a conclusion between the two

18   parties.

19        So MoSys -- MoSys, I'm sorry, and UniRAM have already

20   reached an agreement, and so that's already been taken care of

21   with respect to MoSys.

22        Now, UniRAM is coming back to TSMC and saying, we

23   want you to pay again, and we are not -- we don't want you to

24   pay on your amount.  We want you to pay on MoSys's amount.

25   It's illogical.

1    Q.    Can you explain now in terms of reasonable royalty

2    calculation, terms we have heard is "base" and "rate."   Just

3    briefly describe those concepts before we get into it?

4    A.    Yes.

5    Q.    Mr. McFarlane indicated, and I do as well, that the

6    reasonable royalty damage calculation is a rather simple

7    mathematical calculation of taking the royalty base and

8    multiplying it times the royalty rate.

9            What the base is, as he said in his opening testimony

10   we just looked at, it's the defendant's use, what economically

11   results from the defendant's use.   That should be the base.

12           And the rate, then, should be a rate that is

13   necessary to fairly compensate UniRAM for TSMC's use.

14           So a rate is determined by being -- determining what

15   is fair for the use.   The base is based on their revenue.

16   "Their" being TSMC.

17   Q.    Central to Mr. McFarlane's testimony regarding damages,

18   was the concept of an NRE as both the rate and the base.

19           First of all, can you describe what you understand an

20   NRE to be?

21   A.    Yes.   As is common in this industry and common with

22   respect to both parties, there are a number of purchases and

23   sales and transactions going on.   One is the fabrication of the

24   chip, the actual making of the chip.   Another is the licensing

25   of intellectual property, and the other is a design fee.

1              NRE is Non Recurring Engineering fees.  So one-time

2    design fee, usually paid in an up-front amount for the purposes

3    of actually constructing and completing a design and sometimes

4    shared by the parties.  So the NRE fees are one thing.

5              And the chip royalties are royalties that are paid

6    for intellectual property is another thing.

7    Q.   Now, did you agree with the degree of emphasis that Mr.

8    McFarlane put on NRE fees?

9    A.   Well, I don't know that I have a problem with the

10   emphasis, but one of the problems I have is that each of the

11   agreements that I looked at, and that Mr. McFarlane looked at,

12   too, make a clear distinction between NRE fees and chip fees.

13             So each agreement talks about the difference between

14   the two.  And what I have done is follow those agreements and

15   do just exactly what those agreements did with the chip

16   royalties and with the NRE royalties.

17   Q.   And the agreements that are cited here are Exhibit 279,

18   554 and 380, and I would move them into evidence.

19             MR. GRINSTEIN:  No objection, your Honor.

20             THE COURT:  Very well.

21             (Trial Exhibits 279, 554, 380 received in evidence)

22   BY MR. REINES:

23   Q.   Now, are you aware of any licenses where non-NRE revenue,

24   such as when you sell a chip, is being charged the NRE royalty

25   rate?

1   A.   No, but can I use this chart to explain any answer as

2   well?

3   Q.   Please do.

4   A.   These three licenses that counsel just referred to each

5   break up the royalty in to two pieces.

6            Under the rate, there is a rate that's applied to the

7   chip in each of those licenses or the chip sale.  So if we are

8   talking about the defendant's use, we are talking about the

9   defendant's revenue that it gets from fabricating the chip.

10  That's that column.

11           Each of these licenses also provide for -- does

12  provide for a fee to be paid, a sharing fee or up-front fee out

13  of the NRE.

14           So in the first case it's a sharing of 30 percent of

15  the NRE.  And the second one is just an up front payment of

16  800,000, and the third it's a 20 percent.

17           What Mr. McFarlane does is take the 30 percent and

18  apply it to the chip, and take the 20 percent and apply it to

19  the chip.  So not only is he applying it to the wrong person,

20  MoSys, but he's applying a right from the NRE column to the

21  wrong revenue column.

22  Q.   Now, in terms of the licenses that you reviewed, are NRE

23  fees a major economic component of the transactions or not?

24  A.   Well, I'm not speaking broadly, but speaking specifically

25  as it relates to the 1T-SRAM NRE fees, they are miniscule, as

1    this chart shows.  They represent less than one percent of

2    TSMC's total revenues.  They represent less than one percent of

3    MoSys's revenues from these 1T-SRAM NRE fees.  And they

4    represent less than one percent of TSMC's revenues that were

5    paid to MoSys as NRE royalty.

6            So they are a very small portion, even though it's

7    30 percent.  The 30 percent is big because it's a sharing of a

8    small number.  The numbers get big for Mr. McFarlane because he

9    takes the 30 percent and applies it to the chips, which is not

10   what any of these licenses do.

11   Q.   Let's compare the royalty base that Mr. McFarlane uses and

12   the royalty base that you use, as you have done here in this

13   chart.  Can you describe this for the jury, please?

14   A.   Yes.  And this is a good chart because it shows both from

15   a materiality standpoint and a relative standpoint how I

16   actually come up to a bigger royalty base.

17           My royalty base is $236 million.  Mr. McFarlane is

18   only 63 million.  So we would think that with my large royalty

19   base, there ought to be more damages, and it's actually the

20   result.

21           The difference is is that what is the makeup of my

22   236 million versus Mr. McFarlane's 63 million?  I put in the

23   defendant's chip sales, going back again to Mr. McFarlane's

24   definition, for the defendant's use.  So the defendant's use is

25   that they make chips and they sell the chips and I put that

1   revenue in.

2          It also, as each of those licenses shows, for the

3   defendants use.  So if the defendant received an NRE fee, I put

4   that in.  I don't exclude the NRE fees.  I put them in, but I

5   put them in at the rate that they should be in and the chips at

6   the rate they should be in.

7          Mr. McFarlane ignores the defendant's chip sales.

8   He ignores the defendant's NRE fees, even though he uses the

9   NRE rate, and he puts in MoSys's royalty revenue and MoSys's

10  licensing revenue.

11         So we differ in terms of the amount.  I actually give

12  UniRAM a much, much larger base to be used for the royalty.  He

13  comes up with a much smaller number.

14  Q.   Okay.  Why don't we go to the subject of the

15  UniRAM/TSMC/MoSys relationship.  You have described that a

16  little bit, but you have also prepared a diagram that I think

17  will help explain that further.

18         MR. REINES:  Let's put that up on the screen.

19         (Document displayed)

20  A.   Yes.

21  Q.   Go ahead, please.  Explain this chart.

22  A.   There is a sister slide to this, but this is the starting

23  slide which shows the relationship between TSMC, MoSys and

24  UniRAM, and the customers for both TSMC and MoSys and other

25  design firms, etcetera, down here.

1    And what we can see from this chart is that TSMC is

2  actually receiving these chip royalties and NRE fees.  So there

3  is my base.  There is the incoming revenue, and I say that's

4  the benefit that they get.

5    MoSys does get its own chip royalties and NRE fees,

6  and it gets payments from TSMC as well.  And what we know has

7  happened is that UniRAM has sued both TSMC and MoSys.  However,

8  for purposes of MoSys's benefits, they have already compensated

9  UniRAM and they are no longer in the case.

10    So if we go to the next slide --

11    (Document displayed)

12    -- what we see as left is TSMC and UniRAM.  And that

13  case is here now and what I need to figure out is what is the

14  value of the -- of this defendant's use, which would be those

15  two lines coming in right there, not any of the other activity

16  that took place down here with MoSys.

17  Q.   Now, you have explained that the royalty base is on TSMC's

18  revenues on chip sales and NRE fees.

19    Can you discuss the rate now?  What is the rate you

20  would apply to that 230-some-odd million of TSMC revenue?

21  A.   Yes.  And I did a similar analysis, a *Georgia Pacific*

22  analysis to get to the rate.  And what I get to is -- in

23  summary is I get to a one percent rate on that $235 million

24  number.  So that's the number that we just looked at back in

25  that other exhibit.  And I multiple that times one percent,

1   which produces a 2,359,781 damage.

2           And then the total NRE fees, which I believe Mr.

3   McFarlane agrees with, too, is $705,000.  That's what the

4   30 percent should be.  There should be a sharing of those NRE

5   fees.  And 30 percent times that is 211,000.

6           So when we add those two together, we get a damage of

7   2,571,000.  Well, there is Mr. McFarlane's number.  It's a

8   lower base.  It's not TSMC's base.  It's MoSys's base.  And he

9   multiplies it times 30 percent, the NRE rate -- which is not

10  the appropriate rate, the NRE should be applied times NRE

11  fees -- and he produces a damage of 19,130,319.

12  Q.   Just for clarification, the 30 percent NRE royalty rate,

13  Mr. McFarlane is multiplying that times just the NRE-related

14  revenue?

15  A.   No.  He's multiplying it times, as this shows, MoSys's

16  royalty revenue and MoSys's licensing revenue.  So it's

17  everything, not just -- there may be some NRE fees in there,

18  but it's everything else as well.

19  Q.   And in terms of the revenue that MoSys has this, royalty

20  revenue, $63 million number, is that from TSMC or is that also

21  from other foundries?

22  A.   I would say it's from other foundries as well.

23  Q.   And what I would like to do now is ask you about what you

24  used as your benchmark license to get to your one percent

25  royalty rate that you identified for the chip sales and the

1  30 percent for the NRE fees.

2  A.    Okay.

3  Q.    What's the license agreement that you used as your

4  benchmark?

5  A.    The license agreements that I used were -- to get to the

6  starting point, were the three licenses we had a few slides

7  back.  So I think if we go back to that slide, I think that's

8  probably a good place to begin, if we could.

9          (Document displayed)

10         Yes.  And here those three licenses are what I

11 consider to be the most informative licenses in forming a rate.

12         And here we can see it's the MoSys/TSMC license, and

13 this is really a significant license because it's for the very

14 technology that's claimed to be at issue here.

15         It is claimed, as I understand it as a lay person,

16 that TSMC misappropriated the trade secrets and used that to

17 engage in this relationship for the production of this MoSys

18 1T-SRAM.  So this license actually involves the questioned

19 technology.  And what TSMC had to pay to MoSys was a

20 2.9 percent royalty on the chip sales, and it had to share

21 30 percent of all NRE fees.

22         So this compares -- I -- mine -- you saw a 30 percent

23 and mine was a one percent, and I'm going to explain why I'm

24 lower than the 2.9.

25         Moving to the next license I looked at was this

```
 1   UniRAM ProMOS license, and here the license rate on the chip
 2   was zero to 1.8 percent, and it varied because it depended on
 3   how much volume of sales.  So the more sales you had, the
 4   different the royalty report.  So the range of the rate was
 5   anywhere from zero, no royalty being due, to 1.8.  The NRE fee
 6   under this license was a one-time up-front payment of $800,000.
 7              And the third license is the UniRAM/TSMC draft
 8   license.  This was not completed.  I think this is the RegiRAM,
 9   what's been referred to as the RegiRAM license.  And there the
10   rate contemplated was 1 to 2 percent and the NRE fee, again,
11   was 20 percent.
12   Q.   And once you had this 1 percent royalty rate for chip
13   sales and 30 percent for NRE fees as a benchmark, did you
14   consider -- excuse me.  Once you took these benchmark licenses,
15   how did you get to the 1one percent and 30 percent royalty
16   rates?
17   A.   I did a very similar thing that Mr. McFarlane did, which
18   was that I went through a prior case decision, decision tree of
19   sort.  There are 15 factors, Georgia Pacific factors, and I
20   looked to see whether those Georgia Pacific factors influenced
21   this kind of range of rates from zero to 2.9 and the NRE fees.
22   Q.   And Georgia Pacific factor one was the consideration of
23   these license?
24   A.   No.  Georgia Pacific factor would be the consideration the
25   UniRAM license, since factor number one is what has the -- what
```

1  has the licensor actually engaged in in licensing the property.

2           And, in fact, to be specific or literal about factor

3  one, as we know, there has been no licenses by UniRAM.   So

4  UniRAM has never successfully licensed the trade secrets.   They

5  have licensed or attempted to license some other technology,

6  like RegiRAM, but they have no successful licenses on the

7  technology.

8  Q.   And for *Georgia Pacific* number two, what did you look at?

9  A.   I did look at that -- those other license.   Particularly,

10 the license between MoSys and TSMC.   So that was a license --

11 particularly since factor number two is royalties paid by TSMC

12 for use of other intellectual property.   It's not only other

13 intellectual property, it is the accused intellectual property.

14 So that license is very informative.

15 Q.   Why don't we put the *Georgia Pacific* number three, why

16 don't you address that one?   Nature and scope of the license?

17 A.   The nature and scope of the license is whether or not it's

18 restricted or not, and exclusive or non-exclusive.   And I

19 considered that this would be a non-restrictive, non-exclusive

20 license.   There is nothing between the parties that would

21 suggest that it would be anything but non-exclusive.   So that

22 was a low to neutral result.

23 Q.   Now, in terms of the benchmark licenses that you looked

24 at, were those trends for more rights than the hypothetical

25 license between UniRAM and TSMC in your negotiation?

1   A.   Yes.   And if you want to flip -- I'm sorry to do that to

2   you again, but to flip back to the --

3            (Document displayed)

4            -- the IP rights here.

5            The license that I'm looking at or trying to develop

6   between the two parties involves the 12 trade secrets only.

7   Nothing further.   And each of these licenses, as we can see,

8   involves a lot more.   It involves here, in the case of TSMC and

9   MoSys, 33 patents and there are other intellectual property

10  rights which are spelled out in each of these licenses.

11           So there was considerably more intellectual property

12  that was included in these three licenses versus what would be

13  transferred between the two parties here, which would be

14  limited to the 12 trade secrets.

15  Q.   And so for a naked license of just the trade secrets,

16  would that be less are more valuable than with all these other

17  rights?

18  A.   Much less, and that's why one of the reasons why the 2.9,

19  I drove down to the 1 percent was because of the limitation on

20  the intellectual property that was being transferred.

21  Q.   Now, *Georgia Pacific* number four, UniRAM established

22  licensing policies.   How did that affect your analysis in this

23  matter?

24  A.   The established policy was, is that it had no, as we know,

25  commercial success.   They had been unsuccessful in licensing

```
 1    it.  They had been unsuccessful in bringing this to silicon, to

 2    actually coming up with a product.  They had no customers.  So

 3    it put them, as a negotiating party, in a very weak position

 4    with respect to needing someone like TSMC.  So this, again,

 5    would drive down the rate.

 6            The only thing that they were really offering was the

 7    intellectual property itself.  It wasn't like they were giving

 8    up the ability to make the income themselves.  They were not a

 9    fabricator themselves.  They didn't have that kind of capital

10    or resources or customer relations.

11    Q.   That, I think, covers factor number five.

12            Let's turn to factor number six.  How did that affect

13    your opinion on this matter?

14    A.   It had little to no effect on the effects of promoting

15    convoyed sales.  There really were no convoyed sales.

16    Q.   Okay.  Why don't you go through and identify the factors

17    that you thought were significant to your analysis of the

18    remainder?

19    A.   Yes.  The remaining factors that would be in any way

20    significant was -- is that -- there is some upward pressure

21    because simply TSMC -- I'm assuming, again, that there were

22    trade secrets and that they did contribute to ultimately

23    creating a product.  So there would be some upward pressure

24    there.

25            There is no standard industry profit percentage.
```

1   Ultimately --

2   Q.   Well, let me direct you to factor number 13, the portion

3   of the profit associated with the trade secrets?

4   A.   Right.

5   Q.   In this matter are you familiar with Mr. McFarlane's

6   testimony regarding what percentage of the profit of the

7   1T-SRAM related products was attributable to the alleged trade

8   secrets?

9   A.   I don't recall.  I'm sorry.

10  Q.   Do you remember that he testified that it was 50 percent

11  or less and he couldn't state within which?

12  A.   Well, I do remember that testimony, but that was testimony

13  which he gave which he said he couldn't identify.  He did

14  identify that it would be something less than 50 percent, but

15  he couldn't be more precise than that.

16  Q.   All right.  Now, I would like to just turn to this unjust

17  enrichment calculation, and I want to get into the calculation.

18       I understand you said that wasn't the appropriate

19  measure of damages, but in terms of the calculation made by Mr.

20  McFarlane, accepting that, do you agree or disagree with Mr.

21  McFarlane's calculation regarding what the unjust enrichment

22  damages should be?

23  A.   I disagree that unjust enrichment should be a damage

24  methodology that's used, and I disagree with his calculation.

25  Q.   And could you please address the four reasons why you

1   disagree with that calculation?

2   A.   Yes.   First, he ignores over or close -- it's

3   approximately.  It's under actually.  It's about $90 million of

4   fixed costs.  He ignores fixed costs.  He doesn't deduct fixed

5   costs to get to his profit amount.

6   Q.   Let's talk about the fixed costs.  Let's take them one at

7   a time.

8        In terms of the fixed costs, why do you believe the

9   fixed costs should be deducted from the $230 million in

10  revenue, that $100 million difference between you and Mr.

11  McFarlane?

12  A.   Fixed costs are an ordinary and necessary cost of doing

13  business.  I think Mr. McFarlane gave his lemonade stand

14  example.

15       Well, it doesn't matter what business you are in.  If

16  you are a lawyer, if you are a CPA or a lemonade salesmen, I

17  can't go to my bank.  I run a business and I've run four or

18  five businesses.  I can't go to my bank and say, "I want to

19  borrow more money."  And they look at my profit-and-loss

20  statement and there is no profit there.  And I say, "Well,

21  don't pay attention to that.  Don't include the fixed costs.

22  Get those expenses off there and then I'm making money."

23       Well, the bank is going to say, "Well, I'm not going

24  to ignore the fixed expenses.  Those fixed expenses are a cost

25  of doing business and you can't afford to repay my loan if I

```
 1   exclude those fixed expenses."
 2          I can assure you that Mr. McFarlane's tax return from
 3   his company deducts fixed expenses before he pays his taxes to
 4   the IRS.  I know that I do.  I know that everyone else deducts
 5   fixed expenses.  I know that the accountants for TSMC require
 6   under Generally Accepted Accounting Principles that fixed
 7   expenses be conducted.
 8          His example is a little like my son a couple years
 9   ago who was in college, came home and decided he was going to
10   run a lawn business and use my tractor to complete his lawn
11   business.  He worked all summer using my tractor.  I kept
12   saying to him, "Michael, I don't think your rate structure is
13   high enough."
14          And at the end of summer my son made a fairly good
15   profit and went back to college.  And next spring when I pulled
16   my tractor out and it wouldn't run, I had to go buy a new
17   tractor and I had no money with which to buy it because he
18   didn't include the replacement for fixed costs.
19          It's a cost of doing business and every company in
20   America is -- has that, and it's wrong.  It's got to be
21   included.
22   Q.   And if I direct you to Exhibit 5306, which is by your left
23   arm there, is that the information that records the fixed costs
24   of TSMC that were not included in Mr. McFarlane?
25   A.   It has both the fixed and variable costs, as it should,
```

1    yes.

2              MR. REINES:  Your Honor, I would move into admission

3    Exhibit 5306.

4              MR. GRINSTEIN:  No objection.

5              THE COURT:  5306 is admitted.

6              (Trial Exhibit 5306 received in evidence)

7    BY MR. REINES:

8    Q.    Now, we have talked about apportioning TSMC's profits.

9    Did you make an effort to attempt to apportion the profits?

10   A.    I did, yes.

11   Q.    And what methodology did you use when you attempted to

12   apportion the profits?

13   A.    I talked to the technical experts for TSMC about ways or

14   means in which to make the apportionment, and what the expert,

15   technical expert for TSMC told me was that one way in which to

16   view it would be to look at the overall chip service -- chip

17   service.  Sorry.  Can I get some water eventually?

18   Q.    Sure.

19   A.    The chip service.  So chip service is like real estate.

20   It's valuable property and that surface is finite.

21              So to try and get out any cost accounting

22   relationship, one way to look at it would be to divide up that

23   space between what amount of the space is used for the actual

24   intellectual property itself versus space that's used for other

25   logic processing algorithms, any other processing that's going

DEFENDANT'S EXHIBIT NO. 2576.047

```
 1   on on the chip itself.

 2           And he gave me a percentage, after looking at a

 3   sample of the chips that were actually -- the accused chips

 4   that were manufactured, and told me about 20 to 25 percent of

 5   the surface area of the chips that were manufactured involved

 6   the alleged intellectual property.

 7           MR. REINES:  Why don't we put the apportionment slide

 8   up there?

 9           (Document displayed)

10   Q.   You said 20 to 25 percent.  Did you use -- which number

11   did you use?

12   A.   I used the higher number to be more conservative and give

13   UniRAM the benefit of the doubt.

14   Q.   And what was the apportionment of accused profits?  What

15   was the numbers that you had for that?

16   A.   So it took the 78 million, which is the profit number

17   after deducting the fixed costs.  So take the profit number of

18   Mr. McFarlane's, deduct fixed costs, and you arrive at

19   78,595,270.

20           And then if we apportion it, that is putting the

21   25 percent portion of that profit, and the resulting unjust

22   enrichment number is $19,648,818.

23   Q.   And in terms of the licenses that you have seen with this

24   method of apportionment by surface area in the chip industry,

25   can you describe which licenses you have seen with that in it?
```

DEFENDANT'S EXHIBIT NO. 2576.048

1  A.    Sure.  I didn't just accept the TSMC's technical expert's

2  opinion as the only basis.  I looked further.  And, in fact, I

3  have looked at lots and lots of licenses, particularly in the

4  chip area, chip industry itself.  I have had other, many other

5  matters involving the semiconductor industry.

6          And what I found was two licenses that are actually

7  in Mr. McFarlane's report that adopt the surface area as being

8  an appropriate mechanism.  One was the --

9  Q.    Let me ask you:  Did UniRAM propose using the area of the

10 surface of a chip as the way to apportion profits in its

11 RegiRAM proposal?

12 A.    Well, they didn't oppose it in their proposal.  They --

13 Q.    Propose it.

14 A.    Propose it.

15 Q.    Yes.

16 A.    They did propose it early on as a way of structuring the

17 royalty rate in the RegiRAM.  That would be one.

18          There was another one.  I think it was Gatefield

19 versus Rohm, another license referred to by Mr. McFarlane which

20 actually had the surface area actually in the royalty rate

21 determination.

22 Q.    So there's two documents that show the royalty rate being

23 determined by surface area.  That's Trial Exhibit 5200 is the

24 RegiRAM proposal, and Trial Exhibit 580 is the Gatefield

25 license.

DEFENDANT'S EXHIBIT NO. 2576.049

```
 1              MR. REINES:  We would move those into evidence your

 2   Honor?

 3              MR. GRINSTEIN:  No objection your Honor.

 4              THE COURT:  Very well.  5200 and --

 5              MR. REINES:  5200 and 580.

 6              THE COURT:  580.

 7              (Trial Exhibits 5200, 580 received in evidence)

 8   BY MR. REINES:

 9   Q.   Okay.  Let's just wrap up and ask you:  If damages are

10   awarded in this matter, what do you believe should be the

11   reasonable royalty?

12   A.   I believe the reasonable royalty should be based on --

13   well, it is based on a reasonable royalty, excuse me, and the

14   damages then on the wafer royalties would be $2,359,781, and

15   30 percent of the NRE royalties is 211,665.  So applying the

16   licenses that are in -- supported by both Mr. McFarlane and

17   myself, the total damages are $2,571,446.

18              MR. REINES:  No further questions.

19              THE COURT:  Very well.  Mr. Grinstein, you may cross

20   examine.

21

22                       CROSS EXAMINATION

23   BY MR. GRINSTEIN:

24   Q.   Good morning.

25   A.   Good morning.
```

DEFENDANT'S EXHIBIT NO. 2576.050

1   Q.   It's Musika, right?

2   A.   Yes.

3   Q.   Let's talk about unjust enrichment first.

4        Now, you don't dispute the general methodology that

5   if unjust enrichment is calculable, then the damages in this

6   case are unjust enrichment, right?

7   A.   I think the words that I used are provable.

8   Q.   Let's use your words.  You don't dispute the general

9   methodology that if unjust enrichment is found to be provable

10  in this case, then the damages methodology for this case is

11  unjust enrichment and not reasonable royalty; you don't

12  disagree with that, right?

13  A.   If they are provable, it's a decision.  It's a legal

14  decision that's up to the Court.  So the Court would make that

15  decision, not myself.

16       But if I found that the damages -- an unjust

17  enrichment damage was provable, then I wouldn't have a problem

18  adopting that; but I think the ultimate decision as to whether

19  or not unjust enrichment is the final decision is a matter for

20  the Court.

21  Q.   Well, let's look at your demonstrative number three.

22       (Document displayed)

23  Q.   This is Mr. Musika's number three.

24       You are saying right here that the damages are there

25  left box, including unjust enrichment; if not provable, then

1   the damages are the right box?

2   A.   Yes.

3   Q.   Isn't that a fair characterization of your testimony?

4   A.   Yes, it is.

5   Q.   Okay.  Let's talk for a second about proving unjust

6   enrichment.

7          Now, there are specific parts in this case that are

8   being accused of using the trade secrets, right?

9   A.   Yes.

10  Q.   And, in fact, we all agree on what the sales revenues on

11  those parts are, $236 million, right?

12  A.   Approximately.  That's correct, yes.

13  Q.   Approximately $236 million.  There is some dispute between

14  you and Mr. McFarlane about what the expenses are on those

15  particular products right?

16  A.   A big dispute.  About $100 million dispute.

17  Q.   Presumably we can resolve that dispute, subtract whatever

18  the correct expenses are from the undisputed revenues and come

19  up with a profit figure for those accused parts.  That can be

20  done, right?

21  A.   Yes.

22  Q.   In fact, that's a pretty easy calculation, isn't it?  It's

23  simple subtraction?

24  A.   Yes.

25  Q.   So the point behind your analysis in this case was to

DEFENDANT'S EXHIBIT NO. 2576.052

1   introduce uncertainty into that simple calculation in order to

2   justify an argument that unjust enrichment is not provable;

3   isn't that right?

4   A.   No.

5   Q.   You said that Mr. McFarlane never said that unjust

6   enrichment was the proper measure of damages.  You testified to

7   that on your direct, correct?

8   A.   I don't think so.  Again, I think my testimony was that he

9   did not testify that it was provable.

10  Q.   You say that he did not testify that it was provable.  He

11  provided an unjust enrichment calculation, didn't he?

12  A.   Yes, but it wasn't a final calculation.  I think he agreed

13  to say that that was a starting point and that the result would

14  have to be something that he felt should be done by TSMC.

15  Q.   Were you shown any trial testimony from Mr. McFarlane by

16  TSMC's counsel where he said, "I don't believe unjust

17  enrichment is provable"?

18  A.   No.

19  Q.   Let's talk about your arguments as to why the simple

20  unjust enrichment calculation is not provable.

21          MR. GRINSTEIN:   And if I could see Mr. Musika's

22  demonstrative number seven, please?

23          (Document displayed)

24  Q.   This was the summary of your arguments as to why unjust

25  enrichment was not provable that you discussed with counsel for

1   TSMC on direct, right?

2   A.   Yes.

3   Q.   The first argument was that the alleged trade secret

4   combinations cannot be proved to be valuable, or UniRAM did not

5   prove them?

6   A.   Yes.

7   Q.   That was your first argument?

8   A.   Yes.

9   Q.   That's just your subjective view of what the evidence in

10  this case has been, isn't it?

11  A.   I think I cited -- I know I cited specific testimony from

12  UniRAM's experts, which support that.

13  Q.   Let's take a look at the testimony from UniRAM's expert

14  that you didn't cite.

15       MR. GRINSTEIN:   Can I have demonstrative 12?

16       (Document displayed)

17  Q.   This is Professor Sechen's testimony from the 14th.  You

18  reviewed the trial transcripts, didn't you?

19  A.   I have tried to, yes.

20  Q.   Professor Sechen was asked:

21       "QUESTION:  Would it have been practical to

22       construct an embedded DRAM device using a

23       standard logic process without using these

24       trade secrets?

25       "ANSWER:  No.

1    "QUESTION:  Why not?"

2    He gives a long answer, which we can all see.

3    "QUESTION:  Assuming for purposes of my

4    question that the UniRAM trade secrets appear

5    in the 1T products, if you strip those

6    secrets out of those products, would they be

7    of any practical use?

8    "ANSWER:  No."

9    Do you see that testimony?

10   A.   I do.

11   MR. GRINSTEIN:  Can I see demonstrative number 13?

12   (Document displayed)

13   Q.   There is another part of his testimony:

14   "QUESTION:  I want to talk to you first about

15   your opinion relating to technological value.

16   What, in your opinion, is the technological

17   importance of the UniRAM trade secrets to the

18   MoSys 1T products?"

19   Professor Sechen testifies:

20   "ANSWER:  Well, the UniRAM trade secrets are

21   the fundamental technology upon which the 1T

22   products are enabled."

23   Do you see that testimony?

24   A.   These are good examples between -- the distinction between

25   the technical experts and the damage experts.  The technical

DEFENDANT'S EXHIBIT NO. 2576.055

1  experts can help the damage experts or help the Court explain

2  its technological significance, which these two exhibits show.

3  It's the damage expert's responsibility then to place a value

4  on it.

5          And what these two slides are showing is that there

6  is no monetary value being placed on it.  It speaks to the

7  technological advantages, perhaps, but not an actual commercial

8  or an economic value.

9  Q.   My question actually was only whether or not you saw that

10 testimony.  I assume the answer is yes?

11 A.   Yes, I have.

12 Q.   What you are doing here essentially is just quibbling with

13 Professor Sechen's use of the word "technological value" versus

14 the term "commercial value," aren't you?

15 A.   I don't think there is a quibble at all.  He says

16 technological importance, and that's his role, and I absolutely

17 understand it.

18 Q.   If a product is of no practical use without the trade

19 secrets, as Professor Sechen testifies in that demonstrative,

20 that pretty much means that it has no commercial value, too,

21 doesn't it?  Isn't that fair?

22 A.   It's not an on or off situation.  It's not, it has value,

23 it doesn't have value.

24         The difficult job that the damage experts have are

25 what is the value?  Not, is there value, is there not value;

```
 1   but what is the precise value?

 2            And that's where I think Mr. McFarlane and the unjust

 3   enrichment gets into a lot of trouble, is simply holding up

 4   total profits and saying, total profits are attributable to the

 5   trade secrets.

 6            I grant you it's a difficult job converting a portion

 7   of a product's value to a particular trade secret.  And that's

 8   where it highlights the problem with Mr. McFarlane's not

 9   breaking down the value into the individual trade secrets,

10   because it's very possible that not all 12 trade secrets are

11   valued or misappropriated, and we don't have a value for those

12   individual trade secrets.

13   Q.   Are you finished with your answer?

14   A.   Yes.

15   Q.   Can you answer the question that I asked you, which is:

16   If a product has no practical use without the trade secrets,

17   it's pretty fair to say that it has no commercial value; isn't

18   that fair?

19   A.   No.

20   Q.   Okay.  So if I were to hand you some products -- if I were

21   to give you a computer that has no practical use, you pay me a

22   bunch of money for it because you think it has commercial

23   value, is that what you are saying?

24   A.   If I was able to put another alternative part in and make

25   it operate, maybe not operate as well.  The difference between
```

1   the two, operating quicker or operating with less failures,

2   then that's the measure of the damage.  It's how much better it

3   operates versus with it or without it.

4            I don't think that -- or I know that there are no

5   technical experts that are saying there couldn't have been a

6   chip that would have operated without the trade secrets.  They

7   may not have operated as well.  They may have taken up more

8   space.  They may not have operated as efficiently, but not that

9   they could not operate.

10  Q.   Seems to me that that paragraph right there says just

11  that.

12  A.   Those --

13  Q.   Let me ask the questions, please.

14  A.   Sorry.

15  Q.   If you take the trade secrets out of the embedded DRAM

16  device using a standard logic process, you are no longer left

17  with an embedded DRAM device using a standard logic process.

18  You have got an embedded SRAM or an embedded DRAM with an

19  embedded SRAM practice.  Isn't is that what Professor Sechen is

20  saying?

21  A.   Those are alternatives.  That's my point.  Those are

22  technological alternatives, and it's the delta between that and

23  the presumed benefits of the trade secrets.

24            MR. GRINSTEIN:  Can we go back to Mr. Musika's

25  demonstrative number seven?

```
 1              (Document displayed)
 2    Q.   The next two arguments you make for why unjust enrichment
 3    can't be proven are the value of the alleged trade secrets
 4    combinations and the portion of TSMC's revenues attributable to
 5    alleged trade secret combinations.
 6              Do you see both of those?
 7    A.   I do.
 8    Q.   So basically right here you are saying that UniRAM's
 9    unjust enrichment is not provable because UniRAM did not
10    apportion the trade secrets among the various trade secrets and
11    among the value presented by others.  Is that essentially what
12    you were saying?
13    A.   Yes.
14    Q.   And, in fact, you have an entire section of your expert
15    report where you discuss this whole apportionment idea, right?
16    A.   Yes.
17    Q.   And from that particular section you criticize
18    Mr. McFarlane for not performing an apportionment, correct?
19    A.   I don't recall if it's a criticism or not, but he didn't
20    do it.
21    Q.   You -- you cite his failure to perform an apportionment as
22    a defect in his analysis; is that fair?
23    A.   I don't -- I don't recall.
24    Q.   Okay.  Well, you have got your report up there.  I think
25    it's one of the tabs in the defendant's book there.
```

1       Would you like another copy?  I can provide it to

2  you.

3  A.   I have it here.  That's fine.

4  Q.   Okay.  On Page 13 of your report, you have got an entire

5  section that's labeled:  "Mr. McFarlane fails to ascertain what

6  portions."  Do you see that that?

7  A.   Yes.

8  Q.   Does that refresh your recollection?

9  A.   I was only saying -- I don't know whether I'm saying it's

10 a criticism of Mr. McFarlane or not.  He didn't do it, and I

11 think it should be done.  If we want to call that a criticism,

12 yes.

13 Q.   Just so we are clear, during the relevant period, the

14 sales -- TSMC's sales from about 2000, 2007 were roughly

15 $40 billion; you know that, correct?

16 A.   Which sales are you talking about?

17 Q.   All goods, all services, TSMC as a whole.

18 A.   Now, we are really getting way out there.  Nobody is

19 suggesting that those are relevant sales.

20 Q.   That's actually the question I was about to ask you.

21 A.   Okay.

22 Q.   Mr. McFarlane has only been focusing on the $236 million

23 worth of sales of the accused products, correct?

24 A.   That's my understanding, yes.

25 Q.   So -- and you have criticized his analysis for not

1   dividing up his $1,085,000 in unjust enrichment profits based

2   upon the value that other people contributed to those profits;

3   is that fair?

4   A.   As well as failing to deduct fixed expenses as well, yes.

5   Q.   But you understand, do you not, that it was your burden,

6   not his, to apportion the profits; isn't that right?

7   A.   No, that's not what I understand.

8   Q.   Okay.  Well, in your expert report you rely on a

9   publication put out by the AICPA, the American Institute of

10  Certified Public Accountants.  Are you aware of that

11  publication?

12  A.   Yes, I am.

13  Q.   Let me show that to you.

14          MR. GRINSTEIN:  If I may approach the witness, your

15  Honor?

16          THE COURT:  You may.

17          (Whereupon, document was tendered

18           to the witness.)

19  BY MR. GRINSTEIN:

20  Q.   Does that look like the document that you relied upon in

21  preparing your report?

22  A.   Yes, it is.

23  Q.   And you quote that document in several instances in your

24  report, correct?

25  A.   Yes.

1  Q.   In fact, you quote it on the issue of apportionment,

2  right?

3  A.   I might.  I don't remember, but that's fine.

4  Q.   That document, in fact, recognizes that it is your burden,

5  as the representative of the defendant on damages, to apportion

6  unjust enrichment profits, doesn't it?

7  A.   You will point me to the section.  My recollection is that

8  that is a legal conclusion and that my layman's understanding

9  of the law, that that is generally argued and successfully

10  argued that it is the plaintiff's burden.

11          But that's a legal conclusion and I don't know that

12  it's -- it's true in every particular case.

13  Q.   You quoted from -- first of all, you are not a lawyer,

14  correct?

15  A.   I am note.

16  Q.   And so the expert report that you prepared was not a legal

17  brief or a legal document, correct?

18  A.   It is not.

19  Q.   You quoted from that AICPA guide on the issue of

20  apportionment in your expert report, didn't you?

21  A.   Yes.

22          MR. GRINSTEIN:  Can I see Mr. Musika's report at page

23  16.

24          (Document displayed)

25          MR. REINES:  Your Honor, this is not in evidence and

1    so I object to it being shown you.

2             THE COURT:  This is from the report?

3             MR. GRINSTEIN:  From the report of the expert, your

4    Honor.

5             THE COURT:  Mr. Grinstein, we have been through this

6    before.  You know, if you didn't know before this trial you

7    certainly should have known after.

8             MR. GRINSTEIN:  Yes, your Honor.  Misunderstood.

9    Take it down.

10   BY MR. GRINSTEIN:

11   Q.   You did contain a quote from the AICPA guide in your

12   report at page 16, correct?

13   A.   Yes, I do.

14   Q.   The first word of the quote starts with the word "the,"

15   and the last word of the word quote starts with the word

16   "awarded," correct?

17            And you are quoting Section 2.4.6.2 of the AICPA

18   guide, correct?

19   A.   Yes, I am.

20   Q.   If you flip to page 65 of the AICPA guide -- are you with

21   me?

22   A.   I am.

23   Q.   That's Section 2.4.6.2, correct?

24   A.   Yes, it is.

25   Q.   The very next sentence of that particular guide you did

1  not quote in your report, correct?

2  A.    The very next --

3  Q.    The very next sentence after the word "awarded," where you

4  completed your quote, the very next sentence you didn't quote;

5  correct?

6  A.    Just a second.  Let me check.

7         (Document displayed)

8  A.    That's a new paragraph, you mean?  The new paragraph?

9  Q.    Yes.

10  A.    Okay.

11  Q.    The first sentence of that new paragraph you did not

12  quote, correct?

13  A.    That's correct.

14  Q.    That next sentence didn't inform your conclusions about

15  whether or not it was your burden or the plaintiff's burden to

16  apportion damages?

17  A.    Again, I'm not making a legal conclusion.  I'm not saying

18  that it is the plaintiff or the defendant's burden.  That's a

19  legal determination.

20         I am speaking from the standpoint of a financial

21  expert and in that paragraph you are referring to it says,

22  "Plaintiff may rebut the testimony of the defendant on this

23  issue."

24         In all the cases I have been involved with, I, as the

25  plaintiff, would go ahead and make the apportionment as well.

1       I'm not making a legal determination.  I'm not

2  criticizing Mr. McFarlane on the basis of legal.

3       As a matter of accounting or financial reporting, the

4  apportionment is something that's going to be made and I think

5  has to be made according to this guide.  I'm not talking about

6  who should make it.

7  Q.  You have cited this guide not because it was a legal text,

8  but because it informed your damages opinion, correct?

9  A.  Yes.

10 Q.  You just quoted a sentence from the middle of that

11 paragraph.  Why don't you quote the first sentence that follows

12 that paragraph, starting with the word similar.  Can you read

13 that to us?

14 A.  Sure.  I didn't quote it from the middle, to be correct.

15 It's the last sentence.

16 Q.  I'm sorry.  Can you read the first sentence starting with

17 the word "similar"?

18 A.  I will just read the paragraph.

19       "Similar to the issue of proving deductible

20       costs, it is an unjust enrichment" -- I'm

21       sorry.  I'm going to start that again.

22       Sorry.

23       "Similar to the issue of proving deductible

24       costs, in an unjust enrichment claim it is

25       the defendant's responsibility to prove the

```
 1              deduction from the sales to adjust for the

 2              apportionment of profits to the various

 3              assets that contribute to the sale of an

 4              infringing item.  Plaintiff may rebut the

 5              testimony of defendant on this issue."

 6  Q.    Now -- I'm done with that guide, so you can put it away,

 7  if you like.

 8  A.    Okay.

 9  Q.    You attempted one portion -- one method of apportionment

10  in your report, is that correct?

11  A.    I completed one.

12  Q.    Did you find that that method of apportionment produced a

13  valid or an invalid answer?

14  A.    I believe it's a valid answer based on the use of that by

15  UniRAM themselves and other participants in the industry.

16  Q.    So if it resulted in a valid answer and you found that you

17  completed a reasonable and appropriate apportionment analysis,

18  then unjust enrichment is awardable because apportionment can

19  be done; isn't that right?

20  A.    No.  That's not the only deficiency, as I have stated.

21  There are other deficiencies as well.

22  Q.    I'm only talking about the deficiencies you cited with

23  respect to apportionment.

24              If you successfully apportioned, that would seem to

25  suggest that unjust enrichment is, in fact, provable because
```

1  under your analysis apportionment can be done?

2  A.   No.   That's one of the missing elements.   It's not

3  provable simply because one of the elements, apportionment, has

4  been accomplished.   There are other elements as well.   For

5  example, the issue of apportioning it between the individual

6  trade secrets.

7  Q.   Well, why did you mention an element that you say prevents

8  unjust enrichment from being provable if that one element of

9  three isn't, in fact, a valid argument for why it's not

10 provable?

11 A.   I didn't understand that question.

12 Q.   I will strike that and we will move on.

13        Now, the approach that you followed was an approach

14 that focuses on the size of the memory array in the chip, the

15 relative 20 to 25 percent that it takes up in the chip, right?

16 A.   Yes.

17 Q.   That's sometimes referred to as a volume-based approach to

18 apportionment?

19 A.   Yes.

20 Q.   You understand, of course, that one of the key features of

21 the trade secrets in this case was the ability of the trade

22 secrets to shrink down the memory portion of one of these

23 systems-on-a-chip, isn't that right?

24 A.   Yes.

25 Q.   So essentially what you are saying is that the better that

1   the trade secrets worked in shrinking the memory, the less

2   value the trade secrets would have because their size on the

3   chip would keep getting smaller and smaller and smaller?

4   A.   No.  That's not what I'm saying.

5   Q.   There are other ways of apportioning that you did not

6   attempt, aren't there?

7   A.   There could be.  I'm not aware of any.  I could explore

8   other ways, yes.

9   Q.   In fact, that AICPA guide talks about some other ways of

10  apportionment, doesn't it?

11  A.   It talks about a cost-based approach, yes.

12  Q.   So one way you could have apportioned is to look at the

13  relative costs of the various inputs into the 1T-SRAM chips,

14  right?

15  A.   That could be a way, yes.

16  Q.   You didn't do that, right?

17  A.   No, I didn't.

18  Q.   Another way of apportioning could be to look at a

19  comparable product that doesn't have the 1T-SRAM macro in it,

20  say an embedded SRAM -- I'm sorry, an SRAM chip or a

21  traditional embedded DRAM chip, and compare the prices on those

22  two and attempt to apportion that way?

23  A.   I would think that's impossible in this case because the

24  chip design is so unique and there are so many functions that

25  are included or excluded, getting a relative comparison that

1    would isolate simply the claimed technology would be near

2    impossible.

3    Q.   You didn't do that in this case, right?

4    A.   I think it's inappropriate.

5    Q.   Is that a no?

6    A.   Absolutely.

7    Q.   Another way of apportioning, you could have done a

8    customer survey and asked the customers for these chips which

9    of the various features of the manufacturing technologies, of

10   the logic, of the memory they thought were important.  You

11   could have ranked them, and you could have apportioned that

12   way, right?

13   A.   It's possible.  That would be approach that's possible.

14   I don't know whether it would produce a result that would be

15   acceptable, but that is an approach that could you pursue, yes.

16   Q.   But you didn't do that either?

17   A.   No.

18   Q.   Okay.  Let's talk about the idea of an unjust enrichment.

19        You criticize Mr. McFarlane for not including fixed

20   costs in his unjust enrichment expenses.  Was that your

21   testimony on direct?

22   A.   Yes, it is.

23   Q.   The point behind unjust enrichment is to determine what

24   are the incremental profits that the defendant earned using the

25   plaintiff's trade secrets; isn't that fair?

1    A.    No.

2    Q.    So it's your testimony that -- well, why don't you tell me

3    what your understanding is of what you are trying to measure in

4    an unjust enrichment calculation?

5    A.    The benefits that have been earned or received by the

6    defendants as a consequence or as a result of the use of the

7    trade secret.

8    Q.    And, of course, you would measure the benefits earned by

9    comparing a situation in which the defendant didn't earn those

10   benefits to a situation in which it did, and the change between

11   those would equal the unjust enrichment; isn't that fair?

12   A.    No.  That's not what I would do and that's not what I did

13   do.

14   Q.    So if the defendant earns $50 using the trade secrets and,

15   otherwise, it would only have earned $40 in its normal course

16   of business, you wouldn't say that the unjust enrichment is

17   $10?

18   A.    That's not what I did, and that's not what Mr. McFarlane

19   did either.  I don't think anybody analyzed the what-if

20   scenario, which is what you are proposing as a hypothetical.

21   What if these weren't available, what would TSMC have done in

22   the alternative?

23         You have set up a very interesting hypothetical.

24   They could have gone out and made more money.  I don't think

25   that anybody has analyzed that.

1       So, in theory, if they didn't have that technology,

2   they may have been forced to develop it themselves.  They may

3   have gone out and sought alternative technology.  That's a

4   hypothetical that has been neither explored by me or Mr.

5   McFarlane.

6   Q.   How did TSMC's use of the trade secrets, if we are

7   assuming liability that he used them, how did that increase

8   TSMC's rent?

9   A.   Can I have that question again?  I'm sorry.

10  Q.   Sure.  Assuming that TSMC used UniRAM's trade secrets, how

11  did that increase TSMC's rent?

12  A.   That last word?  Your voice is trailing off.

13  Q.   Rent, R-E-N-T.

14  A.   Increase their rent?  I don't know what you -- I don't

15  understand your question.

16  Q.   You included a rent expense as one of the many expenses in

17  your fixed costs that you charged against the $236 million in

18  revenues, right?

19  A.   Yes.

20  Q.   So tell me how the use by TSMC of the trade secrets

21  increased TSMC's rent?

22  A.   In cost accounting there are linear relationships, which a

23  dollar of revenue pulls a dollar of expense or 50 cents of

24  expense with it.  So there is an even linear relationship, and

25  then there are step functions.

DEFENDANT'S EXHIBIT NO. 2576.071

1    We all wish we were in a business which our costs

2    were all variable and we could identify them all, but that's

3    not true.  We have got -- you have got to rent space for your

4    law firm, and a fabrication company has to go out hundreds of

5    millions of dollars to build this facility.  The only way they

6    can get that facility paid for is to include the cost of that

7    facility or the cost of renting that facility in the rates.

8    So the fact that it is fixed in this step function,

9    it's good for a period of time or it's flat for a period of

10   time and then when they run out of capacity, it has to be

11   stepped up again, that doesn't mean it's not a real cost or

12   that's not a cost that doesn't have to be recouped from the

13   revenue.

14   So it's not that it increased it.  It will at some

15   point, because there are so many chips made that the factory

16   that they have is obsolete or not large enough, but it's the

17   fact that you constantly have to recoup the cost of your rent

18   or your facility through your charges in order to be able to

19   stay in business.

20   **Q.**   But if TSMC had not manufactured these products using the

21   UniRAM trade secrets, it still would have had to pay that same

22   amount of rent, wouldn't it?

23   **A.**   From somebody else.  They would make somebody else's

24   chips.

25   **Q.**   You haven't tried to prove that up, have you?

1    A.    That's exactly my point.  Nobody has looked at the

2    what-if.

3    Q.    So you are essentially saying that in the state of the

4    world in which TSMC did not employ UniRAM's trade secrets,

5    fixed costs would still be the same as if they did use UniRAM's

6    trade secrets, right?

7    A.    Fixed costs are there.  They are the cost of doing

8    business and they have to be recouped from either the sale of

9    the accused products or some other product.

10   Q.    Okay.  Do you ever do lost profits analyses for

11   plaintiffs?

12   A.    Yes.

13   Q.    You have performed those analyses before?

14   A.    I have.

15   Q.    When you do those analyses and you try to figure out the

16   incremental profits that have been lost by a plaintiff, you

17   allocate fixed costs back to those profits?

18   A.    No.

19   Q.    So when you are performing a lost profits analysts for a

20   plaintiff to try to figure out how much additional profits a

21   plaintiff would have earned in a particular situation, you

22   don't allocate fixed costs to that plaintiff's profits, but

23   when the situation is in the reverse and you are trying to

24   deduct profits from a defendant, then you do allocate those

25   fixed costs; is that how you do it?

1   A.   No.   It doesn't matter if I'm on the plaintiff's or

2   defendant's side.   When I'm calculating lost profits in

3   connection with a patent case, the lost profits by law are

4   incremental profits.   And it doesn't matter if I'm calculating

5   the lost profits from the defendant's side or the plaintiff's

6   side, it's still going to be incremental profits.

7           And that's -- the reason incremental profits are used

8   as a standard in the patent law -- and I'm not giving a legal

9   opinion.   It's just economic, but the reason is is there is a

10  very high standard.

11          What plaintiffs have to show in order to qualify for

12  that incremental profit is, they need to show that they meet a

13  certain test.   They need to show there is a demand for the

14  product.   They need to show that they have sufficient marketing

15  capacity.   They need to show and demonstrate that they have

16  significant manufacturing capacity.   They need to prove that

17  there are no non-infringing alternatives.   And when you have

18  proven those four tests, which are sometimes referred to as the

19  Panduit case, from the Panduit case, then, and only then, would

20  you get the incremental profits.

21          I'm not going to take up the Court's time to explain

22  the economic basis, but that's a very severe economic test,

23  which then sets up the ability to get an incremental profit

24  without the operating cost because you basically have proven

25  that you are entitled to that.

DEFENDANT'S EXHIBIT NO. 2576.074

1              None of that analysis is relevant here and none of

2    that analysis has been done here or is required to be done

3    under the law for an unjust enrichment calculation.

4    Q.    Now, you have testified how many times?  I think you said

5    that on your direct.  I forgot.

6    A.    In trial or?

7    Q.    Trial, yeah.

8    A.    75, I suppose.

9    Q.    Probably prepared hundreds of damages analyses, correct?

10   A.    Yes.

11   Q.    You are aware that Mr. McFarlane's approach to unjust

12   enrichment of looking at the incremental expenses and not the

13   fixed expenses is a widely used and widely practiced take on

14   unjust enrichment; you are aware of that, aren't you?

15   A.    I'm not aware of that in my -- I will quibble here with

16   you, is that your use of the word "widely" -- not wildly,

17   widely -- I suppose, it is used sometimes.

18              But as an accountant, as a CPA, for reasons I have

19   stated and won't go through again, I think it's not the

20   appropriate financial conclusion.

21   Q.    That AICPA guide right in front of you there, your

22   testimony is that it doesn't acknowledge that that's a widely

23   used and widely practiced approach?

24   A.    I don't know if it uses the word widely.  I think my

25   recollection of what it says is that you could do it either

1   way, and that the Courts have been split as to the way you do

2   it.

3          I'm giving you my expert opinion as an accountant.

4   I wouldn't allow any of my businesses to conduct their business

5   without something a rate structure that includes fixed costs.

6          That's like the -- the accounting joke, in Accounting

7   101, is that we are losing money at the variable cost line, but

8   we are going to make it up in volume.  Of course, all you are

9   doing is getting further and further behind.

10         Most of the mass transit systems in this country are

11  in that difficult position because they can't generate enough

12  marginal income at the variable cost, variable revenue line, to

13  recoup the maintenance and the infrastructure replacement.

14         It's an ordinary and necessary cost of doing

15  business.  Wall Street needs it.  SEC requires it.  GAAP

16  requires it.  IRS uses it.  That's my basis.

17  Q.   Are you finished with your answer?

18  A.   Okay.

19  Q.   Let's move on to the royalty rate analysis.

20         MR. GRINSTEIN:   Can I see Mr. Musika's slide number

21  14?

22         (Document displayed)

23  Q.   Slide number 14 lists the three licenses that you thought

24  were most relevant to the licensing situation here, correct?

25  A.   Yes.

1   Q.   And just so we are clear, these bottom two licenses don't

2   relate to embedded memory designs in a standard logic process,

3   is that correct?

4   A.   Yes.

5   Q.   The top license, this MoSys/TSMC license, is a 2001

6   license, correct?

7   A.   I think that's correct, yes.

8   Q.   Generally speaking, when we do hypothetical negotiation

9   exercises, it's considered that, all other things being equal,

10  licenses that are closer in time to the date of the

11  hypothetical negotiation are more relevant than licenses that

12  are further away; is that fair?

13  A.   I will agree with that, yes.

14  Q.   And the hypothetical negotiation in this case, both you

15  and Mr. McFarlane agreed, occurred sometime between 1996 and

16  1998; is that right?

17  A.   Yes.

18  Q.   There is another TSMC/MoSys license from 1999 that you

19  have not included on this chart, isn't that right?

20  A.   I don't recall the license.  Sorry.

21  Q.   Well, let's take a look at it.  It's Exhibit 5161.

22  A.   Is it in this book?

23  Q.   No.  I'm going to hand it to you.

24        MR. GRINSTEIN:  May I approach, your Honor?

25        THE COURT:  Very well.

1              (Whereupon, document was tendered

2              to the witness.)

3    BY MR. GRINSTEIN:

4    Q.   Exhibit 5161 before you is the 1999 MoSys TSMC development

5    and promotion agreement.  Do you see that?

6    A.   Yes.

7    Q.   You have, in fact, seen this license before, correct?

8    A.   I believe so, yes.

9    Q.   In fact, you reference in it your expert report, correct?

10   A.   Yes.

11           MR. GRINSTEIN:  Move to admit 5161.

12           MR. REINES:  No objection, your Honor.

13           THE COURT:  5161 is admitted.

14           (Trial Exhibit 5161 received in evidence)

15   BY MR. GRINSTEIN:

16   Q.   If you flip to the second page of 5161?

17   A.   Yes.

18   Q.   Under Section 3.2, there is a discussion there of a

19   license fee of 5 percent.  Do you see that?

20   A.   Yes.

21   Q.   5 percent on wafer sales.  Do you see that?

22   A.   I do.

23   Q.   And that's in a 1999 agreement closer to the date of the

24   hypothetical negotiation than the other agreements that you

25   looked at, correct?

1   A.   The date is closer, yes.

2   Q.   But you didn't include this particular license on your

3   chart in demonstrative 14?

4   A.   No.

5   Q.   We agreed on that, right?

6   A.   Correct.

7   Q.   This particular license didn't grant any patent rights,

8   did it?

9   A.   I was just looking to see.  I don't remember.  I'd have to

10  look.

11       (Brief pause.)

12  A.   I don't see any reference to patents, no.

13  Q.   That -- at that time in that license in 1999, that's

14  pretty early on in the commercialization stage of the 1T-SRAM

15  embedded memory designs in a standard logic process; would you

16  agree with that, right?

17  A.   Yes.

18  Q.   And that particular license doesn't grant TSMC any rights

19  to offer design services in competition with MoSys, does it?

20  A.   No.

21  Q.   Okay.  And the agreement in front of you certainly doesn't

22  grant TSMC the right to disclose MoSys's trade secrets to any

23  MoSys competitors, is that fair?

24  A.   Yes.

25  Q.   Presumably if the license did grant TSMC that right, MoSys

1    probably would have asked for more money, don't you think?

2    A.    I don't know that.

3    Q.    If the license did give up MoSys's rights to do its own

4    design services to TSMC, presumably MoSys would have asked for

5    some more money, don't you think?

6    A.    I don't know.

7    Q.    If that license gave up patent rights to TSMC and gave a

8    license on those patent rights, presumably MoSys would have

9    asked for even more money; isn't that fair?

10   A.    All things being equal, yes.

11   Q.    Now, Mr. McFarlane's $19 million reasonable royalty

12   number, you can calculate out what the effective royalty on

13   that is compared to the larger $236 million TSMC royalty base,

14   right?

15   A.    No.

16   Q.    Well, $19 million -- if you wanted to say what is

17   $19 million as a percentage of the $236 million base, you could

18   easily do that calculation, right?

19   A.    You can calculate that, yes.

20   Q.    It's about eight percent, isn't it?

21   A.    It sounds right, yes.

22   Q.    Eight percent isn't really all that far off from

23   5 percent, especially considering all the factors we just

24   mentioned which depressed the price of that 5 percent; isn't

25   that right?

1  A.   No.   I'm sure you'd take great exception with me if I told

2  you that 1 percent is not far off from 4 percent.

3         I haven't had a chance to look at this license and

4  determine, again, whether and to what extent NRE fees are

5  included in here and what rights.   I just don't know.   I would

6  have to look at the license.

7  Q.   You did cite that license and rely on it in your expert

8  report, didn't you?

9  A.   I did, yes.

10 Q.   I just want to do another brief set of questions with you

11 about some calculations and then we will be close to done,

12 okay?

13 A.   Sure.

14        MR. GRINSTEIN:   I would like to see Mr. Musika's

15 demonstrative number 21.

16        (Document displayed)

17 Q.   This is a demonstrative that your counsel provided last

18 night, but you actually didn't discuss it on direct; isn't that

19 right?

20 A.   Yes.

21 Q.   But you prepared this demonstrative, didn't you?

22 A.   I did.

23 Q.   And do you dispute anything in it?

24 A.   No.

25 Q.   This was part of your analysis that you did to try to

1  confirm the reasonableness of your 1 percent royalty because

2  you calculated out and found an effective royalty rate of

3  .9 percent?

4  A.    Yes.    That was one of the things I did, as you say, to

5  show the reasonableness of the 1 percent, yes.

6  Q.    That's an analysis that's in your report, right?

7  A.    Yes.

8  Q.    The up-front license fee of 1.6 million, that's in the

9  2001 MoSys/TSMC agreement, right?

10  A.    Yes.

11  Q.    In fact, that's what this whole chart is discussing, is

12  the effective royalty rate on that agreement, correct?

13  A.    That's correct.

14  Q.    Second line, royalties on wafer sales.    The royalties on

15  wafer sales in that 2001 agreement were 2.9 percent, right?

16  A.    Yes.    They started off at 4 and then reduced to 2.9, yes.

17  Q.    NRE fees.    The royalties on NRE fees in that particular

18  agreement were 30 percent, right?

19  A.    Yes.

20  Q.    I'm just confused about your math.    If there are two

21  royalties in the agreements, one is for 30 percent and one is

22  for 2.9 percent, how on earth can the effective royalty rate of

23  that agreement be .9 percent?

24  A.    I don't know why or how you are confused.    If you take

25  30 percent times this -- the approximate 700,000, you get

1   $360,000 there.

2           If you add up all the consideration of that license,

3   so they paid $360,000 in connection with their sharing of the

4   NRE fees.  They paid 270,000 on the royalties and wafer sales.

5   They paid a 1.6 million then up front.  That's a total

6   consideration of $2.2 million.  $2.2 million over the

7   235 million calculates to a .9 percent.

8   Q.   But if the royalty rate -- if one royalty rate was

9   30 percent, the only other royalty rate was 2.9 percent, and

10  then on top of that there was a $1.6 million sweetener, how

11  could you have two royalties up here and the effective average

12  royalty be down here (indicating)?  I don't understand.

13  A.   I don't understand why you don't understand, but I will

14  try it again.

15          Is you can't take 30 percent times a very low number

16  and say, "Why isn't my final result much bigger?"  Because you

17  have components of the license.  You have got a component that

18  deals with the chip sales and you have got a component that

19  deals with NRE fees.

20          If the NRE fees are in total only $700,000, even if

21  it was 50 percent or 60 percent, that's a large percentage, but

22  it's going to contribute very little since the NRE fees are

23  very little.

24  Q.   Mr. Musika, we agree that the royalties on wafer sales are

25  2.9 percent, right?

1   A.   Yes.

2   Q.   2.9 percent of 235 million is not $270,000, is it?

3   A.   No it's not.

4   Q.   So how on earth is it proper to compare all of this money

5   to the $235 million if it's plain that these numbers are being

6   calculated off of some different royalty base?

7   A.   The royalty base that's at issue here, the royalty base

8   that should be used, which is the benefit, the total benefit --

9   when Mr. McFarlane starts his calculation, he starts his

10  analysis, he says it should be on the -- the benefits that the

11  defendant received, not MoSys.

12          So the total amount that was paid was -- was -- I'm

13  sorry.  The total amount that was paid to MoSys was

14  $2.2 million.  The total amount that was earned here from the

15  defendants is the $235 million.

16          So to look at the amount that was paid under the

17  MoSys license agreement and put it over the defendant's value

18  shows that based on the technology that was used by TSMC under

19  the MoSys license they had to pay $2.2 million.

20          The total revenue that they earned in connection with

21  the claimed accused products is $235 million.

22          So the math works out.  2.2 million, which was the

23  consideration they pay in connection with MoSys over the

24  accused revenue, the defendant's revenue, is .9 percent.

25  Q.   Where is that defendant's revenue coming from?

1    A.    It's coming from all of the sales of the chips that are

2    accused.

3    Q.    So if it's coming from all of the sales of the chips that

4    are accused, and if MoSys is getting a 2.9 percent royalty on

5    all of the sales of the chips that are accused, where do you

6    get $270,000?

7    A.    The $270,000 is what TSMC paid to MoSys under their

8    agreement.  If you block that top amount there, that's the

9    consideration that TSMC paid to MoSys.

10          The $235 million is what benefit TSMC, the defendant,

11   receives for the alleged use of the intellectual property.

12   Q.    Let me try to go at this a different way.

13          TSMC sent a check, or series of checks, to MoSys for

14   $270,000 to comply with the 2.9 percent part of that agreement,

15   right?

16   A.    Right, right.

17   Q.    How did they calculate $270,000?  Where did that number

18   come from?

19   A.    Where did the $270,000 number come from?  I think it comes

20   from a royalty reporting by MoSys.

21   Q.    But if the agreement said we will pay you 2.9 percent of

22   all chip sales, and they got paid 270 million -- 270,000,

23   excuse me, you can do some simple math to figure out what the

24   chip sales were that they were being paid off of, can't you?

25   A.    Yes.  And it was less than -- one again, I'm going back to

1  what the defendant's alleged benefit is, not to what TSMC paid

2  in terms of a royalty base to MoSys.

3  Q.    But you are calculating here what the effective royalty is

4  under the 2001 MoSys/TSMC agreement, aren't you?

5  A.    I'm calculating what the effective royalty rate would be

6  on the benefit received, the 235 million, based on what TSMC

7  actually paid to MoSys.   The consideration given, 2.2, over the

8  benefit received, 235 million, is .9 percent.

9  Q.    If we do some simple math and divide 270,000 by .029 --

10  no, that's not the simple math.

11          (Laughter.)

12  Q.    Simple math on the fly.   High school algebra would say

13  some number X times 2.9 percent equals 270,000, right?

14  A.    That's a formula, yes.

15  Q.    So dividing the 270,000 by the 2.9 percent will yield you

16  about $9 million in revenues, won't it, 9.3?

17  A.    Your calculator couldn't do it, so I'm not going to

18  attempt to do it in my head, but it sounds about right.

19  Q.    I just did it again.   Do you want to try?

20  A.    No.

21  Q.    270,000 divided by .029 gets you 9,300,000, does that

22  sound fair?

23  A.    I says it is sounds about right.

24  Q.    So if MoSys and TSMC lived by their agreement and TSMC

25  actually paid 2.9 percent of its revenues to MoSys, then the

1    revenues that it was paying off of was a revenue base of

2    9.3 million?

3    A.   Based on the royalty reporting, that's right.

4    Q.   Okay.  So when you compare the $2 million in payments that

5    have been received by MoSys under that 2001 license agreement

6    and you put that as the numerator of your equation to come up

7    with the effective royalty rate, what you should be putting in

8    the denominator is not the 236 million of total sales, but the

9    $10 million of total sales, or $9.3 million of total sales,

10   that actually generated the numbers up at the top of your

11   chart; isn't that right?

12   A.   No, no.  Because what you -- and I will go along with

13   your -- the point you are making, which is to say, shouldn't we

14   just use 2.9 percent as the rate.

15   Q.   That's not the point I'm making.

16   A.   Well, I think that's what you are saying, is to say that

17   the amount should calculate out.  If we take the base that you

18   have calculated, it's going to come back to a 2.9 percent rate.

19            And so you are just saying, why should you reduce the

20   rate by putting it over this base (indicating)?  And I'm saying

21   the reason -- I'm not trying to mislead anyone.

22            The reason I'm using this base is because that's what

23   economic benefit the defendants have received, the 235 million.

24   They have paid $2.2 million.  You may consider it not enough,

25   but the fact is is that what's been reported is that they have

1    paid to MoSys 2.2.  That's all I'm doing, is calculating how

2    much did they pay over the benefit they received.  And that's

3    currently .9 percent.

4    Q.    And I interrupted your answer, and I apologize about that.

5    I will try not to do that again.

6              THE COURT:  How many longer do you have?

7              MR. GRINSTEIN:  Probably about ten minutes, your

8    Honor.

9              THE COURT:  Okay.  Let's move it along.

10   BY MR. GRINSTEIN:

11   Q.    The fact of the matter is, is that you don't have a clear

12   understanding of what the royalty base for the 2001 MoSys/TSMC

13   agreement really is, do you?

14   A.    I only know what was reported in the royalty reports.

15   Q.    I think you have in front of you Exhibit 164, is that

16   right?

17   A.    Which one is it?

18   Q.    In your book there is an Exhibit 164 admitted.

19   A.    I don't think -- I don't think -- oh, yes I do.  Sorry.

20   Yes.

21   Q.    This is the 2001 license agreement which was subsequently

22   amended to change the compensation terms, but this is the base

23   agreement, right?

24   A.    Yes.

25             MR. GRINSTEIN:  Can we see Exhibit 164?  Great.

1       (Document displayed)

2   Q.   Turn to Page 2.1 -- I'm sorry, Section 2.1, Page 3.

3   A.   Yes.

4   Q.   There is a discussion there of the license grants.  Do you

5   see that?

6   A.   Yes.

7   Q.   The first sentence of the license grant says:

8               "In accordance with and upon the completion

9               of Section 3, MoSys agrees to license the

10              licensed technology to TSMC solely for TSMC

11              to provide IP macro design services to TSMC's

12              customers and for TSMC's internal process

13              technology development."

14              Do you see that?

15  A.   Yes.

16  Q.   The license grant in the 2001 agreement, whose effective

17  royalty rate you attempted to calculate, was not a license

18  grant that allowed the $236 million in TSMC 1T-SRAM sales, is

19  it?

20  A.   Well, you said two things wrong.  One, I'm not trying to

21  calculate the effective rate on this agreement.  I'm trying to

22  calculate the effective rate that results from the

23  consideration that was paid under this agreement to the proper

24  royalty base.  That's very different.

25  Q.   You understand that this agreement only actually licensed

1    TSMC to the extent of the products that TSMC was selling in

2    which TSMC also provided design services?

3    **A.**   Yes.

4    **Q.**   So the extent of the products that TSMC was selling for

5    which TSMC only provided design services would have been about

6    $10 million, as confirmed by how we reverse calculate and back

7    out from the 2.9; isn't that fair?

8    **A.**   It's fair.  I don't have a dispute or disagreement with

9    that.

10   **Q.**   So if we go back to your demonstrative -- if we go back --

11   that was good.

12           (Document displayed)

13   **Q.**   If you compare the 2.3 million -- or $2.2 million in MoSys

14   payments to what the payment royalty base actually was, you

15   come up with an effective royalty rate not of .9 percent, but

16   about 22 percent, don't you?

17   **A.**   I don't know.  And that would seem illogical to me as

18   well.  No, absolutely not.

19   **Q.**   Well --

20   **A.**   You are putting in the one million six and the three --

21   yes.  Okay.  It's 2.9 percent on the royalty sales.  That's why

22   I say it's got to be 2.9 percent.

23           If you want to know what the rate is, it's what the

24   rate says it is.  It's 2.9.

25           Now what you want to do is take the million six and

1    call that part of -- part of the running royalty rate.  That's

2    not part of the running royalty rate.  This is -- and I'm not

3    doing that.

4           I'm taking the basket of consideration that was

5    actually paid not under this -- not to calculate the rate under

6    this royalty rate, but to say they paid -- they being TSMC --

7    paid $2.2 million.  Doesn't matter to me if they paid it in a

8    royalty rate or they just wrote a check for it, how much is

9    that over the total benefit they received?  .9 percent.

10   Q.   Suffice it to it say that if the effective royalty rate on

11   this particular agreement was 22 percent, that would be

12   inconsistent with the rest of your opinions about the base line

13   1 percent royalty rate?

14   A.   That would be bad math and that would be an incorrect

15   calculation and, of course, it doesn't agree.

16           MR. GRINSTEIN:  No further questions.  Thank you.

17           THE COURT:  Redirect?

18           MR. REINES:  Yes, your Honor.  Just two questions.

19   Thank you.

20                    REDIRECT EXAMINATION

21   BY MR. REINES:

22   Q.   Would you could keep slide 21 up?

23           (Document displayed)

24   Q.   Let's just get clear what this slide shows.

25           The $235 million in TSMC sales, do the chips that are

1   involved include more than just the alleged UniRAM trade

2   secrets?

3   A.   Yes.

4   Q.   And do they include processing technology or not?

5   A.   Yes.

6   Q.   Do they include logic circuits work that has to go into

7   it?

8   A.   Yes.

9   Q.   Okay.  Now, the total payment -- the total payments that

10  TSMC made to MoSys on these -- on this is 2,230,000 and change,

11  correct?

12  A.   That is correct.

13  Q.   And when TSMC paid MoSys the $2,230,000, did that include

14  more than just MoSys's 1T-SRAM trade secrets?

15  A.   No.

16  Q.   Well, did it include their patents, the 30-something MoSys

17  patents?

18  A.   Oh, yes.  Sorry, sorry.  Yes, yes.

19  Q.   And so it included MoSys patent, rights?

20  A.   Yes.

21  Q.   And did it include MoSys's trade secrets?

22  A.   Yes.  Everything that's been set forth in this agreement,

23  yes.

24  Q.   And were those working products that MoSys provided as

25  part of this, the sales that were sent?

1   A.   Yes.  Extensively more, yes.

2   Q.   And the total amount was $2 million?

3   A.   Yes.

4   Q.   And what's your royalty amount in this matter for --

5   A.   One percent.

6   Q.   And if you just -- last question is:  The reasonable

7   royalty that you believe should be paid to UniRAM for just the

8   alleged -- bare alleged trade secrets?

9   A.   One percent.

10  Q.   What's the total amount of revenue, if you multiple that

11  one percent times the base?

12  A.   2,359,000 -- well, it's more than the 2,359,000 because I

13  do add in the royalty fees -- I'm sorry, the NRE fees, too.  So

14  the exhibit shows it's $2,571,446.

15  Q.   So your $2.5 million reasonable royalty calculation, what

16  you think would be a reasonable royalty from TSMC to UniRAM for

17  the 12 alleged trade secrets is more than all --

18  A.   It's more than what --

19       MR. GRINSTEIN:  Your Honor, this is getting leading,

20  please.

21       THE COURT:  It's what?

22       MR. GRINSTEIN:  Objection.  Leading.

23       MR. REINES:  Let me just ask the question.

24  Q.   Is it more than what -- is what TSMC paid MoSys for all of

25  the baskets of rights that you described more or less than what

DEFENDANT'S EXHIBIT NO. 2576.093

```
1    you are proposing to pay -- that UniRAM should be paid under

2    the reasonable royalty analysis?

3    A.    The accused technology, which is embodied in this

4    MoSys/TSMC license, involves considerably more technology and

5    for that, as we saw, TSMC paid 2.2 million.

6              I have calculated for the use of just the 12 trade

7    secrets 2.5 million, which is greater.

8              MR. REINES:  No further questions, your Honor.

9              THE COURT:  Very well.  Thank you, Mr. Musika.  You

10   may step down.

11             (Witness excused.)

12             THE COURT:  And Mr. Powers?

13             MR. POWERS:  Subject to the exhibit issues we have

14   been discussing, the defendants rest.

15             THE COURT:  Very well.  That means, ladies and

16   gentlemen, you have heard all of the evidence that the

17   defendant wishes to present.

18             Shall I excuse the jury, Mr. Tribble?

19             MR. TRIBBLE:  Our case is in, your Honor.  We have no

20   rebuttal that we need to put in.

21             THE COURT:  That's what I was asking indeed.  That

22   means, ladies and gentlemen, that you have heard all of the

23   evidence in the case and I can let you go home for the day.

24             We will resume tomorrow morning at 8:30, and in the

25   meantime the lawyers and I will work together on the
```

DEFENDANT'S EXHIBIT NO. 2576.094

1   instructions and verdict form and we will see you tomorrow

2   morning.

3          What lies ahead is the instructions that the Court

4   will give you on the law.  The lawyers will have an opportunity

5   to make their closing arguments, and following that you can

6   start your deliberations.  So the case will be in your hands

7   tomorrow.

8          All right.  Any questions before you leave?

9          (No response.)

10          THE COURT:  Fine.  See you tomorrow morning at 8:30.

11          (Jury out at 12:47 p.m.)

12          THE COURT:  Counsel, how is 3:00 o'clock to sit down

13   and talk about jury instructions?

14          MR. TRIBBLE:  That's fine your Honor.

15          MR. REINES:  Fine, your Honor.

16          THE COURT:  Fine.  Anything further at this point?

17          MR. TRIBBLE:  I did have these exhibits to just read

18   into the record.  I think there is no opposition.

19          THE COURT:  All right.

20          MR. TRIBBLE:  The Chen exhibits that were played in

21   his deposition were:  Plaintiff's Exhibit 157, 158, 159, 160,

22   161, 163 -- and 164 was already admitted I believe -- 166, 170

23   and 110.

24          And, your Honor, we would offer all of those into

25   evidence.

1          The time line that was used as a demonstrative is

2    Plaintiff's Exhibit 165, but as to the others, we would offer

3    them into evidence.

4          **MR. POWERS:**  No objection as to the others.  165,

5    obviously, is not being offered in evidence.

6          **THE COURT:**  I understand 165 is simply a

7    demonstrative.

8          **MR. TRIBBLE:**  And then there were some exhibits not

9    reflected in your minute orders that are in the transcript.

10   I've got a list of those as well.

11         Those are Plaintiff's Exhibit 438, 235, 249, 5032 --

12   that's 5,032 -- 250, 240, 304, 305, 5324 and 270.

13         **MR. POWERS:**  And we agree, your Honor, those are in

14   evidence.

15         **THE COURT:**  Very well.  Mr. Powers?

16         **MR. POWERS:**  Finally, your Honor, the deposition

17   excerpts that were read, we have copies here for the Court, and

18   I think we are all in agreement on these.

19         I will just read them into the record.  In the trial

20   transcript at Page 337, Line 11, that corresponds to the

21   testimony that is Exhibit 5408.

22         In the trial transcript at Page 344, Line 12, that

23   corresponds to Exhibit 5409.

24         Trial transcript at Page 380, Line 2, corresponds to

25   the Trial Exhibit No. 5410.

1          The trial transcript, Page 386, Line 2, that

2    corresponds -- the corresponding testimony is Trial Exhibit

3    5410, also.

4          At Page 403, Line 21 of the trial transcript, that

5    corresponds to the deposition testimony in Exhibit 5411.

6          At Page 406, Line 9, that corresponds to the

7    testimony in 5412.

8          At Page 409, Line 11, that corresponds to

9    Exhibit 5413.

10         At 420, Line 21 of the trial transcript, that

11   corresponds to Exhibit 5414.

12         At Page 427, Line 11 of the trial transcript, that

13   corresponds to Trial Exhibit No. 5415.

14         At Page 440, Line 1 of the transcript, that

15   corresponds to Trial Exhibit 5416.

16         Page 965, Line 11 of the transcript, that corresponds

17   to Trial Exhibit 5417.

18         At Page 967, Line 2 of the transcript, that

19   corresponds to Trial Exhibit 5418.

20         At Page 982, Line 2 of the trial transcript, that

21   corresponds to the testimony in Exhibit 5419.

22         At Page 994, Line 7 of the transcript, that

23   corresponds to 5420.

24         And at Page 1172, Line 6 of the trial, finally, that

25   corresponds to Trial Exhibit No. 5421.

1           And I have copies of these for the Court as well.

2           **MR. TRIBBLE:**  I have a list as well.

3           The trial transcript at Page 846, Line 12, that is

4    Exhibit 1331.

5           Trial transcript at Page 998, Line 9 is Trial Exhibit

6    1332.

7           Trial transcript Page 998, Line 22 is Exhibit 1333.

8           Trial transcript Page 1268 Line 22 is Exhibit 1334.

9           Trial transcript Page 1274, Line 23 is Exhibit 1335.

10          Trial transcript Page 1373, Line 2, is Exhibit 1336.

11          Trial transcript Page 1420, Line 11 is Exhibit 1337.

12          Trial transcript Page 1421, Line 6, is Exhibit 1338.

13          And, finally, trial transcript Page 1422 -- 14,

14   Line 2 -- excuse me.  Page 1422, Line 2 is Exhibit 1339.

15          And we have copies of those for the Court as well

16   your Honor.

17          **THE COURT:**  Very well.  That should take care of all

18   of those matters.

19          **MR. POWERS:**  It does, your Honor.

20          **THE COURT:**  See you at 3:00 o'clock.

21          (Whereupon at 12:54 p.m. further proceedings

22           in the above-entitled cause was adjourned

23           until 3:00 p.m., such proceedings bound

24           separately as Volume 11 to the trial transcripts.)

25

DEFENDANT'S EXHIBIT NO. 2576.098

PROCEEDINGS                              1718

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1719

```
 1                    I N D E X

 2

    DEFENDANT'S WITNESSES                    PAGE    VOL.
 3
    CHEN, ED
 4  Via Videotaped Deposition               1624    10

 5

 6  MUSIKA, TERRY
    (SWORN)                                 1635    10
 7  Direct Examination by Mr. Reines        1635    10
    Cross Examination by Mr. Grinstein      1670    10
 8  Redirect Examination by Mr. Reines      1711    10

 9

10                   -   -   -   -

11                 E X H I B I T S

12

13  TRIAL EXHIBITS           IDEN    VOL.   EVID    VOL.

14  279, 554, 380                           1652    10
    5306                                    1666    10
15  5200, 580                               1669    10
    5161                                    1697    10

16

17                   -   -   -   -

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C04-1267 VRW, UNIRAM TECHNOLOGY, INC. vs TSMC, INC. were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_Debra L. Pas_

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, September 20, 2007

# EXHIBIT 12

# Tablet Mock Up No. 14

# 2602

# EXHIBIT 13

**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

April 26, 2012

Writer's Direct Contact

415.268.6024
MMazza@mofo.com

*Via Email* (anthonyalden@quinnemanuel.com)

Anthony Alden
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

**DEFENDANT'S EXHIBIT
NO. 2606.001**
United States District Court
Northern District of California
No. 11-CV-1846-LHK (PSG)
*Apple v. Samsung*
Date Admitted:_____ By: _____

Re:      *Apple v. Samsung Electronics, et al*, No. 5:11-cv-01846-LHK (PSG) (N.D. Cal.)

Dear Anthony:

I write in response to your letter of April 25, 2012, which responded to my letter of April 24 concerning compliance with the Court's April 23 Order.

Samsung has made a repeated point of claiming that the information provided in various spreadsheets is an unmodified version of information taken from the system of record, Samsung's SAP database. Nonetheless, it has not offered information in a way that permits Apple or an independent party to verify this claim. Instead, Samsung has relied on testimony and asked Apple and its independent experts to trust it. That is insufficient.

Apple does not have direct access to the SAP database and has had only limited opportunities to explore or understand the process by which Samsung prepares its financial records, the spreadsheets and its consolidated financial statements. Thus, we cannot provide you the easiest or best way by which to demonstrate the accuracy of your claim. However, if Samsung is correct, it should be both possible and fairly straight-forward to provide data sufficient to support the claim and to reconcile the data to audited financial statements or to reports that themselves reconcile to audited financial statements. The ability to tie figures to a financial statement directly or through intermediate schedules is one of the basic principles of effective financial accounting and internal controls. With this in mind, Apple offers below a series of suggestions, which together likely suffice. We do not claim that these are exclusive or exhaustive options but offer them in an effort to cooperate and avoid unnecessary disputes.

We also emphasize that the production of any new data (and reproduction of prior materials) in native Excel spreadsheets is itself very helpful in achieving this goal. It will permit Apple and its experts (1) the ability to verify how data is being treated; (2) the ability to verify totals

**MORRISON | FOERSTER**

Anthony Alden
April 26, 2012
Page Two

and other information by means of a "control" spreadsheet similar to the work discussed by
Mr. Sheppard in his March 30 deposition; and (3) the ability to compare new data to prior
materials faster and more accurately. These steps *by themselves* would add to the credibility
of your production and your claim. Thus, we emphasize that request again, particularly
because it involves no additional burden to Samsung and simply involves the provision of
material that you have provided or already providing in an easier to use format.

As stated above, we offer the following suggestions, which would provide a means to show
(or help show) that the information Samsung is producing reconciles to Samsung's audited
financial statements:

1.      Production of the materials used by Mr. Sheppard, Mr. Rho, Mr. Kim and/or Mr. Sim
to verify the prior information to the SAP database, including materials pulled at the level of
detail at the chart of accounts, additional detail from the database, screen shots of the SAP
information, control spreadsheets, and comparisons to the monthly closing reports. This
information has already been prepared and in Samsung's possession.

2.      Inclusion of summary line items for major classifications that would reconcile to
monthly closing reports for STA, SEA and/or the Mobile Communications Division of
Samsung (including, of course, production of the monthly closing reports for SEA and/or the
Mobile Communications Division, which we have not received to date).

3.      Even in the absence of specific line items reconciling the data, productions of the
monthly close reports or internal monthly management financial reporting on the Mobile
Communications Divisions for use in comparing trends and verifying consistency with
respect to the data provided (similar to the work that Mr. Sheppard states that he did using
the STA monthly closing reports).

4.      Data provided at the level of the chart of accounts with related account numbers and
names, which would demonstrate both transparency and detail sufficient to verify the data.

5.      Data provided a the same level of detail and in the same format as internal
management reporting, such as business plans or closing statements, so that appropriate
comparisons could be made or so that numbers may be compared or tied without the
uncertainty created by different titles and names.

6.      Manuals, internal guidelines or internal procedures that reflect how indirect costs
such as research and development, sales, marketing, general and administrative costs are
allocated to products to explain how the individual figures reported in the spreadsheet derive
from the unallocated costs recorded in the general ledger.

sf-3138566

DEFENDANT'S EXHIBIT NO. 2606.003

MORRISON | FOERSTER

Anthony Alden
April 26, 2012
Page Three

7.      Existing internal management reports by quarter that reflects the consolidated
financials for SEC and its divisions to which the material in the spreadsheets could be tied or,
if not tied, from which trends could be compared for consistency.

As noted above, this list is not exclusive but illustrative.  Nonetheless, if Samsung continues
to claim that its data is an unmodified extract from SAP, it should be able to verify that
claim, and these are some of the multiple means by which it can be achieved.

As a final note, Apple believes that Samsung should produce data through March 31, 2012
given that this quarter is closed and the delays caused by Samsung's noncompliance.

Erik Olson would be happy to speak live with you a relevant member of your team if you
have questions about what we are seeking or why these proposals advance the ball.  He is
also prepared to discuss with you the use of sampling or other common accounting
techniques could be used to help resolve the issue in the time frame provided.

Sincerely,

*/s/ Mia Mazza*

Mia Mazza

cc:   S. Calvin Walden
      Peter Kolovos

sf-3138566