# EXHIBIT 37

1                    KARAN SINGH, Ph.D.

2    UNITED STATES INTERNATIONAL TRADE COMMISSION

3                    WASHINGTON, D.C.

4

5

6    In the Matter of:          Investigation no.

7    CERTAIN ELECTRONIC DIGITAL     337-TA-796

8    MEDIA DEVICES                  /

9

10

11

12    VIDEOTAPE DEPOSITION OF KARAN SINGH, Ph.D.

13                   WASHINGTON, D.C.

14            Tuesday, October 25, 2011

15

16

17

18

19

20

21

22

23

24    JOB NO. 43209

25    REPORTED BY:  Kathy Savich, RPR, CLR

Page 2

1      KARAN SINGH, Ph.D.
2      Tuesday, October 25, 2011
3      9:20 a.m.
4
5      Videotaped deposition of KARAN
6  SINGH, Ph.D., held at the law offices
7  of:
8
9      STEPTOE & JOHNSON
10   1330 Connecticut Avenue, N.W.
11      Washington, D.C.
12
13
14      Pursuant to notice of taking
15  deposition, held before Kathy Savich,
16  Notary Public in and for the District
17  of Columbia.
18
19
20
21
22
23
24
25

Page 3

1          KARAN SINGH, Ph.D.
2  APPEARANCES:
3
4  Attorneys for Complainant Apple, Inc.:
5      MORRISON & FOERSTER
6      BY:  G. BRIAN BUSEY, ESQUIRE
7          DAVID SCANNELL, ESQUIRE
8      2000 Pennsylvania Avenue, N.W.
9      Washington, D.C.  20006
10      202-887-1504
11      gbusey@mofo.com
12      dscannell@mofo.com
13
14  COUNSEL FOR THE SAMSUNG RESPONDENTS:
15      QUINN EMANUEL URQUHART & SULLIVAN
16      BY:  RON HAGIZ, ESQUIRE
17          S. ALEX LASHER, ESQUIRE (DC OFFICE)
18      51 Madison Avenue
19      New York, New York 10010
20      212-849-7143
21      ronhagiz@quinnemanuel.com
22      alexlasher@quinnemanuel.com
23
24
25  (Continued on next page.)

Page 4

1          KARAN SINGH, Ph.D.
2  APPEARANCES CONTINUED:
3
4  COUNSEL FOR THE INTERNATIONAL TRADE COMISSION:
5  BY:   BRYAN MOORE, ESQUIRE
6      REGINALD LUCAS, ESQUIRE
7      500 E Street, S.W.
8      Washington, D.C.  20436
9      202-205-2767
10      bryan.moore@usitc.gov
11      reginald.lucas@usitc.gov
12
13  ALSO PRESENT:  CONWAY BARKER, VIDEOGRAPHER
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          KARAN SINGH, Ph.D.
2      I N D E X
3  DEPOSITION OF KARAN SINGH, Ph.D.      PAGE
4  BY MR. HAGIZ          07
5  BY MR. BUSEY          271
6
7      E X H I B I T S
8  SINGH EXHIBIT      DESCRIPTION      MARKED
9  Exhibit 1  Singh Expert Report          15
10  Exhibit 2  Singh Rebuttal Report        23
11  Exhibit 3  '922 Patent          49
12  Exhibit 4  Apple Production 2829 to 2883  78
13  Exhibit 5  Copy of Sheet 6, '922 patent
14      with Figure 3i, Bates 0399    100
15  Exhibit 6  IBM technical disclosure
16      Bulletin, Bates 2733 to 2735   160
17  Exhibit 7  Kreitzberg Rebuttal Report    263
18
19
20  (Attached.)
21
22
23
24
25

2 (Pages 2 to 5)

Page 6

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    P R O C E E D I N G S
3        THE VIDEOGRAPHER:  This is the
4    beginning of tape labeled 1 in the
5    deposition of Karan Singh in the
6    matter of Certain Electronic Digital
7    Media Devices and Components Thereof
8    before the United States International
9    Trade Commission, Washington, D.C.,
10   case number 337-TA-796.
11       This deposition is being held at
12   Steptoe Johnson, 1330 Connecticut
13   Avenue, Northwest, Washington, D.C.,
14   on October 25th, 2011, and the time is
15   approximately 9:20.
16       Would counsel please introduce
17   yourselves and state whom you
18   represent.
19       MR. HAGIZ:  Ron Hagiz of Quinn
20   Emanuel on behalf of Samsung.  And
21   with me today I have Alex Lasher also
22   of Quinn Emanuel.
23       MR. BUSEY:  Brian Busey with the
24   firm of Morrison & Foerster -- along
25   with me is Dave Scannell --

Page 7

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    representing Apple.
3        MR. MOORE:  Bryan Moore
4    representing the staff of the
5    International Trade Commission.
6        THE VIDEOGRAPHER:  The court
7    reporter is Kathy Savich, My name is
8    Conway Barker, both in association
9    with TSG.
10       Would you please swear in the
11   witness, and we can proceed.
12   Whereupon,
13       KARAN SINGH, Ph.D.,
14   called as a witness, after having been first
15   duly sworn, testified as follows:
16       EXAMINATION
17   BY MR. HAGIZ:
18       Q.   Good morning, Dr. Singh.
19       A.   Good morning.
20       Q.   Can you state your name and
21   address for the record.
22       A.   Sure.  Karan Singh, or Karan
23   Sher Singh -- I use both names.  Address, 889
24   Carlaw Avenue, Toronto, Canada.
25       Q.   Is that your personal address

Page 8

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    or your business address?
3        A.   That's my personal address.  My
4    business address is 40 St. George Street,
5    Toronto.
6        Q.   And are you currently employed
7    outside of this representation?
8        A.   Yes, I am.
9        Q.   And where are you employed?
10       A.   I'm employed at the University
11   of Toronto.
12       Q.   Okay.  Are you employed
13   anywhere else?
14       A.   I have affiliations elsewhere,
15   but the University of Toronto is my full-time
16   position.
17       Q.   Okay.  Have you been deposed
18   before?
19       A.   No.
20       Q.   All right.  So I get to give my
21   speech.  I would just like to set a few
22   ground rules just to keep the process going.
23   First, you understand that you are under oath
24   right now, correct?
25       A.   Yes.

Page 9

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2        Q.   Okay.  Is there any reason why
3    you would not be able to give full and
4    accurate testimony today?
5        A.   No.
6        Q.   I'll be asking questions, and
7    you'll provide answers.  Occasionally your
8    counsel may interject with objections.  Do
9    you understand that you're still to provide
10   an answer even if counsel objects unless they
11   instruct you not to answer the question?
12       A.   Yes.
13       Q.   If at any time you don't hear
14   me or you don't understand my question, will
15   you ask me to repeat or clarify?
16       A.   I will.
17       MR. BUSEY:  Dr. Singh, if I
18   could just -- I'm sorry to interrupt,
19   Ron.
20       Just keep your voice up --
21       THE WITNESS:  Okay.
22       MR. BUSEY:  -- for the court
23   reporter.
24       THE WITNESS:  Sure.
25       MR. BUSEY:  So that everybody

3  (Pages 6 to 9)

Page 10

KARAN SINGH, Ph.D.

1    KARAN SINGH, Ph.D.
2    can -- thank you.
3    BY MR. HAGIZ:
4        Q.    Yeah.  Actually, on that topic,
5    just make sure to keep your voice up, and
6    just for the ease of the court reporter, I'm
7    going to try my best not to interrupt you
8    when you're answering; I would just ask that
9    you let me finish my questions before you
10   answer.  Is that okay?
11       A.    Yes.
12       Q.    All right.  And last thing.  If
13   at any time you need a break -- I'll try to
14   hold one every hour or so.  But if you need
15   one, you know, please ask for one.  I just
16   request that I might want to finish my
17   question or finish my line of questioning
18   before we break.  Is that okay?
19       A.    Yes, it is.
20       Q.    All right.  Now, you were
21   retained by Apple as an expert in this
22   investigation; is that correct?
23       A.    Yes.
24       Q.    And you're appearing here today
25   as an expert for Apple?

Page 11

1    KARAN SINGH, Ph.D.
2        A.    Yes.
3        Q.    When were you first retained?
4        A.    I can't remember the exact
5    date, but it was around the end of August,
6    early September of this year.
7        Q.    Okay.  And when were you first
8    contacted in regards to this investigation?
9        A.    Probably about a week prior to
10   that.
11       Q.    Who first contacted you?
12       A.    My counsel, Mr. Scannell.
13       Q.    Okay.  And what were you asked
14   to do when you were first contacted?
15       A.    I was asked if I would have an
16   interest in providing expert opinions in
17   claim construction on a patent case.  And --
18   that's what I was asked initially, yes.
19       Q.    Were you asked to look at any
20   patents?
21       A.    After I had indicated an
22   interest, yes.
23       Q.    And which patents were you
24   asked to look at?
25       A.    The patent in question, '922.

Page 12

1    KARAN SINGH, Ph.D.
2        Q.    Were you asked to look at any
3    other patents?
4        A.    No, not initially.
5        Q.    Now, in regards to the '922
6    patent and in regards to claim construction
7    of the '922 patent, did you identify the
8    terms that needed to be construed?
9        A.    I identified them together with
10   my counsel.
11       Q.    Okay.  Did you believe that any
12   of the terms that you construed in your
13   initial report did not need to be construed?
14       A.    No, I do not believe so.  I
15   consulted with my counsel, and we together
16   determined the terms that were construed.
17       Q.    Are there any additional terms
18   that you thought should have been construed
19   that you did not construe?
20       A.    No.
21       Q.    Do you know Apple's expert on
22   the '949 patent, Dr. Balakrishnan?
23       A.    Yes, I do.
24       Q.    How do you know him?
25       A.    He's both a colleague and a

Page 13

1    KARAN SINGH, Ph.D.
2    friend.
3        Q.    Did he refer you to Apple or
4    was he -- did he connect you to Apple in any
5    way?
6            MR. BUSEY:  Objection as to
7        form.
8            THE WITNESS:  No, he did not
9        connect me to Apple.
10   BY MR. HAGIZ:
11       Q.    Did you discuss the '949 patent
12   with him at all?
13       A.    '949?  That's the -- the
14   other -- the other patent?
15       Q.    Yes.
16       A.    No.
17       Q.    Did you discuss the '922 patent
18   with him at all?
19       A.    No.
20       Q.    Okay.  Now, in connection with
21   this investigation, you prepared a report and
22   a rebuttal report; is that correct?
23       A.    That's right.
24       Q.    Is there any other work you've
25   done in connection with this investigation?

4 (Pages 10 to 13)

Page 14

KARAN SINGH, Ph.D.

1
2      A.    No.
3      Q.    What did you do to prepare for
4  this deposition?
5      A.    I met with my counsel.  I
6  reviewed my reports.
7      Q.    Did you meet with anyone
8  outside of counsel?
9      A.    No.
10     Q.    Did you consult or talk to
11  anyone, interview anyone?
12     A.    No.
13     Q.    Did you talk to anyone at
14  Apple?
15     A.    No.
16     Q.    And about how long did you
17  spend preparing?
18     A.    For the deposition?
19     Q.    Yes.
20     A.    I would say a couple of days.
21         MR. HAGIZ:  I'm going to mark --
22  I'm going to ask the court reporter to
23  mark as Exhibit 1 the expert report of
24  Dr. Karan Singh.  It appears to be
25  signed on page 11 and dated

Page 15

KARAN SINGH, Ph.D.

1
2  October 5th, 2011.
3         (Singh Exhibit No. 1 was marked
4      for identification.)
5  BY MR. HAGIZ:
6      Q.    Dr. Singh, do you recognize
7  this document?
8      A.    Yes.
9      Q.    And is that your signature on
10  page 11?
11     A.    It is.
12     Q.    And did you sign this on or
13  about October 5th, 2011?
14     A.    I did.
15     Q.    When you signed this, was it
16  your understanding that the information
17  contained within was true and accurate?
18     A.    Yes.
19     Q.    Did you prepare this report?
20     A.    Yes, I did.
21     Q.    How long --
22     A.    In conjunction with my counsel.
23     Q.    Sorry.
24         How long did you spend
25  preparing the report?

Page 16

KARAN SINGH, Ph.D.

1
2      A.    I would say in the ballpark of
3  around 20 hours, 25, 30, somewhere in that
4  vicinity.
5      Q.    And what was the purpose of the
6  report?
7      A.    The purpose of the report, as I
8  understand it, was to provide a construction
9  for certain claim terms in the '922 patent as
10  a person of ordinary skill in the art at the
11  time of filing the patent would have.
12     Q.    And you provided your opinions
13  on that subject in the report?
14     A.    Yes.
15     Q.    Was it your intent to provide
16  the bases of your opinions?
17     A.    I'm not sure I understand --
18         MR. BUSEY:  Objection.
19         THE WITNESS:  -- that question.
20         MR. BUSEY:  Yeah.  Objection as
21  to form.
22  BY MR. HAGIZ:
23     Q.    Did you intend to provide the
24  reasons behind your opinions or the ways you
25  reached your opinions in the report?

Page 17

KARAN SINGH, Ph.D.

1
2         MR. BUSEY:  Objection.
3  Ambiguous.
4         Go ahead.
5         THE WITNESS:  I provided some
6  reasons based on which the opinions in
7  my report were arrived, yes.
8  BY MR. HAGIZ:
9      Q.    So you didn't provide all the
10  reasons?
11         MR. BUSEY:  Objection.
12  Mischaracterizes the witness'
13  testimony.
14         THE WITNESS:  I provided opinion
15  bases that I felt were relevant and
16  illustrative, but I have been working
17  in this area for over two decades and
18  clearly the term "all" cannot really
19  make its way into such a question.
20  BY MR. HAGIZ:
21     Q.    How did you decide which bases
22  were relevant?
23     A.    I relied upon the claim terms
24  in the patent as well as the intrinsic
25  evidence, as much as it impacted the

5 (Pages 14 to 17)

Page 18

KARAN SINGH, Ph.D.

1   construction of the claim terms.
2   Q.   And what do you mean by
3   intrinsic evidence?
4   A.   My understanding of the
5   intrinsic evidence would be the specification
6   of the patent, figures, cite -- citations in
7   the prosecution history.
8   Q.   What did you review in reaching
9   your conclusions and opinions?
10   A.   The intrinsic evidence.
11   Q.   Did you review anything
12   besides -- any additional documents?
13   A.   I'm not sure I understand that
14   question.
15   Q.   Let me break it down.  So you
16   said that you reviewed the file history of
17   the '922 patent, correct?
18   A.   I said I reviewed the
19   prosecution history.
20   Q.   Okay.  Did you review the
21   references that were cited in the prosecution
22   history?
23   A.   I reviewed some of the
24   references that were cited in the prosecution

Page 19

KARAN SINGH, Ph.D.

1   history.
2   Q.   Do you remember which
3   particular ones you reviewed?
4   A.   Not off the top of my head.
5   Q.   How did you decide which
6   references in the prosecution history to
7   review?
8   A.   I looked for -- for documents
9   or places or pieces of evidence that were
10   relevant in the construction of the specific
11   claims that we were constructing.
12   Q.   Do you understand that the '922
13   patent is a reissue patent?
14   A.   Yes, I do.
15   Q.   What do you understand that to
16   mean?
17   A.   As a person of ordinary skill
18   in the art -- I'm not a lawyer, of course --
19   I believe a reissue patent is one that
20   broadens the scope of a patent as long as
21   the -- as long as it falls within -- as long
22   as it falls within what is disclosed by
23   the -- by -- by the original patent.
24   Q.   And are you -- do you know from

Page 20

KARAN SINGH, Ph.D.

1   which patent the '922 patent reissued?
2   A.   The exact number?  I would like
3   to say it was the '498, but you know,
4   three -- three digits, and a lot of them can
5   be tricky.
6   Q.   And did you review the '489
7   patent?
8   A.   I skimmed it, yes.
9   Q.   Did you review the prosecution
10   history of the '489 patent?
11   A.   I believe I reviewed the
12   prosecution history of the '922 patent.  If
13   the prosecution history of the '489 patent
14   was somehow part of it, then portions of it,
15   I suppose I did.
16   Q.   And are there other documents
17   that you reviewed?
18   A.   None that I can think of.
19   Q.   Sitting here today, are you
20   aware of any conclusions that you had when
21   you signed this initial report regarding
22   claim construction of the '922 patent that
23   you did not include in your report?
24   A.   That's a long --

Page 21

KARAN SINGH, Ph.D.

1   MR. BUSEY:  Objection.
2   Ambiguous.
3   Go ahead.
4   THE WITNESS:  Sorry, Brian.
5   MR. BUSEY:  Just remember to --
6   THE WITNESS:  Yeah.  Yeah.
7   MR. BUSEY:  -- leave me enough
8   time to --
9   THE WITNESS:  I apologize.
10   Yeah.
11   MR. BUSEY:  -- give the -- same
12   problem we had with Dr. Kreitzberg
13   yesterday.
14   THE WITNESS:  Sure.  No problem.
15   No problem.  No problem.
16   BY MR. HAGIZ:
17   Q.   But you're not a New Yorker.
18   A.   No.  But I'm Indian.  We have
19   the same problem.
20   Q.   No problem.  Do you need the
21   question read back to you?
22   A.   Actually, I would prefer if
23   you'd break it down.  It was somewhat of a
24   long question.

6 (Pages 18 to 21)

Page 22

KARAN SINGH, Ph.D.

1
2      Q.    When you signed your initial
3  report, were there any conclusions you had
4  reached regarding claim construction of the
5  '922 patent that were not in the report?
6      A.    None that I can think of.
7      Q.    There were no opinions on other
8  claim terms that you didn't include in your
9  report?
10         MR. BUSEY:  Objection.
11  Confusing.
12         Go ahead.
13         I think it mischaracterizes also
14         the witness' prior testimony, but go
15         ahead.
16         THE WITNESS:  I may have had
17         opinions, but I felt that the material
18         and the opinion that I provided in the
19         report at the time should have been
20         sufficient, while reserving the right
21         to -- to clarify, elaborate, be more
22         explicit on some of the points that I
23         had made.
24  BY MR. HAGIZ:
25      Q.    Is there anything in your

Page 23

KARAN SINGH, Ph.D.

1
2  initial report that at this time you feel
3  needs to be corrected or changed?
4      A.    I believe that as long as
5  somebody with ordinary skill in the art is
6  reading my initial report in the light of the
7  intrinsic evidence and the claim terms of the
8  patent, that that should be sufficient.
9         MR. HAGIZ:  Let's go ahead and
10         mark as Exhibit 2 the rebuttal expert
11         report of Dr. Karan Singh which is
12         signed on page 13 and dated
13         October 14th, 2011.
14         (Singh Exhibit No. 2 was marked
15         for identification.)
16  BY MR. HAGIZ:
17      Q.    Dr. Singh, do you recognize
18  this document?
19      A.    Yes, I do.
20      Q.    And is that your signature on
21  page 13?
22      A.    It is.
23      Q.    And did you sign this on or
24  about October 14th, 2011?
25      A.    That's correct.

Page 24

KARAN SINGH, Ph.D.

1
2      Q.    And when you signed this
3  report, was it your understanding that the
4  information contained within was true and
5  accurate?
6      A.    I'm sorry.  Could you just
7  repeat that?
8      Q.    Sure.  When you signed this
9  report, was it your understanding that the
10  information contained within was true and
11  accurate?
12      A.    Yes.
13      Q.    Did you review anything in
14  preparing your rebuttal report in addition --
15  sorry.  Scratch that.
16         Did you review anything in
17  preparing your rebuttal report that you had
18  not reviewed in preparing your initial
19  report?
20      A.    Not that I am aware of.
21      Q.    Did you review Dr. Kreitzberg's
22  initial report on claim construction?
23      A.    Yes, of course.
24      Q.    And are there any corrections
25  or changes you would like to make to your

Page 25

KARAN SINGH, Ph.D.

1
2  rebuttal report at this time?
3      A.    No.
4      Q.    Can you turn to Exhibit A of
5  Exhibit 1?
6      A.    Exhibit A of Exhibit 1.  Yup.
7      Q.    And is that a copy of your CV?
8      A.    That is a copy of my CV, yes.
9      Q.    Is there --
10      A.    It's --
11      Q.    Sorry.  Go ahead.
12      A.    No, go ahead.
13      Q.    Is there anything in terms of
14  employment and education that is not on this
15  CV?
16      A.    There may be a few minor points
17  on there.  My typical academic CV is about 50
18  pages long.  This, I believe, though,
19  highlights most of the important points.
20      Q.    Okay.  I would like to take a
21  little bit of time just to go through some of
22  these.
23      A.    Sure.
24      Q.    So, under employment, as of
25  June 2006, it says you're the cofounder of

KARAN SINGH, Ph.D.

1
2  Arcestra?
3      A.   That's right.  The company had
4  the name Sketch2 when it was founded.  Since
5  then, it's changed its name.
6      Q.   What does Arcestra do?
7      A.   Arcestra is a company that
8  essentially provides sketch-based solutions
9  for visualizations of architecture and
10 interior design and so on.
11     Q.   And what is a sketch-based
12 solution?
13     A.   A sketch-based solution is --
14 is one where you provide -- where you provide
15 content -- in this case, content related to
16 an architectural or interior design setting
17 that is typically created using a technique
18 that can be compared to sketching as -- as we
19 understand the layman term to mean.
20     Q.   And do you -- do you do the
21 sketching for clients or do you create
22 software that does -- that allows clients to
23 do sketching?
24     A.   I'm actually not very actively
25 involved with Arcestra at -- at this point.

KARAN SINGH, Ph.D.

1
2  I did help found the company that was based
3  on some intellectual property that -- that
4  came out of -- of research that was done by a
5  master's student of mine back in -- I believe
6  it was 2004.
7      Q.   Now, the next item on the list
8  is associate professor at University of
9  Toronto; is that correct?
10     A.   That is correct.
11     Q.   And do you teach or do you do
12 research or both?
13     A.   Both.
14     Q.   And what kind of courses do you
15 teach?
16     A.   I teach courses in graphics and
17 interaction principally, but on occasion I do
18 teach other courses in algorithms and
19 programming.  And, in general, I could be
20 asked to teach a course on pretty much
21 anything within the purview of computer
22 science.
23     Q.   And what does your research
24 focus on?
25     A.   My research focuses on

KARAN SINGH, Ph.D.

1
2  interactive graphics.
3      Q.   What do you mean by interactive
4  graphics?
5      A.   What I mean by interactive
6  graphics is that a large part of where my
7  research lies involves graphical interfaces
8  or graphical entities.  It's -- a good part
9  of my research is visual, and by
10 "interactive" I mean that typically a user or
11 an artist or a person that is -- a person is
12 involved in operating the program, the
13 software, the piece of research that I am
14 working on.
15     Q.   Is there an example research
16 project that you can describe?
17     A.   Sure, there are any number of
18 research projects that you could look up, but
19 if you would like an example, absolutely.
20 Last week I presented a paper on -- on the
21 interactive drawing of -- of curves in -- in
22 applications.
23     Q.   Can you tell me a little bit
24 more about that.  What is interactive drawing
25 of curves?

KARAN SINGH, Ph.D.

1
2      A.   Interactive drawing of curves?
3  When you provide input and you -- you -- be
4  that from a mouse or any other kind of
5  device, you create -- you create strokes, you
6  create lines, and this was looking at --
7  specifically at a technique to help -- help
8  artists create good-looking lines.
9      Q.   Now, during that time -- same
10 time period you were also chief scientist at
11 Geometry Systems; is that correct?
12     MR. BUSEY:  Objection as to
13 form.
14     THE WITNESS:  Sure.
15 BY MR. HAGIZ:
16     Q.   And what -- what kind of work
17 did you do at Geometry Systems?
18     A.   Well, my -- my relationship
19 with Geometry Systems is somewhat similar to
20 my relationship with Arcestra.  They are
21 companies that I had a role in -- in
22 creating, in setting -- in -- in getting up
23 on their feet.
24     Geometry Systems, in
25 particular, is -- is a small company that

KARAN SINGH, Ph.D.

1
2    is -- that -- that looks at engineering --
3    graphical engineering solutions and was -- is
4    sort of run and operated by -- by somebody --
5    by an ex-colleague who is also a friend.
6    And -- and I give them advice from time to
7    time.
8         Q.    And, before that, it looks like
9    you worked at Paraform; is that correct?
10        A.    That's right.
11        Q.    And what did you do at
12   Paraform?
13        A.    I designed and developed tools
14   for -- the technical term is reverse
15   engineering.  I can elaborate on that, if you
16   would like.  Essentially, it deals with the
17   process of taking a real world
18   three-dimensional objects, and typically in a
19   process involving users, transforming them
20   into digital models that are then used
21   further on down the road by other
22   applications.
23        Q.    And how does the process
24   involve users exactly?
25        A.    Users typically interact with

KARAN SINGH, Ph.D.

1
2    these models, everything from acquiring them,
3    which involves operating equipment such as
4    laser scanners and other devices that help
5    you acquire data, and then actually
6    processing this data digitally.
7         Q.    I am going to skip down,
8    actually, to one down on the list, graphics
9    researcher at Alias, Inc.
10        A.    Sure.
11        Q.    What did you do at Alias?
12        A.    I did a number of things as the
13   Alias over the years.  My first mandate when
14   I joined them in, I guess, December of '95
15   was to design and develop tools for -- for
16   animation and -- for animation on at the time
17   what was a brand new piece of software which
18   today is known by the -- by the name Maya.
19        Q.    Is Alias the same as Alias
20   Wavefront?
21        A.    That is correct.  Alias was --
22   I don't remember dates exactly, but Alias was
23   a Canadian company based out of Toronto which
24   at one point either merged or acquired a
25   company called Wavefront which was based down

KARAN SINGH, Ph.D.

1
2    in Santa Barbara.  And I believe the
3    subsequent company was acquired by a company
4    called Silicon Graphics at the time.  And in
5    its current incarnation, this company is
6    owned by Autodesk.
7         Q.    And what did Maya do?
8         A.    Maya is an interactive system
9    that is used in the modeling and animation
10   of -- modeling, animation, visualization of
11   three-dimensional graphical objects.
12        Q.    And what part of that software
13   did you work on?
14        A.    I believe I -- I thought I had
15   answered that question previously, but I
16   worked specifically on tools relating to --
17   to -- to characters where the term
18   "characters" in -- in technical speak refers
19   to things that can be attributed an
20   anthropomorphic nature.  If you watch films
21   where perhaps a lamp takes on a persona, that
22   would be what a character would be.  And so I
23   develop tools for characters.
24        Q.    Now, what do you mean by tools?
25   Did you create the algorithms?  Did you

KARAN SINGH, Ph.D.

1
2    create user interfaces?
3         A.    I created user interfaces, I
4    created tools, I created the actual design
5    and the work flow of how a user would go
6    about coming up with a solution to their
7    problem.  All of those.
8         Q.    Now, let's take a step back to
9    your education.  Is that okay?
10        A.    Absolutely.
11        Q.    So it says you received your
12   Ph.D. from Ohio State University; is that
13   correct?
14        A.    That is correct.
15        Q.    And your thesis was realistic
16   human figure synthesis and animation for VR
17   applications; is that correct?
18        A.    That is correct.
19        Q.    Can you explain what that is in
20   layman's terms?
21        A.    Absolutely.  Realistic, the
22   figures, the entities -- these were digital
23   entities in a virtual system, on a virtual
24   screen -- appeared realistic as in they
25   seemed like they were real.

KARAN SINGH, Ph.D.

1      KARAN SINGH, Ph.D.
2          Human figure synthesis, I
3  looked at what laymans usually understand
4  today, I think -- I believe, you know, in the
5  Internet world as the term avatar or sort of
6  a human proxy, these sort of figures.
7          And I looked into their
8  creation, their -- their animation, their
9  interaction in these -- in these
10  environments, and that's where the term "VR
11  application" comes in, VR being an acronym
12  for virtual reality.
13          So, in essence, my -- my
14  dissertation looked at many aspects of
15  creating, interacting with and animating
16  digital figures in virtual environments.
17      Q.    Now, it says your Ph.D. was in
18  computer and information science.  Was there
19  any specialization?
20      A.    So computer and information
21  science is exactly the way the department, I
22  believe, in Ohio State was called, at least
23  back in '95.  I think now it's -- I believe
24  it's called computer science and engineering.
25  But -- so that's the terminology from there.

1      KARAN SINGH, Ph.D.
2          The specialization -- sure.  In
3  any computer science department where --
4  where a student obtains an advance degree,
5  there -- there is an evident specialization,
6  typically implicitly determined or hinted
7  by -- by their -- by their thesis or by
8  their -- by their coursework.  And in my
9  case, yes, it was in graphics and
10  interaction.
11      Q.    And did you have a
12  specialization for your master's degree?
13      A.    Similarly, my master's degree
14  was also  informed by -- by the courses I
15  took.
16      Q.    And, before that, you received
17  a bachelor's in computer science and
18  engineering from Indian Institute of
19  Technology; is that correct?
20      A.    That is correct.
21      Q.    What types of courses did you
22  take when you were there?
23      A.    At the Indian --
24          MR. BUSEY:  Objection to
25  asking -- with respect to the

1      KARAN SINGH, Ph.D.
2  bachelor's degree?  Is that what
3  you're asking?
4          MR. HAGIZ:  Yes.
5          MR. BUSEY:  Okay.  Thank you.
6          THE WITNESS:  At the Indian
7      Institute of Technology?
8  BY MR. HAGIZ:
9      Q.    Yes.
10      A.    As far as I remember, I took a
11  number of courses, general courses in
12  computer science, in programming, in systems,
13  in compiler design, in graphics, interaction,
14  working in artificial intelligence, a lot of
15  theoretical courses as well, algorithms.  A
16  fair number of courses.  It was a very
17  comprehensive program in a four-year program
18  in a fairly elitist institute.
19      Q.    Now, I heard you say computer
20  graphics.  What types of computer graphics
21  courses did you take?
22      A.    What type of computer graphics
23  courses?
24      Q.    Yes.
25      A.    And this is still you're

1      KARAN SINGH, Ph.D.
2  referring to my bachelor degree?
3      Q.    Yes.
4      A.    I took courses on the creation
5  of graphical elements in windows, in
6  windowing systems, in interacting with such
7  systems, in the creation of graphical
8  entities, primitives, graphical primitives,
9  some which are evident to the layman --
10  things like lines and circles and so on; some
11  that are more specialized that come under
12  terms like parametric terms and Bezier
13  curves.  These were just a list of topics
14  that I can recall.
15      Q.    Which windowing systems did you
16  use?
17      A.    As I recall, one system I
18  recall using was a system called SunView.  It
19  was a system -- I believe it was developed in
20  the early '80s and, at the IIT, we had access
21  to a number of workstations.  I specifically
22  remember having used a Sun workstation.
23  There was a company in business at the time
24  called Apollo Systems.  I used an Apollo
25  workstation.  As well as there was a company

KARAN SINGH, Ph.D.

1
2  at the time called DEC, Digital Equipment
3  Corporation.  I believe they also made
4  workstations, and we had some of those too.
5       Q.   And was it typical to use these
6  workstations as part of undergraduate
7  courses?
8       A.   For us, absolutely.
9       Q.   Now, in paragraph 3 of your
10  report you refer to your undergraduate
11  thesis; is that correct?
12       A.   Paragraph --
13            MR. BUSEY:  You're referring to
14  the initial report, correct --
15            MR. HAGIZ:  The initial report.
16            MR. BUSEY:  -- Exhibit 1?  Yeah.
17            THE WITNESS:  Yes, I do.
18  BY MR. HAGIZ:
19       Q.   Now, it says here you
20  implemented an interactive
21  two-and-a-half-dimensional drawing and
22  animation system in which graphical objects
23  could be layered.  What is
24  two-and-a-half-dimensional?
25       A.   Right.  So -- is it okay to

KARAN SINGH, Ph.D.

1
2  presume that you would understand
3  two-dimensional?
4       Q.   I believe so.
5       A.   Okay.  So add the term
6  "layered" to two-dimensional, and -- and that
7  is sort of synonymous with what, in technical
8  speak, we often refer to as
9  two-and-a-half-dimensional.
10       Q.   Now, it says the system was an
11  interactive editor for layered
12  two-dimensional graphical objects.  What type
13  of editing did it do?
14       A.   From what I remember, a system
15  that is now 20 years back, it allowed you to
16  create these two-dimensional entities and
17  transform them, move them around, and so on.
18       Q.   While we're on this topic,
19  let's take a look at paragraph 23 of
20  Exhibit 1.
21       A.   Paragraph 23.
22       Q.   Now, in paragraph 23, you opine
23  on what ordinary skill in the art at the time
24  of the invention would be; is that correct?
25       A.   That is correct.

KARAN SINGH, Ph.D.

1
2       Q.   What do you consider to be the
3  art of the '922 patent?
4       A.   I'm not sure I understand your
5  question.
6       Q.   What would you say the field of
7  the technology in the '922 patent is?
8       A.   Graphical user interfaces,
9  interactive graphics, human-computer
10  interaction.  These are all key words that
11  could be ascribed to the '922 patent.
12       Q.   And you claim -- again, in
13  paragraph 23 -- "A person of ordinary skill
14  of the art would have had at least a
15  bachelor's degree in computer science or the
16  equivalent, or at least four years of
17  experience working with graphical user
18  interfaces"; is that correct?
19       A.   Yes, I do.
20       Q.   On what do you base that
21  opinion?
22       A.   I base that opinion on --
23  actually, on two things.  One is my own
24  competence at the time, and that's something
25  that you've just been questioning me about,

KARAN SINGH, Ph.D.

1
2  as well as, in the fall of '91, I -- I joined
3  the Ohio State University as a graduate
4  student, as a master's student.
5            During the course of my early
6  studies over there, I -- I -- in the first
7  semester itself I had interactions with a
8  number of my peers in my cohort that were
9  students that, unlike me, came from
10  undergraduate institutions in North America.
11  We were taking similar courses, or the same
12  courses, and those courses -- many of those
13  courses actually required and had what --
14  what one would refer to or -- as ordinary
15  skill in the art of the '922 patent.
16            And so it -- it is not
17  unreasonable to presume that these students
18  had acquired the skill or the capability
19  to -- to -- to be such people of ordinary
20  skill in the art as part of their
21  undergraduate education.
22            I certainly believe that some
23  of them, like me, were students that were
24  coming into the graduate program fresh from
25  an undergraduate degree.

11 (Pages 38 to 41)

Page 42

KARAN SINGH, Ph.D.

1
2      Q.    Now, just to clarify, you said
3   some of those courses would require what's
4   ordinary skill in the art of the '922 patent.
5   By that do you mean they would require a
6   background in graphical user interfaces?
7      A.    That's right.
8         MR. BUSEY: Objection.
9   Go ahead.
10        THE WITNESS: Sorry.
11        MR. BUSEY: Go ahead.
12  BY MR. HAGIZ:
13     Q.    Now, I just wanted to turn back
14  quickly to your CV.
15     A.    Uh-huh.
16     Q.    You have a number of patents;
17  is that correct?
18     A.    Sure. I certainly believe
19  there is a section for it, so there must be
20  something there. Yes.
21     Q.    What field are those patents
22  in?
23     A.    Within the area of graphics and
24  interaction.
25     Q.    Do you know if you're listed as

Page 43

KARAN SINGH, Ph.D.

1
2   the sole inventor on any of them?
3      A.    I certainly do know that I'm
4   not listed as the sole inventor on -- on some
5   of them, but I -- for example, the Japanese
6   patents, I -- I actually don't recall how the
7   company that I worked for went about defining
8   their -- defining their inventors, you know,
9   whether it was their culture to -- to have
10  the entire chain of command or the hierarchy
11  of people that you were working under in the
12  research lab, or whether you were the sole --
13  truly the sole inventor.
14        Certainly, the Japanese patents
15  were an example of -- of work that I sort of
16  largely invented on my own. As to whether I
17  was listed as the sole inventor, I'm not
18  sure.
19     Q.    So are all of these patents in
20  connection with work you did through
21  employment or through an institution?
22     A.    No. All of them barring the
23  first one. The first one, interactive
24  labyrinth curve generation and applications.
25     Q.    And what did that patent come

Page 44

KARAN SINGH, Ph.D.

1
2   from?
3      A.    That patent was collaborative
4   work that I did with an old colleague and
5   friend, and we decided to -- we had a little
6   project that we -- we worked on and
7   collaborated on. My colleague -- my
8   co-inventor felt that -- that it had value
9   and that he would like to protect it, and he
10  was amenable and keen to go through the
11  entire -- the rigors of going through the
12  patenting process, and I was okay with that.
13     Q.    Now, did you assist in
14  preparing any of the patent applications?
15     A.    Yes, inasmuch as any inventor
16  assists with the preparing of a patent
17  application.
18     Q.    And how did you assist exactly?
19     A.    By providing examples, by
20  providing written reports, by -- through
21  conversations with legal counsel. Those are
22  some examples that I can remember, but there
23  may have been others. I haven't actually --
24  I believe the last of these was filed back in
25  2004 or '5, so it's been a few years.

Page 45

KARAN SINGH, Ph.D.

1
2      Q.    Do you recall if you helped
3   prepare the specification on any of the
4   patents?
5      A.    Yes, I believe that would be --
6   be correct in the sense that the figures are
7   often either provided by inventors or -- or
8   perhaps are described by inventors in -- in
9   elucidating their technology.
10        And in my understanding, as a
11  person of ordinary skill in the art, the --
12  the figures are part of the patent
13  specification. I may be wrong on that,
14  though.
15     Q.    And did you help draft any of
16  the claims in any of the patents?
17     A.    That I'm a little more fuzzy
18  on. I may have -- I may have certainly
19  helped in defining them or refining them, but
20  as to whether I was the one specifically
21  proposing those claims as -- as they were
22  presented, I'm not sure though -- though I
23  believe the claims are in -- to a degree a
24  distillation of the inventor's disclosure of
25  what -- what is of value and what is -- what

TSG Reporting 877-702-9580

KARAN SINGH, Ph.D.

1    KARAN SINGH, Ph.D.
2  is interesting or valuable to a patent.
3    So in that respect, sure.
4    Q.    Dr. Singh, what is your
5  understanding of what claim construction is?
6    A.    My understanding of claim
7  construction is to provide a construction of
8  terms, some terms, in a patent that would be
9  the understanding of those terms of a person
10  with ordinary skill in the art at the time of
11  the filing of the patent.
12    Q.    And what do you understand
13  about how terms in a patent are supposed to
14  be construed?
15    A.    My understanding is there are,
16  of course, a number of ways in which terms
17  typically can -- can be construed.  There
18  is -- I'm not using this term in a legal
19  sense in any way, but there is what you might
20  refer to or call sort of a plain language or
21  layman understanding of a term that might be
22  typical.
23    There may be a term that may --
24  may not be exactly layman, but certainly
25  clear -- of simple understanding to a person

1    KARAN SINGH, Ph.D.
2  of ordinary skill in the art, meaning that it
3  may have a certain technical element that a
4  person on the street might not pick up on,
5  but certainly a person of ordinary skill in
6  the art should, as well as -- as well as how
7  that term might be construed based on both
8  the claim language as well as -- as well as
9  the intrinsic evidence.
10    Q.    Now, what is your understanding
11  of the role of the prosecution history in
12  construction of terms?
13    A.    Well, I believe the -- the
14  prosecution history is part of the intrinsic
15  evidence.  And so, in that sense, I think I
16  just answered your -- I answered your
17  question already.
18    Q.    Do you understand that a
19  patent -- an applicant may disclaim certain
20  territory in the claims through statements
21  made in the prosecution history?
22    MR. BUSEY:  Objection to the
23  extent it calls for a legal
24  conclusion.
25    THE WITNESS:  I have no idea

1    KARAN SINGH, Ph.D.
2  what you mean by that question.
3  BY MR. HAGIZ:
4    Q.    Do you understand that, through
5  statements in the prosecution history, a
6  patent applicant can narrow the scope of the
7  claims?
8    MR. BUSEY:  Objection to the
9  extent it calls for a legal
10  conclusion.
11    THE WITNESS:  I think you're
12  really going to have to rephrase that
13  question.  I -- I am just not getting
14  it.
15  BY MR. HAGIZ:
16    Q.    What is your understanding of
17  how the prosecution history affects
18  construction of a claim term?
19    A.    My understanding is that
20  portions of the prosecution history that
21  refer to and relate to a claim term can
22  provide some light or evidence or context for
23  its construction.
24    Q.    So do you understand that if an
25  applicant in the prosecution history states

1    KARAN SINGH, Ph.D.
2  that a certain embodiment is not covered by
3  the patent, he can't later claim that
4  embodiment?
5    MR. BUSEY:  Objection to the
6  extent it calls for a legal conclusion
7  and is ambiguous.
8    Go ahead.
9    THE WITNESS:  Sorry, I lost the
10  question.  Can you -- could you repeat
11  it.
12    MR. HAGIZ:  Can you read it
13  back?
14    (Above-requested testimony was
15  read back by reporter.)
16    THE WITNESS:  I'm not aware of
17  this.  To me this sounds like a
18  legality in -- in -- in patent law
19  that I am unaware of.
20    MR. HAGIZ:  Will the court
21  reporter mark as Exhibit 3 a copy of
22  the '922 patent.
23    (Singh Exhibit No. 3 was marked
24  for identification.)
25  BY MR. HAGIZ:

Page 50

KARAN SINGH, Ph.D.

1
2    Q.    Dr. Singh, do you recognize
3  Exhibit 3?
4    A.    Yes.
5    Q.    And is -- is Exhibit 3 the
6  patent on which you opined in your reports?
7    A.    Yes.
8    Q.    Dr. Singh, what would you say
9  the '922 patent is about?
10      MR. BUSEY:  Objection as to
11  form.  Go ahead.
12      THE WITNESS:  The '922 patent is
13  about the overlay of images using a
14  concept of translucency and further
15  teaches about how input is dealt with
16  in this context and changes
17  resulting -- or the result of that
18  input is manifested within those
19  images.
20      MR. HAGIZ:  I'm about to start
21  on a pretty long line of questions, so
22  do you want to take a break now?
23      MR. BUSEY:  Sure.
24      THE VIDEOGRAPHER:  This is the
25  end of tape 1.  Off the record at

Page 51

KARAN SINGH, Ph.D.

1
2  10:17.
3      (Recess.)
4      THE VIDEOGRAPHER:  This is the
5  beginning of tape 2 in the deposition
6  of Dr. Singh.  On the record at 10:36.
7  BY MR. HAGIZ:
8    Q.    Now, Dr. Singh, before we
9  broke, you briefly mentioned the concept of
10  translucency.  Can I have you turn to
11  paragraph 26 on page 6 of Exhibit 1.
12    A.    Exhibit 1.  Okay.
13  Paragraph 26, yes, sir.
14    Q.    Now, in paragraph 26 you state,
15  "The term 'translucent image' means an image
16  that is neither wholly transparent nor wholly
17  opaque"; is that correct?
18    A.    Yes.
19    Q.    And is that still your opinion
20  at this time?
21    A.    Yes.
22    Q.    Okay.  Before we go into that,
23  let's actually go to your rebuttal report,
24  Exhibit 2, paragraph 12.
25    A.    Paragraph 12.  Yes.

Page 52

KARAN SINGH, Ph.D.

1
2    Q.    And in the first sentence of
3  paragraph 12, you say, "A translucent image,
4  as that term is used in the '922 patent, is
5  characterized by the presence of translucent
6  pixels."
7      What is a pixel?
8    A.    A pixel, as a person of
9  ordinary skill in the art would understand,
10  is an atomic entity of an image or a window,
11  as the term is used in the context of this
12  patent.
13    Q.    Now, is the pixel what appears
14  on your monitor?
15    A.    A pixel can be what appears on
16  your monitor.  A pixel can be an atomic
17  entity that has a virtual representation in
18  memory that -- that can at some point
19  manifest itself on your monitor.  It can also
20  manifest itself as a dot on -- or a number of
21  dots on -- on your printer or any other
22  imaging device.
23    Q.    Now -- so what does it mean for
24  a pixel to be translucent?
25    A.    What it means for a pixel to be

Page 53

KARAN SINGH, Ph.D.

1
2  translucent, where the term "translucent" is
3  used in the context of this patent, is that
4  it is -- that it is -- that a portion of it
5  is some kind of a visual blend of -- of two
6  or more other pixels.
7    Q.    You say a portion of it is a
8  visual blend.  What portion?
9    A.    Sorry.  Did I say a portion of
10  it?
11      THE WITNESS:  Could you read
12  back what I said exactly?
13      (Above-requested testimony was
14  read back by reporter.)
15      THE WITNESS:  Sorry.  I did not
16  mean to say a portion of it.  I meant
17  to say it is.
18  BY MR. HAGIZ:
19    Q.    So what does it mean for the
20  pixel to be a visual blend?
21    A.    For a pixel to be a visual
22  blend means that the pixel has visual aspects
23  of the one or more pixels that is -- or
24  sources that is contributing to it.
25    Q.    And what are those aspects?

14 (Pages 50 to 53)

KARAN SINGH, Ph.D.

1
2      A.    Those could be -- those aspects
3   could be any aspect that define the visual
4   appearance of that pixel such as -- I'll give
5   you an example -- such as the intensity of a
6   pixel.
7      Q.    So how are those aspects
8   blended?
9      A.    There are a number of ways by
10  which these aspects or these pixels are
11  blended.  There are a number of operations,
12  mathematical operations, that can result in a
13  blend.  This blend is sometimes carried out
14  by a software program.  The blend is
15  sometimes carried out by specialized
16  hardware.
17     Q.    And can you tell me what a
18  blending engine is?
19     A.    A blending engine is -- is a
20  program or a process that would do that --
21  the process of blending.
22     Q.    Now, to your knowledge, is the
23  '922 patent the first patent to describe
24  blending?
25     A.    The concept of blending, I

KARAN SINGH, Ph.D.

1
2   don't know.  You know, I obviously don't have
3   a comprehensive knowledge of -- of all the
4   patents that -- that antedate the '922
5   patent.  But the '922 patent does also talk
6   about blending, yes.
7      Q.    Let me rephrase.  To your
8   knowledge, was blending known in the art or
9   in the field before the '922 patent?
10         MR. BUSEY:  Objection as to form
11     and to the extent it calls for any
12     legal conclusion.
13         Go ahead.
14         THE WITNESS:  The concept of a
15     visual blend?  Sure, it may well have
16     been known.
17  BY MR. HAGIZ:
18     Q.    What about the implementation
19  of a visual blend or a blending engine?
20         MR. BUSEY:  Objection.
21     Ambiguous.
22         THE WITNESS:  That I can say
23     less conclusively.
24  BY MR. HAGIZ:
25     Q.    So would you say that the

KARAN SINGH, Ph.D.

1
2   invention of the '922 patent is the blending
3   engine, or the blending?
4          MR. BUSEY:  Objection to the
5      extent it calls for a legal conclusion
6      and is ambiguous.
7          Go ahead.
8          THE WITNESS:  I don't -- let's
9      look at the claim language and see if
10     it actually is claimed.
11         I don't actually see the word
12     "blend" in the claim language.
13  BY MR. HAGIZ:
14     Q.    So to your understanding, what
15  is the utility of the '922 patent?
16         MR. BUSEY:  Object to the extent
17     it calls for a legal conclusion and
18     the term is ambiguous.
19         Go ahead.
20         THE WITNESS:  The utility of the
21     '922 patent is what is stated in the
22     claim terms.
23  BY MR. HAGIZ:
24     Q.    And what do you understand that
25  to be?

KARAN SINGH, Ph.D.

1
2      A.    Well, that's a somewhat long
3   answer.  It's provided in my expert report.
4      Q.    What advantage would you say a
5   user gets from using the method of the '922
6   patent over the prior art?
7          MR. BUSEY:  Objection.  Calls
8      for a legal conclusion.
9          Go ahead.
10         THE WITNESS:  Sorry.  Could you
11     repeat that question.  Brian's
12     interjection made me --
13  BY MR. HAGIZ:
14     Q.    Let me rephrase, actually.
15     A.    Right.
16     Q.    What benefits do the invention
17  of the '922 patent provide over the prior
18  art?
19         MR. BUSEY:  Same objection.
20         THE WITNESS:  I don't know the
21     prior art well enough to -- or the
22     specific prior art that you might be
23     referring to.
24  BY MR. HAGIZ:
25     Q.    But you're familiar with

Page 58

1          KARAN SINGH, Ph.D.
2    windowing systems or windowing graphical user
3    interfaces at the time of the invention,
4    correct?
5          A.    Absolutely, yes.
6          Q.    And did windowing user --
7    graphical user interfaces at the time of the
8    invention implement the method or the
9    invention of the '922 patent?
10         MR. BUSEY:  Objection.  Beyond
11    the scope and to the extent it calls
12    for any legal conclusion.
13         You can answer.
14         THE WITNESS:  If I get that
15    right, you asked me whether windowing
16    systems at the time had an
17    implementation of the '922 patent?
18    BY MR. HAGIZ:
19         Q.    Yes.
20         MR. BUSEY:  Same objection.
21         THE WITNESS:  Not that I am
22    aware of, not the window systems I
23    used, anyway.
24    BY MR. HAGIZ:
25         Q.    So what do you think the --

Page 59

1          KARAN SINGH, Ph.D.
2    scratch that.
3          What advantage do you think the
4    '922 patent provides over the windowing
5    systems that you know of that were available
6    at the time?
7          MR. BUSEY:  Objection.  Asked
8    and answered and to the extent it
9    calls --
10         THE WITNESS:  You just asked
11    me --
12         MR. BUSEY:  -- for a legal
13    conclusion.
14         THE WITNESS:  -- this question.
15         MR. BUSEY:  Go ahead.
16         THE WITNESS:  Sorry.  I thought
17    I had just been asked exactly that
18    question, and my point was the
19    advantages in the claim terms.
20    BY MR. HAGIZ:
21         Q.    What is your understanding of
22    what the '922 patent allows a user to do that
23    could not be done in the windowing systems at
24    the time?
25         MR. BUSEY:  Objection.  Beyond

Page 60

1          KARAN SINGH, Ph.D.
2    the scope.  Calls for a legal
3    conclusion.  And asked and answered.
4          Go ahead.
5          THE WITNESS:  It allows a user
6    to -- to do things that are defined in
7    the claim terms.
8    BY MR. HAGIZ:
9          Q.    But the '922 patent has more
10    than just the claim terms, correct?
11         MR. BUSEY:  Objection.
12    Ambiguous.  Confusing.
13         THE WITNESS:  I'm not sure I
14    understand what you mean by "more" in
15    this case.
16    BY MR. HAGIZ:
17         Q.    The '922 patent had a
18    specification, correct?
19         A.    Yes.
20         Q.    How are the techniques
21    described in the specification of the '922
22    patent an improvement over the windowing
23    systems available at the time?
24         MR. BUSEY:  Objection.  Beyond
25    the scope.  Calls for a legal

Page 61

1          KARAN SINGH, Ph.D.
2    conclusion.
3          Go ahead.
4          THE WITNESS:  The examples in
5    the specification indicate examples of
6    being able to -- to interact with
7    windows and translucent windows where
8    the term "translucent" is viewed in
9    the context of -- of this patent in --
10    in novel ways illustrated in those
11    examples.
12    BY MR. HAGIZ:
13         Q.    And what are some of those
14    novel ways?
15         MR. BUSEY:  Objection.  Beyond
16    the scope.
17         Go ahead.
18         THE WITNESS:  Well, the novel
19    ways relate to acting upon -- that
20    relate to working with programs and
21    applications that coexist via these
22    images, and performing operations in a
23    way that -- that I believe had not
24    been done before.
25    BY MR. HAGIZ:

1              KARAN SINGH, Ph.D.
2       Q.    Can you turn to column 4,
3  line -- starting at line 34 in Exhibit 3.
4       A.    Yup.
5       Q.    So, column 4, line 34 says,
6  "Advantage of the present invention is that a
7  translucent overlay can be provided which
8  permits a user to input data into an active
9  application program without obscuring the
10 user's view of the program's display window."
11             Would you agree that that is an
12 advantage of the '922 patent?
13      A.    Sure, in -- as long as it
14 doesn't limit other advantages.
15      Q.    All right.  What other
16 advantages are there, to your understanding?
17             MR. BUSEY:  Objection to the
18      extent it calls for a legal
19      conclusion.  Beyond the scope.
20             Go ahead.
21             THE WITNESS:  Items that are
22      described in the claim language.
23 BY MR. HAGIZ:
24      Q.    And, Dr. Singh, you can't
25 explain what those advantages are without

1              KARAN SINGH, Ph.D.
2  referring to the claim language?
3       A.    I believe -- I believe I could
4  without being conclusive about them, sure.
5       Q.    So could you try?
6       A.    Okay.  So -- yeah, the
7  advantage essentially allows the program --
8  the program or programs to perform operations
9  on multiple windows that might be
10 translucently overlapped in a way that one
11 typically would otherwise work with them
12 where they were not overlapping but further
13 use the overlap as a context for those
14 operations.
15             So not only does it allow you
16 to -- to perform operations in -- in windows
17 in a way that you might have been able to
18 were they not overlapping, but it allows you
19 to use that overlap to your advantage as --
20 as context for the operations that you
21 perform.
22      Q.    Now, what do you mean by
23 context?
24      A.    I believe I use the word
25 "context" in my claim construction.  I think

1              KARAN SINGH, Ph.D.
2  I probably -- well, essentially, I -- by
3  "context" I mean that the -- I mean its
4  plain -- plain English language meaning,
5  which is the -- the setting under which
6  certain actions or -- or -- actions may be
7  performed or interpretations may be made.
8  Essentially, the -- it establishes a scenario
9  that is distinct from perhaps other
10 scenarios.  That's what I mean by context.
11      Q.    All right.  Now, let's go back
12 to your construction of translucent image.
13      A.    Okay.
14      Q.    So you stated that it is an
15 image that is neither wholly transparent nor
16 wholly opaque.
17      A.    Yes.
18      Q.    What is wholly opaque?
19      A.    Wholly opaque, if we were to
20 use this term in conjunction with -- with the
21 term "pixel" that has been suggested as a way
22 of elaborating and -- and making clear,
23 clarifying certain terms, would be an image
24 where each pixel of that image was precisely
25 opaque, where opaque would mean -- where

1              KARAN SINGH, Ph.D.
2  opaque would mean that the visual appearance
3  of that pixel was determined by a single
4  source.
5       Q.    And then what is wholly
6  transparent?
7       A.    Wholly transparent, similarly,
8  would be an image where every pixel was
9  completely transparent in that, again, given
10 multiple sources, it's -- the visual
11 appearance of the pixel would be determined
12 by a single source; however, to -- to talk
13 about these terms, opaque and transparent and
14 translucent, there -- there needs to be
15 the -- the notion of an ordering of -- a
16 visual ordering of these sources in terms of
17 their -- their depth in relation to -- to the
18 eye.
19             And so a wholly transparent
20 image or a wholly transparent pixel would be
21 one where the -- the source whose -- that was
22 closest to the -- to the eye or to the viewer
23 would play no role in -- in determining the
24 visual appearance of that pixel.
25      Q.    So suppose I had an image where

                              17 (Pages 62 to 65)

Page 66

```
1              KARAN SINGH, Ph.D.
2  50 percent of the pixels were opaque and 50
3  percent of the pixels were transparent.  Is
4  that a translucent image?
5              MR. BUSEY:  Objection.
6  Incomplete hypothetical.
7              Go ahead.
8              THE WITNESS:  That is a
9  translucent image if taken strictly
10  with the sentence "not wholly
11  transparent and not wholly opaque"
12  without the context, without the light
13  of the patent and its intrinsic
14  evidence, yes.
15  BY MR. HAGIZ:
16      Q.    All right.  But your
17  construction of translucent image is "neither
18  wholly transparent nor wholly opaque," so
19  wouldn't my example fit under your
20  construction?
21      A.    My construction of it being not
22  wholly transparent nor wholly opaque is my
23  construction as would be interpreted by
24  somebody of ordinary skill in the art taken
25  in conjunction and in light of the intrinsic
```

Page 67

```
1              KARAN SINGH, Ph.D.
2  evidence.  And -- so with the light -- with
3  the intrinsic evidence, I would exclude that
4  particular example, yes.
5      Q.    Okay.  Does it matter if it's
6  10 percent opaque and 90 percent transparent?
7      A.    Does it matter with reference
8  to what?
9      Q.    Would that change your answer
10  to the question?
11              MR. BUSEY:  Objection.
12  Ambiguous.
13              Go ahead.
14              THE WITNESS:  No.
15  BY MR. HAGIZ:
16      Q.    So essentially you're saying
17  that just the words "neither wholly
18  transparent nor wholly opaque" would include
19  an example that is entirely opaque pixels --
20  sorry, 50 percent opaque pixels and 50
21  percent transparent pixels and no translucent
22  pixels?
23              MR. BUSEY:  Objection.
24  Mischaracterizes the witness'
25  testimony.
```

Page 68

```
1              KARAN SINGH, Ph.D.
2              THE WITNESS:  Sorry.  Could you
3  repeat what you just said?
4  BY MR. HAGIZ:
5      Q.    Sure.  Let me restate.
6      A.    Yes.
7      Q.    So essentially your
8  conclusion -- I'm sorry.  Scratch that.
9              Essentially your construction,
10  the words "neither wholly transparent nor
11  wholly opaque" for translucent image would
12  include under the claims the example of 50
13  percent opaque pixels and 50 percent
14  transparent pixels?
15              MR. BUSEY:  Objection.
16  Misstates the -- mischaracterizes and
17  misstates the witness' prior
18  testimony.  Asked and answered as
19  well.
20              Go ahead.
21              THE WITNESS:  If abstracted from
22  the context of this patent, yes.
23  BY MR. HAGIZ:
24      Q.    What do you mean by abstracted
25  from the concept of the patent?
```

Page 69

```
1              KARAN SINGH, Ph.D.
2      A.    Not concept.  I said context.
3      Q.    Oh, sorry.  What do you mean by
4  abstracted from the context of the patent
5  then?
6      A.    I mean, looked at as a simple
7  sentence that either a layman would
8  understand, or even perhaps a person of
9  ordinary skill in the art might understand,
10  strictly as a sentence by itself without
11  the -- without the -- without being privy to
12  the information, the examples, the
13  prosecution history, the -- the intrinsic
14  evidence of the patent.
15      Q.    So does that mean that your
16  construction doesn't account for those
17  examples?
18              MR. BUSEY:  Objection.
19  Mischaracterizes the witness' prior
20  testimony.
21              THE WITNESS:  My construction
22  doesn't -- does account for those
23  examples.
24  BY MR. HAGIZ:
25      Q.    How does it account for those
```

TSG Reporting 877-702-9580

1          KARAN SINGH, Ph.D.
2   examples?
3       A.    My construction, read along
4   with the -- along with the patent and its
5   intrinsic evidence, does account for those
6   examples.
7       Q.    What did the examples add to
8   your construction?
9       A.    They provide instances that
10  require that terminology to be either -- to
11  be -- to be sort of elaborated upon or made
12  more explicit.
13      Q.    Can you tell me what those
14  instances are?
15      A.    Sure.  Well, I don't actually
16  have the prosecution history with me over
17  here, so it would be very difficult for me to
18  actually provide you with those examples.
19      Q.    Okay.  Well, we'll get to that
20  later, but --
21      A.    Okay.
22      Q.    -- are there any examples in
23  the patent that tell you to read -- that tell
24  you what to add to your construction to
25  understand it completely?

1          KARAN SINGH, Ph.D.
2       A.    No.
3       Q.    Let's go back to your rebuttal
4   report, paragraph 12.  That's Exhibit 2,
5   paragraph 12.
6       A.    Uh-huh.
7       Q.    Now, about halfway down,
8   last -- second to last sentence, you say,
9   "What the patent requires is that at least
10  some of the pixels in a translucent image be
11  a visual blend of two or more images.  This
12  is what the '922 patent means by 'can be seen
13  but also can be seen through.'"
14      A.    Uh-huh.
15      Q.    Is that correct?
16      A.    Yes.
17      Q.    Do you agree with that
18  statement?
19      A.    Yes.
20      Q.    Now, does the construction
21  "neither wholly opaque nor wholly
22  transparent" require that at least some of
23  the pixels in the translucent image be a
24  visual blend of two or more images?
25          MR. BUSEY:  Objection to the

1          KARAN SINGH, Ph.D.
2   extent it calls for a legal
3   conclusion.
4          THE WITNESS:  It doesn't
5   preclude them.
6   BY MR. HAGIZ:
7       Q.    But does it require them?
8          MR. BUSEY:  Objection.  Asked
9   and answered and to the extent it
10  calls for a legal conclusion.
11          THE WITNESS:  No, it does not
12  require them.
13  BY MR. HAGIZ:
14      Q.    So are you saying that you
15  disagree with your statement in paragraph 12?
16      A.    No, absolutely not.  I agree
17  with my statement in paragraph 12.
18      Q.    Then are you changing your
19  construction of translucent image?
20      A.    No, I'm not.
21          MR. BUSEY:  Objection.
22  Mischaracterizes witness' testimony.
23          THE WITNESS:  Sorry about that,
24  Brian.
25          MR. BUSEY:  It's okay.

1          KARAN SINGH, Ph.D.
2          THE WITNESS:  No, I'm not
3   changing because my definition of --
4   or, sorry, my construction of
5   translucent image in the light of this
6   patent exactly requires that it be
7   looked at in the light of this patent
8   which requires that you also look at
9   the intrinsic evidence in conjunction
10  with -- with that term.
11  BY MR. HAGIZ:
12      Q.    So you're saying that your
13  construction, standing alone, does not
14  actually describe the full limits of the
15  claims; is that right?
16          MR. BUSEY:  Objection.
17  Mischaracterizes the witness'
18  testimony and calls for a legal
19  conclusion.
20          Go ahead.
21          THE WITNESS:  I believe I
22  already said that my construction does
23  need to be read in context of the
24  intrinsic evidence.
25  BY MR. HAGIZ:

19 (Pages 70 to 73)

KARAN SINGH, Ph.D.

1
2      Q.   Do any of your other
3  constructions need to be read in the context
4  of the intrinsic evidence to be fully
5  understood?
6      A.   They might.  My understanding
7  is that all constructions are taken and
8  looked at in conjunction with the intrinsic
9  evidence and in light of the patent.
10     Q.   All right, then.  But just to
11 be clear, would you say that the claims of
12 the patent covered the case of a window or an
13 image that is 50 percent opaque pixels and 50
14 percent transparent pixels?
15         MR. BUSEY:  Objection to the
16     extents it calls for a legal
17     conclusion.
18         THE WITNESS:  Can you repeat
19     that?
20         MR. BUSEY:  And it's ambiguous,
21     claims -- as to claims.
22 BY MR. HAGIZ:
23     Q.   Sure.  Actually, I'll rephrase.
24     A.   Yeah.
25     Q.   Would you say that any of the

KARAN SINGH, Ph.D.

1
2  claims of the '922 patent cover a translucent
3  image that is 50 percent opaque pixels and 50
4  percent transparent pixels?
5          MR. BUSEY:  Hold on just a
6      second.  Objection to the extent it
7      calls for a legal conclusion and it's
8      ambiguous.
9          Go ahead.
10         THE WITNESS:  From what I can
11     tell, there is really no explicit
12     reference to that in the claim
13     language at all.
14 BY MR. HAGIZ:
15     Q.   So does that mean the claims do
16 cover it or don't cover it?
17         MR. BUSEY:  Objection.  Same
18     objection.
19         THE WITNESS:  It's saying that
20     the -- that the claims do not
21     specifically address it.
22 BY MR. HAGIZ:
23     Q.   Okay.  But in light of the
24 specification and the other intrinsic
25 evidence, is it your understanding that the

KARAN SINGH, Ph.D.

1
2  claims cover that case or don't cover that
3  case?
4          MR. BUSEY:  Objection to the
5      extents it calls for a legal
6      conclusion.  Go ahead.  And it's
7      ambiguous.
8          THE WITNESS:  Which case?
9  BY MR. HAGIZ:
10     Q.   The 50 percent opaque pixels,
11 50 percent transparent pixels case?
12         MR. BUSEY:  Same objection.
13         THE WITNESS:  So to restate your
14     question, what you're saying is, does
15     the term "translucent image" in light
16     of the intrinsic evidence of the
17     patent cover the 50 percent
18     transparent, 50 percent opaque pixels
19     case; is that correct?
20 BY MR. HAGIZ:
21     Q.   Let me rephrase that, actually.
22     A.   Okay.
23     Q.   Would one of ordinary skill in
24 the art believe that he's infringing this
25 patent if he programs an image that has 50

KARAN SINGH, Ph.D.

1
2  percent opaque pixels and 50 percent
3  transparent pixels?
4          MR. BUSEY:  Objection.  Beyond
5      the scope.  Calls for a legal
6      conclusion and is an incomplete
7      hypothetical and is also ambiguous.
8          Go ahead.
9          THE WITNESS:  Well, I can't
10     really provide an opinion on whether
11     the patent is being infringed upon or
12     not.  I'm just not legally informed
13     enough to -- to actually pass judgment
14     on that.
15 BY MR. HAGIZ:
16     Q.   What would your understanding
17 be, from what you do know?
18         MR. BUSEY:  Objection.  Calls
19     for speculation and, in addition,
20     calls for a legal conclusion.  Beyond
21     the scope.  Ambiguous.  And the
22     witness has answered the question.
23         THE WITNESS:  I believe I've
24     answered the question.
25         MR. HAGIZ:  You know what, let's

1          KARAN SINGH, Ph.D.
2    mark as Exhibit 4, if I can find it --
3    this is produced by Apple as Bates
4    numbers -- and I'll just give the last
5    four digits -- 2829 through 2883.
6    It's a communication with the Patent
7    Office labeled "Reply to office
8    action," dated August 30th, 2007.
9          (Singh Exhibit No. 4 was marked
10         for identification.)
11   BY MR. HAGIZ:
12        Q.    Dr. Singh, have you seen this
13   document before?
14        A.    I would have to look at it more
15   carefully.
16        Q.    Take your time.
17        A.    I may have skimmed across it,
18   but I don't actually recognize it in -- to
19   any strong of degree of familiarity or
20   detail.
21        Q.    Okay.  Do you know this is from
22   the '922 patent file history, prosecution
23   history?
24        A.    If you tell me so.
25        Q.    I would like you to turn to

1          KARAN SINGH, Ph.D.
2    page 37 which is Bates stamped as 2865.
3        A.    37.  Yes.
4        Q.    Now, beginning with the very
5    last sentence, it states, "The applied IBM
6    Phillips references use the term
7    'transparent'" --
8        A.    Excuse me.  Where are you
9    reading from?
10        Q.    Sorry.  The very bottom of the
11   page 37.
12        A.    Okay.
13        Q.    It states, "The applied IBM and
14   Phillips references use the term
15   'transparent'" -- and continuing to the next
16   page, it says, "The two terms 'transparent'
17   and 'translucent' are not identical and, in
18   this case, are not equivalent."
19          Were you aware of that before
20   today?
21        A.    I have seen some discourse
22   similar to this.  I can't say that this is
23   exactly where I saw it or what I saw.
24        Q.    Now, continuing on page --
25   still on 38, actually --

1          KARAN SINGH, Ph.D.
2        A.    Uh-huh.
3        Q.    -- about two-thirds of the way
4    down the page, the paragraph that begins,
5    "References also requested" -- do you see
6    that?
7        A.    Yes.
8        Q.    The next sentence says,
9    "Applicants also note that IBM defines
10   transparent as piece of glass at page 269,
11   first paragraph."
12        A.    Uh-huh.
13        Q.    Now, skipping that block quote,
14   it continues, "Thus, the two terms have very
15   different meanings in the present case, and
16   this difference is much more than just the
17   semantics.  The difference goes into both the
18   implementation and the use of the two
19   techniques.  As shown in the applied
20   references, performing transparency
21   operations on windows, or portions thereof,
22   and images is relatively simple, but this
23   does not teach or suggest the more
24   complicated operations involved in
25   translucency, examples of which are provided

1          KARAN SINGH, Ph.D.
2    in the instant application."
3          Have you seen that before
4    today?
5        A.    I have seen something similar,
6    as I said.  I can't be sure whether it is
7    precisely this page or perhaps a similar one
8    that I have taken a look at.
9        Q.    Did you rely on this statement
10   or a similar one in reaching your conclusion
11   as far as what transparent might mean?
12          MR. BUSEY:  Objection to the
13   form of the question.
14          Go ahead.
15          THE WITNESS:  I did take
16   statements such as this into account,
17   yes.
18   BY MR. HAGIZ:
19        Q.    Okay.  And just for reference,
20   you state that, "A transparent image is one
21   where every single pixel is transparent,"
22   correct?
23          MR. BUSEY:  Objection.
24   Mischaracterizes the witness'
25   testimony.

Page 82

```
1              KARAN SINGH, Ph.D.
2         THE WITNESS:  A transparent
3    image in layman terms divested from
4    any further context, yes.
5    BY MR. HAGIZ:
6         Q.    So does translucent image mean
7    something different in the context of the
8    patent?
9              MR. BUSEY:  Objection to the
10   extent it calls for a legal
11   conclusion.
12        Go ahead.
13        THE WITNESS:  I think in the
14   patent and perhaps in places in the
15   intrinsic evidence, the term
16   "transparency" or the term
17   "transparent" could be used to -- to
18   indicate, for instance, a mix of
19   transparency and opacity.
20        These are terms that cannot
21   be -- cannot be easily divested from
22   each other.  In some sense, they're --
23   they're sort of opposites from each
24   other, right.
25   BY MR. HAGIZ:
```

Page 83

```
1              KARAN SINGH, Ph.D.
2         Q.    Now, before -- scratch that.
3         Your construction of
4    translucent as neither wholly opaque nor
5    wholly transparent, that also includes a mix
6    of transparency and opacity; is that correct?
7              MR. BUSEY:  Objection to the
8    extent it calls for a legal
9    conclusion.
10        You can answer.
11        THE WITNESS:  Can you repeat
12   that?
13        MR. HAGIZ:  Sure.  Can you read
14   that question back?
15        (Above-requested testimony was
16   read back by reporter.)
17        THE WITNESS:  To restate --
18        MR. BUSEY:  Same objection.
19        THE WITNESS:  To restate what I
20   have said before, is that sentence,
21   taken out of context, would include --
22   would include an example that strictly
23   had a mix of transparency and opacity.
24   Within context, that is not the case.
25   BY MR. HAGIZ:
```

Page 84

```
1              KARAN SINGH, Ph.D.
2         Q.    Then, can you give me a
3    construction of translucent that does include
4    the context?
5              MR. BUSEY:  Objection.
6    Objection to the extent it was asked
7    and answered earlier.
8         Go ahead.
9         THE WITNESS:  I could offer you
10   a more elaborate construction from my
11   rebuttal report.  In paragraph 12, "A
12   translucent image, as that term is
13   used in the '922 parent, is
14   characterized by the presence
15   translucent pixels.  Some pixels
16   belonging to a translucent image may
17   be transparent, just as some pixels
18   belonging to a translucent image may
19   be opaque.  What the patent requires
20   is that at least some of the pixels in
21   a translucent image be a visual blend
22   of two or more images."
23   BY MR. HAGIZ:
24        Q.    So, does paragraph 12 --
25   scratch that.
```

Page 85

```
1              KARAN SINGH, Ph.D.
2         Do your statements in
3    paragraph 12, to your understanding, fully
4    characterize the term "translucent image" as
5    it's used in the claims?
6              MR. BUSEY:  Objection to the
7    extent it calls for a legal conclusion
8    and to the extent it's inconsistent
9    with the witness' prior testimony.
10        You can answer.
11        THE WITNESS:  They provide a
12   more -- they provide a more elaborated
13   meaning.  Whether that meaning is
14   truly the definitive one is -- is --
15   is always speculative because there --
16   there is all -- no matter how -- yeah,
17   there is always room for potential
18   misinterpretation on the part of a
19   person with ordinary skill in the art.
20   And so --
21   BY MR. HAGIZ:
22        Q.    Are you finished?
23        A.    Yes, I am.
24        Q.    So are you telling me that one
25   of ordinary skill in the art would not be
```

22 (Pages 82 to 85)

1            KARAN SINGH, Ph.D.
2   able to understand exactly what a translucent
3   image is?
4            MR. BUSEY:  Objection.
5       Mischaracterizes the witness'
6       testimony.
7            THE WITNESS:  No, I am not
8       saying that at all.  I'm just saying
9       that -- I believe you asked me whether
10      the characterization that I provided
11      in paragraph 12 was the final and
12      definitive construction and
13      characterization of -- of -- of the
14      claim.
15           And my point you to was, it is,
16      in my mind, a fairly comprehensive
17      construction, but -- and one that a
18      person of ordinary skill in the art
19      should not misconstrue.  So that was
20      my answer.
21  BY MR. HAGIZ:
22      Q.   So would paragraph 12 include
23  cases that you might think are not
24  translucent images?
25           MR. BUSEY:  Objection.

1            KARAN SINGH, Ph.D.
2       Ambiguous.
3            THE WITNESS:  Paragraph 12,
4       would it contain examples that are --
5       no, I think it should be okay.
6   BY MR. HAGIZ:
7       Q.   Does paragraph 12 omit cases
8   that you think are transparent -- translucent
9   images, rather?
10           MR. BUSEY:  Objection to the
11      extent it calls for a legal
12      conclusion.
13           Go ahead.
14           THE WITNESS:  Paragraph 12
15      distinguishes a case that could be
16      construed as being translucent if
17      looked at -- "if looked at, can be
18      seen, but also be seen through" as a
19      sentence without context, yes.
20  BY MR. HAGIZ:
21      Q.   Let's try this a different way.
22      A.   Okay.
23      Q.   Would you say that translucent
24  image, your construction in light of the
25  specification --

1            KARAN SINGH, Ph.D.
2       A.   Uh-huh.
3       Q.   -- does that include the case
4   that is 50 percent opaque pixels and 50
5   percent transparent pixels?
6            MR. BUSEY:  Objection to the
7       extent it calls for a legal conclusion
8       and it's an incomplete hypothetical,
9       and asked and answered.
10           But go ahead.
11           THE WITNESS:  Could you repeat
12      that question -- could you read it
13      back to me.
14           (Above-requested testimony was
15      read back by reporter.)
16           MR. BUSEY:  Same objection.
17           THE WITNESS:  No, I would not
18      include those.
19  BY MR. HAGIZ:
20      Q.   Now, will you include a case
21  that's 50 percent transparent pixels and
22  50 percent translucent pixels as you define
23  it in paragraph 11 of Exhibit 2?
24           MR. BUSEY:  Objection to the
25      extent it calls for a legal

1            KARAN SINGH, Ph.D.
2       conclusion.  Incomplete hypothetical.
3            Go ahead.
4            THE WITNESS:  As much as a
5       person of ordinary skill in the art
6       would understand, yes.
7   BY MR. HAGIZ:
8       Q.   Are you saying that's your
9   understanding or what you think someone of
10  ordinary skill in art would understand or
11  both?
12      A.   Well, I consider myself a
13  person of ordinary skill in the art, so I
14  believe that that is sort of a tautology
15  there.
16      Q.   Now, what about a case with 50
17  percent opaque pixels and 50 percent
18  translucent pixels?
19      A.   Same answer.
20      Q.   Now, what if I had just a
21  single translucent pixel and everything else
22  was either opaque or transparent?
23           MR. BUSEY:  Objection to the
24      extent it calls for a legal conclusion
25      and it's an incomplete hypothetical.

```
 1          KARAN SINGH, Ph.D.
 2          Go ahead.
 3          THE WITNESS:  Same answer.
 4    BY MR. HAGIZ:
 5      Q.    You would say that is a
 6    translucent image?
 7      A.    Uh-huh.
 8      Q.    What about a transparent image?
 9    Let's go back to that.  Can a transparent
10    image have any opaque pixels in it?
11          MR. BUSEY:  Objection to the
12          extent it calls for a legal conclusion
13          and is an incomplete hypothetical.
14          Go ahead.
15          THE WITNESS:  As a person with
16          ordinary skill in the art would
17          understand in the light of this
18          patent, yes.
19    BY MR. HAGIZ:
20      Q.    Transparent can have opaque
21    pixels?
22          MR. BUSEY:  Same objection.
23          THE WITNESS:  In general, I
24          think it would be great if you can
25          clarify, when you use the term
```

```
 1          KARAN SINGH, Ph.D.
 2    "transparent image" -- when you use
 3    the term "transparent" and
 4    "translucent" and "opaque," whether
 5    you -- sorry, that you qualify that
 6    with image or pixel because the --
 7    because they are, indeed, different.
 8    BY MR. HAGIZ:
 9      Q.    Does your understanding of
10    terms "transparent," 'translucent' and
11    "opaque," are those different depending on
12    whether I am describing a pixel or an image?
13      A.    I believe that's what we have
14    been going into all this time, yes.
15      Q.    Let's go to paragraph 13 of
16    Exhibit 2.
17      A.    Exhibit 2.  The rebuttal?
18      Q.    Uh-huh.
19      A.    Okay.
20      Q.    Now, in paragraph 13 you're
21    discussing figure 20 of the '922 patent,
22    correct?
23      A.    Uh-huh.
24      Q.    And you would say that that is
25    a translucent image; is that correct too?
```

```
 1          KARAN SINGH, Ph.D.
 2          MR. BUSEY:  Objection to the
 3          extent it calls for a legal
 4          conclusion.
 5          Go ahead.
 6          THE WITNESS:  That is what I
 7          wrote, yes.
 8    BY MR. HAGIZ:
 9      Q.    Now, does that image have
10    opaque pixels?
11      A.    If I read from paragraph 13,
12    certain pixels in this keyboard image 1064'
13    shown in figure 20 appear to be opaque, yes.
14      Q.    Does it have transparent
15    pixels?
16      A.    It may, but not as far as I can
17    fairly -- as far as I can visually tell.
18      Q.    What do you mean by that?
19      A.    What I mean by that is, looking
20    at the figures as someone -- as a person of
21    ordinary skill in the art, they are fairly
22    clear in trying to illustrate opacity,
23    transparency and translucency.  I believe the
24    applicants went into a fair amount of detail,
25    for example, in the figures 3a all the way
```

```
 1          KARAN SINGH, Ph.D.
 2    through 3i, as well as the figures -- I
 3    think -- I'm not sure of the exact numbers,
 4    but let's say 18 to 21 -- where they actually
 5    show you the keyboard, where they show you
 6    the other image, both in its opaque state as
 7    well as its -- you know, their translucent
 8    state.
 9          And I believe that if you were
10    to look at them, anybody with ordinary skill
11    in the art would be able to tell both visual
12    similarities and visual differences
13    despite -- irrespective of, you know, of --
14    of their reproduction.
15      Q.    So then why do you think that
16    some of these pixels might be transparent in
17    figure 20?
18          MR. BUSEY:  Objection to the
19          extent it mischaracterizes the
20          witness' testimony.
21          THE WITNESS:  I said there may
22          be some.  If I felt that -- if I felt
23          with a degree of confidence that there
24          were some, I would say, I think there
25          are some transparent pixels, but the
```

KARAN SINGH, Ph.D.

1
2     fact that I said there may be some
3     transparent pixels is simply
4     indicating that I do not preclude the
5     fact that there could be one.
6 BY MR. HAGIZ:
7        Q.    But you don't think there are
8 any?
9           MR. BUSEY:  Objection.
10     Mischaracterizes the witness'
11     testimony.
12           THE WITNESS:  There may be some
13     pixels that are transparent that are
14     inconclusive, that -- that you
15     couldn't from the figures tell
16     specifically.
17 BY MR. HAGIZ:
18        Q.    In figure 20 specifically?
19        A.    In figure 20, yes.
20        Q.    And if I asked you to mark
21     which pixels, or even just some of the pixels
22     that are inconclusive, could you do that for
23     me?
24        A.    I would rather not speculate on
25     which pixels sort of may or may not be sort

KARAN SINGH, Ph.D.

1
2     of transparent or -- or opaque in -- or in
3     the -- in the negative.  It's -- it's much
4     simpler to talk about ones that are -- are
5     sort of fairly clearly one or the other.
6        Q.    Well, if you know which ones
7     are one or the other, then you should -- you
8     can identify which ones are inconclusive,
9     can't you?
10           MR. BUSEY:  Objection.  The
11     question is confusing and ambiguous.
12           Go ahead.
13           THE WITNESS:  In that regard,
14     sure.  Okay.
15 BY MR. HAGIZ:
16        Q.    So if I gave you a highlighter,
17     could you mark on -- say, on Exhibit 2, the
18     replication of figure 20, can you mark at
19     least one pixel which is inconclusive?
20        A.    Sure.  Okay.
21        Q.    Why don't you --
22           MR. HAGIZ:  Just for reference,
23     the witness is marking in green
24     highlighter on page 4 of Exhibit 2 the
25     image labeled as figure 20 (new).

KARAN SINGH, Ph.D.

1
2           THE WITNESS:  (Complies.)
3           There.  It kind of looks like a
4     green dot.
5 BY MR. HAGIZ:
6        Q.    Is that the only pixel that's
7     inconclusive?
8        A.    No, there might be others.
9     Here's another example maybe (marking).
10        Q.    If I asked you to, could you
11     mark all of the pixels that you think are
12     inconclusive?
13        A.    It might take some time, but I
14     feel a couple of examples should be
15     sufficient.
16        Q.    Can you indicate any regions on
17     image that you believe contain inconclusive
18     pixels?
19           MR. BUSEY:  Objection.  The
20     question is confusing.
21           Go ahead.
22           You're asking the witness beyond
23     what he's already done?
24           MR. HAGIZ:  Yeah.
25           MR. BUSEY:  Okay.  I'll restate

KARAN SINGH, Ph.D.

1
2     the objection.  I think it's
3     confusing.
4           Go ahead.
5           THE WITNESS:  There is a region
6     (marking).
7 BY MR. HAGIZ:
8        Q.    And why do you think that
9     region is inconclusive?
10        A.    Because it's -- it's completely
11     white in both the translucent and the base
12     image.
13        Q.    Okay.  Now, taking a step back,
14     you said -- you said earlier that a
15     translucent image can contain opaque pixels
16     and a translucent image can contain
17     transparent pixels.
18           What -- what do you base that
19     conclusion on?
20           MR. BUSEY:  Objection to the
21     extent it calls for a legal
22     conclusion.
23           Go ahead.
24           THE WITNESS:  Can you repeat
25     that question, please.

25 (Pages 94 to 97)

1          KARAN SINGH, Ph.D.
2          MR. HAGIZ:  Can you read that
3    back to him.
4          THE WITNESS:  Yeah.
5          (Above-requested testimony was
6    read back by reporter.)
7          MR. BUSEY:  Objection.  Same
8    objection.
9          THE WITNESS:  Well, I base that
10   conclusion on a few different things.
11   I believe the -- neither the claim
12   language nor the specification
13   actually precludes that statement with
14   regards to translucent images.
15          And, further, the specification
16   and figures, such as figure 20 that
17   we're looking at over here, support
18   the presence of -- the presence of
19   transparent as well as opaque pixels.
20   BY MR. HAGIZ:
21       Q.    Does figure 20 support the
22   presence of transparent pixels?
23       A.    No, figure 20 supports the
24   presence of opaque pixels.
25       Q.    Okay.  So where do you find

1          KARAN SINGH, Ph.D.
2    support for the presence of transparent
3    pixels?
4       A.    Figure 3i.
5       Q.    Now, you discuss that in
6    paragraph 14 of Exhibit 2; is that correct?
7       A.    Paragraph 14 of Exhibit 2, yes.
8    Yes.
9       Q.    Actually, it looks like it's
10   paragraph -- oh, no.
11      A.    No, no, it is paragraph 14.
12      Q.    Okay.  Let's turn to
13   Exhibit 3 -- it's the patent -- column 11,
14   line 45 to column 12, line 4, which discuss
15   figure 3i.
16      A.    Can you point me at the column
17   again.
18      Q.    Sure.  It's column 11, line 45.
19      A.    Okay.
20          MR. HAGIZ:  And actually, just
21   for ease of reference I would like to
22   mark Exhibit 5, which is a separate
23   copy of sheet 6 from the '922 patent
24   containing figure 3i, Bates
25   stamped 0399.

1          KARAN SINGH, Ph.D.
2          (Singh Exhibit No. 5 was marked
3    for identification.)
4    BY MR. HAGIZ:
5       Q.    Dr. Singh, do you have the
6    patent open to column 11?
7       A.    Yes, I do.
8       Q.    Okay.  And you have the
9    separate sheet with figure 3i in front of
10   you?
11      A.    Uh-huh.  Yeah.
12      Q.    Could you tell me what in
13   figure 3i is the translucent image?
14      A.    I believe the translucent
15   window is referred to as the number 79 in the
16   specification language which is marked as
17   this dashed rectangle in 3i.
18      Q.    Okay.  But what -- what's the
19   translucent image?
20          MR. BUSEY:  Objection.  Asked
21   and answered.
22          THE WITNESS:  That's the
23   translucent image.
24   BY MR. HAGIZ:
25      Q.    Are you saying the translucent

1          KARAN SINGH, Ph.D.
2    window and the translucent image are the same
3    thing?
4          MR. BUSEY:  Objection to the
5    extent it calls for a legal
6    conclusion.
7          Go ahead.
8          THE WITNESS:  Inasfar as the
9    terms in some places might be used
10   interchangeably, the translucent image
11   could be used to specifically refer to
12   the region of overlap between a base
13   image and the translucent
14   window/image.
15          So I think you could use those
16   terms interchangeably in the context
17   of -- of this patent, yes.
18   BY MR. HAGIZ:
19      Q.    Okay.  Well, let's take a look
20   for a second just through the specification.
21      A.    Uh-huh.  Yeah.
22      Q.    So the first thing on line 45
23   in column 11, it says, "Figure 3i illustrates
24   display screen 60."
25      A.    Yes.

KARAN SINGH, Ph.D.

1
2      Q.    Now, do you -- can you
3  identify -- do you see 60 on figure 3i?
4      A.    Yes, I do.
5      Q.    Okay.  Now, if we continue, it
6  says, "Display screen 60 of the prior
7  figures, including an opaque window 77."
8          Do you see opaque window 77?
9      A.    Yes, I do.
10     Q.    Okay.  Now, it -- continuing --
11 it actually says, "opaque window 70" on
12 line 47, but I think that's opaque window 77
13 again.  Do you agree with that?
14     A.    Sorry.  Could you say that
15 again?
16     Q.    Sorry.  On line 47 it says,
17 "opaque window 70."  I don't see 70 on that
18 image, so I think they're referring to 77.
19 Does that sound right to you?
20     A.    Opaque window 70 -- including
21 an opaque window 77.
22         Unless 70 is marked somewhere
23 else in one of the other images of the
24 patent...
25     Q.    But, otherwise, the only opaque

KARAN SINGH, Ph.D.

1
2  window in there is 77, right?
3      A.    Yes.  And if, in fact, there is
4  no reference to a 70 elsewhere, then I would
5  concede, yes.
6          MR. HAGIZ:  Well, we've got only
7      a few minutes left on the tape, so
8      let's break now before we move to the
9      next part of the image.
10         THE VIDEOGRAPHER:  This is the
11     end of tape 2 in the deposition of
12     Dr. Singh.  Off the record at 11:48.
13         (Recess.)
14         THE VIDEOGRAPHER:  This is the
15     beginning of tape 3 in the deposition
16     of Dr. Singh.  On the record at 12:08.
17 BY MR. HAGIZ:
18     Q.    So, Dr. Singh, just before the
19 break we were discussing figure 3i, and I'd
20 like to go back to that, if you don't mind.
21     A.    Yeah, absolutely.
22     Q.    Now we just reached the end of,
23 I believe -- well, I'm sorry, the very
24 beginning of line 47, opaque window 70 which
25 I believe we --

KARAN SINGH, Ph.D.

1
2      A.    Yeah.
3      Q.    -- we agreed is probably 77; is
4  that correct?
5      A.    Well, you know, I -- I couldn't
6  be sure.  It could be -- it could be 77.  It
7  could be -- well, it could be 60, right?
8  They both have -- they both have one digit in
9  common, so I'm -- I'm not exactly sure.
10         But I will concede that it
11 doesn't seem -- you know, there doesn't seem
12 to be a 70 marked over there.  But, sure,
13 carry on.
14     Q.    Is 60 labeled or is 60
15 described as an opaque window in the
16 paragraph?
17     A.    Well, 60 -- let's see, where is
18 it -- 60 is labeled as a display screen.
19 Okay.  Yes.
20     Q.    And 77 is labeled as an opaque
21 window?
22     A.    That's right, so I will grant
23 you that.
24     Q.    Now, continuing, it says,
25 "Opaque window 7 is overlaying with an

KARAN SINGH, Ph.D.

1
2  overlay translucent window 79" --
3      A.    Uh-huh.
4      Q.    -- "which in this case is
5  larger than the display screen 60."
6      A.    Yes.
7      Q.    So you agree that 79 is
8  described as the overlay translucent window,
9  correct?
10     A.    Uh-huh.
11     Q.    Now the next sentence reads,
12 "Formed within window 79 is a translucent
13 image, including the legend top secret."
14     A.    Uh-huh.
15     Q.    So do you understand this
16 specification to say that 79 is not the
17 translucent image?
18         MR. BUSEY:  Objection.
19 Confusing.
20         THE WITNESS:  No.
21 BY MR. HAGIZ:
22     Q.    And why is that?
23     A.    I'm sorry.  You said, do I
24 understand the specification to say that 79
25 is not the translucent image?

27 (Pages 102 to 105)

Page 106

KARAN SINGH, Ph.D.

1
2     Q.    Let me -- let me rephrase --
3     A.    Yeah.  Yeah.
4     Q.    -- or repeat.
5     A.    It would be good if you can
6  rephrase it without the negative.  It would
7  make it easier.
8     Q.    Do you believe the
9  specification states --
10    A.    Yes.
11    Q.    -- that 79 in figure 3i is the
12  translucent image?
13    A.    That's what it says, "Formed
14  within window 79 is a translucent image."
15    Q.    Does the specification tell you
16  where within window 79 is the translucent
17  image?
18    A.    No.  And in the light of that,
19  I would imagine that window 79 is the
20  translucent image.
21    Q.    Well, it does say, "A
22  translucent image, including the legend top
23  secret."
24         So why do you think that the
25  translucent image is more than the top secret

Page 107

KARAN SINGH, Ph.D.

1
2  in figure 3i?
3         MR. BUSEY:  Objection.
4  Compound.  Confusing.  Go ahead.
5         THE WITNESS:  Why I do think
6  that what?
7  BY MR. HAGIZ:
8     Q.    Why do you think that the
9  translucent image is anything more than that
10  outline top secret in figure 3i?
11         MR. BUSEY:  Same objection.
12  Go ahead.
13         THE WITNESS:  Because a person
14  of ordinary skill in the art would
15  understand an image typically to be
16  something that is defined by -- by --
17  by a rectangular outline or a region
18  rather than a loose collection of
19  pixels that could be unconnected;
20  that's one.
21         And, secondly, because it refers
22  to -- the sentence just above that
23  says, "Translucent window with an
24  overlay translucent window 79."
25  BY MR. HAGIZ:

Page 108

KARAN SINGH, Ph.D.

1
2     Q.    But it doesn't say "translucent
3  image 79," does it?
4     A.    No, it does not.
5     Q.    And so what support do you find
6  in the specification that suggests that
7  translucent image is the same as 79?
8         MR. BUSEY:  Objection.  Asked
9  and answered.  Mischaracterizes the
10  witness' prior testimony.
11  Go ahead.
12         THE WITNESS:  I would probably
13  have to look at it in detail, but
14  there may places where the word window
15  and image may have been used
16  interchangeably in the -- in this
17  specification, perhaps.
18         But in -- in the absence of --
19  in -- in the absence of any specific
20  distinction in this context over here,
21  I believe a person of ordinary skill
22  in the art would read it the way I...
23  BY MR. HAGIZ:
24    Q.    Can you turn back to Exhibit 4
25  to that excerpt from the prosecution history.

Page 109

KARAN SINGH, Ph.D.

1
2     A.    Uh-huh.
3     Q.    If you turn to page 47 which is
4  Bates stamped 2875.
5     A.    Can you tell me where again?
6     Q.    Sure.  It's page 47 of that
7  prosecution history excerpt.
8     A.    47.  Okay.
9     Q.    And let me know when you've
10  found it.
11    A.    I am on page 47.
12    Q.    Starting at the first full
13  paragraph --
14    A.    Yeah.
15    Q.    -- that begins with further --
16    A.    Yeah.
17    Q.    -- two lines down from there --
18    A.    Yeah.
19    Q.    -- describing a piece of prior
20  art --
21    A.    Yeah.
22    Q.    -- the applicant says,
23  "Phillips may show an object which is somehow
24  transparent, but the objects are not windows
25  and nothing Phillips teaches or suggests that

28  (Pages 106 to 109)

Page 110

```
 1              KARAN SINGH, Ph.D.
 2  windows having frames and backgrounds could
 3  be used.  Phillips may mention windows in
 4  multiple locations, but it is in the context
 5  of defined areas which are operated on, not
 6  windows as having borders and backgrounds."
 7              Now, in light of this, do
 8  you -- do you still say that a window and an
 9  image are the same thing?
10              MR. BUSEY:  Objection.
11          Confusing.  Ambiguous.  Calls for
12          legal conclusion.  Calls for
13          speculation.
14              THE WITNESS:  What I am reading
15          talks about objects and windows.  So
16          I -- I -- I would take nothing from
17          it.
18  BY MR. HAGIZ:
19      Q.    And what do you think the
20  difference is between an object and an image?
21              MR. BUSEY:  Objection.
22          Ambiguous.
23              THE WITNESS:  A plain language
24          definition of an object could be any
25          coherent entity of any shape or form
```

Page 111

```
 1              KARAN SINGH, Ph.D.
 2  that we see around us.  That's sort of
 3  a plain language definition of an
 4  object.
 5              An image usually refers to
 6  something that has some kind of a
 7  notion of a rectangular region or --
 8  or a boundary.  And especially for
 9  people of ordinary skill in the art,
10  images typically are defined as a
11  rectangular grid of pixels.
12              So it's not -- it's not just any
13  collection of connected or unconnected
14  pixels but pixels that have a specific
15  structure.
16  BY MR. HAGIZ:
17      Q.    So an image can't take any
18  shape except for a rectangle?
19              MR. BUSEY:  Objection.
20          Mischaracterizes the witness'
21          testimony.
22              THE WITNESS:  I -- I -- what I
23          gave was a plain language definition.
24          An image in -- in a specific context,
25          the def -- could be -- could have its
```

Page 112

```
 1              KARAN SINGH, Ph.D.
 2          meaning refined to allow certain other
 3          things or -- or other -- yeah, other
 4          definitions or refinements,
 5          potentially, yes.
 6  BY MR. HAGIZ:
 7      Q.    Do you see any of those
 8  refinements in the '922 patent?
 9      A.    Not -- not off the top of my
10  head, no, but there may be.
11      Q.    So -- so what's your
12  understanding of image in the '922 patent?
13              MR. BUSEY:  Objection to the
14          extent it calls for a legal conclusion
15          and is ambiguous.
16              THE WITNESS:  My understanding
17          of an image as a person of ordinary
18          skill in the art is essentially a
19          rectangular grid of pixels and
20          whatever is contained within it,
21          typically.
22  BY MR. HAGIZ:
23      Q.    Can you turn to, I believe it
24  is column 9 in the patent of Exhibit 3.
25      A.    Line 9.
```

Page 113

```
 1              KARAN SINGH, Ph.D.
 2      Q.    And we'll -- we'll begin at the
 3  top of column 9, very top.
 4      A.    Okay.
 5      Q.    So the top of column 9 is
 6  talking about figure 3a.  It says, "To
 7  indicate the implementation of the invention
 8  in greater detail, figure 3a illustrates an
 9  Apple computer Macintosh display screen 60
10  with a single non-translucent window 62 shown
11  on one portion of screen 60, and a gadget bar
12  64 including a wand icon 66 for transitioning
13  selected image windows between opaque and
14  translucent states."
15              We'll be coming back here a few
16  times, so --
17      A.    Uh-huh.
18      Q.    -- I just wanted to get that
19  out of the way.
20              Now here windows 62 encloses an
21  image, in this case a circle 68, for example.
22  Is a circle a rectangular grid?
23      A.    If you were to take a bounding
24  box or a region that encloses it, yes.
25      Q.    Is that what the patent is
```

Page 114

```
1              KARAN SINGH, Ph.D.
2   talking about here?
3       A.   It could be viewed -- it could
4   be viewed that way, yes.
5       Q.   What support do you find for
6   that?
7       A.   I don't find support for it or
8   the lack of support for it.  I don't feel
9   it's adequately addressed.
10      Q.   So you're saying that if
11  somebody told you there is an image of a
12  circle, you would -- your default assumption
13  would be that he needs a bounding box that
14  contains a circle?
15      A.   I would, perhaps, ask what
16  exact context he -- or in what context he was
17  calling that or referring to it as an image.
18  Divested of -- of that context, yes.  In a
19  completely context-free setting, yes, I
20  would.
21      Q.   So circle makes you think
22  square?
23      A.   No, not at all.  Circle makes
24  me think circle.  Image of a circle divested
25  off any context makes me think of a circle
```

Page 115

```
1              KARAN SINGH, Ph.D.
2   lined within a square grid of pixels.
3       Q.   And in the context of the '922
4   patent, what does it make you think?
5           MR. BUSEY:  Objection.
6   Ambiguous.
7           Go ahead.
8           THE WITNESS:  In the context of
9   the '922 patent, I would look at it
10  based on where it was being referred
11  to.
12  BY MR. HAGIZ:
13      Q.   Okay.  And you've examined the
14  '922 patent, correct?
15      A.   Yes, I have.
16      Q.   So what context do you find
17  that suggests that an image, especially an
18  image of a circle, refers to a square
19  bounding box?
20      A.   I don't find any -- anything
21  specifically to that -- to that nature but,
22  equally, I don't find it being precluded.
23      Q.   So you're saying the '922
24  patent does not provide you any context
25  whatsoever to decide whether a circle -- an
```

Page 116

```
1              KARAN SINGH, Ph.D.
2   image of a circle or whether an
3   image of a circle is a square?
4           MR. BUSEY:  Objection.
5   Ambiguous.  Compound.
6           THE WITNESS:  So to begin with,
7   to -- first -- firstly, I don't
8   believe that -- I don't think your --
9   well, your -- your sentence is
10  somewhat incomplete or incorrect in
11  its phrasing.
12          So it would be good -- either if
13  you would rephrase it -- because at no
14  point have I called a circle a square,
15  and --
16  BY MR. HAGIZ:
17      Q.   But you said an image of a
18  circle -- sorry.  Are you done?
19      A.   Yes.
20          MR. BUSEY:  I would appreciate
21  it if you wouldn't interrupt the
22  witness.
23  BY MR. HAGIZ:
24      Q.   You said an image of a circle
25  would be a square, though, right?
```

Page 117

```
1              KARAN SINGH, Ph.D.
2       A.   No, I never said that.
3           MR. BUSEY:  Objection.
4   Mischaracterizes the witness'
5   testimony.
6   BY MR. HAGIZ:
7       Q.   Then --
8           MR. BUSEY:  Excuse me --
9           THE WITNESS:  Sorry.
10          MR. BUSEY:  -- Dr. Singh.
11  Wait --
12          THE WITNESS:  Yes, I --
13          MR. BUSEY:  -- till I can --
14          THE WITNESS:  -- apologize,
15  yeah.
16          MR. BUSEY:  -- process your --
17          THE WITNESS:  Yeah.  I --
18          MR. BUSEY:  -- the question
19  before you --
20          THE WITNESS:  Right.
21          MR. BUSEY:  -- respond.  Thank
22  you.
23  BY MR. HAGIZ:
24      Q.   So what would the image of a
25  circle be, then, if not a square?
```

30 (Pages 114 to 117)

Page 118

```
1           KARAN SINGH, Ph.D.
2       MR. BUSEY:  Objection.
3  Confusing.
4       Go ahead.
5       THE WITNESS:  The image of a
6  circle could be a rectangular or
7  square grid of pixels where the visual
8  appearance of the circle was indicated
9  by the color of some of those pixels.
10  BY MR. HAGIZ:
11      Q.   And in the case of the '922
12  patent, is the image of the circle being
13  discussed in the first paragraph of column 9,
14  is that a square grid of pixels or a circular
15  grid of pixels?
16      A.   It's inconclusive.
17      Q.   What's your conclusion?  That
18  it's a square?
19      MR. BUSEY:  Objection.
20  Mischaracterizes -- asked and answered
21  and mischaracterizes the witness'
22  testimony.
23      THE WITNESS:  I'm not drawing
24  any conclusion is -- is what I said.
25  BY MR. HAGIZ:
```

Page 119

```
1           KARAN SINGH, Ph.D.
2      Q.   Are you saying that you don't
3  know?
4       MR. BUSEY:  Asked and answered,
5  Counsel.
6       THE WITNESS:  I'm not saying
7  that I don't know.  I'm saying that,
8  based on the information provided, I
9  am not drawing a conclusion.  That's
10  different from I don't know.
11  BY MR. HAGIZ:
12      Q.   What's the difference?
13      A.   The difference between I don't
14  know and that something is inconclusive?
15      Q.   In this instance, what --
16      A.   To me --
17      Q.   Sorry.
18      MR. BUSEY:  Had you finished?
19      THE WITNESS:  I had finished,
20  yes.
21  BY MR. HAGIZ:
22      Q.   Okay.  In this instance, I
23  would like you to explain what you mean when
24  you say -- what you think the difference is
25  between inconclusive and not knowing the
```

Page 120

```
1           KARAN SINGH, Ph.D.
2  answer.
3      A.   I believe that the difference
4  is that I do not see sufficient information
5  to provide a conclusive answer.
6      Q.   But previously you said that,
7  depending on the context, you could decide
8  one way or the other what an image
9  corresponded to.
10      Is that true?
11      MR. BUSEY:  Objection.
12  Mischaracterizes the witness' prior
13  testimony.
14      Go ahead.
15      THE WITNESS:  If the context
16  provided enough information for such a
17  conclusion to be drawn.
18  BY MR. HAGIZ:
19      Q.   So are you saying that there is
20  no context provided in this patent?
21      MR. BUSEY:  Objection.
22  Mischaracterizes the witness'
23  testimony.
24      THE WITNESS:  I'm not saying
25  that there is no context provided in
```

Page 121

```
1           KARAN SINGH, Ph.D.
2  this patent.  I am saying that there
3  is insufficient context in the
4  specific instance and the specific
5  embodiment that you are asking me
6  about.
7  BY MR. HAGIZ:
8      Q.   What additional context would
9  you need the patent to provide to be able to
10  identify what an image corresponds to?
11      MR. BUSEY:  Objection to the
12  extent it calls for a legal
13  conclusion.
14      Go ahead.
15      THE WITNESS:  I would expect
16  them to go into perhaps precise detail
17  over -- over what their implementation
18  might be.
19  BY MR. HAGIZ:
20      Q.   Such as?  What details would
21  you need?
22      A.   Details on perhaps what their
23  internal representation of an image might be,
24  which -- in fact, in the case of -- in the
25  case of the '922 patent -- actually, as far
```

Page 122

KARAN SINGH, Ph.D.

1
2  as I can see, there is support for -- for
3  images being represented as -- as -- as a
4  grid of pixels.  I mean, I just happened to
5  flip through, and I'm looking at figure 23,
6  and there is an 1194.
7         Without having looked at 1194
8  in -- in great detail, to me it looks like --
9  it looks like a grid of pixels.
10        I flip back one sheet back at
11 figure 22 and I see 1118 and 1120.
12    Q.   Can you take a look at 1192,
13 actually?
14    A.   Okay.
15    Q.   Does that appear to be a
16 rectangle to you?
17    A.   1192?  1192, actually, yeah, it
18 does look like a rectangle.
19    Q.   Are you looking at the entire
20 thing or just the internal box?
21    A.   No, I'm looking at the entire
22 thing.
23    Q.   What about the internal --
24    A.   That's what 1192 is pointing
25 at, I believe.

Page 123

KARAN SINGH, Ph.D.

1
2    Q.   Looking at that internal box of
3  1192, is that a rectangle or is that
4  something else?
5    A.   I don't know what it is.  I
6  can't opine on what it is without having, you
7  know, read in detail what that is referring
8  to.
9    Q.   Does it look like a rectangle
10 to you?
11    A.   The region inside?  In plain
12 language, no.  But I don't know what that is.
13 I -- what does look like a rectangle to me
14 is -- is -- is what's labeled as 1192.
15    Q.   So is -- is that the only
16 example you're relying on to determine
17 that -- that an image in the context of the
18 '922 patent has to be a rectangular grid?
19        MR. BUSEY:  Objection.
20 Mischaracterizes the witness'
21 testimony.
22        THE WITNESS:  Not at all.  I'm
23 actually relying -- well, I'm relying
24 on what I believe, you know, a person
25 of ordinary skill in the art would --

Page 124

KARAN SINGH, Ph.D.

1
2  would typically understand an image to
3  mean and -- and I pointed out these --
4  these references to you literally
5  skimming the patent right here.
6         There may well be other places
7  in the -- in the patent that inform my
8  opinion.  Flipping back to figure 8, I
9  also see a rectangular grid of pixels.
10        And so these are just cursory --
11 yeah, cursory flip-throughs, but
12 they -- there may well be other
13 regions of -- of the patent.  I would
14 have to read it in significant detail
15 to be able to answer that question
16 conclusively.
17 BY MR. HAGIZ:
18    Q.   Have you looked at figures 3a
19 through 3h before?
20    A.   Yes.
21    Q.   So you've studied those
22 figures?
23    A.   Yes, I have.  I've looked at
24 them.
25    Q.   So are the images discussed in

Page 125

KARAN SINGH, Ph.D.

1
2  those figures, are those rectangular grids --
3  now that you have actually studied them, are
4  they rectangular grids or are they a
5  different shape?
6         MR. BUSEY:  Objection to the
7  extent it calls for a legal
8  conclusion.
9         Go ahead.
10        THE WITNESS:  They look pretty
11 rectangular to me.
12 BY MR. HAGIZ:
13    Q.   Circle 68 in figure 3a looks
14 rectangular to you?
15    A.   The window within it -- the
16 image within which it resides does look
17 rectangular to me, yes.
18    Q.   But the specification, lines 7
19 to 9 of column 9, says that the circle is the
20 image of interest, not the window in which
21 the circle resides; is that correct?
22    A.   I don't see it say -- image
23 of --
24        MR. BUSEY:  Counsel, what lines
25 are you reading?

Page 126

KARAN SINGH, Ph.D.

1                KARAN SINGH, Ph.D.
2          MR. HAGIZ:  Column 9, lines 7 to
3  line --
4          MR. BUSEY:  I don't -- well, let
5  me have that question read back
6  because I don't -- I'm going to object
7  to the question because I think it
8  misquotes -- it paraphrase the
9  language in the specification, and
10  it's ambiguous.  Go ahead.
11         And misleading.  Go ahead.
12      I don't need to have it read
13  back, I'm sorry.  I just state -- my
14  objection is stated.  Thanks.
15        THE WITNESS:  Sorry.  Are we
16  waiting for an answer from me --
17  BY MR. HAGIZ:
18    Q.   Yes.
19    A.   -- on a question?
20      I would appreciate it if that
21  could be either read back to me or --
22        MR. HAGIZ:  Can you read back
23  the question?
24        THE WITNESS:  Yes.
25      (Above-requested testimony was

Page 127

1                KARAN SINGH, Ph.D.
2  read back by reporter.)
3         MR. BUSEY:  Objection.
4  Misleading.  Misstates the
5  specification language.
6        THE WITNESS:  Actually, in the
7  context of this patent, I would be
8  more inclined, as a person of ordinary
9  skill in the art in this instance to
10  look at the term "image of interest to
11  the user" as as a phrase that I would
12  look at together rather than the word
13  "image" in isolation because to me it
14  appears that, in this example -- you
15  know, of course having not read the
16  context in detail prior and after, but
17  it seems to me that they may be
18  referring potentially to another term
19  that -- that shows up in -- in places
20  in the patent called a feature of
21  interest.
22      And so looking at it right now,
23  that's the reading that I would
24  ascribe.
25  BY MR. HAGIZ:

Page 128

1                KARAN SINGH, Ph.D.
2    Q.   We will get to feature of
3  interest later.
4    A.   Sure.
5    Q.   But are you saying that the
6  shape of an image of interest is necessarily
7  different from the shape of an image without
8  the modifier "of interest"?
9    A.   I'm saying that the term "image
10  of interest" needs to be looked at or, if you
11  want to talk about it as being distinct from
12  the term "image" as we have been discussing
13  so far.
14    Q.   Is there anything in the
15  specification or -- the intrinsic evidence or
16  the claims that would lead you to believe
17  that an image of interest would have -- would
18  be restricted in terms of its shape or its
19  internal representation as opposed to any
20  other image?
21        MR. BUSEY:  Objection.
22  Confusing.  Objection to the extent it
23  calls for a legal conclusion.
24        THE WITNESS:  No, but -- there
25  is nothing that explicitly precludes

Page 129

1                KARAN SINGH, Ph.D.
2  that, but, on the other hand, I --
3  again, not, you know, having done or
4  doing an absolutely detailed read
5  right now, I believe that there is --
6  that there either are instances or
7  there is evidence to -- to indicate
8  that -- that the terms "feature of
9  interest" and "image of interest" may
10  have been used -- the phrases may have
11  been used interchangeably.
12      So in that case I don't see
13  any -- I don't see how you -- you can
14  or would want to look at one word as
15  being in any way sort of causing a
16  refinement or a limitation of another
17  term.
18      Right?  They just become
19  independent terms.
20  BY MR. HAGIZ:
21    Q.   Dr. Singh, you've construed the
22  word "feature of interest" -- the term,
23  rather, "feature of interest," correct?
24    A.   Yes, I believe so.
25    Q.   And in doing so, did you study

Page 130

KARAN SINGH, Ph.D.

1                KARAN SINGH, Ph.D.
2 places in the patent that use the word "image
3 of interest"?
4     A.   I may have come across them.  I
5 don't have my notes with me, so I don't have
6 an exhaustive listing of where or where they
7 may not have shown up, but I could ask my
8 counsel if you would like.
9     Q.   Do you recall examining places
10 in the specification where the term "image of
11 interest" appears?
12    A.   I may have.
13    Q.   Do you recall or don't you?
14    A.   Well, I've just examined one,
15 so -- so that's -- so that's one instance
16 right there.
17    Q.   In preparing your report,
18 however, do you recall whether you examined
19 any instances of the phrase "image of
20 interest"?
21    A.   I can't say I conclusively
22 remember based on what's in front of me.
23    Q.   Does your report discuss the
24 phrase "image of interest" anywhere?
25    A.   I will have to go back to my

Page 131

1                KARAN SINGH, Ph.D.
2 report.
3    MR. BUSEY:  Just for the record,
4 we're asking about both reports?
5    MR. HAGIZ:  Both reports.
6    THE WITNESS:  I am sorry, I
7 don't see, at least in the expert
8 report, an explicit equation, but I
9 don't also see an explicit separation
10 of -- of the two terms.
11 BY MR. HAGIZ:
12    Q.   Are you done or do you have
13 more?
14    A.   No.  I'm done.
15    Q.   Okay.  So I don't -- I'm not
16 sure you answered my question.  My question
17 was, did you, in preparing your report,
18 review or study the term "image of interest"
19 as used in the specification?
20    A.   Hold on a second.  Well,
21 actually, in my rebuttal report I see -- "The
22 features include, for example, trace circle,
23 which is an image of interest with reference
24 to which image operations are to be
25 performed."

Page 132

1                KARAN SINGH, Ph.D.
2    So, to me, that's an example
3 of -- of indicating that, in fact, this --
4 this usage of the term "image of interest" is
5 read in the context of a feature of interest.
6    Q.   Fair enough.  Now, what about
7 that usage leads you to believe that image of
8 interest, in that context, is in -- tells you
9 anything about the shape of the grid of the
10 pixels?
11    MR. BUSEY:  Objection.  I think
12 this line of questioning has been
13 asked.  But go ahead.  Asked and
14 answered.
15    THE WITNESS:  Sorry.  Could you
16 say that again?
17 BY MR. HAGIZ:
18    Q.   Sure.  Let me actually rephrase
19 it.
20    A.   Yeah.
21    Q.   What about the specific
22 usage --
23    A.   Uh-huh.
24    Q.   -- of "image of interest" that
25 you just described --

Page 133

1                KARAN SINGH, Ph.D.
2    A.   Uh-huh.
3    Q.   -- leads you to believe that
4 the form or the shape of the pixels --
5    A.   Uh-huh.
6    Q.   -- would take a different shape
7 from any other image?
8    MR. BUSEY:  Objection.
9 Confusing.  Same objection as before.
10    THE WITNESS:  Well --
11    MR. BUSEY:  Go ahead.
12    THE WITNESS:  -- as I said, to
13 me, I would use -- given that I am --
14 I'm referring to an image of interest
15 as a phrase, I could well -- as well
16 call this phrase X, and perhaps that
17 will remove some of the confusion why
18 there would need to be any connection
19 to -- to draw it back to the
20 definition of an image by itself.
21 BY MR. HAGIZ:
22    Q.   But the word "X" doesn't use
23 the word "image," does it?
24    A.   No, it doesn't.
25    Q.   So are you telling me that the

34 (Pages 130 to 133)

Page 134

KARAN SINGH, Ph.D.

1
2    phrase "image of interest" has absolutely no
3    relation to the term "image"?
4            MR. BUSEY:  Objection to the
5        extent it calls for a legal
6        conclusion.
7            THE WITNESS:  No, I'm not saying
8        that at all.  All I'm saying is that a
9        collection of terms put together to
10       form a phrase can have a different
11       meaning from any of the words taken
12       individually.
13           There are many examples of this
14       in -- in the English language.  I'm
15       sure if you -- given enough time, I
16       would be able to come up with one or
17       more such examples.
18   BY MR. HAGIZ:
19       Q.    Dr. Singh, just answer a simple
20   question for me.
21       A.    Okay.
22       Q.    Are -- are you saying that
23   between "image of interest" and "image," you
24   can't figure out what the -- no.  Scratch
25   that.

Page 135

KARAN SINGH, Ph.D.

1
2            Are you telling me you can't
3    figure out what the shape of circle 68 in
4    column 9 should take because it's described
5    as an image of interest and not just as an
6    image?
7            MR. BUSEY:  Objection to the
8        extent it calls for a legal
9        conclusion.
10           Go ahead.
11           And it's ambiguous.
12           THE WITNESS:  What I am saying
13       is that it appears to me that the use
14       of "image" as a phrase "image of
15       interest" in this context is relating
16       to its definition or its meaning as --
17       as -- as a feature in this patent.
18           And in that regard, its -- its
19       shape or -- its shape as a feature or
20       its representation is -- is completely
21       independent from that of an image.  I
22       think that's fairly clear.
23   BY MR. HAGIZ:
24       Q.    So a feature and an image --
25   sorry.  Scratch.

Page 136

KARAN SINGH, Ph.D.

1
2            An image of interest and an
3    image do not take on the same shape?
4            MR. BUSEY:  Objection.
5        Mischaracterizes the witness'
6        testimony and confusing.
7            Go ahead.
8            THE WITNESS:  I said an image of
9        interest, taken as a term, does not
10       have the same meaning as an image --
11       the moment you take that sentence, I
12       don't believe that the rest of the
13       question actually is even relevant.
14   BY MR. HAGIZ:
15       Q.    I am not asking you about the
16   meaning.  All I want to know is, you're
17   telling me that you can't figure out from the
18   patent whether an image of a circle is pixels
19   in the assortment of a circle or pixels in
20   the assortment of a rectangle that have an
21   image of a circle in them; is that correct?
22           MR. BUSEY:  Objection.
23       Mischaracterizes the witness'
24       testimony.  Asked and answered.
25           Go ahead.

Page 137

KARAN SINGH, Ph.D.

1
2            THE WITNESS:  I would have to
3        ask you to rephrase that question
4        because I believe I've already
5        answered it, but I'll do my best to
6        answer it again if you could rephrase
7        it for me, so I perhaps understand it
8        a little more clearly.
9    BY MR. HAGIZ:
10       Q.    Circle 68, column 9, if I said
11   that is an image, would that mean that it is
12   a rectangular grid that has pixels inside
13   that form the shape of a circle, or would
14   that mean that it is pixels in the shape of a
15   circle?
16       A.    I think --
17           MR. BUSEY:  Objection.
18           THE WITNESS:  Sorry.
19           MR. BUSEY:  Ambiguous.  Asked
20       and answered.
21           Go ahead.
22           THE WITNESS:  I think an
23       operative word is "if" I said it was
24       an image.  I'm not necessarily saying
25       that it is an image.

35 (Pages 134 to 137)

Page 138

```
 1              KARAN SINGH, Ph.D.
 2  BY MR. HAGIZ:
 3      Q.   And I'm asking you, if it is,
 4  what's your answer?
 5              MR. BUSEY:  Objection.
 6  Confusing.
 7              THE WITNESS:  If it is an image,
 8      I believe it would be a rectangular
 9      grid of pixels.
10  BY MR. HAGIZ:
11      Q.   Now, what about "image of
12  interest" makes you conclude any other way?
13              MR. BUSEY:  Objection.
14  Ambiguous.
15              THE WITNESS:  Because I believe
16      the term "image of interest" is being
17      used in -- in an manner that appears
18      to indicate its usage in other
19      portions of the patent as a feature of
20      interest.
21  BY MR. HAGIZ:
22      Q.   But you can't point to any part
23  of the specification that tells you that an
24  image of interest would not be a rectangular
25  grid or would not be the same shape as an
```

Page 139

```
 1              KARAN SINGH, Ph.D.
 2  image?
 3              MR. BUSEY:  Objection.
 4  Confusing.
 5              THE WITNESS:  I cannot to --
 6      point to any portion of the -- you
 7      lost me there.  I'm sorry.
 8  BY MR. HAGIZ:
 9      Q.   I'll rephrase.  You can't point
10  to any portion of the specification that
11  specifically says the unique meaning of an
12  image of interest goes to how its pixels are
13  arranged?
14              MR. BUSEY:  Objection.
15  Ambiguous.
16              Go ahead.
17              THE WITNESS:  No.  I'm not --
18      I'm not -- I'm not even referring to
19      how an image of interest, taken as a
20      phrase, would be internally --
21      internally represented.
22              MR. BUSEY:  I'm sorry.
23              THE WITNESS:  Because --
24              MR. BUSEY:  Go ahead.  I didn't
25      mean to interrupt you.
```

Page 140

```
 1              KARAN SINGH, Ph.D.
 2              THE WITNESS:  Because, I was
 3      going to say, in -- if, in this
 4      embodiment, you were to look at the
 5      image of interest as -- as -- as being
 6      similar to a feature of interest, then
 7      in fact the actual representation of
 8      the underlying feature is -- is -- is
 9      less relevant in that the feature is
10      simply defining a context.  And that's
11      something that perhaps will come up,
12      as you said, when you would like to
13      discuss feature of interest.
14              MR. HAGIZ:  Sorry, Brian, did
15      you want to say something?
16              MR. MOORE:  I just was -- at
17      some convenient point --
18              MR. HAGIZ:  Yeah, very soon.
19      I'm --
20              MR. BUSEY:  Right.
21              MR. HAGIZ:  I'm almost done with
22      where I'm going with this.
23              MR. BUSEY:  Okay.
24  BY MR. HAGIZ:
25      Q.   So let me ask a different
```

Page 141

```
 1              KARAN SINGH, Ph.D.
 2  question.  Are you saying that all of the
 3  examples that use the phrase "image of
 4  interest," do not instruct you as to how an
 5  image generally would have its pixels
 6  arranged in the '922 patent?
 7              MR. BUSEY:  Objection to the
 8      extent it calls for a legal
 9      conclusion.
10              THE WITNESS:  I don't -- I don't
11      have an exhaustive list of all of the
12      examples where -- where this phrase
13      shows up, but I don't believe -- I
14      don't believe the example that you
15      have pointed me at provides any
16      information to that effect.
17  BY MR. HAGIZ:
18      Q.   Why don't you look at column 9,
19  line 61 --
20      A.   61.
21      Q.   -- to 64.
22      A.   Okay.
23      Q.   Now, it says, "An example of
24  one image operation which could be
25  implemented is simply the operation of
```

36  (Pages 138 to 141)

1                   KARAN SINGH, Ph.D.
2      copying or tracing the image of a circle
3      68 from the opaque window 62 onto translucent
4      window 70."
5          A.   Sorry.  Where are you reading?
6      Column 10?
7          Q.   Column 9.
8          A.   Oh, column 9.  Okay.  Okay.
9      Yes.  Column 9, line 60?
10         Q.   Lines 61 to 64.
11         A.   Okay.
12         Q.   Do you see that, Dr. Singh?
13         A.   Yes.  I'm reading it --
14         Q.   Okay.
15         A.   -- right now.  Yes.
16         Q.   Okay.  Now, there, in line 63,
17     it talks about the image of circle 68.
18         A.   Uh-huh.
19         Q.   Do you see that?
20         A.   Yeah.
21         Q.   Now, before that, just before
22     that, in line 62, it talks about tracing the
23     image of circle 68.  Do you see that too?
24         A.   Uh-huh.
25         Q.   Now, if -- do you understand

1                   KARAN SINGH, Ph.D.
2      this to be saying that the operation in
3      question here is tracing a rectangular grid
4      that includes a circle as part of the image?
5              MR. BUSEY:  Objection.
6      Ambiguous.  Calls for a legal
7      conclusion -- to the extent it calls
8      for a legal conclusion.
9              Go ahead.
10             THE WITNESS:  I think that's
11     inconclusive.  They don't get into the
12     actual representation of how the copy
13     or the tracing operation is performed.
14             So, yeah, I don't think it says
15     anything to -- towards or -- this
16     issue.
17     BY MR. HAGIZ:
18         Q.   So you think that that one of
19     ordinary skill in the art would think that
20     it's feasible to trace the circle 68 in
21     figure 3a or 3c by tracing the rectangular
22     grid that surrounds that circle?
23             MR. BUSEY:  Objection.
24     Incomplete hypothetical.
25             Go ahead.

1                   KARAN SINGH, Ph.D.
2              THE WITNESS:  Depending on how
3      you were to perform the tracing
4      operation, equally a copy operation --
5      most people of ordinary skill in the
6      art perform a copy operation by
7      marking out a region and copying it
8      over.
9              So it really doesn't say one --
10     one or the other.
11     BY MR. HAGIZ:
12         Q.   And do you understand tracing
13     to be the same thing as copying?
14         A.   They have different plain
15     language meanings, but I think, in this
16     context, it -- it doesn't matter.  The
17     example is essentially showing -- it's
18     showing an end result that -- in one example
19     that might have been created as a result of
20     either of these two operations.
21         Q.   So you have no opinion on
22     whether copying or tracing mean different
23     things here?
24         A.   I believe that they don't --
25     they don't have any specifically different or

1                   KARAN SINGH, Ph.D.
2      similar -- or similar meanings.  They're used
3      in a manner to indicate some examples of an
4      operation that could be -- could be -- could
5      be implemented, any one of -- I mean, this
6      list could have been much longer than just
7      the two examples -- the two words used right
8      there.
9              MR. HAGIZ:  Let's take -- let's
10     break for lunch.
11             MR. BUSEY:  Thank you.
12             THE VIDEOGRAPHER:  This is the
13     end of tape 3.  Off the record at
14     12:57.
15             (Lunch recess.)
16
17
18
19
20
21
22
23
24
25

37 (Pages 142 to 145)

Page 146

```
1            KARAN SINGH, Ph.D.
2         AFTERNOON SESSION
3            THE VIDEOGRAPHER:  This is the
4   beginning of tape number 4 in the
5   deposition of Dr. Singh.  On the
6   record at 2:04.
7   BY MR. HAGIZ:
8      Q.   Welcome back, Dr. Singh.
9      A.   Thank you.
10     Q.   I have just a few more
11  questions I want to ask on translucent image,
12  and then --
13     A.   Sure.
14     Q.   -- we will move on.
15     A.   Okay.
16     Q.   Can you take a look on
17  column 11 of Exhibit 3 -- it's the '922
18  patent.
19     A.   Yeah.
20     Q.   Column 3, lines 37 to 44.
21     A.   Lines -- sorry.  Which lines?
22     Q.   Sorry.  It actually starts at
23  line 41.
24     A.   41.  Okay.
25     Q.   And I'd ask if you can pull out
```

Page 147

```
1            KARAN SINGH, Ph.D.
2   Exhibit 5, that single sheet with the --
3      A.   Yeah, I have it here.
4      Q.   So reading line 41, it says,
5   "Non-translucent window 71 includes the image
6   of a circle 78 which was created by
7   tracing under translucent circle image 75
8   shown in figure 3g."
9            Now, would you say that the
10  image and the window in figure 3h are the
11  same thing?
12     A.   One second.  I just need to
13  make sure I'm reading -- okay.  So it's not
14  41.  It's line 39, I think.
15          Non -- the sentence that
16  starts, "Non-translucent window"?
17     Q.   Yes.
18     A.   Yeah.  Just give me a second to
19  read it.
20          Uh-huh.  Yes.
21     Q.   You say they are the same
22  thing?
23     A.   No, no.  Oh, sorry.  I -- I
24  apologize.  I was just digesting the
25  information, and then I thought a question
```

Page 148

```
1            KARAN SINGH, Ph.D.
2   was going to come, but I guess you had
3   already asked the question.
4      Q.   I'll reask --
5      A.   Yeah.
6      Q.   Would you say that window 71
7   and image 78 are the same thing?
8      A.   Window --
9            MR. BUSEY:  Objection to the
10  extent it calls for a legal conclusion
11  and confusing.
12          Go ahead.
13          THE WITNESS:  Inasmuch as the
14  terms could be used interchangeably in
15  the light of this patent, yes.
16  BY MR. HAGIZ:
17     Q.   They're the same thing?
18          MR. BUSEY:  Objection.
19          THE WITNESS:  Which one?
20          MR. BUSEY:  Confusing.
21          THE WITNESS:  Sorry.  Can you --
22  yeah, I apologize.
23  BY MR. HAGIZ:
24     Q.   Window 71 and image 78 are the
25  same thing; is that what you're saying?
```

Page 149

```
1            KARAN SINGH, Ph.D.
2            MR. BUSEY:  Objection.
3   Confusing.
4            THE WITNESS:  Actually, I would
5   like to correct you over there.  It
6   does not refer to 78 as an image.  It
7   says, "image of a circle 78."
8            So, you know, I'm not sure
9   whether it is the circle -- the word
10  "circle" that is being referred to by
11  78 or the image of a circle.
12  BY MR. HAGIZ:
13     Q.   Are you saying you can't figure
14  out what image of a circle is in this patent,
15  or even in this example?
16     A.   In this example, I -- I cannot
17  necessarily -- I would say that the terms
18  could be used interchangeably in that the
19  window and the image of the circle could be
20  used interchangeably or, if they were chosen
21  to be distinguished, yes, I would not be able
22  to tell you exactly where the -- what the
23  precise bounds of the image of the circle
24  would be as long as it enclosed it.
25     Q.   Okay.  I'm not asking you what
```

38 (Pages 146 to 149)

Page 150

```
1            KARAN SINGH, Ph.D.
2    the bounds of the circle are.
3         A.   Okay.
4         Q.   I'm just asking you if --
5         A.   Okay.
6         Q.   -- the thing called a window --
7         A.   Yes.
8         Q.   -- and the thing called an
9    image, which -- those lines correspond to 71
10   and 78 respectively --
11        A.   Yeah.
12        Q.   Are those the same things or
13   are they different things?
14             MR. BUSEY:  Objection to the
15        extent it calls for a legal conclusion
16        and ambiguous.
17             Go ahead.
18             THE WITNESS:  In the reading of
19        this sentence, to me it's not
20        conclusive as one or the other.
21   BY MR. HAGIZ:
22        Q.   If you look at figure 3h --
23        A.   .yes.
24        Q.   -- do 71 -- do the number 71
25   and the number 78 indicate the same thing on
```

Page 151

```
1            KARAN SINGH, Ph.D.
2    the figure?
3         A.   Yes.  Sorry.  Do -- excuse me.
4    Do the numbers 71 -- no, they're pointing
5    at -- at different regions, yes.
6         Q.   And yet you think that
7    window 71 and circle 78 on line 39 of
8    column 11 is inconclusive?
9             MR. BUSEY:  Object as to the
10        form.
11             THE WITNESS:  Perhaps they could
12        be read as being distinct.
13   BY MR. HAGIZ:
14        Q.   Well, do you think they are
15   distinct or do you think that it's
16   inconclusive?
17        A.   The window and --
18             MR. BUSEY:  Same objection.
19             THE WITNESS:  I believe that
20        it's inconclusive because the -- when
21        you say the image of a circle, that
22        does not preclude the existence of
23        other elements or other things in that
24        image.  What it does tell you is that
25        the circle is part of it, but it
```

Page 152

```
1            KARAN SINGH, Ph.D.
2    doesn't tell you anything about what
3    else might compromise -- comprise it.
4         What it further tells you is
5    that it's included in 71, so you do
6    know that it could, in one instance,
7    go out as far as -- it could be as big
8    as window 71.  On the other hand, it
9    could refer to a region within --
10   within it.  It could be either.
11        Because it only tells you that
12   the circle is -- lies within the image
13   and that this image is included within
14   the window.
15   BY MR. HAGIZ:
16        Q.   But you see -- tell me if you
17   disagree -- that 78 in figure 3h points to
18   the boundary in the shape of a circle and the
19   number 71 in figure 3h points to the boundary
20   of that window.
21             MR. BUSEY:  Object to the extent
22        it calls for a legal conclusion and
23        ambiguous.
24             Go ahead.
25             THE WITNESS:  And to that
```

Page 153

```
1            KARAN SINGH, Ph.D.
2    effect, I mentioned that, in the text,
3    it is unclear whether the phrase
4    "image of a circle" is connected to
5    the number 78 or simply the word
6    "circle" is connected to the word
7    [sic] 78.
8         And I will concede that, indeed,
9    the arrow, the lead arrow from the
10   number 78 is, in fact, pointing and
11   touching the actual circle.  But that
12   in itself does not tell me whether the
13   image of the circle and the window
14   are, in fact, clearly distinct and
15   what that distinction is.
16   BY MR. HAGIZ:
17        Q.   So your answer is that it's
18   inconclusive?
19             MR. BUSEY:  Objection to the
20        extent it mischaracterizes the
21        witness' testimony.
22             THE WITNESS:  What is
23        inconclusive?
24   BY MR. HAGIZ:
25        Q.   Whether 71 and 78 are distinct
```

Page 154

KARAN SINGH, Ph.D.

1           KARAN SINGH, Ph.D.
2  or not distinct, this testimony is inconclusive."
3           MR. BUSEY:  Objection.  Asked
4      and answered.
5           THE WITNESS:  I don't believe
6      that that question can be answered
7      with -- with a yes, no, or it is
8      inclusive or not inclusive.  It needs
9      to be addressed the way I have already
10     addressed it in that there is a range
11     of parameters -- a parameter within
12     which that -- that could be
13     interpreted.
14  BY MR. HAGIZ:
15     Q.   I don't think you quite
16  answered my question, Dr. Singh.
17     A.   Uh-huh.
18     Q.   I am asking you, can you reach
19  a conclusion on whether 78 and 71 are
20  distinct or indistinct?
21          MR. BUSEY:  Asked and answered.
22     Mischaracterizes the witness' prior
23     testimony.
24          Go ahead.
25          THE WITNESS:  As I said, and

Page 155

1           KARAN SINGH, Ph.D.
2      I'll repeat, this tells me that the
3      image of the circle is included in the
4      non-translucent window.  It does not
5      specifically tell me that it is
6      distinct from it.  It does not also
7      tell me that it is not distinct from
8      it.  It doesn't, no.
9  BY MR. HAGIZ:
10     Q.   So -- are you done?
11     A.   Yes.
12     Q.   Sorry.  I couldn't tell
13  sometimes --
14     A.   Okay.
15     Q.   So let's go back to figure 3i
16  very quickly.
17     A.   Uh-huh.
18     Q.   Can you conclude whether
19  window 79 and the image discussed in
20  column 11, lines 49 to 50 --
21     A.   Uh-huh.
22     Q.   -- can you conclude whether
23  those are distinct or not distinct?
24          MR. BUSEY:  Objection to the
25     extent it calls for a legal

Page 156

1           KARAN SINGH, Ph.D.
2      conclusion.
3          Go ahead.
4          THE WITNESS:  Could you repeat
5      that question, please.
6  BY MR. HAGIZ:
7     Q.   Sure.  I'll rephrase it.
8     A.   Or you can just get it read
9  back to me.
10     Q.   I'll rephrase it.
11     A.   Okay.
12     Q.   Can you conclude whether
13  window 79 in figure 3i and the image
14  including the legend "top secret" referenced
15  on line 50 are the same thing?
16          MR. BUSEY:  Objection to the
17     extent it calls for a legal
18     conclusion.
19          THE WITNESS:  I would contend
20     that the image, including the words
21     "top secret," as I have mentioned,
22     certainly does include the words "top
23     secret" in that at least encloses it
24     and perhaps goes beyond it, and
25     whether strictly that region is truly

Page 157

1           KARAN SINGH, Ph.D.
2      identical to -- to the -- to the
3      window 79 is something that I would
4      like to -- to answer that, I would
5      actually first like to know or see as
6      to where exactly the reference to the
7      window -- the image of -- is a
8      translucent image including the legend
9      "top secret."  Right.
10          So in this case, I -- I would
11     read the two -- given the phrasing in
12     the specification, I would read the
13     two to be synonymous.
14          However, even were it not to be
15     read as being synonymous, the image
16     representing the words -- or including
17     the words "top secret" would be an
18     image that would at least enclose the
19     words "top secret" and then perhaps go
20     out as far as the extent of window 79.
21  BY MR. HAGIZ:
22     Q.   Dr. Singh, what parts -- what
23  sections of window 79 are translucent?
24     A.   When you use the word
25  translucent, it would be -- I'd be happy if

Page 158

KARAN SINGH, Ph.D.

1
2  you were to rephrase it either using the word
3  "translucent image" or "translucent pixels,"
4  preferable pixels since that is an atomic
5  unit in this case.
6       Q.   I'll rephrase.
7       A.   Sure.
8       Q.   Dr. Singh, which pixels in
9  figure 3i are translucent?
10       A.   The pixels pertaining to the
11  letters "top secret." And, in fact, I
12  believe you have these figures from the '922
13  patent, if you -- there is a reproduction of
14  the exact same figures with better fidelity
15  in the '489 patent as a -- just as a matter
16  of fact with regards to these.
17            I would -- to -- to reemphasize
18  the answer, the translucent pixels in this
19  would be -- would be the pixels of the words
20  "top secret."
21       Q.   And are there any other pixels
22  in that figure that would be translucent?
23       A.   There are other pixels that
24  might be translucent, but I believe that
25  there are conclusively pixels that we would

Page 159

KARAN SINGH, Ph.D.

1
2  term as transparent.
3       Q.   And which pixels would those
4  be?
5       A.   Those would be pixels -- well,
6  an example of those pixels would be the
7  pixels -- sort of the black pixels directly
8  below the number 39 that you can see in the
9  image.
10       Q.   And how do you know that that's
11  transparent?
12       A.   Visually, those pixels appear
13  to me, and I believe anyone with ordinary
14  skill in the art, as identical to those in
15  the figure 3h where figure 3h refers to -- to
16  those -- to those same -- to those pixels as
17  being -- as being opaque or -- in that
18  there's been -- there's no change in their
19  appearance.
20       Q.   Thank you, Dr. Singh. I'd like
21  to move on to something else. Were you
22  finished?
23       A.   Yeah. I'm finished.
24            MR. HAGIZ:  Would the reporter
25       please mark Exhibit 6. This is the --

Page 160

KARAN SINGH, Ph.D.

1
2  it says, "IBM technical disclosure
3  bulletin." It was produced as Bates
4  ranges 2733 through 2735.
5            (Singh Exhibit No. 6 was marked
6       for identification.)
7  BY MR. HAGIZ:
8       Q.   Dr. Singh, have you seen this
9  document before?
10       A.   In some incarnation, yes. Or
11  in some form, yes.
12       Q.   Now, if you take a look -- if
13  you take a look at figure 1 --
14       A.   Uh-huh.
15       Q.   -- of that document, is that a
16  transparent window?
17       A.   I would not form a conclusion
18  just looking at the figure without -- without
19  a detailed read of the textual description
20  elucidating that figure.
21       Q.   What information do you need to
22  conclude whether it's a transparent window or
23  not?
24       A.   Well, a clearly description of
25  what I am looking at.

Page 161

KARAN SINGH, Ph.D.

1
2       Q.   So you can't visually tell
3  whether this is transparent or translucent or
4  opaque?
5       A.   Well, visually, I see a
6  rectangle with the words "this is a window"
7  written inside it. I see another rectangle
8  with a star inside it. I see an arrow and I
9  see two overlapping rectangles with similar
10  entities as in the first two graphics. And,
11  visually, that is what I see until further
12  informed by -- by a precise textual
13  description that gives me more information
14  about it.
15       Q.   Outside of the context of the
16  patent, just as someone with ordinary skill
17  in the art, if you looked at figure 1, would
18  you see two windows, one of them potentially
19  transparent?
20       A.   Not necessarily because, as I
21  had mentioned to you -- the terms
22  "transparency" and "translucency," "opacity"
23  in the context that we have been discussing
24  them require a certain ordering of depth with
25  respect to a viewer.

41 (Pages 158 to 161)

Page 162

1        KARAN SINGH, Ph.D.
2        Visually, out of the context of
3   this patent, I don't see any -- any evidence
4   of depths as such and -- you know, outside of
5   this context.  And anybody of ordinary skill
6   in the art that perhaps works in -- in simple
7   two-dimensional graphics, you see two
8   overlapping graphics, overlapping without
9   being further informed by a notion of -- of
10  depth with regards to a viewer doesn't even
11  bring in the concept of transparency or
12  translucency or opacity.
13       Q.    Can you flip to the next page.
14  It's Bates stamped 2734.
15       A.    Sure.
16       Q.    I am going to read out the
17  first full paragraph here.  It says, "The
18  concept of transparent windows essentially
19  pertains to windows which do not obscure the
20  windows which they overlay.  They allow the
21  overlaid window's contents to show through as
22  if they were overlaid by a piece of glass,
23  hence the term 'transparent.'  An example of
24  the transparency is shown in figure 1.
25  Window 2 is transparent when it overlays

Page 163

1        KARAN SINGH, Ph.D.
2   window 1 such that the contents of window 1
3   still show through."
4        A.    Uh-huh.
5        Q.    Does that guide your
6   understanding of figure 1?
7        MR. BUSEY:  Objection.
8   Ambiguous.
9        Go ahead.
10       THE WITNESS:  Well, it certainly
11  begins to guide it because it talks
12  about things being overlaid and so on.
13  Yes, so it does begin to guide my
14  understanding of those images.
15  BY MR. HAGIZ:
16       Q.    Would you say that figure 1
17  demonstrates a transparent window as
18  understood by the '922 patent?
19       MR. BUSEY:  Objection.  Calls
20  for a legal conclusion.  Ambiguous.
21       THE WITNESS:  Figure 1 -- could
22  you repeat your question, please?
23  BY MR. HAGIZ:
24       Q.    Would you say that figure 1
25  depicts a transparent window as understood in

Page 164

1        KARAN SINGH, Ph.D.
2   the '922 patent?
3        MR. BUSEY:  Objection.  Calls
4   for a legal conclusion and is
5   ambiguous.
6        THE WITNESS:  I understand it --
7   the '922 patent doesn't really inform
8   us about transparent windows.  It
9   informs us about translucent windows.
10  BY MR. HAGIZ:
11       Q.    But, earlier, you defined
12  transparent window for me within the context
13  of the '922 patent, did you not?
14       MR. BUSEY:  Objection.
15  Mischaracterizes the witness'
16  statement -- witness' testimony.
17       THE WITNESS:  I provided you a
18  definition of the term "transparent"
19  in the context of the '922 patent,
20  yes.
21  BY MR. HAGIZ:
22       Q.    And would you call this a
23  transparent window?
24       MR. BUSEY:  Objection to the
25  extent it calls for a legal

Page 165

1        KARAN SINGH, Ph.D.
2   conclusion.
3        THE WITNESS:  If it were, in
4   fact, to be more precise, to -- to
5   indicate that, in fact -- that, in
6   fact, all -- all the pixels were
7   indeed -- indeed sort of either opaque
8   or transparent, then yes.  Given
9   what's written over here in terms of a
10  piece of glass, that's a little more
11  speculative.
12  BY MR. HAGIZ:
13       Q.    Could this be a translucent
14  window?
15       MR. BUSEY:  Objection to the
16  extent it calls for a legal conclusion
17  and ambiguous.
18       THE WITNESS:  I would say that's
19  unlikely, given the way the terms have
20  been -- the way they have described
21  the description over here.
22  BY MR. HAGIZ:
23       Q.    Now, Dr. Singh, earlier --
24       A.    Uh-huh.
25       Q.    -- you said that a transparent

Page 166

KARAN SINGH, Ph.D.

```
1              KARAN SINGH, Ph.D.
2    window can have pixels that are not
3    transparent; is that correct?
4         A.   Yes.
5              MR. BUSEY:  Objection.
6    Ambiguous.
7              Go ahead.
8    BY MR. HAGIZ:
9         Q.   Can an opaque window have
10   pixels that are not opaque?
11        A.   You would have to refine that
12   by which window you were referring to as the
13   opaque window.
14             If the opaque window was the
15   window that was overlaid rather the window
16   that -- that was considered closer to -- to
17   your vision, then, no, an opaque -- an
18   opaque -- a fully opaque window does not have
19   any pixels other than opaque pixels in the
20   reading of -- of -- of the patent and its
21   intrinsic evidence.
22        Q.   Do you believe that one of
23   ordinary skill in the art would consider
24   an -- a window that has one transparent pixel
25   and every other pixel opaque to not be an
```

Page 167

KARAN SINGH, Ph.D.

```
1              KARAN SINGH, Ph.D.
2    opaque window as understood by the '922
3    patent?
4              MR. BUSEY:  Objection to the
5    extent it calls for a legal conclusion
6    and is ambiguous.
7              Go ahead.
8              THE WITNESS:  If I understand
9    what you're saying correctly, you're
10   asking me whether I would call a pixel
11   [sic] that had a single translucent
12   pixel and the rest of the pixels as
13   being opaque, would I call that a
14   translucent image; is that correct?
15   BY MR. HAGIZ:
16        Q.   No, I actually asked --
17        A.   That's not the question, okay.
18        Q.   I said if you have an image
19   that is all opaque pixels and one transparent
20   peaks, would one of ordinary skill in the art
21   believe that '922 patent would not consider
22   that to be an opaque window?
23             MR. BUSEY:  Objection.
24   Ambiguous, confusing, double negatives
25   and to the extent it calls for a legal
```

Page 168

KARAN SINGH, Ph.D.

```
1              KARAN SINGH, Ph.D.
2    conclusion.
3              THE WITNESS:  Well, as I -- I'll
4    sort of reiterate that, you know, the
5    '922 patent itself does not, in -- in
6    the claims sort of talk about the
7    transparent windows.  But in the light
8    of the intrinsic evidence and so on, I
9    would say that, for a window to be
10   called opaque or wholly opaque that --
11   again, requiring that you specify
12   whether that window is in the
13   foreground or the background, that
14   that window -- the presence of -- of a
15   single transparent pixel would render
16   it not opaque, yes.
17   BY MR. HAGIZ:
18        Q.   Okay.  Let's move to --
19   actually, since we began discussing this
20   before, why don't we move to your initial
21   report that's Exhibit 1, paragraph 31.
22        A.   Yes.
23        Q.   Now, you define a feature of
24   interest or you construe a feature of
25   interest saying, "The term 'feature of
```

Page 169

KARAN SINGH, Ph.D.

```
1              KARAN SINGH, Ph.D.
2    interest' is used to describe a region or
3    element of an image that is used in
4    connection with an image operation."
5              Is that correct?
6         A.   Yes.
7         Q.   Now, after that, you say, "In
8    claim 31, the '922 patent establishes that
9    features of interest are used in the context
10   of image operations when it describes
11   conducting an image operation on said first
12   selected image using said feature of
13   interest."
14        A.   Uh-huh.
15        Q.   What does it mean to -- for a
16   feature of interest to be used in connection
17   with an image operation?
18        A.   Okay.  So -- well, for
19   starters, I would just like to clarify
20   the term "feature" and "features of interest"
21   are used in the singular and plural, and so
22   the answers that -- that -- in general that I
23   may give pertain to both the singular and the
24   plural unless -- you know, unless that
25   becomes a specific point of contention that
```

43 (Pages 166 to 169)

1           KARAN SINGH, Ph.D.
2   you would like to raise.
3           The -- your question was what
4   is the feature of context -- sorry -- feature
5   of interest -- I apologize.  In giving you
6   that point that I wanted to make, I kind of
7   lost your specific question.  Could you
8   please have that reread to me.
9       Q.   Sure.  I'll rephrase it.
10          What does it mean for a --
11  sorry.  Scratch that.
12          What does it mean for a feature
13  of interest to be used in connection with an
14  image operation?
15          MR. BUSEY:  Objection to the
16          extent it calls for a legal
17          conclusion.
18          Go ahead.
19          THE WITNESS:  It means that the
20          feature of interest establishes a
21          context for the image operation.
22  BY MR. HAGIZ:
23      Q.   And what does that mean?
24      A.   That means exactly what I said,
25  in that the feature of interest in some way

1           KARAN SINGH, Ph.D.
2   or form informs the functionality of that
3   image operation -- of -- it creates a context
4   that helps give meaning to the operation --
5   to the image operation that is performed.
6       Q.   Can we -- can you take a look
7   at -- okay.  Can you take a look at column 9,
8   lines 7 through 9?
9       A.   This is the patent?
10      Q.   Yes.
11      A.   Okay.
12      Q.   This is actually one of the
13  lines we were looking at before.
14      A.   Okay.  Column 9.  Which line,
15  again?
16      Q.   Lines 7 through 9.
17      A.   7 through 9.  Okay.  Which
18  sentence do you want me to --
19      Q.   Sure.  It's the sentence that
20  says, "This circle 68 is considered to
21  represent an arbitrary image of interest to
22  the user."
23      A.   Uh-huh.
24      Q.   Now, I believe before you said
25  that "image of interest" and "feature of

1           KARAN SINGH, Ph.D.
2   interest" refer to the same thing; is that
3   correct?
4           MR. BUSEY:  Objection to the
5           extent it mischaracterizes the
6           witness' prior testimony.
7           THE WITNESS:  I believe in this
8           particular instance, in this
9           embodiment, that I would read it as
10          such.
11  BY MR. HAGIZ:
12      Q.   And what context does circle 68
13  provide?
14      A.   In general, the circle -- a
15  circle 68 could -- or a circle could provide
16  any -- any number of -- any number of
17  contexts.  It could provide -- it could
18  represent a button whose clicking does
19  something.  It could represent a smiley face
20  that would give you feedback of some kind.
21  It could really just -- it could have various
22  meanings in general.
23          In the context of the example
24  given, it provides -- in the example given,
25  it provides a context for image operations

1           KARAN SINGH, Ph.D.
2   where transformations of that -- various --
3   various visual manifestations of that -- of
4   that circle are -- are, yeah, copied or
5   created on -- on -- on the -- on the window
6   that is -- that -- on which -- the window on
7   which the image operation is taking place.
8       Q.   And where -- where in the
9   specification do you see that?
10      A.   Where in the specification do I
11  see what?
12      Q.   What you just said.
13      A.   Well, in the -- column 10
14  starting from line 5, reading down, there is
15  lots of examples of the circle -- a circle
16  being copied, maybe the same size, larger,
17  smaller, maybe offset.  "The object is simply
18  to provide the user with ideas, choices or
19  alternatives in connection with a secondary
20  image...which is created by reference to
21  information contained in a primary image or
22  window."
23      Q.   Now, where do you get from that
24  that the feature of interest is used in
25  connection with an image operation as opposed

44 (Pages 170 to 173)

KARAN SINGH, Ph.D.

1
2  to with -- in connection with a second image
3  or a second window?
4      A.    Well, firstly, I get the fact
5  that the feature of interest is used in
6  connection with an image operation in the
7  actual claim language.
8          And then, subsequent to that,
9  all of the figures and examples, I believe,
10  provide a fairly rich set of -- of examples
11  of what a feature of interest could be and
12  the kind of context that they could set up
13  for the image operations that might be
14  performed in conjunction with them.
15          And I have -- going back to my
16  expert report, I show -- I must have cited
17  some of these examples.  I do cite some of
18  them in paragraph 33.  I cite more of them in
19  paragraph 34.
20      Q.    Okay.  Let's talk about some of
21  those examples.
22      A.    Okay.
23      Q.    So the first example in
24  paragraph 33, you refer to column 10,
25  lines 55 through 65; is that correct?

KARAN SINGH, Ph.D.

1
2      A.    Yes.
3      Q.    What is the feature of interest
4  in that example?
5      A.    Features of interest in that
6  example could be selected features of the
7  house.  I think the patent is referring to
8  possible visuals that might indicate things
9  like doors and windows and so on.  Yes.
10      Q.    Now, I apologize because I
11  actually -- I inadvertently gave you a trick
12  question there because the first half of --
13  lines 55 through lines 59 actually discuss a
14  different image operation and a different
15  feature of interest.  I actually was only
16  referring --
17      A.    Okay.
18      Q.    -- to lines 59 through 65,
19  which I believe is what you were talking
20  about.
21      A.    Okay.
22      Q.    Is that correct?
23      A.    Given that you yourself were
24  telling me it was a trick question, I would
25  be inclined to believe you.

KARAN SINGH, Ph.D.

1
2      Q.    Inadvertently, I promise.
3      A.    But I could -- I could, you
4  know, go back and check -- you know, check
5  the actual lines and -- and read them from --
6  well, 55 to 65.
7          And, yes, you are indeed
8  correct that the first few lines talk
9  about -- talk about a circle and -- and
10  further on in that -- yeah, much later down
11  in that paragraph, yeah, there is a reference
12  to a hypothetical -- a house.
13      Q.    Now, in the house example --
14      A.    Yeah.
15      Q.    -- what context is the feature
16  of interest providing?
17      A.    In the house example, the way
18  it's -- it's kind of -- the way it is -- it
19  is proffered, I would say it's providing a
20  visual context.
21      Q.    Okay.  Now, what about -- if
22  you take a look at column 9, lines 61 to
23  64 --
24      A.    Column 9?
25      Q.    Uh-huh.

KARAN SINGH, Ph.D.

1
2      A.    Line 61 to 64.
3      Q.    That references figure 3c, I
4  believe.
5      A.    Yes.  Okay.
6      Q.    What's the feature of interest
7  in that example?
8      A.    It's a circle.
9      Q.    And what is -- what is the
10  context which that feature of interest
11  provides?
12      A.    In the example as shown, it
13  provides -- it provides a context where that
14  circle is copied over in -- in -- in perhaps
15  various forms in one -- in -- yeah, in the
16  example that's proffered there, yes.
17      Q.    Well, that it's copied and
18  traced, that's the image operation that's
19  performed.  But what context does it provide?
20          MR. BUSEY:  Objection.
21  Ambiguous.
22          THE WITNESS:  Well, the context
23  it provides could come from any number
24  of sources.  It could come potentially
25  from -- from what the feature is.  It

45 (Pages 174 to 177)

Page 178

```
1              KARAN SINGH, Ph.D.
2    could come from where it is perhaps in
3    relation to other features that might
4    exist.
5              So the context would really vary
6    from application to application as
7    well as from example to example.
8    BY MR. HAGIZ:
9        Q.    Dr. Singh, I apologize --
10       A.    Yeah.
11       Q.    -- but I would appreciate it if
12   you actually answered my questions.  What I
13   specifically asked me here --
14       A.    Yes.
15       Q.    -- is in the example shown in
16   figure 3c and described in lines 61 to 64 --
17       A.    Uh-huh.
18       Q.    -- what context does circle 68
19   in that example provide?
20             MR. BUSEY:  Counsel, you didn't
21   like what the witness' response was.
22   I object to your -- to your reasking
23   the question.  It was asked and
24   answered, and he did answer it.
25             So -- you can answer the
```

Page 179

```
1              KARAN SINGH, Ph.D.
2    question.
3             THE WITNESS:  Okay.
4             MR. BUSEY:  I think your
5    question was also misleading.
6             Go ahead.
7             THE WITNESS:  In that -- in
8    those -- in that precise example, the
9    context was -- the context by -- was
10   that the resulting image operations
11   created copies and instances of that
12   circle.
13   BY MR. HAGIZ:
14       Q.    So in the example of the house,
15   you said that provided a visual context; is
16   that correct?
17       A.    Yes.
18       Q.    Is the circle example in
19   figure 3c not a visual context?
20       A.    Sure, it is a visual context.
21       Q.    Okay.  Let's look -- let's go
22   back to figure 3i for just a second.  Do you
23   have that in front of you?
24       A.    Yes, but I hadn't finished what
25   I was going to say.
```

Page 180

```
1              KARAN SINGH, Ph.D.
2        Q.    Oh, I'm sorry, I thought you
3    were done.
4        A.    No.  I was going to say that,
5    yes, it does provide a visual context insofar
6    as a visual context is also a functional
7    context in that what is at the -- at the
8    heart of -- of the context is the
9    functionality that results in the image
10   operation, one example of which could be a
11   visual operation.
12             And, yes, indeed, the examples
13   that you've pointed me at, specifically the
14   two that you asked me, the one with the
15   circle and the one with the house, are indeed
16   visual examples of functional context.
17       Q.    And does the spec -- does the
18   specification or the intrinsic evidence
19   anywhere say that the feature of interest is
20   functional?
21             MR. BUSEY:  Objection to the
22   extent it calls for a legal
23   conclusion.
24             Go ahead.
25             THE WITNESS:  The claim language
```

Page 181

```
1              KARAN SINGH, Ph.D.
2    does not preclude it, and the
3    intrinsic evidence certainly -- the
4    examples and the figures provided do
5    support it, yes.
6    BY MR. HAGIZ:
7        Q.    But it does not explicitly say
8    anywhere that feature of interest are
9    functional; is that correct?
10             MR. BUSEY:  Objection.
11   Mischaracterizes the witness' prior
12   testimony.
13             Go ahead.
14             THE WITNESS:  In terms of
15   specifically coining the word
16   "functional," no.
17   BY MR. HAGIZ:
18       Q.    Would you generally call --
19   consider an image to be functional?
20       A.    An image?
21       Q.    Yes.
22       A.    Outside of any context by
23   itself, an image, no.  As an isolated word,
24   no.
25       Q.    And so what about the phrase
```

KARAN SINGH, Ph.D.

1
2 "image of interest" makes you think that that
3 would be functional?
4     A.    The fact that it is used in
5 conjunction, in the claim language, with the
6 term -- let me see the exact term in the
7 claim language -- it will be easier for me to
8 find it in my report, so...
9         Sorry.
10    Q.    Sure.
11    A.    Conducting an image operation
12 on -- selecting an image using said feature
13 of interest.
14         So the -- the use of the term
15 "feature of interest" in conjunction with
16 conducting an image operation, to me,
17 informs...
18    Q.    And why could that not be a
19 purely visual meaning in that context?
20    A.    Oh, absolutely --
21         MR. BUSEY:  Objection to the
22 extent it calls for a legal
23 conclusion.
24         THE WITNESS:  Oh, excuse me.
25         MR. BUSEY:  Go ahead.  Go ahead.

KARAN SINGH, Ph.D.

1
2         THE WITNESS:  It could be
3 visual, but it could be -- it could
4 very easily be not visual and
5 functional.  And there is -- there are
6 clear examples in the intrinsic
7 evidence in the specification to -- to
8 elucidate this.
9 BY MR. HAGIZ:
10    Q.    Well, we'll get to some of the
11 examples that you cite in a second.  I would
12 like to take a look at just two other
13 examples first.
14         MR. BUSEY:  Did you finish your
15 response?
16         THE WITNESS:  Yes, I did.
17         MR. HAGIZ:  Sorry.  I can't tell
18 sometimes.
19         THE WITNESS:  Sure.  No, I
20 apologize.
21 BY MR. HAGIZ:
22    Q.    I would like you to take a
23 look -- sorry.  I was going to go back
24 originally to figure 3i.
25    A.    Uh-huh.

KARAN SINGH, Ph.D.

1
2    Q.    Now, figure 3i, according to
3 column 11, line 49 to 50, as we discussed
4 before, has a translucent image, including
5 the legend "top secret"; is that correct?
6    A.    Uh-huh.  Yes.
7    Q.    Now, would you say that image
8 operations performed on base image or the
9 opaque window, as it's called in this
10 example -- are those image operations using a
11 feature of interest?
12         MR. BUSEY:  Objection.
13 Ambiguous.
14         THE WITNESS:  Yes, insofar as
15         the -- insofar as the feature of
16         interest establishes a context for the
17         work that you are performing in -- in
18         the base image.  So it informs your --
19         the functions and the -- the actions
20         that you might perform.  So yes.
21 BY MR. HAGIZ:
22    Q.    So what -- what would you say
23 is the feature of interest in figure 3i?
24    A.    Let me see what the patent
25 says.

KARAN SINGH, Ph.D.

1
2         Yeah.  I would say the feature
3 of interest in this image would be the --
4 would be the letters "top secret."  I don't
5 believe -- I'm not sure it makes -- you know,
6 the two words may be used explicitly, but the
7 sentence around line 60, it says, "The object
8 of having the translucent overlay in this
9 case is simply to warn of the security status
10 of the underlying information as top secret."
11         So indeed, the words "top
12 secret" are providing you contextual
13 information that may inform the image
14 operations that you might carry out.
15    Q.    And so "top secret" is the --
16 you may have answered this before; "top
17 secret" is the feature of interest, you said?
18         MR. BUSEY:  Objection.  Asked
19 and answered.
20         THE WITNESS:  It could be read
21 that way.  There is no explicit
22 connection between the two.
23 BY MR. HAGIZ:
24    Q.    Can you take a look at line 67
25 in that same column, column 11.  It starts

47 (Pages 182 to 185)

Page 186

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2    there are and goes through column 12, line 4,
3    and says, "The information on the
4    translucency is generally, though not
5    necessarily, external information and not
6    typically specific information relevant
7    to" --
8        A.   I'm sorry.  One second.  Where
9    am I reading?
10       Q.   Sorry.  It's the bottom of the
11   column 11 starting --
12       A.   Bottom of column -- yes.  Okay.
13   Bottom of column 11 -- starting from which
14   line?
15       Q.   Starting with line 67.
16       MR. BUSEY:  65.
17       MR. HAGIZ:  Oh, sorry.
18       THE WITNESS:  "In this case" --
19   "in the case of this embodiment"?
20   BY MR. HAGIZ:
21       Q.   Yeah.  Let me read that.  "In
22   the case of this embodiment, the translucent
23   overlay is completely passive and the
24   information on the translucency is generally
25   though not necessarily external information

Page 187

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2    and not typically specific information
3    relevant to the image operations being
4    conducted on any underlying active window or
5    image."
6          Do you see that section,
7    Dr. Singh?
8        A.   Yeah.  I am just reading it
9    over.
10       Q.   Sure.
11       A.   Just give me a second to read
12   and then you can continue.
13       Yeah.  Okay.
14       Q.   And now go a little further
15   back, actually, to column 11, line 52.
16       A.   Uh-huh.
17       Q.   Which says, "Image operations
18   below overlay translucent window 79 are
19   considered generally independent of and not
20   with reference to the particular translucent
21   image on overlay translucent window 79."
22       A.   Uh-huh.
23       Q.   Now wouldn't you say that the
24   patent here is saying that these image
25   operations in figure 3i are not using the

Page 188

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2    feature of interest?
3        A.   I would say that it's not
4    explicitly saying that they are or are not
5    using it in this embodiment.  It is true
6    there are words like generally followed
7    immediately by, "though not necessarily," as
8    well as there are sentences that read --
9    where is that sentence that -- that talks
10   about something about the object of -- of --
11   of the overlay does inform the -- the user of
12   the security status of the underlying
13   information as top secret.
14          So in my opinion, it -- it
15   seems to indicate that, yes, that information
16   may or may not impact the actual image
17   operations be -- to be performed in this --
18   in this example.
19       Q.   So would you say that one of
20   ordinary skill in the art would consider this
21   example to be an image operation using a
22   feature of interest?
23       A.   They could.  But equally, if
24   they really did want to follow the -- follow
25   the language in reverse, they -- they could

Page 189

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2    attempt to argue against it.  However, given
3    that it is proffered as an example of --
4    of -- of what this patent is -- is trying to
5    offer, which is the ability to perform image
6    operations in the context it have features of
7    interest in -- in translucent images, I would
8    tend to take the positive reading.
9        Q.   Just one for example.  I know
10   you discussed the keyboard example and we'll
11   get to that in a second.  Just one more
12   example of mine.  Can you look at figure -- I
13   believe it's figure 3b.
14       A.   3b.
15       Q.   Sorry.  Figure 3c again.
16       A.   Okay.
17       Q.   Now do you see -- are you
18   there?
19       A.   Yes, I am there.
20       Q.   Do you see what's indicated by
21   the number 66?
22       A.   Yes, I do.
23       Q.   Okay.  Now, just turning back
24   to the specs for a second, column 9 --
25   column 9, rather --

48 (Pages 186 to 189)

Page 190

KARAN SINGH, Ph.D.

1                   KARAN SINGH, Ph.D.
2      A.   Uh-huh.
3      Q.   -- we'll start -- we'll read
4   that whole sentence out, column 9 starting
5   with line 1.  Are you there?  Sorry.
6      A.   I am there.
7      Q.   It says "to implement the --
8   detail, figure 3a -- 60 with a single
9   non-translucent window 62 shown on one
10  portion of the screen 60 and a gadget bar 46
11  including a wand icon 66 for transforming
12  selected image windows between opaque and
13  translucent states."
14         Now my question is, is wand
15  icon 66 a feature of interest?
16     A.   As far as my understanding of
17  the construction of this claim or the term
18  feature of interest, the word feature of
19  interest is really a term that is construed
20  in -- in conjunction and in the context of
21  translucent images and translucent overlays.
22  At this point, the wand icon 66 is not part
23  of that -- that region that you would
24  typically call the translucent overlay.
25     Q.   Fair enough.  Let's say that

Page 191

KARAN SINGH, Ph.D.

1                   KARAN SINGH, Ph.D.
2   gadget 64 that's described here --
3      A.   Uh-huh.
4      Q.   -- let's say that that was
5   translucent and let's say that that
6   overlapped the window 62.
7      A.   In the area?
8      Q.   Yes, overlap.
9      A.   Overlap.
10     Q.   Now would wand icon 66 be a
11  feature of interest?
12     A.   I believe so.  It would be a
13  feature of interest if it was something that
14  a user was to use to conduct image
15  operations.  Insofar as something is -- is
16  considered to be of interest to a user within
17  an image in the sense that -- I mean if you
18  were to populate an image with -- with any
19  number of regions and elements and -- and ask
20  the question -- beg the question whether they
21  were feature of interest, you would need to
22  quantify that or qualify that with whether
23  they were indeed of interest and were to be
24  used in conjunction with image operations by
25  a user.

Page 192

KARAN SINGH, Ph.D.

1                   KARAN SINGH, Ph.D.
2          And if the answer to that is in
3   the affirmative, then -- then absolutely.
4      Q.   What do you mean by if
5   something is considered to be of interest to
6   a user?
7      A.   That means a user would use
8   that as contextual information for an image
9   operation.
10     Q.   Can you give me an example, is
11  a scenario in the specification that -- that
12  has an image or a feature that does not
13  provide context for an image operation?
14     A.   That's something I would call a
15  trick question because, as far as I can see,
16  the -- the definition of feature is one
17  that -- that -- that does provide context for
18  an image operation that might be performed by
19  a user.
20     Q.   So does that mean that any
21  region or element of an image could be a
22  feature of interest?
23     A.   Could be if it satisfied all
24  the other terms and -- all the other
25  conditions that I have previously mentioned.

Page 193

KARAN SINGH, Ph.D.

1                   KARAN SINGH, Ph.D.
2      Q.   Okay.  Can you give me an
3   example of an image operation on--on an image
4   or region of an element of image where there
5   is no context provided?
6          MR. BUSEY:  Objection.
7   Ambiguous.
8   BY MR. HAGIZ:
9      Q.   Actually, I'll withdraw that
10  question.  You know what, let's move on --
11  let's move to your example, I believe
12  discussed --
13     A.   What would you like me to look
14  at?
15     Q.   I'm just double-checking.
16     A.   Oh, okay.
17     Q.   Sorry.  Actually it's Exhibit 1
18  in your initial report paragraph 34.  Now
19  here you discuss the keyboard example that is
20  in figures 18 to 21c?
21     A.   Uh-huh.
22     Q.   Is that correct?
23     A.   Just give me a moment so I can
24  find --
25     Q.   Sure.

49 (Pages 190 to 193)

Page 194

KARAN SINGH, Ph.D.

1
2     A.    -- what I am looking for.
3 Paragraph 34 you said?
4     Q.    Uh-huh.
5     A.    Yes.
6     Q.    And would you say that that is
7 an image operation using a feature of
8 interest?
9     A.    That what is an image operation
10 using a feature of interest?
11        MR. BUSEY: Objection.
12 Ambiguous.
13 BY MR. HAGIZ:
14     Q.    Sorry. You're right.
15        Would you say that typing or
16 pressing keys on that virtual keyboard, is
17 that an image operation using a feature of
18 interest?
19        MR. BUSEY: Objection to the
20     extent it calls for a legal conclusion
21     and is ambiguous.
22        Go ahead.
23        THE WITNESS: Typing is
24     providing input or pressing -- key is
25     providing input. Pressing a button is

Page 195

KARAN SINGH, Ph.D.

1
2 not -- or providing input in itself is
3 not an image operation.
4 BY MR. HAGIZ:
5     Q.    Do you have more or was that
6 it?
7     A.    No, that's it.
8     Q.    So can you explain to me in
9 paragraph 34 -- and I think we should break
10 after this because the video is running
11 out --
12     A.    Yeah.
13     Q.    -- in paragraph 34 you say
14 paragraph 1 -- c provide a --
15     A.    Yes.
16     Q.    What is a feature of interest
17 in those images?
18     A.    The feature of interest, as I
19 believe a person of ordinary skill in the art
20 would understand, as in the example shown by
21 both its visual and the accompanying textual
22 description that -- that combines both the --
23 the -- the feature of interest and the
24 resulting image operation, as I say in my --
25 in my report, is the section -- the enclosing

Page 196

KARAN SINGH, Ph.D.

1
2 rectangles of those keys are the features of
3 interest in that translucent image.
4        When user input is received
5 within the region of those keys, image
6 operations are performed in the base image.
7 The image operation is conducted in
8 connection with the feature of interest.
9        Let's break here and we will
10 pick this up after the break.
11        THE VIDEOGRAPHER: This is the
12     end of tape 4 of Dr. Singh. Off the
13     record at 3:13.
14        (Recess.)
15        THE VIDEOGRAPHER: This is the
16     beginning of tape 5 in the deposition
17     of Dr. Singh. On the record at 3:32.
18 BY MR. HAGIZ:
19     Q.    Now, Dr. Singh, when we left
20 off, I believe you said that in figures 18 to
21 21c the feature of interest is the rectangles
22 of the keys; is that correct?
23        MR. BUSEY: Objection to the
24     extent it mischaracterizes the
25     witness' testimony.

Page 197

KARAN SINGH, Ph.D.

1
2        Go ahead.
3        THE WITNESS: I believe I said
4     the rectangles enclosed -- and
5     whatever is enclosed within the
6     rectangle of the key, yes.
7 BY MR. HAGIZ:
8     Q.    So you're saying it has to be
9 the rectangle and what's enclosed inside, not
10 just the rectangle, if I understand
11 correctly?
12     A.    That's what I would construe,
13 yes.
14     Q.    Now, why is it not just the
15 letters inside the rectangles that are the
16 features of interest?
17     A.    Because, as I had mentioned to
18 you, I believe that these features of
19 interest provide a context for the image
20 operations that occur. The image operations
21 that occur in this case are -- are manifested
22 as keys that appear in the image -- in the
23 application below and, in fact, the context
24 that gets set up is a combination of both
25 the -- both the actual key as well as the

50 (Pages 194 to 197)

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2    rectangular region around it because that
3    rectangular region provides a bound for
4    what -- for -- for the -- these -- what will
5    be the -- what is the semantic meaning of
6    that key in that when input is received
7    within that rectangular region, that
8    particularly -- that particular key gets --
9    gets activated.
10        Q.    So could you explain to me --
11   are you using the feature of interest in the
12   sense that you're pressing or selecting the
13   key or are you using the feature of interest
14   in the sense that you're using the letter
15   represented by the key somehow?
16        A.    Well, I'm using the key as a
17   feature of interest exactly as I said, to
18   establish a context. The context in this
19   case is both the actual key, the semantics of
20   the key, the letter R, the letter I, the
21   letter P, the semantic meaning of the
22   backspace key or the enter key, as well as
23   the region that establishes that context, the
24   region that would be -- would -- would
25   respond and -- and cause image operations to

1          KARAN SINGH, Ph.D.
2    be -- to be created -- to be -- image
3    operations to be performed in the context of
4    that feature.
5          THE VIDEOGRAPHER: Excuse me
6    just a minute. Off the record at
7    3:35.
8          (Pause.)
9          THE VIDEOGRAPHER: Back on the
10   record at 3:36.
11         MR. BUSEY: Did you finish your
12   response, Mr. Singh.
13         THE WITNESS: Yes, I believe so.
14   BY MR. HAGIZ:
15        Q.    So if I understand you
16   correctly, in figures 18 to 21c, someone uses
17   a feature of interest to cause an image
18   operation?
19         MR. BUSEY: Objection to the
20   extent it mischaracterizes the
21   witness' prior testimony.
22         You can go ahead.
23         THE WITNESS: Someone uses a
24   feature of interest to establish the
25   context for an image operation, yes.

1          KARAN SINGH, Ph.D.
2    BY MR. HAGIZ:
3         Q.    Wait. Who establishes the
4    context?
5         A.    Who establishes the context?
6         Q.    Uh-huh.
7         A.    The -- the program that
8    processes the input that might be -- that
9    would be -- that program -- yeah, the program
10   that processes the input, yes.
11        Q.    So is the program using the
12   features of interest or is the user using the
13   features of interest?
14        A.    They are both using the feature
15   of interest.
16        Q.    How is the user using the
17   feature of interest?
18        A.    The user is using the feature
19   of interest to gain semantic meaning to the
20   image operation that they're about to perform
21   based on the input that they're about to
22   provide.
23        Q.    And how does the program use
24   the feature of interest?
25        A.    The program uses the feature of

1          KARAN SINGH, Ph.D.
2    interest to process that input in the context
3    of the input that is provided.
4         Q.    So in that sense, the feature
5    of interest is what the program uses to cause
6    or to decide to perform an image operation?
7          MR. BUSEY: Objection to the
8    extent it mischaracterizes the
9    witness' testimony.
10         THE WITNESS: Could you rephrase
11   that, because I think you sort of lost
12   me there.
13   BY MR. HAGIZ:
14        Q.    Sure. Let's say -- so let's
15   say a user presses a key and the program uses
16   the feature of interest; is that correct?
17        A.    Yeah.
18        Q.    What then happens to reach the
19   image operation?
20        A.    Right. So the user presses a
21   key. The -- using the context that is
22   provided by the features of interest that
23   inform the user where they should press to
24   engage the particular semantic key that --
25   that they wish to engage, the program, which

Page 202

1           KARAN SINGH, Ph.D.
2  is clearly aware of the layout of these
3  features of interest, is able to, by
4  receiving that input, know exactly what
5  semantic meaning to ascribe to it.
6        Q.    Where -- where does the image
7  operation play into all this?
8           MR. BUSEY:  Objection to the
9     extent it calls -- object as ambiguous
10    and to the extent it calls for a legal
11    conclusion.
12        Go ahead.
13        THE WITNESS:  The image
14    operation is a result of programs
15    processing that input.
16 BY MR. HAGIZ:
17       Q.    So the image operation is a
18 result of the program using the feature of
19 interest; is that correct?
20          MR. BUSEY:  Objection to the
21    extent it mischaracterizes the
22    witness' testimony and states a legal
23    conclusion.
24        THE WITNESS:  Could you rephrase
25    that?

Page 203

1           KARAN SINGH, Ph.D.
2  BY MR. HAGIZ:
3        Q.    You said that the program uses
4  the feature of interest to process the input;
5  is that right?
6        A.    It uses the feature of interest
7  as semantic context in processing the input.
8        Q.    Wait.  Now, I --
9        A.    The feature of interest --
10       Q.    Sorry.
11       A.    The feature of interest is not
12 something that is absolutely required for a
13 program to do something with input; however,
14 it establishes a context under which it will
15 likely process that input in a particular
16 way, in a specific way, that is informed by
17 that feature of interest.
18       Q.    How can a program be informed?
19 Doesn't the program do what the code tells it
20 to do?
21       A.    That's exactly right.  That
22 code -- or -- code is what draws lines and
23 letters on a keyboard.  That code knows where
24 these lines and letters on a keyboard are.
25 That code knows that input that is received

Page 204

1           KARAN SINGH, Ph.D.
2  within a rectangle of coordinates A/B to C/D,
3  wherein A/B and C/D are just some example
4  coordinates, would know exactly which key --
5  which semantic key that little feature on the
6  screen is mapping to.
7        Q.    So how does that provide
8  semantic context to the program?
9        A.    Let me address this for you.
10 There is actually a wonderful -- it's fairly
11 long, actually, a couple paragraphs of
12 description -- I think starting from around
13 column 20 in -- somewhere around column 20,
14 line 55, all the way down to column -- yeah,
15 like 25, 30, where essentially the example
16 elucidates that -- that were a user to tap,
17 for example, in the region on -- on the
18 overlay image that corresponded to, for
19 example, the R key, that the semantic result
20 would be the program understanding, as input,
21 the letter R.
22          It continues to provide some
23 other examples.  It provides the example I.
24 It provides the example P.  It further
25 indicates that the image operation that

Page 205

1           KARAN SINGH, Ph.D.
2  results from processing that input is --
3  is -- is both -- it could be, for example,
4  those letters, or it could well be a bullet
5  that -- that -- that indicates that this
6  input has been processed and provided in some
7  semantic way to the program.
8           And it goes further to indicate
9  the -- the working and the functioning of the
10 backspace key and the feature of interest
11 representing the backspace to indicate that
12 it would functionally cause -- it would
13 functionally cause the program to remove from
14 its understood input the last character and
15 be ready then to receive another character in
16 its place.
17          So in my mind, and I would
18 imagine for anybody ordinarily skilled in the
19 art, it can't be more explicit and -- and
20 pedantic, this -- this fairly long
21 explanation both of what a feature of
22 interest is, how it establishes a context for
23 the -- for the input, as well as how that
24 input is processed in a functional way and
25 the resulting -- the result of processing

KARAN SINGH, Ph.D.

1       KARAN SINGH, Ph.D.
2  that input that appears as an image
3  operation.
4       Q.   Now, you talked about a lot of
5  image operations and a lot of features of
6  interest.
7       A.   Uh-huh.
8       Q.   Can you point out where in
9  those two paragraphs or --
10      A.   They show up?
11      Q.   -- or, I think, anywhere in
12  column 20 or 21 any of those terms show up?
13      A.   Which terms?
14      Q.   Feature of interest, image of
15  interest, image operation.
16      A.   Well, I haven't come across the
17  precise use of the terms, but to me it's
18  actually -- and I believe a person ordinarily
19  skilled in the art -- I mean, this example is
20  clearly illustrating precisely what I said.
21  And it certainly doesn't preclude that that
22  is what, in fact, is being conveyed.
23      Q.   Are you finished or is there
24  more?
25      A.   No, I'm finished.

1       KARAN SINGH, Ph.D.
2       Q.   Okay.  But you don't see the
3  words "image of interest," "feature of
4  interest" or "image operation" in that
5  example; is that correct?
6       A.   Well, as I said, to answer that
7  question emphatically, I would probably like
8  to read over the -- the -- essentially the
9  three paragraphs starting from -- from
10  essentially the -- the beginning of the
11  keyboard image around line 30, column 20,
12  down to where -- where this example ends.
13           Quickly looking over the text,
14  the terms don't -- have not jumped out at me,
15  but -- but a precise reading of it may -- may
16  indicate an implication of these terms.
17           Would you like me to spend the
18  time going through it?
19      Q.   Go right ahead.  Sure.
20      A.   It will take a certain amount
21  of time.
22      Q.   Well, you know what, let me ask
23  you a different question.
24      A.   Okay.
25      Q.   If you read that section --

1       KARAN SINGH, Ph.D.
2       A.   Yeah.
3       Q.   -- and none of those words were
4  in there, would you conclude that this is not
5  an image operation or that these are not
6  features of interest?
7       A.   I would conclude neither of
8  those two things.
9       Q.   Then where would you -- from
10  what would you base your idea that the
11  example in figures 18 to 21c describe image
12  operations using features of interest?
13      A.   I would base it on the fact
14  that the -- the image -- sorry, the -- the
15  example has been proffered -- sorry, the
16  figures and their description has been
17  proffered as an example of -- of -- of
18  features of interest and image operations
19  that are -- that are -- and -- that are
20  clearly the -- the -- you know, the subject
21  of this patent.
22           And in that sense I would -- I
23  would not certainly assume or think that
24  there -- the constant repetition of those
25  terms and their -- or their omission at a

1       KARAN SINGH, Ph.D.
2  certain point would preclude that that
3  example was talking about something --
4  something different when, to a person
5  ordinarily skilled in the art, it would
6  appear that they were talking precisely about
7  the subject of the patent.
8       Q.   So you think everything in this
9  patent describes image operations?
10           MR. BUSEY:  Objection.
11           Mischaracterizes the witness'
12           testimony.
13           THE WITNESS:  Not necessarily,
14           but I believe that everything in this
15           patent hopefully talks about things
16           that are pertinent to this patent.
17  BY MR. HAGIZ:
18      Q.   Okay.  But -- strike that.
19           So what else is this patent
20  about besides image operations?
21           MR. BUSEY:  Objection.  Scope.
22           Confusion.  Ambiguity.
23           THE WITNESS:  It's about
24           translucent images, processing input,
25           features of interest, used in

KARAN SINGH, Ph.D.

1          KARAN SINGH, Ph.D.
2          conjunction with image operations.
3   BY MR. HAGIZ:
4          Q.    Now, would you say that
5   figures 18 to 21c -- is there a tran --
6   translucent image in those figures?
7          A.    Is there a what translucent
8   image?
9          Q.    Just is there a translucent
10  image --
11         A.    Oh, just a translucent --
12         Q.    -- in those figures.
13         A.    -- image, okay.
14         MR. BUSEY:  Object to the extent
15  it calls for a legal conclusion.
16         Go ahead.
17         THE WITNESS:  Which figure did
18  you point me in.
19         MR. HAGIZ:  18 to --
20  BY MR. HAGIZ:
21         Q.    18 to 21c.
22         MR. BUSEY:  -- 21c.
23         THE WITNESS:  It would be better
24  if you pointed me at one of those
25  figures.

1          KARAN SINGH, Ph.D.
2   BY MR. HAGIZ:
3          Q.    No, you're right.  Let me
4   rephrase that.
5          A.    Okay.
6          Q.    I think figure 21 --
7   figure 21a.  Is there a translucent image in
8   that?
9          A.    Yeah, I believe so.
10         Q.    Now, did those three paragraphs
11  talk about or use the word "translucent
12  image" at all?
13         MR. BUSEY:  Which three
14  paragraphs?
15         MR. HAGIZ:  Sorry.  The three
16  paragraphs that Dr. Singh indicated
17  earlier, I think beginning at
18  column 20, line 30.
19         THE WITNESS:  Yeah, line 30.
20  Yeah, that's -- I see the term
21  "translucency" in there, yeah.
22  BY MR. HAGIZ:
23         Q.    So isn't it possible that this
24  example is just discussing translucent images
25  and not image operations?

1          KARAN SINGH, Ph.D.
2          MR. BUSEY:  Objection.
3   Ambiguous.
4          Go ahead.
5          THE WITNESS:  Well, I believe
6   not because, if that was the case,
7   they could have stopped at line 50.
8   BY MR. HAGIZ:
9          Q.    Who could have stopped at
10  line 50?
11         A.    The -- patent writers or the
12  people providing this example as -- as an
13  example of features of interest and image
14  operations.
15         Q.    Going back to -- what --
16  figure 3a, I believe --
17         A.    Yes.
18         Q.    No.  Sorry.  Figure 3c.
19         A.    Uh-huh.
20         Q.    Now, the -- the example that
21  spans figure 3a through figure 3e, does the
22  patent use the term "image operation" or
23  "image of interest" or "feature of interest"
24  in discussing that example?
25         MR. BUSEY:  Objection.

1          KARAN SINGH, Ph.D.
2   Ambiguous.  You're asking about the
3   specification?
4          MR. HAGIZ:  Yes.
5          THE WITNESS:  Where is the --
6   BY MR. HAGIZ:
7          Q.    Sorry.  It begins -- it's
8   column 9.
9          A.    Uh-huh.
10         Q.    Figure 3c specifically begins
11  at line 44.
12         A.    Okay.
13         MR. BUSEY:  Do you need the
14  question back?
15         THE WITNESS:  No, no.  I
16  think -- actually, I would like the
17  question back because...
18  BY MR. HAGIZ:
19         Q.    Sure.  So the examples -- the
20  example that spans figure 3a through
21  figure 3e --
22         A.    Uh-huh.
23         Q.    -- are the words "image
24  operation," "image of interest" or "feature
25  of interest" used in discussing that example?

54 (Pages 210 to 213)

Page 214

KARAN SINGH, Ph.D.

1
2   A.   I can see the word "image
3   operation," yes.
4   Q.   Now, what about the example
5   that begins column 10, line 66 at the very
6   bottom -- it spans figure 3f through
7   figure 3h, does that use the words "image
8   operation," "image of interest" or "feature
9   of interest"?
10  A.   Column 10, which lines?
11  Q.   The very bottom, column 10,
12  line 66, spanning figure 3f through 3h.
13      MR. BUSEY:  Take your time to
14  review it if you need to.
15      THE WITNESS:  So you want me to
16  look at the other page?  Column 11
17  or...
18  BY MR. HAGIZ:
19  Q.   Yes.
20  A.   Okay.  Yeah.  I see the word
21  "image operations" in there.
22  Q.   Now, looking at -- beginning of
23  column 11, line 45, describing figure 3i --
24  A.   Uh-huh.
25  Q.   -- do you see the word "image

Page 215

KARAN SINGH, Ph.D.

1
2   operations" in there?
3   A.   Yes.
4   Q.   So can you point me to any
5   example in the specification besides this
6   keyboard example that doesn't describe it as
7   an image operation or as using a feature or
8   image of interest?
9       MR. BUSEY:  Objection.
10  Ambiguous.  Scope.
11      Go ahead.
12      Are you asking the witness to
13  read through the entire specification
14  here?
15  BY MR. HAGIZ:
16  Q.   To the best of your
17  recollection.
18  A.   Could you ask the question
19  again?
20  Q.   Sure.  To the best of your
21  recollection, are there any examples, besides
22  the keyboard examples in 18 to 21c, that do
23  not use the terms "image operation," "image
24  of interest" or "feature of interest"?
25      MR. BUSEY:  Same objection.

Page 216

KARAN SINGH, Ph.D.

1
2       THE WITNESS:  Well, I couldn't
3   tell without reading the entire
4   patent.
5   BY MR. HAGIZ:
6   Q.   But you don't recall any other
7   examples, correct?
8       MR. BUSEY:  Objection.  Calls
9   for speculation.  Same objection as
10  before.
11      THE WITNESS:  As I say, you're
12  asking me whether I found specific
13  terms used in conjunction with
14  specific examples, and that's not
15  something that is straightforward to
16  recall in -- in a patent of this
17  length.
18  BY MR. HAGIZ:
19  Q.   Supposing that the keyboard
20  example were the only example in the patent
21  that did not discuss image operations, images
22  of interest or features of interest, would
23  you still believe that it is an image
24  operation using a feature of interest?
25  A.   Yes, I would.

Page 217

KARAN SINGH, Ph.D.

1
2       MR. BUSEY:  Objection.  Lack of
3   foundation.
4       THE WITNESS:  Sorry.
5       MR. BUSEY:  Ambiguous.
6       Go ahead.  You can answer.
7   BY MR. HAGIZ:
8   Q.   Now, Dr. Singh, I think when we
9   first started I asked you if you reviewed the
10  patent from which the '922 was a reissue.
11  A.   Uh-huh.
12  Q.   That was the -- I believe that
13  was the '489 patent?
14  A.   Uh-huh.
15  Q.   Now, the '489 patent was a
16  continuation in part of another patent, the
17  '501 patent?
18  A.   Uh-huh.
19  Q.   Are you aware of that?
20  A.   Vaguely.
21  Q.   Did you review the '501 patent
22  at all?
23  A.   No.
24  Q.   Hypothetically, if the '501
25  patent disclosed that same keyboard example

Page 218

KARAN SINGH, Ph.D.

1    KARAN SINGH, Ph.D.
2  as in the '922 patent and the entire patent
3  did not use the terms "image of interest,"
4  "feature of interest" or "image operation,"
5  would your opinion as to whether figure 18 to
6  21c is an image operation using a feature of
7  interest change?
8        MR. BUSEY: Objection. Calls
9        for speculation. Lack of foundation.
10       Objection to the extent it calls for a
11       legal conclusion as well.
12       Go ahead.
13       THE WITNESS: I'm not sure I can
14       answer that. I mean, it seems like
15       the question you're asking me is a
16       fairly legal one. And I, for one, am
17       certainly not -- not versed in -- you
18       know, in sort of the continuations or
19       back and forths that take place
20       between patents.
21  BY MR. HAGIZ:
22       Q.   I'm sorry. Let me try to make
23  it a little -- I'm sorry.
24       A.   So maybe, yeah, if you can kind
25  of --

Page 219

1    KARAN SINGH, Ph.D.
2       Q.   Let me try to make it a little
3  simpler.
4       A.   Okay.
5       Q.   Now, you say that the reason
6  you believe that figure 18 to 21c is an image
7  operation using a feature of interest is
8  because that's what this patent is about; is
9  that correct?
10       MR. BUSEY: Objection.
11       Mischaracterizes the witness' prior
12       testimony.
13       Go ahead.
14       THE WITNESS: No. I said that
15       the example describes what, to my
16       understanding and reading, are feature
17       operations in conjunction -- sorry,
18       feature -- image operations in
19       conjunction with -- with features of
20       interest, yes.
21  BY MR. HAGIZ:
22       Q.   Could you explain to me the
23  basis for your opinion that that example
24  describes image operations and features of
25  interest?

Page 220

1    KARAN SINGH, Ph.D.
2       MR. BUSEY: Objection. Asked
3       and answered.
4       THE WITNESS: The basis was the
5       paragraphs that I mentioned. They --
6  BY MR. HAGIZ:
7       Q.   What in those paragraphs claim
8  that it is an image operation using a feature
9  of interest?
10       MR. BUSEY: Objection. Asked
11       and answered.
12       THE WITNESS: The -- the change
13       in the appearance of -- of the
14       underlying image in -- in -- in
15       response to the processing of input
16       that takes place in the context of --
17       of a -- of the feature of interest.
18  BY MR. HAGIZ:
19       Q.   So you're saying an image
20  operation is a visual change?
21       MR. BUSEY: Objection.
22       Mischaracterizes the witness'
23       testimony. Calls for a legal
24       conclusion.
25       THE WITNESS: I'm saying an

Page 221

1    KARAN SINGH, Ph.D.
2  image operation results in a visual
3  change.
4  BY MR. HAGIZ:
5       Q.   Okay. Is there anything else
6  that something needs to do to be an image
7  operation?
8       MR. BUSEY: Objection to the
9       extent it calls for a legal
10       conclusion.
11       THE WITNESS: In the context of
12       this patent and the intrinsic
13       evidence, I believe the image
14       operation is a result of input that is
15       processed in the context of a feature
16       of interest.
17       So as long as it satisfies those
18       conditions, then yes.
19  BY MR. HAGIZ:
20       Q.   But now you -- so are you
21  saying that an image operation is more than a
22  visual change?
23       A.   No. I am saying that an image
24  operation results in a visual change under a
25  certain set of conditions. And I just laid

Page 222

KARAN SINGH, Ph.D.

1       KARAN SINGH, Ph.D.
2  out those set of conditions -- and I guess
3  they could be read back.
4       Q.    Okay.  But at the end of the
5  day, an image operation requires a visual
6  change; isn't that correct?
7       MR. BUSEY:  Objection.
8  Mischaracterizes the witness'
9  testimony and calls for a legal
10  conclusion.
11       THE WITNESS:  In the examples
12  provided in the -- in the examples
13  provided in the -- in the patent, I
14  believe the examples indicate that
15  processing that input typically
16  results in an -- typically does result
17  in a visual change.
18       I don't believe that it
19  precludes the fact that -- that there
20  is absolutely no visual change.
21  BY MR. HAGIZ:
22       Q.    So are you taking the position
23  on whether an image operation requires a
24  visual change or not?
25       MR. BUSEY:  Objection to the

Page 223

1       KARAN SINGH, Ph.D.
2  extent it calls for a legal
3  conclusion.
4       THE WITNESS:  I'm saying that an
5  image operation typically results in a
6  visual change, but the important --
7  the important characterization -- an
8  important characterization of an image
9  operation is -- is that it manifests a
10  change of -- of state of a controlling
11  program as a result of processing
12  input.
13  BY MR. HAGIZ:
14       Q.    Okay.  Where -- where do you
15  see -- sorry.  What is -- scratch that.  Go
16  back.
17       What is your basis for
18  requiring a change of state in a program?
19       A.    Let me go back to my definition
20  of an image operation.  So as I defined it,
21  these operations are those which cause a
22  visual change as a result of the application
23  of which that image or window is a
24  manifestation processing input.
25       So if your question is that, is

Page 224

1       KARAN SINGH, Ph.D.
2  it possible for an application to -- to cause
3  a visual change while preserving its -- its
4  state, as someone with ordinary skill in the
5  art would understand -- understand it, then
6  sure.
7       Q.    I just want to make sure that I
8  heard you clearly.
9       A.    Okay.
10       Q.    So you're saying an image
11  operation would include something that causes
12  a visual change but does not change its
13  state?
14       A.    No.
15       Q.    Okay.
16       A.    All I'm saying is that an image
17  operation typically results in a visual
18  change as a result of the application
19  processing input.
20       Q.    So could you explain, what --
21  strike that.
22       When you were talking about
23  changing state before, what changes its
24  state?
25       A.    So the word -- the term "state"

Page 225

1       KARAN SINGH, Ph.D.
2  typically is used by people of ordinary skill
3  in the art to indicate a particular
4  configuration or a particular point or a
5  particular -- I go back to the word "state,"
6  actually -- a particular form that an
7  application that is running has at a point in
8  time.
9       And what I intend to say by an
10  image operation is that, as a result of
11  processing input, applications go from one
12  configuration state or situation to another.
13  The visual change that typically results -- a
14  visual change that typically results from
15  processing that input, is what I would
16  construe to be an image operation in the
17  light of this patent and its intrinsic
18  evidence.
19       Q.    Okay.  So are you taking the
20  position that a visual change is required or
21  not?
22       MR. BUSEY:  Objection to the
23  extent it calls for a legal
24  conclusion.
25       Go ahead.

57 (Pages 222 to 225)

Page 226

KARAN SINGH, Ph.D.

1
2       THE WITNESS: I believe, in the
3   examples shown, a visual change is, in
4   fact, required.  However, in the
5   specification, I do not find anything
6   specific that -- that precludes that
7   from happening.
8       But, yes, the examples do
9   support visual change.
10  BY MR. HAGIZ:
11      Q.   But I am asking what your
12  conclusion, as one of ordinary skill in the
13  art, is, regarding whether a visual change is
14  required as a result of an image operation.
15      MR. BUSEY: Objection. Asked
16      and answered.  And objection to the
17      extent it calls for a legal
18      conclusion.
19      Go ahead.
20      THE WITNESS: I would say that
21      the -- the intrinsic evidence
22      generally does support this.
23  BY MR. HAGIZ:
24      Q.   It generally supports this or
25  yes, it is required?

Page 227

KARAN SINGH, Ph.D.

1
2       A.   As I said --
3       MR. BUSEY: Same objection.
4       THE WITNESS: As I said, I did
5   not -- I did not find anything that
6   specifically precluded that and, for
7   that reason, I do not wish to say
8   that, yes, it is required.  However, I
9   will concede that largely the examples
10  and in the material that I can see, it
11  does tend to cause a visual change.
12  BY MR. HAGIZ:
13      Q.   Okay.  But Dr. Singh -- sorry.
14  Are you finished?
15      A.   Yes.
16      Q.   Dr. Singh, you are here as
17  Apple's expert on claim construction --
18      A.   Uh-huh.
19      Q.   -- and I'm trying to
20  understand --
21      A.   Yes.
22      Q.   -- whether you're concluding
23  that an image operation requires a visual
24  change or not.
25      MR. BUSEY: Objection -- I'm

Page 228

KARAN SINGH, Ph.D.

1
2   sorry.  Counsel, did you finish?
3       MR. HAGIZ: That's it.
4       MR. BUSEY: Objection.  Asked
5   and answered.  And calls for a legal
6   conclusion.
7       Go ahead.
8       THE WITNESS: As an opinion of
9   somebody ordinarily skilled in the
10  art, without understanding the legal
11  ramifications of the question, yes.
12  BY MR. HAGIZ:
13      Q.   Is required.
14      MR. BUSEY: Counsel, could we
15      take another break?
16      MR. HAGIZ: Oh, yeah.  Not a
17      problem.
18      THE VIDEOGRAPHER: Off the
19  record at 4:12.
20      (Recess.)
21      THE VIDEOGRAPHER: Back on the
22  record at 4:33.
23  BY MR. HAGIZ:
24      Q.   All right.  Dr. Singh, just a
25  couple more questions on image operations.

Page 229

KARAN SINGH, Ph.D.

1
2       A.   Okay.
3       Q.   Can you just tell me where --
4   what's your basis for stating that an image
5   application is a result of process -- of the
6   application processing input?
7       MR. BUSEY: I think you
8       misspoke.  I think it was image --
9       MR. HAGIZ: What did I say?
10      MR. BUSEY: I think you said
11      applications.  Maybe I'm wrong here.
12  BY MR. HAGIZ:
13      Q.   Let me just rephrase.  This is
14  from your initial report, Exhibit 1, page 7,
15  paragraph 29 -- states, "These operations are
16  those which cause a visual change as a result
17  of the application, of which that image or
18  window is a manifestation, processing input."
19      Now, what is your basis for
20  concluding an image operation is the
21  result -- or causes a visual change
22  specifically as the result of the application
23  processing input?
24      A.   Well, firstly, the fact that --
25  the fact that, as you see in -- in

58 (Pages 226 to 229)

Page 230

KARAN SINGH, Ph.D.

1
2       paragraph 21, the specification provides a
3       fairly -- provides a fairly sort of
4       comprehensive definition of the sort of
5       changes that would -- you know, that would be
6       considered to be image operations, various
7       forms of transformations.
8            And the fact that -- and the
9       fact that a feature of interest is
10      essentially establishing a context for these
11      image operations leads me to believe that, in
12      fact, the image operation is -- is a visual
13      result of -- the image operation, as -- as
14      understandable by someone of ordinary skill
15      in the art, on reading, you know, the patent
16      and the examples, is, in fact, essentially
17      the visual result of a program or application
18      processing input.
19           MR. BUSEY:  Just for the record,
20      I think you're referring to
21      paragraph 21 of Exhibit 2, the
22      rebuttal report.  Is that what you
23      were referring to?
24           THE WITNESS:  I believe so, yes.
25      Yes, yes.  Sorry.

Page 231

KARAN SINGH, Ph.D.

1
2            MR. BUSEY:  Okay.  I think
3       that --
4            THE WITNESS:  That was -- yeah.
5            MR. BUSEY:  That's fine.
6            MR. HAGIZ:  That's fine.
7            THE WITNESS:  I don't know where
8       21 -- yeah, on the --
9            MR. BUSEY:  That's fine.  I just
10      wanted to be -- I think the record is
11      a little unclear.
12           THE WITNESS:  Sure.
13      BY MR. HAGIZ:
14      Q.   Okay.  But what do you base
15      that -- the limitation of processing input?
16      Where is that in the patent?
17           MR. BUSEY:  Objection to the --
18      mischaracterizes the witness'
19      testimony and calls for a legal
20      conclusion.
21           Go ahead.
22           THE WITNESS:  Well, the patent
23      talks about image operations conducted
24      in conjunction with features of
25      interest in response to user input.

Page 232

KARAN SINGH, Ph.D.

1
2            I believe that someone of skill
3       in the art -- of ordinary skill in the
4       art would -- oops, I'm sorry.  I just
5       lost my train of thought.  I guess
6       it's a sign of the lateness of the
7       day.  Could you please reread that
8       question to me?
9       BY MR. HAGIZ:
10      Q.   Well, I'll just rephrase.  I
11      just want to know --
12      A.   Okay.
13      Q.   -- where you saw that image
14      operations required processing input.
15           MR. BUSEY:  Objection to the
16      extent it calls for a legal
17      conclusion.
18           Go ahead.
19           THE WITNESS:  Well, I believe
20      that many of the examples certainly
21      that talk about image operations I
22      think explicitly talk about operations
23      that are performed upon receipt of --
24      receipt and processing of user input
25      in the -- in the intrinsic evidence as

Page 233

KARAN SINGH, Ph.D.

1
2       far as -- as far as I can tell.
3       BY MR. HAGIZ:
4       Q.   And is receiving user input --
5       were you finished?
6       A.   Yes, I was.
7       Q.   Is receiving user input the
8       same as processing user input?
9            MR. BUSEY:  Objection to the
10      extent it calls for a legal
11      conclusion.
12           Go ahead.
13           THE WITNESS:  Well, I think if
14      you were to -- or a person of ordinary
15      skill in the art was to read my
16      reports, that might be a conclusion
17      that they might draw.  In general, I
18      would imagine that a person of
19      ordinary skill in the art would
20      consider receiving and processing user
21      input to be synonymous.  Certainly,
22      receiving user input subsumes
23      processing user input.  And perhaps
24      the only real distinction between the
25      two, if -- if you wanted to nitpick on

59 (Pages 230 to 233)

Page 234

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    it, would be a scenario where -- where
3    an application was to receive user
4    input and simply ignore it.
5        And -- so if that is, in fact,
6    the distinction between the two, then
7    I'm willing to concede that as a
8    distinction.
9        But largely to me the terms
10   "receive" and "process" are -- are
11   typically synonymous if -- if your
12   application is to do anything
13   typically meaningful.
14   BY MR. HAGIZ:
15       Q.   So are you saying that this is
16   ordinary meaning of "receive"?
17           MR. BUSEY:  Objection to the
18   extents it calls for a legal
19   conclusion.
20           THE WITNESS:  I believe it's the
21   meaning that a person of ordinary
22   skill in the art would have, yes.
23   BY MR. HAGIZ:
24       Q.   Do you get that meaning from
25   something specific that you read in the

Page 235

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    patent or is that consistent with your
3    ordinary understanding of the -- or your
4    understanding of the ordinary and plain
5    meaning of the word "process" or "receive"?
6           MR. BUSEY:  Objection.
7    Ambiguous.  Compound.
8           THE WITNESS:  Well, as I
9    understand it, as a person of ordinary
10   skill in the art, I have -- I have
11   sort of two levels of understanding,
12   one as an ordinary person without
13   skill in the art -- and I do not
14   attribute that meaning of the English
15   language term "receive" which is --
16   which is -- is incredibly broad.
17          But -- but I believe I'm largely
18   applying the -- the commonly
19   understood term of -- commonly
20   understood meaning of the term
21   "receive" as somebody with ordinary
22   skill in the art in the context of
23   this patent would.
24          There may be some portions of
25   the patent or references that might

Page 236

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2    have further informed my opinions, but
3    I -- if there are, I can't recall them
4    off the top of my head.
5    BY MR. HAGIZ:
6        Q.   So sitting here right now, you
7    believe the term "receive," as used in the
8    patent, is the same as it is ordinarily used
9    in the field of graphical user interfaces?
10          MR. BUSEY:  Objection to the
11   extent it may mischaracterize the
12   witness' prior testimony and calls for
13   a legal conclusion.
14          Go ahead.
15          THE WITNESS:  Inasmuch as it
16   would be used in the context of this
17   patent, yes.
18   BY MR. HAGIZ:
19       Q.   That didn't answer my question.
20       A.   Uh-huh.  Okay.
21       Q.   Is your understanding
22   influenced or changed by the patent or do you
23   understand the term as it's used in the
24   patent to mean the same as it would be used
25   in -- typically in the field?

Page 237

KARAN SINGH, Ph.D.

1        KARAN SINGH, Ph.D.
2           MR. BUSEY:  Calls for a legal
3    conclusion and may mischaracterize the
4    witness' prior testimony.
5           Go ahead.
6           THE WITNESS:  I would largely
7    believe that, yes, it would be more or
8    less the -- the typical sort of skill
9    in the art meaning of -- of the term.
10          However, as I said, there may
11   be -- there may be portions of -- of
12   the patent that -- that may
13   specifically refine this.  But at the
14   moment, I cannot think of any of
15   those.
16   BY MR. HAGIZ:
17       Q.   So as far as you know, it has
18   its plain and ordinary meaning?
19          MR. BUSEY:  Objection.
20   Ambiguous.  Calls for a legal
21   conclusion.
22          Go ahead.
23          THE WITNESS:  I think that's
24   what I said, yes.
25   BY MR. HAGIZ:

60 (Pages 234 to 237)

```
 1          KARAN SINGH, Ph.D.
 2     Q.    Last thing on image operations.
 3  Dr. Singh, do you -- would you agree that the
 4  term "image operations" has to be understood
 5  in the context of the claim in which it
 6  appears?
 7          MR. BUSEY:  Objection to the
 8       extent it calls for a legal
 9       conclusion.
10          THE WITNESS:  I believe so, yes.
11       I think the English language words --
12       "image" independently, the word
13       "operation" independently are -- are
14       broad terms, and this is clearly used
15       as a -- as a claim of construction.
16       And I believe I've provided what I
17       understand to be its -- its meaning in
18       light of the patent in my -- in my
19       report, and perhaps elaborated upon it
20       further in my rebuttal report.
21  BY MR. HAGIZ:
22     Q.    No.  That's fine.  I just want
23  to -- I just want to make sure -- in
24  claim 31, do you believe an image operation
25  is claimed other than when it's used --
```

```
 1          KARAN SINGH, Ph.D.
 2  sorry -- other than using a feature of
 3  interest?
 4          MR. BUSEY:  Objection to the
 5       extent it calls for a legal conclusion
 6       and it's ambiguous.
 7          But go ahead.
 8          THE WITNESS:  I believe it's
 9       whatever the -- to me, this sounds
10       like a very legal question.  I find it
11       hard to actually proffer an opinion.
12       You're asking me something with
13       regards to, I would say, sort of the
14       validity of -- of a claim.
15          I -- I certainly have no -- no
16       way of answering that.
17  BY MR. HAGIZ:
18     Q.    Are you finished?
19     A.    Yes.
20     Q.    Dr. Singh, all I'm asking you
21  is --
22     A.    Yes.
23     Q.    -- does claim 31 describe any
24  image operations that are not using a feature
25  of interest?
```

```
 1          KARAN SINGH, Ph.D.
 2     A.    Claim 31 --
 3          MR. BUSEY:  Same objection.
 4       Calls for a legal conclusion.
 5          THE WITNESS:  Let me read it.
 6          No, I believe it talks about
 7       conducting image operations in
 8       conjunction with features of interest
 9       to establish the context of that
10       operation.
11  BY MR. HAGIZ:
12     Q.    So then would you agree that
13  image operations in the claim are -- scratch
14  that.
15          Would you agree that image
16  operations are limited by the features of
17  interest that they use?
18          MR. BUSEY:  Objection to the
19       extent it calls for a legal conclusion
20       and -- and may mischaracterize the
21       witness' prior testimony.
22          Go ahead.
23          THE WITNESS:  Image -- image
24       operations -- I don't believe they are
25       limited by the features that they use.
```

```
 1          KARAN SINGH, Ph.D.
 2       They are informed by -- by the
 3       features that they use.  So I'm not
 4       sure what you would mean by limited by
 5       the features that they use.
 6  BY MR. HAGIZ:
 7     Q.    Let me rephrase.  If the judge
 8  in this case --
 9     A.    Yes.
10     Q.    -- were to construe "feature of
11  interest" to mean one very specific
12  particular thing, then would you understand
13  "image operations" to only include operations
14  that can use that particular feature of
15  interest?
16          MR. BUSEY:  Objection to the
17       extent it calls for a legal
18       conclusion.  Incomplete hypothetical.
19       Speculation.
20          Go ahead.
21          THE WITNESS:  Well, firstly,
22       something I had stated, actually quite
23       early was that the term "feature of
24       interest" is -- is actually used both
25       in the singular and in plural.  So
```

KARAN SINGH, Ph.D.

1
2       assuming that we're still allowing the
3       plurality of a feature, if the
4       question you're asking is, was the
5       feature to be deemed as something
6       specific, would that limit the kind of
7       image operations that could be
8       performed in conjunction with that
9       feature, then the answer is the image
10      operations that would be performed and
11      take place would -- would be informed
12      by that feature.
13              They -- they -- they definitely
14      take that feature or features into
15      account, but there could clearly be
16      other factors in determining what that
17      image operation performs.
18              And there is absolutely nothing
19      that -- that precludes this image
20      operation from not taking other
21      computational aspects other than the
22      feature of interest into account
23      when -- when determining whatever that
24      image operation does.
25      BY MR. HAGIZ:

KARAN SINGH, Ph.D.

1
2       Q.    All I'm getting at is, to use
3       your word or to use your language --
4       A.    Yeah.
5       Q.    -- the claim only covers image
6       operations that, as you said, could be
7       informed by the features of interest; is that
8       correct?
9       A.    Yes.
10      Q.    So it would not include image
11      operations that could not be informed by the
12      features of interest?
13              MR. BUSEY:  Objection to the
14      extent it calls for a legal
15      conclusion.
16              Go ahead.
17              THE WITNESS:  If you were able
18      to -- if you were able to provide --
19      you're losing me here.  Give me
20      another -- rephrase it for me.
21      BY MR. HAGIZ:
22      Q.    Sure.  If a certain image
23      operations could not be informed --
24      A.    Uh-huh --
25      Q.    -- by a feature of interest --

KARAN SINGH, Ph.D.

1
2       A.    Right.
3       Q.    -- would you say that the claim
4       does not cover it?
5              MR. BUSEY:  Objection.  Calls
6       for a legal conclusion.
7              THE WITNESS:  Okay.
8              MR. BUSEY:  Go ahead.
9              THE WITNESS:  What do you mean
10      by "the claim does not cover it"?
11      BY MR. HAGIZ:
12      Q.    It is not included by the claim
13      or the claim --
14      A.    Isn't that a --
15      Q.    The claim --
16              MR. BUSEY:  Objection.  Calls
17      for a legal conclusion.
18              THE WITNESS:  So inasmuch as
19      you're asking me for a legal opinion,
20      I have no clue.  But as to whether an
21      image operation that was -- that was
22      not informed in any way by the
23      features of interest as to whether
24      that would be considered sort of
25      outside the scope in some sense of --

KARAN SINGH, Ph.D.

1
2       of -- of the claims, I would say
3       perhaps, as long as it was clear that
4       none of that -- that were absolutely
5       no features that in any way laid or
6       established a context for -- for that
7       image operation, as far as I can see.
8       BY MR. HAGIZ:
9       Q.    That's all I was asking.
10      A.    Okay.
11      Q.    All right.  Let me quickly go
12      through a couple of these other terms and
13      then we can wrap up.  "Partially visible.
14      Very quickly.  You don't address it in your
15      initial report in Exhibit 1.  You do address
16      it in Exhibit 2, your rebuttal report --
17      A.    Yes.
18      Q.    -- at paragraph 35.
19      A.    Uh-huh.
20      Q.    You say, "Partially visible" --
21      sorry.  You state, "My initial expert report
22      did not include a construction of the term
23      'partially visible' because this term has its
24      plain and ordinary meaning in the context of
25      the '922 patent."

62  (Pages 242 to 245)

Page 246

```
1              KARAN SINGH, Ph.D.
2         What do you understand the
3    plain and ordinary meaning of the term
4    "partially visible" to be.
5         A.   Sorry.  You were reading.
6    Which paragraph were you reading?
7         Q.   Sorry.  It's paragraph 35.
8         A.   35.  Okay.
9         Q.   It's that first sentence.
10        A.   Uh-huh.  Yeah.  So what's the
11   question.
12        Q.   What do you understand the
13   plain and ordinary meaning of "partially
14   visible" to be?
15        A.   Exactly what I offer over here,
16   that -- that you can partly see through it.
17        Q.   And what does it mean to partly
18   see through it?
19        A.   What that means is that -- that
20   the translucent image is not completely
21   opaque.
22        Q.   So partially visible -- let me
23   see if I understand correctly.
24        A.   Right.
25        Q.   Partially visible is dependent
```

Page 247

```
1              KARAN SINGH, Ph.D.
2    on what a translucent image is; is that
3    correct?
4         MR. BUSEY:  Objection to the
5         extent it calls for a legal
6         conclusion.  Mischaracterizes the
7         witness' testimony.
8         Go ahead.
9         THE WITNESS:  Sure.
10   BY MR. HAGIZ:
11        Q.   Okay.  Let's quickly take a
12   look at receiving input in a base image.
13   It's in your --
14        A.   Sorry.  Could I add to what I
15   was saying?
16        Q.   Sure.
17        A.   You said -- because you
18   mentioned, you know, that -- do you require
19   sort of a translucent image for something to
20   be partially visible?  And the answer is, in
21   the context of this patent, yes, because in
22   this context, when we are talking about
23   partially visible, we are talking about
24   regions of overlap.
25        And so -- you know, clearly, we
```

Page 248

```
1              KARAN SINGH, Ph.D.
2    don't want to broaden the scope of the word
3    "partially visible" to talk about portions or
4    regions of a window where they may be
5    obscured by other things that are -- have --
6    you know, have no bearing within this region
7    of overlap.
8         Q.   I understand.  Thank you.
9         A.   Okay.  Yeah, I just wanted to
10   clarify that.
11        Q.   Can we go to paragraph 39 of
12   Exhibit 1 --
13        A.   Uh-huh.
14        Q.   -- "receiving input in said
15   displayed base image."
16        A.   In paragraph 39?
17        Q.   Yes.
18        A.   Okay.
19        Q.   And you construe that as,
20   "Receiving input in said displayed base image
21   means that a graphical manifestation of an
22   application program receives some data."
23        A.   Uh-huh.
24        Q.   What is "some data"?
25        A.   You can use the word "receive
```

Page 249

```
1              KARAN SINGH, Ph.D.
2    some input" if -- if -- if that makes things
3    clearer.
4         Q.   Well --
5         A.   I was using the word "data" in
6    this case interchangeably with the word
7    "input," and I used the word "data" instead
8    of "input" to avoid any potential confusion
9    that might come from whether the input
10   explicitly came from a user or perhaps some
11   other application program.
12        Q.   So are you saying that the
13   input does not come from a user or does not
14   have to come from a user?
15        A.   Yes, I am saying that, yes,
16   sir.
17        Q.   And what's -- where -- what is
18   your basis for that conclusion?
19        A.   The basis for the fact that
20   input in said displayed base image does not
21   come from the user.
22        Well, in -- in areas where this
23   term is construed -- sorry.
24        In -- in areas of the patent
25   where this term is used, to begin with, there
```

63 (Pages 246 to 249)

Page 250

KARAN SINGH, Ph.D.

1 KARAN SINGH, Ph.D.
2 is no precise specification of -- of -- or
3 prefixing of the word "user input" where
4 there actually is that precision ascribed
5 in -- in other parts of -- of the -- of the
6 patent.
7 And as a further example, the
8 keyboard example, for instance, is an example
9 of the -- the AppleShare program that they
10 use as an example receiving input.  In this
11 case, the input actually is characters R, I,
12 P, backspace, et cetera.  That -- that is
13 input that has not being directly provided by
14 the user.  The user's input is, in fact, taps
15 or clicks on the screen.  And so that's --
16 those are the bases for apply distinction.
17 Q.    But the input in that scenario
18 is still indirectly from the user; is that
19 correct?
20 A.    Well --
21 MR. BUSEY:  Objection.
22 Mischaracterizes --
23 THE WITNESS:  Sorry about that.
24 MR. BUSEY:  Go ahead.
25 THE WITNESS:  In a computational

Page 251

1 KARAN SINGH, Ph.D.
2 scenario, all input indirectly comes
3 from a user.  It may get filtered
4 through many, many levels if, for
5 instance, you have a scheduler that
6 suddenly pops up based on input to
7 tell you about a meeting or something,
8 perhaps at some point you provided
9 input that caused this to happen.
10 So all I'm doing is -- is
11 separating input that comes directly
12 from the user, perhaps, to use your
13 own words, from something that
14 indirectly gets filtered through.
15 BY MR. HAGIZ:
16 Q.    And -- now, can you show me
17 where, in that example, in the -- in the
18 keyword example, where does it discuss input
19 not in the context of a user?
20 A.    Reading from column 21, "Other
21 characters and control characters (such as
22 the return button) can be sent to the
23 application program controlling window in a
24 similar fashion."
25 If I read earlier, they're

Page 252

1 KARAN SINGH, Ph.D.
2 clearly talking about the user input as a tap
3 on the R key.  It talks about the tap, and it
4 says, "instead causes an R to be sent to the
5 AppleShare program and be displayed in the
6 password field of the window."
7 And so, as a result, you
8 have -- you have input that is different from
9 the user tap coming into the AppleShare
10 program.  The specific mechanics of this, I
11 believe, are -- are discussed in -- in a
12 co-pending patent that is filed -- was
13 filed -- I don't know.  There is a number and
14 a definition of it somewhere.
15 Q.    Just to be clear, that section
16 that you were just reading from --
17 A.    Yes.
18 Q.    -- or paraphrasing --
19 A.    Sorry, I was reading -- yeah, I
20 was paraphrasing; I was not precisely
21 reading, but I believe it captured the
22 essence of what was there.  It's column 20
23 towards the bottom below -- line 55 and
24 below.
25 Q.    Right.  So that section --

Page 253

1 KARAN SINGH, Ph.D.
2 A.    Yeah.
3 Q.    -- just to be clear --
4 A.    Uh-huh.
5 Q.    -- if we start at column -- if
6 we look at column 20, starting at line 65 --
7 A.    Uh-huh.
8 Q.    -- in describing that section
9 that you were just discussing, it says, "In
10 figure 21b, second tap 1068 on the I key will
11 cause the keyboard image 1064' to intercept
12 the tap, which would otherwise fall on the
13 window 1044, and to send a I character to the
14 AppleShare application program, which then
15 displays an I after the R in the password
16 field of window 1044."
17 A.    That's right.
18 Q.    Now, that's talking about
19 sending a character.  I don't see the word
20 "input" there.
21 A.    Which is perhaps why I use the
22 word "data" instead of "input" in my
23 expert -- or rebuttal -- rebuttal,
24 paragraph 39.
25 So if -- if the word "data"

64 (Pages 250 to 253)

Page 254

KARAN SINGH, Ph.D.

1         KARAN SINGH, Ph.D.
2  makes you happier, use the word "data."
3  These are terms that, in this context, I
4  believe, a person ordinarily skilled in the
5  art could and would use synonymously in this
6  context.
7      Q.   Okay.  But it's not about what
8  I like.  It's the fact that the claim --
9      A.   Right.
10     Q.   -- uses the term "input," and I
11  was hoping that you could point me to
12  somewhere in this example that describes the
13  process you were just talking about using the
14  word "input."
15      MR. BUSEY:  Objection to the
16  mischaracterization of the witness'
17  testimony.  And the question is not a
18  question, but a narration and a
19  speech.
20      I would ask you to rephrase the
21  question as something less
22  objectionable.
23  BY MR. HAGIZ:
24     Q.   I'll rephrase the question.
25      Is there somewhere in the

Page 255

KARAN SINGH, Ph.D.

1         KARAN SINGH, Ph.D.
2  example you were talking about in column 20
3  and column 21 where sending -- I'm sorry --
4  where the input you describe in paragraphs 39
5  to 41 of your rebuttal report are described
6  as inputs?
7      MR. BUSEY:  Objection.  Asked
8  and answered.  Mischaracterizes the
9  witness' testimony.  If you want to
10  take -- the witness to take the time
11  to look through the entire column...
12     MR. HAGIZ:  I would like him to
13  answer the question.
14     THE WITNESS:  Well, I -- I
15  haven't been through every tap, you
16  know, and -- as they go through the
17  different characters, but -- actually,
18  hold on a second.  Let me -- let me --
19  let me read through this.
20     Reading just below column --
21  line 20 on column 20, This tapping
22  action will send an R" -- just as the
23  word "send" is used later on in the
24  columns that you were pointing me
25  at -- "to be displayed in the window

Page 256

KARAN SINGH, Ph.D.

1         KARAN SINGH, Ph.D.
2  1044 of the AppleShare application,
3  just as if" -- it should have been "an
4  R" but it says "a R" -- had been typed
5  on a physical keyboard."
6      As a person of ordinary skill in
7  the art, I would assume that an R
8  typed on a physical keyboard would be
9  considered under the term "input"
10  and -- and the reference "just as if"
11  to indicate a certain degree of
12  similarity or synonymousness, if
13  that's a word.
14  BY MR. HAGIZ:
15     Q.   Let's move on to "selectively
16  active" and see if we can wrap this up
17  probably early in this next tape.
18      Only question I have for you --
19  well, not quite the only one, but to begin
20  with -- who, under your construction -- well,
21  actually let's look at it.  Exhibit 1,
22  paragraph 35.  You say, "'Selectively active'
23  means the translucent image or the base image
24  can process user input"; is that correct?
25     A.   Uh-huh.

Page 257

KARAN SINGH, Ph.D.

1         KARAN SINGH, Ph.D.
2     Q.   Now, in paragraph -- I'm sorry.
3     A.   So which paragraph were you
4  reading from".
5     Q.   Paragraph 35.
6     A.   35, yes.  Okay.  Yes.
7     Q.   Now -- well, can you agree that
8  in paragraph 36 and 37 --
9     A.   Uh-huh.
10     Q.   -- you discuss your basis for
11  construing the term active, but not
12  selectively, right?
13     A.   Uh-huh.
14     Q.   Okay.  And, in 38, you say, "By
15  'selectively active' the '922 patent means
16  that at any given time, the base image or the
17  translucent image can be active, depending on
18  the user input."
19     A.   Uh-huh.
20     Q.   So does that mean that the user
21  does the selecting?
22     A.   No.  It just means that the
23  user can do the selecting, but equivalently,
24  the selection could -- could happen -- could
25  happen algorithmically or using some other

1           KARAN SINGH, Ph.D.
2    system mechanism, as is quite common and
3    happens with graphical window interfaces
4    often.
5           To me, it's somewhat sort of a
6    somewhat tangential term.
7        Q.    But you are still saying that
8    it has to be responsive to user input in some
9    way.  Am I understanding you correctly?
10       A.    In -- in the patent -- in the
11   embodiments, it indicates that the user --
12   that -- that this notion of active can be
13   performed by the user.  It doesn't -- it
14   doesn't specify that it has to be performed
15   by the user, nor does it specify that it
16   can -- cannot be performed by any other
17   entity.
18       Q.    Okay.  But in paragraph 38 you
19   say that "selectively active" is depending on
20   the user input.  How -- how would it be
21   depending on the user input if -- if it's not
22   responsive to user input?
23          Sorry.  Let me rephrase that,
24   actually.
25          What else could it depend on?

1           KARAN SINGH, Ph.D.
2    Or -- yeah.
3          MR. BUSEY:  Objection.
4    Ambiguous.
5          THE WITNESS:  As I said, it
6    could depend on -- on any number of
7    system or algorithmic factors just as
8    well.  I -- I suggest user input as --
9    as -- as one way because it is
10   suggested as one way in -- in the
11   patent specification.
12          But it certainly -- even in the
13   patent specification, it uses the word
14   "can," I think, a couple of times, to
15   indicate that there -- there could be
16   other mechanisms for it.
17   BY MR. HAGIZ:
18       Q.    So are you changing your
19   construction from your initial report?
20       A.    No.
21       Q.    But your initial report right
22   here says that "selectively active" means
23   that the base image or the translucent image
24   can be active depending on the user input.
25          And if I understand correctly,

1           KARAN SINGH, Ph.D.
2    right now you're telling me it can be
3    dependent on something that's not the user
4    input; is that right?
5        A.    But I don't believe --
6          MR. BUSEY:  Objection.
7    Mischaracterizes --
8          THE WITNESS:  Sorry about that.
9          MR. BUSEY:  -- the witness'
10   prior testimony.
11          Go ahead.
12          THE WITNESS:  I don't believe
13   that paragraph 38 precludes that it
14   could -- that, you know, selective --
15   selective selection could not be the
16   result of -- of -- of something else.
17   BY MR. HAGIZ:
18       Q.    So you're saying --
19       A.    I mean, it doesn't preclude it.
20   You know, to me that's just English
21   construction.
22       Q.    So according to you right now,
23   paragraph 38 means that "selectively active"
24   could be dependent on -- could include
25   something that has no user input?

1           KARAN SINGH, Ph.D.
2        A.    The process of selection could,
3    yes.
4        Q.    Okay.  What's your basis for
5    that?
6        A.    Let's see.  I believe --
7    maybe -- is it in the rebuttal?
8          I see this in paragraph 32, and
9    I talk about -- there is a point where it
10   says, "Another window or image can be
11   activated merely by user selection."
12          The operative sort of word over
13   there is the word "can" to indicate that this
14   is sort of a step that is -- that is
15   optional.  It -- it can be done in one way in
16   some embodiment.  It can be done in a
17   different way in another embodiment.  I don't
18   believe that the -- the patent, in fact,
19   either intends or attempts to make this
20   particular issue very precise.
21          MR. HAGIZ:  We need to change
22   the tape.  I recommend taking a short
23   break, and then I'm almost done.
24   Unless you all prefer would prefer a
25   longer break.

Page 262

KARAN SINGH, Ph.D.

1    KARAN SINGH, Ph.D.
2    MR. BUSEY:  That's fine.
3    THE VIDEOGRAPHER:  This is the
4    end of tape 5.  Off the record at
5    5:14.
6    (Recess.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 263

1    KARAN SINGH, Ph.D.
2    THE VIDEOGRAPHER:  This is it
3    the beginning of tape 6 in the
4    deposition of Dr. Singh.  On the
5    record at 5:19.
6    (Singh Exhibit No. 7 was marked
7    for identification.)
8    BY MR. HAGIZ:
9    Q.    I just asked the reporter to
10    mark Exhibit 7, which is the rebuttal report
11    of Dr. Kreitzberg.  I'll use that in just a
12    second, Dr. Singh.  I just wanted to wrap up
13    where we were on "selectively active."
14    A.    Uh-huh.
15    Q.    Now, I believe you just
16    referred to paragraph -- the end of
17    paragraph 33 of Exhibit 2, your rebuttal
18    report; is that correct?
19    A.    I am not sure what I said just
20    before we broke, but in -- sure, inasmuch as
21    I referred to something that was exactly --
22    where did you say?  Paragraph which?  30 --
23    Q.    Paragraph 33 of your rebuttal
24    report.
25    A.    33 of my rebuttal report -- oh,

Page 264

1    KARAN SINGH, Ph.D.
2    maybe I'm looking at the wrong report.
3    Sorry.  Yeah, I was looking at the wrong
4    report.
5    Yes.  Yeah.
6    Q.    And I believe you were saying
7    that your basis for the term "selectively"
8    meaning that user input is not required --
9    A.    Uh-huh.
10    Q.    -- is that -- one example is
11    quoting from paragraph 33 about six lines
12    down, "As the Kreitzberg report states, one
13    example of how the '922 patent be can be
14    implemented is that another window or image
15    can be activated merely by user selection."
16    And you go on to say --
17    A.    Yeah.  So it's -- you know, for
18    one --
19    MR. BUSEY:  Why don't you wait
20    until the question --
21    MR. HAGIZ:  Hold on till the
22    question --
23    THE WITNESS:  Sorry.  I
24    apologize.
25    MR. BUSEY:  Sorry, Dr. Singh.  I

Page 265

1    KARAN SINGH, Ph.D.
2    didn't mean to interrupt you, but --
3    THE WITNESS:  No, no.  That's
4    okay.  Thank you.
5    BY MR. HAGIZ:
6    Q.    You go on to say, "By the use
7    of the word 'can,' the specification makes
8    clear that this is an option step that may be
9    part of some embodiments, but is not a
10    necessary step before a window can receive
11    user inputs"; is that correct?
12    A.    Yes.
13    Q.    Okay.  Are you aware of any
14    examples or any embodiments in the
15    specification that allow a window or image to
16    be selected without user input?
17    A.    Not in the examples that are
18    proffered, but nothing either in the claim
19    terms, nor in the -- nor in the specification
20    precludes.  And, if anything, the statement,
21    as I -- as I said, this statement -- and I
22    believe there may be one other place in the
23    report as well.  I will have to look at it
24    again in detail, but I think there perhaps is
25    a second place where -- where a term like

Page 266

```
1            KARAN SINGH, Ph.D.
2   this sort of lends, I would say, a person
3   to -- of -- of ordinary skill in the art
4   to -- to believe that it is one potential way
5   of -- of doing things, but certainly not a
6   necessity.
7       Q.   Okay.  Just a few more very
8   quick questions, Dr. Singh.
9       A.   Yeah.  Sure.
10      Q.   Now, I know you mentioned you
11  have never been deposed before.
12      A.   Yes.
13      Q.   Have you worked as an expert
14  witness before in any other cases?
15      A.   No.
16      Q.   Okay.  Now, Exhibit 7, which is
17  Dr. Kreitzberg's rebuttal report, have you
18  seen that before?
19      A.   Yes.
20      Q.   Have you reviewed it?
21      A.   I have been over it, not in
22  great detail, but yes, I have skimmed over
23  it.
24      Q.   Okay.  And have you formed any
25  additional views or any additional
```

Page 267

```
1            KARAN SINGH, Ph.D.
2   conclusions, having read Dr. Kreitzberg's
3   rebuttal?
4            MR. BUSEY:  I don't think we
5   have copies.
6            MR. HAGIZ:  Oh, sorry.  Did I
7   not hand those out?
8            MR. BUSEY:  Not to my knowledge.
9   This is Exhibit --
10           MR. HAGIZ:  My apologies.
11  Exhibit 7.
12           MR. BUSEY:  Okay.
13           THE WITNESS:  Well, as I said,
14  you know, I haven't read it in -- in a
15  great degree of detail, but while
16  going over it, one thing that --
17  that -- that certainly kind of came to
18  my eye was sort of a simple what I
19  would call essentially a logical flaw
20  in -- in simple logic.
21           In paragraph 56 to 57, where
22  Dr. Kreitzberg uses the words "not
23  wholly transparent, nor wholly opaque"
24  to become -- to be sort of equivalent
25  with the fact that no part of an
```

Page 268

```
1            KARAN SINGH, Ph.D.
2   overlay image is transparent.
3            Something that is not wholly
4   transparent does not preclude the
5   existence of transparent pixels.
6   Something that is not wholly opaque
7   does not also preclude the existence
8   of transparent pixels.  So in that
9   sense, the jump from 56 to no part of
10  the overlay image is transparent just
11  didn't make -- didn't seem to make
12  sense to me from a simple logical
13  standpoint.
14           And, of course -- I mean, we've
15  been over the actual construction
16  in -- in a fair amount of detail,
17  trying to use the context of the terms
18  and so on.  This point that I am
19  making is just simply one that -- that
20  is based on "this implies that."
21           That's really the only point
22  that I believe kind of stuck out at
23  me.  I'm sure it there must be others,
24  but none that I have read or reviewed
25  in enough detail to express.
```

Page 269

```
1            KARAN SINGH, Ph.D.
2   BY MR. HAGIZ:
3       Q.   So it would be fair to say that
4   at this time, other than the opinion you just
5   expressed, you haven't formed any additional
6   conclusions in response to Dr. Kreitzberg's
7   rebuttal that are not addressed by your
8   existing reports?
9       A.   I may have had some other
10  opinions.  I believe some of these opinions
11  may -- may have come out during the course of
12  -- of the deposition.  But, in addition to
13  that, there is no specific opinion that I
14  would like to express.
15      Q.   So there are no conclusions
16  that you have at this time that were not
17  either addressed in your reports or during
18  today's deposition, correct?
19           MR. BUSEY:  Objection.  I think
20  that may have mischaracterized the
21  witness' testimony.
22           But go ahead.
23           THE WITNESS:  Inasmuch I
24  mentioned that -- that this is -- that
25  this is not a comprehensive reading of
```

68 (Pages 266 to 269)

Page 270

KARAN SINGH, Ph.D.

1
2  the rebuttal report, yes.  I believe
3  certainly a comprehensive reading of
4  the rebuttal report is certainly
5  likely to create or raise other
6  opinions and -- and so on.  But in
7  the -- to the extent that I reviewed
8  the rebuttal, your statement is fine.
9  BY MR. HAGIZ:
10     Q.    Sitting here today, do you
11 expect to do any additional work for Apple in
12 connection with this investigation?
13     A.    If my retainership continues
14 and my schedule and other things permit,
15 sure.
16     Q.    I'll ask that differently.
17     A.    Okay.
18     Q.    Have you been asked to do any
19 additional work for Apple in connection with
20 this investigation?
21     A.    No.
22     Q.    Okay.  Have you been asked to
23 prepare additional declarations?
24     A.    No?
25     Q.    And have you been asked to

Page 271

KARAN SINGH, Ph.D.

1
2  testify at the Markman hearing?
3     A.    No.
4     Q.    And without going into anything
5  confidential or privileged, are you engaged
6  in any other work for Apple right now?
7     A.    No.
8     Q.    And are you engaged in any
9  other matters for Morrison & Foerster right
10 now?
11     A.    No.
12         MR. HAGIZ:  That's all I got.
13         MR. SCANNELL:  No questions.
14         MR. MOORE:  No questions.
15         MR. BUSEY:  I have just
16 something very briefly on redirect.
17            EXAMINATION
18 BY MR. BUSEY:
19     Q.    Dr. Singh, I know it's been a
20 long afternoon, so this is going to be
21 just -- short.
22         You were asked by Mr. Hagiz
23 about your construction of receiving in put
24 in said displayed base image.  And I think
25 specifically we had a long discussion about

Page 272

KARAN SINGH, Ph.D.

1
2  the use of the word "input."  And I think in
3  your original report you may have used the
4  word "data" --
5     A.    Uh-huh.
6     Q.    -- and you agreed that -- do
7  you recall that?
8     A.    Yes.
9     Q.    And then you think you agreed
10 that the word "input" could also be used
11 interchangeably in that context?
12     A.    Yes.  Yes.
13     Q.    Mr. Hagiz had asked you
14 whether -- you then, I believe, referred to
15 the keyboard examples which are --
16     A.    Uh-huh.
17     Q.    -- I think figures 18 through
18 21 --
19     A.    Yes.  Yes.
20     Q.    -- whatever, in the patent.
21 And he asked you if you -- and you referred
22 to a portion of the specification of the
23 '922 -- I think columns 20 and 21.  Do you
24 recall that?
25     A.    Yes.

Page 273

KARAN SINGH, Ph.D.

1
2     Q.    And if you could -- and you
3  were asked, I think by Mr. Hagiz could you
4  find in that discussion in the specification
5  the use of the word "input."
6     A.    Uh-huh.
7     Q.    Do you recall that?
8     A.    Yes, yes, yes.
9     Q.    And I believe you did not find,
10 in your brief -- you didn't have the
11 opportunity to look at the whole -- all of
12 that text.
13     A.    Right.
14     Q.    Can you look now and tell me
15 whether you see the word -- use of the word
16 "input" in column 20?
17     A.    Column 20.  Sure.
18     Q.    Can you identify where -- read
19 the sentence.
20     A.    "In figure 19, keyboard image
21 1064 has been provided on screen 104028 in
22 the input of data to the AppleShare
23 application program described previously."
24     Q.    What lines is that, Dr. Singh?
25     A.    It's, like, line 3 to 5 or

Page 274

KARAN SINGH, Ph.D.

1    KARAN SINGH, Ph.D.
2  something close to that.
3        Q.    Is there any other place in
4  that column or that portion of the
5  specification discussing the keyboard
6  examples that used the term --
7        A.    Well, give me an minute to --
8  it's a long paragraph.
9        I guess around line 27 there
10  is, "While the keyboard image can be used to
11  input data into a currently active
12  application program..."
13        Q.    How does that bear on your
14  opinion as to whether the input reflects user
15  input or nonuser input?
16        A.    Well, it -- in this example, it
17  reflects the fact that the input or data is
18  coming from -- from the keyboard rather than
19  from -- from what might be termed as user
20  input.
21        I guess if reaffirmed -- I
22  guess they both reaffirm -- I don't remember
23  the exact example that I gave prior, but I
24  believe that, while that one was valid,
25  these -- these further reaffirm that

Page 275

1        KARAN SINGH, Ph.D.
2  standpoint.
3        MR. BUSEY:  No further
4  questions.
5        THE VIDEOGRAPHER:  This
6  concludes the deposition of Dr. Singh.
7  Off the record at 5:33.  It consists
8  of five -- six tapes.
9        (Concluded at 5:33 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 276

1        KARAN SINGH, Ph.D.
2    ACKNOWLEDGMENT OF DEPONENT
3
4        I, KARAN SINGH, Ph.D., do hereby
5  acknowledge I have read and examined
6  the foregoing pages of testimony, and
7  the same is a true, correct and
8  complete transcription of the
9  testimony given by me, and any changes
10  and/or corrections, if any, appear in
11  the attached errata sheet signed by
12  me.
13
14  _____   _____
15  Date          Signature
16
17
18
19
20
21
22
23
24
25

Page 277

1        KARAN SINGH, Ph.D.
2    REPORTER'S CERTIFICATE
3        I, Kathy Savich, the undersigned
4  RPR, CLR, and Notary Public in and for
5  the District of Columbia, do hereby
6  certify that the above-named witness,
7  after having been first duly sworn to
8  testify to the truth, did testify as
9  set forth in the foregoing pages, that
10  the testimony was reported by me in
11  stenotype and transcribed under my
12  personal direction and supervision,
13  and is a true and correct transcript.
14        I further certify that I am not
15  of counsel, not related to counsel or
16  the parties hereto, and not in any way
17  interested in the outcome of this
18  matter.
19        SUBSCRIBED AND SWORN TO under my
  hand this 25th day of October, 2011.
20
21  My Commission Expires:  1/1/2012
22
  _____
23  Kathy Savich, RPR, CLR
  Notary Public in and for the
24  District of Columbia
25

70  (Pages 274 to 277)

Page 278

```
 1         KARAN SINGH, Ph.D.
 2         ERRATA SHEET
 3
   Case Name:  IN RE CERTAIN ELECTRONIC DIGITAL
 4 MEDIA DEVICES
   Witness Name:  KARAN SINGH, Ph.D.
 5 Date:  October 25, 2011
   Job No.:  43209
 6
 7 Page No.  Line No.    Change
 8 _____   _____    _____
 9 _____   _____    _____
10 _____   _____    _____
11 _____   _____    _____
12 _____   _____    _____
13 _____   _____    _____
14 _____   _____    _____
15 _____   _____    _____
16 _____   _____    _____
17 _____   _____    _____
18 _____   _____    _____
19 _____   _____    _____
20 _____   _____    _____
21 _____   _____    _____
22 _____   _____    _____
23 _____   _____    _____
24
   _____        _____
25 Signature          Date
```

TSG Reporting 877-702-9580

Karan Singh, Ph.D.

ERRATA SHEET

Case Name:        IN RE CERTAIN ELECTRONIC DIGITAL MEDIA DEVICES
Witness Name:     KARAN SINGH
Date:             October 25, 2011
Job No.:          43209

| Page No. | Line No. | Change |
| --- | --- | --- |
| 31 | 12 | …at Alias over the years. |
| 32 | 23 | …developed tools for |
| 37 | 12 | …parametric curves and Bezier |
| 84 | 14 | …presence of |
| 143 | 15 | …towards or against |
| 160 | 24 | …a clear description of |
| 165 | 20 | …the way they have been described over here |
| 167 | 20 | …transparent pixel (Questioner) |
| 212 | 6 | …believe not. Because, if |
| 222 | 2 | …out the set of conditions |
| 250 | 16 | …bases for the distinction |
| 251 | 18 | …keyboard example (Questioner) |

Signature _____        24 Nov. 2011
                                          _____
                                          Date

# EXHIBIT 38



DEFENDANT'S EXHIBIT
NO. 2505.001
United States District Court
Northern District of California
No. 11-CV-1846-LHK (PSG)
*Apple v. Samsung*
Date Admitted:_____ By: _____

Duncan Kerr
EXHIBIT
12
2/22/12
J.Jennings, CSR,
CLR, CCRR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APLNDC-NCC00000274



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
APLNDC-NCC00000278



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    APLNDC-NCC00000280



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY