QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Cal. Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**SAMSUNG'S PROFFER OF WITNESS TESTIMONY AND EXHIBITS** |

# TABLE OF CONTENTS

**Page**

A.    Samsung's Proffer of Evidence Regarding the 035 Model .......................................1

B.    Samsung's Proffer of Evidence Regarding the Home Screen Button
Trademark Application ...................................................................................................2

C.    Samsung's Proffer of Evidence Regarding Apple's Additional, Unasserted
Design Patents .................................................................................................................4

D.    Samsung's Proffer of Evidence Regarding Non-Infringement Theories
Related to Galaxy S II Phones......................................................................................7

E.    Samsung's Proffer of Evidence Regarding the Bloomberg Display Patent
Application ........................................................................................................................8

F.    Samsung's Proffer of Evidence Regarding the Samsung Design Patents.................8

G.    Samsung's Proffer of Testimony of Dale Sohn .......................................................10

H.    Samsung's Proffer of Testimony from Hyoung Shin Park .....................................11

I.    Samsung's Proffer of Evidence Regarding the Next Big Thing Television
Ad Campaign.................................................................................................................18

J.    Samsung's Proffer of Testimony of Gregory Joswiak. ..........................................18

K.    Samsung's Proffer of Evidence Regarding Offer Rates for LTE Patent
Portfolios. ......................................................................................................................19

L.    Samsung Proffer of Evidence Regarding Its Defense Against Apple Utility
Patents 7,469,381, 7,844,915 and 7,864,163..........................................................21

        1.    7,469,381 Patent ................................................................................21

              (a)    Blue Glow Design-Around..............................................21

                     (i)     Physical Devices and Source Code ......................21

                     (ii)    Fact Witnesses...................................................23

                     (iii)   Interrogatory Responses.....................................23

                     (iv)    Video of Blue Glow .........................................24

              (b)    Criticism of Apple's Expert Witness .............................24

              (c)    U.S. Patent No. 6,498,590..............................................25

              (d)    Order Granting Request for Ex Parte Reexamination......................25

        2.    7,844,915 Patent ................................................................................26

(a)      U.S. Patent No. 6,498,590 .................................................... 26

3.    7,864,163 Patent ........................................................................... 26

(a)      Design-Around ................................................................ 26

## TABLE OF AUTHORITIES

### CASES

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008) ........................................................................................ 19

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ........................................................................................ 20

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ...................................................................................... 10


### STATUTES

35 U.S.C. § 177 ....................................................................................................................... 9

Federal Rule of Evidence 103(a)(2) ....................................................................................... 1

1    Pursuant to Federal Rule of Evidence 103(a)(2), Samsung respectfully makes the following

2    proffers of witness testimony and exhibits excluded from trial.    The exclusion of this witness

3    testimony and exhibits have affected the substantial rights of Samsung to put forward the full

4    merits of its case.

5

6    A.    **Samsung's Proffer of Evidence Regarding the 035 Model**

7    Samsung respectfully seeks to preserve the record regarding the scope of use of trial

8    Exhibit DX-741, Apple's 035 model, which Samsung was precluded from using for the purpose of

9    showing non-infringement during cross examination of Apple's design patent infringement expert,

10   Peter Bressler.    During trial, Exhibit DX-741 was admitted into evidence during the testimony of

11   Apple employee Christopher Stringer, a named inventor of the D'889 patent.    July 31, 2012 Trial

12   Tr. at 538:1-18.    Mr. Stringer confirmed that the 035 model was an embodiment of the D'889

13   patent, testifying that the D'889 patent "represented" the design of the 035 model.    *Id.* at 528:12-

14   15.    Samsung then sought to use the 035 model during the cross examination of Mr. Bressler, but

15   the Court sustained an objection by Apple that the 035 model had not been properly disclosed as

16   one of Samsung's non-infringement theories.    Aug. 6, 2012 Trial Tr. at 1212:15-1223:2; see also

17   Dkt No. 1091-3 (APLPROS0000010190) (pictures of 035 model, stipulated by Apple to be an

18   embodiment).

19   Samsung had a right to test the accuracy and reliability of Mr. Bressler's infringement

20   opinions.    If Samsung had been permitted to cross-examine Mr. Bressler, it expects that his

21   testimony would have been highly relevant to the question of non-infringement and lack of

22   willfulness by Samsung.    Although Mr. Bressler considered the iPad 2 in forming his opinions, in

23   his deposition, he conceded that he never considered the 035 model in forming his opinions, even

24   though he knew that the 035 model was in Apple's possession.    (*See* Ex. A to the Declaration of

25   Brett Arnold ("Arnold Decl.") (April 24, 2012 Dep. of Peter Bressler at 230:11-14; 237:17)).

26   The obvious differences between the 035 model and the iPad 2 are striking, and would have

27   helped illustrate to the jury the significant differences between the accused products and the

28

D'889, which the 035 model embodies, and highlighted the different standards Mr. Bressler actually used to analyze infringement versus invalidity.

**B.**   **Samsung's Proffer of Evidence Regarding the Home Screen Button Trademark Application**

Samsung also submits this brief to support the relevance and admissibility of the file wrapper for the Home Screen Button trademark application (US Serial No. 85065521) that Apple filed with the USPTO on June 17, 2010, listed as DX-628 on Samsung's exhibit list.   (Arnold Decl., Ex. C).   This document is directly relevant to counter Apple's contentions in this case that the unregistered trade dresses for its iPhone and iPad products do not include the home screen button.   Apple has taken this position in a transparent attempt to gain a monopoly right on product configurations that are different and broader than those Apple has ever presented to the marketplace.

The Home Screen button trademark application states unequivocally that "the mark consists of the design of Apple's 'Home Screen' button, which is a key component of the trade dress of three different Apple products — the iPhone, the iPod touch, and the iPad digital devices."   (Arnold Decl., Ex. C at DX-628.080).   The document contains a number of other, similar admissions by Apple that directly contradict the litigation-driven positions Apple has taken in this action that the home button is not a part of any asserted unregistered trade dresses:

- "The Home Screen button has been a prominent and unmistakable feature of Apple product design since Apple announced the first version of the iPhone device nearly four and a half years ago, in January 2007."   (*Id.* at DX-628.080.)

- "Given its distinctive appearance, its promotion as a standalone mark, and the incredible success of the iPhone, iPod touch, and iPad devices, the Home Screen button design is clearly recognized by consumers, and functions as an indicator of origin for Apple's products."   (*Id.* at DX-628.081.)

- "Apple already owns a federal trademark registration of the iPhone product configuration that claims protection in the Home Screen button (RN 3,470,983).

The Trademark Office has therefore already recognized that the appearance of the iPhone device as a whole has achieved secondary meaning, and that the Home Screen button has necessarily achieved secondary meaning as well by being a component of the iPhone trade dress." (*Id.* at DX-628.081-.082.)

- "The Home Screen button is also recognized by the public as an indicator of source, because it factors prominently in almost any photograph and video of the product." (*Id.* at DX-628.085.)

In the application, Apple even called out three Samsung products as examples of third party smartphones that lack the "distinctive" Apple home button: the Captivate, Infuse 4G, and Galaxy S 4G products. DX-628.082 & DX-628.168-.170. Apple claimed that because third party phones like these do not include the Apple button, "[c]onsumers will therefore view the design of Apple's Home Screen button as an indicator of source." DX-628.082. Yet now Apple accuses all three of those phones of diluting its alleged unregistered iPhone trade dress, after having excised the home screen button from the descriptions of its trade dresses. (Dkt No. 1280 at 6.)

Apple's admissions in the trademark application are also relevant to show that:

- The absence of the "distinctive" home button on Samsung's Galaxy Tab 10.1, which Apple accuses of infringing its alleged iPad-related trade dresses, eliminates or at a minimum weighs against any likelihood that consumers will confuse a Galaxy Tab 10.1 with the iPad.

- Any acquired distinctiveness that the iPhone and iPad designs may have is due to the "distinctive" home button, not Apple's selective trade dress elements. This also rebuts trial testimony from Apple's secondary meaning survey expert, Hal Poret, that Apple's alleged trade dress has acquired secondary meaning based on survey results where respondents were shown the iPad with home button visible. R.T., 8/7/2012, at 1578:1-4; 1578:24-1579:4; 1588:18-1590:5.

- The extent of any actual recognition of Apple's claimed iPhone and iPad trade dresses, a factor that may be considered by the jury in determining whether such

1    trade dresses are famous for purposes of Apple's claim for trade dress dilution, is a

2    function of the home button.

3    Apart from basic admissibility issues, the home screen button application is important for

4    public policy reasons, as the purpose of the Lanham Act is not to lightly give perpetual monopoly

5    rights, especially those based on anything other than what is actually presented in the marketplace

6    and that has gained a source-identifying status.    According to Apple's admission to the U.S.

7    government, the home screen button is an integral source-identifying component of its iPhone and

8    iPad trade dresses, yet Apple is attempting to wield those alleged trade dresses having improperly

9    removed the home screen button from the product configuration.    (*See, e.g.*, Amended Complaint

10   at Dkt No. 75 (failing to include the home screen button or Apple logo in the description of its

11   purported common law trade dress for its iPad and iPhone products).)

12

13   C.    **Samsung's Proffer of Evidence Regarding Apple's Additional, Unasserted**
              **Design Patents**

14

15   The Court's Order on Apple's Motion *in Limine* No. 2 ("MIL 2") excluded evidence of

16   Apple's unasserted design patents that were issued subsequent to its asserted design patents in this

17   case.    (Dkt. 1267 at 3).    The Court's stated basis for excluding these patents was that

18   subsequently issued patents and "non-prior art" are irrelevant to determining the scope of the

19   asserted patents.    (July 18, 2012 Hearing Tr. 129:15-23).    Having succeeded in precluding

20   Samsung from introducing these Apple design patents through its MIL 2, Apple then flaunted its

21   victory by repeatedly referencing the "hundreds" of patents that Apple has been issued and that it

22   had to choose from in bringing this lawsuit.    Apple did this to emphasize and inflate its design

23   achievements in front of the jury.    Because Apple opened the door by referencing its numerous

24   unasserted patents in order to bolster the jury's perception of its accomplishments and the strength

25   of its asserted intellectual property rights, Apple could no longer argue that these patents lack

26   relevance, and the jury should have been permitted to see and evaluate for themselves the

27   numerous design patents that Apple, itself, has now put at issue.

28

In Apple's opening argument, Apple spoke at length about its "hundreds" of patents, and how it was only able to choose a select few on which to sue.   (R.T, 7/31/2012, at 326:14-327:10 (McElhinny) (emphases added).)    Apple's first witness, Christopher Stringer likewise sought to increase his design credibility with the jury by mentioning his numerous design patent achievements – which he described as too numerous for him to even remember the scope.    (*Id.* at 471:19-22 (emphasis added).)    Having heard extensively about Apple's hundreds of design patents, and being left with the impression each claimed something markedly unique, the jurors should be permitted to see some of those patents, so that they can evaluate for themselves the proper weight to give to Apple's claims about its numerous design patent achievements and the patents at issue in this case.    At a minimum, the jury should be permitted to see the following iPhone- and iPad-related patents:[1]



D593,087   D634,319   D602014   D600241   D629799   D602015   D642563   D627,778

D622,270   D602,486   D633,493   D558,758   D581,922   D618,677   D633,908   D622,720   D602,016

D624,072   D630,630   D622,718   D615,083   D586,800   D627,343   D558,757   D601,588

---

[1]    These patents are all attached to the Declaration of Adam Cashman in Support of Samsung's Opening Memorandum Regarding Claim Construction (Dkt. 1091), Exs. 23-25; 35-61.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   Apple's patents are also relevant to put into perspective Apple's expansive claims

17 regarding the scope of its "inventions."    As the numerous patents reflect, Apple deemed minor

18 tweaks—thinner borders, a rectangular back element, the presence or absence of small circular

19 features and the shape of the back surface and edges—to be novel inventions in the field, each

20 worthy of representing to the U.S.P.T.O. that they were unique and new designs.    This context

21 would help the jury understand the specificity with which Apple itself viewed its designs.

22   Samsung also submits an offer of proof for the design patent applications for the iPad 2 for

23 the reasons previously given by Samsung in opposition to Apple's Motion In Limine Number 2.

24 (*See* Samsung's Opposition, submitted under seal on July 10, 2012 at Dkt No. 1208 at 5); (iPad 2

25 design patent application, Trial Exhibit DX-743, Arnold Decl., Ex. Q).    In particular, Apple has

26 claimed through its design witness and expert witness at trial that the iPad 2 is an embodiment of

27 the D'889 patent.    (R.T., 7/31/2012, at 472:24-473:1; R.T., 8/6/2012, at1047:25-1048:9).

28 Apple's iPad 2 applications are therefore directly relevant to impeaching Apple's assertion that its

1   iPad products are embodiments of the D'889 patent, which bears directly on several fact issues for

2   the jury, namely infringement and damages.

3         As with the later issued patents described above, these iPad 2 applications include signed

4   oaths by Apple's designers stating that they believe themselves to be the original inventors of what

5   is claimed as a new, original and ornamental design. (*See, e.g*., Arnold Decl., Ex. Q at APLNDC-

6   Y0000310117-123, 158.)    And the iPad 2 applications cite the D'889 patent as prior art over

7   which the applied-for design is said to be new and novel. (*See, e.g., id*. at APLNDC-

8   Y0000310131; *see als*o Dkt. 1063-2 (Samsung's Reply ISO MSJ) at 8).    Apple should not be

9   permitted to assert these inconsistent positions – namely, that the iPad 2 is both the embodiment

10  of, and also new and original over, the D'889 patent.    And Samsung should be afforded the right

11  to put such documents in front of the jury to impeach any Apple factual assertions to the contrary.

12  Samsung would have offered this evidence through Apple's design patent inventors, including

13  Christopher Stringer, as well as Peter Bressler, Apple's design patent expert on issues of

14  infringement and validity.

        D.      **Samsung's Proffer of Evidence Regarding Non-Infringement Theories Related
                to Galaxy S II Phones**

        Samsung was prevented from offering evidence and testimony, and also from cross-

examining Apple's design expert, about the differences between Apple's design patents (D'677

and D'087) and any Samsung phones other than the Infuse 4G and the Galaxy S 4G.    (R.T.,

8/6/2012, at 1038:20-1039:14).    These other phones included the Galaxy S II phones (Galaxy S II

(AT&T) (JX-1031); Galaxy S II (i9100) (JX-1032); Galaxy S II (T-Mobile) (JX-1033); Galaxy S

II (Epic 4G Touch) (JX-1034); Galaxy S (Skyrocket) (JX-1035), which Apple failed to identify

in its infringement contention interrogatory response until March 4, 2012, four days before the

close of discovery.    (*See* Apple's Am. Obj. and Resp. to Samsung's Interrogatory No. 5 at 8-10,

attached as Arnold Decl. Ex. T).

        If permitted to do so, Samsung would have cross-examined Apple's expert, Mr. Bressler,

about these other phones, as well as asking Justin Denison and Jin Soo Kim to testify about

1  differences among the Samsung phones and between them and Apple's iPhones.   R.T. 8/6/2012,

2  at 949:20-950:17; 951:25-952:14; 2832:22-2833:1.   This testimony would have been highly

3  relevant to Samsung's non-infringement claims.

4

5       E.       **Samsung's Proffer of Evidence Regarding the Bloomberg Display Patent
                 Application**

6

7       If permitted to do so, Samsung would have examined witnesses, including Mr. Stringer

8  and Apple expert Mr. Bressler, regarding U.S. Patent Pub. No. 2004/41504 A1 ("D'504

9  Application" (DX678, attached as Ex. K to Arnold Decl.)), which is prior art to the asserted D'889

10 patent.   Samsung expects that it would have substantiated the following facts:   U.S. Patent

11 Publication No. 2004/0041504 A1 was filed on November 20, 2002 and published on March 4,

12 2004, which was before the D'889 patent was filed, and Mr. Stringer and/or Mr. Bressler

13 understands the D'504 Application to show a continuous, flat front surface from edge to edge in a

14 design that is substantially the same as the D'889 design.   Indeed, if Mr. Stringer failed to testify

15 consistently, then Samsung would have been able to impeach him based on his prior testimony to

16 this effect in the related ITC investigation.   (Arnold Decl., Ex. S (Stringer ITC 796 Dep. Tr.) at

17 366:21-373:23).

18

19      F.       **Samsung's Proffer of Evidence Regarding the Samsung Design Patents**

20      Samsung offers the following Samsung and Apple patents as evidence relevant to

21 Samsung's rebuttal of allegations of willfulness: D638,815 (DX 558), D558,757, D615,083,

22 D645,435, D652,813, D580,387, and D629,799.   Samsung's U.S. D638,815 ("D'815") design

23 patent shows the design of Samsung's Mesmerize, Fascinate and Showcase i500 products that are

24 accused of infringement in this case:

25

26

27

28





| **D'815** | **Mesmerize** | **Fascinate** | **Showcase i500** |

The D'815 patent cites as prior art, on its face, Apple's D558,757 and D615,083 patents, which show designs that are similar to the Apple designs shown in the asserted D618,677 and D593,087 patents at issue in this case:






| **D'757** | **D'083** | **D'677** | **D'087** |

Many of Samsung's patents cite Apple design patents as prior art and were issued by the USPTO as new and original designs over those patents.   They are thus highly relevant to showing Samsung's lack of willfulness regarding Apple's industrial design-related asserted design patents and trade dresses relating to phones.   These patents would have provided evidence corroborating Samsung's understanding of a lack of similarity between its products and the accused designs based on decisions by the U.S. P.T.O. that Samsung's designs were entitled to design patent protection.   Each design patent is deemed to disclose a separate design, one which, by definition, is not substantially similar to (i.e., does not infringe) other design patents."   *E.g.,* 35 U.S.C. § 177. When the USPTO grants a patent, it is "presumed to have properly done its job."   *PowerOasis,*

1   *Inc. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1304 (Fed. Cir. 2008).)    Where – as here – certain of

2   Samsung's design patents *cite to Apple's design patents* on their face as prior art, they are highly

3   relevant to Samsung's lack of willfulness.    Introduction of Samsung's patents would give the jury

4   context for Apple's arguments that Samsung was "on notice" of the alleged similarity of designs

5   based on such admitted evidence as third-party blog postings no witness had ever seen.

6   Samsung would have substantiated the following facts.    The D638,815 design patent was

7   filed on August 31, 2010 and issued on May 31, 2011.    (*See* Arnold Decl., Ex. D).    The

8   D638,815 patent cites as prior art certain Apple patents, including the D558,757 and D615,083.

9   (*See* Arnold Decl., Exs. E-F).    The D645,435 design patent was filed on November 15, 2010 and

10  issued on September 20, 2011.    (*See* Arnold Decl., Ex. G).    The D652,813 design patent was

11  filed on April 7, 2011 and issued on January 24, 2012.    (*See* Arnold Decl., Ex. H).    The

12  D638,815 patent cites as prior art certain Apple patents, including the D580,387 and the

13  D629,799.    (*See* Arnold Decl., Exs. I, J).    Samsung designers and named inventors would have

14  testified that Samsung's accused products are the result of Samsung's internal design team work

15  product, not the result of copying Apple's designs.

16

17  G.      **Samsung's Proffer of Testimony of Dale Sohn**

18  Dale Sohn is the President and Chief Executive Officer of Samsung Telecommunications

19  America ("STA").    Samsung expects that Mr. Sohn would have testified regarding his positions

20  and responsibilities at Samsung since he joined the company in 1982.    Samsung also expects that

21  Mr. Sohn would have testified regarding the development and growth of Samsung's

22  telecommunications unit since he joined Samsung in 1982, including strategies implemented to

23  develop and grow the telecommunications unit; Samsung's commitment to design, research, and

24  development, and the corporate relationship between STA, Samsung Electronics America ("SEA"),

25  and Samsung Electronics Company ("SEC"); STA's primary roles and responsibilities in the

26  United States related to the telecommunications unit and STA's business model, including STA's

27  relationship with mobile carriers and STA's strategy for the release of phone models; Samsung's

28

1  competitive strategy and Samsung's supply of components to Apple; and the lack of any Samsung

2  sales of phones in the United States aside from those sold by STA to carriers.

3      Mr. Sohn's testimony would have been relevant to countering allegations of copying and

4  willfulness, along with providing information regarding Samsung's innovative technology and

5  products, and establishing the lack of infringement of the Galaxy Ace, Galaxy S i9000 and Galaxy

6  SII i9100, which were not sold by Samsung in the United States.   His testimony, even if brief,

7  also would have rebutted Apple's "empty chair" argument about a lack of Samsung executives and

8  other witnesses testifying.

9

10      H.      **Samsung's Proffer of Testimony from Hyoung Shin Park**

11      Hyoung Shin Park is a senior design at Samsung who created the design for Samsung's

12  F700 smartphone (DX 526) in August 2006, months before Apple announced the iPhone in

13  January 2007.   Had her testimony not been excluded at trial, Ms. Park would have testified as

14  summarized below and in Samsung's prior offers of proof (Dkt. Nos. 1463,1474, 1664) and as set

15  forth in her sworn witness statement dated May 3, 2012 submitted to the United States

16  International Trade Commission in the Matter of Certain Electronic Digital Media Devices and

17  Components Thereof, Investigation No. 337-TA-796.   (See Arnold Decl., Ex. W.)

18      In particular, Ms. Park would have testified that she created the design for the F700 as part

19  of a project known at Samsung as the MPCP project that kick-off in May 2006.   Ms. Park was

20  part of a group that included industrial designers, user interface and sound designers and a

21  specialist in colors, materials and finishes, among others, that was selected to come up with a new

22  Samsung mobile phone design.   Ms. Park would have also testified that after a series of initial

23  brainstorming sessions, the MPCP group prepared a presentation identified as DX 596 to

24  summarize the design concepts generated during some of those meetings and the marketing

25  position of the products the group was conceptualizing.   (See DX 596, Arnold Decl. Ex. N.)

26  She would have testified that the chart shown below from DX 596 was created by the MPCP team

27  to show the evolution of cell phones over time.

28



Ms. Park would have further testified that this chart illustrated a trend observed by the MPCP group that LCD screen sizes on mobile phones were getting larger over time as screen technology improved thus allowing people to use their mobile phones for purposes other than making phone calls.   These other purposes included text messaging, playing music, camera functions and viewing media content like videos and mobile television, where they had been used almost exclusively for voice-related activities in the past.   Ms. Park would have testified that based on this observed trend the MPCP group decided that the new phone design should include a full-touch large size LCD display screen that would allow users to view a variety of content.

Ms. Park would have testified that she and three other designers who participated in the MPCP project sought to create phone designs consistent with this concept and that DX 522 and DX 625 are presentations prepared by the MPCP group showing computer renderings and physical mock-ups of various designs created by Ms. Park and these other designers in July and August 2006. (See DX 522 and DX 625, Arnold Decl. Exs. L and O).   For example, Ms. Park would have testified that the page below (DX 522.033) shows on the left computer renderings of a design

1  called "Bowl" that she created in collaboration with one of the other MPCP designers and on the

2  right images of some of the inspirations for the "Bowl" design, including a flat body of water, a

3  bowl containing water, and color combinations.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19
20
21
22
23
24
25
26
27
28

Ms. Park would have testified that the page below (DX 522.045) shows a photograph of a mock-up of a design she created called "Q Bowl" and that the mock-up shown in the photograph was completed by August 2006.    The Q in Q Bowl stood for QWERTY, which is the type of slider keyboard used in her design, and "Bowl" stood for her inspiration for the "Bowl" design. Ms. Park would have also testified as to the functional reasons for many of the elements incorporated in her Q Bowl design, including the rectangular shape of the device and LCD display screen, the four rounded corners, the clear flat front surface, the black borders surrounding the display that are narrow on the sides and wider above and below the display, the oblong-shaped receiver opening at the top of the front face of the device and bezel surrounding the front face. Ms. Park would also have identified designs created by the other designers participating in the MPCP project that are shown in DX 522 and DX 625, including designs with these same elements. Ms. Park would also have testified that Samsung's F700, shown below, is a Samsung smartphone based on her Q Bowl design that was released by Samsung in 2007.

1
2
3
4
5
6
7
8
9



10      Ms. Park would have further testified that DX 1086 is a design patent issued by the Korea

11  Intellectual Property Office for her Q Bowl design and that the date of the application for this

12  design patent is December 20, 2006, prior to Apple's announcement of the iPhone in January 2007.

13  (See DX 1086, Arnold Decl. Ex. P).

14
15
16
17




18
19
20
21
22
23

24      Ms. Park's testimony would have made clear that she first saw the iPhone on the internet

25  shortly after Apple publicly announced it in January 2007, months after she had completed her Q

26  Bowl design in August 2006.    She would also have made clear that her Q Bowl design and the

27  F700 that was based on it were not copied from the iPhone.

28

Ms. Park would have also testified that while she and the other three industrial designers were working on external phone designs as part of the MPCP project, user interface designers were working on a user interface to be used with the touch screen mobile phones with large LCD display screens envisioned by the MPCP group.   The internal Samsung name for this user interface was IReen which stood for interactive screen and intelligent screen.   IReen is specifically referenced in the MPCP presentation identified as DX 596.   Ms. Park would have identified DX 566 as a presentation dated September 14, 2006 regarding the IReen user interface developed in connection with the MPCP project.   (See DX 566, Arnold Decl. Ex. M.)   Ms. Park would have also identified the images from DX 566 shown below as Samsung's plan for a user interface for a full-touch LCD display made up of rounded rectangle icons arranged in a grid layout of a dimension comfortable for human fingers to touch and activate.   She would have testified that the grid layout shown in the figure on the right with the redline through it was rejected because it limited how accurately the user could control the touch screen with his or her finger, given the dimensions of the screen, which was more narrow than the iPhone screen.

Ms. Park's testimony, as summarized above, in Samsung's prior offers of proof and in Ex. W to the accompany Arnold Declaration, is relevant to a host of issues in this case, including the following:

- The functionality of the designs claimed in the D '087, D '677 and D '305 design patents and Apple's claimed iPhone trade dresses, including the functionality of the rectangular shape of the device and LCD display screen, the four rounded corners, that clear flat front surface, the black borders surrounding the display that are narrow on the sides and wider above and below the display, the oblong-shaped receiver opening at the top of the front face of the device, the bezel surrounding the front face and a graphical user interface made up of rounded rectangle icons in a grid layout.

- To rebut Apple's allegations of willful infringement of the design patents-in-suit and the alleged iPhone trade dresses as well as its claims that Samsung copied the iPhone's external design and graphical user interface.    For example, to support its allegations of copying and willful infringement, Apple showed the jury during opening statement a demonstrative exhibit purporting to show Samsung smartphones before and after Apple announced the iPhone in January 2007.    (See Arnold Decl., Ex. X.)    The demonstrative showed the F700 with a date of December 2007, creating the false impression that the F700 was copied from the iPhone.    Had she not been precluded from testifying, Samsung would introduce Ms. Park's testimony concerning the design of the F700, including the renderings and mock-up completed by August 2006 and the design patent application filed in December 2006, to rebut Apple's purported evidence of willful infringement and copying.

- Rebutting Apple's claims of willfulness is relevant to issues relating to damages for patent infringement and trade dress dilution and infringement, among other things. (See Dkt. No. 1849, Final Jury Instruction Nos. 45, 46, 58, 60.)

- Rebutting Apple's claims of copying is relevant to the issue of secondary meaning and thus the protectability of Apple's alleged iPhone trade dresses, among other things.   (See Dkt. No. 1849, Final Jury Instruction No. 50.)

- To rebut allegations by Apple that Samsung intended to create an association with Apple's alleged trade dress which in turn is relevant to Apple's claim for dilution of Apple's alleged iPhone trade dresses.   (See Dkt. No. 1849, Final Jury Instruction No. 55.)

- Obviousness of the design patents-in-suit.

- Invalidity of the design patents-in-suit.

I.     **Samsung's Proffer of Evidence Regarding the Next Big Thing Television Ad Campaign**

Samsung also submits an offer of proof for its Next Big Thing television campaign, which is trial exhibit DX-629.   (Arnold Decl., Ex. R.)   The exhibit consists of short, 30-second television advertisements for Samsung Galaxy S II phones in which the Samsung phones are compared and contrasted in various scenes with the Apple iPhone, sometimes implicitly and other times more explicitly.   The ads are relevant to lack of confusion and lack of dilution as they show how Samsung's advertising was aimed at making explicit *distinctions* for the public between Samsung's products and Apple's.   The ads are also relevant to show Samsung's lack of intent to confuse anyone about the designs of its products.   Part of the point of the campaign was to show the superiority of Samsung's designs compared to Apple's.   The advertisements would have been offered through Justin Denison, who is the chief strategy officer at Samsung Telecommunications America and who has first-hand knowledge of Samsung's strategy and airing of the advertisements and could authenticate them.

J.     **Samsung's Proffer of Testimony of Gregory Joswiak.**

Mr. Joswiak is Apple's Vice President of iPod, iPhone, and iOS product marketing.   If permitted, Samsung would have been able to present deposition testimony from Mr. Joswiak

1   regarding Apple not being aware of any data or evidence regarding consumer confusion as to

2   Apple and Samsung's smartphones (Joswiak Tr. 238:1-238:10; *see also* Joswiak Tr. 236:22 -

3   237:3; 238:25 - 239:15).   (Arnold Decl, Ex. B.)   Apple's objection should not have been

4   sustained.   Evidence of real world deception — or lack thereof — is applicable to the design

5   patent infringement analysis and trade dress issues.   Based on Apple's own claims of

6   embodiment, evidence regarding actual confusion is highly probative of whether Apple's phone

7   designs and Samsung's phone designs are so similar that "a purchase . . . would be deceived by the

8   similarity between the claimed and accused designs, 'inducing him to purchase one supposing it to

9   be the other.'"   *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 683 (Fed. Cir. 2008) (en

10  banc).

11

12       K.   **Samsung's Proffer of Evidence Regarding Offer Rates for LTE Patent Portfolios.**

13        UMTS and LTE are telecommunications standards developed by ETSI.   Hutnyan Decl.,

14  Ex. 16 (DX-618).   LTE is a transitional standard commonly referred to as "4G" and is based on

15  the same wideband CDMA technology as UMTS.   Many companies that have a patent portfolio

16  declared essential to UMTS also have a portfolio declared essential to LTE.   *Id.* at DX-618.003.

17  Most companies have not announced royalty rates for their UMTS-essential portfolios; however, a

18  number of companies have announced a public offer rate to their LTE-essential portfolios.   *Id.* at

19  DX618.001-002.

20        On July 14, the Court excluded Samsung from introducing into evidence the offer rates for

21  LTE patent portfolios published by members of ETSI.   Dkt. 1749, at 4.   Samsung's expert

22  David Teece opined that LTE licensing rates, as rates for similar telecommunications standards,

23  were relevant to the determination of licensing rates for UMTS.   Hutnyan Decl. Ex. 14 (Teece

24  Expert Report, dated March 22, 2012, at ¶ 128).   Dr. Teece testified that LTE was relevant

25  because it is an upgrade from UMTS and understood it to be designed with backwards-

26  compatibility.   Hutnyan Decl., Ex. 15 (Teece 4/19 Dep. Tr. at 142:20-143:23.)   This evidence

27  was thus relevant as a reference point to determining industry-accepted rates for UMTS licenses.

28

1   Dr. Teece would have made clear the difference between the two standards in his testimony.   It

2   was for the jury to weigh whether LTE licensing rates were comparable to UMTS rates.

3   "Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for

4   the jury."   *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010).

5          The Court's exclusion of LTE offer rates excluded a large portion of the expected

6   testimony of Samsung's telecommunications industry licensing expert Eric Stasik.   In his article

7   on Royalty Rates for LTE Standards, Mr. Stasik sets forth a series of published LTE royalty rates

8   on which Dr. Teece intended to rely.   Hutnyan Decl. Ex. 16 (DX-618 at 1).   Mr. Stasik

9   concluded that "the licensing situation confronting LTE is not so very much different than the

10  situation which first confronted GSM and UMTS/W-CDMA."   *Id.* at 4.   LTE is a standard

11  developed by ETSI, the same standards-setting body that promulgated UMTS, and represents an

12  upgrade to UMTS.   *Id.* at 1. As a practical matter, Stasik states, "nearly all handsets which

13  employ the LTE standard will--for some time--also include GSM/GPRS/EDGE/W-CDMA

14  capability."   *Id.* at 4.   In Mr. Stasik's expert report in this case, he opined that there is "no reason

15  in my opinion why the LTE standard should command different levels of royalties than W-

16  CDMA."   Hutnyan Decl. Ex. 17 (Stasik Expert Report, dated March 16, 2012, at ¶ 29).

17  Additionally, in addressing Motorola's identical 2.25% offer with regard to a license to GPRS

18  patents and LTE patents, Stasik also opines that "[i]t is reasonable to expect that most other

19  licensors will follow a similar practice offering the same headline royalty rate for GSM, GPRS,

20  UMTS, and LTE.   *Id.* at 30.   Mr. Stasik would have confirmed the relevance of LTE on the

21  stand.

22          Even if this evidence is not relevant to a reasonable royalty rate analysis under the

23  *Georgia-Pacific* factors, it is relevant to the reasonability of Samsung's July 25, 2011 license offer

24  to Apple, which Apple claims is outside industry norms and not FRAND.   The proffered

25  evidence regarding LTE rates demonstrates that Samsung's offer was well within accepted

26  industry practice.

27

28

L.   **Samsung Proffer of Evidence Regarding Its Defense Against Apple Utility Patents 7,469,381, 7,844,915 and 7,864,163.**

1.   **7,469,381 Patent**

(a)   **Blue Glow Design-Around**

If Samsung were permitted to submit evidence of the "blue glow" design around, this evidence would have rebutted and limited the scope of Apple's assertions of infringement. Moreover, it would have provided additional evidence of smaller damages because of the ease of the design around.   The design around displays a blue glow effect at the border of all electronic documents if a user attempts to scroll past the edge.

The excluded evidence further prevented Samsung from demonstrating the deficiencies in Apple's analysis regarding variations within similar versions of Android.   The excluded evidence would have demonstrated that, despite Apple's blanket statements that the Android source code analyzed by its expert was "representative" of an entire range of devices, different devices using the same version of Android can have different functionality with regard to viewing electronic documents.   Therefore, the excluded evidence would also have demonstrated the insufficiency of Apple's infringement analysis.

Additionally, the excluded evidence would have conserved judicial resources by simultaneously confirming the non-infringement of Samsung's design around during this trial rather than during any post-trial proceedings.

The inability to present evidence of the blue glow has substantially prejudiced Samsung's ability to present an accurate representation of its products functionality and falsely suggests to the jury that, in the event the jury finds past infringement, that infringement continues to the present.

(i)   **Physical Devices and Source Code**

Specifically, Samsung would have submitted the following physical device samples to demonstrate the blue glow functionality: Epic 4G (Android version 2.3.5) *See* Hutnyan Decl., Ex. 1 (Expert Report of Jeffrey Johnson, Ph.D. Regarding Non-Infringement of U.S. Patent No. 7,469,381 ("Johnson Rebuttal Report"); Galaxy Prevail (Android version 2.3.5) (*Id.*); Galaxy S 4G

(Android version 2.3.6) (*Id.*); Galaxy Tab 10.1 (4G LTE) (Android version 3.2) (AS236, JX 1038); and any physical device samples Samsung discovered upon inspection that contained blue glow.    Samsung would also have created videos based on these physical device samples. Moreover, Samsung would have submitted blue glow source code from the following devices Galaxy Tab 10.1, Galaxy S II, Exhibit 4G, Epic 4G, including SAMNDCA-C00000613-1391; SAMNDCA-C00001450-1526; SAMNDCA-C00001528-1908; SAMNDCA-C00001911-2265; SAMNDCA-C00002358-2476; SAMNDCA-C00002481-2529; SAMNDCA-C00002559-2899; SAMNDCA-C00002901-2975; SAMNDCA-C00003054-3555; SAMNDCA-C00003597-4086; SAMNDCA-C00004088-4416; SAMNDCA-C00004451-4524; SAMNDCA-C00007811-8031. Hutnyan Decl., Ex. 2 (Samsung blue glow source code).

In addition, expert Dr. Jeffrey Johnson would have testified to the non-infringement and ease of implementation relating to blue glow as outlined in his April 16, 2012 expert report. Hutnyan Decl., Ex. 1 (Expert Report of Jeffrey Johnson, Ph.D. Regarding Non-Infringement of U.S. Patent No. 7,469,381, pp. 21-25 ¶¶ 63-71, pp. 27-29 ¶¶ 74-75, pp. 40-41 ¶¶ 123-127; Expert Report of Jeffrey Johnson, Ph.D. Regarding Non-Infringement of U.S. Patent No. 7,469,381, Ex. 6; Expert Report of Jeffrey Johnson, Ph.D. Regarding Non-Infringement of U.S. Patent No. 7,469,381, Ex. 7; Expert Report of Jeffrey Johnson, Ph.D. Regarding Non-Infringement of U.S. Patent No. 7,469,381, Ex. 10).    *See also* Hutnyan Decl., Ex. 3 (Depo. Tr. of J. Johnson 4/26/2012 at 54:9-60:22; 56:13-57:24; 59:16-60:22; 64:2-10; 69:25-70:16; 132:20-134:9; 149:7-19; 203:25-204:12; 222:1-225:14).

Samsung would have submitted the following physical device samples to demonstrate the differing functionality even within like versions of the Android operating system: Galaxy S i9000 (Android version 2.3.4) (Declaration of Jeffrey Johnson in Support of Samsung's Motion to Strike Expert Testimony Based on Undisclosed Facts and Theories (Dkt. 934-6)); Galaxy S II SGH-I777 (Android version 2.3.4) (Dkt. 934-6).

(ii)   **Fact Witnesses**

Samsung would also have offered fact witnesses Ioi Lam, Wookyun Kho, Sun Young Yi and Jaewoo Park regarding the implementation of blue glow.   *See* Hutnyan Decl., Exs. 4, 5, 6, and 7 (Depo. Tr. of W. Kho 1/12/12 at 119:16-121:19; Depo. Tr. of I. Lam 3/8/12 at 116:24-118:16; Depo. Tr. of W. Kho 3/4/12 at 200:23-211:16; Depo. Tr. of S. Yi 2/8/12 at 111:25-113:4).)

Ioi Lam would have testified that he has seen versions of Android that indicate the end of a page by stopping the page with no effect, whereas other versions indicate the same by displaying either a blue or an orange glow at the edge of the page.   *See* Hutnyan Decl., Ex. 5 (Depo. Tr. of I. Lam. 3/8/12 at 116:24-118:16.

Wookyun Kho would have testified that the bounce effect in some Samsung projects had been replaced with the blue glow effect and was still referred to internally as the "bounce effect" despite the change.   *See* Hutnyan Decl., Ex. 4 (Depo. Tr. of W. Kho 1/12/12 at 119:16-120:5). He also would have testified that he was personally involved in writing software for the blue glow effect and that the Samsung Effect team began working on the blue glow effect before the Galaxy Nexus was publicly sold in 2010.   (*Id.* at 120:6-4).   Further, Mr. Kho would have testified that the edge glow effect was contained in the Android Gingerbread native code.   (*Id.* at 12-19.)   Mr. Kho would have also testified about the "EdgeGlow" effect that was originally created by Google. *See* Hutnyan Decl., Ex. 6 (Depo. Tr. of W. Kho 3/4/12 at 203:1-7).

Sun Young Yi similarly would have testified that she was aware of the blue glow design around and that the feature had been included in Samsung phones.   *See* Hutnyan Decl., Ex. 7 (Depo. Tr. of S. Yi 2/8/12 at 111:25-113:4).)

(iii)   **Interrogatory Responses**

If permitted, Samsung would have submitted Samsung's Supplemental Responses to Apple's Interrogatory No. 16, 3/8/2012.   *See* (Hutnyan Decl., Ex. 8 (Samsung's Supplemental Responses to Apple's Interrogatory No. 16 dated 3/8/2012).)   The Supplemental Responses to Apple's Interrogatory No. 16 state that the blue glow, edge glow and yellow glow effects are

1   possible design arounds for the '381 patent and identify blue glow source code produced by

2   Samsung on January 23, 2012, the date of the design around implementation, and the Samsung

3   employees responsible for implementing the design around – Wookyun Kho, Kihyung Nam,

4   Dooju Byu, Jaegwan Shin and Seunghwan Han.   *Id.*

6                       (iv)   **Video of Blue Glow**

7          Samsung further would have played, and sought to have admitted into evidence, PX66

8   (plaintiff's demonstrative submitted for Karan Singh) which contains a video that demonstrates

9   the blue glow functionality implemented in released Samsung devices.   *See* Hutnyan Decl., Ex. 9

10  (PX66).)   Samsung also would have played the original and complete version of DX2557 which

11  is a video of Joint Exhibit 1038 which contains the blue glow design around.   *See* Hutnyan Decl.,

12  Ex. 10 (DX2557).

14                      (b)   **Criticism of Apple's Expert Witness**

15         If permitted, Samsung would also have put into evidence the criticism of Apple's expert

16  witness, Ravin Balakrishnan Ph.D., in the 337-TA-750 investigation between Motorola and Apple

17  before the International Trade Commission.   *See* Hutnyan Decl., Ex. 11 (Inv. No. 337-TA-750

18  Initial Determination at 159).)   In his Jan. 13, 2012 Initial Determination, Administrative Law

19  Judge Essex noted that Dr. Balakrishnan's opinion "is inconsistent" and that "it is also difficult to

20  reconcile [his] testimony . . . with his earlier testimony . . . ." (*Id.*)   The ALJ determined that

21  these inconsistencies "undermine[d] Dr. Balakrishnan's credibility" and led the ALJ "to give less

22  weigh to [Dr. Balakrishnan's] testimony because it appears to offer one opinion to defeat

23  indefiniteness and another to fend off anticipation."   (*Id.*).

24         The inability to properly impeach Dr. Balakrishnan regarding his prior inconsistencies has

25  substantially prejudiced Samsung by preventing the jury from accurately assessing the reliability

26  of Dr. Balakrishnan's testimony and his methods.

27

28

1

(c)     **U.S. Patent No. 6,498,590**

2          If permitted, Samsung would have used U.S. Patent No. 6,498,590 ('590 patent) (DX2649)

3  to show the '590 patent inventors' beliefs that the DiamondTouch screen was a touchscreen and

4  not merely a touch-sensitive surface as proper impeachment evidence.    *See* Hutnyan Decl., Ex.

5  12 (DX2649).    The plain language of the '590 patent demonstrates that the patentees viewed the

6  claimed screen to be a touchscreen.    (*See id*. at Fig. 1; col. 1:10-29; col. 2:34-39).    The '590

7  patent also makes clear that the claimed touchscreen may be resistive, capacitive, acoustic or

8  infrared.    (*Id*. at col. 1:16-17).    This evidence would have directly rebutted Apple's argument

9  that the DiamondTouch prior art device did not contain a touchscreen as required by the claims of

10  the '381 patent.

11          The inability to impeach Apple's argument regarding whether the display on the

12  DiamondTouch system is a "touchscreen" has substantially prejudiced Samsung by preventing a

13  complete and accurate rebuttal of Apple's assertions. The patent demonstrates the inventor's and

14  the patent office's view that the claimed device – the DiamondTouch system – contains a

15  touchscreen.

16          Moreover, Samsung would have used this document to rebut Apple's argument that the

17  touchscreen display is not integrated with the "data processing system."    The patent refers to

18  DiamondTouch as a touchscreen system.

19

20

(d)     **Order Granting Request for Ex Parte Reexamination**

21          If permitted, Samsung would have used DX2652, the Order Granting Request for Ex Parte

22  Reexamination of the '381 patent to show the existence of a substantial question regarding the

23  validity of at least claim 1 and likely claims 2-20 which had not been decided in a previous

24  examination.    *See* Hutnyan Decl., Ex. 11 (DX2652.011).    The Court's refusal to allow DX2652

25  into evidence has substantially prejudiced Samsung by preventing the jury from properly

26  evaluating the patent office's opinions regarding the validity of the '381 patent.

27

28

1          2.      **7,844,915 Patent**

2              (a)      **U.S. Patent No. 6,498,590**

3          If permitted, Samsung would have used U.S. Patent No. 6,498,590 ('590 patent) (DX2649)

4    to show the '590 patent inventors' beliefs that the DiamondTouch screen was a touchscreen and

5    not merely a touch-sensitive surface.   *See* Hutnyan Decl., Ex. 12 (DX2649).    The plain language

6    of the '590 patent demonstrates that the patentees viewed the claimed screen to be a touchscreen.

7    *See id*. at Fig. 1; col. 1:10-29; col. 2:34-39.    The '590 patent also makes clear that the claimed

8    touchscreen may be resistive, capacitive, acoustic or infrared.    *Id*. at col. 1:16-17.    This evidence

9    would have directly rebutted Apple's argument that the DiamondTouch prior art device did not

10   contain a touchscreen as required by the claims of the '915 patent.

11         The inability to impeach Apple's argument regarding whether the display on the

12   DiamondTouch system is a "touchscreen" or "integrated" has substantially prejudiced Samsung by

13   preventing a complete and accurate rebuttal of Apple's assertions. The patent demonstrates the

14   inventor's and the patent office's view that the claimed device – the DiamondTouch system –

15   contains a touchscreen.

16

17         3.      **7,864,163 Patent**

18             (a)      **Design-Around**

19         If Samsung were permitted to submit evidence of the '163 patent's design arounds, this

20   evidence would have rebutted and limited the scope of Apple's assertions of infringement.

21   Moreover, it would have provided additional evidence of smaller damages because of the ease of

22   the design around.

23         The excluded evidence further prevented Samsung from demonstrating the deficiencies in

24   Apple's analysis regarding variations within similar versions of Android.    The excluded evidence

25   would have demonstrated that, despite Apple's blanket statements that the Android source code

26   analyzed by its expert was "representative" of an entire range of devices, different devices using

27   the same version of Android can have different functionality with regard to viewing electronic

28

1   documents.    Therefore, the excluded evidence would also have demonstrated the insufficiency of

2   Apple's infringement analysis.

3         Additionally, the excluded evidence would have conserved judicial resources by

4   simultaneously confirming the non-infringement of Samsung's design around during this trial

5   rather than during any post-trial proceedings.

6         The inability to present evidence regarding the possible '163 design arounds has

7   substantially prejudiced Samsung's ability to present an accurate representation of its products

8   functionality and falsely suggests to the jury that, in the event the jury finds past infringement, that

9   infringement continues to the present.

10         If permitted, Samsung would have submitted Samsung's Supplemental Responses to

11   Apple's Interrogatory No. 16, 3/8/2012.    *See* Hutnyan Decl., Ex. 8 (Samsung's Supplemental

12   Responses to Apple's Interrogatory No. 16 dated 3/8/2012).    The Supplemental Responses to

13   Apple's Interrogatory No. 16 describe how the '163 patent may be designed around by not

14   enlarging or translating a web page to substantially center a first box, not expanding the first box

15   so that the width of the first box is substantially the same as the width of the touch screen display,

16   not resizing text in an enlarged first box to meet or exceed a predetermined minimum text size on

17   the touch screen display, and not translating a web page so as to substantially center a second box

18   on the touch screen display while a first box is enlarged.    *Id.* at 8.    Samsung's Interrogatory

19   Responses further would have described how the '163 patent may be designed around when, upon

20   a "second" gesture from the user, either (1) the structured electronic document returns to its

21   original size; and/or (2) no further actions are performed.    *Id.*    This evidence further states that

22   Samsung has modified or is modifying the functionality of its products including its Galaxy Attain

23   4G, Galaxy Tab 10.1, Epic 4G, Galaxy S II Epic 4G Touch, and Galaxy S II Skyrocket devices.

24   *Id.*

25

26

27

28

1   DATED: August 21, 2012          QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP
2

3                                   By  /s/ Victoria F. Maroulis
                                       Charles K. Verhoeven
4                                      Victoria F. Maroulis
                                       Kevin P.B. Johnson
5                                      Michael T. Zeller
                                       Attorneys for SAMSUNG ELECTRONICS
6                                      CO., LTD., SAMSUNG ELECTRONICS
                                       AMERICA, INC., and SAMSUNG
7                                      TELECOMMUNICATIONS AMERICA, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28