# EXHIBIT 3

Highly Confidential - Attorneys' Eyes Only

Page 1

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    SAN JOSE DIVISION
4
5   APPLE INC., a California corporation,
6
              Plaintiff,
7
    vs.                                  CASE NO.  11-cv-01846-LHK
8
    SAMSUNG ELECTRONICS CO.,
9   LTD., a Korean business entity; SAMSUNG ELECTRONICS
10  AMERICA,INC., a New York corporation; SAMSUNG
11  TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited
12  liability company,
13            Defendants.
    _____/
14
15
16       H I G H L Y   C O N F I D E N T I A L
17       A T T O R N E Y S'   E Y E S   O N L Y
18
19    VIDEOTAPED DEPOSITION OF JEFFREY JOHNSON, Ph.D.
20          REDWOOD SHORES, CALIFORNIA
21            THURSDAY, April 26, 2012
22
23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR
24  CSR LICENSE NO. 9830
25  JOB NO. 49051

Page 2

```
 1         THURSDAY, APRIL 26, 2012
 2              9:17 A.M.
 3
 4
 5
 6    VIDEOTAPED DEPOSITION OF JEFFREY JOHNSON,
 7  Ph.D., taken at QUINN EMANUEL URQHART &
 8  SULLIVAN 555 Twin Dolphin Drive,
 9  Redwood Shores, California, pursuant to
10  Notice, before me, ANDREA M. IGNACIO HOWARD,
11  CLR, CCRR, RPR, CSR License No. 9830.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3
 4      FOR APPLE INC.:
 5      MORRISON & FOERSTER
 6      By:  DEOK KEUN MATTHEW AHN, Esq.
 7      425 Market Street
 8      San Francisco, California 94105
 9
10
11
12
13      FOR SAMSUNG ELECTRONICS CO. LTD:
14      QUINN EMANUEL URQUHART & SULLIVAN
15      By:  MARK TUNG, Esq.
16      555 Twin Dolphin Drive
17      Redwood Shores, California 94065
18
19
20
21
22      ALSO PRESENT:  Pete Sais, Videographer
23
               ---oOo---
24
25
```

Page 4

```
 1       SAN FRANCISCO, CALIFORNIA       08:37
 2       THURSDAY, APRIL 26, 2012        08:38
 3            9:17 A.M.                  08:38
 4                                       08:38
 5                                       08:38
 6                                       08:38
 7       THE VIDEOGRAPHER:  Good morning.  08:48
 8       This is the start of disc labeled No. 1 in  09:15
 9  the videotaped deposition of Jeffrey Johnson.  In the  09:15
10  matter of Apple, Inc., versus Samsung Electronics  09:15
11  Company Limited, et al.              09:16
12       In the United States District Court, Northern  09:16
13  District of California.  Case No. 11-CV-01846 LHK.  09:16
14       This deposition is being held at 425 Market  09:16
15  Street in San Francisco, California on April 26, 2012,  09:16
16  at approximately 9:17 a.m.           09:16
17       My name is Pete Sais from TSG Reporting,  09:16
18  Inc., and I am the legal video specialist.  09:16
19       The court reporter is Andrea Ignacio, in  09:16
20  association with TSG Reporting.      09:16
21       Will counsel please introduce yourselves, and  09:16
22  the court reporter can swear in the witness, and we  09:16
23  can proceed.                         09:16
24       MR. AHN:  Matthew Ahn of Morrison & Foerster  09:16
25  on behalf of Apple, Inc.             09:16
```

Page 5

```
 1       MR. TUNG:  Mark Tung from Quinn Emanuel for  09:16
 2  Samsung, and with me is Aileen Kim.  09:16
 3
 4            JEFFREY JOHNSON,
 5       having been sworn as a witness
 6       by the Certified Shorthand Reporter,
 7          testified as follows:
 8
 9       EXAMINATION BY MR. AHN              09:17
10       MR. AHN:  Good morning, Dr. Johnson.  09:17
11       THE WITNESS:  Good morning.         09:17
12       MR. AHN:  We've already met off the record,  09:17
13  but I just want to introduce myself again.  My name is  09:17
14  Matthew Ahn.  I'm an attorney for Morrison & Foerster,  09:17
15  representing Apple in this action.  I'm just going to  09:17
16  ask you a few questions -- actually, probably more  09:17
17  than a few questions -- about the expert report that  09:17
18  you submitted for this case.         09:17
19    Q  I believe you were previously deposed in this  09:17
20  action approximately eight months ago; is that right?  09:17
21    A  In October.                       09:17
22    Q  In October.  About six months ago?  09:17
23    A  Uh-huh.                           09:17
24    Q  Okay.  So the same basic rules are going to  09:17
25  apply.  I'm going to ask you some questions.  Your  09:17
```

Page 6

1  counsel may object every now and then.  You should    09:17
2  just wait until he gets a chance to do so.  And unless  09:17
3  he instructs you not to answer a question, you should  09:17
4  go ahead and respond to the questions that I ask you;  09:17
5  is that fair?                                           09:17
6     A   Yes.                                             09:17
7     Q   Is there any reason that you can't give full    09:17
8  and accurate testimony today?                           09:17
9     A   No.                                              09:17
10    Q   I understand that you are being paid a          09:17
11 consulting rate of approximately $250 an hour for work  09:17
12 that you do that is not under oath?                     09:17
13    A   Correct.                                         09:18
14    Q   And then while you are testifying, it's $350    09:18
15 an hour?                                                09:18
16    A   Yes.                                             09:18
17    Q   Approximately how much have you billed          09:18
18 Samsung in connection with your work on this case?      09:18
19    A   Well, let's see.  I don't -- I don't know the   09:18
20 exact amount.  But there was a fair amount of work     09:18
21 leading up to the deposition in October, so I'd say    09:18
22 maybe 50 or 60 hours there, and then maybe another 20  09:18
23 or 30 so far.  But actually, you asked how much I've   09:18
24 billed IMS Expert Services for this.  And I haven't    09:18
25 yet billed them for anything on this latest round of    09:18

Page 7

1  work.                                                   09:18
2     Q   Sure.                                            09:18
3        Let me try it this way, then:  Through today,    09:18
4  how many -- approximately how many hours do you expect  09:18
5  to bill in connection with your work for this case?    09:18
6     A   Through today, I'd say probably 70, 80, 90,     09:19
7  something like that.                                    09:19
8     Q   And about half of that would be at your $250    09:19
9  rate, and about the other half would be at the $350    09:19
10 rate?                                                   09:19
11    A   No.  Most of it is at the $250 rate because,    09:19
12 you know, I was deposed.  That was the only other time  09:19
13 that I had been under oath until now.                   09:19
14       I was -- I prepared for testifying at the        09:19
15 preliminary injunction hearing, but I wasn't called to  09:19
16 testify, so I wasn't under oath then.                   09:19
17    Q   I understand.                                   09:19
18       Now, you had previously done some consulting    09:19
19 work for Samsung Information Systems America in         09:19
20 San Jose; is that right?                                09:19
21    A   Yes.  Correct.                                  09:19
22    Q   And I think there were two separate             09:19
23 engagements?                                            09:19
24    A   Yes.                                            09:19
25    Q   Have you done any more work for Samsung since  09:19

Page 8

1  then?                                                   09:19
2     A   No.                                              09:19
3     Q   I want to ask you a bit about the second        09:19
4  engagement, which I think dealt with some type of      09:20
5  consumer analysis relating to the Samsung BlackJack    09:20
6  product.                                                09:20
7     A   Yes.                                            09:20
8     Q   Is that accurate?                                09:20
9     A   Yes.                                            09:20
10    Q   Okay.  And I believe specifically, you were    09:20
11 asking users about kind of how they deal with          09:20
12 smartphones; is that correct?                           09:20
13       MR. TUNG:  Objection; vague.                    09:20
14       THE WITNESS:  Users were -- users were given    09:20
15 a Samsung BlackJack phone, about a dozen users, ten or  09:20
16 12, and Samsung was monitoring, with the -- with the   09:20
17 users' consent, the use of applications on the phone.   09:20
18 It wasn't monitoring what was -- what they were using  09:20
19 the applications for, but it was just which            09:20
20 applications were being used at what time.  It's       09:20
21 approximately the same information as is on the        09:20
22 billing statement.                                      09:20
23       And -- but in addition to that monitoring, I    09:20
24 and my colleague, who would help me on that            09:20
25 engagement, interviewed the participants at the        09:20

Page 9

1  beginning, the middle and the end of the six-month    09:21
2  trial period and asked them, you know, what were they  09:21
3  using the phone for, what did they like, did they not  09:21
4  like, what -- you know, what were some of the features  09:21
5  of the phone that they valued and which -- what were   09:21
6  some of the features that they didn't value.           09:21
7        MR. AHN:  Q.  Did you yourself use the         09:21
8  BlackJack?                                             09:21
9     A   No.                                             09:21
10    Q   Did you ever give it a shot to see how it      09:21
11 worked, how it functioned?                              09:21
12    A   Well, I played with one, you know, at the      09:21
13 beginning of the study just to see what a BlackJack    09:21
14 was and what it could do.                               09:21
15    Q   What did you think about the BlackJack's user  09:21
16 interface?                                              09:21
17       MR. TUNG:  Objection; vague.                    09:21
18       THE WITNESS:  All I know is that -- and it     09:21
19 had certain applications and that you could start the  09:21
20 applications.  I don't -- I don't really have          09:21
21 strong -- strong feelings about the BlackJack user    09:22
22 interface.                                              09:22
23       MR. AHN:  Q.  Do you remember thinking this    09:22
24 is bad or this is good, I like this, I don't like     09:22
25 this; anything like that?                               09:22

Page 54

1    MR. TUNG: Objection; vague.                10:35
2    THE WITNESS: I was -- I was asking him     10:35
3  functions about -- questions about the list  10:35
4  functionality because that's what he implemented, and 10:35
5  we were asking questions about the behavior of the 10:35
6  lists under certain -- you know, which -- which -- 10:35
7  which versions of the software the list functionality 10:35
8  did exhibit certain behaviors.                10:35
9    MR. AHN: Q. What were the specific issues 10:36
10 that you wanted to discuss with Mr. Kho? Was it just 10:36
11 the general operation of the contacts list, or were 10:36
12 there any specific cases or examples that you wanted 10:36
13 to discuss with him?                           10:36
14    MR. TUNG: Objection; vague.                10:36
15    THE WITNESS: It was the general behavior, 10:36
16 the overall behavior of the list control that's used 10:36
17 in the contacts application.                   10:36
18    There were also questions about the --    10:36
19 certain features, such as, for example, the -- the 10:36
20 blue glow and how that -- how that worked, and how the 10:36
21 implementation -- how -- how the implementation -- how 10:37
22 the implementation went or how -- how -- what -- what 10:37
23 it took in order to implement the blue glow, for 10:37
24 example.                                        10:37
25    MR. AHN: Q. What is blue glow?             10:37

Page 55

1    A  Blue glow is a means of showing the -- the 10:37
2  user that they've reached the end of the document 10:37
3  that's an alternative to revealing the area beyond the 10:37
4  end of the document and then bouncing back. So the 10:37
5  blue glow is a -- is a blueish-shaded glow that 10:37
6  appears at the edge of the document that the user has 10:37
7  reached.                                         10:37
8    Q  In your opinion, that's an alternative to 10:38
9  what I'm going to refer to as the '381's functionality 10:38
10 of showing an area beyond the edge and then snapping 10:38
11 back?                                            10:38
12   A  Yes.                                       10:38
13   Q  Do you think it's a good alternative?     10:38
14    MR. TUNG: Objection; vague.                 10:38
15    THE WITNESS: I think that it's -- I -- I   10:38
16 think that it's -- it's a workable alternative. I -- 10:38
17 and with my user interface designer hat on, it's -- 10:38
18 it's probably not as intuitive as the -- the bounce, 10:38
19 but it's certainly better than some other      10:38
20 alternatives.                                    10:38
21    MR. AHN: Q. Why is it not as intuitive as  10:38
22 the bounce?                                      10:38
23    MR. TUNG: Objection; vague.                 10:38
24    THE WITNESS: Well, because the user would  10:38
25 have to learn what the blue glow means.          10:38

Page 56

1    MR. AHN: Dr. Balakrishnan referred to some 10:39
2  user commentary that he had seen on the Internet 10:39
3  regarding the blue glow functionality, and I believe 10:39
4  he stated that many users were frustrated by it and 10:39
5  felt that it wasn't as good as the bounce or the snap 10:39
6  back functionality.                              10:39
7    Q  Do you agree with Dr. Balakrishnan?      10:39
8    A  Well, I haven't seen -- I didn't -- I -- I -- 10:39
9  I guess I don't dis -- agree or disagree with his -- 10:39
10 his conclusion because I haven't seen that Internet -- 10:39
11 those Internet discussions. I'm not aware of Internet 10:39
12 discussions about the -- the device.             10:39
13   Q  For the blue glow, you had mentioned that you 10:39
14 had discussed with Mr. Kho the implementation of that 10:39
15 feature; is that correct?                        10:40
16   A  Yes.                                       10:40
17   Q  Can you tell me what he told you in that 10:40
18 regard. Did he discuss just how it's implemented or 10:40
19 how long it took him to develop that functionality? 10:40
20   A  He did discuss those things.              10:40
21   Q  Okay. Let's take them in order.           10:40
22    Can you tell me about how it's implemented 10:40
23 inside of the contacts application.              10:40
24   A  What he said was that the -- that it     10:40
25 wasn't -- once they decided on what it -- what the 10:40

Page 57

1  behavior should -- sorry. Let me start over.    10:40
2    Once they decided what the behavior should  10:40
3  be -- that is, the blue glow -- implementing it was 10:40
4  not that difficult because what they decided to do was 10:40
5  to have the blue glow extend out from the edge the 10:40
6  same distance that the document would have pulled away 10:41
7  from the edge. And so although that calculation is a 10:41
8  complex calculation, they didn't have to redo that 10:41
9  calculation because it was already done.         10:41
10   Q  Why is that a complex calculation?        10:41
11    MR. TUNG: Objection; vague.                 10:41
12    THE WITNESS: I don't actually know why it's 10:41
13 a complex calculation, but he said that it was a 10:41
14 complex calculation. He -- apparently, there's some 10:41
15 function that's related to the distance that the user 10:41
16 has pulled his finger across the -- across the screen. 10:41
17 And in order to -- the document doesn't -- doesn't 10:41
18 follow necessarily the finger that -- that full -- 10:42
19 that full distance.                              10:42
20    And so -- and so the blue glow -- similarly, 10:42
21 the amount that it -- that it extends out from the 10:42
22 edge of the document is based on this complex   10:42
23 function, but he didn't explain to me what the complex 10:42
24 function is.                                     10:42
25    MR. AHN: Q. When you see the blue glow     10:42

Highly Confidential - Attorneys' Eyes Only

Page 58

1    itself, is that something that's overlaid on top of    10:42
2    the image?                                              10:42
3         MR. TUNG: Objection; vague.                        10:42
4         THE WITNESS: Yes.                                  10:42
5         MR. AHN: Q. How do you know that?                  10:42
6    A   Because I saw it.                                   10:42
7    Q   So it's not something that's, for lack of a         10:42
8    better way of describing it, becoming part of the       10:42
9    image, but it's just some type of layer that's over     10:42
10   the image?                                              10:42
11        MR. TUNG: Objection; vague.                        10:42
12        THE WITNESS: Again, all I know is that the         10:42
13   blue glow appears in the image. I don't know whether   10:43
14   it's implemented with layers because I didn't discuss  10:43
15   that with Mr. Kho.                                     10:43
16        MR. AHN: Q. Have you ever seen any source         10:43
17   code for the blue glow functionality?                  10:43
18   A   No.                                                10:43
19   Q   You mentioned that the blue glow itself            10:43
20   appears from the edge of the photograph; is that       10:43
21   right? Strike that.                                    10:43
22        You mentioned that the blue glow itself would     10:43
23   appear from the edge of, for example, the contacts     10:43
24   list inside the contacts application; is that right?   10:43
25        MR. TUNG: Objection; mischaracterizes             10:43

Page 59

1    testimony.                                             10:43
2         THE WITNESS: It would -- it would -- it           10:43
3    would appear from either the top or the bottom of the  10:43
4    list, depending on which -- if you reached the top, it 10:43
5    would appear from the top edge. If you reached the     10:43
6    bottom, it would appear from the bottom edge.          10:44
7         MR. AHN: Q. When you see the blue glow, are       10:44
8    you seeing something that's beyond the edge of the     10:44
9    contacts list?                                         10:44
10   A   No.                                                10:44
11   Q   What are you looking at, then?                     10:44
12   A   You're looking at the edge of the document or      10:44
13   the edge of the contact list in this case, and you're  10:44
14   looking at a blue glow that is superimposed over       10:44
15   the -- the document edge.                              10:44
16   Q   You mentioned that Mr. Kho stated that it was      10:44
17   not that difficult to implement the blue glow          10:44
18   functionality.                                         10:44
19        Did he give you a time frame for how long it      10:44
20   took them to design that functionality?                10:44
21   A   No, he did not give me a time frame.               10:44
22        What he said was that deciding -- given the       10:44
23   fact that there was a team of people working together  10:45
24   on -- on this, deciding what the behavior should be is 10:45
25   what took time. And then once they decided,            10:45

Page 60

1    implementing it did not take much time at all.         10:45
2    Q   But he --                                          10:45
3    A   So there were difference -- there were             10:45
4    differences of opinion on the team as to what the      10:45
5    desired behavior should be.                            10:45
6    Q   Did he tell you about any of those                 10:45
7    differences of opinion?                                10:45
8    A   No.                                                10:45
9    Q   And he didn't give you a specific time frame       10:45
10   for how long -- long it took to actually implement the 10:45
11   functionality; is that correct?                        10:45
12   A   Correct. He just said once they decided what       10:45
13   it should do, it was pretty easy to do.                10:45
14   Q   Do you agree with him on that?                     10:45
15        MR. TUNG: Objection; vague.                       10:45
16        THE WITNESS: I have no way of judging             10:45
17   whether he -- I just have to go by what he said. I     10:46
18   don't -- I don't -- I didn't look at the source code.  10:46
19   I mean, he -- what he said was the blue glow extends   10:46
20   out the same distance that the document would have     10:46
21   pulled away from the edge. And so to me, it makes      10:46
22   sense that that wouldn't be difficult.                 10:46
23        MR. AHN: Q. Is there anything else that you       10:46
24   discussed with Mr. Kho?                                10:46
25   A   Yes. I remember asking him questions about         10:46

Page 61

1    whether there were any situations in which the         10:46
2    contacts list moves in a two-dimensional way.          10:46
3    Q   What was his response?                             10:46
4    A   Well, he said several times during the course      10:46
5    of the conversation that he did not implement the      10:47
6    contacts application. He only implemented the list     10:47
7    functionality, which has built into it a number of     10:47
8    different possible behaviors. But the contacts         10:47
9    application doesn't make use of everything that the    10:47
10   list functionality can do.                             10:47
11        One thing that we had noted before we talked      10:47
12   to him was that it is possible to take specific list   10:47
13   items -- in certain versions of the software, it's     10:47
14   possible to take specific list items and move them     10:47
15   left to right, but the list as a whole only moves up   10:47
16   and down.                                              10:47
17        So we were asking him about other possible        10:47
18   situations in which there could be two-dimensional     10:47
19   motion.                                                10:47
20   Q   Based on your own examination of the Samsung       10:47
21   products, were there any instances in which you could  10:47
22   have the contacts list move in two dimensions?         10:47
23   A   The list as a whole -- no.                         10:48
24        As I said, we did notice situations in which      10:48
25   specific items could be moved left or right.           10:48

Page 62

1   Q   But the list as a whole, it could only be                10:48
2   moved in one dimension; is that correct?                     10:48
3   A   Correct.                                                 10:48
4   Q   I'd like to ask you about the next person who            10:48
5   is listed in your Exhibit 2.  It's Dooju Byun.  I'm          10:48
6   going to ask you the same series of questions.               10:48
7       When did you speak with Mr. Byun?                        10:48
8       MR. TUNG:  Is Dooju Byun listed?                         10:48
9       MR. AHN:  Yes.  It's the third bullet point              10:48
10  from the bottom of the first page of Exhibit 2.              10:48
11      MR. TUNG:  I believe that's a mistake.  It               10:48
12  should be Kihyung Nam, as listed in the report.              10:48
13      MR. AHN:  Q.  Dr. Johnson, is that accurate?             10:49
14  A   That's accurate.                                         10:49
15  Q   Okay.  So instead of Dooju Byun in your                  10:49
16  Exhibit 2 towards the bottom, that should be Kihyung         10:49
17  Nam?                                                         10:49
18  A   Yes.                                                     10:49
19  Q   When did you speak with Mr. Nam?                         10:49
20      Actually, before I ask you that, did you ever            10:49
21  speak with Dooju Byun?                                       10:49
22  A   No.                                                      10:49
23  Q   When did you speak with Ki Young Nam?                    10:49
24  A   It was either on that same Monday or on the              10:49
25  prior Sunday.                                                10:49

Page 63

1   Q   Who was present for that conversation?                   10:49
2   A   On this side, the same counsel.  On the other            10:49
3   side, I don't know.                                          10:49
4   Q   Do you recall how long the conversation was?             10:50
5   A   Less than half an hour.                                  10:50
6   Q   What did you discuss with Mr. Nam?                       10:50
7   A   Questions similar to the ones that we've                 10:50
8   already mentioned for the other applications.  So, you       10:50
9   know, general behavior, certain -- certain features,         10:50
10  which versions those features were in.                       10:50
11  Q   And you discussed the gallery application                10:50
12  with him; is that correct?                                   10:50
13  A   Yes.                                                     10:50
14  Q   Was this conversation interpreted?                       10:50
15  A   I'm going to say no, because I don't                     10:51
16  believe -- I think that there were times in some of          10:51
17  these conversations -- and unfortunately, I don't            10:51
18  remember which one -- there were times in some of            10:51
19  these conversations where the people in Korea had            10:51
20  trouble understanding what we were asking, and so then       10:51
21  either someone on their end or someone on our end had        10:51
22  to translate into Korean.  But for the most part, the        10:51
23  conversations were conducted in English.                     10:51
24      But there were some people we talked to who              10:51
25  were very fluent in English, and I just don't remember       10:51

Page 64

1   which one was which.                                         10:51
2   Q   What, in particular, about the gallery did               10:51
3   you discuss?                                                 10:51
4   A   Well, general behavior.  When -- mostly about            10:51
5   when one would be panning and reach an edge, either an       10:52
6   internal edge or an external edge, of the document,          10:52
7   and whether behavior was different when in zoomed-in         10:52
8   mode versus not zoomed-in mode, and then the existence       10:52
9   of certain features, as are certain things like hard         10:52
10  stop, blue glow, hold still.                                 10:52
11  Q   You mentioned both internal and external                 10:52
12  edges.  Can you tell me what you're talking about with       10:52
13  those terms in the context of the gallery application.       10:52
14  A   Well, the gallery is essentially a -- a --               10:52
15  a -- it's a collection of photographs, and so you're         10:52
16  looking at photographs.  And so you can view the             10:52
17  gallery as essentially a -- a film strip, if you will,       10:53
18  of -- of photographs.  And so you can pan from one           10:53
19  photograph to the other, and you can also pan across a       10:53
20  particular photograph.                                       10:53
21      And so when you go from one photograph to                10:53
22  another, that's an internal edge, what I would call an       10:53
23  internal edge.  It's -- it's an edge between the             10:53
24  photograph itself, which is an embedded document             10:53
25  inside the -- the main document, and then -- and the         10:53

Page 65

1   next photograph, which is the next electronic                10:53
2   document.                                                    10:53
3       So you have these photographs which are each             10:53
4   electronic documents, and then the whole thing is the        10:53
5   document that contains the photographs.                      10:54
6   Q   When you say "the whole thing," you mean the             10:54
7   entire gallery of all of the individual photographs?         10:54
8   A   Yes.                                                     10:54
9   Q   Do you consider that to be an electronic                 10:54
10  document?                                                    10:54
11  A   Yes.                                                     10:54
12  Q   And you also consider the individual                     10:54
13  photographs to be electronic documents?                      10:54
14  A   Yes.                                                     10:54
15  Q   What about a grouping of some of those                   10:54
16  individual photographs?  If you had the first four,          10:54
17  would you consider that a separate electronic                10:54
18  document?                                                    10:54
19  A   Well, I -- I wasn't asked to consider that               10:54
20  because there is no case in the gallery where you can        10:54
21  look at more than one -- you're looking basically at         10:54
22  one picture at a time or you're looking at a stack, I        10:54
23  think, of photos that's all of the photos in the --          10:54
24  but you can't -- you can't see the content of any            10:54
25  particular photo.                                            10:54

Highly Confidential - Attorneys' Eyes Only

Page 66

1    So I -- I -- I don't know. I haven't really    10:55
2    made an opinion about -- about that.    10:55
3    Q  If I simply said I want you to think about    10:55
4    the first four photographs as being a separate    10:55
5    electronic document, would that comport with your    10:55
6    understanding of an electronic document in the sense    10:55
7    of the photo gallery?    10:55
8        MR. TUNG:  Objection; incomplete hypothetical    10:55
9    and beyond the scope.    10:55
10       THE WITNESS:  You know, I haven't -- I'm    10:55
11   really -- I didn't make an opinion about that in my    10:55
12   report, and so I don't think I want to make up an    10:55
13   opinion on the fly about that.    10:55
14       MR. AHN:  Let me try it this way.    10:55
15   Q  Let's say there are just a total of four    10:55
16   photographs in the entire photo album. The first two    10:55
17   are pictures of Mr. Tung when he was in college, and    10:55
18   the second two are photographs of Mr. Tung while he    10:56
19   was in law school.    10:56
20       Would you consider the first two photographs    10:56
21   to be a separate electronic document from the second    10:56
22   two photographs?    10:56
23       MR. TUNG:  So same objections; beyond the    10:56
24   scope and incomplete hypothetical.    10:56
25       THE WITNESS:  I'm -- I'm really -- not really    10:56

Page 67

1    prepared to -- to comment on that.    10:56
2        The only -- I mean, the only case in which I    10:56
3    would -- you know, there -- it would depend -- the    10:56
4    answer would depend on a lot of things, like, for    10:56
5    example, whether someone can pull out those two    10:56
6    photographs as a unit or not.    10:56
7        MR. AHN:  Q.  What would make that possible?    10:56
8        MR. TUNG:  Same objections.    10:56
9        THE WITNESS:  Do you mean in terms of the    10:56
10   user interface? I don't know what you mean. What --    10:57
11   or in terms of the implementation of the software?    10:57
12   I'm not sure what you're asking, what would make it    10:57
13   possible.    10:57
14       MR. AHN:  Sure.    10:57
15   Q  You had mentioned that one thing that you'd    10:57
16   have to consider is whether someone can pull out those    10:57
17   two photographs as a unit. And I'm just trying to --    10:57
18   trying to figure out what you mean by that.    10:57
19       MR. TUNG:  So same -- same objections.    10:57
20       THE WITNESS:  Well, I could -- I could -- I    10:57
21   could -- I could imagine a photo album in which there    10:57
22   were sections, and some of the sections said, you    10:57
23   know, college years versus law school years, and then    10:57
24   there were photographs in each -- each one.    10:57
25       MR. AHN:  Q.  So it would depend on the    10:57

Page 68

1    person who is using the device to make that decision?    10:57
2        MR. TUNG:  Objection; mischaracterizes    10:57
3    testimony; beyond the scope; vague; incomplete    10:58
4    hypothetical.    10:58
5        THE WITNESS:  No. I think it would depend on    10:58
6    the designer of the application.    10:58
7        MR. AHN:  Q.  Can you explain what you mean    10:58
8    by that.    10:58
9        MR. TUNG:  Same objections.    10:58
10       THE WITNESS:  The -- the -- the application    10:58
11   is designed so that -- so that its contents can be    10:58
12   organized in certain ways. So, for example, in most    10:58
13   computer systems we have folders, and we can put    10:58
14   folders inside folders.    10:58
15       MR. AHN:  Q.  So let's try it this way:  If    10:58
16   you had a folder inside the gallery that said "photos    10:59
17   from college," and then there was another folder that    10:59
18   said "photos from law school," you would consider    10:59
19   those to be separate electronic documents; is that    10:59
20   correct?    10:59
21       MR. TUNG:  Same -- same objections.    10:59
22       THE WITNESS:  I would consider the folders to    10:59
23   be electronic documents, just as the photographs are    10:59
24   electronic documents.    10:59
25       MR. AHN:  Q.  And if you simply had an entire    10:59

Page 69

1    gallery full of images, and you looked at the first    10:59
2    column of that and said, "Well, the first column is    10:59
3    going to be my law school photographs; I consider that    10:59
4    to be a separate electronic document," would that make    10:59
5    sense to you?    10:59
6        MR. TUNG:  Objection; incomplete    10:59
7    hypothetical; beyond the scope; vague.    10:59
8        THE WITNESS:  Yeah, I -- I don't know.    10:59
9    That's a hard question to answer because -- because    10:59
10   regardless of what -- regardless of what the designer    10:59
11   does, sometimes the users have to make up -- they have    11:00
12   to use the device in such a way that allows them to do    11:00
13   things that the designer may not have thought of.    11:00
14       And so -- so, for example, I know from my own    11:00
15   case, when I'm putting together a slide show for my    11:00
16   friends, I'll make sure that I'll allot pictures for    11:00
17   certain -- certain subjects are first, and then other    11:00
18   ones follow.    11:00
19       So whether -- whether the photographs, let's    11:00
20   say, that describe the departure on my vacation are a    11:00
21   separate document from the photographs that describe    11:00
22   the -- that depict the return from my vacation are --    11:00
23   are separate documents, is sort of in the mind of me,    11:00
24   the user.    11:01
25       MR. AHN:  Q.  Did you discuss the blue glow    11:01

Highly Confidential - Attorneys' Eyes Only

Page 70

1  functionality in the gallery with Mr. Nam?  11:01
2    A  Probably.  I'm not sure -- I'm not sure I  11:01
3  remember whether we discussed blue glow with Mr. Nam.  11:01
4        The main person I remember discussing it with  11:01
5  was Mr. Kho, but I'm not -- I'm not sure.  11:01
6    Q  Do you know if the blue glow is implemented  11:01
7  the same way in the contacts application as it is in  11:01
8  the gallery application?  11:01
9    A  I don't know.  11:01
10   Q  And you don't recall if you had that specific  11:01
11 discussion with Mr. Nam regarding blue glow and the  11:01
12 gallery; correct?  11:01
13   A  Correct.  11:01
14   Q  Was there anything else that you remember  11:01
15 discussing with Mr. Nam?  11:02
16   A  Hold still.  11:02
17   Q  What do you mean by that?  11:02
18   A  The behavior of the gallery in which, when  11:02
19 you drag an image -- when -- first of all, you have to  11:02
20 go into zoomed-in mode.  So you're in zoomed-in mode,  11:02
21 looking at a picture magnified.  11:02
22       And when you move your finger slowly and pan  11:02
23 the picture and the edge of the document is -- the  11:02
24 edge of the photograph is reached and you let go, it  11:02
25 does not bounce back necessarily to the -- so that  11:02

Page 71

1  the -- the area beyond the edge is -- is no longer  11:02
2  displayed.  It doesn't necessarily bounce back.  11:03
3       It -- if you are moving your finger slowly  11:03
4  enough and you let go, it just stays where -- exactly  11:03
5  where it is.  11:03
6    Q  You just said that it does not bounce back  11:03
7  necessarily.  Does that mean in some instances --  11:03
8  instances it would and in some instances it wouldn't?  11:03
9    A  You have to be moving your finger very slowly  11:03
10 and then let go for it not to bounce back.  11:03
11   Q  What do you think of that functionality?  11:03
12      MR. TUNG:  Objection; vague.  11:03
13      MR. AHN:  And by "that functionality," I'm  11:03
14 referring to the hold still functionality.  11:03
15      MR. TUNG:  It's still -- still vague.  11:03
16      THE WITNESS:  I -- what I thought of it was  11:03
17 that it -- let's see.  11:03
18      It's hard to -- it's hard to make it happen.  11:03
19 So my -- my feeling was that it would -- it has a  11:04
20 certain -- it has a certain purpose.  There's a  11:04
21 certain purpose behind it, but one would have to know  11:04
22 that purpose in order to -- to do it because if you  11:04
23 move your finger too fast, it does bounce back.  11:04
24      MR. AHN:  Q.  What is the purpose of having  11:04
25 that functionality?  11:04

Page 72

1       MR. TUNG:  Objection; vague; beyond the  11:04
2  scope.  11:04
3       THE WITNESS:  Well, this -- this was a  11:04
4  purpose that was mainly just surmised by me, not by  11:04
5  asking Mr. Nam, which is that if you -- if you want to  11:04
6  see some aspect of a photograph that's near the edge,  11:04
7  and if you want to see it enlarged, then this -- this  11:04
8  helps you look at it and put it more in the center of  11:05
9  the screen.  11:05
10      If you -- if you didn't have that, then you  11:05
11 could only look at enlarged views of aspects or  11:05
12 objects in a photograph at the edge -- at the edges of  11:05
13 the screen.  11:05
14      MR. AHN:  Q.  And again, this is something  11:05
15 that you surmised on your own and not something that  11:05
16 Mr. Nam told you; correct?  11:05
17   A  Correct.  11:05
18   Q  Do you think it's a good idea to have this  11:05
19 feature in the photo gallery?  11:05
20      MR. TUNG:  Objection; vague and beyond the  11:05
21 scope.  11:05
22      THE WITNESS:  I don't know.  I was surprised  11:05
23 by it at first.  But I was -- I just came to the  11:05
24 conclusion that there -- there -- that there had to be  11:06
25 a reason for it because in my conversations with  11:06

Page 73

1  Mr. Nam, it was clear that it was -- it's not an  11:06
2  error.  It was put in there intentionally.  11:06
3       MR. AHN:  Q.  Did you ask him if it was a  11:06
4  software defect?  11:06
5    A  Yes.  11:06
6    Q  And he told you that it was intentionally  11:06
7  placed in; is that right?  11:06
8    A  Yes.  11:06
9    Q  What else did he say?  11:06
10   A  That's about it.  11:06
11      MR. TUNG:  Objection -- objection; vague.  11:06
12      THE WITNESS:  Sorry.  11:06
13      MR. AHN:  Q.  You mentioned that you were  11:06
14 surprised at first when you saw this functionality.  11:06
15 Why was that so?  11:06
16   A  Because I considered it to be an exception to  11:06
17 the -- the normal rule that it would bounce back.  11:06
18   Q  Prior to Mr. Nam telling you about it, had  11:06
19 you ever seen that functionality before?  11:07
20   A  Yes, I had seen it before.  I stumbled across  11:07
21 it, basically, you know, just moving the thing around,  11:07
22 and there were some times when it didn't bounce back.  11:07
23 And then I had to sort of try to figure out what I had  11:07
24 done to make it not bounce back.  11:07
25   Q  From a human/computer interface standpoint,  11:07

Page 74

1  do you think this is a desirable functionality?        11:07
2        MR. TUNG: Objection; vague and beyond the       11:07
3  scope.                                                 11:07
4        THE WITNESS: Well, as I said, it's -- it at     11:07
5  first surprised me, and I considered it an             11:07
6  inconsistency and a flaw. But I could see that it      11:07
7  would have some value, some purposes in some           11:07
8  situations.                                            11:07
9        MR. AHN: Q. Have you ever heard of              11:07
10 something -- strike that.                              11:07
11       Have you ever heard of a phenomenon called      11:08
12 desert fog in the field of user interfaces?            11:08
13 A  No.                                                 11:08
14 Q  Maybe there's some other terminology that you      11:08
15 use.                                                   11:08
16       But with the user interface, if a user can      11:08
17 navigate away from all content, essentially into       11:08
18 screen space where there is nothing, is there a        11:08
19 certain time or phrase that you use to describe that   11:08
20 experience?                                            11:08
21 A  I haven't heard that term.                          11:08
22       There's -- there's a similar situation that     11:08
23 I've come across many times in user interfaces which   11:08
24 is generally called tabula rasa, which is you start an 11:08
25 application that's supposedly about, let's say,        11:08

Page 75

1  photographs, and there are no photographs there. It's 11:08
2  just an empty screen. So we -- in user interface,     11:08
3  that's considered not good.                            11:09
4        But navigating fully off screen, I -- I         11:09
5  haven't heard a term for that before.                  11:09
6  Q  When you say "tabula rasa," could that be          11:09
7  interpreted as clean slate?                            11:09
8        MR. TUNG: Objection; vague.                     11:09
9        THE WITNESS: Yes, right, another word for it   11:09
10 could be clean slate.                                  11:09
11       MR. AHN: Q. And why would you consider that    11:09
12 not good?                                              11:09
13       MR. TUNG: Objection; vague and beyond the      11:09
14 scope.                                                 11:09
15       THE WITNESS: Well, the typical situation,      11:09
16 for example, is you start an application, and the      11:09
17 application is about something, let's say creating     11:09
18 documents or -- yeah. And the application comes up    11:09
19 and there are some menus, but there's blank space in  11:09
20 the middle. Users are often at a loss for what to do  11:09
21 next without some guidance.                            11:10
22       So I, as a designer, would tend to advocate    11:10
23 filling the middle of the -- filling the display with  11:10
24 some document, whether it was one that they created or 11:10
25 not. They could replace the content of that document  11:10

Page 76

1  if they wanted to.                                     11:10
2        MR. AHN: Q. Was there anything else that       11:10
3  you discussed with Mr. Nam?                            11:10
4  A  That's probably about it.                          11:10
5  Q  Let me move on to the last person that you        11:10
6  had a telephone conference with. In Exhibit 2 you     11:10
7  refer to Mr. Sehyun Kim, and he's also referenced in  11:10
8  the table on page 37 of your report.                   11:11
9  A  Yes.                                                11:11
10 Q  When did you speak with Mr. Kim?                   11:11
11 A  On that same Monday.                                11:11
12 Q  I understand that Mr. Kim is an employee of       11:11
13 ThinkFree, the software maker, and not of Samsung;    11:11
14 does that sound correct to you?                        11:11
15 A  Yes. In fact, I think he may have been an         11:11
16 employee of ThinkFree Office. I'm not sure he still   11:11
17 is.                                                    11:11
18 Q  At the time that you spoke with him?              11:11
19 A  Yes.                                                11:11
20 Q  I hope it's not in connection with this          11:11
21 litigation.                                            11:11
22       When you spoke with Mr. Kim, that was          11:11
23 approximately two Mondays ago or the Sunday before two 11:11
24 Mondays ago?                                           11:11
25 A  Yes.                                                11:11

Page 77

1  Q  Was that conversation interpreted?                11:11
2  A  No.                                                11:11
3  Q  And I'm assuming the -- it was the same         11:11
4  participants, Mr. Tung, as well as potentially some  11:11
5  Samsung counsel?                                      11:12
6  A  I don't recall who was on the other side.        11:12
7  Q  Do you recall approximately the number of      11:12
8  people who were on the phone?                         11:12
9  A  No. I -- I -- I don't know whether there was  11:12
10 anyone else with Sun Young Kim or not. I just don't  11:12
11 know. I don't recall anyone else on his side of the  11:12
12 phone, but I could be wrong.                          11:12
13 Q  Was this conversation also less than          11:12
14 30 minutes?                                           11:12
15 A  Yes. It was quite short.                         11:12
16 Q  What did you discuss with Mr. Kim?            11:12
17 A  The behavior of the ThinkFree Office pdf       11:12
18 viewer and how -- how it behaves in certain          11:12
19 situations, and also whether there are any differences 11:13
20 in its behavior in certain versions.                   11:13
21 Q  Let's discuss that last part first. Were    11:13
22 there any differences in its behavior in certain      11:13
23 versions that you discussed with Mr. Kim?              11:13
24 A  Well, in some cases the -- in some cases, it    11:13
25 scrolls vertically, and in some cases it scrolls     11:13

Highly Confidential - Attorneys' Eyes Only

Page 130

1  something displayed beyond the edge of the document.   13:38
2      MR. AHN:  Q.  And again, your opinion that   13:38
3  this is not an area beyond the edge is because it is   13:38
4  not directly next to the document?   13:38
5      A  Correct.   13:38
6      Q  Is there anything that is next to the   13:38
7  document when you move it partially off screen?   13:38
8      MR. TUNG:  Objection; vague.   13:38
9      THE WITNESS:  I don't -- I don't -- not   13:38
10 having reviewed that code or discussed that with the   13:38
11 engineer, I -- I don't really know.  I just assume   13:38
12 that there's -- there's transparency in the layer that   13:38
13 the document is in so that we can see the layer -- the   13:38
14 background layer.   13:38
15     MR. AHN:  Q.  Why does the area beyond the   13:38
16 edge need to be next to the electronic document?   13:38
17     MR. TUNG:  Objection; vague.   13:39
18     THE WITNESS:  I'm not sure what you're   13:39
19 asking.  What -- why -- for -- I mean, why for what?   13:39
20     MR. AHN:  Q.  Well, your opinion seems to be   13:39
21 that if something is displayed that's behind an   13:39
22 electronic document but was not previously visible, it   13:39
23 does not qualify as being beyond the edge of that   13:39
24 document when it becomes visible.  So it seems that   13:39
25 your opinion is that something has to be directly next   13:39

Page 131

1  to the electronic document in order to be beyond its   13:39
2  edge.   13:39
3      MR. TUNG:  Objection; mischaracterizes   13:39
4  testimony.   13:39
5      THE WITNESS:  The -- the elements of Claim 1   13:39
6  of the patent say that in response to an edge of the   13:39
7  screen -- the edge of the document being reached, an   13:39
8  area beyond the edge of the document is displayed.   13:39
9      So what that means to me is at the time in   13:40
10 which some -- the area -- the edge of the document is   13:40
11 reached, something -- some software does something to   13:40
12 display something.   13:40
13     And what the software is doing is moving the   13:40
14 document aside and letting -- allowing the -- in the   13:40
15 Samsung phones, the -- the Samsung devices, it's   13:40
16 moving the -- the document aside and allowing the   13:40
17 background to be seen.   13:40
18     And that background was set up at the   13:40
19 beginning of the application, not in -- in response to   13:40
20 reaching the edge of the document.   13:40
21     MR. AHN:  Q.  Is the background being   13:40
22 displayed when you can't see it?   13:40
23     A  It's not being -- it's not being -- it's not   13:41
24 visible to the user.  It's -- so in that sense, it's   13:41
25 not being displayed.   13:41

Page 132

1      Q  Is there anything else you recall about your   13:41
2  discussion with Sun Young Kim from ThinkFree?   13:41
3      A  I think I just mentioned two things.  One is   13:41
4  that -- no.  Well, all I can remember -- all I   13:41
5  remembered with my conversation with him is we just   13:41
6  discussed backgrounds.   13:41
7      And the other thing that I remembered was   13:41
8  that I have seen source code for that -- for that   13:41
9  application, which I wasn't sure I had seen before.   13:41
10     Q  Is that listed in the materials considered in   13:41
11 your expert report?   13:41
12     A  Well, let's see.  Whoops.  Wrong document.   13:41
13     I don't see it listed here.  I think that it   13:42
14 mentions in -- in the report that I viewed source   13:42
15 code.  Let's see.  ThinkFree Office.  Let me just look   13:42
16 here.  Materials considered.   13:43
17     Right now, I'm not finding where it -- it   13:43
18 mentions in here that I considered some soft -- some   13:43
19 of the source code for ThinkFree Office.   13:43
20     Q  Okay.  Let me ask you a little bit more about   13:43
21 the blue glow design-around that we previously   13:43
22 discussed.   13:44
23     A  Uh-huh.   13:44
24     Q  Do you know when that functionality was   13:44
25 implemented in Samsung's devices?   13:44

Page 133

1      A  Well, based on my conversations with the   13:44
2  Samsung engineers, it was implemented sometime in -- I   13:44
3  believe they said it was sometime in 2011, but I --   13:44
4  I'm not -- I'm not really sure.  I -- they didn't   13:44
5  mention a specific date.  They just talked about the   13:44
6  sort of time of the year.  I think it was early 2011.   13:44
7  I don't -- I'm not actually positive about that.   13:44
8      Q  You yourself have not seen the source code   13:44
9  for that functionality; is that correct?   13:44
10     A  That's correct.   13:45
11     Q  You also offered the opinion that this is not   13:45
12 a particularly complicated design-around, that it was   13:45
13 fairly easy to implement; do you recall that?   13:45
14     A  Yes.   13:45
15     Q  Would implementing that type of functionality   13:45
16 be something that was well known by people in the   13:45
17 field?   13:45
18     MR. TUNG:  Objection; vague.   13:45
19     THE WITNESS:  People in what field?   13:45
20     MR. AHN:  In the field of user interfaces,   13:45
21 human/computer interaction.   13:45
22     MR. TUNG:  Objection; vague.   13:45
23     THE WITNESS:  Well, as I said, the Samsung   13:45
24 engineers told me that it took them a while to figure   13:45
25 out on -- among their team what the -- what the design   13:45

Highly Confidential - Attorneys' Eyes Only

Page 134

1  should be. And then once they designed -- figured          13:45
2  that out, then they -- implementing it was not hard.       13:46
3       I don't think there was any -- from that,            13:46
4  I -- I am saying that I am -- I'm getting that             13:46
5  there's -- there wasn't sort of a preconceived idea of     13:46
6  what the design should be. And certainly, in my            13:46
7  experience before, I haven't seen that kind of a way       13:46
8  of indicating that you've reached the edge of a            13:46
9  document.                                                  13:46
10      MR. AHN: Let me turn now to the '381 patent          13:46
11 itself.                                                    13:46
12   Q  You previously testified that you had a              13:46
13 general understanding what the patent was about, and I    13:46
14 think you said that it offered visual feedback             13:46
15 regarding reaching the end of an electronic document;      13:46
16 is that accurate?                                          13:46
17   A  Yes. It's a patent about displaying -- yes.          13:46
18 It's giving users visual feedback when they reach the      13:47
19 edge of a -- edge of a document.                           13:47
20   Q  Do you know what problem the '381 patent was         13:47
21 trying to solve?                                           13:47
22      MR. TUNG: Objection; vague.                          13:47
23      THE WITNESS: Well, it says in the                    13:47
24 specification it was trying to solve -- or in the --       13:47
25 in the -- in the beginning of the patent, in the           13:47

Page 135

1  introduction, it says that it's trying to solve the       13:47
2  problem of the user knowing that they received --         13:47
3  reached the end of the document.                          13:47
4       MR. AHN: Q. Do you think that was an issue          13:47
5  prior to the '381 patent?                                 13:47
6    A  Yes.                                                 13:47
7    Q  Why?                                                 13:47
8    A  Because users would reach ends of documents          13:47
9  and need some feedback that they reached the end.         13:47
10   Q  Do you recall what types of feedback or lack         13:47
11 of feedback that existed prior to the '381 patent?         13:47
12      MR. TUNG: Objection; vague and beyond the           13:47
13 scope.                                                    13:47
14      THE WITNESS: Well, prior to the '381 patent,        13:47
15 I'm not sure. I mean, prior to bounce, there were --     13:48
16 there was -- there were user interfaces that did          13:48
17 nothing, that basically did a hard stop.                  13:48
18      There -- I don't know what other -- you know,       13:48
19 typically in a word processor, let's say Microsoft        13:48
20 Word, when you reach the end of the document, it          13:48
21 stops.                                                    13:48
22      But you weren't scrolling by dragging your          13:48
23 finger. You were scrolling by pulling a scroll bar on    13:48
24 the side of the screen, and that was usually in the       13:48
25 opposite direction that the document was moving. So      13:48

Page 136

1  there wasn't such a direct connection, sort of a          13:48
2  hand/eye coordination kind of a thing, connection.        13:48
3       So -- so in answer to your answer, before the       13:48
4  bounce became -- came into use, I don't know -- other    13:49
5  than hard stop, I don't know what other approaches        13:49
6  were used.                                                13:49
7       MR. AHN: Q. Is the hard stop a desirable            13:49
8  form of feedback?                                         13:49
9       MR. TUNG: Objection; vague; beyond the              13:49
10 scope.                                                    13:49
11      THE WITNESS: It has -- it has its                   13:49
12 disadvantages. Some of the disadvantages are that         13:49
13 maybe he -- you can't tell if your device has frozen,     13:49
14 but it was pretty standard for a very long time.          13:49
15      But usually there would be some other               13:49
16 indicator that you had reached the end besides the        13:49
17 fact that the document stopped; for example, the          13:49
18 position of the scroll bar.                               13:49
19      MR. AHN: Q. And, for example, if the scroll        13:50
20 bar were at the bottom, you would know that there's       13:50
21 nothing more to go to without necessarily having to       13:50
22 try to move the document; correct?                        13:50
23   A  Correct.                                             13:50
24      MR. AHN: I'm going to hand you what I'll            13:50
25 mark as Exhibit No. 1. Exhibit No. 1 was a document       13:50

Page 137

1  that was attached to Dr. Balakrishnan's opening           13:50
2  report. And I understand that you have reviewed these  13:50
3  in connection with reviewing his report.                 13:50
4       Can we go off the record for one second.           13:50
5       THE VIDEOGRAPHER: The time is 1:51 p.m., and       13:50
6  we are off the record.                                   13:50
7       (Recess taken.)                                     13:51
8       THE VIDEOGRAPHER: The time is 1:53 p.m., and       13:52
9  we are on the record.                                    13:52
10      (Document marked J. Johnson Exhibit 1              13:52
11      for identification.)                                13:52
12      MR. AHN: Dr. Johnson, I've handed you what         13:52
13 has been marked as Exhibit No. 1. Exhibit No. 1 is a    13:52
14 translation that was included as an exhibit to           13:52
15 Dr. Balakrishnan's opening report on infringement,       13:52
16 bearing the Bates Nos. SAMNDCA508318 through 508400,    13:52
17 and its excerpts in that Bates range.                    13:53
18      MR. TUNG: So was the translation previously        13:53
19 produced?                                                13:53
20      MR. AHN: Yes.                                      13:53
21   Q  Have you seen this document before,                 13:53
22 Dr. Johnson?                                             13:53
23   A  No.                                                 13:53
24   Q  I'll represent to you that this was included       13:53
25 with Dr. Balakrishnan's opening expert report. And I    13:53

Page 146

1   THE WITNESS: Yeah -- yeah, I'm not going to   14:04
2   speculate about what the motivation -- all I see is   14:04
3   that they said, "We need to provide a fun visual   14:04
4   effect because they do." And like I said, there are   14:04
5   other fun visual effects that you could provide.   14:05
6       MR. AHN: Q. So Dr. Johnson, I've seen a   14:05
7   number of papers that you've authored, as well as some   14:05
8   of the academic articles and books, and I think I've   14:05
9   seen things where you have side-by-side comparisons   14:05
10  and you say, "This form of visual feedback is more   14:05
11  effective than this other example here, and I would   14:05
12  suggest that as you design a user interface, you adopt   14:05
13  form A instead of form B."   14:05
14      Is that a fair representation of some of your   14:05
15  work?   14:05
16  A   I have done that.   14:05
17      MR. TUNG: Objection -- objection; vague.   14:05
18      THE WITNESS: Sorry.   14:05
19      In some of my writings, I have put user   14:05
20  interfaces side by side and showed that one -- or   14:05
21  described one as being better than the other.   14:05
22      MR. AHN: Looking at the page ending in '383   14:05
23  in Exhibit 1, does this appear to be the same type of   14:05
24  comparison suggesting the adoption of one form of   14:06
25  visual feedback over another?   14:06

Page 147

1       MR. TUNG: Objection; beyond the scope and   14:06
2   still calls for speculation.   14:06
3       THE WITNESS: This compares two user   14:06
4   interfaces, suggests that one of them is better than   14:06
5   the other, and then offers a design -- or direction   14:06
6   for improvement, which -- which is more general than a   14:06
7   direction to do the same thing as the iPhone does.   14:06
8       MR. AHN: Q. Based on your review of the   14:06
9   products that have been accused of infringement in   14:06
10  this case, have you seen a bounce effect on any of   14:06
11  those Samsung products?   14:06
12      MR. TUNG: Objection; vague and compound.   14:06
13      THE WITNESS: Yes. That is to say, some of   14:06
14  the phones that I have looked at have -- getting to   14:06
15  the edge of the document will execute a bounce.   14:07
16  Whether it's the bounce covered in the '381 patent is   14:07
17  another question.   14:07
18      MR. AHN: Q. Will you agree with me that the   14:07
19  bounce that you have seen on those Samsung products is   14:07
20  similar to the bounce that you see on the iPhone, for   14:07
21  example?   14:07
22      MR. TUNG: Objection; beyond the scope.   14:07
23      THE WITNESS: Well, the thing is, similarity   14:07
24  is relative, you know. The problem is, we're talking   14:07
25  about a patent case here, and so we're looking at   14:07

Page 148

1   things with a fine-toothed comb, whereas similarity   14:07
2   from the point of view of my grandmother might be a   14:07
3   different -- might be different.   14:07
4       To my grandmother, Microsoft Windows looks   14:07
5   the same whether it's displayed on a Macintosh or a   14:07
6   Windows PC, but not to me.   14:07
7       MR. AHN: Q. Well, let's try it this way:   14:08
8   To a person of ordinary skill in the art, would the   14:08
9   bounce feature that you have seen in Samsung's   14:08
10  products appear similar to the bounce feature that you   14:08
11  have seen in Apple's iPhone?   14:08
12      MR. TUNG: Objection; vague and beyond the   14:08
13  scope.   14:08
14      THE WITNESS: A lot of my report is -- is --   14:08
15  is spent describing ways in which the bounce in   14:08
16  Samsung -- some of Samsung's products is -- differs   14:08
17  from the -- this bounce described in the '381 patent.   14:08
18  So -- but you asked me to compare it against an   14:08
19  iPhone, and I can't really because I -- my experience   14:08
20  with the iPhone is limited.   14:08
21      MR. AHN: Any iOS device.   14:08
22      MR. TUNG: Objection; vague and beyond the   14:08
23  scope.   14:08
24      THE WITNESS: Still limited.   14:08
25      MR. AHN: Q. Sitting here today, do you have   14:08

Page 149

1   an opinion as to whether or not the bounce effect that   14:08
2   you've seen in an accused Samsung product is similar   14:08
3   to the bounce effect that you've seen in any Apple iOS   14:09
4   device?   14:09
5       MR. TUNG: Objection; vague and beyond the   14:09
6   scope.   14:09
7       THE WITNESS: The only Apple iOS devices I   14:09
8   know of are the iPod Touch, the iPhone and the iPad,   14:09
9   and I've -- I've seen bounce effects in those. I've   14:09
10  seen some bounce effects in some Samsung products.   14:09
11  I've also seen alternatives to bounce effects in   14:09
12  Samsung products.   14:09
13      Whether the Samsung products that have bounce   14:09
14  effects are similar or not, like -- as I said, in my   14:09
15  report I describe ways in which they are not similar,   14:09
16  such as hold still behavior and blue glow -- actually,   14:09
17  that's not a -- I wouldn't call that a bounce   14:10
18  effect -- so the hold still behavior and the snap   14:10
19  forward behavior.   14:10
20      MR. AHN: Q. So is your opinion that the two   14:10
21  bounce effects that I mentioned in my question, that   14:10
22  for the Samsung Accused Products and that for Apple's   14:10
23  iOS devices are not similar?   14:10
24      MR. TUNG: Same objections.   14:10
25      THE WITNESS: Well, again, you know,   14:10

Page 150

1  similarity when we're discussing questions of
2  infringement is a different issue from when we're
3  discussing, you know, do I move my finger in the same
4  way or not. And so -- so it's hard -- you know, it's
5  hard for me to answer that question.
6      MR. AHN: Let me try it this way. I
7  understand that in your report, you pointed out
8  various features or functionalities on the Samsung
9  devices that lead you to believe that many, if not all
10 of them, do not infringe any of the claims of the
11 '381 patent.
12     Q  Setting those specific issues aside, do you
13 believe that the bounce functionality that you have
14 seen on Samsung's devices is similar to the bounce
15 functionality on Apple iOS devices?
16     MR. TUNG: Objection; vague; compound and
17 beyond the scope.
18     THE WITNESS: I think I'm going to rephrase
19 your question and say -- say, have I seen bounce --
20 have I seen bounce behavior on Samsung devices? And
21 the answer to that is yes.
22     Whether it's similar or not is a question
23 of -- of, you know, a law, I think.
24     MR. AHN: I'm going to hand you what I have
25 marked as Exhibit No. 2. Exhibit No. 2 is another

Page 151

1  exhibit that was attached to Dr. Balakrishnan's
2  opening report. This is a translation with the Bates
3  label SAMNDCA176053 through '176125. And again, I
4  believe this is excerpts from that complete range.
5      (Document marked J. Johnson Exhibit 2
6      for identification.)
7      MR. AHN: Q. Have you ever seen Exhibit 2
8  before?
9      A  No.
10     Q  I just want to direct your attention to the
11 page ending in '125. It's actually the last page of
12 this document. There is a similar side-by-side
13 analysis here. At the top, it states:
14     "Issue 51. Browser."
15     Underneath that, it states:
16     "During topmost/bottommost/diagonal
17 movements, there is no springing bounce effect."
18     Do you see that?
19     A  Yes.
20     Q  On the left, it states "P5," and below that,
21 it states:
22     "During the topmost/bottommost/diagonal
23 movements, there is no bounce effect in the header and
24 menu sections."
25     On the right, there is a picture of an iPad 2

Page 152

1  screen capture, and it states:
2      "In the case of iPad 2, there is a fun
3  element from a natural bounce effect that follows hand
4  gestures."
5      Do you see that?
6      A  Yes.
7      Q  And actually, above that, next to the word
8  "iPad 2," it states "proposed improvement."
9      Do you see that as well?
10     A  I see that.
11     Q  What is your understanding of what's being
12 depicted here on the page ending in '125?
13     MR. TUNG: Objection; vague; beyond the scope
14 and lacks foundation.
15     THE WITNESS: Well, you know, I haven't seen
16 this before. I mean, usually when I do user interface
17 evaluations and describe -- discuss and evaluate
18 designs in detail, I -- you know, I spend a day or two
19 looking at -- at things before I make -- make
20 comments.
21     But your -- your -- so your question was,
22 what do I -- what was -- what was your question? What
23 is the purpose of this page?
24     MR. AHN: Q. Just what is your understanding
25 of what's being depicted here?

Page 153

1      MR. TUNG: So same objections.
2      THE WITNESS: I -- I -- they're depicting
3  the -- the -- the something P5. There's -- there's
4  something overlaying the labels that are supposed to
5  be here, but they're just depicting something on the
6  left.
7      And the iPad 2 fun element that follows hand
8  gestures on the -- on the right, I'm a little -- I'm a
9  little mystified by why it's necessary here to show
10 two edges being exposed as opposed to just one because
11 the -- but -- but they are showing two edges being
12 exposed.
13     MR. AHN: Q. What do you mean by you're
14 mystified by that?
15     A  Well, I mean, it would seem that if they were
16 just trying to make a point about bounce, then they
17 could do it by showing one edge and not complicate the
18 issue.
19     Q  Does it appear that what is being analyzed
20 here is the bounce effect on the iPad 2?
21     MR. TUNG: Objection; vague; incomplete
22 hypothetical; beyond the scope.
23     THE WITNESS: That's -- that appears to be
24 what is depicted. I can't really tell because this is
25 not a video. But it's showing the area beyond the

Page 154

1  edge of the page being displayed, and it says "natural    14:16
2  bounce effect." So I'm assuming that's what's being    14:16
3  depicted on the right.    14:16
4      I don't know what's being depicted on the    14:16
5  left. I don't know what the P5 stands for. It seems    14:16
6  like something is covered up there.    14:16
7      MR. AHN: Q. The yellow box that's sitting    14:17
8  on top of it, it states "bounce effect scheduled for    14:17
9  review"; do you see that?    14:17
10     A  Yes.    14:17
11     Q  And then in the upper right-hand corner,    14:17
12 there is an exclamation mark and the word "serious."    14:17
13 Do you see that?    14:17
14     A  I see that.    14:17
15     Q  Does this suggest to you that Samsung    14:17
16 considered the bounce effect as it exists on Apple's    14:17
17 devices to be something that needed to be studied and    14:17
18 that was a serious user interface issue?    14:17
19     MR. TUNG: Objection; mischaracterizes    14:17
20 document; vague; lacks foundation and beyond the    14:17
21 scope.    14:17
22     THE WITNESS: You know, the thing is, if    14:17
23 you -- if someone sits down and describes to me what    14:17
24 the document contains, then I might understand it.    14:17
25 But, you know, you put it in front of me, and then you    14:17

Page 155

1  ask me to say what I think it's saying.    14:17
2      Without -- without sort of -- some sort of    14:17
3  introduction into the -- you know, the content of    14:17
4  this -- this -- this document, you know, my feeling is    14:18
5  that you have some idea what this document is trying    14:18
6  to portray, and you're showing it to me.    14:18
7      But I'm -- I'm -- I'm like a new -- new user    14:18
8  coming to this for the first time, and so I -- I --    14:18
9  I'm not as -- I can't read as much into what I see as    14:18
10 perhaps you and others can.    14:18
11     MR. AHN: So I don't want to put any words in    14:18
12 your mouth. I'm just asking for your reactions.    14:18
13     Q  Based on seeing this document for the first    14:18
14 time today, what is your impression of what is being    14:18
15 depicted here?    14:18
16     MR. TUNG: So objection; it's vague; beyond    14:18
17 the scope.    14:18
18     THE WITNESS: You're showing me one page of a    14:18
19 multipage document. Are there -- are there other    14:18
20 pages of this document I should look at in order -- is    14:18
21 there some kind of description?    14:18
22     Usually, these kind of things have a -- an    14:18
23 executive summary or something in them to tell me --    14:19
24 tell me what the purpose was.    14:19
25     I don't see anything like that. "Evaluation    14:19

Page 156

1  summary." I see those words, but I'm just looking at    14:19
2  page -- the last page. I see two user interface    14:19
3  screen shots being compared side by side and the    14:19
4  words, in the case of the iPad 2:    14:19
5      "There's a fun element from a natural bounce    14:19
6  effect that follows hand gestures."    14:19
7      MR. AHN: It looks like we need to change the    14:19
8  tape. Let's go off the record.    14:19
9      THE VIDEOGRAPHER: This marks the end of    14:19
10 Volume I, Disc 2, in the deposition of Jeffrey    14:19
11 Johnson.    14:19
12     The time is 2:20 p.m., and we are off the    14:19
13 record.    14:19
14     (Recess taken.)    14:19
15     THE VIDEOGRAPHER: This marks the beginning    14:36
16 of Volume I, Disc 3 in the deposition of Jeffrey    14:36
17 Johnson.    14:36
18     The time is 2:37 p.m., and we are on the    14:36
19 record.    14:36
20     MR. AHN: Dr. Johnson, just before we went on    14:36
21 the break, we were discussing Exhibit 2, and you were    14:36
22 asking for any type of overview information that might    14:37
23 be part of this document.    14:37
24     I want to direct your attention to the page    14:37
25 ending in '055, either the third or the fourth page of    14:37

Page 157

1  the document. And there, as you noted, it states    14:37
2  there is an evaluation summary as well as a major    14:37
3  usability problem area.    14:37
4      Q  Is this the type of information that you were    14:37
5  asking about?    14:37
6      MR. TUNG: Objection; vague and beyond the    14:37
7  scope.    14:37
8      THE WITNESS: This is the sort of information    14:37
9  I was asking about. Usually in the documents that I    14:37
10 produce, there's an executive summary that sort of    14:37
11 indicates the purpose of the research and then    14:37
12 summarizes the results.    14:37
13     MR. AHN: Q. I think if you look at the    14:37
14 final bullet point on this page, where it states:    14:37
15     "GUI and visual effect are lacking in    14:37
16 comparison to iPad 2 (gallery, music, memo calendar)."    14:38
17     Do you see that?    14:38
18     A  I see that.    14:38
19     Q  Does that give you some sense as to what the    14:38
20 overall purpose of this document is?    14:38
21     MR. TUNG: Objection; vague and beyond the    14:38
22 scope.    14:38
23     THE WITNESS: It gives me some sense of one    14:38
24 of the -- some of the findings of this document.    14:38
25 Whether that was what they set out to do, I don't    14:38

Page 158

1   know.  But I see that one of the bullet points is:       14:38
2       "The GUI and visual effect are lacking in       14:38
3   comparison to iPad 2."                                   14:38
4       I see that.                                          14:38
5       MR. AHN:  Q.  Actually, on the next page of    14:38
6   this exhibit, there is a heading No. 2 stating "major    14:38
7   problem areas"; do you see that?                         14:38
8       A  Yes.                                              14:38
9       Q  And then if you flip through the next couple 14:38
10  of pages, it goes through, my guess is, what are a       14:38
11  number of major problem areas, according to the          14:38
12  author.  And then when you get to the page ending        14:38
13  in '073, there is another heading which states:          14:39
14      "3.  Detailed issues for application."               14:39
15      Do you see that?                                     14:39
16      A  Yes.                                              14:39
17      Q  And then flipping through the rest of the         14:39
18  document, you will see that there is an issue 1,         14:39
19  issue 2.  It jumps next to issue 20 and then issue 51,   14:39
20  which is the last page of this excerpt.                  14:39
21      A  Issue 1, issue 2, issue 20, issue 51.             14:39
22      Q  With that in mind, does that give you a sense     14:39
23  as to what we're looking at here on the page ending      14:39
24  in '125?                                                 14:39
25      MR. TUNG:  So objection; vague and beyond the        14:39

Page 159

1   scope.                                                   14:39
2       THE WITNESS:  It tells me that we're looking   14:39
3   at some kind of a user interface evaluation and          14:39
4   competitive analysis comparison document.                14:39
5       MR. AHN:  Q.  Does this suggest to you, using  14:40
6   your language, that Samsung was conducting a             14:40
7   competitive analysis of the iPad 2 in connection with    14:40
8   the bounce feature?                                      14:40
9       MR. TUNG:  Objection; vague; mischaracterizes  14:40
10  the document and beyond the scope.                       14:40
11      THE WITNESS:  It's -- that's -- that's         14:40
12  possible.  I don't know what a P5 is, however.  So       14:40
13  they're talking about P5.  I don't know what that is.    14:40
14      MR. AHN:  I'll represent to you that the P5    14:40
15  is a code name for a Samsung device.                     14:40
16      THE WITNESS:  Okay.                            14:40
17      MR. AHN:  Q.  Using that representation, does  14:40
18  this suggest to you that Samsung was conducting a        14:40
19  competitive analysis of a device that it was             14:40
20  developing as compared to the iPad 2 and its bounce      14:40
21  feature?                                                 14:40
22      MR. TUNG:  Objection; vague; mischaracterizes  14:40
23  the document and beyond the scope.                       14:40
24      THE WITNESS:  They were conducting a           14:40
25  competitive analysis of the P5 versus the iPad 2.  I     14:41

Page 160

1   think I can say that.                                    14:41
2       MR. AHN:  Q.  Does this document surprise you  14:41
3   in any way?                                              14:41
4       MR. TUNG:  Objection; vague; beyond the        14:41
5   scope.                                                   14:41
6       THE WITNESS:  Dr. Balakrishnan referred to     14:41
7   this and other documents in his report, which I've       14:41
8   read, so it doesn't surprise me to see this document.    14:41
9   This document, as far as I know, was not attached or     14:41
10  included in his report.  It's just cited by it.  I       14:41
11  didn't -- I never saw this document before.              14:41
12      MR. AHN:  Q.  Does this affect your opinion    14:41
13  at all as to whether or not Samsung's devices            14:41
14  implement the bounce feature that's also implemented     14:41
15  on Apple's devices?                                      14:42
16      MR. TUNG:  Objection; mischaracterizes         14:42
17  opinion; beyond the scope --                             14:42
18      THE WITNESS:  My --                            14:42
19      MR. TUNG:  -- vague.                           14:42
20      THE WITNESS:  Sorry.                           14:42
21      MR. TUNG:  Yeah.  Go ahead.                    14:42
22      THE WITNESS:  My opinion expressed in my       14:42
23  report has to do with the Samsung devices relative to    14:42
24  the patent.  I -- I actually really don't care what      14:42
25  Apple's devices do because I'm -- I'm concerned with     14:42

Page 161

1   whether these devices -- the accused devices infringe 14:42
2   on the patent.                                           14:42
3       MR. AHN:  Q.  Does this document suggest to    14:42
4   you that Samsung has copied any portion of the user      14:42
5   interface of an Apple product?                           14:42
6       MR. TUNG:  So objection; vague; beyond the     14:42
7   scope.                                                   14:42
8       THE WITNESS:  This document suggests to me     14:42
9   that Samsung evaluated their product in comparison --   14:42
10  which is called the P5, I guess, in comparison to the    14:43
11  iPad 2.  It doesn't tell me what they did about it.      14:43
12      MR. AHN:  Q.  Does that trouble you in any     14:43
13  way?                                                     14:43
14      MR. TUNG:  Objection; vague and beyond the     14:43
15  scope.                                                   14:43
16      THE WITNESS:  No, that doesn't trouble me.     14:43
17  Doing due diligence when designing a product is --       14:43
18  includes a competitive analysis of -- of -- of other     14:43
19  products in the same market.  If you don't do that,      14:43
20  you're probably not doing your homework.                 14:43
21      MR. AHN:  Okay.                                14:43
22      Q  What if the features that are being studied 14:43
23  are patented?                                            14:43
24      MR. TUNG:  Objection; vague.                   14:43
25      THE WITNESS:  I don't know.  And I --          14:43

Highly Confidential - Attorneys' Eyes Only

Page 162

```
 1   furthermore, I don't know whether the people who did   14:43
 2   this study, since I don't know who they were and what  14:43
 3   their relation was to Samsung management or legal,     14:43
 4   whether they knew that the features were patented or   14:43
 5   not.                                                   14:44
 6        MR. AHN:  You can set that aside.                 14:44
 7        Finally, I'm going to ask you a few questions     14:44
 8   about the order denying the motion for preliminary     14:44
 9   injunction which I previously set before you.          14:44
10        MR. TUNG:  And so Counsel, you're not marking     14:44
11   this as an exhibit; is that correct?                   14:44
12        MR. AHN:  That's right.  I think it's             14:44
13   previously been marked at different depositions, and   14:44
14   it's also just on the docket, so I don't think it's    14:44
15   necessary.                                             14:44
16    Q   I just want to ask you a few questions about      14:44
17   the portions of the Court's order that were opining    14:44
18   about the non-infringement positions that Samsung had  14:44
19   taken during the preliminary injunction phase of this  14:44
20   case.                                                  14:44
21        Earlier today we were discussing the              14:44
22   displaying black by turning off pixels is not          14:44
23   displaying argument that you had previously advanced   14:44
24   in your first expert declaration.                      14:45
25        Do you recall that testimony generally?           14:45
```

Page 163

```
 1    A   Yes.                                              14:45
 2    Q   And I believe you stated that you did not         14:45
 3   include that testimony -- you did not include that     14:45
 4   opinion in your current expert report based on the     14:45
 5   Court's order; is that correct?                        14:45
 6    A   Correct.                                          14:45
 7    Q   In fact, the Court had rejected that position     14:45
 8   as being untenable; is that correct?                   14:45
 9    A   Correct.                                          14:45
10        MR. TUNG:  Objection; mischaracterizes the        14:45
11   document.                                              14:45
12        MR. AHN:  I'd like to direct your attention       14:45
13   to page 53 of the Court's order.                       14:45
14    Q   Right at the bottom the page, it starts a         14:45
15   discussion of, quote-unquote, the first direction      14:45
16   issue; do you see that?                                14:45
17    A   Yes.                                              14:45
18    Q   Going on to the next page, if you look at the     14:45
19   third paragraph, it states in the fourth sentence:     14:46
20        "Because a person skilled in the art would        14:46
21   understand that the claimed method acts in response to 14:46
22   a user's fingers, they would not interpret the claims  14:46
23   to require superhuman precision in the finger          14:46
24   movements."                                            14:46
25        Do you see that?                                  14:46
```

Page 164

```
 1    A   I see that.                                       14:46
 2    Q   It goes on in the fourth paragraph to state:      14:46
 3        "The Court construes the term first direction     14:46
 4   as not requiring a strictly linear finger movement."   14:46
 5        And then it goes on to state:                     14:46
 6        "The Court agrees with Apple that it must         14:46
 7   interpret the claims in a common sense fashion in      14:46
 8   light of the technology and techniques described in    14:46
 9   the specification and must reject any hyper-technical  14:46
10   reading that the claim is incapable of performing."    14:46
11        Do you see that?                                  14:47
12    A   I see that.                                       14:47
13    Q   Now, in your current expert report, you still     14:47
14   advance a position that a first movement must be in a  14:47
15   strictly linear direction; is that correct?            14:47
16        MR. TUNG:  Objection; mischaracterizes            14:47
17   opinion; vague.                                        14:47
18        THE WITNESS:  In my -- my opinion, as I think     14:47
19   we -- I explained in my report, the -- that argument   14:47
20   is being -- that -- that -- I'm making that -- stating 14:47
21   that opinion because I believe that the Court          14:47
22   misunderstood the previous argument.                   14:47
23        We were not talking about the movement of the    14:47
24   finger, and we're never requiring the finger to be     14:47
25   moving in a strictly linear movement.  The -- the      14:47
```

Page 165

```
 1   finger can move however it moves.  The question is how 14:47
 2   the document is translated in response to the finger   14:47
 3   movement.                                              14:48
 4        The software -- the software is in control of     14:48
 5   the movement of the document.  The software is not in  14:48
 6   control of the user's finger.  The finger moves        14:48
 7   however it moves.  Issues -- the software interprets   14:48
 8   that finger movement to -- to then give commands to    14:48
 9   the document as to -- as to how to move.               14:48
10        And the document can move the finger -- can       14:48
11   move the -- sorry -- the doc -- the software can move  14:48
12   the document in constrained or unconstrained ways,     14:48
13   depending on what the situation is.                    14:48
14        So the argument that I made before and the        14:48
15   argument that I'm still making has to do with the      14:48
16   motion -- the translation and direction of the         14:48
17   document, not of the finger.  I -- I -- I do not       14:48
18   believe that -- I believe it is impossible for a       14:48
19   person to move their finger in a strictly linear       14:48
20   fashion, but I don't believe that's relevant to the    14:48
21   argument.                                              14:49
22        The argument is that -- that the software         14:49
23   can, in response to a person's finger movement, move   14:49
24   the -- the document in a strictly linear direction or  14:49
25   not, depending on how it's designed.                   14:49
```

Page 202

1    A   An edge that is at the extreme -- or a         16:00
2   scrollable edge is actually at the -- at the edge of   16:00
3   an electronic document in the -- that's -- I guess the   16:00
4   edge is perpendicular to the direction of movement of   16:00
5   the -- of the document, you know.  In the constrained   16:00
6   case, it's perpendicular to the edge.  If the document   16:00
7   is -- can move in an unconstrained way, then some of   16:00
8   the -- then all of the edges are scrollable edges,    16:00
9   really.                                              16:00
10        MR. AHN:  I'm going to hand you what I've     16:01
11  marked as Exhibit No. 4.                             16:01
12        (Document marked J. Johnson Exhibit 4         16:01
13         for identification.)                          16:01
14        THE WITNESS:  So are we through with this?    16:01
15        MR. AHN:  No.  You can leave that open in    16:01
16  front of you.                                        16:01
17        THE WITNESS:  Okay.                           16:01
18        MR. AHN:  I'll come back to it.               16:01
19        Exhibit 4 is just a screen capture from the   16:01
20  New York Times homepage from yesterday.              16:01
21        THE WITNESS:  Okay.                           16:01
22        MR. AHN:  Q.  Can you tell me in Exhibit 4    16:01
23  what you would consider to be the scrollable edges.   16:01
24        MR. TUNG:  So I'll object that this is a -- a   16:01
25  printout on a piece of paper, and you're asking about   16:01

Page 203

1   edges in the context of the '381 document --         16:01
2   '381 patent.                                          16:01
3         MR. AHN:  Let me give you some context.       16:01
4     Q   This is just a screen capture of Internet     16:01
5   Explorer showing the New York Times homepage.  And I'm   16:01
6   curious as to, if you were looking at this on the     16:02
7   screen of a computer, what you would consider to be a   16:02
8   scrollable edge?                                     16:02
9         MR. TUNG:  So I'll still make the same        16:02
10  objection.                                           16:02
11        THE WITNESS:  Yeah, it would be -- it would   16:02
12  be nicer if this picture had -- had the browser also   16:02
13  shown in it so that I could see something about      16:02
14  where -- you know, how the browser is.               16:02
15        But assuming that the browser is oriented      16:02
16  vertically on the page the same way that this is, then   16:02
17  I would consider scrollable edges to be the top and   16:02
18  the bottom because we are viewing the entire width of   16:02
19  the page.                                            16:02
20        And, therefore, the -- when -- the way the     16:02
21  browser operates is that it's constrained when you're   16:02
22  looking at the -- when you're zoomed out, to me.     16:02
23        And so the scrollable edges are the top and    16:02
24  the bottom.                                          16:02
25        MR. AHN:  And, in fact, if this were being    16:02

Page 204

1   displayed on one of the accused Samsung products with   16:03
2   blue glow in it, if you tried to go up and down, you   16:03
3   would actually see the blue glow appear from the top   16:03
4   or the bottom, depending on the direction of the     16:03
5   scroll; is that correct?                             16:03
6         MR. TUNG:  Objection; incomplete              16:03
7   hypothetical.  I'll just say same objections.        16:03
8         THE WITNESS:  If you are scrolling the page   16:03
9   down and you reach the top, then the blue glow would   16:03
10  appear from the top edge.  If you're scrolling up and   16:03
11  you reach the bottom, then the blue glow would appear   16:03
12  from the bottom edge.                                16:03
13        MR. AHN:  Q.  What about the photograph       16:03
14  towards the center of the page?  Would you consider   16:03
15  that an electronic document?                          16:03
16    A   That's a document inside a document, yes.     16:03
17    Q   So in this example, would you consider the    16:03
18  overall New York Times page as the electronic        16:03
19  document, with other electronic documents embedded in   16:03
20  it?                                                   16:03
21    A   Well, I -- I suppose so.  Yes, I would.        16:03
22  Balakrishnan has said in his statement that a photo --   16:04
23  photographs are electronic documents, so -- and I     16:04
24  agree with him.                                       16:04
25    Q   Would you consider the edges of the           16:04

Page 205

1   photograph to be scrollable edges in this example?    16:04
2         MR. TUNG:  Same -- same objection.            16:04
3         THE WITNESS:  Well, this sort of depends       16:04
4   on -- on the application because in some applications,   16:04
5   as we've seen, there is -- there is snap in between    16:04
6   documents in a -- an electronic -- in documents that   16:04
7   are contained in an electronic document; that is to    16:04
8   say, the subordinate documents.  There is snap in     16:04
9   between them, and in other applications there isn't    16:05
10  any such snap.                                        16:05
11        So, for example, in ThinkFree Office, if it's   16:05
12  in the vertical mode, there is no snap in between any   16:05
13  pages.  But if it's in the horizontal mode, then there   16:05
14  is snap in ThinkFree Office.                          16:05
15        And similarly, in this browser, there --       16:05
16  there isn't -- there isn't -- there isn't snap between   16:05
17  the sub -- subdocuments of the main document.         16:05
18        Now, first of all, I will say that even if    16:05
19  there were snap between subordinate documents in a    16:05
20  browser, I wouldn't expect that snap to ever appear or   16:05
21  to be noticeable unless I were to zoom that -- that --   16:06
22  zoom the document display up such that the photograph   16:06
23  filled the entire display.                            16:06
24        You know, I have seen other applications in    16:06
25  which if I -- if I zoomed up so the page was looking   16:06

Page 218

1  instances in which photographs inside the gallery       16:25
2  application will always exhibit the snap-back           16:25
3  behavior?                                                16:25
4        MR. TUNG: Objection; vague; incomplete           16:25
5  hypothetical.                                            16:25
6        THE WITNESS: The -- there are certain --         16:25
7  there are certain edges that will always snap back.     16:26
8        MR. AHN: Q. What if there is only one            16:26
9  photograph inside the gallery application and you have 16:26
10 zoomed in on that photograph? Would that always        16:26
11 exhibit the '381 patent's snap back functionality?     16:26
12       MR. TUNG: Objection; incomplete                  16:26
13 hypothetical.                                           16:26
14       THE WITNESS: In all the phones that I've         16:26
15 examined, that would be the case.                       16:26
16       MR. AHN: If you could turn to Paragraph 84       16:26
17 of your report.                                         16:26
18       THE WITNESS: 84 of my report?                    16:26
19       MR. AHN: Yes.                                    16:26
20       MR. TUNG: You mean paragraph?                    16:26
21       MR. AHN: Paragraph 84.                           16:26
22       THE WITNESS: Okay.                               16:26
23       MR. AHN: Q. The second sentence from the         16:27
24 bottom, you state:                                      16:27
25       "In certain versions of Android, gallery and     16:27

Page 219

1  filmstrip mode exhibits the same general snapping       16:27
2  behavior in zoomed-in mode as in zoomed-out mode. In    16:27
3  other versions of Android, a second swipe gesture       16:27
4  exhibits general snapping behavior and can be used to   16:27
5  move to an adjacent image."                             16:27
6       Do you see that?                                  16:27
7     A  Yes.                                             16:27
8     Q  Can you tell me which versions of Android you    16:27
9  were discussing in the first sentence that I just       16:27
10 read.                                                   16:27
11    A  Certain versions of Android gallery -- well,     16:27
12 since most of the phones that I looked at, I looked at  16:28
13 one version of the phone. When I'm talking about        16:28
14 different versions of Android, I -- often those are on  16:28
15 different phones as well.                               16:28
16      So -- but -- so you're asking me to explain       16:28
17 the sentence, or what was -- oh, you were asking me     16:28
18 what versions.                                          16:28
19    Q  Yes.                                             16:28
20    A  Well, what I -- what this is -- what this is     16:28
21 pertaining to is that I noticed that on some phones it  16:28
22 behaves one way, and on some phones it behaves another  16:28
23 way. So that in talking to the software engineers,     16:28
24 their explanation for that -- those differences, was    16:28
25 that in certain versions of Android, it works one way,  16:29

Page 220

1  and in certain versions of Android -- and so it        16:29
2  depends on what version of Android is on a particular  16:29
3  phone.                                                  16:29
4       So to answer your question, I don't know what    16:29
5  versions of Android. I just know what phones I looked  16:29
6  at, and I noticed differences. And then when I asked   16:29
7  the software developers about that, they said that's   16:29
8  the difference in the versions of Android.             16:29
9     Q  In Paragraph 85 you are discussing the videos   16:29
10 that were submitted by Dr. Balakrishnan with his       16:29
11 expert report. And you state in the second sentence    16:29
12 the various video exhibits do not depict what happens  16:29
13 when the user pans a document past a threshold beyond  16:29
14 the edge of the document. And I paraphrased that.      16:29
15      What do you mean by that?                        16:29
16    A  All of the demonstrations in the Balakrishnan   16:30
17 videos show snap back. None of them ever show snap    16:30
18 forward. And I don't know this for a fact, but I'm    16:30
19 assuming that that's because he looked only at the     16:30
20 first or last photograph in the gallery and not ever   16:30
21 any of the internal photographs.                       16:30
22      It could also be because he was looking at      16:30
23 photograph 2 or 3 in a five paragraph -- five          16:30
24 photograph -- five photograph -- in a collection of    16:30
25 five photographs, and he only pulled it a certain      16:30

Page 221

1  distance. I don't really know.                        16:30
2       All I know is that all the videos I saw, he    16:30
3  pulled it aside and it snapped back. It never snapped 16:30
4  forward.                                               16:30
5     Q  For the video exhibits that you looked at      16:30
6  from Dr. Balakrishnan, the functionality that was     16:31
7  demonstrated satisfied the limitations of Claim 1 of  16:31
8  the '381 patent; is that correct?                     16:31
9        MR. TUNG: Objection; mischaracterizes          16:31
10 opinion.                                               16:31
11       THE WITNESS: We're talking right now about     16:31
12 the always bouncing back element of that claim. There 16:31
13 are other elements of the claim that -- that I am also 16:31
14 saying were not met, but we're not talking about those 16:31
15 right now.                                             16:31
16      So -- so, you know, it -- to answer the        16:31
17 question directly, in the Balakrishnan videos, he     16:31
18 pulled aside the -- the -- pulled the image aside, and 16:31
19 it always bounced back. So that -- that -- as -- as   16:31
20 illustrated in his videos, it -- it meets that element 16:31
21 of Claim 1.                                            16:32
22       MR. AHN: If I could direct your attention to   16:32
23 page 27 of your report.                                16:32
24    Q  There is a table here which I believe you      16:32
25 used to indicate where a non-infringing feature could  16:32

Page 222

1  be found in the applications that have been accused of   16:32
2  infringement.  And I'd like to focus you on the column   16:32
3  titled "Contacts"; do you see that?   16:32
4      A   Okay.   16:32
5      Q   And there are three boxes that have been   16:32
6  checked with Xs there?   16:32
7      A   Uh-huh.   16:32
8      Q   Do you see that?   16:32
9      A   Yes.   16:32
10     Q   Those three boxes represent instances in   16:32
11 which you felt there was a non-infringing feature for   16:32
12 that contacts application; is that correct?   16:33
13     A   Those three Xs indicate, yes, in which I   16:33
14 believe that there was the feature that's described on   16:33
15 page 28.   16:33
16         There are -- there are also the other --   16:33
17 there are also the other arguments that are -- that   16:33
18 start on page 29.  Accused functionality does not   16:33
19 always bounce back.  Keys functionality does not meet   16:33
20 both direction limitation, et cetera, et cetera.  But   16:33
21 for contacts, we -- we -- we -- we're not asserting   16:33
22 that one.   16:33
23         So -- so these are -- these are -- this is   16:33
24 the presence or absence of this feature listed on   16:33
25 page 20 -- 28 under "Contact," the blue glow.  That's   16:33

Page 223

1  the presence or absence of that feature.   16:34
2          It's -- it's not the -- it's not a -- this is   16:34
3  not a judgment about whether there's infringement or   16:34
4  not.   16:34
5          And I should say that there's -- there's also   16:34
6  one -- one phone in here that should have an X that --   16:34
7  that erroneously was left out.   16:34
8      Q   Which one is that?   16:34
9      A   Well, I made a list of errors that -- in this   16:34
10 document that actually should be corrected, some of   16:34
11 which you found for us and some of which I found.  And   16:34
12 so -- now, the first item on that list is that   16:34
13 contact -- the "Contacts" column should be marked X in   16:34
14 row 12.   16:34
15     Q   And that's for the Galaxy S Showcase?   16:34
16     A   Yes.  Right.  That was an error.  That should   16:34
17 have been marked with an X.   16:34
18         There are also other errors, if you want to   16:34
19 know about them.   16:35
20     Q   When did you prepare that errata?   16:35
21     A   Well, some of these -- some of these errors I   16:35
22 discovered after rereading my report shortly after it   16:35
23 was filed, and some of them you found in -- as we were   16:35
24 going through this deposition earlier.   16:35
25         MR. AHN:  Mark, do you know if we've been   16:35

Page 224

1  provided with a copy of the errata?   16:35
2          MR. TUNG:  No.  We can introduce it as an   16:35
3  exhibit so it will be officially in the record.   16:35
4          MR. AHN:  Why don't we go ahead and mark it a   16:35
5  bit later.   16:35
6          MR. TUNG:  Okay.   16:35
7          THE WITNESS:  But anyway, that's the only   16:35
8  addition to that column.   16:35
9          MR. AHN:  Q.  Let me direct your attention to   16:36
10 page 24, where there's another table.  And the table   16:36
11 is titled "At least three non-infringing features in   16:36
12 browser"; do you see that?   16:36
13     A   I see that.   16:36
14     Q   And there are no Xs for the products   16:36
15 identified as the Exhibit 4G, Galaxy Ace and Gravity   16:36
16 Smart; is that correct?   16:36
17     A   Let's see.  Galaxy Ace, feature one, hard   16:36
18 stop.  I'm just wondering whether there are more   16:36
19 errors here in this table.  I see that there are no --   16:36
20 there are no Xs there, yes.   16:36
21     Q   Does that mean that you believe those   16:37
22 products satisfy the limitations of Claim 1 of the   16:37
23 '381 patent?   16:37
24         MR. TUNG:  Objection; mischaracterizes   16:37
25 opinion.   16:37

Page 225

1          THE WITNESS:  What it -- what it means is   16:37
2  that none of these three features, those three   16:37
3  features being hard stop, escapable scroll lock and   16:37
4  blue glow, apply in those -- are found in those -- in   16:37
5  those phone -- phones.   16:37
6          I'm wondering now whether there are some   16:37
7  errors.  But the -- the -- what it means is that   16:37
8  there -- that those features are not found.  It   16:37
9  doesn't mean necessarily that I'm saying that there's   16:37
10 infringement there or not.   16:37
11         MR. AHN:  Q.  But your three non-infringement   16:37
12 positions regarding the browser application,   16:37
13 specifically the hard stop, the escapable scroll lock   16:38
14 and the blue glow, are not applicable to the   16:38
15 Exhibit 4G, the Galaxy Ace and the Gravity Smart;   16:38
16 correct?   16:38
17     A   If this table is correct, that's true.  I'm   16:38
18 just now looking.  I'm trying to figure out if it's --   16:38
19 if there is an error.  But if the table is error-free,   16:38
20 then that's correct.   16:38
21     Q   I'd like to direct your attention to   16:38
22 Paragraph 90 of your report.   16:38
23         And actually, before I ask you about that,   16:38
24 inside the ThinkFree Office application, what do you   16:38
25 consider to be the electronic document?   16:38