# EXHIBIT 15

# In The Matter Of:

## CERTAIN PORTABLE ELECTRONIC DEVICES, INCLUDING WIRELESS COMMUNICATION DEVICES

_____

## DAVID J. TEECE, Ph.D. - Vol. 1
*April 19, 2012*

_____

## *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
LegaLink, Inc.
179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
DAVID J. TEECE, Ph.D. - 4/19/2012

Page 137

```
14:30:25  1           MR. BURLING:  Q.  And having seen today,
14:30:28  2      and apparently having had it shown to you before by
14:30:33  3      your staff, Exhibit 10, showing Samsung's position
14:30:38  4      of non-entitlement to injunctive relief taken
14:30:41  5      previously, that doesn't affect any of the opinions
14:30:46  6      that you are offering either in the ITC or the
14:30:49  7      Northern District of California; is that correct?
14:30:51  8           A.  That is correct.
14:30:52  9           MR. BURLING:  Okay.  Let's take a tape
14:30:54 10      break.
14:30:54 11           I don't know -- can you do that in a
14:30:54 12      minute, or do we need to --
14:30:54 13           Do you want to --
14:30:59 14           MR. WALL:  I want to take a break.  We've
14:31:01 15      been going well over an hour now.  So if we could
14:31:04 16      take a break, I think it's a good opportunity.
14:31:05 17           MR. BURLING:  We can take a break.
14:31:07 18           MR. WALL:  That's all I'm saying.  I
14:31:07 19      didn't know if you wanted to keep going.
14:31:08 20           MR. BURLING:  I'm not aware of any
14:31:09 21      one-hour rule, but I'm happy to take a break.
14:31:11 22           MR. WALL:  Oh.
14:31:12 23           THE VIDEOGRAPHER:  This is the end of
14:31:13 24      Volume 1 --
14:31:13 25           MR. WALL:  That's how I usually do it.
```

Page 138

```
14:31:13  1           THE VIDEOGRAPHER:  -- Videotape No. 2, in
14:31:14  2      the deposition of Dr. David Teece.  We're going off
14:31:17  3      the record.  The time is 2:31.
14:37:44  4           (Recess taken.)
14:37:58  5           THE VIDEOGRAPHER:  We're back on the
14:37:59  6      record.  This is the beginning of Volume 1,
14:38:01  7      Videotape No. 3, in the deposition of Dr. David
14:38:04  8      Teece.  The time is 2:38.
14:38:10  9           MR. BURLING:  Q.  So, Professor Teece, am
14:38:13 10      I fair in assuming that if I showed you other
14:38:21 11      examples of where Samsung previously had taken the
14:38:25 12      position that "injunctive relief was not available
14:38:31 13      to FRAND declarants" to ETSI, that that would not
14:38:38 14      affect your opinions either?
14:38:40 15           MR. WALL:  Objection; facts not in
14:38:42 16      evidence, lacks foundation.
14:38:45 17           THE WITNESS:  Well, particularly in view
14:38:46 18      of the fact, as I said I think twice before, I mean,
14:38:50 19      ETSI's now looked at this issue and they've not come
14:38:53 20      to the view -- in fact, I think it was very
14:38:57 21      recently -- they've not come to the view that FRAND
14:39:00 22      waives injunctive relief.
14:39:03 23           The fact that Samsung may have taken a
14:39:05 24      different position at some point in time earlier
14:39:10 25      I don't find troubling.  I've got to take the facts
```

Page 139

```
14:39:15  1      as I see them.
14:39:18  2           MR. BURLING:  Q.  Were you involved in any
14:39:23  3      way in the prior litigation between Samsung and
14:39:28  4      Ericsson --
14:39:29  5           A.  No.
14:39:30  6           Q.  -- with respect to declared-essential
14:39:35  7      royalty rates?
14:39:36  8           A.  I don't think so.  I don't recall being
14:39:38  9      involved.
14:39:43 10           Q.  Did you -- did you follow that case at the
14:39:46 11      time of the litigation for any reason?
14:39:48 12           A.  No.
14:39:52 13           Q.  Were any of your colleagues involved in
14:39:55 14      that case?
14:39:56 15           A.  Not to my knowledge.  They could have
14:39:58 16      been.  I just don't -- I just don't know.
14:40:05 17           Q.  Okay.  So look at Exhibit 1, please, and
14:41:42 18      I think it's page 27.  A couple of pages earlier,
14:42:08 19      24.  Do you have that in front of you?
14:42:15 20           A.  Yes.
14:42:16 21           Q.  And there you list -- this is a section
14:42:19 22      where you talk about a number of studies from which,
14:42:30 23      as I understand it, you draw information points to
14:42:35 24      use as what I think you called this morning
14:42:38 25      benchmarks for developing a damages reasonable
```

Page 140

```
14:42:43  1      royalty rate.  Is that correct?
14:42:47  2           A.  Yes.  This is one part of the canvas, if
14:42:56  3      you will, that I review for purposes of determining
14:43:05  4      reasonable royalties.
14:43:08  5           Q.  And this section starting on page 24 up to
14:43:20  6      page 33 is similar to a section that's in your ITC
14:43:33  7      report.  Is that a fair statement?
14:43:37  8           A.  Yes, there's some overlap.
14:43:46  9           Q.  And so let's start first looking at one of
14:43:48 10      the information points, which is the Stasik report
14:44:04 11      that's shown on page 25, or at least a table from it
14:44:07 12      is shown.
14:44:08 13           A.  That's correct.
14:44:09 14           Q.  And this is a report --
14:44:12 15           Let me just mark it for us.  This is
14:44:14 16      Exhibit 11.
14:44:44 17           (Whereupon, Deposition Exhibit 11 was
14:44:44 18           marked for identification.)
14:44:44 19           MR. BURLING:  Q.  Is Exhibit 11 the Stasik
14:44:47 20      article from which the information shown on page 25
14:44:49 21      is drawn?
14:44:51 22           A.  It is.
14:44:52 23           Q.  And the table on page 116 of Exhibit 11
14:44:57 24      is, in fact, reproduced on page 25 of your report?
14:45:06 25           A.  That's correct.
```

36 (Pages 137 to 140)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
DAVID J. TEECE, Ph.D. - 4/19/2012

Page 141

```
14:45:09  1       Q.  Mr. Stasik is also a testifying expert for
14:45:17  2   Samsung in this litigation with Apple?
14:45:23  3       A.  That's my understanding, yes.
14:45:26  4       Q.  And this article lists what he says are
14:45:38  5   published handset royalty rates for LTE; right?
14:45:46  6       A.  Correct.
14:45:48  7       Q.  LTE is a different standard from UMTS?
14:45:54  8       A.  Yes.
14:45:56  9       Q.  It is a so-called fourth-generation
14:45:57 10   standard versus third generation, which is UMTS?
14:46:05 11       A.  That is correct.
14:46:10 12       Q.  And do you know whether any or all of the
14:46:15 13   patents declared essential to UMTS are also declared
14:46:22 14   essential to LTE?
14:46:25 15           MR. WALL:  Objection to form.
14:46:32 16           THE WITNESS:  Do I know whether any of
14:46:33 17   them are?
14:46:34 18           MR. BURLING:  Q.  Yes.
14:46:34 19       A.  I believe that some of them are.  I just
14:46:36 20   don't know which ones and how many.
14:46:41 21       Q.  Do you know roughly what proportion?
14:46:58 22       A.  As I sit here right now, I don't recall.
14:47:01 23   I think I've seen reference to it somewhere.
14:47:08 24       Q.  So you don't know?
14:47:11 25       A.  As I sit here right now, I don't recall.
```

Page 142

```
14:47:19  1       Q.  Do you know if the seven patents at issue
14:47:20  2   in the Northern District of California suit have
14:47:26  3   been declared essential to LTE?
14:47:32  4       A.  I don't know for sure, but I don't believe
14:47:33  5   so, but I don't know for sure.
14:47:36  6       Q.  Do you know whether any of the Samsung
14:47:42  7   portfolio of UMTS declared-essential patents has
14:47:46  8   been declared essential to LTE?
14:47:57  9       A.  As I sit here right now, I don't know.
14:47:59 10       Q.  Do you know whether the published handset
14:48:05 11   royalty rates for LTE listed on page 25 of your
14:48:11 12   Northern District of California report are in
14:48:17 13   addition to any royalty rates for UMTS or inclusive
14:48:22 14   of royalty rates for UMTS?
14:48:32 15       A.  Let me see if I understand what you mean.
14:48:33 16   Are you asking me whether someone seeking a license
14:48:41 17   for LTE would get a credit if they got a contract
14:48:48 18   under a different standard?
14:48:51 19       Q.  Fair question.  Let me back up a second.
14:48:54 20           Do you understand LTE to be in some sense
14:48:56 21   a successor to UMTS?
14:48:58 22       A.  Yes.
14:48:59 23       Q.  A fourth-generation product hoped to
14:49:02 24   supersede and improve a third-generation standard
14:49:06 25   UMTS; right?
```

Page 143

```
14:49:06  1       A.  That is correct.
14:49:10  2       Q.  And do you understand that products
14:49:14  3   compliant -- handsets compliant with LTE or able to
14:49:19  4   function on LTE will, for the foreseeable future,
14:49:24  5   also be required to function on UMTS?
14:49:28  6           MR. WALL:  Objection to form.
14:49:36  7           THE WITNESS:  Are you talking about in the
14:49:38  8   United States or in every jurisdiction or where?
14:49:42  9           MR. BURLING:  Q.  I don't think it
14:49:42 10   matters.  Let me make it expansive.  I don't think
14:49:46 11   it matters.
14:49:47 12       A.  Mm-hmm.  I know there's an effort to
14:49:50 13   secure backward compatibility.  I haven't studied
14:49:54 14   that in any detail.
14:49:55 15       Q.  It's more than an effort.  Isn't that the
14:49:57 16   plan, to have backward compatibility to UMTS?
14:50:01 17       A.  I think so, yes.
14:50:02 18       Q.  So that if you have a fourth-generation
14:50:05 19   LTE phone and you go to the next town, which may not
14:50:10 20   have access to an LTE tower but to a UMTS tower,
14:50:15 21   your phone will revert to UMTS and function on that
14:50:18 22   standard; right?
14:50:20 23       A.  That's my understanding.
14:50:21 24       Q.  Just as today UMTS phones are capable of
14:50:26 25   reverting back to PVDS or whatever it is; is that
```

Page 144

```
14:50:33  1   right?
14:50:34  2       A.  I believe so.
14:50:34  3       Q.  The prior standard.
14:50:36  4           So my question is:  When you see these
14:50:38  5   rates from Mr. Stasik for LTE, do you know if those
14:50:45  6   are announced rates that include patents -- the
14:50:50  7   patent portfolios just for LTE or for LTE and UMTS
14:50:56  8   and prior generations?
14:51:21  9       A.  It's not my understanding that infringed
14:51:26 10   products would pay both, but I'd have to go back and
14:51:30 11   check the -- the announced royalty rates.  There may
14:51:38 12   be some specification with respect to that that's in
14:51:42 13   those disclosures.
14:51:44 14       Q.  But you didn't know or you don't know at
14:51:48 15   the time you were using these LTE-announced rates as
14:51:52 16   a reference point whether those rates include both
14:51:56 17   LTE and UMTS and prior generations or not; is that
14:52:00 18   correct?
14:52:05 19       A.  I don't know the details of that.
14:52:08 20       Q.  You don't know one way or the other?
14:52:12 21       A.  I would have to check further.  I'm
14:52:17 22   implicitly assuming that you only pay once and that
14:52:21 23   there's not stacking across the standards, but I
14:52:24 24   have to check that.
14:52:26 25       Q.  So you're assuming that for
```

37 (Pages 141 to 144)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
DAVID J. TEECE, Ph.D. - 4/19/2012

Page 145

```
14:52:27  1   Alcatel-Lucent, just to be specific, that for a
14:52:30  2   2 percent royalty, you get Alcatel-Lucent's
14:52:34  3   portfolio of declared-essential patents for UMTS and
14:52:37  4   for LTE to the extent that differs?
14:52:40  5        MR. WALL:  Objection to form; lacks
14:52:42  6   foundation, misconstrues testimony.
14:52:44  7        THE WITNESS:  I mean, there may be some
14:52:47  8   ambiguity in this, but I think that certainly in a
14:52:58  9   cross-license arrangement, it's likely that you
14:53:02 10   could get coverage from -- you could get a contract
14:53:09 11   that would include them both.
14:53:11 12        MR. BURLING:  Q.  Well, this isn't a
14:53:12 13   cross-license, is it?  This is a published handset
14:53:15 14   royalty rate for a one-way license from each of
14:53:17 15   these companies to their portfolios.  Isn't that
14:53:21 16   what you understand the report to be?
14:53:24 17       A.  Correct.  This is an offer.  But as I said
14:53:27 18   before, in this industry, almost nobody just takes a
14:53:29 19   one-way license; there's a cross-license.  So
14:53:31 20   negotiations will almost inevitably end up with
14:53:37 21   end-to-end discussions about existing contracts and
14:53:40 22   the kinds of issues you're raising right now.
14:53:43 23       Q.  Negotiations would result in lower rates
14:53:46 24   than those specified on page 25?
14:53:50 25        MR. WALL:  Objection to form.
```

Page 146

```
14:53:53  1        THE WITNESS:  As I've said before, in
14:53:57  2   cross-licensing, you know, typically one does come
14:54:02  3   down from this rate.
14:54:04  4        MR. BURLING:  Q.  I want -- every time
14:54:05  5   I ask about licensing, you go to cross-licensing.  I
14:54:07  6   want -- I want you -- I want not to ask about
14:54:10  7   cross-licensing now.  Okay?
14:54:11  8        I want not to ask about that because you
14:54:14  9   understand on page 25, these royalty rates are the
14:54:19 10   opening positions, as you understand it, for a
14:54:22 11   one-way license of the portfolio of that company for
14:54:26 12   its declared-essential patents to any and all
14:54:29 13   comers.  Isn't that what you understand it to be?
14:54:32 14       A.  Well, if I understand your statement or
14:54:34 15   question correctly, then you want to be talking
14:54:36 16   about a different industry?
14:54:39 17       Q.  No.  I want to be talking about the
14:54:41 18   meaning of your chart on page 25.
14:54:44 19        Don't you understand that to be -- taken
14:54:47 20   from Mr. Stasik's report, to be the royalty rates
14:54:53 21   for one-way license -- they maybe negotiate it out
14:54:56 22   later; there may be a cross-license.  But that's the
14:54:59 23   opening offer to license my declared-essential
14:55:01 24   patent portfolio, with "my" being each of the
14:55:05 25   companies specified.  You understand that; right?
```

Page 147

```
14:55:07  1        MR. WALL:  Hold on.
14:55:07  2        Objection to form; vague.
14:55:13  3        THE WITNESS:  I understand this to be the
14:55:13  4   announced royalty rates which would be in the form
14:55:19  5   of offer rates.  But I'm just making clear that the
14:55:23  6   industry practice is one where almost nobody ever
14:55:27  7   pays these rates because --
14:55:28  8        MR. BURLING:  Q.  Okay.
14:55:30  9       A.  -- they engage in cross-licensing
14:55:32 10   arrangements of one kind or another.
14:55:35 11       Q.  All right.  And because opening offers
14:55:37 12   often go down; correct?
14:55:38 13       A.  Well --
14:55:39 14        MR. WALL:  Objection.
14:55:39 15        Hold on.
14:55:40 16        Objection to form.
14:55:47 17        THE WITNESS:  My testimony this morning is
14:55:48 18   maybe in the early stages of an industry, but once
14:55:50 19   there is some experience amongst the parties, they
14:55:54 20   typically don't go down.
14:55:56 21        What happens is they'll go down in terms
14:56:03 22   of the price, is that something will be traded off;
14:56:05 23   namely, you take back some intellectual property or
14:56:08 24   some intellectual property rights of one kind or
14:56:12 25   another.
```

Page 148

```
14:56:15  1        MR. BURLING:  Q.  All right.  Let's try to
14:56:17  2   focus, though.  I just -- I want to focus on one
14:56:19  3   aspect of this, which is as following:
14:56:21  4        If these published handset royalty rates
14:56:23  5   are for both LTE and UMTS, then doesn't it stand to
14:56:30  6   reason that if someone wanted to license only UMTS
14:56:37  7   and not any different patents for LTE, the royalty
14:56:41  8   rate should be less?
14:56:42  9        MR. WALL:  Objection to form; assumes
14:56:43 10   facts not in evidence.
14:56:52 11        THE WITNESS:  You know, when -- you have
14:56:53 12   to remember that if you're thinking about value
14:57:01 13   obtained, don't get hung up on the rate.  There's
14:57:04 14   also the question of base.  So you have to look at
14:57:06 15   rate and base together.
14:57:08 16        So, you know, all your questions are sort
14:57:10 17   of focused on:  If it's a lower rate, it means it's
14:57:14 18   cheaper; and -- or if there's a higher rate, it
14:57:17 19   means it's more expensive.
14:57:19 20        I'm trying to say two things, and I'll
14:57:21 21   probably repeat this many times.
14:57:23 22        One is (a) it's a cross-licensing context;
14:57:26 23   and (b), the rate doesn't have particular meaning
14:57:29 24   absent also tying it to a particular base.
14:57:37 25        MR. BURLING:  Q.  Well, there's no issue
```

38 (Pages 145 to 148)

Page 149

```
14:57:38  1   about what the base is for this chart for Mr. Stasik
14:57:41  2   that you incorporate in your report, is there?
14:57:48  3        A.  You'd have to go back and look one at a
14:58:08  4   time, but it is, I believe, at the handset level.
14:58:11  5        Q.  And whatever the base is for any one of
14:58:15  6   these, isn't it logical that a rate that applied to
14:58:23  7   both UMTS and LTE would be higher than a rate that
14:58:27  8   applied only to UMTS?
14:58:33  9        A.  No, it is not necessarily.
14:58:34 10        Q.  Assuming that the base always stayed the
14:58:36 11   same?
14:58:36 12        A.  Well, okay.  You slipped something in at
14:58:39 13   the end.
14:58:40 14        Q.  I'm not slipping anything in, Professor
14:58:41 15   Teece.  Apple/Lucent announces a rate, 2.2 percent.
14:58:46 16   Okay?  They obviously have a base in mind.  All
14:58:50 17   right?  I don't know what it is, but they have one
14:58:52 18   in mind.  That's fixed.
14:58:54 19            And my question is:  If for 2 percent,
14:58:55 20   applied to whatever base they specify, you get both
14:59:00 21   LTE and UMTS, then by logic if you only want UMTS
14:59:04 22   and not LTE, you don't want those extra patents that
14:59:07 23   may be peculiar to LTE, the rate should be less.  Do
14:59:11 24   you agree with that or not?
14:59:13 25        A.  No, I don't necessarily agree with it.
```

Page 150

```
14:59:17  1            You'll note that one of the features of
14:59:19  2   cross-licensing is, you know, if you want to piece
14:59:25  3   part a portfolio, it doesn't necessarily give you a
14:59:27  4   discount.  That's a well-recognized aspect of
14:59:31  5   industry practice.
14:59:34  6        Q.  Have these rates ever shown up in any
14:59:36  7   licenses, to your knowledge?
14:59:41  8            MR. WALL:  Objection to form.
14:59:42  9            MR. BURLING:  Q.  Any of these rates on --
14:59:42 10   I'm sticking on page 25, the table there that you
14:59:46 11   reproduced.
14:59:47 12        A.  I have --
14:59:48 13            MR. WALL:  Hold on.
14:59:49 14            Objection to form.
14:59:49 15            THE WITNESS:  I haven't seen any licenses
14:59:53 16   with these rates.  I wouldn't expect necessarily to
15:00:00 17   see them publicly for two reasons.  One, it would be
15:00:03 18   highly confidential; and (b) there's likely to be a
15:00:07 19   cross-license back on the other side.
15:00:09 20            MR. BURLING:  Q.  So you don't have any
15:00:10 21   information to suggest that anyone has ever paid the
15:00:14 22   rates set out here in the third column of the chart
15:00:17 23   on page 25; is that correct?
15:00:20 24            MR. WALL:  Objection to form;
15:00:20 25   mischaracterizes testimony, lacks foundation.
```

Page 151

```
15:00:24  1            THE WITNESS:  I do know that there is some
15:00:28  2   use of the LTE standard.  There are some sales of
15:00:31  3   LTE phones.  I suspect -- but don't know for sure --
15:00:37  4   that there's some licenses that are accruing.
15:00:41  5   I don't know whether they're being paid or not.
15:00:43  6            MR. BURLING:  Q.  Okay.  So you don't know
15:00:45  7   if the rates specified in the third column have ever
15:00:48  8   been paid by anyone; correct?
15:00:50  9            MR. WALL:  Objection to form.
15:00:53 10            THE WITNESS:  I have not seen specific
15:00:55 11   evidence that confirms that people are paying.  And
15:01:00 12   as I said before, I would expect that over time,
15:01:03 13   following the pattern of other standards, that there
15:01:08 14   will be payments made.
15:01:10 15            But the primary currency for payment in
15:01:13 16   this industry is cross-license.  It's not money --
15:01:16 17   it's not money.
15:01:17 18            MR. BURLING:  Q.  All right.  And motions
15:01:22 19   to strike and all that, I reserve.  But I just --
15:01:25 20   I think when you net through all of that, your
15:01:27 21   answer is no, I have no evidence that anyone has
15:01:31 22   actually paid the rates specified in the third
15:01:34 23   column of the chart on page 25?
15:01:37 24            MR. WALL:  Objection; form.
15:01:41 25            MR. BURLING:  Q.  If you have any
```

Page 152

```
15:01:42  1   evidence, tell me what it is now.
15:01:45  2        A.  The only evidence I can refer to is use of
15:01:48  3   the LTE standard.  There is now use taking place, so
15:01:53  4   I would expect that some folks are paying.
15:02:01  5        Q.  From the fact that people are licensing
15:02:02  6   LTE, you draw the conclusion that those people are
15:02:06  7   paying the rates set out in the third column of
15:02:09  8   Exhibit --
15:02:11  9        A.  No.
15:02:12 10        Q.  -- of page 25?
15:02:13 11        A.  To be clear, I told you I didn't
15:02:15 12   necessarily expect that with cross-licensing, that
15:02:18 13   anyone would actually pay these rates as such.  They
15:02:21 14   would -- in normal dollars.  They pay these rates
15:02:25 15   but in kind, through giving back a grant-back of
15:02:28 16   other intellectual property rights.
15:02:30 17        Q.  Are these the equivalent of what you would
15:02:33 18   refer to as opening offers in the same meaning as
15:02:35 19   you use in your ITC report?
15:02:42 20        A.  Yes and no.  I mean, they're announced
15:02:45 21   rates; but, you know, let's look at Motorola, which
15:02:49 22   is in there, 2.25.  This is Motorola's rate that
15:02:52 23   it's held on to in multiple contexts over multiple
15:02:57 24   standards.
15:02:58 25            And, you know, what is known is that
```

Page 153

```
15:03:02  1    Motorola -- what is known publicly is that Motorola
15:03:06  2    doesn't actually discount their rate.  It -- it
15:03:14  3    looks for cross-licenses or access to other folks'
15:03:19  4    intellectual property as a way to get satisfaction.
15:03:22  5         Q.  So haven't you explicitly said that for
15:03:26  6    Motorola, that 2.25 is their normal, what you
15:03:29  7    called, opening rate?
15:03:32  8         A.  Yes.
15:03:32  9         Q.  And haven't you explicitly said in your
15:03:35 10    reports that opening rates are just that and they
15:03:39 11    typically are negotiated down in the give-and-take
15:03:41 12    of subsequent negotiations?
15:03:45 13         A.  Negotiated away from, rather than down.  I
15:03:46 14    mean, those rates don't necessarily come down.  What
15:03:49 15    you get is exchange of consideration in the form of
15:03:56 16    intellectual property.
15:08:21 17         Q.  So is it your testimony, Professor Teece,
15:08:23 18    that the opening offers made by patent holders do
15:08:35 19    not move down in the course of subsequent
15:08:40 20    negotiations?
15:08:43 21         MR. WALL:  Objection to form; lacks
15:08:45 22    foundation, vague.
15:08:48 23         THE WITNESS:  If I could draw your
15:08:49 24    attention to Exhibit 4, paragraph 33, where I talk
15:08:55 25    about initial offers versus final terms, in
```

Page 154

```
15:09:05  1    paragraph 33 I say:
15:09:12  2              "A prospective licensor
15:09:13  3              starts out with an initial offer
15:09:15  4              at the high end of what it
15:09:17  5              believes to be a plausible
15:09:19  6              bargaining range."
15:09:19  7         And then:
15:09:20  8              "The prospective licensee
15:09:21  9              responds with a counteroffer.
15:09:22 10              The parties engage in
15:09:24 11              back-and-forth negotiations
15:09:26 12              whereby the parties' offers move
15:09:28 13              closer together."
15:09:28 14         That does not imply, nor do I say that,
15:09:30 15    quote, the rate comes down as such.  It's -- it's
15:09:36 16    more that the consideration coming back is
15:09:41 17    negotiated over and -- and maybe aspects of the
15:09:51 18    royalty base are also negotiated.
15:09:56 19         So it's much more complicated in the
15:09:58 20    context of a cross-license because, really, the
15:10:01 21    whole purpose is to not collect money damages, but
15:10:06 22    to get design freedom and operating freedom.
15:10:12 23         MR. BURLING:  Q.  Didn't you say in
15:10:13 24    paragraph 34, the following paragraph, ". . . the
15:10:16 25    opening offer is not the pecuniary consideration the
```

Page 155

```
15:10:20  1    licensee [sic] ultimately expects to get"?
15:10:23  2         A.  That's correct.
15:10:25  3         Q.  And didn't you say in the same paragraph
15:10:27  4    that "An [sic] opening offer by a licensor -- even
15:10:31  5    one that is relatively high -- is no more
15:10:34  6    'unreasonable' than a low-ball counteroffer by the
15:10:37  7    prospective licensee"?
15:10:40  8         A.  Yes, I did.
15:10:40  9         Q.  And isn't it no more unreasonable because
15:10:47 10    the opening offer by the licensor will come down and
15:10:50 11    the, quote, low-ball offer by the licensee will come
15:10:54 12    up during the course of negotiation?
15:10:56 13         MR. WALL:  Objection to form; vague,
15:10:58 14    incomplete hypothetical.
15:11:02 15         THE WITNESS:  You know, your questions
15:11:04 16    come as if there's only a negotiation over price.
15:11:07 17         And what I'm trying to say, without much
15:11:10 18    success, trying to get across is that really the
15:11:13 19    negotiation is not about, you know, the royalty rate
15:11:18 20    per se.  It's almost always around what is the
15:11:23 21    cross-consideration; and secondly, what is the base
15:11:29 22    associated with the royalty rate if one is, in fact,
15:11:34 23    specified.  And that may lead to a balancing
15:11:37 24    payment; it may not.
15:11:38 25         MR. BURLING:  Q.  In your report on that
```

Page 156

```
15:11:46  1    page 25 we were looking at, with the Stasik chart --
15:11:50  2         A.  Yeah.
15:11:51  3         Q.  -- did you understand that third column to
15:11:55  4    be the announced rates for a one-way license or not?
15:12:00  5         A.  Yes, I did.
15:12:01  6         Q.  Okay.  And you understood those were
15:12:09  7    subject to negotiation?
15:12:12  8         A.  Yes, but not just negotiation around
15:12:14  9    rates.  It's -- as I've said, you know, this is --
15:12:17 10    that's just the starting point.  There's -- the
15:12:20 11    competitive canvas here is we have players that are
15:12:24 12    not just holders of IP rights; they're also
15:12:29 13    participants in the industry.
15:12:30 14         So I'm trying to point out that they wear
15:12:34 15    multiple hats.  It's a complex negotiation that
15:12:37 16    involves other consideration besides pure money
15:12:42 17    payments.  And, you know, behind it all is an
15:12:47 18    effort, in the case of many parties, to get design
15:12:51 19    freedom and operating freedom.
15:12:53 20         Q.  Are you -- is it your testimony, Professor
15:12:55 21    Teece, that in this industry, those opening royalty
15:13:00 22    rates such as announced by those companies in that
15:13:02 23    chart that you have taken from Mr. Stasik never are
15:13:06 24    negotiated down?
15:13:08 25         MR. WALL:  Objection to form.
```

40 (Pages 153 to 156)