# EXHIBIT 17

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
   50 California Street, 22nd Floor
3  San Francisco, California 94111
   Telephone: (415) 875-6600
4  Facsimile: (415) 875-6700

5     Kevin P.B. Johnson (Bar No. 177129
      kevinjohnson@quinnemanuel.com
6     Victoria F. Maroulis (Bar No. 202603)
      victoriamaroulis@quinnemanuel.com
7  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California  94065-2139
8  Telephone:     (650) 801-5000
   Facsimile:     (650) 801-5100
9
      Michael T. Zeller (Bar No. 196417)
10    michaelzeller@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
11 Los Angeles, California 90017
   Telephone: (213) 443-3000
12 Facsimile: (213) 443-3100

13 Attorneys for SAMSUNG ELECTRONICS CO.,
   LTD., SAMSUNG ELECTRONICS AMERICA,
14 INC. and SAMSUNG
   TELECOMMUNICATIONS AMERICA, LLC
15
                    UNITED STATES DISTRICT COURT
16
          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
17

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. 11-cv-01846-LHK |
| Plaintiff, | |
| vs. | **EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS** |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendant. | |

1 arise over the possibility to seek injunctive relief for the infringement of essential patents (see

2 paragraphs 49 to 53 below).

     **B.**    **"Is Samsung's royalty offer of 2.4% on relevant end products to Apple for its portfolio of W-CDMA essential patents within what I consider to be the normal FRAND range from my industry experience and within Samsung's commitments under clause 6.1 of the ETSI IPR Policy?"**

     23.    I understand that on 25 July 2011, Samsung offered a worldwide license to its W-CDMA essential patent portfolio for 2.4% for each relevant end product to Apple.   There is ample evidence from a variety of sources that establishes that Samsung's 2.4% royalty offer is FRAND.

     **1.**    *Evidence Supporting A 2.4% Headline Offer*

     24.    Based on my own industry experience and other evidence in the public domain, I believe that Samsung's offer is within the FRAND range for a patent portfolio such as that of Samsung's.

     25.    Samsung has a reputation for having a strong essential patent portfolio (see for example the press reports in respect of Samsung's licensing deals with IBM and Ericsson – Exhibits 5 and 6).

     26.    In my experience, licensors of a portfolio of the reputation of Samsung's offer to license their portfolios at rates between 1% and 2.75% as a starting point in bilateral negotiations. In practice, parties almost always negotiate a license to the licensor's entire portfolio of UMTS/WCDMA declared essential patents.

     27.    The experience of other experts within the industry confirms that single digit percentage royalties (as a headline demand) are the norm.   In the book "Technology Patent Licensing: An International Reference on 20th Century Patent Licensing, Patent Pools and Patent Platforms" (see Exhibit 7) the authors, Kearsey and Goldstein, state that "individual patent owners usually charge between 0.5 and 4 percent on essential patents."

     28.    It is well understood in the mobile telephony industry that InterDigital typically requires 1 to 3% for its W-CDMA essential patent portfolio (see page 10 of the report produced on InterDigital by RBC Capital Markets in July 2003 – Exhibit 8).

29.     Further, some members of the Next Generation Mobile Networks IPR Plenary ("NGMN IPR Plenary") have made voluntary public announcements on what they would potentially charge for a royalty on handsets which use the LTE ("4G") standard.   The royalty rates announced by each member range from 0.8% - 3.25% (the latter figure was publicly announced by Qualcomm in December 2008 (see Exhibit 9)).   The average announced royalty rate is approximately 2.1% based on my own calculation set out in a paper I authored and published in 2010 (see Exhibit 9).   There is no reason in my opinion why the LTE standard should command different levels of royalties than W-CDMA.

30.     Indeed, Motorola has made the identical 2.25% offer with regard to a license to GPRS patents as it has announced for LTE.   In July 2009, Motorola announced that it "will offer licenses under its LTE essential patents to willing licensees on FRAND terms, subject to reciprocity" and that it "expects its essential patent royalty rate for LTE systems and equipment (e.g., infrastructure and subscriber handsets) will be approximately 2.25%."   (See Exhibit 11.)   In October 2011, it was revealed in a letter from Apple's German counsel Bardhele Pagenberg that "one of the issues [in a dispute between Apple and Motorola over a GPRS patent] considered may be whether the royalty rate of 2.25% demanded by your client Motorola was a FRAND offer." (See Exhibit 12.)   It is reasonable to expect that most other licensors will follow a similar practice offering the same headline royalty rate for GSM, GPRS, UMTS, and LTE.

31.     Finally it is of significance to note that whilst I believe 2.4% is within the range of royalties of FRAND terms and conditions, in this instance it was also the headline rate offered by Samsung at what I understand to be the start of negotiations with Apple, and not the final result of the parties' negotiations.   In standard licensing practice, a preliminary offer by a licensor is usually counter-offered by a prospective licensee.   The parties then, if capable of reaching an agreement and following a period of bi-lateral negotiation, agree on terms and conditions, including a running royalty somewhere between the headline rate and initial counter offer. Exactly where that royalty rate falls depends on various factors.   The royalty rate agreed as a result of FRAND negotiations in which I have been involved has depended on factors such as the negotiating positions of the parties, the commercial relationship between them, the reputational

strength of the patent portfolios, and the willingness of the licensee to engage in good faith attempts to secure a license.  The initial headline rate offered by licensors is made with this forthcoming negotiation fully in mind, and the end result of the negotiations may be quite different from the initial offer.

32. An important aspect of the ETSI FRAND Declaration is the "condition that those who seek licences agree to reciprocate" (see clause 6.1 of the ETSI IPR Policy, Exhibit 2).  As a practical matter, 'reciprocity' refers not only to the offered terms and conditions, but to the willingness of licensees to engage in meaningful negotiations leading towards a license agreement. In my experience, it is well known that prospective licensees that co-operate and engage in meaningful negotiations and agree on FRAND terms and conditions early in the negotiating process may benefit from what might be called "most favorable terms and conditions." Prospective licensees who refuse to engage in meaningful negotiations and who instead choose a path of obfuscation, delay, and avoidance cannot expect a license under the same favorable terms. When a prospective licensee finally refuses to enter into any agreement, they can no longer be considered as prospective licensees, but rather are seen as infringers.  Infringers are subjected to enforcement proceedings, face the fullest penalties allowed by the law, and any resulting license agreement constitutes a settlement conducted in the shadow of these legal proceedings.  It cannot work any other way; if prospective licensees believe that there is no downside to not being a willing partner in a license negotiation, and that there is no penalty for being an infringer, every prospective licensee will logically select to roll the dice in litigation.  Every license negotiation would therefore end up in the courts with judges and juries being the arbitrators of licensing terms and conditions which are intended by the ETSI IPR Policy to properly be the province of commercial, arms-length negotiations between parties (ETSI IPR FAQs, Answer 7 – see Exhibit 13).

33. With regard to Samsung's 2.4% headline offer for a license to its W-CDMA essential patents, as someone who has been working more or less continuously with licensing of standard essential patents on GSM and UMTS since 1992, I therefore believe that Samsung has

-11-
EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS

1  acted in a manner consistent with Clause 6.1 of the ETSI IPR Policy and standard industry
2  practice and norms.

3  34. It is true that companies, such as Apple, who do not have the same established
4  position on W-CDMA essential patents as Samsung, face a difficult challenge negotiating
5  acceptable royalty rates that they find commercially acceptable.   It is however also true that any
6  new entrant into a successful market faces a challenge to overcome the sunk costs and prior
7  investments made by competitors.   GSM and W-CDMA are the result of enormous investments
8  in R&D made by some companies over decades.   It is fundamentally unfair that a company like
9  Apple can enter into this market, free-ride on the investments and risks taken by others, and be
10  unwilling to pay the cost of entry which every other industry participant has paid, including
11  Samsung.   That entry cost can take several forms, including taking licenses, investing in R&D,
12  participating in the standardization process and purchasing technology portfolios of which there
13  have been an increasing number on the Market as the industry reshapes itself.

14  35. There is no reason why a new market entrant, such as Apple, that is required to
15  acquire necessary technology should be treated any differently from those acquiring or building
16  manufacturing capabilities (e.g. chipset manufacturers are required to invest enormous costs in
17  chip manufacturing plants, a pre-requisite for those who wish to compete in chip manufacture).
18  For example, in 2008 RIM purchased approximately 100 or so patents from Ericsson including
19  some standard essential ones (see RIM's Management's Discussion and Analysis of Financial
20  Condition and Results of Operations for the Three Months ended May 31, 2008 – see Exhibit 14).
21  More recently in April 2011, HTC purchased 82 issued patents and 14 patent applications from
22  ADC Telecommunications relevant to 4G technology at a cost of approximately US$75 million
23  (see the Mobiledia press report 6 April 2011 – Exhibit 15).

24  36. Based on my extensive experience designing commercial solutions for companies
25  involved in the telecommunications industry, it is my opinion that the proper commercial solution
26  to Apple's apparent problem is to invest in the standardization process i.e. engage in R&D, buy or
27  otherwise acquire essential patents to use in bi-lateral negotiations with others, or accept that it
28  must pay license fees to those companies which own the technology that it is using.

37. Nortel patents are known to include a number of declared standard essential patents, and in spending US $2.6bn to acquire those patents of Nortel in July 2011, Apple's conduct appears to corroborate my opinion:  that, in order to compete commercially with its competitors without infringing their patents, it must invest in the standardization process in part.  Apple must now accept that it is required to obtain licenses from those that invested in the R&D of the W-CDMA/UMTS standards.

### 2. *Donaldson's 'Patent Counting' Method And Reliance On The Fairfield Report Are Problematic*

38. Donaldson cites a report published by Fairfield Resources International in 2009 ("Fairfield Report"), which concluded that Samsung owned 103 of 1,889 patent families that had been declared essential to W-CDMA as of 2008 (roughly 5.45%).  (Donaldson Report ¶¶ 42-43.) Donaldson then states that "a simplifying assumption can be made that, absent other evidence, all patents hold an equal value."  (Donaldson Report ¶ 44.)  Donaldson relies on the findings of the Fairfield Report and the above simplifying assumption (amongst other factors) to estimate a FRAND royalty for US patents-in-suit in these proceedings.  Donaldson's reliance on "patent counting" and the Fairfield Report is problematic for at least two reasons.

39. First, a "patent counting" approach to the valuation of patents is fundamentally flawed.  The various patented technologies which become essential to ETSI standards are the result of vastly different levels of investment in R&D, levels of risk for the developer and levels of inventiveness, thereby resulting in vastly different expectations of commercial value to the patent owner.  As not all inventions are of equal value, it would be obviously unfair to assign equal value to all essential patents.

40. The only reliable method for valuing essential patents is an in-depth analytical approach which takes into account multiple factors as one would when appraising any other valuable asset.  For example, the remaining life of the patent; end-product demand forecast; the timing of anticipated entry, the existence of non-infringing alternatives, and the expectations of and the nature and business model of the patent holder.  This type of analysis is what I have routinely experienced in practice.

-13
EXPERT REPORT OF ERIC STASIK REGARDING ETSI AND STANDARDS-SETTING MATTERS