HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
JENNIFER LEE TAYLOR (CA SBN 161368)
jtaylor@mofo.com
ALISON M. TUCHER (CA SBN 171363)
atucher@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
JASON R. BARTLETT (CA SBN 214530)
jasonbartlett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK<br><br>**APPLE'S MOTION FOR A PERMANENT INJUNCTION AND FOR DAMAGES ENHANCEMENTS**<br><br>Date:　　Dec. 6, 2012<br>Time:　　1:30 p.m.<br>Place:　　Courtroom 4, 5th Floor<br>Judge:　　Hon. Lucy H. Koh |

PUBLIC VERSION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION ............................................................................. vi

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.    APPLE IS ENTITLED TO AN INJUNCTION ......................................................... 2

    A.    Samsung's Conduct Imposes Irreparable Harm on Apple ............................ 2

        1.    Apple's loss of market share ................................................. 3

        2.    Apple's losses of future and downstream sales .......................... 4

        3.    Injury to Apple's ecosystem ................................................. 5

        4.    Dilution of Apple's trade dress ............................................. 6

        5.    Samsung's Infringement Causes the Harm Apple Is Suffering ................ 6

    B.    Money Cannot Substitute for An Injunction ............................................. 9

    C.    The Balance of the Equities Weighs Decidedly in Apple's Favor ...................... 10

    D.    The Public Interest Is Served by an Injunction ........................................ 11

II.    THE COURT SHOULD ENHANCE THE AWARD BY $535 MILLION ..................... 11

    A.    Enhancements Are Warranted Under the Patent Act ............................... 11

        1.    The jury found willful infringement ........................................ 12

        2.    The Court should find that Samsung acted despite an objectively high likelihood of infringement of valid patents ....................... 12

        3.    Every *Read* Factor Supports Substantial Enhanced Damages ................. 16

            a.    Samsung deliberately copied Apple's patented designs and technology ....................................................... 16

            b.    Samsung did not have a good faith belief that Apple's patents were invalid or not infringed ........................... 18

            c.    Samsung engaged in improper litigation tactics ......................... 19

                (i)    Samsung withheld copying evidence and made misrepresentations to the Court ........................... 19

                (ii)    Samsung was sanctioned multiple times .......................... 20

                (iii)    Samsung's publication of excluded evidence .................. 21

                (iv)    Other Samsung litigation misconduct .............................. 22

            d.    Samsung's substantial size and financial condition .................... 22

            e.    The case was not close ................................................. 22

            f.    The "duration of the conduct" was over two years at a critical time in the marketplace ........................... 22

            g.    Samsung failed to take remedial action and instead continues to sell infringing products ........................... 23

h.    Samsung's motivation was to use Apple's patented designs and technology to seize market share, revenues, and profit .......... 23

i.    Samsung attempted to conceal its misconduct ............................ 23

4.    The *Read* factors support trebling the damages award ............................ 24

B.    Enhancements Are Warranted Under The Lanham Act ...................................... 24

C.    The Court Should Award Enhancements Totaling $535 Million ........................ 25

1.    The Lanham Act Supports a $400 Million Enhancement. ....................... 25

2.    The Patent Act Separately Supports An Additional Enhancement. .......... 28

III.    CONCLUSION ............................................................................................................. 30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ........................................................................................... 11

*Acumed LLC v. Stryker Inc.*,
    551 F.3d 1323 (Fed. Cir. 2008) ........................................................................................... 11

*Apple v. Samsung Elecs. Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ....................................................................................... 7, 14

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*,
    682 F.3d 1003 (Fed. Cir. 2012) ........................................................................................... 13

*Binder v. Disability Group, Inc.*,
    772 F. Supp. 2d 1172 (C.D. Cal. 2011) ......................................................................... 24, 26

*Braun v. Dynamics Corp. of Am.*,
    975 F.2d 815 (Fed. Cir. 1992) ............................................................................................. 28

*Corse v. McBurnie*,
    No. 86-1812, 1989 U.S. Dist. LEXIS 13442 (S.D. Cal. May 26, 1989) ................................. 6

*Crocs, Inc. v. ITC*,
    598 F.3d 1294 (Fed. Cir. 2010) ........................................................................................... 14

*E.F. Johnson Co. v. Uniden Corp. of Am.*,
    623 F. Supp. 1485 (D. Minn. 1985) ..................................................................................... 11

*Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*,
    No. 86-1812, 1989 U.S. Dist. LEXIS 13442, at *1, *18-20 (S.D. Cal. May 26, 1989) .......... 6

*Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*,
    768 F. Supp. 2d 872 (E.D. Va. 2011) ................................................................................... 11

*Graham v. John Deere Co of Kan. City.*,
    383 U.S. 1 (1966) ................................................................................................................. 14

*Hybritech, Inc. v. Abbott Labs*,
    849 F.2d 1446 (Fed. Cir. 1998) ........................................................................................... 11

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ..................................................................................... *passim*

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) (en banc) ........................................................................... 12

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996) ................................................................ 12

*K-Tech, Inc. v. Vita-Mix Corp.*,
    No. 2011-1244, 2012 U.S. App. LEXIS 18773 (Fed. Cir. Sept. 6, 2012) ............................ 12

*Kaufman Co. v. Lantech, Inc.*,
    926 F.2d 1136 (Fed. Cir. 1991) ................................................................ 30

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
    988 F.2d 1117 (Fed. Cir. 1993) ........................................................... 13, 14

*La Quinta Corp. v. Heartland Props. LLC*,
    603 F.3d 327 (6th Cir. 2010) ............................................................. 24, 26

*Markman v. Westview Instr., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) ....................................................... 12

*Paper Converting Machine Co. v. Magna Graphics Corp.*
    745 F.2d 11 (Fed. Cir. 1984) ................................................................. 30

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
    725 F. Supp. 2d 474 (D. Del. 2010) ....................................................... 12, 13

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992) ..................................................... 12, 16, 22, 24

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ................................................................ 3

*Ryco, Inc. v. Ag-Bag Corp.*,
    857 F.2d 1418 (Fed. Cir. 1988) ............................................................... 30

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*,
    932 F.2d 1113 (5th Cir. 1991) ................................................................ 24

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000) ................................................................ 12

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ................................................................. 10

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ............................................................... 5

*Victor Stanley Inc. v. Creative Pipe Inc.*,
    2011 U.S. Dist. LEXIS 112846 (D. Md. Sept. 30, 2011) ........................................ 25

STATUTES

15 U.S.C.
  § 1125(c)(1) .................................................................................................................... 6
  § 1117(a) .................................................................................................................... 24, 25

35 U.S.C.
  § 284 .................................................................................................................... 11, 28, 30
  § 289 .................................................................................................................... 25, 28, 29

OTHER AUTHORITIES

Cal. R. Prof. Conduct 5-120 .................................................................................................. 21

Fed. R. Civ. P. 65(d) ........................................................................................................... vii

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 6, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Lucy Koh in Courtroom 8 of the above-entitled Court, located at 280 South 1st Street, San Jose, California, Plaintiff Apple will move, and hereby does move, that the Court order:

A.     That Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, Inc., any of their officers, directors, agents, servants, employees, attorneys, subsidiaries, and those persons acting in concert or participation with any of them who receive actual notice hereof, be hereby restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d) from infringing, contributing to the infringement, or inducing the infringement of any of Apple's U.S. Patent No. 7,469,381, U.S. Patent No. 7,844,915, U.S. Patent No. 7,864,163, U.S. Design Patent No. 604,305, U.S. Design Patent No. 593,087, and U.S. Design Patent No. 618,677, including by making, using, offering to sell, selling within the United States, or importing into the United States any of Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S, Galaxy S 4G, Galaxy S II (AT&T), Galaxy S II (i9000), Galaxy Tab, Galaxy Tab 10.1 (Wi-fi), Gem, Indulge, Infuse, Mesmerize, Nexus S 4G, Replenish, Vibrant, Galaxy S II (T-Mobile), Transform, Galaxy S Showcase, Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket) (the "Infringing Products")[1] or any other product with a feature or features not more than colorably different from any of the infringing feature or features in any of the Infringing Products.

B.     That Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, Inc., any of their officers, directors, agents, servants, employees, attorneys, subsidiaries, and those persons acting in concert or participation with any of them who receive actual notice hereof, be hereby restrained and enjoined pursuant to Fed. R.

---

[1] Apple is moving concurrently herewith for judgment as a matter of law with respect to infringement by additional Samsung products.  If the Court grants Apple's motion, Apple will move to amend the permanent injunction order as necessary and appropriate at that time.

1   Civ. P. 65(d) from diluting Apple's registered iPhone trade dress (U.S. Trademark Registration

2   No. 3,470,983) and Apple's unregistered iPhone 3G trade dress, including by selling or offering

3   to sell in the United States any of the Galaxy S 4G, Galaxy S Showcase, Fascinate, Mesmerize,

4   Vibrant, Galaxy S (i9000).[2]

5          C.      That an enhancement of $535 million be added to the existing verdict and

6   judgment.

7          The motion is based on this memorandum, the declarations submitted along with this

8   motion of Philip W. Schiller, Christopher Crouse, Terry Musika, Marylee Robinson, Russell

9   Winer, and Jason Bartlett, and the entire record of this action.

10  Dated: September 21, 2012                MORRISON & FOERSTER LLP

11                                            By:      /s/
12                                            _____

13                                            Attorneys for Plaintiff
14                                            APPLE INC.

15

16

17

18

19

20

21

22

23

24

25

26         [2] Apple is moving concurrently herewith for judgment as a matter of law with respect to
    trade dress dilution by additional Samsung products.   If the Court grants Apple's motion, Apple
27  will move to amend the permanent injunction order as necessary and appropriate at that time.

28

# INTRODUCTION

Samsung made a calculated business decision to copy the industrial designs, graphical user interfaces, and touchscreen navigation technology of the iPhone and iPad.  Samsung has reaped extraordinary rewards from its wrongful sale of iPhone and iPad clones by taking market share, revenues, and profits from Apple.  In the first six months of 2012 alone, Samsung received over 1.5 billion dollars in revenue from the 26 products that the jury found infringed and/or diluted Apple's patents and trade dresses.  Samsung's misuse of Apple's intellectual property has caused severe, long-term and irreparable harm to Apple in a market where customer loyalty is critical and at a time when many consumers are making their first smartphone purchases.

Samsung has engaged in this wrongful conduct willfully, ignoring repeated warnings from Apple, this Court, and the Federal Circuit regarding the validity and infringement of Apple's patents and the dilution of its trade dresses, as well as from the press and carriers that pointed out Samsung's obvious copying.  Samsung bet that the benefits of using Apple's intellectual property would far outweigh any damage award that might result from litigation.  Even the substantial damages awarded by the jury are dwarfed by the profits Samsung has reaped and will continue to reap from its unlawful conduct.  This Court can and should take further action.

First, the Court should order Samsung to stop its continuing infringement and dilution, which is irreparably harming Apple in ways that cannot be compensated by money damages.  The equities favor Apple and the public interest will be served by an injunction.  Thus, a permanent injunction should issue against products that the jury found to infringe Apple's patents and to dilute its trade dresses and any product with features that are not more than colorably different from the infringing or diluting features in those products.

Second, the Court should Court award a $535 million enhancement of the damages award. The Lanham Act authorizes such an award because the existing award under the Lanham Act does not fully compensate Apple for the injuries caused by Samsung's willful dilution and because that amount is just under the circumstances.  The Patent Act separately justifies the award because Samsung willfully infringed Apple's patents, the record is replete with evidence of

1    Samsung's copying and litigation misconduct, and the requested $535 million enhancement is

2    fully consistent with the jury's $1.05 billion award.

3                                          **ARGUMENT**

4    **I.       APPLE IS ENTITLED TO AN INJUNCTION**

5            A prevailing plaintiff is entitled to a permanent injunction if it can show: "that (1) it has

6    suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that

7    injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in

8    equity is warranted; and (4) the public interest would not be 'disserved' by a permanent

9    injunction." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (quoting *eBay*

10   *Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Apple satisfies all four factors.

11           **A.       Samsung's Conduct Imposes Irreparable Harm on Apple**

12           In the related case between these parties, case number 12-cv-00630 ("Apple II"), this

13   Court recently granted Apple's motion for a preliminary injunction against the Samsung Galaxy

14   Nexus smartphone, finding that Samsung's sales of that device pose to Apple a "risk of suffering

15   harm that is substantial, immediate, and irreparable" and for which money damages are

16   inadequate. (Apple II, Dkt. No. 221 at 73 & 96; *see id*. at 64-78.) The Court's findings

17   concerning the marketplace for smartphones and the irreparable harm to Apple when Samsung

18   wrongfully appropriates Apple's intellectual property apply equally here. This Court also made

19   comparable findings in this case that Apple and Samsung are direct competitors in the

20   smartphone and tablet market, Apple has lost market share to Samsung over the last two years,

21   and Apple's loss of market share to Samsung will result in harm that would be difficult to

22   quantify or remedy. (Dkt. No. 452 at 49; Dkt. No. 1135 at 5.)

23           Collectively, these findings establish the existence of irreparable harm to Apple. And

24   although there is no authority in the permanent injunction context requiring a casual nexus

25   between Samsung's continuing infringement and dilution and Apple's irreparable harm, the

26   evidence at trial—in particular, the evidence of Samsung's willful copying—and the declarations

27   included with this motion demonstrate that such a nexus exists here.

28

### 1.     Apple's loss of market share

"It is well settled that loss of market share or the permanent loss of customers as a result of infringing conduct may support a finding of irreparable harm."  (Dkt. No. 452 at 31, citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153-54 (Fed. Cir. 2011).  "Indeed, courts are most likely to grant an injunction when the plaintiff and defendant are direct competitors in the same market, because in that context, the potential harm in allowing the defendant to continue its infringing conduct may be the greatest."  (Apple II, Dkt. No. 221 at 65 (citing *Robert Bosch*, 659 F.3d at 1153; and *i4i Ltd. P'ship*, 598 F.3d at 861).)

"That Apple and Samsung are direct competitors in the smartphone market cannot be genuinely disputed."  (Apple II, Dkt. No. 218 at 66.)  "[E]vidence shows that Samsung is now Apple's largest smartphone competitor worldwide and is rapidly becoming Apple's largest competitor in the U.S. market."  (*Id.* at 67.)  The direct competition extends particularly to consumers who "are looking to make first-time smartphone purchases," who both account for a major portion of new Apple and Samsung customers and are a highly coveted group in light of market dynamics discussed below.  (Dkt. No. 452 at 31.)[3]  In the tablet market, Apple and Samsung similarly are "direct competitors."  (Dkt. No. 1135 at 5.)

Samsung's sales of the infringing and diluting products are substantial.  They include over 53% of Samsung's U.S. smartphone sales from June 2010 through June 2012, generating over $7.25 billion in revenue.  (Musika Decl. ¶ 29.).  Since Samsung launched the Galaxy Tab 10.1 (WiFi) in the second quarter of 2011, Samsung has sold about 585,000 infringing Galaxy Tab 10.1 (WiFi) devices, generating about $237 million in revenue.  (Robinson Decl. ¶ 37.)  In the

---

[3] Samsung's documents repeatedly show Samsung's single-minded focus on competing with Apple.  In June 2011 — shortly before launching the Galaxy S II — Samsung stated that its goal was to "beat Apple" in the smartphone market.  (PX58.1, 58.3, 58.5; *see also* PX62.1, 62.12-62.15, PX62.22-62.28 (Samsung "iPhone 5 Counter Strategy" relying on Galaxy S II and other models to compete against Apple).)  Similarly, in October 2011, Samsung emphasized in its business plan the desire to ██████████ ████████.  (PX184.23-184.29.)  Samsung's records are replete with evidence of Samsung's efforts to compete head to head with Apple in the U.S. market.  (*See, e.g.,* PX60 (STA Paradigm Shift) ("US market becoming a two horse race between Apple and Samsung").)

1   first two quarters of 2012 alone, Samsung sold about 165,000 Galaxy Tab and Galaxy Tab 10.1

2   (WiFi) devices, with combined revenues of approximately $55 million.  (*Id.*)

3        Samsung's massive infringement and dilution through the Galaxy series phones has

4   enabled Samsung to gain substantial market share.  Between June 2010, when the first Galaxy S

5   phone was introduced, and June 30, 2012, Samsung's U.S. market share jumped six-fold from 5%

6   to above 30%.  (Musika Decl. ¶ 30.)

7        Samsung's market share gain has come at Apple's expense, eroding Apple's position as

8   the market leader over the past two years.  Samsung's successful strategy has been to "blunt" and

9   "undercut" Apple using the Galaxy products to take the leading position in the U.S. smartphone

10  market.  (PX62.11-15.)   In February 2012, Samsung concluded that as a result of its own rapid

11  growth in market share, the U.S. smartphone market was "becoming a two horse race between

12  Apple & Samsung."  (PX60.8.)  Given the scope of the competition and the size of Samsung's

13  gains, this Court previously  rejected Samsung's arguments that Samsung's infringing conduct

14  will not lead to significant market share losses for Apple.  (Apple II, Dkt. No. 221at 72).  As the

15  Federal Circuit has recognized, loss of market share alone can satisfy the irreparable harm

16  requirement.  *Bosch LLC*, 659 F.3d at 1153-54.

17                  **2.      Apple's losses of future and downstream sales**

18       As this Court noted, "[t]he high degree of brand loyalty to Apple, which discourages

19  Apple purchasers from switching to other brands, creates customer retention that potentially has

20  long term implications for downstream purchases."  (Dkt. No. 452 at 32.)  Thus, when a customer

21  buys an infringing or diluting Samsung product instead of an iPhone or iPad, Apple not only loses

22  profits on the sale of that product, it may also "lose sales of tag-along products like apps, other

23  Apple devices such as desktops, laptops, and iPods, and future models of Apple smartphones."

24  (*Id.*)  Samsung's own documents and admissions reinforce these findings.  Samsung has

25  concluded that Apple customers are "very sticky" and "loyal" to Apple.  (PX60.18.)  Similarly,

26  Mr. Don-Joo Lee, the head of sales and marketing for Samsung's mobile division, admitted at his

27  deposition that one of Samsung's strategies is "to get first-time smartphone users before they're

28

1    locked into the [Apple] IOS so that Samsung can lock them into the Android []OS."  (Bartlett

2    Decl. Ex. 1 at 9:3-13, 71:22-72:19.))

3          This Court has recognized that this is a critical transition period for the mobile phone

4    market, because a large number of potential customers are abandoning feature phones for

5    smartphones.  (Dkt. No. 452 at 31-32; Apple II, Dkt. No. 221 at 71-72.)  These first-time

6    smartphone purchasers are likely to develop brand and platform loyalty that will affect future

7    sales and market share for years to come (*id.*), which makes the harm to Apple from loss of

8    follow-on and downstream sales particularly severe.  (Musika Decl. ¶ 20-28, 35-39.)

9          While the fact that Apple will lose downstream sales from Samsung's conduct is certain,

10   the full extent of the harm to Apple from the loss of downstream sales cannot be quantified with

11   reasonable certainty.  (Musika Decl. ¶ 35-39.)  Apple limited its claim for lost profits at trial to

12   sales that were directly displaced by Samsung's infringing sales because of the difficulty in

13   proving to a reasonable certainty the lost profits on items other than the first displaced sale.  (*Id.*)

14   As this Court and the Federal Circuit have recognized, these types of losses constitute irreparable

15   harm.  (Dkt. No. 452 at 32 ("loss of customers and future downstream purchases would be

16   difficult to recover and can support a finding of irreparable harm").)  *See Verizon Servs. Corp. v.*

17   *Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007).

18                    **3.      Injury to Apple's ecosystem**

19         Apple also is suffering irreparable harm to the entire Apple "ecosystem" from the

20   resulting smaller base of iPhone users.  Here, as in the related case, Apple has presented evidence

21   showing that "network effects help shape the smartphone market," such that "customer demand

22   of a given smartphone platform increases as the number of other users on the platform increases."

23   (Apple II, Dkt. No. 221 at 76; *see* Musika Decl. ¶¶ 38-39 (discussing harm arising from damage

24   to the Apple ecosystem).)  The reduction of the number of iPhone users will reduce the demand

25   for the Apple platform and "further exacerbate the magnitude of Apple's harm" to an extent that

26   is not quantifiable with reasonable certainty.  (Apple II, Dkt. No. 221 at 76.)

27

28

### 4.     Dilution of Apple's trade dress

The jury found that Samsung willfully diluted Apple's registered iPhone trade dress and unregistered iPhone 3G trade dress.  (Dkt. No. 1931 at 11-12.)  Under the Lanham Act, subject to the principles of equity, a trademark owner who establishes a likelihood of dilution "shall be entitled to an injunction . . . regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).  Moreover, Samsung's diluting sales injure Apple's brand equity and the ability of Apple to use its trade dress to attract and retain customers.  (Winer Decl. ¶¶ 7-14).  Accordingly, the Court should permanently enjoin Samsung from selling each of the diluting phones without further consideration of the harm being caused Apple—the dilution alone is sufficient.

The dilution continues even though Apple has introduced the iPhone 5 and will soon cease directly selling the iPhone 3GS.  The iPhone 3G trade dress continues to be closely associated with Apple because the trade dress of the iPhones that Apple currently offers incorporate many elements of the trade dress found to be diluted, and also because of Apple's extensive advertising of the iPhone 3G and 3GS phones, the sheer number of those phones sold, and the large number of consumers who continue to use their recently purchased iPhone 3GS phones in public.  (Schiller Decl. ¶ 15.)  The iPhone 3GS continues to be available through third-party resellers, like Amazon.com, and refurbished iPhone 3GS phones are widely available in the secondary market.  (Bartlett Decl. ¶¶ 2-3.)  Apple continues to provide replacement iPhone 3GS phones to customers with phones that cannot be repaired.  (Crouse Decl. ¶ 3.)  The ongoing third-party sales, Apple distribution of replacement phones, and strong associations with Apple warrant an injunction.  *See e.g., Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, No. 86-1812, 1989 U.S. Dist. LEXIS 13442, at *1, *18-20 (S.D. Cal. May 26, 1989) (enjoining diluting products because Ferrari "continues to maintain a residual goodwill in the unique design of the DAYTONA SPYDER" even though car was no longer manufactured).

### 5.     Samsung's Infringement Causes the Harm Apple Is Suffering

This Court ruled in the related case that to obtain a preliminary injunction Apple did not need to show that the infringed "patented features are the sole or even the primary driver of

consumer demand," but that the infringement must cause "more than an insubstantial loss of market share."  (Apple II, Dkt. No. 221 at 79; *see Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("some causal nexus between Samsung's infringement and the alleged harm to Apple").  "That a patented feature drives consumer demand may be proven by direct evidence, such as consumer surveys, or by circumstantial evidence, such as evidence that the feature is a 'core' feature of the product at issue." (Apple II, Dkt. No. 221 at 80.)  The trial record and the declarations submitted with this motion show that the harm discussed above stems in significant part from Samsung's misuse of Apple's intellectual property.

*Industrial and GUI design drive consumer demand.*  Apple distinguishes its products in the market based in significant part on their beautiful designs.  Mr. Schiller emphasized how the designs are featured in Apple's marketing.  (Tr. 627-640 (Apple ads feature the "product as hero")); Schiller Decl. ¶ 13 (same).)  In multiple surveys, more than 80% of iPhone purchasers identify "attractive appearance and design" as being significant to their purchases.  (*Id.* ¶ 11 & PDX 10.1.)  Evidence and testimony from Samsung confirms the importance of design.

When the iPhone came out in 2007, Samsung's internal analysis identified "Beautiful design" as one of three "Factors that Could Make iPhone a Success."  (PX34.38)  An April 2011 internal Samsung study concluded that "Exterior Design" was the "Biggest reason for purchasing" a smartphone, with up to 40% of customers identifying it as a factor inducing purchase.  (PX185.11; *see also* PX185.18 (exterior design more than twice as important as carrier, processing speed, application, screen size).)  Dr. Benner, Samsung's internal consumer research expert, could not identify a single survey in which "the physical appearance of the phone is unimportant to consumer purchasing behavior."  (*Id.* at 37:23-38:3.)

Unbiased sources confirm that design is a substantial factor in smartphone purchases.  A JD Power survey commissioned by Samsung found that 45% of consumers listed "Liked overall design/style" as important to their purchase.  (Bartlett Decl. Ex. 4 at 395).)  That response was the most frequently selected among more than 20 listed factors.  *Id.*  Boston Consulting Group studied the smartphone market for Samsung in 2010 and concluded: "Apple is universally

1  regarded as being a master of innovation; Innovative hardware design & intuitive user

2  experience . . . allow Apple to invent & *reinvent* product categories." (PX54.6.)

3      Samsung's only response to the substantial evidence establishing the importance of design

4  was to point to a survey with low response rates to a question regarding "Design/Color."

5  (DX592.) As Mr. Schiller explained, the low response rates stemmed from the requirement that

6  people choose only one response, the inclusion of "color" in the query, and the inclusion of the

7  category "Brand/Model," which also evokes "design" for Apple's products. (Tr. at 717-20.)

8  Properly evaluated, the result is consistent with Apple's research and third parties' conclusions.

9      In sum, this overwhelming evidence of the importance of industrial and graphical user

10  interface design to smartphone purchases establishes a nexus between Samsung's infringement

11  and dilution, and the harm suffered by Apple due to the infringing and diluting products.

12      ***Apple's iOS utility patents drive consumer demand.*** Samsung's own documents confirm

13  the importance to consumer demand of Apple's iOS utility patents. GravityTank, an independent

14  consulting firm, reported to Samsung about the impact of Apple's technology on the market,

15  stating: "Its' cool. It's extraordinary. Like the world of tomorrow, you can enlarge pictures and

16  move them around—it's magic." (PX36.21.) "Consumers applaud the iPhone's ease of use and

17  simplicity." (PX36.24.) "Fun. Gestures like two finger pinch and flick add a game-like quality

18  to interactions . . . . Whimsical. Lists bounce, icons flitter." (PX36.36.)

19      GravityTank's conclusions align with Scott Forstall's and Phil Schiller's testimony on the

20  importance of these features to the consumer's experience. (Tr. 751-59 (tap to zoom feature

21  creates "dramatically better experience browsing the web"); Tr. 629-38 & PX 146.6 (customer

22  survey showing that "ease of use" was important to 95% of U.S. customers); *see also* Schiller

23  Decl. ¶ 12 & PDX 10.2 (importance of ease of use).) Samsung's intensive effort to copy these

24  specific patented features confirms their importance to consumer demand. (PX46.66

25  (copying '381 "bouncing visual effect" for browsing web pages); PX195.1 (reviewing efforts to

26  "obtain[] the bounce effect that was similar to the iPad"); PX44.58 (adopting iPhone methods to

27  double-tap to zoom content in a web browser); PX38.24 ("Adopt Double-Tap to zoom as a

28  supplementary zooming method . . . . The UX of the iPhone can be used as a design

1    benchmark"); PX57.4, .15-.20 ("major problem areas" of Samsung tablet include "GUI" and

2    "Visual Effect" "in comparison to iPad2"); Robinson Decl. Ex. 30 (noting "no Bounce effect is

3    provided" in Galaxy Tab and "thus is unemotional"); *id.* Ex. 31 (discussing how to modify tablet

4    software to create "bounce effect similar to the iPad").

5           Apple also provided specific evidence from a choice-based conjoint survey that

6    demonstrates that Samsung purchasers are willing to pay more for the individual patented features

7    that Samsung has been found to infringe.  (PX30; Tr. 1915:7 – 1916:7.)  Dr. Hauser, a nationally-

8    recognized expert from MIT's Sloan School of Management, conducted the survey (Tr. 1914:5-

9    22) and Dr. Singh and Dr. Balakrishnan vetted its descriptions of the technology (Tr. 1923:10-13).

10   Using the same methods that major companies use outside of court, the results show that

11   Samsung consumers who purchased the infringing products would be willing to pay $39 more for

12   a smartphone or $45 for a tablet that included the technology of the '915 Patent and $100 more

13   for a smartphone or $90 for a tablet that included the technology of all three of the utility patents.

14   (Tr. 1929:12-16; 1946:4-9; PX30.)  This evidence demonstrates strong consumer demand for

15   each patented invention.  (*See also* Musika Decl. ¶¶ 40-57; Robinson Decl. ¶¶ 34-42).

16          ***The combined effects of Samsung's infringement and dilution create an even greater***

17   ***effect on consumer demand***.  While each intellectual property right individually would justify an

18   injunction, Samsung's extensive infringement and dilution exceeds the impact of the infringement

19   of any individual right by itself.  Samsung copied the phones' external look and feel, the

20   graphical user interface, and Apple's implementation of multi-touch technology.  Samsung copied

21   these designs and features because it believed, rightly, that copying all of those elements together

22   improved the competitiveness of its Galaxy line of smartphones.  Samsung cannot now avoid an

23   injunction by arguing that the Court should ignore the overall effect of its misconduct.

24          **B.      Money Cannot Substitute for An Injunction**

25          The harms discussed above cannot be fully compensated through money damages.

26   Damages to address them cannot be calculated to a reasonable certainty, even if they could be

27   calculated at all.  (Musika Decl. ¶¶ 29-39.)  The Court found in the related case that "the full

28   extent" of Apple's losses—including "lost market share and permanent loss of customers" and

APPLE'S MOTION FOR PERMANENT INJUNCTION AND DAMAGES ENHANCEMENTS
CASE NO. 11-cv-01846-LHK                                                                        9
sf-3194189

1   "lost sales in downstream product markets"—"would likely be unascertainable, difficult to

2   calculate, and irreparable" and could not be compensated by money damages.  (Apple II, Dkt.

3   No. 221 at 73, 76, 78.)  Apple has shown that it has suffered and will continue to suffer the

4   identical types of harm from Samsung's adjudicated infringement and dilution, and thus also has

5   shown irreparable harm that money cannot compensate.  ( Musika Decl. ¶¶ 29-39.)

6          Denial of an injunction would amount to a compulsory license of Apple's intellectual

7   property to a direct competitor, which could not possibly compensate Apple for the full extent of

8   the harm that Apple will suffer from Samsung's continued sale of infringing and diluting products.

9   The testimony of Apple's Director of Patent and Licensing Strategy, Boris Teksler, confirms that

10  Apple would not willingly license the infringed patents and designs for use in iPhone knockoffs

11  that Apple considers the asserted utility patents and iPhone designs critical to Apple's "brand

12  identity," (Tr. 1954:22-1957:9, 1963:23-1964:8), and that the patents at issue are "in Apple's

13  unique user experience and not ones that we would license."  (Tr. 2010:15-17, 2012:15-16.)

14  Although Apple offered Samsung a license to certain other Apple patents, there was no offer to

15  license any of the Apple patents at issue in this case.  (Tr. 2013:9-2014:6, 2022:22-24.)

16         **C.      The Balance of the Equities Weighs Decidedly in Apple's Favor**

17         The substantial and irreparable harm that Apple will continue to suffer without immediate

18  injunctive relief far outweighs any potential harm to Samsung, which has deliberately copied

19  Apple's designs and willfully infringed and diluted Apple's utility patents and trade dress rights

20  for more than two years.  From the introduction of the i9000 through the Galaxy S II, Samsung's

21  relentless infringement and dilution has continued unabated notwithstanding Apple's demands,

22  the Federal Circuit's findings, this Court's conclusion in December 2011 that Apple was likely to

23  succeed on its claims as to the D'677 patent and '381 patent, and warnings from the press and

24  Samsung's own carriers about obvious copying.

25         The jury's findings of willful infringement and dilution tip the scale dramatically in favor

26  of an injunction.  (Dkt. No. 1931 at 9.)  Courts "need not balance the hardship when a defendant's

27  conduct has been willful."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358 (5th

28  Cir. 1996).  Thus, "[a] willful infringer which seeks to profit by copying from others' creative

ideas should not be heard to complain that its interests will be disturbed by an injunction." *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1504 (D. Minn. 1985) (citation omitted).

### D.    The Public Interest Is Served by an Injunction

There is a "strong public interest in preserving the rights of patent holders." *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*, 768 F. Supp. 2d 872, 882 (E.D. Va. 2011). "The patent laws promote . . . progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008).

The public interest is particularly strong where, as here, an injunction will not prevent Samsung from selling smartphones and tablets altogether; it will simply prevent Samsung from selling products that use Apple's designs, Apple's patented technology, and Apple's trade dress. There is no countervailing "critical public interest that would be injured by the grant" of injunctive relief. *Hybritech, Inc. v. Abbott Labs*, 849 F.2d 1446, 1458 (Fed. Cir. 1998) (footnote omitted). Smartphones and tablets are widely available, and an injunction would implicate no public health or safety issues. Samsung Chief Strategy Officer Justin Denison testified that Samsung markets fifty new mobile phones each year, (Tr. 880-81), and Samsung's expert Michael Wagner testified that Samsung had multiple alternatives available to it that it could cheaply pursue. (Tr. 3036-38.) *See Acumed LLC v. Stryker Inc.*, 551 F.3d 1323, 1331 (Fed. Cir. 2008) (no public interest bar to injunction because non-infringing alternatives exist).

## II.    THE COURT SHOULD ENHANCE THE AWARD BY $535 MILLION

Samsung willfully infringed Apple's patents and willfully diluted its trade dress, taking billions in sales in the fast-growing U.S. smartphone market at a key moment in the transition between feature phones and smartphones. Two statutes each justify separate enhancements of the jury's monetary award. Apple thus requests an enhancement of $135 million under the Patent Act and $400 million under the Lanham Act, for a combined total of $535 million.

### A.    Enhancements Are Warranted Under the Patent Act

Under the Patent Act, the Court may "increase the damages up to three times the amount found or assessed" because Samsung's conduct was willful. 35 U.S.C. § 284. "The paramount

1    determination . . . is the egregiousness of the defendant's conduct based on all the facts and

2    circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992).  Once the jury

3    finds willful infringement, enhancement is appropriate so that the willful infringement finding

4    will not be rendered meaningless, s*ee Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571-72 (Fed. Cir.

5    1996), and courts must provide a justification if they decide not to enhance the award.  *See Tate*

6    *Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 972 (Fed. Cir. 2000).

### 1.      The jury found willful infringement

8          The jury found that 25 out of 26 accused Samsung smartphones violated one or more of

9    Apple's utility or design patents, with two—the Galaxy S (i9000) and the Galaxy S 4G—

10   violating all of the patents asserted against them.  (Dkt. No. 1931 at 2-12.)  The jury also found

11   that Samsung's infringement was willful.  (Dkt. No. 1931 at 9.)  The jury's findings are amply

12   supported by extensive evidence that the risk that it was infringing "was either known or so

13   obvious that it should have been known" to Samsung.  *In re Seagate Tech., LLC*, 497 F.3d 1360,

14   1371 (Fed. Cir. 2007) (en banc).  The evidence establishes that Samsung intended to take Apple's

15   market share by deliberately copying the iPhone design and features, and that Samsung lacked a

16   good faith belief that Apple's patents were invalid or not infringed.  (*See*, *e.g.*, PX44 (comparing

17   iPhone features to Galaxy S1 features, with "Direction for Improvement" for each Samsung

18   feature); PX36.20 (consultant's report to Samsung that iPhone was considered a "revolution").)

### 2.      The Court should find that Samsung acted despite an objectively high likelihood of infringement of valid patents

21         With little or no evidence of non-infringement and only insubstantial prior art defenses,

22   the trial record proves that Samsung "acted despite an objectively high likelihood that its actions

23   constituted infringement of a valid patent."  *Seagate*, 497 F.3d at 1371.  Objectively high

24   likelihood of infringement has been found where, as here, the accused infringer deliberately

25   copied products embodying the patents-in-suit.  *K-Tech, Inc. v. Vita-Mix Corp*., No. 2011-1244,

26   2012 U.S. App. LEXIS 18773, at *26-28 (Fed. Cir. Sept. 6, 2012) (objectively high likelihood of

27   infringement shown when defendant deliberately copied and non-infringement theories and

28   invalidity theories rejected on summary judgment or by jury); *Power Integrations, Inc. v.*

1    *Fairchild Semiconductor Int'l*, 725 F. Supp. 2d 474, 477 (D. Del. 2010) ("meticulous study of

2    products" followed by "blatant copying" demonstrated objectively high risk of infringement).

3    The existence of objective willfulness is a question of law.  *Bard Peripheral Vascular, Inc. v.*

4    *W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).

5           The record also establishes the objectively high likelihood that Samsung's products would

6    be found to be substantially the same as the hardware and software designs embodied in the

7    iPhone and claimed in the D'677, D'087 and D'305 patents.  The Court previously found that the

8    ordinary observer would likely find that the Samsung products at issue in the preliminary

9    injunction phase are "substantially the same" as the D'677 patent.  (Dkt. No. 452 at 26.)  The

10   substantial similarity of the designs was plain to the press, which characterized some of the

11   accused products as "shockingly similar" to the iPhone.  (PX6.1)  It was plain to Samsung too,

12   which noted the "[s]trong impression that iPhone's icon concept was copied," (PX44.131), and of

13   course was aware of its own choice to copy.  *See* Part II(A)(3)(a), *infra*.  Samsung therefore acted

14   despite an objectively high risk that it would violate Apple's iPhone patents.  *See Power*

15   *Integrations*, 725 F. Supp. 2d at 477 (objectively high likelihood of infringement found when

16   infringer "engaged in a meticulous study of products made with the patented features through

17   detailed reverse engineering efforts and then blatantly copied the products without any regard to

18   the high likelihood of infringement that would arise from such blatant copying").

19          No Samsung witness refuted infringement of the product designs.  Samsung's

20   infringement defense rested almost entirely on the argument that an actual customer would not

21   confuse the products at the point of sale.  As noted by both the Federal Circuit and this Court,

22   however, design patent infringement does not require that purchasers be "likely to be confused or

23   deceived or mistakenly think they were buying the" patent-holder's product.  *L.A. Gear, Inc. v.*

24   *Thom McAn Shoe Co.*, 988 F.2d 1117, 1126, 1134 (Fed. Cir. 1993); Dkt. No. 1774 at 2

25   ("[c]onsumer confusion is not required to establish design patent infringement").)

26          Samsung also disregarded the objectively high likelihood that Apple's design patents

27   would be found valid.  The Court previously held that Samsung failed to raise a substantial

28   question as to the validity of the D'677 patent (Dkt. No. 452 at 24), and the Federal Circuit

1    reversed this Court's finding that Samsung had raised a substantial question as to validity of the

2    D'087 patent.  *Apple*, 678 F.3d at 1327.  At trial, Samsung argued that the designs were obvious,

3    which required Samsung first to identify a "'single reference'" that was "'basically the same'" as

4    the patent at issue.  *Id*. at 1329.  Yet Samsung did not even attempt to identify such a reference in

5    connection with the D'305 patent, and it relied primarily on the prior art previously rejected by

6    this Court and the Federal Circuit as to the D'677 and D'087.

7         Even if Samsung had assembled the basic elements of an obviousness defense, it could not

8    reasonably have expected to overcome the compelling objective indicia of non-obviousness,

9    which linked the extraordinary commercial success of the iPhone with its design.  (PX34.38

10   "([b]eautiful design" an iPhone success factor); PX36.31 (iPhone design "set the standard");

11   PX135/1 (top reason that iPhone was *Time* magazine's 2007 invention of the year was "the

12   iPhone is pretty").)  *See Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310-11 (Fed. Cir. 2010) (finding

13   design patent non-obvious partially due to commercial success of product that embodied design).

14   Nor could Samsung reasonably have hoped to explain its copying, which is also classic evidence

15   of non-obviousness.  *See Graham v. John Deere Co of Kan. City.*, 383 U.S. 1, 17-18 (1966).

16        Samsung also argued that elements of the asserted designs were "dictated by function"

17   and the patents were thus invalid.  *L.A. Gear*, 988 F.2d at 1123.  In the preliminary injunction

18   phase, however, the Court held that this argument failed to raise a substantial question of

19   invalidity of the D'677 and D'087 patents.  (Dkt. No. 452 at 14.)  In light of the undisputed

20   availability of a wide variety of alternative designs, no reasonable party in Samsung's position

21   would have thought that the design patents-in-suit were dictated by function.  (*See* PX3 (Samsung

22   pre-iPhone designs), PX10 (alternative designs), PX148 (Nokia Lumia), PX150 (Casio G'zOne

23   Commando), PX158A (alternative GUI design), PX165-68 (Apple design models).)

24        Samsung also disregarded the objectively high likelihood that it violated Apple's utility

25   patents.  No Samsung expert offered a non-infringement opinion as to the '381 patent.  On the

26   '163 patent, Mr. Gray offered a garbled and irrelevant observation about "nested boxes," even

27   though claim 50 plainly covers gestures to select and center non-overlapping boxes of content.

28   (Tr. 2923.)  This "defense" was not even colorable; Mr. Gray had conceded at his deposition that

1    the claims "could also be used to cover configuration of boxes which aren't overlapped or

2    nested." (Bartlett Ex. 5 at 179-80).)  On the '915 patent, Samsung made a half-hearted assertion

3    that the number of touches did not "cause" a scroll or gesture operation because there were

4    intervening programming steps (Tr. 2911), an argument entirely at odds with the patent

5    specification and the Court's construction of "invokes." (Dkt. No. 1158 at 20 (in construing

6    "invokes," noting that "the event object is not required to directly call a function").)

7        Samsung's validity defenses as to the utility patents were likewise objectively highly

8    unlikely to succeed.  The Court previously found that Samsung failed to raise a "substantial

9    question of validity" as to the '381 patent. (*Id.*)  The only different prior art that Samsung

10   presented at trial was the Diamond Touch system. (PX210.)  The '381 patent claims are limited

11   to a "touch screen display," however, which the Diamond Touch is plainly not. *Id.*  Furthermore,

12   although the asserted claim requires certain *computer instructions* "in response to" the edge of a

13   document being reached, Samsung's expert admitted that he never even looked at the DT

14   "Tablecloth" source code in forming his opinion. (Tr. 2874:6-13.)  Apple's expert, in contrast,

15   confirmed that the Tablecloth source code simply re-centered the original screen display and did

16   not perform any edge detection. (Tr. at 3633:23-3634:11 ("[A]ll they do is any time the finger is

17   lifted off the table, it just simply recenters the image . . . . And I confirmed this in the source code

18   as well.").)  Samsung's obviousness defense could not reasonably be expected to overcome the

19   secondary indicia of non-obviousness.  The bounce-back action of the '381 patent, for example,

20   was specifically identified in Samsung documents as one of the successful features of the iPhone,

21   (PX44; PX46), which Samsung itself worked hard to replicate. (PX195.)

22       Samsung's invalidity defense to the '915 patent was similarly frivolous.  Samsung

23   attempted to rely on DT FractalZoom, Han and Nomura as supposedly anticipatory to the '915

24   patent.  The first two references plainly were not touch screens integrated with a data processing

25   system, as required by claim 8.  Mr. Gray did not attempt to match Han to the claim limitations,

26   did not identify any source code, and instead hoped to prove anticipation through a 30-second

27   video that proved only that the Han system was not "integrated." (Tr. at 2908:1-2910:5 (Samsung

28

expert discussing Han system without reference to source code).)  For Nomura, Gray did not

identify in the reference any events, objects or views, the three key technical elements of claim 8.

Samsung also failed to show that any prior art system taught manipulation of a

"structured" electronic document as claimed in the '163 patent.  Samsung copied the tap-to-zoom

function of the '163 patent, which again is strong evidence of non-obviousness.  (PX44.94)

In sum, Samsung was objectively highly unlikely to prevail on either its non-infringement

or its invalidity defenses.  The Court should so find.

### 3. Every *Read* Factor Supports Substantial Enhanced Damages

Where, as here, a jury has found willful infringement, the *Read* factors determine whether

and how much to enhance damages.  *See i4i*, 598 F.3d at 859.  The *Read* factors require

consideration of:  (1) whether Samsung deliberately copied Apple's patented technology or

designs; (2) whether Samsung had a good faith belief that the patents were invalid or not

infringed; (3) Samsung's litigation conduct; (4) Samsung's size and financial condition; (5) the

closeness of the case; (6) the duration of Samsung's misconduct; (7) remedial action taken by

Samsung; (8) Samsung's motivation for willfully infringing; and (9) whether Samsung attempted

to conceal its misconduct.  *See Read Corp.*, 970 F.2d at 826-28.  As demonstrated below, each of

these factors weighs in favor of substantial enhanced damages.

### a. Samsung deliberately copied Apple's patented designs and technology

There is overwhelming evidence that Samsung recognized the iPhone as a severe threat to

Samsung's smartphone sales and responded by deliberately copying the iPhone's designs and

features.  Soon after Apple introduced the iPhone, Samsung's LSI division—which manufactured

components for Apple—listed the iPhone first in a list of "four key factors that we expect will

shape handsets in the coming five years."  (PX34.13.)  It also concluded that the iPhone's

"[b]eautiful design" and "[e]asy and intuitive UI" were among the key iPhone "[s]uccess

[f]actors" and that copying them would be "easy."  (PX34.38.)  Samsung's consultants confirmed

the importance of the iPhone's hardware design and UI design and features, and reported that

"pundits" and "iPhone users" alike considered the iPhone "a revolution."  (PX36.)  Carriers

1  pressured Samsung to "make something like the iPhone." (PX40.2.) Samsung's phone sales fell

2  dramatically as iPhone sales soared. (Tr. 2044 (Musika testimony that "Samsung was losing

3  market share during the period prior to 2010").)

4       By February 2010, Samsung executives concluded that Samsung was suffering a "crisis of

5  design." (PX40.5.) Samsung responded by convening designers from several plants in an

6  intensive, three-month effort to copy the iPhone. (Tr. 2530:10-2531:16 ("we . . . worked together

7  as a team for about three months").) Samsung wrote a 138-page "Relative Evaluation Report,"

8  which contained 126 "Direction[s] for Improvement" to make Samsung's phone like the iPhone.

9  (PX44.) Samsung's three-month crucible of copying forged the Galaxy S i9000, which,

10  consistent with the hundreds of copying directives in the Relative Evaluation Report:  copied the

11  iPhone industrial design (PX3 (comparing Samsung smartphones before iPhone to Samsung

12  smartphones after iPhone)) copied the iPhone user interface features claimed in the patents-in-suit

13  (PX36 ("Lists bounce, icons flitter – the iPhone has a sense of whimsy"); PX38 ("Adopt Double-

14  Tap as a supplementary zooming method . . . . The UX of iphone can be used as a design

15  benchmark."); PX44.58 (comparing iPhone "Double Tap" to S1 in development, "Double Tap

16  zoom in/out function needs to be supplemented"); PX46.66 (comparing iPhone "bounce" to

17  Behold3 in development, "Provide a fun visual effect when dragging a web page"); PX57.19

18  (lack of "Fun, Wow Effect" is "Critical" and concluding "[B]ounce effect is scheduled to be

19  reviewed"); PX186.1 ("there is no latex effect of having the screen follow along and then

20  returning when you are moving past the edge. (Refer to the iPad)"); PX195.1 ("With regards to

21  bounce, we used the Mass Spring Damper model which was modeled after the actual physical

22  effect and obtained the bounce effect that is similar to the iPad[.]")); and copied the iPhone home

23  screen, down to the shading on the icons (PX35 ("iPhones icons to are colorful and vibrant,

24  however they are in contained square which appear more organized and consistent."); PX44.131

25  (comparing iPhone icons with "[L]ight used . . . gives a luxurious feel" to GT-i9000 icons in

26  development and concluding "[I]nsert effects of light for a softer, more luxurious icon

27  implementation"). Not surprisingly, the press called the phone "very iPhone 3GS-like." (PX6.)

28

Samsung thereafter introduced a whole series of infringing phones that the press called out as "shockingly similar" to Apple's iPhones.  (JX1010 (Galaxy S Vibrant); Dkt. No. 1189 at 12-13 (listing Samsung product release dates); JX1013 (Galaxy S Fascinate); JX1015 (Galaxy S Mesmerize); PX6 ("[t]he Vibrant's industrial design is shockingly similar to the iPhone 3G[.]").) In February 2011, Samsung introduced the Galaxy S 4G, which the jury found infringed every one of Apple's patents-in-suit.

**b.      Samsung did not have a good faith belief that Apple's patents were invalid or not infringed**

The jury's willfulness findings establish that the jury did not believe that Samsung acted with a good faith belief that Apple's patents were invalid or not infringed.  (*See* Dkt. No. 1903, JI No. 59 ("to prove willful infringement, the patent holder must persuade you by clear and convincing evidence that the other side acted with reckless disregard of the patent it infringed").) Indeed, Samsung presented no evidence from which the jury or the Court could conclude that Samsung had formed such a belief.  At trial, no Samsung witness claimed to have investigated and formed a good-faith belief that any of Apple's patents were invalid or not infringed.

The record is replete with evidence contradicting good faith, including the overwhelming evidence of deliberate copying, which continued notwithstanding demands from Apple to stop infringing and rulings from this Court and the Federal Circuit finding likely infringement.  In August 2010, immediately after Samsung introduced its Galaxy S i9000 and Vibrant smartphones, Apple met with Samsung and explicitly told Samsung to stop copying Apple's iPhone "patents and designs."  (PX52 (Apple August 2010 presentation); PX201 at 31:15-16; 31:18-20; 33:21-24; 37:21-38:05 (testimony of Jun Won Lee that Apple raised Samsung's infringement of "Apple phone's patents and design").)  Apple pointed out the similarities between the iPhone design (protected by the D'677, D'087, and D'305 patents and the trade dress) and the Galaxy S i9000's design.  (*Id.*; PX52.17-19; Tr. 1958–1962 (testimony of Boris Teksler regarding Apple's presentation to Samsung in August 2010 which included discussion of similarities of iPhone and Galaxy S i9000).)  Apple specifically identified the '381 bounce patent among many patents that Samsung was infringing.  (PX52.14.)

1    Yet Samsung continued to sell those infringing phones and introduced others that the jury

2    also found to infringe.  Samsung continued infringing after Apple filed this lawsuit in April 2011

3    and after the Court found in connection with Apple's motion for a preliminary injunction that two

4    Samsung phones likely infringed the D'677, that Samsung had raised no substantial question

5    regarding the validity of that patent, and that Apple was likely to prevail on its claims that all four

6    accused Samsung devices infringed the '381.  (Dkt. No. 452 at 24, 26-27, 56; Dkt. Nos. 267, 537,

7    811.)  To this day, Samsung has continued to sell phones that the jury found infringed one or

8    more patents asserted in this case.  (Robinson Decl. ¶ 7 & Exs. 34-37.)

9                         **c.      Samsung engaged in improper litigation tactics**

10    Samsung's strategy from the outset was to conceal the inculpatory evidence.  That is

11    "prototypical" litigation misconduct.  *i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831,

12    859 (Fed. Cir. 2010) (prototypical litigation misconduct includes "discovery abuses, failure to

13    obey orders of the court, or acts that unnecessarily prolong litigation").

14                    **(i)      Samsung withheld copying evidence and made**

15                              **misrepresentations to the Court**

16    When Apple moved to compel production of copying documents to support its

17    preliminary injunction motion, Samsung assured the Court that the evidence Apple sought did not

18    exist:  "in producing our design documents we are not obligated to manufacture documents that

19    don't exist. *They are looking for a smoking gun document, a document that says we copied*

20    *something from Apple.  We don't have those documents*."  (Bartlett Decl. Ex. 6 at 45-48

21    (emphasis added).)  Samsung's counsel told the Court that Samsung's 30(b)(6) witness on

22    document production (and trial witness), Justin Denison, had "interviewed the designers of the

23    products at issue . . . and inquired extensively whether any of them considered Apple products

24    when designing their products, not just copying, but any consideration of frame of reference.

25    [He] testified they have not."  (Bartlett Decl. Ex. 6 at 48).)  Those statements were false.

26    Samsung *did* have documents showing that its designers had not only considered Apple's

27    products but were directed to make Samsung's phone like the iPhone.  (*See* Part II(A)(3)(a),

28    *supra*; *see also*, *e.g.*, PX34, 40, 44, 55.)  Yet despite the Court's granting two motions to compel

1   and setting an absolute deadline of December 31, 2011 for complete compliance, Samsung did

2   not produce those documents until late December 2011 and early 2012, long after the preliminary

3   injunction phase.  (Bartlett Decl. ¶ 7; Dkt. Nos. 267, 537.)  At trial, the Court stated that

4   Samsung's Relative Evaluation Report (PX44) "should have been produced [to] plaintiff [for] the

5   preliminary injunction.  If I had had it, it would have been  highly relevant to my December 2nd

6   ruling."  (Tr. 2517:3-6.)

7                                   **(ii)     Samsung was sanctioned multiple times**

8           ***Sanction for failure to comply with two discovery orders re copying documents.***

9   Judge Grewal sanctioned Samsung for violating two discovery orders requiring production of

10  design and copying documents, stating:  "Samsung's belated production of these documents

11  directly contradicts counsel's multiple representations to this court that the type of documents

12  Apple sought did not exist.  Even more troubling is Samsung's failure to address the inaccuracy

13  of these earlier representations to the court."  (Dkt. No. 880 at 9.)

14          ***Sanction for withholding source code.***  Judge Grewal found that Samsung "plainly

15  violated the court's December 31 deadline" requiring Samsung to produce source code, and did

16  not produce some source code until "*after* the close of fact discovery—knowing full well that the

17  court would not grant the parties any exceptions."  (Dkt. No. 898 at 5-6; *see* 12/22 order.)  The

18  Court ordered "preclusive sanctions," noting that "Samsung offer[ed] precisely zero evidence to

19  show that its actions were in good faith, or otherwise justified."  (*Id*. at 8-9; *see also* Dkt. No.

20  1106 (reconfirming order on motion for clarification).)

21          ***Sanction for withholding financial information.***  Judge Grewal ordered evidentiary

22  sanctions after Samsung failed to comply with a Court-ordered deadline to produce financial

23  documents, despite having  "unequivocally stated" to the Court that it had "'agreed to produce all

24  of the financial information' that Apple requested," by the deadline.  (Dkt. No. 880 at 10.)

25          ***Sanction for delayed disclosure of theories***.  On March 19, 2012, nine days after the close

26  of fact discovery, Samsung served a 145-page amended response to Apple's contention

27  interrogatories regarding the basis of Samsung's non-infringement and validity theories, which it

28  then relied on in expert reports.  (Bartlett Decl. Ex. 7.)  Judge Grewal struck the portions of

APPLE'S MOTION FOR PERMANENT INJUNCTION AND DAMAGES ENHANCEMENTS
CASE NO. 11-cv-01846-LHK
sf-3194189

20

1    Samsung's expert reports that included "theories never disclosed to Apple during discovery."

2    (Dkt. No. 1144 at 3-6.)  This Court affirmed the sanction.  (Dkt. No. 1545 at 7.)

3                              **(iii)    Samsung's publication of excluded evidence**

4            In its opening demonstratives, Samsung sought to use excluded evidence in support of a

5    defense that was not timely disclosed to Apple, but the Court struck the slides and denied

6    reconsideration.  (Dkt. No. 1456 at 2; Dkt. No. 1510 at 2.)  Shortly before opening statements,

7    Samsung counsel John Quinn appeared in Court and "begged" the Court to reconsider again,

8    asking:  "What's the point . . . of having the trial?  What's the point?" (Tr. 291:22-292:9.)  After

9    the Court adhered to its prior rulings, Mr. Quinn authorized a "statement" that was emailed to

10   multiple reporters, attaching a set of the excluded demonstratives.  (Dk. 1539-1 at Ex. A; Dkt.

11   1532 (Quinn declaration stating, "On July 31, 2012, I approved and authorized the release of a brief

12   statement").)  The statement read in part:  "Samsung was not allowed to tell the jury the full

13   story. . . .  The excluded evidence would have established beyond doubt that Samsung did not

14   copy the iPhone design.  Fundamental fairness requires that the jury decide the case based on all

15   the evidence."  (*Id.*)

16           By attaching excluded evidence and asserting that the jury should decide the case based

17   on that evidence, the statement encouraged anyone who read it to share the excluded evidence

18   with the jury, or, at minimum, to tell jury members that they would not be getting the "full story"

19   or "all the evidence."  *See* Cal. R. Prof. Conduct 5-120 (lawyer participating in litigation

20   prohibited from making "extrajudicial statement that a reasonable person would expect to be

21   disseminated by means of public communication if the [lawyer] knows or reasonably should

22   know that it will have a substantial likelihood of materially prejudicing an adjudicative

23   proceeding in the matter").  The Court recognized the "real and possible danger that Samsung and

24   Quinn, Emanuel made the decision to take the risk of tainting the jury," and found that Mr. Quinn

25   "left this courtroom and deliberately and willfully, with Samsung, issued a press release to

26   highlight evidence that they both knew was excluded and was inadmissible in this trial," in a

27   "willful and deliberate attempt to further propagate that excluded evidence the day after a jury

28   had been impaneled." (Tr. 575.)

1

**(iv)     Other Samsung litigation misconduct**

2     Samsung served a 200-person witness list for trial.  The Court ordered Samsung to reduce

3    the number of witnesses, stating:  "I think what's going on is a lot of hide the ball so that one side

4    does not know exactly who's going to be called and has to prepare for over 200 witnesses and

5    that's not right."  (Bartlett Decl. Ex. 8 at 15-18.)  Flouting the Court's Order, Samsung

6    "appended" a list of 112 witnesses to its "reduced" witness list, bringing its total *up* to 207

7    witnesses.  The Court struck the Appendix.  (Dkt. No. 1293.)

8

**d.     Samsung's substantial size and financial condition**

9     Samsung's revenues were $109.2 billion in 2011, which is nearly double the revenues of

10   Microsoft,[4] a company the Federal Circuit has held is of a "size and financial condition" that

11   tends to support enhanced damages under the *Read* factors.  *i4i*, 598 F.3d at 858.  In the first

12   quarter of 2012, Samsung held 21.7% of the United Sates smartphone market with 6.1 million

13   units sold in that quarter alone.  (PX25A1.8)  Samsung earned more than $8 billion on its sales of

14   accused devices during the period covered by the suit.  (JX1500.)

15

**e.     The case was not close**

16     The jury found  infringement by virtually all the accused Samsung phones, found *all* of

17   Apple's patents valid, found Samsung phones diluted Apple's registered and unregistered trade

18   dress, and found that Samsung *willfully* infringed five patents and two trade dresses.  (Dkt. No.

19   1931.)  The jury resoundingly rejected *all* of Samsung's counterclaims.  (*Id*. at 18-19.)

20

**f.     The "duration of the conduct" was over two years at a
critical time in the marketplace**

21

22     Samsung has been infringing for more than two years since being notified of its

23   infringement, and it has continued to infringe even after the jury delivered its verdict.  Moreover,

24   as the Court has found, Samsung's infringement is occurring during a critical transition period in

25   the mobile phone market in which smartphones are replacing feature phones, and first-time smart

26

27   _____

[4] Microsoft had revenues of $62.5 million in 2011 http://money.cnn.com/magazines/
fortune/fortune500/2011/full_list.

28

1   phone purchasers are likely to develop brand and platform loyalty, which in turn will affect future

2   sales and market share for years to come.  (Apple II, Dkt. No. 221 at 71-72.)  In this particular

3   market under these specific conditions, two years is an eternity of infringement.

**g.      Samsung failed to take remedial action and instead continues to sell infringing products**

6       Today, four weeks after the jury verdict, Samsung continues to sell phones that the jury

7   found infringed one or more of the patents in suit.  (Robinson Decl. ¶ 8 & Exs. 34-37.)

**h.      Samsung's motivation was to use Apple's patented designs and technology to seize market share, revenues, and profit**

10      The harm to Apple was deliberate, not accidental.  Samsung's documents repeatedly

11   identify Apple as Samsung's major competitor in the smartphone market.  Samsung's internal

12   records show that the accused products were part of a broader effort to go head to head with

13   Apple in that market.  (PX184:23-184:29.)  Samsung's goal was to "directly go after . . . potential

14   iPhone purchasers" and to "beat Apple" in a head to head battle, using Apple's own technology.

15   (PX58.1, 58.3, 58.5; PX62.11.)  Samsung knew that the iPhone was outperforming Samsung's

16   phones, that Samsung's market share was declining, and that it needed a "hit" in the market to be

17   competitive.  *See*  Part II(A)(3)(a), *supra*.  Samsung's response was to copy and infringe.

**i.      Samsung attempted to conceal its misconduct**

19      Samsung withheld documents during discovery (Part II(A)(3(c), *supra*) and it falsely

20   denied copying in deposition through its designee, Justin Denison and in hearings through its

21   counsel (*id.*).  Samsung's attempted concealment continued at trial when its employee witness

22   Jeeyung Wang denied "mak[ing] reference to Apple icons" notwithstanding the fact that

23   documents containing side-by-side comparisons of iPhone and Samsung icons were produced

24   from her files.  (Tr. 2540:17-20; PX44; PX2257 (comparisons of Apple and Galaxy icons);

25   PX2281.93-94 (iPhone Human Interface Guidelines); PX35.1 "Email from Botello of

26   12/14/2008"); PX55.5,8 & .15 ("Samsung mobile icon design for 2011").

27

28

#### 4.     The *Read* factors support trebling the damages award

The *Read* factors provide the standard not only for whether to enhance damages but also "by how much."  *i4i*, 598 F.3d at 859.  As shown, every *Read* factor weighs decisively in favor of Apple.  These factors establish Samsung's serious misconduct, including deliberate copying of multiple patents for the purpose of taking market share and profits from Apple, by a company with tremendous financial resources.  They also establish a consistent pattern of litigation misconduct throughout discovery and a deliberate attempt to influence the jury and impugn the fairness of the tribunal at the outset of trial.  In these circumstances, the Court should award the highest possible enhancement—trebling the damages subject to enhancement.

### B.     Enhancements Are Warranted Under The Lanham Act

Under the Lanham Act, the Court "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  15 U.S.C. § 1117(a).  Further, the Court has discretion to "enter judgment for such sum as the court shall find to be just" if the jury's award of a defendant's "profits is either inadequate or excessive."  *Id.*  "Such sum in either of the above circumstances shall constitute compensation and not a penalty."  *Id.*

Courts award enhancements under section 1117(a) when, as here, there is "a potential harm from lingering misimpressions that [was] unlikely to be fully captured by the lost profits" or other damages.  *Binder v. Disability Group, Inc.*, 772 F. Supp. 2d 1172, 1182-83 (C.D. Cal. 2011) (doubling award of plaintiff's lost profits); *see also La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 345 (6th Cir. 2010) (affirming treble damages award given "abundant evidence" of willful infringement and finding that the damages award "was inadequate to compensate [plaintiff] for the true extent of its injuries," which loss of "ability to control its brand image and reputation" and required a greater award); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) (affirming doubling of jury award in light of willful infringement and fact that "substantial damages [were] not reflected in the jury award").

Under its plain terms, section 1117(a) does not restrict the kind of award that can be enhanced, and thus authorizes enhancement of both actual damages and Samsung's profits.

1    15 U.S.C. § 1117(a) (court may enter judgment "for any sum above the amount found as actual

2    damages, not exceeding three times such amount" or "enter such sum as the court shall find to be

3    just"). An award under the Lanham Act is thus unaffected by the Patent Act's restriction against

4    trebling awards of an infringer's profits. *See* 35 U.S.C. § 289. No statute or case suggests that

5    Congress intended section 289 to limit the Court's ability to enhance the verdict obtained

6    pursuant to the Lanham Act. At least one court has enhanced a verdict under the Lanham Act that

7    also included an award of the defendants' profits under section 289. *Victor Stanley Inc. v.*

8    *Creative Pipe Inc.*, 2011 U.S. Dist. LEXIS 112846, at *38-*42 (D. Md. Sept. 30, 2011).

9            **C.      The Court Should Award Enhancements Totaling $535 Million**

10                   **1.      The Lanham Act Supports a $400 Million Enhancement.**

11           There is ample evidence that the jury's award of $382 million for the six products that

12   dilute Apple's iPhone trade dress is not adequate to address the full harm Apple experienced.

13   (*See* Dkt No. 1931 at 12, 14, 16) (Fascinate ($144 million), Galaxy S 4G ($73 million), Galaxy S

14   II Showcase ($22 million), Mesmerize ($53 million), Vibrant ($90 million), and the Galaxy S

15   i9000 ($0).) The jury's verdict on these six products demonstrates how pervasive and wrongful

16   Samsung's conduct was. Each violated all three utility patents, the D'677 Patent, the D'305

17   Patent, and two of Apple's trade dresses. (*Id.* at 2-7.) Three of them also infringed the D'087

18   Patent. (*Id.* at 6 (Galaxy S (i9000), Galaxy S 4G, and Vibrant).) This verdict reflects Samsung's

19   deliberate plan to compete with Apple between mid-2010 and early 2011 using Apple's patented

20   navigation technology, its designs, and its trade dress. (*See* Part II(A)(3)(a), *supra*.)

21           Samsung flooded the market with millions of products during the two years prior to June

22   30, 2012. (JX1500 (more than 22 million units of accused products)). Samsung spent hundreds

23   of millions to advertise and promote those products as a part of its "Beat Apple" strategy, forever

24   damaging Apple's brand by diminishing Apple's ability to distinguish its iconic designs and

25   famous trade dress in the U.S. market place. (PX58; Robinson Decl. ¶ 31). In just the three

26   quarters between July 2010 and March 2011 during which these products were introduced, over

27   65 million U.S. customers purchased a smartphone, reflecting more than 60% growth in the

28   marketplace and one fifth of the U.S. population. (PX25A1.8). Samsung's strategy of copying

1   the iPhone to boost its smartphone sales succeeded, as Samsung's market share rose from less

2   than 5% in June 2010 to 20% by the end of 2011 and to 30% by June of 2012.  (PX25A1.8;

3   Musika Decl. ¶ 30; Robinson Decl. ¶ 25.)

4          The massive damage to the iPhone's distinctive product identity caused by Samsung's

5   sale of millions of iPhone clones is irreversible.  No verdict can restore the unique and valuable

6   association between Apple's trade dress and Apple's multi-billion dollar brand in the minds of

7   U.S. consumers.  The initial success gained through sale of these six cloned products was the

8   springboard for the second-generation Galaxy S II line of products as well as numerous other

9   infringing smartphones.  The more than 5.1 million customers who purchased these six

10  smartphones are far more likely to purchase another Samsung (or other Android) smartphone in

11  2012 and 2013 as their contracts expire.  (Musika Decl. ¶¶ 23-28.)  The ill-gotten gains that

12  Samsung obtained through its diluting phones—including the market share "head start," the

13  change in consumer perceptions, and the resulting "stickiness" for Samsung and the Android

14  platform—are all critical elements of Samsung's continued market share growth, which by 2012

15  yielded a "two horse race between Apple & Samsung."  (PX60.8).  As of early 2012, Samsung

16  projected that its revenues will exceed $12.5 billion from smartphones sales in the U.S. this year

17  alone.  (PX60.24).  That number would be *billions less* if Samsung still held only the 5% market

18  share that it had in mid-2010 before the introduction of the six cloned products.  (Robinson Decl.

19  Ex. 7.)  Samsung's diluting conduct has unquestionably had an extraordinary and lasting effect on

20  the marketplace, resulting in harm for which Apple has no complete remedy.

21         The irreparable harm that Apple experienced is exactly why Congress authorized judicial

22  enhancement for trade dress dilution.  (Bartlett Decl. Ex. 9 at 3.)  Congress recognized that

23  "dilution is an infection, which if allowed to spread, will inevitably destroy the advertising value

24  of the mark."  (*Id.*)  Because Apple has been harmed far beyond what the jury could calculate in

25  damages, the Court should enhance Apple's monetary remedy under the Lanham Act to provide

26  Apple at least some recovery for the otherwise incalculable damage caused by Samsung's dilution.

27  *See Binder*, 772 F. Supp. 2d at 1182-83 (enhancing damage award that did not fully compensate

28  trademark owner); *La Quinta*, 603 F.3d at 345 (affirming enhancement of insufficient award).

1   The change in market share alone gained through the introduction of these diluting phones

2   justifies substantial Lanham Act enhancements well in excess of the $400 million Apple seeks.

3   If, following the release of the first of these diluting phones in June 2010, Samsung's market

4   share had remained constant at 5%, Samsung would have sold at least 13.8 million fewer of the

5   diluting and infringing phones between July 2010 and June 2012.  (Robinson Decl. ¶¶ 26-28 &

6   Ex. 8).  Based on Apple's actual market share  between July 2010 and 2012, Apple would have

7   sold more than 4 million additional iPhones as a result.  (*Id*. ¶ 28 & Ex. 8).  Even applying the

8   conservative assumption that Apple would have made only half of those additional sales, Apple

9   still would have sold 2.1 million additional iPhones.  (*Id*.) ███████████████

10  ███████████████████████████████████████████████

11  ███████████████████████████████████████████████

12  ███████████████████████████████████████████████

13  ███████████████████████████████████████████████

14  ███████████████████████████████████████████████

15  ██████████████████████████  And this does not account for the

16  sales of any downstream or follow-on products and services from Apple's product ecosystem

17  discussed above.

18  Instead, Samsung made the 13.9 million sales, gaining $5 billion in additional in revenue.

19  (Robinson Decl. ¶ 30 & Ex.7)  From this, Samsung netted $1.8 billion more in gross profits

20  (according to Mr. Musika's profit calculations) and $598 million more in operating profits

21  (according to Mr. Wagner's profit calculations).  (*Id*.).  Under the circumstances, a $400 million

22  enhancement is a just and appropriate amount to account for Apple's uncompensated losses.

23  Other measures provide additional bases to conclude that $400 million reflects partial but

24  appropriate additional compensation for the harm that Samsung did:  (1) $400 million is roughly

25  equivalent to the existing award for these six products; (2) $400 million approximates Apple's

26  investment in advertising for the products that used the relevant trade dress between 2007 and

27  2010, when the Samsung's copycat products were first introduced (PX16; Robinson Decl. ¶ 31);

28  (3) $400 million reflects 40% of the *annual* amount that STA spends advertising mobile phone

1   products in the U.S. (Tr. 881:20-82:3 (Denison testimony that Samsung spent "about a billion

2   dollars last year, 2011, on marketing their brand"); (4) the jury's verdict for the six products is

3   $71 million less than the minimum amounts that Samsung's expert, Michael Wagner, calculated

4   as the operating profits for these six products (DX 781.3; Robinson Decl. ¶ 31); and (5) the jury's

5   damages award reflects nothing to compensate Apple for the harm done by Samsung's marketing

6   and sale of the Galaxy S i9000, the first Samsung clone of the iPhone which Samsung broadly

7   promoted through media sources directed to the U.S. (PX6 (press summary including PCWorld

8   review of Galaxy S i9000 stating that the reviewer was "surprised by how familiar it looked")).

9        A $400 million enhancement would thus be consistent with Section 1117.  It is a small

10   fraction of Samsung's 2011 gross profits (0.9%), Samsung's 2011 telecommunication product

11   revenues (0.8%), Samsung's revenues for the products included in the verdict (5.1%), and

12   Samsung's telecommunication product profits for 2011 (5.6%), using the figures that Samsung

13   relied upon at trial.  (DX781.005, .076; Robinson Decl. ¶ 31.)  A $400 million enhancement

14   would have almost no effect on Samsung's financial condition or performance.

15        Even if Samsung is enjoined from further dilution, Apple has suffered and will continue to

16   suffer irreparable harm from Samsung's dilution to date.  Precisely because this is true, the Court

17   should enhance the award by $400 million under the Lanham Act to partially compensate Apple

18   for the injury to Apple's goodwill, designs, and trade dress.

19               **2.      The Patent Act Separately Supports An Additional
                           Enhancement.**

20

21        Under the Patent Act, the Court may award up to three times the damages awarded to

22   Apple, although it cannot treble amounts for which the sole basis for the award was disgorgement

23   of Samsung's profits under section 289.  *See* 35 U.S.C. §§ 284, 289; *Braun v. Dynamics Corp. of*

24   *Am.*, 975 F.2d 815, 824 (Fed. Cir. 1992).  The record — including evidence of Samsung's

25   deliberate copying and litigation misconduct (Part II(A)(3)(a), *supra*) — and the jury's finding of

26   willful infringement support the enhancements Apple seeks under the Patent Act.

27        Section 289 presents no impediment to a separate enhancement of at least $135 million.

28   The jury awarded $67,880,583 for the five smartphones and two tablets that it found to infringe

1  only Apple's utility patents.  (Robinson Decl. ¶ 31).  This award is grounded in section 284, not

2  section 289.  Thus, the jury's willfulness verdict permits this amount to be trebled, resulting in

3  enhancement of $135,761,166 for a total award on those products of $203,641,749.  Combining

4  this figure with the separate $400 million enhancement under the trade dress supports a total

5  increase in the judgment of $535,761,166.

6        Moreover, multiple evaluations of the verdict independently justify the full $535 million

7  enhancement based on the Patent Act alone.  As discussed above, Samsung's conduct in the

8  marketplace and in this litigation justifies the maximum enhancement:  trebling the appropriate

9  base.  A $535 million enhancement would be proper under the Patent Act so long as at least

10 $268 million of the $1.05 billion verdict (or roughly 25% of the total award) were not attributable

11 to an award of profits under section 289.  The record amply supports that conclusion.

12       First, the calculations of Samsung's damages expert support this conclusion.  Mr. Wagner

13 testified that "for the calculation that I showed to the jury, 12 percent" reflected Samsung's

14 operating profit margin.  (Tr. 3074-75.)  Applying this figure to the $6.3 billion in revenues that

15 Samsung obtained from products that infringe Apple's design patents yields a "Samsung profit"

16 of $756 million.  (JX1500; Robinson Decl. ¶ 31).  Subtracting $756 million from the jury's total

17 award leaves $293 million of the award that is not attributable to section 289 profits.  (Robinson

18 Decl. ¶ 31.)  This comfortably exceeds the $268 million base that supports Apple's request.

19       Second, the conclusion that at least $268 million of the award is not attributable to section

20 289 profits is consistent with what Apple sought in lost profits and a reasonable royalty.  Apple's

21 damages expert's opinions support a conclusion that the phones that infringed a design or a utility

22 patents or both caused more than $495 million in combined lost profit damages and reasonable

23 royalties for Apple.  (PX25A1.4; Robinson Decl. ¶ 31).  These amounts greatly exceed the

24 $268 million minimum.  Similarly, Apple's expert testified that Apple's damages calculated

25 solely as a reasonable royalty would have been $540 million, which again is nearly double what

26 would be required to support the proposed enhancement.  (Tr. 2093.)

27       A $535 million enhancement under the Patent Act would not be inconsistent with section

28 289.  Nothing on the verdict form requires a conclusion that for the sixteen products found to

1   infringe one or more design patents, the only remedy granted by the jury was Samsung's profits.

2   Apple sought multiple remedies in light of the multiple forms of harm caused by Samsung,

3   including Apple's lost profits and reasonable royalties.  Samsung should not obtain a windfall

4   because its willful infringement caused more than one type of harm to Apple, and Samsung, as

5   the willful infringer, should bear the burden of any uncertainty regarding the relevant amounts.

6   *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141-42 (Fed. Cir. 1991) (reaffirming "pervading

7   principle that doubt in ascertaining appropriate damages comes down against the infringer");

8   *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1427-28 (Fed. Cir. 1988) ("Furthermore, when the

9   amount of the damages cannot be ascertained with precision, any doubts regarding the amount

10  must be resolved against the infringer" (internal quotation marks omitted)); *Paper Converting

11  Machine Co. v. Magna Graphics Corp.* 745 F.2d 11, 22 (Fed. Cir. 1984) (holding that

12  "fundamental principles of justice require us to throw the risk of any uncertainty upon the

13  wrongdoer instead of upon the injured party").

14       A $535 million award thus reflects a sensible enhancement under both statutory regimes.

15  Whether calculated as a $400 million enhancement under the Lanham Act plus a $135 million

16  enhancement under the Patent Act, or a trebling of $268 million from the verdict under both

17  statutes (using amounts that could reasonably be attributed to an award under section 284), this

18  amount reflects a rational and fair effort to address Samsung's willful misconduct that has and

19  will impose lasting harms on Apple.

## III.    CONCLUSION

21       For the reasons stated above, the Court should issue Apple's requested permanent

22  injunction against sales of Samsung's infringing and diluting products, and award an

23  enhancement of $535 million.

24  Dated: September 21, 2012              MORRISON & FOERSTER LLP

25

26                                   By:    */s/ Michael A. Jacobs*
                                          Michael A. Jacobs

27                                        Attorneys for Plaintiff
28                                        APPLE INC.