1   HAROLD J. MCELHINNY (CA SBN 66781)
    hmcelhinny@mofo.com
2   MICHAEL A. JACOBS (CA SBN 111664)
    mjacobs@mofo.com
3   RACHEL KREVANS (CA SBN 116421)
    rkrevans@mofo.com
4   JENNIFER LEE TAYLOR (CA SBN 161368)
    jtaylor@mofo.com
5   ALISON M. TUCHER (CA SBN 171363)
    atucher@mofo.com
6   RICHARD S.J. HUNG (CA SBN 197425)
    rhung@mofo.com
7   JASON R. BARTLETT (CA SBN 214530)
    jasonbartlett@mofo.com
8   MORRISON & FOERSTER LLP
    425 Market Street
9   San Francisco, California  94105-2482
    Telephone:  (415) 268-7000
10  Facsimile:  (415) 268-7522

11

12  Attorneys for Plaintiff and
    Counterclaim-Defendant APPLE INC.

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

13

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16                     SAN JOSE DIVISION

17

18  APPLE INC., a California corporation,

19                 Plaintiff,

20          v.

21  SAMSUNG ELECTRONICS CO., LTD., a
    Korean corporation; SAMSUNG
22  ELECTRONICS AMERICA, INC., a New
    York corporation; and SAMSUNG
23  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
24
25               Defendants.

Case No. 11-cv-01846-LHK (PSG)

**DECLARATION OF TERRY
MUSIKA IN SUPPORT OF
APPLE'S MOTION FOR
PERMANENT INJUNCTION**

**PUBLIC VERSION**

26

27

28

I, Terry Musika, hereby declare as follows:

## I.   BACKGROUND

1.       I am a Co-Founder and Managing Director of Invotex Group, as well as a CPA with over 37 years of business experience. I am a former audit and consulting partner for the international accounting firm of Coopers & Lybrand (currently PricewaterhouseCoopers), former Managing Director for Navigant Consulting, Inc., and have previously formed, owned and operated a proprietary database company, a national financial and economic consulting firm, and a merger and acquisition company. Additionally, I have frequently served the Federal Court system as a Court Appointed Chapter 11 Operating Trustee, Liquidating Chapter 7 Trustee, Operating Chapter 7 Trustee, Examiner, and Paying Agent.  My resume, attached as **Exhibit 1**, lists my work experience, academic degrees, and publications.

2.       I testified at trial on August 13th regarding damages.  Pursuant to the Court's Order, I did not address irreparable harm in my trial testimony.  (Dkt. No. 1157 at 13:21-25.)

3.       My business address is 1637 Thames Street, Baltimore, Maryland 21231.

## II.   ASSIGNMENT

4.       Apple is seeking a permanent injunction for certain Samsung smartphones that the jury concluded violated Apple's intellectual property.  These include but are not limited to the Galaxy S II line of products, the Galaxy S line of products, other Galaxy branded products (such as the Galaxy Prevail) and the Droid Charge.  Throughout this declaration I will refer to this set of products as the "Products at Issue."

5.       I have reviewed the Amended Verdict Form filed on August 24, 2012, (Dkt. No. 1931), and I understand that a nine-member jury unanimously found that Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively "Samsung") willfully infringed one or

1   more valid intellectual property rights held by Apple by importing, offering to sell, or selling the

2   Infringing Products[1] in the United States, including each of the Products at Issue.

3       6.      I have been asked by counsel for Apple Inc. ("Apple") to consider the economic

4   impact to Apple if Samsung is permitted, in the absence of an injunction, to continue to import,

5   offer to sell, and sell the Products at Issue in the United States.

6       7.      I conclude that, absent entry of an injunction, Samsung's continued infringing

7   conduct in the United States with respect to the Products at Issue will cause substantial and

8   irreparable harm to Apple.  Specifically, as I explain in detail in the sections that follow, I find

9   that:

10          •   Apple and Samsung are direct competitors in the same smartphone market.

11          •   The smartphone market is currently at a pivotal moment of transition and

12              acceleration as manufacturers compete for first-time customers making the

13              switch from traditional mobile or feature phones to smartphones.

14              Capturing first-time smartphone customers is of critical importance during

15              this time period not only because of the market's current and projected

16              growth, but also because the loss of first-time customers gives rise to far-

17              reaching economic consequences due to market factors such as brand and

18              platform loyalty.

19          •   Samsung's sale of the Products at Issue in the United States has taken

20              market share from Apple, and unless enjoined, those sales will cause Apple

21              to lose substantial long-term market share to Samsung in the future.  This

22              loss of market share will result in harm that cannot be quantified or

23              recaptured with reasonable certainty.

---

[1] Throughout this declaration I will refer to the following set of products as the "Infringing Products":
Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S
(i9000), Galaxy S 4G, Galaxy S II (AT&T), Galaxy S II (i9100), Galaxy S II (T-Mobile), Galaxy S II (Epic 4G
Touch), Galaxy S II (Skyrocket), Galaxy S Showcase (i500), Galaxy Tab, Galaxy Tab 10.1 (WiFi), Gem,
Indulge, Infuse 4G, Mesmerize, Nexus S 4G, Replenish, Transform, Vibrant.

1
2
3
4

- Samsung's continued sale of the Products at Issue in the United States will also cause substantial downstream losses to Apple in the form of lost sales of products and services within the Apple ecosystem. These lost future sales would also be extremely difficult to quantify or recapture.

5
6
7

- A substantial nexus exists between the Apple intellectual property found to have been infringed by Samsung's importation and sale of the Products at Issue, and consumer purchasing decisions in the smartphone market.

8. In arriving at these conclusions, I have based my opinions on my training and experience in the valuation of intellectual property; my training and experience in accounting, auditing, and financial and damage analysis; my independent research of publicly-available information; my review of the pleadings in this case; my review of the many thousands of documents produced by both parties in this case; and the deposition and trial testimony of both Apple and Samsung witnesses.

9. I previously issued the Reply Declaration of Terry L. Musika, CPA in Support of Apple's Motion for a Preliminary Injunction dated September 30, 2011, ("Reply Declaration"); Expert Report of Terry L. Musika, CPA dated March 22, 2012, ("Original Expert Report"); Rebuttal Expert Report of Terry L. Musika, CPA dated April 16, 2012, ("Rebuttal Expert Report"); and Supplemental Expert Report of Terry L. Musika, CPA dated May 8, 2012, ("Supplemental Expert Report"). I also testified at trial in this case on August 13, 2012. My opinions expressed in the Reply Declaration, Original Expert Report, Rebuttal Expert Report, and Supplemental Expert Report, and in my trial testimony are unchanged. Accordingly, I base my opinions in this declaration on the information and analysis contained in my Reply Declaration, Original Expert Report, Rebuttal Expert Report, Supplemental Expert Report, and my trial testimony, as well as the additional materials identified herein.

III.   **APPLE AND SAMSUNG ARE DIRECT COMPETITORS**

    A.   **Fierce Competition Exists Between Apple and Samsung in the Smartphone Market, Especially for First-Time Purchasers**

10.   Samsung and Apple internal documents, as well as industry reports from third-party analysts leave no doubt that Apple and Samsung compete head-to-head with one another in the U.S. smartphone market. As discussed below, this competition has tended to place special emphasis on capturing first-time smartphone consumers.

11.   Samsung's internal marketing documents, for example, demonstrate that Samsung and Apple are locked in a fierce competition for U.S. smartphone market share. An internal STA document dated as recently as February 16, 2012, acknowledged that the U.S. smartphone market was "becoming a two horse race between Apple and Samsung."[2] This was not accidental. It resulted from Samsung's focused campaign to



_____

[2] Exhibit 5 (STA Competitive Situation: Paradigm Shift, **PX60** at SAMNDCA11547408).

12.     This special focus on competing against Apple, especially for first-time smartphone consumers, is also reflected in Samsung's external marketing efforts.  For example, Samsung's Vice President of Strategic Marketing, Brian Wallace, stated during an interview for Business Insider that Samsung's "Next Big Thing" ad campaign not only targeted Apple directly but also "people entering the smartphone market for the first time."[7]   Additionally, an STA executive, Omar Khan, noted in a January 7, 2011, interview that "[o]ver two-thirds of the U.S. population still has a basic feature phone" and that "[t]here's a huge opportunity there."[8]

13.     Samsung's internal documents acknowledge that the smartphone market has entered a critical phase, where success turns on acquiring first-time smartphone purchasers and building an installed base. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14.     Apple's market research likewise demonstrates that it competes directly with Android smartphones, including those manufactured by Samsung.  Apple's iPhone Buyer Surveys found that an increasing number of iPhone buyers—22% in FY10-Q4, and steadily rising to 40% in FY11-Q3—stated that they "seriously consider[ed]" an Android-based smartphone.[11]

15.     The intensity of competition between Apple and Samsung is also confirmed by numerous reports from industry analysts that identify the two companies as direct competitors.  A

---

[7] Exhibit 10 (Steve Kovach, *Samsung is Going Right for Apple Fanboys' Jugular with Its Latest Commercial*, Bus. Insider, Nov. 22, 2011, http://articles.businessinsider.com/2011-11-22/tech/30428054_1_iphone-users-smartphone-market-android).

[8] Exhibit 11 (Victor Godinez, *Samsung Sees a Bright Future in Smartphones, Tablet Computers*, The Dallas Morning News, Jan. 7, 2011, http://www.dallasnews.com/business/technology/headlines/20110107-samsung-sees-a-bright-future-in-smart-phones-tablet-computers.ece).

Exhibit 15 (2011FY-Q3 iPhone Buyer Survey, APLNDC-Y0000027506-599, at '17).

Macquarie Equities Research report from October 2010 states that Samsung "successfully positioned itself as a major alternative to Apple's iPhone series to telecom operators as well end customers."[12] A June 2011 Woori Investment & Securities report attributes the higher sales of Samsung's Galaxy S2 phone in part to the delayed roll-out of the next Apple iPhone.[13] Further, a Shinhan Investment Corp August 2011 report states that "[c]ompetition with Apple in September will be a key determinant of [Samsung's] share performance …. Samsung Electronics will have to prove its smartphone competitiveness even after Apple launches its new product to sustain an upward trend in share price."[14]  The competition between the two parties was further described in a January 2012 Strategy Analytics report, which acknowledged that "[w]ith global smartphone shipments nearing half a billion units in 2011, Samsung is now well positioned alongside Apple in a two-horse race at the forefront of one of the world's largest and most valuable consumer electronics markets."[15]

**B.**     **Samsung Has Positioned the Products at Issue to Compete Head-to-Head with Apple's Products**

16.     Samsung's marketing documents demonstrate that Samsung has deliberately set its prices for the Products-At-Issue to "surround" Apple's product offerings and "undercut" Apple's retail prices.   A March 25, 2011, internal Samsung document entitled "iPhone 5 Counter Strategy," for example, described the following competitive strategy:

- "Offensive Portfolio Strategy:   directly go after ATT/VZW potential iPhone5 purchasers."  "Defensive Portfolio Strategy:   minimize iPhone defections at Sprint and TMO."[16]

- "Samsung Seine [Galaxy S II (AT&T)] and Celox [Galaxy S II (Skyrocket)] to 'surround' iPhone with $329 an[d] $249 R/P."[17]

---

[12] Exhibit 16 (Macquarie Equities Research, Samsung Electronics, Oct. 29, 2010, at 7).
[13] Exhibit 17 (Woori Investment & Securities, SEC (Handset), June 23, 2011, at 1).
[14] Exhibit 18 (Shinhan Investment Corp., Samsung Electronics, Aug. 1, 2011, at 3).
[15] Exhibit 19 (Chloe Albanesius, *Samsung Beats Apple as of 2011's No. 1 Smartphone Maker*, PCMag.com, Jan. 27, 2012, http://www.pcmag.com/article2/0,2817,2399445,00.asp)  (internal quotation marks omitted).
[16] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351734).
[17] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351743).

- "Samsung Celox [Galaxy S II (Skyrocket)] to undercut iPhone with $249 R/P."[18]

- "Samsung Stealth LTE [Droid Charge] at $249 to undercut $299 iPhone5 (no LTE)."[19]

- "VZW Recommendation:  Samsung 4G products to undercut iPhone across tiers."[20]

- "Sprint Recommendations: . . . Gaudi [Galaxy S II (Epic 4G Touch)] to undercut iPhone5 (4G) by $50."[21]

- "Hercules [Galaxy S II (T-Mobile)] to undercut iPhone5 (4G) by $50."[22]

17.   ████  ████  ███████  ████████  ██████  ████  ████  ███

████████████████████████████████████████████████████████

██████████████████████  ▄

18.     Additionally, STA's Chief Marketing Officer, Todd Pendleton, and STA's Senior Vice President of Mobile Sales, Brian Rosenberg, admitted at their depositions that Apple and Samsung smartphone products compete at all relevant price points.  Mr. Pendleton, for example, testified that Samsung and Apple compete in all three price point differentials in the relevant market.[24]  Mr. Rosenberg testified that "every [Samsung] phone competes" with the iPhone 3GS from "a price point standpoint," and that the Galaxy S II products compete at a similar price point to the iPhone 4.[25]

19.   ████████████████████████████████████████████████████

█████████████████████████████████████████████████

---

[18] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351744).
[19] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351745).
[20] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351746).
[21] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351749).
[22] Exhibit 20 (iPhone5 Counter Strategy, **PX62** at S-ITC-003351751).
███
[24] Exhibit 22 (Deposition of Todd Pendleton, Mar. 21, 2012, at 115:18-116:19).
[25] Exhibit 23 (Deposition of Brian Rosenberg, Jan. 27, 2012, at 72:19-77:23).

1

2

3

4

5

6

7

8

9

10

11

12

13

14   IV.     **THE SMARTPHONE MARKET IS AT A CRITICAL JUNCTURE**

15          A.      **Large Numbers of First-Time Customers Will Be Purchasing a Smartphone**

16                  **Platform Over the Next 12-18 Months**

17          20.     At the present time, competition for market share in the U.S. smartphone market is

18   especially intense due to the current and projected growth of this market.  As depicted in the chart

19   below and on **Exhibit 2**, the overall U.S. smartphone market is expanding rapidly.   I have

20   reviewed and analyzed market share data from International Data Corporation ("IDC"), a "global

21   provider of market intelligence, advisory services, and events for the information technology,

22   telecommunications and consumer technology markets."[30]

23

24          [31]  This growth has come at the expense of feature phones, which lack

25

26

27   [30] Exhibit 27 (About IDC, http://www.idc.com/about/about.jsp?t=1317217596273).

28   [31] Exhibit 2.

sophisticated operating systems, and also occurred while the overall mobile phone market has grown. ███████████████████████████████████ ███████████████████████ ████████ The substantial growth of the smartphone market is projected to continue. ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

21.     Other third party analysts predict similar growth of the smartphone market.  In a July 2012 report, Oppenheimer Equity Research projected that smartphones will have a market share of 92% in North America in 2015.[34]  Yet another analyst, Jeffries, reported that North America smartphone share of total mobile phone shipments was 38% in 2010, will be 51% in 2011 and will reach 80% in 2015.[35]  Just this week, IHS iSuppli, a market research firm focused on the electronics value chain, reported on the growth of smartphones.  IHS iSuppli reported that on a global basis, "[T]he year 2013 will mark the first time that smartphones will make up more

---

[32] Exhibit 2.

[33] Exhibit 2.

[34] Exhibit 28 (Oppenheimer Equity Research Industry Update, 2Q12 Wireless Snapshot, July 31, 2012, at 15 & 17).

[35] Exhibit 29 (Jeffries, *Global Smartphone Outlook: Mid-Tier Under Pressure*, Nov. 3, 2011, at 23).

1     than half of all cellphone shipments . . . . By 2016, smartphones will represent 67.4 percent of the

2     total cellphone market."[36]

3           22.     The smartphone market thus finds itself in a critical period of transition as

4     manufacturers jockey for the sales of the approximately 27% of mobile phone users who are

5     projected to switch to smartphones in the U.S. over the next few years.[37]  Put another way,

6     manufacturers are pursuing the 135 million additional smartphones expected to be sold in the U.S.

7     market between 2012 and 2015 as compared to a total smartphone market of 105 million units in

8     2011.[38]  Shifts in market share during this period will have outsized impacts on future dynamics

9     in the market, making loss of market share now very detrimental to a company's future success.

10

11         **B.**      **The Ability to Capture First-Time Buyers Today Will Have Profound, Long-**

12             **Lasting Effects in the Future Due to Key Smartphone Market Characteristics**

13           23.     The smartphone market exhibits a unique set of characteristics that magnify the

14     importance of capturing first-time smartphone consumers.  Those characteristics include strong

15     customer loyalty and platform stickiness as a result of perceived high switching costs.

16           24.     Apple's Phil Schiller, Apple's Senior Vice President of Worldwide Product

17     Marketing, addressed the importance of first-time buyers in his trial testimony.  He stated, "And

18     we know from all of our products and experiences we've had selling to customers that a customer

19     who already has one is used to that one, that whole ecosystem.  If I have an iPhone, I'm used to

20     how the iPhone works, and I've invested in the applications, and I've invested in the accessories,

21     so I'm more invested in that product, and I'm more likely to stick with that product line once I

22     have it.  So we're at this really critical juncture where customers are either getting into an

23     ecosystem for the first time or they're staying with that ecosystem and most often upgrading and

24     [36] Exhibit 30 (IHS iSuppli, *Smartphones See Accelerated Rise to Dominance,* Aug. 28, 2012,

25     http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Smartphones-See-Accelerated-Rise-to-Dominance.aspx).
    [37] IDC projects that the percentage of consumers who do not own smartphones will drop to 17% by 2015. *See*

26     Exhibit 2.
    [38] Exhibit 2. 135 million additional smartphones calculated by subtracting the 105 million total smartphone

27     units for 2011 from each subsequent annual forecast for the market.  The difference for each year for 2012 to 2015 sums to approximately 135 million units.

28

staying within it."[39]  Mr. Schiller further went on to describe the "halo effect" surrounding the iPhone. "This is very well-known in the industry.  It's often called the halo effect, the idea that once you buy a product from a company, if you have a good experience with that product, that you're more likely to consider other products from that company and especially if those products do a good job working well together.  So that will make you want to buy more products from that company, as well as the other people around you who you work with or in your family."[40]

25.     STA's Chief Strategy Officer, Justin Denison, similarly addressed the importance of first-time smartphone buyers at his deposition.  He explained, "[I]t has been STA's view that there are a significant number of people that have yet to buy their first smartphone, and so we view them as a . . . market of attractive smartphone buyers."[41]  Mr. Denison further explained that "repeat purchase behavior is about equal – in fact, it's a little higher – for Android owners than iOS owners."  When asked if the key opportunity is at entry, Mr. Denison responded, "Certainly, again, we've talked about first-time smartphone buyers being an important segment for us, for many reasons."[42]

26.     STA Vice President of Business Planning and Operations, Corey Kerstetter, also addressed the importance of first-time smartphone buyers at his deposition.  He emphasized that "the key data is the operating – operating system repurchase, repurchase data.  So it's – important . . . for the first-time smartphone purchasers to break them in to the – the specific operating system."[43]  He explained that "when customers make an investment in the ecosystem, around the operating system, then there is reluctance to – to change that, from that ecosystem to another ecosystem."[44]

27.     An international survey conducted by market research firm, GfK, addressed customer loyalty.  The study found that "one in five people who own both an iPad and an iPhone, say switching smartphone is more difficult than changing bank accounts or gas or electricity

---

[39] Exhibit 31 (Trial Testimony of Phil Schiller, Aug. 3, 2012, at 616).
[40] Exhibit 31 (Trial Testimony of Phil Schiller, Aug. 3, 2012, at 616-617).
[41] Exhibit 32 (Deposition of Justin Denison, Jan. 25, 2012, at 108).
[42] Exhibit 32 (Deposition of Justin Denison, January 25, 2012, at 114-115).
[43] Exhibit 33 (Deposition of Corey Kerstetter, February 29, 2012, at 37).
[44] Exhibit 33 (Deposition of Corey Kerstetter, February 29, 2012, at 38).

1    providers."   Further reasons cited for sticking with their current setup include: potential for
2    disruption to apps and services, concerns over learning to use a different type of phone, and the
3    challenges of moving music, video, books, and apps from one type of smartphone to another.[45]

4          28.    Apple, Samsung, and third-party analysts are all aware that Apple's customers
5    tend to be loyal to Apple, and Android customers tend to be loyal to Android.  Apple's own
6    iPhone Owner Study found that 95% of iPhone owners stated that they are likely to recommend
7    the iPhone to others, while 93% stated that they are likely to purchase another iPhone in the
8    future.[46]  Similarly, Apple's January 2011 U.S. Smartphone Market Study found that 91% of
9    iPhone owners would be likely or somewhat likely to buy another iPhone, while 87% of Android
10   owners would similarly be likely to buy another Android smartphone.[47]   Numerous Samsung
11   documents acknowledge platform stickiness.[48]  In addition, third-party research by Nielson Co.
12   found in 2010 that 80% of iPhone owners and 70% of Android users would stick with their prior
13   platform choice for their next purchase.[49]  Similar results were reported by a different third-party
14   research company, The Yankee Group, who found in 2011 that 88% of iPhone users and 78% of
15   Android users would likely stick with their prior platform for future purchases.[50]  These results
16   provide compelling evidence that manufacturers will have much greater difficulty recapturing lost
17   first-time buyers by converting them from one platform to another after their initial purchase,
18   rather than by winning their first smartphone purchase.

---

[45] Exhibit 34 (Emma Woollacott, *iPhone Users Most Loyal (Now, There's a Surprise)*, TG Daily, Nov. 28, 2011, http://www.tgdaily.com/mobility-features/59873-iphone-users-most-loyal-now-theres-a-surprise).
[46] Exhibit 35 (iPhone Owner Study, May 2011, APLNDC-Y0000025024-5147, at '096-097).
[47] Exhibit 36 (Smartphone Market Study US, January 2011, APLNDC-Y0000028850-945, at '897).

   Exhibit 38 (Don Kellogg, iPhone vs. Android, Nielsonwire, June 4, 2010, http://blog.nielsen.com/nielsenwire/online_mobile/iphone-vs-android/).
[50] Exhibit 39 (Yankee Group 2011 U.S. Consumer Survey, Dec.).

# V.   ABSENT AN INJUNCTION, SAMSUNG'S CONTINUED INFRINGEMENT WILL CAUSE SUBSTANTIAL LONG-TERM HARM TO APPLE

### A.   Apple Will Lose Substantial Long-Term Market Share Absent an Injunction

29.   Samsung's infringement to date has been massive.  As Apple showed at trial, Samsung sold 22.7 million accused devices in the United States from June 2010 through the second quarter 2012, generating more than $8.160 billion in revenue.[51]  As shown on **Exhibit 3**, the accused smartphones which the jury found to be infringing account for 20 million units, or 88% of the total accused device units,[52] and a total of $7.245 billion in revenue.  According to a recent IDC smartphone report, Samsung's sales of the Infringing Smartphones accounted for more than 53% of Samsung's total estimated smartphone sales during this time period (*see* **Exhibit 3**).

30.   Samsung's infringement also coincided with a dramatic increase in Samsung's U.S. smartphone market share.  Samsung was losing market share during the period prior to June 2010, when Samsung introduced the first sales of the Infringing Products in the United States.[53]  After that date, Samsung saw sudden and sustained increases in market share.  Between June 2010, when the first Galaxy S phone was introduced, and the second quarter of 2012, Samsung's U.S. market share jumped six-fold from 5% to above 30% (*see* **Exhibit 4.1**).  One analyst stated that in the worldwide mobile phone market, Samsung's "growth is coming entirely from smartphones with the Galaxy line (Samsung's Android OS phones) as the main driver."[54]

31.   Samsung's infringing sales have also coincided with losses in Apple's market share.  Since the fourth quarter of 2011, Apple's market share has decreased from 45% to 36%, while Samsung's market share has risen from 19% to 33% over the same time period (*see* **Exhibit 4**).

---

[51] Exhibit 40 (JX-1500); *see also* Exhibit 41 (Trial Testimony of T. Musika, Aug. 13, 2012, at 2042:4-2043:14).
[52] 88% of total accused device units equals 20 million units of infringing smartphones divided by 22.7 million of accused devices.
[53] Exhibit 41 (Trial Testimony of Terry Musika, Aug. 13, 2012, at 2043:25-2045:10); *see also* Exhibit 42 (PDX34B.9).
[54] Exhibit 43 (Oppenheimer Equity Research, Mixed 2Q11 Wireless Checks, June 7, 2011, at 5).

32.     As previously discussed, the smartphone market is in a unique position where Apple and Samsung are directly competing for first time smartphone purchasers, and their future loyalty, as they make the transition from feature phones.  In addition, the loss of a single smartphone sale has an exponential impact on Apple's overall market share in the wireless device industry. IHS iSupply recently described the competition among platforms.   "The intense competition in smartphone platforms has by now resulted in a few casualties, including Symbian from Nokia and WebOS from Palm.  No longer will hardware capabilities be the sole determinant of success for smartphones moving forward, IHS believes, as victory in the marketplace will now also rely on many other important factors.  These include software capability, a sleek and intuitive user interface, the variety of available applications, strong support from the developer community, and the strength and seamlessness of vertical integration."[55]

33.     Apple Senior Director and former Chief Patent Counsel, Chip Lutton, testified at his deposition that "another form of harm" is "harm to the iOS ecosystem generally."[56]  More specifically, "if Apple is losing market share of momentum or market share generally to Samsung, then it's losing not just the incremental sales and the revenue associated with them, but also the impact on the ecosystem generally, which could be application developer mind share and attention.  It could be other forms of services that are provided into the ecosystem, either by Apple or by third parties, and those could have impacts not only on the vitality of Apple's iOS platform, but also even on revenue that Apple makes in areas like iTunes and the App store."[57]

34.     These facts, together with the evidence set forth above that Samsung has systematically positioned the Products at Issue to "surround" and "undercut" Apple's prices, and that the smartphone market is at a critical juncture characterized by fierce competition for the loyalty of first-time purchasers, points strongly to the conclusion that Samsung's infringing

---

[55] Exhibit 30 (IHS iSuppli, *Smartphones See Accelerated Rise to Dominance,* Aug. 28, 2012, http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Smartphones-See-Accelerated-Rise-to-Dominance.aspx).
[56] Exhibit 44 (Deposition of Chip J. Lutton, Jr., July 26, 2011, at 328).
[57] Exhibit 44 (Deposition of Chip J. Lutton, Jr., July 26, 2011, at 328).

conduct has inflicted incalculable and irremediable harm on Apple in the form of substantial, long-term loss of market share.

### B. Apple Will Also Lose Substantial Downstream Sales and Revenue That Would Be Extremely Difficult to Calculate with Reasonable Certainty

35. Although the jury has awarded Apple monetary damages to compensate Apple for the harm caused by Samsung's past infringing conduct, there are several reasons why the full measure of Apple's economic loss was not—and could not have been—fully calculated by the jury.

36. First, the jury did not consider any future harm to Apple. The jury's calculation of damages only included past harm that could be calculated with reasonable certainty. They jury's award, therefore, did not include any compensation for the future loss of sales and market share that would result if Samsung were permitted, absent an injunction, to continue selling the Products at Issue.

37. Second, even for past harm, the damages calculated by the jury did not account for the critical phase of transition that the smartphone market is experiencing. Loss of market share by Apple at this critical time has substantial, uncompensated harm that will continue long into the future.

38. Third, Apple's past and future loss of market share includes lost sales relating to other Apple products that were not included in the jury's damage award, but nevertheless are part of the established product relationship that Apple enjoys based on Apple's customer loyalty. These losses are derivative of the lost sales within the broader Apple ecosystem. Samsung's damages expert demonstrated the strength of these pull-through sales during his deposition last year, when he testified that when he purchased an iPhone he did not buy just one – he purchased six iPhones because he wanted his entire family to have them.[58] This behavior is representative of a larger phenomenon whereby consumers who purchase an Apple iPhone are more likely to

---

[58] Exhibit 45 (Deposition of Michael J. Wagner, Sept. 14, 2011, at 61-62).

1    purchase other Apple products such as additional smartphones, desktop and laptop computers,

2    iPods, and iPads. These lost sales within the Apple ecosystem are extremely difficult to quantify

3    with reasonable certainty, and did not form any part of the jury's award of damages.

4         39.    Finally, as an additional subdivision of Apple's ecosystem, the Products at Issue

5    have caused and will continue to cause long-term harm in the form of lost sales of accessories,

6    music and videos, and revenue from search engine royalties. Another category of additional

7    revenue generated by Apple through iPhone usage is search engine royalties. When an iPhone

8    user conducts a search on Google, Microsoft Bing, or Yahoo, Apple receives revenue for each of

9    those searches.[59]  Revenue related to search engine royalties for all iOS devices has grown to over

10   $75 million quarterly in the third and fourth quarter of 2011.[60] All of these forms of revenue are

11   extremely difficult to tie to a specific iPhone sale, and therefore were not included in the jury's

12   calculation of monetary damages.   After analysis, I have concluded that these losses are

13   significant, but could not be calculated with reasonable certainty.

14

15   **VI.    A SUBSTANTIAL LINK EXISTS BETWEEN THE INFRINGED FEATURES AND**

16   **CONSUMER PURCHASING DECISIONS**

17        **A.    Physical Appearance & Design ('D677, 'D087, Apple Trade Dress)**

18        40.    A review of the information in the record and produced in discovery shows that

19   Apple's beautiful, patented designs and trade dress drive substantial consumer demand for

20   smartphone products.

21        41.    Phil Schiller, Apple Senior Vice President of Worldwide Product Marketing,

22   testified at trial that "customers value beautiful products and products they can associate and

23   identify with the company who's [sic] made them."[61]  Mr. Schiller also introduced at trial direct

24   evidence of consumer demand for Apple's protected smartphone designs among Apple iPhone

25   buyers.  The image below, shown to the jury as demonstrative exhibit PDX10, is a summary of

26   ---
     [59] Exhibit 46 (Deposition of Mark Buckley, Feb. 23, 2012, at 146–152).
     [60] Exhibit 47 (Exhibit 23 to the 3/22/2012 Expert Report of Terry Musika, citing APLNDC-Y0000232431-33,

27   APLNDC-Y0000232434-44, and APLNDC-Y0000232445-46).
     [61] Exhibit 31 (Trial Testimony of Phil Schiller, Aug. 3, 2012, at 629).

28

survey response data to a question that had asked iPhone buyers how important the attractive appearance and design feature was in their decision to purchase the iPhone 3GS/4. As shown in the chart, 81 percent of customers in first quarter of fiscal year 2011 believed that appearance and design was important to their purchase versus 82 percent in both the second and third quarters of the same year. Mr. Schiller explained that "[t]his survey result, across time, across many customers, affirms for [him] the perspective that, that most customers believe that attractive appearance and design is very important to their choice of buying a product, and specifically our product."[62]



42. Surveys conducted by Samsung confirm that Apple's distinctive appearance and design drive substantial consumer demand among Samsung's own customer base. For example, in a Samsung survey conducted in 2011 of Samsung Galaxy S and Apple iPhone 4 consumers,

---

[62] Exhibit 30 (Trial Testimony of Phil Schiller, Aug. 3, 2012, at 635-636).

1    Samsung Galaxy S owners stated that the ███████████████████████

2    ███████████████████████████████ ███████████████████████████

3    ███████████████████████████████████████████████████████████

4    ███████████████████ ███████████████████████████████████████

5    ███████████████████████████████████████████████████████████

6    ████████████████████████ ██████████████████████████████████

7    ████████████████████████████████████████

8         43.    ████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ██████

14        44.    STA's Senior Manager of Market Research, Timothy Benner, addressed the

15   importance of design in his deposition. When asked if he could "name a single survey which

16   Samsung has received that shows that the physical appearance of a smartphone is unimportant to

17   consumer purchasing behavior?" he responded "I cannot . . . . Because appearance is an aspect of

18   choice in almost every decision."[68]

19        45.    The fact that Samsung deliberately copied Apple's physical designs, incorporated

20   them into the Infringing Products, and continued to market them to the public despite Apple's

21   demands that it stop infringing Apple's design patents and trade dress, is also strong evidence that

22   these intellectual property rights drive substantial market share among Samsung consumers.

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████

     [68] Exhibit 50 (Deposition of Timothy Benner, Feb. 22, 2012, at 37-38).

28

46.    Finally, third-party consumer surveys and market research reports have also highlighted the importance of physical appearance and design to consumer purchase decisions. The December 2008 Gravity Tank presentation produced by Samsung acknowledged the importance of the iPhone's novel, physical appearance when it stated that the iPhone's "[s]creen-centric design has set the standard for touch" and "has come to equal what's on trend and cool for many consumers."[69]  It was the physical beauty of the iPhone that allowed Apple to "overtake[] Samsung as the most stylish brand overall" back in 2008.[70] ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  Two years later, in 2011, J.D. Power & Associates obtained the same result, finding that "[n]early half (45%) of smartphone owners indicate they chose their model because they liked its overall design and style."[72] This result produced a higher numerical value than any other surveyed feature.[73]

---

[69] Exhibit 51 (Gravity Tank, Touch Portfolio: Rollout Strategy, Recommendation Based on Consumer Insight, Dec. 2008, **PX36** at SAMNDCA00191841).

[70] Exhibit 51 (Gravity Tank, Touch Portfolio: Rollout Strategy, Recommendation Based on Consumer Insight, Dec. 2008, **PX36** at SAMNDCA00191842).

[71] Exhibit 52 (J.D. Power, 2009 Wireless Consumer Smartphone Satisfaction Study, SAMNDCA00190144-243, at '194-195).

[72] Exhibit 53 (J.D. Power, 2011 Wireless Smartphone Satisfaction Study, Mar. 2011, **PX69** at SAMNDCA10246348).

[73] Exhibit 53 (J.D. Power, 2011 Wireless Smartphone Satisfaction Study, Mar. 2011, **PX69** at SAMNDCA10246394).



## Smartphone Selection Process

### Reasons for Choosing Handset Brand

| Reason | Percentage |
| --- | --- |
| Liked overall design/style | 45% |
| Internet capable | 44% |
| Touch screen | 43% |
| Ability to use e-mail accounts | 36% |
| Generally easy to use | 36% |
| Wi-Fi capabilities | 35% |
| Quality of phone/best one | 35% |
| Quality of display screen | 34% |
| Digital camera feature | 33% |
| GPS/Location feature | 32% |
| Ease of using Internet features | 32% |
| Ease of using e-mail features | 31% |
| Plays music/MP3 files | 30% |
| Liked size of phone | 29% |
| Latest technology | 29% |
| Easy to understand/navigate menu system | 28% |
| Able to connect to Internet at higher speeds | 26% |
| Variety | 26% |
| Reliability of phone | 26% |
| Bluetooth capabilities | 25% |
| Speakerphone feature | 25% |
| Keyboard style (Qwerty) | 24% |
| Integrated application store | 24% |
| Plays games | 24% |
| Ability to use multiple e-mail accounts | 22% |
| Operating system platform | 20% |
| PDA/PIM functionality | 20% |
| Phone was discounted/reduced price | 19% |
| Captures/plays video images | 19% |
| Durability of phone | 18% |
| Lightweight | 18% |
| Ease of holding | 17% |

Responses less than 17% not shown.

47.     As this evidence shows, both Apple and Samsung consumers have consistently indicated over the years that they place a high premium on the physical appearance and design of smartphones—and especially the protected designs and trade dress associated with the iPhone—when making a purchasing decision.

**B.      GUI Design ('D305)**

48.      A review of the information in the record and produced in discovery also shows that Apple's protected graphical user interface ("GUI") designs drive substantial consumer demand.

49.      The importance of Apple's protected GUI designs to the consumer can be seen from the lengths to which Samsung went to copy those designs when developing the infringing products.  In February 2010, Samsung held an executive level meeting during which the head of Samsung's mobile phone division said that Samsung was facing "a crisis of design," stating that the difference between Samsung's and Apple's user interfaces was "truly that of Heaven and Earth."[74]  Jinyeun Wang, a Samsung UX designer for the Galaxy S phones, testified at trial that for a period of three months, developers from all over South Korea came together to work on the Galaxy S's graphical user interface.[75]  A contemporaneous document from this time period, dated March 2, 2010, illustrates Samsung's massive campaign of copying nearly every detail of Apple's GUI.  The document (admitted at trial as PX44) spans 132 pages, and contains hundreds of side-by-side comparisons of iPhone and Galaxy S screenshots, with specific "directions for improvement" that frequently involved direct copying of Apple.  Of particular note is a side-by-side comparison of the Galaxy S and iPhone GUIs, with an admission next to the picture of the Galaxy S GUI that says, "Strong impression that iPhone's icon concept was copied."[76]

50.      Dr. Susan Kare, Apple's technical expert regarding the GUI design and 'D305 Patent, testified at trial that she was able to use the March 2, 2010 report described above to "see how, by looking at what ultimately happened, how concrete aspects of the Apple icons affected what ultimately were in the [Samsung] phones that I looked at."[77]  Dr. Kare concluded from her review that the GUI adopted by Samsung was directly impacted by the Apple GUI embodied in the 'D305 Patent.  Samsung's admiration and copying of Apple's GUI just months after Samsung

---

[74] Exhibit 54 (2/11/2010 Email from Bong-Hee Kim, **PX40**, at SAMNDCA10247377).
[75] Exhibit 55 (Trial Testimony of Jinyeun Wang, Aug. 14, 2012, at 2530:13-2531:20).
[76] Exhibit 56 (Relative Evaluation Report on S1, iPhone, Mar. 2, 2010, **PX44** at SAMNDCA00204010).
[77] Exhibit 57 (Trial Testimony of Susan Kare, Ph.D, Aug. 7, 2012, at 1411-1412).

1  felt it faced a "crisis of design" with its own user experience provides compelling evidence of the

2  importance of Apple's GUI in the smartphone market.

3       51.    Numerous Samsung internal documents have also noted the importance of Apple's

4  GUI to smartphone consumers.  For example:

5       • A presentation entitled "Lessons from Apple" delivered by the Boston Consulting

6         Group to Samsung in November 2010 called specific attention to Apple's "Clean,

7         beautiful interface" and "Clean menu screens," and concluded that "Apple's sleek

8         and intuitive user interface has been a key driver of its value proposition."[78]

9       • An email sent by Samsung's Sungsik Lee on March 2, 2010 acknowledged that the

10        UX of the iPhone had already set the standard of the industry.[79]

11      • A report entitled "Samsung mobile icon design for 2011" shows the evolution of

12        Samsung's GUI from 2007, in which it looked nothing like the iPhone GUI, to

13        Samsung's infringing GUI design in 2010.[80]

14      • An email sent by Samsung's James Botello on December 14, 2008 contained side-

15        by-side comparisons between the iPhone GUI and various Samsung GUIs, and

16        detailed some negative comments that Samsung received from AT&T regarding

17        Samsung's use of "'cartoonish'/animated" icons, in comparison to the iPhone's

18        "more organized and consistent" icon layout.[81]

19      • ████████████████████████████████████████████████

20        ████████████████████████████████████████████████

21        ███████████████████████████████████

22      • ████████████████████████████████████████████████

23        ████████████████████████████████████████████████

24

25

---

[78] Exhibit 58 (BCG: Lessons from Apple, Nov. 3, 2010, **PX54** at SAMNDCA00274831).
[79] Exhibit 59 (3/2/2010 Email from Sungsik Lee "To UX Executives," **PX194** at SAMNDCA10247549).
[80] Exhibit 60 (Samsung mobile icon design for 2011, **PX55** at SAMNDCA20007212).
[81] Exhibit 61 (12/14/2008 Email from James Botello, **PX35** at SAMNDCA10247689).
[82] Exhibit 62 (Touchscreen Phones Review, July 2007, VOC Group, SAMNDCA20018416-433, at '417.)

26

27

28

1 ███████████████████████ █████████████████

2 ████████████████████████

3      52.     This evidence points strongly to the conclusion that Apple's protected GUI had

4 become recognized as the standard in the industry, desired by consumers, and a feature that

5 Samsung needed to implement in order to recapture market share in this market.

6

7      **C.     User Interface Patents ('381, '915, '163)**

8      53.     A review of the information in the record and produced in discovery also shows

9 that Apple's '381, '915, and '163 patents drive substantial consumer demand.

10      54.     Apple's conjoint survey expert, John Hauser, conducted two surveys to "determine

11 how much money, if any, Samsung consumers would pay for the features" associated with

12 the '915, '163, and '381 patents.[84]   His analysis found the following price premiums for the

13 features embodied in the particular patents.  "Price Premium for:  '915 Patent, +$39 Smartphones

14 / +$45 Tablets."  "Price Premium for:  '915 + '163 + '381 Patents, +$100 Smartphones / +$90

15 Tablets."[85]  Dr. Hauser described that the "results reflect that there is substantial demand for the

16 features associated with the patents at issue in this case."[86]

17      55.     Additionally Samsung itself identified in multiple documents the importance of the

18 features embodied by these user interface patents.  In a 2009 Browser Zooming Methods UX

19 Exploration Study, Samsung found "[T]he most preferred method is 'Double-Tap' zooming (8

20 out of 9 respondents except the iphone respondent.)   Simplicity is the primary reason of the

21 choice." [87]     That  same  study  listed  the  following:  "Design  &  Research

22 Recommendations/Suggestions.  Adopt Double-Tap as a supplementary zooming method for up

23

24

25 [83] Exhibit 63 (Experts' Evaluation Result, SIP, Major Status on Global Design Competitiveness Evaluation, October 2007, SAMNDCA00203016-40, at '33).

26 [84] Exhibit 64 (Trial Testimony of John Hauser, Aug. 10, 2012, at 1915).
[85] Exhibit 65 (Price Premium for Patented Features, Conjoint Survey Results, Dr. John Hauser, **PX30**).

27 [86] Exhibit 64 (Trial Testimony of John Hauser, Aug. 10, 2012, at 1916).
[87] Exhibit 66 (Browser Zooming Methods UX Exploration Study, Apr.17, 2009, **PX38** at SAMNDCA11104133).

28

1  to 2 levels of zooming and back to original in mass market touch devices.  The UX of iphone can

2  be used as a design benchmark."[88]

3      56.    Additional examples where Samsung placed value on the infringed features of the

4  asserted User Interface Patents include the following.  A May 2010 Behold3 Usability Evaluation

5  Results report found, "[N]o visual effects provided when a web page is dragged to its

6  endpoint.  Behold3: Even when webpage is dragged to its end, only information is provided

7  without any effect.  iPhone: Generates fun for the user with a visual element that seems to

8  bounce. . . . Direction of Improvement:  Provide a fun visual effect when dragging a web page."[89]

9  A February 2010 e-mail from Bong-Hee Kim further states, "[W]hen our UX is compared to the

10  unexpected competitor Apple's iPhone, the difference is truly that of Heaven and Earth.  It's a

11  crisis of design."[90]

12      57.    Third parties also placed value on the features embodied by the asserted User

13  Interface Patents.  A December 2009 McKinsey & Co. report identified the following issue for

14  Samsung, "[A]ddress UI gap between Android and iPhone.  Navigation.  [Side-by-side

15  comparison of iPhone and Samsung phone.]  More intuitive and faster to use on iPhone.

16  Preferred applications always visible. . . . Browser.  [Image of IPhone3G user demonstrating

17  pinch-to-zoom.]  Better browser experience on iPhone.  Pinch to zoom in browser allows more

18  intuitive and easier browsing."[91]  Additionally, a Gravity Tank report from December 2008

19  further suggested to Samsung, "[T]he iPhone isn't just easy to use, 'it's sexy to use.'  Consumers

20  don't see the iPhone as simply useable; they see it as enjoyable, engaging and cool.  Their

21  experience is almost cinematic.  Fun.  Gestures like the two fingered pinch and flick add a game-

22  like quality to interactions. . . . Whimsical.  Lists bounce, icons flitter – the iPhone has a sense of

23  whimsy that shows a thoughtful character in the interface."[92]

24  [88] Exhibit 66 (Browser Zooming Methods UX Exploration Study, Apr. 17, 2009, **PX38** at
    SAMNDCA11104138).

25  [89] Exhibit 67 (Behold3 Usability Evaluation Results, **PX46** at SAMNDCA00508383).

26  [90] Exhibit 54 (2/11/2010 Email from Bong-Hee Kim, **PX40** at SAMNDCA10247377).
    [91] Exhibit 68 (McKinsey & Co., Winning in smartphones: It's now or never, Dec. 10, 2009,

27  SAMNDCA10807316-387, at '61).
    [92] Exhibit 51 (Gravity Tank, Touch Portfolio: Rollout Strategy, Recommendation Based on Consumer Insight,
    Dec. 2008, **PX36** at SAMNDCA00191846).

28

VII. **APPLE WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION**

58. After careful review of all the evidence, I conclude that, absent entry of an injunction, Samsung's continued infringing conduct in the United States with respect to the Products at Issue will cause substantial and irreparable harm to Apple.

59. Apple and Samsung are direct competitors in the lucrative market for United States smartphone consumers. As discussed above, the smartphone market is at a critical moment of transition, characterized by intense growth, as the mobile phone market both swells in size, and as feature phones continue to be replaced by smartphones. In addition, special market considerations such as brand and platform loyalty and perceived high switching costs magnify the effects of losing market share, and especially first-time purchasers, at this critical juncture.

60. Further, the Apple intellectual property found to have been infringed by Samsung drives substantial demand among Samsung consumers for the Infringing Products, including the Products at Issue. Samsung's continued sale of the Products at Issue in the United States will cause substantial long-term market share losses to Apple, which will translate into substantial losses in future revenue from direct sales and from sales within the Apple ecosystem. These lost future sales cannot be quantified with reasonable certainty or recaptured, leading to permanent and irreparable harm to Apple absent an injunction.

1       I declare under penalty of perjury that the foregoing is true and correct and that this

2 Declaration was executed this 29th day of August 2012, at Laguna Beach, California.

TERRY L. MUSIKA