HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
JENNIFER LEE TAYLOR (CA SBN 161368)
jtaylor@mofo.com
ALISON M. TUCHER (CA SBN 171363)
atucher@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
JASON R. BARTLETT (CA SBN 214530)
jasonbartlett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**DECLARATION OF RUSSELL S. WINER IN SUPPORT OF APPLE'S MOTION FOR A PERMANENT INJUNCTION** |

WINER DECL. ISO MOTION FOR A PERMANENT INJUNCTION
CASE NO. 11-CV-01846-LHK (PSG)
sf-3188660

I, Russell S. Winer, hereby declare as follows:

1. My name is Russell S. Winer. I previously submitted an expert report, dated March 22, 2012, a declaration in support of Apple's Motion to Exclude Testimony of Samsung's Experts, dated May 17, 2012, and a declaration in support of Apple's Opposition to Samsung's Motion for Summary Judgment, dated May 30, 2012, all in connection with this matter. I also testified at trial on August 7, 2012.

2. I am the William Joyce Professor of Marketing and the Chair of the Marketing Department at the Stern School of Business, New York University. I have been on the faculty of the Stern School of Business since 2003.

3. I received a B.A. in Economics from Union College and an M.S. and Ph.D. in Industrial Administration from Carnegie Mellon University.

4. My research, teaching, and consulting work has mainly been focused on customer choice, marketing research methodology, marketing planning, advertising, and pricing. I have authored over 60 papers and published in top marketing and management journals such as *Journal of Marketing Research*, *Marketing Science*, *Management Science*, and *Journal of Consumer Research*.

5. While preparing my expert report in this matter, I reviewed Apple's Amended Complaint, filed on June 16, 2012, focusing in particular on Apple's trade dress claims. I also reviewed numerous internal Apple and Samsung documents in analyzing aspects of Apple's trade dress claims.

6. I understand that on August 24, 2012, a jury found that several Samsung smartphones diluted Apple's registered iPhone trade dress shown in U.S. Registration No. 3,470,983 (the "Registered iPhone Trade Dress") and Apple's unregistered iPhone 3G trade dress (the "iPhone 3G Trade Dress") and infringed three of Apple's iPhone-related design patents that cover aspects of the iPhone design.

7. In my opinion, Samsung's dilution of Apple's Registered iPhone Trade Dress and iPhone 3G Trade Dress and infringement of Apple's iPhone-related design patents harms Apple. Apple's distinctive iPhone designs significantly contribute to Apple's brand identity and the

success of the iPhone. Indeed, Apple is known for its unique smartphone designs. By selling similar-looking smartphones, Samsung muddies the distinctiveness cues that are inherent in Apple's Registered iPhone Trade Dress, iPhone 3G Trade Dress, and iPhone-related design patents. From a marketing perspective, this reduces the strength of Apple's brand because it weakens consumers' associations of those designs with the Apple brand.

8. As a conceptual matter, there are multiple sources of harm to Apple's brand image. One such source of harm is Samsung's general marketing strategy and tactics for its smartphones that diminish the distinctiveness of Apple's trade dress.

9. An example of this harm is the weakening of Apple's "coolness" factor that is inherent in the look and feel of the iPhone. Many consumers buy an iPhone, in part, because of its aesthetic appeal—it looks "cool." Consumers like using these products and consumers like being seen using these products. When other consumers buy imitative, knock-off products, the iPhone loses part of its distinctive "coolness." Of course, coolness is just an example, and the loss of distinctiveness goes beyond the attenuation of the coolness factor. The entire spectrum of brand associations that consumers of the products at issue have vis-à-vis the Apple brand is affected. Weakened brand associations also reduce the emotional attachment consumers have to a brand; emotional attachment, so important in Apple's marketing, is also a very important driver of Apple's brand image. In essence, then, Samsung's misappropriation of Apple's brand image has an *affective* influence on consumers' brand associations and this erodes Apple's brand image.

10. An eroded brand image inevitably leads to detrimental effects on Apple's brand equity. Strong brands provide enormous benefits to the firms that own them. Therefore, when brands are harmed, the benefits to the firm that positively affect its bottom line—which include higher brand awareness, greater customer loyalty, increased marketing communication effectiveness, and positive word-of-mouth created by loyal customers[1]—are impacted. Reduced

---

[1] Russell S. Winer & Ravi Dhar, MARKETING MANAGEMENT 179-80 (4th ed., Upper Saddle River, NJ: Pearson Education 2011); Kevin Lane Keller & Donald R. Lehmann, *How Do Brands Create Value*, 12 MARKETING MANAGEMENT 26-31 (2003); Steve Hoeffler & Kevin Lane Keller, *The Marketing Advantages of Strong Brands*, BRAND MANAGEMENT 10, 421-45 (2003).

brand awareness and lower brand loyalty increases a company's marketing costs and/or decreases a company's sales.  Lower brand loyalty also leads to fewer recommendations by consumers, and negative word-of-mouth.  An eroded brand image also means that the brand no longer commands the same brand image premium.  An eroded brand image may also affect the firm's ability to invest in new products and engage in product expansions.  It is noteworthy that an eroded brand image not only impacts the current sales of the diluted and infringed products and other branded products (including but not limited to related or ancillary products), but may also result in potential future lost sales of products.

11. An additional source of harm occurs via actual consumer experience of Samsung's knockoff products.  In general, a consistent "Apple" user experience is very important to Apple.  That consistent user experience is an important part of its success in the marketplace and sets Apple apart from other companies.  If consumers associate the diluting and infringing Samsung products with Apple, to the extent the products provide a different consumer experience than Apple products, the consistent nature of the "Apple" user experience will be diminished.  Moreover, to the extent that Samsung's look-alike products provide a user experience that is similar to Apple's, the distinctive nature of the "Apple" user experience will be diminished as that experience will no longer be uniquely identified with Apple.

12. Industry observers agree on the uniqueness and consistency of Apple's user experience.  For instance, according to a UBS Investment Research report, "through its focus on design, its own distribution through retail stores and its software/hardware ecosystems, Apple is providing unique user experiences that are unrivaled in the digital appliance marketplace."[2]

13. The diminution of the distinctiveness of the "Apple" user experience also hurts Apple's brand image and brand equity.  The harm to the equity of the brand can be intensified depending on the brand architecture strategy of the firm.  Two main strategies are the "branded house" strategy (where most or all of the brands bear the company name) and the "house of

---

[2] "AAPL: A Closer Look at the Potential iPhone Ecosystem," UBS Investment Research, December 12, 2006, APL-ITC796-0000058721-58736 at APL-ITC796-0000058722.

brands" strategy (where the company name is usually not present and each individual product has its own stand-alone brand).[3] In a branded house strategy, followed by the likes of Visa, Virgin, and Apple, the exposure to the brand in one context helps the brand's visibility and enhances consumers' awareness of the brand in other contexts. While this strategy can strengthen overall brand associations, it can also make the overall brand more vulnerable. Here, Samsung's misappropriation of Apple's Registered iPhone Trade Dress, iPhone 3G Trade Dress, and patented designs may affect the distinctiveness and value of the Apple brand in other product areas.

14. Finally, the jury's finding that Samsung's sales of several smartphones are likely to dilute Apple's Registered iPhone Trade Dress and iPhone 3G Trade Dress provides strong evidence that consumers will no longer see Apple's once-distinctive trade dresses as distinctive. Indeed, if Samsung continues to sell these smartphones, the likelihood of dilution will only increase. Not only is actual dilution very difficult to quantity, dilution of the distinctiveness of Apple's trade dresses will be difficult to repair once it occurs.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed this 20th day of September 2012, at New York, New York.

_____
Russell S. Winer

---

[3] Russell S. Winer & Ravi Dhar, MARKETING MANAGEMENT 179-80 (4th ed., Upper Saddle River, NJ: Pearson Education 2011); David A. Aaker & Erich Joachimsthaler, *The Brand Relationship Spectrum: The Key to the Brand Architecture Challenge*, CALIFORNIA MANAGEMENT REVIEW 42, 8-23 (2000).