Pierce Declaration

# EXHIBIT 7

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4

5

6    APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
     CORPORATION,                )
                                 )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,        )
                                 )  AUGUST 13, 2012
8         VS.                    )
                                 )  VOLUME 7
9    SAMSUNG ELECTRONICS CO.,    )
     LTD., A KOREAN BUSINESS     )  PAGES 1989-2320
10   ENTITY; SAMSUNG             )
     ELECTRONICS AMERICA,        )
11   INC., A NEW YORK            )
     CORPORATION; SAMSUNG        )
12   TELECOMMUNICATIONS          )
     AMERICA, LLC, A DELAWARE    )
13   LIMITED LIABILITY           )
     COMPANY,                    )
14                               )
               DEFENDANTS.       )
15   _____

16          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17         UNITED STATES DISTRICT JUDGE

18

19

20         APPEARANCES ON NEXT PAGE

21

22

23   OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                    CERTIFICATE NUMBER 9595
24

25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
3                                MICHAEL A. JACOBS
                                 RACHEL KREVANS
4                          425 MARKET STREET
                           SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
7                           BY:  WILLIAM F. LEE
                            60 STATE STREET
8                           BOSTON, MASSACHUSETTS  02109

9                           BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                            50 CALIFORNIA STREET, 22ND FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94111

14                          BY:  VICTORIA F. MAROULIS
                                 KEVIN P.B. JOHNSON
15                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
16                          REDWOOD SHORES, CALIFORNIA  94065

17                          BY:  MICHAEL T. ZELLER
                                 WILLIAM C. PRICE
18                          865 SOUTH FIGUEROA STREET
                            10TH FLOOR
19                          LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

1                    INDEX OF WITNESSES

2    PLAINTIFF'S

3    **BORIS TEKSLER**
             CROSS-EXAM BY MS. MAROULIS (RES.)  P. 2006
4            REDIRECT EXAM BY MR. MUELLER       P. 2009
             RECROSS-EXAM BY MS. MAROULIS       P. 2019
5            FURTHER REDIRECT EXAM              P. 2022

6    **JUN WON LEE**
             BY VIDEOTAPED DEPOSITION           P. 2023
7                                                  2025

8    **DONG HOON CHANG**
             BY VIDEOTAPED DEPOSITION           P. 2026
9

10   **TIMOTHY BENNER**
             BY VIDEOTAPED DEPOSITION           P. 2028
11                                                 2029

12   **TIMOTHY SHEPPARD**
             BY VIDEOTAPED DEPOSITION           P. 2030
13

14   **TERRY MUSIKA**
             DIRECT EXAM BY MS. KREVANS         P. 2031
15           CROSS-EXAM BY MR. PRICE            P. 2098
             REDIRECT EXAM BY MS. KREVANS       P. 2160
16           RECROSS-EXAM BY MR. PRICE          P. 2165
             FURTHER REDIRECT EXAM              P. 2171
17

18

19   DEFENDANT'S

20   **BENJAMIN BEDERSON**
             DIRECT EXAM BY MR. DEFRANCO        P. 2228
21           CROSS-EXAM BY MR. JACOBS           P. 2254
             REDIRECT EXAM BY MR. DEFRANCO      P. 2269
22

23   **ADAM BOGUE**
             DIRECT EXAM BY MR. JOHNSON         P. 2274
24           CROSS-EXAM BY MR. JACOBS           P. 2300

25

1                        INDEX OF EXHIBITS

2                                    MARKED          ADMITTED

3       PLAINTIFF'S

4       69 AND 89                                    2028
        28                                           2057
5       34                                           2079
        194                                          2082
6       25A-1                                        2094
        2227                                         2273
7       41.1 AND 41.2                                2273

8       DEFENDANT'S

9       572.003                                      2128
        518                                          2235
10      3951.001 AND 3951.002                        2235
        3951.010                                     2239
11      546                                          2240
        528                                          2245
12      518                                          2251
        3951.007 AND 3951.009                        2251
13      696                                          2277
        695                                          2281
14      661                                          2287
        3952.101                                     2287
15      662                                          2289
        3952.102                                     2291
16      713                                          2298

17

18      JOINT

19      1500                                         2041

20

21

22

23

24

25

```
1    JURY AND THAT WAY WE DON'T LOSE ANY TIME DURING THE

2    DAY.

3              MR. MCELHINNY:  AND AS I DID AGREE WITH

4    MR. VERHOEVEN, WE WILL NOT RAISE WAIVER -- HIS

5    ARGUMENTS ARE GOING TO BE PRESERVED IN HIS MOTION,

6    WHATEVER IS IN HIS WRITTEN MOTION.

7              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  WHAT ELSE?

9    ANYTHING ELSE THAT WE SHOULD COVER?  I GUESS WE CAN

10   BRING OUR JURY IN A LITTLE EARLY.

11             MS. MAROULIS:  THE ONLY THING IS MY REAL

12   TIME DOESN'T WORK.

13             THE COURT:  MINE IS STUCK AS WELL.

14             (PAUSE IN PROCEEDINGS.)

15             MR. VERHOEVEN:  YOUR HONOR, THERE IS ONE

16   OTHER THING, BUT I THINK WE CAN ADDRESS IT AT A

17   LATER TIME.  MR. GOLDSTEIN, MY PARTNER, WOULD LIKE

18   US TO USE A COUPLE MINUTES OF OUR TIME TO ADDRESS

19   ONE OF THE OBJECTION RULINGS ON DR. YANG.

20             THE COURT:  DR. WHO, WHICH ONE?

21             MR. VERHOEVEN:  DR. YANG, BUT HE'S NOT

22   GOING TO BE UP FOR A LONG TIME, SO MY SUGGESTION IS

23   WE GET GOING AND FIND A SPOT CLOSER IN TIME.

24             THE COURT:  IS YOUR ORDER OF WITNESSES

25   SIMILAR, LARGELY, ACCORDING TO YOUR LIST?
```

```
 1              MS. MAROULIS:  IT'S THE ONE WE FILED,
 2      YESTERDAY, YOUR HONOR, AROUND NOON.
 3              THE COURT:  OKAY.
 4              MS. MAROULIS:  SO BASICALLY THREE PRIOR
 5      ARTISTS, DEPOSITION DESIGNATIONS, AND THEN
 6      MR. WILLIAMS AND MR. YANG.
 7              THE COURT:  OKAY.  SO MR. PALTIAN,
 8      MR. ZORN, MR. WILLIAMS, AND THEN MR. YANG, HE'LL BE
 9      ON BEFORE?
10              MR. VERHOEVEN:  YES.
11              MS. MAROULIS:  BUT THE THREE OTHER
12      WITNESSES ARE GOING FIRST, BOGUE, FORLINES AND
13      BEDERSON BEFORE THE OTHERS.
14              THE COURT:  I'M SORRY.  GIVE ME YOUR
15      ORDER THEN.  PALTIAN, ZORN --
16              MS. MAROULIS:  NO, YOUR HONOR.  IT'S
17      BOGUE, FORLINES, BEDERSON, PALTIAN, ZORN, WILLIAMS,
18      AND YANG.
19              THE COURT:  OKAY.  THANK YOU.
20              ALL RIGHT.  MR. RIVERA, WOULD YOU PLEASE
21      BRING IN OUR JURY?
22              THE CLERK:  YES, YOUR HONOR.
23              (WHEREUPON, THE FOLLOWING PROCEEDINGS
24      WERE HELD IN THE PRESENCE OF THE JURY:)
25              THE COURT:  ALL RIGHT.  GOOD MORNING AND
```

```
1    WELCOME BACK.  THE TIME IS NOW 9:05.

2              GO AHEAD, PLEASE, WITH THE CROSS OF

3    MR. TEKSLER.

4              SIR, YOU ARE STILL UNDER OATH.

5                    BORIS TEKSLER,

6    BEING CALLED AS A WITNESS ON BEHALF OF THE

7    PLAINTIFF, HAVING BEEN PREVIOUSLY DULY SWORN, WAS

8    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

9              CROSS-EXAMINATION (RESUMED)

10   BY MS. MAROULIS:

11   Q    GOOD MORNING, MR. TEKSLER.

12   A    GOOD MORNING.

13   Q    WE'RE GOING TO CONTINUE WITH THE DISCUSSION OF

14   THE ROYALTIES THAT WE STARTED LAST WEEK.

15             DO YOU REMEMBER THAT?

16   A    I DO.

17   Q    LAST WEEK YOU TESTIFIED THAT NO ONE HAS EVER

18   PAID APPLE A ROYALTY OF $2.02 PER UNIT FOR THE '381

19   PATENT.  IS THAT STILL CORRECT?

20   A    YES, THAT'S CORRECT.  THERE'S NO LICENSE FOR

21   THE '381.

22   Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF

23   $2.02 FOR THE '163 PATENT; IS THAT CORRECT AS WELL?

24   A    YES, THAT'S CORRECT.

25   Q    NO ONE HAS EVER PAID APPLE A ROYALTY OF $3.10
```

1    FOR THE '916 PATENT AT ISSUE; IS THAT CORRECT?

2    A    YES, THAT'S CORRECT.

3    Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF

4    $24 DOLLARS PER UNIT FOR ANY OF THE DESIGN PATENTS

5    AT ISSUE IN THIS CASE; IS THAT RIGHT?

6    A    YES, THAT'S CORRECT.

7    Q    FURTHERMORE, NO ONE HAS EVER PAID APPLE A

8    ROYALTY OF $24 A UNIT FOR ALL FOUR DESIGN PATENTS

9    AT ISSUE IN THIS CASE; RIGHT?

10   A    YES, THAT'S CORRECT.

11   Q    AS A LICENSING PROFESSIONAL, SIR, ARE YOU

12   FAMILIAR WITH THE CONCEPT OF MARKING?

13   A    I AM.

14   Q    MARKING IS PUTTING THE PATENT OR REGISTERED

15   TRADE DRESS NUMBER ON YOUR PRODUCT; CORRECT?

16   A    THAT'S ONE INSTANCE, YES.

17   Q    AND THE PURPOSE OF THAT IS TO LET EVERYONE IN

18   THE MARKET KNOW THAT THE PATENTEE HAS RIGHTS TO A

19   PARTICULAR PATENT; RIGHT?

20   A    YES, I BELIEVE THAT'S CORRECT.

21   Q    AND IT IS CORRECT, SIR, THAT APPLE DOES NOT

22   MARK ITS IPHONES; RIGHT?

23   A    YES, I BELIEVE THAT'S CORRECT.

24   Q    IT'S ALSO CORRECT THAT APPLE DOES NOT MARK ITS

25   IPADS; IS THAT RIGHT?

1    A    THAT'S CORRECT.

2    Q    ISN'T IT CORRECT, SIR, THAT PRIOR TO THE

3    FILING OF THIS LAWSUIT, APPLE NEVER TOLD SAMSUNG

4    THAT IT WAS INFRINGING SPECIFIC DESIGN PATENTS BY

5    NUMBER?

6    A    WE TOLD THEM THAT THEY INFRINGED DESIGN

7    PATENTS OF OURS, BUT WE DIDN'T ALLOCATE THOSE

8    NUMBERS TO THEM, THAT'S CORRECT.

9         AS A MATTER OF FACT, SEVERAL OF THOSE

10   PATENTS HADN'T YET ISSUED.

11   Q    MR. TEKSLER, PLEASE ANSWER MY QUESTION.  IS IT

12   CORRECT THAT APPLE NEVER SPECIFIED ANY DESIGN

13   PATENTS TO SAMSUNG THAT IT ALLEGES IN THIS CASE

14   PRIOR TO THE LAWSUIT?

15   A    ANY ENUMERATED NUMBER?  IS THAT WHAT YOU'RE

16   SAYING?

17   Q    YES, MR. TEKSLER.

18   A    YES, I AGREE.

19         MS. MAROULIS:  OKAY.  I DON'T HAVE ANY

20   FURTHER QUESTIONS FOR YOU AT THIS TIME.

21         THE COURT:  OKAY.  THE TIME IS NOW 9:07.

22   IS THERE ANY REDIRECT?

23         MR. MUELLER:  PLEASE, YOUR HONOR.

24         THE COURT:  OKAY.  GO AHEAD, PLEASE.

25         MR. MUELLER:  MAY I PROCEED, YOUR HONOR?

```
 1              THE COURT:  PLEASE, GO AHEAD.

 2                    REDIRECT EXAMINATION

 3    BY MR. MUELLER:

 4    Q    JUST A FEW QUESTIONS FOR YOU.  FIRST,

 5    MS. MAROULIS ASKED YOU SOME QUESTIONS A MOMENT AGO

 6    WITH RESPECT TO LICENSING OF APPLE'S PATENTS.

 7              DO YOU HAVE THOSE PATENTS IN MIND?

 8    A    I DO.

 9    Q    THE '381, THE '163?

10    A    YES.

11    Q    THE '916?

12    A    YES.

13    Q    AND THE DESIGN PATENTS.

14    A    CORRECT.

15    Q    NOW, LET'S BE CLEAR.  HAS APPLE LICENSED ANY

16    OF THOSE PATENTS ON A STANDALONE BASIS AS

17    INDIVIDUAL PATENTS?

18    A    NO.

19              MS. MAROULIS:  OBJECTION.  LEADING.

20              THE COURT:  OVERRULED.

21              THE WITNESS:  SORRY.  NO, IT'S NOT OUR

22    CUSTOMARY PRACTICE TO ENUMERATE SPECIFIC DESIGN

23    PATENTS, OR SPECIFIC PATENT NUMBERS.

24              IN GENERAL, YOU COME UP WITH A PRETTY

25    BROAD CATEGORY OF PATENTS IN A CROSS-LICENSE.  THAT
```

```
1    WAY BOTH PARTIES KNOW THAT THEY HAVE SOME PEACE.

2    BY MR. MUELLER:

3    Q    NOW, MR. TEKSLER, LAST WEEK YOU EXPLAINED TO

4    THE JURY HOW APPLE TREATS DIFFERENT CATEGORIES

5    WITHIN ITS PATENT PORTFOLIO.

6              CAN YOU REMIND US, WHICH CATEGORY DO

7    THESE PATENTS FALL INTO?

8              MS. MAROULIS:  OBJECTION.  BEYOND THE

9    SCOPE OF CROSS.

10             MR. MUELLER:  YOUR HONOR, THESE ARE

11   EXACTLY THE PATENTS THAT MS. MAROULIS JUST ASKED

12   ABOUT.

13             THE COURT:  OVERRULED.

14             GO AHEAD.

15             THE WITNESS:  SO ALL THESE PATENTS ARE IN

16   APPLE'S UNIQUE USER EXPERIENCE AND NOT ONES THAT WE

17   WOULD LICENSE.

18   BY MR. MUELLER:

19   Q    NOW, MS. MAROULIS ASKED YOU SOME QUESTIONS

20   ABOUT THE LIMITED CIRCUMSTANCES IN WHICH APPLE HAS

21   LICENSED ITS DESIGN PATENTS.  THOSE WERE QUESTIONS

22   ASKED LAST FRIDAY.

23             DO YOU RECALL THAT?

24   A    I DO.

25             MS. MAROULIS:  OBJECTION.  ARGUMENTATIVE.
```

```
 1                  THE COURT:  OVERRULED.

 2     BY MR. MUELLER:

 3     Q    NOW, MR. TEKSLER, ARE YOU FAMILIAR WITH

 4     APPLE'S LICENSE WITH MICROSOFT?

 5     A    I AM.

 6     Q    DOES THAT LICENSE COVER APPLE'S DESIGN

 7     PATENTS?

 8     A    IT DOES.

 9     Q    CAN YOU EXPLAIN TO THE JURY THE FORM OF THE

10     LICENSE GRANT?

11     A    SURE.  SO APPLE AND MICROSOFT'S CROSS-LICENSE

12     DOES COVER THE DESIGN PATENTS.

13               HOWEVER, WE TOOK SPECIAL PROHIBITIONS FOR

14     BOTH PARTIES SO THAT THERE'S WHAT I TERM AN

15     ANTI-CLONING PROVISION IN THE AGREEMENT SO THAT WE

16     WOULDN'T COPY EACH OTHER'S PRODUCTS.

17               AND SO EVEN THOUGH THERE'S PEACE BETWEEN

18     THE COMPANIES WITH RESPECT TO THE PATENTS AS A

19     WHOLE, THERE'S A CLEAR ACKNOWLEDGMENT THAT THERE'S

20     NO COPYING WITH THIS ANTI-CLONING PROVISION.

21     Q    AND MR. TEKSLER, TO BE VERY CLEAR, WHAT RIGHTS

22     WERE NOT GIVEN TO MICROSOFT WITH RESPECT TO THESE

23     DESIGN PATENTS?

24               MS. MAROULIS:  OBJECTION.  LEADING,

25     BEYOND THE SCOPE OF CROSS.
```

```
1    Q    OKAY.  HOW MANY OF THE 5 MILLION LEFT DID YOU

2    PUT IN THE APPLE LOST PROFITS DAMAGES CATEGORY?

3    A    I PUT TWO INTO THE LOST PROFITS CATEGORY, SO

4    WE SHOULD HAVE TWO OF THOSE SLIDE DOWN, AND 2

5    MILLION, APPROXIMATELY, COME DOWN THERE.

6         AND THAT, OF COURSE, LEAVES THE 3

7    MILLION, AND YOU CAN OF COURSE GUESS WHERE THOSE

8    GO, DOWN TO THE REASONABLE ROYALTY.

9         AND WE CAN SEE VERY CLEARLY THAT NO

10   INDIVIDUAL PRODUCT HAS HAD MORE THAN ONE DAMAGE

11   CALCULATED ON IT.

12   Q    OKAY.  THAT LOOKED EASY.

13        CAN YOU DESCRIBE FOR THE JURY THE ACTUAL

14   AMOUNT OF EFFORT THAT IT TOOK TO MAKE THESE

15   ALLOCATIONS AND THEN MAKE THOSE ONE, ONE PHONE BY

16   ONE TABLET DAMAGES CALCULATIONS THAT YOU MADE.

17   A    IT -- I CAN ASSURE YOU, IT'S NOT ME SITTING AT

18   A DESK WITH A CALCULATOR DOING 22 MILLION

19   CALCULATIONS.

20        IN FACT, BECAUSE OF THE VARIOUS

21   COMBINATIONS, THERE ARE LITERALLY HUNDREDS OF

22   MILLIONS OF CALCULATIONS, AND SO THE ONLY WAY,

23   PRACTICALLY, TO DO THIS IS TO WRITE A COMPUTER

24   PROGRAM.

25        AND SO OVER THE LAST YEAR AND A HALF TO
```

```
 1    TWO YEARS, I HAVE HAD A TEAM OF 20 PEOPLE,

 2    ECONOMISTS, PROGRAMMERS, STATISTICIANS AND C.P.A.'S

 3    DEVELOPING A MODEL THAT IS DYNAMIC ENOUGH TO TAKE

 4    IN ALL 22 MILLION AND MAKE CHANGES AND ADJUSTMENTS,

 5    SINCE THIS PROCESS WENT ON FOR A YEAR AND A HALF,

 6    AS NEW PRODUCTS CAME IN AND WENT OUT.

 7              AND ABOUT 7,000 TOTAL PROFESSIONAL HOURS

 8    WERE DEDICATED TOWARDS THE CREATION AND OPERATION

 9    OF THAT COMPUTER MODEL.

10    Q    THAT SOUNDS EXPENSIVE.  WAS IT EXPENSIVE?

11    A    IT WAS VERY EXPENSIVE.

12    Q    WHAT DID IT COST TOTAL FOR YOUR TEAM OF 23

13    PEOPLE?

14    A    20 PEOPLE, OVER MORE THAN A YEAR AND A HALF,

15    THAT 7,000 HOURS, WAS APPROXIMATELY $1,750,000.

16    Q    OKAY.  LET'S GO BACK TO THE FIRST CATEGORY YOU

17    TALKED ABOUT, THE SAMSUNG PROFIT CATEGORY.

18              ONCE YOU HAD ALLOCATED 17 MILLION PHONES

19    AND TABLETS TOTAL INTO THAT CATEGORY, WHAT WAS THE

20    NEXT STEP IN DETERMINING THE DAMAGES FOR THOSE 17

21    MILLION DEVICES?

22    A    WELL, IT'S, IT'S MAKING THE ACTUAL

23    CALCULATIONS.  IT'S FIGURING OUT HOW MUCH -- WE NOW

24    KNOW THE UNITS, BUT HOW MUCH DID SAMSUNG ACTUALLY

25    MAKE ON THOSE 17 MILLION?
```

```
 1    Q    OKAY.  IF WE COULD SEE THE NEXT SLIDE.  WE'RE

 2    SHOWING $2.241 BILLION HERE.

 3              CAN YOU EXPLAIN TO THE JURY HOW YOU CAME

 4    UP WITH THAT NUMBER IN CONCEPT?

 5    A    IN CONCEPT, KEEP IN MIND THE 17 MILLION UNITS,

 6    AGAIN, AND IT'S -- IT'S FIGURING OUT HOW MUCH DID

 7    SAMSUNG ACTUALLY MAKE IN PROFIT ON EACH ONE OF

 8    THOSE UNITS, AS SIMPLISTICALLY MULTIPLICATION.

 9    IT'S THE UNITS TIMES THE PROFITS AND THAT GETS YOU

10    TO $2.2 BILLION.

11    Q    WHAT WAS THE SOURCE OF THE INFORMATION YOU

12    USED FOR THE PURPOSES OF MAKING THESE CALCULATIONS?

13    A    THESE NUMBERS ARE, IN THIS CASE ARE SAMSUNG'S

14    NUMBERS.  WHEN I'M TALKING ABOUT SAMSUNG'S PROFIT,

15    THESE ARE NUMBERS THAT COME DIRECTLY FROM SAMSUNG'S

16    FINANCIAL RECORDS.

17    Q    OKAY.  COULD WE SEE SLIDE 34B.15.

18              STARTING HERE -- I KNOW YOU HAVE A SERIES

19    OF SLIDES HERE, MR. MUSIKA.  CAN YOU WALK US

20    THROUGH THE NATURE OF THE CALCULATION YOU DID TO

21    ARRIVE AT THE $2.24 BILLION PROFIT NUMBER FOR THE

22    $17 MILLION PHONES -- 17 MILLION PHONES?

23    A    YES.  WELL, THERE'S THE $8.1 BILLION NUMBER

24    AGAIN -- PARDON ME -- AND HOPEFULLY WE CAN REMEMBER

25    THAT WAS THE TOTAL OF THE ACCUSED SALES.
```

```
 1              BUT KEEPING IN MIND, I'M CALCULATING
 2     THIS, THIS DAMAGE ONLY ON SAMSUNG'S PORTION.
 3              SO THE FIRST THING I DO IS I HAVE TO
 4     REDUCE THAT NUMBER FOR THE UNITS THAT, THAT OTHER 5
 5     MILLION UNITS THAT WENT TO OTHER FORMS OF DAMAGE.
 6     SO THAT'S THE FIRST DEDUCTION.  I THINK THAT'S THE
 7     NEXT SLIDE.
 8              AND I DEDUCT 1.749 BILLION BECAUSE I'M
 9     GOING TO CALCULATE DAMAGES ON A REASONABLE ROYALTY
10     TO LOST PROFITS, AND THAT LEAVES ME $6,411,000,000.
11     Q    AND WHAT WAS THE NEXT STEP?
12     A    THE NEXT STEP IS WHAT WE ALL -- REGARDLESS OF
13     WHAT BUSINESS WE'RE IN, ALL OF US INCUR THE SAME
14     THING.  WE HAVE REVENUE BECAUSE WE MAKE A SALE, AND
15     WE HAVE EXPENSES.  NOBODY JUST GIVES US MONEY.  AND
16     SAMSUNG INCURRED EXPENSES TO GENERATE THAT
17     6,411,000,000, SO I HAD TO IDENTIFY HOW MUCH DID IT
18     COST SAMSUNG TO EARN OR GENERATE THAT
19     6,411,000,000.
20     Q    OKAY.  SO LET'S SEE THE NEXT SLIDE.
21     A     AND THERE YOU SEE -- THERE YOU SEE THE COST OF
22     GOODS SOLD, HOW MUCH DID IT COST, WHAT ARE THE
23     DIRECTLY ATTRIBUTABLE COSTS THAT SAMSUNG INCURRED,
24     AND THAT'S 4,170,000,000.
25              IF I SUBTRACT THAT FROM THAT PRIOR
```

1    NUMBER, THAT GETS US DOWN TO THE BOTTOM,

2    $2,241,000,000.

3    Q    OKAY.  HAVE YOU DONE THIS CALCULATION FOR EACH

4    OF THE DIFFERENT PRODUCTS ACCUSED OF VIOLATING ONE

5    OF APPLE'S DESIGN OR TRADE DRESS PATENT RIGHTS?

6    A    YES.

7    Q    COULD WE SEE SLIDE 34B.19?

8         WHAT IS DEPICTED HERE, MR. MUSIKA?

9    A    THIS IS JUST A, AN ADDITIONAL SLIDE TO HELP

10   THE COURT SEE THAT NOT ONLY DID I DO IT ON AN

11   INDIVIDUAL TABLET-BY-TABLET,

12   SMARTPHONE-BY-SMARTPHONE BASIS, BUT THOSE ARE BY

13   MODEL, TOO.

14        SO HERE IS THAT SAMSUNG'S PROFITS

15   DIVIDED, OR SHOWN BY MODEL, BOTH FOR TABLETS AND

16   SMARTPHONES.

17   Q    OKAY.  HAS SAMSUNG ALSO PROVIDED A CALCULATION

18   IN THIS CASE OF WHAT IT SAYS ARE ITS PROFITS ON

19   THIS SAME GROUP OF 17 MILLION DEVICES?

20   A    WELL, NOT TO CONFUSE ANYONE.  MY NUMBER THAT

21   I'VE JUST GIVEN YOU IS SAMSUNG'S NUMBER, TOO.

22        BUT I DEDUCTED CERTAIN COSTS AND SAMSUNG

23   WOULD -- WOULD AND HAS SAID THAT THEY'VE INCURRED

24   ADDITIONAL COSTS THAT SHOULD BE SUBTRACTED.

25        SO THERE'S NO DISPUTE ABOUT THE NUMBERS

```
1    THAT I'M USING.  IT'S JUST THAT THERE'S A DISPUTE

2    ABOUT HOW MUCH -- HOW MANY COSTS SHOULD BE INCLUDED

3    IN THE CALCULATION.

4    Q    COULD WE SEE PDX 34B.20.

5              WHAT HAVE YOU SHOWN ON THIS SLIDE,

6    MR. MUSIKA?

7    A    THERE'S NO MATH IN THIS SLIDE.  THERE'S JUST

8    THREE NUMBERS.  THE FIRST NUMBER IS THE FAVORITE

9    NUMBER, OR THE OLD NUMBER WE KNOW, THE 8.1 BILLION

10   TOTAL REVENUE.  SO THAT'S THE REVENUE AT ISSUE.

11             THE MIDDLE NUMBER IS MY NUMBER OF WHAT

12   THE UNJUST GAIN IS.  THAT'S THE SAME $2.2 BILLION

13   NUMBER.

14             BUT THE NUMBER ON THE RIGHT IS ANOTHER

15   SAMSUNG CALCULATION WHICH TAKES MY 2.2 BILLION AND

16   TAKES IT DOWN TO $1,086,000,000.

17   Q    AND WHAT IS -- SINCE YOU BOTH STARTED WITH THE

18   SAME NUMBERS FROM SAMSUNG'S RECORDS, WHAT IS THE

19   REASON FOR THE DIFFERENCE BETWEEN YOUR CALCULATION

20   OF TOTAL PROFITS ON THESE 17 MILLION PHONES AND

21   SAMSUNG'S CALCULATION OF TOTAL PROFITS ON THESE 17

22   MILLION PHONE?

23   A    WE'RE GOING TO SEE IT IN JUST A SECOND, BUT

24   IT'S REAL SIMPLE.  KEEP IN MIND I DEDUCTED COSTS

25   WHICH ARE DIRECTLY ATTRIBUTABLE.
```

1          SAMSUNG DEDUCTED THOSE COSTS AS WELL, BUT

2     THEY DEDUCTED ADDITIONAL COSTS WHICH I DID NOT

3     DEDUCT, AND WE'LL LOOK AT THOSE PRESENTLY.

4     Q    OKAY.  WHY DON'T WE LOOK AT EXHIBIT 28.  IT'S

5     IN YOUR BINDER.  AND COULD WE START SIMPLY BY YOU

6     IDENTIFYING WHAT EXHIBIT 28 IS.

7     A    EXHIBIT 28 IS A -- THIS IS A SCHEDULE THAT I

8     PREPARED USING SAMSUNG'S RECORDS, TRANSLATED

9     RECORDS, FOR SEC AND I USED IT FOR PURPOSES OF

10    LOOKING AT THE TYPES OF COSTS -- THIS WILL LIST ALL

11    THEIR COSTS FROM TOP TO BOTTOM, AND WE'LL SEE THE

12    KIND OF COSTS I DEDUCTED AND THE ADDITIONAL COSTS

13    THAT SAMSUNG DEDUCTED.

14          MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE

15    THE ADMISSION OF EXHIBIT PX 28.

16          MR. PRICE:  NO OBJECTION.

17          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          28, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22    BY MS. KREVANS:

23    Q    YOU SAY YOU PREPARED THIS.  WHAT WAS THE

24    SOURCE OF THESE NUMBERS?

25    A    SAMSUNG RECORDS.

1    Q    DID YOU CHANGE THE NUMBERS IN ANY WAY WHEN YOU

2    PREPARED THIS SCHEDULE?

3    A    THE NUMBERS ARE -- THEY'RE IMPORTANT, BUT

4    THEY'RE NOT THE NUMBERS.  THEY'RE THE NUMBERS FOR

5    THE OVERALL ENTITY.  SO IT HAS OTHER SALES OF

6    NON-ACCUSED ITEMS.

7         MY FOCUS IS REALLY MORE ON TERMS OF THE

8    TYPES OF ACCOUNTS, BUT I DIDN'T CHANGE THIS.  THIS

9    COMES DIRECTLY -- THIS IS THE TYPE OF ACCOUNTS AND

10   THE NUMBERS COME DIRECTLY FROM SAMSUNG.

11   Q    OKAY.  COULD WE JUST MAKE A LITTLE LARGER,

12   MR. LEE, THE TOP PORTION OF THIS DOWN THROUGH LINE,

13   GROSS SALES PROFIT PERCENTAGE.

14        WHAT'S DEPICTED HERE, MR. MUSIKA?

15   A    SAMSUNG'S RECORDS ARE, ARE THE SAME AS, IN

16   MANY OTHER SOPHISTICATED, SAME AS APPLE'S.  THEY'RE

17   PREPARED BASICALLY IN THE SAME FORMAT.

18        AND THE BASIC FORMAT OF A FINANCIAL

19   STATEMENT, OR A PROFIT AND LOSS STATEMENT, IS NO

20   DIFFERENT THAN OUR PERSONAL PROFIT AND LOSS

21   STATEMENTS.

22        WE START AT THE TOP WITH HOW MUCH DID WE

23   EARN, WHAT'S THE REVENUE?  AND THEN WE DEDUCT

24   EXPENSES.

25        STARTING AT THE TOP, THOSE EXPENSES ARE

```
1    DIRECTLY ATTRIBUTABLE.  AS YOU MOVE DOWN AND YOU

2    GET TO WHERE PEOPLE USUALLY REFER TO IT, THE BOTTOM

3    LINE, THOSE COSTS THAT ARE INCLUDED BECOME LESS AND

4    LESS SPECIFICALLY ASSOCIATED WITH THE REVENUE.

5              SO HERE WE SEE REVENUE, QUANTITY AT THE

6    TOP, AND THEN SALES IN TERMS OF TOTAL DOLLARS.

7    Q    AND I TAKE IT FROM WHAT YOU SAID A COUPLE

8    MINUTES AGO, WHERE IT SAYS SALES $30 BILLION, YOU

9    DIDN'T USE ALL 30 BILLION OF THOSE DOLLARS IN YOUR

10   CALCULATIONS?

11   A    NO.  AGAIN, THIS IS THEIR NUMBERS FROM THE SEC

12   MANUFACTURING ENTITY THAT HAS SALES OF OTHER ITEMS

13   IN THERE, SO I'VE ALREADY PULLED MY -- MY 8

14   BILLION, OR SAMSUNG'S 8 BILLION IS IN THAT $30

15   BILLION NUMBER IN THERE, BUT THERE ARE OTHER THINGS

16   IN THERE AND WE SHOULDN'T BE FOCUSSED ON THOSE

17   NUMBERS.

18   Q    OKAY.  YOU SEE AT THE BOTTOM PORTION OF THIS

19   EXHIBIT 28 THAT WE'RE LOOKING AT ON THE SCREEN

20   RIGHT NOW, THERE ARE TWO LINES THAT SAY "GROSS

21   SALES PROFIT" AND "GROSS SALES PROFIT PERCENTAGE."

22              WHAT ARE THOSE NUMBERS?

23   A    STANDARD ACCOUNTING TERMINOLOGY.  SALES MINUS

24   COST OF GOODS SOLD, THAT'S -- C.O.G.S. STANDS FOR

25   COST OF GOODS SOLD, AND THOSE ARE COSTS WHICH ARE
```

1    DIRECTLY ATTRIBUTABLE TO THE PRODUCTION AND/OR SALE

2    OF THE ACCUSED DEVICES.

3            AND THIS IS -- AGAIN, THIS ISN'T MY

4    CONSTRUCTION.  THIS IS REALLY GENERALLY ACCEPTED

5    ACCOUNTING PRINCIPALS AND THIS IS DIRECTLY FROM

6    THEIR STATEMENTS.

7            AND THAT GETS US, IF WE DEDUCT THE COST

8    OF GOODS SOLD FROM THE SALES, WE GET A GROSS PROFIT

9    NUMBER AND PERCENTAGE.

10   Q    AND WHAT'S THE GROSS PROFIT PERCENTAGE?

11   A    GROSS PROFIT PERCENTAGE IS, IN THIS STATEMENT

12   IS 39.2 PERCENT.

13   Q    WHAT WAS THE AVERAGE GROSS PROFIT AMOUNT THAT

14   YOU FOUND IN SAMSUNG'S FINANCIAL RECORDS FOR THE $8

15   BILLION IN SALES OF THE ACCUSED PRODUCTS IN THE

16   UNITED STATES?

17   A    ALL RIGHT.  THE ACCUSED PRODUCTS HAVE SLIGHTLY

18   LOWER GROSS PROFIT PERCENTAGE.  PER MY

19   RECOLLECTION, THE OVERALL GROSS PROFIT PERCENTAGE

20   ON JUST THE ACCUSED PRODUCTS WAS APPROXIMATELY 35.5

21   PERCENT.

22   Q    OKAY.  YOU SAID A COUPLE MINUTES AGO THAT IF

23   WE MOVE DOWN THIS SAME PAGE OF EXHIBIT 28, WE'RE

24   GOING TO SEE SOME OTHER KINDS OF EXPENSES.

25   A    YES.

1   Q    DO YOU BELIEVE THAT THOSE OTHER EXPENSES ARE

2   APPROPRIATE TO BE DEDUCTED IN CALCULATING SAMSUNG'S

3   TOTAL PROFITS FOR PURPOSES OF DAMAGES IN THIS CASE?

4   A    FIRST OF ALL, SAMSUNG DEDUCTS ALL THOSE OTHER

5   EXPENSES.  THEY WERE INCURRED.  I'M NOT DISPUTING

6   THEY WERE INCURRED.

7           BUT I DO NOT THINK IT IS APPROPRIATE TO

8   DEDUCT THOSE TO GET TO THE PROFIT NUMBER WHICH

9   WOULD REWARD APPLE FOR SAMSUNG'S UNJUST ENRICHMENT.

10          SO REALLY ALL THE EXPENSES BELOW THERE

11  ARE REALLY THE DISAGREEMENT.

12  Q    AND WHY DO YOU THINK THAT THOSE EXPENSES,

13  THOSE OTHER EXPENSES, ARE NOT PROPERLY DEDUCTED IN

14  CALCULATING SAMSUNG'S PROFITS?

15  A    I HAVE TWO VERY SPECIFIC REASONS.

16  Q    WHAT ARE THEY?

17  A    ONE REASON IS THAT THOSE COSTS, BY THEIR VERY

18  NATURE AND HOW THEY'VE BEEN PUT ON THIS FINANCIAL

19  STATEMENT, I KNOW, AS A C.P.A., THAT THEY ARE LESS

20  AND LESS DIRECTLY ASSOCIATED WITH THE PRODUCT AT

21  HAND.  SO I KNOW THAT BASED ON SAMSUNG'S OWN

22  REPRESENTATION.

23          SECONDLY, WHEN I TRIED TO INVESTIGATE HOW

24  THEY WOULD PERHAPS TRY TO ALLOCATE THESE -- AND

25  WHEN I SAY "TRY," DON'T MEAN THAT IN A NEGATIVE

2062

```
1    WAY, BUT IF YOU HAD A NON-DIRECT COST, THE ONLY WAY

2    TO ASSIGN IT IS YOU HAVE TO DETERMINE SOME FORM OF

3    ALLOCATION, AND WHEN I LOOK FOR THE ALLOCATION

4    BASIS, THE RECORDS WERE UNRELIABLE.

5           SO FOR THOSE TWO PRIMARY REASONS, NO, I

6    DID NOT INCLUDE THEM.

7    Q    OKAY.  CAN YOU GIVE US AN EXAMPLE, FROM

8    SAMSUNG'S ACTUAL EXPENSE CATEGORIES, OF SOMETHING

9    THAT SAMSUNG INCLUDED IN ITS CALCULATION WHICH YOU

10   DID NOT INCLUDE AND EXPLAIN WHY YOU THOUGHT IT WAS

11   INAPPROPRIATE.

12   A    YES.  MAY I?

13   Q    PLEASE.

14   A    R&D IS A GOOD EXAMPLE.  R&D STANDS FOR

15   RESEARCH AND DEVELOPMENT, AND CERTAINLY SAMSUNG

16   ENGAGES IN RESEARCH AND DEVELOPMENT, AS DOES APPLE.

17          FROM AN ACCOUNTING STANDPOINT, IT'S

18   CALLED MATCHING.  WE WANT TO MATCH UP THE EXPENSES

19   WITH THE REVENUE.  WE DON'T WANT TO MATCH UP THE

20   EXPENSES FOR PRODUCT A AND SUBTRACT THEM FROM

21   PRODUCT B.

22          AND I KNOW, AGAIN, BASED ON MY OWN

23   ACCOUNTING EXPERIENCE, THAT THE RESEARCH AND

24   DEVELOPMENT COSTS, WHICH ARE INCURRED IN THE

25   CURRENT TIME PERIOD, RELATE TO FUTURE EVENTS, OR
```

1    FUTURE PRODUCTS, NOT TO THE CURRENT PRODUCTS.

2                AND SO, AGAIN, FOR ANOTHER REASON THERE,

3    IT IS A COST THAT'S NOT A COST THAT'S ASSOCIATED

4    WITH THESE ACCUSED PRODUCTS.

5    Q    OKAY.  LET'S TURN TO THE SECOND REASON THAT

6    YOU SAID YOU THOUGHT IT WAS INAPPROPRIATE TO

7    INCLUDE THESE OTHER CATEGORIES, AND THAT WAS THAT

8    YOU FOUND THE INFORMATION IN SOME WAYS TO BE

9    UNRELIABLE.

10   A    YES, I DID.

11   Q    WHAT LED TO THAT CONCLUSION?

12   A    AS AN AUDITOR FOR THAT FIRST 10, 12 YEARS OF

13   MY LIFE, AND REALLY DOING INVESTIGATIONS

14   AFTERWARDS, WE AS AUDITORS ARE TAUGHT TO, TO APPLY

15   SOMETHING CALLED PROFESSIONAL SKEPTICISM, EXERCISE

16   OUR PROFESSIONAL JUDGMENT.  WE SIMPLY DON'T TAKE

17   FROM OUR CLIENTS OR FROM PARTIES THAT ARE PRODUCING

18   FINANCIAL INFORMATION AND SAY, THAT MUST BE RIGHT.

19                WE GIVE IT -- IN SORT OF LAYMAN'S TERMS,

20   WE GIVE IT A SMELL TEST AND SAY, DOES THIS MAKE

21   SENSE?  AND IN AUDIT LINGO, AGAIN, ARE THERE

22   CERTAIN RED FLAGS?

23                AND I ENCOUNTERED A NUMBER OF RED FLAGS

24   WITH SAMSUNG'S DATA BELOW THE GROSS PROFIT LINE.

25   Q    OKAY.  COULD WE LOOK AT PDX 34B.23, PLEASE.

```
 1                WHAT IS SET OUT IN YOUR SLIDE 23,

 2      MR. MUSIKA?

 3      A    WELL, I WAS GOING TO DO THIS PIECE BY PIECE.

 4      AS A TEACHER, I DON'T LIKE PEOPLE READING AHEAD,

 5      BUT -- GOOD.

 6      Q    THANK YOU, MR. LEE.

 7      A    SO, YES, THERE ARE FOUR RED FLAGS, AS YOU SAW.

 8                IT WAS TAKEN AWAY, BUT THE FIRST ONE IS,

 9      IS THE INFORMATION THAT I'M PRESENTED WITH, DOES

10      THAT TIE TO SOME RELIABLE SOURCE?  SOME OTHER

11      SOURCE, AN AUDITED FINANCIAL STATEMENT, A TAX

12      RETURN, SOMETHING ELSE THAT I KNOW SOMEBODY ELSE IS

13      LOOKING OVER THE COMPANY'S SHOULDER?

14      Q    AND WHAT DID YOU FIND WHEN YOU LOOKED AT THAT

15      ISSUE?

16      A    I'M NOT SAYING IT DIDN'T TIE, BUT NOBODY DID

17      TIE IT.  I COULDN'T TIE IT, AND SAMSUNG DIDN'T

18      RECONCILE OR TIE IT, EITHER.  SO I WAS LACKING WITH

19      THAT LEVEL OF COMFORT.

20      Q    WHAT WAS THE SECOND RED FLAG YOU LOOKED FOR?

21      A    THE SECOND ONE IS, IS THIS INFORMATION THAT'S

22      USED TO RUN THE BUSINESS?  WHEN WE SAY "ORDINARY

23      COURSE," THIS IS INFORMATION THEY USE EVERY DAY.

24      THIS ISN'T SOMETHING THAT'S PRODUCED FOR A SPECIAL

25      PURPOSE.
```

1    Q    OKAY.  COULD WE LOOK AT SLIDE 34B.70, AND I

2    KNOW, AGAIN, THIS IS A SERIES OF SLIDES THAT YOU

3    HAD PREPARED FOR YOU, MR. MUSIKA.

4         CAN YOU WALK US THROUGH HERE AN

5    EXPLANATION OF HOW THAT KIND OF INTERCOMPANY SALE

6    AND TRANSFER THAT YOU JUST MENTIONED WORKS?

7    A    YES.  THIS IS A REAL SIMPLE ANIMATION.  YOU'VE

8    GOT THE UNITED STATES ON THE RIGHT AND KOREA ON THE

9    LEFT AND YOU HAVE SEC BASED IN KOREA AND WE HAVE

10   STA AND SEA BASED IN THE UNITED STATES.

11        AND THERE'S OUR CONSUMERS, OUR

12   PURCHASERS, UP THERE SOMEWHERE OFF THE COAST OF

13   MAINE, I THINK.

14        AND WHAT HAPPENS IS THAT SEC SELLS THE

15   PRODUCT TO, WE'LL SAY, STA, AND THE PHONES MOVE

16   ACROSS THE PACIFIC AND LAND IN THE UNITED STATES.

17        STA, IN TURN, THEN SELLS THEM TO

18   UNITED STATES CUSTOMERS, AND THAT'S WHERE WE GET

19   THE $8.1 BILLION.

20   Q    LET ME JUST STOP YOU THERE FOR A SECOND.

21        THE FIRST STEP HERE, YOU SAID SEC MADE

22   THE PHONES AND THEN SOLD THEM TO THEIR SUBSIDIARY,

23   STA?

24   A    YES.

25   Q    WHO SET THE PRICE IN THAT SALE?

```
 1    A    WELL, AS I THINK YOU JUST HEARD FROM THE

 2    TESTIMONY PRIOR TO ME, TOO, SEC, AS THE CONTROLLING

 3    ENTITY, SAYS -- ESTABLISHES HOW MUCH THEY'RE GOING

 4    TO SELL IT TO THEIR SUBSIDIARY.

 5    Q    OKAY.  THEN YOU SAID STA NOW HAS THE PHONES IN

 6    THE UNITED STATES.  THEY SELL THEM TO CONSUMERS?

 7    A    THAT'S CORRECT.

 8    Q    WHO SETS THE PRICE AT WHICH STA SELLS PHONES

 9    TO CONSUMERS?

10    A    SO WE DON'T CONFUSE ANYONE, WHEN WE SAY

11    "CONSUMERS," I THINK YOU ALL KNOW BY NOW, THE

12    CONSUMERS ARE THE CARRIERS.  MOST OF THE COMPANIES

13    SELL TO THE CARRIERS.

14    Q    "CARRIERS" MEANING PHONE COMPANIES?

15    A    YES.

16    Q    AND THAT'S A WHOLESALE PRICE TO PHONE

17    COMPANIES?

18    A    YES, YES.

19    Q    WHO SETS THE WHOLESALE PRICE AT WHICH STA

20    SELLS PHONES TO PHONE COMPANIES?

21    A    SEC, AGAIN, ESTABLISHES THAT PRICE.

22    Q    THE PARENT?

23    A    THE PARENT.

24    Q    THANKS.  CAN YOU CONTINUE THEN WITH YOUR

25    EXPLANATION?
```

1   A    SURE.  SO THE CARRIERS, CONSUMERS OR CARRIERS,

2   PAY STA FOR THE PURCHASE OF THOSE PHONES IN THE

3   UNITED STATES, AND I'M JUST GOING TO USE $100 AS A

4   REAL SIMPLE EXAMPLE.

5          $100 IS PAID TO STA, BUT -- THERE'S THE

6   $100, BUT STA HAS TO PAY ITS PARENT THE PRICE THAT

7   THE PARENT SAID WE WANT FROM YOU, AND WHAT HAPPENS

8   IS $97 IS PAID TO SEC.

9          NOW, THIS $97 AND THE $3 ARE

10  ILLUSTRATIVE, BUT THEY'RE REPRESENTATIVE OF THE

11  PERCENTAGES.  FOR EVERY DOLLAR THAT STA MAKES IN

12  THE U.S., IT'S REQUIRED, UNDER SEC'S CONTROL, TO

13  SEND 97 TO 98 PERCENT OF THAT BACK TO SEC.  THAT'S

14  THE ARRANGEMENT THAT'S IN PLACE.  ONLY 2 TO $3 OF

15  EVERY $100 SOLD STAYS IN THE UNITED STATES, STAYS

16  WITH STA.  THE REST MOVES BACK TO SEC.

17  Q    AND HOW DOES THAT AFFECT STA AND SEA, THE TWO

18  U.S. ENTITIES, HOW DOES THAT EFFECT THEIR FINANCIAL

19  STATEMENTS?

20  A    WELL, YOU CAN SEE, IF YOU'RE LOOKING FOR THE

21  ECONOMIC BENEFIT THAT'S ASSOCIATED WITH THIS ONE

22  SALE OF $100 AND YOU LOOKED ONLY AT STA, YOU WOULD

23  JUST SEE $3 OF PROFIT AND YOU WOULDN'T SEE THE $97

24  WHICH HAS BEEN TRANSFERRED BACK TO SEC.

25          SO YOU'VE GOT TO COMBINE OR CONSOLIDATE

3072

1    THEM TO SEE THE ENTIRE BENEFIT.

2    Q    WHY DO COMPANIES -- STRIKE THAT.

3              IS THERE A LEGITIMATE REASON FOR

4    COMPANIES TO ARRANGE THEIR TRANSFER PRICING IN THIS

5    WAY?

6    A    YES.

7    Q    AND WHAT IS THAT REASON?

8    A    IT'S -- IT'S TAX STRATEGY.  BY MOVING $97 OVER

9    TO SEC, THAT $97 ESCAPES U.S. TAXES.  SO THE ONLY

10   $3 OR APPROXIMATELY $2 --

11             MR. PRICE:  I'M GOING TO OBJECT.  THIS IS

12   IRRELEVANT AND BEYOND THE SCOPE, AND MOTION IN

13   LIMINE.

14             MS. KREVANS:  YOUR HONOR, THIS IS EXACTLY

15   THE PORTION OF THE TESTIMONY THAT YOU HAD

16   PREVIOUSLY RULED HE CAN GIVE.

17             THE COURT:  WELL, I'M GOING TO STRIKE HIS

18   STATEMENT, THOUGH.  IT'S STRICKEN.

19             YOU'LL HAVE TO ASK HIM ANOTHER QUESTION.

20   BY MS. KREVANS:

21   Q    FOR PURPOSES OF DETERMINING TOTAL PROFITS IN

22   THIS CASE, WHOSE PROFITS DID YOU LOOK AT AS ACROSS

23   THE THREE COMPANIES, SEC, STA, AND SEA?

24   A    I COMBINED ALL THREE.

25   Q    OKAY.  AND EARLIER IN YOUR TESTIMONY YOU

1    MENTIONED THAT YOU HAD TO LOOK AT TIME PERIODS IN

2    CONNECTION WITH YOUR DAMAGE CALCULATION.  WHY IS

3    THAT?

4    A    I HAD TO LOOK AT TIME PERIODS BECAUSE, AS I

5    SAID, YOU NEED THE INTERSECTION.  NOT ALL THE

6    INTELLECTUAL PROPERTY IS ISSUED AT THE SAME TIME,

7    AND CERTAINLY NOT ALL THE SALES OF THE PRODUCTS

8    OCCUR AT THE SAME TIME.

9    Q    WHEN DID YOU START THE CALCULATION OF DAMAGES

10   FOR PURPOSES OF THE NUMBERS THAT YOU'VE EXPLAINED

11   TO THE JURY?

12   A    APPROXIMATELY JUNE OF 2010.

13   Q    DID YOU START DAMAGE ON ALL PATENTS IN JUNE OF

14   2010?

15   A    NO, BECAUSE IF -- THAT'S WHEN THE FIRST

16   ACCUSED SALE IS, AND IF -- IF THAT ACCUSED SALE

17   INFRINGED ONE PATENT, THEN THERE WOULD BE DAMAGES

18   ASSOCIATED WITH THAT ONE PATENT.

19         BUT IF PATENTS WERE ISSUED LATER, THEN

20   THE CALCULATION WOULD NOT HAVE OCCURRED EARLIER.

21   Q    NOW, WITH RESPECT TO YOUR CALCULATION OF

22   SAMSUNG'S PROFITS, IF THE JURY ULTIMATELY DECIDES

23   THAT DAMAGES CALCULATION SHOULD START AT A LATER

24   DATE THAN THE ONE YOU USED, HAVE YOU GIVEN THEM

25   ENOUGH INFORMATION THAT THEY COULD ADJUST THEIR

1    CALCULATION?

2    A    YES.

3    Q    AND WHERE IS THAT INFORMATION?

4    A    THE INFORMATION IS IN TWO PLACES.  ONE WOULD

5    BE THE JOINT EXHIBIT 1500, WHICH WE TALKED ABOUT A

6    LITTLE BIT EARLIER, WHICH REALLY IS THE SUM OF ALL

7    THE 22 MILLION UNITS AND THE $8 BILLION.  SO WE

8    HAVE -- YOU HAVE A CHRONOLOGICAL, BASICALLY -- YOU

9    REMEMBER HOW I TALKED ABOUT THAT BEING HARD TO READ

10   BECAUSE IT HAD INDIVIDUAL COLUMNS FOR EACH QUARTER?

11        SO IF THE DATE MOVES, YOU WOULD SIMPLY GO

12   IN ALONG THAT SCHEDULE AND SAY -- DRAW A LINE AND

13   SAY, WELL, OKAY, INFRINGEMENT IS NOT GOING TO START

14   IN JUNE OF 2010.  IT'S GOING TO START AT A LATER

15   DATE.  DRAW A LINE, AND ALL THE UNITS THAT WERE

16   SOLD BEFORE THEN WOULD COME OUT OF THE CALCULATION.

17   YOU WOULD MULTIPLY THAT REVENUE TIMES THE 35.5

18   PERCENT AND SUBTRACT THAT FROM THE $2.2 BILLION

19   NUMBER.

20   Q    LET'S TURN NOW TO YOUR SECOND CATEGORY OF

21   DAMAGES.  IF WE COULD PUT BACK UP SLIDE 34B.61, I

22   THINK IS WHERE WE ARE.  YOUR SECOND CATEGORY IS

23   APPLE'S LOST PROFITS.

24        AND IF WE COULD ADVANCE OUR SLIDE ONE

25   CLICK, MR. LEE.

```
 1              WHAT NUMBER DID YOU CALCULATE FOR APPLE'S

 2    LOST PROFITS FOR THE $2 MILLION DEVICES THAT YOU

 3    ASSIGNED TO THAT CATEGORY?

 4    A    TWO MILLION UNITS.

 5    Q    SORRY.  TWO MILLION UNITS YOU ASSIGNED TO THAT

 6    CATEGORY?

 7    A    $488.8 MILLION.

 8    Q    HOW DID YOU DETERMINE THAT THE AMOUNT OF

 9    APPLE'S LOST PROFITS ON THESE 2 MILLION UNITS WAS

10    THIS, A LITTLE LESS THAN $500 MILLION?

11    A    I -- I APPLIED A FOUR-PART TEST TO SEE IF THE

12    UNITS ACTUALLY DID QUALIFY FOR LOST PROFITS.

13              LOST PROFITS IS, AGAIN, OUR SECOND AND

14    DIFFERENT TEST AND THE TEST IS DIFFERENT TO QUALIFY

15    FOR LOST PROFITS, SO I WENT THROUGH THIS FOUR TEST

16    TO SEE WHICH UNITS WOULD ACTUALLY QUALIFY.

17    Q    COULD WE SEE SLIDE 34B.32, PLEASE, MR. LEE.

18              WHAT WAS THE FIRST FACTOR YOU CONSIDERED

19    IN SEEING IF THESE 2 MILLION UNITS QUALIFIED FOR

20    LOST PROFITS?

21    A    THE PRESUMPTION HERE IS THAT APPLE WOULD HAVE

22    MADE THE SALE.  IF SAMSUNG DIDN'T, APPLE WOULD HAVE

23    MADE THE SALE.

24              SO FIRST I WANTED TO BE SURE THAT THERE

25    WAS ADEQUATE DEMAND FOR APPLE'S PRODUCT.  IF THERE
```

```
1    WAS NO DEMAND FOR IT, THEY CERTAINLY WOULDN'T MAKE

2    THE SALE.

3    Q    JUST SO WE'RE CLEAR, WHAT YOU'RE TRYING TO

4    TEST HERE IS WHEN SAMSUNG SOLD A PHONE, FOR

5    EXAMPLE, DID THEY REALLY TAKE THAT SALE AWAY FROM

6    APPLE, OR PERHAPS JUST FROM ANOTHER SUPPLIER OF

7    PHONES?

8    A    THAT'S CORRECT.

9    Q    AND WHEN YOU LOOKED AT DEMAND, WHAT DID YOU

10   FIND?

11   A    I FOUND THAT THERE WAS ADEQUATE EVIDENCE OF

12   DEMAND, AND I THINK THAT'S RATHER STRAIGHTFORWARD,

13   THAT APPLE'S IPHONES AND IPADS HAVE BEEN

14   TREMENDOUSLY SUCCESSFUL AND THERE IS A SIGNIFICANT

15   DEMAND IN THE MARKETPLACE FOR THEIR PRODUCTS.

16   Q    WHAT DO YOU MEAN BY DEMAND FOR APPLE'S

17   INTELLECTUAL PROPERTY?

18   A    WHAT I MEAN BY DEMAND FOR APPLE'S INTELLECTUAL

19   PROPERTY IS I LOOKED AT IT BOTH ON A, A PHONE,

20   IPHONE-BY-IPHONE BASIS AND TABLET BASIS, AND I

21   LOOKED AT THE INDIVIDUAL INTELLECTUAL PROPERTY AS

22   WELL.  SO WAS THERE DEMAND FOR THE FEATURES THAT

23   ARE INCLUDED IN THE UTILITY PATENTS?  WAS THERE

24   DEMAND FOR THE DESIGN THAT'S INCORPORATED INTO THE

25   DESIGN PATENTS AND THE TRADE DRESS?
```

1    Q    THE THIRD THING YOU'RE SHOWING UNDER EVIDENCE

2    OF DEMAND IS A CONJOINT SURVEY.  WHAT ARE YOU

3    REFERRING TO THERE?

4    A    WE HEARD LAST WEEK ABOUT DR. HAUSER'S CONJOINT

5    ANALYSIS AND, YES, I KNOW THAT DR. HAUSER HAS

6    ESTABLISHED THAT THERE WAS DEMAND FOR THE THREE

7    UTILITY PATENTS IN HIS CONJOINT ANALYSIS.  SO THAT

8    ADDED TO THE WEIGHT OF MY CONCLUSION.

9         MR. PRICE:  YOUR HONOR, I OBJECT TO HIM

10   GIVING AN OPINION ABOUT DR. HAUSER'S RESULTS.  HE

11   CAN SAY HE RELIED ON THEM, BUT HE CAN'T -- HE CAN'T

12   GIVE A SEAL OF APPROVAL.  THERE'S BEEN NO ANALYSIS.

13        MS. KREVANS:  YOUR HONOR, THIS IS

14   DIRECTLY FROM HIS REPORT.  HE REVIEWED THE REPORTS

15   OF DR. HAUSER'S ANALYSIS.  HE RELIED ON THEM.

16        THE ONLY PREVIOUS OBJECTION WE HAD ON

17   THIS WAS SAMSUNG WANTED AN OPPORTUNITY TO

18   CROSS-EXAMINE DR. HAUSER AND YOU GAVE THEM THAT

19   LAST WEEK.

20        MR. PRICE:  I HAVE NO OBJECTION TO HIM

21   SAYING HE RELIED ON IT.  HE'S NO EXPERT ON WHAT

22   DR. HAUSER DID, SO HE CAN'T GIVE A SEAL OF

23   APPROVAL.  HE CAN SAY "I RELIED ON IT."

24        THE COURT:  OVERRULED.

25        GO AHEAD.

```
 1                 THE WITNESS:  I ANSWERED ALREADY, SO I

 2      APOLOGIZE IF I WAS TOO QUICK.

 3      BY MS. KREVANS:

 4      Q    YES.  DID YOU LOOK AT ANY INTERNAL SAMSUNG

 5      DOCUMENTS IN EVALUATING THIS ISSUE OF DEMAND FOR

 6      APPLE PRODUCTS?

 7      A    YES.

 8      Q    COULD WE LOOK AT -- COULD YOU PLEASE TURN TO

 9      EXHIBIT 34 IN YOUR BINDER.  LET ME KNOW WHEN YOU'RE

10      THERE.

11      A    I AM THERE.

12      Q    IS EXHIBIT 34 A DOCUMENT YOU REVIEWED IN

13      CONNECTION WITH FORMING YOUR OPINIONS IN THIS CASE?

14      A    YES.

15      Q    IS IT A SAMSUNG DOCUMENT PRODUCED IN THIS

16      CASE?

17      A    IT IS.

18                 MS. KREVANS:  YOUR HONOR, WE MOVE THE

19      ADMISSION OF EXHIBIT 34.

20                 MR. PRICE:  OBJECTION.  NO FOUNDATION FOR

21      FROM THIS WITNESS.

22                 MS. KREVANS:  YOUR HONOR, THE WITNESS HAS

23      JUST ESTABLISHED THAT HE REVIEWED AND RELIED ON THE

24      DOCUMENT.  IT IS AN ADMISSION BY SAMSUNG.

25                 THE COURT:  IT'S ADMITTED.
```

2079

```
 1              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 2              34, HAVING BEEN PREVIOUSLY MARKED FOR
 3              IDENTIFICATION, WAS ADMITTED INTO
 4              EVIDENCE.)
 5          THE COURT:  GO AHEAD.
 6     BY MS. KREVANS:
 7     Q    WHAT IS EXHIBIT 34, MR. MUSIKA?
 8     A    THIS IS A FEASIBILITY REVIEW OR ANALYSIS OF
 9     THE SMARTPHONE MARKET BY SAMSUNG, BOTH IMPORTANTLY,
10     OR SIGNIFICANTLY TO ME, ON THE -- AT A TIME WHICH
11     IS DATED 9-2007 WHEN APPLE HAD FIRST ENTERED THE
12     MARKET WITH ITS SMARTPHONES.
13              AND REMEMBER IN THAT GRAPHIC, THIS IS AT
14     THE BEGINNING OF THE BLUE PERIOD WHEN SAMSUNG WAS
15     GOING DOWN.
16     Q    COULD YOU PLEASE TURN TO PAGE 13 OF EXHIBIT
17     34.
18     A    I'M THERE.
19     Q    COULD YOU PLEASE DESCRIBE TO THE JURY WHAT
20     INFORMATION ON THIS PAGE AFFECTED YOUR ANALYSIS.
21     A    YES.  SO THE NUMBER 4 THERE IN THE MIDDLE, TO
22     ORIENT OURSELVES, "MOBILE PHONE TRENDS UP TO 2012,"
23     AND WHAT SAMSUNG DOES THEN IS SAY, IN THE MIDDLE
24     THERE, "OUR RESEARCH HAS IDENTIFIED FOUR KEY
25     FACTORS THAT WE EXPECT WILL SHAPE HANDSETS IN THE
```

```
 1    COME FIVE YEARS," AND THAT CIRCLE -- NUMBER ONE,
 2    THE APPLE IPHONE, THAT'S -- THAT'S THEIR DOCUMENT,
 3    I DIDN'T CIRCLE THAT.  I HAVEN'T CHANGED THIS
 4    DOCUMENT.  SO SAMSUNG HAS IDENTIFIED THE APPLE
 5    IPHONE AS SOMETHING THAT'S GOING TO SHAPE THE NEXT
 6    FIVE YEARS.
 7    Q    AND THE DATE OF THIS DOCUMENT WAS SEPTEMBER
 8    2007?
 9    A    2007, YES.
10    Q    OKAY.  COULD YOU TURN TO PAGE 37 OF THIS
11    DOCUMENT.  AND LET ME KNOW AGAIN WHEN YOU'RE THERE.
12    A    I'M THERE.
13    Q    OKAY.  WHAT IS THIS PORTION OF EXHIBIT 34
14    DEPICTING?
15    A    LISTED AT THE TOP IS "IPHONE EFFECT ANALYSIS,"
16    SO WHAT EFFECT THE IPHONE IS EXPECTED TO HAVE.
17    Q    AND, AGAIN, IS THIS FROM SEPTEMBER 2007?
18    A    THIS ENTIRE DOCUMENT IS FROM THAT TIME PERIOD,
19    YES.
20    Q    OKAY.  COULD YOU TURN TO THE SECOND PAGE OF
21    THIS THREE-PAGE SECTION OF EXHIBIT 34 AND TELLS US
22    WHAT IS INDICATED ON THIS PAGE THAT YOU TOOK INTO
23    ACCOUNT IN YOUR OPINION?
24    A    YES.  THE BOX THAT'S SORT OF AT THE RIGHT, THE
25    TOP BOX, THAT'S CORRECT, IT SAYS "FACTORS THAT
```

```
 1    COULD MAKE IPHONE A SUCCESS."

 2              AND THEN THE FIRST BULLET UNDER THAT IS

 3    "EASE AND INTUITIVE U/I," USER INTERFACE, "THAT

 4    COVERS ALL USER CLASSES, INCLUDING MALE, FEMALE,

 5    OLD AND YOUNG," AND THEN THE FIRST BULLET,

 6    "BEAUTIFUL DESIGN."

 7    Q    AND HOW DID THOSE, THESE PORTIONS OF THE

 8    DOCUMENT EFFECT THE DEMAND FOR THE IPHONE?

 9    A    WELL, THE FOCUS WAS ON IPHONE AND THE

10    IDENTIFICATION BY SAMSUNG OF IPHONE AS BEING A

11    DRIVER IN THE MARKETPLACE, SO OBVIOUSLY THAT'S

12    REPRESENTATIVE OF DEMAND FOR THE IPHONE, AND

13    IDENTIFYING BEAUTIFUL DESIGN AS BEING FURTHER -- OR

14    EVIDENCE OF, OF DEMAND FOR DESIGN.

15    Q    COULD YOU TURN TO EXHIBIT 194 IN YOUR BINDER,

16    PLEASE, MR. MUSIKA.

17    A    I'M THERE.

18    Q    WHAT IS -- STRIKE THAT.

19              IS EXHIBIT 194 A DOCUMENT THAT YOU

20    CONSIDERED AND RELIED UPON IN FORMING YOUR OPINIONS

21    ABOUT DEMAND FOR THE IPHONE?

22    A    YES.

23              MS. KREVANS:  YOUR HONOR, WE MOVE THE

24    ADMISSION OF EXHIBIT 194.

25              MR. PRICE:  SAME OBJECTIONS, YOUR HONOR.
```

1    FOUNDATION.

2              MS. KREVANS:  AGAIN, YOUR HONOR, WE'VE

3    LAID THE FOUNDATION AND IT'S A SAMSUNG ADMISSION.

4              THE COURT:  IT'S ADMITTED.

5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

6              194, HAVING BEEN PREVIOUSLY MARKED FOR

7              IDENTIFICATION, WAS ADMITTED INTO

8              EVIDENCE.)

9    BY MS. KREVANS:

10   Q    WHAT IS EXHIBIT 194, MR. MUSIKA?

11   A    IT'S A, AN INTERNAL E-MAIL FROM SAMSUNG

12   EXECUTIVES TO OTHER SAMSUNG EXECUTIVES.

13   Q    AND THE DATE OF THIS DOCUMENT IS?

14   A    MARCH 2ND, 2010.

15   Q    AND WHO IS IT -- WHAT IS THE SUBJECT MATTER

16   INDICATING?

17   A    THE SUBJECT SAYS "TO UX," USER EXPERIENCE,

18   "EXECUTIVES."

19   Q    WHAT PART OF THIS MARCH 2ND, 2010 E-MAIL DID

20   YOU FIND RELEVANT TO THE DEMAND OPINIONS THAT YOU

21   FORMED?

22   A    GO DOWN ONE, TWO, THREE, FOUR, FIVE PARAGRAPHS

23   AND HIGHLIGHT THAT.  YES.

24              IT SAYS, "I AM NOT SAYING TO MAKE A UX

25   THAT IS EXACTLY IDENTICAL TO THE IPHONE, BUT I AM

1    SAYING TO LEARN THE WISDOM OF THE IPHONE AND

2    RECOGNIZE THE STANDARD OF THE INDUSTRY WHICH WAS

3    SET BY THEM ALREADY."

4    Q    LET'S TURN BACK TO YOUR SLIDE 34B.32, AND LOOK

5    AT THE SECOND FACTOR YOU CONSIDERED, WHICH WAS

6    MARKET ALTERNATIVES.

7              WHAT EVIDENCE DID YOU FIND WHEN YOU

8    LOOKED AT MARKET ALTERNATIVES?

9    A    UM --

10   Q    AND LET ME FIRST ASK YOU, WHAT DO YOU MEAN BY

11   "MARKET ALTERNATIVES"?

12   A    SO I THINK YOU PHRASED IT WELL, IS IF SAMSUNG

13   DIDN'T MAKE THE SALE, WOULD APPLE HAVE MADE THE

14   SALE?

15             SO IF, IF THERE WERE OTHER ALTERNATIVES

16   IN THE MARKETPLACE, THEN APPLE WOULDN'T MAKE EVERY

17   ONE OF THOSE 22 MILLION SALES.  OF COURSE I DIDN'T

18   CALCULATE LOST PROFITS ON THE 22 MILLION.  YOU MAY

19   RECALL IT WAS ONLY 2 MILLION.

20             PART OF THE REASON WAS BECAUSE ALTHOUGH

21   I'M NOT OFFERING AN OPINION THAT THERE ARE MARKET

22   ALTERNATIVES, I CONSERVATIVELY SAID, WELL, I'M JUST

23   GOING TO ASSUME AND ACCEPT THAT SAMSUNG'S OTHER

24   PRODUCTS AND THAT EVERY OTHER MARKET PARTICIPANT IS

25   A MARKET ALTERNATIVE.

```
 1   Q    COULD YOU EXPLAIN TO US THE EVIDENCE THAT YOU
 2   FOUND WHEN YOU LOOKED AT THIS QUESTION.
 3   A    I DID TWO, TWO RESTRICTIONS.  ONE, I, I LOOKED
 4   AT THE TIME PERIOD AND I TOOK THAT TWO YEARS,
 5   BASICALLY THE TWO-YEAR TIME PERIOD OF 2010, 2011,
 6   2012, AND I SHRUNK THAT -- SORRY -- I SHRUNK THAT
 7   DOWN.  I ASSUMED THAT WITH EACH PATENT OR EACH
 8   TRADE DRESS THAT SAMSUNG WOULD SIMPLY NOT LEAVE THE
 9   MARKET, THAT THEY WOULD DO SOMETHING TO TRY TO GET
10   BACK INTO THE MARKET.
11        SO I LIMITED MY CALCULATIONS TO LOST
12   PROFITS TO ONLY A TIME PERIOD WHICH WOULD BE
13   ASSOCIATED WITH THE TIME SAMSUNG WOULD BE OUT OF
14   THE MARKET.
15        SO DEPENDING ON THE INTELLECTUAL
16   PROPERTY, IT WAS AS LITTLE AS ONLY ONE MONTH OR AS
17   HIGH AS EIGHT MONTHS, BUT NOT THE ENTIRE TIME
18   PERIOD.  SO THAT 22 MILLION SHRINKS DOWN TO EIGHT
19   MONTHS OR ONE MONTH, RIGHT, BASED ON THAT.
20        AND THERE WAS ONE OTHER THING.
21   Q    YES, THE MARKET SHARE ALLOCATION.  WHAT ARE
22   YOU REFERRING TO THERE?
23   A    MARKET SHARE ALLOCATION, THERE WAS A FURTHER
24   CUT.  ONCE I GOT IT DOWN TO JUST THAT TIME PERIOD,
25   THE SALES THAT WOULD HAVE BEEN MADE IN THAT TIME
```

1    PERIOD, THEN I DISTRIBUTED THOSE SALES TO ALL THE

2    MARKET PARTICIPANTS.

3         I ONLY PUT IN APPLE'S PILE THEIR MARKET

4    SHARE.  I GAVE BACK TO SAMSUNG THEIR MARKET SHARE.

5    I GAVE NOKIA THEIR MARKET SHARE.  I GAVE MOTOROLA

6    THEIR MARKET SHARE.

7         SO THAT CARVED IT DOWN FURTHER AND THAT'S

8    WHY I ONLY END UP WITH 2 MILLION OUT OF THAT 22

9    MILLION THAT QUALIFY FOR LOST PROFITS.

10   Q    WHAT WAS THE THIRD FACTOR YOU CONSIDERED IN

11   DETERMINING HOW MANY OF THE 22 MILLION UNITS

12   QUALIFIED FOR LOST PROFITS?

13   A    CAPACITY.  COULD APPLE -- DID THEY HAVE THE

14   FACILITIES TO ACTUALLY PRODUCE THIS AND SELL THIS?

15   Q    AND WHAT DID YOU FIND?

16   A    I FOUND THAT THEY DID.  THERE WERE -- THERE

17   WERE LIMITATIONS, AS -- BECAUSE THE DEMAND WAS SO

18   HIGH, FROM TIME TO TIME, APPLE DID HAVE

19   CONSTRAINTS.

20        BUT WITH RESPECT TO THIS 2 MILLION

21   INCREMENTAL UNITS OVER THE TWO YEAR TIME PERIOD,

22   APPLE, I CONCLUDED, DID HAVE THE ABILITY TO MAKE

23   THOSE SALES.

24   Q    WHEN YOU SAY "THE ABILITY TO MAKE THOSE

25   SALES," ARE YOU REFERRING TO MANUFACTURING

1    CAPACITY?

2    A    MANUFACTURING AND MARKETING CAPACITY.  IT

3    COULD BE EITHER OR BOTH.

4    Q    AND WHAT WAS THE FOURTH FACTOR YOU USED IN

5    DETERMINING WHETHER UNITS QUALIFIED FOR LOST

6    PROFITS REMEDY?

7    A    IT'S JUST A CALCULATION OF APPLE'S PROFITS,

8    AND I WAS ABLE TO CALCULATE HOW MUCH APPLE MAKES ON

9    EACH ONE OF ITS SMARTPHONES OR TABLETS.  AND ONCE

10   AGAIN, IT'S SIMPLE MULTIPLICATION, TIMES 2 MILLION

11   UNITS GAVE ME MY LOST PROFITS.

12   Q    LET'S GO BACK TO SLIDE 34B.62.  IF YOU HAD NOT

13   CONCLUDED THAT 2 MILLION OF THE DEVICES DID QUALIFY

14   FOR LOST PROFIT DAMAGES, WHAT WOULD HAVE CHANGED IN

15   YOUR ULTIMATE CONCLUSION?

16   A    WE WOULD JUST SLIDE THOSE PHONES UP BECAUSE

17   THEY'RE ENTITLED -- UNDER THE ASSUMPTION THAT

18   THEY'RE INFRINGING, THEY'RE GOING TO GET SOME FORM

19   OF DAMAGE.  SO I SLIDE IT UP TO SAMSUNG'S

20   PROFITS -- I'M NOT DOUBLE COUNTING -- AND THE

21   RESULT IS, I THINK WE CAN SHOW, WE DON'T HAVE ANY

22   LOST PROFITS, BUT THE INFRINGING PROFITS NOW GOES

23   UP TO $2.481 BILLION.

24   Q    LET'S GO BACK TO YOUR ORIGINAL APPROACH IN

25   WHICH YOU HAVE PHONES AND TABLETS IN ALL THREE

1    CATEGORIES, AND LET ME ASK YOU ABOUT THE LAST

2    CATEGORY, THE REASONABLE ROYALTY CATEGORY.

3            FIRST, COULD YOU EXPLAIN TO THE JURY IN

4    CONCEPT WHAT IS MEANT BY A REASONABLE ROYALTY?

5    A    YES.  I HAVE A SIMPLE LITTLE SLIDE THAT HELPS.

6    Q    34B.42, PLEASE.

7    A    YES.  A ROYALTY PAYMENT IS, IT'S JUST LIKE, AS

8    THE FIRST EXAMPLE, RENT.  SO IF YOU DECIDE TO RENT

9    OUT YOUR HOUSE OR IF YOU HAVE AN APARTMENT AND YOU

10   WANT TO RENT IT, THAT'S YOUR ASSET.  YOU OWN THAT.

11   IT'S A TANGIBLE ASSET.  IF SOMEBODY ELSE IS GOING

12   TO USE IT, YOU WANT TO BE PAID FOR IT.  SO THEY PAY

13   YOU RENT.

14   Q    LET ME STOP YOU RIGHT THERE.  UNDER YOUR REAL

15   ESTATE COLUMN ON THIS GRAPHIC, YOU HAVE WHAT LOOKS

16   LIKE A PICTURE OF TWO HANDS SHAKING.  WHY DO YOU

17   HAVE THAT THERE?

18   A    WELL, IN THE TWO EXAMPLES, REAL ESTATE AND

19   MINERAL RIGHTS, THE PARTIES GET TOGETHER AND

20   ACTUALLY AGREE.

21           BUT HERE, WITHIN THE CONTEXT OF THE

22   LITIGATION, THE REASON WE'RE ALL HERE,

23   UNFORTUNATELY, IS THE TWO PARTIES HAVEN'T AGREED.

24   THEY HAVEN'T SHOOK HANDS AND AGREED.  SO WE DON'T

25   HAVE AN AGREEMENT.

1    Q    AND WE SEE THE WORDS, UNDER PATENTS,

2    "HYPOTHETICAL NEGOTIATION."  WHAT DO YOU MEAN BY

3    THAT?

4    A    WELL, IT'S A -- IT'S CALLED A LEGAL FICTION.

5    THE PARTIES HAVEN'T -- IN FACT, APPLE HAS TAKEN THE

6    POSITION THAT THEY DON'T WANT A ROYALTY.  THEY

7    DON'T WANT TO LICENSE THEIR INTELLECTUAL PROPERTY.

8         BUT AS A FLOOR, REMEMBER THAT, THAT ONE

9    STATUTE THAT WE WERE READING, THAT'S A MINIMUM

10   AMOUNT OF DAMAGES FOR THE UTILITY PATENTS.

11        AND IT'S A LEGAL FICTION THAT I'M ASKING

12   TO TRY TO IDENTIFY WHAT AMOUNT WOULD OR SHOULD --

13   I'M SORRY -- WHAT AMOUNT SHOULD SAMSUNG PAY APPLE

14   FOR THE USE OF THEIR INTELLECTUAL PROPERTY, EVEN

15   THOUGH APPLE DOESN'T WANT IT?

16   Q    AND DID YOU REACH A CONCLUSION ON WHAT THE

17   RIGHT ROYALTY RATES SHOULD BE FROM THIS

18   HYPOTHETICAL NEGOTIATION?

19   A    YES.  I DID A NUMBER OF EVALUATION TECHNIQUES

20   AND I DID SOMETHING CALLED A GEORGIA PACIFIC

21   ANALYSIS, AND THEN I ULTIMATELY IDENTIFIED THE

22   RATES, THE ROYALTY RATES TO BE PAID TO APPLE FOR

23   ITS ASSET.

24   Q    WHAT METHODS DID YOU USE TO IDENTIFY THE RANGE

25   OF POTENTIAL VALUES FOR THIS HYPOTHETICALLY

1    NEGOTIATED LICENSE PAYMENT?

2    A    RIGHT.  I USED THREE VALUATION METHODS:  A

3    COST METHOD; AN INCOME METHOD; AND A MARKET METHOD.

4    Q    WHAT ARE EACH OF THOSE METHODS, JUST BRIEFLY?

5    A    I THINK, AGAIN, EASY REAL ESTATE, A MARKET IS

6    A COMPARABLE, SO IT'S A HOUSE DOWN THE STREET

7    THAT'S LIKE YOURS.  THAT'S A COMPARABLE.

8              IN THIS CASE IT WOULD BE A LICENSE.  ARE

9    THERE OTHER LICENSES THAT ARE LIKE THE LICENSE THEY

10   WOULD ENTER INTO?

11             COST WOULD BE HOW MUCH DID SAMSUNG OR

12   APPLE PAY TO DEVELOP IT OR DESIGN AROUND IT?

13             AND INCOME IS INCOME DRIVEN, HOW MUCH

14   REVENUE IS BEING PRODUCED BY SAMSUNG AND/OR APPLE

15   USING THESE PATENTS.

16             AND WE DISCOUNT THAT BACK AND CAPITALIZE

17   THAT.

18   Q    AND YOU MENTIONED SOMETHING CALLED THE

19   GEORGIA PACIFIC FACTORS.  WHAT ARE THOSE -- THOSE

20   OF US OLD ENOUGH TO REMEMBER KNOW THAT

21   GEORGIA PACIFIC WAS A LUMBAR AND PAPER COMPANY.

22   WHAT DOES THAT HAVE TO DO WITH THIS CASE?

23   A    I THINK THEY STILL ARE.  IT'S A CASE

24   REFERENCE.  GEORGIA PACIFIC WAS INVOLVED IN A

25   PATENT SUIT AND THE COURT IDENTIFIED 15 FACTORS,

1    QUESTIONS TO ASK TO TRY TO GUIDE THIS HYPOTHETICAL

2    NEGOTIATION.  AND NOT ALL 15 FACTORS WOULD

3    NECESSARILY APPLY, BUT I LOOKED AT ALL 15 FACTORS

4    AND APPLIED THEM TO GET TO MY FINAL RATE.

5    Q    CAN YOU GIVE US SOME EXAMPLES OF SOME OF THE

6    GEORGIA PACIFIC FACTORS THAT DID APPLY HERE AND

7    THAT YOU TOOK INTO ACCOUNT IN CALCULATING WHAT YOU

8    DETERMINED TO BE A REASONABLE ROYALTY HERE?

9    A    SURE.  FACTOR NUMBER 1 IS HAS THERE BEEN A

10   LICENSE OF THE INTELLECTUAL PROPERTY?  AND YOU JUST

11   HEARD THE EXCHANGE, NO, THERE HAS NOT BEEN A

12   LICENSE OF INTELLECTUAL PROPERTY, UTILITY, OR

13   DESIGN AND APPLE DOESN'T WANT TO LICENSE IT.

14         THE EXTENT OF BENEFIT, THERE'S ANOTHER

15   FACTOR, THE EXTENT OF BENEFIT OBTAINED BY THE

16   ACCUSED INFRINGER.  AND HERE WE'VE SEEN $8 BILLION

17   OF REVENUE AND $2.4 BILLION OF INCOME.  SO THAT IS

18   PART OF THE GEORGIA PACIFIC FACTORS.

19   Q    COULD WE SEE SLIDE 34B.51, PLEASE, MR. LEE.

20         COULD YOU EXPLAIN TO THE JURY THE

21   ULTIMATE CONCLUSION THAT YOU DREW ABOUT WHAT

22   REASONABLE ROYALTIES WOULD HAVE RESULTED FROM THIS

23   HYPOTHETICAL NEGOTIATION, TAKING INTO ACCOUNT THE

24   FACTORS THAT YOU MENTIONED.

25   A    SO I IDENTIFY AN INDIVIDUAL RATE FOR EACH OF

1    THE UTILITY PATENTS, $3.10, $2.02, $2.02 MULTIPLIED

2    BY EACH UNIT.

3              AND THEN FOR THE DESIGN ELEMENTS, THAT

4    BEING THE DESIGN PATENTS AND THE TRADE DRESS, I

5    LOOKED AT THOSE AS A GROUP, RECOGNIZING THAT APPLE

6    WOULD NOT, AND REALLY COULD NOT LICENSE THAT OUT.

7    YOU CAN'T TAKE YOUR IDENTITY, YOU CAN'T TAKE

8    BASICALLY WHAT YOU'VE BUILT YOUR COMPANY AROUND AND

9    LICENSE A PIECE OF THAT.

10             SO I DEVELOPED MY RATE THAT WOULD BE FOR

11   ONE OR ALL OF THE DESIGN PATENTS OR TRADE DRESS.

12   Q    WHY IS THE DESIGN NUMBER SO MUCH HIGHER THAN

13   THE OTHERS?

14   A    IT'S -- IT'S -- WELL, WE'VE BEEN HERE TWO

15   WEEKS, I GUESS, TWO AND A HALF WEEKS.  IT'S WHAT

16   APPLE HAS SAID -- AND ONE OF THE OTHER

17   GEORGIA PACIFIC FACTORS THAT I DIDN'T MENTION WAS,

18   I THINK IT'S FACTOR 2, IS THE DEGREE OF COMPETITION

19   OR HOW -- IS THIS SOMEONE THAT DIDN'T COMPETE

20   DIRECTLY?

21             THESE ARE TWO MAJOR COMPETITORS COMPETING

22   FOR $8 BILLION, AND APPLE HAS COME INTO THE MARKET

23   ON THE BASIS OF ITS DESIGN AND HAS INDICATED

24   REPEATEDLY THEY DON'T WANT TO LICENSE THEIR DESIGN,

25   AND THE DESIGNS ARE OF CRITICAL ECONOMIC IMPORTANCE

1    TO APPLE, AND THAT'S WHY YOU END UP WITH SUCH A

2    HIGH NUMBER.

3    Q    CAN YOU TELL US WHETHER OR NOT YOU TOOK

4    SAMSUNG'S PROFITS AND APPLE'S PROFITS INTO ACCOUNT

5    IN DETERMINING A HYPOTHETICAL REASONABLE ROYALTY?

6    A    YES.

7    Q    WHERE DID YOU GET THE NUMBERS THAT YOU USED

8    FOR THE APPLE PROFITS PORTION OF THAT CALCULATION?

9    A    FROM APPLE'S AUDITED FINANCIAL STATEMENTS.

10   Q    LET'S GO BACK TO YOUR SLIDE WITH THE THREE

11   CATEGORIES, 34B.65 NOW.  AND GO AHEAD AND PUT UP

12   THE REASONABLE ROYALTY NUMBER.

13   A    $21,240,000 FOR THOSE THREE MILLION UNITS.

14   Q    NOW, IF WE LOOK AT THE TOP TWO NUMBERS ON THIS

15   CHART, THE SAMSUNG PROFIT NUMBER AND THE APPLE LOST

16   PROFIT NUMBER, IS THAT $24 PER UNIT NUMBER WE SAW

17   FOR DESIGN PATENTS, IS THAT INCLUDED IN ANY OF THE

18   NUMBERS WE SEE THERE?

19   A    NO.

20   Q    WHY NOT?

21   A    BECAUSE I DIDN'T -- MAYBE I MISSED THE

22   QUESTION.  I'M NOT DOUBLE COUNTING.  I'M

23   CALCULATING THE REASONABLE ROYALTY ONLY ON THE

24   REMAINING PHONES FOR WHICH I DID NOT CALCULATE THE

25   LOST PROFIT OR INFRINGING PROFIT.

1    Q    OKAY.  IF, INSTEAD OF CALCULATING FOR THE 17

2    MILLION PHONES AND TABLETS IN THE TOP LINE AND THE

3    2 MILLION PHONES AND TABLETS IN THE MIDDLE LINE

4    SAMSUNG PROFITS AND APPLE'S LOST PROFITS, IF YOU

5    HAD JUST DONE A REASONABLE ROYALTY FOR ALL 22

6    MILLION UNITS, WHAT WOULD THAT NUMBER HAVE BEEN?

7    A    RIGHT.  THAT'S 500 -- IT'S APPROXIMATELY

8    540 --

9                MR. PRICE:  OBJECT TO THAT.  THAT'S

10   BEYOND THE SCOPE OF HIS REPORT.

11               MS. KREVANS:  YOUR HONOR, THIS IS IN THE

12   SUPPLEMENTAL EXPERT REPORT AT EXHIBIT 19-S IN THE

13   MIDDLE COLUMN.

14               THE COURT:  THAT'S OVERRULED.

15               GO AHEAD.

16               THE WITNESS:  IF YOU SLID ALL THE PHONES,

17   AS COUNSEL HAS SAID, OVER AND DOWN INTO REASONABLE

18   ROYALTY AND CALCULATED DAMAGES AGAIN AS A FLOOR, A

19   MINIMUM AMOUNT, NO LOST PROFITS, NO REASONABLE --

20   AND NO INFRINGER'S PROFITS, THE AMOUNT IS

21   APPROXIMATELY $540 MILLION, STANDALONE.

22   BY MR. KREVANS:

23   Q    LOOKING AT THE NUMBERS THE WAY YOU DID

24   CALCULATE THEM IN THE THREE SEPARATE BUCKETS, WHAT

25   IS THE TOTAL DAMAGES THAT YOU CALCULATED THAT YOU

1    BELIEVE SAMSUNG SHOULD PAY IN THIS CASE IF THE JURY

2    FINDS THAT APPLE'S INTELLECTUAL PROPERTY IS VALID

3    AND INFRINGED?

4    A    SUMMING THE THREE UP, THE TOTAL NUMBER COMES

5    TO $2,751,000,000.

6    Q    COULD YOU TURN TO EXHIBIT 25 IN YOUR BINDER.

7    I'M SORRY, THIS IS 25A-1.

8    A    YES.

9    Q    WHAT IS 25A-1, MR. MUSIKA?

10   A    THIS IS A SUMMARY OF SOME OF THE CALCULATIONS

11   THAT I'VE BEEN TALKING ABOUT THIS MORNING.

12   Q    AND WHO PREPARED EXHIBIT 25A-1?

13   A    MY TEAM UNDER MY DIRECTION.

14              MS. KREVANS:  YOUR HONOR, WE OFFER

15   EXHIBIT 25A-1.

16              MR. PRICE:  NO FURTHER OBJECTION.

17              THE COURT:  OKAY.  IT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              25A-1, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22              MS. KREVANS:  OKAY.

23   Q    COULD YOU, JUST BRIEFLY, MR. MUSIKA, WALK THE

24   JURY THROUGH WHAT INFORMATION IS SET OUT ON EACH

25   PAGE OF EXHIBIT 25A-1?

1    A    YES.  SO I'LL USE MY BOOK, AND I ASSUME THAT

2    YOU'LL MOVE THE SCREEN AS I TALK.

3            SO PAGE 2 OF 16 IS JUST THE SUMMARY OF

4    DAMAGES, WHAT WE JUST LOOKED AT.

5            PAGE 3 OF 16 --

6    Q    LET ME STOP YOU FOR A MOMENT ON PAGE 3.  YOU

7    SEE AT THE BOTTOM THERE'S A NOTE?

8    A    YES.

9    Q    WHAT DOES THAT NOTE EXPLAIN?

10   A    THAT EXPLAINS THE, THE TIME PERIODS THAT WERE

11   USED FOR THE CALCULATION OF THE DAMAGES.

12   Q    AND WHAT DOES IT INDICATE THOSE TIME PERIODS

13   WERE?

14   A    IT INDICATES THAT THE TIME PERIODS THAT I USED

15   FOR THE REGISTERED TRADE DRESS WAS BASICALLY THE

16   START OF THE INFRINGING TIME PERIOD.

17   Q    THAT'S FOR THE UNREGISTERED TRADE DRESS?

18   A    UNREGISTERED TRADE DRESS.

19   Q    AND FOR THE REST?

20   A    AND FOR THE REST I USED AUGUST 4TH, 2010 AS

21   THE START DATE.

22   Q    THANK YOU.  COULD YOU CONTINUE EXPLAINING TO

23   THE JURY WHAT THE CONTENTS OF PX 25 ARE.

24   A    YES.  PAGE 3 OF 16 IS JUST THE MATRIX.  YOU

25   SEE THE PRODUCTS THERE ON THE LEFT AND ALL THE

1    FORMS OF INTELLECTUAL PROPERTY THAT HAVE BEEN

2    IDENTIFIED THERE, WHICH PRODUCTS ARE ACCUSED OF

3    INFRINGING WHICH OF THE INTELLECTUAL PROPERTY.

4           THE NEXT PAGE IS JUST A SUMMARY OF, A

5    MORE DETAILED SUMMARY BY PRODUCT OF THE FOLLOWING

6    PHONES THAT WE WENT THROUGH.  IT'S JUST DIFFERENT

7    CALCULATIONS.

8           THE SAME IS TRUE OF 5 OF 16.

9           6 OF 16 IS A LISTING OF PRODUCTS AND THE

10   CARRIERS THAT ARE ASSOCIATED WITH EACH PRODUCT.

11   Q    SO THE -- THIS IS JUST WHICH PHONE COMPANIES

12   ARE PROVIDING THEIR CUSTOMERS WITH WHICH SAMSUNG

13   PRODUCTS?

14   A    THAT'S CORRECT.

15   Q    THANK YOU.  AND YOU HAVE A SERIES OF PAGES

16   THAT ARE HEADED "MOR-FLO ANALYSIS."

17   A    THAT'S 7 THROUGH 12.

18   Q    WHAT ARE THOSE?

19   A    THAT'S THE MARKET SHARE ALLOCATIONS.  THAT'S

20   WHERE I LIMITED THE NUMBER OF PHONES THAT APPLE

21   WOULD GET BECAUSE I'VE ALLOCATED PERCENTAGES TO THE

22   OTHER MARKET PARTICIPANTS, AND THOSE ARE THOSE

23   CALCULATIONS.

24   Q    THAT TAKES US TO PAGE 13, AND WHAT IS SET OUT

25   ON PAGE 13?

```
 1    A    PAGE 13 IS A STUDY DONE, I THINK IT WAS DONE
 2    BY IBM, BUT IT WAS DONE BY SOMEONE ELSE WHICH
 3    REALLY LOOKED AT THE PERCENTAGE OF USERS THAT WOULD
 4    SWITCH CARRIERS, AND THAT WAS ANOTHER LIMITING
 5    FACTOR THAT I USED.
 6    Q    OKAY.  LET'S -- MR. LEE, DON'T SHOW IT IN
 7    COURT, BUT JUST SHOW THE JURORS PAGES 14 AND 15.
 8              YOUR HONOR, I'D NOTE FOR THE RECORD THAT
 9    THESE TWO PAGES, PER A PRIOR ORDER OF THE COURT,
10    HAVE BEEN PERMITTED TO BE REDACTED AND FILED UNDER
11    SEAL AND WE HAVE PROVIDED BOTH THE REDACTED AND
12    UNREDACTED COPIES TO THE COURT.
13              AND MR. MUSIKA, CAN YOU TELL US WHAT
14    INFORMATION IS SET OUT ON PAGES 14 AND 15?
15    A    YES.  IT'S MY ANALYSIS THAT RELATES TO THE
16    CAPACITY FACTOR, DETERMINING WHETHER OR NOT THERE'S
17    SUFFICIENT CAPACITY.
18    Q    AND FINALLY, PAGE 16.
19    A    16 IS THE RATES THAT WE JUST LOOKED AT, AND IT
20    GIVES A LITTLE MORE DETAILS ABOUT THE THREE
21    VALUATION METHODOLOGIES I USED.
22    Q    JUST TO FINISH UP, MR. MUSIKA, COULD YOU
23    SUMMARIZE FOR THE JURY YOUR OVERALL DAMAGES OPINION
24    IN THIS CASE?
25    A    YES.  WHERE I BEGAN, THE DAMAGES ARE A RANGE
```

```
1    BETWEEN $2.5 BILLION AND AT THE HIGH END,

2    $2,750,000,000.

3    Q    AND WHAT IS THE DIFFERENCE BETWEEN THE BOTTOM

4    AND THE TOP OF THAT RANGE?

5    A    ONE ASSUMES -- YOU REMEMBER WE WERE SLIDING

6    THE PHONES, THAT WE BASICALLY -- THE LOWER END

7    NUMBER IS JUST ALL OF SAMSUNG'S UNJUST ENRICHMENT,

8    PLUS A REASONABLE ROYALTY.

9         THE HIGHER NUMBER WAS SAMSUNG'S UNJUST

10   ENRICHMENT, LOST PROFIT ON THOSE 2 MILLION, PLUS

11   THE REASONABLE ROYALTY.

12        MS. KREVANS:  THANK YOU.

13        NOTHING FURTHER, YOUR HONOR.

14        THE COURT:  ALL RIGHT.  THE TIME IS NOW

15   11:20.

16              CROSS-EXAMINATION

17   BY MR. PRICE:

18   Q    GOOD MORNING, MR. MUSIKA.

19   A    GOOD MORNING.

20   Q    MY NAME IS BILL PRICE.

21        AND I WANTED TO ASK YOU, BEFORE WE GET

22   INTO YOUR METHODOLOGIES, YOU SAID YOU'VE DONE THIS

23   A NUMBER OF TIMES, THIS SORT OF ANALYSIS; CORRECT?

24   A    YES.

25   Q    AND YOU'VE DONE IT IN CONNECTION WITH
```

2099

```
1    LITIGATION?

2    A    YES.

3    Q    AND I JUST WANT TO SEE HOW YOU APPROACH THAT

4    AS AN EXPERT.  IT'S YOUR UNDERSTANDING THAT YOU ARE

5    SUPPOSED TO KIND OF APPLY YOUR EXPERTISE IN A

6    NEUTRAL FASHION; CORRECT?

7    A    THAT'S CORRECT.

8    Q    YOU'RE NOT SUPPOSED TO FAVOR ONE PARTY OVER

9    THE OTHER; RIGHT?

10   A    THAT'S CORRECT.

11   Q    YOU'RE GOING TO GIVE THE SAME OPINION

12   REGARDLESS OF WHICH SIDE HIRES YOU?  THAT'S THE

13   IDEA?

14   A    THAT IS THE IDEA.

15   Q    AND IN THAT CONNECTION, YOU KNOW THAT IT WOULD

16   BE INAPPROPRIATE, THEN, FOR YOU AS AN EXPERT TO BE

17   AN ADVOCATE?  THAT IS, YOU'RE SUPPOSED TO BE

18   OBJECTIVE USING YOUR EXPERTISE?

19   A    I WOULD AGREE.

20   Q    AND -- NOW, WE LOOKED AT A LOT OF SLIDES.  I

21   ASSUME THAT YOU REVIEWED THOSE SLIDES BEFORE THEY

22   WERE PRESENTED TO THE JURY.

23   A    YES.

24   Q    AND EITHER YOU CREATED THEM OR, LIKE THE

25   PRESIDENTIAL ADS, YOU APPROVED OF THEM?
```

1    A    YES.

2    Q    AND WERE THERE ANY THAT YOU CREATED VERSUS

3    APPROVED, OR --

4    A    I DON'T MAKE THAT DISTINCTION, NO.

5    Q    OKAY.  AND IF WE COULD LOOK AT, FOR EXAMPLE, I

6    THINK IT WAS SLIDE 34B.2, AND I'M JUST WONDERING,

7    FOR EXAMPLE, WITH THIS SLIDE -- I'M NOT GETTING

8    ANYTHING OUT OF THIS.

9            OKAY.  SO ON THIS SLIDE, YOU SEE ON THE

10   RIGHT HERE THERE'S A SAMSUNG PHONE.  DO YOU SEE

11   THAT?

12   A    I DO.

13   Q    AND DID YOU SELECT THAT PICTURE?

14   A    THE INDIVIDUAL PHONE?

15   Q    YES.

16   A    NO.  I THINK THAT -- THIS -- THE SLIDE ITSELF

17   WAS CONSTRUCTED ORIGINALLY BY ME, BUT THERE'S A

18   TEAM OF, OF GRAPHICS PEOPLE THAT, THAT PUT IN THE

19   ICONS ULTIMATELY.  SO, NO, I DIDN'T SELECT THAT

20   PHONE.

21   Q    I JUST WANT TO -- YOUR UNDERSTANDING IS THAT

22   APPLE IS NOT CLAIMING THAT YOU HAVE TO USE HARD

23   KEYS ON A PHONE; RIGHT?

24   A    THAT IS NOT MY UNDERSTANDING, NO.

25   Q    AND IT'S YOUR UNDERSTANDING THAT APPLE IS NOT

```
 1              DO YOU REMEMBER THAT?
 2    A    I DO, YES.
 3    Q    AND THEN A LOT OF THAT MONEY GOES BACK TO
 4    KOREA; CORRECT?
 5    A    97 TO 98 PERCENT OF IT GOES BACK, YES.
 6    Q    AND YOU ALSO LOOKED AT U.S. COMPANIES THAT
 7    SELL THINGS MANUFACTURED HERE, MAYBE AIRPLANES OR
 8    STEEL OR WHATEVER, THAT ARE SOLD TO FOREIGN
 9    COUNTRIES; RIGHT?
10    A    YES.
11    Q    AND MOST OF THAT COMES BACK HERE BECAUSE OUR
12    COMPANIES SOLD IT; RIGHT?
13    A    OUR COMPANIES ARE --
14    Q    IN THE U.S., LIKE THE STEEL COMPANIES?
15    A    DEPENDS ON THE ARRANGEMENT.  DEPENDS ON
16    WHETHER THEY'RE SELLING TO AN INDEPENDENT PARTY.
17    IT'LL DEPEND ON THE FACTS.
18              COULD THEY BE EXACTLY REVERSED?  SURE,
19    THEY COULD BE.
20    Q    OKAY.  AND THERE'S -- AND YOU WERE SAYING
21    THERE'S NOTHING INAPPROPRIATE ABOUT THAT; CORRECT?
22    A    NO, THERE'S NOTHING INAPPROPRIATE ABOUT IT,
23    NO.  OTHER THAN -- UNLESS YOU TRY IT AND DIVIDE IT
24    UP AND SAY, "WELL, NOW I ONLY WANT TO LOOK AT A
25    PIECE OF IT."  THAT'S INAPPROPRIATE.
```

2112

```
 1              BUT AS LONG AS YOU CONSOLIDATE THEM ALL,
 2      I DON'T HAVE A PROBLEM WITH THAT.
 3      Q     FROM AN ANALYTICAL PERSPECTIVE, YOU WANT TO
 4      LOOK AT THE WHOLE THING IS WHAT YOU SAID?
 5      A     NOT ANALYTICAL.  IF I WANT TO KNOW THE VALUE
 6      OR WHAT BENEFITS SAMSUNG GAINED, YOU HAVE TO LOOK
 7      AT THE CONSOLIDATED.  THAT'S MY ONLY POINT.  YOU
 8      CAN'T DIVIDE IT UP AND LOOK AT A PIECE OF IT,
 9      PARTICULARLY WHEN YOU HAVE CASH OR MONEY THAT'S
10      MOVING IN SUCH A DRAMATIC FASHION UNDER THE CONTROL
11      OF SEC.
12      Q     OKAY.  SO LET'S GO BACK TO YOUR CHART THEN, IF
13      WE CAN.
14              IS IT YOUR UNDERSTANDING THAT APPLE -- BY
15      THE WAY, APPLE COMES OUT, BASICALLY, WITH A NEW
16      PHONE ONCE EVERY COUPLE OF YEARS?
17      A     MIGHT BE A LITTLE BIT MORE FREQUENTLY THAN
18      THAT, BUT SOMETHING IN BETWEEN A YEAR AND TWO YEARS
19      I'D SAY.
20      Q     AND WHAT YOU'VE NOTICED IS THAT -- WHEN YOU
21      LOOK AT THE CHARTS IS THAT APPLE'S SALES
22      DRAMATICALLY SPIKE WHEN IT COMES OUT WITH A NEW
23      PHONE; CORRECT?
24      A     THAT'S CORRECT.
25      Q     BECAUSE ITS CUSTOMERS HAVEN'T -- THEY HAVE THE
```

1    OLD MODEL AND THEY WANT A NEW, PRETTIER ADVANCED

2    ONE; RIGHT?

3    A    THEY WAIT.  THAT'S CONSTANTLY -- CUSTOMERS

4    WILL WAIT BECAUSE THEY WANT -- THEY FIGURE, "IT'S

5    COMING OUT.  I'LL WAIT AND GET IT WHEN IT COMES

6    OUT."

7    Q    WHEREAS SAMSUNG COMES OUT WITH LOTS OF PHONES

8    PER YEAR?

9    A    CERTAINLY MORE THAN APPLE, YES, THAT'S TRUE.

10   Q    AND THE SPIKE IN -- WE'VE GOT, LIKE, IN 2011,

11   YOU'VE GOT SAMSUNG GOING UP -- AT THIS POINT WE'RE

12   TALKING ABOUT PHONES LIKE THE GALAXY S II; CORRECT?

13   A    I THINK THAT'S RIGHT.  AGAIN, I DON'T HAVE

14   COMMITTED TO MEMORY THE LAUNCH DATES OF EACH OF THE

15   PHONES.  THAT IS AN ACCUSED PHONE, AND I THINK IT

16   IS IN THE 2011 TIME PERIOD.

17   Q    OKAY.  SO IF YOU WANT TO SEE, YOU KNOW, WHAT

18   SAMSUNG IS ACTUALLY SELLING, HOW IT'S CREATING

19   THIS, THIS, THESE SALES, YOU'D WANT TO LOOK AT KIND

20   OF WHAT PHONES ARE ACTUALLY DRIVING THIS; RIGHT?

21   A    I DON'T UNDERSTAND THE QUESTION.  I'M SORRY.

22   Q    WELL, I MEAN, YOU'D WANT TO SEE, IN 2010 OR

23   2011 HERE, WHAT'S THE PHONE MIX THAT SAMSUNG HAS,

24   BECAUSE IT DOESN'T JUST HAVE ONE PHONE; RIGHT?

25   A    RIGHT.  BUT THE PURPOSE -- I'M NOT DISAGREEING

```
1    WITH THAT.  I'M JUST SAYING I DON'T UNDERSTAND THE

2    QUESTION.

3               THE PURPOSE OF THIS IS TO SHOW THE

4    SMARTPHONE MARKET SHARE.  IF YOU WANT TO KNOW HOW A

5    PARTICULAR PHONE IS DOING, YOU SHOULD LOOK TO THAT

6    PHONE AND BREAK IT DOWN.

7    Q    WELL, IF YOU WANT TO LOOK TO SEE WHETHER OR

8    NOT IT'S BECAUSE SAMSUNG DID SOMETHING WRONG, THAT

9    IS, WHETHER OR NOT A PARTICULAR PHONE WAS, WAS

10   SOMETHING THAT WAS DRIVING INJURY TO APPLE, YOU'D

11   HAVE TO LOOK AT THE PARTICULAR PHONE, LIKE THE

12   DROID, AND MAKE A DECISION AS TO WHETHER OR NOT IT

13   INFRINGED; RIGHT?

14   A    YES.  AGREED.

15   Q    NOW, LET ME ASK YOU A LITTLE BIT ABOUT YOUR

16   ASSUMPTIONS HERE.

17               AND I WANT TO START OUT WITH WHAT YOU

18   TOLD THE JURY AT THE END, THAT DAMAGES WERE

19   SOMEWHERE BETWEEN 2.5 AND 2.75 BILLION.

20   A    THAT'S CORRECT.

21   Q    OKAY.  SO LET ME UNDERSTAND THIS.  IF THE

22   JURORS LOOK AT THIS EVIDENCE -- AND LET ME GIVE YOU

23   A HYPOTHETICAL -- THEY SAY, "WELL, YOU KNOW, THE

24   DESIGN PATENTS, THE TRADEMARK, I DON'T THINK THEY

25   INFRINGE THAT.  I DON'T THINK THERE'S, YOU KNOW,
```

```
1    DECEPTION OR THAT PEOPLE WOULD BE CONFUSED.  AND

2    I'M LOOKING AT THESE, THESE UTILITY PATENTS AND I'M

3    GOING TO CONCLUDE, YOU KNOW, THEY DO THE BOUNCE

4    BACK THING, THEY DO THAT, AND I'M GOING TO FIND

5    THAT'S A VALID PATENT."

6              ARE YOU WITH ME SO FAR?

7              MS. KREVANS:  OBJECTION, YOUR HONOR.

8    THERE ARE NO TRADEMARKS AT ISSUE IN THIS CASE.

9              MR. PRICE:  I'M SORRY.  TRADE DRESS.  I

10   MISSPOKE.  I APOLOGIZE.

11   Q    SO IF YOU SUBSTITUTE "TRADE DRESS" AND THE

12   "TRADEMARK," ARE YOU WITH ME SO FAR?

13   A    I'M ALL RIGHT.  KEEP GOING.  SURE.

14   Q    OKAY.  SO THE JURORS FIND, AFTER ANALYZING

15   THIS THAT, WELL, YOU KNOW, SAMSUNG SHOULDN'T HAVE

16   USED THE BOUNCE BACK AND THAT'S VALID.  LET'S

17   ASSUME THAT'S WHAT THEY FIND, OKAY?

18              YOUR DAMAGES FOR THAT IS GOING TO BE A

19   LOT LESS THAN $2.5 BILLION WHICH YOU SAID WAS THE

20   SMALLEST NUMBER OF DAMAGES THAT SHOULD BE AWARDED;

21   RIGHT?

22   A    WELL, I DON'T KNOW THAT IT'S GOING TO BE A LOT

23   LESS, NO.

24   Q    SO YOU'RE SAYING THAT IF THE ONLY INFRINGEMENT

25   THAT EXISTS OF A VALID PATENT IS THE BOUNCE BACK,
```

1    OKAY -- YOU KNOW WHICH ONE THAT IS; RIGHT?

2    A    SO -- YES.  MAYBE I MISUNDERSTOOD YOUR

3    QUESTION.  SO YOUR HYPOTHETICAL IS ONLY THAT?

4    Q    ABSOLUTELY.

5    A    YES.

6    Q    YOU UNDERSTAND THE JURORS, YOU KNOW, MIGHT

7    DECIDE THAT APPLE'S WRONG ON SOME OF THESE THINGS?

8    A    THEY COULD DECIDE THAT.

9    Q    "AND SO INSTEAD OF THROWING A COUPLE BILLION

10   THEIR WAY, I'M GOING TO LOOK AT IT ANALYTICALLY AND

11   DECIDE, YOU KNOW, WHAT DID -- WHAT DID SAMSUNG

12   ACTUALLY DO WRONG, IF ANYTHING?"

13           YOU UNDERSTAND STAND THEY MIGHT TAKE THAT

14   APPROACH?

15   A    I DO.

16   Q    OKAY.  AND IF THEY TAKE THAT APPROACH, I WANT

17   YOU TO ASSUME THAT THEY DECIDE, NO DESIGN PATENT

18   INFRINGEMENT OR THE DESIGN PATENTS AREN'T VALID OR

19   NO TRADE DRESS INFRINGEMENT BECAUSE, YOU KNOW, AN

20   ORDINARY OBSERVER IS NOT GOING TO BE CONFUSED AND

21   THERE'S NO DECEPTION, NO DECEIT.

22           BUT THEY DO LOOK AT THE UTILITIES AND

23   SAY, "YOU KNOW, THAT BOUNCE BACK, I THINK APPLE

24   OWNED THAT AND THEY HAD A VALID OWNERSHIP RIGHT TO

25   THAT AND SAMSUNG USES THAT."

```
 1              OKAY?  SO UNDER THAT ASSUMPTION, ARE YOU

 2    WITH ME?

 3    A    I'M WITH YOU.

 4    Q    OKAY.  YOUR DAMAGES AREN'T CLOSE TO 2 BILLION

 5    OR 1 BILLION OR ANYTHING LIKE THAT, ARE THEY?

 6    A    AGREED.

 7    Q    NOW, HOW CAN THEY TELL?  HOW CAN THE JURORS

 8    TELL THAT IF IT'S JUST -- ASSUME IT'S JUST A BOUNCE

 9    BACK.  YOU HAVEN'T GIVEN THEM THE TOOLS TO BE ABLE

10    TO COME UP WITH A DAMAGES FIGURE FOR THAT?

11    A    I HAVE.

12    Q    AND YOU SAY THAT'S IN HERE?

13    A    YES, IT IS.

14    Q    YOU CAN GO IN AND LOOK AT IT AND POINT TO IT?

15    I'M SORRY.  BUT WE'LL GET BACK TO THAT.

16              BUT RIGHT NOW WHAT YOU'RE SAYING IS WHAT

17    YOU SAID EARLIER, WHICH IS THE MINIMUM DAMAGES

18    FIGURE, WHICH IS $2.4 BILLION -- I SHOULD HAVE

19    WRITTEN IT DOWN -- 2.5 BILLION?

20    A    THAT'S CORRECT.

21    Q    THAT'S ABSOLUTELY INCORRECT; RIGHT?  THAT'S

22    ABSOLUTELY INCORRECT?  THAT IS NOT THE MINIMUM

23    DAMAGES FIGURE THAT THIS JURY COULD AWARD IF IT

24    FOUND SOME INFRINGEMENT?

25    A    NO, I DISAGREE.
```

2118

```
 1    Q    OKAY.  SO DO YOU AGREE, THEN, THAT IF THIS

 2    JURY FOUND THAT THE ONLY THING WRONG WAS THAT

 3    SAMSUNG USED A BOUNCE BACK, YOU'RE SAYING THAT THAT

 4    DAMAGE WOULD BE 2.5 BILLION?

 5    A    NO.  I THINK YOU'RE MIXING IT UP, AND I'M

 6    LISTENING TO YOUR QUESTIONS CAREFULLY.

 7              WHEN I STARTED MY PRESENTATION, I SAID

 8    THAT I ASSUMED THAT ALL PATENTS ARE VALID AND THAT

 9    ALL PRODUCTS INFRINGE, AND UNDER THAT ASSUMPTION,

10    WHICH I'M GIVEN AS AN EXPERT, THE MINIMUM DAMAGES

11    ARE $2.5 BILLION AND THEY'RE NOT LESS THAN THAT IN

12    MY OPINION.

13              YOU HAVE A HYPOTHETICAL, AND I AGREED

14    WITH YOU, ON THAT HYPOTHETICAL, THE DAMAGES WOULD

15    BE LESS.

16              BUT THAT'S NOT MY OPINION.

17    Q    I WAS LOOKING AT THE TRANSCRIPT AND I WANTED

18    TO MAKE SURE THAT WE ALL UNDERSTOOD.  SO APPARENTLY

19    WHEN YOU TOLD THE JURY THAT THE MINIMUM DAMAGES

20    WERE 2.5 BILLION, THAT WAS ASSUMING THAT APPLE WAS

21    CORRECT ON EVERY PATENT, THAT THERE WAS

22    INFRINGEMENT ON EVERY PATENT AND THAT EVERY PATENT

23    WAS VALID?

24    A    YES.

25    Q    OKAY.  SO I'M JUST CURIOUS, WERE YOU ASKED BY,
```

2119

```
 1    BY APPLE TO PRESENT TO THE JURY, FOR EXAMPLE, WHAT
 2    WOULD BE YOUR OPINION OF THE DAMAGES IF IT WAS JUST
 3    A BOUNCE BACK INFRINGEMENT?
 4    A    NO.
 5    Q    HOW ABOUT IF IT WAS -- I'M TRYING TO THINK OF
 6    THE PATENT NOW -- HIT TO ZOOM AND THEN HIT
 7    SOMEWHERE ELSE TO CENTER AND ZOOM?
 8    A    NO.
 9    Q    I'VE GOT THE LIST HERE.  THERE'S THE ONE WHERE
10    YOU, YOU USE ONE FINGER FOR SCROLLING AND THEN
11    THERE'S A PARTICULAR METHOD BY WHICH YOU USE TWO
12    FINGERS TO ZOOM.
13    A    YOU MAY BE MIXING THE THREE UTILITY PATENTS
14    UP, BUT I'M FOLLOWING YOU, AND THE ANSWER IS STILL
15    NO, I DIDN'T DO -- I WASN'T ASKED TO MAKE THAT
16    CALCULATION.
17    Q    OKAY.  AND THESE -- THE LOST PROFITS THAT --
18    THE LOST PROFITS IS A BIG PERCENTAGE OF YOUR
19    NUMBERS; RIGHT?
20    A    NO, THEY'RE NOT.
21    Q    I'M SORRY.  YOU'RE ABSOLUTELY RIGHT.
22          THE INFRINGER'S PROFITS, SAMSUNG'S,
23    THAT'S A BIG PART OF THE NUMBER; RIGHT?
24    A    THAT'S CORRECT.
25    Q    AND, OF COURSE, YOU DON'T GET INFRINGER'S
```

```
 1    PROFITS IF THERE'S -- IF THE PATENT THAT IS
 2    INFRINGED IS A UTILITY PATENT; RIGHT?
 3    A    THAT'S RIGHT.  THAT'S NOT ONE OF THE FORMS OF
 4    DAMAGES UNDER A UTILITY PATENT, I AGREE.
 5    Q    SO THOSE BIG NUMBERS ALL HAVE SOMETHING TO DO
 6    WITH THE WAY THE PHONE OR THE TABLET LOOKS?
 7    A    WELL, THE ONLY ADDITION, SO THE RECORD IS
 8    CLEAR, IS REMEMBER THE SLIDING PHONES.  SO IF YOU
 9    MOVE THOSE PHONES OUT OF INFRINGER'S PROFITS,
10    YOU'VE GOT TO PUT THEM INTO SOME COLUMN, LOST
11    PROFITS OR REASONABLE ROYALTY.
12         AND SO AT A MINIMUM, YOU WOULD MOVE THEM
13    ALL DOWN TO REASONABLE ROYALTY TO THE EXTENT THAT
14    THEY ALSO INFRINGED THE UTILITY PATENT.
15    Q    AND SO THAT'S, THAT'S WHAT I'M SAYING.  IT'S
16    ONLY -- YOU GET INFRINGER'S PROFITS ONLY IF THERE'S
17    SOME FINDING ABOUT BASICALLY HOW THESE PHONES LOOK?
18    A    RIGHT.
19    Q    THE DESIGN PATENT, THE DESIGN PATENT OR TRADE
20    DRESS INFRINGEMENT; RIGHT?
21    A    I'M AGREEING WITH YOU.  BUT ALL I'M SAYING IS
22    IT'S NOT LIKE YOU SUBTRACT IT.  YOU HAVE TO
23    SUBTRACT IT, BUT YET ADD IT BACK ON THE OTHER FORM.
24    Q    WELL, YOU DON'T ADD IT BACK IF THERE'S A
25    FINDING THAT, YOU KNOW, AN ORDINARY OBSERVER, FOR
```

1   EXAMPLE, IS NOT GOING TO BE CONFUSED OR THERE'S NOT

2   DECEIT OR THAT THE PATENT'S INVALID; RIGHT?

3   A    NO, YOU DO.  THAT'S WHAT'S KEY, BECAUSE THE

4   KEY TO THE CALCULATION IS EVERY PRODUCT -- THE

5   CALCULATION IS DONE ON AN INDIVIDUAL PRODUCT.  SO

6   IN YOUR HYPOTHETICAL, WE HAVE JUST A PHONE, AND

7   THAT PHONE INFRINGES THE UTILITY PATENTS AND IT

8   INFRINGES THE TRADE DRESS AND IT INFRINGES THE

9   DESIGN PATENTS.

10           I'M THINKING THAT YOUR HYPOTHETICAL --

11   AND ON THAT BASIS, THE CALCULATION WOULD BE

12   PRESUMABLY BASED ON THE INFRINGER'S PROFITS.

13           YOU SAY LET'S ASSUME THAT THEY DON'T

14   INFRINGE THE DESIGN PATENTS AND THE TRADE DRESS.

15   LET'S TAKE THAT AWAY.

16           WELL, WE STILL HAVE THE POTENTIAL OF LOST

17   PROFITS ON THE UTILITY AND, AT A MINIMUM, THE

18   REASONABLE ROYALTY.

19           SO WHEN YOU TAKE AWAY THE INFRINGER'S

20   PRODUCTS, YOU'VE TO RECALCULATE THE DAMAGES FOR

21   THAT PARTICULAR PHONE ON ONE OF THOSE OTHER BASES

22   THERE, ASSUMING IT INFRINGES ONE OF THE OTHER

23   UTILITY PATENTS.

24   Q    AND THAT'S WHAT YOU'RE SAYING.  ASSUMING

25   THERE'S SOME OTHER INFRINGEMENT, THERE'S GOING TO

```
1    BE SOME WAY TO CALCULATE IT?

2    A    YES.

3    Q    AND YOU'VE TOLD US THAT YOU WEREN'T ASKED TO

4    CALCULATE ASSUMING THAT, YOU KNOW, ONE OF THESE

5    PATENTS, UTILITY PATENTS WAS INFRINGED ONLY, OR, OR

6    A COMBINATION OF THE UTILITY PATENTS?

7    A    THE COMBINATION -- THAT'S WHY A MODEL WAS

8    REQUIRED -- IS ENDLESS.  THERE ARE REALLY HUNDREDS

9    OF THOUSANDS OF COMBINATIONS GIVEN THE NUMBER OF

10   PATENTS, ET CETERA.

11        AND NO, I WASN'T.  THE ANSWER IS NO, I

12   WASN'T.

13   Q    AND THE ONLY COMBINATIONS I'M TALKING ABOUT

14   ARE THE THREE UTILITY PATENTS.  OKAY?

15   A    YOU'RE RIGHT, I WAS NOT ASKED TO PRESENT THAT.

16   Q    SO THE ASSUMPTIONS, THEN, ARE WE TALKED ABOUT

17   EACH PATENT, DESIGN PATENT IS VALID AND INFRINGED.

18   THAT'S YOUR ASSUMPTION FOR YOUR DAMAGES; RIGHT?

19   A    YES.

20   Q    THAT ALL THE DIFFERENT PRODUCTS THAT APPLE

21   SAYS INFRINGE DO INFRINGE; CORRECT?

22   A    YES.

23   Q    THAT EACH OF THE UTILITY PATENTS IS VALID AND

24   WHATEVER APPLE SAYS INFRINGES INFRINGES; CORRECT?

25   A    UNTIL THE JURY SAYS IT, YES.
```

```
 1    Q    THAT ALL OF APPLE'S TRADE DRESS IS VALID AND

 2    EVERYTHING APPLE SAYS INFRINGES INFRINGES; CORRECT?

 3    A    YES.

 4    Q    AND IT'S GIVEN ALL THOSE ASSUMPTIONS THAT YOU

 5    THEN HAVE THIS RANGE OF 2.5 BILLION TO 2.7 BILLION?

 6    A    THAT'S CORRECT.

 7    Q    SO LET'S TALK ABOUT, FOR EXAMPLE, THE BOUNCE

 8    BACK.  ON YOUR LOST PROFITS, I THINK YOU'RE UP

 9    AROUND, FOR TOTAL, YOU'RE UP AROUND 400 SOMETHING

10    MILLION?

11    A    488 MILLION.

12    Q    OKAY.  AND THAT OBVIOUSLY ISN'T LOST -- WOULD

13    NOT BE APPLE'S LOST PROFITS WITH RESPECT TO, SAY, A

14    BOUNCE BACK PATENT?

15    A    NOT EXCLUSIVELY, NO.  SAME QUESTION, SAME

16    ANSWER.

17    Q    IN FACT, YOUR ANALYSIS ON THAT, WHEN YOU

18    TALKED -- WHEN YOU THOUGHT IT WOULD TAKE -- IF

19    SAMSUNG WERE TOLD "YOU CAN'T DO THAT ON YOUR

20    PHONE," IT WOULD TAKE THEM A MONTH TO DESIGN AROUND

21    THAT AND DO SOMETHING ELSE?

22    A    AS ONE OF THOSE LIMITING CONDITIONS THAT I

23    TALKED ABOUT, YES, I LIMITED THE CALCULATION TO

24    JUST ONE MONTH OF LOST PROFITS FOR THAT.

25    Q    SO LET'S TALK ABOUT YOUR ANALYSIS ON -- YOU
```

```
 1    SAID YOU DID ANALYSIS ON BUT-FOR; THAT IS, IF -- IF
 2    SAMSUNG DIDN'T HAVE A FEATURE, WHAT WOULD HAPPEN?
 3             AND FOR BUT-FOR, FOR LOST PROFITS, FOR
 4    APPLE'S LOST PROFITS, OKAY, YOU'RE SAYING THAT IF
 5    THE JURY FOUND INFRINGEMENT ON A UTILITY PATENT,
 6    THEN YOU'VE GOT TO LOOK AT, OKAY, WHAT WOULD APPLE
 7    HAVE MADE IF SAMSUNG DIDN'T HAVE THAT FEATURE;
 8    RIGHT?
 9    A    MADE?  WHAT --
10    Q    WOULD HAVE MADE.
11    A    ALL RIGHT.  I'LL SAY YES.  I'M NOT SURE WHAT
12    YOU MEAN, BUT I'LL SAY YES.
13             THEY'VE ALREADY MADE THEIR PRODUCTS.  THE
14    PRODUCTS ARE THE IPHONES IN YOUR HYPOTHETICAL, SO
15    IT WOULD BE THE IPHONE.  IT'S ALREADY MADE.
16    Q    OKAY.  AND I DIDN'T MEAN MANUFACTURE, BUT THE
17    PROFITS THEY WOULD HAVE EARNED?
18    A    OKAY.  THAT'S WHERE I WAS NOT SURE.
19    Q    AND WHEN YOU'RE DOING THAT, YOU'VE GOT TO ASK
20    YOURSELF, HERE'S A SAMSUNG CUSTOMER, THEY'VE GOT A
21    PHONE, ONE OF THE ACCUSED PHONES, THAT HAS BOUNCE
22    BACK.  NOW, IF BOUNCE BACK ISN'T IN THERE, ARE THEY
23    GOING TO LEAVE SAMSUNG TO GO TO APPLE BECAUSE OF
24    THAT ONE FEATURE?  THAT'S THE BUT-FOR ANALYSIS,
25    ISN'T IT?  THAT -- IS SOMEONE GOING TO SAY, "I
```

```
 1    BOUGHT THIS PHONE.  I LIKED IT.  WELL, DARN.  IT
 2    DOESN'T HAVE BOUNCE BACK ANYMORE.  I'M GOING TO GO
 3    BUY AN APPLE."
 4    A    WELL, THAT'S KIND OF A STATEMENT, BUT I'LL
 5    RESPOND TO IT AS A QUESTION.
 6    Q    TRUE.
 7    A    MY CALCULATION IS THAT THEY WOULD GO TO THEM
 8    BECAUSE, REMEMBER, I'VE ONLY TAKEN THE SALE AWAY
 9    FOR THE MONTH IT WOULD TAKE FOR SAMSUNG TO
10    BASICALLY REMOVE THE BOUNCE BACK.  THEY'RE GOT
11    TO -- THAT'S JUST A PHYSICAL FACT.  SAMSUNG, WITH
12    THE ASSUMPTION THAT THEY CAN'T USE IT, HAS TO TAKE
13    IT OUT OF THEIR PHONE.  THEY HAVE TO REDESIGN THE
14    PHONE.  THEY HAVE TO NEGOTIATE A DIFFERENT PRICE.
15    THEY NEED TO PUT THE MANUFACTURING FACILITY IN
16    PLACE.  I'VE ALLOWED, FOR EVERYTHING TO HAPPEN, ONE
17    MONTH AND ONLY ONE MONTH.
18         AND DURING THAT PERIOD OF TIME, YES, SOME
19    PORTION OF THE MARKET WOULD CHOOSE AN IPHONE
20    INSTEAD OF SAYING, "OH, WELL, I'M GOING TO WAIT OR
21    DO SOMETHING ELSE."
22    Q    WELL, FOR ONE THING, YOU WOULDN'T HAVE TO
23    START A MANUFACTURING FACILITY TO CHANGE THE BOUNCE
24    BACK.  THAT'S JUST A SOFTWARE UPGRADE, RIGHT?  PLUG
25    IT INTO YOUR COMPUTER AND IT WOULD BE CHANGED?
```

2126

1    A    FAIR ENOUGH, YES.

2    Q    OKAY.  AND MY QUESTION IS DIFFERENT.  WE KNOW

3    SOMETHING ABOUT THE PEOPLE WHO PURCHASE THE SAMSUNG

4    PHONES THAT WE DON'T KNOW ABOUT THE GENERAL PUBLIC,

5    WHICH IS THAT THEY CHOSE A SAMSUNG PHONE; RIGHT?

6    A    YES.

7    Q    OKAY.  SO IF THEY CHOSE A SAMSUNG PHONE, YOU

8    MIGHT WANT TO LOOK AS TO WHY THEY CHOSE THAT PHONE;

9    CORRECT?

10   A    I AGREE, AND I DID.

11   Q    AND IN CONNECTION WITH THAT, YOU'D WANT TO

12   ASK, OR FIND OUT, "OKAY, MR. PURCHASER, IF YOU

13   DIDN'T HAVE BOUNCE BACK, WOULD YOU NOT HAVE CHOSEN

14   THAT PHONE AND GONE SOMEWHERE ELSE?"  THAT'S WHAT

15   THE BUT-FOR CAUSATION IS.  IF NOT FOR WHAT SAMSUNG

16   WAS DOING, IT WOULD HAVE GONE TO APPLE INSTEAD;

17   RIGHT?

18   A    THAT'S CORRECT.

19   Q    AND THERE ARE HUNDREDS AND HUNDREDS OF

20   FEATURES ON A SAMSUNG SMARTPHONE; RIGHT?

21   A    YES.

22   Q    APPLE HAS DONE RESEARCH, ITSELF, ON WHY THE

23   PEOPLE WHO BUY SAMSUNG, OR ANDROID, WHY ARE THEY

24   ATTRACTED TO THAT PRODUCT INSTEAD OF OURS; RIGHT?

25   A    YES.

1    Q    AND YOU REVIEWED SOME OF THAT?

2    A    I DID.

3    Q    SO, FOR EXAMPLE, IF YOU LOOK AT EXHIBIT 572 --

4    A    THESE ARE IN YOUR BOOKS, COUNSEL?

5    Q    YES.  IF YOU NEED HELP FINDING IT, JUST LET ME

6    KNOW.

7    A    572.  OKAY, I'M THERE.

8    Q    AND FIRST LET ME ASK YOU, IS THIS A DOCUMENT

9    THAT YOU HAVE EVER SEEN?

10   A    I'VE SEEN A LOT OF APPLE SURVEYS, SO THAT'S

11   PROBABLY -- TO MOVE IT ALONG, THAT'S PROBABLY ONE

12   I'VE SEEN.  I'VE SEEN A LOT OF THEM.  IT LOOKS LIKE

13   IT.

14   Q    SO APPLE LOOKS AT THE MARKET TO SEE WHY ARE

15   PEOPLE CHOOSING OTHER PHONES?  WHY ARE THEY

16   CHOOSING OUR PHONE?  THINGS LIKE THAT?

17   A    YES.

18   Q    AND THIS LOOKS LIKE AN APPLE DOCUMENT TO YOU?

19   A    YES.

20         MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT

21   572 INTO EVIDENCE.

22         THE COURT:  IT'S ADMITTED.

23         MS. KREVANS:  YOUR HONOR, I WOULD REQUEST

24   THAT THIS DOCUMENT, BECAUSE IT'S A VERY SENSITIVE

25   DOCUMENT, THAT WHAT'S ADMITTED BE ONLY THE PAGES

```
 1    THAT ARE SHOWN.  THERE'S NO REASON TO ADMIT PAGES

 2    THAT ARE NOT SHOWN.

 3              MR. PRICE:  I HAVE NO PROBLEM WITH THAT.

 4              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 5              572.003, HAVING BEEN PREVIOUSLY MARKED

 6              FOR IDENTIFICATION, WAS ADMITTED INTO

 7              EVIDENCE.)

 8    BY MR. PRICE:

 9    Q    SO IF WE CAN LOOK AT 572.003, THAT'S A

10    SMARTPHONE MARKET STUDY.  DO YOU SEE THAT?

11    A    WHAT'S THE BATES PAGE?

12    Q    IT'S 572.003.

13    A    OH, THERE'S TWO DIFFERENT BATES RANGES HERE.

14    SORRY.

15    Q    IT'S AT THE TOP WHERE IT SAYS DEFENDANT'S

16    EXHIBIT NUMBER 572.003.

17    A    YES, I'M THERE.

18    Q    AND IF YOU LOOK AT THE SECOND PAGE, YOU SEE IT

19    SAYS "WHY THIS REPORT," AND IT TALKS ABOUT -- I'M

20    SORRY -- THAT'S 572.004, AND YOU SEE IT TALKS ABOUT

21    "FOCUS ON IPHONE AND ANDROID."

22              AND YOU UNDERSTAND WHAT ANDROID IS?

23    A    I DO.

24    Q    THAT'S A DIFFERENT OPERATING SYSTEM WHICH IS

25    OFFERED ON SAMSUNG AND OTHER PRODUCTS COMPARED TO
```

1    APPLE'S OPERATING SYSTEM; CORRECT?

2    A    NOT ALL SAMSUNG PRODUCTS, BUT SOME SAMSUNG

3    PRODUCTS.  SORRY, SOME SAMSUNG PRODUCTS.

4    Q    LET'S GO TO THE KEY AREAS WHERE YOU HAVE, YOU

5    KNOW, SMARTPHONE PURCHASE DRIVERS, BRAND LOYALTY,

6    DRIVERS OF ANDROID CONSIDERATION AND PURCHASE.

7              DO YOU SEE THAT?

8    A    YES.

9    Q    OKAY.  AND IF WE LOOK AT 572.08 -- I'M

10   SORRY -- 077, YOU SEE THIS IS A SECTION THAT STARTS

11   "DRIVERS OF ANDROID CONSIDERATION AND PURCHASE."

12   DO YOU SEE THAT?

13   A    LET ME CATCH UP.

14   Q    IT'S AT THE TOP AGAIN, 572.077?

15   A    I GOT IT.  I'M THERE.

16   Q    AND IF WE GO TO PAGE 572.082.

17   A    YES.

18   Q    AND THESE ARE THE TOP REASONS FOR BUYING AN

19   ANDROID AMONG THOSE WHO CONSIDERED THE IPHONE.  DO

20   YOU SEE THAT?

21   A    I CAN'T READ THE FINE PRINT THERE, BUT, YES,

22   IT DOES SAY THAT.

23   Q    IT MIGHT BE EASIER IF YOU LOOK AT IT BLOWN UP,

24   BECAUSE, YEAH, THE WAY IT WAS --

25   A    I'M TRYING TO SEE WHAT THE LIGHT PRINT SAYS

2130

```
 1    DOWN IN THE LOWER LEFT-HAND CORNER.
 2    Q    "NOTE 25 PERCENT OF RECENT ANDROID BUYERS
 3    CONSIDERED AN IPHONE."
 4              AND THIS IS, "FOR WHAT REASON DID YOU
 5    DECIDE TO BUY AN ANDROID-BASED SMARTPHONE RATHER
 6    THAN AN IPHONE?"
 7    A    OKAY.
 8    Q    AND IT'S GOT YOU WANT TO STAY WITH THE SERVICE
 9    PROVIDER; RIGHT?
10    A    YES.
11    Q    AND THAT'S BECAUSE DURING THE ENTIRE TIME
12    PERIOD HERE, BY THE WAY, ONLY AT&T SOLD IPHONES
13    DURING THE DAMAGES PERIOD?
14    A    LET ME UNDERSTAND THIS SLIDE.  SO THIS SLIDE
15    REPRESENTS ONLY THOSE PORTIONS WHO -- ONLY THOSE
16    CUSTOMERS WHO HAVE ALREADY DECIDED TO STAY WITH
17    ANDROID, NOT FOR OTHERS?
18    Q    THESE ARE PEOPLE WHO CHOSE ANDROID RATHER THAN
19    CHOOSING AN IPHONE.  THAT IS, WHY DID THEY
20    CHOOSE --
21    A    YES, OKAY.  I'M WITH YOU.
22    Q    OKAY.  AND WE'VE GOT STAY WITH WIRELESS
23    SERVICE PROVIDER, AND I WAS ASKING YOU ABOUT AT&T.
24              DURING THE DAMAGES PERIOD YOU
25    CALCULATED --
```

1    A    YES.

2    Q    -- THE ONLY PLACE YOU COULD BUY AN IPHONE WAS

3    AT&T?

4    A    NO, THAT'S INCORRECT.

5    Q    AT WHAT POINT DID -- WAS THERE A PERIOD OF

6    TIME WHEN YOU COULD ONLY GET IT THROUGH AT&T?

7    A    THERE WAS A PERIOD OF TIME, NOT THE WHOLE

8    DAMAGE PERIOD OF TIME, BUT THERE WAS A PERIOD OF

9    TIME THAT YOU COULD ONLY GET AN IPHONE AT AT&T.

10             BUT AS THE DAMAGE PERIOD PROGRESSED,

11   OTHER CARRIERS DID CARRY THE IPHONE AS WELL.

12   Q    WHAT TIME PERIOD WAS IT WHERE YOU'VE GOT TO GO

13   TO AT&T?

14   A    FROM THE START OF IT, I CAN'T REMEMBER THE

15   EXACT CUT OFF, BUT I KNOW ANOTHER CARRIER CAME IN.

16             THROUGHOUT THE ENTIRE TIME PERIOD AT&T,

17   BUT THERE WAS A LIMITED PERIOD OF TIME THERE EARLY

18   ON.

19   Q    AND YOU SEE TRUSTED MODEL BRAND, PREFERRED

20   LARGE SCREEN; RIGHT?

21   A    YES.

22   Q    PREFERRED THE ANDROID MARKET FOR APPS, THAT

23   WAS ANOTHER REASON?

24   A    YES.

25   Q    AND IT GOES ON -- TURN-BY-TURN GPS NAVIGATION.

```
 1    THERE WAS A PERIOD OF TIME WHEN ANDROID HAD THAT
 2    AND APPLE DID NOT; CORRECT?
 3    A    YES, MY UNDERSTANDING, YES.
 4    Q    AND THIS KIND OF RUNS INTO THE NEWEST, COOLEST
 5    THING, WANTED THE LATEST TECHNOLOGY; RIGHT?
 6    A    THAT'S WHAT IT SAYS, YES.
 7    Q    AND ANOTHER REASON PEOPLE MIGHT CHOOSE PHONES
 8    IS PRICE; RIGHT?  HOW MUCH THEY COST?
 9    A    AGREED.
10    Q    AND YOU ACTUALLY DID A CALCULATION -- BY THE
11    WAY, NOTHING IN HERE MENTIONS -- LET ME WITHDRAW
12    THAT.
13              LET'S GO BACK TO PRICE.  SORRY ABOUT
14    THAT.
15    A    THAT'S ALL RIGHT.
16    Q    MENTAL HICCOUGH.
17              YOU DID A CALCULATION WHICH COMPARED THE
18    AVERAGE IPHONE PRICE TO THE AVERAGE IPHONE PRICE;
19    RIGHT?
20    A    I KNOW THAT THERE'S A DIFFERENCE, YES.  I
21    MEAN, THERE'S MANY, MANY CALCULATIONS, BUT IT
22    DEPENDS AT WHAT POINT IN TIME, WHICH PHONES, ET
23    CETERA.  BUT, YES, I'M AWARE THAT THERE'S A
24    DIFFERENCE.
25    Q    AND YOU DID THAT CALCULATION AS PART OF YOUR,
```

1    YOUR ANALYSIS FOR APPLE PROFITS, RIGHT, WHAT

2    THEY'RE SELLING THESE PHONES FOR?

3    A    NO.  I DIDN'T NEED TO KNOW WHAT SAMSUNG WAS

4    SELLING FOR TO GET TO APPLE'S PROFITS PER SE.  I

5    NEEDED APPLE'S PROFITS ON THAT CALCULATION.

6    Q    LET'S SEE IF WE CAN -- CAN WE PUT UP 3909.046.

7            DO YOU REMEMBER IN YOUR REPORT, YOUR

8    SUPPLEMENTAL REPORT, YOU CALCULATED THE AVERAGE

9    IPHONE SELLING PRICE AT $656; RIGHT?

10   A    THAT LOOKS RIGHT, YES.

11   Q    AND YOU CALCULATED THE AVERAGE -- IF WE CAN GO

12   TO THE NEXT --

13   A    BEFORE YOU LEAVE -- WELL, YOU'RE STILL UP

14   THERE.  THIS WAS FOR A SPECIFIC POINT IN TIME.

15   Q    RIGHT.  YOU HAD TO DO IT FOR EVERY -- YOU DID

16   IT FOR EVERY QUARTER; RIGHT?

17   A    YES.

18   Q    AND IF YOU HAVE A PROBLEM WITH THE QUARTER I

19   CHOSE, JUST LET ME KNOW.

20           AND SO THIS IS FIRST QUARTER OF 2011, THE

21   AVERAGE SAMSUNG SELLING PRICE WAS $369 THAT YOU

22   CALCULATED?

23   A    WELL, I CALCULATED -- THOSE ARE ON TWO

24   DIFFERENT BASES.  THAT'S -- I'M SORRY.  APPLE'S

25   PRICE IS THE SALE TO THE CARRIER, AND SAMSUNG'S

1    PRICE IS A SALE TO THE CARRIER, BUT THE ULTIMATE

2    CONSUMER, OF COURSE, PAYS A DIFFERENT PRICE SINCE

3    THE CARRIER SUBSIDIZES.  SO THE REAL PRICE IS NOT

4    656.  IT'S SOMETHING DRAMATICALLY LESS THAT THE

5    CUSTOMER PAYS ULTIMATELY SINCE THE CARRIERS HAVE

6    SUBSIDIZED APPLE'S PRICE.

7    Q    WELL, AS AN ECONOMIST, YOU KNOW THAT THERE'S

8    NO SUCH THING AS A FREE LUNCH; RIGHT?

9    A    NO FREE LUNCH, RIGHT.

10   Q    AND SO WHAT HAPPENS IS WHEN YOU BUY -- IF YOU

11   WANTED TO BUY AN IPHONE FROM APPLE, FOR EXAMPLE, AS

12   OF A COUPLE WEEKS AGO -- I KNOW THERE WERE SOME BIG

13   REDUCTIONS LAST WEEK BECAUSE OF THE IPHONE BEING

14   OUT THERE, THE 5 -- BUT AS OF LAST WEEK, LIKE THE

15   CHEAPEST YOU COULD GET WAS OVER $300.

16   A    I MISSED THE LAST PART OF THAT.

17   Q    THE CHEAPEST YOU COULD GET WAS OVER $300 IF A

18   CONSUMER WANTED TO BUY IT FROM APPLE; RIGHT?

19   A    I DON'T KNOW THAT TO BE A FACT, BECAUSE AS YOU

20   SAY, IT DEPENDS ON THE SPEED OF PHONE, DEPENDS ON

21   THE CAPACITY OF THE PHONE, DEPENDS ON YOUR

22   CARRIER'S SUBSIDY, BECAUSE EVEN IF YOU WALK INTO AN

23   APPLE RETAIL STORE, IF YOU'RE RE-UPPING, THE

24   CARRIER WILL PAY THAT SUBSIDY TO APPLE, SO THAT

25   REDUCES YOUR PRICE THAT YOU HAVE TO PAY.  SO I

```
 1    THINK WE'D HAVE TO LOOK AT A LOT OF CONSIDERATIONS.
 2    Q    YEAH, BUT YOU PAY.  I MEAN, YOU HAVE TO DO A
 3    TWO YEAR CONTRACT AND YOU'RE -- YOU'VE GOT CERTAIN
 4    RIGHTS AND --
 5    A    THAT'S TRUE FOR BOTH.
 6    Q    SO WHAT I'M SAYING IS THAT ONE WAY OR ANOTHER,
 7    THE CARRIER GETS A PROFIT, EVEN IF IT SELLS THE
 8    PHONE TO THE CUSTOMER -- THE PHONE IS BASICALLY A
 9    DOWN PAYMENT PRICE FOR A TWO YEAR PERIOD TO PAY
10    MONEY; RIGHT?
11    A    IF WE'RE TRYING TO MAKE -- I THINK WHAT YOU'RE
12    TRYING TO DO IS MAKE A PRICE COMPARISON.  YOU HAVE
13    TO LOOK AT ULTIMATELY WHAT THE RETAIL CUSTOMER
14    PAYS, AND YOU'RE ABSOLUTELY RIGHT.  WHAT THE
15    CARRIER IS DOING TO TRY AND MAKE ITS INCOME OFF THE
16    SERVICE IS TO OFFER A PHONE THAT'S COMPETITIVE, AND
17    IF THERE'S HIGH DEMAND FOR THE APPLE PHONE, IT'S
18    GOING TO DISCOUNT THAT PHONE SO THAT YOU WILL BUY
19    IT AND BUY THEIR SERVICE, AND THAT'S THE PRICE THAT
20    WE SHOULD BE COMPARING, NOT THE PRICE THAT APPLE
21    SELLS TO THE CARRIER.  IT'S WHAT BOTH -- THE
22    CARRIER SELLS BOTH OF THOSE PRODUCTS.
23            THE COURT:  IT'S 12:02 AND MS. SHORTRIDGE
24    HAS BEEN GOING ALMOST TWO YEARS SINCE WE TOOK OUR
25    BREAK SO EARLY, SO I THINK WE SHOULD TAKE A BREAK.
```

```
 1                    IT'S 12:02.  WE ARE NOW GOING TO BREAK
 2      FOR LUNCH.
 3                    AGAIN, PLEASE KEEP AN OPEN MIND, DON'T
 4      DISCUSS THE CASE WITH ANYONE AND DON'T READ ABOUT
 5      OR RESEARCH THE CASE.  OKAY.  THANK YOU.
 6                    IF YOU WOULD, PLEASE, GO AHEAD AND LEAVE
 7      YOUR JURY BOOKS IN THE JURY ROOM.
 8                    (WHEREUPON, THE FOLLOWING PROCEEDINGS
 9      WERE HELD OUT OF THE PRESENCE OF THE JURY:)
10                    THE COURT:  ALL RIGHT.  THANK YOU ALL
11      VERY MUCH.  WE'LL SEE YOU 1:00 O'CLOCK.
12                    MR. LEE:  YOUR HONOR, JUST ONE THING.  AS
13      THE NEW EXHIBITS ARE COMING IN FOR TOMORROW, I
14      THINK YOUR HONOR STILL HAS ON YOUR PLATE THE
15      WILLIAMS --
16                    THE COURT:  I DO.
17                    MR. LEE:  OKAY.
18                    THE COURT:  I'LL TRY TO GET THAT OUT --
19      IT'LL DEFINITELY GO OUT TODAY.
20                    MR. LEE:  OKAY.  THANK YOU.
21                    THE COURT:  THANK YOU.
22                    (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)
23
24
25
```

```
 1                      AFTERNOON SESSION

 2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 3      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 4              THE COURT:  OKAY.  THANK YOU.  PLEASE

 5      TAKE A SEAT.

 6              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 7      WERE HELD IN THE PRESENCE OF THE JURY:)

 8              THE COURT:  ALL RIGHT.  PLEASE TAKE A

 9      SEAT.

10              THE TIME IS NOW 1:00 O'CLOCK.  GO AHEAD,

11      PLEASE.

12              MR. PRICE:  THANK YOU.

13      Q   DR. MUSIKA, WE WERE TALKING ABOUT PRICES AND I

14      WANT TO ASK YOU ABOUT SOMETHING YOU SAID IN YOUR

15      DIRECT WHERE YOU SAID THAT YOU RELIED ON

16      DR. HAUSER.

17      A   YES.

18      Q   DID YOU TALK TO HIM FOR MORE THAN ONE AND A

19      HALF MINUTES?

20      A   YES.

21      Q   NOW, LET ME ASK YOU SOME SPECIFICS ABOUT YOUR,

22      YOUR METHODOLOGY, AND I'M GOING TO STICK ON APPLE'S

23      LOST PROFITS, OKAY?

24              AND IN PARTICULAR, I WANT TO ASK YOU

25      ABOUT -- OH, ONE THING.  YOU'RE NOT SEEKING ANY
```

```
1    LOST PROFITS AT ALL FOR THE ICON, OR THE DESIGN

2    PATENT D'305; CORRECT?

3    A    THAT'S THE SO-CALLED GUI PATENTS?

4    Q    SURE.

5    A    I'D HAVE TO LOOK, BUT THERE IS --

6    Q    THE ONE WITH THE ICONS.

7    A    YES, YES.

8    Q    OKAY.

9    A    YOU ARE CORRECT.

10   Q    AND SO LET'S LOOK AT -- WE SHOWED YOU THE

11   CAPTIVATE THIS MORNING, WHICH IS EXHIBIT 1011.  I

12   DON'T KNOW IF IT'S MADE ITS WAY BACK IN FRONT OF

13   YOU.

14   A    NO, IT'S NOT HERE.

15   Q    OH, IT'S RIGHT THERE.

16        YOUR HONOR, MAY I APPROACH?

17        THE COURT:  YES, PLEASE.

18   BY MR. PRICE:

19   Q    SO I WANT TO TALK TO YOU ABOUT YOUR

20   CALCULATION FOR LOST PROFITS OF THE CAPTIVATE.

21        YOUR RECORDS SHOW THIS WAS RELEASED IN

22   JULY 2010; CORRECT?

23   A    I DON'T REMEMBER.

24   Q    WELL, LET ME ASK YOU TO ASSUME THAT, THAT THE

25   RECORDS SHOW IT WAS RELEASED IN 2010.
```

2139

```
 1              NOW, TO GET SALES, OBVIOUSLY APPLE HAD TO

 2    BE ABLE TO MAKE PRODUCT FOR SOMEONE WHO WAS GOING

 3    TO LEAVE SAMSUNG AND BUY AN IPHONE; RIGHT?

 4    A    YES.

 5    Q    OKAY.  AND AS OF JULY 2010, THIS WAS ONE OF

 6    SAMSUNG'S, YOU KNOW, LATEST AND GREATEST NEW

 7    PHONES; RIGHT?  WHATEVER DATE IT CAME OUT?

 8    A    YES.

 9    Q    OKAY.  AND YOU -- AND BEFORE PREPARING YOUR

10    SUPPLEMENTAL REPORT, YOU READ THE DEPOSITION

11    TESTIMONY OF TONY BLEVINS; CORRECT?

12    A    I DID.

13    Q    MR. BLEVINS WAS PRESENTED AS A CORPORATE

14    REPRESENTATIVE ON THE ISSUE OF APPLE'S CAPACITY AND

15    ABILITY TO MANUFACTURE PHONES; CORRECT?

16    A    YES.

17    Q    AND MR. BLEVINS TESTIFIED THAT THERE WERE BACK

18    ORDERS FOR THE IPHONE 4 FROM JUNE THROUGH SEPTEMBER

19    2010.  DO YOU RECALL THAT?

20    A    YES.

21    Q    AND HE SAID THAT'S BECAUSE DEMAND EXCEEDED

22    THEIR ABILITY TO PRODUCE THEM DURING JUNE THROUGH

23    SEPTEMBER OF 2010; CORRECT?

24    A    YES.

25    Q    AND HE SPECIFICALLY SAID THAT IN ORDER TO TRY
```

2140

```
 1    TO INCREASE THE SUPPLY, HE CONTACTED COMPONENT
 2    SUPPLIERS, TRIED TO EXPEDITE SHIPPING, AND THAT
 3    NONETHELESS, HE WASN'T ABLE TO PROVIDE THE SUPPLY
 4    BETWEEN JUNE AND SEPTEMBER OF 2010; CORRECT?
 5    A    WELL, WHAT DO YOU MEAN BY -- WHEN YOU SAY HE
 6    WASN'T ABLE TO PROVIDE SUPPLY?  THERE WERE --
 7    Q    OF THE IPHONE 4.
 8    A    THEY DID CERTAINLY PROVIDE SALES OF THE IPHONE
 9    4.  I DON'T REMEMBER EXACTLY WHEN IT WAS LAUNCHED.
10              ARE YOU SAYING THERE WAS A DATE AT WHICH
11    THERE WERE NO IPHONE 4'S FOR SALE?
12    Q    LET ME ASK IT THIS WAY:  DID MR. BLEVINS
13    TESTIFY THAT APPLE DID EVERYTHING IT COULD TO
14    INCREASE THE SUPPLY OF THE IPHONE 4 FROM JUNE OF
15    2010 UNTIL ABOUT SEPTEMBER OF 2010 SO THAT THEY
16    COULD MEET DEMAND?
17    A    I DON'T REMEMBER HIS EXACT TESTIMONY, BUT
18    SOMETHING TO THAT EFFECT, YES.
19    Q    AND FROM ABOUT JUNE OF 2010 TO SEPTEMBER OF
20    2010, APPLE DID NOT HAVE EXCESS SUPPLY OF THE APPLE
21    IPHONE 4; CORRECT?
22    A    JUNE OF 2010 UNTIL WHEN?
23    Q    SEPTEMBER OF 2010.
24              ACTUALLY, LET ME REPHRASE THAT AND LOOK
25    AT THE NEXT QUESTION.
```

```
 1              FROM JUNE 2010 UNTIL OCTOBER OF 2010,
 2    APPLE DID NOT HAVE EXCESS SUPPLY OF THE IPHONE 4;
 3    CORRECT?
 4    A    I'M JUST LOOKING.
 5    Q    IF YOU WANT TO LOOK AT HIS DEPOSITION
 6    TESTIMONY, IT'S IN THE GREEN BINDER DATED APRIL 3,
 7    2012.
 8    A    OKAY.
 9    Q    THAT'S THE TESTIMONY COLLECTION HERE.  IT
10    SHOULD BE THE LAST TAB THERE, PAGE 17, LINES 1
11    THROUGH 7.  DO YOU SEE THAT?
12    A    YES, I DO.
13    Q    SO BETWEEN JUNE OF 2010 THROUGH OCTOBER OF
14    2010, APPLE DID NOT HAVE EXCESS SUPPLY OF THE
15    IPHONE; CORRECT?
16    A    THAT'S CORRECT.
17    Q    IPHONE 4?
18    A    THAT'S CORRECT.
19    Q    SO IF WE LOOK AT YOUR -- AT THE CALCULATION
20    HERE, YOU CALCULATED THE PROFIT ON THIS PHONE -- IF
21    WE CAN PUT UP DEMONSTRATIVE 3909.4 -- AND WE CAN GO
22    THROUGH THIS TO 5, AND THEN -- WHAT NUMBERS ARE
23    THESE?  LET'S JUST KEEP GOING TO 49.  GO ON TO 50
24    AND JUST DO THE SUMMARY.  OKAY.  RIGHT THERE.
25              SO IN YOUR REPORT, EXHIBIT 17.2-S, YOU'VE
```

1    GOT SALES AND PROFITS FOR SALES FOR THE SAMSUNG

2    GALAXY S CAPTIVATE TOTALING ABOUT $199 MILLION.  DO

3    YOU SEE THAT?

4    A    I DO.

5    Q    AND THAT'S WHAT APPLE WOULD, YOU BELIEVE,

6    WOULD HAVE GOTTEN IN PROFITS BECAUSE IT WOULD HAVE

7    SOLD MORE PHONES; CORRECT?

8    A    I DON'T REMEMBER THE EXACT NUMBERS, BUT I

9    THINK THIS IS PROBABLY ACCURATE, YES.

10   Q    AND THIS IS A TIME WHEN APPLE COULDN'T EVEN

11   SERVICE ITS OWN CUSTOMERS FOR THE IPHONE 4;

12   CORRECT?

13   A    WELL, YES, WITH THE IPHONE 4.  THEY HAD

14   AVAILABLE IPHONES, BUT NOT THE IPHONE 4.

15   Q    SO APPLE COULDN'T SERVICE ITS OWN CUSTOMERS

16   FOR THE IPHONE 4, BUT IT COULD SERVICE THE

17   CUSTOMERS IT DIDN'T HAVE, THAT IT WOULD HAVE GOTTEN

18   FROM SAMSUNG DURING THAT SAME TIMEFRAME?

19   A    IPHONE 3'S, 3G, NOT IPHONE.

20   Q    OH.  SO NOW YOU'RE -- SO YOU'RE SAYING -- TO

21   GET TO YOUR $199 MILLION FIGURE HERE, YOU'RE SAYING

22   THAT CUSTOMERS WOULD HAVE GIVEN UP THEIR SAMSUNG,

23   FOR EXAMPLE, BECAUSE IT DIDN'T HAVE A BOUNCE, AND

24   GONE TO APPLE AND BOUGHT AN OLD MODEL THAT THE

25   WORLD -- WHEN THE WORLD WAS WAITING FOR THE IPHONE

1    4?

2    A    THERE'S A LOT IN THAT QUESTION.  I DON'T THINK

3    THE WHOLE WORLD WAS WAITING FOR IT.  I BOUGHT AN

4    IPHONE 4, FOR EXAMPLE, WHEN THE 4S CAME OUT BECAUSE

5    IT WAS CHEAPER AND I'M A LITTLE CHEAP MAYBE.  BUT

6    I -- I WENT AHEAD AND BOUGHT IT.

7              SO THERE CERTAINLY ARE PEOPLE OUT THERE

8    WHO BUY, AND APPLE CONTINUED TO SELL THE IPHONE 3

9    AND THE IPHONE 3G DURING THAT PERIOD OF TIME.

10             SO FACED WITH THAT OPTION, WOULD SOME

11   PERCENTAGE OF THE CONSUMERS HAVE PURCHASED THE

12   IPHONE 3 OR IPHONE 3G, PARTICULARLY SINCE IT WAS

13   CHEAPER?  YES, I THINK THEY WOULD HAVE.

14   Q    WELL, THIS PARTICULAR CONSUMER, YOU SAID,

15   BOUGHT THE CAPTIVATE, WHICH WAS SAMSUNG LATEST AND

16   GREATEST PHONE, THE NEXT NEW THING IN JULY THROUGH

17   OCTOBER OF 2010, AND YOU'RE SAYING THAT, TO THE

18   TUNE OF $199 MILLION, THEY WOULD HAVE GIVEN UP THAT

19   PHONE BECAUSE IT LACKED BOUNCE BACK AND BOUGHT, NOT

20   THE LATEST AND GREATEST, BUT A PHONE THAT WAS A

21   YEAR OLD AT APPLE WHEN APPLE COULDN'T MAKE THE

22   IPHONE 4, ANYMORE?

23   A    THAT'S SOMEWHAT OF A LARGE STATEMENT.  I

24   DIDN'T SAY EXCLUSIVELY BECAUSE OF THE BOUNCE.

25   Q    SO I WANT -- ANYWAY, THIS IS PART OF YOUR

2144

```
 1    ANALYSIS.  WE DIDN'T GO INTO MUCH DETAIL, BUT YOU
 2    DID SOME ANALYSIS ON CAPACITY; RIGHT?
 3    A    I DID.
 4    Q    AND YOU HAD TO RELY ON MR. BLEVINS' TESTIMONY,
 5    IN PART, BECAUSE OF THAT; CORRECT?
 6    A    THAT'S CORRECT.
 7    Q    AND MR. BLEVINS' TESTIMONY ABOUT THEIR
 8    CAPACITY; RIGHT?
 9    A    YES.
10    Q    AND HIS ANALYSIS ASSUMED THAT A WORKER -- THAT
11    ASSUMED 19 TO 20 HOUR WORKDAYS SIX DAYS A WEEK;
12    RIGHT?
13    A    SAY THAT AGAIN.  19 --
14    Q    HIS ANALYSIS FOR CAPACITY, THAT IS, ENOUGH
15    CAPACITY TO MAKE PHONES ASSUMED 19 TO 20 HOUR
16    WORKDAYS SIX DAYS A WEEK?
17    A    NOT FOR THE SAME WORKER.  THAT'S SHIFTS.
18    Q    THAT'S NOT THE SAME WORKER?
19    A    I DON'T THINK SO, NO.
20    Q    OKAY.  LET ME ASK YOU, AGAIN, A LITTLE BIT,
21    SINCE WE HAVEN'T GONE INTO MUCH DETAIL, I JUST WANT
22    TO HIGHLIGHT A FEW DETAILS.
23            FOR THE IPAD, IN DOING LOST PROFITS, YOU
24    DID A MARKET CALCULATION, AGAIN, TO TRY TO GIVE A
25    NUMBER AS TO HOW MANY PEOPLE WOULD LEAVE THE TABLET
```

```
 1              THE COURT:  I'M SORRY.  CAN YOU REPEAT

 2    THE QUESTION?

 3              (WHEREUPON, THE RECORD WAS READ BY THE

 4    COURT REPORTER.)

 5              THE COURT:  OVERRULED.

 6              GO AHEAD, PLEASE.

 7              THE WITNESS:  YES.  AS I WAS INDICATING,

 8    I LOOKED AT THIS REPORT ANALYSIS BY SAMSUNG FOR

 9    PURPOSES OF SUPPORT FOR DEMAND, WAS THERE DEMAND?

10              I'M NOT HERE TO TALK ABOUT COPYING.

11              AND HERE SPECIFICALLY, FACTORS THAT COULD

12    MAKE AN IPHONE A SUCCESS, EASY, INTUITIVE, USER

13    INTERFACE ON ALL CLASSES, AND THEN MORE

14    SPECIFICALLY, BEAUTIFUL DESIGN.

15              SO I WAS LOOKING FOR AND FOUND EVIDENCE

16    OF THE DESIGN ELEMENT BEING A FUNCTION OR A FACTOR

17    IN THE DEMAND.

18    BY MS. KREVANS:

19    Q    IN SAMSUNG'S OWN WORDS?

20    A    YES.

21    Q    OKAY.  LET'S LOOK AT ANOTHER THING THAT

22    MR. PRICE ASKED YOU ABOUT.

23              COULD WE PUT UP SAMSUNG'S SLIDE SDX

24    3909.053, PLEASE, MR. LEE.

25              DO YOU RECALL MR. PRICE ASKED YOU A
```

```
1    NUMBER OF QUESTIONS ABOUT CAPTIVATE SALES AND

2    APPLE'S CAPACITY ABOUT THIS SLIDE IN ASKING YOU

3    WHETHER THIS WAS $199 MILLION OUT OF YOUR LOST

4    PROFITS CALCULATION?

5    A    RIGHT.

6    Q    DO THE NUMBERS THAT MR. PRICE HAS SET FORTH ON

7    THIS SLIDE ADD UP TO $199 MILLION?

8    A    NO.  THAT'S -- I MEAN, JUST OFF THE TOP OF MY

9    HEAD, 30, 60, 80, 115, 120, 120,000.  120 MILLION.

10   SORRY.

11   Q    OKAY.  LET'S GO BACK TO A QUESTION THAT

12   MR. PRICE ASKED YOU EARLIER BEFORE LUNCH.

13          DO YOU RECALL -- I THINK THIS WAS BEFORE

14   LUNCH.  DO YOU RECALL HE WAS ASKING YOU ABOUT WHAT

15   WOULD HAPPEN IF THE JURY FOUND THAT SOME PATENTS

16   WERE, AND TRADE DRESS WERE NOT INFRINGED, BUT OTHER

17   PATENTS WERE INFRINGED?

18   A    YES.

19   Q    AND HE ASKED YOU WHETHER YOU HAD GIVEN THE

20   JURORS INFORMATION THAT WOULD LET THEM FIGURE OUT

21   WHAT WOULD BE THE APPROPRIATE ROYALTIES OR DAMAGES

22   IN THAT SITUATION.

23          YOU SAID THAT YOU HAD GIVEN THEM THE

24   TOOLS?

25   A    YES, THAT'S CORRECT.
```

```
1    Q    AND WHAT TOOLS DID YOU GIVE THE JURORS THAT

2    WOULD LET THEM FIGURE OUT ROYALTIES ON A

3    PATENT-BY-PATENT BASIS?

4    A    WELL, I'M GOING TO GIVE A BROAD -- A GENERAL

5    ANSWER AND THE COURT CAN ASK ME TO DO IT IN A MORE

6    DETAILED FASHION.

7            BUT I WOULD POINT THE JURORS TO PX 25A-1

8    BECAUSE I THINK THE INFORMATION THAT'S CONTAINED IN

9    THERE, WE WENT THROUGH IN SUMMARY, WOULD PERMIT

10   THEM TO ADJUST DATES AND ADJUST VOLUMES AND ADJUST

11   THEIR DAMAGES APPROPRIATELY BASED ON THE CHANGES

12   THAT HE WAS SUGGESTING.

13   Q    COULD YOU SHOW US THE LAST PAGE OF 25A-1,

14   MR. LEE.

15           WHAT IS THE INFORMATION THAT IS SET OUT

16   ON THE LAST PAGE OF EXHIBIT 25A-1?

17   A    IT IS A DETAILED SCHEDULE OF,

18   PATENT-BY-PATENT, THE ULTIMATE REASONABLE ROYALTY

19   RATES.  SO ON THE LEFT, FOR EXAMPLE, THE '381

20   PATENT, ITS ANALYSIS IN BETWEEN WOULD GO ALL THE

21   WAY TO THE RIGHT, THE ROYALTY IS $2.02 FOR THAT.

22           AND SO FORTH DOWN TO WHERE WE GET TO THE

23   DESIGN AS I HAD INDICATED.

24   Q    IF -- IF THE JURORS WANTED TO CALCULATE JUST A

25   ROYALTY NUMBER FOR ANY OF THE PATENTS THAT ARE SET
```

1    OUT ON THIS CHART, WOULD THEY NEED INFORMATION

2    BEYOND WHAT IS ON THIS PAGE?

3    A    WELL, THEY'D NEED UNITS, YES.

4    Q    AND WHERE WOULD THEY FIND THAT?

5    A    THEY WOULD FIND THAT -- THEY CAN DETERMINE

6    WHICH PRODUCTS WERE ACCUSED OF INFRINGING WHICH

7    PATENT UP ON PAGE 3 OF 16 IN 25A.

8    Q    OKAY.  SO SAME EXHIBIT, PAGE 3?

9    A    YES.

10   Q    OKAY.  AND THIS IS A CHART THAT TELLS US WHAT?

11   A    IT TELLS US, PRODUCT-BY-PRODUCT, WHICH PATENTS

12   ARE ACCUSED.  SO LET'S JUST USE AN EXAMPLE,

13   CAPTIVATE.  IF WE CAN BLOW THAT CAPTIVATE UP.  WE

14   CAN SEE THE CAPTIVATE IS ACCUSED OF INFRINGING THE

15   '163, THE '381, AND THE '915.  SO YOU WOULD

16   MULTIPLY THE RATE TIMES -- FOR EACH OF THOSE

17   UTILITY PATENTS.

18          IF WE MOVED ACROSS, WE WOULD SEE THAT

19   IT'S NOT ACCUSED OF INFRINGING ANY OF THE DESIGN

20   PATENTS EXCEPT THE '305.  AND IF YOU MOVE FURTHER

21   ACROSS, IT'S ACCUSED OF INFRINGING THREE OF THE

22   TRADE DRESS.

23          BUT AS WE REMEMBER FROM THE, FROM THE

24   ROYALTY RATE, WHETHER IT'S ONE OR ALL OF THEM, THAT

25   WOULD BE $24.

```
1            SO THEY KNOW, ONCE IT'S INFRINGING ONE OF
2    THOSE EITHER DESIGN PATENTS OR TRADE DRESS, IT'S
3    $24, AND THEN THE UNIT TIMES EACH OF THE UTILITY
4    PATENTS THAT ARE INFRINGED.
5    Q    AND WHERE IN THE INFORMATION THAT YOU'VE GIVEN
6    THE JURY WOULD THEY FIND THE NUMBER OF UNITS SOLD?
7    A    THE NUMBER OF UNITS SOLD, WE WOULD GO UP TO
8    THE JOINT EXHIBIT, 1500, AND REMEMBER WE KIND OF
9    STARTED THERE.  THAT'S THAT DETAILED -- THERE WE
10   GO -- AND THERE'S PRODUCT-BY-PRODUCT AND
11   PERIOD-BY-PERIOD BOTH IN UNITS AND IN DOLLARS.
12           MS. KREVANS:  NOTHING FURTHER, YOUR
13   HONOR.
14           THE COURT:  OKAY.  THE TIME IS 1:34.  ANY
15   RECROSS?
16              RECROSS-EXAMINATION
17   BY MR. PRICE:
18   Q    SIR, I HEARD YOU SAY SOMETHING ABOUT $24, AND
19   THAT PART OF YOUR CALCULATION ASSUMES THAT THERE
20   HAS BEEN INFRINGEMENT OF A DESIGN PATENT FOR TRADE
21   DRESS.
22   A    ONE OR MORE, YES.
23   Q    OKAY.  SO IF WE'RE TALKING ABOUT JUST THE, FOR
24   EXAMPLE, THE '381 PATENT, YOU WOULDN'T BE USING
25   THAT NUMBER?
```

9166

```
1    A    NO, YOU WOULD NOT.

2    Q    AND YOU SAID THAT YOU COULD GO FROM YOUR

3    ROYALTY, ASSUMING IT'S CORRECT, LOOKING AT THE

4    GRAPH AND THEN LOOKING AT 1500; IS THAT RIGHT?

5    A    YES.

6    Q    WELL, IS IT TRUE THAT -- FOR THE CAPTIVATE

7    HERE, FOR EXAMPLE, HAVE YOU MADE A FINDING THAT ALL

8    OF THE CAPTIVATE, OR YOU'RE ASSUMING THAT ALL OF

9    THE CAPTIVATE PHONES INFRINGE A CERTAIN CLAIM, A

10   CERTAIN PATENT?

11   A    WELL, DEPENDS ON THE TIMING OF THE PATENT

12   AGAIN.

13   Q    AND WHEN YOU LOOK AT THESE NUMBERS ON 1500, I

14   MEAN, THERE'S A CERTAIN TIMEFRAME, RIGHT, YEAH,

15   THAT YOU HAVE TO LOOK AT TO SEE WHETHER OR NOT

16   SOMETHING INFRINGES THE PATENT; RIGHT?

17   A    ABSOLUTELY RIGHT.

18   Q    AND HAVE YOU DONE THAT ON 1500?

19   A    I'M SORRY.  HAVE I DONE WHAT ON 1500?

20   Q    IDENTIFIED WHICH UNITS INFRINGE AND WHICH

21   DON'T?

22   A    ALL THESE UNITS INFRINGE.

23   Q    OKAY.  SO YOU'RE SAYING --

24   A    THESE ARE ALL ACCUSED -- THIS IS EQUAL TO THE

25   22 MILLION UNITS OF THE ACCUSED DEVICES AND THE $8
```

```
 1    BILLION.  SO EVERY UNIT ON HERE IS INFRINGING.
 2    Q    OKAY.  SO YOUR TESTIMONY IS THAT IF YOU LOOK
 3    AT 1500, EVERY UNIT ON HERE IS INFRINGING AND ALL
 4    YOU HAVE TO DO IS ADD THESE UP?  IS THAT WHAT
 5    YOU'RE SAYING?
 6    A    ADD WHAT UP?
 7    Q    WELL, I ASSUME YOU'RE TALKING ABOUT ADDING UP
 8    UNITS.  WHERE IT SAYS UNITS -- FOR EXAMPLE, UNDER
 9    CAPTIVATE, IT HAS UNITS.  DO YOU SEE THAT?
10    A    I DO.
11    Q    AND YOU'RE SAYING YOU JUST HAVE TO ADD THOSE
12    UNITS UP AND THEY'RE ALL INFRINGING?
13    A    THEY ARE ALL INFRINGING --
14    Q    ALLEGEDLY?
15    A    I'M SORRY?
16    Q    I'M SORRY.  APPLE'S CLAIMED THEY INFRINGE?
17    A    YOU TRAILED OFF.
18    Q    THE IPAD -- YOU'RE ASSUMING THAT APPLE ALLEGES
19    THAT ALL OF THESE UNITS INFRINGE?
20    A    ONE OR MORE OF THE PATENTS OR TRADE DRESS,
21    YES.
22              MR. PRICE:  JUST ONE SECOND.
23              (PAUSE IN PROCEEDINGS.)
24    BY MR. PRICE:
25    Q    AND IS IT YOUR UNDERSTANDING THAT FOR THESE
```

```
1    PARTICULAR PATENTS, THAT THERE ARE DIFFERENT NOTICE

2    DATES FROM WHICH DAMAGES RUN?

3    A    YES.

4    Q    AND IS THAT REFLECTED ON THIS CHART, 1500, THE

5    DIFFERENT NOTICE DATES?

6    A    NO.

7    Q    AND WOULDN'T YOU HAVE TO APPLY THAT TO FIGURE

8    OUT WHAT THE DAMAGES SHOULD ACTUALLY BE?

9    A    WELL, YOU'RE ASSUMING THAT THERE ARE DIFFERENT

10   NOTICE DATES.

11   Q    AND WERE YOU ASKED -- THIS IS ANOTHER FACT YOU

12   WERE ASKED TO ASSUME, THAT THERE'S ONLY ONE NOTICE

13   DATE?

14   A    I'M -- THAT'S A LEGAL DETERMINATION AS TO WHAT

15   THE NOTICE DATE IS.

16         BUT THESE DAMAGES ARE BASED ON A SPECIFIC

17   NOTICE DATE, YES.

18   Q    OKAY.  WHAT DAMAGES -- WHAT NOTICE DATE ARE

19   THESE BASED ON?

20   A    THESE ARE BASED ON -- FOR THE TRADE DRESS, IT

21   WOULD BE AT THE TIME THAT THE TRADE DRESS -- FOR

22   THE UNREGISTERED TRADE DRESS, I'M SORRY, AT THE

23   TIME THE PRODUCTS WERE SOLD SINCE THE UNREGISTERED

24   TRADE DRESS WAS IN THE MARKET PRIOR TO THE LAUNCH

25   OF THE ACCUSED PRODUCTS.  SO THOSE WOULD BE FOR THE
```

```
1    ENTIRE PERIOD.

2              FOR ALL OTHER DEVICES THAT ARE IN HERE,

3    IT'S THE AUGUST 11TH OF 2010, I THINK -- I'D HAVE

4    TO GO RESEARCH, BUT I THINK IT'S AUGUST 11TH, 2010

5    IS THE NOTICE PERIOD.

6    Q    AND THAT'S REFLECTED ON YOUR CHART HOW?

7    A    IT'S REFLECTED IN HERE SOMEWHERE.  THAT'S THE

8    DATE, I BELIEVE, AT WHICH THE FIRST MEETING BETWEEN

9    APPLE AND SAMSUNG TOOK PLACE WHERE APPLE NOTIFIED

10   SAMSUNG OF THEIR COMPLAINT.

11   Q    AND IF WE COULD LOOK AT -- YOU WERE SHOWN PAGE

12   34.38, PLAINTIFF'S EXHIBIT, WHERE YOU'RE TALKING

13   ABOUT DEMAND.

14             AND I THINK THIS WAS BLOWN UP, SUCCESS

15   FACTORS FOR THE IPOD -- I'M SORRY -- FACTORS THAT

16   COULD MAKE IPHONE A SUCCESS.

17             DO YOU SEE THAT?

18   A    YES.

19   Q    AND DO YOU SEE HOW, WHERE IT TALKS ABOUT THE

20   INTUITIVE U/I; RIGHT?

21   A    YES.

22   Q    AND IT SAYS BEAUTIFUL DESIGN?

23   A    YES.

24   Q    AND THEN IT SAYS SEAMLESS INTEGRATION OF

25   HARDWARE.  AGAIN, HARDWARE IS NOT THE SAME AS
```

1    DESIGN, IS IT, AS IT'S BEING USED HERE?

2    A    I DON'T KNOW.

3    Q    BUT THAT'S ACTUALLY THE PART YOU WERE ASKED TO

4    LOOK AT.  YOU SAID YOU UNDERSTOOD WHAT YOU WERE

5    ASKED TO LOOK AT, SO I JUST -- LOOKING AT THIS, YOU

6    REALIZE THAT THIS DOCUMENT, GIVEN WHERE IT'S COMING

7    FROM, WHICH IS THE HARDWARE PART OF THE COMPANY

8    THAT MAKES THESE BRAINS, PROCESSORS, IT'S

9    DISTINGUISHING BETWEEN THE DESIGN AND THE HARDWARE?

10   IT'S DISTINGUISHING; RIGHT?

11   A    IT'S LISTED SEPARATELY, YES.

12   Q    SO THEY'RE TALKING ABOUT DIFFERENT THINGS?

13   A    I DON'T KNOW.

14            (PAUSE IN PROCEEDINGS.)

15            MR. PRICE:  MY BRAIN TRUST TELLS ME I'M

16   DONE.  THANK YOU.

17            THE WITNESS:  THANK YOU.

18            THE COURT:  ALL RIGHT.  THE TIME IS NOW

19   1:30.

20            IS THERE GOING TO BE ANY RE-REDIRECT OR

21   NO?

22            MS. KREVANS:  THERE IS VERY BRIEF, YOUR

23   HONOR.

24            THE COURT:  OKAY.  IT'S 1:40.  GO AHEAD,

25   PLEASE.

```
 1              MS. KREVANS:  MR. LEE, WOULD YOU PUT UP

 2     THAT SAME PAGE?  I THINK THAT WAS EXHIBIT 34 AT

 3     PAGE 38.

 4              FURTHER REDIRECT EXAMINATION

 5     BY MS. KREVANS:

 6     Q    MY FIRST QUESTION IS A VERY QUICK ONE,

 7     MR. MUSIKA.  THE LINE OF -- THIS SAMSUNG DOCUMENT

 8     THAT MR. PRICE JUST POINTED YOU TO THAT STARTS WITH

 9     THE WORDS "SEAMLESS INTEGRATION OF HARDWARE," WHAT

10     DOES THE WHOLE LINE ACTUALLY SAY?

11     A    "SEAMLESS INTEGRATION OF HARDWARE, SW," WHICH

12     I UNDERSTAND TO BE SOFTWARE, "AND CONTENTS USING

13     ITUNES."

14     Q    OKAY.  AND COULD YOU GO BACK TO EXHIBIT 25A-1

15     IN YOUR BINDER?

16              AND MR. LEE, COULD YOU SHOW US THE SECOND

17     PAGE OF THAT EXHIBIT?

18              COULD YOU REMIND US WHAT'S SHOWN ON THIS

19     PAGE?

20     A    YES.  SO THIS IS THE DAMAGE SUMMARY, AND THIS

21     IS THE PAGE THAT SETS FORTH THE NOTICE THAT I WAS

22     RECITING.

23     Q    OKAY.  AND YOU WERE TRYING TO REMEMBER A DATE

24     JUST FROM MEMORY.  CAN YOU TELL US WHAT THIS PAGE,

25     WHAT THE ACTUAL DATE WAS IN AUGUST THAT YOU USED
```

1    FOR NOTICE FOR THINGS OTHER THAN UNREGISTERED TRADE

2    DRESS?

3    A    YES.  IT'S LISTED THERE.  IT IS AUGUST, BUT

4    IT'S AUGUST 4TH, 2010.  I THINK I PROBABLY SAID

5    AUGUST 11TH INCORRECTLY.  BUT IT'S AUGUST 4TH,

6    2010.

7              MS. KREVANS:  THANK YOU VERY MUCH.

8              THE COURT:  ALL RIGHT.  IT'S 1:42.  ANY

9    RE-RECROSS-EXAMINATION?

10             MR. PRICE:  NO, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  MAY THIS WITNESS

12   BE EXCUSED?

13             MS. KREVANS:  HE MAY SUBJECT TO RECALL,

14   YOUR HONOR.

15             THE COURT:  ALL RIGHT.  YOU'RE EXCUSED

16   SUBJECT TO RECALL.

17             THE WITNESS:  THANK YOU, YOUR HONOR.

18             MR. MCELHINNY:  YOUR HONOR, SUBJECT TO

19   STIPULATION AND ORDER OF THE COURT AS TO ORDER AND

20   PRODUCTION OF PROOF, WHICH RESERVES OUR CONTRACT,

21   ANTITRUST, UNFAIR COMPETITION AND DECLARATORY

22   JUDGMENT ACTIONS, SUBJECT TO THAT STIPULATION, WE

23   REST OUR CASE-IN-CHIEF.

24             THE COURT:  OKAY.  ALL RIGHT.

25             SO LADIES AND GENTLEMEN OF THE JURY, WE

```
 1              (WHEREUPON, A RECESS WAS TAKEN.)

 2              THE COURT:  ALL RIGHT.  THANK YOU.

 3     PLEASE TAKE A SEAT.  LET'S BRING IN OUR JURY.

 4              MR. JACOBS:  YOUR HONOR, BEFORE THEY COME

 5     IN?

 6              THE COURT:  YES?

 7              MR. JACOBS:  THERE'S AN EXHIBIT ON THE

 8     OTHER MATERIALS, ON THE LIST OF MATERIALS THAT

 9     SAMSUNG INTENDS TO USE.  IT'S THE -- IT'S SDX

10     3951.011.

11              IT'S A DIFFERENT DEVICE FROM THE DEVICE

12     THAT'S ON THE EXHIBIT LIST FOR THIS -- RELEVANT TO

13     THIS WITNESS.  IF IT'S NOT GOING TO BE USED OR

14     COMING IN, THEN WE DON'T NEED TO DEAL WITH IT, BUT

15     I WOULD ASK BEFORE THE JURY COMES IN.

16              THE COURT:  3951, WHAT WERE THE LAST

17     THREE OR FOUR DIGITS?

18              MR. JACOBS:  .011.

19              THE COURT:  I DON'T HAVE THAT IN MINE.

20              MR. JACOBS:  TERRIFIC.  MAYBE IT WON'T

21     COME IN.

22              THE COURT:  MINE ENDS AT .010.

23              MR. DEFRANCO:  WE ACTUALLY HAVE A SLIDE

24     OF THIS THAT WE'RE GOING TO MOVE TO ENTER INTO

25     EVIDENCE, BUT NOT THE DEVICE ITSELF, SO WE DON'T
```

```
 1    NEED TO WORRY ABOUT IT BECOMING PART OF THE RECORD,

 2    THE .011.

 3              MR. JACOBS:  SAME OBJECTION, YOUR HONOR,

 4    BUT I DON'T KNOW THAT I SEE THE SLIDE.

 5              THE COURT:  I DON'T HAVE THE SLIDE,

 6    EITHER.

 7              MR. DEFRANCO:  THE SLIDE IS 3951.006.

 8    IT'S JUST A PHOTOGRAPH OF THE SAME DEVICE.

 9              MR. JACOBS:  WE WOULD OBJECT, YOUR HONOR.

10              THE COURT:  WHAT'S THE OBJECTION?

11              MR. JACOBS:  THE DEVICE IS NOT ON THE

12    EXHIBIT LIST.  THE PHOTO OF THE DEVICE SHOULD NOT

13    COME IN.

14              THE COURT:  IF THE DEVICE IS NOT ON THE

15    LIST, THEN IT'S EXCLUDED.

16              ALL RIGHT.  WHAT ELSE?

17              MR. JACOBS:  WE'RE READY, YOUR HONOR.

18              THE COURT:  OKAY.  THEN WOULD YOU PLEASE

19    BRING IN THE JURY?

20              THE CLERK:  YES, YOUR HONOR.

21              (WHEREUPON, THE FOLLOWING PROCEEDINGS

22    WERE HELD IN THE PRESENCE OF THE JURY:)

23              THE COURT:  THANK YOU FOR YOUR PATIENCE.

24    SORRY TO MAKE YOU WAIT SO LONG, BUT WE HAD TO TAKE

25    CARE OF SOMETHING.
```

1          IT'S 3:04.  PLEASE CALL YOUR FIRST

2     WITNESS.

3               MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

4               SAMSUNG, AS YOUR HONOR KNOW, HAS ALREADY,

5     BY AGREEMENT, CALLED ITS FIRST WITNESS OUT OF

6     ORDER, MR. JUSTIN DENISON.  HE WAS OUR FIRST

7     WITNESS.

8               WE HAVE THREE THIRD PARTY WITNESSES, YOUR

9     HONOR, THAT WE'RE GOING TO NEED TO CALL OUT OF

10    ORDER.

11              THE FIRST IS -- AND THIS IS THE ONE WE'RE

12    CALLING RIGHT NOW -- PROFESSOR BEN BEDERSON.

13              MR. DEFRANCO:  GOOD AFTERNOON, YOUR

14    HONOR.  ED DEFRANCO FOR SAMSUNG.  I'LL BE

15    PRESENTING THIS WITNESS.

16              THE COURT:  OKAY.  GOOD AFTERNOON.

17              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

18                    **BENJAMIN BEDERSON,**

19    BEING CALLED AS A WITNESS ON BEHALF OF THE

20    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

21    EXAMINED AND TESTIFIED AS FOLLOWS:

22              THE WITNESS:  YES.

23              THE CLERK:  PLEASE BE SEATED.

24              THE COURT:  IT'S 3:05.  GO AHEAD.

25              MR. DEFRANCO:  THANK YOU, YOUR HONOR.

1                    **DIRECT EXAMINATION**

2      BY MR. DEFRANCO:

3      Q    GOOD AFTERNOON.  WOULD YOU PLEASE STATE YOUR

4      FULL NAME FOR THE RECORD?

5      A    YES.  I'M BENJAMIN BORIS BEDERSON.

6      Q    WHAT IS YOUR OCCUPATION?

7      A    I'M A PROFESSOR OF COMPUTER SCIENCE AT THE

8      UNIVERSITY OF MARYLAND.

9      Q    SIR, HOW LONG HAVE YOU BEEN A PROFESSOR AT THE

10     UNIVERSITY OF MARYLAND?

11     A    ABOUT 15 YEARS.  I GOT THERE IN 1998.

12     Q    WOULD YOU PLEASE JUST GIVE US A BRIEF

13     DESCRIPTION OF YOUR RESPONSIBILITIES AS A

14     PROFESSOR.

15     A    SURE.  I TEACH AND ADVISE GRADUATE STUDENTS,

16     PERFORM RESEARCH, AND HELP THE UNIVERSITY

17     COMMUNITY.

18     Q    AND DR. BEDERSON, GIVE US A BIT ABOUT YOUR

19     EDUCATIONAL BACKGROUND.

20     A    I HAVE THREE DEGREES IN COMPUTER SCIENCE,

21     ENDING WITH A PH.D. THAT I GOT FROM NEW YORK

22     UNIVERSITY IN 1992.

23     Q    APART FROM YOUR WORK AS A PROFESSOR AT THE

24     UNIVERSITY OF MARYLAND, ARE YOU AFFILIATED WITH ANY

25     COMPANIES?

1    A    YES.  I CO-FOUNDED A COMPANY CALLED ZUMOBI IN

2    SEATTLE THAT I'M CURRENTLY CHIEF SCIENTIST AT.  WE

3    MAKE MOBILE APPS AND ADS, ADVERTISEMENTS.

4    Q    YOU'RE HERE TO TESTIFY AS A FACT WITNESS.  DO

5    YOU UNDERSTAND THAT?

6    A    YES.

7    Q    AND HAVE YOU IN ANY WAY BEEN COMPENSATED FOR

8    YOUR TIME IN THE CASE?

9    A    YES.  NOT FOR MY TIME HERE TODAY, BUT FOR MY

10   TIME PREPARING, REVIEWING CODE, ATTENDING MY

11   DEPOSITION.  I GET PAID $450 AN HOUR, MY STANDARD

12   CONSULTING RATE, AND I'VE WORKED ABOUT 100 HOURS SO

13   FAR.

14   Q    OKAY.  LET'S SHIFT GEARS.  LET'S TALK ABOUT

15   YOUR SOFTWARE PROGRAM.  IT'S CALLED -- WHAT'S THE

16   NAME OF IT?

17   A    LAUNCHTILE.

18   Q    IN A SENTENCE OR TWO, PLEASE, DOCTOR, TELL US

19   WHAT LAUNCHTILE IS.

20   A    IT'S A MOBILE GRAPHICAL USER INTERFACE

21   APPLICATION TO LET PEOPLE ACCESS A LOT OF

22   INFORMATION ON A MOBILE DEVICE.

23   Q    OKAY.  WE'RE GOING TO LOOK AT SOME VIDEO OF

24   THE DEVICE ITSELF.  LET'S GIVE A LITTLE BIT OF

25   BACKGROUND FIRST.  OKAY?  ARE YOU WITH ME?

```
 1              DID OTHERS WORK WITH YOU ON THE
 2    DEVELOPMENT OF LAUNCHTILE?
 3    A    YES.  I WORKED ON -- WITH A FEW PEOPLE.  MY
 4    PH.D. GRADUATE STUDENT, AMY KARLSON; RESEARCH
 5    ASSISTANT, AARON CLAMAGE; AND THE WORK WAS DONE IN
 6    COLLABORATION WITH MICROSOFT AND THEY SPONSORED THE
 7    RESEARCH, THEY PAID FOR IT, SO I WORKED WITH
 8    SOMEONE THERE NAMED JOHN SANGIOVANNI.
 9    Q    GENERALLY, WHAT LED YOUR TEAM TO COME ABOUT TO
10    DEVELOP LAUNCHTILE?
11    A    WE WERE TRYING TO SOLVE TWO MAJOR PROBLEMS.
12    ONE WAS HOW TO FIT A LOT OF INFORMATION ON A SMALL
13    DEVICE; AND THE SECOND WAS TO DESIGN A USER
14    EXPERIENCE THAT PEOPLE COULD USE WITH JUST A SINGLE
15    HAND RATHER THAN TWO HANDS OR A STYLUS.
16    Q    DID YOU SOLVE THOSE PROBLEMS?
17    A    I BELIEVE WE DID.
18    Q    TELL US HOW YOU DID IT, PLEASE.
19    A    I HAD BEEN WORKED FOR ALMOST TEN YEARS AT THE
20    TIME ON AN INTERFACE APPROACH I CALLED ZOOMABLE
21    USER INTERFACES, AND WE APPLIED THAT TECHNIQUE TO
22    LAUNCHTILE.
23    Q    OKAY.  CAN YOU JUST GIVE US A SENTENCE OR TWO
24    ABOUT WHAT A ZOOMABLE USER INTERFACE IS.
25    A    SURE.  GENERALLY SPEAKING, IT'S AN INTERFACE
```

69231

```
1    WHERE YOU PRESENT A BIG INFORMATION SPACE AND YOU

2    CAN ZOOM OUT TO GET SOME CONTEXT, AND ZOOM IN TO

3    LOOK A LITTLE CLOSER TO GET MORE DETAIL.

4    Q    OKAY.  WAS THIS THE FIRST TIME IN YOUR CAREER

5    THAT YOU WORKED WITH ZOOMABLE USER INTERFACES?

6    A    NO.  AS I SAID, I'VE BEEN DOING IT FOR A

7    WHILE.  I THINK I STARTED IN 1993.

8    Q    WHAT, WHAT TYPE OF DEVICE, IN VERY GENERAL

9    TERMS, WAS YOUR LAUNCHTILE PROGRAM DESIGNED TO RUN

10   ON?

11   A    IT WAS DESIGNED IN GENERAL TO WORK ON ANY KIND

12   OF MOBILE TOUCHSCREEN DEVICE.  IN PARTICULAR, WE

13   BUILT THIS, THIS PARTICULAR SOFTWARE TO RUN ON THE

14   MICROSOFT POCKET P.C. PLATFORM, AND WE WERE USING

15   OFTEN AN H-P IPAQ PDA.

16   Q    IS THAT WHAT THIS IS?

17   A    YES.

18   Q    YOU'VE HAD EXPERIENCE WITH THIS DEVICE, THE

19   H-P IPAQ, SIR?

20   A    YES.

21   Q    LET ME JUST NOTE, I'M HOLDING UP WHAT'S BEEN

22   MARKED AS DX EXHIBIT 518.  WE HAVE A SLIDE OF THIS

23   AND A VIDEO WE'RE GOING TO SHOW.

24        WHY DON'T WE PUT UP, RYAN, PLEASE, THE

25   SLIDE WHICH IS NUMBERED SDX 3951.001.
```

```
 1              IS THIS THE SAME AS THE DEVICE I'M

 2    HOLDING UP, EXHIBIT 518, DX 518, DOCTOR?

 3    A    YES, IT IS.

 4    Q    DO US A FAVOR.  I WANT YOU TO NARRATE THE

 5    VIDEO.  OBVIOUSLY BEFORE WE START THE VIDEO AND

 6    NARRATE IT, CAN YOU JUST TELL US GENERALLY WHAT'S

 7    SHOWN ON THE SCREEN ON THE IPAQ DEVICE ITSELF?

 8    A    SURE.  THIS IS THE LAUNCHTILE APPLICATION, AND

 9    WHAT YOU'RE SEEING HERE IS WHAT WE CALLED AN

10    INTERACTIVE ZOOM SPACE.

11              IT IS A COLLECTION OF 36 TILES WHICH ARE,

12    YOU KNOW, INFORMATION SOURCES.  YOU CAN SEE ON THE

13    BOTTOM RIGHT THERE'S SOME STOCK TILES.  IN THE

14    MIDDLE, YOU MIGHT BE ABLE TO MAKE OUT THAT THERE'S

15    A LITTLE MAP, AND E-MAIL TILE, A CALENDAR, A PHONE.

16    THERE'S ALL KINDS OF INFORMATION SOURCES HERE.

17              AND THEN AS YOU'LL SEE IN THE VIDEO, YOU

18    WOULD -- YOU'LL BE ABLE TO SEE THAT YOU CAN ZOOM IN

19    AND OUT AND INTERACT WITH THESE FILES.

20    Q    LET'S SHOW THE VIDEO, AND WHY DON'T YOU

21    NARRATE IT FOR US AS IT PLAYS.  OKAY?

22              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

23    OPEN COURT OFF THE RECORD.)

24              THE WITNESS:  SURE.  SO FIRST YOU CAN SEE

25    SOMEONE TOUCH THE VIDEO.  IT ZOOMS INTO A REGION I
```

62233

```
 1    CALLED A ZONE.
 2                YOU ZOOM IN FURTHER TO AN APPLICATION
 3    TILE.
 4                YOU CAN TOUCH THE BACK BUTTON.  IT'LL
 5    ZOOM OUT TO THAT MIDDLE ZONE LEVEL, AND YOU CAN
 6    ZOOM OUT FURTHER BACK TO WHERE YOU STARTED WITH
 7    WORLD VIEW IN THE ZOOM SPACE.
 8    BY MR. DEFRANCO:
 9    Q    OKAY.  AND I THINK THERE'S ANOTHER SLIDE THAT
10    GOES ALONG WITH THIS.  THIS IS SDX 3951.003.  CAN
11    YOU DESCRIBE GENERALLY WHAT'S SHOWN ON THIS SLIDE?
12    A    SURE.  SO THIS IS SHOWING YOU WHAT WE SAW ON
13    THE VIDEO.  ON THE LEFT IS THAT WORLD VIEW WHERE WE
14    STARTED.  THIS THE ZOOM SPACE THAT CONTAINS ALL OF
15    THE TILES.
16                YOU CAN TAP ON ANY ONE OF THOSE LITTLE
17    GROUPS OF FOUR TILES CALLED A ZONE, AND IF YOU TAP
18    IN THAT MIDDLE GROUP, THAT MIDDLE ZONE, THAT TAKES
19    YOU TO THE ZONE VIEW WHERE FOUR TILES ARE SHOWN.
20    THERE'S MORE INFORMATION DISPLAYED ABOUT EACH ONE.
21                YOU CAN THEN TAP AGAIN AND IT'LL TAKE YOU
22    INTO THE APPLICATION VIEW.
23    Q    LET'S -- I WANT TO FOLLOW UP WITH A LITTLE
24    DETAIL ON SOME OF THE TERMS, SOME OF THE THINGS YOU
25    EXPLAINED TO US IN THIS DEVICE THAT USES
```

1    LAUNCHTILE.  OKAY?

2    A    OKAY.

3    Q    YOU USED -- YOU TALKED ABOUT THE ZOOM SPACE

4    GENERALLY.  WHAT IS THE ZOOM SPACE AGAIN, PLEASE?

5    A    SO A ZOOM SPACE IS JUST A SINGLE COHERENT

6    COLLECTION OF TILES, IN THIS CASE 36 TILES, WHERE

7    YOU COULD ZOOM IN AND OUT TO OR, AS YOU'LL SEE,

8    OTHER WAYS TO ACCESS THE INFORMATION.

9    Q    OKAY.  NOW, THIS, THIS WAS A -- THE SOURCE

10   CODE -- THE CODE ON THIS, FOR LAUNCHTILE, THAT'S

11   SOMETHING THAT YOU ACTUALLY SUPERVISED?

12   A    YES.  I CREATED THE -- I SUPERVISED THE

13   DEVELOPMENT OF THIS APPLICATION.

14   Q    WITH THOSE FOLKS YOU MENTIONED EARLIER THIS

15   MORNING?

16   A    YES.

17   Q    AND FOR EACH ONE OF THOSE TILES, YOU GAVE US

18   SOME EXAMPLES EARLIER ABOUT E-MAIL APPLICATION, THE

19   ABILITY TO OBTAIN STOCK, I THINK I SAW NASCAR IN

20   THE CORNER.

21        WAS THERE ACTUALLY OPERATING CODE

22   UNDERLYING EACH ONE OF THOSE TILES IN THE

23   LAUNCHTILE PROGRAM AT THAT TIME?

24   A    SO, YOU KNOW, EVERY TILE FULLY WAS CAPABLE OF

25   BEING ZOOMED IN AND OUT OF AND NAVIGATING WITHIN

1    THE ZOOM SPACE, BUT THE TILES THEMSELVES, IF YOU

2    WENT ALL THE WAY INTO THE APPLICATION VIEW, NO,

3    MANY OF THEM -- MOST OF THEM WERE NOT IMPLEMENTED

4    BECAUSE THE GOAL WAS TO FOCUS NOT ON THE

5    INTERACTING WITH THE DETAILED DATA, BUT WAS TO

6    EXPERIENCE THE NAVIGATION.

7              MR. DEFRANCO:  YOUR HONOR, AT THE MOMENT,

8    BEFORE I FORGET, I'D LIKE TO MOVE IN DX 518 AND

9    SLIDES 3951.001, .002 AND .003.

10             THE COURT:  ANY OBJECTION?

11             MR. JACOBS:  OBJECT TO .003, YOUR HONOR.

12   IT CONTAINS ARGUMENTATIVE CONTENT ON IT RELATED TO

13   CLAIM INTERPRETATION AND THIS WITNESS IS NOT

14   QUALIFIED TO ARGUE THAT.

15             MR. DEFRANCO:  YOUR HONOR, I'LL REPRESENT

16   THE WITNESS IS NOT GOING TO -- THIS WAS A SLIDE

17   THAT WAS ALSO USED IN OPENING.  THAT'S WHY WE

18   WANTED TO USE IT FOR CONTINUITY.

19             BUT THE WITNESS --

20             THE COURT:  THE FIRST BOX AND THE SECOND

21   BOX SHOULDN'T BE ON THIS, SO THAT'S DENIED.

22             BUT DX 518 IS ADMITTED AND SDX 3951.001

23   AND .002 ARE BOTH ADMITTED.

24             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

25             518, 3951.001, 3951.002, HAVING BEEN

```
 1              PREVIOUSLY MARKED FOR IDENTIFICATION,

 2              WERE ADMITTED INTO EVIDENCE.)

 3              MR. JACOBS:  JUST TO BE CLEAR, YOUR

 4    HONOR, YOU SAID DENIED, BUT THE OBJECTION IS

 5    SUSTAINED?

 6              THE COURT:  YES, .003 IS NOT COMING INTO

 7    EVIDENCE.

 8    BY MR. DEFRANCO:

 9    Q    LET'S TALK ABOUT -- YOU MENTIONED THE ZOOM

10    FUNCTIONALITY?

11              MR. JACOBS:  YOUR HONOR, CAN WE HAVE THAT

12    TAKEN DOWN?

13              THE COURT:  THAT'S FINE.

14    BY MR. DEFRANCO:

15    Q    ZOOM FUNCTIONALITY, DOCTOR, CAN YOU EXPLAIN

16    HOW THE APPEARANCE OF A TILE -- WHAT HAPPENED TO

17    THE APPEARANCE OF A TILE IN YOUR LAUNCHTILE PROGRAM

18    AS YOU WOULD ZOOM IN ON A TILE?

19    A    SURE.  SO AS YOU ZOOM IN, YOU GET MORE AND

20    MORE SPACE AVAILABLE FOR EACH TILE.  AND SO RATHER

21    THAN JUST PURELY GEOMETRICALLY MAKING THE TILES

22    LARGER, WE WOULD USE THE SPACE TO SHOW MORE

23    INFORMATION.

24              SO IN THE E-MAIL TILE, FOR EXAMPLE, WHEN

25    YOU ZOOMED OUT, IT WOULD JUST SAY SOMETHING LIKE 11
```

```
1    UNREAD, MEANING 11 UNREAD MESSAGES.  AND IF YOU

2    ZOOM IN FURTHER, IT WOULD SHOW SOME INFORMATION

3    ABOUT THE E-MAIL IN YOUR INBOX; AND THEN WHEN YOU

4    ZOOMED IN ALL THE WAY, THEN YOU GOT A FULL LIST OF

5    E-MAIL MESSAGES, WHO THEY'RE FROM AND THEIR

6    SUBJECTS AND SO ON.

7    Q    WAS THERE A REASON WHY YOU TEAM DECIDED TO

8    CHANGE THE APPEARANCE OF A TILE AS YOU ZOOMED IN ON

9    IT?

10   A    YEAH.  AS I SAID, USING PURE GEOMETRIC ZOOMING

11   WOULD HAVE WORKED, BUT THAT WAS VERY SIMPLE AND

12   WOULD NOT HAVE USED THE SCREEN SPACE VERY

13   EFFECTIVELY.

14         SO THE IDEA OF SHOWING DIFFERENT VISUAL

15   REPRESENTATIONS AS YOU GOT CLOSER WAS A NATURAL WAY

16   TO TAKE ADVANTAGE OF THE SPACE, AND ALSO THE KIND

17   OF THING I'D BEEN TALKING ABOUT IN MY RESEARCH FOR

18   TEN YEARS PREVIOUS.

19   Q    IS THERE A NAME FOR THAT TYPE OF ZOOMING?

20   A    YES.  WE CALLED IT SEMANTIC ZOOMING.

21   Q    AND AGAIN, THE DIFFERENCE BETWEEN GEOMETRIC

22   AND SEMANTIC ZOOMING?

23   A    SO GEOMETRIC IS PURE VISUAL SCALING.  YOU GET

24   CLOSER, IT GETS LARGER.

25         SEMANTIC ZOOMING IS AS IT GETS LARGER,
```

69238

1    YOU ADD MORE, OR YOU CAN CHANGE THE VISUAL

2    REPRESENTATION TO SHOW MORE RELATED INFORMATION.

3    Q    OKAY.  YOU SHOULD HAVE A BINDER OF EXHIBITS IN

4    FRONT OF YOU.  THERE'S AN ARTICLE I'D LIKE YOU TO

5    LOOK AT.

6              AND RYAN, IF YOU CAN PUT A SLIDE ON THE

7    SCREEN.  IT'S A SNIPPET FROM THE ARTICLE.  IT'S

8    3951.002.

9    A    SORRY.  IS THIS THE BIG BINDER OR LITTLE

10   BINDER?

11   Q    IT SHOULD BE IN THE BLACK BINDER RIGHT IN

12   FRONT OF YOU.

13   A    OKAY.

14   Q    NOW, DOCTOR, CAN YOU LOOK UP ON THE SCREEN FOR

15   A MOMENT AS YOU'RE FLIPPING?

16   A    YES, I SEE IT.

17   Q    SORRY ABOUT THAT.  YOU'RE THERE WITH ME IN THE

18   ARTICLE.

19              A SENTENCE OR TWO, PLEASE, WHAT ARE WE

20   LOOKING AT?  WHAT IS THIS ARTICLE?

21   A    SO THIS IS A PAPER I WROTE AT ANOTHER

22   CONFERENCE, I BELIEVE IT WAS IN 1994, DESCRIBING MY

23   WORK IN ZOOMABLE USER INTERFACES AT THE TIME.

24              AND IN PARTICULAR, I WAS DESCRIBING THIS

25   HIGHLIGHTED SECTION, SEMANTIC ZOOMING, JUST THE WAY

```
1      I WAS JUST DESCRIBING IT.

2      Q    THE YEAR, I'M SORRY, DID YOU GIVE US THE YEAR?

3      A    I THINK IT WAS 1994.

4      Q    AND IS THIS SEMANTIC VERSUS GEOMETRIC?  THIS

5      IS ABOUT WHICH TYPE?

6      A    THIS DESCRIBES SEMANTIC ZOOMING.

7              MR. DEFRANCO:  YOUR HONOR, I WOULD MOVE

8      FOR ADMISSION OF SLIDE 3951.002, AND EXHIBIT

9      546.002.

10              MR. JACOBS:  YOUR HONOR, I BELIEVE

11      COUNSEL HAS GOT A TYPO IN HIS OUTLINE.  IT'S

12      3951.010, WHICH IS AN EXAMPLE OF DX 546.  WE HAVE

13      NO OBJECTION TO DX 546, AND IF EXPANSIONS LIKE THIS

14      ARE COMING IN, WE HAVE NO OBJECTION TO THIS,

15      EITHER.

16              MR. DEFRANCO:  .010, YOUR HONOR, THAT'S

17      CORRECT.

18              THE COURT:  SO I WAS UNCLEAR.  YOU HAVE

19      NO OBJECTION TO 3951.010?

20              MR. JACOBS:  CORRECT, YOUR HONOR.

21              THE COURT:  OKAY.  THAT'S ADMITTED.

22              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23              3951.010, HAVING BEEN PREVIOUSLY MARKED

24              FOR IDENTIFICATION, WAS ADMITTED INTO

25              EVIDENCE.)
```

```
 1                THE COURT:  GO AHEAD, PLEASE.  ARE YOU
 2    ALSO SEEKING THE ACTUAL UNDERLYING ARTICLE AS WELL?
 3                MR. DEFRANCO:  YES, YOUR HONOR.  THAT'S
 4    DX 546.002.
 5                THE COURT:  I JUST HAVE IT AS 546.
 6    THAT'S THE ACTUAL ARTICLE AS WELL.
 7                MR. DEFRANCO:  YES, YOUR HONOR.
 8                THE COURT:  AND NO OBJECTION TO THAT AS
 9    WELL, RIGHT?
10                MR. JACOBS:  CORRECT, YOUR HONOR.
11                THE COURT:  THAT'S ADMITTED.
12                (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
13                546, HAVING BEEN PREVIOUSLY MARKED FOR
14                IDENTIFICATION, WAS ADMITTED INTO
15                EVIDENCE.)
16    BY MR. DEFRANCO:
17    Q    SHIFT GEARS FOR A MOMENT, DOCTOR.  WE TALKED
18    ABOUT ZOOMING, MOVING AROUND WHAT YOU CALL THE ZOOM
19    SPACE.
20                WERE THERE OTHER METHODS OF NAVIGATING
21    AROUND THE ZOOM SPACE IN YOUR LAUNCHTILE PROGRAM?
22    A    YES.  SO WHEN YOU ARE IN THAT MIDDLE ZOOM
23    LEVEL IN THE ZONE VIEW, YOU COULD ALSO WHAT I CALL
24    PAN FROM SIDE TO SIDE, FROM ONE ZONE TO ANOTHER BY
25    USING YOUR FINGERS TO DRAG ON THE SCREEN.
```

1    Q    OKAY.  LET'S LOOK AT ANOTHER VIDEO.

2              RYAN, PLEASE, IF I HAVE THE NUMBER RIGHT,

3    SDX 3951.004.

4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6              THE WITNESS:  SO WHAT YOU'RE SEEING IN

7    THIS VIDEO IS YOU ZOOMED IN, AS WE DID BEFORE, TO

8    THE ZONE VIEW, AND NOW WE'LL DRAG WITH THE FINGER

9    AND WE'LL GO DIRECTLY TO THE NEXT ZONE IN THE

10   DIRECTION THAT YOU'RE DRAGGING THE FINGER.

11             SO WE WENT LEFT, UP, RIGHT, DOWN, AND WE

12   GO BACK TO WHERE WE STARTED.

13             THEN IF YOU DON'T DRAG YOUR FINGER

14   ENOUGH, IT'LL SNAP BACK TO THE ZONE THAT YOU WERE

15   IN BEFORE.  SO, AGAIN, YOU DRAG, YOU DON'T DRAG IT

16   ENOUGH, IT SNAPS BACK.

17             AND SIMILARLY, IF YOU DRAG UP, BUT YOU

18   DON'T DRAG FAR ENOUGH, IT'LL SNAP BACK.

19   BY MR. DEFRANCO:

20   Q    THAT SNAP BACK FEATURE, WAS THAT A FEATURE

21   THAT YOU AND YOUR TEAM INTENTIONALLY CODED OR

22   PROGRAMMED TO WORK IN THE LAUNCHTILE PROGRAM?

23   A    WELL, YEAH, OF COURSE.  IT WAS PART OF THE

24   SOFTWARE OF THE LAUNCHTILE.

25   Q    WHY DID YOU AND YOUR TEAM DO THAT?

```
 1    A    WELL, THERE'S A FEW ADVANTAGES TO THIS KIND OF

 2    INTERACTION.  A KEY ONE IS WE DON'T WANT A USER TO

 3    GET STUCK BETWEEN ZONES.  I MEAN, THE SYSTEM IS

 4    DESIGNED TO HAVE THESE NICE ZONE VIEWS.  YOU CAN

 5    MOVE BETWEEN ZONES, BUT YOU WOULDN'T WANT TO BE

 6    STUCK HALFWAY BETWEEN ONE.

 7              ANOTHER REASON IS THAT USERS DON'T HAVE

 8    HIGH PRECISION WHEN THEY'RE USING THIS KIND OF

 9    DEVICE, SO IF YOU REQUIRE THEM TO MOVE THEIR FINGER

10    IN SUCH A WAY THAT THEY GOT PERFECT ALIGNMENT, THAT

11    WOULD BE PRETTY ANNOYING.

12              SO INSTEAD THIS WAY THEY ONLY HAVE TO GET

13    NEARBY AND THEN THE SYSTEM WILL TAKE THEM WHERE

14    THEY WANT TO GO.

15              THE OTHER THING IS THOSE TWO FEATURES

16    TOGETHER ENABLE PEOPLE TO EXPLORE AND THUS FIND NEW

17    CONTENT, AND IT ADDED UP TO BEING FUN.

18    Q    LET'S STEP BACK FOR A MOMENT, DOCTOR.  DO YOU

19    RECALL GENERALLY ABOUT HOW LONG IT TOOK FOR YOU AND

20    YOUR TEAM TO DEVELOP THE OVERALL LAUNCHTILE

21    PROGRAM?

22    A    YES.  WE DID IT IN THE SUMMER OF 2004.  SO IT

23    WAS APPROXIMATELY THREE MONTHS.

24    Q    AND WE LOOKED AT THIS H-P IPAQ DEVICE.  WERE

25    YOU ABLE TO VERIFY THE DATE OF THE SOFTWARE THAT'S
```

1    RUNNING ON THIS DEVICE THAT WAS SHOWN ON THE VIDEO

2    THAT WE PUT UP EARLIER?

3    A    YES.  IT'S NOVEMBER 9TH, 2004, WHICH I

4    VERIFIED BY LOOKING AT MY COMPUTER WHICH CONTAINED

5    THE CODE THAT ENDED UP ON THAT DEVICE.

6    Q    AND WHEN CODE WENT -- WHEN COMPUTER CODE IS

7    ACTUALLY RUNNING ON THE DEVICE, WHAT'S THE GENERAL

8    TERM FOR THAT TYPE OF CODE?

9    A    IT'S USUALLY CALLED EXECUTABLE CODE.

10   Q    AND THERE'S BEEN TALK IN THIS CASE ABOUT

11   SOURCE CODE.  CAN YOU TELL US THE DIFFERENCE

12   BETWEEN EXECUTABLE AND SOURCE CODE?

13   A    SO SOURCE CODE IS WHAT A HUMAN PROGRAMMER

14   WRITES.  HE GOES THROUGH A PROCESS TO CONVERT IT

15   INTO EXECUTABLE CODE, WHICH IS WHAT A COMPUTER CAN

16   EXECUTE.

17   Q    OKAY.  AND WAS THERE A LATER VERSION -- WELL,

18   YOU HAVE WHAT TYPE OF CODE FOR THIS DEVICE DATING

19   BACK TO NOVEMBER 9TH, 2004?  DO YOU HAVE EXCLUDABLE

20   OR SOURCE CODE?

21   A    EXCLUDABLE CODE FOR THAT PARTICULAR VERSION.

22   Q    OKAY.  WAS THERE A -- DID YOU AND YOUR TEAM

23   DEVELOP A LATER VERSION OF THIS CODE LATER ON IN

24   TIME?

25   A    YES, WE DID.

```
 1     Q    AND WHAT WAS THE NAME OF THAT CODE?

 2     A    AT THE TIME WE WERE PLANNING ON INTEGRATING

 3     WITH IT WITH ANOTHER TECHNOLOGY CALLED XNAV.  WE

 4     NEVER DID THAT INTEGRATION, BUT THE NAME STUCK.

 5     Q    AND WAS THE XNAV SOURCE CODE EVER PROVIDED TO

 6     A THIRD PARTY?

 7     A    YES.  AS I MENTIONED, WE HAVE BEEN UNDER

 8     CONTRACT WITH MICROSOFT, AND SO WE SUPPLIED THE

 9     CODE TO MICROSOFT WHEN WE WERE FINISHED WITH THE

10     DEVELOPMENT.

11     Q    AND THE XNAV SOURCE CODE, JUST SO I'M CLEAR,

12     WAS THAT PREPARED BY THE TEAM THAT WAS WORKING

13     UNDER YOU?

14     A    YES.  SO AMY KARLSON STARTED THE DEVELOPMENT,

15     AARON CLAMAGE ENDED UP FINISHING THE DEVELOPMENT,

16     AND I WAS ADVISING AND WORKING WITH THEM CLOSELY

17     DURING THAT PROCESS.

18     Q    ADVISING AND SUPERVISING THAT WORK WHEN YOU

19     WERE AT THE UNIVERSITY OF MARYLAND; IS THAT

20     CORRECT?

21     A    YES.

22     Q    AND THE ACTUAL XNAV SOURCE CODE THAT'S BEEN

23     USED IN THIS CASE, WHERE DID THAT COME FROM, YOUR

24     OWN COMPUTER?

25     A    YES, I HAVE THAT.
```

1    Q    AND DO YOU HAVE PERSONAL KNOWLEDGE OF THE

2    OPERATION OF THAT SOURCE CODE?

3    A    YES, I DO.

4    Q    IS -- THERE SHOULD BE AN EXHIBIT FOLDER WITH

5    SOME SOURCE CODE PRINTED OUT UP THERE.  IT SHOULD

6    BE MARKED DX 528, IF I HAVE IT RIGHT.  SOMEBODY

7    WILL CORRECT ME IF I DON'T.

8    A    OKAY.

9    Q    IT SHOULD BE IN A FOLDER, IN A BROWN FOLDER.

10   A    OKAY.

11   Q    IS THAT THE XNAV SOURCE CODE?

12   A    YES, IT IS.

13         MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

14   EXHIBIT DX 528 INTO EVIDENCE.

15         THE COURT:  ANY OBJECTION?

16         MR. JACOBS:  NO OBJECTION.

17         THE COURT:  IT'S ADMITTED.

18         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19          528, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22         MR. DEFRANCO:  THANK YOU.

23   Q    LET'S PUT UP A SLIDE THAT'S GOT A SNIPPET OF

24   THAT CODE.  I UNDERSTAND IT'S OKAY TO SHOW THIS ON

25   THE PUBLIC SCREEN.  IS THAT OKAY?

```
1     A    YES.

2     Q    THIS IS, IF I HAVE IT RIGHT AGAIN, SDX

3     3951.007.  IS THIS PART OF THE XNAV SOURCE CODE

4     YOU'VE SEEN, DOCTOR?

5     A    YES, IT IS.

6     Q    AND TELL US A LITTLE BIT ABOUT THE ZONES AND

7     THE WORLD VIEW THAT YOU DESCRIBED EARLIER, HOW

8     THAT'S LAID OUT IN THE CODE JUST IN VERY GENERAL

9     TERMS TO GIVE US AN OVERALL FEEL.

10              DO YOU UNDERSTAND WHAT I'M ASKING?

11    A    WITH RESPECT TO THIS CODE OR JUST IN GENERAL?

12    Q    WITH RESPECT TO THIS CODE.

13    A    ALL RIGHT.  SO THIS IS SHOWING THE CREATION OF

14    A PART OF THAT ZOOM SPACE.  IN PARTICULAR, IT'S

15    CREATING ONE OF THOSE ZONES, I CALLED THEM QUAD

16    TILES BECAUSE THE CODE -- THE ZONE HAD FOUR TILES,

17    SO WE CALLED THEM QUAD TILES.

18              THIS CODE HERE, I KNOW IT'S HARD TO READ

19    UP THERE, BUT IT WAS REPRESENTING THAT MIDDLE ZONE

20    IN THE MIDDLE COLUMN, SO WE CALLED IT THE MIDDLE

21    MIDDLE QUAD TILE.

22              AND THEN WHAT YOU SEE HERE IS FOUR

23    SECTIONS OF CODE THAT CREATE THE STRUCTURE OF THAT

24    ZONE.

25              SO WE FIRST SEE IT CREATING THE UPPER
```

1    LEFT MAP TILE, AND THEN THE LOWER LEFT CALENDAR

2    TILE, THEN THE UPPER RIGHT IN BOX TILE, AND THEN

3    THE LOWER RIGHT PHONE TILE.

4    Q    NOW, SIR, I'D LIKE TO -- LET ME ASK, SO WE'RE

5    LOOKING NOW AT THE XNAV SOURCE CODE AGAIN; CORRECT?

6    A    YES.

7    Q    WE TALKED EARLIER ABOUT ZOOMING, SNAP BACK

8    FUNCTIONALITY IN LAUNCHTILE.  DO YOU REMEMBER THAT?

9    A    YES.

10   Q    WERE YOU ABLE TO COMPARE THOSE TWO

11   FUNCTIONALITIES IN THE TWO DIFFERENT PRODUCTS/CODE

12   THAT YOU LOOKED AT?

13   A    SO, YES, I -- I HAD THE TWO SYSTEMS,

14   LAUNCHTILE SYSTEM THAT YOU SAW AND XNAV, WHICH WAS

15   THE LATER SYSTEM RUNNING ON A DIFFERENT DEVICE, AND

16   I COMPARED THE ZOOMING AND THE SNAP BACK FEATURE

17   AND CONFIRMED THAT THE SNAP BACK FEATURE WORKED

18   IDENTICALLY ON BOTH THE ZOOMING FEATURE -- IT

19   WORKED ALMOST IDENTICALLY.  THERE WAS A SLIGHT

20   VISUAL CHANGE IN THE LATER XNAV AND THE WAY THE

21   BLUE DOTS WERE REPRESENTED.

22   Q    OKAY.  THANKS.

23        SHIFT GEARS MAYBE ONE MORE TIME.  LET'S

24   TALK ABOUT WHEN YOU TOLD, YOU AND YOUR TEAM TOLD

25   THE PUBLIC ABOUT LAUNCHTILE.  OKAY?

1    A    UM-HUM.

2    Q    YOU DID THAT AT SOME POINT.  CAN YOU TELL US

3    ABOUT IT?  WHEN WAS THE FIRST TIME YOU DID IT, AND

4    GIVE US A COUPLE OF SENTENCES ABOUT THE

5    CIRCUMSTANCES SURROUNDING THAT.  OKAY?

6    A    SURE.  SO AS I MENTIONED, WE DEVELOPED THE

7    CODE IN THE SUMMER OF 2004.  I KNOW WE COMPLETED IT

8    BY SEPTEMBER 2004 BECAUSE AT THAT POINT WE HAD

9    WRITTEN A PAPER AND SUBMITTED IT TO A CONFERENCE.

10           IT LATER GOT ACCEPTED TO THE CONFERENCE.

11   IT WAS CALLED THE CHI, COMPUTER HUMAN INTERACTION,

12   AND IT WAS EVENTUALLY PUBLISHED THERE IN APRIL OF

13   2005.

14   Q    OKAY.  AND HOW WAS YOUR PAPER AND LAUNCHTILE

15   RECEIVED AT THE CHI CONFERENCE?  CAN YOU TELL US?

16   A    WE GOT REALLY EXCELLENT FEEDBACK.  IN FACT, IT

17   WAS NOMINATED FOR A BEST PAPER AWARD, WHICH IS

18   GIVEN TO 5 PERCENT OF THE ACCEPTED PAPERS.  IN

19   FACT, NORMALLY ABOUT 20 PERCENT OF THE SUBMITTED

20   PAPERED GOT ACCEPTED, SO IT WAS PRETTY SELECTIVE.

21           AND THEN WE GOT REALLY EXCELLENT FEEDBACK

22   INFORMALLY DURING THE EVENT, DURING THE CONFERENCE.

23   Q    OKAY.  AND DID YOU ACTUALLY PRESENT LAUNCHTILE

24   ITSELF TO THE ATTENDEES AT THE CHI CONFERENCE?

25   A    YES.  IT WAS A BIG CONFERENCE, SOMETHING LIKE

62249

```
1    2500 PEOPLE, AND SOME NUMBER OF THOSE -- I'M NOT
2    SURE EXACTLY HOW MANY, A FAIR NUMBER -- ATTENDED
3    OUR SESSION, WHICH WAS A FORMAL PRESENTATION.  I
4    THINK AMY KARLSON ACTUALLY DELIVERED, MY STUDENT,
5    DELIVERED THE PRESENTATION.  WE HAD POWERPOINT
6    SLIDES.  WE SHOWED A VIDEO.
7    Q    OKAY.  LET'S -- WE HAVE A VIDEO.  LET'S PLAY
8    THE VIDEO.  IF I REMEMBER IT RIGHT, THIS VIDEO HAS
9    SOUND.
10   A    YES.
11   Q    IS THAT RIGHT?  SO WE'LL JUST PLAY IT.  YOU
12   DON'T NEED TO NARRATE THIS VIDEO.
13            HOLD ON FOR ONE SECOND, PLEASE.
14            YOU RECOGNIZE THE COVER OF THIS VIDEO,
15   SIR?
16   A    YES, I BELIEVE THIS IS THE VIDEO WE ACTUALLY
17   PRESENTED AT THAT CONFERENCE.
18   Q    AGAIN, WHAT WAS THE DATE OF THAT?
19   A    APRIL 2005.
20   Q    OKAY.  LET'S PLAY THE VIDEO, PLEASE, RYAN.
21            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
22   OPEN COURT OFF THE RECORD.)
23   BY MR. DEFRANCO:
24   Q    HAVING SEEN THAT, DOCTOR, DOES THAT CONFIRM,
25   OR NOT, THAT THAT'S THE VIDEO THAT WAS SHOWN AT THE
```

8250

```
1    CHI CONFERENCE YOU TESTIFIED ABOUT IN APRIL OF
2    2005?
3    A    THAT IS THE SAME ONE.  THERE WAS SOME OTHER
4    PIECES, SOME OTHER PARTS, BUT THAT'S THE WHOLE
5    SEGMENT ON LAUNCHTILE.
6    Q    OTHER PARTS RELATED TO SOMETHING DIFFERENT
7    THAN LAUNCHTILE?
8    A    CORRECT.
9    Q    ALL RIGHT.  WE'RE NOT GOING TO TAKE THE TIME
10   TO SHOW THOSE.
11            YOUR HONOR, WE WOULD MOVE INTO EVIDENCE
12   THIS VIDEO, WHICH IS SDX 3951.009 AND THE PREVIOUS
13   SLIDE WHICH SHOWED SOME SOURCE CODE, WHICH IS SDX
14   3951.007.
15            THE COURT:  IS THIS DX 518 IS THE ACTUAL
16   VIDEO?  THAT'S WHAT I HAVE IN MY BINDER.  DO YOU
17   WANT THAT IN AS --
18            MR. DEFRANCO:  THAT'S THE DEVICE ITSELF,
19   YOUR HONOR.  THE VIDEO HAS THE SLIDE NUMBER IN THE
20   LOWER RIGHT-HAND CORNER.
21            THE COURT:  NO.  THIS IS MY DX 518.  IT'S
22   THE VIDEO.
23            MR. DEFRANCO:  IT'S BOTH.
24            THE COURT:  ALL RIGHT.  YOU WANT TO MOVE
25   IN 518?
```

```
1              MR. DEFRANCO:  YES, YOUR HONOR.

2              THE COURT:  OKAY.  THAT'S ADMITTED.

3              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

4              518, HAVING BEEN PREVIOUSLY MARKED FOR

5              IDENTIFICATION, WAS ADMITTED INTO

6              EVIDENCE.)

7              THE COURT:  AND THEN ALSO DX --

8              MR. DEFRANCO:  3951.007.

9              THE COURT:  I THINK THAT'S .009.

10             MR. DEFRANCO:  YES, .009 IS THE SLIDE

11   THAT GOES WITH THIS VIDEO.

12             THE COURT:  OH, AND YOU WANT TO MOVE IN

13   .007?

14             MR. DEFRANCO:  AND .007.

15             THE COURT:  THAT'S FINE.  THEY'RE BOTH

16   ADMITTED.

17             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

18             3951.007, 3951.009, HAVING BEEN

19             PREVIOUSLY MARKED FOR IDENTIFICATION,

20             WERE ADMITTED INTO EVIDENCE.)

21             THE COURT:  GO AHEAD, PLEASE.

22   BY MR. DEFRANCO:

23   Q   WE TALKED ABOUT THE CHI CONFERENCE, THE VIDEO

24   THAT WAS PRESENTED.

25             DID THERE COME A TIME WHEN THERE WAS YET
```

1    ANOTHER DEMONSTRATION OF LAUNCHTILE?

2    A    YES.  SO A MONTH LATER, MAY OF 2005, OUR LAB

3    AT THE UNIVERSITY OF MARYLAND HAD OUR CONFERENCE,

4    WE PUT ON AN ANNUAL CONFERENCE, ABOUT 2- OR 300

5    PEOPLE, AND THEY CAME AND WE SHOWED -- WE GAVE A

6    SIMILAR FORMAL PRESENTATION, AND THEN WE ALSO HAD A

7    DEMO TIME FOR A FEW HOURS WHERE WE WOULD HAVE

8    POSTERS, WE WOULD STAND AROUND THE POSTERS AND THE

9    ATTENDEES COULD WALK AROUND, TALK TO US, AND AMY

10   AND I WOULD HAND OUT THE DEVICES AND ENCOURAGE

11   PEOPLE TO ACTUALLY TRY OUT LAUNCHTILE THEMSELVES.

12   Q    OKAY.  AND THE LAUNCHTILE DEVICE AND THE CODE

13   THAT WAS LOADED AT THAT TIME, DID THAT HAVE THE

14   ZOOMING AND THE SNAP BACK FUNCTIONALITY THAT YOU

15   SHOWED US IN THE VIDEOS?

16   A    OH, YES, DEFINITELY.

17   Q    AND WERE PEOPLE -- YOU SAID PEOPLE COULD LOOK

18   AT THE DEVICE.  DID YOU LET PEOPLE TAKE THE DEVICE

19   AND PLAY WITH IT AND PLAY AROUND WITH THE

20   FUNCTIONALITY AT THAT TIME?

21   A    YES, THEY COULD DO WHATEVER THEY WANTED WITH

22   THE LAUNCHTILE.

23   Q    ANY RESTRICTIONS ON PEOPLE'S ABILITY TO DO

24   THAT WHO ATTENDED THAT CONFERENCE?

25   A    NO.

1    Q    SYMPOSIUM.  WAS THAT A SYMPOSIUM OR A

2    CONFERENCE?

3    A    WE CALLED IT A SYMPOSIUM.  IT WAS A

4    CONFERENCE.

5    Q    OKAY.  AND THEN JUST SUMMARIZE FOR US

6    REACTION.  HOW DID PEOPLE REACT TO THE LAUNCHTILE

7    FUNCTIONALITY THAT YOU SHOWED?

8    A    YOU KNOW, PEOPLE LOVED THIS STUFF.  AT THE

9    TIME WE WERE RUNNING ON THIS DEVICE, THIS MICROSOFT

10   POCKET P.C. DEVICE WHICH WAS DESIGNED FOR TWO HANDS

11   WHERE YOU'D USE A STYLUS TO SCROLL A TINY, TINY

12   LITTLE SCROLL BAR AND, TO BE HONEST, IT WAS KIND OF

13   FRUSTRATING.

14          SO WHEN WE WERE SHOWING THE FACT THAT YOU

15   COULD NAVIGATE THIS RICH INFORMATION SPACE CASUALLY

16   WITH ONE HAND, PEOPLE LIKED IT.

17   Q    AND JUST TO CONFIRM, DOCTOR, YOU'RE HERE AS A

18   FACT WITNESS, NOT AS AN EXPERT FOR SAMSUNG, IS THAT

19   CORRECT, IN THIS CASE?

20   A    THAT IS CORRECT.

21          MR. DEFRANCO:  THANK YOU VERY MUCH.

22          THE COURT:  ALL RIGHT.  THE TIME IS NOW

23   3:31.

24   ///

25   ///

1          **CROSS-EXAMINATION**

2     BY MR. JACOBS:

3     Q     GOOD AFTERNOON, SIR.

4     A     GOOD AFTERNOON.

5     Q     NOW, YOU ARE SERVING AS AN EXPERT FOR -- IN A

6     DIFFERENT LAWSUIT AGAINST APPLE; CORRECT, SIR?

7     A     THAT IS CORRECT.

8     Q     AND YOU'VE OFFERED IN THAT CASE AN OPINION ON

9     BEHALF OF AN APPLE COMPETITOR; RIGHT?

10    A     THAT IS CORRECT.

11    Q     NOW, IN LAUNCHTILE AND XNAV, THERE ARE THREE

12    SEPARATE ZOOM LEVELS; TRUE?

13    A     THERE ARE -- YES, THERE ARE THREE ZOOM LEVELS

14    AND YOU MOVE BETWEEN THEM AS I SHOWED IN THE

15    VIDEOS.

16    Q     AND JUST TO GET THE NAMES OF THIS DOWN, IT'S

17    THE WORLD VIEW, THE ZONE VIEW, AND THE APPLICATION

18    VIEW; RIGHT?

19    A     THAT IS CORRECT.

20    Q     NOW, WHEN YOU'RE IN WORLD VIEW, YOU'RE LOOKING

21    AT THE WHOLE WORLD THAT EXISTS ON THAT -- IN

22    LAUNCHTILE; CORRECT?

23    A     THAT IS CORRECT.  YOU CAN SEE THE WHOLE ZOOM

24    SPACE, ALL 36 TILES.

25    Q     AND YOU CAN'T SCROLL AT ALL IN WORLD VIEW?

```
 1    A    NO.  IT WAS DESIGNED WITH A FIXED SET OF

 2    TILES, SO THERE WOULD BE NO REASON TO SCROLL.

 3    Q    NOW, WHEN YOU'RE IN ZONE VIEW, THAT'S THE

 4    MIDDLE LEVEL; RIGHT?

 5    A    THAT IS CORRECT.

 6    Q    YOU CAN SCROLL.  TRUE?

 7    A    YES, AS I SHOWED IN THE VIDEO, YOU CAN SCROLL

 8    OR PAN.  I USE THOSE WORDS INTERCHANGEABLY

 9    TYPICALLY.

10    Q    AND YOU DESCRIBED THE SNAP BACK FUNCTIONALITY

11    IN YOUR TESTIMONY A FEW MOMENT AGO.  DO YOU RECALL

12    THAT?

13    A    YES.

14    Q    AND THE WAY YOU IMPLEMENTED SNAP BACK WAS THAT

15    IF A USER HAS DRAGGED MORE THAN ONE-SIXTH OF A

16    SCREEN WIDTH, LAUNCHTILE WILL SNAP TO THE NEXT

17    ZONE.  TRUE, SIR?

18    A    YES, THAT SOUNDS RIGHT.  WHEN THE USER IS

19    DRAGGING THEIR FINGER, THERE'S A THRESHOLD, AND IF

20    THEY DRAG MORE THAN THAT THRESHOLD, IT SNAPS

21    FORWARD TO THE NEXT ZONE.

22            AND IF THEY'VE DRAGGED LESS THAN THAT

23    THRESHOLD, IT SNAPS BACK TO THE ZONE THEY STARTED

24    FROM.

25    Q    AND THE THRESHOLD IS THE ONE-SIXTH -- WE'LL
```

```
 1    CALL IT THE ONE-SIXTH CONDITION.  TRUE, SIR?
 2    A    YEAH, THE THRESHOLD IS ONE-SIXTH OF THE
 3    DIMENSION OF THE SCREEN THAT YOU'RE DRAGGING.  SO
 4    IF YOU'RE DRAGGING HORIZONTALLY, IT WOULD BE
 5    ONE-SIXTH OF THE WIDTH.  IF YOU'RE DRAGGING
 6    VERTICALLY, I BELIEVE IT WOULD BE ONE-SIXTH OF THE
 7    HEIGHT.
 8    Q    SO LAUNCHTILE CODE ACTUALLY CONTAINS
 9    INSTRUCTIONS THAT MEASURE THE DISTANCE OF MOVEMENT
10    AND THEN PERFORM THAT SNAPPING ANIMATION DEPENDING
11    ON WHETHER THE ONE-SIXTH CONDITION IS SATISFIED.
12    TRUE, SIR?
13    A    I THINK THAT SOUNDS RIGHT, THAT THE -- THE
14    CONDITION IS BASED ON HOW FAR THE USER HAS DRAGGED.
15    Q    AND THE WAY IT WORKS, THOUGH, IS THAT IF
16    YOU'RE AT THE LAST TILE IN ANY PARTICULAR
17    DIRECTION, YOU CAN'T SCROLL PAST IT.  TRUE, SIR?
18    A    WE HAD TO MAKE SURE THAT THE USER ALWAYS HAD A
19    MECHANISM TO KNOW WHERE THEY WERE IN THE ZOOM SPACE
20    AND PROVIDED DIFFERENT MECHANISMS FOR ENSURING GOOD
21    EXPERIENCE AND AWARENESS.
22            SO WHEN -- THERE WAS -- WHEN YOU WERE AT
23    DIFFERENT ZONES, THERE WERE DIFFERENT INDICATORS
24    THAT TOLD YOU WHERE YOU WERE.  WE ACTUALLY HAD SOME
25    LITTLE BLUE DOTS, THESE LITTLE INDICATORS TO SHOW
```

1    DEMONSTRATION OF WHAT AN E-MAIL SYSTEM MIGHT FEEL

2    LIKE.  THE MAIN GOAL WAS TO SHOW THE ZOOMING AND

3    THE PANNING AND THE SNAPPING AND ALL THAT KIND OF

4    NAVIGATION.

5    Q    OKAY.  AND THEN BOUNCE BACK, YOU WERE ASKED

6    ABOUT BOUNCE BACK, SNAP BACK.  THE SNAP BACK

7    FUNCTIONALITY WAS USED IN LAUNCHTILE TO GO FROM

8    WHERE TO WHERE, SIR?

9    A    PRIMARILY FROM ZONE TO ZONE.

10   Q    WAS IT USED ONCE YOU GOT TO THE EDGE WHERE

11   THERE WERE NO MORE ZONES?

12   A    NO.  IT WAS NOT NECESSARY AT THAT POINT.

13   Q    DID YOU USE SOMETHING ELSE?

14   A    YES.  AS I EXPLAINED EARLIER, WE HAD THOSE

15   BLUE INDICATORS THAT GAVE THE USER INFORMATION SO

16   THEY KNEW THAT THERE WAS NO POINT IN GOING PAST

17   THERE.

18   Q    COULD YOU HAVE USED SNAP BACK AT THE EDGE, AND

19   IF SO, WHY DON'T YOU?

20         MR. JACOBS:  OBJECTION, YOUR HONOR.

21   LEADING AND ASKS FOR EXPERT TESTIMONY AND

22   HYPOTHETICAL.

23         THE COURT:  SUSTAINED.

24         MR. DEFRANCO:  THANK YOU VERY MUCH.

25         MR. JACOBS:  YOUR HONOR, VERY BRIEFLY.

```
 1                THE COURT:  GO AHEAD.  THE TIME IS 351.

 2                GO AHEAD.

 3                MR. JACOBS:  I'D LIKE TO OFFER INTO

 4      EVIDENCE 2227.

 5                THE COURT:  ANY OBJECTION?

 6                MR. DEFRANCO:  NO, YOUR HONOR, NO

 7      OBJECTION.

 8                THE COURT:  OKAY.

 9                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10                2227, HAVING BEEN PREVIOUSLY MARKED FOR

11                IDENTIFICATION, WAS ADMITTED INTO

12                EVIDENCE.)

13                MR. JACOBS:  AND I'D LIKE TO OFFER INTO

14      EVIDENCE THE TWO VIDEOS WE SAW, PDX 41.1 AND PDX

15      41.2.

16                THE COURT:  THEY'RE ADMITTED.

17                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBERS

18                41.1 AND 41.2, HAVING BEEN PREVIOUSLY

19                MARKED FOR IDENTIFICATION, WERE ADMITTED

20                INTO EVIDENCE.)

21                MR. JACOBS:  THANK YOU, YOUR HONOR.

22                THE COURT:  MAY THIS WITNESS BE

23      EXCUSED -- I'M SORRY.  GIVE ME THE NUMBER AGAIN OF

24      THE E-MAIL.

25                MR. JACOBS:  THAT WAS 2227.
```

```
1          THE COURT:  ALL RIGHT.  MAY THIS WITNESS
2   BE EXCUSED OR IS IT SUBJECT TO RECALL?
3          MR. VERHOEVEN:  I THINK THE WITNESS MAY
4   BE EXCUSED.  HE'S A THIRD PARTY, YOUR HONOR.
5          THE COURT:  OKAY.  YOU ARE EXCUSED.
6          CALL YOUR NEXT WITNESS, PLEASE.
7          MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS
8   ADAM BOGUE.
9          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
10                    ADAM BOGUE,
11  BEING CALLED AS A WITNESS ON BEHALF OF THE
12  DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS
13  EXAMINED AND TESTIFIED AS FOLLOWS:
14          THE WITNESS:  I DO.
15          THE CLERK:  THANK YOU.  PLEASE BE SEATED.
16                DIRECT EXAMINATION
17  BY MR. JOHNSON:
18  Q    GOOD AFTERNOON, MR. BOGUE.
19  A    GOOD AFTERNOON.
20  Q    DO YOU HAVE AN UNDERSTANDING OF WHY YOU'RE
21  BEING CALLED TO TESTIFY TODAY?
22  A    YES.  I'VE BEEN ASKED TO TALK ABOUT THE
23  DIAMONDTOUCH TABLE.
24  Q    BEFORE WE TALK ABOUT THE DIAMONDTOUCH, CAN YOU
25  PLEASE DESCRIBE FOR US, GIVE US A LITTLE BIT OF
```

1    BACKGROUND ON YOUR EDUCATION.

2    A    YES.  I HAVE AN UNDERGRADUATE DEGREE FROM

3    M.I.T. IN MATERIAL SCIENCE ENGINEERING; AND AN

4    M.B.A. FROM M.I.T. SLOAN SCHOOL OF BUSINESS.

5    Q    WHAT'S YOUR OCCUPATION?

6    A    I'M THE PRESIDENT OF CIRCLE TWELVE, A COMPANY

7    THAT I FOUNDED IN 2008, AND WE'RE THE MAKER OF THE

8    DIAMONDTOUCH TABLE.

9    Q    WHERE DID YOU WORK BEFORE CIRCLE TWELVE?

10   A    BEFORE CIRCLE TWELVE, I WAS AT MITSUBISHI

11   ELECTRIC RESEARCH LABS, OR MERL, AND MERL IS WHERE

12   DIAMONDTOUCH WAS FIRST INVENTED BACK IN 2001.

13   Q    WHERE IS MERL LOCATED?

14   A    201 BROADWAY IN CAMBRIDGE, MASSACHUSETTS.

15   Q    AND WHEN DID YOU START AT MERL?

16   A    IN 2000.

17   Q    NOW, WHEN YOU STARTED AT MERL, WHAT WERE YOUR

18   RESPONSIBILITIES?  WHAT WAS YOUR TITLE THERE?

19   A    I WAS THE VICE-PRESIDENT OF MARKETING AND

20   BUSINESS DEVELOPMENT, AND MY RESPONSIBILITIES WERE

21   TO FIND BUSINESS OPPORTUNITIES FOR THE TECHNOLOGY

22   THAT WAS DEVELOPED AT MERL BY THE RESEARCHERS

23   THERE.

24   Q    OKAY.  AND NOW YOU MENTIONED DIAMONDTOUCH.

25   CAN YOU TELL ME, WHAT WAS DIAMONDTOUCH, OR WHAT IS

1    DIAMONDTOUCH?

2    A    SO DIAMONDTOUCH IS A TABLETOP COMPUTER

3    INTERFACE THAT'S DESIGNED FOR SUPPORTING SMALL

4    GROUP, FACE-TO-FACE COLLABORATION.

5    Q    YOU HAVE A BINDER IN FRONT OF YOU, A BLACK

6    BINDER THAT HAS SOME EXHIBITS IN IT.  AND I'M GOING

7    TO ASK YOU, CAN YOU TURN TO DX 696, PLEASE?

8    A    SORRY.

9    Q    LET ME KNOW WHEN YOU GET THERE.

10   A    BLACK BINDER?

11   Q    IT SHOULD BE BLACK, A BLACK BINDER WITH THE

12   NUMBER 696.

13   A    696.  I'M SORRY.  I'M SORRY.  I GOT IT.

14   Q    ALL RIGHT.  AND IN PARTICULAR, I WANT TO

15   DIRECT YOUR ATTENTION TO PAGE 3, SO 696.003.

16   A    YES.

17   Q    DO YOU SEE A PHOTOGRAPH ON THAT PAGE IN THE

18   UPPER LEFT-HAND CORNER?

19   A    YES.  THIS IS A PHOTOGRAPH OF THE DIAMONDTOUCH

20   TABLE AS IT EXISTED IN THE LOBBY AT MITSUBISHI

21   ELECTRIC RESEARCH LABS.  THAT'S A PICTURE OF ME ON

22   THE LEFT THERE.

23              MR. JOHNSON:  YOUR HONOR, IF WE MAY, I'D

24   LIKE TO MOVE TO ADMIT EXHIBIT 696.

25              THE COURT:  ANY OBJECTION?

```
 1              MR. JACOBS:  NO OBJECTION, YOUR HONOR.

 2              THE COURT:  IT'S ADMITTED.

 3              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 4              696, HAVING BEEN PREVIOUSLY MARKED FOR

 5              IDENTIFICATION, WAS ADMITTED INTO

 6              EVIDENCE.)

 7              MR. JOHNSON:  IF WE MAY PUBLISH THIS TO

 8    THE JURY?

 9              THE COURT:  PLEASE, GO AHEAD.

10              MR. JOHNSON:  THANK YOU.

11    Q    SO YOU MENTIONED DIAMONDTOUCH IS A TABLE

12    TOUCHSCREEN.  CAN YOU TELL US WHAT YOU MEAN BY

13    THAT?

14    A    YES.  SO WHAT YOU'RE LOOKING AT THERE IN THE

15    PICTURE IS A TABLETOP TOUCHSCREEN.  IT'S A

16    RECTANGULAR TOUCHSCREEN, AND IT'S DESIGNED TO

17    SUPPORT SMALL GROUP FACE-TO-FACE COLLABORATION.  SO

18    THE FOUR PEOPLE SITTING AT THAT TABLE, WE CAN ALL

19    INTERACT USING MULTITOUCH GESTURES.

20              WHAT YOU DON'T SEE IN THE TABLE -- IN

21    THIS PICTURE IS ABOVE THERE'S A PROJECTOR AIMED

22    DOWN AND SO THE IMAGE IS PROJECTED FROM ABOVE, AND

23    BEHIND IT IS A P.C. AND TOGETHER THAT'S ALL

24    DIAMONDTOUCH.

25    Q    OKAY.  NOW, COULD DIAMONDTOUCH BE USED WITH A
```

1    SINGLE USER?

2    A    YES.  INDEED, I USE DIAMONDTOUCH IN MY

3    DAY-TO-DAY WORK AND HAVE SINCE 2004, 2005.  I DO

4    EVERYTHING ON IT.  IF YOU HAVE AN E-MAIL FROM ME,

5    IT COMES FROM THE DIAMONDTOUCH TABLE IN MY OFFICE.

6    Q    NOW, WHEN WAS DIAMONDTOUCH DEVELOPED?

7    A    IN 2001 AT MERL.

8    Q    WERE YOU INVOLVED IN THE DEVELOPMENT OF

9    DIAMONDTOUCH?

10   A    SO I WAS ON THE TEAM.  I DID SOME SOFTWARE

11   TESTING.

12         BUT MY PRINCIPAL RESPONSIBILITY WAS THE

13   BUSINESS DEVELOPMENT PERSON.  SO I WAS SHOWING

14   DIAMONDTOUCH TO PEOPLE OUTSIDE OF MERL.

15         WHEN WE HAD VISITORS THAT CAME TO MERL, I

16   WOULD DEMO THE DIAMONDTOUCH TABLE IN THE LOBBY

17   THERE.

18         I ALSO HAD A SYSTEM THAT I WOULD BRING ON

19   THE ROAD TO CUSTOMER SITES, AND I WENT TO A LOT OF

20   TRADE SHOWS AND OTHER PUBLIC EVENTS.

21   Q    OKAY.  NOW, CAN YOU RUN PROGRAMS ON

22   DIAMONDTOUCH?

23   A    YEAH.  IN FACT, ONE OF THE NICE THINGS ABOUT

24   DIAMONDTOUCH IS ANY WINDOWS SOFTWARE WORKS ON IT.

25         IN THIS TIME PERIOD WHEN THIS PHOTO WAS

```
 1    TAKEN, 2004/2005 TIMEFRAME, WE WERE DEVELOPING A

 2    LOT OF DEMONSTRATION APPLICATIONS TO ILLUSTRATE TO

 3    USERS WHAT YOU COULD DO WITH MULTITOUCH AND

 4    MULTIUSER TOUCH.  SO THERE WERE A LOT OF DEMOS

 5    SPECIFICALLY DESIGNED FOR DIAMONDTOUCH.

 6    Q    AND WHEN WAS THIS PHOTOGRAPH TAKEN?

 7    A    IN 2004.

 8    Q    HOW DO YOU KNOW THAT?

 9    A    WELL, I REMEMBER THE PHOTO BEING TAKEN.  ALSO,

10    LOOKING AT THE APPLICATION THERE, THAT'S FROM 2004.

11         I ALSO USE THIS AS A PRESS PIECE.  I

12    WOULD SEND THIS TO PEOPLE WHO ASKED ABOUT

13    DIAMONDTOUCH.

14    Q    WHAT TECHNOLOGY IS USED TO DETECT USER TOUCH

15    ON THE TOUCHSCREEN?

16    A    SO IT'S CAPACITIVE, VERY SIMILAR TO MOBILE

17    DEVICES TODAY.  THERE'S A GRID OF TRANSMITTERS IN

18    THE TOUCH SURFACE, AND WHEN YOU TOUCH IT, YOU'RE

19    CAPACITIVELY COUPLED TO THAT, THOSE SIGNALS.

20    Q    DID ANYBODY OUTSIDE OF MITSUBISHI USE

21    DIAMONDTOUCH?

22    A    YEAH.  SO WE -- IN THIS TIME PERIOD,

23    2003/2004, WE MADE ABOUT 100 OF THESE AND LENT OR

24    GAVE THEM AWAY TO MOSTLY UNIVERSITY RESEARCH GROUPS

25    AROUND THE WORLD, YOU KNOW, STANFORD, BERKELEY,
```

1    THEY ALL HAD DIAMONDTOUCH TABLES AND THEY WERE ALL

2    DEVELOPING APPLICATIONS FOR THEM.

3    Q    WHEN DID YOU FIRST START DEMONSTRATING

4    DIAMONDTOUCH SYSTEM TO PEOPLE OUTSIDE OF MERL?

5    A    THE FIRST TIME I SHOWED DIAMONDTOUCH OUTSIDE

6    OF MERL WAS IN THE SUMMER OF 2003.  I BROUGHT IT TO

7    APPLE HEADQUARTERS AND SHOWED IT TO THE HARDWARE

8    ENGINEERS THERE.

9    Q    AND WHO DID YOU FIRST DEMONSTRATE THE

10   DIAMONDTOUCH SCREEN SYSTEM TO?

11   A    SO IT WAS -- IT WAS A TEAM OF HARDWARE

12   ENGINEERS, AND I REMEMBER JOSH STRICKEN AND

13   STEVE HOTELLING, THOSE TWO NAMES STICK IN MY MIND.

14   THERE WERE OTHERS IN THE ROOM, I THINK MAYBE A HALF

15   A DOZEN.

16   Q    CAN I DIRECT YOUR ATTENTION TO EXHIBIT 695 IN

17   YOUR BINDER.  AND TELL ME -- BEFORE YOU PUT IT

18   UP -- DO YOU RECOGNIZE WHAT THAT IS, PLEASE?

19   A    YES.  THIS IS AN E-MAIL THAT -- IT'S FROM ME

20   AND IT'S TO STEVE HOTELLING FROM APPLE.  THIS IS

21   FROM 2003.

22           MR. JOHNSON:  YOUR HONOR, WE WOULD ASK

23   THAT THIS EXHIBIT 695 BE ADMITTED.

24           THE COURT:  IT'S ADMITTED.

25           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

```
1            695, HAVING BEEN PREVIOUSLY MARKED FOR
2            IDENTIFICATION, WAS ADMITTED INTO
3            EVIDENCE.)
4            MR. JOHNSON:  WILL YOU PUBLISH IT,
5       PLEASE, RYAN?
6       Q    NOW, DO YOU SEE THE DATE ON THIS E-MAIL
7       THREAD?
8       A    YES.  SO IT'S AN E-MAIL THREAD.  THE DATE AT
9       THE TOP IS NOVEMBER 6TH, 2003.  THERE'S ANOTHER
10      ITEM IN THE THREAD BELOW, IT SAYS OCTOBER 23RD,
11      2003.  AND THEY BOTH ARE FOLLOW-UP E-MAILS TO THE
12      MEETING THAT I HAD PREVIOUS IN THE YEAR.
13      Q    AND WHERE DOES THIS E-MAIL COME FROM?
14      A    FROM MY FILES.
15      Q    NOW, DO THESE E-MAILS REFER TO THE MEETING AT
16      APPLE THAT YOU TALKED ABOUT EARLIER?
17      A    YEAH.  IT SAYS "A FEW MONTHS AGO, I MET YOU
18      AND JOSH."  AND SO, YES, IT REFERS TO THAT MEETING.
19      Q    OKAY.  NOW, WHEN YOU MET WITH APPLE TO SHOW
20      THE DIAMONDTOUCH SYSTEM, DID YOU REQUIRE APPLE TO
21      SIGN SOME SORT OF CONFIDENTIALITY AGREEMENT BEFORE
22      SHOWING THEM THE DIAMONDTOUCH SYSTEM?
23      A    NO.  IN FACT, I WAS ASKED TO SIGN AN AGREEMENT
24      THAT SAID ANYTHING THAT I SHOW SHOULD NOT BE
25      CONFIDENTIAL.
```

```
1    Q    AND WHO ASKED YOU TO SIGN THAT AGREEMENT?

2    A    I WAS ASKED BY SOMEONE AT APPLE.

3    Q    AND DID YOU SIGN THAT AGREEMENT?

4    A    YES.

5    Q    NOW, ARE YOU FAMILIAR OF A PROGRAM THAT RAN ON

6    DIAMONDTOUCH CALLED FRACTAL ZOOM?

7    A    YES.

8    Q    AND WHAT'S THAT?

9    A    SO FRACTAL ZOOM WAS ACTUALLY ONE OF THE CORE

10   DEMOS THAT I WOULD SHOW TO DEMONSTRATE THE

11   DIAMONDTOUCH TABLE AND THE MULTIUSER, MULTITOUCH

12   ASPECTS OF IT.

13          IT'S ACTUALLY, I THINK I -- I PREPARED A

14   VIDEO THAT MAYBE WE CAN SHOW.

15   Q    OKAY.

16          YOUR HONOR, MAY WE PLAY THE VIDEO?  IT'S

17   3952.101.

18          THE COURT:  GO AHEAD, PLEASE.

19          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20   OPEN COURT OFF THE RECORD.)

21   BY MR. JOHNSON:

22   Q    NOW, MR. BOGUE, CAN YOU EXPLAIN WHAT WE SEE

23   HERE?

24   A    YEAH.  THIS IS THE DIAMONDTOUCH.  YOU KIND OF

25   SEE A FRAME THERE, THAT RECTANGULAR SCREEN, THAT'S
```

```
1    THE DIAMONDTOUCH TABLE.

2    Q    THAT'S THE BLACK FRAME HERE?

3    A    YEAH.  AND THIS IS SOMETHING WE CALLED THE APP

4    LAUNCHER, SO APP LAUNCHER WAS SOMETHING THAT YOU

5    COULD HAVE APPS, AND IF YOU TOUCH ON THEM, THAT

6    WOULD LAUNCH THE APP.

7         THERE IS FOUR APPS ON THIS SCREEN, AND

8    THIS IS THE CORE SET OF DEMOS THAT I SHOWED IN THE

9    2004/2005 TIME FRAME.

10        AND THE ONE ON THE RIGHT THAT HE'S ABOUT

11   TO TOUCH ON IS, IS FRACTAL ZOOM.  I CALLED IT

12   MANDELBROT.  HE'S THE MATHEMATICIAN THAT SORT OF

13   DEVELOPED FRACTALS.  SORRY.

14   Q    DO FRACTAL ZOOM AND MANDELBROT REFER TO THE

15   SAME THING AS FAR AS DIAMONDTOUCH IS CONCERNED?

16   A    YES.

17   Q    SO WHAT DO WE SEE NEXT IN THE VIDEO?

18   A    OKAY.  SO WHEN HE TOUCHES ON THAT ICON -- I

19   DON'T KNOW IF YOU CAN RUN THIS.  OKAY.  SO THAT

20   LAUNCHED THE APPLICATION.

21        (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22   OPEN COURT OFF THE RECORD.)

23        THE WITNESS:  YOU'LL SEE HERE THERE'S A

24   COPYRIGHT 2004, SO THAT'S WHEN FRACTAL ZOOM WAS

25   FIRST DEVELOPED.
```

```
1              AND IF WE KEEP RUNNING, THERE'S

2     INSTRUCTIONS ON HOW IT WORKS.

3              MR. JOHNSON:  AND CAN WE PAUSE IT HERE

4     JUST FOR A SECOND, PLEASE, RYAN?

5              THE WITNESS:  SO HERE IT TELLS YOU TWO

6     FINGERS TO ZOOM IN, TWO FINGERS TO ZOOM OUT, AND

7     ONE FINGER TO GRAB OR PULL THE IMAGE TO MOVE THE

8     IMAGE AROUND.

9     BY MR. JOHNSON:

10    Q    AND WHAT WAS BEING DESCRIBED THERE?

11    A    THIS IS -- THIS IS THE INSTRUCTIONS ON HOW TO

12    RUN THE DEMO.

13    Q    OKAY.  AND WHAT DO WE SEE NEXT IN THE VIDEO?

14    A    YOU'LL SEE SOMEBODY OPERATING IT.

15             MR. JOHNSON:  CAN WE PRESS PLAY.

16             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17    OPEN COURT OFF THE RECORD.)

18             THE WITNESS:  SO THERE'S ONE FINGER, IT

19    MOVES.  AND NEXT YOU'LL SEE TWO FINGERS AND YOU CAN

20    ZOOM OUT OR ZOOM IN.

21             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

22    OPEN COURT OFF THE RECORD.)

23             THE WITNESS:  SO IT'S -- IT'S KIND OF

24    SIMPLE IN ITS OPERATION, BUT WHAT I LIKED ABOUT

25    FRACTAL ZOOM IS THAT IT WAS KIND OF EYE CATCHING
```

1    WHEN YOU SHOWED IT TO PEOPLE, AND ALSO IT

2    ILLUSTRATED THE MULTITOUCH ASPECTS OF THE HARDWARE.

3    BY MR. JOHNSON:

4    Q    AND WHEN WAS FRACTAL ZOOM FIRST DEMONSTRATED

5    TO PEOPLE?

6    A    SO IT WAS IN THE MID TO LATE 2004 TIME PERIOD.

7    WE LOADED IT INTO THE SYSTEM ON THE LOBBY IN MERL.

8    THAT'S THE FIRST PLACE WE ALWAYS SHOWED THINGS.  WE

9    KIND OF HAD A POLICY OF THE RESEARCHERS WOULD LOAD

10    IN THE LATEST NEW DEMOS ON TO THAT LOBBY MACHINE.

11              AND THEN AFTER THAT I STARTED BRINGING IT

12    ON THE ROAD ON THE TRAVELLING SYSTEM THAT I BROUGHT

13    OUT.

14    Q    HOW MANY TIMES WOULD YOU ESTIMATE THAT YOU'VE

15    PUBLICLY SHOWN FRACTAL ZOOM IN THE 2004/2005 TIME

16    FRAME?

17    A    IT WAS -- IT WAS LITERALLY THOUSANDS BECAUSE I

18    WAS ON THE ROAD A LOT AT TRADE SHOWS AND PUBLIC

19    EVENTS AND THIS WAS ONE OF THE CORE DEMOS THAT I

20    SHOWED.

21    Q    AND CAN YOU DESCRIBE FOR US WHERE IT WAS

22    PUBLICLY DEMONSTRATED.

23    A    YEAH.  SO THERE WAS NEXT BEST, WHICH WAS

24    SPONSORED BY WIRED MAGAZINE; THERE WAS GEOINT;

25    THERE WAS -- THAT WAS A TRADE SHOW, AFCEA WEST,

1    WHICH WAS IN SAN DIEGO; THERE WAS A CONFERENCE

2    CALLED SID, SOCIETY FOR INFORMATION DISPLAY, THAT

3    WAS IN BOSTON.

4           THERE WERE ALSO SOME INDIVIDUAL

5    DEMONSTRATIONS.  I BROUGHT IT TO THE NEW SCHOOL IN

6    NEW YORK CITY.  THERE WAS AN EVENT CALLED CWID,

7    SO -- AND I WAS ON THE ROAD A LOT SHOWING

8    DIAMONDTOUCH BACK IN THAT PERIOD OF TIME.

9    Q    AND THE CONFERENCES THAT YOU JUST REFERRED TO,

10   THE CWID, GEOINT, DID THOSE OCCUR -- WHAT YEAR DID

11   THOSE OCCUR IN WHEN YOU FIRST PUBLICLY DEMONSTRATED

12   FRACTAL ZOOM?

13   A    SO GEOINT WAS OCTOBER, NOVEMBER 2004.  AFCEA

14   WEST WAS JANUARY 2005.  SID WAS MAY 2005.

15   Q    OKAY.

16   A    I CAN KEEP GOING.

17   Q    SO WAS FRACTAL ZOOM OFFERED FOR SALE OR SOLD

18   AS PART OF THE DIAMONDTOUCH SYSTEM IN 2005?

19   A    SO WE -- WE DIDN'T SELL IT SEPARATELY.  IT WAS

20   INCLUDED IN THE PRODUCT.  SO IF YOU BOUGHT A

21   DIAMONDTOUCH TABLE, IT CAME WITH DEMONSTRATION

22   SOFTWARE AND THAT WAS, THAT WAS INCLUDED.

23          SO THIS, YES, THIS WAS INCLUDED IN THE

24   PRODUCT THAT WE SOLD.

25   Q    CAN I TURN YOUR ATTENTION TO DX 661 IN YOUR

1    BINDER, PLEASE.  AND CAN YOU TELL US WHAT THAT IS?

2    A    YES.  THIS IS A PRICE LIST FOR DIAMONDTOUCH

3    AND PRODUCT OPTIONS.  THIS IS -- I PREPARED THIS

4    PRICE LIST BACK IN OCTOBER 2000 -- OCTOBER 25TH,

5    2005.  I CAN SEE THE DATE IN THE LOWER RIGHT-HAND

6    CORNER.

7              MR. JOHNSON:  OKAY.  YOUR HONOR, WE'D ASK

8    THAT DX 661 BE MOVED INTO EVIDENCE.

9              MR. JACOBS:  NO OBJECTION.

10             THE COURT:  IT'S ADMITTED.

11             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12             661, HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15             MR. JOHNSON:  AND YOUR HONOR, I ALSO ASK

16   THAT SDX 3952.101, WHICH IS THE DIAMONDTOUCH VIDEO

17   WE JUST LOOKED AT, ALSO BE ADMITTED.

18             MR. JACOBS:  NO OBJECTION.

19             THE COURT:  IT'S ADMITTED.

20             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

21             3952.101, HAVING BEEN PREVIOUSLY MARKED

22             FOR IDENTIFICATION, WAS ADMITTED INTO

23             EVIDENCE.)

24   BY MR. JOHNSON:

25   Q    SO GOING TO THE PRICE LIST, MR. BOGUE, CAN YOU

1    TELL US WHAT THIS SHOWS?

2    A    WE HAD TWO DIFFERENT MODELS OF DIAMONDTOUCH,

3    DT81 AND DT107, SO BASICALLY TWO DIFFERENT SIZES.

4    WHAT THE PRICE LIST SHOWS IS WHAT'S INCLUDED IN THE

5    PRODUCT AND THE PRICE.

6    Q    OKAY.  NOW, HOW DO YOU KNOW THAT FRACTAL ZOOM

7    WAS INCLUDED IN THE PRICING STRUCTURE HERE?

8    A    OKAY.  SO THE LAST BULLET IN THE LIST OF

9    WHAT'S INCLUDED SAYS DT DEMONSTRATION SOFTWARE

10   APPLICATIONS, AND THAT REFERS TO THE -- THAT CORE

11   SET OF DEMOS THAT I HAD SHOWN.

12   Q    AND FRACTAL ZOOM WAS INCLUDED AS DT

13   DEMONSTRATION SOFTWARE?

14   A    THAT'S CORRECT.

15   Q    WHAT DID DT DEMONSTRATION SOFTWARE REFER TO?

16   A    SO IT INCLUDED THE APP LAUNCHER, THOSE FOUR

17   DEMOS, DT BOXES, DT LENS, MANDELBROT, AND

18   POP-A-BUBBLE, WHICH WAS A GAME.  AND THAT'S IN THE

19   OCTOBER 2005 TIME PERIOD.

20        WE HAD OTHER DEMOS THAT WERE ALSO

21   PROVIDED.

22   Q    WHAT'S THE DATE OF THIS PRICE LIST?

23   A    OCTOBER 25TH, 2005.

24   Q    AND HOW DO YOU KNOW THAT?

25   A    IT'S IN THE LOWER RIGHT-HAND CORNER.

1    Q    OKAY.  AND WHO CREATED THIS PRICE LIST?

2    A    I DID.

3    Q    DID YOU PROVIDE THE PRICE LIST TO ANYBODY IN

4    2005?

5    A    YES.  ANYONE WHO WANTED TO BUY A DIAMONDTOUCH

6    TABLE, I WOULD GIVE THEM THE PRICE LIST.

7    Q    OKAY.  LET'S LOOK AT EXHIBIT DX 662.

8    A    YES.

9    Q    CAN YOU TELL US WHAT THIS IS?

10   A    THIS IS A PURCHASE ORDER FROM SAIC.  THEY

11   BOUGHT A DIAMONDTOUCH TABLE.  THE DATE OF THIS

12   PURCHASE ORDER IS DECEMBER 12TH, 2005.

13            MR. JOHNSON:  YOUR HONOR, WE'D ASK THAT

14   DX 662 BE ADMITTED.

15            MR. JACOBS:  NO OBJECTION.

16            THE COURT:  IT'S ADMITTED.

17            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18            662, HAVING BEEN PREVIOUSLY MARKED FOR

19            IDENTIFICATION, WAS ADMITTED INTO

20            EVIDENCE.)

21   BY MR. JOHNSON:

22   Q    NOW, WAS THE PRICE LIST PROVIDED TO SAIC

23   BEFORE THIS PARTICULAR PURCHASE ORDER?

24   A    YES.  I GAVE THE PRICE LIST TO BILL GUNTHER,

25   WHO'S THE BUYER AT SAIC.

2290

```
1    Q    WHAT DOES EXHIBIT 662 SHOW US?

2    A    SO THIS SHOWS THAT THEY PURCHASED A

3    DIAMONDTOUCH TABLE.  THERE'S THREE PAGES HERE.  THE

4    NEXT PAGE IS AN INVOICE, THAT'S THE INVOICE THAT WE

5    SENT AFTER WE SHIPPED.  AND THEN THE NEXT PAGE IS

6    THE CHECK THAT SHOWS THAT THEY PAID.

7    Q    OKAY.  WAS FRACTAL ZOOM INCLUDED AS PART OF

8    THIS PURCHASE ORDER?

9    A    IT WAS.  I REMEMBER THIS BECAUSE THIS WAS ONE

10   OF OUR FIRST SALES, AND I ACTUALLY TRAVELED TO

11   ARREST LINK TON VIRGINIA TO HELP SET THINGS UP AND

12   I MADE SURE THAT, THAT FRACTAL ZOOM AND THE OTHER

13   DEMOS WERE LOADED IN.

14   Q    WHAT IS SAIC?

15   A    SAIC IS A GOVERNMENT SYSTEMS INTEGRATOR, SO

16   THEY DO A LOT OF WORK WITH GOVERNMENT AGENCIES AND

17   MILITARY ORGANIZATIONS, SO A LOT OF THEIR CUSTOMERS

18   REQUIRE SECRET SECURITY CLEARANCES.

19        I BELIEVE THAT THEY WERE PLANNING TO USE

20   THE DIAMONDTOUCH TABLE FOR A MAPPING APPLICATION.

21   Q    AND NOW I WANT TO TALK ABOUT A DIFFERENT

22   APPLICATION CALLED TABLECLOTH.

23   A    YES.

24   Q    NOW, ARE YOU FAMILIAR WITH TABLECLOTH?

25   A    I AM.
```

1    Q    AND WHAT IS TABLECLOTH?

2    A    SO TABLECLOTH IS AN APPLICATION THAT WAS

3    DESIGNED TO OPERATE ON THE DIAMONDTOUCH TABLE.  IT

4    WAS WRITTEN IN A LANGUAGE CALLED FLASH, WHICH A LOT

5    OF GAME DEVELOPERS USE.

6    Q    OKAY.  DID YOU PREPARE A VIDEO TO SHOW THE

7    JURY HOW TABLECLOTH WORKS?

8    A    YES.

9    Q    CAN WE PULL UP DX 3952.102?

10            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12    BY MR. JOHNSON:

13    Q    AND MR. BOGUE, CAN YOU EXPLAIN TO US WHAT WE

14    SEE HERE?

15    A    YES.  SO YOU SEE AN IMAGE AND WITH ONE FINGER

16    YOU CAN KIND OF PULL THAT DOWN, AND THEN WHEN YOU

17    LET GO, IT SNAPS BACK.  IT'S ACTUALLY PRETTY

18    SIMPLE.

19            MR. JOHNSON:  NOW, YOUR HONOR, WE'D ASK

20    THAT 3952.102 BE MOVED INTO EVIDENCE.

21            THE COURT:  ANY OBJECTION?

22            MR. JACOBS:  NO, YOUR HONOR.

23            THE COURT:  IT'S ADMITTED.

24            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

25            3952.102, HAVING BEEN PREVIOUSLY MARKED

```
 1              FOR IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3    BY MR. JOHNSON:

 4    Q    DOES THIS VIDEO ACCURATELY SHOW THE OPERATION

 5    OF TABLECLOTH?

 6    A    YES.

 7    Q    AND HOW DID THE PROGRAM GET ITS NAME

 8    TABLECLOTH?

 9    A    SO THIS IS KIND OF LIKE A METAPHOR FOR IF

10    YOU'RE AT A TABLE AND YOU WANT TO PULL SOMETHING

11    CLOSER TO YOU, YOU CAN PULL THE TABLECLOTH AND THEN

12    GRAB THE SALT SHAKER AND THEN LET GO AND IT'LL SNAP

13    BACK.

14    Q    AND WHAT WAS THE --

15    A    AND I'LL POINT OUT THAT THIS DEMONSTRATION IS

16    VERY SIMPLE AND IT -- AND THE AUDIENCE FOR WHO WE

17    WOULD SHOW THIS TO IS FLASH DEVELOPERS.

18              SO WHAT WE WANTED TO DO WAS ILLUSTRATE

19    HOW EASY IT WAS TO WRITE AN APPLICATION USING FLASH

20    FOR THE DIAMONDTOUCH TABLE.

21    Q    NOW, CAN YOU ESTIMATE HOW MANY TIMES YOU'VE

22    DEMONSTRATED TABLECLOTH AND ITS SNAP BACK FEATURE

23    OVER THE YEARS?

24    A    SO, I MEAN, WE HAD THIS IN THE MERL LOBBY AND

25    IT WAS -- THERE WAS A SHORTCUT -- SO THIS RUNS IN
```

```
 1    INTERNET EXPLORER AND WE HAD SHORTCUTTED OUR

 2    INTERNET EXPLORER, SO ANYBODY COULD PLAY WITH IT.

 3              WE DIDN'T KEEP RECORDS -- MERL DIDN'T

 4    REQUIRE PEOPLE TO, TO SIGN IN OR ANYTHING, SO IT'S

 5    HARD TO GIVE YOU A NUMBER ON THAT.

 6              BUT I CAN TELL YOU THAT I PERSONALLY

 7    SHOWED IT TO PEOPLE BOTH IN THE MERL LOBBY AND

 8    ON -- AT TRADE SHOWS.

 9    Q    OKAY.  WHEN WAS TABLECLOTH WITH SNAP BACK

10    FIRST DEMONSTRATED ON THE DIAMONDTOUCH SYSTEM?

11    A    SO IT -- AGAIN, IT WOULD HAVE BEEN IN THE

12    LOBBY BECAUSE OUR SORT OF POLICY WAS TO LOAD IN THE

13    LATEST SOFTWARE ON THE LOBBY MACHINE, THAT'S WHERE

14    WE START OUT, AND THEN WE STARTED BRINGING IT ON

15    THE ROAD.

16              I BELIEVE THAT THAT WAS JANUARY 2005 IS

17    WHEN THAT WAS DONE, WHEN DT FLASH, WHICH WAS THE

18    TABLECLOTH, WAS ONE OF SEVERAL APPLICATIONS THAT

19    WERE WRITTEN IN FLASH.

20              SOON AFTER THAT WE HAD SOME MEETINGS

21    OUTSIDE OF, OUTSIDE OF MERL.  I KNOW THAT I BROUGHT

22    IT TO THE NEW SCHOOL IN NEW YORK CITY LATER IN

23    JANUARY.

24    Q    DID YOU DEMONSTRATE TABLECLOTH AT ANY TRADE

25    SHOWS?
```

1    A    YES.  SO I REMEMBER SID, SOCIETY FOR

2    INFORMATION DISPLAY, WAS ONE OF THE FIRST TRADE

3    SHOWS THAT DIDN'T HAVE KIND OF A MILITARY AUDIENCE,

4    AND SO I WAS SHOWING DIFFERENT DEMOS THAN I

5    NORMALLY SHOWED, AND SO I STARTED SHOWING THE FLASH

6    THERE.

7    Q    NOW, WAS TABLECLOTH --

8    A    INCLUDING FLASH -- INCLUDING TABLECLOTH.

9    Q    WAS TABLECLOTH AVAILABLE TO CUSTOMERS AS WELL?

10   A    YES.  WE PROVIDED IT TO -- I'LL POINT OUT THAT

11   ANY DIAMONDTOUCH CUSTOMER OR USER WHO REQUESTED DT

12   FLASH, WHICH INCLUDES ALL THE DEMONSTRATIONS

13   THAT -- OF WHICH TABLECLOTH IS ONE OF THEM, ANYBODY

14   WHO ASKED FOR IT WOULD GET IT.

15            AND I KNOW A FEW PARTNER COMPANIES THAT

16   GOT IT IN EARLY, MID-2005.

17   Q    AND DT FLASH REFERRED TO, OR INCLUDED

18   TABLECLOTH, AND TABLECLOTH WAS WRITTEN IN FLASH?

19   A    YES.

20   Q    AS A SOFTWARE?

21   A    THAT'S EXACTLY RIGHT.

22   Q    OKAY.  SO WHAT WAS THE -- WHAT WAS THE

23   PURPOSE -- WE HEARD ABOUT THE LOBBY A COUPLE OF

24   TIMES AT MERL.

25            WHAT WAS THE PURPOSE OF PUTTING THE

1      DIAMONDTOUCH SYSTEM IN THE LOBBY AT MERL?

2      A    SO THAT WAS MY IDEA, AND I WANTED TO SHOWCASE

3      SOME OF THE INTERESTING THINGS AT MERL.  MERL WAS

4      KIND OF AN OPEN LAB AND HAD A LOT OF VISITORS AND I

5      THOUGHT IT MADE SENSE TO HAVE SOMETHING RIGHT THERE

6      IN THE LOBBY SO THAT, IN THE WAITING AREA WHEN

7      VISITORS ARRIVED, WE COULD SHOW THEM THINGS.  WE

8      WANTED TO SHOWCASE OUR WORK.

9      Q    WHO WAS ALLOWED IN THE MERL LOBBY BACK IN

10     2004/2005?

11     A    SO ANY VISITORS, AND WE HAD A LOT.  AGAIN, WE

12     HAD MANY PEOPLE FROM COMPANIES AND UNIVERSITIES,

13     FAMILY MEMBERS WOULD COME BY.  SO, YEAH, IT WAS --

14     IT WAS OPEN.

15     Q    DID PEOPLE NEED SOME SPECIAL PERMISSION TO USE

16     THE DIAMONDTOUCH SYSTEM IN THE LOBBY?

17     A    NO.  WE PUT IT IN THE LOBBY SO THAT PEOPLE

18     WOULD PLAY WITH IT.

19     Q    WAS A CARD KEY REQUIRED TO GET INTO THE LOBBY

20     IN 2005 OR EARLIER?

21     A    NO.  IT -- IN NORMAL BUSINESS HOURS, THE FRONT

22     DOORS WERE OPEN.  WE DID HAVE A RECEPTIONIST THERE,

23     BUT IT WAS OPEN.

24     Q    NOW, DID THERE COME A TIME WHEN A CARD KEY WAS

25     ADDED AFTER 2005?

```
 1    A    YEAH.  THAT WAS LATER.

 2    Q    WHEN WAS THAT?

 3    A    I THINK IT WAS, LIKE, MID, LATE 2006.  IT

 4    MIGHT HAVE EVEN BEEN 2007.

 5              I KNOW THAT THERE WAS SOME RESISTANCE TO

 6    WANTING TO DO THAT BECAUSE PEOPLE WERE WORRIED

 7    ABOUT IT CHANGING THE CULTURE THERE BECAUSE WE HAD

 8    THIS SORT OF OPEN LAB.  BUT EVENTUALLY WE DID ADD

 9    THE CARD KEY.

10    Q    OKAY.  BACK IN 2004/2005, WERE ANY

11    CONFIDENTIALITY AGREEMENTS REQUIRED TO USE THE

12    DIAMONDTOUCH SYSTEM IN THE LOBBY?

13    A    NO.

14    Q    NOW, I HEARD A, A -- YOU REFER A COUPLE OF

15    TIMES TO THE NEW SCHOOL.

16              CAN YOU TELL US ABOUT THE DEMONSTRATION

17    THAT WAS MADE TO THE NEW SCHOOL.

18    A    YES.  SO WE HAD A PRETTY LONG DAY OF

19    DEMONSTRATIONS THERE.  IT WASN'T JUST ME.  THERE

20    WERE A COUPLE OF OTHER PEOPLE FROM MERL, AND WE

21    WERE SHOWING DIAMONDTOUCH AND THE DEMONSTRATIONS

22    THAT YOU SAW HERE, PLUS MANY OTHERS.

23              ONE OF THE PEOPLE WHO CAME TO VISIT WAS

24    THE PRESIDENT OF THE NEW SCHOOL AT THE TIME,

25    SENATOR BOB KERREY.  SO I REMEMBER THAT VERY WELL.
```

```
 1              AND, YEAH, WE WERE TALKING ABOUT THE

 2    POTENTIAL OF COLLABORATING WITH THEM WHERE WE WOULD

 3    PROVIDE THIS DIAMONDTOUCH HARDWARE, THEY WOULD

 4    WRITE SOME SOFTWARE, AND WE WOULD CREATE SOME SORT

 5    OF INFORMATION SYSTEM THAT SENATORS IN WASHINGTON

 6    D.C. COULD USE.

 7    Q    DID YOU PARTICIPATE IN THE DEMONSTRATION TO

 8    SENATOR KERREY IN THE NEW SCHOOL?

 9    A    I DID.

10    Q    WHEN DID IT OCCUR?

11    A    THIS WAS IN JANUARY 2005.

12    Q    AND WHAT WAS SHOWN AT THIS DEMONSTRATION?

13    A    SO WE SHOWED THE CORE SET OF DEMOS.  I ALSO

14    SHOWED THE DT FLASH DEMOS BECAUSE THEY HAD A FLASH

15    DEVELOPER THERE.

16              AND THEN WE SHOWED A LOT OF OTHER

17    DEMONSTRATIONS THAT WERE WRITTEN IN A DIFFERENT

18    PROGRAMMING LANGUAGE CALLED JAVA.  AND SO, YEAH, WE

19    SHOWED A LOT OF DIFFERENT THINGS.

20    Q    WAS FRACTAL ZOOM SHOWN?

21    A    YEAH.  THAT WAS ONE OF THE CORE DEMOS THAT I

22    WOULD HAVE SHOWN FIRST.

23    Q    AND WAS TABLECLOTH SHOWN?

24    A    YES.

25    Q    NOW, CAN YOU LOOK AT EXHIBIT 713 IN YOUR
```

```
 1    BINDER, AND TELL US IF YOU RECOGNIZE THAT DOCUMENT.

 2    A    I DO.

 3    Q    WHAT IS IT?

 4    A    THIS IS AN E-MAIL FROM ALAN ESENTHER TO

 5    CHIA SHEN AND ME.  THIS -- ALAN AND CHIA ARE BOTH

 6    EMPLOYEES AT MERL.  AND THIS REFERS TO DT FLASH

 7    DEMOS AND A MEETING WITH BOB KERREY.

 8              MR. JOHNSON:  YOUR HONOR, WE ASKED THAT

 9    DX 713 BE ADMITTED.

10              THE COURT:  ANY OBJECTION?

11              MR. JACOBS:  NO, YOUR HONOR.

12              THE COURT:  IT'S ADMITTED.

13              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14              713, HAVING BEEN PREVIOUSLY MARKED FOR

15              IDENTIFICATION, WAS ADMITTED INTO

16              EVIDENCE.)

17              MR. JOHNSON:  IF WE MAY PUBLISH IT TO THE

18    JURY?

19              THE COURT:  PLEASE.

20    BY MR. JOHNSON:

21    Q    WHAT, IF ANYTHING, DOES EXHIBIT 713 DESCRIBE

22    OR REMIND YOU ABOUT WHETHER TABLECLOTH WAS INCLUDED

23    IN THE DEMONSTRATION TO SENATOR KERREY?

24    A    WELL, THIS GIVES ME A GOOD SOLID DATE HERE FOR

25    WHEN DT FLASH DEMOS WERE AVAILABLE FOR THIS MEETING
```

1    TO BOB KERREY.

2    Q    NOW IS THAT?

3    A    SO THE DATE OF THE E-MAIL IS JANUARY 15TH,

4    2005.  IT'S ALSO REFERRING TO A, A PATH THERE -- I

5    DON'T KNOW IF YOU CAN SEE THAT.  IT SAYS

6    DISTRIBUTIONKERRY_1_18_15.  IT WAS KIND OF STANDARD

7    OPERATION AT MERL TO MAKE A FOLDER FOR A MEETING

8    THAT HAD THE DATE FOR THAT MEETING.  SO THIS WAS

9    THE FOLDER WHERE ALL THE STUFF THAT WE WANTED TO

10   SHOW AT THE NEW SCHOOL WOULD HAVE BEEN PLACED.

11   Q    OKAY.  AND YOU'RE LISTED AS ONE OF THE

12   RECIPIENTS?

13   A    YES.  I'M THE "TO," THE SECOND PERSON IN THE

14   "TO" FIELD THERE.

15   Q    WHERE DID THIS E-MAIL COME FROM?

16   A    FROM MY FILES.

17   Q    OKAY.  NOW, MR. BOGUE, ARE YOU APPEARING HERE

18   TODAY AS AN EXPERT ON BEHALF OF SAMSUNG?

19   A    NO.  I'M HIRE AS A FACT WITNESS.

20   Q    OKAY.  ARE YOU BEING COMPENSATED FOR YOUR TIME

21   HERE TODAY TO TESTIFY?

22   A    NO.  I'M HERE ON MY OWN TIME.

23   Q    HAVE YOU BEEN COMPENSATED FOR YOUR TIME

24   LEADING UP TO TODAY?

25   A    YES.  I HAVE BEEN COMPENSATED FOR THE TIME TO

1    DIG UP DOCUMENTS AND ANSWER QUESTIONS.

2    Q    AND AT WHAT RATE HAVE YOU BEEN COMPENSATED?

3    A    $400 AN HOUR.

4    Q    ABOUT HOW MUCH TIME HAVE YOU SPENT ON THIS?

5    A    ABOUT 40 HOURS I'VE BILLED SO FAR.

6         MR. JOHNSON:  THANK YOU VERY MUCH.  I'LL

7    PASS THE WITNESS.

8         THE COURT:  ALL RIGHT.  THE TIME IS NOW

9    4:21.  GO AHEAD, PLEASE.

10        MR. JOHNSON:  I'M SORRY, YOUR HONOR.  I

11   NEGLECTED TO MOVE IN, I'M TOLD, DX 713.

12        THE COURT:  I HAVE IT BEING ADMITTED.

13        MR. JOHNSON:  OKAY.

14        THE COURT:  OKAY.  THE TIME IS 4:21.

15        GO AHEAD, PLEASE.

16                  **CROSS-EXAMINATION**

17   BY MR. JACOBS:

18   Q    WHERE'S THE DEMONSTRATION TABLE, SIR?

19   A    I'M SORRY?

20   Q    WHERE'S THE DEMONSTRATION TABLE?  WHERE'S THE

21   TABLE THAT YOU'VE BEEN TALKING ABOUT?

22   A    IN THE MERL LOBBY.

23   Q    THE ONE THAT WAS IN THE MERL LOBBY IN THE

24   MID-2000S?

25   A    I SOLD THAT ACTUALLY TO QUINN, EMANUEL.

1    Q    YOU SOLD IT?

2    A    YES.

3    Q    TO QUINN, EMANUEL?

4    A    YES.

5    Q    IS IT ANYWHERE HERE IN THE COURTROOM THAT WE

6    COULD SEE IT TODAY?

7    A    NO.

8    Q    ARE YOU AWARE THAT WE ASKED FOR IT TO BE

9    DELIVERED?

10   A    I BELIEVE THAT THERE'S A DIFFERENT

11   DIAMONDTOUCH UNIT THAT IS HERE.

12   Q    IN THE COURTROOM?

13   A    IT'S NOT -- IT'S NOT IN THE MERL -- THAT'S NOT

14   THE ONE THAT WAS IN THE MERL LOBBY, THOUGH.

15   Q    OH.  THE ONE THAT YOU SOLD TO QUINN, EMANUEL

16   ISN'T AVAILABLE TO US TODAY?

17   A    SO I SOLD ONE TO QUINN, EMANUEL THAT WAS IN

18   THE MERL LOBBY, AND THAT'S IN WASHINGTON D.C. RIGHT

19   NOW.

20         AND THERE'S A SECOND ONE THAT I SOLD TO

21   QUINN, EMANUEL AND I BELIEVE THAT THAT IS SOMEWHERE

22   IN THE COURTROOM NEARBY.

23         MR. JOHNSON:  YOUR HONOR, I OBJECT TO

24   THIS LINE OF QUESTIONING.  WE HAVE -- WE HAVE IT

25   HERE WITH US.

```
 1                 MR. JACOBS:  COULD WE HAVE IT?

 2                 MR. JOHNSON:  IF YOU'D LIKE TO SEE IT.

 3                 MR. JACOBS:  WE ASKED FOR IT.

 4                 MR. JOHNSON:  SURE.  DO YOU WANT US TO

 5      GET IT?

 6                 MR. JACOBS:  PLEASE.

 7                 (PAUSE IN PROCEEDINGS.)

 8                 MR. JACOBS:  YOUR HONOR, I DON'T WANT TO

 9      BURDEN THE COURT'S FILES WITH THIS DEVICE, SO WHAT

10      I PROPOSE TO DO IS HAVE IT PHOTOGRAPHED AFTER COURT

11      TODAY AND OFFER PHOTOGRAPHS OF THE DEVICE INTO THE

12      COURT RECORD.  WOULD THAT BE ACCEPTABLE?

13                 THE COURT:  THAT'S FINE.

14      BY MR. JACOBS:

15      Q    SO MR. BOGUE, WHAT HAVE WE GOT HERE?  I'M

16      HOLDING UP A MITSUBISHI THING ON A TRIPOD.  WHAT IS

17      THIS?

18      A    SO THAT'S A PROJECTOR AND IT'S ATTACHED TO A

19      TRIPOD.

20      Q    AND THIS IS PART OF THE DIAMONDTOUCH SYSTEM?

21      A    YES.

22      Q    SO THE IMAGE FOR DIAMONDTOUCH WOULD COME FROM

23      A PROJECTOR?

24      A    YES.

25      Q    AND THE PROJECTOR, IT LOOKS LIKE IT CAN ROTATE
```

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8             I, THE UNDERSIGNED OFFICIAL COURT

9     REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/
                      _____
22                    LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
23

24                    DATED:  AUGUST 14, 2012

25