# Pierce Declaration

# EXHIBIT 8

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

    APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6   CORPORATION,                  )
                                  )  SAN JOSE, CALIFORNIA
7                PLAINTIFF,       )
                                  )  AUGUST 14, 2012
8          VS.                    )
                                  )  VOLUME 8
9   SAMSUNG ELECTRONICS CO.,      )
    LTD., A KOREAN BUSINESS       )  PAGES 2321-2650
10  ENTITY; SAMSUNG               )
    ELECTRONICS AMERICA,          )
11  INC., A NEW YORK              )
    CORPORATION; SAMSUNG          )
12  TELECOMMUNICATIONS            )
    AMERICA, LLC, A DELAWARE      )
13  LIMITED LIABILITY             )
    COMPANY,                      )
14                                )
                 DEFENDANTS.      )
15  _____

16           TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24                          IRENE RODRIGUEZ, CSR, CRR
                            CERTIFICATE NUMBER 8074
25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF        MORRISON & FOERSTER
     APPLE:                   BY:  HAROLD J. MCELHINNY
3                                  MICHAEL A. JACOBS
                                   RACHEL KREVANS
4                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
5
     FOR COUNTERCLAIMANT  WILMER, CUTLER, PICKERING,
6    APPLE:                   HALE AND DORR
                              BY:  WILLIAM F. LEE
7                             60 STATE STREET
                              BOSTON, MASSACHUSETTS  02109
8
                              BY:  MARK D. SELWYN
9                             950 PAGE MILL ROAD
                              PALO ALTO, CALIFORNIA  94304
10
     FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
11                            OLIVER & HEDGES
                              BY:  CHARLES K. VERHOEVEN
12                            50 CALIFORNIA STREET, 22ND FLOOR
                              SAN FRANCISCO, CALIFORNIA  94111
13
                              BY:  VICTORIA F. MAROULIS
14                                 KEVIN P.B. JOHNSON
                              555 TWIN DOLPHIN DRIVE
15                            SUITE 560
                              REDWOOD SHORES, CALIFORNIA  94065
16
                              BY:  MICHAEL T. ZELLER
17                                 WILLIAM C. PRICE
                              865 SOUTH FIGUEROA STREET
18                            10TH FLOOR
                              LOS ANGELES, CALIFORNIA  90017
19
     FOR INTEL:           PERKINS COIE
20                            BY:  DANIEL T. SHVODIAN
                              3150 PORTER DRIVE
21                            PALO ALTO, CALIFORNIA 94304

22
     INTERPRETERS:        JAMES YIM VICTORY
23                        ALBERT S. KIM
                          ANN PARK
24

25
```

1

                    INDEX OF WITNESSES

2


3    DEFENDANT'S


4

     **CLIFTON FORLINES**
5         DIRECT EXAM BY MR. JOHNSON        P. 2349
          CROSS-EXAM BY MR. JACOBS          P. 2367
6


7    **WOODWARD YANG**
          DIRECT EXAM BY MR. JOHNSON        P. 2373
8         CROSS-EXAM BY MR. LEE             P. 2436
          REDIRECT EXAM BY MR. JOHNSON      P. 2485
9         RECROSS-EXAM BY MR. LEE           P. 2490


10

     **JINYEUN WANG**
11        DIRECT EXAM BY MR. QUINN          P. 2522
          CROSS-EXAM BY MR. JACOBS          P. 2541
12        REDIRECT EXAM BY MR. QUINN        P. 2549


13   **ROGER FIDLER**
          BY VIDEOTAPED DEPOSITION          P. 2558
14                                          P. 2565


15   **ITAY SHERMAN**
          DIRECT EXAM BY MR. VERHOEVEN      P. 2573
16        CROSS-EXAM BY MS. KREVANS         P. 2611


17

18

19

20

21

22

23

24

25

<pre>
 1                        INDEX OF EXHIBITS

 2                              MARKED        ADMITTED

 3      PLAINTIFF'S

 4      210, 26.1. & 2288                      2344
        46.2                                   2347
 5      2031                                   2458
        2257                                   2542
 6      2267                                   2543
        55                                     2546
 7      2281                                   2547
        562                                    2606
 8      155                                    2622
        150                                    2633
 9      148                                    2635

10

        DEFENDANT'S
11
        4103                                   2345
12      3951.004                               2346
        548                                    2354
13      693                                    2356
        655.004                                2359
14      665.001                                2360
        697                                    2364
15      655.002                                2365
        698                                    2366
16      1069                                   2381
        1055                                   2385
17      3697.006                               2389
        3967.012                               2394
18      1050, 1053, 1054, 1057, 1051,
        1056, 1076 & 1077                      2395
19      533 & 539                              2399
        1068                                   2401
20      3967.015 & 3967.025                    2412
        1071                                   2413
21      3967.028                               2415
        3967.043                               2424
22      645                                    2433
        3967.012                               2434
23      3967.003 & 3967.005                    2435
        529                                    2564
24      621                                    2565
        1074                                   2599
25      562                                    2606
</pre>

```
 1    PDX 46.2 IS THE SLOW MOTION VIDEO WE SHOWED

 2    YESTERDAY WITH DR. BEDERSON.  WE'D MOVE THAT INTO

 3    EVIDENCE.

 4              THE COURT:  WAIT.  46.2?

 5              MR. JACOBS:  YES.

 6              THE COURT:  ANY OBJECTION?

 7              MR. JOHNSON:  NO, YOUR HONOR.

 8              THE COURT:  THAT WAS WITH DR. BEDERSON?

 9              MR. JACOBS:  SORRY, WITH MR. BOGUE, YOUR

10    HONOR.  I'M SORRY.

11              THE COURT:  OKAY.  ALL RIGHT.  AND WHAT

12    WAS THAT?

13              MR. JACOBS:  THAT'S A SLOW MOTION VIDEO

14    OF TABLECLOTH EXHIBITING THE PULL DOWN BEHAVIOR.

15              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

16              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

17              46.2, HAVING BEEN PREVIOUSLY MARKED FOR

18              IDENTIFICATION, WAS ADMITTED INTO

19              EVIDENCE.)

20              THE COURT:  OKAY.  9:09.  THAT'S IT?

21              MR. JACOBS:  YES, YOUR HONOR.  THANK YOU.

22              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

23    BE EXCUSED AND IS IT SUBJECT TO RECALL?

24              MR. JOHNSON:  YES, HE MAY BE EXCUSED AND,

25    NO, YOUR HONOR, HE'S NOT SUBJECT TO RECALL.
```

2348

1              MR. JACOBS:  AGREED, YOUR HONOR.

2              THE COURT:  OKAY.  THEN YOU ARE EXCUSED

3     AND YOU DON'T HAVE TO COME BACK.

4              THE WITNESS:  OKAY.

5              THE COURT:  ALL RIGHT.  THANK YOU, SIR.

6              OKAY.  GO AHEAD AND PLEASE CALL YOUR NEXT

7     WITNESS.

8              MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS

9     DR. CLIFF FORLINES.

10             THE COURT:  DO YOU HAVE A PHOTO?

11             THE CLERK:  YES, YOUR HONOR.

12             THE COURT:  THANKS.  WE CAN PUT THAT OUT

13    LATER.

14             MR. JOHNSON:  PLEASE TAKE THE STAND.

15             THE COURT:  MR. FORLINES, PLEASE RAISE

16    YOUR RIGHT HAND.

17                    **CLIFTON FORLINES,**

18    BEING CALLED AS A WITNESS ON BEHALF OF THE

19    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

20    EXAMINED AND TESTIFIED AS FOLLOWS:

21             THE WITNESS:  I DO.

22             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

23    /   /   /

24    /   /   /

25    /   /   /

|   |   |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MR. JOHNSON: |
| 3 | Q    GOOD MORNING, DR. FORLINES. |
| 4 | A    GOOD MORNING. |
| 5 | Q    DO YOU HAVE AN UNDERSTANDING OF WHY YOU'RE |
| 6 | HERE TO TESTIFY. |
| 7 | A    YES.  I USED TO BE AN EMPLOYEE OF MITSUBISHI. |
| 8 | I WORKED ON THE DIAMONDTOUCH.  SORRY ABOUT THAT. |
| 9 | I'M SORRY.  IT'S MY FIRST TIME IN COURT. |
| 10 | Q    FIRST TIME IN ANY COURT? |
| 11 | A    YES. |
| 12 | Q    ALL RIGHT.  SO CAN WE -- LET'S STEP BACK.  CAN |
| 13 | YOU DESCRIBE FOR US YOUR EDUCATIONAL BACKGROUND, |
| 14 | PLEASE. |
| 15 | A    SURE.  MY UNDERGRADUATE DEGREE IS IN |
| 16 | INDUSTRIAL DESIGN.  THAT'S FROM CARNEGIE MELLON |
| 17 | UNIVERSITY. |
| 18 |          I HAVE A MASTER'S IN ENTERTAINMENT |
| 19 | TECHNOLOGY AND A BACHELOR'S IN HUMAN COMPUTER |
| 20 | INTERACTION, ALSO FROM CARNEGIE MELLON. |
| 21 |          MY DOCTORATE IS IN COMPUTER SCIENCE. |
| 22 | THAT'S FROM THE UNIVERSITY OF TORONTO. |
| 23 | Q    WHAT DO YOU DO FOR A LIVING? |
| 24 | A    I WORK AT DRAPER LABORATORY.  D-R-A-P-E-R. |
| 25 | DRAPER IS A NOT FOR PROFIT LAB IN CAMBRIDGE, |

1   MASSACHUSETTS.  I WORK IN THE HUMAN CENTERED

2   ENGINEERING GROUP.  SOME PEOPLE IN DRAPER CALL THAT

3   THE USER INTERFACE GROUP.

4   Q    OKAY.  AND WHAT DID YOU DO BEFORE YOU WORKED

5   AT DRAPER?

6   A    BEFORE DRAPER I WORKED AT THE MITSUBISHI

7   ELECTRIC RESEARCH LABS.  WE ALL CALLED IT MERL.

8   THAT'S A LITTLE BIT EASIER.

9   Q    LET'S CALL IT MERL.  WHEN DID YOU START AT

10   MERL?

11   A    I STARTED AS A CONTRACTOR AT MERL IN LATE

12   2001.

13   Q    OKAY.  NOW, YOU MENTIONED THE DIAMONDTOUCH

14   SYSTEM.

15          CAN YOU BRIEFLY DESCRIBE THE DIAMONDTOUCH

16   SYSTEM FOR US?

17   A    SURE.  IT'S A MULTIUSER, MULTITOUCH DISPLAY

18   THAT ALLOWS PEOPLE TO INTERACT WITH GRAPHICAL

19   APPLICATIONS USING THEIR FINGERS AND THEIR HANDS.

20   Q    OKAY.  WAS THERE A TIME WHEN DIAMONDTOUCH WAS

21   ENCASED WITHIN A SINGLE HOUSING?

22   A    SURE.  PART OF THE RESEARCH WE DID IN THE

23   DIAMONDTOUCH WAS DIFFERENT FORM FACTORS.  SO SOME

24   OF THESE FORM FACTORS INCLUDED THE ACTUAL TOUCH

25   SENSITIVE SURFACE AND ALL OF THE COMPUTING AND

1    PROTECTOR ELEMENTS ENCASED IN ALL ONE DESIGN.

2    Q    AND WHAT WAS YOUR ROLE WITH RESPECT TO

3    DIAMONDTOUCH?

4    A    WELL, LIKE WITH OTHER MERL PROJECTS, I WOULD

5    DESIGN AND BUILD NEW USER INTERFACES, TEST THOSE

6    OUT, YOU KNOW, CHECK ON USABILITY, WRITE PAPERS

7    ABOUT THAT WORK, FILE PATENTS, GIVE PRESENTATIONS,

8    THAT KIND OF THING.

9    Q    ALL RIGHT.  WHAT'S FRACTAL ZOOM?

10   A    FRACTAL ZOOM IS AN APPLICATION I WROTE FOR THE

11   DIAMONDTOUCH.  IT'S A VERY SIMPLE APPLICATION.  IT

12   SHOWS OFF FRACTAL GRAPHICS ON THE DIAMONDTOUCH,

13   WHICH IS LIKE MATHEMATICAL IMAGES.

14        A USER WORKING WITH THIS APPLICATION CAN

15   TOUCH THE FRACTAL WITH THE FINGER AND DRAG IT

16   AROUND THE DISPLAY, OR THEY CAN TOUCH THE

17   APPLICATION WITH TWO FINGERS AND USE THOSE TWO

18   FINGERS TO RESIZE THE GRAPHICS.

19   Q    WHEN DID YOU WRITE THE PROGRAM?

20   A    IN LATE 2004.

21   Q    AND WHY DID YOU WRITE IT?

22   A    I WROTE FRACTAL ZOOM TO SHOW OFF SOME OF THE

23   MULTITOUCH MEANS OF INPUT THAT PEOPLE HAD USED

24   PREVIOUSLY.  WE WOULD SHOW FRACTAL ZOOM IMMEDIATELY

25   BEFORE SHOWING SOME OF THE MORE ADVANCED

1    DIAMONDTOUCH GESTURE WORK.

2    Q    I'D LIKE TO SHOW YOU A VIDEO THAT'S ALREADY

3    BEEN ADMITTED INTO EVIDENCE.  IT'S SDX 3952.101,

4    AND I'M GOING TO ASK YOU, BEFORE WE LOOK AT THE

5    VIDEO, BRIEFLY, CAN YOU DESCRIBE HOW FRACTAL ZOOM

6    DISTINGUISHES BETWEEN ONE FINGER AND TWO FINGER

7    INPUTS?

8    A    SURE THING.

9    Q    RYAN, CAN WE SHOW THAT.

10             (WHEREUPON, A VIDEO WAS PLAYED IN OPEN

11   COURT OFF THE RECORD.)

12             THE WITNESS:  SO CAN YOU PAUSE IT HERE,

13   PLEASE.

14             SO WHEN THEY START THE APPLICATION, THEY

15   SEE THIS IMAGE AND THE USER CAN SEE THAT IT WAS

16   WRITTEN BY MITSUBISHI ELECTRIC RESEARCH LABS.  IT

17   TELLS THEM THAT IT WAS WRITTEN IN 2004.

18             AND IT SAYS SOME OTHER THINGS ABOUT THE

19   SOFTWARE, SUCH AS IT'S NOT FOR SALE, IT'S FOR

20   DEMONSTRATIONS, AND THAT THERE ARE PATENTS PENDING

21   ON THE DIAMONDTOUCH TECHNOLOGY AND THE GESTURAL

22   WORK WE WERE WORKING ON.

23             CAN WE GO AHEAD AND PLAY.

24             (WHEREUPON, A VIDEO WAS PLAYED IN OPEN

25   COURT OFF THE RECORD.)

```
1              THE WITNESS:  SO AFTER READING ABOUT THE

2     APPLICATIONS -- CAN YOU PAUSE AGAIN, PLEASE.

3     THEY'D SEE A SET OF INSTRUCTIONS ABOUT WHAT THEY

4     COULD DO WITH THE APPLICATION, AND THE INSTRUCTIONS

5     TELL THEM THAT -- I FORGOT ABOUT THIS -- IT TELLS

6     THEM THAT THEY CAN TOUCH THE TABLE WITH ONE FINGER

7     AND THAT'LL LET THEM PAN, AND PAN IS ANOTHER WORD

8     WE USE FOR MOVING OR SCROLLING.

9              IT SAYS THEY CAN TOUCH THE TABLE WITH TWO

10    FINGERS AND SPREAD THEM APART TO ZOOM IN OR TOUCH

11    THE TABLE WITH TWO FINGERS AND PULL THEM TOGETHER

12    IN ORDER TO ZOOM OUT.

13             AND THAT'S PRETTY MUCH WHAT YOU DO WITH

14    THIS APPLICATION.

15             CAN WE PLAY IT, PLEASE.

16             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17    OPEN COURT OFF THE RECORD.)

18             THE WITNESS:  SO AFTER SEEING THOSE

19    INSTRUCTIONS, THEY GET A CHANCE TO USE THE

20    APPLICATION.  SO ONE FINGER, TOUCH, DRAG, WE'RE

21    GOING TO PAN UP.  ONE FINGER, TOUCH, DRAG, WE'RE

22    GOING TO MOVE BACK DOWN.  AND TWO FINGERS, WE CAN

23    ZOOM OUT.  OR TWO FINGERS WE CAN ZOOM IN.  AGAIN,

24    THAT'S PRETTY MUCH WHAT THE APPLICATION DOES.

25    BY MR. JOHNSON:
```

1    Q    OKAY.  YOU SHOULD HAVE A BINDER IN FRONT OF

2    YOU THAT'S BLACK THAT HAS SOME EXHIBITS IN THERE?

3    A    UM-HUM.

4    Q    AND I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT

5    548, PLEASE.

6    A    548, OKAY.

7    Q    YEAH.  WHAT'S THIS?

8    A    THIS IS A PICTURE OF A, A DIRECTORY.  THIS IS

9    THE SOURCE CODE TO THE APPLICATION WE JUST WATCHED

10   THE VIDEO OF.  THIS IS THE CODE I WROTE.

11           MR. JOHNSON:  OKAY.  YOUR HONOR, WE'D ASK

12   THAT EXHIBIT 548 BE MOVED INTO EVIDENCE.

13           MR. JACOBS:  NO OBJECTION, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

15           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

16           548, HAVING BEEN PREVIOUSLY MARKED FOR

17           IDENTIFICATION, WAS ADMITTED INTO

18           EVIDENCE.)

19           MR. JOHNSON:  CAN WE PUBLISH THAT,

20   PLEASE.

21           THE COURT:  GO AHEAD, PLEASE.

22   BY MR. JOHNSON:

23   Q    WHAT'S THE FILE AT THE TOP, FRACTALZOOM@.JAVA?

24   A    THAT'S THE NAME OF THE SOURCE CODE FOR THIS

25   APPLICATION.  THAT'S MY TYPO.  I MISSPELLED IT.

1    Q    YOU LEFT OUT THE R?

2    A    I LEFT OUT THE R.  IT SAYS FRACTAL ZOOM.

3    Q    AND LET'S, WHAT'S THE DATE OF THIS FILE?

4    A    THIS FILE WAS LAST EDITED ON NOVEMBER 30TH,

5    2004.

6    Q    WHAT DOES THAT MEAN?

7    A    IT MEANS THE LAST TIME ANYBODY MADE ANY

8    CHANGES TO THIS SOURCE CODE WAS NOVEMBER 30TH,

9    2004.

10   Q    ALL RIGHT.  LET'S PULL UP THE EXHIBIT AND LOOK

11   AT EXHIBIT 693?

12   A    693, OKAY.

13   Q    WHAT'S THIS?

14   A    THIS IS THE -- THIS IS THE SOURCE CODE TO THE

15   FRACTAL ZOOM APPLICATION WE JUST WATCHED THE VIDEO

16   OF.

17   Q    IS THIS THE SOURCE CODE YOU WROTE?

18   A    YES, IT IS.  MY NAME IS AT THE VERY TOP OF

19   THIS FILE.

20         MR. JOHNSON:  ALL RIGHT.  CAN WE MOVE

21   EXHIBIT 693 INTO EVIDENCE, PLEASE.

22         THE COURT:  ANY OBJECTION.

23         MR. JACOBS:  NO, YOUR HONOR.

24         THE COURT:  IT'S ADMITTED.

25         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

1          693, HAVING BEEN PREVIOUSLY MARKED FOR

2          IDENTIFICATION, WAS ADMITTED INTO

3          EVIDENCE.)

4    BY MR. JOHNSON:

5    Q    SO WE SEE YOUR NAME AT THE TOP?

6    A    YEAH, THAT'S MY NAME RIGHT THERE, FORLINES.

7    Q    IS THERE A DATE ON THIS SOURCE CODE?

8    A    SURE.  IT SAYS 2004.  THE TOOL I WAS USING TO

9    WRITE CODE AT THE TIME WOULD AUTOMATICALLY INSERT

10   THE YEAR AT THE TOP OF A NEW FILE.

11   Q    CAN YOU BRIEFLY EXPLAIN, I DON'T WANT TO GO

12   INTO A LOT OF DETAILS ON THE SOURCE CODE, BUT CAN

13   YOU BRIEFLY EXPLAIN HOW THIS SOURCE CODE WORKED?

14   A    SURE.  FRACTAL ZOOM WORKS WITH A LOWER LEVEL

15   OF SOFTWARE THAT IS RECEIVING SORT OF RAW DATA FROM

16   THE DIAMONDTOUCH.

17          IT RECEIVES AN INPUT EVENT.  AT THE

18   BOTTOM OF PAGE 2, IT RECEIVES AN INPUT EVENT HERE

19   IN A METHOD CALLED TOUCH DETECTED.  THERE'S A DT

20   LID, DT FRAME, DT LID, INPUT DT FRAME.  I DIDN'T

21   NAME IT.

22          THAT INPUT EVENT HAS INFORMATION ABOUT

23   THE TOUCH, SO LATER IN THE TOUCH DETECTIVE METHOD,

24   THERE'S A CHUNK OF CODE HERE WHERE WE CHECK TO SEE

25   IF THAT TOUCH IS A TWO-FINGER TOUCH.  IF IT'S A

1    TWO-FINGER TOUCH, WE'RE GOING TO SET THE

2    APPLICATION MODE TO ZOOMING MODE, RIGHT THERE.  AND

3    IF IT'S NOT A TWO-FINGER TOUCH, WE SET THE

4    APPLICATION MODE TO PANNING MODE HERE.  AGAIN, PAN

5    IS A WORD FOR MOVE.

6             WE THEN REPAINT THE APPLICATION, AND OVER

7    ON, IT LOOKS LIKE PAGE 4 AT THE VERY BOTTOM HERE,

8    IF THE APPLICATION IS IN ZOOM MODE -- CAN YOU

9    SCROLL THAT UP A LITTLE BIT?  I'M SORRY, SHOW A

10   LITTLE BIT MORE.  PERFECT.

11            IF THE APPLICATION IS IN ZOOMING MODE

12   WHEN WE PAINT, WE'RE GOING TO PAINT THE FRACTAL

13   IMAGES AT A NEW SIZE, AND IF THE APPLICATION IS IN

14   CANDY MODE, WE'RE GOING TO PAINT THE IMAGES AT A

15   NEW LOCATION.

16   Q    WAS THIS THE SOURCE CODE THAT WAS USED IN THE

17   FRACTAL ZOOM VIDEO THAT WE SAW?

18   A    YES, IT IS.

19   Q    ARE YOU FAMILIAR WITH AN APPLICATION THAT ALSO

20   RAN ON DIAMONDTOUCH CALLED TABLECLOTH?

21   A    YES.  TABLECLOTH IS ANOTHER SORT OF SIMPLE

22   DEMONSTRATION APPLICATION.  TABLECLOTH LETS YOU

23   REACH OUT WITH YOUR FINGER AND TOUCH AN IMAGE ON

24   THE DIAMONDTOUCH AND PULL IT UP OR DOWN.  WHEN YOU

25   DO THAT, IT EXPOSES A SECOND IMAGE IMMEDIATELY

```
1    ABOVE OR BELOW THAT FIRST ONE YOU GRABBED.

2              WHAT'S NEAT ABOUT TABLECLOTH IS YOU LET

3    GO AND TABLECLOTH IS GOING TO AUTOMATICALLY ANIMATE

4    THE IMAGE BACK AND SNAP IT BACK INTO ITS ORIGINAL

5    POSITION WHERE IT FIRST STARTED.

6    Q    WHO WROTE TABLECLOTH AND WHEN WAS IT WRITTEN?

7    A    TABLECLOTH WAS WRITTEN BY ONE OF MY COLLEAGUES

8    AT MERL, ALAN ESENTHER.  HE WROTE IT AT THE VERY,

9    VERY END OF 2004 AND EARLY 2005.  I REMEMBER ALAN

10   COMING BACK FROM HIS CHRISTMAS AND NEW YEAR'S

11   VACATION BEING REALLY EXCITED ABOUT TABLECLOTH AND

12   THE OTHER DT FLASH APPLICATIONS HE HAD BEEN WORKING

13   ON.

14   Q    ARE YOU FAMILIAR WITH THE SOURCE CODE FOR

15   TABLECLOTH?

16   A    YES, I AM.

17   Q    LET'S LOOK AT DX 655.ZERO 04 IN YOUR BINDER.

18   CAN YOU TELL US WHAT THIS IS?

19   A    SURE.  THIS IS A DIRECTORY THAT HAS WEB PAGES

20   FOR ALL OF THE DT FLASH DEMONSTRATION APPLICATIONS

21   THAT I JUST MENTIONED.

22             MR. JOHNSON:  YOUR HONOR, WE --

23             THE WITNESS:  SORRY.

24   BY MR. JOHNSON:

25   Q    I DIDN'T MEAN TO INTERRUPT.
```

```
 1    A    THAT'S ALL RIGHT.  THE SECOND ONE FROM THE

 2    BOMB HERE IS CALLED TABLECLOTH UNDERSCORE 2 SEARCH.

 3    THAT'S THE WEB PAGE WITH THE TABLECLOTH SOFTWARE.

 4              MR. JOHNSON:  YOUR HONOR, WE ASK DX

 5    655.004 BE ADMITTED.

 6              MR. JACOBS:  NO OBJECTION.

 7              THE COURT:  THAT'S ADMITTED.

 8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 9              655.004, HAVING BEEN PREVIOUSLY MARKED

10              FOR IDENTIFICATION, WAS ADMITTED INTO

11              EVIDENCE.)

12    BY MR. JOHNSON:

13    Q    I THINK YOU WERE TALKING ABOUT A FUNCTION

14    TOWARDS THE BOTTOM, RIGHT?  WHAT DOES THIS SCREEN

15    SHOT SHOW?

16    A    THE SECOND FILE FROM THE BOTTOM IS TABLECLOTH

17    UNDERSCORE 27.  THAT'S THE WEB PAGE THAT YOU WOULD

18    NEED IN ORDER TO RUN THIS SOFTWARE.

19              YOU CAN SEE HERE THAT IT WAS LAST

20    MODIFIED ON JANUARY 12TH, 2005.

21    Q    WHAT DOES THAT MEAN, LAST MODIFIED

22    JANUARY 12TH, 2005?

23    A    THAT MEANS THE LAST TIME ANYBODY MADE ANY

24    CHANGES TO THIS WEB PAGE WAS JANUARY 12TH, 2005.

25    Q    NOW, IS THAT CONSISTENT WITH YOUR RECOLLECTION
```

2360

```
1    AS TO WHEN TABLECLOTH WAS WRITTEN?

2    A    YES, IT IS.

3    Q    YOU TESTIFIED EARLIER THAT, OR YOU JUST

4    TESTIFIED THERE'S JANUARY 12TH, 2005.  BUT LOOK AT

5    THE PATH DIRECTORY UP AT THE TOP OF THIS DOCUMENT,

6    IT HAS A DATE OF JUNE 7TH, 2005, TOWARDS THE END.

7              WHAT'S YOUR UNDERSTANDING OF WHAT THAT

8    MEANS?

9    A    WELL, ALAN, ALAN WAS WORKING ON THE DT FLASH

10   DRIVES FOR A WHILE.  HIS WORKING PROCESS, IF YOU

11   WILL, WOULD BE TO TAKE A WHOLE COLLECTION OF

12   SOFTWARE AND JUST MAKE A COPY OF IT, PUT A NEW DATE

13   ON IT, AND THEN CONTINUE TO WORK ON PIECES.  SO

14   WE'RE LOOKING AT A JUNE 7TH, 2005 COPY OF THE DT

15   FLASH APPLICATIONS.

16   Q    LET'S LOOK AT DX 655.001.  WHAT'S THIS?

17   A    THIS IS THE SOURCE CODE TO THE TABLECLOTH

18   APPLICATION.

19              MR. JOHNSON:  OKAY.  YOUR HONOR, WE ASK

20   THAT DX 665.001 BE ADMITTED.

21              THE COURT:  ANY OBJECTION.

22              MR. JACOBS:  NO, YOUR HONOR.

23              THE COURT:  IT'S ADMITTED.

24              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

25               665.001, HAVING BEEN PREVIOUSLY MARKED
```

```
 1              FOR IDENTIFICATION, WAS ADMITTED INTO
 2              EVIDENCE.)
 3    BY MR. JOHNSON:
 4    Q    BRIEFLY, CAN YOU EXPLAIN WHAT THAT THE
 5    TABLECLOTH SOURCE CODE SHOWS?
 6    A    SURE.  RIGHT IN THE MIDDLE OF PAGE 1, THERE'S
 7    A FUNCTION DEFINED HERE, AND IT'S, IT'S SET UP TO
 8    RUN -- IT'S SET UP TO RUN ON TOUCH OR RELEASE.
 9    THAT MEANS WHEN THE FINGER IS LIFTED FROM THE
10    DIAMONDTOUCH.
11              SO WHEN THE FINGER IS RELEASED, WE RUN
12    THIS CODE, AND THE VERY LAST THING THIS CODE DOES
13    HERE IS MAKE THIS FUNCTION CALLED SNAP BACK RUN
14    REPEATEDLY, AND IT'S SNAP BACK THAT ACTUALLY MOVES
15    THE IMAGE AND SNAPS IT BACK TO ITS INITIAL
16    POSITION.
17    Q    CAN YOU SHOW THE JURY THE SNAP BACK FUNCTION
18    IN THE CODE?
19    A    SURE.  IT'S AT THE VERY END OF THIS FILE ON
20    THE NEXT PAGE.  IT'S SHOWN HERE.  YEAH, PERFECT.
21              SO THIS IS SNAP BACK.  THIS IS THE
22    FUNCTION THAT'S CALLED REPEATEDLY TO MOVE THE
23    IMAGE, AND IT'S, IT'S SET UP -- IT DOES SOME MATH
24    TO ANIMATE THAT IMAGE BACK USING SORT OF AN
25    ELASTIC-LIKE ANIMATION BASED ON PHYSICS.
```

```
 1              AND IT CONTINUES TO RUN UNTIL THAT IMAGE,

 2     THE TOP OF THAT IMAGE IS ALIGNED WITH THE TOP OF

 3     THE SCREEN.

 4     Q    AND HOW DOES THIS CODE THAT YOU'RE LOOKING AT

 5     COMPARE TO THE CODE THAT EXISTED IN JANUARY OF

 6     2005?

 7     A    IT'S THE SAME.

 8     Q    NOW, WAS THERE A PLACE, DR. FORLINES, AT MERL

 9     WHERE FRACTAL ZOOM AND TABLECLOTH WERE AVAILABLE

10     FOR MERL CUSTOMERS, VISITORS, FRIENDS?

11     A    YES.  WE HAD A DIAMONDTOUCH SETUP IN THE FRONT

12     LOBBY AT MERL.  THIS IS WHERE PEOPLE COMING TO THE

13     LAB COULD TRY OUT THE SOFTWARE MAYBE WHILE THEY

14     WERE WAITING FOR SOMEONE TO SHOW UP.  I'VE SEEN,

15     LIKE, RESEARCHER'S KIDS AND THEIR FRIENDS, PEOPLE

16     COMING TO SEE TALKS AT MERL, THAT SORT OF THING.

17              WE SET IT UP IN THE LOBBY SO THAT IT

18     WOULD BE VISIBLE AND ATTRACTIVE AND ACTUALLY ASKED

19     OUR RECEPTIONIST TO SORT OF SHEPPARD PEOPLE OVER TO

20     TRY OUT THESE DEMOS ON DIAMONDTOUCH.

21     Q    WHEN WAS FRACTAL ZOOM FIRST PUT ON ITSELF

22     DIAMONDTOUCH SYSTEM IN THE LOBBY?

23     A    FRACTAL ZOOM WAS PUT ON ALMOST IMMEDIATELY

24     AFTER I WROTE IT.  AGAIN, WE WROTE THESE

25     APPLICATIONS TO SHOW OFF FEATURES OF THE
```

```
 1    DIAMONDTOUCH.  SO WE WANTED TO GET THEM OUT IN

 2    FRONT OF PEOPLE AND THE LOBBY WAS A GOOD PLACE TO

 3    DO THAT.

 4    Q    HOW DO YOU KNOW IT WAS PUT ON IT RIGHT AFTER

 5    YOU WROTE IT?

 6    A    I PUT IT ON THERE.

 7    Q    OKAY.  WHEN WAS TABLECLOTH FIRST PUT ON THE

 8    DIAMONDTOUCH SYSTEM IN THE LOBBY?

 9    A    IN JANUARY 2005, ALMOST IMMEDIATELY AFTER IT

10    WAS WRITTEN.  THE FIRST TIME I SAW TABLECLOTH

11    RUNNING WAS IN THE LOBBY AT MERL.

12    Q    WHEN WAS THAT?

13    A    JANUARY 2005.

14    Q    WAS THERE A TIME WHEN THE AVAILABILITY TO THE

15    SYSTEM IN THE MERL LOBBY BECAME MORE RESTRICTED?

16    A    SURE.  THE DOORS TO THE LOBBY AT MERL WERE

17    TYPICALLY CHOCKED OPEN DURING BUSINESS HOURS.  WE

18    HAD A RECEPTIONIST THERE.  BUT THERE WAS A LAPTOP

19    STOLEN IN EARLY 2006, I THINK FEBRUARY, AND AFTER

20    THAT TIME WE KEPT THE DOORS CLOSED AND LOCKED BY

21    DEFAULT.  ANYONE WHO WORKED THERE COULD OPEN THE

22    DOOR, AND THERE WAS ALSO A RECEPTIONIST WHO COULD

23    BUZZ PEOPLE IN WHO WERE COMING TO VISIT.

24    Q    WHOSE LAPTOP WAS STOLEN?

25    A    RAVIN BALAKRISHNAN'S.  HE WAS A VISITING
```

2364

```
1    SCIENTIST AT MERL DURING THIS TIME PERIOD.

2    Q    BEFORE THE LAPTOP WAS STOLEN IN 2006, WERE

3    THERE ANY RESTRICTIONS ON THE LOBBY OR THE SYSTEM

4    IN THE LOBBY?

5    A    NO, THERE WEREN'T.

6    Q    NOW, LET'S LOOK AT EXHIBIT 697 IN YOUR BINDER,

7    PLEASE.

8    A    697, CORRECT?

9    Q    YES.  WHAT'S THIS?

10   A    697 IS AN E-MAIL FROM CHIA SHEN TO MYSELF.

11   CHAUDHRI IS SOMEONE I WORKED WITH AT MERL.  SHE'S

12   ACKNOWLEDGING THAT I PUT TOGETHER A CD WITH A BUNCH

13   OF DIAMONDTOUCH SOFTWARE ON IT FOR A DEMONSTRATION

14   IN JANUARY OF 20002.

15              MR. JOHNSON:  YOUR HONOR, WE ASKED THAT

16   EXHIBIT DX 697 BE ADMITTED.

17              MR. JACOBS:  NO OBJECTION.

18              THE COURT:  IT'S ADMITTED.

19              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

20              697, HAVING BEEN PREVIOUSLY MARKED FOR

21              IDENTIFICATION, WAS ADMITTED INTO

22              EVIDENCE.)

23              MR. JOHNSON:  AND WE ALSO ASK THAT

24   EXHIBIT 655.002, THE SOURCE CODE, BE ADMITTED.

25              MR. JACOBS:  NO OBJECTION, YOUR HONOR.
```

```
 1                THE COURT:  THAT'S ADMITTED.

 2                (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 3                699.002, HAVING BEEN PREVIOUSLY MARKED

 4                FOR IDENTIFICATION, WAS ADMITTED INTO

 5                EVIDENCE.)

 6                THE WITNESS:  IT MIGHT BE HELPFUL TO

 7      POINT OUT THAT MANDELBROT, WHO IS MENTIONED HERE BY

 8      NAME.

 9      BY MR. JOHNSON:

10      Q    WHAT'S MANDELBROT?

11      A    MANDELBROT IS THE NAME OF THE MATHEMATICIAN

12      WHO CAME UP WITH THE SPECIFIC FRACTAL THAT IS USED

13      IN THE APPLICATION WE JUST TALKED ABOUT.

14                SO WHEN WE TALK ABOUT MANDELBROT, WE'RE

15      TALKING ABOUT THE FRACTAL ZOOM APPLICATION AND

16      THAT'S THE SAME THING.

17      Q    IS THIS REFERRING TO A DEMONSTRATION THAT WAS

18      GOING TO BE DONE FOR ANYBODY IN PARTICULAR?

19      A    THIS CD I PUT TOGETHER WAS FOR A DEMONSTRATION

20      THE FOLLOWING WEEK TO SENATOR BOB KERREY.  HE WAS

21      AT THE TIME THE PRESIDENT OF THE NEW SCHOOL IN

22      NEW YORK CITY.

23      Q    NOW, LET'S LOOK AT EXHIBIT 698.  WHAT'S THIS

24      DOCUMENT?

25      A    698?  THIS IS AN E-MAIL FROM CHIA SHEN TO
```

2366

```
 1    CATHY RILEY, ALAN ESENTHER, AND MYSELF.  SHE'S
 2    DISCUSSING THE PRACTICE, THE TYPICAL PRACTICE WE
 3    HAD OF KEEPING AWAY THESE GIVING AWAY THESE
 4    DIAMONDTOUCH APPLICATIONS TO THESE CUSTOMERS AND
 5    ANYONE WHO WAS INTERESTED IN DIAMONDTOUCH.  SHE
 6    MENTIONED MANDELBROT BY NAME.  AGAIN, MANDELBROT IS
 7    THE FRACTAL ZOOM APPLICATION.
 8            MR. JOHNSON:  YOUR HONOR, WE ASK THAT
 9    EXHIBIT DX 698 BE MOVED INTO EVIDENCE, YOUR HONOR.
10            MR. JACOBS:  NO OBJECTION, YOUR HONOR.
11            THE COURT:  IT'S ADMITTED.
12            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
13             698, HAVING BEEN PREVIOUSLY MARKED FOR
14             IDENTIFICATION, WAS ADMITTED INTO
15             EVIDENCE.)
16    BY MR. JOHNSON:
17    Q    AND AGAIN THE REFERENCE HERE TO MANDELBROT IS
18    ALSO REFERRING TO FRACTAL ZOOM?
19    A    YES, THEY'RE THE SAME THING.
20    Q    NOW, DR. FORLINES, ARE YOU BEING COMPENSATED
21    FOR YOUR TIME HERE TODAY?
22    A    I'M NOT BEING PAID TO BE HERE TODAY, NO.
23    Q    AND HAVE YOU BEEN COMPENSATED FOR THE TIME
24    YOU'VE SPENT LEADING UP TO YOUR TESTIMONY?
25    A    YES, I HAVE.
```

```
1    Q    WHAT'S YOUR HOURLY RATE?

2    A    IT'S $400 AN HOUR.

3    Q    ABOUT HOW MANY HOURS DID YOU SPEND WORKING ON

4    THIS MATTER?

5    A    I HAVEN'T ADDED IT UP, BUT SOMEWHERE SOUTH OF

6    100 HOURS.  THERE'S A LOT OF SOURCE CODE HERE.

7              MR. JOHNSON:  OKAY.  PASS THE WITNESS,

8    YOUR HONOR.

9              THE COURT:  OKAY.  THE TIME IS NOW 9:29.

10   GO AHEAD, PLEASE.

11                    CROSS-EXAMINATION

12   BY MR. JACOBS:

13   Q    YOU MENTIONED DR. BALAKRISHNAN.  HE WAS YOUR

14   THESIS ADVISOR?

15   A    YES, I MET DR. BALAKRISHNAN BEFORE HE WAS A

16   DOCTOR, HE WAS A STUDENT.  WE WORKED TOGETHER AT

17   MERL AND THEN WHEN I DID MY DOCTORAL WORK, HE WAS

18   MY ADVISOR.

19              MR. JACOBS:  THANK YOU, SIR.

20              NO FURTHER QUESTIONS.

21              THE COURT:  ALL RIGHT.  ANY REDIRECT?

22              MR. JOHNSON:  NO, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

24   BE EXCUSED?  AND IS IT SUBJECT TO RECALL OR NOT?

25              MR. JOHNSON:  YES, YOUR HONOR, HE MAY BE
```

2368

```
1    EXCUSED AND, NO, HE'S NOT SUBJECT TO RECALL.

2              THE COURT:  DO YOU AGREE WITH THAT,

3    MR. JACOBS?

4              MR. JACOBS:  YES, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THEN YOU ARE

6    EXCUSED AND YOU'RE FREE TO LEAVE.

7              OKAY.  THE NEXT WITNESS IS DEPOSITIONS;

8    IS THAT RIGHT?

9              MR. VERHOEVEN:  NO, YOUR HONOR.  WE'RE

10   GOING TO ADJUST THE ORDER AND CALL DR. --

11             MR. JOHNSON:  DR. WOODWARD YANG, YOUR

12   HONOR.

13             MR. VERHOEVEN:  THE DEPOS THAT WE HAD GO

14   TOGETHER WITH DR. WILLIAMS.

15             THE COURT:  OKAY.  BUT I NEED THE

16   PROFFER.

17             MR. LEE:  YES.

18             THE COURT:  SO, YOU KNOW WHAT, LET'S

19   TAKE -- THIS IS GOING TO BE ANOTHER WEIRD DAY.  WHY

20   DON'T WE TAKE OUR --

21             MR. VERHOEVEN:  WE HAVE IT RIGHT HERE.

22             MR. JOHNSON:  IF WE COULD TAKE A QUICK

23   BREAK, WE CAN SHOW IT TO YOUR HONOR.

24             THE COURT:  WELL -- WEIRDLY, WE'RE GOING

25   TO TAKE OUR MORNING BREAK NOW, I'M SORRY, AND THEN
```

```
 1    WE'LL TAKE ANOTHER BREAK -- SO IF WE TAKE OUR BREAK

 2    FROM 9:30 TO 9:45, AND THEN -- WELL, HOW MUCH TIME

 3    DO YOU NEED TO REVIEW THE PROFFER?

 4              MR. LEE:  PARDON?

 5              THE COURT:  HOW MUCH TIME DO YOU NEED

 6    TO -- HAVE YOU SEEN IT?

 7              MR. LEE:  NO.

 8              THE COURT:  OKAY.

 9              MR. LEE:  I THINK I CAN RESPOND, YOUR

10    HONOR, HAVING SEEN IT ORALLY, UNLESS YOUR HONOR

11    WANTS SOMETHING IN WRITING.  I HAVEN'T SEEN IT YET.

12              THE COURT:  OH, OKAY.  ALL RIGHT.  LET'S

13    JUST TAKE A TEN-MINUTE BREAK RIGHT NOW.  OKAY?

14    THANK YOU.

15              PLEASE KEEP AN OPEN MIND AND PLEASE DON'T

16    DISCUSS THE CASE WITH ANYONE AND PLEASE DON'T DO

17    ANY RESEARCH.  AND I APOLOGIZE FOR INCONVENIENCING

18    YOU.

19              (WHEREUPON, THE FOLLOWING PROCEEDINGS

20    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

21              THE COURT:  ALL RIGHT.  HAVE YOU HAD A

22    CHANCE TO LOOK AT IT NOW?

23              MR. LEE:  YES.

24              MR. JOHNSON:  YOUR HONOR, IF I MIGHT?

25              THE COURT:  ALL RIGHT.
```

```
 1    A     YES.  THE MOBILE DEVICE MARKET, YOU MIGHT
 2    RECALL BACK THEN, IF YOU HAD A MOBILE PHONE AND THE
 3    MOBILE PHONE COULD MAKE PHONE CALLS AND MAYBE WE
 4    COULD DO A TEXT WITH THAT MOBILE PHONE.
 5               AND WE ALSO HAD A SEPARATE DEVICE, A
 6    DIGITAL CAMERA THAT COULD TAKE PICTURES AND WE ALSO
 7    HAD A SEPARATE DEVICE LIKE A WALK MAN OR MAYBE IT
 8    WAS AN MP3 PLAYER.
 9               SO WE HAD THE THREE SEPARATE DEVICES, AND
10    AT THE TIME THE COMPANIES WHO WERE MAKING THESE
11    DEVICES, COMPANIES SUCH AS NOKIA, SUCH AS SONY
12    ERICSSON, SAMSUNG, WERE THINKING THAT, WOW, IT
13    WOULD BE VERY USEFUL FOR ALL THESE DEVICES TO
14    ACTUALLY NOT HAVE TO CARRY THREE DEVICES IN THREE
15    POCKETS, BUT TO HAVE ONE DEVICE TOGETHER THAT COULD
16    DO ALL OF THESE FUNCTIONS.
17               SO AT THE TIME, THESE COMPANIES WERE
18    THINKING ABOUT HOW DO WE INTEGRATE THESE THINGS?
19    HOW DO WE PUT THESE THINGS INTO ONE DEVICE?  AND
20    THEN WHAT SORT OF INNOVATIONS WE NEED TO, WHAT SORT
21    OF INVENTIONS DO WE NEED TO DO IN ORDER TO MAKE
22    THIS USEFUL AND PRACTICAL FOR PEOPLE TO USE?
23    Q    ALL RIGHT.  LET'S START WITH THE '460 PATENT.
24    YOU SHOULD HAVE SOME BINDERS IN FRONT OF YOU, AND
25    THERE'S AN EXHIBIT 1069 IN YOUR BINDER.  LET ME
```

1    KNOW WHEN YOU'RE THERE.

2    A    YES.

3    Q    WHAT'S THIS?

4    A    THIS IS THE '460 PATENT.

5            MR. JOHNSON:  YOUR HONOR, WE OFFER JX

6    1069 INTO EVIDENCE.

7            MR. LEE:  NO OBJECTION.

8            THE COURT:  IT'S ADMITTED.

9            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

10           1069, HAVING BEEN PREVIOUSLY MARKED FOR

11           IDENTIFICATION, WAS ADMITTED INTO

12           EVIDENCE.)

13   BY MR. JOHNSON:

14   Q    OKAY.  AND LET'S LOOK AT SDX 3967.004.

15           AND, DR. YANG, CAN YOU GIVE US JUST A

16   GENERAL OVERVIEW OF THE '460 PATENT?

17   A    YES.  A GENERAL OVERVIEW IS THIS HAS TO DO

18   WITH A CAMERA PHONE, AND OS NOW YOU HAVE A MOBILE

19   PHONE AND A CAMERA CONNECTED TOGETHER.  MORE

20   SPECIFICALLY, WHEN YOU LOOK INTO THE DETAILS OF THE

21   CLAIMS, IT SPEAKS SPECIFICALLY OF HAVING THREE CORE

22   FUNCTIONS.

23           THE FIRST CORE FUNCTION IS AN E-MAIL JUST

24   WITH TEXT.

25           THE SECOND CORE FUNCTION IS BEING ABLE TO

1    SEND AN E-MAIL WITH A PICTURE.  SO WHEN YOU SEND

2    THE E-MAIL, YOU NEED TO BE ABLE TO COMPOSE AN

3    E-MAIL AND THE PICTURE OF WHAT YOU WANT TO SEND IN

4    THE E-MAIL SHOULD BE VISIBLE THERE.

5              AND THE THIRD CORE FUNCTION IS YOU ALSO

6    HAVE THE ABILITY TO KIND OF PASS THROUGH AND LOOK

7    AT THE IMAGES THAT YOU HAVE STORED IN YOUR DEVICE.

8    SO THOSE ARE THE THREE CORE FUNCTIONS.

9    Q    WHAT PROBLEM WAS THE '460 PATENT TRYING TO

10   SOLVE?

11   A    WELL, YOU HAVE THIS, YOU HAVE THIS WONDERFUL

12   COMMUNICATION DEVICE, A MOBILE PHONE, AND NOW YOU

13   HAVE A DIGITAL CAMERA WHICH COULD TAKE PICTURED.

14             IT SEEMS KIND OF SILLY TO HAVE TO TAKE A

15   DIGITAL CAMERA AND PLUG IT INTO A P.C. TO TAKE

16   PICTURES, WASN'T THERE A WAY THAT WE COULD MERGE

17   THESE TWO DEVICES TOGETHER AND USE THAT MOBILE

18   PHONE IN ORDER TO SEND THE PICTURE BY E-MAIL.  AND

19   THAT'S WHAT THIS WAS TRYING TO SOLVE.

20   Q    WHAT APPLE PRODUCTS DID YOU EVALUATE WITH

21   RESPECT TO THE '460 PATENT?

22   A    YES, I EVALUATED IN PARTICULAR FOUR PIECES OF

23   HARDWARE, AND YOU CAN SEE THEM HERE.  I EVALUATED

24   THE IPHONE 4, THE IPHONE 3GS, THE IPHONE 3G, THE

25   IPOD TOUCH VOICE GENERATION, AND THE IPAD 2.

```
 1    Q    AND WE'RE LOOKING AT SDX 3967.005.

 2              NOW, DID YOU FIND THAT ANY OF THE

 3    PRODUCTS CAN PERFORM THE THREE CORE FUNCTIONS THAT

 4    YOU JUST DESCRIBED?

 5    A    YES.  I FOUND THAT ALL OF THESE FUNCTIONS CAN

 6    PERFORM THESE THREE CORE FUNCTIONS.

 7    Q    HAVE YOU PREPARED ANYTHING TO SHOW THE JURY

 8    HOW THE APPLE PRODUCTS PERFORM THESE FUNCTIONS?

 9    A    YES.  IN ORDER TO, SO THAT YOU CAN VISIBLY SEE

10    HOW THESE DEVICES PERFORM, I'VE PREPARED A VIDEO OF

11    THE IPHONE 4 OPERATING UNDER A VERSION OF SOFTWARE

12    THAT'S CALLED IOS 4, DIFFERENT VERSIONS OF

13    SOFTWARE, IOS 4 AND IOS 5, THIS IS VERSION 4, AND

14    THIS IS THE IPHONE 4.  SO I PREPARED A VIDEO.  IF

15    WE CAN START THE VIDEO, PLEASE.

16    Q    THIS IS 3967.006.

17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18    OPEN COURT OFF THE RECORD.)

19              THE WITNESS:  SO THIS IS JUST TO SHOW

20    THAT'S THE RIGHT EXHIBIT.  SO YOU CAN SEE THAT THE

21    PHONE IS ON, AND IN THIS MODE, THE PHONE IS IN A

22    PORTABLE PHONE MODE BECAUSE IT CAN RECEIVE A PHONE

23    CALL, AND I'LL DESCRIBE WHAT THAT IS.

24              SO YOU CAN SWITCH TO MAIL APPLICATION,

25    AND YOU CAN SEE YOUR MAIL, REVIEW MAIL, AND THEN
```

1    YOU CAN CHOOSE TO SEND AN E-MAIL, COMPRISE AN

2    E-MAIL.  SO IT BRINGS UP THIS SCREEN WHERE YOU CAN

3    ENTER AN ADDRESS, ENTER A MESSAGE, AND THEN YOU'RE

4    ABLE TO SEND THIS.

5            AND SO THIS WAS -- THIS WAS JUST KIND OF

6    A SIMPLE FUNCTIONALITY.  THIS IS REALLY TO SEND

7    E-MAIL IN A TEXT.

8            NOW, THESE ARE ALSO CAMERA PHONES.  SO

9    THEY ALSO WANT TO BE ABLE TO LOOK AT THE PICTURE.

10   SO YOU MIGHT NOTICE THAT ORANGE THING AT THE TOP,

11   THAT'S AN ORANGE.  SO THAT'S OUR MODEL.

12           SO HERE WE GO FROM THIS HOME SCREEN,

13   WE'RE GOING TO TURN ON THE CAMERA, SO WE'LL TURN ON

14   THE CAMERA AND WE'LL TRY TO TAKE A PICTURE OF THAT

15   ORANGE.

16           SO WE ALSO HAVE THE ABILITY TO BE IN

17   PHOTOGRAPHING MODE AND TAKE A PICTURE AND THE

18   PICTURE IS ACQUIRED AND IT'S STORED.

19           AND WE CAN ALSO VIEW THIS PICTURE THAT WE

20   JUST STORED.  SO IT'S A DIGITAL CAMERA, CERTAINLY.

21   SO IN A MOMENT THE PICTURE WILL BE SELECTED AND WE

22   CAN LOOK AT THE PICTURE AND WE CAN DECIDE NOW THAT

23   WE WANT TO SEND THIS PICTURE BY E-MAIL.

24           SO HERE WE HAVE THE OPTION OF SENDING IT

25   BY E-MAIL.  AND NOW WE HAVE THE OPTION OF NOW

```
 1    ENTERING AN ADDRESS AND A MESSAGE AND BEING ABLE TO

 2    SEND THIS E-MAIL.

 3            BUT THE IMPORTANT THING TO NOTE HERE IS

 4    ALSO THAT THE PICTURE IS ALSO VISIBLE IN THIS

 5    E-MAIL AS YOU'RE SENDING IT.  SO THE MESSAGE WILL

 6    BE PUT IN, AND, BRIEFLY, WE'LL PRESS SEND, AND THEN

 7    THE E-MAIL WILL BE SENT.

 8            SO THAT'S THE SECOND CORE FUNCTION, BEING

 9    ABLE TO SEND AN E-MAIL WITH A PHOTO INSIDE OF IT.

10            AND THE THIRD CORE FUNCTION HERE IS NOW

11    YOU'RE LOOKING AT THE PICTURE OF THE ORANGE, BUT

12    THE PICTURE PREVIOUSLY WERE SOME VACATION PHOTOS

13    AND YOU CAN SEE YOU CAN USE SCROLL KEYS TO GO BACK

14    AND FORTH BETWEEN DIFFERENT IMAGES.

15            SO THIS IS BASICALLY AN ILLUSTRATION OF

16    THOSE THREE CORE FUNCTIONS IN THE '460.

17            MR. JOHNSON:  YOUR HONOR, WE ASK TO MOVE

18    INTO EVIDENCE JX 1055, WHICH WAS THE IPHONE IOS 4.

19            THE COURT:  ANY OBJECTION?

20            MR. LEE:  NO OBJECTION.

21            THE COURT:  THAT'S ADMITTED.

22            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23            1055, HAVING BEEN PREVIOUSLY MARKED FOR

24            IDENTIFICATION, WAS ADMITTED INTO

25            EVIDENCE.)
```

1    BY MR. JOHNSON:

2    Q    DR. YANG, LET'S TURN TO THE ACTUAL CLAIM OF

3    THE '460 PATENT THAT YOU ANALYZED.  AND CAN YOU

4    WALK US THROUGH THAT, PLEASE?

5    A    CERTAINLY.  SO COULD I HAVE THE NEXT SLIDE,

6    PLEASE?

7    Q    IF WE LOOK AT 3967.007.

8    A    YES.

9         SO IN PARTICULAR, IF YOU LOOK AT THIS,

10   THIS IS CLAIM 1 OF THE '460 PATENT, THIS IS THE ONE

11   THAT'S BEING ASSERTED.  AND WHAT I'VE DONE HERE IS

12   THAT FIRST CORE FUNCTION THAT I MENTIONED, SENDING

13   E-MAIL WITH A TEXT, I'VE HIGHLIGHTED THAT IN BLUE.

14        THE SECOND CORE FUNCTION OF SENDING AN

15   E-MAIL WITH A PHOTO IN IT, I'VE HIGHLIGHTED IN

16   ORANGE.

17        AND THE THIRD CORE FUNCTION OF

18   ESSENTIALLY GOING THROUGH THE IMAGES, I'VE

19   HIGHLIGHTED IN GREEN.  SO JUST TO SORT OF ALERT YOU

20   AS FAR AS WHAT'S GOING ON.

21   Q    ALL RIGHT.  LET'S TURN TO THE FIRST PART OF

22   THE CLAIM, WHICH IS .008 SLIDE.

23   A    ALL RIGHT.  SO WE HAVE TO START AT THE VERY

24   BEGINNING OF THE CLAIM, AND THE CLAIM SAYS, "A DATA

25   TRANSMITTING METHOD FOR A PORTABLE COMPOSITE

```
1    COMMUNICATION TERMINAL WHICH FUNCTIONS AS BOTH A

2    PORTABLE PHONE AND A CAMERA, COMPRISING THE STEPS

3    OF."

4              SO THIS IS SAYING WE'RE GOING TO BE

5    TALKING ABOUT A CAMERA PHONE, OKAY?  SO THIS IS A

6    CAMERA PHONE, AND THE CAMERA PHONE HAS TO DO

7    CERTAIN THINGS.  IN FACT, IT HAS TO PERFORM THOSE

8    THREE CORE FUNCTIONS.

9    Q    SO AS PART OF YOUR ANALYSIS, ARE YOU ANALYZING

10   THE CLAIM LANGUAGE COMPARED TO THE ACCUSED

11   PRODUCTS?

12   A    YES.  SO IF YOU LOOK AT THIS, YOU CAN SEE

13   CLEARLY FROM THE IPHONE 4 VIDEO THAT I SHOWED YOU

14   THAT THAT WAS A CAMERA PHONE, IT CAN BE A CAMERA

15   AND A PHONE.

16             AND IF YOU LOOK AT ALL OF THE ACCUSED

17   PRODUCTS, THEY CAN ALL ACT AS A COMMUNICATION

18   TERMINAL AND A CAMERA OR A PHONE AND A CAMERA.

19   Q    SO WHAT'S YOUR CONCLUSION ABOUT WHETHER ANY OF

20   THE APPLE ACCUSED PRODUCTS MEET THIS FIRST CLAIM OF

21   THE '460 PATENT?

22   A    ALL OF THE PRODUCTS MEET THIS CLAIM

23   LIMITATION, SO THE IPHONE 3GS, IPHONE 3G, IPOD

24   TOUCH 4TH GENERATION, THE IPAD 2.

25   Q    YOU SAID ONE FUNCTION WAS ACCEPTING AN E-MAIL
```

```
 1    WITH A MESSAGE.  CAN YOU WALK US THROUGH THAT
 2    FUNCTION AS IT'S DESCRIBED IN CLAIM 1?
 3    A    YES.  SO IF WE GO TO THE NEXT SLIDE, THIS
 4    FIRST CORE FUNCTION NOW WAS THE ONE THAT'S BEEN
 5    HIGHLIGHTED IN BLUE, IT'S BEEN PULLED OUT AND BLOWN
 6    UP HERE.
 7              AND WE CAN SEE THAT IT SAYS, "ENTERING A
 8    FIRST E-MAIL TRANSMISSION SUB-MODE UPON A USER
 9    REQUEST FOR E-MAIL TRANSMISSION WHILE OPERATING IN
10    A PORTABLE PHONE MODE, THE FIRST E-MAIL
11    TRANSMISSION SUB-MODE PERFORMING A PORTABLE PHONE
12    FUNCTION."
13              AND THEN WE WANT TO BE ABLE TO TRANSMIT
14    THE ADDRESS AND OF THE OTHER PARTY AND A MESSAGE
15    RECEIVED THROUGH THE USER INTERFACE IN THE FIRST
16    E-MAIL TRANSMISSION SUB-MODE.
17              SO YOU CAN SEE THERE'S A FIRST E-MAIL
18    SUB-MODE, IT HAS TO BE REACHED FROM SOME USER
19    REQUEST FROM THAT HOME SCREEN.  SO WE HAVE TO PRESS
20    A BUTTON FOR THE MAIL APP, AND PRESS A BUTTON TO
21    COMPOSE, THE USER ENTERS THE FIRST SUB-MODE, AND
22    THEN HE ENTERED IN, HE CAN TYPE IN AN ADDRESS AND A
23    MESSAGE THAT WAS ENTERED THROUGH THE ONSCREEN
24    KEYBOARD, THAT'S THE USER INTERFACE, AND THIS IS
25    THE FIRST E-MAIL TRANSMISSION SUB-MODE AND THEN WE
```

1      SEND IT.

2              SO, IN FACT, THE IPHONE 4 VIDEO THAT I

3      SHOWED YOU SHOWS THIS PERFORMS EXACTLY THIS

4      FUNCTION, AND, IN FACT, ALL THE OTHER ACCUSED

5      DEVICES WILL PERFORM EXACTLY THIS FUNCTION IN

6      EXACTLY THIS SAME WAY AS WELL.

7              MR. JOHNSON:  YOUR HONOR, WE ASK THAT WE

8      MOVE INTO EVIDENCE SDX 3967.006, WHICH IS THE

9      IPHONE 4 VIDEO.

10             THE COURT:  ALL RIGHT.  ANY OBJECTION?

11             MR. LEE:  NO OBJECTION.

12             THE COURT:  IT'S ADMITTED.

13             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14             3697.006, HAVING BEEN PREVIOUSLY MARKED

15             FOR IDENTIFICATION, WAS ADMITTED INTO

16             EVIDENCE.)

17     BY MR. JOHNSON:

18     Q   NOW, LET'S LOOK AT THE NEXT PART OF THE CLAIM

19     LANGUAGE, DR. YANG.  CAN YOU -- YOU SAID THAT

20     ANOTHER FUNCTION WAS SENDING E-MAILS DISPLAYING

21     MESSAGES WITH PHOTOS.  CAN YOU DESCRIBE WHAT YOUR

22     OPINION IS WITH RESPECT TO THIS CLAIM LIMITATION?

23     A   RIGHT.  AS I MENTIONED, THIS IS THE SECOND

24     CORE FUNCTION, TO BE ABLE TO SEND AN E-MAIL WITH A

25     PHOTO THAT'S INSIDE OF IT.

1          SO WE NEED TO READ THIS VERY CAREFULLY

2     AND MAKE SURE IT'S BEING SATISFIED.  SO IT SAYS,

3     "ENTERING A SECOND E-MAIL TRANSMISSION SUB-MODE

4     UPON USER REQUEST FOR E-MAIL TRANSMISSION WHILE

5     OPERATING IN A DISPLAY SUB-MODE, THE SECOND E-MAIL

6     TRANSMISSION SUB-MODE DISPLAYING AN IMAGE MOST

7     RECENTLY CAPTURED IN A CAMERA MODE."

8          SO YOU MIGHT RECALL FROM THE VIDEO, YOU

9     SAW THERE WAS A CAMERA MODE, WE TOOK A PICTURE OF

10    THE ORANGE, AND THEN WE WERE ABLE TO DISPLAY THIS

11    IN A DISPLAY SUB-MODE.  WE WERE LOOKING AT THE

12    PICTURE.

13         AND THEN WE COULD REQUEST TO GO INTO THE

14    SECOND E-MAIL TRANSMISSION SUB-MODE, AND WE WENT

15    THERE AND THAT SECOND E-MAIL TRANSMISSION SUB-MODE,

16    WE THEN NEED TO, JUST AS WE DID BEFORE WITH THE

17    FIRST E-MAIL TRANSMISSION SUB-MODE, BE ABLE TO

18    TRANSMIT.

19         SO WE'RE TRANSMITTING THE ADDRESS OF THE

20    OTHER PARTY AND THE MESSAGE RECEIVED THROUGH THE

21    USER INTERFACE AND THE IMAGE IS DISPLAYED ON THE

22    DISPLAY AS AN E-MAIL IN A SECOND E-MAIL

23    TRANSMISSION SUB-MODE.

24         SO AN IMPORTANT POINT TO NOTE THERE IS

25    YOU CAN NOW ENTER IN THE MESSAGE, THE ADDRESS AND

```
1    IN THE ACTUAL E-MAIL, YOU CAN ACTUALLY SEE THE

2    IMAGE THAT YOU'RE SENDING, THAT'S REALLY CONVENIENT

3    BECAUSE YOU CAN MAKE SURE THAT'S THE IMAGE THAT YOU

4    WANT TO SEND, THE, I BELIEVE, IMAGE OF THE ORANGE,

5    MAYBE NOT SOME OTHER PICTURE THAT YOU DON'T WANT TO

6    SEND.

7    Q    I SEE YOU POINTING AT THE SCREEN A LOT.  WOULD

8    A LASER POINTER?

9    A    A POINTER WOULD BE USEFUL.

10           MR. JOHNSON:  I DON'T KNOW.  MAY I

11   APPROACH, YOUR HONOR?

12           THE COURT:  PLEASE, GO AHEAD.

13           THE WITNESS:  THANK YOU.  SO WE CAN SEE

14   THAT THE IPHONE 4 SATISFIED THIS BECAUSE WE SAW THE

15   VIDEO.  BUT, IN FACT, ALL FOUR OTHER DEVICES

16   PERFORM EXACTLY IN THIS SAME WAY.

17   BY MR. JOHNSON:

18   Q    OKAY.  CAN YOU WALK THE JURY THROUGH THE THIRD

19   FUNCTION OF THE CLAIM.

20   A    YES.  SO THE THIRD FUNCTION OF THE CLAIM WAS

21   THE PART THAT WAS HIGHLIGHTED IN GREEN AND SO I'VE

22   BLOWN IT UP OVER HERE, AND YOU CAN SEE IT JUST SAYS

23   "SEQUENTIALLY DISPLAYING OTHER IMAGES STORED IN A

24   MEMORY THROUGH THE USE OF SCROLL KEYS."

25           AND CERTAINLY YOU SAW THAT HERE WHERE YOU
```

1    SAW THE ORANGE, IT WAS SCROLLING BACK AND FORTH,

2    AND SO CERTAINLY THE IPHONE 4 SATISFIES THIS AND

3    THE OTHER DEVICES ALSO PERFORM IN EXACTLY THE SAME

4    WAY.

5    Q    AND HAVE YOU PREPARED ANYTHING TO SHOW THE

6    JURY HOW THE OTHER APPLE PRODUCTS INFRINGE THE '460

7    PATENT?

8    A    YES.  SO I'VE PREPARED A VIDEO, JUST LIKE THE

9    IPHONE 4 FOR ALL THE DEVICES TO SHOW YOU THAT THEY

10   PERFORM THESE THREE CORE FUNCTIONS IN EXACTLY THE

11   SAME WAY.

12   Q    SO LET'S PULL UP 3967.012.  CAN YOU DESCRIBE

13   WHAT WE SEE HERE, PLEASE?

14   A    YES.  SO THERE'S THE IPHONE 3GS, THE IPHONE

15   3G, THE IPOD TOUCH 4TH GENERATION, AS WELL AS THE

16   IPAD 2.  AND SO THIS IS JUST TO SHOW THAT IT'S THE

17   CORRECT EXHIBIT, AND SO IF YOU COULD START THE

18   VIDEO, PLEASE.

19            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20   OPEN COURT OFF THE RECORD.)

21            THE WITNESS:  SO THE DEVICES WILL BE

22   TURNED OVER AND YOU CAN SEE THAT THEY'RE IN A

23   PORTABLE PHONE MODE, THEY'RE ABLE TO RECEIVE A

24   PHONE CALL FOR A MESSAGE.

25            AND SO WHAT WILL HAPPEN IS THEY WILL ALL

2393

1    CHOOSE THE MAIL APPLICATION, AND WITHIN THE MAIL

2    APPLICATION, YOU CAN THEN CHOOSE TO COMPOSE AN

3    E-MAIL, SO THIS IS NOW -- THEY'RE ALL ENTERING A

4    FIRST E-MAIL TRANSMISSION SUB-MODE.

5              AND SO NOW YOU CAN ENTER IN THE ADDRESS,

6    TYPE IN THE ADDRESS, TYPE IN THE MESSAGE, AND NOW

7    YOU'RE ABLE TO SEND IT.

8              NOW, THEY ALL HAVE CAMERAS IN THEM AS

9    WELL, AND SO THEY CAN ALL TAKE A PICTURE OF THE

10   SAME ORANGE THAT'S AT THE TOP.  SO AFTER THE E-MAIL

11   IS SENT, THE CAMERA APPLICATION WILL GO BACK TO THE

12   PORTABLE PHONE MODE, THE CAMERA APPLICATION WILL BE

13   SELECTED, AND SO IN THE PHOTOGRAPHING MODE, NOW

14   THEY'RE IN PHOTOGRAPHING MODE, THE CAMERA IS ON,

15   AND ALL FOUR DEVICES WILL NOW TAKE A PICTURE OF THE

16   ORANGE.

17             AND SO THEY'VE ALL NOW CAPTURED THIS

18   PICTURE OF THE ORANGE AND STORED IT, AND NOW THIS

19   STORED PICTURE WILL BE DISPLAYED.

20             AND SO NOW THEY'VE ENTERED INTO A DISPLAY

21   SUB-MODE.  SO FROM THIS DISPLAY SUB-MODE, THIS

22   PICTURE CAN BE SELECTED TO BE SENT IN AN E-MAIL,

23   AND WHEN THEY DO THAT, THESE PHONES, OR THESE

24   DEVICES HAVE NOW ALL ENTERED A SECOND E-MAIL

25   TRANSMISSION SUB-MODE.  THE ADDRESS CAN BE ENTERED,

1    A MESSAGE CAN BE ENTERED, AND THEY CAN BE

2    TRANSMITTED.

3              SO NOW ALL THESE DEVICES HAVE NOW

4    COMPLETED THE SECOND CORE FUNCTION.

5              NOW, AFTER THE E-MAILS HAVE BEEN SENT

6    HERE, WE NEED TO SHOW THAT THEY PERFORM THE THIRD

7    CORE FUNCTION.  AND SO IN THE THIRD CORE FUNCTION

8    HERE, YOU CAN SEE THAT ON -- SO NOW THEY'RE ALL

9    LOOKING AT PICTURES AND YOU CAN SEE THAT THERE ARE

10   SCROLL KEYS FOR THE IPHONE 3G, 3GS AND IPOD TOUCH

11   WHICH ALLOW THEM TO GO BACK AND FORTH BETWEEN

12   DIFFERENT IMAGES.  HOWEVER, THE IPAD 2 IS DOING IT

13   SLIGHTLY DIFFERENTLY.  INSTEAD OF WITH A SCROLL

14   KEY, IT'S DOING THIS BY SWIPING.

15             HOWEVER, ALL FOUR OF THESE DEVICES STILL

16   SATISFY THE THIRD CLAIM LIMITATION OF BEING ABLE TO

17   SEQUENTIALLY GO THROUGH IMAGES STORED ON THE

18   DEVICE.

19             MR. JOHNSON:  YOUR HONOR, WE ASKED THAT

20   DX 3967.012 BE ENTERED INTO OBJECTION.

21             THE COURT:  ANY OBJECTION?

22             MR. LEE:  NO OBJECTION.

23             THE COURT:  IT'S ADMITTED.

24             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

25             3967.012, HAVING BEEN PREVIOUSLY MARKED

```
1              FOR IDENTIFICATION, WAS ADMITTED INTO
2              EVIDENCE.)
3              MR. JOHNSON:  AND I ALSO NEED TO MOVE
4      INTO EVIDENCE THE ACCUSED DEVICES, THEY ARE JX
5      1050, 1053, 1054, 1057, 1051, 1056, 1076, AND 1077.
6              THE COURT:  ALL RIGHT.  THOSE ARE ALL
7      ADMITTED.
8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS
9              1050, 1053, 1054, 1057, 1051, 1056, 1076,
10             AND 1077, HAVING BEEN PREVIOUSLY MARKED
11             FOR IDENTIFICATION, WERE ADMITTED INTO
12             EVIDENCE.)
13     BY MR. JOHNSON:
14     Q   NOW --
15             THE COURT:  CAN YOU -- I'LL GET IT OFF
16     THE LIST.  WHICH ONES THOSE ARE?  WHAT IS THE 1050?
17             MR. JOHNSON:  THE 1050 IS THE IPAD 2 WITH
18     IOS 4.
19             THE COURT:  OKAY.
20             MR. JOHNSON:  I CAN GIVE IT TO YOU.
21             THE COURT:  OKAY.
22             MR. JOHNSON:  1053 IS THE IPHONE 3G.
23             THE COURT:  OKAY.
24             MR. JOHNSON:  1054 IS THE IPHONE 3GS.
25     1057 IS THE APPLE IPOD TOUCH; THEN THE NEXT
```

1    EXHIBITS ARE 1051 IS IPAD 2 3G RUNNING IOS 5.

2              THE COURT:  OKAY.

3              MR. JOHNSON:  1056 IS THE APPLE IPHONE 4

4    RUNNING IOS 5.

5              THE COURT:  OKAY.

6              MR. JOHNSON:  1076 IS THE IPHONE 3GS

7    RUNNING IOS 5; AND 1077 IS THE IPOD TOUCH, FOURTH

8    GENERATION RUNNING IOS 5.

9              THE COURT:  THANK YOU.

10   BY MR. JOHNSON:

11   Q    DR. YANG, DOES THE IPAD 2 PERFORM OF FIRST TWO

12   CORE FUNCTIONS YOU TALKED ABOUT?

13   A    YES, WE SAW THAT IT PERFORMED THE FIRST TWO

14   CORE FUNCTIONS IN EXACTLY THE SAME WAY THE IPHONE 4

15   AND EXACTLY AS DESCRIBED IN THE PATENT.

16   Q    DOES THE SWIPING ON THE IPAD 2 PERFORM THE

17   THIRD FUNCTION OF CLAIM 1?

18   A    YES.  THE SWIPING IS CONSIDERED THE SAME AS

19   THE USE OF SCROLL KEYS UNDER SOMETHING CALLED THE

20   DOCTRINE OF EQUIVALENTS.

21   Q    AND WHAT'S YOUR UNDERSTANDING OF THE DOCTRINE

22   OF EQUIVALENTS?

23   A    MY UNDERSTANDING OF THE DOCTRINE OF

24   EQUIVALENTS IS THAT SWIPING AND SCROLLING, SO

25   SWIPING TO GO TO THE NEXT PICTURE, OR USING SCROLL

1    KEYS TO GO TO THE NEXT PICTURE, CAN BE CONSIDERED

2    THE SAME THING IF IT DOES THIS IN ESSENTIALLY -- IF

3    IT'S DOING ESSENTIALLY THE SAME FUNCTION OR THERE

4    AREN'T SUBSTANTIAL DIFFERENCES IN THE FUNCTION

5    BETWEEN SWIPING AND SCROLLING.  IF THERE ARE

6    INSUBSTANTIAL DIFFERENCES IN THE WAY THAT IT'S DONE

7    AND INSUBSTANTIAL DIFFERENCES IN THE RESULT THAT IT

8    ACHIEVES.

9           SO IN THIS PARTICULAR CASE, SWIPING AND

10   SCROLL, THERE ARE INSUBSTANTIAL DIFFERENCES BETWEEN

11   THE FUNCTION.  THE FUNCTION IS TO BASICALLY GO TO

12   THE NEXT IMAGE OR THE PREVIOUS IMAGE.  YOU CAN SEE

13   THAT THE WAY THAT SWIPING SOMETHING DONE IS

14   INSUBSTANTIALLY DIFFERENT FROM SCROLLING.

15          IN ONE CASE YOU'RE TOUCHING THE KEYBOARD

16   OR THE SCREEN WHERE THE SCROLL KEYS ARE.  IN

17   ANOTHER CASE YOU'RE FLICKING TO THE LEFT OR

18   FLICKING TO THE RIGHT TO GO TO THE NEXT IMAGE.

19          AND YOU CAN ALSO SEE THE RESULT THAT THEY

20   ACHIEVE IS THE SAME.  IT'S INSUBSTANTIALLY

21   DIFFERENT.  YOU SWIPE TO GO TO THE NEXT PICTURE.

22   YOU SCROLL TO GO TO THE PREVIOUS PICTURE.  AND IF

23   YOU ACTUALLY LOOK AT THE SOURCE CODE, YOU CAN SEE

24   THAT THEY END UP IN THE SAME PLACE.

25   Q    WHAT'S YOUR OPINION ABOUT WHETHER THE IPAD 2

1    MEETS THE THIRD CORE FUNCTION UNDER THE DOCTRINE OF

2    EQUIVALENTS?

3    A    IT CERTAINLY DOES MEET THE THIRD CORE FUNCTION

4    UNDER THE DOCTRINE OF EQUIVALENTS.

5    Q    OKAY.  NOW, I'D LIKE TO TURN FOR A MOMENT TO

6    THOSE APPLE PRODUCTS THAT ARE RUNNING IOS 5 INSTEAD

7    OF IOS 4?

8    A    YES.

9    Q    AND LET ME ASK YOU, WHAT'S YOUR CONCLUSION

10   ABOUT WHETHER THE APPLE DEVICES RUNNING IOS 5

11   INFRINGE THE '460 PATENT?

12   A    THE APPLE DEVICES OPERATING UNDER IOS 5

13   PERFORM EXACTLY THESE FIRST TWO CORE FUNCTIONS

14   EXACTLY AS WE'VE SEEN HERE.

15        HOWEVER, THE THIRD CORE FUNCTION IS

16   PERFORMED BY SWIPING RATHER THAN THE SCROLL KEYS,

17   BUT THEY STILL PERFORM THE THIRD CORE FUNCTION IN

18   THE SAME WAY UNDER THE DOCTRINE OF EQUIVALENTS.

19   Q    NOW, DR. YANG, HAVE YOU SEEN THE EVIDENCE THAT

20   SUGGESTS THAT APPLE IS AWARE THAT CONSUMERS USE ITS

21   DEVICES TO PERFORM CLAIM 1 OF THE '460 PATENT?

22   A    YES, I HAVE.

23   Q    AND CAN YOU IDENTIFY THAT EVIDENCE FOR US?

24   A    USER MANUALS, THE USER MANUALS FOR ALL OF

25   THESE DEVICES DESCRIBE THESE THREE FUNCTIONS IN

1    VERY CLEAR DETAIL.

2    Q    LET'S TURN TO DX 533 AND 539 IN YOUR BINDER.

3    A    YES.  THIS IS THE IPHONE USER'S DECIDE UNDER

4    IOS 4 AND IOS 5.

5              MR. JOHNSON:  OKAY.  YOUR HONOR, WE ASK

6    THAT THESE BE ADMITTED.

7              THE COURT:  THEY'RE ADMITTED.

8              MR. LEE:  NO OBJECTION.

9              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

10             533 AND 539, HAVING BEEN PREVIOUSLY

11             MARKED IDENTIFICATION, WAS ADMITTED INTO

12             EVIDENCE.)

13   BY MR. JOHNSON:

14   Q    HOW ARE THESE DOCUMENTS RELATIVE TO YOUR

15   ANALYSIS?

16   A    THIS SHOWS THAT APPLE WAS AWARE OF THESE

17   FUNCTIONS AND ACTUALLY TEACHES THEIR USERS HOW TO

18   DO THESE THREE CORE FUNCTIONS.

19   Q    LET'S PULL UP PAGE 31 -- SORRY, 371516.

20   A    YES.

21   Q    WHAT'S DESCRIBED HERE?

22   A    RIGHT.  SO IF YOU LOOK AT EVERYTHING UP HERE,

23   THE FIRST FIVE STEPS THERE ACTUALLY DESCRIBE HOW TO

24   SEND AN E-MAIL IN THE FIRST E-MAIL TRANSMISSION

25   SUB-MODE, JUST THAT TEXT E-MAIL.  SO THEY DESCRIBE

```
1    EXACTLY WHAT YOU WANT TO DO.

2              AND THE SECOND PORTION DOWN HERE BELOW,

3    IT ACTUALLY DESCRIBES HOW YOU WOULD WANT TO SEND AN

4    E-MAIL WITH A PHOTO IN IT, SO THEY DESCRIBE EXACTLY

5    HOW YOU DO THIS.

6    Q    OKAY.  LET'S LOOK AT EXHIBIT 533 AT PAGE

7    371554.

8    A    RIGHT.  AND AT THE VERY BOTTOM --

9    Q    WHAT DOES THIS SHOW?

10   A    THIS SHOWS THAT ACTUALLY THEY SHOW YOU HOW TO

11   GO BETWEEN DIFFERENT IMAGES.  THEY SAY YOU CAN USE

12   YOUR SCROLL KEY OR FLICK TO THE LEFT OR TO THE

13   RIGHT.

14             ACTUALLY THEY SHOW THEM RIGHT NEXT TO

15   EACH OTHER, SO I BELIEVE PEOPLE WOULD UNDERSTAND

16   THESE ARE PERFORMING THE SAME FUNCTIONS.

17   Q    HAVE YOU SEEN ANY EVIDENCE DURING TRIAL THAT

18   APPLE IS AWARE OF THESE THREE FUNCTIONS WE'VE BEEN

19   TALKING ABOUT?

20   A    YES.

21   Q    WHAT'S THAT?

22   A    I BELIEVE THAT I WAS ACTUALLY HERE IN COURT

23   VERY EARLY, I GUESS IT WAS TWO WEEKS AGO ON FRIDAY,

24   AND MR. SCHILLER, THE VICE-PRESIDENT OF MARKETING,

25   ACTUALLY MENTIONED THAT HE'S WELL AWARE THAT THEY
```

2401

```
1    USE THESE -- THAT APPLE'S USERS USE THESE FUNCTIONS

2    HEAVILY.

3    Q    HE SHOWED A VIDEO -- HE WAS PART OF THE VIDEO?

4    A    YES, I BELIEVE HE WAS PART OF THE VIDEO.

5    Q    WHEN THE IPHONE WAS INTRODUCED IN 2007?

6    A    YES.

7    Q    ALL RIGHT.  LET'S TALK ABOUT THE '893 PATENT?

8    A    YES.

9    Q    IF WE COULD, LET'S TURN TO JX 1068.

10   A    YES.

11   Q    WHAT'S THAT?

12   A    THIS IS THE '893 PATENT.

13            MR. JOHNSON:  YOUR HONOR, WE OFFER JX

14   1068 INTO EVIDENCE.

15            MR. LEE:  NO OBJECTION.

16            THE COURT:  IT'S ADMITTED.

17            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18            1068, HAVING BEEN PREVIOUSLY MARKED FOR

19            IDENTIFICATION, WAS ADMITTED INTO

20            EVIDENCE.)

21   BY MR. JOHNSON:

22   Q    NOW, LET'S ALSO PULL UP 3967.013, PLEASE.

23            WAS THIS PATENT FILED BEFORE THE IPHONE

24   WAS INTRODUCED?

25   A    YES, IT WAS FILED BEFORE THE IPHONE WAS
```

2402

```
 1    INTRODUCED.

 2    Q    CAN YOU GIVE US A GENERAL OVERVIEW OF THE '893

 3    PATENT, PLEASE?

 4    A    YES.  THE '893 PATENT HAS TO DO WITH A DIGITAL

 5    CAMERA OR PERHAPS A CAMERA PHONE WITH THE IDEA THAT

 6    NOW YOU CAN TAKE LOTS AND LOTS OF PICTURES BUT NOW

 7    YOU CAN STORE LOTS AND LOTS OF PICTURES.

 8         SO IF YOU STORE LOTS OF THESE PICTURES

 9    AND YOU HAVE THOUSANDS AND MAYBE IN DIFFERENT

10    ALBUMS AND YOU'RE LOOKING AT THEM, BECAUSE THAT'S

11    PART OF THE BEAUTY OF HAVING DIGITAL CAMERA, YOU

12    HAVE IT IN PLACE AND YOU'RE LOOKING AT A PICTURE

13    AND IF YOU GO TO DO ANOTHER FUNCTION OR YOU LOOK AT

14    ANOTHER PICTURE, AND YOU GO BACK, YOU'VE COMPLETELY

15    LOST YOUR PLACE.  AND YOU HAVE TO SCROLL THROUGH OR

16    SOMEHOW FIND YOUR WAY THROUGH ALL OF THAT, AMONG

17    THE PICTURES AMONG THE THOUSANDS THAT YOU MIGHT

18    HAVE STORED ON YOUR DIGITAL CAMERA.

19         THE IDEA HERE WAS LET'S HAVE A BOOKMARK

20    OR INDEX AND KEEP TRACK OF WHERE THAT IS.  THAT'S

21    THE INVENTION OF THE '893.

22    Q    AND WHAT APPLE PRODUCTS DID YOU EVALUATE WITH

23    RESPECT TO THE '893 PATENT?

24    A    I PARTICULARLY INSPECTED -- IF I COULD HAVE

25    THE NEXT SLIDE, PLEASE, IT'S THE IPHONE 4, THE IPOD
```

2403

1    TOUCH FOURTH GENERATION, THE IPHONE 3GS AND THE

2    IPAD 2.

3    Q    IS THE IPHONE 3G ACCUSED OF INFRINGING THE

4    '893 PATENT?

5    A    NO, IT'S NOT ACCUSED -- THE IPHONE 3G IS NOT

6    ACCUSED OF INFRINGING ON THE '893 PATENT.

7    Q    WHY NOT?

8    A    IT DOESN'T HAVE THIS FUNCTIONALITY.

9    Q    OKAY.  WHAT CONCLUSION DID YOU REACH ABOUT THE

10   ACTUALLY ACCUSED PRODUCTS FOR THE '893 PATENT?

11   A    THE ACTUALLY ACCUSED DEVICES ACTUALLY HAVE

12   THIS EXACT FUNCTIONALITY IN THEM.  I'VE ACTUALLY

13   PREPARED A VIDEO TO SORT OF ILLUSTRATE THIS.

14   Q    OKAY.  CAN YOU WALK US THROUGH 3967.005,

15   PLEASE.

16            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17   OPEN COURT OFF THE RECORD.)

18            THE WITNESS:  AGAIN, THIS IS THE IPHONE

19   4, RUNNING THE VERSION IOS 5 SOFTWARE, AND YOU CAN

20   SEE THAT THE DEVICE IS ON, SO THE FIRST THING WE'LL

21   DO IS WE'LL TAKE A LOOK AT SOME OF THE PHOTOS THAT

22   ARE STORED ON THIS DEVICE.

23            SO YOU CAN SEE THERE ARE MANY ALBUMS,

24   THERE MAY BE THOUSANDS OF PHOTOS STORE HERE.  SO IT

25   SEEMS THESE ARE VACATION PHOTOS.  SO WE'VE CHOSEN A

```
 1    PICK VACATION PHOTO OF TWO CHILDREN.  SO THAT'S

 2    WHAT I'M LOOKING AT.

 3              BUT NOW I WANT TO TAKE A PICTURE, AND I

 4    DECIDE I'D LIKE TO TAKE A PICTURE OF THAT ORANGE.

 5    SO I'LL TAKE A PICTURE OF THAT ORANGE, THE PICTURE

 6    WILL BE STORED, AND SO NOW I'M SATISFIED I'VE TAKEN

 7    A PICTURE, IT'S IN PHOTOGRAPHING MODE.  AND THEN I

 8    WANT TO GO BACK TO TAKE A LOOK AT MY PICTURES.

 9              SO I DOUBLE TAP AND THEN CHOOSE THE

10    PHOTOS APPLICATION AND I GO BACK AND I'M RETURNED

11    TO WHERE THE PHOTO I WAS LOOKING AT.  YOU CAN SEE

12    THAT THE PHOTO THAT I TOOK HAS ALSO BEEN STORED,

13    AND PREVIOUSLY, BEFORE THIS INVENTION, YOU WOULD

14    ACTUALLY BE LOOKING AT THE PICTURE OF THE ORANGE.

15    VERY INCONVENIENT TO HAVE TO GO ALL THE WAY BACK.

16    Q    LET'S LOOK MORE CLOSELY AT THE CLAIMS FOR THE

17    '893 PATENT, IN PARTICULAR CLAIM 10.  CAN WE PULL

18    UP 3967.0017.  CAN YOU PLEASE WALK US THROUGH THE

19    CLAIM LANGUAGE?

20    A    YES.  I'VE BROKEN UP THE CLAIM HERE, IF YOU

21    LOOK AT CLAIM 10, THAT'S THE ONE THAT'S BEING

22    ASSERTED.  YOU CAN SEE THAT THE FIRST PART HERE HAS

23    TO DO WITH CAMERA HARDWARE.

24              SO THIS IS JUST SPEAKING ABOUT DIFFERENT

25    PIECES THAT NEED TO BE IN A DIGITAL CAMERA OR A
```

```
 1    CAMERA PHONE.  AND THEN DOWN HERE, IT'S TALKING

 2    VERY SPECIFICALLY ABOUT HOW THAT BOOKMARKING

 3    FUNCTION NEEDS TO BE IMPLEMENTED ON THAT DIGITAL

 4    CAMERA OR CAMERA PHONE.

 5    Q    OKAY.  LET'S START WITH THE BEGINNING OF THE

 6    CLAIM.  CAN WE PULL UP THE NEXT SLIDE.  WHAT DO WE

 7    SEE HERE?

 8    A    SO YOU CAN SEE THAT THIS IS A DIGITAL IMAGE,

 9    SO IT'S CLAIM 10 STARTS A DIGITAL IMAGE PROCESSING

10    APPARATUS COMPRISING, AND IT'S COMPRISING ALL THOSE

11    PARTS AND THAT FUNCTIONALITY.  SO WE CAN SEE HERE

12    THAT THE IPHONE 4 CERTAINLY IS A DIGITAL CAMERA.

13    YOU CAN SEE THAT IT HAS A CAMERA, IT TOOK A PICTURE

14    FROM THE VIDEO, AND ALL OF THE OTHER ACCUSED

15    DEVICES ALSO DIGITAL IMAGE PROCESSES APPARATUS.

16    Q    LET'S GO TO SLIDE 19.  WHAT DOES THAT SHOW?

17    A    SO NOW WE'RE GETTING SPECIFICALLY INTO THE

18    DIFFERENT PARTS THAT MAKE UP THE DIGITAL CAMERA, OR

19    THE DIGITAL CAMERA HARDWARE, AND THE FIRST PART

20    HERE SAYS AN OPTICAL SYSTEM FOR RECEIVING A LIGHT

21    REFLECTED FROM THE SUBJECT.  THAT JUST MEANS THE

22    CAMERA HAS TO HAVE A LENS.

23              A PHOTO ELECTRIC -- THE NEXT PART SAYS

24    THAT YOU HAVE TO HAVE A PHOTO ELECTRIC CONVERSION

25    MODULE IN OPTICAL COMMUNICATION WITH THE OPTICAL
```

1    SYSTEM FOR CONVERTING THE LIGHT TO IMAGE DATA.

2    THAT SAYS THERE HAS TO BE ELECTRONIC FILM TO

3    CONVERT THE LIGHT THAT'S COMING FROM THE LENS INTO

4    AN ELECTRONIC SIGNAL.  SO THAT SAYS YOU HAVE TO

5    HAVE A SENSOR.

6            AND THE THIRD PART HERE SAYS A RECORDING

7    MEDIUM FOR STORING IMAGE DATA AND AN IMAGE FILE.

8    THAT MEANS AFTER YOU'VE ACQUIRED THIS DATA, YOU

9    NEED TO BE ABLE TO STORE IT SOMEWHERE.  IT HAS TO

10   HAVE A MEMORY.

11           SO YOU CAN SEE IN THE IPHONE 4, WE SAW

12   THAT CERTAINLY IF YOU LOOK AT THE BACK OF THE

13   DEVICE, YOU CAN SEE IT HAS A LENS.

14           AND WE ALSO SAW IT CAPTURE AN IMAGE.  SO

15   IT HAS AN IMAGE SENSOR.  IN FACT, THAT'S A CMOS

16   IMAGE SENSOR.

17           AND THEN WE KNOW IT ALSO HAS A MEMORY

18   BECAUSE WE SAW THAT DATA WAS BEING STORED.  SO IT

19   CERTAINLY HAS A MEMORY AS WELL.  SO THAT'S TRUE FOR

20   THE IPHONE 4 AS WELL AS ALL OF THE OTHER ACCUSED

21   DEVICES.

22   Q    LET'S LOOK AT THE NEXT SLIDE, SLIDE 20.

23   WHAT'S THE NEXT PART OF THE CLAIM?

24   A    RIGHT.  THESE ARE THE NEXT TWO PARTS OF THE

25   CAMERA HARDWARE.  SO THE DIGITAL CAMERA HAS TO HAVE

1    THIS.  IT HAS TO HAVE A DISPLAY SCREEN.  SO IT

2    NEEDS TO BE A DISPLAY SCREEN FOR DISPLAYING IMAGE

3    DATA.

4              SO WE SAW CLEARLY THAT THE IPHONE 4 HAS

5    THE ABILITY TO DISPLAY THE DATE THAT THE PICTURE

6    THAT YOU TOOK.  AND IT ALSO HAS TO HAVE A

7    CONTROLLER, AND THE CONTROLLER NEEDS TO BE

8    CONNECTED TO A PHOTO ELECTRIC CONVERSION MODULE FOR

9    RECORDING MEDIUM IN A DISPLAY SCREEN.

10             WHAT IS A CONTROLLER?  A CONTROLLER IS

11   ACTUALLY A PROCESSOR, A MICROPROCESSOR.  IT'S

12   SOMETHING THAT IS KIND OF THE MAIN BRAINS OF THIS.

13   WE KNOW THERE'S A CONTROLLER THERE.  THERE'S

14   SOMETHING CALLED A MAIN APPLICATIONS PROCESSOR

15   WHICH APPLE ACTUALLY ADVERTISES AS THEIR A4

16   PROCESSOR, A4 APPLICATIONS PROCESSOR.

17             AND THAT'S SHOWN HERE.  THAT'S THE ACTUAL

18   INSIDE GUTS OF THE IPHONE IF YOU WERE TO TAKE IT

19   APART.  AND YOU WOULD SEE THAT, AND THAT'S ACTUALLY

20   THE CONTROLLER.  AND THAT IS INDEED CONNECTED TO

21   THE IMAGE SENSOR.  IT'S ALSO CONNECTED TO THE

22   MEMORY.  IT'S ALSO CONNECTED TO THE DISPLAY.

23             AND THIS PROCESSOR, THIS CONTROLLER, MUST

24   BE OPERATIVE IN A PHOTOGRAPHING MODE TO PROCESS THE

25   IMAGE FOR STORAGE AND RECORDING MEDIUM.  THAT MEANS

2408

```
1    YOU HAVE TO BE ABLE TO TAKE A PICTURE, STORE IT AND

2    PROCESS IT AND STORE IT IN THE MEMORY.  WE

3    CERTAINLY DID THAT.

4              AND IN ADDITION IT NEEDS TO BE ABLE TO --

5    AND IN A SQUARED IMAGE DISPLAY MODE BEING OPERATIVE

6    TO CONTROL THE DISPLAY SCREEN FOR DISPLAYING A

7    SINGLE IMAGE RELATIVE TO THE IMAGE.

8              SO THIS SIMPLY SAYS THAT THAT PROCESS

9    NEEDS TO BE ABLE TO GO TO THE MEMORY, TAKE DATA

10   OUT, PROCESS IT AND PUT IT ON THE DISPLAY SCREEN.

11             SO A LITTLE BIT MORE SIMPLY PUT, IT NEEDS

12   TO BE A CONTROLLER TO PROCESS, SAVE, AND DISPLAY

13   IMAGES.

14   Q   IS THIS CLAIM LANGUAGE CONTAINED IN THE

15   ACCUSED PRODUCTS?

16   A   YES.  CERTAINLY THIS IS CONTAINED IN THE

17   IPHONE 4 AND IT'S ALSO THE SAME FOR THE OTHER

18   ACCUSED DEVICES AS WELL.

19   Q   LET'S MOVE TO THE LAST PARAGRAPH OF CLAIM 10.

20   CAN YOU EXPLAIN WHAT WE SEE HERE?  THIS IS SLIDE

21   21?

22   A   YES.  SO THIS LAST PART HERE, THIS BOOKMARKING

23   FUNCTION, IS TYPICALLY -- IS VERY SPECIFICALLY

24   DESCRIBING HOW THIS BOOKMARKING FUNCTION NEEDS TO

25   OPERATE.
```

 1                    SO IF I CAN HAVE THE NEXT SLIDE, PLEASE.

 2        SO LET'S WALK THROUGH THIS VERY, VERY CAREFULLY.

 3        SO IT'S OVER HERE.  IT SAYS, WHEREUPON A USER

 4        PERFORMING A MODE SWITCHING OPERATION DEFINED BY

 5        SWITCHING FROM THE STORED IMAGE DISPLAY MODE TO THE

 6        PHOTOGRAPHING MODE AND BACK TO THE STORED IMAGE

 7        DISPLAY MODE.

 8                    THAT'S A LONG WAY OF SAYING IT NEEDS TO

 9        BE ABLE TO SWITCH FROM LOOKING AT AN IMAGE, GOING

10        TO SOME OTHER FUNCTION, SUCH AS THE PHOTOGRAPHING

11        MODE, TAKE A PICTURE, AND THEN BE ABLE TO GO BACK

12        TO LOOKING AT THE IMAGE.

13                    SO IT NEEDS TO BE ABLE TO SWITCH BETWEEN

14        PHOTOGRAPHING AND THE DISPLAY MODES.

15        Q    LET'S LOOK AT THE NEXT SLIDE.  WHAT DO WE SEE

16        HERE?

17        A    SO THE CONTROLLER ALSO NEEDS -- SO THE NEXT

18        PART SAYS, THE CONTROLLER CAUSES THE DISPLAY

19        SCREEN, THE FIRST DISPLAY, A SINGLE IMAGE FILE THAT

20        WAS MOST RECENTLY DISPLAYED BEFORE THE MODE

21        SWITCHING OPERATION, THE SINGLE IMAGE FILE BEING

22        DIFFERENT FROM A MOST RECENTLY STORED IMAGE FILE.

23                    THIS IS JUST SAYING THAT WHEN YOU GO

24        BACK, WHEN YOU'RE LOOKING IN THE DISPLAY MODE AND

25        YOU HAVE MOST RECENTLY VIEWED IMAGE, THE PICTURE OF

2410

```
1    THE TWO CHILDREN ON VACATION, AND YOU GO TO THE

2    PHOTOGRAPHING MODE AND YOU GO AND DO WHATEVER IN

3    THE PHOTOGRAPHING MODE, TAKE A PICTURE OVER

4    WHATEVER AND YOU COME BACK, YOU SHOULD BE ABLE TO

5    SEE THE PICTURE OF THE CHILDREN, NOT THE PICTURE OF

6    THE ORANGE, THAT'S WHAT THAT SAYS, DISPLAY THE LAST

7    VIEWED PICTURE, NOT THE LAST TAKEN PICTURE.

8    Q    ALL RIGHT.  LET'S LOOK AT THE LAST PART OF

9    THIS PHOTOGRAPH, AND THE LAST PART OF CLAIM 10.

10   WHAT DO WE SEE HERE?

11   A    AND IT SAYS HERE AND THE SINGLE IMAGE FILE

12   BEING FIRST DISPLAYED IRRESPECTIVE OF THE DURATION

13   THAT THE CAMERA WAS USED IN THE PHOTOGRAPHING MODE

14   DURING THE MODE SWITCHING OPERATION.

15        SO THIS SAYS THAT THAT BOOKMARK THAT I

16   HAVE, THE BOOKMARK OF THE TWO CHILDREN THAT WERE,

17   OF THE PHOTOGRAPH ON VACATION, THAT BOOKMARK IS

18   THERE REGARDLESS OF HOW LONG I'M IN THE

19   PHOTOGRAPHING MODE.  IT'S NOT DEPENDENT ON TIME.  I

20   DON'T WANT IT TO GO AWAY.

21   Q    NOW, YOU'VE SHOWN US BOOKMARKING ON THE IPHONE

22   4 RUNNING IOS 5.  DO THE OTHER APPLE ACCUSED

23   PRODUCTS INFRINGE CLAIM 10 OF THE 493?

24   A    ACTUALLY, I SHOWED IT IN IPHONE 4 RUNNING IOS

25   4.  BUT THIS IS PERFORMED EXACTLY THE SAME WAY
```

1    UNDER IOS 5 AS WELL AS ALL THE OTHER DEVICES.

2    Q    SO CAN YOU DEMONSTRATE THAT FOR US, PLEASE?

3    A    THERE'S A VIDEO THAT WILL SHOW THIS.

4    Q    LET'S LOOK AT 3967.025?

5    A    RIGHT.  SO THIS IS THE IPHONE 3GS, THE IPOD

6    TOUCH, AND THE IPOD.

7            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

8    OPEN COURT OFF THE RECORD.)

9            THE WITNESS:  SO THIS IS JUST TO

10   DEMONSTRATE THEY'RE THE CORRECT DEVICE, THE DEVICES

11   ARE ON, THE DEVICES WILL NOW CHOOSE THEIR PHOTOS

12   APPLICATION, AND SO THERE WILL BE A LOT OF PHOTOS

13   STORED IN THERE, THOUSANDS OF PHOTOS, I BELIEVE,

14   AND OUT OF ALL OF THOSE PHOTOS, ONE PARTICULAR

15   PHOTO WILL BE CHOSEN.  IT'LL BE THE VACATION PHOTO

16   OF THE TWO CHILDREN.

17            AND THEN NOW THEY'LL GO INTO A

18   PHOTOGRAPHING MODE BY SELECTING THE CAMERA APP, AND

19   SO THEY'LL GO INTO PHOTOGRAPHING MODE AND A PICTURE

20   OF AN ORANGE WILL BE TAKEN, AND THIS PICTURE OF THE

21   ORANGE THAT THEY'RE TAKING IS THE LAST CAPTURED

22   IMAGE, THE LAST STORED IMAGE.

23            AND NOW WHEN THEY GO BACK TO THE PHOTOS

24   APPLICATION, THEY WON'T BE LOOKING AT THE PICTURE

25   OF THE ORANGE.  THEY'LL BE LOOKING AT THE PICTURE

1    OF THE TWO CHILDREN.

2              THE BOOKMARK HAS BEEN KEPT, AND THAT'S

3    VERY CONVENIENT BECAUSE OTHERWISE WITHOUT THIS

4    INVENTION, YOU'D BE NOW LOOKING AT THE PICTURE OF

5    THE ORANGE.

6              MR. JOHNSON:  YOUR HONOR, WE'D ASK TO

7    MOVE INTO EVIDENCE EXHIBITS 3967.015 AND .025, THE

8    TWO VIDEOS.

9              THE COURT:  ANY OBJECTION?

10             MR. LEE:  NO OBJECTION.

11             THE COURT:  THOSE ARE ADMITTED.

12             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

13             3967.015 AND 3967.025, HAVING BEEN

14             PREVIOUSLY MARKED FOR IDENTIFICATION,

15             WERE ADMITTED INTO EVIDENCE.)

16   BY MR. JOHNSON:

17   Q    DR. YANG, DID YOU PERFORM ANY OPINION ABOUT

18   THE APPLE DEVICES RUNNING IOS 5?

19   A    YES.  THE DEVICES RUNNING IOS 5 PERFORM

20   EXACTLY THESE FUNCTIONS IN EXACTLY THE SAME WAY.

21   Q    OKAY.  LET'S TURN TO THE THIRD SAMSUNG PATENT,

22   THE '711 PATENT?

23   A    OKAY.

24   Q    ALL RIGHT.  AND CAN YOU LOOK AT EXHIBIT 1071

25   IN YOUR BINDER, PLEASE.  WHAT'S THIS?

```
 1    A    THIS IS THE '711 PATENT.
 2              MR. JOHNSON:  YOUR HONOR, WE OFFER IT
 3    INTO EVIDENCE, JX 1071.
 4              MR. LEE:  NO OBJECTION.
 5              THE COURT:  IT'S ADMITTED.
 6              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
 7              1071, HAVING BEEN PREVIOUSLY MARKED FOR
 8              IDENTIFICATION, WAS ADMITTED INTO
 9              EVIDENCE.)
10    BY MR. JOHNSON:
11    Q    LET'S LOOK AT 3967.026.  WHEN WAS THAT
12    ORIGINALLY FILED?
13    A    THE PATENT WAS ORIGINALLY FILED AUGUST 30TH,
14    2005.
15    Q    CAN YOU GIVE US A GENERAL OVERVIEW OF THE '711
16    PATENT, PLEASE?
17    A    YES, THE '711 PATENT, OR OTHERWISE THE GENERAL
18    BACKGROUND MUSIC PATH, IS SPECIFICALLY ABOUT A WAY
19    OF IMPLEMENTING MP3 MUSIC DISPLAY ON A MOBILE PHONE
20    USING ONLY A SINGLE PROCESSOR.  SO NOT REQUIRING
21    ANY SORT OF SPECIAL PURPOSE HARDWARE.
22    Q    WHAT PROBLEM WAS THE '711 PATENT TRYING TO
23    SOLVE?
24    A    IT WAS TRYING TO SOLVE THE IDEA THAT WHEN YOU
25    MERGED THESE DEVICES, HOW CAN I DO THIS EFFICIENTLY
```

2414

```
 1    WITHOUT ADDING EXTRA HARDWARE.  SO MY DEVICE

 2    DOESN'T CONSUME MORE POWER.  HOW DO I DO THIS

 3    WITHOUT EXTRA HARDWARE?  SO IT'S CHEAPER, AND,

 4    POTENTIALLY, IF IT DOESN'T HAVE EXTRA HARDWARE, IT

 5    ACTUALLY CAN BE SMALLER.

 6    Q    LET'S LOOK AT SLIDE 27.  WHAT APPLE PRODUCTS

 7    DID YOU EVALUATE WITH RESPECT TO THE SEARCH 11

 8    PATENT?

 9    A    I EVALUATED THESE FOUR PRODUCTS, THE IPHONE 4,

10    THE IPHONE 3GS, THE IPHONE 3G, AND THE IPOD TOUCH

11    FOURTH GENERATION.

12    Q    AND WHAT CONCLUSIONS, IF ANY, DID YOU REACH

13    WITH RESPECT TO WHETHER THESE FOUR PRODUCTS

14    INFRINGE THE '711 PATENT?

15    A    ALL FOUR OF THESE PRODUCTS CERTAINLY INFRINGE

16    ON THE '711 PATENT.

17    Q    HAVE YOU PREPARED ANYTHING TO SHOW THE JURY

18    THE BASIS FOR YOUR CONCLUSIONS?

19    A    YES.  I PREPARED A VIDEO HERE JUST TO SHOW YOU

20    SOME OF THE BASIC FUNCTIONALITY I'LL BE DISCUSSING

21    IN THE '711 PATENT.

22              SO, AGAIN, THIS IS THE IPHONE 4 OPERATING

23    UNDER IOS 4, AND YOU CAN SEE THAT THE DEVICE IS ON.

24              (WHEREUPON, A VIDEO WAS PLAYED IN OPEN

25    COURT OFF THE RECORD.)
```

```
 1              THE WITNESS:  AND SO THIS IS WHAT WE KNOW
 2     AS THE STANDBY MODE FOR THE PATENT, AND YOU CAN HIT
 3     THE IPOD, OR IN ANOTHER VERSION IT'S CALLED THE
 4     MUSIC APP, AND YOU CAN SEE THERE'S A CHOICE.  YOU
 5     HAVE A CHOICE OF CHOOSING THE MP3 FILE, YOU CAN
 6     CONTROL THE MP3 FILE WITH THE PLAY/PAUSE BUTTON.
 7     BY MR. JOHNSON:
 8     Q   I THOUGHT I HEARD THE BOSS PLAYING IN THE
 9     BACKGROUND.
10     A   YES.  I DON'T KNOW IF YOU CAN HEAR IT PLAYING
11     IN THE BACKGROUND.  AND THERE'S ALSO AN INDICATION
12     THAT I'VE CIRCLED IN RED THAT THERE'S AN INDICATION
13     THAT IT'S CONTINUING TO PLAY.
14              SO WHEN I GO BACK TO THE HOME SCREEN, THE
15     MUSIC CONTINUES TO PLAY IN THE BACKGROUND, AND I
16     CAN PERFORM ANOTHER FUNCTION OF THIS PHONE, SUCH AS
17     LOOKING AT MY E-MAIL.  SO THIS IS QUITE CONVENIENT
18     BECAUSE PEOPLE WOULD LIKE TO BE ABLE TO LISTEN TO
19     MUSIC AND DO SOMETHING ELSE.
20              MR. JOHNSON:  YOUR HONOR, WE OFFER
21     3967.028 INTO EVIDENCE.
22              MR. LEE:  NO OBJECTION.
23              THE COURT:  IT'S ADMITTED.
24              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
25              3967.028, HAVING BEEN PREVIOUSLY MARKED
```

1    INTERROGATORIES.  IT'S NOT IN THE EXPERT REPORT.

2           THE COURT:  HE CAN'T GIVE ANY NEW -- I

3    AGREE WITH MR. LEE THAT WHAT'S IN HIS EXPERT REPORT

4    AND WHAT HE SAID DURING HIS DEPOSITION WAS VERY

5    CONCLUSORY AND DIDN'T SPECIFICALLY IDENTIFY EITHER

6    THE APPLET OR THE APPLICATION MODULE.

7           SO HE CAN'T NOW UNDO WHAT HE DID IN HIS

8    EXPERT REPORT OR IN HIS DEPOSITION TESTIMONY.  SO

9    THAT'S WHY IT WAS STRICKEN.

10          BUT THE ONE QUESTION THAT YOU'VE RAISED

11   NOW WILL BE ALLOWED.  OKAY?

12          MR. JOHNSON:  YOUR HONOR, I WOULD JUST

13   ASK, HIS EXPERT REPORT --

14          THE COURT:  ALL RIGHT.  NOW I'M DOCKING

15   TIME.  GO AHEAD.  I'M DOCKING TIME.  IT'S 10:30.

16   GO AHEAD.  I RULED ON THIS SUNDAY NIGHT FOR

17   RECONSIDERATION YESTERDAY.  GO FOR IT.  10:35.  THE

18   TIME IS TICKING.  GO AHEAD.

19          MR. JOHNSON:  I DON'T HAVE ANYTHING

20   FURTHER.

21          THE COURT:  GO AHEAD.  I'M ALL EARS.

22          MR. JOHNSON:  GO AHEAD.

23          THE COURT:  10:35.

24          SO WHAT ELSE, DO YOU WANT TO KEEP

25   FIGHTING ON THIS OR DO YOU WANT TO GO TO TRIAL?

```
 1     I'M TALKING TO BOTH SIDES HERE.

 2               MR. LEE:  WE'RE READY TO GO.

 3               MR. JOHNSON:  WE'RE READY TO GO.

 4               THE COURT:  ALL RIGHT.

 5               (WHEREUPON, A RECESS WAS TAKEN.)

 6               (WHEREUPON, THE FOLLOWING PROCEEDINGS

 7     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 8               THE COURT:  SO NEITHER INTEL NOR SAMSUNG

 9     FILED ANYTHING.  I GOT THE SELWYN DECLARATION

10     WITH -- PLEASE SIT DOWN -- THAT ATTACHES THE

11     E-MAILS AND OTHER EXPERTS BEING DISCLOSED IN MARCH

12     OF THIS YEAR.

13               WHAT'S HAPPENING WITH THAT?  I SAID TO

14     FILE IT BY 10:30.

15               MR. SHVODIAN:  YOUR HONOR, WE'RE HAVING

16     IT PRINTED RIGHT NOW.  BUT I CAN LET YOU KNOW,

17     INTEL HAS DECIDED THAT THEY WILL REQUEST SANCTIONS

18     AND AN ORDER OF CONTEMPT, BUT ARE NOT GOING TO

19     REQUEST THAT DR. WILLIAMS BE PRECLUDED FROM

20     TESTIFYING.

21               THE COURT:  I WAS NEVER GOING TO GRANT

22     THAT.

23               MR. SHVODIAN:  OKAY.

24               THE COURT:  THAT'S AN EXTREME AND

25     UNWARRANTED SANCTION, AND IT WOULD BE OVERLY
```

2432

1    PREJUDICIAL.

2              MR. SHVODIAN:  OKAY.  THE PAPERS ARE

3    BEING COPIED NOW AND WILL BE ELECTRONICALLY FILE.

4              THE COURT:  WHAT I WAS GOING TO SUGGEST

5    IS WHATEVER IT IS, WE'LL JUST DEAL WITH IT LATER.

6    WE'RE NOT GOING TO DEAL WITH IT RIGHT NOW.

7              MR. SHVODIAN:  THANK YOU, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  WHATEVER YOU'RE

9    GOING TO FILE, IT SHOULD STILL BE FILED, AND WE'LL

10   TAKE CARE OF IT LATER.

11             OKAY.

12             MR. JOHNSON:  SO, YOUR HONOR, THE

13   QUESTION THAT I'M GOING TO ASK --

14             THE COURT:  IT'S 10:52, GO AHEAD.

15             MR. JOHNSON:  -- IS DID YOU LOOK AT THE

16   SOURCE CODE TO CONFIRM THAT THE DEVICES HAD THIS

17   ELEMENT?  THAT'S RIGHT OUT OF THE PROFFER.  THAT'S

18   THE ONE AND ONLY QUESTION I'LL ASK.

19             THE COURT:  THAT'S FINE.  YOU'LL JUST

20   HAVE TO CROSS HIM ON IT.

21             MR. JOHNSON:  AND THEN CAN I MOVE 645

22   INTO EVIDENCE?

23             THE COURT:  WHAT IS 645?

24             MR. JOHNSON:  THAT'S THE SOURCE CODE.

25             THE COURT:  THAT'S FINE.

2433

```
 1                 ALL RIGHT.  LET'S BRING IN THE JURY.

 2                 (WHEREUPON, THE FOLLOWING PROCEEDINGS

 3      WERE HELD IN THE PRESENCE OF THE JURY:)

 4                 THE COURT:  ALL RIGHT.  PLEASE TAKE A

 5      SEAT.  IT'S 10:53.  GO AHEAD, PLEASE.

 6                 MR. JOHNSON:  RYAN, CAN WE BRING UP SDX

 7      3967.034.

 8      Q    DR. YANG, DID YOU LOOK AT THE SOURCE CODE IN

 9      EXHIBIT DX 645 TO CONFIRM THE ACCUSED DEVICES HAD

10      THIS ELEMENT?

11      A    YES, I DID.

12                 MR. JOHNSON:  YOUR HONOR, WE ASK THAT DX

13      645 BE MOVED INTO EVIDENCE.

14                 MR. LEE:  NOTHING MORE THAN THE OBJECTION

15      PREVIOUSLY SUBMITTED.

16                 THE COURT:  UNDERSTOOD.  THAT'S ADMITTED.

17                 (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

18                 645, HAVING BEEN PREVIOUSLY MARKED FOR

19                 IDENTIFICATION, WAS ADMITTED INTO

20                 EVIDENCE.)

21                 MR. JOHNSON:  YOUR HONOR, WE ALSO ASK

22      THAT EXHIBIT 3967.012, WHICH WAS THE VIDEO THAT WAS

23      USED ON THE '460 PATENT, ALSO BE MOVED INTO

24      EVIDENCE.

25                 THE COURT:  012, I THOUGHT THAT WAS
```

```
 1    ALREADY ADMITTED.  THAT'S CLAIM 1 OF THE PRODUCTS
 2    REGARDING THE '460.
 3              MR. JOHNSON:  YEAH.  THERE WAS SOME
 4    DEBATE AS TO WHETHER IT WAS ADMITTED OR NOT.
 5              THE COURT:  OKAY.
 6              MR. JOHNSON:  IT'S 3967.012.
 7              THE COURT:  THAT'S ADMITTED.  IS THAT THE
 8    ONE YOU'RE ASKING ABOUT?
 9              MR. JOHNSON:  YES.
10              THE COURT:  THAT'S ADMITTED.
11              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER
12               3967.012, HAVING BEEN PREVIOUSLY MARKED
13               FOR IDENTIFICATION, WAS ADMITTED INTO
14               EVIDENCE.)
15              MR. JOHNSON:  AND THEN ALSO THE
16    DEMONSTRATIVES THAT WERE REFERRED TO IN DR. YANG'S
17    DIRECT, 3967.002 THROUGH 43, JUST THE INDIVIDUAL
18    SLIDES, NOT THE VIDEOS.  EVERYTHING EXCEPT SLIDE 16
19    AND 29 IN THAT RANGE.  THEY WERE ALL REFERRED TO.
20              THE COURT:  HANG ON ONE SECOND.  002 IS
21    HIS C.V.  I HAVE NOT BEEN ADMITTING THAT FOR
22    ANYBODY.
23              MR. JOHNSON:  THAT SHOULDN'T BE ON THERE,
24    THEN.  003 -- IT SHOULD START AT 003.
25              THE COURT:  003 IS JUST THE PATENTS WITH
```

1    THE DESCRIPTION OF THE PATENTS, I MEAN THE PATENTS

2    THEMSELVES ARE IN.

3              ANYWAY, IS THERE ANY OBJECTION TO THE --

4              MR. LEE:  NO.

5              THE COURT:  NO?  ALL RIGHT.  IF YOU WANT

6    THE C.V. IN --

7              MR. LEE:  TO THE C.V., YES.

8              MR. JOHNSON:  WE DON'T NEED THE C.V.

9              MR. LEE:  NOT TO THE DEMONSTRATIVES OF

10   THE PATENTS.

11             THE COURT:  SO 3967.003 IS IN, WHICH IS

12   THE COVER OF THE PATENTS.  005 AS WELL, IS THAT

13   WHAT YOU'RE REQUESTING?

14             MR. JOHNSON:  YES, FOR 005 --

15             THE COURT:  I DON'T HAVE 004.  WHICH ONE

16   WAS THAT?

17             MR. JOHNSON:  YOUR HONOR, JUST IN THE

18   INTEREST OF TIME, SINCE WE ALREADY HAVE THE VIDEOS

19   IN, I'M JUST GOING TO STICK WITH THE VIDEOS AT THIS

20   POINT.

21             THE COURT:  ALL RIGHT.  003 IS ADMITTED

22   AND 005 IS ADMITTED.

23             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

24             3967.003 AND 3967.005, HAVING BEEN

25             PREVIOUSLY MARKED FOR IDENTIFICATION,

2436

```
 1              WERE ADMITTED INTO EVIDENCE.)

 2              MR. JOHNSON:  OKAY.  YOUR HONOR, I PASS

 3    THE WITNESS.  NO FURTHER QUESTIONS.

 4              THE COURT:  OKAY.  THE TIME IS 10:56.  GO

 5    AHEAD.

 6              MR. LEE:  YOUR HONOR, THE BINDERS ARE ON

 7    THEIR WAY.  MAY I PROCEED, YOUR HONOR?

 8              THE COURT:  GO AHEAD.

 9                    CROSS-EXAMINATION

10    BY MR. LEE:

11    Q    GOOD MORNING, DR. YANG.

12              GOOD MORNING, LADIES AND GENTLEMEN.

13              DR. YANG, YOU TESTIFIED ABOUT THREE

14    PATENTS, THE '460; CORRECT?

15    A    YES.

16    Q    THE '893; CORRECT?

17    A    YES.

18    Q    THE '711; CORRECT?

19    A    YES.

20    Q    I'M GOING TO ASK YOU ABOUT EACH OF THEM

21    INDIVIDUALLY, BUT LET'S SEE IF WE CAN AGREE UPON A

22    FEW THINGS THAT ARE TRUE FOR ALL THREE OF THESE

23    PATENTS.  OKAY?

24    A    OKAY.

25    Q    FIRST, THERE ARE SIX NAMED INVENTORS ON ALL
```

1    A    YES.

2    Q    TURN, IF YOU WOULD, TO VOLUME 1, TAB 11, AND

3    WE'LL GO TO PAGE 2030.7.  DO YOU HAVE IT BEFORE

4    YOU?

5    A    ARE YOU TALKING ABOUT THE ORIGINAL -- YES.

6    Q    OKAY.  AND IF I TAKE YOU, DR. YANG, TO PAGE

7    2030, FOR EXAMPLE, .13?

8    A    I'M SORRY.  I'M HAVING A HARD TIME FOLLOWING

9    YOU.  PAGE 8.

10   Q    IT'S ON THE SCREEN?

11   A    OKAY.

12   Q    AND I'M NOT GOING TO GO THROUGH ALL -- IN THE

13   INTERESTS OF TIME, I'M NOT GOING TO GO THROUGH ALL

14   OF WHAT SAMSUNG SAID.

15            BUT WHAT SAMSUNG IDENTIFIED FOR THE

16   DIFFERENT MODES WERE APPS; RIGHT?

17   A    THEY IDENTIFIED APPLICATION PROGRAMS WHICH ARE

18   CALLED APPS BY APPLE.

19   Q    THEY IDENTIFIED APPLICATION PROGRAMS AND, AND

20   THE ONE THING YOU AND I CAN AGREE UPON IS

21   APPLICATIONS AND MODES ARE DIFFERENT; CORRECT?

22   A    WELL, I WANT TO BE VERY PRECISE HERE.

23   APPLICATION PROGRAMS ARE PROGRAMS THAT ARE EXECUTED

24   BY THE DEVICE.  THEY'RE JUST SOFTWARE THAT ARE

25   EXECUTED BY THE DEVICE AND WHEN THEY'RE EXECUTED,

2483

```
1    THE DEVICE HAS MODES.  SO, YES, APPLICATION

2    PROGRAMS AND MODES ARE DIFFERENT.

3    Q    RIGHT.  AND THAT WAS TRUE -- THAT'S TRUE FOR

4    THE '893 PATENT; CORRECT?

5    A    YES.

6    Q    ALL RIGHT.  AND IT'S TRUE FOR THE APPLE

7    DEVICES; CORRECT?

8    A    YES.  AND IT'S TRUE IN GENERAL AS WELL.

9    Q    RIGHT.  AND WOULD IT BE ACCURATE TO DESCRIBE

10   AN FM/AM VIDEO AS HAVING TWO MODES, AN FM MODE AND

11   AN AM MODE?

12   A    PERHAPS.  THERE MIGHT BE OTHER MODES, BUT YES,

13   IT HAS TWO MODES, SURE.

14   Q    ALL RIGHT.  TURN BACK TO EXHIBIT 44, WHICH IS

15   AT VOLUME 3, TAB 27.  AND I WANT YOU TO HAVE IN

16   MIND THE TESTIMONY YOU GAVE THE JURY THIS MORNING

17   ABOUT THE DEVELOPMENT OF A CAMERA PHONE BY SAMSUNG.

18   CORRECT?

19   A    YES.

20   Q    AND BY THE WAY, YOU GLEANED THAT UNDERSTANDING

21   FROM READING THE PATENT AND THE FILE HISTORY, BUT

22   WITHOUT TALKING TO THE INVENTORS, LOOKING AT THEIR

23   ENGINEERING NOTEBOOKS OR LOOKING AT ANY OF THEIR

24   CONTEMPORANEOUS DOCUMENTS; CORRECT?

25   A    CORRECT.  THAT'S NOT NECESSARY.
```

1    Q    OKAY.  NOW, TURN, IF YOU WOULD, TO PAGE

2    44.111, PAGE 111.

3    A    THIS IS, AGAIN?  COULD YOU TELL ME WHERE I CAN

4    FIND THIS?

5    Q    SURE.  IT'S AT VOLUME 3, TAB 27.

6    A    TAB 27.  YES.

7    Q    MULTIMEDIA CAMERA, CAMERA FUNCTION, ICONS ARE

8    NOT INTUITIVE.  DO YOU SEE THAT PAGE?

9    A    YES.

10   Q    SO WHEN IT CAME TIME FOR SAMSUNG TO DESIGN ITS

11   CAMERA FUNCTION FOR ITS SMARTPHONES, RATHER THAN

12   CALL THE INVENTORS OF THESE PATENTS, RATHER THAN

13   LOOK AT THE PATENTS, WHAT THEY DID IS THEY LOOKED

14   AT THE IPHONE; RIGHT?  ISN'T THAT RIGHT, DR. YANG?

15   A    I MEAN, I'M LOOKING AT THIS DOCUMENT FOR THE

16   FIRST TIME, SO --

17   Q    CAN YOU TELL ME ONE WAY OR ANOTHER?

18   A    COULD YOU REPEAT THE QUESTION?

19   Q    SURE.

20   A    I WAS READING THE DOCUMENT.

21   Q    WHEN IT CAME TIME FOR SAMSUNG TO DESIGN ITS

22   GALAXY SMARTPHONES AND TO IMPROVE ITS CAMERA

23   FUNCTIONS, IT DIDN'T PICK UP THE PHONE AND CALL THE

24   INVENTORS, IT DIDN'T GO LOOK AT THE PATENT.

25   INSTEAD WHAT IT DID IS IT LOOKED AT THE IPHONE;

```
 1    RIGHT?

 2              MR. JOHNSON:  OBJECTION.  FOUNDATION.

 3              THE COURT:  SUSTAINED.

 4    BY MR. LEE:

 5    Q    DO YOU HAVE ANY EVIDENCE THAT WHEN SAMSUNG

 6    WENT TO DEVELOP ITS GALAXY SMARTPHONES IT LOOKED AT

 7    ANY OF THE INVENTIONS DESCRIBED IN THE THREE

 8    PATENTS YOU TALKED TO THE JURY ABOUT TODAY?

 9    A    I HAVEN'T SEEN ANY EVIDENCE ONE WAY OR THE

10    OTHER.

11    Q    AND HAVE YOU SEEN ANY EVIDENCE THAT THE

12    INVENTORS OF THESE PATENTS DEVELOPED A PRODUCT, A

13    REAL WORLD PRODUCT, BASED UPON THEIR CLAIMED

14    INVENTIONS?

15    A    I THINK THERE WAS SOME DEPOSITION TESTIMONY TO

16    THAT EXTENT.

17    Q    IDENTIFY FOR ME A PRODUCT THAT ANY OF THE SIX

18    NAMED INVENTORS BROUGHT TO MARKET.

19    A    THAT WASN'T THE FOCUS OF MY INVESTIGATION.

20              MR. LEE:  NOTHING FURTHER, YOUR HONOR.

21              THE COURT:  ALL RIGHT.  IT'S 11:52.

22    PLEASE GO AHEAD.  WE'LL JUST GO UNTIL NOON.

23                   REDIRECT EXAMINATION

24    BY MR. JOHNSON:

25    Q    DR. YANG, YOU WERE TALKING ABOUT THE '893
```

1    PATENT WITH MR. LEE RIGHT AT THE END THERE.

2              IN THE ACCUSED PRODUCTS, APPLE'S ACCUSED

3    PRODUCTS, ARE YOU IN ONE MODE AT A TIME?

4    A    YES.

5    Q    PLEASE EXPLAIN.

6    A    WELL, A MODE DEFINES KIND OF THE FEATURES --

7    THESE ARE MULTIPLE FEATURES PHONES, RIGHT.  THEY

8    HAVE MANY, MANY FEATURES INSIDE OF THEM.  SO THEY

9    HAVE ALL THESE FEATURES IN THEM, AND WHEN YOU TALK

10   ABOUT A MODE, YOU TALK ABOUT WHICH OF THOSE STATES

11   ARE AVAILABLE IN THAT MODE.

12             SO, FOR EXAMPLE, IF YOU WANT THE RINGER

13   OFF BECAUSE YOU DON'T WANT TO DISTURB THE COURT

14   HERE, YOU'RE IN SILENT MODE.

15             AND CERTAINLY WHILE YOU'RE IN SILENT

16   MODE, MANY OTHER THINGS CAN HAPPEN.  SO YOU NEED TO

17   UNDERSTAND HOW ALL THE OTHER SWITCHES ARE SET.

18   THAT'S THE MODE OF THE DEVICE.

19   Q    DO APPLICATION PROGRAMS HAVE MODES?

20   A    APPLICATION PROGRAMS ARE JUST PROGRAMS THAT

21   ARE RUN ON THIS DEVICE.  THE APPLICATION PROGRAM IS

22   RUN, IT DECIDES THAT YOU CAN HAVE PHOTOGRAPHING

23   MODE, YOU CAN HAVE A DISPLAY MODE, AND SO THE

24   APPLICATION PROGRAMS WHEN THEY'RE RUNNING ON THE

25   DEVICE PROVIDE THE DEVICE WITH A MODE.

1    Q    I WANT TO TAKE ABOUT THE '460 PATENT, THE

2    CAMERA.

3    A    YES.

4    Q    AND EMBEDDED PARAGRAPH PATENT.

5          DO YOU AGREE WITH APPLE'S POSITION THAT

6    ITS DEVICES DON'T HAVE MODES?

7    A    NO, I DISAGREE WITH THAT COMPLETELY.

8    Q    CAN YOU EXPLAIN, PLEASE?

9    A    THEIR DEVICES CLEARLY HAVE MODES.  YOU SAW THE

10   MODES, RIGHT.  THERE'S A MODE WHERE THE DEVICE HAS

11   ALL SORTS OF PHOTOGRAPHING CAPABILITIES AVAILABLE.

12   IF YOU TAKE A PICTURE, THAT'S A PHOTOGRAPHING MODE.

13   THERE'S A MODE FOR DISPLAYING PICTURES.  SO THAT'S

14   A DISPLAY MODE.  SO WE CAN ALL EASILY UNDERSTAND

15   WHAT THOSE MODES MEAN.

16   Q    DO YOU HAVE AN UNDERSTANDING AS TO WHETHER THE

17   ACCUSED DEVICE CAN BE IN TWO MODES AT ONCE?

18   A    I MEAN, BEING IN TWO MODES AT ONCE IS, YOU'RE

19   NOT GOING TO BE IN TWO MODES AT ONCE.  YOU'RE IN

20   ONE MODE.

21          SO THE MODE COULD BE THAT YOU'RE IN

22   SILENT MODE, BUT YOU'RE TAKING A PICTURE.  SO

23   REALLY THE PROPER DEFINITION OF A MODE ISN'T JUST

24   SILENT MODE, IT'S SILENT MODE-PHOTOGRAPHING MODE.

25          SO BECAUSE THESE DEVICES ARE COMPLEX AND

 1    THEY HAVE MANY FEATURES, YOU NEED TO REALLY HAVE

 2    KIND OF A COMPLEX DESCRIPTION OF MODE.  BUT PEOPLE

 3    SHORTEN IT AND SAY I'M IN SILENT MODE AND MY RINGER

 4    IS OFF, BUT CERTAINLY YOU COULD LOOK AT E-MAIL.

 5    Q    I WANT TO DIRECT YOUR ATTENTION TO DEPOSITION

 6    TESTIMONY THAT MR. LEE STARTED AND HE READ AND

 7    THERE WAS ANOTHER SECTION THAT HE LEFT OFF, AND I

 8    WANT TO DIRECT YOUR ATTENTION TO TAB 8, PAGE 270.

 9    A    PAGE 270.

10    Q    AND, RYAN, CAN WE PLEASE PUT UP THE MAY 8TH,

11    2012 DEPOSITION.  DO YOU HAVE THAT?

12              MR. LEE, CAN I ASK YOUR GUY TO PUT IT UP.

13              MR. LEE:  WHAT DO YOU WANT?

14              MR. JOHNSON:  THE MAY 8TH, 2012

15    DEPOSITION.  THE TESTIMONY THAT YOU HAD ON THE

16    BOARD.  IT'S TAB 8.

17              THE WITNESS:  IT'S TAB 7.

18              MR. JOHNSON:  TAB 7.  SORRY.

19              THE COURT:  PX 2028.

20    BY MR. JOHNSON:

21    Q    AND LET'S HIGHLIGHT LINES, STARTING AT LINE 5.

22    PAGE 270.

23              MR. LEE READ TO YOU THE QUESTION THAT

24    STARTS UP THERE, IT SAYS, "IN YOUR UNDERSTANDING OF

25    THE TERM 'MODE,' CAN A DEVICE BE BE IN MORE THAN

1    ONE MODE AT THE SAME TIME?"

2            AND HE READ THE FIRST PART OF THAT ANSWER

3    DOWN TO LINE 14 WHERE IT SAYS, "NO, THE DEVICE HAS

4    A GIVEN STATE.  THAT STATE IS THE STATE THAT

5    DEFINES, NOW, THERE MAY BE A CERTAIN STATE, THERE

6    MAY BE CERTAIN THINGS THAT DON'T CHANGE HOW THE

7    DEVICE OPERATES.  AND SO YOU DON'T WORRY ABOUT IT.

8    FOR EXAMPLE, YOU'VE STORED AN EXTRA TWO PICTURES ON

9    YOUR PHONE.  IT MAY NOT CHANGE THE WAY YOUR PHONE

10   BEHAVES."

11           LINES 16 TO 23 WERE NOT READ, AND IT

12   SAYS, "SO YOU MIGHT SAY, WELL, THEY'RE IN

13   EQUIVALENT MODES, THE MODES ARE THE SAME.  BUT THE

14   STATE IS A LITTLE BIT DIFFERENT.  BUT IT MIGHT MAKE

15   A DIFFERENCE IF YOU'RE GOING BACK TO THE LAST

16   VIEWED IMAGE AND THEN THE STATE MIGHT BE A LITTLE

17   DIFFERENT BECAUSE IT WOULD BEHAVE A LITTLE BIT

18   DIFFERENTLY.  SO YOU WOULD SAY IT'S IN A DIFFERENT

19   MODE."

20           DO YOU STAND BY THAT TESTIMONY?

21   A    YES, I DO.

22   Q    NOW, MR. LEE ALSO ASKED YOU ABOUT THE STEPS IN

23   CLAIM, IN THE CLAIM OF THE '460 PATENT AND HE

24   TALKED ABOUT STEPS A, B, C, D, E.  DO YOU REMEMBER

25   THAT?

1    A    YES.

2    Q    WHAT'S YOUR UNDERSTANDING OF WHETHER THOSE

3    STEPS NEED TO BE PERFORMED IN A PARTICULAR ORDER?

4    A    THOSE STEPS DO NOT NEED TO BE PERFORMED IN ANY

5    PARTICULAR ORDER.

6         HOWEVER, IF YOU DO LOOK AT IT CAREFULLY,

7    YOU CAN SEE THAT STEP A, THE FIRST TRANSMISSION

8    MODE, ENTERING IT NEEDS TO NECESSARILY BE PERFORMED

9    BEFORE YOU SEND IT.  BUT OTHER THAN THAT, AND THE

10   SAME FOR THE SECOND E-MAIL TRANSMISSION MODE.

11   OTHER THAN THAT, THAT SEQUENCE CAN BE PERFORMED IN

12   ANY ORDER.

13        MR. JOHNSON:  NO FURTHER QUESTIONS, YOUR

14   HONOR.  THANK YOU, DR. YANG.

15        THE COURT:  OKAY.  THE TIME IS 11:57.

16   WHY DON'T YOU GO WITH ANY REDIRECT.

17        MR. LEE:  YES, YOUR HONOR.

18                **RECROSS-EXAMINATION**

19   BY MR. LEE:

20   Q    LET'S TALK ABOUT WHERE YOU JUST LEFT OFF.  CAN

21   I HAVE CLAIM 1 OF THE '460 PATENT ON THE SCREEN.

22        OKAY.  DR. YANG, THE BLOWUP, AND YOU SEE

23   IT SAYS, "A DATA TRANSMISSION METHOD."  DO YOU SEE

24   THAT?

25   A    YES.

```
 1    Q    AND THEN THERE'S ONE, TWO, THREE, FOUR, FIVE

 2    PARAGRAPHS; CORRECT?

 3    A    YES.

 4    Q    AND WE'VE CALLED THEM A, B, C, D, AND E;

 5    CORRECT?

 6    A    YES, I RECALL THAT.

 7    Q    NOW, YOU AGREE WITH ME THAT A NEEDS TO BE

 8    PERFORMED BEFORE D; CORRECT?

 9    A    YES, IT LOGICALLY SEEMS LIKE YOU HAVE TO ENTER

10    THAT MODE BEFORE YOU CAN TRANSMIT AN E-MAIL.  SO I

11    THINK THERE IS SOME LOGICAL CONNECTION THERE

12    BETWEEN THOSE TWO.

13    Q    AND B NEEDS TO BE PERFORMED BEFORE E; CORRECT?

14    A    RIGHT.  IT SPECIFICALLY MENTIONED A SECOND

15    E-MAIL TRANSMISSION SUB-MODE, ONE WHERE YOU'RE

16    ENTERING AND ONE WHERE YOU'RE EXITING.

17    Q    BUT WHEN YOU GET TO B AND C WHERE YOU SAY THE

18    WORDS DISPLAYING AN IMAGE FOLLOWED BY A DIFFERENT

19    STEP THAT SAYS SEQUENTIALLY DISPLAYING OTHER

20    IMAGES, YOU FIND NO LOGIC THAT REQUIRES THOSE STEPS

21    TO OCCUR IN AN ORDER; CORRECT?

22    A    CORRECT, BECAUSE THEY'RE NOT MENTIONED IN THE

23    SAME MODE.

24    Q    NOW, DR. YANG, YOU KNOW THAT YOUR -- THAT THE

25    COURT HAS INSTRUCTED THE JURY TO GIVE THESE TERMS
```

```
 1    THEIR PLAIN MEANING; CORRECT?

 2    A    OKAY, YES.

 3    Q    SO THAT WORDS LIKE OTHER THAN IMAGES ARE GIVEN

 4    THE PLAIN, EVERY DAY MEANING TO FOLKS JUST LIKE US;

 5    CORRECT?

 6    A    YES.

 7              MR. LEE:  NOTHING FURTHER, YOUR HONOR.

 8              THE COURT:  ALL RIGHT.  ANY REDIRECT?

 9              MR. JOHNSON:  NO, YOUR HONOR.

10              THE COURT:  OKAY.  MAY THIS WITNESS BE

11    EXCUSED AND IS IT SUBJECT TO RECALL?

12              MR. JOHNSON:  HE MAY BE EXCUSED, AND HE

13    IS SUBJECT TO RECALL, YOUR HONOR.

14              THE COURT:  OKAY.  YOU'RE EXCUSED, BUT

15    YOU'RE SUBJECT TO RECALL.

16              THE WITNESS:  THANK YOU.

17              THE COURT:  OKAY.  THANK YOU.  ALL RIGHT.

18    IT'S 11:59, SO LET'S JUST GO AHEAD -- YOU ARE FREE

19    TO LEAVE.  IT'S 11:59.  WE SHOULD GO AHEAD AND TAKE

20    OUR BREAK AND RATHER THAN CALLING A WITNESS FOR A

21    MINUTE.

22              PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS

23    THE WITH ANYONE, AND PLEASE DON'T READ ABOUT THE

24    CASE OR DO ANY RESEARCH.

25              IF YOU WOULD PLEASE LEAVE YOUR NOTEBOOKS
```

```
1     IN THE JURY ROOM.

2              THANK YOU.

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4     WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5              THE COURT:  OKAY.  WILL THE SCHEDULE OF

6     WITNESSES THEN BE AS ORIGINALLY PLANNED?

7              MR. VERHOEVEN:  YOUR HONOR, I'M GOING TO

8     MEET AND CONFER RIGHT NOW WITH OPPOSING COUNSEL.

9     WE HAVE ONE WITNESS WHO HAS TO GET OFF THE STAND

10    AND WITH THE WAY, HOW LONG THIS IS TAKING, WE MAY

11    HAVE TO MOVE DR. WILLIAMS A LITTLE BIT LATER SINCE

12    HE GOT MOVED ALREADY.  I'LL MEET AND CONFER.

13             THE COURT:  THAT'S FINE.  JUST LET US

14    KNOW.

15             MR. MCELHINNY:  ON THIS ISSUE, YOUR

16    HONOR.

17             THE COURT:  WHAT?

18             MR. MCELHINNY:  WHILE WE'VE BEEN SITTING

19    HERE TODAY, SAMSUNG HAS MADE DISCLOSURE,

20    DISCLOSURE, SO WITH DOCUMENTS AND TESTIMONY, FOR A

21    TOTAL NOW OF 22 WITNESSES.

22             THE COURT:  I DON'T HAVE 22.

23             MR. MCELHINNY:  THEY'VE BEEN DISCLOSED

24    WHILE WE'VE BEEN SITTING HERE THIS MORNING, YOUR

25    HONOR.  WE ONLY HAVE WITNESS ORDER THAT GETS US
```

```
 1    TO LOOK AT THE ACTUAL DEVICE.

 2              SO HE'S ONLY SEEN THE PHOTOS.  HE'S NEVER

 3    SEEN THE ACTUAL DEVICE.

 4              AND I -- THAT'S SOMETHING HE WAS

 5    QUESTIONED ABOUT IN HIS DEPOSITION, AND HE AGREED

 6    HE DID NOT GO LOOK AT THE ORIGINAL DEVICE, AND I

 7    WANT TO BE ABLE TO ASK HIM THAT QUESTION.

 8              THE COURT:  THAT'S FAIR.

 9              MS. KREVANS:  JUST THE DEVICE.  THANK

10    YOU, YOUR HONOR.

11              THE COURT:  THAT'S FAIR.  IT'S JUST IF

12    THERE'S ANY INFERENCES THAT FOLKS ARE TRYING TO

13    DRAW AS TO WHY FIDLER IS NOT HERE TODAY, THEN THAT

14    LETTER WILL BE COMING IN.

15              OKAY.

16              MR. MCELHINNY:  I'M SORRY.  I JUST WANT

17    TO -- IN THE COUNTER-DESIGNATIONS THAT WERE

18    EXCHANGED --

19              THE COURT:  UM-HUM.

20              MR. MCELHINNY:  -- THERE IS -- MR. FIDLER

21    DOES ACKNOWLEDGE THAT HE WAS COMPENSATED FOR HIS

22    TIME.  EVERY WITNESS HAS TESTIFIED TO THAT.  BUT

23    THAT'S ALREADY IN THE DESIGNATIONS.

24              THE COURT:  THAT'S FINE.

25              MR. MCELHINNY:  THANK YOU.
```

1          MR. JACOBS:  WITH RESPECT TO THE NEXT

2     WITNESS, YOUR HONOR, MR. WANG, YOU'VE SEEN A

3     PREVIEW IN SAMSUNG'S -- YOU'VE SEEN A PREVIEW IN

4     SAMSUNG'S DEMONSTRATIVES OF WHAT SAMSUNG MAY BE

5     INTENDING TO ELICIT FROM HERE.

6          THE COURT:  OKAY.  GIVE ME JUST ONE

7     SECOND, PLEASE.

8          OKAY.  IS THERE A SPECIFIC ONE THAT YOU

9     HAVE IN MIND?

10         MR. JACOBS:  AND THE HEADS UP IS THAT AS

11    THE COURT HAS SEEN WITH PRIOR RULINGS, FOR EXAMPLE,

12    ON MR. LUCENTE, THERE WAS A PRETTY DRAMATIC FAILURE

13    OF DISCLOSURE ON SAMSUNG'S PART WITH RESPECT TO

14    NON-INFRINGEMENT ON ANYTHING RELATED TO ICONS, AND

15    I'LL REMIND THE COURT OF THAT IN ADVANCE SO THAT IF

16    MS. WANG STARTS TALKING ABOUT NON-INFRINGEMENT AND

17    I STAND UP, IT WON'T BE A SURPRISE TO ANYBODY.

18         THE COURT:  BUT GIVE ME A HEADS UP.  IS

19    THERE A PARTICULAR EXHIBIT IN THE DIRECT MATERIALS

20    THAT YOU HAVE SPECIFIC ISSUES WITH, OTHER THAN

21    WHAT'S ALREADY BEEN RULED ON?

22         MR. JACOBS:  THE -- WHAT IS STILL IN THE

23    DEMONSTRATIVES, YOUR HONOR, ARE PICTURES OF

24    SLIDES -- SORRY, PICTURES OF SCREENS FROM VARIOUS

25    PHONES.  WE DON'T KNOW WHAT MS. WANG WILL SAY ABOUT

2510

```
 1    THOSE.
 2              THE COURT:  I'M SORRY.  I DON'T THINK I
 3    HAVE HER DIRECT, I MEAN HER CROSS EXHIBIT.  I HAVE
 4    THE DIRECT.  SO THIS JUST REPLACES WHAT WAS IN HERE
 5    UNDER 3972, DX?
 6              THE CLERK:  YES, YOUR HONOR.
 7              THE COURT:  WHAT -- DO I HAVE HER -- CAN
 8    I HAVE HERS, PLEASE.
 9              WAS THERE ANYTHING IN PARTICULAR --
10              MR. JACOBS:  NO, YOUR HONOR.  FRANKLY, I
11    CAN'T IMAGINE WHAT SHE'S GOING TO SAY THAT'S
12    HELPFUL TO SAMSUNG'S CASE THAT DOESN'T FALL INTO A
13    PROHIBITED ZONE.  SO NOT KNOWING WHAT THEY'RE GOING
14    TO DO, I THOUGHT I WOULD FLAG IT.
15              IF IT'S INDEPENDENT DEVELOPMENT, THAT'S
16    BEEN ADDRESSED BY PRIOR COURT RULINGS.  IF THIS
17    ISN'T THE SAME, IT'S DIFFERENT, I THINK THAT'S BEEN
18    ADDRESSED BY PRIOR COURT RULINGS.  IF IT'S THEY
19    MADE ME DO IT, MAYBE SHE CAN SAY THAT.
20              THE COURT:  OKAY.  LET ME HEAR WHAT
21    THE -- TELL ME, YOU -- THE TOPICS FOR WHICH YOU
22    THINK SHE CANNOT TESTIFY.
23              MR. JACOBS:  WAS THAT ADDRESSED TO ME,
24    YOUR HONOR?
25              THE COURT:  WHAT ARE THE TOPICS FOR WHICH
```

1       YOU THINK SHE IS PRECLUDED FROM TESTIFYING?

2               MR. JACOBS:  SHE CANNOT -- SO TO START

3       WITH THE COURT'S RULINGS, SHE CANNOT OFFER

4       EXPERT-LIKE TESTIMONY AT ALL.  IT LOOKED LIKE SHE

5       WAS PRESENTING SOME HYPOTHETICALS IN THE SLIDES

6       YOUR HONOR STRUCK A COUPLE OF THOSE THAT WE

7       FLAGGED.

8               THE COURT:  AND THEY'VE BEEN WHITED OUT.

9               MR. JACOBS:  PERFECT.  AND THEN I BELIEVE

10      IF SHE SPEAKS TO SPECIFIC DIFFERENCES BETWEEN HER

11      ICON DESIGNS OR SAMSUNG'S ICON DESIGNS AND THE

12      APPLE ICON DESIGNS, THAT THAT IS PRECLUDED BY

13      SAMSUNG'S FAILURE OF DISCLOSURE, AND I BELIEVE THE

14      COURT'S PRIOR RULINGS ON INDEPENDENT DEVELOPMENT

15      PRECLUDE HER FROM SAYING "I DIDN'T COPY."

16              THE COURT:  AND THE ICON, REMIND ME,

17      WHICH ORDER SAYS THAT NO DIFFERENCES CAN BE

18      IDENTIFIED WITH REGARD TO SAMSUNG ICONS AND THE

19      APPLE ICONS?

20              MR. JACOBS:  I THINK THE BEST PRECEDENT,

21      IF YOU WILL, IS THE LUCENTE ORDER BY JUDGE GREWAL,

22      WHICH PRECLUDED MOST OF LUCENTE'S TESTIMONY ON THE

23      GROUNDS THAT SAMSUNG PRE-CUTOFF INTERROGATORY

24      RESPONSE GAVE NO DETAILED RESPONSE ON WHY THE ICONS

25      WERE NON-INFRINGING.

```
 1              THE COURT:  ALL RIGHT.  LET ME HEAR FROM
 2    MR. QUINN.  WHAT DO YOU INTEND TO ELICIT WITH
 3    REGARD TO THOSE THREE TOPICS.  WE MIGHT AS WELL
 4    HASH IT OUT NOW.
 5              MR. QUINN:  YES, YOUR HONOR.  MS. WANG IS
 6    THE DESIGNER AT SAMSUNG WHO DESIGNED THE ICONS, WHO
 7    DESIGNED THE LAYOUT OF THE MENU PAGE, WHICH APPLE
 8    WITNESSES HAVE SAID THEY THOUGHT WAS RIPPED OFF,
 9    THAT WAS A COPY OF THEIRS.
10              AND SHE WILL TESTIFY THAT SHE CREATED
11    THESE, HOW SHE CREATED THESE, THAT SHE DID NOT
12    REFER TO APPLE ICONS IN DESIGNING THE ICONS WHICH
13    SHE DESIGNED.
14              SHE WILL TESTIFY THAT SAMSUNG HAD USED
15    THESE ICONS BEFORE ON FEATURE PHONES.  SHE WILL
16    TESTIFY THAT THESE ARE KNOWN IN THE CITY, THE MA
17    BELL PHONE IS KNOWN IN THE INDUSTRY.
18              SHE WILL TESTIFY THE FLOWER ICON, FOR
19    EXAMPLE, THE GALLERY ICON, WHO THE GENESIS OF WAS,
20    THAT SHE DIDN'T LOOK AT THE APPLE FLOWER ICON.
21              THE GRID LAYOUT, WHY IT IS THE WAY IT IS
22    AS TO FUNCTIONALITY ISSUES, ABOUT WHY, PARTICULARLY
23    FOR A TOUCHSCREEN ICON, ICONS HAVE TO BE DESIGNED
24    IN A CERTAIN WAY, WHY THE COLORS SHE CHOSE WERE
25    USED, WHAT THE DECISION WAS FOR THOSE, THE DECISION
```

```
 1    MAKING.

 2               THE COURT:  SO SHE'S NOT GOING TO DO ANY

 3    DIRECT COMPARISON BETWEEN SAMSUNG ICONS AND APPLE

 4    ICONS?

 5               MR. QUINN:  WELL, I -- I WAS, IN A COUPLE

 6    OF INSTANCES, GOING TO ASK HER TO LOOK AT THE

 7    CORRESPONDING APPLE ICON AND -- SHE IS A DESIGNER.

 8    THIS IS A WOMAN WHO HAS A DEGREE IN VISUAL

 9    COMMUNICATIONS AND HAS WORKED IN THAT AREA FOR OVER

10    TEN YEARS, AND SHE'S GOING TO POINT OUT DIFFERENCES

11    IN SOME OF THE ICONS.

12               THE COURT:  MR. JACOBS, IS THAT WHAT YOU

13    WERE CONCERNED ABOUT?

14               MR. JACOBS:  THAT WOULD BE THE, THE

15    SECOND PIECE OF WHAT I KNOW, YOUR HONOR.  THAT

16    WOULD BE THE DIFFERENT TESTIMONY.

17               WHAT WAS ALSO ADDRESSED IN THE LUCENTE

18    MOTION WAS INDEPENDENT DEVELOPMENT EVIDENCE, AND WE

19    HAVE NO DISCLOSURE FROM SAMSUNG OF AN INDEPENDENT

20    DEVELOPMENT STORY ON THEIR ICON LAYOUTS,

21    NOTWITHSTANDING RELEVANT INTERROGATORIES.

22               MR. ZELLER:  YOUR HONOR, IF I MAY JUST

23    ADD SOMETHING IN RESPONSE TO THIS AS WELL?

24               AS THE COURT WILL RECALL THAT WE DID

25    OBJECT TO APPLE'S EXPERT, SUSAN KARE, OFFERING
```

```
 1    CERTAIN TESTIMONY THAT WAS NOT IN HER EXPERT REPORT

 2    AND THE COURT WILL ALSO RECALL THAT SHE

 3    SPECIFICALLY TALKED ABOUT THAT, THAT COMPARISON

 4    DOCUMENT --

 5             THE COURT:  LET ME ASK YOU, WERE THE

 6    COMPARISONS OF SAMSUNG ICONS TO APPLE ICONS

 7    STRICKEN FROM SAM LUCENTE'S REPORT?

 8             MR. ZELLER:  NO, YOUR HONOR, THEY WERE

 9    NOT.

10             THE COURT:  LET ME HEAR FROM MR. JACOBS.

11    DO YOU HAVE A COPY OF THAT?

12             MR. JACOBS:  YES.  IT'S MARKED UP, YOUR

13    HONOR.  I'VE KIND OF YELLOWED IT OUT WITH THE

14    PORTIONS THAT WERE STRICKEN.

15             THE COURT:  UM-HUM.  LET ME SEE THE

16    PARAGRAPH NUMBER, PLEASE, BECAUSE I --

17             MR. ZELLER:  AND TO BE CLEAR, THESE ARE

18    DIFFERENT COMPARISONS THAT WE'RE TALKING ABOUT.

19    AND WHAT I WOULD SAY TO YOUR HONOR IS THAT --

20             THE COURT:  WAIT.  ARE THEY COMPARISONS

21    OF ICONS?

22             MR. ZELLER:  YES.

23             THE COURT:  WHAT'S DIFFERENT ABOUT THEM?

24    THEY'RE DIFFERENT SPECIFIC ICONS OR --

25             MR. ZELLER:  THEY ARE COMPARISONS THAT
```

```
1    APPLE'S -- EXCUSE ME -- THAT SAMSUNG'S EXPERT DID
2    THAT WERE STRICKEN.  SHE IS TALKING --
3              THE COURT:  OKAY.  SO I'M NOT GOING TO
4    LET HER THEN TRY TO GET IN WHAT WAS STRICKEN FROM
5    AN EXPERT'S REPORT.  SO PLEASE DON'T GO THERE.
6              MR. ZELLER:  YOUR HONOR, IF I MAY FINISH.
7    THIS IS A DIFFERENT ISSUE.  THEY'RE FIXING AND
8    MATCHING ISSUES AS THEY'VE DONE BEFORE.  MS. KARE
9    GOT UP AND TESTIFED, THIS WAS NOT IN HER EXPERT
10   REPORT, THIS WAS NOT IN HER DEPOSITION --
11             THE COURT:  LET ME SEE THE LUCENTE
12   REPORT.
13             MR. ZELLER:  SHE GOT UP AND TESTIFIED
14   ABOUT THE COMPARISON DOCUMENT THAT APPLE HAS NOW
15   PUT IN FRONT OF THE JURY MANY TIMES.
16             THERE WAS NO NOTICE THAT THEY WERE EVER
17   GOING TO DO THAT.  THAT WAS NOT IN HER REPORT.  WE
18   OBJECTED TO IT.  THE COURT OVERRULED IT.  SHE IS
19   GOING TO BE ADDRESSING THOSE KINDS OF COMPARISONS.
20             THOSE ARE NOT IN THE SAMSUNG EXPERT
21   REPORT THAT THE COURT HAS IN FRONT OF IT.  SO THIS
22   IS DIRECTLY ADDRESSING SOMETHING THAT APPLE RAISED
23   FOR THE FIRST TIME DURING THIS TRIAL OVER OUR
24   OBJECTION.
25             THE COURT:  THAT'S ALL REGARDING PX 44,
```

2516

```
 1      RIGHT?
 2                  MR. ZELLER:  YES, IT IS, YOUR HONOR.
 3                  THE COURT:  OKAY.  GIVE ME ONE SECOND.  I
 4      BELIEVE THERE WAS ONLY ONE PAGE THAT HAD TO DO WITH
 5      ICONS IN PX 44.
 6                  MR. ZELLER:  I BELIEVE THAT THERE WAS
 7      MORE THAN THAT, YOUR HONOR.  I KNOW THAT THEY
 8      CERTAINLY RAISED MORE THAN ONE OF THOSE PAGES.
 9                  THE COURT:  I BELIEVE THE ONLY -- WELL,
10      I'LL TAKE A LOOK AT 131.  IT WAS ONLY PAGE 122 AND
11      131.  THOSE WERE THE ONLY ONES THAT CAME UP DURING
12      MS. KARE'S --
13                  MR. ZELLER:  BUT THEY HAVE ALSO RAISED
14      THESE OTHER PAGES CONCERNING THE ICONS WITH OTHER
15      WITNESSES, YOUR HONOR.
16                  THIS MORNING THEY PUT UP THE CAMERA.
17                  THE COURT:  I THINK THIS MORNING IS
18      IRRELEVANT.  THAT HAS TO DO WITH THE SAMSUNG.  THIS
19      HAD NOTHING TO DO WITH ICONS.
20                  MR. ZELLER:  AND THE COURT WILL RECALL,
21      TOO, THAT APPLE REQUESTED --
22                  THE COURT:  AND YOU ALL PUT THE CAMERA
23      ICONS UP AND YOU WERE PUTTING UP THE ACCUSED
24      PHONES.
25                  MR. ZELLER:  YOUR HONOR, THE COURT WILL
```

```
 1    ALSO RECALL THAT OVER OUR OBJECTION, APPLE MOVED IN
 2    THE ENTIRE DOCUMENT INTO EVIDENCE.
 3             THE COURT:  IT'S AN ADMISSION AND IT
 4    SHOULD HAVE BEEN PRODUCED PLAINTIFF THE PRELIMINARY
 5    INJUNCTION.  IF I HAD HAD IT, IT WOULD HAVE BEEN
 6    HIGHLY RELEVANT TO MY DECEMBER 2ND RULING.  ANYWAY,
 7    GO AHEAD.
 8             MR. ZELLER:  IF I MAY, YOUR HONOR?  THE
 9    WITNESS IS GOING TO TALK ABOUT THESE PAGES THAT WE
10    ARE REBUTTING WHAT APPLE IS NOW RAISING DURING THIS
11    TRIAL.  AND THAT IS THE COMPARISON THAT WE'RE
12    TALKING ABOUT.  YOUR HONOR, JUST TO TALK ABOUT THE
13    PRELIMINARY INJUNCTION --
14             THE COURT:  WELL, I'M LOOKING AT PAGE 30,
15    THAT WAS ALL STRICKEN WITH REGARD TO THE MESSAGE
16    COMPARISON.  SO WHAT IS SHE GOING TO SAY ABOUT
17    THAT?
18             MR. ZELLER:  I'M SORRY, WE'RE TALKING
19    ABOUT THE --
20             THE COURT:  LUCENTE, YOUR EXPERT'S REPORT
21    SAMSUNG'S CORRECTED REBUTTAL EXPERT REPORT OF
22    SAM LUCENTE.  THAT WAS STRICKEN.  SO WHAT IS SHE
23    GOING TO SAY ABOUT THAT?
24             MR. ZELLER:  I'M SORRY, YOUR HONOR.  I
25    DON'T HAVE THE DOCUMENT.  THEY -- APPLE DIDN'T
```

```
 1    PROVIDE WHATEVER IT IS THAT THEY HAVE PROVIDED TO

 2    YOUR HONOR.

 3              THE COURT:  OKAY.  THIS IS SAMSUNG'S

 4    EXPERT REPORT FROM SAM LUCENTE.  I SAID I NEEDED

 5    THAT FROM APPLE.

 6              MR. ZELLER:  NO, YOUR HONOR, THAT'S

 7    OBVIOUSLY -- WE DO NOT HAVE A COPY OF WHAT APPLE

 8    HAS PROVIDED TO THE COURT.

 9              THE COURT:  I'M SAYING LOOK AT PAGE 30,

10    I'M LOOKING AT YOUR EXPERT'S REPORT, PAGE 30.

11              MR. ZELLER:  YOUR HONOR, WHAT -- ALL I'M

12    TRYING TO SAY IS THAT THEY HAVE HIGHLIGHTED IT TO

13    SHOW WHAT IS ALLEGEDLY STRICKEN.  WE DON'T HAVE

14    THAT.

15              THE COURT:  OH.

16              MR. ZELLER:  THAT'S ALL I'M -- I'M

17    APOLOGIZING, YOUR HONOR.

18              MR. JACOBS:  YOUR HONOR, THAT DOCUMENT

19    HAS BEEN FILED.  WE SET A DATE FOR EXACTLY THIS

20    KIND OF DISCUSSION.  I CAN GET YOU THE ECF NUMBER

21    IN A MINUTE.

22              MR. ZELLER:  AGAIN, YOUR HONOR, WHAT

23    WE'RE TALKING ABOUT IS A DIFFERENT KIND OF

24    COMPARISON.  WE'RE ADDRESSING THE DOCUMENT, THE

25    SAMSUNG DOCUMENT THAT APPLE HAS ASSERTED DURING
```

1    DESIGNER.

2              THE INTERPRETER:  THAT IS CORRECT, YOUR

3    HONOR.

4              JUROR:  OKAY.

5              THE COURT:  ANY OTHER THINGS?

6              JUROR:  NOT AT THIS TIME.

7              THE COURT:  OKAY.  ALL RIGHT.

8         OKAY.  IT'S 1:36.  GO AHEAD, PLEASE.

9              MR. QUINN:  THANK YOU, YOUR HONOR.

10   Q    MS. WANG, WE'VE HEARD TESTIMONY FROM APPLE

11   WITNESSES ABOUT HOW HARD THEY WORKED TO BRING THE

12   IPHONE TO MARKET.

13             DID YOU -- WOULD YOU TELL US WHAT IT WAS

14   LIKE WORKING ON THE GALAXY PHONE, THE DESIGN

15   ASPECTS FOR THE USER EXPERIENCE THAT YOU WORKED ON?

16   A    YES, I CAN.  SAMSUNG IS A COMPANY THAT'S VERY

17   TOUGH TO WORK AT AND IN KOREA.  IT'S A VERY HARD

18   WORKING TYPE OF COMPANY.  ANYWAY, WHEN WE WERE

19   DESIGNING GALAXY SI, WE HAD PEOPLE FROM SEOUL AND

20   ALSO FROM SUWON, AND ALSO FROM GUMI.  THE PEOPLE

21   FROM SUWON, THERE WERE HUNDREDS OF DEVELOPERS, AND

22   ALSO PEOPLE FROM GUMI, THERE WERE MULTIPLE OF TENS

23   WHO WERE INVOLVED IN VERIFICATIONS.

24             SO WITH ALL THOSE PEOPLE COMING FROM

25   DIFFERENT PLACES.  THERE WAS AT ONE POINT WHERE WE

1    HAD ALL COME TOGETHER AND WORKED TOGETHER AS A TEAM

2    FOR ABOUT THREE MONTHS AND DURING THAT TIME PERIOD

3    OF THREE MONTHS, MY RECOLLECTION WOULD BE THAT I

4    SLEPT PERHAPS TWO HOURS OR THREE HOURS A NIGHT.

5    THAT WAS ABOUT IT.

6              AND ALSO DURING THAT TIME PERIOD, I

7    ACTUALLY ENCOUNTERED SOMETHING THAT WAS VERY

8    DIFFICULT FOR ME.  BACK THEN I HAD JUST GIVEN BIRTH

9    TO A NEWBORN, AND I WAS FEEDING MOTHER'S MILK TO

10   THE BABY.  BUT SINCE I WASN'T ABLE TO BE WITH THE

11   BABY SO MUCH, I HAD TO SAVE THE BREAST MILK.

12             BUT IT JUST HAPPENED THAT I WASN'T ABLE

13   TO DO THAT ON A CONSISTENT BASIS.  SO MY

14   RECOLLECTION WAS THAT THE BREAST FEEDING HAD TO

15   COME TO A STOP BECAUSE I HAD -- MY BODY WOULD NOT

16   GIVE MILK ANY MORE.

17   Q    SO IT WAS A DEVELOPING, THE USER INTERFACE,

18   THE ICONS, THAT MENU PAGE, WAS THAT A VERY INTENSE

19   PERIOD OF HARD WORK FOR YOU?

20   A    THAT'S CORRECT.  THOSE WERE DIFFICULT TIMES.

21   Q    LET'S TALK ABOUT SOME -- LET'S TALK ABOUT

22   ICONS AND ICON DESIGN.

23             WHAT FACTORS DO YOU CONSIDER MOST

24   IMPORTANT IN DESIGNING AN EFFECTIVE ICON?

25   A    THERE ARE A FEW THINGS THAT'S IMPORTANT WHEN

1    IT COMES TO DESIGNING AN ICON.  THE FIRST THING

2    THAT COMES TO MIND IS THAT WHEN A USER IS LOOKING

3    AT AN ICON, THE USER SHOULD BE ABLE TO RECOGNIZE IT

4    AS SUCH RIGHT AWAY.

5                AND, SECONDLY, THE COLOR AND THE SHAPE

6    ARE ALSO IMPORTANT IN THAT THEY SHOULD BE GOOD OR

7    PRETTY TO LOOK AT.

8                AND ALSO, EASILY -- EASY TO GRASP.

9                THIRDLY, IT HAS TO BE SOMETHING THAT HAS

10   TO BE EASILY MEMORIZED OR MEMORABLE.

11   Q    AND WHEN YOU'RE DESIGNING -- I'M SORRY.  IS

12   THERE A CORRECTION?

13               THE INTERPRETER:  NO, YOUR HONOR.  NO,

14   SIR.

15   BY MR. QUINN:

16   Q    ARE THERE ADDITIONAL SPECIAL CONSIDERATIONS

17   THAT HAVE TO BE TAKEN INTO ACCOUNT WHEN YOU DESIGN

18   AN ICON THAT'S GOING TO BE USED ON A TOUCHSCREEN?

19   A    YES, OF COURSE.  WHEN IT COMES TO TOUCHSCREEN,

20   IT HAS TO BE A CERTAIN AMOUNT OR A CERTAIN PART OF

21   THE SCREEN THAT WOULD ALLOW FOR THE TOUCHING TO

22   TAKE PLACE.

23               AND SO THERE HAS TO BE A CERTAIN SIZE,

24   SHALL WE SAY, AND ALSO THERE HAS TO BE A VIVID

25   COLOR THAT IS AVAILABLE FOR THE USER SO THE USER

1    WILL BE ABLE TO RECOGNIZE THE AREA AND USE THEIR

2    FINGER TO TOUCH.

3    Q    LET'S TAKE A LOOK AT AN ICON.  WE DON'T HAVE

4    TIME TO GO THROUGH VERY MANY OF THEM, BUT IF WE

5    COULD PUT UP, YOUR HONOR, DEMONSTRATIVE 3972.012,

6    3972.012, THE MENU SCREEN FOR THE GALAXY S, AND

7    LET'S JUST BEGIN WITH THAT PHONE ICON IN THE LOWER

8    LEFT.

9              ARE YOU THE ONE THAT SELECTED THIS ICON

10   FOR USE ON THE GALAXY PHONE?

11   A    YES, THAT IS CORRECT.

12   Q    WHY DID YOU CHOOSE THIS ONE?

13             MR. JACOBS:  YOUR HONOR, OBJECTION.

14   PRIOR DISCUSSION.  YOU WILL SEE AT PAGE 18.

15             THE COURT:  OVERRULED.

16             GO AHEAD.

17             THE WITNESS:  WELL, I DESIGNED IT AS SUCH

18   BECAUSE IT'S A PHONE, SO I DESIGNED IT AS A PHONE.

19   THE SAME GOES WITH THE CLOCK, AND ALSO THE CAMERA.

20   BY MR. QUINN:

21   Q    HAVE YOU, IN THE PAST, HAS SAMSUNG

22   EXPERIMENTED WITH OTHER ICONS FOR PHONE ON

23   TELEPHONES?

24   A    YES, WE HAVE.

25   Q    AND WHAT OTHER ICONS HAVE YOU USED FOR PHONES

```
1    AND WHAT WAS YOUR EXPERIENCE WITH THEM?

2    A    YES.  WELL, WE HAVE TRIED QUITE A FEW

3    DIFFERENT ICONS AND THERE WERE EVEN CERTAIN

4    DIRECTIVES COMING FROM UP ABOVE TELLING US TO COME

5    UP WITH SOMETHING OF A DESIGN THAT'S MORE

6    SOPHISTICATED, SOMETHING THAT LOOKS MORE LIKE A

7    SMARTPHONE.

8              SO WE TRIED DIFFERENT ICONS.  FOR

9    EXAMPLE, WE TRIED AN ICON THAT LOOKED LIKE A CELL

10   PHONE WITH AN ANTENNA, AND THEN WE ALSO TRIED AN

11   ICON THAT LOOKED MORE LIKE A SMARTPHONE.

12             BUT WHAT HAPPENED WAS THAT THE PEOPLE

13   WOULD ACTUALLY MISTAKE THESE ICONS.  SOME PEOPLE

14   THOUGHT THIS WAS A GAME OR MAYBE A PDA OR EVEN A

15   CALCULATOR.  SO WE HAD SOME PROBLEMS.

16   Q    HOW LONG HAS SAMSUNG USED THIS PARTICULAR TYPE

17   OF MA BELL, WE'VE HEARD IT CALLED A MA BELL, I

18   DON'T KNOW IF THAT TRANSLATES INTO KOREAN, ICON ON

19   PHONES.

20             MR. JACOBS:  OBJECTION, YOUR HONOR.

21   LEADING.  HE'S GIVING THE WITNESS A NAME FOR THIS.

22             THE COURT:  SUSTAINED.  SUSTAINED.

23   THAT'S STRICKEN.

24   BY MR. QUINN:

25   Q    DO YOU HAVE A NAME THAT YOU USE FOR THIS
```

1    PARTICULAR TYPE OF ICON FOR A PHONE?

2    A    YEAH.  IN OUR DESIGN TEAM, WE CALLED IT A MA

3    BELL.

4                THE INTERPRETER:  YOUR HONOR, CORRECTION.

5                THE WITNESS:  IN OUR DESIGN TEAM, WE

6    CALLED IT A DUMBBELL ICON.

7    BY MR. QUINN:

8    Q    AND HOW LONG HAS SAMSUNG USED THIS DUMBBELL

9    STYLE ICON ON THE PHONES?

10               THE INTERPRETER:  YOUR HONOR, MAY THE

11   WITNESS REPEAT HER ANSWER?

12               THE COURT:  PLEASE.

13               THE WITNESS:  THAT ICON WAS IN USE EVEN

14   BEFORE I HAD JOINED THE COMPANY IN 2002.  AND THIS

15   WAS USED BY SAMSUNG.  I'M SAYING THAT THE DUMBBELL

16   SHAPE HAD BEEN USED IN SAMSUNG EVEN PRIOR TO 2002.

17   BY MR. QUINN:

18   Q    AND IT'S GREEN, OBVIOUSLY.  DOES THE COLOR

19   GREEN HAVE ANY SIGNIFICANCE FROM A DESIGN

20   STANDPOINT IN THIS ICON?

21   A    YES.  WELL, THE GREEN WOULD HAVE A POSITIVE

22   CONNOTATION TO IT, MEANING GO OR DO OR MAKE THE

23   CALL.

24               LIKEWISE, A RED COLOR WOULD BE SOMETHING

25   LIKE "DON'T" OR "STOP" TYPE OF INFORMATION.

1           SO IN ORDER TO TELL THE USER TO MAKE THE

2    CALL OR ENABLE THE USER TO MAKE THE CALL, OF COURSE

3    IT HAS TO BE GREEN.

4    Q    AND ARE YOU FAMILIAR -- ARE YOU FAMILIAR WITH

5    THE CONCEPT OF A VISUAL LANGUAGE?

6    A    YES, I AM VERY WELL AWARE.

7    Q    WHAT DOES A VISUAL LANGUAGE, WHAT DOES THAT

8    MEAN TO YOU AS AN ICON DESIGNER?

9    A    VISUAL LANGUAGE WOULD MEAN TELLING THE PERSON

10   USING A PICTURE BY LOOKING AT A PICTURE OR AN ART,

11   ONE WOULD BE ABLE TO DISTINCTIVELY TELL WHAT IT

12   MEANS.

13           FOR EXAMPLE, A RESTROOM SIGN FOR THAT

14   WOULD BE A VISUAL COMMUNICATION, EVEN AN AIRPORT, A

15   SIGN FOR THAT, THAT WOULD ALSO BE A VISUAL

16   COMMUNICATION.

17   Q    AND IN THE SMARTPHONE INDUSTRY, DO YOU SEE THE

18   DEVELOPMENT OF A VISUAL LANGUAGE FOR ICONS?

19           MR. JACOBS:  OBJECTION.  LEADING AN

20   EXPERT.

21           THE COURT:  SUSTAINED.

22   BY MR. QUINN:

23   Q    ARE THERE OTHER SMARTPHONE COMPANIES THAT USE

24   A SIMILAR IMAGE OF A HANDSET FOR A TELEPHONE?

25           MR. JACOBS:  SAME OBJECTION, YOUR HONOR.

```
1              THE COURT:  LAY A FOUNDATION, PLEASE.
2      BY MR. QUINN:
3      Q    AS PART OF YOUR JOB, DO YOU PAY ATTENTION TO
4      WHAT ICONS OTHER COMPANIES ARE USING?
5      A    NOT ONLY THE OTHER COMPANIES, I WOULD ALSO
6      LOOK AT THE ICONS THAT COME UP ON THE WEBSITES OR
7      WEBS, AND ALSO AIRPORT SIGN SYSTEMS, THINGS LIKE
8      THAT.  SO I WOULD PAY ATTENTION TO ALL THESE
9      THINGS.
10     Q    AND WHY IS -- IS THERE A REASON WHY THE
11     HANDSET IS TILTED AT AN ANGLE?
12     A    WELL, AS I'VE INDICATED TO YOU EARLIER, THIS
13     IS FOR A TOUCHSCREEN, SO THERE HAS TO BE A CERTAIN
14     AMOUNT OF AREA THAT IS ALLOTTED FOR THE USER TO
15     ACTUALLY ACCESS THIS TYPE OF FUNCTION.
16              SO IT COULD NOT BE SOMETHING THAT IS MORE
17     OF A HORIZONTAL TYPE OF BOX OR SOMETHING THAT'S
18     MORE VERTICAL BECAUSE TO DO SO WOULD MEAN THAT
19     THERE WOULD NOT BE EITHER ENOUGH SPACE OR TOO MUCH
20     SPACE FOR THE FINGER TOUCHING.
21              AND ALSO, IT'S LEANING A LITTLE BIT
22     BECAUSE THAT'S HOW PEOPLE MAKE PHONE CALLS.  WHEN
23     YOU MAKE A PHONE CALL AND SAY HELLO, WHEN YOU PICK
24     IT UP, YOU WOULD PICK IT UP AT AN ANGLE AND YOU
25     WOULD END THE PHONE CALL BY PLACING IT IN THIS
```

4578

```
1              CAN WE PUT UP SDX 3970.02.
2              CAN YOU IDENTIFY WHAT WE'RE LOOKING AT
3     HERE, SIR?
4     A    YES, THIS IS THE DESIGN PATENT '677 FOR AN
5     ELECTRONIC DEVICE.
6     Q    FOR THE RECORD, THAT'S A DEPICTION OF JX 1043
7     IN EVIDENCE.
8              WHEN WAS THIS PATENT FILED?
9     A    IT WAS FILED NOVEMBER 18TH, 2008.
10    Q    WHAT DOES THE D'677 PATENT DISCLOSE?
11    A    IT DISCLOSES AN ELECTRONIC DEVICE WHOSE
12    OVERALL RECTANGULAR SHAPE WITH EVENLY ROUNDED
13    CORNERS, A FLAT TRANSPARENT SURFACE WITH BLACK
14    COLOR.
15             AND AN ELONGATED LOZENGE SHAPED EARPIECE
16    SLOT ON TOP OF THE DISPLAY AREA, AND THERE'S A
17    RECTANGULAR DISPLAY CENTERED ON THE FRONT FACE.
18             THE REALLY IMPORTANT VIEW ON THIS DESIGN
19    PATENT IS REALLY ONLY THE FRONT FACE SINCE NOTHING
20    ELSE IS CLAIMED IN THIS DESIGN PATENT ON THE FRONT
21    FACE ITSELF.
22    Q    SO THERE'S THESE DOTTED LINES GOING AROUND IN
23    WHAT APPEARS TO BE A BEZEL-LIKE SHAPE?  DO YOU SEE
24    THAT?
25    A    YES, I SEE IT.
```

4579

```
 1    Q    WHAT'S YOUR UNDERSTANDING AS TO WHETHER THIS
 2    DESIGN PATENT CLAIMED THAT?
 3    A    SINCE THEY ARE DOTTED, IT WOULD MEAN THAT THIS
 4    IS UNCLAIMED IN THIS DESIGN PATENT.
 5    Q    SO DESIGN '677 ONLY CLAIMS THE FRONT FACE; IS
 6    THAT RIGHT?
 7    A    ONLY THE FRONT FACE.
 8    Q    OKAY.  NOW LET'S GO TO THE D'087 PATENT, THE
 9    NEXT SLIDE, THERE WE GO.
10         AND FOR THE RECORD, THIS IS A DEPICTION
11    OF JX 1041 IN EVIDENCE.
12         HAVE YOU LOOKED AT THE D'087 PATENT, SIR?
13    A    YES, I DID.
14    Q    WHEN WAS THIS PATENT FILED?
15    A    IT WAS FILED IN ON JULY 30TH, 2007.
16    Q    WHAT DOES THE D'087 PATENT DISCLOSE?
17    A    THE D'087 ON THIS EMBODIMENT IS ACTUALLY
18    DISCLOSING A VERY SIMILAR DESIGN TO THE '677, ONLY
19    THAT IN THIS CASE THE BEZEL IS CLAIMED BECAUSE IT
20    IS IN FULL LINE, AND THE BLACK COLOR IS UNCLAIMED.
21    Q    OKAY.  SO THE SIDES AND THE BACK THAT WE'RE
22    LOOKING AT, THE SIDE VIEW HERE ON SLIDE 3, DO YOU
23    SEE THOSE?
24    A    YES, I DO.
25    Q    WHAT'S YOUR UNDERSTANDING AS TO WHETHER THOSE
```

```
1    ARE CLAIMED OR NOT?

2    A    BASED ON THE FACT THAT THEY ARE DOTTED, THEN

3    THEY ARE UNCLAIMED.  SO THE ONLY THING THAT IS

4    CLAIMED IS THE FRONT FACE AND THE BEZEL.

5    Q    OKAY.  NOW LET'S TAKE A LOOK AT SOME OF THE

6    PRIOR ART THAT YOU LOOKED AT.

7              I'LL DIRECT YOUR ATTENTION IN YOUR BINDER

8    TO DX 511, WHICH IS ALREADY IN EVIDENCE.

9              WHAT IS DX 511?

10   A    DX 511 IS A JAPANESE DESIGN PATENT, THE '638,

11   FOR A PORTABLE TELEPHONE DEVICE WITH A CAMERA.

12   Q    IS THIS ONE OF THE PIECES OF PRIOR ART THAT

13   YOU LOOKED AT, SIR?

14   A    YES.

15   Q    I'M GOING TO REFER TO THIS DESIGN PATENT AS

16   JP'638 AS I GO ALONG.  OKAY?

17   A    YES.

18   Q    WHEN DID JP '638 PUBLICLY ISSUE?

19   A    IT WAS ISSUED ON JUNE 6TH, 2005.

20   Q    IS THAT BEFORE OR AFTER THE FILING DATES OF

21   THE '677 AND '087 PATENT?

22   A    IT'S BEFORE.

23   Q    WHAT DOES JP'638 DISCLOSE?

24   A    THE JP'638 DISCLOSES A PORTABLE TELEPHONE

25   DEVICE THAT HAS, AS CAN BE SEEN HERE, A FRONT FACE
```

2581

1    THAT HAS THE DESIGNS.

2    Q    DID YOU COMPARE THE JP'638 TO THE D'087 AND

3    D'677 PATENTS?

4    A    YES, I DID.

5    Q    CAN WE GO TO THE NEXT SLIDE, PLEASE.  THIS IS

6    A DEPICTION OF THE FRONT FACE OF JP'638, D'677 AND

7    '087.  DO YOU SEE THAT, SIR?

8    A    YES, I DO.

9    Q    CAN YOU WALK THE JURY THROUGH -- YOUR ANALYSIS

10   OF THE JP'638 DESIGN WITH REGARDS TO THE D'677 AND

11   D'087?

12   A    AS YOU CAN SEE HERE, THE OVERALL ROUNDED

13   SHAPE, EVENLY ROUNDED CORNERS, THEY ALL HAVE A

14   RECTANGULAR DISPLAY THAT IS CENTERED ON THE FRONT

15   FACE.  IT ACTUALLY OCCUPIES MOST OF THE SPACE ON

16   IT.

17        THEY ALL HAVE LOZENGE SHAPED CENTERED

18   EARPIECE SLOT ON TOP OF THE DISPLAY AREA.  AND THEY

19   ALL HAVE THIS BEZEL SURROUNDING THE FRONT FACE, ON

20   THE '677, IT'S UNCLAIMED, BUT SIMILAR TO WHAT IS

21   CLAIMED IN THE '087.

22   Q    DID YOU REACH AN OPINION AS TO WHETHER THE

23   JP'638 DESIGN PATENT RENDERS THE '677 AND '087

24   PATENTS OBVIOUS?

25   A    YES, I DID.

1     Q    CAN YOU PLEASE TELL THE JURY YOUR OPINION AND

2     EXPLAIN IT?

3     A    MY OPINION IS THE JP'638 RENDERS BOTH OF THESE

4     DESIGNS OBVIOUS.  JUST LOOKING AT THAT, IT IS

5     EXTREMELY SIMILAR.  THE DIFFERENCES THAT EXIST

6     BETWEEN THESE, THE FRONT FACE OF THE '638 IS NOT

7     ENTIRELY FLAT BUT RELATIVELY MINOR.

8              AND I WOULD SAY THAT SOMEBODY WITH

9     ORDINARY SKILLS IN THE ART WOULD BE ABLE TO PERFORM

10    THE MODIFICATIONS AND DO THESE TWO DESIGNS.

11    Q    DID YOU CONSIDER JP'638 IMAGES FROM THE SIDE

12    VIEW AND OTHER VIEWS?

13    A    YES, I DID.

14    Q    OKAY.  CAN WE GO TO THE NEXT SLIDE, PLEASE.

15    CAN YOU EXPLAIN TO THE JURY WHAT WE'RE LOOKING AT

16    ON THIS SLIDE?  THIS IS, FOR THE RECORD, SDX

17    3970.06?

18    A    SO ON THIS SLIDE WE HAVE THE SIDE VIEWS; ON

19    THE LEFT WE HAVE THE '638 SIDE CUT VIEW; AND JUST

20    NEXT TO IT, WE HAVE THE '677 AND THE '087 SIDE

21    VIEWS.

22              AND AS WE CAN SEE HERE ON THE '638, THE

23    FRONT FACE OF THE '638 IS NOT COMPLETELY FLAT.  IT

24    HAS A SMALL CURVATURE ON TOP AND BOTTOM, BUT YOU

25    CAN CLEARLY SEE THIS IS ONE SINGLE PIECE OF

1   MATERIAL THAT GOES FROM TOP TO BOTTOM AND THERE IS

2   AN INSET DISPLAY THAT RESIDES BEHIND THAT FRONT

3   COVER.  OBVIOUSLY SINCE THERE'S A DISPLAY THERE,

4   THE FRONT COVER HAS TO BE TRANSPARENT OBVIOUSLY IN

5   ORDER TO OBSERVE THE INFORMATION ON THE DISPLAY.

6   Q    NOW, IF WE LOOK AT THE SIDE VIEW HERE, JP'638,

7   THE SIDE OF THE FORM FACTOR, IT LOOKS DIFFERENT

8   THAN THE SIDES AND THE BACK ON THE '087 AND '677;

9   IS THAT RIGHT?

10  A    THAT'S CORRECT.  HOWEVER, SINCE BOTH '677 AND

11  '087 DO NOT CLAIM THE SIDE, THIS IS REALLY

12  IRRELEVANT FOR THE COMPARISON.

13  Q    OKAY.  SO DID THE DIFFERENCES THAT YOU NOTICED

14  BETWEEN THE JP'638 AND '677 AND '087 AFFECT YOUR

15  ANALYSIS -- OR AFFECT YOUR CONCLUSION THAT JP'638

16  RENDERS '677 AND '087 OBVIOUS?

17  A    NO, THEY -- NO.

18  Q    DID YOU CONSIDER OTHER PRIOR ART IN CONDUCTING

19  YOUR NON-OBVIOUSNESS ANALYSIS WITH RESPECT TO '677

20  AND '087?

21  A    YES, I DID.

22  Q    I'LL DIRECT YOUR ATTENTION TO DX 727 IN YOUR

23  BINDER, WHICH IS ALREADY IN EVIDENCE, YOUR HONOR .

24          CAN WE GO TO THE NEXT SLIDE.

25          IS THIS A -- I PUT ON THE SCREEN A COUPLE

```
 1    OF VIEWS FROM DX 727, WHICH IS THE KOREAN

 2    REGISTERED DESIGN PATENT, 30-418547.  DO YOU SEE

 3    THAT, SIR?

 4    A    YES, I DO.

 5    Q    IS THIS ONE OF THE OTHER PIECES OF PRIOR ART

 6    YOU CONSIDERED?

 7    A    YES.

 8    Q    AND I'M GOING TO REFER TO THIS AS KR'547 FOR

 9    REFERENCE, OKAY?

10    A    SURE.

11    Q    WHEN DID THAT ISSUE?

12    A    IT WAS ISSUED ON JULY 6TH, 2006.

13    Q    IS THAT BEFORE OR AFTER THE FILING DATES OF

14    THE '677 AND '087 APPLE DESIGN PATENTS?

15    A    BEFORE.

16    Q    WHAT DOES KR'547 DISCLOSE?

17    A    IT DISCLOSES A PORTABLE PHONE THAT HAS OVERALL

18    RECTANGULAR SHAPE WITH EVENLY ROUNDED CORNERS.  IT

19    HAS A DISPLAY THAT IS CENTERED ON THE FRONT FACE.

20    IT HAS A LOZENGE SHAPED EARPIECE SLOT THAT IS

21    VERTICALLY CENTERED.  AND IT HAS A COMPLETELY FLAT

22    FACE AS CAN BE SEEN FROM THE SIDE VIEW.

23    Q    SO WHEN WE WERE LOOKING AT THE JP'638 PATENT,

24    YOU NOTED THAT THERE WAS A SLIGHT -- WHAT WAS THE

25    WORD YOU USED?
```

```
 1    A     SLIGHT CURVATURE.

 2    Q     SLIGHT CURVATURE AT THE VERY TOP AND BOTTOM OF

 3    THE FRONT FACE.

 4          DOES THAT -- IS THERE ANY CURVATURE ON

 5    THE FRONT FACE KR-547?

 6    A     NO, IT'S ENTIRELY FLAT.

 7    Q     OKAY.  AND, AGAIN, THIS SIDE VIEW HERE THAT WE

 8    WERE SEEING IS IRRELEVANT TO YOUR ANALYSIS?  IS

 9    THAT RIGHT?

10    A     IT IS IRRELEVANT AGAIN SINCE THE '677 AND '087

11    DO NOT CLAIM THE SIDE VIEWS.

12          MR. VERHOEVEN:  YOUR HONOR, MAY I

13    APPROACH THE WITNESS WITH A PHYSICAL EXHIBIT?

14          THE COURT:  PLEASE, GO AHEAD.

15    BY MR. VERHOEVEN:

16    Q     I'M GOING TO HAND YOU PHYSICAL EXHIBIT JX

17    1093, WHICH ARE ALREADY IN EVIDENCE.

18          MS. KREVANS:  MAY I SEE THIS, YOUR HONOR?

19    BY MR. VERHOEVEN:

20    Q     DO YOU RECOGNIZE JX 1093?

21    A     YES, THIS IS THE LG PRADA.

22    Q     LET'S PUT UP 3970.08, WHICH ARE PHOTOGRAPHS OF

23    THE PRADA SO THE JURY CAN SEE.  ARE THOSE

24    PHOTOGRAPHS OF WHAT YOU HAVE IN YOUR HAND, SIR?

25    A     YES.
```

```
1    Q    DO YOU KNOW WHEN THE LG PRADA WAS DISCLOSED

2    PUBLICLY?

3    A    IT WAS DISCLOSED IN LATE 2006.

4    Q    HOW DO YOU KNOW THAT?

5    A    I READ ARTICLES ON THE FACT THAT --

6            MS. KREVANS:  OBJECTION, YOUR HONOR, THIS

7    IS BEYOND THE SCOPE OF THE REPORT.

8            THE COURT:  CAN YOU GIVE ME THE PARAGRAPH

9    NUMBER OR THE PAGE NUMBER?  I HAVE HIS REPORT IN

10   FRONT OF ME.

11           MR. VERHOEVEN:  AT PAGE 60, PARAGRAPH 2.

12           MS. KREVANS:  PAGE 60, PARAGRAPH 2, YOUR

13   HONOR, WAS STRUCK.  AND IN ADDITION, IT IS NOT --

14   IT DOES NOT RELATE TO ANY OF THE EVIDENCE THAT THE

15   WITNESS JUST CITED.

16           THE COURT:  LET ME SEE YOUR PAGE 60,

17   PARAGRAPH 2, PLEASE, BECAUSE I HAVE THE OPENING

18   EXPERT REPORT.  WHAT ARE YOU ALL REFERRING TO?

19   REBUTTAL?

20           MS. KREVANS:  I THINK THAT MR. SHERMAN

21   GAVE ONLY ONE REPORT, YOUR HONOR, ON THE TOPIC OF

22   INVALIDITY.

23           THE COURT:  OH, I HAVE THIS.  I'M SORRY.

24   MINE DOESN'T HAVE NUMBERED PARAGRAPHS.

25           (PAUSE IN PROCEEDINGS.)
```

```
 1                THE COURT:  I DON'T SEE HERE ABOUT THE
 2     DATES OF THE --
 3                MR. VERHOEVEN:  YOUR HONOR, IF I COULD
 4     APPROACH.
 5                THE COURT:  -- DEVICE.  OKAY.  I SEE IT.
 6     GO AHEAD.
 7                MR. VERHOEVEN:  THANK YOU.
 8                MS. KREVANS:  YOUR HONOR, I DIDN'T OBJECT
 9     WHEN HE ASKED HIM IF HE THOUGHT HE KNEW WHEN IT WAS
10     RELEASED.  IT WAS THE SUBSEQUENT QUESTION THAT I
11     OBJECTED TO, AND IF YOU LOOK AT THE ANSWER ON YOUR
12     LIVE NOTE, YOU WILL SEE WHY, BECAUSE WHAT THE
13     WITNESS WAS TRYING TO SAY IS NOT IN THIS DOCUMENT.
14                THE COURT:  THAT IS CORRECT.  ALL RIGHT.
15     WHY DON'T YOU --
16                MR. VERHOEVEN:  YOUR HONOR, HE --
17                THE COURT:  IT'S ALSO HEARSAY, RIGHT?
18                MR. VERHOEVEN:  I'M TOLD THAT HE CITES
19     ARTICLES TO THIS EFFECT IN THE MATERIALS THAT ARE
20     CITED IN THE REPORT.
21                THE COURT:  WELL, IT'S NOT ON PAGE 60.
22                MS. KREVANS:  AND THEY'RE NOT IN
23     EVIDENCE, YOUR HONOR, AND THEY WERE STRUCK BY A
24     PRIOR RULING OF THIS COURT.
25                THE COURT:  ANYWAY, HE CAN CERTAINLY SAY
```

1    WHEN HE THOUGHT IT WAS RELEASED.

2             MR. VERHOEVEN:  OKAY.  LET'S DO THAT IN

3    THE INTEREST OF TIME.

4    Q    WHAT'S YOUR OPINION AS TO WHEN THE LG PRADA

5    WAS DISCLOSED PUBLICLY?

6    A    LATE 2006.

7    Q    AND IS LATE 2006 BEFORE OR AFTER THE FILING

8    DATES OF THE '087 AND '677 PATENTS?

9    A    BEFORE.

10   Q    AND CAN YOU DESCRIBE THE PRADA, LG PRADA THAT

11   WE HAVE UP ON THE SCREEN HERE?

12   A    SURE.  SO THIS IS THE MOBILE HANDSET AND IT

13   HAS OVERALL RECTANGULAR SHAPE.  IT HAS EVENLY

14   ROUNDED CORNERS AND COMPLETELY FLAT FRONT SURFACE,

15   TRANSPARENT ONE.

16             THERE IS A LARGE DISPLAY WHICH IS

17   CENTERED ON THE FRONT FACE.

18             IT HAS LOZENGE SHAPED EARPIECE SLOT AND A

19   COMPLETELY FLAT FRONT SURFACE.

20   Q    SO ONE OF THE DIFFERENCES --

21   A    AND IT'S BLACK, SORRY.  OBVIOUSLY.

22   Q    SO ONE OF THE DIFFERENCES BETWEEN THE '677

23   PATENT AND THE '087 PATENT IS THAT THE '677 PATENT

24   IS BLACK; IS THAT RIGHT?

25   A    CORRECT.

1    Q    AND THE LG PRADA IS BLACK AS WELL; IS THAT

2    RIGHT?

3    A    CORRECT.

4    Q    I'LL DIRECT YOUR ATTENTION TO DX 728 IN YOUR

5    BINDER.  THIS IS IN EVIDENCE, YOUR HONOR.

6              SO CAN WE GO TO THE NEXT SLIDE?

7              DID YOU CONSIDER JAPANESE DESIGN PATENT

8    '383 AS PART OF YOUR PRIOR ART ANALYSIS?

9    A    YES, I DID.

10   Q    AND I'M GOING TO REFER TO THIS DESIGN PATENT

11   AS JP'383; OKAY?

12   A    YES.

13   Q    AND WHAT DOES JP'383 SHOW ITSELF?

14   A    IT SHOWS A PORTABLE INFORMATION TERMINAL.  THE

15   DEVICE IS, AGAIN -- THIS IS ACTUALLY COMPOSE OF TWO

16   PIECES.  THERE IS AN EXTERNAL COVER AND THERE IS AN

17   INTERNAL DEVICE.  THE DEVICE HAS OVERALL

18   RECTANGULAR SHAPE WITH EVENLY ROUNDED CORNERS.  IT

19   HAS A CENTERED RECTANGULAR DISPLAY.  IT IS

20   COMPLETELY FLAT, THE FRONT FACE IS COMPLETELY FLAT.

21             AND IT HAS A UNIFORM BEZEL SURROUNDING

22   THE FRONT FACE.

23   Q    MR. FISHER, IF WE COULD TAKE THE FRONT VIEWS

24   OF THESE PRIOR ART REFERENCES AND PUT THEM ON THE

25   SCREEN TOGETHER WITH THE D'677 AND '087.

1         OKAY.  SO UP AT THE TOP HERE IS '677;

2    RIGHT?

3    A    CORRECT.

4    Q    AND THIS IS '087?

5    A    YES.

6    Q    AND THEN THESE ARE THE PIECES OF PRIOR ART

7    THAT YOU JUST WENT THROUGH THAT YOU CONSIDERED?

8    A    YES.

9    Q    IN YOUR OBVIOUSNESS ANALYSIS?

10   A    YES.

11   Q    IS THAT RIGHT?

12   A    YES.

13   Q    DID YOU REACH ANY CONCLUSION, IN ADDITION TO

14   YOUR OPINION ON THE JP'638, DID YOU REACH ANY OTHER

15   CONCLUSION ABOUT THE COMBINATION OF THESE

16   REFERENCES WHEN YOU FORMED YOUR OBVIOUSNESS

17   CONCLUSIONS?

18   A    YES, I DID.

19         MS. KREVANS:  OBJECTION, YOUR HONOR.

20   AGAIN, BEYOND THE SCOPE.  THE PRADA WAS NOT

21   DISCUSSED BY THIS WITNESS IN ANY WAY IN CONNECTION

22   WITH THE '087 PATENT.  HE TESTIFIED ABOUT BOTH.

23         THE COURT:  IS IT JUST PAGE 60 OR IS IT

24   SOMEWHERE ELSE AS WELL?

25         MR. VERHOEVEN:  THE PRADA IS UP THERE,

```
 1    YOUR HONOR, BECAUSE I'M GOING TO ASK ABOUT THE '677

 2    PATENT, AS WELL AS THE '087.  I'VE JUST ASKED HIM A

 3    GENERAL QUESTION AND THERE'S NOT --

 4              THE COURT:  GO AHEAD.

 5              OVERRULED.

 6              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

 7    Q    DO YOU HAVE THE QUESTION IN MIND, SIR?

 8    A    YES.

 9    Q    CAN YOU EXPLAIN TO THE JURY, USING THESE

10    IMAGES, YOUR ANALYSIS AND YOUR OPINIONS WITH

11    RESPECT TO OBVIOUSNESS?

12    A    YES.  SO I FIND THAT THE '638, IN COMBINATION

13    WITH THE THREE OTHER REFERENCES, IS RENDERING THE

14    '677 AND THE '087 OBVIOUS.

15              AND LOOKING AT THE '638 --

16              MS. KREVANS:  YOUR HONOR, HE JUST

17    ELICITED THE EXACT OPINION HE SAID HE WASN'T GOING

18    TO ASK HIM ABOUT IN CONNECTION WITH USING THE PRADA

19    IN CONNECTION WITH THE '087.

20              MR. VERHOEVEN:  LET ME TRY IT THIS WAY,

21    YOUR HONOR.

22    Q    LOOKING AT THE '677 PATENT, DO YOU SEE THAT?

23    A    YES.

24    Q    AND THESE OTHER PRIOR ART REFERENCES TOGETHER,

25    WHICHEVER ONE YOU WANT TO TALK ABOUT, CAN YOU TELL
```

1    THE JURORS THE OPINION YOU REACHED AS TO WHETHER

2    SOME COMBINATION OF THESE RENDERED THE '677

3    OBVIOUS?

4    A    OKAY.  SO AS I SAID, I FIND THAT THE '677 IS

5    OBVIOUS IN LIGHT OF THE '638 IN COMBINATION WITH

6    THE PRADA, AND IF WE LOOK AT THE '638 --

7    Q    SO THIS IS THE '638?

8    A    YES, '638 ON THE LEFT.

9    Q    SO THAT'S THE FIRST JAPANESE DESIGN PATENT WE

10   LOOKED AT; RIGHT?

11   A    YES, CORRECT.

12   Q    IN COMBINATION WITH THE PRADA, WHICH IS THE

13   DARK FACED PHONE RIGHT HERE; RIGHT?

14   A    CORRECT.

15   Q    GO AHEAD?

16   A    SO THE '638 DISCLOSES MOST OF THE ELEMENTS IN

17   THE DESIGN OF THE '677, AND THE ONLY DIFFERENCE

18   BEING THE BLACK COLOR, WHICH, AGAIN, THE PRADA HAD

19   THAT BLACK COLOR AND THE FACT THAT THE FRONT FACE

20   IS COMPLETELY FLAT WHICH, AGAIN, THE PRADA IS

21   COMPLETELY FLAT.

22         AND THERE'S ANOTHER DIFFERENCE, WHICH IS

23   THE LOCATION OF THE EARPIECE SLOT.  ON THE '638, IT

24   IS SLIGHTLY ABOVE CENTER ON TOP OF THE DISPLAY.

25   IT'S CLOSER TO THE TOP .

1          BUT AS CAN BE SEEN BOTH IN THE '677, AS

2     WELL AS IN THE PRADA, IT IS ALMOST CENTERED ABOVE

3     THE DISPLAY.

4          SO TAKING THESE IN COMBINATION, THEY

5     RENDER THE '677 VERY CLEARLY OBVIOUS.

6     Q    OKAY.  SAME QUESTION WITH RESPECT TO THE '087.

7     DO YOU HAVE THE QUESTION IN MIND?

8     A    YES.

9     Q    CAN YOU EXPLAIN TO THE JURY?

10    A    SO IN THE CASE OF THE '087, ACTUALLY A FEW OF

11    THESE COMBINATIONS RENDER IT OBVIOUS.  IF WE TAKE

12    THE '638 WITH THE '383, THE LEFT ONE IS '638 AND

13    THE RIGHT ONE IS THE '383.  SO LOOKING AT THE '383,

14    IT HAS A COMPLETELY FLAT FRONT FACE AND IT HAS THIS

15    UNIFORM BEZEL THAT SURROUNDS THE DISPLAY, AND THEN

16    COMBINING IT WITH THE '638 WOULD YIELD ESSENTIALLY

17    THE DESIGN THAT IS THE '087.

18          OTHER COMBINATIONS ARE ALSO POSSIBLE.

19    SAME THING WOULD BE TAKING THE '638 WITH THE PRADA,

20    AS WELL AS TAKING THE '638 WITH THE KR'547.

21          MS. KREVANS:  OBJECTION, YOUR HONOR, THAT

22    TESTIMONY WAS CLEARLY BEYOND THE SCOPE OF THE

23    REPORT AND WE ASK THAT IT BE STRUCK.

24          THE COURT:  I DON'T SEE THE PRADA

25    DISCUSSED IN THE '087, PAGES 63 THROUGH --

1          MR. VERHOEVEN:  ALL RIGHT.  SO LET ME ASK

2     YOU THIS.

3     Q    EXCLUDING THE PRADA --

4          MS. KREVANS:  YOUR HONOR, MAY I HAVE A

5     RULING ON MY MOTION TO STRIKE?

6          MR. VERHOEVEN:  HE GAVE A VERY LENGTHY

7     ANSWER, YOUR HONOR, IT WOULD BE INAPPROPRIATE.

8          THE COURT:  IT'S NOT IN PAGES 63 TO 75

9     THAT DISCUSSED THE '087.  I DON'T SEE IT.

10          MR. VERHOEVEN:  HOW ABOUT IF I ASK HIM

11     ANOTHER QUESTION THEN.

12     Q    EXCLUDING FOR THE '087, EXCLUDING THE PRADA,

13     CAN YOU EXPLAIN TO THE JURY YOUR OPINION WITH

14     RESPECT TO WHETHER OR NOT, IN ANY OF THESE OTHER

15     REFERENCES BESIDE THE PRADA, RENDER THE '087

16     OBVIOUS.

17          MS. KREVANS:  YOUR HONOR, JUST SO THE

18     RECORD IS CLEAR, MAY I ASK THAT COUNSEL WITHDRAW

19     THE PREVIOUS QUESTION ASKED FOR THE RECORD AND THAT

20     YOUR HONOR STRIKE IT.

21          MR. VERHOEVEN:  I'LL WITHDRAW IT, YOUR

22     HONOR, IN THE INTEREST OF TIME.

23          THE COURT:  ALL RIGHT.  THANK YOU.

24     BY MR. VERHOEVEN:

25     Q    DO YOU WANT ME TO ASK YOU THE QUESTION AGAIN

```
 1    OR DO YOU HAVE IT, SIR?

 2    A    I'M TRYING TO UNDERSTAND.  WHICH --

 3    Q    SO THERE'S AN OBJECTION TO TALKING ABOUT THE

 4    PRADA, SO EXCLUDE THAT FROM YOUR ANSWER IN THE

 5    INTERESTS OF TIME?

 6    A    SURE.

 7    Q    I'M ASKING YOU ABOUT THE '087, THAT'S THIS ONE

 8    HERE, AND YOU'VE REACHED AN OPINION THAT THAT'S

 9    OBVIOUS IN LIGHT OF SOME COMBINATION OF THESE OTHER

10    THREE PHONES; RIGHT?

11    A    YES.

12    Q    OTHER THREE DESIGN PATENTS; RIGHT?

13    A    YES.

14    Q    SO ALL I'M ASKING YOU TO DO IS WALK THE JURY

15    THROUGH YOUR ANALYSIS?

16    A    SURE.  SO TAKING THE '638 AND THEN COMBINING

17    IT WITH THE '383, WHICH IS ON THE RIGHT SIDE, THE

18    '383 HAS A COMPLETELY FLAT FRONT FACE AND IT ALSO

19    HAS THE UNIFORM, COMPLETELY UNIFORM BEZEL.

20         SO COMBINING IT WITH THE '638 WOULD YIELD

21    THE DESIGN OF THE '087.  SO THAT MAKES IT AND

22    RENDERS IT OBVIOUS.

23    Q    ALL RIGHT.  LET'S TURN TO THE LAST DESIGN

24    PATENT, THE TABLET DESIGN, THAT'S THE D'889.

25    THAT'S AT JX 1040 IN YOUR BINDER IF YOU'D LIKE TO
```

1    LOOK AT IT, SIR.  IT'S ALREADY IN EVIDENCE.

2              CAN WE PUT UP THE SLIDE -- THE NEXT

3    SLIDE, MR. FISHER.

4              WHAT'S SHOWN ON THIS SLIDE, SIR?

5    A    IT SHOWS THE DESIGN PATENT, THE D 504,889 FOR

6    THE ELECTRONIC DEVICE.

7    Q    AND YOU REVIEWED THIS DESIGN PATENT; CORRECT?

8    A    YES.

9    Q    WHEN WAS THIS PATENT FILED?

10   A    IT WAS FILED ON MARCH 17TH, 2004.

11   Q    WHAT DOES THE D'889 PATENT SHOW?

12   A    IT SHOWS AN ELECTRONIC DEVICE WHICH HAS

13   OVERALL RECTANGULAR SHAPE WITH EVENLY ROUNDED

14   CORNERS.  IT HAS A FLAT FRONT FACE, A TRANSPARENT

15   FRONT FACE, WITH A LARGE, WHAT I ASSUME IS A

16   DISPLAY BELOW THAT SURFACE.

17             IT HAS A RIM SURROUNDING THE FRONT FACE.

18   AND IT HAS A FLAT BACK.

19   Q    NOW, WE SAW, BY VIDEO TESTIMONY, THE TESTIMONY

20   OF MR. ROGER FIDLER.  DID YOU SEE THAT?

21   A    YES, I DID.

22   Q    AND DID YOU CONSIDER MR. FIDLER'S TABLET IN

23   YOUR ANALYSIS UNDER THE D'889 PATENT?

24   A    YES, I DID.

25   Q    CAN WE PUT UP PX 10.79 IN EVIDENCE?  PX 10.79.

```
 1              THIS IS ACTUALLY A PLAINTIFF'S EXHIBIT.

 2     DO YOU THINK I COULD ASK COUNSEL TO PUT IT UP?

 3     IT'S -- OR PLAINTIFF'S AUDIO/VISUAL GUY.  IT'S PX

 4     10.79 IN EVIDENCE.

 5              MS. KREVANS:  I WILL HAVE TO LOOK, YOUR

 6     HONOR, BECAUSE THIS ISN'T ONE OF THE EXHIBITS THAT

 7     WAS DISCLOSED TO US.

 8              THE COURT:  CAN YOU FIND IT, PLEASE.

 9              MR. VERHOEVEN:  LET'S TRY IT THIS WAY,

10     YOUR HONOR.  I'M JUST TRYING TO AVOID AN OBJECTION

11     BY USING THEIR EXHIBITS.  LET'S TRY SDX 3970.012.

12     GO BACK ONE.  THERE WE GO.

13     Q    DO YOU RECOGNIZE THESE AS DEPICTIONS OF THE

14     1994 FIDLER TABLET THAT WE SAW ON THE DEPOSITION

15     TESTIMONY THAT WAS JUST PLAYED?

16     A    YES.

17     Q    AND DID YOU REVIEW THAT DEPOSITION?

18     A    YES, I DID.

19     Q    AND DID YOU CONSIDER MR. ROGER FIDLER'S 1994

20     TABLET AS PART OF YOUR OBVIOUSNESS ANALYSIS?

21     A    YES, I DID.

22     Q    WHEN DID MR. FIDLER DESIGN THIS TABLET?

23     A    IN 1994.

24     Q    LET'S GO TO THE NEXT SLIDE, PLEASE.

25              CAN YOU EXPLAIN TO THE JURY YOUR ANALYSIS
```

1    OF MR. FIDLER'S TABLET AS WITH REGARDS TO THE D'889

2    DESIGN?

3    A    YES.  SO ON THE TOP WE SEE THE TWO FRONT

4    FACES, THE FIDLER TABLET HAS OVERALL RECTANGULAR

5    SHAPE, EVENLY ROUNDED CORNERS.  IT IS ALMOST FLAT,

6    THE INTENT WAS THAT IT WOULD BE COMPLETELY FLAT,

7    BUT ON THIS ONE IT WAS ALMOST FLAT.

8              IT HAS A VERY LARGE DISPLAY ON THE FRONT

9    FACE.

10             IT HAS A FLAT BACK.  THAT'S IT.

11   Q    DID YOU CONSIDER ANY OTHER PRIOR ART IN

12   CONNECTION WITH YOUR ANALYSIS OF THE VALIDITY OF

13   THE '889 PATENT?

14   A    YES, I DID.

15             MR. VERHOEVEN:  YOUR HONOR, MAY I

16   APPROACH WITH A PHYSICAL EXHIBIT?

17             THE COURT:  PLEASE, GO AHEAD.

18             MR. VERHOEVEN:  FOR THE RECORD, I'M

19   HANDING THE WITNESS PHYSICAL EXHIBIT, JOINT

20   PHYSICAL EXHIBIT 1074.

21             THE WITNESS:  THANK YOU.

22   BY MR. VERHOEVEN:

23   Q    WHAT IS JOINT EXHIBIT 1074?

24   A    THIS IS THE H-P TC 1000, OR COMPAQ AT THAT

25   TIME.

1    Q    CAN YOU HOLD IT UP FOR THE JURY?

2    A    SURE (INDICATING).

3    Q    CAN YOU HOLD IT UP ON A SIDE VIEW AS WELL.

4              YOUR HONOR, IF I MAY LET THE JURORS PASS

5    THAT AROUND?

6              THE COURT:  THAT'S FINE.

7              MR. VERHOEVEN:  YOUR HONOR, I'D MOVE JX

8    1074 INTO EVIDENCE.

9              MS. KREVANS:  NO OBJECTION, YOUR HONOR.

10             THE COURT:  IT'S ADMITTED.

11             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12             1074, HAVING BEEN PREVIOUSLY MARKED FOR

13             IDENTIFICATION, WAS ADMITTED INTO

14             EVIDENCE.)

15   BY MR. VERHOEVEN:

16   Q    WHEN WAS THIS TABLET RELEASED?

17   A    THIS WAS RELEASED IN 2002.

18   Q    DID YOU COMPARE THE -- THIS IS THE -- I'M

19   GOING TO REFER TO THIS AS THE TC1000?

20   A    YES.

21   Q    OKAY.  AND THIS BEING JX 1074.  OKAY?

22   A    OKAY.

23   Q    DID YOU DO A COMPARISON OF THE TC1000 AGAINST

24   THE D'889 PATENT?

25   A    YES, I DID.

1    Q    CAN WE GO TO THE NEXT SLIDE, PLEASE.  ONE

2    MORE.

3              WHAT IS SHOWN ON THIS SLIDE HERE, SIR?

4    A    SO WE SEE SIDE BY SIDE BOTH THE VIEW OF THE

5    D'889 AND THE PHOTO OF THE TC1000, AND ON THE

6    BOTTOM WE SEE A SIDE VIEW OF THE D'889 AND SIDE

7    VIEW OF THE H-P TC1000.

8              AND AS CAN BE SEEN, THE DEVICE ITSELF IS

9    OVERALL RECTANGULAR IN SHAPE WITH EVENLY ROUNDED

10   CORNERS.  IT HAS A FLAT FRONT SURFACE THAT GOES

11   ACROSS THE WHOLE FRONT FACE UP TO A RELATIVELY THIN

12   RIM THAT SURROUNDS THE DEVICE.

13             IT HAS A RELATIVELY NARROW PROFILE, AND

14   THE PROPORTIONS OF THIS DEVICE ARE ACTUALLY ALMOST

15   IDENTICAL TO THE PROPORTIONS OF THE D'889, WHICH

16   MEANS THE RATIO BETWEEN LENGTH, WIDTH, AND HEIGHT

17   ALMOST IDENTICAL.

18   Q    MR. FISHER, CAN WE PUT UP THE '889 VIEWS, THE

19   H-P TC1000, AND THE FIDLER TABLET ALTOGETHER ON THE

20   SAME SCREEN?  NO, THAT'S NOT IT.

21             IN THE INTEREST OF TIME, YOUR HONOR, I'M

22   GOING TO MOVE ON WHILE MR. FISHER IS TRYING TO GET

23   THAT PUT TOGETHER.

24             THE COURT:  THAT'S FINE.

25   BY MR. VERHOEVEN:

2601

```
1    Q    SO IS IT CORRECT THAT YOU EVALUATED WHETHER
2    THE '889 PATENT WAS OBVIOUS IN LIGHT OF THE FIDLER
3    TABLET COMBINED WITH THE TC1000?
4    A    YES.
5    Q    DID YOU REACH A CONCLUSION?
6    A    YES.
7    Q    WHAT WAS YOUR CONCLUSION?
8    A    I FOUND THAT THE D'889 IS OBVIOUS IN LIGHT OF
9    THE COMBINATION OF THE FIDLER TABLET WITH THE H-P
10   TC1000.
11        IF YOU TAKE THE FIDLER TABLET, WHICH HAS
12   NO LIMITATION ON THE FRONT FACE, IT'S RECTANGULAR
13   SHAPE, AND YOU TAKE THE TRANSPARENT, FLAT FRONT
14   COVER OFF THE TC1000 AND WITH THE PROPORTIONS THAT
15   IT HAS AND COMBINE THE TWO, YOU ACTUALLY YIELD THE
16   DESIGN OF THE D'889 AND THAT, THEREFORE, IT RENDERS
17   IT OBVIOUS.
18   Q    OKAY.  LET'S TURN TO THE ISSUE OF
19   FUNCTIONALITY.  YOU TESTIFIED EARLIER, YOU WERE
20   ASKED TO CONSIDER FUNCTIONALITY OF THE DESIGNS IN
21   APPLE'S PATENTS?
22   A    YES.
23   Q    WHY DID YOU CONSIDER FUNCTIONALITY?
24   A    AS FAR AS I UNDERSTAND, THE DESIGN PATENT IS
25   INTENDED TO PROTECT ORNAMENTAL DESIGN.  IT IS NOT
```

1    INTENDED TO PROTECT FUNCTIONAL ELEMENTS.

2    Q    WHAT DID YOU LOOK FOR WHEN YOU WERE

3    CONSIDERING THE ISSUE OF FUNCTIONALITY?

4    A    I WAS TRYING TO SEPARATE WHAT ARE THE

5    ORNAMENTAL ELEMENTS, WHAT ARE THE ORNAMENTAL

6    FEATURES OF THE DESIGN PATENTS AND EXCLUDE OUT THE

7    ONES THAT ARE FUNCTIONAL, THE ELEMENTS THAT ARE

8    FUNCTIONAL.

9    Q    DID YOU USE ANY TEST TO DETERMINE WHETHER

10   SOMETHING WAS FUNCTIONAL OR NOT?

11   A    THE TEST WOULD BE IF SOMETHING IS -- IF AN

12   ELEMENT IS ESSENTIAL FOR THE USE OR IMPACTS THE

13   COST OR QUALITY OF THE PRODUCT, THAT WOULD BE

14   CONSIDERED FUNCTIONAL OR IF THE APPEARANCE OF THAT

15   ELEMENT WOULD BE DICTATED BY FUNCTION.

16   Q    DO YOU HAVE ANY EXPERTISE YOURSELF RELEVANT TO

17   DETERMINING FUNCTIONALITY IN THE SMARTPHONES?

18   A    I'M -- AS I MENTIONED, I'VE WORKED IN MOBILE,

19   I DESIGNED PHONES, I HAVE WORKED VERY HARD ON

20   UNDERSTANDING THE FUNCTIONALITIES FOR A PHONE, WHAT

21   IT MEANS, HOW IT IMPACTS THE DESIGN.

22            SO I DEFINITELY THINK I HAVE THE

23   EXPERIENCE FOR THAT.

24   Q    OKAY.  MR. FISHER, CAN WE PUT UP THE FRONT

25   FACE OF '677, '087, AND '889 FOR REFERENCE.  THERE

1    WE GO.

2                THIS IS JUST AN ILLUSTRATION OF THE FRONT

3    FACE OF THE '677 ON THE LEFT, '087 IN THE MIDDLE,

4    '889 ON THE RIGHT.  DO YOU SEE THAT, SIR?

5    A    YES, I DO.

6    Q    DO ALL OF THESE -- WELL, CAN YOU DESCRIBE THE

7    SHAPE OF THE DISPLAY SCREENS ON THESE DESIGN

8    PATENTS?

9    A    ALL OF THESE DEVICES HAVE RECTANGULAR

10   DISPLAYS.

11   Q    DID YOU FORM AN OPINION AS TO WHETHER A LARGE

12   RECTANGULAR DISPLAY WAS FUNCTIONAL?

13   A    YES, I DID.

14   Q    PLEASE EXPLAIN YOUR OPINION TO THE JURY?

15   A    SO A RECTANGULAR DISPLAY IS FUNCTIONAL AND IT

16   IS FUNCTIONAL BECAUSE, FIRST, THE MEDIA THAT WE'RE

17   CONSUMING ON THESE DEVICES, WHICH MEANS EITHER

18   MOVIES OR NEWSPAPERS OR WEB PAGES, ALL OF THESE

19   COME IN RECTANGULAR SHAPE.

20               SO OBVIOUSLY THE DISPLAYS ARE RECTANGULAR

21   AND THEY HAVE BEEN SO AS FAR AS I CAN REMEMBER.

22               IN ADDITION, IN TERMS OF WHAT'S AVAILABLE

23   AND WHAT'S EASY TO MANUFACTURE IN TERMS OF COST,

24   THESE RECTANGULAR DISPLAYS, THIS IS THE MAJORITY,

25   OVERWHELMING MAJORITY OF THE DISPLAYS ARE

1    RECTANGULAR AND ANY OTHER SHAPE WOULD BE MORE

2    EXPENSIVE, COMPLETELY RARE.

3    Q    WHAT ABOUT THE OUTSIDE SHAPE OF EACH OF THESE

4    FORM FACTORS?  HOW WOULD YOU DESCRIBE THEM?

5    A    SO I WOULD DESCRIBE THAT AS OVERALL

6    RECTANGULAR SHAPE.

7    Q    AND DID YOU FORM ANY OPINION ON WHETHER AN

8    OVERALL RECTANGULAR SHAPE WAS FUNCTIONAL USING THE

9    STANDARD THAT YOU'VE DESCRIBED?

10   A    YES, I DID.

11   Q    PLEASE EXPLAIN TO THE JURY.

12   A    SO ON THESE TYPE OF DEVICES, EITHER A TABLET

13   OR A SMARTPHONE WITH A LARGE DISPLAY, THE DISPLAY

14   IS SORT OF THE MAIN ELEMENT.  YOU ARE TRYING TO

15   MAXIMIZE THE SIZE OF THE DISPLAY.

16        AND ON THE OTHER HAND, SINCE THESE ARE

17   MOBILE DEVICES BY NATURE, YOU ARE TRYING TO

18   MINIMIZE THE OVERALL SIZE OF THE DEVICE.

19        AND, THEREFORE, THE OVERALL SHAPE OF THE

20   DESIGN IS PRACTICALLY DICTATED BY THE FACT THAT

21   THERE IS A RECTANGULAR DISPLAY WHICH BASICALLY

22   YIELDS OVERALL RECTANGULAR SHAPE FOR THE DEVICE.

23   Q    CAN YOU DESCRIBE THE CORNERS ON EACH OF THESE

24   DEVICES?

25   A    ON ALL FOUR -- ON ALL OF THESE DESIGNS, THE

1    CORNERS ARE ROUNDED.

2    Q    AND DID YOU FORM AN OPINION AS TO WHETHER

3    ROUNDED CORNERS WERE FUNCTIONAL USING THE STANDARD

4    YOU DESCRIBED?

5    A    YES.

6    Q    PLEASE EXPLAIN THAT TO THE JURY.

7    A    ROUNDED CORNERS HAVE SIGNIFICANT BENEFITS WHEN

8    IT COMES TO SORT OF THE USABILITY AND ECONOMICS.

9         IT'S EASIER TO HOLD THEM, IT'S MORE

10   COMFORTABLE.

11        THEY ALSO DON'T SNAG WHEN YOU'RE TRYING

12   TO PUT THEM INTO YOUR POCKET OR ACTUALLY YOUR

13   FINGERS OR HURT YOU.

14        AND THERE ARE ALSO BENEFITS IN TERMS OF

15   MANUFACTURING AND THE MECHANICAL STABILITY OF

16   ROUNDED CORNERS.  SHARP CORNERS, MAY BEND AND

17   BREAK, WHILE ROUNDED CORNERS ARE STRONGER AND

18   EASIER TO MANUFACTURE.

19   Q    DID YOU FIND ANY EVIDENCE IN THE RECORD THAT

20   APPLE DESIGNERS CONSIDERED THE FUNCTIONAL ASPECTS

21   OF ROUNDED CORNERS?

22   A    YES.

23   Q    I'LL DIRECT YOUR ATTENTION TO DX 562 IN YOUR

24   BINDER.  AND CAN WE PUT UP SDX 3970.017.

25        YOUR HONOR, I THINK MY RECORDS ARE A

1    LITTLE CONFUSED.  I'M NOT SURE IF DX 562 IS IN

2    EVIDENCE.  I WOULD MOVE IT INTO EVIDENCE FOR THE

3    LIMITED PURPOSE OF FUNCTIONALITY.

4              THE COURT:  IT IS ADMITTED AND I JUST

5    HAVE ONE INSTRUCTION, AND THAT IS THAT THE JURY MAY

6    CONSIDER DX 562 AS TO FUNCTIONALITY, BUT NOT AS TO

7    INVALIDITY OR NON-INFRINGEMENT.

8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

9              562, HAVING BEEN PREVIOUSLY MARKED FOR

10             IDENTIFICATION, WAS ADMITTED INTO

11             EVIDENCE.)

12             MR. VERHOEVEN:  JUST ONE SECOND.  A

13   LITTLE TECHNICAL DIFFICULTY.

14             THE COURT:  THAT'S ADMITTED AND,

15   MS. KREVANS, YOU'RE RESERVING YOUR OBJECTION?

16             MS. KREVANS:  YES, YOUR HONOR.

17             THE COURT:  OKAY.

18             GO AHEAD, PLEASE.

19             MR. VERHOEVEN:  MAY I PUBLISH IT ON THE

20   SCREEN, YOUR HONOR?

21             THE COURT:  GO AHEAD.

22             MR. VERHOEVEN:  THANK YOU.

23   Q    IS THIS ONE OF THE DOCUMENTS YOU CONSIDERED,

24   SIR?

25   A    YES.

```
 1    Q    THIS IS A DOCUMENT FROM RICHARD HOWARTH.  DO
 2    YOU HAVE AN UNDERSTAND WHO HE IS?
 3    A    HE'S A DESIGNER AT APPLE.
 4    Q    AND IT'S TO JONATHAN IVE.  WHO IS HE?
 5    A    THE HEAD OF APPLE.
 6    Q    I'LL READ THIS INTO THE RECORD, "I'M WORRIED
 7    ABOUT THE EXTRUDO SHAPE WE'RE USING FOR P2, ET
 8    CETERA, LOOKING AT WHAT SHIN'S DOING WITH THE
 9    SONY-STYLE CHAPPY.  HE'S ABLE TO ACHIEVE A MUCH
10    SMALLER-LOOKING PRODUCT WITH A MUCH NICER SHAPE TO
11    HAVE NEXT TO YOUR EAR AND IN YOUR POCKET.  BUT IT
12    DOES HAVE THE SIZE AND SHAPE/COMFORT BENEFITS I
13    MENTIONED BEFORE AND THESE ARE HARD TO IGNORE WITH
14    A PRODUCT WE HAVE TO CARRY IN OUR POCKET."
15              DO YOU SEE THAT, SIR?
16    A    YES.
17    Q    AND HOW DID THAT INFORM YOUR OPINION AS TO THE
18    ISSUE OF WHETHER THE ROUNDED CORNERS ARE
19    FUNCTIONAL?
20    A    IT SEEMS THE APPLE DESIGNERS ALSO ACKNOWLEDGED
21    THE ADVANTAGES OF ROUNDED CORNERS SINCE WHAT THEY
22    CALL THE "SONY-STYLE CHAPPY," WHICH IS THE
23    LEFT-SIDE IMAGE, HAS ROUNDED CORNERS VERSUS THE
24    OTHER DESIGN, THE EXTRUDO, WHICH DOES NOT HAVE
25    THEM.  AND THEY ALSO MENTIONED THE ERGONOMIC
```

```
1    BENEFITS OF THAT.  SO I THINK THAT BASICALLY

2    REENFORCES THAT.

3    Q    MR. FISHER, CAN WE GO BACK TO THE SCREEN THAT

4    HAS THE VIEWS OF THE THREE DESIGN PATENTS THAT

5    WE'RE TALKING ABOUT.

6             MS. KREVANS:  AND, YOUR HONOR, I WOULD

7    JUST NOTE THAT THIS WAS NOT A DEMONSTRATIVE THAT

8    WAS DISCLOSED TO US.  WE WOULDN'T HAVE HAD

9    OBJECTION IF IT HAD BEEN, BUT I THINK SINCE THERE

10   HAS BEEN EXTENSIVE TESTIMONY ABOUT IT, IT SHOULD BE

11   GIVEN A NUMBER AND PROVIDED TO US.

12            MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.

13   THIS IS JUST TRIAL DIRECTOR.

14            THE COURT:  I KNOW.  I UNDERSTAND.  GO

15   AHEAD.  PLEASE.

16            MR. VERHOEVEN:  THANK YOU.

17   Q    DO ALL THESE DESIGNS HAVE A FLAT FRONT FACE?

18   A    YES, THEY DO.

19   Q    AND DID YOU CONSIDER WHETHER A FLAT FRONT FACE

20   WAS FUNCTIONAL?

21   A    YES.

22   Q    AND CAN YOU EXPLAIN WHY?

23   A    SO IF WE'RE LOOKING AT THESE DEVICES, THEY ARE

24   ALL TOUCH OPERATED DEVICES WITH VERY LARGE

25   DISPLAYS.  YOU OBVIOUSLY WANT TO BE ABLE TO OPERATE
```

```
 1    THEM AND THEY'RE ALL OPERATED BY FINGERS, SO YOU
 2    WANT TO HAVE A FLAT SURFACE THAT WILL BE EASY TO
 3    MANIPULATE AND SINCE YOUR MOVEMENTS AND YOUR
 4    FINGERS ARE NOT POINT ELEMENTS, THEY'RE NOT PENS,
 5    THEY ALSO EXTEND BEYOND WHAT IS THE ACTIVE AREA.
 6           SO WE WOULD LIKE THIS WHOLE AREA TO BE
 7    FLAT SO IT'S GOING TO BE EASILY MANIPULATED WHEN
 8    YOU'RE MOVING YOUR FINGERS AND OPERATING THE
 9    DEVICE.
10    Q    NOW, THE '677 AND THE '087 HAVE THOSE LOZENGE
11    SHAPED SPEAKER SLOTS IN THE TOP PORTION OF THE
12    PHONE.  DO YOU SEE THAT?
13    A    YES.
14    Q    DID YOU FORM AN OPINION AS TO WHETHER HAVING
15    THESE SPEAKER, LOZENGE SHAPED SPEAKER SLOTS IN THAT
16    POSITION WOULD BE FUNCTIONAL OR NOT?
17    A    YES.
18    Q    CAN YOU EXPLAIN YOUR OPINION TO THE JURY?
19    A    YES.  SO OBVIOUSLY YOU NEED AN EARPIECE IN
20    ORDER TO HAVE CALLS, PRIVATE CALLS.  THE LOCATION
21    OF THE EARPIECE SLOT ON TOP OF THE DISPLAY ON THE
22    UPPER PART OF THE TELEPHONE IS A NATURAL LOCATION.
23    YOU'RE HOLDING IT TO YOUR EAR, SO THAT NEEDS TO BE
24    NEAR YOUR EAR.  THE MICROPHONE ON THE BOTTOM SO
25    IT'S CLOSE TO YOUR MOUTH.
```

1           YOU ALSO WOULD LIKE TO HAVE IT SORT OF IN

2    AN ELONGATED SHAPE WHERE IT HAS A LOT OF BENEFITS,

3    AND THE REASONS FOR THAT ARE TWO.  ONE IS THAT AS A

4    USER, YOU DON'T WANT TO NEED TO KEEP IT AT THE

5    EXACT POINT.  YOU WANT TO HAVE SOME FLEXIBILITY ON

6    THE PLACING IT, YOU PUT IT TOWARDS YOUR EAR, SO IT

7    NEEDED TO HAVE SOME WIDTH.

8           AND ALSO IN TERMS OF SPACE USAGE, YOU

9    DON'T WANT TO SORT OF EXTEND THE LENGTH OF THE

10   DEVICE, SO IT'S MUCH MORE CONVENIENT TO HAVE THE

11   EARPIECE BEING ELONGATED SO IT DOESN'T CREATE MORE

12   LENGTH TO THE DEVICE.  SO THAT'S BASICALLY IT.

13   Q    FINALLY, THE '677 CLAIMS THIS BLACK FRONT

14   SURFACE.  DO YOU SEE THAT?

15   A    YES.

16   Q    DID YOU CONSIDER OR FORM AN OPINION AS TO

17   WHETHER HAVING A BLACK FRONT FACE WAS FUNCTIONAL AS

18   YOU APPLIED YOUR TEST?

19   A    YES.

20   Q    CAN YOU EXPLAIN THAT TO THE JURY.

21   A    SO WHEN WE'RE LOOKING AT THIS TYPE OF DEVICE,

22   THERE ARE A LOT OF COMPONENTS THAT RESIDE BELOW THE

23   SURFACE, AND YOU WOULD LIKE TO HIDE THEM.  YOU

24   DON'T WANT THEM TO BE SEEN.

25           BLACK IS VERY EFFICIENT COLOR IN HIDING

1    THESE TYPE OF COMPONENTS, SO THAT'S ONE REASON.

2         THE OTHER REASON IS THAT THE DISPLAYS

3    THEMSELVES USUALLY COME IN SORT OF GRAY TOWARDS

4    BLACK COLORS, AND SO HAVING THE WHOLE THING AS

5    BLACK IS A NATURAL.

6         IT ALSO PROVIDES GOOD CONTRAST TO THE

7    DISPLAY ITSELF.

8         MR. VERHOEVEN:  PASS THE WITNESS, YOUR

9    HONOR.

10        THE COURT:  ALL RIGHT.  THE TIME IS NOW

11   4:12.  GO AHEAD, PLEASE.

12                 **CROSS-EXAMINATION**

13   BY MS. KREVANS:

14   Q    GOOD AFTERNOON, MR. SHERMAN.

15   A    GOOD AFTERNOON.

16   Q    I'M ALSO ON THE CLOCK, SO I'M JUST GOING TO

17   FOLLOW UP ON A FEW OF THE THINGS THAT MR. VERHOEVEN

18   ASKED YOU.

19        FIRST, LET'S START WITH YOUR BACKGROUND.

20   YOU'RE AN ELECTRICAL ENGINEER; RIGHT?

21   A    CORRECT.

22   Q    YOU'RE NOT AN INDUSTRIAL DESIGNER?

23   A    NO, I'M NOT.

24   Q    AND YOU'VE NEVER TAKEN ANY COURSES IN

25   INDUSTRIAL DESIGN?

1    A    NO.

2    Q    AND YOU'VE NEVER TAUGHT ANY COURSES IN

3    INDUSTRIAL DESIGN?

4    A    NO.

5    Q    AND THOSE 20 PATENTS AND A LOT OF PATENT

6    APPLICATIONS YOU MENTIONED, STARTING YOUR

7    TESTIMONY, THOSE ARE ALL UTILITY PATENTS; RIGHT?

8    A    YES.

9    Q    NONE OF THEM ARE DESIGN PATENTS?

10   A    YES.

11   Q    THEY'RE ON VARIOUS ASPECTS OF ENGINEERING

12   INVENTIONS THAT YOU'VE HELPED MAKE?

13   A    YES.

14   Q    OKAY.  WHY DON'T WE START WITH YOUR

15   OBVIOUSNESS OPINIONS ABOUT THE '889 PATENT.  THAT'S

16   THE IPAD DESIGN PATENT.

17          DO YOU HAVE THE TC1000 STILL THERE WITH

18   YOU?

19   A    NO.

20          MS. KREVANS:  MAY I APPROACH, YOUR HONOR.

21          MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO

22   THE CHARACTERIZATION OF THAT DESIGN PATENT BY

23   COUNSEL.

24          MS. KREVANS:  MAY I GO FETCH THE TABLET

25   WHILE YOU'RE LOOKING, YOUR HONOR?

1                    THE COURT:  OVERRULED.

2                    GO AHEAD.

3      BY MS. KREVANS:

4      Q    THIS IS ONE OF THE TWO PIECES OF PRIOR ART

5      THAT YOU RELY ON TO SAY THAT THE '889 APPLE DESIGN

6      PATENT IS OBVIOUS.

7      A    CORRECT.

8      Q    YOU THINK THE PATENT OFFICE SHOULD NEVER HAVE

9      GRANTED IT IN THE FIRST PLACE?

10     A    I THINK THEY SHOULD NOT.

11     Q    AND YOU'RE RELYING ON TWO THINGS?

12     A    I RELY ON THE FIDLER TABLETS AND ON THAT.

13     Q    AND THIS IS, FOR THE RECORD, THE TC1000

14     COMPAQ PRODUCT, JX 1074.

15             WOULD YOU AGREE WITH ME, MR. SHERMAN,

16     THAT THE ACTUAL DESIGN OF THE TC1000 HAS MULTIPLE

17     BORDERS AROUND THE DISPLAY SCREEN?  FIRST AN INNER

18     BLOCK BORDER; AND THEN AN OUTER SILLIER BORDER; AND

19     THEN BEYOND THAT, STILL, ANOTHER SILVER PIECE

20     THAT'S MADE OF A DIFFERENT KIND OF MATERIAL?

21     A    YES.

22     Q    RIGHT?

23     A    YES.

24     Q    COULD WE PUT UP THE '889 PATENT, MR. LEE.  AND

25     WHY DON'T WE GO TO THE SECOND PAGE OF THE FIGURES.

2614

```
 1              I'M HOLDING THE TC1000, EXHIBIT JX 1074
 2     IN MY HANDS, MR. SHERMAN.  THESE MULTIPLE BORDERS
 3     THAT IT HAS, THEY ARE NOT SHOWN IN THE DESIGN OF
 4     THE '889, ARE THEY?
 5     A    THE '889 SHOWS A SINGLE FRAME PLUS A BORDER.
 6     THIS ONE HAS TWO BORDERS.
 7     Q    IT SHOWS, IN THAT DESIGN, ONE -- ONE EFFECT OF
 8     A BORDER THAT IS UNDER THE TRANSPARENT FACE THAT
 9     COVERS THE ENTIRE FRONT; RIGHT?
10     A    YES.
11     Q    AND THAT'S SHOWN BY THE DOTTED LINE THAT WE
12     SEE GOING AROUND INSIDE THE FRONT FACE; RIGHT?
13     A    YES.
14     Q    IT DOESN'T SHOW MULTIPLE BORDERS LIKE THE
15     TC1000?
16     A    NO, IT DOES NOT.
17     Q    BUT YOU THINK THIS DEVICE MEANS THE PATENT
18     OFFICE SHOULD NEVER HAVE ISSUED THE '889 PATENT?
19     A    THIS DEVICE IN COMBINATION WITH THE FIDLER
20     TABLET.
21     Q    OKAY.  LET'S TURN TO THE FIDLER.
22              NOW, YOU NEVER ACTUALLY HAVE SEEN THE
23     MOCKUP THAT MR. FIDLER SHOWED IN THE VIDEO THAT WE
24     SEE IN COURT EARLIER; RIGHT?
25     A    I HAVE SEEN IT IN MY DEPOSITION, AND I HAVE
```

1

2                    <u>CERTIFICATE OF REPORTERS</u>

3

4

5

6              WE, THE UNDERSIGNED OFFICIAL COURT

7     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

8     THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

9     FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11              THAT THE FOREGOING TRANSCRIPT,

12    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

13    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

14    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

15    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

17

18                        /S/
                 _____.
19               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
20

21                        /S/
                 _____
22               IRENE RODRIGUEZ, CSR, CRR
                 CERTIFICATE NUMBER 8074
23

24                        DATED:  AUGUST 14, 2012

25