1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6  CORPORATION,                )
                               )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,       )
                               )  AUGUST 21, 2012
8          VS.                 )
                               )  VOLUME 13
9  SAMSUNG ELECTRONICS CO.,    )
   LTD., A KOREAN BUSINESS     )  PAGES 3941-4264
10 ENTITY; SAMSUNG             )
   ELECTRONICS AMERICA,        )
11 INC., A NEW YORK            )
   CORPORATION; SAMSUNG        )
12 TELECOMMUNICATIONS          )
   AMERICA, LLC, A DELAWARE    )
13 LIMITED LIABILITY           )
   COMPANY,                    )
14                             )
              DEFENDANTS.      )
15 _____

16         TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE LUCY H. KOH
17       UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24                         IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8074
25

```
 1   A P P E A R A N C E S:

 2   FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
 3                               MICHAEL A. JACOBS
                                 RACHEL KREVANS
 4                          425 MARKET STREET
                           SAN FRANCISCO, CALIFORNIA  94105
 5

 6   FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
 7                          BY:  WILLIAM F. LEE
                            60 STATE STREET
 8                          BOSTON, MASSACHUSETTS  02109

 9                          BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                            50 CALIFORNIA STREET, 22ND FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94111

14                          BY:  VICTORIA F. MAROULIS
                                 KEVIN P.B. JOHNSON
15                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
16                          REDWOOD SHORES, CALIFORNIA  94065

17                          BY:  MICHAEL T. ZELLER
                                 WILLIAM C. PRICE
18                          865 SOUTH FIGUEROA STREET
                            10TH FLOOR
19                          LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

CLOSING ARGUMENT BY MR. MCELHINNY        P. 4075

CLOSING ARGUMENT BY MR. VERHOEVEN        P. 4134

REBUTTAL CLOSING ARGUMENT BY MR. LEE     P. 4216

REBUTTAL CLOSING ARGUMENT               P. 4247
    BY MR. VERHOEVEN

```
1    SAN JOSE, CALIFORNIA                AUGUST 21, 2012

2                    P R O C E E D I N G S

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING AND WELCOME.

6    THANK YOU.  PLEASE TAKE A SEAT.

7              OKAY.  ARE THERE ANY OUTSTANDING ISSUES

8    THAT WE SHOULD HANDLE BEFORE OUR JURY COMES IN?

9              MS. MAROULIS:  YOUR HONOR, VERY BRIEFLY.

10             WITH RESPECT TO THE VERDICT FORM THAT WAS

11   FILED, WE UNDERSTOOD APPLE'S COMMENTS LAST NIGHT TO

12   SAY THAT THE ACE I9000 AND I9100 SHOULD BE TAKEN

13   OFF THE VERDICT FORM AND WE SEE THAT IT'S STILL ON,

14   SO WE'RE JUST WONDERING IF THE COURT SAW APPLE'S

15   FILING.

16             MR. JACOBS:  THAT'S INCORRECT, YOUR

17   HONOR.  WE HAD IT IN MIND TO COME OFF FOR

18   INDUCEMENT, BECAUSE THE EVIDENCE WAS THAT IT WAS

19   NOT SOLD THROUGH THE SUBSIDIARIES.

20             BUT OTHERWISE IT SHOULD REMAIN ON.

21             THE COURT:  THAT'S WHAT WE DID.  WE JUST

22   TOOK IT OUT OF THE INDUCEMENT QUESTIONS.

23             DOES THAT TAKE CARE OF THE ISSUE,

24   MS. MAROULIS?  SINCE IT WAS IMPOSSIBLE FOR DIRECT

25   INFRINGEMENT BY STA AND SEA ON THOSE THREE
```

```
1     PRODUCTS, THERE COULD BE NO INDUCEMENT.  SO --

2              OKAY.  DID YOU ALL HAVE ANY OTHER

3     CHANGES?  WE TRIED TO MAKE EVERY SINGLE CHANGE THAT

4     YOU ALL RECOMMENDED.

5              I MEAN, OBVIOUSLY WE HAVE A LITTLE BIT

6     MORE TIME ON THE VERDICT FORM.  MY GUESS IS IF THEY

7     START DELIBERATING BY THE END OF TODAY, WE'LL BE

8     LUCKY.  SO IF WE HAD TO MAKE A CHANGE DURING LUNCH,

9     WE COULD DO THAT.  SO IF YOU SEE ANYTHING ELSE, YOU

10    KNOW, PLEASE LET US KNOW.

11             NOW, WITH THE EXHIBIT LIST, EVERYBODY IS

12    OKAY WITH THAT, RIGHT?  THERE ARE NO OTHER

13    ADDITIONAL PROBLEMS?

14             MR. JACOBS:  WE'RE FINE.

15             THE COURT:  OKAY.  MS. MAROULIS, IS THAT

16    OKAY, TOO?

17             MS. MAROULIS:  THAT'S FINE.

18             THE COURT:  OKAY.  AND THEN THE JURY

19    INSTRUCTIONS, THERE WERE THREE LAST CHANGES THAT WE

20    MADE THIS MORNING AND WE'RE FILING SOMETHING NOW

21    THAT JUST EXPLAINS WHAT THEY ARE.

22             ONE IS CORRECTING A TYPO THAT SAMSUNG

23    FOUND THAT THE WORD "IS" IS MISSING; AND ANOTHER

24    ONE IS ON, I BELIEVE THE INSTRUCTION ON INDUCEMENT,

25    TO LIST ALL THREE OF THE SAMSUNG ENTITIES VERSUS
```

```
1     JUST DESCRIBING THEM AS SAMSUNG.

2              THE CLERK:  AND THERE WAS ANOTHER ONE

3     THAT MR. JACOBS POINTED OUT TO ME.  NUMBER 55 STILL

4     HAD THE WORD "DISPUTED."

5              THE COURT:  RIGHT.  SO VERY SHORTLY,

6     MS. CHAN WILL BRING UP THE FINAL INSTRUCTIONS AND

7     YOU CAN TAKE A LOOK.  BUT THERE HAVE BEEN NO OTHER

8     SUBSTANTIVE CHANGES OTHER THAN THAT.

9              LATER TODAY I'LL SHOW YOU WHAT OUR JURY

10    NOTE FORM IS GOING TO LOOK LIKE JUST IN CASE YOU

11    HAVE COMMENTS ON THAT.

12             SO A COUPLE OF LAST ISSUES.  YOU GOT, I

13    ASSUME, ALL OF THE RULINGS LAST NIGHT; CORRECT?

14             MR. VERHOEVEN:  YES, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  SO MY REQUEST IS

16    THAT OBVIOUSLY EVERYONE IS GOING TO COMPLY WITH THE

17    PRETRIAL ORDER AND TRIAL ORDERS, BUT ALSO TO STICK

18    WITH WHAT'S IN THE SCOPE OF EACH SEGMENT OF YOUR

19    CLOSING AND REBUTTAL.

20             WE HAD A LITTLE BIT OF AN ISSUE WITH THAT

21    DURING SOME OF THE CROSS OF SOME OF THE SAMSUNG

22    WITNESSES DURING THE SAMSUNG REBUTTAL CASE, AND I

23    JUST DON'T WANT TO HAVE ANY ARGUMENTS THAT IT'S

24    OUTSIDE THE SCOPE OF WHAT YOUR LIMITED TIME IS LEFT

25    FOR.
```

```
 1              THE OTHER THING IS FILING THE EXCLUDED

 2    EXHIBITS.  I WOULD LIKE THOSE FILED AFTER THE JURY

 3    HAS FINISHED ITS DELIBERATIONS BECAUSE I DON'T WANT

 4    ANY ISSUES IN THIS CASE.  IS THAT --

 5              MS. MAROULIS:  YOUR HONOR, I NEED TO

 6    CHECK.  WE MIGHT HAVE FILED SOME IN THE MIDDLE OF

 7    THE NIGHT JUST TO GET IT READY.  IF IT HASN'T BEEN

 8    FILED, I WILL GIVE INSTRUCTIONS NOT TO FILE IT, BUT

 9    IT MAY HAVE BEEN.

10              THE COURT:  ALL RIGHT.  SO JUST AFTER THE

11    JURY FINISHES ITS DELIBERATION, THEN YOU CAN FILE

12    ANYTHING.

13              ALL RIGHT.  WHAT ELSE?  ANYTHING ELSE

14    THAT WE SHOULD COVER?

15              MR. VERHOEVEN:  NOT FROM HERE.

16              THE COURT:  NO?

17              MR. LEE:  NO.

18              THE COURT:  ALL RIGHT.  WELL, THEN, I

19    GUESS WE'LL BE IN RECESS AND THE FINAL INSTRUCTIONS

20    WILL BE BROUGHT UP SHORTLY.

21              OKAY.  THANK YOU.

22              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

23              MR. MCELHINNY:  YOUR HONOR, I'M SORRY.  I

24    JUST WANT TO MAKE SURE WHAT I UNDERSTOOD, ANY

25    INTENT, IN THE ORIGINAL -- IN THE HOUR THAT I HAD
```

```
 1    AT THE BEGINNING WAS TO ADDRESS ALL OF THE ISSUES.

 2               I MEAN, I'M GOING TO TALK ABOUT ALL OF

 3    THE EVIDENCE THAT WAS IN THE CASE, AND THEN I'M

 4    ONLY RESERVING A VERY SHORT PERIOD OF TIME TO DEAL

 5    WITH --

 6               THE COURT:  PLEASE TAKE A SEAT.

 7               MR. MCELHINNY:  I DIDN'T UNDERSTAND THE

 8    FINAL ARGUMENT --

 9               THE COURT:  WELL, I THOUGHT WE WERE

10    FOLLOWING THE PATTERN THAT THE CASE FOLLOWED DURING

11    THE TRIAL, SO APPLE'S AFFIRMATIVE CASE; AND THEN

12    SAMSUNG'S DEFENSIVE CASE AND SAMSUNG'S AFFIRMATIVE

13    CASE; THEN APPLE'S REBUTTAL CASE AND DEFENSIVE

14    CASE; AND THEN SAMSUNG'S REBUTTAL CASE ONLY ON ITS

15    OWN CASE.

16               MR. MCELHINNY:  THAT'S THE ORDER -- I

17    MEAN, I UNDERSTAND THAT'S THE ORDER OF ARGUMENT.

18               BUT I THOUGHT I WAS -- I MEAN, I INTENDED

19    TO ADDRESS ALL OF THE EVIDENCE AND THEN JUST SAVE A

20    VERY SHORT PERIOD OF TIME FOR REBUTTAL FOR ANY

21    POINTS THAT MR. VERHOEVEN RAISED IN HIS ARGUMENT.

22               I DIDN'T INTEND TO DEAL ONLY WITH

23    INFRINGEMENT AND THEN DEAL WITH -- IN OTHER WORDS,

24    TO DIVIDE MY ARGUMENT ENTIRELY.

25               THE COURT:  UM-HUM.
```

```
 1          MR. VERHOEVEN:  YOUR HONOR, MY

 2   UNDERSTANDING IS THAT APPLE WOULD GO FIRST, THEY

 3   PRESENT THEIR ADDRESS, BUT THEY WOULDN'T ADDRESS

 4   OUR OFFENSIVE CASE; THEN WE WOULD GO FIRST AND WE

 5   WOULD DEFEND OURSELVES AGAINST THEIR ASSERTIONS AND

 6   PRESENT OUR OFFENSIVE CASE; AND THEN APPLE WOULD BE

 7   ABLE TO REBUT WITH THEIR RESERVED TIME AND DEFEND

 8   THEMSELVES AGAINST OUR OFFENSIVE CASE AND THEN

 9   RAISE THEIR AFFIRMATIVE FRAND DEFENSE AND OTHER

10   DEFENSES; AND THEN I WOULD STAND UP AND REBUT THE

11   FRAND DEFENSES, AND THAT'S IT.

12          THAT WAS THE WAY I UNDERSTOOD YOUR HONOR

13   TO BE STRUCTURING THE CLOSING.

14          THE COURT:  YES.

15          (DISCUSSION OFF THE RECORD BETWEEN

16   PLAINTIFF'S COUNSEL.)

17          MR. MCELHINNY:  AND THE ONLY -- I JUST

18   WANT TO DEAL WITH MY VALIDITY ISSUES IN THE FIRST

19   BECAUSE ALL THE WITNESSES ARE TOGETHER AND THE

20   EVIDENCE IS ALL TOGETHER.

21          I'M NOT GOING TO GET INTO FRAND OR ANY OF

22   THAT STUFF AT ALL.

23          I MEAN, I JUST WANT TO TAKE IT PATENT BY

24   PATENT AND SHOW INFRINGEMENT AND VALIDITY.

25          MR. VERHOEVEN:  THE ISSUE WE -- I'M NOT
```

3950

```
 1    SURE THAT WE HAVE ANY GREAT DISAGREEMENT.

 2             THE ISSUE THAT I'M TALKING ABOUT IS THEM

 3    ADDRESSING OUR AFFIRMATIVE CASE, OUR ASSERTED

 4    PATENTS --

 5             MR. MCELHINNY:  THAT I'M NOT -- --

 6             MR. VERHOEVEN:  -- IN ADVANCE BEFORE

 7    REBUTTAL.

 8             IF THEY WANT TO TALK ABOUT THE VALIDITY

 9    OF THEIR PATENTS THAT THEY'RE ASSERTING AGAINST US

10    IN THEIR FIRST ROUND, I HAVE --

11             MR. MCELHINNY:  THAT'S EXACTLY WHAT I'M

12    TALKING ABOUT.

13             THE COURT:  ALL RIGHT.

14             MR. VERHOEVEN:  BUT ON THE REBUTTAL,

15    THAT'S LIMITED TO REBUTTING OUR AFFIRMATIVE CASE.

16             THEY CAN'T CIRCLE BACK AND SAY, "OKAY,

17    LET'S TALK ABOUT APPLE'S AFFIRMATIVE CASE AGAIN."

18             INSTEAD THEY'RE ADDRESSING -- THEY'RE

19    DEFENDING OUR AFFIRMATIVE CASE.

20             AND SIMILARLY, I WOULD BE LIMITED IN MY

21    TIME TO ADDRESSING THEIR FIRST RAISED FRAND CASES.

22             MR. MCELHINNY:  WE ARE VERY CLOSE, WHICH

23    IS I -- WE'RE IN COMPLETE AGREEMENT ON THE FIRST

24    PART, WHICH IS IN MY OPENING, I AM NOT GOING TO

25    TALK ABOUT SAMSUNG'S AFFIRMATIVE CASE.  I'M NOT
```

```
1    GOING TO TALK ABOUT THEIR PATENTS.  I'M NOT GOING

2    TO TALK ABOUT ANTITRUST AND I'M NOT GOING TO TALK

3    ABOUT FRAND.

4            I AM GOING TO RESERVE, I HOPE, 15 MINUTES

5    OF MY TIME FOR REBUTTAL TO ADDRESS ANY POINTS THAT

6    MR. VERHOEVEN RAISES ABOUT OUR CASE.  THAT'S

7    TRADITIONAL CLOSING.  IF IT WAS ONLY ONE CASE, I

8    WOULD GO FIRST, HE WOULD GO SECOND, AND THEN I

9    WOULD GET TO REBUT WHATEVER CLOSING HE MADE AS TO

10   MY CASE.

11           AND MR. LEE AND I ARE PLANNING TO SPLIT

12   THE SECOND HOUR SO THAT I HAVE A SHORT REBUTTAL AND

13   THEN HE'S ADDRESSING THE SECOND CASE.

14           THE COURT:  IS THAT ACCEPTABLE TO YOU?

15           MR. VERHOEVEN:  WELL, I GUESS THERE'S TWO

16   COMMENTS I HAVE.

17           ONE IS IF THEY'RE GOING TO TRY TO -- IF

18   THEY'RE GOING TO SPLIT THEIR CLOSING AN HOUR, AN

19   HOUR FOR REBUTTAL, I THINK THAT THAT'S JUST NOT

20   FAIR, YOUR HONOR.  I MEAN, A HALF HOUR FOR REBUTTAL

21   WOULD BE FAIR.

22           BUT THAT'S LIKE DOING MOST OF YOUR CASE

23   IN REBUTTAL, SO THAT TO ME, YOU KNOW, AN HOUR --

24   THEY NEVER TOLD US THEY WERE RESERVING AN HOUR.

25           YOU KNOW, THIS IS LIKE IF YOU'RE IN THE
```

1    FEDERAL CIRCUIT AND YOU ASK TO RESERVE 10 MINUTES

2    OF YOUR 15 MINUTES FOR REBUTTAL, THEY DON'T LET YOU

3    DO THAT.

4         MR. MCELHINNY:  AGAIN, I'M NOT BEING

5    CLEAR.  IF YOU LOOK AT MY CASE, WHAT I'M TALKING

6    ABOUT IS DOING AN HOUR AND RESERVING 15 MINUTES FOR

7    MY REBUTTAL.

8         MR. LEE GETS A FULL CHANCE TO DO HIS

9    DEFENSE, AND THAT'S -- WE'VE -- INTERNALLY WE'VE

10   DECIDED 40 TO 45 MINUTES TO DO HIS DEFENSE.

11        THE COURT:  IS THAT ACCEPTABLE?

12        MR. MCELHINNY:  AND THEN --

13        THE COURT:  AND THEN 15 MINUTES OF

14   REBUTTAL ON THEIR AFFIRMATIVE DEFENSE.

15        MR. VERHOEVEN:  IF THAT'S WHAT IT IS, I

16   DON'T SEE THE PROBLEM THERE.

17        BUT THE ONLY OTHER THING I'D SAY IS THAT

18   I SIMILARLY -- IF THAT'S THE WAY WE'RE GOING TO DO

19   IT, WHEN I STAND UP AT THE END, I SHOULDN'T BE

20   LIMITED TO JUST REBUTTING THE FRAND.  I SHOULD BE

21   ABLE TO GIVE MY LAST WORD ON SOME OF THE ARGUMENTS

22   THAT THEY MADE AS WELL.

23        MR. MCELHINNY:  I AGREE WITH THAT, YOUR

24   HONOR.

25        MR. VERHOEVEN:  AND THAT'LL BE LIMITED.

```
 1    IT WON'T BE OVER HALF OF MY TIME.  IT'LL BE A SHORT
 2    PERIOD OF TIME.
 3              MR. MCELHINNY:  I AGREE WITH THAT.
 4              THE COURT:  ALL RIGHT.
 5              MR. VERHOEVEN:  I THINK WE'RE ALL SET.
 6              THE COURT:  ALL RIGHT.  SO IF YOU ALL
 7    HAVE REACHED AGREEMENT, WHICH IT LOOKS LIKE YOU
 8    HAVE, WHICH IS PROBABLY HISTORIC IN THIS CASE, YOU
 9    CAN DO AS YOU WISH.
10              THAT WAS NOT EXACTLY HOW I WAS
11    ENVISIONING IT.  I WAS ENVISIONING IT BEING MORE
12    CUED TO THE PRESENTATIONS THAT WE DID IN TRIAL.
13              BUT IF YOU'VE REACHED AGREEMENT, THAT'S
14    TOTALLY FINE.
15              SO IT SOUNDS LIKE YOU'RE GOING TO DO AN
16    HOUR AND AN HOUR; YOU WANT TO DO A SIMILAR TIME
17    ALLOCATION, OR --
18              MR. VERHOEVEN:  WELL, IT'S HARD FOR ME TO
19    SAY EXACTLY BECAUSE I'M NOT SURE EXACTLY WHAT -- I
20    AM RESPONDING IN LARGE PART, SO IT MAY BE LONGER OR
21    SHORTER.  BUT I'M TARGETING ABOUT 20 MINUTES OF
22    REBUTTAL.
23              THE COURT:  OKAY.  WELL, YOU JUST LET ME
24    KNOW -- YOU KNOW, TAKE AS MUCH TIME AS YOU WANT.
25    AT THIS POINT, YOU BOTH HAVE TWO HOURS AND YOU CAN
```

3954

1    USE IT HOWEVER YOU WOULD LIKE.

2              MR. VERHOEVEN:  THANK YOU.

3              THE COURT:  OKAY.  SO LET ME GO AND MAKE

4    SURE THAT WE HAVE THE FINAL JURY INSTRUCTIONS FOR

5    YOU, AND I NEED EVERYONE TO STAY CONSCIOUS DURING

6    THE READING OF INSTRUCTIONS, INCLUDING MYSELF, SO

7    WE ARE GOING TO, JUST KIND OF, WE'RE GOING TO STAND

8    UP OCCASIONALLY TO MAKE SURE THE BLOOD IS STILL

9    FLOWING, BECAUSE IT IS QUITE LENGTHY.

10             THE CLERK:  IT LOOKS LIKE THE JURY

11   INSTRUCTIONS HAVE BEEN FILED.

12             THE COURT:  OKAY.  SO THEY JUST NEED TO

13   BE COPIED.

14             THE CLERK:  THEY'RE WORKING ON THAT.

15             (PAUSE IN PROCEEDINGS.)

16             THE COURT:  OKAY.  WE'LL BE IN RECESS

17   UNTIL THE JURY INSTRUCTIONS.  THANK YOU.

18             (WHEREUPON, A RECESS WAS TAKEN.)

19             (WHEREUPON, THE FOLLOWING PROCEEDINGS

20   WERE HELD IN THE PRESENCE OF THE JURY:)

21             THE COURT:  ALL RIGHT.  PLEASE TAKE A

22   SEAT.  WELCOME BACK.  THANK YOU FOR YOUR PATIENCE.

23             JUST IN CASE YOU WERE WONDERING WHY YOU

24   HAD YESTERDAY OFF, AFTER ALL OF THE EVIDENCE IS

25   ADMITTED, THERE ARE A LOT OF THINGS THAT WE NEED TO

3955

```
 1     TAKE CARE OF OUTSIDE YOUR PRESENCE, NOT THE LEAST

 2     OF WHICH IS TO PREPARE ALL THE DOCUMENTS THAT

 3     YOU'RE GOING TO RECEIVE TODAY.  SO THAT'S WHY WE

 4     DIDN'T GET STARTED WITH THE CLOSINGS YESTERDAY.  SO

 5     THANK YOU FOR YOUR UNDERSTANDING AS TO THAT.

 6              SO I'M NOW GOING TO READ OUR 84 JURY

 7     INSTRUCTIONS, AND WE ARE JUST GOING TO PERIODICALLY

 8     JUST STAND UP JUST TO MAKE SURE WE'RE STILL ALIVE,

 9     BUT YOU CAN READ ALONG WITH ME, THAT IS YOUR COPY,

10     YOU CAN TAKE THAT INTO THE JURY DELIBERATION ROOM,

11     YOU CAN MAKE NOTES ON IT, WHATEVER YOU WISH TO DO.

12     IT'S ALSO THREE-HOLE PUNCHED, SO YOU CAN INCLUDE IT

13     IN YOUR BINDER IF YOU WISH.

14              ALL RIGHT.  WE'LL START WITH GENERAL

15     CIVIL INSTRUCTIONS.  MEMBERS OF THE JURY, NOW THAT

16     YOU HAVE HEARD ALL OF THE EVIDENCE, IT IS MY DUTY

17     TO INSTRUCT YOU AS TO THE LAW OF THE CASE.

18              EACH OF YOU HAS RECEIVED A COPY OF THESE

19     INSTRUCTIONS THAT YOU MAY TAKE WITH YOU TO THE JURY

20     ROOM TO CONSULT DURING YOUR DELIBERATIONS.

21              YOU MUST NOT INFER FROM THESE

22     INSTRUCTIONS OR FROM ANYTHING I MAY SAY OR DO AS

23     INDICATING THAT I HAVE AN OPINION REGARDING THE

24     EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

25              IT IS YOUR DUTY TO FIND THE FACTS FROM
```

1    ALL THE EVIDENCE IN THE CASE.  TO THOSE FACTS YOU

2    WILL APPLY THE LAW AS I GIVE IT TO YOU.

3         YOU MUST FOLLOW THE LAW AS I GIVE IT TO

4    YOU, WHETHER YOU AGREE WITH IT OR NOT.  AND YOU

5    MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

6    DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT

7    MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE

8    EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK

9    AN OATH TO DO SO.

10        IN FOLLOWING MY INSTRUCTIONS, YOU MUST

11   FOLLOW ALL OF THEM AND NOT SINGLE OUT SOME AND

12   IGNORE OTHERS.  THEY ARE ALL IMPORTANT.

13        WHEN A PARTY HAS THE BURDEN OF PROOF ON

14   ANY CLAIM OR DEFENSE BY A PREPONDERANCE OF THE

15   EVIDENCE, IT MEANS YOU MUST BE PERSUADED BY THE

16   EVIDENCE THAT THE CLAIM OR DEFENSE IS MORE PROBABLY

17   TRUE THAN NOT.

18        YOU SHOULD BASE YOUR DECISION ON ALL OF

19   THE EVIDENCE, REGARDLESS OF WHICH PARTY PRESENTED

20   IT.

21        INSTRUCTION NUMBER 3.  WHEN A PARTY HAS

22   THE BURDEN OF PROVING ANY CLAIM OR DEFENSE BY CLEAR

23   AND CONVINCING EVIDENCE, IT MEANS YOU MUST BE

24   PERSUADED BY THE EVIDENCE THAT THE CLAIM OR DEFENSE

25   IS HIGHLY PROBABLE.  THIS IS A HIGHER STANDARD OF

1    PROOF THAN PROOF BY A PREPONDERANCE OF THE

2    EVIDENCE.

3              YOU SHOULD BASE YOUR DECISION ON ALL OF

4    THE EVIDENCE, REGARDLESS OF WHICH PARTY PRESENTED

5    IT.

6              NUMBER 4.  YOU SHOULD DECIDE THE CASE AS

7    TO EACH PARTY SEPARATELY.  UNLESS OTHERWISE STATED,

8    THE INSTRUCTIONS APPLY TO ALL PARTIES.

9              NUMBER 5.  THE TRIAL IS NOW OVER.  THE

10   EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

11   FACTS ARE CONSISTS;

12             THE SWORN TESTIMONY OF ANY WITNESS;

13             THE EXHIBITS WHICH ARE RECEIVED INTO

14   EVIDENCE; AND,

15             ANY FACTS TO WHICH THE LAWYERS HAVE

16   AGREED.

17             NUMBER 6.  IN REACHING YOUR VERDICT, YOU

18   CONSIDER ONLY THE TESTIMONY AND EXHIBITS THAT WERE

19   RECEIVED INTO EVIDENCE.  CERTAIN THINGS ARE NOT

20   EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING

21   WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU.

22             ARGUMENTS AND STATEMENTS BY LAWYERS ARE

23   NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT

24   THEY SAID IN THEIR OPENING STATEMENTS AND

25   THROUGHOUT THE TRIAL, AND WHAT THEY WILL SAY IN

1    THEIR CLOSING ARGUMENTS OR AT OTHER TIMES ARE ALL

2    INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT

3    THESE ARGUMENTS AND STATEMENTS ARE NOT EVIDENCE.

4            IF THE FACTS AS YOU REMEMBER THEM DIFFER

5    FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR

6    MEMORY OF THEM CONTROLS.

7            QUESTIONS AND OBJECTIONS BY LAWYERS ARE

8    NOT EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR

9    CLIENTS TO OBJECT WHEN THEY BELIEVE A QUESTION IS

10   IMPROPER UNDER THE RULES OF EVIDENCE.  YOU SHOULD

11   NOT BE INFLUENCED BY THE OBJECTION OR BY THE

12   COURT'S RULING ON IT.

13           TESTIMONY THAT HAS BEEN EXCLUDED OR

14   STRICKEN, OR THAT YOU HAVE BEEN INSTRUCTED TO

15   DISREGARD, IS NOT EVIDENCE AND MUST NOT BE

16   CONSIDERED.  IN ADDITION, SOMETIMES TESTIMONY AND

17   EXHIBITS ARE RECEIVED ONLY FOR A LIMITED PURPOSE.

18           WHEN I GIVE A LIMITING INSTRUCTION, YOU

19   MUST FOLLOW IT.

20           ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN

21   THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU

22   ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE

23   RECEIVE THE AT THE TRIAL.

24           NUMBER 7.  SOME EVIDENCE MAY HAVE BEEN

25   ADMITTED FOR A LIMITED PURPOSE ONLY.  YOU MUST

1    CONSIDER IT ONLY FOR THAT LIMITED PURPOSE AND FOR

2    NO OTHER.

3              NUMBER 8.  CERTAIN CHARTS AND SLIDES NOT

4    RECEIVED IN EVIDENCE HAVE BEEN SHOWN TO YOU IN

5    ORDER TO HELP EXPLAIN THE CONTENTS OF BOOKS,

6    RECORDS, DOCUMENTS OR OTHER EVIDENCE IN THE CASE.

7    THEY ARE NOT THEMSELVES EVIDENCE OR PROOF OF ANY

8    FACTS.

9              NUMBER 9.  CERTAIN CHARTS AND SUMMARIES

10   HAVE BEEN RECEIVED INTO EVIDENCE TO ILLUSTRATE

11   INFORMATION BROUGHT OUT IN THE TRIAL.  YOU MAY USE

12   THOSE CHARTS AND SUMMARIES AS EVIDENCE, EVEN THOUGH

13   THE UNDERLYING DOCUMENTS AND RECORDS ARE NOT HERE.

14   YOU SHOULD GIVE THEM ONLY SUCH WEIGHT AS YOU THINK

15   THEY DESERVE.

16             NUMBER 10.  EVIDENCE MAY BE DIRECT OR

17   CIRCUMSTANTIAL.  DIRECT EVIDENCE IS DIRECT PROOF OF

18   A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT

19   THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

20             CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE

21   OR MORE FACTS FROM WHICH YOU COULD FIND ANOTHER

22   FACT.  YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.

23   THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO

24   BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

25   EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT

1    TO GIVE TO ANY EVIDENCE.

2              NUMBER 11.  IN DECIDING THE FACTS IN THIS

3    CASE, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO

4    BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.  YOU

5    MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF

6    IT, OR NONE OF IT.  PROOF OF A FACT DOES NOT

7    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO

8    TESTIFIED ABOUT IT.

9              IN CONSIDERING THE TESTIMONY OF ANY

10   WITNESS, YOU MAY TAKE INTO ACCOUNT:

11             THE OPPORTUNITY AND ABILITY OF THE

12   WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED

13   TO;

14             THE WITNESS'S MEMORY;

15             THE WITNESS'S MANNER WHILE TESTIFYING;

16             THE WITNESS'S INTEREST IN THE OUTCOME OF

17   THE CASE AND ANY BIAS OR PREJUDICE;

18             WHETHER OTHER EVIDENCE CONTRADICTED THE

19   WITNESS'S TESTIMONY;

20             THE REASONABLENESS OF THE WITNESS'S

21   TESTIMONY IN LIGHT OF ALL THE EVIDENCE; AND,

22             ANY OTHER FACTORS THAT BEAR ON

23   BELIEVABILITY.  THE WEIGHT OF THE EVIDENCE AS TO A

24   FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF

25   WITNESSES WHO TESTIFY ABOUT IT.

1          NUMBER 12.  THE EVIDENCE THAT A WITNESS

2     LIED UNDER OATH OR GAVE DIFFERENT TESTIMONY ON A

3     PRIOR OCCASION MAY BE CONSIDERED, ALONG WITH ALL

4     OTHER EVIDENCE, IN DECIDING WHETHER OR NOT TO

5     BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE TO

6     THE TESTIMONY OF THE WITNESS AND FOR NO OTHER

7     PURPOSE.

8          YOU MAY HAVE -- NUMBER 13.  YOU MAY HAVE

9     TAKEN NOTES DURING THE TRIAL.  WHETHER OR NOT YOU

10    TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF

11    THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR

12    MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY

13    YOUR NOTES OR THOSE OF YOUR FELLOW JURORS.

14         NUMBER 14.  YOU HEARD SOME WITNESSES

15    TESTIFY BY DEPOSITION.  A DEPOSITION IS THE SWORN

16    TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL.  THE

17    WITNESS IS PLACED UNDER OATH TO TELL THE TRUTH AND

18    LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

19    QUESTIONS AND ANSWERS ARE RECORDED.

20         YOU SHOULD CONSIDER DEPOSITION TESTIMONY

21    PRESENTED TO YOU IN COURT IN LIEU OF LIVE

22    TESTIMONY, INSOFAR AS POSSIBLE, IN THE SAME WAY AS

23    IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

24         NUMBER 15.  EVIDENCE WAS PRESENTED TO YOU

25    IN THE FORM OF ANSWERS OF ONE OF THE PARTIES TO

1    WRITTEN INTERROGATORIES SUBMITTED BY THE OTHER.

2    THESE ANSWERS WERE GIVEN IN WRITING AND UNDER OATH,

3    BEFORE THE ACTUAL TRIAL, IN RESPONSE TO QUESTIONS

4    THAT WERE SUBMITTED IN WRITING UNDER ESTABLISHED

5    COURT PROCEDURES.  YOU SHOULD CONSIDER THE ANSWERS,

6    INSOFAR AS POSSIBLE, IN THE SAME WAY AS IF THEY

7    WERE MADE FROM THE WITNESS STAND.

8             NUMBER 16.  SOME WITNESSES, BECAUSE OF

9    EDUCATION OR EXPERIENCE, WERE PERMITTED TO STATE

10   OPINIONS AND THE REASONS FOR THOSE OPINIONS.

11            OPINION TESTIMONY SHOULD BE JUDGED JUST

12   LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT IT OR

13   REJECT IT, AND GIVE IT AS MUCH WEIGHT AS YOU THINK

14   IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION

15   AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

16   AND ALL THE OTHER EVIDENCE IN THE CASE.

17            NUMBER 17.  THE PHYSICAL DEVICES YOU

18   RECEIVE ARE EVIDENCE IN THIS TRIAL.  YOU MAY USE

19   THEM IN YOUR DELIBERATIONS AND MAY CONNECT TO THE

20   INTERNET THROUGH THE WEB BROWSER APPLICATION, BUT

21   MUST NOT ALTER OR MODIFY THE DEVICES IN ANY WAY.

22            SOME OF THE DEVICES HAVE SIM CARDS IN

23   THEIR PACKAGING.  THESE SIM CARDS ARE NOT TO BE

24   INSERTED INTO THE PHONES.

25            SOME OF THE DEVICES HAVE A MOBILE DATA

3963

```
 1    CONNECTION, AND YOU WILL NOT NEED TO TAKE ANY

 2    ADDITIONAL ACTION TO USE THE WEB BROWSER

 3    APPLICATION.

 4             OTHERS MUST FIRST BE CONNECTED TO THE

 5    COURT'S WI-FI NETWORK TO ACCESS THE INTERNET.

 6             ONCE CONNECTED, YOU MUST DECLINE ANY

 7    SOFTWARE UPDATE NOTIFICATIONS THAT MAY BE PRESENTED

 8    TO YOU.

 9             YOU ALSO MUST NOT DOWNLOAD ANY CONTENT,

10    SUCH AS APPS, MUSIC, PHOTOGRAPHS OR GAMES TO THE

11    DEVICES.

12             CONNECTING TO THE INTERNET.  TO CONNECT

13    THE DEVICE TO THE COURT'S WI-FI NETWORK, SELECT

14    "U.S.D.C. SJ 01" FROM THE LIST OF AVAILABLE

15    WIRELESS NETWORKS AS DEPICTED BELOW.

16             FROM THE APPLICATIONS MENU, SELECT THE

17    WEB BROWSER APPLICATION.

18             FROM THE COURT'S WI-FI LOG-IN PAGE,

19    SCROLL TO THE BOTTOM AND CLICK ON THE BLUE

20    "CONNECT" BUTTON.

21             DECLINING SYSTEM UPDATE NOTIFICATIONS.

22    SOME DEVICES MAY DISPLAY A "SYSTEM UPDATE"

23    NOTIFICATION LIKE THE ONES BELOW.

24             NOW, THERE IS TEXT IN THESE JURY

25    INSTRUCTIONS THAT I'M NOT GOING TO READ, BUT IT
```

```
1    WILL ALL BE PART OF THE RECORD SINCE THE

2    INSTRUCTIONS WILL BE PART OF THE RECORD.

3             AND THE TEXT, BY THAT I MEAN THE SCREEN

4    SHOTS OF THE VARIOUS WEBSITE PAGES AND SYSTEM

5    UPDATE NOTIFICATIONS.

6             IF YOU SEE SUCH A SCREEN, YOU MUST

7    DECLINE THE REQUEST TO UPDATE THE SYSTEM.  SELECT

8    "INSTALL LATER" OR PRESS THE "HOME" OR "BACK"

9    BUTTON TO EXIT THE NOTIFICATION SCREEN.

10            NUMBER 18.  I WILL NOW AGAIN SUMMARIZE

11   FOR YOU EACH SIDE'S CONTENTIONS IN THIS CASE.  I

12   WILL THEN TELL YOU WHAT EACH SIDE MUST PROVE TO WIN

13   ON EACH OF ITS CONTENTIONS.

14            AS I PREVIOUSLY MENTIONED, APPLE SEEKING

15   MONEY DAMAGES FROM SAMSUNG ELECTRONICS COMPANY,

16   SEC, SAMSUNG ELECTRONICS AMERICA, INCORPORATED,

17   SEA, AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,

18   STA, FOR ALLEGEDLY INFRINGING CLAIM 19 OF THE '381

19   PATENT, CLAIM 8 OF THE '915 PATENT, CLAIM 50 OF THE

20   '163 PATENT, AND THE D'889, D'087, D'677, AND D'305

21   PATENTS.

22            APPLE ALSO ARGUES THAT SEC ACTIVELY

23   INDUCED SEA AND STA TO INFRINGE THE PATENTS.

24            APPLE ALSO CONTENDS THAT SAMSUNG'S

25   INFRINGEMENT HAS BEEN WILLFUL.
```

1        SAMSUNG DENIES THAT IT HAS INFRINGED THE

2   ASSERTED CLAIMS OF APPLE'S PATENTS AND ARGUES THAT,

3   IN ADDITION, THOSE CLAIMS ARE INVALID.  INVALIDITY

4   IS A DEFENSE TO INFRINGEMENT.

5        SAMSUNG HAS ALSO BROUGHT CLAIMS AGAINST

6   APPLE FOR PATENT INFRINGEMENT.  SAMSUNG SEEKS MONEY

7   DAMAGES FROM APPLE FOR ALLEGEDLY INFRINGING THE

8   '941, '516, '711, '460, AND '893 PATENTS BY MAKING,

9   IMPORTING, USING, SELLING, AND/OR OFFERING FOR SALE

10  APPLE'S IPHONE, IPAD, AND IPOD PRODUCTS THAT

11  SAMSUNG ARGUES ARE COVERED BY CLAIMS 10 AND 15 OF

12  THE '941 PATENT, CLAIMS 15 AND 16 OF THE '516

13  PATENT, CLAIM 9 OF THE '711 PATENT, CLAIM 1 OF THE

14  '460 PATENT, AND CLAIM 10 OF THE '893 PATENT.

15       SAMSUNG ALSO CONTENDS THAT APPLE'S

16  INFRINGEMENT HAS BEEN WILLFUL.

17       APPLE DENIES THAT IT HAS INFRINGED THE

18  CLAIMS ASSERTED BY SAMSUNG AND ARGUES THAT CLAIMS

19  ASSERTED BY SAMSUNG ARE INVALID, AND FOR THE '516

20  AND '941 PATENTS, EXHAUSTED DUE TO SAMSUNG'S

21  LICENSE TO INTEL AND ALSO UNENFORCEABLE.

22       INVALIDITY, EXHAUSTION, AND

23  UNENFORCEABILITY ARE DEFENSES TO INFRINGEMENT.

24       APPLE ALSO CONTENDS THAT, BY ASSERTING

25  ITS "DECLARED ESSENTIAL" PATENTS AGAINST APPLE,

```
 1    SAMSUNG HAS VIOLATED THE ANTITRUST LAWS AND
 2    BREACHED ITS CONTRACTUAL OBLIGATIONS TO TIMELY
 3    DISCLOSE AND THEN LICENSE THESE PATENTS ON FAIR AND
 4    REASONABLE TERMS.
 5              FOR EACH PARTY'S PATENT INFRINGEMENT
 6    CLAIMS AGAINST THE OTHER, THE FIRST ISSUE YOU WILL
 7    HAVE TO DECIDE IS WHETHER THE ALLEGED INFRINGER HAS
 8    INFRINGED THE CLAIMS OF THE PATENT HOLDER'S PATENTS
 9    AND WHETHER THOSE PATENTS ARE VALID.
10              IF YOU DECIDE THAT ANY CLAIM OF EITHER
11    PARTY'S PATENTS HAS BEEN INFRINGED AND IS NOT
12    INVALID, YOU WILL THEN NEED TO DECIDE ANY MONEY
13    DAMAGES TO BE AWARDED TO THE PATENT HOLDER TO
14    COMPENSATE FOR THE INFRINGEMENT.
15              YOU WILL ALSO NEED TO MAKE A FINDING AS
16    TO WHETHER THE INFRINGEMENT WAS WILLFUL.
17              IF YOU DECIDE THAT ANY INFRINGEMENT WAS
18    WILLFUL, THAT DECISION SHOULD NOT AFFECT ANY DAMAGE
19    AWARD YOU GIVE.  I WILL TAKE WILLFULNESS INTO
20    ACCOUNT LATER.
21              TO RESOLVE APPLE'S CLAIMS REGARDING
22    SAMSUNG'S "DECLARED ESSENTIAL" PATENTS, YOU WILL
23    NEED TO MAKE A FINDING AS TO WHETHER SAMSUNG
24    VIOLATED THE ANTITRUST LAWS AND WHETHER SAMSUNG
25    BREACHED ITS CONTRACTUAL OBLIGATIONS.
```

1            IF YOU DECIDE THAT SAMSUNG VIOLATED THE

2    ANTITRUST LAWS OR BREACHED ITS CONTRACTUAL

3    OBLIGATIONS, YOU WILL THEN NEED TO DECIDE WHAT

4    MONEY DAMAGES TO AWARD TO APPLE.

5            APPLE ACCUSES SAMSUNG OF DILUTING APPLE'S

6    REGISTER TRADE DRESS NUMBER 3,470,983.  THIS TRADE

7    DRESS RELATES TO THE IPHONE.

8            APPLE ALSO ACCUSES SAMSUNG OF DILUTING

9    TWO UNREGISTERED TRADE DRESSES RELATING TO THE

10   IPHONE.

11           FINALLY, APPLE CLAIMS THAT SAMSUNG HAS

12   DILUTED AND INFRINGED ITS UNREGISTERED TRADE DRESS

13   RELATING TO THE IPAD.

14           FOR EACH OF APPLE'S TRADE DRESS DILUTION

15   AND INFRINGEMENT CLAIMS, THE FIRST ISSUE YOU WILL

16   HAVE TO DECIDE IS WHETHER THE APPLE TRADE DRESS IS

17   PROTECTABLE OR VALID.  AN ASSERTED TRADE DRESS IS

18   ONLY PROTECTABLE IF THE TRADE DRESS DESIGN AS A

19   WHOLE, AS OPPOSED TO ITS INDIVIDUAL FEATURES

20   STANDING ALONE, IS BOTH DISTINCTIVE AND

21   NON-FUNCTIONAL.

22           FOR APPLE'S TRADE DRESS DILUTION CLAIMS,

23   THE NEXT ISSUES YOU WILL DECIDE ARE WHETHER APPLE'S

24   TRADE DRESS WAS FAMOUS BEFORE SAMSUNG STARTED

25   SELLING ITS ACCUSED PRODUCTS, AND WHETHER SAMSUNG'S

1    ACCUSED PRODUCTS ARE LIKELY TO CAUSE DILUTION OF

2    THE ASSERTED APPLE TRADE DRESSES BY IMPAIRING THEIR

3    DISTINCTIVENESS.

4              APPLE'S TRADE DRESS -- LET ME GET THAT.

5    APPLE'S TRADE DRESS INFRINGEMENT CLAIM WILL REQUIRE

6    YOU TO RESOLVE DIFFERENT ISSUES.  YOU WILL NEED TO

7    DETERMINE WHETHER APPLE'S TRADE DRESS HAD ACQUIRED

8    DISTINCTIVENESS BEFORE SAMSUNG STARTED SELLING ITS

9    ACCUSE PRODUCTS AND WHETHER SAMSUNG'S ACCUSED

10   PRODUCTS ARE LIKELY TO CAUSE CONFUSION ABOUT THE

11   SOURCE OF SAMSUNG'S GOODS.

12             IF YOU DECIDE THAT ANY APPLE TRADE DRESS

13   IS BOTH PROTECTABLE AND HAS BEEN INFRINGED OR

14   WILLFULLY DILUTED BY SAMSUNG, YOU WILL THEN NEED TO

15   DECIDE THE MONEY DAMAGES TO BE AWARDED TO APPLE.

16             SAMSUNG DENIES THAT IT HAS INFRINGED OR

17   DILUTED ANY APPLE TRADE DRESS AND ARGUES THAT EACH

18   ASSERTED TRADE DRESS IS NOT PROTECTABLE.  IF A

19   TRADE DRESS IS NOT PROTECTABLE, THAT IS A DEFENSE

20   TO INFRINGEMENT AND DILUTION.

21             NUMBER 19.  WHEN YOU BEGIN YOUR

22   DELIBERATIONS, YOU SHOULD ELECT ONE MEMBER OF THE

23   JURY AS YOUR PRESIDING JUROR.  THAT PERSON WILL

24   PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU

25   HERE IN COURT.

1          YOU WILL THEN DISCUSS THE CASE WITH YOUR

2     FELLOW JURORS TO REACH AGREEMENT IF YOU CAN DO SO.

3     YOUR VERDICT MUST BE UNANIMOUS.

4          EACH OF YOU MUST DECIDE THE CASE FOR

5     YOURSELF, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE

6     CONSIDERED ALL OF THE EVIDENCE, DISCUSSED IT FULLY

7     WITH THE OTHER JURORS, AND LISTENED TO THE VIEWS OF

8     YOUR FELLOW JURORS.

9          DO NOT HESITATE TO CHANGE YOUR OPINION IF

10    THE DISCUSSION PERSUADES YOU THAT YOU SHOULD.  DO

11    NOT COME TO A DECISION SIMPLY BECAUSE OTHER JURORS

12    THINK IT IS RIGHT.

13         IT IS IMPORTANT THAT YOU ATTEMPT TO REACH

14    A UNANIMOUS VERDICT BUT, OF COURSE, ONLY IF EACH OF

15    YOU CAN DO SO AFTER HAVING MADE YOUR OWN

16    CONSCIENTIOUS DECISION.  DO NOT CHANGE AN HONEST

17    BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

18    SIMPLY TO REACH A VERDICT.

19         NUMBER 20.  IF IT BECOMES NECESSARY

20    DURING YOUR DELIBERATIONS TO COMMUNICATE WITH ME,

21    YOU MAY SEND A NOTE THROUGH THE BAILIFF, SIGNED BY

22    YOUR PRESIDING JUROR OR BY ONE OR MORE MEMBERS OF

23    THE JURY.  NO MEMBER OF THE JURY SHOULD EVER

24    ATTEMPT TO COMMUNICATE WITH ME, EXCEPT BY A SIGNED

25    WRITING.

```
 1              I WILL COMMUNICATE WITH ANY MEMBER OF THE

 2    JURY ON ANYTHING CONCERNING THE CASE ONLY IN

 3    WRITING, OR HERE IN OPEN COURT.

 4              IF YOU SEND OUT A QUESTION, I WILL

 5    CONSULT WITH THE PARTIES BEFORE ANSWERING IT, WHICH

 6    MAY TAKE SOME TIME.  YOU MAY CONTINUE YOUR

 7    DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

 8    QUESTION.

 9              REMEMBER THAT YOU ARE NOT TO TELL

10    ANYONE -- INCLUDING ME -- HOW THE JURY STANDS,

11    NUMERICALLY OR OTHERWISE, UNTIL AFTER YOU HAVE

12    REACHED A UNANIMOUS VERDICT OR HAVE BEEN

13    DISCHARGED.

14              DO NOT DISCLOSE ANY VOTE COUNT IN ANY

15    NOTE TO THE COURT.

16              NUMBER 21.  A VERDICT FORM HAS BEEN

17    PREPARED FOR YOU.  AFTER YOU HAVE REACHED UNANIMOUS

18    AGREEMENT ON A VERDICT, YOUR PRESIDING JUROR WILL

19    FILL IN THE FORM THAT HAS BEEN GIVEN TO YOU, SIGN

20    AND DATE IT, AND ADVISE THE COURT THAT YOU ARE

21    READY TO RETURN TO THE COURTROOM.

22              UTILITY PATENT JURY INSTRUCTIONS, NUMBER

23    22.

24              BEFORE YOU DECIDE WHETHER APPLE OR

25    SAMSUNG HAS INFRINGED THE CLAIMS OF THE OTHER
```

1    SIDE'S UTILITY PATENTS OR WHETHER THE CLAIMS ARE

2    INVALID, YOU WILL NEED TO UNDERSTAND THE PATENT

3    CLAIMS.  AS I MENTIONED, THE PATENT CLAIMS ARE

4    NUMBERED SENTENCES AT THE END OF THE PATENT THAT

5    DESCRIBE THE BOUNDARIES OF THE PATENT'S PROTECTION.

6          IT IS MY JOB AS THE JUDGE TO EXPLAIN TO

7    YOU THE MEANING OF ANY LANGUAGE IN THE CLAIMS THAT

8    NEEDS INTERPRETATION.

9          I HAVE INTERPRETED THE MEANING OF SOME OF

10   THE LANGUAGE IN THE UTILITY PATENT CLAIMS INVOLVED

11   IN THIS CASE.  YOU MUST ACCEPT THOSE

12   INTERPRETATIONS AS CORRECT.  MY INTERPRETATION OF

13   THE LANGUAGE SHOULD NOT BE TAKEN AS AN INDICATION

14   THAT I HAVE A VIEW REGARDING THE ISSUES OF

15   INFRINGEMENT AND INVALIDITY.  THE DECISIONS

16   REGARDING INFRINGEMENT AND INVALIDITY ARE YOURS TO

17   MAKE.

18         U.S. PATENT NUMBER 7,469,381.  THE TERM

19   "DISPLAYING" MEANS SHOWING OR REVEALING TO THE

20   VIEWER.

21         THE TERM "ELECTRONIC DOCUMENT" MEANS "A

22   DOCUMENT STORED IN A DIGITAL FORMAT."  AN

23   "ELECTRONIC DOCUMENT" INCLUDES, BUT IS NOT LIMITED

24   TO, A WEB PAGE, A DIGITAL IMAGE, A WORD PROCESSOR,

25   SPREAD SHEET OR PRESENTATION DOCUMENT, OR A LIST OF

 1    ITEMS IN A DIGITAL FORMAT.  AN ELECTRONIC DOCUMENT

 2    NEED NOT BE STORED IN A SINGLE FILE.

 3            AND THE TERM "FIRST DIRECTION" DOES NOT

 4    REQUIRE A STRICTLY LINEAR FINGER MOVEMENT.

 5            THE TERM "EDGE OF AN ELECTRONIC DOCUMENT"

 6    HAS ITS PLAIN AND ORDINARY MEANING.  AN EDGE OF AN

 7    ELECTRONIC DOCUMENT IS NOT LIMITED TO AN INTERNAL

 8    EDGE AND MAY BE INTERNAL.

 9            U.S. PATENT NUMBER 7,844,915.  THE TERM

10    "INVOKES" MEANS CAUSES OR CAUSES A PROCEDURE TO BE

11    CLEARED OUT.

12            U.S. PATENT NUMBER 7,698,711.

13            THE TERM "APPLET" MEANS AN APPLICATION

14    DESIGNED TO RUN WITHIN AN APPLICATION MODULE THAT

15    NEED NOT BE OPERATING SYSTEM-INDEPENDENT."

16            FOR CLAIM LANGUAGE WHICH I HAVE NOT

17    PROVIDED YOU WITH ANY MEANING, YOU SHOULD APPLY THE

18    CLAIM LANGUAGE'S PLAIN AND ORDINARY MEANING.

19            NUMBER 23.  I WILL NOW INSTRUCT YOU ON

20    THE RULES YOU MUST FOLLOW IN DECIDING WHETHER

21    EITHER APPLE OR SAMSUNG, OR BOTH, HAS OVEN THAT THE

22    OTHER SIDE HAS INFRINGED ONE OR MORE OF THE

23    ASSERTED CLAIMS OF THE ASSERTED UTILITY PATENTS.

24            TO PROVE INFRINGEMENT OF ANY CLAIM, THE

25    PATENT HOLDER MUST PERSUADE YOU BY A PREPONDERANCE

3973

1   OF THE EVIDENCE THAT THE ALLEGED INFRINGER HAS

2   ASSERTED THAT CLAIM.

3            NUMBER 24.  A PATENT'S CLAIMS DEFINE WHAT

4   IS COVERED BY THE PATENT.  A PRODUCT OR METHOD

5   DIRECTLY INFRINGES A PATENT IF IT IS COVERED BY AT

6   LEAST ONE CLAIM OF THE PATENT.

7            DECIDING WHETHER A CLAIM HAS BEEN

8   DIRECTLY INFRINGED IS A TWO-STEP PROCESS.  THE

9   FIRST IS TO DECIDE THE MEANING OF THE PATENT CLAIM.

10  I HAVE ALREADY MADE THIS DECISION, AND I HAVE

11  ALREADY INSTRUCTED YOU AS TO THE MEANING OF THE

12  ASSERTED PATENT CLAIMS.

13           THE SECOND STEP IS TO DECIDE WHETHER

14  SAMSUNG AND/OR APPLE HAS MADE, USED, SOLD, OFFERED

15  FOR SALE, OR IMPORTED WITHIN THE UNITED STATES A

16  PRODUCT OR METHOD COVERED BY ANY OF THE ASSERTED

17  CLAIMS OF THE OTHER SIDE'S UTILITY PATENTS.

18           IF SAMSUNG OR APPLE HAS DONE SO, IT

19  INFRINGES.  YOU, THE JURY, MAKE THIS DECISION.

20           WITH ONE EXCEPTION, YOU MUST CONSIDER

21  EACH OF THE ASSERTED CLAIMS OF THE PATENTS

22  INDIVIDUALLY AND DECIDE WHETHER THE ACCUSED SAMSUNG

23  AND/OR APPLE PRODUCTS OR METHODS INFRINGE THAT

24  CLAIM.

25           THE ONE EXCEPTION TO CONSIDERING CLAIMS

```
1    INDIVIDUALLY CONCERNS DEPENDENT CLAIMS.  A

2    DEPENDENT CLAIM INCLUDES ALL OF THE REQUIREMENTS OF

3    A PARTICULAR INDEPENDENT CLAIM, PLUS ADDITIONAL

4    REQUIREMENTS OF ITS OWN.

5            AS A RESULT, IF YOU FIND THAT AN

6    INDEPENDENT CLAIM IS NOT INFRINGED, YOU MUST ALSO

7    FIND THAT ITS DEPENDENT CLAIMS ARE NOT INFRINGED.

8            ON THE OTHER HAND, IF YOU FIND THAT AN

9    INDEPENDENT CLAIM HAS BEEN INFRINGED, YOU MUST

10   STILL SEPARATELY DECIDE WHETHER THE ADDITIONAL

11   REQUIREMENTS OF ITS DEPENDENT CLAIMS HAVE ALSO BEEN

12   INFRINGED.

13           YOU HAVE HEARD EVIDENCE ABOUT BOTH SIDES'

14   COMMERCIAL PRODUCTS.  HOWEVER, IN DECIDING THE

15   ISSUE OF UTILITY PATENT INFRINGEMENT, YOU MAY NOT

16   COMPARE THE SAMSUNG AND APPLE COMMERCIAL PRODUCTS

17   TO EACH OTHER.  RATHER, YOU MUST COMPARE THE

18   ACCUSED SAMSUNG PRODUCTS TO THE CLAIMS OF THE APPLE

19   UTILITY PATENTS, AND THE ACCUSED APPLE PRODUCTS OR

20   METHODS TO THE CLAIMS OF THE SAMSUNG UTILITY

21   PATENTS.

22           WHETHER OR NOT SAMSUNG OR APPLE KNEW ITS

23   PRODUCTS OR METHODS INFRINGED, OR EVEN KNEW OF THE

24   OTHER SIDE'S PATENTS, DOES NOT MATTER IN

25   DETERMINING DIRECT INFRINGEMENT.
```

```
 1              THERE ARE TWO WAYS IN WHICH A PATENT

 2     CLAIM MAY BE DIRECTLY INFRINGED.  A CLAIM MAY BY

 3     "LITERALLY" INFRINGED OR IT MAY BE INFRINGED UNDER

 4     THE "DOCTRINE OF EQUIVALENTS."  THE FOLLOWING

 5     INSTRUCTIONS WILL PROVIDE MORE DETAIL ON THESE TWO

 6     TYPES OF DIRECT INFRINGEMENT.

 7              NUMBER 25.  IN DECIDING WHETHER A SALE

 8     HAS TAKEN PLACE "WITHIN THE UNITED STATES," YOU MAY

 9     FIND THE FOLLOWING GUIDELINES HELPFUL TO YOUR

10     ANALYSIS:

11              THE LOCATION OF THE SALE DEPENDS ON MANY

12     FACTORS, AND YOU MAY FIND THAT THE SALE OCCURRED IN

13     SEVERAL PLACES.  A SALE OCCURS WHEREVER THE

14     "ESSENTIAL ACTIVITIES" OF THE SALE TOOK PLACE.  THE

15     ESSENTIAL ACTIVITIES INCLUDE, FOR EXAMPLE,

16     NEGOTIATING THE CONTRACT AND PERFORMING OBLIGATIONS

17     UNDER THE CONTRACT.

18              NUMBER 26.  TO DECIDE WHETHER EACH

19     ACCUSED SAMSUNG AND APPLE PRODUCT OR METHOD

20     LITERALLY INFRINGES A CLAIM OF AN ASSERTED PATENT,

21     YOU MUST COMPARE THE PRODUCT OR METHOD WITH THE

22     PATENT CLAIM AND DETERMINE WHETHER EVERY

23     REQUIREMENT OF THE CLAIM IS INCLUDED IN THAT

24     PRODUCT OR METHOD.  PA

25              IF SO, THE SAMSUNG AND APPLE PRODUCT OR
```

1    METHOD IN QUESTION LITERALLY INFRINGES THAT CLAIM.

2            IF, HOWEVER, A PARTICULAR SAMSUNG OR

3    APPLE PRODUCT OR METHOD DOES NOT HAVE EVERY

4    REQUIREMENT IN THE PATENT CLAIM, THAT PRODUCT OR

5    METHOD DOES NOT LITERALLY INFRINGE THAT CLAIM.  YOU

6    MUST DECIDE LITERAL INFRINGEMENT FOR EACH ASSERTED

7    CLAIM SEPARATELY.

8            IF THE PATENT CLAIM USES THE TERM

9    "COMPRISING," THAT PATENT CLAIM IS TO BE UNDERSTOOD

10   AS AN OPEN CLAIM.  AN OPEN CLAIM IS INFRINGED AS

11   LONG AS EVERY REQUIREMENT IN THE CLAIM IS PRESENT

12   IN THE ACCUSED PRODUCT OR METHOD.  THE FACT THAT A

13   PARTICULAR ACCUSED SAMSUNG OR APPLE PRODUCT OR

14   METHOD ALSO INCLUDES OTHER PARTS OR STEPS WILL NOT

15   AVOID INFRINGEMENT, AS LONG AS IT HAS EVERY

16   REQUIREMENT IN THE PATENT CLAIM.

17           NUMBER 27.  IF YOU DECIDE THAT AN ACCUSED

18   SAMSUNG PRODUCT DOES NOT LITERALLY INFRINGE AN

19   ASSERTED APPLE UTILITY PATENT CLAIM, YOU MUST THEN

20   DECIDE WHETHER THAT PRODUCT INFRINGES THE ASSERTED

21   CLAIM UNDER WHAT IS CALLED ITSELF "DOCTRINE OF

22   EQUIVALENTS."

23           IF YOU DECIDE THAT AN ACCUSED APPLE

24   PRODUCT OR METHOD DOES NOT LITERALLY INFRINGE CLAIM

25   1 OF SAMSUNG'S '460 PATENT, YOU MUST THEN DECIDE

1    WHETHER THAT PRODUCT OR METHOD INFRINGES THE

2    ASSERTED CLAIM UNDER WHAT IS CALLED THE "DOCTRINE

3    OF EQUIVALENTS."

4             UNDER THE DOCTRINE OF EQUIVALENTS, THE

5    PRODUCT OR METHOD CAN INFRINGE AN ASSERTED UTILITY

6    PATENT CLAIM IF IT INCLUDES PARTS OR SOFTWARE

7    INSTRUCTIONS THAT ARE IDENTICAL OR EQUIVALENT TO

8    THE REQUIREMENTS OF THE CLAIM.

9             IF THE PRODUCT OR METHOD LACKS A PART OR

10   SOFTWARE INSTRUCTION THAT IS IDENTICAL OR

11   EQUIVALENT TO EVEN ONE REQUIREMENT OF THE ASSERTED

12   UTILITY PATENT CLAIM, THE PRODUCT OR METHOD CANNOT

13   INFRINGE THE CLAIM UNDER THE DOCTRINE OF

14   EQUIVALENTS.

15            THUS, IN MAKING YOUR DECISION UNDER THE

16   DOCTRINE OF EQUIVALENTS, YOU MUST LOOK AT EACH

17   INDIVIDUAL REQUIREMENT OF THE ASSERTED UTILITY

18   PATENT CLAIM AND DECIDE WHETHER THE PRODUCT OR

19   METHOD HAS EITHER A PART OR SOFTWARE INSTRUCTIONS

20   THAT ARE IDENTICAL OR EQUIVALENT TO THAT INDIVIDUAL

21   CLAIM REQUIREMENT.

22            A PRODUCT PART OR SOFTWARE INSTRUCTIONS

23   ARE EQUIVALENT TO A REQUIREMENT OF AN ASSERTED

24   CLAIM IF A PERSON OF ORDINARY SKILL IN THE FIELD

25   WOULD THINK THAT THE DIFFERENCES BETWEEN THE PART

1    OR SOFTWARE INSTRUCTIONS AND THE REQUIREMENT WERE

2    NOT SUBSTANTIAL AS OF THE TIME OF THE ALLEGED

3    INFRINGEMENT.

4              CHANGES IN TECHNIQUE OR IMPROVEMENTS MADE

5    POSSIBLE BY TECHNOLOGY DEVELOPED AFTER THE UTILITY

6    PATENT APPLICATION IS FILED MAY STILL BE EQUIVALENT

7    FOR THE PURPOSES OF THE DOCTRINE OF EQUIVALENTS, IF

8    IT STILL MEETS THE OTHER REQUIREMENTS OF THE

9    DOCTRINE OF EQUIVALENTS SET FORTH IN THIS

10   INSTRUCTION.

11             ONE WAY TO DECIDE WHETHER ANY DIFFERENCE

12   BETWEEN A REQUIREMENT OF AN ASSERTED CLAIM AND A

13   PRODUCT PART OR SOFTWARE INSTRUCTION ARE NOT

14   SUBSTANTIAL IS TO CONSIDER WHETHER, AS OF THE TIME

15   OF THE ALLEGED INFRINGEMENT, THE PART OR SOFTWARE

16   INSTRUCTIONS PERFORMED SUBSTANTIALLY THE SAME

17   FUNCTION, IN SUBSTANTIALLY THE SAME WAY, TO ACHIEVE

18   SUBSTANTIALLY THE SAME RESULT AS THE REQUIREMENT IN

19   THE PATENT CLAIM.

20             IN DECIDING WHETHER ANY DIFFERENCE

21   BETWEEN A CLAIM REQUIREMENT AND THE PRODUCT OR

22   METHOD IS NOT SUBSTANTIAL, YOU MAY CONSIDER

23   WHETHER, AT THE TIME OF THE ALLEGED INFRINGEMENT,

24   PERSONS OF ORDINARY SKILL IN THE FIELD WOULD HAVE

25   KNOWN OF THE INTERCHANGEABILITY OF THE PRODUCT OR

1    SOFTWARE INSTRUCTIONS WITH THE CLAIMED REQUIREMENT.

2              THE KNOWN INTERCHANGEABILITY BETWEEN THE

3    CLAIM REQUIREMENT AND THE PART OR SOFTWARE

4    INSTRUCTIONS OF THE PRODUCT OR METHOD IS NOT

5    NECESSARY TO FIND INFRINGEMENT UNDER THE DOCTRINE

6    OF EQUIVALENTS.

7              HOWEVER, KNOWN INTERCHANGEABILITY MAY

8    SUPPORT A CONCLUSION THAT THE DIFFERENCE BETWEEN

9    THE PART OR SOFTWARE INSTRUCTIONS AND THE CLAIM

10   REQUIREMENT IS NOT SUBSTANTIAL.

11             THE FACT THAT A PART OR SOFTWARE

12   INSTRUCTIONS OF THE PRODUCT OR METHOD PERFORMS THE

13   SAME FUNCTION AS THE CLAIM REQUIREMENT IS NOT, BY

14   ITSELF, SUFFICIENT TO SHOW KNOWN

15   INTERCHANGEABILITY.

16             NOW IS THE TIME FOR A STAND-UP BREAK, SO

17   LET'S ALL STAND UP, PLEASE.

18             (PAUSE IN PROCEEDINGS.)

19             THE COURT:  EVERYONE STILL BREATHING?

20   ALL RIGHT.  LET'S KEEP GOING.

21             NUMBER 28.  IN THIS CASE, SAMSUNG ASSERTS

22   THAT APPLE INFRINGES CLAIM 1 OF THE '460 PATENT,

23   WHICH IS KNOWN AS A METHOD CLAIM.

24             METHOD CLAIMS ARE COMMONLY DRAFTED BY

25   DESCRIBING THE METHOD AS COMPRISING CERTAIN STEPS

1    FOLLOWED BY A LIST OF ACTIONS THAT COMPRISE THE

2    METHOD THAT IS CLAIMED.

3             AS I'VE ALREADY INSTRUCTED YOU, IF THE

4    PATENT CLAIM USES THE TERM "COMPRISING," THAT

5    PATENT CLAIM IS TO BE UNDERSTOOD AS AN OPEN CLAIM.

6             AN OPEN METHOD CLAIM IS INFRINGED AS LONG

7    AS EVERY STEP IN THE CLAIM IS PERFORMED BY THE

8    USER.

9             THE FACT THAT THE USER MAY PERFORM

10   ADDITIONAL STEPS WILL NOT AVOID INFRINGEMENT, AS

11   LONG AS THE USER PERFORMS EVERY STEP SET FORTH IN

12   THE METHOD CLAIM.

13            ABSENT LANGUAGE SPECIFYING A SPECIFIC

14   ORDER IN WHICH THE STEPS ARE TO BE PERFORMED, THE

15   STEPS NEED NOT BE PERFORMED IN SEQUENTIAL ORDER TO

16   FIND INFRINGEMENT.

17            NUMBER 29.  I WILL NOW INSTRUCT YOU ON

18   THE RULES YOU MUST FOLLOW IN DECIDING WHETHER EACH

19   PARTY HAS PROVEN THAT CLAIMS OF THE OTHER SIDE'S

20   UTILITY PATENTS ARE INVALID.  BEFORE DISCUSSING THE

21   SPECIFIC RULES, I WANT TO REMIND YOU ABOUT THE

22   STANDARD OF PROOF THAT APPLIES TO THIS DEFENSE.  TO

23   PROVE INVALIDITY OF ANY PATENT CLAIM, THE ALLEGED

24   INFRINGER MUST PERSUADE YOU BY CLEAR AND CONVINCING

25   EVIDENCE THAT THE CLAIM IS INVALID.

1              NUMBER 30.  A UTILITY PATENT CLAIM IS

2      INVALID IF THE PATENT DOES NOT CONTAIN AN ADEQUATE

3      WRITTEN DESCRIPTION OF THE CLAIMED INVENTION.  THE

4      PURPOSE OF THIS WRITTEN DESCRIPTION REQUIREMENT IS

5      TO DEMONSTRATE THAT THE INVENTOR WAS IN POSSESSION

6      OF THE INVENTION AT THE TIME THE APPLICATION FOR

7      THE PATENT WAS FILED, EVEN THOUGH THE CLAIMS MAY

8      HAVE BEEN CHANGED OR NEW CLAIMS ADDED SINCE THAT

9      TIME.

10             THE WRITTEN DESCRIPTION REQUIREMENT IS

11     SATISFIED IF A PERSON OF ORDINARY SKILL IN THE

12     FIELD, READING THE ORIGINAL PATENT APPLICATION AT

13     THE TIME IT WAS FILED, WOULD HAVE RECOGNIZED THAT

14     THE PATENT APPLICATION DESCRIBED THE INVENTION AS

15     CLAIMED, EVERYONE THOUGH THE DESCRIPTION MAY NOT

16     USE THE EXACT WORDS FOUND IN THE CLAIM.

17             A REQUIREMENT IN A CLAIM NEED NOT BE

18     SPECIFICALLY DISCLOSED IN THE PATENT APPLICATION AS

19     ORIGINALLY FILED IF A PERSON OF ORDINARY SKILL

20     WOULD UNDERSTAND THAT THE MISSING REQUIREMENT IS

21     NECESSARILY IMPLIED IN THE PATENT APPLICATION WAS

22     ORIGINALLY FILED.

23             NUMBER 31.  A UTILITY PATENT CLAIM IS

24     INVALID IF THE CLAIMED INVENTION IS NOT NEW.  FOR

25     THE CLAIM TO BE INVALID BECAUSE IT IS NOT NEW, ALL

1    OF ITS REQUIREMENTS MUST HAVE EXISTED IN A SINGLE

2    DEVICE OR METHOD THAT PRE-DATES THE CLAIMED

3    INVENTION, OR MUST HAVE BEEN DESCRIBED IN A SINGLE

4    PREVIOUS PUBLICATION OR PATENT THAT PRE-DATES THE

5    CLAIMED INVENTION.

6            IN PATENT LAW, THESE PREVIOUS DEVICES,

7    METHOD, PUBLICATIONS OR PATENTS ARE CALLED "PRIOR

8    ART REFERENCES."

9            IF A PATENT CLAIM IS NOT NEW, WE SAY IT

10   IS "ANTICIPATED" BY A PRIOR ART REFERENCE.

11           THE DESCRIPTION OF THE WRITTEN REFERENCE

12   DOES NOT HAVE TO BE IN THE SAME WORD AS THE CLAIM,

13   BUT ALL OF THE REQUIREMENTS OF THE CLAIM MUST BE

14   THERE, EITHER STATED OR NECESSARILY IMPLIED, SO

15   THAT SOMEONE OF ORDINARY SKILL IN THE FIELD,

16   LOOKING AT THAT ONE REFERENCE, WOULD BE ABLE TO

17   MAKE AND USE THE CLAIMED INVENTION.

18           HERE IS A LIST OF THE WAYS THAT EITHER

19   PARTY CAN SHOW THAT A PATENT CLAIM WAS NOT NEW:

20           IF THE CLAIMED INVENTION WAS ALREADY

21   PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS IN THE

22   UNITED STATES BEFORE THE DATE OF CONCEPTION OF THE

23   CLAIMED INVENTION:

24           IF THE CLAIMED INVENTION WAS ALREADY

25   PATENTED OR DESCRIBED IN A PRINTED PUBLICATION

3983

1    ANYWHERE IN THE WORLD BEFORE THE DATE OF CONCEPTION

2    OF THE CLAIMED INVENTION.

3            A REFERENCE IS A "PRINTED PUBLICATION" IF

4    IT IS ACCESSIBLE TO THOSE INTERESTED IN THE FIELD,

5    EVEN IF IT IS DIFFICULT TO FIND;

6            IF THE CLAIMED INVENTION WAS ALREADY MADE

7    BY SOMEONE ELSE IN THE UNITED STATES BEFORE THE

8    DATE OF CONCEPTION OF THE CLAIMED INVENTION, IF

9    THAT OTHER PERSON HAD NOT ABANDONED THE INVENTION

10   OR KEPT IT SECRET;

11           IF THE PATENT HOLDER AND THE ALLEGED

12   INFRINGER DISPUTE WHO IS A FIRST INVENTOR, THE

13   PERSON WHO FIRST CONCEIVED OF THE CLAIMED INVENTION

14   AND FIRST REDUCED IT TO PRACTICE IS THE FIRST

15   INVENTOR.

16           IF ONE PERSON CONCEIVED OF THE CLAIMED

17   INVENTION FIRST, BUT REDUCED TO PRACTICE SECOND,

18   THAT PERSON IS THE FIRST INVENTOR ONLY IF THAT

19   PERSON (A) BEGAN TO REDUCE THE CLAIMED INVENTION TO

20   PRACTICE BEFORE THE OTHER PARTY CONCEIVED OF IT,

21   AND, (B) CONTINUED TO WORK DILIGENTLY TO REDUCE IT

22   TO PRACTICE.

23           A CLAIMED INVENTION IS "REDUCED TO

24   PRACTICE" WHEN IT HAS BEEN TESTED SUFFICIENTLY TO

25   SHOW THAT IT WILL WORK FOR ITS INTENDED PURPOSE OR

1    WHEN IT IS FULLY DESCRIBED IN A PATENT APPLICATION

2    FILED WITH THE PTO.

3            IF THE CLAIMED INVENTION WAS ALREADY

4    DESCRIBED IN ANOTHER ISSUED U.S. PATENT OR

5    PUBLISHED U.S. PATENT APPLICATION THAT WAS BASED ON

6    A PATENT APPLICATION FILED BEFORE THE PATENT

7    HOLDER'S APPLICATION FILING DATE OR THE DATE OF

8    CONCEPTION OF THE CLAIMED INVENTION.

9            SINCE CERTAIN OF THEM ARE IN DISPUTE, YOU

10   MUST DETERMINE DATES OF CONCEPTION FOR THE CLAIMED

11   INVENTIONS AND THE PRIOR INVENTIONS.  CONCEPTION IS

12   THE MENTAL PART OF AN INVENTIVE ACT AND IS PROVEN

13   WHEN THE INVENTION IS SHOWN IN ITS COMPLETE FORM BY

14   DRAWINGS, DISCLOSURE TO ANOTHER, OR OTHER FORMS OF

15   EVIDENCE PRESENTED AT TRIAL.

16           NUMBER 32.  A UTILITY PATENT CLAIM IS

17   INVALID IF THE PATENT APPLICATION WAS NOT FILED

18   WITHIN THE TIME REQUIRED BY LAW.  THIS IS CALLED A

19   "STATUTORY BAR."

20           FOR A PATENT CLAIM TO BE INVALID BY A

21   STATUTORY BAR, ALL OF ITS REQUIREMENTS MUST HAVE

22   BEEN PRESENT IN ONE PRIOR ART PREFERENCE DATED MORE

23   THAN ONE YEAR BEFORE THE PATENT APPLICATION WAS

24   FILED.  HERE IS A LIST OF WAYS EITHER SIDE CAN SHOW

25   THAT THE PATENT APPLICATION WAS NOT TIMELY FILED:

1          IF THE CLAIMED INVENTION WAS ALREADY

2     PATENTED OR DESCRIBED IN A PRINTED PUBLICATION

3     ANYWHERE IN THE WORLD MORE THAN ONE YEAR BEFORE THE

4     EFFECTIVE FILING DATE OF THE PATENT APPLICATION.  A

5     REFERENCE IS A "PRINTED PUBLICATION" IF IT IS

6     ACCESSIBLE TO THOSE INTERESTED IN THE FIELD, EVEN

7     IF IT IS DIFFICULT TO FIND;

8          IF THE CLAIMED INVENTION WAS ALREADY

9     OPENLY USED IN THE UNITED STATES MORE THAN ONE YEAR

10    BEFORE THE EFFECTIVE FILING DATE OF THE PATENT

11    APPLICATION AND THAT USE WAS NOT PRIMARILY AN

12    EXPERIMENTAL USE (A) CONTROLLED BY AN INVENTOR AND

13    (B) TO TEST WHETHER THE INVENTION WORKED FOR ITS

14    INTENDED PURPOSE;

15         IF A DEVICE OR METHOD USING THE CLAIMED

16    INVENTION WAS SOLD OR OFFERED FOR SALE IN THE

17    UNITED STATES, AND THAT CLAIMED INVENTION WAS READY

18    FOR PATENTING, MORE THAN ONE YEAR BEFORE THE

19    EFFECTIVE FILING DATE OF THE PATENT APPLICATION;

20         IF THE PATENT HOLDER HAD ALREADY OBTAINED

21    A PATENT ON THE CLAIMED INVENTION IN A FOREIGN

22    COUNTRY BEFORE THE FILING THE ORIGINAL U.S.

23    APPLICATION AND THE FOREIGN APPLICATION WAS FILED

24    AT LEAST ONE YEAR BEFORE THE U.S. APPLICATION.

25         FOR A CLAIM TO BE INVALID BECAUSE OF A

3986

STATUTORY BAR, ALL OF THE CLAIMED REQUIREMENTS MUST

HAVE BEEN EITHER:

          1.  DISCLOSED IN A SINGLE PRIOR ART

REFERENCE;

          2.  IMPLICITLY DISCLOSED IN A REFERENCE

TO ONE SKILLED IN THE FIELD, OR

          3.  MUST HAVE BEEN PRESENT IN THE

REFERENCE WHETHER OR NOT THAT WAS UNDERSTOOD AT THE

TIME.

          THE DISCLOSURE IN A REFERENCE DOES NOT

HAVE TO BE IN THE SAME WORDS AS THE CLAIM, BUT ALL

OF THE REQUIREMENTS MUST BE THERE, EITHER DESCRIBED

IN ENOUGH DETAIL OR NECESSARILY IMPLIED TO ENABLE

SOMEONE OF ORDINARY SKILL IN THE FIELD LOOKING AT

THE REFERENCE TO MAKE AND USE THE CLAIMED

INVENTION.

          NUMBER 33.  NOT ALL INVENTIONS ARE

PATENTABLE.  A UTILITY PATENT CLAIM IS INVALID IF

THE CLAIMED INVENTION WOULD HAVE BEEN OBVIOUS TO A

PERSON OF ORDINARY SKILL IN THE FIELD AT THE TIME

OF THE INVENTION.

          THIS MEANS THAT EVEN IF ALL OF THE

REQUIREMENTS OF THE CLAIM CANNOT BE FOUND IN A

SINGLE PRIOR ART REFERENCE THAT WOULD ANTICIPATE

THE CLAIM OR CONSTITUTE A STATUTORY BAR TO THAT

1    CLAIM, A PERSON OF ORDINARY SKILL IN THE FIELD WHO

2    KNEW ABOUT ALL THIS PRIOR ART WOULD HAVE COME UP

3    WITH THE CLAIMED INVENTION.

4            THE ULTIMATE CONCLUSION OF WHETHER A

5    CLAIM IS OBVIOUS SHOULD BE BASED UPON YOUR

6    DETERMINATION OF SEVERAL FACTUAL DECISIONS.

7            FIRST, YOU MUST DECIDE THE LEVEL OF

8    ORDINARY SKILL IN THE FIELD THAT SOMEONE WOULD HAVE

9    HAD AT THE TIME THE CLAIMED INVENTION WAS MADE.  IN

10   DECIDING THE LEVEL OF ORDINARY SKILL, YOU SHOULD

11   CONSIDER ALL THE EVIDENCE INTRODUCED AT TRIAL,

12   INCLUDING:

13           THE LEVELS OF EDUCATION AND EXPERIENCE OF

14   PERSONS WORKING IN THE FIELD;

15           THE TYPES OF PROBLEMS ENCOUNTERED IN THE

16   FIELD; AND,

17           THE SOPHISTICATION OF THE TECHNOLOGY.

18           SECOND, YOU MUST DECIDE THE SCOPE AND

19   CONTENT OF THE PRIOR ART.  THE PARTIES DISAGREE AS

20   TO WHETHER CERTAIN PRIOR ART REFERENCES SHOULD BE

21   INCLUDED IN THE PRIOR ART YOU USE TO DECIDE THE

22   VALIDITY OF THE CLAIMS AT ISSUE.

23           IN ORDER TO BE CONSIDERED AS PRIOR ART TO

24   A PARTICULAR PATENT AT ISSUE HERE, THESE REFERENCES

25   MUST BE REASONABLY RELATED TO THE CLAIMED INVENTION

3988

1    OF THAT PATENT.  A REFERENCE IS REASONABLY RELATED

2    IF IT IS IN THE SAME FIELD AS THE CLAIMED INVENTION

3    OR IS FROM ANOTHER FIELD TO WHICH A PERSON OF

4    ORDINARY SKILL IN THE FIELD WOULD LOOK TO SOLVE A

5    KNOWN PROBLEM.

6              THIRD, YOU MUST DECIDE WHAT DIFFERENCES,

7    IF ANY, EXISTED BETWEEN THE CLAIMED INVENTION AND

8    THE PRIOR ART.

9              FINALLY, YOU SHOULD CONSIDER ANY OF THE

10   FOLLOWING FACTORS THAT HAVE BEEN SHOWN BY THE

11   EVIDENCE:

12             COMMERCIAL SUCCESS OF THE PRODUCT DUE TO

13   THE MERITS OF THE CLAIMED INVENTION;

14             A LONG-FELT NEED FOR THE SOLUTION

15   PROVIDED BY THE CLAIMED INVENTION;

16             UNSUCCESSFUL ATTEMPTS BY OTHERS TO FIND

17   THE SOLUTION PROVIDED BY THE CLAIMED INVENTION;

18             COPYING OF THE CLAIMED INVENTION BY

19   OTHERS;

20             UNEXPECTED AND SUPERIOR RESULTS FROM THE

21   CLAIMED INVENTION;

22             ACCEPTANCE BY OTHERS OF THE CLAIMED

23   INVENTION AS SHOWN BY PRAISE FROM OTHERS IN THE

24   FIELD OF FROM THE LICENSING OF THE CLAIMED

25   INVENTION; AND,

1          THE PRESENCE OF ANY FACTORS 1 THROUGH 6

2     MAY BE CONSIDERED BY YOU AS AN INDICATION THAT THE

3     CLAIMED INVENTION WOULD HAVE NOT HAVE BEEN OBVIOUS

4     AT THE TIME THE CLAIMED INVENTION WAS MADE, AND THE

5     PRESENCE OF FACTOR 7 MAY BE CONSIDERED BY YOU AS AN

6     INDICATION THAT THE CLAIMED INVENTION WOULD HAVE

7     BEEN OBVIOUS AT SUCH TIME, ALTHOUGH YOU MAY

8     CONSIDER ANY EVIDENCE OF THESE FACTORS, THE

9     RELEVANCE

10          A PATENT CLAIM COMPOSED OF SEVERAL

11     ELEMENTS IS NOT PROVED OBVIOUS MERELY BY

12     DEMONSTRATING THAT EACH OF ITS ELEMENTS WAS

13     INDEPENDENTLY KNOWN IN THE PRIOR ART.

14          IN EVALUATING WHETHER SUCH A CLAIM WOULD

15     HAVE BEEN OBVIOUS, YOU MAY CONSIDER WHETHER THE

16     ALLEGED INFRINGER HAS IDENTIFIED A REASON THAT

17     WOULD HAVE PROMPTED A PERSON OF ORDINARY SKILL IN

18     THE FIELD TO COMBINE THE ELEMENTS OR CONCEPTS FROM

19     THE PRIOR ART IN THE SAME WAY AS THE CLAIMED

20     INVENTION.

21          THERE IS NO SINGLE WAY TO DEFINE THE LINE

22     BETWEEN TRUE INVENTIVENESS ON THE ONE HAND (WHICH

23     IS PATENTABLE), AND THE APPLICATION OF COMMON SENSE

24     AND ORDINARY SKILL TO SOLVE A PROBLEM ON THE OTHER

25     HAND (WHICH IS NOT PATENTABLE).

3990

```
 1              FOR EXAMPLE, MARKET FORCES OR OTHER

 2    DESIGN INCENTIVES MAY BE WHAT PRODUCED A CHANGE,

 3    RATHER THAN TRUE INVENTIVENESS.

 4              YOU MAY CONSIDER WHETHER THE CHANGE WAS

 5    MERELY THE PREDICTABLE RESULT OF USING PRIOR ART

 6    ELEMENTS ACCORDING TO THEIR KNOWN FUNCTIONS, OR

 7    WHETHER IT WAS THE RESULT OF TRUE INVENTIVENESS.

 8              YOU MAY ALSO CONSIDER WHETHER THERE IS

 9    SOME TEACHING OR SUGGESTION IN THE PRIOR ART TO

10    MAKE THE MODIFICATION OR COMBINATION OF ELEMENTS

11    CLAIMED IN THE PATENT.

12              ALSO, YOU MAY CONSIDER WHETHER THE

13    INNOVATION APPLIES TO A KNOWN TECHNOLOGY THAT HAD

14    BEEN USED TO PROVE A SIMILAR DEVICE OR METHOD IN A

15    SIMILAR WAY.

16              YOU MAY ALSO CONSIDER WHETHER THE CLAIMED

17    INVENTION WOULD HAVE BEEN OBVIOUS TO TRY, MEANING

18    THAT THE CLAIMED INNOVATION WAS ONE OF A RELATIVELY

19    SMALL NUMBER OF POSSIBLE APPROACHES TO THE PROBLEM

20    WITH ONLY EXPECTATION OF SUCCESS BY THOSE SKILLED

21    IN THE ART.

22              YOU SHOULD PUT YOURSELF IN THE POSITION

23    OF A PERSON OF ORDINARY SKILL IN THE FIELD AT THE

24    TIME THE CLAIMED INVENTION WAS MADE AND YOU SHOULD

25    NOT CONSIDER WHAT IS KNOWN TODAY OR WHAT IS LEARNED
```

1    FROM THE TEACHING OF THE PATENT.

2         34.   I WILL NOW INSTRUCT YOU ON HOW TO

3    DECIDE APPLE'S DEFENSE OF PATENT EXHAUSTION.   APPLE

4    CONTENDS THAT SAMSUNG IS BARRED FROM ENFORCING THE

5    '516 AND '941 PATENTS AGAINST APPLE'S ACCUSED

6    IPHONE AND IPAD PRODUCTS BECAUSE THEY INCORPORATE

7    BASEBAND CHIPS THAT INTEL SOLD TO APPLE WITH

8    AUTHORIZATION FROM SAMSUNG.

9         TO PREVAIL ON THE DEFENSE OF PATENT

10   EXHAUSTION, APPLE MUST PROVE THAT THE FOLLOWING IS

11   MORE LIKELY THAN TRUE NOT:

12        FIRST, THAT INTEL WAS AUTHORIZED TO SELL

13   THE BASEBAND CHIPS UNDER THE TERMS OF THE LICENSE

14   AGREEMENT BETWEEN SAMSUNG AND INTEL;

15        SECOND, THAT THE SALES WERE MADE IN THE

16   UNITED STATES.   THE LOCATION OF THE SALE DEPENDS ON

17   MANY FACTORS, AND YOU MAY FIND THAT THE SALE

18   OCCURRED IN SEVERAL PLACES.   A SALE OCCURS WHENEVER

19   THE ESSENTIAL ACTIVITIES OF THE SALE TAKES PLACE.

20   THE ESSENTIAL ACTIVITIES INCLUDE, FOR EXAMPLE,

21   NEGOTIATING THE CONTRACT AND PERFORMING THE

22   OBLIGATIONS UNDER THE CONTRACT.

23        AND, THIRD, THAT IF THE ACCUSED PRODUCTS

24   INFRINGE, IT IS BECAUSE THE BASEBAND CHIPS

25   SUBSTANTIALLY EMBODY THE '516 AND '941 PATENTS.   IF

1    THE BASEBAND CHIPS EMBODY THE RELEVANT PATENT IF

2    THEY INCLUDE ALL OF THE INVENTIVE ASPECTS OF THE

3    PATENTED DEVICE.

4         APPLE MUST PROVE ALL THREE OF THESE

5    ELEMENTS TO PREVAIL ON THE DEFENSE OF PATENT

6    EXHAUSTION.  IF APPLE DOES NOT PROVE ANY ONE OF

7    THESE ELEMENTS, YOU MUST REJECT APPLE'S AFFIRMATIVE

8    DEFENSE AND FIND FOR SAMSUNG ON THIS ISSUE.  IF YOU

9    FIND THAT APPLE HAS PROVEN ALL THREE ELEMENTS, YOU

10   MUST FIND FOR APPLE ON THIS ISSUE.

11        NUMBER 35.  I WILL INSTRUCT YOU ABOUT THE

12   MEASURE OF DAMAGES, FOR CLAIMS OF UTILITY PATENTS

13   INFRINGEMENT.  BY INSTRUCTING YOU ON DAMAGES, I AM

14   NOT SUGGESTING WHICH PARTY SHOULD WIN ON ANY ISSUE.

15   IF YOU FIND THAT EITHER PARTY INFRINGED ANY VALID

16   AND ENFORCEABLE CLAIM OF THE OTHER SIDE'S PATENTS,

17   YOU MUST THEN DETERMINE THE AMOUNT OF MONEY DAMAGES

18   TO BE AWARDED TO THE PATENT HOLDER TO COMPENSATE IT

19   FOR THE INFRINGEMENT.

20        THE AMOUNT OF THOSE DAMAGES MUST BE

21   ADEQUATE TO COMPENSATE THE PATENT HOLDER FOR THE

22   INFRINGEMENT.

23        A DAMAGES AWARD SHOULD PUT THE PATENT

24   HOLDER IN APPROXIMATELY THE FINANCIAL POSITION IT

25   WOULD HAVE BEEN IN HAD THE INFRINGEMENT NOT

1    OCCURRED, BUT IN NO EVENT MAY THE DAMAGES AWARD BE

2    LESS THAN A REASONABLE ROYALTY.  YOU SHOULD KEEP IN

3    MIND THAT THE DAMAGES YOU AWARD ARE MEANT TO

4    COMPENSATE THE PATENT HOLDER AND NOT TO PUNISH AN

5    INFRINGER.

6         EACH PATENT HOLDER HAS THE BURDEN TO

7    PERSUADE YOU OF THE AMOUNT OF ITS DAMAGES.  YOU

8    SHOULD AWARD ONLY THOSE DAMAGES THAT THE PATENT

9    HOLDER PROVES IT SUFFERED BY A PREPONDERANCE OF THE

10   EVIDENCE.  WHILE THE PATENT HOLDER IS NOT REQUIRED

11   TO PROVE ITS DAMAGES WITH MATHEMATICAL PRECISION,

12   IT MUST PROVE THEM WITH REASONABLE CERTAINTY.

13   NEITHER PATENT HOLDER IS ENTITLED TO DAMAGES THAT

14   ARE REMOTE OR SPECULATIVE.

15        NUMBER 36.  IN THIS CASE, APPLE SEEKS TO

16   RECOVER LOST PROFITS FOR SOME OF SAMSUNG'S SALES OF

17   ALLEGEDLY INFRINGING PRODUCTS, AND A REASONABLE

18   ROYALTY ON THE REST OF SAMSUNG'S ALLEGEDLY

19   INFRINGING SALES.

20        SAMSUNG DOES NOT SEEK LOST PROFITS FOR

21   INFRINGEMENT OF ITS UTILITY PATENTS.

22        TO RECOVER LOST PROFITS FOR INFRINGING

23   SALES, APPLE MUST SHOW THAT BUT FOR THE

24   INFRINGEMENT, THERE IS A REASONABLE PROBABILITY

25   THAT IT WOULD HAVE MADE SALES THAT SAMSUNG

1    ELECTRONICS COMPANY, SAMSUNG ELECTRONICS AMERICA,

2    AND SAMSUNG TELECOMMUNICATIONS AMERICA MADE OF THE

3    INFRINGING PRODUCTS.

4           APPLE MUST SHOW THE SHARE OF SAMSUNG'S

5    SALES THAT IT WOULD HAVE MADE IF THE INFRINGING

6    PRODUCTS HAD NOT BEEN ON THE MARKET.

7           YOU MUST ALLOCATE THE LOST PROFITS BASED

8    UPON THE CUSTOMER DEMAND FOR THE PATENTED FEATURES

9    OF THE INFRINGING PRODUCTS.  THAT IS, YOU MUST

10   DETERMINE WHICH PROFITS DERIVE FROM THE PATENTED

11   INVENTION THAT SAMSUNG SELLS AND NOT FROM OTHER

12   FEATURES OF THE INFRINGING PRODUCTS.

13          NUMBER 37.  APPLE IS ENTITLED TO LOST

14   PROFITS IF IT PROVES ALL OF THE FOLLOWING:

15          NUMBER 1.  THAT THERE WAS DEMAND FOR THE

16   PATENTED PRODUCTS;

17          NUMBER 2.  THAT THERE WERE NO

18   NON-INFRINGING SUBSTITUTES FOR EACH OF THE

19   INFRINGING PRODUCTS, OR, IF THERE WERE, THE NUMBER

20   OF THE SALES OF EACH PRODUCT MADE BY SAMSUNG

21   ELECTRONICS COMPANY, SAMSUNG ELECTRONICS AMERICA,

22   AND SAMSUNG TELECOMMUNICATIONS AMERICA, THAT APPLE

23   WOULD HAVE MADE DESPITE THE AVAILABILITY OF OTHER

24   NON-INFRINGING SUBSTITUTES .

25          AN ALTERNATIVE MAY BE CONSIDERED

```
 1    AVAILABLE AS A POTENTIAL SUBSTITUTE EVEN IF IT WAS

 2    NOT ACTUALLY ON SALE DURING THE INFRINGEMENT

 3    PERIOD.  FACTORS SUGGESTING THAT THE ALTERNATIVE

 4    WAS AVAILABLE INCLUDE WHETHER THE MATERIAL,

 5    EXPERIENCE, AND KNOW-HOW FOR THE ALLEGED SUBSTITUTE

 6    WERE READILY AVAILABLE.  FACTORS SUGGESTING THAT

 7    THE ALTERNATIVE WAS NOT AVAILABLE INCLUDE WHETHER

 8    THE MATERIAL WAS OF SUCH HIGH COST AS TO RENDER THE

 9    ALTERNATIVE UNAVAILABLE, AND WHETHER SAMSUNG HAD TO

10    DESIGN OR INVENT AROUND THE PATENTED TECHNOLOGY TO

11    DEVELOP AN ALLEGED SUBSTITUTE;

12              NUMBER 3.  THAT APPLE HAD THE

13    MANUFACTURING AND MARKETING CAPACITY TO MAKE ANY

14    INFRINGING SALES ACTUALLY MADE BY SAMSUNG

15    ELECTRONICS COMPANY, SAMSUNG ELECTRONICS AMERICA,

16    AND SAMSUNG TELECOMMUNICATIONS AMERICA AND FOR

17    WHICH APPLE SEEKS AN AWARD OF LOST PROFITS; AND,

18              NUMBER 4.  THE AMOUNT OF PROFIT THAT

19    APPLE WOULD HAVE MADE IF SAMSUNG ELECTRONICS

20    COMPANY, SAMSUNG ELECTRONICS AMERICA, AND SAMSUNG

21    TELECOMMUNICATIONS AMERICA HAD NOT INFRINGED.

22              NUMBER 38.  APPLE MAY CALCULATE ITS LOST

23    PROFITS ON ANY LOST SALES BY COMPUTING THE LOST

24    REVENUE FOR SALES IT CLAIMS IT WOULD HAVE MADE, BUT

25    FOR THE INFRINGEMENT, AND SUBTRACTING FROM THAT
```

1    FIGURE THE AMOUNT OF ADDITIONAL COSTS OR EXPENSES

2    IT WOULD HAVE INCURRED IN MAKING THOSE LOST SALES,

3    SUCH AS COST OF GOODS, SALES COSTS, PACKAGING

4    COSTS, AND SHIPPING COSTS.

5            NUMBER 39.  ONE WAY APPLE MAY PROVE THE

6    NUMBER OF SALES IT WOULD HAVE MADE IF THE

7    INFRINGEMENT HAD NOT HAPPENED IS TO PROVE ITS SHARE

8    OF THE RELEVANT MARKET EXCLUDING INFRINGING

9    PRODUCTS.  YOU MAY AWARD APPLE A SHARE OF PROFITS

10   EQUAL TO THAT MARKET SHARE.

11           IN DECIDING APPLE'S MARKET SHARE, YOU

12   MUST DECIDE PRODUCTS ARE IN APPLE'S MARKET.

13   PRODUCTS ARE IN THE SAME MARKET IF THEY ARE

14   SUFFICIENTLY SIMILAR TO COMPETE AGAINST EACH OTHER.

15   TWO PRODUCTS ARE SUFFICIENTLY SIMILAR IF ONE DOES

16   NOT HAVE A SIGNIFICANTLY HIGHER PRICE THAN OR

17   POSSESS CHARACTERISTICS SIGNIFICANTLY DIFFERENT

18   THAN THE OTHER.

19           NUMBER 40.  BOTH APPLE AND SAMSUNG SEEK A

20   REASONABLE ROYALTY FOR THE INFRINGEMENT OF THEIR

21   RESPECTIVE UTILITY PATENTS.

22           IF APPLE HAS NOT PROVED ITS CLAIM FOR

23   LOST PROFITS, OR HAS PROVED ITS CLAIM FOR LOST

24   PROFITS FOR ONLY A PORTION OF THE INFRINGING SALES,

25   THEN APPLE SHOULD BE AWARDED A REASONABLE ROYALTY

1   FOR ALL INFRINGING SAMSUNG SALES FOR WHICH APPLE

2   HAS NOT BEEN AWARDED LOST PROFITS DAMAGES.

3           SAMSUNG DOES NOT MAKE A CLAIM FOR LOST

4   PROFITS.  SAMSUNG SHOULD BE AWARDED A REASONABLE

5   ROYALTY FOR ALL INFRINGING APPLE SALES.

6           41.  A ROYALTY IS A PAYMENT MADE TO A

7   PATENT HOLDER IN EXCHANGE FOR THE RIGHT TO MAKE,

8   USE OR SELL THE CLAIMED INVENTION.  THIS RIGHT IS

9   CALLED A "LICENSE."  A REASONABLE ROYALTY IS THE

10  PAYMENT FOR THE LICENSE THAT WOULD HAVE RESULTED

11  FROM A HYPOTHETICAL NEGOTIATION BETWEEN THE PATENT

12  HOLDER AND THE INFRINGER TAKING PLACE AT THE TIME

13  WHEN THE INFRINGING ACTIVITY FIRST BEGAN.

14          IN CONSIDERING THE NATURE OF THIS

15  NEGOTIATION, YOU MUST ASSUME THAT THE PATENT HOLDER

16  AND THE INFRINGER WOULD HAVE ACTED REASONABLY AND

17  WOULD HAVE ENTERED INTO A LICENSE AGREEMENT.

18          YOU MUST ALSO ASSUME THAT BOTH PARTIES

19  BELIEVE THE PATENT WAS VALID AND INFRINGED.

20          YOUR ROLE IS TO DETERMINE WHAT THE RESULT

21  OF THAT NEGOTIATION WOULD HAVE BEEN.  THE TEST FOR

22  DAMAGES IS WHAT ROYALTY WOULD HAVE RESULTED FROM

23  THE HYPOTHETICAL NEGOTIATION AND NOT SIMPLY WHAT

24  EITHER PARTY WOULD HAVE PREFERRED.

25          A ROYALTY CAN BE CALCULATED IN SEVERAL

3998

1    DIFFERENT WAYS AND IT IS FOR YOU TO DETERMINE WHICH

2    WAY IS THE MOST APPROPRIATE BASED ON THE EVIDENCE

3    YOU HAVE HEARD.  ONE WAY TO CALCULATE A ROYALTY IS

4    TO DETERMINE WHAT IS CALLED AN "ONGOING ROYALTY."

5            TO CALCULATE AN ONGOING ROYALTY, YOU MUST

6    FIRST DETERMINE THE "BASE," THAT IS, THE PRODUCT ON

7    WHICH THE INFRINGER IS TO PAY.  YOU THEN NEED TO

8    MULTIPLY THE REVENUE THE DEFENDANT OBTAINED FROM

9    THAT BASE BY THE RATE OR PERCENTAGE THAT YOU FIND

10   WOULD HAVE RESULTED FROM THE HYPOTHETICAL

11   NEGOTIATION.

12           FOR EXAMPLE, IF THE PATENT COVERS A NAIL,

13   AND THE NAIL SELLS FOR $1, AND THE LICENSEE SOLD

14   200 NAILS, THE BASE REVENUE WOULD BE $200.  IF THE

15   RATE YOU FIND WOULD HAVE RESULTED FROM THE

16   HYPOTHETICAL NEGOTIATION IS 1 PERCENT, THEN THE

17   ROYALTY WOULD BE $2, OR THE RATE OF .01 TIMES THE

18   BASE REVENUE OF $200.

19           IF THE PATENT COVERS ONLY PART OF THE

20   PRODUCT THAT THE INFRINGER SELLS, THEN THE BASE

21   WOULD NORMALLY BE ONLY THAT FEATURE OR COMPONENT.

22   FOR EXAMPLE, IF YOU FIND THAT FOR A $100 CAR, THE

23   PATENTED FEATURE IS THE TIRES WHICH SELL FOR $5,

24   THE BASE REVENUE WOULD BE $5 .

25           HOWEVER, IN A CIRCUMSTANCE IN WHICH THE

1      PATENTED FEATURE IS THE REASON THE CUSTOMERS BUY

2      THE WHOLE PRODUCT, THE BASE REVENUE COULD BE THE

3      VALUE OF THE WHOLE PRODUCT.

4              A SECOND WAY TO CALCULATE A ROYALTY IS TO

5      DETERMINE A ONE-TIME LUMP SUM PAYMENT THAT THE

6      INFRINGER WOULD HAVE PAID AT THE TIME OF THE

7      HYPOTHETICAL NEGOTIATION FOR A LICENSE COVERING ALL

8      SALES OF THE LICENSED PRODUCT, BOTH PAST AND

9      FUTURE.  THIS DIFFERS FROM PAYMENT OF AN ONGOING

10     ROYALTY BECAUSE, WITH AN ONGOING ROYALTY, THE

11     LICENSEE BASED ON THE REVENUE OF ACTUAL LICENSED

12     PRODUCTS IT SELLS.

13             WHEN A ONE-TIME LUMP SUM IS PAID, THE

14     INFRINGER PAYS A SINGLE PRICE FOR THE LICENSE

15     COVERED BOTH PAST AND FUTURE INFRINGING SALES.

16             NUMBER 1.  THE ROYALTIES RECEIVED BY THE

17     PATENTEE FOR THE LICENSING OF THE PATENT IN SUIT,

18     PROVING OR TENDING TO PROVE AN ESTABLISHED ROYALTY;

19             NUMBER 2.  THE RATES PAID BY THE LICENSEE

20     FOR THE USE OF THE OTHER PATENTS COMPARABLE TO THE

21     PATENT IN SUIT;

22             NUMBER 3.  THE NATURE AND SCOPE OF THE

23     LICENSE, AS EXCLUSIVE OR NONEXCLUSIVE, OR AS

24     RESTRICTED OR NON-RESTRICTED IN TERMS OF TERRITORY

25     OR WITH RESPECT TO WHOM THE MANUFACTURED PRODUCT

1    MAY BE OLD.

2              THE LICENSOR'S ESTABLISHED POLICY AND

3    MARKETING PROGRAM TO MAINTAIN HIS OR HER PATENT

4    MONOPOLY BY NOT LICENSING OTHERS TO USE THE

5    INVENTION OR BY GRANTING LICENSES UNDER THE SPECIAL

6    CONDITIONS DESIGNED TO PRESERVE THAT MONOPOLY.

7              NUMBER 5.  THE COMMERCIAL RELATIONSHIP

8    BETWEEN THE LICENSE AND LICENSEE, SUCH AS WHETHER

9    THEY ARE COMPETITORS IN THE SAME TERRITORY IN THE

10   SAME LINE OF BUSINESS OR WHETHER THEY ARE THE

11   INVENTOR AND PROMOTER.

12             NUMBER 6.  THE EFFECT OF SELLING THE

13   PATENTED SPECIALTY IN PROMOTING SALES OF OTHER

14   PRODUCTS OF THE LICENSEE, THE EXISTING VALUE OF THE

15   INVENTION TO THE LICENSOR AS A GENERATOR OF SALES

16   OF HIS NONPATENTED ITEMS, AND THE EXTENT OF SUCH

17   DERIVATIVE OR CONVOYED SALES;

18             NUMBER 7.  THE DURATION OF THE PATENT AND

19   THE TERMS OF THE LICENSE;

20             8.  THE ESTABLISHED PROFITABILITY OF THE

21   PRODUCT MADE UNDER THE PATENTS, ITS COMMERCIAL

22   SUCCESS AND ITS CURRENT POPULARITY;

23             9.  THE UTILITY AND ADVANTAGES OF THE

24   PATENTED PROPERTY OVER THE OLD MODES OR DEVICES, IF

25   ANY, THAT HAVE BEEN USED FOR WORKING OUT SIMILAR

1    RESULTS;

2              10.   THE NATURE OF THE PATENTED

3    INVENTION, THE CHARACTER OF THE COMMERCIAL

4    EMBODIMENT OF IT AS OWNED AND PRODUCED BY THE

5    LICENSOR, AND THE BENEFITS TO THOSE WHO HAVE USED

6    THE INVENTION;

7              11.   THE EXTENT TO WHICH THE INFRINGER

8    HAS MADE USE OF THE INVENTION AND ANY EVIDENCE

9    PROBATIVE OF THE VALUE OF THAT USE.

10             12.   THE PORTION OF THE PROFIT OR OF THE

11   SELLING PRICE THAT MAY BE CUSTOMARY IN THE

12   PARTICULAR BUSINESS OR IN COMPARABLE BUSINESS TO

13   ALLOW FOR THE USE OF THE INVENTION OR ANALOGOUS

14   INVENTIONS;

15             13.   THE PORTION OF THE REALIZABLE PROFIT

16   THAT IS SHOULD BE CREDITED TO THE INVENTION AS

17   DISTINGUISHED FROM NONPATENTED ELEMENTS, THE

18   MANUFACTURING PROCESS, BUSINESS RISKS, OR

19   SIGNIFICANT FEATURES OR IMPROVEMENTS ADD BY THE

20   INFRINGER;

21             14.   THE OPINION AND TESTIMONY OF

22   QUALIFIED EXPERTS;

23             15.   THE AMOUNT THAT A LICENSOR, SUCH AS

24   A PATENTEE, AND A LICENSEE, SUCH AS THE INFRINGER,

25   WOULD HAVE AGREED UPON AT THE TIME THE INFRINGEMENT

1    BEGAN IF BOTH HAD BEEN REASONABLY AND VOLUNTARILY

2    TRYING TO REACH AN AGREEMENT; THAT IS, THE AMOUNT

3    WHICH A PRUDENT LICENSEE, WHO DESIRED AS A BUSINESS

4    PROPOSITION, TO OBTAIN AND TO MANUFACTURE AND SELL

5    A PARTICULAR ARTICLE EMBODYING THE PATENTED

6    INVENTION WOULD HAVE BEEN WILLING TO PAY AS A

7    ROYALTY AND YET BE ABLE TO MAKE A REASONABLE PROFIT

8    AND WHICH AMOUNT WOULD HAVE BEEN ACCEPTABLE BY A

9    PRUDENT PATENTEE WHO IS WILLING TO GRANT A LICENSE.

10           IT IS UP TO YOU, BASED ON THE EVIDENCE,

11   TO DECIDE WHAT TYPE OF ROYALTY IS APPROPRIATE IN

12   THIS CASE.

13           42.  DAMAGES THAT APPLE MAY BE AWARDED BY

14   YOU COMMENCE ON THE DATE THAT SAMSUNG ELECTRONICS

15   COMPANY, SAMSUNG ELECTRONICS AMERICA, AND/OR

16   SAMSUNG TELECOMMUNICATIONS AMERICA HAS BOTH

17   INFRINGED AND BEEN NOTIFIED OF THE PATENT OR

18   PATENTS IT INFRINGED.

19           IF YOU FIND THAT APPLE SELLS PRODUCTS

20   THAT INCLUDE THE CLAIMED INVENTIONS, BUT HAS NOT

21   MARKETED THOSE PRODUCTS WITH PATENT NUMBERS, YOU

22   MUST DETERMINE THE DATE THAT EACH SAMSUNG ENTITY

23   RECEIVED ACTUAL WRITTEN NOTICE OF THE PATENTS

24   AND THE SPECIFIC PRODUCTS ALLEGED TO INFRINGE.

25           WHILE YOU MAY IDENTIFY AN EARLIER DATE BY

4003

```
 1    WHICH EACH SAMSUNG ENTITY HAD NOTICE OF APPLE'S

 2    CLAIMS OF INFRINGEMENT BASED ON YOUR EVALUATION OF

 3    THE APPLE, APPLE'S LAWSUIT PROVIDED SAMSUNG SUCH

 4    NOTICE FOR THE '381 AND '915 PATENTS NO LATER THAN

 5    APRIL 15TH, 2011, AND FOR THE 16 PATENTS NO LATER

 6    THAN JUNE 16TH, 2011.

 7              ON THE OTHER HAND, IF YOU FIND THAT APPLE

 8    DOES NOT SELL PRODUCTS COVERED BY A PATENT, THEN

 9    DAMAGES BEGIN WITHOUT THE REQUIREMENT FOR ACTUAL

10    NOTICING UNDER THE FOLLOWING CIRCUMSTANCES IS.

11              IF THE PATENT WAS GRANTED BEFORE THE

12    INFRINGING ACTIVITY BEGAN, DAMAGES SHOULD BE

13    CALCULATED AS OF THE DATE YOU DETERMINE THAT THE

14    INFRINGEMENT BEGAN, OR

15              IF THE PATENT WAS GRANTED AFTER THE

16    INFRINGING ACTIVITIES BEGAN AS DETERMINED BY YOU,

17    DAMAGES SHOULD BE CALCULATED AS OF THE DATE THE

18    PATENT ISSUED.

19              WITH RESPECT TO SAMSUNG '460 PATENT, THE

20    DAMAGES YOU MAY AWARD SAMSUNG FOR ANY INFRINGEMENT

21    SHOULD BE CALCULATED AS OF AUGUST 18TH, 2009,

22    BECAUSE SAMSUNG ASSERTING ONLY METHOD CLAIMS FROM

23    THAT PATENT.

24              WITH RESPECT TO SAMSUNG'S '516, '711,

25    '893, AND '941 PATENTS, DAMAGES THAT SAMSUNG MAY BE
```

4004

1    AWARDED COMMENCE ON THE DATE THAT APPLE HAS BOTH

2    INFRINGED AND BEEN NOTIFIED OF THE PATENT OR

3    PATENTS IT INFRINGED.

4           IF YOU FIND THAT SAMSUNG SELLS PRODUCTS

5    THAT INCLUDE ITS CLAIMED INVENTIONS FROM THESE

6    PATENTS, BUT HAS NOT MARKED THOSE PRODUCT WITH THE

7    PATENT NUMBERS, YOU MUST DETERMINE THE DATE THAT

8    APPLE RECEIVED ACTUAL WRITTEN NOTICE OF THE PATENTS

9    AND THE SPECIFIC PRODUCTS ALLEGED TO INFRINGE.

10          WHILE YOU MAY IDENTIFY AN EARLIER DATE BY

11   WHICH APPLE HAD NOTICE OF SAMSUNG'S CLAIMS OF

12   INFRINGEMENT BASED ON YOUR EVALUATION OF THE

13   EVIDENCE, SAMSUNG'S CLAIMS PROVIDED APPLE SUCH

14   NOTICE BY NO LATER THAN JUNE 16TH, 2011.

15          ON THE OTHER HAND, IF YOU FIND THAT

16   SAMSUNG DOES NOT SELL PRODUCTS COVERED BY THE

17   PATENT, THEN DAMAGES BEGIN WITHOUT THE REQUIREMENT

18   OF ACTUAL NOTICE UNDER THE FOLLOWING CIRCUMSTANCES:

19          IF THE PATENT WAS GRANTED BEFORE THE

20   INFRINGING ACTIVITY BEGAN, DAMAGES SHOULD BE

21   CALCULATED AS OF THE DATE YOU DETERMINE THAT THE

22   INFRINGEMENT BEGAN; OR,

23          IF THE PATENT WAS GRANTED AFTER THE

24   INFRINGING ACTIVITIES BEGAN AS DETERMINED BY YOU,

25   DAMAGES SHOULD BE CALCULATED AS OF THE DATE THE

4005

```
1    PATENT ISSUED.

2              LET'S TAKE ANOTHER STAND UP BREAK.

3              (PAUSE IN PROCEEDINGS.)

4              THE COURT:  ALL RIGHT.  LET'S TAKE A

5    SEAT.

6              NUMBER 43.  BEFORE YOU DECIDE WHETHER

7    SAMSUNG ELECTRONICS COMPANY, SAMSUNG ELECTRONICS

8    AMERICA, AND/OR SAMSUNG TELECOMMUNICATIONS AMERICA

9    HAVE INFRINGED ONE OR MORE OF APPLE'S ASSERTED

10   DESIGN PATENTS, OR WHETHER THE DESIGN PATENTS ARE

11   INVALID, YOU WILL HAVE TO UNDERSTAND THE DESIGN

12   PATENT CLAIMS.

13             UNLIKE UTILITY PATENTS, A DESIGN PATENT

14   CAN ONLY HAVE ONE CLAIM.  THAT CLAIM COVERS ALL OF

15   THE FIGURES IN THE PATENT.  IT IS PERMISSIBLE TO

16   ILLUSTRATE MORE THAN ONE EMBODIMENT OF A DESIGN IN

17   A SINGLE DESIGN PATENT APPLICATION.

18             EACH DESIGN PATENT CONTAINS MULTIPLE

19   DRAWINGS TO ILLUSTRATE THE CLAIMED DESIGN.  THE

20   SCOPE OF THE CLAIM ENCOMPASSES THE DESIGN'S VISUAL

21   APPEARANCE AS A WHOLE.  IT DOES NOT COVER A GENERAL

22   DESIGN CONCEPT, AND IT IS NOT LIMITED TO ISOLATED

23   FEATURES OF THE DRAWINGS.

24             ALL MATTERS DEPICTED IN SOLID LINES

25   CONTRIBUTES TO THE OVERALL APPEARANCE OF THE
```

1    DESIGN.

2            IT IS MY JOB AS A JUDGE TO INTERPRET FOR

3    YOU WHAT IS CLAIMED BY THE PATENTS.  YOU MUST

4    ACCEPT MY INTERPRETATIONS AS CORRECT.  MY

5    INTERPRETATIONS SHOULD NOT BE TAKEN AS AN

6    INDICATION THAT I HAVE AN OPINION ONE WAY OR

7    ANOTHER REGARDING THE ISSUES OF INFRINGEMENT AND

8    INVALIDITY.  THE DECISIONS REGARDING INFRINGEMENT

9    AND INVALIDITY ARE YOURS TO MAKE.

10           WHEN CONSIDERING THE DESIGN PATENTS, YOU

11   SHOULD VIEW CERTAIN FEATURES IN THE DRAWINGS IN

12   THIS WAY:

13           THE D'677 PATENT CLAIMS THE ORNAMENTAL

14   DESIGN OF AN ELECTRONIC DEVICE AS SHOWN IN FIGURES

15   1 THROUGH 8.  THE BROKEN LINES IN THE D'677 PATENT

16   CONSTITUTE UNCLAIMED SUBJECT MATTER.

17           THE USE OF SOLID BLOCK SURFACE SHADING IN

18   THE D'677 PATENT REPRESENTS THE COLOR BLACK.  THE

19   USE OF OBLIQUE LINE SHADING ON THE D'677 PATENT IS

20   USED TO SHOW A TRANSPARENT, TRANSLUCENT OR HIGHLY

21   POLISHED OR REFLECTIVE SURFACE.

22           THE D'087 PATENT COVERS -- I'M SORRY --

23   CLAIMS, EXCUSE ME, THE ORNAMENTAL DESIGN OF AN

24   ELECTRONIC DEVICE AS SHOWN IN FIGURES 1 THROUGH 14.

25   THE BROKEN LINES IN THE D'087 PATENT CONSTITUTE

1    UNCLAIMED SUBJECT MATTER.

2              THUS, THE D'087 PATENT CLAIMS THE FRONT

3    FACE, A BEZEL ENCIRCLING THE FRONT FACE OF THE

4    PATENTED DESIGN THAT EXTENDED FROM THE FRONT OF THE

5    PHONE TO ITS SIDES, AND A FLAT CONTOUR OF THE FRONT

6    FACE, BUT DOES NOT CLAIM THE REST OF THE ARTICLE OF

7    MANUFACTURE.

8              THE D'889 PATENT CLAIMS THE ORNAMENTAL

9    DESIGN OF AN ELECTRONIC DEVICE AS SHOWN IN FIGURES

10   1 THROUGH 9.

11             (PAUSE IN PROCEEDINGS.)

12             THE COURT:  THE BROKEN LINES DEPICTING

13   THE HUMAN FIGURE IN FIGURE 9 DO NOT FORM A PART OF

14   THE CLAIMED DESIGN.

15             THE OTHER BROKEN LINE ON THE OTHER

16   FIGURES ARE PART OF THE CLAIMED DESIGN.

17             THE D'889 ALSO INCLUDES OBLIQUE LINE

18   SHADING ON SEVERAL OF THE FIGURES.  THE OBLIQUE

19   LINE SHADING IN FIGURES 1 THROUGH 3 AND FIGURE 9

20   DEPICTS A TRANSPARENT, TRANSLUCENT OR HIGHLY

21   POLISHED OR REFLECTIVE SURFACE FROM THE TOP

22   PERSPECTIVE OF THE CLAIMED DESIGN, THE TOP VIEW OF

23   THE CLAIMED DESIGN, AND THE BOTTOM PERSPECTIVE VIEW

24   OF THE CLAIMED DESIGN.

25             THE D'305 PATENT CLAIMS THE ORNAMENTAL

```
 1    DESIGN FOR A GRAPHICAL USER INTERFACE FOR A DISPLAY

 2    SCREEN OR PORTION THEREOF AS SHOWN IN FIGURES 1

 3    THROUGH 2.  THE BROKEN LINE SHOWING OF A DISPLAY

 4    SCREEN IN BOTH VIEWS FORMS NO PART OF THE CLAIMED

 5    DESIGN.

 6              NUMBER 44.  TO PROVE THAT ANY SAMSUNG

 7    ENTITY INFRINGED ANY OF APPLE'S DESIGN PATENTS,

 8    APPLE MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE

 9    THAT THE SAMSUNG ENTITY HAS INFRINGED THE PATENT.

10              NUMBER 45.  I WILL NOW INSTRUCT YOU AS TO

11    THE RULES YOU MUST FOLLOW WHEN DECIDING WHETHER

12    APPLE HAS PROVEN THAT ONE OR MORE OF THE SAMSUNG

13    ENTITIES (SAMSUNG ELECTRONICS AMERICA, SAMSUNG

14    TELECOMMUNICATIONS AMERICA, AND SAMSUNG ELECTRONICS

15    COMPANY) HAS DIRECTLY INFRINGE THE D'677, D'087,

16    D'305 AND/OR D'889 DESIGN PATENTS.

17              AS WITH UTILITY PATENTS, PATENT LAW GIVES

18    THE OWNER OF A VALID DESIGN PATENT THE RIGHT TO

19    EXCLUDE OTHERS FROM IMPORTING, MAKING, USING,

20    OFFERING TO SELL OR SELLING THE PATENTED DESIGNS

21    WITHIN THE UNITED STATES DURING THE TERM OF THE

22    PATENT.

23              ANY PERSON OR COMPANY THAT HAS ENGAGED IN

24    ANY OF THOSE ACTS WITHOUT THE DESIGN PATENT OWNER'S

25    PERMISSION INFRINGES THE PATENT.
```

4009

```
 1              IN DECIDING WHETHER A SALE HAS TAKEN

 2    PLACE WITHIN THE UNITED STATES, YOU MAY FIND THE

 3    FOLLOWING GUIDELINES HELPFUL TO YOUR ANALYSIS.  THE

 4    LOCATION OF THE SALE DEPENDS ON MANY FACTORS, AND

 5    YOU MAY FIND THAT THE SALE OCCURRED IN SEVERAL

 6    PLACES.

 7              A SALE OCCURS WHERE THE ESSENTIAL

 8    ACTIVITIES OF THE SALE TAKE PLACE.  THE ESSENTIAL

 9    ACTIVITIES INCLUDE, FOR EXAMPLE, NEGOTIATING THE

10    CONTRACT AND PERFORMING THE OBLIGATIONS UNDER THE

11    CONTRACT.

12              APPLE BEARS THE BURDEN OF PROVING BY A

13    PREPONDERANCE OF THE EVIDENCE THAT EACH DEVICE

14    INFRINGES EACH SEPARATE PATENT.  THEREFORE, YOU,

15    THE JURY, MUST DETERMINE THE INFRINGEMENT FOR EACH

16    PATENT SEPARATELY, CONSIDERING EACH INDIVIDUAL

17    DEVICE SEPARATELY.

18              NUMBER 46.  TO DETERMINE DIRECT

19    INFRINGEMENT OF A DESIGN PATENT, YOU MUST COMPARE

20    THE OVERALL APPEARANCES OF THE ACCUSED DESIGN AND

21    THE CLAIMED DESIGN.

22              IF YOU FIND BY A PREPONDERANCE OF THE

23    EVIDENCE THAT THE OVERALL APPEARANCE OF AN ACCUSED

24    SAMSUNG DESIGN IS SUBSTANTIALLY THE SAME AS THE

25    OVERALL APPEARANCE OF THE CLAIMED APPLE DESIGN
```

1    PATENT AND THAT THE ACCUSED DESIGN WAS MADE, USED,

2    SOLD, OFFERED FOR SALE OR IMPORTED WITHIN THE

3    UNITED STATES, YOU MUST FIND THAT THE ACCUSED

4    DESIGN INFRINGED THE CLAIMED DESIGN.

5           TWO DESIGNS ARE SUBSTANTIALLY THE SAME

6    IF, IN THE EYE OF AN ORDINARY OBSERVER, GIVING SUCH

7    ATTENTION AS A PURCHASER USUALLY GIVES, THE

8    RESEMBLANCE BETWEEN THE TWO DESIGNS IS SUCH AS TO

9    DECEIVE SUCH AN OBSERVER, INDUCING HIM TO PURCHASE

10   ONE SUPPOSING IT TO BE THE OTHER.

11          YOU DO NOT NEED, HOWEVER, TO FIND THAT

12   ANY PURCHASERS ACTUALLY WERE DECEIVED OR CONFUSED

13   BY THE APPEARANCE OF THE ACCUSED SAMSUNG PRODUCTS.

14          YOU SHOULD CONSIDER ANY PERCEIVED

15   SIMILARITIES OR DIFFERENCES BETWEEN THE PATENTED

16   AND ACCUSED DESIGNS.  MINOR DIFFERENCES SHOULD NOT

17   PREVENT A FINDING OF INFRINGEMENT.

18          THIS DETERMINATION OF WHETHER TWO DESIGNS

19   ARE SUBSTANTIALLY THE SAME WILL BENEFIT FROM

20   COMPARING THE TWO DESIGNS WITH PRIOR ART.  YOU MUST

21   FAMILIARIZE YOURSELF WITH THE PRIOR ART ADMITTED AT

22   TRIAL IN MAKING YOUR DETERMINATION OF WHETHER THERE

23   HAS BEEN DIRECT INFRINGEMENT.

24          YOU MAY FIND THE FOLLOWING GUIDELINES

25   HELPFUL TO YOUR ANALYSIS:

1              THE PLACEMENT AND ORNAMENTATION OF A LOGO

2    MAY ALTER THE OVERALL DESIGN.  HOWEVER, THE USE OF

3    A MARK OR LOGO TO IDENTIFY THE SOURCE OF AN

4    OTHERWISE INFRINGING DESIGN WILL NOT AVOID

5    INFRINGEMENT.

6              WHEN THE CLAIMED DESIGN IS VISUALLY CLOSE

7    TO PRIOR ART DESIGN, SMALL DIFFERENCES BETWEEN THE

8    ACCUSED DESIGN AND THE CLAIMED DESIGN MAY BY

9    IMPORTANT IN ANALYZING WHETHER THE OVERALL

10   APPEARANCES OF THE ACCUSED AND CLAIMED DESIGNS ARE

11   SUBSTANTIALLY THE SAME.

12             IF THE ACCUSED DESIGN INCLUDES A FEATURE

13   OF THE CLAIMED DESIGN THAT DEPARTS CONSPICUOUSLY

14   FROM THE PRIOR ART, YOU MAY FIND THAT FEATURE

15   IMPORTANT IN ANALYZING WHETHER THE OVERALL

16   APPEARANCE OF THE ACCUSED AND CLAIMED DESIGNS ARE

17   SUBSTANTIALLY THE SAME.

18             IF THE ACCUSED DESIGN IS VISUALLY CLOSER

19   TO THE CLAIMED DESIGN THAN IT IS TO THE CLOSEST

20   PRIOR ART, YOU MAY FIND THIS COMPARISON IMPORTANT

21   IN ANALYZING WHETHER THE OVER APPEARANCE OF THE

22   ACCUSED AND CLAIMED DESIGNS ARE SUBSTANTIALLY THE

23   SAME.

24             YOU SHOULD NOT CONSIDER THE SIZE OF THE

25   ACCUSED PRODUCTS IF THE ASSERTED DESIGN PATENT DID

4012

1    SLIGHTLY DIFFERENT NOT SPECIFY THE SIZE OF THE

2    DESIGN.

3              WHILE THESE GUIDELINES MAY BE HELPFUL,

4    THE TEST FOR INFRINGEMENT IS WHETHER THE OVERALL

5    APPEARANCES OF THE ACCUSED DESIGN AND THE CLAIMED

6    DESIGN ARE SUBSTANTIALLY THE SAME.

7              WHETHER SAMSUNG KNEW ITS PRODUCTS

8    INFRINGED OR EVEN KNEW OF APPLE DESIGN PATENTS DOES

9    NOT MATTER IN DETERMINING INFRINGE ACTION.

10             47.  IN DECIDING THE ISSUE OF

11   INFRINGEMENT, YOU MUST COMPARE SAMSUNG'S ACCUSED

12   PRODUCTS TO THE DESIGN PATENTS.  IN ADDITION, YOU

13   HAVE HEARD EVIDENCE ABOUT CERTAIN APPLE PRODUCTS

14   AND MODELS.  IF YOU DETERMINE THAT ANY OF APPLE'S

15   PRODUCTS OR MODELS ARE SUBSTANTIALLY THE SAME AS AN

16   APPLE PATENT DESIGN, AND THAT THE PRODUCT OR MODEL

17   HAS NO SIGNIFICANT DISTINCTIONS WITH THE DESIGN,

18   YOU MAY COMPARE THE PRODUCT OR MODEL DIRECTLY TO

19   THE ACCUSED SAMSUNG PRODUCTS.  THIS MAY FACILITATE

20   IF YOU DETERMINE THAT A PARTICULAR APPLE OR PRODUCT

21   DOES NOT EMBODY A PATENTED DESIGN, YOU MAY NOT

22   COMPARE IT TO THE ACCUSED DEVICES.

23             NUMBER 48.  I WILL NOW INSTRUCT YOU ON

24   THE RULES YOU MUST FOLLOW IN DECIDING WHETHER

25   SAMSUNG HAS PROVEN THAT THE APPLE DESIGN PATENTS

4013

```
1    ARE INVALID.  BEFORE DISCUSSING THE SPECIFIC RULES,

2    I WANT TO REMIND YOU ABOUT THE STANDARD OF PROOF

3    THAT APPLIES TO THIS DEFENSE.  TO PROVE INVALIDITY

4    OF ANY DESIGN PATENT, SAMSUNG MUST PERSUADE YOU BY

5    CLEAR AND CONVINCING EVIDENCE THAT THE DESIGN

6    PATENT IS INVALID.

7              49.  BEFORE I DESCRIBE HOW TO ASSESS

8    WHETHER APPLE'S DESIGN PATENTS ARE INVALID, I WILL

9    INSTRUCT YOU ABOUT DOCUMENTS AND THINGS CALLED

10   "PRIOR ART."

11             IN GENERAL, PRIOR ART INCLUDES THINGS

12   THAT EXISTED BEFORE THE CLAIMED DESIGN, THAT WERE

13   PUBLICLY KNOWN IN THIS COUNTRY, OR USED IN A

14   PUBLICLY ACCESSIBLE WAY IN THIS COUNTRY, OR THAT

15   WERE PATENTED OR DESCRIBED IN A PUBLICATION IN ANY

16   COUNTRY.

17             SPECIFICALLY, PRIOR ART INCLUDES ANY OF

18   THE FOLLOWING ITEMS RECEIVED INTO EVIDENCE DURING

19   TRIAL:

20             IF THE CLAIMED DESIGN WAS ALREADY

21   PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS IN THE

22   UNITED STATES BEFORE THE DATE OF THE INVENTION OF

23   THE CLAIMED DESIGN;

24             IF THE CLAIMED DESIGN WAS ALREADY

25   PATENTED OR DESCRIBED IN A PRINTED PUBLICATION
```

1    ANYWHERE IN THE WORLD BEFORE THE DATE OF INVENTION

2    OF THE CLAIMED DESIGN.  A REFERENCE IS A "PRINTED

3    PUBLICATION" IF IT IS ACCESSIBLE TO THOSE

4    INTERESTED IN THE FIELD, EVEN IF IT IS DIFFICULT TO

5    FIND;

6              IF THE CLAIMED DESIGN WAS ALREADY

7    DESCRIBED ANOTHER IN U.S. PATENT OR PUBLISHED U.S.

8    PATENT APPLICATION THAT WAS BASED ON AN APPLICATION

9    FILED BEFORE THE DATE OF THE INVENTION OF THE

10   CLAIMED DESIGN;

11             IF THE CLAIMED DESIGN WAS ALREADY MADE BY

12   SOMEONE ELSE IN THE UNITED STATES BEFORE THE DATE

13   OF INVENTION, IF THAT OTHER PERSON HAD NOT

14   ABANDONED, SUPPRESSED OR CONCEALED HIS OR HER

15   INVENTION.

16             SINCE THE DATE OF INVENTION OF THE D'677

17   AND D'087 IS IN DISPUTE IN THIS CASE, YOU MUST

18   DETERMINE WHETHER APPLE AS PROVED THE DATES THESE

19   DESIGNS WERE INVENTED.

20             THE DATE OF INVENTION OCCURS WHEN THE

21   INVENTION IS SHOWN IN ITS COMPLETE FORM BY

22   DRAWINGS, DISCLOSE TO ANOTHER OR OTHER FORMS OF

23   EVIDENCE PRESENTED AT TRIAL.

24             IF YOU DETERMINE THAT APPLE HAS NOT

25   PROVED WHEN THE PATENTS WERE INVENTED, YOU MUST

4015

1    ASSUME THAT THE DATE OF THE INVENTION OF THE

2    PATENTED DESIGNS WAS NOT UNTIL THE FILING DATE OF

3    THE PATENT.

4              THE APPLE DESIGN PATENTS HAVE THE

5    FOLLOWING FILING DATES:

6              D'677 PATENT, JANUARY 5, 2007.

7              D'087 PATENT, JANUARY 5, 2007.

8              D'889 PATENT, MARCH 17TH, 2004.

9              D'305 PATENT, JUNE 23RD, 2007.

10             NUMBER 50.  A DESIGN PATENT IS INVALID IF

11   IT IS NOT NEW.  IF A DESIGN PATENT IS NOT NEW, WE

12   SAY IT IS "ANTICIPATED" BY A PRIOR ART REFERENCE.

13   FOR A CLAIMED DESIGN PATENT TO BE INVALID BECAUSE

14   IT IS ANTICIPATED, SAMSUNG MUST PROVE BY CLEAR AND

15   CONVINCING EVIDENCE THAT THERE IS A SINGLE PRIOR

16   ART REFERENCE THAT IS SUBSTANTIALLY THE SAME AS THE

17   CLAIMED DESIGN PATENT.

18             THE SAME STANDARD OF SUBSTANTIAL

19   SIMILARITY THAT APPLIED TO INFRINGEMENT ALSO

20   APPLIES TO ANTICIPATION.  THAT IS, THE SINGLE PRIOR

21   ART REFERENCE IN THE CLAIMED DESIGN PATENT ARE

22   SUBSTANTIALLY SAME IF, IN THE EYE OF AN ORDINARY

23   OBSERVER, GIVING SUCH ATTENTION AS A PURCHASER

24   USUALLY GIVES, THE RESEMBLANCE BETWEEN THE TWO

25   DESIGNS IS SUCH AS TO DECEIVE SUCH AN OBSERVER,

1    INDUCING HIM TO PURCHASE ONE SUPPOSING IT TO BE THE

2    OTHER.  YOU SHOULD CONSIDER ANY PERCEIVED

3    SIMILARITIES OR DIFFERENCES BETWEEN THE CLAIMED

4    DESIGN AND THE PRIOR ART REFERENCES.  MINOR

5    DIFFERENCES SHOULD NOT PREVENT A FINDING OF

6    ANTICIPATION.

7            EVEN IF -- THIS IS NUMBER 51.  EVEN IF A

8    DESIGN IS NOT ANTICIPATED BY A SINGLE REFERENCE, IT

9    MAY STILL BE INVALID IN THE CLAIMED DESIGN WOULD

10   HAVE BEEN OBVIOUS TO A DESIGNER OF ORDINARY SKILL

11   IN THE FIELD AT THE TIME THE DESIGN WAS MADE.

12           UNLIKE ANTICIPATION WHICH ALLOWS

13   CONSIDERATION OF ONLY ONE ITEM OF PRIOR ART,

14   OBVIOUSNESS MAY BE OWN BY CONSIDERING MORE THAN ONE

15   ITEM OF PRIOR ART.  THE ULTIMATE CONCLUSION OF

16   WHETHER A CLAIMED DESIGN IS OBVIOUS SHOULD BE BASED

17   UPON YOUR DETERMINATION OF SEVERAL FACTUAL

18   DECISIONS.

19           FIRST, YOU MUST DECIDE THE LEVEL OF

20   ORDINARY SKILL IN THE FIELD OF THE PATENT AT THE

21   TIME THE CLAIMED DESIGN WAS MADE.  IN DECIDING

22   THIS, YOU SHOULD CONSIDER ALL THE EVIDENCE FROM

23   TRIAL, INCLUDING:

24           THE LEVELS OF EDUCATION AND EXPERIENCE OF

25   PERSONS DESIGNING ARTICLES IN THE FIELD;

1          TYPES OF PROBLEMS ENCOUNTERED IN

2     DESIGNING ARTICLES IN THE FIELD; AND,

3          THE SOPHISTICATION OF THE FIELD.

4          SECOND, YOU MUST DETERMINE IF A DESIGNER

5     OF ORDINARY SKILL IN THESE DESIGNS WOULD HAVE

6     COMBINED THE PRIOR ART REFERENCES OR MODIFIED A

7     SINGLE PRIOR ART REFERENCE TO CREATE THE SAME

8     OVERALL VISUAL APPEARANCE AS THE CLAIMED DESIGN.

9          TO DO THIS, YOU MUST CONSIDER WHETHER

10    SAMSUNG HAS IDENTIFIED A PRIMARY PRIOR ART

11    REFERENCE.  A PRIMARY REFERENCE MUST BE AN ACTUAL

12    DESIGN WHICH CREATES BASICALLY THE SAME VISUAL

13    IMPRESSION AS THE PATENTED DESIGN.

14          IF YOU IDENTIFY A PRIMARY REFERENCE, YOU

15    MUST THEN CONSIDER WHETHER SAMSUNG HAS IDENTIFIED

16    ONE OR MORE SECONDARY PRIOR ART REFERENCES.

17          SECONDARY REFERENCES ARE OTHER REFERENCES

18    THAT ARE SO VISUALLY RELATED TO THE PRIMARY

19    REFERENCE THAT THE APPEARANCE OF CERTAIN ORNAMENTAL

20    FEATURES IN THE OTHER REFERENCES WOULD SUGGEST THE

21    APPLICATION OF THOSE FEATURES TO THE PRIMARY

22    REFERENCE.

23          IF YOU FIND THAT THERE ARE ONE OR MORE

24    SUCH SECONDARY REFERENCES, YOU MUST DETERMINE IF A

25    DESIGNER OF ORDINARY SKILL IN THESE DESIGNS WOULD

1    HAVE COMBINED THESE REFERENCES TO CREATE THE SAME

2    OVERALL VISUAL APPEARANCE AS THE CLAIMED DESIGN.

3              FINALLY, BEFORE DECIDING THE ISSUE OF

4    OBVIOUSNESS, YOU MUST CONSIDER OTHER FACTORS THAT

5    MIGHT SHOW THAT THE DESIGNS WERE NOT OBVIOUS

6    DESPITE THE PRIOR ART.  YOU MAY ONLY CONSIDER THOSE

7    FACTORS THAT APPLE HAS ESTABLISHED THROUGH EVIDENCE

8    ADMITTED AT TRIAL.  NO ONE FACTOR ALONE IS

9    DISPOSITIVE:

10             WERE PRODUCTS COVERED BY THE CLAIMED

11   DESIGN COMMERCIALLY SUCCESSFUL DUE TO THE

12   APPEARANCE OF THE CLAIMED DESIGN?

13             DID OTHERS COPY THE CLAIMED DESIGN?

14             DID THE CLAIMED DESIGN ACHIEVE AN

15   UNEXPECTEDLY SUPERIOR APPEARANCE OVER THE CLOSEST

16   PRIOR ART?

17             DID OTHERS IN THE FIELD PRAISE THE

18   CLAIMED DESIGN OR EXPRESS ADMIRATION FOR THE

19   CLAIMED DESIGN?

20             THE PRESENCE OF ANY OF THE FACTORS MAY BE

21   CONSIDERED BY YOU AS AN INDICATION THAT THE CLAIMED

22   INVENTION WOULD HAVE NOT HAVE BEEN OBVIOUS AT THE

23   TIME THE CLAIMED INVENTION WAS MADE.

24             ALTHOUGH YOU SHOULD CONSIDER ANY EVIDENCE

25   OF THESE FACTORS, THE RELEVANCE AND IMPORTANCE OF

1    ANY OF THEM TO YOUR DECISION ON WHETHER THE CLAIMED

2    INVENTION WOULD HAVE BEEN OBVIOUS IS UP TO YOU.

3              IN DECIDING WHETHER THE CLAIMED DESIGN

4    WAS OBVIOUS, KEEP IN MIND THAT A DESIGN WITH

5    SEVERAL FEATURES IS NOT OBVIOUS MERELY BECAUSE EACH

6    INDIVIDUAL FEATURE WAS PRESENT IN PRIOR ART

7    DESIGNS.  YOU MUST ALWAYS BE CAREFUL NOT TO

8    DETERMINE OBVIOUSNESS USING THE BENEFIT OF

9    HINDSIGHT.  YOU SHOULD PUT YOURSELF IN THE POSITION

10   OF A PERSON OF ORDINARY SKILL IN THE FIELD AT THE

11   TIME THE CLAIM DESIGN WAS MADE AND SHOULD NOT

12   CONSIDER WHAT IS KNOWN TODAY.

13             NUMBER 52.  DESIGN PATENTS PROTECT THE

14   ORNAMENTAL APPEARANCE, INCLUDING SHAPE OR

15   CONFIGURATION, OF AN ARTICLE OF MANUFACTURE.

16             IF SAMSUNG PROVES BY CLEAR AND CONVINCING

17   EVIDENCE THAT THE OVERALL APPEARANCE OF AN APPLE

18   PATENTED DESIGN IS DICTATED BY HOW THE ARTICLE

19   CLAIMED IN THE PATENT WORKS, THE PATENT IS INVALID

20   BECAUSE THE DESIGN IS NOT "ORNAMENTAL."

21             IN OTHER WORDS, THE INVENTOR DID NOT

22   "DESIGN" ANYTHING BECAUSE IN ORDER TO ACHIEVE THE

23   FUNCTION OF THE DESIGN, IT HAD TO BE DESIGNED THAT

24   WAY.

25             WHEN DECIDING THIS, YOU SHOULD KEEP IN

4020

1    MIND THAT DESIGN PATENTS MUST BE FOR ARTICLES OF

2    MANUFACTURE, WHICH BY DEFINITION HAVE INHERENT

3    FUNCTIONAL CHARACTERISTICS.  IT IS NORMAL THAT

4    CLAIMED DESIGNS PERFORM SOME FUNCTION.  THAT DOES

5    NOT DISQUALIFY THEM FROM PATENT PROTECTION.

6           IN DETERMINING WHETHER A DESIGN IS

7    DICTATED BY FUNCTIONALITY, YOU MAY CONSIDER WHETHER

8    THE PROTECTED DESIGN REPRESENTS THE BEST DESIGN,

9    WHETHER ALTERNATIVE DESIGNS WOULD ADVERSELY EFFECT

10   THE UTILITY OF SPECIFIED ARTICLE, WHETHER THERE ARE

11   ANY CONCOMITANT UTILITY PATENTS, WHETHER THE

12   ADVERTISING TOUTS PARTICULAR FEATURES OF THE DESIGN

13   AS HAVING SPECIFIC UTILITY, AND WHETHER THERE ARE

14   ANY ELEMENTS IN THE DESIGN OR AN OVERALL APPEARANCE

15   CLEARLY NOT DICTATED BY FUNCTION.

16          WHEN THERE ARE SEVERAL OTHER DESIGNS THAT

17   ACHIEVE THE FUNCTION OF AN ARTICLE OF MANUFACTURE,

18   THE DESIGN OF THE ARTICLE IS MORE LIKELY TO SERVE A

19   PRIMARILY ORNAMENTAL PURPOSE.  HOWEVER, THIS MAY

20   NOT BE TRUE IF THE OTHER DESIGNS ADVERSELY AFFECT

21   THE UTILITY OF THE ARTICLE.

22          NUMBER 53.  I WILL INSTRUCT YOU ABOUT THE

23   MEASURE OF DAMAGES FOR INFRINGEMENT OF APPLE'S

24   DESIGN PATENTS.  BY INSTRUCTING YOU ON DAMAGES, I

25   AM NOT SUGGESTING WHICH PARTY SHOULD WIN ON ANY

1    ISSUE.

2            IF YOU FIND THAT SAMSUNG ELECTRONICS

3    AMERICA, SAMSUNG TELECOMMUNICATIONS AMERICA, AND/OR

4    SAMSUNG ELECTRONICS COMPANY INFRINGED ANY VALID

5    APPLE DESIGN PATENT, YOU MUST THEN DETERMINE THE

6    MONEY DAMAGES TO AWARD APPLE.  THE AMOUNT OF THOSE

7    DAMAGES MUST BE ADEQUATE TO COMPENSATE APPLE FOR

8    THE INFRINGEMENT.  YOU SHOULD KEEP IN MIND THAT THE

9    DAMAGES YOU AWARD ARE MEANT TO COMPENSATE THE

10   PATENT HOLDER AND IS NOT TO PUNISH AN INFRINGER.

11           IN RELATION TO DESIGN PATENTS, APPLE CAN

12   ELECT TO PROVE EITHER ACTUAL DAMAGES, KNOWN AS

13   COMPENSATORY DAMAGES, OR IT MAY ELECT TO PROVE THE

14   DEFENDANT'S PROFITS AS ITS MEASURE OF POTENTIAL

15   RECOVERY WITH RESPECT TO THE SALE OF EACH UNIT OF

16   AN INFRINGING PRODUCT.

17           AS COMPENSATORY DAMAGES, APPLE MAY PROVE

18   EITHER ITS OWN LOST PROFITS OR A REASONABLE ROYALTY

19   FOR THE DESIGN PATENT.  APPLE IS NOT ENTITLED TO

20   RECOVER BOTH COMPENSATORY DAMAGES AND DEFENDANT'S

21   PROFITS ON THE SAME SALE.

22           APPLE HAS THE BURDEN TO PROVE THAT

23   APPLE'S CALCULATION OF DAMAGES IS CORRECT BY A

24   PREPONDERANCE OF THE EVIDENCE.  WHILE APPLE IS NOT

25   REQUIRED TO PROVE ITS DAMAGES WITH MATHEMATICAL

```
 1    PRECISION, IT MUST PROVE THEM WITH REASONABLE

 2    CERTAINTY.  APPLE IS NOT ENTITLED TO DAMAGES THAT

 3    ARE REMOTE OR SPECULATIVE.

 4              NUMBER 54.  IN THIS CASE, APPLE SEEKS

 5    SAMSUNG ELECTRONICS COMPANY'S, SAMSUNG ELECTRONIC

 6    AMERICA'S, AND SAMSUNG TELECOMMUNICATIONS AMERICA'S

 7    PROFITS FROM SALES OF PRODUCTS ALLEGED TO INFRINGE

 8    APPLE'S DESIGN PATENTS.  IF YOU FIND INFRINGEMENT

 9    BY ANY SAMSUNG DEFENDANT AND DO NOT FIND APPLE'S

10    DESIGN PATENTS ARE INVALID, YOU MAY AWARD APPLE

11    THAT SAMSUNG DEFENDANT'S TOTAL PROFIT ATTRIBUTABLE

12    TO THE INFRINGING PRODUCTS.

13              THE "TOTAL PROFIT" OF SAMSUNG ELECTRONICS

14    COMPANY, SAMSUNG ELECTRONICS AMERICA AND/OR SAMSUNG

15    TELECOMMUNICATIONS AMERICA MEANS THE ENTIRE PROFIT

16    ON THE SALE OF THE ARTICLE TO WHICH THE PATENTED

17    DESIGN IS APPLIED AND NOT JUST THE PORTION OF

18    PROFIT ATTRIBUTABLE TO THE DESIGN OR ORNAMENTAL

19    ASPECTS COVERED BY THE DESIGN.

20              "TOTAL PROFIT" DOES NOT INCLUDE PROFIT

21    ATTRIBUTABLE TO OTHER PRODUCTS THAT MAY BE SOLD IN

22    ASSOCIATION WITH AN INFRINGING ARTICLE EMBODYING

23    THE PATENTED DESIGN.

24              IF YOU FIND INFRINGEMENT BY ANY SAMSUNG

25    DEFENDANT, APPLE IS ENTITLED TO ALL PROFIT EARNED
```

1    BY THAT DEFENDANT ON SALES OF ARTICLES THAT

2    INFRINGE APPLE'S DESIGN PATENTS.  PROFIT US

3    DETERMINED BY DEDUCTING CERTAIN EXPENSES FROM GROSS

4    REVENUE.  GROSS REVENUE IS ALL OF THE INFRINGER'S

5    RECEIPTS FROM THE SALE OF ARTICLES USING ANY DESIGN

6    FOUND INFRINGED.  APPLE HAS THE BURDEN OF PROVING

7    THE INFRINGING DEFENDANT'S GROSS REVENUE BY A

8    PREPONDERANCE OF THE EVIDENCE.

9         EXPENSES CAN INCLUDE COSTS INCURRED IN

10   PRODUCING THE GROSS REVENUE, SUCH AS THE COST OF

11   THE GOODS.  OTHER COSTS MAY BY INCLUDED AS

12   DEDUCTIBLE EXPENSES IF THEY ARE DIRECTLY

13   ATTRIBUTABLE TO THE SALE OR MANUFACTURE OF THE

14   INFRINGING PRODUCTS RESULTING IN THE NEXUS BETWEEN

15   THE INFRINGING PRODUCTS AND THE EXPENSE.  SAMSUNG

16   HAS THE BURDEN OF PROVING THE DEDUCTIBLE EXPENSES.

17        NUMBER 55.  APPLE MAY ALTERNATIVELY

18   RECOVER COMPENSATORY DAMAGES IN THE FORM OF LOST

19   PROFITS.  AS PREVIOUSLY EXPLAINED, APPLE MAY NOT

20   RECOVER BOTH SAMSUNG'S PROFITS AND COMPENSATORY

21   DAMAGES ON EACH SALE OF AN INFRINGING PRODUCT.  IN

22   ASSESSING APPLE'S RIGHT TO RECOVER LOST PROFITS FOR

23   SAMSUNG ELECTRONICS COMPANY'S, SAMSUNG ELECTRONICS

24   AMERICA'S AND SAMSUNG TELECOMMUNICATIONS AMERICA'S

25   INFRINGEMENT OF ITSELF DESIGN PATENT, YOU SHOULD

1    APPLY THE SAME RULES I ALREADY EXPLAINED IN THE

2    CONTEXT OF LOST PROFITS FOR INFRINGEMENT OF APPLE'S

3    UTILITY PATENTS.  THOSE INSTRUCTIONS ARE SET OUT IN

4    JURY INSTRUCTIONS NUMBER 36, 37, 38, AND 39.

5         WHENEVER IN THOSE INSTRUCTIONS I REFER TO

6    APPLE'S UTILITY PATENTS, YOU NOW FOCUS ON APPLE'S

7    DESIGN PATENTS.  WHENEVER IN THOSE INSTRUCTIONS I

8    REFERRED TO THE PATENTED INVENTION, YOU SHOULD NOW

9    FOCUS ON THE PATENTED DESIGN.  WHENEVER IN THOSE

10   INSTRUCTIONS I REFERRED TO PATENTED PRODUCTS OR

11   PRODUCTS COVERED BY A PATENT CLAIM, YOU SHOULD NOW

12   FOCUS ON PRODUCTS OR ARTICLES THAT USE OR EMBODY

13   THE PATENTED DESIGN.

14        NUMBER 56.  IF APPLE HAS NOT PROVED ITS

15   CLAIM FOR LOST PROFITS OR HAS NOT PROVED ITS CLAIM

16   TO SAMSUNG'S PROFITS, THEN APPLE SHOULD BE AWARDED

17   A REASONABLE ROYALTY FOR ALL INFRINGING SALES BY

18   SAMSUNG ELECTRONICS AMERICA, SAMSUNG

19   TELECOMMUNICATIONS AMERICA, AND/OR SAMSUNG

20   ELECTRONICS COMPANY.  IN NO EVENT SHOULD THE

21   DAMAGES YOU AWARD APPLE FOR DESIGN PATENT

22   INFRINGEMENT BE LESS THAN A REASONABLE ROYALTY.

23        THE DEFINITION OF A REASONABLE ROYALTY

24   FOR DESIGN PATENT INFRINGEMENT IS THE SAME AS THE

25   DEFINITION I EXPLAINED TO YOU IN JURY INSTRUCTION

4025

1    NUMBER 41 FOR UTILITY PATENT INFRINGEMENT.

2           HOWEVER, WHENEVER IN THAT INSTRUCTION I

3    REFERRED TO THE PATENTED INVENTION OR A UTILITY

4    PATENT, YOU SHOULD NOW FOCUS ON THE DESIGN PATENTS

5    OR PATENTED DESIGNS.

6           NUMBER 57.  DAMAGES THAT APPLE MAY BE

7    AWARDED BY YOU COMMENCE ON THE DATE THAT SAMSUNG

8    ELECTRONICS COMPANIES, SAMSUNG ELECTRONICS AMERICA

9    AND/OR SAMSUNG TELECOMMUNICATIONS AMERICA HAS BOTH

10   INFRINGED AND BEEN NOTIFIED OF THE DESIGN PATENT OR

11   PATENTS IT INFRINGED.

12          IF YOU FIND THAT APPLE SELLS PRODUCTS

13   THAT INCLUDE THE CLAIMED DESIGNS, BUT HAS NOT

14   MARKETED THOSE PRODUCTS WITH THE PATENT NUMBERS,

15   YOU MUST DETERMINE THE DATE THAT EACH SAMSUNG

16   ENTITY RECEIVED ACTUAL WRITTEN NOTICE OF THE

17   PATENTS AND THE SPECIFIC PRODUCTS ALLEGED TO

18   INFRINGE.

19          WHILE YOU MAY IDENTIFY AN EARLIER DATE BY

20   WHICH EACH SAMSUNG ENTITY HAD NOTICE OF APPLE'S

21   CLAIMS OF INFRINGEMENT BASED ON YOUR EVALUATION OF

22   THE EVIDENCE, APPLE'S LAWSUIT PROVIDED SAMSUNG SUCH

23   NOTICE FOR THE D'677 PATENT BY NO LATER THAN APRIL

24   15TH, 2011, AND FOR THE D'305, D'889, AND D'087

25   PATENTS BY NO LATER THAN JUNE 16TH, 2011.

4026

```
1              ON THE OTHER HAND, IF YOU FIND THAT APPLE

2    DOES NOT SELL PRODUCTS COVERED BY A PATENT, THEN

3    DAMAGES BEGIN WITHOUT THE REQUIREMENT FOR ACTUAL

4    NOTICE UNDER THE FOLLOWING CIRCUMSTANCES IS:

5              FOR EACH INFRINGED PATENT THAT WAS

6    GRANTED BEFORE THE INFRINGING ACTIVITY BEGAN,

7    DAMAGES SHOULD BE CALCULATED AS OF THE DATE YOU

8    DETERMINE THAT THE INFRINGEMENT BEGAN;

9              FOR EACH PATENT THAT WAS GRANTED AFTER

10   THE INFRINGING ACTIVITY BEGAN AS DETERMINED BY YOU,

11   DAMAGES SHOULD BE CALCULATED AS OF THE DATE THE

12   PATENT ISSUED.

13              LET'S TAKE A QUICK STAND-UP BREAK.

14              (PAUSE IN PROCEEDINGS.)

15              THE COURT:  ALL RIGHT.  THANK YOU.

16              NUMBER 58.  APPLE CLAIMS THAT SAMSUNG

17   ELECTRONICS COMPANY ACTIVELY INDUCED ITS

18   SUBSIDIARIES IN THE UNITED STATES, SAMSUNG

19   TELECOMMUNICATIONS AMERICA AND SAMSUNG ELECTRONICS

20   AMERICA, TO INFRINGE APPLE'S UTILITY AND DESIGN

21   PATENTS.  SAMSUNG CLAIMS THAT APPLE ACTIVELY

22   INDUCED THIRD PARTIES TO INFRINGE SAMSUNG'S '460

23   PATENT.

24              IN ORDER FOR THERE TO BE INDUCEMENT OF

25   INFRINGEMENT BY EITHER SAMSUNG ELECTRONICS COMPANY
```

1    OR APPLE, SOMEONE ELSE MUST DIRECTLY INFRINGE THE

2    ASSERTED PATENT; IF THERE IS NO DIRECT INFRINGEMENT

3    BY ANYONE, THERE CAN BE NO INDUCED INFRINGEMENT.

4              IN ORDER TO BE ACTIVELY -- I'M SORRY.

5              IN ORDER TO BE LIABLE FOR INDUCEMENT OF

6    INFRINGEMENT, THE ALLEGED INFRINGER MUST HAVE

7    INTENTIONALLY TAKEN ACTION THAT ACTUALLY INDUCED

8    DIRECT INFRINGEMENT BY ANOTHER.

9              HAVE BEEN AWARE OF THE ASSERTED PATENT;

10   AND,

11             HAVE KNOWN THAT THE ACTS IT WAS CAUSING

12   WOULD BE INFRINGING.

13             THE KNOWLEDGE AND AWARENESS REQUIREMENTS

14   FOR INDUCEMENT CAN BE SATISFIED BY SHOWING THAT A

15   PATENT WAS WILLFULLY BLIND.  IF SAMSUNG ELECTRONICS

16   COMPANY OR APPLE DOES NOT KNOW OF THE EXISTENCE OF

17   A PATENT IN QUESTION, OR THAT THE ACTS IT WAS

18   INDUCING WERE INFRINGING, IT CAN BE LIABLE FOR

19   INDUCEMENT ONLY IF IT ACTUALLY BELIEVED THAT IT WAS

20   HIGHLY PROBABLE AND ITS ACTIONS WOULD ENCOURAGE

21   INFRINGEMENT OF A PATENT AND IT TOOK INTENTIONAL

22   ACTS TO AVOID LEARNING THE TRUTH.

23             IT IS NOT ENOUGH THAT SAMSUNG ELECTRONICS

24   COMPANY OR APPLE WAS MERELY INDIFFERENT TO THE

25   POSSIBILITY THAT IT MIGHT ENCOURAGE INFRINGEMENT OF

1    A PATENT NOR IS IT ENOUGH THAT SAMSUNG ELECTRONICS

2    COMPANY OR APPLE TOOK A RISK THAT WAS SUBSTANTIAL

3    AND UNJUSTIFIED.

4              IF YOU FIND THAT SAMSUNG ELECTRONICS

5    COMPANY OR APPLE WAS AWARE OF AN ASSERTED PATENT,

6    BUT BELIEVED THAT THE ACTS IT ENCOURAGED DID NOT

7    INFRINGE THAT PATENT, OR THAT THE PATENT WAS

8    INVALID, SAMSUNG ELECTRONICS COMPANY OR APPLE

9    CANNOT BE LIABLE FOR INDUCEMENT.

10             NUMBER 59.  IN THIS CASE, APPLE AND

11   SAMSUNG BOTH ARGUE THAT THE OTHER SIDE WILLFULLY

12   INFRINGED ITS PATENTS.

13             TO PROVE WILLFUL INFRINGEMENT, EACH PARTY

14   MUST PERSUADE YOU THAT THE OTHER SIDE INFRINGED A

15   VALID AND ENFORCEABLE CLAIM OF ONE OR MORE OF ITS

16   PATENTS.  THE REQUIREMENTS FOR PROVING SUCH

17   INFRINGEMENT WERE DISCUSSED IN MY PRIOR

18   INSTRUCTIONS.

19             IN ADDITION, TO PROVE WILLFUL

20   INFRINGEMENT, THE PATENT HOLDER MUST PERSUADE YOU

21   BY CLEAR AND CONVINCING EVIDENCE THAT THE OTHER

22   SIDE ACTED WITH RECKLESS DISREGARD OF THE PATENT IT

23   INFRINGED.

24             TO DEMONSTRATE SUCH RECKLESS DISREGARD,

25   THE PATENT HOLDER MUST PERSUADE YOU THAT THE OTHER

```
1    SIDE ACTUALLY KNEW, OR IT WAS SO OBVIOUS THAT THE

2    OTHER SIDE SHOULD HAVE KNOWN, THAT ITS ACTIONS

3    CONSTITUTED INFRINGEMENT OF A VALID AND ENFORCEABLE

4    PATENT.

5           IN DECIDING WHETHER SAMSUNG OR APPLE

6    ACTED WITH RECKLESS DISREGARD FOR ANY PATENT THAT

7    YOU FIND IS INFRINGED, YOU SHOULD CONSIDER ALL OF

8    THE FACTS SURROUNDING THE ALLEGED INFRINGEMENT,

9    INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING

10   FACTORS:

11          A FACTOR THAT MAY BE CONSIDERED AS

12   EVIDENCE THAT SAMSUNG OR APPLE WAS NOT WILLFUL IS

13   WHETHER IT ACTED IN A MANNER CONSISTENT WITH THE

14   STANDARDS OF COMMERCE FOR ITS INDUSTRY.

15          A FACTOR THAT MAY BE CONSIDERED AS

16   EVIDENCE THAT SAMSUNG OR APPLE WAS WILLFUL IS

17   WHETHER IT INTENTIONALLY COPIED A PRODUCT OF THE

18   OTHER SIDE THAT IS COVERED BY A PATENT.

19          NUMBER 60.  APPLE SEEKS DAMAGES AGAINST

20   SAMSUNG FOR DILUTING APPLE'S REGISTERED TRADE DRESS

21   NUMBER 3,470,983, UNREGISTERED IPHONE 3G TRADE

22   DRESS, UNREGISTERED COMBINATION IPHONE TRADE DRESS,

23   AND UNREGISTERED IPAD/IPAD 2 TRADE DRESS.

24          SAMSUNG DENIES THAT IT DILUTED APPLE'S

25   ASSERTED TRADE DRESSES AND CONTENDS THE TRADE
```

1    DRESSES ARE UNPROTECTABLE AND THUS INVALID.

2         APPLE ALSO SEEKING DAMAGES AGAINST

3    SAMSUNG FOR INFRINGEMENT OF APPLE'S UNREGISTERED

4    IPAD/IPAD 2 TRADE DRESS.  SAMSUNG DENIES THAT IT

5    INFRINGED APPLE'S ASSERTED IPAD-RELATED TRADE DRESS

6    AND, AS ALREADY STATED, CONTENDS IT IS

7    UNPROTECTABLE.

8         HERE ARE THE INSTRUCTIONS YOU MUST FOLLOW

9    IN DECIDING APPLE'S TRADE DRESS DILUTION AND

10   INFRINGEMENT CLAIMS.

11        NUMBER 61.  TRADE DRESS IS THE

12   NON-FUNCTIONAL, PHYSICAL DETAIL AND DESIGN OF A

13   PRODUCT, WHICH IDENTIFIES THE PRODUCT'S SOURCE AND

14   DISTINGUISHES IT FROM THE PRODUCTS OF OTHERS.

15        TRADE DRESS IS THE PRODUCT'S TOTAL IMAGE

16   AND OVERALL APPEARANCE, AND MAY INCLUDE FEATURES

17   SUCH AS SIZE, SHAPE, COLOR, COLOR COMBINATIONS,

18   TEXTURE OR GRAPHICS.  IN OTHER WORDS, TRADE DRESS

19   IS THE FORM IN WHICH A PERSON PRESENTS A PRODUCT OR

20   SERVICE TO THE MARKET, ITS MANNER OF DISPLAY.

21        A TRADE DRESS IS NON-FUNCTIONAL IF, TAKEN

22   AS A WHOLE, THE COLLECTION OF TRADE DRESS ELEMENTS

23   IS NOT ESSENTIAL TO THE PRODUCT'S USE OR PURPOSE OR

24   DOES NOT AFFECT THE COST OR QUALITY OF THE PRODUCT

25   EVEN THOUGH CERTAIN PARTICULAR ELEMENTS OF THE

1    TRADE DRESS MAY BE FUNCTIONAL.

2              TRADE DRESS CONCERNS THE OVERALL VISUAL

3    IMPRESSION CREATED BY IN THE CONSUMER'S MIND WHEN

4    VIEWING THE NON-FUNCTIONAL ASPECTS OF THE PRODUCT

5    AND NOT FROM THE UTILITARIAN OR USEFUL ASPECTS OF

6    THE PRODUCT.

7              IN CONSIDERING THE IMPACT OF THESE

8    NON-FUNCTIONAL ASPECTS, WHICH ARE OFTEN A COMPLEX

9    COMBINATION OF MANY FEATURES, YOU MUST CONSIDER THE

10   APPEARANCE OF FEATURES TOGETHER, RATHER THAN

11   SEPARATELY.

12             A PERSON WHO USES THE TRADE DRESS OF

13   ANOTHER MAY BE LIABLE FOR DAMAGES.

14             NUMBER 62.  THE FIRST STEP IN CONSIDERING

15   APPLE'S CLAIMS THAT SAMSUNG DILUTED AND INFRINGING

16   CERTAIN OF APPLE'S IPHONE AND IPAD TRADE DRESSES IS

17   TO DETERMINE WHETHER OR NOT EACH ASSERTED TRADE

18   DRESS IS PROTECTABLE.  YOU NEED TO MAKE THIS

19   DETERMINATION FOR EACH OF APPLE'S ASSERTED TRADE

20   DRESSES.

21             YOU MUST FIND THAT AN ASSERTED APPLE

22   TRADE DRESS IS PROTECTABLE IF THE TRADE DRESS;

23             HAS ACQUIRED DISTINCTIVENESS THROUGH

24   SECONDARY MEANING; AND,

25             IS NON-FUNCTIONAL.

4032

1          FOR APPLE'S REGISTERED IPHONE TRADE

2     DRESS, YOU MUST PRESUME THE TRADE DRESS IS BOTH

3     DISTINCTIVE AND NON-FUNCTIONAL, AND, THUS,

4     PROTECTABLE.

5          SAMSUNG BEARS THE BURDEN OF PROVING BY A

6     PREPONDERANCE OF THE EVIDENCE THAT APPLE'S

7     REGISTERED IPHONE TRADE DRESS IS EITHER FUNCTIONAL

8     OR NOT DISTINCTIVE.

9          IF YOU FIND THAT SAMSUNG HAS MET ITS

10     BURDEN, YOU MUST FIND THE TRADE DRESS

11     UNPROTECTABLE.

12          OTHERWISE, YOU MUST FIND APPLE'S

13     REGISTERED IPHONE TRADE DRESS PROTECTABLE.

14          FOR EACH UNREGISTERED IPHONE TRADE DRESS

15     AND FOR THE UNREGISTERED IPAD TRADE DRESS, APPLE

16     BEARS THE BURDEN OF PROVING BY A PREPONDERANCE OF

17     THE EVIDENCE THAT THE TRADE DRESS IS BOTH

18     DISTINCTIVE AND NON-FUNCTIONAL.  IF YOU FIND THAT

19     APPLE HAS MET ITS BURDEN, YOU MUST FIND THAT TRADE

20     DRESS IS PROTECTABLE.  OTHERWISE, YOU MUST FIND THE

21     TRADE DRESS UNPROTECTABLE.

22          FOR EACH APPLE TRADE DRESS THAT YOU FIND

23     PROTECTABLE, RESOLVING WHETHER SAMSUNG HAS DILUTED

24     OR INFRINGED TRADE DRESS WILL REQUIRE YOU TO ASSESS

25     ADDITIONAL QUESTIONS THAT I WILL EXPLAIN AFTER

1      ADDRESSING PROTECTABILITY MORE FULLY.

2              NUMBER 63.  TO BE PROTECTABLE, APPLE'S

3      TRADE DRESSES MUST HAVE ACQUIRED DISTINCTIVENESS

4      THROUGH SECONDARY MEANING.  A TRADE DRESS REQUIRES

5      A SECONDARY MEANING WHEN IT HAS BEEN USED IN SUCH A

6      WAY THAT ITS PRIMARY SIGNIFICANCE IN THE MINDS OF

7      THE PROSPECTIVE CONSUMERS IS NOT THE PRODUCT

8      ITSELF, BUT THE IDENTIFICATION OF THE PRODUCT WITH

9      A SINGLE SOURCE, REGARDLESS OF WHETHER CONSUMERS

10     KNOW WHO OR WHAT THAT SOURCE IS.

11             FOR EACH ASSERTED APPLE TRADE DRESS, YOU

12     MUST FIND THAT THE PREPONDERANCE OF THE EVIDENCE

13     SHOWS THAT A SIGNIFICANT NUMBER OF THE CONSUMING

14     PUBLIC ASSOCIATES THE TRADE DRESS WITH A SINGLE

15     SOURCE, IN ORDER TO FIND THAT IT HAS ACQUIRED

16     SECONDARY MEANING.

17             WHEN YOU ARE DETERMINING WHETHER EACH

18     TRADE DRESS HAS ACQUIRED A SECONDARY MEANING,

19     CONSIDER THE FOLLOWING FACTORS:

20             CONSUMER PERCEPTION.  WHETHER THE PEOPLE

21     WHO PURCHASE SMARTPHONES AND TABLET COMPUTERS

22     ASSOCIATE THE CLAIMED TRADE DRESS WITH APPLE.

23             ADVERTISEMENT.  TO WHAT DEGREE AND IN

24     WHAT MANNER APPLE MAY HAVE ADVERTISED FEATURING THE

25     CLAIMED TRADE DRESS.

4034

1                    DEMONSTRATED SUCCESS.  WHETHER APPLE HAS

2         SUCCESSFULLY USED THE CLAIMED TRADE DRESS TO

3         INCREASE THE SALES OF ITS PRODUCTS.

4                    EXTENT OF USE.  THE LENGTH OF TIME AND

5         MANNER IN WHICH APPLE HAS USED THE CLAIMED TRADE

6         DRESS.

7                    EXCLUSIVITY.  WHETHER APPLE'S USE OF THE

8         CLAIMED TRADE DRESS WAS EXCLUSIVE.

9                    COPYING.  WHETHER SAMSUNG INTENTIONALLY

10        COPIED APPLE'S ALLEGED TRADE DRESS.

11                   AND ACTUAL CONFUSION.  WHETHER SAMSUNG'S

12        USE OF APPLE'S ALLEGED TRADE DRESS HAS LED TO

13        ACTUAL CONFUSION AMONG A SIGNIFICANT NUMBER OF

14        CONSUMERS.

15                   THE PRESENCE OR ABSENCE OF ANY PARTICULAR

16        FACTOR SHOULD NOT NECESSARILY RESOLVE WHETHER THE

17        ASSERTED TRADE DRESS HAS ACQUIRED SECONDARY

18        MEANING.

19                   APPLE HAS THE BURDEN OF PROVING BY A

20        PREPONDERANCE OF THE EVIDENCE THAT ITS UNREGISTERED

21        TRADE DRESSES HAVE ACQUIRED A SECONDARY MEANING.

22                   SAMSUNG HAS THE BURDEN OF PROVING BY A

23        PREPONDERANCE OF THE EVIDENCE THAT APPLE'S

24        REGISTERED IPHONE TRADE DRESS HAS NOT ACQUIRED

25        SECONDARY MEANING.

4035

```
 1              THE MERE FACT THAT APPLE IS USING THE

 2    ASSERTED TRADE DRESSES DOES NOT MEAN THAT THEY HAVE

 3    ACQUIRED SECONDARY MEANING.  THERE IS NO PARTICULAR

 4    LENGTH OF TIME THAT A TRADE DRESS MUST BE USED

 5    BEFORE IT ACQUIRES A SECONDARY MEANING.

 6              NUMBER 64.  A PRODUCT IS FUNCTIONAL IF IT

 7    IS ESSENTIAL TO THE PRODUCT'S USE OR PURPOSE, OR IF

 8    IT AFFECTS THE PRODUCT'S COST OR QUALITY.

 9              HOWEVER, IF THE FEATURE SERVES NO

10    PURPOSE, OTHER THAN AS AN ASSURANCE THAT A

11    PARTICULAR ENTITY MADE, SPONSORED OR ENDORSED THE

12    PRODUCT, IT IS NON-FUNCTIONAL.

13              A PRODUCT FEATURE IS ALSO NON-FUNCTIONAL

14    IF ITS SHAPE OR FORM MAKES NO CONTRIBUTION TO THE

15    PRODUCT'S FUNCTION OR OPERATION.

16              TO DETERMINE WHETHER A PRODUCT'S

17    PARTICULAR SHAPE OR FUNCTION IS FUNCTIONAL, YOU

18    SHOULD CONSIDER WHETHER THE DESIGN AS A WHOLE IS

19    FUNCTIONAL, THAT IS, WHETHER THE WHOLE COLLECTION

20    OF ELEMENTS MAKING UP THE DESIGN OR FORM ARE

21    ESSENTIAL TO THE PRODUCT'S USE OR PURPOSE.

22              TO DETERMINE WHETHER A PRODUCT FEATURE IS

23    FUNCTIONAL, YOU MAY CONSIDER THE FOLLOWING FACTORS:

24              1.  THE DESIGN'S UTILITARIAN ADVANTAGE.

25    IN CONSIDERING THIS FACTOR, YOU MAY EXAMINE WHETHER
```

4036

1    THE PARTICULAR DESIGN, OR PRODUCT FEATURE, YIELD A

2    UTILITARIAN ADVANTAGE OVER HOW THE PRODUCT MIGHT BE

3    WITHOUT THAT PARTICULAR DESIGN OR PRODUCT FEATURE.

4    IF THERE IS A UTILITARIAN ADVANTAGE FROM HAVING THE

5    PARTICULAR DESIGN OR FEATURE, THIS WOULD WEIGH IN

6    FAVOR OF FINDING THE DESIGN OR FEATURE IS

7    FUNCTIONAL; IF IT SEEMS MERELY ORNAMENTAL,

8    INCIDENTAL OR ARBITRARY, IT IS MORE LIKELY TO BE

9    NONFUNCTIONAL.

10           2.  AVAILABILITY OF ALTERNATE DESIGNS.

11   IN CONSIDERING THIS FACTOR, YOU MAY EXAMINE WHETHER

12   AN ALTERNATIVE DESIGN COULD HAVE BEEN USED, SO THAT

13   COMPETITION IN THE MARKET FOR THAT TYPE OF PRODUCT

14   WOULD NOT BE HINDERED BY ALLOWING ONLY ONE PERSON

15   TO EXCLUSIVELY USE THE PARTICULAR DESIGN OR

16   CONFIGURATION.  FOR THIS TO BE ANSWERED IN

17   THE AFFIRMATIVE, THE ALTERNATIVES MUST BE MORE THAN

18   MERELY THEORETICAL OR SPECULATIVE.  THEY MUST BE

19   COMMERCIALLY FEASIBLE.  THE UNAVAILABILITY OF A

20   SUFFICIENT NUMBER OF ALTERNATE DESIGNS WEIGHS IN

21   FAVOR OF FINDING THE DESIGN OR FEATURE IS

22   FUNCTIONAL; AND,

23           3.  ADVERTISING UTILITARIAN ADVANTAGE IN

24   THE DESIGN.  IN CONSIDERING THIS FACTOR, YOU MAY

25   EXAMINE WHETHER THE PARTICULAR DESIGN OR

4037

1    CONFIGURATION HAS BEEN TOUTED IN ANY ADVERTISING AS

2    A UTILITARIAN ADVANTAGE, EXPLICITLY OR IMPLICITLY.

3    IF A SELLER ADVERTISES THE UTILITARIAN ADVANTAGES

4    OF A PARTICULAR FEATURE OR DESIGN, THIS WEIGHS IN

5    FAVOR OF FINDING THAT DESIGN OR FEATURE IS

6    FUNCTIONAL.

7            NUMBER 4.  THE DESIGN'S METHOD OF

8    MANUFACTURE.  IN CONSIDERING THIS FACTOR, YOU MAY

9    EXAMINE WHETHER THE PARTICULAR DESIGN OR FEATURE

10   RESULT FROM A RELATIVELY SIMPLE OR INEXPENSIVE

11   METHOD OF MANUFACTURE.  IF THE DESIGN OR FEATURE IS

12   THE RESULT OF A PARTICULARLY ECONOMICAL PRODUCTION

13   METHOD, THIS WEIGHS IN FAVOR OF FINDING THE DESIGN

14   OR FEATURE IS FUNCTIONAL.  IF THE FEATURE IS

15   ESSENTIAL TO THE USE OR PURPOSE OF A DEVICE OR

16   AFFECTS ITS COST OR QUALITY, IT IS MORE LIKELY

17   FUNCTIONAL.

18           IF YOU FIND THAT THE PREPONDERANCE OF THE

19   EVIDENCE SHOWS THAT THE TRADE DRESS IS ESSENTIAL TO

20   THE PRODUCT'S USE OR PURPOSE, OR THAT IT AFFECTS

21   THE PRODUCT'S COST OR QUALITY, THEN YOU MUST FIND

22   THE TRADE DRESS FUNCTIONAL AND THUS UNPROTECTABLE.

23           IN ADDITION, IF YOU FIND THAT THE

24   PREPONDERANCE OF THE EVIDENCE SHOWS THAT LIMITING

25   APPLE'S COMPETITORS' USE OF THE FEATURE WOULD

1    IMPOSE A SIGNIFICANT NON-REPUTATION-RELATED

2    COMPETITIVE DISADVANTAGE, THEN YOU MUST FIND THE

3    TRADE DRESS FUNCTIONAL AND THUS UNPROTECTABLE.

4         HOWEVER, THE FACT THAT THE FEATURE

5    CONTRIBUTES TO CONSUMER APPEAL AND SALEABILITY OF

6    THE PRODUCT DOES NOT MEAN THAT THE TRADE DRESS IS

7    NECESSARILY FUNCTIONAL.

8         APPLE HAS THE BURDEN OF PROVING BY A

9    PREPONDERANCE OF THE EVIDENCE THAT ITS UNREGISTERED

10   TRADE DRESSES ARE NON-FUNCTIONAL.  SAMSUNG HAS THE

11   BURDEN OF PROVING BY A PREPONDERANCE OF THE

12   EVIDENCE THAT THE APPLE'S REGISTERED IPHONE TRADE

13   DRESS IS FUNCTIONAL.

14        NUMBER 65.  APPLE CONTENDS THAT SAMSUNG

15   HAS DILUTED APPLE'S ASSERTED IPHONE AND IPAD

16   RELATED TRADE DRESSES.  DILUTION MEANS A LESSENING

17   OF THE CAPACITY OF A FAMOUS TRADE DRESS TO IDENTIFY

18   AND DISTINGUISH GOODS OR SERVICES, REGARDLESS OF

19   THE PRESENCE OR ABSENCE OF COMPETITION, ACTUAL OR

20   LIKELY CONFUSION, MISTAKE, DECEPTION, OR ECONOMIC

21   INJURY.

22        TO PROVE THIS CLAIM AS TO ANY OF ITS

23   ASSERTED TRADE DRESSES THAT YOU HAVE FOUND IS

24   PROTECTABLE, APPLE HAS THE BURDEN OF PROVING EACH

25   OF THE FOLLOWING ADDITIONAL ELEMENTS BY A

1    PREPONDERANCE OF THE EVIDENCE:

2              THAT THE ASSERTED APPLE TRADE DRESS IS

3    FAMOUS;

4              THAT SAMSUNG BEGAN SELLING ITS ACCUSED

5    PRODUCTS IN COMMERCE AFTER APPLE'S ASSERTED TRADE

6    DRESS BECAME FAMOUS; AND,

7              THAT SAMSUNG'S ACCUSED PRODUCTS ARE

8    LIKELY TO CAUSE DILUTION OF APPLE'S ASSERTED TRADE

9    DRESS.

10             FOR ANY APPLE TRADE DRESS THAT YOU HAVE

11   FOUND IS PROTECTABLE, IF YOU ALSO FIND THAT APPLE

12   HAS PROVED EACH OF THESE THREE ELEMENTS BY A

13   PREPONDERANCE OF THE EVIDENCE, YOUR VERDICT ON

14   DILUTION WITH RESPECT TO THAT TRADE DRESS SHOULD BE

15   FOR APPLE.

16             IF APPLE HAS FAILED TO PROVE ANY OF THESE

17   ELEMENTS, YOUR VERDICT DILUTION WITH RESPECT TO

18   THAT TRADE DRESS SHOULD BE FOR SAMSUNG.

19             A TRADE DRESS -- NUMBER 66.  A TRADE

20   DRESS IS FAMOUS IF IT IS WIDELY RECOGNIZED BY THE

21   GENERAL CONSUMING PUBLIC OF THE UNITED STATES AS A

22   DESIGNATION OF SOURCE OF THE GOODS OF THE TRADE

23   DRESS OWNER.

24             IN DETERMINING WHETHER EACH OF APPLE'S

25   TRADE DRESSES IS FAMOUS, YOU MAY CONSIDER THE

1    FOLLOWING FACTORS.  THESE FACTORS ARE ONLY

2    SUGGESTIONS AND MAY NOT CONSTITUTE ALL OF THE

3    POSSIBLE TYPES OF EVIDENCE INDICATING WHETHER AN

4    ASSERTED TRADE DRESS IS FAMOUS.  THE PRESENCE OR

5    ABSENCE OF ANY ONE PARTICULAR FACTOR ON THIS LIST

6    SHOULD NOT NECESSARILY DETERMINE WHETHER THE TRADE

7    DRESS IS FAMOUS.

8            YOU CAN CONSIDER ALL OF THE RELEVANT

9    EVIDENCE IN MAKING YOUR DETERMINATION ABOUT WHETHER

10   EACH IPHONE AND IPAD-RELATED TRADE DRESS IS FAMOUS.

11           THE FACTORS YOU MAY CONSIDER ARE:

12           NUMBER 1.  THE DURATION, EXTENT AND

13   GEOGRAPHIC REACH OF ADVERTISING AND PUBLICITY OF

14   THE TRADE DRESS, WHETHER ADVERTISED OR PUBLICIZED

15   BY APPLE OR THIRD PARTIES;

16           2.  THE AMOUNT, VOLUME AND GEOGRAPHIC

17   EXTENT OF SALES OF GOODS OFFERED YOUR HONOR THE

18   TRADE DRESS;

19           3.  THE EXTENT OF ACTUAL RECOGNITION OF

20   THE TRADE DRESS; AND,

21           4.  WHETHER THE TRADE DRESS WAS FEDERALLY

22   REGISTERED.

23           APPLE BEARS THE BURDEN OF PROVING BY A

24   PREPONDERANCE OF THE EVIDENCE THAT EACH OF ITS

25   TRADE DRESSES WAS FAMOUS AT THE TIME OF SAMSUNG'S

1    FIRST COMMERCIAL SALES OF ITS ACCUSED PRODUCTS.

2            FOR EACH OF ITS ASSERTED IPHONE-RELATED

3    TRADE DRESSES, APPLE MUST PROVE BY A PREPONDERANCE

4    OF THE EVIDENCE THAT THE TRADE DRESS WAS FAMOUS BY

5    JULY 15TH, 2010, THE DATE SAMSUNG FIRST SOLD A

6    PRODUCT ACCUSED OF USING THE IPHONE-RELATED TRADE

7    DRESSES.

8            APPLE MUST PROVE BY A PREPONDERANCE OF

9    THE EVIDENCE THAT ITS ASSERTED IPAD-RELATED TRADE

10   DRESS WAS FAMOUS BY JUNE 8TH, 2011, THE DATE

11   SAMSUNG FIRST SOLD A PRODUCT ACCUSED OF USING THE

12   IPAD-RELATED TRADE DRESSES.

13           NUMBER 67.  DILUTION BY BLURRING IS AN

14   ASSOCIATION ARISING FROM THE SIMILARITY BETWEEN THE

15   APPEARANCE OF THE DEFENDANT'S ACCUSED PRODUCTS AND

16   PLAINTIFF'S TRADE DRESS THAT IMPAIRS THE

17   DISTINCTIVENESS OF A TRADE DRESS.

18           DILUTION BY BLURRING OCCURS WHEN A TRADE

19   DRESS PREVIOUSLY ASSOCIATED WITH ONE PRODUCT LOSES

20   SOME OF ITS CAPACITY TO IDENTIFY AND DISTINGUISH

21   THAT PRODUCT.  IN DETERMINING WHETHER THE

22   APPEARANCE OF SAMSUNG'S ACCUSED PRODUCTS IS LIKELY

23   TO CAUSE DILUTION OF EACH ASSERTED APPLE TRADE

24   DRESS, YOU MAY CONSIDER ALL RELEVANT FACTORS,

25   INCLUDING THE FOLLOWING:

```
1            1.  THE DEGREE OF SIMILARITY BETWEEN
2   SAMSUNG'S ACCUSED PRODUCTS AND APPLE'S TRADE DRESS;
3            2.  THE DEGREE OF ACQUIRED
4   DISTINCTIVENESS OF APPLE'S TRADE DRESS;
5            3.  THE EXTENT TO WHICH APPLE IS ENGAGING
6   IN SUBSTANTIALLY EXCLUSIVE USE OF THE TRADE DRESS;
7            4.  THE DEGREE OF RECOGNITION OF APPLE'S
8   TRADE DRESS;
9            5.  WHETHER SAMSUNG INTENDED TO CREATE AN
10  ASSOCIATION WITH APPLE'S TRADE DRESS; AND,
11           6.  ANY ACTUAL ASSOCIATION BETWEEN
12  SAMSUNG'S ACCUSED PRODUCTS AND APPLE'S TRADE DRESS.
13           THESE FACTORS SHOULD BE WEIGHED BY YOU
14  GIVEN THE FACTS AND CIRCUMSTANCES OF THE CASE.
15           FOR EACH OF APPLE'S ASSERTED TRADE
16  DRESSES, APPLE BEARS THE BURDEN OF PROVING BY A
17  PREPONDERANCE OF THE EVIDENCE THAT THE ACCUSED
18  SAMSUNG PRODUCTS ARE LIKELY TO DILUTE THE TRADE
19  DRESS.
20           NUMBER 68.  APPLE ALSO CLAIMS THAT
21  SAMSUNG'S GALAXY TAB 10.1 TABLET COMPUTERS INFRINGE
22  APPLE'S IPAD-RELATED TRADE DRESS.  TO PROVE TRADE
23  DRESS INFRINGEMENT, APPLE BEARS THE BURDEN OF
24  PROVING BY A PREPONDERANCE OF THE EVIDENCE EACH OF
25  THE FOLLOWING ELEMENTS:
```

1          NUMBER 1.  APPLE'S IPAD-RELATED TRADE

2     DRESS IS NON-FUNCTIONAL.  SEE INSTRUCTION NUMBER 64

3     ABOVE.

4          NUMBER 2.  APPLE'S IPAD-RELATED TRADE

5     DRESS HAS ACQUIRED DISTINCTIVENESS THROUGH

6     SECONDARY MEANING.  SEE INSTRUCTION NUMBER 63

7     ABOVE.

8          NUMBER 3.  SAMSUNG USED APPLE'S

9     IPAD-RELATED TRADE DRESS IN A MANNER THAT IS LIKELY

10    TO CAUSE CONFUSION AMONG ORDINARY CONSUMERS AS TO

11    THE SOURCE, SPONSORSHIP, AFFILIATION OR APPROVAL OF

12    SAMSUNG'S GOODS.

13         IF YOU FIND THAT APPLE HAS PROVED EACH OF

14    THESE ELEMENTS, YOUR VERDICT SHOULD BE FOR APPLE.

15    IF, ON THE OTHER HAND, APPLE HAS FAILED TO PROVE

16    ANY ONE OF THESE ELEMENTS, YOUR VERDICT SHOULD BE

17    FOR SAMSUNG.

18         NUMBER 69.  APPLE MUST PROVE BY A

19    PREPONDERANCE OF THE EVIDENCE THAT THE ASSERTED

20    PATENT-RELATED TRADE DRESS ACQUIRED SECONDARY

21    MEANING BEFORE SAMSUNG FIRST SOLD A PRODUCT THAT

22    APPLE CLAIMS IS INFRINGING THAT TRADE DRESS.

23         IF YOU FIND THAT APPLE HAS NOT PROVED BY

24    A PREPONDERANCE OF THE EVIDENCE THAT THE ASSERTED

25    IPAD-RELATED TRADE DRESS ACQUIRED SECONDARY MEANING

1    BEFORE JUNE 8TH OF 2011, THEN YOU MUST FIND FOR

2    SAMSUNG.

3              LET'S TAKE A STAND UP BREAK.

4              (PAUSE IN PROCEEDINGS.)

5              THE COURT:  ALL RIGHT.  WE HAVE LESS THAN

6    20 PAGES.

7              NUMBER 70.  YOU MUST DECIDE WHETHER

8    SAMSUNG'S ALLEGED USE OF APPLE'S IPAD/IPAD 2 TRADE

9    DRESS IN THE SAMSUNG GALAXY TAB 10.1 IS LIKELY TO

10   CAUSE CONFUSION ABOUT THE SOURCE, SPONSORSHIP,

11   AFFILIATION, OR APPROVAL OF SAMSUNG'S GALAXY

12   TAB 10.1.

13             APPLE MUST PROVE BY A PREPONDERANCE OF

14   THE EVIDENCE THAT A REASONABLY PRUDENT CONSUMER IN

15   THE MARKET PLACE IS LIKELY TO BE CONFUSED ABOUT THE

16   SOURCE OF SAMSUNG'S GALAXY TAB 10.1.

17             APPLE MUST SHOW MORE THAN SIMPLY A

18   POSSIBILITY OF SUCH CONFUSION.  APPLE MAY PROVE A

19   LIKELIHOOD OF CONFUSION BY PROVIDING DIRECT

20   EVIDENCE OF CONSUMER CONFUSION.  EVIDENCE OF

21   NON-CONSUMER CONFUSION MAY ALSO BE RELEVANT WHETHER

22   THERE IS CONFUSION ON THE PART OF:  POTENTIAL

23   CUSTOMERS; NON-CONSUMERS WHOSE CONFUSION COULD

24   CREATE AN INFERENCE THAT CONSUMERS LIKELY TO BE

25   CONFUSED; AND NON-CONSUMERS WHOSE CONFUSION COULD

1    INFLUENCE CONSUMERS.

2            I WILL SUGGEST SOME FACTORS THAT YOU

3    SHOULD CONSIDER IN DECIDING WHETHER THERE IS A

4    LIKELIHOOD OF CONFUSION.  THE PRESENCE OR ABSENCE

5    OF ANY PARTICULAR FACTOR THAT I SUGGEST SHOULD NOT

6    NECESSARILY RESOLVE WHETHER THERE WAS A LIKELIHOOD

7    OF CONFUSION, BECAUSE YOU MUST CONSIDER ALL

8    RELEVANT EVIDENCE IN DETERMINING THIS.

9            AS YOU CONSIDER THE LIKELIHOOD OF

10   CONFUSION, YOU SHOULD EXAMINE THE FOLLOWING:

11           1.  STRENGTH OR WEAKNESS OF APPLE'S

12   ASSERTED TRADE DRESS.  THE MORE THE CONSUMING

13   PUBLIC RECOGNIZES APPLE'S ASSERTED IPAD/IPAD 2

14   TRADE DRESS AS AN INDICATION OF ORIGIN OF APPLE'S

15   GOODS, THE MORE LIKELY IT IS THAT CONSUMERS WOULD

16   BE CONFUSED ABOUT THE COURSE OF SAMSUNG'S GOODS IF

17   SAMSUNG USES A SIMILAR DESIGN OR CONFIGURATION.

18           2.  SAMSUNG'S USE OF TRADE DRESS.  IF

19   SAMSUNG AND APPLE USE THEIR DESIGNS ON THE SAME,

20   RELATED, OR COMPLIMENTARY KINDS OF GOODS, THERE MAY

21   BE A GREATER LIKELIHOOD OF CONFUSION ABOUT THE

22   SOURCE OF THE GOODS THAN OTHERWISE.

23           3.  SIMILARITY OF APPLE'S AND SAMSUNG'S

24   DESIGNS.  IF THE OVERALL IMPRESSION CREATED BY

25   APPLE'S ASSERTED PATH/IPAD 2 TRADE DRESS IN THE

1    MARKETPLACE IS SIMILAR TO THAT CREATED BY SAMSUNG

2    DESIGNS AND APPEARANCE, THERE IS A GREATER CHANCE

3    OF LIKELIHOOD OF CONFUSION.

4            4.  ACTUAL CONFUSION.  IF USE BY SAMSUNG

5    OF APPLE'S ASSERTED IPAD/IPAD 2 TRADE DRESS HAS LED

6    TO INSTANCES OF ACTUAL CONFUSION, THIS SUGGESTS A

7    LIKELIHOOD OF CONFUSION.  HOWEVER, ACTUAL CONFUSION

8    IS NOT REQUIRED FOR A FINDING OF LIKELIHOOD OF

9    CONFUSION.  EVEN IF ACTUAL CONFUSION DID NOT OCCUR,

10   SAMSUNG'S USE OF THE TRADE DRESSES MAY STILL BE

11   LIKELY TO CAUSE CONFUSION.

12           AS YOU CONSIDER WHETHER THE DESIGN USED

13   BY SAMSUNG CREATES FOR CONSUMERS A LIKELIHOOD OF

14   CONFUSION WITH APPLE'S PRODUCTS, YOU SHOULD WEIGH

15   ANY INSTANCES OF ACTUAL CONFUSION AGAINST THE

16   OPPORTUNITIES FOR SUCH CONFUSION.  IF THE INSTANCES

17   OF ACTUAL CONFUSION HAVE BEEN RELATIVELY FREQUENT,

18   YOU MAY FIND THERE HAS BEEN SUBSTANTIAL ACTUAL

19   CONFUSION.

20           IF, BY CONTRAST, THERE IS A VERY LARGE

21   VOLUME OF SALES, BUT ONLY A FEW ISOLATED INSTANCES

22   OF ACTUAL CONFUSION, YOU MAY FIND THAT THERE HAS

23   NOT BEEN SUBSTANTIAL ACTUAL CONFUSION.

24           5.  SAMSUNG'S INTENT.  KNOWING USE BY

25   SAMSUNG OF APPLE'S ASSERTED IPAD/IPAD 2 TRADE DRESS

1    TO IDENTIFY SIMILAR GOODS MAY SHOW AN INTENT TO

2    DERIVE BENEFIT FROM THE REPUTATION OF APPLE'S TRADE

3    DRESS, SUGGESTING AN INTENT TO CAUSE A LIKELIHOOD

4    OF CONFUSION.

5            ON THE OTHER HAND, EVEN IN THE ABSENCE OF

6    PROOF THAT SAMSUNG ACTED KNOWINGLY, THE USE OF

7    APPLE'S TRADE DRESS TO IDENTIFY SIMILAR GOODS MAY

8    INDICATE A LIKELIHOOD OF CONFUSION.

9            6.   MARKETING/ADVERTISING CHANNELS.  IF

10   APPLE'S AND SAMSUNG'S GOODS ARE LIKELY TO BE SOLD

11   IN THE SAME OR SIMILAR STORES OR OUTLETS, OR

12   ADVERTISED IN SIMILAR MEDIA, THIS MAY INCREASE THE

13   LIKELIHOOD OF CONFUSION.

14           7.   PURCHASER'S DEGREE OF CARE.  THE

15   MORE SOPHISTICATED THE POTENTIAL BUYERS OF THE

16   GOODS OR THE MOST COSTLY THE GOODS, THE MORE

17   CAREFUL AND DISCRIMINATING THE REASONABLY PRUDENT

18   PURCHASER EXERCISING ORDINARY INDICATION MAY BE.

19   THEY MAY BE LESS LIKELY CONFUSED BY SIMILARITIES IN

20   THE APPLE AND SAMSUNG PRODUCTS.

21           NUMBER 71.  IF YOU FIND THAT APPLE HAS

22   PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT

23   SAMSUNG ELECTRONICS COMPANY, SAMSUNG ELECTRONICS

24   AMERICA AND/OR SAMSUNG TELECOMMUNICATIONS HAVE

25   DILUTED OR INFRINGED UPON ANY OF APPLE'S TRADE

```
 1    DRESSES, THEN THERE ARE TWO FORMS OF MONETARY
 2    RELIEF TO WHICH APPLE MAY BE ENTITLED.  APPLE'S
 3    ACTUAL DAMAGES OR EACH SAMSUNG ENTITY'S PROFITS.
 4            IN DETERMINING THE AMOUNT OF MONEY TO
 5    AWARD APPLE FOR ITS TRADE DRESS CLAIMS, YOU MUST
 6    DETERMINE THE DATE ON WHICH DAMAGES BEGAN TO
 7    ACCRUE.  DAMAGES FOR TRADE DRESS DILUTION AND TRADE
 8    DRESS INFRINGEMENT OF APPLE'S UNREGISTERED TRADE
 9    DRESSES STARTED ON THE DATE THAT THE DILUTING OR
10    INFRINGING CONDUCT OF AN UNREGISTERED APPLE TRADE
11    DRESS BEGAN.
12            YOU MAY AWARD APPLE MONEY DAMAGES FOR ALL
13    VIOLATIONS THAT OCCURRED ON THE DATE THE PRODUCTS
14    THAT DILUTED OR INFRINGED EACH UNREGISTERED APPLE
15    TRADE DRESS WERE RELATED AND ANY DATE AFTER THAT.
16            FOR APPLE'S REGISTERED TRADE DRESS CLAIM,
17    APPLE HAS THE BURDEN OF PROVING BY A PREPONDERANCE
18    OF THE EVIDENCE THAT THE SAMSUNG ENTITIES HAD
19    EITHER STATUTORY OR ACTUAL NOTICE THAT THE
20    PLAINTIFF'S TRADE DRESS WAS REGISTERED.
21            YOU MAY AWARD APPLE MONEY DAMAGES FOR ALL
22    VIOLATIONS THAT OCCURRED ON THE DATE OF ACTUAL
23    NOTICE AND ANY DATE AFTER THAT.
24            YOU SHOULD NOT AWARD APPLE MONETARY
25    RELIEF FOR ANY OF ITS DILUTION CLAIMS UNLESS APPLE
```

1    PROVES BY A PREPONDERANCE OF THE EVIDENCE THAT

2    SAMSUNG'S ACTS OF DILUTION WERE WILLFUL.  IF YOU

3    DETERMINE THAT SAMSUNG'S DILUTION WAS NOT WILLFUL,

4    YOU DO NOT NEED TO ASSESS MONETARY DAMAGES FOR THAT

5    CLAIM.

6            PROOF OF DAMAGES TO A CERTAINTY IS NOT

7    REQUIRED.  HOWEVER, THE BURDEN IS ON APPLE TO SHOW

8    ANY DAMAGES TO A REASONABLE CERTAINTY, AND AWARDED

9    DAMAGES MAY NOT BE SPECULATIVE.

10           IN ORDER FOR APPLE TO RECOVER DAMAGES FOR

11   REGISTERED TRADE DRESS CLAIMS, APPLE HAS THE BURDEN

12   OF PROVING BY A PREPONDERANCE OF THE EVIDENCE THAT

13   EACH SAMSUNG ENTITY HAD EITHER STATUTORY OR ACTUAL

14   NOTICE THAT APPLE'S TRADE DRESS WAS REGISTERED.

15           EACH SAMSUNG ENTITY HAD STATUTORY NOTICE

16   IF:

17           1.  APPLE DISPLAYED WITH THE TRADE DRESS

18   THE WORDS "REGISTERED IN U.S. PATENT AND TRADEMARK

19   OFFICE."

20           2.  APPLE DISPLAYED WITH THE TRADE DRESS

21   THE WORD "U.S. PATENT AND TM OFF."

22           3.  APPLE DISPLAYED THE TRADE DRESS WITH

23   THE LETTER R ENCLOSED WITHIN A CIRCLE, THUS.

24           NUMBER 72.  IF YOU FIND FOR APPLE ON ITS

25   TRADE DRESS INFRINGEMENT AND DILUTION CLAIMS, YOU

4050

1    MUST DETERMINE APPLE'S ACTUAL DAMAGES.  APPLE HAS

2    THE BURDEN OF PROVING BY A PREPONDERANCE OF THE

3    EVIDENCE THE ACTUAL DAMAGES IT HAS SUFFERED.

4    DAMAGES MEANS THE AMOUNT OF MONEY WHICH WILL

5    REASONABLY AND FAIRLY COMPENSATE APPLE FOR ANY

6    INJURY YOU FIND WAS CAUSED BY ANY SAMSUNG ENTITY

7    INFRINGEMENT OR SOLUTION OF APPLE'S REGISTERED OR

8    UNREGISTERED TRADE DRESSES.

9          YOU SHOULD CONSIDER THE PROFITS THAT

10   APPLE WOULD HAVE EARNED BUT FOR SAMSUNG'S

11   INFRINGEMENT AND/OR DILUTION.  SUCH LOST PROFITS

12   ARE DETERMINED BY DEDUCTING ALL EXPENSES FROM GROSS

13   REVENUE.

14          IN ADDITION TO ACTUAL DAMAGES, APPLE IS

15   ENTITLED TO ANY PROFITS EARNED BY THE SAMSUNG

16   ENTITIES THAT ARE ATTRIBUTABLE TO WILLFUL

17   INFRINGEMENT OR WILLFUL DILUTION, WHICH THE

18   PLAINTIFF PROVES BY A PREPONDERANCE OF THE

19   EVIDENCE.

20          YOU MAY NOT, HOWEVER, INCLUDE IN ANY

21   AWARD OF PROFITS ANY AMOUNT THAT YOU TOOK INTO

22   ACCOUNT IN DETERMINING ACTUAL DAMAGES.

23          PROFIT IS DETERMINED BY DEDUCTING ALL

24   EXPENSES FROM GROSS REVENUE.

25          GROSS REVENUE IS EACH OF THE SAMSUNG

1    ENTITY'S SALES OF PRODUCTS THAT INFRINGED OR

2    DILUTED APPLE'S TRADE DRESSES.  APPLE HAS THE

3    BURDEN OF PROVING THE GROSS REVENUES OF EACH

4    SAMSUNG ENTITY'S SALES OF PRODUCTS THAT INFRINGED

5    OR DILUTED APPLE'S TRADE DRESSES BY A PREPONDERANCE

6    OF THE EVIDENCE.

7            EXPENSES ARE ALL OPERATING, OVERHEAD, AND

8    PRODUCTION COSTS INCURRED IN PRODUCING THE GROSS

9    REVENUE.  EACH SAMSUNG ENTITY HAS THE BURDEN OF

10   PROVING THE EXPENSES AND THE PORTION OF THE PROFIT

11   ATTRIBUTABLE TO FACTORS OTHER THAN THE USE OF THE

12   INFRINGED OR DILUTED TRADE DRESS BY A PREPONDERANCE

13   OF THE EVIDENCE.

14           UNLESS YOU FIND THAT THE SAMSUNG ENTITIES

15   HAVE PROVEN THAT A PORTION OF THE PROFIT FROM THE

16   SALE OF ITS PRODUCTS THAT INFRINGED OR DILUTED ANY

17   APPLE TRADE DRESS IS ATTRIBUTABLE TO FACTORS OTHER

18   THAN THE USE OF THE TRADE DRESS, YOU SHALL FIND

19   THAT THE TOTAL PROFIT IS ATTRIBUTABLE TO THE

20   INFRINGEMENT OR DILUTION.

21           NUMBER 74.  YOU SHOULD AWARD ANY REMEDY

22   TO WHICH A PARTY HAS PROVEN IT IS ENTITLED WITH

23   RESPECT TO EACH SALE OF AN ACCUSED SMARTPHONE OR

24   TABLET, EXCEPT THAT YOU SHOULD NOT AWARD A PARTY

25   TWICE FOR THE SAME SALE OF ANY ACCUSED SMARTPHONE

1    OR TABLET.  THIS MEANS THAT IF YOU AWARD

2    INFRINGER'S PROFITS UNDER TRADE DRESS OR DESIGN

3    PATENT INFRINGEMENT FOR THE SALE OF A CERTAIN

4    NUMBER OF ACCUSED SMARTPHONES OR TABLETS, YOU MAY

5    NOT ALSO AWARD REASONABLE ROYALTIES OR LOST PROFITS

6    FOR THOSE SAME SALES.

7            IF YOU AWARD REASONABLE ROYALTIES OR LOST

8    PROFITS FOR THE SALE OF A CERTAIN NUMBER OF ACCUSED

9    SMARTPHONES OR TABLETS, YOU MAY NOT AWARD

10   INFRINGER'S PROFITS AS TO THOSE ACCUSED SMARTPHONES

11   OR TABLETS.

12           YOU DO NOT HAVE TO USE THE SAME THEORY TO

13   CALCULATE DAMAGES FOR EVERY SALE, HOWEVER.  FOR

14   EXAMPLE, AN AWARD MAY BE SPLIT BETWEEN LOST PROFITS

15   FOR SOME SALES AND A REASONABLE ROYALTY FOR THE

16   REMAINDER OF SALES OF A PRODUCT THAT INFRINGES A

17   PATENT AND/OR INFRINGES OR DILUTES A TRADE DRESS.

18           FOR ANY SALE WHERE YOU MEASURE DAMAGES BY

19   A REASONABLE ROYALTY OR LOST PROFITS, YOU MAY

20   INCLUDE ROYALTY AMOUNTS OR LOST PROFITS FOR EACH

21   PATENT THAT YOU FIND VALID AND INFRINGED BY THE

22   SALE.

23           IF A SALE IS AWARDED ONE FORM OF MONETARY

24   RECOVERY, THAT SAME SALE CANNOT BE AWARDED ANOTHER

25   FORM OF MONETARY RECOVERY.

1          INSTRUCTION NUMBER 75.  I WILL NOW

2   INSTRUCT YOU ON THE HOW TO DETERMINE WHETHER APPLE

3   HAS PROVED ITS BREACH OF CONTRACT CLAIM.  A BREACH

4   IS AN UNJUSTIFIED FAILURE TO PERFORM A CONTRACT.

5          SAMSUNG HAS SUBMITTED DECLARATIONS TO

6   ETSI IN WHICH SAMSUNG IDENTIFIED THE '516 AND '941

7   PATENTS, OR RELATED PATENTS OR APPLICATIONS, AS

8   IPR'S THAT IT BELIEVED MAY BE CONSIDERED ESSENTIAL

9   TO THE UMTS STANDARD.

10          IN THOSE DECLARATIONS, SAMSUNG DECLARED

11   THAT IT WOULD BE PREPARED TO FRAND IRREVOCABLE

12   LICENSES UNDER THAT IPR'S ON FAIR, REASONABLE, AND

13   NON-DISCRIMINATORY, FRAND, TERMS AND CONDITIONS TO

14   THE EXTENT THE IPR'S REMAIN ESSENTIAL TO THE UMTS

15   STANDARD.

16          IN ORDER TO DEMONSTRATE BREACH OF THIS

17   PROVISION, APPLE MUST PROVE THAT ALL OF THE

18   CONDITIONS FOR PERFORMANCE OF THIS OBLIGATION

19   OCCURRED, THAT SAMSUNG DID NOT FULFILL THIS

20   OBLIGATION, THAT APPLE WAS HARMED, AND THAT THIS

21   HARM WAS CAUSED BY SAMSUNG'S FAILURE TO PERFORM

22   THIS OBLIGATION.

23          NUMBER 76.  THE NOVEMBER 1997 ETSI IPR

24   POLICY PROVIDES:  EACH MEMBER SHALL USE ITS

25   REASONABLE ENDEAVORS TO TIMELY INFORM ETSI OF

1   ESSENTIAL IPR'S IT BECOMES AWARE OF.  IN

2   PARTICULAR, A MEMBER SUBMITTING A TECHNICAL

3   PROPOSAL FOR A STANDARD SHALL, ON A BONA FIDE

4   BASIS, DRAW THE ATTENTION OF ETSI TO ANY MEMBER'S

5   IPR WHICH MIGHT BE ESSENTIAL IF THAT PROPOSAL IS

6   ADOPTED.

7           IN ORDER TO DEMONSTRATE BREACH OF THIS

8   CONTRACT PROVISION, APPLE MUST PROVE THAT ALL OF

9   THE CONDITIONS FOR PERFORMANCE OF THIS OBLIGATION

10  OCCURRED, THAT SAMSUNG DID NOT FULFILL THIS

11  OBLIGATION, THAT APPLE WAS HARMED AND THAT THIS

12  HARM WAS CAUSED BY SAMSUNG'S FAILURE TO PERFORM

13  THIS OBLIGATION.

14          NUMBER 77.  I WILL NOW INSTRUCT YOU ON

15  HOW TO DECIDE WHETHER APPLE HAS PROVEN THAT SAMSUNG

16  HAS VIOLATED THE FEDERAL ANTITRUST LAWS.

17          APPLE ALLEGES THAT IT WAS INJURED BY

18  SAMSUNG'S UNLAWFUL MONOPOLIZATION OF MARKETS

19  CONSISTING OF TECHNOLOGIES THAT COMPETED TO PERFORM

20  FUNCTIONS INCLUDED IN THE UMTS STANDARD BY 3GPP.

21          TO PREVAIL ON THIS CLAIM, APPLE MUST

22  PROVE EACH OF THE FOLLOWING ELEMENTS BY A

23  PREPONDERANCE OF THE EVIDENCE:

24          FIRST, THAT THE ALLEGED MARKET IS A

25  RELEVANT ANTITRUST MARKET;

1          SECOND, THAT SAMSUNG POSSESSED MONOPOLY

2     POWER IN THAT MARKET;

3          THIRD, THAT SAMSUNG WILLFULLY ACQUIRED

4     ITS MONOPOLY POWER IN THAT MARKET BY ENGAGED IN

5     ANTICOMPETITIVE CONDUCT;

6          FOURTH, THAT SAMSUNG'S CONDUCT OCCURRED

7     IN OR AFFECTED INTERSTATE COMMERCE; AND,

8          FIFTH, THAT APPLE WAS INJURED IN ITS

9     BUSINESS OR PROPERTY BECAUSE OF SAMSUNG'S

10    ANTICOMPETITIVE CONDUCT.

11         IF YOU FIND THAT APPLE HAS FAILED TO

12    PROVE ANY OF THESE ELEMENTS, THEN YOU MUST FIND FOR

13    SAMSUNG AND AGAINST APPLE ON THIS CLAIM.

14         IF YOU FIND THAT APPLE HAS PROVED EACH OF

15    THESE ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE,

16    THEN YOU MUST FIND FOR APPLE AND AGAINST SAMSUNG ON

17    THIS CLAIM.

18         NUMBER 78.  APPLE MUST PROVE BY A

19    PREPONDERANCE OF THE EVIDENCE THAT SAMSUNG HAD

20    MONOPOLY POWER IN ONE OR MORE RELEVANT MARKETS.

21    DEFINING THE RELEVANT MARKET IS ESSENTIAL TO

22    DETERMINING WHETHER SAMSUNG HAD MONOPOLY POWER

23    BECAUSE WHETHER A COMPANY HAS MONOPOLY POWER

24    DEPENDS ON THE CONTOURS OF THE MARKET.  THERE ARE

25    TWO ASPECTS YOU MUST CONSIDER IN DETERMINING

```
1    WHETHER APPLE HAS MET ITS BURDEN OF PROVING THE
2    RELEVANT MARKET OR MARKETS.  THE FIRST IS THE
3    EXISTENCE.
4         A TECHNOLOGY REFERS TO AN INVENTION OR
5    PROCESS FOR ACCOMPLISHING SOMETHING AND IS
6    SOMETIMES COVERED BY A PATENT.  THE BASIC IDEA OF A
7    RELEVANT TECHNOLOGY MARKET IS THAT THE TECHNOLOGIES
8    WITHIN IT ARE REASONABLE SUBSTITUTES FOR EACH OTHER
9    FROM THE USER'S POINT OF VIEW, THAT IS, THE
10   TECHNOLOGIES COMPETE WITH EACH OTHER.
11        IN OTHER WORDS, THE RELEVANT TECHNOLOGY
12   MARKET INCLUDES THE TECHNOLOGIES THAT A CONSUMER
13   BELIEVES ARE REASONABLY INTERCHANGEABLE OR
14   REASONABLE SUBSTITUTES FOR EACH OTHER.  THIS IS A
15   PRACTICAL TEST WITH REFERENCE TO ACTUAL BEHAVIOR OF
16   USERS AND THE MARKETING EFFORTS OF LICENSORS.
17   TECHNOLOGIES NEED NOT BE IDENTICAL OR PRECISELY
18   INTERCHANGEABLE AS LONG AS THEY ARE REASONABLE
19   SUBSTITUTES.
20        THE RELEVANT GEOGRAPHIC MARKET IS THE
21   AREA IN WHICH THE SAMSUNG TECHNOLOGIES FACE
22   COMPETITION FROM OTHER TECHNOLOGIES TO WHICH
23   CONSUMERS CAN REASONABLY TURN.  WHEN ANALYZING THE
24   RELEVANT GEOGRAPHIC MARKET, YOU SHOULD CONSIDER
25   WHETHER CHANGES IN PRICES OR PRODUCT OFFERINGS IN
```

5057

1    ONE AREA HAVE SUBSTANTIAL EFFECTS ON PRICES OR

2    SALES IN ANOTHER AREA, WHICH WOULD TEND TO SHOW

3    THAT BOTH AREAS ARE IN THE SAME RELEVANT GEOGRAPHIC

4    MARKET.

5        THE GEOGRAPHIC MARKET MAY BE AS LARGE AS

6    GLOBAL OR NATIONWIDE OR AS SMALL AS A SINGLE TOWN

7    OR EVEN SMALLER.

8        IF, AFTER CONSIDERING ALL THE EVIDENCE,

9    YOU FIND THAT APPLE HAS PROVEN BOTH A RELEVANT

10   TECHNOLOGY MARKET AND A RELEVANT GEOGRAPHIC MARKET,

11   THEN YOU MUST FIND THAT APPLE HAS MET THE RELEVANT

12   MARKET REQUIREMENT AND YOU MUST CONSIDER THE

13   REMAINING ELEMENTS OF ITS UNLAWFUL MONOPOLIZATION

14   CLAIMS.

15       IF YOU FIND THAT APPLE HAS FAILED TO

16   PROVE EITHER A RELEVANT TECHNOLOGY MARKET OR A

17   RELEVANT GEOGRAPHIC MARKET, THEN YOU MUST FIND FOR

18   SAMSUNG AND AGAINST APPLE ON APPLE'S UNLAWFUL

19   MONOPOLIZATION CLAIM.

20       WE HAVE ABOUT SEVEN MORE PAGES.  WOULD

21   YOU LIKE TO TAKE A BREAK NOW OR FINISH?

22       JUROR:  PROBABLY FINISH.

23       THE COURT:  KEEP GOING?  OKAY.

24       NUMBER 79.  IF YOU FIND THAT PLAINTIFF

25   HAS PROVEN A RELEVANT MARKET, THEN YOU SHOULD

1    DETERMINE WHETHER DEFENDANT HAS MONOPOLY POWER IN

2    THAT MARKET.  MONOPOLY POWER IS THE POWER TO PATROL

3    PRICES AND EXCLUDE COMPETITION IN A RELEVANT

4    ANTITRUST MARKET.

5            IN DETERMINING WHETHER SAMSUNG HAS

6    MONOPOLY POWER IN A RELEVANT MARKET, YOU MAY

7    CONSIDER WHETHER THERE IS DIRECT EVIDENCE THAT

8    SAMSUNG HAS MONOPOLY POWER.

9            IN ORDER TO PROVIDE DIRECT PROOF OF

10   MONOPOLY POWER, APPLE HAS THE BURDEN OF PROVING

11   THAT THE DEFENDANT HAS THE ABILITY TO RAISE OR

12   MAINTAIN THE PRICES THAT IT CHARGES FOR GOODS OR

13   SERVICES IN THE RELEVANT MARKET ABOVE COMPETITIVE

14   LEVELS.

15           APPLE MUST PROVE THAT SAMSUNG HAS THE

16   POWER TO DO SO BY ITSELF -- THAT IS, WITHOUT THE

17   ASSISTANCE OF, AND DESPITE COMPETITION FROM, ANY

18   EXISTING OR POTENTIAL COMPETITORS.  APPLE MUST ALSO

19   PROVE THAT SAMSUNG HAS THE POWER TO MAINTAIN PRICES

20   ABOVE A COMPETITIVE LEVEL FOR A SIGNIFICANT PERIOD.

21           IF SAMSUNG ATTEMPTED TO MAINTAIN PRICES

22   ABOVE COMPETITIVE LEVELS BUT WOULD LOSE SO MUCH

23   BUSINESS TO OTHER COMPETITORS THAT THE PRICE

24   INCREASE WOULD BECOME UNPROFITABLE AND WOULD HAVE

25   TO BE WITHDRAWN, THEN SAMSUNG DOES NOT HAVE

1    MONOPOLY POWER.

2              SIMILARLY, APPLE MUST PROVE THAT SAMSUNG

3    HAS THE ABILITY TO EXCLUDE COMPETITION.  FOR

4    EXAMPLE, IF SAMSUNG ATTEMPTED TO MAINTAIN PRICES

5    ABOVE COMPETITIVE LEVELS, BUT NEW COMPETITORS COULD

6    ENTER THE MARKET OR EXISTING COMPETITORS COULD

7    EXPAND THEIR SALES AND TAKE SO MUCH BUSINESS THAT

8    THE PRICE INCREASE WOULD BECOME UNPROFITABLE AND

9    WOULD HAVE TO BE WITHDRAWN, THEN SAMSUNG DOES NOT

10   HAVE MONOPOLY POWER.

11             THE ABILITY TO EARN HIGH PROFIT MARGINS

12   OR A HIGH RATE OF RETURN DOES NOT NECESSARILY MEAN

13   THAT SAMSUNG HAS MONOPOLY POWER.  OTHER FACTORS MAY

14   ENABLE A COMPANY WITHOUT MONOPOLY POWER TO SELL AT

15   HIGHER PRICES OR EARN HIGHER PROFIT MARGINS THAN

16   ITS COMPETITORS, SUCH AS THE ABILITY TO OFFER SUPER

17   PROCEDURE PRODUCTS OR SERVICES.

18             HOWEVER, AN ABILITY TO SELL AT HIGHER

19   PRICES OR EARN HIGHER PROFIT MARGINS THAN OTHER

20   COMPANIES FOR SIMILAR GOODS OR SERVICES OVER A LONG

21   PERIOD OF TIME MAY BE EVIDENCE OF MONOPOLY POWER.

22             BY CONTRAST, EVIDENCE THAT SAMSUNG WOULD

23   LOSE A SUBSTANTIAL AMOUNT OF SALES IF IT RAISED

24   PRICES SUBSTANTIALLY, OR THAT SAMSUNG'S PROFIT

25   MARGINS WERE LOW COMPARED TO ITS COMPETITORS,

1    ERRATIC, AND/OR DECREASING, MIGHT BE EVIDENCE THAT

2    SAMSUNG DOES NOT HAVE MONOPOLY POWER.

3              IF YOU DO NOT FIND THERE IS DIRECT

4    EVIDENCE OF MONOPOLY POWER, THERE ARE A NUMBER OF

5    FACTORS YOU MAY CONSIDER AS INDIRECT EVIDENCE OF

6    MONOPOLY POWER.

7              THE FIRST FACTOR THAT YOU SHOULD CONSIDER

8    IS SAMSUNG'S MARKET SHARE.  A MARKET SHARE ABOVE 50

9    PERCENT MAY BE SUFFICIENT TO SUPPORT AN INFERENCE

10   THAT A DEFENDANT HAS MONOPOLY POWER, BUT IN

11   CONSIDERING WHETHER A DEFENDANT HAS MONOPOLY POWER,

12   IT IS ALSO IMPORTANT TO CONSIDER OTHER ASPECTS OF

13   THE RELEVANT MARKET, SUCH AS MARKET SHARE TRENDS,

14   THE EXISTENCE OF BARRIERS TO ENTRY, THE ENTRY AND

15   EXIT BY OTHER COMPANIES, AND THE NUMBER AND SIZE OF

16   COMPETITORS.

17             ALONG WITH A DEFENDANT'S MARKET SHARE,

18   THESE FACTORS SHOULD INFORM YOU AS TO WHETHER THE

19   DEFENDANT HAS MONOPOLY POWER.  THE LIKELIHOOD THAT

20   A COMPANY HAS MONOPOLY POWER IS STRONGER THE HIGHER

21   THAT COMPANY'S SHARE IS ABOVE 50 PERCENT.

22             A MARKET SHARE BELOW 50 PERCENT IS

23   ORDINARILY NOT SUFFICIENT TO SUPPORT A CONCLUSION

24   THAT A DEFENDANT HAS MONOPOLY POWER.  HOWEVER, IF

25   YOU FIND THAT THE OTHER EVIDENCE DEMONSTRATED THAT

1    SAMSUNG DOES, IN FACT, HAVE MONOPOLY POWER, DESPITE

2    HAVING A MARKET SHARE BELOW 50 PERCENT, YOU MAY

3    CONCLUDE THAT SAMSUNG HAS MONOPOLY POWER.

4         YOU MAY ALSO CONSIDER WHETHER THERE ARE

5    BARRIERS TO ENTRY INTO THE RELEVANT MARKET.

6    BARRIERS TO ENTRY MAKE IT DIFFICULT FOR NEW

7    COMPETITORS TO ENTER THE RELEVANT MARKET IN A

8    MEANINGFUL AND TIMELY WAY.

9         BARRIERS TO ENTRY MIGHT INCLUDE, AMONG

10   OTHER THINGS, INTELLECTUAL PROPERTY RIGHTS, SUCH AS

11   PATENTS OR TRADE SECRETS, SPECIALIZED MARKETING

12   PRACTICES AND THE REPUTATION OF COMPANIES ALREADY

13   PARTICIPATING IN THE MARKET, OR THE BRAND NAME

14   RECOGNITION OF THEIR PRODUCTS.

15        EVIDENCE OF LOW OR NO ENTRY BARRIERS MAY

16   BE EVIDENCE THAT DEFENDANT DOES NOT HAVE MONOPOLY

17   POWER, REGARDLESS OF DEFENDANT'S MARKET SHARE,

18   BECAUSE NEW COMPETITORS COULD ENTER EASILY IF THE

19   DEFENDANT ATTEMPTED TO RAISE PRICES FOR A

20   SUBSTANTIAL PERIOD OF TIME.

21        BY CONTRAST, EVIDENCE OF HIGH BARRIERS TO

22   ENTRY ALONG WITH HIGH MARKET SHARE MAY SUPPORT AN

23   INFERENCE THAT DEFENDANT HAS MONOPOLY POWER.

24        YOU MAY CONSIDER WHETHER SAMSUNG'S

25   COMPETITORS ARE CAPABLE OF EFFECTIVELY COMPETING.

4062

```
 1              IN OTHER WORDS, YOU SHOULD CONSIDER
 2    WHETHER THE FINANCIAL STRENGTH, MARKET SHARES AND
 3    NUMBER OF COMPETITORS ACT AS A CHECK ON THE
 4    DEFENDANT'S ABILITY TO PRICE ITS PRODUCTS.  IF
 5    SAMSUNG'S COMPETITORS ARE VIGOROUS OR HAVE LARGE OR
 6    INCREASING MARKET SHARES, THIS MAY BE EVIDENCE THAT
 7    SAMSUNG LACKS MONOPOLY POWER.
 8              ON THE OTHER HAND, IF YOU DETERMINE THAT
 9    SAMSUNG'S COMPETITORS ARE WEAK OR HAVE SMALL OR
10    DECLINING MARKET SHARES, THIS MAY SUPPORT AN
11    INFERENCE THAT SAMSUNG HAS MONOPOLY POWER.
12              IF YOU FIND THAT SAMSUNG HAS MONOPOLY
13    POWER IN THE RELEVANT MARKET, THEN YOU MUST
14    CONSIDER THE REMAINING ELEMENTS OF APPLE'S
15    MONOPOLIZATION CLAIM.  IF YOU FIND THAT SAMSUNG
16    DOES NOT HAVE MONOPOLY POWER, THEN YOU MUST FIND
17    FOR SAMSUNG AND AGAINST APPLE ON THIS CLAIM.
18              NUMBER 80.  THE NEXT ELEMENT THAT APPLE
19    MUST PROVE IS THAT SAMSUNG WILLFULLY ACQUIRED
20    MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS OR
21    PRACTICES.  ANTICOMPETITIVE ACTS ARE ACTS OTHER
22    THAN COMPETITION ON THE MERITS THAT HAVE THE EFFECT
23    OF PREVENTING OR EXCLUDING COMPETITION.  HARM TO
24    COMPETITION IS TO BE DISTINGUISHED FROM HARM TO A
25    SINGLE COMPETITOR OR GROUP OF COMPETITORS, WHICH
```

1   DOES NOT NECESSARILY CONSTITUTE HARM TO

2   COMPETITION.

3          IN ADDITION, YOU SHOULD DISTINGUISH THE

4   ACQUISITION OF MONOPOLY POWER THROUGH

5   ANTICOMPETITIVE ACTS THROUGH THE ACQUISITION OF

6   MONOPOLY POWER BY SUPPLYING BETTER TECHNOLOGY,

7   POSSESSES SUPERIOR BUSINESS SKILLS OR BECAUSE OF

8   LUCK, WHICH IS NOT UNLAWFUL.

9          MERE POSSESSION OF MONOPOLY POWER, IF

10  LAWFULLY ACQUIRED, DOES NOT VIOLATE THE ANTITRUST

11  LAWS.  A MONOPOLIST MAY COMPETE AGGRESSIVELY

12  WITHOUT VIOLATING THE ANTITRUST LAWS AND A

13  MONOPOLIST MAY CHARGE MONOPOLY PRICES WITHOUT

14  VIOLATING THE ANTITRUST LAWS.  A MONOPOLIST'S

15  CONDUCT ONLY BECOMES UNLAWFUL WHERE IT INVOLVES

16  ANTICOMPETITIVE ACTS.

17         THE DIFFERENCE BETWEEN ANTICOMPETITIVE

18  CONDUCT AND CONDUCT THAT HAS A LEGITIMATE BUSINESS

19  PURPOSE CAN BE DIFFICULT TO DETERMINE.  THIS IS

20  BECAUSE ALL COMPANIES HAVE A DESIRE TO INCREASE

21  THEIR PROFITS AND INCREASE THEIR MARKET SHARE.

22         THESE GOALS ARE AN ESSENTIAL PART OF A

23  COMPETITIVE MARKETPLACE, AND THE ANTITRUST LAWS DO

24  NOT MAKE THESE GOALS, OR THE ACHIEVEMENT OF THESE

25  GOALS, UNLAWFUL, AS LONG AS A COMPANY DOES NOT USE

1    ANTICOMPETITIVE MEANS TO ACHIEVE THESE GOALS.

2              IN DETERMINING WHETHER SAMSUNG'S CONDUCT

3    WAS ANTICOMPETITIVE OR WHETHER IT WAS LEGITIMATE

4    BUSINESS CONDUCT, YOU SHOULD DETERMINE WHETHER THE

5    CONDUCT IS CONSISTENT WITH COMPETITION ON THE

6    MERITS, WHETHER THE CONDUCT PROVIDES BENEFITS TO

7    CONSUMERS AND WHETHER THE CONDUCT WOULD MAKE

8    BUSINESS SENSE APART FROM ANY EFFECT IT HAS ON

9    EXCLUDING COMPETITION OR HARMING COMPETITORS.

10             APPLE ALLEGES THAT SAMSUNG WILLFULLY

11   ACQUIRED MONOPOLY POWER -- THIS IS INSTRUCTION

12   NUMBER 81 -- BASED ON ANTICOMPETITIVE BEHAVIOR IN

13   CONNECTION WITH THE UMTS STANDARD SETTING PROCESS

14   AT 3GPP.  A STANDARD CAN ENHANCE CONSUMER WELFARE

15   BY ENSURING INTEROPERABILITY OF PRODUCTS AND PRICES

16   AND MAKING MULTIPLE SOURCES OF SUPPLY AVAILABLE TO

17   CONSUMERS.

18             THE IDEAL STANDARD-SETTING PROCESS CAN

19   ALLOW MEMBERS OF A STANDARD SETTING ORGANIZATION TO

20   MAKE AN OBJECTIVE COMPARISON AMONG COMPETING

21   TECHNOLOGIES BEFORE A STANDARD IS ADOPTED.

22             BASED ON THE AVAILABLE INFORMATION, A

23   RATIONAL STANDARD SETTING ORGANIZATION CAN SELECT

24   THE BEST TECHNOLOGY, CONSIDERING ITS COST AND

25   PERFORMANCE, AND CAN INCLUDE THAT TECHNOLOGY IN THE

1    STANDARD.

2         TO THE EXTENT THE INDUSTRY HAS INVESTED

3    IN A STANDARD AND CANNOT EASILY TRANSFER THAT

4    INVESTMENT TO AN ALTERNATIVE STANDARD, THE PROCESS

5    OF STANDARDIZATION MAY ELIMINATE ALTERNATIVE

6    TECHNOLOGIES.  WHEN A PATENTED TECHNOLOGY IS

7    INCORPORATED INTO SUCH A STANDARD, ADOPTION OF THE

8    STANDARD MAY ELIMINATE ALTERNATIVES TO THE PATENTED

9    TECHNOLOGY.  NONETHELESS, WINNING THE COMPETITION

10   BETWEEN TECHNOLOGIES TO BE INCLUDED IN THE STANDARD

11   MAY ENHANCE CONSUMER WELFARE AND NOT BE

12   ANTICOMPETITIVE, EVERYONE IF THE TECHNOLOGY IS

13   COVERED BY A PATENT.

14        DISRUPTION OF A STANDARD SETTING PROCESS,

15   HOWEVER, MAY BE ANTICOMPETITIVE.  AS TO APPLE'S

16   CLAIMS THAT SAMSUNG FAILED TO TIMELY DISCLOSE IPR,

17   INCLUDING PATENTS AND PATENT APPLICATIONS, THAT MAY

18   COVER TECHNOLOGY BEING CONSIDERED FOR INCLUSION IN

19   THE UMTS STANDARD, YOU MAY FIND THAT SAMSUNG

20   WILLFULLY ACQUIRED OR MAINTAINED MONOPOLY POWER

21   THROUGH ANTICOMPETITIVE ACTS IF:  1, ETSI MEMBERS

22   SHARED A CLEARLY DEFINED EXPECTATION THAT MEMBERS

23   WERE REQUIRED TO TIMELY DISCLOSE IPR THAT

24   REASONABLY MIGHT COVER TECHNOLOGY BEING CONSIDERED

25   FOR ADOPTION IN THE UMTS STANDARD; 2, SAMSUNG

1    KNOWINGLY FAILED TO DISCLOSE SUCH IPR IN A TIMELY

2    FASHION; 3, 3GPP RELIED ON THE REQUIREMENT THAT

3    SAMSUNG WOULD TIMELY DISCLOSE SUCH INFORMATION WHEN

4    3GPP ADOPTED THE UMTS STANDARD; AND, 4, SAMSUNG DID

5    NOT COMPLY WITH THE REQUIREMENT.

6            AS TO APPLE'S CLAIMS THAT DURING THE

7    STANDARD-SETTING PROCESS SAMSUNG CONCEALED ITS TRUE

8    INTENTIONS NOT TO MEET THE COMMITMENT IT HAD MADE

9    TO LICENSE ITS DECLARED ESSENTIAL IPR ON FAIR,

10   REASONABLE, AND NON-DISCRIMINATORY, FRAND, TERMS,

11   YOU MAY FIND THAT SAMSUNG WILLFULLY ACQUIRED OR

12   MAINTAINS MONOPOLY POWER THROUGH ANTICOMPETITIVE

13   ACTS IF:  1, ETSI MEMBERS SHARED A CLEARLY DEFINED

14   EXPECTATION THAT PARTICIPANTS WERE BOUND TO LICENSE

15   THEIR DECLARED-ESSENTIAL IPR ON FRAND TERMS TO

16   ETSI, ITS MEMBERS, AND ANY ENTITY THAT IMPLEMENTED

17   THE UMTS STANDARD; 2, SAMSUNG MADE AN INTENTIONALLY

18   FALSE PROMISE TO COMPLY WITH THIS REQUIREMENT; 3,

19   ETSI MEMBERS RELIED ON THE REQUIREMENT WHEN THEY

20   ADOPTED THE STANDARDS WHICH THE DECLARED-ESSENTIAL

21   IPR MIGHT REASONABLY COVER; AND, 4, SAMSUNG DID NOT

22   COMPLY WITH THE REQUIREMENT.

23           IN DETERMINING WHETHER ETSI MEMBERS

24   SHARED SUCH CLEARLY DEFINED EXPECTATIONS, YOU MAY

25   CONSIDER AMONG OTHER FACTORS; 1, THE EXPECTATIONS

4067

```
 1     OF THE INDIVIDUAL ETSI MEMBERS; 2, ANY BEHAVIOR BY

 2     ETSI MEMBERS WITH RESPECT TO DISCLOSING OR NOT

 3     DISCLOSING SUCH INFORMATION; 3, ORAL INFORMATION

 4     COMMUNICATED OR DISCUSSED AT ETSI MEETINGS OR IN

 5     ETSI MINUTES; 4, ANY WRITTEN RULES THAT ETSI MADE

 6     AVAILABLE TO MEMBERS; 5, CUSTOMS OF THE INDUSTRY;

 7     AND, 6, THE PURPOSE OF THE ETSI.

 8               IN DETERMINING WHETHER APPLE HAS PROVED

 9     THAT SAMSUNG WILLFULLY ACQUIRED MONOPOLY POWER, YOU

10     MAY CONSIDER SAMSUNG'S COURSE OF CONDUCT AS A WHOLE

11     AND ITS OVERALL EFFECT, RATHER THAN FOCUSSING ON A

12     PARTICULAR ASPECT OF SAMSUNG'S DISCLOSURE OR

13     LICENSING CONDUCT IN ISOLATION.

14               NUMBER 82.  IN DETERMINING WHETHER OR NOT

15     SAMSUNG WILLFULLY ACQUIRED MONOPOLY POWER IN A

16     RELEVANT TECHNOLOGY MARKET, YOU MAY CONSIDER ANY

17     EVIDENCE THAT SAMSUNG INTENDED TO DECEIVE ETSI TO

18     THE EXTENT IT HELPS TO UNDERSTAND THE LIKELY EFFECT

19     OF SAMSUNG'S CONDUCT.  SPECIFIC INTENT TO

20     MONOPOLIZE, HOWEVER, IS NOT REQUIRED FOR ONE TO BE

21     LIABLE FOR MONOPOLIZATION, ONLY THE INTENT TO

22     COMMIT THE ACTS THAT RESULTED IN MONOPOLIZATION.

23               NUMBER 83.  THE FEDERAL ANTITRUST LAWS

24     APPLY ONLY TO CONDUCT THAT AFFECTS INTERSTATE

25     COMMERCE.  IN THIS CASE, THERE'S NO DISPUTE THAT
```

```
1    SAMSUNG'S CONDUCT AFFECTED INTERSTATE COMMERCE.
2             NUMBER 84.  IF YOU FIND THAT SAMSUNG HAS
3    VIOLATED THE FEDERAL ANTITRUST LAWS AS ALLEGED BY
4    APPLE, YOU MUST THEN DECIDE IF APPLE IS ENTITLED TO
5    RECOVER DAMAGES FROM SAMSUNG.
6             APPLE IS ENTITLED TO RECOVER DAMAGES FOR
7    AN INJURY TO ITS BUSINESS OR PROPERTY IF IT CAN
8    ESTABLISH THREE ELEMENTS OF INJURY AND CAUSATION.
9             FIRST, APPLE MUST PROVE THAT IT WAS, IN
10   FACT, INJURED AS A RESULT OF SAMSUNG'S ALLEGED
11   VIOLATION OF THE ANTITRUST LAWS.
12            SECOND, APPLE MUST PROVE THAT SAMSUNG'S
13   ALLEGED ILLEGAL CONDUCT WAS A MATERIAL CAUSE OF
14   APPLE'S INJURY.  THAT MEANS THAT APPLE MUST PROVE
15   THAT SAMPLE DAMAGES OCCURRED AS A RESULT OF
16   SAMSUNG'S ALLEGED ANTITRUST VIOLATION AND NOT SOME
17   OTHER CAUSE.
18            APPLE IS NOT REQUIRED TO PROVE THAT
19   SAMSUNG'S ALLEGED ANTITRUST VIOLATION WAS THE SOLE
20   CAUSE OF ITS INJURY, NOR NEED APPLE ELIMINATE ALL
21   OTHER POSSIBLE CAUSES OF INJURY.
22            THIRD, APPLE MUST PROVE THAT ITS INJURY
23   IS THE TYPE OF INJURY THAT THE ANTITRUST LAWS WERE
24   INTENDED TO PREVENT.  IF APPLE'S INJURY WAS CAUSED
25   BY A REDUCTION IN COMPETITION OR ACTS THAT WOULD
```

```
 1      OTHERWISE HARM CONSUMERS, THEN APPLE'S INJURY IS AN
 2      ANTITRUST INJURY.  THE COSTS AND EXPENSES IN
 3      DEFENDING AGAINST THE ASSERTION OF DECLARED
 4      ESSENTIAL PATENTS MAY BE AN ANTITRUST.
 5              ON THE OTHER HAND, IF APPLE'S INJURY WAS
 6      CAUSED BY HEIGHTENED COMPETITION, THE COMPETITIVE
 7      PROCESS ITSELF, OR BY ACTS THAT WOULD BENEFIT
 8      CONSUMERS, THEN APPLE'S INJURIES WERE NOT ANTITRUST
 9      JURIES AND APPLE MAY NOT RECOVER DAMAGES FOR THOSE
10      INJURIES UNDER ANTITRUST LAWS.
11              IF YOU FIND THAT APPLE HAS SUFFERED
12      INJURY TO ITS BUSINESS OR PROPERTY, YOU MUST
13      DETERMINE WHETHER APPLE HAS PROVEN THAT IT IS
14      ENTITLED TO DAMAGES FOR SUCH INJURY.  THE AMOUNT OF
15      ANY SUCH DAMAGES IS THE AMOUNT OF DAMAGES THAT
16      APPLE HAS PROVEN AT TRIAL WITH REASONABLE
17      CERTAINTY.
18              ALL RIGHT.  WE ARE -- WE NEED TO TAKE NOW
19      A 15-MINUTE BREAK, BUT IT'S BASICALLY 11:39, SO I
20      SUGGEST WE JUST GO TO LUNCH EARLY TODAY AND WE COME
21      BACK AT 1:00 O'CLOCK.
22              I HOPE YOU ALL CAN STAY LATE TODAY.
23      WE'LL BE GOING BEYOND 4:30.  IS THAT ALL RIGHT ?
24      BECAUSE WE NEED TO FINISH ALL OF THE CLOSINGS
25      TODAY.
```

```
 1              ALL RIGHT.  PLEASE KEEP AN OPEN MIND.
 2    PLEASE DON'T DISCUSS THE CASE WITH ANYONE.  PLEASE
 3    DON'T DO ANY OF YOUR OWN RESEARCH AND DON'T READ
 4    ABOUT THE CASE.  WE WILL SEE YOU BACK AT 1:00
 5    O'CLOCK.
 6              ALL RIGHT.  THANK YOU.
 7              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 8    WERE HELD OUT OF THE PRESENCE OF THE JURY:)
 9              THE COURT:  THE RECORD SHOULD REFLECT THE
10    JURORS HAVE LEFT THE COURTROOM.  PLEASE TAKE A
11    SEAT.
12              HOW WOULD YOU LIKE TO HANDLE THE BREAKS
13    THIS AFTERNOON?  I'M SORRY WE GOOD DID NOT GET TO
14    CLOSING ARGUMENTS THIS MORNING.
15              HOW DO YOU WANT TO HANDLE THE BREAKS?
16              MR. MCELHINNY:  JUST THE NORMAL WAY.
17              MR. VERHOEVEN:  YOUR HONOR, THIS IS
18    MR. VERHOEVEN.  I'LL PROBABLY NEED JUST A FEW
19    MINUTES JUST TO SET UP IN BETWEEN MR. MCELHINNY'S
20    FINISHING.  SO THAT WOULD BE A GOOD TIME FOR A
21    BREAK.  I'M NOT SURE I'LL NEED ONE FOR THE
22    REBUTTAL, BUT WHEN WE'RE SWITCHING, I WANT TO GET
23    SOME PHONES UP HERE AND THAT'LL TAKE A COUPLE
24    MINUTES.
25              MR. MCELHINNY:  I'LL BE GOING ABOUT AN
```

```
 1    HOUR.
 2              THE COURT:  I WAS GOING TO SUGGEST WE
 3    TAKE A BREAK AT 3:00.  I MEAN, OBVIOUSLY THERE WILL
 4    BE A FEW MINUTES JUST TO SET UP, BUT I DON'T WANT
 5    TO TAKE A WHOLE BREAK AFTER ONLY AN HOUR.
 6              MR. VERHOEVEN:  YEAH, I WOULD JUST LIKE
 7    MAYBE FIVE MINUTES.
 8              THE COURT:  YEAH, THAT'S COMPLETELY FINE.
 9    BUT THEN LET'S ROUGHLY, WOULD THAT BE ALL RIGHT TO
10    PLAN IT AT THE HALFWAY MARK, TWO HOURS, TAKING A
11    BREAK FROM 3:00 TO 3:15.
12              MR. VERHOEVEN:  YES, YOUR HONOR.
13              THE COURT:  OKAY.  AND THEN WHATEVER FEW
14    MINUTES YOU ALL NEED TO SET UP TO TRANSMISSION, WE
15    CAN DO THAT AS WELL.  THAT'S FINE.
16              IS THERE ANYTHING ELSE WE NEED TO COVER
17    THIS MORNING?
18              MR. JACOBS:  YOUR HONOR, FOR THE
19    AVOIDANCE OF DOUBT, WE RENEW ALL PREVIOUSLY
20    ASSERTED AND PRESERVED OBJECTIONS TO THE JURY
21    INSTRUCTIONS.
22              MR. JOHNSON:  SINCE HE DID IT --
23              (LAUGHTER.)
24              THE COURT:  YOU COULD HAVE TAKEN THE
25    HIGHER ROAD, MR. JOHNSON.
```

4072

```
1              MR. JOHNSON:  I SHOULD.

2              THE COURT:  UNDERSTOOD.  EVERYONE'S

3      OBJECTIONS TO THE JURY INSTRUCTIONS ARE PRESERVED

4      FOR APPEAL.

5              MS. MAROULIS:  ONE MORE QUESTION ABOUT

6      EXCLUDED EVIDENCE.

7              THE COURT:  YES.

8              MS. MAROULIS:  WE PREPARED A SHORT

9      NON-ARGUMENTATIVE ABOUT EXCLUDED EVIDENCE, AND WE

10     HEARD THE COURT SAY THAT YOU WANT IT FILED AFTER

11     THE JURY DELIBERATES.

12             IS IT POSSIBLE TO FILE IT NOW UNDER SEAL

13     AND THEN THE COURT UNSEALS IT LATER, BECAUSE OUR

14     APPELLATE PEOPLE ARE TELLING US THAT WE NEED TO

15     FILE IT BEFORE THE JURY RETIRED FOR PURPOSES OF

16     APPEAL.

17             THE COURT:  OH.

18             MS. MAROULIS:  BUT WE UNDERSTAND WHAT THE

19     COURT IS SAYING ABOUT THE JURY.

20             THE COURT:  OKAY.  I DON'T KNOW IF I WANT

21     TO GET INTO SEALING ISSUES AT THAT POINT.

22             LET ME THINK ABOUT IT DURING THE BREAK

23     AND FIGURE OUT HOW TO HANDLE IT.  I CERTAINLY DON'T

24     WANT TO IN ANY WAY NEGATIVELY IMPACT ANYONE'S

25     APPELLATE RIGHTS, SO WE'LL FIGURE IT OUT.
```

1               MS. MAROULIS:  THANK YOU, YOUR HONOR.

2               THE COURT:  OKAY.  ALL RIGHT.  ANYTHING

3     ELSE?  NO?  OKAY.  THANK YOU.

4               (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

```
1                    AFTERNOON SESSION

2              (WHEREUPON, THE FOLLOWING PROCEEDINGS

3    WERE HELD IN THE PRESENCE OF THE JURY:)

4              THE COURT:  ALL RIGHT.  WELCOME BACK.

5    PLEASE TAKE A SEAT.

6              SO, LADIES AND GENTLEMEN OF THE JURY,

7    YOU'VE NOW HEARD ALL THE EVIDENCE AND THE LAW.

8    IT'S NOW TIME TO HEAR THE CLOSING ARGUMENTS OF

9    COUNSEL.  EACH COUNSEL WILL HAVE AN OPPORTUNITY TO

10   REVIEW THE EVIDENCE AND TO ARGUE TO YOU WHAT HE OR

11   SHE BELIEVES THAT EVIDENCE HAS SHOWN.

12             I, AGAIN, REMIND YOU THAT WHAT THE

13   ATTORNEYS SAY DURING THEIR ARGUMENTS IS NOT

14   EVIDENCE.  IF EITHER ATTORNEY MISSTATES THE

15   EVIDENCE OR THE LAW, YOU ARE TO RELY ON YOUR OWN

16   RECOLLECTION OF THE EVIDENCE AND THE JURY

17   INSTRUCTIONS THAT I HAVE PROVIDED TO YOU.

18             THE CLOSING ARGUMENTS WILL FOLLOW THE

19   SAME SEQUENCE AS THE TRIAL.  APPLE WILL MAKE THE

20   FIRST CLOSING ARGUMENT; THEN SAMSUNG WILL MAKE ITS

21   CLOSING ARGUMENT; THEN APPLE WILL MAKE ITS REBUTTAL

22   ARGUMENT; AND THEN SAMSUNG WILL MAKE ITS REBUTTAL

23   ARGUMENT.

24             OKAY.  SO UPON THE CONCLUSION OF THE

25   ARGUMENT, IF YOU HAVE TIME, YOU WILL START
```

```
 1    DELIBERATING TODAY, BUT MOST LIKELY YOU WILL START

 2    DELIBERATING TOMORROW AT 9:00 O'CLOCK, AND YOU WILL

 3    BE DELIBERATING ACTUALLY IN THE JURY ROOM THAT'S

 4    ATTACHED TO MY COURTROOM DOWN ON THE FOURTH FLOOR,

 5    AND WE'LL GIVE YOU INFORMATION ABOUT WHERE TO

 6    REPORT TO TOMORROW MORNING.

 7             BUT YOU ARE NOT TO DISCUSS THE CASE

 8    UNLESS ALL NINE OF YOU ARE PRESENT IN THE JURY

 9    ROOM.

10             ALL RIGHT.  WITH THAT, THE TIME IS NOW

11    1:05.  GO AHEAD, PLEASE.

12             MR. MCELHINNY:  THANK YOU.

13             (WHEREUPON, MR. MCELHINNY GAVE HIS

14    CLOSING ARGUMENT ON BEHALF OF APPLE.)

15             MR. MCELHINNY:  MAY IT PLEASE THE COURT,

16    LADIES AND GENTLEMEN OF THE JURY.

17             NOW THAT YOU ARE VETERANS, YOU'VE

18    PROBABLY COME TO REALIZE THAT THERE ARE SOME WEIRD

19    THINGS ABOUT TRIALS, AND ONE OF THE WEIRDEST THINGS

20    ABOUT THEM IS WE DON'T TELL YOU WHAT THE CASE IS

21    ABOUT UNTIL AFTER YOU'VE HEARD ALL THE EVIDENCE.

22             SO YOU SIT HERE FOR THREE WEEKS AND

23    LISTEN TO EVIDENCE, AND THEN WE TELL YOU WHAT THE

24    CASE IS ABOUT AND HOPEFULLY YOU BEGIN TO UNDERSTAND

25    WHY CERTAIN PIECES WERE TOLD TO YOU.
```

1          WHEN I FIRST SPOKE TO YOU THREE WEEKS

2     AGO, I TOLD YOU THAT IT WAS MY JOB AND IT WAS

3     MR. LEE'S JOB TO BRING TO YOU ALL THE EVIDENCE THAT

4     YOU WOULD NEED TO DO YOUR JOB SO THAT YOU COULD

5     COME TO A JUDGMENT.

6          THIS IS MY OPPORTUNITY TO REMIND YOU OF

7     THE EVIDENCE YOU'VE HEARD AND TO EXPLAIN WHY YOU

8     HEARD SOME OF IT AND TO TRY TO HELP YOU PUT IT INTO

9     CONTEXT.

10          CONTEXT, OF COURSE, IS A MATTER OF FOCUS.

11     FIRST YOU HAVE TO LOOK AT THE BIG PICTURE, THEN YOU

12     HAVE TO FOCUS ON THE DETAILS, AND THEN YOU HAVE TO

13     COME TO THE POINT WHERE YOU'RE READY TO MAKE A

14     JUDGMENT.

15          I WOULD LIKE TO START BY MAKING THREE BIG

16     PICTURE POINTS.

17          THE FIRST IS THE DOCUMENTS ARE THE MOST

18     VALUABLE KEY TO THE TRUTH FINDING FUNCTION.

19     WITNESSES CAN BE MISTAKEN.  THEY CAN BE MISTAKEN IN

20     GOOD FAITH, THEY CAN BE MISTAKEN IN BAD FAITH.

21          EXHIBITS THAT ARE CREATED FOR TRIAL ARE

22     ALWAYS CREATED FOR A PURPOSE.  THEY'RE ALWAYS

23     CREATED TO MAKE A POINT AND THEY CAN CONFUSE AND

24     THEY CAN MISLEAD.

25          BUT HISTORICAL DOCUMENTS ARE ALMOST

4077

```
 1    ALWAYS WHERE THE TRUTH LIES.  THEY ARE ALMOST

 2    ALWAYS WRITTEN HONESTLY BY PEOPLE WHO, WHEN THEY

 3    WERE WRITING THEM, NEVER DREAMED THAT A JURY WOULD

 4    BE LOOKING AT THEM TWO AND THREE YEARS LATER

 5    SITTING IN A COURTROOM IN SAN JOSE.  THAT'S MY

 6    FIRST BIG POINT.

 7             SECOND, THIS IS SOMETHING THAT WE

 8    ACTUALLY TEACH YOUNG LAWYERS, AND, YOU KNOW, WE'RE

 9    NOT UNIQUE ABOUT THIS, BUT IF YOU WANT TO FIND OUT

10    WHAT REALLY HAPPENED, IF YOU WANT TO SEE THE TRUTH,

11    MAKE A CHRONOLOGY.  IN A TRIAL WHERE EVIDENCE COMES

12    IN THROUGH WITNESSES, IT ISN'T POSSIBLE TO BRING

13    THE EVIDENCE IN TO CHRONOLOGICAL ORDER.  YOU HAVE

14    TO DO IT ONE WITNESS AT A TIME.

15             BUT WHEN YOU GET IN THE JURY ROOM, YOU

16    CAN PUT THE DOCUMENTS AND YOU CAN PUT THE TESTIMONY

17    INTO A CHRONOLOGY, AND THAT, I SUBMIT, IS WHERE YOU

18    WILL FIND THE TRUTH.

19             LET ME PREVIEW FOR YOU WHAT YOU WILL FIND

20    WHEN YOU MAKE THE CHRONOLOGY IN THIS CASE.

21             STEVE JOBS STARTED THE IPHONE DEVELOPMENT

22    PROJECT IN 2003.  YOU HEARD FROM SCOTT FORSTALL

23    ABOUT THE SOFTWARE DEVELOPERS WORKING OVER THREE

24    YEARS IN THE PURPLE DORM.  YOU HEARD FROM CHRIS

25    STRINGER ABOUT THE NUMBER OF DESIGNS THAT WERE
```

1   CONSIDERED, AND YOU SAW, YOU HAVE IN EVIDENCE, MANY

2   OF THE MODELS, SKETCHES, AND CAD DRAWINGS THAT WERE

3   CONSIDERED, REJECTED, AND REDESIGNED OVER AND OVER

4   DURING THAT THREE-YEAR PERIOD.

5           YOU HEARD FROM PHIL SCHILLER ABOUT THE

6   ENORMOUS RISK THAT APPLE TOOK WHEN IT WENT INTO

7   THIS PROJECT.

8           FROM 2004 TO 2007, WHILE APPLE WAS

9   SPENDING THOSE YEARS IN RESEARCH AND DEVELOPMENT,

10  THESE ARE THE PHONES THAT SAMSUNG WAS SELLING.

11  THIS IS WHAT SAMSUNG'S PHONES LOOKED LIKE BETWEEN

12  2004 AND 2007.

13          AND THEN, IN JANUARY 2007, STEVE JOBS

14  SHOCKED THE PHONE WORLD.  THE FOUR-YEAR INVESTMENT

15  HAD PAID OFF.  APPLE HAD TURNED OVER ITS FUTURE TO

16  INVENTORS AND DESIGNERS, AND THEY HAD PRODUCED THE

17  IPHONE.

18          THE REACTION TO THE IPHONE WAS IMMEDIATE.

19  THE IPHONE WAS CALLED "GORGEOUS."  THE IPHONE MADE

20  THE COVER OF TIME MAGAZINE.  IT WAS NAMED THE

21  INVENTION OF THE YEAR.  IT WAS POSSIBLY THE MOST

22  FAMOUS PRODUCT IN THE WORLD.

23          BY SEPTEMBER OF 2007, SAMSUNG HAD ALREADY

24  BEGUN TO ANALYZE THE IPHONE'S EFFECTS ON THE

25  MARKET.  EXHIBIT 34, WHICH YOU'VE SEEN A COUPLE OF

1    TIMES, IS AN EXTREMELY SIGNIFICANT DOCUMENT.

2              AS YOU HEARD, IT IS FROM SAMSUNG'S LSI

3    DIVISION.  THAT'S NOT THE PHONE DIVISION.  THIS IS

4    THE PART OF SAMSUNG THAT GOT APPLE'S CONFIDENTIAL

5    SEMICONDUCTOR AND PART DESIGNS IN ADVANCE AND

6    PROMISED APPLE COMPLETE CONFIDENTIALITY.

7              WHY WAS THIS GROUP DOING A COMPETITIVE

8    ANALYSIS OF THE IPHONE?

9              WHEN YOU LOOK AT PAGE 13 OF THIS

10   DOCUMENT, YOU WILL SEE A PAGE ABOUT MOBILE PHONE

11   TRENDS FROM 2007 THROUGH 2012 WHERE SAMSUNG RATED

12   THE IPHONE AS THE SINGLE MOST IMPORTANT FACTOR.

13             YOU WILL SEE THAT THE IPHONE IS CIRCLED.

14   I THOUGHT IT WAS PURPLE, BUT I'VE BEEN TOLD THAT

15   IT'S FUSIA.  SO IT'S CIRCLED IN FUSIA.

16             WE DIDN'T DO THIS FOR THIS TRIAL.  THIS

17   IS A HISTORICAL DOCUMENT.  SAMSUNG DID THIS IN

18   2007.

19             ON PAGE 38, UNDER "IPHONE EFFECT

20   ANALYSIS," SAMSUNG'S DOCUMENT IDENTIFIES THE

21   FACTORS THAT COULD MAKE THE IPHONE A SUCCESS.

22             AND AMONG THEM LISTS THE EASY AND

23   INTUITIVE USER INTERFACE AND THE BEAUTIFUL DESIGN.

24             WHY WAS THE SEMICONDUCTOR DIVISION

25   PUTTING TOGETHER A COMPETITIVE ANALYSIS OF APPLE?

4080

```
 1    WHY WAS THE SEMICONDUCTOR DIVISION INTERESTED IN

 2    SAMSUNG'S BEAUTIFUL -- IN APPLE'S BEAUTIFUL DESIGN?

 3              UNFORTUNATELY, WE DON'T KNOW THE ANSWER,

 4    AND WE WON'T KNOW THE ANSWER TO THAT BECAUSE

 5    SAMSUNG DID NOT BRING A WITNESS WHO WAS WILLING OR

 6    ABLE TO TALK ABOUT THIS DOCUMENT.

 7              THE FOLLOWING YEAR, IN 2008, SAMSUNG

 8    HIRED A CONSULTING COMPANY TO ASSESS THE IMPACT

 9    THAT THE IPHONE WAS HAVING ON THE SMARTPHONE

10    MARKET.  EXHIBIT 36, PLAINTIFF'S, PX 36 IN YOUR

11    EXHIBIT LIST IS THEIR REPORT.

12              THIS DOCUMENT, BY THE WAY -- SOME

13    DOCUMENTS CAME IN FOR LIMITED PURPOSES.  THIS

14    DOCUMENT HAS COME IN FOR THE TRUTH OF EVERYTHING

15    THAT'S WRITTEN IN IT.

16              LOOK AT PAGE 20.  AGAIN, THIS IS NOT A

17    GRAPHIC THAT SOME LAW FIRM CREATED FOR THIS CASE.

18    THIS IS A HISTORICAL DOCUMENT.  THIS IS WHAT

19    SAMSUNG WAS THINKING IN 2008.  IT CALLS THE IPHONE

20    A REVOLUTION.

21              IN THE LOWER LEFT-HAND CORNER OF THIS

22    PAGE, IT QUOTES A JUNE 2007 ARTICLE THAT SAYS "TALK

23    ABOUT HYPE.  IN THE LAST SIX MONTHS, APPLE'S IPHONE

24    HAS BEEN THE SUBJECT OF 11,000 PRINT ARTICLES, AND

25    IT TURNS UP ABOUT 69 MILLION HITS ON GOOGLE."
```

1           SIX MONTHS BETWEEN THE -- AFTER THE

2      ANNOUNCEMENT.  THE IPHONE WAS FAMOUS, REMEMBER,

3      THAT'S ONE OF THE ISSUES WE'VE BEEN TALKING ABOUT,

4      THE IPHONE WAS FAMOUS AS SOON AS IT WAS LAUNCHED.

5           LET'S LOOK AT THE NEXT PAGE.  HERE THE

6      CONSULTANTS WERE TALKING ABOUT THE REACTIONS OF

7      IPHONE USERS FROM AROUND THE WORLD, WHAT THE REPORT

8      CALLED "EXPRESSIONS OF LOVE" AND "EXPRESSIONS OF

9      AWE."

10           ONE USER FROM THE BAY AREA SAID, "THIS

11      THING IS WORLD-CHANGING IN TERMS OF PHONES."

12           WHY DID THESE PEOPLE LOVE THE IPHONE?

13      THE REPORT ANSWERS THAT QUESTION AS WELL ON PAGE

14      36.  IT POINTS OUT THAT THE PHONE WASN'T ONLY EASY,

15      IT WAS SEXY TO USE.  USERS SAID THAT THE IPHONE WAS

16      EASY AND FUN TO USE WITH FUN GESTURES LIKE TWO

17      FINGERED PINCH AND WHIMSICAL BOUNCE, THE SPECIAL

18      FEATURES THAT ARE AT ISSUE IN THIS CASE, FEATURES

19      THAT SAMSUNG WILL TRY TO TELL YOU WERE OBVIOUS AND

20      NOT NOVEL, BUT WHICH ARE CALLED OUT IN THEIR OWN

21      DOCUMENTS AT THE TIME HISTORICALLY AS BEING THE KEY

22      TO THE IPHONE'S SUCCESS.

23           AND ON PAGE 31, THEY TALKED ABOUT THE

24      IPHONE'S STRONG SCREEN-CENTRIC DESIGN HAS COME TO

25      EQUAL WHAT'S ON TREND AND COOL.  IT'S BEAUTIFUL,

```
 1    IT'S SEXY, IT'S SLICK.

 2              IN REAL TIME, NOT TODAY, NOT IN THIS

 3    TRIAL WHEN SO MUCH MONEY IS AT STAKE, BUT IN REAL

 4    TIME, SAMSUNG DID NOT SAY A SINGLE WORD ABOUT THE

 5    DESIGN BEING DICTATED BY FUNCTION.  THEY SAID IT

 6    WAS A BEAUTIFUL DESIGN.

 7              AND FINALLY, ON PAGE 32, IN WHAT WE KNOW

 8    HAD TO BE DISTURBING NEWS TO SAMSUNG, THEY HAD

 9    CONCLUDED THAT BY 2008, APPLE HAD OVERTAKEN SAMSUNG

10    AS THE MOST STYLISH BRAND OVERALL.

11              PLAINTIFF'S EXHIBIT 38, 36 DATED DECEMBER

12    2008.

13              IN MY OPENING, I SHOWED YOU SOME OF THE

14    PHONES THAT SAMSUNG SOLD BETWEEN FEBRUARY 2007, SO

15    AFTER THE IPHONE ANNOUNCEMENT, SO BETWEEN FEBRUARY

16    2007 AND NOVEMBER 2009.  THIS WAS DURING THE TIME

17    WHEN SAMSUNG WAS TRYING TO COMPETE FAIRLY AGAINST

18    THE IPHONE.

19              BUT AS WE KNOW, THAT DIDN'T WORK.

20    SAMSUNG SALES CONTINUED TO DECLINE.  WE SPOKE ABOUT

21    THE OMNIA, WHICH YOU SEE HERE, AND THE PUBLIC

22    REACTION THAT IT RECEIVED.

23              AND WE KNOW THAT IN FEBRUARY 2010,

24    SAMSUNG HELD AN EXECUTIVE LEVEL MEETING.  THE NOTES

25    OF THAT MEETING ARE PLAINTIFF'S EXHIBIT 40, AND
```

```
 1      THAT'S WHERE THE HEAD OF THEIR DIVISION SAID THAT

 2      SAMSUNG, IN FEBRUARY 2010, WAS FACING WHAT HE

 3      CALLED "A CRISIS OF DESIGN."

 4              SAMSUNG REALIZED HOW FAR IT WAS FALLING

 5      BEHIND TO THE IPHONE.  BY ITS OWN ASSESSMENT, IT

 6      CALLED IT A DIFFERENCE BETWEEN HEAVEN AND EARTH.

 7              AND SAMSUNG LISTENED TO ITS MOST

 8      IMPORTANT CUSTOMERS, THE TELEPHONE CARRIERS, AND

 9      THEY WERE TELLING SAMSUNG TO MAKE SOMETHING LIKE

10      THE IPHONE.

11              WE NOW KNOW THAT TWO WEEKS AFTER THIS

12      MEETING, TWO WEEKS AFTER THIS CRISIS-OF-DESIGN

13      MEETING, SAMSUNG PEOPLE MET WITH GOOGLE AND GOOGLE

14      DEMANDED -- THAT'S NOT MY WORDS, THAT'S SAMSUNG'S

15      WORDS FROM THEIR OWN NOTES, HISTORICAL NOTES

16      WRITTEN AT THE TIME THAT THEY NEVER THOUGHT WOULD

17      SEE A COURTROOM -- GOOGLE DEMANDED THAT SAMSUNG

18      CHANGE THE DESIGNS OF THE GALAXY S PHONES AND THE

19      TABLETS THEY WERE WORKING ON BECAUSE GOOGLE

20      RECOGNIZED THAT SAMSUNG WAS COPYING APPLE'S

21      DESIGNS.

22              BUT AS THIS DOCUMENT ALSO TOLD US,

23      SAMSUNG'S EXECUTIVES CHOSE TO IGNORE THAT DEMAND

24      AND TO CONTINUE ON THE PATH OF COPYING.

25              FEBRUARY 2010.
```

```
 1              WHAT'S INTERESTING BECAUSE, FRANKLY, I
 2     DIDN'T KNOW IT UNTIL IT HAPPENED IN THIS COURTROOM,
 3     WHAT'S INTERESTING IS WHAT HAPPENED NEXT.
 4              YOU REMEMBER THAT SAMSUNG CALLED THIS
 5     NICE WOMAN, JINYEUN WANG, THE ICON DESIGNER, AND
 6     SHE CAME HERE AND TESTIFIED, AND SHE SPOKE QUITE
 7     EMOTIONALLY ABOUT THE HARDSHIP OF THE PERIOD WHEN
 8     SAMSUNG CALLED IN A TEAM OF DESIGNERS FROM THREE
 9     PLANTS TO WORK NIGHT AND DAY TO FINISH THE GALAXY
10     PHONE.
11              BUT MOST IMPORTANTLY, I ALMOST -- I
12     LITERALLY, LITERALLY ALMOST FELL OUT OF MY CHAIR
13     WHEN SHE SAID IT.  SHE TOLD US THAT THAT DESIGN
14     EFFORT WAS A THREE-MONTH EFFORT.  A THREE-MONTH
15     EFFORT.
16              IN THOSE CRITICAL THREE MONTHS, SAMSUNG
17     WAS ABLE TO COPY AND INCORPORATE THE RESULTS OF
18     APPLE'S FOUR-YEAR INVESTMENT IN HARD WORK AND
19     INGENUITY WITHOUT TAKING ANY OF THE RISKS BECAUSE
20     THEY WERE COPYING THE WORLD'S MOST SUCCESSFUL
21     PRODUCT.
22              HOW DO WE KNOW THAT?  AGAIN, WE KNOW THAT
23     FROM SAMSUNG'S OWN DOCUMENTS BECAUSE WE'VE SEEN --
24     WE CAN SEE HOW THEY DID IT.
25              THE MOST FAMILIAR, YOU'VE SEEN IT A
```

1   MILLION TIMES NOW; EXHIBIT 44.  THIS DOCUMENT IS

2   DATED MARCH 2010, OVER 100 PAGES OF DETAILED

3   SIDE-BY-SIDE COMPARISONS AND INSTRUCTIONS TO COPY.

4   THIS IS ONE MONTH AFTER THE CRISIS OF DESIGN

5   MEETING AND THE MEETING WITH GOOGLE.

6            WHENEVER SAMSUNG TALKS TO YOU, AS THEY

7   WILL I'M SURE TODAY, ABOUT BENCHMARKING OR SAYS

8   THAT APPLE BENCHMARKED, JUST LOOK AT THE DATES OF

9   THE APPLE DOCUMENTS AND HOW FAR AFTER THE

10  DEVELOPMENT CYCLE THEY ARE AND REMEMBER THIS

11  DOCUMENT AND COMPARE THEM, PUT THEM NEXT TO EACH

12  OTHER, WHAT BENCHMARKING LOOKS LIKE AND WHAT

13  EXHIBIT 44 LOOKS LIKE.

14           AND REMEMBER HOW SAMSUNG USED THE IPHONE

15  IN ORDER TO TURN THE GT I9000 INTO A COPY.

16           AMONG THE HUNDREDS OF PAGES OF COPYING

17  DIRECTIONS, SEVERAL ARE DIRECTLY RELATED TO ISSUES

18  IN THIS CASE.

19           SO, FOR EXAMPLE, ON PAGE 58 OF EXHIBIT

20  44, THIS PAGE WAS DIRECTED -- DIRECTLY DIRECTED TO

21  APPLE'S DOUBLE TAP TO ZOOM, ONE OF THE PATENTS IN

22  THIS CASE, INCORPORATED INTO THE GALAXY PRODUCT.

23           ON PAGE 131, SAMSUNG COPIES THE IPHONE

24  ICONS AND LAYOUT RIGHT DOWN TO THE LIGHT EFFECT ON

25  THE ICONS.

1          I WANT TO LOOK AT THIS SPECIFICALLY.

2     YOU'LL NOTICE NEXT TO THE IPHONE IT SAYS THERE,

3     "LIGHT USED FOR A THREE DIMENSIONALITY, GIVES A

4     LUXURIOUS FEEL."

5          WHEN YOU SEE THESE PHONES, WHEN YOU SEE

6     THE IPHONE, YOU'LL BE ABLE TO SEE AT THE TOP OF THE

7     ICON, THERE'S A LIGHT EFFECT AT THE TOP OF EACH

8     ICON.  IT GIVES A LUXURIOUS FEEL.

9          ON THEIR OWN PHONE, THE GT I9000, IT

10    SAYS, "THE MENU ICONS WERE LACKING IN THREE

11    DIMENSIONAL EFFECT USING LIGHT."

12         AND SO THE DIRECTION FOR IMPROVEMENT WAS

13    INSERT EFFECTIVE LIGHT FOR SOFTER, MORE LUXURIOUS

14    FEEL."

15         TAKE WHAT WAS GOOD ABOUT THE APPLE ICONS

16    AND PUT IT IN YOUR PHONE.

17         SAMSUNG'S LAWYERS LIKE TO POINT TO THE

18    LAST LINE ON THIS POINT THAT SAYS "REMOVE THE

19    FEELINGS OF COPYING."

20         AND IT DOES SAY THAT.

21         BUT YOU KNOW WHAT SAMSUNG ACTUALLY DID.

22    ON THIS SLIDE, YOU CAN SEE THESE ARE THE TWO

23    DESIGNS FROM PX 44 NEXT TO THE DESIGN OF THE IPHONE

24    THAT SAMSUNG ACTUALLY RELEASED.

25         YOU REMEMBER WE TALKED ABOUT THIS AND WE

```
 1      SHOWED YOU HOW THE CLOCK ICON, THE PHONE ICON, AND
 2      THE GALLERY ICONS WERE ACTUALLY CHANGED TO LOOK
 3      MORE LIKE THE IPHONE.  AND THAT WAS BECAUSE AT THE
 4      VERY TOP OF SAMSUNG'S CORPORATE STRUCTURE, THOSE
 5      EXECUTIVES WERE BOUND AND DETERMINED TO CASH IN ON
 6      THE IPHONE'S SUCCESS.
 7              AS A FOOTNOTE, THERE MUST HAVE BEEN SOME
 8      QUESTION ABOUT WHETHER THIS GT I9000 IN THE PICTURE
 9      WAS SOLD IN THE UNITED STATES AS THE
10      GALAXY S I9000.
11              BUT WHEN YOU LOOK AT THE BOX, IT'S JOINT
12      EXHIBIT 1007, AT THE GALAXY A I9000, ON THE SIDE
13      YOU WILL SEE THAT IT SAYS GT I9000.  THIS WAS THE
14      PHONE THEY RELEASED IN THE UNITED STATES.
15              THAT DOCUMENT WAS DATED MARCH 2010.
16              NEXT WE SHOWED YOU THE BEHOLD 3 DOCUMENT
17      DATED MAY 2010, WHICH IS EXHIBIT 46, WHERE EVEN
18      MORE CHANGES WERE MADE TO INCORPORATE IPHONE
19      EFFECTS INTO THE GALAXY PRODUCT.
20              THE RESULT OF SAMSUNG'S THREE-MONTH CRASH
21      PROJECT, THE GALAXY S I9000, WAS RELATED IN THE
22      UNITED STATES IN JUNE OF 2010.
23              WE NOW KNOW THAT SAMSUNG GOT EXACTLY WHAT
24      IT WANTED.  SAMSUNG'S SMARTPHONE SALES, WHICH HAD
25      BEEN SORT OF DOLDERING ALONG, STEADILY DECLINING,
```

```
 1    SUDDENLY TOOK OFF AFTER THE FIRST IPHONE KNOCK-OFF
 2    WAS INTRODUCED INTO THE PRODUCT MIX.
 3            AND SO SAMSUNG PROCEEDED TO RELEASE A
 4    WHOLE SERIES OF IPHONE KNOCK-OFFS, UP THROUGH THE
 5    DAY WHEN APPLE SUED THEM, AND EVEN AFTERWARDS.
 6            WE ALSO KNOW NOW THAT IN AUGUST OF 2010,
 7    APPLE CALLED FOUL.  IT CALLED SAMSUNG TO A MEETING
 8    TO PUT SAMSUNG ON NOTICE THAT SAMSUNG WAS
 9    INFRINGING APPLE'S PATENTS AND DESIGNS AND TO
10    INSIST THAT SAMSUNG STOP COPYING.
11            WE ALSO KNOW FROM THE TESTIMONY THAT
12    SAMSUNG GOT THE MESSAGE.  WE BROUGHT YOU BY
13    DEPOSITION MR. JUNWON LEE, SAMSUNG'S DIRECTOR OF
14    LICENSING, AND HE SAID AT THAT MEETING APPLE WAS
15    TALKING ABOUT SAMSUNG'S SMARTPHONE INFRINGED
16    APPLE'S PHONE PATENTS AND DESIGN, SO THEY WERE
17    COMPLAINING ABOUT OUR INFRINGEMENT, ABOUT APPLE'S
18    PATENT AND DESIGNS IN THEIR PHONES.
19            AND, FINALLY, WE KNOW THAT INSTEAD OF
20    DOING THE RIGHT THING, SAMSUNG CHOSE TO CONTINUE ON
21    THE COPYING PATH OF ITS OWN AND TAKE US DOWN THE
22    ROAD THAT HAS LED US TO THIS COURTHOUSE.
23            THAT, LADIES AND GENTLEMEN, IS THE
24    CHRONOLOGY OF THE CASE BASED ON HISTORICAL
25    DOCUMENTS.  THAT IS WHERE THE TRUTH LINES.
```

1           THE THIRD BIG PICTURE POINT THAT I WANT

2     TO MAKE IS THAT FROM THE VERY BEGINNING, SAMSUNG

3     HAS DISRESPECTED THIS PROCESS.

4           APPLE BROUGHT YOU TWO OF ITS MOST SENIOR

5     EXECUTIVES, MR. SCHILLER AND MR. FORSTALL, TO

6     TESTIFY ABOUT APPLE'S HISTORY AND ITS CLAIMS.  THEY

7     WERE WILLING TO FACE CROSS-EXAMINATION.

8           NO SAMSUNG EXECUTIVE WAS WILLING TO COME

9     HERE FROM KOREA AND TO ANSWER QUESTIONS UNDER OATH.

10           INSTEAD OF WITNESSES, THEY SENT YOU

11     LAWYERS.  SAMSUNG DID NOT CALL ITS MOST IMPORTANT

12     DESIGNERS AND INVENTORS EVEN THOUGH WE KNOW THEY

13     WERE HERE PHYSICALLY PRESENT IN SAN JOSE.  THEY DID

14     NOT CALL MINHYOUK LEE, THE MAN WHO ACTUALLY

15     DESIGNED THE FIRST GALAXY PHONE.  HE WAS JUST DOWN

16     THE STREET, BUT HE DID NOT WANT TO SIT IN THAT

17     CHAIR AND FACE YOU.

18           HE CERTAINLY DID NOT WANT TO TALK TO ME

19     WHILE HE WAS UNDER OATH.

20           THAT DOESN'T MAKE HIM UNUSUAL.  THERE'S A

21     LOT OF PEOPLE THAT DON'T WANT TO TALK TO ME UNDER

22     OATH.  BUT HE DIDN'T WANT TO COME HERE AND DO THAT.

23           SAMSUNG ALSO DID NOT CALL THE INVENTORS

24     ON ITS OWN PATENTS.  MR. LEE WILL TALK ABOUT THAT

25     LATER.

```
 1            INSTEAD, THEY SENT YOU LAWYERS.

 2            SAMSUNG DID NOT BRING A SINGLE WITNESS

 3    WHO ADMITTED EVER SEEING, MUCH LESS WRITING, ANY OF

 4    THE MANY COPYING DOCUMENTS WE SHOWED YOU.

 5            SAMSUNG HAD A CHANCE TO DEFEND ITSELF IN

 6    THIS CASE.  INSTEAD, THEY SENT YOU LAWYERS.

 7            BUT LET'S CONSIDER WHO SAMSUNG DID BRING

 8    TO THIS TRIAL.  THEY BROUGHT YOU JUSTIN DENISON,

 9    WHO TESTIFIED UNDER OATH THAT SAMSUNG DESIGNERS

10    NEVER REFERRED TO APPLE PRODUCTS DURING THE DESIGN

11    PROCESS.

12            THEY BROUGHT YOU JINYEUN WANG, WHO

13    TESTIFIED THAT SHE HAD NEVER REFERRED TO APPLE

14    ICONS IN DESIGNING THE GALAXY S.

15            BUT THEN IT TURNED OUT THAT SHE WAS

16    ACTUALLY PART OF SAMSUNG'S LITIGATION TEAM, WORKING

17    WITH ITS LAWYERS, AND THAT HER FILE DID CONTAIN

18    SEVERAL APPLE DOCUMENTS, INCLUDING, AS YOU SEE

19    HERE, THE APPLE IPHONE HUMAN INTERFACE GUIDELINES,

20    A DOCUMENT THAT SHE OBTAINED IN 2008.

21            AND THEN THE OTHER WITNESS, VERY

22    INTERESTING WITNESS, WHO IS JIN SOO KIM, THE MAN

23    WHO DESIGNED THE TABLET AND WHO TESTIFIED THAT EVEN

24    THOUGH EXECUTIVES AT SAMSUNG KNEW HIS DESIGNS WERE

25    PROBLEMATIC, AND EVEN THOUGH GOOGLE WANTED THE
```

1    DESIGNS CHANGED BECAUSE THEY WERE COPIES OF APPLE

2    DESIGNS, THAT THOSE SAME EXECUTIVES NEVER BOTHERED

3    TO TELL MR. KIM.

4           AND SO HE KEPT ON USING THOSE DESIGNS IN

5    SAMSUNG PHONES.

6           IF YOU BELIEVE MR. KIM, THEN SAMSUNG HAS

7    ADMITTED TO YOU THAT THE DECISION TO COPY WAS

8    INTENTIONAL AND WILLFUL ON THE PART OF ITS HIGHEST

9    EXECUTIVES.  THEY NEVER TOLD THEIR DESIGNERS TO

10   STOP.  THEY NEVER TOLD THEM TO BE CAREFUL.

11          SO THESE ARE THE THREE BIG-PICTURE POINTS

12   THAT I'D LIKE TO LEAVE YOU WITH:

13             TRUST THE DOCUMENTS;

14             FIND THE TRUTH IN THE CHRONOLOGY; AND,

15             RECOGNIZE THAT IF YOU'RE GOING TO INSIST

16   ON EVIDENCE RATHER THAN ATTORNEY ARGUMENT, YOU

17   HEARD NO DEFENSE FROM SAMSUNG.

18          NOW I'M GOING TO TALK ABOUT THE DETAILS

19   OF APPLE'S INTELLECTUAL PROPERTY RIGHTS AND HOW

20   THEY'VE BEEN VIOLATED.

21          WE ARE, AS I'M SURE YOU ARE AWARE FROM

22   LISTENING PATIENTLY TO THE INSTRUCTIONS, ASSERTED

23   DESIGN PATENTS, TRADE DRESS, AND UTILITY PATENTS IN

24   THIS CASE.

25             LET'S START WITH THE DESIGN PATENTS.  ON

1    THOSE PATENTS, YOU'RE GOING TO BE ASKED TO DECIDE

2    TWO QUESTIONS:  INFRINGEMENT AND VALIDITY.

3           THE TEST FOR INFRINGEMENT OF DESIGN

4    PATENTS, WHICH JUDGE KOH JUST GAVE YOU, IS ACTUALLY

5    PRETTY STRAIGHTFORWARD.  INFRINGEMENT HAS OCCURRED,

6    QUOTE, "IF THE OVERALL APPEARANCE OF A SAMSUNG

7    DESIGN IS SUBSTANTIALLY THE SAME AS THE OVERALL

8    APPEARANCE OF THE CLAIMED APPLE DESIGN PATENT."

9           AN IMPORTANT POINT.  WE'RE TALKING ABOUT

10   COMPARING DESIGN TO DESIGN.  YOU WILL HAVE THE

11   ACCUSED PHONES AND TABLETS IN THE JURY ROOM AND YOU

12   SHOULD COMPARE THEM ONE BY ONE TO THE DRAWINGS IN

13   THE PATENTS.

14          WE THINK YOU WILL CONCLUDE THAT THEY ARE

15   MORE THAN SUBSTANTIALLY SIMILAR TO THE PATENTED

16   DESIGNS.

17          LET ME NOTE, HOWEVER, AND THIS IS AGAIN A

18   LITTLE SOMETHING THAT WAS A LITTLE UNUSUAL IN THE

19   TRIAL HERE, NOT ALL OF THE ACCUSED PHONES ARE

20   ACCUSED OF INFRINGING DESIGN PATENTS.  SOME OF THE

21   PHONES ARE APPARENTLY USED OF INFRINGING JUST THE

22   UTILITY PATENTS.

23          SO THERE WERE A COUPLE OF CASES WHERE A

24   PHONE WAS HANDED OUT FOR YOU TO COMPARE THAT WAS

25   NOT ACCUSED OF A DESIGN PATENT.  SO YOU NEED TO

1    MAKE SURE THAT THE YOU'RE COMPARING TO THE PATENT

2    IS THE ONE THAT WAS ACTUALLY ACCUSED OF THE DESIGN

3    PATENT SO THAT YOU'RE COMPARING THE DESIGN PATENT

4    DRAWINGS TO THE ACTUAL PHONES THAT WE HAVE ACCUSED.

5            YOU WILL FIND A CHART, OUR CHART, THAT

6    SETS OUT WHICH PHONES INFRINGE WHICH PATENTS AT

7    EXHIBIT 25-A1.  I'LL TALK ABOUT THAT EXHIBIT A LOT,

8    BUT IT'S 25-A1, AND ON PAGE 3, THAT'S WHERE YOU

9    HAVE OUR CHART OF WHICH PRODUCTS WE ACCUSE OF

10   INFRINGING WHICH PATENTS.

11           SO LET'S LOOK AT THE ACCUSED PHONES.

12   THIS IS THE GALAXY, THE SAMSUNG GALAXY S 4G

13   COMPARED TO THE D'66 -- '677 PATENT.

14           AND THESE ARE ALL OF THE SAMSUNG PHONES

15   THAT WE ACCUSE OF INFRINGING THE D'677 PATENT.  YOU

16   WILL HAVE THE OPPORTUNITY TO TAKE THOSE ONE BY ONE

17   AND DETERMINE IF, IN YOUR VIEW, THE DESIGNS ARE

18   SUBSTANTIALLY SIMILAR.

19           THIS IS THE GALAXY S 4G COMPARED TO THE

20   D'087 PATENT.  AND THESE ARE THE -- ALL OF THE

21   PHONES THAT WE HAVE ACCUSED OF INFRINGING THE D'087

22   PATENT.

23           FINALLY, THE TABLET AND THE D'889 PATENT.

24   A COUPLE OF KEY, WHAT WE THINK ARE KEY POINTS THAT

25   YOU HEARD THIS MORNING IN THE INSTRUCTIONS.

```
 1            JUDGE KOH TOLD US THAT MINOR DIFFERENCES

 2    SHOULD NOT PREVENT A FINDING OF INFRINGEMENT.

 3            SHE ALSO TOLD US THAT THE USE OF A MARK

 4    OR A LABEL TO IDENTIFY THE COURSE OF AN OTHERWISE

 5    INFRINGING DESIGN WILL NOT AVOID INFRINGEMENT.

 6            SO THE SAMSUNG BRAND NAME ON THE PHONE IS

 7    NOT A DEFENSE.

 8            AND FINALLY, JUDGE KOH TOLD US THAT WHEN

 9    YOU ARE COMPARING TWO DESIGNS, IF -- AND THIS IS A

10    QUOTE -- "THE RESEMBLANCE BETWEEN THE TWO DESIGNS

11    IS SUCH AS TO DECEIVE SUCH AN OBSERVER, INDUCING

12    HIM TO PURCHASE ONE SUPPOSING IT TO BE THE OTHER,

13    THEN THEY ARE SUBSTANTIALLY SIMILAR."

14            LET'S FOCUS ON THAT LANGUAGE FOR A

15    MOMENT.  THIS TEST DOES NOT REQUIRE US TO PROVE

16    THAT CONSUMERS ARE OR WERE ACTUALLY CONFUSED.

17    WE'RE GOING TO TALK ABOUT CONFUSION LATER WHEN WE

18    GET TO TRADE DRESS, BUT HERE IN DESIGN PATENTS, ALL

19    WE NEED TO PROVE IS THAT THE RESEMBLANCE BETWEEN

20    THE TWO DESIGNS IS DECEPTIVE.

21            IN INSTRUCTION 46, JUDGE KOH EXPLICITLY

22    TOLD US, "YOU DO NOT NEED, HOWEVER, TO FIND THAT

23    ANY PURCHASERS ACTUALLY WERE DECEIVED OR CONFUSED

24    BY THE APPEARANCE OF THE SAMSUNG PRODUCTS."

25            AGAIN, IMPORTANT TO KEEP IN MIND.  ALL
```

4095

1    THE ARGUMENTS THAT SAMSUNG MADE ABOUT THE SAMSUNG

2    BRAND, ABOUT BOOTING UP THE DEVICES, ABOUT MOVING

3    THROUGH THE VARIOUS SCREENS, ALL THAT STUFF IS

4    IRRELEVANT TO DESIGN PATENTS BECAUSE IN DESIGN

5    PATENTS, THE KEY ISSUE IS WHETHER THE DESIGNS

6    THEMSELVES ARE SUBSTANTIALLY SIMILAR.

7              THAT IS WHY OUR EXPERTS, MR. BRESSLER AND

8    DR. KARE, TESTIFIED THAT THE OVERALL VISUAL

9    IMPRESSION OF THE ACCUSED PRODUCTS IS SO SIMILAR

10   AND THAT IT IS DECEPTIVE AND THAT IS WHY IT IS SO

11   IMPORTANT TO REMEMBER THAT SAMSUNG NEVER CALLED A

12   WITNESS, EXPERT OR OTHERWISE, NO SAMSUNG WITNESS

13   EVER SAT IN THAT CHAIR AND SAID "THESE DESIGNS ARE

14   NOT SIMILAR."

15             JUDGE KOH CONCLUDES WITH THE ULTIMATE

16   INSTRUCTION THAT SAYS, "WHILE THESE GUIDELINES MAY

17   BE HELPFUL, THE TEST FOR INFRINGEMENT IS WHETHER

18   THE OVERALL APPEARANCES OF THE ACCUSED DESIGN AND

19   THE CLAIMED DESIGN ARE SUBSTANTIALLY THE SAME."

20             IN CROSS-EXAMINATION OF OUR WITNESSES,

21   WHEN THEY TRIED TO CONTEST INFRINGEMENT, SAMSUNG'S

22   LAWYERS FOCUSSED ON TINY DETAILS THAT NO ORDINARY

23   OBSERVER WOULD EVER NOTICE.  SO WE TALKED ABOUT THE

24   DIFFERENCE BETWEEN CORNERS WITH A RADIUS OF 10

25   MILLIMETER VERSUS 13 MILLIMETERS, A DIFFERENCE

4096

```
 1     PRACTICALLY INVISIBLE TO THE HUMAN EYE.

 2              WE TALKED ABOUT A MILLIMETER OR TWO

 3     DIFFERENCE IN THE WIDTH OF THE BEZEL AT THE BOTTOM

 4     VERSUS THE TOP.

 5              AND, FINALLY, WE TALKED ABOUT WHETHER YOU

 6     CAN FEEL, NOT WHETHER YOU CAN SEE, BUT WHETHER YOU

 7     COULD FEEL THE EDGE OF THE GLASS WITH THE FINGER.

 8              THE TEST IS OVERALL VISUAL APPEARANCE,

 9     NOT THESE MINOR DIFFERENCES.

10              THE MINOR DIFFERENCES HAVE NO EFFECT ON

11     THE VISUAL APPEARANCE OF THESE PRODUCTS.

12              ON TABLETS, SAMSUNG'S ONLY ARGUMENT WAS

13     THAT A MINOR DIFFERENCE ON THE BACK, TWO PIECES OF

14     MATERIAL INSTEAD OF ONE, CHANGES THE OVERALL VISUAL

15     IMPRESSION.

16              BUT IT DOESN'T.  THE FRONTS ARE

17     IDENTICAL.

18              SAMSUNG WILL REMIND YOU THAT CHRIS

19     STRINGER, OUR DESIGNER WHO WE BROUGHT, HAD A DESIGN

20     VISION, HE TESTIFIED ABOUT THIS QUITE PROUDLY, THAT

21     THE BACK OF THE DEVICE BE ONE SEAMLESS PIECE OF

22     MATERIAL, AND THAT'S ABSOLUTELY TRUE.

23              BUT THAT'S NOT THE TEST.

24              THE TEST IS NOT WHAT INSPIRED THE

25     DESIGNER.  THE TEST IS THE OVERALL VISUAL
```

```
 1      IMPRESSION OF THE PATENTED DESIGN.

 2              THIS CASE IS ABOUT INFRINGING OUR

 3      PATENTS.  IT'S NOT ABOUT INFRINGING CHRIS

 4      STRINGER'S INSPIRATION.

 5              SWITCHING TO THE D'305 PATENT, WHICH IS

 6      THE ICON, THE TEST FOR INFRINGEMENT IS EXACTLY THE

 7      SAME.  AND THIS ONE IS EASY.  JUST LOOK AT THE

 8      SCREENS.

 9              AND, OF COURSE, WE DO HAVE SAMSUNG'S

10      WELL-DOCUMENTED COPYING.  THEY SAT WITH THE IPHONE

11      AND WENT FEATURE BY FEATURE COPYING THE SMALLEST

12      DETAIL.

13              THEY ASKED THEMSELVES, HOW DOES OUR APP

14      SCREEN COMPARE TO THE IPHONE HOME SCREEN?  AND THEY

15      CHANGED THEIR ORIGINAL DESIGN INTO AN IPHONE LOOK

16      ALIKE.

17              A LITTLE PRACTICAL PIECE OF ADVICE.  YOU

18      WILL HAVE THESE PHONES, THE SAMSUNG PHONES IN THE

19      JURY ROOM, AND WHEN YOU WANT TO LOOK AT THIS ISSUE,

20      THE WAY TO NAVIGATE ON A SAMSUNG PHONE IS YOU TURN

21      IT ON, AND THAT WILL BRING UP THE HOME SCREEN.  AND

22      THEN WHEN YOU GET TO THE HOME SCREEN, IF YOU TOUCH

23      THE BLUE BUTTON WITH THE FOUR WHITE DOTS DOWN IN

24      THE CORNER, THAT WILL BRING UP THE APP SCREEN AND

25      IT'S THE APP SCREEN THAT WE ARE ACCUSING AND YOU
```

... 

1    CAN COMPARE THAT TO THE PATENT.

2              WE ARE NOT ACCUSING THE HOME SCREEN.

3    IT'S THE APP SCREEN THAT WE HAVE ACCUSED.

4              IN ADDITION TO DECIDING INFRINGEMENT, YOU

5    WILL NEED TO DECIDE WHETHER OR NOT SAMSUNG HAS

6    PROVEN BY CLEAR AND CONVINCING EVIDENCE, A HIGHER

7    LEVEL OF PROOF, THAT THE APPLE PATENTS ARE INVALID.

8              SAMSUNG WANTS TO CONVINCE YOU THE PATENT

9    AND TRADEMARK OFFICE WAS WRONG WHEN IT APPROVED OUR

10   PATENTS AND ALLOWED THEM TO ISSUE.

11             SAMSUNG HAS MADE TWO ARGUMENTS.  THEY SAY

12   THAT OUR PATENTS ARE INVALID BECAUSE THEY ARE

13   FUNCTIONAL, AND BECAUSE THEY ARE OBVIOUS.  I'M

14   GOING TO DESCRIBE -- I'M GOING TO DISCUSS THESE

15   SEPARATELY.

16             SAMSUNG, IN MY VIEW, SAMSUNG'S

17   FUNCTIONALITY DEFENSE IS A WORD GAME.  SAMSUNG

18   OFFERED A LOT OF TESTIMONY ABOUT HOW PHONES HAVE A

19   FUNCTION, HOW ROUNDED CORNERS WON'T GET CAUGHT ON

20   YOUR POCKETS, AND HOW YOU PUSH ON ICONS.

21             BUT NONE OF THAT TESTIMONY HAS ANYTHING

22   TO DO WITH THE ACTUAL LEGAL TEST FOR VALIDITY.

23   THIS IS WHAT JUDGE KOH TOLD US THE LEGAL TEST FOR

24   FUNCTIONALITY IS.  SAMSUNG HAS TO PROVE BY CLEAR

25   AND CONVINCING EVIDENCE THAT THE OVERALL APPEARANCE

1   OF AN APPLE PATENTED DESIGN IS DICTATED BY HOW,

2   DICTATED BY HOW THE ARTICLE CLAIMED IN THE PATENT

3   WORKS.  OVERALL APPEARANCE DICTATED BY LAW THE

4   ARTICLE WORKS.

5           NONE OF SAMSUNG'S ARGUMENTS OR EVIDENCE

6   ABOUT FUNCTIONALITY MEET THIS IS TEST.  THEY NEVER

7   TALKED ABOUT THE OVERALL DESIGN.

8           SAMSUNG'S EXPERT, MR. ITAY SHERMAN, ONLY

9   TESTIFIED ABOUT INDIVIDUAL ELEMENTS OF THE IPHONE

10  AND IPAD DESIGNS.  HE NEVER MENTIONED OVERALL

11  APPEARANCE, AND HE NEVER SAID ANY ELEMENT WAS

12  DICTATED BY THE WAY THE ARTICLE WORKED.

13          THERE ARE, AS YOU KNOW, PLENTY OF

14  PERFECTLY FUNCTIONAL ALTERNATIVE DESIGNS.  EVERY

15  SMARTPHONE DOES NOT HAVE TO LOOK LIKE AN IPHONE.

16  HERE ARE EXAMPLES OF PERFECTLY FUNCTIONAL PHONES.

17  THEY ALL WORK.  THEY ALL LOOK COMPLETELY DIFFERENT

18  BECAUSE DESIGN OF A IPHONE IS A MATTER OF

19  CREATIVITY.

20          WHEN IT COMES TO THE D'305 PATENT ON THE

21  DISPLAY SCREEN DESIGN, NO SAMSUNG EXPERT TESTIFIED

22  TO ANY OPINION WHATSOEVER REGARDING THE VALIDITY OF

23  THIS PATENT.

24          ON THE OTHER HAND, WE BROUGHT YOU

25  DR. SUSAN KARE, WHO IS ONE OF THE MOST RESPECTED

4100

```
 1    ICONOGRAPHERS AND GRAPHIC USER INTERFACE DESIGNERS

 2    IN THE WORLD, AND SHE TESTIFIED THAT OTHER THAN

 3    PROVIDING A TARGET FOR YOUR FINGER, THERE ARE NO

 4    FUNCTIONAL LIMITATIONS WHATSOEVER AND THE DESIGNERS

 5    ARE, IN FACT, ONLY LIMITED BY THEIR IMAGINATION.

 6              COMMON SENSE TELLS YOU THAT HAS TO BE

 7    TRUE.  IN THIS CASE YOU'VE SEEN NUMEROUS EXAMPLES

 8    OF APPLICATION SCREENS THAT DON'T LOOK ANYTHING

 9    LIKE THE D'305 PATENT.

10              WE SHOWED YOU A SAMSUNG DOCUMENT FROM

11    2011, EXHIBIT 55, AND IT SHOWED HOW SAMSUNG CHANGED

12    ITS OWN APPLICATION SCREENS FROM 2007 TO 2010 AND

13    ALL OF THESE EARLIER ONES, BEFORE THEY COPIED OURS,

14    WERE ALTERNATIVES TO THE APPLE DESIGN.

15              SAMSUNG'S SECOND ARGUMENT WAS THAT THE

16    IPHONE AND IPAD PATENTS WERE OBVIOUS.

17              NOW, TO PROVE OBVIOUSNESS, AS THE JUDGE

18    TOLD US, SAMSUNG WOULD HAVE TO PROVE THAT DESPITE

19    WHAT THE PATENT EXAMINER MAY HAVE THOUGHT, THE

20    DESIGNS WERE NOT NEW.

21              AGAIN, BECAUSE SAMSUNG IS TRYING TO

22    OVERTURN THE PTO, IT HAS TO PROVE THAT DEFENSE BY A

23    HIGHER STANDARD OF PROOF, CLEAR AND CONVINCING

24    EVIDENCE.

25              NOW, I WILL CONFESS THAT NON-OBVIOUSNESS
```

1    IS A LITTLE BIT CONVOLUTED.  IT'S A LITTLE BIT

2    TRICKY.  IT HAS A LEGAL PART AND A NON-LEGAL PART.

3             THE LEGAL PART IS THE SPECIFIC PROCESS

4    THAT JUDGE KOH DESCRIBED FOR YOU.  IT'S IN YOUR

5    INSTRUCTIONS.

6             THE NON-LEGAL PART IS A SET OF WHAT ARE

7    CALLED OTHER FACTORS THAT YOU MUST CONSIDER WHEN

8    YOU CONSIDER THE QUESTION OF OBVIOUSNESS.

9             THE LEGAL TEST REQUIRES YOU TO LOOK AT

10   THE EVIDENCE THROUGH THE EYES OF A DESIGNER OF

11   ORDINARY SKILL IN THE ART.

12            THEN, TAKING THAT ADVANTAGE POINT, AS

13   JUDGE KOH EXPLAINED, IT REQUIRES YOU TO DECIDE

14   WHETHER THERE IS ANY PRIOR ART DESIGN THAT WOULD

15   SERVE AS WHAT THE LAW CALLS A PRIMARY REFERENCE,

16   AND A PRIMARY REFERENCE WOULD BE A PIECE OF ART

17   THAT CREATES BASICALLY THE SAME VISUAL IMPRESSION

18   AS THE PATENTED DESIGN.

19            NEXT, THIS DESIGNER OF ORDINARY SKILL IS

20   SUPPOSED TO DETERMINE WHETHER THERE ARE ANY

21   SECONDARY REFERENCES WHICH ARE OTHER DESIGNS THAT

22   ARE -- AND AGAIN, THIS IS A LEGAL TERM -- SO

23   VISUALLY RELATED TO THE PRIMARY REFERENCE THAT THE

24   APPEARANCE OF CERTAIN ORNAMENTAL FEATURES IN THE

25   OTHER REFERENCE WOULD SUGGEST THE APPLICATION OF

```
1    THOSE FEATURES TO THE PRIMARY REFERENCE.

2              IN MY LANGUAGE, WHAT THIS MEANS IS YOU

3    HAVE TO FIND ANOTHER PIECE OF ART THAT IS SO CLOSE

4    IN APPEARANCE THAT A DESIGNER WOULD SEE, IN THE

5    SECOND DESIGN, A REASON TO COMBINE THE TWO.

6              LET'S LOOK AT THE EVIDENCE THAT SAMSUNG

7    OFFERED TO TRY TO MEET THIS LEGAL TEST.

8              FIRST, WHEN YOU LOOK AT YOUR NOTES, YOU

9    WILL SEE, AS I MENTIONED EARLIER, THAT NO WITNESS,

10   NO WITNESS TESTIFIED THAT THE ICON DESIGN, THE '305

11   PATENT, WAS OBVIOUS.  THERE WAS NO TESTIMONY

12   WHATSOEVER ABOUT PRIOR ART TO THAT PATENT.

13             SECOND, YOU WILL RECALL THAT MR. SHERMAN,

14   THE ONLY EXPERT SAMSUNG CALLED ON THE OBVIOUSNESS

15   QUESTION, WAS NOT EVEN AN INDUSTRIAL DESIGNER.

16   THEY BROUGHT YOU AN ELECTRICAL ENGINEER TO TRY TO

17   TALK TO YOU ABOUT DESIGN.

18             BUT MOST IMPORTANT, I'M SURE YOU ARE

19   AWARE NOW HAVING HEARD THESE TERMS, YOU NEVER HEARD

20   A WORD FROM MR. SHERMAN ABOUT ANYTHING BEING A

21   PRIMARY REFERENCE.  YOU NEVER HEARD HIM MENTION A

22   SECONDARY REFERENCE.  HE NEVER USED THOSE TERMS.

23   HE NEVER CARRIED OUT THAT TEST.

24             HE SHOWED YOU FOUR DESIGNS OF PHONES AND

25   TWO TABLETS, BUT HE NEVER TOLD YOU THAT ANY ONE OF
```

1    THOSE DESIGNS MET THE LEGAL DEFINITION OF A PRIMARY

2    REFERENCE.

3             YOU HAVE NO WAY OF KNOWING THAT WITHOUT

4    EVIDENCE UNLESS YOU'RE GUESSING.

5             THERE HAS BEEN A COMPLETE FAILURE OF

6    PROOF ON THAT ISSUE.

7             AND THE REASON IS CLEAR.  SAMSUNG HAS NOT

8    BEEN ABLE TO FIND A PRIOR ART DESIGN THAT HAS A

9    FLAT, EDGE TO EDGE FRONT FACE LIKE THE APPLE IPHONE

10   DESIGN.  IT HAS NOT BEEN ABLE TO FIND A PRIOR

11   DESIGN THAT CREATES THE SAME OVERALL VISUAL

12   IMPRESSION AS THE D'677 AND THE D'087 PATENTS.

13            NONE OF THE FOUR PHONES THAT SAMSUNG

14   SHOWED US MEETS THAT TEST.  TWO OF THESE PHONES ARE

15   NOT EVERYONE PRIOR ART.

16            AGAIN, AN IMPORTANT POINT.  LET ME

17   JUST -- I'LL SAY IT AND THEN WHEN WE TIE IT TO THE

18   EVIDENCE, YOU'LL SEE WHY IT HAPPENED.

19            CHRIS STRINGER, WHEN HE WAS TESTIFYING,

20   TESTIFIED THAT APPLE CONCEIVED OF THE TWO IPHONE

21   PATENTS ON APRIL 20TH, 2006, EARLIER THAN THE

22   FILING DATE.

23            SO HE TESTIFIED THAT HE GOT THE IDEA ON

24   APRIL 20TH, 2006, AND MOREOVER, WE MOVED INTO

25   EVIDENCE PLAINTIFF'S EXHIBIT 162 WHICH WERE DATED

1    CAD DRAWINGS OF THE DESIGNS IN ORDER TO PROVE THAT

2    EARLIER DATE, APRIL 20TH, 2006.

3           THE KR'547, THE KOREAN PATENT DESIGN

4    HERE, WASN'T PUBLISHED UNTIL JUNE 26TH, 2006.

5    THAT'S AFTER THE APPLE INVENTION DATE, SO IT CANNOT

6    BE PRIOR ART.

7           BUT EVEN IF IT WAS, IT DOESN'T LOOK

8    ANYTHING LIKE THE IPHONE PATENTS.  THERE IS NO

9    EDGE-TO-EDGE CONTINUOUS MATERIAL ON THE FRONT FACE.

10   IT'S NOT BLACK.  IT'S NOT TRANSPARENT.  IT HAS NO

11   BEZEL.  AND ALL OF THE PROPORTIONS ARE DIFFERENT.

12   THE PHONE AND THE SCREEN ARE ALMOST SQUARE.

13          THE LG PRADA CANNOT BE PRIOR ART BECAUSE

14   THERE IS NO EVIDENCE, AND YOU'LL SEE THIS IN THE

15   DETAIL IN YOUR INSTRUCTION, BUT THERE'S NO EVIDENCE

16   THAT THIS PHONE WAS EVER DISPLAYED OR SOLD IN THE

17   UNITED STATES, WHICH IS THE LEGAL REQUIREMENT FOR

18   IT TO BE PRIOR ART.

19          MR. SHERMAN TRIED TO DODGE THAT ISSUE BY

20   SAYING IT WAS DISCLOSED IN 2006, BUT HE NEVER SAID

21   THAT THAT HAPPENED IN THE UNITED STATES.

22          AND, AGAIN, EVEN IF IT HAD BEEN, IT'S

23   VERY DIFFERENT FROM THE IPHONE.  THERE IS NO

24   EDGE-TO-EDGE GLASS.  THERE'S NO BEZEL.  THE SCREEN

25   ISN'T CENTERED.  AND IT HAS A LONG, SHINY PHYSICAL

1    BUTTON STICKING UP WITH FROM THE FRONT FACE.

2              AS FOR THE JP'638, WE KNOW THAT IT WAS

3    NOT FLAT.  ITS DESIGN WAS AT THE OTHER END OF THE

4    SPECTRUM FROM THE IPHONE.  IT CLEARLY IS NOT BLACK,

5    AND IT DOESN'T HAVE THE CONTINUOUS EDGE-TO-EDGE

6    SURFACE.

7              FINALLY, THEY SHOWED US THE JP'383, BUT

8    IT HAS NO BEZEL, IT'S NOT BLACK, AND IT DOESN'T

9    HAVE THE CONTINUOUS FRONT SURFACE EDGE TO EDGE,

10   WHICH IS THE DEFINING CHAIR CHARACTERISTIC OF THE

11   IPHONE, AND THERE ARE NO SIDE BORDERS AROUND THE

12   SCREEN.

13             IT SHOULD BE CLEAR TO YOU WHY NO REAL

14   DESIGNER WAS WILLING TO COME TO THIS TRIAL AND

15   TESTIFY UNDER OATH THAT ANY OF THESE REFERENCES WAS

16   A PRIMARY REFERENCE AS THE LAW REQUIRES.

17             THE SAME ANALYSIS HOLDS TRUE FOR THE

18   D'889 PATENT.  SAMSUNG SHOWED YOU A VIDEO, A VIDEO

19   OF THE FIDLER TABLET AND HOPED THAT YOU WOULD FIND

20   THAT THAT WAS CLEAR AND CONVINCING EVIDENCE OF

21   INVALIDITY.

22             BUT, AGAIN, MR. SHERMAN WAS NOT WILLING

23   TO TELL YOU THAT THAT WAS A PRIMARY REFERENCE.

24             WE BROUGHT, WE BROUGHT THIS ACTUAL

25   REPLICA OF FIDLER SO THAT YOU COULD SEE THAT WHAT

1    YOU CAN'T SEE FROM THE VIDEO, THAT IT WAS A

2    TRADITIONAL PICTURE FRAME DESIGN.  IT CERTAINLY

3    DOESN'T HAVE AN ALL GLASS FACE THAT THE WORLD HAS

4    FOUND SO DISTINCTIVE IN THE APPLE TABLET DESIGN.

5             THE OTHER TABLET, THE TC1000, COULD NOT

6    BE MORE DIFFERENT.

7             AND, AGAIN, EVEN MR. SHERMAN WAS

8    UNWILLING TO CALL THIS A PRIMARY REFERENCE.

9             AND AS JUDGE KOH TELLS YOU IN YOUR

10   INSTRUCTIONS, WITHOUT A PRIMARY REFERENCE, YOU

11   CANNOT HOLD A PATENTED DESIGN OBVIOUS.

12            THE SECOND -- THAT'S THE LEGAL PART I

13   TOLD YOU ABOUT.

14            THE SECOND PART OF THE OBVIOUSNESS TEST

15   IS WHAT THE LAW CALLS THE OTHER FACTORS YOU

16   CONSIDER.  THESE FACTORS ARE, FOR ME, A LITTLE BIT

17   EASIER TO GET MY HANDS AROUND BECAUSE THEY'RE REAL

18   WORLD FACTORS THAT YOU CAN LOOK AT TO VALIDATE THE

19   DECISION THAT YOU'RE ASKED TO MAKE.

20            HOW DID THE REAL WORLD ACTUALLY REACT TO

21   APPLE'S INVENTIONS?  DID IT IGNORE THEM?  OR DID IT

22   RECOGNIZE THEM AS SOMETHING NEW?

23            HERE THOSE OTHER FACTORS ALL CONFIRM IN

24   AN OVERWHELMING FASHION THAT APPLE'S DESIGNS WERE

25   NEW.  ON THE INITIAL -- ON THE ISSUE OF INITIAL

 1    SKEPTICISM, IT'S A LONG TIME AGO, THREE WEEK AGO,

 2    BUT YOU MAY REMEMBER THAT PHIL SCHILLER CAME HERE

 3    AND TESTIFIED THAT WHEN THEY FIRST SAW IT, BOTH THE

 4    EXECUTIVES OF MICROSOFT AND PALM PREDICTED THAT THE

 5    IPHONE WOULD FAIL.

 6         YOU ALSO KNOW, HOWEVER, THAT A CLAIM FOR

 7    THE DESIGN WAS OVERWHELMING.  I ALREADY SHOWED YOU

 8    EVIDENCE OF THE MEDIA PHRASING THE IPHONE DESIGN.

 9    IT WAS DEEMED GORGEOUS AND BEAUTIFUL.

10         AND AS YOU MAY RECALL, THE PATENT AND

11    TRADEMARK OFFICE ITSELF CREATED AN EXHIBIT OF

12    IPHONES THAT RECENTLY GOT MOVED TO THE SMITHSONIAN.

13         THE SAME IS TRUE FOR COMMERCIAL SUCCESS.

14    APPLE SELLS MILLIONS OF IPHONES AND IPADS EVERY

15    YEAR.

16         HAVE I MENTIONED THAT SAMSUNG COPIED THE

17    DESIGN?  I THINK I MAY HAVE SAID THAT.

18         EVERYONE, EVEN SAMSUNG, THOUGHT THAT THE

19    IPHONE CHANGED THE WORLD.  AN OBVIOUS DESIGN IS NOT

20    CALLED REVOLUTIONARY BY THE DESIGNER'S BIGGEST

21    COMPETITOR.  IT DOESN'T GET NAMED INVENTION OF THE

22    YEAR OR INSPIRE AN EXHIBIT AT THE PTO.

23         SAMSUNG WAS THE IPHONE'S BIGGEST FAN.

24    THEY KNEW A GOOD THING WHEN THEY SAW IT.  THEY

25    TRIED TO COMPETE WITH IT.  AND WHEN THEY COULDN'T,

1    THEY COPIED IT.

2              COPYING IS NOT ONLY EVIDENCE OF

3    INFRINGEMENT, IT'S EVIDENCE OF VALIDITY.

4              I'M GOING TO MOVE NOW TO OUR TRADE DRESS

5    CLAIMS.  FRANKLY, TRADE DRESS -- I FIND IT VERY,

6    VERY COMPLICATED, AND IT'S MORE COMPLICATED BECAUSE

7    IN THE TRADE DRESS THAT WE'RE ASSERTING, WE HAVE

8    REGISTERED AND UNREGISTERED TRADE DRESS AND PART OF

9    THE UNDERLYING PROBLEM IS THAT, AS YOU'LL SEE WHEN

10   YOU GO THROUGH THE INSTRUCTIONS, WE USE THE SAME

11   WORDS IN TRADE DRESS THAT WE USE IN DESIGN PATENTS,

12   BUT THE LEGAL TESTS ARE DIFFERENT.

13             SO YOU REALLY HAVE TO DO ONE AND THEN DO

14   THE OTHER AND USE THE INSTRUCTIONS AS A GUIDELINE

15   TO GET THERE.

16             BUT I HOPE WHAT I'M GOING TO SAY WILL

17   HELP.

18             AS JUDGE KOH TOLD US, TRADE DRESS IS THE

19   NON-FUNCTIONAL PHYSICAL DETAIL AND DESIGN OF A

20   PRODUCT WHICH IDENTIFIES THE PRODUCT'S SOURCE AND

21   DISTINGUISHES IT FROM THE PRODUCTS OF OTHERS.

22             IN OTHER WORDS, IT'S THE LOOK OF THE

23   DESIGN THAT TELLS YOU WHO MADE OR WHO SELLS THE

24   PRODUCT.

25             APPLE HAS ASSERTED FOUR TRADE DRESSES IN

1    THIS CASE COVERING ITS IPHONE AND ITS IPAD DESIGNS.

2              THE ELEMENTS OF EACH OF THOSE TRADE

3    DRESSES ARE LISTED IN YOUR JUROR NOTEBOOKS SO I

4    WON'T TAKE THE TIME TO READ THEM HERE.

5              THE FIRST OF THE TRADE DRESSES ON THE

6    LEFT HAS BEEN REGISTERED AT THE U.S. PTO.  THERE IS

7    A VERBAL DESCRIPTION IN THE REGISTRATION

8    CERTIFICATE, BUT IT IS THE PICTURE THAT IS THE

9    TRADE DRESS, NOT THE WORDS.

10             TO MAKE IT WORSE, THE PTO'S -- THE TITLE

11   ON THE REGISTRATION SAYS TRADEMARK REGISTRATION,

12   BUT THAT'S HOW THEY REGISTER TRADE DRESSES.  SO

13   EVEN -- WE DON'T HAVE TRADEMARKS IN THIS CASE.

14   THERE'S TWO OTHER THINGS WE DON'T HAVE IN THIS

15   CASE.  WE HAVE EVERYTHING ELSE IN THIS CASE, BUT WE

16   DON'T HAVE TRADEMARK.

17             FIRST, AS THE JUDGE TOLD US, YOU MUST

18   DETERMINE WHETHER APPLE'S TRADE DRESS IS

19   PROTECTABLE.  TWO-PART TEST.  IT'S PROTECTABLE IF

20   IT'S NON-FUNCTIONAL AND IF IT HAS WHAT THE LAW

21   CALLS SECONDARY MEANING.

22             FOR APPLE'S REGISTERED TRADE DRESS,

23   BECAUSE IT HAS BEEN REVIEWED BY THE PTO, THE BURDEN

24   OF PROOF IS ON SAMSUNG.  SAMSUNG HAS TO PROVE THAT

25   THE DESIGN WAS FUNCTIONAL OR THAT IT LACKED

4110

```
1    SECONDARY MEANING IN ORDER TO INVALIDATE OUR

2    INTELLECTUAL PROPERTY.

3              FOR THE UNREGISTERED TRADE DRESSES, WE

4    HAVE TO PROVE THE OTHER SIDE OF THAT COIN.  WE HAVE

5    TO PROVE THAT THE DESIGNS ARE NOT FUNCTIONAL AND

6    THAT THEY HAVE SECONDARY MEANING.

7              WE'RE ALL TOGETHER ON THIS SO FAR?  IS

8    THAT RIGHT?  OKAY.

9              THE TEST IS THE SAME DEPENDING --

10   IRRESPECTIVE OF WHO HAS TO PROVE IT.

11             TRADE DRESS IS NOT FUNCTIONAL IF -- AND

12   THIS IS A KEY PHRASE -- IF TAKEN AS A WHOLE, SO

13   YOU'RE LOOKING AT THE ENTIRE TRADE DRESS, IF TAKEN

14   AS A WHOLE, THE COLLECTION OF TRADE DRESS ELEMENTS

15   IS NOT ESSENTIAL TO THE PRODUCT'S USE OR PURPOSE OR

16   DOES NOT AFFECT THE TOTAL COST OR QUALITY OF THE

17   PRODUCT, EVEN IF CERTAIN PARTICULAR ELEMENTS OF THE

18   TRADE DRESS MAY BE FUNCTIONAL.

19             YOU SEE WHERE I'M GOING WITH THAT RIGHT

20   AWAY.  ALL OF THE ELEMENTS HERE WENT TO ELEMENTS,

21   WENT TO WHETHER A CORNER DID THIS, WHETHER A

22   PICTURE DID THIS, WHETHER A COLOR WAS IMPORTANT.

23             BUT THE TEST GOES TO THE ENTIRE TRADE

24   DRESS AS A WHOLE, AND SAMSUNG -- WHOEVER HAS THE

25   BURDEN OF PROOF HAD TO PROVE THE TRADE DRESS AS A
```

1    WHOLE WAS NOT FUNCTIONAL.

2         THE ALTERNATIVE DESIGNS THAT YOU HAVE

3    SEEN FOR THE IPHONE AND THE IPAD, AS WELL AS ALL

4    THE DIFFERENT PHONE PICTURES, ALL THE MODELS THAT

5    APPLE LOOKED AT BEFORE THEY CHOSE THIS, THE

6    PHYSICAL MODELS THAT WERE IN EVIDENCE THAT

7    MR. STRINGER BROUGHT TO COURT DEMONSTRATE THAT THE

8    SPECIFIC DESIGN OF THE IPHONE AND THE IPAD IS NOT

9    ESSENTIAL TO THE PRODUCT'S USE OR PURPOSE.

10         NO ONE CAN SAY THAT THERE IS ONLY ONE WAY

11   TO DESIGN A TABLET OR THAT THERE IS ONLY ONE WAY TO

12   DESIGN A SMARTPHONE.

13         AND THERE IS NO RECORD WHATSOEVER THAT

14   APPLE'S DESIGNS WERE DRIVEN BY COST.  IN FACT, YOU

15   HEARD MR. STRINGER TESTIFIED THAT APPLE'S DESIGNS

16   WERE DRIVEN SOLELY BY THE DESIRE, AS HE PUT IT,

17   QUOTE, "TO CREATE SOMETHING THAT SEEMED SO

18   WONDERFUL THAT YOU CAN'T IMAGINE HOW YOU WOULD

19   FOLLOW IT."

20         THAT WAS NOT A COST-BASED OR COST-DRIVEN

21   DESIGN PROCESS THAT HE TESTIFIED ABOUT.

22         WE THINK THERE CAN BE NO QUESTION THAT

23   THE IPHONE AND THE IPAD TRADE DRESS HAVE SECONDARY

24   MEANING.  THESE APPEARANCES ARE INDELIBLY

25   ASSOCIATED WITH APPLE.  YOU HEARD THAT FROM

1     MR.  SCHILLER; YOU HEARD THAT FROM APPLE'S SURVEY

2     EXPERT, THAT'S WHY WE BROUGHT THE SURVEY EXPERTS,

3     MR. PORET; AND YOU HEARD THAT FROM APPLE'S

4     MARKETING EXPERT, DR. WINER.

5               IF YOU FIND THAT APPLE'S IPAD TRADE DRESS

6     IS PROTECTABLE, YOU WILL NEED TO DESIGN IF THE

7     GALAXY -- SAMSUNG'S GALAXY TAB 10.1 PRODUCT

8     INFRINGES IT.

9               WE HAVE -- THERE'S TWO DIFFERENT CLAIMS,

10    INFRINGEMENT AND DILUTION.  THE INFRINGEMENT CLAIM

11    IS ALLEGED ONLY AGAINST THE TABLET.

12              THE TEST FOR INFRINGEMENT IS WHETHER OR

13    NOT SAMSUNG'S GALAXY TAB 10.1 IS LIKELY TO CAUSE

14    CONSUMERS TO BE CONFUSED AS TO THE SOURCE OF THE

15    PRODUCT.

16              SO THIS IS WHERE WE'RE APPLYING A

17    DIFFERENT TEST THAN IN THE DESIGN PATENTS.  FOR THE

18    DESIGN PATENTS, WE HAD TO PROVE THAT THERE WAS

19    SIMILARITY.  HERE WE HAVE TO PROVE WHAT THE LAW

20    CALLS A LIKELIHOOD OF CONFUSION, AND WE THINK WE

21    SHOWED THAT TO YOU.

22              IF YOU REMEMBER PLAINTIFF'S EXHIBIT 59,

23    THIS WAS THE EVIDENCE THAT THE PURCHASERS OF THE

24    GALAXY TABS AT BEST BUY MISTAKENLY PURCHASED THEM

25    THINKING THAT THEY WERE IPADS AND RETURNED THEM

1   WHEN THEY REALIZED THAT THEY WERE NOT.

2           THIS -- AGAIN, THIS IS WHY I KEEP TALKING

3   ABOUT HISTORICAL DOCUMENTS.  THIS IS A HISTORICAL

4   DOCUMENT.  THIS ACTUALLY HAPPENED.  IT'S NOT

5   CONJECTURE.  IT'S NOT LAWYER'S ARGUMENT.  THIS

6   HAPPENED IN THE REAL WORLD.  IT'S NOT HYPOTHETICAL.

7   WE KNOW THERE WAS CONFUSION.

8           MOREOVER, SAMSUNG KNEW THAT THIS WOULD

9   HAPPEN BECAUSE, AS YOU WILL RECALL, ITS VERY OWN

10  SURVEYS SHOWED THAT OVER HALF OF THE PEOPLE WHO

11  RESPONDED TO A SURVEY AFTER WATCHING AN AD FOR THE

12  GALAXY TAB TELEVISION COMMERCIAL SAID THEY THOUGHT

13  THE APPLE -- THAT THE AD WAS FOR APPLE, NOT

14  SAMSUNG.

15          THE MARKET WAS CONFUSED AT THE TIME THESE

16  PRODUCTS CAME OUT.

17          SAMSUNG HAS TALKED A LOT ABOUT CONFUSION

18  AT THE POINT OF SALE, BUT THAT'S NOT, AS YOU HEARD,

19  THE ONLY PLACE WHERE CONFUSION CAN HAPPEN.

20          MR. SCHILLER TALKED ABOUT CONFUSING

21  DRIVING BY SIGNS ON THE FREEWAY.  YOU CAN'T TELL

22  WHOSE COMPANY IS ADVERTISING, AND WE SAW THE TYPE

23  OF CONFUSION THAT WAS REPORTED IN THIS MAGAZINE

24  WHERE THE AUTHOR STATED, "IN MY HANDS-ON TESTING,

25  THE TAB 10.1 ACHIEVED PERHAPS THE BEST DESIGN

```
1    COMPLIMENT AN ANDROID TABLET COULD HOPE FOR, OFTEN

2    BEING MISTAKEN BY PASSERS-BY, INCLUDING APPLE IPAD

3    USERS, FOR AN IPAD 2."

4              WE BELIEVE THAT WE HAVE GIVEN YOU AMPLE

5    EVIDENCE TO FIND, FROM REAL WORLD EXPERIENCE, THAT

6    THERE WAS CONFUSION AND THAT, THEREFORE, SAMSUNG

7    INFRINGED THE IPAD TRADE DRESS.

8              AGAIN, IF YOU FIND THAT OUR TRADE DRESSES

9    ARE PROTECTABLE, WE WOULD NEED YOU TO DECIDE IF

10   SAMSUNG'S GALAXY PHONES AND THE GALAXY TAB 10.1

11   PRODUCTS DILUTE THEM.  WE HAVE THE INFRINGEMENT

12   CLAIM AND WE HAVE THE DILUTION CLAIM.

13             THE TEST FOR TRADE DRESS DILUTION IS

14   WHETHER THE IPHONE AND IPAD -- TRADE DRESSES ARE

15   FAMOUS AND WHETHER THE SAMSUNG PRODUCTS ARE LIKELY

16   TO DILUTE THE DISTINCTIVENESS OF THE TRADE DRESS.

17             IN OTHER WORDS, ARE THE SAMSUNG PRODUCTS

18   LIKELY TO CAUSE THE APPLE PRODUCTS TO BE LESS

19   UNIQUELY ASSOCIATED WITH APPLE?

20             WE SUBMIT THERE'S NO QUESTION ABOUT

21   WHETHER THE PRODUCTS ARE FAMOUS.  AS WE SAW, AND

22   I'VE SHOWN YOU TWICE ALREADY, SAMSUNG'S OWN

23   DOCUMENTS MAKE THAT POINT FOR US.  THE GRAVITY TANK

24   STUDY THAT COLLECTED ALL THE PRESS REPORTS AND HITS

25   PROVED THAT THESE PRODUCTS WERE FAMOUS.
```

4115

1           AS FOR THE IPAD, WE SHOWED YOU A <u>WALL</u>

2  <u>STREET JOURNAL</u> ARTICLE THAT SAID THAT THE IPAD WAS

3  A LAPTOP KILLER AND A GAME CHANGER.  THESE PRODUCTS

4  WERE FAMOUS.

5           AS FOR DILUTION, YOU WILL HAVE THESE

6  PRODUCTS, YOU CAN SEE FOR YOURSELF THE SIMILARITY

7  OF DESIGN.  IF YOU COMPARE THE GALAXY PRODUCTS TO

8  THE IPHONE AND IPAD, YOU CANNOT HELP BUT REACH THE

9  CONCLUSION THAT SAMSUNG'S DESIGNS ARE SO SIMILAR TO

10  THE APPLE DESIGNS THAT THEY ARE LIKELY TO CAUSE

11  APPLE'S DESIGNS TO BE VIEWED AS LESS THAN UNIQUE IN

12  THE MARKETPLACE.

13           HERE IS WHERE THERE'S A DIFFERENCE

14  BETWEEN US, AND IT'S IMPORTANT HERE.  THE CRITICAL

15  IMPORTANT THING ABOUT DILUTION WHERE OUR EVIDENCE

16  DIFFERS IS THE ISSUE OF TIMING.

17           AS JUDGE KOH TOLD YOU, WHEN YOU'RE

18  LOOKING AT DILUTION, YOU'RE LOOKING AT DILUTION AS

19  OF THE DATE THE PRODUCTS CAME INTO THE MARKET.  SO

20  WE HAD TO PROVE THAT THEY WERE FAMOUS BEFORE THEY

21  CAME INTO THE MARKET AND THAT THE DILUTION OCCURRED

22  WHEN -- AT THE TIME THE PRODUCTS CAME INTO THE

23  MARKET.

24           THAT'S WHY THE ADVERTISING WAS SO

25  IMPORTANT, BECAUSE IT WAS THE FIRST TIME -- YOU

1    REMEMBER THAT MR. SHEPPARD GOT ON THE STAND AND HE

2    SAID, WELL, THERE WAS CONFUSION BECAUSE EVERYBODY

3    KNEW ABOUT THE APPLE PRODUCTS AND THIS WAS THE

4    FIRST TIME THEY WERE SEEING THE SAMSUNG AD.

5            WELL, THAT IS THE DILUTION, BECAUSE THAT

6    WAS HAPPENING AT THE TIME THEY WERE INTRODUCING

7    THEIR PRODUCT INTO THE MARKET.

8            SAMSUNG PUT ON THE BIG SCREEN AND SAID,

9    OH, LOOK, EVERYBODY USES THESE DESIGNS.

10           BUT IF YOU LOOK AT THE DATES, THEY'RE

11   SHOWING YOU WHAT'S HAPPENING TODAY.  THEY'RE

12   SHOWING YOU THE EFFECT OF THEIR TORT.  THEY LED THE

13   WAY.  THEY INTRODUCED THE COPYING DESIGNS AND

14   OTHERS HAVE FOLLOWED THEM.

15           BUT IF YOU APPLY THE TEST AT THE CORRECT

16   LEGAL TIME, YOU WILL SEE THAT IT WAS SAMSUNG THAT

17   DILUTED WHAT, AT THE TIME, WAS OUR WORLD FAMOUS

18   DESIGNS.

19           I HAD TWO SORT OF EYE-OPENING MOMENTS IN

20   THE TRIAL.  ONE I TOLD YOU ABOUT, THIS THREE-MONTH

21   CRASH DESIGN.

22           THE OTHER ONE WAS MR. DENISON WHEN HE

23   STOOD THERE AND HE SAID SAMSUNG SPENT A BILLION

24   DOLLARS LAST YEAR, A BILLION DOLLARS JUST ON

25   MARKETING ITS PRODUCTS IN THE UNITED STATES.

117

```
 1              THAT IS THE DEFINITION OF DILUTION.  THEY

 2    HAVE SPENT A BILLION DOLLARS MIMICKING OUR

 3    DESIGNING AND HOLDING IT OUT TO THE WORLD SO THAT

 4    THE APPLE DESIGN IS NO LONGER SEEN AS UNIQUE.

 5              UTILITY PATENTS.  STILL WITH ME?  I DON'T

 6    HAVE -- I CAN'T TELL YOU TO STAND UP AND TAKE A

 7    BREAK.  DO THAT IN YOUR HEAD, BUT PAY ATTENTION,

 8    TOO, AT THE SAME TIME.

 9              THE UTILITY PATENT CLAIMS.

10              WHILE SAMSUNG WAS COPYING THE OUTSIDE OF

11    THE IPHONE, IT WAS ALSO BUSY COPYING THE USER

12    INTERFACE AND THE INNER WORKINGS OF THE IPHONE.

13    LIKE DESIGN PATENTS, UTILITY PATENTS PRESENT TWO

14    ISSUES:  INFRINGEMENT AND VALIDITY.

15              WE HAVE ACCUSED ALL THREE SAMSUNG

16    COMPANIES OF DIRECT INFRINGEMENT.

17              JUDGE KOH GAVE US THE TEST FOR DIRECT

18    INFRINGEMENT.  FIRST, THE INFRINGER MUST MAKE, USE

19    OR SELL THE ACCUSED PRODUCTS IN THE UNITED STATES.

20    ALL THREE OF THESE COMPANIES SOLD PRODUCTS INTO THE

21    UNITED STATES.  SEC SELLS TO ITS AMERICAN

22    SUBSIDIARIES IN THE UNITED STATES AND THEY SELL TO

23    CARRIERS AND CUSTOMERS IN THE UNITED STATES .

24              SECOND, THE ACCUSED DEVICES MUST MEET

25    EVERY ELEMENT OF THE ALLEGED PATENT CLAIM.
```

5118

```
1              LET'S START WITH THE '381 PATENT, THE
2    BOUNCEBACK PATENT.  PROFESSOR BALAKRISHNAN
3    EXPLAINED HOW SAMSUNG'S PRODUCTS INFRINGE.  HE
4    ANALYZED THE PERFORMANCE OF 21 ACCUSED PRODUCTS.
5    HE THEN LOOKED AT ALL OF THE RELEVANT CODE THAT
6    SAMSUNG PROVIDED FOR EACH OF THE FOUR MAJOR
7    VERSIONS OF THE ANDROID OPERATING SYSTEM THAT RUN
8    ON THE ACCUSED DEVICES.
9              NO SAMSUNG EXPERT, NO SAMSUNG WITNESS
10   TESTIFIED THAT SAMSUNG IS NOT USING THE BOUNCEBACK
11   FEATURE.  NO ONE CAME HERE AND DENIED IT.
12             NEXT UP, THE '163 PATENT, THE DOUBLE TAP
13   TO ZOOM.
14             PROFESSOR SINGH EXPLAINED HOW SAMSUNG'S
15   PRODUCTS INFRINGE.  DR. SINGH STUDIED 24 ACCUSED
16   PRODUCTS AND ALL FOUR RELEASES OF SAMSUNG'S SOURCE
17   CODE IN GREAT DETAIL AND PROVIDED THEIR BEHAVIOR
18   ACROSS ALL SOURCE CODE VERSIONS PROVIDED BY
19   SAMSUNG.
20             HE DEMONSTRATED THAT FOR YOU AND HE READ
21   THE SOURCE CODE.
22             AGAIN, SAMSUNG NEVER PUT UP A
23   NON-INFRINGEMENT DEFENSE.
24             FINALLY, ON THE '915 SCROLL VERSUS
25   GESTURE PATENT, DR. SINGH DEMONSTRATED AND
```

```
1     EXPLAINED IN DETAIL HOW SAMSUNG'S PRODUCTS

2     INFRINGE.  DR. SINGH EXAMINED THE CODE FOR ALL 24

3     PRODUCTS AND EXPLAINED HOW AN EVENT OBJECT CAUSES

4     SCROLL OR GESTURE IN EACH PRODUCT.

5               SO WHAT DOES SAMSUNG SAY?  ONCE AGAIN,

6     SAMSUNG CLAIMS THAT EACH OF THESE PATENTS IS

7     INVALID.

8               SAMSUNG RAISES TWO INVALIDITY DEFENSES:

9     ANTICIPATION AND OBVIOUSNESS.

10              FOR ANTICIPATION, SAMSUNG HAD TO FIND

11    EVERY CLAIM LIMITATION IN A SINGLE PIECE OF PRIOR

12    ART.  ESSENTIALLY SAMSUNG HAS TO SHOW THAT A SINGLE

13    PIECE OF PRIOR ART WOULD HAVE INFRINGED EACH OF

14    THESE PATENTS.

15              FOR OBVIOUSNESS, SAMSUNG HAD TO SHOW THAT

16    ONE OR MORE PIECES OF PRIOR ART, THAT IT WOULD HAVE

17    BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE

18    ART TO COMBINE WOULD GET YOU TO THE APPLE INVENTION

19    WITHOUT USING HINDSIGHT, WITHOUT USING WHAT YOU

20    KNOW NOW AND SAYING, OH, YES, I CAN FIND THOSE

21    PIECES IN VARIOUS PLACES.

22              SAMSUNG NEVER MADE THIS SHOWING.

23    CERTAINLY IT DID NOT MAKE A CLEAR AND CONVINCING

24    SHOWING, WHICH WAS THEIR BURDEN.

25              LET ME TALK ABOUT SOME OF THE KEY ISSUES
```

1    ABOUT SAMSUNG'S PRIOR ART.

2              SAMSUNG ASSERTS THAT.  SO SAME PIECES OF

3    ARE RELATE TO MORE THAN ONE OF APPLE'S PATENTS.

4    NONE OF THESE REFERENCES INVALIDATES ANY OF APPLE'S

5    PATENTS BECAUSE EACH IS MISSING MULTIPLE CLAIM

6    LIMITATIONS.

7              FIRST WE SAW THE DIAMONDTOUCH.  BUT IF

8    YOU RECALL, YOU DIDN'T ACTUALLY SEE THE

9    DIAMONDTOUCH.  WHEN SAMSUNG WAS PUTTING ON THEIR

10   EVIDENCE, YOU SAW PICTURES OF THE DIAMONDTOUCH PUT

11   ON THE WALL.  IT WASN'T UNTIL MR. JACOBS MADE THEM

12   BRING THE THING OUT OF THE CLOSET THERE THAT YOU

13   ACTUALLY SAW THE DIAMONDTOUCH, AND AS SOON AS YOU

14   SEE THE DIAMONDTOUCH, YOU REALIZE THAT IT DOES NOT

15   HAVE AN INTEGRATED TOUCHSCREEN DISPLAY AND IT

16   DOESN'T HAVE MANY OF THE OTHER LIMITATIONS OF THE

17   '915 AND THE '381 PATENT.  THESE ARE -- ON THE

18   SCREEN HERE, THESE ARE THE VARIOUS LIMITATIONS THAT

19   ARE MISSING FROM THE DIAMONDTOUCH.

20             IT REALLY IS DIFFICULT TO IMAGINE HOLDING

21   THE DIAMONDTOUCH IN YOUR HAND AND MAKING A PHONE

22   CALL.

23             THE SECOND PIECE OF ART THEY SHOWED YOU

24   WAS THE LAUNCHTILE, BUT AS DR. BALAKRISHNAN

25   EXPLAINED, THE LAUNCHTILE DOESN'T SOLVE THE FROZEN

1     SCREEN OR DESERT FOG PROBLEMS THAT THE '381 AND

2     '163 PATENTS SOLVED.

3             DR. BALAKRISHNAN STUDIED THE SOURCE CODE

4     AND TESTIFIED THAT IT DOESN'T DO ANYTHING, QUOTE,

5     AND THIS IS ONE OF THE LIMITATIONS OF THE PATENT,

6     SAYS, "THE PATENT HAS TO REACT," QUOTE, "IN

7     RESPONSE TO THE EDGE OF A DOCUMENT BEING REACHED."

8             THAT'S THE WHOLE NATURE OF THE INVENTION

9     WAS THAT IT TELLS YOU WHEN YOU GOT TO THE EDGE OF

10    THE DOCUMENT AND IT HAS TO BE IN THE SOURCE CODE.

11            SAMSUNG'S EXPERT, DR. VAN DAM, ADMITTED

12    THAT HE HAD NEVER LOOKED AT THE SOURCE CODE.

13    DR. SINGH ALSO TESTIFIED AND SHOWED YOU VIDEOS

14    PROVING THAT THE LAUNCHTILE DOES NOT ENLARGE THE

15    STRUCTURED ELECTRONIC DOCUMENT.  INSTEAD, IT

16    LAUNCHES APPLICATIONS.  YOU DON'T GET THE ZOOM

17    FUNCTION.  YOU SIMPLY GET A DIFFERENT PROGRAM.

18            FOR THE '915 PATENT, SAMSUNG ALSO

19    MENTIONED THE NOMURA JAPANESE PATENT APPLICATION,

20    BUT NOMURA FAILED TO DISCLOSE KEY ASPECTS OF THE

21    '915 PATENT.  THERE WERE NO EVENTS, NO OBJECTS, NO

22    VIEWS, AND NO INVALIDITY.

23            AND THEN THEY SHOWED US THE HAN VIDEO,

24    WHICH IS AN INTERESTING VIDEO, BUT YOU HAVE NO IDEA

25    HOW THE HAN VIDEO WORKS.  WE NEVER SAW THE

1    SOFTWARE.  WE DON'T KNOW WHAT THE SOFTWARE DOES OR

2    DOESN'T DO.

3              AGAIN, A COMPLETE FAILURE OF PROOF.

4              IN INVALIDITY AND IN UTILITY PATENTS, WE

5    LOOK TO THE SAME OTHER FACTORS THAT WE LOOKED FOR

6    DESIGN PATENTS, A WAY OF VALIDATING THIS DECISION.

7              AND, AGAIN, THEY'RE ALL PRESENT HERE.

8              GOING BACK TO THAT 2008 SURVEY, YOU SAW

9    ON PAGE 36 WHERE IT SPECIFICALLY MENTIONED THE TWO

10   FINGER PINCH AND THE BOUNCING LISTS.  THIS IS

11   SAMSUNG ITSELF RECOGNIZING THE NOVELTY OF APPLE'S

12   INVENTION.

13             I'M NOT GOING TO REPEAT THEM ALL, BUT

14   EACH OF THE OTHER FACTORS SUPPORTS THE CONCLUSION

15   THAT THE PTO WAS ABSOLUTELY RIGHT WHEN IT

16   RECOGNIZED APPLE'S INVENTIONS.

17             TO SUM UP, WE BELIEVE THAT WE HAVE

18   DEMONSTRATED THAT SAMSUNG HAS VIOLATED EACH AND

19   EVERY ONE OF OUR VALID INTELLECTUAL PROPERTY

20   RIGHTS.

21             AND THAT, IF YOU AGREE WITH US THAT FAR,

22   WOULD BRING YOU TO THE ISSUE OF DAMAGES.

23             SAMSUNG MAKES FUN OF OUR DAMAGES CLAIM.

24   THEY MAKE FUN OF US FOR ASKING FOR BILLIONS OF

25   DOLLARS.

1          BUT THERE ARE TWO FACTORS THAT ARE

2    DRIVING THE DAMAGES NUMBERS IN THIS CASE.  THE

3    FIRST FACTOR IS THAT SAMSUNG HAS SOLD 22.7 MILLION

4    INFRINGING PHONES AND TABLETS IN THE UNITED STATES

5    BETWEEN JUNE 2010 AND TODAY.

6          THE SECOND FACTOR IS THAT SAMSUNG'S

7    INFRINGING SALES HAVE GENERATED $8.160 BILLION IN

8    REVENUE FOR SAMSUNG.  THE DAMAGES IN THIS CASE

9    SHOULD BE LARGE BECAUSE THE INFRINGEMENT HAS BEEN

10   MASSIVE.

11         THESE NUMBERS ARE NOT IN DISPUTE.  THEY

12   COME DIRECTLY FROM THE PARTY'S JOINT EXHIBIT, JX

13   1500.  OUR DAMAGES EXPERT, MR. MUSIKA, WALKED YOU

14   THROUGH HOW TO VERIFY THAT CALCULATION YOURSELVES.

15         THE JOB WE'RE ASKING YOU TO DO IS TO

16   CALCULATE HOW MUCH OF THAT $8.16 BILLION APPLE

17   SHOULD RECEIVE AS DAMAGES.

18         TO DO THAT, AS MR. MUSIKA EXPLAINED, YOU

19   WILL NEED TO PLACE THESE 22.7 MILLION INFRINGING

20   SMARTPHONES AND TABLETS INTO ONE OF THREE BUCKETS.

21         THE FIRST CATEGORY THAT I WANT TO TALK

22   ABOUT IS SAMSUNG'S PROFITS.  THIS REMEDY, YOU WOULD

23   AWARD US SAMSUNG'S PROFITS IF YOU CONCLUDED THAT

24   SAMSUNG HAD INFRINGED APPLE'S TRADE DRESS OR ITS

25   DESIGN PATENT CLAIMS.

4124

1          SAMSUNG HAS SUGGESTED, OR MAYBE I'M JUST

2     SENSITIVE, BUT IT SOUNDED TO ME LIKE SAMSUNG WAS

3     SUGGESTING THAT DESIGN PATENTS ARE NOT IMPORTANT.

4          BUT AS YOU HAVE NOW BEEN TOLD, CONGRESS

5     HAS DECIDED THAT BECAUSE OF THE IMPORTANCE OF THIS

6     PARTICULAR FORM OF INTELLECTUAL PROPERTY, THAT AN

7     INFRINGER MUST GIVE BACK ALL OF THE PROFITS EARNED

8     FROM THE SALES THAT INFRINGED SOMEONE ELSE'S TRADE

9     DRESS OR PATENT DESIGN.  THE PAYMENT OF SAMSUNG'S

10    PROFITS TO APPLE IS PAYMENT BACK OF THE UNJUST

11    ENRICHMENT THAT SAMSUNG GOT BY USING APPLE'S I.P.

12    WITHOUT PERMISSION.

13         AND, AS JUDGE KOH JUST TOLD YOU, CONGRESS

14    AWARDS THE ENTIRE PROFIT ON A PRODUCT, NOT JUST

15    PART OF THAT PRODUCT.  PROFIT.

16         AT THE OUTSET, THERE ARE TWO QUESTIONS

17    THAT YOU NEED TO ANSWER BEFORE YOU DECIDE HOW MUCH

18    OF SAMSUNG'S INFRINGING PROFITS YOU SHOULD AWARD

19    APPLE.

20         THE FIRST IS THIS QUESTION OF WHAT WE

21    CALL NOTICE, AND THE SECOND IS THIS QUESTION OF HOW

22    MUCH, IF ANY, OF SAMSUNG'S INDIRECT COSTS SHOULD BE

23    SUBTRACTED FROM THE GROSS REVENUE NUMBER.

24         LET'S TALK ABOUT NOTICE.  THE QUESTION IS

25    WHEN DID APPLE GIVE SAMSUNG NOTICE OF INFRINGEMENT.

```
 1    EVERYTHING HAS AN EXCEPTION.  EVERYTHING HAS A
 2    SEPARATE RULE, UNFORTUNATELY, IN THIS CASE.  BUT
 3    THE FIRST THING YOU NEED TO KNOW ABOUT THE NOTICE
 4    ISSUE IS THAT YOU'LL SEE IN THE INSTRUCTIONS, THIS
 5    IS IN INSTRUCTION 71 OF THE INSTRUCTIONS THE JUDGE
 6    GAVE YOU, THE NOTICE ISSUE DOES NOT APPLY TO CLAIMS
 7    FOR UNREGISTERED TRADE DRESS.  IF YOU FIND THAT
 8    SAMSUNG INFRINGED OUR UN -- OR DILUTED OUR
 9    UNREGISTERED TRADE DRESSES, EVERY INFRINGING CLAIM
10    OR DILUTING SALE MUST BE INCLUDED IN THE DAMAGES
11    CLAIM.
12              FOR DESIGN PATENTS AND REGISTERED TRADE
13    DRESS, THE QUESTION THEN IS WHEN DID APPLE GIVE
14    SAMSUNG NOTICE OF INFRINGEMENT?
15              AS JUDGE KOH HAS INSTRUCTED YOU, NOTICE
16    OCCURS NO LATER THAN THE DATE THAT WE FILED SUIT,
17    BUT WE WERE ENTITLED TO PROVE THAT APPLE GAVE
18    SAMSUNG NOTICE BEFORE WE FILED SUIT.
19              HERE WE BELIEVE THAT WE GAVE SAMSUNG
20    NOTICE IN AUGUST OF 2010.
21              BORIS TEKSLER, WHO WAS APPLE'S DIRECTOR
22    OF PATENTS AND LICENSING, TESTIFIED ABOUT THE
23    PRESENTATION THAT APPLE MADE TO SAMSUNG ON
24    AUGUST 4TH, 2010.  THIS PRESENTATION TOLD SAMSUNG
25    IN NO UNCERTAIN TERMS THAT IT WAS COPYING APPLE'S
```

5126

1    PATENTS AND DESIGNS.  AND AS WE ALREADY SAW,

2    SAMSUNG'S DIRECTOR OF LICENSING IN KOREA, JUNWON

3    LEE, TESTIFIED THAT SAMSUNG HAD GOTTEN THAT NOTICE.

4              THUS, IN OUR VIEW, WE BELIEVE THAT YOU

5    SHOULD CALCULATE DAMAGES BASED ON DESIGN PATENT

6    INFRINGEMENT BEGINNING IN AUGUST OF 2010.

7              NEXT IS THE COST DEDUCTION ISSUE.  THE

8    QUESTION IS WHETHER OR NOT YOU SHOULD DEDUCT

9    SAMSUNG'S INDIRECT COSTS FROM ITS GROSS REVENUES,

10   GROSS PROFITS.

11             ON THIS ISSUE, SAMSUNG HAS THE BURDEN OF

12   PROOF.  SAMSUNG CAN ONLY DEDUCT COSTS THAT IT

13   PROVED WERE DIRECTLY ATTRIBUTABLE TO THE ACCUSED

14   PRODUCTS.  THAT'S THE LANGUAGE YOU'LL FIND IN YOUR

15   INSTRUCTION.  THEY HAD TO PROVE THAT THE COSTS THEY

16   WANT TO DEDUCT WERE DIRECTLY ATTRIBUTABLE TO THE

17   ACCUSED PRODUCTS.

18             AS YOU WILL RECALL, MR. MUSIKA DID NOT

19   DEDUCT THOSE COSTS, AND THERE WERE VERY MANY

20   REASONS WHY HE DID NOT AND WHICH WE THINK YOU

21   SHOULD NOT CONSIDER SAMSUNG FOR INDIRECT COSTS.

22             FIRST, AS YOU'LL REMEMBER, SAMSUNG

23   REFUSED TO GIVE US OR EVEN -- REFUSED TO GIVE THEIR

24   OWN EXPERT ANY DOCUMENTATION OF THE SO-CALLED

25   INDIRECT COSTS UNTIL THE VERY LAST MINUTE.

1    SAMSUNG'S EXPERT, MR. WAGNER, HAD TO RELY ON

2    INFORMATION HE WAS GIVEN THE NIGHT BEFORE HIS

3    EXPERT REPORT WAS DUE.

4         SECOND, SAMSUNG PRODUCED NINE DIFFERENT

5    VERSIONS OF THE FINANCIAL SPREADSHEET THAT IT

6    ULTIMATELY OFFERED AS EVIDENCE OF ITS INDIRECT

7    COSTS.

8         THIRD, MR. MUSIKA, WHO, AS YOU RECALL, IS

9    A FORMER FRAUD INVESTIGATOR, A BANKRUPTCY COURT

10   FRAUD INVESTIGATOR, A KPMG PARTNER, ANALYZED

11   SAMSUNG'S DATA AND CONCLUDED THAT IT WAS NOT

12   RELIABLE.

13        EVEN SAMSUNG'S EXPERT COULD NOT TIE HIS

14   NUMBERS BACK TO A RELIABLE SOURCE.

15        FOURTH, AS THEY ADMIT, AND THIS GOES BACK

16   TO MY HISTORICAL DOCUMENT POINT, SAMSUNG MADE UP

17   THIS, WROTE OUT THIS COST ALLOCATION THAT THEY WANT

18   YOU TO ACCEPT, THIS SPREADSHEET SOLELY FOR THE

19   PURPOSES OF THIS LITIGATION.

20        REMEMBER THEY MADE A BIG POINT ABOUT

21   TESTIFYING THAT IT HAD TO BE RIGHT BECAUSE THEY

22   STORE ALL THEIR NUMBERS ON AN S.A.P. SYSTEM.

23        BUT WHEN YOU LOOK AT THE EXHIBIT, THE

24   NUMBER OF THE EXHIBIT THEY'RE OFFERING YOU IS

25   SIMPLY AN EXCEL SPREADSHEET.  WE HAVE NO IDEA, YOU

1    HAVE NO IDEA WHO CREATED IT OR THE BASIS FOR THE

2    NUMBERS IN IT.

3              AND, FINALLY, INDIRECT COST ALLOCATIONS

4    WERE COMPLETELY UNEXPLAINED.

5              SO BASED ON ALL OF THESE FACTORS, WE

6    THINK SAMSUNG HAS FAILED TO PROVE THAT ANY OF THE

7    INDIRECT COSTS THAT IT'S CLAIMING SHOULD BE

8    ALLOCATED TO THE INFRINGING PRODUCTS.

9              ONCE YOU RESOLVE THESE TWO QUESTIONS,

10   NOTICE AND DEDUCTION OF PROFITS, THERE ARE ONLY

11   FOUR POSSIBLE OUTCOMES FOR CALCULATING SAMSUNG'S

12   PROFITS.

13             BOTH EXPERTS ACTUALLY AGREE ON THESE

14   NUMBERS.  THEY DISAGREE ON THOSE TWO FACTORS, BUT

15   THEY AGREE ON THESE NUMBERS.

16             AGAIN, NOTHING IS EASY.  I'M SORRY.

17             BUT IF YOU FIND UNREGISTERED TRADE DRESS

18   VIOLATIONS, OR THAT APPLE GAVE SAMSUNG NOTICE ON

19   AUGUST 4TH, 2010, SO IF YOU AGREE WITH BOTH OF OUR

20   SUPPOSITIONS, AND THAT APPLE FAILED TO MEET ITS

21   BURDEN OF PROOF ON INDIRECT COSTS, THEN YOU SHOULD

22   AWARD $2.241 BILLION OF SAMSUNG'S PROFITS TO APPLE.

23             ANOTHER FOOTNOTE.  IN A MINUTE I'M GOING

24   TO TALK ABOUT APPLE'S LOST PROFITS.  SAMSUNG'S

25   PROFITS NUMBER THAT I JUST TALKED ABOUT DOES NOT

```
1    REFLECT THE TWO MILLION UNITS THAT I'M GOING TO

2    TALK ABOUT THERE.

3              IF YOU DECIDE NOT TO AWARD APPLE LOST

4    PROFITS, THEN YOU WOULD NEED TO INCLUDE THOSE 2

5    MILLION UNITS IN YOUR AWARD OF SAMSUNG PROFITS HERE

6    AND THAT WOULD INCREASE THE NUMBER TO $2.481

7    BILLION.

8              OBVIOUSLY, GIVEN THAT CHOICE, WE PREFER

9    OUR LOST PROFITS BECAUSE OUR PROFIT MARGIN PER

10   PHONE IS HIGHER.

11             THE SECOND OPTION IS IF YOU FIND THAT

12   THERE'S BEEN NO TRADE DRESS VIOLATION, IF YOU FIND

13   FOR SAMSUNG ON THE ISSUE OF NOTICE, SO IF YOU START

14   DAMAGES AS OF THE DATE OF THE LAWSUIT, BUT IF YOU

15   REJECT THEIR POSITION ON THE ISSUE OF INDIRECT

16   COSTS, THEN THE NUMBER IS 1.396 BILLION IN PROFITS.

17             THE THIRD OPTION IS IF YOU FIND FOR APPLE

18   ON UNREGISTERED TRADE DRESS OR NOTICE, BUT FIND FOR

19   SAMSUNG ON THE AMOUNT OF INDIRECT COSTS, THEN THE

20   NUMBER IS 1.086 BILLION OF DOLLARS TO APPLE.

21             AND, FINALLY, IF YOU FIND FOR SAMSUNG ON

22   BOTH OF THEIR POSITIONS, BOTH NOTICE AND INDIRECT

23   COSTS, THEN THE AWARD IS 519 MILLION OF PROFITS TO

24   APPLE.

25             THAT IS THE MINIMUM AMOUNT THAT YOU
```

```
 1    SHOULD AWARD IF YOU FIND IN OUR FAVOR ON DESIGN

 2    LIABILITY.

 3              ON THE QUESTION OF DAMAGES FOR UTILITY

 4    PATENTS, WE ARE CLAIMING OUR LOST PROFITS ON 2

 5    MILLION UNITS OF SALES.  MR. MUSIKA CONSIDERED ALL

 6    OF THE FACTORS THAT THE COURT HAS INSTRUCTED YOU TO

 7    CONSIDER BEFORE AWARDING THIS TYPE OF REMEDY AND

 8    FOUND THAT THEY WERE MET.

 9              HE MADE CONSERVATIVE ASSUMPTIONS TO

10    ASSURE HIMSELF THAT APPLE REALLY WOULD HAVE MADE AN

11    ADDITIONAL 2 MILLION SALES DURING THE TWO YEARS

12    THAT SAMSUNG WAS SELLING ITS 22 MILLION INFRINGING

13    PHONES.

14              HE REVIEWED APPLE'S CAPACITY INFORMATION

15    AND ASSURED YOU THAT APPLE HAD THE CAPACITY TO MAKE

16    THE ADDITIONAL 2 MILLION SALES DURING THE LIMITED

17    TIME PERIODS IN WHICH THEY WOULD HAVE OCCURRED.

18              AGAIN, HIS WORK PAPERS ARE PART OF THAT

19    EXHIBIT THAT I MENTIONED TO YOU, PX 25-A1, AND HIS

20    WORK PAGES ON THIS CAPACITY ISSUE ARE AT PAGES 14

21    AND 15.

22              IF YOU AGREE THAT APPLE SHOULD RECOVER

23    ITS LOST PROFITS FOR THE UTILITY PATENTS, THE

24    NUMBER IS $488 MILLION IN LOST PROFITS.

25              AND THE FINAL BUCKET WAS REASONABLE
```

```
 1    ROYALTY.  THIS SERVES AS THE FLOOR ON DAMAGES FOR

 2    ANY SALES THAT YOU CHOSE NOT TO INCLUDE IN A

 3    CALCULATION OF LOST PROFITS.  BECAUSE APPLE HAS

 4    BEEN VERY CAREFUL NOT TO DOUBLE COUNT DAMAGES, AND

 5    MOST OF THE PHONES AND TABLETS FALL INTO ONE

 6    PROFITS OR ANOTHER PROFITS BUCKET, WE WERE ONLY

 7    SEEKING $20 MILLION IN REASONABLE ROYALTY DAMAGES.

 8             IF YOU DON'T AWARD ANY SAMSUNG PROFITS OR

 9    LOST PROFITS AT ALL TO APPLE, BUT IF YOU FIND

10    LIABLE ON ALL 22 MILLION UNITS SOLD, THE DAMAGES

11    FIGURE WOULD BE APPROXIMATELY $494 MILLION.

12             YOU WHEN LOOK -- FIRST OF ALL, WE

13    CERTAINLY HOPE YOU GET TO THE DAMAGES ISSUE, BUT

14    WHEN YOU LOOK TO THE DAMAGES ISSUE, WE HOPE THAT

15    YOU WILL LOOK AT EXHIBITS PX 25-A1 AND JX 1500.

16    THESE ARE THE EXHIBITS IN WHICH MR. MUSIKA LAID OUT

17    ALL OF THE NUMBERS NECESSARY TO CALCULATE DAMAGES

18    FOR ANY FINDING OF LIABILITY YOU MAY DECIDE TO

19    MAKE.

20             WHEN YOU READ THE VERDICT FORM, YOU WILL

21    SEE THAT IT ASKS YOU TO STATE YOUR DAMAGES AWARD ON

22    A TOTAL BASIS, AND ALSO ON A PRODUCT-BY-PRODUCT

23    BASIS.

24             IF YOU CHOSE TO ACCEPT AND TO CREDIT

25    MR. MUSIKA'S TESTIMONY, YOU WILL FIND THAT
```

1    CALCULATION IS ALREADY DONE AT PAGE 4 OF PX 25-A1.

2          IF YOU NEED TO CALCULATE DAMAGES BY SOME

3    OTHER METHOD, YOU WILL FIND THE NUMBERS YOU NEED IN

4    THE TWO EXHIBITS THAT I'VE MENTIONED.

5          AT THIS POINT, I THINK I'VE COVERED

6    EVERYTHING EXCEPT FOR TWO REMAINING QUESTIONS, BUT

7    BOTH OF THESE ARE IMPORTANT.

8          I EXPLAINED TO YOU WHAT THE LAW IS ON

9    DIRECT INFRINGEMENT.  ALL THREE SAMSUNG COMPANIES

10   CELL PHONES AND TABLETS TO CUSTOMERS IN THE

11   UNITED STATES AND THAT IS DIRECT INFRINGEMENT.

12         ANOTHER FOOTNOTE.  THERE ARE THREE PHONES

13   THAT MR. DENISON TOLD YOU THAT THE SUBSIDIARIES

14   DIDN'T SELL, THE I9000, THE I9100 AND THE ACE, AND

15   SO THEY RAISE AN INDEPENDENT QUESTION OF WHETHER OR

16   NOT THEY'VE BEEN SOLD IN THE UNITED STATES.

17         WHAT I WANTED TO REMIND YOU WAS THAT

18   MR. DENISON TESTIFIED THAT THESE ARE GLOBAL

19   VERSIONS.  THEY'RE GLOBAL VERSIONS.

20         AND IF YOU TURN THEM ON, ON TWO OF THEM

21   YOU WILL FIND OUT THAT THE LANGUAGE OPTION COMES UP

22   AND SAYS ENGLISH, UNITED STATES AND THE THIRD ONE

23   SAYS ENGLISH, CLEARLY INTENDED FOR SALE IN THIS

24   COUNTRY.

25         WE HAVE ALSO ACCUSED SEC, THE KOREAN

4133

COMPANY, OF WHAT'S CALLED INDUCING THE

INFRINGEMENT.

SEC CAUSES ITS SUBSIDIARIES IN THE

UNITED STATES TO SELL INFRINGING PHONES AND

TABLETS.  JUDGE KOH WAS SET OUT THE TEST FOR

INDUCEMENT IN INSTRUCTION 58.  WE ARE CONFIDENT

THAT WHEN YOU EXAMINE THE EVIDENCE, YOU WILL

CONCLUDE THAT SEC KNEW THAT THESE PRODUCTS WERE

INFRINGING AND DIRECTED ITS SUBSIDIARIES TO MAKE

SALES.

AS YOU MAY RECALL, SEC EVEN SETS THE

PRICE AT WHICH ITS AMERICAN SUBSIDIARIES SELL THE

PHONES AND TABLETS TO CARRIERS IN THE

UNITED STATES.

THE FINAL QUESTION IS, FOR US, VERY

IMPORTANT, AND THAT IS THE QUESTION THAT IF YOU

FIND INFRINGEMENT, WHETHER OR NOT THESE COMPANIES

ACTED WILLFULLY.

UNDER JUDGE KOH'S INSTRUCTIONS, THEY

ACTED WILLFULLY IF THEY ACTED WITH RECKLESS

DISREGARD OF APPLE'S PATENTS AND TRADE DRESS RIGHTS

THAT THEY INFRINGED.

WHEN YOU, AND WE HOPE YOU WILL, ADDRESS

THE ISSUE OF RECKLESS DISREGARD, THINK OF THE

COPYING DOCUMENTS, THINK ABOUT THE MEETING WITH

4134

1    GOOGLE, THINK ABOUT SAMSUNG BLOWING OFF ANY ATTEMPT

2    TO NEGOTIATE A RESOLUTION AND FIND THAT THEIR

3    INFRINGEMENT IS WILLFUL.

4            THE COURT:  OKAY.  TIME IS NOW 2:23.

5            WHY DON'T WE TAKE A STAND-UP BREAK.  IF

6    ANYONE NEEDS ANY WATER OR IF YOU NEED TO GET ANY

7    DRINKS FROM THE JURY ROOM, PLEASE FEEL FREE TO DO

8    SO.

9            (PAUSE IN PROCEEDINGS.)

10           THE COURT:  ALL RIGHT.  WELCOME BACK.

11   PLEASE TAKE A SEAT.

12           ALL RIGHT.  IT'S 2:35.  PLEASE GO AHEAD.

13           MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

14           **(WHEREUPON, MR. VERHOEVEN GAVE HIS**

15   **CLOSING ARGUMENT ON BEHALF OF SAMSUNG.)**

16           MR. VERHOEVEN:  GOOD AFTERNOON, LADIES

17   AND GENTLEMEN OF THE JURY.

18           APPLE'S LARGEST CLAIMS IN THIS CASE ARE

19   ITS DESIGN PATENTS.  APPLE IS CLAIMING AND ASKING

20   YOU TO AWARD IT OVER $2 BILLION BASED ON

21   INFRINGEMENT OF ITS DESIGN PATENTS.

22           NOW, MR. MCELHINNY MENTIONED IN HIS

23   CLOSING ARGUMENT THAT TODAY, THIS MORNING, YOU WERE

24   TOLD WHAT THE TESTS WERE AND THE RULES YOU NEED TO

25   APPLY.

```
 1              WELL, ONE OF THOSE RULES THAT YOU WERE

 2     TOLD ABOUT WAS THE TEST FOR INFRINGEMENT OF DESIGN

 3     PATENTS.

 4              MR. FISHER, CAN WE PUT THAT UP ON THE

 5     SCREEN.

 6              THIS IS THE TEST, IT'S JURY INSTRUCTION

 7     NUMBER 46.  AND I'LL JUST READ IT.  "TWO DESIGNS

 8     ARE SUBSTANTIALLY THE SAME IF, IN THE EYE OF AN

 9     ORDINARY OBSERVER, GIVING SUCH ATTENTION AS A

10     PURCHASER USUALLY GIVES, THE RESEMBLANCE BETWEEN

11     THE TWO DESIGNS IS SUCH AS TO DECEIVE SUCH AN

12     OBSERVER, INDUCING HIM TO PURCHASE ONE SUPPOSING IT

13     TO BE THE OTHER."

14              NOW, YOU'D THINK THAT IF APPLE WAS GOING

15     TO COME IN HERE AND ASK FOR OVER $2 BILLION IN

16     DAMAGES, THAT MIGHT HAVE USED ALL THE MONEY FOR THE

17     LAWYERS AND THE EXPERTS TO HAVE AN EXPERT COME IN

18     AND SAY, "I'VE INVESTIGATED WHETHER PEOPLE ARE

19     DECEIVED."

20              THAT THEY WOULD HAVE AN EXPERT TO COME IN

21     AND SAY, "I DID A STUDY IN EVALUATING WHETHER

22     PEOPLE WERE DECEIVED OR CONFUSED."

23              THAT THEY'D HAVE AN EXPERT THAT ACTUALLY

24     SPOKE TO PEOPLE AND DID A SYSTEMATIC ANALYSIS.

25              BUT YOU DON'T.  WHAT DID WE HAVE TODAY,
```

1    OR OVER THIS TRIAL.  WE HAD MR. BRESSLER, HE DIDN'T

2    DO ANY STUDIES.  HE DIDN'T TALK TO PEOPLE TO SEE IF

3    THEY WOULD BE DECEIVED.  I DIDN'T APPLY THIS

4    STANDARD.

5           YOU HAD DR. KARE.  SHE JUST LOOKED AT THE

6    IMAGES.  SHE DIDN'T DO ANY ANALYSIS AS TO WHETHER

7    THERE WAS ANY DECEPTION.  SHE SAID SHE COULDN'T

8    EVEN TESTIFY ABOUT WHEN I ASKED HER.

9           THE ONLY SURVEY THAT CAME IN THAT EVEN

10   HAD ANYTHING TO DO WITH DECEPTION OR CONFUSION WAS

11   MR. VAN LIERE.  BUT HE DIDN'T DO A TEST TO SEE IF

12   CONSUMERS WOULD BE DECEIVED WHEN THEY'RE PURCHASING

13   ONE PRODUCT INDUCING THEM TO BELIEVE IT'S ANOTHER.

14   HE DIDN'T DO A TEST, HE DIDN'T DO A SURVEY FOR

15   POINT-OF-SALE CONFUSION.  HE HAD DONE A LOT OF

16   THOSE, BUT THE LAWYERS TOLD HIM NOT TO.  THEY ASKED

17   HIM TO DO A TEST HE HAD NEVER DONE BEFORE, WHICH

18   WAS LOOKING AT PEOPLE AFTER A PURCHASE HAS BEEN

19   MADE.

20          AND THIS WAS THE, THIS WAS THE PRODUCT

21   THAT HE USED AS THE CONTROL, THE NOOK, WHICH

22   OBVIOUSLY IS DIFFERENT.  THAT'S THE SUM AND

23   SUBSTANCE OF WHAT THEY BROUGHT BEFORE YOU.

24          BUT YET THEY'RE ASKING YOU TO AWARD THEM

25   $2 BILLION UNDER THIS TEST.

```
 1            I SUBMIT THE REASON APPLE DIDN'T PROVIDE

 2     ANY EVIDENCE OF DECEPTION OR CONFUSION IS BECAUSE

 3     THEY KNOW THERE ISN'T ANY.  THERE WAS NO CONFUSION,

 4     NO DECEIT, NO CONSUMER HARM PROVEN, APPLE IS HERE

 5     ASKING FOR WHAT IT'S NOT ENTITLED TO.

 6            IT'S HERE ASKING YOU TO PREVENT A

 7     SECOND -- ITS LARGEST COMPETITOR FROM GIVING

 8     CONSUMERS WHAT THEY WANT, SMARTPHONES WITH BIG

 9     SCREENS.

10            WHY IS APPLE BRINGING THIS CASE?  BECAUSE

11     A FEW OF ITS PATENTS ARE INFRINGED WHEN BOTH

12     COMPANIES HAVE LITERALLY THOUSANDS OF PATENTS THAT

13     THEY CAN ASSERT AGAINST EACH OTHER?  NO, THAT'S NOT

14     WHY APPLE IS DOING THIS.

15            THE REAL REASON APPLE IS BRINGING THIS

16     CASE IS BECAUSE RATHER THAN COMPETING IN THE MARKET

17     PLACE, APPLE IS SEEKING A COMPETITIVE EDGE THROUGH

18     THE COURTROOM.

19            JUST LOOK AT THIS CASE.  APPLE IS

20     ASSERTING CLAIMS AGAINST OVER 20 PRODUCTS WITH ALL

21     KINDS OF VARIOUS DIFFERENT THEORIES.  IT'S ASKING

22     FOR WELL OVER $2.7 BILLION.  IT'S SEEKING TO BLOCK

23     ITS BIGGEST AND MOST SERIOUS CONTENDER FROM EVEN

24     ATTENDING THE GAME .

25            THIS IS AN IMPORTANT POINT.  LOOK OUT
```

4138

1    HERE IN THE PEWS.  DO YOU SEE ALL THOSE REPORTERS?

2    WHY ARE THEY HERE?  THEY'RE HERE, LADIES AND

3    GENTLEMEN, IF YOU GO APPLE'S WAY, IT COULD CHANGE

4    THE WAY DECISIONS WORK IN THIS COUNTRY.  IT'S A

5    VERY IMPORTANT DECISION YOU HAVE TO MAKE.  IS THIS

6    COUNTRY GOING TO HAVE VIGOROUS COMPETITION BETWEEN

7    COMPETITORS, OR IS IT GOING TO TURN INTO A COUNTRY

8    WITH GIANT CONGLOMERATES ARMED WITH PATENT ARSENALS

9    THAT BLOCK PATENT COMPETITION?

10           THINK ABOUT SILICON VALLEY AND THE WAY IT

11   USED TO BE BACK IN THE DAY WITH ITS GROVES OF

12   ORCHARDS.  NOW THERE'S TENS OF THOUSANDS OF TECH

13   JOBS.  WHY DID THAT HAPPEN?  IT HAPPENED BECAUSE OF

14   FREE COMPETITION.

15           YOUR DECISION COULD CHANGE ALL THAT.

16           CONSUMERS DESERVE A CHOICE.  SURE, APPLE

17   HAS GREAT PRODUCTS.  WE DON'T DENY THAT.

18           BUT CONSUMER DESERVE A CHOICE BETWEEN A

19   LOT OF GREAT PRODUCTS.  COMPETITION IS WHAT HAS

20   BUILT THIS COUNTRY AND WE CAN SEE IT FOR OURSELVES

21   HERE IN SILICON VALLEY.

22           IT'S NOT AGAINST THE LAW IN THIS COUNTRY

23   TO BE INSPIRED BY YOUR COMPETITION.  IT'S NOT

24   AGAINST THE LAW TO DO COMPETITIVE ANALYSES.  IT'S

25   NOT AGAINST THE LAW TO LOOK AT WHAT THEY'RE DOING

1    AND SAY, "HOW CAN WE DO BETTER?"

2              THEN ABOUT IT.  JUST THINK ABOUT WALKING

3    INTO A BEST BUY STORE.  YOU KNOW TO THE TV SECTION.

4    ALL OF TV'S LOOK THE SAME.  THEY'RE ALL BOXES.

5    THEY'RE ALL FLAT SCREEN.  THEY ALL HAVE MINIMALIST

6    DESIGN.

7              REMEMBER IN THE OLD DAYS TV'S HAD KNOBS

8    ON THEM AND YOU TURNED THE DIAL LIKE THIS AND THEY

9    LOOKED DIFFERENT.

10             NOW THEY ALL LOOK THE SAME.  THEY'RE

11   SQUARE AND THERE ARE NO BUTTONS.  WHY?  BECAUSE

12   TECHNOLOGY CHANGED.  REMOTE CONTROLS CAME ALONG.

13   LCD'S CAME ALONG.  PLASMA SCREENS CAME ALONG.

14             AND WHAT HAPPENED?  FORM FOLLOWED

15   FUNCTION.

16             NOW, THINK ABOUT TURNING TO THE

17   SMARTPHONE SECTION OF THE BEST BUY.  IT'S THE SAME

18   THING THERE, TOO.  ALL THE SMARTPHONES ARE

19   RECTANGULAR WITH VERY LARGE SCREENS.  THINK ABOUT

20   IT.

21             REMEMBER BACK WHEN, BEFORE THERE WERE

22   SMARTPHONES, WHEN THEY WERE -- WHEN PHONES WERE

23   JUST USED FOR MAKING PHONE CALLS?  IT HAD MAYBE A

24   TINY LITTLE SCREEN AND IT HAD THE OLD MA BELL TOUCH

25   TONE KEYPAD ON IT, THE REDUCED KEYPAD?

1          WHY WERE THE PHONES ALL DESIGNED LIKE

2    THAT BACK THEN?  BECAUSE PEOPLE JUST USED THEM TO

3    MAKE PHONE CALLS.

4          THEN TECHNOLOGY ADVANCED.  WHAT HAPPENED?

5    WELL, TECHNOLOGY ENABLED YOU TO SEND E-MAILS AND

6    TEXTS ON YOUR MOBILE DEVICE.  AND THERE WAS A

7    COMPANY CALLED RESEARCH IN MOTION THAT RELEASED A

8    PRODUCT CALLED THE BLACKBERRY THAT HAD A FULL

9    KEYBOARD JUST LIKE YOU HAD ON THE OLD TYPEWRITER.

10   IT'S CALLED A QWERTY KEYBOARD, AND IT WAS EXTREMELY

11   SUCCESSFUL.  WHY?  BECAUSE IT WANTED TO SEND

12   E-MAILS AND IT WAS A LOT EASIER TO SEND E-MAILS

13   WITH A FULL KEYBOARD THAN WITH THAT OLD KEYBOARD.

14   AND GUESS WHAT?  BLACKBERRY WAS INCREDIBLY

15   SUCCESSFUL.

16         WHAT HAPPENED WITH THE COMPETITION?

17   EVERY SINGLE ONE OF THEM CAME OUT WITH A FULL

18   KEYBOARD MOBILE PHONE?  ARE THEY ILLEGAL COPYISTS?

19   NO.  THEY'RE FOLLOWING THE TECHNOLOGY.  FORM

20   FOLLOWS FUNCTION.

21         NOW, THINK ABOUT SMARTPHONES.  YOU CAN DO

22   A LOT MORE WITH A SMARTPHONE THAN E-MAIL AND

23   PHONES, AND PHONE CALLS.  YOU CAN PLAY VIDEO GAMES.

24   YOU CAN TALK TO YOUR FAMILY ON FACE TIME OR OTHER

25   TYPES OF APPLICATIONS.

```
 1            YOU CAN SURF THE INTERNET.  YOU CAN GO

 2    WATCH MOVIES.  THEY'RE INCREDIBLE DEVICES.  THEY'RE

 3    LIKE HAVING A PHONE, A COMPUTER, LET'S SEE, A

 4    PHONE, A COMPUTER, A VIDEO GAME CONSOLE, JUST ABOUT

 5    EVERYTHING IN SOMETHING YOU CAN PUT IN YOUR POCKET.

 6            NOW, GUESS WHAT?  FORM FOLLOWED FUNCTION

 7    HERE, TOO.  THINK ABOUT IT.

 8            IF YOU'RE A CONSUMER AND YOU CAN WATCH

 9    MOVIES ON YOUR SMARTPHONE OR PLAY VIDEO GAMES ON

10    YOUR SMARTPHONE, ARE YOU GOING TO WANT A TWO-INCH

11    SCREEN OR ARE YOU GOING TO WANT A FOUR-INCH SCREEN?

12    THE ANSWER IS YOU'RE GOING TO WANT THE BIGGEST

13    SCREEN YOU CAN POSSIBLY HAVE.  CONSUMERS WANT THAT.

14            BUT THERE'S A LIMIT.  AND WHAT'S THE

15    LIMIT?  FUNCTIONAL LIMIT.  IF IT'S GOING TO BE A

16    SMARTPHONE, IT HAS TO BE IN A SIZE THAT FITS IN

17    YOUR POCKET.

18            SO GUESS WHAT?  EVERY SINGLE SMARTPHONE

19    HAS A RECTANGULAR SHAPE, ROUNDED CORNERS, AND ABOUT

20    90 PERCENT OF THE REAL ESTATE OF THE FRONT OF THAT

21    PHONE IS THE SCREEN.

22            IS THAT BECAUSE PEOPLE ARE COPYING EACH

23    OTHER?  NO.  IT'S BECAUSE TECHNOLOGY ADVANCED AND

24    FORM IS FOLLOWING FUNCTION.

25            CAN WE PUT UP SDX 5010.130?  THIS IS WHAT
```

```
1    YOU SEE WHEN YOU GO INTO THE BEST BUY STORE.  ALL
2    OF THE PHONES HAVE THESE LARGE SCREENS, AND THEY'RE
3    ALL RECTANGULAR.  THERE'S NOTHING NEFARIOUS ABOUT
4    THIS.  IT'S THE WAY THE TECHNOLOGY HAS EVOLVED.
5             NOW, APPLE IS HERE SEEKING $2 BILLION IN
6    DAMAGES FROM SAMSUNG FOR ALLEGED ORNAMENTATION ON
7    THAT LITTLE 10 PERCENT AROUND THE SCREEN.
8             ACCORDING TO APPLE, THE WAY IT'S
9    INTERPRETING ITS PATENTS, IT'S ENTITLED TO HAVE A
10   MONOPOLY ON A ROUNDED RECTANGLE WITH A LARGE
11   SCREEN.  IT'S AMAZING, REALLY.
12            BUT, LADIES AND GENTLEMEN, YOU ARE THE
13   ORDINARY OBSERVER IN THIS CASE.  YOU'RE THE ONES
14   WHO ARE GOING TO MAKE THE DECISION.  YOU DON'T NEED
15   A PAID EXPERT TO TELL YOU.  IS ANYONE REALLY
16   DECEIVED BY SAMSUNG'S DEVICES INTO THINKING THEY'RE
17   BUYING AN APPLE DESIGN?
18            THE FACT IS, MEMBERS OF THE JURY,
19   CONSUMERS MAKE CHOICES, NOT MISTAKES.  THESE ARE
20   EXPENSIVE PRODUCTS.  THEY'RE HEAVILY RESEARCHED BY
21   CONSUMERS BEFORE THEY BUY THEM.  THERE'S NO
22   DECEPTION AND THERE'S NO CONFUSION AND APPLE HAS NO
23   CREDIBLE EVIDENCE OF IT.
24            AND WITH THAT, I'D LIKE TO TURN AND GO
25   THROUGH THE EVIDENCE.
```

1          NOW, CAN WE PUT BACK UP THE STANDARD,

2     JUST SO WE HAVE IT THERE, SLIDE 7.

3          NOW, MR. MCELHINNY WAS TALKING AT THE

4     START OF HIS OPENING, OR HIS CLOSING ARGUMENT ABOUT

5     CATEGORIES OF EVIDENCE AND WHICH ONES HE THINKS ARE

6     IMPORTANT AND HE URGES YOU TO PAY ATTENTION TO.  DO

7     YOU REMEMBER THAT?

8          WELL, HE LEFT OUT ONE THAT I THINK IS

9     REALLY IMPORTANT, AND THAT IS CROSS-EXAMINATION.

10    WHEN YOU HAVE A PAID EXPERT WHO'S ON APPLE'S SIDE,

11    IF HE MAKES ADMISSIONS THAT ARE FAVORABLE TO

12    SAMSUNG, THAT IS VERY CREDIBLE EVIDENCE, PERHAPS

13    THE MOST CREDIBLE EVIDENCE YOU'RE GOING TO SEE.

14          AND ANOTHER THING THAT I'VE GOT A LITTLE

15    BIT DIFFERENT STYLE THAN MR. MCELHINNY, YOU HEARD

16    HIM CHARACTERIZE WHAT PEOPLE SAID, SO AND SO SAID

17    THIS.  SO AND SO SAID THAT.  WE DON'T KNOW IF THEY

18    DID OR NOT.  THAT'S JUST LAWYER ARGUMENT.

19          WHAT I'M GOING TO DO IS I'M GOING TO SHOW

20    YOU WHAT THEY ACTUALLY SAID.  I'LL PUT UP THE

21    TRANSCRIPT SO THERE'S NO MISTAKE.

22          "SO HERE WE HAVE THE TEST, TWO DESIGNS

23    ARE SUBSTANTIALLY THE SAME IF, IN THE EYE OF AN

24    ORDINARY OBSERVER, GIVING SUCH ATTENTION AS A

25    PURCHASER USUALLY GIVES, THE RESEMBLANCE BETWEEN

1    THE TWO DESIGNS IS SUCH AS TO DECEIVE SUCH AN

2    OBSERVER, INDUCING HIM TO PURCHASE ONE SUPPOSING IT

3    TO BE THE OTHER."

4              NOW, LET'S TURN TO THE '087 AND THE '677

5    PATENTS, DO YOU REMEMBER THOSE, THE PHONE DESIGN

6    PATENTS, ONE IS THE BLACK FLAT SCREEN, AND THE

7    OTHER ONE IS THE FLAT SCREEN WITH THE BEZEL, AND

8    LET'S SEE WHAT THE TESTIMONY OF APPLE'S SOLE EXPERT

9    ON THESE PATENTS WAS.

10             MR. BRESSLER.

11             "QUESTION:  GIVEN THE ENVIRONMENT IN

12   WHICH THESE PHONES ARE BEING SOLD AND THE DEGREE OF

13   ADVERTISING BRANDING, YOU DON'T KNOW WHETHER

14   ANYBODY WOULD EVER BE DECEIVED INTO THINKING THEY

15   WERE BUYING A SAMSUNG PHONE WHEN THEY WERE BUYING

16   AN APPLE PHONE OR VICE-VERSA; ISN'T THAT TRUE,

17   SIR?"

18             MR. BRESSLER, HE KNEW THIS WAS AN

19   IMPORTANT QUESTION.  HE THOUGHT ABOUT IT, AND HE

20   ASKED, "CAN WE HAVE IT READ BACK?  COULD YOU REPEAT

21   IT AGAIN.

22             SO I HAD THE REPORTER READ IT AGAIN SO

23   YOU COULD LISTEN VERY CAREFULLY.

24             AND HE SAID "YES."

25             YES, HE DOES NOT KNOW WHETHER ANYBODY

```
 1    WOULD EVER BE DECEIVED INTO THINKING THEY WERE

 2    BUYING A SAMSUNG PHONE WHEN THEY WERE BUYING AN

 3    APPLE PHONE OR VICE-VERSA.  THAT'S THE EVIDENCE.

 4    THAT'S THE EVIDENCE APPLIED TO THE STANDARD.

 5    THAT'S NOT ME CHARACTERIZING WHAT SOMEBODY SAID.

 6            AND HE SAID MORE.  I ASKED HIM, "PLEASE

 7    TELL ME, IN YOUR EXPERT OPINION, DO YOU BELIEVE

 8    THAT CONSUMERS GET CONFUSED DURING THE COURSE OF

 9    THEIR PURCHASING DECISIONS AND CONFUSE APPLE

10    DEVICES WITH SAMSUNG DEVICES OR VICE-VERSA?

11            "ANSWER:  I DO NOT KNOW IF THEY GET

12    CONFUSED."

13            NOW, ONE OF THE INSTRUCTIONS YOU GOT

14    TODAY WAS ABOUT BURDEN OF PROOF.  THIS IS APPLE'S

15    BURDEN OF PROOF.  THEY HAVE TO PROVE TO YOU, WITH

16    THEIR EVIDENCE, THAT CONSUMERS WERE BEING DECEIVED

17    UNDER THIS STANDARD, THERE'S A LIKELIHOOD OF

18    DECEPTION.  AND THIS IS THEIR EVIDENCE.

19            THIS DOESN'T MEET THEIR BURDEN OF PROOF.

20            I ASKED HIM AGAIN, "YOU DON'T KNOW

21    WHETHER CONSUMERS HAVE BEEN CONFUSED AT ANY TIME

22    WHEN PURCHASING APPLE DEVICES OR SAMSUNG DEVICES

23    INTO THINKING THEY WERE DEVICES FROM THE OTHER

24    MANUFACTURER; CORRECT?

25            "ANSWER:  I BELIEVE THAT'S CORRECT."
```

```
1              BUT HE WANTED TO BE CAREFUL, I'M SORRY,

2       COULD YOU REPEAT THE QUESTION?

3              SO WE READ IT TO HIM AGAIN AND THEN HE

4       VERIFIED, YEP, "THAT'S CORRECT."

5              SO HE TWICE HEARD THE QUESTION AND

6       CONFIRMED THAT HE DOESN'T KNOW WHETHER CONSUMERS

7       HAVE BEEN CONFUSED AT ANY TIME IN PURCHASING APPLE

8       DEVICES OR SAMSUNG DEVICES INTO THINKING THEY'RE

9       DEVICES FROM THE OTHER MANUFACTURER.

10             I ASKED HIM, "SMARTPHONE CONSUMERS

11      EVALUATE DIFFERENT MODELS, COMPARE THEM TO ONE

12      ANOTHER, EVEN BEFORE GOING INTO THE STORE; RIGHT?

13             "ANSWER:  YES.

14             "QUESTION:  SMARTPHONE CONSUMERS CONSIDER

15      A NUMBER OF FACTORS, SUCH AS PRICE, PERFORMANCE, AS

16      WELL AS APPEARANCE; RIGHT?

17             "ANSWER:  I GUESS.

18             "QUESTION:  DO YOU BELIEVE THAT'S TRUE?

19             "ANSWER:  I SUSPECT THEY DO.

20             "QUESTION:  YOU WOULD EXPECT THAT IF THE

21      PURCHASER WAS ENTERING INTO A MULTI-YEAR CONTRACT,

22      THEY WOULD KNOW WHAT BRAND OF PHONE THEY WERE

23      BUYING; RIGHT?

24             "ANSWER:  YES.

25             "QUESTION:  YOU BELIEVE, BY THE END OF
```

1    THE SMARTPHONE PURCHASING PROCESS, THE ORDINARY

2    CONSUMER WOULD HAVE TO KNOW WHICH PHONE THEY WERE

3    BUYING; RIGHT?

4            "ANSWER:  YES."

5            THAT'S IT.  THEY CAN'T MEET THE STANDARD.

6    HE'S ADMITTED IT.

7            NOW, LET'S GO ON AND LOOK AT ANOTHER JURY

8    INSTRUCTION.

9            MR. FISHER, CAN WE PUT UP JURY

10   INSTRUCTION 50?  IT'S ON PAGE 67.

11           AND WE'LL TALK A LITTLE BIT ABOUT

12   ANTICIPATION, AND CAN WE BLOW OUT THE SECOND

13   PARAGRAPH SO IT'S BIGGER?

14           AND THE JUDGE READ THIS TO YOU THIS

15   MORNING.

16           BY THE WAY, ANTICIPATION HAS TO DO WITH

17   WHETHER THE PRIOR ART DESIGN PATENTS THAT I SHOWED

18   YOU AT THE TRIAL INVALIDATE, INVALIDATE THESE TWO

19   APPLE DESIGN PATENTS.

20           AND JUDGE KOH READ TO YOU, "THE SAME

21   STANDARD OF SUBSTANTIAL SIMILARITY THAT APPLIED TO

22   INFRINGEMENT ALSO APPLIES TO ANTICIPATION.  THAT

23   IS, THE SINGLE PRIOR ART REFERENCE AND THE CLAIMED

24   DESIGN PATENT ARE SUBSTANTIALLY THE SAME IF, IN THE

25   EYE OF AN ORDINARY OBSERVER, GIVING SUCH ATTENTION

1    AS A PURCHASER USUALLY GIVES, THE RESEMBLANCE

2    BETWEEN THE TWO DESIGNS IS SUCH AS TO DECEIVE SUCH

3    AN OBSERVER, INDUCING HIM TO PURCHASE ONE SUPPOSING

4    IT TO BE THE OTHER."

5              NOW, IF YOU GO TO SLIDE 14.

6              SO THE POINT IS IT'S THE SAME TEST FOR

7    INFRINGEMENT AS IT IS FOR INVALIDITY.  YOU HAVE TO

8    APPLY IT EQUALLY.  IT'S THE SAME TEST.

9              NOW, YOU REMEMBER I SHOWED YOU THESE

10   PRIOR ART PHONES COMPARING THE D'087.  THEY ALL ARE

11   RECTANGLES.  THEY ALL HAVE ROUNDED CORNERS.  SOME

12   OF THEM HAVE THE LOZENGE SLIGHTLY DIFFERENT PLACES,

13   BUT THE LOZENGE, THEY ALL HAVE THESE BIG SCREENS

14   THAT MAKE UP, TAKE UP MOST OF THE SPACE ON THE

15   PHONE.  THEY ALL HAVE THESE NARROW LATERAL BORDERS

16   AND THE WIDER TOP AND BOTTOM BORDERS.

17             NOW, THERE'S ONE OTHER JURY INSTRUCTION I

18   WANT TO SHOW YOU BEFORE I GO INTO THE DETAILS OF

19   MR. BRESSLER'S TESTIMONY.

20             CAN WE GO TO SLIDE 13.

21             THE COURT INSTRUCTED YOU THAT "WHEN THE

22   CLAIMED DESIGN," IN THIS CASE THE '087 CLAIMED

23   DESIGN PATENT OR '677 DESIGN PATENT, "WHEN THE

24   CLAIMED DESIGN IS VISUALLY CLOSE TO PRIOR ART

25   DESIGN, SMALL DIFFERENCES BETWEEN THE ACCUSED

1    DESIGN AND THE CLAIMED DESIGN MAY BE IMPORTANT."

2            WELL, LET'S LOOK HERE.  THESE ARE

3    OBVIOUSLY SIMILAR.  SO WHAT WE NEED TO LOOK FOR IF

4    WE'RE GOING TO DO THIS INFRINGEMENT ANALYSIS IS

5    NOT, OH, WELL, WAS IT SORT OF THE SAME, ROUND,

6    RECTANGLE, ROUNDED CORNERS.  YOU CAN'T DO THAT.

7    THAT'S WHAT ALL THE PRIOR ART HAS.  YOU HAVE TO

8    LOOK FOR THE SMALL DIFFERENCES.

9            WHEN THE CLAIMED DESIGN IS VISUALLY CLOSE

10   TO THE PRIOR ART DESIGN, SMALL DIFFERENCES BETWEEN

11   THE ACCUSED DESIGN AND THE CLAIMED DESIGN MAY BE

12   IMPORTANT IN ANALYZING WHETHER THE OVERALL

13   APPEARANCE BETWEEN THE ACCUSED AND CLAIMED DESIGNS

14   ARE SUBSTANTIALLY THE SAME.

15           YOU'LL RECALL MR. BRESSLER AGREED WITH

16   THAT.  WELL, DETAILS ARE IMPORTANT IN A DESIGN

17   PATENT, AREN'T THEY?  YOU SAID SO ON DIRECT?

18           AND HE ANSWERED YES, THEY ARE.

19           NOW, WHAT DOES THIS SHOW ABOUT THE

20   DIFFERENCES THAT THE ONLY APPLE DESIGNER WHO CAME

21   TO TESTIFY MADE THESE '087 AND '677 PATENTS UNIQUE.

22           FIRST DIFFERENCE THAT MR. STRINGER SAID,

23   IT WAS IMPORTANT THAT THE BEZEL GO CONTINUOUSLY AND

24   UNIFORMLY AROUND THE RIM OF THE PHONE, RIGHT?

25           ANSWER:  YES.

```
 1                    AND MR. BRESSLER ADMITTED THAT, TOO.  I

 2     ASKED HIM, "AND THAT'S IMPORTANT, RIGHT, THAT'S

 3     IMPORTANT, THE ABSENCE OF A BEZEL TAKES YOU OUT OF

 4     SUBSTANTIAL SIMILARITY, DOESN'T IT?

 5                    "ANSWER:  IN THE '087 PATENT, IT DOES."

 6                    AND WHAT DOES THE EVIDENCE SHOW, LADIES

 7     AND GENTLEMEN?

 8                    WELL, LET'S TAKE THE INFUSE 4G.  IT

 9     DOESN'T HAVE A BEZEL AT ALL.  SO HERE WE HAVE

10     MR. BRESSLER SAYING IF IT DOESN'T HAVE A BEZEL, IT

11     DOESN'T INFRINGE, AND HE SAYS THAT FOR THE PRIOR

12     ART.  THAT'S WHERE HE SAYS IT.

13                    FOR THIS, HE SAYS, OH, IT STILL DOES

14     INFRINGE EVEN THOUGH IT DOESN'T HAVE A BEZEL.  DO

15     YOU REMEMBER THAT?

16                    CLEARLY THE INFUSE HAS NO BEZEL.

17     MR. STRINGER SAYS THAT'S A DIFFERENTIATING ASPECT

18     OF OUR DESIGN.  IT'S NOT IN THE ACCUSED -- MANY OF

19     THE ACCUSED PRODUCTS.

20                    CAN WE GO TO SLIDE 26?

21                    MR. STRINGER ALSO SAID, NOT ONLY WAS IT

22     IMPORTANT TO HAVE A BEZEL THAT GOES CONTINUOUSLY

23     AND UNIFORMLY AROUND THE RIM OF THE PHONE, HE SAID

24     IT WAS IMPORTANT THAT THE BEZEL BE OF UNIFORM

25     THICKNESS.
```

1              I SAID.

2              "QUESTION:  AND WAS IT ALSO IMPORTANT

3      THAT THE BEZEL BE OF UNIFORM THICKNESS; CORRECT?

4              "ANSWER:  YES.

5              YOU CAN PLAINLY SEE, BOTH IN THE INITIAL

6      IPHONE, WHICH YOU'LL HAVE A PHYSICAL EXAMPLE OF,

7      AND IN THE '087 DESIGN PATENT, THE BEZEL IS

8      COMPLETELY UNIFORM ALL THE WAY AROUND THE

9      CIRCUMFERENCE OF THE PHONE.  THAT WAS AN IMPORTANT

10     DESIGN CONSIDERATION.

11             WHAT DOES THE EVIDENCE SHOW?  THE

12     GALAXY S 4G, YOU CAN PLAINLY SEE, DOES NOT HAVE A

13     UNIFORM THICKNESS.  IT VARIES AS YOU TURN THE PHONE

14     AROUND.  THAT'S A COMPLETELY DIFFERENT TYPE OF

15     DESIGN STYLE.

16             WHEN YOU'VE GOT PRIOR ART THAT SHOWS VERY

17     SIMILAR DESIGNS, THESE DIFFERENCES MATTER.

18             LET'S GO TO SLIDE 29.

19             MR. STRINGER SAID, AS TO THE '677 PATENT,

20     I ASKED HIM, "IN FACT, YOU WANTED TO CREATE A

21     PRODUCT THAT EMBODIED THE SIMPLEST OF ICONS, AND

22     ONE KEY IMAGE WAS THAT OF A DARK, OILY POND.  IS

23     THAT RIGHT?

24             "ANSWER:  YES.

25             "QUESTION:  THAT WAS YOUR DESIGN GOAL;

1    RIGHT?

2              "ANSWER:  THAT WAS ONE --

3              "QUESTION:  GO AHEAD.

4              "ANSWER:  THAT WAS ONE DESCRIPTION OF A

5    DESIGN GOAL, YES.

6              "QUESTION:  YOU DIDN'T WANT TO MULTIPLE

7    BUTTONS THE PHONE OF THE PHONE; CORRECT?

8              "ANSWER:  CORRECT.

9              "QUESTION:  YOU WANTED IT TO BE AS SIMPLE

10   AS POSSIBLE?

11             "ANSWER:  YES."

12             WHAT DOES THE EVIDENCE SHOW ABOUT THE

13   ACCUSED PHONES?  WELL, THEY'VE GOT FOUR VERY

14   CONSPICUOUS BUTTONS AT THE BOTTOM, THE MENU KEY,

15   THE HOME KEY, THE BACK KEY, THE SEARCH KEY.

16             NOTABLY ABSENT IS THE ICONIC AND

17   UBIQUITOUS APPLE HOME SCREEN BUTTON.

18             THEY ALSO HAVE -- YOU CAN'T SEE IT IN

19   THIS IMAGE, BUT THERE'S THE BRAND SAME SAMSUNG, THE

20   BRAND NAME AT&T, MULTIPLE SENSORS ACROSS THE TOP OF

21   THE PHONE.

22             MR. BRESSLER ADMITTED, "THE ORDINARY

23   OBSERVER IS GOING TO LOOK AT THAT AND UNDERSTAND

24   THAT'S COMMUNICATING A HOUSE AND IF THEY TOUCH IT,

25   THEY CAN GO TO THE HOME SCREEN; RIGHT?

 1                    "ANSWER:  THAT'S TRUE IN HOW THE PHONE

 2        OPERATES, THAT'S CORRECT.

 3                    "QUESTION:  SO THE USER IS GOING TO KNOW

 4        THAT, THEY'RE GOING TO SEE IT, THEY'RE GOING TO

 5        UNDERSTAND IT; RIGHT?

 6                    "ANSWER:  YES.

 7                    "QUESTION:  AND THE SAME THING IS TRUE

 8        WITH THE MENU BUTTON; RIGHT?

 9                    "ANSWER:  YES.

10                    I ASKED HIM.

11                    "QUESTION:  WHEN YOU CONDUCTED YOUR

12        ANALYSIS OF THE INFUSE 4G, DID YOU ACTUALLY USE ANY

13        OF THESE BUTTONS?

14                    "ANSWER:  IN TERMS OF MY ANALYSIS OF THE

15        DESIGN PATENTS, NO."

16                    SO NOT ONLY DID HE NOT CONDUCT ANY

17        RESEARCH, SURVEYS, SPEAK TO ANYBODY ABOUT WHETHER

18        THEY WERE DECEIVED, THESE FOUR BUTTONS WHICH ARE

19        PLAINLY DIFFERENTIATING ON THE FRONT OF THIS PHONE,

20        HE DIDN'T EVEN TEST THEM OUT OR ANALYZE THEM.

21        THAT'S NOT CREDIBLE TESTIMONY, I WOULD SUBMIT,

22        MEMBERS OF THE JURY.

23                    WHAT DID MR. STRINGER SAY ABOUT THESE

24        BUTTONS?  WELL, I ASKED HIM, "WHY DIDN'T APPLE PUT

25        FOUR BUTTONS AT THE BOTTOM OF ITS IPHONES?

4154

```
1              "ANSWER:  BECAUSE WE BELIEVED THE EASIEST

2     DESIGN FOR THE IPHONE IS A SINGLE HOME BUTTON UNDER

3     THE SCREEN.

4              "QUESTION:  AND THAT SINGLE HOME BUTTON

5     THE SCREEN IS ON EVERY IPHONE AND IPAD PRODUCT THAT

6     HAS EVER BEEN RELEASED; CORRECT?

7              "ANSWER:  THE HOME BUTTON IS ON EVERY

8     IPHONE AND IPAD."

9              MR. BRESSLER DECIDED JUST TO IGNORE IT.

10    WE'RE GOING TO IGNORE THIS FACT THAT THESE ACCUSED

11    PHONES HAVE THIS DIFFERENTIATION OF THESE FOUR

12    CONSPICUOUS BUTTONS AT THE BOTTOM.

13              ONE QUICK LOOK, THAT'S AN ANDROID PHONE,

14    THAT'S NOT AN IPHONE.

15              BUT HE JUST IGNORES IT.

16              ANOTHER EXAMPLE, I ASKED MR. STRINGER,

17    "IN YOUR VIEW, ONE IMPORTANT DESIGN ASPECT OF THE

18    '087 PATENT, AND THE INITIAL IPHONE, WAS THAT IT

19    HAD FOUR EVENLY RADIUS CORNERS; CORRECT?

20              "ANSWER:  YES."

21              THAT'S REFERRING TO THE CORNERS AND ALL

22    AROUND THE PHONE THERE.  THEY ALL HAVE TO HAVE THE

23    SAME RADIUS.  THAT'S AN IMPORTANT DESIGN POINT.

24              WELL, SAMSUNG GALAXY S 4G, TAKE A LOOK AT

25    IT.  THE RADIUS ON THE TOP TWO CORNERS OF THE PHONE
```

```
1    ARE COMPLETELY DIFFERENT THAN THE RADII ON THE

2    BOTTOM.

3              AND I ASKED MR. BRESSLER ABOUT THAT.

4    "WHEN YOU DID YOUR ANALYSIS, YOU MADE NO EFFORT TO

5    ASCERTAIN WHETHER THE ACCUSED PHONES HAD EQUAL

6    RADII, DID YOU, SIR?

7              "ANSWER:  I DID NOT.

8              "QUESTION:  DO YOU DISPUTE THAT THE RADII

9    ON THE TOP OF THE -- THE TOP TWO ROUNDED CORNERS OF

10   THE SAMSUNG GALAXY S 4G ARE DIFFERENT FROM THE

11   RADII ON THE BOTTOM ROUNDED CORNERS?

12             "ANSWER:  I COULDN'T DISPUTE YOUR

13   MEASUREMENT BECAUSE I HAVEN'T TAKEN THEM."

14             SO THE ONLY PERSON MR. BRESSLER SPOKE TO,

15   THE ONLY PERSON WAS MR. STRINGER.  WHEN I ASKED

16   MR. STRINGER, WHAT ARE THE IMPORTANT DESIGN

17   ELEMENTS, THIS IS ONE OF THEM THAT HE LISTED.

18   PRESUMABLY HE LISTED THEM TO MR. BRESSLER.  BUT

19   MR. BRESSLER COULDN'T BE BOTHERED TO EVERYONE

20   MEASURE THE RADII ON THE ACCUSED PHONES.

21             ANOTHER IMPORTANT DESIGN ATTRIBUTE THAT

22   MR. STRINGER TALKED ABOUT FOR THE '087 AND '677

23   PATENTS WAS THE COMPLETELY FLAT FRONT SURFACE.  I

24   ASKED HIM, "ANOTHER DESIGN ASPECT -- OR AN ASPECT

25   OF THE DESIGN IN THE '087 PATENT THAT WAS IMPORTANT
```

```
 1    TO YOU AND YOUR TEAM AS DESIGNERS WAS THAT THE

 2    FRONT SURFACE, FOR EXAMPLE, IF YOU LOOK AT FIGURE

 3    16 OR FIGURE 15, YOU CAN SEE IT, THE FRONT SURFACE

 4    WAS COMPLETELY FLAT ALL THE WAY ACROSS THE FRONT.

 5    THAT WAS AN IMPORTANT DESIGN ELEMENT; RIGHT?

 6             "ANSWER:  YES."

 7             AND I CLARIFIED, "THIS RIM WAS

 8    INTENTIONALLY DESIGNED TO BE NOMINALLY FLUSH WITH

 9    THE GLASS; IS THAT RIGHT?

10             "ANSWER:  YES.

11             "QUESTION:  SOMETHING THAT DISTINGUISHED

12    IT FROM OTHER DESIGNS PREVIOUSLY; RIGHT?

13             "ANSWER:  THIS WAS OUR DESIGN."

14             WHAT DOES THE EVIDENCE SHOW?  ON THE

15    ACCUSED PHONES, THEY ARE DEMONSTRABLY NOT

16    COMPLETELY FLAT ACROSS THE FRONT SURFACE.

17             LOOK AT THE GALAXY S.  GALAXY S 4G.  AND

18    YOU'LL HAVE THESE.  YOU CAN LOOK AT THEM FOR

19    YOURSELVES.  YOU DON'T HAVE TO LOOK AT SLIDES AND

20    TRY TO FIGURE IT OUT.  YOU CAN SEE THAT THEY'RE NOT

21    FLAT.

22             AND IT ACTUALLY COSTS MORE TO DO IT THIS

23    WAY, AND IT ALSO MAKES THE PHONE LESS -- IT MAKES

24    IT EASIER TO SCRATCH THE GLASS WHEN YOU DO IT

25    APPLE'S WAY.  THIS ISN'T JUST SOME TRIVIAL, MINOR
```

```
 1    THING.  DETAILS MATTER WHEN YOU'RE TALKING ABOUT

 2    DESIGN.

 3               I ASKED MR. BRESSLER, "SIR, WOULD YOU

 4    AGREE THAT THE SAMSUNG GALAXY S 4G IS NOT FLAT ALL

 5    THE WAY ACROSS?  IN FACT, THE BEZEL PROTRUDES ABOVE

 6    THE GLASS?

 7               "ANSWER:  ABOUT A HALF A MEMBERS OF THE

 8    JURY, YES.  QUESTION AND THAT'S IMPORTANT, ISN'T

 9    IT?

10               "ANSWER:  I BELIEVE IT WAS IMPORTANT TO

11    MR. STRINGER."

12               WELL, THAT'S THE ONLY GUY WHO TALKED TO

13    YOU ABOUT THESE DESIGN PATENTS.  IT WAS IMPORTANT

14    TO MR. STRINGER, BUT MR. BRESSLER IGNORED IT.

15               WELL, I TAKE THAT BACK.  HE IGNORED IT

16    FOR INFRINGEMENT.

17               WHAT DID HE SAY WHEN HE WAS DEFENDING

18    THESE PATENTS AGAINST THE PRIOR ART ON INVALIDITY

19    GROUNDS?  REMEMBER, YOU HAVE TO USE THE SAME

20    STANDARD.

21               HE USED THIS SLIDE.  HE WAS LOOKING AT

22    THE SIDE VIEW OF THE JP'638 AND HE SAID, LOOK,

23    THERE'S A LITTLE BIT OF CONTOURING AT THE VERY TOP

24    AND BOTTOM OF THAT FRONT FACE.  AND HE DIDN'T SAY,

25    WHEN HE WAS TALKING ABOUT VALIDITY, THAT THAT WAS
```

```
 1    JUST A MINOR DIFFERENCE.

 2              HERE'S WHAT HE SAID:  "ON THE JP 683

 3    PATENT, 26.87, COULD YOU PLEASE SUMMARIZE FOR THE

 4    JURY THE DIFFERENCES BETWEEN THIS DESIGN AND THE

 5    '677 AND THE '087 PATENTS?

 6              "ANSWER:  YES.  I BELIEVE THE '638 PATENT

 7    IS SUBSTANTIALLY DIFFERENT FROM EITHER OF THOSE TWO

 8    PATENTS MOST DRAMATICALLY BECAUSE THE FRONT FACE IS

 9    NOT FLAT, WHICH CREATES AN EXTRAORDINARILY

10    DIFFERENT OVERALL IMPRESSION."

11              SO WHEN HE WAS TALKING ABOUT VALIDITY,

12    BEING A LITTLE BIT NOT FLAT IS EXTRAORDINARILY

13    DIFFERENT.

14              WHEN HE'S TALKING ABOUT INFRINGEMENT,

15    DOESN'T MATTER.

16              THAT'S NOT CREDIBLE TESTIMONY.

17              MR. STRINGER ALSO TESTIFIED ABOUT THE

18    LOZENGE.

19              "QUESTION:  IT WAS IMPORTANT TO YOU, AS

20    THE DESIGN TEAM, THAT THAT LOZENGE SHAPED DESIGN

21    ELEMENT BE CENTERED VERTICALLY ON THE PHONE; RIGHT?

22              AND THEN HE SAID CENTERED, AND THERE WAS

23    SOME QUESTION ABOUT CENTERED VERTICALLY MEANT, HE

24    SAID IT'S CENTERED BOTH WAYS, YES.  HE SAID THAT'S

25    IMPORTANT.
```

```
 1              OKAY.  THAT'S ANOTHER IMPORTANT DESIGN

 2     ELEMENT THAT MR. STRINGER IDENTIFIED.

 3              LET'S LOOK AT THE EVIDENCE.  THE GALAXY S

 4     4G.  IT'S NOT CENTERED.  IT'S MUCH CLOSER TO THE

 5     TOP OF THIS AREA OF THE PHONE.  IT'S NOT CENTERED

 6     HORIZONTALLY.  OR EXCUSE ME, VERTICALLY.  IF YOU

 7     PULL IT OUT, YOU CAN SEE IT'S A COMPLETELY

 8     DIFFERENT SHAPE.  IT'S LONGER, THINNER, HAS A ROW

 9     OF DOTS.

10              LOOK AT THE INFUSE.  SAME THING.  YOU'RE

11     GOING TO GET A CHANCE TO LOOK AT THESE PHONES AND

12     YOU CAN SEE IS CLEARLY.  BUT THE SPEAKER SLOT IS

13     CLEARLY NOT CENTERED LIKE THIS IS AND IT'S CLEARLY

14     A DIFFERENT SHAPE WITH TWO ROWS OF DOTS IN IT.

15              SO, AGAIN, ANOTHER DESIGN PRINCIPLE,

16     ANOTHER DESIGN PRINCIPLE IDENTIFIED WITH THE ONLY

17     DESIGN INVENTOR THAT CAME HERE AS MAKING HIS DESIGN

18     UNIQUE THAT'S NOT FOUND.

19              IN FACT, MEMBERS OF THE JURY, EVERY

20     SINGLE DESIGN ELEMENT THAT MR. STRINGER SAID TO ME

21     DIFFERENTIATED HIS DESIGN FROM THE PRIOR ART IS NOT

22     PRESENT IN THE ACCUSED PRODUCTS.

23              THE ONLY WAY YOU'RE GOING TO FIND

24     SUBSTANTIAL SIMILARITY IS IF YOU THINK HAVING A

25     RECTANGLE WITH ROUNDED CORNERS AND A BIG SCREEN AND
```

5160

1    A LOZENGE, WITHOUT ANYTHING MORE, IS INFRINGEMENT.

2              BUT IF YOU DO THAT, YOU HAVE TO APPLY THE

3    SAME STANDARD WITH THE PRIOR ART, WHICH MEANS THESE

4    PATENTS ARE INVALID.

5              NOW I'D LIKE TO SWITCH TO THE '889 DESIGN

6    PATENT BRIEFLY.  MR. BRESSLER ALSO TALKED ABOUT

7    THAT DESIGN.

8              CAN WE GO TO SLIDE 70.

9              THIS IS THE '889.  WHAT THEY CALL THE

10   TABLET DESIGN PATENT.

11             AND IF WE LOOK AT THE ART, WE CAN SEE,

12   YOU APPLY THE SAME TEST I JUST WENT THROUGH, THE

13   PRIOR ART, ALSO IS A LARGE RECTANGLE WITH A LARGE

14   SCREEN, NARROW EQUAL BORDERS AROUND IT, AT LEAST ON

15   THE COMPACT, FLAT BACK.

16             SO THE GENERAL DESIGN ELEMENTS ARE ALL

17   THERE IN THE PRIOR ART.  SO YOU NEED TO LOOK AT THE

18   SPECIFICS, THE SPECIFIC THINGS THAT MAKE THE '889

19   UNIQUE.

20             AND, AGAIN, THE ONLY PERSON WHO COULD

21   TELL US THAT WHO APPEARED AT THIS TRIAL WAS

22   MR. STRINGER, AND WHAT DID HE SAY?

23             "QUESTION:  NOW, WITH RESPECT TO THE '889

24   DESIGN PATENT, ISN'T IT CORRECT THAT THE DESIGN

25   TEAMS' OBJECTIVES WERE TO REDUCE THE PRODUCT TO

1    WHAT WAS ESSENTIALLY A SINGLE, SEAMLESS VESSEL,

2    WHICH WAS THE REAR HOUSING?

3              "ANSWER:  THAT WAS THE INSPIRATION, THAT

4    WAS THE INSPIRATION OF THIS DESIGN, YES."

5              "QUESTION:  AND ANOTHER IMPORTANT DESIGN

6    GOAL WAS TO HAVE JUST ONE GAP IN THE PRODUCT

7    BETWEEN THE BACK HOUSING AND WHAT YOU REFER TO AS

8    THE CLEAR GLASS BEZEL THAT EXTENDS ALL THE WAY

9    ACROSS THE FRONT; RIGHT?

10             "ANSWER:  YES."

11             JUST ONE GAP.  AN IMPORTANT DESIGN GOAL

12   OF THE '889, JUST ONE GAP.

13             NOW, YOU REMEMBER THE 035 MODEL.  I

14   SHOWED THIS TO MR. STRINGER, AND HE ADMITTED THAT

15   THIS WAS THE ACTUAL MODEL THAT THEY USED TO DRAW

16   THE PICTURES FOR THE '889 PATENT.

17             IF WE CAN GO TO SLIDE 76.

18             THESE ARE PHOTOGRAPHS, DX 740, OF THIS

19   RIGHT HERE, THE 035 MODEL.

20             THEY WERE SUBMITTED TO THE PATENT OFFICE,

21   AND YOU CAN SEE THE PHOTOGRAPHS MATCH UP DIRECTLY

22   TO THE PICTURES IN THE '889 PATENT.  AND YOU CAN

23   SEE WHEN YOU TAKE THIS BACK TO THE JURY ROOM, YOU

24   CAN SEE WHAT MR. STRINGER IS TALKING ABOUT .

25             THERE'S NOTHING ON THE BACK.  IT'S SHINY.

```
 1    NO SEAMS, NOTHING.  AND THERE'S ONE, ONE SEAM HERE

 2    ON THE FRONT.  THAT'S WHAT HE'S TALKING ABOUT.

 3              NOW, LET'S TALK ABOUT THE ACCUSED GALAXY

 4    TABLET.

 5              CAN WE GO TO SLIDE 77.

 6              HERE IT IS.  IT'S HARD TO SEE FROM HERE,

 7    BUT IT'S CLEARLY GOT -- IT DOESN'T HAVE A HOUSING

 8    ON THE BACK WITH JUST ONE PIECE, JUST LIKE ON THE

 9    SLIDE HERE.  IT'S GOT A MULTIPLE PIECE HOUSING.

10    IT'S CLEARLY DIFFERENT DESIGN ON THE BACK.  AND YOU

11    CAN TAKE THIS BACK IN THE ROOM AND YOU CAN CHECK IT

12    OUT.

13              BUT THE INSPIRATION FOR THE '889 DOES NOT

14    EVEN EXIST ON THESE ACCUSED PRODUCTS.

15              LET'S GO TO SLIDE 81, PLEASE, MR. FISHER.

16              ANOTHER DISTINGUISHING FEATURE OF THE

17    '889 IS GOT THESE OBLIQUE LINE SHADINGS HERE ON THE

18    BACK, AND THE COURT INSTRUCTED YOU AS TO WHAT THAT

19    MEANS.

20              IF WE CAN SHOW JURY INSTRUCTION 43 FROM

21    PAGE 59.

22              AND HIGHLIGHT, YEAH, THE PARAGRAPH '889

23    PATENT.

24              AND, MR. FISHER, IF YOU COULD HIGHLIGHT

25    WHAT I'M READING, I'M GOING TO START WITH THE
```

```
 1    OBLIQUE LINE SHADING.  "THE OBLIQUE LINE SHADING OF

 2    FIGURES 1 THROUGH 3 AND FIGURE 9 DEPICTS A

 3    TRANSPARENT, TRANSLUCENT OR HIGHLY POLISHED OR

 4    REFLECTIVE SURFACE," AND IT SAYS, "FROM THE TOP

 5    PERSPECTIVE VIEW OF THE CLAIMED DESIGN, THE TOP

 6    VIEW OF THE CLAIMED DESIGN, AND THE BOTTOM

 7    PERSPECTIVE VIEW OF THE CLAIMED DESIGN."

 8            THE JUDGE HAS INSTRUCTED YOU AS TO THE

 9    MEANING OF THIS DESIGN PATENT AND HAS SAID THAT

10    THAT OBLIQUE LINE SHADING DEPICTS A TRANSPARENT,

11    TRANSLUCENT OR HIGHLY POLISHED OR REFLECTIVE

12    SURFACE ON THE BOTTOM PERSPECTIVE VIEW OF THE

13    CLAIMED DESIGN.

14            COULD WE GO TO SLIDE 82.

15            AND MR. BRESSLER DOESN'T DISPUTE THIS.

16    "AND WHEN YOU FORMED YOUR OPINIONS FOR THE '889

17    PATENT, YOU KNEW THAT OBLIQUE LINE SHADING MUST BE

18    USED TO SHOW TRANSPARENT, TRANSLUCENT AND HIGHLY

19    POLISHED SURFACES; RIGHT?

20            "ANSWER:  YES.

21            "QUESTION:  SO WHAT THIS IS TELLING US IS

22    THAT THE BACK OF THE '889 PATENT IS A SHINY

23    SURFACE.

24            "ANSWER:  I BELIEVE SO."

25            OKAY.  YOU CAN SEE IT WITH YOUR OWN EYES.
```

1    THIS IS NOT A SHINY SURFACE.  THIS IS A MATTE

2    SURFACE.  SO ANOTHER DIFFERENTIATING FACTOR.  I

3    SHOWED THAT TO MR. BRESSLER.

4              I SAID, "OKAY.  WHEN YOU HOLD THIS UP AND

5    LOOK AT IT, CAN YOU SEE YOUR REFLECTION IN IT, SIR?

6              "ANSWER:  NO, I CAN'T SEE MY REFLECTION."

7              REMEMBER HE WAS SAYING IT WAS REFLECTIVE.

8    I ASKED HIM TO LOOK AT IT.  HE SAYS, NO, I CAN'T

9    SEE MY REFLECTION.

10             "QUESTION:  BUT YOU'RE SAYING IT'S

11   REFLECTIVE?

12             "ANSWER:  I CAN SEE LIGHTS REFLECTING OFF

13   OF IT.

14             "QUESTION:  WELL, YOU CAN SEE LIGHT

15   REFLECTING ON ANY SURFACE, CAN'T YOU, SIR?

16             AND HE ADMITTED, PRETTY MUCH.  SEEING

17   LIGHT REFLECTED OFF OF THIS DOES NOT MEAN IT'S A

18   SHINY SURFACE.  IT DOESN'T MEAN IT'S A REFLECTIVE

19   SURFACE.  WE ALL KNOW WHAT REFLECTIVE MEANS.  THIS

20   SURFACE IS REFLECTIVE.  THIS SURFACE IS NOT.

21             YOU'RE THE ORDINARY OBSERVER AND YOU CAN

22   DECIDE.

23             NOW, I'D LIKE TO TURN TO THE LAST OF THE

24   PATENTS, APPLE'S D'305 PATENT .

25             CAN WE GO TO SLIDE 93.

```
1              NOW, IMPORTANTLY, THE D'305 PATENT

2    ACTUALLY CLAIMS, IT DOESN'T JUST CLAIM ELECTRONIC

3    DEVICE OR SOMETHING LIKE THAT.  IT SPECIFICALLY

4    CLAIMS A GRAPHICAL USER INTERFACE.

5              WHAT IS A GRAPHICAL USER INTERFACE?

6    WELL, THAT'S SOMETHING THAT YOU USE TO INTERFACE

7    WITH THE COMPUTER OR A SMARTPHONE.

8              THE SAME TEST APPLIES HERE.  "TWO DESIGNS

9    ARE SUBSTANTIALLY THE SAME IF, IN THE EYE OF AN

10   ORDINARY OBSERVER, GIVING SUCH ATTENTION AS A

11   PURCHASER USUALLY GIVES, THE RESEMBLANCE BETWEEN

12   THE TWO DESIGNS IS SUCH AS TO DECEIVE SUCH AN

13   OBSERVER, INDUCING HIM TO PURCHASE ONE SUPPOSING IT

14   TO BE THE OTHER."

15             NOW, YOU REMEMBER DR. PORET CAME AND

16   TESTIFIED ABOUT THAT.  IF WE CAN SWITCH TO THE

17   ELMO.  AND YOU ALSO REMEMBER THAT APPLE IS NOT

18   ACCUSING THE HOME SCREEN ON ANY OF THESE PHONES AS

19   BEING SUBSTANTIALLY SIMILAR TO THESE PRODUCTS.

20   THEY'RE ACCUSING THE APPLICATION SCREEN.

21             AND REMEMBER I TOOK THIS PHONE, FOR THE

22   RECORD, THIS IS JOINT TRIAL EXHIBIT NUMBER 1025, I

23   THINK DR. KARE CALLED IT THE CHIN PHONE.  I TURNED

24   IT ON TO SEE WHAT AN ORDINARY OBSERVER WOULD SEE TO

25   GET TO THAT HOME SCREEN -- TO GET TO THAT
```

1    APPLICATION SCREEN.

2              WHAT DO THEY SEE?  SAMSUNG.  STILL

3    SAMSUNG.  DROID.  I DON'T HAVE THE MICROPHONE THIS

4    TIME SO YOU CAN'T HEAR THE NOISE.  SO YOU SEE

5    SAMSUNG FOR A LONG TIME AND THEN YOU SEE DROID,

6    SHORT FOR ANDROID, AND THEN YOU SEE THIS SCREEN.

7    THAT'S NOT THE ACCUSED SCREEN.

8              SO THEY HAVE TO GO AND UNLOCK THE PHONE

9    AND THEY GET TO THIS SCREEN.  WELL, THAT'S NOT AN

10   ACCUSED SCREEN, EITHER.

11             THE ONLY WAY THEY EVEN GET TO THIS SCREEN

12   IS THAT APPLE IS SAYING IT'S GOING TO DECEIVE

13   PEOPLE INTO PURCHASING ONE PRODUCT VERSUS THE OTHER

14   IS IF THEY HIT THE APPLICATION MENU.  IT TAKES THAT

15   MANY STEPS TO GET TO THIS SCREEN.  DO YOU REMEMBER

16   THAT?

17             AND AFTER I PLAYED THAT, OR TURNED ON

18   THAT PHONE FOR DR. KARE -- CAN WE GO TO SLIDE 96 --

19   I ASKED HER.

20             "QUESTION:  BY THE TIME THAT THE CONSUMER

21   TURNS ON THE PHONE, SEES THE SAMSUNG NAME

22   PROMINENTLY DISPLAYED, SEES THE DROID ADVERTISEMENT

23   AND ANIMATION, WOULDN'T YOU AGREE THAT NO CONSUMER

24   WOULD BE CONFUSED AS TO WHICH PHONE THEY HAVE BY

25   THAT TIME?"

4167

```
 1              LET'S USE OUR COMMON SENSE.

 2              WHAT DID DR. KARE SAY?  "I CAN'T AGREE

 3     BECAUSE I HAVEN'T -- I DON'T -- I DON'T KNOW ABOUT

 4     CONSUMER BEHAVIOR STARTING -- I DON'T KNOW ABOUT

 5     THE QUESTION YOU'RE ASKING ME.  THAT'S OUTSIDE MY

 6     FOCUS."

 7              JUST FOR THIS ICON DESIGN PATENT, APPLE

 8     IS SEEKING OVER $2 BILLION.  THE STANDARD IS, IS

 9     THERE DECEPTION?  THIS IS THEIR EXPERT TO SUPPORT

10     THEIR REQUEST FOR OVER $2 BILLION AND SHE SAID SHE

11     DOESN'T KNOW.

12              NOW, I HEARD COUNSEL FOR APPLE SAY TO YOU

13     ALL THAT DR. KARE TESTIFIED -- LET ME CHECK MY

14     NOTES -- HE SAID DR. KARE TESTIFIED THAT THE ICONS

15     IN THE D 035 HAD NO FUNCTIONAL LIMITATIONS, THAT'S

16     WHAT HE SAID ACCORDING TO MY NOTES.

17              SO LET'S SEE WHAT SHE ACTUALLY SAID.

18     THIS IS THE DANGER OF CHARACTERIZING TESTIMONY

19     RATHER THAN SHOWING IT.

20              CAN WE GO TO PAGE 98?

21              "QUESTION:  IS IT FAIR TO SAY THAT YOU

22     DIDN'T INVESTIGATE THE FUNCTIONALITY OF THE ICONS

23     AND HOW THEY WORK AND HOW A USER WOULD INTERACT

24     WITH THEM AS PART OF YOUR ANALYSIS?

25              "ANSWER:  YES."
```

```
 1              THAT'S WHAT SHE ACTUALLY SAID.

 2              "QUESTION:  AND YOU DIDN'T COMPARE -- YOU

 3    DIDN'T CONSIDER, AS PART OF YOUR ANALYSIS FOR YOUR

 4    EXPERT OPINION, HOW A USER INTERACTS WITH THOSE

 5    ICONS WAS PART OF YOUR ANALYSIS, DID YOU?

 6              "ANSWER:  NO."

 7              SO, IN FACT, DR. KARE DIDN'T -- EVEN

 8    THOUGH IT'S A GRAPHICAL USER INTERFACE WHICH IS

 9    OBVIOUSLY FUNCTIONAL, DR. KARE DIDN'T INVESTIGATE

10    IT AT ALL.  ALL SHE DID WAS SHE CAME AND SHE SHOWED

11    YOU PICTURES AND SAID, THEY LOOK -- THE OVERALL

12    IMPRESSION IS SIMILAR.  SHE DIDN'T PROVE THAT

13    ANYONE WOULD BE DECEIVED OR CONFUSED IN ANY WAY.

14              LET'S LOOK AT HER PICTURES.  REMEMBER,

15    SHE SPENT TIME ON THIS FASCINATE SCREEN AND THEN

16    SHOWED A WHOLE BUNCH OF OTHER PICTURES WITHOUT

17    ANALYZING THEM.  SO LET'S LOOK AT THE ONE, THE ONE

18    SCREEN FROM AN ACCUSED PHONE THAT SHE ACTUALLY

19    ANALYZED.

20              ALL RIGHT.  AND LET'S LOOK AT IT FROM THE

21    FASCINATE SIDE FIRST AND ASK THE QUESTION -- WELL,

22    LET ME BACK UP.  YOU ALL KNOW THAT EACH OF THESE

23    ICON S IS ASSOCIATED WITH AN APPLICATION PROGRAM.

24    THAT'S BECAUSE IT'S A GRAPHICAL USER INTERFACE.

25    THAT MEANS IF YOU HIT ONE OF THESE BUTTONS, AN
```

1    APPLICATION IS GOING TO LOAD.

2              SO LET'S ASK THE QUESTION, ON THE

3    FASCINATE SCREEN THAT SHE'S USING, HOW MANY

4    APPLICATIONS DON'T EVEN EXIST ON THE '305?

5              WELL, I PUT RED BOXES OVER THEM.  SO 12

6    OUT OF THE 20 APPLICATION ICONS ON THE FASCINATE

7    SIMPLY DO NOT EXIST ON THE DESIGN '305 PATENT.

8              DR. KARE'S ONLY OPINION, SHE DIDN'T LOOK

9    AT PRIOR ART LIKE SHE WAS SUPPOSED TO, SHE SAID SHE

10   DIDN'T LOOK AT FUNCTIONALITY.  HER ONLY OPINION

11   WAS, WELL, THE OVERALL IMPRESSION WAS THE SAME.

12             OKAY.  LET'S TALK ABOUT OVERALL

13   IMPRESSION.

14             60 PERCENT OF THE REAL ESTATE FOR THESE

15   APPLICATION ICONS DOES NOT EXIST ON THE '305, 60

16   PERCENT DIFFERENCE.  THAT'S NOT OVERALL IMPRESSION

17   OF IT BEING THE SAME.

18             LET'S LOOK AT IT FROM THE OTHER ANGLE.

19   LET'S ASK THE QUESTION, LOOKING AT DESIGN '305

20   PATENT, HOW MANY APPLICATION ICONS FROM THE D'305

21   CANNOT BE FOUND?  FORGET ABOUT SUBSTANTIAL

22   SIMILARITY, JUST AREN'T THERE ON THE FASCINATE?

23             ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN.

24   SEVEN OF THOSE D'305 APPLICATION ICONS DO NOT EXIST

25   ON THE FASCINATE.  THAT'S OVER 40 PERCENT OF THE

4170

1    REAL ESTATE, ICON REAL ESTATE ON THE D'305 DOES NOT

2    EVEN EXIST ON THE FASCINATE.  THAT'S NOT OVERALL

3    IMPRESSION BEING THE SAME.  THAT'S A BIG

4    DIFFERENCE.

5              NOW, LET'S LOOK AT -- LET'S LOOK AT THE

6    APPLICATION ICONS, WHETHER THERE'S AN OVERLAP.

7    THERE'S SEVEN OF THEM, AND I'VE HIGHLIGHTED THEM

8    WITH BOXES HERE.

9              I ASKED DR. KARE ABOUT FIVE OF THOSE AND

10   LET'S SEE WHAT SHE SAID.  FIRST, THE TEXT MESSAGES

11   ICONS, SMS VERSUS THE MESSAGING ICON SPEECH BOX

12   WITH THE SMILY FACE THERE.

13             "QUESTION:  DR. KARE, YOU'RE NOT

14   TESTIFYING TO THIS JURY THAT THIS SMS ICON IS

15   SUBSTANTIALLY SIMILAR TO THIS OTHER ICON THAT SAYS

16   MESSAGES, ARE YOU?

17             "ANSWER:  NO.

18             "QUESTION:  IT'S NOT SUBSTANTIALLY

19   SIMILAR, IS IT?

20             "ANSWER:  NO.

21             LET'S GO TO THE NEXT ICON.  THE CALENDAR

22   ICON, I'VE HIGHLIGHTED IT HERE AND OVER HERE.  YOU

23   CAN SEE FOR YOURSELVES IT'S NOT SUBSTANTIALLY

24   SIMILAR.  AND DR. KARE AGREES.

25             "QUESTION:  THAT CALENDAR ICON IS NOT

1    SUBSTANTIALLY SIMILAR TO THE CALENDAR ICON ON THE

2    D'3055 THE; RIGHT?

3            "ANSWER:  NO.

4            GO TO THE NEXT ONE, THE FLOWER, THE TWO

5    FLOWER ICONS, I ASKED HER.

6            "QUESTION:  IT'S OBVIOUSLY A DIFFERENT

7    IMAGE THAN THE PICTURE OF THE FLOWER ON THE D'305;

8    RIGHT?

9            "ANSWER:  YES."

10           IT'S OBVIOUSLY A DIFFERENT IMAGE.  THAT'S

11   NOT SUBSTANTIALLY SIMILAR.

12           LET'S GO TO THE NEXT ONE.  THE

13   CALCULATOR.  YOU CAN SEE IT ON THE D'305, YOU CAN

14   SEE IT RIGHT HERE ON THE FASCINATE, CLEARLY

15   DIFFERENT.  I ASKED DR. KARE, "DR. KARE, WOULD YOU

16   AGREE WITH ME THAT THE CALCULATOR ICON IN THE

17   FASCINATE IS NOT SUBSTANTIALLY SIMILAR TO THE

18   CALCULATOR ICON IN THE D'305?

19           "ANSWER:  YES."

20           LET'S GO TO THE NEXT ONE.  THE SETTINGS

21   ICON, HERE YOU CAN SEE THE D'305, SEVERAL GEARS AND

22   A LARGE RECTANGLE.  HERE ON FASCINATE YOU SEE NO

23   BACKGROUND AND A TINY GEAR.

24           "QUESTION:  WOULD YOU AGREE WITH ME THAT

25   THE GEAR IN THE TOP LEFT QUADRANT OF THE FASCINATE

1    DEPICTED ON THE PX 14.7 IS NOT SUBSTANTIALLY

2    SIMILAR TO THE SETTINGS ICON IN THE D'305?

3              "ANSWER:  NO.

4              "QUESTION:  YOU WOULD AGREE WITH ME.

5              "ANSWER:  YES.

6              "QUESTION:  IT'S NOT SUBSTANTIALLY

7    SIMILAR, IS IT?

8              "ANSWER:  NO."

9              SO WE JUST WENT THROUGH FIVE OF THE SEVEN

10   APPLICATION ICONS, THERE'S ONLY SEVEN APPLICATION

11   ICONS THAT CORRESPOND, AND WE JUST WENT THROUGH

12   FIVE OF THOSE ICONS AND DR. KARE HERSELF SAYS

13   THEY'RE NOT SUBSTANTIALLY SIMILAR.

14             WHAT DOES THAT LEAVE US WITH?  TWO ICONS.

15   OUT OF 36 TOTAL ICONS, THERE'S ONLY 2 ICONS THAT

16   DR. KARE SAYS ARE SIMILAR, THE IPHONE AND THE

17   CLOCK.

18             OUT OF 36 ICONS, YET SHE TESTIFIES TO YOU

19   THAT THE OVERALL IMPRESSION OF THE D'305 AND

20   FASCINATE ARE THE SAME, 2 OUT OF 36.

21             I WOULD SUBMIT THE VAST MAJORITY OF THE

22   ICONS ARE SUBSTANTIALLY DIFFERENT.

23             AND LET'S NOT THINK THAT YOU CAN PATENT A

24   COLORFUL ROW, A COLORFUL MATRIX OF ICONS.

25             I ASKED DR. KARE ABOUT THAT.

```
 1                  CAN WE GO TO SLIDE 116.

 2                  "QUESTION:  YOU'RE NOT TELLING THE JURY

 3     THAT APPLE OWNS THE RIGHT TO HAVE A COLORFUL MATRIX

 4     OF ICONS, ARE YOU?

 5                  "ANSWER:  NO.

 6                  "QUESTION:  AND YOU'RE NOT TELLING THE

 7     JURY THAT APPLE OWNS THE EXCLUSIVE RIGHT TO HAVE

 8     THE ICONS ARRANGED IN ROWS AND COLUMNS IN A GRID

 9     MATRIX, ARE YOU?

10                  "ANSWER:  NO."

11                  I ASKED HER ABOUT THE PHONE.

12                  "QUESTION:  DO YOU BELIEVE THAT APPLE

13     OWNS THE IMAGE OF THE OLD RETRO PHONE RECEIVER?

14                  "ANSWER:  I DON'T KNOW.

15                  "QUESTION:  APPLE DOESN'T OWN THE COLOR

16     GREEN FOR GO, DOES IT?

17                  "ANSWER:  NO.  I DON'T -- I DON'T KNOW,

18     BUT I WOULD ASSUME NO."

19                  WELL, THE ONLY THING LEFT IS THE CLOCK

20     AND YOU CAN SEE ONE IS BLACK AND ONE IS BLUE.  THE

21     ONLY WAY THEY COULD POSSIBLY BE SIMILAR IS IF APPLE

22     OWNED THE IMAGE OF THE CLOCK.

23                  I ASKED DR. KARE ABOUT THAT.

24                  "QUESTION:  YOU ALSO POINT TO THIS CLOCK

25     ICON.  THIS IS A PICTURE OF THE FRONT FACE OF A
```

1      CLOCK; RIGHT?

2                  "ANSWER:  YES.

3                  "QUESTION:  AND WHEN YOU HIT THE CLOCK

4      ICON, YOU LAUNCH THE CLOCK APPLICATION; RIGHT?

5                  "ANSWER: YES.  YES.

6                  "QUESTION:  APPLE DOESN'T OWN THE PICTURE

7      OF THE CLOCK, DOES IT?

8                  "ANSWER:  I DON'T KNOW."

9                  THAT IS THE SUM AND SUBSTANCE OF THE

10     TESTIMONY THAT APPLE PRESENTED TO YOU FOR THIS

11     D'305 PATENT WHERE THEY ARE ASKING FOR OVER 2 --

12     JUST ON THIS PATENT -- $2 BILLION.

13                 NOW LET'S MOVE ON TO TRADE DRESS QUICKLY.

14     AND FIRST, VERY BRIEFLY, THE COURT INSTRUCTED YOU

15     AS TO TRADE DRESS AS TO THE IPAD WHERE TRADE DRESS

16     INFRINGEMENT IS ALLEGED, THE TEST IS LIKELIHOOD OF

17     CONFUSION, WHETHER OR NOT THERE'S GOING TO BE

18     CONFUSION.

19                 AND THEN THERE'S ALSO THE DILUTION CLAIM.

20                 WHO DID APPLE CALL AS ITS EXPERT FOR THE

21     TRADE DRESS CLAIMS?  WELL, IT CALLED DR. RUSSELL

22     WINER.  AND WHAT DID HE SAY ABOUT WHETHER THERE'S

23     DILUTION?  LET'S SEE.  I'M NOT GOING TO

24     CHARACTERIZE IT.  I'M GOING TO READ IT.

25                 "QUESTION:  DR. WINER, YOU HAVE NO

```
 1    EMPIRICAL EVIDENCE TO SHOW THAT SAMSUNG'S ACTIONS

 2    HAVE DILUTED APPLE'S BRAND; RIGHT?

 3              "ANSWER:  CORRECT.

 4              "QUESTION:  AND YOU HAVE NO HARD DATA TO

 5    SHOW THAT SAMSUNG'S ACTIONS HAVE DILUTED APPLE'S

 6    BRAND; RIGHT?

 7              "ANSWER:  I WAS NOT ASKED TO DO THAT."

 8              HE'S THEIR EXPERT WHO IS HERE TO PROVE

 9    DILUTION.  AND THIS IS HIS TESTIMONY ON

10    CROSS-EXAMINATION, NOT ON DIRECT EXAMINATION, ON

11    CROSS-EXAMINATION.  HE ADMITTED THAT HE HAD NO

12    EVIDENCE OF DILUTION.

13              SAMSUNG (SIC) IS ALSO ASKING FOR $2

14    BILLION JUST IF YOU FIND THE TRADE DRESS VIOLATION,

15    AND THAT'S WHAT THEIR -- THAT'S THE STRENGTH OF

16    THEIR EVIDENCE.

17              REMEMBER, I ALSO PLAYED AND TOOK THE

18    TABLET AND I PLAYED THIS, TURNED THIS ON FOR HIM,

19    BECAUSE YOU HAVE TO GET TO THE APPLICATION SCREEN

20    ON THE TABLET, TOO.  YOU HAVE TO TURN IT ON -- PUT

21    THIS ON AUTO FOCUS FOR ME.  MAYBE I CAN GET A

22    LITTLE HELP.

23              WHAT DO YOU SEE?  WELL, YOU SEE GALAXY

24    TAB, SAMSUNG GALAXY TAB 10.1 FOR A LONG TIME.  AND

25    THEN AN APP FOR VERIZON.  AND THEN IT'S LOCKED, SO
```

4176

```
 1    THE USER NOW HAS SEEN ALL OF THAT, STILL HASN'T
 2    GOTTEN TO THE APPLICATION SCREEN, HAS TO UNLOCK
 3    IT -- WHAT WERE THE INSTRUCTIONS, YOUR HONOR, ABOUT
 4    SYSTEM UPDATE?
 5              THE COURT:  IT'S NO, I THINK.
 6              MR. VERHOEVEN:  IT DOESN'T HAVE NO.  ALL
 7    RIGHT.  THANK YOU.
 8              AND THEN YOU SEE THE HOME SCREEN.
 9              WELL, THAT'S NOT ACCUSED, EITHER.  SO NOW
10    YOU HAVE TO FIGURE OUT, HOW ARE YOU GOING TO GET TO
11    THE APP?
12              WELL, IF YOU'VE NEVER PLAYED WITH THIS
13    BEFORE, IF YOU'RE A CONSUMER IN THE STORE, YOU HAVE
14    TO LOOK AROUND FOR A BIT, BECAUSE IT'S WAY UP THERE
15    ON THE TOP?  DO YOU SEE IT?  IT'S WAY UP THERE.
16    YOU HIT IT AND THEN YOU GET IT.
17              THAT'S THE SCREEN THEY'RE SAYING
18    INFRINGES THEIR TRADE DRESS.
19              SO THE CONSUMER HAS TO SEE THE SAMSUNG
20    GALAXY LOGO WHILE THEY'RE BOOTING UP AND HAS TO
21    MANIPULATE THEMSELVES THROUGH IT.
22              I SHOWED THAT TO MR. WINER AND I ASKED
23    HIM -- IF YOU GO TO SLIDE 126 --
24              "QUESTION:  SO IT'S YOUR TESTIMONY TO
25    THIS JURY THAT CONSUMERS, USING THE DEGREE OF CARE
```

```
 1    THAT THEY WOULD NORMALLY USE, TURNING ON THIS

 2    PHONE, SEEING THE SAMSUNG, SEEING THE SWIRL THAT

 3    TURNS INTO THE SAMSUNG, SEEING IT GLOW TWO TIMES,

 4    HAVING TO NAVIGATE BEYOND THE HOME SCREEN TO THE

 5    APPLICATION SCREEN, THAT THOSE CONSUMERS WOULD BE

 6    CONFUSED AND WOULDN'T KNOW THAT THIS IS A SAMSUNG

 7    SOURCED PRODUCT?  IS THAT YOUR TESTIMONY?"

 8              AND HE HAD TO ADMIT, NO, THAT'S NOT MY

 9    TESTIMONY.

10              WHY?  BECAUSE IT'S OBVIOUS.  ANY CONSUMER

11    WHO GOES IN AND WANTS TO BUY ONE OF THESE THINGS IS

12    GOING TO KNOW THEY'RE GETTING A SAMSUNG PRODUCT.

13    THEY'RE NOT GOING TO FINALLY GET TO THE APPLICATION

14    SCREEN AND SAY, OH, THAT LOOKS A LOT LIKE APPLE.

15    MAYBE THIS IS AN APPLE PRODUCT.  IT JUST ISN'T

16    CREDIBLE TO SUGGEST THAT.

17              NOW, I'D LIKE TO TURN NOW TO COUNSEL FOR

18    APPLE'S REPEATED ACCUSATIONS THAT SAMSUNG IS

19    NOTHING BUT A COPY ISSUE AN ORDER.  I'D LIKE TO

20    TALK A LITTLE BIT ABOUT WHAT THEY'RE DOING WHEN

21    THEY MAKE THOSE ACCUSATIONS.

22              SO IF WE COULD PUT UP SLIDE 136, AND THIS

23    IS FROM THE OPENING.

24              SIMILAR TO THE SLIDE YOU SAW FROM COUNSEL

25    FOR APPLE THIS MORNING SUGGESTING, OR TRYING TO
```

1    SUGGEST TO YOU THAT SAMSUNG HAD COMPLETELY

2    DIFFERENT DESIGNS AND DECIDED TO COPY LATER.

3             I SUBMIT TO YOU THAT THAT'S AN

4    INTENTIONAL ATTEMPT TO MISLEAD THE JURY.

5             CAN WE GET THE BOARD?  CAN EVERYONE SEE

6    THE SCREEN, TOO?  ALL RIGHT.

7             WHAT PHONES ARE THEY SHOWING?  WELL, THE

8    I7 FINAL SET OF INSTRUCTIONS FINAL SET OF

9    INSTRUCTIONS, I730, I830 AND THE BLACKJACK.

10            REMEMBER HOW I TOLD YOU IN OPENING THAT

11   SAMSUNG'S BUSINESS MODEL IS DIFFERENT FROM APPLE'S.

12   APPLE HAS A BUSINESS MODEL WHERE THEY HAVE ONE

13   PHONE, THAT'S IT, AND THEY CHANGE IT ONCE A YEAR.

14            SAMSUNG'S BUSINESS MODEL IS THEY HAVE ALL

15   KINDS OF DIFFERENT PHONES FOR ALL KINDS OF

16   DIFFERENT PEOPLE.

17            WELL, THESE ARE SOME OF THEIR ALL KINDS

18   OF DIFFERENT PHONES.  THE I700, IT'S RIGHT HERE,

19   I700.  IT'S A BAR-TYPE PHONE.

20            THE BLACKJACK, THE BLACKJACK IS RIGHT

21   HERE.  IT'S ALSO A BAR-TYPE PHONE.

22            THE I830, THE I830 IS A SLIDER TYPE

23   PHONE.

24            THESE AREN'T EVEN THE SAME CATEGORY OF

25   DESIGN AS THE OTHER SAMSUNG PHONES HERE WHICH

1    COUNSEL FOR APPLE DIDN'T TELL YOU ABOUT.

2            THIS HERE, MEMBERS OF THE JURY, THIS IS

3    WHEN THE IPHONE WAS RELEASED, OKAY?  THERE'S NO

4    QUESTION, SAMSUNG HAD RECTANGULAR PHONES WITH

5    ROUNDED SCREENS, OR EXCUSE ME, ROUNDED CORNERS,

6    LARGE SCREENS AND MINIMALIST DESIGN BEFORE THE

7    IPHONE EVEN CAME OUT.

8            WELL, WHAT APPLE'S COUNSEL IS DOING IS

9    THEY'RE INTENTIONALLY IGNORING THESE PHONES AND

10   POINTING TO A COMPLETELY DIFFERENT CATEGORY OF

11   PHONES.  THESE ARE THE TOUCHSCREEN SMARTPHONES.

12   THESE ARE THE BAR-TYPE AND SLIDER TYPE PHONES.

13           IT'S A SHELL GAME.  THEY'RE POINTING TO

14   THESE PHONES BEFORE AND THESE PHONES AFTER AND

15   PRETENDING THAT THESE PHONES NEVER EXISTED.

16           IS THAT FAIR?  NO, IT'S NOT FAIR.

17           DOES THAT SHOW COPYING?  NO, IT DOESN'T

18   SHOW COPYING.

19           WHAT DID THE EVIDENCE SHOW?  MR. BENSON

20   CAME, CHIEF STRATEGY OFFICER FOR SAMSUNG.  COUNSEL

21   FOR APPLE SAID, OH, WE DIDN'T BRING ANY EXECUTIVES.

22   WELL, HERE'S ONE.  HE SAID, "WE WANT COMERS TO HEAR

23   OUR MESSAGE, UNDERSTAND THAT OUR MESSAGE IS OURS

24   AND GO OUT AND BUY OUR DEVICE" WHEN HE WAS ASKED

25   ABOUT COPYING.

```
 1              WE BROUGHT YOU MR. KIM FROM KOREA.  HE
 2     TESTIFIED THAT HE PERSONALLY DESIGNED THESE PHONES
 3     OVER HERE ON THE SCREEN.
 4              AND HE WAS ASKED.
 5              "QUESTION:  MR. KIM, IN DOING THE WORK
 6     THAT YOU DID IN DESIGNING TABLETS FOR SAMSUNG AND
 7     SMARTPHONES FOR SAMSUNG, AT ANY TIME DID YOU COPY
 8     THE WORK OF ANY OTHER SMARTPHONE MANUFACTURER?
 9              "ANSWER:  I HAVE NOT."
10              MR. KIM FURTHER TESTIFIED.
11              "QUESTION:  WHEN DID SAMSUNG BEGIN
12     WORKING ON THE GALAXY TAB 10.1 PROJECT?
13              "ANSWER:  THAT WOULD BE OCTOBER 2009.
14              "QUESTION:  AND WHEN DID YOU PERSONALLY
15     BEGIN WORKING ON THAT PROJECT?
16              "ANSWER:  SAME TIME, OCTOBER OF 2009.
17              "QUESTION:  AND CAN YOU TELL US WHETHER
18     THAT WAS BEFORE OR AFTER APPLE ANNOUNCED THE IPAD?
19              "ANSWER:  THAT WOULD BE BEFORE."
20              MORE TESTIMONY.  I'M NOT CHARACTERIZING.
21     YOU CAN READ IT FOR YOURSELF.
22              HE WAS SHOWN THIS DOCUMENT, DX 900 AND HE
23     IDENTIFIED THAT WAS THE OVERALL REVIEW OF THE SIZES
24     CONCERNING THE GALAXY TAB 10.1, BASICALLY
25     DISCUSSING THE DISPLAY SIZE, AND ALSO THE BORDER
```

1    AREA SIZE.

2                 "QUESTION:  AND IS THIS DATED BEFORE

3    APPLE ANNOUNCED THE IPAD?

4                 "ANSWER:  YES, THAT'S CORRECT."

5                 HERE IT IS.  TAKE A LOOK AT IT.  THIS

6    DOCUMENT WAS CREATED INTERNALLY WITHIN SAMSUNG, THE

7    DEVELOPMENT OF THE TAB 10.1, BEFORE ANYONE KNEW THE

8    IPAD EXISTED.  AND THEY SAID HE'S A COPY ISSUE AND

9    ORDER.

10                LET'S LOOK AT THE CHRONOLOGY.  OCTOBER

11   2009, THE DEVELOPMENT STARTED ACCORDING TO MR. KIM.

12   THAT PROTOTYPE E-MAIL WE JUST SHOWED YOU THAT HAS

13   THE PICTURE, BEFORE THE IPAD WAS ANNOUNCED.

14                YOU KNOW HOW SECRETIVE APPLE IS.  NOBODY

15   KNOWS WHAT THEY'RE WORKING ON UNTIL THEY ANNOUNCE

16   IT.

17                THE IDEA THAT THIS WAS A COPY OF THE IPAD

18   MAKES NO SENSE BECAUSE THIS WAS DEVELOPED BEFORE

19   THE IPAD.

20                NOW, ON CROSS-EXAMINATION, THIS WAS

21   APPLE'S CHANCE TO SHOW THAT THIS MAN WAS A COPYIST.

22   THIS IS APPLE'S CHANCE TO SHOW HIM THE COPYING

23   DOCUMENTS.

24                WHAT DID THEY DO?  THEY SHOWED HIM THE

25   P3 -- DOCUMENTS CONCERNING THE P3 AND THE P1.

```
1            DO YOU REMEMBER THAT GOOGLE, GOOGLE

2    RECOMMENDATION THEY KEEP TALKING ABOUT, GOOGLE

3    WANTS YOU TO CHANGE IT, THE ONE MR. KIM DIDN'T KNOW

4    ABOUT?

5            WELL, HE TESTIFIED -- I THINK YOU TOLD US

6    THE P1 IS THE GALAXY 7?  IS THAT CORRECT?

7            SIR, IS IT YOUR UNDERSTANDING THAT THERE

8    ARE ANY DESIGN CLAIMS REGARDING THE GALAXY 7

9    PRODUCT?

10           NO.

11           THIS IS THE GALAXY 7.  THIS IS THE

12   PRODUCT THAT THAT GOOGLE DOCUMENT WAS TALKING

13   ABOUT.  IT'S NOT EVEN AN ACCUSED PRODUCT IN THE

14   DESIGN CASE.  THEY'RE TALKING ABOUT APPLES AND

15   ORANGES AND THEY'RE TRYING TO CONFUSE YOU BY TAKING

16   A DOCUMENT THAT HAS SOMETHING THAT THEY LIKE, BUT

17   IT'S ABOUT A PRODUCT THAT'S NOT EVEN IN THIS CASE.

18           THAT'S ALL THEY'VE GOT.

19           WHAT ABOUT MS. WANG?  WE ASKED HER WHEN

20   SHE CAME, WE BROUGHT HER HERE, SHE WAS THE DESIGNER

21   OF THE ICONS, WE BROUGHT HER HERE TO TALK TO YOU

22   AND EVALUATE.

23           "QUESTION:  WERE YOU AND THE TEAM THAT

24   YOU LEAD RESPONSIBLE FOR DESIGNING THE ICON AND THE

25   LAYOUT OF THE ICONS ON THE MENU PAGE FOR THE GALAXY
```

4183

```
1    PHONES?

2              "ANSWER:  YES, THAT'S CORRECT.

3              "QUESTION:  IN DOING THAT, DID YOU COPY

4    ANY APPLE ICONS OR THE LAYOUT OF THE APPLE

5    APPLICATION PAGE?

6              "ANSWER:  NOT AT ALL."

7              SHE WAS SHOWN, I DON'T KNOW IF YOU CAN

8    SEE IT DOWN HERE, THE GALAXY S I9000, SDX 3972.12

9    AND ASKED ABOUT THE PHONE ICON.

10             "QUESTION:  LET'S TAKE A LOOK AT AN

11   ICON."

12             I'M GOING TO SKIP AHEAD.

13             "ARE YOU THE ONE THAT SELECTED THIS ICON

14   FOR USE ON THE GALAXY PHONE?

15             "ANSWER:  YES, THAT'S CORRECT."

16             THIS IS THE ONLY ICON THAT DR. KARE SAYS

17   WAS SUBSTANTIALLY SIMILAR.  SHE SAYS SHE DEVELOPED

18   IT.  SO HERE WE GO, SHOW COPYING.  THEY HAVE THEIR

19   CHANCE.

20             WE ASKED HER, WHY DID YOU CHOOSE THIS

21   ONE?

22             "WELL, I DESIGNED IT AS SUCH BECAUSE IT'S

23   A PHONE, SO I DESIGNED IT AS A PHONE.  THE SAME

24   GOES WITH THE CLOCK, AND ALSO THE CAMERA."

25             OF COURSE.  ICONS ARE METAPHORS.
```

1              WE ASKED HER.

2              "QUESTION:  WHAT OTHER ICONS HAVE YOU

3    USED FOR THE PHONES AND WHAT WAS YOUR EXPERIENCE

4    WITH THEM?

5              SHE SAYS, "WELL, WE HAVE TRIED QUITE A

6    FEW DIFFERENT ICONS AND THERE WERE EVEN CERTAIN

7    DIRECTIVES COMING FROM UP ABOVE TELLING US TO COME

8    UP WITH SOMETHING OF A DESIGN THAT'S MORE

9    SOPHISTICATED, SOMETHING THAT LOOKS MORE LIKE A

10   SMARTPHONE.

11             "SO WE TRIED DIFFERENT ICONS.  FOR

12   EXAMPLE, WE TRIED AN ICON THAT LOOKED LIKE A CELL

13   PHONE WITH AN ANTENNA, AND THEN WE ALSO TRIED AN

14   ICON THAT LOOKED MORE LIKE A SMARTPHONE.

15             "BUT WHAT HAPPENED WAS THAT THE PEOPLE

16   WOULD ACTUALLY MISTAKE THESE ICONS.  SOME PEOPLE

17   THOUGHT THIS WAS A GAME OR MAYBE A PDA OR EVEN A

18   CALCULATOR.  SO WE HAD SOME PROBLEMS."

19             SO THE REASON THEY STAYED WITH THE PHONE

20   ICON IS BECAUSE WHEN THEY TRIED TO DO A SMARTPHONE

21   ICON OR A PDA TYPE ICON, IT CONFUSED PEOPLE.

22             WE FURTHER ASKED HER, "DO YOU HAVE A NAME

23   THAT YOU USE FOR THIS PARTICULAR TYPE OF ICON FOR A

24   PHONE?

25             "ANSWER:  IN OUR DESIGN TEAM, WE CALLED

```
 1    IT A DUMBBELL ICON.

 2              "QUESTION:  HOW LONG HAS SAMSUNG USED

 3    THIS DUMBBELL STYLE ICON ON THE PHONES?

 4              "ANSWER:  THAT ICON WAS IN USE EVEN

 5    BEFORE I JOINED THE COMPANY IN 2002.  AND THIS WAS

 6    USED BY SAMSUNG.  I'M SAYING THAT THE DUMBBELL

 7    SHAPE HAS BEEN USED IN SAMSUNG EVEN PRIOR TO 2002."

 8              WELL, THERE WAS NO IPHONE IN 2002.  LOOK

 9    AT THE CHRONOLOGY.  MS. WANG, WHO CHOSE THAT ICON,

10    TESTIFIED THAT SAMSUNG WAS USING THAT ICON

11    INTERNALLY, SORT OF A DUMBBELL ICON, WHEN SHE

12    ARRIVED IN 2002.

13              YET APPLE IS SAYING, OH, SHE'S A COPYIST,

14    SHE SAW APPLE DO IT AND COPIED IT.

15              THE EVIDENCE DOESN'T ADD UP.

16              AND, AGAIN, THEY HAD THEIR CHANCE TO

17    CROSS HER AND WHAT DID THEY DO?

18              THEY SHOWED HER THIS DOCUMENT, PX 55.

19    AND INTIMATED THAT THIS WAS A COPYING DOCUMENT.

20              WELL, IT TURNS OUT THAT THE DOCUMENT THEY

21    SHOWED HER -- WELL, I'LL JUST READ THE.

22              "QUESTION:  SO FAR AS YOU'RE AWARE, ARE

23    THESE EVEN, THESE BADA PHONES, ARE THEY ACCUSED IN

24    THIS CASE.  DO THEY HAVE ANYTHING TO DO WITH THIS

25    CASE SO FAR AS YOU'RE AWARE?
```

```
 1              "ANSWER:  NO."

 2              THEY'RE DOING IT AGAIN.  THEY'RE TAKING

 3      SOMETHING FROM A FOREIGN PHONE AND THEY'RE PUTTING

 4      IT HERE IN THE U.S. AND CONTENDING IT WAS ONE OF

 5      THE ACCUSED PHONES.

 6              WHAT WAS THE OTHER THING THEY DID?  THEY

 7      SHOWED HER A DOCUMENT WHERE SHE HAD COMPARED HER

 8      ICONS WITH -- OR APPLE ICONS WITH THE GALAXY ICONS

 9      AND SUGGESTED THIS IS EVIDENCE THAT YOU COPIED ON

10      CROSS-EXAMINATION.

11              WHAT THEY DIDN'T TELL YOU, MEMBERS OF THE

12      JURY, SO WE HAD TO TELL YOU ON REDIRECT, WAS THIS

13      DOCUMENT IS DATED APRIL 22, 2011, A YEAR AFTER THE

14      GALAXY S IS RELEASED TO THE PUBLIC, AND THE REASON

15      SHE CREATED THIS DOCUMENT WAS BECAUSE APPLE HAD

16      SUED SAMSUNG AND SHE, BEING IN CHARGE OF ICONS, WAS

17      ASKED TO PUT TOGETHER THE DOCUMENT.

18              THAT DOESN'T SHOW COPYING.  THAT SHOWS

19      THE COMPANY TRYING TO FIGURE OUT WHAT'S GOING ON.

20              JUST ONE SECOND, YOUR HONOR, CAN I CHECK

21      MY TIME?

22              THE COURT:  PLEASE, GO AHEAD.  YOU'RE

23      ABOUT AN HOUR AND SEVEN MINUTES.

24              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

25      LET'S GO TO SLIDE 159.
```

```
 1              NOW, WE'VE SEEN THIS DOCUMENT, THIS IS PX

 2     34, OVER AND OVER, IN THE OPENING STATEMENT.

 3              THIS DOCUMENT, AGAIN, IS AN EXAMPLE OF

 4     APPLE MIXING AND MATCHING.  SAMSUNG IS A LARGE

 5     COMPANY.  IT HAS MANY DIVISIONS.  DO YOU REMEMBER

 6     HEARING THAT OVER 20 PERCENT OF THE IPHONE

 7     COMPONENTS COST COMPRISED OF SAMSUNG'S PARTS FROM

 8     SAMSUNG'S COMPONENT DIVISION?  THIS DOCUMENT ISN'T

 9     EVEN FROM SAMSUNG'S DESIGN GROUP.  IT'S NOT EVEN

10     FROM SAMSUNG'S PHONE GROUP.  THIS DOCUMENT IS FROM

11     SYSTEM LSI.

12              MR. DENISON WAS ASKED:

13              "QUESTION:  WHAT IS THE DIVISION OF

14     SAMSUNG THAT MAKES THE APPLICATIONS PROCESSOR

15     THAT'S THEN SUPPLIED TO APPLE TO BE THE PROCESSOR

16     FOR THE PHONE?

17              "ANSWER:  THAT'S THE, WHAT WE CALL THE

18     SYSTEM LSI DIVISION WITHIN SAMSUNG SEMICONDUCTORS."

19              THAT'S A WHOLE DIFFERENT COMPANY.

20              ALL RIGHT.  YET, THEY'RE USING THIS

21     DOCUMENT, THEY'RE MIXING AND MATCHING, THEY'RE

22     TAKING A DOCUMENT FROM A COMPLETELY DIFFERENT PART

23     OF THE COMPANY AND PRETENDING IT'S A PHONE DOCUMENT

24     AND THEN TAKING A SNIPPET OUT OF THAT DOCUMENT TO

25     SAY, OH, THAT'S PROOF OF COPYING BY THE DESIGN
```

1    GROUP WITHIN THE PHONES.

2            THEY SHOWED YOU THIS IN THE OPENING

3    STATEMENT, COUNSEL FOR APPLE SHOWED YOU THIS.  THEY

4    SAID, SEE, IT SAYS HARDWARE PORTION, IMITATION.

5    AH, EVIDENCE OF COPYING.

6            WELL, GUESS WHAT?  LET'S PUT THIS

7    DOCUMENT IN CONTEXT.  THIS WAS THE COMPONENT GROUP.

8    THESE WERE GUYS WHO MAKE THE CHIPS THAT GO INTO

9    PHONES FOR ALL KINDS OF DIFFERENT COMPANIES, AND

10   THEY'RE LOOKING AT THE IPHONE EFFECT ANALYSIS ON

11   THEIR COMPONENT BUSINESS.  THIS ISN'T TALKING ABOUT

12   DESIGNING PHONES.

13           AND THEY'RE SAYING, WHAT IS THE EFFECT?

14   WHAT'S THE IPHONE EFFECT?  SIMULATE ENHANCING AND

15   UPGRADING HARDWARE PERFORMANCE FOR OTHER

16   COMPETITORS' SMARTPHONES.

17           THEY'RE NOT EVEN TALKING ABOUT SAMSUNG

18   SMARTPHONES.  THEY'RE TALKING ABOUT SELLING THEM TO

19   OTHER COMPETITORS THAT MAKE SMARTPHONES THAT

20   COMPETE WITH THE IPHONE.  THAT'S WHERE THEY'RE

21   SAYING EASY IMITATION.  THEY'RE SAYING THE

22   COMPONENT PARTS, THEY'RE EASY TO PUT TOGETHER LIKE

23   THAT.  IT HAS NOTHING TO DO WITH DESIGN.  IT HAS

24   NOTHING TO DO WITH ICONS.

25           LOOK AT WHAT WE'RE TALKING ABOUT, FLASH

1    MOTION, MEMORY, PROXIMITY, AND LIGHT SENSORS.

2              AGAIN, IT'S A SHELL GAME.  COUNSEL FOR

3    APPLE IS TRYING TO MISLEAD YOU.  THERE IS NO BAD

4    INTENT AND THERE IS NO COPYING.

5              LET'S GO TO SLIDE 163.

6              NOW, COUNSEL FOR APPLE POOH-POOH'D MY

7    STATEMENT THAT BENCHMARKING IS COMMON, SUGGESTING

8    THAT BENCHMARKING IS NOT WHAT'S GOING ON OVER AT

9    SAMSUNG.

10             BUT LET'S LOOK AT WHAT APPLE'S INTERNAL

11   DOCUMENTS SHOW ABOUT WHAT APPLE DOES.  THIS IS A

12   NOVEMBER 18TH, 2008 E-MAIL.

13             AND IT'S AN APPLE E-MAIL FROM 2008.  AND

14   IT SAYS, I ADDED TWO LATEST DEVICES FROM SONY

15   ERICSSON AND LG.  WE NOW HAVE A FINAL LIST OF

16   LATEST AND GREATEST MODELS FROM EVERY MAJOR

17   SMARTPHONE VENDOR, RESEARCH IN MOTION, HTC, NOKIA,

18   SAMSUNG, MOTOROLA, SENIOR E AND LG.  WE ARE NOT IN

19   THE PROCESS OF PURCHASING THESE DEVICES.  ONCE THEY

20   ARRIVE, WE WILL START VERIFYING THEIR FEATURE SET

21   IN EACH AREA AND THEN START PERFORMANCE

22   BENCHMARKING AGAINST THE IPHONE.

23             "ONCE WE GET THESE DEVICES AND HAVE

24   PERFORMANCE METRICS FINALIZED, HOOMAN'S TEAM WILL

25   ALLOCATE SOME BANDWIDTH TO HELP TEST THESE DEVICES.

1    EACH FUNCTIONAL TEAM WILL NEED TO ANALYZE THE AREA

2    THAT WE ARE LAGGING COMPETITION."

3         THERE'S NOTHING WRONG WITH THAT.  THERE'S

4    NOTHING WRONG WITH THAT WHEN SAMSUNG DOES IT, AND

5    THERE'S NOTHING WRONG WITH IT WHEN APPLE DOES IT.

6         EVERY MAJOR TECH COMPETITOR DOES IT.

7    THEY DO TEAR-DOWNS AND THEY SAY, ARE WE BEATING

8    THEM HERE?  ARE THEY BEATING US THERE?  ARE WE

9    BEATING THEM HERE?  ARE WE BEATING THEM THERE?

10        AND THEN YOU TRY TO ADJUST TO BE

11   COMPETITIVE.  YOU MAKE CHANGES TO BE COMPETITIVE.

12   THERE'S NOTHING WRONG WITH THAT.

13        MR. STRINGER, ONE OF THE THINGS THAT YOU

14   ALSO DO AS AN INDUSTRIAL DESIGNER IS YOU PAY

15   ATTENTION TO MOBILE PHONES AND SMARTPHONES

16   MANUFACTURED AND SOLD BY YOUR COMPETITORS, DON'T

17   YOU?

18        "ANSWER:  ON OCCASION WE PAY SOME

19   ATTENTION.

20        "QUESTION:  YOU ACTUALLY GET COMPETITIVE

21   ANALYSES DONE AND REVIEW THOSE OF YOUR COMPETITION,

22   DON'T YOU?

23        "ANSWER:  THERE IS A COMPETITIVE ANALYSIS

24   EXERCISE THAT'S PERFORMED BY OUR PRODUCT DESIGN."

25        IT'S A SYSTEMATIC THING THAT APPLE

```
 1    ACTUALLY DOES.

 2              AND MR. STRINGER HIMSELF DOES IT.  DO YOU

 3    REMEMBER THIS E-MAIL, DX 687 I SHOWED HIM WHEN I

 4    WAS CROSS-EXAMINING HIM.

 5              HE SAID TO THAT, TO PAUL FROM THAT GROUP,

 6    I NEED YOUR LATEST SUMMARY OF OUR ENEMIES FOR AN

 7    I.D. BRAINSTORM ON FRIDAY.  AND HE GETS IT, AND ONE

 8    OF THOSE ENTITIES IS THE GALAXY TAB TEAR-DOWN, ONE

 9    OF THE ACCUSED PRODUCTS IN THIS CASE.

10              APPLE'S INSPIRED BY OTHERS, JUST LIKE

11    EVERY COMPETITOR IS.

12              REMEMBER, WITH THE INITIAL IPHONE DESIGN,

13    APPLE WAS INSPIRED BY THE FUNCTIONAL ASPECTS OF THE

14    SONY STYLE CHAPPY.  THERE'S NOTHING WRONG WITH

15    THAT.

16              AND APPLE PERFORMS ITS OWN TEAR-DOWNS OF

17    THE VERY ACCUSED PRODUCTS IN THIS CASE.  THIS IS AN

18    APPLE DOCUMENT WE'RE LOOKING AT, DX 2519.  MINI

19    TEAR DOWN, SAMSUNG GALAXY S.  THIS IS ONE OF THE

20    PAGES OF THESE DOCUMENTS.

21              THEY TAKE THEM APART METICULOUSLY, THEY

22    TAKE PICTURES OF THEM.  THE SAME THING WITH THE

23    GALAXY SAMSUNG 10.1, TAKE APART DOCUMENT, THIS IS

24    AN APPLE DOCUMENT, DX 717.  THERE'S JUST ONE PAGE

25    OF A MULTI PAGE ANALYSIS.  THEY'VE TAKEN THE THING
```

```
 1    COMPLETELY APART AND SEPARATED ALL THE PARTS AND

 2    LABELED THEM.

 3              DOES THAT MEAN THEY'RE COPYISTS?  DOES

 4    THAT MEAN WE CAN SUE THEM?  COMPETITIVE

 5    BENCHMARKING IS NORMAL PRACTICE, AND WHAT'S GOING

 6    ON HERE IS THIS IS ANOTHER EFFORT BY COUNSEL FOR

 7    APPLE TO MISLEAD YOU INTO THINKING, BECAUSE YOU'RE

 8    NOT IN THIS INDUSTRY, THAT THERE'S SOMETHING WRONG

 9    WITH THAT.

10              IN FACT, THEY'RE STILL DOING IT TODAY.

11    THIS IS AN APPLE JANUARY 24TH, 2011 E-MAIL FROM

12    EDDY CUE TO THE HEAD OF APPLE, TIM COOK, CEO, SCOTT

13    FORSTALL.

14              YOU SAW BOTH THOSE GUYS TESTIFY.  THEY'RE

15    TALKING ABOUT AN ARTICLE, WHY JUST DUMP THE IPAD.

16    HYPOTHETICAL, SIZE MATTERS.

17              AND APPARENTLY THEY ASKED SOMEONE TO LOOK

18    INTO THAT AND SEE WHETHER OR NOT SIZE DOES MATTER.

19              AND HE SAYS, HAVING USED THE SAMSUNG

20    GALAXY, I TEND TO AGREE WITH MANY OF THE COMMENTS

21    BELOW, EXCEPT ACTUALLY MOVING OFF THE IPAD, I

22    BELIEVE THERE WILL BE A SEVEN INCH MARKET AND WE

23    SHOULD DO ONE.

24              THAT'S THIS.  NOT ACCUSED.  APPLE DOESN'T

25    MAKE SOMETHING LIKE THIS.  BUT THEY LOOKED AT
```

1    SAMSUNG'S SEVEN INCH TAB, THEY EVALUATED IT, THEY

2    SAID WE SHOULD DO THAT.  WE SHOULD COPY SAMSUNG.

3              SO WHEN YOU LOOK AT THE EVIDENCE HERE,

4    CAREFULLY LOOK AT IT, AND YOU PUT IT IN CONTEXT

5    INSTEAD OF MIXING AND MATCHING FROM DIFFERENT

6    DIVISIONS, OR USING DOCUMENTS FROM PHONES THAT

7    AREN'T EVEN ACCUSED, IF YOU LOOK AT THE ACTUAL

8    RELIABLE EVIDENCE, THE COPYING CLAIMS FAIL.

9              SAMSUNG'S A GOOD CORPORATE CITIZEN, AND

10   ALL IT WANTS TO DO IS MAKE PRODUCTS THAT CONSUMERS

11   WANT.

12             WE LOOKED EARLIER IN MY CLOSING AT WHAT

13   MATTERS IN THIS CASE, WHICH IS WHETHER THERE'S

14   INFRINGEMENT OF THESE DESIGN PATENTS.  ALL THIS

15   COPYING NONSENSE IS HAND WAVING BY APPLE.

16             WHY?  BECAUSE THEY DON'T HAVE ANY

17   EVIDENCE OF DECEPTION.  THEY DON'T HAVE ANY

18   EVIDENCE OF CONFUSION.  AND THEY KNOW THAT, JUST

19   LIKE I KNOW, YOU WILL KNOW THAT NO ONE IS EVER

20   GOING TO BE CONFUSED WHEN THEY GO TO A VERY

21   EXPENSIVE SMARTPHONE WITH MULTI-YEAR CONTRACTS,

22   NOBODY IS GOING TO BE CONFUSED.

23             NOW LET'S TURN TO THE UTILITY PATENTS

24   THAT APPLE HAS ASSERTED, AND I WON'T SPEND AS MUCH

25   TIME ON THOSE AS.

```
 1              JUST ONE SECOND, YOUR HONOR.

 2              (PAUSE IN PROCEEDINGS.)

 3              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

 4              LET'S GO TO APPLE'S UTILITY PATENTS.

 5   APPLE ASSERTS THREE PATENTS IN THIS CASE.  AND I

 6   THINK THAT COUNSEL FOR APPLE TOLD YOU THIS ALREADY,

 7   BUT I'LL REITERATE.  THIS, AGAIN, IS APPLE'S BURDEN

 8   OF PROOF, AND THE STANDARD FOR UTILITY PATENTS IS

 9   DIFFERENT FROM THE STANDARD FOR A DESIGN PATENT.

10   FOR A UTILITY PATENT, YOU HAVE WRITTEN CLAIM

11   LANGUAGE, NOT A PICTURE.

12              AND THE TEST IS THAT YOU MUST COMPARE THE

13   PRODUCT WITH THE PATENT CLAIM AND DETERMINE WHETHER

14   EVERY REQUIREMENT OF THE CLAIM IS INCLUDED IN THAT

15   PRODUCT OR METHOD.

16              IF, HOWEVER, A PARTICULAR SAMSUNG OR

17   APPLE PRODUCT, DO YOU SEE THAT, PARTICULAR, THAT'S

18   A PRODUCT-BY-PRODUCT COMPARISON, YOU CAN'T JUST

19   THROW A BUNCH OF IMAGES ON THE SCREEN AND SAY

20   THEY'RE ALL THE SAME.  YOUR JOB, AND THEIR JOB, IS

21   TO PROVE TO YOU THIS, WAS TO TAKE EACH PRODUCT

22   SEPARATELY THAT'S ACCUSED, OVER 20 DIFFERENT

23   PRODUCTS, AND DO THIS ELEMENT-BY-ELEMENT ANALYSIS,

24   A PARTICULAR SAMSUNG OR APPLE PRODUCT OR METHOD

25   DOES NOT HAVE EVERY REQUIREMENT IN THE PATENT
```

1    CLAIM, THAT PRODUCT OR METHOD DOES NOT LITERALLY

2    INFRINGE THAT CLAIM.

3              YOU MUST DECIDE THE LITERAL INFRINGEMENT

4    FOR EACH ASSERTED CLAIM SEPARATELY.  THAT'S A VERY

5    IMPORTANT INSTRUCTION BECAUSE IF YOU RECALL, ALL

6    APPLE'S WITNESSES DID WAS THEY TOOK ONE PRODUCT AND

7    THEY WALKED VERY QUICKLY THROUGH A CLAIM AND THEN

8    WHAT DID THEY DO?  THEY FLASHED ON THE SCREEN

9    SOMETIMES TEN, SOMETIMES FIVE DEMONSTRATIVES, WHICH

10   AREN'T EVEN EVIDENCE, THEY DON'T EVEN GO BACK INTO

11   THE JURY ROOM, AND SAID, OH, THESE ARE ALL THE

12   SAME.  TRUST ME.

13             IT'S THEIR BURDEN, YOU'LL SEE WHEN YOU

14   SEE THE JURY VERDICT FORM, YOU'RE GOING TO BE

15   ASKED, YOU'RE GOING TO BE ASKED, IS THERE

16   INFRINGEMENT SEPARATELY FOR EACH ONE OF THOSE

17   PRODUCTS.

18             APPLE HAS NOT MET ITS BURDEN.  YOU CAN'T

19   MEET YOUR BURDEN OF PROVING INFRINGEMENT AND ASKING

20   FOR HUNDREDS OF MILLIONS OF DOLLARS WHEN ALL YOU DO

21   IS FLASH ON THE SCREEN A DEMONSTRATIVE AND DON'T

22   INTRODUCE ANY EVIDENCE OR ANALYSIS.

23             BUT THAT'S WHAT HAPPENED FOR EACH ONE OF

24   THEIR ASSERTED PATENTS.  THEY HAVEN'T MET THEIR

25   BURDEN.

4196

```
 1            IT'S NOT ENOUGH TO SAY, WELL, FOR

 2     EXAMPLE, ON THIS ONE, IT BOUNCES SO, THEREFORE, IT

 3     INFRINGES.

 4            MR. BALAKRISHNAN ADMITTED ON

 5     CROSS-EXAMINATION, "AREN'T THERE BOUNCE EFFECTS

 6     THAT ARE NOT COVERED BY CLAIM 19?

 7               "ANSWER:  JUST GENERALLY OUT THERE?

 8               "QUESTION:  YES.

 9               "ANSWER:  SURE, YOU CAN HAVE ALL KINDS OF

10     THINGS THAT BOUNCE THAT DON'T --

11               "QUESTION:  ALL RIGHT.

12               "ANSWER:  -- THAT DON'T MEET THE ELEMENTS

13     OF CLAIM 19."

14            SO SIMPLY SHOWING YOU, OH, IT BOUNCES, HE

15     EVEN ADMITS, THAT DOESN'T INFRINGE.  THAT'S NOT

16     NECESSARILY INFRINGING.  THAT WAS THERE BEFOREHAND.

17     YOU NEED TO DO AN ELEMENT-BY-ELEMENT ANALYSIS.

18            DR. BALAKRISHNAN DID NOT DO THAT.  YOU'LL

19     HAVE TO GO BACK IN THE JURY ROOM WITHOUT ANY

20     INFORMATION.  THAT TRANSLATES INTO THEY DIDN'T MEET

21     THEIR BURDEN.

22            LET'S GO QUICKLY TO WHETHER THESE PATENTS

23     ARE VALID.  THE COURT INSTRUCTED A UTILITY PATENT

24     IS INVALID IF THE CLAIMS INVENTION IS NOT NEW.  NOT

25     ALL INVENTIONS ARE PATENTABLE.  A UTILITY PATENT IS
```

1        INVALID IF THE CLAIMS INVENTION WOULD HAVE BEEN

2        OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE FIELD

3        AT THE TIME OF THE INVENTION.

4                WELL, HERE WE'VE GOT CLEAR EVIDENCE OF

5        INVALIDITY OF THIS BOUNCEBACK PATENT.

6                FOR EXAMPLE, THE TABLECLOTH FROM 2005 ON

7        THE DIAMONDTOUCH, THIS WAS NEVER PRESENTED TO THE

8        PATENT OFFICE.  THE PATENT OFFICE DIDN'T KNOW ABOUT

9        THIS WHEN IT ISSUED THIS PATENT.

10               WHEN YOU LOOK AT THIS EVIDENCE, I ASK YOU

11       TO ASK YOURSELF THE QUESTION, IF THE PATENT OFFICE

12       KNEW ABOUT THIS PRIOR ART, WOULD THEY HAVE LET THIS

13       PATENT ISSUE?

14               I THINK YOU'LL SEE THAT THE ANSWER IS NO.

15               CAN WE PLAY TABLECLOTH.

16               (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

17       OPEN COURT OFF THE RECORD.)

18               MR. VERHOEVEN:  WE'VE SEEN IT SEVERAL

19       TIMES.  AND LET'S GO TO THE NEXT SLIDE, PLEASE.

20               AND UNLIKE WHAT APPLE DID WITH ITS

21       INFRINGEMENT CLAIMS, WE CAREFULLY WENT THROUGH AND

22       SHOWED YOU THE ELEMENTS OF THE ASSERTED CLAIM WERE

23       MET BY THIS PRIOR ART.  WE SHOWED THAT IT WAS A

24       DEVICE -- IN FACT, COUNSEL FOR APPLE SHOWED YOU THE

25       DEVICE, THE COMPUTER AND THE PROJECTOR AND THE

4198

1    SCREEN.  IT HAD A TOUCHSCREEN DISPLAY AND PROCESSOR

2    AND MEMORY.

3         WE SHOWED YOU THE INSTRUCTIONS FOR

4    DISPLAYING A FIRST PORTION.  WE HIGHLIGHTED THAT.

5         WE SHOWED YOU THE INSTRUCTIONS FOR

6    TRANSLATING THE DOCUMENT INTO A SECOND PORTION, AND

7    WE HIGHLIGHTED IT.

8         WE SHOWED YOU THE INSTRUCTIONS FOR

9    DISPLAYING AN AREA BEYOND THE EDGE, AND WE SHOWED

10   YOU THE INSTRUCTIONS FOR TRANSLATING THE ELECTRONIC

11   DOCUMENT IN A SECOND DIRECTION.

12        IF THE PATENT HAD KNOWN ABOUT TABLECLOTH

13   RUNNING ON DIAMONDTOUCH, THEY WOULD NOT, THEY WOULD

14   NOT HAVE ALLOWED THIS PATENT TO ISSUE.

15        WE ALSO SHOWED -- CAN WE GO TO SLIDE 227?

16        WE ALSO SHOWED YOU ANOTHER PIECE OF PRIOR

17   ART, THE LAUNCHTILE FROM 2004, WHICH WAS RUNNING ON

18   THE H-P IPAD.  CAN WE PLAY THAT ONE?

19        (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20   OPEN COURT OFF THE RECORD.)

21        MR. VERHOEVEN:  AND DO YOU REMEMBER WE

22   CALLED LIVE WITNESSES WHO DEVELOPED THIS AND HE

23   TESTIFIED EXACTLY HOW THIS WORKED.  IF YOU WENT TOO

24   FAR, IT WOULD SNAP OVER TO THE OTHER SIDE.  BUT IF

25   YOU WENT WITHIN A CERTAIN PARAMETER, IT WOULD

1    BOUNCE BACK.  AND I DON'T HAVE TIME NOW, BUT WE DID

2    COMPARE THIS TO ALL THE TESTIMONY ELEMENTS OF THE

3    CLAIM AND SHOWED YOU THAT THIS ALSO RENDERED THE

4    PATENT INVALID.

5              AND AS YOU CAN SEE FROM THE EVIDENCE, THE

6    LAUNCHTILE PROGRAM WAS PRIOR ART, PRE-DATES THE

7    APPLICATION FOR THE '381 PATENT.

8              SOMEBODY ELSE DID IT BEFORE.  YOU CAN'T

9    GET A PATENT IF SOMEBODY ELSE DOES IT BEFORE.

10             THEN WITH RESPECT TO THE '915 PATENT,

11   THIS IS THE SCROLLING PATENT.  AGAIN, ALL THE --

12   YOU WERE SHOWN ONE PHONE, ANALYSIS OF ONE PHONE,

13   BUT THERE'S OVER 20 ASSERTED PHONES IN THIS CASE.

14             AND FOR THOSE OTHER PHONES, WHAT DID YOU

15   SEE?  JUST THIS.  JUST A DEMONSTRATIVE, ALL OF THEM

16   GOING AT THE SAME TIME AND YOU CAN'T EVEN WATCH

17   THEM ALL.  THAT WAS THE EXTENT OF THE EVIDENCE.

18             REMEMBER THE JUDGE'S INSTRUCTION.  FOR

19   EACH ACCUSED DEVICE EXAMINE FOR EACH CLAIM, THE

20   PLAINTIFF, APPLE, HAS TO PROVE TO YOU, IT'S THEIR

21   BURDEN, THAT EACH AND EVERY ELEMENT IS MET.

22             FLASHING A BUNCH OF PHONES ON A

23   DEMONSTRATIVE SCREEN, WHICH ISN'T EVEN EVIDENCE,

24   DOES NOT MEET THAT BURDEN.

25             IS THAT IMPORTANT?  YES, IT'S IMPORTANT.

```
 1              WHY?  WELL, LET'S SEE WHAT MR. SINGH,

 2    APPLE'S EXPERT SAID ABOUT IT.

 3              "THAT CONCEPT ALONE, SCROLL, THE '915

 4    INVENTORS DIDN'T INVENT SCROLLING.  THAT'S FAIR,

 5    ISN'T IT?

 6              "ANSWER:  THAT'S FAIR.

 7              "QUESTION:  THE INVENTORS OF THE '915

 8    PATENT, THEY DIDN'T INVENT A GESTURE, A SCALE, A

 9    ZOOM, OR DETECTING THOSE ON THE DEVICES WE'RE

10    TALKING ABOUT.  ISN'T THAT FAIR, SIR?

11              "ANSWER:  ABSOLUTELY NOT.  THE CONCEPT OF

12    SCALING GOES BACK TO THE ANCIENT GREEKS."

13              THAT'S ALL THEY SHOWED YOU.  THEY SHOWED

14    YOU SCROLLING AND GESTURING INSTEAD OF SHOWING YOU

15    EACH OF THOSE ELEMENTS AND WHETHER THOSE ELEMENTS

16    ARE INFRINGED.  BUT THAT'S NOT ENOUGH.  EVERY ONE

17    THEIR OWN EXPERT ADMITS THOSE BASIC FEATURES WERE

18    ALREADY THERE.

19              ON CROSS-EXAMINATION, WE DID -- WE

20    FOCUSSED ON THE CLAIM AND WE SHOWED YOU CLAIM 8D,

21    WHICH IS THE ELEMENT THAT'S REQUIRED FOR

22    INFRINGEMENT.  AND IN 8D, IT SAYS, DETERMINING

23    WHETHER THE EVENT OBJECT INVOKES A SCROLL OR

24    GESTURE OPERATION BY DISTINGUISHING BETWEEN, BY

25    DISTINGUISHING BETWEEN, SO YOU'RE DETERMINING
```

4201

```
 1    WHETHER IT'S A SCROLL OR IT'S A GESTURE, AND HOW DO
 2    YOU DO IT, BY DISTINGUISHING BETWEEN A SINGLE
 3    INPUT, ONE FINGER, APPLIED -- OOPS -- A SINGLE
 4    INPUT AND WHETHER IT'S TWO INPUTS, A GESTURE.
 5              AND WE ASKED MR. DEFRANCO, IF YOU
 6    REMEMBER HIM, ASKED MR. SINGH, "BUT AS YOU SAID,
 7    IT'S THE ALL-IMPORTANT TEST IN THE CLAIM AS TO
 8    WHETHER IT'S A ONE-FINGER SCROLL VERSUS A
 9    TWO-FINGER GESTURE.  THAT'S WHAT THIS INVENTION IS
10    ABOUT.  FAIR?
11              "ANSWER:  SURE."
12              AND WE SHOWED THAT ON THE ACCUSED
13    PRODUCTS, TWO FINGERS, YOU'RE SCROLLING.  THERE'S
14    NO DETERMINATION.  IT SCROLLS WITH TWO FINGERS.
15              LET'S GO BACK TO THE CLAIM.
16              THE CLAIM REQUIRES -- THIS IS HOW THEY
17    GOT AROUND THE PRIOR ART -- DETERMINING WHETHER
18    IT'S A SCROLL OR GESTURE BY DISTINGUISHING BETWEEN
19    ONE FINGER AND TWO FINGERS.
20              THE ACCUSED PHONES DON'T DO IT.
21              SO IN ADDITION TO THE COMPLETE ABSENCE OF
22    PROOF, THERE'S ALSO NO INFRINGEMENT.
23              YOUR HONOR, I'M BEING INFORMED I SHOULD
24    ASK FOR A BREAK BECAUSE I'M GOING LONG AND I NEED
25    TO ORGANIZE MYSELF.  IS THAT OKAY?  IT'S 3:00
```

```
 1    O'CLOCK, 4:00 O'CLOCK.

 2               THE COURT:  OKAY.  IT'S 4:00 -- I HAVE

 3    4:02.  OKAY.  YOU'VE BEEN GOING ONE HOUR AND 28

 4    MINUTES.

 5               ALL RIGHT.  WHY DON'T WE TAKE LIKE A

 6    TEN-MINUTE BREAK AND IF YOU NEED TO GET ANY WATER

 7    OR ANYTHING TO DRINK, OKAY?

 8               (WHEREUPON, A RECESS WAS TAKEN.)

 9               THE COURT:  WELCOME BACK.  PLEASE TAKE A

10    SEAT.

11               ALL RIGHT.  THE TIME IS NOW 4:14.  GO

12    AHEAD, PLEASE.

13               MR. VERHOEVEN:  MR. FISHER, CAN WE GO TO

14    SLIDE 159.  I'D LIKE TO TALK ABOUT SAMSUNG PATENT

15    ITSELF, AND I'LL TALK ABOUT THEM, AND THEN I'LL

16    TALK ABOUT APPLE'S CLAIMS FOR DAMAGES.  WHOOPS,

17    259.

18               FIRST I WANT TO START WITH SAMSUNG'S HIGH

19    SPEED DATA PATENTS.  YOU HEARD DR. WILLIAMS WAS OUR

20    WITNESS ON THE HIGH SPEED DATA PATENTS AND HE

21    EXPLAINED, IN GREAT DETAIL, WHY HIS OPINION APPLE

22    INFRINGES, AND I'LL START WITH THE '516 PATENT.

23               REMEMBER, HE WENT THROUGH THE 3GPP

24    STANDARD, THE INTEL, MR. PALTIAN'S TESTIMONY, INTEL

25    SPECIFICATION, AND SOURCE CODE.
```

```
 1              WHEN APPLE FIRST RELEASED ITS IPHONE, IT

 2    WAS ONLY 2G.  AFTER A COUPLE YEARS LATER, THE

 3    EVIDENCE SHOWS APPLE RELEASED ITS FIRST 3G PHONE.

 4    APPLE WAS SO PROUD OF THE FACT THAT IT WAS 3G, IT

 5    NAMED IT THE IPHONE 3G.

 6              DURING HIS OPENING, YOU HEARD MR. LEE SAY

 7    THAT APPLE'S PATENTS ARE OLD TECHNOLOGY THAT APPLE

 8    DOESN'T USE.

 9              THAT'S JUST NOT TRUE.  SAMSUNG'S PATENTS

10    ALLOW PHONES TO SURF THE INTERNET, ACCEPTED

11    PICTURES AND WATCH VIDEO.  THAT'S NOT OLD OR

12    OUTDATED.  IT'S CUTTING EDGE.  YOU HEARD THE

13    TESTIMONY FROM MR. PALTIAN.  HE TESTIFIED THAT HE

14    PROGRAMMED THE CHIPS TO COMPLY WITH 3GPP STANDARD.

15              DR. WILLIAMS WENT THROUGH THE STANDARD

16    AND EXPLAINED TO YOU HOW IT READ ON THE CLAIMS.

17              HE ALSO WENT INTO, WE'RE GOING TO PUT

18    THIS, IN THE INTEREST OF TIME, BECAUSE SOME OF THIS

19    IS CONFIDENTIAL, YOUR HONOR, AT LEAST FOR

20    DR. WILLIAMS, THE INTEL STUFF, WE'RE NOT GOING TO

21    PUT IT ON THE BIG SCREEN.

22              THE COURT:  THAT'S FINE.

23              MR. VERHOEVEN:  IT'S JUST ON THE SMALL

24    SCREEN, MEMBERS OF THE JURY .

25              DR. WILLIAMS ALSO SHOWED YOU HOW THE
```

1    CHIPS THAT WERE USED IN THE APPLE PHONES REDUCED

2    THE POWER OF THE ENHANCED DATA CHANNEL.  HE WENT

3    THROUGH IN GREAT DETAIL SHOWING YOU THE ACTUAL

4    SPECIFICATION, THE INPUTS AND THE GATE CONTROLS ON

5    THOSE CHIPS.

6            HE ALSO SHOWED YOU HOW THE CHIPS HAVE A

7    CONTROLLER, CHANNEL GENERATORS AND GAIN SCALE UNIT.

8            AND REMEMBER, HE EVEN WENT THROUGH AND

9    EXPLAINED THE SOURCE CODE AND THE FUNCTIONS IN THE

10   SOURCE CODE TO SHOW YOU HOW ALL OF THE ELEMENTS OF

11   THE PATENT ARE MET.

12           NOW, APPLE'S EXPERT WITNESS, DR. KIM,

13   CAME TO TESTIFY ABOUT IT AND REMEMBER ON

14   CROSS-EXAMINATION, I SAID, "YOU DIDN'T ADDRESS ANY

15   OF THE INTEL DOCUMENTS, DID YOU?

16           "ANSWER:  NO.

17           "QUESTION:  AND YOU DIDN'T ADDRESS THE

18   INTEL SOURCE CODE, DID YOU?

19           "ANSWER:  NO.

20           "QUESTION:  YOU DON'T DISPUTE THE

21   ACCURACY OF DR. WILLIAMS' DESCRIPTION OF HOW THOSE

22   DOCUMENTS SHOW THE OPERATION OF THE CHIP, DO YOU,

23   SIR?

24           "ANSWER:  HE SAYS I DON'T DISPUTE.

25   THAT'S THE EVIDENCE.

1           NOW, ON DIRECT, MR. KIM, WHEN MR. LEE WAS

2     CROSS-EXAMINING HIM, MADE THIS DISTINCTION YOU'RE

3     SEEING ON THIS PART, PDX 35.15, SUGGESTING ON THE

4     LEFT THAT THE '516 PATENT ONLY HAD TWO CHANNELS AND

5     THAT THE 3GPP STANDARD HAD MULTIPLE.

6           BUT ALL YOU NEED TO DO, MEMBERS OF THE

7     JURY, TO DISPENSE WITH THAT ARGUMENT IS LOOK AT THE

8     PATENT.  HERE IS FIGURE 6 ON THE LEFT, FIGURE 6 OF

9     THE '516 PATENT AND WE'VE PUT COLOR CODING ON THERE

10    AND YOU CAN SEE FOR YOUR VERY OWN EYES THAT THE

11    ILLUSTRATION OF THE SOLUTION OF THE '516 PATENT

12    ISN'T LIMITED TO TWO CHANNELS.

13          IT HAS MULTIPLE CHANNELS AND THE

14    DEPICTION ON THE RIGHT, WHICH IS JUST A

15    DEMONSTRATIVE CREATED BY LITIGATION COUNSEL, DOES

16    NOT ACCURATELY REFLECT THE SOLUTION SET FORTH IN

17    THE PATENT.

18          APPLE HAS MADE SOME INVALIDITY ARGUMENTS

19    WITH RESPECT TO THE PATENT AS WELL.

20          THEY'RE NOT EVEN ARGUING ANTICIPATION,

21    THAT THERE'S A SINGLE REFERENCE THAT ANTICIPATES.

22    THEY'RE ARGUING OBVIOUSNESS.  AND THEY CITE TO THIS

23    HATTA PREFERENCE.  BUT HATTA DOESN'T SHOW

24    OBVIOUSNESS, IT SHOWS THE OPPOSITE, AND WHAT YOU

25    CAN SEE IS WHAT'S GOING ON IN THE PRIOR ART IS THE

1    SAME THING THAT'S GOING ON IN FIGURE 5 OF THE PRIOR

2    ART, AND THAT'S THE PROBLEM.

3              THE PROBLEM WAS REDUCING THE POWER IN THE

4    VOICE CHANNEL AND YOU WOULD GET DROPPED CALLS.

5              THIS IS EXACTLY WHAT THE PRIOR ART

6    THEY'RE CITING FOR THE SOLUTION IS.  COMBINING A

7    PROBLEM WITH A PROBLEM DOESN'T GIVE YOU A SOLUTION.

8    THE INNOVATION IS NOT DISCLOSED.

9              MOVING TO THE '941, DR. WILLIAMS ALSO

10   SHOWED YOU HIS OPINIONS EXTENSIVELY WITH RESPECT TO

11   INFRINGEMENT BY APPLE'S PRODUCTS OF THE '941.  YOU

12   SAW THE 3G STANDARD, HIS ANALYSIS OF THAT.  HIS

13   ANALYSIS OF MR. ZORN'S TESTIMONY WHICH WE PLAYED

14   FOR YOU, THE INTEL DESIGN DESCRIPTION, THE SOURCE

15   CODE.

16             HE WALKED YOU THROUGH THE TECHNICAL

17   DOCUMENTATION.  AS WE CAN SEE HERE, YOU REMEMBER WE

18   HIGHLIGHTED THE TECHNICAL DOCUMENTATION AND HE

19   WALKED YOU THROUGH IT AGAINST THE CLAIMS ON THE

20   TRANSMIT SIDE.  HE WALKED YOU THROUGH THE CLAIMS ON

21   THE RECEIVE SIDE.  AND HE EVEN WENT INTO SOURCE

22   CODE AGAIN AND EXPLAINED TO YOU THE SOURCE CODE

23   FUNCTIONS THAT SHOWED EXACTLY HOW THIS OPERATED IN

24   ACCORDANCE WITH THE ELEMENTS OF THE CLAIMED

25   INNOVATION.

1          DR. EDWARD KNIGHTLY WAS APPLE'S EXPERT ON

2   THIS PATENT, AND HE ALSO DID NOT DISPUTE THE

3   ACCURACY OF DR. WILLIAMS' DESCRIPTIONS OF HOW THE

4   INTEL SPECIFICATIONS AND CHIPS WORKED.

5          THE ARGUMENT WAS MADE, WELL, WE'VE GOT

6   THE SINGLE SMILY FACE, AND DOUBLE SMILY FACE AND

7   SOMEHOW WHEN YOU USE THE DOUBLE SMILY FACE, YOU'RE

8   NOT INFRINGING.

9          BUT NO ONE PROVED TO YOU THAT APPLE NEVER

10  USES THE SINGLE SMILY FACE WHICH IS AN EXACT FIT.

11  AND YOU REMEMBER HE TESTIFIED THAT IF YOU INFRINGE

12  SOME OF THE TIME, YOU STILL INFRINGE.

13         WE ALSO PRESENTED EVIDENCE TO YOU FROM

14  DR. YANG FROM HARVARD, YOU REMEMBER HIM, HE CAME

15  AND TESTIFIED ABOUT SAMSUNG'S THREE FEATURE

16  PATENTS, THE CAMERA PHONE, THE BOOKMARKING AND THE

17  MUSIC BACKGROUND PATENT.

18         HE WALKED THROUGH AND EXPLAINED EACH OF

19  APPLE'S ACCUSED PRODUCTS AND HOW THEY MET EACH

20  LIMITATION.

21         I DON'T HAVE TIME TO GO THROUGH ALL OF

22  THAT WITH YOU, OTHERWISE THIS WOULD BE A MUCH

23  LONGER CLOSING SUMMATION.

24         BUT YOU'LL RECALL HIS TESTIMONY AND THE

25  EVIDENCE WE PRESENTED WITH DR. YANG AS WELL.

```
1              NOW, THE REMAINING TIME I HAVE I'D LIKE
2    TO ADDRESS THE ISSUE OF DAMAGES.
3              WE DON'T THINK THAT SAMSUNG SHOULD HAVE
4    TO PAY ANY DAMAGES.  WE DON'T THINK WE'RE LIABLE.
5              BUT WE HAVE TO ADDRESS THE ISSUE OF
6    DAMAGES BECAUSE THIS IS OUR ONLY CHANCE.  IF YOU
7    DISAGREE WITH US, WE NEED TO AT LEAST BE ABLE TO
8    EXPLAIN TO YOU WHY WE THINK THAT MR. MUSIKA'S
9    DAMAGES NUMBERS ARE RIDICULOUS.
10              SO PLEASE DO NOT, JUST BECAUSE I'M
11   TALKING ABOUT DAMAGES, IMPLY OR INFER THAT I IN ANY
12   WAY THINK DAMAGES ARE DUE.  I DON'T.
13              BUT YOU MIGHT DISAGREE, AND IF YOU DO,
14   YOU NEED TO HEAR WHAT I HAVE TO SAY ABOUT IT.
15              NOW, FIRST POINT.  DR. MUSIKA, 2.75
16   BILLION DOLLARS?  REALLY?  WHAT DOES IT TAKE TO GET
17   A DAMAGE EXPERT TO SAY YOU'RE ENTITLED TO $2.75
18   BILLION?
19              LET'S GO TO SLIDE -- I CAN'T EVEN READ
20   IT -- 396.  IT TAKES 1.1 MILLION -- $1,750,000.
21   THAT'S HOW MUCH HE WAS PAID, MEMBERS OF THE JURY,
22   FOR HIS OPINION.  $1 ,750,000.  AND WHAT DID HE DO
23   FOR THAT $1,750,000?  HE IGNORED COSTS.  HE
24   CALCULATED THE REVENUES, BUT HE IGNORED COSTS.
25              YOU NEVER DO THAT.  ANY ACCOUNTING 101,
```

1    IF YOU'RE TRYING TO CALCULATE PROFITS, YOU HAVE TO

2    TAKE OUT COSTS OF GOODS SOLD, YOU HAVE TO TAKE OUT

3    OPERATING EXPENSES, SALES EXPENSES, MARKETING, R&D,

4    GENERAL ADMINISTRATIVE.

5         BUT HE DIDN'T DO IT.

6         DO YOU REMEMBER DR., OR MR. WAGNER

7    TESTIFIED TO CRITIQUE MR. MUSIKA'S TESTIMONY.  HE

8    WAS ASKED, "LET ME ASK YOU, DID MR. MUSIKA, IN

9    MISCALCULATION, DEDUCT THESE EXPENSES, SALES,

10   MARKETING, R&D?

11        "ANSWER:  NOT ONE PENNY.

12        "QUESTION:  SO NOT A PENNY OF

13   ADVERTISING?

14        "ANSWER:  NO.

15        "QUESTION:  NOT A PENNY OF RESEARCH AND

16   DEVELOPMENT?

17        "ANSWER:  NO."

18        THAT'S NOT PROFITS.  THAT'S NOT EVEN

19   CLOSE TO PROFITS.  THAT'S NOT REASONABLE IN ANY

20   WAY.  IT'S A RIDICULOUS NUMBER.

21        IN FACT, APPLE'S PUBLIC FINANCIAL

22   STATEMENTS DEDUCT THESE COSTS, APPLE'S PUBLIC

23   FINANCIAL STATEMENTS DEDUCT THESE COSTS.  AND

24   SAMSUNG'S PUBLIC FINANCIAL STATEMENTS DEDUCT THESE

25   COSTS.

4210

1          THESE STATEMENTS ARE AUDITED BY OUTSIDE

2   AUDITORS TO MAKE SURE THEY'RE ACCURATE AND WHAT THE

3   COMPANY'S PROFITS REALLY ARE.

4          BUT MR. MUSIKA IGNORES THEM.

5          SO WHAT DO WE HAVE?  WELL, WE HAVE

6   APPLE'S AUDITED STATEMENTS, SAMSUNG'S AUDITED

7   STATEMENTS, MR. WAGNER'S CALCULATIONS, MR. MUSIKA'S

8   CALCULATIONS.

9          COST OF SALES, DO YOU DEDUCT THAT TO GET

10  PROFITS?  APPLE DOES.  SAMSUNG DOES, MR. WAGNER

11  DID.  MR. MUSIKA DIDN'T.

12         DO YOU DEDUCT ADVERTISING COSTS?  APPLE'S

13  AUDITED STATEMENTS DO.  SAMSUNG'S AUDITED

14  STATEMENTS DO.  MR. WAGNER DID.  MR. MUSIKA DIDN'T.

15         RESEARCH AND DEVELOPMENT COSTS.  APPLE

16  AUDITED STATEMENTS DEDUCTED THEM.  SAMSUNG'S

17  AUDITED STATEMENTS DEDUCTED THEM.  MR. WAGNER

18  DEDUCTED THEM.  MR. MUSIKA DID NOT.

19         DEDUCTING ALLOCATED OPERATING COSTS.

20  APPLE DOES IT.  SAMSUNG DOES IT IN THEIR AUDITED

21  STATEMENTS.  MR. WAGNER PROPERLY DID IT.

22  MR. MUSIKA DID NOT.

23         WE PUT THESE AUDITED PUBLIC FINANCIAL

24  STATEMENTS IN EVIDENCE, SO YOU CAN REVIEW THEM FOR

25  YOURSELF.  APPLE DEDUCTS THESE EXPENSES BEFORE IT

```
 1          PAYS TAXES AND SO DOES SAMSUNG.
 2                    THE ONLY ONE WHO IGNORED THESE BILLIONS,
 3          THESE ARE BILLIONS OF DOLLARS IN COSTS, DIRECTLY
 4          RELATED TO EXPENSES, IS MR. MUSIKA.  YOU'RE WRONG
 5          TO DO SO.
 6                    HERE YOU SEE, THIS IS MR. MUSIKA'S
 7          OPINION ON TOTAL PROFITS, 35.5 PERCENT, WHEN
 8          SAMSUNG'S AUDITED FINANCIAL STATEMENTS
 9          COMPANY-WIDE, 10 PERCENT.
10                    SAMSUNG AUDITED FINANCIAL STATEMENTS FROM
11          THE TELECOM, THE PHONE SEGMENT, 15 PERCENT.
12                    WHAT DID MR. WAGNER DO?  HE GOT 12
13          PERCENT.
14                    WHAT DID MR. MUSIKA DO?  35.5 PERCENT.
15          IT'S JUST NOT REASONABLE.  IT'S TOO HIGH.  IT CAN'T
16          BE RECONCILED WITH THE COMPANY'S FINANCIAL
17          STATEMENTS.
18                    YOU CAN LOOK AT THE EVIDENCE YOURSELF AND
19          SEE.
20                    MR. WAGNER'S -- BY THE WAY, YOU WERE
21          SHOWN A PRODUCT-BY-PRODUCT CALCULATION OF PROFITS
22          AND TOLD YOU SHOULD LOOK THERE FOR MR. MUSIKA'S
23          CALCULATION.
24                    WELL, WE SUGGEST YOU LOOK AT MR. WAGNER'S
25          CALCULATION BECAUSE HE'S THE ONE WHO ACTUALLY
```

4212

```
 1    DEDUCTED COSTS AND YOU CAN FIND THAT AT DX 781.

 2    THAT'S WHERE IT IS.

 3              NOW, MR. MUSIKA TALKED ABOUT BUT-FOR

 4    CAUSATION.  IN OTHER WORDS, HE'S SAYING, WELL, YOU

 5    SHOULD AWARD THESE GIANT AMOUNTS OF MONEY TO APPLE

 6    BECAUSE, ACCORDING TO HIM, PEOPLE ARE GOING TO DROP

 7    THEIR, GET RID OF THEIR SAMSUNG PHONE IF THEY CAN'T

 8    HAVE A LITTLE BOUNCEBACK FEATURE, EVEN THOUGH THEY

 9    CAN STILL PLAY MOVIES AND VIDEO GAMES, USE THE

10    INTERNET, IN FACT, HAVE FEATURES THAT AREN'T EVEN

11    AVAILABLE ON APPLE PHONES, LIKE FLASH MEMORY, LIKE

12    THE FACT THAT YOU CAN REMOVE THE BATTERY, WHICH YOU

13    CAN'T DO IN AN APPLE PHONE, HE'S SAYING, WELL, YOU

14    WOULDN'T STAY.  YOU'D MOVE TO APPLE BECAUSE, JUST

15    BECAUSE OF THE LITTLE BOUNCEBACK.

16              THAT'S NOT CREDIBLE.

17              AND THE EVIDENCE SHOWS IT'S NOT CREDIBLE.

18    LET'S TALK ABOUT THE DESIGN.  APPLE'S OWN SURVEYS

19    CONFIRM THAT DESIGN COLOR IS ONLY A SMALL

20    PERCENTAGE, 1 PERCENT OF THE REASON FOR PURCHASE.

21    YET MR. MUSIKA, HIS OPINION DEPENDS ON THE

22    ASSUMPTION THAT THERE'S 100 PERCENT OF THE PEOPLE

23    THAT WILL SWITCH OVER TO APPLE JUST BECAUSE OF THE

24    DESIGN.

25              IT'S NOT CREDIBLE.
```

1          THERE ARE PLENTY OF -- THERE ARE PLENTY

2    OF OTHER NON-INFRINGING PRODUCTS MADE BY SAMSUNG

3    AND OTHER COMPETING MANUFACTURERS IN THE

4    MARKETPLACE.

5          IF WE GO TO SLIDE 408, YOU CAN SEE FOR

6    YOURSELVES, IF SAMSUNG'S OUT, YOU CAN GET THE

7    MOTOROLA DROID, YOU CAN GET THE HTC EVO, LG

8    OPTIMUS, ALL KINDS OF DIFFERENT CHOICES.

9          MOST LIKELY, IF SOMEONE WAS GOING TO MAKE

10   A MOVE, IF THEY'VE ALREADY CHOSEN NOT TO GET AN

11   APPLE PHONE, THEY'LL PROBABLY GO TO ANOTHER ANDROID

12   PHONE.

13         SO THE NOTION THAT BUT-FOR THIS ALLEGED

14   INFRINGEMENT, 100 PERCENT OF THE PEOPLE USING

15   SAMSUNG PHONES WILL GO TO APPLE PHONES DOESN'T MAKE

16   ANY SENSE.  PEOPLE BUY PHONES TO PLAY GAMES, TO USE

17   THE CAMERAS, TO WATCH VIDEOS, TO SURF THE WEB.

18   THAT'S WHY PEOPLE BUY SMARTPHONES, NOT BECAUSE THEY

19   HAVE ROUNDED CORNERS, NOT BECAUSE THERE'S A

20   BOUNCEBACK FEATURE.

21         LOOK AT THIS SURVEY THAT MR. WAGNER PUT

22   IN.  THIS SURVEY SHOWS THE VAST SHORT OF ANDROID

23   BUYERS IN THIS COUNTRY, 75 PERCENT, WOULD NOT

24   EVERYONE CONSIDER BUYING AN IPHONE.

25         IN FACT, IN THE NEXT SLIDE, YOU'LL SEE

1    THAT THE BIGGEST REASON FOR BUYING ANDROID WAS

2    BECAUSE THEY WANTED TO STAY WITH A PARTICULAR

3    CARRIER.  IT HAS NOTHING TO DO WITH TRIVIAL LITTLE

4    U/I FEATURES LIKE BOUNCEBACK.

5              IN THE END, IF WE CAN GO TO SLIDE 419,

6    YOU NEED TO USE YOUR COMMON SENSE.  ALL RIGHT?

7    THIS IS WHAT APPLE IS SEEKING.  THIS IS WHAT

8    MR. MUSIKA, WHO WAS PAID $1.7 MILLION, SAYS SHOULD

9    BE THE DAMAGES.

10             LOOK AT, IN COMPARISON, THE CLAIMS THAT

11   APPLE SAYS ARE RIDICULOUS, APPLE SAYS THEY'RE

12   INCREDIBLY TOO HIGH, THE DAMAGES CLAIMS THAT

13   SAMSUNG IS MAKING.

14             WELL, IF 22 MILLION IS RIDICULOUS AND TOO

15   HIGH, WHAT'S 2.7 BILLION?

16             IF 290 MILLION FOR STANDARD ESSENTIAL,

17   CRITICAL, HARD CORE DATA, HIGH SPEED DATA

18   TRANSMISSION PATENTS IS RIDICULOUS, HOW ABOUT 2.7

19   BILLION FOR AN ICON DESIGN PATENT?  2.7 BILLION FOR

20   ICONS?  THAT'S WHAT THEY'RE ASKING YOU FOR.

21             MEMBERS OF THE JURY, YOU HEARD FROM

22   DR. O'BRIEN, WHO IS SAMSUNG'S DAMAGES EXPERT, AND

23   HE TOLD YOU WHAT HE THOUGHT THE DAMAGES SHOULD BE

24   FOR SAMSUNG FOR APPLE'S INFRINGEMENT.

25             FOR THE IPHONE, 13,872,430; IPAD 2 3G,

4215

```
1    5,058,083; IPAD TOUCH, 3,913,171.  THAT COMES TO A
2    TOTAL OF 22,84,684.
3              THOSE ARE REASONABLE NUMBERS.  APPLE'S
4    NUMBERS ARE NOT REASONABLE.
5              APPLE DIDN'T INVENT TOUCHSCREEN
6    TECHNOLOGY.  APPLE DIDN'T INVENT SQUARE SMARTPHONES
7    ARE ROUNDED CORNERS AND LARGE SCREENS.  THE
8    INTELLECTUAL PROPERTY APPLE IS ASSERTING IS NOT
9    WORTH THE MONEY THEY'RE ASKING FOR.  WE HOPE YOU
10   NEVER GET THERE, BUT IF YOU DO, WE'VE GOT TO USE
11   OUR COMMON SENSE.
12             I'LL RESERVE THE REST OF MY TIME, YOUR
13   HONOR.
14             THE COURT:  OKAY.  IT IS NOW 4:31.
15             GO AHEAD AND TAKE JUST A MINUTE TO STAND
16   UP IF YOU LIKE AND STRETCH WHILE WE GET SET UP
17   HERE.
18             (PAUSE IN PROCEEDINGS.)
19             THE COURT:  OKAY.  YOU READY?  ALL RIGHT.
20   PLEASE TAKE A SEAT.
21             APPLE, YOU HAVE 41 MINUTES LEFT.
22             MR. LEE:  31?
23             THE COURT:  41.
24             MR. LEE:  THANK YOU.
25             THE COURT:  IT'S 4:32.  GO AHEAD, PLEASE.
```

1          **(WHEREUPON, MR. LEE GAVE HIS REBUTTAL**

2     **CLOSING ARGUMENT ON BEHALF OF SAMSUNG.)**

3          MR. LEE:  GOOD AFTERNOON, LADIES AND

4     GENTLEMEN.  I GET YOU AT THE END OF A LONG DAY WHEN

5     YOU'VE HEARD AN AWFUL LOT, AND I REALIZE IT'S BEEN

6     THE END OF A LONG DAY AND WE'VE HEARD A LOT, SO I

7     WOULD ASK YOU TO HANG IN THERE WITH ME BECAUSE THIS

8     IS MY ONE CHANCE TO GET TO ADDRESS YOU.

9          AND I WANT TO START WHERE I DID IN OUR

10    OPENING, WHICH IS BY THANKING YOU FOR YOUR TIME AND

11    ATTENTION.  THIS HAS BEEN A LONG FOUR WEEKS.

12    THERE'S BEEN A LOT OF INFORMATION SENT YOUR WAY,

13    AND WE KNOW THAT YOUR JURY SERVICE HAS IMPOSED

14    SUBSTANTIAL BURDENS UPON YOU.  FOR ALL OF APPLE'S

15    LAWYERS, FOR APPLE, AND FOR ME PERSONALLY, I WANT

16    TO SAY THANK YOU.

17          NOW, I SAT THROUGH MR. VERHOEVEN'S

18    CLOSING AND I HEARD RIDICULOUS, SHELL GAME, MISLED,

19    MISREPRESENT.

20          THAT'S WHAT WE DID TO YOU OVER THE LAST

21    FOUR WEEKS.

22          I'VE BEEN DOING THIS FOR 37 YEARS, AND I

23    HEARD THAT MORE TODAY THAN I HAVE AT ANY OTHER

24    POINT IN MY CAREER.

25          THE BEST I CAN DO IS SAY THIS TO YOU.

1    YOU'VE BEEN WITH US FOR FOUR WEEKS.  YOU'VE GOT TO

2    SEE THE WITNESSES GET ON THE STAND.  YOU'VE GOT TO

3    HEAR OUR QUESTIONS.  YOU'VE GOT TO JUDGE THE

4    HISTORICAL DOCUMENTS, AS MR. MCELHINNY SAID, NOT

5    WHAT SOMEONE SAYS TODAY.

6           YOU MAKE YOUR OWN JUDGMENT AS TO WHO SHOT

7    FAIR AND SQUARE WITH YOU.  YOU HAVE TO MAKE YOUR

8    OWN JUDGMENT AS TO WHO SHOT STRAIGHT, AND WE'RE

9    PREPARED TO TRUST YOU.  THERE'S NO GROUP OF PEOPLE

10   IN THE WORLD WE'D RATHER HAVE DECIDE THAT ISSUE

11   THAN YOU.

12          NOW, AMONG TRIAL LAWYERS THERE'S AN OLD

13   SAYING.  IF YOU HAVE THE FACTS, POUND ON THE FACTS.

14   IF YOU HAVE THE LAW, POUND ON THE LAW.  IF YOU HAVE

15   NEITHER, ATTACK THE OTHER CLIENT, ATTACK THE

16   WITNESSES, AND ATTACK THE OTHER LAWYERS.

17          AND THAT'S WHAT SAMSUNG HAS DONE.

18          AND I'M GOING TO SAY THREE THINGS TO YOU

19   RIGHT AT THE OUTSET, THREE THINGS THAT I THOUGHT

20   WERE STARTLING FROM SAMSUNG'S CLOSING.

21          THE FIRST IS THIS IS ALL ABOUT

22   COMPETITION AND APPLE'S UNWILLINGNESS TO COMPETE IN

23   THE MARKET PLACE.  I'M GOING TO COME BACK TO THAT

24   BECAUSE NOTHING COULD BE FURTHER FROM THE TRUTH.

25   IT IS STARTLING THAT THEY WOULD SAY SO AND IT IS

1    WRONG.

2              NO ONE HAS TOLD SAMSUNG TO GET OUT OF THE

3    MARKETPLACE.  NO ONE IS TRYING TO STOP THEM FROM

4    SELLING SMARTPHONES.  ALL WE'RE SAYING IS MAKE YOUR

5    OWN.  MAKE YOUR OWN DESIGNS.  MAKE YOUR OWN PHONES.

6    COMPETE ON YOUR OWN INNOVATIONS.

7              THIS IDEA THAT THIS IS ALL ABOUT OUR

8    EFFORT TO STOP COMPETITION IN AMERICA IS INTENDED

9    TO FRIGHTEN THE FOLKS IN THE AUDIENCE AND TO

10   FRIGHTEN YOU, AND IT'S NOT TRUE.

11             MR. VERHOEVEN, IF YOU WERE TO BELIEVE

12   MR. VERHOEVEN, WE MIGHT AS WELL TAKE ALL OF THE

13   PATENT LAWS, ALL OF THE TRADE DRESS LAWS THAT HER

14   HONOR SPENT TWO AND A HALF HOURS INSTRUCTING YOU ON

15   THIS MORNING AND THROW THEM OUT THE WINDOW.

16             BUT WE CAN'T.  WE CAN'T BECAUSE OUR

17   CONSTITUTION SAYS WE'RE GOING TO HAVE THEM AND

18   WE'RE GOING TO HAVE THEM PROTECT YOU -- TO PROTECT

19   INVESTMENT AND INNOVATION AND INVENTION.

20             MR. VERHOEVEN CLICKED OFF A SERIES OF

21   INNOVATIONS AND SAID FORM FOLLOWS FUNCTION.  DO YOU

22   REMEMBER THAT?  I THINK I'VE GOT THE LIST RIGHT.

23   TELEVISIONS, MICROPROCESSORS, COMPUTERS, CELL

24   PHONES.  A LOT OF THAT WORK DONE RIGHT HERE IN THE

25   VALLEY.

```
 1              WELL, LADIES AND GENTLEMEN, EVERY SINGLE
 2    ONE OF THOSE INVENTIONS WAS PROTECTED BY A PATENT,
 3    MULTIPLE PATENTS.  WHY?  BECAUSE THE INVESTMENT OF
 4    THE PEOPLE WHO DID THE WORK NEEDED TO BE PROTECTED
 5    FOR SOME PERIOD OF TIME OR WE'RE NOT GOING TO HAVE
 6    ANY INVENTIONS AT ALL.
 7              EVERY SINGLE ONE OF THEM WAS PROTECTED.
 8    DID FORM FOLLOW FUNCTION?  YES.  AFTER THE PATENTS
 9    EXPIRED.
10              AND EVERY SINGLE ONE OF THOSE FOLKS WAS
11    PROTECTED FOR THE PERIOD OF THEIR PATENT BY OUR
12    CONSTITUTION AND OUR LAWS BECAUSE IF WE DON'T, WE
13    WON'T HAVE PEOPLE LIKE APPLE SPENDING FIVE YEARS IN
14    A ROOM COMING UP WITH A PHONE THAT REVOLUTIONIZED
15    THE MARKETPLACE.
16              NOW, THE SECOND STARTLING THING IS THIS:
17    HOW MANY TIMES DID YOU HEAR MR. VERHOEVEN TALK
18    ABOUT $2.7 BILLION.
19              WELL, HERE'S A NUMBER THAT THEY DON'T
20    WANT TO TALK ABOUT.  THEY COPIED OUR PRODUCTS AND
21    THEY MADE $8 BILLION.  WHAT THEY'RE SAYING TO YOU
22    IS WE WANT YOU TO LET US KEEP ALL $8 BILLION.  WE
23    DON'T WANT TO PAY A PENNY, NOT A PENNY, FOR THE
24    PRIVILEGE OF HAVING TAKEN YOUR INTELLECTUAL
25    PROPERTY .
```

4220

```
 1              THAT'S THE NUMBER, THE NUMBER FOR YOU TO
 2    FOCUS ON IS 8 BILLION.  AND THE QUESTION OF DO THEY
 3    GET A GET-OUT-OF-JAIL CARD FOR FREE?
 4              AND THE THIRD IS THIS, AND I'M GOING TO
 5    USE HIS DIAGRAM.
 6              MR. MCELHINNY TOLD YOU THAT IT'S VERY
 7    IMPORTANT TO DISTINGUISH BETWEEN HISTORICAL
 8    DOCUMENTS AND WHAT LAWYERS MADE -- LAWYERS MADE IT
 9    RIGHT-SIDE UP, OKAY.
10              MR. VERHOEVEN FOCUSSED YOU ON THESE
11    MOCKUPS.  TWO I THINK THIS IS.  THEY FORGOT TO TELL
12    YOU THAT MOST OF THESE PHONES ARE SLIDER PHONES, DO
13    YOU REMEMBER THE SLIDER PHONES WHERE YOU SLIDE THE
14    PHONE OUT AND THERE'S A LITTLE KEYBOARD?
15              WELL, YOU CAN'T SEE THAT.  WHY?  BECAUSE
16    THIS IS SOMETHING -- THIS IS NOT A HISTORICAL
17    DOCUMENT.  THIS IS SOMETHING THE LAWYERS MADE.
18              WHAT HAPPENS IF YOU LOOK AT THE
19    HISTORICAL DOCUMENTS?  IT'S WHAT MR. MCELHINNY TOOK
20    YOU THROUGH TODAY.
21              AND, LADIES AND GENTLEMEN, JUST ASK
22    YOURSELF THIS QUESTION:  IF SAMSUNG HAD ALL OF
23    THIS, AS THEY JUST TOLD YOU, WHY WAS THERE A CRISIS
24    IN DESIGN?  WHY WAS THERE A DIFFERENCE BETWEEN
25    HEAVEN AND EARTH?  WAS, IN 2010, DID THEY BRING
```

1   PEOPLE FROM THREE DIFFERENT PLANTS ALL OVER KOREA

2   AND IN THREE MONTHS, IN THREE MONTHS, COPIED

3   IPHONE?

4           THERE'S A REALLY FUNDAMENTAL FACTOR THAT

5   GETS LOST IN ALL THESE ACCUSATIONS ABOUT

6   MR. MCELHINNY AND I MISLEADING YOU, ABOUT

7   RIDICULOUS CLAIMS.

8           APPLE TOOK FIVE YEARS TO BRING THIS

9   REVOLUTION TO US.  SAMSUNG TOOK THREE MONTHS TO

10  COPY IT.

11          THAT'S TRUTH AND THAT'S SIMPLE, CLEAR,

12  AND NOT DISPUTED.

13          NOW, I'M GOING TO BRIEFLY ADDRESS FOR YOU

14  THE CLAIMS THAT SAMSUNG HAS BROUGHT AGAINST APPLE.

15  BY MY WATCH, THEY DEVOTED ABOUT FIVE MINUTES OF THE

16  CLOSINGS TO THOSE PATENTS.

17          BUT I'M GOING TO START BY REMINDING YOU

18  OF THE QUESTION THAT I POSED TO YOU IN OUR OPENING.

19  WHEN DID SAMSUNG FIRST ACCUSE APPLE OF INFRINGING

20  ITS PATENTS AND WHY THEN?

21          BECAUSE WE KNOW THAT SAMSUNG NEVER SAID A

22  WORD ABOUT THESE PATENTS UNTIL APPLE SAID "STOP

23  COPYING."

24          NOW, WHAT SAMSUNG SAID TO YOU IN ITS

25  OPENING IS "WE WERE BEING GOOD BUSINESS PARTNERS .

1    WE HAD THIS BIG RELATIONSHIP WITH APPLE.  WE DIDN'T

2    WANT TO UPSET THEM BY TELLING THEM THAT WE HAD

3    PATENTS."

4          LADIES AND GENTLEMEN, YOU NOW KNOW THAT

5    IS NOT TRUE.

6          WE BROUGHT MR. DENISON TO YOU.  DO YOU

7    REMEMBER THAT?  THIS IDEA THAT THEY BROUGHT HIM?  I

8    BROUGHT HIM TO YOU AND WE PUT HIM ON THE STAND

9    ADVERSELY.

10          MR. DENISON ACTUALLY SUGGESTED TO YOU

11    THAT APPLE NEEDED COMPONENTS BECAUSE IT NEEDED

12    SAMSUNG'S TECHNOLOGY, AND I'LL PUT THAT ON THE

13    SCREENS.

14          BUT WHEN HE WENT ON CROSS-EXAMINATION,

15    WHAT DID HE SAY?  HE TOLD YOU THE HONEST TRUTH.

16    ACTUALLY, IT WAS APPLE'S CONFIDENTIAL INFORMATION,

17    APPLE'S DESIGNS THAT GAVE IT TO SAMSUNG SO THEY

18    COULD MAKE COMPONENTS FOR APPLE.

19          WHEN MR. VERHOEVEN SAYS IT'S THIS LSI

20    SYSTEMS, IT'S A DIFFERENT PART OF SAMSUNG.  HE'S A

21    WONDERFUL LAWYER, BUT I DON'T GET IT.  IT'S PART OF

22    THE SAME COMPANY.

23          AND LET'S LOOK AT WHAT HAPPENED.

24          EXHIBIT 34 IS DATED SEPTEMBER 2007.  IT

25    IS FOUR MONTHS AFTER THE IPHONE HAS COME ON THE

```
 1    MARKET.  AND WHAT DOES IT SHOW?  IT SHOWS THAT
 2    SAMSUNG WAS EVALUATING HOW EASY IT WOULD BE TO COPY
 3    THE IPHONE.
 4              MR. MCELHINNY SHOWED YOU SOME PAGES.
 5    I'LL SHOW YOU ONE THAT MR. VERHOEVEN DIDN'T, PAGE
 6    37.
 7              "HW PORTION:  EASY IMITATION."
 8              NOW, MR. PRICE BROUGHT OUT THE FACT THAT
 9    HW MEANS HARDWARE.  IT DOES, THE HARDWARE THAT
10    THEY'RE MAKING FOR US.
11              AND WHAT ARE THEY TELLING FOLKS?  EASY TO
12    IMITATE.
13              WHAT REALLY HAPPENED HERE IS THIS:
14    SAMSUNG TRIED TO COMPETE WITH ITS OWN DESIGNS, THE
15    ONES THAT WERE ON THIS CHART, IN 2007, 2008, AND
16    2009.
17              IN 2010, IT KNEW IT COULDN'T ANY MORE AND
18    IT HAD A CRISIS IN DESIGN AND IT KNEW IT NEEDED TO
19    DO SOMETHING AND IT DID IT IN THREE MONTHS.
20              BUT IT ALSO KNEW THAT ALL THE BUSINESS
21    THAT APPLE WAS GIVING TO IT WAS CRITICALLY
22    IMPORTANT, AND IF THEY SAID ANYTHING TO APPLE ABOUT
23    ITS INTELLECTUAL PROPERTY, THEY'D HAVE A PROBLEM.
24              THEY WANTED TO FLY BELOW THE RADAR.  THEY
25    WANTED TO FLY BELOW THE RADAR SO THEY COULD AMBUSH
```

4224

```
 1    THEIR PARTNER WITH A KNOCK-OFF PHONE, AND THAT'S

 2    WHAT THEY DID.

 3              AND WHEN APPLE SAID STOP COPYING, WHICH

 4    IS WHAT ANY OF US WOULD HAVE DONE, WHAT DID THEY

 5    DO?  THEY DUSTED OFF THESE PATENTS.

 6              AND WE HAVE PROVEN TO YOU WHAT I SAID WE

 7    WOULD PROVE TO YOU IN OUR OPENING.  YOU NOW KNOW

 8    THAT THESE PATENTS DESCRIBE OLD TECHNOLOGY THAT

 9    APPLE DOESN'T USE.

10              YOU ACTUALLY NOW KNOW THAT THEY DESCRIBE

11    OLD TECHNOLOGY THAT SAMSUNG DOES NOT EVEN USE.

12              THINK ABOUT IT, LADIES AND GENTLEMEN, WE

13    SPENT TWO DAYS AT THE END THINKING ABOUT THESE

14    PATENTS.  THERE IS NO EVIDENCE THAT SAMSUNG USES

15    ANY OF THEM.

16              YOU NOW KNOW THAT NONE OF THE 13

17    INVENTORS WERE WILLING TO GET IN THAT CHAIR AND BE

18    CROSS-EXAMINED.

19              YOU NOW KNOW THAT FOR TWO OF THEM, THEY

20    BROKE THE ETSI RULES ON NONDISCLOSURE, THE VERY

21    ONES THAT HER HONOR INSTRUCTED YOU ON TODAY, AND

22    YOU NOW KNOW THAT THEY BROKE THE RULES

23    INTENTIONALLY.

24              IN FACT, YOU NOW KNOW THAT THEY BROKE

25    THEM BECAUSE TO PLAY BY THE RULES WOULD BE STUPID.
```

```
 1              THE ONLY THING THAT COULD BE MORE STUPID
 2    IS FOR APPLE TO STAND BY, WHEN SOMEONE HAS BROKEN
 3    THE RULES, TAKE AN $8 BILLION OF REVENUE AND SAY,
 4    "GO.  THAT'S FINE."
 5              THAT'S NOT THE WAY OUR SYSTEM WORKS.
 6              NOW, MR. VERHOEVEN DEVOTED APPROXIMATELY
 7    A MINUTE TO THE PATENTS THAT DR. YANG TESTIFIED
 8    ABOUT.
 9              DR. YANG WAS THE ONLY WITNESS YOU HEARD
10    FROM, YOU'LL RECALL.  HE HAD NOT EVER HEARD OF THE
11    PATENTS BEFORE THIS CASE.  HE HAD NEVER SPOKEN TO
12    THE INVENTORS.  HE HAD NEVER LOOKED AT ANY OF THEIR
13    DOCUMENTS, AND YOU'LL RECALL HE COULDN'T EVEN
14    IDENTIFY WHERE THE MODE BUTTON WAS WHEN WE ASKED
15    HIM ON CROSS-EXAMINATION.
16              NONE OF THE SIX INVENTORS CAME TO
17    TESTIFY, EVEN THOUGH THREE OF THEM CAME TO VISIT
18    THE COURTROOM WHILE THEY WERE IN SAN JOSE.
19              AND HERE'S WHY:  THEY'RE ASKING YOU TO
20    DECIDE THAT WE INFRINGE THE '460 PATENT.  YET
21    DR. -- MR. OH, THEIR OWN INVENTOR, HE DIDN'T KNOW
22    WHAT IT MEANS.  YET HE WANTS -- THEY WANT YOU TO
23    AWARD THEM MILLIONS OF DOLLARS OF DAMAGES.  NO
24    APPLE INVENTOR STOOD HERE AND TOLD YOU THAT HE
25    DIDN'T KNOW WHAT HE INVENTED.  BUT DR. OH DID, AND
```

4226

```
1    SO DID DR. PARK.
2              NOW, AS I SAID, THE BEST INDICATION THAT
3    THESE INVENTIONS ARE OLD IS THAT SAMSUNG DOESN'T
4    CLAIM TO USE THEM.
5              BUT AN EVEN BETTER INDICATION IS THIS,
6    LADIES AND GENTLEMEN:  WHEN SAMSUNG WANTED TO
7    DESIGN THESE FEATURES, CAMERA FEATURES, PHOTO
8    FEATURES, ATTACH E-MAILS INTO ITS CELL PHONES, DID
9    THEY CALL UP THE INVENTORS AND SAY, HEY, YOU'VE GOT
10   THIS GREAT PATENT, TELL ME HOW TO DO THIS?  DID
11   THEY GO BACK AT THE PATENTS?  NO.
12             INSTEAD, AS YOU KNOW FROM EXHIBIT 44,
13   WHAT THEY DID IS LOOKED AT THE IPHONE.
14             NOW, THIS IS NOT BENCHMARKING, LADIES AND
15   GENTLEMEN.  THE DOCUMENT MR. VERHOEVEN SHOWED YOU
16   IS AFTER SAMSUNG CAME TO MARKET, AFTER THEY HAD
17   COPIED THE IPHONE OR THE IPAD, AND AFTER WE WENT
18   AND LOOKED AT WHAT THEY HAD DONE TO COPY US.
19             THIS IS BEFORE THEY CAME TO MARKET.  THIS
20   IS 100 PAGES OF SIDE-BY-SIDE COMPARISON WHERE
21   THEY'RE SAYING WE'RE GOING TO COPY THE IPHONE.
22             BUT ONE THING WE KNOW THEY DIDN'T DO IS
23   ASK THE INVENTORS OF THEIR OWN PATENTS, CAN YOU
24   HELP US OUT HERE?  AND THE REASON IS THEY COULDN'T.
25             NOW, REALLY QUICKLY, BECAUSE SAMSUNG
```

1    HASN'T ADDRESSED IT, I'M GOING TO SHOW YOU WHY EACH

2    OF THESE PATENTS IS NOT INFRINGED SO YOU HAVE A

3    BASIS FOR YOUR DECISION.

4              ON THE '711 PATENT, I'M GOING TO PUT

5    CLAIM 9 ON THE SCREEN, IT REQUIRES AN APPLET.  YOU

6    MAY REMEMBER THAT THERE'S BEEN AN AWFUL LOT THAT'S

7    COME YOUR WAY, BUT IT REQUIRES AN APPLET.

8              HER HONOR HAS DEFINED WHAT AN APPLET

9    MEANS AND IT'S IN YOUR CLAIM CONSTRUCTION

10   MATERIALS.

11             IT'S AN APPLICATION DESIGNED TO RUN

12   WITHIN AN APPLICATION MODULE THAT NEED NOT BE

13   OPERATING SYSTEM INDEPENDENT.

14             THIS ONE IS PRETTY SIMPLE.  DR. YANG

15   COULD NEVER IDENTIFY THE SOFTWARE CODE.  JUST NOT.

16             DR. GIVARGIS, WHO SPENT DAYS REVIEWING

17   THE CODE, SAID IT'S NOT THERE.

18             THERE IS NO INFRINGEMENT BECAUSE THERE IS

19   NO APPLET.

20             DR. YANG COULDN'T IDENTIFY IT FOR YOU

21   BECAUSE IT'S NOT THERE, AND DR. GIVARGIS TOLD YOU

22   IT WASN'T.

23             NOW, REMEMBER WHAT MR. VERHOEVEN SAID

24   ABOUT THE IMPORTANCE OF CROSS-EXAMINATION.  I AGREE

25   WITH HIM.  THEY DIDN'T ASK DR. GIVARGIS A SINGLE

```
 1    QUESTION ON THE DEVICE.

 2              THE '893 PATENT IS OLD TECHNOLOGY THAT

 3    DEALS WITH MODES AND MODE SWITCHING.  THIS IS THE

 4    ONE WHERE DR. YANG COULDN'T QUITE REMEMBER WHERE

 5    THE MODE BUTTON IS.

 6              ALL YOU NEED TO KNOW ARE TWO THINGS:

 7    CLAIM 10, WHICH IS THE ONLY ASSERTED CLAIM, HAS

 8    MODES AND MODE SWITCHING ALL OVER IT.  I'VE

 9    HIGHLIGHTED IT FOR YOU ON THE SCREEN.

10              WHAT SAMSUNG SAYS INFRINGES IS OUR APPS.

11    OKAY?  NOT MODES.  THERE ARE -- THERE ARE AIRPLANE

12    MODES, THERE'S SILENT MODES ON THE IPHONE.  THAT'S

13    NOT WHAT THEY CLAIM IS INFRINGING.

14              THEY SAY IT'S APPS, NOT MODES.

15              WHAT DOES DR. YANG ADMIT ON

16    CROSS-EXAMINATION?  AND I'M SHOWING YOU HIS ACTUAL

17    TESTIMONY, JUST AS MR. VERHOEVEN ASKED ME TO DO,

18    "SO, YES, APPLICATION PROGRAMS AND MODES ARE

19    DIFFERENT."

20              INCIDENTALLY, YOU'VE HEARD ABOUT THE

21    DOCTRINE OF EQUIVALENTS THIS MORNING.  THERE'S NO

22    DOCTRINE OF EQUIVALENTS CLAIM ON ANY OF THESE

23    PATENTS EXCEPT ON THE ONE ISSUE.

24              PROFESSOR DOURISH, PROFESSOR SRIVASTAVA,

25    PROFESSOR GIVARGIS, EMILIE KIM ALL CAME HERE AND
```

1    TOLD YOU THAT MODES AND APPS ARE DIFFERENT.

2            YOU HAD THREE EXPERTS FROM US, ONE

3    ENGINEER, AND THEIR EXPERT SAY THEY'RE DIFFERENT.

4            THE SAME IS TRUE OF THE '460 PATENT.

5    THIS IS THE THREE CORE FUNCTION.  DO YOU REMEMBER

6    DR. YANG TALKING ABOUT THE THREE CORE FUNCTIONS?

7            BUT WHAT HE DIDN'T TELL YOU ON DIRECT WAS

8    THAT THE PATENT OFFICE HAD SAID THESE THREE CORE

9    FUNCTIONS HAD BEEN DONE BY OTHERS BEFORE, AND I'M

10   GOING TO PUT ON THE SCREEN THE CROSS-EXAMINATION

11   RIGHT NOW OF DR. YANG WHERE HE SAID, YEAH, THE

12   PATENT OFFICE SAID THOSE THREE CORE FUNCTIONS HAD

13   BEEN DONE BEFORE.

14           BUT MOST IMPORTANTLY, THIS IS ALL ABOUT

15   MODES AND APPS AGAIN.  THIS IS ALL ABOUT THE OLD

16   FM/AM MODE AND NOT ABOUT THE APPS.

17           HERE'S THE CLAIM.  IT IS REPLETE WITH

18   MODES AND SUB-MODES AND THE SWITCHING.

19           AGAIN, DR. SRIVASTAVA HAD TAKEN THE TIME,

20   18 HOURS, TO GO THROUGH THE SOURCE CODE.  EMILIE

21   KIM HAD HELPED DESIGN THE PRODUCT.  THEY TOLD YOU

22   THAT THERE WERE APPS, NOT MODES.

23           HOW DID DR. YANG RESPOND?  HONESTLY, WITH

24   A WATERFALL OF WORDS.  BUT WHEN YOU SORT THROUGH

25   THE WATERFALL OF WORDS, APPLICATION PROGRAMS AND

1    MODES ARE DIFFERENT.

2              NOW, WE ALSO PRESENTED YOU WITH THE PRIOR

3    ART THAT WOULD RENDER EACH OF THESE THREE PATENTS

4    INVALID.

5              IN THE INTERESTS OF TIME, I'M NOT GOING

6    TO GO THROUGH THEM NOW.  YOU HAVE THE PROOF BEFORE

7    YOU.

8              BUT I WANT TO POINT OUT ONE IMPORTANT

9    THING.  HER HONOR'S INSTRUCTION NUMBER 20 HAS

10   SOMETHING CALLED OTHER CONSIDERATIONS, AND I'D

11   ENCOURAGE YOU TO LOOK AT IT.  IT TALKS ABOUT REAL

12   WORLD FACTORS.  THIS IS THE PLACE WHERE THE LAW IS

13   NOT SO IMPRACTICAL THAT IT'S DIVORCED FROM WHAT WE

14   DO EVERY DAY.  THESE ARE THE REAL WORLD FACTORS

15   THAT SAY IS THERE REALLY AN INVENTION HERE?  IF

16   IT'S BEEN PRAISED BY OTHERS, IT'S PROBABLY AN

17   INVENTION.  IF IT'S BEEN COMMERCIALLY SUCCESSFUL,

18   IT'S PROBABLY AN INVENTION.  IF THERE ARE

19   UNEXPECTED SUPERIOR RESULTS, IT'S PROBABLY AN

20   INVENTION.

21             THE DIFFERENCE BETWEEN APPLE PATENTS,

22   WHICH SAMSUNG HAS TAKEN TWO HOURS TO BELITTLE

23   TODAY, AND THESE FIVE PATENTS THAT HAVE NEVER EVEN

24   RESULTED IN A SAMSUNG PRODUCT AS FAR AS WE KNOW, IS

25   THIS:  THE APPLE PRODUCTS THAT HAVE THESE PATENTS

1      ARE COMMERCIALLY SUCCESSFUL AND THEY'VE BEEN

2      PRAISED BY OTHERS AND THEY HAD UNEXPECTED RESULTS

3      AND THEY'VE BEEN COPIED BY THEM.

4              THE SAMSUNG PATENTS HAVE NOT BEEN PRAISED

5      BY ANYONE, THEY HAVEN'T BEEN USED BY ANYONE, THEY

6      HAVEN'T BEEN COMMERCIALLY SUCCESSFUL, AND THERE IS

7      NO UNEXPECTED RESULTS.

8              NOW, I WANT TO SAY JUST TWO LAST THINGS

9      ON THESE FEATURE PATENTS, AND I WILL MOVE QUICKLY

10     TO THE DECLARED ESSENTIAL PATENTS, AND THAT'S THIS:

11             FIRST, THERE'S MR. O'BRIEN, WHO CLAIMS

12     THEY'RE OWED $2.8 MILLION FOR THESE PATENTS.

13             BUT MR. WAGNER TESTIFIED RIGHT BEFORE

14     HIM, DO YOU REMEMBER MR. WAGNER, HE SAID FOR THE

15     APPLE PATENTS THAT INCLUDE THESE INVENTIONS,

16     APPLE'S INVENTIONS IN THE IPHONE AND THE IPAD, WE

17     SHOULD GET $27,000.  $27,000.  THEY PAID MORE TODAY

18     FOR THEIR LAWYERS THAN THEY'RE SAYING IT WOULD COST

19     TO DESIGN AROUND.

20             HOW CAN YOU TRUST THAT?

21             THE SECOND IS THEY SAY THAT WE'RE WILLFUL

22     INFRINGERS.  WE DIDN'T KNOW ABOUT THE PATENTS.  OUR

23     DESIGNERS DIDN'T KNOW ABOUT THE PATENTS.  THERE'S

24     NO EVIDENCE THAT WE COPIED, BUT WE'RE WILLFUL

25     INFRINGERS.

1        YOU SAW MR. MCELHINNY MARCH THROUGH ALL

2   OF THE COPYING DOCUMENTS TODAY AND THEY SAY THEY'RE

3   NOT.

4        DOES THAT MAKE SENSE?  WHO'S OFFERING YOU

5   THE CONTENTIONS THAT THEY MAKE NO SENSE?

6        SO LET'S GO TO THE DECLARED ESSENTIAL

7   PATENTS, WHICH I'M GOING TO DO NOW BECAUSE THESE

8   ARE IMPORTANT NOT BECAUSE THEY'RE IMPORTANT

9   PATENTS, THEY'RE IMPORTANT BECAUSE THEY ARE THE

10  BASIS FOR THE MISCONDUCT BY SAMSUNG BEFORE THE

11  STANDARD SETTING BODY, MISCONDUCT THAT THEY HAVE

12  BROUGHT NO EVIDENCE TO YOU, OTHER THAN ATTACKING

13  THE WITNESSES LIKE DR. WALKER, MR. DONALDSON.

14  THAT'S ALL THAT THEY HAVE DONE.

15        NOW, NONE OF THE INVENTORS CAME TO

16  TESTIFY.  I'LL PUT ON THE SCREEN, JUST TO REMIND

17  YOU HOW MANY THERE WERE.  THE ONLY TWO PEOPLE YOU

18  HEARD FROM WERE DR. WILLIAMS, WHO HAD NEVER HEARD

19  OF THE ALTERNATIVE E-BIT, AND WHO'S BEEN PAID A

20  MILLION DOLLARS A YEAR FOR THE LAST TWO YEARS TO

21  TESTIFY.  AND HE WAS TESTIFYING FOR SEVEN COMPANIES

22  AGAINST APPLE IN TEN DIFFERENT CASES.

23        NOW, I WANT YOU TO THINK ABOUT

24  DR. WILLIAMS MILLION DOLLARS ABOUT WHAT THEY JUST

25  SAID ABOUT MR. MUSIKA.  I'M GOING TO DEFEND

4233

1   MR. MUSIKA FOR A SECOND.  HIS 1.7 MILLION WAS TO

2   BUILD THE PROGRAM AND THE COMPUTER MODEL THAT

3   ALLOWED THEM TO PRODUCE THE DOCUMENT THAT'S IN YOUR

4   NOTEBOOK.  IT WASN'T ABOUT SITTING THERE FOR HOURS,

5   HIS HOURLY RATE LIKE DR. WILLIAMS.  SO IT'S OKAY IF

6   DR. WILLIAMS GETS PAID A MILLION DOLLARS, BUT NOT

7   OKAY TO GET PAID TO DEVELOP A MODEL.

8           NOW, I'M GOING TO SAY TWO THINGS TO YOU.

9   I'M NOT GOING TO GO THROUGH THE NON-INFRINGEMENT

10  DEFENSES BECAUSE THE NON-INFRINGEMENT SERVICES WE

11  THINK WERE CLEAR AND THERE WAS NO

12  CROSS-EXAMINATION.

13          YOU NOTICE THAT MR. VERHOEVEN TRIED TO

14  MAKE THE INFRINGEMENT CASE JUST NOW ON THE '516

15  PATENT.  DID HE COMPARE THE CLAIM TO WHAT WAS

16  HAPPENING?  OR DID HE TRY TO COMPARE A DRAWING TO

17  WHAT WAS HAPPENING?  DO YOU REMEMBER THAT?  HE'S

18  COMPARING A DRAWING, NOT THE CLAIM.

19          HER HONOR TOLD YOU TODAY THAT YOU CAN'T

20  DO THAT.

21          FOR THE REASON THAT IS DR. KIM AND

22  DR. KNIGHTLY TESTIFIED, WITH VIRTUALLY NO

23  CROSS-EXAMINATION, THERE IS NO INFRINGEMENT.

24          BUT THERE ARE TWO BIGGER PROBLEMS TO

25  THESE PATENTS, AND I THINK THESE TWO PROBLEMS ARE

```
 1    GOING TO SHOW YOU, THEY'RE GOING TO HELP BE THE TIE
 2    BREAKER ON THE ISSUE OF WHO ARE YOU GOING TO TRUST.
 3              THE FIRST IS PATENT EXHAUSTION.  NOW,
 4    PATENT EXHAUSTION YOU PROBABLY THINK IS WHAT YOU
 5    HAVE AFTER FOUR WEEKS, RIGHT?  THIS IS A DIFFERENT
 6    CONCEPT.  THIS CONCEPT IS YOU CAN'T GIVE A LICENSE
 7    TO SOMEONE TO SELL AND THEN GO SUE THEIR CUSTOMER.
 8              THAT'S JUST NOT RIGHT.  YOU CAN'T TELL
 9    SOMEONE, INTEL, YOU CAN GO AHEAD AND SELL TO APPLE,
10    YOU'RE AUTHORIZED TO DO IT, BUT THEN APPLE, WE'RE
11    GOING TO SUE YOU.
12              PATENT EXHAUSTION SAYS YOU CAN'T DO THAT.
13              NOW, WHEN YOU HEARD MR. WILLIAMS'
14    TESTIMONY, YOU MIGHT HAVE THOUGHT, THIS IS ALL
15    ABOUT INTEL.  WHY ISN'T INTEL A DEFENDANT?  WHY IS
16    APPLE THE DEFENDANT?  THIS IS ALL ABOUT A CHIP
17    INTEL DESIGNED, INTEL HAD MADE, AND INTEL SOLD TO
18    APPLE.
19              THERE'S A SIMPLE REASON.  INTEL HAS A
20    LICENSE.
21              AND AS HER HONOR HAS EXPLAINED TO YOU,
22    THERE'S ONLY THREE THINGS THAT YOU NEED TO FIND TO
23    KILL THESE PATENTS FOREVER.  THE FIRST IS THAT
24    INTEL WAS AUTHORIZED TO SELL BASEBAND CHIPS TO
25    APPLE.  YOU HAVE BEFORE YOU THE LICENSE AGREEMENT,
```

1    AND DR. -- MR. DONALDSON TOLD YOU, IT'S PX 65 -- PX

2    81 -- THAT THERE'S A LICENSE.

3              WHAT'S THE SECOND THING?  APPLE HAS TO

4    PROVE THAT THERE WAS A SALE IN THE UNITED STATES.

5              WELL, YOU KNOW, INTEL IS DOWN THE ROAD,

6    RIGHT?  APPLE IS DOWN THE ROAD.  MR. BLEVINS CAME

7    HERE AND SHOWED YOU THE INVOICE.  ISSUED OUT OF

8    CALIFORNIA.  PAYMENT TO CHICAGO.

9              AND YET SAMSUNG WANTS YOU TO THINK THIS

10   IS NOT A UNITED STATES TRANSACTION.

11             THE THIRD THING WE HAVE TO PROVE IS THAT

12   THE ACCUSED PRODUCTS INFRINGE BECAUSE THEY INCLUDE

13   THE CHIP.  WELL, IF DR. WILLIAMS IS CORRECT, THEN

14   THIS IS SATISFIED AND THE PATENT'S EXHAUSTED.

15             THIS IS NOT JUST A TECHNICAL DEFENSE.

16   THIS ALSO IS PART OF OUR PATENT LAWS.  IT'S A PART

17   OF OUR PATENT LAW THAT IS SAYS IF YOU HAVE AN

18   INVENTION THAT'S PROTECTED, THERE ARE LIMITS TO THE

19   PROTECTION AND YOU CANNOT GO OUT AND TRY TO DOUBLE

20   DIP.  AND THAT'S WHAT THESE FOLKS ARE DOING.

21   THEY'RE TRYING TO DOUBLE DIP TO THE TUNE OF $399

22   MILLION.

23             NOW, THERE ARE A LOT OF THINGS IN LIFE

24   THAT CAN BE RIDICULOUS.  I THINK THAT'S ONE OF

25   THEM.

```
 1                    NOW LET ME TALK ABOUT THE REAL HEART, AND

 2      I THINK THE REAL TIE BREAKER IN THIS CASE, BECAUSE

 3      YOU'RE GOING TO HAVE TO DECIDE WHO LIVES BY THE

 4      RULES IN THIS CASE AND WHO HASN'T LIVED BY THE

 5      RULES AND THE FOLKS THAT HAVEN'T LIVED BY THE RULES

 6      ARE SAMSUNG.

 7                    SAMSUNG HAS NOT LIVED BY THE ETSI RULES,

 8      AND THERE'S NO DISPUTE.

 9                    LET ME SHOW YOU THE DISCLOSURE TIMELINE

10      FOR THE '941 PATENT.

11                    LADIES AND GENTLEMEN, THIS IS WHAT

12      DR. WALKER TESTIFIED ABOUT.  THE PATTERN WAS

13      SIMPLE.  FILE A PATENT APPLICATION, SUBMIT A

14      PROPOSAL, GET IT ADOPTED, AND DON'T DISCLOSE FOR

15      YEARS.

16                    NOW, MR. VERHOEVEN MAY GET UP AND SHOW

17      YOU ANOTHER SLIDE WHERE HE STICKS IN THE U.S.

18      APPLICATION DATE.  THAT'S COMPLETELY IRRELEVANT.

19      THE QUESTION IS, DID -- SINCE THEY'RE A EUROPEAN

20      ORGANIZATION, WORLDWIDE, DID THEY HAVE IT?  DID

21      THEY NOT DISCLOSE IT?

22                    THE ANSWER IS DR. WALKER TOLD YOU YES.

23                    AND HE TOLD YOU -- IF WE CAN GO TO THE

24      NEXT SLIDE -- THAT FOR THE '516, THEY DID IT AGAIN

25      .
```

1           NOW, LADIES AND GENTLEMEN, HERE'S WHAT

2    THEY WERE DOING.  THEY HAD ENGINEERS WHO NEVER

3    DESIGNED A PRODUCT, ENGINEERS WHOSE SOLE JOB WAS TO

4    GO TO THE STANDARDS MEETING, ENGINEERS WHOSE SOLE

5    JOB WAS TO WORK WITH PATENT LAWYERS AT THOSE

6    MEETINGS TO TRY TO GET, TO TRY THEIR BEST TO GET

7    PATENTS ON THE STANDARDS.  THEY WERE EVEN REWARDED

8    FOR GETTING PATENTS IN THE STANDARDS.

9           DR. TEECE, THEIR ONLY WITNESS ON THIS

10   ISSUE, COULD NOT DISPUTE THESE TIMELINES AND YOU

11   HEARD HIS TESTIMONY.

12          THIS, LADIES AND GENTLEMEN, WAS A BREACH

13   OF SECTION 4.1 OF ETSI'S RULES.

14          THOSE RULES REQUIRE YOU, IF YOU'RE MAKING

15   A PROPOSAL, TO DISCLOSE ANY PATENTS OR PATENT

16   APPLICATIONS THAT YOU HAVE.  IT REQUIRES IT SO THAT

17   THERE WILL BE NO HOLD-UP.

18          BUT THE REALLY CRITICAL POINT NOW, WHICH

19   WILL HELP YOU JUDGE THE COMPANIES, APPLE AND

20   SAMSUNG, IS THIS WAS NOT A COINCIDENCE.  I'VE TOLD

21   YOU HOW THEY GOT THE ENGINEERS THERE.  I TOLD YOU

22   WHO THE ENGINEERS WERE AND I TOLD YOU HOW THEY GOT

23   THE PATENTS.

24          BUT THE NONDISCLOSURE, THE UNDISPUTED

25   NONDISCLOSURE WAS A CORPORATE STRATEGY BECAUSE, TO

```
 1    QUOTE MR. JUNWON LEE, TO DISCLOSE WOULD HAVE BEEN

 2    STUPID.  STUPID, LADIES AND GENTLEMEN.  STUPID TO

 3    PLAY BY THE RULES.

 4              THIS IS NOT A -- THIS IS ONE OF THE

 5    HIGHEST RANKING EXECUTIVES AT SAMSUNG.  HE ISN'T

 6    OUT THERE SITTING OUT ON HIS OWN.  YOU JUDGE WHAT

 7    IT SAYS ABOUT THE CORPORATE CULTURE AT THE COMPANY.

 8              NOW, WHAT DOES SAMSUNG SAY TO YOU?  WELL,

 9    IT SAYS, THESE WERE ALL CONFIDENTIAL.  BUT IT'S

10    DR. WALKER WHO EXPLAINED NOTHING IS CONFIDENTIAL

11    UNLESS YOU REQUEST CONFIDENCE AND SAMSUNG DIDN'T.

12              BUT THE MOST UNBELIEVABLE THING THEY SAID

13    TO YOU IS THIS, THEY RECALLED DR. TEECE, AND

14    DR. TEECE PUT ON THE SCREEN SDX 5004.001, DO YOU

15    REMEMBER THAT, AND HE SAID, OH, THIS SHOWS

16    EVERYBODY DELAYS.

17              DR. TEECE HAS NEVER BEEN TO AN ETSI

18    MEETING, NEVER PARTICIPATED IN A WORKING GROUP AND

19    HAD NO INVOLVEMENT AT ETSI.

20              HE FORGOT TO TELL YOU THAT UNTIL CROSS.

21              HERE'S THE OTHER THING HE FORGOT TO TELL

22    YOU.  HE HAS NO IDEA WHEN THESE PATENTS WERE FILED

23    OR ISSUED.  THIS CHART INCLUDES PATENTS THAT WERE

24    FILED AFTER THE PROPOSAL WAS FIXED.  THIS INCLUDES

25    PATENTS THAT WERE ACQUIRED AFTER THE STANDARD WAS
```

1   FIXED.  NO ONE COULD DISCLOSE THEM BECAUSE THEY

2   DIDN'T EXIST.

3            YET HE WANTS YOU TO BELIEVE THAT THIS IS

4   AN EXCUSE.

5            I CALL THIS TESTIMONY THE "EVERYBODY ELSE

6   IS BAD" EXCUSE.  IT'S LIKE WHEN YOUR KID COMES HOME

7   AND SAYS I DIDN'T DO MY HOMEWORK, BUT NOBODY ELSE

8   IS DOING IT.

9            EVERYBODY ELSE ISN'T BAD.  EVERYBODY ELSE

10  ISN'T BREAKING THE RULES.

11           AND THEY BROKE THE RULE A SECOND TIME.

12  THEY SAID THAT WHEN THEIR PATENTS BECAME PUBLIC,

13  THEY WOULD LICENSE THE WORLD, ALL OF YOU, ALL OF

14  US, ON FRAND TERMS, FAIR, REASONABLE, AND

15  NON-DISCRIMINATORY TERMS.  THEY PROMISED THAT.

16           THAT WAS THEIR COMPLIANCE WITH RULE 6.1

17  OF ETSI.

18           BUT THEY DIDN'T.  THEY MADE A DEMAND TO

19  APPLE OF 2.4 PERCENT OF APPLE'S ENTIRE SELLING

20  PRICE, BUT ONLY AFTER THEY GOT CAUGHT COPYING.

21           IT WASN'T FAIR BECAUSE IT'S BASED UPON

22  THE ENTIRE SELLING PRICE.  IT WASN'T

23  NON-DISCRIMINATORY BECAUSE THEY HAD NEVER GOTTEN IT

24  FROM ANYBODY ELSE, AND IT WASN'T REASONABLE BECAUSE

25  SAMSUNG HAS NEVER BEEN PAID A PENNY, NOT ONE RED

1    CENT VERTICALLY, FOR ANY OF ITS DECLARED ESSENTIAL

2    PATENTS.

3              THESE BREACHES OF THE RULES HAVE REAL

4    LIFE CONSEQUENCES.  THEY MAKE -- IT'S A BREACH OF

5    CONTRACT BY SAMSUNG.  IT IS ALSO, AS PROFESSOR

6    ORDOVER TOLD YOU, A VIOLATION OF OUR ANTITRUST

7    LAWS.

8              NOW, WE'RE NOT ASKING FOR A LOT FROM YOU

9    ON THE ANTITRUST CLAIM.  ALL WE'RE ASKING FOR IS

10   $350,000, WHICH IS WHAT WE HAD TO PAY PROFESSOR KIM

11   AND DR. KNIGHTLY TO DEFEND AGAINST THE ANTITRUST

12   CLAIMS.

13             BUT, LADIES AND GENTLEMEN, IT DOESN'T

14   MAKE THE PRINCIPLE ANY LESS IMPORTANT.  YOU CAN'T

15   COME IN AND WALK OVER OUR ANTITRUST LAWS.  YOU

16   CAN'T COME IN AND INTENTIONALLY LIE TO A STANDARD

17   SETTING BODY AND THEN JUST GET A GET-OUT-OF-JAIL

18   FREE CARD.

19             NOW, WHAT IS SAMSUNG'S RESPONSE TO ALL

20   THIS?  MR. MCELHINNY AND I ARE GOING TO ADDRESS

21   THAT NOW.  I'M GOING TO ADDRESS THE FIRST PART TO

22   GO BACK TO THIS COMPETITION.

23             THEIR RESPONSE OVER AND OVER AGAIN IS

24   IT'S ALL ABOUT COMPETITION.  APPLE IS TRYING TO

25   MONOPOLIZE THE MARKET.  APPLE IS CLAIMING TO OWN

1    THE COLOR GREEN.  APPLE IS CLAIMING TO OWN THE

2    DEPICTION OF A MA BELL PHONE.  APPLE DOESN'T WANT

3    TO COMPETE.

4         MAKE NO MISTAKE ABOUT IT.  APPLE WANTS TO

5    COMPETE.  DO YOU THINK THAT TWO GUYS WITH AN IDEA

6    STARTED A COMPANY THAT GREW INTO APPLE TODAY

7    BECAUSE THEY DIDN'T WANT TO COMPETE?  APPLE WANTS

8    TO COMPETE FAIRLY AND SQUARELY WITH INNOVATIONS AND

9    INVENTIONS AND PRODUCTS.

10        AND THAT'S WHAT THEY HAVE DONE.  WE ASKED

11   MR. DENISON, YOU'LL RECALL, IF THERE WAS A

12   DIFFERENCE BETWEEN FAIR AND SQUARE COMPETITION AND

13   UNFAIR COMPETITION.  AND THERE IS.  AND THAT'S WHAT

14   I WANT YOU TO KEEP IN MIND WHEN YOU'RE SITTING BACK

15   IN THE JURY ROOM, WHAT'S THE DIFFERENCE BETWEEN

16   FAIR AND SQUARE COMPETITION AND UNFAIR COMPETITION?

17        TAKING SOMEONE ELSE'S INTELLECTUAL

18   PROPERTY IS NOT FAIR AND SQUARE.  HAVING THREE

19   MONTHS OF EXTENDED EFFORT TO COPY SOMEONE ELSE'S

20   PRODUCT IS THE NO FAIR AND SQUARE.

21        INTENTIONALLY CONCEALING PATENTS IS NOT

22   FAIR AND SQUARE.

23        ONE OF THE MARVELOUS PARTS OF OUR SYSTEM,

24   IT'S A 300 YEAR OLD SYSTEM, IS IT BRINGS 9 FOLKS

25   LIKE YOU TOGETHER WHO CAN BRING YOUR COLLECTIVE

```
 1    WISDOM AND JUDGMENT TO BEAR ON THE ISSUES BEFORE
 2    YOU.
 3              AND AS YOU CONSIDER THOSE ISSUES, I'M
 4    GOING TO ASK YOU ONE LAST THING.  USE THAT COMMON
 5    SENSE.  WE ALL KNOW THAT WHEN SOMEONE IS CAUGHT
 6    DOING SOMETHING THEY SHOULDN'T, SOME PEOPLE REACT
 7    BY SAYING, TOSSING ACCUSATIONS AT OTHERS, BLAMING
 8    OTHERS.  THAT'S WHAT'S HAPPENED HERE.
 9              SAMSUNG'S RESPONSE TO THE REVELATION OF
10    ITS THREE MONTH COPYING EFFORT IS THIS:
11    MR. DENISON, WE DIDN'T COPY.  WE KNOW THAT'S NOT
12    TRUE.
13              WELL, IF WE DID COPY, YOU DON'T HAVE ANY
14    INVENTIONS.  THE RULE HAS TOLD US THAT'S NOT TRUE.
15              BUT IF YOU DO HAVE INVENTIONS, YOU COPIED
16    OURS, AND WE KNOW THAT'S NOT TRUE.
17              SO THE LAST THING I'LL ASK YOU IS THIS --
18    AND I'M GOING TO GIVE THE FLOOR FOR THE LAST FEW
19    MINUTES TO MR. MCELHINNY -- USE YOUR COMMON SENSE.
20              COMPETITION AND INNOVATION HAS BEEN
21    ACCOMPLISHED IN THIS FIELD NOT BY LAWYERS TOSSING
22    ACCUSATIONS, BUT BY REAL SCIENTISTS AND INNOVATORS.
23    DON'T LET SOMEONE GET A GET-OUT-OF-JAIL FREE CARD .
24    DON'T LET SOMEONE TAKE $8 BILLION FROM US BECAUSE
25    THEY'RE ACCUSING US OF MISLEADING YOU.
```

1          AND WITH THAT, I'M GOING TO TURN IT BACK

2     OVER TO MR. MCELHINNY FOR WHATEVER TIME WE HAVE

3     LEFT.

4          THE COURT:  YOU'VE GOT SIX MINUTES.

5          MR. MCELHINNY:  OH, MY GOD, I'M BACK.

6     THREE QUICK POINTS.  ONE, THE JURY INSTRUCTIONS ON

7     TRADE DRESS AND DESIGN POINTS TELL YOU QUITE

8     CLEARLY IT'S ALL ABOUT OVERALL IMPRESSION.  IT'S

9     NOT INDIVIDUAL ICONS, IT'S NOT THIS PIECE, IT'S

10    NOT -- IT'S WHAT THE OVERALL PART LOOKS LIKE.

11         TWO, THIS MODEL, THE 035 MODEL, THE JUDGE

12    WILL GIVE YOU A LIST OF ALL OF THE EXHIBITS THAT

13    ARE IN EVIDENCE WITH THE LIMITING INSTRUCTION AND

14    THIS MODEL IS EXHIBITS DX 740 AND DX 741.  AND NEXT

15    TO THAT YOU WILL READ THE JUDGE'S INSTRUCTION, DO

16    NOT CONSIDER FOR NON-INFRINGEMENT OR INVALIDITY.

17         WHY WAS THE HONEST LAWYER FROM SAMSUNG

18    WAVING THIS AROUND AT YOU WHEN HE KNEW THAT WAS THE

19    JUDGE'S INSTRUCTION?

20         3.  I CAN'T HELP IT.  I AM AN ABSOLUTE

21    SLAVE TO CHRONOLOGY.  CAN I HAVE DX 900 UP, PLEASE?

22         THEY BROUGHT THIS DOCUMENT.  THEY DIDN'T

23    BRING THE CAD DRAWING WHICH WOULD SHOW US WHAT IT

24    ACTUALLY LOOKED LIKE.  THEY BROUGHT THIS DOCUMENT.

25    YOU CAN'T TELL FROM THIS DOCUMENT WHETHER OR NOT

4244

```
1    IT'S AN ALL FLAT GLASS FACE OR WHETHER IT'S A

2    PICTURE FRAME LIKE EVERYBODY ELSE WAS MAKING AT

3    THIS TIME.

4            WHAT YOU CAN TELL IS THAT IT WAS NARROW

5    ON THE TOP AND IT WAS BROAD ON THE BOTTOM, AND WHEN

6    YOU LOOK, YOU CAN SEE THE WHITE BASE ALL THE WAY

7    AROUND IT BECAUSE THE FACE WAS SMALLER THAN THE

8    BACK.  THAT WAS THE DESIGN THEY WERE WORKING ON.

9            THEN, AS THEY SAID, THEY CAME OUT WITH

10   THE SEVEN.  GOOGLE SAID EVEN THIS, WE DON'T EVEN

11   ACCUSE THIS BECAUSE WE'VE BEEN SO CAREFUL, BUT

12   GOOGLE SAID, THIS LOOKS TOO MUCH LIKE APPLE.

13           SO WHAT DID THEY DO?  THEY CAME OUT WITH

14   THE 10.1 WHICH WE DID ACCUSE BECAUSE IT IS AN

15   IDENTICAL CLONE.  THAT IS WHAT THE CHRONOLOGY TELLS

16   YOU ABOUT WHAT SAMSUNG HAS BEEN DOING IN THIS CASE.

17           IF YOU RENDER JUDGMENT FOR APPLE IN THIS

18   CASE, YOU WILL HAVE REAFFIRMED THE AMERICAN PATENT

19   SYSTEM.  PEOPLE IN THIS VALLEY WILL CONTINUE TO

20   INVEST.  THEY WILL MAKE INVESTMENTS.  THEY WILL

21   HIRE PEOPLE.  THEY WILL TAKE CHANCES BECAUSE THEY

22   KNOW THAT THOSE INVESTMENTS WILL BE PROTECTED.

23           IF YOU AWARD US THE DAMAGES WE'RE

24   SEEKING, YOU WILL HAVE UPENDED SAMSUNG'S CYNICAL

25   GAME PLAYING, THE WAY THAT YOU SEND PEOPLE TO
```

```
 1    PATENT THE DISCLOSURES THAT PEOPLE ARE MAKING AT

 2    STANDARDS BODIES, THE WAY THAT YOU COPY OTHER

 3    PEOPLE'S STUFF, YOU WILL HAVE TAKEN THE PROFIT AWAY

 4    FROM THAT AND YOU WILL HAVE TAUGHT SAMSUNG AND

 5    EVERYONE ELSE WHO IS ATTEMPTING TO GO DOWN THAT

 6    ROAD THAT THAT IS NOT THE WAY THAT WE SHOULD BE

 7    DOING COMPETITION.

 8         YOU WILL -- THEY'RE RIGHT.  THE WORLD IS

 9    WATCHING AND THE NINE OF YOU HAVE THE POWER.  YOU

10    WILL, WITH YOUR DECISION, DETERMINE THE RULES OF

11    COMPETITION FOR A LONG TIME TO COME IN THIS

12    COUNTRY, AND YOU GET TO DECIDE WHETHER WE'LL BE THE

13    PEOPLE WHO FOLLOW THE RULES AND MAKE THE

14    INVESTMENTS AND REAP THOSE INVESTMENTS OR THE

15    PEOPLE WHO STEAL THEM.

16         THERE ARE TWO WAYS THAT SAMSUNG CAN WIN

17    THIS CASE.  OBVIOUSLY IF YOU COME BACK AND SAY,

18    SORRY, APPLE, YOUR PATENTS ARE NO GOOD, THEY'RE

19    INVALID, ALL OF THEM, YOU RULE FOR SAMSUNG AND

20    SAMSUNG WINS THE CASE.

21         BUT THE OTHER WAY SAMSUNG WINS IS IF YOU

22    COMPROMISE ON DAMAGES.  THIS IS A COMPANY THAT

23    SPENT A BILLION DOLLARS ON ADVERTISING.  ALL OF A

24    SUDDEN, I DON'T KNOW IF YOU'VE NOTICED AROUND THIS

25    COURTHOUSE, ALL OF A SUDDEN THERE ARE SAMSUNG ADS
```

4246

```
 1    EVERYWHERE YOU LOOK.  THERE ARE SAMSUNG ADS ON

 2    EVERY GIANT'S GAME I HAPPEN TO NOTICE.  A BILLION

 3    DOLLARS.

 4              THEY WILL NOT CHANGE THEIR WAY OF

 5    OPERATING IF YOU SLAP THEM ON THE WRIST.

 6              BILL AND I TOLD YOU AT THE BEGINNING OF

 7    THIS CASE THAT WE WOULD BRING YOU EVIDENCE.  WE

 8    BROUGHT YOU DOCUMENTS.  WE'VE DONE EVERYTHING WE

 9    CAN TO GIVE YOU THE INFORMATION YOU NEED TO MAKE

10    YOUR JUDGMENT.  WE TRUST YOU AND ON BEHALF OF MY

11    CLIENT AND ALL OF US WHO HAVE SAT AT OUR TABLE, WE

12    WANT TO THANK YOU VERY MUCH FOR THE TIME THAT

13    YOU'VE GIVEN US.

14              THE COURT:  ALL RIGHT.  YOU HAVE TWO

15    MINUTES LEFT.

16              MR. MCELHINNY:  WELL, THEN, IN THAT

17    CASE --

18              (LAUGHTER.)

19              MR. LEE:  WE'LL CEDE THAT, TOO, WITH THE

20    OTHER THREE MINUTES.

21              THE COURT:  ALL RIGHT.  IT'S 5:10.  ALL

22    RIGHT.  GO AHEAD.

23              MR. VERHOEVEN:  YOUR HONOR, MAY I?  YOUR

24    HONOR?

25              THE COURT:  YES.  YOU HAVE 14 MINUTES
```

1    LEFT, AND IT'S 5:10.  REBUTTAL.

2              **(WHEREUPON, MR. VERHOEVEN GAVE HIS**

3    **REBUTTAL CLOSING ARGUMENT ON BEHALF OF SAMSUNG.)**

4              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

5              LET ME ADDRESS MR. LEE'S CLAIMS,

6    ACCUSATIONS REALLY, THAT SAMSUNG ENGINEERS,

7    ENGINEERS THAT WEREN'T CALLED, ENGINEERS WHOSE

8    DEPOSITIONS THEY DIDN'T PLAY, LET ME ADDRESS HIS

9    ACCUSATION THAT THEY INTENTIONALLY DECEIVED PEOPLE

10   AT ETSI.

11             THERE'S NO EVIDENCE OF THAT WHATSOEVER.

12   LET'S LOOK AT WHAT THE EVIDENCE IS.  CAN WE GO TO

13   SLIDE 300.

14             NOW, SECTION 4.1 IS THE SECTION THAT

15   MR. LEE POINTED TO IN SAYING THERE'S BEEN SOME SORT

16   OF BREACH OF ETSI POLICY.

17             EACH MEMBER SHALL USE ITS REASONABLE

18   ENDEAVORS TO TIMELY INFORM ETSI OF ESSENTIAL IPR'S

19   IT BECOMES AWARE OF.  IPR IS A DEFINED TERM.  IPR

20   SHALL MEAN ANY INTELLECTUAL PROPERTY RIGHT

21   CONFERRED BY STATUTE, LAW, INCLUDING APPLICATIONS

22   THEREFORE OTHER THAN TRADEMARKS.  AND IT SAYS FOR

23   THE AVOIDANCE OF DOUBT, RIGHTS RELATING TO GET-UP,

24   CONFIDENTIAL INFORMATION, TRADE SECRETS OR THE LIKE

25   ARE EXCLUDED FROM THE DEFINITION OF IPR.

```
1              THOSE KOREAN APPLICATIONS THAT HE'S

2    POINTING TO ARE CONFIDENTIAL.  THERE'S NO DUTY

3    UNDER THE STATUTE TO DISCLOSE CONFIDENTIAL

4    INFORMATION, IT EXPRESSLY SAYS IT RIGHT THERE.

5              MR. LEE DIDN'T SHOW YOU THAT.

6              LET'S GO TO SLIDE 292.

7              HERE WE HAVE THE DISCLOSURE OF IPR'S.

8    THAT'S THE PROVISION THEY SAY WE VIOLATED.

9              EACH MEMBER SHALL USE REASONABLE

10   ENDEAVORS TO DO WHAT?  TO TIMELY INFORM ETSI, AND

11   THEY'RE SUPPOSED TO DO SO ON A BONA FIDE BASIS.

12             WHAT DOES BONA FIDE MEAN?  IT MEANS IF

13   YOU KNOW YOU HAVE IPR, YOU CAN'T INTENTIONALLY

14   WITHHOLD IT.  WE CAN LOOK TO THE GUIDELINES FOR THE

15   ETSI POLICY, EXHIBIT 613, PAGE 8 THROUGH 9.  THE

16   IMPORTANCE OF TIMELY DISCLOSURE OF ESSENTIAL IPR,

17   THIS IS TELLING YOU ABOUT THIS, OKAY, IT SAYS, NOTE

18   ONE, DEFINITION FOR TIMELINESS OR TIMELY CANNOT BE

19   AGREED BECAUSE SUCH DEFINITIONS WOULD CONSTITUTE A

20   CHANGE TO THE POLICY.

21             THIS SECTION DOES NOT SAY, MEMBERS OF THE

22   JURY, THAT YOU BREACH THE, THE ETSI POLICIES IF YOU

23   FAIL TO DISCLOSE CONFIDENTIAL INFORMATION BEFORE A

24   STANDARD IS ADOPTED.

25             WHERE IN THIS SECTION DOES IT SAY BEFORE
```

1    THE STANDARD IS ADOPTED?  IT SAYS, IN PARTICULAR, A

2    MEMBER SUBMITTING A TECHNICAL PROPOSAL FOR A

3    STANDARD OR TECHNICAL SPECIFICATION SHALL, ON A

4    BONA FIDE BASIS, DRAW THE ATTENTION TO ETSI OF THAT

5    MEMBER'S IPR WHICH MIGHT BE ESSENTIAL IF THAT

6    PROPOSAL IS ADOPTED.

7              IT DOESN'T SAY BEFORE IT'S ADOPTED.  IT

8    SAYS YOU NEED TO DO IT WHEN YOU FIGURE IT OUT.

9              IF YOU HAVE AN APPLICATION, YOU DON'T

10   EVEN KNOW IF IT'S GOING TO BE GRANTED.  YOU DON'T

11   KNOW IF IT'S ESSENTIAL.  YOU DON'T KNOW WHAT YOUR

12   CLAIMS ARE GOING TO BE.  YOU HAVE NO IDEA.

13             BUT IF YOU DO GET A PATENT GRANTED AND

14   YOU DO KNOW ON A BONA FIDE BASIS THAT IT'S

15   ESSENTIAL, THEN AT THAT POINT YOU HAVE A DUTY THAT

16   KICKS IN, AND YOU CAN SEE IT RIGHT HERE.  NOTE 2,

17   INTENTIONAL DELAY.  INTENTIONAL DELAY HAS ARISEN

18   WHEN IT IS DEMONSTRATED THAT AN ETSI MEMBER HAS

19   DELIBERATELY WITHHELD IPR DISCLOSURES SIGNIFICANTLY

20   BEYOND WHAT WOULD BE EXPECTED FOR NORMAL

21   CONSIDERATIONS OF TIMELINESS.

22             INTENTIONAL DELAY, NOT DELAY, INTENTIONAL

23   DELAY, WHERE PROVEN SHOULD BE TREATED AS A BREACH

24   OF THE IPR POLICY, CLAUSE 4.

25             NOW, IF YOU REMEMBER I ASKED DR. WALKER,

```
1    WHO WAS THE ONLY WITNESS THEY HAD COME TESTIFY

2    ABOUT THAT, WHETHER HE HAD AN OPINION AS TO

3    WHETHER -- I HEARD MR. LEE REPEATEDLY SAY THESE

4    ENGINEERS, THESE SAMSUNG ENGINEERS WHO THEY DIDN'T

5    CALL, WHOSE DEPOSITIONS THEY DIDN'T PLAY, HE

6    REPEATEDLY SAID THEY INTENTIONALLY BREACHED.  THEY

7    INTENTIONALLY DELAYED.  THAT'S NOT EVIDENCE.

8    THAT'S ATTORNEY ARGUMENT.

9              WHAT DID THEIR ONLY EXPERT ON THIS SAY?

10             "QUESTION:  YOU'RE NOT OFFERING AN

11   OPINION HERE TODAY THAT SAMSUNG DELIBERATELY OR

12   INTENTIONALLY DELAYED, ARE YOU, SIR?

13             "ANSWER:  I HAVE NOT USED THOSE WORDS,

14   NO.

15             "QUESTION:  AND YOU'RE NOT OFFERING THAT

16   OPINION, ARE YOU, SIR?

17             "ANSWER:  NO, I AM NOT."

18             YET MR. LEE GETS UP AND SAYS, "THEY

19   INTENTIONALLY DELAYED."

20             NO EVIDENCE.  IN FACT, THE ONLY PERSON

21   THEY CALLED SAID, NO, HE HAS NO OPINION THEY

22   INTENTIONALLY DELAYED.

23             AND IF YOU LOOK AT THESE GUIDELINES IN

24   CONNECTION WITH THE AGREEMENT, YOU CAN SEE VERY

25   CLEARLY THAT THAT IS WHAT WOULD BE CONSIDERED A
```

1   BREACH.  INTENTIONAL DELAY BEYOND WHAT COULD BE

2   REASONABLY EXPECTED.  THERE'S NOTHING IN THERE THAT

3   SAYS YOU BREACH IF YOU DON'T DISCLOSE BEFORE

4   SOMETHING IS ADOPTED.

5          NOW, APPLE IS A MEMBER OF ETSI, TOO.

6   APPLE HAS ENGINEERS THAT GO TO ETSI MEETINGS, TOO.

7   THEY DIDN'T CALL A SINGLE ONE OF THEIR ENGINEERS TO

8   TALK ABOUT, WELL, WHEN ARE YOU SUPPOSED TO DISCLOSE

9   UNDER ETSI?  WHAT'S OUR EXPERIENCE OF WHEN YOU

10  DISCLOSE UNDER ETSI?

11         AND THE REASON IS CLEAR.  IF WE GO TO

12  SLIDE 291.

13         NOBODY DOES IT.  NOBODY DOES IT.  APPLE

14  DOESN'T DO IT.  HTC DOESN'T DO IN IT.  NOKIA

15  DOESN'T DO IT.  THAT'S NOT BECAUSE IT'S WRONG.

16  IT'S BECAUSE IT'S NOT REQUIRED.  IT'S BECAUSE IF

17  YOU FILE FOR SOMETHING, YOU DON'T KNOW WHAT IT'S

18  GOING TO END UP BEING.  YOU DON'T KNOW IF IT'S

19  GOING TO BE MATERIAL OR NOT.  DOESN'T MAKE ANY

20  SENSE TO REQUIRE THAT.

21         YOU SAW THE CHRONOLOGY THAT MR. LEE PUT

22  UP OF THE DISCLOSURE CHRONOLOGY, AND HE WAS -- THE

23  DISCLOSURES, HE SAID, IN HIS CHRONOLOGY SHOULD HAVE

24  BEEN MADE IN THESE THINGS CALLED WORKING GROUPS

25  WHERE THESE ENGINEERS GO.  HE SAID THEY

```
 1    INTENTIONALLY BREACHED THAT BY NOT DISCLOSING THESE

 2    CONFIDENTIAL APPLICATIONS IN THESE WORKING GROUPS.

 3              WELL, THEIR OWN EXPERT -- GO TO SLIDE

 4    303 -- REMEMBER I ASKED HIM, YOU USED TO GO TO

 5    WORKING GROUP MEETINGS WHEN YOU WERE, BEFORE YOU

 6    GOT ELEVATED TO MANAGEMENT.  HE SAID, YEAH, HE WENT

 7    A WHOLE BUNCH OF THEM.  YEAH.

 8              AND I SAID, "IN ALL OF THOSE MEETINGS

 9    WHERE YOU ATTENDED AS A MEMBER OF THE WORKING

10    GROUP, NEVER ONCE DID ANYBODY RAISE THEIR HAND AND

11    SAY, HEY, I'VE GOT ESSENTIAL IPR.  CORRECT?

12              "ANSWER:  THAT IS CORRECT."

13              THERE'S NO EVIDENCE THAT ANYBODY, ANYBODY

14    DOES WHAT APPLE IS NOW SAYING IS A REQUIREMENT IN

15    THEIR BREACH.  THEY COULD HAVE BROUGHT THEIR OWN

16    WITNESSES WHO ATTEND ETSI MEETINGS TO TELL YOU

17    OTHERWISE.  THEY DIDN'T.  WHY NOT?  BECAUSE THAT'S

18    NOT THE WAY IT WORKS AT ETSI.

19              FINALLY, LET'S GO TO SECTION 306 --

20    SORRY -- SLIDE 306.

21              '305.  I APOLOGIZE.  ETSI HAS A PROVISION

22    FOR BREACH, SECTION 14, VIOLATION OF POLICY.

23              ANY VIOLATION OF THE POLICY BY A MEMBER

24    SHALL BE DEEMED A BREACH BY THAT MEMBER OF ITS

25    OBLIGATIONS TO ETSI.  THE ETSI GENERAL ASSEMBLY
```

1    SHALL HAVE THE AUTHORITY TO DECIDE THE ACTION TO BE

2    TAKEN, IF ANY, AGAINST THE MEMBER IN BREACH IN

3    ACCORDANCE WITH ETSI STATUTES.

4            I ASKED DR. WALKER, "YOU HAVE NO OPINION

5    AS TO WHETHER OR NOT, UNDER SECTION 14, SAMSUNG

6    VIOLATED THE ETSI POLICY; CORRECT?

7            "ANSWER:  CORRECT."

8            SO MR. LEE GETS UP AND SAYS THIS IS A

9    BREACH OF THEIR DUTIES TO ETSI AND YOU SHOULD NOT

10   ALLOW THEIR PATENTS TO BE ENFORCEABLE BECAUSE THEY

11   INTENTIONALLY WITHHELD.

12           BUT THERE'S NO EVIDENCE.  ALL YOU HAVE IS

13   LAWYER ARGUMENT.  THEY DIDN'T CALL ANYBODY ON

14   INTENT.  AND THE ONLY PERSON THEY DID CALL,

15   DR. WALKER, WHO'S A NICE GUY, BUT HE ADMITTED,

16   THERE ISN'T ANY BREACH HERE.

17           NOW, MR. LEE ALSO TALKED ABOUT, SUGGESTED

18   THAT SAMSUNG WASN'T NEGOTIATING ON FAIR AND

19   REASONABLE AND NON-DISCRIMINATORY WAY WITH APPLE.

20   WELL, YOU SAW THE EVIDENCE.  SAMSUNG MADE AN OFFER,

21   AND THE UNDISPUTED EVIDENCE WAS APPLE REFUSED TO

22   EVEN SIT DOWN AND TALK ABOUT IT.

23           AND WHAT -- THE UNDISPUTED EVIDENCE IS

24   THAT SAMSUNG MADE A GENERAL FRAND DECLARATION IN

25   THE '90S, WAY BEFORE, THEY SAID, LOOK, IF ANY OF

```
 1    OUR IPR DOES BECOME ESSENTIAL, WE'LL LICENSE IT ON

 2    FAIR TERMS.

 3              AND THE EVIDENCE SHOWS THAT SAMSUNG HAS

 4    LICENSED NUMEROUS MAJOR PEOPLE IN THIS SPACE ON

 5    FAIR AND REASONABLE TERMS.

 6              THERE'S NO EVIDENCE THAT SAMSUNG HAS

 7    VIOLATED THE POLICIES OF ETSI CONCERNING FRAND.

 8              SLIDE 310, PLEASE.

 9              IN FACT, DR. WALKER, APPLE'S EXPERT, DOES

10    NOT HAVE THAT OPINION.

11              "QUESTION:  NOW, UNDER THIS FRAND

12    PROVISION, WHAT DOES THE PATENT OWNER GET?

13              "ANSWER:  WELL THE PATENT OWNER GETS, IF

14    HE HAS FRAND ON IPR WHICH IS ESSENTIAL TO WORKING

15    WITH THAT STANDARD, THEN ANYBODY WHO WISHES TO

16    IMPLEMENT THE STANDARD IS REQUIRED TO COME AND GET

17    A LICENSE UNDER FRAND TERMS FROM THE OWNER OF THAT

18    IPR."

19              IF APPLE WANTED A LICENSE ON FRAND TERMS,

20    THEY WERE SUPPOSED TO COME TO US UNDER THEIR OWN

21    EXPERT AND COME AND SAY, "WE HAVE A LICENSE?"

22              NEVER DID.  THEY JUST RELEASED THE PHONE

23    WITHOUT EVEN TALKING TO US.  WE MADE AN OFFER TO

24    THEM.  THEY DIDN'T RESPOND.

25              I ASKED DR. WALKER, "NOW, YOU TALKED A
```

```
 1    LITTLE BIT ABOUT FRAND.  ISN'T IT TRUE, SIR, YOU

 2    HAVE NO OPINION TO PRESENT TO THIS JURY WITH

 3    RESPECT TO WHETHER SAMSUNG HAS MADE A FRAND OFFER

 4    OR NOT?

 5              "ANSWER:  I'M DEALING WITH DISCLOSURE AT

 6    THE MOMENT, YES?

 7              "QUESTION:  SO THE ANSWER IS YES?

 8              "ANSWER:  YES."

 9              SO THEIR OWN EXPERT SAYS THERE'S NO

10    INTENTIONAL DELAY, THERE'S NO VIOLATION OF POLICY,

11    AND THERE'S NO VIOLATION OF THE FRAND OFFER.

12              IT'S ATTORNEY ARGUMENT WITHOUT EVIDENCE.

13              CAN YOU GO TO SLIDE 313.

14              VERY BRIEFLY ON THE EXHAUSTION ARGUMENT.

15    IT REQUIRES THAT THE PRODUCTS BE SOLD IN THE

16    UNITED STATES.  HERE THE UNDISPUTED EVIDENCE SHOWS

17    THAT INTEL CHIPS WERE MADE AND DESIGNED IN GERMANY,

18    DELIVERED FOR ASSEMBLY TO CHINA.  APPLE MAKES ITS

19    PHONES IN CHINA.  THAT'S WHERE THE CHIPS GET

20    INTEGRATED.  YOU CAN'T SUE SOMEONE FOR PATENT

21    INFRINGEMENT IN THE UNITED STATES FOR ACTIVITIES IN

22    CHINA, MEMBERS OF THE JURY.  WHEN THEY GET BROUGHT

23    INTO THE UNITED STATES, THAT'S WHERE THE

24    INFRINGEMENT OCCURS .

25              IN SUMMARY, I HEARD MR. LEE SAY
```

```
 1    COMPETITION, THAT'S WHAT INNOVATORS DO, NOT THE

 2    LAWYERS.  I COULDN'T AGREE MORE.  LET'S LET THE

 3    INNOVATORS COMPETE.  LET'S LET SAMSUNG COMPETE

 4    FREELY IN THE MARKETPLACE RATHER THAN HAVE APPLE

 5    TRYING TO STOP IT WITH ITS LAWYERS IN THE

 6    COURTROOM.

 7              THANK YOU VERY MUCH.

 8              THE COURT:  ALL RIGHT.  YOU HAVE A FEW

 9    MINUTES LEFT AS WELL.

10              MR. VERHOEVEN:  I SAID THANK YOU VERY

11    MUCH -- I'LL USE ONE MINUTE, I FORGOT, I'LL USE ONE

12    MINUTE.

13              THE COURT:  GO AHEAD, PLEASE.

14              MR. VERHOEVEN:  BECAUSE I REALLY FORGOT,

15    AND I APOLOGIZE, MEMBERS OF THE JURY.  I WANT TO

16    THANK YOU.  I KNOW SITTING HERE IS NOT EASY, AND ON

17    BEHALF OF MYSELF AND OUR ENTIRE TEAM AND WE HAVE

18    MANY, MANY FOLKS FROM SAMSUNG THAT HAVE BEEN HERE

19    EVERY DAY FOR THE TRIAL.  WE VERY MUCH APPRECIATE

20    IT.  WE KNOW YOU'RE GOING TO EXERCISE YOUR BEST

21    JUDGMENT, AND SO THANK YOU VERY MUCH.

22              THE COURT:  I ESTIMATE YOU HAVE A MINUTE

23    LEFT.

24              (LAUGHTER.)

25              MR. VERHOEVEN:  THAT'S OKAY, YOUR HONOR.
```

```
 1              THE COURT:  ALL RIGHT.  ALL RIGHT.  WELL,
 2    THANK YOU TO EVERYONE.
 3              SO --
 4              THE CLERK:  READY TO SWEAR IN THE
 5    MARSHAL.
 6              THE COURT:  OKAY.  WE'RE SWEARING IN OUR
 7    BAILIFF, TO BASICALLY EVERY DAY WHILE YOU'RE
 8    DELIBERATING, A BAILIFF WILL BE STANDING WATCH OUT,
 9    AND IF YOU NEED ANYTHING, YOU KNOCK ON THE DOOR AND
10    THE BAILIFF WILL BE ABLE TO HAND NOTES BACK AND
11    FORTH AND WHATNOT.
12              (MARSHAL SWORN.)
13              THE MARSHAL:  I DO.
14              THE CLERK:  THANK YOU.
15              THE COURT:  OKAY.  SO LET ME JUST QUICKLY
16    TELL YOU WHAT YOU ARE GOING TO RECEIVE.  YOU ARE
17    GOING TO RECEIVE A VERDICT FORM.  YOU ARE GOING TO
18    RECEIVE SOME NOTE PAPER.  IF YOU WANT TO
19    COMMUNICATE WITH ANYONE, YOU MUST DO IT IN WRITING,
20    SO YOU WRITE ON HERE WHAT YOUR QUESTION IS OR
21    WHATEVER THE DATE, TIME.  ANYONE ON THE JURY CAN
22    SUBMIT ONE OF THESE NOTES, SIGN IT, AND THEN AS
23    WE'VE SAID, WE'LL GET BACK TO YOU PROBABLY WRITE AN
24    ANSWER BACK WITH THE DATE AND TIME AND THAT WILL BE
25    OUR WAY OF COMMUNICATING.
```

```
 1            SO PLEASE DON'T COMMUNICATE WITH
 2   MS. PARKER-BROWN OR WITH THE BAILIFF OR WITH ANYONE
 3   ELSE.  IT HAS TO BE DONE IN WRITING.  OKAY?
 4            NOW, YOU'RE ALSO GOING TO RECEIVE THE
 5   EXHIBIT LIST.  THERE ARE THREE OR FOUR COPIES HERE.
 6   AND YOU'RE GOING TO RECEIVE THREE COPIES.  YOU'RE
 7   GOING TO RECEIVE ALL OF THE EXHIBITS THAT HAVE BEEN
 8   ADMITTED INTO EVIDENCE DURING THE TRIAL.  THEY'RE
 9   GOING TO BE ON CARTS AND IN BINDERS AND IN RED
10   WELLS.
11            ALSO IN THE JURY ROOM THERE'S GOING TO BE
12   A SORT OF ELMO TYPE PROJECTOR AND A TV SO THAT YOU
13   CAN SHARE AND LOOK AT ALL OF THE EVIDENCE TOGETHER
14   SIMULTANEOUSLY USING THAT EQUIPMENT.
15            SO WE WILL BE ADJOURNING FOR THE DAY.  IF
16   YOU WOULD COME BACK, PLEASE, AT 9:00 O'CLOCK TO THE
17   FOURTH FLOOR, YOU'LL BE DELIBERATING IN A LARGER
18   JURY DELIBERATION ROOM STARTING TOMORROW.
19            OKAY?  SO, AGAIN, PLEASE DON'T DISCUSS
20   THE CASE WITH ANYONE, PLEASE DON'T READ ABOUT THE
21   CASE OR DO ANY INVESTIGATION ABOUT THE CASE.
22   YOU'LL BEGIN DELIBERATING TOMORROW AT 9:00 A.M.,
23   AND IF YOU WOULD, PLEASE, JUST GO AHEAD AND LEAVE
24   YOUR JURY BINDERS IN THE JURY ROOM.
25            JUROR:  THIS JURY ROOM (INDICATING).
```

```
 1              THE COURT:  THIS JURY ROOM, UNLESS --
 2     THAT'S EASIER, RIGHT?  DO YOU WANT THEM TO TAKE IT
 3     DOWN?
 4              THE CLERK:  I CAN GO DOWN WITH THEM NOW
 5     AND SHOW THEM WHERE IT IS.
 6              THE COURT:  MAYBE THAT WILL BE BETTER.
 7     SHE CAN SHOW YOU WHERE OUR ROOM IS AND WHERE YOU
 8     SHOULD GO STARTING IN THE MORNING.  OKAY?  BUT
 9     WE'LL MOVE ALL THE DRINKS AND SNACKS AND THAT KIND
10     OF STUFF FOR YOU.
11              ALL RIGHT.  SO THANK YOU FOR YOUR
12     PATIENCE AND YOUR SERVICE.  IT WAS A LONG DAY
13     TODAY.  WE APPRECIATE YOUR TIME.
14              (WHEREUPON, THE FOLLOWING PROCEEDINGS
15     WERE HELD OUT OF THE PRESENCE OF THE JURY:)
16              THE COURT:  THANK YOU.  ALL RIGHT.  THE
17     RECORD SHOULD REFLECT THE JURORS HAVE LEFT THE
18     COURTROOM.  I JUST HAVE A FEW QUICK -- OH, PLEASE,
19     TAKE A SEAT -- HOUSEKEEPING MATTERS.  ARE YOU ALL
20     PLANNING TO STAY NEARBY?  HOW MUCH TIME WILL YOU
21     NEED TO GET TO THE COURTHOUSE IF THERE'S A JURY
22     NOTE?
23              MR. JACOBS:  WE'RE AT YOUR SERVICE, YOUR
24     HONOR.  WHATEVER YOU WOULD LIKE IN TERMS OF OUR
25     AVAILABILITY, WE WILL MAKE HAPPEN.
```

```
 1              MR. VERHOEVEN:  THEY'RE AT THE FAIRMONT,

 2    WE'RE AT THE MARRIOTT.

 3              THE COURT:  OKAY.  SO WHAT WE SHOULD

 4    PROBABLY DO IS WE'LL NOTIFY YOU RIGHT AWAY WHAT THE

 5    NOTE IS, AND THEN PROBABLY THEN JUST GET TOGETHER

 6    IN COURT AND COME TO AN AGREEMENT AS TO WHAT ANSWER

 7    YOU WANT TO SEND BACK TO THE JURY.

 8              MR. VERHOEVEN:  WOULD YOU LIKE US TO STAY

 9    IN COURT?

10              THE COURT:  NO, NO, JUST MAKE SURE

11    MS. PARKER-BROWN HAS A WAY TO CONTACT YOU AS

12    QUICKLY AS POSSIBLE, WHOEVER YOU WANT TO CONTACT

13    SHOULD THAT HAPPEN.

14              MR. LEE:  YOUR HONOR, JUST TO REMIND YOU

15    OF THE CONVERSATION WE HAD OFF THE RECORD, I HAVE

16    THIS OTHER TRIAL THAT STARTED TODAY, SO I'M GOING

17    TO LEAVE AND MR. SELWYN FROM OUR OFFICE WILL BE

18    HERE.

19              THE COURT:  OKAY.  SO IF YOU WOULD,

20    PLEASE, AT THE END, AND YOU CAN EITHER JUST SEND IT

21    TO LHK CRD, THE E-MAIL, AS TO WHO YOU WANT US TO

22    CONTACT IF THERE'S A JURY NOTE AND THEN THE BEST

23    WAY TO CONTACT THOSE PEOPLE, AND THEN WE'LL MAKE

24    SURE THAT WHEN WE DO THE CONTACT VIA E-MAIL OR IF

25    YOU WANT IT VIA PHONE CALL, THAT WE CONTACT THE
```

1    PEOPLE THAT YOU WANT US TO CONTACT IF ANYTHING

2    HAPPENS.

3              OKAY?  GO AHEAD AND FILE THE EXHIBITS

4    THAT YOU WANT TO FILE TODAY UNDER SEAL AND THEN AS

5    SOON AS THE DELIBERATION IS DONE, WE'LL UNSEAL IT

6    ALL.  OKAY.

7              MS. MAROULIS:  THANK YOU, YOUR HONOR.

8    JUST TO CLARIFY, SOME EXHIBITS WERE ALREADY FILED

9    IN THE MIDDLE OF THE NIGHT BEFORE WE KNEW THAT.

10             THE COURT:  THAT'S FINE.

11             MS. MAROULIS:  BUT THE PROFFER IS GOING

12   TO BE FILED NOW UNDER SEAL.  THANK YOU.

13             THE COURT:  THAT'S FINE.  WHAT ELSE DO WE

14   HAVE TO HANDLE?

15             IN THE EVENT, I DOUBT ECF WILL HOPEFULLY

16   NOT COME DOWN LIKE IT DID AT THE END OF JUNE, BUT

17   IF YOU'D LIKE, WE WILL ALSO BE ECF, JUST FILING

18   NOTICES THAT THE JURY HAS LEFT FOR THE DAY, THAT

19   THERE'S A NOTE, SO YOU'LL GET THOSE E-MAIL

20   NOTIFICATIONS.

21             WHAT ELSE?  IS THERE ANY OTHER

22   HOUSEKEEPING OR COORDINATION WE NEED TO DO?

23             MS. PARKER-BROWN NOW HAS ALL OF THE

24   ORIGINAL EXHIBITS?  THE ROGUE PHONE WAS RELOCATED,

25   THAT'S GOOD.

```
1              ANYTHING ELSE?  SHE'S GOT EVERYTHING?

2              SO WE'LL GO AHEAD AND LOCK THAT UP IN

3     THEIR NEW JURY ROOM.

4              MS. MAROULIS:  YOUR HONOR, WHAT ARE THE

5     HOURS OF DELIBERATION?  IS IT 9:00 TO 4:30?

6              THE COURT:  9:00 TO 4:30, AND, YOU KNOW,

7     THEY'LL PROBABLY TAKE LUNCH NOON TO 1:00.  WE'RE

8     ACTUALLY -- STARTING TOMORROW, WE'RE GOING TO

9     PROVIDE THEM LUNCH, SO THEY CAN WORK THROUGH LUNCH

10    IF THEY WISH.

11             MR. JACOBS:  WE JUST NEED TO FIGURE OUT

12    THE MECHANICS OF GETTING THAT ELMO SET UP.  MAYBE

13    WE CAN CONSULT WITH MS. PARKER-BROWN.

14             THE COURT:  YES.  SO IF YOUR TECHNICAL

15    FOLKS WANT TO DO IT TODAY.

16             MR. JACOBS:  YES, THAT WOULD BE GREAT.

17             THE COURT:  THAT'S FINE.  LET'S WAIT

18    UNTIL THE JURY LEAVES, I DON'T THINK THEY'RE GOING

19    TO BE THERE VERY LONG, AND THEN AS SOON AS THEY

20    LEAVE, YOU'RE WELCOME TO COME AND SET IT UP.

21             MR. JOHNSON:  I THINK THE EXHIBITS ARE

22    ALMOST COMPLETE.  THE ONLY THING THAT'S MISSING

23    THAT WE HAVE TO SUPPLY IS THE INTEL SOURCE CODE

24    THAT'S UNDER CERTAIN RESTRICTIONS, WHICH WE WILL --

25    OH, THE COURT HAS IT I'M TOLD.
```

```
 1          THE COURT:  OH, IT'S IN THERE.  OKAY.

 2   ALL RIGHT.  WHAT ELSE?  I MEAN, I'M SURE WE'LL HAVE

 3   TO DO SOME COORDINATION AT THE END ABOUT WHAT'S

 4   GOING TO HAPPEN WITH ALL THE ORIGINAL EXHIBITS.

 5          MS. KREVANS:  YOUR HONOR, BEFORE THOSE

 6   CARTS GO AHEAD, I THINK WE NEED TO PUT BACK THE

 7   THINGS THAT WE'VE USED TODAY, THE PHYSICAL

 8   EXHIBITS, AND BOTH PARTIES WILL PUT THEM BACK IN

 9   THERE, AND THEN I THINK WE'RE DONE.

10          THE COURT:  ALL RIGHT.  THAT'S FINE.

11          THEN JUST PLEASE SEND TO LHK CRD THE

12   INFORMATION THAT YOU HAVE FOR YOUR CONTACT.

13          LET'S JUST TAKE A ONE MINUTE BREAK.  LET

14   ME SEE IF THERE'S ANYTHING ELSE.  OKAY?

15          DO YOU WANT TO SEE THE THINGS THAT ARE

16   GOING BACK TO THE JURY ROOM, THE THINGS THAT I

17   MENTIONED?  JUST THREE COPIES OF THE REFORMATTED

18   FINAL EXHIBIT LIST, THE BLANK JURY NOTES, AND THE

19   VERDICT FORM?

20          MS. MAROULIS:  YES.

21          THE COURT:  WHY DON'T YOU TAKE A LOOK

22   BEFORE THEY GO BACK?

23          (PAUSE IN PROCEEDINGS.)

24          THE COURT:  ALL RIGHT.  THANK YOU ALL

25   VERY MUCH.  LET ME KNOW IF YOU HAVE ANY --
```

```
1              I'LL PUT THIS ON THE RECORD.  YOU CAN GO
2      AHEAD AND TAKE A SEAT.  SORRY.
3              I JUST WANT TO PUT ON THE RECORD THAT
4      THEY'VE APPROVED WHAT'S GOING BACK THERE.
5              (PAUSE IN PROCEEDINGS.)
6              THE COURT:  OKAY.  LET ME JUST, PLEASE,
7      BEFORE WE ADJOURN FOR THE DAY, JUST PLACE ON THE
8      RECORD THAT BOTH PARTIES HAVE REVIEWED THE VERDICT
9      FORM, THREE COPIES OF THE REFORMATTED FINAL EXHIBIT
10     LIST, AND THE JURY -- THE BLANK JURY NOTE FORMS.
11             MS. MAROULIS, HAVE YOU APPROVED THOSE?
12             MS. MAROULIS:  I LOOKED AT THEM, YEAH.
13             THE COURT:  OKAY.  AND MR. JACOBS, YOU
14     APPROVED THEM AS WELL?
15             MR. JACOBS:  YES, YOUR HONOR, THEY'RE
16     APPROVED.
17             THE COURT:  OKAY.  SO THOSE WILL BE THE
18     ONES THAT GO INTO THE JURY ROOM.  THAT RED WELL
19     WILL GO IN TOMORROW MORNING.
20             OKAY.  THANK YOU ALL.  WE'LL LET YOU KNOW
21     IF WE HEAR ANYTHING.
22             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
23             MR. MCELHINNY:  THANK YOU, YOUR HONOR.
24             (WHEREUPON, THE EVENING RECESS WAS
25     TAKEN.)
```

1

2

3

4                    <u>CERTIFICATE OF REPORTERS</u>

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT

8    REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

9    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

10   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

11   CERTIFY:

12          THAT THE FOREGOING TRANSCRIPT,

13   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

14   CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

15   SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

16   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

17   TRANSCRIPTION TO THE BEST OF OUR ABILITY.

18

19                    /S/
                _____
20              LEE-ANNE SHORTRIDGE, CSR, CRR
                CERTIFICATE NUMBER 9595
21

22                    /S/
                _____
23              IRENE RODRIGUEZ, CSR, CRR
                CERTIFICATE NUMBER 8074
24

25                    DATED:  AUGUST 21, 2012