# Estrich Declaration

# EXHIBIT F

# Filed Under Seal

# SEAGATE TECHNOLOGY PLC

## FORM 10-K
### (Annual Report)

## Filed 08/17/11 for the Period Ending 07/01/11

| | |
|---|---|
| Telephone | (353) (1) 234-3136 |
| CIK | 0001137789 |
| Symbol | STX |
| SIC Code | 3572 - Computer Storage Devices |
| Industry | Computer Storage Devices |
| Sector | Technology |
| Fiscal Year | 06/30 |


http://www.edgar-online.com
© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

Use these links to rapidly review the document
TABLE OF CONTENTS
PART IV

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

———————

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended July 1, 2011
OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                to
Commission File No. 001-31560

# SEAGATE TECHNOLOGY PUBLIC LIMITED COMPANY
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Ireland** | **98-0648577** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**38/39 Fitzwilliam Square
Dublin 2, Ireland**
(Address of principal executive offices)

**Registrant's telephone number, including area code: (353) (1) 234-3136**

———————

**Securities registered pursuant to Section 12 (b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Ordinary Shares, par value $0.00001 per share** | **The NASDAQ Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act:
None**

———————

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒   NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. YES ☐   NO ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and

(2) has been subject to such filing requirements for the past 90 days. YES ☒   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES ☒     NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐

<div style="text-align:center">(Do not check if a<br>smaller reporting company)</div>

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐     NO ☒

The aggregate market value of the voting and non-voting ordinary shares held by non-affiliates of the registrant as of December 31, 2010, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $5.8 billion based upon the closing price reported for such date by the NASDAQ.

The number of outstanding ordinary shares of the registrant as of August 11, 2011 was 419,546,623.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Proxy Statement to be delivered to shareholders in connection with our 2011 Annual Meeting of Shareholders (the "Proxy Statement") are incorporated herein by reference in Part III.

# SEAGATE TECHNOLOGY PLC

## TABLE OF CONTENTS

| Item | | Page No. |
|------|------|---------|
| *PART I* | | |
| 1. | Business | 4 |
| 1A. | Risk Factors | 18 |
| 1B. | Unresolved Staff Comments | 38 |
| 2. | Properties | 39 |
| 3. | Legal Proceedings | 40 |
| 4. | (Removed and Reserved) | 40 |
| *PART II* | | |
| 5. | Market for Registrant's Shares, Related Shareholder Matters and Issuer Purchases of Equity Securities | 41 |
| 6. | Selected Financial Data | 46 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| 7A. | Qualitative and Quantitative Disclosures About Market Risk | 67 |
| 8. | Financial Statements and Supplementary Data | 69 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 120 |
| 9A. | Controls and Procedures | 120 |
| 9B. | Other Information | 120 |
| *PART III* | | |
| 10. | Directors, Executive Officers and Corporate Governance | 121 |
| 11. | Executive Compensation | 121 |
| 12. | Security Ownership of Certain Beneficial Owners and Management | 121 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 121 |
| 14. | Principal Accountant Fees and Services | 121 |
| *PART IV* | | |
| 15. | Exhibits and Financial Statement Schedules | 122 |
| | SIGNATURES | 123 |
| | EXHIBIT INDEX | 125 |

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

Effective as of 1:30 p.m. PDT on July 3, 2010 (the "Effective Time"), Seagate Technology public limited company, an Irish public limited company, ("Seagate-Ireland") became the successor to Seagate Technology, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Seagate-Cayman"). In this Annual Report on Form 10-K (this "Form 10-K"), unless the context indicates otherwise, as used herein, the terms "we," "us," "Seagate," the "Company" and "our" refer to Seagate-Cayman and its subsidiaries for periods prior to the Effective Time and to Seagate-Ireland and its subsidiaries for periods after the Effective Time. References to "$" are to the United States dollar.

We have compiled the market size in this Form 10-K using statistics and other information obtained from several third-party sources.

Various amounts and percentages used in this Form 10-K have been rounded and, accordingly, they may not total 100%.

We own or otherwise have rights to the trademarks and trade names, including those mentioned in this Form 10-K, used in conjunction with the marketing and sale of our products.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Some of the statements contained in this Form 10-K that are not historical facts, particularly in "Item 1. Business," "Item 1A. Risk Factors," "Item 3. Legal Proceedings," and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," are statements of future expectations and other forward-looking statements (within the meaning of Section 27A of the Securities Act of 1933 or Section 21E of the Securities Exchange Act of 1934, each as amended). Certain of these forward-looking statements can be identified by the use of forward-looking terminology, such as "believes," "expects," "may," "are expected to," "will," "will continue," "should," "would be," "seeks" or "anticipates" or similar expressions or the negative thereof or other variations thereof or comparable terminology, or by discussions of strategy, plans or intentions. These forward-looking statements are based on management's current views and assumptions, and are conditioned upon and also involve known and unknown risks, uncertainties and other factors that could cause actual results, performance or events to differ materially from those in such statements due to, among other factors:

-    uncertainty in global economic conditions as customers may defer purchases in response to tighter credit and negative financial news;

-    the impact of the variable demand and the pricing environment for disk drives, particularly in view of current business and economic conditions;

-    our dependence on our ability to successfully qualify, manufacture and sell our disk drive products in increasing volumes on a cost-effective basis and with acceptable quality, particularly the new disk drive products with lower cost structures;

-    the impact of competitive product announcements and industry supply with respect to particular disk drive products;

-    our ability to achieve potential cost savings from restructuring activities; and

-    the risk that our recently announced transaction with Samsung Electronics Co., Ltd. ("Samsung") will not be consummated and the risk that we will incur significant costs in connection with the transaction (see Item 1A Risk Factors for risks related to our Pending Alignment with Samsung below).

These risks and uncertainties include a variety of factors, some of which are beyond our control. Additional risks and uncertainties are set forth and are discussed in more detail in "Item 1A. Risk Factors" of this Form 10-K. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those described in this Annual Report on Form 10-K as anticipated, believed or expected. These forward-looking statements should not be relied upon as representing our views as of any subsequent date and we undertake no obligation to update forward-looking statements to reflect events or circumstances after the date they were made.

*PART I*

## ITEM 1.   BUSINESS

We are the world's leading provider of hard disk drives based on revenue. We design, manufacture, market and sell hard disk drives. Hard disk drives, commonly referred to as disk drives, hard drives or HDDs, are devices that store digitally encoded data on rapidly rotating disks with magnetic surfaces. The performance attributes of disk drives, including their cost effectiveness, high quality, high storage capacities and energy efficiencies have resulted in disk drives being used as the primary medium for mass storage of electronic data.

We produce a broad range of disk drive products addressing enterprise applications, where our products are designed for enterprise servers, mainframes and workstations; client compute applications, where our products are designed for desktop and notebook computers; and client non-compute applications, where our products are designed for a wide variety of end user devices such as digital video recorders (DVRs), personal data backup systems, portable external storage systems and digital media systems. In addition to manufacturing and selling disk drives, we provide data storage services for small- to medium-sized businesses, including online backup, data protection and recovery solutions.

### Industry Overview

*Electronic Data Storage Industry*

The electronic data storage industry is comprised of companies that manufacture components or subcomponents designed for electronic data storage devices and companies that provide storage solutions through a variety of technologies such as disk drives, tape storage and semiconductor-based storage technologies such as flash memory. Participants in the electronic data storage industry include:

*Major subcomponent manufacturers.*    Companies that manufacture components or subcomponents used in electronic data storage devices or solutions include companies such as Fuji Electric Device Technology Co., Ltd., Showa Denko K.K. and TDK Corporation, which supply heads and media to disk drive manufacturers; LSI Corporation and Marvell Technology Group Limited, which supply application specific integrated circuits (ASICs); and Hoya Corporation, which supplies glass substrates.

*Hardware storage solutions manufacturers.*    Companies that transform components into storage products include disk drive manufacturers such as Seagate, Hitachi Global Storage Technologies, Samsung Electronics Co., Ltd., Toshiba Corporation and Western Digital Corporation; magnetic tape storage manufacturers such as Quantum Corporation; and semiconductor storage manufacturers such as Intel Corporation, Micron Technology, Samsung Electronics Co., Ltd., SanDisk Corporation and STEC, Inc., whose operations include integrating flash memory into storage products such as solid state drives (SSDs).

*System integrators.*    Companies that bundle and package storage components such as storage hardware and software into client compute, client non-compute or enterprise applications. Client compute original equipment manufacturers (OEMs) include Acer Inc., Apple Inc., Dell Inc., Hewlett-Packard Company and Lenovo Group Limited; client non-compute OEMs include Apple Inc., DIRECTV Group, Inc., Microsoft Corporation, Motorola, Inc., Scientific-Atlanta Inc., Sony Corporation and TiVo Inc.; and enterprise storage system OEMs include EMC Corporation, Hewlett-Packard Company and NetApp, Inc. Distributors who integrate storage hardware and software into end-user applications are also included in this category.

*Storage services.*    Another area within the electronic data storage industry is services and solutions related to the backup, archiving, recovery and discovery of electronic data.

4

*Demand for Electronic Data Storage*

The electronic data storage industry has traditionally been focused on client compute applications. We believe that technological advances in storage technology and a proliferation of client non-compute applications such as digital video recorders, gaming devices, digital music players and digital cameras are driving the broad, global proliferation and growth of digital content through the:

- *creation and sharing* of all types of digital content, such as high-resolution photos, high definition video and movies and music by consumers and electronic data by enterprises;

- *aggregation and distribution* of digital content through services and other offerings such as YouTube, Facebook, Pandora, iTunes, Hulu and LinkedIn;

- *network and video infrastructure* , including broadband, internet protocol television (IPTV), cable and satellite that has enabled the access, hosting and distribution of such digital content;

- *enjoyment and consumption* of digital content through DVRs, handheld devices, tablets and gaming consoles, as well as in automobiles; and

- *protection* of digital content through storage on backup devices and storage services.

As a result of these factors, the nature and amount of content being created requires increasingly higher storage capacity in order to store, manage, distribute, utilize and backup such content. This in turn has resulted in the rapid growth in demand for electronic data storage applications and solutions which we believe will continue to grow with the increased demand for electronic data storage, in developed countries as well as in emerging economies.

We believe that demand for electronic data storage in the enterprise and traditional compute markets continues to grow as the proliferation of digital content in the consumer space has resulted in additional demand for storage by enterprises, including those that host, aggregate, distribute or share such content. Other factors driving demand for additional storage include:

- continued growth in cloud computing and backup services for enterprises seeking efficient and cost-effective methods of processing and storing mass data increases demand for storage as data centers expand and proliferate;

- increasing legal and regulatory requirements, which necessitate larger archives; and

- changes in the nature and amount of data being stored, such as the growing use of digital records in the healthcare industry

*Demand Trends for Disk Drives*

We believe that continued growth in digital content requires increasingly higher storage capacity in order to store, aggregate, host, distribute, manage, backup and use such content, which we believe will continue to result in increased demand for disk drive products. In addition, we believe the continued increase in demand for disk drives, in developed countries as well as in emerging economies, reflects the demand for real-time access to rich data and content driven by the impact of a highly mobile and increasingly connected user base. We believe these trends will continue as computing architectures evolve to serve the growing commercial and consumer user base throughout the world.

Historically, the electronic data storage industry has introduced alternative technologies that directly compete with hard disk drives. SSDs, using NAND flash memory, are a potential alternative to disk drives in certain applications such as consumer handheld devices, tablets and portable external storage. NAND flash memory is a type of non-volatile storage technology. However, we believe that in the foreseeable future the traditional enterprise and client compute markets that require high capacity storage solutions, as well as the data intensive client non-compute markets, will continue to be best served by hard disk drives based on the industry's ability to deliver reliable, energy efficient and cost effective mass storage devices.

*Disk Drives for Enterprise Storage.*    We define enterprise storage as disk drives designed for mission critical applications and nearline applications.

Mission critical applications are defined as applications that are vital to the operation of enterprises, requiring high performance, and high reliability disk drives. We expect the market for mission critical enterprise storage solutions to continue to be driven by enterprises moving network traffic to dedicated storage area networks in an effort to reduce network complexity and increase energy savings. We believe that this transition will lead to an increased demand for more energy efficient, smaller form factor disk drives. These solutions are comprised principally of high performance enterprise class disk drives with sophisticated firmware and communications technologies.

Nearline applications are defined as applications that are capacity-intensive and require high capacity and energy efficient disk drives featuring low costs per gigabyte. We expect such applications, which include storage for cloud computing and backup services, will continue to grow and drive demand for disk drives designed with these attributes.

SSD storage applications have been introduced as a potential alternative to redundant system startup or boot disk drives. In addition, enterprises are gradually adopting SSDs in applications where rapid processing and/or energy efficiency is required. The timing of significant adoption of SSDs is dependent on enterprises weighing the cost effectiveness and other benefits of mission critical enterprise disk drives against the perceived performance benefits of SSDs.

*Disk Drives for Client Compute.*    We define client compute applications as disk drives designed for the traditional desktop and mobile compute applications. We believe that the increase in demand resulting from growing economies of certain countries and the continued proliferation of digital content will drive the demand for the client compute market.

*Disk Drives for Client Non-Compute.*    We define client non-compute applications as disk drives designed for consumer electronic devices and disk drives used for external storage and network-attached storage (NAS). Disk drives designed for consumer electronic devices are primarily used in applications such as DVRs that require a higher capacity, low cost-per-gigabyte storage solution. Disk drives for external and NAS devices are designed for purposes such as personal data backup and portable external storage, and to augment storage capacity in the consumer's current desktop, notebook, tablet or DVR disk drive capacities. Client non-compute applications also include devices designed to display digital media in the home theater. We believe the proliferation of high definition and media-rich digital content will continue to create increasing consumer demand for higher storage solutions. As the proliferation of client non-compute applications that require minimal storage such as tablets continues, SSDs could become more competitive within the client compute market in the future.

*Industry Supply Balance*

From time to time the industry has experienced periods of imbalance between supply and demand. To the extent that the disk drive industry builds capacity based on expectations of demand that do not materialize, price erosion may become more pronounced. Conversely, during periods where demand exceeds supply, price erosion is generally muted. For the first half of fiscal year 2011, our industry experienced a period of relative balance between supply and demand. We also believe there was unmet demand in the last quarter of fiscal year 2011 due to a reaction to possible supply chain disruptions stemming from the earthquake and tsunami in Japan. However, the industry returned to a relatively balanced supply environment at the end of the fiscal year.

6

**Disk Drive Technology**

*Overview*

The design and manufacturing of disk drives depends on highly advanced technology and manufacturing techniques and therefore requires high levels of research and development spending and capital equipment investments. Manufacturing our disk drives is a complex process that begins with the production of individual components and ends with a fully assembled unit. We design, fabricate and assemble a number of the most important components found in our disk drives, including read/write heads and recording media. Our design and manufacturing operations are based on technology platforms that are used to produce various disk drive products that serve multiple data storage applications and markets. Our core technology platforms are focused around the areal density of media and read/write head technologies. Using an integrated platform design and manufacturing leverage approach allows us to deliver a portfolio of disk drive products to service a wide range of electronic data storage applications and a wide range of industries.

*Disk Drive Performance*

Disk drive performance is commonly differentiated by six key characteristics:

- storage capacity, commonly expressed in gigabytes (GB) or terabytes (TB), which is the amount of data that can be stored on the disk;

- spindle rotation speed, commonly expressed in revolutions per minute (RPM), which has an effect on speed of access to data;

- interface transfer rate, commonly expressed in megabytes per second, which is the rate at which data moves between the disk drive and the computer controller;

- average seek time, commonly expressed in milliseconds, which is the time needed to position the heads over a selected track on the disk surface;

- data transfer rate, commonly expressed in megabytes per second, which is the rate at which data is transferred to and from the disk; and

- product quality and reliability, commonly expressed in annualized return rates.

*Areal Density*

Areal density is a measure of storage capacity per square inch on the recording surface of a disk. The capacity of a disk drive is determined by the number of disks it contains as well as the areal density capability of these disks. We have been pursuing, and will continue to pursue, a number of technologies to increase areal densities across the entire range of our products for expanding disk drive capacities and reducing the number of disks and heads per drive to further reduce product costs.

**Manufacturing**

Disk drive manufacturers are distinguished by their level of vertical integration, which is the degree to which they control the design and manufacture of the technology used in their products and by whether they are captive, producing disk drives for their own computer systems, or independent, producing disk drives as a stand-alone product.

Vertically integrated hard drive manufacturers design and produce their own read/write heads and recording media, which are critical technologies for disk drives. This integrated approach enables manufacturers to lower costs and to improve the functionality of components so that they work together efficiently. In contrast, manufacturers that are not integrated purchase most of their components from third-party suppliers, upon whom they depend for key elements of their technological innovation and

7

differentiation. This can limit their ability to coordinate technology roadmaps and optimize the component design process for manufacturing efficiency and product reliability while making them reliant on the technology investment decisions of their suppliers. Independent manufacturers can enjoy a competitive advantage over captive manufacturers in working with OEMs because they do not compete with OEMs for computer system sales. We believe the competitive dynamics of the disk drive industry favor vertically integrated, independent manufacturers with the scale to make substantial technology investments and apply them across a broad product portfolio and set of customers.

We pursue a vertically integrated business strategy based on the ownership of critical component technologies, allowing us to maintain control over our product roadmap and component cost, quality and availability. We believe that because of our vertical design and manufacturing strategy, we are well suited to meet the challenges posed by the close interdependence of components for disk drives. Our manufacturing efficiency and flexibility are critical elements of our integrated business strategy. We continuously seek to improve our manufacturing efficiency and cost by:

- employing manufacturing automation to enhance our efficiency;

- improving product quality and reliability and reducing costs;

- integrating our supply chain with suppliers and customers to enhance our demand visibility and reduce our working capital requirements;

- coordinating between our manufacturing group and our research and development organization to rapidly achieve volume manufacturing; and

- rationalizing the facilities we operate and reducing the number of personnel we employ.

A vertically integrated model, however, tends to have less flexibility when demand moderates as it exposes us to higher unit costs as capacity utilization is not optimized.

Due to the significant challenges posed by the need to continually innovate and improve manufacturing efficiency and the continued demands on capital and research and development investments required to do so, the disk drive industry has undergone significant consolidation as disk drive manufacturers and component manufacturers merged with other companies or exited the industry. The increasing technological challenges, associated levels of investment and competitive necessity of large-scale operations may also drive future industry consolidation. Additionally, we may in the future face indirect competition from customers who from time to time evaluate whether to offer electronic data storage products that may compete with our products.

*Components and Raw Materials*

All of our disk drive products incorporate certain components, including a head disk assembly and a printed circuit board mounted to the head disk assembly, which are sealed inside a rigid base and top cover containing the recording components in a contamination controlled environment. We maintain a highly integrated approach to our business by designing and manufacturing a significant portion of the components we view as critical to our products, such as recording heads and media.

*Read/Write Heads.*    The function of the read/write head is to scan across the disk as it spins, magnetically recording or reading information. The tolerances of recording heads are extremely demanding and require state-of-the-art equipment and processes. Our read/write heads are manufactured with thin-film and photolithographic processes similar to those used to produce semiconductor integrated circuits, though challenges in magnetic film properties and topographical structures are unique to the disk drive industry. We perform all primary stages of design and manufacture of read/write heads at our facilities. We use a combination of internally manufactured and externally sourced read/write heads, the mix of which varies based on product mix, technology and our internal capacity levels.

*Media.*     Information is written to the media, or disk, as it rotates at very high speeds past the read/write head. The media is made from non-magnetic material, usually aluminum alloy or glass, and is coated with a thin layer of magnetic material. We use a combination of internally manufactured and externally sourced finished media and aluminum substrates, the mix of which varies based on product mix, technology and our internal capacity levels. We purchase all of our glass substrates from third parties, which we use in the disk drives we make for mobile products.

*Printed Circuit Board Assemblies.*     The printed circuit board assemblies (PCBAs) are comprised of standard and custom ASICs and ancillary electronic control chips. The ASICs control the movement of data to and from the read/write heads and through the internal controller and interface, which communicates with the host computer. The ASICs and control chips form electronic circuitry that delivers instructions to a head positioning mechanism called an actuator to guide the heads to the selected track of a disk where the data is recorded or retrieved. Disk drive manufacturers use one or more industry standard interfaces such as serial advanced technology architecture (SATA); small computer system interface (SCSI); serial attached SCSI (SAS); or Fibre Channel (FC) to communicate to the host systems. We outsource to third parties the manufacture and assembly of the PCBAs used in our disk drives. We do not manufacture any ASICs, but we participate in their proprietary design.

*Head Disk Assembly.*     The head disk assembly consists of one or more disks attached to a spindle assembly powered by a spindle motor that rotates the disks at a high constant speed around a hub. Read/write heads, mounted on an arm assembly, similar in concept to that of a record player, fly extremely close to each disk surface and record data on and retrieve it from concentric tracks in the magnetic layers of the rotating disks. The read/write heads are mounted vertically on an E-shaped assembly (E-block) that is actuated by a voice-coil motor to allow the heads to move from track to track. The E-block and the recording media are mounted inside the head disk assembly. We purchase spindle motors from outside vendors and from time to time participate in the design of the motors that go into our products.

*Disk Drive Assembly.*     Following the completion of the head disk assembly, it is mated to the PCBA, and the completed unit goes through extensive defect mapping and testing prior to packaging and shipment. Disk drive assembly and test operations occur primarily at facilities located in China and Thailand. We perform subassembly and component manufacturing operations at our facilities in China, Malaysia, Northern Ireland, Singapore, Thailand and in the United States in Minnesota. In addition, third parties manufacture and assemble components for us in various Asian countries, including China, Japan, South Korea, Malaysia, the Philippines, Singapore, Taiwan, Thailand and Vietnam, in Europe and in the United States.

*Suppliers of Components and Industry Constraints.*     Due to industry consolidation, there are a limited number of independent suppliers of components, such as recording heads and media, available to disk drive manufacturers. Vertically integrated disk drive manufacturers, who manufacture their own components, are less dependent on external component suppliers than less vertically integrated disk drive manufacturers.

*Commodity and Other Manufacturing Costs.*     The production of disk drives requires rare earth elements, precious metals, scarce alloys and industrial commodities, which are subject to fluctuations in prices and the supply of which has at times been constrained. During the latter part of fiscal year 2011, the industry experienced significant increases in the costs of rare earth elements, which are used in magnets as well as in the process for polishing glass substrates. In addition to increased costs of components and commodities, volatility in fuel costs may also increase our costs related to commodities, manufacturing and freight. As a result, we may increase our use of ocean shipments to help offset any increase in freight costs.

**Products**

We offer a broad range of disk drive products for the enterprise, client compute and client non-compute market applications. We offer more than one product within each product family and

differentiate products on the basis of price, performance, form factor, capacity, interface, power consumption efficiency, security features like full disk encryption and other customer integration requirements. Our industry is characterized by continuous and significant advances in technology which contribute to rapid product life cycles. We list our main current product offerings below.

### Enterprise Storage

*Cheetah SCSI/SAS/Fibre Channel Family.*    Our Cheetah 3.5-inch disk drives ship in 10,000 and 15,000 RPM and in storage capacities ranging from 73GB to 600GB. Commercial uses for Cheetah disk drives include Internet and e-commerce servers, data mining and data warehousing, mainframes and supercomputers, department/enterprise servers and workstations, transaction processing, professional video and graphics and medical imaging.

*Savvio SCSI/SAS/Fibre Channel Family.*    We are currently shipping our fifth generation Savvio 2.5-inch enterprise disk drive featuring increased throughput and improved energy efficiency, targeted at space optimized enterprise storage systems. Our Savvio disk drives ship in 10,000 and 15,000 RPM and in storage capacities ranging from 73GB to 900GB. We believe that end-user customers are increasingly adopting the smaller 2.5-inch form factor enterprise class disk drives, which allow the installation of more disk drives per square foot, thus facilitating faster access to data.

*Constellation ES SATA Family.*    Our Constellation disk drives ship in both 2.5-inch and 3.5-inch and in storage capacities of up to 1TB and 3TB, respectively, at 7,200 RPM. The Constellation is designed for reference data environments that require high capacity, enterprise reliability, energy efficiency and optional security.

*Pulsar Family.*    Our Pulsar family of products are performance-optimized solid state drives for high-value, critical data, requiring enterprise class endurance and reliability in capacities ranging from 50GB to 800GB.

### Client Compute

*Momentus ATA/SATA Family.*    Our Momentus family of disk drives for mobile computing disk drive products ship in 5,400 and 7,200 RPM and in capacities ranging from 160GB to 1 TB. Momentus disk drives are used in notebooks for business, government, education and consumer applications. Consumer uses for Momentus disk drives also include tablets and digital audio applications. Our Momentus 7200.4 is a 7,200 RPM disk drive for high-performance notebooks. In addition, we are the industry leader in shipments of hybrid drives into the notebook market with our Momentus XT product line. Hybrid disk drives incorporate both a hard disk drive and NAND flash storage. The benefits of such drives are improved performance over hard disk drives, as well as higher capacity and lower cost compared to SSDs alone.

*Barracuda ATA/SATA Family.*    Our Barracuda 3.5-inch disk drives ship in 5,400 and 7,200 RPM and in storage capacities of up to 2TB. Barracuda disk drives are designed for applications such as PCs, workstations and personal external storage devices.

### Client Non-Compute

*Pipeline HD and DB35 SATA Family.*    We sell our 3.5-inch Pipeline HD and DB35 disk drives primarily for use in DVRs. These disk drives are optimized for leading-edge digital entertainment and range from 160GB to 2TB.

*Pipeline Mini SATA Family.*    We sell our 2.5-inch, 5,400 RPM Pipeline Mini disk drives, with capacities ranging from 160GB up to 500GB, for use in low-profile DVRs, gaming consoles, home entertainment devices and small footprint media PCs.

We ship external backup storage solutions under our Free Agent Go™ and Free Agent Go Flex™ product lines. Both of these product lines utilize our 3.5-inch and 2.5-inch disk drives, which are available in capacities up to 3TB and 1TB, respectively.

**Customers**

We sell our disk drives to major OEMs, distributors and retailers under our globally recognized brand names. We have longstanding relationships with many of our OEM customers, such as Hewlett-Packard Company, Dell Inc. and EMC Corporation.

The following table summarizes our disk drive revenue by channel and by geography:

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| *Revenues by Channel (%)* | | | |
| OEM | 69% | 71% | 64% |
| Distributors | 22% | 21% | 27% |
| Retail | 9% | 8% | 9% |
| *Revenues by Geography (%)* | | | |
| Americas | 29% | 26% | 28% |
| EMEA | 20% | 22% | 27% |
| Asia Pacific | 51% | 52% | 45% |

OEM customers typically enter into master purchase agreements with us. These agreements provide for pricing, volume discounts, order lead times, product support obligations and other terms and conditions. The term of these agreements is usually 6 to 24 months; however they are generally cancelable for convenience by either party upon written notice. Our product support obligations generally extend substantially beyond the term of these agreements. These master agreements typically do not commit the customer to buy any minimum quantity of products or create exclusive relationships. Deliveries are scheduled only after receipt of purchase orders. In addition, with limited lead-time, customers may cancel or defer most purchase orders without significant penalty. Anticipated orders from many of our customers have in the past failed to materialize or OEM delivery schedules have been deferred or altered as a result of changes in their business needs.

Our distributors generally enter into non-exclusive agreements for the resale of our products. They typically furnish us with a non-binding indication of their near-term requirements and product deliveries are generally scheduled accordingly. The agreements and related sales programs typically provide the distributors with limited right of return and price protection rights. In addition, we offer sales programs to distributors on a quarterly and periodic basis to promote the sale of selected products in the sales channel.

Our retail channel consists of our branded storage products sold to retailers either by us directly or by our distributors. Retail sales made by us or our distributors typically require greater marketing support, sales incentives and price protection periods.

In fiscal year 2011, Hewlett-Packard Company accounted for approximately 15% of consolidated revenue, while Dell Inc. accounted for approximately 13% of consolidated revenue. In each of fiscal years 2010 and 2009, Hewlett-Packard Company accounted for approximately 16% of consolidated revenue, while Dell Inc. accounted for approximately 11% of consolidated revenue. We have master purchase agreements in place with Hewlett-Packard Company and Dell Inc. that are cancelable for convenience by either party upon written notice, and do not require either customer to purchase any minimum or other specified quantity of our products. See "Item 1A. Risk Factors—Risks Related to Our Business—Dependence on Key Customers—We may be adversely affected by the loss of, or reduced, delayed or cancelled purchases by, one or more of our larger customers."

**Competition**

The markets that we compete in are intensely competitive. Disk drive manufacturers not only compete for a limited number of major disk drive customers but also compete with other companies in the electronic data storage industry that provide alternative storage solutions, such as flash memory, tape, optical and SSDs. Some of the principal factors used by customers to differentiate among electronic data storage solutions manufacturers are storage capacity, price per unit and price per gigabyte, storage/retrieval access times, data transfer rates, product quality and reliability, supply continuity, form factor, warranty and brand. We believe that our disk drive products are competitive with respect to each of these factors in the markets that we currently address.

We summarize below our principal disk drive competitors, other competitors, the effect of competition on price erosion for our products, product life cycles and technology.

*Principal Disk Drive Competitors.*    We have experienced and expect to continue to experience intense competition from a number of domestic and foreign companies, some of which have greater financial and other resources than we have. These competitors include independent disk drive manufacturers such as Western Digital Corporation, as well as large captive manufacturers such as Hitachi Global Storage Technologies, Samsung Electronics Co., Ltd. and Toshiba Corporation. Because these captive manufacturers produce complete computer systems and other non-compute consumer electronics and mobile devices, they can derive a greater portion of their operating margins from other components, which may reduce their need to realize a profit on the disk drives included in their computer systems and may allow them to sell disk drives to third parties at very low margins. Many captive manufacturers are also formidable competitors because they have more resources and greater access to their internal customers than we do. In addition, competitors such as Samsung Electronics Co., Ltd. and Toshiba Corporation are increasingly integrating other storage technologies such as flash memory, hybrid disk drives and SSDs into their product offerings. Not only may they be willing to sell their disk drives at a lower margin to advance their overall business strategy, their portfolio may allow them to be indifferent to which technology prevails over the other as they can offer a broad range of storage media and solutions and focus on those with lowest costs and greatest sales. In addition to competing with our disk drive competitors, we also compete with companies such as Iomega Corporation (an EMC company) and LaCie S.A. that purchase disk drives from us and our competitors for use in their branded storage products.

*Other Competitors.*    We also are experiencing competition from companies that provide alternative storage technologies such as flash memory and SSDs. In the flash memory market, primarily used in lower capacity handheld devices, our principal competitors include Micron Technology, Inc., Samsung Electronics Co., Ltd., SanDisk Corporation and Toshiba Corporation. In enterprise applications, where SSDs are used for rapid processing and high volume transactions, our principal SSD competitors include Hitachi Global Storage Technologies, Intel Corporation and STEC Inc., with others expected to enter in the near future.

*Price Erosion.*    Our industry has been characterized by price declines for disk drive products with comparable capacity, performance and feature sets ("like-for-like products"). Price declines for like-for-like products ("price erosion") are more pronounced during periods of:

- economic contraction or industry consolidation in which competitors may use discounted pricing to attempt to maintain or gain market share;

- few new product introductions when multiple competitors have comparable or alternative product offerings;

- temporary imbalances between industry supply and demand; and

- seasonally weaker demand, which may cause excess supply.

12

Disk drive manufacturers typically attempt to offset price erosion with an improved mix of disk drive products characterized by higher capacity, better performance and additional feature sets and/or product cost reductions.

We expect price erosion in our industry to continue. To remain competitive, we believe it is necessary for industry participants to continue to introduce new product offerings that utilize advanced technologies ahead of the competition in order to take advantage of potentially higher initial profit margins and reduced cost structures on these new products.

*Product Life Cycles and Changing Technology.*    Our industry has been characterized by significant advances in technology, which have contributed to rapid product life cycles. As a result, success in our industry has been dependent to a large extent on the ability to be the first-to-market with new products, allowing those disk drive manufacturers who introduce new products first to benefit from improved product mix, favorable profit margins and less pricing pressure until comparable products are introduced. Also, because our industry is characterized by continuous price erosion, the existence of rapid product life cycles has necessitated quick achievement of product cost effectiveness. Changing technology also necessitates on-going investments in research and development, which may be difficult to recover due to rapid product life cycles and economic declines. Further, there is a continued need to successfully execute product transitions and new product introductions, as factors such as quality, reliability and manufacturing yields become of increasing competitive importance.

## Seasonality

The disk drive industry traditionally experiences seasonal variability in demand with higher levels of demand in the second half of the calendar year. This seasonality is driven by consumer spending in the back-to-school season from late summer to fall and the traditional holiday shopping season from fall to winter. In addition, corporate demand is typically higher during the second half of the calendar year. However, with volatility in fuel costs, the industry may be experiencing higher levels of demand earlier in the calendar year as customers attempt to take advantage of less expensive modes of transportation, which generally require longer lead times.

## Research and Development

We are committed to developing new component technologies, products and alternative storage technologies, including solid state technology. Our research and development focus is designed to bring new products to market in high volume, with quality attributes that our customers expect, before our competitors. Part of our product development strategy is to leverage a design platform and/or subsystem within product families to serve different market needs. This platform strategy allows for more efficient resource utilization, leverages best design practices, reduces exposure to changes in demand, and allows for achievement of lower costs through purchasing economies. Our advanced technology integration effort focuses disk drive and component research on recording subsystems, including read/write heads and recording media, market-specific product technology and technology focused towards new business opportunities. The primary purpose of our advanced technology integration effort is to ensure timely availability of mature component technologies to our product development teams as well as allowing us to leverage and coordinate those technologies in the design centers across our products in order to take advantage of opportunities in the marketplace. During fiscal years 2011, 2010 and 2009, we had product development expenses of approximately $875 million, $877 million and $953 million, respectively, which represented 8%, 8% and 10% of our consolidated revenue, respectively.

## Patents and Licenses

As of July 1, 2011, we had 4,370 U.S. patents and 553 patents issued in various foreign jurisdictions as well 1,093 U.S. and 444 foreign patent applications pending. The number of patents and patent

13

applications will vary at any given time as part of our ongoing patent portfolio management activity. Due to the rapid technological change that characterizes the electronic data storage industry, we believe that, in addition to patent protection, the improvement of existing products, reliance upon trade secrets, protection of unpatented proprietary know-how and development of new products are also important to our business in establishing and maintaining a competitive advantage. Accordingly, we intend to continue our efforts to broadly protect our intellectual property, including obtaining patents, where available, in connection with our research and development program.

The electronic data storage industry is characterized by significant litigation relating to patent and other intellectual property rights. Because of rapid technological development in the electronic data storage industry, some of our products have been, and in the future could be, alleged to infringe existing patents of third parties. From time to time, we receive claims that our products infringe patents of third parties. Although we have been able to resolve some of those claims or potential claims by obtaining licenses or rights under the patents in question without a material adverse affect on us, other claims have resulted in adverse decisions or settlements. In addition, other claims are pending, which if resolved unfavorably to us could have a material adverse effect on our business and results of operations. For more information on these claims, see "Item 8. Financial Statements and Supplementary Data—Note 13, Legal, Environmental, and Other Contingencies." The costs of engaging in intellectual property litigation in the past have been, and in the future may be, substantial, irrespective of the merits of the claim or the outcome. We have patent licenses with a number of companies. Additionally, as part of our normal intellectual property practices, we may be engaged in negotiations with other major electronic data storage companies and component manufacturers with respect to patent licenses.

## Backlog

In view of our customers' rights to cancel or defer orders with little or no penalty, we believe backlog in the disk drive industry is of limited indicative value in estimating future performance and results.

## Environmental Matters

Our operations are subject to U.S. and foreign laws and regulations relating to the protection of the environment, including those governing discharges of pollutants into the air and water, the management and disposal of hazardous substances and wastes and the cleanup of contaminated sites. Some of our operations require environmental permits and controls to prevent and reduce air and water pollution, and these permits are subject to modification, renewal and revocation by issuing authorities.

We have established environmental management systems and continually update our environmental policies and standard operating procedures for our operations worldwide. We believe that our operations are in material compliance with applicable environmental laws, regulations and permits. We budget for operating and capital costs on an ongoing basis to comply with environmental laws. If additional or more stringent requirements are imposed on us in the future, we could incur additional operating costs and capital expenditures.

Some environmental laws, such as the Comprehensive Environmental Response Compensation and Liability Act of 1980 (as amended, the "Superfund" law) and its state equivalents, can impose liability for the cost of cleanup of contaminated sites upon any of the current or former site owners or operators or upon parties who sent waste to these sites, regardless of whether the owner or operator owned the site at the time of the release of hazardous substances or the lawfulness of the original disposal activity. We have been identified as a potentially responsible party at several sites. At each of these sites, we have an assigned portion of the financial liability based on the type and amount of hazardous substances disposed of by each party at the site and the number of financially viable parties. We have fulfilled our responsibilities at some of these sites and remain involved in only a few sites at this time.

14

While our ultimate costs in connection with these sites is difficult to predict with complete accuracy, based on our current estimates of cleanup costs and our expected allocation of these costs, we do not expect costs in connection with these sites to be material.

We may be subject to various state, federal and international laws and regulations governing the environment, including those restricting the presence of certain substances in electronic products. For example, the European Union ("EU") enacted the Restriction of the Use of Certain Hazardous Substances in Electrical and Electronic Equipment, which prohibits the use of certain substances, including lead, in certain products, including disk drives, put on the market after July 1, 2006. Similar legislation has been or may be enacted in other jurisdictions, including in the United States, Canada, Mexico, Taiwan, China, Japan and others. The European Union REACH Directive (Registration, Evaluation, Authorization, and restriction of Chemicals, EC 1907/2006) also restricts substances of very high concern (SVHCs) in products.

If we or our suppliers fail to comply with the substance restrictions, recycle requirements or other environmental requirements as they are enacted worldwide, it could have a materially adverse effect on our business.

## Employees

At July 1, 2011, we employed approximately 52,700 employees, temporary employees and contractors worldwide, of which approximately 45,500 employees were located in our Asian operations. We believe that our future success will depend in part on our ability to attract and retain qualified employees at all levels. We believe that our employee relations are good.

## Financial Information

Financial information for our reportable business segment and about geographic areas is set forth in "Item 8. Financial Statements and Supplementary Data—Note 12, Business Segment and Geographic Information."

## Corporate Information

On July 3, 2010, we consummated our previously announced reorganization pursuant to which Seagate Technology public limited company, a public limited company organized under the laws of Ireland, became the publicly traded parent of the Seagate corporate family. Prior to the reorganization our publicly traded parent was Seagate Technology, an exempted company incorporated with limited liability under the laws of the Cayman Islands.

## Available Information

*Availability of Reports.*    We are a reporting company under the Securities Exchange Act of 1934, as amended (the "1934 Exchange Act"), and we file reports, proxy statements and other information with the U.S. Securities and Exchange Commission (the "SEC"). The public may read and copy any of our filings at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Because we make filings to the SEC electronically, the public may access this information at the SEC's website: *www.sec.gov* . This site contains reports, proxies and information statements and other information regarding issuers that file electronically with the SEC.

*Web Site Access.*    Our website is *www.seagate.com* . We make available, free of charge at the "Investor Relations" section of our website, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the 1934 Exchange Act as soon as reasonably practicable after we electronically

15

file such material with, or furnish it to, the SEC. Reports of beneficial ownership filed pursuant to Section 16(a) of the 1934 Exchange Act are also available on our web site. Information in, or that can be accessed through, our web site is not incorporated into this Form 10-K.

## Executive Officers

The following sets forth the name, age and position of each of the persons who were serving as executive officers as of August 4, 2011. There are no family relationships among any of our executive officers.

| Name | Age | Positions |
|---|---|---|
| Stephen J. Luczo | 54 | Chairman, President and Chief Executive Officer |
| Patrick J. O'Malley | 49 | Executive Vice President and Chief Financial Officer |
| Robert W. Whitmore | 49 | Executive Vice President and Chief Technology Officer |
| William D. Mosley | 44 | Executive Vice President, Operations |
| Albert A. "Rocky" Pimentel | 55 | Executive Vice President, Chief Sales and Marketing Officer |
| D. Kurt Richarz | 50 | Executive Vice President, Sales |
| Kenneth M. Massaroni | 50 | Executive Vice President, General Counsel and Chief Administrative Officer |
| David H. Morton Jr. | 39 | Vice President, Finance, Treasurer and Principal Accounting Officer |

Stephen J. Luczo, Chairman, President and Chief Executive Officer. Mr. Luczo, 54, has served as President and CEO since January 2009, and continues to serve as Chairman of the Board. Mr. Luczo joined Seagate in October 1993 as Senior Vice President of Corporate Development. In September 1997, he was promoted to President and Chief Operating Officer of our predecessor, Seagate Technology, Inc. and, in July 1998, he was promoted to CEO at which time he joined the board of directors of Seagate Technology, Inc. He was appointed Chairman of the Board in 2002. Mr. Luczo resigned as CEO effective as of July 3, 2004, but retained his position as Chairman of the Board. He served as non-employee Chairman from October 2006 to January 2009. From October 2006 until he rejoined us in January 2009, Mr. Luczo was a private investor. Prior to joining Seagate in 1993, Mr. Luczo was Senior Managing Director of the Global Technology Group of Bear, Stearns & Co. Inc., an investment banking firm, from February 1992 to October 1993.

Patrick J. O'Malley, Executive Vice President and Chief Financial Officer. Mr. O'Malley, 49, has served as Executive Vice President and Chief Financial Officer since August 2008. Previously, he served as Senior Vice President, Finance from 2005 to August 2008, and assumed the additional roles of Principal Accounting Officer and Treasurer in 2006. Prior to that, he was Senior Vice President, Consumer Electronics from 2004 to 2005; Senior Vice President, Finance, Manufacturing from 1999 to 2004; Vice President, Finance-Recording Media from 1997 to 1999; Senior Director Finance, Desktop Design, from 1996 to 1997; Senior Director, Finance, Oklahoma City Operations from 1994 to 1996; Director/Manager, Corporate Financial Planning & Analysis from 1991 to 1994; Manager, Consolidations & Cost Accounting from 1990 to 1991; Manager, Consolidations from 1988 to 1990; and Senior Financial Analyst in 1988.

Robert W. Whitmore, Executive Vice President and Chief Technology Officer. Mr. Whitmore, 49, has been Executive Vice President and Chief Technology Officer since March 2011. Prior to that he was executive Vice President, Design and Operations from 2007 through March 2011; Executive Vice President, Product and Process Development from 2006 to 2007; Senior Vice President, Product and Process Development from 2004 to 2006; Senior Vice President, Product Development Engineering from 2002 to 2004; Vice President, Enterprise Storage Design Engineering from 1999 to 2002, Vice President and Executive Director, Twin Cities Manufacturing Operations from 1997 to 1999; Senior Director, Manufacturing Engineering, Singapore Operations from 1995 to 1997; and Senior Manager, Design Engineering, Twin Cities Division from 1992 to 1995.

16

William D. Mosley, Executive Vice President, Operations. Mr. Mosley, 44, has served as Executive Vice President, Operations since March 2011. Prior to that, he served as Executive Vice President, Sales and Marketing from September 2009 through March 2011; Executive Vice President, Sales, Marketing and Product Line Management from February 2009 to September 2009; Senior Vice President, Global Disk Storage Operations from 2007 to 2009; Vice President, Research and Development, Engineering from 2002 to 2007; Senior Director, Research and Development, Engineering from 2000 to 2002; Director, Research and Development, Engineering from 1998 to 2000; and Manager, Operations and Manufacturing from 1996 to 1998.

Albert A. "Rocky" Pimentel, Executive Vice President, Worldwide Sales and Marketing. Mr. Pimentel, 55, joined Seagate in April 2011. Mr. Pimentel was previously a director of Seagate from 2009 until his resignation from the Board of Directors on April 7, 2011. Mr. Pimentel served as Chief Operating Officer and Chief Financial Officer ("CFO") at McAfee, Inc., from 2008 until he retired in August 2010. He served as the Executive Vice President and CFO of Glu Mobile from 2004 to 2008. Prior to joining Glu Mobile, Mr. Pimentel served as Executive Vice President and CFO at Zone Labs from 2003 to 2004, which was acquired by Check Point Software in 2004. From 2001 to 2003, Mr. Pimentel was a partner with Redpoint Ventures. Mr. Pimentel also held the positions of Senior Vice President and CFO of WebTV Networks, which was acquired by Microsoft in 1997; from 1996 until 2001, Senior Vice President and CFO of LSI Logic Corporation from 1992 to 1996 and was part of the founding management team of Conner Peripherals, Inc., which was acquired by the Company in 1996.

D. Kurt Richarz, Executive Vice President, Sales and Marketing. Mr. Richarz, 50, joined Seagate in May 2006, when we acquired Maxtor Corporation. He has served as our Executive Vice President, Sales and Marketing since March 2011. Prior to that, he served as our Executive Vice President, Sales from May 2008 through March 2011;Executive Vice President, Sales and Customer Service Operations since from May 2006 to May 2008; Senior Vice President of Global OEM Sales from 2007 to 2008, and Vice President of Global OEM Sales from 2006 to 2007. At Maxtor Corporation, from 2002 to 2006, he served as Vice President, Global OEM Account Sales and Senior Vice President of Worldwide Sales. From 1990 to 2001, he served in various sales positions at Quantum Corporation.

Kenneth M. Massaroni, Executive Vice President, General Counsel and Chief Administrative Officer. Mr. Massaroni, 50, was appointed Executive Vice President, General Counsel and Chief Administrative Officer in July 2011. Prior to that, he served as Senior Vice President, General Counsel and Corporate Secretary from April 2008 through July 2011; Vice President and Acting General Counsel from December 2007 to April 2008; and Vice President of Intellectual Property from 2006 to December 2007. Prior to joining Seagate in 2006, Mr. Massaroni was vice president of law, deputy general counsel and assistant secretary at Scientific-Atlanta Inc. from 1997 to 2006. In addition, Mr. Massaroni has also held senior patent counsel positions at Motorola Inc. from 1993 to 1997, served as general counsel and secretary at Optical Imaging Systems, Inc. from 1990 to 1992 and as a patent attorney at Energy Conversion Devices Inc. from 1987 to 1990, and as an associate at the law firm of Collier, Shannon, Rill and Scott from 1992 to 1993.

David H. Morton Jr., Vice President, Finance, Treasurer and Principal Accounting Officer. Mr. Morton, 39, joined Seagate in 1995 and has served as our Vice President, Finance, Treasurer and Principal Accounting Officer since October 2009. Prior to that, he served as our Vice President of Finance, Sales and Marketing from March 2009 to October 2009; Vice President of Sales Operations from July 2007 to March 2009; Vice President of Finance, Storage Markets from October 2006 to July 2007; Executive Director of Consumer Electronics Finance from October 2005 to October 2006; and Executive Director of Corporate FP&A from June 2004 to October 2005. Prior to June 2004, Mr. Morton held a variety of progressively senior management positions within our finance organization.

## ITEM 1A.   RISK FACTORS

### Risks Related to our Business

***Macroeconomic Conditions—Changes in the macroeconomic environment have, and may continue to, negatively impact our results of operations.***

Due to the continuing uncertainty about current macroeconomic conditions, we believe our customers may postpone spending in response to tighter credit, unemployment, negative financial news and/or declines in income or asset values, which could have a material adverse effect on the demand for our products. Other factors that could influence demand include conditions in the residential real estate and mortgage markets, labor and healthcare costs, access to credit, consumer confidence and other macroeconomic factors affecting consumer spending behavior. These and other economic factors could have a material adverse effect on demand for our products and on our financial condition and operating results.

In addition, the capital and credit markets continue to experience some measure of volatility and disruption, resulting in a tightening in the credit markets, a low level of liquidity in many financial markets and reduced stability in fixed income, credit, currency and equity markets. There could be a number of follow-on effects from the credit crisis on our business including our customers being less able to obtain financing to purchase our products.

***Competition—Our industry is highly competitive and our products have experienced and will continue to experience significant price erosion and market share variability.***

The disk drive industry is intensely competitive and vendors typically experience substantial price erosion over the life of a product. Our competitors have historically offered existing products at lower prices as part of a strategy to gain or retain market share and customers, and we expect these practices to continue. We will need to continually reduce our prices for existing products to retain our market share, which could adversely affect our results of operations.

We believe price erosion and market share variability will continue, as the industry engages in aggressive pricing actions targeted to shift customer demand to offset lower demand due to the deterioration in business and economic conditions.

Our ability to offset the effect of price erosion through new product introductions at higher average prices is diminished to the extent competitors introduce products into particular markets ahead of our similar, competing products. This risk is particularly pronounced in markets where we have experienced lower market share, as is the case in the market for 2.5-inch ATA products. Our ability to offset the effect of price erosion is also diminished during times when product life cycles for particular products are extended, allowing competitors more time to enter the market.

The growth of sales to distributors that serve producers of non-branded products in the personal storage sector may also contribute to increased price erosion. These customers generally have limited product qualification programs, which increases the number of competing products available to satisfy their demand. As a result, purchasing decisions for these customers are based largely on price and terms. Any increase in our average price erosion would have an adverse effect on our results of operations.

Additionally, a significant portion of our success in the past has been a result of increasing our market share at the expense of our competitors, particularly in enterprise markets. Market share for our products can be negatively affected by our customers' diversifying their sources of supply as our competitors enter the market for particular products, as well as by our ability to ramp volume production of new product offerings. When our competitors successfully introduce product offerings that are competitive with our recently introduced products, our customers may quickly diversify their sources of supply. Any significant

18

decline in our market share in any of our principal market applications would adversely affect our results of operations.

***Principal Competitors—We compete with both independent manufacturers, whose primary focus is producing technologically advanced disk drives, and captive manufacturers, who do not depend solely on sales of disk drives to maintain their profitability.***

We have experienced and expect to continue to experience intense competition from a number of domestic and foreign companies, including other independent disk drive manufacturers, and large captive manufacturers. The term "independent" in this context refers to manufacturers that primarily produce disk drives as a stand-alone product, such as Western Digital Corporation, and the term "captive" in this context refers to manufacturers who themselves or through affiliated entities produce complete computer or other systems that contain disk drives or other electronic data storage products, such as Hitachi Global Storage Technologies, Samsung Electronics Incorporated and Toshiba Corporation.

Captive manufacturers are formidable competitors because they have the ability to determine pricing for complete systems without regard to the margins on individual components. As components other than disk drives generally contribute a greater portion of the operating margin on a complete computer system than do disk drives, captive manufacturers do not necessarily need to realize a profit on the disk drives included in a complete computer system and, as a result, may be willing to sell disk drives to third parties at very low margins. Captive manufacturers are also formidable competitors because they have more substantial resources than we do. Samsung and Hitachi (together with affiliated entities) also sell other products to our customers, including critical components like flash memory, ASICs and flat panel displays, and may be willing to sell their disk drives at a lower margin to advance their overall business strategy. To the extent we are not successful competing with captive or independent disk drive manufacturers, our results of operations will be adversely affected.

In response to customer demand for high-quality, high-volume and low-cost disk drives, manufacturers of disk drives have had to develop large, and in some cases global, production facilities with highly developed technological capabilities and internal controls. The development of these large production facilities combined with industry consolidation can further increase the intensity of competition.

We also face indirect competition from present and potential customers who evaluate from time to time whether to manufacture their own disk drives or other electronic data storage products.

We also experience competition from other companies that produce alternative storage technologies like flash memory, where increasing capacity, decreasing cost, energy efficiency and improvements in performance ruggedness have resulted in competition with our lower capacity, smaller form factor disk drives. While this competition has traditionally been in the markets for handheld consumer electronics applications, these competitors have announced solid state drives (SSDs) for tablet, notebook and enterprise compute applications. Some of these companies, like Samsung, also sell disk drives. Certain customers for both notebook and enterprise compute applications are evaluating and may adopt SSDs as alternatives to hard drives in certain applications.

***Volatility of Quarterly Results—Our quarterly results of operations fluctuate, sometimes significantly, from period to period, and may cause our share price to decline.***

In the past, our quarterly revenue and results of operations have fluctuated, sometimes significantly, from period to period. These fluctuations, which we expect to continue, may be occasioned by a variety of factors, including:

- current uncertainty in global economic conditions may pose a risk to the overall economy;

- adverse changes in the level of economic activity in the major regions in which we do business;

19

- competitive pressures resulting in lower selling prices by our competitors targeted to encourage shifting of customer demand;

- delays or problems in our introduction of new products, particularly new disk drives with lower cost structures, the inability to achieve high production yields or delays in customer qualification or initial product quality issues;

- changes in purchasing patterns by our distributor customers;

- increased costs or adverse changes in availability of supplies of raw materials or components;

- the impact of corporate restructuring activities that we have and may continue to engage in;

- changes in the demand for the computer systems, storage subsystems and consumer electronics that contain our disk drives, due to seasonality, economic conditions and other factors;

- changes in purchases from period to period by our primary customers, particularly as our competitors are able to introduce and produce in volume competing disk drive solutions or alternative storage technology solutions, such as flash memory or SSDs;

- shifting trends in customer demand which, when combined with overproduction of particular products, particularly when the industry is served by multiple suppliers, results in unfavorable supply/demand imbalances;

- our high proportion of fixed costs, including research and development expenses;

- announcements of new products, services or technological innovations by us or our competitors; and

- adverse changes in the performance of our products.

As a result, we believe that quarter-to-quarter comparisons of our revenue and results of operations may not be meaningful, and that these comparisons may not be an accurate indicator of our future performance. Our results of operations in one or more future quarters may fail to meet the expectations of investment research analysts or investors, which could cause an immediate and significant decline in the trading price of our ordinary shares.

***New Product Offerings—Market acceptance of new product introductions cannot be accurately predicted, and our results of operations will suffer if there is less demand for our new products than is anticipated.***

We are continually developing new products with the goal that we will be able to introduce technologically advanced and lower cost disk drives into the marketplace ahead of our competitors.

The success of our new product introductions is dependent on a number of factors, including market acceptance, our ability to manage the risks associated with product transitions, the effective management of inventory levels in line with anticipated product demand and the risk that our new products will have quality problems or other defects in the early stages of introduction that were not anticipated in the design of those products. Accordingly, we cannot accurately determine the ultimate effect that our new products will have on our results of operations.

In addition, the success of our new product introductions is dependent upon our ability to qualify as a primary source of supply with our OEM customers. In order for our products to be considered by our customers for qualification, we must be among the leaders in time-to-market with those new products. Once a product is accepted for qualification testing, any failure or delay in the qualification process or a requirement that we requalify can result in our losing sales to that customer until new products are introduced. The limited number of high-volume OEMs magnifies the effect of missing a product qualification opportunity. These risks are further magnified because we expect competitive pressures to result in declining sales, eroding prices, and declining gross margins on our current generation products.

We cannot assure that we will be among the leaders in time-to-market with new products or that we will be able to successfully qualify new products with our customers in the future.

If we cannot successfully deliver competitive products, our future results of operations may be adversely affected.

***Smaller Form Factor Disk Drives—If we do not continue to successfully market smaller form factor disk drives, our business may suffer.***

The disk drive industry is experiencing significant increases in sales of smaller form factor disk drives for an expanding number of applications, in particular notebook computers and consumer electronic devices, but also in personal computers and enterprise storage applications. Our future success will depend on our ability to develop and introduce smaller form factor drives at desired price and capacity points faster than our competitors.

We have experienced competition from other companies that produce alternative storage technologies like solid state or flash memory, where increased capacity, improving cost, energy efficiency and performance ruggedness have resulted in flash memory largely replacing disk drives in handheld applications. We believe that the demand for disk drives to store or back up related media content from such handheld devices, however, continues to grow. While this competition has traditionally been limited to the markets for handheld consumer electronics applications, these competitors have announced SSDs for tablet, notebook and enterprise compute applications.

If we do not suitably adapt our product offerings to successfully introduce additional smaller form factor disk drives or alternative storage products based on flash storage technology, or if our competitors are successful in achieving customer acceptance of SSD products for tablet, notebook and enterprise compute applications, then our customers may decrease the amounts of our products that they purchase, which would adversely affect our results of operations.

***Difficulty in Predicting Quarterly Demand—If we fail to predict demand accurately for our products in any quarter, we may not be able to recapture the cost of our investments.***

The disk drive industry operates on quarterly purchasing cycles, with much of the order flow in any given quarter typically coming at the end of that quarter. Our manufacturing process requires us to make significant product-specific investments in inventory in each quarter for that quarter's production. Since we typically receive the bulk of our orders late in a quarter after we have made our investments, there is a risk that our orders will not be sufficient to allow us to recapture the costs of our investment before the products resulting from that investment have become obsolete. We cannot assure you that we will be able to accurately predict demand in the future.

The difficulty in forecasting demand also increases the difficulty in anticipating our inventory requirements, which may cause us to over-produce finished goods, resulting in inventory write-offs, or under-produce finished goods, affecting our ability to meet customer requirements. Additionally, the risk of inventory write-offs could increase if we were to continue to hold higher inventory levels. We cannot be certain that we will be able to recover the costs associated with increased inventory.

Other factors that may negatively impact our ability to recapture the cost of investments in any given quarter include:

- the impact of variable demand and an aggressive pricing environment for disk drives;

- the impact of competitive product announcements and possible excess industry supply both with respect to particular disk drive products and with respect to competing alternative storage technology solutions such as SSDs in tablet, notebook and enterprise compute applications;

21

- our inability to reduce our fixed costs to match sales in any quarter because of our vertical manufacturing strategy, which means that we make more capital investments than we would if we were not vertically integrated;

- dependence on our ability to successfully qualify, manufacture and sell in increasing volumes on a cost-effective basis and with acceptable quality our disk drive products, particularly the new disk drive products with lower cost structures;

- variations in the cost of components for our products, especially during periods when the U.S. dollar is relatively volatile as compared to other currencies;

- uncertainty in the amount of purchases from our distributor customers who from time to time constitute a large portion of our total sales;

- our product mix and the related margins of the various products;

- accelerated reduction in the price of our disk drives due to technological advances and/or an oversupply of disk drives in the market and shifting trends in demand which can create supply and demand imbalances;

- manufacturing delays or interruptions, particularly at our manufacturing facilities in China, Malaysia, Northern Ireland, Singapore, Thailand or the United States;

- limited access to components that we obtain from a single or a limited number of suppliers;

- the impact of changes in foreign currency exchange rates on the cost of producing our products and the effective price of our products to foreign consumers; and

- operational issues arising out of the increasingly automated nature of our manufacturing processes.

***Dependence on Supply of Components, Equipment and Raw Materials—If we experience shortages or delays in the receipt of, or cost increases in, critical components, equipment or raw materials necessary to manufacture our products, we may suffer lower operating margins, production delays and other material adverse effects.***

The cost, quality and supply of components, certain equipment and raw materials used to manufacture disk drives and key components like recording media and heads are critical to our success. The equipment we use to manufacture our products and components is frequently custom made and comes from a few suppliers and the lead times required to obtain manufacturing equipment can be significant. Particularly important components for disk drives include read/write heads, aluminum or glass substrates for recording media, ASICs, spindle motors, printed circuit boards, and suspension assemblies. We rely on sole suppliers or a limited number of suppliers for some of these components that we do not manufacture, including aluminum and glass substrates, read/write heads, ASICs, spindle motors, printed circuit boards, and suspension assemblies. If our vendors for these components are unable to meet our cost, quality, and supply requirements, we could experience a shortage in supply or an increase in production costs, which would adversely affect our results of operations.

Certain rare earth elements are critical in the manufacture of our products. We purchase components that contain rare earth elements from a number of countries, including the People's Republic of China. We cannot predict whether any nation will impose regulations, quotas or embargoes upon the rare earth elements incorporated into our products that would restrict the worldwide supply of such metals or increase their cost. We have experienced increased costs and production delays when we were unable to obtain the necessary equipment or sufficient quantities of some components, and/or have been forced to pay higher prices or make volume purchase commitments or advance deposits for some components, equipment or raw materials that were in short supply in the industry in general. If any major supplier were to restrict the supply available to us or increase the cost of the rare earth elements used in our products, we

22

could experience a shortage in supply or an increase in production costs, which would adversely affect our results of operations.

Consolidation among component manufacturers may result in some component manufacturers exiting the industry or not making sufficient investments in research to develop new components.

If there is a shortage of, or delay in supplying us with, critical components, equipment or raw materials, then:

- it is likely that our suppliers would raise their prices and, if we could not pass these price increases to our customers, our operating margin would decline;

- we might have to reengineer some products, which would likely cause production and shipment delays, make the reengineered products more costly and provide us with a lower rate of return on these products;

- we would likely have to allocate the components we receive to certain of our products and ship less of others, which could reduce our revenues and could cause us to lose sales to customers who could purchase more of their required products from manufacturers that either did not experience these shortages or delays or that made different allocations; and

- we might be late in shipping products, causing potential customers to make purchases from our competitors, thus causing our revenue and operating margin to decline.

We cannot assure you that we will be able to obtain critical components in a timely and economic manner.

***Importance of Time-to-Maturity—Our results of operations may depend on our being among the first-to-maturity with new product offerings and achieving sufficient production volume with our new products.***

To achieve consistent success with our OEM customers, it is important that we be an early provider of new types of disk drives featuring leading, high-quality technology and lower per gigabyte storage cost. Historically, our results of operations have substantially depended upon our ability to be among the first-to-maturity with new product offerings. Our market share and results of operations in the future may be adversely affected if we fail to:

- consistently maintain our time-to-maturity performance with our new products;

- produce these products in sufficient volume;

- qualify these products with key customers on a timely basis by meeting our customers' performance and quality specifications; or

- achieve acceptable manufacturing yields, quality and costs with these products.

If the delivery of our products is delayed, our OEM customers may use our competitors' products to meet their production requirements. If the delay of our products causes delivery of those OEMs' computer systems into which our products are integrated to be delayed, consumers and businesses may purchase comparable products from the OEMs' competitors.

We face the related risk that consumers and businesses may wait to make their purchases if they want to buy a new product that has been shipped or announced but not yet released. If this were to occur, we may be unable to sell our existing inventory of products that may be less efficient and cost effective compared to new products. As a result, even if we are among the first-to-maturity with a given product, subsequent introductions or announcements by our competitors of new products could cause us to lose revenue and not achieve a positive return on our investment in existing products and inventory.

23

***Industry Demand—Poor global economic conditions and changes in demand for computer systems and storage subsystems may cause in the future a decline in demand for our products.***

Our disk drives are components in computers, computer systems, storage subsystems and consumer electronics devices. The demand for these products has been volatile. During times of poor global economic conditions, consumer spending tends to decline and retail demand for personal computers and consumer electronics devices tends to decrease, as does enterprise demand for computer systems and storage subsystems. Moreover, unexpected slowdowns in demand for computer systems, storage subsystems or consumer electronics devices generally cause sharp declines in demand for disk drive products. The decline in consumer spending could have a material adverse effect on demand for our products and services and on our financial condition and results of operations.

Additional causes of declines in demand for our products in the past have included announcements or introductions of major new operating systems or semiconductor improvements or changes in consumer preferences, such as the shift from desktop to notebook computers. We believe these announcements and introductions have from time to time caused consumers to defer their purchases and made inventory obsolete. Whenever an oversupply of disk drives causes participants in our industry to have higher than anticipated inventory levels, we experience even more intense price competition from other disk drive manufacturers than usual.

***Dependence on Distributors—We are dependent on sales to distributors and retailers, which may increase price erosion and the volatility of our sales.***

A substantial portion of our sales has been to distributors of disk drive products. Certain of our distributors may also market other products that compete with our products. Product qualification programs in this distribution channel are limited, which increases the number of competing products that are available to satisfy demand, particularly in times of lengthening product cycles. As a result, purchasing decisions in this channel are based largely on price, terms and product availability. Sales volumes through this channel are also less predictable and subject to greater volatility than sales to our OEM customers. In addition, deterioration in business and economic conditions could exacerbate price erosion and volatility as distributors lower prices to compensate for lower demand and higher inventory levels. Our distributors' ability to access credit for purposes of funding their operations may also affect purchases of our products by these customers.

If distributors reduce their purchases of our products or prices decline significantly in the distribution channel or if distributors experience financial difficulties or terminate their relationships with us, our revenues and results of operations would be adversely affected.

***Dependence on Sales of Disk Drives in Client Non-Compute Applications—Our sales of disk drives for client non-compute applications, which have contributed significant revenues to our results, can experience significant volatility due to seasonal and other factors, which could materially adversely impact our future results of operations.***

Sales of disk drives for client non-compute applications have contributed significant revenues to our results. Consumer spending on client non-compute has, and may continue to, deteriorate in many countries and regions, due to poor global economic conditions and high levels of unemployment. This could have a material adverse effect on demand for our products and services and on our financial condition and results of operations.

In addition, the demand for client non-compute products can be even more volatile and unpredictable than the demand for client compute products. In some cases, our products manufactured for client non-compute applications are uniquely configured for a single customer's application, which creates a risk of unwanted and unsellable inventory if the anticipated volumes are not realized. This potential for unpredictable volatility is increased by the possibility of competing alternative storage technologies like flash memory meeting the customers' cost and capacity metrics, resulting in a rapid shift in demand from

24

our products and disk drive technology, generally, to alternative storage technologies. Unpredictable fluctuations in demand for our products or rapid shifts in demand from our products to alternative storage technologies in new client non-compute applications could materially adversely impact our future results of operations.

***Dependence on Sales of Disk Drives Directly to Consumers Through Retail Outlets—Our sales of disk drives directly to consumers through retail outlets can experience significant volatility due to seasonal and other factors, which could materially adversely impact our future results of operations.***

We believe that industry demand for storage products in the long-term is increasing due to the proliferation of media-rich digital content in consumer applications and is fuelling increased consumer demand for storage. This has led to the expansion of solutions such as external storage products to provide additional storage capacity and to secure data in case of disaster or system failure, or to provide independent storage solutions for multiple users in home or small business environments. Consumer spending on retail sales of our branded solutions has deteriorated in some markets and may continue to do so if poor global economic conditions continue and higher levels of unemployment persist. This could have a material adverse effect on demand for our products and services and on our financial condition and results of operations.

In addition, such retail sales of our branded solutions traditionally experience seasonal variability in demand with higher levels of demand in the first half of our fiscal year driven by consumer spending in the back-to-school season from late summer to fall and the traditional holiday shopping season from fall to winter. Additionally, our ability to reach such consumers depends on our maintaining effective working relationships with major retailers and distributors. Failure to anticipate consumer demand for our branded solutions as well as an inability to maintain effective working relationships with retail and online distributors may adversely impact our future results of operations.

***Importance of Controlling Operating Costs—If we do not control our operating expenses, we will not be able to compete effectively in our industry.***

Our strategy involves, to a substantial degree, increasing revenue and product volume while at the same time controlling operating expenses. If we do not control our operating expenses, our ability to compete in the marketplace may be impaired. In the past, activities to reduce operating costs have included closures and transfers of facilities, significant personnel reductions and efforts to increase automation. The reduction of personnel and closure of facilities may adversely affect our ability to manufacture our products in required volumes to meet customer demand and may result in other disruptions that affect our products and customer service.

***Impairment Charges—We may be required to record additional impairment charges for goodwill and/or other long-lived assets.***

We are required to assess goodwill annually for impairment, or on an interim basis whenever events occur or circumstances change, such as an adverse change in business climate or a decline in the overall industry, that would more likely than not reduce the fair value of a reporting unit below its carrying amount. We are also required to test other long-lived assets, including acquired intangible assets and property, equipment and leasehold improvements, for recoverability and impairment whenever there are indicators of impairment, such as an adverse change in business climate.

Adverse changes in business conditions could materially impact our estimates of future operations and result in impairment charges to our goodwill or other long lived assets. If our goodwill or other long-lived assets were to become impaired, our results of operations could be materially and adversely affected.

25

***Dependence on Key Customers—We may be adversely affected by the loss of, or reduced, delayed or cancelled purchases by, one or more of our larger customers.***

Some of our key customers, including Hewlett-Packard Company, Dell Inc. and EMC Corporation, account for a large portion of our disk drive revenue. While we have longstanding relationships with many of our customers, if any of our key customers were to significantly reduce their purchases from us, our results of operations would be adversely affected. While sales to major customers may vary from period to period, a major customer that permanently discontinues or significantly reduces its relationship with us could be difficult to replace. In line with industry practice, new customers usually require that we pass a lengthy and rigorous qualification process at the customer's cost. Accordingly, it may be difficult or costly for us to attract new major customers. Additionally, mergers, acquisitions, consolidations or other significant transactions involving our customers generally entail risks to our business. If a significant transaction involving any of our key customers results in the loss of or reduction in purchases by these key customers, it could have a materially adverse effect on our business, results of operations, financial condition and prospects.

***Impact of Technological Change—Increases in the areal density of disk drives may outpace customers' demand for storage capacity.***

The rate of increase in areal density, or storage capacity per square inch on a disk, may be greater than the increase in our customers' demand for aggregate storage capacity, particularly in certain market applications like client compute. As a result, our customers' storage capacity needs may be satisfied with lower priced, low capacity disk drives. These factors could decrease our sales, especially when combined with continued price erosion, which could adversely affect our results of operations.

***Changes in Electronic Data Storage Products—Future changes in the nature of electronic data storage products may reduce demand for traditional disk drive products.***

We expect that in the future, new personal computing devices and products will be developed, some of which, such as Internet appliances, tablet or mobile phones with advanced capabilities, or smartphones, may not contain a disk drive. While we are investing development resources in designing disk drives for these new applications, these new applications may have an impact on future demand for disk drive products. Products using alternative technologies, such as flash memory, optical storage and other storage technologies, are becoming increasingly common and could become a significant source of competition to particular applications of our products, which could adversely affect our results of operations.

***New Product Development and Technological Change—If we do not develop products in time to keep pace with technological changes, our results of operations will be adversely affected.***

Our customers have demanded new generations of disk drive products as advances in computer hardware and software have created the need for improved storage products, with features such as increased storage capacity, improved performance and reliability and lower cost. We, and our competitors, have developed improved products, and we will need to continue to do so in the future. Such product development requires significant investments in research and development. We cannot assure you that we will be able to successfully complete the design or introduction of new products in a timely manner, that we will be able to manufacture new products in sufficient volumes with acceptable manufacturing yields, that we will be able to successfully market these new products or that these products will perform to specifications on a long-term basis. In addition, the impact of slowing areal density growth may adversely impact our ability to be successful.

When we develop new products with higher capacity and more advanced technology, our results of operations may decline because the increased difficulty and complexity associated with producing these products increases the likelihood of reliability, quality or operability problems. If our products suffer

26

increases in failures, are of low quality or are not reliable, customers may reduce their purchases of our products and our manufacturing rework and scrap costs and service and warranty costs may increase. In addition, a decline in the reliability of our products may make us less competitive as compared with other disk drive manufacturers or competing technologies.

***Substantial Leverage—Our substantial leverage may place us at a competitive disadvantage in our industry.***

We are leveraged and have significant debt service obligations. Our significant debt and debt service requirements could adversely affect our ability to operate our business and may limit our ability to take advantage of potential business opportunities. For example, our high level of debt presents the following risks:

- we are required to use a substantial portion of our cash flow from operations to pay principal and interest on our debt, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, product development efforts, strategic acquisitions, investments and alliances, and other general corporate requirements;

- our substantial leverage increases our vulnerability to economic downturns and adverse competitive and industry conditions and could place us at a competitive disadvantage compared to those of our competitors that are less leveraged;

- our debt service obligations could limit our flexibility in planning for, or reacting to, changes in our business and our industry and could limit our ability to pursue other business opportunities, borrow more money for operations or capital in the future and implement our business strategies;

- our level of debt may restrict us from raising additional financing on satisfactory terms to fund working capital, capital expenditures, product development efforts, strategic acquisitions, investments and alliances, and other general corporate requirements; and

- covenants in our debt instruments limit our ability to pay future dividends or make other restricted payments and investments.

In the event that we need to refinance all or a portion of our outstanding debt as it matures, we may not be able to obtain terms as favorable as the terms of our existing debt or refinance our existing debt at all. If prevailing interest rates or other factors existing at the time of refinancing result in higher interest rates upon refinancing, then the interest expense relating to the refinanced debt would increase. Furthermore, if any rating agency changes our credit rating or outlook, our debt and equity securities could be negatively affected, which could adversely affect our ability to refinance existing debt or raise additional capital.

***Significant Debt Service Requirements—Servicing our debt requires a significant amount of cash and our ability to generate cash may be affected by factors beyond our control.***

Our business may not generate cash flow in an amount sufficient to enable us to pay the principal of, or interest on, our indebtedness or to fund our other liquidity needs, including working capital, capital expenditures, product development efforts, strategic acquisitions, investments and alliances and other general corporate requirements.

Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. We cannot assure you that:

- our business will generate sufficient cash flow from operations;

- we will continue to realize the cost savings, revenue growth and operating improvements that result from the execution of our long-term strategic plan; or

27

- future sources of funding will be available to us in amounts sufficient to enable us to fund our liquidity needs.

If we cannot fund our liquidity needs, we will have to take actions such as reducing or delaying capital expenditures; product development efforts, strategic acquisitions, investments and alliances, and other general corporate requirements. We cannot assure you that any of these remedies could, if necessary, be effected on commercially reasonable terms, or at all, or that they would permit us to meet our scheduled debt service obligations. In addition if we incur additional debt, the risks associated with our substantial leverage, including the risk that we will be unable to service our debt or generate enough cash flow to fund our liquidity needs, could intensify.

***Restrictions Imposed by Debt Covenants—Restrictions imposed by our senior secured revolving credit facility and the indenture governing our 10% Senior Secured Second-Priority Notes due 2014 may limit our ability to finance future operations or capital needs or engage in other business activities that may be in our interest.***

Our senior secured revolving credit facility and the indenture governing our 10% Senior Secured Second-Priority Notes due 2014 (the "10% Notes") impose, and the terms of any future debt may impose, operating and other restrictions on us. Subject to qualifications and exceptions, our senior secured revolving credit facility and such indenture limit, among other things, our ability to:

- incur additional indebtedness and issue certain preferred shares;

- create liens;

- pay dividends or make distributions in respect of our capital stock;

- redeem or repurchase capital stock or debt;

- make certain investments or other restricted payments;

- sell assets;

- issue or sell capital stock of subsidiaries;

- enter into transactions with affiliates;

- engage to any material extent in business other than our current business; and

- effect a consolidation or merger.

The credit agreement that governs our senior secured revolving credit facility contains certain covenants that we must satisfy in order to remain in compliance with the credit agreement, including three financial covenants: (1) minimum cash, cash equivalents and short-term investments; (2) a fixed charge coverage ratio; and (3) a net leverage ratio. A breach of any of the covenants in our debt agreements, including our inability to comply with the required financial ratios, could result in a default under our senior secured revolving credit facility. If a condition of default occurs, and we are not able to obtain a waiver from the lenders holding a majority of the commitments under our senior secured revolving credit facility, the administrative agent of our senior secured revolving credit facility may, and at the request of lenders holding a majority of the commitments shall, declare all of our outstanding obligations under our senior secured revolving credit facility, together with accrued interest and other fees, to be immediately due and payable, and may terminate the lenders' commitments thereunder, cease making further loans and, if we cannot repay our outstanding obligation, institute foreclosure proceedings against our assets. If our outstanding indebtedness were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that debt and any potential future indebtedness, which would cause the market price of our ordinary shares to decline significantly. We could also be forced into bankruptcy or liquidation.

In addition, some of the agreements governing our other debt instruments contain cross-default provisions that may be triggered by a default under our senior secured revolving credit facility. In the event that we default under our senior secured revolving credit facility, there could be an event of default under cross-default provisions for the applicable debt instrument. As a result, all outstanding obligations under certain of our debt instruments may become immediately due and payable. If such acceleration were to occur, we may not have adequate funds to satisfy all of our outstanding obligations, the lenders could exercise their rights, as described above, and we could be forced into bankruptcy or liquidation.

***Substantially all of our Assets are Pledged as Collateral to Secure Certain Indebtedness—Since substantially all of our assets are used to secure portions of our existing debt obligations, we may be limited in our ability to incur additional indebtedness or to provide additional credit support, and if we fail to meet our payment or other obligations under certain of our existing debt obligations, the lenders thereunder could foreclose on, and acquire control of, substantially all of our assets.***

Substantially all our assets and the assets of our significant subsidiaries organized in the United States, the Cayman Islands, the Netherlands, Northern Ireland and Singapore, as well as certain assets located in the United States, the Cayman Islands, the Netherlands, Northern Ireland and Singapore owned by other significant subsidiaries, and all proceeds therefrom, are pledged as security for borrowings under our 10% Notes, as well as obligations under our hedging agreements, cash management arrangements and certain metal leasing arrangements. Since substantially all of our assets are used to secure portions of our existing debt obligations, we have a limited amount of collateral that is available for future secured debt or credit support. As a result, we may be limited in our ability to incur additional indebtedness or to provide additional credit support for our existing indebtedness. In addition, our failure to comply with the terms of the indenture governing our 10% Notes would entitle the lenders thereunder to declare all funds borrowed thereunder to be immediately due and payable. If we were unable to meet these payment obligations, the lenders could foreclose on, and acquire control of, substantially all our assets that serve as collateral.

***Failure to Pay Quarterly Dividends—Our failure to pay quarterly dividends to our shareholders could cause the market price of our ordinary shares to decline significantly.***

On April 7, 2011, we declared a dividend of $0.18 per share that was paid on June 1, 2011 to our shareholders of record as of May 2, 2011. On July 20, 2011, the Board of Directors approved a cash dividend of $0.18 per share, which will be payable on August 26, 2011 to our shareholders of record as of the close of business on August 5, 2011.

Our ability to pay quarterly dividends will be subject to, among other things, our financial position and results of operations, available cash and cash flow, capital requirements, and other factors. Any reduction or discontinuation of quarterly dividends could cause the market price of our ordinary shares to decline significantly. Moreover, in the event our payment of quarterly dividends is reduced or discontinued, our failure or inability to resume paying dividends at historical levels could result in a persistently low market valuation of our ordinary shares.

***Purchase Commitments to Certain Suppliers—If revenues fall or customer demand decreases significantly, we may not meet all of our purchase commitments to certain suppliers.***

From time to time, we enter into long-term, non-cancelable purchase commitments with certain suppliers in order to secure certain components for the production of our products or to supplement our internal manufacturing capacity for certain components. If our actual revenues in the future are lower than our projections or if customer demand decreases significantly below our projections, we may not meet all of our purchase commitments with these suppliers. As a result, it is possible that we will have to shift output from our internal manufacturing facilities to these suppliers or make penalty-type payments under these contracts.

29

***Risks Associated with Future Strategic Alliances, Joint Ventures or Investments—We may not be able to identify suitable strategic alliances, acquisitions, joint ventures or investment opportunities, or successfully acquire and integrate companies that provide complementary products or technologies.***

Our growth strategy may involve pursuing strategic alliances with, making acquisitions of, forming joint ventures with or making investments in other companies that are complementary to our business. There is substantial competition for attractive strategic alliance, acquisition, joint venture and investment candidates. Accordingly, we may not be able to identify suitable strategic alliances, acquisition, joint venture, or investment candidates. Even if we can identify them, we cannot assure you that we will be able to partner with, acquire or invest in suitable candidates, or integrate acquired technologies or operations successfully into our existing technologies and operations. Moreover, our ability to finance potential strategic alliances, acquisitions, joint ventures or investments will be limited by our high degree of leverage, the covenants contained in the indentures that govern our outstanding indebtedness, and any agreements governing any other debt we may incur.

If we are successful in forming strategic alliances or acquiring, forming joint ventures or making investments in other companies, any of these transactions may have an adverse effect on our results of operations, particularly while the operations of an acquired business are being integrated. It is also likely that integration of acquired companies would lead to the loss of key employees from those companies or the loss of customers of those companies. In addition, the integration of any acquired companies would require substantial attention from our senior management, which may limit the amount of time available to be devoted to our day-to-day operations or to the execution of our strategy. Growth by strategic alliance, acquisition, joint venture or investment involves an even higher degree of risk to the extent we combine new product offerings and enter new markets in which we have limited experience, and no assurance can be given that acquisitions of entities with new or alternative business models will be successfully integrated or achieve their stated objectives.

Furthermore, the expansion of our business involves the risk that we might not manage our growth effectively, that we would incur additional debt to finance these acquisitions or investments, that we may have impairment of goodwill or acquired intangible assets associated with these acquisitions and that we would incur substantial charges relating to the write-off of in-process research and development, similar to that which we incurred in connection with several of our prior acquisitions. Each of these items could have a material adverse effect on our financial condition and results of operations.

In addition, we could issue additional ordinary shares in connection with future strategic alliances, acquisitions, joint ventures or investments. Issuing shares in connection with such transactions would have the effect of diluting your ownership percentage of the ordinary shares and could cause the price of our ordinary shares to decline.

***Risk of Intellectual Property Litigation—Our products may infringe the intellectual property rights of others, which may cause us to incur unexpected costs or prevent us from selling our products.***

We cannot be certain that our products do not and will not infringe issued patents or other intellectual property rights of others. We may not be aware of currently filed patent applications that relate to our products or technology. If patents are later issued on these applications, we may be liable for infringement. We may be subject to legal proceedings and claims, including claims of alleged infringement of the patents, trademarks and other intellectual property rights of third parties by us, or our customers, in connection with their use of our products.

30

***We are currently subject to lawsuits involving intellectual property claims which could cause us to incur significant additional costs or prevent us from selling our products, and which could adversely affect our results of operations and financial condition.***

Intellectual property litigation is expensive and time-consuming, regardless of the merits of any claim, and could divert our management's attention from operating our business. In addition, intellectual property lawsuits are subject to inherent uncertainties due to the complexity of the technical issues involved, and we cannot assure you that we will be successful in defending ourselves against intellectual property claims. Patent litigation has increased due to the current uncertainty of the law and the increasing competition and overlap of product functionality in the field. If we were to discover that our products infringe the intellectual property rights of others, we would need to obtain licenses from these parties or substantially reengineer our products in order to avoid infringement. We might not be able to obtain the necessary licenses on acceptable terms, or at all, or be able to reengineer our products successfully. Moreover, if we are sued for patent infringement and lose the suit, we could be required to pay substantial damages and/or be enjoined from using or selling the infringing products or technology. Any of the foregoing could cause us to incur significant costs and prevent us from selling our products, which could adversely affect our results of operations and financial condition. See Part II, Item 8. Financial Statements and Supplementary Data—Note 13, Legal, Environmental and Other Contingencies of this Annual Report on Form 10-K for a description of pending intellectual property proceedings.

***System Failures—System failures caused by events beyond our control could adversely affect computer equipment and electronic data on which our operations depend.***

Our operations are dependent upon our ability to protect our computer equipment and the electronic data stored in our databases from damage by, among other things, earthquake, fire, natural disaster, power loss, telecommunications failures, unauthorized intrusion and other catastrophic events. As our operations become more automated and increasingly interdependent, our exposure to the risks posed by these types of events will increase. While we continue to improve our disaster recovery processes, system failures and other interruptions in our operations could have a material adverse effect on our business, results of operations and financial condition.

***Economic Risks Associated with International Operations—Our international operations subject us to risks related to currency exchange fluctuations, longer payment cycles for sales in foreign countries, seasonality and disruptions in foreign markets, tariffs and duties, price controls, potential adverse tax consequences, increased costs, our customers' credit and access to capital and health-related risks.***

We have significant operations in foreign countries, including manufacturing facilities, sales personnel and customer support operations. We have manufacturing facilities in China, Malaysia, Northern Ireland, Singapore and Thailand, in addition to those in the United States. A substantial portion of our client compute disk drive assembly occurs in our facility in China.

Our international operations are subject to economic risks inherent in doing business in foreign countries, including the following:

- *Disruptions in Foreign Markets.* Disruptions in financial markets and the deterioration of the underlying economic conditions in the past in some countries, including those in Asia, have had an impact on our sales to customers located in, or whose end-user customers are located in, these countries.

- *Fluctuations in Currency Exchange Rates.* Prices for our products are denominated predominately in U.S. dollars, even when sold to customers that are located outside the United States. Currency instability in Asia and other geographic markets may make our products more expensive than products sold by other manufacturers that are priced in the local currency. Moreover, many of the costs associated with our operations located outside the United States are denominated in local

31

currencies. As a consequence, the increased strength of local currencies against the U.S. dollar in countries where we have foreign operations would result in higher effective operating costs and, potentially, reduced earnings. From time to time, fluctuations in foreign exchange rates have negatively affected our operations and profitability and there can be no assurance that these fluctuations will not adversely affect our operations and profitability in the future.

- *Longer Payment Cycles.*  Our customers outside of the United States are often allowed longer time periods for payment than our U.S. customers. This increases the risk of nonpayment due to the possibility that the financial condition of particular customers may worsen during the course of the payment period.

- *Seasonality.*  Seasonal reductions in the business activities of our customers during the summer months, particularly in Europe, typically result in lower earnings during those periods.

- *Tariffs, Duties, Limitations on Trade and Price Controls.*  Our international operations are affected by limitations on imports, currency exchange control regulations, transfer pricing regulations, price controls and other restraints on trade. In addition, the governments of many countries, including China, Malaysia, Northern Ireland, Singapore and Thailand, in which we have significant operating assets, have exercised and continue to exercise significant influence over many aspects of their domestic economies and international trade.

- *Potential Adverse Tax Consequences.*  Our international operations create a risk of potential adverse tax consequences, including imposition of withholding or other taxes on payments by subsidiaries.

- *Increased Costs.*  The shipping and transportation costs associated with our international operations are typically higher than those associated with our U.S. operations, resulting in decreased operating margins in some foreign countries.

- *Credit and Access to Capital Risks.*  Our international customers could have reduced access to working capital due to higher interest rates, reduced bank lending resulting from contractions in the money supply or the deterioration in the customer's or its bank's financial condition, or the inability to access other financing.

- *Global Health Outbreaks.*  The occurrence of a pandemic disease may adversely impact our operations, and some of our key customers. Such diseases could also potentially disrupt the timeliness and reliability of the distribution network we rely on.

***Political Risks Associated with International Operations—Our international operations subject us to risks related to political unrest and terrorism.***

We have manufacturing facilities in parts of the world that periodically experience political unrest. This could disrupt our ability to manufacture important components as well as cause interruptions and/or delays in our ability to ship components to other locations for continued manufacture and assembly. Any such delays or interruptions could result in delays in our ability to fill orders and have an adverse effect on our results of operations and financial condition. U.S. and international responses to the ongoing hostilities in various regions and the risk of terrorist attacks or hostilities elsewhere in the world could exacerbate these risks.

***Legal and Operational Risks Associated with International Operations—Our international operations subject us to risks related to staffing and management, legal and regulatory requirements and the protection of intellectual property.***

Operating outside of the United States creates difficulties associated with staffing and managing our international manufacturing facilities, complying with local legal and regulatory requirements and protecting our intellectual property. We cannot assure you that we will continue to be found to be

32

operating in compliance with applicable customs, currency exchange control regulations, transfer pricing regulations or any other laws or regulations to which we may be subject. We also cannot assure you that these laws will not be modified.

***Dependence on Key Personnel—The loss of key executive officers and employees could negatively impact our business prospects.***

Our future performance depends to a significant degree upon the continued service of key members of management as well as marketing, sales and product development personnel. The loss of one or more of our key personnel may have a material adverse effect on our business, results of operations and financial condition. We believe our future success will also depend in large part upon our ability to attract, retain and further motivate highly skilled management, marketing, sales and product development personnel. We have experienced intense competition for personnel, and we cannot assure you that we will be able to retain our key employees or that we will be successful in attracting, assimilating and retaining personnel in the future.

***Potential Governmental Action—Governmental action against companies located in offshore jurisdictions may lead to a reduction in the demand for our ordinary shares.***

Recent U.S. federal and state legislation has been proposed, and additional legislation may be proposed in the future which, if enacted, could have an adverse tax impact on either Seagate or its shareholders.

***Securities Litigation—Significant fluctuations in the market price of our ordinary shares could result in securities class action claims against us.***

Significant price and value fluctuations have occurred with respect to the publicly traded securities of disk drive companies and technology companies generally. The price of our ordinary shares is likely to be volatile in the future. In the past, following periods of decline in the market price of a company's securities, class action lawsuits have often been pursued against that company. If similar litigation were pursued against us, it could result in substantial costs and a diversion of management's attention and resources, which could materially adversely affect our results of operations, financial condition and liquidity.

***Global Credit and Financial Market Conditions—Deterioration in global credit and financial market conditions could negatively impact the value of our current portfolio of cash equivalents, short-term investments or auction rate securities and our ability to meet our financing objectives.***

Our cash and cash equivalents are maintained in highly liquid investments with remaining maturities of 90 days or less at the time of purchase. Our short-term investments consist primarily of readily marketable debt securities with remaining maturities of more than 90 days at the time of purchase. Our investment policy has as its principal objectives the preservation of principal and maintenance of liquidity. We mitigate default risk by investing in high-quality investment grade securities, limiting the time to maturity and by monitoring the counter-parties and underlying obligors closely.

While as of the date of this filing, we are not aware of any other material downgrades, losses, or other significant deterioration in the fair value of our cash equivalents or short-term investments or auction rate securities since July 1, 2011, no assurance can be given that further deterioration in conditions of the global credit and financial markets would not negatively impact our current portfolio of cash equivalents, short-term investments or auction rate securities or our ability to meet our financing objectives.

***Environmental Regulations—Failure to comply with applicable environmental laws and regulations could have a material adverse effect on our business, results of operations and financial condition.***

The sale and manufacturing of products in certain states and countries may subject us to environmental and other regulations including, in some instances, the responsibility for environmentally safe disposal or recycling. For example, the EU has enacted the Restriction of the Use of Certain Hazardous Substances in Electrical and Electronic Equipment directive, which prohibits the use of certain substances in electronic equipment, and the Waste Electrical and Electronic Equipment directive, which obligates parties that place electrical and electronic equipment onto the market in the EU to put a clearly identifiable mark on the equipment, register with and report to EU member countries regarding distribution of the equipment, and provide a mechanism to take-back and properly dispose of the equipment. Similar legislation may be enacted in other locations where we manufacture or sell our products. Although we do not anticipate any material adverse effects based on the nature of our operations and the focus of such legislation, we will need to ensure that we comply with these laws and regulations as they are enacted and that our suppliers also comply with these laws and regulations. If we fail to timely comply with the legislation, our customers may refuse to purchase our products, which would have a material adverse effect on our business, results of operations and financial condition. In addition, if we were found to be in violation of these laws or noncompliance with these initiatives or standards of conduct, we could be subject to governmental fines, liability to our customers and damage to our reputation, which would also have a material adverse effect on our business, results of operations and financial condition.

***Seasonality—Because we experience seasonality in the sales of our products, our results of operations will generally be adversely impacted during the second half of our fiscal year.***

Sales of computer systems, storage subsystems and consumer electronics tend to be seasonal, and therefore we expect to continue to experience seasonality in our business as we respond to variations in our customers' demand for disk drives. In particular, we anticipate that sales of our products will continue to be lower during the second half of our fiscal year. In the client compute and client non-compute market applications of our business, this seasonality is partially attributable to the historical trend in our results derived from our customers' increased sales of desktop computers, notebook computers, and consumer electronics during the back-to-school and winter holiday season. In the enterprise market our sales are seasonal because of the capital budgeting and purchasing cycles of our end users. Since our working capital needs peak during periods in which we are increasing production in anticipation of orders that have not yet been received, our results of operations will fluctuate seasonally even if the forecasted demand for our products proves accurate. Furthermore, it is difficult for us to evaluate the degree to which this seasonality may affect our business in future periods because of the rate and unpredictability of product transitions and new product introductions, particularly in the client non-compute market, as well as macroeconomic conditions.

***Volatile Public Markets—The price of our ordinary shares may be volatile and could decline significantly.***

The stock market, in general, and the market for technology stocks in particular, has recently experienced volatility that has often been unrelated to the operating performance of companies. If these market or industry-based fluctuations continue, the trading price of our ordinary shares could decline significantly independent of our actual operating performance, and you could lose all or a substantial part of your investment. The market price of our ordinary shares could fluctuate significantly in response to several factors, including among others:

- general uncertainty in stock market conditions occasioned by global economic conditions, negative financial news and the continued instability of several large financial institutions;

- actual or anticipated variations in our results of operations;

34

- announcements of innovations, new products or significant price reductions by us or our competitors, including those competitors who offer alternative storage technology solutions;

- our failure to meet the performance estimates of investment research analysts;

- the timing of announcements by us or our competitors of significant contracts or acquisitions;

- general stock market conditions;

- the occurrence of major catastrophic events;

- changes in financial estimates by investment research analysts;

- changes in the credit ratings of our indebtedness by rating agencies; and

- the sale of our ordinary shares held by certain equity investors or members of management.

## Risks Related to our Pending Strategic Alignment with Samsung

***We will not be able to complete the Strategic Alignment with Samsung unless we receive the requisite regulatory approvals, or the regulatory approvals may contain burdensome conditions.***

We have recently announced the entry into an asset purchase agreement with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which we agreed to acquire certain assets and assume certain liabilities of Samsung relating to the research and development, manufacture and sale of hard disk drives and to enter into certain related agreements in connection therewith, including an intellectual property agreement, a patent cross-license agreement, a disk drive supply agreement, a NAND flash memory supply agreement and a shareholder agreement. The purchase price for these assets consists of $687.5 million in cash and approximately 45.2 million of our ordinary shares. Under the terms of the asset purchase agreement, the transactions contemplated thereby are subject to the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, clearance by the European Commission and the receipt of certain other similar regulatory approvals from the Republic of Korea, Japan, and the People's Republic of China. While we intend to consummate the transactions contemplated by the asset purchase agreement and related agreements as soon as practicable after such regulatory approvals are obtained, there can be no assurance that we will obtain such approvals when expected or at all, which could, among other things, delay or prevent us from completing the transactions contemplated by the asset purchase agreement and related agreements or restrict our ability to realize the expected financial and strategic goals of the transactions contemplated thereby. In certain specified circumstances, we must pay Samsung a termination fee of $72.5 million (generally if the transaction has not been consummated and the requisite regulatory approvals have not been obtained by the Expiration Date of December 31, 2011, which may be extended in certain circumstances to March 31, 2012). If regulatory approvals have been obtained but the transaction has not been consummated by the Expiration Date, then in certain specified circumstances we must pay Samsung a termination fee of $82.5 million (generally if we are in breach of the agreement and legal remedies are not awarded to Samsung).

In addition, the governmental entities from which these approvals are required may impose conditions on the completion of the transaction or require changes to the terms of the strategic alignment. While we do not currently expect that any such conditions or changes would be imposed, there can be no assurance that there will not be, and such conditions or changes could have the effect of jeopardizing or delaying completion of the transaction or reducing its anticipated benefits. If we agree to any material conditions in order to obtain any approvals required to complete the strategic alignment, the business and results of operations of the combined company may be adversely affected.

***If we do not realize the expected benefits of our Strategic Alignment with Samsung, our business and financial condition may be materially impaired.***

We may not achieve the desired benefits from our strategic alignment with Samsung. If we cannot successfully integrate the assets we acquire from Samsung into our operations, we may experience negative consequences to our business, financial condition or results of operations. The integration of the assets that we acquire from Samsung into our business will involve a number of risks, including, but not limited to:

- Diversion of senior management's attention from the management of daily operations to the integration of the acquired assets into our business;

- The potential that we do not successfully integrate the employees that we hire from Samsung's hard disk drive business into our business;

- The potential loss of key customers or suppliers of Samsung's hard disk drive business who do not choose to do business with us;

- The potential that key customers do not accept new products of the combined company;

- The potential that we do not successfully coordinate sales and marketing efforts to communicate the capabilities of the combined company;

- Potential revenue attrition in excess of anticipated levels;

- The potential that we do not qualify the combined company's products as a primary source of supply with OEM customers on a timely basis or at all;

- The risk of higher than anticipated costs in continuing support and development of acquired products;

- Difficulties and uncertainties in achieving anticipated cost reductions and operational synergies;

- Potential difficulties integrating manufacturing and design processes and controls;

- Potential difficulties integrating and harmonizing financial reporting systems; and

- Potential incompatibility of technology and systems.

Even if we are able to successfully integrate the assets that we acquire from Samsung into our business, we may not be able to realize the cost savings, synergies and growth that we anticipate from this transaction in the timeframe we currently expect, and the costs of achieving these benefits may be higher than we currently expect, because of a number of risks, including but not limited to:

- The possibility that the transaction may not further our business strategy as we expected;

- Our operating results or financial condition may be adversely impacted by liabilities that we assume in the transaction; and

- The risk of intellectual property disputes with respect to the acquired assets.

As a result of these risks, the transaction may not contribute to our earnings as we expected, we may not achieve expected cost synergies when expected, or at all, and we may not achieve the other anticipated strategic and financial benefits of this transaction.

***The issuance of our ordinary shares to Samsung in connection with the asset purchase agreement will dilute the holdings of our existing shareholders.***

In connection with the asset purchase agreement with Samsung, we expect to issue approximately 45.2 million shares of our ordinary shares to Samsung, representing over 10% of our outstanding ordinary

shares. We will be issuing these shares from our authorized but unissued share reserves, and this issuance will have the effect of diluting the ownership of our existing shareholders.

***We expect the integration of Seagate and Samsung's hard drive business will result in revenue attrition, significant accounting charges and increased capital expenditures that will have an adverse effect on the results and financial condition of the combined company.***

The financial results of the combined company may be adversely affected by cash expenditures and non-cash charges incurred in connection with the strategic alignment. In addition to the anticipated cash expenditures, we expect significant non-cash charges, including those associated with the amortization of intangible assets. We anticipate that the majority of these cash expenditures and non-cash charges will occur in the 12 months following the closing of the combination, and will reduce earnings of the combined enterprise. In addition, the combined company is likely to incur revenue attrition. As a result of the revenue attrition, capital expenditures and charges described above, the operating results and financial condition of the combined company may be adversely affected after the consummation of the strategic alignment, particularly in the first year following the closing.

***The announcement and pendency of the strategic alignment could cause disruptions in the businesses of Seagate and Samsung, which could have an adverse effect on their respective business and financial results, and consequently on the combined company.***

Seagate and Samsung have operated and, until the completion of the strategic alignment, will continue to operate independently. Uncertainty about the effect of the strategic alignment on employees, customers, distributors and suppliers may have an adverse effect on Seagate and Samsung and consequently on the combined company. These uncertainties may impair Seagate's and Samsung's ability to retain and motivate key personnel and could cause customers, distributors, suppliers and others with whom each company deals to seek to change existing business relationships which may materially and adversely affect their respective businesses. Due to the materiality standards agreed to by the parties in the Agreement, Seagate and Samsung may be obligated to consummate the transaction in spite of the adverse effects resulting from the disruption of Seagate's and Samsung's ongoing businesses. Furthermore, this disruption could adversely affect the combined company's ability to maintain relationships with customers, distributors, suppliers and employees after the transaction or to achieve the anticipated benefits of the transaction. For example, in many instances, Seagate and Samsung serve the same customers, and some of these customers may decide it is desirable to have additional or different suppliers, reducing the combined company's share of the market. Revenues that may have ordinarily been received by Seagate or Samsung may be delayed until or after the transaction is completed or not earned at all, and cost reductions that would ordinarily have been achieved might be delayed or not achieved at all, whether or not the transaction is completed. Moreover, efforts to integrate Samsung's hard drive business into Seagate's operations will also divert management attention and resources. These integration matters could have an adverse effect on each of Seagate and Samsung. Each of these events could adversely affect Samsung in the near term and the combined company, if the transaction is completed.

***Failure to complete the Merger could negatively impact the stock prices and the future business and financial results of Seagate.***

If the strategic alignment is not completed, the ongoing business of Seagate may be adversely affected and Seagate will be subject to a number of risks, including the following:

- Seagate will be required to pay Samsung a termination fee as described above;

- Seagate will be required to pay certain costs relating to the transaction, such as legal, accounting, financial advisor and related fees whether or not the transaction is completed; and

37

- matters relating to the transaction (including integration planning) may require substantial commitments of time and resources by Seagate management, which could otherwise have been devoted to other opportunities that may have been beneficial to Seagate, in each case, without realizing any of the benefits of having completed the transaction. If the strategic alignment is not completed, these risks may materialize and may adversely affect Seagate's business, financial results and stock price.

**ITEM 1B.   UNRESOLVED STAFF COMMENTS**

None.

## ITEM 2.   PROPERTIES

Our company headquarters are located in Ireland, while our U.S. executive offices are located in Cupertino, California. Our principal manufacturing facilities are located in China, Malaysia, Northern Ireland, Singapore, Thailand and Minnesota. Our principal product development facilities are located in California, Colorado, Minnesota, Massachusetts and Singapore. Our leased facilities are occupied under leases that expire at various times through 2022.

Our material manufacturing, product development and marketing and administrative facilities at July 1, 2011 are as follows:

| Location | Building(s) Owned or Leased | Approximate Square Footage | Use |
|---|---|---|---|
| **United States** | | | |
| California | | | |
| Fremont | Leased | 157.925 | Product development |
| Cupertino | Owned | 141,598 | Marketing and administrative |
| Colorado | Owned | 528,479 | Product development |
| Minnesota | Owned | 1,084,783 | Manufacture of recording heads and product development |
| Oklahoma | Owned/Leased | 145,461 | Administrative |
| Massachusetts | Leased | 89,185 | Product development |
| **Europe** | | | |
| *Northern Ireland* | | | |
| Springtown | Owned | 478,800 | Manufacture of recording heads |
| **Asia** | | | |
| *China* | | | |
| Suzhou | Owned [1] | 1,047,787 | Manufacture of drives |
| Wuxi | Leased | 562,479 | Manufacture of drives and drive subassemblies |
| *Malaysia* | | | |
| Johor | Owned [1] | 630,500 | Manufacture of substrates |
| Penang | Owned [1] | 390,254 | Manufacture of drive subassemblies |
| *Singapore* | | | |
| Woodlands | Owned [1] | 1,404,049 | Manufacture of media |
| Ang Mo Kio | Leased | 701,474 | Administrative, manufacturing support, and product development |
| Science Park | Leased | 100,850 | Product development |
| *Thailand* | | | |
| Korat | Owned | 1,162,846 | Manufacture of drives and drive subassemblies |
| Teparuk | Owned | 362,028 | Manufacture of drive subassemblies |

[1]   Land leases for these facilities expire at varying dates through 2067.

As of July 1, 2011, we owned or leased a total of approximately 11.9 million square feet of space worldwide. We occupied approximately 6.6 million square feet for the purpose of manufacturing, 1.3 million square feet for product development, 1.5 million square feet for marketing and administrative purposes and subleased 0.9 million square feet. Included in the 11.9 million square feet of owned or leased space is a total of 1.6 million square feet that is currently unoccupied, primarily as a result of site closures at our facilities in Longmont, Colorado; Ang Mo Kio (AMK), Singapore; Milpitas, California; Scotts Valley, California; and Pittsburgh, Pennsylvania. We believe that our existing properties are in good operating condition and are suitable and adequate for the operations for which they are used. As of July 1, 2011, all of our material manufacturing facilities are operating at normal utilization levels and none of our manufacturing facilities are experiencing significant underutilization.

In August 2009, we announced that we will close our AMK facility in Singapore. Manufacturing operations at this facility have ceased as of the third quarter of fiscal year 2011. Our hard drive manufacturing operations have been relocated to other existing facilities and our Asia International Headquarters (IHQ) remains in Singapore. The closure did not meaningfully change production capacity.

**ITEM 3.   LEGAL PROCEEDINGS**

   See Item 8. Financial Statements and Supplementary Data—Note 13, Legal, Environmental, and Other Contingencies.

**ITEM 4.   (REMOVED AND RESERVED)**

*PART II*

## ITEM 5.   MARKET FOR REGISTRANT'S SHARES, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our shares have traded on the NASDAQ Global Select Market under the symbol "STX" since September 16, 2008, and previously traded on the New York Stock Exchange under the symbol "STX" since December 11, 2002. Prior to that time there was no public market for our shares. The high and low sales prices of our shares, as reported by both the NASDAQ and the New York Stock Exchange, are set forth below for the periods indicated.

| | Price Range | |
|---|---|---|
| **Fiscal Quarter** | **High** | **Low** |
| Quarter ended October 2, 2009 | $ 16.16 | $ 9.25 |
| Quarter ended January 1, 2010 | $ 18.59 | $ 13.78 |
| Quarter ended April 2, 2010 | $ 21.58 | $ 16.47 |
| Quarter ended July 2, 2010 | $ 20.90 | $ 12.69 |
| Quarter ended October 1, 2010 | $ 15.28 | $ 9.84 |
| Quarter ended December 31, 2010 | $ 15.66 | $ 11.29 |
| Quarter ended April 1, 2011 | $ 15.33 | $ 12.26 |
| Quarter ended July 1, 2011 | $ 18.35 | $ 14.14 |

As of August 11, 2011 there were approximately 1,280 holders of record of our ordinary shares. We did not sell any of our equity securities during fiscal year 2011 that were not registered under the Securities Act of 1933, as amended.

41

**Performance Graph**

The performance graph below shows the cumulative total shareholder return on our ordinary shares for the period from June 30, 2006 to July 1, 2011. This is compared with the cumulative total return of the Dow Jones US Computer Hardware Index and the Standard & Poor's 500 Stock Index over the same period. The graph assumes that on June 30, 2006, $100 was invested in our ordinary shares and $100 was invested in each of the other two indices, with dividends reinvested on the date of payment without payment of any commissions. Dollar amounts in the graph are rounded to the nearest whole dollar. The performance shown in the graph represents past performance and should not be considered an indication of future performance.

**COMPARISON OF 60 MONTH
CUMULATIVE TOTAL RETURN** *
**Among Seagate Technology, The S&P 500 Index
And The Dow Jones US Computer Hardware Index**



|  | 6/30/06 | 6/29/07 | 6/27/08 | 7/3/09 | 7/2/10 | 7/1/11 |
|---|---|---|---|---|---|---|
| **Seagate Technology** | 100.00 | 97.80 | 89.15 | 49.04 | 62.83 | 78.91 |
| **S&P 500** | 100.00 | 118.36 | 100.64 | 70.57 | 80.51 | 105.47 |
| **Dow Jones US Computer Hardware** | 100.00 | 142.15 | 143.10 | 114.03 | 162.06 | 207.30 |

\*    $100 invested on 6/30/06 in stock and in index, including reinvestment of dividends.

Copyright© 2011 Bloomberg Finance L.P. All rights reserved.

42

**Dividends**

Our ability to pay dividends in the future will be subject to, among other things, general business conditions within the disk drive industry, our financial results, the impact of paying dividends on our credit ratings and legal and contractual restrictions on the payment of dividends by our subsidiaries to us or by us to our ordinary shareholders, including restrictions imposed by covenants in our debt instruments.

In 2009, we adopted a policy of no longer paying a dividend to our shareholders to enhance liquidity. In 2011, we reinstated our dividend policy and declared a dividend of $0.18 per share that was paid on June 1, 2011 to our shareholders of record as of May 2, 2011. Since the closing of our initial public offering in December 2002 up to 2011, we have paid dividends, pursuant to our dividend policy then in effect, totaling approximately $1.0 billion in the aggregate. The following were dividends paid in the last two fiscal years:

| Record Date | Paid Date | Dividend per Share |
|---|---|---|
| May 2, 2011 | June 1, 2011 | $ 0.18 |

**Repurchases of Our Equity Securities**

On January 27, 2010, our Board of Directors authorized an Anti-Dilution Share Repurchase Program, which was publicly announced on February 1, 2010. The repurchase program authorizes us to repurchase our shares to offset increases in diluted shares, such as those caused by employee stock plans and convertible debt, used in the determination of diluted net income per share. The timing and number of shares to be repurchased by us will be dependent on general business and market conditions, cash flows generated by future operations, the price of our shares, cash requirements for other investing and financing activities, and maintaining compliance with our debt covenants. Repurchases may be made through open market or in privately negotiated transactions, pursuant to Rule 10b5-1 trading plans or other available means, such as by way of an accelerated share repurchase program, through block trades or through the purchase of call options or the sale of put options. Additionally, there is no minimum or maximum number of shares to be repurchased under the program and the authority for the Anti-Dilution Share Repurchase Program will continue until terminated by our Board of Directors.

On November 29, 2010, the Company's Board of Directors authorized repurchases of up to an additional $2 billion of the Company's outstanding ordinary shares.

43

The following table sets forth information with respect to repurchases of our shares made during fiscal year 2011:

**January 2010 Anti-Dilution Share Repurchase Program**

| (In millions, except average price paid per share) | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased Under Publicly Announced Plans or Programs | Approximate Dollar Value of Shares Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Cumulative repurchased from February 1, 2010 through July 2, 2010 | 32.4 | $ 18.02 | 32.4 | $ 584 |
| July 3, 2010 through July 30, 2010 | — | — | — | — |
| July 31, 2010 through August 27, 2010 | — | — | — | — |
| August 28, 2010 through October 1, 2010 | — | — | — | — |
| Through 1st Quarter of Fiscal Year 2011 | 32.4 | 18.02 | 32.4 | 584 |
| October 2, 2010 through October 29, 2010 | — | — | — | — |
| October 30, 2010 through November 26, 2010 | — | — | — | — |
| November 27, 2010 through December 31, 2010 | 20.7 | 14.75 | 20.7 | 305 |
| Through 2nd Quarter of Fiscal Year 2011 | 53.1 | 16.74 | 53.1 | 889 |
| January 1, 2011 through January 28, 2011 | — | — | — | — |
| January 29, 2011 through February 25, 2011 | — | — | — | — |
| February 26, 2011 through April 1, 2011 | — | — | — | — |
| Through 3rd Quarter of Fiscal Year 2011 | 53.1 | 16.74 | 53.1 | 889 |
| April 2, 2011 through April 29, 2011 | — | — | — | — |
| April 30, 2011 through May 27, 2011 | — | — | — | — |
| May 28, 2011 through July 1, 2011 | — | — | — | — |
| Total Through 4th Quarter of Fiscal Year 2011 | 53.1 | $ 16.74 | 53.1 | $ 889 |

**November 2010 Share Repurchase Program**

| (In millions, except average price paid per share) | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased Under Publicly Announced Plans or Programs | Approximate Dollar Value of Shares Purchased Under the Plans or Programs |
|---|---|---|---|---|
| November 27, 2010 through December 31, 2010 | — | $ — | — | $ — |
| Through 2nd Quarter of Fiscal Year 2011 | — | — | — | — |
| January 1, 2011 through January 28, 2011 | 9.4 | 13.71 | 9.4 | 130 |
| January 29, 2011 through February 25, 2011 | 18.7 | 13.78 | 18.7 | 257 |
| February 26, 2011 through April 1, 2011 | 1.4 | 12.65 | 1.4 | 18 |
| Through 3rd Quarter of Fiscal Year 2011 | 29.5 | 13.71 | 29.5 | 405 |
| April 2, 2011 through April 29, 2011 | — | — | — | — |
| April 30, 2011 through May 27, 2011 | 6.7 | 16.76 | 6.7 | 112 |
| May 28, 2011 through July 1, 2011 | — | — | — | — |
| Total Through 4th Quarter of Fiscal Year 2011 | 36.2 | $ 14.27 | 36.2 | $ 517 |

## ITEM 6.   SELECTED FINANCIAL DATA

The following selected consolidated financial data set forth below is not necessarily indicative of results of future operations, and should be read in conjunction with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Consolidated Financial Statements and related notes thereto included in "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K, which are incorporated herein by reference, to fully understand factors that may affect the comparability of the information presented below.

The Consolidated Statements of Operations data for the years ended July 1, 2011, July 2, 2010 and July 3, 2009 and the Consolidated Balance Sheet data at July 1, 2011 and July 2, 2010, are derived from our audited Consolidated Financial Statements appearing elsewhere in this Annual Report on Form 10-K. The Consolidated Statements of Operations data for the years ended June 27, 2008 and June 29, 2007, and the Consolidated Balance Sheet data at July 3, 2009, June 27, 2008 and June 29, 2007, are derived from our audited Consolidated Financial Statements that are not included in this Annual Report on Form 10-K.

|  | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|
| (Dollars in millions, except per share data) | July 1, 2011 | July 2, 2010 | July 3, 2009 [(1)] | June 27, 2008 | June 29, 2007 |
| Revenue | $ 10,971 | $ 11,395 | $ 9,805 | $ 12,708 | $ 11,360 |
| Gross margin | 2,146 | 3,204 | 1,410 | 3,205 | 2,185 |
| Income (loss) from operations | 806 | 1,740 | (2,665) | 1,376 | 614 |
| Net income (loss) | 511 | 1,609 | (3,125) | 1,251 | 933 |
| Total assets | 9,225 | 8,247 | 7,087 | 10,150 | 9,502 |
| Total debt | 3,512 | 2,502 | 2,697 | 1,978 | 2,000 |
| Shareholders' equity | $ 2,463 | $ 2,724 | $ 1,554 | $ 4,667 | $ 4,829 |
| | | | | | |
| Net income (loss) per share: | | | | | |
| Basic | $ 1.13 | $ 3.28 | $ (6.40) | $ 2.44 | $ 1.67 |
| Diluted | 1.09 | 3.14 | (6.40) | 2.33 | 1.59 |
| | | | | | |
| Number of shares used in per share computations: | | | | | |
| Basic | 451 | 491 | 488 | 512 | 558 |
| Diluted | 467 | 514 | 488 | 538 | 587 |
| | | | | | |
| Cash dividends declared per share | $ 0.18 | $ — | $ 0.27 | $ 0.42 | $ 0.38 |

(1)    Includes the effect of a $2.3 billion impairment of goodwill and other long-lived assets.

46

**Supplementary Financial Data (Unaudited)**

*Quarterly Data*

The Company operated and reported financial results based on 13-week quarters in fiscal years 2011 and 2010, which ended on the Friday closest to September 30, December 31, March 31, and June 30.

| (In millions, except per share data) | Fiscal Year 2011 Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | October 1, 2010 | December 31, 2010 | April 1, 2011 | July 1, 2011 |
| Revenue | $ 2,697 | $ 2,719 | $ 2,695 | $ 2,859 |
| Gross margin | 550 | 529 | 516 | 551 |
| Income (loss) from operations | 231 | 206 | 179 | 190 |
| Net income (loss) | 149 | 150 | 93 | 119 |
| Net income (loss) per share: | | | | |
| Basic | $ 0.32 | $ 0.32 | $ 0.21 | $ 0.28 |
| Diluted | 0.31 | 0.31 | 0.21 | 0.27 |

| (In millions, except per share data) | Fiscal Year 2010 Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | October 2, 2009 | January 1, 2010 | April 2, 2010 | July 2, 2010 |
| Revenue | $ 2,663 | $ 3,027 | $ 3,049 | $ 2,656 |
| Gross margin | 653 | 923 | 901 | 728 |
| Income (loss) from operations | 221 | 578 | 560 | 380 |
| Net income (loss) | 179 | 533 | 518 | 379 |
| Net income (loss) per share: | | | | |
| Basic | $ 0.36 | $ 1.07 | $ 1.05 | $ 0.79 |
| Diluted | 0.35 | 1.03 | 1.00 | 0.76 |

47

## ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following is a discussion of the financial condition and results of operations for the fiscal years ended July 1, 2011, July 2, 2010, and July 3, 2009. References to "$" are to United States dollars .*

*You should read this discussion in conjunction with "Item 6. Selected Financial Data" and "Item 8. Financial Statements and Supplementary Data" included elsewhere in this report. Except as noted, references to any fiscal year mean the twelve-month period ending on the Friday closest to June 30 of that year.*

*Some of the statements and assumptions included in this Annual Report on Form 10-K are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 or Section 21E of the Securities Exchange Act of 1934, each as amended, including, in particular, statements about our plans, strategies and prospects and estimates of industry growth for the fiscal year ending July 1, 2011 and beyond. These statements identify prospective information and include words such as "expects," "plans," "anticipates," "believes," "estimates," "predicts," "projects," and similar expressions. These forward-looking statements are based on information available to us as of the date of this Annual Report on Form 10-K. Current expectations, forecasts and assumptions involve a number of risks, uncertainties and other factors that could cause actual results to differ materially from those anticipated by these forward-looking statements. Such risks, uncertainties and other factors may be beyond our control. In particular, the uncertainty in global economic conditions continues to pose a risk to our operating and financial performance as consumers and businesses may defer purchases in response to tighter credit and negative financial news. Such risks and uncertainties also include, but are not limited to, the impact of the variable demand and the adverse pricing environment for disk drives, particularly in view of current business and economic conditions; dependence on our ability to successfully qualify, manufacture and sell our disk drive products in increasing volumes on a cost-effective basis and with acceptable quality, particularly the new disk drive products with lower cost structures; the impact of competitive product announcements and possible excess industry supply with respect to particular disk drive products; our ability to achieve projected cost savings in connection with restructuring plans; and the risk that our recently announced transaction with Samsung Electronics Co., Ltd. ("Samsung") will not be consummated and the risk that we will incur significant costs in connection with the transaction (see Pending Transaction with Samsung below). Information concerning risks, uncertainties and other factors that could cause results to differ materially from those projected in the forward-looking statements is also set forth in "Item 1A. Risk Factors" of this Annual Report on Form 10-K, which we encourage you to carefully read. These forward-looking statements should not be relied upon as representing our views as of any subsequent date and we undertake no obligation to update forward-looking statements to reflect events or circumstances after the date they were made. The following is a discussion of the financial condition and results of operations for the fiscal years ended July 1, 2011, July 2, 2010, and July 3, 2009.*

Our Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) is provided in addition to the accompanying consolidated financial statements and notes to assist readers in understanding our results of operations, financial condition, and cash flows. MD&A is organized as follows:

- *Our Company.*    Discussion of our business.

- *Business Overview.*    Discussion of industry trends and their impact on our business.

- *Fiscal Year 2011 Summary.*    Overview of financial and other highlights affecting us for fiscal year 2011.

- *Results of Operations.*    Analysis of our financial results comparing 2011 to 2010 and comparing 2010 to 2009.

- *Liquidity and Capital Resources.*    An analysis of changes in our balance sheets and cash flows, and discussion of our financial condition including the credit quality of our investment portfolio and potential sources of liquidity.

48

- *Contractual Obligations and Off-Balance-Sheet Arrangements.* Overview of contractual obligations and contingent liabilities and commitments outstanding as of July 1, 2011 and an explanation of off-balance-sheet arrangements.

- *Critical Accounting Estimates.* Accounting estimates that we believe are important to understanding the assumptions and judgments incorporated in our reported financial results.

## Our Company

We are the world's leading provider of hard disk drives based on revenue. We design, manufacture, market and sell hard disk drives. Hard disk drives, commonly referred to as disk drives, hard drives or HDDs, are devices that store digitally encoded data on rapidly rotating disks with magnetic surfaces. The performance attributes of disk drives, including their cost effectiveness, high quality, high storage capacities and energy efficiencies have resulted in disk drives being used as the primary medium for mass storage of electronic data.

We produce a broad range of disk drive products addressing enterprise applications, where our products are designed for enterprise servers, mainframes and workstations; client compute applications, where our products are designed for desktop and notebook computers; and client non-compute applications, where our products are designed for a wide variety of end user devices such as digital video recorders (DVRs), personal data backup systems, portable external storage systems and digital media systems. In addition to manufacturing and selling disk drives, we provide data storage services for small- to medium-sized businesses, including online backup, data protection and recovery solutions.

Effective as of July 3, 2010, Seagate Technology public limited company, an Irish public limited company, ("Seagate-Ireland") became the successor to Seagate Technology, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Seagate-Cayman"). In connection with the reorganization, all issued and outstanding Seagate-Cayman common shares were cancelled and ceased to exist, and Seagate-Ireland issued ordinary shares on a one-for-one basis to the holders of Seagate-Cayman common shares for each Seagate-Cayman common share that was cancelled.

## Business Overview

Our industry is characterized by several trends and factors that have a material impact on our strategic planning, financial condition and results of operations.

*Demand Trends for Disk Drives.* The Total Available Market (TAM) for hard disk drives in the fiscal year 2011 was approximately 657 million units, an increase of 4% from the prior fiscal year. The average capacity per drive shipped by the industry continued to increase and reached approximately 560 gigabytes per unit in the last quarter of the fiscal year, which represents an increase of 34% year over year. Overall storage demand increased approximately 40% year over year. We believe that continued growth in digital content requires increasingly higher storage capacity in order to store, aggregate, host, distribute, manage, back up and use such content, which we believe will continue to result in increased demand for disk drive products. In addition, we believe the continued increased demand for disk drives, in developed countries as well as in emerging economies, reflects the demand for real-time access to rich data and content driven by the impact of a highly mobile and increasingly connected user base. We believe these trends will continue as computing architectures evolve to serve the growing commercial and consumer user base throughout the world.

Historically, the electronic data storage industry has introduced alternative technologies that directly compete with hard disk drives. SSDs, using NAND flash memory, are a potential alternative to disk drives in certain applications such as consumer handheld devices, tablets and portable external storage. However, we believe that in the foreseeable future the traditional enterprise and client compute markets that require high capacity storage solutions, as well as the data intensive client non-compute markets, will continue to

49

be best served by hard disk drives based on the industry's ability to deliver reliable, energy efficient and cost effective mass storage devices.

*Disk Drives for Enterprise Storage.*     We define enterprise storage as disk drives designed for mission critical applications and nearline applications.

Mission critical applications are defined as applications that are vital to the operation of enterprises, requiring high performance, and high reliability disk drives. We expect the market for mission critical enterprise storage solutions to continue to be driven by enterprises moving network traffic to dedicated storage area networks in an effort to reduce network complexity and increase energy savings. We believe that this transition will lead to an increased demand for more energy efficient, smaller form factor disk drives. These solutions are comprised principally of high performance enterprise class disk drives with sophisticated firmware and communications technologies.

Nearline applications are defined as applications that are capacity-intensive and require high capacity and energy efficient disk drives featuring lower costs per gigabyte. We expect such applications, which include storage for cloud computing and backup services, will continue to grow and drive demand for disk drives designed with these attributes.

We believe the TAM for enterprise disk drives for the fiscal year 2011 was approximately 55 million units, an increase of 16% compared to the prior fiscal year. We believe that the increase in the TAM from fiscal year 2010 was driven by enterprises moving network traffic to dedicated storage area networks in an effort to reduce network complexity and increase energy savings.

SSD storage applications have been introduced as a potential alternative to redundant system startup or boot disk drives. In addition, enterprises are gradually adopting SSDs in applications where rapid processing and/or energy efficiency is required. The timing of significant adoption of SSDs is dependent on enterprises weighing the cost effectiveness and other benefits of mission critical enterprise disk drives against the perceived performance benefits of SSDs.

*Disk Drives for Client Compute.*     We define client compute applications as disk drives designed for the traditional desktop and mobile compute applications. We believe that the client compute TAM for the fiscal year 2011 was approximately 483 million units, a decrease of 1% compared to prior fiscal year. We believe that the increase in demand resulting from growing economies of certain countries and the continued proliferation of digital content will drive the demand for the client compute market.

*Disk Drives for Client Non-Compute.*     We define client non-compute applications as disk drives designed for consumer electronic devices and disk drives used for external storage and network-attached storage (NAS). Disk drives designed for consumer electronic devices are primarily used in applications such as DVRs that require a higher capacity, lower cost-per-gigabyte storage solution. Disk drives for external and NAS devices are designed for purposes such as personal data backup and portable external storage, and to augment storage capacity in the consumer's current desktop, notebook, tablet or DVR. Client non-compute applications also include devices designed to display digital media in the home theater. We believe the proliferation of high definition and media-rich digital content will continue to create increasing consumer demand for higher storage solutions. As the proliferation of non-client compute applications that require minimal storage such as tablets continues, SSDs could become more competitive within the client compute market in the future.

We believe the client non-compute TAM in the fiscal year 2011 was approximately 119 million units, an increase of 20% from the prior fiscal year primarily due to the strength of the retail market in Asia Pacific during most of the fiscal year.

*Industry Supply Balance*

From time to time the industry has experienced periods of imbalance between supply and demand. To the extent that the disk drive industry builds capacity based on expectations of demand that do not

50

materialize, price erosion may become more pronounced. Conversely, during periods where demand exceeds supply, price erosion is generally muted. For the first half of fiscal year 2011, our industry experienced a period of relative balance between supply and demand. While we believe there was unmet demand in the last quarter of fiscal year 2011 due to a reaction to possible supply chain disruptions stemming from the earthquake and tsunami in Japan, the industry returned to a relatively balanced supply environment at the end of the fiscal year.

### Suppliers of Components and Industry Constraints

Due to industry consolidation, there are a limited number of independent suppliers of components, such as recording heads and media, available to disk drive manufacturers. Vertically integrated disk drive manufacturers, who manufacture their own components, are less dependent on external component suppliers than less vertically integrated disk drive manufacturers. We believe the supply chain was generally tight for the industry during most of fiscal year 2011.

### Commodity and Other Manufacturing Costs

The production of disk drives requires rare earth elements, precious metals, scarce alloys and other industrial commodities, which are subject to fluctuations in prices, and the supply of which has at times been constrained. During the latter part of fiscal year 2011, the industry experienced significant increases in the costs of rare earth elements, which are used in magnets as well as in the process for polishing glass substrates. In addition to increased costs of components and commodities, volatility in fuel costs may also increase our costs related to commodities, manufacturing and freight. As a result, we may increase our use of ocean shipments to help offset any increase in freight costs.

### Price Erosion

Our industry has been characterized by price declines for disk drive products with comparable capacity, performance and feature sets ("like-for-like products"). Price declines for like-for-like products ("price erosion") are more pronounced during periods of:

- economic contraction or industry consolidation in which competitors may use discounted pricing to attempt to maintain or gain market share;

- few new product introductions when multiple competitors have comparable or alternative product offerings;

- temporary imbalances between industry supply and demand; and

- seasonally weaker demand, which may cause excess supply.

Disk drive manufacturers typically attempt to offset price erosion with an improved mix of disk drive products characterized by higher capacity, better performance and additional feature sets and/or product cost reductions.

We expect price erosion in our industry to continue. To remain competitive, we believe it is necessary for industry participants to continue to introduce new product offerings that utilize advanced technologies ahead of the competition in order to take advantage of potentially higher initial profit margins and reduced cost structures on these new products.

### Product Life Cycles and Changing Technology

Our industry has been characterized by significant advances in technology, which have contributed to rapid product life cycles. As a result, success in our industry has been dependent to a large extent on the ability to be the first-to-market with new products, allowing those disk drive manufacturers who introduce new products first to benefit from improved mix, favorable profit margins and less pricing pressure until comparable products are introduced. Also, because our industry is characterized by continuous price

erosion, the existence of rapid product life cycles has necessitated quick achievement of product cost effectiveness. Changing technology also necessitates on-going investments in research and development, which may be difficult to recover due to rapid product life cycles and economic declines. Further, there is a continued need to successfully execute product transitions and new product introductions, as factors such as quality, reliability and manufacturing yields become of increasing competitive importance.

*Seasonality*

The disk drive industry traditionally experiences seasonal variability in demand with higher levels of demand in the second half of the calendar year. This seasonality is driven by consumer spending in the back-to-school season from late summer to fall and the traditional holiday shopping season from fall to winter. In addition, corporate demand is typically higher during the second half of the calendar year. However, with volatility in fuel costs, the industry may be experiencing higher levels of demand earlier in the calendar year as customers attempt to take advantage of less expensive modes of transportation, which generally require longer lead times.

## Fiscal Year 2011 Summary

Revenues for fiscal year 2011 were $11.0 billion which represented a 4% decrease in revenues from $11.4 billion in the prior fiscal year. Gross margin as a percentage of revenue decreased to 20% from 28% in the prior fiscal year. We shipped 199 million units during fiscal year 2011, which represents 3% growth over the prior fiscal year. The decline in revenue reflects the cumulative effect of the competitive pricing environment the industry experienced during the middle of calendar year 2010, partially offset by an industry-wide supply constraint experienced in the second half of fiscal year 2011 in what we believed to be a reaction to possible supply chain disruptions stemming from the earthquake and tsunami in Japan. The decline in gross margin reflects the effects of price erosion as well as the timing in which we were able to achieve increased manufacturing yields.

We generated operating cash flow of $1.3 billion, used approximately $822 million to repurchase 56.8 million of our ordinary shares and used $843 million for capital expenditures. In 2011, we issued $1.3 billion in new long-term debt and we repaid approximately $377 million in existing long-term debt.

*Pending Transaction with Samsung*

On April 19, 2011, we entered into an Asset Purchase Agreement with Samsung, a company organized under the laws of the Republic of Korea, pursuant to which we will acquire certain assets and assume certain liabilities of Samsung relating to the research and development, manufacture and sale of hard-disk drives. Under the terms of the agreement, Samsung will receive consideration comprised of $687.5 million in cash and approximately 45.2 million of our ordinary shares.

The agreement has no financing contingencies, and is subject to customary closing conditions, including review by U.S. and international regulators. The agreement contains certain termination rights for Samsung and provides that a specified fee must be paid by us to Samsung in connection with certain termination events. In certain specified circumstances, we must pay Samsung a termination fee of $72.5 million (generally if the transaction has not been consummated and the requisite regulatory approvals have not been obtained by the Expiration Date of December 31, 2011, which may be extended in certain circumstances to March 31, 2012). If regulatory approvals have been obtained but the transaction has not been consummated by the Expiration Date, then in certain specified circumstances we must pay Samsung a termination fee of $82.5 million (generally if we are in breach of the agreement and legal remedies are not awarded to Samsung).

On May 20, 2011, we received a request for additional information from the U.S. Federal Trade Commission (the "FTC") in connection with the FTC's review of the pending transaction. On May 30, 2011, we received notification from the European Commission (the "EC") that the EC has decided to seek more information regarding the pending transaction. We are in the process of gathering information to

respond to both the FTC and the EC, however, we continue to believe the transaction will close by the end of calendar year 2011.

**Results of Operations**

The following table summarizes information from our consolidated statements of operations by dollars and as a percentage of revenue:

| | | Fiscal Years Ended | |
| --- | --- | --- | --- |
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Revenue | $ 10,971 | $ 11,395 | $ 9,805 |
| Cost of revenue | 8,825 | 8,191 | 8,395 |
| Gross margin | 2,146 | 3,204 | 1,410 |
| Product development | 875 | 877 | 953 |
| Marketing and administrative | 445 | 437 | 537 |
| Amortization of intangibles | 2 | 27 | 55 |
| Restructuring and other, net | 18 | 66 | 210 |
| Impairment of goodwill and other long-lived assets, net of recoveries | — | 57 | 2,320 |
| Income (loss) from operations | 806 | 1,740 | (2,665) |
| Other income (expense), net | (227) | (171) | (149) |
| Income (loss) before income taxes | 579 | 1,569 | (2,814) |
| Provision for (benefit from) income taxes | 68 | (40) | 311 |
| Net income (loss) | $ 511 | $ 1,609 | $ (3,125) |

| | | Fiscal Years Ended | |
| --- | --- | --- | --- |
| (as a percentage of Revenue) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Revenue | 100% | 100% | 100% |
| Cost of revenue | 80 | 72 | 86 |
| Gross margin | 20 | 28 | 14 |
| Product development | 8 | 8 | 10 |
| Marketing and administrative | 4 | 4 | 5 |
| Amortization of intangibles | — | — | 1 |
| Restructuring and other, net | — | 1 | 2 |
| Impairment of goodwill and other long-lived assets, net of recoveries | — | — | 24 |
| Income (loss) from operations | 7 | 15 | (28) |
| Other income (expense), net | (2) | (1) | (1) |
| Income (loss) before income taxes | 5 | 14 | (29) |
| Provision for (benefit from) income taxes | 1 | — | 3 |
| Net income (loss) | 5% | 14% | (32)% |

53

The following table summarizes information regarding volume shipments, average selling prices (ASPs) and revenues by channel and geography:

| (In millions, except percentages and ASPs) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
|---|---|---|---|
| Net Revenue | $ 10,971 | $ 11,395 | $ 9,805 |
| Unit Shipments: | | | |
|   Enterprise | 29.1 | 25.4 | 22.3 |
|   Client Compute | 132.3 | 135.0 | 114.9 |
|   Client Non-Compute | 37.6 | 32.8 | 26.6 |
| Total Units Shipped | 199.0 | 193.2 | 163.8 |
| ASPs (per unit) | $ 54 | $ 58 | $ 59 |
| | | | |
| Revenues by Channel (%) | | | |
|   OEM | 69% | 71% | 64% |
|   Distributors | 22% | 21% | 27% |
|   Retail | 9% | 8% | 9% |
| Revenues by Geography (%) | | | |
|   Americas | 29% | 26% | 28% |
|   EMEA | 20% | 22% | 27% |
|   Asia Pacific | 51% | 52% | 45% |

*Fiscal Year 2011 Compared to Fiscal Year 2010*

*Revenue*

| (Dollars in millions) | July 1, 2011 | July 2, 2010 | Change | % Change |
|---|---|---|---|---|
| Revenue | $ 10,971 | $ 11,395 | $ (424) | (4)% |

Revenue in fiscal year 2011 decreased approximately 4%, or $424 million, from fiscal year 2010. Units shipped increased 3% or 6 million units from fiscal year 2010. This decrease in revenue was due to the cumulative effect of the competitive pricing environment the industry experienced, partially offset by industry-wide supply constraints.

We maintain various sales programs such as point-of-sale rebates, sales price adjustments and price protection, aimed at increasing customer demand. We exercise judgment in formulating the underlying estimates related to distributor and retail inventory levels, sales program participation and customer claims submittals in determining the provision for such programs. Sales programs recorded as contra revenue were approximately 8% and 6% of our gross revenue for fiscal years 2011 and 2010, respectively.

*Gross Margin*

| (Dollars in millions) | July 1, 2011 | July 2, 2010 | Change | % Change |
|---|---|---|---|---|
| Cost of revenue | $ 8,825 | $ 8,191 | $ 634 | 8% |
| Gross margin | $ 2,146 | $ 3,204 | $ (1,058) | (33)% |
| Gross margin percentage | 20% | 28% | | |

54

For fiscal year 2011, gross margin as a percentage of revenue decreased to 20% from 28% in the prior fiscal year, primarily due to price erosion. In addition, gross margin was negatively impacted by delays in ramping to maturity for new products, which unfavorably affected our manufacturing yields.

*Operating Expenses*

| | Fiscal Years Ended | | | |
|---|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | Change | % Change |
| Product development | $ 875 | $ 877 | $ (2) | — |
| Marketing and administrative | 445 | 437 | 8 | 2% |
| Amortization of intangibles | 2 | 27 | (25) | (93)% |
| Restructuring and other, net | 18 | 66 | (48) | (73)% |
| Impairment of long-lived assets | — | 57 | (57) | (100)% |
| Operating expenses | $ 1,340 | $ 1,464 | $ (124) | |

*Product Development Expense.*    Product development expenses for fiscal year 2011 were relatively flat from fiscal year 2010, reflecting a $28 million decrease in variable performance-based compensation, offset by an $18 million increase in spending for new programs and an $8 million decrease in research grants.

*Marketing and Administrative Expense.*    The increase in Marketing and administrative expenses for fiscal year 2011 compared to fiscal year 2010 was due to a $13 million increase related to Samsung acquisition expenses, $10 million increase in litigation related expenses, and a net $11 million reduction in total compensation expenses, part of which included a $23 million decrease in variable performance-based compensation.

*Amortization of Intangibles.*    Amortization of intangibles for fiscal year 2011 decreased approximately 93% from fiscal year 2010 as certain intangibles relating to the MetaLINCS, Inc. acquisitions have been fully amortized.

*Restructuring and Other, net.*    During fiscal year 2011, we recorded restructuring and other charges of $18 million primarily associated with previously announced restructuring activities. Restructuring and Other, net decreased approximately $48 million when compared to the prior fiscal year, which included a $39 million charge for our AMK restructuring plan announced in August 2009 and an $18 million charge related to our Pittsburgh, Pennsylvania facility.

*Impairment of Long-Lived Assets.*    During fiscal year 2011, we did not record any impairment charge related to our long-lived assets. Impairment of long-lived assets decreased approximately $57 million when compared to the prior fiscal year, which included an impairment charge to adjust the carrying value of certain assets held for sale to their estimated fair value, less cost to sell.

*Other Income (Expense), net*

| | Fiscal Years Ended | | | |
|---|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | Change | % Change |
| Other expense, net | $ (227) | $ (171) | $ (56) | 33% |

The change in Other expense, net for fiscal year 2011 compared to fiscal year 2010 was primarily due to a $40 million increase in interest expense resulting from higher average debt balances and $24 million in losses related to the redemption of debt.

*Income Taxes*

| (Dollars in millions) | Fiscal Years Ended | | | |
| --- | --- | --- | --- | --- |
| | July 1, 2011 | July 2, 2010 | Change | % Change |
| Provision for (benefit from) income taxes | $ 68 | $ (40) | $ 108 | 270% |

We recorded an income tax provision of $68 million for fiscal year 2011 compared to an income tax benefit of $40 million for fiscal year 2010. Our fiscal year 2011 provision for income taxes included non-U.S. income taxes recorded for increases in income tax reserves for non-U.S. income tax positions taken in prior fiscal years, partially offset by tax benefits recorded for the release of income tax reserves associated with settlements of income tax audits and the expiration of certain statutes of limitation. Our fiscal year 2010 income tax benefit included $55 million of deferred tax benefit from the reversal of a portion of the U.S. valuation allowance recorded in earlier years.

Our Irish tax resident parent holding company owns various U.S. and non-U.S. subsidiaries that operate in multiple non-Irish tax jurisdictions. Our worldwide operating income is either subject to varying rates of tax or is exempt from tax due to tax holidays or tax incentive programs we operate under in Malaysia, Singapore, Switzerland and Thailand. These tax holidays or incentives are scheduled to expire in whole or in part at various dates through 2020.

Our income tax provision recorded for fiscal year 2011 differed from the provision for income taxes that would be derived by applying the Irish statutory rate of 25% to income before income taxes primarily due to the net effect of (i) tax benefits related to non-U.S. earnings generated in jurisdictions that are subject to tax holidays or tax incentive programs and are considered indefinitely reinvested outside of Ireland, (ii) income tax expense related to intercompany transactions, (iii) a decrease in valuation allowance for certain deferred tax assets, and (iv) non-U.S. losses with no tax benefit. Our benefit for income taxes recorded for the comparative fiscal year ended July 2, 2010 differed from the provision (benefit) for income taxes that would be derived by applying the Irish statutory rate of 25% to income before income taxes primarily due to the net effect of (i) tax benefits related to non-U.S. earnings generated in jurisdictions that are subject to tax holidays or tax incentive programs and are considered indefinitely reinvested outside of Ireland, (ii) a decrease in valuation allowance for certain deferred tax assets, (iii) non-U.S. losses with no tax benefit, and (iv) tax expense related to intercompany transactions.

Based on our non-U.S. ownership structure and subject to (i) potential future increases in our valuation allowance for deferred tax assets; and (ii) a future change in our intention to indefinitely reinvest earnings from our subsidiaries outside of Ireland, we anticipate that our effective tax rate in future periods will generally be less than the Irish statutory rate.

At July 1, 2011, our deferred tax asset valuation allowance was approximately $1.1 billion.

At July 1, 2011, we had net deferred tax assets of $462 million. The realization of $455 million of these deferred tax assets is primarily dependent on our ability to generate sufficient U.S. and certain non-U.S. taxable income in future periods. Although realization is not assured, we believe that it is more likely than not that these deferred tax assets will be realized. The amount of deferred tax assets considered realizable, however, may increase or decrease in subsequent periods when we re-evaluate the underlying basis for our estimates of future U.S. and certain non-U.S. taxable income.

Approximately $364 million and $90 million of our U.S. net operating loss and tax credit carry forwards, respectively, are subject to an aggregate annual limitation of $45 million pursuant to U.S. tax law.

As of July 1, 2011 and July 2, 2010, we had approximately $128 million and $115 million, respectively, in unrecognized tax benefits excluding interest and penalties. The unrecognized tax benefits that, if recognized, would impact the effective tax rate were $128 million and $115 million as of July 1, 2011 and July 2, 2010, respectively, subject to certain future valuation allowance reversals.

It is our policy to include interest and penalties related to unrecognized tax benefits in the provision for taxes on the Consolidated Statements of Operations. During fiscal year 2011, we recognized a net expense for interest and penalties of less than $1 million as compared to a net benefit of $1 million and $6 million during fiscal year 2010 and fiscal year 2009, respectively. As of July 1, 2011, we had $15 million of accrued interest and penalties related to unrecognized tax benefits which remain unchanged from fiscal year 2010.

During the fiscal year ended July 1, 2011, our unrecognized tax benefits excluding interest and penalties increased by approximately $13 million primarily due to (i) reductions associated with the expiration of certain statutes of limitation of $10 million, (ii) reductions associated with effectively settled positions of $21 million, (iii) increases associated with the election to expense foreign tax credits of $1 million, (iv) increases in current year unrecognized tax benefits of $13 million (v) increases in prior year of unrecognized tax benefits of $26 million, and (vi) increases from other activity, including non-U.S. exchange losses, of $4 million.

During the 12 months beginning July 2, 2011, we expect to reduce our unrecognized tax benefits by approximately $10 million as a result of the expiration of certain statutes of limitation and resolution of issues with relevant authorities. We do not believe it is reasonably possible that other unrecognized tax benefits will materially change in the next 12 months.

We are subject to taxation in many jurisdictions globally and are required to file U.S. federal, U.S. state, and non-U.S income tax returns. In May 2011, the U.S. Internal Revenue Service (IRS) completed its field examination of our U.S. federal income tax returns for fiscal years ending in 2005 through 2007. The IRS issued a Revenue Agent's Report and proposed certain adjustments. We are currently contesting certain of these proposed adjustments through the IRS Appeals Office. We believe that the resolution of these disputed issues will have no material impact on our financial statements.

With respect to U.S. state and non-U.S. income tax returns, we are generally no longer subject to tax examinations for years prior to fiscal year 2003. We are also no longer subject to tax examination of U.S. federal income tax returns for years prior to fiscal year 2005.

*Fiscal Year 2010 Compared to Fiscal Year 2009*

*Revenue*

| | Fiscal Years Ended | | | |
|---|---|---|---|---|
| (Dollars in millions) | July 2, 2010 | July 3, 2009 | Change | % Change |
| Revenue | $ 11,395 | $ 9,805 | $ 1,590 | 16% |

Revenue in fiscal year 2010 increased approximately 16%, or $1.6 billion, from fiscal year 2009 primarily due to an 18% increase in the total number of disk drives shipped. This increase in revenue reflects an industry-wide supply constraint experienced in the first half of fiscal year 2010 and a relatively balanced supply and demand environment during the March 2010 quarter resulting in muted price erosion. In the June 2010 quarter, industry supply exceeded demand and resulted in an increase in price erosion to levels typical of a June quarter.

Sales programs recorded as contra revenue were approximately 6% and 12% of our gross revenue for fiscal years 2010 and 2009, respectively.

*Gross Margin*

| (Dollars in millions) | Fiscal Years Ended | | | |
| | July 2, 2010 | July 3, 2009 | Change | % Change |
|---|---|---|---|---|
| Cost of revenue | $ 8,191 | $ 8,395 | $ (204) | (2)% |
| Gross margin | $ 3,204 | $ 1,410 | $ 1,794 | 127% |
| Gross margin percentage | 28% | 14% | | |

For fiscal year 2010, gross margin as a percentage of revenue increased to 28% from 14% in the fiscal year 2009 primarily as a result of an 18% increase in drive shipments, muted price erosion, a more cost-effective product mix and a substantial improvement in manufacturing capacity utilization.

*Operating Expenses*

| (Dollars in millions) | Fiscal Years Ended | | | |
| | July 2, 2010 | July 3, 2009 | Change | % Change |
|---|---|---|---|---|
| Product development | $ 877 | $ 953 | $ (76) | (8)% |
| Marketing and administrative | 437 | 537 | (100) | (19)% |
| Amortization of intangibles | 27 | 55 | (28) | (51)% |
| Restructuring and other, net | 66 | 210 | (144) | (69)% |
| Impairment of goodwill and other long-lived assets, net of recoveries | 57 | 2,320 | (2,263) | (98)% |
| Operating expenses | $ 1,464 | $ 4,075 | $ (2,611) | |

*Product Development Expense.*    Product development expenses for fiscal year 2010 decreased approximately 8% from fiscal year 2009 primarily due to restructuring and other cost reduction efforts, and the effect of an additional week of compensation expenses in fiscal year 2009, which was a 53-week fiscal year. These cost reduction efforts resulted in decreases of $66 million in headcount related expenses in fiscal year 2010, $38 million due to the cessation of certain product development activities, and $26 million due to the non-recurrence of accelerated depreciation expense related to the closure of our Pittsburgh, Pennsylvania facility. These decreases were partially offset by increases of $48 million for variable performance-based compensation expense recorded in fiscal year 2010 compared to none in fiscal year 2009, and a $16 million benefit related to our deferred compensation plan recorded in fiscal year 2009.

*Marketing and Administrative Expense.*    Marketing and administrative expenses for fiscal year 2010 decreased approximately 19% from fiscal year 2009 primarily due to restructuring and other cost reduction efforts, and the effect of an additional week of compensation expenses in fiscal year 2009, which was a 53-week fiscal year. These cost reduction efforts resulted in decreases of $69 million in headcount related expenses, $26 million in advertising costs, and $29 million in legal expenses. These decreases were partially offset by increases of $28 million for variable performance-based compensation expense recorded in fiscal year 2010 compared to none in fiscal year 2009, and a $9 million benefit related to our deferred compensation plan recorded in fiscal year 2009.

*Amortization of Intangibles.*    Amortization of intangibles for fiscal year 2010 decreased approximately 51% from fiscal year 2009 as certain intangibles relating to the Maxtor Corporation ("Maxtor") and MetaLINCS, Inc. acquisitions have been fully amortized.

*Restructuring and Other, net.*    During fiscal year 2010, we recorded restructuring and other charges of $66 million mainly comprised of charges related to our AMK restructuring plan announced in August 2009

58

and additional restructuring charges related to our Pittsburgh, Pennsylvania facility and facilities acquired as a part of the Maxtor acquisition.

Restructuring and Other, net decreased approximately $144 million in fiscal year 2010 when compared to the fiscal year 2009, which include restructuring plans announced in January and May 2009 that were intended to realign our cost structure with the fiscal year 2009 macroeconomic business environment.

*Impairment of Goodwill and Other Long-Lived Assets, net of Recoveries.*    During fiscal year 2010, we committed to a plan to sell certain equipment related to certain research activities that had ceased. In connection with this plan, we reclassified these assets as held for sale and recorded a net impairment charge of approximately $57 million to adjust the carrying value of these assets to the estimated fair value, less cost to sell.

Impairment of goodwill and other long-lived assets, net of recoveries decreased approximately $2.2 billion in fiscal year 2010 when compared to the fiscal year 2009 due to non-recurring $2.3 billion impairment charge we recorded in fiscal year 2009 as a result of the significant adverse change to our business climate.

*Other Income (Expense), net*

| | Fiscal Years Ended | | | |
| (Dollars in millions) | July 2, 2010 | July 3, 2009 | Change | % Change |
| --- | --- | --- | --- | --- |
| Other income (expense), net | $ (171) | $ (149) | $ (22) | 15% |

The change in Other income (expense), net for fiscal year 2010 compared to fiscal year 2009 was primarily due to a $31 million increase in interest expense resulting from higher average borrowing costs, a decrease in gains from foreign currency remeasurements of $15 million, a $13 million write-down of an equity investment in fiscal year 2010, a $12 million decrease in interest income as a result of lower yields on our cash and investments and an $8 million non-recurring gain recognized on the sale of an equity investment in fiscal year 2009. These were partially offset by a $44 million loss related to our deferred compensation plan assets recorded in fiscal year 2009.

*Income Taxes*

| | Fiscal Years Ended | | | |
| (Dollars in millions) | July 2, 2010 | July 3, 2009 | Change | % Change |
| --- | --- | --- | --- | --- |
| Provision for (benefit from) income taxes | $ (40) | $ 311 | $ (351) | (113)% |

During fiscal year ended July 2, 2010, an enacted legislative change in U.S. tax law was taken into account in computing our income tax provision. The Worker, Homeownership, and Business Assistance Act of 2009, was enacted on November 6, 2009. This law allowed us to elect an increased carryback period for net operating losses incurred in 2008 or 2009 from two years to three, four or five years at our option. We recorded an $11 million income tax benefit as a result of the increased carryback period.

We recorded an income tax benefit of $40 million for fiscal year 2010 compared to a provision for income taxes of $311 million for fiscal year 2009. Our fiscal year 2009 provision for income taxes included $271 million of income tax expense recorded in the second quarter associated with an increase in our valuation allowance for U.S. deferred tax assets related to a reduction in our forecasted U.S. taxable income.

In connection with our previously announced plans to move our corporate headquarters to Ireland, we initiated certain pre-reorganization steps which resulted in our existing Cayman parent holding company

59

becoming an Irish tax resident in fiscal year 2010. Our Irish tax resident parent holding company owns various U.S. and non-U.S. subsidiaries that operate in multiple non-Irish taxing jurisdictions. Our worldwide operating income is either subject to varying rates of tax or is exempt from tax due to tax holidays or tax incentive programs we operate under in China, Malaysia, Singapore, Switzerland and Thailand. These tax holidays or incentives are scheduled to expire in whole or in part at various dates through 2020.

Since we became an Irish tax resident in fiscal year 2010, the Irish statutory rate of 25% is used for purposes of the reconciliation between the provision for income taxes at the statutory rate and our effective tax rate. For fiscal years 2009, a notional 35% statutory rate was used.

Our income tax benefit recorded for fiscal year 2010 differed from the provision (benefit) for income taxes that would be derived by applying the Irish statutory rate of 25% to income before income taxes primarily due to the net effect of (i) tax benefits related to non-U.S. earnings generated in jurisdictions that are subject to tax holidays or tax incentive programs and are considered indefinitely reinvested outside of Ireland, (ii) a decrease in valuation allowance for certain deferred tax assets, (iii) non-U.S. losses with no tax benefit, and (iv) tax expense related to intercompany transactions. Our provision for income taxes recorded for the comparative fiscal year ended July 3, 2009 differed from the provision for income taxes that would be derived by applying a notional U.S. 35% rate to income before income taxes primarily due to the net effect of (i) non-deductible goodwill impairments, (ii) an increase in our valuation allowance for certain deferred tax assets, (iii) non-U.S. losses with no tax benefit, (iv) tax benefits related to tax holiday and tax incentive programs, and (v) tax expense related to intercompany transactions.

**Liquidity and Capital Resources**

The following sections discuss our principal liquidity requirements, as well as our sources and uses of cash and our liquidity and capital resources. Our cash and cash equivalents are maintained in highly liquid investments with remaining maturities of 90 days or less at the time of purchase. Our short-term investments consist primarily of readily marketable debt securities with remaining maturities of more than 90 days at the time of purchase. The principal objectives of our investment policy are the preservation of principal and maintenance of liquidity. We attempt to mitigate default risk by investing in high-quality investment grade securities, limiting the time to maturity and by monitoring the counter-parties and underlying obligors closely. We monitor our investment portfolio and position our portfolio to respond appropriately to a reduction in credit rating of any investment issuer, guarantor or depository. We intend to maintain a highly liquid portfolio by investing only in those marketable securities that we believe have active secondary or resale markets. We believe our cash equivalents and short-term investments are liquid and accessible. We operate in some countries that may have restrictive regulations over the movement of cash and/or foreign exchange across their borders. These restrictions have not impeded our ability to conduct business in those countries, nor do we expect them to in the next 12 months. We are not aware of any downgrades, losses or other significant deterioration in the fair value of our cash equivalents or short-term investments and accordingly, we do not believe the fair value of our short-term investments has significantly changed from the values reported as of July 1, 2011.

*Cash and cash equivalents, short-term investments, and restricted cash and investments*

| (Dollars in millions) | As of | | |
| | July 1, 2011 | July 2, 2010 | Change |
|---|---|---|---|
| Cash and cash equivalents | $ 2,677 | $ 2,263 | $ 414 |
| Short-term investments | 474 | 252 | 222 |
| Restricted cash and investments | 102 | 114 | (12) |
| Total | $ 3,253 | $ 2,629 | $ 624 |

60

Our cash and cash equivalents, short-term investments and restricted cash and investments increased by $624 million from July 2, 2010 primarily as a result of net proceeds from the issuance of long-term debt of $1.3 billion, $1.3 billion in cash provided by operating activities, and $83 million in cash received from the issuance of ordinary shares under employee stock plans. Partially offsetting this increase were $822 million of cash paid to repurchase 56.9 million of our ordinary shares, $843 million cash paid for capital expenditures, $377 million for the redemption of long-term debt and $74 million in dividends paid to our shareholders.

The following table summarizes results of statement of cash flows for the periods indicated:

| | Fiscal Years Ended | | |
|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Net cash flow provided by (used in): | | | |
| Operating activities | $ 1,264 | $ 1,932 | $ 823 |
| Investing activities | (981) | (752) | (618) |
| Financing activities | 131 | (344) | 232 |
| Net increase in cash and cash equivalents | $ 414 | $ 836 | $ 437 |

*Cash Provided by Operating Activities*

Cash provided by operating activities for fiscal year 2011 was approximately $1.3 billion and includes the effects of net income adjusted for non-cash items including depreciation, amortization, stock-based compensation, impairment of long-lived assets, and:

- an increase of $386 million in accounts payable due to higher direct material purchases related to an increase in volume;

- an increase of $168 million related to an increase in vendor non-trade receivables; and

- an increase of $115 million in inventories related to an increase in volume.

Cash provided by operating activities for fiscal year 2010 was approximately $1.9 billion and includes the effects of net income adjusted for non-cash items including depreciation, amortization, stock-based compensation, impairment of long-lived assets, and:

- an increase of $367 million in accounts receivable due to an increase in revenue; and

- an increase of $170 million in inventories due to an increase in production requirements.

Cash provided by operating activities for fiscal year 2009 was approximately $823 million and includes the effects of a net loss adjusted for non-cash items including depreciation, amortization, stock-based compensation, impairment of goodwill and other long-lived assets and the income tax provision related to a change in our valuation allowance for deferred tax assets, and:

- a decrease of $372 million in accounts receivable due to a decrease in revenue, improved sales linearity and a shift in channel mix;

- a decrease of $358 million in inventories due to improved inventory and build schedule management and supply chain improvements; and

- a decrease of $296 million in accrued employee compensation primarily due to no variable performance-based compensation expense in fiscal year 2009.

61

*Cash Used in Investing Activities*

In fiscal year 2011, we used $981 million for net cash investing activities, which was primarily attributable to payments for property, equipment and leasehold improvements of approximately $843 million.

In fiscal year 2010, we used $752 million for net cash investing activities, which was primarily attributable to payments for property, equipment and leasehold improvements of approximately $639 million.

In fiscal year 2009, we used $618 million for net cash investing activities, which was primarily attributable to payments for property, equipment and leasehold improvements of approximately $633 million.

*Cash Provided by (Used in) Financing Activities*

Net cash provided by financing activities of $131 million for fiscal year 2011 was attributable to $1.3 billion in net proceeds from the issuance of long-term debt partially offset by $822 million to repurchase 56.9 million of our ordinary shares and $377 million for the repayment of our long-term debt.

Net cash used in financing activities of $344 million for fiscal year 2010 was primarily attributable to the repayment of $350 million of our amended credit facility and the repayment and repurchases of $457 million of our long-term debt. The repayment and repurchases were paid primarily with $379 million of restricted cash, previously held in escrow. We also paid approximately $584 million to repurchase 32.4 million of our ordinary shares, which was partially offset by $587 million in net proceeds from the issuance of long-term debt and $86 million in proceeds from the exercise of stock options and employee stock purchases.

Net cash provided by financing activities for fiscal year 2009 was attributable to $399 million in net proceeds from the issuance of long-term debt, of which $19 million was used to repay our long-term debt and the remaining proceeds of $380 million were held in escrow for the repayment and repurchase of our long-term debt. We also had proceeds of $350 million from the draw down of our credit facility offset by $132 million in dividends paid to our shareholders.

*Liquidity Sources*

Our primary sources of liquidity as of July 1, 2011, consisted of: (1) approximately $3.2 billion in cash, cash equivalents, and short-term investments, (2) cash we expect to generate from operations and (3) a $350 million senior secured revolving credit facility. We also had $102 million in restricted cash and investments, of which $84 million was related to our employee deferred compensation liabilities under our non-qualified deferred compensation plan.

On January 18, 2011, Seagate Technology plc, and its subsidiary Seagate HDD entered into a Credit Agreement which provides for a $350 million senior secured revolving credit facility. Seagate Technology plc and certain of its material subsidiaries fully and unconditionally guarantee, on a senior secured basis, the revolving credit facility. The revolving credit facility matures in January 2015. The revolving credit facility is available for cash borrowings and for the issuance of letters of credit up to a sub-limit of $75 million. As of July 1, 2011, no borrowings have been drawn under the revolving credit facility, and $4 million had been utilized for letters of credit. The line of credit is available for borrowings, subject to compliance with financial covenants and other customary conditions to borrowing.

The credit agreement that governs our revolving credit facility contains certain covenants that we must satisfy in order to remain in compliance with the credit agreement, including three financial covenants: (1) minimum amount of cash, cash equivalents and marketable securities; (2) a fixed charge coverage ratio;

and (3) a net leverage ratio. As of July 1, 2011, we are in compliance with all covenants, including the financial ratios that we are required to maintain.

We believe that our sources of cash will be sufficient to fund our operations and meet our cash requirements for at least the next 12 months.

*Cash Requirements and Commitments*

Our liquidity requirements are primarily to meet our working capital, research and development and capital expenditure needs, to fund scheduled payments of principal and interest on our indebtedness, and to fund our dividend. Our ability to fund these requirements will depend on our future cash flows, which are determined by future operating performance, and therefore, subject to prevailing global macroeconomic conditions and financial, business and other factors, some of which are beyond our control.

On July 20, 2011, we announced that our Board of Directors approved a cash dividend of $0.18 per share, which will be payable on August 26, 2011 to shareholders of record as of the close of business on August 5, 2011.

In fiscal year 2011, we issued $1.3 billion in long-term debt. We intend to use the net proceeds for general corporate purposes, which may include the repayment and/or repurchase of a portion of our outstanding indebtedness, capital expenditures and investments in our business.

As of July 1, 2011, we were in compliance with all of the covenants under our debt agreements. Based on our current outlook, we expect to be in compliance with the covenants of our debt agreements over the next 12 months.

The carrying value of our long-term debt as of July 1, 2011 and July 2, 2010 was $3.5 billion and $2.5 billion, respectively. The table below presents the principal amounts of our outstanding long-term debt in order of maturity:

| | As of | | |
| --- | --- | --- | --- |
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | Change |
| 6.375% Senior Notes due October 2011 | $    559 | $    560 | $    (1) |
| 5.75% Subordinated Debentures due March 2012 | — | 33 | (33) |
| 2.375% Convertible Senior Notes due August 2012 | — | 326 | (326) |
| 10.0% Senior Secured Second-Priority Notes due May 2014 | 416 | 430 | (14) |
| 6.8% Senior Notes due October 2016 | 600 | 600 | — |
| 7.75% Senior Notes due December 2018 | 750 | — | 750 |
| 6.875% Senior Notes due May 2020 | 600 | 600 | — |
| 7.00% Senior Notes due November 2021 | 600 | — | 600 |
| Total | $ 3,525 | $ 2,549 | $    976 |

During fiscal year 2011, we repurchased approximately 56.9 million of our ordinary shares. See Item 5. Market for Registrant's Shares, Related Shareholder Matters and Issuer Purchases of Equity Securities—Repurchases of Our Equity Securities.

We expect the pending transaction with Samsung to close by the end of calendar 2011. The purchase price for this transaction includes cash consideration of $687.5 million, which we are obligated to pay upon closing. We currently expect to fund this transaction with our current sources of liquidity and cash from operations.

For fiscal year 2012, we expect capital investment to be at or below the low end of our targeted range of 6-8% of revenue. We require substantial amounts of cash to fund scheduled payments of principal and interest on our indebtedness, future capital expenditures and any increased working capital requirements. We will continue to evaluate and manage the retirement and replacement of existing debt and associated obligations, including the issuance of new debt securities, exchanging existing debt securities for other debt securities and retiring debt pursuant to privately negotiated transactions, open market purchases or otherwise. In addition, we may selectively pursue strategic alliances, acquisitions and investments, which may require additional capital.

**Contractual Obligations and Commitments**

Our contractual cash obligations and commitments as of July 1, 2011, have been summarized in the table below:

| | | | Fiscal Year(s) | | |
|---|---|---|---|---|---|
| (Dollars in millions) | Total | 2012 | 2013-2014 | 2015-2016 | Thereafter |
| Contractual Cash Obligations: | | | | | |
| Long-term debt [(1)] | $ 3,525 | $ 559 | $ 416 | $ — | $ 2,550 |
| Interest payments on debt | 1,613 | 241 | 446 | 364 | 562 |
| Capital expenditures | 166 | 163 | 3 | — | — |
| Operating leases [(2)] | 193 | 42 | 51 | 23 | 77 |
| Purchase obligations [(3)] | 1,158 | 1,150 | 8 | — | — |
| Subtotal | 6,655 | 2,155 | 924 | 387 | 3,189 |
| Commitments: | | | | | |
| Letters of credit or bank guarantees | 31 | 27 | 4 | — | — |
| Total | $ 6,686 | $ 2,182 | $ 928 | $ 387 | $ 3,189 |

(1)    Included in long-term debt for fiscal year 2012 is the principal amount of $559 million related to our 6.375% Notes.

(2)    Includes total future minimum rent expense under non-cancelable leases for both occupied and vacated facilities (rent expense is shown net of sublease income).

(3)    Purchase obligations are defined as contractual obligations for the purchase of goods or services, which are enforceable and legally binding on us, and that specify all significant terms.

As of July 1, 2011, we had a liability for unrecognized tax benefits and an accrual for the payment of related interest totaling $75 million, $8 million of which is expected to be settled within one year. Outside of one year, we are unable to make a reasonably reliable estimate of when cash settlement with a taxing authority will occur.

**Off-Balance Sheet Arrangements**

As of July 1, 2011, we did not have any material off-balance sheet arrangements (as defined in Item 303(a)(4)(ii) of Regulation S-K).

**Critical Accounting Policies**

The methods, estimates and judgments we use in applying our most critical accounting policies have a significant impact on the results we report in our consolidated financial statements. The SEC has defined the most critical accounting policies as the ones that are most important to the portrayal of our financial condition and operating results, and require us to make our most difficult and subjective judgments, often as a result of the need to make estimates of matters that are highly uncertain at the time of estimation.

Based on this definition, our most critical policies include: establishment of sales program accruals, establishment of warranty accruals, accounting for income taxes, and the accounting for goodwill and other long-lived assets. Below, we discuss these policies further, as well as the estimates and judgments involved. We also have other accounting policies and accounting estimates relating to uncollectible customer accounts, valuation of inventory, valuation of share-based payments and restructuring. We believe that these other accounting policies and accounting estimates either do not generally require us to make estimates and judgments that are as difficult or as subjective, or it is less likely that they would have a material impact on our reported results of operations for a given period.

*Establishment of Sales Program Accruals.*    We establish certain distributor and OEM sales programs aimed at increasing customer demand. For the distribution channel, these programs typically involve rebates related to a distributor's level of sales, order size, advertising or point of sale activity and price protection adjustments. For OEM sales, rebates are typically based on an OEM customer's volume of purchases or other agreed upon rebate programs. We provide for these obligations at the time that revenue is recorded based on estimated requirements. We estimate these contra-revenue rebates and adjustments based on various factors, including price reductions during the period reported, estimated future price erosion, customer orders, distributor sell-through and inventory levels, program participation, customer claim submittals and sales returns. Our estimates reflect contractual arrangements but also our judgment relating to variables such as customer claim rates and attainment of program goals, and inventory and sell-through levels reported by our distribution customers. Currently, our distributors' inventories are at the low end of the historical range.

While we believe we have sufficient experience and knowledge of the market and customer buying patterns to reasonably estimate such rebates and adjustments, actual market conditions or customer behavior could differ from our expectations. As a result, actual payments under these programs, which may spread over several months after the related sale, may vary from the amount accrued. Accordingly, revenues and margins in the period in which the adjustment occurs may be affected.

Significant actual variations in any of the factors upon which we base our contra-revenue estimates could have a material effect on our operating results. In fiscal year 2011, sales programs were approximately 8% of gross revenue, reflecting the cumulative effect of the competitive pricing environment during the first half of fiscal year 2011. For fiscal years 2009 and 2010, total sales programs have ranged from 6% to 12% of gross revenues. Adjustments to revenues due to under or over accruals for sales programs related to revenues reported in prior quarterly periods have averaged 0.5% of quarterly gross revenue for fiscal years 2009 through 2011, and were approximately 0.4% of quarterly gross revenue in fiscal year 2011. Any future shifts in the industry supply-demand balance as well as other factors may result in a more competitive pricing environment and may cause sales programs as a percentage of gross revenue to increase from the current or historical levels. If such rebates and incentives trend upwards, revenues and margins will be reduced.

*Establishment of Warranty Accruals.*    We estimate probable product warranty costs at the time revenue is recognized. We generally warrant our products for a period of one to five years. Our warranty provision considers estimated product failure rates and trends (including the timing of product returns during the warranty periods), estimated repair or replacement costs and estimated costs for customer compensatory claims related to product quality issues, if any. We use a statistical model to help with our estimates and we exercise considerable judgment in determining the underlying estimates. Should actual experience in any future period differ significantly from our estimates, or should the rate of future product technological advancements fail to keep pace with the past, our future results of operations could be materially affected. Our judgment is subject to a greater degree of subjectivity with respect to newly introduced products because of limited experience with those products upon which to base our warranty estimates.

The actual results with regard to warranty expenditures could have an adverse or favorable effect on our results of operations if the actual rate of unit failure, the cost to repair a unit, or the actual cost required to satisfy customer compensatory claims differs from those estimates we used in determining the warranty accrual. Since we typically outsource our warranty repairs, our repair cost is subject to periodic negotiations with vendors and may vary from our estimates. We also exercise judgment in estimating our ability to sell certain repaired disk drives. To the extent such sales fall below our forecast, warranty cost will be adversely impacted.

We review our warranty accrual quarterly for products shipped in prior periods and which are still under warranty. Any changes in the estimates underlying the accrual may result in adjustments that impact the current period gross margins and income. In fiscal year 2011, net favorable changes in estimates of prior warranty accruals as a percentage of revenue were not material. Our total warranty cost was 1.8%, 1.3% and 2.4% of revenue during fiscal years 2011, 2010 and 2009, respectively, while warranty cost related to new shipments (exclusive of the impact of re-estimates of pre-existing liabilities) were 1.8%, 1.8% and 2.7% respectively, for the same periods. Changes in anticipated failure rates of specific products and significant changes in repair or replacement costs have historically been the major reasons for significant changes in prior estimates. Any future changes in failure rates of certain products, as well as changes in repair costs or the cost of replacement parts, may result in increased or decreased warranty accruals.

*Accounting for Income Taxes.*     We account for income taxes pursuant to Accounting Standards Codification (ASC) Topic 740 (ASC 740), Income Taxes. In applying, ASC 740, we make certain estimates and judgments in determining income tax expense for financial statement purposes. These estimates and judgments occur in the calculation of tax credits, recognition of income and deductions and calculation of specific tax assets and liabilities, which arise from differences in the timing of recognition of revenue and expense for tax and financial statement purposes, as well as tax liabilities associated with uncertain tax positions. The calculation of tax liabilities involves uncertainties in the application of complex tax rules and the potential for future adjustment of our uncertain tax positions by the Internal Revenue Service or other tax jurisdictions. If estimates of these tax liabilities are greater or less than actual results, an additional tax benefit or provision will result. The deferred tax assets we record each period depend primarily on our ability to generate future taxable income in the United States and certain non-U.S. jurisdictions. Each period, we evaluate the need for a valuation allowance for our deferred tax assets and, if necessary, we adjust the valuation allowance so that net deferred tax assets are recorded only to the extent we conclude it is more likely than not that these deferred tax assets will be realized. If our outlook for future taxable income changes significantly, our assessment of the need for a valuation allowance may also change.

*Accounting for Goodwill, and Other Long-lived Assets.*     We account for goodwill in accordance with ASC 350, *Intangibles—Goodwill and Other* . As required by ASC 350, we test goodwill of our reporting units annually during our fourth quarter or whenever events occur or circumstances change, such as an adverse change in business climate or a decline in the overall industry, that would more likely than not reduce the fair value of a reporting unit below its carrying amount.

In accordance with ASC 360-05-4, *Impairment or Disposal of Long-lived Assets* . We test other long-lived assets, including property, equipment and leasehold improvements and other intangible assets subject to amortization, for recoverability whenever events or changes in circumstances indicate that the carrying values of those assets may not be recoverable. We assess the recoverability of an asset group by determining if the carrying value of the asset group exceeds the sum of the projected undiscounted cash flows expected to result from the use and eventual disposition of the assets over the remaining economic life of the primary asset in the asset group. If the recoverability test indicates that the carrying value of the asset group is not recoverable, we will estimate the fair value of the asset group using the same approaches indicated above for ASC 360 step two and compare it to its carrying value. The excess of the carrying value over the fair value is allocated pro rata to derive the adjusted carrying value of each asset in the asset group. The adjusted carrying value of each asset in the asset group is not reduced below its fair value.

66

**Recent Accounting Pronouncements**

See Item 8. Financial Statements and Supplementary Data, Note 1. Basis of Presentation and Summary of Significant Accounting Policies for information regarding the effect of new accounting pronouncements on our financial statements.

**ITEM 7A.   QUALITATIVE AND QUANTITATIVE DISCLOSURES ABOUT MARKET RISK**

We have exposure to market risks due to the volatility of interest rates, foreign currency exchange rates, equity and bond markets. A portion of these risks are hedged, but fluctuations could impact our results of operations, financial position and cash flows. Additionally, we have exposure to downgrades in the credit ratings of our counterparties as well as exposure related to our credit rating changes.

*Interest Rate Risk.*   Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. At July 1, 2011, with the exception of our auction rate securities, we had no marketable securities that had been in a continuous unrealized loss position for a period greater than 12 months and determined that no investments were other-than-temporarily impaired. We currently do not use derivative financial instruments in our investment portfolio.

We have fixed rate debt obligations. We enter into debt obligations for general corporate purposes including capital expenditures and working capital needs. We currently do not use interest rate derivatives to hedge interest rate exposure on our outstanding debt.

The table below presents principal amounts and related weighted average interest rates by year of maturity for our investment portfolio and debt obligations as of July 1, 2011. All short-term investments mature in four years or less.

### Fiscal Years Ended

| (Dollars in millions, except percentages) | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter | Total | Fair Value at July 1, 2011 |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash equivalents | | | | | | | | |
| Fixed rate | $ 2,590 | $ — | $ — | $ — | $ — | $ — | $ 2,590 | $ 2,590 |
| Average interest rate | 0.08% | | | | | | 0.08% | |
| Short-term investment | | | | | | | | |
| Fixed rate | $ 260 | $ 132 | $ 68 | $ 8 | $ — | $ — | $ 468 | $ 474 |
| Average interest rate | 1.53% | 2.34% | 1.82% | 2.98% | | | 1.82% | |
| Long-term investment | | | | | | | | |
| Variable rate | $ — | $ — | $ — | $ — | $ — | $ 18 | $ 18 | $ 16 |
| Average interest rate | | | | | | 0.41% | 0.41% | |
| Total investment securities | $ 2,850 | $ 132 | $ 68 | $ 8 | $ — | $ 18 | $ 3,076 | $ 3,080 |
| Average interest rate | 0.21% | 2.34% | 1.82% | 2.98% | | 0.41% | 0.34% | |
| **Debt** | | | | | | | | |
| Fixed rate | $ 559 | $ — | $ 416 | $ — | $ — | 2,550 | $ 3,525 | $ 3,658 |
| Average interest rate | 6.38% | | 10.00% | | | 7.14% | 7.36% | |

*Foreign Currency Exchange Risk.*   We may enter into foreign currency forward exchange contracts to manage exposure related to certain foreign currency commitments and anticipated foreign currency denominated expenditures. Our policy prohibits us from entering into derivative financial instruments for speculative or trading purposes. During fiscal years 2011 and 2010, we did not enter into any hedges of net investments in foreign operations.

We also hedge a portion of our foreign currency denominated balance sheet positions with foreign currency forward exchange contracts to reduce the risk that our earnings will be adversely affected by

67

changes in currency exchange rates. The changes in fair value of these hedges are recognized in earnings in the same period as the gains and losses from the remeasurement of the assets and liabilities. These foreign currency forward exchange contracts are not designated as hedging instruments under ASC 815, *Derivatives and Hedging.* All these forward contracts mature within 12 months.

We evaluate hedging effectiveness prospectively and retrospectively and record any ineffective portion of the hedging instruments in Costs of Revenue on the Consolidated Statements of Operations. We did not have any material net gains (losses) recognized in Costs of Revenue for cash flow hedges due to hedge ineffectiveness or discontinued cash flow hedges during fiscal years 2011 and 2010.

The table below provides information as of July 1, 2011 about our foreign currency forward exchange contracts. The table is provided in U.S. dollar equivalent amounts and presents the notional amounts (at the contract exchange rates) and the weighted average contractual foreign currency exchange rates.

| (Dollars in millions, except average contract rate) | Notional Amount | | Average Contract Rate | Estimated Fair Value [1] | |
|---|---|---|---|---|---|
| Foreign currency forward exchange contracts: | | | | | |
| Thai Baht | $ | 333 | 30.35 | $ | (5) |
| Singapore Dollar | | 221 | 1.25 | | 4 |
| Chinese Renminbi | | 78 | 6.38 | | — |
| Czech Koruna | | 11 | 16.95 | | — |
| Total | $ | 643 | | $ | (1) |

(1) Equivalent to the unrealized net gain (loss) on existing contracts.

*Other Market Risks.*    We have exposure to counterparty credit downgrades in the form of credit risk related to our foreign currency forward exchange contracts and our fixed income portfolio. We monitor and limit our credit exposure for our foreign currency forward exchange contracts by performing ongoing credit evaluations. We also manage the notional amount of contracts entered into with any one counterparty, and we maintain limits on maximum tenor of contracts based on the credit rating of the financial institutions. Additionally, the investment portfolio is diversified and structured to minimize credit risk. As of July 1, 2011, we had counterparty credit exposure of $5 million comprised of the mark-to-market valuation related to our foreign currency forward exchange contracts in a gain position. Changes in our corporate issuer credit ratings have minimal impact on our financial results, but downgrades may negatively impact our future transaction costs and our ability to execute transactions with various counterparties.

We are subject to equity market risks due to changes in the fair value of the notional investments selected by our employees as part of our Seagate Deferred Compensation Plan (the "SDCP"). Prior to January 3, 2011, we had a Total Return Swap (TRS) in order to manage the equity market risks associated with the SDCP liabilities. Effective January 3, 2011, we cancelled the TRS, and we currently manage our exposure to equity market risks associated with the SDCP liabilities by investing directly in mutual funds that mirror the employees' investment options.

During fiscal year 2011, approximately $1 million of our auction rate securities were called by the issuers. As of July 1, 2011 we continued to hold auction rate securities with a par value of approximately $18 million, all of which are collateralized by student loans guaranteed by the Federal Family Education Loan Program. Beginning in the March 2008 quarter, these securities have continuously failed to settle at auction. As of July 1, 2011, the estimated fair value of these auction rate securities was $16 million. We believe that the impairments totaling $2 million are temporary as we do not intend to sell these securities and have concluded it is not more likely than not that we will be required to sell the securities before the recovery of the amortized cost basis. As such, the impairment was recorded in Other comprehensive income (loss) and these securities were classified as long-term investments.

68

**ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

### SEAGATE TECHNOLOGY PLC

### CONSOLIDATED BALANCE SHEETS
**(In millions, except share and per share data)**

| | July 1, 2011 | July 2, 2010 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 2,677 | $ 2,263 |
| Short-term investments | 474 | 252 |
| Restricted cash and investments | 102 | 114 |
| Accounts receivable, net | 1,495 | 1,400 |
| Inventories | 872 | 757 |
| Deferred income taxes | 99 | 118 |
| Other current assets | 706 | 514 |
| Total current assets | 6,425 | 5,418 |
| Property, equipment and leasehold improvements, net | 2,245 | 2,263 |
| Deferred income taxes | 374 | 395 |
| Other assets, net | 181 | 171 |
| Total Assets | $ 9,225 | $ 8,247 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,063 | $ 1,780 |
| Accrued employee compensation | 199 | 263 |
| Accrued warranty | 189 | 189 |
| Accrued expenses | 438 | 422 |
| Accrued income taxes | 14 | 14 |
| Current portion of long-term debt | 560 | 329 |
| Total current liabilities | 3,463 | 2,997 |
| Long-term accrued warranty | 159 | 183 |
| Long-term accrued income taxes | 67 | 59 |
| Other non-current liabilities | 121 | 111 |
| Long-term debt, less current portion | 2,952 | 2,173 |
| Total Liabilities | 6,762 | 5,523 |
| | | |
| Commitments and contingencies (See Notes 13 and 14) | | |
| | | |
| Shareholders' equity: | | |
| Preferred shares, $0.00001 par value per share—100 million authorized; no shares issued or outstanding | — | — |
| Ordinary shares, $0.00001 par value per share—1,250 million authorized; 424,611,591 issued and outstanding at July 1, 2011 and 493,008,776 issued and outstanding at July 2, 2010 | — | — |
| Additional paid-in capital | 3,980 | 3,851 |
| Accumulated other comprehensive income (loss) | (6) | (4) |
| Retained earnings (accumulated deficit) | (1,511) | (1,123) |
| Total Shareholders' Equity | 2,463 | 2,724 |
| Total Liabilities and Shareholders' Equity | $ 9,225 | $ 8,247 |

*See notes to consolidated financial statements.*

**SEAGATE TECHNOLOGY PLC**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share data)**

|  | Fiscal Years Ended | | |
|---|---|---|---|
|  | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Revenue | $ 10,971 | $ 11,395 | $ 9,805 |
| Cost of revenue | 8,825 | 8,191 | 8,395 |
| Product development | 875 | 877 | 953 |
| Marketing and administrative | 445 | 437 | 537 |
| Amortization of intangibles | 2 | 27 | 55 |
| Restructuring and other, net | 18 | 66 | 210 |
| Impairment of goodwill and other long-lived assets, net of recoveries | — | 57 | 2,320 |
| Total operating expenses | 10,165 | 9,655 | 12,470 |
| Income (loss) from operations | 806 | 1,740 | (2,665) |
| Interest income | 7 | 6 | 17 |
| Interest expense | (214) | (174) | (143) |
| Other, net | (20) | (3) | (23) |
| Other income (expense), net | (227) | (171) | (149) |
| Income (loss) before income taxes | 579 | 1,569 | (2,814) |
| Provision for (benefit from) income taxes | 68 | (40) | 311 |
| Net income (loss) | $ 511 | $ 1,609 | $ (3,125) |
| Net income (loss) per share: | | | |
| Basic | $ 1.13 | $ 3.28 | $ (6.40) |
| Diluted | 1.09 | 3.14 | (6.40) |
| Number of shares used in per share calculations: | | | |
| Basic | 451 | 491 | 488 |
| Diluted | 467 | 514 | 488 |
| Cash dividends declared per share | $ 0.18 | $ — | $ 0.27 |

*See notes to consolidated financial statements.*

70

## SEAGATE TECHNOLOGY PLC

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In millions)

| | Fiscal Years Ended | | |
|---|---|---|---|
| | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ 511 | $ 1,609 | $ (3,125) |
| Adjustments to reconcile net income (loss) to net cash from operating activities: | | | |
| Depreciation and amortization | 754 | 780 | 931 |
| Share-based compensation | 51 | 57 | 83 |
| Loss on redemption of debt | 26 | — | — |
| Gain on sale of property and equipment | (23) | (4) | (1) |
| Impairment of goodwill and other long-lived assets, net of recoveries | — | 57 | 2,320 |
| Deferred income taxes | 46 | (36) | 306 |
| Other non-cash operating activities, net | 15 | 38 | 9 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | (95) | (367) | 372 |
| Inventories | (115) | (170) | 358 |
| Accounts payable | 386 | 2 | (79) |
| Accrued employee compensation | (64) | 119 | (296) |
| Accrued expenses, income taxes and warranty | (28) | (169) | (131) |
| Other assets and liabilities | (200) | 16 | 76 |
| Net cash provided by operating activities | 1,264 | 1,932 | 823 |
| **INVESTING ACTIVITIES** | | | |
| Acquisition of property, equipment and leasehold improvements | (843) | (639) | (633) |
| Proceeds from the sale of property and equipment | 77 | 21 | 7 |
| Purchases of short-term investments | (487) | (373) | (155) |
| Sales of short-term investments | 159 | 119 | 89 |
| Maturities of short-term investments | 101 | 114 | 103 |
| Change in restricted cash and investments | 14 | 15 | (128) |
| Proceeds from liquidation of deferred compensation plan investments | — | — | 85 |
| Other investing activities, net | (2) | (9) | 14 |
| Net cash used in investing activities | (981) | (752) | (618) |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from short-term borrowings | — | 15 | 350 |
| Net proceeds from issuance of long-term debt | 1,324 | 587 | 399 |
| Repayments of short-term borrowings | — | (365) | — |
| Repayments of long-term debt and capital lease obligations | (377) | (462) | (55) |
| Change in restricted cash and investments | 2 | 379 | (380) |
| Proceeds from issuance of ordinary shares under employee stock plans | 83 | 86 | 54 |
| Dividends to shareholders | (74) | — | (132) |
| Repurchases of ordinary shares | (822) | (584) | — |
| Other financing activities, net | (5) | — | (4) |
| Net cash provided by (used in) financing activities | 131 | (344) | 232 |
| Increase in cash and cash equivalents | 414 | 836 | 437 |
| Cash and cash equivalents at the beginning of the year | 2,263 | 1,427 | 990 |
| Cash and cash equivalents at the end of the year | $ 2,677 | $ 2,263 | $ 1,427 |
| **Supplemental Disclosure of Cash Flow Information** | | | |
| Cash paid for interest | $ 193 | $ 138 | $ 118 |
| Cash paid for income taxes, net of refunds | 18 | (14) | 10 |

*See notes to consolidated financial statements.*

71

**SEAGATE TECHNOLOGY PLC**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

**For Fiscal Years Ended July 1, 2011, July 2, 2010 and July 3, 2009**
**(In millions)**

| | Number of Ordinary Shares | Par Value of Shares | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings/ (Accumulated Deficit) | Total |
|---|---|---|---|---|---|---|
| Balance at June 27, 2008 | 485 | $ — | $ 3,574 | $ (16) | $ 1,109 | $ 4,667 |
| Comprehensive income (loss), net of tax: | | | | | | |
| Change in unrealized gain (loss) on cash flow hedges, net | | | | 12 | | 12 |
| Change in unrealized gain (loss) on auction rate securities, net | | | | 1 | | 1 |
| Change in unrealized gain (loss) on post-retirement plan costs | | | | (3) | | (3) |
| Net loss | | | | | (3,125) | (3,125) |
| Comprehensive loss | | | | | | (3,115) |
| Issuance of ordinary shares under employee stock plans | 8 | | 54 | | | 54 |
| Dividends to shareholders | | | | | (132) | (132) |
| Share-based compensation | | | 83 | | | 83 |
| Other, net | | | (3) | | | (3) |
| Balance at July 3, 2009 | 493 | — | 3,708 | (6) | (2,148) | 1,554 |
| Comprehensive income (loss), net of tax: | | | | | | |
| Change in unrealized gain (loss) on cash flow hedges, net | | | | 4 | | 4 |
| Change in unrealized gain (loss) on post-retirement plan costs | | | | (2) | | (2) |
| Net income | | | | | 1,609 | 1,609 |
| Comprehensive income | | | | | | 1,611 |
| Issuance of ordinary shares under employee stock plans | 9 | | 86 | | | 86 |
| Repurchases of shares | (32) | | | | (584) | (584) |
| Share-based compensation | | | 57 | | | 57 |
| Balance at July 2, 2010 | 470 | — | 3,851 | (4) | (1,123) | 2,724 |
| Comprehensive income (loss), net of tax: | | | | | | |
| Change in unrealized gain (loss) on cash flow hedges, net | | | | (1) | | (1) |
| Change in unrealized gain (loss) on post-retirement plan costs | | | | (1) | | (1) |
| Net income | | | | | 511 | 511 |
| Comprehensive income | | | | | | 509 |
| Issuance of ordinary | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| shares under employee stock plans | 12 | | | 83 | | | | | 83 |
| Tax benefit from exercise of stock options | | | | 2 | | | | | 2 |
| Repurchases of shares | (57) | | | | | | (822) | | (822) |
| Adjustment to equity component of convertible debt upon redemption | | | | (7) | | | | | (7) |
| Dividends to shareholders | | | | | | | (77) | | (77) |
| Share-based compensation | | | | 51 | | | | | 51 |
| Balance at July 1, 2011 | 425 | $ | — | $ 3,980 | $ | (6) | $ | (1,511) | $ 2,463 |

*See notes to consolidated financial statements.*

72

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Basis of Presentation and Summary of Significant Accounting Policies**

*Organization*

Effective as of July 3, 2010, Seagate Technology public limited company (plc), an Irish public limited company, ("Seagate-Ireland", "Seagate" or the "Company") became the successor to Seagate Technology, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Seagate-Cayman"). In connection with the reorganization, all issued and outstanding Seagate-Cayman common shares were cancelled and ceased to exist, and Seagate-Ireland issued ordinary shares on a one-for-one basis to the holders of Seagate-Cayman common shares for each Seagate-Cayman common share that was cancelled. For presentation purposes, unless otherwise noted, common shares prior to the reorganization and ordinary shares subsequent to the reorganization are referred to herein as ordinary shares.

The Company designs, manufactures, markets and sells hard disk drives. Hard disk drives, which are commonly referred to as disk drives or hard drives, are used as the primary medium for storing electronic data. The Company produces a broad range of disk drive products addressing enterprise applications, where its products are primarily used in enterprise servers, mainframes and workstations; client compute applications, where its products are used in desktop and notebook computers; and client non-compute applications, where its products are used in a wide variety of end user devices such as digital video recorders (DVRs), personal data backup systems, portable external storage systems and digital media systems. The Company sells its disk drives primarily to major original equipment manufacturers (OEMs), distributors and retailers. In addition to manufacturing and selling disk drives, the Company provides storage services for small- to medium-sized businesses, including online backup, data protection and recovery solutions.

*Basis of Presentation and Consolidation*

The consolidated financial statements include the accounts of the Company and all its wholly-owned subsidiaries, after elimination of intercompany transactions and balances. The preparation of financial statements in accordance with accounting principles generally accepted in the United States also requires management to make estimates and assumptions that affect the amounts reported in the Company's consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. The methods, estimates and judgments the Company uses in applying its most critical accounting policies have a significant impact on the results the Company reports in its consolidated financial statements. The consolidated financial statements reflect, in the opinion of management, all material adjustments necessary to present fairly the consolidated financial position, results of operations, cash flows and shareholders' equity for the periods presented.

The Company operates and reports financial results on a fiscal year of 52 or 53 weeks ending on the Friday closest to June 30. Accordingly, fiscal years 2011 and 2010 were comprised of 52 weeks and ended on July 1, 2011 and July 2, 2010, respectively. Fiscal year 2009 was comprised of 53 weeks and ended on July 3, 2009. All references to years in these Notes to Consolidated Financial Statements represent fiscal years unless otherwise noted. Fiscal year 2012 will be 52 weeks and will end on June 29, 2012.

*Summary of Significant Accounting Policies*

*Cash, Cash Equivalents and Short-Term Investments.*    The Company considers all highly liquid investments with a remaining maturity of 90 days or less at the time of purchase to be cash equivalents. Cash equivalents are carried at cost, which approximates fair value. The Company's short-term investments are primarily comprised of readily marketable debt securities with remaining maturities of more than 90 days at the time of purchase. With the exception of restricted cash and investments, the Company has

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

classified its entire investment portfolio as available-for-sale and it is stated at fair value with unrealized gains and losses included in Accumulated other comprehensive income (loss), which is a component of Shareholders' Equity. The amortized cost of debt securities is adjusted for amortization of premiums and accretion of discounts to maturity. Such amortization and accretion are included in interest income. Realized gains and losses are included in Other, net. The cost of securities sold is based on the specific identification method.

*Restricted Cash and Investments.*     Restricted cash and investments represents cash and investments that are restricted as to withdrawal or use for other than current operations.

*Allowances for Doubtful Accounts.*     The Company maintains an allowance for uncollectible accounts receivable based upon expected collectibility. This reserve is established based upon historical trends, global macroeconomic conditions and an analysis of specific exposures. The provision for doubtful accounts is recorded as a charge to general and administrative expense.

*Inventory.*     Inventories are valued at the lower of cost (which approximates actual cost using the first-in, first-out method) or market. Market value is based upon an estimated average selling price reduced by estimated cost of completion and disposal.

*Property, Equipment and Leasehold Improvements.*     Property, equipment and leasehold improvements are stated at cost. Equipment and buildings are depreciated using the straight-line method over the estimated useful lives of the assets. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated life of the asset or the remaining term of the lease. The costs of additions and substantial improvements to property, equipment and leasehold improvements, which extend the economic life of the underlying assets, are capitalized. The cost of maintenance and repairs to property, equipment and leasehold improvements is expensed as incurred.

*Impairment of Goodwill and Other Long-lived Assets.*     The Company accounts for goodwill in accordance with Accounting Standards Codification (ASC) Topic 350 (ASC 350), *Intangibles—Goodwill and Other* . As required by ASC 350, the Company tests goodwill of its reporting units for impairment annually during its fourth quarter or whenever events occur or circumstances change, such as an adverse change in business climate or a decline in the overall industry, that would more likely than not reduce the fair value of a reporting unit below its carrying amount.

The Company tests other long-lived assets, including property, equipment and leasehold improvements and other intangible assets subject to amortization, for recoverability whenever events or changes in circumstances indicate that the carrying value of those assets may not be recoverable. The Company performs a recoverability test to assess the recoverability of an asset group. If the recoverability test indicates that the carrying value of the asset group is not recoverable, the Company will estimate the fair value of the asset group and the excess of the carrying value over the fair value is allocated pro rata to derive the adjusted carrying value of assets in the asset group. The adjusted carrying value of each asset in the asset group is not reduced below its fair value.

*Derivative Financial Instruments.*     The Company applies the requirements of ASC Topic 815 (ASC 815), *Derivatives and Hedging* . ASC 815 requires that all derivatives be recorded on the balance sheet at fair value and establishes criteria for designation and effectiveness of hedging relationships.

*Establishment of Warranty Accruals.*     The Company estimates probable product warranty costs at the time revenue is recognized. The Company generally warrants its products for a period of one to five years. The Company's warranty provision considers estimated product failure rates and trends (including the

74

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

timing of product returns during the warranty periods), estimated repair or replacement costs and estimated costs for customer compensatory claims related to product quality issues, if any. Should actual experience in any future period differ significantly from its estimates, or should the rate of future product technological advancements fail to keep pace with the past, the Company's future results of operations could be materially affected. The Company also exercises judgment in estimating its ability to sell certain repaired disk drives. To the extent such sales vary significantly from the Company's forecast, warranty cost will be adversely or favorably impacted.

*Revenue Recognition, Sales Returns and Allowances, and Sales Incentive Programs.*    The Company's revenue recognition policy complies with ASC Topic 605 (ASC 605), *Revenue Recognition* . Revenue from sales of products, including sales to distribution customers, is generally recognized when title and risk of loss has passed to the buyer, which typically occurs upon shipment from the Company or third party warehouse facilities, persuasive evidence of an arrangement exists, including a fixed or determinable price to the buyer, and when collectability is reasonably assured. Revenue from sales of products to direct retail customers and to customers in certain indirect retail channels is recognized on a sell-through basis.

The Company records estimated product returns at the time of shipment. The Company also estimates reductions to revenue for sales incentive programs, such as price protection, and volume incentives, and records such reductions when revenue is recorded. The Company establishes certain distributor and OEM sales programs aimed at increasing customer demand. For the distribution channel, these programs typically involve rebates related to a distributor's level of sales, order size, advertising or point of sale activity and price protection adjustments. For OEM sales, rebates are typically based on an OEM customer's volume of purchases from Seagate or other agreed upon rebate programs. The Company provides for these obligations at the time that revenue is recorded based on estimated requirements. Marketing development programs are either recorded as a reduction to revenue or as an addition to marketing expense depending on the contractual nature of the program.

*Shipping and Handling.*    The Company includes costs related to shipping and handling in Cost of revenue for all periods presented.

*Restructuring Costs.*    The Company records restructuring activities, including costs for one-time termination benefits, in accordance with ASC Topic 420 (ASC 420), *Restructuring* . Severance costs accounted for under ASC 420 are recognized when management, having the appropriate authorization, has committed to a restructuring plan and has communicated those actions to employees. Employee termination benefits covered by existing benefit arrangements are recorded in accordance with ASC Topic 712, *Non-retirement Postemployment Benefits* . These costs are recognized when management has committed to a restructuring plan and the severance costs are probable and estimable.

*Advertising Expense.*    The cost of advertising is expensed as incurred. Advertising costs were approximately $21 million, $23 million and $48 million in fiscal years 2011, 2010 and 2009, respectively.

*Stock-Based Compensation.*    The Company accounts for stock-based compensation under the fair value recognition provisions of ASC Topic 718 (ASC 718), *Compensation-Stock Compensation* . The Company has elected to apply the with-and-without method to assess the realization of excess tax benefits.

*Accounting for Income Taxes.*    The Company accounts for income taxes pursuant to ASC Topic 740 (ASC 740), *Incomes Taxes* . In applying ASC 740, the Company makes certain estimates and judgments in determining income tax expense for financial statement purposes. These estimates and judgments occur in the calculation of tax credits, recognition of income and deductions and calculation of specific tax assets and liabilities, which arise from differences in the timing of recognition of revenue and expense for tax and

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

financial statement purposes, as well as tax liabilities associated with uncertain tax positions. The calculation of tax liabilities involves uncertainties in the application of complex tax rules and the potential for future adjustment of the Company's uncertain tax positions by the Internal Revenue Service or other tax jurisdictions. If estimates of these tax liabilities are greater or less than actual results, an additional tax benefit or provision will result. The deferred tax assets the Company records each period depend primarily on the Company's ability to generate future taxable income in the United States and certain non-U.S. jurisdictions. Each period, the Company evaluates the need for a valuation allowance for its deferred tax assets and, if necessary, adjusts the valuation allowance so that net deferred tax assets are recorded only to the extent the Company concludes it is more likely than not that these deferred tax assets will be realized. If the Company's outlook for future taxable income changes significantly, the Company's assessment of the need for a valuation allowance may also change.

*Foreign Currency Remeasurement and Translation.* The U.S. dollar is the functional currency for substantially all of the Company's foreign operations. Monetary assets and liabilities denominated in foreign currencies are remeasured into U.S. dollars at the balance sheet date. The gains and losses from the remeasurement of foreign currency denominated balances into U.S. dollars are included in net income (loss) for those operations.

*Concentrations*

*Concentration of Credit Risk.* The Company's customer base for disk drive products is concentrated with a small number of OEMs and distributors. The Company does not generally require collateral or other security to support accounts receivable. To reduce credit risk, the Company performs ongoing credit evaluations on its customers' financial condition. The Company establishes an allowance for doubtful accounts based upon factors surrounding the credit risk of customers, historical trends and other information. Hewlett-Packard Company and Dell Inc. each accounted for more than 10 percent of the Company's accounts receivable as of July 1, 2011.

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash equivalents, short-term investments and foreign currency forward exchange contracts. The Company further mitigates concentrations of credit risk in its investments through diversification, by limiting its investments in the debt securities of a single issuer, and investing in highly rated securities.

In entering into foreign currency forward exchange contracts, the Company assumes the risk that might arise from the possible inability of counterparties to meet the terms of their contracts. The counterparties to these contracts are major multinational commercial banks, and the Company has not incurred and does not expect any losses as a result of counterparty defaults.

*Supplier Concentration.* Certain of the raw materials, components and equipment used by the Company in the manufacture of its products are available from a sole supplier or a limited number of suppliers. Shortages could occur in these essential materials and components due to an interruption of supply or increased demand in the industry. If the Company were unable to procure certain materials, components or equipment at acceptable prices, it would be required to reduce its manufacturing operations, which could have a material adverse effect on its results of operations. In addition, the Company has made prepayments to certain suppliers. Should these suppliers be unable to deliver on their obligations or experience financial difficulty, the Company may not be able to recover these prepayments.

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Newly Adopted and Recently Issued Accounting Pronouncements*

In June 2011, the Financial Accounting Standards Board (FASB) issued Accounting Standard Update (ASU) No. 2011-05, *Comprehensive Income (ASC Topic 220)—Presentation of Comprehensive Income.* The ASU requires companies to report comprehensive income, including items of other comprehensive income, for all periods presented in a single continuous financial statement in the Consolidated Statements of Operations or split between the Consolidated Statements of Operations and a separate Consolidated Statements of Other Comprehensive Income. The ASU is effective for the Company's first quarter of fiscal year 2013. Other than requiring additional disclosures, the adoption of this new guidance will not have a material impact on the Company's consolidated financial statements.

In May 2011, the FASB issued ASU No. 2011-04, *Fair Value Measurement (ASC Topic 820)—Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs.* The ASU requires additional disclosures about the sensitivity to changes in unobservable inputs for Level 3 measurements. In addition, for items that are not measured at fair value on the balance sheet but for which the disclosure of fair values in the footnotes is required, the ASU requires disclosures of the categorization by level within the fair value hierarchy. The ASU is effective for the Company's first quarter of fiscal year 2013. Other than requiring additional disclosures, the adoption of this new guidance will not have a material impact on the Company's consolidated financial statements.

In December 2010, the FASB issued ASU No. 2010-29, *Business Combinations (ASC Topic 805)—Disclosures of Supplementary Pro Forma Information for Business Combinations* . The ASU clarifies that pro forma information to be disclosed should be as though the business combination(s) that occurred during the current year had occurred as of the beginning of the annual reporting period. The ASU is effective for the Company's first quarter of fiscal year 2012. The adoption of this new guidance will not have a material impact on the Company's consolidated financial statements.

In January 2010, the FASB issued ASU No. 2010-06, *Fair Value Measurements and Disclosures (ASC Topic 820)—Improving Disclosures About Fair Value Measurements* . The ASU requires new disclosures about transfers into and out of Levels 1 and 2 and separate disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements. It also clarifies existing fair value disclosures about the level of disaggregation and about inputs and valuation techniques used to measure fair value. The new disclosures and clarifications of existing disclosures are effective for the Company's third quarter of fiscal year 2010, except for the disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements, which are effective for the Company's first quarter of fiscal year 2012. Other than requiring additional disclosures, the adoption of this new guidance did not and will not have a material impact on the Company's consolidated financial statements.

In October 2009, the FASB issued ASU No. 2009-13, *Revenue Recognition (ASC Topic 605)—Multiple-Deliverable Revenue Arrangements* , a consensus of the FASB Emerging Issues Task Force. This guidance modifies the fair value requirements of ASC subtopic 605-25, Revenue Recognition-Multiple Element Arrangements by allowing the use of the best estimate of selling price (BESP) in addition to vendor-specific objective evidence (VSOE) and verifiable objective evidence (VOE) (now referred to as TPE standing for third-party evidence) for determining the selling price of a deliverable. A vendor is now required to use its best estimate of the selling price when VSOE or TPE of the selling price cannot be determined. In addition, the residual method of allocating arrangement consideration is no longer permitted. The Company implemented the provisions of this guidance beginning on July 3, 2010 on a prospective basis for all new or materially modified arrangements entered into on or after that date. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

77

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In October 2009, the FASB issued ASU No. 2009-14, *Software (ASC Topic 985)—Certain Revenue Arrangements That Include Software Elements* , a consensus of the FASB Emerging Issues Task Force. This guidance modifies the scope of ASC subtopic 985-605, Software-Revenue Recognition to exclude from its requirements (a) non-software components of tangible products and (b) software components of tangible products that are sold, licensed, or leased with tangible products when the software components and non-software components of the tangible product function together to deliver the tangible product's essential functionality. The Company implemented the provisions of this guidance beginning on July 3, 2010 on a prospective basis for all new or materially modified arrangements entered into on or after that date. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

## 2. Balance Sheet Information

*Investments*

The Company's short-term investments are primarily comprised of readily marketable debt securities with remaining maturities of more than 90 days at the time of purchase. With the exception of securities held for its non-qualified deferred compensation plan, which are classified as trading securities, the Company classifies its investment portfolio as available-for-sale. The Company recognizes its available-for-sale investments at fair value with unrealized gains and losses included in Accumulated other comprehensive income (loss), which is a component of shareholders' equity. The amortized cost of debt securities is adjusted for amortization of premiums and accretion of discounts to maturity. Such amortization and accretion are included in interest income. Realized gains and losses are included in Other, net. The cost of securities sold is based on the specific identification method.

The Company's available-for-sale securities include investments in auction rate securities. Beginning in fiscal year 2008, the Company's auction rate securities failed to settle at auction and have continued to fail through July 1, 2011. Since the Company continues to earn interest on its auction rate securities at the maximum contractual rate, there have been no payment defaults with respect to such securities, and they are all collateralized, the Company expects to recover the entire amortized cost basis of these auction rate securities. The Company does not intend to sell these securities and has concluded it is not more likely than not that the Company will be required to sell the securities before the recovery of their amortized cost basis. As such, the Company believes the impairments totaling $2 million are not other-than-temporary and therefore have been recorded in Accumulated other comprehensive income (loss). Given the uncertainty as to when the liquidity issues associated with these securities will improve, these securities were classified as long-term investments in the Company's Consolidated Balance Sheets.

As of July 1, 2011, the Company's restricted cash and investments consisted of $84 million in cash and investments held in trust for payment of its non-qualified deferred compensation plan liabilities and $18 million in cash and investments held as collateral at banks for various performance obligations. As of July 2, 2010, the Company's restricted cash and investments consisted of $76 million in cash and investments held in trust for payment of its non-qualified deferred compensation plan liabilities and $38 million in cash and investments held as collateral at banks for various performance obligations.

Effective January 3, 2011, the Company cancelled its Total Return Swap (TRS), which had been used to manage the equity market risks associated with its Non-qualified Deferred Compensation Plan—the Seagate Deferred Compensation Plan (the "SDCP"). Currently, the Company manages its exposure to equity market risks associated with the deferred compensation liabilities by investing directly in mutual funds that mirror the employees' investment options. The Company classified investments held to satisfy the deferred compensation liabilities as trading securities.

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes, by major type, the fair value and amortized cost of the Company's investments as of July 1, 2011:

| (Dollars in millions) | Amortized Cost | | Unrealized Gain/(Loss) | | Fair Value | |
|---|---|---|---|---|---|---|
| Available-for-sale securities: | | | | | | |
| Commercial paper | $ | 1,729 | $ | — | $ | 1,729 |
| Money market funds | | 815 | | — | | 815 |
| U.S. treasuries and agency bonds | | 190 | | — | | 190 |
| Certificates of deposit | | 136 | | — | | 136 |
| Corporate bonds | | 116 | | — | | 116 |
| Auction rate securities | | 18 | | (2) | | 16 |
| Other debt securities | | 96 | | | | 96 |
| | | 3,100 | | (2) | | 3,098 |
| Trading securities | | 80 | | 4 | | 84 |
| Total | $ | 3,180 | $ | 2 | $ | 3,182 |
| Included in Cash and cash equivalents | | | | | $ | 2,590 |
| Included in Short-term investments | | | | | | 474 |
| Included in Restricted cash and investments | | | | | | 102 |
| Included in Other assets, net | | | | | | 16 |
| Total | | | | | $ | 3,182 |

As of July 1, 2011, with the exception of the Company's auction rate securities, the Company had no available-for-sale securities that had been in a continuous unrealized loss position for a period greater than 12 months. The Company determined no available-for-sale securities were other-than-temporarily impaired as of July 1, 2011.

The fair value of the Company's investments in debt securities classified as available-for-sale at July 1, 2011 by remaining contractual maturity was as follows:

| (Dollars in millions) | Amortized Cost | | Fair Value | |
|---|---|---|---|---|
| Due in less than 1 year | $ | 2,876 | $ | 2,876 |
| Due in 1 to 3 years | | 206 | | 206 |
| Thereafter | | 18 | | 16 |
| Total | $ | 3,100 | $ | 3,098 |

79

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table summarizes, by major type, the fair value and amortized cost of the Company's investments as of July 2, 2010:

| (Dollars in millions) | Amortized Cost | | Unrealized Gain/(Loss) | | Fair Value | |
|---|---|---|---|---|---|---|
| Available-for-sale securities: | | | | | | |
| Commercial paper | $ | 1,231 | $ | — | $ | 1,231 |
| Money market funds | | 833 | | — | | 833 |
| U.S. treasuries and agency bonds | | 154 | | 1 | | 155 |
| Other debt securities | | 134 | | — | | 134 |
| Auction rate securities | | 19 | | (2) | | 17 |
| Total | $ | 2,371 | $ | (1) | $ | 2,370 |
| Included in Cash and cash equivalents | | | | | $ | 2,101 |
| Included in Short-term investments | | | | | | 252 |
| Included in Other assets, net | | | | | | 17 |
| Total | | | | | $ | 2,370 |

As of July 2, 2010, with the exception of the Company's auction rate securities, the Company had no available-for-sale securities that had been in a continuous unrealized loss position for a period greater than 12 months. The Company determined no available-for-sale securities were other-than-temporarily impaired as of July 2, 2010.

### Accounts Receivable, net

| (Dollars in millions) | July 1, 2011 | | July 2, 2010 | |
|---|---|---|---|---|
| Accounts receivable | $ | 1,505 | $ | 1,410 |
| Allowance for doubtful accounts | | (10) | | (10) |
| | $ | 1,495 | $ | 1,400 |

Activity in the allowance for doubtful accounts is as follows:

| (Dollars in millions) | Balance at Beginning of Period | | Charges to Operations | | Deductions [1] | | Balance at End of Period | |
|---|---|---|---|---|---|---|---|---|
| Fiscal year ended July 3, 2009 | $ | 6 | $ | 4 | $ | — | $ | 10 |
| Fiscal year ended July 2, 2010 | $ | 10 | $ | 1 | $ | (1) | $ | 10 |
| Fiscal year ended July 1, 2011 | $ | 10 | $ | 1 | $ | (1) | $ | 10 |

(1)    Uncollectible accounts written off, net of recoveries.

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### Inventories

| (Dollars in millions) | July 1, 2011 | July 2, 2010 |
|---|---|---|
| Raw materials and components | $ 286 | $ 263 |
| Work-in-process | 201 | 145 |
| Finished goods | 385 | 349 |
| | $ 872 | $ 757 |

### Other Current Assets

| (Dollars in millions) | July 1, 2011 | July 2, 2010 |
|---|---|---|
| Vendor non-trade receivables | $ 519 | $ 351 |
| Other | 187 | 163 |
| | $ 706 | $ 514 |

Other current assets include non-trade receivables from certain manufacturing vendors resulting from the sale of components to these vendors who manufacture and sell completed sub-assemblies back to the Company. The Company does not reflect the sale of these components in Revenue and does not recognize any profits on these sales. The costs of the completed sub-assemblies are included in inventory upon purchase from the vendors.

### Property, Equipment and Leasehold Improvements, net

| (Dollars in millions) | Useful Life in Years | July 1, 2011 | July 2, 2010 |
|---|---|---|---|
| Land | | $ 29 | $ 22 |
| Equipment | 3 – 5 | 5,988 | 5,309 |
| Buildings and leasehold improvements | Up to 48 | 1,203 | 1,164 |
| Construction in progress | | 163 | 347 |
| | | 7,383 | 6,842 |
| Less accumulated depreciation and amortization | | (5,138) | (4,579) |
| | | $ 2,245 | $ 2,263 |

Depreciation expense, which includes amortization of leasehold improvements, was $748 million, $745 million and $862 million for fiscal years 2011, 2010 and 2009, respectively. Additionally, depreciation expense in fiscal year 2009 included $57 million of accelerated depreciation charges related primarily to the closure of the Company's Milpitas, California and Pittsburgh, Pennsylvania facilities.

Interest on borrowings related to eligible capital expenditures is capitalized as part of the cost of the qualified assets and amortized over the estimated useful lives of the assets. During fiscal years 2011, 2010 and 2009, the Company capitalized interest of $5 million, $3 million and $6 million, respectively.

81

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**3. Impairment of Goodwill and Other Long-lived Assets**

*Goodwill*

The Company tests goodwill for impairment on an annual basis and, if required, at an interim date should events occur or circumstances change that would more likely than not reduce the fair value of goodwill below its carrying value.

The Company did not record any goodwill impairment since fiscal year 2009. During fiscal year 2009, the Company observed a sharp deterioration in the general business environment and in all of its major markets. The Company determined that a significant adverse change in its business climate had occurred, and completed a review of goodwill for impairment.

As a result, in the fiscal year 2009, the Company recorded impairment charges of approximately $2.2 billion for the goodwill of the Hard Disk Drive reporting unit, representing its entire carrying value, and $150 million for the goodwill of the Services reporting unit reducing the carrying value to $31 million. These impairment charges were included in Impairment of goodwill and other long-lived assets, net of recoveries in the Consolidated Statements of Operations. The Company concluded that goodwill in the amount of $31 million, which relates entirely to the Company's Services reporting unit, was not impaired as of July 1, 2011 and July 2, 2010.

*Other Long-lived Assets (Property, equipment, leasehold improvements, and other intangible assets)*

The Company tests other long-lived assets, including property, equipment and leasehold improvements and other intangible assets, subject to amortization, for recoverability whenever events or changes in circumstances indicate that their carrying value may not be recoverable.

During fiscal year 2010, the Company committed to a plan to sell certain equipment related to certain research activities that had ceased. The Company recorded a charge of $57 million in order to write down the carrying amount of these assets to estimated fair value less costs to sell. As of July 1, 2011, the Company has completed the sale of these assets.

During fiscal year 2009, the Company determined that the adverse change in the business climate discussed under "Goodwill" above was also an indicator requiring the testing of its other long-lived assets for recoverability. The Company determined that the asset group to be tested for recoverability was at the reporting unit level as it was the lowest level at which cash flows were identifiable. The Company tested the other long-lived assets of both the Hard Disk Drive and Services reporting units for recoverability and concluded that the carrying value of the Hard Disk Drive reporting unit was recoverable while that of the Services reporting unit was not.

The Company recorded impairment charges of $3 million for the property and equipment and intangible assets of the Services reporting unit during fiscal year 2009. The Company recorded these impairment charges in Impairment of goodwill and other long-lived assets, net of recoveries in the Consolidated Statements of Operations. No impairment charge was recorded for the intangible assets or property, equipment and leasehold improvements of the Hard Disk Drive reporting unit.

Other intangible assets consist primarily of existing technology, customer relationships and trade names acquired in business combinations. Acquired intangibles are amortized on a straight-line basis over the respective estimated useful lives of the assets. Amortization of the existing technology intangible asset is charged to Cost of revenue while the amortization of the other intangible assets is included in Operating expenses in the Consolidated Statements of Operations. The carrying values of intangible assets were not

82

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

material as of July 1, 2011 and July 2, 2010. In fiscal years 2011, 2010 and 2009, amortization expense for other intangible assets was $6 million, $35 million and $69 million, respectively.

## 4. Restructuring and Exit Costs

During fiscal year 2011, the Company recorded restructuring and other charges of $18 million, mainly comprised of charges related to its AMK restructuring plan announced in the first quarter of fiscal year 2010 and costs associated with the closure of facilities previously announced. During fiscal year 2010, the Company recorded restructuring and other charges of $66 million mainly comprised of charges related to its AMK restructuring plan announced in the first quarter of fiscal year 2010 and additional restructuring charges related to its Pittsburgh, Pennsylvania facility and facilities acquired as part of the 2006 acquisition of Maxtor Corporation ("Maxtor"). During fiscal year 2009, the Company recorded restructuring and other charges of $210 million, comprised mainly of charges related to the May 2009 Plan and January 2009 Plan, both intended to realign its cost structure with the macroeconomic business environment. All restructuring charges are reported in Restructuring and other, net in the Consolidated Statements of Operations, unless otherwise noted. The Company's significant restructuring plans are described below.

*2010 Plan.*    From the inception of the Company's restructuring plan announced in fiscal year 2010 as a result of the ongoing focus on cost efficiencies in all areas of its business, the Company recorded a total of $4 million related to employee termination costs prior to fiscal year ended July 1, 2011; no additional charges were incurred during the fiscal year 2011. The Company made cash payments of $2 million and completed the plan during the fiscal year ended July 1, 2011.

*AMK Plan.*    In August 2009, the Company announced that it would close its AMK facility in Singapore. Manufacturing operations at this facility had ceased as of the third quarter of fiscal year 2011. The hard drive manufacturing operations have been relocated to other existing Seagate facilities and the Company's Asia International Headquarters (IHQ) remains in Singapore. This closure and relocation is part of the Company's ongoing focus on cost efficiencies in all areas of its business and is intended to facilitate leveraging manufacturing investments across fewer sites. The Company currently estimates total restructuring charges of approximately $60 million, all in cash, including approximately $40 million for post-employment benefits, approximately $10 million for the relocation of manufacturing equipment, and approximately $10 million for other plant closure and relocation costs. From the inception of the plan the Company has recorded $48 million in restructuring charges. During fiscal year 2011, the Company accrued total restructuring charges of $3 million related to post-employment benefits and $6 million related to other exit costs. The Company made cash payments of $38 million relating to this plan during fiscal year 2011.

*Other Restructuring and Exit Costs.*    Through July 1, 2011, the Company has recorded restructuring related charges of approximately $120 million, net of adjustments, related to the previously announced closures of its Pittsburgh, Pennsylvania and Milpitas, California facilities, and also has recorded certain exit costs aggregating to $270 million related to its acquisition of Maxtor. These plans are currently expected to result in total charges of approximately $410 million. During the year ended July 1, 2011, the Company recorded restructuring charges of $4 million related to facility lease obligations, $3 million related to post-employment benefits and $2 million related to other exit costs. The Company made cash payments of $23 million on these and other smaller restructuring plans. Payment of these exit costs are expected to continue through the end of fiscal year 2017.

83

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table summarizes the Company's restructuring activities for fiscal years 2011, 2010 and 2009:

| (Dollars in millions) | Post-Employment Benefits | Operating Leases | Other Exit Costs | Total |
|---|---|---|---|---|
| **All Restructuring Activities** | | | | |
| Accrual balances at June 27, 2008 | $ 52 | $ 17 | $ 18 | $ 87 |
| Restructuring charges | 176 | 12 | 15 | 203 |
| Cash payments | (164) | (8) | (24) | (196) |
| Adjustments | (3) | 19 | (9) | 7 |
| Accrual balances at July 3, 2009 | 61 | 40 | — | 101 |
| Restructuring charges | 42 | 15 | 7 | 64 |
| Cash payments | (62) | (14) | (7) | (83) |
| Adjustments | (3) | 5 | — | 2 |
| Accrual balances at July 2, 2010 | 38 | 46 | — | 84 |
| Restructuring charges | 3 | 4 | 8 | 15 |
| Cash payments | (36) | (19) | (8) | (63) |
| Adjustments | 3 | — | — | 3 |
| Accrual balances at July 1, 2011 | $ 8 | $ 31 | $ — | $ 39 |

Of the accrued restructuring balance of approximately $39 million at July 1, 2011, $15 million is included in Accrued expenses and $24 million is included in Other non-current liabilities in the Company's Consolidated Balance Sheet. Of the accrued restructuring balance of approximately $84 million at July 2, 2010, $51 million is included in Accrued expenses and $33 million is included in Other non-current liabilities in the Company's Consolidated Balance Sheet.

## 5. Debt and Convertible Notes

*Short-Term Borrowings*

On January 18, 2011, the Company, and its subsidiary Seagate HDD Cayman entered into a Credit Agreement which provides for a $350 million senior secured revolving credit facility. The Company and certain of its material subsidiaries fully and unconditionally guarantee, on a senior secured basis, the revolving credit facility. The $350 million revolving credit facility matures in January 2015. The $350 million revolving credit facility is available for cash borrowings and for the issuance of letters of credit up to a sub-limit of $75 million. As of July 1, 2011, no borrowings have been drawn under the revolving credit facility, and $4 million had been utilized for letters of credit. The line of credit is available for borrowings, subject to compliance with financial covenants and other customary conditions to borrowing. The credit agreement that governs the revolving credit facility contains certain covenants that the Company must satisfy in order to remain in compliance with the credit agreement, including three financial covenants: (1) minimum amount of cash, cash equivalents and marketable securities; (2) a fixed charge coverage ratio; and (3) a net leverage ratio. As of July 1, 2011, the Company was in compliance with all covenants, including the financial ratios that it is required to maintain.

*Long-Term Debt*

*$600 Million Aggregate Principal Amount of 7.00% Senior Notes due November 2021 (the "2021 Notes").*    On May 18, 2011, the Company's subsidiary, Seagate HDD Cayman, completed the sale of $600 million aggregate principal amount of the 2021 Notes, in a private placement exempt from the registration

# SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

requirements of the Securities Act of 1933, as amended. The obligations under the 2021 Notes are fully and unconditionally guaranteed, on a senior unsecured basis, by the Company. The net proceeds from the offering of the 2021 Notes were approximately $588 million, which the Company intends to use for general corporate purposes, which may include the repayment, redemption and/or repurchase of a portion of its outstanding indebtedness, capital expenditures and investments in its business. The interest on the 2021 Notes is payable semi-annually on January 1 and July 1 of each year. The 2021 Notes are redeemable any time prior to May 1, 2016 at the option of the Company, in whole or in part, at a redemption price of 100% of the principal amount plus an "applicable premium" and accrued and unpaid interest, if any, to the redemption date. The "applicable premium" will be equal to the greater of (1) 1% of the principal amount of the 2021 Notes, or (2) the excess, if any, of (a) the present value of the redemption price on May 1, 2016 plus interest payments due through May 1, 2016, discounted at the applicable Treasury rate as of the redemption date plus 50 basis points; over (b) the principal amount of such note. The 2021 Notes are redeemable at any time on or after May 1, 2016 at various prices expressed as a percentage of principal amount, as set forth in the indentures, plus accrued and unpaid interest, if any, to the redemption date. In addition, any time before May 2, 2014, the Company may redeem up to 35% of the principal amount with the net cash proceeds from permitted sales of the Company's stock at a redemption price of 107.0% of the principal amount plus accrued interest to the redemption date.

*$750 Million Aggregate Principal Amount of 7.75% Senior Notes due December 2018 (the "2018 Notes").*   On December 14, 2010, the Company's subsidiary, Seagate HDD Cayman, completed the sale of $750 million aggregate principal amount of the 2018 Notes in a private placement exempt from the registration requirements of the Securities Act of 1933, as amended. The obligations under the 2018 Notes are fully and unconditionally guaranteed, on a senior unsecured basis, by the Company. The net proceeds from the offering of the 2018 Notes were approximately $736 million, which the Company intends to use for general corporate purposes, which may include the repayment, redemption and/or repurchase of a portion of its outstanding indebtedness. The interest on the 2018 Notes is payable semi-annually on June 15 and December 15 of each year. The 2018 Notes are redeemable at any time prior to December 15, 2014 at the option of the Company, in whole or in part, at a redemption price of 100% of the principal amount plus an "applicable premium" and accrued and unpaid interest, if any, to the redemption date. The "applicable premium" will be equal to the greater of (1) 1% of the principal amount of the 2018 Notes, or (2) the excess, if any, of (a) the present value of the redemption price on December 15, 2014 plus interest payments due through December 15, 2014, discounted at the applicable Treasury rate as of the redemption date plus 50 basis points; over (b) the principal amount of such note. The 2018 Notes are redeemable at any time on or after December 15, 2014 at various prices expressed as a percentage of the principal amount, as set forth in the indentures, plus accrued and unpaid interest, if any, to the redemption date. In addition, any time before December 15, 2013, the Company may redeem up to 35% of the principal amount with the net cash proceeds from permitted sales of the Company's stock at a redemption price of 107.75% of the principal amount plus accrued interest to the redemption date.

*$600 Million Aggregate Principal Amount of 6.375% Senior Notes due October 2011 (the "2011 Notes").*   The interest on the 2011 Notes is payable semi-annually on April 1 and October 1 of each year. The issuer under the 2011 Notes is Seagate Technology HDD Cayman, and the obligations under the 2011 Notes are unconditionally guaranteed by certain of the Company's significant subsidiaries. The 2011 Notes are redeemable at the option of the Company in whole or in part, on not less than 30, nor more than 60 days notice, at a "make-whole" premium redemption price. The "make-whole" redemption price will be equal to the greater of (1) 100% of the principal amount of the notes being redeemed, or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the 2011 Notes being redeemed, discounted at the redemption date on a semi-annual basis at a rate equal to the sum of the

85

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

applicable Treasury rate plus 50 basis points. The 2011 Notes are included in Current portion of long-term debt in the Condensed Consolidated Balance Sheet at July 1, 2011.

*$430 Million Aggregate Principal Amount of 10.00% Senior Secured Second-Priority Notes due May 2014 (the "2014 Notes").*    On May 1, 2009, the Company's subsidiary, Seagate Technology International, completed the sale of $430 million aggregate principal amount of the 2014 Notes, in a private placement exempt from the registration requirements of the Securities Act of 1933, as amended. The obligations under the 2014 Notes are unconditionally guaranteed by the Company and certain of its significant subsidiaries. In addition, the obligations under the 2014 Notes are secured by a second-priority lien on substantially all of the Company's tangible and intangible assets. The indenture governing the 2014 Notes contains covenants that limit the Company's ability, and the ability of certain of its subsidiaries, (subject to certain exceptions) to: incur additional debt or issue certain preferred shares, create liens, enter into mergers, pay dividends, redeem or repurchase debt or shares, and enter into certain transactions with the Company's shareholders or affiliates. The interest on the 2014 Notes is payable semi-annually on May 1 and November 1 of each year. The 2014 Notes are redeemable any time prior to May 1, 2013 at the option of the Company, in whole or in part, at a redemption price of 100% of the principal amount plus an "applicable premium" and accrued and unpaid interest, if any, to the redemption date. The "applicable premium" will be equal to the greater of (1) 1% of the principal amount of the 2014 Notes, or (2) the excess, if any, of (a) the present value of the redemption price on May 1, 2013 plus interest payments due through May 1, 2013, discounted at the applicable Treasury rate as of the redemption date plus 50 basis points; over (b) the principal amount of such note. The 2014 Notes are redeemable at any time on or after May 1, 2013 at the option of the Company in whole or in part, at a redemption price equal to 100% of the principal amount thereof, plus a premium equal to one-half the annual coupon thereon and accrued and unpaid interest, if any, to the redemption date. In addition, any time before May 1, 2012, the Company may redeem up to 35% of the principal amount with the net cash proceeds from permitted sales of the Company's stock at a redemption price of 110% of the principal amount plus accrued interest to the redemption date. During the fiscal year 2011, the Company redeemed approximately $14 million aggregate principal amount of its 2014 Notes for cash at 110% of their principal amount, plus accrued and unpaid interest to the redemption date. The Company recorded a loss on the redemption of approximately $2 million, which is included in Other, net in the Company's Consolidated Statements of Operations for the fiscal year ended July 1, 2011.

*$600 Million Aggregate Principal Amount of 6.8% Senior Notes due October 2016 (the "2016 Notes").*    The interest on the 2016 Notes is payable semi-annually on April 1 and October 1 of each year. The issuer under the 2016 Notes is Seagate Technology HDD Cayman, and the obligations under the 2016 Notes are unconditionally guaranteed by certain of the Company's significant subsidiaries. The 2016 Notes are redeemable at the option of the Company in whole or in part, on not less than 30, nor more than 60 days notice, at a "make-whole" premium redemption price. The "make-whole" redemption price will be equal to the greater of (1) 100% of the principal amount of the notes being redeemed, or (2) the sum of the present values of the remaining scheduled payments of principal and interest on the 2016 Notes being redeemed, discounted at the redemption date on a semi-annual basis at a rate equal to the sum of the applicable Treasury rate plus 50 basis points.

*$600 Million Aggregate Principal Amount of 6.875% Senior Notes due May 2020 (the "2020 Notes").*    On May 13, 2010, the Company's subsidiary, Seagate HDD Cayman, completed the sale of $600 million aggregate principal amount of the 2020 Notes, in a private placement exempt from the registration requirements of the Securities Act of 1933, as amended. The obligations under the 2020 Notes are fully and unconditionally guaranteed, on a senior unsecured basis, by the Company. The net proceeds from the offering of the 2020 Notes were approximately $587 million, which the Company intends to use to repay,

86

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

redeem and/or repurchase a portion of the Company's outstanding indebtedness and for general corporate purposes. The interest on the 2020 Notes is payable semi-annually on May 1 and November 1 of each year. The 2020 Notes are redeemable any time prior to May 1, 2015 at the option of the Company, in whole or in part, at a redemption price of 100% of the principal amount plus an "applicable premium" and accrued and unpaid interest, if any, to the redemption date. The "applicable premium" will be equal to the greater of (1) 1% of the principal amount of the 2020 Notes, or (2) the excess, if any, of (a) the present value of the redemption price on May 1, 2015 plus interest payments due through May 1, 2015, discounted at the applicable Treasury rate as of the redemption date plus 50 basis points; over (b) the principal amount of such note. The 2020 Notes are redeemable at any time on or after May 1, 2015 at various prices expressed as a percentage of the principal amount, as set forth in the indentures, plus accrued and unpaid interest, if any, to the redemption date. In addition, any time before May 1, 2013, the Company may redeem up to 35% of the principal amount with the net cash proceeds from permitted sales of the Company's stock at a redemption price of 106.875% of the principal amount plus accrued interest to the redemption date.

*$55 Million Aggregate Principal Amount of 5.75% Subordinated Debentures due March 2012 (the "5.75% Debentures").* On July 27, 2010, the Company redeemed the entire outstanding aggregate principal amount of the 5.75% Debentures for cash at 100% of their principal amount, plus accrued and unpaid interest to the redemption date for approximately $34 million. The Company recorded a loss on the redemption of approximately $2 million, which is included in Other, net in the Company's Consolidated Statement of Operations for the fiscal year ended July 1, 2011.

### Convertible Notes

*$326 Million Aggregate Principal Amount of 2.375% Convertible Senior Notes due August 2012 (the "2.375% Notes").* On August 19, 2010, the Company redeemed the entire $326 million outstanding aggregate principal amount of the 2.375% Notes for cash at a redemption price equal to 100.68% of their principal amount, plus accrued and unpaid interest to the redemption date for approximately $328 million. The Company recorded a loss on the redemption of approximately $22 million, which is included in Other, net in the Company's Consolidated Statements of Operations for the fiscal year ended July 1, 2011. The effective interest rate, contractual interest expense and amortization of debt discount for the 2.375% Notes for the fiscal years ended July 1, 2011 and July 2, 2010 were as follows:

| | Fiscal Years Ended | |
| | July 1, 2011 | July 2, 2010 |
| (Dollars in millions, except for percentages) | | |
|---|---|---|
| Effective interest rate | 6.9% | 6.9% |
| Interest expense—contractual | $ 1 | $ 8 |
| Interest expense—amortization of debt discount due to change in accounting | $ 2 | $ 12 |

At July 1, 2011, future principal payments on long-term debt were as follows (in millions):

| Fiscal Year | |
|---|---|
| 2012 | $ 559 |
| 2013 | — |
| 2014 | 416 |
| 2015 | — |
| 2016 | — |
| Thereafter | 2,550 |
| | $ 3,525 |

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**6. Income Taxes**

The provision for (benefit from) income taxes consisted of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Current tax expense (benefit): | | | |
| U.S. Federal | $ (6) | $ (14) | $ 2 |
| U.S. State | — | 1 | 3 |
| Non-U.S. | 28 | 9 | — |
| Total Current | 22 | (4) | 5 |
| Deferred tax expense (benefit): | | | |
| U.S. Federal | 23 | (37) | 291 |
| U.S. State | 3 | 2 | 4 |
| Non-U.S. | 20 | (1) | 11 |
| Total Deferred | 46 | (36) | 306 |
| Provision for (benefit from) income taxes | $ 68 | $ (40) | $ 311 |

Income (loss) before income taxes consisted of the following:

| | Fiscal Years Ended | | |
|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| U.S. | $ 100 | $ 58 | $ (354) |
| Non-U.S | 479 | 1,511 | (2,460) |
| | $ 579 | $ 1,569 | $ (2,814) |

During fiscal year 2011, the Company recorded an income tax provision of $68 million which includes non-U.S. income tax expense for income tax reserves recorded for non-U.S. income tax positions taken in prior fiscal years partially offset by tax benefits for the release of income tax reserves associated with settlements of income tax audits and the expiration of certain statutes of limitation. The U.S. federal and state net deferred tax expense recorded in fiscal year 2011 included taxes on intercompany transactions.

The U.S. federal and state net deferred tax benefit recorded in fiscal year 2010 of $35 million included $55 million of deferred tax benefit from the reversal of a portion of the U.S. valuation allowance recorded in fiscal year 2009. The valuation allowance reversal recorded in fiscal year 2010 resulted from revisions to the Company's forecasts of U.S. taxable income. The U.S. federal and state deferred tax expense in fiscal year 2009 of $295 million resulted primarily from recording additional valuation allowance for U.S. federal and state deferred tax assets.

During the fiscal year ended July 2, 2010, an enacted legislative change in U.S. tax law was taken into account in computing the Company's income tax provision. The Worker, Homeownership, and Business Assistance Act of 2009, was enacted on November 6, 2009. This law allowed the Company to elect an increased carryback period for net operating losses incurred in 2008 or 2009 from two years to three, four, or five years at the Company's option. The Company recorded an $11 million income tax benefit as result of the increased carryback period.

88

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company recorded an excess tax benefit associated with stock option deductions in fiscal year 2011 of $2 million and no excess tax benefits in 2010 or 2009.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The significant components of the Company's deferred tax assets and liabilities were as follows:

| | Fiscal Years Ended | |
| | July 1, 2011 | July 2, 2010 |
| --- | --- | --- |
| (Dollars in millions) | | |
| **Deferred tax assets** | | |
| Accrued warranty | $ 130 | $ 137 |
| Inventory valuation accounts | 68 | 54 |
| Receivable reserves | 18 | 16 |
| Accrued compensation and benefits | 117 | 147 |
| Depreciation | 126 | 145 |
| Restructuring accruals | 10 | 15 |
| Other accruals and deferred items | 50 | 51 |
| Net operating losses and tax credit carry-forwards | 1,087 | 1,085 |
| Other assets | 10 | 12 |
| Total Deferred tax assets | 1,616 | 1,662 |
| Valuation allowance | (1,146) | (1,164) |
| Net Deferred tax assets | 470 | 498 |
| **Deferred tax liabilities** | | |
| Unremitted earnings of certain non-U.S. entities | (8) | (3) |
| Trading Securities—Unrealized Gain | (2) | — |
| Acquired intangible assets | — | (3) |
| Debt discount | — | (10) |
| Depreciation | (5) | (9) |
| Total Deferred tax liabilities | (15) | (25) |
| Net Deferred tax assets | 455 | 473 |
| Deferred taxes on inter-company transactions | 7 | 32 |
| Total Deferred tax assets | $ 462 | $ 505 |
| **As Reported on the Balance Sheet** | | |
| Current assets—Deferred income taxes | $ 99 | $ 118 |
| Non-current assets—Deferred income taxes | 374 | 395 |
| Other current liabilities | (11) | (8) |
| Total Deferred income taxes | $ 462 | $ 505 |

The deferred tax asset valuation allowance decreased by approximately $18 million in fiscal year 2011, decreased by approximately $133 million in fiscal year 2010 and increased by approximately $864 million in fiscal year 2009.

At July 1, 2011, the Company recorded $462 million of net deferred tax assets. The realization of $455 million of these deferred tax assets is primarily dependent on the Company's ability to generate sufficient U.S. and certain non-U.S. taxable income in future periods. Although realization is not assured,

89

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

the Company's management believes that it is more likely than not that these deferred tax assets will be realized. The amount of deferred tax assets considered realizable, however, may increase or decrease in subsequent periods when the Company reevaluates the underlying basis for its estimates of future U.S. and certain non-U.S. taxable income.

At July 1, 2011, the Company had U.S. federal, state and non-U.S. tax net operating loss carryforwards of approximately $2.6 billion, $1.8 billion and $623 million, respectively, which will expire at various dates beginning in fiscal year 2013, if not utilized. At July 1, 2011, the Company had U.S. federal and state tax credit carryforwards of $278 million and $74 million, respectively, which will expire at various dates beginning in fiscal year 2012, if not utilized. Of the $2.6 billion of loss carryovers noted above, approximately $754 million will be credited to Additional paid-in capital upon recognition.

Approximately $364 million and $90 million of the Company's U.S. NOL and tax credit carryforwards, respectively, are subject to an aggregate annual limitation of $45 million pursuant to U.S. tax law.

The Company became an Irish tax resident in fiscal year 2010. Prior to fiscal year 2010, the Company was headquartered in the Cayman Islands and not subject to tax in the Cayman Islands. For purposes of the tax reconciliation between the provision for income taxes at the statutory rate and the effective tax rate, the Irish statutory rate of 25% was used in fiscal years 2011 and 2010. For fiscal year 2009, a notional 35% statutory rate was used.

| | Fiscal Years Ended | | |
|---|---|---|---|
| (Dollars in millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Provision (benefit) at statutory rate | $   145 | $   392 | $   (985) |
| Net U.S. state income tax provision | 2 | 3 | 6 |
| Permanent differences | — | 2 | 9 |
| Non-deductible goodwill impairments | — | — | 813 |
| Valuation allowance | (18) | (77) | 310 |
| Non-U.S. losses with no tax benefits | 7 | 31 | 263 |
| Non-U.S. earnings taxed at less than statutory rate | (102) | (393) | (138) |
| Tax expense related to intercompany transactions | 26 | 26 | 27 |
| Other individually immaterial items | 8 | (24) | 6 |
| Provision for (benefit from) income taxes | $   68 | $   (40) | $   311 |

A substantial portion of the Company's operations in Malaysia, Singapore, Switzerland and Thailand operate under various tax holidays and tax incentive programs, which expire in whole or in part at various dates through 2020. Certain of the tax holidays may be extended if specific conditions are met. The net impact of these tax holidays and tax incentive programs was to increase the Company's net income by approximately $117 million in fiscal year 2011 ($0.25 per share, diluted), to increase the Company's net income by $307 million in fiscal year 2010 ($0.60 per share, diluted), and to decrease the Company's net loss by approximately $79 million in fiscal year 2009 ( $ 0.16 per share, diluted).

Since establishing Irish tax residency in fiscal year 2010 as a result of the implementation of certain pre-reorganization steps in connection with the Company's previously announced plan to move its corporate headquarters to Ireland, the Company consists of an Irish tax resident parent holding company with various U.S. and non-U.S. subsidiaries that operate in multiple non-Irish taxing jurisdictions. The amount of temporary differences (including undistributed earnings) related to outside basis differences in the stock of non-Irish resident subsidiaries considered indefinitely reinvested outside of Ireland for which

90

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Irish income taxes have not been provided as of July 1, 2011 was approximately $2.5 billion. If such amount were remitted to Ireland as a dividend, it is likely that tax at 25% or approximately $625 million would result.

As of July 1, 2011 and July 2, 2010, the Company had approximately $128 million and $115 million, respectively, in unrecognized tax benefits excluding interest and penalties. The amount of unrecognized tax benefits, if recognized, that would impact the effective tax rate were $128 million and $115 million as of July 1, 2011 and July 2, 2010, respectively, subject to certain future valuation allowance reversals.

The following table summarizes the activity related to the Company's gross unrecognized tax benefits:

| | Fiscal Years Ended | | |
| | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| (Dollars in millions) | | | |
| --- | --- | --- | --- |
| Balance of unrecognized tax benefits at the beginning of the year | $ 115 | $ 118 | $ 374 |
| Gross increase for tax positions of prior years | 30 | 2 | 49 |
| Gross decrease for tax positions of prior years | (24) | (5) | (287) |
| Gross increase for tax positions of current year | 13 | 6 | 13 |
| Gross decrease for tax positions of current year | — | — | — |
| Settlements | — | (4) | — |
| Lapse of statutes of limitation | (10) | (3) | (23) |
| Non-U.S. exchange (gain)/loss | 4 | 1 | (8) |
| Balance of unrecognized tax benefits at the end of the year | $ 128 | $ 115 | $ 118 |

It is the Company's policy to include interest and penalties related to unrecognized tax benefits in the provision for taxes on the Consolidated Statements of Operations. During fiscal year 2011, the Company recognized a net tax expense for interest and penalties of less than $1 million as compared to a net benefit of $1 million and $6 million during fiscal year 2010 and fiscal year 2009, respectively. As of July 1, 2011, the Company had $15 million of accrued interest and penalties related to unrecognized tax benefits which was unchanged from fiscal year 2010.

During the 12 months beginning July 2, 2011, the Company expects to reduce its unrecognized tax benefits by approximately $10 million as a result of the expiration of certain statutes of limitation. The Company does not believe it is reasonably possible that other unrecognized tax benefits will materially change in the next 12 months.

The Company is subject to taxation in many jurisdictions globally and is required to file U.S. federal, U.S. state and non-U.S. income tax returns. In May 2011, the U.S. Internal Revenue Service (IRS) completed its field examination of the Company's U.S. federal income tax returns for fiscal years ending in 2005 through 2007. The IRS issued a Revenue Agent's Report and proposed certain adjustments. The Company is currently contesting certain of these proposed adjustments through the IRS Appeals Office. The Company believes that the resolution of these disputed issues will have no material impact on its financial statements.

With respect to U.S. state and non-U.S. income tax returns, the Company is generally no longer subject to tax examinations for years ending prior to fiscal year 2003. The Company is also no longer subject to tax examination of U.S. federal income tax returns for years prior to fiscal year 2005.

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### 7. Derivative Financial Instruments

The Company is exposed to foreign currency exchange rate, interest rate, and to a lesser extent, equity price risks relating to its ongoing business operations. The Company enters into foreign currency forward exchange contracts in order to manage the foreign currency exchange rate risk on forecasted expenses denominated in foreign currencies and to mitigate the remeasurement risk of certain foreign currency denominated liabilities. The Company's accounting policies for these instruments are based on whether the instruments are classified as designated or non-designated hedging instruments. The Company records all derivatives in the Consolidated Balance Sheets at fair value. The effective portions of designated cash flow hedges are recorded in Accumulated other comprehensive income (loss) until the hedged item is recognized in earnings. Derivatives that are not designated as hedging instruments and the ineffective portions of cash flow hedges are adjusted to fair value through earnings. As of July 1, 2011 and July 2, 2010, the Company had net unrealized gains on cash flow hedges of approximately $2 million and $3 million, respectively.

The Company dedesignates its cash flow hedges when the forecasted hedged transactions are realized or it is probable the forecasted hedged transactions will not occur in the initially identified time period. At such time, the associated gains and losses deferred in Accumulated other comprehensive income (loss) are reclassified immediately into earnings and any subsequent changes in the fair value of such derivative instruments are immediately reflected in earnings. The Company did not recognize any material net gains or losses related to the loss of hedge designation on discontinued cash flow hedges during fiscal years 2011, 2010, and 2009. As of July 1, 2011, the Company's existing foreign currency forward exchange contracts mature within 12 months. The deferred amount currently recorded in Accumulated other comprehensive income (loss) expected to be recognized into earnings over the next 12 months is a net gain of $3 million.

As of July 1, 2011, the total notional value of the Company's outstanding foreign currency forward exchange contracts was:

| (Dollars in millions) | Contracts Designated as Hedges | | Contracts Not Designated as Hedges | |
|---|---|---|---|---|
| Thai baht | $ | 98 | $ | 235 |
| Singapore dollars | | 212 | | 9 |
| Chinese Renmin | | 78 | | — |
| Czech koruna | | — | | 11 |
| | $ | 388 | $ | 255 |

As of July 2, 2010, the total notional value of the Company's outstanding foreign currency forward exchange contracts was:

| (Dollars in millions) | Contracts Designated as Hedges | | Contracts Not Designated as Hedges | |
|---|---|---|---|---|
| Thai baht | $ | 406 | $ | 163 |
| Singapore dollars | | 84 | | 8 |
| Japanese Yen | | 1 | | — |
| Czech koruna | | — | | 10 |
| | $ | 491 | $ | 181 |

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company is subject to equity market risks due to changes in the fair value of the notional investments selected by its employees as part of its SDCP. Prior to January 3, 2011, the Company had a TRS in order to manage the equity market risks associated with the SDCP liabilities. Effective January 3, 2011, the Company cancelled the TRS, and currently manages its exposure to equity market risks associated with the SDCP liabilities by investing directly in mutual funds that mirror the employees' investment options.

The following table shows the Company's derivative instruments measured at gross fair value as reflected in the Consolidated Balance Sheets as of July 1, 2011 and July 2, 2010:

**Fair Values of Derivative Instruments as of July 1, 2011**

| | Asset Derivatives | | Liability Derivatives | |
| --- | --- | --- | --- | --- |
| (Dollars in millions) | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| **Derivatives designated as hedging instruments:** | | | | |
| Foreign currency forward exchange contracts | Other current assets | $ 4 | Accrued expenses | $ (2) |
| **Derivatives not designated as hedging instruments:** | | | | |
| Foreign currency forward exchange contracts | Other current assets | 1 | Accrued expenses | (4) |
| **Total derivatives** | | $ 5 | | $ (6) |

**Fair Values of Derivative Instruments as of July 2, 2010**

| | Asset Derivatives | | Liability Derivatives | |
| --- | --- | --- | --- | --- |
| (Dollars in millions) | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| **Derivatives designated as hedging instruments:** | | | | |
| Foreign currency forward exchange contracts | Other current assets | $ 5 | Accrued expenses | $ — |
| **Derivatives not designated as hedging instruments:** | | | | |
| Foreign currency forward exchange contracts | Other current assets | 2 | Accrued expenses | — |
| Total return swap | Other current assets | — | Accrued expenses | (1) |
| **Total derivatives** | | $ 7 | | $ (1) |

93

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables show the effect of the Company's derivative instruments on Other comprehensive income (loss) (OCI) and the Consolidated Statements of Operations for the fiscal year ended July 1, 2011:

| (Dollars in millions)<br>Derivatives Designated as Cash Flow Hedges | Amount of Gain or (Loss) Recognized in OCI on Derivative (Effective Portion) | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Location of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain or (Loss) Recognized in Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) [a] |
|---|---|---|---|---|---|
| Foreign currency forward exchange contracts | $ 39 | Cost of revenue | $ 39 | Cost of revenue | $ (1) |

| Derivatives Not Designated as Hedging Instruments | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
|---|---|---|
| Foreign currency forward exchange contracts | Other, net | $ 18 |
| Total return swap | Operating expenses | $ 14 |
| | | $ 32 |

(a)    The amount of gain or (loss) recognized in income represents $0 related to the ineffective portion of the hedging relationships and $1 million related to the amount excluded from the assessment of hedge effectiveness, for the fiscal year ended July 1, 2011.

The following tables show the effect of the Company's derivative instruments on Other comprehensive income (loss) (OCI) and the Consolidated Statements of Operations for the fiscal year ended July 2, 2010:

| (Dollars in millions)<br>Derivatives Designated as Cash Flow Hedges | Amount of Gain or (Loss) Recognized in OCI on Derivative (Effective Portion) | Location of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Amount of Gain or (Loss) Reclassified from Accumulated OCI into Income (Effective Portion) | Location of Gain or (Loss) Recognized in Income on Derivative (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain or (Loss) Recognized in Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) [a] |
|---|---|---|---|---|---|
| Foreign currency forward exchange contracts | $ 14 | Cost of revenue | $ 10 | Cost of revenue | $ 1 |

| Derivatives Not Designated as Hedging Instruments | Location of Gain or (Loss) Recognized in Income on Derivative | Amount of Gain or (Loss) Recognized in Income on Derivative |
|---|---|---|
| Foreign currency forward exchange contracts | Other, net | $ 14 |
| Total return swap | Operating expenses | $ 9 |
| | | $ 23 |

(a)    The amount of gain or (loss) recognized in income represents $0 related to the ineffective portion of the hedging relationships and $1 million related to the amount excluded from the assessment of hedge effectiveness, for the fiscal year

ended July 2, 2010:

94

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**8. Fair Value**

*Measurement of Fair Value*

Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required to be recorded at fair value, the Company considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

*Fair Value Hierarchy*

A fair value hierarchy is based on whether the market participant assumptions used in determining fair value are obtained from independent sources (observable inputs) or reflects the Company's own assumptions of market participant valuation (unobservable inputs). A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The three levels of inputs that may be used to measure fair value:

Level 1—Quoted prices in active markets that are unadjusted and accessible at the measurement date for identical, unrestricted assets or liabilities;

Level 2—Quoted prices for identical assets and liabilities in markets that are inactive; quoted prices for similar assets and liabilities in active markets or financial instruments for which significant inputs are observable, either directly or indirectly; or

Level 3—Prices or valuations that require inputs that are both unobservable and significant to the fair value measurement.

The Company considers an active market to be one in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis, and views an inactive market as one in which there are few transactions for the asset or liability, the prices are not current, or price quotations vary substantially either over time or among market makers. Where appropriate the Company's or the counterparty's non-performance risk is considered in determining the fair values of liabilities and assets, respectively.

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Items Measured at Fair Value on a Recurring Basis*

The following table presents the Company's assets and liabilities that are measured at fair value on a recurring basis, excluding accrued interest components, as of July 1, 2011:

| | Fair Value Measurements at Reporting Date Using | | | |
| (Dollars in millions) | Quoted Prices in Active Markets for Identical Instruments (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Balance |
|---|---|---|---|---|
| Assets: | | | | |
| Commercial paper | $ — | $ 1,729 | $ — | $ 1,729 |
| Money market funds | 800 | — | — | 800 |
| U.S. treasuries and agency bonds | — | 190 | — | 190 |
| Certificates of deposit | — | 133 | — | 133 |
| Corporate bonds | — | 116 | — | 116 |
| Other debt securities | — | 96 | — | 96 |
| Total cash equivalents and short-term investments | 800 | 2,264 | — | 3,064 |
| Restricted cash and investments: | | | | |
| Mutual Funds | 81 | — | — | 81 |
| Other debt securities | 19 | 2 | — | 21 |
| Auction rate securities | — | — | 16 | 16 |
| Derivative assets | — | 5 | — | 5 |
| Total assets | $ 900 | $ 2,271 | $ 16 | $ 3,187 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ (6) | $ — | $ (6) |
| Total liabilities | $ — | $ (6) | $ — | $ (6) |

| | Fair Value Measurements at Reporting Date Using | | | |
| (Dollars in millions) | Quoted Prices in Active Markets for Identical Instruments (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Balance |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents | $ 800 | $ 1,790 | $ — | $ 2,590 |
| Short-term investments | — | 474 | — | 474 |
| Restricted cash and investments | 100 | 2 | — | 102 |
| Other current assets | — | 5 | — | 5 |
| Other assets, net | — | — | 16 | 16 |
| Total assets | $ 900 | $ 2,271 | $ 16 | $ 3,187 |
| Liabilities: | | | | |
| Accrued expenses | $ — | $ (6) | $ — | $ (6) |
| Total liabilities | $ — | $ (6) | $ — | $ (6) |

SEAGATE TECHNOLOGY PLC

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table presents the Company's assets and liabilities that are measured at fair value on a recurring basis, excluding accrued interest components, as of July 2, 2010:

| (Dollars in millions) | Fair Value Measurements at Reporting Date Using | | | |
| | Quoted Prices in Active Markets for Identical Instruments (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Balance |
|---|---|---|---|---|
| Assets: | | | | |
| Commercial paper | $ — | $ 1,231 | $ — | $ 1,231 |
| Money market funds | 833 | — | — | 833 |
| U.S. treasuries and agency bonds | — | 155 | — | 155 |
| Other debt securities | — | 134 | — | 134 |
| Total Cash Equivalents and Marketable Securities | 833 | 1,520 | — | 2,353 |
| Restricted Cash and Investments: | | | | |
| Other debt securities | 76 | 5 | — | 81 |
| Auction rate securities | — | — | 17 | 17 |
| Derivative assets | — | 7 | — | 7 |
| Total Assets | $ 909 | $ 1,532 | $ 17 | $ 2,458 |
| Liabilities: | | | | |
| Derivative liabilities | $ — | $ (1) | $ — | $ (1) |
| Total Liabilities | $ — | $ (1) | $ — | $ (1) |

| (Dollars in millions) | Fair Value Measurements at Reporting Date Using | | | |
| | Quoted Prices in Active Markets for Identical Instruments (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Balance |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents | $ 833 | $ 1,268 | $ — | $ 2,101 |
| Short-term investments | — | 252 | — | 252 |
| Restricted cash and investments | 76 | 5 | — | 81 |
| Other current assets | — | 7 | — | 7 |
| Other assets, net | — | — | 17 | 17 |
| Total Assets | $ 909 | $ 1,532 | $ 17 | $ 2,458 |
| Liabilities: | | | | |
| Accrued expenses | $ — | $ (1) | $ — | $ (1) |
| Total Liabilities | $ — | $ (1) | $ — | $ (1) |

Level 1 assets consist of money market funds and mutual funds for which quoted prices are available in an active market.

97

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company classifies items in Level 2 if the financial asset or liability is valued using observable inputs. The Company uses observable inputs including quoted prices in active markets for similar assets or liabilities. Level 2 assets include: agency bonds, corporate bonds, commercial paper, municipal bonds, and U.S. Treasuries. These debt investments are priced using observable inputs and valuation models which vary by asset class. The Company uses a pricing service to assist in determining the fair values of all of its cash equivalents and short-term investments. For the cash equivalents and short-term investments in the Company's portfolio, multiple pricing sources are generally available. The pricing service uses inputs from multiple industry standard data providers or other third party sources and various methodologies, such as weighting and models, to determine the appropriate price at the measurement date. The Company corroborates the prices obtained from the pricing service against other independent sources and, as of July 1, 2011, has not found it necessary to make any adjustments to the prices obtained. The Company's derivative financial instruments are also classified within Level 2. The Company's derivative financial instruments consist of foreign currency forward exchange contracts and the TRS. The Company recognizes derivative financial instruments in its consolidated financial statements at fair value. The Company determines the fair value of these instruments by considering the estimated amount it would pay or receive to terminate these agreements at the reporting date.

The Company's Level 3 assets consist of auction rate securities with a par value of approximately $18 million, all of which are collateralized by student loans guaranteed by the Federal Family Education Loan Program. Beginning in fiscal year 2008, these securities failed to settle at auction and have continued to fail through July 1, 2011. Since there is no active market for these securities, the Company valued them using a discounted cash flow model. The valuation model is based on the income approach and reflects both observable and significant unobservable inputs.

98

# SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The table below presents a reconciliation of all assets and liabilities measured at fair value on a recurring basis, excluding accrued interest components, using significant unobservable inputs (Level 3) for the fiscal year ended July 2, 2011:

| (Dollars in millions) | Auction Rate Securities |
|---|---:|
| Balance at June 27, 2008 | $ 28 |
| Total net gains (losses) (realized and unrealized): | |
| Realized gains (losses) [1] | (2) |
| Unrealized gains (losses) [2] | — |
| Sales and settlements | (8) |
| Balance at July 3, 2009 | 18 |
| Total net gains (losses) (realized and unrealized): | |
| Realized gains (losses) [1] | (1) |
| Unrealized gains (losses) [2] | — |
| Sales and settlements | — |
| Balance at July 2, 2010 | 17 |
| Total net gains (losses) (realized and unrealized): | |
| Realized gains (losses) [1] | — |
| Unrealized gains (losses) [2] | — |
| Sales and settlements | (1) |
| Balance at July 1, 2011 | $ 16 |

(1)  Realized gains (losses) on auction rate securities are recorded in Other, net in the Consolidated Statements of Operations.

(2)  Unrealized gains (losses) on auction rate securities are recorded as a separate component of Total comprehensive income (loss) in Accumulated other comprehensive income (loss), which is a component of Shareholders' Equity.

*Items Measured at Fair Value on a Non-Recurring Basis*

| | Fair Value Measurements Using | | | |
|---|---|---|---|---|
| (Dollars in millions) | Quoted Prices in Active Markets for Identical Instruments (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Balance |
| Assets: | | | | |
| Equity investment | $ — | $ — | $ 2 | $ 2 |

The Company enters into certain strategic investments for the promotion of business and strategic objectives. Strategic investments are included in the accompanying balance sheets in Other assets, net, are recorded at cost and are periodically analyzed to determine whether or not there are indicators of impairment. The carrying value of the Company's strategic investments at July 1, 2011 and July 2, 2010 totaled $27 million and $28 million, respectively.

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

During the fiscal years 2011 and 2010, the Company determined that some of its equity investments accounted for under the cost method were other-than-temporarily impaired, and recognized a charge of $5 million and $13 million, respectively, in order to write down the carrying amount of the investment to its estimated fair value. These amounts were recorded in Other, net in the Consolidated Statements of Operations. Since there was no active market for the equity securities of the investee, the Company estimated fair value of the investee by using the market approach which was then used to estimate the applicable portion of the fair value of its underlying intellectual property assets at the end of the fourth quarter of fiscal 2011.

*Other Fair Value Disclosures*

The Company's debt is carried at amortized cost. The fair value is derived from quoted prices in active markets, except for capital leases, which are reflected at carrying value. The carrying amounts and fair values of the Company's debt are included in the following table in order of maturity:

| (Dollars in millions) | July 1, 2011 Carrying Amount | July 1, 2011 Estimated Fair Value | July 2, 2010 Carrying Amount | July 2, 2010 Estimated Fair Value |
|---|---|---|---|---|
| Capital Leases | $ 1 | $ 1 | $ 2 | $ 2 |
| 6.375% Senior Notes due October 2011 | 559 | 561 | 559 | 577 |
| 5.75% Subordinated Debentures due March 2012 | — | — | 31 | 33 |
| 2.375% Convertible Senior Notes due August 2012 | — | — | 298 | 329 |
| 10.0% Senior Secured Second-Priority Notes due May 2014 | 403 | 481 | 413 | 490 |
| 6.8% Senior Notes due October 2016 | 599 | 647 | 599 | 587 |
| 7.75% Senior Notes due December 2018 | 750 | 780 | — | — |
| 6.875% Senior Notes due May 2020 | 600 | 591 | 600 | 574 |
| 7.00% Senior Notes due November 2021 | 600 | 598 | — | — |
| | 3,512 | 3,659 | 2,502 | 2,592 |
| Less short-term borrowings and current portion of long-term debt | (560) | (562) | (329) | (362) |
| Long-term debt, less current portion | $ 2,952 | $ 3,097 | $ 2,173 | $ 2,230 |

## 9. Shareholders' Equity

*Share Capital*

On July 3, 2010, the Company consummated a reorganization pursuant to which Seagate-Ireland became the publicly traded parent of the Seagate corporate family. In connection with the reorganization, all issued and outstanding Seagate-Cayman common shares were cancelled and ceased to exist, and Seagate-Ireland issued ordinary shares on a one-for-one basis to the holders of Seagate-Cayman common shares for each Seagate-Cayman common share that was cancelled. In addition, Seagate-Ireland assumed Seagate-Cayman's equity incentive related plans, sub-plans and agreements, including, but not limited to, the Seagate Technology 2001 Share Option Plan, the Amended Seagate Technology 2004 Share Compensation Plan, the Seagate Technology Employee Stock Purchase Plan, the Maxtor Corporation 2005 Performance Incentive Plan, the Maxtor Corporation Amended and Restated 1996 Stock Option Plan, and the Quantum Corporation Supplemental Stock Option Plan.

# SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company's authorized share capital is $13,500 and consists of 1,250,000,000 ordinary shares, par value $0.00001, of which 424,611,591 shares were outstanding as of July 1, 2011, and 100,000,000 preferred shares, par value $0.00001, of which none were issued or outstanding as of July 1, 2011.

*Ordinary shares* —Holders of ordinary shares are entitled to receive dividends when and as declared by the Company's board of directors (the "Board of Directors"). Upon any liquidation, dissolution, or winding up of the Company, after required payments are made to holders of preferred shares, any remaining assets of the Company will be distributed ratably to holders of the preferred and ordinary shares. Holders of shares are entitled to one vote per share on all matters upon which the ordinary shares are entitled to vote, including the election of directors.

*Preferred shares* —The Company may issue preferred shares in one or more series, up to the authorized amount, without shareholder approval. The Board of Directors is authorized to establish from time to time the number of shares to be included in each series, and to fix the rights, preferences and privileges of the shares of each wholly unissued series and any of its qualifications, limitations or restrictions. The Board of Directors can also increase or decrease the number of shares of a series, but not below the number of shares of that series then outstanding, without any further vote or action by the shareholders.

The Board of Directors may authorize the issuance of preferred shares with voting or conversion rights that could harm the voting power or other rights of the holders of the ordinary shares. The issuance of preferred shares, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in control of the Company and might harm the market price of its ordinary shares and the voting and other rights of the holders of ordinary shares. As of July 1, 2011, there were no preferred shares outstanding.

### Dividends

In fiscal year 2011, the Company reinstated its dividend policy and declared a cash dividend aggregating $77 million, or $0.18 per share, payable on June 1, 2011 to our shareholders of record as of May 2, 2011. As of July 1, 2011, $74 million of the related cash dividend was paid to the shareholders and $3 million was withheld for taxes. The Company did not declare or pay any dividends in fiscal year 2010.

### Repurchases of Equity Securities

On February 1, 2010, the Company announced that its Board of Directors authorized an Anti-Dilution Share Repurchase Program. The repurchase program authorizes the Company to repurchase its ordinary shares to offset increases in diluted shares, such as those caused by employee stock plans and convertible debt, used in the determination of diluted net income per share. The timing and number of shares to be repurchased by the Company will be dependent on general business and market conditions, cash flows generated by future operations, the price of its ordinary shares, cash requirements for other investing and financing activities, and maintaining compliance with its debt covenants. Repurchases may be made through open market or in privately negotiated transactions, pursuant to Rule 10b5-1 trading plans or other available means, such as by way of an accelerated share repurchase program, through block trades or through the purchase of call options or the sale of put options. Additionally, there is no minimum or maximum number of shares to be repurchased under the program and the authority for the Anti-Dilution Share Repurchase Program will continue until terminated by the Company's Board of Directors.

On November 29, 2010, the Company's Board of Directors authorized repurchases of up to an additional $2 billion of the Company's outstanding ordinary shares.

101

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables set forth information with respect to repurchases of the Company's shares made during fiscal year 2011:

**January 2010 Anti-Dilution Share Repurchase Program**

| (In millions) | Number of Shares Repurchased | | Dollar Value of Shares Repurchased |
|---|---|---|---|
| Cumulative repurchased from February 1, 2010 through July 2, 2010 | 32.4 | $ | 584 |
| Repurchased in fiscal year 2011 | 20.7 | | 305 |
| Cumulative repurchased through July 1, 2011 | 53.1 | $ | 889 |

**November 2010 Share Repurchase Program**

| (In millions) | Number of Shares Repurchased | | Dollar Value of Shares Repurchased |
|---|---|---|---|
| Repurchased in fiscal year 2011 | 36.2 | $ | 517 |
| Cumulative repurchased through July 1, 2011 | 36.2 | $ | 517 |

## 10. Compensation

### *Stock-Based Compensation Plans*

The Company's stock-based compensation plans have been established to promote the Company's long-term growth and financial success by providing incentives to its employees, directors, and consultants through grants of share-based awards. The provisions of the Company's stock-based benefit plans, which allow for the grant of various types of equity-based awards, are also intended to provide greater flexibility to maintain the Company's competitive ability to attract, retain and motivate participants for the benefit of the Company and its shareholders.

*Seagate Technology plc 2001 Share Option Plan (the "SOP").*     A maximum of 100 million ordinary shares are issuable under the SOP. Options granted to employees generally vest as follows: 25% of the options on the first anniversary of the vesting commencement date and the remaining 75% proportionately each month over the next 36 months. Options granted under the SOP were granted at fair market value, with options granted up through September 5, 2004 expiring ten years from the date of grant and options granted subsequent to September 5, 2004 expiring seven years from the date of grant. The SOP expired on February 1, 2011, and no shares have been granted from the SOP subsequent to that date.

*Seagate Technology plc 2004 Share Compensation Plan (the "SCP").*     A maximum of 63.5 million ordinary shares are issuable under the SCP, including 10 million authorized for issuance of share awards and restricted units. Share awards and restricted units granted to employees generally vest 25% annually. Options granted to employees generally vest as follows: 25% of the options on the first anniversary of the vesting commencement date and the remaining 75% proportionately each month over the next 36 months. Options granted under the SCP were granted at fair market value. As of July 1, 2011, there were approximately 15.8 million ordinary shares available for issuance under the SCP.

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On September 13, 2010, the Company granted performance-based restricted units to its senior executive officers under the SCP. A single restricted unit represents the right to receive a single ordinary share of the Company. The performance-based restricted units vest after the end of the performance period of three years from the grant date. Vesting is subject to both the continued employment of the participant by the Company and the achievement of certain performance goals established by the Compensation Committee of the Company's Board of Directors. The performance goals are a three-year average return on invested capital (ROIC) goal and a relative total shareholder return (TSR) goal, which is based on the Company's ordinary shares measured against a benchmark TSR of a peer group over the same three-year period. A percentage of the performance-based restricted units may vest only if at least the minimum ROIC goal is met regardless of whether the TSR goal is met. The number of stock units to vest will range from 0% to 200% of the targeted 0.3 million units. In evaluating the fair value of the performance-based restricted stock unit, the Company used a Monte Carlo simulation on the grant date, taking the TSR goal into consideration, and determined the fair value to be $12.13 per unit. Compensation expense related to the performance-based restricted units is only recorded in a period if it is probable that the ROIC goal will be met, and it is to be recorded at the expected level of achievement. Compensation expense related to these restricted units for fiscal year 2011 was not material.

*Seagate Technology plc Stock Purchase Plan (the "ESPP").*    There are 40 million ordinary shares authorized to be issued under the ESPP. In no event shall the total number of shares issued under the ESPP exceed 75 million ordinary shares. The ESPP consists of a six-month offering period with a maximum issuance of 1.5 million ordinary shares per offering period. The ESPP permits eligible employees to purchase ordinary shares through payroll deductions generally at 85% of the fair market value of the ordinary shares. As of July 1, 2011 there were approximately 7.0 million ordinary shares available for issuance under the ESPP.

*i365, Inc. 2010 Equity Incentive Plan (the "i365 Plan").*    In October 2010, i365, Inc. ("i365"), a wholly owned subsidiary of the Company, adopted the i365, Inc. 2010 Equity Incentive Plan (the "i365 Plan"). A maximum of 5 million shares of i365's common stock are issuable under the i365 Plan. Options granted to employees generally vest as follows: 25% of the options on the first anniversary of the vesting commencement date and the remaining 75% proportionately each month over the next 36 months. Options expire ten years from the date of grant. During fiscal year 2011, the Company issued options for the purchase of approximately 4 million i365 common shares with an exercise price of $1.59. As of July 1, 2011, there were approximately 1 million shares of common stock available for issuance under the i365 Plan. The compensation expense associated with options granted to date under the i365 Plan is not material.

*Determining Fair Value of Seagate Technology Stock Plans*

*Valuation and amortization method* —The Company estimates the fair value of stock options granted using the Black-Scholes-Merton valuation model and a single option award approach. This fair value is then amortized on a straight-line basis over the requisite service periods of the awards, which is generally the vesting period or the remaining service (vesting) period.

*Expected Term* —Expected term represents the period that the Company's stock-based awards are expected to be outstanding and was determined based on historical experience of similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules and expectations of future employee behavior as influenced by changes to the terms of its stock-based awards.

103

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Expected Volatility* —The Company uses a combination of the implied volatility of its traded options and historical volatility of its share price.

*Expected Dividend* —The Black-Scholes-Merton valuation model calls for a single expected dividend yield as an input. The dividend yield is determined by dividing the expected per share dividend during the coming year by the grant date share price. The expected dividend assumption is based on the Company's current expectations about its anticipated dividend policy. Also, because the expected dividend yield should reflect marketplace participants' expectations, the Company does not incorporate changes in dividends anticipated by management unless those changes have been communicated to or otherwise are anticipated by marketplace participants.

*Risk-Free Interest Rate* —The Company bases the risk-free interest rate used in the Black-Scholes-Merton valuation model on the implied yield currently available on U.S. Treasury zero-coupon issues with an equivalent remaining term. Where the expected term of the Company's stock-based awards do not correspond with the terms for which interest rates are quoted, the Company performed a straight-line interpolation to determine the rate from the available term maturities.

*Fair Value* —The fair value of the Company's nonvested shares and performance shares for fiscal years 2011, 2010, and 2009 is the price of the Company's shares on the grant date.

|  | Fiscal Years | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
| Nonvested shares |  |  |  |
| Weighted-average fair value | $ 11.61 | $ 15.47 | $ 13.09 |
| Performance shares |  |  |  |
| Weighted-average fair value | $ 13.63 | n/a | $ 12.38 |
| Performance units |  |  |  |
| Weighted-average fair value | $ 12.13 | n/a | n/a |

The fair value of the Company's shares related to options granted to employees and shares issued from the ESPP for fiscal years 2011, 2010 and 2009 were estimated using the following weighted-average assumptions:

|  | Fiscal Years | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
| Options |  |  |  |
| Expected term (in years) | 4.2 | 4.2 | 4.0 – 4.5 |
| Volatility | 49 – 57% | 51 – 57% | 36 – 50% |
| Expected dividend rate | 0 – 4.3% | 0% | 0 – 12.2% |
| Risk-free interest rate | 0.9 – 1.8% | 1.7 – 2.1% | 1.6 – 3.0% |
| Weighted-average fair value | $5.32 | $6.45 | $1.47 |
| ESPP |  |  |  |
| Expected term (in years) | 0.5 | 0.5 | 0.5 |
| Volatility | 44 – 47% | 49 – 60% | 39 – 84% |
| Expected dividend rate | 0% | 0% | 3.0 – 3.2% |
| Risk-free interest rate | 0.1 – 0.2% | 0.2 – 0.3% | 0.4 – 2.0% |
| Weighted-average fair value | $3.42 | $4.19 | $2.48 |

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Stock Compensation Expense*

The Company recorded $51 million, $57 million and $83 million of stock-based compensation during fiscal years 2011, 2010 and 2009, respectively. Management has made an estimate of expected forfeitures and is recognizing compensation costs only for those equity awards expected to vest. When estimating forfeitures, the Company considers voluntary termination behavior as well as analysis of actual forfeited awards.

*Cash Flows from Excess Tax Benefits*

The cash flows resulting from excess tax benefits (tax benefits related to the excess of proceeds from employee's exercises of stock options over the stock-based compensation cost recognized for those options) are classified as financing cash flows. The Company did not recognize any cash flows from excess tax benefits during fiscal years 2011, 2010 and 2009.

*Stock Option Activity*

The Company issues new ordinary shares upon exercise of stock options. The following is a summary of option activities:

| Options | Number of Shares (In millions) | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (In years) | | Aggregate Intrinsic Value (Dollars In millions) |
|---|---|---|---|---|---|---|
| Outstanding at July 2, 2010 | 54.6 | $ | 12.73 | 3.9 | $ | 232 |
| Granted | 3.1 | | 12.14 | | | |
| Exercised | (7.9) | | 6.45 | | | |
| Forfeitures | (1.3) | | 9.59 | | | |
| Expirations | (2.1) | | 21.74 | | | |
| Outstanding at July 1, 2011 | 46.4 | $ | 13.44 | 3.3 | $ | 259 |
| Vested and expected to vest at July 1, 2011 | 45.2 | $ | 13.59 | 3.1 | $ | 247 |
| Exercisable at July 1, 2011 | 32.8 | $ | 16.14 | 2.6 | $ | 126 |

The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the quoted price of the Company's ordinary shares for the options that were in-the-money at July 1, 2011. During fiscal years 2011, 2010 and 2009, the aggregate intrinsic value of options exercised under the Company's stock option plans was $76 million, $41 million and $12 million, respectively, determined as of the date of option exercise. The aggregate fair value of options vested during fiscal year 2011 was approximately $44 million.

At July 1, 2011, the total compensation cost related to options granted to employees but not yet recognized was approximately $28 million, net of estimated forfeitures of approximately $1 million. This cost is being amortized on a straight-line basis over a weighted-average remaining term of approximately 2.4 years and will be adjusted for subsequent changes in estimated forfeitures.

105

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Nonvested Share Activity*

The following is a summary of nonvested share activities:

| Nonvested Shares<br>(In millions) | Number of<br>Shares | | Weighted-<br>Average<br>Grant-<br>Date<br>Fair Value |
|---|---|---|---|
| Nonvested at July 2, 2010 | 0.9 | $ | 13.77 |
| Granted | 2.0 | $ | 11.61 |
| Forfeitures | (0.1) | $ | 12.51 |
| Vested | (0.3) | $ | 14.04 |
| Nonvested at July 1, 2011 | 2.5 | $ | 12.05 |

At July 1, 2011, the total compensation cost related to nonvested shares granted to employees but not yet recognized was approximately $21 million, net of estimated forfeitures of approximately $1 million. This cost is being amortized on a straight-line basis over a weighted-average remaining term of 2.7 years and will be adjusted for subsequent changes in estimated forfeitures. The aggregate fair value of nonvested shares vested during fiscal year 2011 was approximately $3 million.

*Performance Share Activity*

The following is a summary of performance share activities:

| Performance Shares<br>(In millions) | Number of<br>Shares | | Weighted-<br>Average<br>Grant-<br>Date<br>Fair Value |
|---|---|---|---|
| Performance shares at July 2, 2010 | 0.3 | $ | 12.34 |
| Granted | 0.2 | $ | 13.63 |
| Forfeitures | — | $ | — |
| Vested | (0.2) | $ | 12.34 |
| Performance shares at July 1, 2011 | 0.3 | $ | 11.97 |

At July 1, 2011, the total compensation cost related to performance shares granted to employees but not yet recognized was approximately $3 million. This cost is being amortized on a straight-line basis over a weighted-average remaining term of 3 years. As of July 1, 2011, none of the performance shares issued have vested.

106

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Performance Unit Activity*

The following is a summary of performance unit activities:

| Performance Units<br>(In millions) | Number of<br>Shares | | Weighted-<br>Average<br>Grant-<br>Date<br>Fair Value |
|---|---|---|---|
| Performance units at July 2, 2010 | — | $ | — |
| Granted | 0.3 | $ | 12.13 |
| Forfeitures | — | $ | — |
| Performance units at July 1, 2011 | 0.3 | $ | 12.13 |

At July 1, 2011, the total compensation cost related to performance units granted to employees but not yet recognized was approximately $2 million. This cost is being amortized on a straight-line basis over a weighted-average remaining term of 2.2 years.

*ESPP*

During fiscal years 2011 and 2010, the aggregate intrinsic value of shares purchased under the Company's ESPP was approximately $7 million and $31 million, respectively. At July 1, 2011, the total compensation cost related to options to purchase the Company's ordinary shares under the ESPP but not yet recognized was approximately $1 million. This cost will be amortized on a straight-line basis over a weighted-average period of approximately one month.

The following table shows the shares issued, and their respective weighted-average purchase price, pursuant to the ESPP during fiscal year 2011.

| | July 30, 2010 | January 31, 2011 |
|---|---|---|
| Shares issued (in millions) | 1.5 | 1.5 |
| Weighted-average purchase price per share | $    10.67 | $    10.99 |

*Tax-Deferred Savings Plan*

The Company has a tax-deferred savings plan, the Seagate 401(k) Plan (the "40l(k) plan"), for the benefit of qualified employees. The 40l(k) plan is designed to provide employees with an accumulation of funds at retirement. Qualified employees may elect to make contributions to the 401(k) plan on a monthly basis. Pursuant to the 401(k) plan, the Company matches 50% of employee contributions, up to 6% of compensation, subject to maximum annual contributions of $3,500 per participating employee. During fiscal years 2011, 2010 and 2009, the Company made matching contributions of $13 million, $12 million and $13 million, respectively.

*Deferred Compensation Plan*

On January 1, 2001, the Company adopted the SDCP for the benefit of eligible employees. This plan is designed to permit certain discretionary employer contributions, in excess of the tax limits applicable to the 401(k) plan and to permit employee deferrals in excess of certain tax limits. The Company's assets designated to pay benefits under the plan are held by a rabbi trust. The assets and liabilities of a rabbi trust are accounted for as assets and liabilities of the Company. At July 1, 2011 and July 2, 2010, the assets held

107

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

in the rabbi trust were approximately $84 million and $76 million, respectively, and are included in Restricted cash and investments in the Consolidated Balance Sheets. The deferred compensation obligation related to the rabbi trust included in Accrued expenses on the accompanying Consolidated Balance Sheets was approximately $93 million and $82 million as of July 1, 2011 and July 2, 2010, respectively.

Effective January 3, 2011, the Company cancelled its TRS, which had been used to manage the equity market risks associated with SDCP. Currently, the Company manages its exposure to equity market risks associated with the deferred compensation liabilities by investing directly in mutual funds that mirror the employees' investment options. The Company classified investments held to satisfy the deferred compensation liabilities as trading securities.

## 11. Earnings Per Share

The following table sets forth the computation of basic and diluted net income (loss) per share:

| | Fiscal Years Ended | | |
|---|---|---|---|
| (In millions, except per share data) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| **Numerator:** | | | |
| Net income (loss) | $ 511 | $ 1,609 | $ (3,125) |
| Adjustment for interest expense on 6.8% Convertible Senior Notes due April 2010 | — | 5 | — |
| Net income (loss), as adjusted | $ 511 | $ 1,614 | $ (3,125) |
| **Number of shares used in per share calculations:** | | | |
| Weighted-average shares outstanding | 451 | 492 | 490 |
| Weighted-average nonvested shares | — | (1) | (2) |
| Total shares for purpose of calculating basic net income (loss) per share | 451 | 491 | 488 |
| Weighted-average effect of dilutive securities: | | | |
| Employee equity award plans | 16 | 20 | — |
| 2.375% Convertible Senior Notes due August 2012 | — | 1 | — |
| 6.8% Convertible Senior Notes due April 2010 | — | 2 | — |
| Dilutive potential shares: | 16 | 23 | — |
| Total shares for purpose of calculating diluted net income (loss) per share | 467 | 514 | 488 |
| **Net income (loss) per share:** | | | |
| Basic net income (loss) per share | $ 1.13 | $ 3.28 | $ (6.40) |
| Diluted net income (loss) per share | $ 1.09 | $ 3.14 | $ (6.40) |

108

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following potential shares were excluded from the computation of diluted net income (loss) per share as their effect would have been anti-dilutive:

| | Fiscal Years Ended | | |
|---|---|---|---|
| (In millions) | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| Employee equity award plans | 15 | 20 | 57 |
| 6.8% Convertible Senior Notes due April 2010 | — | — | 4 |

## 12. Business Segment and Geographic Information

The Company has concluded that its manufacture and distribution of disk drives constitutes one reporting segment. The Company's manufacturing operations are based on technology platforms that are used to produce various disk drive products that serve multiple disk drive applications and markets. The Company's main technology platforms are primarily focused around areal density of media and read/write head technologies. In addition, the Company also invests in certain other technology platforms including motors, servo formatting read/write channels, solid state technologies and sealed drive technologies. The Company has determined that its Chief Executive Officer is the Company's chief operating decision maker (CODM) as he is responsible for reviewing and approving investments in the Company's technology platforms and manufacturing infrastructure.

In the fiscal year 2011, Hewlett-Packard Company accounted for approximately 15% of consolidated revenue, while Dell Inc. accounted for approximately 13% of consolidated revenue. In each of fiscal years 2010 and 2009, Hewlett-Packard Company accounted for approximately 16% of consolidated revenue, while Dell Inc. accounted for approximately 11% of consolidated revenue.

Other long-lived assets consist of property, equipment and leasehold improvements, capital leases, equity investments and other non-current assets as recorded by the Company's operations in each area.

109

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes the Company's operations by geographic area:

| | Fiscal Years Ended | | |
| | July 1, 2011 | July 2, 2010 | July 3, 2009 |
| --- | --- | --- | --- |
| | | (In millions) | |
| Revenue from external customers [1]: | | | |
| Singapore | $ 5,507 | $ 5,546 | $ 4,186 |
| United States | 3,043 | 3,081 | 2,695 |
| The Netherlands | 2,344 | 2,728 | 2,849 |
| Other | 77 | 40 | 75 |
| Consolidated | $ 10,971 | $ 11,395 | $ 9,805 |
| Long-lived assets: | | | |
| Singapore | $ 748 | $ 888 | $ 842 |
| Thailand | 380 | 287 | 223 |
| United States | 355 | 369 | 547 |
| China | 277 | 246 | 178 |
| Malaysia | 173 | 208 | 238 |
| Other | 462 | 398 | 320 |
| Consolidated | $ 2,395 | $ 2,396 | $ 2,348 |

(1)   Revenue is attributed to countries based on the shipping location.

## 13. Legal, Environmental and Other Contingencies

The Company assesses the probability of an unfavorable outcome of all its material litigation, claims, or assessments to determine whether a liability had been incurred and whether it is probable that one or more future events will occur confirming the fact of the loss. There is significant judgment required in both the probability determination and as to whether an exposure can be reasonably estimated. In the event that an unfavorable outcome is determined to be probable and the amount of the loss can be reasonably estimated, the Company establishes an accrual for the litigation, claim or assessment. In addition, in the event an unfavorable outcome is determined to be less than probable, but reasonably possible, the Company will disclose an estimate of the possible loss or range of such loss; however, when a reasonable estimate of the possible loss or range of such loss cannot be made, the Company will provide disclosure to that effect. Litigation is inherently uncertain and may result in adverse rulings or decisions. Additionally, the Company may enter into settlements or be subject to judgments that may, individually or in the aggregate, have a material adverse effect on its results of operations. Accordingly, actual results could differ materially.

*Intellectual Property Litigation*

*Convolve, Inc. ("Convolve") and Massachusetts Institute of Technology ("MIT") v. Seagate Technology LLC, et al.* —On July 13, 2000, Convolve and MIT filed suit against Compaq Computer Corporation and the Company in the U.S. District Court for the Southern District of New York, alleging infringement of U.S. Patent Nos. 4,916,635, "Shaping Command Inputs to Minimize Unwanted Dynamics" (the '635 patent) and U.S. Patent No. 5,638,267, "Method and Apparatus for Minimizing Unwanted Dynamics in a Physical System" (the '267 patent), misappropriation of trade secrets, breach of contract, tortious interference with contract and fraud relating to Convolve and MIT's Input Shaping® and

110

## SEAGATE TECHNOLOGY PLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Convolve's Quick and Quiet™ technology. The plaintiffs claimed their technology is incorporated in Seagate's sound barrier technology, which was publicly announced on June 6, 2000. The complaint seeks injunctive relief, $800 million in compensatory damages and unspecified punitive damages, including for willful infringement and willful and malicious misappropriation. If willful infringement is found by the jury, the court may assess, in addition to compensatory damages for the infringement, punitive damages in an amount up to three times the amount of such compensatory damages. If willful and malicious misappropriation is found by the jury, the court may assess, in addition to compensatory damages for the misappropriation, punitive damages in an amount up to two times the amount of such compensatory damages.

On November 6, 2001, the U.S. Patent and Trademark Office (USPTO) issued to Convolve US Patent No. 6,314,473, "System for Removing Selected Unwanted Frequencies in Accordance with Altered Settings in a User Interface of a Data Storage Device," (the '473 patent"). Convolve filed an amended complaint on January 16, 2002, alleging defendants infringe this patent. The '635 patent expired on September 12, 2008. The court ruled in 2010 that the '267 patent was out of the case. No trial date has been set in the litigation. The Company believes the claims are without merit, and intends to defend against them vigorously. In view of the uncertainty regarding the amount of damages, if any, that could be awarded Convolve in this matter, the Company does not believe that it is currently possible to determine a reasonable estimate of the possible range of loss related to this matter.

*Siemens, AG v. Seagate Technology (Ireland)* —On December 2, 2008, Siemens served Seagate Technology (Ireland), an indirect wholly-owned subsidiary of Seagate Technology, with a writ of summons alleging infringement of European Patent (UK) No. 0 674 769 (the EU '769 patent), which is the European counterpart to US Patent No. 5,686,838 upon which Siemens had sued Seagate Technology in the United States. The suit was filed in the High Court of Justice in Northern Ireland, Chancery Division. Siemens alleges that giant magnetoresistive (GMR), tunnel magnetoresistive (TMR), and tunnel giant magnetoresistive (TGMR) products designed and manufactured by Seagate Technology (Ireland) infringe the EU '769 patent. Trial on liability issues was completed in June 2010. The court issued its decision on July 4, 2011. The court rejected Siemens' claims of patent infringement and made a provisional ruling that the patent was invalid over the prior art. In view of the court's ruling, the Company does not expect this matter will result in a loss.

*Qimonda AG v. LSI Corporation, et al.* —On December 19, 2008, the US International Trade Commission (ITC) instituted an investigation under section 337 of the Tariff Act of 1930, as amended, at the request of complainant Qimonda AG, naming LSI Corporation and six Seagate Technology entities as respondents. The complaint alleges that LSI Corporation and Seagate import products into the US that infringe seven Qimonda patents relating to the design and manufacture of semiconductor integrated chips. The ITC trial was held in June 2009. On October 14, 2009, the Administrative Law Judge issued an Initial Determination finding the Qimonda patents either invalid, not infringed, or both. Qimonda appealed to the ITC Commission, which ruled on January 29, 2010, that the patents were either invalid, not infringed, or both. On March 31, 2010, Qimonda noticed an appeal of the Commissions' ruling to the Court of Appeals for the Federal Circuit. On January 17, 2011, the Federal Circuit affirmed the Commission's ruling in full; accordingly, the Company does not expect this matter will result in a loss.

*Collins, et al. v. Seagate Technology, et al.* —On July 15, 2009, Carl Collins and Farzin Davanloo filed a complaint against Seagate Technology, Seagate Technology LLC, and 19 other hard drive, computer, and retail companies. The complaint alleges that unspecified hard disk drives and components thereof infringe US patent Nos. 5,411,797 (the '797 patent) and 5,478,650 (the '650 patent), both entitled "Nanophase Diamond Films." The case is pending in the US District Court for the Eastern District of Texas, Marshall

111

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Division. The complaint seeks unspecified damages and an injunction. The Company filed an answer to the complaint on September 8, 2009, denying all material allegations and asserting affirmative defenses. On October 4, 2010, the case against the Seagate entities was dismissed with prejudice pursuant to a confidential settlement agreement; accordingly, the Company does not expect this matter will result in a loss.

*Alexander Shukh v. Seagate Technology* —Former Seagate engineer Alexander Shukh filed a complaint and an amended complaint against Seagate in Minnesota federal court, alleging, among other things, employment discrimination based on his Belarusian national origin and wrongful failure to name him as an inventor on several patents and patent applications. Mr. Shukh's employment was terminated as part of a company-wide reduction in force in fiscal year 2009. He seeks damages in excess of $75 million. The Company believes the claims are without merit and intends to vigorously defend this case. Trial is scheduled to begin April 1, 2013. In view of the uncertainty regarding the amount of damages, if any, that could be awarded in this matter, the Company does not believe that it is currently possible to determine a reasonable estimate of the possible range of loss related to this matter.

*Siemens GmbH v. Seagate Technology (Germany)* —On March 26, 2010, Siemens commenced proceedings against Seagate Technology GmbH, the Netherlands branch office of Seagate Technology International, and Seagate Technology LLC in the Dusseldorf District Court in Germany. The complaint alleges infringement of European Patent Number 0 674 769 (the "EU '769 Patent"), which corresponds to the patent in suit in the U.S. and Northern Ireland Siemens' litigations. Siemens seeks a declaration that the EU '769 Patent is infringed by GMR and TMR products, removal of all infringing inventory, damages in an unstated amount, and costs. The Company intends to vigorously oppose this action. The trial on liability issues has not been held. That trial is scheduled to begin September 20, 2011. If, following that trial, the court finds liability for patent infringement, a separate trial on damages issues would be held. No such trial has been scheduled at this time. Siemens has not stated the amount of damages it would seek in such a trial. In view of the uncertainty regarding the amount of damages, if any, that could be established at the separate trial and in light of Siemens not having stated an amount of damages it may seek in this matter, the Company does not believe that it is currently possible to determine a reasonable estimate of the possible loss or possible range of losses related to this matter.

*Rembrandt Data Storage, LP v. Seagate Technology LLC* —On November 10, 2010, Rembrandt Data Storage, LP filed suit against Seagate Technology LLC in the U.S. District Court for the Western District of Wisconsin alleging infringement of U.S. Patent No. 5,995,342 C1, "Thin Film Heads Having Solenoid Coils," and U.S. Patent No. 6,195,232, "Low-Noise Toroidal Thin Film Head With Solenoidal Coil." The complaint seeks unspecified compensatory damages, enhanced damages, injunctive relief, and attorneys' fees and costs. The company intends to vigorously defend this case. Trial is scheduled to begin June 4, 2012. Rembrandt has not stated the amount of damages it would seek at trial. In view of the uncertainty regarding the amount of damages, if any, that could be established at trial and in light of Rembrandt not having stated an amount of damages it may seek in this matter, the Company does not believe that it is currently possible to determine a reasonable estimate of the possible loss or possible range of loss related to this matter.

*Rambus, Inc. ITC Investigation re Certain Semiconductor Chips and Products Containing the Same* —On December 1, 2010, Rambus, Inc. filed a complaint with the International Trade Commission seeking an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended. The complaint names Seagate Technology LLC and numerous other defendants, including LSI, Inc. and ST Microelectronics, Inc., alleging that Seagate products incorporate semiconductor products made by LSI and STMicroelectronics that infringe various patents owned by Rambus. The ITC initiated an investigation on December 29, 2010.

112

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Rambus seeks an order to exclude entry of infringing products into the U.S. and a cease and desist order. Seagate is responding to the investigation. The hearing before the Administrative Law Judge is scheduled to begin October 12, 2011. In light of the current status of this matter and the nature of the relief sought, to the Company does not believe that it is currently possible to determine a reasonable estimate of the possible loss or range of loss, or other possible adverse result, if any, that may be incurred with respect to this matter.

*Environmental Matters*

The Company's operations are subject to U.S. and foreign laws and regulations relating to the protection of the environment, including those governing discharges of pollutants into the air and water, the management and disposal of hazardous substances and wastes and the cleanup of contaminated sites. Some of the Company's operations require environmental permits and controls to prevent and reduce air and water pollution, and these permits are subject to modification, renewal and revocation by issuing authorities.

The Company has established environmental management systems and continually updates its environmental policies and standard operating procedures for its operations worldwide. The Company believes that its operations are in material compliance with applicable environmental laws, regulations and permits. The Company budgets for operating and capital costs on an ongoing basis to comply with environmental laws. If additional or more stringent requirements are imposed on the Company in the future, it could incur additional operating costs and capital expenditures.

Some environmental laws, such as the Comprehensive Environmental Response Compensation and Liability Act of 1980 (as amended, the "Superfund" law) and its state equivalents, can impose liability for the cost of cleanup of contaminated sites upon any of the current or former site owners or operators or upon parties who sent waste to these sites, regardless of whether the owner or operator owned the site at the time of the release of hazardous substances or the lawfulness of the original disposal activity. The Company has been identified as a potentially responsible party at several sites. At each of these sites, the Company has an assigned portion of the financial liability based on the type and amount of hazardous substances disposed of by each party at the site and the number of financially viable parties. The Company has fulfilled its responsibilities at some of these sites and remains involved in only a few at this time.

While the Company's ultimate costs in connection with these sites is difficult to predict with complete accuracy, based on its current estimates of cleanup costs and its expected allocation of these costs, the Company does not expect costs in connection with these sites to be material.

The Company may be subject to various state, federal and international laws and regulations governing the environment, including those restricting the presence of certain substances in electronic products. For example, the European Union ("EU") enacted the Restriction of the Use of Certain Hazardous Substances in Electrical and Electronic Equipment, which prohibits the use of certain substances, including lead, in certain products, including disk drives, put on the market after July 1, 2006. Similar legislation has been or may be enacted in other jurisdictions, including in the United States, Canada, Mexico, Taiwan, China, Japan and others. The European Union REACH Directive (Registration, Evaluation, Authorization, and Restriction of Chemicals, EC 1907/2006) also restricts substances of very high concern (SVHCs) in products. If the Company or its suppliers fails to comply with the substance restrictions, recycle requirements or other environmental requirements as they are enacted worldwide, it could have a materially adverse effect on the Company's business.

113

## SEAGATE TECHNOLOGY PLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Matters*

The Company is involved in a number of other judicial and administrative proceedings incidental to its business, and the Company may be involved in various legal proceedings arising in the normal course of its business in the future. Although occasional adverse decisions or settlements may occur, the Company believes that the final disposition of such matters will not have a material adverse effect on its financial position or results of operations.

## 14. Commitments

*Leases.*    The Company leases certain property, facilities and equipment under non-cancelable lease agreements. Land and facility leases expire at various dates through 2067 and contain various provisions for rental adjustments including, in certain cases, a provision based on increases in the Consumer Price Index. Also, certain leases provide for renewal of the lease at the Company's option at expiration of the lease. All of the leases require the Company to pay property taxes, insurance and normal maintenance costs.

Future minimum lease payments for operating leases (including accrued lease payments relating to restructuring plans) with initial or remaining terms of one year or more were as follows at July 1, 2011 (lease payments are shown net of sublease income):

| Fiscal Years Ending | Operating Leases |
| --- | --- |
| | (Dollars in millions) |
| 2012 | $      42 |
| 2013 | 30 |
| 2014 | 21 |
| 2015 | 13 |
| 2016 | 10 |
| Thereafter | 77 |
| | $     193 |

Total rent expense for all land, facility and equipment operating leases, net of sublease income, was approximately $24 million, $25 million and $23 million for fiscal years 2011, 2010 and 2009, respectively. Total sublease rental income for fiscal years 2011, 2010 and 2009 was $12 million, $10 million and $10 million, respectively. The Company subleases a portion of its facilities that it considers to be in excess of current requirements. As of July 1, 2011, total future lease income to be recognized for the Company's existing subleases is approximately $12 million.

During the fiscal year 2011, the Company entered into a sale-leaseback transaction for its AMK facility in Singapore. The transaction was completed in the fourth fiscal quarter and net proceeds were $73 million. Upon execution of the sale, the Company recognized a $15 million gain and an additional $26 million of deferred gain. The deferred gain is being recognized ratably over the minimum lease term of three years, as an offset to the related rental expense. The Company considers this lease as a normal leaseback and classified the lease as an operating lease. As of July 1, 2011, the total future minimum lease payments for the leaseback were $25 million, which are included in the total future minimum lease payments for operating leases shown above.

The Company recorded amounts for both adverse and favorable leasehold interests and for exit costs that apply directly to the lease commitments assumed through the 2006 acquisition of Maxtor. As of July 1, 2011, the Company had a $17 million adverse leasehold interest related to leases acquired from Maxtor.

114

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The adverse leasehold interest is being amortized to Cost of revenue and Operating expenses over the remaining duration of the leases. In addition, the Company had $16 million and $24 million remaining in accrued exit costs related to the planned exit of Maxtor leased excess facilities at July 1, 2011 and July 2, 2010, respectively.

*Capital Expenditures.*    The Company's non-cancelable commitments for construction of manufacturing facilities and purchases of equipment approximated $166 million at July 1, 2011.

## 15. Guarantees

*Indemnifications to Officers and Directors*

On May 4, 2009, the Company entered into a new form of indemnification agreement (the "Revised Indemnification Agreement") with its officers and directors of the Company and its subsidiaries (each, an "Indemnitee"). The Revised Indemnification Agreement provides indemnification in addition to any of Indemnitee's indemnification rights under the Company's Articles of Association, applicable law or otherwise, and indemnifies an Indemnitee for certain expenses (including attorneys' fees), judgments, fines and settlement amounts actually and reasonably incurred by him or her in any action or proceeding, including any action by or in the right of the Company or any of its subsidiaries, arising out of his or her service as a director, officer, employee or agent of the Company or any of its subsidiaries or of any other entity to which he or she provides services at the Company's request. However, an Indemnitee shall not be indemnified under the Revised Indemnification Agreement for (i) any fraud or dishonesty in the performance of Indemnitee's duty to the Company or the applicable subsidiary of the Company or (ii) Indemnitee's conscious, intentional or willful failure to act honestly, lawfully and in good faith with a view to the best interests of the Company or the applicable subsidiary of the Company. In addition, the Revised Indemnification Agreement provides that the Company will advance expenses incurred by an Indemnitee in connection with enforcement of the Revised Indemnification Agreement or with the investigation, settlement or appeal of any action or proceeding against him or her as to which he or she could be indemnified. The nature of the indemnification obligations prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay on behalf of its officers and directors. Historically, the Company has not made any significant indemnification payments under such agreements and no amount has been accrued in the accompanying consolidated financial statements with respect to these indemnification obligations.

*Intellectual Property Indemnification Obligations*

The Company has entered into agreements with customers and suppliers that include limited intellectual property indemnification obligations that are customary in the industry. These guarantees generally require the Company to compensate the other party for certain damages and costs incurred as a result of third party intellectual property claims arising from these transactions. The nature of the intellectual property indemnification obligations prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay to its customers and suppliers. Historically, the Company has not made any significant indemnification payments under such agreements and no amount has been accrued in the accompanying consolidated financial statements with respect to these indemnification obligations.

*Product Warranty*

The Company estimates probable product warranty costs at the time revenue is recognized. The Company generally warrants its products for a period of one to five years. The Company uses estimated

115

**SEAGATE TECHNOLOGY PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

repair or replacement costs and uses statistical modeling to estimate product return rates in order to determine its warranty obligation. In addition, estimated settlements for customer compensatory claims relating to product quality issues, if any, are accrued as warranty expense. Changes in the Company's product warranty liability during the fiscal years ended July 1, 2011 and July 2, 2010 were as follows:

| | Fiscal Years Ended | |
| --- | --- | --- |
| (In millions) | July 1, 2011 | July 2, 2010 |
| Balance, beginning of period | $ 372 | $ 437 |
| Warranties issued | 199 | 200 |
| Repairs and replacements | (221) | (214) |
| Changes in liability for pre-existing warranties, including expirations | (2) | (51) |
| Balance, end of period | $ 348 | $ 372 |

## 16. Related Party Transactions

During fiscal year 2011, members of the Company's board of directors also served on the boards of the following companies with which the Company had transactions:

*Symantec Corporation ("Symantec")* The Company made payments of $30 million for the purchase of its new Cupertino, California facility to Symantec in fiscal year 2011.

*United Parcel Service, Inc. ("UPS")* The Company made payments for freight and logistics services to UPS of $150 million, $120 million and $167 million in fiscal years 2011, 2010 and 2009, respectively. At July 1, 2011 and July 2, 2010, the Company had accounts payable to UPS of $14 million and $21 million, respectively.

*LSI Corporation ("LSI")* The Company recorded revenue of $65 million, $63 million and $38 million from sales to LSI for fiscal years 2011, 2010 and 2009, respectively. The Company made payments to LSI in fiscal years 2011, 2010 and 2009 of $333 million, $320 million and $153 million, respectively, related to purchases of various components. The Company had accounts payable to LSI of $70 million and $48 million at July 1, 2011 and July 2, 2010, respectively.

## 17. Subsequent Events

*Dividends*

On July 20, 2011, the Board of Directors approved a cash dividend of $0.18 per share, which will be payable on August 26, 2011 to shareholders of record as of the close of business on August 5, 2011.

116

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders
Seagate Technology public limited company

We have audited the accompanying consolidated balance sheets of Seagate Technology public limited company (plc) as of July 1, 2011 and July 2, 2010, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended July 1, 2011. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Seagate Technology plc at July 1, 2011 and July 2, 2010, and the consolidated results of its operations and its cash flows for each of the three years in the period ended July 1, 2011, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Seagate Technology's (predecessor of Seagate Technology plc) internal control over financial reporting as of July 1, 2011, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated August 17, 2011 expressed an unqualified opinion thereon.

/S/ ERNST & YOUNG LLP

Redwood City, California
August 17, 2011

117

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders
Seagate Technology public limited company

We have audited Seagate Technology public limited company (plc)'s internal control over financial reporting as of July 1, 2011, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Seagate Technology plc's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Seagate Technology plc maintained, in all material respects, effective internal control over financial reporting as of July 1, 2011, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Seagate Technology plc as of July 1, 2011 and July 2, 2010, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended July 1, 2011 and our report dated August 17, 2011 expressed an unqualified opinion thereon.

/S/ ERNST & YOUNG LLP

Redwood City, California
August 17, 2011

118

**SUPPLEMENTARY FINANCIAL DATA (UNAUDITED)**

For quarterly financial data see Part II, Item 6. Selected Financial Data

## ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

## ITEM 9A.    CONTROLS AND PROCEDURES

### Conclusions Regarding Disclosure Controls and Procedures

Our chief executive officer and our chief financial officer have concluded, based on the evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended) by our management, with the participation of our chief executive officer and our chief financial officer, that our disclosure controls and procedures were effective as of July 1, 2011.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended). Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO.

Based on our evaluation under the framework in *Internal Control—Integrated Framework* , our management has concluded that our internal control over financial reporting was effective as of July 1, 2011. Our management's assessment of the effectiveness of our internal control over financial reporting as of July 1, 2011 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report that is included herein.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting during our fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Limitations on the Effectiveness of Controls

Our management, including our chief executive officer and chief financial officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Our disclosure controls and procedures and our internal controls have been designed to provide reasonable assurance of achieving their objectives. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within Seagate have been detected. An evaluation was performed under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of July 1, 2011. Based on that evaluation, our management, including our chief executive officer and chief financial officer, concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

## ITEM 9B.    OTHER INFORMATION

None.

*PART III*

## ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information regarding our directors and compliance with Section 16(a) of the Securities Exchange Act of 1934, as amended, set forth in the sections entitled "Proposal 1—Election of Directors," "Corporate Governance" and "Section 16(a) Beneficial Ownership Reporting Compliance," in our Proxy Statement to be filed with the Commission within 120 days of the end of our fiscal year pursuant to General Instruction G(3) to Form 10-K are hereby incorporated by reference in this section. In addition, the information set forth in Part I of this report under "Item 1. Business—Executive Officers" is also incorporated by reference in this section.

We have adopted a Code of Business Conduct and Ethics that applies to all Seagate employees, officers and members of our Board of Directors, including our principal executive, finance and accounting officers. This Code of Business Conduct and Ethics is posted on our Website. The Internet address for our Website is *www.seagate.com* , and the Code of Business Conduct and Ethics may be found from our main Web page by clicking first on "Investors," next on "Corporate Governance" and then on "Code of Business Conduct and Ethics."

We intend to satisfy any disclosure requirements under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of this Code of Business Conduct and Ethics by posting such information on our Website, at the Internet address and location specified above.

## ITEM 11.    EXECUTIVE COMPENSATION

The information regarding executive compensation required by this Item 11 set forth in the section entitled "Compensation of Executive Officers" in our Proxy Statement to be filed with the Commission within 120 days of the end of our fiscal year pursuant to General Instruction G(3) to Form 10-K is hereby incorporated by reference in this section.

## ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information regarding security ownership beneficial owners and management and related shareholders required by this Item 12 set forth in the section entitled "Security Ownership of Directors, Executive Officers and Certain Beneficial Owners" in our Proxy Statement to be filed with the Commission within 120 days of the end of our fiscal year pursuant to General Instruction G(3) to Form 10-K is hereby incorporated by reference in this section.

## ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information regarding certain relationships, related transactions and director independence required by this Item 13 set forth in the section entitled "Certain Relationships and Related Transactions" in our Proxy Statement to be filed with the Commission within 120 days of the end of our fiscal year pursuant to General Instruction G(3) to Form 10-K is hereby incorporated by reference in this section.

## ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information regarding principal accountant fees and services required by this Item 14 set forth in the section entitled "Information about the Independent Auditors" in our Proxy Statement to be filed with the Commission within 120 days of the end of our fiscal year pursuant to General Instruction G(3) to Form 10-K is hereby incorporated by reference in this section.

*PART IV*

**ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)    The following documents are filed as part of this Report:

1.    *Financial Statements* .   The following Consolidated Financial Statements of Seagate Technology plc and Report of Independent Registered Public Accounting Firm are included in Item 8:

| | Page No. |
|---|---|
| Consolidated Balance Sheets—July 1, 2011 and July 2, 2010 | 69 |
| Consolidated Statements of Operations—Fiscal Years Ended July 1, 2011, July 2, 2010 and July 3, 2009 | 70 |
| Consolidated Statements of Cash Flows—Fiscal Years Ended July 1, 2011, July 2, 2010 and July 3, 2009 | 71 |
| Consolidated Statements of Shareholders' Equity—Fiscal Years Ended July 1, 2011, July 2, 2010 and July 3, 2009 | 72 |
| Notes to Consolidated Financial Statements | 73 |
| Reports of Independent Registered Public Accounting Firm | 117 |

2.    *Financial Statement Schedules* .   All schedules are omitted because they are not applicable or the required information is included in the Financial Statements or in the notes thereto.

(b)    *Exhibits* .   The information required by this Item is set forth on the Exhibit Index (following the Signatures section of this report) and is included, or incorporated by reference, in this Annual Report on Form 10-K.

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="center">

SEAGATE TECHNOLOGY PUBLIC LIMITED COMPANY

/s/ STEPHEN J. LUCZO
_____

(Stephen J. Luczo, Chief Executive Officer, President, Director and Chairman of the Board of Directors)

</div>

Dated: August 17, 2011

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Stephen J. Luczo, Patrick J. O'Malley, and Kenneth M. Massaroni, and each of them, as his true and lawful attorneys-in-fact and agents, with power to act with or without the others and with full power of substitution and resubstitution, to do any and all acts and things and to execute any and all instruments which said attorneys and agents and each of them may deem necessary or desirable to enable the registrant to comply with the U.S. Securities Exchange Act of 1934, as amended, and any rules, regulations and requirements of the U.S. Securities and Exchange Commission thereunder in connection with the registrant's Annual Report on Form 10-K for the fiscal year ended July 1, 2011 (the "Annual Report"), including specifically, but without limiting the generality of the foregoing, power and authority to sign the name of the registrant and the name of the undersigned, individually and in his capacity as a director or officer of the registrant, to the Annual Report as filed with the U.S. Securities and Exchange Commission, to any and all amendments thereto, and to any and all instruments or documents filed as part thereof or in connection therewith; and each of the undersigned hereby ratifies and confirms all that said attorneys and agents and each of them shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ STEPHEN J. LUCZO <br> **(Stephen J. Luczo)** | Chief Executive Officer, President, Director and Chairman of the Board of Directors (Principal Executive Officer) | August 17, 2011 |
| /s/ PATRICK J. O'MALLEY <br> **(Patrick J. O'Malley)** | Executive Vice President, Finance and Chief Financial Officer (Principal Financial Officer) | August 17, 2011 |
| /s/ DAVID H. MORTON, JR. <br> **(David H. Morton, Jr.)** | Vice President, Finance and Treasurer (Principal Accounting Officer) | August 17, 2011 |

<div align="center">

123

</div>

| Signature | Title | Date |
|---|---|---|
| /s/ FRANK J. BIONDI, JR.<br>(Frank J. Biondi, Jr.) | Director | August 17, 2011 |
| /s/ LYDIA M. MARSHALL<br>(Lydia M. Marshall) | Director | August 17, 2011 |
| /s/ C.S. PARK<br>(Dr. C.S. Park) | Director | August 17, 2011 |
| /s/ ALBERT A. PIMENTEL<br>(Albert A. Pimentel) | Director | August 17, 2011 |
| /s/ GREGORIO REYES<br>(Gregorio Reyes) | Director | August 17, 2011 |
| /s/ JOHN W. THOMPSON<br>(John W. Thompson) | Director | August 17, 2011 |
| /s/ EDWARD J. ZANDER<br>(Edward J. Zander) | Director | August 17, 2011 |

124

## EXHIBIT INDEX

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| | | Form | File No. | Exhibit | Filing Date | |
|---|---|---|---|---|---|---|
| 2.1 | Scheme of Arrangement among Seagate Technology ("Seagate-Cayman"), Seagate Technology plc ("Seagate-Ireland") and the Scheme Shareholders (incorporated by reference to Annex A to Seagate Technology's Definitive Proxy Statement on Schedule 14A filed on March 5, 2010) | DEF 14A | 001-31560 | Annex A | 03/05/10 | |
| 3.1 | Memorandum and Articles of Association of Seagate Technology plc | 8-K12B/A | 001-31560 | 3.1 | 07/09/10 | |
| 3.2 | Certificate of Incorporation of Seagate Technology plc | 10-K | 001-31560 | 3.2 | 08/20/10 | |
| 4.1 | Specimen Ordinary Share Certificate | 10-K | 001-3560 | 4.1 | 08/20/10 | |
| 4.2 | Indenture dated September 20, 2006 among Seagate Technology, Seagate Technology HDD Holdings and U.S. Bank National Association | 8-K | 001-31560 | 4.1 | 09/21/06 | |
| 4.3 | Forms of Global Note for the Senior Notes due 2011 and Senior Notes due 2016 of Seagate Technology HDD Holdings issued pursuant to the Indenture | 8-K | 001-31560 | 4.1 | 09/21/06 | |
| 4.4 | Indenture dated as of May 1, 2009, among Seagate Technology International, as Issuer, Seagate Technology, Seagate Technology HDD Holdings, Maxtor Global Ltd., Seagate Technology (Ireland), Seagate Technology Media (Ireland), Seagate International (Johor) Sdn. Bhd., Penang Seagate Industries (M) Sdn. Bhd., Seagate Singapore International Headquarters Pte. Ltd., | 8-K | 001-31560 | 4.1 | 05/05/09 | |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | Seagate Technology (Thailand) Limited, Seagate Technology (US) Holdings, Inc., Maxtor Corporation, i365 Inc. and Seagate Technology LLC, as Guarantors, and Wells Fargo Bank, National Association, as Trustee | | | | |
| 4.5 | Form of 10.0% Senior Secured Second-Priority Note due 2014 | 8-K | 001-31560 | 4.1 | 05/05/09 |

125

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 4.6 | Indenture dated as of May 13, 2010, among Seagate HDD Cayman, as Issuer, Seagate Technology, as Guarantor, and Wells Fargo Bank, National Association, as Trustee | 8-K | 001-31560 | 4.1 | 05/14/10 | |
| 4.7 | Form of 6.875% Senior Note due 2020 | 8-K | 001-31560 | 4.1 | 05/14/10 | |
| 4.8 | Registration Rights Agreement dated as of May 13, 2010, among Seagate HDD Cayman, Seagate Technology and Morgan Stanley & Co. Incorporated and Banc of America Securities LLC | 8-K | 001-31560 | 4.3 | 05/14/10 | |
| 4.9 | Indenture dated as of December 14, 2010, among Seagate HDD Cayman, as Issuer, Seagate Technology plc, as Guarantor, and Wells Fargo Bank, National Association, as Trustee | 8-K | 001-31560 | 4.1 | 12/14/10 | |
| 4.10 | Form of 7.75% Senior Note due 2018 | 8-K | 001-31560 | 4.1 | 12/14/10 | |
| 4.11 | Registration Rights Agreement dated as of December 14, 2010, among Seagate HDD Cayman, Seagate Technology plc and Morgan Stanley & Co. Incorporated and Merrill Lynch, Pierce, Fenner & Smith Incorporated | 8-K | 001-31560 | 4.3 | 12/14/10 | |
| 4.12 | Indenture dated as of December 14, 2010, among Seagate HDD Cayman, as Issuer, Seagate Technology plc, as Guarantor, and Wells Fargo Bank, National Association, as Trustee | 8-K | 001-31560 | 4.1 | 05/18/11 | |
| 4.13 | Form of 7.000% Senior Note due 2021 | 8-K | 001-31560 | 4.1 | 05/18/11 | |
| 4.14 | Registration Rights Agreement dated as of May 18, 2011, among Seagate HDD Cayman, Seagate Technology plc and Morgan | 8-K | 001-31560 | 4.3 | 05/18/11 | |

Stanley & Co.
Incorporated

| | | | | | |
|---|---|---|---|---|---|
| 10.1+ | Third Amended and Restated Seagate Technology Executive Officer Severance and Change in Control Plan | 10-Q | 001-31560 | 10.2 | 02/01/10 |

126

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 10.2+ | Amended Seagate Technology plc 2001 Share Option Plan | 10-K | 001-31560 | 10.2 | 08/20/10 | |
| 10.3+ | Seagate Technology plc 2001 Share Option Plan Form of Notice of Stock Option Grant and Option Agreement (includes Compensation Recovery Policy) | 10-K | 001-31560 | 10.3 | 08/20/10 | |
| 10.4(a)+ | Form of Indemnification Agreement between Seagate Technology Holdings and the director or officer named therein | S-4/A | 333-88388 | 10.17 | 07/05/02 | |
| 10.4(b)+ | Form of Revised Indemnification Agreement between Seagate Technology and the director or officer named therein | 10-Q | 001-31560 | 10.4(b) | 05/06/09 | |
| 10.5+ | Seagate Technology Executive Officer Performance Bonus Plan | 10-Q | 001-31560 | 10.6 | 10/30/08 | |
| 10.6+ | Amended Seagate Technology plc 2004 Share Compensation Plan | 10-K | 001-31560 | 10.6 | 08/20/10 | |
| 10.7+ | Seagate Technology 2004 Stock Compensation Plan Form of Option Agreement (For Outside Directors) | 10-Q | 001-31560 | 10.7 | 11/04/09 | |
| 10.8+ | Seagate Technology 2004 Stock Compensation Plan Form of Option Agreement (For Non-Officer employees) | S-8 | 333-128654 | 99.3 | 09/28/05 | |
| 10.9+ | Seagate Technology 2004 Stock Compensation Plan Form of Restricted Stock Bonus Agreement | 10-K | 001-31560 | 10.11 | 08/13/08 | |
| 10.10+ | Seagate Technology 2004 Stock Compensation Plan Notice of Restricted Stock Bonus Grant (For Outside Directors) | 10-Q | 001-31560 | 10.10 | 11/04/09 | |
| 10.11+ | Seagate Technology 2004 Stock Compensation Plan Form of Restricted Stock Unit Agreement | 10-Q | 001-31560 | 10.11 | 10/30/08 | |

| 10.12+ | Seagate Technology plc 2004 Share Compensation Plan Form of Restricted Share Unit Agreement (Outside Directors) | 10-K | 001-31560 | 10.12 | 08/20/10 |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.13+ | Seagate Technology plc 2004 Share Compensation Plan Form of Notice of Stock Option Grant and Option Agreement (includes Compensation Recovery Policy) | 10-K | 001-31560 | 10.13 | 08/20/10 | |
| 10.14+ | Seagate Technology plc Employee Stock Purchase Plan | 8-K | 001-31560 | 10.5 | 07/06/10 | |
| 10.15+ | Summary description of Seagate Technology plc's Compensation Policy for Non-Management Members of the Board of Directors | 10-Q | 001-31560 | 10.15 | 05/03/11 | |
| 10.16+ | Seagate Technology plc 2004 Share Compensation Plan Form of Notice of Performance Share Bonus Grant and Agreement (includes Compensation Recovery Policy) | 10-K | 001-31560 | 10.16 | 08/20/10 | |
| 10.17+ | Offer Letter, dated as of January 29, 2009, by and between Seagate Technology and Stephen J. Luczo | 10-Q | 001-31560 | 10.20 | 02/10/09 | |
| 10.18+ | Seagate Technology 2004 Stock Compensation Plan Form of Restricted Stock Bonus Agreement (includes Compensation Recovery Policy) | 10-Q | 001-31560 | 10.22 | 02/10/09 | |
| 10.19+ | Seagate Technology plc 2004 Share Compensation Plan Form of Restricted Share Unit Agreement (includes Compensation Recovery Policy) | 10-Q | 001-31560 | 10.19 | 11/03/10 | |
| 10.20+ | Seagate Technology plc 2004 Share Compensation Plan Form of Executive Performance Unit Award Agreement | 8-K | 001-31560 | 10.1 | 09/13/10 | |
| 10.21+ | Second Amendment to Seagate Deferred Compensation Plan | 10-Q | 001-31560 | 10.21 | 05/03/11 | |
| 10.22+ | Restated Seagate Deferred Compensation | 10-Q | 001-31560 | 10.27 | 05/05/10 | |

Plan

| | | | | | |
|---|---|---|---|---|---|
| 10.23+ | Seagate Deferred Compensation Sub-Plan | 10-Q | 001-31560 | 10.28 | 05/05/10 |

128

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| | | Form | File No. | Exhibit | Filing Date | |
|---|---|---|---|---|---|---|
| 10.24 | Second Lien U.S. Security Agreement dated as of May 1, 2009, among Seagate Technology International, Seagate Technology, Seagate Technology (US) Holdings, Inc., Maxtor Corporation, i365 Inc., Seagate Technology LLC and Seagate Technology HDD Holdings, as Grantors, and Wells Fargo Bank, National Association, as Collateral Agent for the Secured Parties (as defined therein) | 8-K | 001-31560 | 10.7 | 05/05/09 | |
| 10.25 | Second Lien U.S. Pledge Agreement dated as of May 1, 2009, among Seagate Technology, Seagate Technology (US) Holdings, Inc., Maxtor Corporation, i365 Inc., Seagate Technology LLC and Seagate Technology HDD Holdings, as Pledgors, and Wells Fargo Bank, National Association, as Collateral Agent for the Secured Parties (as defined therein) | 8-K | 001-31560 | 10.8 | 05/05/09 | |
| 10.26 | Second Priority Omnibus Debenture dated May 1, 2009, between Seagate Technology, Seagate Technology HDD Holdings, Seagate Technology International, Seagate Technology (Ireland) and Seagate Technology Media (Ireland), as Chargors, and Wells Fargo Bank, National Association, as Collateral Agent or Chargee | 8-K | 001-31560 | 10.9 | 05/05/09 | |
| 10.27 | Form of Second Priority Equitable Share Mortgage in respect of shares dated May 1, 2009, between [Seagate entity], as Mortgagor, and Wells Fargo Bank, National Association, as Collateral Agent | 8-K | 001-31560 | 10.10 | 05/05/09 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.28 | Intercreditor Agreement dated as of May 1, 2009, among JPMorgan Chase Bank, N.A., as Administrative Agent and First Priority Representative for the First Priority Secured Parties (as defined therein), Wells Fargo Bank, National Association, as Collateral Agent and Second Priority Representative for the Second Priority Secured Parties (as defined therein), Seagate Technology HDD Holdings, as Borrower, Seagate Technology International, as the Second Lien Issuer, and each of the other Loan Parties (as defined therein) party thereto | 8-K | 001-31560 | 10.11 | 05/05/09 | |
| 10.29 | Second Priority Share Charge, dated September 25, 2009, between Seagate Technology International, as chargor and Wells Fargo Bank, National Association, as collateral agent | 8-K | 001-31560 | 10.2 | 10/01/09 | |
| 10.30 | Second Priority Debenture, dated September 25, 2009, between Seagate Singapore International Headquarters Pte. Ltd., as chargor and Wells Fargo Bank, National Association, as collateral agent | 8-K | 001-31560 | 10.4 | 10/01/09 | |
| 10.31 | First Supplemental Indenture, dated as of March 1, 2010, among Seagate Technology International, Seagate HDD Cayman and Wells Fargo Bank, National Association, as trustee, amending and supplementing the Indenture, dated as of May 1, 2009, among Seagate Technology International, as issuer, Seagate Technology and the other guarantors party | 8-K | 001-31560 | 10.2 | 03/03/10 | |

thereto and Wells Fargo
Bank, National
Association, as trustee

130

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 10.32 | Second Supplemental Indenture, dated as of March 1, 2010, among Seagate Technology International, Seagate Technology plc and Wells Fargo Bank, National Association, as trustee, amending and supplementing the Indenture, dated as of May 1, 2009, among Seagate Technology International, as issuer, Seagate Technology and the other guarantors party thereto and Wells Fargo Bank, National Association, as trustee | 8-K | 001-31560 | 10.3 | 03/03/10 | |
| 10.33 | Supplement No. 1, dated as of March 1, 2010, to the Second Lien U.S. Security Agreement, dated as of May 1, 2009, among Seagate Technology International, Seagate Technology and the other guarantors from time to time party thereto and Wells Fargo Bank, National Association, as trustee | 8-K | 001-31560 | 10.7 | 03/03/10 | |
| 10.34 | Supplement No. 1, dated as of March 1, 2010, to the Second Lien U.S. Pledge Agreement, dated as of May 1, 2009, among Seagate Technology and each of the other guarantors from time to time party thereto and Wells Fargo Bank, National Association, as collateral agent | 8-K | 001-31560 | 10.11 | 03/03/10 | |
| 10.35 | Supplement No. 1, dated as of March 1, 2010, to the Intercreditor Agreement, dated as of May 1, 2009, among JPMorgan Chase Bank, N.A., as administrative agent, Wells Fargo Bank, National Association, as Collateral Agent, Seagate Technology HDD Holdings, Seagate Technology International and each of the other loan parties from time to time party thereto | 8-K | 001-31560 | 10.12 | 03/03/10 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 10.36 | Supplement No. 2, dated as of March 1, 2010, to the Intercreditor Agreement, dated as of May 1, 2009, among JPMorgan Chase Bank, N.A., as administrative agent, Wells Fargo Bank, National Association, as Collateral Agent, Seagate Technology HDD Holdings, Seagate Technology International and each of the other loan parties from time to time party thereto | 8-K | 001-31560 | 10.13 | 03/03/10 | |
| 10.37 | Second Priority Mortgage of Shares in Seagate HDD Cayman, dated March 1, 2010, between Seagate Technology HDD Holdings, as mortgagor, and Wells Fargo Bank, National Association, as mortgagee | 8-K | 001-31560 | 10.15 | 03/03/10 | |
| 10.38 | Second Priority Mortgage of Shares in Seagate Technology International, dated March 1, 2010, between Seagate HDD Cayman, as mortgagor, and Wells Fargo Bank, National Association, as mortgagee | 8-K | 001-31560 | 10.17 | 03/03/10 | |
| 10.39 | Second Lien Debenture, dated March 1, 2010, between Seagate HDD Cayman, as chargor, and Wells Fargo Bank, National Association, as chargee | 8-K | 001-31560 | 10.19 | 03/03/10 | |
| 10.40 | Second Priority Debenture, dated March 1, 2010, between Seagate Technology plc, as chargor, and Wells Fargo Bank, National Association, as collateral agent | 8-K | 001-31560 | 10.21 | 03/03/10 | |
| 10.41 | Second Priority Mortgage of Shares in Seagate Technology, dated March 1, 2010, between Seagate Technology plc, as mortgagor, and Wells Fargo Bank, National Association, as | 8-K | 001-31560 | 10.23 | 03/03/10 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.42 | First Supplemental Indenture, dated as of March 1, 2010, among Seagate Technology HDD Holdings, Seagate HDD Cayman, Seagate Technology and U.S. Bank National Association, as trustee, amending and supplementing the Indenture, dated as of September 20, 2006, among Seagate Technology HDD Holdings, Seagate Technology and U.S. Bank National Association, as trustee | 8-K | 001-31560 | 10.24 | 03/03/10 | |
| 10.43 | Third Supplemental Indenture, dated as of March 19, 2010, among Seagate Technology International, as issuer, Seagate Technology and the other guarantors party thereto and Wells Fargo Bank, National Association, as trustee, amending and supplementing the Indenture, dated as of May 1, 2009, among Seagate Technology International, as issuer, Seagate Technology and the other guarantors party thereto and Wells Fargo Bank, National Association, as trustee | 8-K | 001-31560 | 10.1 | 03/22/10 | |
| 10.44 | Supplemental Indenture, dated as of July 3, 2010, among Seagate HDD Cayman, as issuer, Seagate Technology, as original guarantor, Seagate Technology plc, as successor guarantor, and Wells Fargo Bank, National Association, as trustee, amending and supplementing the Indenture, dated as of May 13, 2010, among Seagate HDD Cayman, as issuer, Seagate Technology, as guarantor, and Wells Fargo Bank, National Association, as trustee | 8-K | 001-31560 | 10.1 | 07/06/10 | |

| | | | | | |
|---|---|---|---|---|---|
| 10.45 | Deed Poll of Assumption by Seagate Technology plc, dated July 2, 2010 | 8-K | 001-31560 | 10.2 | 07/06/10 |
| 10.46+ | Form of Deed of Indemnity between Seagate Technology plc and the director or company secretary named therein | 8-K | 001-31560 | 10.1 | 07/29/10 |

133

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.47 | Credit Agreement, dated as of January 18, 2011, among Seagate Technology Public Limited Company, Seagate HDD Cayman, as Borrower, the lending institutions thereto, The Bank of Nova Scotia, as Administrative Agent, Morgan Stanley Senior Funding, Inc., Merrill Lynch Pierce Fenner and Smith Incorporated and BNP Paribas as Syndication Agents and Wells Fargo Bank, National Association, as Documentation Agent | 10-Q | 001-31560 | 10.47 | 02/03/11 | |
| 10.48 | U.S. Guarantee Agreement, dated as of January 18, 2011, among Seagate Technology Public Limited Company, Seagate HDD Cayman, as Borrower, the Guarantor parties thereto and The Bank of Nova Scotia, as Administrative Agent | 10-Q | 001-31560 | 10.48 | 02/03/11 | |
| 10.49 | U.S. Security Agreement, dated as of January 18, 2011, among Seagate Technology Public Limited Company, Seagate HDD Cayman, as Borrower, the Guarantor parties thereto and The Bank of Nova Scotia, as Administrative Agent | 10-Q | 001-31560 | 10.49 | 02/03/11 | |
| 10.50 | U.S. Pledge Agreement, dated as of January 18, 2011, among Seagate Technology Public Limited Company, Seagate HDD Cayman, as Borrower, the Subsidiary Pledgor parties thereto and The Bank of Nova Scotia, as Administrative Agent | 10-Q | 001-31560 | 10.50 | 02/03/11 | |
| 10.51 | Intercreditor Agreement, dated as of January 18, among The Bank of Nova Scotia, as Administrative Agent for the First Priority Secured Parties, Wells Fargo Bank, National Association, as Collateral Agent for the | 10-Q | 001-31560 | 10.51 | 02/03/11 | |

Second Priority Secured
Parties, Seagate HDD
Cayman, as Borrower,
Seagate Technology
International, as Second
Lien Issuer, and each of
the other Loan Parties
thereto

134

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.52 | Indemnity, Subrogation and Contribution Agreement, dated as of January 18, among Seagate Technology Public Limited Company, Seagate HDD Cayman, as Borrower, the Subsidiary parties thereto and The Bank of Nova Scotia, as Administrative Agent | 10-Q | 001-31560 | 10.52 | 02/03/11 | |
| 10.53 | Asset Purchase Agreement by and among Samsung Electronics Co., ltd., Seagate Technology International and Seagate Technology plc dated April 19, 2011 | | | | | X |
| 10.54 | Intellectual Property Agreement by and between Samsung Electronics Co., ltd. and Seagate Technology International dated April 19, 2011 | | | | | X |
| 10.55 | Shareholder Agreement by and between Seagate Technology plc and Samsung Electronics Co., ltd. Dated as of April 19, 2011 | | | | | X |
| 14.1 | Code of Business Conduct and Ethics | 10-K | 001-31560 | 14.1 | 08/20/10 | |
| 21.1 | List of Subsidiaries | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 24.1 | Power of Attorney (see signature page to this annual report) | | | | | X |
| 31.1 | Certification of the Chief Executive Officer pursuant to rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 31.2 | Certification of the Chief Financial Officer | | | | | X |

pursuant to rules 13a-14
(a) and 15d-14(a) under
the Securities Exchange
Act of 1934, as adopted
pursuant to Section 302
of the Sarbanes-Oxley
Act of 2002

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 32.1† | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14 (b) and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 101.INS†† | XBRL Instance Document. | | | | | X |
| 101.SCH†† | XBRL Taxonomy Extension Schema Document. | | | | | X |
| 101.CAL†† | XBRL Taxonomy Extension Calculation Linkbase Document. | | | | | X |
| 101.LAB†† | XBRL Taxonomy Extension Label Linkbase Document. | | | | | X |
| 101.PRE†† | XBRL Taxonomy Extension Presentation Linkbase Document. | | | | | X |

+    Management contract or compensatory plan or arrangement.

†    The certifications attached as Exhibit 32.1 that accompany this Annual Report on Form 10-K, are not deemed filed with the Securities and Exchange Commission and are not to be incorporated by reference into any filing of Seagate Technology plc under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Form 10-K, irrespective of any general incorporation language contained in such filing.

††    In accordance with Rule 406T of Regulation S-T, the information in these exhibits is furnished and deemed not filed or a part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, is deemed not filed for purposes of Section 18 of the Exchange Act of 1934, and otherwise is not subject to liability under these sections and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing.

**Exhibit 10.53**

# ASSET PURCHASE AGREEMENT

by and among

## SAMSUNG ELECTRONICS CO., LTD.

## SEAGATE TECHNOLOGY INTERNATIONAL

and

## SEAGATE TECHNOLOGY PLC

DATED APRIL 19, 2011

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| SECTION 1 | | DESCRIPTION OF TRANSACTION | 2 |
| | 1.1 | Agreement to Purchase and Sell | 2 |
| | 1.2 | Excluded Assets | 2 |
| | 1.3 | Assumption of Assumed Liabilities | 4 |
| | 1.4 | Excluded Liabilities | 5 |
| | 1.5 | Delivery of Assets | 6 |
| | 1.6 | Subsequent Delivery | 7 |
| | 1.7 | Internal Approval | 7 |
| SECTION 2 | | PURCHASE PRICE; ALLOCATIONS | 7 |
| | 2.1 | Purchase Price | 7 |
| | 2.2 | Payment of Purchase Price | 8 |
| | 2.3 | VAT; Withholding Taxes | 9 |
| | 2.4 | Allocation of Purchase Price | 10 |
| | 2.5 | Allocation of Certain Items | 11 |
| SECTION 3 | | REPRESENTATIONS AND WARRANTIES OF THE SELLER | 11 |
| | 3.1 | Organization | 11 |
| | 3.2 | Subsidiaries | 11 |
| | 3.3 | Authority; Binding Nature of Agreement | 12 |
| | 3.4 | Absence of Restrictions | 12 |
| | 3.5 | Governmental Consents | 13 |
| | 3.6 | Absence of Changes | 13 |
| | 3.7 | Conduct in the Ordinary Course | 13 |
| | 3.8 | Assets | 13 |
| | 3.9 | Inventory | 14 |
| | 3.10 | Compliance with Law | 14 |
| | 3.11 | Permits and Approvals | 14 |
| | 3.12 | Intellectual Property | 15 |
| | 3.13 | Contracts | 16 |
| | 3.14 | Employee Matters | 17 |
| | 3.15 | Product Liability; Warranties | 18 |
| | 3.16 | Environmental Matters | 18 |
| | 3.17 | Legal Proceedings | 18 |

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| 3.18 | Customers and Suppliers | 19 |
| 3.19 | Tax Matters | 19 |
| 3.20 | Finder's Fee | 19 |
| 3.21 | Investment Representations | 19 |
| 3.22 | No Other Representations or Warranties | 20 |
| SECTION 4 | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER AND THE GUARANTOR | 20 |
| 4.1 | Organization and Standing | 20 |
| 4.2 | Authority; Binding Nature of Agreement | 21 |
| 4.3 | Capitalization | 21 |
| 4.4 | Valid Issuance | 22 |
| 4.5 | Governmental Consents | 22 |
| 4.6 | SEC Filings; Financial Statements | 22 |
| 4.7 | Absence of Restrictions | 24 |
| 4.8 | Absence of Changes | 24 |
| 4.9 | Legal Proceedings | 25 |
| 4.10 | Availability of Funds | 25 |
| 4.11 | Finder's Fee | 25 |
| SECTION 5 | CERTAIN COVENANTS AND AGREEMENTS | 25 |
| 5.1 | Access and Investigation | 25 |
| 5.2 | Operation of the Seller's Business | 25 |
| 5.3 | Preparation of Financial Statements | 26 |
| 5.4 | Purchaser Designees; Local Asset Transfers | 27 |
| 5.5 | No Negotiation | 27 |
| 5.6 | Employee Matters | 28 |
| 5.7 | Assumed Contracts; Non-Assignable Contracts | 29 |
| 5.8 | Public Announcements | 30 |
| 5.9 | Confidentiality | 30 |
| 5.10 | Reasonable Efforts; Further Assurances; Cooperation | 31 |
| 5.11 | Regulatory Approvals | 32 |
| 5.12 | Transfer Taxes; Expenses | 34 |
| 5.13 | Non-Competition | 34 |

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| 5.14 | Non-Solicitation | 35 |
| 5.15 | Customer Visits; Supplier Relationships | 35 |
| 5.16 | Inventory | 36 |
| 5.17 | Delivery of Books and Records | 36 |
| 5.18 | Valuation in Respect of the Loan Note | 36 |
| 5.19 | Covenant to Pay Irish Stamp Duty | 36 |
| SECTION 6 | CONDITIONS PRECEDENT | 37 |
| 6.1 | Conditions Precedent to Obligations of Purchaser, Guarantor and Seller | 37 |
| 6.2 | Conditions Precedent to Obligations of Purchaser and Guarantor | 37 |
| SECTION 7 | CLOSING | 37 |
| 7.1 | Closing | 37 |
| 7.2 | Closing Actions | 38 |
| 7.3 | Issuance of Share Consideration | 38 |
| SECTION 8 | TERMINATION | 38 |
| 8.1 | Termination Events | 38 |
| 8.2 | Closing Breach | 39 |
| 8.3 | Effect of Termination | 39 |
| SECTION 9 | INDEMNIFICATION | 39 |
| 9.1 | Indemnification Obligations of the Seller | 40 |
| 9.2 | Indemnification Obligations of the Purchaser and the Guarantor | 40 |
| 9.3 | Indemnification Procedure | 40 |
| 9.4 | Survival Period; Time Limits | 42 |
| 9.5 | Liability Limits | 43 |
| 9.6 | Exclusive Remedy | 43 |
| SECTION 10 | GUARANTEE | 43 |
| 10.1 | Guarantee | 43 |
| 10.2 | Obligations Absolute | 43 |
| 10.3 | Primary Obligation; Waivers | 44 |
| SECTION 11 | MISCELLANEOUS PROVISIONS | 44 |
| 11.1 | Enforcement of Agreement | 44 |
| 11.2 | Further Assurances | 44 |
| 11.3 | Fees and Expenses | 45 |

**TABLE OF CONTENTS**

|       |                                                              | Page |
|-------|--------------------------------------------------------------|------|
| 11.4  | Waiver; Amendment                                            | 45   |
| 11.5  | Entire Agreement                                             | 45   |
| 11.6  | Execution of Agreement; Counterparts; Electronic Signatures | 45   |
| 11.7  | Governing Law; Jurisdiction and Venue                       | 46   |
| 11.8  | WAIVER OF JURY TRIAL                                         | 47   |
| 11.9  | Assignment and Successors                                   | 47   |
| 11.10 | Parties in Interest                                         | 47   |
| 11.11 | Notices                                                     | 47   |
| 11.12 | Seller Disclosure Schedules                                 | 49   |
| 11.13 | Construction; Usage                                         | 49   |
| 11.14 | Severability                                                | 50   |
| 11.15 | Time of Essence                                             | 51   |
| 11.16 | Schedules and Exhibits                                      | 51   |

iv

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of April 19, 2011 (the " **Agreement Date** "), by and among Samsung Electronics Co., Ltd., a company organized under the laws of the Republic of Korea (the " **Seller** "), Seagate Technology International, an exempted company incorporated with limited liability under the laws of the Cayman Islands and a wholly-owned subsidiary of the Guarantor (the " **Purchaser** "), and Seagate Technology plc, a company organized under the laws of the Republic of Ireland (the " **Guarantor** ").  Certain capitalized terms used herein are defined in Exhibit A .

### RECITALS

**WHEREAS** , the Seller and the Seller Subsidiaries are engaged in the Business (as defined below);

**WHEREAS** , the Seller proposes, and proposes to cause the Seller Subsidiaries, to transfer to the Purchaser, and the Purchaser proposes to acquire or assume from the Seller and the Seller Subsidiaries, the assets and liabilities relating to the Business as further described below; and

**WHEREAS** , in connection with the proposed transfer by the Seller and the Seller Subsidiaries to the Purchaser of the assets and liabilities relating to the Business as further described below, the parties are also entering into, or will enter into on or prior to the Closing Date, (i) an intellectual property agreement between the Seller and the Purchaser (the " **IP Agreement** ") and (ii) a shareholder agreement providing for certain rights and obligations with respect to the Share Consideration between the Seller and the Guarantor (the " **Shareholder Agreement** "), each in the forms set forth in Exhibit B and Exhibit C attached hereto, respectively, and each of which shall become effective upon the Closing. On or prior to the Closing, the relevant parties hereto will enter into (x) a supply agreement between the Seller and the Purchaser with respect to the Seller's internal hard-disk drive requirements (the " **Supply Agreement for Internal Drives** "), the major terms and conditions of which are attached hereto as Exhibit D , (y) an exchangeable loan note in the amount of US$687,500,000 (the " **Loan Note** ") issued by the Purchaser to the Seller, and guaranteed by the Guarantor, pursuant to which the parties agree that, at the option of each of the parties hereto, the amount due under the Loan Note will be exchangeable for the Share Consideration (as defined in Section 2.1(a) and in the manner provided in the instrument constituting the Loan Note) in full and final satisfaction of all amounts owed by the Purchaser to the Seller under the Loan Note, in the form set forth in Exhibit E , and (z) a transition services agreement between the Seller and the Purchaser (the " **Transition Services Agreement** "), each of which shall become effective upon the Closing (all of the foregoing documents, together with this Agreement and the Transfer Agreements, collectively, the " **Transaction Documents** ").

**NOW, THEREFORE** , in consideration of the respective covenants, agreements and representations and warranties set forth herein, the parties to this Agreement, intending to be legally bound, agree as follows:

## SECTION 1
## DESCRIPTION OF TRANSACTION

1.1     <u>Agreement to Purchase and Sell</u> . Subject to the terms and conditions hereof, at the Closing, the Seller shall, and shall cause each of the Seller Subsidiaries to, sell, assign, transfer and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller and the Seller Subsidiaries, the assets, properties and rights of the Seller and the Seller Subsidiaries related to the Business as of the Closing Date as listed below, except for the Excluded Assets (as defined below) (such assets, properties and rights being referred to as the " *Acquired Assets* " ) :

> (a)     the Transferred Tangible Assets;

> (b)     the Transferred Inventory;

> (c)     the Transferred Patents;

> (d)     the Transferred Trademarks;

> (e)     the Transferred Other IP;

> (f)     the Transferred Technology;

> (g)     all causes of action, claims and demands of any nature arising under or with respect to the Transferred Patents, including all claims and damages for the past or future infringement of any of the Transferred Patents;

> (h)     the Assumed Contracts;

> (i)     the Exclusive Permits, including but not limited to those Governmental Authorizations set forth on <u>Schedule 1.1(i)</u> of the Seller Disclosure Schedules, but only to the extent that the Seller is legally permitted to assign or transfer such Governmental Authorizations;

> (j)     to the extent permitted by applicable Laws, originals of all books and records that are exclusive to the Business, including inventor notebooks, Patent disclosures, Patent files and other documents related to the Transferred IP; and

> (k)     the Additional Transferred Assets.

1.2     <u>Excluded Assets</u> . Notwithstanding anything to the contrary set forth herein, the Acquired Assets shall not include the following assets, properties and rights of the Seller or the Seller Subsidiaries (collectively, the " *Excluded Assets* "):

> (a)     any asset that is not expressly an Acquired Asset;

2

(b)        all real property which the Seller or any of the Seller Subsidiaries owns or of which the Seller or any of the Seller Subsidiaries is the lessee or sublessee (together with all fixtures and improvements thereon other than any Transferred Tangible Assets);

(c)        all assets used in the Seller's Component Business, other than the designs, molds, mask works and other materials, but not manufacturing equipment, required to make or have made the Custom Components;

(d)        all cash, cash equivalents and marketable securities and all rights to any bank account of the Seller or any of the Seller Subsidiaries;

(e)        accounts receivable, notes receivable and other receivables arising out of the conduct of or otherwise related to the Business as of 11:59 p.m. (local time for the Seller) on the Closing Date;

(f)        all Intellectual Property of the Seller and the Seller Subsidiaries, other than the Transferred Patents, the Transferred Trademarks and the Transferred Other IP;

(g)        any and all causes of action, lawsuits, judgments, claims, counterclaims and demands of any nature related to the Business, in each case, that accrued, accrue, arose or arise out of events occurring prior to the Closing, or any proceeds or receivables therefrom or related thereto, other than with respect to the Transferred Patents;

(h)        all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in relation to the Business which arise from or relate to events occurring prior to the Closing;

(i)        all insurance proceeds and insurance awards receivables with respect to any of the Acquired Assets or related to the Business which arise from or relate to events occurring prior to the Closing;

(j)        any Retained Technology;

(k)        certain plants, equipments or other tangible assets used exclusively in the Business, including without limiting those set forth on Schedule 1.2(k) of the Seller Disclosure Schedules, and certain office equipments and other tangible assets related to the Subject Employees that are not employed by the Purchaser or any Purchaser Designee as at the Closing (the " ***Excluded Tangible Assets*** ");

(l)        certain Patents used exclusively in the conduct of the Business which are set forth on Schedule 1.2(l) of the Seller Disclosure Schedules (the " ***Excluded Patents*** ");

(m)        certain Seller Contracts that relate exclusively to the Business which are set forth on Schedule 1.2(m) of the Seller Disclosure Schedules (the " ***Excluded Contracts*** ");

(n)        all Non-Assignable Contracts;

(o)       all rights that accrue to the Seller hereunder;

(p)       all insurance policies (and any cash or surrender value thereon), other than the insurance policies applicable to the Transferred Employees set forth in <u>Schedule 1.3(d)</u> of the Seller Disclosure Schedules; and

(q)       (i) personnel records pertaining to any Business Employee, except to the extent that copies thereof are required to be made and transferred to the Purchaser in accordance with applicable Law, and (ii) human resources information management systems of the Seller or the Seller Subsidiaries.

1.3      <u>Assumption of Assumed Liabilities</u> .  Effective as of the Closing, the Purchaser shall assume, and hereby agrees to pay, perform and discharge, the liabilities and obligations of the Seller and the Seller Subsidiaries related to the Business as listed below (collectively, the " ***Assumed Liabilities*** "):

(a)       all liabilities, obligations and product warranties (in each case, whether ongoing or contingent) arising under or with respect to or contained in the Assumed Contracts, including those Assumed Contracts under which the Seller or the Seller Subsidiaries have not rendered performance prior to the Closing, including (i) any and all liabilities and obligations vis-à-vis customers to deliver products or vis-à-vis suppliers as well as any other similar liabilities and obligations under the respective Assumed Contracts (such as forecast, investment and volume commitments that arose prior to the Closing) and (ii) any and all liabilities and obligations vis-à-vis customers arising from product warranty claims, whether expressed or implied, that result from performances made by or on behalf of the Seller or the Seller Subsidiaries prior to the Closing, and all other similar liabilities and obligations that arise prior to the Closing, provided that any such liabilities and obligations described under (ii) above shall be limited to US$20,000,000 (the " ***Warranty Liability Cap*** ") and any excess amount shall be deemed excluded from the Assumed Liabilities (and, for the avoidance of doubt, shall be Excluded Liabilities under this Agreement);

(b)       all liabilities, claims, suits, actions, investigations and obligations (i) resulting from, arising out of, or related to (x) the Acquired Assets or the ownership or use thereof, (y) the sale or provision of Business Products, or (z) the conduct of the Business by the Purchaser, in the case of clauses (x) through (z), after the Closing, or (ii) specified on <u>Schedule 1.3(b)</u> of the Seller Disclosure Schedules;

(c)       except as otherwise expressly set forth in Section 5.6, all liabilities related to the employment of the Transferred Employees that arise out of service to the Purchaser or any Purchaser Designee after the Closing, including any liability resulting from the transfer or termination of any Transferred Employee's employment with the Purchaser or any Purchaser Designee, as applicable; and

(d)       all liabilities related to the insurance policies set forth in <u>Schedule 1.3(d)</u> of the Seller Disclosure Schedules as and to the extent applicable to the Transferred

Employees and all liabilities related to the rolled-over severances related to the Transferred Employees.

1.4     Excluded Liabilities . For the avoidance of doubt and without in any way limiting the generality of Section 1.3, the Assumed Liabilities shall not include, and in no event shall the Purchaser assume, agree to pay, discharge or satisfy any liability or obligation under or otherwise have any responsibility for, any of the following liabilities or obligations of the Seller or any of its Affiliates (the " ***Excluded Liabilities*** "):

(a)     any liability of the Seller or any of its Affiliates that is not expressly an Assumed Liability, including any liability that would become a liability of the Purchaser or a Purchaser Designee as a matter of Law in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, other than as otherwise contemplated by this Agreement;

(b)     any liability resulting from, arising out of or related to the operation or conduct by the Seller or any of its Affiliates of any business other than the Business;

(c)     (i) any outstanding obligations of the Seller or any of its Affiliates for senior debt, subordinated debt and any other outstanding obligation for borrowed money, including that evidenced by notes, bonds, debentures or other instruments (and including all outstanding principal, prepayment premiums, if any, and accrued interest, fees and expenses related thereto), (ii) any outstanding obligations of the Seller or any of its Affiliates under capital leases and purchase money obligations, (iii) any amounts owed by the Seller or any of its Affiliates with respect to drawn letters of credit and (iv) any outstanding guarantees by the Seller or any of its Affiliates of obligations of the type described in clauses (i) through (iii) above;

(d)     except as specifically assumed pursuant to Section 1.3(d) or otherwise expressly set forth in Section 5.6, all liabilities resulting from, arising out of or related to any employee benefit plan of the Seller or any of its Affiliates whether such liabilities arose or arise prior to, on or after the Closing Date;

(e)     except as specifically assumed pursuant to Section 1.3(d) or otherwise expressly set forth in Section 5.6, all liabilities resulting from, arising out of or related to the employment, termination or transfer of the Business Employees, Subject Employees, Transferred Employees, which arose out of service to the Seller or any Seller Subsidiary prior to the Closing, together with all liabilities resulting from, arising out of or related to the employment, termination or transfer of the Business Employees or Subject Employees, excluding Transferred Employees, which arose out of service to the Seller or any Seller Subsidiary, whether such liabilities arose or arise prior to, on or after the Closing Date;

(f)     any liabilities resulting from, arising out of or related to any claim, action, arbitration, audit, hearing, inquiry, examination, proceeding, investigation, litigation or suit (whether criminal, administrative or investigative) commenced or brought by any

5

Governmental Body brought prior to the Closing to the extent relating to the conduct of the Seller or any Affiliate of the Seller or the Business prior to the Closing;

(g)     all liabilities for (i) Taxes of the Seller or any Affiliate of the Seller and (ii) Taxes that arise from the conduct of the Business, including ownership of the Acquired Assets, for any periods prior to the Closing, other than Taxes expressly assumed by the Purchaser under this Agreement;

(h)     any and all liabilities and obligations vis-à-vis customers resulting from, arising out of or related to product warranty claims, whether express or implied, that result from performances made by or on behalf of the Seller or any Seller Subsidiary prior to the Closing, and all other similar liabilities and obligations that arise prior to the Closing, to the extent such liabilities and obligations are in excess of the Warranty Liability Cap;

(i)     any liabilities resulting from, arising out of or related to the Seller Contracts, other than the Assumed Contracts;

(j)     any and all liabilities or claims to the extent resulting from, arising out of or related to such Business Products as sold by the Seller or any Affiliate of the Seller prior to the Closing with respect to infringement or misappropriation of the Intellectual Property of a third party occurring prior to the Closing;

(k)     any liabilities resulting from, arising out of or related to the violation or alleged violation by the Seller or any of its Affiliates of any Law relating to health, safety, labor, discrimination, Export and Import Control Laws, Anti-Corruption and Anti-Bribery Laws, Environmental Laws and Antitrust Laws;

(l)     all Seller Retained Environmental Liabilities;

(m)     accounts payable arising from the conduct of the Business prior to the Closing;

(n)     any liability to any broker, finder or agent for any investment banking or brokerage fees, finder's fees or commission and any other fees and expenses payable by the Seller pursuant to this Agreement and the other Transaction Documents with respect to

the transactions contemplated by this Agreement and the other Transaction Documents;

(o)        all liabilities pertaining to any Excluded Asset; and

(p)        any liabilities resulting from, arising out of or related to matters described in <u>Schedule 1.4(p)</u> of the Seller Disclosure Schedules.

1.5        <u>Delivery of Assets</u>.

(a)        Upon the Closing:

6

(i)        any Software or other Technology capable of being delivered by electronic means shall, at the Purchaser's request, be so delivered; and

(ii)        the Seller shall deliver to the Purchaser all, and not retain any, Transferred Technology that is not also Retained Technology or Transferred Copyable Technology.

(b)        The following items of the Transferred Technology shall be deemed delivered upon the Closing:

(i)        Transferred Technology embodied in tangible or electronic form contained within the facilities transferred to the Purchaser; and

(ii)        those items of Transferred Technology within the knowledge of Transferred Employees and not subject to any duty of confidentiality or non-use under any Excluded Contract.

(c)        Upon the Closing, delivery of all of the other Transferred Tangible Assets shall be at the Asset Locations.

1.6      <u>Subsequent Delivery</u> . To the extent that any items of the Transferred Technology have not already been delivered in the manner set forth in Section 1.5 and such items exist in tangible or electronic form, the Seller shall deliver such items (or copies thereof) to the Purchaser after the Closing Date in tangible or electronic form as requested by the Purchaser.

1.7      <u>Internal Approval</u> . Notwithstanding anything in this Section 1, if any Technology that meets the definition set forth in subsection (i)(A) of the definition of "Transferred Technology" in <u>Exhibit A</u> of this Agreement cannot be transferred to the Purchaser because the Seller's Storage System Division does not have the right to transfer such technology without the internal approval of another division of the Seller or an Affiliate of the Seller, the Seller may satisfy its obligations under this Section 1 by using its reasonable best efforts to procure the consent of the relevant division for such transfer and if it is not able to obtain such consent it shall use its reasonable best efforts to either otherwise obtain the benefit of such Transferred Technology for the Purchaser or to obtain and transfer to the Purchaser Technology which is substantially equivalent to such Transferred Technology.

<div align="center">

**SECTION 2**
**PURCHASE PRICE; ALLOCATIONS**

</div>

2.1      <u>Purchase Price</u> .

(a)        The aggregate purchase price (the " ***Purchase Price*** ") to be paid for the Acquired Assets shall be, net of any VAT, transfer Taxes or withholding Taxes, (i) US$687,500,000 payable in cash (the " ***Cash Consideration*** "), and (ii) the Loan Note, the amount due thereunder being exchangeable, at the option of each of the parties hereto, for 45,239,490 Ordinary Shares (the " ***Share Consideration*** "). In addition to the foregoing payment, as consideration for the sale, assignment, transfer and delivery of the Acquired Assets, the Purchaser shall assume and discharge the Assumed Liabilities.  It is

<div align="center">7</div>

understood and agreed among the parties that the LOI Deposit Amount (to the extent not forfeited under the Letter of Intent) shall be subtracted from the amount of the Cash Consideration that the Purchaser is obligated to wire to the Seller hereunder.

(b)        If, at any time prior to the forty-fifth (45th) day following the Closing Date, the Purchaser notifies the Seller in writing that any manufacturing equipment included in the Acquired Assets and identified on Schedule 1.1(a)(i) of the Seller Disclosure Schedules with either (X) a Book Value as of the Closing Date equal to or greater than US$100,000 individually or (Y) an original actual cost equal to or in excess of US$250,000 individually and where such amounts in (X) and (Y) in the aggregate exceed US$1,000,000 was not transferred or delivered to the Purchaser or the relevant Purchaser Designee at the Closing as contemplated by Section 1.1 hereof (with such notice identifying each such non-delivered manufacturing equipment by reference to the relevant section of the Seller Disclosure Schedules) (such non-delivered manufacturing equipment, the " ***Non-Delivered Equipment*** " ), then the Seller shall, within twenty (20) Business Days of receipt of such notice, (i) transfer the Non-Delivered Equipment to the Purchaser, to the extent such Non-Delivered Equipment exists and is transferable to the Purchaser, or (ii) to the extent such Non-Delivered Equipment does not exist or is not transferable to the Purchaser, pay to the Purchaser by wire transfer of immediately available funds, to an account designated by the Purchaser in such notice, an amount equal to the value of such Non-Delivered Equipment (such amount, the " ***Non-Delivered Equipment Refund Amount*** "), with the value of each piece of such Non-Delivered Equipment calculated as an amount equal to (A) if the Book Value as of the Closing Date is equal to or greater than US$100,000, the Book Value of such Non-Delivered Equipment or (B) if the Book Value of such Non-Delivered Equipment is less than US$100,000, the lesser of US$100,000 and the amount of the Replacement Value, in which case the Purchase Price shall be deemed adjusted accordingly. The total aggregate Non-Delivered Equipment Refund Amount shall be limited to five percent (5%) of the Purchase Price (the " ***Non-Delivered Equipment Refund Cap*** "); provided that any amount in respect of Non-Delivered Equipment in excess of the Non-Delivered Equipment Refund Cap and any and all other claims and rights arising from or in connection with the failure to deliver or the delay in delivering the Non-Delivered Equipment shall be subject to the liability limits under Section 9.5.

2.2        Payment of Purchase Price .

(a)        On the Closing Date, the Purchaser and/or a Purchaser Designee shall pay the Cash Consideration by wire transfer of immediately available funds to such bank account(s) (including any bank account(s) for local purchase price payable under the Transfer Agreements) as shall be designated in writing by the Seller.

(b)        On the Closing Date, the Purchaser shall execute and deliver to the Seller the Loan Note. As soon as practicable following the Closing, in accordance with Section 7.3, the Guarantor shall (i) procure that (x) its register of members is written up to reflect an allotment of the Share Consideration to the Seller credited as fully paid and (y) the Seller is entered therein as the holder of the Share Consideration, (ii) deliver to the Seller evidence satisfactory to the Seller thereof, and (iii) issue and deliver to the Seller a share

8

certificate of the Guarantor executed under its common seal in respect of the Share Consideration.

2.3      <u>VAT; Withholding Taxes</u> .

(a)      The Purchase Price is meant to be a net amount that does not include any VAT.  To the extent that the consummation of the transactions contemplated by this Agreement is subject to VAT, such VAT shall be paid (i) if and to the extent such VAT is owed by the Seller under the Laws of the relevant jurisdictions, by the Purchaser and/or a Purchaser Designee, as the case may be, to the Seller at the Closing in addition to the Purchase Price, and (ii) if such VAT is owed by the Purchaser under the Laws of the relevant jurisdictions, by the Purchaser to the competent Taxing Authority.  The determination of (i) to what extent the execution of this Agreement is subject to VAT, and (ii) to what extent such VAT is owed by the Seller or by the Purchaser shall be agreed, in accordance with applicable Laws regarding VAT, by the parties at least fifteen (15) days prior to the Closing; *provided, however* , that if the parties fail to reach such an agreement, the opinion of the Purchaser on the applicable VAT treatment of this Agreement shall prevail and such treatment shall be applied at the Closing. For purposes of making this determination, the Purchaser and/or Purchaser Designee shall be entitled to seek rulings from the relevant Taxing Authority, and upon the request of the Purchaser and/or Purchaser Designee, the Seller shall cooperate and provide all reasonable assistance in connection therewith. On the Closing Date, the Seller shall issue an invoice or the equivalent thereof in the relevant jurisdiction in accordance with applicable Laws regarding VAT. The parties hereto shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any VAT.

(b)      If the VAT amount actually payable is higher or lower than the amount shown on the relevant invoice (including cases where no VAT has been invoiced at all) based on a determination of the parties (in accordance with applicable Laws regarding VAT) made after the Closing or due to an assessment after the Closing of a Taxing Authority, the parties shall make appropriate declarations and filings with the relevant Taxing Authorities, amend any invoices (to the extent required by applicable Laws regarding VAT), provide to the respective other party any requested information and copies of relevant documents and make any required payments to each other and the Taxing Authorities, respectively, in each case without unreasonable delay. In particular, if according to a final determination made by a Taxing Authority the VAT payable by the Seller is higher than shown on the relevant invoice (including cases where no VAT has been invoiced at all), the Purchaser and/or Purchaser Designee shall pay the corresponding shortfall amount to the Seller within ten (10) Business Days after receipt from the Seller of notification of the shortfall amount and a copy of the notification from the relevant Taxing Authority. Any interest and/or penalty due to be paid to a Taxing Authority shall be borne by the Purchaser and/or Purchaser Designee as the case may be, unless to the extent such interest and/or penalty is triggered by a default of the Seller to timely pay the VAT in accordance with the determination under Section 2.3(a), in which case the Seller shall solely bear such interest/penalty.  If the VAT assessed by such Taxing Authority is lower than that shown on the relevant invoice (including cases where no VAT has to be invoiced), the Seller shall pay such excess amount to the Purchaser

9

and/or Purchaser Designee as the case may be within ten (10) Business Days after receipt of the respective VAT refund from the respective Taxing Authority, including any interest thereon received from such Taxing Authority.

(c)        Any claim under this Section 2.3 shall become time-barred five (5) years after the ultimate, final and binding assessment of the relevant VAT.

(d)        The Purchaser and the Guarantor believe that no withholdings of whatever nature are to be made on payments owed by the Purchaser or the Guarantor under any of the transactions contemplated by this Agreement.  If withholding Taxes are due on payments to be made by the Purchaser or the Guarantor hereunder, then the Purchaser and the Guarantor shall make the necessary gross up payments to leave the Seller (after the deduction of the withholding Tax) with an amount equal to the payment which would have been due if no withholding Tax deduction had been required. The parties hereto shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any such withholding Tax.

2.4        Allocation of Purchase Price .

(a)        As soon as practicable after the Agreement Date, but no later than ninety (90) days thereafter, the Seller shall submit a preliminary allocation of the Purchase Price (taking into account any Assumed Liabilities to the extent treated as "amount realized" under applicable Law) among the Acquired Assets consistent with the arm's length principle (the " *Purchase Price Allocation* ") to the Purchaser in writing (such statement, the " *Preliminary Allocation Statement* "). The Purchaser shall thereupon have thirty (30) days to review the preliminary Purchase Price Allocation set forth on the Preliminary Allocation Statement and to notify the Seller in writing of any aspects thereof with which it disagrees. If the Purchaser does not respond within thirty (30) days of receipt of the Preliminary Allocation Statement from the Seller, the Purchase Price Allocation provided by the Seller shall be treated as conclusive and binding on the parties hereto for all purposes hereunder. In the event of any such disagreement, the parties shall negotiate in good faith to resolve such disagreement. If the Purchaser and the Seller are unable to agree on the Purchase Price Allocation by the date that is one hundred fifty (150) days after the Agreement Date, the Purchaser and the Seller shall jointly engage a third-party accountant, reasonably acceptable to both the Purchaser and the Seller, to prepare, in its reasonable determination, the Purchase Price Allocation that shall be conclusive and binding on the parties hereto for all purposes hereunder. The Purchaser and the Seller agree to provide to the third-party accountant such information as the third-party accountant may reasonably request in connection with the preparation of such schedule and shall request that the third-party accountant prepare and deliver to the Purchaser and the Seller such Purchase Price Allocation as promptly as practicable, but no later than 180 days after the Agreement Date. Any fees of the third-party accountant shall be split equally by the Purchaser and the Seller.

(b)        The Purchase Price Allocation shall be used to make (i) the necessary determinations for VAT purposes pursuant to Section 2.3(a), and (ii) purchase price allocations necessary for statutory accounting (i.e., Korean IFRS or any other local

generally accepted accounting principles) and Tax purposes. The parties agree to report the transactions contemplated hereby for any Tax purposes in accordance with the Purchase Price Allocation.

2.5     Allocation of Certain Items . With respect to certain expenses incurred in the operations of the Seller and the Seller Subsidiaries, the following allocations shall be made between the Seller and the Purchaser:

(a)     In the case of Taxes based on ad valorem or similar Taxes assessed against the Acquired Assets, the portion of such Taxes allocated to the Seller shall be deemed to be the amount of such Tax for the entire taxable period, multiplied by a fraction the numerator of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the number of days in the entire taxable period, with the remaining portion of such Taxes allocated to the Purchaser.

(b)     Taxes described in Section 2.5(a) above shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 2.5(a) . Upon payment of any such Taxes, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 2.5(a) together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of such statement.

## SECTION 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth on the Seller Disclosure Schedules, as such schedules may be updated pursuant to Section 11.12, the Seller represents and warrants to the Purchaser and the Guarantor as follows:

3.1     Organization . The Seller is duly organized and validly existing under the Laws of the Republic of Korea, is not in administration, receivership or liquidation, no petition has been presented for its winding-up and there are no grounds on which any petition or application could be based for its winding-up or the appointment of an administrator or receiver over its assets, has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, is duly qualified to do business and, to the extent such jurisdiction has a concept of good standing, is in good standing as a foreign entity in each jurisdiction where the nature of its activities makes such qualification necessary, except for jurisdictions in which the failure to be so qualified, individually or in the aggregate, would not have a Seller Material Adverse Effect.

3.2     Subsidiaries . Each of the Seller Subsidiaries is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation, as applicable and to the extent such jurisdiction has a concept of good standing, is not in administration, receivership or liquidation, no petition has been presented for its winding-up and

11

there are no grounds on which any petition or application could be based for its winding-up or the appointment of an administrator or receiver over its assets, has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, is duly qualified to do business and, to the extent such jurisdiction has a concept of good standing, is in good standing as a foreign entity in each jurisdiction where the nature of its activities makes such qualification necessary, except for jurisdictions in which the failure to be so qualified, individually or in the aggregate, would not have a Seller Material Adverse Effect.

3.3     <u>Authority; Binding Nature of Agreement</u> . The Seller has the power and authority to enter into and to perform its obligations under this Agreement and the other Transaction Documents to which it is a party, and the execution, delivery and performance by the Seller of this Agreement and the other Transaction Documents to which it is a party have been duly authorized by all necessary action on the part of the Seller.  The Seller has the power and authority to cause each of the Seller Subsidiaries to transfer any Acquired Assets owned by it pursuant to the provisions of this Agreement. Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and the Guarantor, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency, fraudulent conveyance and transfer, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (b) rules of law governing specific performance, injunctive relief and other equitable remedies.

3.4     <u>Absence of Restrictions</u> .  Assuming compliance with all applicable Antitrust Laws, neither (1) the execution, delivery or performance by the Seller of this Agreement or any of the other Transaction Documents, nor (2) the consummation of the transactions contemplated by this Agreement or any of the other Transaction Documents, will directly or indirectly (with or without the giving of notice or the lapse of time or both):

(a)     contravene, conflict with or result in a violation of any of the provisions of the Seller Constituent Documents;

(b)     contravene, conflict with or result in a violation of any resolution adopted by the shareholders, the board of directors, or any committee of the board of directors of any of the Seller or the Seller Subsidiaries;

(c)     except as set forth on <u>Schedule 3.4(c)</u> of the Seller Disclosure Schedules, contravene, conflict with or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the transactions contemplated by this Agreement or any of the other Transaction Documents or to exercise any remedy or obtain any relief under, any Law or any order, writ, injunction, judgment or decree to which the Seller or any of the Seller Subsidiaries, or any of the Acquired Assets, is subject, except for such contravention, conflict, violation, challenge, remedy or relief which, individually or in the aggregate, would not have a Seller Material Adverse Effect;

(d)     result in the imposition or creation of any Encumbrance (other than any Permitted Encumbrance) upon or with respect to any Acquired Asset; or

(e)        contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any material Governmental Authorization that is held by the Seller or the Seller Subsidiaries and that relates to the Business or to any of the Acquired Assets, except for such contravention, conflict, violation, revocation, withdrawal, suspension, cancellation, termination or modification which, individually or in the aggregate, would not have a Seller Material Adverse Effect.

3.5        <u>Governmental Consents</u> .  Other than as set forth on <u>Schedule 3.5</u> of the Seller Disclosure Schedules, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to (any of the foregoing being a " **Consent** "), any Governmental Body is required to be obtained or made by the Seller or any Seller Subsidiary in connection with the execution, delivery and performance by the Seller or any Seller Subsidiary of this Agreement or the consummation by the Seller or any Seller Subsidiary of the transactions contemplated hereby, except for such Consents which if not obtained or made would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

3.6        <u>Absence of Changes</u> . Since December 31, 2010:

(a)        no Seller Material Adverse Effect has occurred, and no event, occurrence, development or state of circumstances or facts has occurred that would reasonably be expected to, have a Seller Material Adverse Effect; and

(b)        there has not been any loss, damage or destruction to, or any interruption in the use of, any of the assets of the Business that has had or would reasonable be expected to have a Seller Material Adverse Effect (whether or not covered by insurance).

3.7        <u>Conduct in the Ordinary Course</u> .  Since December 31, 2010, other than as set forth on <u>Schedule 3.7</u> of the Seller Disclosure Schedules or as permitted by this Agreement, the Business has been conducted in the ordinary course of business and none of the actions or events prohibited by Section 5.2 has been taken or has occurred.

3.8        <u>Assets</u> .

(a)        The Seller and the Seller Subsidiaries have and shall convey to the Purchaser at the Closing possession of, and good, valid and transferable title to, all of the Transferred Tangible Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)        Except as set forth on <u>Schedule 3.8(b)</u> of the Seller Disclosure Schedules, the Transferred Tangible Assets include the manufacturing equipment capable of manufacturing eighteen (18) million units of Business Products per quarter on the basis of operating at full capacity (i.e., 24 hours per day, 365 days per annum).

(c)        <u>Schedule 3.8(c)</u> of the Seller Disclosure Schedules sets forth an accurate and complete list of all plants, equipments and other tangible assets used exclusively in the Business or located at the Asset Locations (other than the Excluded Tangible Assets) with a net book value of US$10,000 or more. All Transferred Tangible Assets (i) are in

13

good operating condition and in a state of good maintenance and repair, subject to ordinary wear and tear, (ii) are free of any material defects and (iii) were acquired and are usable in the ordinary course of business.

(d)        To the Knowledge of the Seller, no Affiliate of the Seller (other than the Seller Subsidiaries) owns any assets, properties or rights that would be Acquired Assets were such assets, properties or rights owned by the Seller or a Seller Subsidiary.

(e)        To the Knowledge of the Seller, none of the Acquired Assets is located in the Republic of Ireland.

3.9        Inventory . The Transferred Inventory (a) was acquired and is sufficient for the operation of the Business in the ordinary course consistent with past practice and (b) is of a quality and quantity usable or saleable in the ordinary course of business.

3.10        Compliance with Law .

(a)        Except as set forth in Schedule 3.10(a) of the Seller Disclosure Schedules, since December 31, 2007:

(i)        to the Knowledge of the Seller, the Seller and each of the Seller Subsidiaries has conducted the Business in compliance with all applicable Laws in all material respects;

(ii)        neither the Seller nor any Seller Subsidiary has received any written notice or other communication from any Governmental Body regarding any actual or possible violation in any material respect of, or failure to comply in any material respect with, any applicable Law with respect to the Business;

(iii)        to the Knowledge of the Seller, the Seller and the Seller Subsidiaries have at all times been, and are currently, in material compliance with all applicable Anti-Corruption and Anti-Bribery Laws with respect to the Business;

(iv)        the Seller and the Seller Subsidiaries have established and maintain compliance programs and reasonable internal controls and procedures appropriate to the requirements of applicable Anti-Corruption and Anti-Bribery Laws;

(v)        to the Knowledge of the Seller, the Seller and the Seller Subsidiaries have at all times conducted, in all material respects, their export and import transactions in accordance with all applicable Export and Import Control Laws with respect to the Business; and

(vi)        the Seller and the Seller Subsidiaries have established and maintain compliance programs and reasonable internal controls and procedures appropriate to the requirements of all applicable Export and Import Control Laws.

14

3.11    Permits and Approvals.

(a)    Schedule 1.1(i) of the Seller Disclosure Schedules identifies all material Exclusive Permits. The Exclusive Permits held by the Seller and the Seller Subsidiaries are valid and in full force and effect. Schedule 1.1(i) of the Seller Disclosure Schedules identifies with an asterisk each material Exclusive Permit set forth therein which by its terms or by applicable Law cannot be transferred to the Purchaser at the Closing.

(b)    The Seller and the Seller Subsidiaries are in compliance with, in all material respects, the terms and requirements of the respective material Exclusive Permits held by the Seller or a Seller Subsidiary.

(c)    Neither the Seller nor any Seller Subsidiary has received any notice or other communication from any Governmental Body regarding (i) any actual or possible violation of or failure to comply with any term or requirement of any material Exclusive Permit or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any material Exclusive Permit.

(d)    All applications required to have been filed for the renewal of any material Exclusive Permit have been duly filed on a timely basis with the relevant Governmental Body, and each other notice or filing required to have been given or made with respect to such material Exclusive Permit has been duly given or made on a timely basis with the appropriate Governmental Body.

3.12    Intellectual Property .

(a)    Schedule 1.1(c) and Schedule 1.2(l) of the Seller Disclosure Schedules includes a true and complete list of all Patents owned by the Seller or any of the Seller's Affiliates and (i) for which employees of the Seller's Storage Systems Division were the sole inventors, (ii) for which the cost of prosecution or maintenance is internally allocated to the Storage Systems Division of the Seller, (iii) which were otherwise internally allocated to the Storage Systems Division of the Seller, or (iv) which are otherwise exclusive to the Business. Schedule 1.1(d) of the Seller Disclosure Schedules sets forth a true and complete list, as of the Agreement Date, of all Trademarks used for internal hard-disk drive products other than any Trademark that incorporates the Seller's trade name which are both part of the Business and owned by the Seller or any of the Seller's Affiliates.

(b)    Except as set forth in Schedule 3.12(b) of the Seller Disclosure Schedules, to the Knowledge of the Seller, the operation of the Business as currently conducted does not infringe or misappropriate the Intellectual Property of any third party in any material respect.

(c)    Schedule 3.12(c) of the Seller Disclosure Schedules is a complete and accurate list of Software owned by the Seller or any Seller Subsidiary and which is embodied in any Business Product or distributed by the Seller or any Seller Subsidiary to end users of Business Products.

(d)    To the Knowledge of the Seller, no Person is engaging in any activity that infringes or misappropriates any of the material Transferred IP.

15

(e)    Except as set forth in Schedule 3.12(e) of the Seller Disclosure Schedules, with respect to each item of the Transferred Technology and Transferred IP, the Seller or a Seller Subsidiary is the owner of the entire right, title and interest in and to such Technology and Intellectual Property and, following the Closing, Purchaser will be entitled to use such Technology and Intellectual Property in the continued operation of the Business as currently conducted.

(f)    To the Knowledge of the Seller, the Transferred Patents, Transferred Trademarks and Copyrights which are part of the Transferred Other IP are valid and enforceable and have not been adjudged invalid or unenforceable.

(g)    Except as set forth in Schedule 3.12(g) of the Seller Disclosure Schedules, no Legal Proceeding has been asserted, is pending, or to Knowledge of the Seller, is threatened, against the Seller or any Seller Subsidiaries alleging that the operation of any material portion of the Business or any Business Product infringes or misappropriates the Intellectual Property of any third party in any material respect.

(h)    Schedule 3.12(h) of the Seller Disclosure Schedule lists (i) all agreements, contracts and licenses pursuant to which any third party has licensed or granted any rights to the Seller or any Seller Subsidiary of Intellectual Property or Technology that is practiced by, incorporated in, or distributed with any Business Product and material to the operation of the Business other than licenses to generally available Software licensed on standard industry terms and other than corporate level cross-licenses (" *In-Licenses* ") and (ii) all HDD Patent corporate-level cross licenses to which the Seller is a party other than those with respect to which the Seller has disclosed to the Purchaser the other parties thereto through a process to be mutually agreed upon.

(i)    Except as set forth in Schedule 3.12(i) of the Seller Disclosure Schedules, to the Knowledge of the Seller, the Business is not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling materially restricting the use of any Transferred Patent, Transferred Trademark or Transferred Other IP or the making, importing or selling of any Business Product.

(j)        Except as set forth in Schedule 3.12(j) of the Seller Disclosure Schedules or those corporate level cross licenses to which the Seller is a party and where the Seller has disclosed to the Purchaser the other parties thereto through a process to be mutually agreed upon, the Seller has not entered into any written Contract granting to any third party any general right or license to any Transferred Patent or Transferred Trademark (" **Out-Licenses** ").

(k)        Except as set forth on Schedule 3.12(k) of the Seller Disclosure Schedules, none of the Product Software owned by the Seller or any Affiliate of the Seller and used in the Business at the Closing includes any Open Source Materials.

3.13        Contracts .

(a)        Subject to Section 5.7, Schedule 1.1(h) of the Seller Disclosure Schedules sets forth an accurate and complete list of all Seller Contracts that relate exclusively to

16

the conduct of the Business (other than the Excluded Contracts) with an annual Contract value of US$1,000,000 or more. Each of the Assumed Contracts, In-Licenses and Out-Licenses is valid and in full force and effect, and is enforceable by the Seller or the Seller Subsidiaries in accordance with its terms. Except as set forth on <u>Schedule 3.13(a)</u> to the Seller Disclosure Schedules, the consummation of the transactions contemplated hereby shall not (either alone or upon the occurrence of additional acts or events) result in any payment or payments becoming due from the Seller, the Purchaser or any of its Affiliates to any Person or give any Person the right to terminate or alter the provisions of any Assumed Contract.

(b)        None of the Seller or the Seller Subsidiaries has committed any material violation or breach of, or any material default under, any Assumed Contract, and, to the Knowledge of the Seller, no other Person has committed any material violation or material breach of, or any material default under, any Assumed Contract.

(c)        The Seller has not received any written notice or other communication regarding any actual or possible material violation or material breach of, or material default under, any Assumed Contract.

(d)        The Seller has not knowingly waived any of its material rights under any Assumed Contract.

(e)        Except as set forth in <u>Schedule 3.13(e)</u> , there is no Assumed Contract limiting in any material respect the right of the Seller or any of the Seller Subsidiaries to engage in any line of business, including the Business, or to compete with any Person.

3.14        <u>Employee Matters</u> .

(a)        <u>Schedule 3.14(a)</u> of the Seller Disclosure Schedules contains a list of employees employed by the Seller or the Seller Subsidiaries related to the Business (the " ***Business Employees*** ") as of the Agreement Date, and accurately reflects each such employee's location of employment, salary, and other cash compensation payable to them, date of employment, position, accrued paid time off or vacation as of March 31, 2011, and exempt or non-exempt status, where applicable.  The Seller will provide an updated list of the Business Employees as of the Closing in the event that any Business Employee's employment with the Seller is terminated prior to the Closing or any employees are hired by the Seller after the Agreement Date who would have been included on <u>Schedule 3.14(a)</u> of the Seller Disclosure Schedules if employed by the Seller on the Agreement Date.

(b)        To the Knowledge of the Seller, the Seller and each Seller Subsidiary is, and has at all times since December 31, 2007 been, in compliance, in all material respects, with all applicable Laws relating to employment, employment practices, wages, bonuses, employee benefit plans and programs and terms and conditions of employment related to the Business Employees.

(c)        Except as set forth on <u>Schedule 3.14(c)</u> of the Seller Disclosure Schedules, there is no pending Legal Proceeding or, to the Knowledge of the Seller, threatened Legal

17

Proceeding against the Seller or the Seller Subsidiaries raised by a Business Employee or a former employee of the Seller or the Seller Subsidiaries related to the Business.

(d)        Except as set forth on <u>Schedule 3.14(d)</u> of the Seller Disclosure Schedules, no strike, labor dispute, slowdown, concerted refusal to work overtime or work stoppage against the Seller or any of the Seller Subsidiaries is pending, or to the Knowledge of the Seller, threatened, or reasonably anticipated.

3.15        <u>Product Liability; Warranties</u> . Except as set forth on <u>Schedule 3.15</u> of the Seller Disclosure Schedules:

(a)        there is no notice, demand, claim, action, suit, inquiry, hearing, proceeding, notice of violation or investigation from, by or before any Governmental Body relating to any Business Product, including the packaging and advertising related thereto, designed, formulated, manufactured, processed, distributed, sold or placed in the stream of commerce by the Business, or claim or lawsuit involving a Business Product which is pending or, to the Knowledge of the Seller, threatened by any Person; and

(b)        there has not been, nor is there under consideration by the Business, any Business Product recall or post-sale warning of a material nature conducted by or on behalf of the Business concerning any Business Product.

3.16        <u>Environmental Matters</u> .  Except as set forth on <u>Schedule 3.16</u> of the Seller Disclosure Schedules:

(a)        the Business has at all times complied and is presently in compliance with all applicable Environmental Laws in all material respects;

(b)        the Seller and the Seller Subsidiaries have not received any notice, demand, claim, letter or request for information, relating to any alleged violation of Environmental Law; and

(c)        the Seller and the Seller Subsidiaries possess all material Governmental Authorizations required under Environmental Laws for the Business as presently conducted and there are no circumstances, other than the transactions contemplated hereby, that could reasonably be expected to result in any such Governmental Authorizations being revoked, terminated or revised; and there are no writs, injunctions, decrees, directives, orders or judgments outstanding, in each case under any applicable Environmental Law or any actions, suits, proceedings or investigations pending or threatened relating to compliance with any applicable Environmental Law affecting the Business or the Acquired Assets.

3.17        <u>Legal Proceedings</u> .

(a)        Except as set forth in <u>Schedule 3.17(a)</u> of the Seller Disclosure Schedules, there is no pending Legal Proceeding, and to the Knowledge of the Seller, there is no threatened Legal Proceeding:

(i)        that involves the Business or any of the Acquired Assets which if decided adversely would have a Seller Material Adverse Effect; or

(ii)        that involves the Business or any of the Acquired Assets which challenges, or that may have the effect of preventing, materially delaying, making illegal or otherwise interfering with, the transactions contemplated by this Agreement.

(b)        Except as set forth in Schedule 3.17(b) of the Seller Disclosure Schedules and, except as would not have a Seller Material Adverse Effect, there is no decree, order, judgment, injunction, temporary restraining order or other order in any Legal Proceeding to which the Seller, the Business or any Acquired Asset is subject.

3.18        Customers and Suppliers .  Schedule 3.18 of the Seller Disclosure Schedules contains a true, correct and complete list of the names and addresses of the Customers and Suppliers as of the Agreement Date.  The Seller and the Seller Subsidiaries maintain good commercial relations with each of their respective Customers and Suppliers and, to the Knowledge of the Seller, no event has occurred that would materially and adversely affect the Seller's or the Seller Subsidiaries' relations with any such Customer or Supplier, excluding the transactions contemplated by this Agreement and any announcement related thereto. The Seller has not received any written notice to the effect that any current customer or supplier may terminate or materially alter its business relations with the Seller or any Seller Subsidiary, either as a result of the transactions contemplated hereby or otherwise, that, in either case, would have a Seller Material Adverse Effect.

3.19        Tax Matters .

(a)        Except as set forth in Schedule 3.19(a) of the Seller Disclosure Schedules, the Seller and the Seller Subsidiaries have (i) paid, withheld and remitted on a timely basis to the competent Taxing Authority all Taxes arising out of the conduct of the Business or concerning or attributable to the Acquired Assets that may become due and payable on or prior to the Closing Date and (ii) timely filed all Tax Returns relating to all Taxes arising out of the conduct of the Business or concerning or attributable to the Acquired Assets, which Tax Returns are true and correct in all material respects.

(b)        There are no liens on any of the Acquired Assets with respect to Taxes.

3.20        Finder's Fee .  No broker, finder or investment banker, other than Allen & Company LLC, is entitled to any brokerage, finder's or other fee or commission payable by the Seller in connection with the transactions contemplated hereby.

3.21        Investment Representations . The Seller (a) understands that the Ordinary Shares comprising the Share Consideration have not been, and, except as contemplated by and in accordance with the terms of Article IV of the Shareholder Agreement, will not be, registered under the Securities Act, or registered or qualified for resale under any state or foreign securities laws, and are being offered and sold to the Seller hereunder in reliance upon U.S. federal and state exemptions for transactions not involving any public offering, (b) is subscribing for the Ordinary Shares comprising the Share Consideration solely for its own account for investment

purposes and not with a view to the distribution thereof, (c) has had the opportunity to obtain additional information concerning the Guarantor as desired in order to evaluate the merits and the risks inherent in holding the Ordinary Shares, (d) is able to bear the economic risk inherent in holding the Ordinary Shares, subject to the restrictions on transfer of the Ordinary Shares set forth in the Shareholder Agreement, and (e) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

3.22     No Other Representations or Warranties .  Except for the representations and warranties contained in this Section 3, the Seller is not making or granting any representation or warranty or any other statement whether express or implied and the Seller hereby disclaims any other representation or warranty or any other statement, whether made by the Seller or any Affiliate of the Seller or any of their respective Representatives with respect to the Business, the Acquired Assets, the Assumed Liabilities, the execution of this Agreement or the other Transaction Agreements or the transactions contemplated hereunder and thereunder, and in particular and without limiting the generality of the foregoing, the Purchaser and the Guarantor acknowledge that the Seller makes no representation or warranty with respect to:

(a)     any projections, estimates or budgets or any future revenues, future results of operations (or any component thereof), future cash flows, future financial condition (or any component thereof) or the future conduct and operations of the Business delivered or made available to the Purchaser, the Guarantor, their respective Affiliates or their or their respective Affiliates' Representatives, and

(b)     any other information or documents made available to the Purchaser, the Guarantor, their respective Affiliates or their or their respective Affiliates' Representatives with respect to the Business.

SECTION 4
REPRESENTATIONS AND WARRANTIES OF
THE PURCHASER AND THE GUARANTOR

Each of the Purchaser and the Guarantor, jointly and severally, represents and warrants to the Seller as follows, and in addition, without prejudice to the foregoing, the Purchaser individually and on its own account as a separate covenant represents and warrants to the Seller as follows:

4.1     Organization and Standing .  Each of the Purchaser and the Guarantor is a corporation duly incorporated, validly existing and, in the case of the Purchaser, in good standing under the Laws of the jurisdiction of its incorporation, is not in administration, examinership, receivership or liquidation, and no petition has been presented for its winding-up and there are no grounds on which any petition or application could be based for its winding-up or the appointment of an administrator or receiver over its assets, has all corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, and is duly qualified to do business and, to the extent such jurisdiction has a concept of good standing, is in good standing as a foreign entity in each jurisdiction where the nature of its activities makes such qualification necessary, except for jurisdictions in which the failure to

20

be so qualified, individually or in the aggregate, would not have a Guarantor Material Adverse Effect.

4.2       Authority; Binding Nature of Agreement .  Each of the Purchaser and the Guarantor has the power and authority to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party (in case of the Purchaser, including without limitation the issuance of the Loan Note and in case of the Guarantor, including without limitation the issuance of the Share Consideration), and the execution, delivery and performance by each of the Purchaser and the Guarantor of this Agreement and the other Transaction Documents have been duly authorized by all necessary action on the part of the Purchaser and the Guarantor.  Assuming the due authorization, execution and delivery of this Agreement by the Seller, this Agreement constitutes the valid and binding obligation of each of the Purchaser and the Guarantor, enforceable against each of the Purchaser and the Guarantor in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency, fraudulent conveyance and transfer, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (b) rules of law governing specific performance, injunctive relief and other equitable remedies.

4.3       Capitalization .  The authorized share capital of the Guarantor consists of (i) 1,250,000,000 Ordinary Shares, of which 427,567,347 shares were issued and outstanding as of April 15, 2011, (ii) 100,000,000 preferred shares, par value $0.00001 per share, of which no shares were issued and outstanding as of April 15, 2011 and (iii) 40,000 non-voting deferred shares, all of which were issued and outstanding as of April 15, 2011. No shares in the capital of the Guarantor were held by a Subsidiary of the Guarantor as of the Agreement Date. As of April 15, 2011, 12,130,279 Ordinary Shares were subject to outstanding options granted under the Seagate Technology plc 2001 Share Option Plan (the " *SOP* "), 37,958,529 Ordinary Shares were subject to outstanding options granted under the Seagate Technology plc 2004 Share Compensation Plan, as amended (the " *SCP* "), 129,132 Ordinary Shares were subject to outstanding options granted under the Maxtor Corporation 2005 Performance Incentive Plan, and 307,300 Ordinary Shares were subject to outstanding options granted under the Maxtor Corporation Amended and Restated 1996 Stock Option Plan. As of April 15, 2011 15,586,344 additional Ordinary Shares were reserved and available for issuance pursuant to the Seagate Technology plc Employee Stock Purchase Plan.  All of the issued and outstanding Ordinary Shares and all shares in the capital of the Guarantor issued pursuant to the Guarantor Stock Plans have been, or will be upon issuance, duly authorized and validly issued, and are fully paid, and non-assessable. There are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, reserved for issuance, agreements, arrangements or commitments of any character under which the Guarantor is or may become obligated to issue or sell any shares or other equity interests, or any securities or obligations exercisable or exchangeable for or convertible into any shares or other equity interests, of the Guarantor, and no securities or obligations evidencing such rights are authorized, issued or outstanding. To the Knowledge of the Guarantor, the issued and outstanding shares and other equity interests of the Guarantor are not subject to any voting trust arrangement or other contract, agreement or arrangement restricting or otherwise relating to the voting, dividend rights or disposition of such stock or other equity interests.  There are no phantom stocks or

21

similar rights providing economic benefits based, directly or indirectly, on the value or price of the capital stock or other equity interests of the Guarantor.

4.4     Valid Issuance .

(a)     Prior to the Closing, the Guarantor shall have taken all necessary action, and has and shall have sufficient authorized shares available, to permit it to issue or otherwise deliver the Share Consideration to be delivered hereby pursuant to the Loan Note, when and if either the Seller or the Guarantor exercise the option to exchange the amount due under the Loan Note for the Share Consideration. All Ordinary Shares to be delivered to the Seller as the Share Consideration pursuant to the Loan Note following the Closing will be validly issued, fully paid, non-assessable and free and clear of all Encumbrances, and no Person will have any preemptive right of subscription or purchase or any other right in respect thereof.

(b)     Prior to the Closing, the Purchaser shall have taken all necessary action to permit it to issue and deliver the Loan Note at the Closing.  The Loan Note to be delivered to the Seller as the Closing will be validly issued and free and clear of all Encumbrances, other than the Encumbrances relating to the obligations of the Purchaser therein.

4.5     Governmental Consents .  Other than the Requisite Regulatory Approvals, no Consent is required to be obtained or made by the Purchaser or the Guarantor in connection with the execution, delivery and performance by the Purchaser or the Guarantor of this Agreement or the consummation by the Purchaser or the Guarantor of the transactions contemplated hereby, except for such Consents which if not obtained or made would not reasonably be expected to have, individually or in the aggregate, a Guarantor Material Adverse Effect.

4.6     SEC Filings; Financial Statements .

(a)     All registration statements, proxy statements and other statements, reports, schedules, forms, exhibits and other documents filed by the Guarantor with the SEC and available on the SEC website, including all amendments thereto, since July 2, 2010 are accurate and complete copies thereof (collectively, the " **_Guarantor SEC Documents_** "). All statements, reports, schedules, forms, exhibits and other documents required to have been filed by the Guarantor with the SEC since July 2, 2010 have been so filed on a timely basis. None of the Guarantor's Subsidiaries is required to file any documents with the SEC. As of the time filed with the SEC (or, if amended or superseded by a filing prior to the Agreement Date, then on the date of such filing): (i) each of the Guarantor SEC Documents complied in all material respects with the applicable requirements of the Securities Act or the Exchange Act (as the case may be); and (ii) none of the Guarantor SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Each of the certifications and statements relating to the Guarantor SEC Documents required by: (A) Rule 13a-14 or Rule 15d-14 under the Exchange Act; (B) 18 U.S.C. §1350 (Section 906 of the Sarbanes-Oxley Act); or (C) any other rule or regulation promulgated

22

by the SEC or applicable to the Guarantor SEC Documents is accurate and complete, and complies as to form and content with all applicable Laws. As used in this Section 4.6, the term " *file* " and variations thereof shall be broadly construed to include any manner in which a document or information is filed, furnished, submitted, supplied or otherwise made available to the SEC or any member of its staff in accordance with the applicable requirements of the Securities Act or the Exchange Act (as the case may be).

(b)       The financial statements (including any related notes) contained or incorporated by reference in the Guarantor SEC Documents: (i) complied as to form in all material respects with the published rules and regulations of the SEC applicable thereto; (ii) were prepared in accordance with US GAAP applied on a consistent basis throughout the periods covered (except as may be indicated in the notes to such financial statements or, in the case of unaudited financial statements, as permitted by Form 10-Q, Form 8-K or any successor form under the Exchange Act, and except that the unaudited financial statements may not contain footnotes and are subject to normal and recurring year-end adjustments, none of which were or will be material); and (iii) fairly present, in all material respects, the consolidated financial position of the Guarantor and its consolidated Subsidiaries as of the respective dates thereof and the consolidated results of operations and cash flows of the Guarantor and its consolidated Subsidiaries for the periods covered thereby. No financial statements of any Person other than the Guarantor and its Subsidiaries are required by US GAAP to be included in the consolidated financial statements of the Guarantor.

(c)       The Guarantor's auditor has at all times since the date of enactment of the Sarbanes-Oxley Act been: (i) a registered public accounting firm (as defined in Section 2(a)(12) of the Sarbanes-Oxley Act); (ii) "independent" with respect to the Guarantor within the meaning of Regulation S-X under the Exchange Act; and (iii) to the Knowledge of the Guarantor, in compliance with subsections (g) through (l) of Section 10A of the Exchange Act and the rules and regulations promulgated by the SEC and the Public Company Accounting Oversight Board thereunder.  All non-audit services performed by the Guarantor's auditors for the Guarantor that were required to be approved in accordance with Section 202 of the Sarbanes-Oxley Act were so approved.

(d)       The Guarantor maintains, and at all times since July 2, 2010 has maintained, a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) which is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with US GAAP, and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and disposition of the assets of the Guarantor; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with US GAAP and that receipts and expenditures are being made only in accordance with authorizations of management and directors of the Guarantor; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Guarantor that would have a material effect on the financial statements. To the Knowledge of the Guarantor, except as set forth in the Guarantor SEC Documents

23

filed prior to the Agreement Date, since July 2, 2010 neither the Guarantor nor any of its Subsidiaries nor the Guarantor's independent registered accountant has identified or been made aware of: (A) any significant deficiency or material weakness in the design or operation of internal control over financial reporting utilized by the Guarantor; (B) any illegal act or fraud, whether or not material, that involves the Guarantor's management or other employees; or (C) any claim or allegation regarding any of the foregoing.

4.7     Absence of Restrictions .  Assuming compliance with all applicable Antitrust Laws, neither (1) the execution, delivery or performance of this Agreement or any of the other Transaction Documents, nor (2) the consummation of transactions contemplated by this Agreement or any of the other Transaction Documents (including without limitation the issuance of the Loan Note at the Closing and the issuance of the Share Consideration upon the exercise of the option to exchange the amount due under the Loan Note for the Share Consideration), will directly or indirectly (with or without the giving of notice or the lapse of time or both):

(a)     contravene, conflict with or result in a violation of any of the provisions of the Guarantor Constituent Documents or the Purchaser Constituent Documents;

(b)     contravene, conflict with or result in a violation of any resolution adopted by the shareholders, the board of directors, or any committee of the board of directors of the Guarantor or the Purchaser;

(c)     contravene, conflict with or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the transactions contemplated by this Agreement or any of the other Transaction Documents or to exercise any remedy or obtain any relief under, any Law or any order, writ, injunction, judgment or decree to which each of the Purchaser and the Guarantor, or any of the assets owned, used or controlled by the Purchaser or the Guarantor, is subject, except for such contravention, conflict, violation, challenge, remedy or relief which, individually or in the aggregate, would not have a Guarantor Material Adverse Effect; or

(d)     contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any material Governmental Authorization that is held by the Purchaser or the Guarantor or that otherwise relates to the business of the Purchaser or the Guarantor or to any of the assets owned, used or controlled by the Purchaser or the Guarantor, except for such contravention, conflict, violation, revocation, withdrawal, suspension, cancellation, termination or modification which, individually or in the aggregate, would not have a Guarantor Material Adverse Effect.

4.8     Absence of Changes . Since December 31, 2010:

(a)     no Guarantor Material Adverse Effect has occurred, and no event, occurrence, development or state of circumstances or facts has occurred that will, or would reasonably be expected to, have a Guarantor Material Adverse Effect; and

(b)     there has not been any loss, damage or destruction to, or any interruption in the use of, any of the assets of the business or the Purchaser or the Guarantor that has

24

had or would reasonable be expected to have a Guarantor Material Adverse Effect (whether or not covered by insurance).

4.9    Legal Proceedings .

(a)    There is no pending Legal Proceeding, and to the Knowledge of the Guarantor, there is no threatened Legal Proceeding:

(i)    that involves the Guarantor or the Purchaser which if decided adversely would have a Guarantor Material Adverse Effect; or

(ii)    that involves the Guarantor or the Purchaser which challenges, or that may have the effect of preventing, materially delaying, making illegal or otherwise interfering with, the transactions contemplated by this Agreement.

(b)    Except as would not have a Guarantor Material Adverse Effect, there is no decree, order, judgment, injunction, temporary restraining order or other order in any Legal Proceeding to which the Purchaser or the Guarantor is subject.

4.10    Availability of Funds .  The Purchaser has lawfully available, and will have lawfully available on the Closing Date, sufficient funds without any external financing to enable the Purchaser to consummate the transactions contemplated by this Agreement and to pay all of the Cash Consideration and the Purchaser's and the Guarantor's fees and expenses in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby. No action or proceeding has been commenced by or against the Purchaser or the Guarantor under any bankruptcy Law of any relevant jurisdiction for the relief of debtors or for the enforcement of the rights of creditors.

4.11    Finder's Fee .  Other than Morgan Stanley & Co. Incorporated, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission payable by the Guarantor or the Purchaser in connection with the transactions contemplated hereby.

## SECTION 5
## CERTAIN COVENANTS AND AGREEMENTS

5.1    Access and Investigation .  During the period from the Agreement Date through the Closing Date (the " **Pre-Closing Period** "), the Seller shall provide the Purchaser and the Purchaser's Representatives with reasonable access to the Seller's Representatives, personnel, properties and assets and to all existing books, records, work papers, financial data (other than pricing information) and other documents and information relating to the Business as the Purchaser may reasonably request, subject to any restrictions under applicable Law.

5.2    Operation of the Seller's Business .  During the Pre-Closing Period, except as otherwise consented to by the Purchaser, the Seller shall, and shall cause the Seller Subsidiaries to:

(a)    conduct the Business (i) in the ordinary course and in accordance with past practices and (ii) in compliance with (x) all Laws and Governmental Authorizations

applicable to the Business and (y) the requirements of all Assumed Contracts to which the Seller or the Seller Subsidiaries are a party; and

(b)    use commercially reasonable efforts to ensure that it preserves the Business intact and maintains its relations and goodwill with all suppliers, customers, licensors and licensees providing services or products to the Business.

For the avoidance of doubt, any change in the Business or in the conduct or operation of the Business as a result of any loss of or any other change in the relationships with employees (including any strikes and other labor dispute), suppliers or customers (including customer orders or contracts) of the Seller or the Seller Subsidiaries or any change to the financial performance or position or results of operation of the Seller or the Seller Subsidiaries resulting from the announcement or pendency of the transactions contemplated by this Agreement or any other industry-related factors, in and of itself without otherwise breaching this Section 5.2, shall not be deemed to be a breach of this Section 5.2.

5.3    Preparation of Financial Statements .  Prior to the Closing Date, the Seller shall cause to be prepared and delivered to the Guarantor (a) such audited financial statements (the " **Business Financial Statements** ") of the Business that the Guarantor determines in good faith (after consultation with its accounting and legal advisors) to be required by, and would enable the Guarantor to comply with, the public reporting and other rules and regulations of the SEC and the NASDAQ Global Select Market applicable to the Guarantor in the context or as a result of the transactions contemplated by the Transaction Documents, including those public reporting and other rules and regulations that require, permit or contemplate the public reporting of audited financial statements and pro forma information following the consummation of the transactions contemplated by the Transaction Documents and (b) such audited financial statements for the Business for the fiscal year ended December 31, 2010, (the " **2010 Financial Statements of the Business** ") to be prepared by the Seller in accordance with Korean IFRS and its accounting policies and practices under its sole control, judgment and discretion. For the avoidance of doubt, the 2010 Financial Statements of the Business shall not be prepared for the Guarantor to comply with its reporting obligations and shall not be required to be prepared with any consultation with, determination by, or any other input from the Guarantor. In connection with the preparation and delivery of the Business Financial Statements, the Guarantor shall, and shall cause its Representatives to, fully cooperate with the Seller and its Representatives in a

manner that is adequate to, and exercise its reasonable best efforts to, permit the Business Financial Statements and unaudited quarterly Business Financial Statements for the periods ended March 31, 2011 and June 30, 2011 to be prepared and delivered as soon as possible following the Agreement Date, but no later than 180 days thereafter, and to be updated on a quarterly basis for each quarter ending after June 30, 2011, with such updated unaudited quarterly Business Financial Statements to be prepared and delivered no later than 45 days after the end of such quarter and to be updated on an annual basis for the year ending on December 31, 2011 (and if the Closing occurs in 2013, for the year ending on December 31, 2012), with such updated audited Business Financial Statements to be prepared and delivered no later than 90 days after the end of each such year. The Seller shall be entitled to retain such internationally recognized accounting firm without any conflict with the Seller and any other advisors as are reasonably necessary to timely and properly prepare the Business Financial Statements and shall be entitled to retain its current independent accounting firm for the preparation of the 2010 Financial

26

Statements of the Business. All fees, costs and expenses incurred by the Seller or any Affiliate thereof in the preparation of the Business Financial Statements shall be reimbursed to the Seller by the Guarantor promptly, and in any event within ten (10) Business Days, after the submission to the Guarantor of written invoices therefor.

5.4     Purchaser Designees; Local Asset Transfers .

(a)     The Purchaser may assign the right to acquire certain of the Acquired Assets, or to assume certain of the Assumed Liabilities or employment relationships with the Transferred Employees to one or more of its Affiliates (the " **Purchaser Designees** "). No later than ninety (90) days following the Agreement Date, the Purchaser shall provide to the Seller a list of the Purchaser Designees, their respective constitutional documents and other documents and information reasonably requested by the Seller.

(b)     The Seller shall, in good faith consultation with the Purchaser, select the manner by which the Acquired Assets are sold, conveyed, transferred or assigned to the Purchaser and/or the Purchaser Designees; *provided* that the manner selected shall result in the Purchaser and/or the Purchaser Designees, as applicable, receiving a Tax basis in each of the relevant jurisdictions for local Tax purposes at least equal to the applicable Purchase Price Allocation. If a Tax basis is not available with respect to any Acquired Asset as a result of a non-Tax issue, the parties will discuss the reasonable resolution of such matter.

(c)     The parties shall enter into and deliver (and, in case of the Purchaser, shall cause the relevant Purchaser Designees to enter into and deliver, and, in case of the Seller, shall cause the relevant Seller Subsidiaries to enter into and deliver) the Transfer Agreements promptly after the Agreement Date, but no later than ninety (90) days thereafter, subject to any delays resulting from compliance with applicable Law.  The consummation and closing of the sale, conveyance, transfer and/or assignment under each Transfer Agreement shall be subject to and occur simultaneously on the Closing Date.

5.5     No Negotiation . From the date hereof until the earlier of (a) the Closing Date and (b) the date on which this Agreement is terminated in accordance with its terms, the Seller shall not, and the Seller shall cause each of the Seller Subsidiaries not to, directly or indirectly through any of their respective directors, officers or other employees, affiliates, representatives or other agents (including its financial, legal, accounting or other advisors):  (i) solicit, knowingly encourage, knowingly initiate or knowingly facilitate any inquiry, proposal or offer from any third party regarding an acquisition or sale of the Business, regardless of the structure or form of transaction (an " **Alternative Transaction** "); (ii) furnish or make available to any third party any non-public information regarding the Business in a manner intended to facilitate an Alternative Transaction; (iii) participate in any discussions with any third party regarding an Alternative Transaction; or (iv) enter into an agreement, or otherwise make any commitment or other arrangement, whether binding or non-binding, regarding an Alternative Transaction. Notwithstanding the foregoing, the Seller and each Seller Subsidiary shall be permitted to provide confidential information and otherwise engage in discussions with any third party in the ordinary course of business and in furtherance of the conduct of the Business.

27

5.6      Employee Matters .

(a)      Pursuant to the procedures set forth in Exhibit F , and in consultation with the Seller, the Purchaser shall make offers of employment to all of the Subject Employees. The Purchaser hereby agrees to employ all of the Subject Employees, and any other Business Employee who received an offer from the Purchaser, who accept offers of employment from the Purchaser, effective as of the Closing Date (collectively, the " *Transferred Employees* "). The Seller agrees that concurrent with the Closing, the Seller and the Seller Subsidiaries shall ensure the termination of the employment relationship with all Transferred Employees.  The Transferred Employees shall be employed by the Purchaser in accordance with the terms and conditions set forth in Sections 5.6(b), 5.6(c) and 5.6(d) below.

(b)      The Purchaser (or one or more Purchaser Designees, as the case may be) shall provide guaranteed employment for no less than five (5) years for each of the Subject Employees identified in Schedule 5.6(b) of the Seller Disclosure Schedules who become Transferred Employees, as described in Exhibit F .

(c)      Effective upon the Closing, the Purchaser agrees that it will employ the Transferred Employees in the same and/or similar functional disciplines and at no less than their then current respective total compensation (including, among other things, bonuses and payments under any profit sharing scheme and other material employee benefits). All Transferred Employees will be entitled to retirement, health, welfare and other employee benefits (including vacation, floating holiday, sickness, paid time off, and severance) that are substantially comparable, on an aggregate basis, to the retirement, health, welfare and other employee benefits provided by the Seller or a Seller Subsidiary to the Transferred Employees immediately prior to the Closing Date.  Transferred Employees also will be entitled to participate in the Purchaser's employee benefit plans, commissions, bonus plans, and severance benefit plans at the same level and in the same manner as provided to comparably situated employees of the Purchaser as of the Agreement Date.  The duration of each Transferred Employee's employment with the Seller or a Seller Subsidiary will be credited to such Transferred Employee as employment with the Purchaser for all employment purposes, including the calculation of severance pay, seniority and benefits eligibility, and vacation accrual, subject to applicable Laws and the approval of any applicable insurance carrier, and, in the case of severance pay, subject to any full pay-outs by the Seller, or the rollover to and assumption by the Purchaser or relevant Purchaser Designee, upon such Transferred Employee's transfer or termination of employment, as applicable.

(d)      From and after the Closing Date, with respect to the Transferred Employees, the Purchaser shall be solely responsible for paying, providing or satisfying when due all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice and benefits under all applicable Law and under any Purchaser plan, policy, practice or agreement and all other liabilities, in each such case incurred or arising as a result of employment or separation of employment with the Purchaser, as well as any taxes, social

28

charges or similar contributions relating to the same. The Purchaser shall be responsible for liabilities with respect to the transfer or termination of any Transferred Employees by the Purchaser after the Closing, including without limitation, health care or any other continuation coverage with respect to benefits plans established or maintained by the Purchaser after the Closing, as applicable. Notwithstanding the foregoing, the Seller shall transfer to the Purchaser and/or Purchaser Designee(s), as applicable, the accrued but unpaid severance reserves for the Transferred Employees at the Closing.

(e)     The Seller and the Purchaser agree and acknowledge that the employment relationships of the Transferred Employees are governed by the Laws of various jurisdictions and that the offer or transfer of employment and subsequent employment of the Transferred Employees by the Purchaser as contemplated by this Section 5.6 is subject to different legal requirements depending on the jurisdiction by which the employment relationship of the respective Transferred Employee is governed. Irrespective of the various obligations which are set forth in this Agreement and in particular in this Section 5.6, the Purchaser agrees to undertake all actions which may be reasonably required to effect the employment of the Transferred Employees by the Purchaser, and the Seller shall reasonably cooperate therewith. In connection with the employment of the Transferred Employees by the Purchaser, each party hereto shall comply in all material respects with all applicable Laws and any written agreement with any relevant trade union, works council, other employee representative body, or with any individual Transferred Employee. Each party hereto agrees to provide the other party with information reasonably required by the other party to (i) comply with any legal requirement (whether statutory or pursuant to any written agreement with any relevant trade union, works council or other employee representative body) in respect of the contemplated employment of the Transferred Employee by the Purchaser and (ii) inform, consult or negotiate with or seek consent from the relevant employees, relevant trade unions, relevant works councils or any other employee representative body in relation to this Agreement and the transactions contemplated hereby. Unless approved by the other party in writing, the parties hereto shall at all times between the Agreement Date and the Closing Date, refrain from any communication or other actions which are intended to cause, provoke or encourage a Transferred Employee to reject the Purchaser's offer of employment.

5.7     Assumed Contracts; Non-Assignable Contracts . The Seller and the Seller Subsidiaries, as applicable, shall use commercially reasonable efforts to (a) obtain the consent of the third parties required under any Assumed Contract in connection with the Transaction Documents or the consummation of the transactions contemplated by the Transaction Documents, or that may be necessary in order to prevent the termination by any third party of any Assumed Contract as a result of the Transaction Documents or the consummation of the transactions contemplated by the Transaction Documents, (b) make the benefit of any Non-Assignable Contract available to or seek the Purchaser so long as the Purchaser fully cooperates with the Seller and the Seller Subsidiaries and promptly reimburses the Seller and the Seller Subsidiaries for all payments made by the Seller or the Seller Subsidiaries (with the prior written approval of the Purchaser) in connection therewith and (c) enforce, at the request of the Purchaser and at the sole expense and for the account of the Purchaser, any right of the Seller or the Seller Subsidiaries arising from any Non-Assignable Contract against the other party or parties thereto

29

(including the right to elect or terminate any such Non-Assignable Contract in accordance with the terms thereof). The Purchaser shall use commercially reasonable efforts to avoid taking any action or suffering any omission which would limit, restrict or terminate in any material respect the benefits to the Purchaser of any Non-Assignable Contract. Nothing in this Agreement or any document executed in connection herewith shall constitute a sale, assignment, transfer or conveyance to, or assumption by, the Purchaser of the Non-Assignable Contracts, and prior to obtaining the applicable third-party consent with respect to a Non-Assignable Contract that would otherwise be included in an Assumed Contract, such Contract shall not be included in the Assumed Contracts and shall be retained by the Seller. With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to the Purchaser is obtained following the Closing, the Seller shall transfer such Non-Assignable Contract to the Purchaser by execution and delivery of an instrument of conveyance promptly after the receipt of such approval or consent. Notwithstanding anything to the contrary in this Section 5.7, the Seller shall not be obligated to incur any out-of-pocket expenses in order to obtain a third-party consent related to any Assumed Contract.

5.8     Public Announcements . During the Pre-Closing Period, neither the Purchaser or the Guarantor, on the one hand, nor the Seller or the Seller Subsidiaries, on the other hand, shall (and they shall not permit any of their respective Affiliates or Representatives to) issue any press release or make any public statement regarding this Agreement or any of the other Transaction Documents, or regarding any of the transactions contemplated hereby or thereby, without the other parties' prior written consent; *provided, however* , that nothing herein shall be deemed to prohibit any party from making any public disclosure that such party deems necessary or appropriate under applicable Law or the rules of any securities exchange or market, in which case the other parties shall be consulted in good faith as to the nature, content and form of such public disclosure prior to disclosure; *provided, further* , that without the prior written consent of the other parties, no party shall at any time disclose to any Person the fact that this Agreement or any of the other Transaction Documents has been entered into or any of the terms of this Agreement or any of the other Transaction Documents other than to such party's advisors who such party reasonably determines needs to know such information for the purpose of advising such party, it being understood that such advisor will be informed of the confidential nature of this Agreement and the other Transaction Documents and the terms hereof and thereof and will be directed to treat such information as confidential in accordance with the terms of this Agreement.

5.9     Confidentiality .

(a)     Except as set forth in Schedule 5.9 of the Seller Disclosure Schedules, none of the parties hereto shall, and each party shall ensure that none of their respective Affiliates will, during the Pre-Closing Period and after the Closing Date, disclose any Confidential Information, whether regarding itself or regarding the other parties, to any third Person. The obligation of the parties under this Section 5.9 shall not apply to any of the following: (i) disclosure of such Confidential Information required by applicable Law or the rules of any securities exchange or market, in which case the other parties shall be consulted in good faith as to the nature, content and form of such disclosure prior to disclosure; (ii) disclosure of such Confidential Information to such party's professional advisors who have been retained in relation to the transactions contemplated by this

30

Agreement and the other Transaction Documents and who have been informed of the confidential nature of such information and agreed to treat such information as confidential in accordance with the terms of this Agreement, but only to the extent necessary for such advisors to perform their duties; and (iii) disclosure of such Confidential Information for the purpose of defending any claim against the other party or parties under this Agreement or enforcing its rights hereunder.

(b)      Upon the Closing, any Confidential Information which is part of the Acquired Assets that pertains exclusively to the Business shall be deemed to be the Confidential Information of the Purchaser.

(c)      The parties acknowledge that the Guarantor and the Seller have previously entered in a Mutual Nondisclosure Agreement, dated February 28, 2011 (the " ***Nondisclosure Agreement*** "), which Nondisclosure Agreement shall continue in full force an effect in accordance with its terms except as modified by this Section 5.9.

5.10      Reasonable Efforts; Further Assurances; Cooperation . Subject to the other provisions hereof, each party hereto shall use its reasonable best efforts to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Expiration Date, in accordance with the terms hereof and shall cooperate fully with each other party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder, including the following:

(a)      Each party hereto shall promptly and timely make its filings and submissions and shall use its reasonable best efforts to obtain any required approval of any Governmental Body with jurisdiction over the Acquired Assets or the transactions contemplated by this Agreement and the other Transaction Documents. Each of the parties hereto shall furnish to each other party all information required for any application or other filing to be made by such other party pursuant to any applicable Law in connection with the transactions contemplated hereby; *provided* that if any such information, in the discretion of the party providing the information, is deemed confidential, it shall be provided on an outside counsel basis only;

(b)      Each party hereto shall promptly notify the other party of (and provide written copies of) any communications from or with any Governmental Body in connection with the transactions contemplated hereby;

(c)      In the event any claim, action, suit, investigation or other proceeding by any Governmental Body or other Person is commenced that questions the validity or legality of the transactions contemplated by this Agreement or the other Transaction Documents or seeks damages in connection therewith, the parties hereto shall (i) cooperate and use their respective reasonable best efforts to defend against such claim, action, suit, investigation or other proceeding, (ii) in the event an injunction or other order is issued in any such claim, action, suit, investigation or other proceeding, use their respective best efforts to have such injunction or other order lifted and (iii) cooperate

31

reasonably regarding any other impediment to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents;

(d)      The Seller shall give notices to all relevant third parties and use its commercially reasonable efforts (in consultation with the Purchaser) to obtain such third-party consents necessary or required to consummate the transactions contemplated by this Agreement and the other Transaction Documents;

(e)      The Seller will, without demanding any further consideration therefor, at the request and expense of the Purchaser (except for the value of the time of the Seller's employees), use its commercially reasonable efforts to do (and cause its Affiliates to do) all lawful acts that are necessary for prosecuting, sustaining, obtaining continuations of, or reissuing Transferred IP and for evidencing, maintaining, recording and perfecting the Purchaser's rights to any Transferred IP, including but not limited to (i) execution and acknowledgement of (and causing its Affiliates to execute and acknowledge) assignments and other instruments in a form reasonably required by the Purchaser for each Patent jurisdiction and (ii) providing the Purchaser (or the relevant Purchaser Designee) with reasonable assistance to secure the Purchaser's rights in any inventions within the Transferred IP, in any and all applicable countries, including the disclosure to the Purchaser of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Purchaser, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all such inventions, and testifying in a suit or other proceeding relating to such inventions within the Transferred IP;

(f)      As soon as practicable after the Agreement Date, but no later than sixty (60) days thereafter, the parties hereto shall agree on the list and scope of services to be provided under the Transition Services Agreement, which services thereunder shall be provided for up to a maximum of twelve months after the Closing Date, unless the parties otherwise mutually agree in writing. Within sixty (60) days thereafter, the parties hereto shall negotiate in good faith and agree on the form of the Transition Services Agreement; and

(g)      The parties hereto shall negotiate in good faith, enter into and deliver the Supply Agreement for Internal Drives and the Transition Services Agreement on or prior to the Closing Date, which shall become effective as of the Closing Date.

5.11      Regulatory Approvals .

(a)      Each of (i) the Guarantor, (ii) the Purchaser and (iii) to the extent required by applicable rules and regulations, the Seller and the Seller Subsidiaries, agrees to make, and if applicable, agrees to cause its respective Affiliates to make, an appropriate filing pursuant to (a) the HSR Act and (b) Regulation (EC) no. 139/2004 (the " *EU Merger Regulation* ") with respect to the transactions contemplated by this Agreement and the other Transaction Documents within ten (10) Business Days after the Agreement Date and to supply promptly any additional information and documentary material that may be

32

requested pursuant to the HSR Act and the EU Merger Regulation as referred to above. In addition, each party hereto agrees to make, or to cause to be made, to the extent required by applicable rules and regulations, any filing that may be required under any other Antitrust Law or by any other Governmental Body, including any other requirements of the Antitrust Law of any relevant jurisdiction, if applicable, within thirty (30) days after the Agreement Date and to supply promptly any additional information and documentary material that may be requested pursuant thereto. In the event that any applicable Antitrust Law requires that a filing be made within less than thirty (30) days after the Agreement Date, then such requirement shall be complied with by the parties. Each party hereto shall have responsibility for its respective filing fees (and the filing fees of their respective Affiliates, if applicable) associated with the HSR Act filings, the EU Merger Regulation filings and any other filings required in any other jurisdictions under any other Antitrust Laws.

(b)        If a party hereto (or any Affiliate of a party hereto) receives a request for additional information or documentary material from any Governmental Body with respect to the transactions contemplated by this Agreement or the other Transaction Documents, then it shall use its reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request, and, if permitted by applicable Law and by any applicable Governmental Body, provide the other party's counsel with advance notice and the opportunity to participate in any material meeting with any Governmental Body in respect of any filing made thereto in connection with the transactions contemplated by this Agreement or the other Transaction Documents.  Neither the Guarantor or the Purchaser (or any Affiliates thereof), on the one hand, nor the Seller or the Seller Subsidiaries (or any Affiliates thereof), on the other hand, shall commit to or agree with any Governmental Body to stay, toll or extend any applicable waiting period under the HSR Act, the EU Merger Regulation or other applicable Antitrust Laws, without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed).

(c)        In the event the Requisite Regulatory Approvals have not been obtained by December 31, 2011 and to the extent the Guarantor and the Purchaser have not materially breached this Agreement or any other Transaction Document that has been entered into and is effective and are not in material breach of this Section 5.11, then the Guarantor shall have the right to extend the Expiration Date to March 31, 2012, solely for the purpose of obtaining the Requisite Regulatory Approvals. The Guarantor shall, not less than five (5) Business Days prior to December 31, 2011, provide to the Seller written notice that it intends to extend the Expiration Date (such notice, the "***Notice of Extension***").  The Notice of Extension shall (i) identify the Requisite Regulatory Approvals not yet obtained, and (ii) provide a detailed explanation of the information being requested by any Governmental Body that has not yet provided a Requisite Regulatory Approval and the actions such Governmental Body has required the Guarantor, the Purchaser and any of their respective Affiliates to take in order to obtain such Requisite Regulatory Approvals.

(d)        None of the parties hereto shall take any action that would reasonably be expected to hinder or delay the obtaining of clearance or any necessary approval of any Governmental Body under any Antitrust Laws or the expiration of any required waiting periods under any Antitrust Laws.

(e)        For the avoidance of doubt, each of the parties hereto hereby fully acknowledges and unequivocally agrees that such party would be irreparably damaged if any of the provisions of this Section 5.11 are not performed by the other party in accordance with their specific terms and that any breach of this Section 5.11 by the Purchaser or the Guarantor, or the Seller, as the case may be, would not be adequately compensated by monetary damages alone. Accordingly, to the fullest extent permitted by applicable Law, (i) in addition to any other right or remedy to which the Seller, the Purchaser or the Guarantor may be entitled, at law or in equity, the Seller, the Purchaser or the Guarantor, as the case may be, shall be entitled to enforce any provision of this Section 5.11 by a decree of specific performance and temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Section 5.11 in any action instituted in a court of competent jurisdiction, without the posting of any bond or other undertaking, and (ii) each party hereto hereby irrevocably waives, in any action for specific performance, the defense of adequacy of a remedy at law. For the avoidance of doubt, in case a remedy of specific performance is not granted, the Seller would remain entitled to terminate this Agreement under Section 8.1(b) .

(f)        Notwithstanding any of the foregoing, none of the Purchaser or any of its Affiliates shall be under any obligation to agree to sell, hold, separate, divest, discontinue or limit, before or after the Closing Date, any material assets or businesses or interest in any material assets or businesses of the Purchaser or any of its Affiliates.

5.12        Transfer Taxes; Expenses .  Any transfer Taxes or recording fees payable as a result of the purchase and sale of the Acquired Assets or any other action arising out of this Agreement or the other Transaction Documents shall be paid by the Purchaser.  The parties hereto shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any such transfer Taxes or recording fees. The parties hereto shall cooperate in the preparation, execution and filing of all returns, questionnaires, applications and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions contemplated hereby that are required or permitted to be filed at or prior to the Closing.

5.13        Non-Competition . For period of five (5) years from the Closing Date (the " **Non-Compete Period** "), neither the Seller nor any Affiliate of the Seller (other than natural Persons) shall, directly or indirectly, engage in whole or in part in a business substantially the same as the Business as it is conducted by the Seller and any Affiliate of the Seller as of the Closing Date, or in the design or manufacturing of (or having manufactured) HDDs.  Notwithstanding the foregoing and anything else in this Agreement or any other Transaction Document, neither the Seller nor any Affiliate of the Seller (other than natural Persons) shall be precluded from, and shall not be in violation of this Section 5.13 by, (i) performing any obligations under, exercising any rights under or otherwise conducting or engaging in any activities contemplated to be

34

undertaken by the Seller or any Affiliate of the Seller in connection with this Agreement or any other Transaction Document, including the IP Agreement and the Transition Services Agreement, (ii) conducting or in any manner otherwise engaging in, directly or indirectly, (x) the Seller's Component Business or (y) the research and development, design, manufacture, sale or any other commercialization of semiconductor products, solid-state drives or devices, components or other products which are not complete HDDs or which merely include or incorporate HDDs, (iii) the distribution or resale of HDDs purchased from the Purchaser, its Affiliates or a third party and warranty and other support in connection with the same or (iv) acquiring less than five percent (5%) of the outstanding equity interest in or investing less than US$100,000,000 in any Person engaged in the business of designing, making, assembling, servicing, supporting or selling HDDs.

5.14    Non-Solicitation . Neither the Purchaser nor the Guarantor shall, for a period of thirty (30) months from the Agreement Date, in any manner, directly, indirectly, individually, in partnership, jointly or in conjunction with any Person, except as otherwise expressly permitted by Section 5.6 with respect to Subject Employees and Transferred Employees, (i) recruit or solicit or attempt to recruit or solicit, on any of their behalves or on behalf of any other Person, any Business Employee, (ii) encourage any Person to recruit or solicit any Business Employee, or (iii) otherwise encourage any Business Employee to discontinue his or her employment with the Seller or any Affiliate of the Seller; *provided* that the placement of advertisements or general solicitations for employment in publications of broad dissemination, including in newspapers or on the Internet, shall not be deemed to be a violation of this Section 5.14, so long as no employee or group of employees of the Seller or any Affiliate of the Seller are specifically targeted.

5.15    Customer Visits; Supplier Relationships.

(a)    During the Pre-Closing Period, the Seller shall permit the Purchaser to discuss and meet, and shall reasonably cooperate in such discussions and meetings, with any Customer of the Seller and the Seller Subsidiaries that the Purchaser so requests. A Representative of the Seller or a Seller Subsidiary shall have the right, but not the obligation, to accompany the Purchaser's Representative to such meetings and shall participate with the Purchaser's Representative in any such discussions. Furthermore, the Seller and the Seller Subsidiaries shall cooperate with the Purchaser in the preparation of presentations to such Customers with respect to the transactions contemplated by this Agreement and the other Transaction Documents. All costs relating to the actions described in this Section 5.15 (other than the cost of travel for the Seller's Representative) shall be borne solely by the Purchaser. The Seller shall promptly notify the Purchaser if a commercial relationship and/or agreement it has with a Customer terminates during the Pre-Closing Period.

(b)    The Purchaser acknowledges that the Seller and the Seller Subsidiaries have made non-documented informal commitments with certain suppliers set forth on Schedule 5.15(b) of the Seller Disclosure Schedules for maintaining long-term business relationships and continued supply and purchase. The Purchaser hereby agrees to use good-faith commercially reasonable efforts to honor such long-term commitments as long as practicably possible after the Closing.

5.16    Inventory . The Seller shall maintain a target level of all inventory intended for use exclusively in the Business so that at the time of the Closing the value of the Transferred Inventory shall be as follows: (a) raw materials being equal to or greater than the value of 17.3 days, (b) work-in-progress being equal to or greater than 6.4 days, and (c) finished goods being equal to or greater than 17.2 days, in each case intended for use exclusively in the Business measured as of the Closing Date based on the cost of goods sold as of the end of the last quarter immediately preceding the Closing Date; *provided* , *however* , that the parties hereto agree that the aforementioned inventory level targets as of the Closing may be reduced by 10% by the relevant division of the Seller.

5.17    Delivery of Books and Records . During the period commencing on the Agreement Date and continuing through the one year anniversary of the Closing Date, upon reasonable written request by the Purchaser, the Seller shall make commercially reasonable efforts to deliver, and to cause its Affiliates to deliver, to the Purchaser copies of all books and records used in the conduct of the Business, including all manuals, records and files, correspondence, logs, technical records, research and development files, litigation files, sales and promotional materials, advertising materials, warranty records, engineering records and personnel records of the Seller, as well as such additional financial, operating, and other data and information as the Purchaser may reasonably request predominantly relating to the operations of the Business to the extent permitted by relevant Contracts and applicable Laws.

5.18    Valuation in Respect of the Loan Note . The Purchaser and the Guarantor shall have procured that a valuation report reasonably satisfactory to the Seller and in compliance with Section 30 Companies (Amendment) Act 1983 of Ireland in respect of the promissory note to be delivered to the Guarantor as consideration for the allotment of the Share Consideration issuable pursuant to the instrument constituting the Loan Note, and copies of such report shall be delivered to the Guarantor and the Seller on or prior to the Closing Date.

5.19    Covenant to Pay Irish Stamp Duty .

(a)    If any Irish stamp duty is payable on or in respect of this Agreement or any document or any transfer, assignment or other conveyance on sale (as defined for the purposes of the Stamp Duties Consolidation Act 1999 of Ireland), in each case, contemplated herein or required to be delivered by the terms hereof or the instrument constituting the Loan Note or any document contemplated therein or required to be delivered by the terms thereof, then the Purchaser shall pay such liability in accordance with its obligations under Irish law.

(b)      Without prejudice to the foregoing, if the Seller becomes liable to pay any Irish stamp duty as a result of the execution of the Transaction Documents or on the allotment of the Shares (as such term is defined in the form of the Loan Note attached as <u>Exhibit E</u> hereto), the Seller shall notify the Purchaser promptly and the Purchaser shall pay promptly to the Seller by way of liquidated damages an amount equal to any such stamp duty and any interest or penalties or surcharges payable in respect thereof.

# SECTION 6
## CONDITIONS PRECEDENT

6.1     <u>Conditions Precedent to Obligations of Purchaser, Guarantor and Seller</u> .  The obligations of the Purchaser, the Guarantor and the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions:

      (a)     the waiting period applicable to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents under the HSR Act (or any extension thereof) shall have expired or been terminated;

      (b)     the European Commission shall have issued a decision under Article 6(1)(b) or 8(1) or 8(2) of the EC Merger Regulation (or shall be deemed to have done so under Article 10(6) thereof), declaring the transactions contemplated by this Agreement and the other Transaction Documents compatible with EC Common Market;

      (c)     similar approvals under the Antitrust Laws of the Republic of Korea, Japan and the People's Republic of China applicable to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents shall have been obtained (through the expiration of any applicable waiting period or otherwise) (the approvals contemplated under Sections 6.1(a), 6.1(b) and 6.1(c), collectively, the " ***Requisite Regulatory Approvals*** "); and

      (d)     no Governmental Body in the United States, the European Union, the Republic of Korea, Japan or the People's Republic of China shall have enacted, issued, promulgated, enforced or entered any Law or Order (which Order has become final and non-appealable), which Law or Order is in effect and which has the effect of making any of the transactions contemplated by this Agreement illegal or otherwise prohibiting the Closing, other than any Antitrust Law (or Order seeking to enforce the provisions of any Antitrust Law) and any Law or Order that would not have a Seller Material Adverse Effect or a Guarantor Material Adverse Effect.

6.2     <u>Conditions Precedent to Obligations of Purchaser and Guarantor</u> . The obligations of the Purchaser and the Guarantor to consummate the transactions contemplated by this Agreement are subject to the preparation and delivery of the 2010 Financial Statements of the Business pursuant to Section 5.3.

# SECTION 7
## CLOSING

7.1     <u>Closing</u> . The Closing shall take place at the offices of Paul, Hastings, Janofsky & Walker LLP in Palo Alto, California within three (3) Business Days following the day on which the conditions set forth in Section 6.1 shall have been satisfied or waived in accordance with this Agreement or at such other place or time or on such other date as the Seller, the Purchaser and the Guarantor may agree in writing.

7.2     <u>Closing Actions</u> .  On the Closing Date, the parties shall perform the following actions:

(a)     the Purchaser shall pay the Cash Consideration to the Seller, as provided in Section 2.2(a);

(b)     the Purchaser and the Guarantor shall deliver to the Seller the executed Loan Note under which the Seller or the Guarantor may, at its option, require that the amount due under the Loan Note be exchanged for the Share Consideration;

(c)     the Seller shall deliver to the Purchaser such other executed instruments of assignment, certificates of title documents, deeds and conveyance documents necessary to transfer to the Purchaser the Acquired Assets, together with possession of the Acquired Assets;

(d)     without limiting the foregoing, the Seller shall deliver to the Purchaser executed Patent and Trademark assignments, in a form reasonably acceptable to the Purchaser, suitable for filing with the US Patent and Trademark Office or other relevant authority in each jurisdiction in which such Transferred Patents or Transferred Trademarks have been filed or issued;

(e)     the relevant parties hereto shall enter into and deliver the Supply Agreement for Internal Drives and the Transition Services Agreement; and

(f)     the parties hereto shall perform all their respective obligations (and, in case of the Purchaser, shall cause the Purchaser Designees to perform their respective obligations, and, in case of the Seller, shall cause the Seller Subsidiaries to perform their respective obligations) required to be performed at Closing under the Transfer Agreements.

7.3     <u>Issuance of Share Consideration</u> . As soon as practicable after the Closing, but no later than 00:01 a.m., Irish time, on the date immediately following the Closing Date and upon any party's exercise of its option to require that the amount due under the Loan Note be exchanged for the Share Consideration, the Guarantor shall allot, issue and deliver the Share Consideration, free and clear of all Encumbrances, to the Seller.

<div align="center">

**SECTION 8**
**TERMINATION**

</div>

8.1     <u>Termination Events</u> .  This Agreement may be validly terminated (and the transactions contemplated by this Agreement and the other Transaction Documents abandoned) at any time prior to the Closing only as follows:

(a)     by mutual written consent of the Guarantor and the Seller; or

(b)     by the Seller in its sole discretion, in the event the Closing has not occurred by the Expiration Date and the Requisite Regulatory Approvals have not been obtained by such date.

<div align="center">38</div>

8.2      Closing Breach . In the event that (a) the Requisite Regulatory Approvals have been obtained pursuant to Section 6.1, (b) the conditions set forth in Section 6.1(d) and Section 6.2 have been satisfied or waived, and (c) the Purchaser and the Guarantor do not fulfill their obligations under this Agreement to timely consummate the transactions contemplated by this Agreement and the other Transaction Documents (" **Closing Breach** "), the Seller shall be entitled to seek specific performance of the provisions of this Agreement, including the provisions relating to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, as set forth in Section 11.1. If such remedy of specific performance is not granted to the Seller for any reason whatsoever, the Seller may terminate this Agreement at its sole discretion and receive the termination fee pursuant to Section 8.3(b), as well as seek any and all other remedy available under law and equity.

8.3      Effect of Termination .

(a)      If this Agreement is terminated by the Seller pursuant to Section 8.1(b), the Purchaser and the Guarantor, jointly and severally, shall pay to the Seller an amount equal to US$72,500,000 as promptly as possible (but in any event within five (5) Business Days after the date of termination).

(b)      If this Agreement is terminated by the Seller pursuant to Section 8.2, the Purchaser and the Guarantor, jointly and severally, shall pay to the Seller an amount equal to US$82,500,000 as promptly as possible (but in any event within five (5) Business Days after the date of termination).

(c)      The payment contemplated by Section 8.3(a) and Section 8.3(b) shall only be payable by the Guarantor and the Purchaser, together, one time as a single payment.

(d)      In the event of termination of this Agreement, this Agreement shall forthwith become void and there shall be no liability on the part of any party to this Agreement, except for the obligations and other provisions set forth under Section 5.8 ( *Public Announcements* ), Section 5.9 ( *Confidentiality* ), this Section 8 ( *TERMINATION* ), and Section 11 ( *MISCELLANEOUS PROVISIONS* ) (other than Section 11.12 ( *Seller Disclosure Schedules* )) and Exhibit A ( *Certain Definitions* ), all of which shall survive the date of termination of this Agreement. Notwithstanding the foregoing, but subject to the following proviso of this sentence, nothing contained herein shall relieve any party from liability for any fraud and willful and intentional breach hereof; *provided, however* , that in the event this Agreement is terminated pursuant to Section 8.1(b) and the Seller receives the payment contemplated by Section 8.3(a), then receipt of such payment in full shall constitute liquidated damages for any breach of this Agreement and none of the Seller or any of its Affiliates shall be entitled to additional damages or other remedies for any breach of the this Agreement occurring prior to such termination.

**SECTION 9**
**INDEMNIFICATION**

9.1     <u>Indemnification Obligations of the Seller</u> . From and after the Closing, the Seller shall indemnify and hold harmless the Purchaser Indemnified Parties from, against, and in respect of, any and all Losses arising out of or relating to:

(a)     any inaccuracy in or breach of any representation or warranty of the Seller set forth in this Agreement, either at and as of the Agreement Date or the Closing Date as if such representation and warranty had been made at and as of the Closing Date;

(b)     any breach of any covenant, agreement or undertaking made by the Seller in this Agreement; or

(c)     the Excluded Liabilities.

The Losses of the Purchaser Indemnified Parties described in this Section 9.1 as to which the Purchaser Indemnified Parties are entitled to indemnification are collectively referred to as " ***Purchaser Losses*** ."

9.2     <u>Indemnification Obligations of the Purchaser and the Guarantor</u> . From and after the Closing, the Purchaser and the Guarantor shall, jointly and severally, indemnify and hold harmless the Seller Indemnified Parties from, against and in respect of any and all Losses arising out of or relating to, and in addition, without prejudice to the foregoing, the Purchaser individually and on its own account as a separate covenant shall indemnify and hold harmless the Seller Indemnified Parties from, against and in respect of any and all Losses arising out of or relating to:

(a)     any inaccuracy in or breach of any representation or warranty of the Purchaser or the Guarantor set forth in this Agreement, either at and as of the Agreement Date or the Closing Date as if such representation and warranty had been made at and as of the Closing Date;

(b)     any breach of any covenant, agreement or undertaking made by the Purchaser or the Guarantor in this Agreement; or

(c)     the Assumed Liabilities.

The Losses of the Seller Indemnified Parties described in this Section 9.2 as to which the Seller Indemnified Parties are entitled to indemnification are collectively referred to as " ***Seller Losses*** ."

9.3     <u>Indemnification Procedure</u> .

(a)     Within ten (10) Business Days following receipt by an Indemnified Party of notice by a third party (including any Governmental Body) of any complaint, dispute or claim or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a " ***Third-Party Claim*** "), such Indemnified Party shall provide written notice thereof to the party obligated to indemnify under this Agreement (the " ***Indemnifying Party*** "), *provided, however* , that the failure to so notify the Indemnifying Party shall

relieve the Indemnifying Party from liability hereunder with respect to such Third-Party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party prejudices the Indemnifying Party or results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-Party Claim.  The Indemnifying Party shall have the right, upon written notice assuming full responsibility for any Purchaser Losses or Seller Losses (as the case may be) resulting from such Third-Party Claim delivered to the Indemnified Party within twenty (20) days thereafter, to assume the defense of such Third-Party Claim.  In the event, however, that the Indemnifying Party declines or fails to assume the defense of such Third-Party Claim within such twenty (20) day period, then the Indemnified Party shall have the right, but not the obligation, to assume the defense of such Third-Party Claim and any Purchaser Losses or Seller Losses (as the case may be) shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-Party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-Party Claim, shall have the right to participate in such matter and to retain its own counsel at such party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter the defense of which it is maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)      No Indemnified Party may settle or compromise any Third-Party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld, delayed or conditioned), unless the Indemnifying Party fails to assume and maintain the defense of such Third-Party Claim pursuant to Section 9.3(a) after providing a written notice assuming full responsibility thereof to the Indemnifying Party. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-Party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise or consent (x) includes an unconditional release of the Indemnified Party and its officers, directors, employees and Affiliates from all liability arising out of, or related to, such Third-Party Claim, (y) does not contain any admission or statement suggesting any wrongdoing or liability on behalf of the Indemnified Party and (z) does not contain any equitable order, judgment or term that in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      In the event an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-Party Claim (a " ***Direct Claim*** "), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (a " ***Notice of Claim*** "). Such Notice of Claim shall specify in detail the legal basis for and the underlying facts of such Direct Claim. For the avoidance of doubt, the parties agree and understand that Notices of Claim in respect of a breach of a representation or warranty must be delivered prior to the expiration of the survival period for such representation or warranty under Section 9.4. In case the Indemnifying Party

41

disputes the liability asserted under such Direct Claim, the Indemnifying Party shall send a notice of such dispute (an " **Objection Notice** ") to the Indemnified Party within thirty (30) days following its receipt of such Notice of Claim. In the event the Indemnifying Party disputes its liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within ten (10) Business Days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party immediately available funds in an amount equal to such Direct Claim as determined hereunder.

9.4      Survival Period; Time Limits .

(a)      The representations and warranties made by the parties herein shall not be extinguished by the Closing, but shall survive the Closing for, and all claims for indemnification in connection therewith and all claims for indemnification in connection with a breach of any covenant or other agreement made by the parties herein shall be asserted not later than the date falling, twelve (12) months after the Closing Date, except that the representations and warranties set forth in Section 3.1 ( *Organization* ), Section 3.2 ( *Subsidiaries* ), Section 3.3 ( *Authority; Binding Nature of Agreement* ), clauses (a) and (b) of Section 3.4 ( *Absence of Restrictions* ), Section 3.19 ( *Tax Matters* ), Section 4.1 ( *Organization and Standing* ), Section 4.2 ( *Authority; Binding Nature of Agreement* ), Section 4.3 ( *Capitalization* ), Section 4.4 ( *Valid Issuance* ) and clauses (a) and (b) of Section 4.7 ( *Absence of Restrictions* ) shall survive until the date of the expiration of the applicable statute of limitations and as otherwise specified in the covenants in Section 5.

(b)      All claims for indemnification arising out of any of the Excluded Liabilities falling under Section 1.4(a) (and not otherwise described in clauses (b) through (p) of Section 1.4) shall be asserted no later than the date falling two (2) years after the Closing Date and be time-barred thereafter.

(c)      All claims for indemnification arising out of any of the Excluded Liabilities falling under Section 1.4(j) shall be asserted no later than the date falling three (3) years after the Closing Date and be time-barred thereafter.

(d)      The Purchaser Indemnified Parties' ability to make claims for indemnification arising out of the Excluded Liabilities falling under clauses (b) through (i) and (k) through (p) of Section 1.4 shall survive until the date of the expiration of the applicable statute of limitations.

(e)      Notwithstanding the foregoing clauses (a) through (d) of this Section 9.4, if, prior to the close of business on the last day a claim for indemnification may be asserted hereunder, an Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.

9.5     Liability Limits . Notwithstanding anything to the contrary set forth herein, the Purchaser Indemnified Parties shall not make a claim against the Seller for indemnification under Section 9 for Purchaser Losses unless and until the aggregate amount of such Purchaser Losses (excluding all Purchaser Losses in respect of any single claim which do not exceed US$100,000, for which no claim for indemnification may be made (the " *Threshold Amount* ")) exceeds US$10,000,000 (the " *Purchaser Basket* "), in which event the Purchaser Indemnified Parties may claim indemnification only with respect to the amount of such Purchaser Losses in excess of the Purchaser Basket.  The total aggregate liability, other than Excluded Liabilities pursuant to Section 1.4(j), of the Seller for Purchaser Losses with respect to any and all claims made pursuant to Section 9 shall be limited to US$137,500,000 (the " *Indemnity Cap* "). Notwithstanding anything to the contrary set forth herein, (i) the Threshold Amount and the Purchaser Basket shall not apply to the Seller's indemnification obligations (x) based on Section 9.1 (c) or (y) arising out of a breach of Section 5.16; (ii) the Indemnity Cap shall not apply to the Seller's indemnification obligations arising out of (x) any of the Excluded Liabilities falling under clauses (b) through (i) and clauses (k) through (p) of Section 1.4 or (y) a breach of Section 2.1 (b), Section 2.3(b), Section 5.9 or Section 5.13; and (iii) the total aggregate liability of the Seller for Purchaser Losses with respect to any and all claims made pursuant to Section 9 that arise out of any of the Excluded Liabilities falling under clause (j) of Section 1.4 shall be limited to a separate indemnity cap equal to US$68,750,000.

9.6     Exclusive Remedy . Except for actions grounded in fraud or willful or intentional breach, from and after the Closing and subject to Section 8 and Section 11.1, the indemnities provided in this Section 9 shall constitute the sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement. Notwithstanding the foregoing, nothing herein shall limit the ability of the Parties to seek specific performance or other equitable remedies pursuant to Section 11.1.

## SECTION 10
## GUARANTEE

10.1     Guarantee . Without limiting any of the obligations and liabilities of the Guarantor under this Agreement, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees to the Seller the full and prompt payment, performance and satisfaction of all of the Purchaser's and any Purchaser Designee's obligations, duties, covenants, agreements, and liabilities to the Seller arising under this Agreement and under any other Transaction Documents, whether such obligations, duties, covenants, agreements and liabilities of the Purchaser or any Purchaser Designee arise prior to, on or after the Closing Date (the " *Guaranteed Obligations* ").

10.2     Obligations Absolute . To the fullest extent permitted by applicable Law, the Guaranteed Obligations of the Guarantor hereunder shall remain fully effective without regard to, and shall not be affected, limited or impaired in any way by: (i) any bankruptcy, insolvency, reorganization, adjustment, dissolution, liquidation, examinership or other like proceeding (each, an " *Insolvency Proceeding* ") relating to the Seller, the Purchaser, any Purchaser Designee or the Guarantor or any Affiliates thereof or any other implied or express guaranty thereof; (ii) any action taken by any trustee or receiver, or by any court, in any Insolvency Proceeding, whether or not the Guarantor shall have had notice or knowledge of any Insolvency Proceeding; (iii) any

43

assignment of this Agreement by any party to any other party; (iv) any modification, alteration, amendment or addition of or to this Agreement; or (v) any defense of the Purchaser, any Purchaser Designee or any other Person or any circumstance whatsoever (with or without notice to or knowledge of the Guarantor) which may or might in any manner or to any extent vary the risks of such Guarantor or might otherwise constitute a legal or equitable discharge of a surety or a guarantor or otherwise.

10.3    Primary Obligation; Waivers .  The guarantee provided by the Guarantor to the Seller under this Section 10 is a primary obligation of the Guarantor and the Guarantor hereby agrees that it is directly liable to the Seller for the Guaranteed Obligations and that a separate action for enforcement of such obligations may be brought against the Guarantor, whether such action is brought against the Purchaser, a Purchaser Designee or any other party or whether the Purchaser, a Purchaser Designee or any other party is joined in any such action. The Guarantor hereby waives any right it may have by Law or otherwise to require the Seller to institute suit against the Purchaser or a Purchaser Designee or to require the Seller to exhaust any rights and remedies which the Seller may have against the Purchaser or a Purchaser Designee.

## SECTION 11
## MISCELLANEOUS PROVISIONS

11.1    Enforcement of Agreement .  Each of the parties hereto hereby fully acknowledges and unequivocally agrees that such party would be irreparably damaged if any of the provisions of this Agreement are not performed by the other parties in accordance with their specific terms and that any breach of this Agreement by the Seller, the Purchaser or the Guarantor, as the case may be, would not be adequately compensated by monetary damages alone. Accordingly, to the fullest extent permitted by applicable Law, (i) in addition to any other right or remedy to which the Seller, the Purchaser or the Guarantor may be entitled, at law or in equity, the Seller, the Purchaser or the Guarantor, as the case may be, shall be entitled to enforce any provision of this Agreement by a decree of specific performance and temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement in any action instituted in a court of competent jurisdiction, without the posting of any bond or other undertaking, and (ii) each party hereto hereby irrevocably waives, in any action for specific performance, the defense of adequacy of a remedy at law. For the avoidance of doubt, in the case of a Closing Breach, to the fullest extent permitted by applicable Law, the Seller shall be entitled to specifically enforce the provisions of this Agreement, including the provisions relating to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, and the Seller may terminate this Agreement and seek monetary payments pursuant to Section 8 when such remedy of specific performance has been denied by a court of competent jurisdiction.

11.2    Further Assurances .  Each party hereto shall execute and cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement and the other Transaction Documents.

11.3     Fees and Expenses .  Unless otherwise specified herein, each party to this Agreement shall bear and pay all fees, costs and expenses (including legal fees and accounting fees, but excluding all stamp duties associated herewith which shall be paid by the Purchaser and/or the Guarantor) that have been incurred or that are incurred by such party in connection with the transactions contemplated by this Agreement and the other Transaction Documents.

11.4     Waiver; Amendment .  Any agreement on the part of a party hereto to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such party. A waiver by a party hereto of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time. This Agreement may not be amended, modified or supplemented except by written agreement of all of the parties hereto.

11.5     Entire Agreement .

(a)     This Agreement and the other Transaction Documents constitute the entire agreement among the parties to this Agreement and the other Transaction Documents and supersede all other prior agreements, representations and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof.

(b)     This Agreement shall take precedence over any Transfer Agreement. To the extent that any Transfer Agreement shall be inconsistent with the terms and conditions of this Agreement, the parties shall undertake to amend such Transfer Agreement such that it is consistent with the terms and conditions of this Agreement and, if during the period and to the extent such amendment has not occurred, shall put each other in the same economic position among the parties as if such amendment had occurred.

11.6     Execution of Agreement; Counterparts; Electronic Signatures .

(a)     This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties; it being understood that all parties need not sign the same counterparts.

(b)     The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures

45

of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

11.7     Governing Law; Jurisdiction and Venue .

(a)     This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws). The parties hereto hereby declare that it is their intention that this Agreement shall be regarded as made under the laws of the State of Delaware and that the laws of said State shall be applied in interpreting its provisions in all cases where legal interpretation shall be required. Each of the parties hereto agrees that this Agreement has been entered into by the parties hereto in express reliance upon 6 Del. C. § 2708.

(b)     All disputes, controversies or claims arising out of or in connection with this Agreement or the transactions contemplated hereby shall be heard and determined exclusively by the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware. Each party to this Agreement expressly, irrevocably and unconditionally:

(i)     consents and submits to the jurisdiction of the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware (and each appellate court located in the State of Delaware), in connection with any legal proceeding relating to any disputes, controversies or claims arising out of or in connection with this Agreement or the transactions contemplated hereby;

(ii)     agrees (1) to the extent such party is not otherwise subject to service of process in the State of Delaware, to appoint and maintain an agent in the State of Delaware as such party's agent for acceptance of legal process and notify the other party or parties hereto of the name and address of such agent, and (2) that service of any process, summons, notice or document by registered or certified mail (with a proof of receipt validated by the United States Postal Service) addressed to such party at the address set forth in Section 11.11 shall, to the fullest extent permitted by applicable Law, constitute effective service of such process, summons, notice or document for purposes of any such legal proceeding, and that service made pursuant to (ii) (1) or (2) above shall, to the fullest extent permitted by law, have the same legal force and effect as if served upon such party personally within the State of Delaware;

(iii)      agrees that the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware (and each appellate court located in the State of Delaware), shall be deemed to be a convenient forum; and

(iv)      agrees not to assert (by way of motion, as a defense or otherwise), in any such legal proceeding commenced in the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the

46

State of Delaware (and each appellate court located in the State of Delaware), any claim by any of the Seller, the Purchaser or the Guarantor that it is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

11.8   <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

11.9   <u>Assignment and Successors</u>.

(a)   No party hereto may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, except that the Seller may assign any of its rights and delegate any of its obligations under this Agreement to any of its Affiliates and the Purchaser may assign the right to acquire certain of the Acquired Assets, or to assume certain of the Assumed Liabilities or employment relationships with the Transferred Employees to the Purchaser Designees pursuant to Section 5.4.

(b)   Irrespective of any assignment, assumption or execution of a Transaction Document by a Purchaser Designee, the Purchaser and the Guarantor shall remain as the primary obligors under this Agreement and the other Transaction Documents, and shall remain jointly and severally liable in addition to such Purchaser Designee for, and any such assignment, assumption or execution shall not relieve the Purchaser or the Guarantor of, any liabilities or obligations of the Purchaser, the Guarantor and the Purchaser Designees under or in connection with this Agreement and the other Transaction Documents. Any reference to the Purchaser in this Agreement shall, to the extent applicable, also be deemed a reference to the applicable Purchaser Designee, except where in context of this Agreement such use would not be appropriate. The fact that the Purchaser Designees are expressly referenced or not referenced in certain provisions of the Agreement shall not limit the generality of the immediately preceding sentence with respect to other provisions of this Agreement.

(c)   Subject to the foregoing Sections 11.9(a) and 11.9(b), this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties.

11.10   <u>Parties in Interest</u>. None of the provisions of this Agreement is intended to provide any rights or remedies to any Person other than the parties hereto and their respective successors and assigns (if any).

11.11   <u>Notices</u>. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier

47

service (costs prepaid), or (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

the Seller:

Samsung Electronics Co., Ltd.
38th Fl., Samsung Electronics Bldg.
1320-10, Seocho 2-Dong, Seocho-Gu
Seoul, Korea 137-857
Fax no.:        +82-2-2255-8399
Attention:      International Legal Department, Office of the General Counsel

with a mandatory copy to (which copy shall not constitute notice):

Paul, Hastings, Janofsky & Walker
22/F Bank of China Tower
1 Garden Road, Hong Kong
Fax no.:        +852-3192-9689
Attention:      Daniel Sae-Chin Kim

the Purchaser:

Seagate Technology International
Ugland House, South Church Street, P.O. Box 309
George Town, Grand Cayman
Cayman Islands, British West Indies
Fax no.:        +1-831-439-2547/+1-831-439-2545
Attention:      Kenneth Massaroni
                Patrick O'Malley III

with a mandatory copy to (which copy shall not constitute notice):

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
United States of America
Fax No.:        +1-650-493-6811
Attention:      Larry W. Sonsini
                Mark B. Baudler

the Guarantor:

Seagate Technology plc

48

Arthur Cox Building
Earlsfort Centre, Earlsfort Terrace
Dublin 2, Ireland
Fax no.:        +1-831-439-2547/+1-831-439-2545
Attention:      Kenneth Massaroni
                Patrick O'Malley III

with a mandatory copy to (which copy shall not constitute notice):

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
United States of America
Fax No.:        +1-650-493-6811
Attention:      Larry W. Sonsini
                Mark B. Baudler

11.12    <u>Seller Disclosure Schedules</u> . The section and subsection references in the Seller Disclosure Schedules shall update, modify, amend and supplement the corresponding section or subsection of this Agreement to which the disclosure relates and any other section or subsection of this Agreement (other than Section 1 hereof) to which it is reasonably apparent that such disclosure relates. At any time prior to the Closing, the Seller may update, modify, amend and supplement the Seller Disclosure Schedules subject to the prior written consent (not to be unreasonably withheld) of the Purchaser with any additional information necessary to make such disclosures accurate and complete in all material respects; *provided* that such updated disclosures shall be deemed to update, modify, amend and supplement all representations, warranties, covenants and other provisions to which such disclosures relate for all purposes hereunder, including for purposes of Section 9.1 of this Agreement. At any time within fourteen (14) days after the Agreement Date, the Purchaser may request specific changes to or modifications of the Seller Disclosure Schedules by giving a written request to the Seller, in which case the Seller shall have a right to consent in writing to such changes or modification which consent shall not be unreasonably withheld. If the Seller so consents, it shall update and modify the Seller Disclosure Schedules as necessary. The inclusion of any information in the Seller Disclosure Schedules or other documents made available or delivered by the Seller pursuant to this Agreement shall be not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

11.13    <u>Construction; Usage</u> .

(a)      <u>Interpretation</u> . In this Agreement, unless a clear contrary intention appears:

(i)      the singular number includes the plural number and vice versa;

(ii)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited

49

by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii)     reference to any gender includes each other gender;

(iv)     reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v)     reference to any Law means such Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Law means that provision of such Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision;

(vi)     reference to the Purchaser shall be deemed reference to the Purchaser and all relevant Purchaser Designee(s);

(vii)     reference to the Seller shall be deemed reference to the Seller and the Seller Subsidiaries;

(viii)     "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof;

(ix)     "including" means including without limiting the generality of any description preceding such term; and

(x)     references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b)     <u>Legal Representation of the Parties</u> . This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

(c)     <u>Headings</u> . The headings contained in this Agreement are for the convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

(d)     <u>Accounting Terms</u> . All accounting terms not specifically defined herein shall be construed in accordance with Korean IFRS.

11.14     <u>Severability</u> . If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full

force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

11.15    <u>Time of Essence</u> . With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

11.16    <u>Schedules and Exhibits</u> . The Schedules and Exhibits (including the Seller Disclosure Schedules) are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.

[Remainder of Page Intentionally Left Blank]

51

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, as of the date first above written.

**SELLER:**

**SAMSUNG ELECTRONICS CO., LTD.**

By: _/s/ Oh-Hyun Kwon_
Name: Oh-Hyun Kwon
Title: President

<Signature Page to Asset Purchase Agreement>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, as of the date first above written.

**PURCHASER:**

**SEAGATE TECHNOLOGY INTERNATIONAL**

By: /s/ Stephen J. Luczo
Name: Stephen J. Luczo
Title: President

<Signature Page to Asset Purchase Agreement>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, as of the date first above written.

**GUARANTOR:**

**Given under the common seal of SEAGATE TECHNOLOGY PLC**

/s/ Lai Chun Cheong                    /s/ Stephen J. Luczo
**(Witness' Signature)**                    **Stephen J. Luczo, Director**

90 Woodlands Ave 7 S(737911)
**(Witness' Address)**

Finance Exec. Director
**(Witness' Occupation)**

**(Company Seal)**

&lt;Signature Page to Asset Purchase Agreement&gt;

## EXHIBIT A

## CERTAIN DEFINITIONS

For purposes of the Agreement (including this <u>Exhibit A</u> ):

**"2010 Financial Statements of the Business"** has the meaning ascribed to it in Section 5.3.

**"Acquired Assets"** has the meaning ascribed to it in Section 1.1.

**"Additional Transferred Assets"** means all of the assets specified on <u>Schedule 1.1(k)</u> of the Seller Disclosure Schedules.

**"Affiliate"** means a corporation, company, partnership or other entity that now or later owns, is owned by or is under common ownership or control with, directly or indirectly, a Party to this Agreement. For purposes of the foregoing, "control," "own", "owned", or "ownership" means ownership, either directly or indirectly, of fifty percent (50%) or more of the stock or other equity interest entitled to vote for the election of directors or an equivalent body. The corporation, company, partnership, or other entity will be deemed to be an Affiliate only so long as such ownership or control exists.

**"Agreement"** means this Asset purchase agreement, together with all exhibits and schedules thereto, as amended from time to time.

**"Agreement Date"** has the meaning ascribed to it in the Preamble.

**"Alternative Transaction"** has the meaning ascribed to it in Section 5.5.

**"Anti-Corruption and Anti-Bribery Laws"** means the Foreign Corrupt Practices Act of 1977, as amended, any rules or regulations thereunder, or any other applicable United States or foreign anti-corruption or anti-bribery laws or regulations.

**"Antitrust Law"** means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, as amended, the Federal Trade Commission Act, as amended, the EC Merger Regulation, and all other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or creation or strengthening of a dominant position through merger or acquisition.

**"Asset Locations"** means those locations set forth in <u>Schedule 1.1(a)(ii)</u> of the Seller Disclosure Schedules.

**"Assumed Contracts"** means, subject to Section 5.7, all rights of the Seller and the Seller Subsidiaries in and to all Seller Contracts that relate exclusively to the Business (other than the Excluded Contracts), including but not limited to those contracts set forth on <u>Schedule 1.1 (h)</u> of the Seller Disclosure Schedules and all Seller Contracts that relate exclusively to the conduct of the Business entered into between the Agreement Date and the Closing.

<div align="center">A-1</div>

---

**"Assumed Liabilities"** has the meaning ascribed to it in Section 1.3.

" **Book Value** " shall mean the dollar value at which a given asset is carried on the balance sheet of the owner of the asset.

**"Business"** means the Seller's and its Subsidiaries' HDD business and operations, as conducted by the Storage Systems Division of the Seller and the Seller Subsidiaries as of the Agreement Date, including without limitation: (i) the design and development, and manufacture and testing of Business Products, including both internal operations for the foregoing and management of third party vendor and suppliers with respect to the foregoing; (ii) the design and development of Custom Components and the procurement of Custom Components from third parties; (iii) the development and creation of Software for Business Products, including firmware, drivers and Software distributed for use with Business Products; (iv) the sales, distribution and marketing of Business Products; (v) support of Business Products including fulfillment of warranty obligations, reverse logistics, and customer support; and (vi) provisions of services related to Business Products including OEM, custom design support and provision of reference designs; provided that, notwithstanding any of the foregoing, in no event shall the "Business" include Seller's Component Business or any portion or element thereof.

**"Business Day"** means any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of New York, New York or Seoul, the Republic of Korea.

**"Business Employees"** has the meaning ascribed to it in Section 3.14(a).

**"Business Products"** means (i) any HDDs that are, or have been within the 5-year period preceding the Closing Date, designed, manufactured and sold by the Storage Systems Division of the Seller and (ii) any HDDs that are currently under development by the Storage Systems Division of the Seller including those products identified as being currently under development on <u>Schedule A-2</u> of the Seller Disclosure Schedules. Business Products include Product Software, housing, documentation, packaging and the like that form or constitute a complete HDD product sold directly or indirectly to end users.

**"Business Financial Statements"** has the meaning ascribed to it in Section 5.3.

**"Cash Consideration"** has the meaning ascribed to it in Section 2.1.

**"Closing"** means the consummation of the purchase and sale of the Acquired Assets and assumption of the Assumed Liabilities, as set forth in Section 7 of this Agreement.

**"Closing Breach"** has the meaning ascribed in Section 8.2.

**"Closing Date"** means the date on which the Closing occurs.

**"Component"** shall mean any components, assemblies and other materials (other than an integrated and complete HDDs), including without limitation magnetic discs, motors, actuators, and ASICs and other semiconductor products.

**"Confidential Information"** means any data or information concerning a party to this Agreement (including Trade Secrets), without regard to form, regarding (for example and including) (a) business process models; (b) proprietary Software; (c) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, Contracts, suppliers, customers, and customer lists; (d) the identity, skills and compensation of employees, contractors, and consultants; (e) specialized training; and (f) discoveries, developments, Trade Secrets, processes, formulas, data, lists, and all other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registerable under any applicable Intellectual Property Laws or industrial property Laws. Notwithstanding the foregoing, no data or information constitutes "Confidential Information" if such data or information is publicly known and in the public domain through means that do not involve a breach by any party of any covenant or obligation set forth in this Agreement.  Residuals shall not be considered Confidential Information.  " **Residuals** " means information of a general nature that would otherwise be Confidential Information that is retained in the unaided memory of a Person who has had access to Confidential Information.

**"Consent"** has the meaning ascribed to it in Section 3.5.

**"Contract"** means any written, oral or other agreement, contract, subcontract, lease, understanding, instrument, note, warranty, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature, whether express or implied.

**"Copyable Technology"** means Technology that can be copied or replicated without incurring material cost in any form, including for example, Software and documents.

**"Copyrights"** means mask works, rights of publicity and privacy, and copyrights in works of authorship of any type, registrations and applications for registration thereof throughout the world, all rights therein provided by international treaties and conventions, all moral and common-law rights thereto, and all other rights associated therewith.

**"Custom Component"** means a specific component of a Business Product (a) being manufactured and sold as of the Closing (i) where each and every element of the design, and the design as a whole, of such component was created exclusively by the Storage Systems Division of Seller or by a third party (alone or with the Storage Systems Division of the Seller) exclusively for the Storage Systems Division of the Seller, in each case exclusively for use in a Business Product, and (ii) that has been manufactured exclusively by the Storage Systems Division of the Seller or by a third party (alone or with the Storage Systems Division of the Seller) exclusively for the Storage Systems Division of Seller, in each case exclusively for use in a Business Product or (b) otherwise set forth on the Seller Disclosure Schedules.

**"Customer"** means a customer of the Seller or the Seller Subsidiaries that paid the Seller and the Seller Subsidiaries more than US$100,000 in the aggregate during the twelve (12)-month period ended December 31, 2010 or a customer that is expected to pay the Seller and the Seller Subsidiaries more than US$100,000 in the aggregate during the twelve (12)-month period ended December 31, 2010, in each case for services or products related exclusively to the Business.

**"Direct Claim"** has the meaning ascribed to it in Section 9.3(c).

**"Encumbrance"** means any lien, pledge, hypothecation, charge, mortgage, security interest, claim, affecting property, real or personal, tangible or intangible, any restriction on the transfer of any Acquired Asset, any restriction on the receipt of any income derived from any Acquired Asset, any restriction on the use of any Acquired Asset, any restriction on the possession, exercise or transfer of any other attribute of ownership of any Acquired Asset, or any filing of or agreement to give any financing statement under any applicable Laws governing security interests.

**"Entity"** means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**"Environmental Law"** means any federal, state, local or non-U.S. Law (i) relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), (ii) relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or (iii) otherwise relating to the manufacture, processing, sale, distribution, use, treatment, storage, labeling, recycling, exposure of others to, disposal, transport or handling of Materials of Environmental Concern or a product or waste containing Materials of Environmental Concern, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, the Resource Recovery and Conservation Act of 1976, the Federal Water Pollution Control Act, the Clean Air Act, the Hazardous Materials Transportation Act, the Clean Water Act, the European Union Directive 2002/96/EC on Waste Electrical and Electronic Equipment (" **WEEE Directive** ") and European Union Directive 2002/95/EC on the Restriction on the Use of Hazardous Substances (" **RoHS Directive** "), and China's Management Methods on the Control of Pollution Caused by Electronic Information Products (" **China RoHS** "), all as amended at any time.

**"EU Merger Regulation"** has the meaning ascribed to it in Section 5.11(a).

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended and, the rules and regulations promulgated thereunder.

**"Excluded Assets"** has the meaning ascribed to it in Section 1.2.

**"Excluded Contracts"** has the meaning ascribed to it in Section 1.2(m).

**"Excluded Liabilities"** has the meaning ascribed to it in Section 1.4.

**"Excluded Patents"** has the meaning ascribed to it in Section 1.2(l).

**"Excluded Tangible Assets"** has the meaning ascribed to it in Section 1.2(k).

**"Exclusive Permits"** means Governmental Authorizations that relate exclusively to the conduct of the Business.

**"Expiration Date"** means December 31, 2011, or if extended pursuant to Section 5.11(c), March 31, 2012.

**"Export and Import Control Laws"** means any U.S. or applicable non-U.S. law, regulation, or order governing (i) imports, exports, re-exports, or transfers of products, services, software, or technologies from or to the United States or another country; (ii) any release of technology or software in any foreign country or to any foreign Person (anyone other than a citizen or lawful permanent resident of the United States, or a protected individual as defined by 8 U.S.C. § 1324b(a)(3)) located in the United States or abroad; (iii) economic sanctions or embargoes; or (iv) compliance with unsanctioned foreign boycotts.

**"Governmental Authorization"** means any:  (a) approval, permit, license, certificate, franchise, permission, clearance, consent, registration, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, or (b) right under any Contract with any Governmental Body.

**"Governmental Body"** means any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, supranational or other government; or (c) governmental, self-regulatory or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal).

**"Guaranteed Obligations"** has the meaning ascribed to it in Section 10.1.

**"Guarantor"** has the meaning ascribed to it in the Preamble.

**"Guarantor Constituent Documents"** means the formation documents (including, as applicable, any certificate of incorporation, bylaws or other charter documents), including all amendments thereto, of the Guarantor.

**"Guarantor Material Adverse Effect"** means any fact, change, event, effect, occurrence or circumstance that, individually or in the aggregate (considered together with all other facts, changes, events, effects, occurrences or circumstances) has or would reasonably be expected to have or give rise to a material adverse effect on (a) the business, financial condition or results of operations of the Guarantor and its Subsidiaries, taken as a whole; *provided* that in no event shall any fact, change, event, effect, occurrence or circumstance, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has occurred a Guarantor Material Adverse Effect: (i) the failure of the Guarantor to meet historic, budgeted or forecasted revenue levels, earnings or other financial metrics or any public estimates of such metrics (provided that this clause (i) shall not prevent a determination that any change or effect underlying such failure to meet forecasts or projections has resulted in a Guarantor Material Adverse Effect (to the extent such change or effect is not otherwise excluded from this definition of Guarantor Material Adverse Effect)), (ii) the trading price or trading volume of the common stock of the Guarantor, (iii) changes in general local, domestic, foreign, or international economic conditions, (iv) changes affecting generally the industries or markets in which the Guarantor operates or conducts business, (vi) changes arising out of acts of war, sabotage or

A-5

terrorism, military actions or the escalation thereof, (vii) changes arising out of weather conditions or other force majeure events, (viii) changes in applicable laws or accounting rules or principals, including changes in US GAAP, or (ix) the taking of or failure to take any action expressly required to be taken or not taken by this Agreement, or (b) the ability of the Guarantor or the Purchaser to consummate the transactions contemplated by, or to perform any of its obligations under, this Agreement and the Loan Note.

"**Guarantor SEC Documents"** has the meaning ascribed to it in Section 4.6(a).

"**Guarantor Stock Option Plan"** means the Seagate Technology plc 2001 Share Option Plan, the Seagate Technology plc 2004 Share Compensation Plan, the Maxtor Corporation 2005 Performance Incentive Plan, the Maxtor Corporation Amended and Restated 1996 Stock Option Plan, the Quantum Corporation Supplemental Stock Option Plan and the Seagate Technology plc Employee Stock Purchase Plan.

" **Hazardous Material Activity** " means the manufacture, processing, sale, distribution, use, treatment, storage, labeling, recycling, removal, remediation, release, any exposure of others to, disposal, transport or handling of Material of Environmental Concern or any product or waste containing a Material of Environmental Concern, including without limitation, any recycling product content, or product take-back requirements (including but not limited to RoHS, WEEE and China RoHS.

"**HDD"** means an assembled and integrated device used solely for storing and retrieving electronic data and without any other material functionality and which consists of a single enclosure containing one or more of each of the following as well as other components designed to be used with the following and necessary for its functionality: (i) a rigid rotating magnetic disc used as the storage medium, (ii) a one motor-driven spindle for engaging and rotating the magnetic disc, (iii) a magnetic head assembly, and (iv) an actuator assembly for positioning the magnetic head assembly across the disc. For the avoidance of doubt and without limitation, "HDD" shall not include (i) floppy discs, optical storage devices, magnetic tape storage devices or solid state storage devices (or other flash memory based storage devices) (ii) any device which merely has one or more HDDs embedded, incorporated or included as part of it, including without limitation PCs, DVRs, media players, media servers, NAS, DAS and print servers and (iii) products that incorporate generally available HDDs acquired from third parties. For further avoidance of doubt, "HDD" may include as an integrated or embedded component ancillary solid state memory as a means of secondary storage to the magnetic storage.

"**HSR Act"** means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Indemnified Party"** means a Purchaser Indemnified Party or a Seller Indemnified Party.

"**Indemnifying Party"** has the meaning ascribed to it in Section 9.3(a).

"**Indemnity Cap"** has the meaning ascribed to it in Section 9.5.

"**In-Licenses"** has the meaning ascribed to it in Section 3.12(h).

**"Insolvency Proceeding"** has the meaning ascribed to it in Section 10.2.

**"Intellectual Property"** means any and all of the rights in or associated with the following throughout the world: (a) Patents, (b) Trademarks, (c) Copyrights, (d) Trade Secrets and (e) any equivalent intellectual property right to the foregoing.

**"Internet Properties"** means Uniform Resource Locators, Web site addresses and domain names, all of the foregoing of which are used exclusively by the Business other than any of the foregoing that incorporate the Seller's trade name, as set forth on <u>Schedule A-7</u> of the Seller Disclosure Schedules.

**"IP Agreement"** has the meaning ascribed to it in the Recitals.

**"Knowledge of the Guarantor"** means the actual knowledge of Mr. Stephen J. Luczo, Mr. Patrick O'Malley, or Mr. Kenneth Massaroni after reasonable due inquiry.

**"Knowledge of the Seller"** means the actual knowledge of Mr. Hakeung (Edward) Kim, Mr. Namseong Cho, or Mr. Noyeol Park after reasonable due inquiry.

**"Korean IFRS"** means Korean International Financial Reporting Standards.

**"Law"** means any federal, state, local, municipal, foreign or international, multinational other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, directive, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, including, without limitation, the Companies Acts 1963 to 2009 of Ireland.

**"Legal Proceeding"** means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

**"Letter of Intent"** means that certain letter of intent entered into between the Seller and the Guarantor on March 29, 2011.

**"Loan Note"** has the meaning ascribed to it in the Recitals.

**"LOI Deposit Amount"** means US$10,000,000 which the Guarantor has provided as a deposit to the Seller under the Letter of Intent.

**"Losses"** means any and all claims, liabilities, obligations, damages, losses, penalties, fines, judgments, costs and expenses (including amounts paid in settlement, costs of investigation and attorney's fees and expenses), whenever arising or incurred, and whether arising out of a third party claim.

**"Materials of Environmental Concern"** include any chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products and any other

substance, emission or chemical that is now or hereafter regulated by any Environmental Law or that is otherwise a danger to health, reproduction or the environment.

"**Non-Assignable Contracts**" means Seller Contracts that require third-party consents for assignment that have not been obtained by the Seller prior to or as of the Closing which would otherwise be Assumed Contracts.

"**Non-Compete Period**" has the meaning ascribed to it in Section 5.13.

"**Non-Copyable Technology**" means Technology, including for example, mask works and hardware, that cannot be copied or replicated without incurring material costs in any form.

"**Non-Delivered Equipment,**" "**Non-Delivered Equipment Refund Amount,**" and "**Non-Delivered Equipment Refund Cap**" have the respective meanings ascribed to them in Section 2.1(b).

"**Nondisclosure Agreement**" has the meaning ascribed to it in Section 5.9(c).

"**Notice of Claim**" has the meaning ascribed to it in Section 9.3(c).

"**Notice of Extension**" has the meaning ascribed to it in Section 5.11(c).

"**Objection Notice**" has the meaning ascribed to it in Section 9.3(c).

"**Open Source Materials**" mean any Software or other material that is distributed as "free software", "open source software" or under a similar licensing or distribution model (including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL) the Sun Industry Standards License (SISL) and the Apache License).

"**Order**" means any law, rule, regulation, executive order or decree, judgment, injunction, ruling or other order, whether temporary, preliminary or permanent enacted, issued, promulgated, enforced or entered by any Governmental Body.

"**Ordinary Shares**" shall mean the ordinary shares, par value US$0.00001 per share, of the Guarantor.

"**Other IP**" means Intellectual Property other than Patents and Trademarks.

"**Out-Licenses**" has the meaning ascribed to it in Section 3.12(j).

"**Patent Application**" means an application or filing for a Patent including, provisional patent applications and regular patent applications, and claims of priority under any treaty or convention, anywhere in the world.

"**Patents**" means patents, statutory invention registrations, including reissues, divisions, continuations, continuations-in-part, extensions, and reexaminations thereof, and all rights

therein provided by international treaties and conventions.  Unless the context otherwise requires, the term "Patent" includes any Patent Application.

**"Permitted Encumbrance"** means (a) Encumbrance for Taxes not yet due and payable; and (b) Encumbrance of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course of business consistent with past practice and not yet delinquent.

**"Person"** means any individual, corporation, partnership, joint venture, limited liability company, trust, Governmental Body or other organization.

**"Pre-Closing Period"** has the meaning ascribed to it in Section 5.1.

**"Preliminary Allocation Statement"** has the meaning ascribed to it in Section 2.4(a).

**"Product Software"** means any and all versions of any Software, in source or object code form (including firmware), that is (i) distributed together with a Business Product, either preloaded on such Business Product or distributed together with such Business Product on a CD-ROM or similar storage media, or (ii) made available for download by Seller solely for use on or for Business Products.

**"Purchase Price"** has the meaning ascribed to it in Section 2.1.

**"Purchase Price Allocation"** has the meaning ascribed to it in Section 2.4(a).

**"Purchaser"** has the meaning ascribed to it in the Preamble.

**"Purchaser Basket"** has the meaning ascribed to it in Section 9.5.

**"Purchaser Constituent Documents"** means the formation documents (including, as applicable, any certificate of incorporation, bylaws or other charter documents), including all amendments thereto, of the Purchaser.

**"Purchaser Designees"** has the meaning ascribed to it in Section 5.4(a).

**"Purchaser Indemnified Parties"** means the Purchaser and the Guarantor, and their respective Affiliates, officers, directors, employees, agents and representatives.

**"Purchaser Losses"** has the meaning ascribed to it in Section 9.1.

**"Replacement Value"** shall mean the dollar value at which a given asset may be replaced with a substantially equivalent asset through an arm's-length third party transaction.

**"Representatives"** means, with respect to a Person, the officers, directors, employees, agents, attorneys, accountants, advisors and representatives of such Person.

**"Requisite Regulatory Approvals"** has the meaning ascribed to it in Section 6.1(c).

**"Retail Drives"** means all HDD products sold by the Seller through retail channels as Samsung-branded products, including bare-drives and other internal drives, direct attach HDDs (including HDDs with USB, IEEE, eSata and other similar interfaces) and network attach HDDs.

**"Retained Technology"** means any Technology that is not exclusively used in the Business as of the Closing.

**"SEC"** means the United States Securities and Exchange Commission.

**"Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**"Seller"** has the meaning ascribed to it in the Preamble.

**"Seller Constituent Documents"** means the certificate of incorporation and bylaws, or any similar charter documents, of the Seller and the Seller Subsidiaries.

**"Seller Contract"** means any Contract, including any amendment or supplement thereto: (a) to which the Seller or a Seller Subsidiary is a party; (b) by which the Seller or the Seller Subsidiaries or any of their respective assets is or may become bound or under which the Seller or the Seller Subsidiaries has, or may become subject to, any obligation; or (c) under which the Seller or the Seller Subsidiaries has or may acquire any right or interest.

**"Seller Disclosure Schedules"** means the disclosure schedules delivered to the Purchaser on behalf of the Seller and the Seller Subsidiaries on the Agreement Date, as such schedules may be modified, updated, supplemented and amended by the Seller prior to the Closing Date as contemplated by Section 11.12.

**"Seller Indemnified Parties"** means the Seller, the Seller Subsidiaries and their respective Affiliates, shareholders officers, directors, employees, agents and representatives.

**"Seller Losses"** has the meaning ascribed to it in Section 9.2.

**"Seller Material Adverse Effect"** means any fact, change, event, effect, occurrence or circumstance that, individually or in the aggregate (considered together with all other facts, changes, events, effects, occurrences or circumstances) has or would reasonably be expected to have or give rise to a material adverse effect on (a) the Business, the Acquired Assets or the Assumed Liabilities; *provided* that in no event shall any fact, change, event, effect, occurrence or circumstance, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has occurred a Seller Material Adverse Effect: (i) the failure of the Seller or the Business to meet historic, budgeted or forecasted revenue levels, earnings or other financial metrics or any public estimates of such metrics (provided that this clause (i) shall not prevent a determination that any change or effect underlying such failure to meet forecasts or projections has resulted in a Seller Material Adverse Effect (to the extent such change or effect is not otherwise excluded from this definition of Seller Material Adverse Effect)), (ii) the trading price or trading volume of the common stock of the Seller, (iii) changes in general local, domestic, foreign, or international economic conditions, (iv) changes affecting generally the industries or markets in which the Seller operates or conducts the Business, (v) loss of or any

A-10

other change in the relationships with employees (including any strikes and other labor dispute), suppliers or customers (including customer orders or contracts) resulting from the announcement or pendency of the transactions contemplated by this Agreement, (vi) changes arising out of acts of war, sabotage or terrorism, military actions or the escalation thereof, (vii) changes arising out of weather conditions or other force majeure events, (viii) changes in applicable laws or accounting rules or principals, including changes in Korean IFRS, or (ix) the taking of or failure to take any action expressly required to be taken or not taken by this Agreement, or (b) the ability of the Seller to consummate the transactions contemplated by, or to perform any of its obligations under, this Agreement.

"**Seller's Component Business**" shall mean the business and operations of researching, developing, designing, manufacturing, selling, offering for sale, importing or otherwise commercializing Components (other than Custom Components), all as conducted by the Seller and the Seller Subsidiaries.

"**Seller Retained Environmental Liabilities**" means any liability, obligation, judgment, penalty, fine, cost or expense, of any kind or nature, or the duty to indemnify, defend or reimburse any Person with respect to: (i) the presence on or before the Closing Date of any Materials of Environmental Concern in the soil, groundwater, surface water, air or building materials of any real property owned, leased, used, or occupied by the Seller or any Seller Subsidiaries with respect to the Business (" **Pre-Existing Contamination** "); (ii) the migration at any time prior to or after the Closing Date of Pre-Existing Contamination to any other real property, or the soil, groundwater, surface water, air or building materials thereof; (iii) any Hazardous Materials Activity conducted on any real property owned, leased, used, or occupied by the Seller or any Seller Subsidiaries with respect to the Business prior to the Closing Date or otherwise occurring prior to the Closing Date in connection with or to benefit the Business (" **Pre-Closing Hazardous Materials Activities** "); (iv) the exposure of any person to Pre-Existing Contamination or to Materials of Environmental Concern in the course of or as a consequence of any Pre-Closing Hazardous Materials Activities, without regard to whether any health effect of the exposure has been manifested as of the Closing Date; (v) the violation of any Environmental Laws by the Seller, the Seller Subsidiaries, or their agents, employees, predecessors in interest, contractors, invitees or licensees with respect to the Business prior to the Closing Date or in connection with any Pre-Closing Hazardous Materials Activities prior to the Closing Date; (vi) any actions or proceedings brought or threatened by any third party with respect to any of the foregoing; and (vii) any of the foregoing to the extent they continue after the Closing Date.

"**Seller Subsidiaries**" means the Subsidiaries of the Seller as set forth in <u>Schedule A-11</u> of the Seller Disclosure Schedules.

"**Share Consideration**" has the meaning ascribed to it in Section 2.1.

"**Shareholder Agreement**" has the meaning ascribed to it in the Recitals.

"**Software**" means computer software, programs, and databases in any form, including source code, object code, operating systems and specifications, data, databases, database

A-11

management code, utilities, graphical user interfaces, menus, images, icons, forms and software engines, and all related documentation, developer notes, comments, and annotations.

"**Subject Employees**" has the meaning ascribed to it in Exhibit F .

"**Subsidiary**" means any Entity shall be deemed to be a "Subsidiary" of another Person if such Person directly or indirectly (a) has the power to direct the management or policies of such Entity; or (b) owns, beneficially or of record, (i) an amount of voting securities or other interests in such Entity that is sufficient to enable such Person to elect at least a majority of the members of such Entity's board of directors or other governing body, or (ii) at least 50% of the outstanding equity or financial interests of such Entity.

"**Supplier**" means any supplier of goods or services to which the Seller and the Seller Subsidiaries paid more than US$100,000 in the aggregate during the twelve (12)-month period ended December 31, 2010 or expects to pay more than US$100,000 in the aggregate during the twelve (12)-month period ended December 31, 2010.

"**Supply Agreement for Internal Drives**" has the meaning ascribed to it in the Recitals.

"**Tax**" means any tax (including any income tax, franchise tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Body.

"**Tax Return**" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"**Taxing Authority**" means any Governmental Body in charge of imposing or collecting any Tax.

"**Technology**" means embodiments of Intellectual Property in electronic, written or other media, including Software, Internet Properties, designs, design and manufacturing schematics, algorithms, databases, lab notebooks, development and lab equipment, know-how, inventions and invention disclosures.

"**Third-Party Claim**" has the meaning ascribed to it in Section 9.3(a).

"**Threshold Amount**" has the meaning ascribed to it in Section 9.5.

"**Trademarks**" means trademarks, service marks, trade dress, logos, trade names, corporate names, URL addresses, Internet domain names and other indicia of source or origin, including the goodwill of the business symbolized thereby or associated therewith, all common-

law rights thereto, registrations and applications for registration thereof throughout the world, all rights therein provided by international treaties and conventions.

"**Trade Secrets**" means all rights in any jurisdiction to limit the use or disclosure of know-how and other confidential or proprietary technical, business, and other information, including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing, and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information based on both reasonable measures being taken to keep the foregoing confidential and the foregoing having economic value.

"**Transaction Documents**" has the meaning ascribed to it in the Recitals.

"**Transfer Agreement**" means each transfer, assignment and assumption agreement by the Seller and/or any of the Seller Subsidiaries, as applicable, on the one hand, and the Purchaser and/or any of the Purchaser Designees, on the other hand, in order to consummate the transactions contemplated by this Agreement in each relevant jurisdiction, reflecting local legal requirements or local customary practice, which may also require that the Transfer Agreement shall take the form of a separate sale and purchase agreement with a local purchase price to be paid in U.S. dollars or any other currency agreed by the parties thereto; it being understood that all substantive agreements shall be governed by this Agreement without creating any additional indemnification or other liabilities on any party under any Transfer Agreement and this Agreement shall take precedent over any and all Transfer Agreements.

"**Transferred Employees**" has the meaning ascribed to it in Section 5.6(a).

"**Transferred Inventory**" means all inventory, including finished goods, raw materials and work in progress (whether in transit to or otherwise in storage on behalf of the Seller or the Seller Subsidiaries) intended for use exclusively in the Business.

"**Transferred Other IP**" means the Other IP that both is owned by the Seller or the Seller Subsidiaries and used exclusively in the Business including, if applicable, Other IP exclusively in and to any Transferred Technology, as set forth on <u>Schedule 1.1(e)</u> of the Seller Disclosure Schedules.

"**Transferred IP**" means (i) the Transferred Patents, (ii) the Transferred Other IP and (iii) the Transferred Trademarks.

"**Transferred Patents**" means the Patents listed on <u>Schedule 1.1(c)</u> of the Seller Disclosure Schedules, it being agreed and understood that the Patents listed on <u>Schedule 1.1(c)</u> of the Seller Disclosure Schedules shall include, without limitation, (i) any Patent owned by the Seller or any of its Subsidiaries that claims (or is entitled to claim) priority from any of the other Patents listed on the schedule, (ii) any Patent that is a continuation, continuation in part, divisional or reissue, of any other scheduled Patent or linked to any other scheduled Patent by a terminal disclaimer, and (iii) any foreign counterpart of any scheduled Patent.

"**Transferred Tangible Assets**" means all plants, equipments and other tangible assets used exclusively in the Business and located at the Asset Locations (other than the Excluded

A-13

Tangible Assets), including but not limited to the items set forth on <u>Schedule 1.1(a)(i)</u> of the Seller Disclosure Schedules.

**"Transferred Technology"** means: (i) copies of any Copyable Technology owned by the Seller or the Seller's Affiliates and either (A) necessary for the manufacture, testing, sale or servicing of any Business Product or (B) used exclusively in the Business ( **"Transferred Copyable Technology"** ); and (ii) all of the Non-Copyable Technology used exclusively in the Business ( **"Transferred Non-Copyable Technology"** ).

**"Transferred Trademarks"** means all Trademarks both used exclusively by the Business and for Business Products which are internal HDDs and owned by the Seller or the Seller Subsidiaries, other than any Trademark that incorporates the Seller's trade name, as set forth on <u>Schedule 1.1(d)</u> of the Seller Disclosure Schedules, and the goodwill of the Business appurtenant thereto.

**"Transition Services Agreement"** has the meaning ascribed to it in the Recitals.

**"US GAAP"** means United States generally accepted accounting principles as in effect from time to time.

**"VAT"** means Korean value added tax ( *boo-ga-ga-chi-se* ) and any similar charge under Laws of other jurisdictions.

**"Warranty Liability Cap"** has the meaning ascribed to it in Section 1.3(a).

A-14

Exhibit 10.54

# INTELLECTUAL PROPERTY AGREEMENT

by and between

## SAMSUNG ELECTRONICS CO., LTD.

and

## SEAGATE TECHNOLOGY INTERNATIONAL

DATED APRIL 19, 2011

**TABLE OF CONTENTS**

| | | Page |
|---|---|---:|
| ARTICLE I. DEFINITIONS | | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 3 |
| | | |
| ARTICLE II. LICENSES TO PURCHASER | | 4 |
| 2.1 | Other IP License | 4 |
| 2.2 | Sublicense to Third Party Intellectual Property | 4 |
| 2.3 | License to Custom Components | 4 |
| 2.4 | Sublicensing and Transfer Rights | 5 |
| 2.5 | No Warranties | 5 |
| | | |
| ARTICLE III. LICENSES BACK TO SELLER | | 5 |
| 3.1 | Other IP License | 5 |
| 3.2 | [Intentionally Omitted] | 6 |
| 3.3 | Sublicensing and Transfer Rights | 6 |
| 3.4 | No Warranties | 6 |
| | | |
| ARTICLE IV. RE-ACQUISITION OF CERTAIN PATENTS | | 6 |
| 4.1 | Right to Re-Purchase Patents | 6 |
| 4.2 | Procedure | 6 |
| 4.3 | Non-Use | 7 |
| 4.4 | No Obligation | 7 |
| 4.5 | Right to Acquire Excluded Patents | 7 |
| | | |
| ARTICLE V. TERMINATION | | 7 |
| 5.1 | Licenses Irrevocable | 7 |
| 5.2 | Copyrights | 7 |
| | | |
| ARTICLE VI. MISCELLANEOUS | | 7 |
| 6.1 | No Implied Licenses | 7 |
| 6.2 | Binding on Successors and Assigns | 8 |
| 6.3 | Governing Law | 8 |
| 6.4 | Enforcement | 8 |
| 6.5 | Confidentiality | 9 |
| 6.6 | Waiver | 9 |
| 6.7 | Notices | 9 |
| 6.8 | Changes to Contact Information | 10 |
| 6.9 | No Third-Party Beneficiaries | 10 |
| 6.10 | Amendments | 10 |
| 6.11 | Entire Agreement | 10 |
| 6.12 | Severability | 11 |
| 6.13 | Mutual Drafting | 11 |
| 6.14 | Counterparts and Signatures | 11 |
| 6.15 | Waiver of Jury Trial | 11 |

**INTELLECTUAL PROPERTY AGREEMENT**

**THIS INTELLECTUAL PROPERTY AGREEMENT** (this " **IP Agreement** ") is dated as of April 19, 2011 (the " **Agreement Date** "), by and between Samsung Electronics Co., Ltd., a company organized under the laws of the Republic of Korea (" **Seller** "), and Seagate Technology International, an exempted company incorporated with limited liability under the laws of the Cayman Islands (" **Purchaser** ") which is a wholly-owned subsidiary of Seagate Technology plc, a company incorporated under the laws of the Republic of Ireland (" **Guarantor** "). Each of Seller and Purchaser shall be a " **Party** ", and together the " **Parties** ", as the context requires.  This IP Agreement is entered into in connection with the Asset Purchase Agreement (the " **APA** ") of even date herewith among Guarantor, Seller, and Purchaser. This IP Agreement shall take effect as of the date of the Closing (as defined in the APA). In the event the Closing does not occur, this IP Agreement shall not take effect, and neither Party shall have any rights or obligations hereunder.

**W I T N E S S E T H:**

**WHEREAS** , in connection with the APA, Seller will transfer to Purchaser certain Transferred IP and Transferred Technology *;*

**WHEREAS** , pursuant to this IP Agreement, Seller will license to Purchaser certain other of Seller's Intellectual Property rights other than Patents and Trademarks;

**WHEREAS** , pursuant to this IP Agreement, Purchaser will license back to Seller certain of the Transferred IP (other than Patents and Trademarks) and Transferred Technology transferred to Purchaser pursuant to the APA;

**WHEREAS** , the Parties are entering into a Patent Cross License (as defined below); and

**WHEREAS** , the Parties wish to address certain other matters related to Technology and Intellectual Property rights (other than Patents and Trademarks).

**NOW, THEREFORE** , in consideration of the mutual premises recited in this IP Agreement as well as the associated payments and other consideration recited in the APA, the Parties agree as follows, to become effective only upon the Closing (as defined hereinafter):

**ARTICLE I.**
**DEFINITIONS**

1.1    Definitions . As used in this IP Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Capitalized term not defined herein, are as defined in the APA:

(a)    " **Affiliate** " has the meaning set forth in the APA.

(b)    " **Business** " has the meaning set forth in the APA.

(c)    " **Business Products** " has the meaning set forth in the APA.

(d)　　" **Change of Control** " means a transaction or a series of related transactions in which ownership or control, directly or indirectly, of more than fifty percent (50%) of the voting stock or other equity interest of an entity or individual or to one or more related entities or individuals who did not previously own at least a fifty percent (50%) interest in such entity.  Notwithstanding the foregoing, a "Change of Control" shall not include, and the following shall not be considered a restricted transfer or assignment of this IP Agreement: any public offering of such entity's capital stock pursuant to a registration statement filed with the Securities and Exchanges Commission, a reincorporation or re-domicile of an entity, or a change in corporate form from a public to a private company (including through the acquisition of an entity by management or financial investors).

(e)　　" **Closing** " has the meaning set forth in the APA.

(f)　　" **Closing Date** " has the meaning set forth in the APA.

(g)　　" **Components** " has the meaning set forth in the APA.

(h)　　" **Confidential Information** " has the meaning set forth in the APA. For the avoidance of doubt, the Transferred Copyable Technology (as such term is defined in the APA) shall, prior to the Closing Date, be the Confidential Information of Seller and following the Closing Date be the Confidential Information of both Seller and Purchaser.

(i)　　" **Copyrights** " has the meaning set forth in the APA.

(j)　　" **Custom Components** " has the meaning set forth in the APA.

(k)　　" **Derivative Work(s)** " means any work of authorship, or other subject matter that is protected by Copyright, that is based, in whole or in part, upon one or more pre-existing works, such as a revision, modification, translation, abridgment, condensation, expansion or any other form in which such pre-existing works may be recast, transformed or adapted and which, if prepared without authorization of the owner of the Copyright in such pre-existing work, would constitute a Copyright infringement absent a license. For purposes of this IP Agreement, a Derivative Work shall also include any compilation that incorporates such a pre-existing work.

(l)　　**"Excluded Patents"** has the meaning set forth in the APA.

(m)　　" **HDD** " has the meaning set forth in the APA.

(n)　　" **Licensed Back Other IP** " means all of the Transferred Other IP to the extent embodied in, or practiced by, or disclosed by the Retained Technology (including any of the Transferred Copyable Technology not used exclusively in the Business) being used in the business of Seller or its Affiliates, other than in the Business, as of the Closing.

(o)　　" **Licensed Other IP** " means any Other IP owned by Seller or any Seller Subsidiary, other than the Transferred Other IP, that is embodied in, practiced by, or disclosed by, the Transferred Technology, as of the Closing, as the case may be.

(p)　　" **Mask Work** " means a semiconductor mask work and the files (including GDSII files) needed to generate such mask work.

2

(q)     " **Other IP** " has the meaning set forth in the APA.

(r)     " **Patents** " has the meaning set forth in the APA.

(s)     " **Patent Cross License** " means the Patent Cross License between the Parties as amended by the First Amendment thereto of even date herewith.

(t)     " **Person** " has the meaning set forth in the APA.

(u)     " **Product Software** " has the meaning set forth in the APA.

(v)     " **Re-Purchased Patent** " has the meaning set forth in Section 4.2(a).

(w)     " **Retained Technology** " has the meaning set forth in the APA.

(x)     " **Seller's Component Business** " has the meaning set forth in the APA.

(y)     " **Software** " has the meaning set forth in the APA.

(z)     " **Supply Agreement** " has the meaning set forth in the APA.

(aa)    " **Technology** " has the meaning set forth in the APA.

(bb)    " **Third Party IP** " means all Other IP (other than any Licensed Other IP or Transferred Other IP) identified by Seller in Schedule 3 hereto, and licensed by third parties to Seller or its Affiliates (i) that, as of the Closing Date, is sublicensable without payment of a royalty or other consideration by the Seller or the Seller Subsidiaries (other than a royalty due to an employee inventor under applicable law or similar royalty) and (ii) which, if such Intellectual Property would have been owned by Seller, would have been considered Licensed Other IP hereunder.  For the avoidance of any doubt, Third Party IP does not include any Patents or other Intellectual Property licensed by third parties in connection with any corporate-level cross-licenses.

(cc)    " **Trade Secrets** "  has the meaning set forth in the APA.

(dd)    " **Trademarks** " has the meaning set forth in the APA.

(ee)    " **Transferred Copyable Technology** " has the meaning set forth in the APA.

(ff)    " **Transferred IP** " has the meaning set forth in the APA.

(gg)    " **Transferred Other IP** " has the meaning set forth in the APA.

(hh)    " **Transferred Patents** " has the meaning set forth in the APA.

(ii)    " **Transferred Technology** " has the meaning set forth in the APA.

(jj)    " **Transferred Trademarks** " has the meaning set forth in the APA.

1.2    Construction . In this IP Agreement:

(a)    All references to "Articles", "Sections", "Subsections", "Paragraphs" and "Exhibits" refer to the articles, sections, subsections, paragraphs and exhibits of this IP Agreement.

(b)    Neutral pronouns and any variations thereof shall be deemed to include the feminine and masculine and all terms used in the singular shall be deemed to include the plural, and vice versa, as the context may require.

(c)    The words "hereof," "herein" and "hereunder" and other words of similar import refer to this IP Agreement as a whole, as the same may be amended or supplemented, and not to any subdivision contained in this IP Agreement.

(d)    The word "including" when used herein is not intended to be exclusive and means "including, without limitation."

## ARTICLE II.
## LICENSES TO PURCHASER

2.1    Other IP License . Seller, for itself and on behalf of its Affiliates, hereby grants to Purchaser and its Affiliates, a worldwide, perpetual, irrevocable, fully paid-up, royalty-free, non-exclusive, transferable (as provided in Section 2.4 below), sublicenseable (as provided in Section 2.4(a) below), license under all of the Licensed Other IP to use, copy, distribute, perform, display and otherwise exploit in any manner the Transferred Technology in any manner in connection with the operation of Purchaser's and its Affiliate's HDD businesses, subject to the restrictions with respect to Confidential Information set forth in Section 6.5 below. For the avoidance of any doubt, the license granted in this Section 2.1 does not include a license, whether express or implied, to any Patents.

2.2    Sublicense to Third Party Intellectual Property . Seller, for itself and on behalf of its Affiliates, hereby grants to Purchaser, only to the extent they are legally or contractually permitted, a sublicense under any Third Party IP of the scope set forth in Section 2.1, above provided that if Seller is not permitted to grant a license of such scope, then such license is of the maximum scope permitted under Seller's license from such third party. Seller shall not be required to grant the foregoing sublicense with respect to any Third Party IP that requires as a condition of the grant of such sublicense payment of a royalty or other consideration to such third party (except solely for a royalty due to an employee inventor under applicable law or similar royalty).  In addition, any sublicenses granted to Purchaser under this Section 2.2 shall be subject to any pass-through restrictions or conditions as may be contractually or legally required by the licensor of such Third Party IP, including without limitation, any reporting obligations, audit rights, patent marking requirements, limitations on license scope and restrictions on sublicensing or right to have any right exercised by a third party, and any confidentiality restrictions, restrictions on the form of disclosure to third parties and other restrictions as and to the extent set forth on Schedule 1. Seller shall be under no obligation whatsoever to obtain any rights under any Third Party IP on behalf of Purchaser. For the avoidance of any doubt, the license granted in this Section 2.2 does not include a license, whether express or implied, to any Patents.

2.3    License to Custom Components . For clarification, to the extent applicable and without limiting the license granted in Section 2.1 above, the Licensed Other IP licensed to

4

Purchaser under Section 2.1 above shall include the Licensed Other IP with respect to Custom Components that are not supplied to Purchaser by Seller or a third party.

2.4 <u>Sublicensing and Transfer Rights</u> .

(a) Purchaser may sublicense in whole or in part the licenses granted to it under the Licensed Other IP in Section 2.1 above provided that (i) such sublicenses may not be of greater scope than, and are subject to the same limitations and restrictions as, the license granted to Purchaser with respect to such Licensed Other IP in Section 2.1, and (ii) such sublicense under the Licensed Other IP may only be granted in connection with Purchaser sublicensing the Transferred Technology along with a license to owned, pre-existing or independently developed Technology of Purchaser and the other Other IP of Purchaser embodied in such owned, pre-existing or independently developed Technology of Purchaser. In addition to the foregoing, Purchaser's right to sublicense the Licensed Other IP identified in Schedule 1 shall be expressly limited to the extent set forth on Schedule 1, including, without limitation, any confidentiality restrictions, restrictions on the form of disclosure to third parties and other restrictions as and to the extent set forth thereon.

(b) Without limiting Section 2.4(a) above, the licenses granted to Purchaser in this ARTICLE II may not be assigned or transferred except in connection with a Change of Control of Purchaser or the transfer or sale of any business unit, Subsidiary or division (by means of a reorganization, asset sale, stock sale, merger or otherwise) of Purchaser to which such licenses relate.  In addition to the foregoing, Purchaser's right to assign or transfer the licenses granted to Purchaser in this ARTICLE II shall be expressly limited to the extent set forth on Schedule 1, including, without limitation, any limitations on assignment or transfer, confidentiality restrictions, restrictions on the form of disclosure to third parties and other restrictions as and to the extent set forth thereon.

2.5 <u>No Warranties</u> . All rights and licenses granted to Purchaser hereunder are granted "AS IS" and without any representation or warranty of any kind except as set expressly forth in the APA.

<div align="center">

**ARTICLE III.**
**LICENSES BACK TO SELLER**

</div>

3.1 <u>Other IP License</u> . Subject to Section 5.13 of the APA ( *Non-Competition* ), Purchaser, for itself and on behalf of its Affiliates, hereby grants to Seller and its Affiliates a worldwide, perpetual, irrevocable, fully paid-up, royalty-free, non-exclusive, transferable (as provided in Section 3.3 below), sublicensable (as provided in Section 3.3 below), license under all of the Licensed Back Other IP to use, copy, distribute, perform, display and otherwise exploit in any manner the Retained Technology in any manner in connection with the operation of Seller's and its Affiliates' business, subject only to the restrictions with respect to Confidential Information set forth in Section 6.5 below and provided that, for the period set forth in Section 5.13 of the APA ( *Non-Competition* ), the scope of such license does not include designing and manufacturing (or having manufactured) HDDs. For the avoidance of any doubt, (i) the license granted in this Section 3.1 does not include a license, whether express or implied, to any Patents and (ii) the restrictions on the license granted to Purchaser set forth in the first sentence of this Section 3.1 shall lapse upon expiry of the period set forth in Section 5.13 of the APA ( *Non-Competition* ).

<div align="center">5</div>

3.2      [Intentionally Omitted]

3.3      <u>Sublicensing and Transfer Rights</u> .

(a)      Subject to Section 5.13 of the APA ( *Non-Competition* ), Seller may sublicense in whole or in part the licenses granted to it under the Licensed Back Other IP in Section 3.1 above provided that such sublicenses may not be of greater scope, and are subject to the same limitations and restrictions as, than the license granted to Seller with respect to such Licensed Back Other IP in Section 3.1. For the avoidance of any doubt, the restrictions on the license granted to Purchaser set forth in the first sentence of this Section 3.1 shall lapse upon expiry of the period set forth in Section 5.13 of the APA ( *Non-Competition* ).

(b)      Without limiting Section 3.3(a), the licenses granted to Seller in this ARTICLE III may not be assigned or transferred except in connection with a Change of Control of Seller or the transfer or sale of any business unit, Subsidiary or division (by means of a reorganization, asset sale, stock sale, merger or otherwise) of Seller to which such licenses relate.

3.4      <u>No Warranties</u> . All rights and licenses granted to Seller hereunder are granted "AS IS" and without any representation or warranty of any kind under this IP Agreement or otherwise.

## ARTICLE IV.
## RE-ACQUISITION OF CERTAIN PATENTS

4.1      <u>Right to Re-Purchase Patents</u> . If, prior to the fourth (4 th ) anniversary of the Closing Date, any claim, demand, suit, action or proceeding for Patent infringement is brought against Seller or its Affiliates (" **Patent Action** "), and Seller reasonably believes that it would be of benefit in that Patent Action to assert a Transferred Patent, Seller shall have the right, in accordance with the terms set forth in this ARTICLE IV, to re-purchase up to ten (10) of the Transferred Patents upon payment to Buyer of $100,000 per Patent (the " **Re-Purchase Amount** "). For the avoidance of doubt, Seller may exercise the rights in this Section 4.1 any number of times up to the maximum number of re-purchasable Transferred Patents.

4.2      <u>Procedure</u> .

(a)      If to the extent provided in Section 4.1, Seller wishes to re-acquire a Transferred Patent, it shall provide Purchaser with written notice thereof specifying the Patent or Patents it wishes to re-acquire.

(b)      Subject to Seller's compliance with the terms hereof and the execution of a patent assignment agreement substantially in the form attached hereto as Schedule 2, Purchaser shall, upon receipt of the Re-Purchase Amount for each Patent, re-assign such Patent or Patents (each a "Re-Purchased Patent") to Seller.

(c)      The re-assignment of any Re-Purchased Patent shall be subject to Purchaser retaining a license to such Patent in accordance with the Patent Cross License, and such Patent shall be deemed a licensed Patent under the Patent Cross License.

6

(d)      Purchaser agrees to execute any and all powers of attorney, applications, assignments, declarations, affidavits, and other instruments of assignment, transfer, conveyance and recordal in connection therewith, as may be reasonably necessary to perfect such right, title, and interest in Seller.

4.3      <u>Non-Use</u> . If Seller does not assert any Re-Purchased Patent in the Patent Action against a third party in accordance with Section 4.1 above within one (1) year of receiving title to such Patent, at Purchaser's sole option it shall re-assign such Patent to Purchaser upon the execution of a patent assignment agreement substantially in the form attached hereto as Schedule 2 and receipt of a payment of $100,000 from Purchaser. For the avoidance of doubt, any such reassigned Patent shall be deemed licensed to Seller under the Patent Cross License. In the event that Seller re-assigns a Re-Purchased Patent to Purchaser pursuant to this Section 4.3, such Patent shall no longer be a Re-Purchased Patent for the purposes hereof and Seller shall have the right to re-purchase another Patent in its place.

4.4      <u>No Obligation</u> . Neither Party shall be required under this IP Agreement to maintain any Patents in force.  Nothing set forth herein shall restrict either Party from transferring, assigning or licensing any Patent owned by it as a result of this IP Agreement or otherwise; provided that Purchaser may not grant a license under any Transferred Patents to any party knowingly and for the purpose of derogating Seller's rights under this ARTICLE IV.

4.5      <u>Right to Acquire Excluded Patents</u> . Seller shall notify Purchaser if Seller or a Seller Subsidiary intends to abandon any Excluded Patent prior to the fourth anniversary of the Closing Date.  Upon Purchaser's request, Seller shall transfer and sell such Excluded Patent and all rights thereto or therein to Purchaser in return for a payment of $100.00, subject to Seller retaining a license to such Excluded Patent as set forth in ARTICLE III. For the avoidance of doubt, any such reassigned Patent shall be deemed licensed to Seller under the Patent Cross License.

## ARTICLE V.
## TERMINATION

5.1     <u>Licenses Irrevocable</u> . Each Party acknowledges and agrees that the licenses granted under this IP Agreement, except where specified otherwise, are perpetual and irrevocable, and that its remedy for breach by the other Party of the licenses granted to it hereunder or of any other provision hereof, shall be to bring a claim to recover damages and to seek appropriate equitable relief, other than termination of the licenses granted by it in this IP Agreement.

5.2     <u>Copyrights</u> . All licenses granted herein with respect to each Copyright shall expire upon the expiration of the term of such Copyright.

<div align="center">

**ARTICLE VI.**
**MISCELLANEOUS**

</div>

6.1     <u>No Implied Licenses</u> . No right or license is granted by implication or estoppel in connection with this IP Agreement, the APA or any other Transaction Document. Except as expressly provided in this IP Agreement, the APA, or any other Transaction Agreement,

<div align="center">7</div>

no rights are granted to a Party with respect to any improvements or Derivative Works made by the other Party after Closing.

6.2     <u>Binding on Successors and Assigns</u> . This IP Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and on the successors and assigns of any Patent that is the subject of a license or obligation to transfer granted to a Party under this IP Agreement.

6.3     <u>Governing Law</u> .

(a)     This IP Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(b)     All disputes, controversies or claims arising out of or in connection with this IP Agreement or the transactions contemplated hereby shall be heard and determined exclusively by the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware. Each Party:

(i)     expressly and irrevocably consents and submits to the jurisdiction of the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware (and each appellate court located in the State of Delaware), in connection with any legal proceeding relating to any disputes, controversies or claims arising out of or in connection with this IP Agreement or the transactions contemplated hereby;

(ii)     agrees that service of any process, summons, notice or document by registered or certified mail addressed to it at the address set forth in Section 6.7 shall constitute effective service of such process, summons, notice or document for purposes of any such legal proceeding;

(iii)     agrees that the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware (and each appellate court located in the State of Delaware), shall be deemed to be a convenient forum; and

(iv)     agrees not to assert (by way of motion, as a defense or otherwise), in any such legal proceeding commenced in the Court of Chancery of the State of Delaware, or if that court lacks jurisdiction, a state or federal court sitting in the State of Delaware (and each appellate court located in the State of Delaware), any claim by any of the Seller, the Purchaser or the Guarantor that it is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this IP Agreement or the subject matter of this IP Agreement may not be enforced in or by such court.

6.4     <u>Enforcement</u> . Each Party acknowledges that the other Party will be irreparably harmed and that there will be no adequate remedy at law for any violation by any Party of any of the covenants or agreements contained in this IP Agreement, including the confidentiality obligations set forth in Section 6.5. It is accordingly agreed that, in addition to any other remedies that may be available upon the breach of any such covenants or

8

agreements, each Party shall have the right to injunctive relief to restrain a breach or threatened breach of, or otherwise to obtain specific performance of, the other Party's covenants and agreements contained in this IP Agreement.

6.5    <u>Confidentiality</u> . Except as otherwise expressly provided in this IP Agreement or the APA, the obligation and duty of each Party's (as a "Recipient") with respect to Confidential Information of the other Party (as a "Disclosing Party") licensed to the Recipient hereunder shall be limited to (i) Recipient treating such Confidential Information with the same degree of care, but no less than reasonable care as it treats its own like confidential information and (ii) not disclosing such information to third parties without other material confidential information of the Receiving Party. For clarification, Purchaser's obligation and duty with respect to the sublicenses granted to Purchaser under Section 2.2, the right of Purchaser to sublicense the Licensed Other IP set forth in Section 2.4(a) and the right of Purchaser to assign or transfer the licenses granted to Purchaser under ARTICLE II set forth in Section 2.4(b) shall not be affected by the foregoing.

6.6    <u>Waiver</u> . Neither any failure nor any delay by any Party in exercising any right, power or privilege under this IP Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this IP Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this IP Agreement. Any extension or waiver by any Party of any provision hereto shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

6.7    <u>Notices</u> . All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed given to a Party when (a) delivered by hand or by a nationally recognized overnight courier service (costs prepaid) or (b) sent by facsimile with confirmation of transmission by the transmitting equipment, in each case to the following:

*if to Seller, to:*

Samsung Electronics Co., Ltd.
38th Fl., Samsung Electronics Bldg.
1320-10, Seocho 2-Dong, Seocho-Gu
Seoul, Korea 137-857
Facsimile:          +82-2-2255-8399
Attention:          International Legal Department,
                         Office of the General Counsel

*with a mandatory copy to (which copy shall not constitute notice):*

Paul, Hastings, Janofsky & Walker LLP
1117 S. California Avenue
Palo Alto, California 94304
Facsimile:          +1-650-320-1900
Attention:          Matthew D. Berger

9

*if to Purchaser, to:*

> Seagate Technology International
> Ugland House, South Church Street, P.O. Box 309
> George Town, Grand Cayman
> Cayman Islands, British West Indies
> Facsimile:      +1-831-439-2547/+1-831-439-2545
> Attention:      Kenneth Massaroni
>                 Patrick O'Malley III

*with a copy to:*

> Wilson Sonsini Goodrich &Rosati
> Professional Corporation
> 650 Page Mill Road
> Palo Alto, California 94304-1050
> Facsimile:      +1-650-493-6811
> Attention:      Larry W. Sonsini
>                 Mark Baudler
>                 Selwyn Goldberg

6.8    <u>Changes to Contact Information</u> . Either Party may change its contact information for notices and other communications hereunder by notice to the other Party.

6.9    <u>No Third-Party Beneficiaries</u> . This IP Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights, remedy or claim hereunder.

6.10    <u>Amendments</u> . This IP Agreement may be amended by the Parties hereto at any time by execution of an instrument in writing signed on behalf of each of the Parties hereto. This IP Agreement may not be amended, modified or supplemented except by written agreement of the Parties

6.11    <u>Entire Agreement</u> .

    (a)    This IP Agreement (which includes the Annexes hereto) and the other Transaction Documents (as defined in the APA) contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior oral and written agreements and understandings relating to such subject matter.

    (b)    Notwithstanding the forgoing, nothing set forth herein, the APA, or in any Transaction Document, shall limit, amend, or in any way restrict the terms and conditions of the Patent Cross License and any other patent cross license entered into between the Parties prior to the date hereof. Any licenses granted by one Party to the other hereunder shall be independent of, and in addition to any license granted under such prior patent agreements.

6.12    <u>Severability</u> . If any provision of this IP Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

6.13    <u>Mutual Drafting</u> . The Parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof.  As a consequence, the Parties do not intend that the presumptions of any laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this IP Agreement and therefore waive their effects.

6.14    <u>Counterparts and Signatures</u> .

(a)    This IP Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties; it being understood that all parties need not sign the same counterparts.

(b)    The exchange of copies of this IP Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this IP Agreement as to the parties and may be used in lieu of the original IP Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

6.15    <u>Waiver of Jury Trial</u> . EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS IP AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS IP AGREEMENT.

[Remainder of Page Intentionally Left Blank]

11

IN WITNESS WHEREOF, the Parties have executed this IP Agreement in duplicate on the signature page hereof.

**Seller:**

**SAMSUNG ELECTRONICS CO., LTD.**

By:      /s/ Oh-Hyun Kwon

Name:    Oh-Hyun Kwon

Title:    President

Date:    April 19, 2011

[Signature Page to Intellectual Property Agreement]

IN WITNESS WHEREOF, the Parties have executed this IP Agreement in duplicate on the signature page hereof.

**Purchaser:**

**SEAGATE TECHNOLOGY INTERNATIONAL**

By:  /s/ Stephen J. Luczo

Name:  Stephen J. Luczo

Title:  President

Date:  April 19 2011

[Signature Page to Intellectual Property Agreement]

SCHEDULE 1

| TRANSFERRED TECHNOLOGY | RESTRICTIONS AND LIMITATIONS (IF ANY) |
|---|---|
| 1) [         ] | [         ] |

Schedule 1-1

SCHEDULE 2

Form of Patent Assignment

Schedule 2-1

SCHEDULE 3

Sublicensed Third Party Other IP

Schedule 3-1

Exhibit 10.55

**SHAREHOLDER AGREEMENT**

**by and between**

**SEAGATE TECHNOLOGY PLC**

**and**

**SAMSUNG ELECTRONICS CO., LTD.**

**Dated as of April 19, 2011**

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION ............................................................ 1

    Section 1.1.    *Certain Definitions.* .......................................................... 1
    Section 1.2.    *Rules of Construction.* ...................................................... 2

ARTICLE II STANDSTILL AND VOTING .......................................................................... 2

    Section 2.1.    *Standstill Provisions* ......................................................... 2
    Section 2.2.    *Voting.* ...................................................................... 4

ARTICLE III RESTRICTIONS ON TRANSFER ..................................................................... 4

    Section 3.1.    *Transfer Restrictions.* ....................................................... 4
    Section 3.2.    *Restrictive Legends; Securities Law Compliance.* ............................. 6
    Section 3.3.    *Procedures for Transfer; Right of First Refusal.* ............................. 7
    Section 3.4.    *Applicability to Other Securities* ............................................ 8

ARTICLE IV REGISTRATION ...................................................................................... 8

    Section 4.1.    *Registration; Registration Procedures.* ...................................... 8
    Section 4.2.    *Information Supplied.* ...................................................... 11
    Section 4.3.    *Expenses.* ................................................................. 11
    Section 4.4.    *Restrictions on Disposition.* ................................................ 11
    Section 4.5.    *Indemnification Indemnification by Company.* ............................... 12
    Section 4.6.    *No Inconsistent Agreements; No Free Writing Prospectuses.* ................. 15
    Section 4.7.    *Termination of Registration Rights.* ........................................ 15
    Section 4.8.    *Reports under the Exchange Act.* ........................................... 15

ARTICLE V BOARD DESIGNATION RIGHTS .................................................................... 16

    Section 5.1.    *Board Designation Rights.* .................................................. 16

ARTICLE VI MISCELLANEOUS ................................................................................... 17

    Section 6.1.    *Governing Law.* ........................................................... 17
    Section 6.2.    *Consent to Jurisdiction.* .................................................... 17
    Section 6.3.    *Successors and Assigns.* .................................................... 17
    Section 6.4.    *Entire Agreement.* ......................................................... 17
    Section 6.5.    *Amendment; Waiver.* ...................................................... 17
    Section 6.6.    *Notices.* .................................................................. 18
    Section 6.7.    *Counterparts.* ............................................................. 19
    Section 6.8.    *Severability.* .............................................................. 19
    Section 6.9.    *Injunctive Relief.* .......................................................... 19

**SHAREHOLDER AGREEMENT**

THIS SHAREHOLDER AGREEMENT (this " **Agreement** ") is dated as of April 19, 2011 by and between Seagate Technology plc, a company incorporated under the laws of the Republic of Ireland (" **Company** "), and Samsung Electronics Co., Ltd., a company organized under the laws of the Republic of Korea (" **Shareholder** ") (each, a " **Party** " and together, the " **Parties** "). This Agreement is entered into in connection with the Asset Purchase Agreement (the " **Asset Purchase Agreement** ") of even date herewith by and among the Company, Shareholder and Seagate Technology International, an exempted company incorporated with limited liability under the laws of the Cayman Islands and a wholly owned subsidiary of Company (" **Purchaser** "). This Agreement shall take effect as of the date of the Closing (as defined in the Asset Purchase Agreement). In the event the Closing does not occur, this Agreement shall not take effect, and no party hereto shall have any rights or obligations hereunder.

**RECITALS**

WHEREAS, as partial consideration for acquisition of the Acquired Assets (as defined in the Asset Purchase Agreement) under the terms of the Asset Purchase Agreement, Purchaser has agreed to issue a loan note in the amount of US$687,500,000 (the " **Loan Note** ") to Shareholder, and guaranteed by Company, pursuant to which the parties thereto agree that, at the option of Shareholder or Company, the amount due under the Loan Note will be exchangeable for up to an aggregate of 45,239,490 ordinary shares of Company, par value $0.00001 per share (the " **Ordinary Shares** ") in full and final satisfaction of all amounts owed by Purchaser to Shareholder under the Loan Note.

WHEREAS, as a material inducement for Company, Purchaser and Shareholder to enter into the Asset Purchase Agreement, Company and Shareholder have agreed to enter into this Agreement as of the Closing Date to be effective immediately upon the allotment and issue of the Ordinary Shares.

NOW, THEREFORE, in consideration of the foregoing premises, and the mutual covenants and agreements, representations and warranties set forth herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged and accepted, and intending to be legally bound hereby, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS; RULES OF CONSTRUCTION**

*Section 1.1*        *Certain Definitions.*   For all purposes of and under this Agreement, certain terms not otherwise defined herein have the meanings ascribed to those terms in <u>Appendix A</u> .

***Section 1.2.***     ***Rules of Construction.***     All references herein to Articles or Sections shall be deemed to be references to Articles and Sections of this Agreement unless the context shall otherwise require.

(b)     The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

(c)     The headings set forth in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)     All references in this Agreement to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person.

(e)     Unless otherwise specifically provided, all references in this Agreement to "dollars" or "$" shall mean United States Dollars.

(f)     The definitions set this Agreement shall apply equally to both the singular and plural forms of the terms defined.

(g)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(h)     Unless the context shall otherwise require, any reference to any contract, instrument, statute, rule or regulation is a reference to it as amended and supplemented from time to time (and, in the case of a statute, rule or regulation, to any successor provision).

(i)     Any reference in this Agreement to a "day" or a number of "days" (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. In the event that any date provided for in this Agreement falls on a date that is not a Business Day, such date shall be deemed extended to the next Business Day.

## ARTICLE II
## STANDSTILL AND VOTING

***Section 2.1.***     ***Standstill Provisions.***

(a)     Shareholder agrees that it will not, and will cause its Affiliates and the Representatives acting on its or any of its Affiliates' behalf not to, directly or indirectly, acting alone or in concert with others, unless specifically invited to do so in writing in advance by the Board:

(i)     acquire or agree to acquire, or offer, propose or seek to acquire, directly or indirectly, by purchase or otherwise, ownership (including beneficial ownership) of any securities, assets or businesses of Company or any of its Subsidiaries, or any direct or indirect rights or options to acquire such ownership (including from any other Person) if the effect of such acquisition would be that Shareholder and its Affiliates (including, without

2

limitation, any Group of which Shareholder or any of its Affiliates is a member) beneficially own, in aggregate, more than 19.9% of the then outstanding Voting Securities;

(ii)        effect or seek, offer or propose to effect (with or without conditions) any merger, takeover (whether effected by means of an offer, scheme of arrangement or otherwise), consolidation, business combination, recapitalization, restructuring, liquidation, dissolution or other extraordinary transaction with or involving Company or any of its Subsidiaries or any of its or their respective securities or assets;

(iii)        except as provided for in Section 5.1 , and subject to the limitations therein, (A) make, or in any way participate in or encourage, or form or join or in any way participate in any Group or otherwise act in concert with any third Person (other than any Affiliate of Shareholder), in any "solicitation" of "proxies" (as such terms are used in the rules of the SEC) or consents to vote Voting Securities (other than in accordance with and consistent with the recommendation of the Board of Directors of Company), (B) seek to advise or influence any Person or form or join or in any way participate in any Group or otherwise act in concert with any third Person to seek to advise or influence any Person (other than any Affiliate of such Shareholder) with respect to the voting of any Voting Securities (other than in accordance with and consistent with the recommendation of the Board), or (C) call or seek to have called, or form or join or in any way participate in any Group or otherwise act in concert with any third Person, to call or seek to have called, any meeting of the holders of Voting Securities (or securities convertible into, or exercisable or exchangeable for, Voting Securities);

(iv)        except as provided for in Section 5.1 , and subject to the limitations therein, deposit any Voting Securities in a voting trust or, except as otherwise provided in Section 2.2 , subject any Voting Securities to any arrangement or agreement with any Person with respect to the voting of such Voting Securities;

(v)        except as provided for in Section 5.1 , and subject to the limitations therein, seek, whether alone or in concert with any Group or otherwise in concert with others (A) to place a representative on the Board, (B) seek the removal of any member of the Board, or (C) otherwise seek or propose to control the Board, the management, or the policies of Company;

(vi)        other than any Affiliate of such Shareholder with respect to voting, and except as provided for in Section 5.1 (a) , and subject to the limitations therein, form, join or in any way participate in a Group or other group, or otherwise act in concert with any third Person, for the purpose of acquiring, holding, voting or disposing of Voting Securities;

(vii)        publicly disclose any intent, purpose, plan or proposal to do any of the foregoing; or

(viii)        assist, participate in, provide or arrange financing to do any of the foregoing, whether alone or in concert with any Group or otherwise in concert with others.

(b)        Notwithstanding any other provision of this Section, nothing in Section 2.1(a) shall be deemed to prevent or otherwise limit the exercise of any rights or remedies available to Shareholder or any Affiliate of Shareholder under, in connection with, contemplated

3

by or arising out of the Asset Purchase Agreement or any other Transaction Document (as defined in the Asset Purchase Agreement).

(c)  The provisions of this <u>Section 2.1</u> shall terminate automatically without any further action upon the fifth (5 th) anniversary of the Closing Date.

**Section 2.2.**  *Voting.*

(a)  Shareholder shall take such action (and shall cause each of its Affiliates that beneficially own Voting Securities to take such action) as may be required so that all Voting Securities beneficially owned by Shareholder (or any such Affiliate of Shareholder) from time to time are voted in the same manner ("for," "against," "withheld," "abstain" or otherwise, with lost, damaged or disfigured ballots counting as abstentions to the extent that they cannot be counted as "for," "against," "withheld" or otherwise under applicable law) as recommended by the Board to the other holders of Voting Securities with respect to the appointment and removal of members of the Board, subject to <u>Article V</u> .

(b)  Shareholder (or any Affiliate of Shareholder), as the holder of Voting Securities, shall use its commercially reasonable efforts to be present, in person or by proxy, at all meetings of the shareholders of Company so that all Voting Securities beneficially owned by Shareholder (or such Affiliate of Shareholder) from time to time may be counted for the purposes of determining the presence of a quorum at such meetings. The foregoing provision shall also apply to the execution by Shareholder of any written consent in lieu of a meeting of holders of Voting Securities or any class thereof.

(c)  The provisions of this <u>Section 2.2</u> shall terminate automatically without any further action at such time as Shareholder (together with all of its Affiliates) beneficially owns less than five percent (5%) of the then outstanding Voting Securities.

**ARTICLE III**
**RESTRICTIONS ON TRANSFER**

**Section 3.1.**  *Transfer Restrictions.*

(a)  Shareholder shall not Transfer any Acquisition Shares, other than as expressly permitted by, and in compliance with, the provisions of this <u>Article III</u> .

(b)  Prior to the date that is twelve (12) months after the Closing Date (the " **Release Date** "), Shareholder shall not, without the prior written consent of Company, Transfer any of the Acquisition Shares other than as expressly permitted by, and in compliance with, the following provisions of this <u>Section 3.1(b)</u> (such restrictions on Transfer, together with the restrictions on Transfer set forth in <u>Section 3.1(d)</u> , the " **Transfer Restrictions** "):

(i)  Shareholder may Transfer all or any of its Acquisition Shares in a transaction exempt from the registration requirements under the Securities Act to any Affiliate, so long as prior to or concurrent with any such Transfer the Affiliate (1) agrees to be bound by the terms hereunder as a "Shareholder" and such other terms hereunder applicable to the transferring Shareholder, (2) agrees that the representations, covenants and other agreements

4

made by the transferring Shareholder in this Agreement shall be deemed to have been made by such Affiliate, (3) shall execute a joinder to this Agreement, the execution of which shall constitute such Affiliate's agreement to the terms of this <u>Section 3.1(b)(i)</u> , (4) agrees that all notices hereunder to it may be delivered to the transferring Shareholder on its behalf and that all consents and waivers given by the transferring Shareholder will be binding on the Affiliate, and (5) agrees to Transfer such Acquisition Shares to the transferring Shareholder or other Affiliate of the transferring Shareholder (as designated by the transferring Shareholder) if it ceases to be an Affiliate of such Person, subject to compliance with the applicable provisions of <u>Section 3.2</u> and <u>Section 3.3</u> ; or

(ii)        Shareholder (and any applicable Affiliate) may Transfer all or any of its Acquisition Shares pursuant to the terms of any tender offer, exchange offer, takeover (whether effected by means of an offer, scheme or arrangement or otherwise), merger, reclassification, reorganization, recapitalization or other similar transaction in which shareholders of Company are offered, permitted or required to participate as holders of Ordinary Shares; *provided* that such tender offer, exchange offer, takeover, merger, reclassification, reorganization, recapitalization or other transaction has been approved or recommended by the Board (and which at the time of Transfer continues to be approved or recommended by the Board) (any such transaction, an " **Approved Transaction** ").

(c)        On and after the Release Date, Shareholder may Transfer any of the Acquisition Shares, pursuant to an effective registration statement or in a transaction exempt from the registration requirements under the Securities Act (including pursuant to and in compliance with Rule 144) and in compliance with all applicable laws and regulations and the limitations set forth in <u>Section 3.1(d)</u> .

(d)        Notwithstanding anything to the contrary set forth in this Agreement, other than pursuant to clauses (i) or (ii) of <u>Section 3.1(b)</u> , neither Shareholder nor any of its Affiliates may, in any single transaction or series of related transactions, Transfer to any Person or group of related Persons any Acquisition Shares (or, in the case of an intermediary such as a "broker," indirectly Transfer to such intermediary's transferee or group of related transferees, if the transferee or transferees are known to Shareholder) if, to the actual knowledge of Shareholder (without any duty of inquiry other than as and to the limited extent provided in the immediately following paragraph):

(i)        such Person or group of related Persons has filed or, to the actual knowledge of Shareholder, is required to file (in connection with such Transfer or otherwise) a Schedule 13D disclosing an intent with respect to its beneficial ownership of Equity Securities other than a passive investment intent; or

(ii)        to the extent such Person or group of related Persons would, upon completion of the Transfer of such Acquisition Shares, beneficially own more than five percent (5%) of Company's then outstanding Voting Securities;

unless, in each case, such Transfer:

5

(1)        has been approved by, or is in connection with a transaction approved or recommended by, the Board;

(2)        is made pursuant to a tender offer, exchange offer, takeover (whether effected by means of an offer, scheme of arrangement or otherwise) merger, consolidation or similar transaction that is an Approved Transaction; or

(3)        Shareholder or its Affiliate proposing to effect such Transfer has complied with the procedures set forth in Section 3.3(b) .

The restrictions on Transfer set forth in this Section 3.1(d) shall terminate automatically without any further action at such time as Shareholder, together with its Affiliates, beneficially owns less than five percent (5%) of the then outstanding Voting Securities.

Section 3.2.        *Restrictive Legends; Securities Law Compliance.*

(a)        The certificate or certificates representing the Acquisition Shares shall be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD UNLESS REGISTERED OR EXEMPT FROM REGISTRATION UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS.  IN ADDITION, THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF A SHAREHOLDER AGREEMENT AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN ACCORDANCE WITH SUCH AGREEMENT."

(b)        Shareholder agrees and consents to the entry of stop transfer instructions with Company's transfer agent and registrar against the transfer of Shareholder's Acquisition Shares except in compliance with this Article III .

(c)        Each certificate evidencing the Acquisition Shares transferred as herein provided shall bear the restrictive legend set forth (or described) in Section 3.2(a) above, except that (i) such certificate shall not be required to bear the first sentence of such restrictive legend if (A) in the opinion of counsel for Company, such legend is not required in order to establish compliance with the registration requirements of the Securities Act or (B) the securities represented by such certificate are Transferred in reliance upon Rule 144 or such other available exemption from registration under the Securities Act, and (ii) such certificate shall not be required to bear the second sentence of such restrictive legend from and after the time that the securities represented by such certificate are no longer subject to any contractual restrictions set forth in this Agreement, it being understood and agreed, for the avoidance of doubt and without prejudice to any other provision of this Agreement that would operate to terminate any such contractual restriction, that such securities will no longer be subject to any contractual

6

restrictions following any Transfer thereof in accordance with Section 3.1(b)(ii) or Section 3.1(c) .

**Section 3.3.** **Procedures for Transfer; Right of First Refusal.**

(a)    In order to ensure compliance with the provisions of this Article III , prior to any proposed Transfer of Acquisition Shares (other than any Transfer of Registrable Securities pursuant to Article IV ), Shareholder shall give written notice to Company of its intention to effect such Transfer.  Each such notice shall describe the manner and circumstances of the proposed Transfer in sufficient detail and shall be accompanied by:

(i)    an opinion of a nationally recognized securities law firm that such Transfer is exempt from the registration requirements of Section 5 of the Securities Act;

(ii)    a seller's representation letter and, if such Transfer is proposed to be executed through a broker, a broker's representation letter, in each case, in customary form, confirming that such sale will be or has been effected pursuant to Rule 144 under the Securities Act; or

(iii)    a "no action" letter from the staff of the SEC addressed to Shareholders to the effect that the Transfer without registration would not result in a recommendation by the staff to the SEC that action be taken with respect thereto.

(b)    In the event that Shareholder or one of its Affiliates proposes to Transfer any Acquisition Shares pursuant to Section 3.1(d)(ii)(3) , Shareholder (or the applicable Affiliate) shall first comply with the following provisions of this Section 3.3(b) :

(i)    Prior to Transferring any of its Acquisition Shares, Shareholder (or the applicable Affiliate) shall deliver to Company a written notice (the " **Transfer Notice** ") stating: (A) Seller's (or the applicable Affiliate's) bona fide intention to Transfer such Acquisition Shares; (B) the name, address and phone number of the proposed purchaser or other transferee (a " **Proposed Transferee** "); (C) the aggregate type and number of Acquisition Shares proposed to be Transferred to each Proposed Transferee (the " **Offered Shares** "); and (D) the bona fide cash price or, in reasonable detail, other consideration for which Shareholder (or the applicable Affiliate) proposes to Transfer the Offered Shares (the " **Offered Price** ").

(ii)    For a period of fifteen (15) days (the " **Exercise Period** ") after the date on which the Transfer Notice is deemed to have been delivered to Company, subject to compliance with the requirements of Irish law, Company shall have the right to purchase all of the Offered Shares for the Offered Price. In order to exercise its right hereunder, Company must deliver written notice (the " **Exercise Notice** ") to Seller within the Exercise Period. In such case, Company shall purchase, or cause its designee (which Company shall notify Shareholder or the applicable Affiliate in advance) to purchase, all of the Offered Shares by paying the Offered Price to Shareholder (or the applicable Affiliate) and taking such other necessary actions to effect the foregoing and Shareholder (or the applicable Affiliate) shall deliver the Offered Shares and other necessary transfer documents and take such other necessary actions to effect the foregoing, within ten (10) days after the payment of the Offered Price.

7

(iii)    In the event that Company declines to exercise its right of purchase under the preceding clause (ii) of this Section 3.3(b) or fails to pay, or cause to be paid, prior to the expiration of the Exercise Period, the Offered Price in full after delivering the Exercise Notice in accordance with Section 3.3(b)(ii) or Company fails to send an Exercise Notice prior to the expiration of the Exercise Period, Shareholder (or the applicable Affiliate) shall be permitted to Transfer to the Proposed Transferee the Offered Shares at the Offered Price at any time from and including the date falling thirty (30) days after the end of the Exercise Period, if the Exercise Notice is not received by Shareholder, or forty (40) days after the end of the Exercise Period, if the Exercise Notice is received by Shareholder but Company fails to pay, or cause to be paid, the Offered Price in full in accordance with Section 3.3(b)(ii) . In the event that Shareholder shall not Transfer to the Proposed Transferee all or any of the Offered Shares at the Offer Price during the periods contemplated by this Section 3.3(b)(iii) , then Shareholder and its Affiliates shall comply with the terms of this Section 3.3(b) prior to, and as a condition of, any subsequent Transfer of any Acquisition Shares.

(c)    Notwithstanding anything to the contrary set forth herein, if Company fails to effect the Registration of all of the Registrable Securities in accordance with Section 4.1 , and subject to the limitations therein, the rights and obligations of the Parties under Section 3.3(b) shall terminate automatically without any further action.

(d)    Any attempted or purported Transfer of Acquisition Shares in violation of this Agreement shall be null and void, regardless of whether the purported transferee has any actual or constructive knowledge of the provisions hereof. Company shall not record on its stock transfer books or otherwise any attempted or purported Transfer in violation of this Agreement.

(e)    Company will cooperate with, and will direct its transfer agent and registrar to cooperate with and process, as promptly as practicable, any proposed Transfer of Acquisition Shares by Shareholder that does not violate the provisions of this Agreement.

**Section 3.4.** **Applicability to Other Securities.** If, following the date hereof, Company issues any Ordinary Shares or any other securities of Company in respect of or in substitution or exchange for the Acquisition Shares in connection with any stock split, dividend or combination, or any recapitalization, reclassification or similar transaction, such shares or securities shall be subject to the same restrictions set forth in this Article III as are then applicable to the Acquisition Shares with respect to which such shares or securities have been issued in respect

of or in substitution or exchange for. In such an event, the Parties hereby agree to make such amendments or modifications to this Agreement as may be appropriate to reflect such treatment of such shares or other securities.

**ARTICLE IV**
**REGISTRATION**

*Section 4.1.*        *Registration; Registration Procedures.*

(a)        Subject to the provisions of this <u>Article IV</u>, to the extent not prohibited by any applicable law or applicable interpretation of the Staff of the SEC, on or prior to the Release Date, Company shall effect the registration under the Securities Act of all of Shareholder's

8

Registrable Securities on or prior to the Release Date; *provided, however* , that if the Release Date occurs when (i) the registration, offering or sale of the Registrable Securities would, in Company's judgment, impede, delay or otherwise interfere with any pending or contemplated material acquisition, disposition, corporate reorganization or similar material transaction, or (ii) non-public material information not otherwise then required by applicable law to be publicly disclosed regarding Company exists, the immediate disclosure of which would in Company's judgment be significantly disadvantageous to Company (clauses (i) and (ii), a " **Material Pending Event** "), then Company may postpone the filing of a Registration Statement for a period not to exceed 90 consecutive calendar days from the Release Date upon providing Shareholder with written notice of such postponement (which notice need not include a statement of the reason for such postponement).  Shareholder shall keep confidential any communications received by it from Company regarding the postponement pursuant to this Section 4.1(a) (including the fact of the postponement).

       (b)       Subject to the limitations set forth in Article IV , Company shall:

       (i)       prepare and file with the SEC such amendments and supplements to such registration statement (including Exchange Act documents incorporated by reference into the registration statement) and the prospectus used in connection therewith as may be necessary to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all securities covered by such registration statement in accordance with the intended methods of disposition by Shareholder set forth in such registration statement; *provided* that before filing a registration statement or prospectus or any amendments or supplements thereto in accordance with this Section 4.1 (b)(i) to the extent that doing so will not materially interfere with the timing of the offering: (i) Company will furnish to counsel of Shareholder copies of all documents proposed to be filed, and (ii) such documents will be subject to the review of such counsel reasonably in advance of any filing to permit a reasonable opportunity to review and comment in light of the circumstances;

       (ii)       comply as to form in all material respects with the requirements of the applicable form and include all financial statements required by the SEC and use its commercially reasonable efforts to comply with all applicable securities laws in the United States and Register or qualify such Registrable Securities covered by such registration in such jurisdictions in the United States as Shareholder shall reasonably request, and do any and all other acts and things which may be reasonably necessary to enable Shareholder to consummate the disposition in such jurisdictions of the Registrable Securities owned by Shareholder, except that Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction where, but for the requirements of this Section 4.1(b)(ii) , it would not be obligated to, subject itself to taxation in any such jurisdiction or to consent to general service of process in any such jurisdiction;

       (iii)       notify Shareholder promptly if Company becomes aware that the prospectus included in such registration statement, as then in effect, or the registration statement includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing and prepare an amended or supplemental prospectus as may be necessary so that, as thereafter made available to the purchasers of such Registrable Securities,

such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(iv)     otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable (but not more than 18 months) after the effective date of the registration statement, an earnings statement which shall satisfy the provisions of Section 11(a) of the Securities Act;

(v)     (A) list such Registrable Securities on the exchange on which the Ordinary Shares are then listed (if such Registrable Securities are not already so listed and if such listing is then permitted under the rules of such exchange) to the extent required and (B) provide for a transfer agent and registrar for such Registrable Securities covered by such registration statement not later than the effective date of such registration statement;

(vi)     make available for inspection by Shareholder, by any underwriter participating in any disposition to be effected pursuant to such registration statement and by any attorney, accountant or other agent retained by Shareholder or any such underwriter, all pertinent financial and other records, pertinent corporate documents and properties of Company, and cause all of Company's officers, directors and employees to supply all information reasonably requested by Shareholder, or any such underwriter, attorney, accountant or agent in connection with the "due diligence" of Shareholder with respect to such registration statement, subject to the execution of a mutually acceptable confidentiality agreement;

(vii)     promptly notify counsel for Shareholder in writing (A) of the receipt of any comments from the SEC, (B) of any request by the SEC to amend the registration statement or amend or supplement the prospectus or for additional information, and (C) of the issuance by the SEC of any stop order suspending the effectiveness of the registration statement or of any order preventing or suspending the use of any prospectus, or of the suspension of the qualification of the registration statement for offering or sale in any jurisdiction, or of the institution or threatening of any proceedings for any of such purposes;

(viii)     use commercially reasonable best effort to obtain the withdrawal of any stop order suspending the effectiveness of the registration statement or of any order preventing or suspending the use of any prospectus as soon as practicable;

(ix)     (A) if requested by Shareholder, promptly incorporate in a prospectus supplement or post-effective amendment such information as Shareholder reasonably requests to be included therein; and (B) make all required filings of such prospectus supplement or post-effective amendment as soon as practicable after being notified of the matters incorporated in such prospectus supplement or post-effective amendment; and

(x)     cooperate with Shareholder to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing Registrable Securities to be sold under the registration statement, and enable such securities to be in such denominations and Registered in such names as Shareholder may reasonably request.

**Section 4.2.** **Information Supplied.** It shall be a condition precedent to the obligations of Company to take any action to Register the Registrable Securities held by Shareholder as to which any registration is being effected that Shareholder shall furnish Company with such information regarding Shareholder that is pertinent to the disclosure requirements relating to the registration and the distribution of such securities as Company may from time to time reasonably request. Shareholder agrees to furnish to Company as promptly as reasonably practicable all information required to be disclosed in order to make the information previously furnished to Company by Shareholder not misleading.

**Section 4.3.** **Expenses.** All of the costs and expenses incurred by Company in connection with any Registration Statement shall be borne by Company. The costs and expenses of any such registration shall include, without limitation, the reasonable fees and expenses of Company's counsel and its accountants and all other out-of-pocket costs and expenses of Company incident to the preparation, printing and filing of the registration statement and all amendments and supplements thereto and the cost of furnishing copies of each preliminary prospectus, each final prospectus and each amendment or supplement thereto to purchasers of the securities so Registered, the costs and expenses incurred in connection with the qualification of such securities so Registered under the securities or "blue sky" laws of various jurisdictions, the fees and expenses of Company's transfer agent and all other costs and expenses of complying with the provisions of this Article IV with respect to such registration and the reasonable fees and expenses of any special counsel to Shareholder, as necessary (collectively, the " **Registration Expenses** "). All Selling Expenses will be borne by the holders of the securities Registered *pro rata* on the basis of the number of securities so Registered.

**Section 4.4.** **Restrictions on Disposition.**

(a)     Shareholder agrees that, upon receipt of any notice from Company of the happening of any event of the kind described in Section 4.1(b)(iii) or Section 4.1(b)(vii)(C) , Shareholder will forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until Shareholder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4.1(b)(iii) or written notice from Company that the Registration Statement is again effective and no amendment or supplement is needed; *provided* that Company shall use its commercially reasonable best efforts to make the Registration Statement effective again as soon as practicable thereafter by taking all necessary actions including filing any amendments and supplements necessary.

(b)     At any time following the effectiveness of any Registration Statement when there is a Material Pending Event or if the prospectus relating to the Registrable Securities contains a material misstatement or omission, Company may request in writing that Shareholder discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities, and Shareholder shall do so upon receipt of such written request; *provided, however* , that unless expressly requested in writing by Shareholder, Company shall not divulge to Shareholder the reason for any such postponement, and Company shall be under no obligation to divulge such reason even if requested by Shareholder. Company will use its reasonable best efforts to ensure that the use of the prospectus may be resumed (A) in the case of clause (i) of the definition of Material Pending Event, as soon as, in the sole judgment of Company, public disclosure of such Material Pending Event would not be prejudicial to or

11

contrary to the interests of Company or, if necessary to avoid unreasonable burden or expense, as soon as practicable thereafter, and (B) in the case of clause (ii) of the definition of Material Pending Event, as soon as in the reasonable discretion of Company, such suspension is no longer appropriate. Company shall be entitled to exercise its right under this <u>Section 4.4</u> no more than once in any 12-month period; *provided, however* , that the duration of any such suspension period shall not exceed 90 consecutive days. Shareholder shall keep confidential any communications received by it from Company regarding the postponement pursuant to this <u>Section 4.4</u> (including the fact of the postponement).

        *Section 4.5.*        **Indemnification.**

        (a)        ***Indemnification by Company.***  To the fullest extent permitted by law, Company hereby agrees to indemnify and hold harmless Shareholder, each Affiliate of Shareholder and its respective directors and officers, members or general and limited partners (and the directors, officers, employees, affiliates and each Person who Controls such Shareholder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) (hereinafter referred to as a " **Controlling Person** ") of any of the foregoing) and each underwriter, if any, and its Controlling Person, (collectively, the " **Shareholder Indemnified Parties** "), against all claims, losses, damages and liabilities, joint or several, actions or proceedings (whether commenced or threatened in writing) in respect thereof (" **Claims** ") and expenses arising out of or based on: (i) any untrue statement or alleged untrue statement of a material fact contained in a registration statement (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, (ii) any untrue statement or alleged untrue statement of a material fact contained in a prospectus (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, (iii) any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus prepared by it or authorized by it in writing for use by Shareholder (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, or (iv) any violation by Company (or alleged violation) of any rule or regulation promulgated under the Securities Act, the Exchange Act or applicable "blue sky" laws in connection with any Registration, qualification or compliance, and Company will reimburse each Shareholder Indemnified Party for any reasonable fees and disbursements of counsel and any other reasonable out-of-pocket expenses incurred in connection with investigating, defending or settling any such Claim; *provided* that Company will not be liable in any such case to the extent that any such Claim arises out of or is based on any untrue statement or alleged untrue statement or omission or alleged omission by Shareholder but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission is made in such registration statement, prospectus, or Issuer Free Writing Prospectus in reliance upon and in conformity with written information furnished to Company by or on behalf of Shareholder and stated to be specifically for use therein; and *provided* , *further,* that the indemnity agreement contained in this <u>Section 4.5(a)</u> shall not apply to amounts paid in

settlement of any such Claim if such settlement is effected without the consent of Company (which consent shall not be unreasonably withheld, conditioned or delayed).

(b)       ***Indemnification by Shareholder.***  To the fullest extent permitted by law, Shareholder shall indemnify and hold harmless Company and any of its Affiliates, directors, officers and Controlling Persons (collectively, the " **Company Indemnified Parties** "), against all Claims and expenses arising out of or based on:  (i) any untrue statement or alleged untrue statement of a material fact contained in a registration statement (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, (ii) any untrue statement or alleged untrue statement of a material fact contained in a prospectus (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, or (iii) any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus (or any amendment or supplement thereto), including all documents incorporated therein by reference, or any omission or alleged omission therefrom of a material fact, in each case, necessary in order to make the statements therein not misleading, in light of the circumstances under which they were made, and Shareholder will reimburse each such Company Indemnified Party for any reasonable fees and disbursements of counsel and any other reasonable expenses incurred in connection with investigating and defending or settling any such Claim, in each case to the extent, but only to the extent that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, or Issuer Free Writing Prospectus in reliance upon and in conformity with written information furnished to Company by or on behalf of Shareholder and stated to be specifically for use therein; *provided* that in the absence of fraud by Shareholder, the liability of Shareholder hereunder shall be limited to the net proceeds received by Shareholder from the sale of Registrable Securities covered by such registration statement; and *provided , further,* that the indemnity agreement contained in this Section 4.5(b) shall not apply to amounts paid in settlement of any such Claim if such settlement is effected without the consent of Shareholder (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)       ***Notification of Claims.***   Promptly after receipt by a Person entitled to indemnification pursuant to Section 4.5 (an " **Indemnified Party** ") hereunder of written notice of the commencement of any action or proceeding with respect to which a claim for indemnification may be made pursuant to this Section 4.5 , such Indemnified Party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action or proceeding; *provided* that the failure of the Indemnified Party to give notice as provided herein shall not relieve the indemnifying party of its obligations under this Section 4.5 , except to the extent that the indemnifying party is prejudiced in any material respect by such failure to give notice. In case any such action or proceeding is brought against an Indemnified Party, unless in such Indemnified Party's reasonable judgment, based upon advice of counsel, a conflict of interest between such indemnified and indemnifying parties may exist in respect of such action or proceeding (in which case the Indemnified Party shall have the right to assume or continue its own defense and the indemnifying party shall be liable for any

13

reasonable expenses therefor (but in no event will bear the expenses for more than one firm of counsel for all Indemnified Parties in each jurisdiction), the indemnifying party will be entitled to participate in and to assume the defense thereof (at its expense), jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such Indemnified Party, and after notice from the indemnifying party to such Indemnified Party of its election so to assume the defense thereof, the indemnifying party will not be liable to such Indemnified Party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation and shall have no liability for any settlement made by the Indemnified Party without the consent of the indemnifying party, such consent not to be unreasonably withheld. No indemnifying party will settle any action or proceeding or consent to the entry of any judgment without the prior written consent of the Indemnified Party, unless such settlement or judgment (i) includes as an unconditional term thereof the giving by the claimant or plaintiff of a release to such Indemnified Party from all liability in respect of such action or proceeding and (ii) does not involve the imposition of equitable remedies or the imposition of any obligations on such Indemnified Party and does not otherwise adversely affect such Indemnified Party, other than as a result of the imposition of financial obligations for which such Indemnified Party will be indemnified hereunder. An Indemnified Party may not settle any action or proceeding or the entry of any judgment without the prior written consent of the indemnifying party.

(d)      **Contribution.** (i) If the indemnification provided for in this <u>Section 4.5</u> from the indemnifying party is held by a court of competent jurisdiction to be unavailable to an Indemnified Party hereunder in respect of any Claim or expenses referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Claim or expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and Indemnified Party in connection with the actions which resulted in such Claim or expenses, as well as any other relevant equitable considerations.  The relative fault of such indemnifying party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such indemnifying party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party under this <u>Section 4.5(d)</u> as a result of the Claim and expenses referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with any action or proceeding; and (ii) the Parties agree that it would not be just and equitable if contribution pursuant to this <u>Section 4.5(d)</u> were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in <u>Section 4.5(d)(i)</u> .  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The liability of Shareholder shall, in the absence of fraud by Shareholder, be limited to the net proceeds received by Shareholder from the sale of Registrable Securities covered by such registration statement.

(e)      **Non-Exclusive Remedy.** The obligations of the Parties under this <u>Section 4.5</u> shall be in addition to any liability which any Party may otherwise have to the other Party.

14

(f)        *Survival.* The indemnity and contribution provisions contained in this <u>Section 4.5</u> shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of Shareholder, any person Controlling Shareholder or any Affiliate of Shareholder or by or on behalf of Company, its officers or directors or any person Controlling Company or (iii) the sale of any Registrable Securities by any Shareholder pursuant to a Registration Statement.

**Section 4.6.        No Inconsistent Agreements; No Free Writing Prospectuses.** Company represents and warrants that it is not a party to a contract which conflicts with or limits or prohibits the exercise of the rights granted to Shareholder holding Registrable Securities in this <u>Article IV</u> . Shareholder agrees that, unless it obtains the prior consent of Company it will not make any offer relating to the Registrable Securities that would constitute a "free writing prospectus," as defined in Rule 405, required to be filed with the SEC.

**Section 4.7.        Termination of Registration Rights.** The rights of Shareholder under this Article IV shall terminate (other than Section 4.3, Section 4.5 and Section 4.7) upon the earliest to occur of (a) the date on which all shares of Registrable Securities held by Shareholder may immediately be sold under Rule 144, (b) the date on which Shareholder ceases to hold any Registrable Securities, (c) the date on which Company is no longer required to file reports pursuant to Section 13(a) or 15(d) of the Exchange Act, or (d) the date on which a Form 15 (or any successor form) has been filed under the Exchange Act with respect to the Ordinary Shares. Company shall have no obligation to maintain the effectiveness of any Registration Statement with respect to any Registrable Securities held by Shareholder following the earlier of (x) the termination of Shareholder's rights under this Article IV (other than Section 4.3, Section 4.5 and Section 4.7) or (y) the date Shareholder ceases to be a Rule 144 Affiliate.

**Section 4.8.        Reports under the Exchange Act.** With a view to making available to Shareholder the benefits of Rule 144 promulgated under the Securities Act and any other rule or regulation of the SEC that may at any time permit Shareholder to sell securities of Company to the public without Registration or pursuant to a Registration Statement, Company agrees to use its commercially reasonable efforts to:

(a)        make and keep current public information available, as those terms are understood and defined in Rule 144, at all times;

(b)        take all commercially reasonable action necessary to enable Shareholder to utilize Form S-3 for the resale of its Registrable Securities;

(c)        file with the SEC in a timely manner all reports and other documents required of Company under the Securities Act and the Exchange Act; and

(d)        furnish to Shareholder, so long as Shareholder owns any Registrable Securities, as soon as reasonably practicable upon request (i) a written statement by Company that it has complied with the reporting requirements of Rule 144, the Securities Act and the Exchange Act, or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies); (ii) a copy of the most recent annual or quarterly report of Company and any other reports and documents filed by Company; and (iii) any other

15

information as may be reasonably requested in availing Shareholder of any rule or regulation of the SEC which permits the selling of any securities without Registration or pursuant to Form S-3.

## ARTICLE V
## BOARD DESIGNATION RIGHTS

**Section 5.1.**     **Board Designation Rights.**

(a)       From and after the Closing and so long as Shareholder (together with its Affiliates) holds at least seven percent (7%) of the Voting Securities, Shareholder shall have the right to designate one director to the Board, who shall, unless otherwise consented to in writing by Company, at all times be a current executive officer or current employee of Shareholder (except for any current executive officer or current employee of Shareholder as of the date hereof who subsequently resigns from or otherwise leaves his or her position or employment with Shareholder), to be nominated by Company to serve as a member of the Board (the " **Shareholder Nominated Director** ") and Company shall nominate such designee as a member of the Board. In the event that Shareholder and its Affiliates shall hold less than seven percent (7%) of the Voting Securities, any director of the Board who was theretofore designated by Shareholder (or its Affiliate) and elected or appointed to the Board pursuant to Section 5.1(b) shall promptly offer to resign from the Board, effective immediately.

(b)       Company shall, to the extent permitted by applicable Laws and the articles of association of Company, take all action necessary to cause the individuals so designated by Shareholder (or its Affiliate, as applicable) to be elected or appointed to the Board, including (at the election of Company) either by increasing the size of the Board or by seeking and accepting or otherwise securing the resignations of such number of then incumbent directors as is necessary to enable the individuals so designated by Shareholder (or its Affiliate, as applicable) to be elected or appointed to the Board.

(c)       Company shall reimburse the Shareholder Nominated Director for his or her out-of-pocket expenses incurred in connection with his or her participation as a member of the Board in a manner consistent with Company's policies for reimbursing such expenses of the members of the Board. Company shall indemnify the Shareholder Nominated Director to the same extent it indemnifies its other directors pursuant to its articles of association and other organizational documents and applicable law.

(d)       Company shall maintain in full force and effect director and officer liability insurance covering the directors and officers of Company with terms, conditions, retentions and limits of liability that are no less favorable than the coverage provided under Company's policies existing as of the date of this Agreement.  Company shall use its commercially reasonable efforts to maintain Company's articles of association and other organizational documents to require Company to indemnify its directors and officers to the fullest extent permitted by law.

16

**ARTICLE VI**
**MISCELLANEOUS**

**Section 6.1.**    **Governing Law.**  This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**Section 6.2.**    **Consent to Jurisdiction.** Any suit, action or proceeding brought by any Party seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement will be brought in a state or federal court located in the State of Delaware and each of the Parties to this Agreement hereby consents and submits to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

**Section 6.3.**    **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement may not be assigned by either Party without the prior written consent of the other Party; *provided, however* , that, without the consent of Company, Shareholder may assign this Agreement (and the rights and obligations hereunder) to any of its Affiliates, in connection with a transfer of Acquisition Shares to such Affiliate pursuant to Section 3.1(b)(i) ; *provided, however* , that, notwithstanding such assignment, the assigning Shareholder shall continue to be bound by all of its obligations hereunder and the applicable Affiliate shall execute a joinder agreement if required by Section 3.1(b) of this Agreement so as to be bound by the terms of this Agreement. This Agreement is not intended and shall not be construed to create any rights or remedies in any parties other than Shareholder and Company, and no Person shall assert any rights as third party beneficiary hereunder.

**Section 6.4.**    **Entire Agreement.**  This Agreement (including Appendix A , which is incorporated herein and forms an integral part hereof) and Company's articles of association contain the entire understanding and agreement between the Parties with regard to Shareholder's rights in relation to the Acquisition Shares and supersedes all prior agreements and understandings among the Parties relating to the subject matter hereof.

**Section 6.5.**    **Amendment; Waiver.**

(a)    This Agreement may be amended if, and only if, such amendment is in writing and signed by Company and Shareholder.  Any provision of this Agreement may be waived by the Party against whom the waiver is to be effective.

(b)    No waiver by a Party of any misrepresentation of any representation or warranty, or any breach or failure to perform or comply with any agreement, covenant or other obligation, of any other Party hereunder, whether intentional or not, shall be deemed to extend to

17

any prior or subsequent default, misrepresentation or breach of a warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent occurrence.  No failure or delay by a Party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Except as otherwise provided herein, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided under applicable law.

**Section 6.6.**    **Notices.** All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, telecopied, sent by nationally-recognized overnight courier or mailed by U.S. registered or certified mail (return receipt requested), postage prepaid, to the Parties at the addresses set forth below or to such other address as the Party to whom notice is to be given may have furnished to the other Party in writing in accordance herewith.  Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of telecopy delivery, on the date sent if confirmation of receipt is received and such notice is also promptly mailed by registered or certified mail (return receipt requested), (c) in the case of a nationally-recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date when sent and (d) in the case of mailing, on the fifth Business Day following that on which the piece of mail containing such communication is posted to the address provided herein or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Any Party hereto may give any notice, request, demand, claim or other communication hereunder using any other means (including ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the individual for whom it is intended. Notices to Parties pursuant to this Agreement shall be given:

If to Company:

Seagate Technology Public Limited Company
Arthur Cox Building
Earlsfort Centre, Earlsfort Terrace
Dublin 2
Facsimile:          +1-831-439-2547

Attention:        Kenneth Massaroni

with a copy (which shall not constitute notice) to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Facsimile:        +1-415-493-6811
Attention:        Larry W. Sonsini
                      Mark Baudler

18

If to Shareholder:

> Samsung Electronics Co., Ltd.
> 38th Floor, Samsung Electronics Bldg.
> 1320-10, Seocho 2 Dong, Seocho-Gu
> Seoul, Korea 137-857
> Facsimile:            +82-2-2255-8399
> Attention:           International Legal Department, Office of the General Counsel

> with a copy (which shall not constitute notice) to:

> Paul, Hastings, Janofsky & Walker
> 22nd Floor, Bank of China Tower
> 1 Garden Road, Hong Kong
> Facsimile:            +852-3192-9689
> Attention:           Daniel S. Kim

**Section 6.7.**        ***Counterparts.*** This Agreement may be signed in any number of counterparts and the signatures delivered by telecopy, each of which shall be an original, with the same effect as if the signatures were upon the same instrument and delivered in person. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Parties.

**Section 6.8.**        ***Severability.*** If any provision of the Agreement is held to be invalid or unenforceable at law, all other provisions of the Agreement shall remain in full force and effect. Upon any such determination, the Parties agree to negotiate in good faith to modify this Agreement so as to give effect to the original intent of the Parties to the fullest extent permitted by applicable law.

**Section 6.9.**        ***Injunctive Relief.*** The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to a decree of specific performance and temporary, preliminary and permanent injunctive relief to prevent any breach or threatened breach of this Agreement, and to enforce specifically the terms and provisions of this Agreement, in any action instituted in a court of competent jurisdiction, without the posting of any bond or other undertaking, this being in addition to any other remedy to which they are entitled at law or in equity.  Each Party hereby irrevocably waives, in any action for specific performance, the defense of adequacy of a remedy at law.

[Remainder of Page Intentionally Left Blank]

19

IN WITNESS WHEREOF, the Parties have caused this Shareholder Agreement to be executed by their respective authorized officers as of the date aforesaid.


**SEAGATE TECHNOLOGY PLC**


By:    /s/ Stephen J. Luczo                            
Name:  Stephen J. Luczo
Title:   Chairman, President and Chief Executive Officer

[Signature Page to Shareholder Agreement]

IN WITNESS WHEREOF, the Parties have caused this Shareholder Agreement to be executed by their respective authorized officers as of the date aforesaid.

**SAMSUNG ELECTRONICS CO., LTD.**

By:    /s/ Oh-Hyun Kwon

Name:  Oh-Hyun Kwon

Title:   President

[Signature Page to Shareholder Agreement]

**APPENDIX A**

**SHAREHOLDER AGREEMENT**

**DEFINITIONS AND INDEX OF DEFINED TERMS**

1.      *Definitions.* For all purposes of and under this Agreement, the following terms have the following meanings:

" **Acquisition Shares** " means the Ordinary Shares issued to Shareholder by Company pursuant to the terms of the Asset Purchase Agreement.

" **Affiliate** " has the meaning set forth in the Asset Purchase Agreement.

" **beneficial owner** " (including, with correlative meaning, the terms " **beneficially own** " and " **beneficial ownership** ") has the meaning given such term in Rule 13d-3 under the Exchange Act, and a Person's beneficial ownership of securities will be calculated in accordance with the provisions of such Rule; *provided* , *however* , that (i) a Person will be deemed to be the beneficial owner of any security which may be acquired by such Person whether within 60 days or thereafter, upon the conversion, exchange or exercise of any rights, options, warrants or similar securities to subscribe for, purchase or otherwise acquire (x) capital stock of any person or (y) debt or other evidences of indebtedness, capital stock or other securities directly or indirectly convertible into or exercisable or exchangeable for such capital stock of such person and (ii) a Person shall be deemed to be the beneficial owner of any securities with which a Person has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of such securities.

" **Board** " means the Board of Directors of Company.

" **Business Day** " means each day that is not a Saturday, Sunday or other day on which banking institutions located in the U.S., Ireland or Korea are authorized or obligated by applicable law or executive order to close.

" **Business Entity** " means any Person other than a natural person or a Governmental Entity.

" **Closing** " and " **Closing Date** " have the respective meanings set forth in the Asset Purchase Agreement.

" **Control** ", " **Controlling** " and " **Controlled by** " have the respective meanings set forth in the Asset Purchase Agreement.

" **Economic Rights** " means, with respect to a security, the right to all or any portion of the pecuniary interest in the security, including, without limitation, the right to receive dividends and distributions, proceeds upon liquidation and receive the proceeds of disposition or conversion (if applicable) of the security.

" **Entity** " means any Person that is not a natural person.

" **Equity Securities** " means the "equity securities" (as such term is defined in Rule 3a11-1 under the Exchange Act) of Company.

" **Exchange Act** " means the Securities Exchange Act of 1934, as amended.

" **Governmental Entity** " means any supranational, national, state, municipal, local or foreign government, any court, arbitrator, administrative agency, commission or other governmental official, authority or instrumentality, in each case whether domestic or foreign, any stock exchange or similar self-regulatory organization or any quasi-governmental or private body exercising any regulatory, taxing or other governmental or quasi-governmental authority.

" **Group** " means any group of Persons formed for the purpose of acquiring, holding, voting or disposing of Equity Securities which would be required under Section 13(d) of the Exchange Act, and the rules and regulations promulgated thereunder, to file a statement on Schedule 13D pursuant to Rule 13d-1(a) of the rules and regulations promulgated under the Exchange Act or a statement on Schedule 13G pursuant to Rule 13d-1(c) of the rules and regulations promulgated under the Exchange Act with the SEC as a "person" within the meaning of Section 13(d)(3) of the Exchange Act if such group directly or indirectly beneficially owned Equity Securities representing more than five percent (5%) of any class of Equity Securities then outstanding.

" **Issuer Free Writing Prospectus** " has the meaning set forth in Rule 433 of the Securities Act.

" **Korea** " means the Republic of Korea.

" **Person** " means any natural person, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity.

" **Register** ," " **Registered** " and " **Registration** " refer to a registration effected by preparing and filing a Registration Statement and the declaration or ordering of the effectiveness of such Registration Statement.

" **Registrable Securities** " means the Acquisition Shares held by Shareholder and any Ordinary Shares or other securities which may be issued in connection with any stock split, dividend or combination, or any recapitalization, reclassification or similar transaction, with respect to the Acquisition Shares. As to any particular Registrable Securities, such Registrable Securities shall cease to be Registrable Securities when: (i) a registration statement with respect to the sale by Shareholder of such securities has become effective under the Securities Act and such securities have been disposed of in accordance with such registration statement, (ii) such securities have been transferred pursuant to Rule 144 or (iii) such securities shall have ceased to be outstanding.

<div align="center">Appendix A-2</div>

" **Registration Statement** " means a registration statement prepared on Forms S-1, S-3, F-1, F-3 or F-6 under the Securities Act.

" **Representative** " means, as to any Person, the directors, managers, managing members, general partners, officers, employees, attorneys, investment banking and financial advisors, independent accountants and any other agents and representatives of the Person.

" **Rule 144** " means Rule 144 promulgated pursuant to the Securities Act, as such rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same purpose and effect as such rule.

" **Rule 144 Affiliate** " means an "affiliate", as such term is defined under Rule 144.

" **SEC** " means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

" **Securities Act** " means the Securities Act of 1933, as amended.

" **Selling Expenses** " means all underwriting discounts, selling commissions and transfer taxes, if any, applicable to the sale or disposition of Registrable Securities pursuant to this Agreement.

" **Subsidiary** " of a Person means, at the time of determination, any Business Entity of which the securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are owned, directly or indirectly through subsidiaries or otherwise, by such Person.

" **Transfer** " means, directly or indirectly, to offer, sell (including any short sale), transfer, assign, pledge, encumber, hypothecate or similarly dispose of (by merger, testamentary disposition, operation of law or otherwise), either voluntarily or involuntarily, or enter into any contract, option or other arrangement or understanding with respect to the offer, sale (including any short sale), transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of (by merger, testamentary disposition, operation of law or otherwise), any Acquisition Shares beneficially owned by a Person or any interest (including any Economic Rights or Voting Rights) in any Acquisition Shares beneficially owned by a Person. Whether or not treated as an offer or sale of the Acquisition Shares under the Securities Act, "Transfer" shall also include any hedging or other transaction entered into after the date hereof, such as any purchase, sale (including any short sale) or grant of any right (including without limitation any put or call option) with respect to any of the Acquisition Shares or with respect to any security that includes or derives any significant part of its value from such Acquisition Shares.

" **Voting Rights** " means, with respect to a security, the right to direct the voting of the security with respect to any matter for which the security is entitled to vote.

" **Voting Securities** " means the Ordinary Shares and any other securities of Company entitled, in the ordinary course, to vote in the election of directors of Company.

Appendix A-3

**2.** ***Other Defined Terms .*** The following terms are defined in the Section of this Agreement set forth opposite each such respective term below.

| Term | Section |
|---|---|
| Agreement | Preamble |
| Approved Transaction | Section 3.1(b)(ii) |
| Asset Purchase Agreement | Recital A |
| Company Indemnified Parties | Section 4.5(b) |
| Controlling Person | Section 4.5(a) |
| Exercise Notice | Section 3.3(b) |
| Exercise Period | Section 3.3(b) |
| Indemnified Party | Section 4.5(c) |
| Material Pending Event | Section 4.1 |
| Offered Price | Section 3.3(b) |
| Offered Shares | Section 3.3(b) |
| Parties | Preamble |
| Party | Preamble |
| Proposed Transferee | Section 3.3(b) |
| Registration Expenses | Section 4.3 |
| Release Date | Section 3.1(b) |
| Registration Expenses | Section 4.3 |
| Shareholder | Preamble |
| Shareholder Indemnified Parties | Section 4.5(a) |
| Shareholder Indemnified Parties | Section 4.4(b) |
| Transfer Notice | Section 3.3(b) |
| Transfer Restrictions | Section 3.1(b) |

Appendix A-4

Exhibit 21.1

## Seagate Technology Public Limited Company Subsidiaries as of July 1, 2011

| | |
|---|---|
| Seagate Technology Public Limited Company | Ireland |
| Seagate Technology | Cayman |
| Seagate Technology (Dublin Branch) | Ireland |
| Seagate Technology HDD Holdings | Cayman |
| Seagate Technology HDD Holdings (Dublin Branch) | Ireland |
| Seagate HDD Cayman | Cayman |
| Seagate Technology (US) Holdings, Inc. | Delaware |
| i365 Inc. | Delaware |
| i365 Canada Inc. | Canada |
| i365 GmbH | Germany |
| i365 UK Limited | United Kingdom |
| i365 (Netherlands) B.V. | Netherlands |
| Seagate Services Singapore Pte. Ltd. | Singapore |
| Quinta Corporation | California |
| Seagate Technology LLC | Delaware |
| Seagate Technology AB | Sweden |
| Seagate Technology Australia Pty Limited | Australia |
| Seagate Technology Canada Inc. | Canada |
| Seagate Technology GmbH | Germany |
| Seagate Technology (Hong Kong) Limited | Hong Kong |
| Beijing Representative Office | China |
| Shanghai Representative Office | China |
| Shenzhen Representative Office | China |
| Seagate Technology SAS | France |
| Seagate Technology Taiwan Ltd. | Taiwan |
| Seagate US LLC | Delaware |
| Seagate Technology International | Cayman |
| Seagate Technology International (Netherlands Branch) | Netherlands |
| Seagate Technology International (Singapore Branch) | Singapore |
| Maxtor Global Ltd. | Bermuda |
| Maxtor Luxembourg S.àr.l. | Luxembourg |
| Maxtor Peripherals (S) Pte Ltd | Singapore |
| Maxtor International S.àr.l. | Switzerland |
| Penang Seagate Industries (M) Sdn. Bhd. | Malaysia |
| Seagate International (Johor) Sdn. Bhd. | Malaysia |
| Seagate Memory Products International | Cayman |
| Seagate Singapore International Headquarters Pte. Ltd. | Singapore |
| Seagate Technology International (Wuxi) Co. Ltd. | China |
| Seagate Technology (Netherlands) B.V. | Netherlands |
| Nippon Seagate Inc. | Japan |
| Seagate Technology Republic Ireland Limited | Ireland |
| Seagate Technology Asia Holdings | Cayman |
| Seagate Technology China Holding Company | Cayman |
| Seagate Technology Manufacturing (Hong Kong) Limited | Hong Kong |
| Seagate Technology (Suzhou) Co. Ltd. | China |
| Seagate Technology HDD (India) Private Limited | India |
| Seagate Technology (Ireland) | Cayman |
| Springtown Northern Ireland Branch | Northern Ireland |
| Seagate Technology (Malaysia) Holding Company | Cayman |
| Senai Seagate Industries (M) Sdn. Bhd. | Malaysia |
| Seagate Technology UK Ltd. | United Kingdom |
| Cork Office | Ireland |
| Seagate Technology Media (Ireland) | Cayman |
| Limavady Northern Ireland Branch | Northern Ireland |
| Seagate Technology (Thailand) Limited | Thailand |

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 23.1**

### Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the Registration Statements (Form S-8 Nos. 333-162958, 333-139433, 333-132420 and 333-101848) of Seagate Technology public limited company (plc), as amended, of our reports dated August 17, 2011, with respect to the consolidated financial statements of Seagate Technology plc, and the effectiveness of internal control over financial reporting of Seagate Technology plc, included in this Annual Report (Form 10-K) for the year ended July 1, 2011.

/s/ ERNST & YOUNG LLP

Redwood City, California
August 17, 2011

QuickLinks

Exhibit 23.1

Consent of Independent Registered Public Accounting Firm

**QuickLinks** -- Click here to rapidly navigate through this document

**Exhibit 31.1**

## CERTIFICATION

I, Stephen J. Luczo, certify that:

1.   I have reviewed this annual report on Form 10-K of Seagate Technology plc;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 17, 2011

/s/ STEPHEN J. LUCZO

| | |
|---|---|
| Name: | Stephen J. Luczo |
| Title: | Chief Executive Officer |

QuickLinks

Exhibit 31.1

CERTIFICATION

**QuickLinks** -- Click here to rapidly navigate through this document

**Exhibit 31.2**

### CERTIFICATION

I, Patrick J. O'Malley, certify that:

1.  I have reviewed this annual report on Form 10-K of Seagate Technology plc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 17, 2011                                    /s/ PATRICK J. O'MALLEY

                                                         Name:      Patrick J. O'Malley
                                                         Title:     Chief Financial Officer

QuickLinks

Exhibit 31.2

CERTIFICATION

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

This certification is not to be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and does not constitute a part of the Annual Report of Seagate Technology plc (the "Company") on Form 10-K for the fiscal year ended July 1, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report").

In connection with the Report we, Stephen J. Luczo, Chief Executive Officer of the Company, and Patrick J. O'Malley, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   August 17, 2011

/s/ STEPHEN J. LUCZO

Stephen J. Luczo
Chief Executive Officer

Date:   August 17, 2011

/s/ PATRICK J. O'MALLEY

Patrick J. O'Malley
Chief Financial Officer

QuickLinks

Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002