# Estrich Declaration

# EXHIBIT L

# Filed Under Seal



**31 August 2012** Last updated at 01:09

# Apple versus Samsung: Full interview with the jury foreman

**This is the full text of the BBC's interview with Velvin Hogan, foreman of the jury in the recent Apple versus Samsung patent lawsuit.**

The case resulted in the jury ruling that the iPhone-maker should be awarded $1.05bn (£665m) in damages, and the South Korean firm's claims of infringement rejected. The judge has scheduled further hearings and Samsung has said it intends to appeal.

An edited version of the **conversation can be found here**.

**What was the crucial bit of evidence that made you give a verdict that was so decisive in Apple's favour rather than Samsung's?**

As I have told others that have interviewed me, for me one of the most decisive pieces of evidence was reading the minutes for myself of a meeting that was held at a very high level between Google executives and Samsung executives, where it was for a tablet and Google was concerned that for the sake of their operating system that the look and feel and the methodology that they [Samsung] were using to create their tablet was getting too close to what Apple was doing.

And in the memo themselves - remember this was minutes - they stated that Google demanded that they back away from that design. And later there was a follow-up memo among themselves, these executives, and in black and white it says: we elect to not pass this information down to the divisions that were actually involved in the design.

So, from the sake of the engineers they went merrily along continuing their design not given any orders to back away. They knew nothing of that meeting. To me that kind of raised a lightbulb in my head that when I got in the jury room I wanted to read the minutes of that meeting myself.

What they had done in the courtroom, was just of course highlighted certain things.

But when we went into deliberation in the jury room we not only had all the physical evidence of everything that was presented, but we also had sealed source code in its entirety from both sides, we actually had the memos that were talked about in the trial - but we had the full copy, not just what was shown [to] us [in the courtroom] - and there was a piece of evidence after a piece of evidence that just clearly stacked up.

That it became rather obvious that they either knowingly - or should have known - that they were getting close to infringing.

**What did you make of the evidence given in the court? Did you form opinions of the two companies from what both sides put on show?**

We, at least for me, there was several areas that caused question marks. What the jurors attempted to do was not form an opinion at all on either side until we got to the jury room.

We weren't allowed to keep our notes after the trial was over, but for every piece of evidence that was offered I had notes and

asterisks to myself to, when I get into the jury room, look for myself, read for myself.

**A lot has been made about the original interview you gave to Reuters in which you said you wanted to make the award sufficiently high to be painful to Samsung, but not unreasonable. There has been concern raised by some people that that may have been prejudicial and the awards should have been based on the facts alone. I wonder if you would like to clarify that.**

Yes I would. Bloomberg asked me that question and others that have interviewed me asked that question and I have tried to make it clear that it wasn't an attempt from a punitive standpoint.

And it wasn't necessarily focused at Samsung - that is where it had been taken out of context.

What was actually meant by that statement when I made it was that what I wanted... the jurors wanted to send a message to the industry at large that no matter who you are - whether you are Apple, whether you are Samsung, or anybody - if you wilfully take the risk to cross the line and start infringing and you get caught, and again I emphasise wilfully, you need to be prepared to pay the cost for that.

**And to what extent were you aware that because it was wilful, that the judge could now treble the damages, or was that not a concern?**

We were never privy to that. There are a lot of things in the trial that we weren't privy to.

Case in point, every time the judge ruled on an action such as the injunction that they talked about we were not informed of that. We were either dismissed for the day, depending on what time it was, or retired to the jury room so that those discussions in the court would be out of our hearing.

And so there was a number of things like that we were kept in the dark. Further we had sworn an oath that we would not watch the media, we would not talk to each other or form any opinion until this was over, and we took that oath seriously.

So, a lot of things that you as individuals observing the trial before and after were made privy to, we were not until the deliberation was concluded and the verdict yielded.

**There were two issues, looking at Apple's case: Whether Samsung had infringed their patents and whether the patents were valid. Why weren't you convinced by Samsung's arguments that some of the patents that Apple had put forward shouldn't be allowed to stand? There has been a lot made in the media and elsewhere that Apple wasn't the first with some of the ideas that they had patented.**

To try to make it as easy as possible - I have addressed this in other interviews that I have had - what it amounts to is there has been a big fuss since the deliberation that prior art was not considered. Prior art was considered.

When we had to determine the validity of Apple's patent against the charges of Samsung's with the prior art examples, what we had to do - to make it clear - is that not only did we have to validate, if you will, the Apple patent, but in looking at the prior art we had stipulations in the law that tested both sides and if the test wasn't passed then it was clear either the patent was valid or it wasn't.

Prior art didn't mean that the prior art wasn't valid. It was valid. But the stipulation under the law is for the prior art to be sufficient to negate or invalidate the Apple patents in this case, it had to be sufficiently similar or, more importantly, it had to be interchangeable.

And in example after example, when we put it to the test, the older prior art was just that. Not that there's anything [wrong] with older prior art - but the key was that the hardware was different, the software was an entirely different methodology, and the more modern software could not be loaded onto the older example and be run without error.

And vice versa of that was also true. So the point being, at the 40,000 foot-level, even though the outcome of the two seemed similar, the internal methodology of how you got there was entirely different.

One could not be exchanged for the other. And that is the thing that most people at large do not understand about the legal system.

Case 5:11-cv-01846-LHK   Document 2013-13   Filed 10/02/12   Page 4 of 9

And as a result of that you have heard a lot of hype in the media about did we turn our back on prior art? No.

Did it mean prior art could not have been used to compete against anything any other company had done? No, I'm not saying that.

I'm saying both could have existed independently of each other and been used. The thing you have to remember is that the prior art that belonged to Samsung, or belonged to somebody else that they had the ability of using, they had not used for quite some time.

And the methodology that they had implemented was just right up against the line of infringement and went beyond it in most cases. And not all cases.

Not everything that Apple accused of Samsung was correct and we made those stipulations as we filled out the form, and well, you know how it played out.

My point is that there were substantially difference between the prior art and the new method, but the key was you could not replace one for the other.

**There had been a lot of speculation that although Apple might get damages, Samsung might get damages as well. Why did Samsung's case fail?**

Whenever we considered the prior art and we looked at those patents, and specifically the claims that were involved, and the claim limitations that were involved, we had the instruction from the judge who had given us the stipulation of the precedent in the law that for the prior art in this case to negate or invalidate the patent on Apple's side - that was being involved in the allegation from Samsung that the patent was invalid because of the prior art - we had to establish that number one, the two methods were substantially similar; that the outcome was the same, in other words the functionality was the same, that would be at the 40,000-foot level. But what was key to us, and it was a very important piece, is that the stipulation in the law, they had to be interchangeable.

And so consequently, when we looked at the source code - I was able to read source code - I showed the jurors that the two methods in software were not the same, nor could they be interchangeable because the hardware that was involved between the old processor and the new processor - you couldn't load the new software methodology in the old system and expect that it was going to work, and the converse of that was true.

**And we're talking about Samsung's patent claim about combining a mobile phone with email [and a camera]?**

Exactly, in fact that is the one issue that we left on Wednesday night, the first day of deliberation, that had hung us up. And I, being the foreman, said because we had ran over and the US marshals had already told us that we could not work past six o'clock, and we were approaching six o'clock.

And we had hung up on this for over an hour and 45 minutes. I told them let's leave it, let's come back fresh in the morning and then let's deal with this.

And it was that evening that when I was sitting at home relaxing - and I have the type of mind when I'm relaxing doing one thing, my mind is running 90 miles an hour typically thinking about my distraction.

In this case, I was thinking about that specific patent and I was thinking of each and every claim and each and every claim limitation. And I know there are people out there that question what I have said and why it was important. But the task that I put it to, for myself, while I was going through this thought process is: let's pretend that this patent is mine.

And what I mean by the term "can I defend this patent", there's a process you go through in this country that you go through before a patent issued.

When the patent office determines that they are going to reject your patent based on a claim you are making against prior art - and in my case I had several of those - you have to be able to lay the groundwork and defend your claim that in light of the prior art it would not have been obvious to the individual who drafted that prior art that the new methodology could have been accomplished.

So that's the comparison and that's what I meant by defending the patent. And I'm going through this thought process of the patent

that was involved and the prior art example that was involved, and making that comparison.

And when I got through with that comparison and that test, I asked myself the question: could I defend this patent, not in the court, could I defend this patent through that process just like I had to do my own if this were mine? And that's the "aha" moment that you hear talked about out there.

The answer to that question for me was yes. And so it just hit me that evening that that process I needed to explain to my fellow jurors because I was the only one that had ever gone through that process among them.

And there's a lot of misconception - even in the engineering community today among individuals who have never had to go through that process - of what that process consists of.

**Do you think if you hadn't been on the jury then we might have ended up with a very different verdict?**

I think so. But let's not say me specifically.

Let's say if there had not been an individual who had the technical background, and there had not been an individual who had gone through the process, the verdict might have been different, or it might have been the same.

I believe that the jury system in this country stands. The individuals would have ultimately come to a verdict. It might have been a lot longer.

But what definitely would have been required is passing more questions to the judge and having them come back. In our case we didn't have to.

**A lot has been made of the speed that you came to a verdict. Bearing in mind the instructions were, I think, about 109 pages long...**

Yes, the instructions were 109 pages long and you hear a lot of hype in the media about that there were 700 individual questions.

But what the misconception is, is the reality was there was only 33 questions but over 26 accused devices. And the judge had set up - you have seen pictures of what that looked like - a question and there was a matrix and you kind of had to put Xs or Ys or Nos in the box.

And some of them were blacked out and some of them weren't. And the patents were grouped.

In the sample I'm thinking of specifically, the very first question, there was three patents together and was the evidence da-da-da-da such that, against three division of Samsung. And where it is clear that a division could not have been involved in this the judge blacked out that area. You didn't have to answer it.

So what it amounted to for us, is that first we had to answer that question.

The very first one dealt with the validity issue. And so it was clear we had to determine that the Apple patent was valid in this case in the first place.

And it's because of that revelation moment that I had that evening, first off that we needed to do this with each case. We needed to go through this prosecution process that would have been done in the patent office against the inventors and their attorney to establish the validity of the patent compared to the validity of the prior art.

Once we had gone through that exercise and answered that question we could answer the question at hand and fill in the blanks, if you will. And the blanks were listed - not for all the 26 devices, that is something people haven't understood - not all of the 26 devices infringed all of the patents.

Some infringed one, some infringed two, some infringed three. Not all were accused by Apple as a bucket-list against all of the

patents.

And the judge had broken things out by the questions in the matrix according to the group of two or three patents that Apple had accused certain devices against and created the matrix, and what we had to do is if they were valid we had to answer the question: did they infringe? And so forth.

**A lot has been made that a couple had to be sent back [to the jury]?**

That's not true. Let me explain what that was about.

It was as simple as this: When we had issued the verdict and the judge had given it to the court deputy and the court deputy had read aloud to the jurors and to ourselves what our verdict was item by item, copies of it were given to the attorneys on both sides, and the judge had a copy of it.

And the jurors were retired to the jury room while they looked it over. They were looking it over to make sure that there was no mistake and it was consistent. Because there was 700 entries across 33 questions.

And, even though we filled it out, and even though we had three people independently... we had one juror to be the transcriber and we had three others to proof-read the results. And then I checked it over again and at the end was my signature.

But we were called back in the jury room. What had happened is we were told that the attorneys had found inconsistency.

What it translated into was there were two products, there were the Samsung products, the two that we had determined did not - they were the tablets - that did not violate or infringe.

And somehow when we transcribed an answer to one matrix to each of those questions, they were answered yes when they should have been answered no.

And that translated for those two products into just two mistakes. But it translated into four complete places in the form where those two products, based on the answers that we gave, changed the damage award figures.

So we had to go back through for the two products and, first off make the adjustment in terms of how that question was answered and then adjust the award figure.

**So just to be clear, this was a transcription error rather than a error of judgement.**

Absolutely, absolutely.

**Looking at the bigger picture, going forward do you have a concern that this case and the verdict given could encourage further patent litigation?**

Yes. I have no doubt that, number one, this case for this country is historical. It's a landmark case and, as people have said, we set the bar rather high. But as jurors we took the job seriously.

What needs to be understood by those outside that are watching this and listening to it, no matter whether we or anyone else feel personally that the patent procedure in this country or the patent system is broken or sick, we as jurors were sworn to abide by the rules and the stipulations in law as they exist today, at the time we made the decision.

And so, if those had changed tomorrow, well that would have been tomorrow.

**And personally, do you think it is broken and sick and needs reform?**

I believe we definitely need to continue the discussion. What I applaud is the fact that there is a discussion going on. Not everybody agrees with me or agrees with the decision that we made.

But that's OK. Whether I believe it is sick or broken or needs to be fixed or not, the rules are today what they are.

But if the community of engineers at large believe that it needs to be changed or re-reviewed, this court, this trial, and this set of jurors - myself included - was not the genre for that. It was not the right place.

That wasn't our authority and it wasn't what we were supposed to do.

However, Congress is one vehicle, and the President has a cabinet post for technology, that is the other one.

Keep the buzz going, keep the debate going, and if you genuinely believe that change is in order, there is an outlet for that.

**Stepping outside the legal process do you think for the health of the industry that this was the right verdict, or do you think people should look at what has happened here and maybe rewrite the rules?**

At this point in time it's the right verdict.

But am I saying that the system shouldn't be looked at to make it more efficient? I believe how perfect or not you think the system is, it's not above being reviewed.

And the test of whether or not after 200 years in this country this protocol is correct or not, it's the court of public opinion - specifically those of us who that are technologists, no matter what our disciplines of technology are - it is our responsibility if we believe there is a problem, to request that the system be reviewed.

And the only way that is going to happen is to continue this discussion and to continue it in such a way that... there's a lot of statements that are made out there that you read everything that has been said, and some focus right at me and at my judicial peers, that this was the wrong thing and the wrong decision.

And that's why I make such a big deal is the rules exist the way they are. But if at large we believe some kind of change is in order, then the only way it is going to happen is if sufficient number of those that believe that are willing to stand up and make their point known.

And I applaud that debate and I don't take any of this personal. Debate is healthy in this country, no matter how heated it is. It's the only way that change is going to take place.

And I'm not saying that the system is perfect. But I am saying it is what it is today and that's the yardstick that we had to use in this trial.

Can anything be made better? Yes.

In fact the patent office has reviewed the fact that for several years now the system has been kind of clogged up.

And so, as a result, passing things through this process is rather slow. Because Silicon Valley is at the heart of the innovation in this country, they have determined it necessary to open an additional office in this area and I applaud that.

**Samsung has suggested if the verdict is allowed to stand it would be hugely damaging to consumers. What do you make of that statement?**

I believe that was gut-level reactionary and as it played out across the last several days, the statement I made at the very outset was that Samsung has a collection of some of the most innovative engineers on the globe, and that I believe they were sufficiently smart enough at the executive level to have two strategies.

One what if we lose, and one what if we win. And while the rhetoric initially was saying this is going to hurt the consumer - we are going to lose. I didn't hold that viewpoint, and I made it clear publicly what my viewpoint was.

And at the outset a few of the quote-unquote experts out there had a differing opinion.

But if you look at some of the question-and-answer sessions that have gone on since then you will see that the experts are starting to line up behind me.

Because what has been clear in the last 24 hours is the fact that Samsung hasn't in fact lost any revenue and has been able to move forward and has a strategy to do so.

My thing is for any company, and specifically for Samsung, as you're approaching that line you can get as close as you want to that line without infringing. Stop short of infringing and start innovating like crazy.

And Samsung is clever enough. Perhaps at the end of the day because of your innovation you wind up with a solution that surpasses Apple.

And if you do so I applaud you because I think you are capable of it. That's the point that I want to leave things with.

It's not that we're saying one side had to copy because they're not as good as. That's not true. There are many ways they could have accomplished this, they chose to infringe.

But I say step back from infringement, make the minor changes that are necessary, and then innovate forward and maybe even you'll surpass Apple.

**You said earlier that one of the killer punches for you was the Google meeting with Samsung. A lot has been made of the idea that Apple may have ultimately been gunning for Android rather than just specifically for Samsung. Do you think this verdict will have implications for other companies who use Android?**

No. There was a lot of rhetoric about that at the beginning, but it's becoming clearer. And the belief that I held from what I was hearing was specifically the Android operating system - the way that operating system runs - was not, first off... that was the point behind Google's demands against Samsung and the look-and-feel issue.

But that had no bearing on infringement. Nor did whether they infringed or not infringed hurt the Android operating system. As it played out those two operating systems can stand side-by-side, even though there is some similarity. The way those two operating systems function are sufficiently different enough that there is no infringement.

Just to make it clear, the phone that I have is a Motorola Droid X2 and the reason I'm mentioning that is because it is in the record, it was told to the judge and told to the court when asked that question.

And it is of a slider variety so it has a normal keyboard, and for that reason it's not among the 26 accused phones. It uses icons, and they are more than sufficiently different than what the iPhone, what Apple uses.

At the 40,000 foot-level there are some what you would perceive to be similarities. When you look at how the code is running and what the outcome is you will find that when you compare even that phone against the current patents that Apple is using, there is no infringement.

My point is that the consumer at large does not have to lose functionality. But the methodology that is used by the company building that can get as close as they want to to that line of infringement, but just don't cross it.

Don't cross the infringement line, make some changes so that you're not going to cross it and then innovate like crazy.

And that's really the most important part. And I think Samsung has the capability, perhaps like no other on the globe, to be able to do it sufficiently fast enough that they are not going to lose any revenue.

And if you look at the financial reports as of yesterday it seems to bear out that very case that I make.

**A lot of people have said this case happened in Apple's backyard, what else would you expect? I wonder if you would**

like to address that.

I will. I have already stated publicly in a couple of taped video interviews about this very question.

Yes, this trial took place in San Jose in the heart of Silicon Valley and Apple is located just down the road west of where the trial was, and two of Samsung's divisions are here down the road north-east of where this decision was made.

Everybody in the valley knows that Apple's headquarters is local. Samsung's headquarters is in South Korea, but everyone in this valley knows also that there is two divisions functioning in this valley.

Everybody knows Samsung, everybody in this valley knows Apple. There is absolutely no ground to say that Apple had a hometown advantage.

Certainly it did not influence any of us on the jury panel.

*Mr Hogan asked that it be reported that he had not requested any money for any of the interviews he had given.*

# More Technology stories

 **Windows 8 spurs new PC designs [/news/technology-19421341]**
Computers that work as both tablets and laptop computers are shown off in a variety of form factors ahead of the release of Windows 8.
**Twitter ads become more targeted [/news/technology-19426943]**
**Hacker 'steals' police force data [/news/uk-england-beds-bucks-herts-19432487]**

---



**BBC © 2012** The BBC is not responsible for the content of external sites. Read more.