Estrich Declaration

# EXHIBIT M

Filed Under Seal

# Jury foreman in Apple vs. Samsung had 'light bulb moment'

## Rick Merritt

## 8/28/2012 10:05 AM EDT

Velvin Hogan (shown), the jury foreman in the Apple-Samsung patent infringement case, used his experience as a patent holder and engineer to sort out the many claims made by the companies.
SAN JOSE, Calif. – As foreman of the jury that awarded Apple just over $1 billion in its **patent infringement suit** against Samsung, Velvin R. Hogan returned time and again to his experience as an electrical engineer. Now at the center of a media blitz, Hogan, who holds two of his own patents, talked at length about the case he calls the highlight of his career, one idea sometimes flowing into the next.

The jury "got hung up the first day" debating the validity of one of Apple's patents, "so I said let's leave it for tonight," he said Monday (Aug. 27) in an interview with *EE Times*.

In days of testimony, lawyers for both sides presented world-class experts who showed multiple pieces of what they claimed were prior art invalidating each other's patents. "When I got home I was watching a movie on TV, but not really watching it because my mind was going 90 miles an hour thinking about this patent, claim by claim," he recalled.

"My light bulb moment came that Wednesday night when I asked myself if I could defend [the Apple '381 software patent], and I realized I could, so in the morning I explained this to my fellow jurors," the 67-year-old Hogan said.

After that, the group fairly quickly found all the Apple and Samsung patents in the case were valid. As instructed the jury then considered Samsung devices one by one, deciding that most of them willfully infringed Apple's patents and trade dress, or look and feel, levying **$1.05 billion in damages** on Samsung.

Hogan's "light-bulb moment" was a flashback to his experience defending his patent on an alternative to the MPEG 4 Part 10 video codec.

The patent "took seven years to be granted—the last three-and-a-half years debating with the patent examiner my claims, and ultimately I won. I learned in that exercise what's needed to defend a patent against prior art," he said.

Hogan spent much of his 40+ year career building test equipment and servo components for the emerging hard disk drive industry. He refused to join Samsung's lawyers and some observers who scoffed at Apple's claims on the industrial design of iPhones and the look and feel of their user interfaces.

"If you accept the premise of intellectual property--regardless of what it is—it needs to be protected," he said.

"I confess a few years ago when Congress let the patent office authorize trade dress and design patents I was quite frankly not sure it was the right thing to do, but after being in this trial my position changed--IP needs to be protected if it is legitimate," he said.

**A message to the industry**
The verdict "was a message to the industry at large that if you are going to compete in this country there's a set of rules, and if you decide to take a calculated risk and infringe you need to be willing to pay a price for it," he said.

Lawyers debated in court whether Samsung was copying Apple or merely benchmarking the competition. Again, Hogan recalled his own experience.

"I worked in R&D at Memorex when IBM first came out with the Winchester hard drive," he recalled. "One weekend a colleague and I were tasked with reverse engineering it.

"We were concerned how IBM created an index point against the clock to establish where to write on the disk," he said. "Once we saw how they did it, we asked ourselves how we could do it differently.

"I was tasked with designing a pattern generator which would create our clock track with an entirely different way to create the track," he said. "We set out to understand [IBM's drive], but made sure we would not copy it--it just takes a little innovation to do that, and at no time did IBM sue us," he recalled

"Benchmarking is benchmarking, but that's no carte blanche to copy a competitor," he said.
**"Methodical, meticulous and fair"**
Samsung's own internal documents were among the most convincing evidence in the case Hogan said. The documents included an email among as many as 40 Samsung executives recounting a warning from Google

the Samsung Galaxy Tab too closely resembled Apple's iPad.

"The test we had to give was did they have sufficient time and should they have known they were going to infringe. The evidence stacked up one item after another," Hogan said.

Some observers were surprised how quickly the jury was able to finish its work which included filling out **a verdict form** with 33 multipart questions. The jury's process was methodical and fair, Hogan insisted.

At one point, "we picked one juror to chose each [accused] product, turning it on close to his chest in a darkened jury room and not telling us which one it was. He turned one [device] around quickly and then another and then both--it absolutely made it clear" whether the devices infringed or not, he said.

In **another part of the case**, the jury was asked to determine if Samsung willfully failed to disclose information about its own 3G patents-in-progress while it was part of an ETSI working group defining the 3G standard. Hogan drew on his experience when he worked for Seagate and sat on an ANSI committee setting standards for how to test disk drive components.

"Samsung was under no obligation [to disclose] because there was no patent issued at that time. If a patent has not been issued the IP does not have to be disclosed," he said.

Hogan was the most technical person on the jury that also included a mechanical engineer from a telecom company and an AT&T project engineer.

"When we got into the jury room to start deliberations, the first thing we did was a round robin, telling each other a little more about our backgrounds and asking each other questions. Then we took a vote to see who would become foreman," he said.

"The only thing preventing it being a unanimous decision [for me] was one dissenting vote--I voted for the project engineer," he said.

When it came to determining damages the three technical members of the jury led the group to a decision based on their experiences with licensing rates. Apple asked for $2.7 billion which included 35.5 percent of Samsung's revenues on its infringing phones, an amount it said represented its profits.

"In our experience the real norm was half of what Apple claimed—between 13 and 15 percent. So we chose 14 percent to be the magic number," he said.

"When it came time to do the [damages] calculations we had four people in the room with calculators. I looked over the shoulder of everyone working on calculators. We read all the numbers twice and double checked the figures again," he recalled.

"The **only errors** were two points of inconsistency which translated into four items about two tablets. There were a number of entries [on each table in the verdict form], and it was easy to transcribe wrongly," he said.

"We felt we were methodical, meticulous and fair," he added.
### Highlight of a 40+ EE year career
After serving in the Navy, Hogan started his career in 1969 as a hard disk technician, spending three years in night school earning his EE degree.  He worked for many of the top storage and computing companies including Memorex, Storage Technology, Digital Equipment, Seagate. Micropolis and Quantum. It was a time when drives were evolving from "the size of top-loading washing machines to bricks."

"Besides my family, this case was a highlight of my life--it's a landmark and precedent setting. It's a historic case. We've never had a patent infringement case this size or this kind of technology," he said.

When it was all over, "I didn't know I was going to be bombarded, but since the trial stopped both of my phones haven't stopped ringing," Hogan said.

His hour-long interview with EE Times took place after he had spent the day driving up to San Francisco and back for a live video interview with Bloomberg. Since the case was over, Hogan read much of the reporting on it and felt much of it was inaccurate.

"I determined I wanted to set the record straight," he said.

Jurors "had the ability to understand legal jargon, profit-and-loss statements, patent language and how hardware and software functions--so we had the ability to come to a just decision and we stand by it," he said.

As a tech consumer, Hogan is a PC guy and owns a Motorola Droid smartphone. "People called me an Apple skeptic," he said.

"I never owned Apple products. I grew up in the computer industry on the hard drive side. What made me a PC person was my experience designing test equipment. Apple products are consumer oriented, and could not be easily used in test equipment--they are not designed in that way," he said.