# Estrich Declaration

# EXHIBIT N

# Filed Under Seal

http://www.bloomberg.com/video/jury-foreman-discusses-apple-samsung-trial-verdict-ikNjTofgRRecKM4cFXZoZA.html

## Apple v. Samsung
## Jury Foreman: Here's How We Reached A Verdict

Val Hogan, jury foreman in the Apple/Samsung case joins me now live here in the studio.  And it is so great to have you here.  I mean, as you guys were in that courtroom for three weeks, everybody on the outside was wondering what you guys were thinking.  So bring us into the courtroom.  Put me in your chair.  What was it like?  I mean, was it exciting?  Was it boring at times?

VH:   It was exciting.  For some it was boring.  For me it was always very interesting because of my tech background.  But the thing that was important is we were inundated with evidence and people trying to buy us our opinion on both sides.  But when we went into the jury room, we determined to set all of that aside and focus right on the evidence.

Let's talk about the inundation part.  I mean, were you ever confused?  Were other people ever confused?

VH:   I wasn't confused, but there was a few of the jurors that were confused.  So what we did in the jury room before we did anything, after we did the election of who was going to lead the jury, I told them "let's just lay out on the table any concerns or open questions you may have that's left over and let's just get that out of the way first."

Now when you got into the jury room, initially, this was Wednesday, right?

VH:   Yes.

Was, there are reports that you were initially divided, but did you have a feeling that this was going to sway overwhelmingly into Apple's favor?

VH:   No, in fact, if you'd have asked me at that moment in time, I thought it was going ultimately maybe lean the other way.

Why?

VH:   Why?  We were at a stalemate, but some of the jurors weren't sure of the patent prosecution process.  Some weren't sure of how, uh, prior art could either render a patent, uh, acceptable or whether it could invalidate it.  And so what we did is we started talking about one and the day was over. When I was at home thinking about that patent, uh, claim by claim, limit by limit, I had what we call an "a-ha moment" and I suddenly decided that I could defend this if it was my patent.

Really?

VH: Really. And with that, I took that story back to the jury, laid it out for them. They understood the points that I was talking about, and then we meticulously went patent by patent, claim by claim, against the test that the judge had given us because each area, each patent, had a, uh, different legal premise to judge on. We got that all sorted out and decided which ones were valid, which ones weren't valid.

So the initial stalemate that you found yourself in, what was that about?

VH: It was about a particular, uh, patent, uh, the '460 patent, and whether or not the prior art really did invalidate that pattern, that patent. And so, with that moment I had, I realized that the software on the Apple side could not be placed into the processor on the prior art and vice versa. And that means that they are not interchangeable and that just changed everything, right there.

You know, it is obviously extremely technical. There's been a lot of talk since this verdict has come down. How did you guys make this verdict so quickly? There were more than 100 pages of jury instructions. There are even reports that you didn't read all of those instructions.

VH: Oh, we read them first off. Before closing arguments was given, the judge read to us the final instructions, instruction by instruction. Then she allowed the closing arguments. Then she dismissed us. And so we had those closing argu., those instructions, and we had them open there. And then we took patent by patent, and got hung up on the first one, but the day was almost over by then and so I said to the jury we are not going to allow ourselves to get hung up. We are going to, if we find a debate like this we will move on. We'll do the simplest things first. So then when I came back the next day, there was ...

So then how did you make a decision so quickly? I mean do you think there was emotion involved here?

VH: The thing that needs to be understood, there was emotion. But if you set that aside, the form that we were given, what it did is, the judge had broken, by patent, on every accused device, uh, violated each and every patent, she had broken them up into groups. Some violated one, some violated two, some violated three. And so we had to take the accused devices for each one and compare them to the declaration of the patent and claim and limitation by limitations.

So when you say there was emotion, what kind of emotion?

VH: Emotion from an emphatic viewpoint putting a stake in the ground and at least not willing to change.

This was one juror?

VH: Well, I was one of them, there was a couple other jurors. But we said we're going to move on and come back to this. And so, that's exactly what we did. The first nine questions were such that once they were answered, then that directed how a couple of the other questions were to be answered. And so it simplified.

I understand there was a 20-year-old juror who actually provided most of the debate.

VH: Yes. Um, actually he did. What it amounted to is, he thought very logically, and I'm glad. He was never willing, at first, to take anybody's viewpoint until he had thought it out. And that was a good thing. And so that would create discussions. We would either convince all of ourselves and be unanimous on the point or we would move on and then eventually we would come back. And we learned enough going forward that when we came back it made the process a lot easier.

Now, let's talk a little bit about the damages. The jury instructions say that damages are not supposed to punish, they are just supposed to compensate. You told Reuters "we wanted to make sure the message we sent was not just a slap on the wrist, we wanted to make sure it was sufficiently high to be painful, but not unreasonable." That sort of makes it sound like you were trying to punish.

VH: I realize that, but it wasn't punish. Where I was coming from from that statement is, in this country, intellectual property deserves to be protected. And my real point was, that if anyone, the industry at large, if any company decides to ignore the stipulations and the rules and get too close that they cross the line and infringe and do it willfully, they need to understand if they take the risk and get caught, they should have to pay for it.

So, $1 billion. Where did you come up with that number? Why not more? Why not less?

VH: In the evidence, Apple had declared that Samsung had cost them in profits 35% of their revenue. On the other hand, Samsung said it's because they took out operating costs and the value is 12%. Well, three of us had been thru the process in our careers of dealing with financial documents and I understood P&L statements as well as the other two. And so what we did then was look at it against our matrix of what infringed and what didn't. We determined that in our experience, the percentage wasn't 12 and it wasn't certainly 35%, it should be closer between 13 and 15.

Okay.

VH: And so we zeroed in on 15, on 14%. That became the magic number. So then we went thru and did our own calculations for each of the areas, adding those up along with royalties that were entitled, called reasonable royalties for some of the items, and we had cut that value in half. When we added them together and tallied them up then and you all have the number that we came up with.

Val, you don't own an iPhone, and in fact nobody on the jury owned an iPhone.

VH: No, nobody owned an iPhone and not everybody owned some Apple equipment. I own no Apple equipment and intentionally have not for a number of years. I'm a PC person.

What about Samsung?

VH: Samsung, my wife has a Samsung phone as I told the judge. But it is not a smart phone.

So there has been a lot of question as to whether Apple had home field advantage here.  Apple headquarters only miles from the courtroom, miles from where you live.

VH: No, they did not.  You're right in what you are saying, but they didn't have home field advantage.  The other side, the Android operating system clear and of itself was not something that infringed.  We actually as the jury, set aside the close proximity and looked strictly at the evidence that spoke for itself and it was overwhelming that Samsung had, should have known, or did know, that they were infringing.

Do you think the fact that Samsung is a South Korean company was any disadvantage?

VH: None at all.  Because here clearly as I said, the evidence to us spoke overwhelmingly.  We put each side to the test, as though the patent I did at least, as though the patents were mine both ways.  And then the evidence on top of that.  It was not, no question about it.

So let's talk about this issue of willfulness.  You guys found that on at least five counts, Samsung willfully infringed Apple patents.  Now the judge has to decide if indeed there was willfulness.  And if so, she could multiply damages by three times, up to three billion dollars.

VH: Yes, we're aware of that, but we weren't aware of it at the time we made our ruling.

Oh, really.

VH: She had kept us out of it, well, we were back in the jury room every time she had to rule on an issue with the attorneys.  Because she didn't want any of that to influence our decision.

Would that have influenced your decision?

VH: Well it would have caused... no, actually not because of the way that we did it.  All it would have done for us, was to make absolutely 100% sure, which we felt we were anyway, that the damage awards was sufficient and fair.

Do you think she is going to find willfulness here?

VH: I really don't know.  She is going to find that willfulness, because that's what swayed us.  We had some internal...  In the discovery phase, each side had to give some documents to each other.  And what was put in the evidence was two things:  Minutes of a meeting that was held in Korea and Google was present.  And it had to do with a tablet.  And Google demanded in their minutes, they were too close to Apple, they needed to pull back because they were worried about their operating system.

So Google wanted Samsung to make their phones or the tablet look less like the iPad.

VH: The tablet.  But overall, they wanted everything to be less like Apple.  There's other approaches they could have used.  They chose not to pass that information down to the engineers that were developing the product, so they went on about their work not knowing the decision.  And then there was the other internal memos after that that were

in the evidence, where they were comparing in the cell phone, Apple to Samsung and the individual on the Samsung side, a VP at a very high level, said the difference was that of heaven and earth. You need to move closer. They did move closer. But in moving closer, they crossed the line. That was unnecessary. You can compete in this country, be similar, and at the same time, compete fairly.

So you think she will find willfulness in that the damages...?

VH: I don't know. She's an interesting personality. She's young but an experienced judge, as far as that goes, in IP. But she was very frustrated throughout the trial, at both sides. And so, not that that's going to influence her, but at the same time, I think she will be very fair. I know she is going to look, like we did, at the evidence and against the law very carefully.

So I want to ask you about the design question. Because you did find that Apple's design patents were valid and that was a very, very important question in this case.

VH: Yes.

Samsung has come out and said "It is unfortunate that patent law can be manipulated to give one company a monopoly over rectangles with rounded corners."

VH: That's not true from our viewpoint. We didn't look at any singular aspect that closely for any patent to be valid, whether it be utility or whether it be design. All of the claims and all of the limitations have to be taken in an entirety. So in the case of a design patent, it was the look and feel of it and how the device presented itself. And when you compared them side by side against the statements in the patent, it was clear to every one of us that not only was the patent valid, but the Samsung products that were accused, that were legitimately a problem.

Do you think, I mean you have a patent yourself, that design can and should be patentable?

VH: For years, when that decision was made by Congress to have the PTO allow design patents and also trade dress, I wasn't sure I supported that. But as I went into this process and went thru the exercise of looking at how the patent presented itself, my opinion toggled. Because when I compared the patent, the law, against the accused products, side by side with the equivalent Apple product, it was clear not only to me but to the whole jury unanimously that they were too close in their feel and function.

So Apple has asked for eight Samsung phones to be banned. Do you think they will be?

VH: They probably will be. The thing that everyone should remember is that just because, not all of Samsung's devices, phones in particular, infringe property rights. There are other ways that they could accomplish something. Nokia is an example, Blackberry is an example, Motorola is an example. Just because it has a Droid operating system that may to some seem like it is Apple-like, it isn't.

Right.

VH:   And so they don't have to be 100% the same to, you know, you can back off from that and have an acceptable product.

And quickly Valvin, do you think that this is, a decision this complicated should be in the hands of a civilian jury?

VH:   Yes I do.  Because the reality of it was, while it was complicated, as I had told you during the break, I believe that any jury of our peers could have reached this decision asking more questions of the judge, it would have taken longer.

Okay.

VH:   But at no time were we so confused that we felt we were going in the wrong direction.

Valvin Hogan I am so glad we had you in here today.  Obviously a very impactful decision and it's so great to hear what was actually happening inside that jury room.  Valvin Hogan the jury foreman in the Apple Samsung patent trial.  Thanks so much.