1   HAROLD J. MCELHINNY (CA SBN 66781)          WILLIAM F. LEE
    hmcelhinny@mofo.com                          william.lee@wilmerhale.com
2   MICHAEL A. JACOBS (CA SBN 111664)            WILMER CUTLER PICKERING
    mjacobs@mofo.com                             HALE AND DORR LLP
3   JENNIFER LEE TAYLOR (CA SBN 161368)          60 State Street
    jtaylor@mofo.com                             Boston, MA 02109
4   ALISON M. TUCHER (CA SBN 171363)             Telephone: (617) 526-6000
    atucher@mofo.com                             Facsimile: (617) 526-5000
5   RICHARD S.J. HUNG (CA SBN 197425)
    rhung@mofo.com
6   JASON R. BARTLETT (CA SBN 214530)            MARK D. SELWYN (SBN 244180)
    jasonbartlett@mofo.com                       mark.selwyn@wilmerhale.com
7   MORRISON & FOERSTER LLP                      WILMER CUTLER PICKERING
    425 Market Street                            HALE AND DORR LLP
8   San Francisco, California  94105-2482        950 Page Mill Road
    Telephone:  (415) 268-7000                   Palo Alto, California 94304
9   Facsimile:  (415) 268-7522                   Telephone: (650) 858-6000
                                                 Facsimile: (650) 858-6100
10

11  Attorneys for Plaintiff and
    Counterclaim-Defendant APPLE INC.
12

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                  SAN JOSE DIVISION

16

| | |
|---|---|
| 17  APPLE INC., a California corporation, | Case No. 11-cv-01846-LHK (PSG) |
| 18              Plaintiff, | **APPLE INC.'S MOTION TO COMPEL DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES** |
| 19       v. | |
| 20  SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| 21 | |
| 22 | Date:      February 28, 2012 |
| 23 | Time:      10:00 a.m. |
|    | Place:     Courtroom 5, 4th Floor |
|    | Judge:     Hon. Paul S. Grewal |
| 24              Defendants. | |

25

26                  **SUBMITTED UNDER SEAL**

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

NOTICE OF MOTION AND MOTION .................................................................................. iv

RELIEF REQUESTED .......................................................................................................... iv

APPLE'S CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL
    PROCEDURE 37(A)(1) AND LOCAL RULE 37-1(A) ................................................... v

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... v

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

I.      BACKGROUND ........................................................................................................ 2

      A.    Samsung's Apex Objections And Apple's Attempt To Resolve Them ................. 2

      B.    Apple Has Produced Its Own Comparable "High Level" Employees For
           Deposition ........................................................................................................ 3

II.    LEGAL STANDARDS .............................................................................................. 4

      A.    Overarching Standards For Resisting Depositions Of "Apex" Witnesses ............. 4

      B.    Standards For Finding That A Witness Has Unique, Firsthand, Non-
           Repetitive Knowledge of the Facts at Issue ...................................................... 5

      C.    Standards For Finding That The Party Seeking The Deposition Has
           Exhausted Less Intrusive Discovery Methods ........................................................ 6

III.   ARGUMENT .............................................................................................................. 7

      A.    Apple Seeks To Depose Witnesses Who Have Knowledge That Samsung
           Considered, And Deliberately Copied, Apple's Products In Developing
           The Accused Products ...................................................................................... 8

           1.    Apple Is Entitled To Depose Gee Sung Choi, Who Has Been
                Actively Involved In Samsung's Policy To Consider And Copy
                Apple's Products ................................................................................... 9

           2.    Apple Is Entitled To Depose Jong-Kyun Shin, Head of Mobile
                Communications, Who Has Directed Designers To Make
                Samsung's Products More Like Apple's ................................................ 10

           3.    Apple Is Entitled To Depose Samsung's Personnel Who Oversaw
                Product Strategy And Design For The Accused Products ......................... 12

           4.    Apple is Entitled To Depose Samsung Employees Who Oversaw
                The Development Of The Features That Apple Contends Infringe
                Its Utility Patents ................................................................................... 13

      B.    Apple Is Entitled To Depose Samsung Employees Knowledgeable About
           Apple's Damages Claims ................................................................................. 14

      C.    Apple Is Entitled To Depose Witnesses With Knowledge Related To
           Apple's Defenses To Samsung's Counterclaims .................................................. 16

      D.    Samsung Has Frustrated Apple's Other Efforts To Obtain This Information ...... 20

IV.   CONCLUSION ........................................................................................................ 23

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

i

# TABLE OF AUTHORITIES

Page(s)

CASES

*Affinity Labs of Tex. v. Apple Inc.,*
No. C 09-4436 CW (JL),
2011 U.S. Dist. LEXIS 53649 (N.D. Cal. May 9, 2011) .......................................................... 7

*Blankenship v. Hearst Corp.,*
519 F.2d 418 (9th Cir. 1975) ................................................................................................... 6

*Dobson v. Twin City Fire Ins. Co.,*
No. SACV 11-192-DOC,
2011 U.S. Dist. LEXIS 143042 (C.D. Cal. Dec. 12, 2011) ..................................................... 7

*DR Sys., Inc. v. Eastman Kodak Co.,*
No. 08cv669-H (BLM),
2009 U.S. Dist. LEXIS 83755 (S.D. Cal. Sept. 14, 2009) ................................................ 5, 7, 9

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust,*
No. C 03-02013 RMW (RS),
2007 U.S. Dist. LEXIS 88625 (N.D. Cal. Nov. 19, 2007) ................................................ 6, 20

*First United Methodist Church of San Jose v. Atl. Mut. Ins. Co.,*
No. C-95-2243 DLJ,
1995 U.S. Dist. LEXIS 22469 (N.D. Cal. Sept. 19, 1995) ..................................................... 11

*Google Inc. v. Am. Blind & Wallpaper Factory,*
No. C 03-5340 JF (RS),
2006 U.S. Dist. LEXIS 67284 (N.D. Cal. Sept. 6, 2006) .................................................. 5, 15

*In re Chase Bank USA, N.A. "Check Loan" Contract Litig.,*
No. 3:09-md-2032 MMC (JSC),
2011 U.S. Dist. LEXIS 127259 (N.D. Cal. Nov. 3, 2011) ................................................ 7, 23

*In re Google Litig.,*
No. C 08-03172 RMW (PSG),
2011 U.S. Dist. LEXIS 120905 (N.D. Cal. Oct. 19, 2011) ................................................. 4, 7

*In re Nat'l W. Life Ins. Deferred Annuities Litig.,*
No. 05-CV-1018-AJB (WVG),
2011 U.S. Dist. LEXIS 37746 (S.D. Cal. Apr. 6, 2011) .................................................... 5, 9

*In re NCAA Student-Athlete Name & Likeness Litig.,*
No. 09-cv-01967 CW (NC),
2012 U.S. Dist. LEXIS 6461 (N.D. Cal. Jan. 20, 2012) ........................................................ 21

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

ii

*Kennedy v. Jackson Nat'l Life Ins. Co.*,
      No. C. 07-0371 CW (MEJ),
      2010 U.S. Dist. LEXIS 47866 (N.D. Cal. Apr. 22, 2010)........................................4, 6, 16, 22

*Mansourian v. Bd. of Regents of the Univ. of Cal. at Davis*,
      No. CIV S-03-2591 FCD EFB,
      2007 U.S. Dist. LEXIS 95428 (E.D. Cal. Dec. 21, 2007) ........................................................7

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
      138 F.3d 1437 (Fed. Cir. 1998) ............................................................................................15

*Oracle America Inc. v. Google Inc.*,
      No. C-10-03561-WHA (DMR),
      2011 U.S. Dist. LEXIS 79465 (N.D. Cal. July 21, 2011) ...................................................7, 22

*Ray v. Bluehippo Funding*,
      LLC, No. C-06-1807 JSW (EMC),
      2008 U.S. Dist. LEXIS 92821 (N.D. Cal. Nov. 6, 2008) .........................................................7

*Rite-Hite Corp. v. Kelley Corp.*,
      56 F.3d 1538 (Fed. Cir. 1995) ..............................................................................................14

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
      No. CV 08-635 CAS,
      2009 U.S. Dist. LEXIS 111938 (C.D. Cal. Nov. 16, 2009) ...................................................10

*Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*,
      145 F.R.D. 92 (S.D. Iowa 1992) .....................................................................................5, 8, 12

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
      203 F.R.D. 98 (S.D.N.Y. 2001) ...............................................................................................6

*WebSideStory Inc. v. NetRatings, Inc.*,
      No. 06cv408 WQH (AJB),
      2007 U.S. Dist. LEXIS 20481 (S.D. Cal. Mar, 22, 2007) ...............................................5, 6, 21

**STATUTES**

15 U.S.C. § 1117 ....................................................................................................................15

35 U.S.C.
      § 284 ....................................................................................................................................15
      § 289 ...............................................................................................................................14, 15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37 ................................................................................................................i, ii, 3

Rule 30(b)(6) ....................................................................................................................6, 21

iii

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 28, 2012 at 10 a.m., or as soon as the matter may be heard by the Honorable Paul S. Grewal in Courtroom 5, United States District Court for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, CA 95113, Apple Inc. ("Apple") shall and hereby does move the Court for an order pursuant to Federal Rule of Civil Procedure 37(a) & (d) compelling the depositions of Samsung Electronics Co., Ltd.'s ("SEC"), Samsung Electronics America, Inc.'s, and Samsung Telecommunications America's, LLC (collectively, "Samsung's") witnesses listed below.

This motion is based on this notice of motion and supporting memorandum of points and authorities; the Declaration of Mia Mazza in Support of Apple's Motion to Compel the Depositions of 14 of Samsung's Purported "Apex" Witnesses ("Mazza Decl.") and exhibits attached thereto; the Declaration of S. Calvin Walden in Support of Apple's Motion to Compel the Depositions of 14 of Samsung's Purported "Apex" Witnesses; and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

**RELIEF REQUESTED**

Pursuant to Federal Rule of Civil Procedure 37 and 30, and the Court's inherent authority, Apple seeks an order compelling dates for the depositions of the following 14 Samsung witnesses, and compelling that the witnesses appear for depositions in the Bay Area:

1. Seungho Ahn
2. Dong Hoon Chang
3. Joseph (Joon Kyo) Cheong
4. Jaewan Chi
5. Seunghwan Cho
6. Gee Sung Choi
7. Minhyung Chung
8. Won-Pyo Hong

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

iv

1     9.     Heonbae Kim

2     10.    Dong Jin Koh

3     11.    Ken Korea

4     12.    Seung Gun Park

5     13.    Jong-Kyun Shin

6     14.    Dale Sohn

## APPLE'S CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(A)(1) AND LOCAL RULE 37-1(A)

In accordance with Federal Rule of Civil Procedure 37(a)(1) and Local Rule 37-1(a), Apple hereby certifies that it has in good faith conferred with Samsung in an effort to obtain the discovery described immediately above without court action.  Apple's efforts to resolve this discovery dispute without court intervention are described in the Mazza Declaration and exhibits attached thereto, submitted concurrently herewith.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the 14 Samsung witnesses listed above, who were served with proper notice, must attend and testify at depositions in the Bay Area.

Dated:  February 16, 2012        MORRISON & FOERSTER LLP

By:   /s/ Michael A. Jacobs
         Michael A. Jacobs

         Attorneys for Plaintiff
         APPLE INC.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2   It is self-evident that Samsung's accused products look like Apple's products.  This

3   motion seeks to compel depositions of Samsung witnesses who know *why* that is so.  The

4   decisions to redesign Samsung's products to look like Apple's were not made by lower level

5   employees—they were made by senior management responsible for Samsung's smartphone and

6   tablet lines, including witnesses at issue in this motion.  Samsung recently produced documents

7   showing that those witnesses urgently directed Samsung's designers and developers to make

8   products that were more like Apple's iPhone and iPad products.  The witnesses have relevant and

9   likely inculpatory information supporting Apple's claims that Samsung deliberately copied

10   Apple's products.  Apple is entitled to obtain their testimony.

11   Samsung has refused to produce these witnesses for deposition, asserting that each witness

12   has "no relationship to the accused products or the patents-in-suit other than their place atop

13   Samsung's organization hierarchy."  This is a baseless objection that bears no relationship to the

14   reality reflected in documents that tie witnesses at issue to Samsung's deliberate copying of

15   Apple's products.  Samsung's refusal to produce these witnesses for deposition may reflect its

16   recent tactics to delay discovery with hopes of extending case deadlines, or may be designed to

17   prevent Apple from discovering inculpatory testimony.  Whatever Samsung's underlying reasons,

18   it has no legitimate basis to prevent these depositions from going forward.

19   Samsung also has refused to produce witnesses with key marketing and financial

20   information about Samsung's accused products, which is directly related to Apple's damages

21   claims, as well as witnesses with information about Samsung's licensing of the patents at issue in

22   Samsung's counterclaims, which is essential to Apple's defense of these claims.  In all, Samsung

23   has refused to produce *14 witnesses* on "apex" grounds, with less than a month until the discovery

24   deadline.

25   The apex deposition rule that Samsung invokes allows courts to prevent harassment of top

26   corporate officials at the "apex" of the organization who lack knowledge about a case.  Samsung

27   turns the rule on its head, having claimed apex protection for a broad range of employees—not

28   only the 14 witnesses at issue in this motion but another 9 witnesses no longer at issue—who

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

1

certainly are not all at the apex of Samsung.  Indeed, Apple has allowed Samsung to depose numerous high-level Apple employees—with similar titles or positions to some of those at issue in this motion.

Regardless of title, the apex rule does not shield from deposition even the highest officials where, as here, they have unique, firsthand, non-repetitive knowledge of facts and events central to the litigation.  Thus, even Gee Sung Choi, the President and CEO of SEC, is subject to deposition because he has been deeply involved in key issues in this case.  As but one example, according to Samsung's recently-produced documents, Mr. Choi is the person who decided that Samsung should make changes to its tablets, including to decrease their thickness, in order to improve "product competitiveness against iPad2."

Samsung has no valid basis for preventing any of these depositions.  Thus, Apple respectfully requests an order compelling Samsung to make the 14 witnesses available for deposition.  Apple further requests an order requiring that the depositions take place in the Bay Area, so that Apple is not forced at this late date to send teams of attorneys to Korea for double- or triple-track depositions, with the March 8 discovery cut-off looming, when Apple could have taken those depositions in an orderly fashion had Samsung not asserted its baseless objections.

## I.    BACKGROUND

### A.    Samsung's Apex Objections And Apple's Attempt To Resolve Them

Between December 6, 2012, and January 28, 2012, Apple timely served written notices of the 14 depositions at issue here.  (Mazza Decl. ¶ 3, Ex. 1.)  Apple served each notice at least 10 days before the scheduled deposition, and served many of the notices more than 30 days before the scheduled deposition.  (*Id.* ¶ 4, Ex. 1.)  All depositions were set to occur before the March 8, 2012 discovery cutoff, and were set for dates when Apple's attorneys would be in Korea taking other depositions.  (*See id.*)

Samsung objected to some of the 14 depositions in January 2012 and others on February 2, but did not always object on the basis that the witnesses were apex employees. (Mazza Decl. ¶ 5, Exs. 2-3.)  On February 3, Samsung sent a letter asking Apple to justify why Apple could depose these, and 9 other, "high-ranking Samsung executives."  (*Id.* ¶ 6, Ex. 4.)

1    Samsung asserted, without support, that "these depositions are highly unlikely to lead to the

2    discovery of relevant information" because none of the witnesses has "unique personal

3    knowledge that is relevant to this case, and no relationship to the accused products or the patents-

4    in-suit other than their place atop Samsung's organization hierarchy." (*Id*.)  Samsung also

5    claimed that "Apple has not exhausted other means for obtaining whatever information these

6    individuals possess[.]" (*Id*.)

7         Apple raised Samsung's objections at the February 6 lead trial counsel meet and confer

8    but the parties could not resolve their differences.  (Mazza Decl. ¶ 7.)  Instead, Samsung asked

9    Apple to send a letter providing more information as to why Apple should be permitted to depose

10   the witnesses.  (*Id*.)  On February 9, Apple sent a detailed, thirteen-page letter containing a

11   witness-by-witness summary outlining each witness's involvement with issues in this case and

12   referenced documents that showed the witnesses' connection to issues.  (*Id*. ¶ 8, Ex. 5.)  Apple

13   subsequently withdrew its notices for six of the witnesses, leaving 17 at issue.  (*Id*. ¶ 9.)  The

14   parties thereafter exchanged another round of correspondence and Apple raised the issue again at

15   the next-scheduled lead trial counsel meet and confer, which took place on February 14 and 15.

16   (*Id*. ¶ 10, Exs. 6-7.)  On February 15, Samsung withdrew its objections to three witnesses, but

17   continued to refuse to produce 14 witnesses for deposition.  (*Id*. ¶ 11.)  During the February 15

18   meeting, counsel for Samsung acknowledged Apple's intent to move to compel the depositions of

19   the remaining 14 purported "apex" witnesses, and stated that Samsung intended to move for a

20   protective order to prevent Apple from deposing those 14 witnesses.  (*Id*.)  Thus, Apple "has in

21   good faith conferred or attempted to confer" with Samsung "in an effort to obtain [the

22   depositions] without court action."  Fed. R. Civ. P. 37(a)(1).  (*See* Mazza Decl. ¶¶ 7–10.)

23        **B.    Apple Has Produced Its Own Comparable "High Level" Employees For**
         **Deposition**
24

25        In contrast to Samsung's approach, Apple has permitted Samsung to depose numerous

26   high-level Apple employees.  (Mazza Decl. ¶¶ 12-13.)  Apple produced (or is scheduled to

27   produce) three of its nine most senior executives—Scott Forstall, Jonathan Ive, and Phil Schiller,

28   the most senior individuals in the iOS Software, Industrial Design, and Marketing groups,

1   respectively.  (*Id.* ¶ 12.)  Apple has also allowed Samsung to depose many other senior

2   executives, vice presidents, and directors (the same ranks as most of Samsung's witnesses at issue

3   in this motion).  (*Id.* ¶ 13.)

4   **II.**    **LEGAL STANDARDS**

5         **A.**    **Overarching Standards For Resisting Depositions Of "Apex" Witnesses**

6         This Court recently addressed the "heavy burden" that must be satisfied when a party

7   seeks to prevent discovery, and the factors that a court should consider in determining whether to

8   prevent an apex deposition:

9 
10 
11 
12 
13 
14 
15 
16 
17 

> A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied.  When the party seeks the deposition of a high-level executive (a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery.   In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods.  Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition.  Additionally, when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition.  A claimed lack of knowledge, by itself, is insufficient to preclude a deposition.  Moreover, the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery.

18   *In re Google Litig.*, No. C 08-03172 RMW (PSG), 2011 U.S. Dist. LEXIS 120905, at *10 (N.D.

19   Cal. Oct. 19, 2011) (internal quotations and citations omitted) (allowing deposition of Google

20   CEO Larry Page and denying deposition of President Sergey Brin without prejudice to further

21   motion to compel).  "[W]here the testimony of lower level employees indicates that the apex

22   deponent may have some relevant personal knowledge, the party seeking protection will not

23   likely meet the high burden necessary to warrant a protective order."  *Kennedy v. Jackson Nat'l*

24   *Life Ins. Co.,* No. C. 07-0371 CW (MEJ), 2010 U.S. Dist. LEXIS 47866, at *7 (N.D. Cal.

25   Apr. 22, 2010) (testimony of defendant's 30(b)(6) witness showed that its CEO had relevant

26   personal knowledge).

27         The apex rule is not a blunt instrument that allows a party to prevent depositions based on

28   job title.  "The apex deposition principle is not an automatic bar that [the deposition-seeking

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

4

1   party] must overcome by a showing of good cause.  Rather, it is a protective tool that is

2   selectively employed on a case by case basis when deemed appropriate."  *In re Nat'l W. Life Ins.*

3   *Deferred Annuities Litig.,* No. 05-CV-1018-AJB (WVG), 2011 U.S. Dist. LEXIS 37746, at *13

4   n.2 (S.D. Cal. Apr. 6, 2011).

5       **B.     Standards For Finding That A Witness Has Unique, Firsthand, Non-Repetitive Knowledge of the Facts at Issue**

6

7       Where a witness was the ultimate decision-maker or participated in a relevant decision-

8   making process, courts do not hesitate to find that the witness has the knowledge necessary to

9   justify a deposition.  *See, e.g., In re Nat'l W. Life Ins. Annuities Litig.,* 2011 U.S. Dist. LEXIS

10  37746, at *7-9 (allowing depositions where witnesses played central decision-making roles and

11  had "ultimate authority" to take action).  As the court explained in *Rolscreen Co. v. Pella*

12  *Products of St. Louis, Inc.,* No. 4-91-CV-70766, 145 F.R.D. 92 (S.D. Iowa 1992), although an

13  apex witness's testimony "may prove to be duplicative in some respects from that provided by

14  lower ranking executives, individuals with greater authority may have the final word on why a

15  company undertakes certain actions, and the motives underlying those actions."  *Id.* at 97.

16      Courts have also found the requisite knowledge where the witness:

17      •     Had hands-on involvement with a relevant issue, including issues related to

18  corporate policy, *see, e.g., Google Inc. v. Am. Blind & Wallpaper Factory*, No. C 03-5340 JF

19  (RS), 2006 U.S. Dist. LEXIS 67284, at *9-10 (N.D. Cal. Sept. 6, 2006) (allowing deposition of

20  Larry Page based on personal involvement in changing Google's trademark policies);

21      •     Performed a relevant analysis, *see, e.g., WebSideStory Inc. v. NetRatings, Inc.,*

22  No. 06cv408 WQH (AJB), 2007 U.S. Dist. LEXIS 20481, at *12-13 (S.D. Cal. Mar, 22, 2007)

23  (allowing deposition where another witness identified apex witness as one of two people to have

24  performed analysis relevant to damages);

25      •     Authored or received relevant correspondence, *see, e.g., DR Sys., Inc. v. Eastman*

26  *Kodak Co.,* No. 08cv669-H (BLM), 2009 U.S. Dist. LEXIS 83755, at *9 (S.D. Cal. Sept. 14,

27  2009) (allowing deposition where apex witness had discussed important letter with CFO and did

28  not direct CFO to investigate letter's allegation of patent infringement, and allowing deposition of

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

5

1   another apex witness who authored letter);

2           •       Participated in discussions or meetings regarding a relevant topic, *see, e.g., Six*

3   *West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 203 F.R.D. 98, 103 (S.D.N.Y. 2001)

4   (allowing deposition where CEO took part in relevant board of directors meeting and

5   discussions); and

6           •       May otherwise have been a percipient witness to important events, *see*

7   *Blankenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir. 1975) (plaintiff entitled to depose

8   newspaper publisher who "may have had knowledge" about key letter).

9           Numerous courts have also noted that "[t]he mere fact . . . that other witnesses may be

10  able to testify as to what occurred at a particular time or place does not mean that a high-level

11  corporate officer's testimony would be 'repetitive.'  Indeed, it is not uncommon for different

12  witnesses to an event to have differing recollections of what occurred."  *First Nat'l Mortg. Co. v.*

13  *Fed. Realty Inv. Trust*, No. C 03-02013 RMW (RS), 2007 U.S. Dist. LEXIS 88625, at *7 (N.D.

14  Cal. Nov. 19, 2007) (allowing deposition where testimony of lower-level employees suggested

15  apex witness "may have at least *some* relevant personal knowledge").

16      **C.      Standards For Finding That The Party Seeking The Deposition Has**
                 **Exhausted Less Intrusive Discovery Methods**
17

18          Courts regularly find that less intrusive discovery methods have been exhausted where the

19  party seeking discovery has already deposed lower-level employees or conducted written

20  discovery, but has been unable to obtain the desired information.  *See, e.g., Kennedy*, 2010 U.S.

21  Dist. LEXIS 47866, at *3-4, 7-8 (plaintiff already deposed lower-level employee as Rule 30(b)(6)

22  witness); *First Nat'l Mortg.,* 2007 U.S. Dist. LEXIS 88625, at *7 (plaintiff already deposed

23  lower-level employees).

24          Less intrusive methods have also been exhausted where the opposing party prevents the

25  discovery of relevant information through other sources.  In *WebSideStory*, for example, the court

26  rejected a failure-to-exhaust argument as "disingenuous," because the plaintiff had delayed a

27  Rule 30(b)(6) deposition by failing to designate a witness in response to the defendant's notice.

28  *WebSideStory,* 2007 U.S. Dist. LEXIS 20481, at *14-15.

1    Finally, and importantly, some courts have acknowledged that less intrusive discovery

2    methods *may not exist* when the apex witness personally participated in events at issue.  *See*

3    *Oracle America Inc. v. Google Inc.,* No. C-10-03561-WHA (DMR), 2011 U.S. Dist. LEXIS

4    79465, at *6-7 n.1 (N.D. Cal. July 21, 2011) (because CEO Larry Page likely participated in

5    decision-making regarding critical licensing negotiations, less intrusive discovery methods were

6    exhausted); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.,* No. 3:09-md-2032 MMC

7    (JSC), 2011 U.S. Dist. LEXIS 127259, at *11 (N.D. Cal. Nov. 3, 2011) (because apex witness

8    was directly involved in key decision and may have information unknown to other deponents or

9    different recollections, less intrusive discovery methods were exhausted).  This is because the

10   desired information "is specific and unique to [the apex witness] and his involvement in" the

11   relevant events.  *Id.* at *12.  Any "less burdensome" source "would be a poor substitute for [the

12   apex witness's] testimony regarding his own personal knowledge and actions."  *Mansourian v.*

13   *Bd. of Regents of the Univ. of Cal. at Davis*, No. CIV S-03-2591 FCD EFB, 2007 U.S. Dist.

14   LEXIS 95428, at *10 (E.D. Cal. Dec. 21, 2007) (allowing deposition).

## III.   ARGUMENT

16   The "extraordinary circumstances" that may warrant a court "to prohibit the taking of a

17   deposition" are absent here.  *In re Google*, 2011 U.S. Dist. LEXIS 120905, at *10.  The apex

18   deposition doctrine is designed "to prevent harassment of a high-level corporate official where he

19   or she has little or no knowledge."  *Ray v. Bluehippo Funding*, LLC, No. C-06-1807 JSW (EMC),

20   2008 U.S. Dist. LEXIS 92821, at *6 (N.D. Cal. Nov. 6, 2008).  Apple assuredly has not sought to

21   harass any witness (and Samsung has not suggested otherwise).

22   Further, the doctrine protects "an official at the *highest level* or 'apex' of a corporation."

23   *DR Sys., Inc.,* 2009 U.S. Dist. LEXIS 83755, at *5 (emphasis added); *see also Affinity Labs of*

24   *Tex. v. Apple Inc.,* No. C 09-4436 CW (JL), 2011 U.S. Dist. LEXIS 53649 (N.D. Cal. May 9,

25   2011) (affording apex protection to former Apple CEO Steve Jobs).  Samsung paints with far too

26   broad a brush, having characterized as apex witnesses not only the 14 witnesses at issue in this

27   motion but also 9 others no longer at issue, based on their titles as director of a division or vice

28   president.  Such labels are not sufficient.  *See Dobson v. Twin City Fire Ins. Co.,* No. SACV 11-

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

7

1   192-DOC (MLGx), 2011 U.S. Dist. LEXIS 143042, at *16 (C.D. Cal. Dec. 12, 2011) (court

2   refused to infer that Vice President of Claims was "an apex witness based solely on his title as

3   Vice President of Claims").  And Apple has allowed depositions of employees with comparable

4   titles, including Vice Presidents for Product Marketing (iPad), iPod/iPhone Product Design, and

5   Software Engineering (iOS Apps & Frameworks).  (Mazza Decl. ¶ 13.)  Moreover, Samsung is

6   inconsistent about who is an apex employee, having recently claimed apex protection for a vice

7   president, even though Samsung previously produced for deposition that "apex" witness's

8   supervisor.  (*See id.* ¶ 14, Ex. 54.)

9        Finally, as developed below, Samsung is flat wrong in asserting that these witnesses have

10   no connection to the issues "other than their place on top of the organization's hierarchy."

11   (Mazza Decl. Ex. 6)  Samsung's own documents and witnesses contradict its bald assertion.  *See*

12   *Rolscreen*, 145 F.R.D. at 97 ("Rolscreen's mere incantation of [the witness's] status as president

13   and his claim of limited knowledge cannot be a basis for insulating [the witness] from appropriate

14   discovery").

15   **A.    Apple Seeks To Depose Witnesses Who Have Knowledge That Samsung
           Considered, And Deliberately Copied, Apple's Products In Developing The
16           Accused Products**

17        Apple now has evidence that high level Samsung employees were deeply concerned about

18   competition from Apple's iPhone and iPad products, and took deliberate steps to have Samsung

19   compete with those products by copying Apple's designs and features.  For example, in the

20   months before Samsung launched the accused Galaxy S smartphones, Gee Sung Choi, the

21   President of SEC, criticized Samsung's designers for "clinging to the past generation" and

22   charged them to "learn the wisdom of the iPhone."  (Mazza Decl. Ex. 9 at

23   SAMNDCA10247549.)  Jong-Kyun Shin, the Head of Mobile Communications, gave a speech

24   during a February 2010 meeting where he described "a crisis of design" due to Samsung's

25   products' failing to measure up to the iPhone design.  (*Id.* Ex. 8 at SAMNDCA10247377.)

26        Apple now has evidence that Samsung implemented a strategy, which was approved at the

27   highest levels, to make Samsung's next-generation smartphones look and feel like Apple's

28   products.  As set forth in the "Phase 2 Design Strategy" dated October 2007, specialists from the

1  U.S., Europe, and Asia scored the iPhone much higher than Samsung's products in every

2  category, including "Appearance/Desire," "Emotional resonance/Delight," and "Intrigue/Sensory

3  Perception/Interaction."  (Mazza Decl. Ex. 10 at SAMNDCA00202379.)  The document shows

4  that Samsung was shifting from its "Phase 1" focus on "logical value" (*e.g.,* reliability and

5  performance) to a "Phase 2" focus on "emotional value" (*e.g.,* "[i]ndividuality" and the "5

6  senses").  (*Id.* at SAMNDCA00202338.)  Samsung's internal designers suggested that Samsung

7  create designs that "make you love the product itself," and are "something that you desire to have,

8  can be your own and gives satisfaction for the emotional value that you'll feel once you own it."

9  (*Id.* at SAMNDCA00202340.)  The report concluded by recommending that Samsung offer its

10  users a "total experience" just like Apple's, citing Apple's use of "Event[s]" (Steve Jobs's

11  product introduction), advertisements, Apple stores, and distinctive Apple packaging.  (*Id.* at

12  SAMNDCA00202363.)  The Phase 2 Design Strategy was approved by Samsung Chairman Lee

13  Kun Hee; Samsung's Vice-Chairman and Design Committee; and the Head of Samsung's Design

14  Center and its Design Executive Team.  (*Id.* at SAMNDCA00202341.)

15        Apple is entitled to depose the witnesses who created and implemented Samsung's

16  strategy to consider Apple's products when creating the new phase of Samsung's products that—

17  not coincidentally—have the same designs and features as Apple products.  *See, e.g., In re Nat'l W.*

18  *Life Ins. Annuities Litig.,* 2011 U.S. Dist. LEXIS 37746, at *7 (allowing deposition of executives

19  closely involved in details and "possible prime architects" of financial instrument at issue); *DR*

20  *Sys.,* 2009 U.S. Dist. LEXIS 83755, at *9 (allowing deposition of apex witness who had

21  discussed important letter with CFO and did not direct CFO to investigate letter's allegation of

22  patent infringement).

### 1.    Apple Is Entitled To Depose Gee Sung Choi, Who Has Been Actively Involved In Samsung's Policy To Consider And Copy Apple's Products

25        Gee Sung Choi, who has been President and CEO of SEC since 2009, has been deeply

26  involved in key issues in this case, including directing Samsung employees to make Samsung's

27  tablets and phones more like Apple's products.  In 2007, when the first infringing Galaxy

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

9

1    products were launched, Choi was the President of the Telecommunications Network Business.

2    *See* http://www.samsung.com/hk_en/aboutsamsung/management/boardofdirectors.html.  On

3    March 5, 2011—just days after Apple announced the new iPad 2—Mr. Choi presided over an

4    important meeting to improve "product competitiveness against i-PAD2."  (Mazza Decl. Ex. 11.)

5    Mr. Choi ordered detailed changes to the Galaxy Tab 10.1 (referred to initially as the "P3" and

6    later as the "P4") in light of the iPad 2, including redesigning Samsung's product to make it

7    slimmer.  (*Id*. at SAMNDCA 00513784.)  Mr. Choi also decided to reduce the megapixel count of

8    the camera, discussed pricing strategy relative to the iPad, and emphasized that the Tab's graphics

9    capabilities must remain competitive.  (*Id*. Ex. 13.)  *See Rock River Commc'ns, Inc. v. Universal*

10   *Music Grp., Inc.,* No. CV 08-635 CAS (AJWx), 2009 U.S. Dist. LEXIS 111938, at *20 (C.D.

11   Cal. Nov. 16, 2009) (allowing deposition of executive who "was actively involved" in decision

12   central to litigation).

         In March 2010—four months before Samsung launched its first infringing Galaxy S

13   phones, a strongly-worded message from Mr. Choi was conveyed to Samsung's senior designers,

14   criticizing their mindset of "clinging to the past generation."  (Mazza Decl. Ex. 8.)  That message

15   stated that "[t]he most representative example" of the new design is "***obviously the iPhone***" and

16   urged Samsung's designers to "learn the wisdom of the iPhone" and recognize that Apple has "set

17   the industry standard."  (*Id.* (emphasis added).)

18

19                  **2.    Apple Is Entitled To Depose Jong-Kyun Shin, Head of Mobile
                            Communications, Who Has Directed Designers To Make Samsung's
20                          Products More Like Apple's**

21        Jong-Kyun ("JK") Shin, as the head of Samsung's mobile division, was responsible for

22   directing the development of Samsung's mobile touchscreen products, at a hands-on level.

23   Mr. Shin is responsible for the external design of Samsung products, and internal UX aspects.

24   (Mazza Decl. Ex. 45)  Samsung has produced documents indicating that Mr. Shin has repeatedly

25   compared Samsung's phones to Apple's iPhone and found them wanting.  For example, in

26   February 2010, Mr. Shin gave a speech at an important meeting with 28 senior Samsung

27   designers and executives, in which he strongly criticized the design of Samsung's current phones

28   and, at the same time, praised the iPhone design.  (*Id*. Ex. 9.)  As summarized in detail in an email

1   produced by Samsung, Mr. Shin stated: "when our UX is compared to the unexpected competitor

2   Apple's iPhone, the difference is truly that of Heaven and Earth. It's a crisis of design." (*Id*.) He

3   further stated, "All the carriers tell me, Hey JK! Your phones have great technological prowess

4   and everything's great. But it's hard to sell them as high-end phones. . . . I hear things like this:

5   Let's make something like the iPhone." (*Id*. Ex. 9.) Mr. Shin went on to laud the iPhone: "When

6   everybody (both consumers and the industry) talk about UX, they weigh it against the iPhone.

7   iPhone has become the standard." And referring to Samsung's Omnia phone, Mr. Shin stated:

8   "Do you know how inconvenient the Omnia is? When you compare the 2007 version iPhone

9   with our current Omnia, can you honestly say Omnia is better? If you compare the UX to the

10  iPhone, the difference is heaven and earth." (*Id*.)

11        Mr. Shin has been involved in Samsung's strategy on the Galaxy Tab. (Mazza Decl. Ex.

12  14 at SAMNDCA00516172; *see also* Exs. 15-16 ("Galaxy Nexus designed to bypass Apple

13  patents: Samsung mobile chief" and "Samsung Decides Galaxy Nexus Was Not Actually

14  Designed to Avoid Apple Patents").) He also has issued orders to the design team to improve the

15  design of a phone by rounding the "sharp corners" (*id*. Ex. 17); ordered changes to the "Galaxy S

16  package design to [the] iPhone style" (*id*. Ex. 18); and was listed as the person who was to

17  approve the direction new visuals for the Galaxy S packaging (*id*. Ex. 19). Shin has final

18  authority on external design of SS products (*id*. Ex. 45 at 19:5-20; 77:4-16.) and gave feedback on

19  design mockups for Samsung tablets as well as other product design, including the Galaxy S (*id*.

20  Ex. 51 at 70-71; Ex. 35; *see also* Ex. 21). Mr. Shin has given detailed orders to designers. (*Id*.

21  Ex. 53 at 28-29.)

22        Mr. Shin also participated in the meeting in which Mr. Choi directed that Samsung make

23  changes to its tablet products to better compete with the iPad 2. The minutes reflect that Mr. Shin

24  held a "follow on meeting" where he went into more detail regarding Samsung's tablet strategy.

25  (Mazza Decl. Ex. 13.) *See First United Methodist Church of San Jose v. Atl. Mut. Ins. Co.*,

26  No. C-95-2243 DLJ, 1995 U.S. Dist. LEXIS 22469, at *8 (N.D. Cal. Sept. 19, 1995) (allowing

27  deposition where apex witness approved relevant plan, participated in relevant decisions, received

28  relevant reports and might have issued directions to employees regarding relevant issues).

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

11

### 3.     Apple Is Entitled To Depose Samsung's Personnel Who Oversaw Product Strategy And Design For The Accused Products

Apple needs to depose the Samsung employees who were responsible, at the strategic decision-making level, for the designs that Apple contends were copied from of Apple's products. These employees were in a position to carry out the directives from Gee Sung Choi and Jong-Kyun Shin to make products that reflect Apple's designs and features.  And they issued orders and directives of their own to the employees who actually created Samsung's accused products.

Won-Pyo Hong makes ultimate decisions on initiating new designs.  (Mazza Decl. Ex. 45 at 46:25-47:20.)  He has been described as the head of the Product Strategy Team (*id.* Ex.48 at 14:22-15:25), the "head of product strategy" for mobile products (*id.* Ex. 49 at 126:23-127:5), and "in charge of global product strategy" (*id.* Ex. 45 at 15:9-23; Ex. 46 at 197:9-21).  In that role, Mr. Hong necessarily had knowledge not only of how Samsung directed its designers to create their ultimate designs, but also of the core strategic reasons for Samsung's doing so.  Samsung's evidence indicates that Mr. Hong directed designers (including Minhyouk Lee) to compare Apple and Samsung products side-by-side when reporting on initial designs of Samsung products.  (*Id.* Ex. 22.)  Given his ultimate responsibility for new product designs, Mr. Hong was likely involved in approving Samsung's decision to shift to a "Phase 2" design strategy in 2007 that sought to attract consumers away from Apple by offering a "Total Experience" based on Apple's model.  (*See id.* Ex. 10.)  Indeed, Samsung's Phase 2 Design Strategy states that it was approved in April 2007 by the head of Samsung's Design Center, as well as by its Design Executive Team.  (*Id.*)

Dong Jin Koh is the head of Samsung's R&D Management Group—which is also known as the Development Management Group or Office of Development—within Samsung's Mobile & Communication Division.  (Mazza Decl. Ex. 48 at 69:5-15.)  Individuals within the R&D Management Group have generated numerous documents that closely compare Apple's products and user interfaces with Samsung's counterparts.  (*See, e.g., id.* Ex. 23; *see also* Exs. 24-28.)  Apple is entitled to depose Koh to learn why the employees in his group were comparing Apple's products with Samsung's and what Koh directed them to do with those results.  *See Rolscreen,*

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

12

1   145 F.R.D. at 97 ("individuals with greater authority may have the final word on why a company

2   undertakes certain actions, and the motives underlying those actions.")

3          Dong Hoon Chang is Senior Vice President and Head of Product Design for the Mobile &

4   Communications Division.  As Head of Product Design, Mr. Chang was involved in approving

5   Samsung's important shift to a Phase 2 Design Strategy based on Apple's "Total Experience" and

6   "Intuitive Interface."  (*See* Mazza Decl. Ex. 10.)  Mr. Chang also was involved in directing

7   Samsung's choices that resulted in the accused GUI designs, including changes to the colors in

8   icon designs.  (*Id*. Ex. 47 at 46:9-48:10, 67:2-69:4, 102:2-103:17; Ex. 29).  One witness identified

9   Chang as the individual who is "responsible for external design of Samsung's cell phone products

10  as well as internal design, which includes [user experience] aspects."  (*Id*. Ex. 45 at 16:17-19.)

11  Mr. Chang participated in the February 2010 meeting described above (*id*. Ex. 9), where Mr. Shin

12  gave the speech about the iPhone user experience and design.

### 4.  Apple is Entitled To Depose Samsung Employees Who Oversaw The Development Of The Features That Apple Contends Infringe Its Utility Patents

15         Apple also should be permitted to depose the Samsung employees responsible for

16  developing the specific features that Apple contends infringe its utility patents.

17         Heonbae Kim, Executive VP of Advanced Software R&D, led hardware development for

18  the Galaxy S and Galaxy Tab products.  Mr. Kim purportedly contributed to Samsung's

19  overwhelming first-place ranking in the domestic market, having successfully launched the

20  Galaxy S II and Galaxy S.  In a July 2010 email, Dong Jin Koh (the head of the R&D

21  Management Group) ordered Mr. Kim to help the Task Force marketing Samsung products to

22  Korean-American consumers.  (Mazza Decl. Ex. 31.)  Mr. Kim also organized workshops (*id.*

23  Ex. 32) and modified Samsung's phones to allow consumers to better recognize when calls drop

24  on their phones (*id.* Ex. 33).

25         Seunghwan Cho, Sr. VP of Advanced R&D, led software development for Galaxy S and

26  Galaxy Tab products.  Mr. Cho communicated with other Samsung employees about comparisons

27  between Samsung and Apple products.  For example, Mr. Cho explained that the user experience

28  of the "Lismore" product was deficient compared to the iPhone.  (Mazza Decl. Ex. 34.)  Mr. Cho

1   also ordered Samsung employees to improve the usability of various GUIs (*Id.* Ex. 35) and

2   provided detailed feedback on UX designs and models.  (*See, e.g., id.*)  Multiple emails addressed

3   Mr. Cho as the main recipient on User Experience issues.  (*See, e.g., id.* Exs. 36-37.)  Mr. Cho

4   also oversaw the software development process and directed UX-related meetings.  (*Id.* Ex. 38.)

5           **B.      Apple Is Entitled To Depose Samsung Employees Knowledgeable About
            Apple's Damages Claims**

6

7           Apple contends Samsung has copied the look and feel of Apple's products, infringed

8   Apple's patents, and marketed the resulting products to Apple's customers, causing Apple to lose

9   money it would have earned and entitling Apple to obtain Samsung's profits under 35 U.S.C.

10  § 289.  *See* 35 U.S.C. § 289 (entitling a patentee to the infringer's "total profit" following a

11  finding of design patent infringement); *Rite-Hite Corp. v. Kelley Corp.,* 56 F.3d 1538, 1545 (Fed.

12  Cir. 1995) (explaining that "the general rule for determining actual damages to a patentee . . . is

13  to determine the sales and profits lost to the patentee because of the infringement").  Samsung

14  Telecommunications America ("STA") is the wholly owned subsidiary of Samsung that markets

15  and sells the accused products in the U.S., and determines Samsung's strategy regarding sales of

16  the infringing products.  (Mazza Decl. Ex. 49 at 10:19-24, 17:21-19:21.  Sales of the accused

17  products make up more than half of STA's sales and an even greater percentage of its

18  contributions to SEC's profits.  There is no question that STA's sales, sales strategies,

19  projections, marketing plans, and profits are all therefore relevant to the remedies that Apple

20  seeks to prove in this case.  Nor is there any question that each of the witnesses identified below

21  has unique information relevant to these questions.

22          Dale Sohn, the STA president, made decisions that contributed directly to the trademark,

23  trade dress, and patent infringement alleged by Apple.  For example, Mr. Sohn came up with, and

24  directed the implementation of, Samsung's "Beat Apple" campaign.  (*See* Mazza Decl. Ex. 39

25  (email from Mr. Sohn to team of people who report to him laying out the "STA Beat Apple

26  strategy"); *id.* Ex. 40 (email from Mr. Sohn to his team stating "I am not sure our efforts have

27  been enough to make sure [sic] beating Apple," requesting preparation of a an "Apple benchmark

28  report" on "[Apple's] product line and road map (iPod, iPad, iPhone[)]," and setting up a

1  workshop "to share this and brainstorm the idea" of Apple products).)  Mr. Sohn's actions are the

2  extension in the U.S. of the actions set in motion by J.K. Shin and G.S. Choi in Korea.  Mr.

3  Sohn's approval and involvement in formulating a strategy "to beat Apple" in the smartphone

4  market, and his work directing Samsung's marketing of the infringing products more broadly

5  renders Samsung's apex objection meritless.  *See, e.g., Google Inc.* v. *Am. Blind*, 2006 U.S. Dist.

6  LEXIS 67284, at *9-10 (allowing CEO deposition based on involvement in policy accused of

7  giving rise to trademark infringement).

8      Mr. Sohn also contributed to design decisions Apple alleges have given rise to consumer

9  confusion.  For example, Mr. Sohn disagreed with Samsung's decision not to place the Samsung

10  name on its tablets—and warned a lower-level employee not to "go to HQ" in the future without

11  first consulting STA about it. (Mazza Decl. Ex. 41 at 0051349).

12      Joseph Cheong, the chief financial officer of STA, is the officer chiefly responsible for

13  STA's revenue and profit contributions to SEC's financial performance.  Mr. Cheong signs

14  STA's financial statements and submits them to headquarters in Korea, thus taking ultimate

15  responsibility for the statements' accuracy and contents. (Mazza Decl. Ex. 50 at 9:4-19.)

16  Mr. Cheong is also at STA on assignment from SEC, the Korean parent. (*id.* at 7:20-8:7; 8:25-

17  10:9).  As such, he has unique knowledge of the financial position, profitability, and operations of

18  STA in relation to SEC, and is best able to discuss specifically the difference that STA's

19  infringing sales of smartphones makes to the financial performance of the Korean parent

20  company.[1]  Mr. Cheong, then, can testify in a unique, non-repetitive way as to Samsung's profits

21  from sales in the U.S., which are key to Apple's case for damages under 35 U.S.C. §§ 284 and

22  289 and 15 U.S.C. § 1117.  *See Nike, Inc. v. Wal-Mart Stores, Inc.,* 138 F.3d 1437, 1448 (Fed.

23  Cir. 1998) (noting that "an award of only the infringers' post-tax profits would leave [the

24  _____

25      [1] This issue is vital because STA accounts for its profits on a "transfer pricing" basis
    designed to provide to the IRS a pre-determined minimum income for STA's activities.  Mr.

26  Cheong himself signed the "Advanced Pricing Agreement' with the IRS that sets up this
    arrangement for SEA.  (*See* Mazza Decl. Ex. 44).  Apple is entitled to understand this

27  arrangement and to determine the actual, consolidated profit that Samsung on a whole earns.
    Mr. Cheong has knowledge from which Apple can determine this.

28

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

15

1  infringers] in possession of their tax refunds, and that . . . cannot be their 'total profits' as

2  mandated by the statute").

3       Further, Mr. Cheong has ultimate authority to make decisions that impact STA's

4  profitability from sale of the accused products.  (*See, e.g.,* Mazza Decl. Ex. 42 (memorandum to

5  Mr. Cheong regarding carrier claim for reimbursement from sale of phones with certain quality

6  issues; explaining that "after a discussion with . . . [Mr. Cheong]" it was proposed that STA pay

7  carrier $7M); Ex. 43 (email describing "request from [Mr.] Cheong to negotiate a settlement"

8  with T-Mobile as to broken phone kits and referencing follow-up discussion with Mr. Cheong).)

9  *See Kennedy*, 2010 U.S. Dist. Lexis 47866, at *7 (allowing deposition of CEO identified as "main

10  decision-maker.")

11       **C.       Apple Is Entitled To Depose Witnesses With Knowledge Related To Apple's**
                    **Defenses To Samsung's Counterclaims**
12

13       Samsung is refusing to produce five witnesses who Apple believes have personal

14  knowledge of facts relevant to Apple's licensing and standards defenses.  By way of background,

15  Samsung seeks to enjoin Apple from practicing seven patents that Samsung claims are "essential"

16  for the UMTS telecommunications standard.  Testimony from these witnesses is relevant to

17  Apple's defenses and counterclaims based on Samsung breaches of commitments to ETSI (the

18  standards-setting body) and its members (like Apple) that fall into two broad categories:

19  Samsung's intentional and deceptive (i) failures to disclose its intellectual property rights (IPR)

20  that it now claims cover technologies in the UMTS standard and (ii) failures to disclose that it had

21  no intention to meet its FRAND commitments and then refusing to offer Apple FRAND licensing

22  terms.  Apple also has asserted as a defense that Samsung cannot enforce its declared-essential

23  patents in suit against Apple based on Samsung's license agreement with Apple's baseband

24  chipset supplier (Intel) for the accused products, which authorizes Apple to practice Samsung's

25  declared-essential patents based on the doctrine of patent exhaustion.

26       Apple seeks to take the depositions of Samsung employees Seungho Ahn, Jaewan Chi,

27  Minhyung Chung, Ken Korea and Seung Gun Park to support these defenses.  In particular, as set

28  forth in more detail below, fact discovery to date suggests that Seung Gun Park and Minhyung

1   Chung have personal knowledge regarding Samsung's IPR disclosure practices and its actions in

2   3GPP standards setting organizations, which are relevant to Apple's non-disclosure defenses.  To

3   support its claims and defenses relating to Samsung's breach of its IPR disclosure obligations,

4   Apple is entitled to discovery related to, among other things, Samsung's determination when to

5   disclose its declared-essential IPR and its conduct during the UMTS standard-setting process.  In

6   addition, the discovery to date and Apple's own interactions with Samsung indicates that

7   Seungho Ahn, Jaewan Chi and Ken Korea have personal knowledge regarding Samsung's

8   licenses with other parties for UMTS declared-essential patents; and Samsung's negotiations with

9   and license terms offered to Apple.  To support its claims and defenses related to Samsung's

10  failure to offer FRAND license terms, Apple seeks to obtain discovery related to these licenses

11  and negotiations.  To support its claims and defense based on its authorization to practice the

12  patents in suit based, Apple seeks to obtain to discovery relating to Samsung's license agreement

13  with Intel.

14          While Samsung objects to these five witnesses on "apex" grounds, Samsung has blocked

15  Apple's attempts to identify alternative witnesses on these issues.  Apple, on the other hand, has

16  agreed to produce its two most senior licensing employees—B.J. Watrous and Boris Teksler—

17  and its former senior director of patents Richard Lutton, all of whom have been or will be

18  deposed in this matter (Walden Decl. ¶ 2).  Despite its superior knowledge of its own

19  organization, Samsung has done nothing to help Apple identify alternative employees to provide

20  the testimony Apple seeks.  In an effort to identify a group of deponents, Apple served Samsung

21  with an interrogatory seeking the names of the five Samsung individuals with the most

22  knowledge about the negotiations for and royalties received under Samsung's licenses with other

23  parties for UMTS standards-essential patents, Samsung's IPR disclosure practices, and

24  Samsung's actions in 3GPP standards setting organizations. (*Id.* ¶ 3.).  Samsung provided not a

25  single name in response. (*Id.*)  Instead, Samsung objected and indicated that its investigation is

26  ongoing, and it will supplement its response.  (*Id.*)  Apple is further hampered in identifying

27  relevant witnesses by Samsung's failure even to begin producing documents relating to licensing

28  and standards topics until after this Court ordered it to do so on January 27, 2012.  (*Id.* ¶ 4.)

Apple's Motion to Compel the Depositions of 14 of Samsung's Purported "Apex" Witnesses
Case No. 11-cv-01846-LHK
sf-3108163

17

Apple has had no choice but to endeavor to identify the relevant Samsung witnesses based on the limited available information.  The information available to Apple regarding the five witnesses in questions is as follows:

Apple understands that Dr. Seungho Ahn is the Head of the IP Center and Licensing Team at Samsung Electronics with nearly two decades of IP and licensing-related work at Samsung.  Dr. Ahn appears to play a key role in Samsung's licensing decisions and has extensive experience and knowledge on Samsung's licensing practices and policies, and also personally participated in licensing discussions with Apple.  Samsung's own documents indicate that Dr. Ahn has been involved in numerous licensing negotiations and agreements.  For instance, in Samsung's November 18, 2010 press release, entitled "Samsung Electronics and Intellectual Ventures Enter Into License Agreement," Dr. Ahn commented that the agreement "grants Samsung access to a broad and comprehensive IP portfolio under terms attractive to Samsung."  (*See* Walden Decl. Ex. 1.)

In addition, Dr. Ahn participated in the pre-litigation meetings with Apple seeking to negotiate a resolution to the parties' IP-related disputes.  (*See* Walden Decl. Exs. 7-8), including an in-person meeting with Mr. Lutton, then of Apple.  Apple notes that Samsung has noticed Mr. Lutton's deposition, and Apple has not objected.  The fact of Dr. Ahn's participation in these meetings further suggests that he has been involved in similar negotiations with other parties related to declared-essential patents.

Mr. Jaewan Chi is the Leader of the IP Center's Licensing Team at Samsung Electronics.  Because Samsung has not produced any documents for Mr. Chi, it is difficult for Apple to quantify the scope of his involvement in licensing at Samsung.  However, earlier this week, Samsung employee Seongwoo Kim testified that Mr. Chi is "a team leader of licensing team and his level is also executive VP."  (*See* Walden Decl. Ex. 2 at 39:7-8.)  Mr. Kim testified that he reported to Mr. Chi and confirmed that Mr. Chi works on licenses involving mobile wireless devices.  (*See id.* at 39:13-18).)  Mr. Chi appears to have an important role in Samsung's licensing decisions and extensive experience and knowledge on Samsung's licensing practices and policies relating to both essential and non-essential patents.

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

18

1    Mr. Minhyung Chung is the Head of the Technical Planning Team at Samsung's Digital

2    Multimedia Communications (DMC) R&D Center with responsibilities for both licensing and

3    management of Samsung's IP portfolio.  Seongwoo Kim has testified that Mr. Chung, "leads the

4    patent and technology team – patent and technology analysis team."  (*See* Walden Decl. Ex. 2 at

5    40:4-5.)  A number of Samsung witnesses have testified that the DMC R&D Center plays a key

6    role in guiding Samsung's participation in standards-setting organizations.  Samsung's

7    standardization group is part of the DMC R&D Center.  (*Id.* Ex. 3 at 142:9-10.)  Similarly,

8    Samsung inventor Young Bum Kim testified that one of the responsibilities of the

9    telecommunications R&D center is Samsung's participation in standard setting organizations.

10   (*Id.* Ex. 4 at 72:6-14; *see also id.* Ex. 5 at 137:13-19 ("there was a department [in the

11   Telecommunications R&D Center] which was responsible for standard-related work within this

12   research center.").)  The DMC also includes a patent prosecution group.  (*Id.* Ex. 3 at 143:2-5.)

13   This group is involved in the process of technical development.  (*Id.* at 14-16.)  According to Dr.

14   Hyeon-Woo Lee, "at some point in time the patent team belonged to the [telecommunication]

15   R&D center, and during other periods, it didn't."  (*Id.* Ex. 6 at 110:16-25.)  Dr. Lee was not

16   certain during which time period the patent team was part of the R&D center.  (*Id.* at 111:1-7.)

17   Apple understands that Mr. Ken Korea is Vice President of Samsung's San Jose IP Office.

18   Although Apple does not have a full understanding of the differences between the U.S. and

19   Korean operations (because Samsung has not provided such discovery), Apple wants to ensure its

20   discovery spans both locations.  Mr. Korea has participated in and has personal knowledge of the

21   pre-litigation meetings with Apple seeking to negotiate a resolution to the parties' IP-related

22   disputes, and is the only US-based Samsung employee who attended these meetings.  (*See*

23   Walden Decl. Exs. 9-10.)  Further, his participation in these meetings suggests that Mr. Korea had

24   been involved in similar negotiations with other parties related to standards-essential patents.

25   Mr. Seung Gun Park headed the Intellectual Property and Standards Team at the Digital

26   Media and Communication Business Division.  Mr. Park is currently at Stanford University.

27   Mr. Park signed several of Samsung's IPR disclosure forms submitted to ETSI, including those

28   identifying a number of the Patents-in-Suit.  (*See* Walden Decl. Ex. 11 (relating to the '516

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-CV-01846-LHK
sf-3108163

19

patent); Ex. 12 (relating to the '941 patent); Ex. 13 (relating to the '792 patent).)  Mr. Park also has signed or has been listed as Samsung's contact in numerous other IPR disclosure forms.  (*See id.* Exs. 14-20.)

The testimony of Samsung's inventors confirms that Mr. Park played a personal role in determining whether to disclose patents to standards organizations.  Soeng-Hun Kim explained that the process for determining whether to declare a patent essential was as follows: "Well, the patent prosecution team and the people or person who handles the standard would gather together or when a patent has been reflected as part of a standard whether -- and have a discussion whether this patent is indeed valuable or not and whether the patent is to be classified as essential or not. So the results of such discussion would have been reported to the senior vice president Seung-Gun Park, and based on that, this decision such as this would have been made."  (Walden Decl. Ex. 21 at 129:14-24.)

Further, Mr. Park was personally aware of the ETSI discussions on the IPR policies which are at issue in Apple's defense.  He can testify on the joint proposal by Ericsson, Motorola, and Nokia at the ETSI GA ad hoc group meeting on IPR Review in Sophia Antipolis on February 22-23, 2006.  (Walden Decl. Ex. 22.)  The proposal addresses the problem caused by fragmented approaches in determining FRAND rates and seeks to revise and clarify FRAND's definition in the ETSI IPR policy.  Mr. Park should be able to testify on Samsung's understanding of the proposal and any actions taken by Samsung in reacting to the proposal.

Finally, documents produced by Samsung show Mr. Park's in depth involvement in Samsung's licensing negotiations, including those with Motorola, Siemens, and Ericsson.  (*See e.g.,* Walden Decl. Exs. 23-25.)  Additionally, Apple notes that Mr. Park was deposed in March of 2007 in the case *In the Matter of: Certain Wireless Communication Equipment, Articles Therein, and Products Containing the Same*, No. 337-TA-577.  (*Id.*)

### D.    Samsung Has Frustrated Apple's Other Efforts To Obtain This Information

Apple has attempted, repeatedly, to gather the information it needs through other witnesses.  *See First Nat'l Mortg. Co.,* 2007 U.S. Dist. LEXIS 88625, at *7 (less intrusive discovery methods exhausted where plaintiff already deposed lower-level employees).  Eighteen

1    lower-level employees have already been deposed but they have not provided the information that

2    the witnesses at issue are in a position to provide.  In many cases, those witnesses testified that

3    they did not know, or could not answer, questions highly relevant to Apple's claims.  Some even

4    pointed to the very employees Samsung seeks to shield as the individual responsible or

5    knowledgeable about an issue.  In addition, Apple sought to streamline discovery by requesting

6    30(b)(6) depositions of Samsung witnesses, but Samsung has only designated four 30(b)(6)

7    witnesses to date.  (*See* Mazza Decl. ¶ 53; Walden Decl. ¶ 3.)  *See WebSideStory*, 2007 U.S. Dist.

8    LEXIS 20481, at *15 (rejecting argument that defendant should have exhausted other avenues of

9    discovery where plaintiff failed to designate 30(b)(6) witness).

10           The employees that Apple has already deposed have shown a marked tendency to evade

11    direct questioning.  Some deponents asserted their confusion with regard to simple, job-related

12    words.  When asked whether Samsung had redesigned a product, Jungmin Yeo, an industrial

13    designer at Samsung, testified that he did not "know what [the term redesign] means at all."

14    (Mazza Decl. Ex. 51 at 33.)  In another instance, senior Samsung designer Ahyoung Kim testified

15    that she did not understand the term "largest competitor," and could not answer whether she had

16    evaluated the design of an iPhone because she could not define the term design.  (*Id*. Ex. 52 at 73,

17    77.)  Ms. Kim also expressed confusion as to the meaning of "worked on."  (*Id*. at 15.)  Another

18    Samsung employee, senior designer Hangil Song, could not—or would not—offer testimony

19    comparing the external appearance of Samsung and Apple smartphones.  (*Id*. Ex. 55 at 34:19-24.)

20           These are just a few of the numerous instances of the evasion by Samsung's lower-level

21    employees that has stymied Apple's efforts to pursue less intrusive discovery methods.  *See, e.g.,*

22    *WebSideStory*, 2007 U.S. Dist. LEXIS 20481, at *14-15 (rejecting argument that defendant

23    "should be required to exhaust other avenues of discovery" where plaintiff delayed Rule 30(b)(6)

24    deposition by failing to designate witness); *In re NCAA Student-Athlete Name & Likeness Litig.,*

25    No. 09-cv-01967 CW (NC), 2012 U.S. Dist. LEXIS 6461, at *13 (N.D. Cal. Jan. 20, 2012)

26    (because NCAA stalled plaintiffs' efforts to obtain discovery from NCAA members, it was unfair

27    to prevent discovery from NCAA management).

28           Moreover, Apple tried to question Samsung employees about meetings and decisions

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

21

made by the witnesses at issue.  Many of the employees could not recall the details of those meetings, which makes the unique recollections and knowledge of the witnesses at issue that much more important.  (*See, e.g.*, Mazza Decl. Ex. 48 at 79; *id.* Ex. 50 at 109.)  These same employees often could not answer questions directed to the heart of Apple's claims in the case.  Regarding the identical pricing of entry-level iPads and Galaxy Tabs, Justin Denison could not "personally testify as to whether that's intentional or not."  (*Id.* Ex. 49 at 62:8-9.)  And Jungmin Yeo testified that it was "impossible" for him to answer a question regarding alternative ways of designing a tablet.  (*Id.* Ex. 51 at 64-66.)  Another witness, Omar Khan, was asked whether the external look of the iPhone drives its commercial success.  In response to this critically relevant question, Mr. Khan answered that he "can't speak to sort of where it is on the spectrum."  (*Id.* Ex. 46 at 115:22-23.)

And far from taking responsibility for decision-making themselves, Samsung's employees have *repeatedly* testified that the so-called apex employees were either the final authority on a matter, or were involved in the decision-making process.  For example, Won-Pyo Hong made "the final decision" when it came "to the product planning request[s] involving new products." (Mazza Decl. Ex. 45 at 47.)  The results of multi-year strategy planning at STA would be submitted to Dale Sohn for his approval and review.  (*Id.* Ex. 49 at 19.)  Jeeyeun Wang testified that Dong Hoon Chang made the final confirmation of icon modifications.  (*Id.* Ex. 47 at 113.) And when asked how "Samsung makes a final decision on what design to adopt for its products," an issue at the *very core* of Apple's claims, Jinsoo Kim answered that employees "would report it to the head of the business division . . . JongKyun Shin."  (*Id.* Ex. 45 at 77.)  Given this testimony identifying the "apex" employees as key decision-makers, Samsung cannot meet its "high burden" to prevent discovery.  *Kennedy*, 2010 U.S. Dist. LEXIS 47866, at *7.

The witnesses Apple seeks to depose have unique views and different recollections of decisions and meetings.  Testimony thus far also indicates that these employees may have the *only* recollection of some events.  No lesser or alternative means of fact-finding will yield the information Apple seeks from these senior employees.  *See Oracle Am.,* 2011 U.S. Dist. LEXIS 79465, at *6-7 n.1 (other methods exhausted where Larry Page likely participated in decisions

APPLE'S MOTION TO COMPEL THE DEPOSITIONS OF 14 OF SAMSUNG'S PURPORTED "APEX" WITNESSES
CASE NO. 11-cv-01846-LHK
sf-3108163

22

1   regarding critical licensing negotiations); *In re Chase Bank*, 2011 U.S. Dist. LEXIS 127259, at

2   *12 (other methods exhausted where apex witness directly involved in key decision and may have

3   had information unknown to others or different recollections).

4   **IV.    CONCLUSION**

5          Samsung's wholesale refusal to produce 14 witnesses for deposition is unjustified and has

6   prejudiced Apple.  Had Samsung produced the witnesses for the dates they were noticed, Apple

7   could have handled the depositions in an orderly fashion with attorneys from its litigation team

8   who already had traveled to Korea for other depositions.  But by refusing to produce these

9   witnesses and forcing Apple to move to compel with the March 8 discovery cut-off looming,

10  Apple will now have to depose two or more deponents on the same day in order to meet the

11  deadline.  If double- or triple-tracked depositions were to take place in Korea, Apple would have

12  to send teams of lawyers to Korea to complete the depositions, thereby disrupting Apple's ability

13  to complete other critical tasks in this fast-moving case.

14         Accordingly, for all the reasons discussed above, the Court should grant Apple's motion

15  and issue orders compelling Samsung to produce the 14 witnesses for depositions in the Bay

16  Area.

17

18  Dated:  February 16, 2012                         MORRISON & FOERSTER LLP

19

20                                          By:    */s/ Michael A. Jacobs*
                                                   Michael A. Jacobs

21                                                 Attorneys for Plaintiff
22                                                 APPLE INC.

23

24

25

26

27

28