# EXHIBIT 49

# FILED UNDER SEAL

Highly Confidential Pursuant to Protective Order

Page 1

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                 SAN JOSE DIVISION
4   APPLE INC., a California      §
    Corporation,                  §
5                                 §
         Plaintiff,               §
6                                 §
    Vs.                           §        Case No.
7                                 §   11-CV-01846-LHK
                                  §
8   SAMSUNG ELECTRONICS CO.,      §
    LTD., a Korean business       §
9   entity; SAMSUNG ELECTRONICS   §
    AMERICA, INC., a New York     §
10  corporation; SAMSUNG          §
    TELECOMMUNICATIONS AMERICA,   §
11  LLC, a Delaware limited       §
    liability company,            §
12                                §
         Defendants.              §
13
14             HIGHLY CONFIDENTIAL
            UNDER THE PROTECTIVE ORDER
15
16
17        DEPOSITION OF JUSTIN DENISON
                  Dallas, Texas
18       Wednesday, September 21st, 2011
19
20
21
22
    Reported by:
23
    Daniel J. Skur, Notary Public and CSR
24
    JOB NO. 41964
25

monitor competitive pricing, we monitor competitive announcements in regards to new devices. It's a normal course of running a product business.
Q. In your last answer, you just referred to monitoring competitive pricing I believe; is that right?
A. Yes.
Q. Does Samsung adjust its prices in response to its competitors' pricing?
MS. MAROULIS: Objection, outside the scope.
A. Samsung will, at times, adjust pricing in order to, again, compensate or meet its sales targets. I cannot testify to any particular, you know, pricing adjustment that was made directly as a result of anything Apple has done.
BY MR. HUNG:
Q. Can you confirm for me that the Galaxy Tab 10.1 had not been released in the United States as of February 14th, 2011?
A. That's correct.
Q. Okay. I apologize. The Tab had not been released as of March 1st, 2011, the 10.1,

correct?
MS. MAROULIS: He's referring to the title page of the document.
A. Yes, that is correct.
(Deposition Exhibit 229 marked.)
BY MR. HUNG:
Q. Court reporter's handed you Exhibit 229, which is the SEA Galaxy Tab/Player Key Issues Status document dated February 14th, 2011. Do you recognize this document?
A. I would need to review it to make sure.
(Witness reviews document.)
A. To the best of my recollection, I don't believe that I reviewed this as part of my deposition preparation.
BY MR. HUNG:
Q. Nevertheless, have you seen this document before, even if apart from your deposition preparation?
A. I believe that there are parts that I've seen before. I do not believe I've seen this document in its totality before.
Q. Could you do me a favor and turn to page 335. Those are the last three numbers of

the Bates number that is in the far left-hand corner, if that makes sense.
A. I understand. Okay.
Q. Do you see reference to portfolio pricing strategy recommended?
A. Yes.
Q. Was it Samsung's desire that the seven-inch tab compete with the iPad 2?
A. In the section that you're referencing, I don't see any reference to the seven-inch tablet.
Q. As of the date of this document, February 14th, 2011, the Tab had not been released yet, correct, the 10.1 Tab had not been released yet, correct?
A. That's correct.
Q. Do you have an understanding as to, on page 16 of Exhibit 229 at Samsung 500335, to what product, Samsung product, this slide in this deck is referring?
MS. MAROULIS: Objection, beyond the scope.
A. My personal interpretation is that there are two different products being -- actually more than -- more than two, three or

four products, if you -- if you look at it very carefully, that are being referenced in this document, several seven-inch variants, and one 10-inch WiFi tablet is being referenced here.
BY MR. HUNG:
Q. What is your understanding of -- with respect to the phrase "be on par with iPad 2 for WiFi only 10-inch tablet," to what Samsung product that line was intended to refer?
MS. MAROULIS: Objection, beyond the scope in this context.
A. Obviously I'm not the author. It would be hard for me to say exactly. What I see in that sentence is a reference to the iPad 2 and a reference to the 10-inch WiFi tablet.
BY MR. HUNG:
Q. As of this date, February 14th, 2011, did Samsung have a WiFi only 10-inch tablet?
A. No.
Q. Did Samsung intend that the Tab 1 compete in terms of price with the iPad 2?
MS. MAROULIS: Objection, beyond the scope.

Highly Confidential Pursuant to Protective Order

Page 62

1      A.   By "Tab 1," can I assume you mean P1
2  as is referenced here?
3  BY MR. HUNG:
4      Q.   Is the P1 the 10.1?
5      A.   No.  So I don't understand your
6  question.
7      Q.   Okay.  I'm sorry.  I was asking
8  about the 10.1.
9      A.   Okay.
10      Q.   The Samsung 10.1, --
11      A.   Uh-huh.
12      Q.   -- Galaxy Tab 10.1 --
13      A.   Uh-huh.
14      Q.   -- is roughly a 10-inch --
15      A.   Yes.
16      Q.   -- WiFi only --
17      A.   Yes.
18      Q.   -- tablet, correct?
19      A.   Yes.
20      Q.   Does Samsung intend that the Samsung
21  Galaxy Tab 10.1 tablet compete with the iPad 2
22  in terms of price?
23           MS. MAROULIS:  Objection, beyond the
24  scope.
25      A.   I personally can confirm that our

Page 63

1  Galaxy Tab 10.1 WiFi only edition, our entry
2  level price is the same as the iPad 2 WiFi only
3  entry level price.
4  BY MR. HUNG:
5      Q.   Is that intentional?
6           MS. MAROULIS:  Objection, beyond the
7  scope.
8      A.   I cannot personally testify as to
9  whether that's intentional or not.
10  BY MR. HUNG:
11      Q.   Are you involved with the pricing
12  for the Galaxy Tab 10.1 in the United States?
13      A.   I am not personally involved in the
14  pricing of the Galaxy Tab 10.1 in the United
15  States.
16      Q.   Who is?
17           MS. MAROULIS:  Objection, beyond the
18  scope.
19      A.   I don't believe there is one person
20  that I can point to that decides the pricing
21  strategy with regards to tablets in the United
22  States.
23  BY MR. HUNG:
24      Q.   Is --
25           MS. MAROULIS:  Counsel, there's been

Page 64

1  a number of questions about pricing.  I
2  don't believe it's part of your notice, and
3  since you're complaining to the court that
4  you need more time with the witness, I want
5  to make sure we don't go too far into it
6  because I can object for the record, but
7  we're still taking up the time.
8      MR. HUNG:  You stated your
9  objection, I heard your objection.  I don't
10  think it's productive to debate your
11  objection on the record.  I think --
12      MS. MAROULIS:  Is there a topic to
13  which you believe your questions pertain?
14      MR. HUNG:  I think that many of
15  these questions go generally to the concept
16  of Samsung's awareness and decision to
17  emulate Apple with respect to its product
18  releases and marketing and strategy
19  generally, and I'm trying to drill down in
20  terms of what Samsung is copying at a high
21  level, if Samsung is copying something, and
22  then drill down into the specifics starting
23  from marketing all the way down to specific
24  design details.  Again, I note your
25  objection, I'm going to proceed with the

Page 65

1  deposition.
2      MS. MAROULIS:  Okay.  Well, we're
3  proceeding with the question-by-question
4  objections beyond the scope, but it's not
5  the most efficient way.  Go ahead.
6  BY MR. HUNG:
7      Q.   You can answer.
8      A.   I don't remember the question.
9      Q.   Okay.  Let me ask a different one.
10  Is the Samsung strategy to undercut the iPad 2
11  in terms of pricing?
12           MS. MAROULIS:  Objection, beyond the
13  scope.
14      A.   I personally would describe
15  Samsung's pricing strategy as market-based
16  pricing.
17  BY MR. HUNG:
18      Q.   What does that mean?
19      A.   Market-based pricing, in my opinion,
20  is simply delivering products at the prices
21  that consumers desire to purchase those
22  products.
23      MR. HUNG:  I'm happy to continue.
24  As Ms. Maroulis knows, I'm not a person
25  that keeps the witness going hour after

Highly Confidential Pursuant to Protective Order

Page 66

```
1    hour.  If you need to take a break at any
2    time, just let me know.
3         MS. MAROULIS:  Should we take a
4    short break now?
5         THE WITNESS:  A break now would be
6    terrific.
7         MR. HUNG:  If you like.
8         MS. MAROULIS:  Let's do it.
9         THE WITNESS:  Please.
10         VIDEOGRAPHER:  We're off the record
11    at 10:53 a.m., end of tape 1.
12         (Recess held.)
13         VIDEOGRAPHER:  We're back on record
14    at 11:03 a.m., beginning of tape 2.
15         (Deposition Exhibit 230 marked.)
16    BY MR. HUNG:
17    Q.    Same starting question, Mr. Denison,
18    if you need to take a minute to review Exhibit
19    230, please do.  My question for you is whether
20    you recognize the document.
21    A.    I do need to take a minute.
22         (Witness reviews document.)
23    A.    I don't believe that I specifically
24    reviewed this document in preparation for the
25    deposition, but I do recognize certain aspects
```

Page 67

```
1    of it.
2    BY MR. HUNG:
3    Q.    Very basic question for you.  If you
4    look on the first page of this document under
5    industry reference, is that a reference to the
6    iPad?
7         MS. MAROULIS:  Objection, assumes
8    facts.
9    A.    I'm not aware if that is intended to
10    be Apple.
11    BY MR. HUNG:
12    Q.    If you look at the specifications
13    under industry reference, do you know whether
14    those are the same as for the iPad?
15         MS. MAROULIS:  Objection, outside
16    the scope.
17    A.    I personally know that 9.7 inches is
18    the size of the iPad display.  I personally
19    know that their resolution is 1024 by 768.  I
20    do not know for sure what they advertise as
21    their thickness, and I don't recall exactly how
22    many grams the iPad claims to be, so I can only
23    confirm partial knowledge of their
24    specifications offhand.
25    BY MR. HUNG:
```

Page 68

```
1    Q.    Let me take a step back, perhaps ask
2    a more basic question.  In terms of its, I
3    think you called, competitive tracking for the
4    Galaxy Tab 10.1, does Samsung consider the
5    Apple iPad 2 the industry reference?
6         MS. MAROULIS:  Objection, vague.
7    A.    So I don't believe I've ever seen
8    Apple referred to as the industry reference
9    inside Samsung.
10    BY MR. HUNG:
11    Q.    Have you ever referred to the iPad 2
12    as the industry reference?
13    A.    No, I don't believe I've ever used
14    those terms.
15    Q.    Have you -- have you ever heard
16    anyone refer to the iPad 2 as the industry
17    reference?
18    A.    No, I have not.  I can only assume
19    that this is meant to be an industry reference
20    in this case.
21    Q.    Have you ever heard anyone refer to
22    the iPad 2 as an industry reference?
23         MS. MAROULIS:  Objection, vague.
24    A.    No, I've not heard anyone
25    specifically.  That was just my assumption
```

Page 69

```
1    based on reading this document.
2    BY MR. HUNG:
3    Q.    What about the industry leader; have
4    you ever heard anyone refer to the iPad 2 as
5    the industry leader in the tablet space?
6    A.    I have certainly seen market reports
7    that show Apple as the industry leader in terms
8    of sales in the tablet space and have referred
9    to them as such.
10    Q.    When you said "market reports," were
11    you referring to third-party reports or
12    Samsung's own reports?
13    A.    I am -- I am referring to
14    third-party reports.
15    Q.    Have you seen market reports that
16    show Apple as the industry leader in terms of
17    sales in the tablet space within Samsung?
18         MS. MAROULIS:  Objection, assumes
19    facts.
20    A.    I apologize, I think I need a
21    clarification.
22    BY MR. HUNG:
23    Q.    Sure.  When you refer to market
24    reports, you were referring to third-party
25    market reports.
```

Highly Confidential Pursuant to Protective Order

**Page 70**

1   A.   Yes.
2   Q.   I'm wondering whether you've seen
3  any reports within Samsung that refer to Apple
4  as the industry leader in terms of sales within
5  the tablet space that were not third-party
6  reports?
7        MS. MAROULIS:  Objection, vague.
8   A.   As I understand the question, I have
9  seen reports inside Samsung which try to
10  estimate Apple's sales, but they do not refer
11  to Apple as the industry leader, as I recall.
12 BY MR. HUNG:
13  Q.   When did Samsung first learn about
14  the iPhone?
15        MS. MAROULIS:  Objection, vague, you
16  mean the original iPhone?
17 BY MR. HUNG:
18  Q.   Yeah, the original iPhone.
19  A.   As part of the preparation for this
20  deposition, I don't recall asking designers
21  specifically when they first learned of the
22  iPhone, as the products at issue were designed
23  much later than what we're calling the original
24  iPhone, nor was I a part of Samsung when the
25  original iPhone was launched, so I don't have

**Page 71**

1  personal knowledge either.
2   Q.   Is it fair to say that the -- start
3  again.
4        I'm happy to break this down by
5  product, if it's helpful.  Let me first ask the
6  general question.  Is it fair to say that the
7  three phones that are at issue in the
8  preliminary injunction papers that I believe
9  you read, the Droid Charge, the Infuse 4G, and
10  the Galaxy S 4G, --
11  A.   Uh-huh.
12  Q.   -- were all designed after the
13  original iPhone was released?
14        MS. MAROULIS:  Objection, compound,
15  but you may answer.
16  A.   In all cases, meaning the design of
17  the Galaxy S 4G, the design of the Infuse 4G,
18  and the design of the Droid Charge, we did -- I
19  did specifically ask the designers whether they
20  were personally aware of the iPhone when they
21  were designing those products, and each
22  designer was aware that the iPhone existed when
23  they were designing those products.
24 BY MR. HUNG:
25  Q.   Your counsel stated an appropriate

**Page 72**

1  compound objection.  Just to remove the
2  objection, is it accurate that the designers on
3  the Infuse 4G were aware of the original iPhone
4  when designing that product?
5        MS. MAROULIS:  Objection, vague.
6   A.   I asked the Infuse 4G designers if
7  they were aware of the iPhone when they
8  designed the Infuse 4G, and, yes, they were
9  aware, they confirmed their awareness, if you
10  will, of that product.
11 BY MR. HUNG:
12  Q.   Is it accurate that the designers of
13  the Droid Charge were aware of the original
14  iPhone when designing that product?
15        MS. MAROULIS:  Same objection.
16  A.   When I entered into discussions with
17  the designers of the Droid Charge, and the same
18  is true for the Infuse 4G or the Galaxy S 4G, I
19  did not specifically ask them about the
20  original iPhone versus the second generation
21  iPhone versus the third generation iPhone
22  versus the fourth generation iPhone, so it's
23  difficult to answer your question precisely.
24        I can confirm that those designers,
25  including the Droid Charge designers, were

**Page 73**

1  generally aware of the iPhone, the iPhone
2  family, as it were.
3        (Deposition Exhibit 231 marked.)
4 BY MR. HUNG:
5   Q.   Mr. Denison, I'm showing you an
6  email from Daniel4u.kim at Samsung.com to a
7  number of individuals whose names we'll see in
8  Korean dated July 24th, 2007 with the subject
9  line of online buzz report for Apple iPhone.  I
10  wanted to ask you whether you had ever seen
11  this document before.
12  A.   I have not seen this document
13  before.
14  Q.   Do you know whether Samsung
15  representatives attended the January 2007 Mac
16  World conference at which the iPhone was
17  announced?
18  A.   I do not know whether there were
19  Samsung representatives at that Mac World
20  conference.
21  Q.   Do you know whether Samsung was
22  public -- start again.
23        Do you know whether Samsung was
24  aware of the iPhone, the original iPhone,
25  before it was publicly announced?

Highly Confidential Pursuant to Protective Order

Page 74

1      MS. MAROULIS:  Objection, beyond the
2  scope.
3      A.  I'm not aware of any foreknowledge
4  regarding the iPhone.
5  BY MR. HUNG:
6      Q.  What was Samsung's reaction to the
7  announcement of the iPhone, the original
8  iPhone?
9      MS. MAROULIS:  Objection, beyond the
10  scope.
11      A.  I do not -- I do not know what their
12  reaction was.  I was not employed by Samsung at
13  that time.
14  BY MR. HUNG:
15      Q.  Do you know whether Samsung's -- let
16  me start again.
17      Do you know whether Apple's
18  announcement of the original iPhone had any
19  impact on Samsung's business plans with respect
20  to its development of smart phones?
21      MS. MAROULIS:  Objection, beyond the
22  scope.
23      A.  I am not aware.
24  BY MR. HUNG:
25      Q.  Do you know whether -- just want to

Page 75

1  confirm what you know or what you don't know.
2      A.  Sure.
3      Q.  Do you know whether Apple's
4  announcement of the original iPhone had any
5  impact on Samsung's strategy with respect to
6  the Android -- strike that, smart phone market?
7      MS. MAROULIS:  Objection, beyond the
8  scope.
9      A.  I -- I personally have no knowledge
10  of any change in strategy following the iPhone
11  announcement.
12  BY MR. HUNG:
13      Q.  Finally, do you know whether Apple's
14  announcement of the iPhone had any impact on
15  Samsung's product development efforts with
16  respect to smart phones?
17      MS. MAROULIS:  Objection.  I believe
18  it was asked and answered previously.
19      A.  Again, I personally have no
20  knowledge of any change in corporate or
21  portfolio strategy following the announcement
22  of the iPhone.
23  BY MR. HUNG:
24      Q.  Have you held an iPhone, any model
25  of the iPhone?

Page 76

1      A.  Yes, I've held an iPhone.
2      Q.  Have you held the iPhone for work
3  purposes, in the course of your work is what I
4  mean?
5      A.  I have held an iPhone while I was on
6  the job, so to speak.
7      Q.  In the Richardson facility for
8  Samsung?
9      A.  Yes.
10      Q.  What about the iPad?
11      A.  I have held an iPad -- iPad as well
12  as many competitive products while on the job
13  at Samsung.
14      Q.  What about the iPad 2?
15      A.  I have.
16      Q.  Do you know what versions of the
17  iPhone you held?
18      MS. MAROULIS:  Objection, vague.
19      A.  I personally have seen and/or held,
20  I can't delineate which is the case, all
21  versions of the iPhone, that were released in
22  the U.S. market at least.
23  BY MR. HUNG:
24      Q.  Has Samsung ever analyzed an iPhone?
25  Let me take a step back.

Page 77

1      Has Samsung ever analyzed the
2  hardware characteristics of the original
3  iPhone?
4      MS. MAROULIS:  Objection, vague.
5      A.  I think -- I think I would need you
6  to define "analyze" in this case.
7  BY MR. HUNG:
8      Q.  Sure.  Studied it.  By studied it, I
9  mean study it in any sense but with respect to
10  product development.
11      MS. MAROULIS:  Same objection,
12  vague.
13      A.  I cannot confirm any study that was
14  directly tied to development, let's say, of
15  Samsung products.
16  BY MR. HUNG:
17      Q.  So this will be a common issue today
18  where I need to make sure I understand your
19  understanding or lack of understanding.
20      So you don't know whether such
21  studies took place in terms of the iPhone and
22  Samsung product development?
23      MS. MAROULIS:  I believe that
24  misstates testimony.
25      A.  I'm not sure I understand your

Highly Confidential Pursuant to Protective Order

1  question.  Maybe you can rephrase?
2  BY MR. HUNG:
3      Q.   Sure.  Do you know whether or not
4  such studies took place of the iPhone with
5  respect to Samsung product development?
6          MS. MAROULIS:  Objection, vague.
7      A.   With respect to the products at
8  issue, I asked each hardware designer whether
9  they had studied or considered the iPhone or
10 its variants as a normal course or as a course
11 of their actual design, and each designer told
12 me they had not.
13 BY MR. HUNG:
14     Q.   For the Galaxy S on Exhibit 225, how
15 did you arrive at Mr. Minhyouk Lee as the
16 appropriate person to speak with about the
17 hardware design for the Galaxy S?
18     A.   I was not personally involved in
19 identifying the designers of the Galaxy S 4G;
20 however, when participating in a conference
21 call with said designers, I asked them
22 specifically what their roles were or whether
23 they were involved in the design of the Galaxy
24 S 4G, and each confirmed the role -- their role
25 as is written in these meeting notes.

1      Q.   Do you know what it means to be the
2  principal designer of the Galaxy S?
3          MS. MAROULIS:  Objection, assumes
4      facts.
5      A.   I know what Mr. M.Y. Lee told me
6  regarding his role in the design of the Galaxy
7  S, Galaxy S 4G.
8  BY MR. HUNG:
9      Q.   What did he tell you?
10     A.   He told me that he was the head
11 designer of the Galaxy S device, which later
12 became the Galaxy S 4G in this case.
13     Q.   With respect to the Infuse 4G, did
14 Mr. Bo-Ra Kim and Mr. Yunjung Lee both confirm
15 for you that they were the head designers on
16 the Infuse 4G?
17     A.   Yes.
18     Q.   What about on the Tab; did Mr. Not
19 a Jinsoo Kim confirm that he was the principal
20 designer on the Tab 10.1?
21     A.   Yes, he did.
22     Q.   Also that he was the head designer;
23 is that right?
24     A.   As I recall from my conversation
25 with -- with Jinsoo Kim, I don't remember

1  whether he described himself as the principal
2  chief head or otherwise designer, but that he
3  was responsible for the design of the Galaxy
4  Tab 10.1.
5      Q.   What about Mr. Jung Min Yeo; I'll
6  note that Exhibit 225 refers to him as an
7  assistant designer.  Do you know whether there
8  is another individual who worked on the Tab as
9  a principal designer for the Tab seven-inch?
10     A.   So I'm not aware of any other
11 designers that, you know, would be called
12 principal designers of the Galaxy Tab 10.1.
13     Q.   Did Mr. Jung Min Yeo represent to
14 you that he was the head designer for the
15 Galaxy Tab seven-inch?
16     A.   The Galaxy Tab seven-inch was not
17 part of my discussion with those individuals,
18 so that was not asked or offered.
19     Q.   I'll represent to you that the
20 iPhone 3G was announced on June 9th, 2008, and
21 released to the public on July 11th, 2008.  Do
22 you know whether the designers for the Infuse
23 4G were aware of the iPhone 3G when designing
24 the Infuse 4G?
25         MS. MAROULIS:  Objection, asked and

1  answered.
2      A.   So when speaking to the Infuse 4G
3  designers, I asked them whether they
4  specifically considered or studied the iPhone
5  when designing the Infuse 4G, and they said
6  that they had not.
7  BY MR. HUNG:
8      Q.   I'm sorry.  I'm asking about
9  awareness.  Do you know whether they were aware
10 of -- and I'm focusing on a specific iPhone
11 model, the iPhone 3G.  Do you know whether the
12 designers on the Infuse 3 -- 4G were aware of
13 the iPhone 3G when designing the Infuse 4G?
14         MS. MAROULIS:  Objection, asked and
15     answered.
16     A.   I cannot -- I cannot testify as to
17 their awareness of the product, but they
18 confirmed that they did not study or consider
19 the iPhone 4G -- or iPhone 3G, in this case,
20 when designing the Infuse 4G.
21 BY MR. HUNG:
22     Q.   So you don't know one way or the
23 other whether they were aware specifically of
24 the iPhone 3G when designing the Infuse 4G; is
25 that right?

Highly Confidential Pursuant to Protective Order

Page 82

1      MS. MAROULIS:  Objection, asked and
2  answered.
3      A.   What I can tell you is that I
4  specifically asked each designer in this case
5  whether they had a -- pardon me, I need to take
6  a drink.  Whether they had a iPhone device in
7  their possession when designing, had they
8  touched it, felt it, examined it when they
9  designed the device, and they confirmed that
10  they had not.
11  BY MR. HUNG:
12      Q.   What about with respect to the
13  Galaxy S 4G; when you spoke with the Galaxy S
14  designers, did you ask them whether they were
15  aware of the iPhone 3G in designing that
16  product?
17      MS. MAROULIS:  Objection, asked and
18  answered.
19      A.   With respect to the Galaxy S 4G
20  designers, I asked them directly whether they
21  had studied the iPhone, whether they had
22  closely examined it or considered it when
23  designing their device, and whether they had an
24  iPhone in their possession, in their office
25  when they were designing the device, and the

Page 83

1  answer to each of those questions was no.
2  BY MR. HUNG:
3      Q.   Did you ask them whether they had
4  any images of the -- of an iPhone product in
5  their possession when designing the hardware of
6  the Galaxy S 4G?
7      A.   With respect to the Galaxy S 4G, I
8  asked the designers whether they had seen
9  images of an iPhone.  I did not specifically
10  ask them of a particular iPhone version in this
11  case, and the designers confirmed that they had
12  seen pictures of an iPhone over the normal
13  course of their, let's say, interest in the
14  mobile phone market.  It would have been
15  difficult for them to avoid having seen an
16  iPhone.  I did follow up and ask the designers
17  whether they had photos in their office that
18  they referred to when designing the Galaxy S 4G
19  in this case, and they said they did not.
20      Q.   Did you ask them whether they had
21  reviewed photos on the Internet in connection
22  with designing the Galaxy S phone?
23      MS. MAROULIS:  Objection, asked and
24  answered.
25      A.   Again, I asked the designers whether

Page 84

1  they had seen photos of the iPhone.  They
2  confirmed that they had seen photos of an
3  iPhone at that point in time.
4  BY MR. HUNG:
5      Q.   I need to take a step back because I
6  neglected to ask that question for the Infuse
7  4G.
8      Did you ask the designers on the
9  Infuse 4G whether they had seen photos of a
10  model of the iPhone before designing the Infuse
11  4G?
12      A.   I believe that I recall asking the
13  same question of the Infuse 4G designers, and,
14  again, the specific question that was posed, I
15  believe, was had you seen an image of an iPhone
16  at any point during your design process, and in
17  that case, the designers confirmed that they
18  had seen images of an iPhone.
19      Q.   What about with respect to the
20  Galaxy Tab 10.1; did you ask the designers for
21  the Galaxy Tab 10.1 whether they were aware of
22  the iPad 2 when designing the 10.1?
23      A.   I don't believe the question was
24  posed strictly as awareness, but if we rephrase
25  as to whether they had seen images of an iPad

Page 85

1  prior to designing the tablet, frankly
2  speaking, I don't recall whether I asked them
3  that question or -- and if I did, what their
4  answer was.  The timing is much tighter in this
5  case between iPad being released and the
6  Samsung tablet being released.
7      MS. MAROULIS:  IPad 2 in your answer
8  or iPad?
9  BY MR. HUNG:
10      Q.   Actually, it's -- Ms. Maroulis
11  raises a good point.
12      A.   Yes.
13      Q.   My last question was with respect to
14  the iPad 2.
15      A.   I apologize.
16      Q.   Now, let me just ask about -- let me
17  ask about a model of the iPad to remove any
18  ambiguity.
19      Did you ask the designers whether
20  they were -- whether they had seen a model of
21  the iPad in the course of designing the Galaxy
22  Tab 10.1?
23      A.   Yes, I recall -- I believe I recall
24  asking them whether they had ever seen an iPad
25  over the course of the design process.  I don't

Highly Confidential Pursuant to Protective Order

Page 94

1    MR. HUNG:  I just conferred with
2  Ms. Maroulis, and the translator for
3  Samsung is still reviewing the exhibit that
4  we just provided her, so as a result, we're
5  going to take our lunch break now.
6    MS. MAROULIS:  Thank you, counsel.
7    VIDEOGRAPHER:  We're off the record
8  at 11:50 a.m.
9    (Recess held.)
10    VIDEOGRAPHER:  We're back on record
11  at 12:49 p.m.
12    MS. MAROULIS:  Prior to the break,
13  we objected to the translation of the
14  exhibits before the witness, and I think
15  the fastest way to do it is for us to
16  preserve our objections and to submit our
17  own certified translation after the
18  deposition to be appended to the exhibits,
19  but just for the record, I want to point
20  out that there's a number of mistakes in
21  translation, including reference to
22  corporation, which should be subsidiary,
23  business people should be salespeople, and
24  in particular, with respect to the quote
25  that was placed before the witness before

Page 95

1  the break, I want to read into the record
2  what we understand the actual translation
3  to be, which is, it seems they, missing
4  word, are trying to respond to the iPad 2.
5    With that objection, thank you for
6  letting us state it on the record,
7  counselor.  You can proceed.
8    MR. HUNG:  Ms. Maroulis, just so I
9  understand where your edits are, you're
10  referring to corporation as capitalized
11  that appears at 513783 and believe that
12  should be subsidiary; is that correct?
13    MS. MAROULIS:  Correct.
14    MR. HUNG:  And I apologize, what was
15  your third change besides the "at seems"
16  language?
17    MS. MAROULIS:  It seems they are
18  trying to respond to iPad 2.  And do you
19  want me to exhaust them or not, because I
20  don't want to take your time on the
21  questioning.  For example, please take into
22  consideration, it should be this is for
23  your information or purposes like FYI.
24    MR. HUNG:  I'm just looking for the
25  word business people, which what I believe

Page 96

1    your last -- the third edit that you
2    identified on the record, where does
3    business people appear?
4    MS. MAROULIS:  It's in the -- on the
5    first page, confer with the business
6    people.  It should be salespeople.
7  BY MR. HUNG:
8    Q.   Mr. Denison, did you review this
9  document during the break, Exhibit 232?
10    A.   I did not.
11    Q.   As you sit here today, do you have
12  any testimony to offer with respect to what
13  Mr. Benjamin Lee meant by, quote, it seems they
14  are trying to respond to iPad 2 in his March
15  6th, 2011, email and with the translation as
16  modified by your counsel?
17    MS. MAROULIS:  Objection, vague.
18    A.   If I understand the question
19  correctly, I do not know what Benjamin Lee
20  intended by that statement as offered by the
21  translator that we've brought to this meeting.
22  BY MR. HUNG:
23    Q.   And if you look below that email
24  from Mr. Lee, he appears to be forwarding an
25  email from Mr. Byung-Soo Kim; do you see that?

Page 97

1    A.   I do.
2    Q.   And you see that Mr. Byung-Soo Kim
3  is referring to, quote, we are expecting some
4  problems with the schedule in slimming down the
5  thickness of the product to below nine
6  millimeters.
7    Do you see that?
8    A.   I do.
9    Q.   So as you sit here today as
10  Samsung's corporate representative, you do not
11  have any testimony to offer with respect to
12  what Mr. Lee meant when he said it seems they
13  are trying to respond to iPad 2 with respect to
14  whether that statement refers to slimming down
15  the thickness of the product to below nine
16  millimeters; is that correct?
17    MS. MAROULIS:  I'm going to object
18    to the question.  The topic of the Tab
19    design is within the scope, but you cannot
20    expect any witness of a company to
21    interpret somebody else's thoughts as to
22    specific documents, so I'm going to object
23    to the specific meaning of this document as
24    beyond the scope and let the witness
25    proceed.

Highly Confidential Pursuant to Protective Order

Page 98

1    A.   So to answer your question, I cannot
2  link Benjamin Lee's statement myself to the
3  email that he was forwarding, that particular
4  sentence that you highlighted regarding the
5  thinness of the design.
6  BY MR. HUNG:
7    Q.   You agree with me, don't you, that
8  as corrected by your counsel, Mr. Lee's email
9  states, it seems they are trying to respond to
10  iPad 2; is that right?  I read that correctly?
11       MS. MAROULIS:  Objection, vague,
12  beyond the scope.
13    A.   My personal understanding, based on
14  conversations about this translation, is
15  that -- and again, I do not know the Korean
16  language, but my understanding is the actual
17  subject in that sentence is missing, so "they"
18  was offered as a substitute in brackets, so I
19  don't believe that we can even confirm the
20  subject "they" in that sentence.
21  BY MR. HUNG:
22    Q.   So despite having had the
23  opportunity to review Exhibit 232, this email
24  from Mr. Lee, it is your testimony under oath
25  as Samsung's corporate representative that

Page 99

1  Samsung did not take any steps to vary the
2  thickness of the Samsung Galaxy Tab 10.1 in
3  response to the introduction of the iPad 2; is
4  that correct?
5       MS. MAROULIS:  Objection, misstates
6  testimony.
7    A.   So as you provided this document and
8  certainly we reviewed it and provided our own
9  translation, I cannot link the comments that
10  Benjamin Lee made to the -- what you're
11  describing as the response that is outlined in
12  B.S. Kim's email, so I cannot confirm that
13  anything in -- as described in B.S. Kim's email
14  was done directly in response to an
15  announcement by Apple.
16  BY MR. HUNG:
17    Q.   To ask a more general question,
18  despite having read Exhibit 232, is it still
19  your testimony under oath as Samsung's
20  corporate representative that Samsung took no
21  steps to change the thickness of the Galaxy Tab
22  10.1 in response to Apple's introduction of the
23  iPad 2?
24       MS. MAROULIS:  Objection, misstates
25  testimony, mischaracterizes the record.

Page 100

1    A.   I don't understand how that question
2  was different than the previous question.  I
3  apologize.
4  BY MR. HUNG:
5    Q.   I was confirming what Samsung's
6  position is.  Samsung's position remains that
7  it took no steps to alter the thickness of the
8  iPad 2 -- took no steps to alter the thickness
9  of the Galaxy Tab 10.1 in response to the
10  introduction of the iPad 2; is that right?
11    A.   Are we specifically referring to
12  this exhibit when you ask this question?
13    Q.   I'm just confirming your testimony.
14       MS. MAROULIS:  But I think you're
15  changing the question, so I'll -- this is a
16  general question.  So are you asking about
17  the exhibit, or are you asking generally?
18       MR. HUNG:  Let me first ask
19  generally.
20  BY MR. HUNG:
21    Q.   Is it your testimony under oath as
22  the chief strategy officer and Samsung's
23  designated corporate representative that
24  Samsung took no steps to alter the thickness of
25  the Samsung Galaxy Tab 10.1 in response to

Page 101

1  Apple's introduction of the iPad 2?
2    A.   I can confirm that Samsung did
3  change the thickness of the Galaxy Tab 10.1,
4  and that thickness was not finalized until
5  after the Apple iPad 2 announcement.
6    Q.   Can you confirm as Samsung's
7  corporate representative that that change in
8  the thickness of the Samsung Galaxy Tab 10.1
9  was, in fact, in response to Apple's
10  introduction of the iPad 2?
11       MS. MAROULIS:  Objection, vague.
12    A.   Based on discussions with parties
13  involved in the design that we've discussed,
14  there was a general desire to be as thin, if
15  not thinner, than the rest of the competition
16  in the market.  This was a belief and design
17  intent that was started from beginning, and to
18  be specific, prior to the iPad 2 announcement.
19  Again, I can confirm that the actual final
20  design of the Galaxy Tab 10.1 was not completed
21  until after the iPad 2 announcement.
22  BY MR. HUNG:
23    Q.   And the final design of the iPad --
24  of the Samsung Galaxy Tab 10.1, did the
25  announcement of the iPad 2 cause that

Highly Confidential Pursuant to Protective Order

Page 102

1   specification to be reduced in terms of
2   thickness?
3        MS. MAROULIS:  Objection, vague,
4        assumes facts.
5        A.   As I stated, the intent was for our
6   tablet to be the thinnest tablet on the market
7   originally.  As with any competitive
8   announcement, whether it be from any competitor
9   in the market on a tablet, our objective would
10  be to try and be thinner than that tablet.
11  That was always the intent behind the design.
12  BY MR. HUNG:
13       Q.   Did Samsung act on that intent and
14  change, and by change I mean reduce, the
15  thickness of the Samsung Galaxy 10.1 in
16  response to Apple's introduction of the iPad 2?
17       MS. MAROULIS:  Objection, assumes
18       facts.
19       A.   I cannot --
20  BY MR. HUNG:
21       Q.   Sorry, to be clear, just to make
22  sure we're not talking past each other, I
23  understand your testimony about intent.  For
24  this last question I'm not asking about intent.
25  I'm asking about what Samsung did.

Page 103

1        MS. MAROULIS:  Objection, vague.
2        A.   Based on discussions with parties
3   involved in the design of the tablet, I believe
4   that Samsung did know, was aware of all
5   competitive devices in the market that had been
6   announced or being sold at the time that the
7   design was finalized.  Again, the intent and
8   the goal was to be thinner than all devices.
9   BY MR. HUNG:
10       Q.   Between the time of the introduction
11  of the iPad 2 and the time that Samsung
12  finalized the thickness of the Galaxy Tab 10.1,
13  did the thickness change for the Galaxy Tab
14  10.1?
15       MS. MAROULIS:  Objection, vague.
16       A.   I believe, to answer that question,
17  we would have to separate final thickness
18  versus intended or target thickness, so the
19  final thickness was not determined until after
20  the iPad 2 announcement.
21  BY MR. HUNG:
22       Q.   And was the final thickness reduced
23  in response to the iPad 2 announcement?
24       MS. MAROULIS:  Objection, assumes
25       facts.

Page 104

1        A.   Based on conversations with
2   designers involved in said product, Galaxy Tab
3   10.1, the thinness was in the process of being
4   reduced during the same period of time that the
5   iPad 2 was announced; however, the actual final
6   thickness was not determined, not completed,
7   until after the iPad 2 announcement.
8   BY MR. HUNG:
9        Q.   So is it your testimony under oath
10  as Samsung's chief strategy officer that
11  Samsung did not respond to the introduction of
12  the iPad 2 by reducing the thickness of the
13  Samsung Galaxy Tab 10.1?
14       MS. MAROULIS:  Objection, assumes
15       facts, asked and answered.
16       A.   What I'm testifying to is that
17  Samsung considered all competitive tablet
18  products in the market when they finalized the
19  design of the Galaxy Tab 10.1.  It also
20  includes devices that were launched -- were not
21  launched rather, but announced at the same time
22  as Samsung's original Galaxy Tab 10.1 design,
23  which would have been around -- on or around
24  February 17th, so the entire competitive
25  portfolio of products was considered when

Page 105

1   finalizing that design.
2   BY MR. HUNG:
3        Q.   I'm going to try and ask a yes-or-no
4   question.  If you can't answer it, you can just
5   say as much.  If you need additional
6   clarification, I'm happy to provide it.
7        Did Samsung change the thickness of
8   the Galaxy Tab 10.1 in response to the
9   introduction of the iPad?
10       MS. MAROULIS:  Objection, asked and
11       answered, assumes facts.  Some questions
12       are not yes or no to counsel so can't force
13       a witness.
14       A.   So I do not believe it's a yes-or-no
15  question.  Again, the redesign of the tablet
16  was begun before the iPad 2 announcement.
17  BY MR. HUNG:
18       Q.   Again, just to confirm, you cannot
19  answer the question of whether -- start again.
20       To confirm, you do not believe -- as
21  Samsung's chief strategy officer and Samsung's
22  corporate designee, you do not believe that you
23  can answer the question of whether Samsung
24  changed the thickness of the Galaxy Tab 10.1 in
25  response to Apple's introduction of the iPad 2.

Highly Confidential Pursuant to Protective Order

Page 106

1       MS. MAROULIS:  Objection, assumes
2   facts, vague, misstates testimony.
3       A.   I believe that Samsung took into
4   consideration all competitive products that had
5   been launched and announced at the time the
6   design was finalized but that the redesign was
7   begun before the iPad 2 announcement.
8   BY MR. HUNG:
9       Q.   So is the answer yes, you can't
10  answer my question?
11      MS. MAROULIS:  Objection.
12      A.   Yes.
13      MS. MAROULIS:  You're harassing the
14  witness.  Okay?  You're entitled to his
15  response, not to the response you want.
16      MR. HUNG:  I understand that.
17  BY MR. HUNG:
18      Q.   I'm just trying to confirm is that
19  your final answer.
20      A.   I've given you my best answer.
21      Q.   Okay.  And that is your best answer,
22  despite having read Exhibit 232.  Exhibit 232,
23  to be clear, does not change your answer.
24      A.   That's correct.
25      Q.   Okay.  And having read the Omar Kahn

Page 107

1   article in which Mr. Kahn refers to -- I
2   apologize, can I have the article back?
3       A.   Let me see if I can find it here.
4   That one.
5       Q.   And despite having read the March
6   25th, 2011, CNN.com article, which has been
7   marked as Exhibit 405, in which Mr. Kahn refers
8   to going back to the drawing board, in that
9   paragraph, that statement occurs with reference
10  to the iPad 2.  Despite reading Exhibit 405,
11  that does not change your testimony that
12  Samsung did not change the thickness of the
13  Galaxy Tab 10.1 in response to the introduction
14  of the iPad 2; is that right?
15      MS. MAROULIS:  Objection,
16  misleading.
17      A.   I actually believe that his
18  statement, if it's, in fact, an accurate
19  depiction of what he said, confirms what I
20  discussed, which was that the development
21  process was either already underway for the new
22  Galaxy Tab 10.1 and that any announcement by
23  any competitor would have at best merely
24  accelerated the deployment of a more aggressive
25  design.

Page 108

1   BY MR. HUNG:
2       Q.   When you just read that statement,
3   how do you interpret "going back to the drawing
4   board"?
5       MS. MAROULIS:  Objection, beyond the
6   scope.  This is interpreting someone else's
7   thoughts.
8       A.   I do not know what was intended by
9   Mr. Kahn when he made that statement.
10  BY MR. HUNG:
11      Q.   So you just interpreted the article,
12  Mr. Kahn's statement, to support your view that
13  it's consistent with the ongoing product
14  development, but as you sit here today, you
15  can't interpret the first clause that I just
16  read to you with respect to "going back to the
17  drawing board"; is that right?
18      MS. MAROULIS:  Objection, beyond the
19  scope.
20      A.   My personal feeling upon reading it,
21  and again, I caveated my statement with if this
22  is, in fact, an accurate depiction of what
23  Mr. Kahn said, accelerate the development
24  process sounds like a more readily understood
25  statement than back to the drawing board.  I

Page 109

1   don't know what the drawing board is in this
2   case.
3   BY MR. HUNG:
4       Q.   So you don't know how to interpret
5   that phrase "drawing board" in reading the CNN
6   article which I just presented to you?
7       A.   No, I do not.
8       MS. MAROULIS:  Objection, beyond the
9   scope.
10  BY MR. HUNG:
11      Q.   And therefore, the statement with
12  respect to the drawing board doesn't change
13  your testimony that Samsung did not change the
14  thickness of the Samsung Galaxy Tab 10.1 in
15  response to the iPad 2 introduction; is that
16  right?
17      MS. MAROULIS:  Objection, beyond the
18  scope.
19      A.   I believe I've answered that
20  question.
21  BY MR. HUNG:
22      Q.   What is the answer?
23      MS. MAROULIS:  Objection, asked and
24  answered.
25      A.   Is it possible to read back my

Highly Confidential Pursuant to Protective Order

Page 110

1    previous answer to that same question?
2    BY MR. HUNG:
3       Q.   I didn't specifically ask that
4    question with respect to the Kahn article
5    before you.
6       A.   Uh-huh.
7       Q.   So now I'd like to focus and confirm
8    your testimony, having reviewed the Kahn
9    article, the statement referring to the drawing
10   board, despite the statement in Exhibit 405,
11   Kahn Exhibit 405, in the article that refers to
12   going back to the drawing board, and that
13   paragraph also referring to the iPad 2, it is
14   still your sworn testimony under oath as
15   Samsung's corporate representative and
16   Samsung's chief strategy officer that Samsung
17   did not change the thickness of the Galaxy Tab
18   10.1 in response to Apple's introduction of the
19   iPad 2; is that correct?
20          MS. MAROULIS:  Objection, misstates
21   testimony, misleading, asked and answered.
22      A.   With respect to reviewing this
23   document, again, my -- my statement is that
24   Samsung had already begun the redesign of the
25   Galaxy Tab 10.1 at the time that the iPad 2 was

Page 111

1    announced.
2    BY MR. HUNG:
3       Q.   The court reporter is going to hand
4    you what's being marked as Exhibit 233.
5          (Deposition Exhibit 233 marked.)
6    BY MR. HUNG:
7       Q.   First ask you whether you've seen
8    this document before.
9       A.   I need to take a minute to look at
10   it.
11         (Witness reviews document.)
12         MS. MAROULIS:  We're going to lodge
13   objections to this exhibit as well and
14   provide our own certified translation, and
15   there are some apparent translation
16   mistakes that we'll get to, if necessary.
17         MR. HUNG:  Can you please identify
18   them for the record since I do plan on
19   questioning Mr. Denison about this
20   document.
21         MS. MAROULIS:  To start with, the
22   word "too" in too difficult does not appear
23   in the original.  And in that sentence
24   should be "but."
25         MR. HUNG:  I apologize.  Is your --

Page 112

1    are you proposing that the word but precede
2    the phrase "it is realistically"?
3          MS. MAROULIS:  That's the correct
4    translation.
5          MR. HUNG:  Any other revisions?
6          MS. MAROULIS:  At least one more
7    deputy senior -- the title of the person
8    being addressed to is deputy senior
9    manager, not head of division.
10         (Discussion held outside the hearing
11   of the reporter.)
12         MR. HUNG:  I'm only pausing to see
13   whether there are any other revisions that
14   you want to identify, Ms. Maroulis.
15         MS. MAROULIS:  On page 2 of this
16   document, contention is properly translated
17   as to controversies.  And executive
18   director is executive VP.
19         And in the future, I understand that
20   we're under tight deadlines here because
21   this is preliminary junction discovery, but
22   I think the depositions would go smoother
23   if we agree to provide translations ahead
24   of time.
25         MR. HUNG:  And again, I'll note for

Page 113

1    the record we just received this document
2    literally, I believe, within the last 24
3    hours and had this document translated
4    overnight.
5          MS. MAROULIS:  Okay.  Again, reserve
6    the right to vet further objections by
7    submitting a proper certified translation
8    to the court reporter and to you, of
9    course.
10         THE WITNESS:  Can I see the
11   translated?
12         MS. MAROULIS:  Is it okay if I show
13   the witness the --
14         THE WITNESS:  Can we read in the
15   revised suggested sentence of as we did
16   before?
17         MR. HUNG:  I am happy to have you
18   show the comments to Mr. Denison if you
19   would like, doesn't concern me.  I won't
20   claim work product waiver --
21         MS. MAROULIS:  You're not going to
22   claim a waiver of any kind, this is
23   literally just handmade notations.
24         MR. HUNG:  That's fine.
25         MS. MAROULIS:  I'm going to place in

Highly Confidential Pursuant to Protective Order

Page 134

1    A.   I do not know if there are iPhones
2  housed in Samsung corporate, excuse me, offices
3  in Korea.
4  BY MR. HUNG:
5    Q.   What about iPads; do you know
6  whether Samsung Electronics Corporation has
7  iPads housed in Korea to study?
8      MS. MAROULIS:  Same objection.
9    A.   I do not know.
10  BY MR. HUNG:
11    Q.   Just to confirm.  Assuming that
12  Samsung had purchased iPhones to study, you
13  also don't know where they would be physically
14  housed; is that right?
15      MS. MAROULIS:  Objection, misstates
16    testimony.
17    A.   To me, the premise of the question
18  is improper.  For instance, I don't know, so
19  how would I know?
20  BY MR. HUNG:
21    Q.   And the same is true for iPads; you
22  couldn't answer the same question with respect
23  to iPads for the same reason, correct?
24    A.   The question has the same premise.
25      MS. MAROULIS:  Objection, improper

Page 135

1  hypothetical, beyond the scope.
2  BY MR. HUNG:
3    Q.   What steps does Samsung take, if
4  any, to ensure that its employees do not copy
5  Apple's designs in developing its Android smart
6  phones?
7      MS. MAROULIS:  Objection, beyond the
8    scope to the extent it goes beyond products
9    at issue.
10    A.   When conferring with the designers
11  for the products at issue, in all cases I
12  specifically asked them if they had considered
13  or studied or drawn direct comparisons or what
14  have you versus the relevant Apple products,
15  whether it be tablet or smart phone in either
16  case, and in each case the designers said that
17  they had not.
18    Q.   Did you ask them whether they had
19  used -- let's focus first on the Infuse 4G.
20  Did you ask the designers on the Infuse 4G
21  whether they had used any Apple product as
22  inspiration for the design of the Infuse 4G?
23      MS. MAROULIS:  Objection, vague,
24    asked and answered.
25    A.   I specifically asked the engineers

Page 136

1  what their inspiration was for the Infuse 4G.
2  BY MR. HUNG:
3    Q.   And what did they say?
4    A.   The Infuse 4G was intended to be
5  futuristic.  That was the inspiration.  The
6  designers felt like the existing models in the
7  market, including iPhone or other competitive
8  devices, were somewhat staid and generic
9  looking.  They wanted something edgier and more
10  futuristic.
11    Q.   Did you ask the designers on the
12  Samsung Galaxy S whether they had turned to
13  Apple's products for inspiration in designing
14  the Galaxy S?
15      MS. MAROULIS:  Objection, vague,
16    asked and answered.
17    A.   I asked the Galaxy S 4G designers
18  the same question.
19  BY MR. HUNG:
20    Q.   What was their response?
21    A.   Their response was really to create
22  a device that had, in their opinion, the
23  broadest appeal to the general smart phone
24  user.  The intent was to make it extremely
25  comfortable to hold, hence why the curvature

Page 137

1  wood -- treatment was done as it was on the
2  bottom of the device.
3    Q.   Make sure I'm understanding your
4  testimony.  You testified that the response by
5  the Galaxy S 4G designers with respect to what
6  their inspiration was in creating the Galaxy S
7  was to create a device that had, in their
8  opinion, the broadest appeal to the general
9  smart phone user.  By "appeal" there, did you
10  mean that would be attractive to the general
11  smart phone user?
12    A.   I don't recall, when asking the
13  Galaxy S 4G users, if they used the word appeal
14  or if I'm using that word.  That was my
15  understanding or interpretation, just to
16  clarify that the phone would have a broad
17  market appeal.  It would be ergonomically
18  attractive to the largest number of consumers
19  possible.
20      MS. MAROULIS:  I think the witness
21    meant designers in the first sentence of
22    his response.  You said Galaxy users.  I
23    think you meant Galaxy designers.
24    A.   I apologize.  I meant the Galaxy S
25  4G designers, yes.

Highly Confidential Pursuant to Protective Order

Page 138

1   BY MR. HUNG:
2       Q.   And what I'm trying to understand is
3   what you meant by appeal.  What do you mean by
4   appeal?
5           MS. MAROULIS:  Objection, beyond the
6       scope.  You mean in that sentence or
7       generally?
8           MR. HUNG:  In that sentence.
9       A.   So when I say the word appeal, I
10  mean visually appealing, feels appealing in the
11  hand, highly usable, that's what I mean,
12  appeals in all senses.
13  BY MR. HUNG:
14      Q.   I understand that you stated that
15  it's your opinion as Samsung's corporate
16  designee that the designers of the Droid -- of
17  the Galaxy S 4G and also the Infuse 4G did not
18  copy Apple's products in designing those
19  products.  Is that accurate?
20      A.   Yes, that was my testimony.
21      Q.   Okay.  What affirmative steps does
22  Samsung do to ensure that the designers of its
23  Samsung Android smart phones such as the Infuse
24  4G do not use Apple designs for inspiration
25  when creating those products?

Page 139

1           MS. MAROULIS:  Objection, assumes
2       facts, beyond the scope.
3       A.   So I personally cannot, you know,
4   answer as to your question of steps.  So I
5   guess I can't answer your question.
6   BY MR. HUNG:
7       Q.   Okay.  Same question with respect to
8   the Samsung S 4G.  What affirmative steps does
9   Samsung take, if any, to ensure that the
10  designers who worked on the design of that
11  product were not copying Apple products in
12  doing so?
13          MS. MAROULIS:  Objection, assumes
14      facts, beyond the scope.
15      A.   Again, same answer as the previous.
16  BY MR. HUNG:
17      Q.   You can't answer?
18      A.   I can't answer that question.
19      Q.   I trust that you asked the designers
20  of the Samsung Galaxy Tab 10.1 what their
21  inspiration was for that product, did you?
22      A.   Yes, I discussed that.
23      Q.   What was -- how did they respond,
24  what was their answer?
25      A.   In the case of the tablet, the

Page 140

1   inspiration was to make it as ergonomically
2   attractive and as usable as possible.
3       Q.   I want to turn to, next, one of the
4   other topics in the 30(b)(6) notice, which was
5   Samsung's awareness of the patents at issue,
6   and I believe you testified that you prepared
7   for that to offer testimony on that topic,
8   correct?
9       A.   I indicated awareness of the patents
10  at issue.
11      Q.   Does Samsung have a process for
12  monitoring patents to ensure that it is not
13  infringing a utility patent, to your knowledge?
14          MS. MAROULIS:  Objection, beyond the
15      scope.
16      A.   I'm not aware of a process in place
17  to monitor competitive patents in this case.
18  BY MR. HUNG:
19      Q.   Let me expand that slightly to
20  intellectual property generally.  Does Samsung
21  have a process for monitoring intellectual
22  property to insure that Samsung is not
23  infringing such intellectual property by its
24  competitors when designing its Android smart
25  phone products?

Page 141

1           MS. MAROULIS:  Objection, beyond the
2       scope.  The topic is awareness of the
3       patents at issue.
4       A.   I cannot answer as to your question
5   of process.
6   BY MR. HUNG:
7       Q.   Have you reviewed the three patents
8   that are at issue, the three design patents
9   that are at issue in the preliminary injunction
10  papers filed by Apple?
11      A.   I have looked briefly at the
12  documents.  I'm not sure quite what you mean by
13  review, so I'm hesitant to say that I reviewed
14  them.  I've looked at them.
15      Q.   You're not a lawyer, right?
16      A.   I'm not a lawyer.
17      Q.   I'll accept that.  You have seen
18  them, the three design patents that are at
19  issue in the preliminary injunction papers
20  filed by Apple, correct?
21      A.   I have seen two design patents, I
22  believe, and one utility patent.  I'm not sure
23  I remember a third design patent, but I might
24  recognize it if it's presented to me.  I do
25  actually recall the three design patents now

Highly Confidential Pursuant to Protective Order

| | |
|---|---|
| Page 142 | Page 143 |

Page 142

1  so...
2      Q.   Okay.  Do you recall whether the
3  three design patents were discussed during
4  meetings between the parties?  Do you know?
5          MS. MAROULIS:  Objection, vague.
6      A.   Sorry, can you repeat the question?
7  BY MR. HUNG:
8      Q.   Sure.  For the three design
9  patents --
10     A.   Uh-huh.
11     Q.   -- that are at issue in the Apple's
12 preliminary injunction motion papers, and I'll
13 represent to you that both Samsung and Apple
14 have referred to those patents in our papers as
15 the D '677, the D '889, and the D '087 design
16 patents.
17         MS. MAROULIS:  You can just call
18     them design patents.  I don't think he'll
19     remember the number.
20 BY MR. HUNG:
21     Q.   I'll just call them the design
22 patents.  Okay.  Do you know whether those
23 design patents were discussed during the
24 meetings between Apple and Samsung that
25 preceded this lawsuit?

Page 143

1      A.   I believe, to accurately answer that
2  question, I need to refer to notes that cover
3  those meetings, those sequence of meetings.
4          MS. MAROULIS:  Okay.
5  BY MR. HUNG:
6      Q.   If it would be helpful, please do
7  so.
8          MR. HUNG:  Do you have a similar
9      work product issue, or are you going --
10         MS. MAROULIS:  No, this is just to
11     refresh witness on dates so he can have a
12     copy.  I'm handing the witness what's been
13     marked highly confidential, outside counsel
14     eyes only, and that's notes relating to his
15     conversation with fact witnesses about the
16     discussions between Samsung and Apple.
17         MR. HUNG:  I'd like to go ahead
18     actually and mark this as an exhibit,
19     exhibit next, which is 234.
20         (Deposition Exhibit 234 marked.)
21     A.   So this document confirms what I
22 believe I understood from the conversations
23 with people that were familiar with these
24 meetings, and that's that Apple did not present
25 to Samsung any design patents during the

| | |
|---|---|
| Page 144 | Page 145 |

Page 144

1  sequence of discussions between August and
2  November of 2010.
3          (Deposition Exhibit 235 marked.)
4  BY MR. HUNG:
5      Q.   Have you seen Exhibit 235 before,
6  Mr. Denison?
7          MS. MAROULIS:  Okay.  I'm going to
8      object as beyond the scope.
9      A.   I have not seen this before.
10 BY MR. HUNG:
11     Q.   Okay.  I'll represent to you that
12 the fourth line down under references cited,
13 under U.S. patents, you'll see D 504,889; do
14 you see that?
15     A.   I do see that.
16     Q.   And I'll represent to you that that
17 patent is one of the patents that is at issue
18 in the preliminary injunction motion.  Okay?
19 I'll also represent to you from the face of
20 this patent that the assignee is Samsung
21 Electronics Company, Limited; do you see that?
22     A.   Yes, I see that.
23     Q.   As Samsung's designee in terms of
24 the issue of awareness of Apple's patents at
25 issue in the preliminary injunction papers, do

Page 145

1  you have any testimony to offer with respect to
2  whether Samsung had knowledge of the D '889
3  patent as listed in the fourth row of Exhibit
4  235?
5          MS. MAROULIS:  I'm going to object
6      to this as beyond the scope.  This patent
7      is outside the scope and the witness never
8      seen them, and he's not privy to the
9      prosecution of this particular patent which
10     would explain or elucidate any citations
11     thereto, so with that objection, he can
12     proceed.
13         MR. HUNG:  Apologize, Ms. Maroulis.
14     I actually wasn't done with the question.
15         MS. MAROULIS:  I'm sorry, my bad.
16     A.   Maybe we can start over?
17 BY MR. HUNG:
18     Q.   I will state -- I'll restate my
19 question and I am happy to have Ms. Maroulis
20 carry forward the objection.
21         MS. MAROULIS:  I'll just say same
22     objection so we don't have to repeat.
23 BY MR. HUNG:
24     Q.   As Samsung's designee in terms of
25 the issue of awareness of Apple's patent,

Page 338

1    MS. MAROULIS: Consumer surveys,
2 yes.
3    MR. HUNG: Consumer surveys.
4 BY MR. HUNG:
5    Q.   I did want to ask a couple of
6 questions just to see what you know, if any, in
7 case it is determined that your testimony is
8 appropriately within that scope.  I am not
9 going to ask many.
10    Is Samsung aware of any customer
11 confusion as to the source of the products at
12 issue in the preliminary injunction motion?
13    MS. MAROULIS:  Objection, vague,
14 beyond the scope, assumes facts.
15    A.   I'm not personally aware of any
16 study that Samsung has executed to determine or
17 understand the potential for consumer confusion
18 in the market.
19 BY MR. HUNG:
20    Q.   Putting aside any studies, is
21 Samsung aware of any instances in which people
22 have come forward and stated that they are
23 confused by the origin of the Samsung products
24 that are at issue in the PI motion?
25    MS. MAROULIS:  Objection, beyond the

Page 339

1 scope, relevance.
2    A.   I personally am not aware of any
3 awareness within Samsung as to consumer
4 confusion regarding the products at issue.
5    MR. HUNG:  I appreciate your time
6 today, Mr. Denison.  I realize it was a
7 long day, do appreciate that.  As
8 Ms. Maroulis and I have discussed, not
9 subject to Samsung's agreement, but I do
10 want to state Apple's position that we
11 would like to keep the deposition open
12 because, among other things, we've received
13 a number of documents very recently and
14 also we had a number of topics to cover
15 with you today.  We would like to continue
16 to explore some of those areas, but it has
17 been a long day, and we would like to
18 conclude the deposition today while leaving
19 it open.  I defer -- I refer to
20 Ms. Maroulis for her comments.
21    MS. MAROULIS:  Samsung disagrees.
22 We believe this deposition is properly
23 closed.  The witness was questioned for
24 well over seven hours.  We hit every topic
25 for which the witness was proffered, and he

Page 340

1 was thoroughly prepared to respond to all
2 of your questions.  Also note that we
3 offered to stay another hour if there's
4 specific questions that you haven't had a
5 chance to ask on the condition that we will
6 not have to come back, and I understand
7 that you do not wish to proceed that way.
8 So from our perspective, the deposition is
9 done.
10    MR. HUNG:  Appreciate your effort of
11 compromise.  As I indicated off the record,
12 Ms. Kruze and I, unfortunately, have a
13 flight to make.  We have to leave for the
14 flight, but I appreciate the offer, and I
15 guess we'll agree to disagree.
16    MS. MAROULIS:  Thank you,
17 Mr. Denison.  I don't have any questions
18 for you.  We're going to reserve the right
19 to read and sign the transcript and
20 reiterating that we're putting everything
21 under the protective order, outside
22 counsel's eyes only.
23    VIDEOGRAPHER:  We're off the record
24 at 7:32 p.m.
25

Page 341

1 C E R T I F I C A T E
2 STATE OF TEXAS    )
                    )
3 COUNTY OF DALLAS  )
4
5    I, Daniel J. Skur, a Notary Public
6 within and for the State of Texas, do
7 hereby certify:
8    That JUSTIN DENISON, the witness
9 whose deposition is hereinbefore set forth,
10 was duly sworn by me and that such
11 deposition is a true record of the
12 testimony given by such witness.
13    I further certify that I am not
14 related to any of the parties to this
15 action by blood or marriage; and that I am
16 in no way interested in the outcome of this
17 matter.
18    IN WITNESS WHEREOF, I have hereunto
19 set my hand this 21st day of September,
20 2011.
21
22
    _____
23    Daniel J. Skur
    Notary Public, State of Texas.
24    My Commission Expires 7/10/2014
25

Highly Confidential Pursuant to Protective Order

| Page 342 |
|---|

```
1        ERRATA SHEET FOR THE TRANSCRIPT OF:
2   Case Name: APPLE INC.,
              vs.
3        SAMSUNG ELECTRONICS CO., LTD.
         et al.
4   Dep. Date: September 21st, 2011
    Deponent:  JUSTIN DENISON
5
    Reason codes:
6   1. To clarify the record.
    2. To conform to the facts.
7   3. To correct transcription errors.
8        CORRECTIONS:
9   Pg. Ln.  Now Reads      Should Read   Reason
10  ___ ___  _____    _____  _____
11  ___ ___  _____    _____  _____
12  ___ ___  _____    _____  _____
13  ___ ___  _____    _____  _____
14  ___ ___  _____    _____  _____
15  ___ ___  _____    _____  _____
16  ___ ___  _____    _____  _____
17  ___ ___  _____    _____  _____
18  ___ ___  _____    _____  _____
19  ___ ___  _____    _____  _____
20  ___ ___  _____    _____  _____
21  ___ ___  _____    _____  _____
22  ___ ___  _____    _____  _____
23  ___ ___  _____    _____  _____
24  ___ ___  _____    _____  _____
25  ___ ___  _____    _____  _____
```

| Page 343 |
|---|

```
1   ___ ___ ___   _____ _____ ____
2   ___ ___ ___   _____ _____ ____
3   ___ ___ ___   _____ _____ ____
4   ___ ___ ___   _____ _____ ____
5   ___ ___ ___   _____ _____ ____
6   ___ ___ ___   _____ _____ ____
7   ___ ___ ___   _____ _____ ____
8   ___ ___ ___   _____ _____ ____
9   ___ ___ ___   _____ _____ ____
10  ___ ___ ___   _____ _____ ____
11  ___ ___ ___   _____ _____ ____
12  ___ ___ ___   _____ _____ ____
13  ___ ___ ___   _____ _____ ____
14
15
16
17       _____
         JUSTIN DENISON
18
19
20  SUBSCRIBED AND SWORN BEFORE ME
    THIS _____ DAY OF _____, 2011.
21
22
    _____
23  (Notary Public) MY COMMISSION EXPIRES:_____
24
25
```

| Page 344 |
|---|

```
1        -------I N D E X-------
2   WITNESS:   EXAMINATION BY       PAGE:
    JUSTIN DENISON
3     Mr. Hung
4
5
6        *****
7   --------------------EXHIBITS------------------
8   Deposition Exhibits         PAGE/LINE
9   Exhibit 225  List of People and    19/13
                 Responsibilities
10               1 page
11  Exhibit 226  Apple, Inc.'s Notice of   42/9
                 Rule 30(B)(6) Deposition
12               of Samsung Electronics
                 Company Limited Relating
13               to Apple's Motion For on
                 a Preliminary Injunction
14               5 pages
15  Exhibit 227  Document Depicting IPhone   52/4
                 Bates No. SAMNDCA00024785
16               through 00024787
17  Exhibit 228  3/1/2011 Slide Deck   55/25
                 Entitled SEA Galaxy
18               Tab/Player Key Issues
                 Status
19               Bates No. SAMNDCA00500303
                 through 00500305
20
    Exhibit 229  2/14/2011 SEA      59/5
21               Glass/Player Key Issues
                 Status
22               Bates No. SAMNDCA00500320
                 through 000500344
23
    Exhibit 230  Document Entitled Galaxy   66/15
24               Tab Number 1 in Its Class
                 Bates No. SAMNDCA00500352
25               through 00500360
```

| Page 345 |
|---|

```
1        *****
2   --------------------EXHIBITS------------------
3   Deposition Exhibits         PAGE/LINE
4   Exhibit 231  7/24/2007 Kim Email    73/3
                 Regarding on-Line Buzz
5                Report For Apple IPhone
                 Bates No. SAMNDCA00512436
6                through 00512437
7   Exhibit 232  Translated Emails    91/8
                 9 pages
8
9   Exhibit 233  Translated Emails Bates   111/5
                 No.
10               10 pages
11  Exhibit 234  Meetings Between Samsung  143/20
                 and Apple
                 1 page
12
13  Exhibit 235  United States Design   144/3
                 Patent Number D 578,983 S
                 7 pages
14
15  Exhibit 236  11/11/2010 Lutton Email  152/18
                 to Kim Regarding Document
                 Disclosure
16               Bates No. APLNDC000001058
17  Exhibit 237  Slide Deck Entitled   159/4
                 Example Patents Infringed
18               By All Samsung Android
                 Phones
19               Bates No. APLNDC00000445
                 through 00000511
20
21  Exhibit 238  Samsung's Response and  187/5
                 Objections to Apple's
22               Interrogatories to
                 Defendants Relating to
23               Apple's Motion For a
                 Preliminary Injunction
                 (Number 1)
24               7 pages
25
```

Highly Confidential Pursuant to Protective Order

| | Page 346 |
|---|---|
| 1 | ***** |
| 2 | --------------------EXHIBITS------------------ |
| 3 | Deposition Exhibits          PAGE/LINE |
| | Exhibit 239   Slide Deck Entitled       264/9 |
| 4 | Samsung Replenish Release |
| | Date May 8, 2011 |
| 5 | 12 pages |
| 6 | Exhibit 240   Certificate of        290/18 |
| | Translation of |
| 7 | SAMNDCA00507493 through |
| | 00507496 |
| 8 | 1 page |
| 9 | Exhibit 241   H/W Platform 2G,        313/2 |
| | 6/23/2010 |
| 10 | Bates No. SAMNDCA00521924 |
| | through 00521931 |
| 11 | |
| | Exhibit 242   H/W Platform 2G 9/11/2011 330/20 |
| 12 | Bates No. SAMNDCA00521989 |
| | through 00522000 |
| 13 | |
| | Exhibit 243   Spreadsheet Entitled       332/7 |
| 14 | Weekly U.S. Smart Phone |
| | Report |
| 15 | Bates No. SAMNDCA00024783 |
| | through 00024790 |
| 16 | |
| | Exhibit 244   U.S. Market Intelligence   334/4 |
| 17 | (Week 14 |
| | Bates No. SAMNDCA00522403 |
| 18 | through 00522426 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 347 |
|---|---|
| 1 | PREVIOUSLY MARKED EXHIBITS |
| 2 | Exhibit 183   Article, Smart Phone       321/25 |
| | Politics By Nielsen: |
| 3 | Google and Apple |
| | Embroiled in Fight For |
| 4 | Undecideds |
| | Bates No. |
| 5 | APLNDC0000036115 through |
| | 0000036125 |
| 6 | |
| | Exhibit 402   Samsung's Initial        261/3 |
| 7 | Disclosures Pursuant to |
| | Fed Rule of Civil |
| 8 | Procedure 26(a)(1) |
| | 10 pages |
| 9 | |
| | Exhibit 404   2/17/2011 Slides       313/20 |
| 10 | Regarding Galaxy Tab |
| | Bates No. SAMNDCA00501516 |
| 11 | through 00501578 |
| 12 | Exhibit 405   3/25/2011 CNN.Com       88/15 |
| | Article, to Take on |
| 13 | Apple, New Tablets Go |
| | Where iPad Won't |
| 14 | 3 pages |
| 15 | Exhibit 406   Depiction of iPhone 3GS   251/1 |
| | Bates No. SAMNDCA00024754 |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Highly Confidential Attorneys' Eyes Only

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   APPLE, INC., a California     )

     corporation,                  )

 6                                 )

         Plaintiff,                )

 7                                 )

     VS.                           )   NO. 11-cv-01846-LHK

 8                                 )

     SAMSUNG ELECTRONICS CO.,      )

 9   LTD., a Korean business       )

     entity; SAMSUNG ELECTRONICS   )

10   AMERICA, INC., a New York     )

     corporation; SAMSUNG          )

11   TELECOMMUNICATIONS AMERICA,   )

     LLC, a Delaware limited       )

12   liability company,            )

                                   )

13       Defendants.               )

14

15

16

17         ORAL AND VIDEOTAPED DEPOSITION OF

18                  JUSTIN DENISON

19                 JANUARY 25, 2012

20       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

21

22

23

24

25   Job No: 45459
```

Highly Confidential Attorneys' Eyes Only

## Page 10

09:12  1    Q. By whom are you employed, Mr. Denison?
09:12  2    A. Samsung Telecommunications America.
09:12  3    Q. And what is the address of that organization?
09:12  4    A. 1301 East Lookout Drive, Richardson, Texas
09:12  5    75082.
09:12  6    Q. Do you have a title, sir?
09:12  7    A. Chief strategy officer.
09:12  8    Q. Is there a chief executive officer of Samsung
09:12  9    Telecommunications of America?
09:12  10   A. His formal title is president.
09:12  11   Q. President.
09:12  12        And what's his name?
09:13  13   A. Dale Sohn, S-O-H-N.
09:13  14   Q. Is Samsung Telecommunications of America
09:13  15   sometimes referred to by the acronym STA?
09:13  16   A. It is.
09:13  17   Q. And are you comfortable if I use that?
09:13  18   A. Yes.
09:13  19   Q. Okay.  What -- what is the business of STA,
09:13  20   sir?
09:13  21   A. STA is in charge of the sales and marketing
09:13  22   for mobile devices, mobile wireless infrastructure
09:13  23   equipment, and enterprise PBX systems in the United
09:13  24   States.
09:13  25   Q. And can I have the second one -- mobile

## Page 11

09:13  1    devices was the first.  What's the second one?
09:13  2    A. Wireless network infrastructure.
09:13  3    Q. And when you say mobile devices, what do you
09:13  4    mean by that?
09:13  5    A. Mobile -- mobile phones and connected tablets,
09:13  6    meaning WAN, wireless connected tablets.
09:13  7    Q. Are you familiar with the expression wireless
09:14  8    terminals?
09:14  9    A. Yes.
09:14  10   Q. And is wireless terminals the same or
09:14  11   different as mobile devices?
09:14  12   A. It's the same.  I would use them
09:14  13   interchangeably.
09:14  14   Q. What do you mean by wireless network
09:14  15   infrastructure?
09:14  16   A. Specifically, we -- we build and sell radio
09:14  17   access network equipment for 4G and 3G networks for
09:14  18   wireless operators in the US.
09:14  19   Q. And what do you mean by enterprise PBX
09:14  20   systems?
09:14  21   A. Those are in -- in building, office and
09:14  22   personal business exchange systems, so think of it as
09:14  23   your desk phone, you know, in your office setting.
09:14  24   Q. Are -- all of the products that you are
09:15  25   responsible for selling Samsung products?

## Page 12

09:15  1    A. Yes.
09:15  2    Q. Does STA have a board of directors, sir?
09:15  3    A. I believe there is a board of directors that
09:15  4    is constituted of just employees of Samsung.
09:15  5    Q. And when you say Samsung, what do you mean in
09:15  6    that context?
09:15  7    A. I -- I actually do not know the formal
09:15  8    membership of that board of directors.  I do know that
09:15  9    President Dale Sohn and our CFO, Joseph Cheong are
09:15  10   members of the STA board of directors.
09:15  11   Q. You are not, I take it?
09:15  12   A. I am not a member of the board of directors.
09:15  13        Frankly, I don't know if we refer to it as
09:15  14   a board of directors.  I've just heard it referred to
09:15  15   as the STA board, if that makes sense.
09:16  16   Q. Do you know whether STA is a publicly held
09:16  17   corporation?
09:16  18   A. STA is not publicly held, at least in the
09:16  19   United States.
09:16  20   Q. Do you know who owns STA?
09:16  21   A. My understanding is that STA is a company
09:16  22   entity that exists within SEA, or Samsung Electronics
09:16  23   America.
09:16  24   Q. Do you know in what state STA is incorporated?
09:16  25   A. Off the top of my head, no, I don't.

## Page 13

09:16  1    Q. If I ask you questions about reporting
09:16  2    responsibilities, would you understand what I meant by
09:16  3    reporting responsibilities?
09:16  4    A. If you're referring to fiduciary reporting
09:16  5    responsibilities, or maybe you could clarify what you
09:16  6    mean.
09:16  7    Q. Sure.  Within the corporation, is there
09:16  8    someone -- within STA, is there someone to whom you
09:17  9    report directly?
09:17  10   A. I report to President Dale Sohn.
09:17  11   Q. Do you report to anyone else within STA?
09:17  12   A. I do not.
09:17  13   Q. Okay.  Are there people within the
09:17  14   organization who report to you?
09:17  15   A. Yes.
09:17  16   Q. Approximately how many?
09:17  17   A. I have three direct reports.
09:17  18   Q. Who are they?
09:17  19   A. One is named Thomas Chun, one is named Alok
09:17  20   Shah, and one is named Chris Martinez.
09:17  21   Q. Were you involved in hiring any of those three
09:17  22   people?
09:17  23   A. I hired all three of those people.
09:18  24   Q. What is the business of Samsung Electronics of
09:18  25   America?

Highly Confidential Attorneys' Eyes Only

## Page 14

09:18  1       A. Samsung Electronics America, my best
09:18  2   understanding, is in charge of sales and marketing for
09:18  3   televisions, laptop computers, printers, WiFi tablets,
09:18  4   media players, digital cameras.  There may be a couple
09:18  5   of other businesses -- home appliances, front-door
09:18  6   washers and dryers, French-door refrigerators,
09:18  7   et cetera, for the United States.
09:18  8       Q. Are -- are there products for which both STA
09:18  9   and SEA are responsible for sales and marketing?
09:18 10       A. No.
09:19 11       Q. Do you report to anyone at SEA?
09:19 12       A. I do not.
09:19 13       Q. Do you know whether or not SEA is a public
09:19 14   corporation, publicly owned?
09:19 15       A. SEA is not publicly owned in the United
09:19 16   States.
09:19 17       Q. Do you know who owns it?
09:19 18       A. I believe it's owned by Samsung Electronics
09:19 19   Corporation, but, to be honest, I'm not sure.
09:19 20       Q. Is Samsung Electronics Corporation sometimes
09:19 21   referred to as SEC?
09:19 22       A. Yes.
09:19 23       Q. Do you know what the business of Samsung
09:19 24   Electronics Corporation is?
09:19 25       A. Sure.  Samsung Electronics Corporation is

## Page 15

09:19  1   Samsung's global electronics company in charge of
09:19  2   selling of all semiconductor devices, sometimes
09:19  3   referred to as the component business, as well as all
09:19  4   finished goods, or sometimes referred to as set
09:20  5   business inside Samsung.  Similar products to which I
09:20  6   named in terms of what STA and SEA sell, but not
09:20  7   necessarily a comprehensive list of products.
09:20  8       Q. Okay.  Do you know where the home office of
09:20  9   Samsung Electronics Corporation is?
09:20 10       A. It's headquartered in Seoul, Korea.
09:20 11       Q. We'll look at some documents that have been
09:20 12   produced to us in this case from STA, and from time to
09:20 13   time, there is a reference in some of these documents
09:20 14   to HQ or headquarters.
09:20 15       A. Uh-huh.
09:20 16       Q. Do you -- is there an entity to which STA
09:20 17   typically refers as being headquarters?
09:20 18       A. I think it depends on the context of
09:20 19   conversation of the document, but HQ, generally
09:20 20   speaking, refers to people or teams that live and work
09:20 21   in Korea. The exact location or the exact team might
09:21 22   depend on the context.
09:21 23       Q. Okay.  Are -- are there companies in Korea
09:21 24   with whom you interact -- Samsung companies in Korea
09:21 25   with whom you interact other than Samsung Electronics

## Page 16

09:21  1   Corporation?
09:21  2       A. No.
09:21  3       Q. I'm sorry, did you pronounce the president's
09:21  4   name as Sohn?
09:21  5       A. Sohn.
09:21  6       Q. Sohn?
09:21  7       A. S-O-H-N.
09:21  8       Q. Do you -- do you know to whom President Sohn
09:21  9   reports in the Samsung organization?
09:21 10       A. I'm not exactly sure of his direct reporting
09:21 11   structure, so, no, I probably can't definitively answer
09:21 12   that question.
09:21 13       Q. Where is SEA located?
09:21 14       A. SEA is headquartered in Ridgefield Park, New
09:21 15   Jersey.
09:22 16       Q. Do your duties at STA require you from time to
09:22 17   time to travel to SEA?
09:22 18       A. Yes.
09:22 19       Q. And -- and approximately how many times a year
09:22 20   do you go to SEA?
09:22 21       A. I would say perhaps four to six times per
09:22 22   year, something like that.
09:22 23       Q. And -- and for what kind of purposes do you go
09:22 24   to SEA?
09:22 25       A. I have counterparts in SEA in the strategy

## Page 17

09:22  1   area, so we might meet to discuss or share long-term,
09:22  2   you know, company strategy.  Specifically, I will go to
09:22  3   New Jersey perhaps two or three times a year for a
09:22  4   strategy meeting of kind of the leadership inside SEA
09:22  5   and STA.
09:23  6       Q. To your knowledge, does SEA have a chief
09:23  7   strategy officer?
09:23  8       A. I don't believe there's anybody in SEA with
09:23  9   that specific title.
09:23 10       Q. Do your duties at STA require you to travel to
09:23 11   Korea from time to time?
09:23 12       A. I have rarely traveled to Korea.
09:23 13       Q. So -- so the answer to my question is yes or
09:23 14   no?
09:23 15       A. I have traveled exactly once to Korea during
09:23 16   my employment at Samsung.
09:23 17       Q. Okay.  And when was that?
09:23 18       A. That was very close to when I first joined, so
09:23 19   that was back in 2008, maybe the fall of 2008, I
09:23 20   believe.
09:23 21       Q. Okay.  Does STA typically create something in
09:23 22   the nature of an annual strategy for its business?
09:23 23       A. I wouldn't be able to point to one document
09:23 24   that persists as the strategy of STA.
09:24 25       Q. At any given time, is there typically a

Highly Confidential Attorneys' Eyes Only

| | Page 18 |
|---|---|

09:24  1  document which sets out what the -- is the then-current
09:24  2  sort of over -- high-level strategy of the company?
09:24  3      A. I think the best answer to the question I can
09:24  4  give is that at any given time, there's probably a
09:24  5  collection of documents that lay out the strategy of
09:24  6  the company, not necessarily one document or -- yeah,
09:24  7  not necessarily one document that I can point to.
09:24  8      Q. Are you the person who determines from time to
09:24  9  time what -- what the overall strategy of STA is?
09:24  10     A. My role, as I describe it to people inside
09:24  11  STA, is -- is not to own the strategy or dictate the
09:24  12  strategy, but to facilitate the strategy within the
09:24  13  company.
09:24  14     Q. Can you tell me, just sort of in layman's
09:25  15  terms, what is the process by which strategy is
09:25  16  developed at STA?
09:25  17     A. There's a corporate planning process that we
09:25  18  try to adhere to somewhat based on a trimester system.
09:25  19         The first trimester we'll look at
09:25  20  long-term strategy three to five years out.
09:25  21         The second trimester we'll look at annual
09:25  22  strategy for the following year.
09:25  23         And the third trimester is more focused on
09:25  24  implementation, execution, organizational-type
09:25  25  discussions.

| | Page 19 |
|---|---|

09:25  1      Q. Are -- are the -- what -- what word would you
09:25  2  use to describe sort of the conclusions of any one of
09:25  3  those reviews? I mean, are they conclusions? Are they
09:25  4  recommendations? Are they a policy? What -- what's --
09:25  5  what word can I use that will be meaningful to you?
09:25  6      A. I think in any -- in -- in any given strategy
09:26  7  piece that I might be involved in would include
09:26  8  analysis and implications, perhaps recommendations --
09:26  9  but maybe implications is a better word.
09:26  10     Q. Okay. Is the -- is the -- so the end result
09:26  11  of this policy is sort of marching orders to the
09:26  12  organization about what -- what they should be focused
09:26  13  on for a particular time period?
09:26  14     A. I think it results in more themes --
09:26  15     Q. Okay.
09:26  16     A. -- for -- for where we should focus our --
09:26  17  focus our energy or attention.
09:26  18     Q. And when these themes have been developed
09:26  19  within STA, I assume that they are submitted to the --
09:26  20  to President Sohn for his review and approval?
09:26  21     A. Yes.
09:26  22     Q. Are the -- are the -- the strategy themes for
09:26  23  STA typically submitted to -- to any other Samsung
09:27  24  entity for review?
09:27  25     A. We might share our -- a version of any one of

| | Page 20 |
|---|---|

09:27  1  those documents or results with the North America
09:27  2  headquarters entity. If -- if we were to share those
09:27  3  in -- in document form, that would traditionally be the
09:27  4  place.
09:27  5      Q. Okay.
09:27  6      A. There are some live -- live meetings we have
09:27  7  with headquarters executives if and when they come to
09:27  8  visit. That would be the other way that those types of
09:27  9  things would be shared.
09:27  10     Q. The second time you said headquarters, you
09:27  11  meant Korean headquarters, correct?
09:27  12     A. Correct. I apologize, yes.
09:27  13     Q. No, no, that's -- it's your -- I have to learn
09:27  14  your language. That's the best way to do this.
09:27  15         Where is North American headquarters?
09:27  16     A. North American headquarters is colocated with
09:27  17  Samsung Electronics America in Ridgefield Park, New
09:27  18  Jersey.
09:28  19     Q. As you understand the organization, is North
09:28  20  America headquarters an organization separate from SEA?
09:28  21     A. To be sure, I don't know the formal reporting
09:28  22  structure or ownership structure, if you will, but --
09:28  23  but the way that I think about it is that North America
09:28  24  headquarters is an umbrella organization that includes
09:28  25  underneath it SEA, STA, Samsung Canada and Samsung

| | Page 21 |
|---|---|

09:28  1  Mexico.
09:28  2      Q. Okay. Thank you.
09:28  3         Is there a person who is the chief
09:28  4  executive officer or the president of the North
09:28  5  American headquarters?
09:28  6      A. Yes.
09:28  7      Q. And who is that?
09:28  8      A. That's Y.K. Kim. I don't know his full Korean
09:28  9  name.
09:28  10     Q. Is there a person on the staff of the North
09:28  11  American headquarters whose responsibilities are such
09:28  12  that that person is your normal contact in terms of
09:29  13  talking about strategy issues?
09:29  14     A. There is a a -- small team led by an
09:29  15  individual there that I would consider to be a -- a
09:29  16  strategy counterpart.
09:29  17     Q. Okay. And what's the name -- what is the --
09:29  18  the name of that team at North American headquarters?
09:29  19     A. I believe that they're officially known as
09:29  20  strategic marketing within North America headquarters.
09:29  21     Q. And who is the person that's in charge of that
09:29  22  team?
09:29  23     A. His name is David Steel.
09:29  24     Q. Do you know whether Mr. Steel also works for
09:29  25  SEA?

Highly Confidential Attorneys' Eyes Only

| Page 22 | Page 23 |
|---|---|

**Page 22**

09:29  1    A. No, I believe he reports to President Y.K.
09:29  2  Kim --
09:29  3    Q. Got it.
09:29  4    A. -- of North America headquarters.
09:29  5    Q. Does STA, in fact, actually sell telephones to
09:30  6  anyone?
09:30  7    A. So do you mean any person or any corporate
09:30  8  entity?
09:30  9    Q. As largely defined.  Are you the -- are you
09:30  10  the seller in any transaction?
09:30  11    A. Yes, we -- we sell directly to several
09:30  12  carriers in the United States.
09:30  13    Q. I take it STA is not in the manufacturing
09:30  14  business?
09:30  15    A. We do not manufacture any of the devices we
09:30  16  sell.
09:30  17    Q. Do you know from whom STA obtains the phones
09:30  18  that it sells to the carriers?
09:30  19    A. I -- I wouldn't know the exact legal name of
09:30  20  the entity from which we take ownership or title of
09:31  21  goods as they come into the United States.  I -- I
09:31  22  would generally refer to it as SEC.
09:31  23    Q. Are you involved in setting the price at which
09:31  24  STA purchases phones from SEC?
09:31  25    A. I am not involved in that.

**Page 23**

09:31  1    Q. Do you know who is involved in that?
09:31  2    A. I'm not actually sure which -- if I can point
09:31  3  to a person that is involved in that.
09:31  4    Q. Do you know whether or not there is a
09:31  5  negotiation between STA and SEC to set that price?
09:31  6    MR. BRINKMAN:  Objection, foundation.
09:31  7    A. I -- I don't really know.  I'm not personally
09:31  8  aware of the -- of any interaction related to what
09:31  9  you're asking.
09:32  10    Q. Okay.  Other than directly to carriers, does
09:32  11  STA sell phones to any other entity or person?
09:32  12    A. I believe that we sell all of our devices
09:32  13  directly to -- to carriers or to entities on behalf of
09:32  14  carriers such as distributors.
09:32  15    Q. Okay.  Is it -- to your knowledge, is it true
09:32  16  that there are stores -- not -- not carriers, but --
09:32  17  but stores, big box stores, Target, Best Buy, that sell
09:32  18  Samsung mobile devices to the public?
09:32  19    A. I'm sorry, is the question am I aware of that?
09:32  20    Q. Yes.
09:32  21    A. Yes, I am aware of that.
09:32  22    Q. Do you know from whom those stores obtain
09:32  23  their phones?
09:32  24    A. So for phones, again, the best way to answer
09:33  25  it would be that they receive the devices or the goods

| Page 24 | Page 25 |
|---|---|

**Page 24**

09:33  1  directly from the carrier distribution channel.  I
09:33  2  can't point to which distributor or entity exactly
09:33  3  gives it to them, but it would be through the carrier
09:33  4  distribution channel.
09:33  5    Q. Would your answer be different if I was asking
09:33  6  about tablets?
09:33  7    A. So I can only speak to connected tablets,
09:33  8  and -- and my answer would be the same for wireless WAN
09:33  9  connected tablets.
09:33  10    Q. And -- and what do you mean by a connected
09:33  11  tablet?
09:33  12    A. I mean it's a tablet that has a mobile WAN
09:33  13  chip set in it that would connect directly to a
09:33  14  carrier's wireless network.
09:33  15    Q. Okay.  Do you know whether or not stores in
09:33  16  the United States sell Samsung tablets that are other
09:33  17  than what you would call connected tablets?
09:33  18    A. Yes, I'm aware.
09:33  19    Q. Is there a name for these tablets that you
09:33  20  use, other than if -- to distinguish them from
09:33  21  connected tablets?
09:33  22    A. I previously referred to it as a WiFi tablet
09:34  23  or WiFi-only tablet.
09:34  24    Q. Does STA -- is STA responsible for the
09:34  25  marketing and sales of WiFi tablets?

**Page 25**

09:34  1    A. I believe in one case we sold a WiFi tablet to
09:34  2  Sprint, again, to the carrier, but the -- the vast
09:34  3  majority of WiFi tablets are sold by SEA directly.
09:34  4    Q. Are you involved in negotiating the price at
09:34  5  which STA sells products to carriers?
09:34  6    A. No, I'm not.
09:34  7    Q. Is anyone at STA, to your knowledge, involved
09:34  8  in that negotiation?
09:34  9    A. Yes.
09:34  10    Q. And -- and who is the senior person at STA
09:34  11  that's responsible for that?
09:35  12    A. I would say our head of sales, Brian
09:35  13  Rosenberg.
09:35  14    Q. Does STA -- does STA sell any products
09:35  15  directly to the public?
09:35  16    A. Excuse me.  I'm -- I would have to
09:35  17  double-check.  We may sell some accessories directly to
09:35  18  the public through our -- our Web site, but of the
09:35  19  other devices we've discussed, phones and tablets, I do
09:35  20  not believe we transact directly with the public, as it
09:35  21  were.
09:35  22    Q. Is -- is the sale of any products directly to
09:35  23  the public any part of your responsibility?
09:36  24    A. No, it is not.
09:36  25    Q. Is STA involved in any way in advertising the

Highly Confidential Attorneys' Eyes Only

| | | Page 122 |
|---|---|---|
| 13:56 | 1 | Do you see that? |
| 13:56 | 2 | A. I do. |
| 13:56 | 3 | Q. And then it's followed by a section that says, |
| 13:56 | 4 | begin meeting notes? |
| 13:56 | 5 | A. Yes. |
| 13:56 | 6 | Q. And were these notes that you took at the |
| 13:56 | 7 | meeting, sir? |
| 13:56 | 8 | A. I think these notes that I appear to have |
| 13:56 | 9 | published were, in part, likely due to my direct notes, |
| 13:56 | 10 | may have also been based on conversations I had with |
| 13:56 | 11 | people following the meeting. That would be |
| 13:56 | 12 | commonplace. |
| 13:57 | 13 | Q. I can't tell from the context of your e-mail, |
| 13:57 | 14 | so I'll just ask you, do you report to J.K. Shin every |
| 13:57 | 15 | Friday? |
| 13:57 | 16 | A. No, I do not. |
| 13:57 | 17 | Q. So this was a unique report that happened on a |
| 13:57 | 18 | Friday; is that how to read that? |
| 13:57 | 19 | A. I don't even know if unique's the right word, |
| 13:57 | 20 | but -- all I can say is, we don't have a regularly |
| 13:57 | 21 | scheduled report to J.K. Shin. |
| 13:57 | 22 | Q. Okay. Do you know all of the people to whom |
| 13:57 | 23 | you sent this e-mail? |
| 13:58 | 24 | A. I'll say that I know the vast majority of the |
| 13:58 | 25 | people here. There may be a couple of names where I |

| | | Page 123 |
|---|---|---|
| 13:58 | 1 | don't remember who the people are. |
| 13:58 | 2 | Q. Are -- is there anybody on this list who is |
| 13:58 | 3 | not an employee of STA? |
| 13:58 | 4 | A. Certainly there's people listed on this e-mail |
| 13:58 | 5 | who are no longer with the company, so by definition, |
| 13:58 | 6 | they are not with STA. |
| 13:58 | 7 | Q. At the time that you sent out this e-mail, |
| 13:58 | 8 | were you sending it to anyone that was -- that was not |
| 13:58 | 9 | at that time an employee of STA? |
| 13:59 | 10 | A. There are two names that I can't definitively |
| 13:59 | 11 | say whether they're STA employees or not. I just don't |
| 13:59 | 12 | know. Two Korean names. |
| 13:59 | 13 | Q. And which are those? |
| 13:59 | 14 | A. Seunghyun Choi. I don't -- I don't know or |
| 13:59 | 15 | remember exactly who that is. |
| 13:59 | 16 | Q. That's S-E-U-N-G-H-Y-U-N is the first name, |
| 13:59 | 17 | and the last name is C-H-O-I? |
| 13:59 | 18 | A. Yes. |
| 13:59 | 19 | Q. Okay. |
| 13:59 | 20 | A. And then then Sang Boh Yun. |
| 13:59 | 21 | Q. S-A-N-G, next name B-O-H, last name Y-U-N, |
| 13:59 | 22 | correct? |
| 13:59 | 23 | A. That's right. I believe everyone else I can |
| 13:59 | 24 | confirm was an STA employee at the time. |
| 13:59 | 25 | Q. Does this group of addressees constitute some |

| | | Page 124 |
|---|---|---|
| 13:59 | 1 | sort of team, in your mind? |
| 13:59 | 2 | A. No, I would not say that this is a team as |
| 13:59 | 3 | such, a formal team. |
| 14:00 | 4 | Q. Do you know why you addressed them as team? |
| 14:00 | 5 | A. I think that's just a normal -- a normal way |
| 14:00 | 6 | that I address a large group of people. |
| 14:00 | 7 | Q. Was this a face-to-face meeting with Mr. Shin? |
| 14:00 | 8 | A. I don't remember the exact meeting, but it |
| 14:00 | 9 | appears where it says attendees making comments, so |
| 14:00 | 10 | Mr. Shin at least appeared to have represented himself |
| 14:00 | 11 | in some way or form. |
| 14:00 | 12 | Q. And it also says that a presentation was |
| 14:00 | 13 | shown? |
| 14:00 | 14 | A. Right. |
| 14:00 | 15 | Q. Yeah. |
| 14:00 | 16 | A. But by face-to-face, I think you're implying |
| 14:00 | 17 | an in-person meeting. |
| 14:00 | 18 | Q. That's what -- |
| 14:00 | 19 | A. I don't -- I don't remember if this was |
| 14:00 | 20 | in-person or a videoconference or by telephone or what |
| 14:00 | 21 | have you. |
| 14:00 | 22 | Q. Have you -- have you met Mr. Shin in Dallas |
| 14:00 | 23 | previously before today? |
| 14:00 | 24 | A. I have met Mr. Shin in Dallas. I don't know |
| 14:00 | 25 | if we established whether this occurred in Dallas or |

| | | Page 125 |
|---|---|---|
| 14:00 | 1 | not, however. |
| 14:01 | 2 | Q. If you look at the next page, under the notes, |
| 14:01 | 3 | the first entry says, 2011 goals. |
| 14:01 | 4 | Do you see that? |
| 14:01 | 5 | A. I see that. |
| 14:01 | 6 | Q. And if I'm reading this correctly, it shows |
| 14:01 | 7 | Mr. Shin inquiring how many smartphones will RIM and |
| 14:01 | 8 | Apple ship this year. |
| 14:01 | 9 | Do you see that? |
| 14:01 | 10 | A. I see that. |
| 14:01 | 11 | Q. You know, maybe just to be sure, to your |
| 14:01 | 12 | knowledge, does Apple sell a telephone that you would |
| 14:01 | 13 | not consider to be a smartphone? |
| 14:01 | 14 | A. I believe when we record devices as, you know, |
| 14:01 | 15 | being smartphones, let's say, I believe all Apple's |
| 14:01 | 16 | products are currently denoted as smartphones. |
| 14:02 | 17 | Q. Okay. And this shows, again, you and somebody |
| 14:02 | 18 | named Corey Kerstetter responding to that question, |
| 14:02 | 19 | correct? |
| 14:02 | 20 | A. I think that's what that's indicating, yes. |
| 14:02 | 21 | Q. Is Corey a man or a woman? |
| 14:02 | 22 | A. Man. |
| 14:02 | 23 | Q. What position did Mr. Kerstetter hold in |
| 14:02 | 24 | January of 2011? |
| 14:02 | 25 | A. I would describe his position as the head of |

Highly Confidential Attorneys' Eyes Only

| | | Page 126 |
|---|---|---|

4:02 1 what we call business planning.

4:02 2     Q. It's he still employed by STA?

4:02 3     A. He is.

4:02 4     Q. And is he still in that position?

4:02 5     A. Yes.

4:02 6     Q. And this shows the two of you responding that

4:02 7 Apple will ship approximately 22 million smartphones in

4:02 8 the year 2011, correct?

4:02 9     A. That seems to be what we're saying there.

4:03 10     Q. And what was the source -- how were you --how

4:03 11 were you able to project Apple's sales?

4:03 12     A. That's really just a guess.

4:03 13     Q. If you look under marketing -- you know what?

4:03 14 I'm sorry, I'm going to take you back to the first page

4:03 15 and do a little persona dramatis here.

4:03 16     Who is D.J. Lee?

4:03 17     A. D.J. Lee is the -- I believe he's identified

4:03 18 as the head of sales and marketing globally for Samsung

4:03 19 mobile products.

4:03 20     Q. From Samsung Electronics in Korea; is that

4:04 21 correct?

4:04 22     A. Yes.

4:04 23     Q. Who's W.P. Hong?

4:04 24     A. Excuse me. I'm not sure exactly what

4:04 25 Mr. Hong's title is. I believe he's the head of

| | | Page 127 |
|---|---|---|

4:04 1 product strategy.

4:04 2     Q. For mobile products?

4:04 3     A. Yes.

4:04 4     Q. From SEC in Korea?

4:04 5     A. Yes.

4:04 6     Q. I think we talked about Omar Kahn earlier.

4:04 7     A. Yes.

4:04 8     Q. Is Paul Golden still employed by STA?

4:04 9     A. He is not.

4:04 10     Q. And when did he leave?

4:04 11     A. I don't remember exactly when he left.

4:04 12     Q. What was his title at the time that he left?

4:04 13     A. I believe he was acting chief marketing

4:04 14 officer at the time.

4:04 15     Q. So if we go back, then, to page 2 of the

4:04 16 notes, it shows -- in the middle of the marketing

4:04 17 section, it shows Mr. Hung asking, is Galaxy Tab

4:05 18 awareness higher than Galaxy S?

4:05 19     Do you see that?

4:05 20     A. I do.

4:05 21     Q. What does awareness mean in that sentence?

4:05 22     A. I don't remember exactly, but given that the

4:05 23 comment was made in the marketing section, I presume it

4:05 24 has something to do with, I guess, what we generically

4:05 25 refer to as product awareness, which we identified a

| | | Page 128 |
|---|---|---|

4:05 1 metric earlier in terms of unaided awareness of

4:05 2 products.

4:05 3     Q. What does it mean when it says, what is the

4:05 4 global benchmark for awareness?

4:05 5     A. I don't recall what was meant by that

4:05 6 question.

4:05 7     Q. If you look at the next page, page 3, under

4:06 8 tablets, in the first bullet point, it says, Galaxy Tab

4:06 9 was not considered a success this year. It is very

4:06 10 important for STA to find the lessons to be learned and

4:06 11 apply them immediately to improve the situation.

4:06 12     Do you -- do you remember being told by

4:06 13 Samsung people from Korea that Galaxy Tab had not been

4:06 14 a success in 2010?

4:06 15     A. I don't remember that specific comment.

4:06 16     Q. Do you recall participating in any exercise to

4:06 17 find the lessons to be learned?

4:06 18     A. That's a -- the phrase "lessons to be learned"

4:06 19 is very common inside Samsung. Frankly speaking, it

4:06 20 usually just means do better and figure out how you can

4:06 21 do better.

4:06 22     Q. Do you recall being involved in an exercise to

4:06 23 figure out the lessons to be learned from the fact that

4:07 24 Galaxy Tab was not considered a success in 2010?

4:07 25     A. I don't recall a specific exercise that was

| | | Page 129 |
|---|---|---|

4:07 1 spawned from that comment.

4:07 2     MR. McELHINNY: Which one are we going to

4:07 3 do next?

4:07 4     (Off the record.)

4:07 5     MR. McELHINNY: Oh, yea, new binder.

4:07 6     Q. Moving now --

4:07 7     A. Thinner binder.

4:08 8     Q. Binder 2. We're into binder 2.

4:08 9     MR. McELHINNY: I still don't have a 24

4:08 10 anywhere.

4:08 11     MS. KRIPKE: Use this copy.

4:08 12     MR. McELHINNY: Let's just skip this one

4:08 13 right now. Let's go to 26.

4:09 14     MR. McELHINNY: Would you mark that as

4:09 15 next in order, please.

4:09 16     (Exhibit Number 1262 marked.)

4:09 17     THE WITNESS: Thank you.

4:09 18     Q. Sir, you've been handed an e-mail chain. It

4:09 19 runs one, two, three, four -- five pages. The -- the

4:10 20 top e-mail in the chain is from Nicholas DiCarlo to a

4:10 21 group of people, dated Monday, June 27th, 2011. It

4:10 22 runs from Bates pages 10376690 to 10376698.

4:10 23     A. I see that.

4:10 24     Q. Sir, is this a copy of an e-mail that you

4:10 25 received from Mr. DiCarlo on or about June 27, 2011?

Highly Confidential Attorneys' Eyes Only

Page 130

| | | |
|---|---|---|
| 14:10 | 1 | A. First, let me briefly review this. |
| 14:10 | 2 | Q. Sure. |
| 14:11 | 3 | A. Okay. I apologize, your question again? |
| 14:12 | 4 | Q. Actually, I'm going to ask you a slightly |
| 14:12 | 5 | different question. |
| 14:12 | 6 | If you look at the bottom of the first -- |
| 14:12 | 7 | the first page, there is a -- an e-mail from a |
| 14:12 | 8 | gentleman by the name of Brent Yoo to a group of |
| 14:12 | 9 | people, dated Thursday, June 23rd 2011. |
| 14:12 | 10 | A. I see that. |
| 14:12 | 11 | Q. And in -- is the remainder of this document a |
| 14:12 | 12 | copy of an e-mail that you received from Mr. Yoo on |
| 14:12 | 13 | that date? |
| 14:12 | 14 | A. Certainly, as the e-mail appears to be stamped |
| 14:12 | 15 | and has my name on it, I'm sure that I received it. I |
| 14:12 | 16 | don't recall having received it or read it |
| 14:12 | 17 | specifically. |
| 14:12 | 18 | Q. If you look at the next page, it starts at the |
| 14:13 | 19 | beginning with a Brian, slash, Todd, slash, Omar, |
| 14:13 | 20 | slash, Justin Denison. |
| 14:13 | 21 | Do you see that? |
| 14:13 | 22 | A. I see that. |
| 14:13 | 23 | Q. First of all, who -- who is Mr. Brent Yoo? |
| 14:13 | 24 | A. Brent -- and I don't know if I can precisely |
| 14:13 | 25 | define his title, but Brent is, by my description, the |

Page 131

| | | |
|---|---|---|
| 14:13 | 1 | most senior sales dispatcher within STA. |
| 14:13 | 2 | Q. Works on the marketing team? |
| 14:13 | 3 | A. Specifically, he's attached to the sales team. |
| 14:13 | 4 | Q. And who is D.J. Lee? |
| 14:13 | 5 | A. D.J. Lee, I think we established earlier, is |
| 14:13 | 6 | the global head of sales and marketing for Samsung |
| 14:13 | 7 | global. |
| 14:14 | 8 | Q. The e-mail says, as D.J. Lee reinforced the |
| 14:14 | 9 | importance of GS II ... |
| 14:14 | 10 | Do you see that? |
| 14:14 | 11 | A. I do see that. |
| 14:14 | 12 | Q. What does that stand for? |
| 14:14 | 13 | A. GS II typically refers to Galaxy S II. |
| 14:14 | 14 | Q. Okay. Reinforced the importance of Galaxy |
| 14:14 | 15 | S II to STA as well as to Global Samsung in the Tuesday |
| 14:14 | 16 | conference call this week. |
| 14:14 | 17 | And, again, let me ask you, do you have |
| 14:14 | 18 | regular Tuesday conference calls with Mr. Lee? |
| 14:14 | 19 | A. I do not. |
| 14:14 | 20 | Q. It says, through a separate e-mail to Dale -- |
| 14:14 | 21 | that would be Mr. Sohn, the president, correct? |
| 14:14 | 22 | A. Presumably. |
| 14:14 | 23 | Q. -- D.J. is asking STA to come up with a clear |
| 14:14 | 24 | winning strategy in relation with making big impact on |
| 14:14 | 25 | Apple's rise in the US. |

Page 132

| | | |
|---|---|---|
| 14:15 | 1 | Do you see that? |
| 14:15 | 2 | A. I do. |
| 14:15 | 3 | Q. D.J. believes that in order to make a big |
| 14:15 | 4 | impact on Apple in the US, STA needs to make a holistic |
| 14:15 | 5 | strategy around our three Galaxy S II products. |
| 14:15 | 6 | Success of Galaxy S II in the US market is even more |
| 14:15 | 7 | critical concerning Apple iPhone 5 is likely to be |
| 14:15 | 8 | launched. If we fail to succeed in Galaxy S II, STA |
| 14:15 | 9 | and Samsung will be struggling even more by Apple |
| 14:15 | 10 | taking more and more share in the marketplace. |
| 14:15 | 11 | Do you see that? |
| 14:15 | 12 | A. I do. |
| 14:15 | 13 | Q. Do you recall this conference call with |
| 14:15 | 14 | Mr. Lee? |
| 14:15 | 15 | A. No. I'm not even sure I was part of a |
| 14:15 | 16 | conference call with Mr. Lee. |
| 14:15 | 17 | Q. Have you ever seen the e-mail to -- to |
| 14:15 | 18 | Mr. Sohn that's referred to here? |
| 14:15 | 19 | A. No, I -- however, I believe that it's likely |
| 14:16 | 20 | one of the other e-mails that's captured in this |
| 14:16 | 21 | document. |
| 14:16 | 22 | Q. Does Mr. Sohn speak Korean? |
| 14:16 | 23 | A. Yes. |
| 14:16 | 24 | Q. On or about June 23rd, did you -- after |
| 14:16 | 25 | June 23rd, did you participate in any attempt to define |

Page 133

| | | |
|---|---|---|
| 14:16 | 1 | a strategy such as the one that's called for in this |
| 14:16 | 2 | document? |
| 14:16 | 3 | A. I don't specifically recall a project that was |
| 14:16 | 4 | spawned specifically due to this e-mail discussion. |
| 14:16 | 5 | Q. At the bottom of that page 2, it says, as Dale |
| 14:17 | 6 | challenged us many times, we also need to have the |
| 14:17 | 7 | followings in our GS II strategy in addition to the |
| 14:17 | 8 | above D.J. Lee's points. Do we believe GS II is |
| 14:17 | 9 | competitive and wow -- W-O-W -- enough compared to |
| 14:17 | 10 | competing models? |
| 14:17 | 11 | When you got this e-mail, did you |
| 14:17 | 12 | understand what that meant? |
| 14:17 | 13 | A. So I think I established that I don't even |
| 14:17 | 14 | remember receiving this e-mail or reading this e-mail, |
| 14:17 | 15 | so I can't answer your question directly. |
| 14:17 | 16 | Q. Now that you see this e-mail again addressed |
| 14:17 | 17 | to you, and you read that sentence, do you understand |
| 14:17 | 18 | what it means? |
| 14:17 | 19 | A. I can interpret it, what I believe it means. |
| 14:17 | 20 | Q. Okay. And what does -- what does -- what does |
| 14:17 | 21 | wow enough mean? |
| 14:17 | 22 | A. That's just a very generic term that's just |
| 14:17 | 23 | meant to be kind of a synonym with competitive, so it's |
| 14:17 | 24 | not -- |
| 14:17 | 25 | Q. So you think it's redundant; what he was |

Highly Confidential Attorneys' Eyes Only

Page 174

15:26  1   correct?

15:26  2   A. No.  I think what we established is that the

15:26  3   person -- that FMO stands for field marketing

15:26  4   organization, and that there is individual -- an

15:26  5   individual within STA named Abraham Chu, who manages

15:26  6   that organization.

15:26  7   Q. So the FMO who visited the locations

15:26  8   referenced here was an employee of STA?

15:27  9   A. Again, I -- I don't think I was the author of

15:27  10  this slide.  I can only presume that FMO, as referenced

15:27  11  here, means a group of people.  So I think you're

15:27  12  presuming it means a person.

15:27  13  Q. Do you -- do you know what happened to the FMO

15:27  14  report that is pictured here?

15:27  15  A. No, I'm not aware of its current location.

15:27  16  Q. If you look, please, at page 12.

15:27  17  Can you -- can you explain to me the --

15:27  18  the numbers on the left-hand side of this chart?

15:28  19  For the Galaxy S Captivate it shows an

15:28  20  MCPU of $235.  Do you see that?

15:28  21  A. I do.

15:28  22  Q. What does that stand for?

15:28  23  A. MCPU, I think in this case, is meant to

15:28  24  represent the cost basis to Samsung for the Galaxy S

15:28  25  Captivate.

Page 175

15:28  1   Q. And -- and do you know what the difference

15:28  2   between the $179 and the $56 is?

15:28  3   A. 179 -- it's difficult to tell, because this is

15:28  4   a grayscale printout of a color slide, but if I'm

15:28  5   matching it properly, 179 refers to the BOM, or bill of

15:28  6   materials, which generally means literally the cost of

15:28  7   the parts that go into a product, or the Galaxy S

15:29  8   Captivate in this case.

15:29  9   The $56, I believe, is associated with

15:29  10  conversion plus royalty, which effectively is the added

15:29  11  cost, generally accepted terminology, that implies the

15:29  12  added value cost of manufacturing, as well as royalties

15:29  13  that a -- a given manufacturer may have to pay to third

15:29  14  parties in order to sell a device.

15:29  15  Q. I'm sorry, what is M?  I -- I must have missed

15:29  16  it.

15:29  17  Do you know what the acronym MCPU stands

15:29  18  for?

15:29  19  A. I don't remember off the top of my head.

15:29  20  Q. Okay.

15:29  21  A. And -- or actually any of it stands for.

15:29  22  Q. Okay.  And do you know, is the $235 there, is

15:29  23  that a transfer price?  Is that the price that SEA --

15:29  24  that S -- that Samsung Electronics sells to S -- STA?

15:29  25  A. No, I don't believe that's what that

Page 176

15:29  1   represents.

15:29  2   Q. Can you tell me what GM percentage equals 48

15:29  3   stands for?

15:30  4   A. Well, GM in this context means gross margin.

15:30  5   And the percentage obviously means gross margin

15:30  6   percentage.  So that essentially means gross margin

15:30  7   with a dollar sign says that -- our best guess, because

15:30  8   we don't know for sure, within STA, that it costs

15:30  9   Samsung at that time $235 to manufacture -- fully

15:30  10  manufacture a Galaxy S Captivate, and 459 at that time,

15:30  11  which is above that bar chart, likely represented the

15:30  12  wholesale price that we were charging to -- it would

15:30  13  have been AT&T for that particular device.

15:30  14  Q. Uh-huh.

15:30  15  A. And, therefore, simple math tells you that the

15:30  16  gross margin dollars is the difference between those

15:30  17  two, which is 244.  And the percentage calculation,

15:31  18  therefore, suggests or implies a 48 percent gross

15:31  19  margin.

15:31  20  Q. In the conversion in royalty, what -- what is

15:31  21  the royalty?

15:31  22  A. Royalty is -- manufacturers commonly have to

15:31  23  pay each other royalties in order to produce -- produce

15:31  24  a device.  So generally speaking, that's what that

15:31  25  refers to.

Page 177

15:31  1   Q. And do you know what the source of the numbers

15:31  2   for the Apple phone is, the iPhone 4?

15:31  3   A. If you look at the bottom of the chart, it

15:31  4   says, among other things, ASPs per STA account teams

15:31  5   for -- it says, ASP, or average selling price, per STA

15:31  6   account teams for 3Q11, MCPU per iSupply and STA.

15:31  7   So we -- we license or purchase

15:31  8   third-party data from iSupply, who does teardown

15:32  9   analyses of many different products in the market.  And

15:32  10  I believe that we, you know, took that information and

15:32  11  used that here.

15:32  12  Q. Okay.

15:32  13  MR. McELHINNY:  Let's take a break.

15:32  14  THE VIDEOGRAPHER:  The time is 3:31.

15:32  15  We're now going off record.

15:32  16  (Recess 3:31-3:47 p.m.)

15:48  17  (Exhibit Number 1269 marked.)

15:48  18  THE VIDEOGRAPHER:  We're now back on

15:48  19  record at 3:47.

15:48  20  Q. Mr. Denison, you've been handed a two-page

15:48  21  document which has been marked as Exhibit 1269, Bates

15:48  22  numbers 1037655 through 65 -- 56 -- I'm sorry -- Bates

15:48  23  numbers 10376565 through 6567.

15:48  24  A. I see that.

15:48  25  Q. If you look at the second page --

Highly Confidential Attorneys' Eyes Only

| | | Page 178 |
|---|---|---|
| 15:48 | 1 | A. Do you mind if I briefly read through it |
| 15:48 | 2 | all -- |
| 15:49 | 3 | Q. Certainly. Go ahead. |
| 15:49 | 4 | A. -- just to get context? |
| 15:49 | 5 | Q. Yeah. |
| 15:50 | 6 | (Off the record.) |
| 15:50 | 7 | A. Okay. I've looked at it. |
| 15:50 | 8 | Q. Sir, if you look at the second page, there's |
| 15:50 | 9 | an e-mail from Dale Sohn, the president of STA, to a |
| 15:50 | 10 | group of people. You're the first one on the list, |
| 15:50 | 11 | dated September 15th, 2010. Do you see that? |
| 15:50 | 12 | A. I do. |
| 15:50 | 13 | Q. Did you receive this e-mail from President |
| 15:50 | 14 | Sohn on or about September 15th, 2010? |
| 15:50 | 15 | A. I don't remember this specific e-mail, but I |
| 15:50 | 16 | have no doubt that I did, based on what I'm seeing |
| 15:50 | 17 | here. |
| 15:50 | 18 | Q. Okay. So the president writes to you and |
| 15:50 | 19 | says, Justin, STA has initiated the Beat Apple campaign |
| 15:50 | 20 | for the last several years. |
| 15:50 | 21 | Do you see that? |
| 15:50 | 22 | A. I do. |
| 15:50 | 23 | Q. Just so that I'm sure, did you have a Beat HTC |
| 15:50 | 24 | campaign every year, too? |
| 15:51 | 25 | A. So taking a step back, you know, when I first |

| | | Page 179 |
|---|---|---|
| 15:51 | 1 | joined STA, our focus was on beating LG and Motorola. |
| 15:51 | 2 | I don't know if -- if I could point to a -- again, a |
| 15:51 | 3 | particular project or campaign as such -- |
| 15:51 | 4 | Q. Okay. |
| 15:51 | 5 | A. -- for each of those competitors. |
| 15:51 | 6 | Q. So the answer to my question is no? |
| 15:51 | 7 | A. You have to rephrase it so I can give you an |
| 15:51 | 8 | answer. |
| 15:51 | 9 | Q. Did you have every year a Beat HTC campaign? |
| 15:51 | 10 | A. We currently have an initiative or a goal of |
| 15:51 | 11 | growing our share versus HTC. I don't -- I don't think |
| 15:51 | 12 | we specifically refer to it as Beat HTC. |
| 15:51 | 13 | Q. So the answer to my question is no; is that |
| 15:51 | 14 | correct? |
| 15:51 | 15 | A. Taken literally -- |
| 15:51 | 16 | Q. Yes. |
| 15:51 | 17 | A. -- your question -- the answer to your |
| 15:51 | 18 | question is no. |
| 15:51 | 19 | Q. Please -- please take my questions literally. |
| 15:51 | 20 | Thank you. |
| 15:51 | 21 | In the second sentence here, he says, |
| 15:51 | 22 | while we are approaching 40 percent share in the |
| 15:52 | 23 | market, we have to focus more on smartphone and wow |
| 15:52 | 24 | product creation area. |
| 15:52 | 25 | Do you see that? |

| | | Page 180 |
|---|---|---|
| 15:52 | 1 | A. I see that sentence, yes. |
| 15:52 | 2 | Q. As a person to whom this e-mail is addressed, |
| 15:52 | 3 | what did you think the president was talking about when |
| 15:52 | 4 | he said smartphones? |
| 15:52 | 5 | A. Again, if you're asking me to define what a |
| 15:52 | 6 | smartphone is, I can't define what it is versus a |
| 15:52 | 7 | non-smartphone, let's say. |
| 15:52 | 8 | Q. Okay. What -- what did -- what was the |
| 15:52 | 9 | president talking about when he was talking about wow |
| 15:52 | 10 | products? |
| 15:52 | 11 | A. Wow in this context -- this is just a term |
| 15:52 | 12 | that -- that Dale has coined in the past to just be a |
| 15:52 | 13 | synonym for innovative or distinguished. |
| 15:52 | 14 | Q. Sharp, catchy, is that the kind of thing we're |
| 15:53 | 15 | talking about, that has a -- causes a wow reaction to |
| 15:53 | 16 | the consumer; is that what we're talking about? |
| 15:53 | 17 | A. Again, I'll just use the words I just used. |
| 15:53 | 18 | Q. Okay. Innovative? |
| 15:53 | 19 | A. Innovative. |
| 15:53 | 20 | Q. Okay. What is wow experience technology? |
| 15:53 | 21 | A. I'm not sure exactly what he's referring to |
| 15:53 | 22 | when he says that in that sentence. |
| 15:53 | 23 | Q. And he says, in order to do this, we have done |
| 15:53 | 24 | some work so far, such as building up wow product |
| 15:53 | 25 | creation team. |

| | | Page 181 |
|---|---|---|
| 15:53 | 1 | Are you familiar with something that was |
| 15:53 | 2 | called the wow product creation team? |
| 15:53 | 3 | A. I believe I know what he's referring to when |
| 15:53 | 4 | he says that. |
| 15:53 | 5 | Q. And what was he referring to? |
| 15:53 | 6 | A. There is a team that at one point was referred |
| 15:54 | 7 | to as the wow product creation team or the wow team |
| 15:54 | 8 | within STA product planning and management |
| 15:54 | 9 | organization. |
| 15:54 | 10 | Q. Do you know when their -- what their -- what |
| 15:54 | 11 | their mission was? |
| 15:54 | 12 | A. I think the best description is that similar |
| 15:54 | 13 | to product planning -- in fact, they worked directly |
| 15:54 | 14 | with the product planning team at STA to come up with |
| 15:54 | 15 | innovative, you know, product ideas. |
| 15:54 | 16 | Q. He talks about something called the STAM |
| 15:54 | 17 | process, S-T-A-M. Do you see that? |
| 15:54 | 18 | A. I do. |
| 15:54 | 19 | Q. Do you know what that acronym refers to? |
| 15:54 | 20 | A. I think that's actually an incomplete acronym, |
| 15:54 | 21 | but I think I know what he's referring to. |
| 15:54 | 22 | Q. And what is that? |
| 15:55 | 23 | A. As I recall, as I interpret this, it was a |
| 15:55 | 24 | specific process that was established whereby employees |
| 15:55 | 25 | of STA could submit ideas, not necessarily even product |

Highly Confidential Attorneys' Eyes Only

Page 182

15:55  1   ideas, but any idea to improve business or processes or
15:55  2   what have you at STA.
15:55  3      Q.  Okay.  Then he refers to something called the
15:55  4   Eat and Beat Apple campaigns.  Do you see that?
15:55  5      A.  I do.
15:55  6      Q.  Were you familiar with something called the
15:55  7   Eat and Beat Apple campaigns?
15:55  8      A.  Again, we talked about an early reference to,
15:55  9   you know, Beat Apple campaign in the same paragraph,
15:55  10  and we've seen many presentations that have the terms
15:55  11  "Beat Apple" on it, so I'm familiar with that grouping
15:55  12  of words.
15:55  13     Q.  Was there -- was there a campaign that was
15:55  14  called the Eat and Beat Apple campaign?
15:55  15     A.  I don't -- I don't think there was something
15:55  16  called the Eat and Beat Apple campaign.  I don't recall
15:55  17  that specifically.
15:55  18     Q.  It says, I am really concerned what Apple
15:56  19  would launch next time with wow idea.
15:56  20         Do you see that?
15:56  21     A.  I do.
15:56  22     Q.  And, again, do you understand wow to mean
15:56  23  innovative in that context?
15:56  24     A.  It could be.
15:56  25     Q.  Do you know what he meant?

Page 183

15:56  1      A.  I -- again, I tried my best to define wow.
15:56  2   I'm not sure exactly how or why Dale is using it in
15:56  3   this context, but ...
15:56  4      Q.  Okay.  Then he says, I asked the leadership
15:56  5   team to think over this issue.  Justin may need to have
15:56  6   an Apple benchmark report ASAP.  It should include --
15:56  7   and then he's got one, two, three, four, five items.
15:56  8      A.  That's right.
15:56  9      Q.  Did you do the Apple benchmark report that is
15:56  10  referred to there?
15:56  11     A.  I -- I did not create a report in direct
15:56  12  response to this, as I recall.
15:56  13     Q.  Did your team?
15:56  14     A.  No.
15:56  15     Q.  Okay.  If you look at the first page,
15:57  16  continuing along the Internet chain, there's an e-mail
15:57  17  to you from Donna Cerny?
15:57  18     A.  I see that.
15:57  19     Q.  It has no date on it.
15:57  20     A.  Correct.
15:57  21     Q.  And then it's got an e-mail from you to
15:57  22  yourself, if I'm reading this correctly, at two
15:57  23  different addresses?
15:57  24     A.  Yes.
15:57  25     Q.  Can you tell me what's going on in that top

Page 184

15:57  1   e-mail?
15:57  2      A.  The e-mail from me to myself?
15:57  3      Q.  Yes, sir.
15:57  4      A.  I don't remember why I would have sent it to
15:57  5   myself.
15:57  6      Q.  Did you send it to a different address so that
15:57  7   there's a file record of it?
15:57  8      A.  No, I don't -- I don't recall that being the
15:57  9   reason.
15:57  10     Q.  All right.  In Ms. Cerny's, do you see that
15:57  11  she was introducing you -- to you -- introducing you to
15:57  12  an employee named Audra Cooper?
15:57  13        MR. BRINKMAN:  Objection, foundation.
15:57  14     A.  As I read the last sentence of her e-mail, I
15:57  15  see her mentioning someone named Audra Cooper.  I don't
15:58  16  see an introduction as such of me to that person.
15:58  17     Q.  That's my question.  Did -- in response to
15:58  18  this e-mail, did you -- did you talk to Audra Cooper?
15:58  19     A.  I've never spoken to Audra Cooper.
15:58  20        (Off the record.)
15:58  21        (Exhibit Number 1270 marked.)
15:58  22        THE WITNESS:  Thank you.
15:59  23     Q.  Sir, I've handed you a two-page e-mail.  The
15:59  24  most recent one is one from Reza Rahman to a group of
15:59  25  people, including yourself.  It bears the date Friday,

Page 185

15:59  1   December 9th, 2011.  It's Bates number 10374444 through
15:59  2   4447.
15:59  3      A.  I see that.
15:59  4      Q.  Do you recall receiving this e-mail from
15:59  5   Mr. Rahman on or about December 9th, 2011?
15:59  6      A.  I need to review first, please.
16:01  7         Okay.  I've reviewed it.
16:01  8      Q.  All right.  Now, I think previously we talked
16:01  9   about preparing the leadership group to attend strategy
16:01  10  meetings in Korea in December of 2011.  Correct?
16:01  11     A.  Yes, I believe we talked about that.
16:01  12     Q.  Okay.  When this says that these are the key
16:01  13  business objectives from the first quarter 12 STA
16:01  14  business review with headquarters, is -- is that the
16:01  15  same meetings in Korea?
16:01  16     A.  No, I don't believe so.
16:01  17     Q.  Okay.  What did -- what -- if you know, what
16:01  18  is the first quarter 2012 STA business review with
16:01  19  headquarters?
16:01  20     A.  As I -- as I read and understand the e-mail,
16:01  21  this is a summary of a series of meetings that occurred
16:01  22  between our sales and marketing organization and their
16:02  23  mirror organization, sales and marketing organization
16:02  24  at headquarters.  The meeting itself, I believe, would
16:02  25  have occurred at STA.

Highly Confidential Attorneys' Eyes Only

Page 214

17:10   1   similar retail price point, the only example I can
17:10   2   think of would be the Galaxy Tab WiFi edition 10.1
17:10   3   device.
17:10   4           MR. McELHINNY:  Good.  Sir, thank you very
17:10   5   much for your time.  I have no further questions.
17:10   6           THE WITNESS:  Thank you.
17:10   7           MR. BRINKMAN:  Thank you.
17:10   8           THE VIDEOGRAPHER:  The time is 5:10.
17:10   9   We're now going off record.  This is the end of tape 4.
17:11   10          THE REPORTER:  How do you want to handle
17:11   11  the original?
17:11   12          MR. BRINKMAN:  Send it to the contact
17:11   13  person at our firm.
        14          (Deposition concluded at 5:10 p.m.)
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24
        25

Page 215

1   CHANGES AND SIGNATURE
2   WITNESS NAME: JUSTIN DENISON        DATE: 1-25-12
3   PAGE LINE        CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 216

1         I, JUSTIN DENISON, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4         _____
5               JUSTIN DENISON
6
7   THE STATE OF _____
8   COUNTY OF _____
9
10        Before me, _____, on this
11  day personally appeared JUSTIN DENISON, known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed
16  the same for the purposes and consideration therein
17  expressed.
18        Given under my hand and seal of office this
19  _____ day of _____, 2012.
20
21        _____
22        NOTARY PUBLIC IN AND FOR
23        THE STATE OF _____
24  My commission expires: _____
25

Page 217

1         IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF CALIFORNIA
3              SAN JOSE DIVISION
4
5   APPLE, INC., a California  )
    corporation,              )
6                             )
       Plaintiff,             )
7                             )
    VS.                       )  NO. 11-cv-01846-LHK
8                             )
    SAMSUNG ELECTRONICS CO.,  )
9   LTD., a Korean business   )
    entity; SAMSUNG ELECTRONICS )
10  AMERICA, INC., a New York  )
    corporation; SAMSUNG      )
11  TELECOMMUNICATIONS AMERICA, )
    LLC, a Delaware limited    )
12  liability company,        )
                              )
13      Defendants.           )
14
15       REPORTER'S CERTIFICATION
16   ORAL AND VIDEOTAPED DEPOSITION OF JUSTIN DENISON
17            JANUARY 25, 2012
18       I, Therese J. Casterline, Registered Merit
19  Reporter, Certified Realtime Reporter, Certified
20  Shorthand Reporter in and for the State of Texas, do
21  hereby certify that there came before me on the 25th
22  day of January, 2012, at the offices of Regus, located
23  at 4514 Cole Avenue, Suite 600, Dallas, Texas, the
24  following named person, to wit:  JUSTIN DENISON, who
25  was duly sworn to testify the truth, the whole truth,

Highly Confidential Attorneys' Eyes Only

Page 218

1    and nothing but the truth of knowledge touching and
2    concerning the matters in controversy in this cause;
3    and that he was thereupon examined upon his oath and
4    his examination reduced to typewriting under my
5    supervision; that the deposition is a true record of
6    the testimony given by the witness, that review by the
7    witness was requested on the record, and signature of
8    the witness is to be signed before any notary public.
9        I further certify that I am neither attorney
10   nor counsel for nor related to any of the parties to
11   the action in which this deposition is taken, and
12   further that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto, or
14   financially interested in this action.
15       Given under my hand on this the 25th day of
16   January, 2012.
17
18   _____
         Therese J. Casterline, Texas CSR
19       5001, Expiration Date:  12-31-13
         Firm Registration No. 615
20       TSG Reporting - Worldwide
         747 Third Avenue
21       New York, New York  10017
         (877) 702-9580
22
23
24
25