# EXHIBIT 52

# FILED UNDER SEAL

Page 1

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5    APPLE INC., a California
     corporation,

6

                     Plaintiff,

7

     vs.                          CASE NO.  11-cv-01846-LHK

8

     SAMSUNG ELECTRONICS CO.,

9    LTD., a Korean business
     entity; SAMSUNG ELECTRONICS

10   AMERICA,INC., a New York
     corporation; SAMSUNG

11   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited

12   liability company,

13                   Defendants.
     _____/

14

15

16        H I G H L Y    C O N F I D E N T I A L

17

18      VIDEOTAPED DEPOSITION OF AHYOUNG KIM

19          SAN FRANCISCO, CALIFORNIA

20         WEDNESDAY, JANUARY 11, 2012

21

22   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

23   CSR LICENSE NO. 9830

24   JOB NO. 45306

25

Highly Confidential

Page 10

1    Q  Do you ever use your private e-mail accounts   09:25
2  for work-related e-mails?   09:25
3       MR. BASINGER:  Objection; vague and   09:25
4  ambiguous.   09:25
5       THE WITNESS:  First of all, I don't exactly   09:25
6  recall in that regard.  And since it is the company's   09:26
7  policy currently at Samsung that an employee is not to   09:26
8  use his or her private account for work-related e-mail   09:26
9  communications, so, therefore, I don't think I would   09:26
10  have used any -- any of those for work matters.   09:26
11       MR. BEARD:  Q.  Setting aside Samsung's   09:26
12  policy, do you recall ever using a private e-mail   09:26
13  account for a work-related e-mail?   09:26
14       MR. BASINGER:  Same objection.   09:26
15       THE WITNESS:  Not that I can recall.  But   09:26
16  if -- well, not as far as I can recall, no.   09:27
17       MR. BEARD:  Q.  Do you currently own any   09:27
18  Apple products?   09:27
19    A  Yes.   09:27
20    Q  Which ones?   09:27
21    A  iPhone.   09:27
22    Q  Any others?   09:27
23    A  Oh, there may be, other than the iPhone that   09:27
24  I personally possess, by my family members, but the   09:27
25  one that I have personally under my ownership is   09:28

Page 11

1  iPhone.   09:28
2    Q  And is that for your personal use?   09:28
3    A  Yes.   09:28
4    Q  Other than your personal iPhone, do you use   09:28
5  any Apple products in the course of your work?   09:28
6    A  No.   09:28
7    Q  Has Samsung ever given you any Apple products   09:28
8  for any purpose?   09:28
9       MR. BASINGER:  Objection; vague and   09:28
10  ambiguous.   09:28
11       And I'll caution the witness not to reveal   09:28
12  any privileged communications, to the extent you would   09:28
13  need to, to answer the question.   09:28
14       THE WITNESS:  I don't think I have been given   09:28
15  any by the company.   09:29
16       MR. BEARD:  Q.  Who is your current employer?   09:29
17    A  Samsung Electronics.   09:29
18    Q  And where are you -- where is your home base?   09:29
19    A  In Seoul, Korea.   09:29
20    Q  What's your current title?   09:29
21    A  Senior engineer.  We call it senior designer.   09:29
22  It's basically the same title.   09:30
23    Q  In which group do you work?   09:30
24    A  UX design part.   09:30
25    Q  What does UX stand for?   09:30

Page 12

1    A  User Experience.   09:30
2    Q  How long have you worked for Samsung?   09:30
3    A  It's been approximately three years and five   09:30
4  months now, I think.   09:30
5    Q  Did you have a job prior to Samsung?   09:30
6    A  Yes.   09:31
7    Q  For whom did you work prior to Samsung?   09:31
8    A  Immediately prior to Samsung, I had worked   09:31
9  for Motorola.  And prior to that, in terms of full   09:31
10  employment, prior to Motorola, was for a furniture   09:31
11  company in Korea.   09:31
12    Q  How long did you work for Motorola?   09:31
13    A  From 2005 up until I was -- I -- up until I   09:31
14  joined Samsung in 2008.   09:31
15    Q  What position did you hold at Motorola?   09:31
16    A  I don't know in terms of position, but I was   09:32
17  called a UI designer.   09:32
18    Q  What does UI stand for?   09:32
19    A  User Interface.   09:32
20    Q  What types of products did you work on while   09:32
21  at Motorola?   09:32
22       MR. BASINGER:  Objection; assumes facts.   09:32
23       THE WITNESS:  Mobile area.   09:32
24       MR. BEARD:  Q.  What do you mean by "mobile   09:32
25  area"?  What types of products are included within   09:32

Page 13

1  mobile area?   09:32
2    A  I don't think I would be able to remember all   09:33
3  the types, but I worked on -- primarily on cell   09:33
4  phones.   09:33
5    Q  In addition to cell phones, did you work on   09:33
6  computers?   09:33
7    A  When you say "work on computers," what do you   09:33
8  specifically mean by that?   09:33
9    Q  For example, a laptop or a desktop computer.   09:33
10    A  Are you asking me -- let me clarify.   09:34
11       Are you asking me whether I've worked on   09:34
12  anything by way of using a laptop or a desktop, or   09:34
13  work related to those products?   09:34
14    Q  The latter, so -- so developing computers.   09:34
15    A  I've worked on a software-related thing.   09:34
16    Q  Software for what purpose?   09:34
17    A  Things like conveying information that's   09:34
18  within the mobile device to PC, and things like that.   09:34
19    Q  While at Motorola, did you work on any tablet   09:34
20  products?   09:35
21    A  Not that I can recall.   09:35
22    Q  Your current title -- title at Samsung is   09:35
23  senior engineer or senior designer.   09:35
24       Is -- is that the position that you've held   09:35
25  the entire time that you've been at Samsung?   09:35

Highly Confidential

1    A  Yes.                                      09:35
2    Q  Is there an organization chart for your   09:35
3  group, the UX design part group?              09:35
4      MR. BASINGER:  Objection; assumes facts;   09:35
5  vague and ambiguous.                          09:35
6      THE WITNESS:  There is none that I was     09:35
7  personally given.  But I would think that there might  09:36
8  probably be one at the company because there has to be  09:36
9  an organizational structure managed by the company, I  09:36
10  think.                                        09:36
11      MR. BEARD:  Q.  If you were looking for the  09:36
12  organization -- organizational chart for your group,  09:36
13  who within your group would you ask for that?  09:36
14      MR. BASINGER:  Objection; calls for       09:36
15  speculation.                                  09:36
16      THE WITNESS:  Perhaps anything related to the  09:36
17  organization, I would have to ask HR for it.  09:37
18      MR. BEARD:  Q.  Is there a particular person  09:37
19  within the HR department who you would contact?  09:37
20      MR. BASINGER:  Same objection.            09:37
21      THE WITNESS:  I don't know for sure as to  09:37
22  whom I would ask for that because I don't even know  09:37
23  how big the HR group is.  I would believe it is a  09:37
24  rather large organization because Samsung is a very  09:37
25  large company itself.                         09:38

1      MR. BEARD:  Q.  During the time that you've  09:38
2  been at Samsung, what products have you been involved  09:38
3  with designing or engineering?                09:38
4      MR. BASINGER:  Objection; assumes facts;   09:38
5  vague and ambiguous.                          09:38
6      THE WITNESS:  I would think that I would   09:38
7  probably have come across numerous types of products,  09:38
8  too many to remember.  Therefore, I don't think I can  09:38
9  name them all one by one.                     09:39
10      Since I've been involved in working on the  09:39
11  products that have been launched in the marketplace,  09:39
12  so if I am shown or given some type of reference to  09:39
13  refresh my recollection, then I would probably give  09:39
14  that answer to you.                           09:39
15      MR. BEARD:  Q.  Have you worked on cell phone  09:39
16  products while at Samsung?                    09:39
17      MR. BASINGER:  Objection; vague and       09:39
18  ambiguous.                                    09:39
19      THE WITNESS:  First of all, working on    09:39
20  something would mean various things -- could mean  09:40
21  various things, although I don't know how broad the  09:40
22  term "work" that counsel is using in your question.  09:40
23      But since I've been working at the company, I  09:40
24  think I would have worked on something related to the  09:40
25  product.                                      09:40

1      MR. BEARD:  Let me see if I can ask a more  09:40
2  clear question.                               09:41
3    Q  Have you helped engineer or design cell   09:41
4  phones while at Samsung?                      09:41
5      MR. BASINGER:  Objection; compound.        09:41
6      THE WITNESS:  Yes.                         09:41
7      MR. BEARD:  Q.  Have you helped engineer or  09:41
8  design the Galaxy line of Samsung cell phones?  09:41
9      MR. BASINGER:  Same objection.            09:41
10      THE WITNESS:  Yes, but since I have primarily  09:41
11  been involved in the designing side of work, so by the  09:42
12  time that product line was at work, I think I would  09:42
13  have helped designing in that regard.         09:42
14      Yeah, I worked primarily with the designers.  09:42
15      THE INTERPRETER:  Let me start all over.   09:42
16  Strike that.                                  09:42
17      THE WITNESS:  Yes, but since I primarily   09:42
18  worked with the designers, so by the time this  09:42
19  particular product line was worked on, I think I would  09:42
20  have helped designing in that aspect.         09:42
21      MR. BEARD:  Q.  So that I'm clear, your    09:42
22  testimony is that you helped design some of the Galaxy  09:42
23  line of cell phones for Samsung?             09:43
24      MR. BASINGER:  Objection; mischaracterizes  09:43
25  previous testimony.                          09:43

1      THE WITNESS:  Yes, I believe I was in the  09:43
2  position of helping the designers in that regard.  09:43
3      MR. BEARD:  Q.  While at Samsung, have you  09:43
4  worked on any tablet -- sorry -- have you helped  09:43
5  design any tablet products?                   09:43
6    A  Yes.                                      09:43
7    Q  Which tablet products?                    09:43
8    A  First of all, since the names of the      09:44
9  products, as referred to as they're in the market --  09:44
10  by the marketplace and the names that I've referred to  09:44
11  within the company are -- are different, so the names  09:44
12  may not match.                                09:44
13      As far as I remember, there is 7-inch and   09:44
14  10.1-inch products.                           09:44
15    Q  What was the internal name for the 7-inch  09:45
16  tablet?                                       09:45
17    A  P1; right.                               09:45
18    Q  What was the internal name for the 10.1-inch  09:45
19  tablets?                                      09:45
20    A  P4.                                       09:45
21    Q  For the Samsung cell phones that you helped  09:45
22  design, what were some of the -- to the -- to the  09:45
23  extent that you can remember, the internal names for  09:45
24  those products?                               09:45
25      MR. BASINGER:  Objection; mischaracterizes  09:45

Highly Confidential

Page 18

1    previous testimony; and vague and ambiguous.        09:45
2        THE WITNESS:  Those lines were called        09:45
3    Galaxy S.  There could have been multiple.  There was  09:46
4    the project name when there was the suggestion for a  09:46
5    work task.                    09:46
6        THE INTERPRETER:  Oh, strike that.        09:47
7        THE WITNESS:  There was an overall one big  09:47
8    project name for different types of products in some  09:47
9    cases, and in other cases there were separate designs  09:47
10   for individual devices.  So in other words, there have  09:47
11   been multiple different kinds -- kinds of names.    09:47
12       So since there have been multiple --        09:47
13   multiple, I'd like for you, counsel, to clarify to me  09:48
14   as to what you mean, whether you're referring to    09:48
15   project name or individual design.            09:48
16       MR. BEARD:  Q.  Project name.            09:48
17       CHECK INTERPRETER:  Project name.        09:48
18       THE WITNESS:  I'm slightly confused now as to  09:48
19   what the original question was.            09:48
20       So do I just give you any names related to    09:48
21   Galaxy S series?                09:48
22       MR. BEARD:  Q.  Project names for phones that  09:48
23   you helped with.                09:48
24       MR. BASINGER:  And objection; vague and    09:48
25   ambiguous as to "helped with."            09:48

Page 19

1        MR. BEARD:  And please limit your objection  09:49
2    just to the basis without the additional instruction  09:49
3    for the witness about -- for example, having "helped  09:49
4    with" is improper.                09:49
5        MR. BASINGER:  Counsel, I'm just doing    09:49
6    exactly what Apple has been doing.            09:49
7        MR. BEARD:  I'm asking you not to do that    09:49
8    because that's improper in order to -- I'm asking you  09:49
9    to follow the rules here.            09:49
10       MR. BASINGER:  I am following the rules, but  09:49
11   I will continue to follow -- follow the rules.    09:49
12       THE WITNESS:  Well, one of the projects under  09:49
13   which the phones have been launched into U.S. market  09:49
14   under the name of Galaxy, there has been one called  09:50
15   Octopus.                    09:50
16       And there have been other projects, but I    09:50
17   don't know whether any of those have the name of    09:50
18   Galaxy attached to those projects.            09:50
19       There were similar size products -- or    09:50
20   rather, similar tier group products.  Of those, the  09:50
21   one that I can remember at the moment is Celox.  There  09:50
22   has been such designs named Celox.            09:51
23       Again, there have been multiple, so I find it  09:51
24   rather difficult to recollect all of those names at  09:51
25   the moment because I'm rather nervous.        09:51

Page 20

1        MR. BEARD:  Let's see if we can break it down  09:51
2    to smaller parts.                09:51
3        Q  For those phones that you've helped design  09:51
4    that have been launched in the U.S. market, what are  09:51
5    the project names for those phones?            09:51
6        MR. BASINGER:  Objection; assumes facts;    09:51
7    vague and ambiguous.                09:51
8        If we can -- let me just stop right here.  If  09:51
9    it's possible, I'll state my objection after he asks  09:51
10   the question, and then we'll have the interpretation.  09:51
11   I just don't want to speak over you while --    09:51
12       THE INTERPRETER:  Can we do it the other way  09:52
13   around?                    09:52
14       MR. BASINGER:  I prefer not to for the    09:52
15   witness.  But is that -- is that not going to be    09:52
16   possible?                    09:52
17       MR. BEARD:  Well, she -- she will still get  09:52
18   your objection before she answers.            09:52
19       MR. BASINGER:  Right.  I understand that.  It  09:52
20   would be easier for the witness if the objection is  09:52
21   stated in English up front, and then the full thing is  09:52
22   translated all at once.  Is that possible?        09:52
23       THE INTERPRETER:  It is possible, but it's  09:52
24   better if I interpret first because I have to retain  09:52
25   all this.                    09:52

Page 21

1        For the sake of the flow of the        09:52
2    interpretation, it will be better if I render my    09:52
3    translation first.  Then I will let the witness know  09:52
4    there's an objection so she doesn't answer before she  09:52
5    hears the objection.                09:52
6        MR. BASINGER:  Okay.  And -- and is that    09:52
7    okay -- I'm asking the witness.  Is that okay if the  09:52
8    objection is stated in English after the translation  09:52
9    of the question?                09:53
10       THE WITNESS:  Yes.            09:53
11       MR. BASINGER:  Okay.  We'll try that.    09:53
12       THE WITNESS:  Fine.            09:53
13       MR. BASINGER:  So let's --            09:53
14       THE WITNESS:  What was the question, please?  09:53
15       (Whereupon, record read by the Reporter as  09:53
16   follows:                    09:53
17       "Q.  Let's see if we can break it down to    09:51
18       smaller parts.            09:51
19       For those phones that you've helped design  09:51
20       that have been launched in the U.S. market,  09:51
21       what are the project names for those    09:51
22       phones?")                09:51
23       MR. BASINGER:  And my objection is assumes  09:53
24   facts and vague and ambiguous.            09:53
25       THE WITNESS:  Since the -- most of the    09:54

Highly Confidential

---

Page 30

1  MR. BEARD:  Q.  What are CDMA carriers?     10:15
2  A  I thought that term was a term commonly used,     10:15
3  but those are primarily Verizon, Sprint and a little     10:15
4  bit of regional carriers.                              10:15
5  Q  And going back to my prior question about     10:15
6  your job responsibilities, I'm not sure I got an     10:15
7  answer to that.                                         10:15
8  MR. BASINGER:  And counsel, can you -- can     10:15
9  you ask the question again.                            10:15
10  MR. BEARD:  Sure.                                     10:16
11  Q  What are your job responsibilities?               10:16
12  MR. BASINGER:  And objection; vague and          10:16
13  ambiguous; calls for a narrative.                     10:16
14  THE WITNESS:  I thought I answered the         10:16
15  question.  But UX design is what I do, and the models     10:16
16  that I am primarily charged with are for CDMA carriers  10:16
17  in the U.S.                                            10:16
18  MR. BEARD:  Q.  Is it accurate to say that as     10:16
19  part of your UX design responsibilities, that you     10:16
20  prepare models of cell phones?                        10:16
21  MR. BASINGER:  Objection -- objection;          10:17
22  assumes facts; mischaracterizes previous testimony.     10:17
23  THE WITNESS:  I'm not sure if I didn't fully     10:17
24  describe as to my job duties earlier.  I think you     10:17
25  probably didn't understand what I was saying because     10:17

Page 31

1  of the sequence of things that I just said since not     10:18
2  everything with work happens in a sequential manner.     10:18
3  There's one fact out there, that I'm doing     10:18
4  UX-related work, UX design, and that UX job affairs     10:18
5  are related to the model products that mostly the CDMA     10:19
6  carriers in the U.S. are buying.                       10:19
7  MR. BEARD:  Q.  What are the -- the main     10:19
8  tasks that you perform as part of your job     10:19
9  responsibilities?                                      10:19
10  MR. BASINGER:  Objection; foundation; vague     10:19
11  and ambiguous.                                         10:19
12  THE WITNESS:  At the current time, you mean?     10:19
13  MR. BEARD:  Yes.                                      10:19
14  THE WITNESS:  If I was to give you a little     10:19
15  more detail among the UX-related job duties, let's say     10:19
16  there is one particular feature.                       10:20
17  And by the way, "feature" and "function" are     10:20
18  commonly used terms in relation -- in connection with     10:20
19  design work.                                           10:20
20  So in order to implement a certain feature,     10:20
21  supposing there is a final target or objective.  One     10:20
22  has to work towards that final target and objective.     10:20
23  So what we do is that for the end user to     10:21
24  accomplish the final objective -- I'm talking about     10:21
25  the end user using the product -- so easily put, we     10:21

Page 32

1  work on a screen configuration in order to have such a     10:21
2  goal accomplished.                                     10:21
3  There is a role of making wire frames, and     10:21
4  there are people who work on graphic work in     10:21
5  connection with that.                                  10:21
6  So I can tell you the area that I am more     10:22
7  involved in.  Out of those two, it would be the wire     10:22
8  framework, easily put.  And on some occasions I would     10:22
9  personally draw out a flowchart, wire frame-related     10:22
10  flowcharts.                                            10:22
11  Or in other occasions, when I would get     10:22
12  feedbacks from the team members under my group, when     10:22
13  those members provide their input, then I would add     10:23
14  comments to their input or make corrections, or     10:23
15  accomplish the particular configuration layout by way     10:23
16  of having discussions with those people.              10:23
17  And those people who are working on the     10:23
18  graphic side, since they cannot be totally separate     10:23
19  and independent from this side of work, they would     10:23
20  provide their input, and which I would sometimes     10:23
21  comment on.                                            10:23
22  MR. BASINGER:  Counsel, we've been going for     10:23
23  about -- we've been going for over an hour.  I think     10:23
24  this might be a good time for a break.                10:23
25  MR. BEARD:  You've got it.                            10:24

Page 33

1  THE VIDEOGRAPHER:  The time is 10:25 a.m.,     10:24
2  and we are off the record.                             10:24
3  (Recess taken.)                                        10:24
4  THE VIDEOGRAPHER:  The time is 10:46 a.m.,     10:26
5  and we are on the record.                              10:45
6  MR. BEARD:  Before our break, you mentioned     10:45
7  something called wire frames as one of the projects     10:45
8  that you work on.                                      10:45
9  Q  Can you describe what you mean by wire     10:45
10  frames.                                                10:45
11  MR. BASINGER:  Objection; mischaracterizes     10:45
12  previous testimony.                                    10:45
13  CHECK INTERPRETER:  Wire frame is not a name     10:45
14  of a product.                                          10:45
15  THE WITNESS:  Wire frame is not the name of a     10:45
16  product.                                               10:45
17  MR. BEARD:  Q.  I meant it as a task, not a     10:45
18  project name.                                          10:45
19  MR. BASINGER:  I'm sorry.  So what's the     10:45
20  question?                                              10:46
21  MR. BEARD:  What did she mean by wire frame?     10:46
22  THE WITNESS:  At the time of displaying or     10:46
23  expressing a screen by way of -- way of shape or at     10:46
24  the time of expressing some type of info, this -- wire     10:46
25  frame is a structure used as a means of conveying such     10:46

Highly Confidential

Page 34

1    information.  It's information structure.        10:46
2         MR. BEARD:  Q.  Do you actually use wires?    10:46
3    A   No.  I don't know how else to put wire frame    10:47
4    as to what it is.  It's not using wires.        10:47
5    Q   Is it a drawing?                        10:47
6    A   It's similar to a drawing.              10:47
7    Q   Is it electronically rendered?           10:47
8    A   No, it can be done by hand, like, if you're    10:47
9    drawing a picture, or you can use some other tools.    10:47
10   Q   Do you ever use a software modeling tool to    10:47
11   create a wire frame?                       10:48
12        MR. BASINGER:  Objection; vague and        10:48
13   ambiguous.                             10:48
14        THE WITNESS:  What did you say?  A software    10:48
15   what tool?                             10:48
16        MR. BEARD:  Q.  Like a CAD?           10:48
17   A   No, it's not that.                      10:48
18   Q   Do you take pictures of your wire frames?    10:48
19   A   On some occasions when many people work    10:48
20   together, like I said before, in those instances    10:48
21   pictures are taken.                       10:48
22   Q   Do you maintain those pictures?          10:48
23   A   The goal of taking those pictures is not to    10:49
24   maintain them afterwards.  The picture-taking is one    10:49
25   of the means used to -- that is used in the interim to    10:49

Page 35

1    convey one piece of information to another.        10:49
2    Q   Do you convey that information to the other    10:49
3    person via e-mail?                        10:49
4         MR. BASINGER:  Objection; vague and        10:49
5    ambiguous; calls for speculation.            10:49
6         THE WITNESS:  I believe you could do that in    10:49
7    the event it's necessary.                   10:50
8         MR. BEARD:  I'm not asking you if you could.    10:50
9    You've -- you've said that at times you take pictures    10:50
10   of your wire frames.                       10:50
11   Q   My question is:  Do you send those pictures    10:50
12   to others on the team via e-mail?            10:50
13        MR. BASINGER:  Objection; mischaracterizes    10:50
14   previous testimony; asked and answered.          10:50
15        THE WITNESS:  I thought I answered, but --    10:50
16   well, you think that do I always send those pictures    10:51
17   to others?  What I meant to say, that sometimes they    10:51
18   are sent.  That's why I said that could be done in the    10:51
19   event it's necessary.                      10:51
20        MR. BEARD:  Q.  In those instances where you    10:51
21   have, in fact, shared those photos, have you done so    10:51
22   by e-mail?                             10:51
23        MR. BASINGER:  Objection; foundation;        10:51
24   mischaracterizes previous testimony; asked and        10:51
25   answered.                             10:51

Page 36

1         THE WITNESS:  By e-mail?  I don't know how to    10:51
2    put it.  I don't quite understand.  I'm not sure if I    10:52
3    didn't properly answer the question or what.        10:52
4         What is the gist of your question?        10:52
5         MR. BEARD:  Sure.                   10:52
6         THE WITNESS:  The pictures are sent by        10:52
7    e-mail?                               10:52
8         MR. BEARD:  Q.  Let's see if we can -- we'll    10:52
9    try to break it down into two parts.          10:52
10   A   Okay.                             10:52
11   Q   You've testified that you sometimes take    10:52
12   pictures of your wire frames.               10:52
13   A   Yes.                             10:52
14   Q   You've said that sometimes you share those    10:53
15   pictures with other members of the team.        10:53
16   A   Yes.                             10:53
17   Q   How do you share it with the -- how -- how do    10:53
18   you share those pictures with the other team members?    10:53
19   Do you hand them to them?  Send them via e-mail?  Via    10:53
20   interoffice mail?                        10:53
21   A   Sometimes by hand.  In the event of        10:53
22   exchanging such information with the person or persons    10:53
23   in the same office, sometimes those are done by hand,    10:53
24   and sometimes via e-mail, too.              10:54
25   Q   The wire frames that you create, do you    10:54

Page 37

1    maintain those?                         10:54
2    A   Yes.                             10:54
3    Q   Do you have all of them that you prepared    10:54
4    since the time that you joined Samsung?        10:54
5    A   Yes.                             10:54
6         MR. BASINGER:  Objection; vague and        10:54
7    ambiguous.                             10:54
8         And just give me a minute to state my        10:54
9    objection.                             10:54
10        THE WITNESS:  Okay.                  10:54
11        MR. BEARD:  Q.  Have you provided all of the    10:54
12   wire frames that you have to Samsung's counsel for    10:54
13   potential production in this case?            10:54
14   A   I -- I have provided the entire PC, my entire    10:55
15   PC.                                10:55
16   Q   Are the wire frames that you've created        10:55
17   maintained on your personal computer -- I'm sorry --    10:55
18   PC?                                10:55
19   A   Yes.                             10:55
20   Q   Do you have any employees that report to you?    10:55
21   In other words, are you the supervisor to any        10:56
22   employees within your group?               10:56
23   A   I think it will be fair to say that I do.    10:56
24   Q   How many?                         10:56
25        MR. BASINGER:  And just objection; vague as    10:56

Highly Confidential

Page 38

1    to time frame.                          10:56
2         MR. BEARD:  Fair enough.           10:56
3         THE WITNESS:  Right.               10:56
4         MR. BEARD:  Q.  Currently.         10:56
5      A  Currently, there are approximately 12.    10:56
6    They're not officially my subordinate employees.  10:57
7      Q  Over the last three years and five months,   10:57
8    have the number of people that report in to you -- has  10:57
9    that number changed?                    10:57
10     A  Yes.                               10:57
11     Q  And how many employees reported in to you   10:57
12   when you first started at Samsung?       10:57
13        MR. BASINGER:  Objection; assumes facts.    10:57
14        THE WITNESS:  I find it rather difficult to   10:57
15   describe in that regard because, like I said before,   10:58
16   those people do not officially report to me as my   10:58
17   subordinates, and I do not make any approval on those   10:58
18   reporting materials, so I don't know how to describe   10:58
19   that.                                   10:58
20        MR. BEARD:  Q.  Within the UX design group,   10:58
21   who's the group leader?                  10:58
22        MR. BASINGER:  Objection; vague and   10:58
23   ambiguous.                              10:58
24        THE WITNESS:  There are multiple UX groups,   10:58
25   so it would be rather complicated to describe that,   10:59

Page 39

1    because there are also multiple layers.   10:59
2         MR. BEARD:  Q.  Within your group, the group   10:59
3    that you work in, who is the lead -- leader of that   10:59
4    group?                                  10:59
5      A  First of all, when you say "group," I don't   10:59
6    know which organization within the company should be   10:59
7    referred to as a group or groups.         10:59
8      Q  The group that you work for.       10:59
9         MR. BASINGER:  Yeah, I think -- I think the   11:00
10   confusion is --                         11:00
11        THE WITNESS:  There are so many groups,   11:00
12   though.  It's like a big diagram.  There's a bigger   11:00
13   pie and there's smaller pies.  It's like that.  So I   11:00
14   don't know up to what level should be called as a   11:00
15   group here.                             11:00
16        MR. BEARD:  Q.  You testified earlier, when I   11:00
17   asked you what group you work in, that you work in the   11:00
18   UX design part or User Experience group?   11:00
19     A  I don't think I used the term "UX group."  It   11:00
20   is correct that I said I am with the UX design part.   11:00
21        So were you asking me the leader of the part   11:01
22   that I am with?                         11:01
23     Q  Yes.                             11:01
24     A  A VP named Seong Sik Lee.          11:01
25     Q  Please spell that.                11:01

Page 40

1         THE INTERPRETER:  The Interpreter's general   11:01
2    spelling is S-E-O-N-G, S-I-K, L-E-E, phonetic spelling   11:01
3    subject to later verification.          11:01
4         MR. BEARD:  Q.  How many layers of   11:01
5    supervisors are there between you and Mr. Lee?   11:01
6         MR. BASINGER:  Objection; vague and   11:01
7    ambiguous; calls for speculation.        11:01
8         THE WITNESS:  I think I should say there are   11:01
9    two.                                    11:02
10        MR. BEARD:  Q.  Who are they?      11:02
11     A  I'm not sure if I -- I should disclose all   11:02
12   this information.                        11:02
13     Q  On what grounds?                  11:02
14     A  I think I was told by our legal team that   11:02
15   I --                                    11:03
16        MR. BASINGER:  And let me just stop you right   11:03
17   there.  Let's not reveal anything that we've talked   11:03
18   about.  Let's -- let's do this.  Let's --   11:03
19        THE WITNESS:  No, no, no, no, not by the --   11:03
20   not something that was said by the counsel.   11:03
21        MR. BASINGER:  Okay.  Let me -- let me just   11:03
22   stop right here and say that -- let's make sure --   11:03
23   I -- I think we have a stipulation in place.  We'll   11:03
24   make sure that this transcript is designated Highly   11:03
25   Confidential; okay.                      11:03

Page 41

1         And so I'll counsel -- or I'll caution you   11:03
2    not to reveal any privileged information or   11:03
3    communications with counsel.             11:03
4         But to the extent you can ask -- or excuse   11:03
5    me -- to the extent you can answer the question   11:03
6    without revealing any privileged information and to   11:03
7    the extent you know, you can answer the question.   11:03
8         THE WITNESS:  Okay.  Just to make sure, so   11:03
9    I -- I can provide that information?      11:03
10        MR. BASINGER:  You can provide -- you can   11:04
11   answer the question if you know the names, and if it's   11:04
12   not -- it's not information you obtained from   11:04
13   counsel -- from legal counsel.           11:04
14        THE WITNESS:  Okay.  I understand.   11:04
15        MR. BASINGER:  Why don't we -- you want to   11:04
16   ask the question again?                  11:04
17        THE WITNESS:  I was slightly confused.   11:04
18        MR. BEARD:  Q.  Who -- who are the two people   11:04
19   that are supervisors to you between you and Mr. Lee,   11:04
20   the vice president of the part that you belong to?   11:04
21        MR. BASINGER:  And let me just object and say   11:04
22   assumes facts; vague and ambiguous.      11:04
23        But you can answer the question.    11:04
24        THE WITNESS:  It's hard.  Okay.  I'll tell   11:04
25   you the names.  Joon Ho Won, J-O-O-N, H-O, W-O-N, and   11:05

Highly Confidential

Page 62

1   meeting or meetings held with the carrier, those        12:05
2   carriers make comments on occasions. I don't think      12:05
3   those comments are identical to changes.                12:05
4       MR. BEARD: Q. What types of comments were           12:05
5   you receiving from the carriers?                        12:05
6       MR. BASINGER: Vague and ambiguous.                  12:05
7       THE WITNESS: There will be various, many            12:05
8   different kinds.                                         12:05
9       MR. BEARD: Q. Please describe the ones that         12:05
10  you can remember.                                       12:05
11      A  Okay. Well, since this is meeting minutes        12:05
12  that I created, so I would just explain about one item  12:05
13  here.                                                   12:06
14      Q  And you're referring to the May 6, 2010,         12:06
15  e-mail that you wrote; correct?                         12:06
16      A  Yes, that's right.                               12:06
17      If you look at Atlas, there is a "CMF"              12:06
18  under -- under Atlas. The phrase that comes right       12:06
19  after CMF which reads "The mockup CMF that is           12:06
20  presently being used at FLD is preferred," they         12:06
21  preferred that. That's what it means.                   12:06
22      Since this Atlas is a premium device, well,         12:07
23  they commented and made a request that they would like  12:07
24  to see more different types of CMF.                     12:07
25      Q  And CMF stands for colors, materials, finish?    12:07

Page 63

1       A  Yes, that's correct.                             12:07
2       Q  And this May 6, 2010, e-mail is your notes       12:07
3   from -- reflecting a meeting that you had with          12:07
4   Verizon; is that correct?                               12:07
5       A  That's correct.                                  12:07
6       Q  During the time that you held this position      12:08
7   as senior designer within the design strategy part,     12:08
8   was it your practice to take notes at the meetings       12:08
9   that you attended with the U.S. carriers?               12:08
10      MR. BASINGER: Objection; vague and                  12:08
11  ambiguous.                                              12:08
12      THE WITNESS: If you say was it my practice,         12:08
13  well, I would not always prepare the meeting minutes.   12:08
14  However, I have prepared meeting minutes.               12:08
15      MR. BEARD: Q. This May 6th, 2010, e-mail,           12:08
16  this is the meeting minutes; is that correct?           12:09
17      A  This is the meeting minutes that I prepared,     12:09
18  correct.                                                12:09
19      Q  My question is different.                        12:09
20      My question is whether you took notes at the        12:09
21  meetings that you attended with the carriers, not       12:09
22  necessarily whether you presented the meeting minute    12:09
23  notes yourself.                                         12:09
24      A  Have I taken notes at the meeting?               12:09
25      Q  Was it your practice to take notes at the        12:09

Page 64

1   meetings that you attended with the U.S. carriers?      12:09
2       MR. BASINGER: Vague and ambiguous.                  12:09
3       THE WITNESS: I'm slightly confused.                 12:09
4       If you're asking me whether I wrote something       12:10
5   or recorded the items that were discussed at the        12:10
6   meeting, if that's the question, I may have written     12:10
7   some notes down or just put notes on my personal        12:10
8   computer if I remembered some items that were           12:10
9   discussed.                                              12:10
10      I don't know what the difference is between         12:10
11  the note taking versus preparing meeting minutes like   12:11
12  this.                                                   12:11
13      MR. BEARD: Q. You testified that sometimes          12:11
14  you prepare meeting minutes; correct?                   12:11
15      A  I'm a little confused here because -- maybe      12:11
16  this is the expression difference with English and      12:11
17  Korean.                                                 12:11
18      When you say "prepare meeting minutes,"             12:11
19  that's the meeting outcome; right? This is something    12:11
20  that you are creating in advance, and this is an        12:11
21  outcome.                                                12:12
22      I regard this as a note that I took, note           12:12
23  taking. Is that the same thing or different?            12:12
24      I think -- I think that those are the same.         12:12
25      Q  So we are now referring to the May 6, 2010,      12:12

Page 65

1   e-mail that you wrote. You described these as notes     12:12
2   that you prepared after a meeting with Verizon;         12:12
3   correct?                                                12:12
4       A  Yes.                                             12:12
5       Q  Did you prepare and circulate notes such as     12:12
6   this May 6th, 2010, e-mail each and every time that     12:12
7   you attended a carrier meeting?                         12:12
8       A  Not every time.                                  12:13
9       Q  In those instances where you did not prepare    12:13
10  the notes after the meeting, did someone else from the  12:13
11  design and strategy part prepare and circulate those    12:13
12  notes?                                                  12:13
13      MR. BASINGER: Objection to the extent this         12:13
14  calls for speculation.                                  12:13
15      THE WITNESS: That may or may not have been         12:13
16  the case.                                               12:13
17      MR. BEARD: Q. In those instances where you         12:13
18  did attend a carrier meeting but did not circulate      12:13
19  notes similar to the May 6, 2010, e-mail that we're     12:13
20  looking at, did you nevertheless take notes for         12:13
21  yourself at that meeting?                               12:13
22      A  It depends. Sometimes I would; right.            12:14
23      Q  Prior to preparing the post-meeting notes,      12:14
24  such as this May 6, 2010, e-mail, the notes that you    12:14
25  took for the meeting, were they on your computer?       12:14

Highly Confidential

Page 66

1   Were they handwritten notes?  What -- what form did   12:14
2   they take?                                           12:14
3        MR. BASINGER:  I'm going to object.             12:15
4   Objection; assumes facts; objection to the extent it  12:15
5   mischaracterizes your previous testimony.            12:15
6        THE WITNESS:  So the question is, in the        12:15
7   event that I write something as a record or notes, I  12:15
8   could -- I think both are possible, computer and     12:15
9   handwriting.                                         12:15
10       I'm not saying that those two means are         12:16
11  always used.  There are occasions where I don't write  12:16
12  any notes and just remember what's being discussed by  12:16
13  heart.                                               12:16
14       MR. BEARD:  Q.  We've already talked about      12:16
15  UX.  UX means User Experience; correct?             12:16
16    A   Yes.                                           12:16
17    Q   And ID refers to industrial design; correct?   12:16
18    A   Correct.                                       12:16
19    Q   CMF refers to colors, material, finish;        12:16
20  correct?                                             12:16
21       MR. BASINGER:  I'm just going to object to      12:16
22  this to the extent this is asking for information    12:16
23  that's contained in the document.  The document speaks  12:16
24  for itself.                                          12:16
25       THE WITNESS:  Yes.                              12:16

Page 67

1        MR. BEARD:  Okay.                               12:17
2        (Document marked Exhibit 1192                   12:17
3        for identification.)                            12:17
4        MR. BEARD:  You have in front of you what's     12:17
5   been marked as Plaintiff's Deposition Exhibit 1192.   12:17
6   This is a May 3rd, 2010, e-mail from you to various   12:17
7   people.  The title is:                               12:17
8        "Share for the design report result of the     12:17
9   project department, Verizon project manager."        12:17
10    Q   Would you take a moment and review this, and   12:17
11  let me know when you have.                           12:18
12    A   I've looked at it.                             12:19
13    Q   Do you recognize this e-mail?                  12:19
14    A   Yes, I do.                                     12:19
15    Q   And you were the author of this e-mail;        12:19
16  correct?                                             12:19
17    A   Yes.                                           12:19
18    Q   What was the purpose of preparing this         12:19
19  e-mail?                                              12:19
20       MR. BASINGER:  Objection; vague and            12:19
21  ambiguous.                                           12:19
22       THE WITNESS:  Just as what's reflected in      12:19
23  this document.  This was to report the designs to the  12:19
24  head of the business department, business unit, CEO of  12:20
25  the unit.                                            12:20

Page 68

1        And this e-mail is the meeting minutes          12:20
2   reflecting the CEO's comments, shared with relevant   12:20
3   departments.                                         12:20
4        MR. BEARD:  Q.  Who was the CEO?                12:20
5     A   Jong Kyun Shin, who is the current president.   12:20
6   I don't know of his exact title, whether it's vice    12:21
7   president, executive vice president or the president.  12:21
8   His name is Jong Kyun Shin.  Spelling is J-O-N-G --   12:21
9     Q   At the time that you wrote this e-mail in      12:21
10  March of 2010, Mr. Shin was at that time the CEO of   12:21
11  the -- of the business unit; correct?               12:21
12    A   Yes.                                           12:21
13    Q   I apologize.  "May" for the e-mail.            12:21
14       How often did you meet with Mr. Shin during    12:21
15  the time that you were the senior designer within the  12:21
16  design strategy part?                                12:21
17       MR. BASINGER:  Objection; assumes facts;       12:21
18  vague and ambiguous.                                 12:22
19       THE WITNESS:  Well, I can't say how often I    12:22
20  met with him because there was not a set frequency of  12:22
21  meetings that I had with him.                        12:22
22       According to my recollection, at times where   12:22
23  there was U.S. market-related models involved, or when  12:22
24  he requested I make reports to him, or at times I     12:23
25  would also attend meetings prior to the meetings held  12:23

Page 69

1   with the carriers, but not always.                   12:23
2        I would not make reports to him.  I would       12:23
3   just attend those meetings.                          12:23
4        MR. BEARD:  Q.  During the time that you were   12:23
5   a senior designer within the design strategy part,   12:23
6   what's your best estimate of the number of times that  12:23
7   you met with the CEO?                                12:23
8        MR. BASINGER:  Calls for speculation.           12:23
9        THE WITNESS:  I will find it hard to come up   12:23
10  with an estimate in terms of number of meetings.     12:24
11       MR. BEARD:  Q.  Was it more than ten times?    12:24
12       MR. BASINGER:  Asked and answered.             12:24
13       THE WITNESS:  Maybe so, but I'm not exactly    12:24
14  sure how many times.                                 12:24
15       MR. BEARD:  Q.  I'm not asking for a precise   12:24
16  number.  I'm asking for your best estimate.          12:24
17    A   I would think that I would have had meetings   12:24
18  or -- with him prior to a scheduled meeting, whenever  12:25
19  it was necessary to.                                 12:25
20       Actually, I don't even remember when he        12:25
21  became the head of the business unit.                12:25
22       I will say occasionally, from time to time,    12:25
23  whenever he calls me over.                           12:25
24    Q   Focusing on the May 3rd, 2010, e-mail that     12:25
25  you wrote, what was the purpose of the meeting with   12:25

Highly Confidential

Page 70

1  the CEO as reflected in this e-mail?                    12:25
2        MR. BASINGER:  Objection; the document speaks    12:25
3  for itself; calls for speculation.                     12:25
4        THE WITNESS:  I think I already answered that    12:25
5  question when I was describing about this document     12:26
6  earlier.                                               12:26
7        MR. BEARD:  I don't think I've got an answer     12:26
8  to that one.                                           12:26
9     Q   So I'll ask you to do it again; obviously,      12:26
10 subject to your counsel's objection.                   12:26
11       MR. BASINGER:  Just same objection.              12:26
12       MR. BEARD:  I think so far you've told us        12:26
13 that this e-mail reflects the result of the meeting.   12:26
14    Q   My question is:  What was the purpose of the    12:26
15 meeting?                                               12:26
16       MR. BASINGER:  Objection; calls for             12:26
17 speculation.                                           12:26
18       THE WITNESS:  I don't think this is a meeting    12:26
19 that -- wherein there was any agenda.                  12:27
20       So the reason why I think I have already         12:27
21 answered the question is that I remember having        12:27
22 testified that this was a meeting where the designs    12:27
23 were reported on, and the comments were received in    12:27
24 that regard prior to the meeting with the carriers.    12:27
25       MR. BEARD:  So you understand what she's         12:27

Page 71

1  saying in English?                                     12:27
2        MR. BASINGER:  Sorry.  Was that -- wait a        12:27
3  second.  Was that a question?                          12:27
4        MR. BEARD:  Yeah.                                12:28
5        MR. BASINGER:  So your question is -- you're     12:28
6  asking the interpreter whether she understands what -- 12:28
7        MR. BEARD:  No, no, no.  The witness is          12:28
8  nodding as she's providing the interpretation, and so  12:28
9  it sounds like she's --                                12:28
10       THE WITNESS:  No, no.                            12:28
11       MR. BASINGER:  Wait.  What's the pending         12:28
12 question?  I'm sorry.                                  12:28
13       THE WITNESS:  I was -- I was just checking       12:28
14 that the interpreter is using the terminology or       12:28
15 terminologies that I don't normally use.  That was...  12:28
16       MR. BASINGER:  This may be a good time for a     12:28
17 break for lunch.                                       12:28
18       MR. BEARD:  Sure.  We can do that.               12:28
19       THE VIDEOGRAPHER:  The time is 12:29 p.m.,       12:28
20 and we are off the record.                             12:28
21       (Lunch break taken at 12:29 p.m.)                12:28
22            ---oOo---                        12:28
23                                             12:28
24                                             12:28
25                                             12:28

Page 72

1       A F T E R N O O N   S E S S I O N            13:10
2            1:33 p.m.                   13:10
3                                        13:32
4        THE VIDEOGRAPHER:  The time is 1:33 p.m., and   13:32
5  we are on the record.                                  13:32
6        MR. BEARD:  Q.  For the phone products that     13:32
7  you work on, who do you consider to be Samsung's       13:32
8  competitors?                                           13:32
9        MR. BASINGER:  Objection; foundation; vague     13:32
10 and ambiguous.                                         13:32
11       THE WITNESS:  You mean projects that I worked   13:32
12 on?  Well, I'll have to just offer you a general       13:32
13 description in that regard because I cannot pinpoint   13:33
14 as to what particular products that I worked on.       13:33
15       THE INTERPRETER:  That sounds better, yeah.     13:33
16       MR. BEARD:  I missed the last part.             13:33
17       THE WITNESS:  Because I'm not fully assigned    13:33
18 to any specific products, I can't tell you which ones. 13:33
19       MR. BEARD:  My question is about that.          13:33
20    Q   At the beginning of this deposition, you       13:33
21 testified that at Samsung, you've worked on cell       13:33
22 phones and tablets; correct?                           13:33
23    A   Yes, yes.  I am working on those that are      13:33
24 released by Samsung.                                   13:33
25    Q   From your perspective, who are Samsung's       13:33

Page 73

1  competitors in the cell phone space?                   13:34
2        MR. BASINGER:  Vague and ambiguous.             13:34
3        THE WITNESS:  If I were to tell you of my       13:34
4  personal view on that, there may be many competitors  13:34
5  in the U.S. market.  I think all the companies who    13:34
6  manufacture the same type of products will be         13:34
7  competitors.                                           13:34
8        MR. BEARD:  Q.  Are you capable of giving me    13:34
9  the name of any of those companies?                    13:34
10    A   Well, of course I can.                          13:35
11    Q   That's my question.                             13:35
12    A   The companies that are selling cell phones in  13:35
13 the U.S. would be Apple, Motorola, Nokia, BlackBerry   13:35
14 and Sony Ericsson.  These -- these are cell phone      13:35
15 companies --                                           13:35
16    Q   Of the companies that you identified --        13:35
17    A   -- as far as I can recall.                      13:36
18    Q   -- of the companies that you identified, who   13:36
19 do you consider to be Samsung's largest competitor in  13:36
20 the U.S. market for cell phones?                        13:36
21       MR. BASINGER:  Objection; vague and            13:36
22 ambiguous; foundation; calls for speculation.         13:36
23       THE WITNESS:  That will be all relative if     13:36
24 you say "largest competitor."                          13:36
25       MR. BEARD:  Q.  You don't have a -- you work    13:36

Highly Confidential

Page 74

1  at Samsung, but you don't have an opinion about who   13:36
2  your largest competitor is in the cell phone space?   13:36
3      MR. BASINGER:  Objection; argumentative;   13:36
4  asked and answered.   13:36
5      THE WITNESS:  I don't quite understand the   13:37
6  term "the largest competitor," the term itself.   13:37
7      MR. BEARD:  Q.  Who do you compete with the   13:37
8  most?   13:37
9      MR. BASINGER:  Objection; vague and   13:37
10  ambiguous.   13:37
11      THE WITNESS:  I think that can vary,   13:37
12  depending on the situation and -- and depending on the   13:37
13  product.   13:37
14      MR. BEARD:  Q.  For the Galaxy series of cell   13:37
15  phones?   13:38
16      MR. BASINGER:  Objection -- same objection;   13:38
17  vague and ambiguous; calls for speculation.   13:38
18      THE WITNESS:  I believe all the competitors   13:38
19  who manufacture the same level products will be all   13:38
20  competitors.   13:38
21      MR. BEARD:  Q.  But you don't -- you don't   13:38
22  have a view as to which ranks as your largest   13:38
23  competitor versus your smallest competitor?   13:38
24      MR. BASINGER:  Objection; asked and answered;   13:38
25  mischaracterizes previous testimony.   13:38

Page 75

1      THE WITNESS:  I think I already stated that I   13:39
2  don't fully understand the description "the largest   13:39
3  competitor."  And I don't believe there will be a   13:39
4  largest or a smallest competitor necessarily.   13:39
5      MR. BEARD:  Q.  In the work that you do   13:39
6  currently at Samsung, do you ever do competitive   13:39
7  analysis?   13:39
8      MR. BASINGER:  Vague and ambiguous.   13:39
9      THE WITNESS:  When you say "competitive   13:39
10  analysis," what do you specifically mean by that?   13:39
11      MR. BEARD:  Q.  Assessing, comparing the   13:40
12  products that are offered by your competitors.   13:40
13      MR. BASINGER:  Same objection.   13:40
14      THE WITNESS:  Are you asking me whether I   13:40
15  conduct such an analysis, or does Samsung?   13:40
16      MR. BEARD:  Q.  I'm asking if you personally   13:40
17  are involved in competitive analysis for cell phone   13:40
18  products?   13:40
19   A  Well, although I cannot define as to what   13:41
20  types of work, what items were based on the   13:41
21  competitive analysis, I have performed a personal   13:41
22  assessment.   13:41
23      CHECK INTERPRETER:  Based on my personal   13:41
24  criteria.   13:41
25      THE WITNESS:  Based on my personal criteria.   13:41

Page 76

1      MR. BEARD:  I'm sorry.  So what is the   13:41
2  answer?  I was asking the trans -- what's the   13:41
3  translation?  There was two things, and I wasn't sure   13:41
4  what --   13:41
5      THE INTERPRETER:  No, there wasn't.  She was   13:41
6  adding it in.  It's all reflected.  It's fully there.   13:41
7      MR. BEARD:  Q.  What -- what personal   13:41
8  assessment have you done in the way of competitive   13:41
9  analysis?   13:41
10      MR. BASINGER:  Object; vague and ambiguous.   13:42
11      THE WITNESS:  You want me to give you an   13:42
12  example?   13:42
13      MR. BEARD:  Yes.   13:42
14      THE WITNESS:  For example, supposing a   13:42
15  product is released not by Samsung, but by its   13:42
16  competitor, I have conducted a comparison between our   13:42
17  company's product versus a competitor's product by   13:43
18  category.   13:43
19      CHECK INTERPRETER:  Based on -- wait.  Based   13:43
20  on the items of criteria that I personally created.   13:43
21      THE WITNESS:  Based on the items of criteria   13:43
22  that I personally created.   13:43
23      MR. BEARD:  Q.  What was the basis for the   13:44
24  comparisons that you performed?   13:44
25   A  The fact that I can notice upon viewing the   13:44

Page 77

1  product.   13:44
2   Q  Have you ever done that type of analysis with   13:44
3  the iPhone?   13:44
4      MR. BASINGER:  Vague -- sorry.  I can't tell   13:44
5  when you're finished.   13:44
6      Vague and ambiguous.   13:44
7      THE WITNESS:  As far as I can recall, I don't   13:44
8  think I have made any -- I have not prepared any per   13:44
9  item to compare our products with the iPhone.   13:45
10      MR. BEARD:  Q.  Have you ever evaluated the   13:45
11  design of an iPhone?   13:45
12      MR. BASINGER:  Vague and ambiguous.   13:45
13      THE WITNESS:  When you say have I evaluated   13:45
14  the design, I don't know what specifically you're   13:45
15  referring to since there are so many different   13:45
16  elements involved with designing work.   13:45
17      MR. BEARD:  Q.  Any?   13:46
18   A  I would like to add one more thing to my   13:46
19  previous answer to the previous question.   13:46
20      The reason I didn't really feel the need to   13:46
21  conduct any evaluation on the iPhone was that the --   13:46
22  the first time the iPhone was launched was before I   13:46
23  joined Samsung.   13:46
24   Q  Let's go back to my question.   13:46
25      My question is much more simple:  Have you   13:46

Highly Confidential

## Page 78

```
1   ever done an evaluation of the design of the iPhone?   13:46
2       MR. BASINGER:  Vague and ambiguous.  Same   13:46
3   objection as before.                         13:47
4       THE WITNESS:  Well, I don't think I have done   13:47
5   anything that could be deemed as an evaluation.   13:47
6       MR. BEARD:  Q.  In connection with the design   13:47
7   work that you've done on Samsung phones, have you ever   13:47
8   compared the iPhone design to the design that you were   13:47
9   working on for a Samsung phone?              13:47
10      MR. BASINGER:  Objection; foundation; asked   13:47
11  and answered; vague and ambiguous.           13:47
12      THE WITNESS:  First of all, the one that I   13:47
13  worked on, the boundary of work that you're referring   13:48
14  to is unclear.                               13:48
15  The ones that I worked on is really         13:48
16  overbroad, so I don't really understand as to which   13:48
17  specific area you're asking about.           13:48
18  I don't quite understand as to what         13:48
19  comparison that you're asking me about that I did in   13:48
20  relation with what type of work.            13:48
21      MR. BEARD:  Q.  Ms. Kim, you do -- you work   13:49
22  on designs for Samsung phones; correct?     13:49
23      MR. BASINGER:  Objection; vague and          13:49
24  ambiguous; mischaracterizes previous testimony.   13:49
25      THE WITNESS:  What was the question about   13:49
```

## Page 79

```
1   designs?  May I have that one more time, please.   13:49
2       MR. BEARD:  Sure.                         13:49
3       Q  Do you do design work on Samsung phones?   13:49
4       A  Although I don't know how to define the term   13:50
5   "design" and the scope of design, but in a general   13:50
6   sense of design that is as commonly referred to, I   13:50
7   think I engaged in that type of work.        13:50
8       Q  You're a senior designer; correct?     13:50
9       A  Yes.                                    13:50
10      Q  And you're not certain whether you've engaged   13:50
11  in design work; is that what your testimony is?   13:50
12      MR. BASINGER:  Objection; argumentative;   13:50
13  asked and answered; mischaracterizes her testimony.   13:50
14      THE WITNESS:  Well, I feel that I -- without   13:51
15  being provided an explanation as to what design   13:51
16  activities you're referring to, I don't think I can   13:51
17  correctly answer the question.              13:51
18      MR. BEARD:  That's amazing.              13:51
19      Q  Your -- your title is senior designer;   13:51
20  correct?                                     13:51
21      A  Yes.                                    13:51
22      Q  What do you do as a senior designer?  What's   13:51
23  your definition of "design" that falls under the   13:51
24  auspices of your title, the work that you do?   13:51
25      MR. BASINGER:  Objection; asked and answered.   13:52
```

## Page 80

```
1       THE WITNESS:  What point in time; currently?   13:52
2       MR. BEARD:  Right now.                    13:52
3       THE WITNESS:  Well, although I think I      13:52
4   already answered that this morning, according to my   13:52
5   recollection, I already stated that I work on UX.  I   13:52
6   believe I already testified that I work on the   13:52
7   products that are offered to the carriers.   13:52
8       MR. BEARD:  Q.  Your title is senior        13:52
9   designer, but you're asking me for a definition of   13:52
10  "designer"?  Do I -- do I have that correct?  That's   13:52
11  what you're asking of me?                    13:52
12      MR. BASINGER:  Okay.  Let's -- I think,      13:53
13  counsel, she just wants to know what you're asking   13:53
14  her, and she's not clear what you mean by design.  So   13:53
15  you're asking her about design in general, but we   13:53
16  haven't established what she means by design.   13:53
17  So she's just -- she's trying to answer your   13:53
18  question, and she's trying to do it accurately; okay?   13:53
19      MR. BEARD:  Okay.  I'm just flabbergasted   13:53
20  that a senior designer doesn't understand the concept   13:53
21  of design.                                   13:53
22      MR. BASINGER:  You haven't asked her that,   13:53
23  so --                                        13:53
24      MR. BEARD:  Yeah, I have.  I've asked her --   13:53
25  my question was:  Do you do design work on Samsung   13:53
```

## Page 81

```
1   phones?                                      13:53
2       MR. BASINGER:  Right, but you --          13:53
3       MR. BEARD:  That's it.                    13:53
4       MR. BASINGER:  She just wants you to clarify   13:53
5   what it is about -- what about design that you're   13:53
6   asking her about.  So your understanding of design is   13:53
7   different than her understanding of design.  She just   13:53
8   wants a common -- I think a common understanding.   13:53
9       MR. BEARD:  Q.  What's your understanding of   13:53
10  "design"?                                    13:53
11      A  Well, first of all, the design -- the concept   13:54
12  is too overbroad.  I don't think I can explain it all   13:54
13  here.                                        13:54
14  But if I were to tell you my job duties that   13:54
15  I carry out at the current time as a senior designer,   13:54
16  they are like a -- I'm currently working on the --   13:54
17  working -- we call this a design that can be used by   13:54
18  the users in connection with UX.            13:55
19      CHECK INTERPRETER:  End user customers.   13:55
20      THE WITNESS:  As "users," I meant end users.   13:55
21      CHECK INTERPRETER:  Consumers.           13:55
22      THE WITNESS:  Were you asking me about UX   13:55
23  design?  Just by the -- design by itself will be a   13:55
24  very broad concept.                          13:55
25      MR. BEARD:  Correct.  I'm asking you that   13:55
```

Highly Confidential

Page 82

1  broad of a question.  I'm asking you the question      13:55
2  about design generally.                                13:55
3      Q  Do you do design work on Samsung phones,        13:55
4  however you define design?                             13:56
5      I mean, you're a senior designer.                  13:56
6      A  Well, since there's -- there are so many        13:56
7  different aspects attached to what's called a design,  13:56
8  if you ask me if I do any design work on Samsung       13:56
9  phones, I will find that very difficult to answer.     13:56
10     So what I can answer to your question is --        13:57
11 what I can tell you is that at Samsung, I do UX        13:57
12 designs for the carriers.                              13:57
13     Q  You're not designing carriers; are you?         13:57
14     A  I never testified to that.                      13:57
15     Q  You just testified:                             13:57
16     "ANSWER:  I do UX designs for the carriers."       13:57
17     A  But that's -- that's not saying that I am       13:57
18 designing the carrier.                                 13:57
19     Q  What are you designing?  Perhaps would it be    13:57
20 cell phones?                                           13:58
21     A  I think I answered this already.                13:58
22     MR. BEARD:  Okay.  So counsel, we've got two       13:58
23 options here.                                          13:58
24     MR. BASINGER:  I think --                          13:58
25     MR. BEARD:  We can take a break --                 13:58

Page 83

1      MR. BASINGER:  Yeah.                               13:58
2      MR. BEARD:  -- and you can talk with your          13:58
3  client about what's going on right now, or I'm going   13:58
4  to stop this deposition and I'm going to raise this    13:58
5  with a judge.  This is absolutely ridiculous.          13:58
6      MR. BASINGER:  It's not ridiculous; okay.  I       13:58
7  think there's a misunderstanding.  She's not trying to 13:58
8  be uncooperative.  So I think I'll address this off    13:58
9  the record, and I think we can come back.              13:58
10     And what is the question that you want             13:58
11 answered that hasn't been answered?                    13:58
12     MR. BEARD:  Well, when we started all of           13:58
13 this, it was -- it's in connection with her design     13:58
14 work, if she had ever made a comparison to the Apple   13:58
15 iPhone while doing that design work.                   13:58
16     MR. BASINGER:  And she answered --                 13:58
17     MR. BEARD:  We got sidetracked.  We never got      13:58
18 an answer to that.                                     13:58
19     MR. BASINGER:  She did.  She said "no."            13:58
20     MR. BEARD:  Never got an answer to that.           13:58
21     MR. BASINGER:  I believe that she testified        13:58
22 she did not.                                           13:58
23     MR. BEARD:  We haven't got an answer to that,      13:58
24 because she then asked me for a definition of          13:58
25 "design."                                              13:58

Page 84

1      MR. BASINGER:  Okay.  I don't think that's         13:58
2  what happened.                                         13:58
3      MR. BEARD:  We got sidetracked, so --              13:58
4      MR. BASINGER:  So what -- okay.  We'll take        13:59
5  this up off the record.                                13:59
6      And the question that you think she's not          13:59
7  answering is the issue about comparison?               13:59
8      MR. BEARD:  The first question is:  Do you do      13:59
9  design work on Samsung phones?                         13:59
10     MR. BASINGER:  That's the question?                13:59
11     MR. BEARD:  That's been the question pending       13:59
12 for the last ten minutes.                              13:59
13     MR. BASINGER:  Okay.  Let's take a                 13:59
14 five-minute break.                                     13:59
15     MR. BEARD:  Great.                                 13:59
16     MR. BASINGER:  Then we'll come back.               13:59
17     THE VIDEOGRAPHER:  This marks the end of           13:59
18 Volume I, Disc 2, in the deposition of Ahyoung Kim.    13:59
19     The time is 2:00 p.m., and we are off the          13:59
20 record.                                                13:59
21     (Recess taken.)                                    13:59
22     THE VIDEOGRAPHER:  This marks the beginning        14:06
23 of Volume I, Disc 3 in the deposition of Ahyoung Kim.  14:06
24     The time is 2:08 p.m., and we are on the           14:07
25 record.                                                14:07

Page 85

1      MR. BEARD:  Q.  Ms. Kim, do you do design          14:07
2  work on Samsung cell phones?                           14:07
3      A  Yes.                                            14:07
4      But if I were to explain in that regard,           14:07
5  well, there are many aspects involved with what's      14:07
6  called a design.                                       14:07
7      But one of the things that I am doing at the       14:07
8  present time is that I work on screen flow work that   14:08
9  is done to implement some functions, and I discuss     14:08
10 that with the carrier.                                 14:08
11     So I-- to be more accurate, I would like to        14:08
12 say that I'm involved in UX design rather than just    14:08
13 design.                                                14:08
14     Q  What do you mean by "screen flow work"?         14:08
15     A  That's the process where you prepare steps      14:09
16 that are necessary in order to provide some -- a       14:09
17 certain function for the consumer.                     14:09
18     Q  Can you please give an example.                 14:09
19     A  Actually, let me think.  I'm trying to think    14:09
20 of an example.                                         14:09
21     Okay.  For example, the basic function is          14:09
22 when a user can send one message simultaneously to     14:10
23 five different people, the same type of message.       14:10
24     Then my work would start by considering            14:10
25 what's necessary -- what screen will be necessary.     14:10

Highly Confidential

Page 86

1  And there's a window called messaging composer. This  14:10
2  is just -- this is just an example. Messaging        14:10
3  composer.                              14:11
4        CHECK INTERPRETER: C-O-M-P-O-S-E-R.         14:11
5        THE WITNESS: This is a screen that has the    14:11
6  function of messaging a composer. I'm just giving you  14:11
7  an example. Well, that has to contain a receiver, a   14:11
8  recipient, and a title and the body of the message,   14:11
9  and if even necessary, you can attach file attachment.  14:11
10       There might be a need for an option menu in    14:11
11 order to have all those things done. In such event,   14:12
12 then we would make a menu and make a -- send a button  14:12
13 after having done all those to have those messages    14:12
14 sent.                                 14:12
15       So I'll go from the first screen. And         14:12
16 supposing if one sender would send one message to five  14:12
17 different people, then the screen has to be able to   14:12
18 include all those five recipients.              14:12
19       Then you need to consider from what list that  14:12
20 those five recipients would be choose from, from a   14:13
21 call log or from a phone book or from other sources,  14:13
22 like social network site. Then you have to decide and  14:13
23 figure out from which source of lists those five     14:13
24 recipients would be selected from.            14:13
25       Once you decide that all those things have to  14:13

Page 87

1  be done, then "how" is the next step to consider. So  14:13
2  I'll have to set up all different screens for each    14:13
3  purpose. And once those recipients are selected, then  14:14
4  I have to decide as to how that could be displayed on  14:14
5  the screen.                             14:14
6        After all those selection of recipients and   14:14
7  sending the message -- all -- when all those are      14:14
8  completed, then I'll have to decide finally as to     14:14
9  the -- the message sent confirmation will be -- how   14:15
10 that confirmation will be conveyed to the author of   14:15
11 the message.                            14:15
12       The step-by-step configuration is the screen   14:15
13 flow work that I was referring to earlier.          14:15
14       MR. BEARD: Q. Other than the example you've   14:15
15 just provided of screen flow involving messages, have  14:15
16 you been involved in designing the screens for any    14:15
17 icons for Samsung cell phones?                 14:15
18       MR. BASINGER: Objection; vague and           14:15
19 ambiguous.                             14:15
20       THE WITNESS: Any work for any icons or icon    14:15
21 designs? The work of deciding that an icon is needed,  14:16
22 would that be included as well?                14:16
23       MR. BEARD: Q. No, just the design of the      14:16
24 icon itself.                            14:16
25       MR. BASINGER: Objection; vague and           14:16

Page 88

1  ambiguous.                             14:16
2        THE WITNESS: If the icon design has to do     14:16
3  with drawing, I am not personally involved in the     14:16
4  drawing of an icon.                       14:16
5        MR. BEARD: Q. Are you involved in a          14:16
6  different aspect of creating icons other than drawing?  14:17
7     A  Well, my primary job is not creating an icon,  14:17
8  but preparing an overall function flow that I        14:17
9  mentioned earlier; right.                    14:17
10    Q  So I'm not asking about your primary job.     14:17
11       My question was simply whether you have ever  14:17
12 been involved with creating an icon other than drawing  14:17
13 the icon?                              14:17
14       MR. BASINGER: Objection; vague and           14:17
15 ambiguous.                             14:17
16       THE WITNESS: Creating an icon? Well, I'm     14:17
17 not involved in actual --                    14:18
18       THE INTERPRETER: I need to clarify one word   14:18
19 with the witness.                        14:18
20       Okay. Rendition.                     14:19
21       THE WITNESS: Initial sample work that the     14:19
22 graphic designers do, I'm not doing that type of work.  14:19
23       CHECK INTERPRETER: There is a certain term   14:19
24 that we use at Samsung in-house which is SI-AN, which  14:19
25 is S-I hyphen A-N. That's not what I do.          14:19

Page 89

1        THE WITNESS: I'm not doing the work that     14:19
2  graphic designers do.                      14:19
3        As I said earlier, I am engaged in UI/UX job  14:19
4  with the carriers. And in that course of work,       14:20
5  although I'm not directly involved, but I am doing --  14:20
6  whatchamacallit? I don't know how to put it.        14:20
7        MR. BEARD: Let me -- let me try something     14:20
8  else, then.                             14:20
9     Q  Do -- does any of the screen flow work that   14:20
10 you do involve icons?                      14:20
11       MR. BASINGER: Objection; vague and           14:20
12 ambiguous.                             14:21
13       THE WITNESS: I would think that icon may be   14:21
14 necessary. It may be necessary, I think. Because     14:21
15 we're talking about small size screen, it can be      14:21
16 possible that a certain function can be described or   14:21
17 displayed by way of an icon.                  14:21
18       MR. BEARD: Q. Can you give me an example of   14:21
19 where a certain function is described or displayed by  14:21
20 way of an icon.                          14:21
21    A  If I were to use the previous messaging       14:21
22 example again, at the time of selecting recipient, I   14:22
23 already gave you an example that those repeat --      14:22
24 recipients could be derived from different sources.    14:22
25       Supposing that a recipient or recipients      14:22

Highly Confidential

Page 118

1   between the headquarters office and the subsidiary    15:54
2   office in the U.S.                    15:55
3       Q   Based on the earlier e-mail we looked at,    15:55
4   which was the March 17th, 2010, e-mail that you wrote   15:55
5   regarding the Octopus project, you were still with the   15:55
6   design strategy part at that time; correct?       15:55
7       A   Yes.                     15:55
8       Q   And the design strategy part falls under the   15:55
9   umbrella of the headquarters company Samsung; is that   15:55
10  correct?                       15:55
11      A   Yes.                     15:55
12      Q   During the time that you've worked at      15:55
13  Samsung, has it been common for the part that you've   15:55
14  worked in to collaborate with the Samsung          15:55
15  Telecommunications Americas subsidiary?        15:56
16      MR. BASINGER:  Objection; vague and       15:56
17  ambiguous; calls for speculation.            15:56
18      THE WITNESS:  I'm not so sure whether that    15:56
19  was a common thing back at the time.  When you say    15:56
20  "common," I understand that means a frequent       15:56
21  occurrence.  I don't think that's something that      15:57
22  frequently happened.                  15:57
23      MR. BEARD:  Q.  Do you know who created this   15:57
24  document, the Octopus project presentation marked as   15:57
25  Exhibit Plaintiff's 1196?                15:57

Page 119

1       MR. BASINGER:  Objection; foundation; calls   15:57
2   for speculation.                    15:57
3       THE WITNESS:  No, I don't know as to who      15:57
4   prepared this.                     15:57
5       MR. BEARD:  Q.  Do you recall who you passed   15:57
6   along the information to that is reflected in the     15:57
7   slides that you pointed out earlier?           15:57
8       A   I'm not exactly certain as to where this     15:58
9   information came from originally and where it was    15:58
10  heading to.                      15:58
11      And it's my recollection that there were many   15:58
12  people that were involved with this.  And as I recall,  15:58
13  all these people that are listed in this e-mail will   15:58
14  be the ones that were related to this, I think,      15:58
15  going -- this was going back and forth among these    15:58
16  people.                        15:58
17      Q   Now, this exhibit was identified as having   15:58
18  come from your files.  Do you personally know whether  15:58
19  this Octopus project presentation is located in your   15:59
20  files?                         15:59
21      MR. BASINGER:  Objection; foundation.       15:59
22      THE WITNESS:  I don't know exactly whether    15:59
23  this particular document came from my PC or not.     15:59
24      MR. BEARD:  Let's take a short break.        15:59
25      THE VIDEOGRAPHER:  The time is 4:00 p.m., and  15:59

Page 120

1   we are off the record.                 15:59
2       (Recess taken.)                  15:59
3       THE VIDEOGRAPHER:  The time is 4:19 p.m., and  16:18
4   we are on the record.                 16:18
5       MR. BEARD:  So I think, subject to our review  16:18
6   of the late -- late produced documents, we're going to  16:18
7   go ahead and stop for today and determine later on    16:18
8   whether we think we need to reopen this deposition.    16:18
9       MR. BASINGER:  Okay.  And just -- just to     16:18
10  reiterate, so we did produce about 500 documents, but  16:18
11  it was due to a vendor glitch.  And we -- and the     16:18
12  production of Ms. Kim's documents is substantially    16:18
13  complete.                       16:18
14      THE VIDEOGRAPHER:  This marks the end of     16:18
15  Volume I, Disc 3 and concludes today's deposition of   16:18
16  Ahyoung Kim.                     16:18
17      The time is 4:19 p.m., and we're off the      16:18
18  record.                        16:18
19      (WHEREUPON, the deposition ended at        16:18
20      4:19 p.m.)                    16:18
21          ---oOo---

Page 121

1               J U R A T
2
3
4       I, AHYOUNG KIM, do hereby certify under
5   Penalty of perjury that I have read the
6   foregoing transcript of my deposition taken
7   on January 11, 2012; that I have made such
8   corrections as appear noted herein in ink,
9   initialed by me; that my testimony as
10  contained herein, as corrected, is true and
11  correct.
12
13
14      DATED this ____ day of _____, 2012,
15  at _____, California.
16
17
18
19      _____
20          SIGNATURE OF WITNESS
21
22
23
24
25

Highly Confidential

Page 122

1          CERTIFICATE OF REPORTER

2

3

4          I, ANDREA M. IGNACIO HOWARD, hereby certify

5     that the witness in the foregoing deposition was by me

6     duly sworn to tell the truth, the whole truth, and

7     nothing but the truth in the within-entitled cause;

8

9          That said deposition was taken in shorthand

10    by me, a Certified Shorthand Reporter of the State of

11    California, and was thereafter transcribed into

12    typewriting, and that the foregoing transcript

13    constitutes a full, true and correct report of said

14    deposition and of the proceedings which took place;

15

16         That I am a disinterested person to the said

17    action.

18

19         IN WITNESS WHEREOF, I have hereunto set my

20    hand this 11th day of January 2012.

21

22    _____

23    ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25

Page 123

1               I N D E X

2

3     DEPOSITION OF AHYOUNG KIM

4

5               EXAMINATION

6                              PAGE

7     BY MR. BEARD              6

8

9               E X H I B I T S

10

11    EXHIBIT                         PAGE

12    Exhibit 1190    6/29/10 E-mail, Bates Nos.    42

13          SAMNDCA00533160 - '64; 5 pgs.

14    Exhibit 1191    5/6/10 E-mail, Subject: VZW    56

15          Roadmap Bates, Bates Nos.

16          SAMNDCA00507452 - '55; 4 pgs.

17    Exhibit 1192    5/3/10 E-mail, Subject VZW,    67

18          Bates Nos. SAMNDCA00507467 -

19          '68; 2 pgs.

20    Exhibit 1193    Cubic37 Presentation, Bates    96

21          Nos. SAMNDCA00214274 - '318;

22          45 pgs.

23    Exhibit 1194    S1, i-Phone, Bates Nos.    102

24          SAMNDCA00203880 - '4010;

25          131 pgs.

Page 124

1          E X H I B I T S  (Continued.)

2

3     EXHIBIT                         PAGE

4     Exhibit 1195    3/17/10 E-mail String,    106

5          Subject: Octopus 3/17, Bates

6          Nos. SAMNDCA00507826 - '27;

7          2 pgs.

8     Exhibit 1196    Octopus Project HQ-STA    117

9          Collaboration, Bates Nos.

10         SAMNDCA10123001 - '037;

11         37 pgs.

12

13              ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

1          E R R A T A  S H E E T

2

3          I, AHYOUNG KIM, make the following changes to

4     my deposition taken in the matter of Apple, Inc., vs.

5     Samsung Electronics taken on January 11, 2012:

6

7     DATE:_____    _____

8               Signature of Witness

9     Page    Line    Change

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25    _____   _____   _____

Confidential Attorneys' Eyes Only

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4    In the Matter of Certain  )

     Electronic Digital Media  )

5    Devices and Components     )  Inv. No. 337-TA-796

     Thereof,                   )

6    _____)

7

8

9

10

11

12              ** CONFIDENTIAL TRANSCRIPT **

13                ** ATTORNEYS'EYES ONLY **

14              DEPOSITION OF AHYOUNG KIM

15              San Francisco, California

16               Friday January 13, 2012

17

18

19

20

21

22

23   Reported By:

24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25   JOB NO. 45584

Confidential Attorneys' Eyes Only

Page 90

```
1    categories?
2         MR. BASINGER: Foundation. Vague
3    and ambiguous.
4         THE WITNESS: To tell you what
5    exactly that column heading says, it
6    says, Expected decisionmaker. And that's
7    referring to a possibility there. So
8    based on what's reflected in these
9    documents as I read it now as I sit here,
10   I can tell you the person stated here is
11   the possibility is an expected
12   decisionmaker.
13   BY MR. BEARD:
14        Q.   And who was that person in October
15   of 2010?
16        MR. BASINGER: Objection,
17   foundation.
18        MR. BEARD: I think I have the
19   date wrong. I think it's as of March of
20   2010.
21        MR. BASINGER: Same objection.
22        THE WITNESS: If I were to
23   speculate as to who that person would
24   have been based upon what's in this
25   document, who was expected to do that job
```

Page 91

```
1    as of this date, it states in this
2    document business unit leader.
3         But did you, Counsel, just ask
4    me in a general sense as who was the
5    decisionmaker for mock-up and packaging
6    back at this time, right?
7    BY MR. BEARD:
8         Q.   Yes. For the packaging that was
9    being decided upon as part of the Octopus Project
10   in March of 2010, who was that expected
11   decisionmaker, the specific person?
12        MR. BASINGER: Foundation. Vague
13   and ambiguous.
14        THE WITNESS: Just like the
15   document states, it states business unit
16   leader.
17        MR. BASINGER: Counsel, we have
18   been going for a little bit over an
19   hour. I don't know if you can wrap up
20   this line of questioning.
21        MR. BEARD: Sure.
22   BY MR. BEARD:
23        Q.   Who was the business unit leader
24   at that time?
25        MR. BASINGER: Asked and answered.
```

Page 92

```
1         THE WITNESS: You mean the name?
2    BY MR. BEARD:
3         Q.   Yes.
4         A.   Jay Kay Shin or Jong Kyun Shin.
5         Q.   Let's take a break.
6         THE VIDEOGRAPHER: This marks the
7    end of disc number two in the deposition
8    of Ahyoung Kim. The time is 2:11 p.m.
9    and we are off the record.
10        (Recess taken from 2:11 p.m. to
11   2:24 p.m.)
12        THE VIDEOGRAPHER: This marks the
13   beginning of disc number three in the
14   deposition of Ahyoung Kim. The time is
15   2:24 p.m. and we are back on the record.
16   BY MR. BEARD:
17        Q.   Ms. Kim, you've just been handed a
18   deposition Exhibit Number 8. It is a May 6, 2010
19   e-mail from you to various people. The re line
20   is VZW road map conference record five/six design
21   strategy. Bates numbers on this document are
22   SAMNDCA 00507452 through 455.
23        You wrote this e-mail, correct?
24        A.   According to this document, it
25   states that I did.
```

Page 93

```
1         Q.   Do you recall writing this e-mail?
2         A.   I don't specifically recall
3    writing this e-mail. But if I'm remembering
4    correctly, I think it looks similar to the e-mail
5    that I was shown day before yesterday.
6         Q.   And this e-mail relates to a
7    meeting with Verizon. That's what the VZW stands
8    for, correct?
9         MR. BASINGER: Wait a minute. One
10   second. If you don't mind, when she's
11   referring to the day before yesterday,
12   she's referring to the deposition in the
13   Northern California case not to any
14   meetings with attorneys. So I just
15   wanted to clarify that.
16   BY MR. BEARD:
17        Q.   In the first line of this e-mail
18   it says VZW. Does that refer to Verizon?
19        MR. BASINGER: Foundation.
20        THE WITNESS: I think so, yes.
21   BY MR. BEARD:
22        Q.   Did you write this e-mail?
23        A.   I would think I did. Yeah. I
24   probably did.
25        Q.   Do you have any reason to believe
```

Confidential Attorneys' Eyes Only

Page 94

1  that you did not write this e-mail?
2      A.   Nothing in particular.
3      Q.   What was the purpose of this
4  e-mail?
5          MR. BASINGER: Objection. Calls
6      for speculation.
7          THE WITNESS:  Just as reflected in
8      this document, it's to share the meeting
9      minutes.
10  BY MR. BEARD:
11      Q.   And these are meeting minutes that
12  you took from a meeting that you had with
13  Verizon, correct?
14          MR. BASINGER:  Document speaks for
15      itself.
16          THE WITNESS:  I believe this has
17      to do with something that was mentioned
18      at the meeting with Verizon that I
19      attended.
20  BY MR. BEARD:
21      Q.   Was it your regular practice to
22  prepare meeting notes and distribute it to your
23  team members after meeting with a carrier?
24          MR. BASINGER: Objection. Vague.
25          THE WITNESS:  Sometimes I did and

Page 95

1  other times I didn't.  But not
2  officially, though.  Because that was not
3  official job responsibility that I was to
4  carry out.
5  BY MR. BEARD:
6      Q.   What do you mean by not
7  officially?
8      A.   It was not my job duty that I had
9  to carry out.  Sometimes I would write down notes
10  and share them and other times not.  Just like
11  that.
12      Q.   In those instances after attending
13  a meeting with a carrier that you did take notes
14  and distribute them, did they take the same form
15  as this May 6, 2010 e-mail?
16          MR. BASINGER:  Vague.
17          THE WITNESS:  There is no set
18      form.
19  BY MR. BEARD:
20      Q.   In the first paragraph where it
21  refers to 2010 products and the first one lists
22  Atlas, what was Atlas?
23      A.   Based upon what I can see in this
24  e-mail and also based on my memory, it's
25  something, whether I should perhaps call it a

Page 96

1  product or a design, that can comprehensively
2  incorporate all these three things listed here,
3  UX, CMF, and IED.  Some sort of proposal.
4      Q.   Ms. Kim, was the Atlas a Verizon
5  version of the Galaxy S phone?
6      A.   My recollection may not be
7  accurate.  First of all, I don't know exactly as
8  to whether the name Galaxy S existed back at this
9  time or not.  I'm not quite sure.  A little
10  confused.
11          Just like what's indicated here in
12  this document, by looking at this phrase where it
13  says, premium device, in relation with loading
14  item that's stated -- I misspoke.  It's not
15  related to loading.  But when it says premium
16  device, where I think Atlas would be premium
17  device.  That's what it says.
18      Q.   Ms. Kim, did Atlas -- did that
19  relate to the Verizon Galaxy S?
20          MR. BASINGER:  Vague.
21          THE WITNESS:  I don't know how exactly
22      I should say about that, whether I could
23      definitely say yes to that.
24  BY MR. BEARD:
25      Q.   Do you remember being deposed two

Page 97

1  days ago?
2      A.   Yes.
3      Q.   And you were under oath, weren't
4  you?
5      A.   Yes.
6      Q.   And do you recall during that
7  deposition I asked you the question, For the
8  Atlas, what product did that relate to, and your
9  answer was Verizon Galaxy S?
10          Do you recall that testimony?
11      A.   Although I don't specifically
12  recall at this time if that was my answer, but I
13  would assume that there would have been some
14  other context related to that.
15      Q.   Ms. Kim, this is the very same
16  document that you had in front of you at the time
17  that I asked that very same question two days
18  ago.
19          What's happened between Wednesday
20  and today that's caused you to change your
21  testimony?
22          MR. BASINGER:  Objection,
23      foundation.
24          THE WITNESS:  I don't think I
25      changed anything in my answer.  It's my

Confidential Attorneys' Eyes Only

Page 98

1     recollection that I stated on that day
2     that this was a premium device at first.
3 BY MR. BEARD:
4     Q.   I just read you right from the
5 official transcript the question and answer that
6 was provided.
7           You didn't qualify your answer in
8 any way.  Your answer was that the Atlas related
9 to the Verizon Galaxy S.
10    A.   As I was doing work related to
11 Atlas, I think I need to explain more precisely
12 as to that.  When I said context earlier in my
13 answer, I was referring to other perhaps previous
14 questions or questions that followed subsequently
15 and other documents that I was shown before or
16 after.  That's what I meant by context.
17          If that was my answer on
18 Wednesday, that's probably because of the context
19 that question was in.
20    Q.   Let me read more of the transcript
21 so you can hear the context.  After handing you
22 that very same document, here is my question:  In
23 Exhibit 1191, this is the May 5, 2010 e-mail that
24 you wrote, there's a list of products under the
25 heading, 2010 Products, including Atlas and

Page 99

1 Garnet.
2           Question:  Are those -- and I
3 think I might have used the word, product.  I
4 apologize for that.  What I mean was projects.
5 Are those project names?  Answer -- go ahead, I'm
6 sorry.
7     Q.   Answer:  That's rather ambiguous.
8 Each would be both project and also products.
9           Question:  For the Atlas what
10 product did that relate to?
11          Answer:  Verizon Galaxy S.
12          What's caused you to change your
13 testimony between Wednesday and today?
14          MR. BASINGER:  Objection,
15 foundation.  Mischaracterizes testimony.
16          THE WITNESS:  I don't think I've
17 changed my testimony.  I understood you
18 just asked me today what Atlas means.  So
19 I was taking a guess that it was probably
20 a premium device as stated in this
21 document.
22          Rather than a guess, I was
23 inferring from the description reflected
24 in this document.
25          The reason that I find it

Page 100

1     difficult today to state with certainty
2     that this is Galaxy S, that is because
3     now I come to think many things may have
4     undergone a change or changes after I
5     took a maternity leave.
6           Looking at this document right
7     now I think on Wednesday right upon
8     looking at the same document I just took
9     a guess that it was probably Galaxy S.
10    But after -- upon a second view of the
11    document I come to think, I think it may
12    or may not be the case.
13 BY MR. BEARD:
14    Q.   But on Wednesday you didn't
15 qualify your answer in any way, did you?
16    A.   I don't quite -- I don't
17 exactly --
18          CHECK INTERPRETER:  The answer is
19 not complete.
20          THE WITNESS:  Recall.
21          I don't quite -- I don't exactly
22    recall.
23 BY MR. BEARD:
24    Q.   Ms. Kim, on the May 6, 2010 e-mail
25 that's in front of you that's deposition Exhibit

Page 101

1 Number 8, what product did the Garnet relate to?
2          MR. BASINGER:  Objection, foundation,
3     vague.
4          THE WITNESS:  I don't think I can
5     answer the question without venturing my
6     guess.  That's because there are various
7     different project names, and I don't know
8     which any of this ultimately related to
9     which launched product.
10 BY MR. BEARD:
11    Q.   Ms. Kim, did Garnet relate to a
12 smartphone product offered by Samsung?
13    A.   I think so based upon my
14 recollection of back at this time under this
15 name.
16    Q.   And did it relate to the Galaxy
17 series of phones offered by Samsung?
18    A.   I don't know exactly as to that.
19    Q.   Under the 2011 products, what
20 product did Stealth relate to?
21          MR. BASINGER:  Objection.  Vague,
22 foundation.
23          THE WITNESS:  According to my
24 recollection, I think this was also a
25 premium device.

Confidential Attorneys' Eyes Only

Page 102

1  BY MR. BEARD:
2      Q.   A smartphone?
3      A.   Well, yes.
4      Q.   And one offered by Samsung,
5  correct?
6      A.   Yes.
7      Q.   Was it the Galaxy S line of
8  phones?
9      A.   Well, this was even before there
10 was a concept of Galaxy S at this time, and it
11 was before the decision that was made in that
12 regard.
13         THE INTERPRETER:  You know what,
14     please stop.  She said two things;
15     decision and definition.  I'm just
16     stating what she said.  And it's being
17     videotaped.
18         THE WITNESS:  When I said
19     decision, I was not specifically
20     referring to anything.
21     (Discussion in Korean between
22     interpreters.)
23 BY MR.BEARD:
24     Q.   Ms. Kim, looking further down on
25 the list of products under 2011, on this May 6,

Page 103

1  2010 e-mail that you wrote, what product does
2  Dongle relate to?
3         MR. BASINGER:  Objection,
4     foundation.  Mischaracterizes the
5     document.
6         THE WITNESS:  To my recollection,
7     modem.
8  BY MR. BEARD:
9      Q.   Modem?
10     A.   Yes.  I think it could be referred
11 to as that if you're asking me about product
12 series, product category.
13     Q.   So Dongle was not a smartphone; is
14 that correct?
15     A.   Not that I can recall, no.
16     Q.   Moving down the list, where it
17 says, Atlas 2 curved.  Did that relate to a
18 smartphone?
19         MR. BASINGER:  Objection.  Vague.
20         THE WITNESS:  Well, there's
21     nothing that really pops out of my
22     memory, nothing that sticks out, any
23     image that sticks out.  There is no image
24     that I can visualize.
25         But according to this

Page 104

1      document, it states it's a premium
2      device.
3  BY MR. BEARD:
4      Q.   And that would be a smartphone,
5  correct?
6         MR. BASINGER:  Objection.  Calls
7      for speculation.
8         THE WITNESS:  I would think that
9      would be the case.
10 BY MR. BEARD:
11     Q.   What did you mean when you wrote
12 the word, curved, next to Atlas 2?
13         MR. BASINGER:  Objection.
14     Foundation.
15         THE WITNESS:  I don't exactly
16     recall.
17 BY MR. BEARD:
18     Q.   Do you remember if there was a --
19 if it related to the shape of the device?
20         MR. BASINGER:  Same objection.
21         THE WITNESS:  I don't know how to
22     explain this.  But I don't think I
23     could -- I don't think I could state as
24     to that, not necessarily.  So if you
25     asked me if the word, curved, related to

Page 105

1      a shape, I can't answer as to that.
2  BY MR. BEARD:
3      Q.   Looking down the list of products
4  under 2011, the next one is WP7 Chassis 1.  What
5  type of product is that?
6         MR. BASINGER:  Objection.
7      Foundation.
8         THE WITNESS:  I can only guess as
9      to what that would have been.  I cannot
10     state with any certainty or preciseness.
11 BY MR. BEARD:
12     Q.   I don't want you to guess.  Do you
13 have a belief as to what product it related to?
14         MR. BASINGER:  Calls for
15     speculation.
16         THE WITNESS:  I don't know how to
17     explain this, but according to my rough
18     and vague recollection, I can say that
19     this is related to a phone, a mobile
20     phone.
21 BY MR. BEARD:
22     Q.   Next product down is identified as
23 Arthos.  Do you recall what that relates to?
24         MR. BASINGER:  Foundation.  Vague
25     and ambiguous.

Confidential Attorneys' Eyes Only

Page 182

1    have a disagreement, and that's okay.
2         MR. BASINGER:  And we have been
3    going for seven hours almost.
4         Roughly seven hours?
5         MR. BASINGER:  Actually, I have
6    one question.  Can we take a break and
7    then come back and ask the question
8    before we go off the record, so I want to
9    come back and ask some redirect, yes.
10        THE VIDEOGRAPHER:  The time is
11   6:51 p.m. and we are off the record.
12        (Recess taken from 6:51 p.m. to
13   7:04 p.m.)
14        THE VIDEOGRAPHER:  The time is
15   7:04 p.m. and we are back on the record.    3
16        EXAMINATION
17   BY MR. BASINGER:
18        Q.   Miss Kim, do you remember today
19   being asked whether you gathered any documents to
20   be produced in this litigation?
21        A.   Yes.
22        Q.   And Miss Kim, do you recall giving
23   a response to the effect of, I don't think I've
24   done any separate search work?
25        A.   Yes.

Page 183

1         Q.   Ms. Kim, what did you mean by
2    "search work"?
3         A.   At the time, I conveyed all the
4    material that I had in my possession and handed
5    them over so I didn't have to make -- conduct a
6    separate search, in person.
7         Q.   And what material did you hand
8    over?
9         A.   Almost everything that I would
10   have created or I would have possessed such as
11   PC, my personal notes, diary and everything.
12        Q.   And who did you hand it over to?
13        A.   To our legal team.
14        Q.   And that was for the case that
15   you're being deposed for here today?
16        A.   I think so.  Yes.
17        MR. BASINGER:  Great.  That's all
18   I have.  Off the record.
19        MR. BEARD:  Whoa, whoa, whoa.  I
20   have to follow up.
21        FURTHER EXAMINATION
22   BY MR. BEARD:
23        Q.   A moment ago, you testified that
24   you provided almost everything that you would
25   have created or was in your possession.  What did

Page 184

1    you not provide?
2         A.   There is nothing that I did not
3    provide or handed over.  It's just my personal
4    habit, and typically, Korean people say that
5    "almost" when you don't have 100 percent
6    certainty about what you're saying.
7         THE INTERPRETER:  No, no, no.  She
8    said two things.
9         (Discussion in Korean between
10   Interpreters.)
11        MR. BEARD:  Now I have no more
12   questions.
13        THE WITNESS:  I don't even
14   remember whether I said "almost" in my
15   answer.
16        MR. BEARD:  And subject to our
17   earlier discussion amongst counsel, we'll go
18   ahead and end for the day.
19        THE VIDEOGRAPHER:  This marks the
20   end of Disk Number 4 of four, and
21   concludes today's deposition of Ahyoung
22   Kim.  The time is 7:09 p.m. and we are
23   off the record.
24        (Time noted:  7:09 p.m.)
25

Page 185

1
2
3
4         _____
5              AHYOUNG KIM
6
7
8    Subscribed and sworn to before me
9    This      day of          , 2012.
10   _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential Attorneys' Eyes Only

Page 186

```
 1      C E R T I F I C A T E
 2   STATE OF CALIFORNIA    )
 3                          )
 4   COUNTY OF SAN FRANCISCO )
 5       I, LINDA VACCAREZZA, a Certified
 6   Shorthand Reporter for the State of
 7   California, do hereby certify:
 8       That AHYOUNG KIM, the witness whose
 9   deposition is hereinbefore set forth, was
10   duly sworn by me and that such deposition
11   is a true record of the testimony given
12   by such witness.
13       I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage; and that I
16   am in no way interested in the outcome of
17   this matter.
18       IN WITNESS WHEREOF, I have hereunto
19   set my hand this 14th day of January,
20   2012.
21
22   _____
23   LINDA VACCAREZZA, CSR. NO. 10201
24
25
```

Page 187

```
 1   -------------I N D E X---------------
 2   WITNESS    EXAMINATION BY    PAGE
 3   AHYOUNG KIM  MR. BEARD       5
 4   --------------EXHIBITS---------------
 5   PLAINTIFFS              PAGE LINE
 6   Exhibit 1
 7   Samsung Electronics -
 8   Organization chart
 9   Bates stamped SAMNDCA10165058
10   Through SAMNDCA10165059..........29  11
11
12   Exhibit 2
13   Organization Chart bates stamped
14   SAMNDCA00205345 through
15   SAMNDCA00205346.................29  11
16
17   Exhibit 3
18   Email dated April 6, 2010, Bates
19   Stamped SAMNDCA10159595 through
20   SAMNDCA101597...................62  2
21
22   Exhibit 4
23   Document, Bates stamped SAMNDCA10142416
24   through SAMNDCA10142465..........71  11
25
```

Page 188

```
 1   EXHIBITS (CONT'D)
 2
 3   Exhibit 5
 4   iPad Document, Bates stamped
 5   SAMNDCA10145614 through
 6   SAMNDCA10145628.................81  24
 7
 8   Exhibit 6
 9   Document "All About Octopus Project,"
10   Bates stamped SAMNDCA1061198 through
11   SAMNDCA1061235.................82  20
12
13   Exhibit 7
14   Octopus Project HQ T/F Weekly Meetin,
15   Bates stamped SAMNDCA10144025 through
16   SAMNDCA10144027.................87  10
17
18   Exhibit 8
19   Email dated May 6, 2010, Bates
20   Stamped SAMNDCA00507452 through
21   SAMNDCA00507455.................117  6
22
23
24
25
```

Page 189

```
 1   EXHIBITS (CONT'D)
 2
 3   Exhibit 9
 4   Email dated May 3, 2010, Bates
 5   Stamped SAMNDCA00507467 through
 6   SAMNDCA00507468.................119  16
 7
 8   Exhibit 10
 9   Email dated July 14, 2010, Bates
10   Stamped S-ITC-000107741 through S-ITC-
11   000107744.......................135  15
12
13   Exhibit 11
14   Email dated March 17, 2010, Bates
15   Stamped SAMNDCA00507826 through
16   SAMNDCA00507827.................154  18
17
18   Exhibit 12
19   Insights Overview Summary of Research
20   Insights, Bates stamped
21   SAMNDCA00528815 through
22   SAMNDCA00528836.................159  11
23
24
25
```

Confidential Attorneys' Eyes Only

Page 190

1  EXHIBITS (CONT'D)
2
3  Exhibit 13
4  2012 UX Roadmap Research, Bates
5  SAMNDCA00528837 through
6  SAMNDCA00528849.................161  23
7
8  Exhibit 14
9  Email dated May 4, 2010, Bates
10  SAMNDCA00512454 through
11  SAMNDCA00512458.................166  2
12
13  Exhibit 15
14  T-Mobile & Samsung Jeju Meeting,
15  Bates stamped SAMNDCA00528149
16  Through SAMNDCA00528208..........168  25
17
18  Exhibit 16
19  Brainstorming Session #1 - Product
20  Value Proposition SAMNDCA00530673
21  Through sAMNDCA00530674...........171  15
22
23
24
25

Page 191

1  INSTRUCTIONS NOT TO ANSWER
2  Page 38 Line 15
3  Page 57 Line 20
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1      ERRATA SHEET FOR THE TRANSCRIPT OF:
2  Case Name:  Apple Inc VS. Samsung Electronics
3  Dep. Date:  January 13, 2012
4  Deponent:  AHYOUNG KIM
5  Pg. Ln.  Now Reads     Should Read      Reason
6  __ ___  _____  _____ _____
7  __ ___  _____  _____ _____
8  __ ___  _____  _____ _____
9  __ ___  _____  _____ _____
10  __ ___  _____  _____ _____
11  __ ___  _____  _____ _____
12  __ ___  _____  _____ _____
13  __ ___  _____  _____ _____
14  __ ___  _____  _____ _____
15  __ ___  _____  _____ _____
16  __ ___  _____  _____ _____
17
          _____
18         Signature of Deponent
19
       SUBSCRIBED AND SWORN BEFORE ME
20
       THIS_____ DAY OF_____, 2012.
21
       _____
22
       (Notary Public)  MY COMMISSION
23
       EXPIRES:_____
24
25