# EXHIBIT 54

# FILED UNDER SEAL

Highly Confidential Attorneys' Eyes Only

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
 5   APPLE, INC., a California   )
     corporation,                )
 6                               )
           Plaintiff,            )
 7                               )
     VS.                         )   NO. 11-cv-01846-LHK
 8                               )
     SAMSUNG ELECTRONICS CO.,    )
 9   LTD., a Korean business     )
     entity; SAMSUNG ELECTRONICS )
10   AMERICA, INC., a New York   )
     corporation; SAMSUNG        )
11   TELECOMMUNICATIONS AMERICA, )
     LLC, a Delaware limited     )
12   liability company,          )
                                 )
13         Defendants.           )
14
15
16
17         ORAL AND VIDEOTAPED DEPOSITION OF
18                   BRIAN ROSENBERG
19                  JANUARY 27, 2012
20      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
21
22
23
24   Reporter: Therese Casterline
25   Job Number: 45460
```

Page 26

```
 1      Q.  To whom does he report directly?           09:25
 2      A.  To Corey Kerstetter.                       09:25
 3      Q.  And Mr. Kerstetter reports to you?         09:25
 4      A.  Yes.                                       09:25
 5      Q.  What is Mr. Kerstetter's title?            09:25
 6      A.  I believe it's VP of business planning.    09:25
 7      Q.  Okay.  What -- what does business planning 09:25
 8  mean?                                              09:25
 9      A.  Business planning for us is everything from -- 09:25
10  it's really focused on forecasting and managing the 09:25
11  supply chain.                                      09:25
12      Q.  Did you receive this e-mail from Mr. Rahman on 09:25
13  or about December 9th, 2011?                       09:26
14      A.  I'm sure that I did.                       09:26
15      Q.  Okay.  In the first paragraph, it talks about 09:26
16  this being meeting notes from a first quarter 2012 STA 09:26
17  business review with headquarters.  Do you see that? 09:26
18      A.  Yes.                                       09:26
19      Q.  What -- what -- what is that?  What is a -- 09:26
20  the first quarter STA business review with         09:26
21  headquarters?                                      09:26
22      A.  It's an alignment meeting to al- -- to align 09:26
23  with our headquarters executives on things like pricing 09:26
24  and investments and volume for the first quarter plan. 09:26
25      Q.  And -- and is that typically done          09:26
```

Page 27

```
 1  face-to-face?                                      09:26
 2      A.  Typically.                                 09:26
 3      Q.  And did you attend the -- the meeting that -- 09:26
 4  that is referred to in these meeting notes?        09:26
 5      A.  Yes.                                       09:26
 6      Q.  And where was it held?                     09:26
 7      A.  In Dallas --                               09:26
 8      Q.  And --                                     09:26
 9      A.  -- at our office.                          09:26
10      Q.  And who attended from headquarters?        09:26
11      A.  So a number of people.  I mean, I think it's 09:26
12  probably on here, isn't it?                        09:26
13      Q.  If it is, I couldn't find it.              09:27
14      A.  So I believe in that meeting that it was Sam 09:27
15  Lee, Iou Byun, and Moon-Chul Lee.                  09:27
16      Q.  And you just told me about Sam Lee; is that 09:27
17  right?                                             09:27
18      A.  Yes.                                       09:27
19      Q.  And -- and what is Mr. Byun's position,    09:27
20  B-Y-U-N?                                           09:27
21      A.  So Mr. Byun has responsibility at headquarters 09:27
22  for sales and marketing of CDMA products in the US. 09:27
23      Q.  And what does CDMA mean?                   09:27
24      A.  So the legacy technology used by Verizon and 09:27
25  Sprint.                                            09:27
```

Page 28

```
 1      Q.  And Moon-Chul, M-O-O-N-C-H-U-L, Lee, what is 09:27
 2  his position?                                      09:27
 3      A.  It's -- it's actually a bit unclear, but   09:28
 4  Mr. Moon-Chul Lee, for the most part, focuses on partly 09:28
 5  the tablet business, but then also overall volume  09:28
 6  assumptions for the US market.                     09:28
 7      Q.  It -- do you typically have one of these   09:28
 8  meetings every quarter?                            09:28
 9      A.  Yes.                                       09:28
10      Q.  Do you work on a calendar quarter, so is the 09:28
11  first quarter January, February and March?         09:28
12      A.  Yes.                                       09:28
13      Q.  At this particular meeting in December, how 09:28
14  does the process start?  Who makes the recommendations 09:28
15  for what the objectives are going to be?           09:28
16      A.  So it's a -- it's an iterative process, so 09:28
17  we'll typically get -- we'll put together what we  09:28
18  believe we can achieve over the course of the year. 09:28
19  The headquarters team will put together their      09:28
20  assumptions of what they believe we can achieve, and 09:28
21  then we'll meet to figure out, where do we set targets. 09:29
22      Q.  I'm -- I got distracted when I was talking 09:29
23  about pricing.                                     09:29
24          In terms of the pricing between SEC and    09:29
25  STA, is that price negotiated -- for phones, I'm   09:29
```

Page 29

```
 1  talking about?                                     09:29
 2      A.  So I don't -- I don't know.                09:29
 3      Q.  Okay.  In terms of the pricing, STA's pricing 09:29
 4  that they're going to set -- sell -- at which they're 09:29
 5  going to sell to carriers, is -- is that pricing   09:29
 6  negotiated between STA and the carriers?           09:29
 7      A.  Yes.                                       09:29
 8      Q.  And -- and who is the person or people who are 09:29
 9  responsible for doing -- at STA who are responsible for 09:29
10  doing those negotiations?                          09:29
11      A.  The different sales teams.                 09:29
12      Q.  Okay.  Do you have final approval of those 09:29
13  prices within STA?                                 09:29
14      A.  No.                                        09:29
15      Q.  Who does within STA?                       09:30
16      A.  I would say within STA, Dale Sohn.         09:30
17      Q.  Okay.  Are you in the approval chain for those 09:30
18  prices?                                            09:30
19      A.  Yes.                                       09:30
20      Q.  Okay.  Do -- does -- are STA's proposed prices 09:30
21  to carriers submitted to SEC for review?           09:30
22      A.  Yes.                                       09:30
23      Q.  And are they submitted to SEC for approval? 09:30
24      A.  Yes.  I'd say yes.                         09:30
25      Q.  Okay.  Now I'm back to Mr. Rahman's e-mail of 09:30
```

Highly Confidential Attorneys' Eyes Only

Page 42

1  A. I'm assuming they're these at the bottom.  09:47
2  Q. That's correct.  09:47
3     There's an e-mail there from a gentleman  09:47
4  called Jongsung Oh that's dated Monday, January 24th,  09:47
5  2011. Do you see that?  09:47
6  A. Yes.  09:47
7  Q. And it shows that you are copied on that.  09:47
8     It's interesting, it doesn't show you as  09:47
9  an e-mail copy, but it shows, Dear Omar, and then it  09:47
10 says, cc Brian Rosenberg.  09:47
11 A. It also has me at my e-mail address.  09:47
12 Q. Oh, you've got it. I missed that one. Okay.  09:47
13 Got it.  09:47
14    Who -- who is Jongsung Oh?  09:47
15 A. I don't know.  09:47
16 Q. All right. Under background, it says,  09:48
17 currently there is no brand logo in front face of  09:48
18 Galaxy Tab P1.  09:48
19    Do you see that?  09:48
20 A. Yes.  09:48
21 Q. What -- what is the Galaxy Tab P1?  09:48
22 A. So Galaxy Tab P1 is the -- the 7-inch  09:48
23 tablets that we launched second half of 2010 with  09:48
24 carriers.  09:48
25 Q. Okay. And then it says, since we are to  09:48

Page 43

1  launch the Galaxy Tab WiFi version, we would like to  09:48
2  add Samsung logo in the front upper space. Do you see  09:48
3  that?  09:48
4  A. Yes.  09:48
5  Q. Do you recall this discussion?  09:48
6  A. Yes.  09:48
7  Q. And -- and what was -- what was the issue, as  09:48
8  you recall?  09:48
9  A. As I recall, the issue was when we were taking  09:48
10 the tablet into national retail, there was a debate on  09:48
11 whether or not we would have the Samsung logo on the  09:48
12 front so that you could more quickly identify that it  09:48
13 was a Samsung product.  09:48
14 Q. Were you in any way involved in the decision  09:49
15 not to have the Samsung logo on the front of the P1?  09:49
16    MR. BRINKMAN: Objection, foundation.  09:49
17 A. I was not. It was before my time at Samsung.  09:49
18 Q. Right. Okay.  09:49
19    Did you, personally, on this issue about  09:49
20 whether or not to put the Samsung logo on the face of  09:49
21 the products that would be sold in retail, did you have  09:49
22 a view about that?  09:49
23 A. I did. I mean, it was a heated debate, right.  09:49
24 It's an ongoing debate. My view was that I did not  09:49
25 want to.  09:49

Page 44

1  Q. And why was that?  09:49
2  A. Because we had succeeded in keeping the -- the  09:49
3  face of the product clean with the carriers, and I knew  09:49
4  that if we had the Samsung logo on the front in the  09:49
5  WiFi version, that we would end up in a battle with the  09:49
6  carriers about getting their logo on the front of the  09:49
7  3G versions.  09:49
8  Q. And in your view, why was it an advantage to  09:49
9  have the front face of the product clean?  09:50
10    MR. BRINKMAN: Objection, foundation.  09:50
11 A. So, number one for me is the -- the risk of  09:50
12 obsolescence and inventory, component assets that you  09:50
13 need to sell through the channel.  09:50
14    If you have a clean front, you have a lot  09:50
15 more flexibility in which phone you actually make with  09:50
16 that front, and the glass is one of the most expensive  09:50
17 parts of the phone. Once it's printed, if it's got  09:50
18 logos, then you're more limited.  09:50
19 Q. So -- so if it says AT&T on it, you can  09:50
20 only --  09:50
21 A. You can only sell it to AT&T.  09:50
22 Q. Right.  09:50
23    If you look at page 3, there -- there's an  09:50
24 e-mail from Young Hoon -- even I have trouble with that  09:51
25 one.  09:51

Page 45

1  A. Eom.  09:51
2  Q. Eom.  09:51
3  A. Uh-huh.  09:51
4  Q. Do you know Mr. Eom?  09:51
5  A. Yes.  09:51
6  Q. And what's his position?  09:51
7  A. His position at the time was at SEA as -- I  09:51
8  don't recall his exact title, but he was kind of the  09:51
9  number two guy at SEA.  09:51
10 Q. Does he no longer have that position?  09:51
11 A. He does not. He -- I think he -- he moved  09:51
12 back to Korea in the changes here in December.  09:51
13 Q. Okay. And within his e-mail, there's an --  09:51
14 there's -- he's quoting from an e-mail from a gentleman  09:51
15 called Ian Huh. Is that how you say his name?  09:51
16 A. Huh.  09:51
17 Q. Huh.  09:51
18    And -- and do you know Mr. Huh?  09:51
19 A. Yes.  09:51
20 Q. And what was his position at that time?  09:51
21 A. So at the time Ian was, within SEA,  09:51
22 responsible for the tablet business into national  09:51
23 retail.  09:52
24 Q. Into national retail; is that right?  09:52
25 A. Yes.  09:52

Page 46

1  Q. Okay.                                        09:52
2  A. Selling into national retail.                09:52
3  Q. Who holds that position today?               09:52
4  A. So it's -- it's still -- Ian's still on the  09:52
5  role, I believe. I thought -- at the time the business 09:52
6  was new, there were a couple key guys running it, Ian 09:52
7  Huh and -- and Travis Merrill. I think now it's more 09:52
8  Travis. Ian's doing some other things in        09:52
9  semiconductor.                                  09:52
10 Q. Okay. In -- in the -- in Mr. Huh's statement, 09:52
11 which is quoted here, he -- he says, based on the 09:52
12 Samsung Group's CI guide. Do you see that?      09:52
13 A. Uh-huh.                                      09:52
14 Q. What does CI guide stand for?                09:52
15 A. I'm not sure.                                09:52
16 Q. Are -- are you -- do you know whether or     09:52
17 not -- do you know what the words "CI" stand for? 09:52
18 A. No.                                          09:52
19 Q. Have you ever seen a written guide about a   09:52
20 presentation of Samsung products, labeling design? 09:52
21 A. Not that I can recall.                       09:53
22 Q. On the first page of this e-mail, at the     09:53
23 bottom there's an e-mail from Ian Huh to a group of 09:53
24 people, including you.                          09:53
25    And for context, he's referring to the       09:53

Page 47

1  decision that's on the next page, the decision not to 09:53
2  put the Samsung logo on the WiFi version.       09:53
3     Do you see that?                             09:54
4  A. Let me read through that real quick.         09:54
5  Q. Sure.                                        09:54
6  A. I see it.                                    09:54
7  Q. And Mr. Huh says, please make it clear that  09:54
8  this is only for P1 or goes to other models in the 09:54
9  future.                                         09:54
10    And I think he meant to say, I am pretty     09:54
11 sure that extra costs for branding would be much more 09:54
12 than cost saving by using leftover materials.   09:54
13    Do you see that?                             09:54
14 A. I see it.                                    09:54
15 Q. Do you understand what he's saying?          09:54
16 A. Yes, I believe I -- I believe I do.          09:54
17 Q. Okay.                                        09:54
18 A. I mean, I --                                 09:54
19 Q. What is your understanding?                  09:54
20 A. My understanding of what he's communicating is 09:54
21 he wants to clarify if this is only for the P1 tablet 09:54
22 or if we launch other tablets -- and I'm speculating 09:54
23 that he means if we launch other tablets in the future, 09:54
24 does the same rule apply.                       09:55
25 Q. Okay. And then the -- the last e-mail on this 09:55

Page 48

1  chain is from Mr. -- the president of STA, correct, to 09:55
2  a group of people?                              09:55
3     Who -- who -- at this time, who is Omar     09:55
4  Kahn?                                           09:55
5  A. At this time, Omar Kahn ran the product     09:55
6  organization -- product planning organization for the 09:55
7  US.                                             09:55
8  Q. The same job that Mr. Packingham has now?    09:55
9  A. That's correct.                              09:55
10 Q. Mr. Kahn no longer works for the company?    09:55
11 A. That's correct.                              09:55
12 Q. Do you know where he works now?              09:55
13 A. Yes. He just started in a new company called 09:55
14 NetQin.                                         09:55
15 Q. Is that here in Dallas?                      09:55
16 A. It is.                                       09:55
17 Q. And then this is copied to a person whose name 09:55
18 is Tim Baxter at Samsung.com?                   09:55
19 A. Yes.                                         09:55
20 Q. Do you know Mr. Baxter?                      09:55
21 A. Yes.                                         09:55
22 Q. And what was his position at this time?      09:55
23 A. So president of SEA.                         09:55
24 Q. What is his current position?                09:55
25 A. I believe it's still president of SEA.       09:55

Page 49

1  Q. Okay. So Mr. Sohn says, thank you for your   09:56
2  feedback on the logo issue. From now on, please 09:56
3  consult with STA on this kind of product and marketing 09:56
4  issue before you go to headquarters.            09:56
5     What -- what was he -- what was the         09:56
6  problem that he was referring to there?         09:56
7     MR. BRINKMAN: Objection, foundation.        09:56
8  A. I'm not sure.                                09:56
9  Q. He says, I don't personally agree that we    09:56
10 should have Samsung logo on the front concerning -- 09:56
11 considering this bezel of the design. Do you see that? 09:56
12 A. I see it.                                    09:56
13 Q. Do you know what the term "bezel" means?     09:56
14 A. Bezel generally refers to the edge of the    09:56
15 product.                                        09:56
16 Q. Did you ever have a discussion with President 09:56
17 Sohn about his views of why the Samsung logo should not 09:56
18 be on the front?                                09:56
19 A. I recall we had a -- discussions about it.   09:56
20 It's hard to recall the outcome of the discussions. 09:57
21 Q. Did you ever discuss what he has put here in 09:57
22 writing about his view about the -- the interplay 09:57
23 between the bezel of the design and the logo?   09:57
24 A. No, I don't.                                 09:57
25 Q. Okay.                                        09:57

## Page 110

1 chipset is going to change from a T20 application 12:15
2 processor to an OMAP4430 application processor. 12:15
3   Q. Below that it says, develop two versions, 12:15
4 Touch and Touch Q. Do you see that? 12:15
5   A. Yes. 12:15
6   Q. Did that actually happen? Did you release two 12:15
7 versions, a Touch and a Touch Q version? 12:15
8   A. We did not. 12:15
9   Q. What was proposed to be the difference between 12:15
10 the Touch and the Touch Q version? 12:15
11   A. The Touch Q had a keyboard built in, and so it 12:16
12 had a hinge mechanism where you could open it up and it 12:16
13 would look like a laptop. 12:16
14   Q. And is Q short for QWERTY, Q-W-E-R-T-Y? 12:16
15   A. Yes. 12:16
16   Q. All right. 12:16
17       MR. McELHINNY: As this point, I'd like to 12:16
18 take another break. 12:16
19       THE WITNESS: Okay. 12:16
20       THE VIDEOGRAPHER: We're off record at 12:16
21 12:17 p.m. 12:16
22       (Recess 12:17-12:30 p.m.) 12:29
23       THE VIDEOGRAPHER: We're back on record at 12:29
24 12:30 p.m. 12:29
25       (Exhibit Number 1289 marked.) 12:29

## Page 111

1   Q. Sir, I've handed you a three-page document 12:29
2 which purports to be an e-mail from you to Paul 12:30
3 Chapple, C-H-A-P-P-L-E, and Hyoungtaek Chang, 12:30
4 H-Y-O-U-N-G-T-A-E-K, C-H-A-N-G, dated September 21, 12:30
5 2011, Bates pages 10463234 through 3236. 12:30
6   A. Okay. 12:31
7   Q. Do you know a gentleman named Paul Chapple? 12:32
8   A. Yes. 12:32
9   Q. Was he employed by a Samsung company in 12:32
10 September of 2011? 12:32
11   A. Yes. 12:32
12   Q. What was his position? 12:32
13   A. So general manager of the AT&T account. 12:32
14   Q. Do you know a gentleman by the name of 12:32
15 Hyoungtaek Chang? 12:32
16   A. Yes. 12:33
17   Q. Was he a Samsung employee as of September 21, 12:33
18 2011? 12:33
19   A. Yes. 12:33
20   Q. And what was his position? 12:33
21   A. He was the dispatcher for the AT&T account 12:33
22 team. 12:33
23   Q. Is this a true copy of an e-mail that you sent 12:33
24 to those gentlemen on September 21, 2011? 12:33
25   A. I believe it to be, yes. 12:33

## Page 112

1   Q. Okay. And does this -- this deals with 12:33
2 pricing for connected tablets, correct? 12:33
3   A. Yes. 12:33
4   Q. In your first sentence -- well, first of all, 12:33
5 let me ask you, why -- why did you send this e-mail to 12:33
6 Mr. Chang -- is it Chang? 12:33
7   A. Yes. 12:33
8   Q. Okay. 12:33
9   A. Yes. 12:33
10   Q. How do -- why did you send it to him? 12:33
11   A. So I don't recall exactly. I believe, though, 12:33
12 at the time we were trying to get the pricing for AT&T 12:33
13 P5 nailed down and wanting to make sure that we could 12:33
14 get it ranged at Best Buy. 12:33
15   Q. Were you expecting him to communicate this 12:33
16 message to Korea? 12:33
17   A. So I -- I believe from my comments on here 12:34
18 that I had had a conversation with Dale Sohn at a high 12:34
19 level about what we needed to do to -- to get the P5 12:34
20 priced to sell and to get it into Best Buy, that I had 12:34
21 not a lot of luck on that, and so I asked HT to have 12:34
22 the conversation with Dale. Sometimes if you don't get 12:34
23 very far in English, having the discussion in Korean 12:34
24 helps. 12:34
25   Q. Okay. In your first sentence you said, to be 12:34

## Page 113

1 successful at NR. Does that stand for national retail? 12:34
2   A. Yes, it does. 12:34
3   Q. You have a section here that's called pricing 12:34
4 issues. And in point 2 -- well, first of all, in point 12:34
5 1, you talk about a no contract session based model, 12:34
6 with quotes around it. What does that refer to? 12:34
7   A. So a no contract session based model would be 12:34
8 when the carrier does not provide a subsidy in exchange 12:34
9 for a contract at the purchase of the tablet. 12:34
10   Q. And -- and what does the session based mean? 12:35
11   A. So meaning that you would pay for data service 12:35
12 on a -- either on a per-session basis or that you would 12:35
13 buy it month-to-month. 12:35
14   Q. Okay. In the second bullet point there you 12:35
15 say that, our connected retail pricing for a no 12:35
16 contract session based model is not competitive with 12:35
17 the market leader. 12:35
18       Do you see that? 12:35
19   A. Yes. 12:35
20   Q. And by market leader, were you referring to 12:35
21 Apple? 12:35
22   A. Apple had -- was the volume leader at that 12:35
23 time. 12:35
24   Q. So the answer to my question is yes? 12:35
25   A. Yes. 12:35

Highly Confidential Attorneys' Eyes Only

Page 114

1  MR. McELHINNY: Sir, I have no further          12:35
2  questions for you.                              12:35
3       THE WITNESS: Okay.                         12:35
4       MR. BRINKMAN: I think have just one        12:35
5  question, or maybe a couple that I want to ask, just to  12:35
6  make sure something isn't unclear.              12:35
7           EXAMINATION                            12:35
8  BY MR. BRINKMAN:                                12:35
9   Q. Could you pull out -- I think it was 1283 and  12:35
10 1287. And I'm just asking you to pull those out so you  12:35
11 know what documents I'm referring to, not that I'm  12:36
12 going to go into those documents.                12:36
13      But when Mr. McElhinny was asking you     12:36
14 questions about your competitors' pricing and volume  12:36
15 data that's in those documents, my question is, how do  12:36
16 you know whether or not those -- those numbers are  12:36
17 accurate?                                        12:36
18  A. Hm. So usually when we're in the quarter, we  12:36
19 don't, right. It's the -- the best we could come up  12:36
20 with.                                            12:36
21      It's interesting on this one, our Q3 sell  12:36
22 through, we missed the HTC number by about a million.  12:36
23 So we'll -- we'll base it on a week-to-week kind of  12:36
24 bottoms up, try to figure out what it is.       12:37
25      But then when the vendors report volume,  12:37

Page 115

1  when strategy analytics and Gartner report volume,  12:37
2  we'll go back and see how -- how accurate we were.  12:37
3       Third quarter -- second quarter we were  12:37
4  off big on HTC; third quarter we were off by over a  12:37
5  million units.                                   12:37
6       MR. McELHINNY: Have you finished your  12:37
7  answer?                                          12:37
8       THE WITNESS: Yes.                          12:37
9       MR. McELHINNY: I move to strike the  12:37
10 answer as nonresponsive.                         12:37
11      THE WITNESS: Okay.                         12:37
12      MR. McELHINNY: You don't have to do  12:37
13 anything.                                        12:37
14      MR. BRINKMAN: I don't have any further  12:37
15 questions.                                       12:37
16      MR. McELHINNY: Done.                       12:37
17      THE WITNESS: Okay.                         12:37
18      THE VIDEOGRAPHER: We're off record at  12:37
19 12:38 p.m.                                       12:37
20      THE REPORTER: Do we send the original to  12:37
21 your office?                                     12:37
22      MR. BRINKMAN: Send it to the Quinn        12:37
23 Emanuel person responsible.                      12:37
24      (Deposition concluded at 12:37 p.m.)
25

Page 116

1           CHANGES AND SIGNATURE
2  WITNESS NAME: BRIAN ROSENBERG    DATE: 1-27-12
3  PAGE  LINE      CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 117

1       I, BRIAN ROSENBERG, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4              _____
5                   BRIAN ROSENBERG
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10     Before me, _____, on this
11 day personally appeared BRIAN ROSENBERG, known to me
12 (or proved to me under oath or through
13 _____) (description of identity card or
14 other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18     Given under my hand and seal of office this
19 _____ day of _____, 2012.
20
21          _____
22          NOTARY PUBLIC IN AND FOR
23          THE STATE OF _____
24 My commission expires: _____
25

Highly Confidential Attorneys' Eyes Only

Page 118

```
 1     IN THE UNITED STATES DISTRICT COURT
 2    FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3           SAN JOSE DIVISION
 4
 5   APPLE, INC., a California   )
     corporation,                )
 6                               )
         Plaintiff,               )
 7                               )
     VS.             ) NO. 11-cv-01846-LHK
 8                               )
     SAMSUNG ELECTRONICS CO.,    )
 9   LTD., a Korean business     )
     entity; SAMSUNG ELECTRONICS )
10   AMERICA, INC., a New York   )
     corporation; SAMSUNG        )
11   TELECOMMUNICATIONS AMERICA, )
     LLC, a Delaware limited     )
12   liability company,          )
                                 )
13       Defendants.              )
14
15           REPORTER'S CERTIFICATION
16     ORAL AND VIDEOTAPED DEPOSITION OF BRIAN ROSENBERG
17              JANUARY 27, 2012
18       I, Therese J. Casterline, Registered Merit
19   Reporter, Certified Realtime Reporter, Certified
20   Shorthand Reporter in and for the State of Texas, do
21   hereby certify that there came before me on the 27th
22   day of January, 2012, at the offices of Regus, located
23   at 4514 Cole Avenue, Suite 600, Dallas, Texas, the
24   following named person, to wit: BRIAN ROSENBERG, who
25   was duly sworn to testify the truth, the whole truth,
```

Page 119

```
 1   and nothing but the truth of knowledge touching and
 2   concerning the matters in controversy in this cause;
 3   and that he was thereupon examined upon his oath and
 4   his examination reduced to typewriting under my
 5   supervision; that the deposition is a true record of
 6   the testimony given by the witness, that review by the
 7   witness was requested on the record, and signature of
 8   the witness is to be signed before any notary public.
 9       I further certify that I am neither attorney
10   nor counsel for nor related to any of the parties to
11   the action in which this deposition is taken, and
12   further that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto, or
14   financially interested in this action.
15       Given under my hand on this the 27th day of
16   January, 2012.
17
18       _____
         Therese J. Casterline, CSR, RMR, CRR
19       TSG Reporting - Worldwide
         747 Third Avenue
20       New York, New York  10017
         (877) 702-9580
21
22
23
24
25
```