# EXHIBIT 9

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN ELECTRONIC DEVICES,<br>INCLUDING WIRELESS COMMUNICATION<br>DEVICES, PORTABLE MUSIC AND DATA<br>PROCESSING DEVICES, AND TABLET<br>COMPUTERS** | Inv. No.  337-TA-794 |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Administrative Law Judge E. James Gildea

(September 14, 2012)

**Appearances:**

*For the Complainants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC:*

Charles K. Verhoeven, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP of San Francisco, California

Victoria Maroulis, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP of Redwood Shores, California

Robert Becher, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP of Los Angeles, California

Alan Whitehurst, Esq. and Marissa Ducca, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP of Washington, D.C.

Thomas D. Pease, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP of New York, New York

(CRBr. at 87.)  According to Samsung, almost a year ago it offered to license its portfolio of patents that had been declared essential to the UMTS standard to Apple at a "headline" rate of 2.4 percent for each relevant end product.  (*Id.* (citing CX-1589.0001).)  In response, Apple by letter proposed a "methodology to derive a FRAND royalty rate" for Samsung's patent portfolio. (*Id.* (citing RBr. at 137-138).)  Samsung claims that Apple's letter did not provide a counteroffer, but merely critiqued Samsung's offer.  (*Id.* (citing RX-1659C).)  Although Apple contends that Samsung's offer was too high, Samsung argues that Apple submits no evidence to suggest that it has ever made a counterproposal to Samsung's outstanding offer.  (*Id.*)

Samsung says that Apple's contention that Samsung's licensing offer was too high is wrong and the fact that the royalty payments might be significant hardly demonstrates that Samsung's offer is unreasonable, particularly given the size of Samsung's UMTS patent portfolios and the valuable contributions reflected therein.  (*Id.* at 88.)  As regards Apple's contention that the royalty sought by Samsung would be higher than the price of a baseband chip, Samsung says this is irrelevant, because Apple fails to identify a single industry license that uses the price of a baseband chip as a royalty base.  (*Id.*)  Samsung says that licenses in the telecommunications industry typically use the net sales price of a handset as the royalty base, not the price of the baseband chip.  (*Id.* (citing RX-0174C at 2; RX-205C at 2; RX-206C at 19-20; RX-0201C at 5; RX-0194C at 6; CX-0395C at 9).)  Samsung says that even if its royalties would result in payments greater than the price of a baseband chipset, such royalty rates are consistent with industry practice, and other participants in the industry, including Qualcomm and Ericsson, require licensees to pay a royalty rate of more than 2.4 percent of the net sales price of handsets for patents declared essential to ETSI standards.  (*Id.* (citing RX-0174C at 2; RX-205C at 2; RX-206C at 19-20; RX-0194C at 6).)

Samsung says that Apple's reliance on a Fed. R. Evid. 408 document from the negotiation of a cross-license between {      } and Samsung is misplaced, and explains by way of this scenario: That {          } percent royalty rate for Samsung's WCDMA-declared-essential portfolio and Samsung pays {            } percent royalty rate for {      } WCDMA-declared-essential portfolio. (*Id.* (citing RX-0190C at S-794-ITC-005280737).) Samsung says that applying the rates used in this scenario to each party's projected sales of handsets, the parties calculated that Samsung would owe {                            }, resulting in a net payment of {              }. (*Id.*) However, the parties ultimately agreed to a net payment of {                } greater than what was indicated by the initial calculations. (*Id.* (citing RX-0189C at S-794-ITC-005280293).) At best, argues Samsung, the {        } rate is not reflective of the actual agreement reached by the parties, and if anything, the rate supports the reasonableness of Samsung's offer. (*Id.*) If the royalty rate contemplated in the scenario is proportionally increased to match the actual {        } net payment, the resulting royalty rate is over {        }, which is comparable to the rate offered by Samsung to Apple. (*Id.*)

Samsung counters that Apple's contention that Samsung's proposed rate is out of line with other licenses to which Samsung is a party, is also wrong. (*Id.* (citing RBr. at 139-140).) Samsung argues that the fact that it has not previously licensed its portfolio of UMTS patents for a royalty rate of 2.4 percent demonstrates only that Apple's litigation-driven request for such a limited license, and Apple's refusal to negotiate terms and conditions are at odds with the typical practice in the industry, and at Samsung, of entering into cross-licenses of entire declared-essential patent portfolios, often in exchange for a balancing, or net, payment from one party to the other. (*Id.* (citing RX-0189C; RX-0191C; RX-0193C;RX-0178C; RX-0194C; RX-0195C;

RX-0196C; RX-0197C; RX-0198C; RX-0199C; RX-0200C; RX-0202C; RX-0203C; RX-0204C; RX-0205C; RX-0206C; RX-0207C; RX-0208C; RX-0209C; RX-0421C; RX-0423C).) Samsung says that the fact that {                                        } in regards to some of these licenses does not reflect adversely on the value of Samsung's UMTS portfolio, but instead, suggests that Samsung's sales volume and corresponding exposure might be higher than that of competitors with much lower sales.  (*Id.*)

Apple responds that Samsung's 2.4 percent demand of Apple is not FRAND, nor remotely close.  (RRBr. at 90.)  Apple repeats that Samsung asks Apple to pay a price that {                                        }, which would result in per-unit royalties of greater than $12 a unit, which is greater than the price of the baseband processors that Samsung claims are infringing.  (*Id.*)  Apple argues that, having failed to put on any trial evidence, and without citation to any proof, Samsung claims that its proposed royalty rate and base are in line with the royalty rates of other companies for their declared-essential patents.  (*Id.*)  Apple says that Samsung's position is based only on attorney argument and is insufficient to meet Samsung's challenges of proving it made a FRAND offer.  Insofar as Samsung suggests that Apple has refused to negotiate, Apple says that this is belied by the course of communications between the parties, including Apple's April 30, 2012 offer to Samsung that included a proposal for the parties to cross-license each other's UMTS portfolios on truly FRAND terms.  (*Id.* (citing RX-1659C).)

The Administrative Law Judge concludes that the evidence does not support Apple's allegation that Samsung failed to offer Apple licenses to Samsung's declared-essential patents on FRAND terms.  Patents have the attributes of personal property.  35 U.S.C. § 261.  Their value, in terms of licensing, varies according to a myriad of factors, and it is not enough for Apple to

PUBLIC VERSION

say that Samsung's license offer was unreasonable based on Apple's rationale. Remarkably, even though Apple complains that Samsung's license offer was not FRAND, Apple has not shown that, as a member to ETSI, it ever availed itself of the process and procedures of the ETSI under Clause 4.3 of the ETSI Guide on IPRs, which provides for mediation by ETSI Members or the Secretariat. (RX-0713 at Clause 4.3.) It is not enough for Apple to complain that Samsung's license offer of 2.4 percent of the selling prices of Apple's devices, is unreasonable, since there is insufficient evidence of customs and practices of industry participants showing that Samsung's demand is invidious with respect to Apple. Furthermore, negotiations often involve a process of offer and counteroffer before the parties arrive at an agreed price, but Apple's evidence does not demonstrate that Apple put forth a sincere, bona fide effort to bargain with Samsung. Rather, it appears that Apple and Samsung both decided to negotiate licensing terms between each other through the tortuous, and expensive, process of litigation. More than what has been cited by Apple is necessary in order to establish that Samsung violated its obligations under Clause 6.1 of Annex 6: ETSI Intellectual Property Rights Policy. More than that, Apple needs to establish a legal basis for foreclosing enforcement under Section 337 in this Investigation, which Apple has not done.

### B. '644 Patent Enforceability

#### 1. Alleged Standards Setting Misconduct (3GPP)

##### a) Apple's allegation that Samsung engaged in misconduct in transactions with 3GPP and ETSI involving the disclosures in the '644 patent

Apple alleges that the '644 patent is unenforceable because Samsung violated the ETSI IPR Policy[84] by hiding Samsung's then-pending '644 patent applications from ETSI and 3GPP

---

[84] This is the European Telecommunications Standards Institute (*see* RX-723 at APLNDC-WH-A 9397) Intellectual

while simultaneously advocating that TS 25.212 § 4.10.4 should be amended to adopt the rate-matching pattern of those applications.  (RBr. at 127 (citing RX-710 at Clause 4.1).)  Apple contends that Samsung was bound by the duties of disclosure set forth by the ETSI in Section 4, entitled "Disclosure of IPRs," which reads as follows:

> Each MEMBER shall use its reasonable endeavors to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.  In particular, a MEMBER submitting a technical proposal for STANDARD shall, on a bona fide basis, draw attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(*Id.* at 127, 62-63 (citing RX-710 at Clause 4.1).)  Apple says that the duties set forth in Clause 4.1 apply to Samsung, and Apple maintains that Samsung's actions in connection with the '644 patent, and in particular, Samsung's claims that the patent has priority to three prior Korean patent applications: KR 10-2004-0099917 ("KR 917"), filed December 1, 2004; KR 10-2004-0110552, filed December 22, 2004; and KR 10-2005 0007437 filed January 27, 2005, demonstrate that Samsung breached those duties.  (*Id.* (citing JXM-3).)  Apple further notes, in that connection, that the United States application (App. No. 11/289, 572) was filed on November 30, 2005.  (*Id.* (citing JXM-3).)

Apple argues that the ETSI IPR policy contemplates that its members must declare any of their proprietary IPR that may be essential to a standard that is under consideration before any such standards are adopted by the ETSI.  (*Id.* (citing Tr. (Walker) at 1362-65 (explaining ETSI IPR policies)).)  Apple alleges that Samsung did not declare any of the aforementioned patent applications as essential to TS 25.212 until May 16, 2006, almost a year after Samsung successfully convinced the 3GPP to adopt the claimed '644 rate-matching pattern as TS 25.212 § 4.10.4.  (*Id.* (citing RX-722 at APL79-A000000963 (indicating adoption of Samsung's E-AGCH

---

Property Rights Policy (*see* RX-710 at APLNDC-WH-A 12542).

proposal by RAN 1); RX-854 at 55 (indicating adoption of Samsung's E-AGCH proposal by RAN 1); RX-133 at 14 (declaring KR 917 as essential)).) According to Apple, what Samsung did declare was a single application, which was the only application (KR 917), which does not disclose the claimed '644 rate-matching pattern. (*Id.*)

Apple says that Mr. Kim, one of the named inventors of the '644 patent, was unabashed at the hearing about Samsung's strategy vis-à-vis its involvement in the ETSI when he conceded that his Korean applications covered the very same rate-matching pattern that he had proposed to RAN 1. (*Id.* (citing Tr. at 374-376, 378 (Kim)).) Despite that connection and what Apple contends were his and Samsung's obligation to disclose potentially essential IPR, Mr. Kim admitted that he withheld the pending Korean patent applications:

> Q. And on February 14th, 2005, you're in, I believe it was Scottsdale, Arizona for the meeting, right?
> A. Yes, that's how I recall.
> Q. And you heard the call for IPR, right?
> A. As I sit here today, I don't quite recall, but I would believe that's how it had happened.
> Q. Well, you do recall that the RAN 1 meetings always started with a call for IPR, right?
> A. That is correct, based on my ten years of experience.
> Q. And what the chairman says is if you have IPR that might be essential to your proposal, you have to disclose it, right?
> A. No, I don't think so.
> Q. It says, "own IPR which are or likely to become essential," right?
> A. That's how it is written.
> Q. Now, 18 days before this on January 27th, you had filed the third of your three patent applications, right?
> A. I believe so.
> Q. An application that covered the rate-matching patterns at this meeting, right?
> A. I believe so.
> Q. And you took no steps in response to the chairman's call for IPR to disclose your patent applications, right?
> A. I did not take any step in response to the call for IPR....

(*Id.* at 127-128 (citing Tr. at 377-378 (Kim)).) Apple notes that Mr. Kim conceded that he never disclosed the applications leading to the '644 patent at any time. (*Id.* (citing Tr. at 380 (Kim)).)

Apple says that, although Samsung kept the '644 patent secret from 3GPP and ETSI, the named inventors actively lobbied RAN 1 and other member companies to adopt Samsung's pattern as § 4.10.4, instead of better-performing technology, known as "tail-baiting," that had been proposed by Motorola. (*Id.* at 128 (citing RX-718 at APL794-A0000009562-63 (showing competing E-AGCH proposals at RAN 1 Meeting #40).) Apple says that Samsung's internal and external communications tell two entirely inconsistent stories, because Mr. Kim's simulation data from 2004 show that he was aware the Motorola's technology substantially outperformed what Samsung was proposing. (*Id.* (contrasting RPX-31C at "case4(2)," col. W-AB at lines 154-177 to RPX-31C at "case4(s)," col. Q-V at lines 156-177).) According to Apple, Mr. Kim's March 2005 internal report states that Motorola's tail-biting proposal produced a gain of 1.2 dB over standard convolutional codes, which is about six times as much gain as that produced by the '644 rate-matching pattern, which was 0.2 dB. (*Id.* (citing RX-878C at 4).) Apple says that Mr. Kim's report admits that tail-biting was "no problem from the ...complexity point of view"; however, he quickly recognized that adoption of Motorola's tail-biting technology would obviate the need for his adapted rate-matching pattern. (*Id.* at 128-129 (citing RX-878C at 4 ("it is expected that the performance gain from the improved rate matching pattern would be marginal due to the equal error protection of tail-biting convolutional code, i.e., uniform puncturing (R99 type RM) may be enough.")).) Apple argues that, in order to thwart that outcome, Samsung set upon a strategy to exploit the conservative nature of 3GPP and ensure that Motorola's technology was excluded. (*Id.* at 129 (citing RX-878C at 4 ("tail-biting convolutional code may be excluded by the conservativeness of 3GPP.")).)

Apple contends that Samsung's representations to the 3GPP were in furtherance of Samsung's devious strategy, and just before RAN 1 Meeting #40bis, Mr. Kim e-mailed RAN 1

delegates from Ericsson, Qualcomm, Nokia, and Siemens to discuss Motorola's tail-biting proposal. (*Id.* (citing RX-893C).) Apple argues that Mr. Kim deliberately misled other 3GPP delegates by reporting that the gains from tail-biting were "just about 0.2 dB" and that the gain did not justify adopting Motorola's proposal, in light of the "big increase in receiver complexity." (*Id.* (citing RX-893C).) Based on these representations, Mr. Kim asked these delegates to endorse Samsung's proposal. (*Id.* (citing RX-893C; Tr. at 380 (Kim)).) According to Apple, Mr. Kim never revealed that his own testing was directly contrary to these representations, and he never revealed that Samsung had filed several patent applications covering Samsung's proposal. (*Id.* (citing Tr. at 380 (Kim)).)

Apple says that, in April 2005, at RAN 1 Meeting #40bis, Mr. Kim submitted E-AGCH proposal R1-050308, again recommending that Samsung's technology be adopted over Motorola's. (*Id.* (citing RX-152).) Contrary to Mr. Kim's own internal reports, Mr. Kim again argued that tail-biting increased decoder complexity. (*Id.* (comparing RX-152, at 3, with RX-878C at 4).) Apple reports that Mr. Kim also submitted change request R1-050309, seeking adoption of the '644 rate-matching pattern as part of TS 25.212 § 4.10.4. (*Id.* (citing RX-152, RX-050 at APL794A0000075473, 75).) Apple contends that, based on Mr. Kim's representations, the delegates to RAN 1 #40bis decided to move forward with Samsung's technology, at which time they had not been informed by Samsung's participating members that Samsung had applied for patents that were based on Mr. Kim's proposal, or that Mr. Kim's internal reports showed that Motorola's technology performed better and that complexity was "no problem." (*Id.*)

Apple says that the following month, at RAN 1 Meeting #41, Mr. Kim renewed his formal request to adopt the '644 pattern. (*Id.* (citing RX-722 at APL794-A0000009663).) At no

474

time, argues Apple, did any of the named '644 inventors or anyone else from Samsung inform the 3GPP participants that they had filed three patent application on the very technology they were advocating for adoption. (*Id.* at 129-130).) Apple says that Samsung's technology was adopted by RAN 1 and then embedded in the standard by the full RAN group in June 2005. (*Id.* (citing RX-854 at 55).)

Apple contends that Samsung's strategy of "non-disclosure" was part of a corporate policy to generate "standards adopted" patents. (*Id.* at 130 (citing JX-23 at 114 (J.W. Lee) ("disclosure of IPR prior to its adopting would be "stupid"); RX-741C at 6 ("[E-AGCH rate matching] appears to be valuable as a patent if we can find the puncturing position that can ensure gain of approximately 0.2 dB and can be contained in the specification in the same way."); JX-9C at 31-35 (Choi Dep.) (Samsung's corporate representative witness testifying that Samsung {                                        }); RX-163C at 23-24 (showing "deliverables" for 1998-2005)).) Apple argues that the named inventors of the '644 patent went so far as to {


}. (*Id.* citing RX-141C at 7; JX-30C at 120 (Van Lieshout Dep.)).) These efforts, argues Apple, were part of a specific "standards project" that set quotas for Samsung patents to be "adopted in to the standard." (*Id.* (citing JX-9C at 31-35 (Choi Dep.)).) Standards' "adopted patents" were a specific "deliverable" that Samsung expected from all of its engineers that Samsung allowed to participate in RAN 1, according to Apple. (*Id.* (citing JX-9C at 31-35; RX-163C at 23-24).)

Apple argues that Samsung deliberately misled 3GPP on two fronts. First, Samsung failed to disclose Samsung's patents to ETSI in a timely fashion, thereby depriving other

member companies of the opportunity to balance Samsung's IPR against the benefits of adopting their technology. (*Id.* (citing Tr. at 1363-65 (Walker) ("If solution one is encumbered by IPR...it is going to cost your company something. If solution 2, which is technically the equivalent is not encumbered by any IRP, so it will be free to use, then I believe that most people would choose the second."))).) Second, Samsung made false and misleading statements to the 3GPP regarding the relative merits of their own technology compared to Motorola's technology. (*Id.* at 130-131.) These statements were made in service of Samsung's policy of acquiring a certain number of standards-essential patents on a yearly basis and in light of Samsung's failure to disclose its patent applications, and its misleading statements to the 3GPP, the '644 patent should be held unenforceable, argues Apple. (*Id.* at 131.)

Samsung responds that the Motorola proposal was discussed at 3GPP, but "tail-biting" was a brand-new technology that would have required an entire overhaul of all decoders that were already implemented in UMTS systems. (CRBr. at 74 (citing Tr. (Kim) at 299-300).) Therefore, according to Samsung, it was not an option for the 3GPP to adopt Motorola's proposal. (*Id.* (citing Tr. (Kim) at 299-301).) Eventually, after much discussion, the members of 3GPP adopted Samsung's proposal, recognizing that it was the best solution to the problem they were facing. (*Id.* (citing Tr. at 300-301).) The technology in the '644 patent was adopted into the 3GPP standard and is practiced by all HSUPA-capable products today. (*Id.* (citing CX-1748).)

Samsung says that Apple has pointed to no evidence that corroborates Apple's accusation that Samsung misled the 3GPP regarding Motorola's proposal. (*Id.* (citing Tr. (Kim) at 299-301).) In fact, argues Samsung, Apple itself completely misrepresents a document in an attempt to make its point. As regards Apple's assertion that "Mr. Kim falsely told these other RAN 1

delegates that the results from Motorola's tail biting proposal 'show that the gain from the tail

biting code is just about 0.2 dB'—the same gain Mr. Kim contended his rate-matching pattern

produced[,]" (*id.* at 74-75 (citing RBr. at 84)), Samsung says the actual language of document

shows otherwise and corroborates Mr. Kim's testimony:

> Enclosed are Samsung draft contributions on coding for E-AGCH.
> In this contribution, we compared performance of the tail-biting convolutional code and the convolutional code specified in current TS 25.212. The results show that the gain from the tail-biting code is just about 0.2 dB. In our view, this gain is not enough to justify the impact on implementation especially big increase of the UE decoder complexity.

(*Id.* at 75 (citing (RX-0893C).) This shows that Mr. Kim admitted that there is gain from the

tail-biting code, but he said that it was not enough to justify the impact, given the necessary

complexity in the decoder. (*Id.* (citing Tr. (Kim) at 299-300).)

Samsung says that Apple seeks the creation of a new patent unenforceability defense

untethered to any recognized legal or equitable doctrine, namely, if a patent owner fails to

disclose an IPR before a potentially related standards contribution has been "frozen," there must

be a declaration that any patent in the family of that IPR is unenforceable regardless of

circumstances. (CRBr. at 77.) But this is not the law, argues Samsung, as *Qualcomm v.*

*Broadcom,* 548 F.3d 1008, 1024 (Fed. Cir. 2008), the sole legal authority on which Apple relies,

demonstrates. Although a court sitting in equity has the discretion to declare a patent

unenforceable based on conduct before a standards body, such an order must be predicated on

clear and convincing evidence that the patent owner engaged in intentional conduct that was so

egregious as to fall squarely within a recognized equitable doctrine, such as implied waiver,

equitable estoppel, or unclean hands. (*Id.* at 78 (citing *Broadcom* at 1024).) For example,

although Apple contends that in *Broadcom* "there was no evidence that the inventors had

participated in the standards-setting process," Apple necessarily ignores a critical fact, namely

that Qualcomm concealed its involvement in, and manipulation of, the standard-setting process

right through trial as part of its "carefully orchestrated scheme" to conceal its patents and thereby

hold the industry hostage. (*Id.* (citing *Broadcom* at 548 F.3d at 1009-10).)

      Samsung says that Apple failed to provide any evidence of such bad faith conduct on the

part of Samsung; rather, to the contrary, the record reflects that Samsung complied with its ETSI

obligations. (*Id.*) Samsung says that it openly complied with its ETSI obligations and only

participated in the standard-setting process and voluntarily submitted a general IPR declaration

in 1998, long before the standards proposals or patent applications at issue existed, stating that is

was prepared to offer licenses to all of its essential patents on FRAND terms and conditions.

(*Id.*) Samsung says that it then declared members of the '348 and '644 patent families, along

with dozens of other patents and pending patent applications, as essential to the UMTS standard

to ETSI in December 2003 and May 2006. (*Id.* at 78-79 (citing RX-0164C; RX-0133).)

Samsung says it has entered into licensing agreements with numerous industry participants that

include the '348 and '644 patents along with Samsung's entire portfolio of UMTS-declared

essential patents. (*Id.* at 79 (citing RX-0188; RX-0189C; RX-0191C; RX-0193C; RX-0178C;

RX-0194C; RX-0195C; RX-0195C; RX-0197C; RX-0198C: RX-0199C; RX-200C; RX-0201C;

RX-202C; RX-020cC; RX-204C; RX-205C; RX-206C; RX-0207C; RX-0209C; RX-0421C;

RX-0423C).) Samsung says that before this Investigation was initiated, Samsung offered Apple

a license that would have included these patents and then, nearly a year ago, at Apple's request,

offered Apple a license limited to Samsung's portfolio of UMTS-essential patents, and Samsung

has unsuccessfully attempted to engage Apple in negotiations ever since. (*Id.* (citing CX-0390C;

CX-0769.0006; CX-1589C).) Samsung says it thereby fully complied with ETSI's disclosure

obligations and there is no evidence to suggest that Samsung intentionally shielded the related

Korean patent application from disclosure or refused to license its declared-essential UMTS

patents on FRAND terms and conditions.  (*Id.*)  Samsung says that Apple's own expert testified

that he was not accusing Samsung of any intentional conduct.  (*Id.* (citing Tr. at 1418).)

Samsung argues that the testimony of its witnesses, including its inventors, that Apple

cites does not support a finding of implied waiver; nor is it reasonable to infer from this evidence

that Samsung intentionally failed to timely disclose its patents to ETSI, let alone that this is the

single most reasonable inference.  (*Id.* (citing *Therasense, Inc.* 649 F.3d at 1290 (holding that, to

find a patent unenforceable for inequitable conduct, the accused infringer must prove that "the

specific intent to deceive must be the single most reasonable inference able to be drawn from the

evidence")).)  Although Apple faults the inventors for not disclosing their Korean applications at

ETSI technical working group meetings, Apple ignores unequivocal evidence that ETSI

members never disclose IPRs at such meetings in response to a call for IPR; in fact, working

group members like Mr. Kim would have neither the responsibility nor the authority to make

such disclosures.  (*Id.* at 79-80 (citing Tr. (Kim) at 381).)  Samsung says that Apple's own

expert, Dr. Walker, until recently the Chairman of the ETSI Board, conceded that in his 25 years

of involvement at ETSI he could not recall a participant at a working group meeting "ever having

made a declaration about IPR in a submission." (*Id.* (citing Tr. (Walker) at 1414).)  Mr. Walker

also confirmed that it has never been the policy of ETSI that participants in working groups

should submit e-mails mentioning the filing of patents in lieu of submitting an IPR declaration.

(*Id.* (citing Tr. at 248, 378-379 (Kim), 1414-15 (Walker)).)  Samsung says that this is not

surprising given that ETSI unequivocally states that technical meeting are not the proper forum

for disclosures and discussion of IPR.  (*Id.* (citing CX-0441.0012).)

Samsung says that the only mechanism that ETSI provides for IPR disclosures is the

"ETSI IPR Information Statement and Licensing Forms" that is attached to Annex 2 of ETSI

Guide to IPRs.  (*Id.* (citing CX-0902.0022).)  These IPR declaration forms are typically signed

by relatively senior executives who can bind the company to the required FRAND licensing

terms.  (*Id.* (citing Tr. at 1410 (Walker)).)  Samsung says that in large companies like Samsung,

there are several layers of management between working group members and those with the

authority to sing these forms.  (*Id.* (citing Tr. at 1413-14 (Walker)).)  Thus, the evidence

presented at the hearing, including Mr. Walker's own testimony, cannot support an inference that

the inventors of the '348 and '644 patents or Samsung intended to deceive ETSI.

In response to Apple's assertion that "Samsung's strategy of non-disclosure is part of a

corporate policy to obtain 'standards adopted' patents," Samsung says there is no ETSI

regulation against obtaining standard essential patents and, for the reasons previously mentioned

by Samsung, discussed above, Samsung's conduct of developing successful technologies, openly

working with ETSI, disclosing potentially relevant patents, and willingly licensing them on

FRAND terms, is plainly inconsistent with a "strategy of non-disclosure." (*Id.* at 80-81.)

Samsung says the testimony cited by Apple actually demonstrates that Samsung has established

internal processes to comply with ETSI policies, including patent teams that access whether

patents being prosecuted are essential to an ETSI standard.  (*Id.* at 81 (citing JX-0009C at 65

(Choi Dep.); JX-0023C at 12 (JW Lee Dep.)).)  The most reasonable inference from such

evidence is that Samsung, unlike Apple, had processes in place to comply with the policies of

standards setting organizations, and endeavored to comply with them.  (*Id.* (citing JX-0023C at

12 (JW Lee Dep.)).)

Samsung argues that Apple's assertion that Samsung did not timely disclose its patents

rests on a bright-line rule that finds no support in the ETSI Policy.  (*Id.*)  Relying on Clause 4.1,

Apple contends that an IPR disclosure is not timely unless the IPR is disclosed before the

adoption of the proposal to which it applies; however, argues Samsung, Clause 4.1 simply states this:

> Each MEMBER shall use its reasonable endeavors to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of the ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

(*Id.* (citing CX-0908.002 at § 4.1).) Samsung says that Apple misreads this clause, which merely requires that a member use "its reasonable endeavors" with respect to IPR it "becomes aware of," and then goes on to require disclosure, on a "bona fide basis," i.e., in good faith and without deceit, of IPR that might be essential if a proposal submitted by a member is adopted. (*Id.*) The second sentence of the clause unmistakably refers back to the first sentence and cannot be read in isolation without reference to the required "reasonable endeavors" of IPRs that the member "becomes aware of." (*Id.* at 81-82.) Samsung notes that Apple's expert, Dr. Walker, confirmed the evidence of intentional misconduct is absent here. (*Id.* at 82 (citing Tr. (Walker) at 1418 ("Q. But you were not offering an opinion to His Honor that Samsung intentionally delayed, are you sir? A. No, I had not said—I had not used the word intentionally delayed at all.").)

Samsung says that Apple erroneously asserts that the use of the phrase "if the proposal is adopted" in Clause 4.1 of the ETSI IPR Policy necessarily requires disclosure before the proposal has been adopted; however, the clause simply provides the conditions under which IPR must be disclosed if a proposal is adopted, not the time when it must be disclosed before the proposal is adopted. (*Id.*) Samsung argues that Apple failed to introduce any evidence that ETSI has ever considered whether a proposal is subject to an IPR before adopting it, let alone that it should have done so here. Samsung says that Dr. Walker admitted that he had virtually no personal experience with IPR disclosures, and Samsung notes that he did not offer an opinion on

whether ETSI might have adopted an alternative technology had it known of the Korean patent applications. (*Id.* (citing Tr. at 1365, 1399-1401 (Walker)).)

Samsung says that Apple's theory that members must disclose their patents before a standard is "frozen," because patents disclosed thereafter "only emerge when it is too late for ETSI to consider them," is fundamentally at odds with the ETSI IPR Policy, which prohibits members from discussing IPRs at meetings, as well as the practice at ETSI. (*Id.* (citing CX-0441.0012 at § 4.1.).) Delegates at technical meetings, like the Samsung inventors, are to discuss the technical merits of a proposal, not their relative cost. (*Id.* (citing CX-0908.002 at § 3.1 (stating that the goal of ETSI is to promulgate standards that "best meet the technical objectives of the European telecommunications sector.").) Samsung contends that the ETSI IPR Policy simply ensures that the relevant IPR will be available through a FRAND commitment. (*Id.* at 82-83 (citing CX-0908.003 § 6.1).) According to Samsung, ETSI encourages the filing of general disclosures, followed by the submission of specific disclosures "as soon as feasible." (*Id.* (citing CX-0441.0005 at § 2.1.1.).) Samsung contends that Apple has failed to demonstrate that the ETSI IPR Policy requires that a specific disclosure must occur before a proposal is frozen and also has failed to provide any evidence that ETSI members understand and require IPR to be declared before a potentially relevant standard is finalized. (*Id.* (citing *Broadcom*, 548 F.3d at 1016 (noting that the Federal Circuit relied on testimony regarding understanding of SSO members to define the disclosure duty).)

Samsung says Apple failed to provide any evidence that Samsung's Korean patent applications were not confidential at the time Samsung made its proposals, and therefore that they even fell within ETSI's definition of IPR, which expressly excludes such information. (*Id.* at 84.) As an initial matter, Samsung says that Apple asserts that "confidential information,"

which appears in that definition in lower case letters, includes "only information that a chairman of a committee has requested and agreed to treat as confidential." (*Id.* (citing RBr. at 84).) Samsung protests that because Apple did not disclose this theory in its pre-hearing brief and discovery responses, and Dr. Walker did not testify about it at the hearing or even in deposition, it should be deemed waived, and besides, is wrong. (*Id.*)

Samsung notes that in defining "IPR," ETSI IPR Policy specifically provides that "[f]or the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition." (*Id.* (citing CX-0908.006 ("Definition of 'IPR'")).) Although ETSI's IPR Policy does separately define "CONFIDENTIAL INFORMATION" using upper-case letters to denote certain information requested by a committee chairman per Clause 10, this upper-case definition of the phrase does not appear outside of Clause 10, say Samsung. (*Id.*) Had the ETSI IPR Policy intended to incorporate the narrowly-defined phrase, "CONFIDENTIAL INFORMATION" in the definition of "IPR," it would have used upper-case letters to denote that fact as all of the other defined terms are capitalized in the IPR Policy; instead, "confidential information" is used in a more generic way (along with "get-up,…trade secrets or the like." ) (*Id.* at 84-85.) Samsung contends that Apple offered no evidence that the Korean patent applications had been published or otherwise had lost their confidential status at the time when Apple claims they should have been "timely" disclosed. (*Id.* at 85.) Because Apple has failed to show that Samsung violated any ETSI policy with the specific intent to deceive ETSI and manipulate the standard-setting process, Apple's affirmative defense of implied waiver fails.

Staff says that Apple's contentions regarding both the '348 and '644 patents and Samsung's conduct vis-à-vis the 3GPP and ETSI in regard to those patents does not constitute

PUBLIC VERSION

misconduct that warrants holding the patents unenforceable. (SBr. at 87.) Staff says that the '644 patent claims priority to three Korean applications, two that were filed in December 2004, and one that was filed in January 2005. Staff notes that in February 2005 Samsung submitted a proposal to the relevant 3GPP working group regarding rate-matching candidates for absolute scheduling grants of 5-10 bits in length. (Id.) Then in June 2005, Samsung's rate-matching proposal was adopted by the 3GPP. (Id. (citing RX-854).) Staff notes that Samsung did not declare any of these patent applications as essential to the working group involved in the TS 25.212 standard until May 16, 2006, nearly a year after Samsung had successfully convinced the 3GPP to adopt the claimed '644 rate-matching pattern as TS 25.212 § 4.10.4. (Id. at 87-88.)

Staff recognizes that ETSI IPR Policy establishes a duty for ETSI members such as Samsung to disclose potential "Essential IPR" to ETSI in a timely manner. (Id. at 88 (citing RX-701 Annex 6 §§ 4.1-4.2 (ETSI IPR Policy).) Staff concludes that Apple has not shown a breach of that duty for at least two reasons. First, a relatively short time passed between adoption of Samsung's rate-matching proposals by the 3GPP plenary group and Samsung's disclosure of the Korean patent applications to which the '644 patent claims priority, less than one year later. Second, the evidence suggests that the technology disclosed in Samsung's '644 patent is not essential to compliance with the technical standards of TS 25.212 and thus would not qualify as "Essential IPR." Staff says the evidence demonstrates that the Apple Accused Products, all of which are CDMA-compliant, do not infringe the asserted claims of the '644 patent. Accordingly, argues Staff, it must be possible to comply with the ETSI technical standard without making use of Samsung's IPR. Thus, the evidence is insufficient to establish by clear and convincing evidence that the '644 patent is unenforceable due to Samsung's conduct as an ETSI or 3GPP member. (Id.)

484

PUBLIC VERSION

In its reply brief, Apple argues that, although Samsung refers generally to standards disclosure (citing CBr. at 128-131), Samsung singularly fails to address the specific reasons Apple demonstrated at trial for why the conduct of Mr. Kim and the other specifically-identified Samsung RAN 1 delegates renders the '644 patent unenforceable, including their failure to timely inform fellow RAN 1 delegates or ETSI that Samsung had applied for three patents covering every permutation of AG and rate-matching pattern that Samsung had proposed to them and deliberately misleading other delegates about the superior performance and low complexity of Motorola's tail-biting technology.  (RRBr. at 76.)  According to Apple, Samsung failed to rebut Apple's proof in its opening brief and has waived any responsive arguments under Ground Rule 10.1.

The Administrative Law Judge concludes that Apple has failed to demonstrate that either the evidence or the law supports Apple's contention that the '644 patent is unenforceable by reason of alleged acts of misconduct on the part of any of the named inventors or Samsung in its dealings with the 3GPP and ETSI.  With respect to the evidence, Samsung has shown a legitimate reason for why it advanced its proposals in opposition to Motorola's.  The fact that members of consensus bodies that set industry standards advocate positions they favor and denigrate positions advocated by others is a dialectical process which is conducive to arriving at outcomes deemed desirable to the goals of the organization.  The fact that Samsung, or its participating members, found fault with Motorola's proposals and favor with their own is not enough to demonstrate misconduct.  Samsung has shown reasons for the stand it took and the Administrative Law Judge finds no reason to conclude that there were any improprieties in what Samsung did vis-à-vis its participation in the ETSI.

Nor has Apple provided a legal basis for rendering the '644 patent unenforceable even if it were to be concluded that Samsung's activities with respect to the 3GPP and ETSI contravened in some respect a policy thereof. ETSI is an organization that has adopted various policies, among which is the following:

> 14    Violation of Policy
>
> Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI statutes.

(RX-710 at APLNDC-WH-A0000012546.) There is no evidence that Apple has exhausted, or even pursued any course of action or remedy available to it under this provision, or any other, offered by ETSI or otherwise shown that pursuit of the forms of relief or remedy available from ETSI would be inadequate. There is no law cited by Apple that authorizes an Administrative Law Judge to superintend the affairs of ETSI and make findings that may not be in accordance with its objectives and governing provisions. For example, Apple points to Clause 4.1 which states that each member shall use its reasonable endeavors to timely inform ETSI of essential IPRs. What constitutes "timely" is not specified, but it stands to reason that the members have views on that matter which may differ not only among each other but also, by way of their consensus, with what an Administrative Law Judge might determine in the context of a Section 337 investigation, not having the benefit of the members' thinking on the matter, as far as effectuating the policies of ETSI. The ETSI Guide on Intellectual Property Rights (IPRs) (RX-0713 at APLNDC-WH-000012464), NOTE 1, states: "Definitions for 'Timeliness' or "Timely" cannot be agreed, because such definitions would constitute a 'change to the Policy.'" If the ETSI itself cannot arrive at a definition of "timely," for someone outside that body to do so would amount to an assumption of non-delegated legislative power. It would be ill-advised to

decree what the members might by consensus not agree with. In short, Apple has not carried its evidentiary or legal burden for establishing that the '644 patent, a valid United States patent, should be held unenforceable by reason of Samsung's ETSI activities.

### 2. Alleged Inequitable Conduct

#### a) Applicable Law

Patent applicants and their attorneys have "a duty of candor and good faith" in dealing with the PTO, "which includes a duty to disclose . . . information known . . . to be material to patentability." 37 C.F.R. § 1.56(a). A patent may become unenforceable on the grounds of inequitable conduct if the patentee withheld material information from the PTO with intent to mislead or deceive the PTO into allowing the claims. *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1070-1074 (Fed. Cir. 1992) ("*LaBounty*"). Both materiality and intent must be proven by clear and convincing evidence. *Id.* When inequitable conduct occurs in relation to one or more claims of a patent, the entire patent is unenforceable. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988) (en banc).

"The materiality of information withheld during prosecution may be judged by the 'reasonable examiner' standard." *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007) ("Materiality . . . embraces any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent."). However, a patentee need not disclose material information that is merely cumulative of other information already before the examiner. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998); 37 C.F.R. 1.56(b).

"Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances."

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

However, intent may not be inferred from materiality. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011) ("*Therasense*"). Once the materiality of the withheld information and the patentee's intent to mislead have been established, the administrative law judge "must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)).

### b) Apple's Allegation that the '644 patent was obtained by means of inequitable conduct

Apple contends that the '644 patent is unenforceable because of inequitable conduct committed by Samsung in the course of prosecuting the application for the patent. (*Id.*) Apple argues that, at the time that the named inventors of the '644 patent were telling the 3GPP that they "took" their '644 rate-matching pattern form Siemens's HS-SCCH, they and those involved with them in the prosecution of the patent application that resulted in the '644 patent, deliberately kept this fact, as well as the R1-02-0604 and R1-041520 proposals, previously discussed, from the USPTO. (*Id.*) These references were unquestionably material for the reasons already discussed, argues Apple, citing *Aventis Pharma S.A. v. Hospira, Inc.*, No. 2011-1018, 2012 U.S. App. LEXIS 7095 (Fed. Cir. Apr. 9. 2012) at *20 (defining materiality).) Apple points to Dr. Stark's testimony that none of the art that was before the USPTO was even close to being as material as Siemens's R1-02-0604 and R1-041520 proposals, and Apple says that his testimony in this regard was un-rebutted. (*Id.* (citing Tr. (Stark) at 2257-61).) Apple says that Figure 24 of Siemens's R1-41520 proposal admittedly disclosed every limitation of claims 1, 9, and 13, except the specific rate-matching puncturing positions. (*Id.* (citing RX-927; Tr. (Kim) at

488

PUBLIC VERSION

339-42, (Min) at 3080-81).)  Apple argues that those puncturing positions were obvious from the

teaching of Siemens's R1-02-0406.  (*Id.* (citing RX-54; RX-1527C).)  Apple says that Mr. Kim

admitted at the hearing that his '644 rate-matching pattern was {


}.  (*Id.* (citing Tr. (Kim) at 344).)  There was no way, argues

Apple, for the USPTO to have considered Mr. Kim's derivation of the '644 pattern from the

prior invention of Siemens other than through disclosure by the named inventors of the '644

patent.  (*Id.*)

　　　　Apple says that Mr. Kim admitted he had a duty to disclose prior art like R1-02-0604 and

R1-041520 to the USPTO, yet these prior art references and the facts of derivation of the '644

invention were intentionally withheld.  (*Id.*)  The named '644 inventors' own correspondence,

just weeks before they filed their first patent applications respecting the claimed invention,

{


}, says Apple.  (*Id.* at 131-132 (citing CX-1857C at 2 (questioning

patentability); RX-739C).)  According to Apple, the named inventors and Samsung's "patent

team" were motivated to withhold these important references because of Samsung's

{




}.  (*Id.*)

　　　　In order to achieve Samsung's {                                          }, the named '644 inventors

executed a plan that was calculated to ensure that the pattern they derived from Siemens was

both patented and adopted by 3GPP.  (*Id.*)  According to Apple, in order to get their Siemens-

derived pattern adopted as the standard, the named inventors misled the 3GPP both by withholding the existence of their patent applications in the face of a known duty to disclose them to ETSI and by actively assuring the other RAN 1 delegates that the rate-matching pattern that they were proposing was old technology taken from Siemens, and by implication, was not patentable. (*Id.* (citing Tr. (Kim) at 380 (admitting failure to disclose); RX-125 at 1 (representing to RAN 1 that "we took the similar concept as used for the HS-SCCH"); RX-893C ("{

}").) Moreover, according to Apple, the named inventors of the '644 patent lobbied against adoption of Motorola's better-performing "tail-biting" technology by misstating both the efficacy of Motorola's technology and its complexity. (*Id.*)

Apple claims that Samsung told an entirely different story to the USPTO and rather than acknowledge that they had taken the invention from the work of Siemens, as they had admitted to the 3GPP, the named inventors and Samsung studiously withheld all of Siemens's rate-matching prior art from the USPTO, art they admittedly not only possessed, but had used to derive their E-AGCH pattern. (*Id.* at 132-133.) Apple says that named inventor Kim testified that he {

}. (*Id.* at 133 (citing JX-18 (Kim Dep.) at 67-68; JX-11C (Gha Dep.) at 61-62).) Apple says that Mr. Gha testified that one purpose of the {

}. (*Id.* (citing JX-11C at 93-94).) Apple argues that, because of Mr. Kim's extensive use of Siemens's R1-041520 and R1-02-0604 to derive his '644 rate-matching pattern, these prior art references should have