QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Michael T. Zeller (Bar No. 196417)
michaelzeller@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-01846-LHK<br><br>**DECLARATION OF STEPHEN GRAY IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR A PERMANENT INJUNCTION AND DAMAGES ENHANCEMENT**<br><br>**PUBLIC REDACTED VERSION** |

**DECLARATION OF STEPHEN GRAY**

I, Stephen Gray, declare:

1.      I have personal knowledge of the facts set forth herein, and am competent to testify to the same.

2.      I submit this declaration in support of Samsung's Opposition to Apple's Motion for a Permanent Injunction relating to U.S. Patents 7,844,915 and 7,864,163.  If asked at hearings or trial, I am prepared to testify regarding the matters I discuss in this declaration.

3.      I reserve the right to supplement or amend this declaration based on any new information that is relevant to my opinions.

## I.      PROFESSIONAL BACKGROUND

4.      I am an independent consultant.  All of my opinions stated in this Declaration are based on my personal knowledge and professional judgment.  In forming my opinions, I have relied on my knowledge and experience in graphical user interfaces and operating systems; software development practices; programming, including C and graphical programming; and on the documents and information referenced in this Declaration.  I have attached as Exhibit 1 a true and correct copy of my current curriculum vitae (CV), which details my education and experience. The following thus provides only a brief overview of some of my experience that is relevant to the matters set forth in this Declaration.

5.      Since the mid-1970s, I have designed, developed, and deployed computing systems and products that operate in server, desktop, and graphical environments.  As such, I have acquired expertise and am an expert in the areas of server computing architecture and design, graphical user interfaces, operating systems, local area and wide area networks, and various programming languages used in the development of those systems and products.  I have been employed by or retained as a consultant, including acting as a litigation consultant, for numerous companies such as Burroughs, Filenet, Fujitsu, Marriott Corporation, MCI, Northern Telecom, Olivetti, TRW, and Xerox, as well as other companies.

6.      I have several relevant professional experiences that further demonstrate my expertise in the field of graphical user interfaces.  In late-2001 to mid-2002, as Chief Technology

Officer for Networld Exchange Inc., I was responsible for the design, development, and deployment of a suite of products that delivered eCommerce functions. These functions were provided over the Internet and included product catalog information display, purchase and/or purchase order creation, order delivery to fulfillment systems, and order status reporting. The products for which I had responsibility provided an electronic shopping graphical user interface for business-to-business and business-to-consumer transactions. The graphical user interface was designed to support both vendors of products as well as customers. Each of these user interfaces were an optimization based on the specific user class.

7.     In the mid-1990s I was a consultant for Xerox. One of my assignments there was to develop a graphical interface for network attached office products. For example, one of the graphical user interfaces I designed provided end-user visibility into printer queues supporting distributed network printers. Another graphical user interface I designed provided network operations distributed job management control.

8.     As a software development professional, I have had numerous occasions to review bodies of source code. I have analyzed source code written in several variants of C, SQL, COBOL, RPG, variants of Basic, Java, Perl, several Assembler languages, and others. For example, as an individual contributor at Xerox during the mid-1980s to 1990, I evaluated the quality of source code from third-party software providers for possible inclusion in the Xerox product line. Also, I evaluated the source code of several application software packages for completeness and maintainability, and for possible inclusion into the NTN product line in 2000-2001. During my early career, I spent time maintaining source code written by others. In each of these assignments, I analyzed the source code to identify the data structures, logical flow, algorithms, and other aspects.

9.     During my career as a software development professional, I have several relevant professional experiences that demonstrate my expertise in the field of operating system technologies. I have performed operating system programming assignments, I have publicly lectured regarding various operating systems, and I have provided litigation support where operating system technology was central to the matter.

10.     Finally, I have been retained by attorneys for plaintiffs and defendants in several matters where the concepts and practice of graphical user interface technology was a central issue. The matters include contract disputes:  *GTE v. Videotron*; *Eyefinity, Inc. v. Entigo*; *HealthFirst v. HealthTrio*; *Waltrip Associates v. Kevin Kimperlin & Spencer Trask Ventures*, as well as patent infringement: *WebSide Story v. NetRatings; ICR v. Harpo*; *Leader v. Facebook*; *Fotomedia v. Yahoo!*; *Cisco v. Telcordia*; *Ampex v. Kodak, et al.*; and *ICI v. Red Hat and Novell*.

## II.     <u>LEGAL STANDARDS</u>

11.     In this section I describe my understanding of certain legal standards.  I have been informed of these legal standards by Samsung's attorneys.  I am not an attorney and I am relying only on instructions from Samsung's attorneys for these legal standards.  In conducting my analysis of the '915 and '163 patent claims, I have applied the legal understandings set out in this declaration.

12.     I understand that assessment of infringement is a two step process.  First, the language of the patent claims must be construed by the Court.  Second, the claims as construed are applied to the accused product or process to determine whether the accused product or process meets each and every limitation of the claim as construed by the Court.  To establish infringement of a patent, I understand that it is the patentee 's burden to show that each accused product practices every limitation of at least one asserted claim in that patent.

13.     I understand that the patentee has the burden of proving infringement by the preponderance of the evidence.  I understand that this standard requires that the patentee present evidence that as a whole shows that the fact sought to be proved is more probable than not.

14.     I understand that there are two types of infringement: literal infringement and infringement under the doctrine of equivalents.  I understand that to literally infringe a claim, an accused product or process must literally meet every limitation of the claim.

15.     I understand that even if all limitations of a claim are not literally met, an accused product or process may still infringe under the doctrine of equivalents.  I understand that to establish infringement under the doctrine of equivalents, the accused product or process must, for each element of the claim not literally present, contain a structure or perform a step that is

1   substantially equivalent to the element in the claim. I am informed by counsel that one common

2   way of determining substantial equivalence is to examine whether the accused structure or step

3   performs substantially the same function, in substantially the same way, to achieve substantially

4   the same result as the corresponding limitation of the claim.

5        16.    I also understand that there are several restrictions on the application of the doctrine

6   of equivalents. First, if an accused product or process wholly lacks even a single limitation of a

7   claim, it cannot infringe the claim under the doctrine of equivalents.  Second, the range of

8   equivalents cannot be so broad as to encompass that which was already known in the prior art.

9   Third, the doctrine of prosecution history estoppel precludes a patentee from reclaiming through

10  equivalents subject matter that was relinquished based on statements or amendments during

11  prosecution.

12       17.    I understand that every claim limitation is essential in proving infringement, and

13  that the absence of even one limitation in an accused product or process avoids infringement.

14  **III.**   **MATERIALS CONSIDERED**

15       18.    In forming my opinions in this Declaration, I reviewed a number of materials,

16  including U.S. Patent Nos. 7,844,915 (the "'915 Patent") and 7,864,163 (the "'163 Patent") as well

17  as their respective file histories, and relevant portions of the record in this case to date.  I have also

18  reviewed the Expert Infringement and Rebuttal Reports of Dr. Karan Singh as well as the

19  deposition transcript and trial testimony of Dr. Singh.

20       19.    In addition, I have reviewed the new source code relating to the Web Browser

21  functionalities accused of infringing the '915 and '163 patents and a Galaxy SII (T-Mobile)

22  product running this new source code.

23  **IV.**   **THE '915 PATENT**

24      **A.**   **OVERVIEW OF THE '915 PATENT**

25       20.    The '915 Patent, entitled "Application Programming Interfaces for Scrolling

26  Operations," issued on Nov. 30, 2010 from an application filed Jan. 7, 2007.  The named inventors

27  of the '915 Patent are Andrew Platzer and Scott Herz.

28

21.     The '915 Patent generally relates to the field of application programming interfaces that provide user interface operations, such as scrolling and scaling.  The asserted claims of the '915 Patent are directed to a technique for distinguishing between a single-input point that is interpreted as a scroll operation and two or more input points that are interpreted as a gesture operation.  This technique is set forth in element [c] of claim 8, which is reproduced below:

8.  A machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:

[a] receiving a user input, the user input is one or more input points applied to a touch-sensitive display that is integrated with the data processing system;

[b] creating an event object in response to the user input;

[c] **determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;**

[d] issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

[e] responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object; and

[f] responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving the two or more input points in the form of the user input.

### B.      PROSECUTION HISTORY

22.      Claim 8 as originally filed read as follows:

> 8.      A machine readable medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:
>
> > receiving a user input;
> >
> > creating an event object in response to the user input;
> >
> > determining whether the event object invokes a scroll or gesture operation;
> >
> > issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;
> >
> > responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object based on an amount of a scroll with the scroll stopped at a predetermined position in relation to the user input; and
> >
> > responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving a plurality of input points in the form of the user input.

JX 1048.6.

23.      During prosecution, the Examiner rejected many of the pending claims, including claim 8, under 35 U.S.C. 103(a) as being unpatentable over Li (U.S. Patent No. 7,576,732 B2) and Hollemans (2007/0252821).  *See* 12/29/09 Office Action.  In response, Apple argued that Li and Hollemans did not render the claims obvious.  *See* 3/29/10 Response to Office Action.  On June 9, 2010, Apple and the Examiner conducted a telephonic interview where Li and Hollemans were discussed.  *See* 6/21/10 Interview Summary.  An agreement with respect to the claims was not reached as a result of that interview.  *Id*.  On July 16, 2010, Apple submitted a new prior art reference, Sato (GB 2319591 A).  *See* 7/16/10 IDS.  On July 20, 2010, the Examiner issued a Notice of Allowance along with an Examiner's Amendment to the claims and an Examiner's Amendment and Statement of Reasons for Allowance.  *See* 7/20/10 Notice of Allowability.

24.     The Examiner's Amendment amended claim 8 as follows:

8. (Currently amended)  A machine readable storage medium storing executable program instructions which when executed cause a data processing system to perform a method comprising:

receiving a user input, the user input is one or more input point applied to a touch-sensitive display that is integrated with the data processing system;

creating an event object in response to the user input;

determining whether the event object invokes a scroll or gesture operation by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation;

issuing at least one scroll or gesture call based on invoking the scroll or gesture operation;

responding to at least one scroll call, if issued, by scrolling a window having a view associated with the event object; and

responding to at least one gesture call, if issued, by scaling the view associated with the event object based on receiving a plurality of the two or more input points in the form of the user input.

25.     As shown above, this amendment added the limitation "by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation" to claim element [c].  Apple's counsel authorized this amendment during a telephone interview on July 7, 2010.  *Id.* at 2.

26.     In the Reasons for Allowance, the Examiner stated that the "[p]rior art of record fails to teach the combination of claimed elements including creating an event object in response to a user input; *determining whether the event object invokes a scroll operation or a gesture operation; distinguishing between a single input point and a two or more input points applied to a touch-sensitive display, wherein a single input point is interpreted as a scroll operation and two or more input points are interpreted as a gesture operation*."  *Id.* (emphasis added).

27.     Thus, in allowing the independent claims, including claim 8, the Examiner found that the amendment to the claims that added the language "by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two

or more input points applied to the touch-sensitive display that are interpreted as the gesture operation" distinguished the claims of the '915 patent from the prior art.

### C. THE '915 PATENT REQUIRES PERFORMANCE OF A "QUINTESSENTIAL" TEST

28. During the August 2012 trial, Apple's expert for the '915 patent, Dr. Singh, testified that 24 Samsung products infringed the '915 patent.  More specifically, Dr. Singh testified that the Web Browser application in these accused products infringed claim 8 of the '915 patent. Dr. Singh testified that the Web Browser application infringed because it performed a "quintessential" and "very important" test required by claim elements [c] and [d].  With respect to these claim elements, Dr. Singh testified as follows:

> A. Okay. So these elements, again, are – sort of describe in some sense what's happening below in the, in the Samsung code.
>
> And the operative words in the big one are determining whether the event object invokes a scrolling operation, which I've described before, which is moving content, or the small complex gesture operation, such as scaling, by distinguishing between whether a single input point is applied to the screen or two or more inputs, in which case a gesture operation is made.
>
> So to understand this – to understand this element, what you see below is a schematic. It's, it's just a schematic showing the Samsung smartphone and tab phone.
>
> Again, what you see over there are excerpts taken from the Samsung source code and laid out just to make things very clear.
>
> And upon receiving input, there is a – there's a function in the web view. The web view is the browser program, the internet browser program on the Samsung device.
>
> Web view has a function called on touch event, so whenever there's a touch, you go into that code. When you go into that code, that code is called and caused by this motion event object that is being passed into this piece of code and it's – it's sent into this code as a parameter. I've kind of illustrated it on top just so you can clearly see the flow that is taking place in the code. And there's a very important line in this code where a simple test is made. The motion event object has a pointer count. The pointer count tells you whether one input is one input touch, two input touches, or more.

So all you're doing over here is making this quintessential test, and then based on the test, when a single input touch is on the screen, you go down a one finger part, that results in a scroll operation. So that takes you to this claim element c where you're distinguishing and you're going down this scroll bar, and I'll go one step further into claim element d, which says issues at least a scroll call or a gesture call, depending on which part you go down, and a scroll call, an example of a scroll call in this case is a method that says do drag, which says I'm dragging now, and what do I do? That's if you go down the scroll call. Very similarly, if you go down the gesture part, which is two or more fingers, you go down in the code and you perform a gesture operation which results in a gesture call being made. In this example, the gesture call is a the touch event of a scale gesture, something that results in the scale operation.

So what we've just seen over here is a run through the Samsung source code to give you a sense of two important things. One, that the motion event object causes a very important test to be made, one finger or two or more fingers; and then based on that test, there's a fork in the code and you either go down a scroll box where a scroll call is made and a scroll operation results, or down the gesture part and a gesture call is made and a gesture results.

So that's these two elements.

Trial Tr. at 1823:3-1825:22 (Singh testimony).

29.     During this testimony, Dr. Singh referred to demonstratives numbered PDX 29.12 and PDX 29.13, which have been reproduced below.

30.     As Dr. Singh testified and as is shown in his demonstratives above, the "quintessential" and "very important" test occurs in the line of source code "ev.getPointerCount() > 1" found in Android's WebView code.  Dr. Singh testified that this code receives a motion event and distinguishes between a single input point and two or more input points.  If a single input point is detected, the "ev.getPointerCount() > 1" test causes the code to proceed to a scroll operation.   If two or more input points are detected, the "ev.getPointerCount() > 1" test causes the code to proceed to a gesture operation.  This fork in the code is illustrated in Dr. Singh's demonstratives in the box that includes "ev.getPointerCount() > 1".  The portion of the accused WebView source code that includes the "quintessential" test performed by "ev.getPointerCount() > 1" is shown below.



Exhibit 2, Android source code [SAMNDCA-C000002857].

**D.      SAMSUNG'S NEW CODE DOES NOT INFRINGE THE '915 PATENT**

31.     I have examined a new version of the source code for the Web Browser application. I understand that this source code was used to create the following software:  Android version 4.0.4, Baseband version T989UVLI1, Kernel version 3.0.8, and Build number IMM76D.UVLI1.[1] It is my opinion that this new source code does not infringe the '915 patent because it removes the "quintessential test" for distinguishing between scroll and gesture operations required by the '915

---

[1]    Declaration of Hee-chan Choi In Support Of Samsung's Opposition To Apple's Motion For A Permanent Injunction And Damages Enhancement.

patent and instead employs a fundamentally different technique for processing scroll and scaling operations.[2]

35.    Importantly, there is no code that determines whether the scrolling code or scaling code should be executed "by distinguishing between a single input point applied to the touch-sensitive display that is interpreted as the scroll operation and two or more input points applied to the touch-sensitive display that are interpreted as the gesture operation"  as required by claim 8.

---

[2]  I understand that the new version of code for the Web Browser that does not include the "quintessential test" was released in the Jelly Bean version of Android in July 2012. http://grepcode.com/file_/repository.grepcode.com/java/ext/com.google.android/android/4.1.1_r1/ android/webkit/WebViewClassic.java/?v=source

36.     The following flowchart illustrates how the new code operates:



37.     As illustrated above, the new code does not include the "quintessential" test performed by the "ev.getPointerCount() > 1" source code.  That source code has been removed and a fundamentally different technique that does not distinguish the number of input points has been implemented.

38.     ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████  Thus, the motion events do not "cause[] a very important test to be made, one finger or two or more fingers; and then based on that test, there's a fork in the code and you either go down a scroll box where a scroll call is made and a scroll operation results, or down the gesture part and a gestured call is made and a gesture operation results."  Singh Trial Tr. at 1825:15-21.  In other words, the new code does not "determine[] whether the event object invokes a scroll or gesture operation by distinguishing between a single input point . . . that is interpreted as the scroll operation and two or more input points . . . that are interpreted as the gesture operation" as required by all claims of the '915 patent, including claim 8.  Consequently, the new code does not literally infringe any claims of the '915 patent.

39.     I also understand that the doctrine of prosecution history estoppel prevents Apple from arguing the new code infringes under the doctrine of equivalents.  As noted above, the claims of the '915 patent were amended to add the narrowing limitation "distinguishing between a single input point . . . and two or more input points . . ." to avoid prior art.  Consequently, it is my understanding that prosecution history estoppel applies and precludes a finding of infringement under the doctrine of equivalents.

40.     Even if Apple were allowed to argue that the new code infringes under the doctrine of equivalents, it is my opinion that the new code does not infringe for several reasons.

41.     First, there are substantial differences between the claimed technique for processing scroll and gesture operations and the technique used by the new code.  The claimed technique examines the number of input points and based on the results of that examination, invokes either a scroll or gesture operation.  The technique utilized in the new code is fundamentally and substantially different. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████

42.     Second, the new code does not perform substantially the same function, in substantially the same way, to obtain substantially the same result.  The technique found to infringe performs the function of determining whether the event object invokes a scroll or scale.  The way it performs this is by distinguishing between a single input point applied to the touch-sensitive display and two or more input points applied to the touch-sensitive display.  The result of this is that either a scroll call or a gesture call is issued. ████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████  Even assuming the function performed by the new code were the same as the function recited in the claim, the way in which the function performed is substantially different.  The code found to infringe determines whether an event object invokes a scroll or scale operation by distinguishing between the number of input points applied to the touch

1   screen display.  Dr. Singh identified this as the "quintessential" test.  The new code does not

2   ███████████████████████████████████████████████████████████████

3   ████████████████████████        Finally, the new code produces results that are substantially

4   different than the claimed function.  For example, the claimed function results in either a scroll or

5   gesture operation based on a motion event.  ████████████████████████████

6   ██████████████████████████

7        43.    I have also examined the scrolling code in WebView that processes scrolling

8   operations and the scaling code in WebviewScaleGestureDetector that processes scaling

9   operations and confirmed that both do not include any code that meet the limitations of claim 8.

10  Specifically, none of the scrolling code or scaling code "distinguish[es] between a single input

11  point applied to the touch-sensitive display that is interpreted as the scroll operation and two or

12  more input points applied to the touch-sensitive display that are interpreted as the gesture

13  operation" or "issu[es] at least one scroll or gesture call based on invoking the scroll or gesture

14  operation."

15       44.    I have also examined the Web Browser application in a Galaxy S II (T-Mobile)

16  product that includes this new code.  I understand that this source code was used to create the

17  following software:  Android version 4.0.4, Baseband version T989UVLI1, Kernel version 3.0.8,

18  and Build number IMM76D.UVLI1.[3]  The Galaxy S II (T-Mobile) was running the following

19  software:  Android version 4.0.4, Baseband version T989UVLI1, Kernel version 3.0.8, and Build

20  number IMM76D.UVLI1.  Using this device, I was able to scroll web pages using one finger and

21  zoom in and out of web pages using two fingers.

22       **E.      PRODUCTS USING THE NEW CODE DO NOT INFRINGE THE '915**
            **PATENT**

23

24       45.    For the reasons stated above, it is my opinion that products running the new code

25  described above does not infringe claim 8 of the '915 patent literally or under the doctrine of

26  _____

27  [3]   Declaration of Hee-chan Choi In Support Of Samsung's Opposition To Apple's Motion For
    A Permanent Injunction And Damages Enhancement.

28

1  equivalents.  I understand that, as of the filing of this declaration, the only product accused of

2  infringing the '915 patent that has not been discontinued is the Galaxy S II (T-Mobile).  It is my

3  opinion that Galaxy S II (T-Mobile) products running the new code do not infringe the '915 patent.

4  **V.**   **THE '163 PATENT**

5      **A.**   **OVERVIEW OF THE '163 PATENT**

6      46.   The '163 patent, entitled "Portable Electronic Device, Method and Graphical User

7  Interface for Displaying Structured Electronic Documents," issued on January 4, 2011 from an

8  application filed on September 4, 2007.  The named inventors of the '163 Patent are Bas Ording,

9  Scott Forstall, Greg Christie, Stephen O. Lemay, Imran Chaudhri, Richard Williamson, Chris

10 Blumenberg, and Marcel Van Os.  A review of the file history shows that Apple filed a certificate

11 of correction on January 14, 2011 to remove Bas Ording as an inventor and add Andre M.J. Boule

12 as an inventor.

13     47.   The '163 patent relates to methods and systems for navigating an information space

14 on portable electronic devices with limited display screens.  The independent claims of the '163

15 patent generally cover a two-step process for enlarging and substantially centering a first box of

16 content and substantially centering a second box of content within a structured electronic

17 document.  This technique is set forth in claim 50 of the '163 patent, which is reproduced below:

18     **50.**  A portable electronic device, comprising:

19         **[a]** a touch screen display; one or more processors; memory; and one or
20     more programs, wherein the one or more programs are stored in the memory and
       configured to be executed by the one or more processors,

21         **[b]** the one or more programs including: instructions for displaying at least
22     a portion of a structured electronic document on the touch screen display, wherein
       the structured electronic document comprises a plurality of boxes of content;

23         **[c]** instructions for detecting a first gesture at a location on the displayed
24     portion of the structured electronic document; instructions for determining a first
       box in the plurality of boxes at the location of the first gesture; instructions for
25     enlarging and translating the structured electronic document so that the first box is
       substantially centered on the touch screen display;

26

27         **[d]** instruction[s] for, while the first box is enlarged, detecting a second
       gesture on a second box other than the first box; and instructions for, in response to

28

detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display.

## B. PROSECUTION HISTORY

48.     As initially drafted, claim 50 of the '163 patent (then numbered claim 51) did not include claim element [d], which requires "instruction[s] for, while the first box is enlarged, detecting a second gesture on a second box other than the first box; and instructions for, in response to detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display." JX-1049.49-50.

49.     On October 20, 2011, the patent Examiner issued a Notice of Allowability for the '163 patent. JX-1049.1696-1712. According to this notice, the Examiner conducted a telephone interview with Apple on October 12, 2010, who authorized the following Examiner's Amendment to claim 50 (then claim 51). JX-1049.1698. This amendment added claim element [d].

> **[50].** A portable electronic device, comprising:
>
> **[a]** a touch screen display; one or more processors; memory; and one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors,
>
> **[b]** the one or more programs including: instructions for displaying at least a portion of a structured electronic document on the touch screen display, wherein the structured electronic document comprises a plurality of boxes of content;
>
> **[c]** instructions for detecting a first gesture at a location on the displayed portion of the structured electronic document; instructions for determining a first box in the plurality of boxes at the location of the first gesture; ~~and~~ instructions for enlarging and translating the structured electronic document so that the first box is substantially centered on the touch screen display**:**
>
> **[d] instruction[s] for, while the first box is enlarged, detecting a second gesture on a second box other than the first box; and instructions for, in response to detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display.**

## C. SAMSUNG'S NEW CODE DOES NOT INFRINGE THE '163 PATENT

50.     In Exhibit 5 of his infringement report, Dr. Singh cites motionUp() as the WebView.cpp function in the accused Samsung code that is ultimately responsible for "in

1  response to detecting the second gesture, translating the structured electronic document so that the

2  second box is substantially centered on the touch screen display."

3       51.    I have reviewed the new source code for the Web Browser application.  I

4  understand that this source code was used to create the following software:  Android version 4.0.4,

5  Baseband version T989UVLI1, Kernel version 3.0.8, and Build number IMM76D.UVLI1.[4]  Based

6  on my review, I have confirmed that the relevant source code in the motionUp() function,

7  identified by Dr. Singh as infringing, has been commented out and is therefore inoperative.  As a

8  result, it is my opinion that the Samsung accused code no longer contains "instructions for, in

9  response to detecting the second gesture, translating the structured electronic document so that the

10  second box is substantially centered on the touch screen display" as required by claim 50.  The

11  new code does not literally infringe the '163 patent.

12       52.    I have also examined the Web Browser application in a Galaxy S II (T-Mobile)

13  product that includes this new code.  The Galaxy S II (T-Mobile) was running the following

14  software:  Android version 4.0.4, Baseband version T989UVLI1, Kernel version 3.0.8, and Build

15  number IMM76D.UVLI1.  Using the Web Browser application on this device, I loaded a web

16  page from the New York Times website.  After "enlarging and translating" a first box of content

17  on the web page using a double tap, I was unable to then cause the device to "translate" to

18  "substantially center" a second box in response to a "second gesture" on a "second box other than

19  the first box."  Any attempt to single-tap on a second region outside the first, enlarged region

20  resulted in no response from the device.  Any attempt to double-tap anywhere on the webpage,

21  including a second region outside the first, enlarged region, resulted in the structured electronic

22  document returning to its original size (*i.e.*, a "zoom out").  This non-infringing behavior is

23  illustrated in the video attached as Exhibit 3.  As a result, Web Browser application does not

24  literally infringe claim 50 of the '163 patent.

25

26  _____

27     [4]  Declaration of Hee-chan Choi In Support Of Samsung's Opposition To Apple's Motion For
A Permanent Injunction And Damages Enhancement.

28

53.     I also understand that the doctrine of prosecution history estoppel prevents Apple from arguing the new code infringes under the doctrine of equivalents.  Claim 50 was amended to add the limitation "instruction[s] for, while the first box is enlarged, detecting a second gesture on a second box other than the first box; and instructions for, in response to detecting the second gesture, translating the structured electronic document so that the second box is substantially centered on the touch screen display" to avoid prior art.  As a result, my understanding is that prosecution history estoppel applies and precludes a finding of infringement under the doctrine of equivalents.

54.     Even if Apple were allowed to argue that the new code infringes under the doctrine of equivalents, it is my opinion that the new code does not infringe the '163 patent under the doctrine of equivalents.  In my opinion, without the functionality associated with the second gesture, the Galaxy S II (T-Mobile) does not perform substantially the same function, in substantially the same way, to achieve the substantially same result.  The claimed function of centering a second box is no longer performed.  Instead, the Galaxy S II (T-Moblie) performs a substantially different function of doing nothing (single tap) or zooming out to the web pages' original size (double tap).  For the same reasons, the result of the claimed function and the result of the function performed by the Galaxy S II (T-Mobile) are substantially different.

55.     I also note that while the structured electronic document is in an enlarged state, a user makes a second gesture on a second box other than the first box and the structured electronic document reduces to its original size, there could be a case where the second box is by chance substantially centered on the display.  It is my opinion that this does not infringe claim 50 because the centering of the second box in this example did not occur as a result of "instructions for" "substantially centering" the "second box."  In this example, the centering of the second box is not caused by any code designed specifically to bring about that result.  It is merely an incidental effect of the zoom out operation.  Indeed, the lines of code specifically cited by Dr. Singh as responsible for "translating the structured electronic document so that the second box is substantially centered on the touch screen display" are no longer operative and are unable to perform any functionality on the Samsung accused devices.  In my opinion, absent "instructions

1   for, in response to detecting the second gesture, translating the structured electronic document so

2   that the second box is substantially centered on the touch screen display," there is no infringement.

3

4       I declare under penalty of perjury under the laws of the United States that the foregoing is

5   true and correct. Executed on October 18, 2012, in SAN FRANCISCO .

6

7

8                                     Stephen Gray

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Curriculum Vitae

# Stephen Gray

## Expertise

- Distributed Computing Architecture
- Internet/Web/e-Commerce
- Web Services Protocols/SOA
- Client/Server Technology
- Electronic Presentation Technology
- Programming Languages

- Image and Document Processing
- Relational Database Design
- Network Architecture
- Software Quality
- Software and Systems Development, Integration and Management

## Professional Summary

Mr. Gray has over 30 years of experience in the computer and communications industries. His background includes systems and software architecture, design and development as well as senior management positions in development, marketing, and general management.

## Employment History

From:   1984
To:       Present

**Gray & Yorg, LLC**
San Diego, CA
Position:  *Principal*

Mr. Gray is an expert in modern computing platform architecture, design, implementation and integration, including relational database design in networking environments.  In providing consulting services, he has successfully completed the following projects:

- Performed patent portfolio analysis for large corporations
- Developed policies and procedures for a "clean" software development environment.  Monitored activities to ensure conformance.
- CSO for a Business Process Management software start up.  The firm develops Web Services/SOA based BPM creation, orchestration, management and optimization solutions.
- CTO for an e-Commerce Internet start up.  The firm developed a product that specializes in procurement for public agencies.
- Interim CEO for a broadband Competitive Local Exchange Carrier (CLEC).  Helped negotiate the successful sale of the CLEC.
- CTO for an Internet-based secure content distribution startup.  The firm developed comprehensive Digital Rights Management (DRM) solutions for the control and promotion of content on the Internet.
- Architected several e-Commerce applications for legacy interoperability

## Curriculum Vitae

- Participated in the architecture definition and design of a highly scalable, high performance device controller for multifunction document processing products
- Performed a detailed analysis of the competitive environment for retail point-of-sale hardware and software systems.  Analysis included technology, marketing, compensation and back office interface issues
- Provided system design, product selection and project management for a turnkey software/hardware system for residential refuse hauling and toxic waste disposal company.  System involved multiple hardware and software vendors around the IBM AS400 central processing system
- Led the design of a high performance, LAN-based image capture and statement printing subsystem using IBM system components using DBII relational database and SQL language for TRW
- Led the design of an image assisted, remittance processing system using IBM system components and Sybase relational database in a client/server architecture for TRW.  Additionally, designed an object-oriented front end to the database so that the UNIX platform could execute Sybase applications
- Engaged to perform a technology audit for the United States Department of Agriculture using ORACLE database products, which resulted in a major overhaul of the database management implementation for their application
- Collaborated with FileNet to develop an IBM-to-UNIX interconnection strategy for their optical disk-based document imaging and filing system
- Defined high speed interconnection and relational database methods using SQL language for Marriott Corporation to handle large transaction volumes in a hotel reservations system
- Collaborated with Xerox in mid 1990s development of an electronic printing system front end supporting a wide range of advanced printing services, including resolution enhancement technology
- Advised Northern Telecom on the performance of IBM's Net View product
- Authored two technical seminars: SNA Technology Update, OS/2 and SAA, Introduction to Client/Server Technology with special emphasis on relational database management.  Published articles in trade journals such as Interface Age, CASE World and Info World

| | | |
|---|---|---|
| From: | 2001 | **Networld Exchange Incorporated** |
| To: | 2002 | Bonsall, CA |
| | Position: | *Chief Technical Officer* |

## Curriculum Vitae

Networld Exchange, Inc. (NEI) provides Fortune 2000 companies private trading exchange (PTX) solutions that automate their B2B commerce activities. NEI is a restart. NEI is funded by institutional investors in New York and Florida. Mr. Gray was recruited in 4Q01 by the investors as part of the new management team.

From: 2000  
To: 2001  
Position:

**NTN Communications**  
Carlsbad, CA  
*Chief Technical Officer*  
NTN Communications, Inc. (AMEX: NTN) is the parent corporation of two operating divisions: Buzztime Entertainment, Inc. and the NTN Network®. Mr. Gray serves as CTO for the parent corporation and each of its operating divisions.  
Buzztime Entertainment, Inc. develops and distributes sports and trivia games to a variety of interactive platforms including interactive television, the Internet, PDS and mobile phones.  
The NTN Network, NTN's hospitality business, operates two interactive television (ITV) networks that broadcast games to millions of consumers each month at 3500 restaurants, sports bars and taverns in North America.  
Mr. Gray is responsible for all of the technical aspects of the corporations as well as forward looking programs and business opportunities.

From: 1987  
To: 1988  
Position:

**Simpact Associates**

*Director, Product Marketing*  
Directed the full life cycle of definition, delivery, marketing and enhancement of four sets of IBM connectivity products, including:
- SNA protocol support hardware and software for DEC VAX systems
- An IBM PC-based gateway product that supports SNA and other industry-standard communications architectures
- A Netware-based Token Ring Network adapter board and software for DEC VAX systems
- A hardware/software product that receives financial market feeds and reformats the information for presentation to programs running a VAX via a proprietary applications programming interface (API)

From: 1982  
To: 1987  
Position:  
1985-87

**Xerox Corporation**

*General Manager, Host Software Products*  
As the founder and leader of the product delivery organization of a Xerox independent business unit, Mr. Gray managed 21 employees and 33 contract professionals. He directed the definition, architecture,

## Curriculum Vitae

design, development, test, product transfer and sustaining engineering of six products for electronic page printers connected to IBM mainframes, DEC VAX and IBM PC's.

1982-85   Manager, Foreign System Interconnect. Managed four professionals who defined and developed the technical interconnect strategy for electric page printers to wide-and local-area networks.  Mr. Gray's group delivered host software, network and printer engineering services.  He invented a new printer interconnection technique, developed interfaces to Ethernet local area network, and designed connections to IBM mainframes using SNA and the System/370 channel.

From:   1979   **Computer Communications, Inc.**
To:   1982
    Position:   *Manager, Communication Controller Software Development*
    As leader of the architecture, design, development, and testing of an SNA communications controller, Mr. Gray managed 24 professionals.  His group successfully designed, developed and deployed the controller's operating software, diagnostics, host-based compilers, and system support software.  Before that, he was the product manager for front-end processors and remote concentrators.  Also, he engineered an X.25 multi-channel controller.

From:   1977   **Olivetti Corporation**
To:   1979
    Position:   *Regional Support Manager*
    Started as a district manager and later became a regional software support manager for a series of mini- and microcomputer business systems.  Applications included general business and on-line front-office banking.

From:   1973   **Burroughs Corporation**
To:   1977
    Position:   *Systems Programmer, Systems Analyst*
    Specializing in data communications software and held several design and product implementation positions in the mid range and small system development groups.

## Additional Professional Experience:

- Designed and implemented numerous relational database management systems using Sybase, Informix, Microsoft Access, DB2.
- Knowledgeable in C, C++, SQL, COBOL, RPG, Basic, Java, various Assembler languages, HTML, XML.

## Curriculum Vitae

- Designed IBM SNA Distribution Services compatible electronic mail interface product. The product interfaced to MCI mail services.
- Designed peer-to-peer printing network product for MCI
- Designed image-processing system for TRW on contract with the Internal Revenue Service.  Participated in the implementation of a prototype of the system.
- Designed image based item processing system for TRW and IBM Participated in the implementation of a prototype of the system.
- Defined IBM interoperability strategy for FileNet products.
- Defined distributed network printing product for Xerox.
- Defined and managed several networking products for Simpact Associates.  Used the System Strategies Inc. Express SNA package.
- Defined, designed and implemented several interoperability interfaces to Xerox Electronic Printers.
- Defined, designed and implemented telecommunications control devices for Computer Communication Incorporated.
- Developed and presented numerous public and in-house courses in IBM, Unix, Internet and related networking technologies.
- Member of UCSD Connect "Most Innovative Product Award" Selection Committee (2002, 2003, 2004).
- Member of Association of Computing Machinery

## Litigation Support Experience

Date:     2012     **Morrison & Foerster**
                   Augme v. Yahoo
                   Patent infringement – distributed processing
                   Active

Date:     2011     **Quinn Emanuel**
                   Catalina Marketing v. Coupons Inc.
                   Contract Dispute
                   Active

Date:     2011     **Alston & Bird**
                   Openwave v. Apple, et al
                   Patent infringement – distributed processing
                   Active

Date:     2011     **DLA Piper**
                   Motorola v. Tivo
                   Patent infringement – audio/video processing
                   Inactive

Date:     2010     **Law Office of Christian E. Mammen, Lieff Cabraser Heimann and Bernstein, LLP and Tousley Brain Stephens, LLP**

## Curriculum Vitae

Deep9 v. Barnes & Noble
Patent infringement – distributed processing
Active

Date:    2010    **McDermott Will & Emery, Alston & Bird**
Bedrock v. Soft Layer, et al
Patent infringement – distributed processing
Inactive

Date:    2010    **Quinn Emanuel**
Soverain v. J.C. Penney, et al
Patent infringement – distributed processing
Active

Date:    2009    **Jones Day**
Oracle v. SAP
Copyright infringement – enterprise software
Inactive

Date:    2009    **Foley & Lardner**
DataTreasury v. US Bank
Patent infringement – distributed processing
Inactive

Date:    2009    **Gibson, Dunn & Crutcher**
IPI v. Red Hat, Novell
Patent infringement – distributed file systems
Inactive

Date:    2009    **Jackson and Walker**
ICR v. Harpo
Patent infringement – e-Commerce
Inactive

Date:    2009    **Cooley Godward**
Leader v. Facebook
Patent infringement – distributed file systems
Inactive

Date:    2009    **Jones Day**
SuperSpeed v. IBM
Patent infringement – distributed file systems
Inactive

Date:    2008    **Baker & Botts**
Fotomedia v. Yahoo!

## Curriculum Vitae

Patent infringement – file sharing
Inactive

Date:   2008   **Hogan & Hartson**
ODS v. Magna Entertainment
Patent infringement – E-Commerce
Inactive

Date:   2008   **Winston & Strawn**
CNET v. Etilize
Patent infringement – E-Commerce
Inactive

Date:   2008   **Weil, Gotshal & Manges**
i4i v. Microsoft
Patent infringement – Data formatting, representation
Inactive

Date:   2008   **Jones Day**
MathWorks v. COMSOL
Patent infringement - interoperability, Copyright
Inactive

Date:   2008   **Townsend, Townsend & Crew**
Anthurium v. Spheris
Patent infringement – Distributed Processing
Inactive

Date:   2008   **Jones Day**
Soverain v. CDW, et al
Patent infringement – e-commerce
Inactive

Date:   2008   **Paul Hastings**
Sify v. Yahoo
Trade secrets
Inactive

Date:   2007   **Finnegan Henderson**
Cisco v. Telcordia
Patent infringement – system monitoring
Inactive

Date:   2007   **Brown Raysman**
WebSide Story v. NetRatings
Patent infringement – web monitoring

## Curriculum Vitae

Inactive

Date:    2007    **Paul Hastings**
MediaTek v. Sanyo
Patent infringement – data compression
Inactive

Date:    2007    **Sutherland**
FedEx v. U.S.
Tax Credit
Active

Date:    2006    **Jones Day**
IBM v. Amazon
Patent infringement – Electronic commerce
Inactive

Date:    2006    **Brown Raysman**
NetRatings v. SageMetrics
Patent infringement – web monitoring
Inactive

Date:    2006    **Young Conaway Stargatt & Taylor**
Sungard v. PHI
Breach of contract
Inactive

Date:    2006    **Paul Hastings**
Autobytel v. Dealix
Patent Infringement – Electronic commerce
Inactive

Date:    2005    **Brown Raysman**
NetRatings v. Coremetrics, et al
Patent Infringement – Electronic commerce
Inactive

Date:    2005    **Kim & Wilcox**
HealthFirst v. HealthTrio
Contract Dispute – Electronic information portals
Inactive

Date:    2005    **Ropes & Gray (Fish & Neave)**
Ampex v. Kodak, et al
Patent Infringement – Image transformation
Inactive

## Curriculum Vitae

Date:     2005     **Sedgwick Detert Moran & Arnold LLP**
Waltrip Associates v. Kevin Kimperlin & Spencer Trask Ventures
Contract Dispute - Theft of trade secret, EDI and ecommerce
Inactive

Date:     2005     **Orrick, Herrington & Sutcliffe LLP**
Metilinx v. Hewlett-Packard
Contract Dispute - Large scale software deployment, QA, system
management
Inactive

Date:     2005     **Morrison & Foerster**
BEA v. SoftwareAG
Patent Infringement - Web Services, Software development tools,
OOP
Inactive

Date:     2005     **Jones Day**
Orion v. American Honda
Patent Infringement – Electronic Catalogs and Brochures
Inactive

Date:     2004     **Keker & Van Nest**
AB Cellular v. City of Los Angeles
Contract Dispute – Tax Authority, Source Code Analysis
Inactive

Date:     2004     **Silicon Edge Law Group**
Oracle v. Mangosoft
Patent Infringement – Web System Personalization
Inactive

Date:     2003     **Smith Katzenstein & Furlow LLP**
S. Rakoff et al v. Dot Com Group, A. Nash et al
Contract Dispute – Web Analytics
Inactive

Date:     2003     **Jones Day**
Hill v. IBM
Patent Infringement – Electronic Catalog, data management
Inactive

Date:     2003     **Fish & Richardson**
Mirror Imaging LLC v. Affiliated Computer Services

## Curriculum Vitae

Patent Infringement – Electronic Document Storage
Inactive

Date:   2003   **Jones Day**
VPS LLC v. Eastman Kodak Co. and Ofoto
Patent Infringement – Digital Media distribution
Inactive

Date:   2002   **Steptoe and Johnson**
Steven Heard & Dean Messier v. California Institute of Technology
& Jet Propulsion Laboratory
Patent Infringement - Digital Images Upload/Storage
Inactive

Date:   2002   **Fish & Neave LLP**
Harrah's Casino v. Station's Casino
Patent Infringement – Player loyalty system in a network
Inactive

Date:   2002   **Preston Gates and Ellis LLP**
Case    Eyefinity, Inc. vs. Entigo, Inc.
Project:   Contract Dispute - Faulty software development
Status:   Inactive

Date:   1998   **Robman & Seeley**
Case    Ametron-American Electronic Supply v. Entin, et al
Project:   Theft of Trade Secrets - Recovery of Data and Evaluation
Status:   Inactive

Date:   1998   **Kronish Lieb Weiner & Hellman**
Case    GTE v. Videotron
Project:   Contract Dispute - Analysis of UNIX-based system
Status:   Inactive

Date:   1998   **Kudo & Daniels**
Case    Total Recovery Services v. Microage
Project:   Contract Dispute - Faulty Product, evaluation of product.
Status:   Inactive

Date:   1996   **Baker & Botts**
Case    BMC Software v. Peregrine Systems, Inc.
Project:   Theft of Trade Secrets -  DB2 enhancement software.

## Curriculum Vitae

|  |  |  |
|---|---|---|
| | Status: | Inactive |

| Date: | 1995 | **Pacific Bell Inside Counsel** |
|---|---|---|
| | Case | David McGoveran v. Pacific Telesis Group and Pacific Bell |
| | | Damages trial in Theft of Trade Secret Litigation - assess market |
| | | potential and value of SQL software. |
| | Status: | Inactive |

| Date: | 1994 | **Cooley Godward Castro Huddleson & Tatum** |
|---|---|---|
| | Case | ADV Freeman v. Boole & Babbage |
| | Project: | Contract Dispute - Assessment of software quality, expert witness |
| | | on product marketing and software quality. |
| | Status: | Inactive |

| Date: | 1984 | **O'Melveny & Myers** |
|---|---|---|
| | Case | IBM v. NCR Comten |
| | Project: | Copyright Infringement - Code comparison and product analysis |
| | | and design of alternative technologies. |
| | Status: | Inactive |

## Education

| Year | College/University | Degree |
|---|---|---|
| 1973 | California Polytechnic University | BS, Economics |

# EXHIBIT 2

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kevin P.B. Johnson (Bar No. 177129)
    kevinjohnson@quinnemanuel.com
6   Victoria F. Maroulis (Bar No. 202603)
    victoriamaroulis@quinnemanuel.com
7   555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California  94065-2139
8   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
9
    Michael T. Zeller (Bar No. 196417)
10  michaelzeller@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
11  Los Angeles, California 90017
    Telephone: (213) 443-3000
12  Facsimile: (213) 443-3100

13  Attorneys for SAMSUNG ELECTRONICS CO.,
    LTD., SAMSUNG ELECTRONICS AMERICA,
14  INC. and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC
15

16              UNITED STATES DISTRICT COURT

17      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19  APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

20              Plaintiff,                          **MANUAL FILING NOTIFICATION FOR
                                                    EXHIBIT 2 TO THE DECLARATION OF
21      vs.                                         STEPHEN GRAY IN SUPPORT OF
                                                    SAMSUNG'S OPPOSITION TO APPLE'S
22  SAMSUNG ELECTRONICS CO., LTD., a               MOTION FOR A PERMANENT
    Korean business entity; SAMSUNG                INJUNCTION AND DAMAGES
23  ELECTRONICS AMERICA, INC., a New              ENHANCEMENT**
    York corporation; SAMSUNG
24  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
25
                Defendant.
26

27

28

**MANUAL FILING NOTIFICATION**

Regarding:       Exhibit 3 to the Declaration of Stephen Gray in Support of Samsung's Opposition

to Apple's Motion for a Permanent Injunction and Damages Enhancements

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's

office.  The exhibits were previously served on all parties.

For information on retrieving this filing directly from the court, please see the court's main web

site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).


This filing was not e-filed for the following reason(s):

_____       Voluminous Document (PDF file size larger than efiling system allowances)

_____       Unable to Scan Documents

_____       Physical Object (description):

_____       Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

\_\_\_X\_\_\_       Item Under Seal

_____       Conformance with the Judicial Conference Privacy Policy (General Order 53)

_____       Other (description):  _____


DATED:  October 19, 2012                      Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP



By  *Victoria F. Maroulis*  _____
Victoria F. Maroulis
Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

# EXHIBIT 3

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kevin P.B. Johnson (Bar No. 177129)
    kevinjohnson@quinnemanuel.com
6   Victoria F. Maroulis (Bar No. 202603)
    victoriamaroulis@quinnemanuel.com
7   555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California  94065-2139
8   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
9
    Michael T. Zeller (Bar No. 196417)
10  michaelzeller@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
11  Los Angeles, California 90017
    Telephone: (213) 443-3000
12  Facsimile: (213) 443-3100

13  Attorneys for SAMSUNG ELECTRONICS CO.,
    LTD., SAMSUNG ELECTRONICS AMERICA,
14  INC. and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC
15

16                  UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19  APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

20              Plaintiff,                         **MANUAL FILING NOTIFICATION FOR
                                                   EXHIBIT 3 TO THE DECLARATION OF
21        vs.                                      STEPHEN GRAY IN SUPPORT OF
                                                   SAMSUNG'S OPPOSITION TO APPLE'S
22  SAMSUNG ELECTRONICS CO., LTD., a               MOTION FOR A PERMANENT
    Korean business entity; SAMSUNG               INJUNCTION AND DAMAGES
23  ELECTRONICS AMERICA, INC., a New               ENHANCEMENT**
    York corporation; SAMSUNG
24  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,
25
                Defendant.
26

27

28

**MANUAL FILING NOTIFICATION**

Regarding:       Exhibit 3 to the Declaration of Stephen Gray in Support of Samsung's Opposition

to Apple's Motion for a Permanent Injunction and Damages Enhancements

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office.  The exhibits were previously served on all parties.

For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).


This filing was not e-filed for the following reason(s):

_____       Voluminous Document (PDF file size larger than efiling system allowances)

_____       Unable to Scan Documents

_____       Physical Object (description):

__X___       Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_____       Item Under Seal

_____       Conformance with the Judicial Conference Privacy Policy (General Order 53)

_____       Other (description): _____


DATED:  October 19, 2012              Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  *Victoria F. Maroulis*_____
Victoria F. Maroulis
Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC