# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

    APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6   CORPORATION,               )
                               )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,       )
                               )  JULY 31, 2012
8         VS.                   )
                               )  VOLUME 2
9   SAMSUNG ELECTRONICS CO.,    )
    LTD., A KOREAN BUSINESS     )  PAGES 283-555
10  ENTITY; SAMSUNG             )
    ELECTRONICS AMERICA,        )
11  INC., A NEW YORK            )
    CORPORATION; SAMSUNG        )
12  TELECOMMUNICATIONS          )
    AMERICA, LLC, A DELAWARE    )
13  LIMITED LIABILITY           )
    COMPANY,                    )
14                              )
               DEFENDANTS.      )
15  _____

16              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595
24

25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
3                                MICHAEL A. JACOBS
                                 RACHEL KREVANS
4                           425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
7                           BY:  WILLIAM F. LEE
                            60 STATE STREET
8                           BOSTON, MASSACHUSETTS  02109

9                           BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                            50 CALIFORNIA STREET, 22ND FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94111

14                          BY:  VICTORIA F. MAROULIS
                                 KEVIN P.B. JOHNSON
15                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
16                          REDWOOD SHORES, CALIFORNIA  94065

17                          BY:  MICHAEL T. ZELLER
                                 WILLIAM C. PRICE
18                               JOHN B. QUINN
                            865 SOUTH FIGUEROA STREET
19                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017
20

21

22

23

24

25
```

1

2                       INDEX OF PROCEEDINGS

3

4   OPENING STATEMENT BY MR. MCELHINNY        P. 304

5   OPENING STATEMENT BY MR. LEE              P. 353

6   OPENING STATEMENT BY MR. VERHOEVEN        P. 380

7

8

9

10

11

12

13                      INDEX OF WITNESSES

14  PLAINTIFF'S

15  CHRISTOPHER STRINGER
        DIRECT EXAM BY MR. MCELHINNY          P. 469
16      CROSS-EXAM BY MR. VERHOEVEN           P. 511
        REDIRECT EXAM BY MR. MCELHINNY        P. 537
17

18  PHILIP SCHILLER
        DIRECT EXAM BY MR. MCELHINNY          P. 541
19

20

21

22

23

24

25

```
 1    Q     WERE YOU EVER TOLD BY ANYONE THAT YOU HAD TO
 2    PICK PARTICULAR DESIGNS BECAUSE OF REQUIREMENTS
 3    FROM THE COMPONENTS OR THE INTERNAL ELEMENTS OF THE
 4    PHONE?
 5    A     NO.
 6    Q     HOW -- WHO WAS IN CONTROL OF YOUR DESIGN
 7    PROCESS ULTIMATELY?
 8    A     WE WERE IN CONTROL OF OUR DESIGN PROCESS.
 9    Q     IS THERE A REASON WHY YOU DIDN'T PUT THE APPLE
10    LOGO ON THE FRONT FACE -- ON THE FRONT FACE OF THE
11    FACE?
12    A     FIRST OF ALL, IT -- IT DIDN'T LOOK GOOD.
13            AND WE ALSO KNEW FROM OUR EXPERIENCE WITH
14    IPOD, IF YOU MAKE A STARTLINGLY BEAUTIFUL AND
15    ORIGINAL DESIGN, YOU DON'T NEED TO.  IT STANDS FOR
16    ITSELF.  IT BECOMES A CULTURAL ICON.
17    Q     WHAT DO YOU MEAN WHEN YOU USE THE WORD "ICON,"
18    SIR?
19    A     ICON, IT'S A HARD CREDENTIAL, REALLY.  I THINK
20    THAT BECOMES TRUE WITH ENORMOUS SUCCESS.
21            BUT IF YOU SEE SOMETHING ACROSS THE ROOM
22    AND YOU KNOW WHAT IT IS AND YOU CAN SIMPLY DESCRIBE
23    IT, IT'S AN ICON.
24            MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE
25    JX 1000 INTO EVIDENCE.
```

```
 1              MR. VERHOEVEN:  NO FURTHER OBJECTION.

 2              THE COURT:  OKAY.  IT'S ADMITTED.

 3              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 4              1000, HAVING BEEN PREVIOUSLY MARKED FOR

 5              IDENTIFICATION, WAS ADMITTED INTO

 6              EVIDENCE.)

 7              (PAUSE IN PROCEEDINGS.)

 8    BY MR. MCELHINNY:

 9    Q    SIR, I'VE HANDED YOU THREE EXHIBITS.

10         WOULD YOU LOOK AT THE ONE, PLEASE, THAT

11    HAS THE NUMBER ON THE BACK JX 1001.  CAN YOU TELL

12    ME WHAT THAT IS, PLEASE?

13    A    THIS IS IPHONE 3G.

14              MR. MCELHINNY:  YOUR HONOR, I MOVE 1001

15    INTO EVIDENCE.

16              MR. VERHOEVEN:  NO FURTHER OBJECTION.

17              THE COURT:  OKAY.  THAT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              1001, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. MCELHINNY:

23    Q    WOULD YOU LOOK, PLEASE, AT THE ONE THAT'S BEEN

24    NUMBERED JX 1002?

25    A    YES.
```

```
 1    Q    WHAT IS THAT PHONE, SIR?

 2    A    I BELIEVE IT'S THE 3GS.

 3              MR. MCELHINNY:  YOUR HONOR, I'D MOVE 1002

 4    INTO EVIDENCE.

 5              MR. VERHOEVEN:  NO FURTHER OBJECTION.

 6              THE COURT:  IT'S ADMITTED.

 7              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 8              1002, HAVING BEEN PREVIOUSLY MARKED FOR

 9              IDENTIFICATION, WAS ADMITTED INTO

10              EVIDENCE.)

11    BY MR. MCELHINNY:

12    Q    WOULD YOU LOOK AT THE ONE THAT HAS 1003 ON IT,

13    PLEASE.

14    A    YES.

15    Q    AND WHAT IS THAT?

16    A    IPHONE 4.

17              MR. MCELHINNY:  YOUR HONOR, I'D MOVE 1003

18    INTO EVIDENCE.

19              MR. VERHOEVEN:  NO FURTHER OBJECTION.

20              THE COURT:  IT'S ADMITTED.

21              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

22              1003, HAVING BEEN PREVIOUSLY MARKED FOR

23              IDENTIFICATION, WAS ADMITTED INTO

24              EVIDENCE.)

25    BY MR. MCELHINNY:
```

1    Q    SIR, LET'S TALK ABOUT THE IPAD FOR A MOMENT.

2    A    OKAY.

3    Q    WHAT, IF ANYTHING, DID YOU WANT TO ACHIEVE IN

4    DESIGNING THE IPAD?

5    A    WE WANTED TO, AGAIN, MAKE A, A BREATHTAKINGLY

6    SIMPLE, BEAUTIFUL DEVICE, SOMETHING THAT YOU REALLY

7    WANT, AND SOMETHING THAT'S VERY EASILY

8    UNDERSTANDABLE.

9    Q    WHAT DOES THAT MEAN TO YOU?

10   A    SOMETHING THAT'S VERY IMMEDIATE.  YOU PICK IT

11   UP, YOU USE IT, SOMETHING THAT'S JUST -- IT NEEDS

12   NO EXPLANATION.

13   Q    DO YOU RECALL APPROXIMATELY HOW LONG THE

14   DESIGN PROCESS LASTED FOR THE IPAD BEFORE IT WAS

15   RELEASED?

16   A    IT WAS AN ENORMOUS AMOUNT OF TIME.  WE STARTED

17   THE IPAD BEFORE WE STARTED THE IPHONE.  THAT'S WHEN

18   WE FIRST STARTED ON THE MULTITOUCH TECHNOLOGY AND

19   PRODUCTS ASSOCIATED.

20   Q    WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT

21   EXHIBIT PX 171.

22        OH, NEVER MIND.

23        LET ME HAND YOU THIS, WHICH IS PX 171

24   (HANDING).

25   A    YES.

1    Q    CAN YOU TELL ME WHAT THAT IS, PLEASE?

2    A    THIS IS, I WOULD THINK, A VERY, VERY EARLY

3    MODEL OF IPAD.

4    Q    AGAIN, WE DON'T HAVE TIME TO PASS IT AROUND,

5    BUT CAN YOU HOLD IT UP SO THAT PEOPLE CAN SEE IT?

6             CAN YOU HOLD THE BACK UP SO THAT PEOPLE

7    CAN SEE IT?

8    A    (INDICATING.)

9             MR. VERHOEVEN:  EXCUSE ME, COUNSEL.  I

10   DON'T THINK YOU SHOWED THAT TO ME PREVIOUSLY, IF

11   YOU DON'T MIND.

12            MR. MCELHINNY:  SORRY.

13            (PAUSE IN PROCEEDINGS.)

14            MR. VERHOEVEN:  THANK YOU.

15   BY MR. MCELHINNY:

16   Q    WAS THE DESIGN GROUP FAVORABLY IMPRESSED WITH

17   THIS DESIGN, SIR?

18   A    I DON'T RECALL US LOOKING AT IT FOR VERY LONG.

19            MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

20   PX 171 INTO EVIDENCE.

21            MR. VERHOEVEN:  NO FURTHER OBJECTION.

22            THE COURT:  THAT'S ADMITTED.

23            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

24            171, HAVING BEEN PREVIOUSLY MARKED FOR

25            IDENTIFICATION, WAS ADMITTED INTO

```
 1                    EVIDENCE.)

 2             THE COURT:  WHY DON'T WE TAKE A BREAK AT

 3      ABOUT 3:30, SO ABOUT FIVE OR TEN MINUTES.

 4             MR. MCELHINNY:  PERFECT, YOUR HONOR.

 5             THE COURT:  AND IF FOLKS NEED

 6      CAFFEINATION, THERE ARE DRINKS IN THE FRIDGE IN THE

 7      JURY ROOM, AND YOU CAN GO TO THE BATHROOM.

 8      BY MR. MCELHINNY:

 9      Q    WHAT IS PX 170, SIR?

10      A    THIS IS A MODEL WE BUILT FOR IPAD.

11      Q    AGAIN, CAN YOU HOLD IT UP SO THE JURY CAN SEE

12      IT?

13      A    (INDICATING.)

14      Q    AND WHAT DOES IT SAY ON THE BACK?

15      A    IPOD.

16      Q    AND WHY DOES IT SAY IPOD, SIR?

17      A    I'M ASSUMING SIMILARLY TO THE DISCUSSION ABOUT

18      THE PHONE, WE EITHER HAD NOT COINED THE TERM YET

19      OR -- ACTUALLY, IT'S HARD TO BELIEVE WE WERE

20      CONSIDERING THIS IDENTITY, BUT MY STRONG SUSPICION

21      IS THAT WE WERE NOT AWARE OF THE NAME AND WE NEEDED

22      TO REPRESENT SOMETHING GRAPHICALLY.

23      Q    DOES APPLE HAVE A THING ABOUT SECRECY?

24      A    YES.

25      Q    OH, OKAY.
```

```
1                    LET ME SHOW YOU JX 1004.

2                    YOUR HONOR, I WOULD MOVE PX 170.

3                    MR. VERHOEVEN:  NO FURTHER OBJECTION.

4                    THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

5     THAT'S 170, IS THAT RIGHT?

6                    MR. MCELHINNY:  YES, YOUR HONOR.

7                    THE COURT:  OKAY.

8                    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

9                    170, HAVING BEEN PREVIOUSLY MARKED FOR

10                   IDENTIFICATION, WAS ADMITTED INTO

11                   EVIDENCE.)

12    BY MR. MCELHINNY:

13    Q    LET ME SHOW YOU PX 1004.

14                   WHAT IS THAT, MR. STRINGER?

15    A    THIS IS THE IPAD.

16    Q    HOW DID YOUR GROUP SELECT THE FINAL DESIGN FOR

17    THE IPAD?

18    A    WE -- WE HAD TRIED SO MANY THINGS.  IT WAS A

19    LONG PROJECT AND IT TRACKED THE COURSE OF EVENTS OF

20    IPHONE.

21                   DURING THE DESIGN OF IPHONE, AS WE WENT

22    THROUGH VARIOUS FORM FACTORS, WE WOULD MODEL IPADS

23    IN SIMILAR SORT OF FAMILY APPEARANCES.

24                   YOU SEE, THIS IS KIND OF THE EXTRUDED

25    FORM.  WE DID THAT, I'M QUITE CONFIDENT, AT THE
```

519

```
 1    WERE LOOKING AT, PLEASE.

 2              AND AGAIN, LOOKING AT FIGURE 16 AND 15,

 3    THE SIDE VIEWS, POSITIONING -- AN IMPORTANT DESIGN

 4    ELEMENT HERE WAS POSITIONING THE GLASS FLUSH WITH

 5    THE BEZEL; RIGHT?

 6    A    YES.

 7    Q    EVEN THOUGH THAT MIGHT PRESENT SOME

 8    MANUFACTURING DIFFICULTIES; CORRECT?

 9    A    I AGREE.

10    Q    OKAY.  NOW, LET'S TURN TO THE FRONT FACE --

11    ACTUALLY, CAN WE GO BACK A PAGE, PLEASE.  ONE MORE.

12              LET'S GO TO THE '677 PATENT, WHICH SHOULD

13    BE IN YOUR BINDER.  I'M SORRY, '678.

14              I APOLOGIZE, YOUR HONOR.

15              (PAUSE IN PROCEEDINGS.)

16              MR. VERHOEVEN:  HERE IT IS.  IT'S IN YOUR

17    BINDER AT 1043.

18              MR. MCELHINNY:  WHAT EXHIBIT ARE YOU ON?

19              MR. VERHOEVEN:  IT'S JOINT TRIAL EXHIBIT

20    1043.  AND LET'S GO TO -- A PAGE INTO THE FIGURE.

21    Q    THIS IS ANOTHER DESIGN PATENT THAT YOU

22    TESTIFIED ABOUT ON DIRECT.  DO YOU REMEMBER?

23    A    YES.

24    Q    AND THIS IS ALSO A DESIGN PATENT THAT

25    CORRESPONDS TO THE INITIAL IPHONE; IS THAT RIGHT?
```

1    A    YES.

2    Q    AND DO YOU SEE THERE'S THIS ELEMENT UP HERE,

3    I'M CIRCLING IT AT THE TOP OF THE PHONE THERE?

4    A    YES.

5    Q    CAN YOU DESCRIBE FOR THE JURY WHAT THAT IS?

6    A    THAT IS THE RECEIVER DETAIL.

7    Q    IS THAT THE LOZENGE SHAPE DESIGN ELEMENT ON

8    THE PHONE?

9    A    YES, THAT'S THE OPENING FOR THE RECEIVER.

10   Q    AND THAT'S ANOTHER DESIGN ELEMENT IN THE

11   MINIMALIST DESIGN FOR THE INITIAL IPHONE; CORRECT?

12   A    CORRECT.

13   Q    AND IT WAS IMPORTANT FOR YOUR DESIGN TEAM,

14   WITH RESPECT TO THAT DESIGN ELEMENT, TO MAKE SURE

15   IT WAS CENTERED HORIZONTALLY; IS THAT CORRECT?

16   A    CAN YOU BE MORE SPECIFIC OF WHAT YOU MEAN BY

17   "CENTERED HORIZONTALLY"?

18   Q    SURE.  SO IF THIS IS HORIZONTAL FROM THE

19   BOTTOM TO THE TOP OF THE PHONE, DO YOU FOLLOW ME?

20   A    THAT IS VERTICAL TO ME, BUT, YES, IT'S

21   CENTERED ON THAT AXIS.

22   Q    OKAY.  LET'S SAY CENTERED VERTICALLY THEN.

23   A    YES.

24   Q    CAN I ASK THE QUESTION ONE MORE TIME FOR THE

25   RECORD?

521

```
1    A    PLEASE DO.

2    Q    IT WAS IMPORTANT TO YOU, AS THE DESIGN TEAM,

3    THAT THAT LOZENGE SHAPED DESIGN ELEMENT BE CENTERED

4    VERTICALLY ON THE PHONE; RIGHT?

5    A    YES.

6    Q    AND THAT -- AND THAT'S BETWEEN THE TOP OF THE

7    DISPLAY ELEMENT, WHICH WE SEE RIGHT HERE, AND THE

8    TOP OF THE PHONE?  IS THAT CORRECT?

9    A    CENTERED THAT WAY ALSO, YES.

10   Q    OKAY.  SO IT'S CENTERED IN BOTH WAYS?

11   A    YES.

12   Q    OKAY.  AND THAT WAS AN IMPORTANT DESIGN

13   ELEMENT FOR THE INITIAL IPHONE; CORRECT?

14   A    YES.

15   Q    OKAY.  IT WAS ALSO IMPORTANT TO YOU AND THE

16   DESIGN TEAM OF THE INITIAL IPHONE THAT THE DESIGN

17   BE MINIMALISTCI.  FAIR?

18   A    THAT'S NOT THE WORD THAT I WOULD USE.

19   Q    NOT HAVE A LOT OF BUTTONS ON IT?  NOT HAVE A

20   LOT OF ORNAMENTATION ON IT?

21   A    TO BE SIMPLE.

22   Q    TO BE SIMPLE.

23        IN FACT, YOU WANTED TO CREATE A PRODUCT

24   THAT EMBODIED THE SIMPLEST OF ICONS, AND ONE KEY

25   IMAGE WAS THAT OF A DARK, OILY POND.  IS THAT
```

```
 1    RIGHT?

 2    A    YES.

 3    Q    THAT WAS YOUR DESIGN GOAL; RIGHT?

 4    A    THAT WAS ONE --

 5    Q    GO AHEAD.

 6    A    THAT WAS ONE DESCRIPTION OF A DESIGN GOAL,

 7    YES.

 8    Q    YOU DIDN'T WANT TO PUT MULTIPLE BUTTONS ON THE

 9    FACE OF THE PHONE; CORRECT?

10    A    CORRECT.

11    Q    YOU WANTED IT TO BE AS SIMPLE AS POSSIBLE?

12    A    YES.

13    Q    ALL RIGHT.  LET'S TURN TO THE '889 DESIGN

14    PATENT, WHICH YOU'RE ALSO LISTED AS AN INVENTOR ON.

15              THIS IS JX 1040 IN YOUR WITNESS BINDER IF

16    YOU'D LIKE.

17              AND IF WE COULD GO TO PAGE 146 OF JX

18    1040.

19              JUST FOR THE RECORD, YOU'RE AN INVENTOR

20    ON THE '889 DESIGN PATENT; CORRECT?

21    A    YES.

22    Q    AND YOU'RE FAMILIAR WITH THIS DESIGN PATENT?

23    A    YES.

24    Q    NOW, WITH RESPECT TO THE '889 DESIGN PATENT,

25    ISN'T IT CORRECT THAT THE DESIGN TEAMS' OBJECTIVES
```

1    WERE TO REDUCE THE PRODUCT TO WHAT WAS ESSENTIALLY

2    A SINGLE, SEAMLESS VESSEL, WHICH WAS THE REAR

3    HOUSING?

4    A    THAT WAS THE INSPIRATION OF THIS DESIGN, YES.

5    Q    AND ANOTHER IMPORTANT DESIGN GOAL WAS TO HAVE

6    JUST ONE GAP IN THE PRODUCT BETWEEN THE BACK

7    HOUSING AND WHAT YOU REFER TO AS THE CLEAR GLASS

8    BEZEL THAT EXTENDS ALL THE WAY ACROSS THE FRONT;

9    RIGHT?

10   A    YES.

11   Q    SORRY.  WAS THAT YES?

12   A    YES.

13   Q    YOU WANTED A SINGLE PIECE OF REAR HOUSING;

14   RIGHT?

15   A    THAT WAS THE INSPIRATION FOR THE DESIGN, YES.

16   Q    NOW --

17             MAY I APPROACH THE WITNESS WITH A

18   PHYSICAL EXHIBIT, YOUR HONOR?

19             THE COURT:  PLEASE, GO AHEAD.

20             MR. VERHOEVEN:  (HANDING.)

21             THE WITNESS:  THANK YOU.

22             MR. MCELHINNY:  I DON'T BELIEVE THAT

23   EXHIBIT HAS BEEN MARKED, YOUR HONOR.

24             MR. VERHOEVEN:  YOUR HONOR, THE EXHIBIT

25   HAS BEEN IN THE EXCLUSIVE CUSTODY OF APPLE AND

```
 1     THEY'VE RETAINED POSSESSION OF IT.  WE'D BE HAPPY

 2     TO MARK IT WITH THE NEXT APPROPRIATE NUMBER.

 3               MR. MCELHINNY:  I'M NOT OBJECTING TO IT.

 4     I'M TRYING TO GET MR. VERHOEVEN A CLEAR RECORD.

 5               THE COURT:  WHAT NUMBER SHOULD IT BE?

 6               MR. VERHOEVEN:  WELL, IT'S ACTUALLY BEEN

 7     MARKED AS DX 741.

 8               THE COURT:  DX?  I'M SORRY.  CAN YOU

 9     REPEAT THAT, PLEASE?

10               MR. VERHOEVEN:  DX 741, YOUR HONOR.

11               THE COURT:  OKAY.

12               (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

13               741 WAS MARKED FOR IDENTIFICATION.)

14     BY MR. VERHOEVEN:

15     Q    NOW, YOU'VE SEEN THIS -- I'VE BEEN REFERRING

16     TO THIS AS APPLE MODEL 035.  WILL YOU UNDERSTAND

17     THAT'S WHAT I'M REFERRING TO?

18     A    YES.

19     Q    IT SAYS IT RIGHT ON THE BACK; RIGHT?

20     A    ABSOLUTELY.

21     Q    SO DX 741 IS APPLE MODEL 035.  FAIR?

22     A    EXCUSE ME.  WHAT WAS THE FIRST NUMBER AGAIN?

23     Q    THE EXHIBIT NUMBER WE JUST MARKED THAT AS, DX

24     741, CORRESPONDS TO APPLE MODEL 035?  FAIR?

25     A    I BELIEVE SO.
```

1    Q    AND YOU'VE SEEN THIS MODEL 035 BEFORE;

2    CORRECT?

3    A    YES.

4    Q    AND IF YOU LOOK AT -- IF WE CAN PUT ON THE

5    SCREEN DX 740, HERE WE HAVE -- AND THIS SHOULD BE

6    IN YOUR BINDER AS WELL IF YOU'D LIKE TO LOOK AT THE

7    HARD COPY IMAGES, SIR.

8    A    YES, I SEE IT.

9    Q    I DON'T HAVE MY HARD COPY YET, SO I'M GOING TO

10   GET MY HARD COPY, TOO.

11            MR. MCELHINNY:  YOUR HONOR, THIS EXHIBIT

12   HAS NOT BEEN MOVED INTO EVIDENCE.  I'M NOT SURE IT

13   SHOULD BE PUBLISHED.

14            THE COURT:  IS THERE GOING TO BE AN

15   OBJECTION?

16            MR. MCELHINNY:  IT DEPENDS ON WHETHER OR

17   NOT THERE'S A FOUNDATION THAT'S LAID, YOUR HONOR.

18            THE COURT:  ALL RIGHT.  LAY THE

19   FOUNDATION, PLEASE.

20            MR. VERHOEVEN:  OKAY.

21   Q    YOU'VE SEEN THESE IMAGES BEFORE, THESE PHOTOS;

22   RIGHT, SIR?

23   A    I BELIEVE I MAY HAVE SEEN THEM IN DEPOSITION.

24   Q    AND YOU'VE STUDIED THOSE PHOTOS AND YOU

25   COMPARED THEM TO THE APPLE MODEL 035, WHICH IS

```
1    MARKED AS DX 741; CORRECT?

2    A    I BELIEVE THAT IS TRUE.

3    Q    AND IT'S YOUR OPINION, IN FACT, YOU'RE

4    CONVINCED FROM STUDYING THEM BOTH THAT THEY ARE ONE

5    AND THE SAME?  IN OTHER WORDS, THE PHOTOS ARE

6    PICTURES OF APPLE MODEL 035; RIGHT?

7    A    I DO RECALL SUCH AN EXERCISE OF COMPARING THE

8    MODEL AND THE PHOTOS.  I THINK THESE ARE THOSE

9    PHOTOS, I THINK THIS IS THAT MODEL, SO IT FEELS

10   TRUE.

11   Q    OKAY.  AND YOU AGREE WITH ME THAT THE APPLE

12   MODEL 035 AND THE CORRESPONDING PICTURES ARE

13   EMBODIMENTS OF THE '889 DESIGN PATENT; RIGHT?

14          MR. MCELHINNY:  OBJECTION, YOUR HONOR.

15   CALLS FOR A LEGAL CONCLUSION FROM THIS WITNESS.

16          MR. VERHOEVEN:  YOUR HONOR, ON DIRECT THE

17   WITNESS TESTIFIED TO THE EXACT QUESTION WITH

18   RESPECT TO OTHER APPLE PHYSICAL EXHIBITS --

19          MR. MCELHINNY:  NO, WE'RE --

20          MR. VERHOEVEN:  -- IN TESTIMONY ELICITED

21   BY MR. MCELHINNY.

22          MR. MCELHINNY:  THE WORD "EMBODIMENT,"

23   WHICH IS A LEGAL WORD, WAS NEVER USED IN ANY

24   QUESTION THAT I ASKED.

25          THE COURT:  WHY DON'T YOU REPHRASE THE
```

```
 1    QUESTION, PLEASE?

 2    BY MR. VERHOEVEN:

 3    Q    THE SPECIFIC PHYSICAL MODEL, APPLE MODEL 035,

 4    IS THE SAME MODEL OR MOCK-UP APPEARS IN PHOTOGRAPHS

 5    THAT WERE SUBMITTED TO THE PATENT OFFICE TOGETHER

 6    WITH THE '889 PATENT APPLICATION?  ISN'T THAT TRUE,

 7    SIR?

 8              MR. MCELHINNY:  AGAIN, THAT LACKS

 9    FOUNDATION FROM THIS WITNESS, YOUR HONOR.

10              THE COURT:  IF YOU KNOW, SIR, GO AHEAD.

11              AND IF YOU COULD LAY THE FOUNDATION.

12              BUT IF YOU KNOW, SIR, YOU CAN ANSWER.

13              THE WITNESS:  YOU -- COULD YOU REPEAT THE

14    QUESTION?  YOU WERE ASKING ABOUT PHOTOGRAPHS WITH

15    THE PATENT APPLICATION?

16    BY MR. VERHOEVEN:

17    Q    YOU'RE AWARE THAT PHOTOGRAPHS WERE TAKEN OF

18    THE APPLE MODEL 035; RIGHT?

19    A    I SEE PHOTOGRAPHS OF 035.

20    Q    AND THOSE PHOTOGRAPHS WERE SUBMITTED TO THE

21    PATENT OFFICE AS PART OF THE PROSECUTION OF WHAT

22    BECAME THE '889 PATENT; ISN'T THAT TRUE, SIR?

23    A    I DON'T RECALL THE SPECIFICS OF SUCH AN

24    ATTACHMENT.

25    Q    WELL, YOU'RE AN INVENTOR ON THE PATENT; RIGHT?
```

```
 1                MR. MCELHINNY:  ARGUMENTATIVE, YOUR
 2     HONOR.
 3                THE COURT:  OVERRULED.
 4                YOU CAN ANSWER.  GO AHEAD.
 5                THE WITNESS:  YES, I AM.
 6     BY MR. VERHOEVEN:
 7     Q    IN YOUR --
 8                JUST ONE SECOND, YOUR HONOR.
 9                (DISCUSSION OFF THE RECORD BETWEEN
10     DEFENSE COUNSEL.)
11     BY MR. VERHOEVEN:
12     Q    ALL RIGHT.  WOULD YOU AGREE WITH ME, SIR, THAT
13     APPLE MODEL 035 INCORPORATES THE '889 DESIGN?
14     A    I BELIEVE THAT THE '889 PATENT REPRESENTS THIS
15     DESIGN.
16     Q    OKAY.  NOW, YOU TESTIFIED AT THE END OF YOUR
17     DIRECT TESTIMONY ABOUT SAMSUNG PHONES.
18     A    CORRECT.
19     Q    YOU'VE SEEN THE FOUR SOFT BUTTONS AT THE
20     BOTTOM OF SAMSUNG PHONES?
21     A    WOULD YOU LIKE TO SHOW ME WHAT YOU MEAN?
22     Q    WELL, YOU'RE THE ONE WHO TESTIFIED ON DIRECT
23     ALL ABOUT HOW IT WAS A RIP OFF.  DO YOU REMEMBER --
24                MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.
25     BY MR. VERHOEVEN:
```

529

```
 1    Q    DO YOU REMEMBER, SIR, LOOKING AT SOFT BUTTONS

 2    AT THE BOTTOM OF THE SAMSUNG PHONES?

 3              MR. MCELHINNY:  OBJECTION, YOUR HONOR.

 4    THAT'S NOT A QUESTION.  HE'S ARGUING WITH THE

 5    WITNESS.

 6              THE COURT:  OVERRULED.

 7              YOU CAN ANSWER.

 8              THE WITNESS:  COULD YOU REPEAT THE

 9    QUESTION, PLEASE?

10    BY MR. VERHOEVEN:

11    Q    DO YOU REMEMBER, YES OR NO, WHEN YOU LOOKED AT

12    THE SAMSUNG PHONES TO FORM THE OPINION AND THE

13    TESTIMONY THAT YOU GAVE BEFORE THE JURY, WHETHER

14    THEY HAD FOUR SOFT BUTTONS AT THE BOTTOM?

15    A    I HAVE SEEN MANY SAMSUNG PHONES.  I DO NOT

16    REMEMBER THE EXACT DETAILS OF SOFTWARE BUTTONS.

17    Q    SO YOU DON'T REMEMBER WHETHER THEY HAD BUTTONS

18    ON THE BOTTOM?

19    A    I -- LIKE I SAID, I'VE SEEN MANY SAMSUNG

20    PHONES.  I DO NOT KNOW THAT THEY'RE ALL THE SAME IN

21    TERMS OF THEIR BUTTON ARRANGEMENTS AT THE BOTTOM.

22    Q    HAVE YOU EVER SEEN ANY SAMSUNG PHONES THAT

23    HAVE FOUR SOFT BUTTONS AT THE BOTTOM?

24    A    I WOULD LIKE YOU TO SHOW ME THE PHONE.  THIS

25    COULD BE A TRICK QUESTION.  I DON'T KNOW.
```

530

```
 1     Q    I'M JUST ASKING YOU, HAVE YOU EVER SEEN A
 2   SAMSUNG PHONE THAT HAD FOUR SOFT BUTTONS AT THE
 3   BOTTOM?
 4     A    IF YOU SHOWED ME THE PHONE, I COULD DETERMINE
 5   THAT THERE ARE FOUR SOFT BUTTONS.
 6     Q    THAT'S NOT MY QUESTION, SIR.  MY QUESTION IS,
 7   HAVE YOU SEEN A SAMSUNG PHONE THAT HAD FOUR SOFT
 8   BUTTONS AT THE BOTTOM?
 9     A    I CANNOT RECALL IT IT'S THREE OR FOUR.  I
10   CANNOT RECALL.
11     Q    HAVE YOU SEEN ANY PHONE, ANY SMARTPHONE THAT
12   HAD FOUR SOFT BUTTONS AT THE BOTTOM?
13     A    QUITE POSSIBLY.
14     Q    DID YOU THINK THEY WERE BEAUTIFUL?
15     A    CLEARLY THEY DID NOT STICK IN MY MIND.
16     Q    NOW, YOU TESTIFIED ON DIRECT ABOUT BUTTONS AND
17   HOW SOMETIMES YOU MIGHT DO 50 DIFFERENT MODELS OF A
18   BUTTON.  DO YOU REMEMBER THAT?
19     A    THAT'S CORRECT.
20     Q    HOW MANY MODELS DID YOU DO OF THE HOME BUTTON?
21     A    I COULD NOT GIVE YOU AN EXACT NUMBER, BUT I'M
22   SURE THERE WERE MANY.
23     Q    OVER TEN?
24     A    VERY LIKELY.
25     Q    OVER 100?
```

1    A    MAYBE NOT.

2    Q    WHAT'S YOUR BEST ESTIMATE?

3    A    I WILL NOT ESTIMATE BECAUSE I DO NOT KNOW.

4    Q    DID YOU WORK ON THE DIFFERENT MODELS OF THE

5    HOME BUTTON?

6    A    YES.

7    Q    AND WHY WERE THERE SO MANY MODELS OF THE HOME

8    BUTTON DONE?

9    A    TO GET IT EXACTLY RIGHT.

10   Q    BECAUSE SMALL DETAILS MATTER; RIGHT?

11   A    ABSOLUTELY.

12   Q    AS AN APPLE INDUSTRIAL DESIGNER, YOU TESTIFIED

13   ABOUT THE WORK YOU DID TO COME UP WITH YOUR DESIGNS

14   ON DIRECT.

15           DO YOU REMEMBER THAT?  YOU TESTIFIED

16   GENERALLY ABOUT SITTING AROUND THE KITCHEN TABLE

17   AND ALL THAT.

18   A    YES.

19   Q    ONE OF THE THINGS THAT YOU ALSO DO AS AN

20   INDUSTRIAL DESIGNER IS YOU PAY ATTENTION TO MOBILE

21   PHONES AND SMARTPHONES MANUFACTURED AND SOLD BY

22   YOUR COMPETITORS, DON'T YOU?

23   A    ON OCCASION WE PAY SOME ATTENTION.

24   Q    YOU ACTUALLY GET COMPETITIVE ANALYSES DONE AND

25   REVIEW THOSE OF YOUR COMPETITION, DON'T YOU?

535

```
 1    WAS ON THE SCREEN.
 2            GO TO PAGE 2.  AND BRING OUT --
 3    Q    THIS IS WHAT WE WERE JUST TALKING ABOUT FROM
 4    PAGE 2; RIGHT?
 5    A    YES.
 6    Q    WHERE YOU SAID, "PAUL, I NEED YOUR LATEST
 7    SUMMARY OF OUR ENEMIES FOR THE I.D. BRAINSTORM ON
 8    FRIDAY."
 9            DO YOU SEE THAT?
10    A    I DO.
11    Q    AND THEN IF WE GO TO 9, PAGE 9, AND HIGHLIGHT
12    THAT AGAIN ONE MORE TIME, PLEASE.
13            THAT'S A LITTLE BIT HARD TO READ.  MAYBE
14    WE COULD JUST HIGHLIGHT THE TOP FEW ROWS SO WE CAN
15    SEE BETTER.  THAT DOESN'T LOOK MUCH BETTER.
16            BUT YOU CAN SORT OF SEE THERE'S THE
17    PLAYBOOK.  DO YOU SEE THAT, MR. STRINGER?
18    A    YES.
19    Q    WHO MAKES THE PLAYBOOK?
20    A    COULD YOU ZOOM IN?  I CAN'T READ IT.
21    Q    YOU DON'T KNOW WHO MAKES THE PLAYBOOK?
22    A    NOT OFF THE TOP OF MY HEAD.
23    Q    OKAY.  AND THEN THERE'S THE GALAXY TAB.  DO
24    YOU SEE THAT?
25    A    YES.
```

1    Q    AND THAT'S ONE OF THE PRODUCTS THAT'S BEING

2    ACCUSED IN THIS CASE?

3    A    YES.

4    Q    RIGHT?  AND ON THE LEFT-HAND SIDE, IT SAYS OS,

5    PROCESSOR, RAM, AND A BUNCH OF OTHER DETAILS.

6              DO YOU SEE THAT?

7    A    YES.

8    Q    SO ISN'T IT TRUE THAT YOU WANTED THIS

9    INFORMATION FOR YOUR BRAINSTORMING SESSION SO YOU

10   COULD ASSESS AND YOU AND THE OTHER DESIGN TEAM

11   MEMBERS COULD ASSESS WHAT YOUR COMPETITORS ARE

12   DOING?

13   A    WE WERE INTERESTED IN UNDERSTANDING THE

14   FEATURE SETS AND OVERALL DIMENSIONS OF COMPETITIVE

15   PRODUCTS.

16   Q    YOU WERE INTERESTED IN KNOWING WHAT THEY WERE

17   DOING?

18   A    WE WERE INTERESTED IN UNDERSTANDING THOSE

19   FACTS.

20   Q    SO YOU ANALYZED THEIR PRODUCTS AND THE

21   PARAMETERS OF THEIR PRODUCTS, DIDN'T YOU?

22   A    WE PAID ATTENTION TO THE FEATURE SET AND WE

23   WERE VERY INTERESTED IN THE DIMENSIONS.

24   Q    IS THERE ANYTHING WRONG WITH DOING THAT?

25   A    NO.

```
 1              MR. VERHOEVEN:  PASS THE WITNESS, YOUR

 2     HONOR.

 3              THE COURT:  YOU'RE DONE?

 4              MR. VERHOEVEN:  PASS THE WITNESS.

 5              THE COURT:  OKAY.  ALL RIGHT.  IT IS NOW

 6     4:20.

 7              MR. MCELHINNY:  I HAVE ONE REDIRECT

 8     QUESTION, YOUR HONOR.

 9              THE COURT:  ALL RIGHT.  GO AHEAD.  IT'S

10     4:20.  IT'S ALL YOURS.

11              MR. MCELHINNY:  I'M ON THE CLOCK HERE.

12                    REDIRECT EXAMINATION

13     BY MR. MCELHINNY:

14     Q    SIR, THE LAST DOCUMENT THAT WAS VIEWED, WAS

15     THAT USED FOR DESIGN INSPIRATION ON HOW TO DESIGN

16     SOME NEW APPLE PRODUCT?

17     A    ABSOLUTELY NOT.

18              MR. MCELHINNY:  NOTHING FURTHER, YOUR

19     HONOR.

20              THE COURT:  ALL RIGHT.

21              ANY RECROSS, MR. VERHOEVEN?

22              MR. VERHOEVEN:  JUST ONE SECOND, YOUR

23     HONOR.  I'M SORRY.

24              (DISCUSSION OFF THE RECORD BETWEEN

25     DEFENSE COUNSEL.)
```

```
1              MR. VERHOEVEN:  JUST SOME HOUSEKEEPING

2    MATTERS.  I'VE BEEN INFORMED I FAILED TO MOVE IN

3    EXHIBIT 740.

4              THE COURT:  ANY OBJECTION?

5              MR. MCELHINNY:  NO OBJECTION.

6              THE COURT:  IT'S ADMITTED.

7              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

8              740, HAVING BEEN PREVIOUSLY MARKED FOR

9              IDENTIFICATION, WAS ADMITTED INTO

10             EVIDENCE.)

11             MR. VERHOEVEN:  AND 741.

12             THE COURT:  ANY OBJECTION?

13             MR. MCELHINNY:  NO OBJECTION.

14             THE COURT:  SO ADMITTED.

15             (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

16             741, HAVING BEEN PREVIOUSLY MARKED FOR

17             IDENTIFICATION, WAS ADMITTED INTO

18             EVIDENCE.)

19             THE COURT:  IS THAT IT, MR. VERHOEVEN?

20             MR. VERHOEVEN:  WELL, THAT -- 741 IS A

21   STIPULATION ABOUT THE PHOTOGRAPHS FROM THE MODEL.

22             AT SOME POINT I'D LIKE TO READ IT INTO

23   THE RECORD.  I COULD DO THAT NOW.  IT'S ADMITTED

24   INTO EVIDENCE, YOUR HONOR.

25             THE COURT:  THAT'S FINE.
```

```
1              MR. VERHOEVEN:  IT STATES, QUOTE, "APPLE,
2    INC., THROUGH ITS COUNSEL, STIPULATES AS FOLLOWS:
3              PARAGRAPH 1.  THE SPECIFIC PHYSICAL MODEL
4    IDENTIFIED BY APPLE INDUSTRIAL DESIGNER
5    CHRISTOPHER STRINGER DURING THE NOVEMBER 4TH, 2011
6    DEPOSITION IDENTIFIES APPLE MODEL 035 IS THE SAME
7    MODEL OR MOCK-UP APPEARING IN THE PHOTOGRAPHS OF
8    THE D'889 PATENT PROSECUTION HISTORY PRODUCED BY
9    APPLE.
10             PARAGRAPH 2.  THE PHOTOGRAPHS FROM THE
11   '889 PATENT PROSECUTION HISTORY PRODUCED BY APPLE
12   ARE THE HIGHEST QUALITY THAT IT HAS FOUND."
13             AND THAT CONCLUDES THE STIPULATION, YOUR
14   HONOR.
15             THE COURT:  ALL RIGHT.
16             ANYTHING FURTHER FOR MR. STRINGER OR IS
17   HE EXCUSED?  IS HE EXCUSED?
18             MR. MCELHINNY:  HE'S EXCUSED, YOUR HONOR.
19             THE COURT:  ALL RIGHT.  AND NOT WITH
20   ANY -- HE'S JUST EXCUSED, PERIOD?  NOT SUBJECT TO
21   RECALL?
22             MR. MCELHINNY:  HE'S EXCUSED.  WE ARE NOT
23   GOING TO HAVE HIM IN THE COURTROOM IN CASE THERE'S
24   A REBUTTAL ISSUE.
25             THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.
```

```
1              THE WITNESS:  THANK YOU.

2              DO YOU HAVE YOUR NEXT WITNESS?

3              MR. MCELHINNY:  I HAVE HIM READY.  IT'LL

4    TAKE US A COUPLE MINUTES TO GET THE BINDERS OUT,

5    YOUR HONOR.

6              THE COURT:  ALL RIGHT.

7              (PAUSE IN PROCEEDINGS.)

8              THE COURT:  WHO'S YOUR NEXT WITNESS,

9    PLEASE?

10             MR. MCELHINNY:  MR. PHILIP SCHILLER, YOUR

11   HONOR.

12             THE COURT:  OKAY.  WE'RE ONLY GOING TO GO

13   UNTIL 4:30, BUT I FIGURE EVEN IF THERE'S SOME

14   PRELIMINARY STUFF WE CAN DO TODAY, LET'S DO IT.

15             MR. MCELHINNY:  YOUR HONOR, APPLE CALLS

16   PHILIP SCHILLER.

17             THE COURT:  OKAY.  THE TIME IS 4:23.

18             THE CLERK:  RAISE YOUR RIGHT HAND,

19   PLEASE.

20             **PHILIP SCHILLER,**

21   BEING CALLED AS A WITNESS ON BEHALF OF THE

22   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

23   EXAMINED AND TESTIFIED AS FOLLOWS:

24             THE WITNESS:  I DO.

25             THE COURT:  WOULD YOU HAVE A SEAT UP
```

541

1    THERE, PLEASE.

2              MR. MCELHINNY:  YOUR HONOR, WE'RE STILL

3    PASSING OUT THE BINDERS.  IF I CAN HAVE THAT NOT BE

4    ON MY TIME, PLEASE.

5              (PAUSE IN PROCEEDINGS.)

6              THE CLERK:  WOULD YOU STATE YOUR NAME,

7    PLEASE, AND SPELL IT?

8              THE WITNESS:  PHILIP WILLIAM SCHILLER,

9    THAT'S P-H-I-L-I-P, W-I-L-L-I-A-M, S-C-H-I-L-L-E-R.

10             THE CLERK:  THANK YOU.

11                     **DIRECT EXAMINATION**

12   BY MR. MCELHINNY:

13   Q    GOOD AFTERNOON, MR. SCHILLER.

14   A    GOOD AFTERNOON.

15   Q    BY WHOM ARE YOU EMPLOYED?

16   A    APPLE.

17   Q    AND WHAT IS YOUR CURRENT POSITION AND TITLE,

18   SIR?

19   A    I AM THE SENIOR VICE-PRESIDENT OF WORLDWIDE

20   MARKETING.

21   Q    AND DOES APPLE HAVE SOMETHING THAT THEY CALL

22   THE EXECUTIVE TEAM?

23   A    YES, WE DO.

24   Q    AND WHAT IS THE EXECUTIVE TEAM?

25   A    IT IS THE GROUP OF EXECUTIVES AT APPLE THAT

1    ARE THE MOST SENIOR PEOPLE WHO RUN THE COMPANY AND

2    WORK FOR THE CEO DIRECTLY, AND WE MEET WEEKLY AND

3    ARE RESPONSIBLE FOR THE BUSINESS OF THE COMPANY.

4    Q    ARE YOU A MEMBER OF THE EXECUTIVE TEAM, SIR?

5    A    YES, I AM.

6    Q    TO WHOM DO YOU REPORT AT APPLE?

7    A    TO THE CEO, TIM COOK.

8    Q    SIR, JUST TO CONNECT VARIOUS LITTLE PIECES IN

9    MIND.  TODAY SAMSUNG'S COUNSEL SHOWED US A VIDEO OF

10   THE INTRODUCTION AT MAC WORLD OF THE IPHONE AND IN

11   THAT VIDEO, IT SHOWED MR. JOBS SENDING A PICTURE, I

12   THINK OF A HAWAIIAN VACATION, TO SOME GUY NAMED

13   PHIL IN THE AUDIENCE.

14        DO YOU KNOW THAT MR. PHIL THAT WAS IN THE

15   AUDIENCE?

16   A    THAT WOULD BE ME.

17   Q    OKAY.  THANK YOU.

18        CAN YOU -- CAN YOU DESCRIBE FOR US,

19   PLEASE, WHAT YOU WERE -- WHAT YOUR JOB

20   RESPONSIBILITIES ARE AT APPLE?

21   A    SO I RUN THE MAJORITY OF MARKETING AT APPLE

22   COMPUTERS, SO FOR ME, THAT'S A PRETTY LARGE

23   ORGANIZATION.  IT'S MADE UP OF A NUMBER OF

24   MARKETING FUNCTIONS, SOMETHING WE CALL PRODUCT

25   MARKETING, THE MARKETING OF ALL OF OUR PRODUCTS;

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8             I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/

                 _____
22               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
23

24                    DATED:  JULY 31, 2012

25

# EXHIBIT 2

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

       APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6      CORPORATION,                )
                                   )  SAN JOSE, CALIFORNIA
7                  PLAINTIFF,      )
                                   )  AUGUST 3, 2012
8            VS.                   )
                                   )  VOLUME
9      SAMSUNG ELECTRONICS CO.,    )
       LTD., A KOREAN BUSINESS     )  PAGES 556-930
10     ENTITY; SAMSUNG             )
       ELECTRONICS AMERICA,        )
11     INC., A NEW YORK            )
       CORPORATION; SAMSUNG        )
12     TELECOMMUNICATIONS          )
       AMERICA, LLC, A DELAWARE    )
13     LIMITED LIABILITY           )
       COMPANY,                    )
14                                 )
                   DEFENDANTS.     )
15     _____

16              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22

23     OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595
24

25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF         MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
 3                                MICHAEL A. JACOBS
                                  RACHEL KREVANS
 4                          425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT  WILMER, CUTLER, PICKERING,
      APPLE:                HALE AND DORR
 7                          BY:  WILLIAM F. LEE
                            60 STATE STREET
 8                          BOSTON, MASSACHUSETTS  02109

 9                          BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                            50 CALIFORNIA STREET, 22ND FLOOR
13                          SAN FRANCISCO, CALIFORNIA  94111

14                          BY:  VICTORIA F. MAROULIS
                                 KEVIN P.B. JOHNSON
15                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
16                          REDWOOD SHORES, CALIFORNIA  94065

17                          BY:  MICHAEL T. ZELLER
                                 WILLIAM C. PRICE
18                                JOHN B. QUINN
                            865 SOUTH FIGUEROA STREET
19                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA  90017
20

21

22

23

24

25
```

1                    INDEX OF WITNESSES

2    PLAINTIFF'S

3    **PHILIP SCHILLER**
          DIRECT EXAM BY MR. MCELHINNY      P. 594
4         (RES.)
          CROSS-EXAM BY MR. PRICE           P. 666
5         REDIRECT EXAM BY MR. MCELHINNY    P. 717
          RECROSS-EXAM BY MR. PRICE         P. 721
6

7    **SCOTT FORSTALL**
          DIRECT EXAM BY MR. MCELHINNY      P. 724
8         CROSS-EXAM BY MR. JOHNSON         P. 760
          REDIRECT EXAM BY MR. MCELHINNY    P. 784
9         RECROSS-EXAM BY MR. JOHNSON       P. 787

10

11   **JUSTIN DENISON**
          AS-ON CROSS-EXAM BY MR. LEE       P. 790
12        AS-ON DIRECT EXAM BY MR. QUINN    P. 839

13

14

15

16

17

18

19

20

21

22

23

24

25

614

1    QUESTION, PLEASE.

2    BY MR. MCELHINNY:

3    Q    AS THE HEAD OF MARKETING, DO YOU KEEP TRACK OF

4    WHAT -- OF TRENDS AND WHAT'S HAPPENING IN THE PHONE

5    MARKETPLACE?

6    A    OF COURSE.

7    Q    DID YOU OBSERVE CHANGES IN THE PHONE

8    MARKETPLACE AS A RESULT OF THE INTRODUCTION OF THE

9    IPHONE?

10   A    YES, I DID.

11   Q    AND WHAT CHANGES DID YOU OBSERVE, SIR?

12              MR. PRICE:  SAME OBJECTION.

13              THE COURT:  OVERRULED.  GO AHEAD.

14              THE WITNESS:  WE CONSIDERED THE IPHONE A

15   NEW GENERATION OF SMARTPHONE, AND WE LOOKED AT THE

16   MARKET AS BECOMING DIVIDED INTO TWO LARGE

17   CATEGORIES OF CUSTOMERS.

18              THERE ARE CUSTOMERS WHO HAVE NOT YET

19   BOUGHT INTO THESE NEW SMARTPHONES.  THEY WERE

20   HAVING PREVIOUS GENERATION DEVICES, SOME CALLED

21   THEM FEATURE PHONES, LIKE FLIP PHONES WITH

22   CHARACTER DISPLAYS; AND CUSTOMERS THAT HAVE

23   PURCHASED THESE NEW SMARTPHONES AND NOW WERE INTO

24   THIS ECOSYSTEM OF ALL THAT THAT MEANS, THE

25   SMARTPHONE AND THE APPLICATIONS AND HOW ALL THOSE

615

```
 1    THINGS WORK.
 2    BY MR. MCELHINNY:
 3    Q    AND DID THE INTRODUCTION OF THE IPHONE CHANGE
 4    THE DYNAMICS OF THAT TWO-PART MARKET AS YOU'VE JUST
 5    DESCRIBED IT?
 6    A    YES.  THE IPHONE CREATED THAT SECOND CATEGORY
 7    OF NEW SMARTPHONES AS NOW STARTED TO CREATE A
 8    MARKET WHERE, EITHER SOMEONE DOESN'T HAVE A NEW
 9    GENERATION PHONE YET OR THEY DO, AND ONCE THEY DO,
10    WE SEE OTHER DYNAMICS THAT OCCUR BECAUSE THEY'RE IN
11    THE SMARTPHONE MARKETPLACE.
12    Q    LET'S FOCUS -- SAME KIND OF QUESTION BUT ON
13    THE CURRENT TIME FRAME.
14         WHAT ARE THE CURRENT DYNAMICS OF THE CELL
15    PHONE MARKETPLACE AS YOU OBSERVED THEM FROM THE
16    HEAD OF MARKETING.
17         MR. PRICE:  OBJECTION, VAGUE AND
18    AMBIGUOUS AND CALLS FOR EXPERT OPINION UNDISCLOSED.
19         THE COURT:  OVERRULED.
20         GO AHEAD.
21         THE WITNESS:  SO AS MORE AND MORE
22    CUSTOMERS START TO GET THESE SMARTPHONES, LIKE THE
23    IPHONE, THEN YOU, AGAIN, AS WE SEE THESE TWO
24    CATEGORIES, YOU'RE EITHER TRYING TO SELL TO A NEW
25    USER WHO DOESN'T HAVE ONE OR YOU'RE SELLING TO AN
```

1    UPGRADE USER.

2              AND WE KNOW FROM ALL OF OUR PRODUCTS AND

3    EXPERIENCES WE'VE HAD SELLING TO CUSTOMERS THAT A

4    CUSTOMER WHO ALREADY HAS ONE IS USED TO THAT ONE,

5    THAT WHOLE ECOSYSTEM.

6              IF I HAVE AN IPHONE, I'M USED TO HOW THE

7    IPHONE WORKS, AND I'VE INVESTED IN THE

8    APPLICATIONS, AND I'VE INVESTED IN THE ACCESSORIES,

9              SO I'M MORE INVESTED IN THAT PRODUCT, AND

10   I'M MORE LIKELY TO STICK WITH THAT PRODUCT LINE

11   ONCE I HAVE IT.

12             SO WE'RE AT THIS REALLY CRITICAL JUNCTURE

13   WHERE CUSTOMERS ARE EITHER GETTING INTO AN

14   ECOSYSTEM FOR THE FIRST TIME OR THEY'RE STAYING

15   WITH THAT ECOSYSTEM AND MOST OFTEN UPGRADING AND

16   STAYING WITHIN IT.

17   BY MR. MCELHINNY:

18   Q    DO YOU FIND THAT WHEN A CUSTOMER BUYS AN

19   IPHONE THEY TEND TO BUY ADDITIONAL APPLE PRODUCTS

20   OR SERVICES?

21   A    YES.  THIS IS VERY WELL-KNOWN IN THE INDUSTRY.

22   IT'S OFTEN CALLED THE HALO EFFECT, THE IDEA THAT

23   ONCE YOU BUY A PRODUCT FROM A COMPANY, IF YOU HAVE

24   A GOOD EXPERIENCE WITH THAT PRODUCT, THAT YOU'RE

25   MORE LIKELY TO CONSIDER OTHER PRODUCTS FROM THAT

1    COMPANY AND ESPECIALLY IF THOSE PRODUCTS DO A GOOD

2    JOB WORKING WELL TOGETHER.

3              SO THAT WILL MAKE YOU WANT TO BUY MORE

4    PRODUCTS FROM THAT COMPANY, AS WELL AS THE OTHER

5    PEOPLE AROUND YOU WHO YOU WORK WITH OR IN YOUR

6    FAMILY.

7    Q    LET'S CHANGE SUBJECTS NOW AND GO BACK IN TIME,

8    BACK TO THE IPAD.  OKAY?

9    A    YES.

10   Q    CAN YOU TELL US, AGAIN BRIEFLY, DESCRIBE FOR

11   US THE GENESIS, HOW THE IPAD CAME ABOUT.

12   A    THE IPAD ACTUALLY STARTED BEFORE THE IPHONE.

13   WE HAVE, AS EXPLAINED BEFORE, A COMPUTER BUSINESS,

14   THE MACINTOSH BUSINESS, AND INCREASINGLY PEOPLE

15   WERE BUYING NOTEBOOKS IN THIS BUSINESS.

16             AND NOTEBOOKS WERE GETTING MORE AND MORE

17   AFFORDABLE, LOWER PRICE POINTS.

18             BUT MANY OF OUR COMPETITORS WERE MAKING

19   NOTEBOOKS THAT WERE OF A CHEAPER QUALITY THAN WE

20   WOULD BE WILLING TO MAKE TO GET TO REALLY

21   AFFORDABLE PRICE POINTS.

22             SO WE DECIDED WE NEED TO CREATE A NEW

23   CATEGORY OF DEVICE, SOMETHING BELOW THE PRICE POINT

24   OF A NOTEBOOK, SOMETHING BEAUTIFUL, EASY TO USE,

25   EVERYONE MORE PORTABLE, LONGER BATTERY LIFE, AND WE

618

```
 1    HAD TO INVENT A NEW CATEGORY OF DEVICE FOR THAT.

 2              AND THAT'S WHAT LED TO THE WHOLE CONCEPT

 3    OF CREATING AN IPAD.

 4    Q    WHEN WAS THE IPAD INTRODUCED?

 5    A    WE PUT ASIDE THAT EARLY WORK ON THE IPAD TO

 6    SHIP THE IPHONE, AND THEN GOT BACK TO IT AFTER THE

 7    IPHONE WAS NOW IN THE MARKETPLACE.

 8              EVENTUALLY WE SHIPPED OUR FIRST, OR

 9    INTRODUCED OUR FIRST IPAD, EXCUSE ME, IN 2010.

10    Q    AND WHEN DID YOU SHIP YOUR FIRST IPAD?

11    A    WE ALSO SHIPPED OUR FIRST IPAD IN EARLY APRIL

12    OF 2010.

13    Q    AGAIN, SO WE'RE ALL USING THE SAME LANGUAGE,

14    WHAT IS THE DIFFERENCE FROM, IN THE INDUSTRY

15    BETWEEN AN INTRODUCTION AND A SHIPMENT?

16    A    THE WAY WE TALK ABOUT IT AT APPLE IS AN

17    INTRODUCTION IS A LAUNCH OF THAT, THE FIRST TIME WE

18    TELL THE WORLD ABOUT A PRODUCT.

19              AND THEN THE PRODUCT MAY EITHER SHIP AT

20    THAT SAME TIME OR WITH REALLY BIG BRAND NEW

21    GENERATION PRODUCTS LIKE IPHONE AND IPAD, SOME TIME

22    AFTERWARDS, AND THAT'S THE AVAILABILITY OR SHIP

23    DATE OF THAT PRODUCT.

24    Q    SIR, WAS THERE, AGAIN, PUBLIC MEDIA REACTION

25    TO THE INTRODUCTION OF THE IPAD?
```

619

```
 1    A     YES, THERE WAS HUGE COVERAGE OF THE IPAD.

 2    Q     IF YOU LOOK IN YOUR BINDER AT EXHIBIT PX 138.

 3          CAN YOU TELL ME WHAT THAT DOCUMENT IS,

 4    PLEASE?

 5    A     YES.  THIS IS AN ARTICLE FROM THE WALL STREET

 6    JOURNAL.

 7    Q     WHAT'S THE DATE OF IT, SIR?

 8    A     THIS WAS WRITTEN IN JANUARY OF 2010, RIGHT

 9    AFTER THE INTRODUCTION OF THE IPAD.

10          MR. MCELHINNY:  YOUR HONOR, I MOVE PX

11    138.

12          THE COURT:  SAME LIMITING INSTRUCTION,

13    MR. PRICE?

14          MR. PRICE:  YES, YOUR HONOR.  NO FURTHER

15    OBJECTIONS.

16          THE COURT:  ALL RIGHT.  YOU CANNOT

17    CONSIDER THIS FOR THE TRUTH OF WHAT'S IN THE

18    ARTICLE, BUT YOU CAN CONSIDER IT OTHERWISE.

19          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20           138, HAVING BEEN PREVIOUSLY MARKED FOR

21           IDENTIFICATION, WAS ADMITTED INTO

22           EVIDENCE.)

23          THE COURT:  GO AHEAD, PLEASE.

24          MR. MCELHINNY:  PLEASE PUBLISH

25    DEMONSTRATIVE PDX 5.
```

```
1    Q    SIR, WHAT IS THIS?

2    A    THIS IS A SUMMARY OF THAT SAME WALL STREET

3    JOURNAL ARTICLE FROM JANUARY 25TH, 2010.

4    Q    YOU SEE THE TITLE OF THIS ARTICLE IS "APPLE

5    TAKES A BIG GAMBLE ON THE" -- I'M SORRY.  "APPLE

6    TAKES BIG GAMBLE ON NEW IPAD."

7         DO YOU SEE THAT?

8    A    YES.

9    Q    DID APPLE'S EXECUTIVES AGREE WITH THAT

10   CHARACTERIZATION THAT THE WALL STREET JOURNAL MADE?

11   A    ABSOLUTELY.

12   Q    AND WHY, WHY DID YOU CONSIDER THE IPAD A

13   GAMBLE?

14   A    IT WAS A BIG GAMBLE TO INTRODUCE THE IPAD FOR

15   A COUPLE REASONS.

16        FIRST, THIS WAS A NEW CATEGORY DEVICE.

17   THE IPHONE WE WERE INVENTING, REINVENTING THE

18   PHONE.  PEOPLE WERE ALREADY BUYING OVER A BILLION

19   PHONES A YEAR.

20        PEOPLE HAD TRIED TO MAKE TABLET --

21   COMPANIES HAD TRIED TO MAKE TABLET PRODUCTS BEFORE

22   AND FAILED MISERABLY AND THERE WAS NO CATEGORY OF

23   TABLET COMPUTERS SELLING IN ANY QUANTITY THAT

24   MATTERED.

25        SO IT WAS CONSIDERED A, PRETTY MUCH A
```

621

```
1     DEAD CATEGORY AND NOT LIKELY TO SUCCEED.

2              AND IN ADDITION TO THAT, HERE APPLE NOW

3     HAD RISEN UP FROM PAST TROUBLES AND HAD A HUGE HIT

4     WITH THE IPOD, HAD A SECOND HUGE HIT WITH THE

5     IPHONE.  WE WERE ROLLING AND DOING WELL.

6              SO TO TAKE ON A NEW CATEGORY OF PRODUCT

7     THAT MOST ASSUMED WAS NOT GOING TO SUCCEED WAS A

8     RISK TO OUR OWN IMAGE, OUR MARKETING, HOW PEOPLE

9     PERCEIVED US.  SO IT WAS A BIG GAMBLE, BOTH FROM

10    THE PRODUCT AND MARKETING PERCEPTION OF APPLE.

11    Q    WHAT WAS THE PUBLIC PERCEPTION FOR THE IPAD?

12    A    IT WAS FANTASTIC.

13    Q    IF YOU LOOK IN YOUR BINDER, PLEASE, AT EXHIBIT

14    PX 141.

15    A    YES.

16    Q    WHAT IS THAT DOCUMENT?

17    A    THIS IS A REVIEW OF THE IPAD FROM THE WALL

18    STREET JOURNAL.

19              MR. MCELHINNY:  YOUR HONOR, I MOVE

20    EXHIBIT 141.

21              MR. PRICE:  SAME OBJECTION.  NO FURTHER

22    OBJECTIONS, YOUR HONOR, MEANING FURTHER TO THE ONES

23    WE MADE AND ASK FOR A LIMITING INSTRUCTION.

24              THE COURT:  ALL RIGHT.  YOU CANNOT

25    CONSIDER THIS EXHIBIT FOR THE TRUTH OF WHAT'S
```

1    STATED IN THE ARTICLE, BUT YOU CAN CONSIDER IT

2    OTHERWISE.

3                   (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

4                   141, HAVING BEEN PREVIOUSLY MARKED FOR

5                   IDENTIFICATION, WAS ADMITTED INTO

6                   EVIDENCE.)

7                   THE COURT:  GO AHEAD, PLEASE.

8                   MR. MCELHINNY:  WOULD YOU SHOW, PLEASE,

9    DEMONSTRATIVE PDX 6.

10   Q    WHAT IS THIS DEMONSTRATIVE, SIR?

11   A    THIS IS A SUMMARY OF THAT SAME WALL STREET

12   JOURNAL REVIEW OF THE IPAD.

13   Q    NOW, AGAIN, REMIND US WHO MR. MOSSBERG IS?

14   A    MR. MOSSBERG IS A WRITER FOR THE WALL STREET

15   JOURNAL AND CONSIDERED ONE OF THE TOP TECH

16   JOURNALISTS IN OUR INDUSTRY.

17   Q    IF YOU LOOK AT PX 140, WHAT IS THIS DOCUMENT?

18   A    THIS IS A PRODUCT REVIEW, ALSO OF THE IPAD, BY

19   THE U.S.A. TODAY NEWSPAPER.

20                  MR. MCELHINNY:  YOUR HONOR, I MOVE PX

21   140.

22                  THE COURT:  SAME LIMITING INSTRUCTION?

23                  MR. PRICE:  YES, YOUR HONOR.

24                  THE COURT:  ALL RIGHT.  YOU CANNOT

25   CONSIDER THIS EXHIBIT FOR THE TRUTH OF WHAT'S

```
 1    STATED IN THE EXHIBIT, BUT YOU CAN CONSIDER IT

 2    OTHERWISE.

 3              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 4              140, HAVING BEEN PREVIOUSLY MARKED FOR

 5              IDENTIFICATION, WAS ADMITTED INTO

 6              EVIDENCE.)

 7              THE COURT:  GO AHEAD, PLEASE.

 8              MR. MCELHINNY:  PLEASE SHOW DEMONSTRATIVE

 9    PDX 7.

10    Q    AND WHAT IS THIS DEMONSTRATIVE, SIR?

11    A    THIS IS A SUMMARY OF THAT SAME U.S.A. TODAY

12    REVIEW OF THE IPAD AND SOME OF THE COMMENTS THE

13    WRITER WROTE.

14    Q    SIR, WAS THE EARLY PRESS FOR THE IPAD ALL

15    POSITIVE?

16    A    NO.

17    Q    AND WHAT WERE THE -- CAN YOU TELL US, JUST

18    GENERALLY, WHAT THE NEGATIVE COMMENTS WERE.

19    A    THERE WERE STILL MANY IN THE INDUSTRY AFTER WE

20    LAUNCHED THE IPAD WHO QUESTIONED WHETHER IT WOULD

21    SUCCEED AT ALL.

22         THEY QUESTIONED THE VALUE OF A PRODUCT

23    THAT PEOPLE MIGHT USE TO CREATE CONTENT LIKE THEY

24    DO ON A PERSONAL COMPUTER AND WHETHER THEY WOULD

25    USE A TABLET TO DO THOSE SAME ACTIONS.
```

```
 1              THEY QUESTIONED THE NEED FOR SOMETHING
 2    LARGER THAN AN IPHONE TO DO SOME OF THE SAME TASKS
 3    AN IPHONE CAN DO.
 4              THERE WAS GREAT DOUBT ON WHETHER IT WOULD
 5    BE SUCCESSFUL TO ANYONE.
 6    Q    DID THE IPAD HAVE A KEYBOARD?
 7    A    IT HAD A SOFT SCREEN KEYBOARD, TOUCH KEYBOARD,
 8    NO PHYSICAL KEYBOARD ATTACHED TO IT.
 9    Q    WAS THERE REACTION TO THE FACT OF IT
10    ELIMINATED A PHYSICAL KEYBOARD?
11    A    OF COURSE.
12    Q    WHAT WAS THE NATURE OF THAT REACTION, SIR?
13    A    MANY IN THE INDUSTRY DOUBTED THAT A DEVICE
14    THAT DIDN'T HAVE A PHYSICAL KEYBOARD ATTACHED TO IT
15    COULD SUCCEED IN ANY MEANINGFUL NUMBERS.
16    Q    LET'S GO BACK TO PLAINTIFF'S EXHIBIT 15 IN
17    EVIDENCE.  DOES THIS CHART TELL US ABOUT SALES FOR
18    THE IPAD?
19    A    YES, IT DOES.
20    Q    AND CAN YOU SUMMARIZE THAT FOR US, PLEASE?
21    A    YES.  THE ORANGE LINE ON THE BOTTOM RIGHT THAT
22    STARTS IN MID-2010 AND GOES UNTIL 2012 SHOWS THE
23    CUMULATIVE SALES OF THE IPAD.
24    Q    SIR, I'M GOING TO CHANGE SUBJECTS A LITTLE
25    BIT.
```

```
 1              AS THE HEAD OF MARKETING, IN APPLE'S
 2    VIEW, HAS THE IPHONE BEEN A SUCCESSFUL PRODUCT?
 3    A    YES, IT'S BEEN VERY SUCCESSFUL.
 4    Q    AND WHAT IS YOUR UNDERSTANDING OF THE REASONS
 5    FOR ITS SUCCESS?
 6    A    WELL, I THINK THERE ARE --
 7              MR. PRICE:  I'LL OBJECT.  IT'S
 8    UNDISCLOSED OPINION.
 9              THE COURT:  OVERRULED.
10              GO AHEAD.
11              THE WITNESS:  I THINK THERE ARE MANY
12    REASONS FOR THE IPHONE SUCCESS.
13              FOR ME, WHAT I BELIEVE IS VERY PREVALENT
14    IS, NUMBER ONE, PEOPLE FIND THE IPHONE DESIGNS
15    BEAUTIFUL.
16              NUMBER TWO, IT'S AN INCREDIBLY
17    EASY-TO-USE DEVICE WITH ALL OF OUR SOFTWARE
18    INVENTIONS TO MAKE IT INTUITIVE AND SIMPLE AND WELL
19    INTEGRATED.
20              I THINK, THIRD, THE FACT THAT WE DO SUCH
21    A GOOD JOB INTEGRATING HARDWARE AND SOFTWARE
22    TOGETHER TO MAKE ONE EXPERIENCE.
23              AND, FOURTH, I THINK BECAUSE IT HAS --
24    WE'VE REALLY TAKEN THE ENTIRE EXPERIENCE, EVERY
25    ELEMENT OF IT, HARDWARE, SOFTWARE, APPLICATIONS,
```

626

```
1    INTERNET SERVICES AND TAKEN RESPONSIBILITY TO MAKE
2    ALL THOSE THINGS WORK WELL FOR THE CUSTOMER.  I
3    THINK THAT'S SORT OF MY LIST OF WHAT'S MADE IT
4    SUCCESSFUL.
5    Q    HAS THE IPAD BEEN A SUCCESSFUL DEVICE?
6    A    ABSOLUTELY.
7    Q    AND WHAT ARE YOUR UNDERSTANDINGS FOR THE
8    REASONS OF ITS SUCCESS?
9    A    WELL, FIRST I WOULD REPEAT SIMILAR ITEMS AS
10   WITH THE IPHONE, THAT IT'S ABSOLUTELY BEAUTIFUL;
11   THAT IT'S VERY EASY TO USE WITH ITS SOFTWARE; THAT
12   IT'S INTEGRATED TOGETHER HARDWARE AND SOFTWARE; AND
13   THE RESPONSIBILITY WE TAKE FOR ALL THOSE SERVICES.
14        BUT I WOULD ADD ONE MORE IN ADDITION TO
15   THE IPHONE, WHICH IS WE'VE ACTUALLY SHOWN PEOPLE
16   THE VALUE THAT THIS INCREDIBLY BEAUTIFUL PRODUCT
17   CAN HAVE IN THEIR LIVES AND WHY THEY WANT ONE WHEN
18   THEY NEVER HAD BEFORE.  THAT WAS ONE OF THE BIGGEST
19   CHALLENGES.
20   Q    COULD YOU PLEASE PUBLISH PDX 8.
21        SIR, THESE ARE PHOTOGRAPHS OF THE PHONES
22   THAT ARE ALREADY IN EVIDENCE IN THIS CASE.
23        I NOTICE THAT WHEN YOU LOOKED AT THE PTO
24   DISPLAY, YOU IMMEDIATELY RECOGNIZED, YOU TALKED
25   ABOUT THE DISTINCTIVE NATURE OF THE IPHONE.
```

```
 1            WHAT IS IT ABOUT THESE DESIGNS THAT
 2     CAUSES YOU TO CALL THEM DISTINCTIVE?
 3     A     WELL, AS A MARKETING PERSON, IT'S IMPORTANT TO
 4     ME THAT A PRODUCT BE UNIQUE, BE DISTINCTIVE, BE
 5     CONSISTENT OVER TIME.
 6            WHAT YOU'RE SEEING UP HERE, YOU MAY THINK
 7     IT'S JUST FOUR PICTURES OF PHONES, BUT IT ACTUALLY
 8     REPRESENTS MANY YEARS OF IPHONE TO APPLE.  WE DON'T
 9     BRING OUT NEW VERSIONS EVERY MONTH.  WE BRING THEM
10     OUT ABOUT ONCE A YEAR.
11            AND YOU SEE THE VERY CONSISTENT SHAPE OF
12     IT.  IT'S ROUNDED CORNERS, IT'S RECTANGULAR SHAPE,
13     ITS FULL GLASS FACE WITH THE BLACK SCREEN AND BLACK
14     AREA AROUND THE SCREEN JUST SEEN AS ONE.  YOU SEE
15     THE COLORFUL ICONS, THE APPLICATIONS, THE SQUARES
16     WITH THEIR ROUNDED CORNERS.
17            YOU SEE THE BOX ALONG THE BOTTOM WHICH
18     WE'RE KNOWN FOR.  I THINK THERE ARE A NUMBER OF
19     FACTS ALTOGETHER THAT MAKE IT VERY OBVIOUS THAT
20     IT'S AN IPHONE.
21            THE COURT:  MR. MCELHINNY, I DON'T HAVE
22     IT IN MY NOTES AS HAVING BEEN ADMITTED.  WHICH
23     WITNESS WAS THIS?
24            MR. MCELHINNY:  I'M SORRY, YOUR HONOR.
25     THE PHONES WERE ADMITTED THROUGH MR. SCHILLER, I
```

628

```
 1    BELIEVE -- THROUGH MR. STRINGER, I BELIEVE, AND

 2    THIS IS SIMPLY A PICTURE OF THE PHONES THAT ARE IN

 3    EVIDENCE.

 4              THE COURT:  OH, ALL RIGHT.

 5    BY MR. MCELHINNY:

 6    Q    WHICH IPHONES INCORPORATE THE DESIGN FEATURES

 7    THAT YOU JUST DISCUSSED?

 8    A    THEY ALL DO.

 9    Q    IF YOU WOULD PUT UP, PLEASE, PDX 9.

10              THESE ARE PICTURES OF THE IPAD IN

11    EVIDENCE.

12              AGAIN, WHAT IS IT ABOUT THESE, THE SHAPE

13    OF THESE DEVICES THAT MAKES YOU THINK THAT THEY'RE

14    DISTINCTIVE?

15    A    AS A MARKETING PERSON, IT'S IMPORTANT TO ME

16    THAT THE IMAGE OF THE PRODUCT BE SIMPLE, CLEAR,

17    CONSISTENT OVER TIME AND WHAT YOU'RE SEEING IS THE

18    IPAD HAS HAD A CONSISTENT DESIGN OF THE LARGE

19    RECTANGLE WITH FOUR ROUNDED CORNERS, A FULL GLASS

20    FACE WITH A SCREEN AND THE AREA AROUND THE SCREEN

21    JUST BECOME ONE SURFACE.  THAT WE HAVE A BEAUTIFUL

22    SET OF ICONS THAT ARE COLORFUL, SQUARES WITH

23    ROUNDED CORNERS.  A DOCK FOR THE MOST COMMONLY USED

24    ICONS ALL ON THE BOTTOM.

25              AND ALTOGETHER IT'S A SIMPLE, BEAUTIFUL
```

629

1    LOOK THAT HAS STAYED CONSISTENT WITH ACROSS THE

2    PRODUCT LINE.

3    Q    IN YOUR EXPERIENCE, DOES THE DESIGN OF THESE

4    PRODUCTS CONTRIBUTE TO THEIR SUCCESS?

5    A    ABSOLUTELY.

6    Q    AND WHY DO YOU SAY THAT?

7    A    BECAUSE I BELIEVE CUSTOMERS VALUE BEAUTIFUL

8    PRODUCTS AND PRODUCTS THEY CAN ASSOCIATE AND

9    IDENTIFY WITH THE COMPANY WHO'S MADE THEM.

10   Q    SIR, IF YOU LOOK IN YOUR BINDER AT EXHIBIT

11   1 -- PX 143.

12   A    YES.

13   Q    WHAT IS EXHIBIT PX 143?

14   A    THIS IS AN APPLE CUSTOMER OR BUYER SURVEY OF

15   PEOPLE WHO PURCHASED IPHONES.

16   Q    CAN YOU TELL ME THE DATES OF IT, PLEASE?

17   A    THIS WAS FROM THE FOURTH FISCAL QUARTER IN

18   FISCAL YEAR 2010.

19   Q    ALL RIGHT.  WOULD YOU LOOK AT THE PAGES THAT

20   YOU'VE GOT THERE, PLEASE, AND TELL ME WHETHER YOU

21   HAVE THE ENTIRE SURVEY OR EXCERPTS FROM THE SURVEY?

22   A    THIS IS JUST A BRIEF EXCERPT OF A LARGER

23   SURVEY.

24        MR. MCELHINNY:  THANK YOU.  YOUR HONOR, I

25   MOVE PX 143.

630

```
1              THE COURT:  ANY OBJECTION, MR. PRICE?
2              MR. PRICE:  NO FURTHER OBJECTIONS.
3              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
4              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
5              143, HAVING BEEN PREVIOUSLY MARKED FOR
6              IDENTIFICATION, WAS ADMITTED INTO
7              EVIDENCE.)
8    BY MR. MCELHINNY:
9    Q    SIR, IF YOU WOULD LOOK IN YOUR BINDER AT PX
10   144, WHAT IS 144?
11   A    THIS IS ANOTHER IPHONE BUYER SURVEY PERFORMED
12   BY APPLE.
13   Q    IS IT THE ENTIRE SURVEY OR EXCERPTS, SIR?
14   A    THIS ALSO IS AN EXCERPT OF THAT SURVEY.
15   Q    FOR WHAT TIME PERIOD, SIR?
16   A    FOR THE FIRST QUARTER OF FISCAL YEAR 2011.
17             MR. MCELHINNY:  YOUR HONOR, I MOVE PX
18   144.
19             THE COURT:  MR. PRICE?
20             MR. PRICE:  NO FURTHER OBJECTION.
21             THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
22             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
23             144, HAVING BEEN PREVIOUSLY MARKED FOR
24             IDENTIFICATION, WAS ADMITTED INTO
25             EVIDENCE.)
```

```
1    BY MR. MCELHINNY:

2    Q    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT

3    PX 145, WHAT IS 145?

4    A    THIS IS ALSO AN IPHONE BUYER SURVEY.

5    Q    IS IT THE ENTIRE SURVEY OR EXCERPTS, SIR?

6    A    THIS IS ALSO AN EXCERPT OF THAT SURVEY.

7    Q    FOR WHAT TIME PERIOD?

8    A    THIS IS FOR THE SECOND QUARTER OF FISCAL YEAR

9    2011.

10             MR. MCELHINNY:  YOUR HONOR, I MOVE PX

11   145.

12             MR. PRICE:  NO ADDITIONAL OBJECTIONS.

13             THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

14             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

15             145, HAVING BEEN PREVIOUSLY MARKED FOR

16             IDENTIFICATION, WAS ADMITTED INTO

17             EVIDENCE.)

18   BY MR. MCELHINNY:

19   Q    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT

20   PX 146.  WHAT IS 146, SIR?

21   A    THIS IS AN IPHONE BUYER SURVEY.

22   Q    THE WHOLE SURVEY, SIR, OR EXCERPTS?

23   A    IT IS AN EXCERPT OF THAT SURVEY.

24   Q    FROM WHAT TIME PERIOD?

25   A    THAT IS FROM THE THIRD QUARTER OF FISCAL YEAR
```

```
 1    2011.
 2              MR. MCELHINNY:  YOUR HONOR, I MOVE PX
 3    146.
 4              MR. PRICE:  NO ADDITIONAL OBJECTION.
 5              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
 6              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 7              146, HAVING BEEN PREVIOUSLY MARKED FOR
 8              IDENTIFICATION, WAS ADMITTED INTO
 9              EVIDENCE.)
10    BY MR. MCELHINNY:
11    Q    WHAT IS AN IPHONE BUYER SURVEY?
12    A    PERIODICALLY MY MARKET RESEARCH TEAM WILL DO
13    SURVEYS OF CUSTOMERS WHO HAVE ALREADY PURCHASED OUR
14    PRODUCT TO ASK THEM QUESTIONS.  WE'RE CURIOUS ABOUT
15    THEM.
16    Q    WHAT IS A MARKET RESEARCH TEAM, SIR?
17    A     I HAVE A SMALL GROUP OF PEOPLE WHO REPORT TO
18    ME WHO DO PRIMARILY TWO FUNCTIONS.  ONE IS TO
19    PURCHASE THIRD PARTY REPORTS THAT EXIST IN THE
20    MARKETPLACE, USUALLY ANALYSIS OF MARKET TRENDS OR
21    DATA.
22              AND THEN ALSO TO PERFORM A LIMITED NUMBER
23    OF RESEARCH PROJECTS ON EXISTING CUSTOMERS SO WE
24    CAN HEAR WHAT THEY HAVE TO SAY ABOUT THE PRODUCTS
25    THEY'VE PURCHASED.
```

```
 1              THE COURT:  GO AHEAD.

 2              MR. MCELHINNY:  WOULD YOU SHOW EXHIBIT --

 3    DO WE NEED HELP WITH THAT?

 4              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 5              127, HAVING BEEN PREVIOUSLY MARKED FOR

 6              IDENTIFICATION, WAS ADMITTED INTO

 7              EVIDENCE.)

 8              MR. MCELHINNY:  CAN YOU SHOW EXHIBIT PX

 9    127, PLEASE.

10              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12    BY MR. MCELHINNY:

13    Q    THAT WAS ONE OF THE EARLY ADS FOR THE IPHONE;

14    IS THAT CORRECT?

15    A    YES, IT WAS.

16    Q    EXPLAIN TO US THE LOGIC.  WHAT DID WE JUST SEE

17    FROM AN ADVERTISING PERSPECTIVE?

18    A    ADVERTISING IS ALWAYS CHALLENGING BECAUSE YOU

19    ONLY HAVE 30 SECONDS TO GET AN IDEA ACROSS, AND IN

20    THAT 30 SECONDS, WHAT YOU SAW FIRST WAS, WHAT I

21    SPOKE ABOUT EARLIER, THE PRODUCT WAS THE HERO.  YOU

22    SAW THE DISTINCTIVE DESIGN VERY CLEARLY.

23              SECONDLY, WE GAVE YOU THE ABILITY TO SEE

24    A BIT ABOUT HOW IT MIGHT WORK.  SINCE YOU'VE NEVER

25    USED THIS PRODUCT BEFORE AS A CUSTOMER, YOU SAW HOW
```

643

```
1    FLICKING AND SCROLLING AND TAPPING AND ALL THESE

2    MULTITOUCH IDEAS SIMPLY.

3              AND THEN THE THIRD THING I THINK THE AD

4    DID VERY WELL WAS EXPRESS WHAT WE SPOKE ABOUT

5    EARLIER FROM THE ORIGINAL LAUNCH, THAT THE IPHONE

6    WAS A BREAKTHROUGH OF THREE THINGS:

7              IT WAS A GREAT PHONE; IT WAS A PERSONAL

8    COMMUNICATION DEVICE; AND IT WAS THE BEST IPOD YOU

9    EVER HAD.

10             ALL THREE OF THOSE WERE USED IN THAT

11   ADVERTISEMENT.

12   Q    CAN YOU LOOK IN YOUR BINDER, PLEASE, TO

13   EXHIBIT PX 12.

14   A    YES.

15   Q    I THINK YOU'RE GOING TO FIND TWO THINGS THERE.

16   I THINK YOU'RE GOING TO FIND A CHART AND ANOTHER

17   CD.  IS THAT CORRECT?

18   A    CORRECT.

19   Q    WHAT IS THE CHART?

20   A    THIS IS A, A TABLE REPRESENTING ALL OF THE ADS

21   ABOUT IPHONE THAT WE'VE PUT ON A DVD.

22   Q    AND WHAT IS THE DVD?

23   A    THE DVD HAS ALL OF THESE ADS.  IT SHOWS THE

24   ORIGINAL IPHONE ADS, AS WELL AS FOLLOW-ON VERSIONS

25   OF THE IPHONE, ALL AS INDIVIDUAL VIDEOS.
```

644

```
 1   Q    DOES IT INCLUDE THE AD WE JUST SAW.

 2   A    YES, IT DOES.

 3            MR. MCELHINNY:  YOUR HONOR, I MOVE PX 12.

 4            MR. PRICE:  ONE MOMENT, PLEASE.

 5            (PAUSE IN PROCEEDINGS.)

 6            MR. PRICE:  NO ADDITIONAL OBJECTIONS,

 7   JUDGE.

 8            THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

 9            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10            12, HAVING BEEN PREVIOUSLY MARKED FOR

11            IDENTIFICATION, WAS ADMITTED INTO

12            EVIDENCE.)

13   BY MR. MCELHINNY:

14   Q    AND THIS IS THE CHART THAT YOU WERE TALKING

15   ABOUT WITH THE ADS?

16   A    YES, IT IS.

17   Q    AND YOU'VE GIVEN EACH ONE OF THESE ADS AN

18   INDIVIDUAL NAME?

19   A    WE DO.

20   Q    ALL RIGHT.  AND JURY WILL HAVE THE DVD IN THE

21   COURTROOM?

22   A    THEY WILL.

23   Q    DO YOU KNOW, DID THESE ADS ACTUALLY AIR IN THE

24   UNITED STATES?

25   A    YES.  ALL OF THESE WERE ADS THAT WE RAN ON TV.
```

```
1    Q    THANK YOU.  WERE THERE ANY SPECIAL CHALLENGES

2    TO MARKETING THE IPAD?

3    A    OH, YES.

4    Q    AND CAN YOU GIVE US EXAMPLES OF WHAT THOSE

5    CHALLENGES WERE?

6    A    AGAIN, LIKE WITH THE IPHONE, THE IPAD IS A

7    DEVICE THAT WAS BRAND NEW AND PEOPLE HAD NO

8    EXPERIENCE WITH ANYTHING LIKE THE IPAD.

9              AND SO THE CHALLENGE IN MARKETING IS TO,

10   AGAIN, NOT ONLY SHOW IT AS THIS HERO, BEAUTIFUL

11   PRODUCT BUT GIVE YOU A SENSE OF HOW IT MIGHT WORK

12   AND WHAT IT MIGHT DO FOR YOU BEFORE YOU EVEN GET A

13   CHANCE TO GO TO THE STORE AND TRY ONE YOURSELF.

14   Q    IF YOU OPEN YOUR BINDER TO EXHIBIT PX 128.

15   WHAT IS THIS, SIR?

16   A    THIS IS A VIDEO.

17   Q    AND IS IT AN AD FOR THE IPAD AGAIN?

18   A    YES, IT IS.

19              MR. MCELHINNY:  YOUR HONOR, I MOVE PX

20   128.

21              MR. PRICE:  NO FURTHER OBJECTION TO THIS

22   VIDEO.

23              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

24              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25              128, HAVING BEEN PREVIOUSLY MARKED FOR
```

```
 1              IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3              MR. MCELHINNY:  WE'D LIKE TO PUBLISH THIS

 4      ONE, TOO, YOUR HONOR.

 5              THE COURT:  GO AHEAD, PLEASE.

 6              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 7      OPEN COURT OFF THE RECORD.)

 8      BY MR. MCELHINNY:

 9      Q    AGAIN, WHAT WERE THE MESSAGES THAT WE TAKE

10      FROM -- THAT WE SHOULD HAVE TAKEN FROM THAT?

11      A    SO IN THAT BRIEF AD, WE WANTED YOU TO SEE THE

12      BEAUTIFUL DESIGN; GET A SENSE OF HOW EASY IT IS TO

13      USE; REALIZE THAT IT WAS MEANT FOR A WIDE RANGE OF

14      USERS.  IT'S REALLY FOR EVERYBODY, AND IT SHOWED

15      STUDENTS AND BUSY PEOPLE AND MANY OTHER EXAMPLES.

16              AND THEN TO GIVE YOU A TASTE OF THE RICH

17      DEPTH OF THE SOFTWARE THAT COULD BE USED ON THIS

18      AND HOW APPLICABLE IT IS TO THE THINGS YOU MIGHT DO

19      IN YOUR LIFE, TO CREATE A REASON THAT YOU MIGHT

20      WANT A TABLET DEVICE LIKE AN IPAD IN YOUR LIFE.

21      Q    WOULD YOU LOOK AT EXHIBIT PX 13, PLEASE.

22      A    YES.

23      Q    WHAT IS PX 13?

24      A    IT IS A TABLE OF A LIST OF OUR ADS FOR IPAD.

25      Q    FOR IPAD.
```

```
 1              YOUR HONOR, I MOVE -- AND IS THERE A CD
 2    THAT ACTUALLY HAS THOSE?
 3              THE WITNESS:  THERE'S ALSO A DISK THAT
 4    HAS THESE ON IT AS WELL.
 5              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 13.
 6              MR. PRICE:  IF YOU'RE TALKING ABOUT THE
 7    SUMMARY, THERE'S NO ADDITIONAL OBJECTION.
 8              THE COURT:  YOU'RE TALKING ABOUT THE
 9    SUMMARY; CORRECT?
10              MR. MCELHINNY:  THE SUMMARY AND THE DVD.
11              MR. PRICE:  NO, NO, THOSE ARE DIFFERENT
12    ISSUES.  EARLIER --
13              THE COURT:  WHICH ONE IS THE CD?  DOES IT
14    HAVE A DIFFERENT NUMBER?  BECAUSE I ONLY HAVE PX 13
15    AS BEING A ONE-PAGE CHART.
16              MR. MCELHINNY:  THEY'RE NUMBERED THE
17    SAME, YOUR HONOR.  THE CHART IS THE LIST OF THE
18    CONTENTS OF THE DVD, AND THE DVD IS PART OF THE
19    EXHIBIT.
20              THE COURT:  ALL RIGHT.  WHAT'S THE
21    OBJECTION?
22              MR. PRICE:  WELL, YOUR HONOR, THERE'S NO
23    OBJECTION TO THE SUMMARY.  WE OBJECT TO THE ACTUAL
24    DVD'S.  THAT'S THE PURPOSE OF THE SUMMARY GETTING
25    INTO EVIDENCE.
```

```
 1                AND, SECOND, WITH RESPECT TO THE PRIOR

 2    SUMMARY, I DIDN'T OBJECT TO ANY OF THE DETAILED

 3    DVD'S ALTHOUGH, FOR EXAMPLE, THERE'S ONE AD ON

 4    THERE WHICH YOUR HONOR HAS ALREADY EXCLUDED.  SO --

 5    THE ISSUE OF THE DVD'S ACTUALLY GETTING IN IS THE

 6    OBJECTION.

 7                THE COURT:  ALL RIGHT.  WELL, WHY DON'T

 8    WE DO THIS.  I'M GOING TO, OVER THE BREAK, LOOK AT

 9    THE DVD'S, OKAY?

10                BUT THE CHARTS, THE CHART YOU HAVE NO

11    OBJECTION TO?

12                MR. PRICE:  THE SUMMARY CHART, WE HAVE NO

13    ADDITIONAL OBJECTIONS.

14                THE COURT:  ALL RIGHT.  SO THE CHART

15    ITSELF IS ADMITTED, AND WHY DON'T WE RESERVE UNTIL

16    AFTER THE BREAK THE TWO DVD'S.

17                MR. MCELHINNY:  THANK YOU, YOUR HONOR.

18                THE COURT:  ALL RIGHT.

19                (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20                13, CHARTS, HAVING BEEN PREVIOUSLY MARKED

21                FOR IDENTIFICATION, WAS ADMITTED INTO

22                EVIDENCE.)

23    BY MR. MCELHINNY:

24    Q    OTHER THAN TV COMMERCIALS, SIR, WHAT OTHER

25    KINDS OF ADVERTISING HAVE YOU DONE FOR THE IPHONE
```

1    AND THE IPAD?

2    A    WE DO A LOT OF ADVERTISING.  WE ADVERTISE ON

3    MAGAZINES, NEWSPAPERS, OUTDOORS ON BILLBOARDS AND

4    BUS SHELTERS, MANY PLACES.

5    Q    WHAT KINDS OF MAGAZINES DO YOU -- IN WHAT KIND

6    OF MAGAZINES DO YOU ADVERTISE?

7    A    WELL, IT'S IMPORTANT WHEN WE PICK MEDIA, BE IT

8    TV SHOWS OR MAGAZINES, WE TRY TO PICK PUBLICATIONS

9    THAT FIT WELL WITH APPLE'S IMAGE, REALLY HIGH, WHAT

10   WE DO OF OUR HIGH QUALITY AND BEST OF CLASS.

11           AND WE ALSO TRY TO PICK NATIONWIDE,

12   LARGEST REACH PUBLICATIONS.  SO SOMETHING THAT'S A

13   NATIONAL TOP NEWSPAPER MAGAZINE WOULD BE THE

14   TYPICAL PLACE YOU WOULD FIND OUR ADS.

15   Q    IF YOU WOULD LOOK, PLEASE, AT EXHIBIT PX 11,

16   WHAT IS THAT?

17   A    PX 11 IS A DOCUMENT THAT SHOWS EXAMPLES OF

18   SOME OF OUR PRINT AND OUTDOOR ADVERTISEMENTS.

19           MR. MCELHINNY:  YOUR HONOR, I'D MOVE PX

20   11.

21           THE COURT:  ANY OBJECTION, MR. PRICE?

22           MR. PRICE:  NO ADDITIONAL OBJECTIONS.

23           THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

24           (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

25           11, HAVING BEEN PREVIOUSLY MARKED FOR

```
1    MR. SINCLAIR.

2    Q    THANK YOU VERY MUCH.  WHO IS MR. SINCLAIR?

3    A    HE IS A PRODUCT MANAGER ON MY TEAM.

4    Q    IT'S ACTUALLY A STRING OF E-MAILS.  DO YOU SEE

5    THAT?

6    A    YES, THERE ARE A NUMBER OF E-MAILS REFERENCED

7    IN HERE.

8    Q    AND ON THE SECOND PAGE, DO YOU SEE IT SAYS ON

9    APRIL 6TH, 2010, STEVE SINCLAIR WROTE; CORRECT?

10   A    YES, I SEE THAT.

11            MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 578

12   INTO EVIDENCE.

13            THE COURT:  ANY OBJECTION?

14            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  IT'S ADMITTED.

16            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17             578, HAVING BEEN PREVIOUSLY MARKED FOR

18             IDENTIFICATION, WAS ADMITTED INTO

19             EVIDENCE.)

20            MR. PRICE:  AND IF WE COULD PUT UP THAT

21   SECOND PAGE AND JUST BLOW UP THE PART THAT STARTS

22   HERE WITH STEVE SINCLAIR, RIGHT HERE ON DOWN, THERE

23   WE GO.

24   Q    AND DO YOU SEE MR. SINCLAIR WRITES, "IT'S

25   TOUCH TO APPROACH THIS WITH THE CRITERIA BEING
```

```
 1    'FIRST,'" AND THIS WAS IN CONNECTION WITH A
 2    MARKETING APPROACH THAT WAS BEING DISCUSSED; RIGHT?
 3    A    THIS WAS A DISCUSSION BETWEEN STEVE SINCLAIR
 4    AND THE AD TEAM ON SOME CLAIMS.
 5    Q    "AD" BEING ADVERTISING?
 6    A    YES.
 7    Q    OKAY.  AND HE SAYS, "I DON'T KNOW HOW MANY
 8    THINGS WE CAN COME UP WITH THAT YOU COULD
 9    LEGITIMATELY CLAIM WE DID FIRST.  CERTAINLY WE HAVE
10    THE FIRST COMMERCIALLY SUCCESSFUL VERSIONS OF MANY
11    FEATURES."
12            AND I JUST WANT TO GO, "THE FIRST PHONE
13    TO INCORPORATE A FULL TOUCHSCREEN FACE," AND IT
14    SAYS, "NOT TRUE," AND YOU SEE THERE'S THAT
15    WIKIPEDIA SITE TO A PRODUCT, THE LG PRADA.
16            DO YOU SEE THAT?
17    A    I SEE THAT.
18            MR. PRICE:  AND BY THE WAY, YOUR HONOR, I
19    MOVE THE PRADA INTO EVIDENCE, IF I CAN REMEMBER THE
20    EXHIBIT NUMBER.  DOES IT HAVE A NUMBER ON THE BACK?
21    1093.
22            THE COURT:  OKAY.  ANY OBJECTION?
23            MR. MCELHINNY:  THIS IS NOT SUPPOSED TO
24    COME IN, YOUR HONOR, PURSUANT TO YOUR ORDER ABOUT
25    THE SPECIFIC LIMITING INSTRUCTION WHICH HAS NOT
```

```
 1    BEEN PREPARED YET.  BUT IT IS NOT PRIOR ART AS THAT

 2    TERM IS USED AND WILL BE USED BY THE JURY.

 3              MR. PRICE:  AND WE'RE NOT -- THIS

 4    EXAMINATION IS NOT TALKING ABOUT PRIOR ART.

 5              MR. MCELHINNY:  SO IT'S NOT RELEVANT TO

 6    THE VALIDITY OF ANY OF OUR PATENTS AT ISSUE, YOUR

 7    HONOR.

 8              THE COURT:  ALL RIGHT.  SO WHAT -- IT'S

 9    1093?

10              MR. PRICE:  YES, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  SO THE LIMITING

12    INSTRUCTION IS THAT THIS EXHIBIT, OR I GUESS THIS

13    PHONE, IS ADMITTED, BUT IT IS NOT PRIOR ART FOR

14    PURPOSES OF ANY INVALIDITY OF THE PATENTS.  OKAY?

15              SO YOU CAN CONSIDER IT.

16              MR. PRICE:  THANK YOU, YOUR HONOR.

17              THE COURT:  IT'S IN EVIDENCE.

18              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19              1093, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22              THE COURT:  GO AHEAD.

23    BY MR. PRICE:

24    Q    TO BE CLEAR, THERE'S NO PATENT THAT HAS BEEN

25    ASSERTED HERE THAT SAYS THAT THE TOUCHSCREEN, THAT
```

1    APPLE OWNS THAT EXCLUSIVELY; RIGHT?

2    A    I'M NOT CERTAIN.  I KNOW THERE'S SOME

3    TOUCHSCREEN PATENTS INVOLVED.  I DON'T KNOW EXACTLY

4    WHICH ONES AND HOW TO SUMMARIZE THAT.

5    Q    OKAY.  WELL, IF -- YOU UNDERSTAND, AS SOMEONE

6    WHO'S IN MARKETING, THAT THERE IS AN ADVANTAGE TO

7    HAVING A LARGER SCREEN ON THE PHONE?

8    A    TO AN EXTENT OF THE THERE ARE TIMES WHEN IT IS

9    AND TIMES WHEN IT CAN BECOME A DISADVANTAGE.

10   Q    SO IT'S A FUNCTIONAL ADVANTAGE IF, FOR

11   EXAMPLE, YOU WANT TO WATCH MOVIES; RIGHT?

12              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

13   IF YOU THINK IT IS A TERM OF ART AND IT'S A LEGAL

14   EXPRESS WHICH HE JUST SUBSTITUTED INTO HIS

15   QUESTION.  WE DON'T HAVE A DEFINITION OF FUNCTIONAL

16   AS HE'S USING IT.

17              THE COURT:  WHY DON'T YOU REPHRASE YOUR

18   QUESTION.

19              MR. PRICE:  SURE.

20   Q    YOU BELIEVE THAT A LARGER SCREEN PROVIDES

21   ADVANTAGES TO A CONSUMER IF THE CONSUMER WANTS TO

22   WATCH A MOVIE?

23   A    THERE ARE TIMES WHEN A LARGER SCREEN IS A

24   BENEFIT AND ONE OF THOSE WOULD BE WATCHING A MOVIE.

25   Q    OKAY.  AND THAT IT'S AN ADVANTAGE BECAUSE YOU

```
 1   CAN VIEW A LARGER SECTION, FOR EXAMPLE, OF A WEB

 2   PAGE?

 3   A    DEPENDING ON THE SCREEN RESOLUTION, IT CAN BE

 4   AN ADVANTAGE FOR THAT.

 5   Q    AND IT'S YOUR EXPERIENCE THAT THESE ARE THINGS

 6   WHICH CONSUMERS WANT, THAT THEY WANT SCREENS THAT

 7   ARE LARGER SO THEY CAN SEE WEB PAGES, MOVIES, YOU

 8   KNOW, WITHIN THE LIMIT OF THE, YOU KNOW, BEING

 9   USEFUL IN YOUR HAND?

10   A    LARGER SCREENS ARE -- CAN BE A BENEFIT TO

11   USERS.  IT'S NOT THE ONLY THING THEY WANT, BUT IT'S

12   ONE THING THAT THEY WANT.

13   Q    AND WHEN, WHEN YOU -- WHEN APPLE RELEASED THE

14   IPHONE IN 2007, IT EXPECTED COMPETITION IN THE

15   SMARTPHONE INDUSTRY WITH PHONES THAT YOU COULD

16   WATCH MOVIES ON OR VIEW WEB PAGES; CORRECT?

17   A    WE EXPECTED COMPETITION IN THE SMARTPHONE

18   SPACE, YES.

19   Q    BECAUSE YOU DIDN'T THINK THAT APPLE -- APPLE

20   DIDN'T THINK THAT IT HAD THE EXCLUSIVE RIGHT TO

21   GIVE THE CONSUMER A SMARTPHONE WITH A SCREEN THAT

22   COULD EXHIBIT WEB PAGES, MOVIES, MUSIC; RIGHT?

23   A    WE DID NOT HAVE EXCLUSIVITY ON PLAYING MOVIES

24   OR MUSIC ON PHONES.

25   Q    SO LET'S TALK THEN NOW ABOUT, ABOUT OTHER
```

```
1    THINGS ABOUT THE WAY THE PHONE WORKS.

2              IF -- LET ME ASK YOU, YOU'VE HEARD THE

3    PHRASE THAT EVERYTHING DEFERS TO THE SCREEN?

4    A    NO, ACTUALLY, I DON'T RECALL THAT PHRASE.

5    Q    DO YOU REMEMBER MR. IVE SAYING SOME PHRASE

6    LIKE THAT, THAT EVERYTHING DEFERS TO THE SCREEN?

7    A    YOU MEAN JONATHAN IVE?

8    Q    YES, IVE, THANK YOU.

9    A    I DON'T RECALL THAT SAYING.

10   Q    BUT THAT'S THE IDEA FOR APPLE'S PHONES, FOR

11   EXAMPLE, IS THAT THE SCREEN KIND OF DOMINANTS THE

12   PHONE?

13             MR. MCELHINNY:  THIS IS BEYOND THE SCOPE

14   OF DIRECT EXAMINATION, YOUR HONOR, TALKING ABOUT

15   THE ELEMENTS OF THE DESIGN.

16             MR. PRICE:  HE TALKED ABOUT THE DESIGN AT

17   LENGTH.

18             THE COURT:  GO AHEAD.  OVERRULED.

19   BY MR. PRICE:

20   Q    CORRECT?

21   A    I'M SORRY.  COULD YOU REPEAT THE QUESTION.

22   Q    THE SCREEN DOMINANTS THE APPLE IPHONE;

23   CORRECT?

24   A    THE SCREEN IS ONE OF THE DOMINANT FEATURES OF

25   THE PHONE.
```

```
1    Q    AND I'M GOING TO -- WE WERE TALKING ABOUT

2    EXHIBIT 1000, WHICH WAS THE FIRST PHONE, AND YOU

3    WERE ASKED BY YOUR COUNSEL ABOUT THAT, SO WHEN THE

4    SCREEN DOMINANTS, THEN, FOR EXAMPLE, ON THE IPHONE,

5    THERE'S THESE TWO AREAS AT THE TOP AND BOTTOM,

6    FAIRLY SMALL AREAS COMPARED TO THE SCREEN; CORRECT?

7    A    YEAH, THERE ARE AREAS ON THE TOP AND BOTTOM OF

8    THE PHONE AND THE SCREEN AS WELL.

9    Q    AND IN THAT REGARD, APPLE'S PHILOSOPHY HAS

10   BEEN LET'S MAKE THIS REALLY CLEAN AND NOT HAVE

11   APPLE ON IT AND JUST HAVE A SPEAKER AND HAVE WHAT

12   IS CALLED THE HOME BUTTON; CORRECT?

13   A    OUR PHILOSOPHY IS TO CREATE ONE SEAMLESS FACE

14   ON THE FRONT FOR THE SCREEN AND THE AREA ABOVE AND

15   BELOW IT.  THAT'S OUR PHILOSOPHY ON THAT.

16   Q    SO IF YOU'VE GOT A TOUCHSCREEN, AND MOST

17   PEOPLE HOLD THEIR PHONES LIKE I'M HOLDING THIS IN

18   MY HAND NOW, RIGHT (INDICATING)?

19   A    THAT'S ONE WAY TO HOLD IT.

20   Q    VERY RARELY, WHEN MAKING A CALL, FOR EXAMPLE,

21   DO PEOPLE HOLD PHONES LIKE THIS WITH ONE FINGER,

22   RIGHT (INDICATING)?

23   A    I HOLD IT LIKE THAT WHEN I MAKE A CALL

24   (INDICATING).

25   Q    NOW, WHEN YOU HAVE A TOUCHSCREEN, YOU HAVE TO
```

678

```
1    DO SOMETHING ON THE EDGES HERE SO THAT YOUR FINGERS

2    AREN'T TOUCHING THAT SCREEN AND, AND DOING

3    SOMETHING THAT YOU DON'T WANT IT TO DO; RIGHT?

4    A    NO.  IT'S MUCH MORE COMPLICATED THAN THAT.

5    Q    WELL, YOU DON'T WANT TO HAVE SOMEONE

6    ACCIDENTALLY TOUCHING THE PHONE WHEN THEY'RE

7    HOLDING IT THE WAY THAT THEY WOULD NORMALLY HOLD IT

8    FOR A CALL; CORRECT?

9    A    AGAIN, I'M NOT SURE WHAT YOU MEAN.  YOU DO

10   WANT PEOPLE TO TOUCH THEIR PHONE WHEN THEY'RE

11   HOLDING IT TO MAKE A CALL AND IT WILL TOUCH THE

12   SCREEN.

13   Q    THE SCREEN.  YOU DON'T WANT PEOPLE TO -- IF

14   IT'S AN INTERACTIVE TOUCHSCREEN, YOU DON'T WANT

15   PEOPLE TO ACCIDENTALLY TOUCH IT WHILE THEY'RE

16   MAKING A CALL.  THAT WOULD BE A PROBLEM THAT WOULD

17   BE KIND OF AN INCONVENIENCE?

18   A    WELL, THEY WILL FROM TIME TO TIME TOUCH IT, SO

19   WE'VE INVENTED WAYS TO, TO KEEP THAT FROM CREATING

20   CONTACTS THAT YOU DON'T WANT OR SIGNALS THAT YOU

21   DON'T WANT TO HAPPEN ON YOUR CALL, YES.

22   Q    AND WHAT APPLE HAS DONE HERE, AT LEAST ON THE

23   FIRST IPHONE, IT HAS THIS METAL BEZEL AND IT HAS

24   THESE VERY SMALL DARK LINES DOWN THE SIDE WHICH ARE

25   NOT PART OF THE ACTUAL INTERACTIVE SCREEN; RIGHT?
```

```
 1    A    THERE ARE -- THERE IS A BORDER AROUND THE
 2    SCREEN THAT'S VERY SMALL, YES.
 3    Q    AND THAT BORDER, IF YOU TOUCH IT, IT WON'T DO
 4    ANYTHING TO MAKE THE PHONE FUNCTION; RIGHT?
 5    A    IF YOU'RE NOT TOUCHING THE TOUCHSCREEN, YOU'RE
 6    NOT -- EXCEPT FOR, OF COURSE, THE HOME BUTTON AND
 7    THE BUTTONS ON THE SIDE, YOU'RE NOT INTERACTING
 8    WITH IT; CORRECT.
 9    Q    AND YOU NEED A SPEAKER AT THE TOP TO HEAR?
10    A    YOU NEED A SPEAKER TO HEAR, UNLESS YOU'RE
11    USING A HEAD SET.
12    Q    AND IF YOU'RE GOING TO HAVE A CAMERA, YOU NEED
13    SOMETHING ON THE TOP FOR A CAMERA; CORRECT?
14    A    FOR A FRONT FACING CAMERA, YES.
15    Q    AND THESE AREAS THAT ARE DARK, YOU KNOW, ABOVE
16    AND BELOW THE SCREEN, DO THEY HIDE INTERNAL WIRING
17    AND COMPONENTS?
18    A    THERE ARE COMPONENTS BEHIND EVERY PART OF THE
19    IPHONE, THE SCREEN AND THE TOP AND BOTTOM, AND
20    ALONG THE BOTTOM AS WELL.
21    Q    NOW, ANOTHER THING, THESE ARE ROUNDED.  I
22    ASSUME YOU THOUGHT THAT CUSTOMERS MIGHT PUT THESE
23    PHONES IN THEIR POCKETS.
24    A    WE CERTAINLY ASSUME CUSTOMERS PUT THEIR PHONE
25    IN THEIR POCKET.  I WOULDN'T SAY THAT'S WHY IT'S
```

1    ROUNDED.  THAT'S NOT THE ONLY REASON.

2    Q    IT MAY NOT BE THE ONLY REASON, BUT IF IT'S

3    SQUARE, THAT WOULD MAKE IT MORE DIFFICULT FOR A

4    CUSTOMER TO TAKE THEIR PHONE OUT OF THEIR POCKET?

5    A    IT DEPENDS.  THERE ARE WAYS TO HANDLE THAT NO

6    MATTER WHAT THE SHAPE IS.  SO I WOULDN'T SAY THAT'S

7    A GUARANTEED RULE.  I'VE SEEN SQUARE PHONES THAT

8    WORK JUST FINE IN YOUR POCKETS.

9    Q    YOU THINK THAT JUST GENERALLY, USING YOUR

10   COMMON SENSE, IT WOULD BE MORE DIFFICULT TO TAKE A

11   SQUARE PHONE OUT OF YOUR POCKET BECAUSE IT MIGHT

12   CATCH ON SOMETHING?

13   A    I THINK IT DEPENDS ON THE SIZE, BUT ROUNDED

14   CORNERS CERTAINLY HELP YOU MOVE THINGS IN AND OUT

15   OF YOUR POCKET.

16   Q    NOW, YOU SAID THAT YOU WERE INVOLVED IN THE

17   DEVELOPMENT OF THE IPHONE; RIGHT?

18   A    YES.

19   Q    AND YOU SAID THAT YOU THOUGHT IT WAS, I THINK,

20   BEAUTIFUL, UNIQUE, DISTINCTIVE; CORRECT?

21   A    YES.

22   Q    AND WE SHOWED THAT PICTURE IN 2011, AFTER

23   MR. JOBS PASSED AWAY, AND THEY HAD THE IPHONES AND

24   YOU SAID YOU COULD IMMEDIATELY RECOGNIZE THOSE AS

25   IPHONES; CORRECT?

1    A    YES, I DID.

2    Q    BECAUSE THEY WERE SO UNIQUE; RIGHT?

3    A    YES.

4    Q    SO I THEN HEARD YOU TESTIFY FROM, I GUESS,

5    MR. MCELHINNY SAYING THAT YOU BELIEVED THERE WAS

6    CONSUMER CONFUSION REGARDING THE IPHONE AND

7    SAMSUNG'S PRODUCTS; RIGHT?

8    A    I SAID -- I EXPLAINED AN EXAMPLE BOTH WITH TV

9    ADS AND OUTDOOR ADVERTISING HOW IT WOULD CREATE

10   CONFUSION AND IF THE USER SEES EITHER A SAMSUNG OR

11   AN APPLE PHONE, THE MORE THAT A SAMSUNG PHONE

12   COPIES AN APPLE PHONE, THE HARDER IT IS TO TELL

13   WHICH IS WHICH IN SITUATIONS LIKE I DESCRIBED,

14   DRIVING BY A BILLBOARD OR WATCHING TV AND MOVING

15   OUT OF THE ROOM.

16   Q    LET'S TALK ABOUT HOW, ABOUT HOW -- YOUR

17   UNDERSTANDING OF HOW CONSUMERS OVER THE YEARS HAVE

18   BUILT THESE SMARTPHONES.

19        THEY'RE FAIRLY EXPENSIVE COMPARED TO

20   OTHER PHONES; CORRECT?

21   A    NOT NECESSARILY.

22   Q    OKAY.  WOULD YOU SAY $500, $600 IS EXPENSIVE?

23   A    THE IPHONE STARTS AT FREE WHEN YOU PURCHASE

24   IT -- IN THE U.S., THE PREDOMINANT NUMBER OF

25   CUSTOMERS BUY IT WITH A CONTRACT AND IT'S FREE.

682

1    Q    THE CURRENT IPHONE ALSO?  MODELS?

2    A    THE IPHONE 3GS STARTS AT FREE, YES.

3    Q    I'M TALKING ABOUT THE LATEST AND GREATEST

4    MODELS THAT YOU COME OUT WITH AND THERE'S A BIG

5    SPLASH OF MEDIA, THEY'RE KIND OF EXPENSIVE?  SOME

6    PEOPLE DON'T BUY THEM BECAUSE THEY'RE EXPENSIVE?

7    A    SOME PEOPLE DO, SOME DON'T.  THEY

8    TRADITIONALLY START AT ABOUT $199 UNDER A CONTRACT.

9    SO DEPENDING ON YOUR PERSPECTIVE WHETHER THAT'S

10   EXPENSIVE OR NOT.

11   Q    AND YOUR RESEARCH TELLS YOU THAT PEOPLE

12   USUALLY CONSIDER THEIR PHONE PURCHASE CAREFULLY

13   WHEN THEY'RE BUYING SUCH A PERSONAL AND PRICED

14   ITEM?

15   A    I DON'T RECALL ANY SPECIFIC RESEARCH ABOUT THE

16   CARE SOMEONE TAKES IN AN INDIVIDUAL PURCHASE.

17   Q    YOU'VE HAD EXPERIENCE GOING INTO STORES;

18   CORRECT?

19   A    I HAVE GONE INTO STORES.

20   Q    AND IN THE STORES, THE IPHONE PRODUCTS ARE

21   SEGREGATED, AT THE CARRIERS, FROM SAMSUNG PRODUCTS;

22   RIGHT?

23   A    IT DEPENDS ON THE STORE AND THE SETUP, BUT

24   THEY'RE NOT ALWAYS NEXT TO EACH OTHER.

25   Q    THAT'S A LITTLE BIT DIFFERENT.  EVERY STORE

683

```
 1    YOU'VE BEEN INTO THAT'S A CARRIER, THE IPHONE

 2    PRODUCTS ARE SEGREGATED FROM THE SAMSUNG PRODUCTS;

 3    RIGHT?

 4    A    AGAIN, I'M NOT SURE BY SEGREGATED WHAT YOU

 5    MEAN, BUT USUALLY THEY'RE DISPLAYED SEPARATELY FROM

 6    EACH OTHER.

 7    Q    AND YOU ARE SAYING THAT THE IPHONE IS CONFUSED

 8    WITH SAMSUNG PHONES.  YOU KNOW THERE ARE A NUMBER

 9    OF PHONES THAT ARE, THAT ARE ACCUSED IN THIS CASE;

10    RIGHT?

11    A    YES, I BELIEVE THERE ARE A NUMBER OF PHONES

12    THAT HAVE COPIED THE IPHONE, YES.

13    Q    AND SO IS IT YOUR TESTIMONY THAT IF YOU LOOK

14    AT THESE PHONES, THEN CUSTOMERS ARE GOING TO BE

15    CONFUSED ABOUT ALL THE PHONES THAT ARE ACCUSED IN

16    THIS CASE?

17    A    I BELIEVE CUSTOMERS CAN BE CONFUSED.

18              AND, AGAIN, I WAS SPEAKING SPECIFICALLY

19    ABOUT ALL THE MARKETING EFFORT AND I BELIEVE

20    THEY'RE CREATING CONFUSION THERE.

21    Q    WELL, LET ME SHOW YOU WHAT HAS BEEN MARKED AS

22    EXHIBIT 1016.  THIS IS A, A JOINT EXHIBIT.  IT'S

23    ONE OF THE ACCUSED PRODUCTS.  IT'S THE CONTINUUM.

24              IF I MAY APPROACH, YOUR HONOR?

25              THE COURT:  GO AHEAD, PLEASE.
```

```
1    BY MR. PRICE:

2    Q    SO THAT'S ONE OF THE PHONES YOU BELIEVE PEOPLE

3    WOULD CONFUSE FOR AN IPHONE (HANDING)?

4    A    YES.

5    Q    AND I'D LIKE YOU TO LOOK IN YOUR BINDER,

6    THERE'S A DEMONSTRATIVE --

7             MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

8    I'D LIKE TO CORRECT THE RECORD.  THIS PHONE IS

9    ACTUALLY NOT ACCUSED OF INFRINGING THE DESIGN

10   PATENTS.  IT'S ACCUSED OF INFRINGING THE UTILITY

11   PATENTS.

12            MR. PRICE:  AND TRADE DRESS.

13            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

14   BY MR. PRICE:

15   Q    SO IF YOU LOOK IN THE BINDER, THERE'S SDX

16   3557, WHICH IS A DEMONSTRATIVE.  IT'S AT THE FRONT

17   OF THE BINDER.  IT SHOULD BE UNDER DEMONSTRATIVES.

18   A    I'M SORRY.

19            MR. MCELHINNY:  WHAT'S THE NUMBER?

20            MR. PRICE:  IT'S 3557.  YOUR HONOR, IF I

21   MAY ASSIST THE WITNESS?

22            THE COURT:  GO AHEAD, PLEASE.

23            MR. PRICE:  IT SHOULD BE RIGHT AT THE

24   FRONT WHERE IT SAYS DEMONSTRATIVES, MEANING THESE

25   DON'T GO INTO EVIDENCE.
```

```
 1              MR. MCELHINNY:  YOUR HONOR, THERE IS AN
 2   OBJECTION PENDING ON THIS WHICH YOU HAVE NOT RULED
 3   ON AND IT SHOULDN'T BE PUBLISHED.
 4              MR. PRICE:  TAKE IT DOWN, PLEASE.
 5              AND SO OUR REQUEST OF MR. MCELHINNY CAN
 6   STATE THAT, THAT WE SHOW DEMONSTRATIVE 3557.
 7              THE COURT:  ALL RIGHT.  WHAT'S THE
 8   OBJECTION?
 9              MR. MCELHINNY:  COUNSEL JUST AGREED, THIS
10   IS RELEVANT TO THE TRADE DRESS ISSUES.  IT DOESN'T
11   SHOW THE TRADE DRESS, YOUR HONOR.  THEY BLANKED OUT
12   THE SCREEN.
13              MR. PRICE:  WE CAN DO DIFFERENT ELEMENTS,
14   YOUR HONOR.  THIS IS THE --
15              MR. MCELHINNY:  AH, THE
16   ELEMENT-BY-ELEMENT ARGUMENT, WHICH IS ABSOLUTELY
17   INCORRECT AS A MATTER OF LAW BECAUSE AS YOUR HONOR
18   HAS SAID, MANY TIMES YOU HAVE TO LOOK AT THE
19   OVERALL APPEARANCE OF A PRODUCT.
20              THE COURT:  UNDERSTOOD.  BUT I'M GOING TO
21   OVERRULE THE OBJECTION.
22              GO AHEAD, MR. PRICE.
23              MR. PRICE:  NOW, IF YOU CAN PUT 3557 UP.
24   Q   NOW, FIRST, YOU'VE SAID THAT -- WELL, YOU CAN
25   SEE THE SCREENS ARE DIFFERENT SHAPES?  RIGHT?
```

```
 1    A    THEY'RE BOTH RECTANGLES BUT OF DIFFERENT

 2    SIZES.

 3    Q    OKAY.  SO HERE'S WHAT I WANT TO ASK YOU ABOUT

 4    THEN.  DO YOU SEE ON THE, ON THE SAMSUNG PHONE, IT

 5    HAS THESE FOUR, IT LOOKS LIKE FOUR BUTTONS HERE?

 6    A    THE ONE YOU HANDED ME DOES NOT.

 7    Q    BUT WHEN YOU TURN IT ON IT DOES.  IT'S A SOFT

 8    BUTTON THAT HIGHLIGHTS WHEN IT'S ON.

 9    A    WHEN IT'S ON I SEE THOSE, YES.

10         MR. MCELHINNY:  AGAIN, YOUR HONOR, NOW

11    THEY'VE TURNED ON THE PARTS THEY WANT AND TURNED

12    OFF THE PARTS THEY DON'T WANT.  IT'S NOT EVEN A

13    FAIR PICTURE.  IT'S PART ON AND PART OFF.

14         MR. PRICE:  NO, YOUR HONOR, IF YOU IGNORE

15    THE SCREEN, WHICH HE'S SAYING THEY DON'T HAVE.

16         MR. MCELHINNY:  IT'S TRADE DRESS.

17         THE COURT:  WHY IS THIS SCREEN WHITED

18    OUT?

19         MR. PRICE:  WE COULD MAKE IT BLACK.  I

20    MEAN, IT'S WHITED OUT --

21         THE COURT:  BUT FOR TRADE DRESS, WHY IS

22    THE SCREEN MISSING IF THIS IS FOR THE TRADE DRESS

23    CLAIM?

24         MR. PRICE:  BECAUSE I'M FOCUSSING ON

25    SPECIFIC AREAS OF THE PHONE, AND ONE CAN DO THAT TO
```

875

```
 1    STARTING ON PAGE BATES NUMBER 659, INTERNALLY IT'S
 2    PAGE 18 OF THE DOCUMENT.
 3              THIS IS ABOUT YOUR ASSESSMENT OF LG.
 4              GO FORWARD TWO MORE PAGES.  IF WE CAN
 5    ENLARGE THAT IN THE UPPER LEFT.
 6              LG?
 7    A    YES.  THIS SHOWS OUR, OUR ROAD MAP ANALYSIS,
 8    COMPETITIVE ANALYSIS OF THEM.
 9    Q    ALL RIGHT.  SO IS -- I MEAN, DOES SAMSUNG ONLY
10    WANT TO BEAT APPLE?
11    A    NO, ABSOLUTELY NOT.
12    Q    CAN YOU TELL US WHETHER OR NOT SAMSUNG ALSO
13    MONITORS ITS OTHER COMPETITORS AND SEEKS TO BEAT
14    THEM AS WELL?
15    A    WE DO.  WE MONITOR ALL THE COMPETITION IN THE
16    MARKET.
17    Q    AND THE NEXT PAGE, YOU SEE RIM IN THE UPPER
18    LEFT?  THAT'S -- RIM IS RESEARCH IN MOTION,
19    BLACKBERRY?
20    A    YES, IT IS.
21    Q    AND ON THE NEXT PAGE, HTC?
22    A    YES.
23    Q    WHO'S HTC?
24    A    HTC IS A COMPETITOR.  I FORGET WHAT THE
25    ACRONYM STANDS FOR.
```

1    Q    HIGH TECH CORPORATION, SOMETHING LIKE THAT?

2    A    THAT RINGS A BELL.

3    Q    AND THE NEXT PAGE, IS THAT MOTOROLA?

4    A    YES.

5    Q    OKAY.  DOES -- THANK YOU VERY MUCH.

6         DOES SAMSUNG, AT ANY GIVEN TIME, TEND TO

7    FOCUS ONLY ON ONE COMPETITOR OR ON ONE COMPETITOR

8    MORE THAN OTHERS?

9    A    I WOULD SAY IT'S FAIR TO SAY THAT SAMSUNG

10   LOOKS AT ALL THE COMPETITION.  WE MAY FOCUS ON ONE

11   COMPETITOR VERSUS THE OTHER DEPENDING ON THE MARKET

12   THAT WE'RE LOOKING AT DURING THAT TIME.

13   Q    COULD YOU EXPLAIN TO THE JURY WHAT YOU MEAN?

14   A    THERE'S DIFFERENT WAYS TO SEGMENT THE MARKET.

15   ONE WAY WOULD BE TO LOOK AT IT ON A CARRIER BY

16   CARRIER BASIS.  ANOTHER WAY TO LOOK AT IT IS

17   PREPAID VERSUS POST PAID.  SO THOSE ARE WAYS TO

18   SEGMENT THE MARKET.

19   Q    ALL RIGHT.  WHAT EXACTLY IS YOUR JOB AT

20   SAMSUNG?  I HAVEN'T ASKED YOU THAT.  WHAT ARE YOUR

21   RESPONSIBILITIES?

22   A    SO I'M THE HEAD OF CORPORATE PLANNING STRATEGY

23   FOR STA, SO MY JOB IS TO CHART THE LONG-RANGE

24   STRATEGIC PLAN FOR STA, OR AT LEAST TO FACILITATE

25   THE CREATION OF THAT PLAN.

877

```
 1              THAT INCLUDES A MULTI-YEAR PLAN; THAT

 2    INCLUDES A SINGLE YEAR PLAN, I.E., THE NEXT YEAR;

 3    IT INCLUDES TRACKING OUR PROGRESS AGAINST THOSE

 4    PLANS THROUGHOUT THE YEAR.

 5    Q    ALL RIGHT.  SO YOU SAID THAT MARKETS MAY

 6    INCLUDE CARRIER MARKETS?

 7    A    CORRECT.

 8    Q    CAN YOU EXPLAIN TO US HOW IT IS THAT A CARRIER

 9    CAN BE A MARKET?

10    A    WELL, CARRIERS CARRY A FINITE SET OF DEVICES

11    IN THEIR PORTFOLIO.  THEY THEMSELVES CAN'T MANAGE A

12    THOUSAND DEVICES, LET'S SAY, IN THEIR SUPPLY CHAIN.

13              THEY CHOSE TO OFFER A SELECT NUMBER OF

14    DEVICES TO THEIR CONSUMERS, AND EACH CARRIER HAS

15    VERY SPECIFIC REQUIREMENTS WITH REGARD TO NETWORK

16    TECHNOLOGY, FREQUENCIES THEY USE, THEY HAVE THEIR

17    OWN PROPRIETARY SOFTWARE AND SERVICES THEY WANT YOU

18    TO PUT ON THEIR DEVICE.

19              SO YOU BRING ALL THIS TOGETHER AND YOU

20    HAVE JUST A, A FINITE NUMBER OF DEVICES OF

21    COMPANIES COMPETING WITHIN THAT CARRIER.

22    Q    SO IS IT -- CAN YOU TELL US WHETHER OR NOT

23    YOUR COMPETITORS WITH ONE CARRIER MAY BE DIFFERENT

24    THAN YOUR COMPETITORS WITH ANOTHER CARRIER?

25    A    THAT'S RIGHT.  NOT ALL COMPETITORS ARE
```

1    PRESENT, LET'S SAY, AT ALL CARRIERS.

2    Q    BUT YOU SAID THAT SAMSUNG'S STRATEGY IS TO

3    BEAT APPLE, BEAT HTC, BEAT, YOU KNOW, ALL YOUR

4    COMPETITORS, TO BE NUMBER ONE.

5         YOU'RE THE HEAD STRATEGY GUY AT SAMSUNG.

6    CAN YOU EXPLAIN TO US, IN GENERAL, WHAT IS

7    SAMSUNG'S STRATEGY FOR BECOMING NUMBER ONE?

8    A    SAMSUNG'S STRATEGY TO BECOME NUMBER ONE IS

9    BASED ON I GUESS WHAT I WOULD SUMMARIZE AS A RECIPE

10   FOR OUR SUSTAINABLE ADVANTAGE IN THE MARKET.

11        THE --

12   Q    WHAT'S A SUSTAINABLE ADVANTAGE?

13   A    SO ANY TIME YOU'RE CHARTING A STRATEGY, LET'S

14   SAY FOR A COMPANY OR ENTITY, I GUESS WHEN YOU'RE

15   SOMEONE LIKE ME THINKING ABOUT THE STRATEGY, WHAT

16   YOU'RE TRYING TO FIND IS YOU'RE TRYING TO FIND SOME

17   UNIQUE CAPABILITIES AND COMPETENCIES THAT YOUR

18   COMPANY HAS THAT THEY CAN LEVERAGE THAT YOUR

19   COMPETITORS MAY NOT HAVE.  SO ASSETS, LET'S SAY

20   THAT YOU CAN DEVELOP, INCUBATE AND LEVERAGE AS A

21   WIN.

22        AND THAT'S WHAT WE DO AT SAMSUNG.

23   Q    AND BASED ON YOUR EXPERIENCE AND YOUR

24   BACKGROUND, CAN YOU OBTAIN A COMPETITIVE ADVANTAGE

25   JUST BY COPYING WHAT SOMEBODY ELSE DOES IN THE

1    MARKET?

2    A    NO.   THAT WOULD NOT REPRESENT A SUSTAINABLE

3    ADVANTAGE.

4    Q    HOW IS IT THAT SAMSUNG GOES ABOUT TRYING TO

5    MAINTAIN A COMPETITIVE ADVANTAGE?

6    A    SAMSUNG'S STRATEGY, I GUESS IN SHORT, IS TO

7    DELIVER THE LATEST AND GREATEST TECHNOLOGY TO

8    CONSUMERS, MORE FREQUENTLY THAN THE COMPETITION, AT

9    AS MANY POINTS OF DISTRIBUTION AS POSSIBLE --

10   AGAIN, THE CARRIER IS AN EXAMPLE OF DISTRIBUTION

11   POINT -- LEVERAGING MULTIPLE UNDERLYING

12   TECHNOLOGIES, INCLUDING MULTIPLE OPERATING SYSTEMS,

13   AND AT AS MANY DIFFERENT PRICE POINTS AS POSSIBLE,

14   I.E., PREMIUM, HIGH PRICE POINTS, AS WELL AS LOWER

15   END PRICE POINTS, SO THAT OUR DEVICES ARE AS

16   ACCESSIBLE AS POSSIBLE TO ALL CONSUMERS WHEN THEY

17   WANT TO PURCHASE.

18         SOMETIMES WE REFER TO THAT AS THE

19   DEMOCRATIZATION OF THE CELL PHONE.

20   Q    AND HOW IS THAT STRATEGY THAT YOU'VE JUST

21   DESCRIBED DIFFERENT FROM APPLE'S STRATEGY IN TERMS

22   OF THE PRODUCTS IT BRINGS TO MARKET?

23         MR. LEE:  I OBJECT.  NO FOUNDATION FOR

24   HIM TO KNOW WHAT APPLE'S STRATEGY IS.

25         MR. QUINN:  BASED ON HIS COMPETITIVE --

1    HIS JOB.  I CAN LAY SOME FOUNDATION, YOUR HONOR.

2              THE COURT:  PLEASE DO THAT.

3              MR. QUINN:  ALL RIGHT.

4    Q    IN YOUR JOB, ARE YOU REQUIRED TO UNDERSTAND

5    WHAT APPLE'S PRODUCT STRATEGY IS IN TERMS OF WHAT

6    PRODUCTS IT'S BRINGING TO MARKET?

7    A    WE ABSOLUTELY TRY TO UNDERSTAND WHAT OUR

8    COMPETITORS ARE GOING TO BRING TO MARKET.

9    Q    WOULD THAT INCLUDE APPLE?

10   A    YES.

11   Q    HTC AND ALL THE OTHERS?

12   A    YES.

13   Q    OKAY.  BASED ON WHAT YOU SEE IN TERMS OF THE

14   PRODUCTS APPLE BRINGS TO MARKET, WHAT IS YOUR

15   UNDERSTANDING ABOUT WHAT APPLE'S STRATEGY IS?

16   A    WELL, FROM MY VIEW, APPLE IS LAUNCHING, OR HAS

17   BEEN LAUNCHING, THE PRODUCTS AT ABOUT ONE

18   SMARTPHONE A YEAR, OKAY, AND THEY HAVE CHARTED A

19   VERY SPECIFIC PATH, STARTING IN 2007, WHEREBY THEY

20   LAUNCHED THAT WITH ONE PARTICULAR CARRIER ON AN

21   EXCLUSIVE BASIS.

22        THEY'VE CONTINUED TO LAUNCH AN UNDATED

23   PRODUCT EVERY SUBSEQUENT YEAR, AS WELL AS STARTED

24   TO SLOWLY EXPAND THEIR DISTRIBUTION TO MORE

25   CARRIERS.

1   Q    WELL, SO APPLE, BASED ON YOUR OBSERVATION,

2   BRINGS OUT ROUGHLY ONE NEW PHONE A YEAR.

3            APPROXIMATELY HOW MANY NEW PHONES DOES

4   SAMSUNG BRING OUT EVERY YEAR?

5   A    WE LAUNCH APPROXIMATELY 50-ISH DEVICES A YEAR.

6   I THINK IN 2011, IT WAS A LITTLE BIT MORE THAN 50

7   DEVICES.

8   Q    AND WHY IS -- WHY DOES SAMSUNG DO THAT, BRING

9   OUT SO MANY DIFFERENT PHONES?

10  A    IN PART IT GOES TO WHAT I DESCRIBED AS OUR

11  DESIRE TO BRING OUT THE LATEST TECHNOLOGY WHEN IT'S

12  AVAILABLE, MORE FREQUENTLY THAN THE COMPETITION.

13           IT ALSO HAS TO DO WITH SOME OF THE

14  UNIQUENESS THAT WE CHOSE TO BRING TO THE CARRIERS

15  IN TERMS OF THE PORTFOLIO.

16  Q    DOES SAMSUNG INVEST IN ITS BRAND AND ITS NAME,

17  SAMSUNG?

18  A    WE INVEST QUITE A BIT IN THE U.S. ON BEHALF OF

19  SAMSUNG.

20  Q    DO YOU KNOW HOW MUCH SAMSUNG INVESTED IN ITS

21  BRAND?

22  A    SAMSUNG, STA I SHOULD SAY SPECIFICALLY, HAS

23  INVESTED, LET'S SAY, ABOUT A BILLION DOLLARS LAST

24  YEAR, 2011, ON MARKETING THEIR BRAND.

25  Q    IN THE U.S.?

```
1    A     IN THE U.S.

2    Q     THAT WAS ONE BILLION WITH A "B"?

3    A     YES, IT WAS.

4    Q     ALL RIGHT.  DOES -- IS SAMSUNG PROUD OF ITS

5    NAME?

6    A     ABSOLUTELY.

7    Q     DOES SAMSUNG PUT ITS NAME ON ITS PRODUCTS?

8    A     IT'S ON EVERY PRODUCT.

9    Q     WAS THERE A TIME PERIOD WHERE THERE WAS A

10   TABLET THAT SAMSUNG BROUGHT WHERE THE NAME WASN'T

11   ON THE FRONT, IT WAS ON THE BACK?

12   A     THERE WAS, YES.

13   Q     AND CAN YOU EXPLAIN WHY THAT WAS?

14   A     SO THAT -- I BELIEVE YOU'RE REFERRING TO THE

15   ORIGINAL GALAXY TAB 10.1.

16   Q     YOU TELL ME.

17   A     OKAY.  THAT'S THE WAY I REMEMBER IT, ANYWAY.

18         SO WE DID NOT ORIGINALLY PUT THE SAMSUNG

19   BRAND ON THE FACADE, THE FRONT FACE OF THAT

20   PRODUCT, BECAUSE THE PROCESS BY WHICH YOU, I GUESS

21   YOU ETCH, I THINK IT'S SOME KIND OF LASER ETCHING,

22   YOU ETCH THE ACTUAL BRAND INTO THE DISPLAY WAS

23   CAUSING THE GLASS TO INTERFERE WITH THE ACTUAL, YOU

24   KNOW, KIND OF HIDDEN WIRES, IF YOU WILL, FOR THE

25   TOUCH SENSITIVITY ON THE DISPLAY.  SO IT WAS
```

885

```
1    AND INDEED WORKING FOR COMPETITORS BEFORE, DID YOU

2    BECOME -- DID YOU COME TO LEARN ABOUT INNOVATIONS

3    THAT SAMSUNG BROUGHT TO, TO MOBILE

4    TELECOMMUNICATIONS, YOU KNOW, FIRSTS, THINGS THAT

5    SAMSUNG DID FIRST IN THE INDUSTRY?

6    A    SURE I DID.

7    Q    AND CAN YOU TELL THE JURY WHAT SOME OF THOSE

8    ARE?

9    A    CERTAINLY.  FOR INSTANCE, SAMSUNG -- AND THIS

10   WAS WHEN I WAS, AS YOU SAID, AT OTHER COMPETITORS,

11   BUT I SAW THAT FROM A COMPETITOR'S POINT OF VIEW --

12   SAMSUNG LAUNCHED THE FIRST MP3 PHONE IN

13   APPROXIMATELY THE YEAR 2000, AS I RECALL.

14        SAMSUNG LAUNCHED THE FIRST DEVICE TO BE

15   SUB-TEN MILLIMETERS THICK.  OKAY, THAT'S KIND OF AN

16   IMPORTANT MILESTONE, LET'S SAY.  I THINK SOME

17   PEOPLE CALLED IT THE FIRST WAVE OF ULTRATHIN

18   DEVICES IN THE MARKET.  THAT WAS AROUND 2001, I

19   BELIEVE.

20        SAMSUNG WAS THE FIRST COMPANY TO LAUNCH A

21   DEVICE WITH VOICE RECOGNITION.  THAT, I BELIEVE,

22   WAS IN 2007 IF I'M NOT MISTAKEN.

23        SAMSUNG ALSO LAUNCHED THE FIRST CAMERA

24   PHONE GLOBALLY.  THAT WAS DONE AROUND THE YEAR

25   2001.
```

```
 1              AND THEN MORE RECENTLY, SAMSUNG WAS ALSO

 2    THE FIRST MANUFACTURER TO LAUNCH DEVICES WITH THE

 3    SUPER AMOLED, A-M-O-L-E-D, SUPER AMOLED TECHNOLOGY

 4    WITH THE FIRST FAMILY OF GALAXY S DEVICES, AND THAT

 5    WAS IN 2010.

 6    Q    WHAT IS AMOLED TECHNOLOGY?

 7    A    AMOLED TECHNOLOGY, I THINK IT STANDS FOR

 8    ACTIVE MATRIX ORGANIC LIGHT EMITTING DIODE,

 9    SOMETHING TO THAT EFFECT.

10              IT'S A TYPE OF SCREEN TECHNOLOGY THAT

11    SAMSUNG HAS DEVELOPED AND EMPLOYED IN ITS OWN

12    PRODUCTS AND IT, SIMPLY SPEAKING, ALLOWS FOR A MUCH

13    FASTER RESPONSE TIME.

14              SO IMAGES CAN APPEAR WITH LESS BLUR.  IT

15    ALLOWS FOR MORE CONTRAST IN BRIGHTNESS.

16              AND IT ALSO ALLOWS FOR BETTER THINNESS OF

17    THE DEVICE BECAUSE THE ORIGINAL SUPER AMOLED

18    TECHNOLOGY INCLUDED THE -- THIS WAS, I GUESS, A

19    BREAKTHROUGH OF SORTS.  IT TOOK THE TOUCH

20    SENSITIVITY OF A DISPLAY, WHICH IS NORMALLY

21    SEPARATE FROM THE ACTUAL DISPLAY IN PAST PHONES,

22    AND ACTUALLY COMBINED THE TWO.

23              SO IT ESSENTIALLY ELIMINATED A LAYER OF

24    DISPLAY SO IT ALLOWED PHONES TO BE THINNER BECAUSE

25    THE DISPLAYS WERE THINNER.
```

```
 1    Q    LET'S -- WE'VE HEARD SOME TESTIMONY FROM

 2    APPLE'S POINT OF VIEW ABOUT ADVERTISING AND

 3    MARKETING OF APPLE PRODUCTS.

 4           ARE YOU FAMILIAR WITH HOW STA ADVERTISES

 5    AND MARKETS FROM A STRATEGIC STANDPOINT, PROMOTES

 6    ITS PRODUCTS IN THE UNITED STATES?

 7    A    YES, GENERALLY SPEAKING, I AM.

 8    Q    AND WHAT IS SAMSUNG'S STRATEGY IN TERMS OF

 9    ADVERTISING ITS PRODUCTS?

10    A    WELL, REALLY ALL WE'RE TRYING TO POINT OUT TO

11    CONSUMERS IS I GUESS WHAT YOU WOULD CALL A BRAND

12    PROMISE OR A BRAND MESSAGE, AND IT'S TIED BACK TO

13    THAT STRATEGY I TALKED TO YOU ABOUT.

14           SO IT ONLY WORKS WHEN EVERYTHING IS

15    LINKED TOGETHER.  SO WE TRY AND SHOW CONSUMERS IN

16    OUR ADVERTISING THAT WE'VE BROUGHT THEM THE LATEST

17    AND GREATEST TECHNOLOGY, THAT WE'RE BRINGING IT TO

18    THEM FASTER THAN THE COMPETITION, THAT YOU CAN

19    COUNT ON SAMSUNG TO DO THAT CONTINUOUSLY.  YOU CAN

20    TRUST US.

21    Q    FOR DIFFERENT PRODUCTS, DOES SAMSUNG HAVE, YOU

22    KNOW, DIFFERENT LAUNCH MESSAGES THAT THEY ASSOCIATE

23    WITH THOSE PRODUCTS?

24    A    AT TIMES WE'LL TWEAK THE LAUNCH MESSAGE

25    DEPENDING ON THE PRODUCT, YES.
```

888

```
 1      Q    CAN YOU GIVE THE JURY AN EXAMPLE OF THAT?

 2      A    FOR INSTANCE, FOR THE GALAXY S 2 LAUNCH IN THE

 3   UNITED STATES, I THINK THE TAG LINE WAS SOMETHING

 4   LIKE "THE NEXT BIG THING."

 5      Q    I MEAN, DOES -- DOES SAMSUNG EVER SEEK TO SELL

 6   ITS PRODUCTS BY CAUSING CONSUMERS TO BE CONFUSED

 7   INTO THINKING THAT, YOU KNOW, YOU'RE -- YOU THINK

 8   YOU'RE BUYING AN APPLE PRODUCT BUT YOU'RE ACTUALLY

 9   GETTING A SAMSUNG PRODUCT?

10      A    NO.  WE WANT CONSUMERS TO HEAR OUR MESSAGE,

11   UNDERSTAND THAT OUR MESSAGE IS OURS, AND GO OUT AND

12   BUY OUR DEVICE.

13           MR. QUINN:  AND, YOUR HONOR, I'D REQUEST

14   PERMISSION -- THE COURT HAS RULED ON THIS ALREADY,

15   BUT IN LIGHT OF THE TESTIMONY ABOUT COPYING AND

16   MARKETING AND THE ADVERTISING, I'D REQUEST

17   PERMISSION TO PLAY A 30 SECOND SAMSUNG TELEVISION

18   ADVERTISEMENT CALLED URBAN CAMPING.  IT'S DX 629.

19   IT'S 30 SECONDS.

20           MR. LEE:  YOUR HONOR --

21           THE COURT:  THAT WAS FOR EVIDENCE ABOUT

22   WILLFULNESS, RIGHT, AND I JUST DIDN'T SEE THE

23   CONNECTION.

24           MR. QUINN:  THIS WOULD BE OFFERED TO SHOW

25   HOW WE TRY TO SET OURSELVES APART.  FAR FROM TRYING
```

```
 1    TO CREATE CONFUSION OR DECEPTION, WE TRY TO SET

 2    OURSELVES APART IN OUR ADVERTISING.

 3             MR. LEE:  YOUR HONOR HAS RULED THIS

 4    INADMISSIBLE.  IT IS INADMISSIBLE.

 5             ACTUALLY, ALL OF THEIR BRANDING IS OUR

 6    TRADE DRESS, OUR TRADE DILUTION THAT'S AT ISSUE,

 7    NOT THEIRS.

 8             MR. QUINN:  THEY'RE ALLEGING CONFUSION,

 9    YOUR HONOR, AND DECEPTION.

10             MR. LEE:  WELL, MR. QUINN KNOWS THAT THE

11    QUESTION OF CONFUSION ONLY GOES TO SOME CLAIMS, NOT

12    TO OTHERS.

13             MR. QUINN:  SO THEY'RE DISMISSING THOSE?

14             MR. LEE:  I'M SORRY.  GO AHEAD.  YOU GO

15    AHEAD.

16             MR. QUINN:  I'D REQUEST PERMISSION TO

17    PLAY THAT ADVERTISEMENT.

18             MR. LEE:  YOUR HONOR HAS RULED IT OUT AND

19    IT OUGHT TO STAY OUT.

20             THE COURT:  OKAY.  IT'S -- THE OBJECTION

21    IS STILL SUSTAINED.

22             GO AHEAD AND GO TO SOMETHING ELSE.

23             MR. QUINN:  ALL RIGHT.

24    Q    DO YOU HAVE ANY -- DO YOU HAVE ANY INFORMATION

25    ABOUT THE VALUE OF THE SAMSUNG BRAND?
```

```
 1   A    YES, I DO.

 2   Q    AND WHAT DO YOU KNOW IN THAT REGARD?

 3            MR. LEE:  YOUR HONOR, CAN WE HAVE A

 4   FOUNDATION?  AND THE SAMSUNG BRAND IS IRRELEVANT TO

 5   OUR TRADE DRESS AND TRADE DILUTION.  I DON'T KNOW

 6   WHAT HIS BASIS IS.

 7            THE COURT:  WELL, JUST LAY A FOUNDATION.

 8            I'M GOING TO OVERRULE THE OBJECTION.

 9            GO AHEAD, PLEASE.

10   BY MR. QUINN:

11   Q    SO WHAT YOU KNOW ABOUT THE VALUE OF THE

12   SAMSUNG BRAND, IS IT -- CAN YOU TELL US WHETHER OR

13   NOT THAT'S SOMETHING YOU LEARNED IN THE COURSE OF

14   YOUR WORK?

15   A    YES, IT'S SOMETHING I'VE COME ACROSS OVER THE

16   COURSE OF MY JOB.

17   Q    AND IN DOING YOUR JOB IN TERMS OF PLANNING AND

18   STRATEGY, IS THAT SOMETHING THAT YOU NEED TO BE

19   AWARE OF?

20   A    YES, IT IS.

21   Q    AND WHAT IS IT THAT YOU KNOW ABOUT THE VALUE

22   OF THE SAMSUNG BRAND?

23   A    ONE OF THE WAYS WE TRACK OUR BRAND IS USING A

24   SURVEY OR A REPORT FROM A COMPANY CALLED

25   INTERBRAND.  THEY DO A RANKING OF GLOBAL BRANDS.
```

```
 1              AND IN THE LAST REPORT, ANNUAL RELEASE,
 2    THIS ONE WAS 2011, WE WERE RANKED IN THE TOP 20 OF
 3    GLOBAL BRANDS IN TERMS OF BRAND VALUE OR BRAND
 4    EQUITY.
 5    Q    AS PART OF YOUR JOB, IS IT -- CAN YOU TELL US
 6    WHETHER OR NOT IT'S IMPORTANT FOR YOU TO UNDERSTAND
 7    HOW CONSUMERS GO ABOUT MAKING DECISIONS TO BUY
 8    PHONES AND OTHER DEVICES?
 9    A    YES.
10    Q    AND HOW IS IT -- HOW CAN CONSUMERS PURCHASE
11    SAMSUNG DEVICES IN THE UNITED STATES?
12    A    SO SAMSUNG CONSUMERS CAN PURCHASE IN ANY
13    NUMBER OF PHYSICAL POINTS OF SALE.  SO CARRIER
14    STORES, FOR INSTANCE, OR NATIONAL --
15    Q    WHAT DO YOU MEAN BY "CARRIER STORES"?
16    A    SO CARRIER STORES ARE STORES THAT ARE, I
17    GUESS, OWNED AND OPERATED BY THE U.S. WIRELESS
18    CARRIERS.  SO AN EXAMPLE WOULD BE A STORE OWNED BY
19    AT&T, IT SAYS AT&T ON THE OUTSIDE.
20              ANOTHER EXAMPLE WOULD BE A NATIONAL
21    RETAILER.  THAT'S NOT AN EXAMPLE OF A CARRIER
22    STORE.  THAT'S AN EXAMPLE OF ANOTHER TYPE OF RETAIL
23    ENVIRONMENT.
24    Q    AND OTHER THAN CARRIER STORES, ARE THERE OTHER
25    STORES WHERE CONSUMERS CAN BUY SAMSUNG PRODUCTS?
```

1    A    THERE ARE.

2    Q    AND WHAT ARE THOSE?

3    A    THERE'S MULTIPLE DIFFERENT TYPES.  SOMETHING

4    THAT WE CALL DEALERS, SO THESE ARE TYPICALLY

5    EXCLUSIVE DEALERS, PEOPLE THAT OWN STORES THAT

6    LICENSE A CARRIER BRAND AND OFFER THOSE CARRIER

7    BRANDED SERVICES AND PRODUCTS IN THEIR STORES.  SO

8    THEY STILL MAY APPEAR LIKE A CARRIER OWNED STORE,

9    BUT THEY'RE NOT.  THEY'RE INDEPENDENTLY OWNED AND

10    OPERATED.

11            ANOTHER EXAMPLE WOULD BE A NATIONAL

12    RETAILER, SUCH AS BEST BUY OR WAL-MART OR RADIO

13    SHACK.  WE CALL THOSE NATIONAL RETAILERS.

14            ANOTHER EXAMPLE WOULD BE ON-LINE, SO

15    ON-LINE RETAILERS, LIKE AMAZON.COM, WHO WOULD SELL

16    THESE AS WELL.

17    Q    DO THESE STORES SOMETIMES SELL SAMSUNG PHONES

18    THAT THEY DID NOT OBTAIN FROM SAMSUNG IN THE

19    UNITED STATES?

20    A    IT'S POSSIBLE THAT THEY COULD SELL DEVICES

21    THAT THEY DID NOT OBTAIN FROM STA.

22    Q    AND HOW MIGHT THEY ACQUIRE THEM?

23    A    THEY CAN -- THEY CAN ACTUALLY BUY DEVICES FROM

24    INTERNATIONAL DISTRIBUTORS.

25    Q    BUT NOT FROM SAMSUNG?

```
1    A    THE DEVICES THAT THEY WOULD BUY FROM, FROM I
2    GUESS WHAT I'M CALLING INTERNATIONAL DISTRIBUTORS
3    WOULD NOT HAVE BEEN -- WOULD NOT HAVE BEEN PROVIDED
4    BY STA.
5    Q    AND BY THE WAY, DO YOU KNOW WHETHER -- WHERE
6    TITLE TO THE PRODUCTS, THE DEVICE -- WE HAD
7    TESTIMONY ABOUT HOW, YOU KNOW, STA, SAMSUNG AMERICA
8    INVOICES, YOU KNOW, BIG SAMSUNG BACK IN SEOUL.
9            DO YOU HAPPEN TO KNOW WHERE TITLE TO
10   THOSE DEVICES PASSES?
11   A    MY UNDERSTANDING IS TITLE -- STA TAKES TITLE
12   OR OWNERSHIP WHEN THE DEVICE ACTUALLY LEAVES THE
13   PORT HEADED TOWARDS THE UNITED STATES.
14   Q    SO OUTSIDE OF THE UNITED STATES?
15   A    CORRECT.
16   Q    NOW, ARE CONSUMERS -- IF WE COULD TAKE A LOOK,
17   WE HAVE A DEMONSTRATIVE EXHIBIT, SDX 3586.  SDX
18   3586.  AND WHEN --
19           MR. LEE:  BEFORE WE PUT IT UP --
20           THE COURT:  DO I HAVE THAT?  I ONLY HAVE
21   ALL THE OBJECTIONS.
22           (PAUSE IN PROCEEDINGS.)
23           THE COURT:  OKAY.  WHAT'S THE NUMBER,
24   PLEASE?
25           MR. QUINN:  IT'S 3586.
```

```
 1              THE COURT:  OKAY.
 2              MR. LEE:  AND, YOUR HONOR, WE OBJECT.  IF
 3     YOU LOOK AT THE BOTTOM OF THE DOCUMENT, THIS IS AN
 4     APPLE -- THIS IS AN EXCERPT FROM AN APPLE
 5     PRESENTATION DOCUMENT.  HAVING HIM COMMENTING UPON
 6     ON APPLE DOCUMENT, DEMONSTRATIVE --
 7              MR. QUINN:  YOUR HONOR, I WOULD LAY A
 8     FOUNDATION THAT HE'S FAMILIAR WITH THESE PHONES.
 9              MR. LEE:  BUT THIS IS AN APPLE DOCUMENT
10     THAT I THINK HE'S NOT SEEN BEFORE.
11              MR. QUINN:  IT SAYS THAT THE IMAGES ARE
12     FROM AN APPLE DOCUMENT.
13              THE COURT:  YOU CAN LAY A FOUNDATION.
14              GO AHEAD, PLEASE.
15     BY MR. QUINN:
16     Q    DO YOU HAVE BEFORE YOU SOME IMAGES OF PHONES?
17     A    I DO.
18     Q    ALL RIGHT.  AND ARE YOU FAMILIAR WITH THOSE
19     PHONES THAT ARE DISPLAYED THERE?
20     A    LET ME LOOK AT THEM ONE-BY-ONE BRIEFLY.
21              (PAUSE IN PROCEEDINGS.)
22              THE WITNESS:  I'M FAMILIAR WITH THESE
23     PHONES.
24              MR. QUINN:  SO WE WOULD OFFER THIS, YOUR
25     HONOR, JUST AS A DEMONSTRATIVE.
```

```
1              THE COURT:  ANY OBJECTION, MR. LEE?

2              MR. LEE:  JUST THE SAME OBJECTION.  YOUR

3      HONOR, ACTUALLY, IF THEY WANT TO OFFER A SUBSTITUTE

4      WITHOUT THE LEGEND AT THE BOTTOM, THAT WOULD BE

5      FINE AND I THINK MORE APPROPRIATE.

6              MR. QUINN:  WE CAN REPLACE IT, YOUR

7      HONOR.

8              THE COURT:  THAT'S FINE.

9              GO AHEAD, PLEASE.

10             MR. QUINN:  ALL RIGHT.  IF WE CAN PUT

11     THAT UP ON THE SCREEN.

12     Q    WHEN CONSUMERS ARE -- CAN YOU TELL US WHETHER

13     OR NOT IT'S FAIR TO SAY THAT WHEN CONSUMERS ARE

14     DECIDING WHAT PHONE DEVICE TO BUY, THEY'VE GOT A

15     LOT OF DIFFERENT CHOICES?

16     A    YES, THAT'S RIGHT.

17     Q    AND WOULD IT BE FAIR TO SAY THAT A LOT OF THEM

18     LOOK KIND OF ALIKE?

19     A    I WOULD SAY THAT GENERALLY SPEAKING, YEAH,

20     THEY CAN LOOK ALIKE.

21     Q    AND WHEN THEY GO TO THE STORE -- THANKS VERY

22     MUCH -- WHEN THEY GO TO ONE OF THESE STORES WHERE

23     SAMSUNG PRODUCTS CAN BE FOUND -- YOU KNOW, BY THE

24     WAY, DO YOU VISIT STORES YOURSELF?

25     A    I DO.
```

```
 1    Q    AS PART OF YOUR JOB?

 2    A    ACTUALLY, WE'RE ALL EXPECTED TO GO VISIT

 3    STORES SO WE CAN UNDERSTAND THE CONSUMER BUYING

 4    ENVIRONMENT.

 5    Q    AND HOW OFTEN DO YOU GO TO STORES TO TRY TO

 6    UNDERSTAND, TRY TO UNDERSTAND THE CONSUMER BUYING

 7    ENVIRONMENT?

 8    A    I'LL GO IN SEVERAL TIMES A MONTH.

 9    Q    SEVERAL TIMES A MONTH?

10    A    YES.

11    Q    AND CAN YOU TELL US WHETHER OR NOT IT'S

12    TYPICAL THAT -- I MEAN, DO YOU SEE APPLE PHONES

13    THAT ARE FOR SALE IN STORES WHEN YOU GO VISIT?

14    A    SURE.

15    Q    CAN YOU TELL US WHETHER OR NOT IT'S TYPICAL

16    THAT, YOU KNOW, APPLE PHONES AND DEVICES ARE MIXED

17    IN WITH OTHER COMPANIES' DEVICES OR WHETHER THEY'RE

18    SEGREGATED IN A SEPARATE AREA?

19    A    IN MY GENERAL EXPERIENCE, IT'S ALMOST ALWAYS

20    THIS CASE, APPLE DEVICES ARE BY THEMSELVES ON A

21    SEPARATE DISPLAY.

22    Q    ALL RIGHT.  IF WE COULD TAKE A LOOK AT EXHIBIT

23    60 IN EVIDENCE, PAGE 60.11.

24         AND UP ON THE RIGHT-HAND -- CAN YOU --

25    WE'VE GOT PICTURES ON THE LEFT-HAND SIDE.  DO YOU
```

```
 1    KNOW WHAT THAT IS ON THE LEFT-HAND SIDE?

 2    A    THAT IS AN APPLE RETAIL STORE.

 3    Q    AND THEN IN THE MIDDLE, WHAT IS THAT PICTURE?

 4    A    AS IT'S LABELED AND AS I'LL DESCRIBE, IT'S

 5    WHAT WE CALL A STORE IN A STORE.  SO IT'S

 6    ACTUALLY -- IT'S ACTUALLY A SMALL PIECE OF REAL

 7    ESTATE, IF YOU WILL, INSIDE A STORE THAT IS

 8    DISTINCTLY APPLE.

 9    Q    OKAY.  AND WHEN YOU TOLD US EARLIER THAT APPLE

10    PRODUCTS ARE ALWAYS SEGREGATED IN STORES, IS THIS

11    AN EXAMPLE OF THAT?

12    A    THAT IS ONE EXAMPLE OF IT, YES.

13    Q    IF YOU GO TO A, AN AT&T STORE, IS A CONSUMER

14    LIKELY TO ENCOUNTER A GALAXY S 2 PHONE SIDE-BY-SIDE

15    WITH AN IPHONE?

16    A    YOU CERTAINLY WILL NOT ENCOUNTER ANY GALAXY

17    PHONES ON THE APPLE DISPLAY.

18    Q    IN TERMS OF -- ARE THERE SOME CARRIERS,

19    EACH -- FOR EXAMPLE, WOULD IT BE TRUE TO SAY AT A

20    T-MOBILE STORE, YOU'RE NOT GOING TO FIND ANY AT&T

21    PHONES?

22    A    THAT'S RIGHT.

23    Q    DOES T-MOBILE SELL THE IPHONE?

24    A    T-MOBILE DOES NOT SELL THE IPHONE.

25    Q    EVER?
```

898

```
1     A     THEY HAVE NOT EVER SOLD THE IPHONE.

2     Q     SO WOULD A CONSUMER EVER ENCOUNTER A SAMSUNG

3     PHONE FOR SALE IN THE SAME STORE AS AN IPHONE IN A

4     T-MOBILE STORE?

5     A     THEY WOULD NOT.

6     Q     DOES SPRINT CARRY THE IPHONE?

7     A     THEY DO.

8     Q     AND FOR HOW LONG HAS SPRINT CARRIED THE

9     IPHONE?

10    A     SINCE I THINK IT WAS OCTOBER OF LAST YEAR.

11    Q     AND HOW ABOUT VERIZON?

12    A     VERIZON HAS CARRIED IT SINCE, I BELIEVE,

13    FEBRUARY OF LAST YEAR.

14    Q     SO BEFORE THOSE DATES WHEN THOSE CARRIERS

15    STARTED CARRYING THE IPHONE, CONSUMERS WHO WANTED

16    TO USE THOSE CARRIERS, WOULD THEY HAVE BEEN ABLE TO

17    BUY AN IPHONE THERE?

18    A     YES.

19    Q     BEFORE THOSE DATES?

20    A     OH, NO, I'M SORRY.  NOT BEFORE THOSE DATES,

21    NO.

22    Q     I MEAN, DO YOU HAVE ANY INFORMATION ABOUT HOW,

23    YOU KNOW, WHAT CONSUMERS DO OR -- LET ME ASK IT

24    THIS WAY.

25            AS THE CHIEF STRATEGY OFFICER, IS IT
```

```
 1    IMPORTANT FOR YOU TO UNDERSTAND HOW A CONSUMER GOES

 2    ABOUT MAKING A DECISION TO BUY A SMARTPHONE?

 3    A    SURE, YES.

 4    Q    AND IS THAT SOMETHING THAT YOU'VE STUDIED AND

 5    COLLECTED INFORMATION ON?

 6    A    YES.

 7    Q    IS THE DECISION -- BASED ON WHAT YOU'VE

 8    LEARNED, IS THE DECISION TO MAKE AN INVESTMENT IN

 9    BUYING A PHONE, IS THAT TYPICALLY SOMETHING THAT'S

10    DONE, YOU KNOW, ON THE SPUR OF THE MOMENT?  OR

11    WITHOUT A LOT OF STUDY AND ASSESSMENT?

12    A    NO.  IN FACT, WE FIND CONSUMERS DO A

13    CONSIDERABLE AMOUNT OF STUDYING.  THEY TAKE A

14    CONSIDERABLE AMOUNT OF TIME, ACTUALLY, TO MAKE

15    THEIR PHONE CHOICE.

16    Q    DO YOU HAVE ANY INFORMATION ABOUT HOW MUCH

17    TIME, IN AVERAGE, A CONSUMER SPENDS IN DECIDING

18    WHAT TYPE OF PHONE TO PURCHASE?

19    A    WE FIND THE AVERAGE CONSUMER TAKES

20    APPROXIMATELY SIX WEEKS, ABOUT ONE AND A HALF

21    MONTHS, TO MAKE THEIR PHONE PURCHASE DECISION.

22    Q    SO, I MEAN, BASED ON EVERYTHING THAT YOU KNOW

23    ABOUT HOW PHONES ARE SOLD, HOW IPHONES ARE SOLD,

24    THE DIFFERENT CHANNELS AND HOW CONSUMERS GO ABOUT

25    MAKING THESE DECISIONS, DO YOU HAVE ANY -- DO YOU
```

```
1    BELIEVE THAT ANY REASONABLE CONSUMER WOULD BUY A

2    SAMSUNG PHONE THINKING IT WAS AN IPHONE?

3              MR. LEE:  YOUR HONOR, THIS IS NOW OPINION

4    AND THIS IS THEIR EFFORT TO SUBSTITUTE HIM FOR

5    THEIR STRICKEN EXPERT.

6              THE COURT:  IT'S SUSTAINED.

7    BY MR. QUINN:

8    Q    WELL, I MEAN, HAVE YOU PERSONALLY HEARD OF

9    INSTANCES WHERE CONSUMERS BOUGHT A, A SAMSUNG PHONE

10   THINKING IT WAS AN IPHONE, AN APPLE PRODUCT?

11   A    I'M NOT AWARE OF ANY EXAMPLES OF THAT.

12   Q    YOU WERE ASKED SOME QUESTIONS ABOUT THE THREE

13   SAMSUNG ENTITIES, STA, SEA, AND SEC.

14             DO THOSE THREE COMPANIES EACH HAVE -- CAN

15   YOU TELL US WHETHER OR NOT THEY EACH HAVE DIFFERENT

16   MANAGEMENT?

17   A    THEY DO.

18   Q    DO THEY HAVE DIFFERENT EMPLOYEES?

19   A    YES, THEY DO.

20   Q    DO THEY HAVE DIFFERENT LOCATIONS?

21   A    YES, THEY DO.

22   Q    AND DOES STA, IN ITS BUSINESS HERE IN AMERICA,

23   MAKE ITS OWN BUSINESS DECISIONS?

24   A    WE DO.

25   Q    YOU WERE SHOWN EXHIBIT 62, AND IF WE COULD GO
```

```
 1    TO PAGE 62.13.

 2              MR. LEE SHOWED YOU THIS.  AND THE

 3    RECOMMENDATION AT THE TOP, "RECOMMENDATION, SAMSUNG

 4    4G PRODUCTS TO UNDERCUT IPHONE 5, GAP POTENTIALLY

 5    REMAINS AT $49."

 6              DO YOU SEE THAT?

 7    A    I DO.

 8    Q    AND I THOUGHT I HEARD YOU SAY, WHEN MR. LEE

 9    WAS ASKING YOU ABOUT THIS, THAT THIS NEVER

10    HAPPENED.

11              IS THAT WHAT YOU SAID?  I WAS JUST GOING

12    TO GIVE YOU A CHANCE TO EXPLAIN WHAT YOU MEANT IF I

13    HEARD YOU RIGHT.

14    A    YEAH.  THERE ARE SEVERAL THINGS WRONG WITH

15    THIS, IF I MAY.

16              FIRST, THE ACTUAL DOCUMENT, IF I REMEMBER

17    CORRECTLY, WAS CREATED IN MARCH.

18              AND IT'S -- IT'S ATTEMPTING TO PROJECT

19    FORWARD THINGS THAT MAY OR MAY NOT HAPPEN.  SO, FOR

20    INSTANCE, THERE WAS NO IPHONE 5 THAT CAME OUT IN

21    2011.

22              IN TERMS OF THE PRICING, IT'S ACTUALLY --

23    IF YOU LOOK AT THIS CHART, IT'S -- WHAT IT'S TRYING

24    TO SAY IS THAT THERE'S ACTUALLY GOING TO BE A GAP

25    BETWEEN OUR FLAGSHIP SMARTPHONE, WHICH WAS SHOWN AS
```

1    CELOX, C-E-L-O-X, AT THE TOP, AND WHAT WE'RE

2    DEPICTING IS THE, I GUESS, FIGURATIVE IPHONE 5 AT

3    199.

4            OKAY.  SO AT THE 199 PRICE BAND, THAT'S

5    SHOWING THE IPHONE 5, AND THAT'S THE DEVICE THAT WE

6    THOUGHT CONSUMERS WOULD COMPARE OUR CELOX TO.

7            ACTUALLY WHAT WE'RE POINTING OUT IS THAT

8    WE'RE GOING TO BE PRICED, WE THOUGHT AT THE TIME AT

9    LEAST, $49 ABOVE THE IPHONE 5.

10           THE AUTHOR FURTHER GOES TO COMPARE TO

11   ANOTHER VERSION, A MORE EXPENSIVE VERSION OF THE

12   IPHONE 5 AT 32 GIGABYTES AT 299 RETAIL PRICE POINT

13   ABOVE, AND SO THAT'S AN ERRONEOUS COMPARISON.

14   Q    I MEAN, THESE PHONES, EXCEPT FOR THE REFERENCE

15   TO THE IPHONE 5 AND THE IPHONE 4 AND THE IPHONE

16   NANA AND THE SGS, THESE OTHER PHONES, CAN YOU TELL

17   US WHETHER OR NOT THOSE ARE ALL SAMSUNG PHONES?

18   A    THE ONES THAT ARE LABELED SAMSUNG ARE

19   DEFINITELY SAMSUNG.

20           I CAN'T ACTUALLY BE SURE WHETHER ALL OF

21   THEM ACTUALLY EVER CAME TO MARKET.  FOR INSTANCE,

22   HANOVERQ, I DON'T REMEMBER THAT IN PARTICULAR.

23   Q    WOULD THIS BE WHAT WAS REFERRED TO AS SAMSUNG

24   STRATEGY, DIFFERENT POINTS, DIFFERENT PRICE POINTS,

25   THE DEMOCRATIZATION OF THE CELL PHONE?

903

1      A    YES, IT IS AN EXAMPLE OF A PORTFOLIO THAT

2    SPANS WHAT WE HOPE IS MULTI-RETAIL PRICE POINTS AND

3    YOU'RE SIMPLY SEEING A NORMAL, I GUESS, PRODUCT

4    LIFECYCLE MANAGEMENT WHERE, WHEN YOU LAUNCH A NEW

5    PHONE, LIKE THE CELOX, YOU HAVE TO DO OTHER THINGS

6    TO OTHER DEVICES SO THAT THEY'RE NOT PRICED ON TOP

7    OF EACH OTHER IN THE MARKET.

8            MR. QUINN:  YOUR HONOR, I WAS GOING TO GO

9    INTO A NEW AREA, BUT IT LOOKS LIKE WE'RE CLOSE TO

10   THE TIME --

11           THE COURT:  OH, I'M SORRY.  IT IS 4:32.

12   WHY DON'T WE END FOR THE DAY?

13           MR. DENISON WILL RESUME ON MONDAY.

14           SO I'M SORRY TO SOUND LIKE A BROKEN

15   RECORD, BUT LET ME JUST REITERATE, SINCE WE'RE

16   ABOUT TO HAVE A LONG WEEKEND, THAT BECAUSE YOU HAVE

17   TO BASE YOUR DECISION SOLELY ON THE EVIDENCE THAT'S

18   ADMITTED DURING THIS TRIAL AND APPLY THE LAW AS I

19   INSTRUCT YOU, YOU MUST NOT BE EXPOSED TO ANY OTHER

20   INFORMATION.

21           SO PLEASE, OVER THE WEEKEND, DON'T SPEAK

22   WITH ANYONE ABOUT THIS CASE, DON'T DO ANY OF YOUR

23   OWN RESEARCH, DON'T READ, WATCH, OR LISTEN TO ANY

24   NEWS OR MEDIA ACCOUNTS.

25           AND HAVE A GOOD EVENING.  ALL RIGHT.

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21              /S/

                 _____
22              LEE-ANNE SHORTRIDGE, CSR, CRR
                CERTIFICATE NUMBER 9595
23

24              DATED:  AUGUST 3, 2012

25

# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6  CORPORATION,                  )
                                 )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,        )
                                 )  AUGUST 6, 2012
8         VS.                    )
                                 )  VOLUME 4
9  SAMSUNG ELECTRONICS CO.,      )
   LTD., A KOREAN BUSINESS       )  PAGES 931-1296
10 ENTITY; SAMSUNG               )
   ELECTRONICS AMERICA,          )
11 INC., A NEW YORK              )
   CORPORATION; SAMSUNG          )
12 TELECOMMUNICATIONS            )
   AMERICA, LLC, A DELAWARE      )
13 LIMITED LIABILITY             )
   COMPANY,                      )
14                               )
              DEFENDANTS.        )
15 _____

16          TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
24                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074
25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
3                                MICHAEL A. JACOBS
                                 RACHEL KREVANS
4                           425 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                 HALE AND DORR
7                           BY:  WILLIAM F. LEE
                            60 STATE STREET
8                           BOSTON, MASSACHUSETTS  02109

9                           BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
10                          PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:     QUINN, EMANUEL, URQUHART,
                            OLIVER & HEDGES
12                          BY:  CHARLES K. VERHOEVEN
                                 ALBERT P. BEDECARRE
13                          50 CALIFORNIA STREET, 22ND FLOOR
                            SAN FRANCISCO, CALIFORNIA  94111
14
                            BY:  VICTORIA F. MAROULIS
15                               KEVIN P.B. JOHNSON
                            555 TWIN DOLPHIN DRIVE
16                          SUITE 560
                            REDWOOD SHORES, CALIFORNIA  94065
17
                            BY:  MICHAEL T. ZELLER
18                               WILLIAM C. PRICE
                                 JOHN B. QUINN
19                          865 SOUTH FIGUEROA STREET
                            10TH FLOOR
20                          LOS ANGELES, CALIFORNIA  90017

21   FOR INTERVENOR         RAM, OLSON,
     REUTERS:               CEREGHINO & KOPCZYNSKI
22                          BY:  KARL OLSON
                            555 MONTGOMERY STREET, SUITE 820
23                          SAN FRANCISCO, CALIFORNIA  94111

24

25
```

1

2

3                              <u>INDEX OF WITNESSES</u>

4        <u>PLAINTIFF'S</u>

5

6        **JUSTIN DENISON**
              AS-ON DIRECT EXAM BY MR. QUINN      P. 946
              AS-ON RECROSS-EXAM BY MR. LEE       P. 977
7             AS-ON REDIRECT EXAM BY MR. QUINN    P. 997

8

9        **PETER BRESSLER**
              DIRECT EXAM BY MS. KREVANS          P. 1002
              CROSS-EXAM BY MR. VERHOEVEN         P. 1098
10            REDIRECT EXAM BY MS. KREVANS        P. 1236

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1076

```
 1     AND I'M GIVING HIM AN OPPORTUNITY TO EXPLAIN HOW.

 2               THE COURT:  WELL, YOU'RE ASKING HIM ABOUT

 3     THE CONTENT OF THIS AND WHETHER IT'S FOR THE TRUTH.

 4     SO IT'S SUSTAINED.

 5               GO ON TO ANOTHER LINE OF QUESTIONING,

 6     PLEASE.

 7     BY MS. KREVANS:

 8     Q    MR. BRESSLER, DID THE CONTENTS OF THIS ARTICLE

 9     IN ANY WAY CONFIRM TO YOU YOUR VIEWS ABOUT WHAT AN

10     ORDINARY OBSERVER WOULD BELIEVE WHEN THEY LOOKED AT

11     THE VISUAL IMPRESSION OF THE IPHONE?

12               MR. VERHOEVEN:  SAME OBJECTION, YOUR

13     HONOR.

14               THE COURT:  SUSTAINED.

15     BY MS. KREVANS:

16     Q    COULD YOU LOOK AT PX 4 IN YOUR BINDER,

17     MR. BRESSLER?  WHAT IS EXHIBIT PX 4, MR. BRESSLER?

18     YOU HAVE TO FIRST IDENTIFY IT.

19     A    OH, I'M SORRY.  IT IS A PHOTOGRAPHIC

20     PRESENTATION COMPARING THE SAMSUNG Q1 PRODUCT PRIOR

21     TO THE INTRODUCTION OF THE IPADS, IPADS, AND THEN

22     THE DESIGN OF THE SAMSUNG PRODUCTS AFTER THE IPAD

23     INTRODUCTION.

24     Q    AND WHAT DOES THE SECOND PAGE GENERALLY SHOW?

25     A    THE SECOND PAGE SHOWS A -- AN ASSORTMENT OF
```

1    DESIGNS FOR TABLET COMPUTERS THAT WERE AVAILABLE

2    FROM OTHER COMPANIES PRIOR TO THE INTRODUCTION OF

3    THE IPAD.

4              THE CENTER COLUMN SHOWS THE IPAD AND

5    SAMSUNG PRODUCTS.

6              AND THE THIRD COLUMN SHOWS A SAMPLING OF

7    OTHER DESIGNS THAT WOULD BE PERFECTLY ADEQUATE FOR

8    USE IN TABLET COMPUTERS.

9              MS. KREVANS:  YOUR HONOR, WE WOULD MOVE

10   THE ADMISSION OF PX 4.

11             MR. VERHOEVEN:  YOUR HONOR, WE OBJECT TO

12   THIS.  AND WE PREVIOUSLY OBJECTED AND YOU SUSTAINED

13   OUR OBJECTION AS TO THIS.

14             MS. KREVANS:  YOUR HONOR, THE OBJECTION

15   WAS SUSTAINED WITH THE PROVISO THAT APPLE COULD

16   RESUBMIT TAKING OUT --

17             THE COURT:  I UNDERSTAND.  THAT'S

18   OVERRULE.

19             GO AHEAD.

20             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 4,

21             HAVING BEEN PREVIOUSLY MARKED FOR

22             IDENTIFICATION, WAS ADMITTED INTO

23             EVIDENCE.)

24             MR. VERHOEVEN:  YOUR HONOR, JUST FOR THE

25   RECORD, THEY DIDN'T -- OVEN THE SECOND PAGE OF THIS

```
 1    EXHIBIT, THE LEFT-HAND TWO COLUMNS, THEY DID NOT

 2    REMOVE THOSE.

 3            MS. KREVANS:  YOUR HONOR, WE REMOVED

 4    EVERYTHING THAT WAS NOT IN MR. BRESSLER'S REPORT,

 5    WHICH WAS THE OBJECTION.

 6            AND ON THE LEFT-HAPPENED SIDE, WE

 7    CORRECTED A DATE THAT WAS WRONG COMPARED TO HIS

 8    REPORT.

 9            THE COURT:  ALL RIGHT.  OVERRULED.  GO

10    AHEAD.

11            MS. KREVANS:  SO IS THE DOCUMENT

12    ADMITTED, YOUR HONOR?

13            THE COURT:  YES.

14            MS. KREVANS:  THANK YOU.

15    Q    OKAY.  COULD YOU TELL THE JURY WHAT WE'RE

16    SEEING ON THE FIRST PAGE OF PX 4?

17    A    OH, I'M SORRY.  I THOUGHT I DID ALREADY.  YOU

18    WANT ME TO DO IT AGAIN?

19    Q    YES, THANK YOU.

20    A    I APOLOGIZE.

21            BRIEFLY, THE LEFT-HAND COLUMN IS A

22    PICTURE OF THE SAMSUNG Q1 THAT WAS IN THE MARKET

23    BEFORE THE APPLE PRODUCTS.  THE CENTER COLUMN IS

24    THE APPLE TABLET PRODUCTS; AND THE RIGHT-HAND

25    COLUMN IS THE SAMSUNG TABLET PRODUCTS.
```

```
1    Q    AND COULD WE SEE THE SECOND PAGE, MR. LEE?

2              WHAT HAVE YOU DEPICTED ON THE SECOND PAGE

3    OF EXHIBIT PX 4?

4    A    AGAIN, THE LEFT-HAND COLUMN IS ALTERNATIVE

5    DESIGNS THAT WERE ON THE MARKET BEFORE THE

6    INTRODUCTION OF THE IPAD; AND THE CENTER COLUMN

7    IS -- SHOWS THE IPAD PRODUCTS AND THE SAMSUNG

8    PRODUCTS; AND THEN THE RIGHT-HAND COLUMN SHOWS

9    ALTERNATIVE DESIGNS THAT ARE CONTEMPORARY TO THESE

10   PRODUCT, TO THE CENTER PRODUCTS.

11   Q    WHEN YOU SAY, "ALTERNATIVE DESIGNS," WHAT DO

12   YOU MEAN?

13   A    I MEAN THAT THEY ARE APPEARANCES FOR TABLET

14   COMPUTERS THAT COULD BE USED FOR A TABLET COMPUTER

15   THAT WOULD PROVIDE THE SAME FUNCTIONS.

16   Q    SAME FUNCTIONS AS WHAT?

17   A    SAME FUNCTIONS AS THE IPAD SAME FUNCTION AS

18   THE SAMSUNG TABLET.

19   Q    IN THE MIDDLE OF THE SECOND PAGE, WHAT'S THAT

20   THING AT THE TOP THAT SAYS MAY 2006, SAMSUNG Q1?

21   A    THAT IS THE SAME PRODUCT FROM THE PAGE BEFORE,

22   WHICH IS THEIR OFFERING IN 2006.

23   Q    "THEIR" BEING SAMSUNG'S?

24   A    YES.

25   Q    OKAY.  COULD YOU LOOK IN YOUR BINDER AT
```

1080

```
 1    EXHIBIT PX 173.
 2              THE COURT:  THIS SHOULD BE THE LAST
 3    QUESTION BEFORE THE LUNCH BREAK.
 4              MS. KREVANS:  CERTAINLY, YOUR HONOR.
 5    Q    IS PX 173 A DOCUMENT YOU CONSIDERED IN THE
 6    COURSE OF FORMING YOUR OPINIONS IN THE CASE?
 7    A    YES.
 8              MS. KREVANS:  YOUR HONOR, WE'D MOVE PX
 9    173.
10              MR. VERHOEVEN:  YOUR HONOR, THIS IS ALSO
11    AN EXHIBIT THAT WAS SUBJECT TO A LIMITING
12    INSTRUCTION.  NO FURTHER OBJECTION, BUT I'M JUST
13    REMINDING THE COURT THIS IS SUBJECT TO A LIMITING
14    INSTRUCTION.
15              THE COURT:  THAT'S RIGHT.  THIS IS NOT
16    OFFERED FOR THE TRUTH OF WHAT'S IN THE ACTUAL
17    ARTICLE, BUT YOU CAN CONSIDER IT FOR OTHER
18    PURPOSES.  IT'S ADMITTED.
19              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
20              173 HAVING BEEN PREVIOUSLY MARKED FOR
21              IDENTIFICATION, WAS ADMITTED INTO
22              EVIDENCE.)
23    BY MS. KREVANS:
24    Q    OKAY.  CAN WE LOOK AT EXHIBIT PX 173.  GREAT.
25              WHAT IS EXHIBIT PX 173, MR. BRESSLER?
```

```
 1    A    THIS IS AN ARTICLE FROM P.C. WORLD ENTITLED

 2    "SAMSUNG GALAXY TAB 10.1 WI-FI" AND IT -- COLON, "A

 3    WORTHY RIVAL TO THE IPAD 2."

 4    Q    OKAY.  CAN WE SEE --

 5               MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO

 6    FURTHER QUESTIONING ON THIS WITH THIS PARTICULAR

 7    WITNESS BECAUSE THE ONLY PURPOSE I CAN ENVISION

 8    THAT THESE QUESTIONS WOULD GO TO WOULD BE IN

 9    VIOLATION OF A LIMITING INSTRUCTION.

10               THE COURT:  DO YOU HAVE MORE QUESTIONS

11    ABOUT THIS EXHIBIT?

12               MS. KREVANS:  I HAVE ONE MORE QUESTION,

13    YOUR HONOR.

14               THE COURT:  WHAT IS IT?

15               MS. KREVANS:  I WANT TO ASK THE WITNESS

16    TO POINT OUT A PORTION OF THE TEXT IN THE ARTICLE

17    TO THE JURY.

18               THE COURT:  GO AHEAD, BUT IT'S SUBJECT TO

19    THE SAME INSTRUCTION THAT YOU'RE NOT TO CONSIDER

20    THIS FOR THE TRUTH OF WHAT'S IN THE ARTICLE ITSELF.

21    BY MS. KREVANS:

22    Q    OKAY.  IF WE COULD LOOK AT THE SECOND PAGE,

23    COULD YOU READ FOR THE JURY WHAT IS SET OUT IN THE

24    SECOND PARAGRAPH OF THIS ARTICLE ON THIS SECOND

25    PAGE.
```

1          MR. VERHOEVEN:  SAME OBJECTION, YOUR

2     HONOR.

3          THE COURT:  GO AHEAD.

4          THE WITNESS:  "IN MY HANDS-ON TESTING,

5     THE TAB 10.1 ACHIEVED PERHAPS ITSELF BEST DESIGN

6     COMPLIMENT AN ANDROID TABLET COULD HOPE FOR --

7     OFTEN BEING MISTAKEN BY PASSERS-BY (INCLUDING APPLE

8     IPAD USERS) FOR AN IPAD 2.  THE CONFUSION IS

9     UNDERSTANDABLE WHEN YOU SEE AND HOLD THE TAB 10.1

10    FOR THE FIRST TIME."

11         MS. KREVANS:  THANK YOU, MR. BRESSLER.

12         IS THIS THE TIME THAT YOUR HONOR WOULD

13    LIKE TO TAKE A BREAK?

14         THE COURT:  THAT'S FINE.  IT'S 12:05, AND

15    SO WE'LL TAKE AN HOUR LUNCH BREAK.  I'LL SEE YOU AT

16    1:00 O'CLOCK.  AGAIN, PLEASE KEEP AN OPEN MIND AND

17    DON'T TALK TO ANYONE ABOUT THE CASE AND PLEASE

18    DON'T RESEARCH ANYTHING ABOUT THE CASE.  OKAY.

19    THANK YOU.

20         AND IF YOU COULD LEAVE YOUR JURY

21    NOTEBOOKS IN THE JURY ROOM WHEN YOU GO OUT TO

22    LUNCH.  THANK YOU.

23         (WHEREUPON, THE FOLLOWING PROCEEDINGS

24    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

25         THE COURT:  YOU CAN STEP DOWN.

```
 1    EXPERT REPORT FOR THIS WITNESS, THERE'S A CITATION

 2    TO THIS DOCUMENT.  THERE'S ABSOLUTELY NO DISCUSSION

 3    OF IT OR DISCLOSURE OF WHAT TESTIMONY HE WOULD LIKE

 4    TO SEEK.

 5    BY MS. KREVANS:

 6    Q    EXPLAIN TO THE JURY WHAT THE GIST OF THE

 7    CONTENTS OF PX 59 ARE, MR. BRESSLER.

 8              THE COURT:  WAIT ONE SECOND.  ONE SECOND.

 9              WHAT'S YOUR RESPONSE TO MR. VERHOEVEN'S

10    OBJECTION?

11              MS. KREVANS:  YOUR HONOR, IN PARAGRAPH

12    105 OF THE REPORT, AND I HAVE A COPY HERE IF YOUR

13    HONOR DOES NOT HAVE IT HANDY.

14              THE COURT:  I HAVE IT HERE.

15              MS. KREVANS:  PARAGRAPH 105 OF THE

16    REPORT, WHICH IS ON PAGE 35, AT THE BOTTOM OF THE

17    PAGE, IT HAS THE SUBSTANCE OF THE TESTIMONY THAT I

18    INTEND TO ELICIT FROM THE WITNESS ABOUT THIS

19    DOCUMENT, AND THE BATES NUMBER CITATION THERE IS

20    THE CITATION TO THIS DOCUMENT.

21              THE COURT:  OVERRULED.

22              GO AHEAD, PLEASE.

23    BY MS. KREVANS:

24    Q    MR. BRESSLER, WHAT'S THE GIST OF THE CONTENTS

25    OF -- ACTUALLY, LET ME BACK UP.
```

```
1              IS PX 59 A DOCUMENT CREATED BY SAMSUNG?

2    A    YES.

3    Q    AND ORIGINALLY IT WAS IN KOREAN, BUT YOU'RE

4    LOOKING AT THE TRANSLATION?

5    A    THAT'S CORRECT.

6    Q    OKAY.  WHAT'S THE GIST OF THE CONTENTS OF PX

7    59?

8    A    THE GIST OF THE CONTENTS IS THIS IS A REPORT

9    THAT A SAMSUNG TEAM CREATED DOING RESEARCH AT BEST

10   BUY STORES TO DETERMINE WHY A LARGER NUMBER THAN

11   USUAL OF GALAXY TAB 10.1'S WERE BEING RETURNED IN

12   CERTAIN REGIONS.

13   Q    OKAY.  WOULD YOU LOOK AT THE TITLE ON THE

14   FRONT PAGE OF THE DOCUMENT.  IT SAYS, "NORTH

15   AMERICAN P4 (P7510 WIFI) BBY RETAIL STORE VISIT TF

16   REPORT."

17             CAN YOU EXPLAIN TO THE JURY WHAT THAT

18   REFERS TO?

19   A    I'LL DO THE BEST I CAN.

20             CERTAINLY IT'S IN NORTH AMERICA.  I

21   BELIEVE THAT P4 MAY HAVE BEEN WHAT THEY REFERRED TO

22   AS THE 10.1.  THE WI-FI SUGGESTS THAT TO ME.

23             THE BBY, AS I UNDERSTAND IT, STANDS FOR

24   BEST BUY.

25             RETAIL STORE VISIT, I THINK THAT'S FAIRLY
```

1089

1    CLEAR THAT THEY'RE DOING RESEARCH IN RETAIL STORES,

2    AND IT'S A TEAM REPORT AS I UNDERSTAND IT.

3    Q     AND THE DATE OF THE DOCUMENT IS WHAT?

4    A     IT IS AUGUST 11TH -- I'M SORRY.  AUGUST 2011.

5    Q     OKAY.  IF WE LOOK AT THE SECOND PAGE OF PX 59.

6    WHAT DOES IT SAY THE PURPOSE OF THIS TASK FORCE

7    VISIT WAS?

8    A     IT SAYS THE PURPOSE IS TO "INVESTIGATE THE

9    REASONS CONSUMERS RETURN THE PRODUCT, AND IDENTIFY

10   AREAS FOR IMPROVEMENT, BY VISITING THE 30 STORES

11   WITH THE HIGHEST NUMBER OF RETURNS, OF OUR LARGEST

12   VENDOR FOR NORTH AMERICAN P4 WI-FI MODEL, BBY."

13   Q     OKAY.  AND DOWN BELOW, SECTION 2, WHAT

14   GENERALLY IS SET OUT IN SECTION 2 OF THIS DOCUMENT

15   ON PAGE 2?

16   A     THIS BASICALLY DEFINES THE PROCESS THEY INTEND

17   TO GO THROUGH.

18   Q     OKAY.  AND THAT INCLUDED IN-PERSON VISITS TO

19   BEST BUY STORES BY A NUMBER OF SAMSUNG PERSONNEL?

20   A     YES.  THERE WAS A TEAM SENT OUT TO THREE

21   REGIONS IN THE COUNTRY.  I BELIEVE IT WAS FLORIDA,

22   L.A., AND NEW YORK.

23   Q     OKAY.  COULD YOU GO TO PAGE 19 OF THIS REPORT.

24   AND COULD YOU TELL US WHAT IS SET OUT ON PAGE 19 OF

25   THIS REPORT WITH RESPECT TO THE FINDINGS THAT THE

1090

1    SAMSUNG TEAM MADE ABOUT THE REASONS FOR RETURNS OF

2    THE GALAXY TAB 10.1?

3    A    THIS IS A PAGE IN THE PORTION OF THE DOCUMENT

4    THAT RELATES TO MARKETABILITY.  AND IF I CAN CALL

5    THE ATTENTION TO THE NOTES BOX, THE NUMBER 1 LINE

6    IN THE NOTES BOX READS "GREATEST NUMBER OF CUSTOMER

7    RETURN TYPE WERE THOSE WHO PURCHASED THINKING IT

8    WAS AN APPLE IPAD 2."

9    Q    THANK YOU, MR. BRESSLER.

10            YOU CAN PUT THAT DOCUMENT ASIDE.  I WANT

11   TO SWITCH TO A DIFFERENT TOPIC.

12            DID YOU PERFORM AN ANALYSIS OF WHETHER

13   THE APPEARANCE OF ANY ELEMENT IN THE DESIGN OF THE

14   THREE APPLE DESIGN PATENTS THAT YOU ANALYZED WAS

15   DICTATED BY FUNCTION?

16   A    I DID.

17   Q    AND DID YOU, AS A RESULT OF THAT ANALYSIS,

18   CONCLUDE THAT ANY OF THE VISUAL ELEMENTS OF THE

19   APPLE DESIGN PATENTS WERE, IN FACT, DICTATED BY

20   FUNCTION?

21   A    I CONCLUDED THEY -- NONE OF THE ELEMENTS WERE

22   DICTATED BY FUNCTION.

23   Q    WHY DID YOU CONCLUDE THAT NONE OF THE ELEMENTS

24   OF THE APPLE DESIGN PATENTS WERE DICTATED BY

25   FUNCTION?

```
 1    A    FOR A COUPLE OF REASONS.  ONE, IN MY

 2    EXPERIENCE, I KNOW FULL WELL THAT VIRTUALLY EVERY

 3    FUNCTION THAT'S INCLUDED CAN BE DESIGNED WITH A

 4    DIFFERENT APPEARANCE.

 5              SECONDLY, I REVIEWED AND IDENTIFIED A

 6    NUMBER OF DIFFERENT ALTERNATIVE DESIGNS THAT

 7    PERFORMED THE SAME OR SIMILAR FUNCTIONS TO THOSE

 8    THAT WERE IN THE PATENTS.

 9    Q    OKAY.  LET'S TURN TO THE OPINIONS YOU GAVE

10    ABOUT TRADE DRESS.

11              DO YOU UNDERSTAND THAT APPLE IS, IN

12    ADDITION TO THE DESIGN PATENTS, ASSERTS IPHONE AND

13    IPAD TRADE DRESS CLAIMS IN THIS CASE?

14    A    I DO.

15    Q    I'D LIKE TO SHOW YOU SLIDE PDX 26.18.

16              ARE THE ELEMENTS OF THE APPLE IPHONE

17    TRADE DRESS THAT YOU ANALYZED FOR THIS CASE SET OUT

18    ON THIS SLIDE?

19    A    YES, THEY ARE.

20    Q    WHICH OF THE BULLET POINT ELEMENTS ON THIS

21    SLIDE DID YOU ANALYZE?

22    A    IT'S THE FIRST FIVE THAT RELATE PRIMARILY TO

23    THE INDUSTRIAL DESIGN OF THE DEVICE ITSELF, NOT THE

24    SCREEN.

25    Q    OKAY.  SO YOU IGNORED THE ICONS IN THE MIDDLE?
```

```
1    A     CORRECT.

2    Q     OKAY.  DID YOU PERFORM AN ANALYSIS OF WHETHER

3    ANY ELEMENTS OF THE ASSERTED IPHONE TRADE DRESS

4    WERE FUNCTIONAL AS THAT TERM IS USED IN TRADE DRESS

5    ANALYSIS?

6    A     I DID.

7    Q     AND WHAT IS YOUR UNDERSTANDING OF THE LEGAL

8    STANDARD FOR FUNCTIONALITY OF A TRADE DRESS?

9    A     MY UNDERSTANDING UNDER TRADE DRESS IS THAT THE

10   APPEARANCE IS NOT FUNCTIONAL UNDER TRADE DRESS IF

11   IT DOES NOT CONTRIBUTE UNUSUALLY EITHER TO THE

12   USABILITY OR TO THE REDUCTION IN COST OR EASE OF

13   MANUFACTURING.

14   Q     AND DID YOU FIND ANY ELEMENT OF THE INDUSTRIAL

15   DESIGN, THE PHYSICAL DESIGN OF THE IPHONE WAS

16   FUNCTIONAL UNDER THAT TEST?

17   A     UNDER THOSE TESTS, I DID NOT FIND THAT ANY OF

18   THOSE APPEARANCE ELEMENTS WERE FUNCTIONAL.

19   Q     DID YOU, IN YOUR ANALYSIS, DETERMINE WHETHER

20   THERE WERE ALTERNATIVES TO THE HARDWARE ASPECTS OF

21   THE IPHONE TRADE DRESS?

22   A     YES, THERE ARE A SIGNIFICANT NUMBER OF

23   ALTERNATIVES.

24   Q     OKAY.  COULD YOU LOOK AT EXHIBIT PX 10 IN YOUR

25   BINDER.
```

1               WHAT IS PX 10, MR. BRESSLER?

2    A    PX 10 IS ANOTHER COMPILATION OF A PHOTOGRAPH

3    SLIDE THAT IS CREATED TO ILLUSTRATE A NUMBER OF

4    ALTERNATIVE DESIGNS.

5               AND ON THE THIRD PAGE SPECIFICALLY FOR

6    SMARTPHONES.

7               MS. KREVANS:  YOUR HONOR, WE MOVE PX 10

8    INTO EVIDENCE.

9               MR. VERHOEVEN:  OBJECTION.  IT'S A

10   DEMONSTRATIVE.

11              MS. KREVANS:  YOUR HONOR, THIS OBJECTION

12   HAS BEEN MADE AND PREVIOUSLY OVERRULED BY YOUR

13   HONOR.  THIS IS A COMPILATION OF PHOTOGRAPHS OF

14   ACTUAL OBJECTS.

15              THE COURT:  THAT'S ADMITTED.

16   BY MS. KREVANS:

17   Q    ON THE THIRD PAGE OF PX 10, WHAT HAVE YOU

18   SHOWN?

19   A    THESE ARE FIVE EXAMPLES OF A LARGE NUMBER OF

20   ALTERNATIVE CELL PHONE, SMARTPHONE DESIGNS THAT

21   EXIST.

22              THEY'RE CLEARLY MARKETED BY LARGE

23   COMPANIES.

24   Q    DID YOU FIND, IN DOING YOUR ANALYSIS OF

25   FUNCTIONALITY WITH RESPECT TO TRADE DRESS, THAT THE

10094

```
1    PHYSICAL HARDWARE DESIGN OF THE IPHONE WAS THE
2    RESULT OF PARTICULARLY SIMPLE OR INEXPENSIVE
3    MANUFACTURING PROCESS?
4    A    ABSOLUTELY NOT.  IN FACT, I'VE SEEN
5    DOCUMENTATION AND READ DEPOSITIONS FROM APPLE
6    PERSONNEL THAT INDICATE THAT THE AESTHETICS THEY
7    WERE TRYING TO ACHIEVE WERE PARTICULARLY DIFFICULT
8    AND MORE EXPENSIVE TO DO.
9         THEY HAD TO BASICALLY DEVELOP A GLASS
10   THAT WAS NOT BREAKABLE ENOUGH, SCRATCH RESISTANT
11   ENOUGH, AND THEY HAD TO DEVELOP SPECIAL MACHINING
12   PROCESSES TO CREATE THE RECEIVER SLOT IN THE GLASS
13   AND TO MACHINE THE BEZEL.
14   Q    WHAT WAS YOUR OVERALL CONCLUSION ABOUT WHETHER
15   ANY ASPECTS OF THE IPHONE TRADE DRESS WERE
16   FUNCTIONAL?
17   A    IT'S MY OPINION THAT THESE ASPECTS OF THE
18   TRADE DRESS ARE NOT FUNCTIONAL.
19   Q    DID YOU ALSO ANALYZE THE, QUOTE,
20   "FUNCTIONALITY" FOR TRADE DRESS OF THE ASSERTED
21   IPAD TRADE DRESS?
22   A    I DID.
23   Q    LET'S LOOK AT YOUR SLIDE PDX 26.19.
24        ARE THESE THE ELEMENTS OF THE IPAD TRADE
25   DRESS THAT WERE PRESENTED TO YOU FOR CONSIDERATION
```

```
1    IN THIS CASE?

2    A    YES.  AGAIN, THE TOP FIVE ARE FOR THE PHYSICAL

3    DEVICE, NOT INCLUDING THE LIT SCREEN.

4    Q    OKAY.  WHAT OPINION DID YOU FORM REGARDING THE

5    FUNCTIONALITY OF THE ASSERTED IPAD TRADE DRESS?

6    A    USING THE SAME PROCESS AS I DID ON THE IPHONE,

7    I DETERMINED THAT NONE OF THESE ELEMENTS OF THE

8    APPEARANCE OF THE IPAD WERE FUNCTIONAL AS THEY

9    RELATE TO TRADE DRESS.

10   Q    DID YOU LOOK TO SEE WHETHER THERE WERE

11   ALTERNATIVE DESIGNS FOR A TABLET DESIGN, THAT IS,

12   ALTERNATIVES TO THE ASSERTED IPAD TRADE DRESS?

13   A    YES.

14   Q    AND DID YOU FIND ANY?

15   A    I DID.

16   Q    OKAY.  COULD WE LOOK BACK AT PX 10, AND THIS

17   TIME I'D ASK YOU TO LOOK AT PAGES 1 AND 2, STARTING

18   WITH PAGE 1.

19         WHAT HAVE YOU SET OUT IN THE FIRST TWO

20   PAGES OF EXHIBIT PX 10, MR. BRESSLER?

21   A    PAGE 1 IS FOUR DIFFERENT TABLET DESIGNS THAT I

22   THINK I TALKED ABOUT EARLIER, ALL OF WHICH ARE

23   DESIGNS THAT COULD BE APPLIED TO A TABLET COMPUTER.

24   THEY ARE CERTAINLY DIFFERENT THAN THE IPHONE AND

25   THE GALAXY 10.1 -- I'M SORRY, THE IPAD 2 AND THE
```

```
 1    GALAXY 10.1.

 2    Q    AND WERE THESE ALL ACTUALLY SOLD?

 3    A    I BELIEVE SO.

 4    Q    LET'S LOOK AT THE SECOND PAGE.

 5              ACTUALLY, LET'S JUST SKIP THE SECOND

 6    PAGE.

 7              GOING BACK TO THE FIRST PAGE, CAN YOU

 8    TELL US A LITTLE BIT MORE ABOUT THAT SONY TABLET S

 9    ON THE BOTTOM RIGHT?

10    A    YES.  THE SONY TABLET S IS ACTUALLY A PRETTY

11    INTERESTING DESIGN IN THAT IT HAS A SHEET OF

12    MATERIAL, WHICH I BELIEVE IS PLASTIC, THAT GOES

13    ACROSS THE FRONT AND LITERALLY FOLDS AROUND TO THE

14    BACK OF THE COMPUTER, AND IT PROVIDES THIS KIND OF

15    FOLIO FEELING DEVICE THAT SOME PEOPLE ACTUALLY SAY

16    IS EASIER TO HOLD THAN THINNER TABLET COMPUTERS.

17    Q    IS THAT FOLDED-OVER DESIGN WHAT WE'RE SEEING

18    IN THE MIDDLE PICTURE ON THE BOTTOM RIGHT?

19    A    THAT'S AN ILLUSTRATION OF IT, YES.  THE FRONT

20    IS ON THE LEFT AND WHERE IT FOLDS DOWN PARTIALLY IS

21    ON THE RIGHT.

22    Q    OKAY.

23              THANK YOU, MR. BRESSLER.

24              NO FURTHER QUESTIONS AT THIS TIME, YOUR

25    HONOR.
```

```
 1                    THE COURT:  LET ME DO JUST A LITTLE

 2    CLEANUP, AND THIS IS NOT GOING TO BE CHARGED TO

 3    ANYONE'S TIME.

 4                    PX 59, IS THAT ADMITTED?

 5                    MS. KREVANS:  DID YOU ADMIT THAT, YOUR

 6    HONOR?

 7                    THE COURT:  OKAY.  AND THEN YOU SHOWED

 8    26.18, A DEMONSTRATIVE, AND 26.19.

 9                    DID YOU SHOW ANY OTHERS?

10                    MS. KREVANS:  SINCE LUNCH?

11                    THE COURT:  NO.  JUST -- YES, JUST IN THE

12    LAST FEW MINUTES.  I CAUGHT 18 AND 18, BUT I DON'T

13    KNOW IF I MISSED ONE.

14                    MS. KREVANS:  THOSE ARE THE ONLY TWO

15    DEMONSTRATIVES I THINK I'VE SHOWN SINCE LUNCH.

16                    I ALSO USED PX 10 AS AN EXHIBIT.

17                    THE COURT:  I UNDERSTOOD THAT THAT WAS

18    ADMITTED.  I JUST WANTED TO MAKE SURE I HAVE IT.

19                    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20                     10, HAVING BEEN PREVIOUSLY MARKED FOR

21                     IDENTIFICATION, WAS ADMITTED INTO

22                     EVIDENCE.)

23                    THE COURT:  OKAY.  THANK YOU.

24                    ARE YOU READY, MR. VERHOEVEN?

25                    MR. VERHOEVEN:  I AM.  EVERYTHING HAS
```

```
 1    BEEN PASSED OUT?  YES.
 2              THE COURT:  ALL RIGHT.  WE'RE ALL SET.
 3    IT'S 1:23.  PLEASE GO AHEAD.
 4              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
 5                    CROSS-EXAMINATION
 6    BY MR. VERHOEVEN:
 7    Q    GOOD AFTERNOON, MR. BRESSLER.
 8    A    GOOD AFTERNOON.
 9    Q    GOOD TO SEE YOU AGAIN.
10    A    AND YOU.
11    Q    WE'RE ALL ON THE CLOCK HERE, SO I'M GOING TO
12    ASK YOU A PRELIMINARY QUESTION, AND THAT IS, AS I
13    GO THROUGH MY QUESTIONING, IF YOU CAN MAKE AN
14    EFFORT, IF MY QUESTION IS FAIRLY ANSWERABLE WITH A
15    YES OR A NO, I'D ASK YOU TO ANSWER IT IN THAT
16    MANNER.  OKAY?
17    A    YES.
18    Q    NOW, MR. BRESSLER, IN FORMING YOUR OPINIONS,
19    IT'S CORRECT THAT YOU DID NOT RELY ON ANY APPLE
20    CONSUMER SURVEYS THAT IDENTIFIED WHAT APPLE
21    CUSTOMERS CONSIDERED TO BE IMPORTANT WITH RESPECT
22    TO IPHONES; TRUE?
23    A    YES.
24    Q    YOU DON'T HAVE ANY FIRST-HAND KNOWLEDGE OF ANY
25    SURVEYS THAT APPLE HAS CONDUCTED WITH RESPECT TO
```

```
 1    IPHONES; RIGHT?

 2    A    I BELIEVE I HAVE SEEN A COUPLE, BUT I DON'T --

 3    I HAVEN'T EXAMINED THEM.

 4    Q    THE ANSWER IS YOU DON'T HAVE ANY FIRST-HAND

 5    KNOWLEDGE OF ANY SURVEYS APPLE CONDUCTED WITH

 6    RESPECT TO ITS IPHONES; TRUE?

 7    A    NOT TRUE.

 8    Q    OKAY.  NOW, YOU TESTIFIED FOR APPLE BEFORE IN

 9    ANOTHER HEARING ON MAY 31ST, 2012.

10              DO YOU REMEMBER THAT?

11    A    YES.

12    Q    AND YOU TESTIFIED UNDER OATH; CORRECT?

13    A    YES.

14    Q    AND SO YOU TOOK JUST AS MUCH CARE WITH YOUR

15    ANSWERS TO QUESTIONS DURING THAT HEARING AS YOU ARE

16    TODAY; RIGHT?

17    A    YES.

18    Q    OKAY.  LET'S PUT UP WHAT YOU SAID AT THAT

19    HEARING ON MAY 31ST, 2012, PAGE 705, LINES 6

20    THROUGH 10.

21              MS. KREVANS:  OBJECTION, YOUR HONOR.

22              MR. VERHOEVEN:  MR. FISHER, IF WE COULD

23    DO THAT.

24              MS. KREVANS:  IT'S IMPROPER TO SHOW

25    TESTIMONY UNTIL THE JURY -- UNTIL IT'S BEEN SHOWN
```

```
 1    THAT IT'S IMPEACHING TO SOMETHING THE WITNESS HAS

 2    SAID AND THAT SHOWING HAS NOT BEEN MADE.

 3              MR. VERHOEVEN:  YOUR HONOR, THIS IS

 4    EXACTLY WHAT COUNSEL IN EXAMINING MR. DENISON DID.

 5              THE COURT:  OVERRULED.

 6              GO AHEAD, PLEASE.

 7              MR. VERHOEVEN:  PULL THAT UP, MR. FISHER.

 8    AND PULL OUT LINES 7 THROUGH 10, AND I'LL READ IT

 9    INTO THE RECORD.

10              "QUESTION:  YOU DON'T HAVE ANY FIRSTHAND

11    KNOWLEDGE OF ANY SURVEYS APPLE'S CONDUCTED WITH

12    RESPECT TO ITS IPHONES, CORRECT?

13              "ANSWER:  CORRECT."

14    Q    WAS THAT TRUTHFUL TESTIMONY WHEN YOU GAVE IT

15    IN MAY?

16    A    IT WAS TRUE THEN, YES.

17    Q    OKAY.  THANK YOU, MR. FISHER.

18              IN FORMING YOUR OPINIONS, YOU DID NOT

19    HAVE ANY INFORMATION ABOUT WHAT PERCENTAGE OF

20    PURCHASERS OF IPHONES PURCHASED THOSE PRODUCTS

21    EITHER FROM AN APPLE STORE OR A WEBSITE; RIGHT?

22    A    CORRECT.

23    Q    YOU DID NOT TALK TO CONSUMERS ABOUT THEIR

24    PERCEPTIONS OF PRODUCTS IN AN APPLE STORE; RIGHT?

25    A    I DID SPEAK TO A FEW CONSUMERS IN SOME VERY
```

```
 1    BRIEF DISCUSSIONS I HAD WITH THEM.
 2    Q    SIR, YOU DID NOT TALK TO CONSUMERS ABOUT THEIR
 3    PERCEPTIONS OF PRODUCTS AT AN APPLE STORE, DID YOU?
 4    A    AN APPLE STORE, NO, I DID NOT.
 5    Q    OKAY.  YOU DID HAVE A 20-MINUTE PHONE
 6    CONVERSATION WITH MR. STRINGER; RIGHT?
 7    A    YES.
 8    Q    BUT YOU SPOKE WITH NO ONE ELSE AT APPLE IN
 9    FORMING YOUR OPINIONS, DID YOU, SIR?
10    A    NO, I DIDN'T.
11    Q    AND YOU HAVE NO DIRECT EVIDENCE TO SUGGEST
12    THAT ANY CONSUMER HAS EVER PURCHASED A SAMSUNG
13    SMARTPHONE OR AN APPLE SMARTPHONE BELIEVING IT WAS
14    ACTUALLY A DEVICE MANUFACTURED BY THE OTHER, DO
15    YOU?
16    A    WOULD YOU REPEAT THAT, PLEASE?
17          MR. VERHOEVEN:  CAN WE HAVE THE QUESTION
18    READ BACK, PLEASE?
19          (WHEREUPON, THE RECORD WAS READ BY THE
20    COURT REPORTER.)
21          THE WITNESS:  I DO NOT.
22    BY MR. VERHOEVEN:
23    Q    YOU DON'T KNOW WHETHER CONSUMERS HAVE BEEN
24    CONFUSED AT ANY TIME WHEN PURCHASING APPLE DEVICES
25    OR SAMSUNG DEVICES INTO THINKING THEY ARE DEVICES
```

```
 1    FROM THE OTHER MANUFACTURER; CORRECT?

 2    A    I BELIEVE THAT'S CORRECT.  I'M SORRY.  COULD

 3    YOU REPEAT THE QUESTION?

 4              MR. VERHOEVEN:  CAN WE HAVE IT READ BACK

 5    FOR MR. BRESSLER?

 6              (WHEREUPON, THE RECORD WAS READ BY THE

 7    COURT REPORTER.)

 8              THE WITNESS:  THAT'S CORRECT.

 9    BY MR. VERHOEVEN:

10    Q    YOU DON'T KNOW WHETHER CONSUMERS CONFUSE APPLE

11    AND SAMSUNG DEVICES DURING THE COURSE OF THEIR

12    PURCHASING DECISIONS, DO YOU?

13    A    I BELIEVE I HAVE SEEN SOME ARTICLES THAT

14    SUGGEST THAT PEOPLE DO GET CONFUSED.

15    Q    WELL, IN ADDITION TO THIS HEARING IN WHICH YOU

16    TESTIFIED, YOU ALSO HAD YOUR DEPOSITION TAKEN.

17              DO YOU REMEMBER THAT IN THIS CASE?

18    A    YES, I DO.

19    Q    AND THAT HAPPENED ON APRIL 24TH, 2012?  DOES

20    THAT SOUND ABOUT RIGHT?

21    A    SOUNDS ABOUT RIGHT, YES.

22    Q    AND A DEPOSITION, YOU UNDERSTAND, IS A

23    PROCEEDING JUST LIKE IN THE COURT HERE WHERE YOU'RE

24    SWORN UNDER OATH AND YOU GAVE TRUTHFUL TESTIMONY;

25    RIGHT?
```

1    A    YES.

2    Q    LET'S LOOK AT WHAT YOU SAID AT YOUR DEPOSITION

3    AT PAGE 145:24 THROUGH 146, LINE 7, THE DEPOSITION

4    DATED APRIL 24TH, 2012.

5              CAN WE PLAY THAT?

6              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

7    OPEN COURT OFF THE RECORD.)

8    BY MR. VERHOEVEN:

9    Q    THAT WAS TRUTHFUL TESTIMONY WHEN YOU GAVE IT

10   AT THE DEPOSITION IN APRIL OF THIS YEAR; RIGHT,

11   SIR?

12   A    I BELIEVE SO.

13   Q    TO THE BEST OF YOUR KNOWLEDGE, SMARTPHONE

14   CONSUMERS EVALUATE DIFFERENT MODELS, COMPARE THEM

15   TO ONE ANOTHER, EVEN BEFORE GOING INTO THE STORE;

16   RIGHT?

17   A    YES.

18   Q    SMARTPHONE CONSUMERS CONSIDER A NUMBER OF

19   FACTORS, SUCH AS PRICE, PERFORMANCE, AS WELL AS

20   APPEARANCE; RIGHT?

21   A    I GUESS.

22   Q    DO YOU BELIEVE THAT'S TRUE?

23   A    I SUSPECT THEY DO.

24   Q    YOU WOULD EXPECT THAT IF THE PURCHASER WAS

25   ENTERING INTO A MULTI-YEAR CONTRACT, THEY WOULD

1    KNOW WHAT BRAND OF PHONE THEY WERE BUYING; RIGHT?

2    A    YES.

3    Q    YOU BELIEVE, BY THE END OF THE SMARTPHONE

4    PURCHASING PROCESS, THE ORDINARY CONSUMER WOULD

5    HAVE TO KNOW WHICH PHONE THEY WERE BUYING; RIGHT?

6    A    YES.

7    Q    GIVEN THE ENVIRONMENT IN WHICH THESE PHONES

8    ARE BEING SOLD AND THE DEGREE OF ADVERTISING

9    BRANDING, YOU DON'T KNOW WHETHER ANYBODY WOULD EVER

10   BE DECEIVED INTO THINKING THEY WERE BUYING A

11   SAMSUNG PHONE WHEN THEY WERE BUYING AN APPLE PHONE

12   OR VICE-VERSA; ISN'T THAT TRUE, SIR?

13   A    COULD YOU REPEAT THAT AGAIN, PLEASE.

14          MR. VERHOEVEN:  CAN WE READ IT BACK,

15   PLEASE.

16          (WHEREUPON, THE RECORD WAS READ BY THE

17   COURT REPORTER.)

18          THE WITNESS:  YES.

19   BY MR. VERHOEVEN:

20   Q    AND WHEN YOU PERFORMED YOUR INFRINGEMENT

21   ANALYSIS THAT YOU'VE TESTIFIED TO EARLIER TODAY,

22   YOU DID NOT ENDEAVOR TO DETERMINE WHETHER THE

23   SIMILARITY BETWEEN TWO DESIGNS WAS DECEPTIVE, DID

24   YOU?

25   A    YES, I DID.

1    Q    OKAY.  LET'S GO TO YOUR TESTIMONY ON MAY 31ST,

2    2012, PAGE 659, LINES 6 THROUGH 14.

3             CAN WE PUT THAT UP, MR. FISHER?  659,

4    PAGE -- LINES 6 THROUGH 14.  IT'S THE MAY 31ST,

5    2012.  THERE WE GO.

6             "QUESTION:  DID YOU APPLY THIS TEST THAT

7    I HAVE ON THE SCREEN ON RDX-49C, PAGE 20?

8             "ANSWER:  I CERTAINLY APPLIED THE ISSUE

9    OF THE EYE OF THE ORDINARY OBSERVER GIVING AS MUCH

10   ATTENTION AS A PURCHASER USUALLY GIVES TO THE TWO

11   DESIGNS, FINDING THEM SUBSTANTIALLY THE SAME.

12            "IT WAS MY UNDERSTANDING, FROM COUNSEL,

13   THAT IT WAS NOT NECESSARY THAT THE SIMILARITY BE

14   DECEPTIVE."

15   Q    DO YOU SEE THAT?

16   A    I SEE THAT, YES.

17   Q    AND THAT'S THE TESTIMONY YOU GAVE ON MAY 31ST,

18   2012; RIGHT?

19   A    IT IS.

20   Q    AFTER YOU SUBMITTED YOUR OPINIONS IN THIS

21   CASE?

22   A    YES.

23   Q    SO AT THE TIME YOU SUBMITTED YOUR OPINIONS IN

24   THIS CASE, IT WAS YOUR UNDERSTANDING IT WAS NOT

25   NECESSARY TO LOOK INTO WHETHER A SIMILARITY WAS

```
 1    DECEPTIVE; ISN'T THAT TRUE, SIR?
 2    A     NO.  IT WAS MY UNDERSTANDING THAT THE
 3    MEASUREMENT WAS DIFFERENT THAT YOU'RE DESCRIBING.
 4              MS. KREVANS:  YOUR HONOR, MAY I ASK, FOR
 5    COMPLETENESS, THAT I BE PERMITTED TO READ AN
 6    ADDITIONAL PORTION OF THE TESTIMONY?  THIS IS FROM
 7    THE ITC TRIAL.
 8              THE COURT:  NO.  YOU'LL HAVE AN
 9    OPPORTUNITY IN REDIRECT.
10    BY MR. VERHOEVEN:
11    Q     NOW, I WANT TO SWITCH TO TALKING ABOUT THE
12    DESIGN PATENTS, '087 AND '677 MORE SPECIFICALLY,
13    OKAY?
14    A     YES.
15    Q     WHEN YOU PREPARED YOUR OPINIONS WITH RESPECT
16    TO THOSE DESIGN PATENTS, YOU WERE ASKED TO APPLY
17    CERTAIN PRINCIPALS OR RULES OF THE ROAD FOR YOUR
18    ANALYSIS BY THE ATTORNEYS; CORRECT?
19    A     YES.
20    Q     AND IF WE COULD JUST GO TO, MR. BRESSLER, YOUR
21    OPENING EXPERT REPORT DATED MARCH 22, 2012 AT
22    PARAGRAPH 21.  I THINK THAT'S IN YOUR BINDER IF
23    YOU'D LIKE TO LOOK AT IT.  WE'RE GOING TO PUT IT ON
24    THE SCREEN AS WELL.
25    A     COULD YOU TELL ME WHERE IT WAS IN MY BINDER,
```

```
 1    PLEASE.

 2

 3              MR. VERHOEVEN:  IF I COULD APPROACH, YOUR

 4    HONOR?

 5              THE COURT:  GO AHEAD, PLEASE.

 6              MR. VERHOEVEN:  THANK YOU.

 7              YOU HAVE MY BINDER, SO -- THERE SHOULD BE

 8    AN EXHIBIT IN THERE.

 9              THE WITNESS:  THANK YOU.

10              MR. VERHOEVEN:  SURE.

11              THE WITNESS:  AND WHAT PAGE WAS THIS

12    AGAIN, PLEASE?

13    BY MR. VERHOEVEN:

14    Q    IT'S PARAGRAPH 21, SIR.  ARE YOU THERE?

15    A    YES.

16    Q    OKAY.  SO OBVIOUSLY YOU'RE NOT A LAWYER;

17    RIGHT?

18    A    THAT'S CORRECT.

19    Q    BUT YOU WERE GIVEN, BY THE LAWYERS, CERTAIN

20    PRINCIPLES THEY ASKED YOU TO APPLY IN CONDUCTING

21    YOUR ANALYSIS; CORRECT?

22    A    YES.

23    Q    AND THIS WAS IN THE PART OF YOUR REPORT WHERE

24    YOU DELINEATE WHAT THOSE PRINCIPLES WERE; CORRECT?

25    "I, THEREFORE, HAVE BEEN ASKED TO APPLY THE
```

1    A    YES.

2    Q    OKAY.  THAT PRE-DATES BOTH THE '087 PATENT AND

3    THE '677 PATENT FILINGS; CORRECT, SIR?

4    A    I BELIEVE IT PRE-DATES THE FILING, BUT I'M NOT

5    SURE -- I DON'T THINK IT PRE-DATES THE CONCEPTION

6    DATE THAT'S BEEN IDENTIFIED.

7    Q    WELL, YOU AGREE IT PRE-DATES THE FILING DATE?

8    A    I -- WITHOUT LOOKING AT THE PATENT, I'M NOT

9    100 PERCENT SURE, BUT IT MIGHT.

10   Q    WELL, WOULD YOU AGREE THAT THAT'S

11   APPROXIMATELY SIX MONTHS BEFORE THE IPHONE WAS EVER

12   EVEN ANNOUNCED PUBLICLY?

13   A    YES.

14   Q    NOW, LET'S GO TO PAGE 7, THE SECOND IMAGE ON

15   PAGE 7 AND PULL THAT OUT.  PUT THAT NEXT TO THE

16   '087.

17           SO DX 727, RECTANGULAR IN SHAPE?

18   A    YES.

19   Q    ROUNDED CORNERS?

20   A    YES.

21   Q    IT'S GOT A BIG DISPLAY SCREEN; YES?

22   A    NOT AS BIG, BUT YES.

23   Q    IT'S GOT A LOZENGE SHAPED SPEAKER SLOT?  YES?

24   A    YES.

25   Q    IT'S GOT LATERAL BORDERS THAT ARE NARROWER

```
 1    THAN THE TOP AND BOTTOM BORDERS?

 2    A    CORRECT.  IT DOES NOT SHOW A BEZEL.

 3    Q    THE SCREEN IS BALANCED; RIGHT?

 4    A    I'M NOT SURE WHAT YOU MEAN BY "BALANCED."

 5    Q    HORIZONTALLY AND VERTICALLY CENTERED?

 6    A    YES.  AGAIN, I BELIEVE THIS IS A DISTORTED

 7    VIEW OF HOW ONE SHOULD READ A PATENT.

 8    Q    NOW, LET'S ALSO LOOK AT JX 1093, I THINK WE

 9    HAVE A PHYSICAL -- THAT'S A PHYSICAL EXHIBIT, YOUR

10    HONOR.

11          CAN I JUST SEE THAT AND MAKE SURE IT'S

12    THE RIGHT ONE?

13          YOU'VE SEEN THIS PHYSICAL DEVICE BEFORE;

14    CORRECT?

15    A    YES.

16    Q    IT'S THE LG PRADA PHONE?

17    A    YES.

18    Q    CAN WE PUT UP SDX 3750 ON THE SCREEN, PLEASE.

19          MS. KREVANS:  YOUR HONOR, THERE'S A

20    LIMITING INSTRUCTION WITH RESPECT TO THIS DEVICE,

21    THAT IT IS NOT PRIOR ART FOR PURPOSES OF ANY

22    VALIDITY --

23          MR. VERHOEVEN:  I DISPUTE THAT, YOUR

24    HONOR.

25          THE COURT:  IS THIS THE KE850?
```

```
 1            MR. VERHOEVEN:  NO, IT IS NOT, YOUR

 2    HONOR.  THIS IS NOT -- THIS IS IN EVIDENCE.

 3            MS. KREVANS:  IT WAS SUBJECT TO A

 4    LIMITING INSTRUCTION --

 5            THE COURT:  MOTION IN LIMINE NUMBER 3,

 6    THERE WAS A -- THIS IS COMING IN.  OVERRULED

 7    PLEASE.

 8            GO AHEAD, MR. VERHOEVEN.

 9            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

10            3750, HAVING BEEN PREVIOUSLY MARKED FOR

11            IDENTIFICATION, WAS ADMITTED INTO

12            EVIDENCE.)

13            MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

14    Q    NOW, I'VE GOT A PICTURE OF THIS PHONE ON THE

15    SLIDE SDX 3750.  DO YOU SEE IT ON THE SCREEN?

16    A    I DO.

17    Q    THAT'S THE PHONE YOU HAVE IN YOUR HAND; RIGHT?

18    A    IT IS.

19    Q    OKAY.  AND THIS PHONE IS ALSO RECTANGULAR IN

20    SHAPE; CORRECT?

21    A    YES.

22    Q    ROUNDED CORNERS?

23    A    SLIGHTLY ROUNDED, YES.

24    Q    WHAT WAS THAT?

25    A    THEY'RE SLIGHTLY ROUNDED.
```

```
 1    Q    OKAY.  IS THERE SOMETHING DIFFERENT THAN

 2    SLIGHTLY ROUNDED IN THE '087?

 3    A    I BELIEVE THE '087 LOOKS MORE -- THE OVERALL

 4    IMPRESSION OF THE '087 IS MORE ROUNDED THAN THESE.

 5    Q    OKAY.  AND THAT'S A DISTINGUISHING DIFFERENCE?

 6    A    WITHIN A GIVEN RANGE, YES.

 7    Q    SO IF THE CORNERS ARE MORE SHARPLY ROUNDED,

 8    THAT'S A DISTINGUISHING FACTOR?

 9    A    WITHIN THE OVERALL IMPRESSION, YES.

10    Q    OKAY.  IT HAS A LOZENGE SHAPED SLOT FOR THE

11    SPEAKER?

12    A    YES.

13    Q    IT'S GOT A LARGE TOUCHSCREEN?

14    A    I DON'T KNOW THAT IT'S A TOUCHSCREEN.

15    Q    WELL, IT'S A LARGE SCREEN?

16    A    YES.

17    Q    CENTERED?

18    A    IT SEEMS SO.

19    Q    AND THE LATERAL BORDERS ARE NARROWER AND THE

20    TOP AND BOTTOM BORDERS ARE WIDER?

21    A    YES.  AND IT ALSO HAS A HUGE BUTTON ACROSS THE

22    BOTTOM.

23    Q    SO ALL OF THIS ART WE'VE LOOKED AT IS

24    RECTANGULAR IN SHAPE WITH ROUNDED CORNERS; RIGHT?

25    A    I GUESS YOU COULD LOOK AT IT THAT WAY.
```

1    Q    IS THERE A WAY FOR US TO PUT EACH OF THOSE

2    IMAGES TOGETHER ON THE SCREEN?  MR. FISHER, I'M

3    SORRY.

4               THERE WE GO.  SO HERE WE'VE JUST PUT ALL

5    OF THESE IMAGES WE'VE LOOKED AT NEXT TO THE '087.

6    DO YOU SEE THAT, SIR?

7    A    I DO.

8    Q    IN ALL OF THESE OTHER DESIGN PATENTS AND THIS

9    PHONE ARE SIMILARLY RECTANGULAR TO THE '087; RIGHT?

10   A    YES.

11   Q    AND THEY ALL HAVE BIG SCREENS; RIGHT?

12   A    YES.

13   Q    SOME OF THEM HAVE LOZENGE SHAPED EARPIECES;

14   RIGHT?

15   A    YES.

16   Q    THEY ALL HAVE MINIMALIST DESIGN?

17   A    I DON'T KNOW WHAT THAT MEANS.

18   Q    YOU DON'T KNOW WHAT MINIMALIST DESIGN MEANS?

19   A    NOT IN YOUR COMPARISON OF THESE ONE VIEWS OF

20   ALL THESE PHONES.

21   Q    OKAY.

22   A    THIS IS NOT HOW YOU REVIEW FIGURES IN PATENTS.

23   Q    OKAY.  THEY ALL HAVE NARROWER LATERAL BORDERS

24   OF DIFFERING WIDTHS, BUT THEY ALL HAVE NARROWER

25   LATERAL BORDERS?

1021

```
 1    A     YES.

 2    Q     AND LARGER BORDERS ABOVE AND BELOW THE SCREEN;

 3    RIGHT?

 4    A     THAT'S CORRECT.

 5    Q     SO --

 6    A     AT LEAST THREE OF THEM DON'T HAVE BEZELS.

 7    Q     AND THAT'S IMPORTANT, RIGHT, THAT'S IMPORTANT,

 8    THE ABSENCE OF A BEZEL TAKES YOU OUT OF SUBSTANTIAL

 9    SIMILARITY, DOESN'T IT?

10    A     IN THE '087 PATENT, IT DOES.

11    Q     OKAY.  SO CIRCLING BACK, AS YOU UNDERSTAND THE

12    RULES OF THE ROAD, THE ORDINARY OBSERVER IS

13    SUPPOSED TO TAKE INTO ACCOUNT THIS PRIOR ART AND

14    LOOK AT WHAT IS DIFFERENT FROM THE PRIOR ART IN THE

15    '087 AND TAKE THOSE DIFFERENCES WHICH FOCUS ON

16    THOSE DIFFERENCES WHEN CONDUCTING THE INFRINGEMENT

17    ANALYSIS AS TO THE ACCUSED PHONES; RIGHT?

18    A     THIS IS AN INCORRECT ANALYSIS.  THESE ARE --

19    YOU ARE SUPPOSED TO BE COMPARING ALL OF THE VIEWS

20    OF EACH OF THESE PATENTS TO DEVELOP AN OVERALL

21    IMPRESSION OF WHAT THE ORDINARY OBSERVER WOULD

22    UNDERSTAND.

23    Q     OKAY.

24    A     YOU CANNOT GET THAT UNDERSTANDING FROM A

25    SINGLE VIEW.
```

```
 1      Q    OKAY.  LET'S ACCEPT THAT.  YOU LOOK AT ALL THE

 2      VIEWS OF EACH OF THESE FOUR ITEMS HERE TO THE LEFT

 3      OF THE '087 PATENT, YOU WOULD AGREE WITH ME THAT

 4      WHEN YOU DO THAT, THAT THE ANALYSIS SHOULD BE THAT

 5      THE ATTENTION OF THE ORDINARY OBSERVER WOULD BE

 6      DRAWN TO THOSE ASPECTS OF THE DESIGN IN THE '087

 7      THAT ARE DIFFERENT FROM THE DESIGN ELEMENTS IN THE

 8      PRIOR ART; RIGHT?

 9      A    IF, IF THIS WERE A PROPER ANALYSIS, YOU COULD

10      SAY THAT, YES.

11      Q    OKAY.  NOW, LET'S GO TO -- LET'S GO TO YOUR

12      OPINIONS WITH RESPECT TO THE ACCUSED DEVICES.

13           NOW, YOU -- THE ONLY PERSON YOU SPOKE TO

14      FROM APPLE IN FORMING YOUR OPINIONS WAS

15      MR. STRINGER; CORRECT?

16      A    THAT'S CORRECT.

17      Q    WERE YOU HERE WHEN HE CAME AND TESTIFIED

18      BEFORE THE JURY?

19      A    I WAS.

20      Q    OKAY.  AND MR. STRINGER IS LISTED AS AN

21      INVENTOR ON THE '087 AND '677 PATENTS; CORRECT?

22      A    YES.

23      Q    AND SO FAR, AT LEAST, HE'S THE ONLY INVENTOR

24      ON THE PATENTS THAT WE'VE HEARD TESTIFY SO FAR;

25      RIGHT?
```

1    A    I DON'T KNOW THAT FOR SURE.

2    Q    HAVE YOU BEEN IN COURT EVERY DAY?

3    A    NO.

4    Q    OKAY.  WELL, I'LL REPRESENT THAT SO FAR HE'S

5    BEEN THE ONLY ONE THAT'S COME.

6    A    OKAY.

7    Q    SO LET'S LOOK AT WHAT HE SAID ABOUT WHAT HE

8    THINKS IS NEW AND UNIQUE ABOUT THE '087 DESIGN, OR

9    THE IPHONE, THE INITIAL IPHONE DESIGN.

10              CAN WE PUT UP SDX 37?

11              MS. KREVANS:  OBJECTION, YOUR HONOR.

12   IRRELEVANT TO THIS WITNESS'S TESTIMONY.  HE'S

13   TESTIFYING ABOUT THE IMPACT ON THE ORDINARY

14   OBSERVER.  MR. STRINGER IS AN INDUSTRIAL DESIGNER.

15   HE'S AN EXPERT.  HE'S NOT AN ORDINARY OBSERVER.

16              THE COURT:  OVERRULED.

17              MS. KREVANS:  CERTAINLY IT'S NOT

18   IMPEACHING.

19              THE COURT:  OVERRULED.  IF HE'S RELIED ON

20   ANY PART OF MR. STRINGER'S STATEMENTS, THEN IT MAY

21   COME IN.

22              GO AHEAD.

23              MR. VERHOEVEN:  MAY WE PUT UP THE SCREEN

24   OR THE SLIDE, THANK YOU.

25              FOR THE RECORD, THIS IS SDX 3191.  IT'S A

```
 1    DEMONSTRATIVE SLIDE.

 2    Q    MR. BRESSLER, ON THE LEFT IS A HIGHLIGHTED

 3    VERSION OF A COUPLE OF THE FIGURES FROM THE '087

 4    PATENT.

 5              DO YOU RECOGNIZE THOSE?

 6              MS. KREVANS:  OBJECTION, YOUR HONOR.

 7    THERE IS NO TESTIMONY OR FOUNDATION THAT THIS

 8    WITNESS RELIED ON ANY STATEMENTS FROM MR. STRINGER,

 9    CERTAINLY NOT HIS TRIAL TESTIMONY, IN FORMING HIS

10    OPINIONS.  THERE'S NO FOUNDATION FOR THIS TO BE

11    PART OF THIS WITNESS'S OPINION.

12              AND, AGAIN, MR. STRINGER IS NOT THE

13    ORDINARY OBSERVER.

14              THE COURT:  OVERRULED.  GO AHEAD.

15              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

16    Q    SO LET'S LOOK AT, ON JULY 31ST WHAT

17    MR. STRINGER SAID TO THE JURY ABOUT THIS FEATURE

18    THAT I'VE HIGHLIGHTED HERE, THE BEZEL ON THE '087

19    PATENT.

20              "QUESTION:  ANOTHER IMPORTANT DESIGN

21    FEATURE WITH RESPECT TO THE INITIAL IPHONE WAS THE

22    '087 -- AND THE '087 PATENT WAS THAT IT HAD THIS

23    CONTINUOUS RIM, OR BEZEL I THINK IS THE WORD YOU

24    USED.  IS THAT RIGHT?"

25              MR. STRINGER SAYS, "YES."
```

1          "QUESTION:  AND YOU AGREE WITH ME, THAT

2     WAS AN IMPORTANT ASPECT OF THIS DESIGN, RIGHT?

3          "ANSWER:  YES.

4          "QUESTION:  AND THE -- IT WAS IMPORTANT

5     THAT THE BEZEL GO CONTINUOUSLY AROUND THE RIM OF

6     THE PHONE, RIGHT?

7          "ANSWER:  YES.

8          "QUESTION:  AND IT WAS ALSO IMPORTANT

9     THAT THE BEZEL BE OF UNIFORM THICKNESS, CORRECT?

10          "ANSWER:  YES."

11          AND YOU CAN SEE FROM THE IMAGE, THE BEZEL

12     GOES ALL THE WAY AROUND AND IT HAS UNIFORM

13     THICKNESS ALL THE WAY AROUND.

14          DO YOU SEE THAT, SIR?

15     A    YES, I SEE IT.

16     Q    NOW, YOU AGREE WITH MR. STRINGER, DON'T YOU?

17     A    I AGREE THAT THAT WAS HIS GOAL AS A DESIGNER.

18     Q    AND THAT WAS AN IMPORTANT DESIGN FEATURE OF

19     THE '087, IT'S A DISTINCTION FROM THESE OTHER PRIOR

20     ART IMAGES WE LOOKED AT, THE UNIFORM BEZEL AND

21     UNIFORM THICKNESS?

22     A    I DON'T BELIEVE THAT'S THE ONLY DISTINCTION

23     FROM IT.  IT WAS ONE OF THEM.

24     Q    IT WAS ONE OF THEM?

25     A    IT MAY BE ONE OF THEM, YES.

```
1    Q    SO THIS IS ONE OF THE THINGS THAT THE ORDINARY

2    OBSERVER SHOULD FOCUS ON IN LOOKING AT THE ACCUSED

3    PRODUCTS; RIGHT?

4    A    NO.  I BELIEVE THE ORDINARY OBSERVER IS SEEING

5    AND DEVELOPING AN OVERALL IMPRESSION OF THE DESIGN

6    WHEN ALL OF THOSE ELEMENTS ARE TAKEN INTO

7    CONSIDERATION AT THE SAME TIME.

8              I DON'T BELIEVE AN ORDINARY OBSERVER

9    LOOKS AT ONE PART OF THE PHONE AT A TIME.

10   Q    SIR, DO YOU HAVE THE SAMSUNG INFUSE 4G IN

11   FRONT OF YOU, JX 1027?

12   A    I THINK I HAVE IT HERE SOMEWHERE.

13   Q    IF YOU DON'T --

14   A    CAN I CLOSE THIS BINDER?

15   Q    MS. KHAN HAS IT.  IT'S A PHYSICAL EXHIBIT,

16   SIR.

17             THAT'S THE ACTUAL PHYSICAL PHONE, RIGHT?

18   A    THIS IS WHICH ONE.

19   Q    THE INFUSE 4G, JX 1027.

20   A    YES, I BELIEVE IT IS.

21   Q    OKAY.  LET'S PUT UP SDX 3753.

22             THE INFUSE 4G HAS NO BEZEL, DOES IT, SIR?

23   A    I BELIEVE IT HAS A CREASE LINE THAT INFERS THE

24   SHAPE OF A BEZEL.

25   Q    SIR, THE INFUSE 4G HAS NO BEZEL, DOES IT?
```

```
 1   A    AS A SEPARATE PART, THAT'S CORRECT.

 2            MR. VERHOEVEN:  YOUR HONOR, IF I MAY

 3   APPROACH AND LET THE JURORS INSPECT THE 4G, THE

 4   INFUSE 4G?

 5            THE COURT:  YES, GO AHEAD.  CHANGE YOU.

 6   BY MR. VERHOEVEN:

 7   Q    DIDN'T YOU JUST TESTIFY A FEW MINUTES AGO THAT

 8   IF THE PHONE DOESN'T HAVE A BEZEL, THAT TAKES IT

 9   OUT OF BEING SUBSTANTIALLY SIMILAR, SIR?

10   A    NO.  I TESTIFIED THAT THE OVERALL IMPRESSION

11   OF THE ORDINARY OBSERVER SHOULD BE SUBSTANTIALLY

12   THE SAME AS THE FIGURES IN THE PATH.

13            WHETHER YOU CALL IT A BEZEL OR NOT, THERE

14   IS A SHAPE ON THIS PHONE THAT CAUSES A BELT LINE,

15   IF YOU WILL, OR A CREASE LINE THAT YOU SEE WITH THE

16   HIGHLIGHT THAT DOES MAKE IT SIMILAR TO THE

17   IMPRESSION THAT THE ORDINARY OBSERVER WOULD HAVE OF

18   THAT DESIGN.

19   Q    SO EVEN THOUGH YOU ADMIT THAT THE INFUSE 4G

20   HAS NO BEZEL, IT'S YOUR TESTIMONY TO THIS JUROR,

21   JURY, THAT IT'S STILL SUBSTANTIALLY SIMILAR TO THE

22   '087?

23   A    I BELIEVE THE OVERALL IMPRESSION IS SIMILAR,

24   YES.

25   Q    MS. KHAN, COULD YOU SHOW MR. BRESSLER PHYSICAL
```

```
 1    PHONE JX 1019, THE GALAXY S 4G?

 2    A    DOES THIS HAVE A STICKER ON IT?

 3    Q    IS THAT THE CORRECT PHONE?  WE'LL REPRESENT

 4    THAT'S THE CORRECT PHONE, SIR.  THE GALAXY S 4G?

 5    A    OH, I SEE, IT DOES HAVE A STICKER ON THE SIDE,

 6    THE JX 1019.

 7    Q    DO YOU AGREE THAT'S THE GALAXY S 4G?

 8    A    IT APPEARS TO BE.

 9             MS. KREVANS:  YOUR HONOR, THERE IS AN

10    EXHIBIT WHICH HAS BEEN AGREED ON BY THE PARTIES

11    WHICH IS A JOINT EXHIBIT THAT IS THE GALAXY S 4G.

12    IT'S IN EVIDENCE.  THIS IS NOT THAT PHONE.  I

13    OBJECT TO THIS.  THEY SHOULD SHOW THE ACTUAL

14    EXHIBIT WHICH THE PARTIES HAVE AGREED IS THE

15    GALAXY S 4G.

16             THE COURT:  WELL, I THOUGHT IT WAS

17    EXHIBIT 1019.

18             MS. KREVANS:  IT IS.  BUT THAT'S NOT THE

19    PHONE THEY'VE SHOWED HIM.  THIS PHONE HAS NO

20    EXHIBIT STICKER ON IT.

21             MR. VERHOEVEN:  IT DOES.

22             THE COURT:  DOES IT HAVE IT ON THE SIDE?

23             MS. KREVANS:  THAT'S NOT THE EXHIBIT

24    STICKER, YOUR HONOR.  THAT'S NOT THE EXHIBIT

25    THAT'S --
```

```
1              THE COURT:  IT SAYS JX 1019.
2              MS. KREVANS:  SOMEONE, I DON'T KNOW WHO,
3    HAS PUT THAT ON THE PHONE.  I DON'T KNOW IF THAT'S
4    THE RIGHT ONE.  WE HAVE IT.
5              THE COURT:  WHERE IS IT?  WHERE IS THE
6    OTHER ONE.
7              THE WITNESS:  RIGHT HERE.
8              MS. KREVANS:  RIGHT THERE.
9              THE COURT:  OKAY.  DOES IT HAVE A STICKER
10   ON IT?
11             THAT SAYS A-S 469.
12             THE WITNESS:  NO, IT -- OH, NO, THAT'S --
13             THE COURT:  IS THAT -- IS IT SLIGHTLY
14   DIFFERENT?  DOES IT HAVE HAS JX 1019 ON IT
15   ANYWHERE?
16             THE WITNESS:  YES, IT DOES.  I'M HAPPY TO
17   HAND IT TO YOU.
18             THE COURT:  OH, I SEE.  OKAY.  ALL RIGHT.
19   WHY DO WE HAVE TWO UP THERE?
20             MS. KREVANS:  THE A-S NUMBERS, YOUR
21   HONOR, WERE NUMBERS THAT THE PARTIES USED TO KEEP
22   TRACK OF THE DEVICES DURING DEPOSITION AND
23   INSPECTION BEFORE THERE WERE ACTUAL FORMAL EXHIBIT
24   NUMBERS.
25             THE COURT:  WHY DO WE HAVE TWO PHONES UP
```

```
 1    THERE?
 2              MS. KREVANS:  I DON'T KNOW WHY THERE'S
 3    ANOTHER EXHIBIT.  THAT'S WHY I SUGGEST WE USE THE
 4    ACTUAL EXHIBIT NUMBER.
 5              THE COURT:  WHY DON'T YOU TAKE BACK THE
 6    1019 THAT'S NOT THE OFFICIAL ONE, JUST SO WE DON'T
 7    GET CONFUSED WHEN THE JURY GOES INTO THE
 8    DELIBERATION ROOM, THEY SHOULD HAVE JUST ONE SET.
 9              WHERE IS THAT?  THE SECOND ONE.
10              MR. VERHOEVEN:  HE'S GOT IT IN HIS HAND.
11              THE COURT:  ALL RIGHT.  WHAT HAPPENED TO
12    THE OTHER ONE THAT SAYS 1019.
13              MR. VERHOEVEN:  MS. KHAN TOOK IT BACK.
14              THE COURT:  ALL RIGHT.  THANKS.
15              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
16    Q    SO WE'VE GOT IT NOW.
17    A    YES.
18    Q    THAT'S THE GALAXY S 4G, JX 1019 IN FRONT OF
19    YOU?
20    A    YES, I BELIEVE SO.
21    Q    OKAY.  JUST SO THAT WE CAN REFRESH OURSELVES,
22    LET'S GO BACK TO SLIDE SDX 3791.
23              AND, AGAIN, MR. STRINGER SAYS, "IT WAS
24    ALSO IMPORTANT THAT THE BEZEL BE OF UNIFORM
25    THICKNESS," AND IF YOU LOOK AT THE PICTURE FOR THE
```

1    Q    SUBSTANTIALLY DIFFERENT?

2    A    SUBSTANTIALLY DIFFERENT, I'M SORRY, I NEED TO

3    RESERVE FOR THE OVERALL DESIGN.

4    Q    SO YOU DISAGREE --

5    A    IT'S A LONG LEVEL OF DETAIL TO LOOK AT IN

6    ANALYZING THE DESIGN.

7    Q    DO YOU DISAGREE THAT THEY'RE SUBSTANTIALLY

8    DIFFERENT IN TERMS OF THE LATERAL BORDER?

9    A    PARDON ME.

10    Q    YOU DISAGREE THAT THE IPHONE 4G IS

11    SUBSTANTIALLY DIFFERENT FROM THE '677 PATENT AND

12    THE '087 PATENT IN TERMS OF THE WIDTH OF THE

13    LATERAL BORDER?

14    A    I BELIEVE THERE IS A MINOR DIFFERENCE BETWEEN

15    THEM.  I DON'T BELIEVE IT'S SUBSTANTIALLY

16    DIFFERENT.

17    Q    SO IF THE WIDTH IS MEASURED AND IT TURNS OUT

18    TO BE A FACTOR OF 15 TIMES WIDER, YOU THINK THAT'S

19    JUST A MINOR DETAIL?

20    A    I BELIEVE THAT DEPENDS ON THE CONTEXT OF THE

21    DESIGN AND THE OVERALL IMPRESSION THAT'S BEING

22    CREATED.

23    Q    SO YOU CAN'T SAY?

24    A    OKAY, IF THAT WORKS FOR YOU.

25         I MEAN, THAT'S -- YOU'RE ASKING ME TO

1    COMPARE PEANUT BUTTER TO TURKEY.  I'M SORRY.

2    Q     PEANUT BUTTER AND TURKEY?

3    A     YES.

4    Q     WHICH ONE IS PEANUT BUTTER AND WHICH ONE IS

5    TURKEY?

6    A     I HAVE NO IDEA.  I'M JUST GETTING FRUSTRATED

7    THAT YOU'RE ASKING ME TO DESIGN.

8    Q     SIR, DETAILS MATTER IN DESIGN PATENTS, DON'T

9    THEY?

10   A     IN GENERAL, YES.  THEY FORM -- THEY CONTRIBUTE

11   TO HOW AN ORDINARY OBSERVER FORMS AN OVERALL

12   IMPRESSION.

13   Q     LET'S GO TO SDX 3799.

14         NOW, MR. STRINGER ALSO TESTIFIED ON JULY

15   31ST ABOUT THE DARK OILY POND.

16         YOU'VE HEARD ABOUT THE DARK, OILY POND

17   BEFORE; RIGHT?

18   A     YES.

19   Q     THIS IS JULY 31ST, TRANSCRIPT PAGES 521:23

20   THROUGH 522, LINE 12.

21         "QUESTION:  IN FACT, YOU WANTED TO CREATE

22   A PRODUCT THAT EMBODIED THE SIMPLEST OF ICONS, AND

23   ONE KEY IMAGE WAS THAT OF A DARK, OILY POND.  IS

24   THAT RIGHT?

25         "ANSWER:  YES.

1158

```
 1              "QUESTION:  THAT WAS YOUR DESIGN GOAL;
 2      RIGHT?
 3              "ANSWER:  THAT WAS ONE --
 4              "QUESTION:  GO AHEAD.
 5              "ANSWER:  THAT WAS ONE DESCRIPTION OF A
 6      DESIGN GOAL, YES.
 7              "QUESTION:  YOU DIDN'T WANT TO PUT
 8      MULTIPLE BUTTONS ON THE FACE OF THE PHONE; CORRECT?
 9              "ANSWER:  CORRECT.
10              "QUESTION:  YOU WANTED IT TO BE AS SIMPLE
11      AS POSSIBLE?
12              "ANSWER:  YES."
13              DO YOU REMEMBER THAT TESTIMONY?
14      A    I DO.
15      Q    IS THAT WHAT "MINIMALIST DESIGN" MEANS, MAKING
16      IT AS SIMPLE AS POSSIBLE?
17      A    DO YOU REALLY WANT ME TO GET INTO A --
18      Q    I'M ASKING YOU, SIR.  CAN YOU ANSWER THE
19      QUESTION?
20      A    I DON'T BELIEVE IT'S THAT SIMPLE, BUT YES.
21      Q    OKAY.  NOW, LET'S LOOK AT A COMPARISON OF THE
22      '677, DARK, OILY POND AGAINST THE GALAXY S II
23      T-MOBILE.  OOPS.
24              JUST ONE SECOND, YOUR HONOR.
25              THE COURT:  OKAY.
```

```
 1                (PAUSE IN PROCEEDINGS.)

 2                MR. VERHOEVEN:  I MISSPOKE, YOUR HONOR.

 3     Q    AGAINST THE INFUSE 4G.  THIS IS SDX 3776.

 4                SO ON THE LEFT HERE, WE'VE GOT THE '677

 5     DESIGN PATENT.  IT'S GOT THE BLACK FACE; RIGHT?

 6     A    YES.

 7     Q    AND IT'S GOT -- IT'S NOT CLAIMING THIS BUTTON

 8     DOWN AT THE BOTTOM; RIGHT?

 9     A    YES.

10     Q    THAT'S WHY THE DOTTED LINES ARE AROUND IT;

11     RIGHT?

12     A    CORRECT.

13     Q    SO THE ONLY DESIGN ELEMENTS IN THIS DARK, OILY

14     POND THAT MR. STRINGER WAS TALKING ABOUT ARE THIS

15     LOZENGE SHAPE AND THIS SCREEN SHAPE; RIGHT?

16     A    YES.

17     Q    NOW, IF YOU LOOK AT THE INFUSE 4G, IT'S GOT A

18     BUNCH OF KEYS, DOESN'T IT, SIR?

19     A    YES.  THEY'RE SO SMALL YOU NEED TO POINT THEM

20     OUT WITH A CIRCLE, BUT, YES, THERE ARE KEYS THERE,

21     YES.

22     Q    THESE ARE KEYS THAT ARE DESIGNED FOR USERS TO

23     TOUCH AND HAVE FUNCTIONS HAPPEN; CORRECT, SIR?

24     A    YES.

25     Q    THE MENU KEY RIGHT THERE, DO YOU HAVE AN
```

1    UNDERSTANDING OF WHAT THAT'S FOR?

2    A    I DO, BUT THAT HAD NOTHING TO DO WITH MY

3    DESIGN PATENT INVESTIGATION.

4    Q    TELL THE JURY WHAT THAT'S FOR?

5    A    I ASSUME IT'S TO PULL UP A MENU.

6    Q    THERE'S THIS LITTLE PICTURE OF A HOUSE.

7    THAT'S A SEPARATE KEY, ISN'T IT?

8    A    I GUESS.

9    Q    YOU DON'T KNOW?

10   A    I'M NOT AN EXPERT IN THE FUNCTION OF PHONE,

11   SIR.  I'M SORRY.

12   Q    WELL, YOU'RE A DESIGN --

13   A    I AM ANALYZING THE OVERALL IMPRESSION OF THE

14   DESIGN AND THOSE ARE VISUAL ELEMENTS THAT, IN THIS

15   DESIGN, I HAVE A FEELING YOU BARELY NOTICE UNTIL

16   THE PHONE LIGHTS UP.

17   Q    I THOUGHT I HEARD YOU TESTIFY ABOUT WHETHER OR

18   NOT CERTAIN ELEMENTS OF THE DESIGN ARE FUNCTIONAL

19   WHEN COUNSEL FOR APPLE WAS ASKING YOU QUESTIONS ON

20   YOUR DIRECT EXAM.

21         ARE YOU TELLING ME YOU'RE NOT AN EXPERT

22   IN THAT AREA?

23   A    NO, I'M NOT TELLING YOU THAT.

24   Q    I THOUGHT I JUST HEARD YOU SAY THAT, SIR?

25   A    WHAT?

```
 1   Q    THAT YOU'RE NOT AN EXPERT IN THE FUNCTIONALITY

 2   OF THE PHONE?

 3   A    I'M NOT AN EXPERT IN HOW THE PHONE WORKS.

 4   Q    IS THAT DIFFERENT FROM --

 5   A    YES, IT IS.

 6   Q    -- FROM THE FUNCTIONALITY OF THE PHONE?

 7   A    IT'S DIFFERENT FROM THE FUNCTIONALITY AS IT'S

 8   UNDERSTOOD IN A DESIGN PATENT.

 9   Q    HOW SO?

10   A    PARDON ME?

11   Q    HOW SO?

12   A    FUNCTIONALITY IN A DESIGN PATENT HAS TO DO

13   WITH WHETHER ANY OF THE VISUAL ELEMENTS OF THE

14   APPEARANCE ARE DICTATED BY THE FUNCTION THEY

15   PERFORM.

16   Q    OKAY.  SO FUNCTION IN THAT SENTENCE MEANS HOW

17   IT WORKS?

18   A    NO.  FUNCTIONALITY IN THAT SENTENCE IS

19   RELATING TO THE APPEARANCE, AND IF YOU CAN HAVE A

20   DIFFERENT APPEARANCE THAT PERFORMS THE SAME

21   FUNCTION, THEN IT IS NOT CONSIDERED FUNCTIONAL AS

22   IT RELATES TO A DESIGN PATENT.

23   Q    OKAY.  WHEN YOU USE THE PHRASE "PERFORMS THE

24   SAME FUNCTION," YOU'RE TALKING ABOUT HOW THE PHONE

25   WORKS; RIGHT?
```

```
 1    A    NOT NECESSARILY.  I MEAN, IF IT'S -- IF IT'S

 2    WHERE THE DISPLAY IS, YOU KNOW, YOU CAN -- A

 3    DISPLAY FUNCTIONS, IT IS FUNCTIONAL.

 4         BUT WHERE IT IS, WHAT SIZE IT IS, THE

 5    LOCATION OF IT AND WHAT THE SHAPE OF THE OUTSIDE OF

 6    IT IS, THOSE ARE ALL APPEARANCE DECISIONS THAT ARE

 7    NOT DRIVEN BY FUNCTION.

 8    Q    WHEN YOU USE THE WORD "FUNCTION" IN THAT LAST

 9    ANSWER, YOU MEAN HOW THE PHONE FUNCTIONS?  NO?

10    A    NO, I DO NOT.

11    Q    OKAY.  AND THAT WAS THE UNDERSTANDING YOU USED

12    WHEN YOU APPLIED YOUR ANALYSIS, WHAT YOU JUST SAID?

13    A    AS I EXPLAINED IT, YES.

14    Q    BUT JUST SO THAT WE'RE CLEAR, YOU'RE NOT AN

15    EXPERT ON FUNCTIONALITY OF THE SMARTPHONES?

16    A    IN YOUR USE OF THE WORD "FUNCTIONALITY" AS IT

17    RELATES TO HOW THEY WORK, THAT'S CORRECT.

18    Q    IS THIS -- DO YOU SEE THESE FOUR KEYS ON THE

19    BOTTOM OF THE INFUSE 4G?

20    A    YES.

21    Q    THAT'S -- THAT'S ORNAMENTATION ON THE FRONT

22    FACE OF THE PHONE; RIGHT?

23    A    YEAH, MINOR ORNAMENTS, YES.

24    Q    AND THAT'S DIFFERENT FROM THE CONCEPT OF A

25    DARK, OILY POND?
```

1    A    NO.  I BELIEVE THE DARK, OILY POND IS THERE

2    AND THOSE HAPPEN TO BE SOME RELATIVELY INDISTINCT

3    ELEMENTS THAT ARE AT THE BOTTOM OF IT.

4    Q    WHAT DOES LITTLE HOUSE SYMBOL MEAN?

5    A    DO YOU WANT ME TO INTERPRET IT SITTING HERE ON

6    THE STAND?

7    Q    TELL THE JURY YOUR UNDERSTANDING?

8    A    I WOULD INTERPRET IT TO BE A HOME BUTTON.

9    Q    SO A USER --

10   A    HOME KEY.

11   Q    SO THAT'S FOR A USER TO TOUCH TO GO BACK TO

12   THE HOME SCREEN?

13   A    YES.

14   Q    OKAY.  YOU SAY THIS IS MINIMALIST AND NO ONE

15   WOULD NOTICE IT?

16   A    PARDON ME?

17   Q    IS IT YOUR TESTIMONY TO THE JURY THAT THIS IS

18   SO MINIMALIST THAT NOBODY WOULD NOTICE IT?

19   A    NO.  IT'S MY TESTIMONY THAT THEY WOULD NOT

20   HAVE A SIGNIFICANT INFLUENCE ON THE OVERALL

21   IMPRESSION THAT THE ORDINARY OBSERVER HAD OF THE

22   DESIGN OF THIS PHONE.

23   Q    THE ORDINARY OBSERVER IS GOING TO LOOK AT THAT

24   AND UNDERSTAND THAT'S COMMUNICATING A HOUSE AND IF

25   THEY TOUCH IT, THEY CAN GO TO THE HOME SCREEN;

```
 1     RIGHT?
 2     A    THAT'S TRUE IN HOW THE PHONE OPERATES, THAT'S
 3     CORRECT.
 4     Q    SO THE USER IS GOING TO KNOW THAT, THEY'RE
 5     GOING TO SEE IT, THEY'RE GOING TO UNDERSTAND IT;
 6     RIGHT?
 7     A    YES.
 8     Q    AND THE SAME THING IS TRUE FOR THIS MENU
 9     BUTTON; RIGHT?
10     A    YES.
11     Q    DO YOU SEE THIS ARROW THAT CURVES AROUND
12     BACKWARDS?
13     A    YES.
14     Q    WHAT'S YOUR UNDERSTANDING OF WHAT THAT BUTTON
15     IS?
16     A    I'M NOT SURE.  I CAN GUESS IT MEANS GO BACK.
17     Q    WHEN YOU CONDUCTED YOUR ANALYSIS OF THE
18     INFUSE 4G, DID YOU ACTUALLY USE ANY OF THESE
19     BUTTONS?
20     A    IN TERMS OF MY ANALYSIS OF THE DESIGN PATENTS,
21     NO.
22     Q    SO IN ANY EVENT, YOU'D AGREE WITH ME THAT THIS
23     IS SOMETHING THAT A USER WOULD SEE AND UNDERSTAND,
24     THIS IS A BUTTON THEY CAN PRESS IN ORDER TO GO
25     BACKWARDS?
```

1    A     THAT WOULD BE PART OF THEIR UNDERSTANDING OF

2    THE USE OF THE PHONE, NOT THEIR OVERALL IMPRESSION

3    OF THE DESIGN AS IT RELATES TO A DESIGN PATENT.

4    Q     YOU WOULD AGREE WITH ME THAT IN THEIR OVERALL

5    IMPRESSION, THEY WOULD SEE THERE'S FOUR SEPARATE

6    BUTTONS ON THE BOTTOM OF THIS PHONE?  YES?

7    A     I BELIEVE THEY WOULD SEE THEM AND THAT THEY

8    ARE NOT AS IMPORTANT IN THE OVERALL IMPRESSION AS

9    THE CONTINUOUS GLASS REFLECTIVE, TRANSPARENT BLACK

10   FACE.

11   Q     AND DO YOU SEE THIS SEARCH KEY DOWN AT THE

12   BOTTOM?

13   A     I SEE YOU POINTING TO IT, YES.

14   Q     I GUESS WE LABELED IT A SEARCH KEY.

15         DID YOU UNDERTAKE ANY ANALYSIS OF THAT

16   BUTTON?

17   A     NO.

18   Q     SO YOU DIDN'T FACTOR ANY OF THESE BUTTONS INTO

19   YOUR ANALYSIS, DID YOU, SIR?

20   A     ONLY AS TO WHETHER I COULD SEE THEM AND WHAT

21   FACTOR THEY HAD IN THE OVERALL IMPRESSION OF THE

22   APPEARANCE OF THE PHONE.

23   Q     AND THEN YOU SEE THERE'S, THERE'S BRANDING ON

24   THE PHONE, AT&T AND SAMSUNG?

25   A     I BELIEVE THAT BRANDING IS NOT CONSIDERED --

166

```
1    Q    DO YOU SEE THAT?

2    A    I SEE IT, YES.

3    Q    AND THEN THERE'S HOLES AT THE TOP THAT ARE

4    HARD TO SEE ON THIS SCREEN, FOR THE CAMERA; RIGHT?

5    A    IF YOU SAY SO.

6    Q    AND THE SENSORS?

7    A    I --

8    Q    YOU DIDN'T EXAMINE THIS TO DETERMINE WHETHER

9    IT'S GOT A CAMERA HOLE?

10   A    TO BE HONEST WITH YOU, I NOTICED THAT THERE

11   WAS AN OPENING IN THE FRONT FACE AS A DESIGNER

12   EXAMINING THE DETAILS OF A PHONE.

13            I DO NOT BELIEVE THAT AN ORDINARY

14   OBSERVER WOULD BE LOOKING AROUND FOR WHERE THE

15   SENSOR IS ON THE FRONT OF THE PHONE.

16            MR. VERHOEVEN:  YOUR HONOR, I'M ABOUT TO

17   SWITCH SUBJECTS.  I DON'T KNOW IF YOU WANT ME TO

18   KEEP GOING OR IF YOU WANT TO TAKE A BREAK NOW.

19            THE COURT:  WE CAN GO AHEAD AND TAKE A

20   BREAK NOW.  IT'S 2:43.  SO WE'LL TAKE A 15-MINUTE

21   BREAK.

22            PLEASE CONTINUE TO KEEP AN OPEN MIND.

23   DON'T TALK AMONG YOURSELVES OR WITH ANYONE ABOUT

24   THE CASE AND PLEASE DON'T READ ABOUT THE CASE OR DO

25   ANY RESEARCH.
```

```
 1                 THANK YOU.

 2                 YOU CAN LEAVE YOUR BOOKS EITHER HERE OR

 3      IN THE JURY ROOM.  WHATEVER IS EASIER FOR YOU.

 4                 (WHEREUPON, THE FOLLOWING PROCEEDINGS

 5      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

 6                 THE COURT:  YOU CAN STEP DOWN.  THE

 7      RECORD SHOULD REFLECT THE JURORS HAVE LEFT THE

 8      COURTROOM.

 9                 DO WE NEED TO HANDLE THIS '087 COMPARISON

10      WITH THE INFUSE, OR ARE YOU GOING TO MOVE ON?

11                 MR. VERHOEVEN:  I WOULD LIKE TO SHOW

12      THOSE SLIDES, YOUR HONOR.  WHAT WE DID WAS WE

13      DIDN'T REALIZE THAT THEY HAD OBJECTIONS TO THOSE

14      OTHER PHONES.  THEY NEVER TOLD US THAT.  IF WE HAD

15      KNOWN THAT, WE COULD HAVE SWAPPED THESE OUT.  WE'RE

16      SWAPPING OUT THE IMAGE OF THE INFUSE 4G TO BE THE

17      GALAXY S.  IT'S NOT CONTROVERSIAL.

18                 THE COURT:  WHAT IS THIS -- I ONLY

19      THOUGHT THIS WAS ONE THAT WAS IN DISPUTE.

20                 MR. VERHOEVEN:  I DIDN'T USE THE OTHER

21      ONE BECAUSE YOUR HONOR TOLD ME TO MOVE ON.  WE CAN

22      PUT THEM UP.

23                 THE COURT:  ALL RIGHT.  WHY DON'T WE SEE

24      THOSE, PLEASE.

25                 MR. VERHOEVEN:  I DON'T KNOW IF EVERYONE
```

```
 1    HAS TO STAND UP STILL.

 2             THE COURT:  OH, NO.  I'M SORRY.  I ALWAYS

 3    FORGET ABOUT THAT.  PLEASE TAKE A SEAT.

 4             ALL RIGHT.  SO THAT ONE I HAD AS DEFENSE

 5    EXHIBIT 62.  YOU SAID IT'S UNNUMBERED?  DO YOU

 6    HAVE --

 7             MR. VERHOEVEN:  WHAT WE DID, YOUR HONOR,

 8    IS WHEN YOU TOLD US YOUR RULING, WE HAD A DIFFERENT

 9    PHONE FOR THIS POINT.

10             THE COURT:  OKAY.

11             MR. VERHOEVEN:  AND ALL WE DID IS WE TOOK

12    A PICTURE OF THE PHONE YOU SAID WE COULD USE

13    INSTEAD OF THE OTHER PHONE.

14             THE COURT:  ALL RIGHT.

15             MR. VERHOEVEN:  AND IT'S THE SAME IMAGE,

16    EXCEPT A DIFFERENT PHONE.

17             THE COURT:  ALL RIGHT.  SO LET ME HEAR

18    FROM MS. KREVANS.  WHAT'S YOUR OBJECTION?

19             MS. KREVANS:  BECAUSE, YOUR HONOR, THEY

20    HAVE BLOWN UP A SMALL PORTION OF THE FACE OF THE

21    PHONE TO A DEGREE THAT NO PERSON WOULD ACTUALLY SEE

22    IT IN THEIR LIFE.  SO IT'S A COMPLETE DISTORTION OF

23    WHAT EITHER AN ORDINARY OBSERVER OR EVEN A DESIGN

24    EXPERT WOULD SEE.  THERE'S TINY DETAIL ON THE FRONT

25    OF THE PHONE AND THEY'VE CREATED THIS BIG IMAGE OF
```

```
 1    OPEN COURT OFF THE RECORD.)

 2              MS. KREVANS:  YOUR HONOR, THAT DOES NOT

 3    IMPEACH ANY TESTIMONY THAT THE WITNESS HAS GIVEN

 4    HERE IN COURT.

 5              THE COURT:  OVERRULED.

 6    BY MR. VERHOEVEN:

 7    Q    THAT WAS YOUR UNDERSTANDING WHEN YOU TESTIFIED

 8    AT YOUR DEPOSITION; RIGHT?

 9    A    I GUESS.  I GUESS I SAID THAT IN ANSWER TO

10    THAT QUESTION, YES.

11    Q    AND LET ME ASK IT ONE MORE TIME?

12    A    I WAS CONFUSED.

13    Q    LET ME ASK ONE MORE TIME.  AND, AGAIN, TO THE

14    EXTENT YOU CAN FAIRLY ANSWER MY QUESTION YES OR NO,

15    I WOULD APPRECIATE IT.

16              ARE YOU AN EXPERT IN THE FUNCTIONALITY OF

17    PHONES?

18    A    IN TERMS OF THEIR OPERATION FUNCTIONALITY, NO.

19    Q    OKAY.  YOU'RE NOT AN EXPERT WITH RESPECT TO

20    TOUCH DISPLAY TECHNOLOGY; CORRECT?

21    A    THAT IS CORRECT.

22    Q    IN FACT, YOU'RE NO MORE EQUIPPED THAN ANY

23    ORDINARY OBSERVER TO OPINE ON THE FUNCTIONALITY OF

24    A SMARTPHONE?

25    A    DEPENDS ON WHETHER YOU MEAN FUNCTIONALITY
```

1097

1    RELATIVE TO A DESIGN PATENT OR THE GENERAL

2    FUNCTIONALITY OF HOW IT OPERATES.

3    Q    IN TERMS OF THE SPECIFIC TECHNICAL KNOWLEDGE

4    AND SCIENTIFIC FUNCTIONALITY, YOU DON'T HAVE ANY

5    KNOWLEDGE; RIGHT?

6    A    THAT'S CORRECT.

7    Q    IN FACT, YOU BELIEVE THAT YOU ONLY NEED A

8    THIN, TOP LEVEL KNOWLEDGE TO BE ABLE TO PASS

9    JUDGMENT ON THE COMPARABLE FUNCTIONALITY OF THE

10   DIFFERENT PHONES?

11   A    AS IT RELATES TO DESIGN FUNCTION, I BELIEVE

12   THAT'S TRUE.

13   Q    IT'S YOUR TESTIMONY, SIR, THAT HAVING A

14   DISPLAY ELEMENT IS NOT NECESSARY OR FUNCTIONAL FOR

15   A SMARTPHONE?  THAT'S YOUR TESTIMONY TO THIS JURY;

16   RIGHT?

17   A    NO.

18   Q    OKAY.  WELL, LET'S -- YOUR DEPOSITION

19   TESTIMONY, AGAIN, WAS TAKEN APRIL 24TH, 2012;

20   RIGHT?

21   A    THAT'S CORRECT.

22   Q    IT WAS UNDER OATH?

23   A    YES.

24   Q    AND YOU ANSWERED QUESTIONS AS CAREFULLY AS YOU

25   COULD; RIGHT?

1    A    YES.

2    Q    LET'S PLAY AN EXCERPT FROM YOUR DEPOSITION,

3    PAGE 210, LINES 14 THROUGH 24.

4            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

5    OPEN COURT OFF THE RECORD.)

6    BY MR. VERHOEVEN:

7    Q    THAT WAS TRUE TESTIMONY WHEN YOU GAVE IT?

8    A    THAT WAS PART OF THE TESTIMONY THAT I GAVE

9    THAT IT TURNS OUT WAS, WAS GOING BOTH DIRECTIONS

10   DEPENDING ON -- BECAUSE I MISUNDERSTOOD THE USE OF

11   THE TERM "FUNCTION" AND THE QUESTION AT THAT TIME.

12   Q    SO THAT TESTIMONY IS NOT TRUE?

13   A    THE TESTIMONY IS TRUE.  I WAS REFERRING TO THE

14   FUNCTION AS IT RELATES TO A DESIGN PATENT, WHICH

15   MEANS THEY CAN BE ANY SHAPE AND LOCATION AND SIZE.

16           AND IN THAT SENSE, IT'S NOT FUNCTIONAL IN

17   THAT SHAPE, LOCATION OR SIZE ARE NOT REQUIRED BY AS

18   FUNCTIONS.

19   Q    CAN WE PUT UP THE HARD COPY TRANSCRIPT OF WHAT

20   WE JUST WATCHED, PAGE 210, LINES 14 THROUGH 24.

21           SO THIS IS 210, LINE 14 THROUGH 24.

22   APRIL 24TH, 2012 DEPOSITION.

23           SIR, DO YOU SEE THE QUESTION, IT DOESN'T

24   TALK ABOUT THE DESIGN PATENTS, IT TALKS ABOUT

25   SMARTPHONES.

1099

```
 1              DO YOU SEE THAT, SIR?

 2    A    I SEE THAT'S WHAT IT SAYS.

 3    Q    THAT'S WHAT YOU WERE ASKED; RIGHT?

 4    A    I BELIEVE IT WAS ASKING ME ABOUT AS IT RELATED

 5    TO DESIGN PATENTS.

 6    Q    BUT IT DOESN'T SAY THAT, DOES IT?

 7    A    I DON'T SEE IT SAYING THAT.

 8    Q    USING YOUR DEFINITION OF FUNCTIONAL, ISN'T IT

 9    TRUE THAT YOUR OPINION TO THIS JURY IS THAT THE USE

10    OF A TRANSPARENT COVER OVER A DISPLAY IS NOT

11    NECESSARY FOR FUNCTIONAL?

12    A    IN DEFINING "FUNCTIONAL" AS NOT BEING DRIVEN

13    BY THE SHAPE AND LOCATION AND IT NOT BEING -- I

14    BELIEVE THAT'S TRUE.  I THINK THE FACT THAT IT IS

15    CLEAR ON A SMARTPHONE NEEDS -- YES, THAT'S

16    FUNCTIONAL.

17    Q    LET'S PLAY PAGE 209 FROM THE SAME DEPOSITION,

18    LINES 9 THROUGH 21.

19              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20    OPEN COURT OFF THE RECORD.)

21    BY MR. VERHOEVEN:

22    Q    DO YOU STAND BY THAT TESTIMONY?

23    A    I BELIEVE THAT'S WHAT I MAY HAVE JUST SAID A

24    MOMENT AGO.

25    Q    SO IT'S YOUR TESTIMONY TO THIS JURY THAT
```

1    HAVING A CLEAR COVER OVER THE DISPLAY ELEMENT IS

2    NOT SOMETHING THAT'S FUNCTIONAL?

3    A    FROM A PERFORMANCE STANDPOINT AND OPERATIONS

4    STANDPOINT, I BELIEVE IT'S ABSOLUTELY FUNCTIONAL.

5    Q    BUT JUST NOT IN YOUR ANALYSIS?  IS THAT RIGHT?

6    A    IF IT'S CLEAR THAT IT'S A -- IF IT IS CLEAR IN

7    THE DESIGN PATENT THAT IT'S A DISPLAY, THEN ONE

8    WOULD EXPECT IT TO BE TRANSPARENT OVER THAT

9    DISPLAY.

10   Q    BUT YOUR CONCLUSION, WHEN YOU WERE ASKED UNDER

11   OATH ABOUT WHETHER USE OF A COVER THAT IS

12   TRANSPARENT OR A DISPLAY IS FUNCTIONAL, IS THAT

13   IT'S NOT FUNCTIONAL AS YOU'VE DEFINED IT; RIGHT?

14   A    I WAS TALKING ABOUT ITS SHAPE AND LOCATION AND

15   SIZE AND THE DESIGN PATENT DEFINITION OF

16   FUNCTIONALITY.

17   Q    AND YOU ALSO TESTIFIED THAT -- WELL, LET ME

18   ASK YOU, IN YOUR VIEW, IS LOCATING THE SPEAKER IN

19   THE UPPER PORTION OF THE FRONT FACE OF A SMARTPHONE

20   SOMETHING THAT'S NOT FUNCTIONAL AS YOU USE THAT

21   TERM IN YOUR EXPERT REPORTS?

22   A    DEFINING THE PRECISE LOCATION FROM AN

23   AESTHETIC STANDPOINT, IS NOT DRIVEN BY FUNCTION.

24   Q    SO THAT'S NO, IT'S NOT FUNCTIONAL?

25   A    WITH THE CONDITIONS THAT I JUST SAID, YES,

```
 1     IT'S NOT FUNCTIONAL.

 2     Q    LET'S PLAY PAGE 212, LINE 25 THROUGH 213, LINE

 3     4 OF YOUR APRIL 24TH DEPOSITION.

 4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 5     OPEN COURT OFF THE RECORD.)

 6     BY MR. VERHOEVEN:

 7     Q    YOU DIDN'T HAVE ANY QUALIFICATIONS WHEN YOU

 8     ANSWERED THAT AT YOUR DEPOSITION, DID YOU, SIR?

 9     A    BECAUSE I UNDERSTOOD IT TO BE THE WAY I JUST

10     SAID IT.

11     Q    DO YOU STAND BY THAT TESTIMONY?

12     A    YES.

13     Q    NOW, YOU TESTIFIED ON DIRECT EXAMINATION THAT

14     YOUR AN INDUSTRIAL DESIGNER; CORRECT?

15     A    THAT'S CORRECT.

16     Q    BUT, IN FACT, YOU'VE NEVER DESIGNED A

17     SMARTPHONE, HAVE YOU?

18     A    NO, I HAVE NOT DESIGNED A SMARTPHONE.

19     Q    IS IT FAIR TO SAY THAT YOU HAVE NEVER DESIGNED

20     A SMARTPHONE AT ANY STAGE?

21     A    I'M NOT SURE WHAT YOU MEAN BY "ANY STAGE."

22     Q    WELL, LET ME ASK IT THIS WAY:  REGARDLESS OF

23     WHETHER OR NOT THE DESIGN WAS ACTUALLY IMPLEMENTED

24     OR MANUFACTURED OR PRODUCED IN ANY WAY, YOU NEVER

25     HAVE NOT DESIGNED ANY SMARTPHONES AT ANY STAGE IN
```

```
 1      THAT PROCESS?

 2      A    NO.  I'VE DESIGNED CELL PHONES, NOT

 3      SMARTPHONES.

 4      Q    YOU HAVE DESIGNED SOME CELL PHONES, BUT THOSE

 5      DESIGNS ARE ONLY CONCEPTS; RIGHT?

 6      A    THAT'S CORRECT.

 7      Q    AND NONE OF THOSE CONCEPTS WERE EVER PRODUCED

 8      OR MANUFACTURED; CORRECT?

 9      A    I DON'T KNOW FOR SURE.

10      Q    WELL, AS FAR AS YOU KNOW, THOSE CONCEPTS WERE

11      NEVER EVEN MADE INTO MODELS OR PROTOTYPES, WERE

12      THEY?

13      A    YES, THEY WERE MADE INTO MODELS.

14      Q    OKAY.  LET'S LOOK AT YOUR DEPOSITION, THIS

15      TIME LET'S JUST PUT UP THE WRITTEN DEPOSITION,

16      PLEASE, MR. FISHER, DATED APRIL 23, 2012.

17                  JUST ONE SECOND, YOUR HONOR.

18                  (PAUSE IN PROCEEDINGS.)

19                  MR. VERHOEVEN:  I'M SORRY, MR. FISHER.

20      CAN WE GO TO THE ITC TRANSCRIPT, PAGE 219, LINES 13

21      THROUGH 24.

22      Q    DO YOU SEE THIS IS FROM THE HEARING THAT YOU

23      ATTENDED AND GAVE TESTIMONY TO RELATED IN ANOTHER

24      PROCEEDING.  DO YOU REMEMBER THAT, IN WASHINGTON?

25      A    IT LOOKS FAMILIAR, YES.
```

1203

1    Q    AND YOU WERE ASKED, WITH RESPECT TO OTHER CELL

2    PHONE DESIGNS THAT YOU WORKED ON, DID YOU WORK ON

3    ANY OF THOSE PRIOR TO 2006?  DO YOU SEE THAT?

4    A    YES.

5    Q    AND DOWN AT THE BOTTOM, IT SAYS QUESTION, THIS

6    IS LINES 21 THROUGH 24?

7             "QUESTION:  DID ANY OF THEM BECOME MODELS

8    OR PROTOTYPES OR WERE OTHERWISE EXPRESSED IN

9    THREE-DIMENSIONAL FORM?"

10            WHAT WAS YOUR ANSWER?

11   A    APPARENTLY I SAID "NOT THAT I KNOW OF," AND

12   I'D APPARENTLY FORGOTTEN THAT MODELS AND MOCK-UPS

13   WERE MADE.

14   Q    SO IN MAY OF THIS YEAR YOU TESTIFIED NONE WERE

15   MADE, AND NOW YOU'RE TESTIFYING THAT SOME WERE

16   MADE?  IS THAT RIGHT?

17   A    YES.  I MEAN, IT WAS A LONG TIME AGO.  I THINK

18   I REMEMBERED THAT THERE WERE MODELS MADE.

19   Q    SO IT THIS TESTIMONY NOT TRUE?

20   A    AT THAT POINT, I DIDN'T REMEMBER THAT.

21   Q    THAT TESTIMONY WAS GIVEN UNDER OATH, SIMILAR

22   TO THIS TESTIMONY; CORRECT?

23   A    TO THE BEST OF MY ABILITY, YES.

24   Q    ISN'T IT TRUE THAT IN ALL YOUR TIME AS AN

25   INDUSTRIAL DESIGNER, YOU ONLY WORKED ON CONCEPTS

1    FOR TWO OR THREE CELL PHONE PRODUCTS?

2    A    I'M NOT SURE HOW MANY THERE WERE.  I THINK

3    THERE MAY HAVE BEEN AS MANY AS HALF A DOZEN.

4    Q    ALL RIGHT.  WELL, LET'S GO TO YOUR DEPOSITION,

5    APRIL 23 -- I'M SORRY.  WITHDRAW THAT.

6            LET'S GO TO THE HEARING PROCEEDING, PAGE

7    53, LINE 17 THROUGH 54, LINE 6.

8            I APOLOGIZE, YOUR HONOR.  ONE MORE TIME.

9            LET'S GO TO THE DEPOSITION OF

10   MR. BRESSLER DATED APRIL 23, 2012, PAGE 53, LINE 17

11   THROUGH 54, LINE 6.

12           HERE THIS IS YOUR DEPOSITION.

13           "QUESTION:  THESE DESIGNS OR SKETCHES

14   THAT YOU WORKED ON, WERE THEY FOR ONE CELL PHONE

15   PRODUCT OR MORE THAN ONE?

16           "ANSWER:  MORE THAN ONE.

17           "QUESTION:  CAN YOU TELL ME IN TERMS OF

18   JUST GENERALLY HOW MANY YOU BELIEVE YOU WORKED ON

19   IF YOU WERE TO DEFINE IT AS SORT OF -- AT LEAST THE

20   GOAL WAS ULTIMATELY TO COME UP WITH SOMETHING THAT

21   LOOKED LIKE A PRODUCT?

22           "ANSWER:  I BELIEVE THERE WERE TWO OR

23   THREE PROJECTS.  I DON'T REMEMBER WHETHER IT WAS

24   TWO OR THREE."

25           DO YOU SEE THAT, SIR?

1    A    YES.  THOSE ARE PROJECTS.  EACH PROJECT HAS A

2    NUMBER OF DESIGNS FOR CELL PHONES IN IT.

3    Q    OKAY.  SO YOU AGREE THAT YOU ONLY WORKED ON

4    CONCEPTS FOR TWO OR THREE CELL PHONE PROJECTS?

5    A    CORRECT.

6    Q    AND ASIDE FROM PHONES, YOU HELPED DESIGN ONE

7    COMPUTER TABLET; CORRECT?

8    A    THAT'S CORRECT.

9    Q    AND THAT'S IT?

10   A    THAT'S IT.

11   Q    AND THAT WAS SOME TIME WAY BACK IN THE EIGHT

12   '80S; RIGHT?

13   A    I BELIEVE SO.

14   Q    THE VERSION OF THE TABLET COMPUTER THAT

15   REACHED THE MARKET ON THAT PRODUCT WAS

16   SUBSTANTIALLY DIFFERENT THAN THE DESIGN YOU WORKED

17   ON; CORRECT?

18   A    IT WAS DIFFERENT, YES.

19   Q    AND THE PROJECT YOU WORKED ON ONLY REACHED THE

20   PROTOTYPE STAGE; CORRECT?

21   A    YES.  IT WAS A PREPRODUCTION PROTOTYPE.

22   Q    THE PRODUCT WAS INTENDED FOR INSURANCE AGENTS

23   APPRAISING CAR ACCIDENTS; RIGHT?

24   A    THAT'S CORRECT.

25   Q    IT HAD JUST A VERY SMALL DISPLAY LOCATED AT

1    THE TOP OF THE DEVICE?

2    A    THE DISPLAY TOOK UP ABOUT 50 PERCENT OF THE

3    FRONT OF THE DEVICE.

4    Q    SMALLER THAN WHAT WE'RE LOOKING AT IN THESE

5    SMARTPHONES HERE?

6    A    YES.

7    Q    IT WASN'T DESIGNED FOR WATCHING MOVIES?

8    A    NO.

9    Q    BROWSING THE INTERNET?

10   A    NO.

11   Q    READING BOOKS?

12   A    NO.

13   Q    COMPLETELY DIFFERENT TYPE OF PRODUCT?

14   A    DIFFERENT TYPE OF PRODUCT IN THE SENSE THAT IT

15   DIDN'T DO THE SAME THING, YES.  A LOT OF THE DESIGN

16   QUESTIONS OF VISIBILITY, IMPORTABILITY, AND HOW YOU

17   PRESENT INFORMATION WERE SIMILAR.

18   Q    NOW, FOR EACH OF THE DESIGN PATENT AND TRADE

19   DRESS THAT YOU LOOKED AT, YOU CONCLUDED, HEY,

20   THERE'S OTHER DESIGNS OUT THERE THAT ARE EQUALLY

21   FUNCTIONAL; RIGHT?

22   A    I BELIEVE THAT'S A FAIR STATEMENT.

23   Q    THAT WAS PART OF YOUR ANALYSIS OF WHY YOU

24   DIDN'T THINK THERE'S ANY FUNCTIONAL ELEMENT FOR THE

25   DESIGN PATENTS; RIGHT?

```
 1    A    I BELIEVE THERE WAS NO FUNCTIONING THAT WAS
 2    DRIVEN -- THERE WAS NOTHING IN THE APPEARANCE THAT
 3    WAS DRIVEN BY FUNCTION, YES.
 4    Q    SO I WANT TO FOCUS ON THAT STATEMENT THAT YOU
 5    MADE IN YOUR REPORTS AND YOU'RE MAKING TO THE JURY
 6    THAT THESE ALTERNATE DESIGNS OR EQUALLY FUNCTIONAL.
 7              ARE YOU WITH ME?
 8    A    I AM.
 9    Q    OKAY.  ISN'T IT TRUE, SIR, THAT THE EXTENT OF
10    YOUR ANALYSIS OF WHETHER THEY WERE EQUALLY
11    FUNCTIONAL WAS SIMPLY REVIEWING THE PACKAGING OF
12    THESE OTHER PHONES AND TURNING THEM ON TO SEE THAT
13    THEIR OPERATING SYSTEM WAS RUNNING?
14    A    ACTUALLY, MOST OF MY ANALYSIS DID NOT ENTAIL
15    DOING THOSE THINGS.  MOST OF IT ENTAILED REVIEWING
16    THE DESIGN OF THE PHONES, THE APPEARANCE AND DESIGN
17    OF THE PHONES.
18    Q    SO --
19    A    HOW THEY FUNCTION -- HOW THEY FUNCTION REALLY
20    WAS INSIGNIFICANT TO ME.
21    Q    HOW THEY FUNCTION -- OH, HOW THESE ALTERNATIVE
22    DESIGN PHONES FUNCTIONED WAS IRRELEVANT TO YOU?
23    A    IT WAS CERTAINLY A LESSER ELEMENT THAN WHETHER
24    THERE WERE ALTERNATIVE DESIGNS FOR SOMETHING THAT
25    DID THE SAME THING THAT IT WAS CLAIMING ON ITS
```

1    PACKAGING, YES.

2    Q    WHETHER OR NOT THEY FUNCTIONED THE SAME OR NOT

3    WAS INSIGNIFICANT TO YOU?

4    A    AGAIN, THE WAY WE'RE USING THE TERM "FUNCTION"

5    MAKES IT A DIFFICULT QUESTION TO ANSWER, BUT IN

6    BROAD TERMS, YES.

7    Q    BUT IN ANY CASE, TO THE EXTENT YOU DID EVEN

8    LOOK AT THE ISSUE OF THE FUNCTIONALITY OF THESE

9    ALTERNATIVE DESIGNS, THE EXTENT OF YOUR ANALYSIS

10   WAS TO REVIEW THE PACKAGING OF THE PHONE AND SIMPLY

11   TURN IT ON TO SEE THE OPERATING SYSTEM; RIGHT?

12   A    WHAT MATTERED IN THIS ANALYSIS WAS THAT THESE

13   WERE PHONES --

14   Q    SIR, CAN YOU JUST -- CAN YOU ANSWER THE

15   QUESTION?  IS THAT THE EXTENT OF YOUR ANALYSIS?

16   A    NO.

17   Q    OTHER THAN LOOKING AT THE PACKAGING AND

18   TURNING THE PHONES ON TO SEE THEIR OPERATING

19   SYSTEM, YOU DID NOT USE ANY OTHER CRITERIA AS AN

20   EXPERT TO DETERMINE WHETHER OR NOT THE

21   FUNCTIONALITY OF THE ALTERNATIVE PHONES WERE THE

22   SAME OR LARGELY THE SAME; RIGHT?

23   A    IN TERMS OF THE OPERATION, THAT IS CORRECT.

24   Q    SO IN TERMS OF THE OPERATION OF THESE

25   ALTERNATIVE PHONES, FOR MANY OF THEM, YOU DIDN'T

```
1    LOOK AT IT AT ALL; RIGHT?

2    A    PARDON ME?

3    Q    FOR MANY OF THE ALTERNATIVE PHONES, YOU DIDN'T

4    EVEN LOOK AT THE OPERATION OF THE PHONES AT ALL;

5    RIGHT?

6    A    NO.  I SAID I TURNED THEM ON AND I LOOKED AT

7    THE OPERATING SYSTEM.

8    Q    OKAY.  AND THAT'S ALL YOU DID?

9    A    AND REVIEWED THE CLAIMS ON THE PACKAGING AS TO

10   WHETHER THEY HAD THE SAME PERFORMANCE AS THE

11   IPHONE.

12   Q    SO ALL YOU DID WAS YOU REVIEWED THE PACKAGING

13   AND YOU TURNED THEM ON; RIGHT?

14   A    IF YOU WANT TO SAY IT THAT WAY, YES.

15   Q    OKAY.  AND BASED ON THAT, YOU'RE TESTIFYING TO

16   THE JURY THAT ALL THESE ALTERNATIVE PHONES --

17   A    THAT IS --

18   Q    -- HAVE EQUAL FUNCTIONALITY?

19   A    I'M SORRY.  PARDON ME?

20   Q    AND BASED ON THAT ANALYSIS, IT'S YOUR

21   TESTIMONY TO THE JURY THAT ALL OF THESE ALTERNATIVE

22   PHONES HAVE EQUAL FUNCTIONALITY; RIGHT?

23   A    NOT NECESSARILY.

24   Q    SO THEY DON'T ALL HAVE EQUAL FUNCTIONALITY?

25   A    TO THE DEGREE THAT THEY ARE ALL SMARTPHONES
```

1    AND THEY CLAIM THEY ARE SMARTPHONES, THEY HAVE

2    SIMILAR FUNCTIONALITY.

3    Q    AND YOUR BASIS FOR THAT OPINION IS READING THE

4    PACKAGING AND TURNING ON THE OPERATING SYSTEM?

5    THAT'S IT; RIGHT?

6    A    AND COMPARING THE DESIGNS TO ONE ANOTHER TO

7    SEE IF ANY OF THEM WERE THE -- WERE REQUIRED BY

8    THOSE FUNCTIONS, YES.

9    Q    THE PHONES THAT YOU IDENTIFIED AS ALTERNATIVE

10   MODELS, MR. BRESSLER, YOU DON'T HAVE ANY

11   INFORMATION AS TO WHETHER THE PRODUCT FEATURES OF

12   THOSE ALTERNATIVE PHONES AFFECT THE COST OF THE

13   PHONES, DO YOU?

14   A    I DID BUY MOST OF THOSE PHONES, AND SO WE HAD

15   A REASONABLY GOOD -- OR I HAD A REASONABLY GOOD

16   SENSE THAT THEY WERE AT LEAST COMPETITIVELY PRICED

17   IN THE MARKETPLACE, WHICH SUGGESTS THAT THEIR

18   MANUFACTURING COST MUST HAVE BEEN COMPETITIVE.

19   Q    LET'S SEE WHAT YOU SAID AT YOUR APRIL 24TH,

20   2012 DEPOSITION, PAGE 171, LINE 24 THROUGH 172,

21   LINE 4.

22          (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

23   OPEN COURT OFF THE RECORD.)

24   BY MR. VERHOEVEN:

25   Q    THAT WAS THE QUESTION AND THE ANSWER YOU GAVE

1    AT YOUR SWORN DEPOSITION IN APRIL; RIGHT?

2    A    I WAS BEING ASKED ABOUT A PARTICULAR FEATURE,

3    YES.

4    Q    DO YOU STAND BY THAT TESTIMONY?

5    A    YES.

6              MS. KREVANS:  YOUR HONOR, FOR

7    COMPLETENESS, MAY I READ A PORTION OF THE TESTIMONY

8    JUST PRIOR?

9              THE COURT:  NO.  NO.  YOU'LL HAVE

10   REDIRECT OPPORTUNITY.

11   BY MR. VERHOEVEN:

12   Q    AND YOU DON'T HAVE ANY INFORMATION FOR THE

13   COMPETITIVE PHONES THAT YOU IDENTIFIED IN YOUR

14   REPORT AS TO WHETHER ANY PRODUCT FEATURE AFFECTED

15   THE QUALITY OF THE PHONES; RIGHT?

16   A    QUALITY WAS NOT A PART OF MY ANALYSIS.

17   Q    SO IS THE ANSWER NO?

18   A    I GUESS IT WOULD HAVE TO BE NO, YES.

19   Q    LET ME MAKE SURE THE RECORD IS CLEAR.  IT IS

20   CORRECT THAT YOU DO NOT HAVE ANY INFORMATION FOR

21   THE COMPETITIVE PHONES THAT YOU IDENTIFIED AS TO

22   WHETHER ANY PRODUCT FEATURE AFFECTED THE QUALITY OF

23   THOSE PHONES?

24   A    AGAIN, HOW YOU MEASURE QUALITY IS NOT CLEAR TO

25   ME.

10222

```
1              MR. PRICE:  IN A DESIGN CASE, BECAUSE YOU
2    CAN LOOK AT IT AND I CAN LOOK AT IT AND I CAN LOOK
3    AT THIS AND WE CAN DECIDE.  SO THAT TWO MINUTES
4    GOES ON OUR TIME.
5              THIS I WOULD BEG YOU TO RECONSIDER
6    BECAUSE IT IS JUST A, I BELIEVE A MAJOR
7    MISINTERPRETATION OF WHAT WE'RE REQUIRED TO DO IN
8    DISCOVERY, AND OBVIOUSLY THIS SERIOUSLY IMPACTS OUR
9    NON-INFRINGEMENT CASE BECAUSE WE SHOULD BE ABLE TO
10   SAY WE DON'T LOOK LIKE THIS.
11             MS. KREVANS:  YOUR HONOR --
12             MR. PRICE:  "THIS" BEING THE PHYSICAL
13   EXHIBIT.
14             SO HOPEFULLY YOU WON'T CHARGE US FOR
15   THEIR RESPONSE, BUT THAT'S YOUR DISCRETION.
16             MS. KREVANS:  IF YOUR HONOR LOOKS AT
17   THEIR NON-INFRINGEMENT CONTENTIONS AND RESPONSE TO
18   THE INTERROGATORY, THEY ARE SIMPLY BOILERPLATE
19   AFTER BOILERPLATE AFTER BOILERPLATE PARAGRAPHS.
20             THIS HAS NEVER BEEN DISCLOSED.  IT NEEDED
21   TO BE DISCLOSED.  IT IS A CONTENTION.
22             IT'S AN AMBUSH NOW IF YOU LET THEM DO IT.
23             AND YOU HAVE DRAWN THIS LINE
24   CONSISTENTLY.  WE THINK YOU'RE DRAWING IT AGAIN
25   CORRECTLY NOW.
```

```
 1            THE COURT:  ALL RIGHT.  WELL, I'VE MADE
 2    MY RULING.
 3            IT'S 4:05.  I'D LIKE TO BRING THE JURY
 4    BACK IN.  I NEED TO GO BACK INTO THE RECORD AND SEE
 5    WHAT TIME DID WE EXCUSE THE JURY.  I'M SORRY.
 6            (DISCUSSION OFF THE RECORD BETWEEN THE
 7    COURT AND THE REPORTER.)
 8            THE COURT:  OKAY.  LET'S BRING THE JURY
 9    BACK IN, PLEASE.
10            (WHEREUPON, THE FOLLOWING PROCEEDINGS
11    WERE HELD IN THE PRESENCE OF THE JURY:)
12            THE COURT:  ALL RIGHT.  LET'S GO AHEAD,
13    PLEASE.
14            MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
15            THE COURT:  IT'S 4:07.  4:08.  GO AHEAD.
16    BY MR. VERHOEVEN:
17    Q    MR. BRESSLER, LET'S TALK BRIEFLY ABOUT THE
18    '889 DESIGN PATENT.  AND DO YOU HAVE THAT PATENT IN
19    MIND?
20    A    IN MIND?
21    Q    YEAH.  DO YOU NEED -- DO YOU WANT ME TO SHOW
22    YOU WHERE IT IS?
23    A    I THINK I HAVE IT.
24    Q    IT'S JX 1061.  YOU CAN LOOK AT IT.
25    A    YES, I HAVE THAT.  IT'S NOT EXACTLY THE SAME
```

```
 1    AS THE PATENT THAT I'M USED TO SEEING, BUT I
 2    BELIEVE IT REPRESENTS IT.
 3    Q    I'M SORRY.  DO YOU HAVE THAT?
 4    A    I DO.
 5    Q    OKAY.  NOW, DO YOU REMEMBER ON JULY 31ST,
 6    MR. STRINGER TESTIFIED -- PROVIDED SOME TESTIMONY
 7    ABOUT THE DESIGN OF THE '889 PATENT AS WELL?
 8    A    YES.
 9    Q    MR. STRINGER IS ALSO LISTED AS AN INVENTOR ON
10    THE DESIGN '889 PATENT; CORRECT?
11    A    I DON'T KNOW.  I SUSPECT -- I BELIEVE SO.
12    Q    YOU DON'T KNOW?
13    A    I DON'T KNOW FOR CERTAIN.  I BELIEVE SO.
14    Q    WELL, YOU HAVE THE '889 PATENT THERE.  CAN YOU
15    LOOK FOR HIS NAME AS AN INVENTOR?
16    A    I WILL.
17          YES, I SEE.
18    Q    SO WE'RE AGREED HE IS LISTED AS AN INVENTOR?
19    A    YES.
20    Q    NOW LET'S GO LOOK AT WHAT MR. STRINGER SAID
21    WITH RESPECT TO THE '889.
22          THIS IS SDX 3789.
23          SO MR. BRESSLER, JUST FOR CLARITY ON THIS
24    SLIDE, SDX 3789, ON THE LEFT-HAND SIDE IS PULLED
25    OUT TWO FIGURES FROM THE DESIGN PATENT.  YOU HAVE
```

1225

```
1    THE '889 DESIGN PATENT IN FRONT OF YOU, JUST TO

2    CHECK ON THAT.

3              AND THIS IS TESTIMONY FROM

4    MR. SPRINGER -- STRINGER, EXCUSE ME -- FROM

5    JULY 31ST, PAGE 522, LINE 24 THROUGH 523, LINE 4.

6              "QUESTION:  NOW, WITH RESPECT TO THE '889

7    DESIGN PATENT, ISN'T IT CORRECT THAT THE DESIGN

8    TEAM'S OBJECTIVES WERE TO REDUCE THE PRODUCT TO

9    WHAT WAS ESSENTIALLY A SINGLE, SEAMLESS VESSEL,

10   WHICH WAS THE REAR HOUSING?

11             "ANSWER:  THAT WAS THE INSPIRATION OF

12   THIS DESIGN, YES."

13             DO YOU REMEMBER THAT TESTIMONY?

14   A    I DO.

15   Q    AND IF YOU LOOK AT THE BACK OF THE FIGURES FOR

16   THE '889 PATENT, YOU SEE IT'S A SINGLE, SEAMLESS

17   VESSEL; RIGHT?

18   A    IT DOES APPEAR TO BE A SINGLE SHAPE, YES.

19   Q    OKAY.  AND CAN WE GO TO SDX 3790.

20             AND MR. STRINGER CONTINUED ON JULY 31ST,

21   PAGE 523, LINES 5 THROUGH 10 OF THE TRANSCRIPT.

22             "QUESTION:  AND ANOTHER IMPORTANT DESIGN

23   GOAL WAS TO HAVE JUST ONE GAP IN THE PRODUCT

24   BETWEEN THE BACK HOUSING AND WHAT YOU REFER TO AS

25   THE CLEAR GLASS BEZEL THAT EXTENDS ALL THE WAY
```

```
1    ACROSS THE FRONT, RIGHT?

2              "ANSWER:  YES."

3              DO YOU REMEMBER THAT TESTIMONY?

4    A    I DO.

5    Q    AND THAT'S REFERRING TO, ON THE FRONT OF THE

6    IMAGE, THIS GAP GOING AROUND BETWEEN THE GLASS AND

7    THE EDGE; RIGHT?

8    A    THERE IS A RING AND A SEAM THERE, YES.

9    Q    YES.  THAT'S THE JUST ONE GAP IN THE PRODUCT?

10   A    I BELIEVE HE CALLS SEAMS GAPS, YES.

11   Q    SO HE'S REFERRING TO THAT ON THE FRONT, RIGHT?

12   A    YES, ALL THE WAY ON THE OUTSIDE.

13   Q    RIGHT.  SO THE TWO DESIGN GOALS THAT

14   MR. STRINGER IDENTIFIED AS BEING NEW AND UNIQUE FOR

15   THE '889 WERE, NUMBER ONE, ON THE BACK HOUSING,

16   THERE WAS A SINGLE, SEAMLESS VESSEL; AND THEN THE

17   OTHER IMPORTANT DESIGN GOAL WAS THERE'S JUST ONE

18   GAP BETWEEN THE BACK HOUSING, WHICH IS THE SEAMLESS

19   VESSEL, AND THE FRONT.  FAIR?

20   A    I BELIEVE THAT WAS HIS INTENT, YES.

21   Q    NOW, MS. KHAN, DO WE HAVE THE PHYSICAL EXHIBIT

22   FOR THE SAMSUNG TAB 10.1, JX 1038?

23              OKAY.  NOW, CAN YOU HOLD UP THE BACK SO

24   THE JURY CAN SEE IT?

25   A    (INDICATING.)
```

```
 1    Q    WITH RESPECT TO THE ACCUSED PRODUCT, THE BACK

 2    HOUSING IS NOT A SINGLE -- A SINGLE, SEAMLESS

 3    VESSEL, IS IT, SIR?

 4    A    NO, IT'S NOT.  I BELIEVE IT GIVES THE

 5    IMPRESSION OF ONE.

 6    Q    THANK YOU, SIR.

 7    A    BUT I DON'T BELIEVE IT IS.

 8    Q    IF YOU LOOK AT THE BACK -- ACTUALLY, LET'S GO

 9    TO SDX 3784.

10            AND YOUR HONOR, MAY I APPROACH TO HAND

11    THE TAB TO THE JURY?

12            THE COURT:  YES, PLEASE GO AHEAD.

13            MR. VERHOEVEN:  THANK YOU.

14            SO FOR THE RECORD, I'VE HANDED PHYSICAL

15    EXHIBIT JX 1038 TO THE JURY TO INSPECT.  THAT'S THE

16    GALAXY TAB 10.1.

17    Q    AND ON THE SCREEN, SLIDE SDX 3784, WE'VE GOT

18    SOME IMAGES OF THAT SAME TAB 10.1 BLOWN UP SO

19    PEOPLE CAN SEE.

20            SO I'M GOING TO REFER TO THESE IMAGES

21    WHILE THE JURY IS -- JURORS ARE LOOKING AT THE

22    PHYSICAL PRODUCT.  OKAY?

23    A    SURE.

24    Q    SO IF YOU LOOK AT THE ACCUSED PRODUCT, YOU'LL

25    SEE -- IF YOU'RE LOOKING AT THE BACK, THERE'S AT
```

```
 1    LEAST TWO PIECES; RIGHT?

 2    A    YES.

 3    Q    AND THERE'S A SEAM THAT GOES ALONG THE BACK

 4    AND PROTRUDES DOWN UNDER -- I GUESS THAT'S A

 5    CAMERA.  IS THAT A CAMERA?

 6    A    I BELIEVE SO.

 7    Q    AND THEN THAT WHOLE ASSEMBLY -- LET'S GO TO

 8    SDX 3785 -- ALSO FORMS A RIM BETWEEN THE FRONT

 9    GLASS SURFACE AND THE BACK SURFACE, THERE'S A WHOLE

10    RIM STRUCTURE THAT GOES ALL THE WAY AROUND THE TAB

11    BETWEEN THOSE TWO; RIGHT?

12    A    I SEE THAT.

13    Q    THERE'S NO RIM BETWEEN THE BACK HOUSING AND

14    THE FRONT GLASS IN THE '889 DESIGN PATENT.  TRUE?

15    A    THAT'S TRUE.

16    Q    AND THERE'S NO SEAM THAT GOES ALONG THE BACK

17    SEPARATING TWO PORTIONS OF THE BACK HOUSING IS

18    THERE, SIR, ON THE '889?

19    A    NO.

20    Q    BUT THERE IS ON THE GALAXY TAB 10.1; RIGHT?

21    A    IT'S AN ABSOLUTELY FLUSH SEAM, YES, THAT MAKES

22    IT APPEAR TO BE A CONTINUOUS SURFACE.

23    Q    YOU'RE SAYING IN THE PHOTO, AN OBSERVER

24    LOOKING AT THIS WOULD THINK THIS IS A CONTINUOUS

25    SURFACE, THIS SILVER COLOR THAT CHANGES COLOR
```

```
 1    TWO-TONE TO A BLACK COLOR?
 2    A    I THINK THEIR PERCEPTION WOULD BE THAT IT'S
 3    ALL THE SAME SHAPE, PARTICULARLY IF THERE WASN'T
 4    ANY CHANGE IN COLOR, WHICH ON A DESIGN PATENT THERE
 5    ISN'T.
 6    Q    WELL, MR. STRINGER DIDN'T TALK ABOUT THE
 7    BACK -- WE CAN GO BACK TO SDX 3790.  EXCUSE ME.
 8    3789.
 9          MR. STRINGER DIDN'T TALK ABOUT THE SAME
10    SHAPE OR TWO DIFFERENT PIECES OF THE HOUSING.  HE
11    SAYS THE "OBJECTIVES WERE TO REDUCE THE PRODUCT TO
12    WHAT WAS ESSENTIALLY A SINGLE, SEAMLESS VESSEL,"
13    AND THERE'S NO SEAMS AT ALL VISIBLE ON THE '889;
14    RIGHT?
15    A    I BELIEVE THAT WAS HIS DESIGN, YES.
16    Q    AND THE TAB 10.1 IS NOT A SINGLE, SEAMLESS
17    VESSEL WITH A REAR HOUSING, IS IT, SIR?
18    A    NO.  BUT IT APPEARS TO BE.
19    Q    LET'S GO TO SDX 3787.
20          NOW, THIS IS JUST A SLIDE WITH THE GALAXY
21    TAB 10 ON THE RIGHT AND IMAGES FROM THE '889 PATENT
22    ON THE LEFT.
23          DO YOU SEE THAT, SIR?
24    A    I DO.
25    Q    NOW, YOU KNEW, WHEN YOU FORMED YOUR
```

```
 1      OPINIONS -- WITHDRAW THE QUESTION.
 2              DO YOU SEE THESE LINES ON THE BACK?
 3      A    I DO.
 4      Q    CAN YOU TELL THE JURORS WHAT THAT -- WELL,
 5      WITHDRAW THE QUESTION AGAIN.
 6              IS IT FAIR TO REFER TO THAT AS OBLIQUE
 7      LINE SHADING?
 8      A    THAT'S ONE WAY TO VIEW IT, YES.
 9      Q    THAT'S WHAT IT'S CALLED; RIGHT?
10      A    I BELIEVE SO.
11      Q    RIGHT.  AND WHEN YOU FORMED YOUR OPINIONS FOR
12      THE '889 PATENT, YOU KNEW THAT OBLIQUE LINE SHADING
13      MUST BE USED TO SHOW TRANSPARENT, TRANSLUCENT, AND
14      HIGHLY POLISHED SURFACES; RIGHT?
15      A    YES.
16      Q    SO WHAT THIS IS TELLING US IS THAT THE BACK OF
17      THE '889 PATENT IS A SHINY SURFACE?
18      A    I BELIEVE SO.
19      Q    NOW, IF YOU LOOK AT THE TAB, AND I DON'T
20      KNOW -- DID WE -- MAYBE WE CAN PASS IT OUT ONE MORE
21      TIME SO THE JURORS CAN SEE.
22      A    I BELIEVE THE TERM I WOULD USE WOULD NOT BE
23      SHINY.  IT WAS BE REFLECTIVE.
24      Q    MS. KHAN, IF WE COULD JUST HAND THAT TO THE
25      JURORS SO THEY CAN PASS IT AROUND ONE MORE TIME.
```

1              NOW, WHEN YOU LOOK AT THE BACK SURFACE OF
2     THE GALAXY TAB 10.1, IT IS NOT A SHINY SURFACE, IS
3     IT?
4     A    IT IS NOT SHINY.  IT'S REFLECTIVE.
5     Q    IT'S BRUSHED MATTE FINISH, ISN'T IT, SIR?
6     A    IT'S OVER THERE.
7     Q    DO YOU NEED TO LOOK AT IT?
8     A    WELL, IT'S -- I DON'T KNOW IF THAT ONE IS
9     BRUSHED.  I KNOW ONE OF THEM IS BRUSHED.  I KNOW
10    ONE OF THEM IS PAINTED.  THEY ALL HAVE SOME DEGREE
11    OF REFLECTIVITY.
12    Q    AS SOON AS THE JURORS ARE DONE, I'LL SHOW IT
13    TO YOU.  OKAY.
14            YOU DO KNOW WHAT A BRUSHED, MATTE FINISH
15    IS; RIGHT?
16    A    YES.
17    Q    AND A BRUSHED, MATTE FINISH IS NOT THE SAME AS
18    A TRANSPARENT OR HIGHLY POLISHED SURFACE, IS IT?
19    A    NO.  BUT IT IS A REFLECTIVE SURFACE.
20    Q    SO THE ANSWER IS NO; RIGHT?
21    A    IT'S NOT THE WORDS YOU USED, THAT'S CORRECT.
22    Q    IT'S NOT A TRANSPARENT, TRANSLUCENT, OR HIGHLY
23    POLISHED SURFACE, IS IT, A BRUSHED MATTE SURFACE?
24    A    I'M NOT SURE IT'S HIGHLY POLISHED.  I BELIEVE
25    IT'S REFLECTIVE.

1232

```
 1              MR. VERHOEVEN:  YOUR HONOR, MAY I

 2     APPROACH?

 3              THE WITNESS:  AND I DO BELIEVE THAT THIS

 4     IS REFLECTIVE.

 5              MR. VERHOEVEN:  MAY I APPROACH?

 6              THE COURT:  PLEASE, GO AHEAD.

 7     BY MR. VERHOEVEN:

 8     Q    OKAY.  WHEN YOU HOLD THIS UP AND LOOK AT IT,

 9     CAN YOU SEE YOUR REFLECTION IN IT, SIR?

10     A    NO, I CAN'T SEE MY REFLECTION.

11     Q    BUT YOU'RE SAYING IT'S REFLECTIVE?

12     A    I CAN SEE LIGHTS REFLECTING OFF OF IT.

13     Q    WELL, YOU CAN SEE LIGHT REFLECTING ON ANY

14     SURFACE, CAN'T YOU, SIR?

15     A    PRETTY MUCH.

16     Q    YOU CAN SEE LIGHT REFLECTING OFF A BRUSHED

17     MATTE FINISH, CAN'T YOU, SIR?

18     A    I BELIEVE SO.

19     Q    BUT YOU'D AGREE THAT THAT PRODUCT RIGHT THERE,

20     THE BACK IS A BRUSHED, MATTE SURFACE?

21     A    YES.

22     Q    AND IT'S TWO --

23     A    I BELIEVE IT'S A BRUSHED SURFACE.  I DON'T

24     KNOW IF I'D QUALIFY IT AS MATTE.

25     Q    YOU CAN'T SEE YOUR FACE IN IT?
```

```
 1    A    YES, I CAN'T SEE MY FACE IN IT.

 2    Q    IN FACT, IT'S TWO-TONED; RIGHT?

 3    A    YES.  BUT THAT DOESN'T MATTER IN A DESIGN

 4    PATENT.

 5    Q    TELL THE JURORS WHAT COLORS YOU SEE ON THE

 6    BACK.

 7    A    I BELIEVE THERE IS A LIGHT GRAY AND A SLIGHTLY

 8    DARKER GRAY.

 9    Q    OKAY.  YOU CAN PUT THAT DOWN.  THANKS.

10         MR. BRESSLER, APPLE IS PAYING YOU TO

11    TESTIFY AS THEIR EXPERT WITNESS IN THIS CASE;

12    RIGHT?

13    A    YES, THEY ARE.

14    Q    HOW MUCH ARE YOU BEING PAID PER HOUR?

15    A    $400.

16    Q    HOW MUCH MONEY HAS APPLE PAID YOU SO FAR?

17    A    SO FAR?

18    Q    YES.

19    A    FOR THIS CASE, ABOUT $75,000.

20    Q    YOU ADVERTISE YOURSELF ON THE INTERNET AS AN

21    EXPERT WITNESS; CORRECT?

22    A    I BELIEVE I'M LISTED ON THE IDSA WEBSITE

23    HAVING TAKEN A CERTIFICATION COURSE.

24    Q    SO IS THAT YES?

25    A    I GUESS IN THAT ONE PLACE, YES.
```

```
 1     Q    YOU'RE ALSO LISTED AS AN EXPERT WITNESS ON A
 2     WEBSITE CALLED PETERBRESSLERIDSA.COM; RIGHT?
 3     A    I DON'T BELIEVE I'M LISTED AS AN EXPERT
 4     WITNESS THERE.  I BELIEVE THAT'S A WEBSITE THAT I
 5     TOOK OUT WHEN I SOLD BRESSLER GROUP AND I HAVEN'T
 6     DONE ANYTHING WITH AT ALL YET.  I BELIEVE IT'S
 7     UNDER CONSTRUCTION.
 8     Q    RYAN, CAN WE PUT UP THE SITE
 9     HTTP://PETERBRESSLERIDSA.COM?  KEEP IT OFF THE BIG
10     SCREEN FIRST.  KEEP IT OFF THE BIG SCREEN FIRST.
11              DO YOU SEE THAT ON THE SCREEN THERE, SIR?
12     A    YES, I DO.
13     Q    WELL, WHAT DO YOU KNOW?
14     A    YES, I DO.
15     Q    YOU DO?
16     A    I DO.  I HAD FORGOTTEN ALL ABOUT THAT.
17     Q    YOU FORGOT ABOUT IT?
18     A    I DID.
19     Q    THIS IS YOU -- THIS IS -- YOU'RE THE SAME
20     PETER BRESSLER AS IN THIS WEB LINK; RIGHT?
21     A    I AM.
22     Q    CAN WE PUT IT UP ON THE SCREEN?  THAT'S YOU,
23     PETER BRESSLER; RIGHT?
24     A    THAT'S CORRECT.
25     Q    AND IT SAYS, "EXPERT WITNESSES FOR TRADE
```

```
 1     DRESS, UTILITY AND DESIGN PATENTS AND PRODUCT

 2     LIABILITY."

 3               RIGHT?

 4     A    THAT'S CORRECT.

 5     Q    AND THAT'S YOU ADVERTISING YOURSELF TO BE AN

 6     EXPERT WITNESS IN LIABILITY CASES, PRODUCT CASES,

 7     DESIGN CASES, UTILITY CASES; RIGHT?

 8     A    YES, IT'S THERE.

 9     Q    AND THIS ISN'T THE FIRST TIME YOU'VE PROVIDED

10     PAID TESTIMONY FOR APPLE; RIGHT?

11     A    IF YOU WANT TO COUNT THE ITC CASE, THAT WOULD

12     MAKE IT THE SECOND TIME.

13     Q    AND, INDEED, YOU TESTIFIED AS AN EXPERT IN

14     MANY CASES; RIGHT?

15     A    I BELIEVE I'VE TESTIFIED NOW FOUR TIMES.

16               MR. VERHOEVEN:  OKAY.  I'LL PASS THE

17     WITNESS AT THIS POINT, YOUR HONOR.

18               THE COURT:  ALL RIGHT.

19               IT'S NOW 4:24.  GO AHEAD WITH THE CROSS,

20     PLEASE, OR THE REDIRECT, I'M SORRY.

21               (PAUSE IN PROCEEDINGS.)

22               MS. KREVANS:  LET ME MOVE THE STOOL FOR

23     MR. VERHOEVEN.  I DON'T WANT TO HIT MYSELF.

24               THE COURT:  IT'S 4:25.

25               MS. KREVANS:  THANK YOU, YOUR HONOR.
```

```
 1    ///
```

**REDIRECT EXAMINATION**

```
 3    BY MS. KREVANS:

 4    Q    COULD YOU LOOK AT PX 59 IN THE ORIGINAL BINDER

 5    I GAVE YOU, MR. BRESSLER.

 6    A    LET ME PUT THIS BACK A SECOND.  IT'S LIKE A

 7    LAUREL AND HARDY MOVIE.

 8              WHAT PAGE?

 9    Q    PX 59.

10    A    YES.

11    Q    OKAY.  YOU RECALL THAT EARLY IN HIS

12    CROSS-EXAMINATION, MR. VERHOEVEN ASKED YOU SOME

13    QUESTIONS ABOUT WHAT KIND OF EVIDENCE YOU HAD OF

14    CONFUSION BY BUYERS OF THE SAMSUNG DEVICES?

15    A    YES.

16    Q    HAVE YOU PERSONALLY DONE ANY SURVEYS OR

17    RESEARCH TO DETERMINE WHETHER BUYERS OF SAMSUNG --

18    CONSUMERS CAN BUY A SAMSUNG DEVICE THINKING THAT

19    IT'S AN APPLE DEVICE?  HAVE YOU DONE SUCH RESEARCH

20    PERSONALLY?

21    A    NO.  I'VE SEEN ARTICLES THAT SUGGEST PEOPLE

22    WOULD MISTAKE ONE FOR THE OTHER, BUT I --

23              MR. VERHOEVEN:  OBJECTION, YOUR HONOR.

24    THIS IS TESTIMONY REFERRING TO THIS FOR THE TRUTH,

25    WHICH THERE'S A LIMITING INSTRUCTION ON.
```

1

2

3

4                    <u>CERTIFICATE OF REPORTERS</u>

5

6

7              WE, THE UNDERSIGNED OFFICIAL COURT

8     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

9     THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

10    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

11    CERTIFY:

12              THAT THE FOREGOING TRANSCRIPT,

13    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

14    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

15    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

16    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

17    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

18

19                    /S/
                  _____
20                LEE-ANNE SHORTRIDGE, CSR, CRR
                  CERTIFICATE NUMBER 9595
21

22                    /S/
                  _____
23                IRENE RODRIGUEZ, CSR, CRR
                  CERTIFICATE NUMBER 8074
24

25                DATED:  AUGUST 6, 2012

# EXHIBIT 4

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA   )  C-11-01846 LHK
     CORPORATION,               )
                             )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,    )
                             )  AUGUST 7, 2012
8         VS.                )
                             )  VOLUME 5
9   SAMSUNG ELECTRONICS CO.,    )
     LTD., A KOREAN BUSINESS    )  PAGES 1297-1637
10  ENTITY; SAMSUNG             )
     ELECTRONICS AMERICA,       )
11  INC., A NEW YORK          )
     CORPORATION; SAMSUNG       )
12  TELECOMMUNICATIONS        )
     AMERICA, LLC, A DELAWARE   )
13  LIMITED LIABILITY         )
     COMPANY,                 )
14                           )
               DEFENDANTS.   )
15  _____

16            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE LUCY H. KOH
17        UNITED STATES DISTRICT JUDGE

18

19

20         APPEARANCES ON NEXT PAGE

21

22

23  OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
24                  IRENE RODRIGUEZ, CSR, CRR
                      CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF         MORRISON & FOERSTER
      APPLE:                    BY:  HAROLD J. MCELHINNY
 3                                   MICHAEL A. JACOBS
                                     RACHEL KREVANS
 4                              425 MARKET STREET
                                SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                  HALE AND DORR
 7                            BY:  WILLIAM F. LEE
                              60 STATE STREET
 8                            BOSTON, MASSACHUSETTS  02109

 9                            BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                           OLIVER & HEDGES
12                           BY:  CHARLES K. VERHOEVEN
                                  ANNE ABRAMOWITZ
13                         50 CALIFORNIA STREET, 22ND FLOOR
                           SAN FRANCISCO, CALIFORNIA  94111
14
                           BY:  VICTORIA F. MAROULIS
15                              KEVIN P.B. JOHNSON
                           555 TWIN DOLPHIN DRIVE
16                         SUITE 560
                           REDWOOD SHORES, CALIFORNIA  94065
17
                           BY:  MICHAEL T. ZELLER
18                              WILLIAM C. PRICE
                           865 SOUTH FIGUEROA STREET
19                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA  90017
20

21

22

23

24

25
```

1299

<u>INDEX OF WITNESSES</u>

<u>PLAINTIFF'S</u>

**PETER BRESSLER**
    REDIRECT EXAM BY MS. KREVANS (RES.)P. 1336
    RECROSS-EXAM BY MR. VERHOEVEN      P. 1349
    FURTHER REDIRECT BY MS. KREVANS    P. 1354


**SUSAN KARE**
    DIRECT EXAM BY MS. KREVANS         P. 1356
    CROSS-EXAM BY MR. VERHOEVEN        P. 1414
    REDIRECT EXAM BY MS. KREVANS       P. 1478
    RECROSS-EXAM BY MR. VERHOEVEN      P. 1489
    FURTHER REDIRECT BY MS. KREVANS    P. 1492
    FURTHER RECROSS BY MR. VERHOEVEN   P. 1493


**RUSSELL WINER**
    DIRECT EXAM BY MR. JACOBS          P. 1496
    CROSS-EXAM BY MR. VERHOEVEN        P. 1529
    REDIRECT EXAM BY MR. JACOBS        P. 1565
    RECROSS-EXAM BY MR. VERHOEVEN      P. 1572
    FURTHER REDIRECT BY MR. JACOBS     P. 1576


**HAL PORET**
    DIRECT EXAM BY MR. JACOBS          P. 1577
    CROSS-EXAM BY MR. PRICE            P. 1591

```
 1    THE ACCUSED DESIGN IS NATURALLY MORE LIKELY TO BE

 2    REGARDED AS DECEPTIVELY SIMILAR TO THE CLAIMED

 3    DESIGN, AND THUS INFRINGING."

 4              WAS THAT PART OF THE LEGAL TEST THAT YOU

 5    APPLIED IN FORMING YOUR OPINIONS?

 6    A    ABSOLUTELY.

 7    Q    OKAY.  DO YOU RECALL THAT MR. VERHOEVEN ASKED

 8    YOU SOME QUESTIONS ABOUT WHETHER, ON THE SAMSUNG

 9    PHONES, AND HE HAD A SLIDE ABOUT THIS WITH A BLUE

10    LINE THAT WENT ACROSS THE FACE, IF YOU RAN YOUR

11    FINGER ACROSS THE PHONE, YOU COULD FEEL THAT BEZEL

12    PROTRUDED A LITTLE BIT ABOVE THE GLASS SURFACE OF

13    THE PHONE.

14    A    YES.

15    Q    DO YOU RECALL THAT?

16    A    I DO.

17    Q    OKAY.  IS THE TEST FOR DESIGN INFRINGEMENT A

18    TEST ABOUT WHAT A PRODUCT FEELS LIKE IF YOU RUN

19    YOUR FINGERS OVER IT, OR IS IT A TEST OF THE VISUAL

20    IMPRESSION THE PRODUCT MAKES.

21              MR. VERHOEVEN:  OBJECTION.  LEADING.

22              THE COURT:  SUSTAINED.

23    BY MS. KREVANS:

24    Q    WHAT IS THE TEST FOR WHETHER A DESIGN IS

25    SUBSTANTIALLY SIMILAR TO A DESIGN OF A PATENT,
```

```
 1     MR. BRESSLER?
 2              MR. VERHOEVEN:  OBJECTION.  CALLS FOR
 3     LEGAL CONCLUSION.
 4              THE COURT:  SUSTAINED.
 5     BY MS. KREVANS:
 6     Q    WHAT'S THE TEST THAT YOU APPLIED,
 7     MR. BRESSLER, TO DETERMINE WHETHER THE DESIGN OF
 8     THE SAMSUNG PHONES APPLIED -- WAS THE DESIGN OF THE
 9     IPHONE PATENTS?
10              MR. VERHOEVEN:  ASKED AND ANSWERED.
11              THE COURT:  I'LL ALLOW IT.
12              GO AHEAD.  OVERRULED.
13              THE WITNESS:  COULD YOU REPEAT IT,
14     PLEASE?  SORRY.
15     BY MS. KREVANS:
16     Q    WHAT WAS THE TEST, BRIEFLY, THAT YOU APPLIED
17     IN DETERMINING WHETHER THE SAMSUNG PHONES INFRINGED
18     THE APPLE DESIGN PATENTS?
19     A    THE TEST THAT I APPLIED, BRIEFLY, WAS THAT THE
20     APPEARANCE OF THE ACCUSED PHONES SHOULD LOOK LIKE
21     THE APPEARANCE THAT AN ORDINARY OBSERVER WOULD --
22     OR AN ORDINARY OBSERVER WOULD THINK THE APPEARANCE
23     OF THE ACCUSED PHONES LOOKED LIKE THE APPEARANCE
24     DEPICTED IN THE DESIGN PATENT.
25     Q    OKAY.  NOW, DO YOU RECALL THAT MR. VERHOEVEN
```

1    ACTUALLY SHOWED YOU, DURING YOUR CROSS-EXAMINATION,

2    THE FRONT FACES OF A NUMBER OF PHONES UP ON THE

3    SCREEN?

4    A    YES.

5    Q    AND ONE OF THOSE WAS THE PRADA?

6    A    YES.

7    Q    IS THE PRADA IN FRONT OF YOU RIGHT NOW,

8    MR. BRESSLER?

9    A    YES, THERE IS ONE HERE.

10   Q    IS, IS THE PRADA A PHONE THAT IS PRIOR ART TO

11   THE APPLE DESIGN PATENTS?

12             MR. VERHOEVEN:  OBJECTION.  CALLS FOR A

13   LEGAL CONCLUSION.

14             THE COURT:  SUSTAINED.

15   BY MS. KREVANS:

16   Q    MR. BRESSLER, BASED ON THE INFORMATION

17   AVAILABLE TO YOU, MR. BRESSLER, WAS THE PRADA

18   PUBLICLY DISPLAYED OR SOLD IN THE UNITED STATES

19   BEFORE THE APPLICATION DATE OF THE APPLE IPHONE

20   DESIGN PATENTS?

21   A    I HAVE BEEN INFORMED THAT IT WAS NOT.

22   Q    OKAY.  DO YOU THINK, IN YOUR OPINION, THAT THE

23   DESIGN OF THE PRADA THAT YOU'RE HOLDING IN YOUR

24   HAND IS SUBSTANTIALLY SIMILAR TO THE DESIGN OF THE

25   APPLE IPHONE PATENT?

1    A    I DO NOT.

2              MS. KREVANS:  YOUR HONOR, MAY I PASS THE

3    PRADA AROUND TO THE JURY?

4              THE COURT:  ANY OBJECTION?

5              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

6              THE COURT:  GO AHEAD, PLEASE.

7              DO YOU WANT TO SEE THIS PRADA?

8              MR. VERHOEVEN:  SHE HAS SHOWED IT TO ME.

9              MS. KREVANS:  I SHOWED IT TO HIM IN

10   ADVANCE.

11             AND MAY I ALSO PASS OUT THE IPHONE?

12             THE COURT:  SHOW IT TO MR. VERHOEVEN.

13             MR. VERHOEVEN:  NO OBJECTION.

14             MS. KREVANS:  I SHOWED IT TO HIM.

15             THE COURT:  GO AHEAD.

16   BY MS. KREVANS:

17   Q    DO YOU RECALL WHEN MR. VERHOEVEN WAS SHOWING

18   YOU THE SLIDES OF THOSE FRONT FACES, YOU TOLD HIM

19   YOU DIDN'T THINK IT WAS PROPER JUST TO LOOK AT THE

20   FRONT VIEW.

21             WHY DID YOU SAY THAT?

22   A    IT'S MY UNDERSTANDING THAT THE ANALYSIS IS

23   CONDUCTED WITH ALL OF THE VIEWS OF THE PATENT IN

24   EACH INDIVIDUAL CASE, NOT USING A SINGLE VIEW,

25   ACTUALLY VIEWING A SINGLE VIEW DISTORTS ONE'S

1    UNDERSTANDING OF THE DESIGN.

2    Q    OKAY.  LET'S LOOK AT ONE OF THE PHONES, ONE OF

3    THE DESIGNS THAT MR. VERHOEVEN SHOWED YOU.  THIS

4    WAS DX 511.

5              COULD WE SEE THAT?  IT'S ALSO IN YOUR

6    BINDER, MR. BRESSLER.

7              IF YOU START AT THE FIRST PAGE, PLEASE,

8    THOMAS, AND LET'S JUST WALK THROUGH THE VIEWS.

9    DON'T BLOW IT UP BECAUSE THEN IT'LL -- WE BEGIN

10   SEEING EXACTLY WHAT'S THERE.

11             JUST FOLLOWING ALONG ON THE SCREEN,

12   MR. BRESSLER, COULD YOU JUST BRIEFLY TELL US, AS WE

13   GO THROUGH THESE PAGES, WHAT WE'RE LOOKING AT HERE.

14   THIS IS THE JAPANESE '638 PATENT FOR THE RECORD.

15   A    YES.  AND THIS IS THE JAPANESE NON-TRANSLATED

16   VERSION.

17   Q    IT'S PICTURES, SO WE CAN LOOK AT THEM IN

18   JAPANESE, RIGHT?

19   A    EXACTLY.

20   Q    OKAY.

21   A    THIS IS ACTUALLY TWO THREE-QUARTER FRONT

22   VIEWS.  THE UPPER ONE IS SHOWING IT IN A DEPLOYED

23   MODE BECAUSE THIS IS A SLIDER PHONE.

24             THE SECOND ONE SHOWING IT IN THE CLOSED

25   MODE.

1    Q     OKAY.  LET'S SEE THE NEXT PAGE, THOMAS.

2              WHAT DO WE SEE HERE?

3    A     THIS IS A DEAD-ON FRONT VIEW OF THE PHONE.

4    Q     OKAY.

5    A     AND A DEAD-ON BACK VIEW OF THE PHONE.

6    Q     UM-HUM.

7    A     AND THEN IT APPEARS IT IS A DEAD-ON TOP VIEW

8    OF THE PAGE.

9    Q     OKAY.  NEXT PAGE, PLEASE, THOMAS.

10             WHAT DO WE HAVE HERE?

11   A     THE NEXT FIGURE WOULD BE THE BOTTOM VIEW, AND

12   LET ME GET MY ORIENTATION CORRECT, BUT I BELIEVE

13   THIS IS THE LEFT-HAND VIEW, DEPENDING ON WHICH WAY

14   YOU ARE FACING.  AND THE OTHER ONE IS THE

15   RIGHT-HAND VIEW.

16   Q     AND WHAT DO YOU SEE IN THESE EIGHT VIEWS, IF

17   ANYTHING, THAT YOU COULD NOT SEE IN JUST THE FRONT

18   VIEW?

19   A     IMMEDIATELY WHAT YOU SEE IS THE DIMENSIONALITY

20   OF THE PHONE, MEANING THAT THE PHONE CAN BE SEEN TO

21   NOT BE A DEVICE THAT'S ABSOLUTELY FLAT.

22             YOU CAN SEE THAT THE FRONT END -- AND IF

23   YOU CAN GO BACK TO THE THREE-QUARTER VIEW, I THINK

24   IT'S MOST EASILY DEMONSTRATED VIEW.

25   Q     THOMAS, CAN YOU GO BACK TO THE THREE-QUARTER

1044

```
 1    VIEW.  ONE BEFORE THAT.
 2    A    RIGHT.  I THINK YOU CAN SEE THAT IN THESE
 3    VIEWS THAT LOOKING AT IT FACE ON, ONE COULD
 4    MISUNDERSTAND WHAT THIS DESIGN IS, AND NOT
 5    UNDERSTAND THAT IT IS A DIMENSIONAL FACE THAT, IN
 6    FACT, IS NOT CONTINUOUS FLAT ALL THE WAY ACROSS THE
 7    FRONT, THAT THERE ARE NO INDICATIONS THAT IT'S
 8    EITHER REFLECTIVE OR GLASSY OR TRANSPARENT; AND
 9    THAT IT'S NOT BLACK OR NOT SPECIFIED TO BE BLACK.
10            AND IF YOU LOOK CLOSELY AT THE PIECE OF
11    MATERIAL AROUND IT, ONE CAN HAVE A DEBATE WHETHER
12    THAT'S, IN FACT, A BEZEL OR A FRONT COVER OF THE
13    FRONT PART OF THE PHONE.
14    Q    OKAY.  LET'S LOOK AT ONE MORE EXAMPLE OF THE
15    PHONE, THE PICTURES THAT MR. VERHOEVEN SHOWED YOU.
16            COULD WE SEE DX 728.  AND, AGAIN, LET'S
17    WALK QUICKLY THROUGH THE VIEWS.  THIS IS, FOR THE
18    RECORD, THE JAPANESE '383 PATENT.
19            BRIEFLY, COULD YOU WALK US THREE THESE
20    VIEWS, MR. BRESSLER?
21    A    YES.  THE FIRST PAGE HERE SHOWS THE FRONT
22    THREE-QUARTER VIEW AND THE FRONT HEAD-ON VIEW OF
23    THIS PHONE, WHICH IS ACTUALLY IN THE SPECIFICATION,
24    THIS IS DESCRIBED AS TWO SEPARATE PARTS.  THERE'S
25    AN INTERNAL PHONE COMPONENT THAT THERE'S AN
```

```
 1    EXTERNAL COVER COMPONENT.

 2    Q    OKAY.

 3    A    THAT'S TRANSPARENT.

 4    Q    LET'S SEE THE NEXT VIEW.

 5              WHAT'S HERE?

 6    A    THIS VIEW, I BELIEVE, IS A BACK VIEW AND A TOP

 7    VIEW.

 8    Q    OKAY.  LET'S SEE THE NEXT PAGE, THOMAS.

 9              WHAT IS THIS?

10    A    THIS, I BELIEVE, IS A BOTTOM VIEW AND A

11    SIDE -- AND A LEFT SIDE VIEW, RIGHT SIDE VIEW.

12    Q    OKAY.  AND THE NEXT PAGE, THOMAS?

13    A    IS THE OTHER SIDE VIEW.

14              AND THE NEXT PART IS A SECTION.  NOW, A

15    SECTION IS WHERE YOU SLICE THE OBJECT IN THE PATH

16    POTENTIALLY AND YOU CAN GET TO LOOK AT WHAT IT

17    LOOKS LIKE FROM THE END OF THE SLICE OF BOLOGNA, IF

18    YOU WILL.

19    Q    OKAY.  SO THAT'S NOT WHAT AN ORDINARY OBSERVER

20    WOULD SEE?

21    A    USUALLY, NO.

22    Q    UNLESS WE CUT OUR PHONES IN HALF?

23    A    RIGHT.

24    Q    OKAY.  LET'S LOOK AT THE NEXT PAGE.  WHAT DO

25    WE SEE HERE?
```

```
 1    ME THAT A CONSUMER, IF THEY'RE GOING TO BUY AN
 2    EXPENSIVE ITEM LIKE AN I -- A SMARTPHONE, THEY GO
 3    TO THE STORE AND THEY FIDDLE WITH IT FOR A WHILE
 4    AND THEY FIGURE OUT IF THEY WANT TO BUY IT; RIGHT?
 5    A    I CAN'T SPEAK TO CONSUMER BEHAVIOR, YOU KNOW,
 6    EXCEPT MY OWN ANECDOTALLY.  BUT IT'S NOT MY AREA.
 7    Q    SO YOU DON'T HAVE AN OPINION AS TO WHETHER --
 8    GO BACK TO THE SLIDE AGAIN -- AS TO WHETHER A
 9    CONSUMER WOULD KNOW FROM ALL OF THE APPLE
10    ADVERTISING AND MARKETING THAT, WITH RESPECT TO THE
11    IPHONE, THE HOME BUTTON IS NOT AN ICON, IT'S A
12    PHYSICAL BUTTON?
13    A    NO.
14    Q    OKAY.  NOW, DO YOU SEE UP AT THE TOP HERE
15    THERE'S THESE LITTLE DOTS?
16    A    YES.
17    Q    THERE'S ONE BIG CIRCLE -- OR ONE RELATIVE TO
18    THE OTHER DOTS, IT'S A BIGGER CIRCLE THAT HAS A 1
19    ON IT?
20    A    YES.
21    Q    AND TWO OTHER DOTS?
22    A    YES.
23    Q    WHERE IS THAT ON THE D'305?
24    A    THERE ISN'T CORRESPONDING DOTS ON THE D'305.
25    Q    THOSE DOTS INDICATE TO A CONSUMER THAT THERE'S
```

1    THREE PAGES WORTH OF APPLICATION; RIGHT?

2    A    YES.

3    Q    THERE'S NOTHING INDICATING PAGES OF

4    APPLICATIONS IN THE D'305; CORRECT?

5    A    YES.

6    Q    AND CAN YOU TELL, BY LOOKING AT THIS, WHETHER

7    OR NOT THE ICONS ARRANGED IN THE FASCINATE ARE IN

8    ALPHABETICAL ORDER?  DO YOU SEE THE FIRST ONE IS

9    THREE, THEN A, THEN B, B-I, B-L, B-R, C-A, C-A,

10   C-A.  DO YOU SEE THAT?

11   A    LOOKS ALPHABETIC.

12   Q    IT'S ALPHABETICAL; RIGHT?

13   A    YES.

14   Q    LOOK AT THE D'305.  TEXT, CALENDAR.  WELL, T

15   COMES AFTER C IN THE ALPHABET; RIGHT?

16   A    YES.

17   Q    AND THEN PHOTOS AND BACK TO CAMERA AND THEN TO

18   YOUTUBE, THAT'S WITH A Y, AND THEN STOCKS.

19        SO THE D'305, THE ICONS ARE NOT ARRANGED

20   ALPHABETICAL ORDER; RIGHT?

21   A    RIGHT.

22   Q    SO BEING ARRANGED IN ALPHABETICAL ORDER IS

23   KIND OF USEFUL, ISN'T IT?

24   A    SOMETIMES.

25   Q    YEAH, ESPECIALLY IF YOU HAVE THREE PAGES OF

```
 1    ICONS.  IT'S EASIER TO FIND THE APPLICATION PROGRAM

 2    YOU WANT IF IT'S ARRANGED IN ALPHABETICAL ORDER;

 3    RIGHT?

 4    A    I WOULD PROBABLY, IF I WERE DESIGNING IT, I

 5    WOULD ARRANGE THINGS IN ORDER THAT I THOUGHT WOULD

 6    BE THE MOST FREQUENTLY USED.

 7            BUT I THINK IT'S A -- THAT, WHAT YOU SAY,

 8    SOMETIMES ALPHABETICAL MAKES TOTAL SENSE.

 9            IT OFTEN MAKES SENSE, YOU KNOW, TYPE

10    FACES, YOU'VE GOT A SUPER LONG LIST OF 50 NAMES,

11    SCREEN ELEMENTS TENDS TO DEPEND HOW MANY YOU'RE

12    TALKING ABOUT, AND HOW THEY'RE DISPLAYED.

13            SO I WOULDN'T CATEGORICALLY SAY THAT

14    ALPHABETICAL IS PREFERRED TO NOT ALPHABETICAL.

15    Q    WELL, LET'S TALK ABOUT A HOME SCREEN.

16            THAT'S WHERE YOU COULD PUT -- A USER CAN

17    ACTUALLY TOUCH AND DRAG THEIR FAVORITE APPLICATIONS

18    TO THEIR HOME SCREEN WHERE THEY CAN SEE THEM FAST

19    AS SOON AS THEY PICK UP THEIR PHONE; RIGHT?

20    A    YES.

21    Q    WHEREAS AN APPLICATIONS SCREEN IS SIMPLY A

22    LIST OF ALL OF YOUR APPLICATIONS; RIGHT?

23    A    RIGHT.

24    Q    AND SO FOR AN APPLICATION SCREEN, IT MAKES

25    SENSE THAT YOUR ICONS ARE IN ALPHABETICAL ORDER SO
```

```
 1    YOU CAN FIND THEM; RIGHT?
 2    A    I WOULDN'T -- I WOULDN'T SAY THAT BECAUSE YOU
 3    MIGHT WANT YOUR GAMES TOGETHER AND YOUR ART
 4    PROGRAMS TOGETHER AND YOUR CAMERA STUFF TOGETHER,
 5    AND THAT MIGHT BE A BETTER SPACIAL WAY TO FIND
 6    THINGS.
 7            YOU KNOW, IT DEPENDS ON THE PERSON.
 8    Q    AND YOU MIGHT WANT A PLACE YOU CAN GO TO SEE
 9    AN ENTIRE LIST OF YOUR APPLICATIONS TO SEE IF YOU
10    DOWNLOADED SOMETHING OR NOT, RIGHT?
11    A    I DON'T DISPUTE ALPHABETICAL CAN BE USEFUL,
12    BUT I WOULDN'T SAY THAT IS IT FOR EASE OF USE.
13    Q    NOW, YOU MENTIONED IN YOUR ANSWER A FEW
14    MINUTES AGO, YOU REFERENCED FUNCTIONALITY.
15            DO YOU REMEMBER THAT GENERALLY?
16    A    YES.
17    Q    WOULD YOU AGREE WITH ME THAT THE ICONS ON THE
18    D'305 DESIGN ARE AT LEAST IN PART FUNCTIONAL?
19    A    ICONS IN GENERAL HAVE A PURPOSE.
20            THE D'305, AS I UNDERSTAND IT, IS AN
21    ORNAMENTAL DESIGN, SO IT'S, IT'S A PICTURE.
22    Q    WHEN YOU SAY ICONS HAVE A PURPOSE, WHAT DO YOU
23    MEAN?
24    A    I MEAN THAT TO GENERALIZE, YOU INTERACT WITH
25    ONE AND SOMETHING HAPPENS.
```

```
1    Q    THE PURPOSE OF ICONS IS TO COMMUNICATE

2    INFORMATION TO THE USER; RIGHT?

3    A    YES.

4    Q    ICONS ARE SORT OF LIKE TRAFFIC SIGNS?

5    A    YES.

6    Q    THEY HELP USERS MAKE CHOICES AMONG OPTIONS?

7    A    YES.

8    Q    ICONS CAN ALSO BE USED ON TOUCHSCREENS WHERE

9    YOU DON'T HAVE A LOT OF SPACE TO SAVE SPACE; RIGHT?

10   A    THAT IS AN OPTION.  THERE ARE -- AGAIN,

11   THERE'S -- THERE ARE NO HARD AND FAST RULES.

12   Q    ICONS ARE ALSO USEFUL BECAUSE IT CAN BE

13   UNDERSTOOD BY DIFFERENT PEOPLE WHO SPEAK DIFFERENT

14   LANGUAGES; RIGHT?

15   A    AS OPPOSED TO TEXT, SOMETIMES A PICTURE IS

16   UNIVERSAL.

17   Q    I CAN LOOK AT THIS CLOCK AND IT DOESN'T MATTER

18   WHAT COUNTRY I'M FROM, I DON'T HAVE TO SPEAK

19   ENGLISH, I CAN SEE THE CLOCK AND THAT WOULD

20   COMMUNICATE TO ME AS A USER THAT IF I HIT THAT

21   ICON, I'LL LAUNCH THE CLOCK APPLICATION; RIGHT?

22   A    YES.

23   Q    SAME THING WITH THIS ICONIC PHONE SYMBOL FROM,

24   WHAT DID YOU SAY, THE '50S, '40S?

25   A    '38.
```

10453

```
1     Q     '38?

2     A     BUT IT EVOLVED OVER TIME.

3     Q     EVERYBODY SEEING THAT KNOWS, HEY, THAT'S

4     COMMUNICATING TO ME IF I HIT THAT BUTTON, I'LL

5     LAUNCH THE PHONE APPLICATION; RIGHT?

6     A     GENERALLY, YES.

7     Q     PEOPLE FROM DIFFERENT COUNTRIES WHO SPEAK

8     DIFFERENT LANGUAGES WOULD UNDERSTAND THAT?

9     A     YES.

10    Q     YOU AGREE THAT FAMILIAR REAL WORLD OBJECTS

11    MAKE GOOD ICONS; RIGHT?

12    A     YES AND NO.  SOMETIMES USING A REAL WORLD

13    OBJECT WHERE, LET'S SAY, A PRINTER, A PRINTER LOOKS

14    SO MUCH DIFFERENT TEN YEARS LATER THAT SOMETIMES WE

15    FIND VESTIGES OF THINGS THAT LOOK ODD BECAUSE THE

16    INDUSTRIAL DESIGN CHANGES.  SO SOMETIMES USING --

17    SOMETIMES A METAPHOR IS STRONGER BECAUSE YOU'RE NOT

18    TIED TO A PARTICULAR WAY SOMETHING LOOKS IN TIME.

19    Q     OKAY.  YOU DON'T DISPUTE THAT THE ICONS USED

20    IN THE D'305 HERE WERE CHOSEN TO COMMUNICATE THE

21    VARIOUS FUNCTIONS OF THE APPLICATIONS ON THE

22    DEVICE, DO YOU?

23    A     THE D'305 DOESN'T SAY ANYTHING IN THE PATENT

24    ABOUT THOSE PARTICULAR DESIGNS.  I'M -- I CAN --

25    AND I WASN'T INVOLVED IN THE DESIGN OF THOSE, SO I
```

10454

1    CAN SPECULATE.

2    Q    ISN'T IT TRUE THAT IN YOUR OPINION, THE WAY

3    THE D'305 IS SET UP IS THE MOST EFFECTIVE VISUAL

4    WAY TO COMMUNICATE THE FUNCTIONS ON THE PHONE?

5    A    ON A PHONE?

6    Q    YES.

7    A    WELL, NO.  I MEAN, THE D'305 PATENT DOESN'T

8    SAY IT'S A PHONE.  IT JUST SAYS IT'S A DEVICE.

9    Q    WHEN YOU LOOK AT THE D'305, YOU DON'T DISPUTE

10   THAT THE CLOCK ICON COMMUNICATES TO A CONSUMER THAT

11   IF THEY PUSH THAT BUTTON, IT'LL LAUNCH THE CLOCK

12   APPLICATION FUNCTION?

13   A    YES.

14   Q    AND THE SAME IS TRUE FOR THE CALCULATOR;

15   RIGHT?  IT INDICATES TO THE CONSUMER, IT

16   COMMUNICATES TO THE CONSUMER FUNCTIONAL

17   INFORMATION, I.E., IF YOU HIT THAT ICON, THE

18   CALCULATOR ICON, IT'LL LAUNCH THE CALCULATOR

19   APPLICATION; RIGHT?

20   A    WELL, AGAIN, THERE ISN'T ANYTHING THAT I SAW

21   IN THE D'305 THAT TALKS ABOUT WHAT ANY OF THOSE

22   THINGS DO.  YOU KNOW, YOU READ THE WORD AND I'M

23   ASSUMING THOSE ARE ALL ILLUSTRATIONS OF POSSIBLE

24   ICONS.

25   Q    THAT'S THE WHOLE POINT OF AN ICON IS TO

1    COMMUNICATE TO THE USER -- WITHDRAW THE QUESTION.

2              ISN'T IT TRUE THE WHOLE POINT OF AN ICON

3    ON A SMARTPHONE IS TO COMMUNICATE TO THE CONSUMER

4    USING THAT PRODUCT, THAT IF THEY HIT THAT ICON,

5    CERTAIN FUNCTIONALITY WILL OCCUR ON THE PHONE?

6    A    GENERALLY, YES.

7              BUT THAT'S NOT SPELLED OUT, IN MY

8    UNDERSTANDING, IN THE D'305 DESIGN.

9    Q    OKAY.  GIVEN THAT IT'S NOT SPELLED OUT, YOU

10   AGREE GENERALLY THAT, AS AN EXPERT ON ICONS --

11   A    YEAH.

12   Q    -- THAT THAT'S THE WAY ICONS ARE FOR, RIGHT?

13   ON SMARTPHONES AT LEAST?

14   A    UM --

15   Q    TO COMMUNICATE TO THE CONSUMERS, HEY, IF YOU

16   HIT THIS BUTTON, CERTAIN FUNCTIONS WILL HAPPEN.  IF

17   YOU HIT THIS OTHER BUTTON, OTHER DIFFERENT

18   FUNCTIONS WILL HAPPEN; RIGHT?

19   A    AGREED.  VISUAL SHORTHAND FOR SOMETHING.

20   Q    AND THE BEST ICONS ARE THE ONES THAT CAN

21   COMMUNICATE THAT FUNCTIONALITY THE BEST SO THE USER

22   ISN'T CONFUSED ABOUT WHICH BUTTONS WILL DO WHAT;

23   RIGHT?

24   A    GOOD ICONS COMMUNICATE CLEARLY AND

25   CONSISTENTLY.

1    Q    AND THEY -- ON SMARTPHONES, THEY COMMUNICATE

2    TO THE CONSUMER WHAT THE FUNCTIONALITY OF THE PHONE

3    IS?  IN OTHER WORDS, IF YOU HIT THIS BUTTON, YOU'LL

4    LAUNCH THE PHONE APPLICATION.  IF YOU HIT THIS

5    OTHER BUTTON, YOU'LL LAUNCH THE CAMERA APPLICATION.

6    FAIR?

7    A    IF SOMEONE HAD GENERAL KNOWLEDGE THAT THEY

8    BRING TO IT, YES.

9              MR. VERHOEVEN:  YOUR HONOR, I'M ABOUT TO

10   CHANGE SUBJECTS.  DO YOU WANT TO TAKE THE LUNCH

11   NOW?

12             THE COURT:  SURE.  IT'S 1202.  AGAIN,

13   PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS THE CASE

14   WITH ANYONE AND PLEASE DON'T DO ANY OF YOUR OWN

15   RESEARCH.

16             GO AHEAD -- ACTUALLY, IF YOU COULD JUST

17   LEAVE YOUR NOTEBOOKS IN THE JURY ROOM.  THANK YOU.

18   WE'LL SEE YOU BACK AT 1:00 O'CLOCK.

19             (WHEREUPON, THE FOLLOWING PROCEEDINGS

20   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

21             THE COURT:  OKAY.  THANK YOU ALL.

22             (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

23

24

25

1           **AFTERNOON SESSION**

2                (WHEREUPON, THE FOLLOWING PROCEEDINGS

3      WERE HELD OUT OF THE PRESENCE OF THE JURY:)

4                THE COURT:  ALL RIGHT.  LET ME ASK ONE

5      QUICK QUESTION, BECAUSE THIS IS COMING UP WITH

6      MR. DENISON AND WITH MS. KARE.

7                THANK YOU, PLEASE TAKE A SEAT.

8                EXHIBIT 44, LET ME HEAR, BECAUSE I THINK

9      MAYBE I'VE BEEN TOO HARD WITH THE FOUNDATION, I'M

10     ASSUMING THAT SAMSUNG IS NOT GOING TO ARGUE THAT

11     THIS IS NOT A SAMSUNG DOCUMENT.  OR ARE YOU?

12               ARE YOU GOING TO SAY IT WAS FABRICATED?

13     IT'S NOT YOUR DOCUMENT OR ANYTHING ELSE WITH THE

14     COMPARISON?  I THINK IT'S HIGHLY RELEVANT.  I THINK

15     IT WAS UNFORTUNATE IF IT WASN'T PRODUCED BEFORE

16     MR. DENISON WAS DEPOSED FOR THE PRELIMINARY

17     INJUNCTION.

18               LET ME HEAR, WHAT'S YOUR POSITION ON

19     THAT, BECAUSE THIS KEEPS COMING UP, AND I'D LIKE TO

20     GET IT ADDRESSED.

21               MR. VERHOEVEN:  OUR POSITION?

22               THE COURT:  YEAH.

23               MR. VERHOEVEN:  WE'RE NOT CHALLENGING

24     THAT IT'S A SAMSUNG DOCUMENT, YOUR HONOR, BUT

25     THERE'S BEEN NO FOUNDATION LAID FOR ADMISSION, FOR

1    ADMISSIBILITY.

2              THE COURT:  SO WHAT IS YOUR REQUIREMENT,

3    THAT THEY BRING IN A SAMSUNG EMPLOYEE FROM KOREA

4    WHO CAN SAY THAT, YES, HE/SHE WORKED ON THAT

5    DOCUMENT?

6              MR. VERHOEVEN:  IF THEY HAVE DEPOSITION

7    TESTIMONY THAT LAYS THE FOUNDATION OF THE DOCUMENT,

8    WE CAN PUT IF IN THAT WAY, YOUR HONOR.

9              BUT AS WITH ALL OF THESE EXHIBITS, YOU

10   NEED TO LAY A FOUNDATION BEFORE THEY COME IN.  AND

11   THE OBJECTION I HAD THIS MORNING, YOUR HONOR, WAS

12   THAT WE DON'T BELIEVE THAT AN EXPERT WITNESS IS

13   SOMEBODY WHO CAN LAY A FOUNDATION --

14             THE COURT:  I'M NOT GOING TO ALLOW THAT

15   IT COME IN THROUGH HER.  I JUST WANT TO RESOLVE

16   THIS ISSUE.

17             MR. VERHOEVEN:  I'M SORRY.  WHAT WE'RE

18   SAYING IS THEY NEED TO DO IT THE RIGHT WAY, HAVE A

19   WITNESS WHO THEY'VE HAD OVER A ONE DEPOSITION, I

20   THINK IN THIS CASE, SAMPLE WITNESSES, AND THIS WAS

21   THEIR JOB TO SHOW THIS TO A WITNESS AND GET THE

22   FOUNDATION SO THAT THEY CAN MOVE IT INTO EVIDENCE.

23   AND --

24             THE COURT:  RIGHT.  BUT I DON'T THINK IT

25   SHOULD BE -- YOU KNOW, SAMSUNG SHOULD HAVE PRODUCED

10466

```
 1    AND HOW APPLE AND SAMSUNG HAD ACTUAL NOTICE OF THE

 2    APPLE PATENTS-IN-SUIT, APPLE TRADE DRESS, AND APPLE

 3    TRADEMARK.

 4              SO I'M GOING TO OVERRULE THE OBJECTION

 5    ABOUT DISCLOSURE BECAUSE I FIND THAT THIS IS

 6    SUFFICIENT.

 7              SO IF YOU WANT TO KEEP ARGUING IT, IT'S

 8    NOW JUST GOING TO BE BILLED STRAIGHT TO SAMSUNG'S

 9    TIME.

10              MR. VERHOEVEN:  I THINK THAT COMPLETES

11    OUR ARGUMENT, YOUR HONOR.

12              THE COURT:  OKAY.  ALL RIGHT.  I'M GOING

13    TO RETURN THIS -- THAT WAS FROM THE APPLE'S

14    CORRECTED AMENDED OBJECTIONS AND RESPONSES TO

15    SAMSUNG ELECTRONICS' LIMITED INTERROGATORIES NUMBER

16    4, 6, 7, 16, 17, 18 TO APPLE, INC.

17              ALL RIGHT.

18              (WHEREUPON, THE FOLLOWING PROCEEDINGS

19    WERE HELD IN THE PRESENCE OF THE JURY:)

20              THE COURT:  ALL RIGHT.  WELCOME BACK.

21              OH, PLEASE TAKE A SEAT.  SORRY.  I FORGET

22    THAT.

23              ALL RIGHT.  GO AHEAD, PLEASE.

24              IT'S 1:13.

25              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.
```

1    Q    GOOD AFTERNOON, DR. KARE.

2    A    GOOD AFTERNOON.

3    Q    I'D LIKE TO SWITCH SUBJECTS AND TALK A LITTLE

4    BIT ABOUT THE PLACEMENT OF ICONS ON THE USER

5    INTERFACE.

6              WOULD YOU AGREE THAT THERE ARE PRACTICAL

7    ENGINEERING CONSIDERATIONS INVOLVED IN THE SPACING

8    FOR THE ICONS ON A GRAPHICAL USER INTERFACE?

9    A    GENERALLY, YES.

10   Q    THE USER INTERFACE SHOULD BE ORGANIZED OR MUST

11   BE ORGANIZED SO THAT THERE'S ENOUGH SPACE FOR THE

12   ICON SO THE USER CAN ACTUALLY SELECT THE ICON;

13   RIGHT?

14   A    YES.

15   Q    SO A DESIGNER HAS TO TAKE INTO ACCOUNT THE

16   SPACE REQUIRED ON THE TOUCHSCREEN TO EFFECTIVELY

17   SELECT AN ICON IN DECIDING HOW TO POSITION ICONS ON

18   THE SCREEN?

19   A    IT'S FAIR TO SAY THAT IF IT'S A TOUCHSCREEN

20   AND YOU'RE USING YOUR FINGER AND NOT A STYLUS, THEN

21   THERE'S SOME PRACTICAL CONSIDERATION OF HOW CLOSE

22   THINGS -- HOW CLOSE AREAS COULD BE TOGETHER AND HOW

23   BIG THEY ARE.

24   Q    RIGHT.  SO IF YOU HAD, FOR EXAMPLE, A COMPUTER

25   SCREEN AND YOU'RE USING A MOUSE, YOU CAN USE -- YOU

1    CAN HAVE SMALLER ICONS IF YOU WANTED TO AND JUST

2    CLICK ON THE POINT; RIGHT?

3    A    YOU HAVE A ONE PIXEL POINTER.

4    Q    RIGHT.

5    A    EASY TO BE PRECISE.

6    Q    NOW, IF YOU HAD ONE OF THOSE OUGHT PALM PILOTS

7    WHERE YOU HAD A STYLUS -- DO YOU REMEMBER THOSE?

8    A    YES.

9    Q    THAT WOULD BE A TIGHT LITTLE POINT THAT YOU

10   PUSH; RIGHT?

11   A    YES.

12   Q    AND THAT'S ALL THE SPACE YOU'D NEED?

13   A    YOU KNOW, MAYBE THERE'S OTHER -- YOU KNOW,

14   VISUAL DESIGN.

15   Q    OF COURSE.

16   A    BUT, YES.

17   Q    SO -- BUT IF YOU HAVE ONE OF THESE NEWER

18   SMARTPHONES THAT ARE DESIGNED TO HAVE A TOUCHSCREEN

19   WITH JUST YOUR FINGER, YOU DON'T NEED A STYLUS,

20   THEN YOU NEED A LARGER AREA BECAUSE THE FINGER

21   TOUCH IS LARGER; RIGHT?

22   A    YES.

23   Q    SO THAT CAN AFFECT THE NUMBER OF OR HOW BIG

24   THE ICONS NEED TO BE?

25   A    IT WOULD AFFECT HOW BIG THE HIT AREA NEEDS TO

```
 1    BE, THE ICON AND THE HIT AREA THAT ARE SENSITIVE TO

 2    THE FINGER DON'T NEED TO BE EXACTLY THE SAME SIZE.

 3    Q    WELL, THEY NEED TO BE ABOUT THE SAME SIZE,

 4    DON'T THEY?

 5    A    YOU CAN HAVE THE ICON IS THE TARGET AND THE

 6    HIT AREA COULD BE A HALO AROUND IT SO THAT YOU

 7    DON'T NEED TO HAVE EVERY PIXEL THAT'S SENSITIVE TO

 8    YOUR FINGER BE PART OF THE ICON.

 9    Q    IS ONE REASON WHY THE DOCK OR FAVORITES GROUP

10    THAT WAS AT THE BOTTOM OF THE D'305 DESIGN

11    PATENT -- D'305 DESIGN PATENT IS PUT DOWN THERE

12    BECAUSE, BY DESIGN FUNCTIONALLY, YOU WANT THE

13    USER'S THUMB TO BE ABLE TO TOUCH THE ICON WHILE

14    STILL HOLDING THE PHONE WITH THE REST OF THE HAND?

15    A    I THINK OF THE D'305 PATENT AS JUST A PICTURE.

16    IT DOESN'T REALLY SAY ANYTHING ABOUT HOW ANYTHING

17    WORKS.

18          SO ALL I CAN REALLY SEE IN THAT PATENT --

19    IN THAT ORNAMENTAL DESIGN IS THAT THERE ARE FOUR

20    ICONS AT THE BOTTOM.

21    Q    WELL, YOU ALSO TALKED ABOUT TRADE DRESS.

22          DO YOU REMEMBER THAT?

23    A    YES.

24    Q    AND DID YOU CONSIDER ANY FUNCTIONAL

25    CONSIDERATIONS WHEN YOU WERE TALKING ABOUT TRADE
```

1    DRESS -- WHEN YOU WERE FORMING YOUR OPINIONS ABOUT

2    TRADE DRESS?

3    A    BECAUSE I WAS ASKED ABOUT THE OVERALL VISUAL

4    IMPRESSION, TO THE EXTENT THAT THE OVERALL VISUAL

5    IMPRESSION INCLUDES, YOU KNOW, ABOUT 20 THINGS, I

6    ASSUMED FROM THAT THAT YOU NEED TO HAVE AN

7    AFFORDANCE TO MAKE THOSE THINGS HAPPEN.

8         BUT I DIDN'T CONSIDER REALLY THE

9    MECHANICS OF, YOU KNOW -- IT WAS MUCH MORE FOCUSSED

10   ON HOW THINGS LOOKED VERSUS HOW THINGS WORKS, MY

11   PARTICULAR ANALYSIS FOR WHAT I WAS ASKED TO DO.

12   Q    IS IT FAIR TO SAY THAT YOU DIDN'T INVESTIGATE

13   THE FUNCTIONALITY OF THE ICONS AND HOW THEY WORK

14   AND HOW A USER WOULD INTERACT WITH THEM AS PART OF

15   YOUR ANALYSIS?

16   A    YES.

17   Q    NOW, ISN'T IT -- I THINK YOU TALKED A LITTLE

18   BIT ABOUT THE SHAPE OF THE ICON BEING A RECTANGLE.

19        DO YOU REMEMBER THAT?

20   A    YES.

21   Q    THERE'S A REASON PEOPLE DON'T HAVE TRIANGULAR

22   SHAPED ICONS ON SMARTPHONES, ISN'T THERE?

23   A    THERE'S NO REASON YOU COULDN'T.

24   Q    HAVE YOU EVER SEEN ANY?

25   A    NO.  BUT I WOULDN'T SAY THAT BECAUSE YOU

```
 1    HAVEN'T SEEN SOMETHING DOESN'T MEAN IT'S NOT A
 2    REASONABLY -- IT COULDN'T WORK.
 3    Q    WELL, YOU WOULD AGREE WITH ME THAT TRIANGULAR
 4    ICONS WOULD NOT WORK AS WELL AS RECTANGULAR ICONS
 5    ON A SMARTPHONE?
 6    A    I WOULDN'T AGREE WITH YOU THAT THAT IS A
 7    TRUISM.
 8    Q    SO YOU THINK TRIANGULAR CONTAINERS WORK JUST
 9    AS WELL AS RECTANGULAR CONTAINER S?
10    A    I THINK YOU NEED TO UNDERSTAND THE DESIGN
11    PROBLEM AND, YOU KNOW, SOMETIMES IF YOU HAVE A
12    SQUARE, IT COULD BE DIVIDED INTO TWO TRIANGLES.  SO
13    IF YOU NEEDED TO GET COURT THINGS ON THAT SCREEN, A
14    SCREEN, MAYBE THAT WOULD BE A GOOD WAY TO DO IT.
15             BUT IT ALSO WOULD -- IF YOU USE
16    TRIANGLES, THERE WOULD BE A LOT MORE BACKGROUND
17    SPACE BETWEEN THEM AND MAYBE THAT COULD BE A GOOD
18    DIFFERENTIATING FACTOR.  I WOULDN'T RULE IT OUT.
19    Q    WELL, YOU HAD YOUR DEPOSITION TAKEN IN APRIL
20    OF THIS YEAR; RIGHT?
21    A    YES.
22    Q    DO YOU REMEMBER THAT?
23    A    YES.
24    Q    AND YOUR DEPOSITION WAS TAKEN, YOU WERE UNDER
25    OATH JUST LIKE TODAY; RIGHT?
```

1    A    YES.

2    Q    I'D LIKE TO SHOW YOU AN EXCERPT FROM YOUR

3    TRANSCRIPT.

4           IF WE CAN JUST PUT UP THE WRITTEN

5    TRANSCRIPT, MR. FISHER, PAGE 117, LINE 18, AND IT

6    GOES THROUGH 118, LINE 14.

7           LOOK UP HERE, DOCTOR.

8           "QUESTION:  DO YOU THINK THAT TRIANGULAR

9    CONTAINERS WOULD WORK JUST AS WELL AS RECTANGULAR

10   CONTAINERS?

11          "ANSWER:  NO.

12          "QUESTION:  AND WHY IS THAT?

13          "ANSWER:  BECAUSE A TRIANGLE, EXCEPT

14   FOR -- IT'S HARD TO FIT A LOT OF IMAGES.  IF YOU'RE

15   TRYING TO USE A TRIANGLE AS A BACKGROUND SHAPE,

16   YOU'D BE A LOT MORE LIMITED AS TO WHAT YOU COULD

17   FIT IN IT TO MODIFY IT BECAUSE YOU'D BE GIVING UP

18   ESSENTIALLY HALF OF YOUR REAL ESTATE."

19          DO YOU MEAN REMEMBER THAT TESTIMONY?

20   A    I DO.

21   Q    YOU AGREE WITH THAT, RIGHT?

22          MS. KREVANS:  YOUR HONOR, COULD I ASK

23   THAT MR. VERHOEVEN READ THE ENTIRE QUESTION?

24          THE COURT:  NO.  YOU'LL HAVE AN

25   OPPORTUNITY IN REDIRECT.

```
 1              THE WITNESS:  THAT'S SOMETHING, BECAUSE I
 2     REVIEWED MY DEPOSITION TESTIMONY FOR THIS EVENT,
 3     THAT I WOULD SAY I THOUGHT MORE ABOUT IT, AND I
 4     COULD ALSO EXPLAIN WHAT I MEANT.
 5              A SQUARE DOES HAVE MORE REAL ESTATE.
 6     BY MR. VERHOEVEN:
 7     Q    MY QUESTION IS WHETHER YOU STAND BY YOUR
 8     TESTIMONY UNDER OATH AT YOUR DEPOSITION.
 9     A    I HAVE RETHOUGHT ABOUT THAT, AND IF I HAD THE
10     OPPORTUNITY TO ANSWER THAT QUESTION, I WOULD GIVE A
11     BIT OF A DIFFERENT ANSWER.
12     Q    YOU DON'T STAND BY IT?
13     A    I HAVE THOUGHT -- I HAVE HAD MORE THOUGHTS
14     ABOUT WHEN I WENT BACK AND RECONSIDERED IT.
15     Q    OKAY.  SO THE ANSWER TO MY QUESTION IS YOU
16     DON'T STAND BY IT?  YOU WOULD RATHER HAVE A
17     DIFFERENT ANSWER?
18     A    YES.  OR THE REST OF MY ANSWER GOES ON TO
19     EXPLAIN WHAT I WAS TRYING TO SAY.
20     Q    OKAY.  LET'S LOOK AT THAT.  "AND AT THE SAME
21     TIME, MAYBE THERE'S A -- HOW BIG ARE THEY?  YOU
22     KNOW, HOW ARE YOU ARRANGING THEM?  TRIANGLES ARE A
23     GOOD WAY TO GET MAYBE FOUR SHAPES IN A COMPACT
24     SPACE.  MAYBE IF IT WAS SOMETHING THAT DIDN'T NEED
25     LABELS, IT COULD BE POSSIBLE.  BUT IN GENERAL, A
```

```
 1              MR. VERHOEVEN:  YOUR HONOR, IF I CAN HAVE
 2    JUST TEN MINUTES, I CAN REALLY SHORTEN IT.  I
 3    WASN'T SURE HOW MUCH -- HOW LONG THE DIRECT WOULD
 4    BE.  I THINK IT WOULD BE USEFUL.  SO I WOULD
 5    SUGGEST WE TAKE OUR AFTERNOON BREAK NOW IF YOUR
 6    HONOR IS WILLING TO.  OTHERWISE I CAN GO, BUT
 7    OTHERWISE --
 8              THE COURT:  WE'RE GOING TO GO NOW.  WE'RE
 9    GOING TO GO UNTIL 2:45 AND TAKE OUR BREAK.
10              MR. VERHOEVEN:  YES, YOUR HONOR.
11              (PAUSE IN PROCEEDINGS.)
12              THE COURT:  HOW IS THIS DIFFERENT FROM
13    THE WINER CROSS I GOT YESTERDAY?  IS THAT THE SAME
14    OR DIFFERENT?
15                      CROSS-EXAMINATION
16    BY MR. VERHOEVEN:
17    Q    GOOD AFTERNOON, DR. WINER.
18    A    GOOD AFTERNOON, COUNSEL.
19    Q    MY NAME IS CHARLES VERHOEVEN, AND I'LL BE
20    EXAMINING YOU.
21              NOW, YOU'VE BEEN -- YOU WERE ENGAGED,
22    HIRED TO WORK ON THIS CASE FOR APPLE THROUGH A
23    COMPANY CALLED CORNERSTONE RESEARCH?
24    A    THAT'S CORRECT.
25    Q    AND CORNERSTONE RESEARCH IS A LITIGATION
```

1530

```
1    SUPPORT COMPANY; RIGHT?

2    A    THAT'S CORRECT.

3    Q    THEY CONSULT DIRECTLY WITH ATTORNEYS ON

4    LITIGATION MATTERS?

5    A    YES, THEY DO.

6    Q    AND THEY HELP FACILITATE CLIENTS TO FIND

7    EXPERT WITNESSES FOR LITIGATION; RIGHT?

8    A    THAT'S CORRECT.

9    Q    AND THAT'S HOW YOU BECAME INVOLVED IN THIS

10   CASE?

11   A    YES.  I WAS CONTACTED BY SOMEONE AT

12   CORNERSTONE.

13   Q    NOW, AND YOU ACCEPTED THE ASSIGNMENT?

14   A    I SURE DID.

15   Q    OKAY.  AND WHEN YOU WERE HIRED AS AN EXPERT ON

16   THIS CASE, THERE WERE -- CORNERSTONE HAD A STAFF OF

17   FOLKS THAT ASSISTED YOU WITH THE PREPARATION OF

18   YOUR EXPERT REPORT?

19   A    THAT'S CORRECT.

20   Q    AND, IN FACT, CORNERSTONE -- THE FOLKS AT

21   CORNERSTONE SUBSTANTIALLY WROTE THE FIRST DRAFT OF

22   YOUR REPORT; RIGHT?

23   A    I GAVE SUBSTANTIAL INPUT AND APPROVED

24   EVERYTHING IN IT, BUT THEY WROTE THE FIRST DRAFT.

25   Q    OKAY.  SO WHO WAS IT?
```

1     A     THE LEAD PERSON AT CORNERSTONE.  HIS NAME IS

2     SHANKAR, S-H-A-N-K-A-R, IYER, I-Y-E-R.

3     Q     SINCE 2000 -- SINCE THE YEAR 2000, YOU'VE

4     SERVED AS AN EXPERT WITNESS ON AT LEAST 14 OTHER

5     LITIGATION MATTERS; RIGHT?

6     A     THAT MIGHT BE CORRECT.  I HAVEN'T COUNTED.

7     Q     AND YOU'RE BEING PAID FOR YOUR TIME IN THIS

8     CASE; RIGHT?

9     A     CORRECT.

10    Q     TELL THE JURY HOW MUCH YOU'RE BEING PAID?

11    A     SIX HUNDRED AND TWENTY-FIVE DOLLARS AN HOUR.

12    Q     AND HOW MUCH MONEY HAS APPLE PAID YOU SO FAR?

13    A     APPROXIMATELY $50,000.

14    Q     AND HOW MUCH TOTAL HAS IT PAID CORNERSTONE?

15    A     I HAVE NO IDEA.

16    Q     NOW, IN REACHING YOUR OPINIONS IN YOUR EXPERT

17    REPORT, YOU DID NOT DO ANY SYSTEMATIC CONSUMER

18    RESEARCH, DID YOU, SIR?

19    A     I DID NOT CONDUCT ANY NEW STUDIES BEYOND WHAT

20    WAS ALREADY DONE FOR THE CASE.

21    Q     YOU, YOURSELF, DID NOT PERSONALLY CONDUCT ANY

22    SYSTEMATIC CONSUMER RESEARCH; FAIR?

23    A     THAT'S CORRECT.

24    Q     YOU DIDN'T DO ANY FORMAL INTERVIEWS WITH

25    CONSUMERS ABOUT THEIR PURCHASING EXPERIENCES;

```
 1      RIGHT?

 2      A     THAT'S CORRECT.

 3      Q     AND YOU HAVE NO EVIDENCE THAT CONSUMERS IN THE

 4      REAL WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES

 5      THINKING THEY ARE SAMSUNG DEVICES; RIGHT?

 6            MR. JACOBS:  YOUR HONOR, OPENING THE

 7      DOOR.  MR. LEE'S TESTIMONY THAT YOUR HONOR EXCLUDED

 8      THIS MORNING, MR. VERHOEVEN HAS JUST ASKED THIS

 9      WITNESS WHETHER HE HAS ANY ACTUAL EVIDENCE OF

10      CONSUMER CONFUSION AND THIS WITNESS DOES.

11            MR. VERHOEVEN:  LET ME, LET ME ASK YOU --

12      Q     AT YOUR DEPOSITION -- DO YOU REMEMBER YOUR

13      DEPOSITION WAS TAKEN ON APRIL 27TH?

14      A     I REMEMBER BEING DEPOSED.  I DON'T REMEMBER

15      THAT DATE, BUT I'LL ASSUME YOU'RE CORRECT.

16      Q     AND DO YOU REMEMBER TESTIFYING THAT YOU HAVE

17      NO EVIDENCE THAT CONSUMERS OUT THERE IN THE REAL

18      WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES THINKING

19      THEY WERE SAMSUNG DEVICES?

20      A     I THINK THAT MY REPLY WAS IN THE CONTEXT OF I

21      DID NOT DO ANY RESEARCH MYSELF THAT PROVED THAT.

22      Q     WELL, LET'S LOOK AT WHAT YOU SAID.

23            CAN WE PLAY DR. WINER'S DEPOSITION

24      TESTIMONY FROM APRIL 27TH, 2012, PAGE 35, LINES 7

25      THROUGH 15.
```

```
 1                    (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
 2      OPEN COURT OFF THE RECORD.)
 3                    MR. VERHOEVEN:  ALL RIGHT.  LET'S PAUSE
 4      IT AND GET THE VOLUME WORKING.  I APOLOGIZE, YOUR
 5      HONOR.
 6                    (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
 7      OPEN COURT OFF THE RECORD.)
 8      BY MR. VERHOEVEN:
 9      Q    THAT WAS YOUR TESTIMONY YOU GAVE UNDER OATH IN
10      APRIL, SIR?
11                    MR. JACOBS:  YOUR HONOR, UNDER THE RULE
12      OF COMPLETENESS, I BELIEVE WE SHOULD READ A COUPLE
13      MORE PASSAGES DOWN, AND MR. VERHOEVEN HAS OPENED
14      THE DOOR.
15                    THE COURT:  I THINK HE'S OPENED THE DOOR,
16      BUT YOU'RE NOT GOING TO DO IT DURING HIS CROSS.
17                    THE WITNESS:  I BELIEVE I RESPONDED TO
18      THAT IN THE CONTEXT OF WHETHER I HAD DONE ANY
19      RESEARCH MYSELF.
20                    I CERTAINLY HAD READ DOCUMENTS, AND I
21      ALLUDED TO THEM IN MY DEPOSITION, AND MY REPORT,
22      THAT THERE WERE INTERNAL SAMSUNG DOCUMENTS
23      INDICATING REAL CASES OF CONFUSION IN THE
24      MARKETPLACE.
25      BY MR. VERHOEVEN:
```

```
 1    Q    DO YOU STAND BY THE TESTIMONY WE JUST SAW,

 2    SIR?

 3    A    SURE I DO.

 4    Q    OKAY.  THANK YOU.

 5          YOU HAVE NO IDEA WHETHER CONSUMERS HAVE

 6    ACTUALLY BOUGHT APPLE DEVICES THINKING THEY WERE

 7    SAMSUNG DEVICES, HAVE YOU?

 8          MR. JACOBS:  YOUR HONOR, I'M SORRY.  THE

 9    WITNESS HAS BEEN INSTRUCTED NOT TO -- TO FOLLOW AN

10    EARLIER ORDER OF THE COURT AND MR. VERHOEVEN IS

11    OPENING THE DOOR.  THE WITNESS SHOULD BE INFORMED

12    THAT HE CAN ANSWER THAT QUESTION TRUTHFULLY.

13          MR. VERHOEVEN:  I'LL MOVE ON, YOUR HONOR.

14    Q    DR. WINER, YOU HAVE NO EMPIRICAL EVIDENCE TO

15    SHOW THAT SAMSUNG'S ACTIONS HAVE DILUTED APPLE'S

16    BRAND; RIGHT?

17    A    CORRECT.

18    Q    AND YOU HAVE NO HARD DATA TO SHOW THAT

19    SAMSUNG'S ACTIONS HAVE DILUTED APPLE'S BRAND;

20    RIGHT?

21    A    I WAS NOT ASKED TO DO THAT.

22    Q    YOU HAVE NEVER QUANTIFIED THE AMOUNT OF ANY

23    ALLEGED HARM FROM DILUTION OR LOSS OF ANY KIND TO

24    APPLE AS A RESULT OF SAMSUNG'S ACTIONS; RIGHT?

25    A    CORRECT.
```

```
 1    Q    YOU HAVE NO EMPIRICAL EVIDENCE THAT SHOWS THAT
 2    APPLE HAS ACTUALLY LOST ANY MARKET SHARE AS A
 3    RESULT OF SAMSUNG'S SALES OF ITS DEVICES; RIGHT?
 4    A    NO.
 5    Q    THAT ANSWER IS YOU DON'T HAVE ANY EMPIRICAL
 6    EVIDENCE; CORRECT?
 7    A    CORRECT.
 8    Q    AND YOU DON'T HAVE ANY EVIDENCE THAT
 9    QUANTIFIES THE AMOUNT OF ANY LOST MARKET SHARE;
10    CORRECT?
11    A    THAT'S CORRECT.
12    Q    YOU HAVE NO EVIDENCE QUANTIFYING THE NUMBER OF
13    PURCHASERS WHO BOUGHT A SAMSUNG DEVICE IN LIEU OF
14    BUYING AN APPLE DEVICE; RIGHT?
15    A    I KNOW OF AT LEAST ONE.
16    Q    YOU CAN'T QUANTIFY THE NUMBER OF PURCHASERS
17    WHO BOUGHT A SAMSUNG DEVICE IN LIEU OF BUYING AN
18    APPLE DEVICE; RIGHT?
19    A    AS FAR AS I KNOW, ONE IS A QUANTIFICATION,
20    COUNSELOR.
21    Q    OKAY.  LET'S SEE WHAT YOU SAID IN RESPONSE TO
22    THAT AT YOUR DEPOSITION, SIR.  PAGE NOTE NOTE LINE
23    CITE.
24              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
25    OPEN COURT OFF THE RECORD.)
```

1536

```
 1    BY MR. VERHOEVEN:
 2    Q    YOU WERE ASKED THAT QUESTION AND YOU GAVE THAT
 3    ANSWER AT YOUR DEPOSITION; RIGHT, SIR?
 4    A    APPARENTLY SO.
 5    Q    DO YOU STAND BY THAT TESTIMONY?
 6    A    YES.
 7    Q    WILL HE ME SWITCH SUBJECTS NOW.
 8         IN YOUR MARCH 22ND, 2012 EXPERT REPORT AT
 9    PAGE 160, YOU REFER TO WHAT YOU CALL A SLEEKCRAFT
10    FACTOR, NUMBER 6, DEGREE OF CARE WITH RESPECT TO
11    THE IPAD.
12         CAN WE PUT UP PARAGRAPH 160 FROM
13    DR. WINER'S EXPERT REPORT FROM MARCH 22, PLEASE.
14         CAN YOU PUSH THAT DOWN SO I CAN SEE WHERE
15    IT WAS PULLED OUT FROM, MR. FISHER?  GO BACK.
16         OKAY.  SO CAN WE -- THAT'S WHAT I'M
17    LOOKING FOR, 160.
18         DO YOU SEE IT SAYS SLEEK, SLEEK -- YOU
19    HAVE IT IN YOUR BINDER AS WELL, SIR?
20    A    YES, I DO HAVE IT.
21    Q    SLEEK -- SLEEKCRAFT FACTOR SAYS, "TYPES OF
22    GOODS AND," THIS IS WHAT I'M GOING TO FOCUS ON
23    HERE, THE REST OF THIS, "AND THE DEGREE OF CARE
24    LIKELY TO BE EXERCISED BY THE PURCHASER."
25         DO YOU SEE THAT?
```

1    A    I DO.

2    Q    AND SO THE DEGREE OF CARE, YOU'D AGREE WITH

3    ME, THAT THE HIGHER THE DEGREE OF CARE EXERCISED BY

4    THE CONSUMER, THE LESS CHANCE THERE IS GOING TO BE

5    THAT THERE'S CONFUSION OR DILUTION; RIGHT?

6    A    FOR ANY INDIVIDUAL CONSUMER, THAT WOULD BE

7    TRUE.

8    Q    SO IF IT'S LIKE A 50 CENTS DOODAD IN THE

9    GROCERY STORE THAT PEOPLE MIGHT PICK UP, THE DEGREE

10    OF CARE WOULD BE REALLY LOW, RIGHT?

11    A    YOU WOULD BE SURPRISED, BUT I WOULD AGREE THAT

12    IT WOULD BE, OVERALL, LOWER THAN FOR A $600 ITEM OR

13    $300 ITEM.

14    Q    OR TO GET REALLY CONTRASTING, A NEW CAR WOULD

15    BE SOMETHING THAT WOULD BE VERY EXPENSIVE FOR A LOT

16    OF PEOPLE, YOU'LL HAVE TO PAY FOR IT OVER A NUMBER

17    OF YEARS, SO THEY'LL BE REALLY CAREFUL WHEN THEY

18    BUY THAT, RIGHT?

19    A    I JUST DON'T WANT TO USE GENERALITIES.  I

20    WOULD SAY THAT THERE ARE ALWAYS SEGMENTS OF

21    CONSUMERS WHO TAKE MORE OR LESS CARE IN MAKING

22    PURCHASES OF PRODUCTS.

23    SOME MARKETING, WE DON'T WORK WITH THE

24    NOTION OF THERE BEING A MARKET.  WE WORK WITH THE

25    IDEA THAT THERE ARE SEGMENTS AND DIFFERENT KINDS OF

```
 1    CUSTOMERS.

 2              SO WHILE THE RATIONAL -- YOU KNOW,

 3    EXPLANATION OF PURCHASING WOULD BE, YES, PEOPLE

 4    TAKE A LOT OF CARE EVEN IN BUYING CARS.  THE FACT

 5    IS THAT EVEN THAT WILL VARY OVER CONSUMERS IN TERMS

 6    OF HOW MUCH INFORMATION THEY USE, HOW MANY

 7    DEALERSHIPS THEY VISIT AND THE WHOLE RANGE OF

 8    INFORMATION AND COLLECTION ACTIVITIES.

 9    Q    FAIR ENOUGH.  DIFFERENT CONSUMERS EXHIBIT

10    DIFFERENT BEHAVIORS; RIGHT?

11    A    THAT'S WHAT I'M SAYING.

12    Q    BUT SETTING THAT ASIDE, GENERALLY SPEAKING,

13    WHEN WE'RE TALKING ABOUT THIS FACTOR HERE, IF IT'S

14    A MORE EXPENSIVE ITEM, ON AVERAGE, CONSUMER WILL

15    EXERCISE MORE CARE; RIGHT?

16    A    ONE WOULD EXPECT THAT.

17    Q    THAT MEANS THERE'S LESS CHANCE OF CONFUSION,

18    RIGHT?

19    A    LESS, BUT NOT ZERO.

20    Q    SO IF WE SWITCH TO WHAT WE'RE TALKING ABOUT

21    HERE, I'M HOLDING IN MY HAND ACCUSED SAMSUNG

22    TAB 10.1, WHICH IS EXHIBIT, TRIAL JOINT EXHIBIT

23    1037, YOU'VE SEEN THIS DOCUMENT, THIS --

24    A    IT'S NOT TURNED ON, BUT I'LL ASSUME THAT

25    YOU'RE CORRECT.
```

1    Q    DO YOU WANT TO TAKE A LOOK AT IT?

2    A    NO, I BELIEVE YOU.

3    Q    OKAY.  SO IF A CONSUMER IF WE'RE TALKING ABOUT

4    A CONSUMER PURCHASING AN ELECTRONIC DEVICE LIKE

5    THIS TABLET, THEY'RE GOING TO EXERCISE MORE CARE

6    THAN IF THEY'RE BUYING SOME SERIAL AT THE GROCERY

7    STORE, RIGHT, ON AVERAGE?

8    A    LET ME BE CLEAR.  ON AVERAGE.

9    Q    TABLET IS A PRETTY EXPENSIVE PRODUCT; RIGHT?

10   A    DEPENDS ON WHAT'S RELATIVE TO YOU.  NOT TO A

11   NEW HOUSE.  BUT TO A TUBE OF TOOTHPASTE, YES.

12   Q    TO AN AVERAGE CONSUMER IT'S NOT A TRIVIAL

13   PURCHASE, IS IT?

14   A    IT'S A CONSUMER DURABLE GOOD THAT'S REASONABLY

15   EXPENSIVE, I'LL AGREE.

16   Q    AND CONSUMERS ACTUALLY RESEARCH VARIOUS

17   TABLETS BEFORE THEY GO BUY THEM.  WOULD YOU AGREE

18   WITH THAT?

19   A    NO, I DON'T.

20   Q    YOU DON'T AGREE THAT CONSUMERS CONSIDER THE

21   VARIOUS FUNCTION AS AVAILABLE ON ALL THE DIFFERENT

22   TABLETS AVAILABLE?

23   A    IT DEPENDS ON HOW YOU DEFINE "RESEARCH."  SOME

24   CONSUMERS WILL MAKE A DECISION BASED ON INFORMATION

25   THEY GET IN A RETAIL STORE, WHICH CAN BE AFFECTED

1    BY A SALESPERSON.  THE QUALITY OF THE DISPLAY.

2              OTHERS WILL SEARCH TEN DIFFERENT SOURCES

3    ON THE INTERNET TO FIND OUT INFORMATION.

4    Q    YOU DON'T AGREE THAT CONSUMERS WILL, IF

5    THEY'RE THINKING ABOUT BUYING A TABLET THAT HAS A

6    PHONE FUNCTIONALITY, WILL EVALUATE WHAT THE

7    DIFFERENT CARRIER PLANS THAT THE CARRIERS OFFER

8    THAT ARE AVAILABLE FOR VARIOUS DIFFERENT TABLETS?

9    A    THAT'S NOT THE SAME AS EVALUATING THE PRODUCT

10   ITSELF.

11             BUT I ASSUME THAT THEY WILL TRY TO

12   UNDERSTAND WHAT THE COST IS OF THE -- ASSOCIATED

13   COST WITH USING THE PRODUCT.

14   Q    THE PRODUCTS ARE BUNDLED WITH LONG-TERM

15   CONTRACTS IN SOME CASES; RIGHT?

16   A    IN SOME CASES, CORRECT.

17   Q    TWO YEARS LONG; RIGHT?

18   A    I'M NOT AS FAMILIAR WITH THE CONTRACT NATIVE,

19   BUT, YES, MINE IS TWO YEARS, FOR EXAMPLE.

20   Q    IF YOU WERE GOING TO SIGN A TWO-YEAR CONTRACT,

21   YOU'D WANT TO KNOW WHAT THE TERMS OF THE CONTRACT

22   ARE AND WHAT YOU'RE GETTING INTO FOR TWO YEARS;

23   RIGHT?

24   A    YES.  BUT MY FOCUS WAS ON TRADE DRESS OF THE

25   PRODUCTS, NOT ON THE DETAILS OF THE CONTRACTS THAT

1    PEOPLE ARE SIGNING WITH AT&T.

2    Q    I'M ASKING YOU ABOUT THE DEGREE OF CARE FACTOR

3    HERE.  RIGHT?

4    A    RESTATE YOUR QUESTION, PLEASE.

5    Q    WELL, CONSUMERS -- TYPICALLY A CUSTOMER

6    INTERESTED IN A TABLET WILL ACTUALLY WANT TO GO IN

7    A STORE AND PLAY AROUND WITH IT TO SEE HOW IT

8    WORKS; RIGHT?

9    A    IN MOST CASES.

10    Q    SO YOU'D AGREE THAT BEFORE BUYING A TABLET,

11    MOST CONSUMERS WOULD TURN IT ON AND PLAY WITH IT A

12    LITTLE BIT?

13    A    I WOULD AGREE WITH THAT.

14    Q    OKAY.  LET'S DO THAT WITH THIS JX 103 SEARCH.

15          NOW, BEFORE I TURN THIS ON -- IS THAT

16    GOING TO AUTOMATICALLY FOCUS?

17          CAN YOU HELP ME OUT?

18          BEFORE I TURN THIS ON, THE TRADE DRESS

19    THAT YOU'RE EVALUATING INCLUDES THE APPLICATION

20    SCREEN; RIGHT?

21    A    YES, YES, IT DOES.

22    Q    THAT'S AN ACCUSED FEATURE THAT YOU SAY IS

23    INFRINGING ON THE TABLET; RIGHT?

24    A    THAT'S PART OF THE OVERALL TRADE DRESS.

25    Q    OKAY.  IS THERE A WAY TO DIM THE LIGHTS?

```
 1              THAT'S A LITTLE BETTER.  SO I'M A
 2     CONSUMER AND I GO INTO THE STORE TO SEE HOW THIS
 3     TABLET WORKS.
 4              I TURN IT ON.
 5     A    IF YOU'RE LUCKY, SOMETHING COMES UP ACTUALLY.
 6     MOST STORES IT DOESN'T.  NOT JUST FOR THE GALAXY
 7     TAB.
 8     Q    THAT'S RIGHT.  THIS IS SET UP FOR LANDSCAPE.
 9              DO YOU SEE THE GALAXY TAB NAME, AND THE
10     BIG SWIRLING SAMSUNG.  DO YOU SEE THAT?
11     A    I DO.
12     Q    AND THEN IT GLOWS A COUPLE TIMES AT YOU.  DO
13     YOU SEE THAT?
14              AND THEN YOU GET A LOCKED SCREEN; RIGHT?
15              AND YOU HAVE TO MOVE YOUR FINGER OUTSIDE
16     THE CIRCLE TO UNLOCK IT.
17              AND THEN THIS IS NOT THE ACCUSED TRADE
18     DRESS; CORRECT?
19     A    NO, IT'S NOT.
20     Q    THIS IS THE HOME SCREEN; RIGHT?
21     A    IT'S THE HOME SCREEN.
22     Q    RIGHT.  SO A CONSUMER HAS TO BE ABLE TO FIGURE
23     OUT, HOW DO I GET TO THE APPLICATION SCREEN?
24              AND UP HERE ON THE TOP RIGHT, IF THEY CAN
25     FIGURE IT OUT, IT SAYS APPS, AND THEY HIT THAT
```

1    BUTTON, AND THAT'S THE SCREEN THAT YOU SAY CAUSES

2    CONFUSION AMONG CONSUMERS; RIGHT?

3    A    CORRECT.

4    Q    SO IT'S YOUR TESTIMONY TO THIS JUROR THAT

5    CONSUMERS, USING THE DEGREE OF CARE THAT THEY WOULD

6    NORMALLY USE, TURNING ON THIS PHONE, SEEING THE

7    SAMSUNG, SEEING THE SWIRL THAT TURNS INTO THE

8    SAMSUNG, SEEING IT GLOW TWO TIMES, HAVING TO

9    NAVIGATE BEYOND THE HOME SCREEN TO THE APPLICATION

10   SCREEN, THAT THOSE CONSUMERS WOULD BE CONFUSED AND

11   WOULDN'T KNOW THAT THIS IS A SAMSUNG SOURCED

12   PRODUCT?  IS THAT YOUR TESTIMONY?

13   A    NO, I DON'T AGREE WITH THAT.

14   Q    OKAY.  LET'S MOVE ON TO ANOTHER SUBJECT.  I'D

15   LIKE TO GO TO ANOTHER PORTION OF YOUR REPORT, SIR.

16         THIS IS WITH RELATIONSHIP -- EXCUSE ME.

17   LET ME START OVER.

18         THIS RELATES TO THE PORTION OF YOUR

19   REPORT CONCERNING WHAT YOU CALL DILUTION FACTOR 3,

20   SUBSTANTIAL EXCLUSIVE USE.

21         AND YOU CAN FIND THIS, FOR THE IPHONE, AT

22   PARAGRAPH 173 AND -- OF YOUR MARCH 22ND EXPERT

23   REPORT; AND FOR THE IPAD AT PARAGRAPH 183 OF YOUR

24   MARCH 22ND, 2012 REPORT.

25         AND, MR. FISHER, IF IT'S POSSIBLE TO TAKE

```
 1    THOSE TWO PARAGRAPHS AND PUT THEM ONE ON THE TOP

 2    AND ONE AT THE BOTTOM.

 3            MR. JACOBS:  YOUR HONOR, THIS IS BEYOND

 4    THE SCOPE.

 5            I DID NOT ASK THIS WITNESS ABOUT THIS

 6    FACTOR, AND AS YOU'LL SEE IN THE REPORT, HE RELIES

 7    ON DR. BRESSLER'S TESTIMONY, MR. BRESSLER'S

 8    TESTIMONY.

 9            THE COURT:  OVERRULED.

10            GO AHEAD.

11            MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

12    Q    AND YOU HAVE THE ACTUAL DOCUMENT IF YOU'D LIKE

13    TO LOOK AT IT, SIR.

14            SO THIS IS THE SAME FACTOR, ONE FOR THE

15    PHONE -- THE IPHONE.  DO YOU SEE UP THERE, IPHONE?

16    A    YES.

17    Q    AND THEN YOU'VE GOT IT HERE AGAIN, DILUTION

18    FACTOR, SUBSTANTIALLY EXCLUSIVE USE OF TRADE DRESS

19    FOR THE IPAD?

20    A    I SEE THAT.

21    Q    AND YOU'RE RELYING ON MR. BRESSLER; IS THAT

22    RIGHT?

23    A    YES.  I HAVE NO OPINION ON THE DILUTION FACTOR

24    3 ON THE EXCLUSIVE USE OF THE TRADE DRESS AS MY --

25    AS COUNSEL MENTIONED, I REFERRED TO MR. BRESSLER ON
```

```
 1    THIS.
 2    Q    OKAY.  DO YOU KNOW WHAT THIS FACTOR CONCERNS,
 3    EXCLUSIVE USE OF TRADE DRESS?
 4    A    I'M SORRY.  COULD YOU RESTATE THE QUESTION?
 5    Q    DO YOU KNOW WHAT THIS FACTOR CONCERNS?
 6    A    NO, I DON'T.
 7              MR. VERHOEVEN:  YOUR HONOR, IT IS ONE
 8    MINUTE BEFORE, BUT I'M GETTING CLOSE TO BEING DONE.
 9              THE COURT:  THAT'S FINE.  IT'S 2:46.
10    WE'LL TAKE OUR BREAK NOW.
11              THIS IS WHAT WE'RE GOING TO DO FROM NOW
12    ON:  IF THERE IS AN OBJECTION THAT REQUIRES ME TO
13    DO SOME RESEARCH, WE'RE GOING TO JUST HAVE YOU WAIT
14    PATIENTLY AND I'M GOING TO START CHARGING TIME TO
15    THE OBJECTING PARTY AND YOU WILL THEN HAVE AN
16    OPPORTUNITY TO GIVE ME WHATEVER SPECIFIC DOCUMENTS
17    YOU WANT ME TO LOOK AT, EITHER ORDERS ON MOTIONS IN
18    LIMINE, WHETHER IT'S CONTENTION INTERROGATORY
19    RESPONSES.
20              BUT THE TIME THAT IT TAKES ME TO RULE
21    WILL BE CHARGED TO THE OBJECTING PARTY, AND WE'LL
22    JUST DO IT RIGHT HERE IN COURT, AND WE'LL JUST TAKE
23    A BRIEF PAUSE SO THAT OBJECTION CAN BE DEALT WITH.
24              NOW, IF IT'S AN OBJECTION THAT CAN BE
25    DEALT WITH QUICKLY, THEN THAT WILL STILL BE CHARGED
```

```
 1    TO THE TIME OF THE NON-OBJECTING PARTY.  OKAY.

 2              THAT'S THE PROCEDURE WE'RE GOING TO DO

 3    FROM NOW ON.  I'M SORRY TO OUR JURY THAT YOU'RE

 4    GOING TO HAVE TO SIT AND WATCH US DO THAT, BUT I

 5    DON'T SEE THAT MUCH OTHER WAY TO GET AROUND THAT.

 6    OKAY?

 7              ANYWAY, KEEP AN OPEN MIND AND PLEASE

 8    DON'T DO ANY RESEARCH OR READ ABOUT THE CASE.

 9    PLEASE DON'T DISCUSS THE CASE WITH ANYONE.

10              YOU CAN GO AHEAD AND LEAVE YOUR JURY

11    NOTEBOOKS ON YOUR CHAIR.  WE'RE GOING TO TAKE A

12    15-MINUTE BREAK.  IT'S 2:45 -- THIS CLOCK SAYS

13    2:47.  WE'LL SEE YOU BACK HERE AT 3:00.  OKAY?

14              (WHEREUPON, THE FOLLOWING PROCEEDINGS

15    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

16              THE COURT:  YOU CAN STEP DOWN.

17              ALL RIGHT.  THE RECORD SHOULD REFLECT THE

18    JURORS HAVE LEFT THE COURTROOM.

19              SO LET'S GET A CLEAR AGREEMENT NOW AS

20    TO -- I BELIEVE THE DOOR HAS BEEN OPENED AS TO

21    MR. LEE, WHO I EXCLUDED THIS MORNING.  I SUSTAINED

22    SAMSUNG'S OBJECTION, BUT OTHERWISE I THINK IT'S

23    MISLEADING TO THE JURY TO LEAVE IT OTHERWISE.

24              ANYTHING ELSE?  LET'S GET -- LET'S HASH

25    THEM OUT NOW.  ANY OTHER ISSUES?
```

```
 1                    AND IT GOES TO WHAT PAGE?  WHAT PAGE IS

 2      THE ONE YOU JUST SHOWED, MR. JACOBS?  WHAT'S THE

 3      PAGE YOU JUST SHOWED?

 4                    MR. JACOBS:  WHAT I SHOWED WAS 36, YOUR

 5      HONOR.

 6                    THE COURT:  ALL RIGHT.  HANG ON.  I'M ON

 7      35, PAGE 35, LINE 7 THROUGH 15.

 8                    (PAUSE IN PROCEEDINGS.)

 9                    MR. JACOBS:  SO ACTUALLY, NOW THAT I LOOK

10      AT IT, I SEE THE SOURCE EVEN OF WHY THIS WAS

11      COMPLETELY MISLEADING.

12                    THE QUESTION WAS, ON 35, HAVE PEOPLE

13      BOUGHT APPLE DEVICES THINKING THEY'RE SAMSUNG

14      DEVICES, WHICH IS, OF COURSE, NOT A RELEVANT

15      QUESTION TO BEGIN WITH.

16                    BUT IN THE NEXT PASSAGE HE IS ASKED,

17      SAMSUNG DEVICES THINKING THEY'RE APPLE DEVICES.

18                    THE COURT:  ALL RIGHT.  WELL, I THINK THE

19      RULE OF COMPLETENESS, HAVING REVIEWED PAGES 34,

20      LINE 19, HE IS ASKED IN THAT, LINE 19 THROUGH LINE

21      25, ABOUT WHETHER CONSUMERS OUT IN THE REAL WORLD

22      HAVE BOUGHT SAMSUNG DEVICES THINKING THEY'RE APPLE

23      DEVICES.

24                    BUT I THINK FOR THE RULE OF

25      COMPLETENESS --
```

```
 1              MR. VERHOEVEN:  CAN I LOOK AT YOUR
 2    TRANSCRIPT WITH YOU?
 3              THE COURT:  ALL RIGHT.  THIS IS WHAT I'M
 4    GOING TO ALLOW I THINK FOR THE RULE OF
 5    COMPLETENESS.
 6              YOU HAVE PAGE 35, LINES 7 THROUGH 15 WAS
 7    THE VIDEO DEPOSITION THAT WAS ALREADY SHOWN.
 8              I THINK RULE OF COMPLETENESS GOES FROM
 9    35, LINE 16 -- WHAT ABOUT THROUGH 37, LINE 9 AND
10    THAT'S IT?  YOU DON'T GET ANYTHING ELSE IN.
11              MR. JACOBS:  UNDERSTOOD, YOUR HONOR.
12              THE COURT:  LET ME GIVE THIS BACK TO --
13    DO YOU HAVE ONE, MR. VERHOEVEN?  I DON'T WANT TO
14    TAKE YOURS.
15              MR. VERHOEVEN:  I FOUND ANOTHER ONE.
16              THE COURT:  OKAY.
17              MR. VERHOEVEN:  THAT ONE HAS PROBABLY GOT
18    WORK PRODUCT ON IT, YOUR HONOR.
19              THE COURT:  OH, LET ME GIVE THIS BACK.
20              MR. VERHOEVEN:  JUST DISREGARD IT.
21              THE COURT:  THAT'S IT.  YOU DON'T GET
22    INTO MR. LEE.  YOU DON'T GET IN THAT POWERPOINT.
23    YOU DON'T GET IN HIS DEPOSITION -- WAS HE DEPOSED?
24              MR. JACOBS:  MR. LEE WAS DEPOSED, YES.
25              THE COURT:  OKAY.
```

```
1              MR. JACOBS:  THAT'S WHAT THE WITNESS WAS

2     RELYING ON.

3              THE COURT:  THAT'S RIGHT.  THAT'S THE

4     DEPOSITION.  OKAY.  SO THAT'S THE RULING.

5              NOW, WHAT I'M GOING TO DO, IT'S 3:26.

6     I'M GOING TO CHARGE THIS EQUALLY TO BOTH SIDES.

7              MR. JACOBS:  OH, YOUR HONOR, IF I HAD

8     KNOWN -- WE'RE BEING SO CAREFUL ABOUT TIME.

9              THE COURT:  WELL, LET ME -- I AM NOT --

10    SAMSUNG SEVEN MINUTES.  I'LL CHARGE YOU SIX

11    MINUTES, THREE MINUTES EACH.  IT'S NOT GOING TO --

12             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

13             THE COURT:  IF IT DOESN'T KILL YOU, IT

14    WON'T HURT YOU, OKAY.  SO SIX MINUTES, IT'S THREE

15    MINUTES EACH.

16             MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  ALL RIGHT.  SO

18    WHERE ARE WE?  WE'RE BACK IN THE CROSS.  WILL YOU

19    PLEASE BRING IN OUR JURY.  WE'LL GO UNTIL 4:30

20    TODAY.

21             MR. VERHOEVEN:  I HAVE NO FURTHER

22    QUESTIONS AT THIS TIME.  I'LL JUST LET THE JURORS

23    KNOW THAT.

24             THE COURT:  PLEASE, ALL RIGHT.

25             (WHEREUPON, THE FOLLOWING PROCEEDINGS
```

1565

```
 1    WERE HELD IN THE PRESENCE OF THE JURY:)
 2              THE COURT:  ALL RIGHT.  WELCOME BACK.
 3              ALL RIGHT.  MR. VERHOEVEN.  IT'S 3:28.
 4              MR. VERHOEVEN:  YOUR HONOR, I PASS THE
 5    WITNESS AT THIS TIME.
 6              THE COURT:  ALL RIGHT.  MR. JACOBS, YOUR
 7    REDIRECT, 3:28.
 8              MR. JACOBS:  THANK YOU, YOUR HONOR.
 9              THE COURT:  GO AHEAD.
10                    REDIRECT EXAMINATION
11    BY MR. JACOBS:
12    Q    DR. WINER, DURING YOUR CROSS-EXAMINATION, YOU
13    WERE ASKED ABOUT A PORTION OF YOUR DEPOSITION, AND
14    I'D LIKE TO SHOW THE JURY SOME ADDITIONAL PORTIONS
15    OF THAT DEPOSITION.
16              MR. LEE, COULD YOU PUT UP PAGE 35, LINE 7
17    THROUGH 37, LINE 9.  WE'LL JUST GO THROUGH THAT
18    CAREFULLY.
19              SO YOU'LL RECALL, DR. WINER, YOU WERE
20    ASKED ABOUT THIS TESTIMONY WHERE YOU WERE ASKED,
21    "DO YOU BELIEVE THAT CONSUMERS OUT THERE IN THE
22    REAL WORLD HAVE ACTUALLY BOUGHT APPLE DEVICES
23    THINKING THEY ARE SAMSUNG DEVICES?"
24              AND YOU SAID IN YOUR DEPOSITION, "I HAVE
25    NO EVIDENCE OF THAT THAT."
```

```
 1              DO YOU RECALL GOING THROUGH THAT WITH
 2     MR. VERHOEVEN?
 3     A    YES, I DO.
 4     Q    AND THEN IF WE GO A LITTLE BIT AHEAD --
 5              MR. VERHOEVEN:  YOUR HONOR, I THOUGHT
 6     THIS WAS SUPPOSED TO BE READ IN ITS ENTIRETY FOR
 7     COMPLETENESS.
 8              THE COURT:  YES.  DO THE WHOLE THING
 9     THROUGH.  WHAT WAS THAT, PAGE 37?
10              MR. JACOBS:  OKAY.
11     Q    AND THEN YOU WERE ASKED, "DO YOU BELIEVE THAT
12     CONSUMERS OUT THERE IN THE REAL WORLD HAVE ACTUALLY
13     BOUGHT APPLE DEVICES THINKING THEY'RE SAMSUNG
14     DEVICES?"
15              YOU SAID, "I HAVE NO EVIDENCE OF THAT."
16              THEN YOU WERE ASKED, "I'M ASKING ABOUT
17     YOUR BELIEF.  DO YOU BELIEVE IT?"
18              YOU SAID, "I HAVE NO RESPONSE.  I HAVE NO
19     IDEA."
20              "QUESTION:  SO IT'S APPLE CONSUMERS WHO
21     WOULD BE CONFUSED, IS THAT RIGHT, IN YOUR VIEW?
22              "ANSWER:  I THINK THERE IS GENERAL
23     CONFUSION IN THE MARKETPLACE BETWEEN THE PRODUCTS.
24     I AM NOT READY TO STATE EXACTLY WHOSE CONSUMERS
25     HAVE BEEN CONFUSED.
```

1             "QUESTION:  RIGHT NOW I AM ASKING ABOUT

2    PURCHASING.  LET'S FOCUS ON ACTUAL PURCHASING.

3    IT'S YOUR BELIEF THAT APPLE CONSUMERS HAVE BOUGHT

4    SAMSUNG DEVICES THINKING THEY ARE APPLE DEVICES,

5    CORRECT?

6             "ANSWER:  I DON'T KNOW THE ANSWER TO

7    THAT.  I CAN'T RESPOND TO THAT.

8             "QUESTION:  WHO -- WHAT IS THE CLASS OF

9    CONSUMERS WHO YOU BELIEVE HAVE BOUGHT SAMSUNG

10    DEVICES THINKING THEY ARE APPLE DEVICES?  ARE THEY

11    WOULD-BE APPLE PURCHASERS?

12             "ANSWER:  I HAVE -- THE ONLY EVIDENCE I

13    HAVE FROM TESTIMONY THAT I REVIEWED IS THAT SOME

14    INDIVIDUALS BOUGHT A SAMSUNG GALAXY TAB MISTAKENLY

15    THINKING IT WAS AN IPAD AND SUBSEQUENTLY RETURNED

16    IT TO THE STORE AND GOT AN IPAD.  THAT'S THE ONLY

17    DIRECT EVIDENCE I HAVE FOR ANY OF THESE QUESTIONS

18    THAT YOU ARE ASKING ON THIS PATH.

19             "QUESTION:  SO WE HAVE A CLEAR RECORD,

20    THE ONLY EVIDENCE YOU HAVE THAT IN THE REAL WORLD,

21    ANY CONSUMERS HAVE PURCHASED A SAMSUNG PRODUCT

22    BELIEVING THAT IT WAS AN APPLE PRODUCT IS BASED

23    UPON DOCUMENTS RELATING TO BEST BUY RETURNS IN NEW

24    JERSEY; IS THAT TRUE?

25             "ANSWER:  CORRECT.

```
1              "QUESTION:  AND YOU HAVE NOTHING ELSE
2     BEYOND THAT; IS THAT TRUE?
3              "ANSWER:  I HAVE NOT SEEN ANY OTHER
4     REPORT THAT GIVES THAT SUCH EVIDENCE.
5              "QUESTION:  DO YOU HAVE ANY EVIDENCE THAT
6     ANY CONSUMER HAS BOUGHT A SAMSUNG PHONE BELIEVING
7     THAT IT IS AN APPLE PHONE?
8              "ANSWER:  NO, I DON'T."
9              MR. JACOBS:  AND, YOUR HONOR, THAT
10    CONCLUDES THE PORTION THAT, FOR THE RECORD, WE'D
11    READ.
12             THE COURT:  OKAY.
13    BY MR. JACOBS:
14    Q   NOW, I'D LIKE TO DECONFUSE POSSIBLE CONFUSION
15    ABOUT DILUTION AND LIKELY -- AND CONFUSION, AND
16    WHAT I'D LIKE TO DO IS ASK YOU A COUPLE QUESTIONS,
17    DR. WINER, ABOUT WHAT'S REALLY GOING ON HERE.
18             DR. WINER, WHAT'S THIS?
19    A   THAT'S ONE OF THE TWO TABLETS.  I CAN'T TELL
20    YOU.
21    Q   SO LET ME SHOW YOU THE TABLET (HANDING).
22             MAY I, YOUR HONOR?  I'M SORRY?
23             THE COURT:  YES.  MR. VERHOEVEN, DO YOU
24    WANT TO SEE IT?
25             MR. JACOBS:  HE DID.
```

```
1              MR. VERHOEVEN:  I DID, YOUR HONOR, AND
2     IT'S FINE.
3              THE COURT:  OKAY.
4     BY MR. JACOBS:
5     Q    WHAT IS IT?
6     A    IT'S AN IPAD.
7     Q    AND YOU BELIEVE THAT THE IPAD HAS ACQUIRED
8     DISTINCTIVENESS IN THE MARKETPLACE; CORRECT?
9              MR. VERHOEVEN:  OBJECTION, LEADING.
10             THE COURT:  SUSTAINED.
11             MR. JACOBS:  I'M SUMMARIZING HIS
12    TESTIMONY.
13    Q    DO YOU BELIEVE THE IPAD HAS ACQUIRED
14    DISTINCTIVENESS IN THE MARKETPLACE?
15    A    YES, I DO.
16    Q    WHAT DOES THAT MEAN?  WHEN SOMEONE SEES --
17    WHEN YOU SAY THAT A PRODUCT HAS ACQUIRED
18    DISTINCTIVENESS, WHAT DOES THAT MEAN IN TERMS OF
19    WHAT A CONSUMER WOULD THINK ABOUT THIS PRODUCT
20    BEFORE ANOTHER PRODUCT THAT THREATENED DILUTION BY
21    BLURRING ENTERED THE MARKETPLACE?
22    A    I THINK THAT WHAT THAT MEANS IS THAT THE
23    CONSUMERS ASSOCIATE A PARTICULAR TRADE DRESS OR
24    LOOK AND FEEL WITH A PARTICULAR COMPANY THAT MAKES
25    THAT PRODUCT, AND IN THIS CASE THAT WAS APPLE.
```

1    Q    NOW, MR. VERHOEVEN HAD ON THE PODIUM ALREADY

2    THIS PRODUCT, WHICH, AS YOU CAN SEE, I DON'T HAVE

3    TO PLAY THE GUESSING GAME, IS THE GALAXY TAB.

4              AND WHEN YOU TALK ABOUT DILUTION BY

5    BLURRING, WHAT ARE YOU SAYING ABOUT THE IMPACT OF

6    THIS PRODUCT BEING ON THE MARKET ON THE

7    DISTINCTIVENESS OF THE APPLE IPAD?

8    A    WHAT I'M SAYING IS THAT THE IMPACT OF THAT

9    COPYING OF THE TRADE DRESS HAS A SUBSTANTIAL IMPACT

10   ON THE INVESTMENT THAT APPLE HAS MADE IN DEVELOPING

11   THE PRODUCTS AND HAS A NEGATIVE IMPACT ON THEIR

12   MARKETING STRATEGY AS A RESULT.

13   Q    AND WHY IS THAT?  WHAT DOES THE EXISTENCE OF

14   THIS PRODUCT, THE SALES OF THIS PRODUCT IN THE

15   MARKET DO TO THE DISTINCTIVENESS -- I'M HOLDING UP

16   THE TAB -- TO THE DISTINCTIVENESS OF THE IPAD?

17   A    IT DIMINISHES IT.

18   Q    NOW, MR. VERHOEVEN ASKED YOU A LOT OF

19   QUESTIONS ABOUT ACTUAL CONFUSION.

20             IS IT YOUR UNDERSTANDING THAT THE TEST

21   FOR INFRINGEMENT REQUIRES THAT THERE BE ACTUAL

22   CONFUSION AT THE POINT OF SALE AT A STORE --

23             MR. VERHOEVEN:  OBJECTION.  LEADING AND

24   ALSO CALLS FOR A LEGAL CONCLUSION.

25             MR. JACOBS:  I DON'T THINK --

1571

```
 1              THE COURT:  SUSTAINED.
 2    BY MR. JACOBS:
 3    Q    WHAT IS YOUR UNDERSTANDING OF THE -- OF
 4    WHETHER ACTUAL CONFUSION AT THE POINT OF SALE IS
 5    REQUIRED IN ORDER FOR THERE TO BE A FINDING OF
 6    LIKELIHOOD OF CONFUSION?
 7    A    I'M AFRAID I DON'T KNOW THE ANSWER TO THAT.
 8    Q    WELL, YOU DISCUSSED THE SCENARIO IN WHICH
 9    SOMEONE IS WALKING DOWN THE STREET, LET'S SAY,
10    HOLDING THIS PRODUCT, MAYBE IT'S ON, MAYBE IT'S
11    OFF?
12    A    YES.
13    Q    AND WHAT DID YOU DESCRIBE THAT AS?
14    A    I CALLED IT THE IMITATOR, IMITATIVE SCENARIO.
15    Q    AND WHAT DID YOU MEAN BY THAT?
16    A    I MEAN THAT SOMEBODY COULD BE WALKING DOWN THE
17    STREET WITH A SAMSUNG GALAXY TAB LOOKING AT THE
18    TRADE DRESS, IF SOMEONE IS USING IT, HAS SEEN IPADS
19    BEFORE, SAY, I LIKE THAT, I LIKE THAT TRADE DRESS,
20    OR LOOK AND FEEL, APPEARANCE, AND THEN GO AND BUY A
21    SAMSUNG GALAXY TAB.
22    Q    AND IS THAT POINT-OF-SALE CONFUSION OR
23    POST-SALE CONFUSION?
24    A    THAT'S POST-SALE CONFUSION.
25              MR. JACOBS:  THANK YOU VERY MUCH,
```

```
1              MR. JACOBS:  THANK YOU VERY MUCH,
2    MR. PORET.
3              I HAVE NO FURTHER QUESTIONS, YOUR HONOR.
4              THE COURT:  ALL RIGHT.  3:56, PLEASE GO
5    AHEAD WITH THE CROSS.
6              MR. PRICE:  YOUR HONOR, BEFORE MY TIME
7    STARTS, COULD YOU READ THE LIMITING INSTRUCTION
8    CONCERNING FAME?
9              THE COURT:  AH.  ONE SECOND, PLEASE.
10             NOW, AS FOR PX 23, AND PX 30.2, AND 30.5,
11   THE 30.2 WAS THE QUESTION THAT WAS ASKED IN THE
12   SURVEY, 30.5 -- OH, THROUGH 30.5.
13             SO THOSE WERE ACTUALLY THE SURVEY RESULTS
14   AND THE QUESTIONS THAT WERE ASKED IN THE SURVEY, AS
15   WELL AS PX 23, WHICH IS ALL OF THOSE COPIES OF THE
16   PHONES AND THE TABLETS THAT WERE ACTUALLY USED IN
17   THE SURVEY, BOTH AS CONTROL AND OTHERWISE, YOU MAY
18   CONSIDER THIS SURVEY AS EVIDENCE THAT APPLE DESIGNS
19   HAVE ACQUIRED SECONDARY MEANING, BUT YOU MAY NOT
20   CONSIDER THE SURVEY AS EVIDENCE THAT THE APPLE
21   DESIGNS ARE FAMOUS.
22             ALL RIGHT.  GO AHEAD, PLEASE.
23             MR. PRICE:  THANK YOU, YOUR HONOR.
24                   CROSS-EXAMINATION
25   BY MR. PRICE:
```

1    Q    LET ME MAKE SURE I GET THE -- BY THE WAY, I'M

2    BILL PRICE.  AND I WANT TO MAKE SURE I HAVE YOUR

3    PRONUNCIATION CORRECTLY.  IS IT PORET?

4    A    YES.

5    Q    THANK YOU.  FIRST OF ALL, LET ME CLARIFY WHAT

6    YOU ARE NOT DOING HERE.

7             THESE STUDIES ARE NOT TRYING TO STUDY

8    CONFUSION AMONG CONSUMERS; CORRECT?

9    A    CORRECT.

10   Q    AND BASED ON THE SURVEYS YOU DID, YOU CAN'T

11   MAKE A CONCLUSION ABOUT WHETHER OR NOT CONSUMERS

12   ARE CONFUSED; RIGHT?

13   A    RIGHT.

14   Q    INSTEAD, WHAT YOU'RE LOOKING AT IS SOMETHING

15   CALLED SECONDARY MEANING; RIGHT?

16   A    YES.

17   Q    AND THAT'S SORT OF A LEGAL TERM IN SOME WAYS

18   WHICH YOU TRIED TO EXPLAIN TO THE JURY; RIGHT?

19   A    YES.

20   Q    OKAY.  SO -- AND YOU'RE TALKING ABOUT

21   SECONDARY MEANING ASSOCIATED WITH APPLE'S CLAIMED

22   TRADE DRESS; RIGHT?

23   A    YES.

24   Q    SO LET ME ASK YOU ABOUT THAT.

25             NOW, APPLE'S CLAIMED TRADE DRESS, THE

1    ELEMENTS OF THAT WERE DESCRIBED TO YOU BY SOMEONE;

2    CORRECT?

3    A    YES.  OR READ IN THE COMPLAINT.

4    Q    SO IT WASN'T A SITUATION WHERE YOU DID A STUDY

5    TO FIND OUT WHAT IS APPLE'S TRADE DRESS; CORRECT?

6    YOU JUST ACCEPTED WHAT WAS EITHER DESCRIBED TO YOU

7    OR WHAT YOU READ IN A COMPLAINT; RIGHT?

8    A    NO, THAT'S NOT REALLY RIGHT.

9    Q    SO DID YOU ACTUALLY DO SOME SORT OF

10   INDEPENDENT STUDY TO SEE, YOU KNOW, WHAT ELEMENTS,

11   TOTAL ELEMENTS CONSTITUTE APPLE'S TRADE DRESS?

12   A    NO.  BUT THE SURVEY SHOWING THE DEVICES AS

13   THEY ARE, SO IT'S NOT AS IF I HAVE IN ANY WAY

14   DECIDED WHAT TRADE DRESS I'M SHOWING PEOPLE.

15   Q    WELL, FOR EXAMPLE, YOU DID SOME STATISTICAL

16   ANALYSIS ON THE EFFECT OF THE HOME BUTTON ON THE

17   APPLE PRODUCTS; CORRECT?

18   A    I WOULDN'T SAY I DID STATISTICAL ANALYSIS ON

19   THAT.  I WOULD SAY THAT WE DID HAVE TWO GROUPS, ONE

20   OF WHICH DID SEE A VERSION WITH THE IPAD BUTTON AND

21   ONE WITHOUT, SO THERE'S SOME DATA ON THAT.

22   Q    AND THE DATA THAT YOU FOUND SHOWED THAT THERE

23   WAS A HIGH ASSOCIATION OF PEOPLE BEING ABLE TO

24   IDENTIFY AN APPLE PRODUCT JUST BY THAT INDENTED

25   HOME BUTTON; CORRECT?

```
1    A    NO.

2    Q    YOU DIDN'T FIND A HIGH ASSOCIATION BETWEEN THE

3    HOME BUTTON AND BEING ABLE TO IDENTIFY AN APPLE

4    PRODUCT?

5    A    THAT'S NOT WHAT THE RESULTS SHOWED.

6    Q    DID YOU SHOW AN ASSOCIATION?

7    A    YOU MEAN REGARDING THE HOME BUTTON?

8    Q    YES.

9    A    NO.  WHAT, WHAT THE SURVEYS SHOW IS THAT IN

10   THE VERSION WHERE THE HOME BUTTON WAS VISIBLE,

11   THERE WAS A HIGHER RATE OF ASSOCIATION, BUT THAT IS

12   NOT THE ONLY THING THAT WAS DIFFERENT ABOUT THAT

13   IMAGE.  IT WAS ALSO SHOWN AT AN ANGLE THAT MAY HAVE

14   GIVEN PEOPLE A BETTER SENSE OF THE SHAPE AND

15   DIMENSIONS OF THE PRODUCTS.

16   Q    WELL, I'LL GO TO THE, THE DETAILS IN A SECOND,

17   BUT IF WE GO TO, I GUESS IT'S YOUR EXHIBIT, AND --

18   CAN YOU HELP ME OUT HERE.

19            I THINK IT'S 30.5.  DO YOU SEE THAT ON

20   THE RIGHT-HAND SIDE, YOU'VE GOT AN IPAD AND IT'S

21   NOT CLEAR HERE, BUT IN WHAT THE, THE SURVEY PEOPLE

22   COULD SEE, THERE'S A HOME BUTTON ON THAT IPAD;

23   CORRECT?

24   A    YES, THE ONE ON THE RIGHT, YES.

25   Q    AND THERE'S NOT A HOME BUTTON ON THIS TEST
```

```
 1    WHERE YOU GOT THE 40.3 PERCENT NET ASSOCIATION

 2    COMPARED TO THE 64.4; CORRECT?

 3    A    YES.

 4    Q    AND DO YOU HAVE -- WELL, YOU UNDERSTAND THAT

 5    SAMSUNG'S PRODUCTS DON'T HAVE THAT KIND OF UNIQUE,

 6    DISTINCTIVE HOME BUTTON LIKE APPLE HAS; CORRECT?

 7    A    I BELIEVE THAT'S THE CASE.

 8    Q    ALL RIGHT.  SO THAT'S A DISTINCTION BETWEEN

 9    THE PRODUCTS; CORRECT?

10    A    I DON'T -- I DON'T KNOW IF YOU'D CHARACTERIZE

11    IT LIKE THAT.

12    Q    WELL, WERE YOU TOLD THAT THAT THE REASON APPLE

13    DID NOT INCLUDE THAT AS BEING AN ELEMENT OF ITS

14    TRADE DRESS IS BECAUSE SAMSUNG IS DIFFERENT FROM

15    APPLE ON THAT UNIQUE IDENTIFYING PART OF APPLE'S

16    PRODUCT?

17    A    NO, I WASN'T TOLD THAT ONE WAY OR THE OTHER.

18    Q    SO YOU WEREN'T GIVEN ANY REASON, IN DOING YOUR

19    SURVEYS, OF WHY APPLE WASN'T CLAIMING WHY THAT HOME

20    BUTTON WAS A DISTINCTIVE PART OF ITS TRADE DRESS

21    WHICH WOULD DISTINGUISH IT FROM OTHER COMPANIES?

22    A    I WAS NOT TOLD WHAT APPLE THINKS OF THE HOME

23    BUTTON.

24    Q    WELL, LET ME ASK YOU ABOUT THE NUMBERS YOU DID

25    PUT TOGETHER, AND THERE'S A -- AND WE CAN TAKE THAT
```

```
 1     DOWN FOR NOW.

 2               THERE'S A, A CORRECT PROCEDURE TO FOLLOW

 3     TO FIND THE PERCENTAGE OF ASSOCIATION FOR SECONDARY

 4     CONSIDERATION; CORRECT?

 5     A    SECONDARY MEANING, YES.

 6     Q    SECONDARY MEANING.

 7               AND THE FIRST THING YOU HAVE TO DO IS

 8     IDENTIFY THE RIGHT POPULATION; CORRECT?

 9     A    YES.

10     Q    AND YOU AGREE THAT THE RIGHT POPULATION THAT

11     YOU SHOULD ASK QUESTIONS OF IS CONSUMERS WHO

12     PURCHASED IN THE LAST 12 MONTHS OR WERE LIKELY TO

13     PURCHASE IN THE NEXT 12 MONTHS THESE SORTS OF

14     PRODUCTS; CORRECT?

15     A    YEAH, GENERALLY.

16     Q    SO THAT'S LIKE THE TOTAL POPULATION.  AND HOW

17     MANY OF THOSE PEOPLE DID YOU HAVE IN THE SURVEY?

18     A    I NEED TO LOOK AT MY REPORT TO TELL YOU.

19     Q    CAN YOU GIVE ME AN ESTIMATE?

20     A    OFF THE TOP OF MY HEAD, I FEEL LIKE THERE WERE

21     800 PEOPLE IN ONE OF THE SURVEYS AND MAYBE 500 IN

22     ONE OF THE OTHERS.  BUT THERE WERE SOME OF THOSE

23     WHO MIGHT NOT HAVE BEEN IN THE CATEGORY YOU JUST

24     DESCRIBED.

25     Q    AND ALL OF THE PEOPLE IN THAT SURVEY, ALL
```

10597

 1    THOSE PEOPLE IN THAT POPULATION, WHAT YOU'RE TRYING

 2    TO FIND OUT IS WHAT PERCENTAGE OF THE PEOPLE IN

 3    THAT POPULATION ASSOCIATED THESE IMAGES WITH AN

 4    APPLE PRODUCT IN A CERTAIN TIME FRAME; RIGHT?

 5    A    I UNDERSTAND THE TIME FRAME TO BE RELEVANT.

 6    IN THE TYPICAL SECONDARY MEANING SURVEY, THE ISSUE

 7    OF TIMING IS NOT ADDRESSED.

 8              I DID MAKE AN ATTEMPT TO ASK ABOUT TIMING

 9    IN THIS ONE, SO IT'S A RELEVANT ISSUE.

10              BUT IT'S NOT THE HEART OF WHAT A

11    SECONDARY MEANING SURVEY IS ABOUT.

12    Q    NOW, WAIT A MINUTE.  ISN'T A SECONDARY MEANING

13    SURVEY SUPPOSED TO FIND OUT, IN THE APPROPRIATE

14    POPULATION, WHAT PERCENTAGE IN THAT POPULATION

15    ASSOCIATED THESE IMAGES WITH APPLE BETWEEN THE TIME

16    APPLE FIRST CAME OUT WITH ITS PRODUCT AND THE TIME

17    SAMSUNG FIRST CAME OUT WITH ITS PRODUCT?

18    A    I THINK THAT SOUNDS LIKE THE LEGAL DEFINITION,

19    BUT EVERY SECONDARY MEANING SURVEY IS DONE AFTER

20    THE FACT.  SO IT'S BEING USED TO DEAL WITH THE

21    PERIOD OF TIME THAT HAPPENED BEFORE THE SURVEY.

22    Q    OKAY.  SO LET'S TALK ABOUT, THEN, LEGALLY,

23    USING THE LEGAL DEFINITION WHAT YOU'RE SUPPOSED TO

24    BE TRYING TO FIND IN THIS SURVEY, OKAY?

25              AND IF YOU'D LOOK AT -- I'M GOING TO PUT

```
 1    UP RIGHT NOW DEMONSTRATIVE 3705.101, THAT'S

 2    3705.101.  DO WE HAVE THE BOOKS IN FRONT OF HIM.

 3              SO LEGALLY, IF YOU'RE TRYING TO FIND

 4    SECONDARY MEANING, YOU WANT TO SEE WHAT PERCENTAGE

 5    OF PEOPLE IN THAT POPULATION, PEOPLE BUYING WITHIN

 6    A YEAR OR AFTER A YEAR, ASSOCIATED THE ACCUSED

 7    TRADE DRESS WITH APPLE BETWEEN, IN THIS CASE,

 8    JANUARY 2007 WHEN THE PRODUCT CAME OUT, WAS

 9    ANNOUNCED, AND JULY 2010 WHEN THE CASE OF THE

10    PHONE, THE FIRST ACCUSED SAMSUNG PHONE CAME OUT;

11    CORRECT?  THAT'S THE LEGAL DEFINITION?

12    A    YEAH.  MY UNDERSTANDING OF THE LEGAL

13    DEFINITION WOULD BE THAT THERE NEEDS TO BE

14    SECONDARY MEANING, IN OTHER WORDS, THAT CONSUMERS

15    WOULD HAVE TO HAVE ALREADY ASSOCIATED THIS LOOK

16    WITH APPLE AS OF JULY 2010.

17    Q    SO YOU ASKED THE CORRECT GROUP OF PEOPLE,

18    PEOPLE WHO HAD BOUGHT A PHONE 12 MONTHS BEFORE, OR

19    12 MONTHS AFTER, YOU ASKED THEM WHETHER OR NOT THEY

20    ASSOCIATED IMAGES YOU SHOWED THEM WITH APPLE;

21    CORRECT?

22    A    YES.  THAT'S A SUMMARY.

23    Q    OKAY.  AND YOU ALSO ASKED THEM -- AND IF WE

24    COULD LOOK AT YOUR REPORT, AND YOU'D LOOK AT PAGE,

25    I BELIEVE IT'S PARAGRAPH 91 OF YOUR REPORT.  LET ME
```

```
1     SEE IF I CAN FIND THAT.  I'M SORRY, PARAGRAPH 91.
2             YOU HAVE THIS THING CALLED TIMING OF
3     SECONDARY MEANING.
4             DO YOU SEE THAT?
5     A    YES.
6     Q    AND NOW I WANT TO SEE IF I CAN FIND THE EXACT
7     QUESTION THAT YOU USED.
8             IF WE CAN TAKE THAT DOWN.
9             AND I BELIEVE IT IS ON, LET'S SEE, PAGE
10    14, LINES 9 THROUGH 17 RIGHT HERE.
11            SO YOU ASKED, THEN, "TO THE BEST OF YOUR
12    RECOLLECTION, DID YOU FIRST COME TO ASSOCIATE THE
13    OVERALL APPEARANCE OF THE MOBILE PHONE YOU WERE
14    SHOWN WITH," WHATEVER COMPANY, AND THEN YOU GAVE
15    THE OPTIONS BEFORE JULY 2010, DURING OR AFTER
16    JULY 2010, AND DON'T KNOW.
17            RIGHT?
18    A    THAT, THAT WAS ONLY A FOLLOW-UP QUESTION FOR
19    CERTAIN PEOPLE.  WHAT PEOPLE WERE REALLY ASKED --
20    FIRST THEY WERE ASKED IN WHAT YEAR DID THEY COME TO
21    ASSOCIATE THE APPEARANCE WITH APPLE.
22    Q    WELL, THAT -- THEY WERE ASKED, WHEN IS THE
23    FIRST YEAR YOU BECAME -- YOU ASSOCIATED THAT
24    APPEARANCE WITH APPLE; RIGHT?
25            IF THEY IDENTIFIED APPLE AS SOMETHING
```

1600

```
 1    THEY ASSOCIATED THE IMAGE WITH; RIGHT?
 2    A    YES.  I'M JUST SAYING THIS IS NOT THE QUESTION
 3    MOST PEOPLE WERE ASKED.
 4    Q    OKAY.
 5    A    THEY WERE ASKED JUST TO NAME THE YEAR.
 6    Q    OKAY.  IN THAT CASE, LET'S GO UP ABOVE.
 7            WHAT YOU'RE SAYING IS THAT, RIGHT ABOVE
 8    HERE IT SAYS, YOU WERE ASKED, "IN WHAT YEAR, IF YOU
 9    KNOW, DID YOU FIRST COME TO ASSOCIATE THIS OVERALL
10    APPEARANCE OF THE MOBILE PHONE YOU WERE SHOWN
11    WITH," FILL IN THE BLANK, APPLE; CORRECT?
12    A    CORRECT.
13    Q    OKAY.  AND IF WE LOOK AT EXHIBIT 3705.101 FOR
14    IDENTIFICATION, THIS IS THE -- OKAY, AND THAT WAS
15    -- SO OF THOSE -- YOU WANTED TO FIND OUT, OF THE
16    POPULATION, WHAT PERCENTAGE OF PEOPLE ASSOCIATED
17    THOSE IMAGES WITH APPLE AND ASSOCIATED THOSE IMAGES
18    WITH APPLE IN THIS TIME FRAME, PRIOR TO JULY 2010;
19    RIGHT?
20    A    I, I WOULDN'T -- I DON'T THINK THAT'S AN
21    ACCURATE DESCRIPTION OF WHAT THE QUESTION ABOUT THE
22    YEAR WAS, WAS TRYING TO DO.
23            IT WAS TRYING TO TAKE THE GROUP OF PEOPLE
24    WHO DID ASSOCIATE IT WITH APPLE AND BREAK IT UP
25    INTO THOSE THAT WERE BEFORE THAT POINT AND THOSE
```

1    THAT WERE AFTER TO SEE WHETHER THIS IS REALLY JUST

2    A NEW PHENOMENON THAT OCCURRED AFTER THE SAMSUNG

3    TABLETS CAME OUT OR WHETHER IT WAS ALREADY AN

4    EXISTING THING.

5    Q    THE LEGAL DEFINITION, YOU SAID, OF SECONDARY

6    MEANING WHICH YOU WERE TRYING TO MEASURE IS THE

7    PERCENTAGE IN THE APPROPRIATE POPULATION WHO

8    ASSOCIATED THE ALLEGED TRADE DRESS WITH APPLE AND

9    HAD THAT AN ASSOCIATION BETWEEN JANUARY 27TH, 2007

10   AND JULY 2010.

11           THAT'S THE LEGAL DEFINITION.  YOU CONCEDE

12   THAT; CORRECT?

13   A    THAT SOUNDS TO ME LIKE A FAIR DESCRIPTION OF

14   HOW I UNDERSTAND STAND THE LAW.

15   Q    OKAY.  AND YOU GOT THE INFORMATION FROM THESE

16   FOLKS AS TO WHEN THEY FIRST ASSOCIATED THE TRADE

17   DRESS WITH APPLE BECAUSE YOU ASKED THEM THE

18   QUESTION; CORRECT?

19   A    WE GOT THE INFORMATION FROM SOME PEOPLE WHO

20   COULD REMEMBER AND TO THE BEST OF THEIR, THEIR

21   RECOLLECTION.

22   Q    SO THEN YOU HAD THE ABILITY TO DO A

23   CALCULATION CONSISTENT WITH THE LEGAL MEANING OF

24   SECONDARY -- LEGAL DEFINITION OF SECONDARY MEANING,

25   YOU COULD HAVE DONE A CALCULATION TO SEE HOW MANY

1    OF THAT POPULATION ASSOCIATED THE ALLEGED TRADE

2    DRESS WITH APPLE IN THE LEGALLY RELEVANT TIME?

3              YOU COULD HAVE DONE THAT CALCULATION?

4    A    YOU'RE ASKING ME?

5    Q    YEAH, YES.

6    A    NO.  YOU CAN'T DO ANYTHING OTHER THAN EXACTLY

7    WHAT I DID.  YOU CAN MEASURE THE LEVEL OF SECONDARY

8    MEANING NOW AND YOU CAN ASK A QUESTION TO SEE

9    WHETHER OR NOT IT LOOKS LIKE THAT'S SOMETHING THAT

10   JUST HAS HAPPENED OVER THE PAST FEW MONTHS OR

11   WHETHER IT HAPPENED A WHILE AGO, AND THAT'S WHAT I

12   DID.

13   Q    NO.  THE LEVEL OF ASSOCIATION NOW IS NOT

14   RELEVANT TO SECONDARY MEANING, IS IT?

15             MR. JACOBS:  YOUR HONOR, OBJECTION.  I

16   DON'T WANT TO HAVE THIS IN -- THIS IS A LEGAL

17   ISSUE.  I'D RATHER NOT HAVE IT IN FRONT OF THE

18   JURY.

19             I BET YOU WOULD RATHER NOT HAVE IT IN

20   FRONT OF THE JURY.

21             MR. PRICE:  LET ME REPHRASE IT.

22             THE COURT:  ALL RIGHT.

23   BY MR. PRICE:

24   Q    ACCORDING TO THE LEGAL DEFINITION YOU GAVE US

25   OF SECONDARY MEANING, THE QUESTION IS WHAT

```
 1    PERCENTAGE OF THOSE, THAT GENERAL POPULATION, HAD

 2    AN ASSOCIATION WITH APPLE OF THIS TRADE DRESS

 3    BETWEEN JANUARY 2007 AND JULY 2010; RIGHT?

 4    A    I AGREE WITH THAT.

 5    Q    OKAY.  AND HAVING ASKED THESE, THIS GENERAL

 6    POPULATION THE QUESTION YOU ASKED, IS THERE AN

 7    ASSOCIATION, AND HAVING ASKED THEM, WHEN DID YOU

 8    FIRST HAVE THAT ASSOCIATION, ALL RIGHT, YOU HAD A

 9    NUMBER FOR THE GEM POPULATION; RIGHT?  HOW MANY --

10    YOU HAD A CERTAIN NUMBER OF THE GENERAL POPULATION;

11    RIGHT?  YOU ASKED A CERTAIN NUMBER OF PEOPLE?

12    A    YES.

13    Q    OKAY.  THAT WOULD BE THE, THE NOMINATOR, IS

14    THAT RIGHT?  THAT WOULD BE THE THING ON THE BOTTOM,

15    THAT WOULD BE THE NUMBER ON THE BOTTOM, RIGHT, FOR

16    TRYING TO FIND A PERCENTAGE, RIGHT?  YOU ASKED,

17    SAY, 800 PEOPLE, YOU WANT A PERCENTAGE, AND YOU PUT

18    800 DOWN THERE, RIGHT?  RIGHT?

19    A    YOU'RE --

20    Q    RIGHT?

21    A    WELL, I CAN'T SAY "RIGHT" BECAUSE I CAN TELL

22    YOU'RE CONFUSED ABOUT WHAT YOU'RE TALKING ABOUT, SO

23    I CAN'T REALLY SAY "RIGHT."

24          I CAN SEE WHAT YOU'RE CONFUSED ABOUT AND

25    SO --
```

```
1    Q    WELL, THAT'S VERY NICE OF YOU, BUT LET ME ASK

2    A QUESTION.

3    A    OKAY.

4    Q    AND THEN MAYBE SOMETIME OVER DRINKS YOU CAN

5    TELL ME HOW CONFUSED I AM.

6              IF YOU'RE TRYING TO FIND THE SECONDARY

7    MEANING OF A PRODUCT WITHIN A CERTAIN TIME PERIOD,

8    YOU NEED TO FIND OUT IF PEOPLE HAD THAT MEANING

9    DURING THAT TIME PERIOD; RIGHT?  IS THAT CORRECT?

10   A    NO.  I DON'T AGREE WITH THAT.

11   Q    WELL, YOU COULD LOOK AT YOUR DATA AND FIND THE

12   NUMBER OF PEOPLE WHO SAID THEY HAD AN ASSOCIATION

13   BETWEEN THESE IMAGES AND APPLE AND THEY HAD THAT

14   ASSOCIATION BETWEEN JANUARY OF 2007 AND JULY 2010?

15             YOU HAD THAT DATA; RIGHT?

16   A    I HAD THE DATA TO THE QUESTION THAT WE JUST

17   TALKED ABOUT, YES.

18   Q    AND THAT DATA WAS -- IF WE CAN GET BACK TO

19   PAGE 14 OF YOUR REPORT -- IN WHAT YEAR, IF YOU

20   KNOW, DID YOU FIRST COME TO ASSOCIATE THE OVERALL

21   APPEARANCE OF THE MOBILE PHONE YOU WERE SHOWN WITH,

22   AND THEY SAID APPLE.

23             THAT'S THE DATA YOU GOT; RIGHT?

24   A    YES.

25   Q    OKAY.  SO YOU HAD BOTH THE DATA FOR WHAT
```

1    PERCENTAGE OF THE LARGE POPULATION ASSOCIATED THESE

2    IMAGES WITH APPLE DURING THE 2007 TO 2010 TIME

3    FRAME, YOU HAD THAT DATA BECAUSE YOU ASKED THOSE

4    QUESTIONS; RIGHT?

5    A    NO.  YOU'RE -- YOU ARE MISINTERPRETING WHAT

6    THE ANSWERS TO THOSE QUESTIONS MEAN.

7    Q    WELL, PEOPLE EITHER FILLED IN A NUMBER, LIKE

8    2008, 2009, OR THEY SAID I DON'T KNOW TO THE

9    QUESTION; RIGHT?  YOU HAD THAT DATA?

10   A    YES.

11   Q    AND IF YOU TOOK THAT AS THE NUMERATOR, THE

12   NUMBER OF PEOPLE WHO SAID "I HAD AN ASSOCIATION OF

13   THESE IMAGES WITH APPLE'S TRADE DRESS BETWEEN 2000

14   SEARCH AND 2010," IF THAT'S THE NUMERATOR, AND THEN

15   THE DENOMINATOR, YOU HAVE YOUR POPULATION, WHICH

16   WE'VE AGREED UPON IS THE PEOPLE WHO BOUGHT PHONES

17   12 MONTHS BEFORE OR WERE LIKELY TO 12 MONTHS LATER,

18   RIGHT, YOU'RE WITH ME SO FAR, IF YOU HAD THAT, YOU

19   WOULD BE ABLE TO MAKE A CALCULATION AND GIVE US A

20   PERCENTAGE, RIGHT?

21   A    YES.  IT WOULD BE AN ARBITRARY PERCENTAGE, BUT

22   YOU COULD DO WHATEVER CALCULATION YOU'RE

23   DESCRIBING.

24   Q    WELL, YOU SAY "ARBITRARY ."  IF WE GO TO YOUR

25   NUMBERS, IF WE CAN GO BACK TO THE TABLE YOU HAD UP,

1

2

3

4

5                          CERTIFICATE OF REPORTERS

6

7

8              WE, THE UNDERSIGNED OFFICIAL COURT

9     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

19

20                          /S/
                          _____
21                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
22

23                          /S/
                          _____
24                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074
25

1              DATED:   AUGUST 7, 2012

# EXHIBIT 5

1638

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5

  APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6 CORPORATION,                )
                              )  SAN JOSE, CALIFORNIA
7            PLAINTIFF,        )
                              )  AUGUST 10, 2012
8        VS.                   )
                              )  VOLUME 6
9 SAMSUNG ELECTRONICS CO.,    )
  LTD., A KOREAN BUSINESS     )  PAGES 1638-1988
10 ENTITY; SAMSUNG            )
   ELECTRONICS AMERICA,       )
11 INC., A NEW YORK           )
   CORPORATION; SAMSUNG       )
12 TELECOMMUNICATIONS         )
   AMERICA, LLC, A DELAWARE   )
13 LIMITED LIABILITY          )
   COMPANY,                   )
14                            )
              DEFENDANTS.      )
15 _____

16       TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE LUCY H. KOH
17       UNITED STATES DISTRICT JUDGE

18

19

20       APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                  CERTIFICATE NUMBER 9595
24

25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF        MORRISON & FOERSTER
     APPLE:                   BY:  HAROLD J. MCELHINNY
3                                  MICHAEL A. JACOBS
                                   RACHEL KREVANS
4                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                   HALE AND DORR
7                             BY:  WILLIAM F. LEE
                              60 STATE STREET
8                             BOSTON, MASSACHUSETTS  02109

9                             BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                         OLIVER & HEDGES
12                            BY:  CHARLES K. VERHOEVEN
                              50 CALIFORNIA STREET, 22ND FLOOR
13                            SAN FRANCISCO, CALIFORNIA  94111

14                            BY:  VICTORIA F. MAROULIS
                                   KEVIN P.B. JOHNSON
15                            555 TWIN DOLPHIN DRIVE
                              SUITE 560
16                            REDWOOD SHORES, CALIFORNIA  94065

17                            BY:  MICHAEL T. ZELLER
                                   WILLIAM C. PRICE
18                            865 SOUTH FIGUEROA STREET
                              10TH FLOOR
19                            LOS ANGELES, CALIFORNIA  90017

20                            BY:  EDWARD J. DEFRANCO
                              51 MADISON AVENUE, 22ND FLOOR
21                            NEW YORK, NEW YORK  10010

22

23

24

25
```

1640

1                    INDEX OF WITNESSES

2     PLAINTIFF'S

3     **HAL PORET**
            CROSS-EXAM BY MR. PRICE (RES.)    P. 1665
4           REDIRECT EXAM BY MR. JACOBS       P. 1687

5     **KENT VAN LIERE**
            DIRECT EXAM BY MR. JACOBS         P. 1690
6           CROSS-EXAM BY MR. PRICE           P. 1702

7     **RAVIN BALAKRISHNAN**
            DIRECT EXAM BY MR. JACOBS         P. 1723
8           CROSS-EXAM BY MR. JOHNSON         P. 1769
            REDIRECT EXAM BY MR. JACOBS       P. 1806
9           RECROSS-EXAM BY MR. JOHNSON       P. 1813

10    **KARAN SINGH**
            DIRECT EXAM BY MR. JACOBS         P. 1815
11          CROSS-EXAM BY MR. DEFRANCO        P. 1848
            REDIRECT EXAM BY MR. JACOBS       P. 1909
12

13    **JOHN HAUSER**
            DIRECT EXAM BY MR. JACOBS         P. 1914
14          CROSS-EXAM BY MR. PRICE           P. 1917
            REDIRECT EXAM BY MR. JACOBS       P. 1945
15          RECROSS-EXAM BY MR. PRICE         P. 1948

16    **BORIS TEKSLER**
            DIRECT EXAM BY MR. MUELLER        P. 1951
17          CROSS-EXAM BY MS. MAROULIS        P. 1964

18

19

20

21

22

23

24

25

```
 1    COVERED?

 2    Q    YES.

 3    A    YES, FOR THIS GROUP IT WAS ALSO COVERED.

 4    Q    AND THEN WE HAVE THE CONTROL, AND FOR THE

 5    CONTROL, IF WE LOOK AT EXHIBIT -- LET'S GO TO --

 6    AND TO REMIND THE JURORS, WE'LL GO TO 30.5, SDX

 7    30.5 TO SHOW WHAT WE'RE DOING HERE.  IT SHOULD BE

 8    SD -- THERE WE GO.

 9              WE'RE NOW IN THIS STUDY AND WE'RE TALKING

10    ABOUT THE FIRST STUDY YOU DID OF THE IPAD, OKAY,

11    BECAUSE YOU DID TWO; RIGHT?

12    A    THERE WERE MULTIPLE PARTS OF IT.  I CONSIDERED

13    IT ALL PART OF THE SAME SURVEY, BUT YES, THERE WERE

14    MULTIPLE PARTS OF IT.

15    Q    I WANT TO REMEMBER THAT, THAT IT'S ALL PART OF

16    THE SAME SURVEY.  THAT'S WHAT YOU'RE SAYING TO THE

17    JURY.  RIGHT?

18    A    YES.

19    Q    SO YOU DO AN ASSOCIATION WITH THE IPAD, AND

20    YOU SUBTRACT THE CONTROL, SO AGAIN, YOU'VE GOT TO

21    SEE IF THE CONTROL HAS INDICATORS THAT MIGHT SCREAM

22    "NOT APPLE" THAT MIGHT DISTORT THE RESULTS,

23    CORRECT, BECAUSE YOU'RE SUBTRACTING THAT?

24    A    THAT'S NOT REALLY HOW I WOULD PUT IT, BUT I --

25    I MEAN, YOU GENERALLY HAVE THE GIST RIGHT, THAT,
```

```
 1    YES, I WOULD NOT WANT THE CONTROL TO BE SCREAMING

 2    "NOT APPLE."

 3    Q    OKAY.  I'M GLAD I'M NOT TOTALLY WRONG THIS

 4    TIME.

 5              SO IF WE LOOK AT THAT CONTROL, YOU SEE

 6    YOU USED THIS -- AND WE CAN GET IT BIGGER, I THINK,

 7    AT 2544, PAGE 32.

 8              THIS IS THE CONTROL FROM YOUR REPORT?

 9    A    YES.  THIS WAS A CONTROL FOR THE HEAD-ON VIEWS

10    OF THE IPAD THAT WE SHOWED.

11    Q    SO LET ME ASK YOU, DO YOU KNOW OF ANY TABLETS

12    THAT ONLY HAVE THREE ICONS ACROSS?  I MEAN, THIS --

13    A    I DON'T -- I CAN'T SPEAK FOR HOW MANY ICONS

14    ALL THE TABLETS HAVE.  LIKE I WAS TALKING ABOUT

15    BEFORE, I THINK MOST OF THESE TABLETS CAN HAVE, YOU

16    KNOW, ANY NUMBER OF ICONS DEPENDING ON WHAT PEOPLE

17    PUT ON THEM.

18    Q    I MEAN, EVEN THE SMALL IPHONE HAS FOUR ACROSS;

19    RIGHT?

20    A    I DON'T KNOW HOW MANY ICONS.  IT VARIES

21    DEPENDING ON WHAT PEOPLE HAVE ON THEM.

22    Q    WELL, SO YOU'RE AWARE OF A TABLET THAT, THAT

23    HAS ONLY THREE ICONS INSTEAD OF FOUR?

24    A    I'M NOT SAYING THAT.  I'M JUST SAYING I THINK

25    THE NUMBER OF TABLETS VARIES -- THE NUMBER OF ICONS
```

1    CAN VARY FOR EACH INDIVIDUAL USER DEPENDING ON HOW

2    MANY THEY HAVE ON A SCREEN OR WHAT SCREEN THEY'RE

3    LOOKING AT.

4    Q    WELL, HAVING THREE HERE SCREAMS "NOT APPLE"?

5    A    NO.

6    Q    BUT THIS ISN'T ACTUALLY ICONS ON A REAL

7    SCREEN, THIS IS SOMETHING DONE WITH CGI OR -- I

8    MEAN, YOU KIND OF CREATED THIS LOOKING SCREEN ON

9    YOUR COMPUTER; RIGHT?

10   A    I DIDN'T PERSONALLY, BUT THE CONTROL WAS

11   CREATED TO APPEAR TO BE A TABLET WITH A FIELD OF

12   ICONS.

13   Q    NOW, WHEN YOU TALKED TO THE JURY AND SHOWED

14   THEM 30.5, EXHIBIT 30.5 -- IF WE CAN SHOW THAT

15   AGAIN -- DO YOU SEE THIS HERE, WHAT YOU SHOWED THE

16   JURY HAS THE STICKER WHERE A HOME BUTTON WOULD BE?

17   A    YES.

18   Q    BUT IN YOUR REPORT THAT YOU WERE JUST LOOKING

19   AT, WHICH IS 2544, PAGE 32, IN YOUR REPORT, THAT

20   STICKER IS UP ON THE SCREEN, AND SO THE PERSON

21   COULD SEE THAT THERE IS NO HOME BUTTON AND,

22   THEREFORE, KNOW IT'S NOT AN APPLE?

23   A    NO, THAT -- THAT'S NOT RIGHT.  MAYBE THIS

24   IMAGE GOT MESSED UP SOMEHOW.  BUT THE STICKER WAS

25   OVER THE BLACK PART.

```
1    Q    THIS IS THE IMAGE THAT IS IN YOUR REPORT;

2    CORRECT?

3    A    I -- I DON'T KNOW.  I MEAN, I'M -- I'M SEEING

4    THIS UP HERE NOW.  I'M PRETTY SURE THAT THE ACTUAL

5    DIGITAL IMAGES WERE, WERE PROVIDED AS THE EXHIBITS

6    TO THE REPORT.  THIS WAS SOMETHING THAT WAS SHOWN

7    IN THE BODY AND PERHAPS SOMETHING GOT MESSED UP IN

8    PASTING THAT EXHIBIT INTO THE BODY.

9              BUT I KNOW THAT'S NOT WHAT WAS SHOWN.

10   Q    WELL, ON PAGE -- I'M SORRY.  ON PAGE 31, JUST

11   THE PAGE BEFORE THIS, YOU'VE GOT PARAGRAPH 4.  YOU

12   SAY "THE CONTROL IMAGES ARE SHOWN ON THE FOLLOWING

13   PAGES," AND THAT'S ON THE VERY NEXT PAGE; RIGHT?

14   A    YES.

15   Q    AND YOUR RESULTS, WHICH WE'VE SEEN AT 30.5

16   AGAIN OF THE STUDY THAT YOU DID THAT IS -- YOU

17   ENDED UP WITH A 40.3 USING THIS CONTROL; CORRECT?

18   A    YES.

19   Q    AND YOU -- YOU'VE GRADUATED FROM LAW SCHOOL;

20   RIGHT?

21   A    YES.

22   Q    AND YOU HAVE AN UNDERSTANDING THAT FOR

23   SECONDARY MEANING, THERE'S KIND OF A, A THRESHOLD

24   THAT IS ABOUT 50 PERCENT?  THAT'S THE NUMBER YOU

25   WANT TO GET ABOVE?
```

1   A    NO.

2   Q    WELL, WHEN YOU DID THIS AND GOT THE 40.3

3   PERCENT NUMBER, YOU THOUGHT THAT YOUR JOB WAS OVER

4   AND YOU ACTUALLY STARTED WRITING THE REPORT?

5   A    I -- I THINK THAT'S CORRECT, THAT AT THAT

6   POINT I, I THOUGHT THAT THAT WAS GOING TO BE THE

7   END OF THE RESEARCH.

8   Q    AND THEN APPLE CAME TO YOU AND SAID, "WE NEED

9   YOU TO DO ANOTHER STUDY."

10  A    NO, THAT'S NOT -- THAT'S NOT EXACTLY ACCURATE.

11  Q    YOU DID ANOTHER STUDY BECAUSE APPLE CAME TO

12  YOU AND ASKED YOU TO DO ANOTHER STUDY; CORRECT?

13  A    I CERTAINLY DID MORE ASPECTS OF THE SURVEY AT

14  APPLE'S REQUEST.

15  Q    OKAY.  SO THE ANSWER IS CORRECT, AT APPLE'S

16  REQUEST, YOU DID MORE WORK AFTER SHOWING THEM THE

17  RESULTS OF THIS STUDY; CORRECT?

18  A    YES.

19  Q    AND LET'S TALK ABOUT THAT STUDY THEN.

20       SO ON YOUR NEXT GO-ROUND -- LET'S LOOK AT

21  EXHIBIT 2544-24.  IF YOU CAN BLOW UP THE TOP HERE.

22       NOW, THIS ISN'T THE CLEAREST BLOW UP, BUT

23  ON YOUR NEXT STUDY, YOU DIDN'T PUT A STICKER OVER

24  THAT HOME BUTTON AS YOU PREVIOUSLY SAID WAS

25  NECESSARY TO GET A FAIR STUDY AND MAKE SURE THAT

1    YOU WERE LOOKING JUST AT THE TRADE DRESS?

2    A    I DON'T AGREE WITH HOW YOU JUST CHARACTERIZED

3    THAT, BUT YOU'RE CORRECT THAT THERE WAS NO LABEL

4    OVER THE BUTTON IN THIS PART OF IT.

5    Q    AND ALSO, IF WE LOOK AT THE NEXT PAGE, WHICH

6    IS 25, ANOTHER PART OF THE STUDY, AND AGAIN, THIS

7    ISN'T THE CLEAREST VIEW, BUT YOU SEE NOT -- THE

8    HOME BUTTON IS NOT COVERED; RIGHT?

9    A    RIGHT.

10   Q    AND THE ICONS ARE NOT BLURRED, EITHER, WHEREAS

11   PREVIOUSLY IN YOUR REPORT, YOU SAID THAT WAS

12   NECESSARY TO MAKE SURE YOU WERE GETTING A RESPONSE

13   THAT WAS MEANINGFUL TO TRADE DRESS.  RIGHT?

14   A    YOU'RE CORRECT THAT THAT'S WHAT'S SHOWN HERE.

15           I DON'T THINK YOU'RE CORRECT THAT AT THIS

16   POINT IT WAS NECESSARY TO DO THOSE THINGS GIVEN

17   THAT I HAD ALREADY DONE THEM AND HAD ALREADY SEEN

18   THAT THERE WAS SECONDARY MEANING EVEN WITH THOSE

19   THINGS COVERED.

20   Q    WITH THE 40 PERCENT FIGURE THAT YOU GOT?

21   A    IT'S NOT JUST THE 40 PERCENT FIGURE THAT'S

22   RELEVANT.  THE 57 PERCENT FIGURE IS THE PRIMARY

23   FIGURE AS WELL.

24   Q    SO BASICALLY FOR THIS SECOND STUDY THAT APPLE

25   ASKED YOU TO DO AFTER GETTING THE 40 PERCENT

10682

1    RESULT, YOU STACKED THE DECK ACCORDING TO WHAT YOU

2    SAID, IN YOUR REPORT, WAS THE STANDARD PROCEDURE

3    FOR DOING SUCH STUDIES?

4    A    NO.

5    Q    WELL, IN FACT, YOU GOT COMMENTS FROM

6    PARTICIPANTS LIKE "THE BOTTOM BUTTON AT THE BOTTOM

7    IS A DEAD GIVE AWAY THAT THIS IS AN APPLE."

8    A    I DO RECALL THERE WERE SOME RESPONDENTS WHO

9    MENTIONED THE HOME BUTTON AS ONE OF THE THINGS THEY

10   RECOGNIZED.  I THINK IT WAS A PRETTY SMALL NUMBER,

11   BUT THERE WERE DEFINITELY SOME.

12   Q    AND THEN AS THE CONTROL -- IF WE CAN PUT UP

13   2544-33 -- YOU USED A NOOK, AN E-READER; RIGHT?

14   A    IT'S -- IT'S A TABLET.

15   Q    AND WITH THE NOOK, YOU SHOWED THE "N" HERE

16   THAT IDENTIFIES IT AS A NOOK TO PEOPLE WHO KNOW

17   NOOKS?

18   A    NO, THAT'S NOT TRUE.

19   Q    ISN'T THAT WHAT THAT IS RIGHT THERE?

20   A    WELL, I DON'T KNOW EXACTLY WHAT THAT IS, BUT I

21   KNOW THAT BARELY ANYBODY -- ONLY A VERY SMALL

22   NUMBER OF PEOPLE IN THE SURVEY SAID THAT THEY

23   THOUGHT THIS WAS A NOOK.  SO IT CLEARLY DID NOT

24   GIVE AWAY THAT IT WAS A NOOK TO MOST PEOPLE.

25   Q    IT DID GIVE AWAY THAT IT WASN'T AN APPLE?

1    A    NO.  A LOT MORE PEOPLE SAID IT WAS AN APPLE.

2    Q    WELL, BUT NOT MANY.  YOU KIND OF MADE SURE OF

3    THAT.

4    A    NO.  YOU'RE JUST WRONG.  10 PERCENT, I

5    BELIEVE, I THINK THAT WAS THE NUMBER, I THINK 10

6    PERCENT SAID THAT THIS WAS AN APPLE, AND IT WAS A

7    LOT LESS THAN THAT THAT SAID ANYTHING ABOUT A NOOK,

8    SO THAT'S JUST NOT TRUE.

9    Q    SO ONLY 10 PERCENT SAID THAT IT WAS AN APPLE,

10   AND THAT COULDN'T BE, OF COURSE, BECAUSE APPLE

11   DOESN'T HAVE A HOME BUTTON LIKE THAT?

12   A    CERTAINLY IT'S POSSIBLE THAT ONE -- THAT

13   THAT'S ONE OF THE REASONS THAT PEOPLE DIDN'T THINK

14   THIS WAS AN APPLE.

15   Q    AND THEN IF WE CAN LOOK AT 34, 2544-34, WE'VE

16   GOT -- YOU SHOWED THEM ALSO A VERSION OF THIS THAT

17   HAS THAT NOOK BUTTON AND THEN HAS UNBLURRED ICONS;

18   RIGHT?

19   A    YES, JUST ONE GROUP.

20   Q    AND THESE DON'T LOOK ANYTHING LIKE APPLE'S?

21   AGAIN, IT SCREAMS "I'M NOT AN APPLE"?

22   A    AGAIN, THAT'S NOT WHAT THE SURVEY RESULTS

23   SHOW.

24   Q    BECAUSE YOU THINK 10 PERCENT IS A BIG NUMBER?

25   A    I'M NOT SAYING IT'S A BIG NUMBER, BUT 10

1    PERCENT OF PEOPLE SAYING THEY THINK SOMETHING IS AN

2    APPLE CERTAINLY SHOWS THAT IT WAS A POSSIBILITY

3    THAT PEOPLE WHO WERE GUESSING MIGHT GUESS THAT THIS

4    IS AN APPLE.

5    Q    AND IT'S A LOT CLEARER IN THE ACTUAL, WHAT YOU

6    SHOWED THEM, BUT UP HERE ALSO IT HAS THIS THING

7    THAT SAYS "APPS" AND IT SAYS "ARCHIVE."  IS THAT

8    CORRECT?

9    A    YES.

10   Q    AND TELL ME STEVE JOBS WOULDN'T HAVE FIRED

11   SOMEBODY THAT HAD PUT "ARCHIVE" UP THERE ON A HOME

12   SCREEN?

13   A    I COULDN'T SPEAK TO THAT.

14   Q    AND THEN THERE ARE OTHER ALTERNATIVES YOU

15   COULD HAVE USED.  FOR EXAMPLE, LET ME SHOW YOU

16   EXHIBIT 2529 FOR IDENTIFICATION.

17             THIS IS A MOTOROLA TABLET.

18             DO YOU RECOGNIZE THAT AS A MOTOROLA

19   TABLET?

20             I'M SORRY.  DO YOU WANT TO SEE IT?

21             THE WITNESS:  YES.

22             MR. PRICE:  AND I FORGOT TO SHOW IT TO

23   MR. JACOBS.  LET ME DO THAT.

24             (DISCUSSION OFF THE RECORD BETWEEN

25   COUNSEL.)

```
 1              MR. PRICE:  SINCE THE WITNESS RECOGNIZES

 2    THIS AS A MOTOROLA, I'LL MOVE IT INTO EVIDENCE FOR

 3    THE PURPOSE OF CHALLENGING HIS METHODOLOGY.

 4              MR. JACOBS:  SO, YOUR HONOR, THIS WAS

 5    ACTUALLY DISCLOSED TO US AS A DEMONSTRATIVE, ALONG

 6    WITH 2528 AND 2534.  I WAS A LITTLE SLOW ON THE

 7    UPTAKE WHEN THEY WERE PRESENTED, BUT THEY ARE NOT

 8    ON THE EXHIBIT LIST FOR ADMISSION AS EXHIBITS.

 9              THE COURT:  ARE THEY ON YOUR --

10              MR. PRICE:  THEY ARE ON THE EXHIBIT LIST

11    FOR THE CASE.

12              WHAT WE GAVE THEM FOR THE WITNESS, I

13    THINK WE DID LIST THEM AS DEMONSTRATIVES BECAUSE I

14    DIDN'T KNOW IF HE WOULD BE ABLE TO SAY, "YES, I SEE

15    THIS IS A MOTOROLA TABLET," AND NOW THAT THEY'RE

16    GOING IN FOR THAT LIMITED PURPOSE, I'D ASK THAT

17    THAT BE ADMITTED.  THERE'S NO PREJUDICE TO

18    DEMONSTRATIVES GOING INTO EVIDENCE.

19              MR. JACOBS:  I THINK THERE IS, YOUR

20    HONOR.  IF IT HAD BEEN DISCLOSED TO US AS AN

21    EXHIBIT, IT MIGHT HAVE CHANGED THE WAY WE

22    APPROACHED OBJECTIONS.

23              MR. PRICE:  MR. JACOBS CAN'T SAY --

24              THE COURT:  WAS IT TIMELY ON THE EXHIBIT

25    LIST?
```

1699

```
1              MR. JACOBS:  WE OFFER 24.6 INTO EVIDENCE,
2    YOUR HONOR.
3              MR. PRICE:  NO OBJECTION.
4              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.
5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
6              24.6, HAVING BEEN PREVIOUSLY MARKED FOR
7              IDENTIFICATION, WAS ADMITTED INTO
8              EVIDENCE.)
9              MR. JACOBS:  I MOVE ALL OF 24 IN.
10             THE COURT:  ANY OBJECTION?  YOU WANT ALL
11   OF 24 IN?
12             MR. PRICE:  NO OBJECTION.
13             THE COURT:  ALL RIGHT.  IT'S IN.
14             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
15             24, HAVING BEEN PREVIOUSLY MARKED FOR
16             IDENTIFICATION, WAS ADMITTED INTO
17             EVIDENCE.)
18             THE COURT:  GO AHEAD, PLEASE.
19             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
20   OPEN COURT OFF THE RECORD.)
21             MR. JACOBS:  THANK YOU.  LET'S PUT UP PX
22   31.2, PLEASE.
23   Q    SO WHAT QUESTION DID YOU ASK IF YOUR SURVEY?
24   A    SO THE PRIMARY QUESTION WAS, WHAT'S SHOWN ON
25   THE SCREEN HERE, WHICH IS, IN YOUR OPINION, WHAT
```

1    TABLET WAS SHOWN IN THE VIDEO?

2    Q    AND LET'S GO TO 31.3.  WHAT IS THIS SLIDE

3    SHOWING, SIR?

4    A    SO THIS IS ALSO A SUMMARY OF THE RESULTS FROM

5    THE LIKELIHOOD OF CONFUSION SURVEY.  SIMILAR TO THE

6    OTHER ONE, THE FIRST TWO COLUMNS SHOW THE RESULTS

7    FOR THE TWO TEST VIDEOS, AND THEN THE FAR RIGHT

8    COLUMN SHOWS THE TEST FOR THE BARNES & NOBLE COLOR

9    NOOK CONTROL.

10             AND WHAT IT SHOWS IS FOR THE BRANDED

11   VERSION OF THE SAMSUNG GALAXY 10, THE FIRST COLUMN,

12   APPROXIMATELY 30 PERCENT OF THE RESPONDENTS

13   IDENTIFIED IT AS AN IPAD OR APPLE DEVICE.

14             IN THE SAMSUNG GALAXY 10.1 UNBRANDED

15   VERSION, APPROXIMATELY 43 PERCENT IDENTIFIED IT AS

16   AN IPAD OR APPLE DEVICE.

17             AND THEN IF YOU SIMPLY COMBINE THE

18   RESULTS FROM THOSE TWO, JUST TO BE -- JUST TO

19   EXPLAIN, SO EACH RESPONDENT ONLY SAW ONE VIDEO, AND

20   THEY WERE RANDOMLY ASSIGNED TO THE VIDEO THAT THEY

21   SAW.

22             AND THERE WERE APPROXIMATELY 200

23   RESPONDENTS WHO SAW THE FIRST VIDEO, 200 WHO SAW

24   THE SECOND, AND 200 WHO SAW THE CONTROL VIDEO.

25             SO IF YOU COMBINE THE 400 PEOPLE WHO SAW

1    THE BRANDED AND THE UNBRANDED, YOU GET ROUGHLY 36

2    PERCENT OF RESPONDENTS OVERALL THAT IDENTIFIED THE

3    GALAXY TABLET AS AN IPAD OR APPLE PRODUCT.

4    Q    AND WHAT ABOUT THE CONTROL RESULTS?

5    A    SO IN THIS PARTICULAR STUDY, WE FOUND THAT 24

6    PERCENT IDENTIFIED THE BARNES & NOBLE NOOK COLOR AS

7    AN APPLE OR AN IPAD, AND SO THAT'S OUR ESTIMATE OF

8    GUESSING AND THE EFFECTS OF OUR SURVEY PROCESS,

9    SIMILAR TO WHAT WE'VE DISCUSSED.

10            AND SO WHEN WE NET THAT OFF, WE GET A NET

11   RATE OF CONFUSION BETWEEN 6 AND 19 PERCENT.

12   Q    AND THE COMBINED RATE?

13   A    THE COMBINED RATE WOULD BE 12 PERCENT FOR THAT

14   STUDY.

15   Q    WHAT DO YOU BELIEVE THE RESULTS OF THIS SURVEY

16   SHOW, SIR?

17   A    WELL, THE RESULTS SUGGEST THAT THERE'S A, A

18   SUBSTANTIAL PORTION OF THE CONSUMERS WHO ARE LIKELY

19   TO BE CONFUSED WHEN THEY SEE A SAMSUNG GALAXY

20   TABLET IN A POST-SALE ENVIRONMENT, THAT THEY'RE

21   ACTUALLY VIEWING AN IPAD OR APPLE PRODUCT.

22            MR. JACOBS:  THANK YOU, DR. VAN LIERE.

23   NO FURTHER QUESTIONS.

24            THE COURT:  ALL RIGHT.  TIME IS NOW 9:55.

25            PLEASE GO AHEAD WITH YOUR CROSS.

```
 1            MR. PRICE:  THANK YOU, YOUR HONOR.
 2                   CROSS-EXAMINATION
 3   BY MR. PRICE:
 4   Q    IS IT MR. VAN LIERE OR DOCTOR?
 5   A    DR. VAN LIERE.  YOU CAN CALL ME EITHER.
 6   Q    I'LL CALL YOU DOCTOR.  WE'RE IN COURT.
 7            SO FIRST OF ALL, LET'S TALK ABOUT WHAT
 8   YOU DID NOT DO WITH THAT CONFUSION STUDY.
 9            YOU DID NOT DO A STUDY THAT MEASURED
10   CONFUSION OF CONSUMERS AT THE TIME THEY BUY AN IPAD
11   OR A TABLET; CORRECT?
12   A    YES.  I BELIEVE YOU'RE REFERRING TO A POINT OF
13   PURCHASE STUDY, AND I DID NOT DO A POINT OF
14   PURCHASE STUDY.
15   Q    NOW, HAVE YOU DONE POINT OF PURCHASE STUDIES
16   IN YOUR CAREER?
17   A    YES.
18   Q    ABOUT HOW MANY?
19   A    I DON'T KNOW EXACTLY.  PROBABLY SOMEWHERE
20   BETWEEN 5 AND 15.
21   Q    AND WHEN YOU WERE ASKED BY APPLE TO DO A
22   STUDY, DID THEY KIND OF EXPLAIN TO YOU WHAT THE
23   CASE WAS ABOUT?
24            MR. JACOBS:  YOUR HONOR, I THINK THIS
25   LINE OF QUESTIONING POTENTIALLY INVADES RULE 26.
```

1703

```
 1              MR. PRICE:  LET ME WITHDRAW THAT.

 2     Q    WELL, LET ME ASK YOU THIS:  DID -- GIVEN YOUR

 3     EXPERIENCE IN DOING, YOU KNOW, POINT OF SALE

 4     STUDIES, DID APPLE ASK YOU TO DO ONE TO SEE WHETHER

 5     OR NOT THERE'S ANY EMPIRICAL EVIDENCE THAT A

 6     CONSUMER BUYING A SAMSUNG TABLET WOULD BE CONFUSED

 7     INTO THINKING IT'S AN IPAD OR VICE-VERSA?

 8     A    APPLE DID NOT ASK ME TO CONDUCT A POINT OF

 9     PURCHASE SURVEY.  THEY ASKED ME TO CONDUCT A

10     POST-SALE CONFUSION SURVEY.

11     Q    OKAY.  SO LET'S TALK ABOUT THE POST-SALE

12     CONFUSION SURVEY.

13              IT'S MY UNDERSTANDING, IS IT NOT, THAT

14     UNTIL THIS CASE, YOU HAD NEVER DONE A

15     POST-CONFUSION SURVEY.

16     A    I THINK THIS IS THE FIRST CASE THAT I'VE PUT

17     IN A SURVEY THAT IS PUBLICLY AVAILABLE IN WHICH WE

18     WERE TESTING A POST-SALE ENVIRONMENT.  I THINK THIS

19     IS THE FIRST TIME FOR THAT FOR SURE.

20     Q    SO LET'S SEE WHAT YOU DID ON YOUR FIRST TIME

21     OUT ON THIS THING.

22              BY THE WAY, DID YOU SAY TO APPLE, "THIS

23     IS THE FIRST TIME I'VE DONE ONE AFTER SALE"?

24     A    I DON'T RECALL IF APPLE ASKED ME THAT QUESTION

25     OR NOT.
```

```
 1     Q     OKAY.  AND SO YOU CAN'T USE YOUR STUDY TO SHOW

 2     EITHER -- WHETHER A CONSUMER WAS CONFUSED WHEN HE

 3     BOUGHT A SAMSUNG TABLET OR TO SHOW ANY IMPACT ON

 4     FUTURE PURCHASING DECISIONS; CORRECT?

 5     A     THE SURVEY, AS IT'S DESIGNED, DOES NOT TEST

 6     POINT OF PURCHASE, AND IT DOES NOT TEST THE EXTENT

 7     TO WHICH THE CONFUSION AFFECTS FUTURE PURCHASE

 8     BEHAVIOR, THAT'S CORRECT.

 9     Q     NOW, SO IN THE SURVEY YOU DID, YOU DIDN'T SHOW

10     THESE PEOPLE IN THE MALL AN ACTUAL IPAD OR AN

11     ACTUAL SAMSUNG TABLET; CORRECT?

12     A     NO, I DON'T THINK YOU SAID THAT CORRECTLY.

13     Q     OKAY.  MAYBE I DIDN'T.  YOU DIDN'T -- THIS WAS

14     THE ONE IN THE MALL, RIGHT, THE ONE WITH THE IPAD

15     AND THE SAMSUNG?

16     A     THE TABLET CONFUSION STUDY WAS THE STUDY DONE

17     IN A MALL, YES.

18     Q     OKAY.  AND YOU DIDN'T SHOW THESE FOLKS -- YOU

19     DIDN'T ACTUALLY HAND THEM AN ACTUAL IPAD OR A

20     SAMSUNG TABLET; RIGHT?

21     A     THAT'S CORRECT.  WE SHOWED THE VIDEOS THAT

22     YOU'VE SEEN TWO EXAMPLES OF.

23     Q     AND WHY NOT SHOW THEM THE TABLET?

24     A     YOU SAY "SHOW THEM THE TABLET."  JUST TO BE

25     CLEAR, THEY DID SEE THE TABLETS.  THE TABLETS WERE
```

```
 1    IN THE VIDEO.  WE JUST DID NOT HAND THEM PHYSICALLY

 2    TO THEM.

 3    Q    WELL, IF WE LOOK AT JOINT EXHIBIT 1004, THIS

 4    IS AN ACTUAL IPAD, YOU KNOW, THREE-DIMENSIONAL

 5    IPAD.

 6              IS THIS ALREADY IN EVIDENCE?  IT IS,

 7    OKAY.

 8              SO I'M JUST ASKING YOU, DID YOU ACTUALLY

 9    HAND ONE OF THESE OUT, AN ACTUAL ONE?

10    A    NO, WE DID NOT HAND THEM A PHYSICAL DEVICE.

11    Q    OR HAND THEM A, A -- THE SAMSUNG TABLET

12    EITHER; CORRECT?  YOU DIDN'T HAND THEM THAT?

13    A    THAT'S CORRECT.  WE DID NOT HAND THEM THE

14    SAMSUNG TABLETS, EITHER.

15    Q    NOW, IF WE COULD LOOK AT THE VIDEO YOU SHOWED

16    THEM, THE 24.5, COULD WE PLAY THAT?

17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18    OPEN COURT OFF THE RECORD.)

19    BY MR. PRICE:

20    Q    THAT WAS THE FULL VIDEO THAT YOU SHOWED THEM;

21    RIGHT?

22    A    THAT'S CORRECT.

23    Q    OKAY.  NOW, WAS THERE ANY BUDGET LIMITATION

24    THAT YOU HAD TO STOP THE VIDEO THERE?

25    A    WELL, TWO COMMENTS.  ONE, THE -- NO, I DIDN'T
```

1    KNOW OF ANY SPECIFIC ONE.  THE IDEA WAS TO

2    REPLICATE A REASONABLE POST-SALE ENVIRONMENT

3    INTERACTING WITH THE DEVICE.

4         BUT TWO, AS I WAS COMMENTING IN THESE

5    KINDS OF STUDIES, WE ALSO LET THE RESPONDENTS VIEW

6    THE VIDEO TWICE.

7    Q    OKAY.

8    A    SO THEY SAW IT ONCE, THEN THEY SAW IT AGAIN,

9    AND THEN THEY ANSWERED THE QUESTIONS.

10   Q    I'M JUST WONDERING, YOU'VE BEEN IN CAFES OR

11   PLACES WHERE YOU'VE SEEN PEOPLE, FOR EXAMPLE, WITH

12   APPLE COMPUTERS; RIGHT?

13   A    YES.

14   Q    AND YOU'VE SEEN, FOR EXAMPLE, ON APPLE

15   COMPUTERS THAT THEY HAVE THAT BIG NEON APPLE AT THE

16   TOP OF THE COMPUTER?  YOU CAN SEE THAT PRETTY

17   EASILY WHEN YOU'RE LOOKING AT SOMEBODY WITH THEIR

18   APPLE COMPUTER; RIGHT?

19   A    MAYBE.  IT DEPENDS ON THE POINT OF VIEW THAT

20   YOU HAVE AS YOU OBSERVE THE PERSON USING THEIR

21   COMPUTER.

22   Q    IT'S ACTUALLY BACK LIT IN THE COMPUTERS;

23   RIGHT?

24   A    I'M NOT COMPLETELY CERTAIN, BUT PART OF AN

25   APPLE COMPUTER -- ARE YOU TALKING ABOUT THE ONE

1707

```
 1    THAT'S ON THE TOP OF IT WHEN IT'S CLOSED SO THAT

 2    WHEN IT'S OPEN, YOU WOULD NOT SEE IT?

 3    Q    WHEN IT'S -- WHEN AN APPLE COMPUTER IS OPEN,

 4    YOU WOULDN'T SEE THE BIG NEON APPLE ON IT?

 5    A    IF YOU'RE LOOKING -- I'M MAYBE

 6    MISUNDERSTANDING WHAT YOU'RE ASKING ME.

 7          BUT IF I HAVE THE COMPUTER, I OPEN IT,

 8    AND I'M OBSERVING OVER THE SHOULDER, I DON'T SEE

 9    THE NEON DEVICE THAT'S ON THE TOP.  I BELIEVE

10    THAT'S WHAT YOU'RE ASKING ME.

11    Q    AH, I SEE.  AND HERE, I GUESS, IS THE PROBLEM.

12          SO LET ME ASK YOU THIS:  SO WHY DIDN'T

13    YOU, YOU KNOW, IN YOUR VIDEO, JUST RUN IT A LITTLE

14    BIT LONGER AND HAVE THE PERSON WALK AROUND SO THAT

15    THE PERSON YOU'RE STUDYING COULD SEE THE BACK OF

16    THE DEVICE?

17    A    THE WAY WE CREATED THE STIMULI WAS TO TEST THE

18    ALLEGEDLY INFRINGING CONDITIONS THAT WERE OUTLINED

19    IN THE COMPLAINT.

20          AND IT WAS MY UNDERSTANDING, AT THE TIME

21    I DESIGNED THIS STUDY, THAT THE BACK OF THESE

22    DEVICES WAS NOT AT ISSUE, THAT IT WAS THE FRONT AND

23    THE SIDE VIEWS.

24          SO WHEN WE SET UP THE VIDEOS, WE SET THEM

25    UP TO SHOW A REAL PRODUCT THAT'S IN THE REAL
```

1     MARKETPLACE WHERE YOU WOULD SEE A SIDE VIEW AND A

2     FRONT VIEW OF THE PRODUCT.

3             SO THAT'S WHY WE DID NOT SHOW THE BACK.

4     Q    OKAY.  SO YOU WERE TOLD THAT IF THE PRODUCT

5     HAD SOMETHING ON THE BACK WHICH WOULD TELL ANY

6     CONSUMER THAT IT'S AN APPLE OR A SAMSUNG, THAT YOU

7     WERE TO IGNORE THAT AND NOT TEST IT?  THAT WAS YOUR

8     UNDERSTANDING AS GIVEN TO YOU BY APPLE'S COUNSEL?

9     A    IT WAS MY UNDERSTANDING THAT THE FRONT OF THE

10    DEVICE AND THE SIDE VIEW OF THE DEVICE WERE PART OF

11    THE ALLEGED INFRINGEMENT AND THE BACK WAS NOT.

12    Q    BUT DON'T YOU UNDERSTAND THAT TO SHOW

13    CONFUSION, YOU LOOK AT THE PRODUCT AND NOT JUST

14    WHAT THE ALLEGED TRADE DRESS IS?

15    A    NO, I DON'T AGREE WITH THE WAY YOU'VE STATED

16    THAT.

17    Q    OKAY.  SO IF THAT ACTUALLY IS THE TEST, THAT

18    IS, THAT YOU'RE SUPPOSED TO LOOK TO SEE WHETHER THE

19    PRODUCT AS SEEN BY A CONSUMER WOULD CONFUSE THEM,

20    IF THAT'S THE TEST, YOU DIDN'T TEST FOR THAT, DID

21    YOU?

22    A    NO.  IN FACT, I DID TEST FOR THAT.

23    Q    WELL, YOU SAID YOU DIDN'T TEST, FOR EXAMPLE,

24    IF THE CONSUMER JUST WALKS A LITTLE FURTHER AND SAW

25    THE PERSON LOOKING AT -- THIS IS EXHIBIT 1004 LIKE

```
 1    THIS -- YOU DIDN'T TEST WHETHER SEEING THIS BIG
 2    APPLE HERE WOULD LEAD THEM TO THINK IT WAS AN
 3    APPLE?
 4    A    NO, I DID NOT -- WELL, THERE'S TWO ISSUES.
 5    ONE, I DID NOT TEST APPLE DEVICES.  I TESTED
 6    SAMSUNG DEVICES.
 7            BUT NO, WE DID NOT SHOW ALL VIEWS OF THE
 8    PRODUCT.  WE SHOWED VIEWS THAT WOULD REPRESENT
 9    TYPICAL POST-SALE OBSERVATIONS OF THESE PRODUCTS
10    BEING USED IN THE MARKETPLACE, AND THOSE POST-SALE
11    VIEWS WERE DESIGNED TO REPRESENT THE ALLEGEDLY
12    INFRINGING TRADE DRESS, NOT THE WHOLE DEVICE.
13    Q    LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT
14    1038 FOR IDENTIFICATION.
15            APPARENTLY THIS IS IN EVIDENCE.
16            SO THIS IS A -- THE SAMSUNG TABLET -- AND
17    BY THE WAY, GIVEN WHAT YOU KNOW ABOUT THE MARKET,
18    IF SOMEONE SEES A TABLET THAT DOESN'T HAVE THAT BIG
19    APPLE ON IT, THEY KNOW IT'S NOT AN APPLE; RIGHT?
20    A    I DON'T KNOW THAT SPECIFICALLY.
21    Q    BUT IF THEY WERE LOOKING AT THE SAMSUNG TABLET
22    AND THEY WALK AROUND AND SAW IT, YOU KNOW, YOU CAN
23    SEE IT SAYS SAMSUNG.  IT DOESN'T SAY APPLE.  IT
24    SAYS SAMSUNG; RIGHT?
25    A    MY EYES AREN'T GOOD ENOUGH TO SEE THAT FROM
```

1    HERE.

2    Q    OKAY.  LET'S SAY IT'S AS CLOSE AS THE VIDEO

3    WOULD HAVE BEEN, SAY.

4         OKAY.  SO LOOKING AT IT HERE, YOU WALK

5    AROUND AND, INSTEAD OF STOPPING THE VIDEO HERE, YOU

6    ACTUALLY CONTINUE IT JUST A FEW SECONDS TO SEE

7    WHETHER OR NOT THE PRODUCT IS ACTUALLY CONFUSING.

8         DO YOU THINK YOU'D GET A DIFFERENT

9    RESULT?

10   A    I DON'T KNOW.  I DIDN'T TEST THAT.  BUT I

11   DIDN'T ALSO UNDERSTAND THAT TO BE THE ALLEGED

12   INFRINGEMENT HERE.

13   Q    OKAY.  SO IF -- SO YOU DESIGNED YOUR STUDY

14   BASED UPON WHAT YOU WERE TOLD BY APPLE'S COUNSEL?

15   A    AND WHAT I UNDERSTOOD FROM READING THE

16   COMPLAINT.

17   Q    OKAY.  AND SO YOUR STUDY WAS DESIGNED TO

18   IGNORE THE ENTIRE PRODUCT AND JUST SHOW THE BACK?

19   I MEAN THE FRONT AND SIDE?

20   A    YES.  MY STUDY WAS DESIGNED TO CREATE A

21   POST-SALE CONFUSION-LIKE INTERACTION FOR A CONSUMER

22   AND SHOW THAT IN A VERSION IN WHICH THEY WOULD SEE

23   THE FRONT AND THE SIDE OF THE DEVICE.  THAT'S WHAT

24   I DID, YES.

25   Q    OKAY.  AS A MATTER OF FACT, AT THE TIME YOU

1    DID THE STUDY, YOU DIDN'T EVEN KNOW THAT SAMSUNG'S

2    NAME WAS ON THE BACK BECAUSE YOU HAD NEVER SEEN ONE

3    OF THESE IN PERSON; RIGHT?

4    A    I KNEW THAT SAMSUNG WAS ON THE FRONT.  BUT I

5    DIDN'T KNOW FOR CERTAIN IF THE SAMSUNG WAS ON THE

6    BACK OF ALL THE DEVICES.

7    Q    AND NOW YOU KNOW -- YOU CALLED THESE BRANDED

8    VERSUS UNBRANDED PHONES, TABLETS.

9         YOU KNOW NOW THAT ALL THE SAMSUNG

10   TABLETS, IN FACT, ARE BRANDED BECAUSE THEY HAVE THE

11   SAMSUNG ON THE BACK; RIGHT?

12   A    I'LL UNDERSTAND THAT FROM WHAT YOU'VE JUST

13   TOLD ME.  I DIDN'T KNOW THAT FOR SURE.

14   Q    OKAY.  AND NOW LET'S TALK ABOUT THE CONTROL

15   YOU USED.

16        WHAT YOU USED WAS THE NOOK; RIGHT?

17   A    THE NOOK COLOR.

18   Q    OKAY.  THE NOOK COLOR.  AND IF WE CAN SHOW

19   3900.107.

20        SO THIS IS AN IPAD AND THIS IS A NOOK.

21        NOW, THIS IS THE NUMBER YOU SUBTRACT FROM

22   THE ASSOCIATION YOU GOT FROM SHOWING JUST THE FRONT

23   AND SIDE OF THE SAMSUNG TABLET.

24        AND YOU SUBTRACT THE NUMBER OF PEOPLE WHO

25   SAY THIS IS AN APPLE IPAD; RIGHT?

1    A    YES.  I THINK AS YOU'RE DESCRIBING IT, THAT'S

2    CORRECT.

3    Q    OKAY.  AND THIS HAS THIS LITTLE SCREEN THING

4    HERE WHICH SCREAMS "I'M NOT AN IPAD," RIGHT?  WOULD

5    YOU AGREE?

6    A    NO.

7    Q    OKAY.  AND IT HAS -- IT ACTUALLY HAS THE NOOK

8    TRADEMARK ON IT AND THE NOOK BUTTON THERE; RIGHT?

9    A    IT HAS THOSE THINGS ON THERE, YES, THAT'S

10   CORRECT.

11   Q    AND THE NOOK IS AN E-READER; RIGHT?  IT'S

12   BASICALLY KNOWN AS AN E-READER FOR READING BOOKS

13   ON?

14   A    THE NOOK COLOR, WHICH IS THE DEVICE WE USED IN

15   OUR STUDY, IS MARKETED AS A TABLET AND IT HAS THE

16   SAME BASIC FUNCTIONALITY AS THE IPAD AND THE

17   GALAXY.

18   Q    LET ME SHOW YOU EXHIBIT 2526 FOR

19   IDENTIFICATION.

20        THIS IS THE NOOK TABLET THAT WAS USED IN

21   YOUR STUDY, OR ONE JUST LIKE IT -- I MEAN NOOK

22   READER, COLOR; RIGHT?

23   A    I'LL UNDERSTAND THAT TO BE JUST LIKE IT.  I

24   DON'T THINK THAT'S THE ONE WE ACTUALLY USED.

25   Q    OKAY.  AND THERE WERE OTHER CONTROLS YOU COULD

1713

```
 1    HAVE USED?  YOU COULD HAVE USED A MOTOROLA.  YOU
 2    COULD HAVE USED AN LG TABLET.  YOU COULD HAVE USED
 3    SOMETHING THAT LOOKED A LOT CLOSER TO THE IPAD THAN
 4    THAT?
 5    A    NO, I DON'T AGREE WITH THAT.
 6    Q    OKAY.  SO HAVE YOU SEEN OTHER TABLETS IN THE
 7    MARKET AND WHAT THEY LOOK LIKE?
 8    A    YES.
 9    Q    OKAY.  AND YOU DON'T AGREE THAT THE MOTOROLA
10    AND LG, WHICH WE'VE SEEN ALREADY HERE IN COURT AND
11    PASSED AROUND, YOU DON'T THINK THEY LOOK MORE LIKE
12    THE IPAD THAN THIS?
13    A    YES, I THINK, IN FACT, THEY DO LOOK MORE LIKE
14    THE IPAD IN THE SENSE THAT THEY HAVE MORE ELEMENTS
15    OF THE ALLEGEDLY INFRINGING TRADE DRESS.
16              SO IN CHOOSING THE CONTROL, THE IDEA IS
17    TO GET A PRODUCT THAT'S IN THE SAME MARKET THAT HAS
18    THE SAME BASIC FUNCTIONALITY, BUT DOES NOT INCLUDE
19    THE ALLEGEDLY INFRINGING TRADE DRESS.
20    Q    WELL, ACTUALLY -- SO ARE YOU SAYING THAT APPLE
21    IS CONTENDING THAT MOTOROLA AND LG, THAT THOSE
22    TABLETS INFRINGE APPLE'S TRADE DRESS AND THAT'S WHY
23    YOU DIDN'T USE THEM?
24              MR. JACOBS:  YOUR HONOR, THIS IS ASKING
25    FOR A LEGAL CONCLUSION FROM THIS WITNESS AND LACKS
```

```
 1    FOUNDATION.

 2              THE COURT:  SUSTAINED.

 3    BY MR. PRICE:

 4    Q    I'M ASKING YOUR UNDERSTANDING AS TO WHY YOU

 5    DIDN'T USE THEM.  OKAY?

 6              IS IT YOUR UNDERSTANDING, WHICH WOULD BE

 7    THE BASIS OF YOU NOT USING THE MOTOROLA AND THE LG,

 8    IS IT YOUR UNDERSTANDING THAT YOU COULDN'T USE THEM

 9    BECAUSE APPLE IS SAYING THAT THOSE INFRINGE ITS

10    TRADE DRESS?

11              MR. JACOBS:  YOUR HONOR, YOU JUST

12    SUSTAINED AN OBJECTION TO THIS SAME QUESTION.

13              THE COURT:  SUSTAINED.

14    BY MR. PRICE:

15    Q    IF WE CAN LOOK BACK AT THAT 30.5, I THINK IT

16    WAS 30.5, 24.5.  NO, I'M SORRY.  31.3.  THIS IS

17    YOUR STUDY.  I BELIEVE IT'S 31.3.

18              SO IS THIS THE STUDY -- THIS IS YOUR

19    RESULTS SHOWING THAT VIDEO, SHOWING THE NOOK, AND

20    YOU GOT 6 PERCENT IS POST-CONFUSION WITH THE

21    BRANDED, 19, AND YOU AVERAGED THOSE TO GET 12.

22              NOW, IF YOU REALLY WANTED TO COME UP WITH

23    AN AVERAGE THAT MEANT ANYTHING AS FAR AS THE REAL

24    WORLD, YOU'D HAVE TO WEIGHT THOSE NUMBERS; RIGHT?

25    A    WELL, I THINK I UNDERSTAND YOUR QUESTION, AND
```

307 15

```
1    THE -- FIRST OF ALL, THE 12 WAS NOT -- IT ISN'T --
2    I DIDN'T AVERAGE THE TWO.  I JUST SUMMED EVERYTHING
3    ACROSS THE TWO CONDITIONS AND THEY COME TO 12
4    PERCENT.
5    Q    SO LET ME STOP YOU THERE.
6         SO THIS IS NOT AN OPINION YOU HAVE AS TO
7    NET CONFUSION RATE IN THE MARKET; RIGHT?
8    A    NO.  I BELIEVE THE CONFUSION -- THE OPINION I
9    OFFERED IN MY REPORT IS THAT IT'S SOMEWHERE BETWEEN
10   6 PERCENT AND 19 PERCENT WERE ACTUALLY CONFUSED BY
11   MY TEST.
12   Q    AND THE 19 HERE, YOU DON'T KNOW HOW MANY,
13   QUOTE, "UNBRANDED" TABLETS WERE IN THE MARKET
14   COMPARED TO THE BRANDED ONES; RIGHT?
15   A    WELL, TWO COMMENTS.  ONE --
16   Q    CAN YOU ANSWER YES OR NO?  BECAUSE I'M ON THE
17   CLOCK.
18   A    I'M SORRY.  I UNDERSTAND.
19   Q    DO YOU KNOW HOW MANY --
20   A    ASK ME THE QUESTION AGAIN.
21   Q    DO YOU KNOW IN THE MARKETPLACE HOW MANY
22   UNBRANDED VERSUS BRANDED THERE WERE?
23   A    NO, I DON'T KNOW HOW MANY UNBRANDED VERSUS
24   BRANDED THERE WERE.
25   Q    NOW LET'S TALK ABOUT YOUR PHONE ASSOCIATION
```

1716

```
 1    SURVEY.

 2              AND, AGAIN, THIS IS NOT A SURVEY THAT

 3    SHOWS CONSUMER CONFUSION AT ALL; CORRECT?

 4    A    LET ME JUST MENTALLY SHIFT GEARS.

 5              SO YOU'RE TALKING ABOUT NOW MY PHONE

 6    ASSOCIATION STUDY?

 7    Q    YES.

 8    A    YES, THAT STUDY WAS NOT DESIGNED TO MEASURE

 9    LIKELIHOOD OF CONFUSION.  THAT STUDY WAS DESIGNED

10    TO MEASURE ASSOCIATION.

11    Q    OKAY.  SO IF WE CAN LOOK AT YOUR STUDY AND

12    LOOK AT 3900.153, THIS IS THE QUESTION YOU ASKED.

13    3900.153.  YOU SHOWED THE PICTURE OF ONE OF THE

14    SAMSUNG PHONES AND SAID, "DOES THE LOOK AND DESIGN

15    OF THIS PHONE BRING TO MIND OR CREATE ANY

16    ASSOCIATION FOR YOU WITH ANY OTHER PHONES?"

17              DO YOU SEE THAT?

18    A    YES.

19    Q    IN THE DEMONSTRATIVE YOU SHOWED THE JURY,

20    WHICH WAS THE QUESTION YOU ASKED, YOU DIDN'T

21    UNDERLINE "OTHER," BUT "OTHER" WAS UNDERLINED IN

22    THE ACTUAL SURVEY?

23    A    YES.

24    Q    THE PEOPLE WHO READ THIS KNEW THEY WERE

25    SUPPOSED TO THINK OF SOME OTHER PHONE FOR
```

1   ASSOCIATION; RIGHT?

2   A    IT SUGGESTS THAT -- WE'RE ASKING THEM, FIRST,

3   YES, NO, OR DON'T KNOW, DOES IT BRING TO MIND ANY

4   ASSOCIATION?  AT THIS STAGE WE'RE NOT TELLING THEM

5   THERE IS AN ASSOCIATION.

6   Q    NOW, I WANT TO ASK YOU, IF SOMEONE ASKED YOU,

7   FOR EXAMPLE, SHOWED YOU A PICTURE OF A COKE AND

8   SAID, "DOES THIS BRING TO MIND OR CREATE ANY

9   ASSOCIATION WITH ANY OTHER SOFT DRINK," YOU'D THINK

10  A LOT OF PEOPLE MIGHT SAY PEPSI; RIGHT?  BECAUSE

11  THEY'RE THE TWO BIGGEST PLAYERS IN THE MARKET?

12  A    I HAVEN'T DONE THAT STUDY, SO I WOULDN'T HAVE

13  AN OPINION ON HOW THAT MIGHT TURN OUT.

14  Q    WELL, IF SOMEONE ASKED YOU, YOU KNOW, SHOWED A

15  PICTURE OF A BURGER KING, YOU KNOW, RESTAURANT AND

16  SAID, "DOES THE LOOK AND DESIGN OF THIS RESTAURANT

17  BRING TO MIND OR CREATE ANY ASSOCIATION WITH YOU OF

18  ANY OTHER RESTAURANT," THEY'RE QUITE LIKELY TO SAY

19  MCDONALD'S; RIGHT?

20  A    AGAIN, I HAVEN'T DONE THAT SURVEY.  I DON'T

21  KNOW THAT TO BE THE CASE.

22  Q    YOU DON'T KNOW THAT FROM COMMON SENSE?

23  A    I DON'T KNOW THAT FROM COMMON SENSE AS YOU'VE

24  DESCRIBED IT.

25  Q    WELL, IF YOU DID FIND THAT, HYPOTHETICALLY,

1    HYPOTHETICALLY YOU DID A SURVEY, "DOES THIS BURGER

2    KING RESTAURANT BRING TO MIND ANY OTHER FAST FOOD

3    RESTAURANT" AND THEY SAID MCDONALD'S, YOU CERTAINLY

4    COULDN'T CONCLUDE FROM THAT THAT THE ASSOCIATION

5    WAS BECAUSE THE DESIGNS ARE SIMILAR; RIGHT?

6    A    AGAIN, YOU'RE ASKING ME ABOUT A HYPOTHETICAL

7    STUDY THAT I HAVEN'T CONDUCTED, SO --

8    Q    WELL, IN THIS CASE, YOU UNDERSTAND THAT

9    SAMSUNG AND APPLE ARE THE TWO LARGEST COMPETITORS

10   IN THIS MARKET; RIGHT?

11   A    I UNDERSTAND THEY'RE TWO LARGE COMPETITORS IN

12   THIS MARKET.

13   Q    AND YOU UNDERSTAND FROM KNOWING THE MARKET

14   THAT IF SOMEONE SHOWED YOU A SAMSUNG PHONE AND SAID

15   "WHAT OTHER PHONE DOES THIS REMIND YOU OF," PEOPLE

16   ARE LIKELY TO SAY APPLE, AND VICE-VERSA, BECAUSE

17   THEY'RE THE TWO BIGGIES, JUST LIKE BURGER KING AND

18   MCDONALD'S AND COKE AND PEPSI?

19   A    PERHAPS.

20         BUT TO THE EXTENT THAT THAT'S TRUE,

21   THAT'S ALSO HAPPENING IN THE CONTROL.  SO IF THIS

22   WAS CREATING A DEMAND CHARACTERISTIC AS YOU

23   SUGGEST, THEN IT WOULD BE NETTED OUT IN THE CONTROL

24   CONDITION.

25   Q    SO NOW LET'S TALK ABOUT THE CONTROL.  THE

```
 1    CONTROL -- I THINK IF WE CAN SHOW 3900.129.

 2             IN SELECTING A CONTROL, YOU COULD HAVE

 3    SELECTED FROM A NUMBER OF PHONES; RIGHT?

 4    A    YES.

 5    Q    AND YOU INSTEAD -- WELL, OF THE PHONES, YOU

 6    SELECTED A BLACKBERRY?

 7    A    YES, A BLACKBERRY STORM.

 8    Q    AND IF WE COULD LOOK AT EXHIBIT 24, I GUESS

 9    PAGE 4.  AND AGAIN, A BLACKBERRY, YOU SAID THIS

10    CONTROL, THE BLACKBERRY CONTROL FOR THE FACT THAT

11    SAMSUNG AND APPLE JUST MIGHT BE NAMES ON THE TIPS

12    OF YOUR TONGUE.

13             IF SOMEONE SHOWED YOU A PICTURE OF A CAN

14    OF MOXIE, DO YOU THINK PEOPLE WOULD ASSOCIATE THAT

15    WITH COKE OR PEPSI?

16    A    A CAN OF WHAT?

17    Q    MOXIE.  YOU DON'T KNOW MOXIE?

18    A    I DON'T KNOW MOXIE.

19    Q    OKAY.  WELL, JUST AS WITH THE BLACKBERRY --

20    AND BY THE WAY, IN THE REAL PICTURE, YOU CAN SEE

21    BLACKBERRY ACROSS THE TOP HERE; RIGHT?

22    A    YES.  IN ALL OF THE PHONES, THE PICTURES ARE

23    THE ACTUAL PRODUCTS THAT ARE IN THE MARKETPLACE AS

24    THEY WOULD LOOK.

25    Q    AND BLACKBERRY AND RIM ARE, ARE PRETTY MUCH --
```

```
1    AT THE TIME YOU TOOK THIS SURVEY, THEY'RE NOT ON

2    THE TONGUES OF MANY PEOPLE THINKING ABOUT

3    SMARTPHONES?  THEY ARE HAVING SERIOUS TROUBLE AND

4    ALMOST DROPPING OUT OF THE MARKET; RIGHT?

5    A    I DON'T HAVE THAT UNDERSTANDING DURING THE

6    PERIOD OF TIME OF THE SURVEY.

7    Q    YOU DON'T HAVE IT ONE WAY OR THE OTHER?

8    A    THAT'S CORRECT.

9    Q    AND IS IT JUST A COINCIDENCE THAT BOTH YOU AND

10   DR. PORET USED A NOOK AND THE BLACKBERRY STORM FOR

11   YOUR CONTROLS?  DID YOU GUYS GET TOGETHER AND TALK

12   ABOUT THIS?

13   A    NO.  I HAVE NO KNOWLEDGE OF MR. PORET'S WORK

14   BEFORE I CAME TO TRIAL AND HEARD ABOUT IT OTHER

15   THAN I KNEW HE HAD DONE SURVEYS.

16   Q    DID YOU -- WERE YOU GIVEN THESE PHONES AND THE

17   BLACKBERRY AND THE NOOK TO USE AS THE CONTROLS?

18   A    NO.  I SELECTED THESE PHONES AND TABLETS WITH

19   MY STAFF FROM OUR REVIEW OF THE PRODUCTS THAT WERE

20   AVAILABLE.

21   Q    SO YOU INTENTIONALLY SELECTED THE NOOK AS THE

22   TABLET TO USE AS A CONTROL; RIGHT?

23   A    YES.

24   Q    YOU'RE SAYING THAT?

25   A    YES.
```

1021

1    Q    AND YOU INTENTIONALLY SELECTED THE BLACKBERRY

2    TO USE AS THE CONTROL; RIGHT?

3    A    THE BLACKBERRY STORM.

4    Q    AND YOU INTENTIONALLY DECIDED, IN THOSE

5    VIDEOS, NOT TO SHOW THE COMPLETE PRODUCT, THE

6    SAMSUNG TABLET?  THAT WAS YOUR DECISION?

7    A    WELL, IT WAS MY DECISION BASED ON MY

8    UNDERSTANDING FROM THE COMPLAINT, THAT -- AND

9    DISCUSSION WITH COUNSEL, THAT THE FRONT AND THE

10   SIDE VIEWS WAS WHAT MATTERED IN THE TABLET SETTING.

11   Q    AND WITH RESPECT TO THE SAMSUNG PHONES, YOU

12   TESTED JUST TWO OF THE PHONES?

13   A    YES, I TESTED TWO OF THE, WHATEVER THE NUMBER

14   OF PHONES IS.

15   Q    SO, FOR EXAMPLE, YOU DIDN'T TEST THE PHONE

16   THAT MS. KARE SAID HAD A CHIN, THE DROID CHARGE?

17   A    NO, I DIDN'T TEST THAT SPECIFIC DEVICE.

18            MR. PRICE:  THANK YOU, YOUR HONOR.

19            THE COURT:  ALL RIGHT.  THE TIME IS

20   10:19.

21            MR. PRICE:  I'M SORRY.  I MEANT TO MOVE

22   IN THE NOKIA -- I MEAN THE NOOK.

23            MR. JACOBS:  YOUR HONOR, AGAIN, THAT IS

24   LISTED ON THE LIST OF DEMONSTRATIVES.

25            THE COURT:  IS THAT 2526?

```
 1                    THE CLERK:  I BELIEVE SO.

 2                    MR. PRICE:  YES, 2526.  IT WOULD BE FOR

 3      THE SAME PURPOSE.

 4                    THE COURT:  ALL RIGHT.  IT'S ADMITTED

 5      WITH A LIMITING INSTRUCTION THAT IT'S ADMITTED

 6      SOLELY TO ASSESS MR. VAN LIERE'S SURVEY.  IT'S

 7      ADMITTED.

 8                    (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 9                    2526, HAVING BEEN PREVIOUSLY MARKED FOR

10                    IDENTIFICATION, WAS ADMITTED INTO

11                    EVIDENCE.)

12                    THE COURT:  ALL RIGHT.  THE TIME IS NOW

13      10:20.

14                    DO YOU HAVE ANY REDIRECT?

15                    MR. JACOBS:  NO, YOUR HONOR.

16                    THE COURT:  ALL RIGHT.  MAY THIS WITNESS

17      BE EXCUSED?

18                    MR. JACOBS:  SUBJECT TO RECALL.

19                    THE COURT:  ALL RIGHT.  YOU ARE EXCUSED

20      SUBJECT TO RECALL.  YOU MAY LEAVE.

21                    THE WITNESS:  THANK YOU, YOUR HONOR.

22                    THE COURT:  ALL RIGHT.  CALL YOUR NEXT

23      WITNESS, PLEASE.

24                    MR. JACOBS:  THE NEXT WITNESS IS

25      DR. RAVIN BALAKRISHNAN.
```

```
 1              THE CLERK:  RAISE YOUR RIGHT HAND,

 2     PLEASE.

 3                    RAVIN BALAKRISHNAN,

 4     BEING CALLED AS A WITNESS ON BEHALF OF THE

 5     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 6     EXAMINED AND TESTIFIED AS FOLLOWS:

 7              THE WITNESS:  I DO.

 8              THE CLERK:  WOULD YOU HAVE A SEAT,

 9     PLEASE.

10              THE WITNESS:  THANK YOU.

11              MR. JACOBS:  YOUR HONOR, LET'S JUST TAKE

12     A MOMENT TO GET SETTLED WITH THE BINDERS.

13              THE COURT:  THAT'S FINE.

14              (PAUSE IN PROCEEDINGS.)

15              THE CLERK:  COULD YOU STATE YOUR NAME,

16     PLEASE, AND SPELL IT.

17              THE WITNESS:  MY NAME IS RAVIN

18     BALAKRISHNAN.  THAT IS SPELLED R-A-V-I-N, LAST NAME

19     IS SPELLED B-A-L-A-K-R-I-S-H-N-A-N.

20              THE CLERK:  IT'S 10:22.  GO AHEAD.

21                    DIRECT EXAMINATION

22     BY MR. JACOBS:

23     Q   DR. BALAKRISHNAN, THE JURY HAS BEEN HEARING

24     ABOUT TRADEMARK SURVEYS.  ARE YOU HERE TO TALK

25     ABOUT TRADEMARK SURVEYS?
```

```
 1      A     NO, I'M NOT.

 2      Q     WHAT ARE YOU HERE TO TALK ABOUT?

 3      A     I'M HERE TO TALK ABOUT THE UTILITY PATENT

 4      KNOWN AS THE '381 PATENT.

 5      Q     COULD YOU INTRODUCE YOURSELF TO THE JURY?

 6      THEY'VE HEARD YOUR NAME, BUT CAN YOU DESCRIBE FOR

 7      THEM WHAT YOU DO.

 8      A     SURE.  I'M A PROFESSOR THE COMPUTER SCIENCE AT

 9      THE DEPARTMENT OF COMPUTER SCIENCE AT THE

10      UNIVERSITY OF TORONTO, WHERE I ALSO HOLD A CANADA

11      RESEARCH CHAIR IN HUMAN CENTER INTERFACES, AND I

12      ALSO CODIRECT A USER INTERFACES AND GRAPHICS

13      LABORATORY AT THE UNIVERSITY OF TORONTO.

14      Q     TELL THE JURY A LITTLE BIT ABOUT YOUR

15      TRAINING.

16      A     I HOLD THREE DEGREES IN COMPUTER SCIENCE,

17      INCLUDING A PH.D. IN COMPUTER SCIENCE, GRADUATED IN

18      2001 FROM THE UNIVERSITY OF TORONTO.

19            AND I'VE SINCE THEN BEEN A PROFESSOR AT

20      THE UNIVERSITY SINCE 2001, SO THAT WOULD MAKE IT

21      ALMOST 11 YEARS AT THIS POINT.

22      Q     TELL THE JURY -- ACTUALLY, PULL THE MICROPHONE

23      A LITTLE BIT CLOSER TO YOU, AND THEN TELL THE JURY

24      JUST A LITTLE BIT ABOUT THE RESEARCH THAT YOU DO.

25      A     MY RESEARCH IS BROADLY IN THE FIELD OF
```

1    DOCUMENT.

2    BY MR. JACOBS:

3    Q    AND THAT WAS PDX 27.24.  WHAT'S THE NEXT

4    PROBLEM THAT THE '381 PATENT WAS DESIGNED TO SOLVE?

5    A    THE SECOND PROBLEM IS KNOWN IN THE FIELD AS A

6    DESERT FOG PROBLEM.

7              SO THIS IS A BIT OF THE CONVERSE OF THE

8    FROZEN SCREEN PROBLEM IN THAT ONE COULD MANIPULATE

9    THE IMAGE SUCH THAT IT GOES OFF, COMPLETELY OFF THE

10   SCREEN AND YOU'RE LEFT WITH A BLANK SCREEN, WHAT WE

11   WOULD CALL THE DESERT FOG, AND YOU HAVE NO IDEA

12   WHERE THE SCREEN IS RELATIVE TO WHERE THE

13   PHOTOGRAPH IS OUTSIDE THE SCREEN.

14             SO I PREPARED A LITTLE ANIMATION FOR THAT

15   AS WELL.

16             AS YOU CAN SEE, THE PHOTOGRAPH IS TAKEN

17   OFF THE SCREEN, AND NOW THE USER IS MANIPULATING

18   THE DESERT FOG AND IT'S UNCLEAR, ESSENTIALLY THEY

19   PAUSE FOR A MOMENT, HOW TO BRING THAT PHOTOGRAPH

20   BACK ON TO THE SCREEN.

21             SO THESE ARE OF THE TWO KEY PROBLEMS THAT

22   ARE FOUND IN THIS KIND OF NAVIGATION INTERFACE THAT

23   THE '381 PATENT IS FOCUSSED ON SOLVING.

24   Q    AND THAT WAS PDX 27.25.  HOW DOES THE '381

25   PATENT SOLVE THESE TWO PROBLEM PROBLEMS, FROZEN

```
 1    SCREEN AND DESERT FOG?

 2    A    THE '381 PATENT SOLVES BOTH THESE PROBLEMS IN

 3    ONE FELL SWOOP.  ESSENTIALLY, A, IT SOLVES THE

 4    DESERT FOG PROBLEM BY NOT ALLOWING THE PHOTOGRAPH

 5    TO GO OFF THE SCREEN COMPLETELY.

 6              AND THE FROZEN SCREEN PROBLEM IT SOLVES

 7    BY WHEN THE DOCUMENT REACHES THE EDGE, IT ALLOWS A

 8    CERTAIN AMOUNT OF MOVEMENT BEYOND THE EDGE, SHOWS

 9    AN AREA BEYOND THE EDGE, SO THE USER KNOWS, I'VE

10    REACHED THE EDGE OF THE DOCUMENT, AND THEN WHEN

11    THEY RELEASE THEIR FINGER, IT BOUNCES BACK.

12              IT GIVES NICE FEEDBACK SAYING "YOU'VE

13    REACHED THE EDGE.  THE SYSTEM IS STILL ALIVE.  IT'S

14    NOT FROZEN."

15              I PREPARED AN ANIMATION TO ILLUSTRATE

16    THAT AS WELL.

17              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

18    OPEN COURT OFF THE RECORD.)

19              THE WITNESS:  AS YOU CAN SEE, YOU'VE

20    REACHED THE EDGE OF THE DOCUMENT.  THE BLACK AREA

21    BELOW IS SHOWN.

22              CAN WE SHOW THAT AGAIN IF YOU DON'T MIND?

23              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

24    OPEN COURT OFF THE RECORD.)

25              THE WITNESS:  AND WHEN THE USER RELEASES
```

1740

```
 1    THEIR FINGER, IT BOUNCES BACK.  SO IT GIVES THE

 2    ILLUSION OF A VERY LIVELY SYSTEM THAT'S NOT FROZEN

 3    BECAUSE THE USER KNOWS WHERE THE EDGES ARE AND IT

 4    DOESN'T DISAPPEAR IN THE DESERT FOG.

 5    BY MR. JACOBS:

 6    Q    WERE THESE PROBLEMS RECOGNIZED IN THE FIELD

 7    BEFORE THE '381 PATENT?

 8    A    THE TWO PROBLEMS WERE WELL RECOGNIZED IN THE

 9    FIELD.  IN FACT, PAPERS WERE PUBLISHED ABOUT IT

10    YEARS BACK.

11    Q    DID ANYONE SOLVE IT BEFORE APPLE?

12    A    NO, IT DID NOT.

13    Q    NOW, DOES THE IPHONE IMPLEMENT CLAIM 19 OF THE

14    '381 PATENT?

15    A    YES, IT DOES.

16    Q    AND HOW DO YOU KNOW THAT?

17    A    I INVESTIGATED THE DIFFERENT IPHONE DEVICES

18    AND TRIED THE FUNCTIONALITY ON THE DIFFERENT

19    DEVICES.

20              I ALSO LOOKED AT THE IPHONE SOURCE CODE

21    TO UNDERSTAND HOW IT'S IMPLEMENTED.

22    Q    SO LET'S LOOK AT 27.7, MR. LEE.

23    A    SO THIS IS A VIDEO OF THE FUNCTIONALITY BEING

24    SHOWED IN THE PHOTOS APPLICATION ON THE IPHONE 3GS.

25    THIS IS THE ACTUAL IPHONE, THE ACTUAL PERSON DOING
```

```
1    THE FUNCTIONALITY.

2              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

3    OPEN COURT OFF THE RECORD.)

4              THE WITNESS:  AS YOU CAN SEE, YOU MOVE TO

5    THE RIGHT, YOU GET TO THE EDGE, IT SHOWS BEYOND THE

6    EDGE, AND THEN IT BOUNCES BACK.

7    BY MR. JACOBS:

8    Q    LET'S SHOW THAT ONE MORE TIME, PLEASE.

9              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

10   OPEN COURT OFF THE RECORD.)

11             THE WITNESS:  THE USER IS DRAGGING, AN

12   AREA BEYOND THE EDGE IS SHOWN, AND THEN IT BOUNCES

13   BACK.

14   BY MR. JACOBS:

15   Q    LET'S TURN NOW TO SAMSUNG PRODUCTS AND YOUR

16   ANALYSIS OF HOW THEY -- WHETHER THEY INFRINGE CLAIM

17   19 OF THE '381 PATENT, AND LET'S START WITH THE

18   SAMSUNG GALAXY S II AT&T.

19             DOES IT INFRINGE CLAIM 19?

20   A    YES.  THE SAMSUNG GALAXY S II, AT&T VERSION,

21   INFRINGES CLAIM 19 OF THE '381 PATENT.

22   Q    NOW, YOU'VE LISTED HERE ON THE SLIDE THE

23   GALLERY APPLICATION.  WHAT'S THE GALLERY

24   APPLICATION?

25   A    THE GALLERY APPLICATION IN SAMSUNG'S PRODUCT
```

```
 1    IS ESSENTIALLY THE PHOTO MIGRATION AND VIEWING

 2    APPLICATION THAT ALLOWS YOU TO LOOK THROUGH A SET

 3    OF PHOTOGRAPHS.

 4    Q    SO LET'S LOOK AT THE GALLERY APPLICATION IN

 5    THE GALAXY S II.

 6              MR. LEE, COULD WE HAVE 27.9, PLEASE.

 7              WHAT ARE WE SEEING HERE,

 8    DR. BALAKRISHNAN?

 9    A    HERE WE'RE SEEING ON THE GALAXY S II, AT&T

10    VERSION, THE GALLERY APPLICATION.  WE CONTINUE TO

11    USE THE SAME PHOTOGRAPH WE USED IN THE EARLIER

12    EXAMPLES.

13              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

14    OPEN COURT OFF THE RECORD.)

15              THE WITNESS:  AND AS YOU CAN SEE, THE

16    SAME BOUNCE BACK FUNCTIONALITY AS WE'VE SEEN.

17              AND IF YOU CAN SHOW THAT ONE MORE TIME,

18    YOU CAN SEE THE USER IS DRAGGING THE DOCUMENT, IT

19    REACHES THE EDGE, THE AREA BEYOND THE EDGE IS

20    SHOWN, AND IT BOUNCES BACK WHEN THEY RELEASE THE

21    FINGER.  ESSENTIALLY IT'S THE SAME AS THE WAY THE

22    IPHONE WORKS.

23    BY MR. JACOBS:

24    Q    LET'S BREAK THE REQUIREMENTS OF CLAIM 19 DOWN

25    INTO ITS VARIOUS PARTS.
```

1743

```
1              COULD WE HAVE 27.10, MR. LEE.

2              SO THE FIRST PART OF CLAIM 19 DISCUSSES A

3    DEVICE WITH A TOUCHSCREEN DISPLAY, A PROCESSOR,

4    MEMORY, AND A PROGRAM FOR PERFORMING RUBBER BANDING

5    OF THE BOUNCE FUNCTION.

6              DO SAMSUNG'S PRODUCTS MEET THESE

7    ELEMENTS, REQUIREMENTS, OR LIMITATIONS AS THE

8    PATENT LAWYERS CALL THEM?

9    A    YES, THEY DO.

10   Q    SO LET'S GO TO 27.12.  AND CAN YOU JUST REVIEW

11   THIS ELEMENT, THIS FIRST ELEMENT OF CLAIM 19

12   BRIEFLY WITH THE JURY AND WHY YOU FIND IT PRESENT

13   IN THE SAMSUNG DEVICE?

14   A    SURE.  THIS FIRST ELEMENT ESSENTIALLY SAYS IT

15   HAS TO BE A COMPETING DEVICE WHICH HAS A

16   TOUCHSCREEN DISPLAY.  AND WHAT A TOUCHSCREEN

17   DISPLAY IS IS A TOUCH SENSOR THAT SENSES THE USER'S

18   TOUCH INPUTS INTEGRATED WITH A DISPLAY.

19              AND ALL THESE PHONES AND TABLETS CLEARLY

20   HAVE A TOUCH SENSOR INTEGRATED WITH THE DISPLAY.

21              IT ALSO HAS ONE OR MORE COMPUTING

22   PROCESSORS, WHICH MAKES ALL THE PROGRAMS RUN;

23   MEMORY TO INSTALL THOSE PROGRAMS AND DATA; AND ONE

24   OR MORE PROGRAMS THAT ACTUALLY GIVE YOU THE

25   FUNCTIONALITY THAT WE USE ON THESE DIFFERENT
```

1    DEVICES.

2    Q    CAN WE HAVE 27.14, MR. LEE.

3              NOW, THIS IS ELEMENT 2 OF THE CLAIM -- OF

4    CLAIM 19 OF THE '381 PATENT.  WHAT IS IT CALLING

5    FOR?

6    A    ELEMENT 2 SIMPLY SAYS IT HAS TO BE

7    INSTRUCTIONS OR COMPUTER CODE FOR DISPLAYING A

8    FIRST PORTION OF AN ELECTRONIC DOCUMENT.

9              SO THE GALLERY APPLICATION, THE

10   ELECTRONIC DOCUMENT WILL BE THE PHOTOGRAPH, AND AS

11   YOU CAN SEE ON THIS PARTICULAR SLIDE, I'VE

12   ILLUSTRATED IT DISPLAYING A FIRST PORTION, JUST A

13   FIRST PART OF THAT DOCUMENT.

14   Q    LET'S GO TO THE NEXT SLIDE, MR. LEE, 27.16.

15             THIS IS THE THIRD ELEMENT OF CLAIM 19,

16   AND WHAT IS IT LOOKING FOR?

17   A    THIS ELEMENT IS LOOKING FOR THE DETECTION OF

18   AND MOVEMENT OF AN OBJECT ON A TOUCHSCREEN DISPLAY.

19             NOW, THE OBJECT COULD BE ANY OBJECT OR IT

20   COULD BE THE FINGER, THE USER'S FINGER AS WELL, AND

21   THE SAMSUNG DEVICES CLEARLY DETECT THE TOUCH.

22             AS YOU CAN SEE IN SUBSEQUENT VIDEOS, AND

23   EVEN THE ORIGINAL VIDEO WE SHOWED, IT CLEARLY

24   DETECTS THE MOVEMENT OF THAT OBJECT, A FINGER ON

25   THE SCREEN.

```
 1   Q    LET'S GO TO 27.18.  THIS IS THE FOURTH ELEMENT
 2   OF CLAIM 19.  AND WHAT IS IT REQUIRING?
 3   A    THIS REQUIRES A TRANSLATION OR MOVEMENT OF THE
 4   ELECTRONIC DOCUMENT, IN THIS EXAMPLE, THE
 5   PHOTOGRAPH, IN A FIRST DIRECTION, AND THEN IT
 6   SUBSEQUENTLY DISPLAYS A SECOND PORTION OF THAT SAME
 7   DOCUMENT WHERE THAT SECOND PORTION HAS TO BE
 8   DIFFERENT FROM THE FIRST PORTION.
 9            AS YOU CAN SEE HERE -- IF YOU CAN SHOW
10   THE VIDEO AGAIN, PLEASE?
11            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
12   OPEN COURT OFF THE RECORD.)
13   BY MR. JACOBS:
14   Q    THAT'S THE FIRST PORTION.
15   A    NOW, WHEN YOU DRAG IT IN THE FIRST DIRECTION,
16   A SECOND PORTION OF THE SAME ELECTRONIC DOCUMENT OR
17   PHOTOGRAPH IS SHOWN.
18            AS YOU CAN SEE, THE SECOND PORTION COULD
19   OVERLAP THE FIRST PORTION, BUT IT'S STILL DIFFERENT
20   FROM THE FIRST PORTION.
21   Q    AND JUST BECAUSE IT WENT A LITTLE FAST, SIR,
22   WHEN YOU WERE APPLYING THE PHRASE "TRANSLATING THE
23   ELECTRONIC DOCUMENT," YOU WERE LOOKING FOR WHAT?
24   A    I'M LOOKING FOR MOVEMENT.  "TRANSLATION"
25   SIMPLY MEANS MOVEMENT ON A PARTICULAR SET OF AXES,
```

1    IN THIS CASE IT'S MOVING ON THE X AND Y OR

2    TWO-DIMENSIONAL PLANE OF THE SCREEN.

3    Q    SO NOW LET'S LOOK AT THE FIFTH ELEMENT ON THE

4    SCREEN, AND WE'RE LOOKING AT 27.20.  WHAT DOES THIS

5    ELEMENT CALL FOR?

6    A    THIS ELEMENT IS WHAT HAPPENS WHEN THE USER

7    CONTINUES TO DRAG THE DOCUMENT, TRANSLATE THE

8    DOCUMENT, AND IT REACHES THE EDGE OF THE DOCUMENT.

9          WHEN THE SYSTEM RECOGNIZES THAT THE EDGE

10    OF A DOCUMENT HAS BEEN REACHED, IN RESPONSE TO THAT

11    EDGE BEING REACHED, AN AREA BEYOND THE EDGE IS

12    SHOWN, WHAT I'VE ILLUSTRATED IN THE YELLOW BOX TO

13    THE LEFT OF THE ACTUAL DOCUMENT'S EDGE THERE ON THE

14    SCREEN.

15          AND THE LAST PART OF THIS IS THAT A THIRD

16    PORTION OF THE DOCUMENT HAS TO REMAIN ON THE SCREEN

17    WHERE THAT THIRD PORTION HAS TO BE SMALLER THAN THE

18    ORIGINAL FIRST PORTION.

19          AND THAT'S PRETTY APPARENT FROM THIS

20    IMAGE HERE.  THE THIRD PORTION IS NOT -- DOESN'T

21    FILL THE FULL SCREEN, WHEREAS THE FIRST PORTION I

22    ORIGINALLY SHOWED FILLS THE FULL SCREEN.

23    Q    DOES THE SAMSUNG GALAXY S II, AT&T, MEET THIS

24    LIMITATION?

25    A    YES, IT DOES.

```
 1     Q    LET'S GO TO THE SIXTH ELEMENT OF CLAIM 19.

 2     WHAT DOES THIS ELEMENT REQUIRE?

 3     A    THIS ELEMENT DEALS WITH WHAT HAPPENS WHEN THE

 4     OBJECT OR FINGER IS RELEASED FROM THE SCREEN, IT'S

 5     NO LONGER DETECTED BY THE TOUCHSCREEN, AND THIS

 6     REQUIRES THAT WHEN THAT HAPPENS, THE DOCUMENT IS

 7     TRANSLATED IN A SECOND DIRECTION, IT'S MOVED IN A

 8     SECOND DIRECTION, SUCH THAT THE AREA BEYOND THE

 9     EDGE OF THE SCREEN PREVIOUSLY DISPLAYED IS NO

10     LONGER DISPLAYED.

11              AND FINALLY, IT DISPLAYS A FOURTH PORTION

12     OF THE ELECTRONIC DOCUMENT, AND THAT FOURTH PORTION

13     HAS TO BE DIFFERENT FROM THE ORIGINAL FIRST PORTION

14     THAT WE SAW AT THE START OF THIS SEQUENCE OF

15     VIDEOS.

16              AND FOR SAKE OF ILLUSTRATION, JUST TO

17     REMIND US, I'VE ASKED TO PUT UP THE FOURTH -- THE

18     FIRST PORTION AS A CALL OUT.  IF WE CAN HAVE THAT

19     ON THE SLIDE?

20              THAT IS THE ORIGINAL FIRST PORTION.  AS

21     YOU CAN SEE, IT'S DIFFERENT FROM THE FOURTH PORTION

22     THAT'S ENDED UP ON THE SCREEN AND OF THIS

23     INTERACTION.

24     Q    SO WE'VE BEEN LOOKING AT THESE ELEMENTS IN THE

25     CONTEXT OF THE GALLERY APPLICATION ON THE
```

1    GALAXY S II, AT&T.  DOES THIS PHONE MEET THESE SAME

2    REQUIREMENTS IN OTHER APPLICATIONS?

3    A    YES, IT DOES.  THE GALAXY S II, AT&T, MEETS

4    THE ELEMENTS OF CLAIM 19 OF THE '381 PATENT IN TWO

5    OTHER APPLICATIONS, IN THE CONTACTS LIST AND THE

6    INTERNET BROWSER APPLICATIONS.

7    Q    LET'S TAKE A LOOK AT THOSE BRIEFLY.

8              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

9    OPEN COURT OFF THE RECORD.)

10             THE WITNESS:  SO ON THE LEFT YOU HAVE A

11   VIDEO OF THE CONTACTS LIST APPLICATION.  THIS IS

12   SIMPLY THE LIST OF PEOPLE YOU HAVE PHONE NUMBERS

13   AND SO FORTH FOR ON THE PHONE.

14             AND IF WE CAN PLAY THAT AGAIN, THE USER

15   IS DRAGGING THE LIST UPWARDS, AND WHEN THEY REACH

16   THE EDGE, IT'S HARD TO SEE, BUT YOU REACH THE EDGE,

17   IT'S BLACK ON THE BOTTOM, THE AREA BEYOND THE EDGE,

18   A BLACK AREA IS SHOWN.

19             WHEN THE USER LIFTS THEIR FINGER UP, IT

20   BOUNCES BACK.  IT'S THE EDGE OF THE PHOTOGRAPH,

21   JUST IN A DIFFERENT DIRECTION.

22   BY MR. JACOBS:

23   Q    AND HOW ABOUT IN THE BROWSER APPLICATION?

24   A    THE BROWSER APPLICATION SIMILARLY WORKS THE

25   SAME WAY.  YOU CAN DRAG IT BEYOND THE EDGE, IN THIS

1    CASE YOU'VE REACHED THE EDGE, AN AREA BEYOND THE

2    EDGE IS SHOWN, YOU RELEASE YOUR FINGER, IT BOUNCES

3    BACK, VERY MUCH LIKE THE GALLERY ACTUALLY.

4    Q    CLAIM 19 DISCUSSES INSTRUCTIONS THAT MAKE THIS

5    FEATURE WORK.  WHAT ARE INSTRUCTIONS IN THE CONTEXT

6    OF A SMARTPHONE OR A TABLET COMPUTER?

7    A    INSTRUCTIONS IN THE CONTEXT OF PHONES AND

8    TABLET COMPUTERS THAT WE'RE DISCUSSING HERE ARE

9    REALLY JUST COMPUTER CODE, COMPUTER PROGRAM

10   INSTRUCTIONS, AND THIS IS LINES OF CODE THAT'S IN

11   THE COMPUTER THAT EXECUTE ON THE PROCESSOR TO MAKE

12   THIS FUNCTIONALITY WORK.

13   Q    HOW DO YOU KNOW THAT THESE INSTRUCTIONS ARE

14   PRESENT ON THE GALAXY S II, AT&T?

15   A    AS I TESTIFIED EARLIER, I LOOKED AT THE

16   SAMSUNG PRODUCED CODE AND WHAT I'VE DONE IS I'VE

17   EXCERPTED JUST TWO SMALL PORTIONS TO ILLUSTRATE

18   SOME OF THE PERTINENT CODE FOR THE GALLERY AND FOR

19   THE BROWSER APPLICATIONS ON THE SCREEN.

20            IT'S NOT ON THE SCREEN YET.

21            MR. JACOBS:  SO, YOUR HONOR, WE'D LIKE TO

22   DISPLAY THIS FOR YOU, FOR OPPOSING COUNSEL, AND FOR

23   THE JURY AS IS REPRESENTATIVE OF THE CODE OF

24   SAMSUNG.

25            THE COURT:  OKAY.  GO AHEAD.

```
1    BY MR. JACOBS:
2    Q    SO WE'RE LOOKING AT 27.31, SIR, AND IS IT ON
3    THE JURY'S SCREEN.
4              NO, NOT ON THE PUBLIC SCREEN.
5              THE COURT:  TAKE THAT DOWN, PLEASE.
6              MR. JACOBS:  IS IT ON THE JURORS'
7    SCREENS?  NO.
8              THANK YOU MR. LEE.
9    Q    SO DR. BALAKRISHNAN, CAN YOU SHOW US WHAT WE
10   ARE SEEING ON THIS, IN THIS SOURCE CODE?
11   A    SURE.
12   Q    CAN YOU TELL US WHAT WE'RE SEEING ON THE
13   SOURCE CODE?
14   A    ON THE LEFT-HAND SIDE IS THE SOURCE CODE FOR
15   THE GALLERY APPLICATION THAT WE'VE BEEN TALKING
16   ABOUT.  SO THIS IS A VERY SMALL SNIPPET OF THE
17   OVERALL CODE THAT RUNS.  WHAT I'VE DONE IS
18   ILLUSTRATE JUST A PORTION THAT SETS UP THE
19   PARAMETERS FOR DETERMINING WHAT HAPPENS AT THE EDGE
20   OF THE DOCUMENT.
21             SO IT LOOKS AT THE LEFT EXTENT OR THE
22   RIGHT EXTENT OR THE TOP OR BOTTOM.  THOSE ARE FOUR
23   EDGES OF THE DOCUMENT.  IF IT EXCEEDS THE THRESHOLD
24   OF THAT EDGE, IT MOVES THE DOCUMENT BY THE
25   APPROPRIATE AMOUNT SO YOU CAN SEE IT.
```

```
 1            ON THE RIGHT-HAND SIDE IS THE SAME
 2   FUNCTIONALITY, BUT WRITTEN IN A SLIGHTLY DIFFERENT
 3   WAY FOR THE BROWSER APPLICATION, AND IN THIS CASE
 4   IT'S COMPUTING THE AMOUNT OF BOUNCE THAT NEEDS TO
 5   HAPPEN WHEN THE FINGER IS RELEASED AND IT DOES SOME
 6   CALCULATIONS WITH THAT.
 7            SO I WANT TO EMPHASIZE, THIS IS JUST THE
 8   RELEVANT SNIPPET OF THE OVERALL CODE.  THERE'S MUCH
 9   MORE CODE THAT MAKES THIS ALL REALLY WORK IN
10   TOTALITY.
11   Q    SO BASED ON YOUR REVIEW OF THE CODE AND OF THE
12   DEVICE, WHAT IS YOUR CONCLUSION AS TO WHETHER THE
13   SAMSUNG GALLERY S II, AT&T, INFRINGES CLAIM 19 OF
14   THE '381 PATENT?
15   A    BASED ON MY REVIEW OF THE DEVICES AND THE
16   CODE, IT IS MY OPINION THAT THE SAMSUNG
17   GALAXY S II, AT&T, INFRINGES CLAIM 19 OF THE '381
18   PATENT IN ALL THREE APPLICATIONS.
19   Q    YOU ANALYZED OTHER SAMSUNG PHONES?
20   A    YES, I DID.
21   Q    AND DOES YOUR OPINION EXTEND TO OTHERS OF THE
22   PHONES THAT YOU EXAMINED?
23   A    YES, 20 OTHER PHONES ALSO INFRINGE THE '381
24   PATENT.
25   Q    CAN WE SHOW THAT TO THE JURY ?
```

1752

```
 1    A    SURE.

 2    Q    OKAY.  SO LET'S LOOK AT 27.32.  I'M SORRY,

 3    .33?

 4    A    WHAT I HAVE HERE IS THE FOUR OTHER PHONES,

 5    GALAXY S I9000, GALAXY S II I9100, S 4G, AND THE

 6    VIBRANT, ALL SHOWING THE SAME FUNCTIONALITY THAT I

 7    WENT THROUGH IN DETAIL EARLIER WITH THE

 8    GALAXY S II, AND YOU CAN SEE THAT ALL OF THEM DO

 9    THE SAME KIND OF BOUNCING.

10    Q    AND NOW LET'S LOOK AT PDX 27.34?

11    A    THESE ARE FOUR MORE PHONES, THE ACE,

12    CAPTIVATE, CONTINUUM, AND THE DROID CHARGE.

13          AGAIN, EACH OF THEM DO THE SAME

14    FUNCTIONALITY AS I ILLUSTRATED BEFORE IN THE

15    GALLERY APPLICATION.

16    Q    LET'S JUST SEE THAT ONE MORE TIME SINCE WE

17    SHOWED ALL FOUR TOGETHER.

18    A    YOU DRAG TO THE RIGHT, REACH THE EDGE, YOU LET

19    GO, IT BOUNCES BACK.

20    Q    AND 27.35.

21    A    THESE ARE FOUR MORE DEVICES, EXHIBIT 4G, THE

22    EPIC 4G, THE FASCINATE, AND THE INDULGE,

23    ESSENTIALLY DOING WHAT YOU'VE ALREADY SEEN.

24    Q    AND LET'S PLAY THAT ONE MORE TIME.

25    A    AGAIN, DRAG TO THE RIGHT, YOU REACH THE EDGE,
```

```
 1    AN AREA BEYOND THE EDGE IS SEEN, AND IT BOUNCES

 2    BACK WHEN YOU LET GO.

 3    Q    AND 27.36.

 4    A    THIS IS ANOTHER FIVE PHONES, THE INFUSE, THE

 5    MESMERIZE, THE NEXUS S 4G, THE PREVAIL, AND THE

 6    REPLENISH.

 7              AGAIN, SAME FUNCTIONALITY.  YOU DRAG TO

 8    THE RIGHT, WHEN YOU LET GO, IT BOUNCES BACK.

 9    Q    AND THEN 27.37.

10    A    AND THESE ARE THE TWO TABLET DEVICES RUNNING

11    THE GALLERY.  THEY DO THE EXACT SAME FUNCTIONALITY.

12    YOU REACH THE EDGE, YOU LET GO, IT BOUNCES BACK.

13    Q    NOW, DID YOU ALSO SHOW -- LOOK AT SOME OTHER

14    SAMSUNG PRODUCTS IN CONNECTION WITH THE CONTACTS

15    APPLICATION?

16    A    YES, I DID.  AND I THINK I'VE ILLUSTRATED FOUR

17    MORE OF THEM HERE.

18    Q    27.38?

19    A    RIGHT.  THIS IS THE FASCINATE, THE GALAXY S

20    4G, THE GEM, AND THE VIBRANT, AND THEY ALL DO THE

21    SAME BOUNCE BACK FUNCTIONALITY IN THE CONTACTS

22    LIST.

23              AND IN THIS CASE YOU DRAG UP AND DOWN,

24    YOU REACH THE EDGE, IT SHOWS AN AREA BEYOND THE

25    EDGE, AND IT BOUNCES BACK.
```

```
 1    Q    DO OTHER SAMSUNG PRODUCTS ALSO INFRINGE IN THE

 2    CONTACTS LIST APPLICATION?

 3    A    YES, THEY DO.  I BELIEVE THERE'S A TOTAL OF 16

 4    OF THE 21 ACCUSED PRODUCTS THAT INFRINGE IN THE

 5    CONTACTS LIST APPLICATION.

 6    Q    AND DO YOU HAPPEN TO REMEMBER WHAT THE OTHERS

 7    ARE?

 8    A    I DON'T REMEMBER, BUT I HAVE A LIST HERE AND I

 9    CAN READ THEM OUT IF YOU WANT ME TO.

10    Q    THAT WOULD BE GREAT.

11    A    SO THE ONES THAT DO INFRINGE IN THE CONTACTS

12    LIST ARE THE CAPTIVATE, THE CONTINUUM, THE DROID

13    CHARGE, THE EPIC 4G, THE EXHIBIT 4G, THE FASCINATE,

14    THE GALAXY ACE, THE GALAXY S I9000, THE GALAXY S II

15    I9100, THE GALAXY S II, AT&T, WHICH WE'VE ALREADY

16    GONE THROUGH IN DETAIL, THE GALAXY S 4G, THE GEM,

17    THE INDULGE, THE INFUSE 4G, THE MESMERIZE, AND THE

18    VIBRANT.

19    Q    HAVE YOU PREPARED ADDITIONAL VIDEOS DEPICTING

20    INFRINGEMENT IN THE BROWSER APPLICATION?

21    A    YES, I HAVE.

22    Q    LET'S TAKE A LOOK AT THOSE, 27.39.

23    A    THESE ARE FOUR SAMSUNG DEVICES, THE ACE,

24    EXHIBIT 4G, GALAXY S II I9100, AND THE GALAXY

25    TAB 10.1, ALL OF WHICH ARE PERFORMING THE '391,
```

```
 1    CLAIM 19 FUNCTIONALITY IN THE BROWSER APPLICATION.

 2              AND IF WE PLAY THAT AGAIN JUST VERY

 3    QUICKLY, YOU CAN SEE YOU DRAG THE DOCUMENT, WHEN AN

 4    EDGE IS REACHED, AN AREA BEYOND THE EDGE, THE GRAY

 5    AREA IS SHOWN.  WHEN YOU LET GO, IT BOUNCES BACK.

 6    Q    HAVE YOU PREPARED A COMPILATION OF THESE

 7    VIDEOS FOR THE JURY?

 8    A    YES, I PREPARED A WHOLE SET OF VIDEOS OVER THE

 9    COURSE OF THIS THAT ILLUSTRATE THE DIFFERENT

10    INFRINGEMENT.

11    Q    AND ARE THOSE VIDEOS IN PX 64?

12    A    YES, THEY ARE.

13              MR. JACOBS:  YOUR HONOR, WE OFFER PX 64

14    IN EVIDENCE.

15              THE COURT:  ANY OBJECTION?

16              MR. JOHNSON:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              64, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. JACOBS:

23    Q    GOING BACK TO THE GALLERY APPLICATION FOR A

24    MINUTE --

25              YOU CAN TAKE THAT DOWN, MR. LEE, THANK
```

1    YOU.

2              GOING BACK TO THE GALLERY APPLICATION FOR

3    A MINUTE, HAVE YOU HEARD OF SOMETHING CALLED THE

4    HOLD STILL BEHAVIOR IN SOME SAMSUNG PRODUCTS?

5    A    YES, I HAVE.

6    Q    AND WHAT IS YOUR UNDERSTANDING OF THAT

7    BEHAVIOR AND HOW DOES IT AFFECT YOUR INFRINGEMENT

8    ANALYSIS?

9    A    THIS IS BEHAVIOR THAT SEEMS TO MANIFEST ITSELF

10   IN SOME SAMSUNG PRODUCTS THAT ARE ACCUSED, BUT NOT

11   ALL, IN THE GALLERY APPLICATION.  AND I HAVE NOT

12   BEEN ABLE TO RELIABLY DUPLICATE IT, BUT IT DOES

13   OCCUR IN SOME OF THOSE PRODUCTS.

14             AND WHAT HAPPENS THERE IS WHEN YOU DRAG

15   THE IMAGE VERY, VERY SLOWLY, VERY GINGERLY, VERY

16   SLOWLY FROM THE EDGE INTO -- SO THE EDGE OF THE

17   DOCUMENT IS PASSED, AND YOU LET GO, IT SIMPLY

18   FREEZES.  IT DOESN'T ACTUALLY DO THE BOUNCE.

19             AND IN THOSE SITUATIONS, THOSE GALLERY

20   APPLICATIONS STILL DO THE BOUNCE FUNCTIONALITY MOST

21   OF THE TIME.

22             SO AS A RESULT, MY OPINION IS THAT THE

23   GALLERY APPLICATION, EVEN ON THOSE DEVICES THAT

24   HAVE THE HOLD STILL BEHAVIOR ONCE IN A WHILE, THEY

25   STILL INFRINGE THE '381 PATENT BECAUSE THE

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13          THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/

                 _____
22               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
23

24                    DATED:  AUGUST 11, 2012

25

# EXHIBIT 6

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

      APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6     CORPORATION,                  )
                                    )  SAN JOSE, CALIFORNIA
7                   PLAINTIFF,      )
                                    )  AUGUST 13, 2012
8             VS.                   )
                                    )  VOLUME 7
9     SAMSUNG ELECTRONICS CO.,      )
      LTD., A KOREAN BUSINESS       )  PAGES 1989-2320
10    ENTITY; SAMSUNG               )
      ELECTRONICS AMERICA,          )
11    INC., A NEW YORK              )
      CORPORATION; SAMSUNG          )
12    TELECOMMUNICATIONS            )
      AMERICA, LLC, A DELAWARE      )
13    LIMITED LIABILITY             )
      COMPANY,                      )
14                                  )
                    DEFENDANTS.     )
15    _____

16              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20             APPEARANCES ON NEXT PAGE

21

22

23    OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595
24

25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF        MORRISON & FOERSTER
      APPLE:                   BY:  HAROLD J. MCELHINNY
 3                                  MICHAEL A. JACOBS
                                    RACHEL KREVANS
 4                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                   HALE AND DORR
 7                             BY:  WILLIAM F. LEE
                               60 STATE STREET
 8                             BOSTON, MASSACHUSETTS  02109

 9                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
10                             PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                               OLIVER & HEDGES
12                             BY:  CHARLES K. VERHOEVEN
                               50 CALIFORNIA STREET, 22ND FLOOR
13                             SAN FRANCISCO, CALIFORNIA  94111

14                             BY:  VICTORIA F. MAROULIS
                                    KEVIN P.B. JOHNSON
15                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
16                             REDWOOD SHORES, CALIFORNIA  94065

17                             BY:  MICHAEL T. ZELLER
                                    WILLIAM C. PRICE
18                             865 SOUTH FIGUEROA STREET
                               10TH FLOOR
19                             LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

1                    INDEX OF WITNESSES

2      PLAINTIFF'S

3      **BORIS TEKSLER**
            CROSS-EXAM BY MS. MAROULIS (RES.)  P. 2006
4           REDIRECT EXAM BY MR. MUELLER        P. 2009
            RECROSS-EXAM BY MS. MAROULIS        P. 2019
5           FURTHER REDIRECT EXAM               P. 2022

6      **JUN WON LEE**
            BY VIDEOTAPED DEPOSITION            P. 2023
7                                                  2025

8      **DONG HOON CHANG**
            BY VIDEOTAPED DEPOSITION            P. 2026
9

10     **TIMOTHY BENNER**
            BY VIDEOTAPED DEPOSITION            P. 2028
11                                                 2029

12     **TIMOTHY SHEPPARD**
            BY VIDEOTAPED DEPOSITION            P. 2030
13

14     **TERRY MUSIKA**
            DIRECT EXAM BY MS. KREVANS          P. 2031
15          CROSS-EXAM BY MR. PRICE             P. 2098
            REDIRECT EXAM BY MS. KREVANS        P. 2160
16          RECROSS-EXAM BY MR. PRICE           P. 2165
            FURTHER REDIRECT EXAM               P. 2171
17

18

19     DEFENDANT'S

20     **BENJAMIN BEDERSON**
            DIRECT EXAM BY MR. DEFRANCO         P. 2228
21          CROSS-EXAM BY MR. JACOBS            P. 2254
            REDIRECT EXAM BY MR. DEFRANCO       P. 2269
22

23     **ADAM BOGUE**
            DIRECT EXAM BY MR. JOHNSON          P. 2274
24          CROSS-EXAM BY MR. JACOBS            P. 2300

25

```
 1              WE GO TO THE SAME SPOT, AND THERE'S THE

 2     1,438 TABLETS, WE ADD THAT TO THE SMARTPHONE TO GET

 3     TO THE $22 MILLION -- OR 22 MILLION UNITS, AND

 4     THERE'S 644,000, WHICH WE ADD THAT BACK TO THE

 5     SMARTPHONES, WE GET TO THE $8.1 BILLION.

 6     Q    NOW, MR. MUSIKA, YOU SAID 644,000, THAT NUMBER

 7     THERE IS -- BECAUSE IT'S MISSING ZEROS, IT'S

 8     ACTUALLY WHAT?

 9     A    MILLIONS.  SORRY.  I DID IT MYSELF.  I

10     APOLOGIZE.

11     Q    ALL RIGHT.  DOES THIS REPRESENT SALES JUST IN

12     THE UNITED STATES?

13     A    SALES OF TABLETS AND SMARTPHONES ONLY IN THE

14     UNITED STATES BY THE DEFENDANT SAMSUNG.

15     Q    OKAY.  HAVE YOU LOOKED AT INFORMATION ABOUT

16     HOW SAMSUNG'S SALES OF THE ACCUSED PRODUCTS IN THIS

17     CASE -- LET ME START OVER.

18              HAVE YOU LOOKED AT INFORMATION ABOUT HOW

19     SAMSUNG SALES OF SMARTPHONES AND TABLETS BEFORE THE

20     INTRODUCTION OF THE ACCUSED PRODUCTS IN THIS CASE

21     COMPARED TO SAMSUNG SALES OF SMARTPHONES AND

22     TABLETS AFTER THE INTRODUCTION OF THE ACCUSED

23     PRODUCTS?

24     A    YES.

25     Q    OKAY.  COULD WE SEE SLIDE 34B.9.  WHAT
```

2044

```
 1      INFORMATION IS SHOWN ON 34B.9, MR. MUSIKA?

 2      A     THIS IS A GRAPH, AND ON THE VERTICAL AXIS,

 3      IT'S THE MARKET SHARE PERCENT.  SO IT'S HOW MUCH OF

 4      THE OVERALL SMARTPHONE MARKET DID SAMSUNG HAVE OVER

 5      TIME, WHICH IS OUR HORIZONTAL X AXIS THERE.

 6              AND THE SLIDE IS DIVIDED UP, AS YOU JUST

 7      INDICATED, INTO TWO SEGMENTS.  ON THE LEFT-HAND

 8      SIDE WITH THE BLUE IS THE TIME PERIOD FOR SAMSUNG

 9      PRIOR TO THE INTRODUCTION OF THEIR FIRST ACCUSED

10      PHONE, AND WHAT WE CAN SEE THEN WITH THE

11      INTRODUCTION OF THE FIRST ACCUSED PHONE, THE RED

12      LINE, ON THE RIGHT-HAND SIDE IS THE PERIOD OF TIME

13      AFTERWARDS.

14      Q     AND HOW DO THE TWO PERIODS, THAT IS, BEFORE

15      AND AFTER, COMPARE TO ONE ANOTHER?

16      A     YES.  IT'S A RATHER DRAMATIC DEMONSTRATION OF

17      SAMSUNG WAS LOSING MARKET SHARE DURING THE PERIOD

18      PRIOR TO 2010, APPROXIMATELY JUNE OF 2010 WHEN THEY

19      INTRODUCED THE FIRST ACCUSED PHONE.

20              AFTER THEY INTRODUCED THE FIRST ACCUSED

21      PHONE, SAMSUNG'S MARKET SHARE TOOK AN ABRUPT UPWARD

22      SWING AND HAS CONTINUED TODAY TO ADVANCE

23      DRAMATICALLY IN INCREASES IN MARKET SHARE.

24      Q     WHERE DID THE INFORMATION THAT FORMS THIS

25      CHART COME FROM?
```

2045

```
 1    A    ONCE AGAIN, THIS ISN'T MY INFORMATION.  THIS

 2    IS TAKEN NOT FROM APPLE OR FROM SAMSUNG IN THIS

 3    CASE.  THIS IS TAKEN -- YOU CAN SEE PERHAPS RIGHT

 4    DOWN THERE ON THE BOTTOM, SOURCE IDC WORLDWIDE

 5    QUARTERLY.

 6              IDC IS AN INDEPENDENT MARKETING

 7    ORGANIZATION THAT BOTH APPLE AND SAMSUNG USE TO

 8    HELP THEM IN DOING THEIR OWN MARKET RESEARCH.  SO

 9    THIS IS AN INDEPENDENT STUDY AND ANALYSIS THAT WAS

10    DONE BY IDC.

11    Q    OKAY.  LET'S TURN TO THE SPECIFIC DAMAGES

12    REMEDIES THAT YOU EVALUATED IN THIS CASE.

13              WHAT KINDS OF REMEDIES DID YOU APPLY WITH

14    RESPECT TO THE VARIOUS INTELLECTUAL PROPERTY RIGHTS

15    THAT APPLE HAS ASSERTED IN THE CASE?

16    A    I CONSIDERED THREE DIFFERENT FORMS OF REMEDY

17    IN TOTAL AS IT RELATES TO THE DESIGN, AND THAT

18    WOULD BE THE DESIGN PATENT AND THE TRADE DRESS.  I

19    CONSIDERED TWO FORMS OF DAMAGE.

20    Q    WHAT WERE THOSE TWO FORMS?

21    A    ONE, ONE IS CALLED SAMSUNG'S PROFITS, AND THE

22    OTHER IS CALLED APPLE'S LOST PROFITS.

23              TO PUT IT IN REAL STRAIGHT TERMS, IT'S

24    EITHER WHAT SAMSUNG HAS GAINED OR IT'S WHAT APPLE

25    HAS LOST.
```

```
 1              IN THE CASE OF SAMSUNG'S GAIN, THAT'S

 2   SOMETIMES REFERRED TO AS AN UNJUST ENRICHMENT

 3   BECAUSE THE PRESUMPTION IS THEY'VE MADE THAT GAIN,

 4   THAT MONEY HAS SLID ACROSS THE SLIDE BECAUSE THEY

 5   VIOLATED APPLE'S INTELLECTUAL PROPERTY.

 6   Q    OKAY.  AND REMIND US AGAIN, WHICH TYPES OF

 7   INTELLECTUAL PROPERTY RIGHTS DID YOU USE THIS KIND

 8   OF ANALYSIS, THE SAMSUNG PROFIT OR APPLE'S LOST

 9   PROFITS FOR?

10   A    I USED THEM BOTH, AND WE'RE GOING TO SEE THE

11   SITUATION -- THIS ISN'T DOUBLE COUNTING.  I USED

12   THEM BOTH FOR THE DESIGN PATENTS AND TRADE DRESS.

13   Q    OKAY.  WHAT KIND OF REMEDY DID YOU LOOK AT FOR

14   VIOLATIONS OF APPLE'S UTILITY PATENT RIGHTS?

15   A    DIFFERENT COMBINATION THERE.  LOST PROFITS

16   AGAIN, WHICH I'VE ALREADY DESCRIBED, THAT'S APPLE'S

17   LOSS.

18              BUT HERE I'VE CONSIDERED IN THE

19   ALTERNATIVE WHAT'S CALLED A REASONABLE ROYALTY.

20   Q    OKAY.  HOW DID YOU -- WHAT WAS YOUR BASIS FOR

21   APPLYING A DIFFERENT KIND OF REMEDY FOR SOME KINDS

22   OF PATENT RIGHTS THAN OTHERS?

23   A    IT'S MY UNDERSTANDING OF WHAT IS THE ACCEPTED

24   DAMAGE METHODOLOGY TO BE USED, DEPENDING ON THE

25   TYPE OF INTELLECTUAL PROPERTY.  SO THAT'S WHY WE
```

2047

```
 1    SEE A SLIGHT CHANGE IN THE UTILITY PATENTS VERSUS

 2    THE DESIGN AND TRADE DRESS.

 3    Q    OKAY.  COULD WE LOOK AT SLIDE 34B.75.

 4              WHAT IS SHOWN ON SLIDE 34B.75,

 5    MR. MUSIKA?

 6              MR. PRICE:  YOUR HONOR, I OBJECT.  HE'S

 7    NOT A LAWYER.  I OBJECT TO SHOWING HIM LAW.

 8              THE COURT:  I'VE OVERRULED THAT OBJECTION

 9    IN MY ORDER OF LAST NIGHT, SO I'LL STILL OVERRULE

10    IT.

11              THE WITNESS:  YES.  THIS IS THE DAMAGES

12    DESCRIPTION UNDER THE LAW FOR DESIGN PATENT

13    DAMAGES.

14    BY MS. KREVANS:

15    Q    AND IS THIS THE TEST YOU APPLIED, THAT IS,

16    THAT THE -- IF THE DEFENDANT DID INFRINGE, THEY'RE

17    FOUND LIABLE TO THE EXTENT OF TOTAL PROFIT?

18    A    RIGHT.  KEEPING IN MIND, AGAIN, I'M MAKING NO

19    DETERMINATION ON WHETHER THEY DID OR DIDN'T

20    INFRINGE.  I'M ACCEPTING THAT AS AN ASSUMPTION.

21              BUT, YES, HAVING DONE THAT, I'VE USED THE

22    TOTAL PROFITS, AGAIN, OF SAMSUNG.

23    Q    OKAY.  COULD WE SEE SLIDE 34B.76, WHICH IS

24    HEADED TRADE DRESS DAMAGES.

25              IS THIS THE TEST FOR DAMAGES THAT YOU
```

```
1    USED FOR TRADE DRESS VIOLATIONS?

2    A    YES.  AND, AGAIN, WE CAN SEE IN THE

3    ENUMERATION, ONE, DEFENDANT'S PROFITS, THAT WOULD

4    BE SAMSUNG AGAIN; AND DAMAGES SUSTAINED BY

5    PLAINTIFF, THAT WOULD BE LOST PROFITS; AND COSTS OF

6    THE ACTION.  I'M NOT GIVING ANY OPINION ON THAT

7    THIRD PIECE.

8    Q    AND IF WE COULD SEE SLIDE 34B.74.  THIS ONE IS

9    JUST HEADED PATENT DAMAGES.

10            WHAT IS THIS TEST?

11   A    YES.  AND THIS TEST BASICALLY SAYS THAT UNDER

12   A UTILITY PATENT, THE PATENTEE IS ENTITLED TO

13   DAMAGES ADEQUATE TO COMPENSATE FOR INFRINGEMENT,

14   BUT UNDER NO EVENT LESS THAN A REASONABLE ROYALTY.

15            SO THAT'S WHY YOU USE THOSE TWO FORMS,

16   LOST PROFITS OR, IN THE ALTERNATIVE, A REASONABLE

17   ROYALTY.

18   Q    OKAY.  YOU'VE TALKED, MR. MUSIKA, ABOUT THREE

19   DIFFERENT FORMS OF DAMAGES AND 22 MILLION PHONES

20   AND TABLETS.

21            DID YOU DO ANYTHING TO MAKE SURE THAT YOU

22   WERE NOT DOUBLE COUNTING THE DAMAGES FOR ANY ONE OF

23   THOSE PHONES AND TABLETS?

24   A    I DID.

25   Q    WHAT DID YOU DO?
```

2049

```
 1    A    WELL, IT'S -- IT'S -- IT'S EASY TO VISUALIZE,

 2    BUT IT'S HARD TO IMAGINE.

 3              BUT THE CALCULATION REALLY HAD TO BE DONE

 4    ON A PHONE-BY-PHONE, TABLET-BY-TABLET BASIS.  EACH

 5    PHONE, EACH TABLET DESERVES OR GETS ITS OWN DAMAGE,

 6    AND SO THAT CALCULATION HAD TO BE DONE INDIVIDUALLY

 7    ON EACH ONE OF THOSE PRODUCTS.

 8    Q    AND HOW DID YOU DECIDE, FOR EACH ONE OF THOSE

 9    PRODUCTS, WHICH OF THE THREE DIFFERENT KINDS OF

10    DAMAGES YOU DESCRIBED SHOULD BE ASSIGNED TO IT?

11    A    WELL, THERE WERE SEVERAL CRITERIA.  ONE WE

12    JUST WENT THROUGH, WHICH IS THE FORM OF DAMAGES.

13              ANOTHER WOULD BE THE TIME PERIOD IN

14    WHICH -- NOT ALL SALES OCCURRED AT THE SAME TIME.

15    THEY OCCURRED AT DIFFERENT TIMES.

16              AND NOT ALL THE INTELLECTUAL PROPERTY,

17    WHETHER IT WAS A UTILITY PATENT OR A DESIGN PATENT,

18    THEY DIDN'T ALL ISSUE AT ONCE.  SO THEY ISSUED AT

19    VARIOUS POINTS IN TIME.

20              SO IT'S REALLY THE INTERSECTION OF WHEN

21    SOMETHING WAS SOLD, WHICH FORM OF DAMAGES -- WHICH

22    FORM OF INTELLECTUAL PROPERTY IT IS ACCUSED OF, AND

23    THEN MAKING THAT CALCULATION ON, AGAIN, A

24    UNIT-BY-UNIT BASIS.

25    Q    OKAY.  COULD WE SEE SLIDE 34B.56.
```

```
 1                WHAT HAVE YOU DEPICTED ON THIS SLIDE,
 2      MR. MUSIKA?
 3      A    I THINK THIS IS GOING TO HELP SHOW AND EXPLAIN
 4      WHAT I WAS JUST BRIEFLY TRYING TO EXPLAIN.
 5                I'VE GOT 22 PHONES AT THE TOP, AND THINK
 6      OF THESE AS EITHER PHONES OR TABLETS, IT DOESN'T
 7      MATTER.  BUT EACH ONE OF THOSE REPRESENTS A MILLION
 8      UNITS TO TRY AND KEEP US ORIENTED ON THE 22 MILLION
 9      TOTAL UNITS.
10                AND SO AS WE JUST WENT THROUGH, I HAVE
11      THREE FORMS OF DAMAGE.  EACH ONE OF THOSE PHONES,
12      EACH ONE OF THOSE 22 MILLION PHONES, HAS TO GO IN
13      ONE OF THOSE CATEGORIES, BUT NOT TWO CATEGORIES.
14      IF WE PUT IT IN TWO CATEGORIES, THEN WE'RE GOING TO
15      END UP WITH DOUBLE COUNTING.
16      Q    OKAY.  CAN YOU JUST WALK US THROUGH,
17      UNDERSTANDING THIS IS A SIMPLIFICATION, WALK US
18      THROUGH THE ALLOCATION THAT YOU MADE.
19      A    WELL, THE ALLOCATION THAT I MADE WAS I, I
20      FIRST -- I THINK THE NEXT SLIDE IS GOING TO SHOW
21      THE AMOUNT OF 17 MILLION UNITS SHOULD SLIDE DOWN,
22      AND I CALCULATED THEM AS SAMSUNG'S PROFITS.  THAT'S
23      THE UNJUST GAIN.  SO I'M USING THAT FORM OF DAMAGES
24      FOR APPROXIMATELY 17 MILLION OF THE TOTAL 22
25      MILLION.
```

2051

```
1    Q    OKAY.  HOW MANY OF THE 5 MILLION LEFT DID YOU

2    PUT IN THE APPLE LOST PROFITS DAMAGES CATEGORY?

3    A    I PUT TWO INTO THE LOST PROFITS CATEGORY, SO

4    WE SHOULD HAVE TWO OF THOSE SLIDE DOWN, AND 2

5    MILLION, APPROXIMATELY, COME DOWN THERE.

6          AND THAT, OF COURSE, LEAVES THE 3

7    MILLION, AND YOU CAN OF COURSE GUESS WHERE THOSE

8    GO, DOWN TO THE REASONABLE ROYALTY.

9          AND WE CAN SEE VERY CLEARLY THAT NO

10   INDIVIDUAL PRODUCT HAS HAD MORE THAN ONE DAMAGE

11   CALCULATED ON IT.

12   Q    OKAY.  THAT LOOKED EASY.

13         CAN YOU DESCRIBE FOR THE JURY THE ACTUAL

14   AMOUNT OF EFFORT THAT IT TOOK TO MAKE THESE

15   ALLOCATIONS AND THEN MAKE THOSE ONE, ONE PHONE BY

16   ONE TABLET DAMAGES CALCULATIONS THAT YOU MADE.

17   A    IT -- I CAN ASSURE YOU, IT'S NOT ME SITTING AT

18   A DESK WITH A CALCULATOR DOING 22 MILLION

19   CALCULATIONS.

20         IN FACT, BECAUSE OF THE VARIOUS

21   COMBINATIONS, THERE ARE LITERALLY HUNDREDS OF

22   MILLIONS OF CALCULATIONS, AND SO THE ONLY WAY,

23   PRACTICALLY, TO DO THIS IS TO WRITE A COMPUTER

24   PROGRAM.

25         AND SO OVER THE LAST YEAR AND A HALF TO
```

```
 1    TWO YEARS, I HAVE HAD A TEAM OF 20 PEOPLE,

 2    ECONOMISTS, PROGRAMMERS, STATISTICIANS AND C.P.A.'S

 3    DEVELOPING A MODEL THAT IS DYNAMIC ENOUGH TO TAKE

 4    IN ALL 22 MILLION AND MAKE CHANGES AND ADJUSTMENTS,

 5    SINCE THIS PROCESS WENT ON FOR A YEAR AND A HALF,

 6    AS NEW PRODUCTS CAME IN AND WENT OUT.

 7              AND ABOUT 7,000 TOTAL PROFESSIONAL HOURS

 8    WERE DEDICATED TOWARDS THE CREATION AND OPERATION

 9    OF THAT COMPUTER MODEL.

10    Q    THAT SOUNDS EXPENSIVE.  WAS IT EXPENSIVE?

11    A    IT WAS VERY EXPENSIVE.

12    Q    WHAT DID IT COST TOTAL FOR YOUR TEAM OF 23

13    PEOPLE?

14    A    20 PEOPLE, OVER MORE THAN A YEAR AND A HALF,

15    THAT 7,000 HOURS, WAS APPROXIMATELY $1,750,000.

16    Q    OKAY.  LET'S GO BACK TO THE FIRST CATEGORY YOU

17    TALKED ABOUT, THE SAMSUNG PROFIT CATEGORY.

18              ONCE YOU HAD ALLOCATED 17 MILLION PHONES

19    AND TABLETS TOTAL INTO THAT CATEGORY, WHAT WAS THE

20    NEXT STEP IN DETERMINING THE DAMAGES FOR THOSE 17

21    MILLION DEVICES?

22    A    WELL, IT'S, IT'S MAKING THE ACTUAL

23    CALCULATIONS.  IT'S FIGURING OUT HOW MUCH -- WE NOW

24    KNOW THE UNITS, BUT HOW MUCH DID SAMSUNG ACTUALLY

25    MAKE ON THOSE 17 MILLION?
```

```
 1    Q    OKAY.  IF WE COULD SEE THE NEXT SLIDE.  WE'RE

 2    SHOWING $2.241 BILLION HERE.

 3              CAN YOU EXPLAIN TO THE JURY HOW YOU CAME

 4    UP WITH THAT NUMBER IN CONCEPT?

 5    A    IN CONCEPT, KEEP IN MIND THE 17 MILLION UNITS,

 6    AGAIN, AND IT'S -- IT'S FIGURING OUT HOW MUCH DID

 7    SAMSUNG ACTUALLY MAKE IN PROFIT ON EACH ONE OF

 8    THOSE UNITS, AS SIMPLISTICALLY MULTIPLICATION.

 9    IT'S THE UNITS TIMES THE PROFITS AND THAT GETS YOU

10    TO $2.2 BILLION.

11    Q    WHAT WAS THE SOURCE OF THE INFORMATION YOU

12    USED FOR THE PURPOSES OF MAKING THESE CALCULATIONS?

13    A    THESE NUMBERS ARE, IN THIS CASE ARE SAMSUNG'S

14    NUMBERS.  WHEN I'M TALKING ABOUT SAMSUNG'S PROFIT,

15    THESE ARE NUMBERS THAT COME DIRECTLY FROM SAMSUNG'S

16    FINANCIAL RECORDS.

17    Q    OKAY.  COULD WE SEE SLIDE 34B.15.

18              STARTING HERE -- I KNOW YOU HAVE A SERIES

19    OF SLIDES HERE, MR. MUSIKA.  CAN YOU WALK US

20    THROUGH THE NATURE OF THE CALCULATION YOU DID TO

21    ARRIVE AT THE $2.24 BILLION PROFIT NUMBER FOR THE

22    $17 MILLION PHONES -- 17 MILLION PHONES?

23    A    YES.  WELL, THERE'S THE $8.1 BILLION NUMBER

24    AGAIN -- PARDON ME -- AND HOPEFULLY WE CAN REMEMBER

25    THAT WAS THE TOTAL OF THE ACCUSED SALES.
```

```
 1              BUT KEEPING IN MIND, I'M CALCULATING
 2     THIS, THIS DAMAGE ONLY ON SAMSUNG'S PORTION.
 3              SO THE FIRST THING I DO IS I HAVE TO
 4     REDUCE THAT NUMBER FOR THE UNITS THAT, THAT OTHER 5
 5     MILLION UNITS THAT WENT TO OTHER FORMS OF DAMAGE.
 6     SO THAT'S THE FIRST DEDUCTION.  I THINK THAT'S THE
 7     NEXT SLIDE.
 8              AND I DEDUCT 1.749 BILLION BECAUSE I'M
 9     GOING TO CALCULATE DAMAGES ON A REASONABLE ROYALTY
10     TO LOST PROFITS, AND THAT LEAVES ME $6,411,000,000.
11     Q    AND WHAT WAS THE NEXT STEP?
12     A    THE NEXT STEP IS WHAT WE ALL -- REGARDLESS OF
13     WHAT BUSINESS WE'RE IN, ALL OF US INCUR THE SAME
14     THING.  WE HAVE REVENUE BECAUSE WE MAKE A SALE, AND
15     WE HAVE EXPENSES.  NOBODY JUST GIVES US MONEY.  AND
16     SAMSUNG INCURRED EXPENSES TO GENERATE THAT
17     6,411,000,000, SO I HAD TO IDENTIFY HOW MUCH DID IT
18     COST SAMSUNG TO EARN OR GENERATE THAT
19     6,411,000,000.
20     Q    OKAY.  SO LET'S SEE THE NEXT SLIDE.
21     A    AND THERE YOU SEE -- THERE YOU SEE THE COST OF
22     GOODS SOLD, HOW MUCH DID IT COST, WHAT ARE THE
23     DIRECTLY ATTRIBUTABLE COSTS THAT SAMSUNG INCURRED,
24     AND THAT'S 4,170,000,000.
25              IF I SUBTRACT THAT FROM THAT PRIOR
```

1    NUMBER, THAT GETS US DOWN TO THE BOTTOM,

2    $2,241,000,000.

3    Q    OKAY.  HAVE YOU DONE THIS CALCULATION FOR EACH

4    OF THE DIFFERENT PRODUCTS ACCUSED OF VIOLATING ONE

5    OF APPLE'S DESIGN OR TRADE DRESS PATENT RIGHTS?

6    A    YES.

7    Q    COULD WE SEE SLIDE 34B.19?

8              WHAT IS DEPICTED HERE, MR. MUSIKA?

9    A    THIS IS JUST A, AN ADDITIONAL SLIDE TO HELP

10   THE COURT SEE THAT NOT ONLY DID I DO IT ON AN

11   INDIVIDUAL TABLET-BY-TABLET,

12   SMARTPHONE-BY-SMARTPHONE BASIS, BUT THOSE ARE BY

13   MODEL, TOO.

14             SO HERE IS THAT SAMSUNG'S PROFITS

15   DIVIDED, OR SHOWN BY MODEL, BOTH FOR TABLETS AND

16   SMARTPHONES.

17   Q    OKAY.  HAS SAMSUNG ALSO PROVIDED A CALCULATION

18   IN THIS CASE OF WHAT IT SAYS ARE ITS PROFITS ON

19   THIS SAME GROUP OF 17 MILLION DEVICES?

20   A    WELL, NOT TO CONFUSE ANYONE.  MY NUMBER THAT

21   I'VE JUST GIVEN YOU IS SAMSUNG'S NUMBER, TOO.

22             BUT I DEDUCTED CERTAIN COSTS AND SAMSUNG

23   WOULD -- WOULD AND HAS SAID THAT THEY'VE INCURRED

24   ADDITIONAL COSTS THAT SHOULD BE SUBTRACTED.

25             SO THERE'S NO DISPUTE ABOUT THE NUMBERS

```
 1    THAT I'M USING.  IT'S JUST THAT THERE'S A DISPUTE

 2    ABOUT HOW MUCH -- HOW MANY COSTS SHOULD BE INCLUDED

 3    IN THE CALCULATION.

 4    Q    COULD WE SEE PDX 34B.20.

 5              WHAT HAVE YOU SHOWN ON THIS SLIDE,

 6    MR. MUSIKA?

 7    A    THERE'S NO MATH IN THIS SLIDE.  THERE'S JUST

 8    THREE NUMBERS.  THE FIRST NUMBER IS THE FAVORITE

 9    NUMBER, OR THE OLD NUMBER WE KNOW, THE 8.1 BILLION

10    TOTAL REVENUE.  SO THAT'S THE REVENUE AT ISSUE.

11              THE MIDDLE NUMBER IS MY NUMBER OF WHAT

12    THE UNJUST GAIN IS.  THAT'S THE SAME $2.2 BILLION

13    NUMBER.

14              BUT THE NUMBER ON THE RIGHT IS ANOTHER

15    SAMSUNG CALCULATION WHICH TAKES MY 2.2 BILLION AND

16    TAKES IT DOWN TO $1,086,000,000.

17    Q    AND WHAT IS -- SINCE YOU BOTH STARTED WITH THE

18    SAME NUMBERS FROM SAMSUNG'S RECORDS, WHAT IS THE

19    REASON FOR THE DIFFERENCE BETWEEN YOUR CALCULATION

20    OF TOTAL PROFITS ON THESE 17 MILLION PHONES AND

21    SAMSUNG'S CALCULATION OF TOTAL PROFITS ON THESE 17

22    MILLION PHONE?

23    A    WE'RE GOING TO SEE IT IN JUST A SECOND, BUT

24    IT'S REAL SIMPLE.  KEEP IN MIND I DEDUCTED COSTS

25    WHICH ARE DIRECTLY ATTRIBUTABLE.
```

1          SAMSUNG DEDUCTED THOSE COSTS AS WELL, BUT

2     THEY DEDUCTED ADDITIONAL COSTS WHICH I DID NOT

3     DEDUCT, AND WE'LL LOOK AT THOSE PRESENTLY.

4     Q    OKAY.  WHY DON'T WE LOOK AT EXHIBIT 28.  IT'S

5     IN YOUR BINDER.  AND COULD WE START SIMPLY BY YOU

6     IDENTIFYING WHAT EXHIBIT 28 IS.

7     A    EXHIBIT 28 IS A -- THIS IS A SCHEDULE THAT I

8     PREPARED USING SAMSUNG'S RECORDS, TRANSLATED

9     RECORDS, FOR SEC AND I USED IT FOR PURPOSES OF

10    LOOKING AT THE TYPES OF COSTS -- THIS WILL LIST ALL

11    THEIR COSTS FROM TOP TO BOTTOM, AND WE'LL SEE THE

12    KIND OF COSTS I DEDUCTED AND THE ADDITIONAL COSTS

13    THAT SAMSUNG DEDUCTED.

14          MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE

15    THE ADMISSION OF EXHIBIT PX 28.

16          MR. PRICE:  NO OBJECTION.

17          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          28, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22    BY MS. KREVANS:

23    Q    YOU SAY YOU PREPARED THIS.  WHAT WAS THE

24    SOURCE OF THESE NUMBERS?

25    A    SAMSUNG RECORDS.

1    Q    DID YOU CHANGE THE NUMBERS IN ANY WAY WHEN YOU

2    PREPARED THIS SCHEDULE?

3    A    THE NUMBERS ARE -- THEY'RE IMPORTANT, BUT

4    THEY'RE NOT THE NUMBERS.  THEY'RE THE NUMBERS FOR

5    THE OVERALL ENTITY.  SO IT HAS OTHER SALES OF

6    NON-ACCUSED ITEMS.

7         MY FOCUS IS REALLY MORE ON TERMS OF THE

8    TYPES OF ACCOUNTS, BUT I DIDN'T CHANGE THIS.  THIS

9    COMES DIRECTLY -- THIS IS THE TYPE OF ACCOUNTS AND

10   THE NUMBERS COME DIRECTLY FROM SAMSUNG.

11   Q    OKAY.  COULD WE JUST MAKE A LITTLE LARGER,

12   MR. LEE, THE TOP PORTION OF THIS DOWN THROUGH LINE,

13   GROSS SALES PROFIT PERCENTAGE.

14        WHAT'S DEPICTED HERE, MR. MUSIKA?

15   A    SAMSUNG'S RECORDS ARE, ARE THE SAME AS, IN

16   MANY OTHER SOPHISTICATED, SAME AS APPLE'S.  THEY'RE

17   PREPARED BASICALLY IN THE SAME FORMAT.

18        AND THE BASIC FORMAT OF A FINANCIAL

19   STATEMENT, OR A PROFIT AND LOSS STATEMENT, IS NO

20   DIFFERENT THAN OUR PERSONAL PROFIT AND LOSS

21   STATEMENTS.

22        WE START AT THE TOP WITH HOW MUCH DID WE

23   EARN, WHAT'S THE REVENUE?  AND THEN WE DEDUCT

24   EXPENSES.

25        STARTING AT THE TOP, THOSE EXPENSES ARE

```
 1    DIRECTLY ATTRIBUTABLE.  AS YOU MOVE DOWN AND YOU

 2    GET TO WHERE PEOPLE USUALLY REFER TO IT, THE BOTTOM

 3    LINE, THOSE COSTS THAT ARE INCLUDED BECOME LESS AND

 4    LESS SPECIFICALLY ASSOCIATED WITH THE REVENUE.

 5              SO HERE WE SEE REVENUE, QUANTITY AT THE

 6    TOP, AND THEN SALES IN TERMS OF TOTAL DOLLARS.

 7    Q    AND I TAKE IT FROM WHAT YOU SAID A COUPLE

 8    MINUTES AGO, WHERE IT SAYS SALES $30 BILLION, YOU

 9    DIDN'T USE ALL 30 BILLION OF THOSE DOLLARS IN YOUR

10    CALCULATIONS?

11    A    NO.  AGAIN, THIS IS THEIR NUMBERS FROM THE SEC

12    MANUFACTURING ENTITY THAT HAS SALES OF OTHER ITEMS

13    IN THERE, SO I'VE ALREADY PULLED MY -- MY 8

14    BILLION, OR SAMSUNG'S 8 BILLION IS IN THAT $30

15    BILLION NUMBER IN THERE, BUT THERE ARE OTHER THINGS

16    IN THERE AND WE SHOULDN'T BE FOCUSSED ON THOSE

17    NUMBERS.

18    Q    OKAY.  YOU SEE AT THE BOTTOM PORTION OF THIS

19    EXHIBIT 28 THAT WE'RE LOOKING AT ON THE SCREEN

20    RIGHT NOW, THERE ARE TWO LINES THAT SAY "GROSS

21    SALES PROFIT" AND "GROSS SALES PROFIT PERCENTAGE."

22              WHAT ARE THOSE NUMBERS?

23    A    STANDARD ACCOUNTING TERMINOLOGY.  SALES MINUS

24    COST OF GOODS SOLD, THAT'S -- C.O.G.S. STANDS FOR

25    COST OF GOODS SOLD, AND THOSE ARE COSTS WHICH ARE
```

```
 1    DIRECTLY ATTRIBUTABLE TO THE PRODUCTION AND/OR SALE
 2    OF THE ACCUSED DEVICES.
 3              AND THIS IS -- AGAIN, THIS ISN'T MY
 4    CONSTRUCTION.  THIS IS REALLY GENERALLY ACCEPTED
 5    ACCOUNTING PRINCIPALS AND THIS IS DIRECTLY FROM
 6    THEIR STATEMENTS.
 7              AND THAT GETS US, IF WE DEDUCT THE COST
 8    OF GOODS SOLD FROM THE SALES, WE GET A GROSS PROFIT
 9    NUMBER AND PERCENTAGE.
10    Q    AND WHAT'S THE GROSS PROFIT PERCENTAGE?
11    A    GROSS PROFIT PERCENTAGE IS, IN THIS STATEMENT
12    IS 39.2 PERCENT.
13    Q    WHAT WAS THE AVERAGE GROSS PROFIT AMOUNT THAT
14    YOU FOUND IN SAMSUNG'S FINANCIAL RECORDS FOR THE $8
15    BILLION IN SALES OF THE ACCUSED PRODUCTS IN THE
16    UNITED STATES?
17    A    ALL RIGHT.  THE ACCUSED PRODUCTS HAVE SLIGHTLY
18    LOWER GROSS PROFIT PERCENTAGE.  PER MY
19    RECOLLECTION, THE OVERALL GROSS PROFIT PERCENTAGE
20    ON JUST THE ACCUSED PRODUCTS WAS APPROXIMATELY 35.5
21    PERCENT.
22    Q    OKAY.  YOU SAID A COUPLE MINUTES AGO THAT IF
23    WE MOVE DOWN THIS SAME PAGE OF EXHIBIT 28, WE'RE
24    GOING TO SEE SOME OTHER KINDS OF EXPENSES.
25    A    YES.
```

2061

```
 1     Q    DO YOU BELIEVE THAT THOSE OTHER EXPENSES ARE
 2   APPROPRIATE TO BE DEDUCTED IN CALCULATING SAMSUNG'S
 3   TOTAL PROFITS FOR PURPOSES OF DAMAGES IN THIS CASE?
 4     A    FIRST OF ALL, SAMSUNG DEDUCTS ALL THOSE OTHER
 5   EXPENSES.  THEY WERE INCURRED.  I'M NOT DISPUTING
 6   THEY WERE INCURRED.
 7          BUT I DO NOT THINK IT IS APPROPRIATE TO
 8   DEDUCT THOSE TO GET TO THE PROFIT NUMBER WHICH
 9   WOULD REWARD APPLE FOR SAMSUNG'S UNJUST ENRICHMENT.
10          SO REALLY ALL THE EXPENSES BELOW THERE
11   ARE REALLY THE DISAGREEMENT.
12     Q    AND WHY DO YOU THINK THAT THOSE EXPENSES,
13   THOSE OTHER EXPENSES, ARE NOT PROPERLY DEDUCTED IN
14   CALCULATING SAMSUNG'S PROFITS?
15     A    I HAVE TWO VERY SPECIFIC REASONS.
16     Q    WHAT ARE THEY?
17     A    ONE REASON IS THAT THOSE COSTS, BY THEIR VERY
18   NATURE AND HOW THEY'VE BEEN PUT ON THIS FINANCIAL
19   STATEMENT, I KNOW, AS A C.P.A., THAT THEY ARE LESS
20   AND LESS DIRECTLY ASSOCIATED WITH THE PRODUCT AT
21   HAND.  SO I KNOW THAT BASED ON SAMSUNG'S OWN
22   REPRESENTATION.
23          SECONDLY, WHEN I TRIED TO INVESTIGATE HOW
24   THEY WOULD PERHAPS TRY TO ALLOCATE THESE -- AND
25   WHEN I SAY "TRY," DON'T MEAN THAT IN A NEGATIVE
```

2062

```
 1    WAY, BUT IF YOU HAD A NON-DIRECT COST, THE ONLY WAY

 2    TO ASSIGN IT IS YOU HAVE TO DETERMINE SOME FORM OF

 3    ALLOCATION, AND WHEN I LOOK FOR THE ALLOCATION

 4    BASIS, THE RECORDS WERE UNRELIABLE.

 5            SO FOR THOSE TWO PRIMARY REASONS, NO, I

 6    DID NOT INCLUDE THEM.

 7    Q    OKAY.  CAN YOU GIVE US AN EXAMPLE, FROM

 8    SAMSUNG'S ACTUAL EXPENSE CATEGORIES, OF SOMETHING

 9    THAT SAMSUNG INCLUDED IN ITS CALCULATION WHICH YOU

10    DID NOT INCLUDE AND EXPLAIN WHY YOU THOUGHT IT WAS

11    INAPPROPRIATE.

12    A    YES.  MAY I?

13    Q    PLEASE.

14    A    R&D IS A GOOD EXAMPLE.  R&D STANDS FOR

15    RESEARCH AND DEVELOPMENT, AND CERTAINLY SAMSUNG

16    ENGAGES IN RESEARCH AND DEVELOPMENT, AS DOES APPLE.

17            FROM AN ACCOUNTING STANDPOINT, IT'S

18    CALLED MATCHING.  WE WANT TO MATCH UP THE EXPENSES

19    WITH THE REVENUE.  WE DON'T WANT TO MATCH UP THE

20    EXPENSES FOR PRODUCT A AND SUBTRACT THEM FROM

21    PRODUCT B.

22            AND I KNOW, AGAIN, BASED ON MY OWN

23    ACCOUNTING EXPERIENCE, THAT THE RESEARCH AND

24    DEVELOPMENT COSTS, WHICH ARE INCURRED IN THE

25    CURRENT TIME PERIOD, RELATE TO FUTURE EVENTS, OR
```

2063

```
 1    FUTURE PRODUCTS, NOT TO THE CURRENT PRODUCTS.
 2              AND SO, AGAIN, FOR ANOTHER REASON THERE,
 3    IT IS A COST THAT'S NOT A COST THAT'S ASSOCIATED
 4    WITH THESE ACCUSED PRODUCTS.
 5    Q    OKAY.  LET'S TURN TO THE SECOND REASON THAT
 6    YOU SAID YOU THOUGHT IT WAS INAPPROPRIATE TO
 7    INCLUDE THESE OTHER CATEGORIES, AND THAT WAS THAT
 8    YOU FOUND THE INFORMATION IN SOME WAYS TO BE
 9    UNRELIABLE.
10    A    YES, I DID.
11    Q    WHAT LED TO THAT CONCLUSION?
12    A    AS AN AUDITOR FOR THAT FIRST 10, 12 YEARS OF
13    MY LIFE, AND REALLY DOING INVESTIGATIONS
14    AFTERWARDS, WE AS AUDITORS ARE TAUGHT TO, TO APPLY
15    SOMETHING CALLED PROFESSIONAL SKEPTICISM, EXERCISE
16    OUR PROFESSIONAL JUDGMENT.  WE SIMPLY DON'T TAKE
17    FROM OUR CLIENTS OR FROM PARTIES THAT ARE PRODUCING
18    FINANCIAL INFORMATION AND SAY, THAT MUST BE RIGHT.
19              WE GIVE IT -- IN SORT OF LAYMAN'S TERMS,
20    WE GIVE IT A SMELL TEST AND SAY, DOES THIS MAKE
21    SENSE?  AND IN AUDIT LINGO, AGAIN, ARE THERE
22    CERTAIN RED FLAGS?
23              AND I ENCOUNTERED A NUMBER OF RED FLAGS
24    WITH SAMSUNG'S DATA BELOW THE GROSS PROFIT LINE.
25    Q    OKAY.  COULD WE LOOK AT PDX 34B.23, PLEASE.
```

```
 1              WHAT IS SET OUT IN YOUR SLIDE 23,
 2     MR. MUSIKA?
 3     A    WELL, I WAS GOING TO DO THIS PIECE BY PIECE.
 4     AS A TEACHER, I DON'T LIKE PEOPLE READING AHEAD,
 5     BUT -- GOOD.
 6     Q    THANK YOU, MR. LEE.
 7     A    SO, YES, THERE ARE FOUR RED FLAGS, AS YOU SAW.
 8              IT WAS TAKEN AWAY, BUT THE FIRST ONE IS,
 9     IS THE INFORMATION THAT I'M PRESENTED WITH, DOES
10     THAT TIE TO SOME RELIABLE SOURCE?  SOME OTHER
11     SOURCE, AN AUDITED FINANCIAL STATEMENT, A TAX
12     RETURN, SOMETHING ELSE THAT I KNOW SOMEBODY ELSE IS
13     LOOKING OVER THE COMPANY'S SHOULDER?
14     Q    AND WHAT DID YOU FIND WHEN YOU LOOKED AT THAT
15     ISSUE?
16     A    I'M NOT SAYING IT DIDN'T TIE, BUT NOBODY DID
17     TIE IT.  I COULDN'T TIE IT, AND SAMSUNG DIDN'T
18     RECONCILE OR TIE IT, EITHER.  SO I WAS LACKING WITH
19     THAT LEVEL OF COMFORT.
20     Q    WHAT WAS THE SECOND RED FLAG YOU LOOKED FOR?
21     A    THE SECOND ONE IS, IS THIS INFORMATION THAT'S
22     USED TO RUN THE BUSINESS?  WHEN WE SAY "ORDINARY
23     COURSE," THIS IS INFORMATION THEY USE EVERY DAY.
24     THIS ISN'T SOMETHING THAT'S PRODUCED FOR A SPECIAL
25     PURPOSE.
```

2081

```
 1    COULD MAKE IPHONE A SUCCESS."
 2              AND THEN THE FIRST BULLET UNDER THAT IS
 3    "EASE AND INTUITIVE U/I," USER INTERFACE, "THAT
 4    COVERS ALL USER CLASSES, INCLUDING MALE, FEMALE,
 5    OLD AND YOUNG," AND THEN THE FIRST BULLET,
 6    "BEAUTIFUL DESIGN."
 7    Q    AND HOW DID THOSE, THESE PORTIONS OF THE
 8    DOCUMENT EFFECT THE DEMAND FOR THE IPHONE?
 9    A    WELL, THE FOCUS WAS ON IPHONE AND THE
10    IDENTIFICATION BY SAMSUNG OF IPHONE AS BEING A
11    DRIVER IN THE MARKETPLACE, SO OBVIOUSLY THAT'S
12    REPRESENTATIVE OF DEMAND FOR THE IPHONE, AND
13    IDENTIFYING BEAUTIFUL DESIGN AS BEING FURTHER -- OR
14    EVIDENCE OF, OF DEMAND FOR DESIGN.
15    Q    COULD YOU TURN TO EXHIBIT 194 IN YOUR BINDER,
16    PLEASE, MR. MUSIKA.
17    A    I'M THERE.
18    Q    WHAT IS -- STRIKE THAT.
19              IS EXHIBIT 194 A DOCUMENT THAT YOU
20    CONSIDERED AND RELIED UPON IN FORMING YOUR OPINIONS
21    ABOUT DEMAND FOR THE IPHONE?
22    A    YES.
23              MS. KREVANS:  YOUR HONOR, WE MOVE THE
24    ADMISSION OF EXHIBIT 194.
25              MR. PRICE:  SAME OBJECTIONS, YOUR HONOR.
```

```
 1    FOUNDATION.
 2              MS. KREVANS:  AGAIN, YOUR HONOR, WE'VE
 3    LAID THE FOUNDATION AND IT'S A SAMSUNG ADMISSION.
 4              THE COURT:  IT'S ADMITTED.
 5              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 6              194, HAVING BEEN PREVIOUSLY MARKED FOR
 7              IDENTIFICATION, WAS ADMITTED INTO
 8              EVIDENCE.)
 9    BY MS. KREVANS:
10    Q    WHAT IS EXHIBIT 194, MR. MUSIKA?
11    A    IT'S A, AN INTERNAL E-MAIL FROM SAMSUNG
12    EXECUTIVES TO OTHER SAMSUNG EXECUTIVES.
13    Q    AND THE DATE OF THIS DOCUMENT IS?
14    A    MARCH 2ND, 2010.
15    Q    AND WHO IS IT -- WHAT IS THE SUBJECT MATTER
16    INDICATING?
17    A    THE SUBJECT SAYS "TO UX," USER EXPERIENCE,
18    "EXECUTIVES."
19    Q    WHAT PART OF THIS MARCH 2ND, 2010 E-MAIL DID
20    YOU FIND RELEVANT TO THE DEMAND OPINIONS THAT YOU
21    FORMED?
22    A    GO DOWN ONE, TWO, THREE, FOUR, FIVE PARAGRAPHS
23    AND HIGHLIGHT THAT.  YES.
24              IT SAYS, "I AM NOT SAYING TO MAKE A UX
25    THAT IS EXACTLY IDENTICAL TO THE IPHONE, BUT I AM
```

2083

```
 1    SAYING TO LEARN THE WISDOM OF THE IPHONE AND
 2    RECOGNIZE THE STANDARD OF THE INDUSTRY WHICH WAS
 3    SET BY THEM ALREADY."
 4    Q    LET'S TURN BACK TO YOUR SLIDE 34B.32, AND LOOK
 5    AT THE SECOND FACTOR YOU CONSIDERED, WHICH WAS
 6    MARKET ALTERNATIVES.
 7              WHAT EVIDENCE DID YOU FIND WHEN YOU
 8    LOOKED AT MARKET ALTERNATIVES?
 9    A    UM --
10    Q    AND LET ME FIRST ASK YOU, WHAT DO YOU MEAN BY
11    "MARKET ALTERNATIVES"?
12    A    SO I THINK YOU PHRASED IT WELL, IS IF SAMSUNG
13    DIDN'T MAKE THE SALE, WOULD APPLE HAVE MADE THE
14    SALE?
15              SO IF, IF THERE WERE OTHER ALTERNATIVES
16    IN THE MARKETPLACE, THEN APPLE WOULDN'T MAKE EVERY
17    ONE OF THOSE 22 MILLION SALES.  OF COURSE I DIDN'T
18    CALCULATE LOST PROFITS ON THE 22 MILLION.  YOU MAY
19    RECALL IT WAS ONLY 2 MILLION.
20              PART OF THE REASON WAS BECAUSE ALTHOUGH
21    I'M NOT OFFERING AN OPINION THAT THERE ARE MARKET
22    ALTERNATIVES, I CONSERVATIVELY SAID, WELL, I'M JUST
23    GOING TO ASSUME AND ACCEPT THAT SAMSUNG'S OTHER
24    PRODUCTS AND THAT EVERY OTHER MARKET PARTICIPANT IS
25    A MARKET ALTERNATIVE.
```

2084

```
1    Q    COULD YOU EXPLAIN TO US THE EVIDENCE THAT YOU
2    FOUND WHEN YOU LOOKED AT THIS QUESTION.
3    A    I DID TWO, TWO RESTRICTIONS.  ONE, I, I LOOKED
4    AT THE TIME PERIOD AND I TOOK THAT TWO YEARS,
5    BASICALLY THE TWO-YEAR TIME PERIOD OF 2010, 2011,
6    2012, AND I SHRUNK THAT -- SORRY -- I SHRUNK THAT
7    DOWN.  I ASSUMED THAT WITH EACH PATENT OR EACH
8    TRADE DRESS THAT SAMSUNG WOULD SIMPLY NOT LEAVE THE
9    MARKET, THAT THEY WOULD DO SOMETHING TO TRY TO GET
10   BACK INTO THE MARKET.
11        SO I LIMITED MY CALCULATIONS TO LOST
12   PROFITS TO ONLY A TIME PERIOD WHICH WOULD BE
13   ASSOCIATED WITH THE TIME SAMSUNG WOULD BE OUT OF
14   THE MARKET.
15        SO DEPENDING ON THE INTELLECTUAL
16   PROPERTY, IT WAS AS LITTLE AS ONLY ONE MONTH OR AS
17   HIGH AS EIGHT MONTHS, BUT NOT THE ENTIRE TIME
18   PERIOD.  SO THAT 22 MILLION SHRINKS DOWN TO EIGHT
19   MONTHS OR ONE MONTH, RIGHT, BASED ON THAT.
20        AND THERE WAS ONE OTHER THING.
21   Q    YES, THE MARKET SHARE ALLOCATION.  WHAT ARE
22   YOU REFERRING TO THERE?
23   A    MARKET SHARE ALLOCATION, THERE WAS A FURTHER
24   CUT.  ONCE I GOT IT DOWN TO JUST THAT TIME PERIOD,
25   THE SALES THAT WOULD HAVE BEEN MADE IN THAT TIME
```

```
1    PERIOD, THEN I DISTRIBUTED THOSE SALES TO ALL THE

2    MARKET PARTICIPANTS.

3                I ONLY PUT IN APPLE'S PILE THEIR MARKET

4    SHARE.  I GAVE BACK TO SAMSUNG THEIR MARKET SHARE.

5    I GAVE NOKIA THEIR MARKET SHARE.  I GAVE MOTOROLA

6    THEIR MARKET SHARE.

7                SO THAT CARVED IT DOWN FURTHER AND THAT'S

8    WHY I ONLY END UP WITH 2 MILLION OUT OF THAT 22

9    MILLION THAT QUALIFY FOR LOST PROFITS.

10   Q    WHAT WAS THE THIRD FACTOR YOU CONSIDERED IN

11   DETERMINING HOW MANY OF THE 22 MILLION UNITS

12   QUALIFIED FOR LOST PROFITS?

13   A    CAPACITY.  COULD APPLE -- DID THEY HAVE THE

14   FACILITIES TO ACTUALLY PRODUCE THIS AND SELL THIS?

15   Q    AND WHAT DID YOU FIND?

16   A    I FOUND THAT THEY DID.  THERE WERE -- THERE

17   WERE LIMITATIONS, AS -- BECAUSE THE DEMAND WAS SO

18   HIGH, FROM TIME TO TIME, APPLE DID HAVE

19   CONSTRAINTS.

20               BUT WITH RESPECT TO THIS 2 MILLION

21   INCREMENTAL UNITS OVER THE TWO YEAR TIME PERIOD,

22   APPLE, I CONCLUDED, DID HAVE THE ABILITY TO MAKE

23   THOSE SALES.

24   Q    WHEN YOU SAY "THE ABILITY TO MAKE THOSE

25   SALES," ARE YOU REFERRING TO MANUFACTURING
```

1    CAPACITY?

2    A    MANUFACTURING AND MARKETING CAPACITY.  IT

3    COULD BE EITHER OR BOTH.

4    Q    AND WHAT WAS THE FOURTH FACTOR YOU USED IN

5    DETERMINING WHETHER UNITS QUALIFIED FOR LOST

6    PROFITS REMEDY?

7    A    IT'S JUST A CALCULATION OF APPLE'S PROFITS,

8    AND I WAS ABLE TO CALCULATE HOW MUCH APPLE MAKES ON

9    EACH ONE OF ITS SMARTPHONES OR TABLETS.  AND ONCE

10   AGAIN, IT'S SIMPLE MULTIPLICATION, TIMES 2 MILLION

11   UNITS GAVE ME MY LOST PROFITS.

12   Q    LET'S GO BACK TO SLIDE 34B.62.  IF YOU HAD NOT

13   CONCLUDED THAT 2 MILLION OF THE DEVICES DID QUALIFY

14   FOR LOST PROFIT DAMAGES, WHAT WOULD HAVE CHANGED IN

15   YOUR ULTIMATE CONCLUSION?

16   A    WE WOULD JUST SLIDE THOSE PHONES UP BECAUSE

17   THEY'RE ENTITLED -- UNDER THE ASSUMPTION THAT

18   THEY'RE INFRINGING, THEY'RE GOING TO GET SOME FORM

19   OF DAMAGE.  SO I SLIDE IT UP TO SAMSUNG'S

20   PROFITS -- I'M NOT DOUBLE COUNTING -- AND THE

21   RESULT IS, I THINK WE CAN SHOW, WE DON'T HAVE ANY

22   LOST PROFITS, BUT THE INFRINGING PROFITS NOW GOES

23   UP TO $2.481 BILLION.

24   Q    LET'S GO BACK TO YOUR ORIGINAL APPROACH IN

25   WHICH YOU HAVE PHONES AND TABLETS IN ALL THREE

2087

```
1    CATEGORIES, AND LET ME ASK YOU ABOUT THE LAST

2    CATEGORY, THE REASONABLE ROYALTY CATEGORY.

3              FIRST, COULD YOU EXPLAIN TO THE JURY IN

4    CONCEPT WHAT IS MEANT BY A REASONABLE ROYALTY?

5    A    YES.  I HAVE A SIMPLE LITTLE SLIDE THAT HELPS.

6    Q    34B.42, PLEASE.

7    A    YES.  A ROYALTY PAYMENT IS, IT'S JUST LIKE, AS

8    THE FIRST EXAMPLE, RENT.  SO IF YOU DECIDE TO RENT

9    OUT YOUR HOUSE OR IF YOU HAVE AN APARTMENT AND YOU

10   WANT TO RENT IT, THAT'S YOUR ASSET.  YOU OWN THAT.

11   IT'S A TANGIBLE ASSET.  IF SOMEBODY ELSE IS GOING

12   TO USE IT, YOU WANT TO BE PAID FOR IT.  SO THEY PAY

13   YOU RENT.

14   Q    LET ME STOP YOU RIGHT THERE.  UNDER YOUR REAL

15   ESTATE COLUMN ON THIS GRAPHIC, YOU HAVE WHAT LOOKS

16   LIKE A PICTURE OF TWO HANDS SHAKING.  WHY DO YOU

17   HAVE THAT THERE?

18   A    WELL, IN THE TWO EXAMPLES, REAL ESTATE AND

19   MINERAL RIGHTS, THE PARTIES GET TOGETHER AND

20   ACTUALLY AGREE.

21             BUT HERE, WITHIN THE CONTEXT OF THE

22   LITIGATION, THE REASON WE'RE ALL HERE,

23   UNFORTUNATELY, IS THE TWO PARTIES HAVEN'T AGREED.

24   THEY HAVEN'T SHOOK HANDS AND AGREED.  SO WE DON'T

25   HAVE AN AGREEMENT.
```

```
1    PROFITS IF THERE'S -- IF THE PATENT THAT IS
2    INFRINGED IS A UTILITY PATENT; RIGHT?
3    A    THAT'S RIGHT.  THAT'S NOT ONE OF THE FORMS OF
4    DAMAGES UNDER A UTILITY PATENT, I AGREE.
5    Q    SO THOSE BIG NUMBERS ALL HAVE SOMETHING TO DO
6    WITH THE WAY THE PHONE OR THE TABLET LOOKS?
7    A    WELL, THE ONLY ADDITION, SO THE RECORD IS
8    CLEAR, IS REMEMBER THE SLIDING PHONES.  SO IF YOU
9    MOVE THOSE PHONES OUT OF INFRINGER'S PROFITS,
10   YOU'VE GOT TO PUT THEM INTO SOME COLUMN, LOST
11   PROFITS OR REASONABLE ROYALTY.
12        AND SO AT A MINIMUM, YOU WOULD MOVE THEM
13   ALL DOWN TO REASONABLE ROYALTY TO THE EXTENT THAT
14   THEY ALSO INFRINGED THE UTILITY PATENT.
15   Q    AND SO THAT'S, THAT'S WHAT I'M SAYING.  IT'S
16   ONLY -- YOU GET INFRINGER'S PROFITS ONLY IF THERE'S
17   SOME FINDING ABOUT BASICALLY HOW THESE PHONES LOOK?
18   A    RIGHT.
19   Q    THE DESIGN PATENT, THE DESIGN PATENT OR TRADE
20   DRESS INFRINGEMENT; RIGHT?
21   A    I'M AGREEING WITH YOU.  BUT ALL I'M SAYING IS
22   IT'S NOT LIKE YOU SUBTRACT IT.  YOU HAVE TO
23   SUBTRACT IT, BUT YET ADD IT BACK ON THE OTHER FORM.
24   Q    WELL, YOU DON'T ADD IT BACK IF THERE'S A
25   FINDING THAT, YOU KNOW, AN ORDINARY OBSERVER, FOR
```

2021

```
 1    EXAMPLE, IS NOT GOING TO BE CONFUSED OR THERE'S NOT
 2    DECEIT OR THAT THE PATENT'S INVALID; RIGHT?
 3    A     NO, YOU DO.  THAT'S WHAT'S KEY, BECAUSE THE
 4    KEY TO THE CALCULATION IS EVERY PRODUCT -- THE
 5    CALCULATION IS DONE ON AN INDIVIDUAL PRODUCT.  SO
 6    IN YOUR HYPOTHETICAL, WE HAVE JUST A PHONE, AND
 7    THAT PHONE INFRINGES THE UTILITY PATENTS AND IT
 8    INFRINGES THE TRADE DRESS AND IT INFRINGES THE
 9    DESIGN PATENTS.
10         I'M THINKING THAT YOUR HYPOTHETICAL --
11    AND ON THAT BASIS, THE CALCULATION WOULD BE
12    PRESUMABLY BASED ON THE INFRINGER'S PROFITS.
13         YOU SAY LET'S ASSUME THAT THEY DON'T
14    INFRINGE THE DESIGN PATENTS AND THE TRADE DRESS.
15    LET'S TAKE THAT AWAY.
16         WELL, WE STILL HAVE THE POTENTIAL OF LOST
17    PROFITS ON THE UTILITY AND, AT A MINIMUM, THE
18    REASONABLE ROYALTY.
19         SO WHEN YOU TAKE AWAY THE INFRINGER'S
20    PRODUCTS, YOU'VE TO RECALCULATE THE DAMAGES FOR
21    THAT PARTICULAR PHONE ON ONE OF THOSE OTHER BASES
22    THERE, ASSUMING IT INFRINGES ONE OF THE OTHER
23    UTILITY PATENTS.
24    Q     AND THAT'S WHAT YOU'RE SAYING.  ASSUMING
25    THERE'S SOME OTHER INFRINGEMENT, THERE'S GOING TO
```

1    BE SOME WAY TO CALCULATE IT?

2    A    YES.

3    Q    AND YOU'VE TOLD US THAT YOU WEREN'T ASKED TO

4    CALCULATE ASSUMING THAT, YOU KNOW, ONE OF THESE

5    PATENTS, UTILITY PATENTS WAS INFRINGED ONLY, OR, OR

6    A COMBINATION OF THE UTILITY PATENTS?

7    A    THE COMBINATION -- THAT'S WHY A MODEL WAS

8    REQUIRED -- IS ENDLESS.  THERE ARE REALLY HUNDREDS

9    OF THOUSANDS OF COMBINATIONS GIVEN THE NUMBER OF

10   PATENTS, ET CETERA.

11          AND NO, I WASN'T.  THE ANSWER IS NO, I

12   WASN'T.

13   Q    AND THE ONLY COMBINATIONS I'M TALKING ABOUT

14   ARE THE THREE UTILITY PATENTS.  OKAY?

15   A    YOU'RE RIGHT, I WAS NOT ASKED TO PRESENT THAT.

16   Q    SO THE ASSUMPTIONS, THEN, ARE WE TALKED ABOUT

17   EACH PATENT, DESIGN PATENT IS VALID AND INFRINGED.

18   THAT'S YOUR ASSUMPTION FOR YOUR DAMAGES; RIGHT?

19   A    YES.

20   Q    THAT ALL THE DIFFERENT PRODUCTS THAT APPLE

21   SAYS INFRINGE DO INFRINGE; CORRECT?

22   A    YES.

23   Q    THAT EACH OF THE UTILITY PATENTS IS VALID AND

24   WHATEVER APPLE SAYS INFRINGES INFRINGES; CORRECT?

25   A    UNTIL THE JURY SAYS IT, YES.

```
1    Q     THAT ALL OF APPLE'S TRADE DRESS IS VALID AND

2    EVERYTHING APPLE SAYS INFRINGES INFRINGES; CORRECT?

3    A     YES.

4    Q     AND IT'S GIVEN ALL THOSE ASSUMPTIONS THAT YOU

5    THEN HAVE THIS RANGE OF 2.5 BILLION TO 2.7 BILLION?

6    A     THAT'S CORRECT.

7    Q     SO LET'S TALK ABOUT, FOR EXAMPLE, THE BOUNCE

8    BACK.  ON YOUR LOST PROFITS, I THINK YOU'RE UP

9    AROUND, FOR TOTAL, YOU'RE UP AROUND 400 SOMETHING

10   MILLION?

11   A     488 MILLION.

12   Q     OKAY.  AND THAT OBVIOUSLY ISN'T LOST -- WOULD

13   NOT BE APPLE'S LOST PROFITS WITH RESPECT TO, SAY, A

14   BOUNCE BACK PATENT?

15   A     NOT EXCLUSIVELY, NO.  SAME QUESTION, SAME

16   ANSWER.

17   Q     IN FACT, YOUR ANALYSIS ON THAT, WHEN YOU

18   TALKED -- WHEN YOU THOUGHT IT WOULD TAKE -- IF

19   SAMSUNG WERE TOLD "YOU CAN'T DO THAT ON YOUR

20   PHONE," IT WOULD TAKE THEM A MONTH TO DESIGN AROUND

21   THAT AND DO SOMETHING ELSE?

22   A     AS ONE OF THOSE LIMITING CONDITIONS THAT I

23   TALKED ABOUT, YES, I LIMITED THE CALCULATION TO

24   JUST ONE MONTH OF LOST PROFITS FOR THAT.

25   Q     SO LET'S TALK ABOUT YOUR ANALYSIS ON -- YOU
```

```
 1    SAID YOU DID ANALYSIS ON BUT-FOR; THAT IS, IF -- IF
 2    SAMSUNG DIDN'T HAVE A FEATURE, WHAT WOULD HAPPEN?
 3            AND FOR BUT-FOR, FOR LOST PROFITS, FOR
 4    APPLE'S LOST PROFITS, OKAY, YOU'RE SAYING THAT IF
 5    THE JURY FOUND INFRINGEMENT ON A UTILITY PATENT,
 6    THEN YOU'VE GOT TO LOOK AT, OKAY, WHAT WOULD APPLE
 7    HAVE MADE IF SAMSUNG DIDN'T HAVE THAT FEATURE;
 8    RIGHT?
 9    A    MADE?  WHAT --
10    Q    WOULD HAVE MADE.
11    A    ALL RIGHT.  I'LL SAY YES.  I'M NOT SURE WHAT
12    YOU MEAN, BUT I'LL SAY YES.
13            THEY'VE ALREADY MADE THEIR PRODUCTS.  THE
14    PRODUCTS ARE THE IPHONES IN YOUR HYPOTHETICAL, SO
15    IT WOULD BE THE IPHONE.  IT'S ALREADY MADE.
16    Q    OKAY.  AND I DIDN'T MEAN MANUFACTURE, BUT THE
17    PROFITS THEY WOULD HAVE EARNED?
18    A    OKAY.  THAT'S WHERE I WAS NOT SURE.
19    Q    AND WHEN YOU'RE DOING THAT, YOU'VE GOT TO ASK
20    YOURSELF, HERE'S A SAMSUNG CUSTOMER, THEY'VE GOT A
21    PHONE, ONE OF THE ACCUSED PHONES, THAT HAS BOUNCE
22    BACK.  NOW, IF BOUNCE BACK ISN'T IN THERE, ARE THEY
23    GOING TO LEAVE SAMSUNG TO GO TO APPLE BECAUSE OF
24    THAT ONE FEATURE?  THAT'S THE BUT-FOR ANALYSIS,
25    ISN'T IT?  THAT -- IS SOMEONE GOING TO SAY, "I
```

1    BOUGHT THIS PHONE.  I LIKED IT.  WELL, DARN.  IT

2    DOESN'T HAVE BOUNCE BACK ANYMORE.  I'M GOING TO GO

3    BUY AN APPLE."

4    A    WELL, THAT'S KIND OF A STATEMENT, BUT I'LL

5    RESPOND TO IT AS A QUESTION.

6    Q    TRUE.

7    A    MY CALCULATION IS THAT THEY WOULD GO TO THEM

8    BECAUSE, REMEMBER, I'VE ONLY TAKEN THE SALE AWAY

9    FOR THE MONTH IT WOULD TAKE FOR SAMSUNG TO

10   BASICALLY REMOVE THE BOUNCE BACK.  THEY'RE GOT

11   TO -- THAT'S JUST A PHYSICAL FACT.  SAMSUNG, WITH

12   THE ASSUMPTION THAT THEY CAN'T USE IT, HAS TO TAKE

13   IT OUT OF THEIR PHONE.  THEY HAVE TO REDESIGN THE

14   PHONE.  THEY HAVE TO NEGOTIATE A DIFFERENT PRICE.

15   THEY NEED TO PUT THE MANUFACTURING FACILITY IN

16   PLACE.  I'VE ALLOWED, FOR EVERYTHING TO HAPPEN, ONE

17   MONTH AND ONLY ONE MONTH.

18         AND DURING THAT PERIOD OF TIME, YES, SOME

19   PORTION OF THE MARKET WOULD CHOOSE AN IPHONE

20   INSTEAD OF SAYING, "OH, WELL, I'M GOING TO WAIT OR

21   DO SOMETHING ELSE."

22   Q    WELL, FOR ONE THING, YOU WOULDN'T HAVE TO

23   START A MANUFACTURING FACILITY TO CHANGE THE BOUNCE

24   BACK.  THAT'S JUST A SOFTWARE UPGRADE, RIGHT?  PLUG

25   IT INTO YOUR COMPUTER AND IT WOULD BE CHANGED?

2026

```
 1    A    FAIR ENOUGH, YES.

 2    Q    OKAY.  AND MY QUESTION IS DIFFERENT.  WE KNOW

 3    SOMETHING ABOUT THE PEOPLE WHO PURCHASE THE SAMSUNG

 4    PHONES THAT WE DON'T KNOW ABOUT THE GENERAL PUBLIC,

 5    WHICH IS THAT THEY CHOSE A SAMSUNG PHONE; RIGHT?

 6    A    YES.

 7    Q    OKAY.  SO IF THEY CHOSE A SAMSUNG PHONE, YOU

 8    MIGHT WANT TO LOOK AS TO WHY THEY CHOSE THAT PHONE;

 9    CORRECT?

10    A    I AGREE, AND I DID.

11    Q    AND IN CONNECTION WITH THAT, YOU'D WANT TO

12    ASK, OR FIND OUT, "OKAY, MR. PURCHASER, IF YOU

13    DIDN'T HAVE BOUNCE BACK, WOULD YOU NOT HAVE CHOSEN

14    THAT PHONE AND GONE SOMEWHERE ELSE?"  THAT'S WHAT

15    THE BUT-FOR CAUSATION IS.  IF NOT FOR WHAT SAMSUNG

16    WAS DOING, IT WOULD HAVE GONE TO APPLE INSTEAD;

17    RIGHT?

18    A    THAT'S CORRECT.

19    Q    AND THERE ARE HUNDREDS AND HUNDREDS OF

20    FEATURES ON A SAMSUNG SMARTPHONE; RIGHT?

21    A    YES.

22    Q    APPLE HAS DONE RESEARCH, ITSELF, ON WHY THE

23    PEOPLE WHO BUY SAMSUNG, OR ANDROID, WHY ARE THEY

24    ATTRACTED TO THAT PRODUCT INSTEAD OF OURS; RIGHT?

25    A    YES.
```

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9     REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                   /S/

                     _____
22                   LEE-ANNE SHORTRIDGE, CSR, CRR
                     CERTIFICATE NUMBER 9595
23

24                   DATED:  AUGUST 14, 2012

25

# EXHIBIT 7

2321

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5

      APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
 6    CORPORATION,                )
                                  )  SAN JOSE, CALIFORNIA
 7                 PLAINTIFF,     )
                                  )  AUGUST 14, 2012
 8            VS.                 )
                                  )  VOLUME 8
 9    SAMSUNG ELECTRONICS CO.,    )
      LTD., A KOREAN BUSINESS     )  PAGES 2321-2650
10    ENTITY; SAMSUNG             )
      ELECTRONICS AMERICA,        )
11    INC., A NEW YORK            )
      CORPORATION; SAMSUNG        )
12    TELECOMMUNICATIONS          )
      AMERICA, LLC, A DELAWARE    )
13    LIMITED LIABILITY           )
      COMPANY,                    )
14                                )
                      DEFENDANTS. )
15    _____

16               TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LUCY H. KOH
17              UNITED STATES DISTRICT JUDGE

18

19

20             APPEARANCES ON NEXT PAGE

21

22

23    OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24                             IRENE RODRIGUEZ, CSR, CRR
                               CERTIFICATE NUMBER 8074
25
```

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF        MORRISON & FOERSTER
      APPLE:                   BY:  HAROLD J. MCELHINNY
 3                                  MICHAEL A. JACOBS
                                    RACHEL KREVANS
 4                             425 MARKET STREET
                               SAN FRANCISCO, CALIFORNIA  94105
 5
      FOR COUNTERCLAIMANT  WILMER, CUTLER, PICKERING,
 6    APPLE:                  HALE AND DORR
                               BY:  WILLIAM F. LEE
 7                             60 STATE STREET
                               BOSTON, MASSACHUSETTS  02109
 8
                               BY:  MARK D. SELWYN
 9                             950 PAGE MILL ROAD
                               PALO ALTO, CALIFORNIA  94304
10
      FOR THE DEFENDANT:    QUINN, EMANUEL, URQUHART,
11                            OLIVER & HEDGES
                               BY:  CHARLES K. VERHOEVEN
12                             50 CALIFORNIA STREET, 22ND FLOOR
                               SAN FRANCISCO, CALIFORNIA  94111
13
                               BY:  VICTORIA F. MAROULIS
14                                  KEVIN P.B. JOHNSON
                               555 TWIN DOLPHIN DRIVE
15                             SUITE 560
                               REDWOOD SHORES, CALIFORNIA  94065
16
                               BY:  MICHAEL T. ZELLER
17                                  WILLIAM C. PRICE
                               865 SOUTH FIGUEROA STREET
18                             10TH FLOOR
                               LOS ANGELES, CALIFORNIA  90017
19
      FOR INTEL:           PERKINS COIE
20                             BY:  DANIEL T. SHVODIAN
                               3150 PORTER DRIVE
21                             PALO ALTO, CALIFORNIA 94304

22
      INTERPRETERS:        JAMES YIM VICTORY
23                         ALBERT S. KIM
                           ANN PARK
24

25
```

2323

INDEX OF WITNESSES


DEFENDANT'S


**CLIFTON FORLINES**
     DIRECT EXAM BY MR. JOHNSON          P. 2349
     CROSS-EXAM BY MR. JACOBS            P. 2367


**WOODWARD YANG**
     DIRECT EXAM BY MR. JOHNSON          P. 2373
     CROSS-EXAM BY MR. LEE               P. 2436
     REDIRECT EXAM BY MR. JOHNSON        P. 2485
     RECROSS-EXAM BY MR. LEE             P. 2490


**JINYEUN WANG**
     DIRECT EXAM BY MR. QUINN            P. 2522
     CROSS-EXAM BY MR. JACOBS            P. 2541
     REDIRECT EXAM BY MR. QUINN          P. 2549

**ROGER FIDLER**
     BY VIDEOTAPED DEPOSITION            P. 2558
                                         P. 2565

**ITAY SHERMAN**
     DIRECT EXAM BY MR. VERHOEVEN        P. 2573
     CROSS-EXAM BY MS. KREVANS           P. 2611

```
 1              MR. VERHOEVEN:  ALL RIGHT.  SO LET ME ASK
 2    YOU THIS.
 3    Q    EXCLUDING THE PRADA --
 4              MS. KREVANS:  YOUR HONOR, MAY I HAVE A
 5    RULING ON MY MOTION TO STRIKE?
 6              MR. VERHOEVEN:  HE GAVE A VERY LENGTHY
 7    ANSWER, YOUR HONOR, IT WOULD BE INAPPROPRIATE.
 8              THE COURT:  IT'S NOT IN PAGES 63 TO 75
 9    THAT DISCUSSED THE '087.  I DON'T SEE IT.
10              MR. VERHOEVEN:  HOW ABOUT IF I ASK HIM
11    ANOTHER QUESTION THEN.
12    Q    EXCLUDING FOR THE '087, EXCLUDING THE PRADA,
13    CAN YOU EXPLAIN TO THE JURY YOUR OPINION WITH
14    RESPECT TO WHETHER OR NOT, IN ANY OF THESE OTHER
15    REFERENCES BESIDE THE PRADA, RENDER THE '087
16    OBVIOUS.
17              MS. KREVANS:  YOUR HONOR, JUST SO THE
18    RECORD IS CLEAR, MAY I ASK THAT COUNSEL WITHDRAW
19    THE PREVIOUS QUESTION ASKED FOR THE RECORD AND THAT
20    YOUR HONOR STRIKE IT.
21              MR. VERHOEVEN:  I'LL WITHDRAW IT, YOUR
22    HONOR, IN THE INTEREST OF TIME.
23              THE COURT:  ALL RIGHT.  THANK YOU.
24    BY MR. VERHOEVEN:
25    Q    DO YOU WANT ME TO ASK YOU THE QUESTION AGAIN
```

```
 1    OR DO YOU HAVE IT, SIR?

 2    A    I'M TRYING TO UNDERSTAND.  WHICH --

 3    Q    SO THERE'S AN OBJECTION TO TALKING ABOUT THE

 4    PRADA, SO EXCLUDE THAT FROM YOUR ANSWER IN THE

 5    INTERESTS OF TIME?

 6    A    SURE.

 7    Q    I'M ASKING YOU ABOUT THE '087, THAT'S THIS ONE

 8    HERE, AND YOU'VE REACHED AN OPINION THAT THAT'S

 9    OBVIOUS IN LIGHT OF SOME COMBINATION OF THESE OTHER

10    THREE PHONES; RIGHT?

11    A    YES.

12    Q    OTHER THREE DESIGN PATENTS; RIGHT?

13    A    YES.

14    Q    SO ALL I'M ASKING YOU TO DO IS WALK THE JURY

15    THROUGH YOUR ANALYSIS?

16    A    SURE.  SO TAKING THE '638 AND THEN COMBINING

17    IT WITH THE '383, WHICH IS ON THE RIGHT SIDE, THE

18    '383 HAS A COMPLETELY FLAT FRONT FACE AND IT ALSO

19    HAS THE UNIFORM, COMPLETELY UNIFORM BEZEL.

20         SO COMBINING IT WITH THE '638 WOULD YIELD

21    THE DESIGN OF THE '087.  SO THAT MAKES IT AND

22    RENDERS IT OBVIOUS.

23    Q    ALL RIGHT.  LET'S TURN TO THE LAST DESIGN

24    PATENT, THE TABLET DESIGN, THAT'S THE D'889.

25    THAT'S AT JX 1040 IN YOUR BINDER IF YOU'D LIKE TO
```

```
 1    LOOK AT IT, SIR.  IT'S ALREADY IN EVIDENCE.

 2              CAN WE PUT UP THE SLIDE -- THE NEXT

 3    SLIDE, MR. FISHER.

 4              WHAT'S SHOWN ON THIS SLIDE, SIR?

 5    A    IT SHOWS THE DESIGN PATENT, THE D 504,889 FOR

 6    THE ELECTRONIC DEVICE.

 7    Q    AND YOU REVIEWED THIS DESIGN PATENT; CORRECT?

 8    A    YES.

 9    Q    WHEN WAS THIS PATENT FILED?

10    A    IT WAS FILED ON MARCH 17TH, 2004.

11    Q    WHAT DOES THE D'889 PATENT SHOW?

12    A    IT SHOWS AN ELECTRONIC DEVICE WHICH HAS

13    OVERALL RECTANGULAR SHAPE WITH EVENLY ROUNDED

14    CORNERS.  IT HAS A FLAT FRONT FACE, A TRANSPARENT

15    FRONT FACE, WITH A LARGE, WHAT I ASSUME IS A

16    DISPLAY BELOW THAT SURFACE.

17              IT HAS A RIM SURROUNDING THE FRONT FACE.

18    AND IT HAS A FLAT BACK.

19    Q    NOW, WE SAW, BY VIDEO TESTIMONY, THE TESTIMONY

20    OF MR. ROGER FIDLER.  DID YOU SEE THAT?

21    A    YES, I DID.

22    Q    AND DID YOU CONSIDER MR. FIDLER'S TABLET IN

23    YOUR ANALYSIS UNDER THE D'889 PATENT?

24    A    YES, I DID.

25    Q    CAN WE PUT UP PX 10.79 IN EVIDENCE?  PX 10.79.
```

```
 1              THIS IS ACTUALLY A PLAINTIFF'S EXHIBIT.

 2    DO YOU THINK I COULD ASK COUNSEL TO PUT IT UP?

 3    IT'S -- OR PLAINTIFF'S AUDIO/VISUAL GUY.  IT'S PX

 4    10.79 IN EVIDENCE.

 5              MS. KREVANS:  I WILL HAVE TO LOOK, YOUR

 6    HONOR, BECAUSE THIS ISN'T ONE OF THE EXHIBITS THAT

 7    WAS DISCLOSED TO US.

 8              THE COURT:  CAN YOU FIND IT, PLEASE.

 9              MR. VERHOEVEN:  LET'S TRY IT THIS WAY,

10    YOUR HONOR.  I'M JUST TRYING TO AVOID AN OBJECTION

11    BY USING THEIR EXHIBITS.  LET'S TRY SDX 3970.012.

12    GO BACK ONE.  THERE WE GO.

13    Q    DO YOU RECOGNIZE THESE AS DEPICTIONS OF THE

14    1994 FIDLER TABLET THAT WE SAW ON THE DEPOSITION

15    TESTIMONY THAT WAS JUST PLAYED?

16    A    YES.

17    Q    AND DID YOU REVIEW THAT DEPOSITION?

18    A    YES, I DID.

19    Q    AND DID YOU CONSIDER MR. ROGER FIDLER'S 1994

20    TABLET AS PART OF YOUR OBVIOUSNESS ANALYSIS?

21    A    YES, I DID.

22    Q    WHEN DID MR. FIDLER DESIGN THIS TABLET?

23    A    IN 1994.

24    Q    LET'S GO TO THE NEXT SLIDE, PLEASE.

25              CAN YOU EXPLAIN TO THE JURY YOUR ANALYSIS
```

```
1    OF MR. FIDLER'S TABLET AS WITH REGARDS TO THE D'889

2    DESIGN?

3    A    YES.  SO ON THE TOP WE SEE THE TWO FRONT

4    FACES, THE FIDLER TABLET HAS OVERALL RECTANGULAR

5    SHAPE, EVENLY ROUNDED CORNERS.  IT IS ALMOST FLAT,

6    THE INTENT WAS THAT IT WOULD BE COMPLETELY FLAT,

7    BUT ON THIS ONE IT WAS ALMOST FLAT.

8              IT HAS A VERY LARGE DISPLAY ON THE FRONT

9    FACE.

10             IT HAS A FLAT BACK.  THAT'S IT.

11   Q    DID YOU CONSIDER ANY OTHER PRIOR ART IN

12   CONNECTION WITH YOUR ANALYSIS OF THE VALIDITY OF

13   THE '889 PATENT?

14   A    YES, I DID.

15             MR. VERHOEVEN:  YOUR HONOR, MAY I

16   APPROACH WITH A PHYSICAL EXHIBIT?

17             THE COURT:  PLEASE, GO AHEAD.

18             MR. VERHOEVEN:  FOR THE RECORD, I'M

19   HANDING THE WITNESS PHYSICAL EXHIBIT, JOINT

20   PHYSICAL EXHIBIT 1074.

21             THE WITNESS:  THANK YOU.

22   BY MR. VERHOEVEN:

23   Q    WHAT IS JOINT EXHIBIT 1074?

24   A    THIS IS THE H-P TC 1000, OR COMPAQ AT THAT

25   TIME.
```

1    Q     CAN YOU HOLD IT UP FOR THE JURY?

2    A     SURE (INDICATING).

3    Q     CAN YOU HOLD IT UP ON A SIDE VIEW AS WELL.

4          YOUR HONOR, IF I MAY LET THE JURORS PASS

5    THAT AROUND?

6          THE COURT:  THAT'S FINE.

7          MR. VERHOEVEN:  YOUR HONOR, I'D MOVE JX

8    1074 INTO EVIDENCE.

9          MS. KREVANS:  NO OBJECTION, YOUR HONOR.

10         THE COURT:  IT'S ADMITTED.

11         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12         1074, HAVING BEEN PREVIOUSLY MARKED FOR

13         IDENTIFICATION, WAS ADMITTED INTO

14         EVIDENCE.)

15   BY MR. VERHOEVEN:

16   Q     WHEN WAS THIS TABLET RELEASED?

17   A     THIS WAS RELEASED IN 2002.

18   Q     DID YOU COMPARE THE -- THIS IS THE -- I'M

19   GOING TO REFER TO THIS AS THE TC1000?

20   A     YES.

21   Q     OKAY.  AND THIS BEING JX 1074.  OKAY?

22   A     OKAY.

23   Q     DID YOU DO A COMPARISON OF THE TC1000 AGAINST

24   THE D'889 PATENT?

25   A     YES, I DID.

```
 1    Q    CAN WE GO TO THE NEXT SLIDE, PLEASE.  ONE
 2    MORE.
 3              WHAT IS SHOWN ON THIS SLIDE HERE, SIR?
 4    A    SO WE SEE SIDE BY SIDE BOTH THE VIEW OF THE
 5    D'889 AND THE PHOTO OF THE TC1000, AND ON THE
 6    BOTTOM WE SEE A SIDE VIEW OF THE D'889 AND SIDE
 7    VIEW OF THE H-P TC1000.
 8              AND AS CAN BE SEEN, THE DEVICE ITSELF IS
 9    OVERALL RECTANGULAR IN SHAPE WITH EVENLY ROUNDED
10    CORNERS.  IT HAS A FLAT FRONT SURFACE THAT GOES
11    ACROSS THE WHOLE FRONT FACE UP TO A RELATIVELY THIN
12    RIM THAT SURROUNDS THE DEVICE.
13              IT HAS A RELATIVELY NARROW PROFILE, AND
14    THE PROPORTIONS OF THIS DEVICE ARE ACTUALLY ALMOST
15    IDENTICAL TO THE PROPORTIONS OF THE D'889, WHICH
16    MEANS THE RATIO BETWEEN LENGTH, WIDTH, AND HEIGHT
17    ALMOST IDENTICAL.
18    Q    MR. FISHER, CAN WE PUT UP THE '889 VIEWS, THE
19    H-P TC1000, AND THE FIDLER TABLET ALTOGETHER ON THE
20    SAME SCREEN?  NO, THAT'S NOT IT.
21              IN THE INTEREST OF TIME, YOUR HONOR, I'M
22    GOING TO MOVE ON WHILE MR. FISHER IS TRYING TO GET
23    THAT PUT TOGETHER.
24              THE COURT:  THAT'S FINE.
25    BY MR. VERHOEVEN:
```

1601

```
1    Q    SO IS IT CORRECT THAT YOU EVALUATED WHETHER
2    THE '889 PATENT WAS OBVIOUS IN LIGHT OF THE FIDLER
3    TABLET COMBINED WITH THE TC1000?
4    A    YES.
5    Q    DID YOU REACH A CONCLUSION?
6    A    YES.
7    Q    WHAT WAS YOUR CONCLUSION?
8    A    I FOUND THAT THE D'889 IS OBVIOUS IN LIGHT OF
9    THE COMBINATION OF THE FIDLER TABLET WITH THE H-P
10   TC1000.
11          IF YOU TAKE THE FIDLER TABLET, WHICH HAS
12   NO LIMITATION ON THE FRONT FACE, IT'S RECTANGULAR
13   SHAPE, AND YOU TAKE THE TRANSPARENT, FLAT FRONT
14   COVER OFF THE TC1000 AND WITH THE PROPORTIONS THAT
15   IT HAS AND COMBINE THE TWO, YOU ACTUALLY YIELD THE
16   DESIGN OF THE D'889 AND THAT, THEREFORE, IT RENDERS
17   IT OBVIOUS.
18   Q    OKAY.  LET'S TURN TO THE ISSUE OF
19   FUNCTIONALITY.  YOU TESTIFIED EARLIER, YOU WERE
20   ASKED TO CONSIDER FUNCTIONALITY OF THE DESIGNS IN
21   APPLE'S PATENTS?
22   A    YES.
23   Q    WHY DID YOU CONSIDER FUNCTIONALITY?
24   A    AS FAR AS I UNDERSTAND, THE DESIGN PATENT IS
25   INTENDED TO PROTECT ORNAMENTAL DESIGN.  IT IS NOT
```

1    INTENDED TO PROTECT FUNCTIONAL ELEMENTS.

2    Q    WHAT DID YOU LOOK FOR WHEN YOU WERE

3    CONSIDERING THE ISSUE OF FUNCTIONALITY?

4    A    I WAS TRYING TO SEPARATE WHAT ARE THE

5    ORNAMENTAL ELEMENTS, WHAT ARE THE ORNAMENTAL

6    FEATURES OF THE DESIGN PATENTS AND EXCLUDE OUT THE

7    ONES THAT ARE FUNCTIONAL, THE ELEMENTS THAT ARE

8    FUNCTIONAL.

9    Q    DID YOU USE ANY TEST TO DETERMINE WHETHER

10   SOMETHING WAS FUNCTIONAL OR NOT?

11   A    THE TEST WOULD BE IF SOMETHING IS -- IF AN

12   ELEMENT IS ESSENTIAL FOR THE USE OR IMPACTS THE

13   COST OR QUALITY OF THE PRODUCT, THAT WOULD BE

14   CONSIDERED FUNCTIONAL OR IF THE APPEARANCE OF THAT

15   ELEMENT WOULD BE DICTATED BY FUNCTION.

16   Q    DO YOU HAVE ANY EXPERTISE YOURSELF RELEVANT TO

17   DETERMINING FUNCTIONALITY IN THE SMARTPHONES?

18   A    I'M -- AS I MENTIONED, I'VE WORKED IN MOBILE,

19   I DESIGNED PHONES, I HAVE WORKED VERY HARD ON

20   UNDERSTANDING THE FUNCTIONALITIES FOR A PHONE, WHAT

21   IT MEANS, HOW IT IMPACTS THE DESIGN.

22        SO I DEFINITELY THINK I HAVE THE

23   EXPERIENCE FOR THAT.

24   Q    OKAY.  MR. FISHER, CAN WE PUT UP THE FRONT

25   FACE OF '677, '087, AND '889 FOR REFERENCE.  THERE

1    WE GO.

2              THIS IS JUST AN ILLUSTRATION OF THE FRONT

3    FACE OF THE '677 ON THE LEFT, '087 IN THE MIDDLE,

4    '889 ON THE RIGHT.  DO YOU SEE THAT, SIR?

5    A    YES, I DO.

6    Q    DO ALL OF THESE -- WELL, CAN YOU DESCRIBE THE

7    SHAPE OF THE DISPLAY SCREENS ON THESE DESIGN

8    PATENTS?

9    A    ALL OF THESE DEVICES HAVE RECTANGULAR

10   DISPLAYS.

11   Q    DID YOU FORM AN OPINION AS TO WHETHER A LARGE

12   RECTANGULAR DISPLAY WAS FUNCTIONAL?

13   A    YES, I DID.

14   Q    PLEASE EXPLAIN YOUR OPINION TO THE JURY?

15   A    SO A RECTANGULAR DISPLAY IS FUNCTIONAL AND IT

16   IS FUNCTIONAL BECAUSE, FIRST, THE MEDIA THAT WE'RE

17   CONSUMING ON THESE DEVICES, WHICH MEANS EITHER

18   MOVIES OR NEWSPAPERS OR WEB PAGES, ALL OF THESE

19   COME IN RECTANGULAR SHAPE.

20             SO OBVIOUSLY THE DISPLAYS ARE RECTANGULAR

21   AND THEY HAVE BEEN SO AS FAR AS I CAN REMEMBER.

22             IN ADDITION, IN TERMS OF WHAT'S AVAILABLE

23   AND WHAT'S EASY TO MANUFACTURE IN TERMS OF COST,

24   THESE RECTANGULAR DISPLAYS, THIS IS THE MAJORITY,

25   OVERWHELMING MAJORITY OF THE DISPLAYS ARE

```
 1    RECTANGULAR AND ANY OTHER SHAPE WOULD BE MORE

 2    EXPENSIVE, COMPLETELY RARE.

 3    Q    WHAT ABOUT THE OUTSIDE SHAPE OF EACH OF THESE

 4    FORM FACTORS?  HOW WOULD YOU DESCRIBE THEM?

 5    A    SO I WOULD DESCRIBE THAT AS OVERALL

 6    RECTANGULAR SHAPE.

 7    Q    AND DID YOU FORM ANY OPINION ON WHETHER AN

 8    OVERALL RECTANGULAR SHAPE WAS FUNCTIONAL USING THE

 9    STANDARD THAT YOU'VE DESCRIBED?

10    A    YES, I DID.

11    Q    PLEASE EXPLAIN TO THE JURY.

12    A    SO ON THESE TYPE OF DEVICES, EITHER A TABLET

13    OR A SMARTPHONE WITH A LARGE DISPLAY, THE DISPLAY

14    IS SORT OF THE MAIN ELEMENT.  YOU ARE TRYING TO

15    MAXIMIZE THE SIZE OF THE DISPLAY.

16            AND ON THE OTHER HAND, SINCE THESE ARE

17    MOBILE DEVICES BY NATURE, YOU ARE TRYING TO

18    MINIMIZE THE OVERALL SIZE OF THE DEVICE.

19            AND, THEREFORE, THE OVERALL SHAPE OF THE

20    DESIGN IS PRACTICALLY DICTATED BY THE FACT THAT

21    THERE IS A RECTANGULAR DISPLAY WHICH BASICALLY

22    YIELDS OVERALL RECTANGULAR SHAPE FOR THE DEVICE.

23    Q    CAN YOU DESCRIBE THE CORNERS ON EACH OF THESE

24    DEVICES?

25    A    ON ALL FOUR -- ON ALL OF THESE DESIGNS, THE
```

```
 1   CORNERS ARE ROUNDED.

 2   Q    AND DID YOU FORM AN OPINION AS TO WHETHER

 3   ROUNDED CORNERS WERE FUNCTIONAL USING THE STANDARD

 4   YOU DESCRIBED?

 5   A    YES.

 6   Q    PLEASE EXPLAIN THAT TO THE JURY.

 7   A    ROUNDED CORNERS HAVE SIGNIFICANT BENEFITS WHEN

 8   IT COMES TO SORT OF THE USABILITY AND ECONOMICS.

 9        IT'S EASIER TO HOLD THEM, IT'S MORE

10   COMFORTABLE.

11        THEY ALSO DON'T SNAG WHEN YOU'RE TRYING

12   TO PUT THEM INTO YOUR POCKET OR ACTUALLY YOUR

13   FINGERS OR HURT YOU.

14        AND THERE ARE ALSO BENEFITS IN TERMS OF

15   MANUFACTURING AND THE MECHANICAL STABILITY OF

16   ROUNDED CORNERS.  SHARP CORNERS, MAY BEND AND

17   BREAK, WHILE ROUNDED CORNERS ARE STRONGER AND

18   EASIER TO MANUFACTURE.

19   Q    DID YOU FIND ANY EVIDENCE IN THE RECORD THAT

20   APPLE DESIGNERS CONSIDERED THE FUNCTIONAL ASPECTS

21   OF ROUNDED CORNERS?

22   A    YES.

23   Q    I'LL DIRECT YOUR ATTENTION TO DX 562 IN YOUR

24   BINDER.  AND CAN WE PUT UP SDX 3970.017.

25        YOUR HONOR, I THINK MY RECORDS ARE A
```

```
1    LITTLE CONFUSED.  I'M NOT SURE IF DX 562 IS IN

2    EVIDENCE.  I WOULD MOVE IT INTO EVIDENCE FOR THE

3    LIMITED PURPOSE OF FUNCTIONALITY.

4              THE COURT:  IT IS ADMITTED AND I JUST

5    HAVE ONE INSTRUCTION, AND THAT IS THAT THE JURY MAY

6    CONSIDER DX 562 AS TO FUNCTIONALITY, BUT NOT AS TO

7    INVALIDITY OR NON-INFRINGEMENT.

8              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

9              562, HAVING BEEN PREVIOUSLY MARKED FOR

10             IDENTIFICATION, WAS ADMITTED INTO

11             EVIDENCE.)

12             MR. VERHOEVEN:  JUST ONE SECOND.  A

13   LITTLE TECHNICAL DIFFICULTY.

14             THE COURT:  THAT'S ADMITTED AND,

15   MS. KREVANS, YOU'RE RESERVING YOUR OBJECTION?

16             MS. KREVANS:  YES, YOUR HONOR.

17             THE COURT:  OKAY.

18             GO AHEAD, PLEASE.

19             MR. VERHOEVEN:  MAY I PUBLISH IT ON THE

20   SCREEN, YOUR HONOR?

21             THE COURT:  GO AHEAD.

22             MR. VERHOEVEN:  THANK YOU.

23   Q    IS THIS ONE OF THE DOCUMENTS YOU CONSIDERED,

24   SIR?

25   A    YES.
```

```
 1    Q    THIS IS A DOCUMENT FROM RICHARD HOWARTH.  DO
 2    YOU HAVE AN UNDERSTAND WHO HE IS?
 3    A    HE'S A DESIGNER AT APPLE.
 4    Q    AND IT'S TO JONATHAN IVE.  WHO IS HE?
 5    A    THE HEAD OF APPLE.
 6    Q    I'LL READ THIS INTO THE RECORD, "I'M WORRIED
 7    ABOUT THE EXTRUDO SHAPE WE'RE USING FOR P2, ET
 8    CETERA, LOOKING AT WHAT SHIN'S DOING WITH THE
 9    SONY-STYLE CHAPPY.  HE'S ABLE TO ACHIEVE A MUCH
10    SMALLER-LOOKING PRODUCT WITH A MUCH NICER SHAPE TO
11    HAVE NEXT TO YOUR EAR AND IN YOUR POCKET.  BUT IT
12    DOES HAVE THE SIZE AND SHAPE/COMFORT BENEFITS I
13    MENTIONED BEFORE AND THESE ARE HARD TO IGNORE WITH
14    A PRODUCT WE HAVE TO CARRY IN OUR POCKET."
15             DO YOU SEE THAT, SIR?
16    A    YES.
17    Q    AND HOW DID THAT INFORM YOUR OPINION AS TO THE
18    ISSUE OF WHETHER THE ROUNDED CORNERS ARE
19    FUNCTIONAL?
20    A    IT SEEMS THE APPLE DESIGNERS ALSO ACKNOWLEDGED
21    THE ADVANTAGES OF ROUNDED CORNERS SINCE WHAT THEY
22    CALL THE "SONY-STYLE CHAPPY," WHICH IS THE
23    LEFT-SIDE IMAGE, HAS ROUNDED CORNERS VERSUS THE
24    OTHER DESIGN, THE EXTRUDO, WHICH DOES NOT HAVE
25    THEM.  AND THEY ALSO MENTIONED THE ERGONOMIC
```

2608

```
 1    BENEFITS OF THAT.  SO I THINK THAT BASICALLY
 2    REENFORCES THAT.
 3    Q    MR. FISHER, CAN WE GO BACK TO THE SCREEN THAT
 4    HAS THE VIEWS OF THE THREE DESIGN PATENTS THAT
 5    WE'RE TALKING ABOUT.
 6          MS. KREVANS:  AND, YOUR HONOR, I WOULD
 7    JUST NOTE THAT THIS WAS NOT A DEMONSTRATIVE THAT
 8    WAS DISCLOSED TO US.  WE WOULDN'T HAVE HAD
 9    OBJECTION IF IT HAD BEEN, BUT I THINK SINCE THERE
10    HAS BEEN EXTENSIVE TESTIMONY ABOUT IT, IT SHOULD BE
11    GIVEN A NUMBER AND PROVIDED TO US.
12          MR. VERHOEVEN:  THAT'S FINE, YOUR HONOR.
13    THIS IS JUST TRIAL DIRECTOR.
14          THE COURT:  I KNOW.  I UNDERSTAND.  GO
15    AHEAD.  PLEASE.
16          MR. VERHOEVEN:  THANK YOU.
17    Q    DO ALL THESE DESIGNS HAVE A FLAT FRONT FACE?
18    A    YES, THEY DO.
19    Q    AND DID YOU CONSIDER WHETHER A FLAT FRONT FACE
20    WAS FUNCTIONAL?
21    A    YES.
22    Q    AND CAN YOU EXPLAIN WHY?
23    A    SO IF WE'RE LOOKING AT THESE DEVICES, THEY ARE
24    ALL TOUCH OPERATED DEVICES WITH VERY LARGE
25    DISPLAYS.  YOU OBVIOUSLY WANT TO BE ABLE TO OPERATE
```

```
 1    THEM AND THEY'RE ALL OPERATED BY FINGERS, SO YOU
 2    WANT TO HAVE A FLAT SURFACE THAT WILL BE EASY TO
 3    MANIPULATE AND SINCE YOUR MOVEMENTS AND YOUR
 4    FINGERS ARE NOT POINT ELEMENTS, THEY'RE NOT PENS,
 5    THEY ALSO EXTEND BEYOND WHAT IS THE ACTIVE AREA.
 6              SO WE WOULD LIKE THIS WHOLE AREA TO BE
 7    FLAT SO IT'S GOING TO BE EASILY MANIPULATED WHEN
 8    YOU'RE MOVING YOUR FINGERS AND OPERATING THE
 9    DEVICE.
10    Q    NOW, THE '677 AND THE '087 HAVE THOSE LOZENGE
11    SHAPED SPEAKER SLOTS IN THE TOP PORTION OF THE
12    PHONE.  DO YOU SEE THAT?
13    A    YES.
14    Q    DID YOU FORM AN OPINION AS TO WHETHER HAVING
15    THESE SPEAKER, LOZENGE SHAPED SPEAKER SLOTS IN THAT
16    POSITION WOULD BE FUNCTIONAL OR NOT?
17    A    YES.
18    Q    CAN YOU EXPLAIN YOUR OPINION TO THE JURY?
19    A    YES.  SO OBVIOUSLY YOU NEED AN EARPIECE IN
20    ORDER TO HAVE CALLS, PRIVATE CALLS.  THE LOCATION
21    OF THE EARPIECE SLOT ON TOP OF THE DISPLAY ON THE
22    UPPER PART OF THE TELEPHONE IS A NATURAL LOCATION.
23    YOU'RE HOLDING IT TO YOUR EAR, SO THAT NEEDS TO BE
24    NEAR YOUR EAR.  THE MICROPHONE ON THE BOTTOM SO
25    IT'S CLOSE TO YOUR MOUTH.
```

```
 1              YOU ALSO WOULD LIKE TO HAVE IT SORT OF IN

 2     AN ELONGATED SHAPE WHERE IT HAS A LOT OF BENEFITS,

 3     AND THE REASONS FOR THAT ARE TWO.  ONE IS THAT AS A

 4     USER, YOU DON'T WANT TO NEED TO KEEP IT AT THE

 5     EXACT POINT.  YOU WANT TO HAVE SOME FLEXIBILITY ON

 6     THE PLACING IT, YOU PUT IT TOWARDS YOUR EAR, SO IT

 7     NEEDED TO HAVE SOME WIDTH.

 8              AND ALSO IN TERMS OF SPACE USAGE, YOU

 9     DON'T WANT TO SORT OF EXTEND THE LENGTH OF THE

10     DEVICE, SO IT'S MUCH MORE CONVENIENT TO HAVE THE

11     EARPIECE BEING ELONGATED SO IT DOESN'T CREATE MORE

12     LENGTH TO THE DEVICE.  SO THAT'S BASICALLY IT.

13     Q    FINALLY, THE '677 CLAIMS THIS BLACK FRONT

14     SURFACE.  DO YOU SEE THAT?

15     A    YES.

16     Q    DID YOU CONSIDER OR FORM AN OPINION AS TO

17     WHETHER HAVING A BLACK FRONT FACE WAS FUNCTIONAL AS

18     YOU APPLIED YOUR TEST?

19     A    YES.

20     Q    CAN YOU EXPLAIN THAT TO THE JURY.

21     A    SO WHEN WE'RE LOOKING AT THIS TYPE OF DEVICE,

22     THERE ARE A LOT OF COMPONENTS THAT RESIDE BELOW THE

23     SURFACE, AND YOU WOULD LIKE TO HIDE THEM.  YOU

24     DON'T WANT THEM TO BE SEEN.

25              BLACK IS VERY EFFICIENT COLOR IN HIDING
```

1    THESE TYPE OF COMPONENTS, SO THAT'S ONE REASON.

2            THE OTHER REASON IS THAT THE DISPLAYS

3    THEMSELVES USUALLY COME IN SORT OF GRAY TOWARDS

4    BLACK COLORS, AND SO HAVING THE WHOLE THING AS

5    BLACK IS A NATURAL.

6            IT ALSO PROVIDES GOOD CONTRAST TO THE

7    DISPLAY ITSELF.

8            MR. VERHOEVEN:  PASS THE WITNESS, YOUR

9    HONOR.

10           THE COURT:  ALL RIGHT.  THE TIME IS NOW

11   4:12.  GO AHEAD, PLEASE.

12                    **CROSS-EXAMINATION**

13   BY MS. KREVANS:

14   Q    GOOD AFTERNOON, MR. SHERMAN.

15   A    GOOD AFTERNOON.

16   Q    I'M ALSO ON THE CLOCK, SO I'M JUST GOING TO

17   FOLLOW UP ON A FEW OF THE THINGS THAT MR. VERHOEVEN

18   ASKED YOU.

19           FIRST, LET'S START WITH YOUR BACKGROUND.

20   YOU'RE AN ELECTRICAL ENGINEER; RIGHT?

21   A    CORRECT.

22   Q    YOU'RE NOT AN INDUSTRIAL DESIGNER?

23   A    NO, I'M NOT.

24   Q    AND YOU'VE NEVER TAKEN ANY COURSES IN

25   INDUSTRIAL DESIGN?

```
1    A    NO.

2    Q    AND YOU'VE NEVER TAUGHT ANY COURSES IN

3    INDUSTRIAL DESIGN?

4    A    NO.

5    Q    AND THOSE 20 PATENTS AND A LOT OF PATENT

6    APPLICATIONS YOU MENTIONED, STARTING YOUR

7    TESTIMONY, THOSE ARE ALL UTILITY PATENTS; RIGHT?

8    A    YES.

9    Q    NONE OF THEM ARE DESIGN PATENTS?

10   A    YES.

11   Q    THEY'RE ON VARIOUS ASPECTS OF ENGINEERING

12   INVENTIONS THAT YOU'VE HELPED MAKE?

13   A    YES.

14   Q    OKAY.  WHY DON'T WE START WITH YOUR

15   OBVIOUSNESS OPINIONS ABOUT THE '889 PATENT.  THAT'S

16   THE IPAD DESIGN PATENT.

17            DO YOU HAVE THE TC1000 STILL THERE WITH

18   YOU?

19   A    NO.

20            MS. KREVANS:  MAY I APPROACH, YOUR HONOR.

21            MR. VERHOEVEN:  YOUR HONOR, I OBJECT TO

22   THE CHARACTERIZATION OF THAT DESIGN PATENT BY

23   COUNSEL.

24            MS. KREVANS:  MAY I GO FETCH THE TABLET

25   WHILE YOU'RE LOOKING, YOUR HONOR?
```

1

2                    CERTIFICATE OF REPORTERS

3

4

5

6            WE, THE UNDERSIGNED OFFICIAL COURT

7    REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

8    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

9    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11            THAT THE FOREGOING TRANSCRIPT,

12   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

13   CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

14   SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

15   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16   TRANSCRIPTION TO THE BEST OF OUR ABILITY.

17

18                         /S/
                 _____.
19               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
20

21                         /S/
                 _____
22               IRENE RODRIGUEZ, CSR, CRR
                 CERTIFICATE NUMBER 8074
23

24                         DATED:  AUGUST 14, 2012

25

# EXHIBIT 8

2651

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5

         APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6        CORPORATION,                )
                                     )  SAN JOSE, CALIFORNIA
7                    PLAINTIFF,      )
                                     )  AUGUST 15, 2012
8              VS.                   )
                                     )  VOLUME 9
9        SAMSUNG ELECTRONICS CO.,    )
         LTD., A KOREAN BUSINESS     )  PAGES 2651-2965
10       ENTITY; SAMSUNG             )
         ELECTRONICS AMERICA,        )
11       INC., A NEW YORK            )
         CORPORATION; SAMSUNG        )
12       TELECOMMUNICATIONS          )
         AMERICA, LLC, A DELAWARE    )
13       LIMITED LIABILITY           )
         COMPANY,                    )
14                                   )
                     DEFENDANTS.     )
15       _____

16               TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LUCY H. KOH
17               UNITED STATES DISTRICT JUDGE

18

19

20               APPEARANCES ON NEXT PAGE

21

22

23      OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24                               IRENE RODRIGUEZ, CSR, CRR
                                 CERTIFICATE NUMBER 8074
25

2652

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF        MORRISON & FOERSTER
      APPLE:                  BY:  HAROLD J. MCELHINNY
 3                                 MICHAEL A. JACOBS
                                   RACHEL KREVANS
 4                           425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:              HALE AND DORR
 7                           BY:  WILLIAM F. LEE
                             60 STATE STREET
 8                           BOSTON, MASSACHUSETTS  02109

 9                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                           OLIVER & HEDGES
12                           BY:  CHARLES K. VERHOEVEN
                                  ALBERT P. BEDECARRE
13                           50 CALIFORNIA STREET, 22ND FLOOR
                             SAN FRANCISCO, CALIFORNIA  94111
14
                             BY:  VICTORIA F. MAROULIS
15                                KEVIN P.B. JOHNSON
                             555 TWIN DOLPHIN DRIVE
16                           SUITE 560
                             REDWOOD SHORES, CALIFORNIA  94065
17
                             BY:  MICHAEL T. ZELLER
18                                WILLIAM C. PRICE
                                  JOHN B. QUINN
19                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
20                           LOS ANGELES, CALIFORNIA  90017

21    FOR INTERVENOR       RAM, OLSON,
      REUTERS:             CEREGHINO & KOPCZYNSKI
22                           BY:  KARL OLSON
                             555 MONTGOMERY STREET, SUITE 820
23                           SAN FRANCISCO, CALIFORNIA  94111

24
      INTERPRETERS:        JAMES YIM VICTORY
25                         ANN PARK
                           ALBERT KIM
```

1

2                        INDEX OF WITNESSES

3       DEFENDANT'S

4       MARKUS PALTIAN
             VIDEO DEPOSITION PLAYED              P. 2670
5                                                 P. 2671

6

        ANDRE ZORN
7            VIDEO DEPOSITION PLAYED              P. 2671
                                                  P. 2672
8

        TIM ARTHUR WILLIAMS
9            DIRECT EXAM BY MR. VERHOEVEN         P. 2676
             CROSS-EXAM BY MR. LEE                P. 2739
10

11      JIN SOO KIM
             DIRECT EXAM BY MR. QUINN            P. 2787
12           CROSS-EXAM BY MR. MCELHINNY         P. 2821
             REDIRECT EXAM BY MR. QUINN          P. 2833
13

14      RICHARD HOWARTH
             DIRECT EXAM BY MR. PRICE            P. 2838
15           CROSS-EXAM BY MR. MCELHINNY         P. 2842

16

        ANDRIES VAN DAM
17           DIRECT EXAM BY MR. JOHNSON          P. 2845
             CROSS-EXAM BY MS. KREVANS           P. 2873
18           REDIRECT EXAM BY MR. JOHNSON        P. 2883
             RECROSS-EXAM BY MS. KREVANS         P. 2884
19

20      STEPHEN GRAY
             DIRECT EXAM BY MR. DEFRANCO         P. 2893
21           CROSS-EXAM BY MR. JACOBS            P. 2924

22

23

24

25

```
 1    OBJECTION ON, BECAUSE I DON'T HAVE THE TIME FOR

 2    THIS, IS SIMPLY THE FACT THAT THE LAST THREE PAGES

 3    WERE DISCLOSED TO US AFTER THE DISCLOSURE DATE,

 4    AFTER WE BRIEFED THE HPO'S AND WE DIDN'T HAVE A

 5    CHANCE TO BRING THIS TO YOUR ATTENTION IN AN

 6    ORDERLY FASHION WHEN WE CITED ALL THE DOCUMENTS.

 7              THE COURT:  SO YOU'RE WITHDRAWING YOUR

 8    OBJECTION TO THE FIRST ONE, 684?

 9              MR. MCELHINNY:  WE HAVE NEVER OBJECTED TO

10    THAT.  I'M -- THAT WAS DISCLOSED.  I'M NOT

11    OBJECTING TO THAT.  I'M OBJECTING TO THE

12    VARIATIONS, THE THREE VARIATIONS --

13              THE COURT:  THE A, B, AND C?

14              MR. MCELHINNY:  YES, YOUR HONOR, THAT

15    WERE DISCLOSED TO US AT 4:00 O'CLOCK YESTERDAY

16    AFTERNOON.

17              THE COURT:  ALL RIGHT.  WELL --

18              MR. BEDECARRE:  AND, AGAIN, YOUR HONOR,

19    MR. SHERMAN'S REPORT, WHICH HE POINTED YOU TO, HAS

20    IMAGES FROM A DIFFERENT DOCUMENT.

21              THE COURT:  NO, NO, NO.  I SET A

22    PROCEDURE FOR ORDERLY OBJECTIONS AND YOU SHOULD

23    HAVE DISCLOSED A, B, AND C SO THAT THEY COULD HAVE

24    BE OBJECTED TO IT IN A TIMELY MANNER.

25              MR. QUINN:  YOUR HONOR, B WAS DISCLOSED
```

```
 1     IN A TIMELY MANNER.

 2               684.001B, THAT'S THE SLIDE THAT WE USED

 3     IN OPENING.  IT'S THE SLIDE WE USED WITH

 4     MR. DENISON.  ALTHOUGH THE JURY DIDN'T SEE IT, THE

 5     COURT SAID IF HE CAN'T IDENTIFY ALL THE PHONES, THE

 6     JURY IS NOT GOING TO SEE IT.  THIS WITNESS CAN

 7     IDENTIFY THE PHONES --

 8               THE COURT:  I DISAGREE WITH YOU.  I

 9     THINK, AND YOU CAN CORRECT ME IF I'M WRONG, I

10     BELIEVE WHAT MR. DENISON SAW WAS 684.001.  I DON'T

11     THINK HE SAW 001B.  I DON'T REMEMBER SEEING 001B.

12               MR. QUINN:  WE RESEARCHED THAT, YOUR

13     HONOR, BECAUSE I HAD THE SAME QUESTION AND WANTED

14     TO BE CERTAIN OF IT.

15               THE COURT:  OKAY.  LET ME SEE THE

16     TRANSCRIPT.  LET ME SEE THE TRANSCRIPT.  THIS IS

17     ALL TIME THAT'S BEING BILLED TO YOU BOTH 50/50.

18     SHOW ME THE TRANSCRIPT OF THAT DATE, PLEASE.  AND

19     LET ME SEE WHERE IN -- JUST SHOW ME, TAB FOR ME

20     WHERE IT SAYS THAT THIS PARTICULAR EXHIBIT WAS

21     REVIEWED.

22               MR. QUINN:  SINCE THERE'S NO OBJECTION,

23     YOUR HONOR, TO 681.001, TO SAVE TIME, WE'LL JUST

24     USE THAT.

25               THE COURT:  WHICH ONE?
```

```
1              MR. QUINN:  MY UNDERSTANDING IS 684.001.

2              THE COURT:  ALL RIGHT.

3              MR. MCELHINNY:  I'M SORRY, YOUR HONOR.

4    THE SLIDE THAT WAS DISCLOSED IS THE -- THAT'S

5    RIGHT.  I'M SORRY.

6              THE COURT:  ALL RIGHT.  SO ARE WE IN

7    AGREEMENT AS TO WHICH ONE IS GOING IN?

8              MR. MCELHINNY:  WE'RE IN AGREEMENT, YOUR

9    HONOR, AS TO WHICH ONE CAN BE USED.  WHETHER OR NOT

10   THIS WITNESS CAN HELP US WITH THIS DOCUMENT IS YET

11   TO BE SEEN.

12             THE COURT:  ALL RIGHT.  THAT'S 684.001;

13   CORRECT?

14             MR. MCELHINNY:  YES, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  1:14.  YOU'RE

16   GETTING BILLED FOR THAT 50/50.  THAT'S GOING TO BE

17   SIX MINUTES EACH.

18             ALL RIGHT.  PLEASE BRING IN OUR JURY.

19             (WHEREUPON, THE FOLLOWING PROCEEDINGS

20   WERE HELD IN THE PRESENCE OF THE JURY:)

21             THE COURT:  ALL RIGHT.  WELCOME BACK.

22   PLEASE TAKE A SEAT.  THE TIME IS NOW 1:15.

23             PLEASE GO AHEAD.

24             MR. QUINN:  THANK YOU, YOUR HONOR.

25   Q    IF THE WITNESS COULD PLEASE RECEIVE EXHIBITS,
```

2802

```
 1   GALAXY TAB EXHIBIT, JOINT EXHIBIT 1037 AND 1038.
 2              AND LET ME ASK YOU, MR. KIM, IF YOU WERE
 3   INVOLVED IN DESIGNING THE GALAXY TAB.
 4              MR. MCELHINNY:  MAY I SEE THOSE, PLEASE?
 5              MR. QUINN:  I THINK THEY'RE BOTH IN
 6   EVIDENCE.
 7              MR. MCELHINNY:  BUT WE HAVE A PROCEDURE,
 8   MR. QUINN, YOU HAVEN'T BEEN HERE -- WE HAVE A
 9   PROCEDURE.  WE'VE HAD MISTAKES BEFORE.
10              MR. QUINN:  WOULD YOU LIKE TO COME UP OR
11   SHALL I BRING THEM TO YOU?
12              MR. MCELHINNY:  AS YOU -- I DON'T WANT TO
13   INTERRUPT YOU.
14              THANK YOU.
15              MR. QUINN:  WE HAVE SOME OTHER PHONES.
16   PERHAPS YOU COULD SHOW THEM TO COUNSEL.
17   Q    SO KIM -- MR. KIM, MY QUESTION IS WHETHER YOU
18   WERE THE PERSON INVOLVED IN DESIGNING THESE TWO
19   TABLETS.
20   A    THAT IS CORRECT.
21   Q    AND WHAT IS THE DIFFERENCE, IF YOU CAN TELL
22   THE JURY, BETWEEN THOSE TWO GALAXY TAB 10.1'S?
23   A    ONE IS A SIMPLE WI-FI VERSION.  THE OTHER ONE
24   IS A 4G LTE VERSION.
25   Q    WHEN DID SAMSUNG BEGIN WORKING ON THE GALAXY
```

```
1     TAB 10.1 PROJECT?

2     A     THAT WOULD BE OCTOBER 2009.

3     Q     AND WHEN DID YOU PERSONALLY BEGIN WORKING ON

4     THAT PROJECT?

5     A     THE SAME TIME, OCTOBER OF 2009.

6     Q     AND CAN YOU TELL US WHETHER THAT WAS BEFORE OR

7     AFTER APPLE ANNOUNCED THE IPAD.

8     A     THAT WOULD BE BEFORE.

9     Q     AND DO YOU RECALL WHEN THE IPAD WAS ANNOUNCED?

10    A     END OF JANUARY OF 2010.  THAT'S MY

11    UNDERSTANDING.

12    Q     AND DO YOU HAVE ANY DOCUMENTS THAT REFLECT

13    THAT YOU WERE WORKING ON THE GALAXY TAB 10.1 BEFORE

14    APPLE ANNOUNCED THE IPAD?

15    A     YES, I DO.

16    Q     AND WHAT IS YOUR RECOLLECTION OF ANY DOCUMENTS

17    THAT WOULD REFLECT THAT, THAT YOU WERE WORKING ON

18    THAT?

19              THE INTERPRETER:  YOUR HONOR, MAY THE

20    WITNESS REPEAT HIS ANSWER?

21              THE WITNESS:  YES, I RECEIVED THE

22    PACKAGING REVIEW DOCUMENTS FROM THE DEVELOPMENT

23    OFFICE, WHICH WAS IN THE FORM OF AN E-MAIL.

24    BY MR. QUINN:

25    Q     AND IF WE COULD LOOK AT SDX 3973.009.  IF THAT
```

```
 1      COULD BE DISPLAYED ON THE SCREEN?

 2                  AND THIS IS THE KOREAN LANGUAGE VERSION.

 3                  DO WE HAVE THE ENGLISH LANGUAGE VERSION?

 4      IS THIS THE DOCUMENT THAT YOU'RE REFERRING TO?

 5      A     YES, THAT'S CORRECT.

 6      Q     AND WHAT IS THE DATE OF THAT DOCUMENT?

 7      A     THAT WOULD BE JANUARY 6TH, 2010.

 8      Q     AND IN TERMS OF THE CONTENT OF THIS DOCUMENT,

 9      WHAT DOES IT SAY?

10      A     THIS IS A, THE OVERALL REVIEW OF THE SIZES

11      CONCERNING THE GALAXY TAB 10.1, BASICALLY

12      DISCUSSING THE DISPLAY SIZE, AND ALSO THE BORDER

13      AREA SIZE.

14      Q     AND IS THIS DATED BEFORE APPLE ANNOUNCED THE

15      IPAD?

16      A     YES, THAT'S CORRECT.

17                  MR. QUINN:  WE'D OFFER THIS IN EVIDENCE,

18      YOUR HONOR.

19                  THE COURT:  ANY OBJECTION?

20                  MR. MCELHINNY:  NO OBJECTION?

21                  THE COURT:  IT'S ADMITTED.

22                  (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

23                  3973.009, HAVING BEEN PREVIOUSLY MARKED

24                  FOR IDENTIFICATION, WAS ADMITTED INTO

25                  EVIDENCE.)
```

1    BY MR. QUINN:

2    Q    LET'S TALK ABOUT THE BASIC DESIGN PRINCIPLES

3    THAT WENT INTO DESIGNING THE GALAXY TAB.

4              AND WHAT WAS THE MOST IMPORTANT INITIAL

5    CONSIDERATION?

6    A    THE MOST IMPORTANT THING AT THE TIME WAS TO

7    PROVIDE FOR THE BIGGEST ROOM OR THE LARGEST ROOM

8    FOR THE DISPLAY WITHIN AN EXTERIOR THAT IS AS SMALL

9    AS POSSIBLE.

10   Q    AND WHAT SIZE DID YOU ARRIVE AT FOR THE SIZE

11   OF THE DISPLAY?

12   A    WHEN YOU DETERMINE THE SIZE OF A DISPLAY, YOU

13   WOULD HAVE TO CONSIDER THE ECONOMIC ASPECTS OF IT.

14   YOU WANT TO MAKE SURE THAT THERE WOULD BE THE

15   LARGEST AVAILABLE NUMBER OF THE GLASSES WHEN YOU

16   CUT THE BIGGER GLASS, AND ALSO THERE HAS TO BE

17   EFFICIENCY OR PRODUCTIVITY ASPECT TO IT.

18   Q    HOW DID YOU ARRIVE AT THE SIZE OF 10.1 INCHES?

19   THAT SOUNDS LIKE KIND OF AN ODD NUMBER TO CHOOSE.

20   A    PRODUCTIVITY-WISE, AND ALSO THE ECONOMIC

21   EFFICIENCY-WISE, WHEN IT COMES TO MANUFACTURING

22   CAPABILITIES WHICH WERE CONCERNED, WE FELT IT WAS

23   BETTER PERHAPS INCREASING IT BY POINT ONE INCH OF

24   THIS UNIT.

25              THE INTERPRETER:  AFTER HAVING CHECKED,

```
 1    YOUR HONOR, WITH THE CHECKERS, RATHER THAN

 2    PRODUCTIVITY, IT SHOULD BE MANUFACTURABILITY.

 3    BY MR. QUINN:

 4    Q   IF YOU HAD INCREASED IT BY ONE INCH, HOW WOULD

 5    THAT HAVE AFFECTED THE MANUFACTURABILITY?

 6    A   WELL, WE START WITH A MOTHER GLASS, AND IF YOU

 7    WERE TO INCREASE THE DISPLAY SIZE OR THE GLASS TO

 8    BE CUT BY EVEN 0.1 INCH, IT WOULD MEAN THAT INSTEAD

 9    OF HAVING 50 GLASSES THAT COULD BE CUT OUT FROM THE

10    MOTHER GLASS, YOU WOULD END UP WITH 30 TO 35 UNITS

11    ONLY.

12    Q   WHAT WAS THE SECOND PRINCIPAL CONSIDERATION

13    ARRIVING AT THE DESIGN OF THE GALAXY TABLET?

14              MAY I APPROACH THE WITNESS, YOUR HONOR?

15              THE COURT:  PLEASE, GO AHEAD.

16              THE WITNESS:  THE -- THE SECOND THING I

17    HAD CONSIDERED WAS WHETHER THEY WANT TO HAVE THE

18    DISPLAY ON A MORE HORIZONTAL BASIS OR THE VERTICAL

19    BASIS.

20              MR. QUINN:  I'M HANDING THE WITNESS, YOUR

21    HONOR, AN IPAD, EXHIBIT 1004 IN EVIDENCE.

22    Q   AND CAN YOU EXPLAIN TO US WHAT THE DIFFERENCE

23    IN ORIENTATION, WHAT YOU MEAN BY "ORIENTATION"?

24              MR. MCELHINNY:  YOUR HONOR, OBJECTION.

25    THIS IS THE NON-INFRINGEMENT COMPARISONS.  THIS
```

```
 1    WITNESS IS NOT AN EXPERT.  HE'S NOT BEEN DISCLOSED
 2    AS AN EXPERT.
 3              MR. QUINN:  I'M JUST ASKING HIM TO
 4    EXPLAIN WHAT HE MEANS BY ORIENTATION, YOUR HONOR.
 5              THE COURT:  I'M GOING TO SUSTAIN THE
 6    OBJECTION.
 7              GO AHEAD WITH YOUR NEXT QUESTION, PLEASE.
 8    BY MR. QUINN:
 9    Q    YOU REFERRED TO PORTRAIT AND LANDSCAPE.  CAN
10    YOU EXPLAIN THE DIFFERENCE?
11              MR. MCELHINNY:  COULD SOMEONE EXPLAIN TO
12    THE WITNESS THAT HE'S NOT SUPPOSED TO BE HOLDING UP
13    THE TWO DEVICES?
14              MR. QUINN:  IS THAT THE COURT'S RULING,
15    THAT HE SHOULD NOT HOLD THE TWO DEVICES?
16              THE COURT:  WELL, MY RULING WAS THAT HE'S
17    NOT TO TESTIFY ON INVALIDITY OR NON-INFRINGEMENT.
18              SO, YES.
19              MR. QUINN:  ALL RIGHT.
20    Q    SO WOULD YOU PUT DOWN THE IPAD, PLEASE.
21              COULD YOU EXPLAIN THE DIFFERENCE BETWEEN
22    LANDSCAPE AND PORTRAIT ORIENTATION?
23    A    WELL, WHEN YOU LOOK AT THESE DEVICES, THERE'S
24    THE HARDWARE PART AND THEN THERE ARE PARTS THAT ARE
25    UNSEEN, OR NOT SEEN.  FOR EXAMPLE, WE WOULD HAVE TO
```

```
 1    DECIDE WHERE WE WANT TO PUT THE PLACE, THE 30 PIN

 2    CONNECTOR, AND ALSO THERE'S A CAMERA HERE WHICH

 3    WOULD TAKE A SHOT OF THE FRONT VIEW, AND ALSO

 4    THERE'S ANOTHER CAMERA FOR A REAR, REAR VIEWS.

 5         AND ALSO, WE HAVE TO CONSIDER THE

 6    PLACEMENT OF THE EAR DUCTS AND THE SPEAKERS.  SO

 7    ALL THESE PLACEMENTS WOULD BE A BEARING ON WHETHER

 8    THE ORIENTATION SHOULD BE VERTICAL OR HORIZONTAL.

 9         SO AS DESIGNERS WE WOULD HAVE TO CONSIDER

10    ALL THESE THINGS.

11    Q   IN THE CASE OF THE GALAXY TAB, WHAT DECISION

12    WAS MADE IN TERMS OF ORIENTATION, LANDSCAPE OR

13    PORTRAIT?

14    A   WELL, WE HAVE VARIOUS FEATURES, SUCH AS THE

15    MULTIMEDIA PLAYER AND ALSO THE CAMERA AND ALSO

16    MOVING PICTURE, CAMCORDER, THINGS LIKE THAT, AS

17    WELL AS TV.

18         SO WE HAD TO CONSIDER ALL THOSE THINGS,

19    AND WE HAD TO DECIDE, SINCE WE WERE EMPLOYING A

20    LANDSCAPE ALREADY ANYWAY, THAT THE GALAXY TAB

21    SHOULD ALSO BE LANDSCAPE ORIENTED.

22    Q   OKAY.  IN TALKING ABOUT THE DESIGN OF THE

23    GALAXY, WE TALKED ABOUT SCREEN SIZE AND

24    ORIENTATION.

25         WAS THERE A THIRD FACTOR -- SIGNIFICANT
```

```
 1    DESIGN DECISION THAT YOU HAD TO MAKE?
 2    A     AND ALSO WE HAD TO CONSIDER THE DISPLAY THAT
 3    YOU -- ONE WOULD ENCOUNTER FROM THE FRONT, MORE OF
 4    A FRONTAL DISPLAY.
 5              AND ALSO, WE HAD TO CONSIDER THE
 6    PACKAGING ITSELF.
 7              SO WE HAD TO DECIDE WHETHER WE WANT TO
 8    REDUCE THE IMAGING AREA, OR THE DISPLAY AREA, AND
 9    THEREBY PERHAPS INCREASING THE THICKNESS, OR
10    DECREASE THE THICKNESS AND PERHAPS HAVE THE
11    VERTICAL AND THE HORIZONTAL PART IMAGE SHOWING
12    SMALLER.
13    Q    SO IS IT TRUE THAT YOU COULD --
14              THE INTERPRETER:  I'M SORRY, COUNSEL.
15              (DISCUSSION OFF RECORD BETWEEN
16    INTERPRETERS.)
17              THE WITNESS:  LET ME SAY, YES, WHEN WE
18    TALK ABOUT THE FRONT DISPLAY PART, WE HAVE TO
19    CONSIDER THE FACTORS, INCLUDING RELATING TO THE
20    COMPONENTS.  SO WHETHER WE ARE GOING TO DECREASE
21    THE HORIZONTAL AND THE VERTICAL SIZE, MEANING THE
22    LANDSCAPE ORIENTATION AND THE VERTICAL ORIENTATION
23    OF IT, OR -- IF THAT'S THE CASE, WE HAVE TO
24    INCREASE THE THICKNESS.
25              AND ON THE OTHER HAND, IF YOU WANT TO
```

2810

```
 1    DECREASE THE THICKNESS, WE HAVE TO DECREASE THE

 2    HORIZONTAL AND THE VERTICAL SIZE OF IT.

 3    BY MR. QUINN:

 4    Q    IN DEVELOPING --

 5              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.

 6    IT DOESN'T MATTER, BUT WE HAVE AN OFFICIAL

 7    TRANSLATOR.  WE HAVE TWO CHECK TRANSLATORS.  THAT

 8    WAS SAMSUNG'S TRANSLATOR.  IS THAT THE OFFICIAL

 9    TRANSLATION?  I THOUGHT WE WERE GOING TO GET IT

10    FROM THE OFFICIAL TRANSLATOR.

11              MR. QUINN:  I HAD UNDERSTOOD THE OFFICIAL

12    TRANSLATOR INVITED THE -- WHAT WE JUST HEARD.

13              THE COURT:  WAS THAT A CONSENSUS AMONGST

14    THE THREE OF YOU, OR NOT?

15              THE INTERPRETER:  WE DON'T INTEND TO

16    OFFER INTERPRETATION BY COMMITTEE BUT FIRST --

17              (DISCUSSION OFFER THE RECORD BETWEEN

18    INTERPRETERS.)

19              THE INTERPRETER:  YOUR HONOR, AFTER

20    HAVING CONFIRMED WITH THE CHECK INTERPRETERS, THE

21    MAIN INTERPRETER STANDS CORRECTED AND THE CHECKER'S

22    RENDITION SHOULD STAND.

23              THE COURT:  OKAY.

24              MR. QUINN:  I'M SORRY.  I DIDN'T HEAR,

25    YOUR HONOR.
```

```
 1            THE COURT:  HE IS ACCEPTING THE

 2    INTERPRETATION OR THE TRANSLATION OF THE CHECK

 3    INTERPRETER.

 4            MR. QUINN:  OKAY.  THANK YOU, YOUR HONOR.

 5            THE INTERPRETER:  IN THAT REGARD, THIS IS

 6    ALBERT KIM.  I'M SORRY, BUT THIS INTERPRETER'S

 7    RENDITION, I DIDN'T WANT IT TO GET TOO MESSY.  I

 8    THINK SOMETIMES TO RE-ELICIT THE TESTIMONY, THIS IS

 9    WHAT I BELIEVE I RECALL.

10            MR. QUINN:  YOUR HONOR, THE OFFICIAL

11    TRANSLATOR HAS ALREADY ADOPTED A TRANSLATION.  THIS

12    IS COMING OUT OF MY TIME PRESUMABLY.  WE ALREADY

13    HAVE AN OFFICIAL ADOPTED TRANSLATION.

14            MR. MCELHINNY:  I ACCEPT THE OFFICIAL

15    TRANSLATOR, YOUR HONOR.

16            THE COURT:  OKAY.  WE'RE FINE.  THANK

17    YOU.

18            MR. QUINN:  THANK YOU, YOUR HONOR.

19    Q    OKAY.  IN TERMS OF THIS TRADEOFF THAT YOU

20    DESCRIBED ABOUT STRETCHING THE SCREEN SIZE AND

21    AFFECTING THE THICKNESS, IN DEVELOPING THE GALAXY

22    TAB, WHAT DID YOU DECIDE TO DO?

23    A    OF COURSE THERE WAS THE VERY IMPORTANT

24    DECISION AS TO THE VERTICAL AND THE HORIZONTAL SIZE

25    AND THE THICKNESS.
```

1          ALSO, WHAT WAS IMPORTANT TO US WAS THE

2    FEELING THAT YOU WOULD HAVE ONCE YOU HOLD THE

3    DEVICE IN YOUR HAND.  SO YOU HAD TO CONSIDER

4    WHETHER HOLDING THE DEVICE IN YOUR HAND WOULD

5    RENDER A PERSON TO FEEL AS IF IT'S QUITE

6    COMFORTABLE OR NOT.

7    Q    BUT IN TERMS OF THIS TRADEOFF IN DEVELOPING

8    THE TABLET, WHAT DID YOU DECIDE TO DO INITIALLY IN

9    TERMS OF HAVING A THICKER OR THINNER TABLET?

10   A    OF COURSE WE START WITH THE SCHEDULING WHEN IT

11   COMES TO DEVELOPMENT, AND AS WE WORK THROUGH THE

12   SCHEDULES, SOMETIMES THE DESIGNS WOULDN'T

13   NECESSARILY HAVE TO BE CHANGED ALONG THE WAY.

14          AND, FOR EXAMPLE, INTERNALLY, WITHIN

15   THESE DEVICES, WE HAVE TO DECIDE HOW WE WANT TO

16   HAVE THE LAYOUT OF THE COMPONENTS INTERNALLY.

17   WOULD YOU WANT TO STACK THEM OR DO YOU WANT TO HAVE

18   THEM SITTING NEXT TO ONE ANOTHER?

19   Q    ALL RIGHT.  DID YOU PREPARE PROTOTYPES OF A

20   THICKER VERSION AND A THINNER VERSION?

21   A    YES, WE HAD DESIGN MOCKUPS.

22   Q    AND DO YOU HAVE THOSE WITH YOU TODAY OF THE

23   THINNER ONE AND THE THICKER ONE?

24   A    YES, I HAVE THEM.

25   Q    ALL RIGHT.  DID YOU DECIDE INITIALLY, THE

```
 1    INITIAL DECISION, THAT YOU COULD MAKE THE THINNER

 2    VERSION?

 3    A    NO, I DID NOT.  THAT'S BECAUSE THE COMPONENTS,

 4    THEY COULD NOT BE DEVELOPED AS FAST AS THE SCHEDULE

 5    HAD ASKED -- HAD REQUIRED.

 6    Q    ALL RIGHT.  WHEN DID SAMSUNG FIRST DISCLOSE TO

 7    THE WORLD THE GALAXY 10.1 TAB DESIGN?

 8    A    IT WAS AT THE MOBILE WORLD CONGRESS, WHICH WAS

 9    HELD ON -- IN FEBRUARY OF 2011.

10    Q    AND AT THAT TIME, THE DESIGN THAT WAS

11    DISCLOSED, WAS THAT THE THICKER ONE OR THE THINNER

12    ONE?

13    A    THE THICKER ONE.

14    Q    AND DID SAMSUNG ULTIMATELY SELL THAT THICKER

15    VERSION IN THE UNITED STATES?

16    A    NO.

17    Q    WHY NOT?

18    A    AT THE MOBILE WORLD CONGRESS, THERE HAD BEEN

19    ABOUT 80 COMPETITORS WHICH HAVE ANNOUNCED THEIR OWN

20    TABLETS.

21              AND AT THE TIME WHEN WE HAD COMPARED OUR

22    SAMSUNG TABLET TO THOSE TABLETS, WE FELT THAT WE

23    DID NOT HAVE MUCH BETTER OF A COMPETITIVENESS OVER

24    THESE OTHER PRODUCTS.

25              SO WE DECIDED THAT WE SHOULD REDESIGN.
```

1    Q    AND SO WHAT DID SAMSUNG DO AS A RESULT OF

2    SEEING THESE OTHER 80 COMPETITIVE TABLETS AT THE

3    MOBILE WORLD CONGRESS?

4    A    WE HAVE DECIDED THAT WE WILL PRODUCE THE

5    LIGHTEST AND THINNEST TABLET IN THE WORLD AND SELL

6    SUCH.

7    Q    AND DID THAT DEVELOPMENT EFFORT TO MAKE THE

8    LIGHTEST AND THINNEST TABLET IN THE WORLD, DID THAT

9    BEGIN BEFORE OR AFTER APPLE ANNOUNCED THE IPAD 2?

10   A    IT WOULD BE BEFORE.

11   Q    AND DO YOU RECALL WHEN THE IPAD 2 WAS

12   ANNOUNCED TO THE WORLD?

13   A    MY UNDERSTANDING IS MARCH, AROUND MARCH OF

14   2011.

15   Q    AND AS A RESULT OF THE ANNOUNCEMENT OF THE

16   IPAD 2, DID SAMSUNG MAKE ANY CHANGES IN YOUR GALAXY

17   TAB PROJECT THAT YOU THEN WERE REDOING AFTER THE

18   WORLD MOBILE CONFERENCE?

19   A    NO.  WE WERE ALREADY CONTINUALLY PURSUING THE

20   THINNEST TABLET IN THE WORLD.

21   Q    AND AS A RESULT, DID THE IPAD 2, WAS THAT

22   THINNER OR THICKER THAN WHAT YOU WERE THEN

23   DEVELOPING INTERNALLY?

24   A    THINNER.

25   Q    AND DID THE TABLET THAT -- DO YOU KNOW WHETHER

```
 1    OR NOT THE TABLET THAT SAMSUNG ULTIMATELY BROUGHT

 2    TO MARKET, THE GALAXY TAB 10.1, WAS THINNER OR

 3    THICKER THAN THE IPAD 2?

 4    A    THINNER.

 5    Q    AND DID YOU THINK -- DID IT OCCUR TO YOU THAT

 6    THERE WAS ANYTHING INAPPROPRIATE, IN SEEING THE

 7    IPAD 2 AND THEN TRYING TO MAKE SOMETHING THINNER

 8    THAN THAT?

 9            MR. MCELHINNY:  HE'S LEADING, YOUR HONOR.

10            THE COURT:  SUSTAINED.

11    BY MR. QUINN:

12    Q    ALL THE -- DID YOU CONSIDER ANY -- ANY --

13    WE'VE HEARD ABOUT THE SMOOTH GLASS SURFACE ON THE

14    GALAXY TAB.

15            DID YOU EVER CONSIDER A SURFACE OTHER

16    THAN A SMOOTH GLASS SURFACE?

17    A    WE HAVE NOT.

18    Q    WHY NOT?

19    A    WE HAVE NOT.  SAMSUNG DOES NOT PRODUCE

20    REINFORCED GLASSES.  WE WOULD HAVE TO IMPORT SUCH

21    FROM CORNING OF THE U.S. OR SOME OTHER JAPANESE

22    COMPANIES.

23            AND IF YOU WERE TO HAVE A CURVATURE OR

24    DIMPLED WITHIN OR ON THE SURFACE OF THE GLASSES,

25    THEN THIS COULD LEAD TO ERROR BECAUSE -- DUE TO
```

2816

```
 1    SUCH IMPERFECTIONS, A USER MAY BE PRESSING A
 2    CERTAIN SPOT BUT A DIFFERENT SPOT MAY RESPOND.
 3    Q    AND IN TERMS OF THE BEZEL, WHAT CONSIDERATIONS
 4    WENT INTO DESIGNING THE BEZEL AROUND THE GALAXY
 5    TAB?
 6    A    WELL, THE BEZEL OF THESE DEVICES, IT'S
 7    REALLY -- IT ACTS LIKE A BUMPER, SAY, ON A CAR.  IT
 8    IS TO PROTECT THE DEVICE, AND SO REALLY IT'S FOR
 9    THE USER.
10         SO WITHOUT A FRAME, WHICH I THINK OF IT
11    AS PROVIDING A FENCE OR A FENCING MECHANISM, IF YOU
12    DIDN'T HAVE SUCH FRAME, YOU WOULD HAVE THE
13    REINFORCED GLASS THAT COMES DIRECTLY IN CONTACT
14    WITH THE USER, PERHAPS THE USER'S HAND, AND IF THE
15    GLASS WERE SOMEHOW SHATTERED OR ABSORBS SOME SORT
16    OF A SHOCK, THEN THIS COULD INFLICT A DEEP WOUND ON
17    THE USER'S HAND.
18         AND ALSO, IF IT DROPS, SO IT COULD
19    SHATTER.  SO THAT'S WHY THE FRAME HAS TO BE THERE,
20    IN ORDER TO PROTECT THE USER, AND ALSO TO MAKE SURE
21    THAT THE SECONDARY DAMAGES DO NOT OCCUR, DAMAGES TO
22    THE REINFORCED GLASS.
23    Q    AND CAN YOU DESCRIBE THE SHAPE OF THE EDGE AND
24    THE REASONS WHY YOU DESIGNED THE EDGE THE WAY YOU
25    DID.
```

1    A    WELL, LOOKING AT THE BACK SIDE, THE EDGE,

2    WELL, YOU WANT TO MAKE SURE THAT WHEN A USER HOLDS

3    THE DEVICE THAT THE LARGEST AREA THAT A USER'S HAND

4    WOULD COME IN CONTACT WITH THE BACK SIDE OF THE

5    DEVICE, AND ALSO YOU WANT TO MAKE IT SO THAT THE

6    USER WOULD HAVE AN EASIER TIME, OR IT WOULD BE

7    EASIER FOR THE USER TO PICK UP THE DEVICE, WHETHER

8    IT'S LAYING ON THE FRONT OR ON THE BACK SIDE.

9    Q    ALL RIGHT.  YOU SHOULD HAVE SOME PHONES UP

10   THERE, SOME SMARTPHONES BEFORE YOU, MR. KIM.

11        THESE ARE ALL IN EVIDENCE, THE DROID

12   CHARGE, JOINT EXHIBIT 1025; THE GALAXY S EPIC 4G

13   SLIDE, JOINT EXHIBIT 1012; THE GALAXY S II, AT&T,

14   JOINT EXHIBIT 1031; THE GALAXY S II SKYROCKET,

15   JOINT EXHIBIT 1035; AND THE GALAXY S II EPIC 4G

16   TOUCH, JOINT EXHIBIT 1034.

17        AND MY QUESTION TO YOU, MR. KIM, IS

18   WHETHER YOU'RE THE INDIVIDUAL WHO DESIGNED ALL OF

19   THESE ACCUSED PHONES?

20   A    YES, I AM.

21   Q    AND WE DON'T HAVE TIME TO GO THROUGH ALL OF

22   THEM, BUT IN EACH CASE, IS THE DESIGN OF THE PHONE

23   DIFFERENT?

24   A    THAT IS CORRECT, THESE DESIGNS ARE DIFFERENT.

25   Q    AND WHY ARE THE DESIGNS OF EACH OF THESE

2818

```
1    PHONES DIFFERENT?  IN OTHER WORDS, WHY DO YOU

2    DESIGN MULTIPLE PHONES WHICH ARE DIFFERENT?

3    A    WELL, FOR STARTERS, YOU WOULD HAVE DIFFERENT

4    SCREEN SIZES OF EACH DEVICE.

5              AND ALSO SOMETHING CALLED A FORM FACTOR,

6    SUCH AS WHETHER THE PHONE IS A SLIDE PHONE OR

7    SOMETHING THAT IS A FULL TOUCH PHONE.

8              AND ALSO, THE FACTORS SUCH AS WHETHER

9    THERE ARE KEYS ON THE FRONT OR NOT.

10             ALL THESE THINGS WOULD HAVE A

11   DETERMINATION, DETERMINING EFFECT.

12   Q    IF WE COULD PUT UP ON THE SMALL SCREEN THE

13   EXHIBIT 684.001, JUST ON THE SMALL SCREEN AT THIS

14   POINT.  AND, MR. KIM, I'M GOING TO CALL YOUR

15   ATTENTION TO THE IMAGES OF PHONES IN THE UPPER LEFT

16   OF THIS EXHIBIT UNDER BAR TYPE TOUCHSCREEN DISPLAY.

17             DO YOU SEE THAT?

18   A    YEAH, I CAN SEE THOSE.

19   Q    AND JUST FOCUSSING ON THOSE IN THAT UPPER

20   QUARTER OF THE EXHIBIT, ARE THERE ANY OF THOSE THAT

21   YOU CANNOT IDENTIFY AS BEING TRUE AND CORRECT

22   IMAGES OF SAMSUNG PHONES OR MOCKUPS THAT EXISTED IN

23   2006?

24             SO AT THIS POINT I'M ASKING THAT IF THERE

25   ARE ANY THAT YOU CANNOT IDENTIFY AS BEING SAMSUNG
```

```
 1    Q    HE'S THE PERSON WHO'S TWO LEVELS ABOVE YOU IN

 2    THE ORGANIZATION; CORRECT?

 3    A    THAT IS CORRECT.

 4              MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

 5    PX 43 IN.

 6              MR. QUINN:  OBJECTION, RELEVANCE, YOUR

 7    HONOR.  THIS RELATES TO THE KEY --

 8              THE COURT:  OVERRULED.

 9              MR. QUINN:  THAT'S NOT AT ISSUE IN THIS

10    CASE.

11              THE COURT:  THAT'S ADMITTED.

12              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER PX

13              43, HAVING BEEN PREVIOUSLY MARKED FOR

14              IDENTIFICATION, WAS ADMITTED INTO

15              EVIDENCE.)

16              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17    Q    BEFORE I LOOK AT THAT, BEFORE I LOOK AT THAT,

18    SIR, WOULD YOU OPEN YOUR BINDER, I WANT TO DEAL

19    WITH MR. QUINN'S ISSUE HERE, WOULD YOU OPEN YOUR

20    BINDER TO PLAINTIFF'S EXHIBIT 42.

21    A    IS THIS IT?

22    Q    YES, SIR, THAT'S IT.  AND IT SHOULD BE THE

23    KOREAN ON THE NEXT PAGE.

24    A    IS THAT FOUND IN MY BINDER HERE?

25    Q    IT SHOULD BE RIGHT BEHIND TAB 42, SIR.  IT'S
```

```
1    THE FIRST DOCUMENT IN MINE, PX 42.  IT'S IN THE

2    WHITE BINDER, SIR.

3    A    YES, I'M LOOKING AT IT.

4    Q    SIR, DO YOU SEE THERE AN E-MAIL THAT'S DATED

5    FEBRUARY 16TH, 2010?

6    A    YES, THAT'S CORRECT.

7    Q    FROM A PERSON NAMED HYUN KIM, DO YOU SEE THAT?

8    A    YES, I SEE IT.

9    Q    HYUN KIM IS DESIGNATED HERE AS A SENIOR

10   DESIGNER AT SAMSUNG?

11   A    I HAVE NOT SEEN THIS PERSON BEFORE.

12   Q    SIR, MY QUESTION IS, DOES HIS TITLE ON THE

13   E-MAIL SAY THAT HE IS A SENIOR DESIGNER AT SAMSUNG?

14   A    YES, THAT'S HOW IT'S WRITTEN.

15            MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE

16   EXHIBIT, PLAINTIFF'S EXHIBIT 42.

17            MR. QUINN:  OBJECTION.  RELEVANCE,

18   RELATES TO P1, P3, NEITHER OF WHICH ARE AT ISSUE IN

19   THIS CASE.

20            THE COURT:  THAT'S OVERRULED.

21            GO AHEAD.  IT'S ADMITTED.

22            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23            42, HAVING BEEN PREVIOUSLY MARKED FOR

24            IDENTIFICATION, WAS ADMITTED INTO

25            EVIDENCE.)
```

```
 1    BY MR. MCELHINNY:

 2    Q    NOW LET'S LOOK AT THESE DOCUMENTS, SIR.

 3              EXHIBIT 42, ON FEBRUARY 16TH, 2010,

 4    ACCORDING TO THIS, THERE WAS A MEETING BETWEEN

 5    GOOGLE AND A SAMSUNG SENIOR DESIGNER CHO.  DO YOU

 6    SEE THAT?

 7    A    YES.

 8    Q    AND THERE'S AN ENTRY THERE TALKING ABOUT P1

 9    AND P3.

10    A    YES.

11    Q    AND THE QUOTE IS, "SINCE IT IS TOO SIMILAR TO

12    APPLE, MAKE IT NOTICEABLY DIFFERENT, STARTING WITH

13    THE FRONT SIDE."

14              DO YOU SEE THAT?

15    A    YES, THAT'S HERE, YES.

16    Q    AND THEN, SIR, IF YOU LOOK AT PX 43., IF YOU

17    LOOK AT THE SECOND PAGE AT BULLET POINT NUMBER 6.

18    THIS IS THE MINUTES OF THE TEAM LEADER'S DIRECTIVES

19    AT THE EXECUTIVE MEETING.

20              DO YOU SEE THAT?

21    A    YES, THAT'S CORRECT.

22    Q    AND THE FIRST ENTRY SAYS, "RESPOND TO THE

23    ISSUE OF DESIGN SIMILARITY FOR THE S SERIES."

24              DO YOU SEE THAT?

25    A    YES, THERE IS A MENTION THAT THE CMF SHOULD BE
```

1    CHANGED.

2    Q    AND THE S SERIES, SO WE ALL UNDERSTAND IT, IS

3    THE GALAXY S SERIES OF PHONES.  THAT'S WHAT THEY'RE

4    TALKING ABOUT HERE WHERE THEY'RE TALKING ABOUT

5    DESIGN SIMILARITY?

6    A    YES, THAT IS CORRECT.

7    Q    AND THEN FURTHER DOWN, IT SAYS, "GOOGLE IS

8    DEMANDING DISTINGUISHABLE DESIGN VIS-À-VIS THE IPAD

9    FOR THE P3."

10             DO YOU SEE THAT?

11   A    I SEE IT.  BUT THIS IS ABOUT THE FRONTAL

12   DIFFERENTIATION AND THERE IS A FAMOUS ARCHITECT IN

13   THE U.S. WHO HAD SAID THAT FORM FOLLOWS FUNCTION,

14   SO THE FUNCTION IS MORE IMPORTANT WHEN IT COMES TO

15   THE FRONTAL SIZE.

16   Q    AND THE DECISION THAT THE TEAM EXECUTIVES MADE

17   AT THIS MEETING WAS TO MAINTAIN THE CURRENT DESIGN.

18             DO YOU SEE THAT?

19   A    YES, THAT IS CORRECT.

20   Q    IN FACT --

21   A    YES.  HOWEVER, THE TIME PERIOD HERE CONCERNED,

22   THIS WOULD BE AFTER THE CONCLUSION OF MWC, AND THIS

23   IS WHEN WE HAD ALREADY DECIDED THAT WE WOULD

24   PRODUCE THE THINNEST DEVICE IN THE WORLD.

25   Q    AND LET'S MAKE SURE OF YOUR TESTIMONY.

```
 1              DESPITE THIS TEAM LEADER'S MEETING, THE

 2    DISCUSSION ABOUT GOOGLE AND THE DECISION, YOU HAVE

 3    TESTIFIED HERE UNDER OATH THAT NOT ONE OF YOUR

 4    SUPERVISORS EVER MENTIONED THIS ISSUE TO YOU?  IS

 5    THAT YOUR TESTIMONY?

 6              MR. QUINN:  YOUR HONOR, ASSUMES FACTS NOT

 7    IN EVIDENCE.  THERE'S NO FOUNDATION THAT'S BEEN

 8    LAID THAT HE WAS AT THE MEETING OR THAT HE HAS ANY

 9    KNOWLEDGE OF THIS.  HE'S BEING QUESTIONED ABOUT A

10    DOCUMENT HE HASN'T EVEN LAID A FOUNDATION HE'S EVEN

11    SEEN.

12              THE COURT:  OVERRULED.

13              THE WITNESS:  I DIDN'T QUITE CATCH THAT.

14    COULD YOU ASK ME THE QUESTION AGAIN, PLEASE.

15    BY MR. MCELHINNY:

16    Q    IS IT YOUR TESTIMONY, UNDER OATH, THAT NO

17    SUPERVISOR OF YOURS EVER MENTIONED TO YOU THE

18    DISCUSSION WITH GOOGLE?

19    A    THAT IS CORRECT.

20    Q    SIR, IN FACT, YOU THEN WENT ON TO USE THE

21    DESIGN OF THE GALAXY TAB AS YOUR INSPIRATION WHEN

22    YOU DESIGNED THE GALAXY ACE PHONE; ISN'T THAT TRUE?

23              THE INTERPRETER:  COUNSEL, WAS THAT ACE

24    PHONE?

25              MR. MCELHINNY:  ACE, GALAXY CASE.
```

2833

```
 1              THE WITNESS:  YES, THAT IS CORRECT.
 2    BY MR. MCELHINNY:
 3    Q    SIR, DO YOU KNOW A GENTLEMAN BY THE NAME OF
 4    MINHYOUK LEE?
 5    A    YES, I DO.
 6    Q    HE WAS THE ORIGINAL DESIGNER OF THE GALAXY
 7    PHONES, WASN'T HE?
 8    A    THAT'S CORRECT.  HE DESIGNED THE GALAXY S I.
 9    Q    HAVE YOU SEEN MR. LEE SINCE YOU'VE BEEN HERE
10    IN SAN JOSE?
11    A    YES, I HAVE.
12    Q    IS HE GOING TO COME AND TESTIFY TO THIS JURY?
13    A    I DON'T KNOW THAT.
14              MR. MCELHINNY:  MR. KIM, THANK YOU VERY
15    MUCH FOR YOUR TIME.
16              THE COURT:  ALL RIGHT.  THE TIME IS NOW
17    2:17.  PLEASE GO AHEAD.
18              MR. QUINN:  IF WE COULD PUT UP ON THE
19    SCREEN PLAINTIFF'S EXHIBIT 43.
20              REDIRECT EXAMINATION
21    BY MR. QUINN:
22    Q    AND LOOK AT THE PAGE -- THE SECOND PAGE, BATES
23    NUMBER 857 THAT COUNSEL WAS JUST ASKING YOU ABOUT.
24              AND IF WE CAN BLOW UP THAT 6, RESPOND TO
25    THE ISSUE.
```

1          "GOOGLE IS DEMANDING DISTINGUISHABLE

2     DESIGN VISIT APPARENTLY VISIT THE IPAD FOR THE P3."

3     DO YOU SEE THAT, THAT COUNSEL ASKED YOU ABOUT?

4     A    YES.

5     Q    THAT'S THE TABLET THAT WAS NEVER SOLD IN THE

6     UNITED STATES; CORRECT?

7     A    THAT'S CORRECT.  THE P3 WAS NOT SOLD.

8     Q    THAT TABLET IS NOT AT ISSUE IN THIS CASE, IS

9     IT?

10    A    THAT IS CORRECT.

11    Q    IF WE COULD LOOK AT EXHIBIT 42, THE OTHER

12    DOCUMENT THAT COUNSEL SHOWED YOU, AND IF WE CAN

13    ENLARGE THAT P1, P3 LANGUAGE THERE.

14             I THINK YOU TOLD US THE P1 IS THE GALAXY

15    7.0.

16    A    YES, THAT'S CORRECT.

17    Q    IS THAT -- IS THAT TABLET AT ISSUE IN THIS

18    CASE?

19             MR. MCELHINNY:  YOUR HONOR, THERE'S NO

20    WAY THIS WITNESS WOULD KNOW THAT CORRECTLY.

21             MR. QUINN:  YOUR HONOR, I THINK WE CAN

22    GET A STIPULATION ON THAT, YOUR HONOR.

23             THE COURT:  OVERRULED.

24             GO AHEAD, PLEASE.

25    BY MR. QUINN:

```
 1    RECEIVES THAT, THAT INPUT AND PERFORMS -- SENDS IT
 2    TO THE DISPLAY UNIT, WHICH THEN UPDATES THE DISPLAY
 3    ON THE E-BOOK ITSELF.
 4    Q    OKAY.  I THINK THERE'S A LITTLE MOTION.
 5    A    SO THERE'S A SCROLL BAR THAT SHOWS, THAT
 6    DEMONSTRATES THE SCROLL OPERATION.  SO THAT
 7    LIMITATION IS MET.
 8    Q    OKAY.  AND LET'S FINISH THE LAST SLIDE WITH
 9    RESPECT TO NOMURA.
10    A    SO, AGAIN, SIMILARLY TO THE WAY THAT THE
11    SCROLL OPERATION WAS, WAS MET, THE SYSTEM ALSO
12    RESPONDS TO A GESTURE CALL BY PASSING THE
13    INFORMATION TO THE IMAGE GENERATION UNIT WHICH GOES
14    TO THE DISPLAY UNIT WHICH UPDATES THE E-BOOK.
15    Q    OKAY.  NOW, IN YOUR OPINION, SIR, WITH
16    RESPECT -- ARE ALL THE LIMITATIONS OF CLAIM 8 OF
17    THE 195 -- '915 PATENT FOUND IN NOMURA?
18    A    YES, THEY ARE.
19    Q    AND WHAT DOES THAT LEAD YOU TO CONCLUDE?
20    A    WHAT THAT MEANS IS BY VIRTUE OF THE FACT THAT
21    ALL OF THE CLAIM LIMITATIONS ARE COVERED BY NOMURA,
22    OR THAT IT ANTICIPATES OR RENDERS OBVIOUS, OR
23    INVALIDATES, RATHER, THE '915 PATENT BY WHAT'S
24    REFERRED TO AS ANTICIPATION, MEANING THAT ONE
25    SOURCE ENCOMPASSES ALL OF THE CLAIM ELEMENTS.
```

```
 1     Q    AND WHAT CONCLUSION, SIR, JUST TO MAKE SURE I
 2    DIDN'T MISS IT, WHAT WAS YOUR CONCLUSION WITH
 3    RESPECT TO DIAMONDTOUCH RUNNING FRACTAL ZOOM
 4    COMPARED TO CLAIM 8 OF THE '915 PATENT?
 5     A    LIKE NOMURA, DIAMONDTOUCH COVERS ALL OF THE
 6    CLAIM ELEMENTS OF CLAIM 8, AND, THEREFORE,
 7    INVALIDATES CLAIM 8 AS WELL.
 8     Q    I JUST WANT TO SPEND A MOMENT ON A THIRD
 9    REFERENCE, IF I HAVE SUCCESS BRINGING IT UP HERE
10    HERE.
11            JUST A SENTENCE OR TWO, SIR, ABOUT WHAT
12    THE HAN SYSTEM WAS?
13     A    SURE.  JEFFERSON HAN WAS A RESEARCH SCIENTIST
14    AT NEW YORK UNIVERSITY AND HE CREATED A DEVICE, NOT
15    ENTIRELY DISSIMILAR FROM THE DIAMONDTOUCH SYSTEM,
16    BUT IT'S A USER INTERFACE, LARGE SCALE USER
17    INTERFACE THAT RESPONDS TO TOUCH INPUT.  AND
18    THERE'S A, A FILM HERE THAT SHOWS EXACTLY WHAT THAT
19    SYSTEM DOES.
20     Q    OKAY.  AND I THINK JUST TO BRING IT BACK TO
21    MIND, LET'S SHOW A VERY SHORT PORTION OF THE HAN
22    VIDEO.
23            CAN YOU PUT THAT UP, PLEASE.
24            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
25    OPEN COURT OFF THE RECORD.)
```

```
 1              MR. DEFRANCO:  OKAY.

 2              THE COURT:  WHAT'S THE NUMBER ON THAT

 3    VIDEO, PLEASE?

 4              MR. DEFRANCO:  YOUR HONOR, WE WOULD OFFER

 5    THAT INTO EVIDENCE.  THAT IS GOING TO BE EXHIBIT DX

 6    556.

 7              THE COURT:  ALL RIGHT.  THAT'LL BE

 8    PENDING THE STIPULATION.  OKAY.  SO IT'S NOT

 9    ADMITTED RIGHT NOW UNLESS THERE'S A STIPULATION ON

10    THE VIDEO.  SO I'LL HOLD THAT.

11              MR. DEFRANCO:  YES, YOUR HONOR.

12              THE COURT:  GO AHEAD, PLEASE.

13    BY MR. DEFRANCO:

14    Q    BRIEFLY, CAN YOU WALK THROUGH CLAIM 8 OF THE

15    '915 PATENT WITH RESPECT TO THE HAN VIDEO, SIR?

16    A    SO THE HAN DEMONSTRATION SHOWS A MACHINE

17    READABLE -- A COMPUTER THAT HAS INSTRUCTIONS IN IT

18    THAT PERFORM VARIOUS OPERATIONS.  IT'S SHOWN IT

19    RECEIVES INPUTS, AS YOU CAN SEE WHEN HE WAS

20    DEMONSTRATING THE SYSTEM, IT RECEIVES INPUTS IN THE

21    FORM OF SINGLE INPUT SCROLLS, MULTI INPUT ZOOMING

22    OPERATIONS.  IT CREATES -- IT DETERMINES WHETHER OR

23    NOT THE EVENT OBJECT INVOKES A SCROLL BECAUSE IT

24    RECORDS THOSE EVENTS IN AN EVENT OBJECT.  IT

25    DETERMINES BY DISTINGUISHING WHETHER IT'S A SINGLE
```

1    POINT OR MULTIPOINT.

2            IT THEN ISSUES A SCROLL OR GESTURE CALL

3    BASED ON THE DETERMINATION IT MADE AND THEN UPDATES

4    THE SCREEN TO REFLECT WHAT THE USER HAD DONE WITH

5    THE SINGLE OR MULTITOUCH INPUTS.

6    Q    OKAY.  LET'S TALK ABOUT NON-INFRINGEMENT,

7    INFRINGEMENT ISSUES FOR JUST A MOMENT.

8            CAN YOU TELL US WHAT CLAIM ELEMENT D IS

9    ABOUT AGAIN IN THIS CLAIM.

10   A    SO CLAIM ELEMENT D HAS TO DO WITH DETERMINING

11   WHETHER THE EVENT OBJECT INVOKES A SCROLL BY

12   DISTINGUISH -- OR A GESTURE BY DISTINGUISHING

13   BETWEEN ONE POINT OR MULTIPOINT.

14           AND IT'S -- THE EVENT OBJECT IS --

15   INVOKES THE SCROLL OR GESTURE OPERATION.  THERE'S

16   AN INVOCATION OF THE SCROLL OR GESTURE OPERATION BY

17   THE EVENT OBJECT.

18   Q    WHAT IS YOUR UNDERSTANDING OF THE DEFINITION

19   OF INVOKE AS IT'S TO BE USED IN THIS CASE?

20   A    SO INVOKE, AS I UNDERSTAND IT, HAS COME TO

21   MEAN TO CAUSE, AND I UNDERSTAND THAT'S THE COURT'S

22   CONSTRUCTION FOR THE TERM "INVOKE."

23   Q    OKAY.  AND --

24           MR. JACOBS:  YOUR HONOR, THAT'S AN

25   INCOMPLETE RECITATION OF THE COURT'S CLAIM

2911

1    CONSTRUCTION.

2              THE COURT:  OVERRULED.  YOU'LL HAVE A

3    CHANCE ON CROSS.

4              GO AHEAD.

5    BY MR. DEFRANCO:

6    Q    OKAY.  IN YOUR OPINION, DO THE ACCUSED

7    PRODUCTS HAVE THAT FEATURE, SIR?

8    A    NO.  THE ACCUSED PRODUCTS, I THINK THERE'S A

9    SLIDE ON THIS, BUT THE ACCUSED PRODUCTS OPERATE

10   MORE ALONG THE LINES LIKE THIS.

11             WE HEARD THE OTHER DAY DR. SINGH TALK

12   ABOUT THE WEB VIEW OBJECT AND THAT THE WEB VIEW

13   OBJECT RELIED -- USES THE DATA THAT IS STORED IN

14   THE MOTION EVENT OBJECT TO MAKE A DETERMINATION AS

15   TO WHETHER ONE TOUCH OR MULTIPLE TOUCHES HAD

16   OCCURRED.

17             AND IF ONE USES -- IT TAKES A DIFFERENT

18   PATH THROUGH THE CODE, IN ORDER TO SEE IF ONE TOUCH

19   OR MULTITOUCH HAD BEEN USED.

20             THE POINT IS THAT THE MOTION EVENT OBJECT

21   IS NOT THE CAUSER OF THIS DETERMINATION AS TO

22   WHETHER OR NOT ONE TOUCH OR MULTIPLE TOUCHES HAVE

23   OCCURRED.

24             THE MOTION OF THAT OBJECT THAT CONTAINS

25   THE DATA, WHICH IS THEN USED BY THE WEB VIEW OBJECT

2012

```
 1    IN ORDER TO MAKE THE DETERMINATION.

 2    Q    OKAY.  AND THEN THERE'S BEEN SOME TALK ABOUT

 3    TWO FINGER SCROLLING.  WOULD YOU TELL US WHAT

 4    YOU'VE CONCLUDED WITH RESPECT TO TWO-FINGER

 5    SCROLLING IN SOME OF THE SAMSUNG PRODUCTS THAT YOU

 6    ANALYZED?

 7    A    SO ON SOME OF THE SAMSUNG PRODUCTS THAT I HAD

 8    THE OPPORTUNITY, THAT I'VE ANALYZED, WHICH ARE THE

 9    ACCUSED PRODUCTS IN THIS MATTER, THE PRODUCTS DO

10    PERFORM MULTIPOINT SCROLLING, IN OTHER WORDS, BEING

11    ABLE TO SCROLL A DEVICE USING MULTIPLE POINTS.

12             AGAIN, THE PATENT CALLS FOR

13    DISTINGUISHING BETWEEN A MULTIPOINT SCROLL AND A

14    SINGLE -- I MEAN, A MULTIPOINT SCALE AND A SINGLE

15    POINT SCROLL.

16             WHAT I WAS ABLE -- WHAT I'VE OBSERVED IS

17    THAT SOME OF THE DEVICES DO PERFORM MULTIPOINT

18    SCROLLING WHICH, AGAIN, IS CONTRARY TO THE WAY THE

19    PATENT, THE WAY THE PATENT CLAIMS OPERATE.

20    Q    OKAY.  LET'S SHIFT GEARS NOW AND LET'S TALK

21    ABOUT THE '163 PATENT, OKAY?

22    A    SURE.

23    Q    I WANT TO MOVE AHEAD A LITTLE BIT.  I KNOW

24    THIS IS INTRODUCTORY SLIDE.  YOU'VE GOT THE SAME

25    PRIOR ART?
```

```
 1    A    AGAIN, SAME PRIOR ART, YES, TO THE RIGHT.

 2    Q    THERE'S BEEN QUITE A BIT OF DISCUSSION OF

 3    LAUNCHTILE IN THIS CASE.  I THINK WE'VE HEARD

 4    ENOUGH ABOUT THAT.  SO WHY DON'T WE GO STRAIGHT TO

 5    THE ASSERTED CLAIM IN THE '163 PATENT.  THAT'S

 6    CLAIM 50, IS THAT RIGHT, SIR?

 7    A    CLAIM 50 IS THE ASSERTED CLAIM IN THE '163

 8    PATENT.

 9    Q    WHY DON'T WE DO THIS.  WHY DON'T WE -- LET'S

10    START WITH THE FIRST ELEMENT AND I WILL MOVE

11    THROUGH THE SLIDES AS YOU DESCRIBE WHERE YOU

12    BELIEVE THE ELEMENT AT ISSUE IS FOUND IN CLAIM 50.

13    ARE YOU WITH ME?

14    A    OKAY.  SO THE FIRST ELEMENT IS OF -- DESCRIBES

15    A PORTABLE ELECTRONIC DEVICE WHICH THE LAUNCHTILE

16    SYSTEM RUNNING ON THIS HEWLETT-PACKARD IPAQ

17    HANDHELD UNIT PERFORMS.  IT'S A CROSS -- IT'S WITH

18    A PROCESSOR, A TOUCH SENSITIVE SCREEN, MEMORY, AND

19    A SERIES OF PROGRAMS AND THOSE PROGRAMS CONTAIN

20    INSTRUCTIONS WHICH ALLOW THE PROGRAM TO DO WHAT

21    IT'S SUPPOSED TO DO.  SO THAT CLAIM ELEMENT IS MET.

22         SO THE SECOND PART OF CLAIM 50 SAYS

23    DISPLAYING AT LEAST A PORTION OF A STRUCTURED

24    ELECTRONIC DOCUMENT.

25         WHAT'S REFERRED TO THERE, IN LAUNCHTILE,
```

1    THE STRUCTURED ELECTRONIC DOCUMENT IS WHAT

2    DR. BEDERSON REFERRED TO AS THE INTERACTIVE ZOOM

3    SPACE.  THAT INTERACTIVE ZOOM SPACE IS THAT

4    COLLECTION OF 36 TILES THAT DR. BEDERSON TALKED

5    ABOUT, AND THOSE 36 TILES ARE AN INTERACTIVE ZOOM

6    SPACE THAT IS THE STRUCTURED ELECTRONIC DOCUMENT OF

7    THE REQUIREMENT.

8         IF YOU SEE HERE, WHAT IT ALLOWS IS FOR

9    THE IDENTIFICATION OF A FIRST BOX IN THAT -- IN A

10   PLURALITY OF BOXES OF CONTENT.

11   Q    OKAY.  AND THE NEXT LIMITATION, SIR?

12   A    SO THE -- THE PATENT REQUIRES THAT THE SYSTEM

13   BE ABLE TO DETECT A FIRST GESTURE AT THE LOCATION

14   DISPLAYED ON THE -- AT A LOCATION DISPLAYED ON THE

15   STRUCTURED ELECTRONIC DOCUMENT FOR DETERMINING A

16   FIRST BOX IN THE PLURALITY OF BOXES LOCATED AT THAT

17   LOCATION.

18        SO, IN OTHER WORDS, AS YOU CAN SEE HERE,

19   THE USER IS ABOUT TO SELECT AN AREA WITHIN THAT BOX

20   OF FOUR, BECAUSE THAT'S THE WAY THAT THE LAUNCHTILE

21   IS ORGANIZED IS A SERIES OF QUAD TILES, OR

22   TWO-BY-TWO ELEMENTS, AND WHEN THAT HAPPENS, THE

23   STRUCTURED ELECTRONIC DOCUMENT, OR THE INTERACTIVE

24   ZOOM SPACE, IS TRANSLATED AND ENLARGED, AND WE'LL

25   SEE THAT IN THE NEXT CLAIM ELEMENT.  THIS MEANS

```
 1    THIS ONE HAS BEEN MET.

 2              SO HERE WE SEE THE STRUCTURED ELECTRONIC

 3    DOCUMENT, THE INTERACTIVE ZOOM SPACE IS NOW

 4    TRANSLATED, MEANING SCROLLED, AND ENLARGED OR

 5    CENTERED, CENTERED AND ENLARGED SO THAT WE ENLARGE

 6    THAT, THAT FIRST BOX OF CONTENT WITHIN THAT

 7    STRUCTURED ELECTRONIC DOCUMENT.

 8              AND THAT'S WHAT'S SHOWN HERE.  THE

 9    FOUR -- THAT QUAD TILE, THOSE FOUR TILES, ARE NOW

10    SELECTED AND ENLARGED.  SO THAT CLAIM ELEMENT IS

11    MET.

12    Q    AND THE NEXT LIMITATION, SIR?

13    A    SO THE NEXT LIMITATION, THIS IS AN IMPORTANT

14    ONE, THE NEXT LIMITATION IS AFTER THE FIRST BOX IS

15    ENLARGED, DETECTING A SECOND BOX WHICH IS NOT THAT

16    FIRST BOX.

17              AND THAT SECOND GESTURE NOW, YOU CAN SEE

18    IT BEING DONE HERE, THE USER IS SELECTING THAT

19    SECOND BOX OTHER THAN THE FIRST BOX.

20              AND SO THE -- ONCE THE FIRST BOX HAS BEEN

21    ENLARGED, NOW I'M SELECTING A SECOND BOX, WHICH IS

22    THIS UPPER LEFT-HAND QUADRANT HERE.  SO THAT

23    ELEMENT IS MET.

24    Q    OKAY.  AND THEN FINALLY THE LAST LIMITATION,

25    SIR?
```

1   ENLARGED AND CENTERED, SO THAT MEANS THAT CLAIM 50D

2   AND E ARE MET, AND F FOR THAT MATTER.

3            AND IN ADDITION, ONCE THAT -- ONCE THE

4   TILE HAS BEEN ENLARGED AND CENTERED, THE ADJACENT

5   TILES AROUND IT ARE AVAILABLE, THE USER THEN HAS

6   THE OPPORTUNITY TO SELECT THOSE ADJACENT TILES,

7   WHICH THAT TILE WILL NOW BE CENTERED AND ENLARGED

8   AS WELL.  SO MUCH LIKE LAUNCHTILE, THE AGNETTA

9   PATENT PERFORMS THE SAME OPERATIONS AND SAME

10  FUNCTIONS.

11  Q    AND WHAT IS YOUR YOUR OPINION OF THE VALIDITY

12  OF CLAIM 50 OF THE '163 PATENT IN VIEW OF THE

13  AGNETTA REFERENCE, SIR?

14  A    I BELIEVE THE AGNETTA REFERENCE INVALIDATES

15  CLAIM 50 BECAUSE IT MEETS ALL THE CLAIM

16  LIMITATIONS.

17  Q    WE HAVE ONE MORE TO DO, THE ROBBINS PATENT.

18  IT SHOULD BE IN YOUR BINDER AGAIN.  IT'S '349

19  PATENT.  DO YOU SEE THAT THERE, SIR?  IT'S EXHIBIT

20  DX 1081.

21            AND, RYAN, WHILE WE'RE DOING THAT, CAN

22  YOU PLEASE PUT UP THE SUMMARY SLIDE FOR THAT

23  REFERENCE.

24  A    I DO.  I SEE EXHIBIT 1081 AND IT IS THE '349

25  OR ROBBINS PATENT.

```
1    Q    IS THAT THE ROBBINS PATENT THAT YOU ANALYZED

2    IN YOUR WORK IN THIS CASE?

3    A    IT IS.

4            MR. DEFRANCO:  YOUR HONOR, WE WOULD MOVE

5    EXHIBIT DX 1081 INTO EVIDENCE, PLEASE.

6            THE COURT:  ANY OBJECTION?

7            MR. JACOBS:  IS THAT THE PATENT?

8            THE COURT:  YES, IT IS.

9            MR. JACOBS:  NO OBJECTION.

10           THE COURT:  IT'S ADMITTED.

11           (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

12            1081, HAVING BEEN PREVIOUSLY MARKED FOR

13            IDENTIFICATION, WAS ADMITTED INTO

14            EVIDENCE.)

15           THE COURT:  GO AHEAD, PLEASE.

16   BY MR. DEFRANCO:

17   Q    MR. GRAY, ONE MORE TIME.  WE'RE ALMOST DONE.

18   WOULD YOU PLEASE DO THE SAME.  TAKE US THROUGH EACH

19   ELEMENT IN CLAIM 50 OF THE '163 PATENT AND TELL US

20   WHERE IN YOUR OPINION THAT IS FOUND IN THE ROBBINS

21   '349 PRIOR ART PATENT.

22   A    SO THE ROBBINS PATENT, AGAIN, IS A ZOOM

23   PATENT.  IT IS DIRECTED TO PORTABLE ELECTRONIC

24   DEVICES.  AGAIN, THERE'S A MAP APPLICATION

25   UNDERNEATH IT.  THE ROBBINS PATENT AGAIN BEING
```

2021

1    DIRECTED TO A PORTABLE ELECTRONIC DOCUMENT HAS

2    PROCESSOR AND A TOUCHSCREEN AND A VARIETY -- AND

3    MEMORY AND INSTRUCTIONS THAT PERFORM VARIOUS

4    OPERATIONS.

5              IN THIS PARTICULAR CASE, WHAT HAPPENS IS,

6    IN THIS EXAMPLE THAT'S SHOWN HERE, THE SCREEN IS

7    DIVIDED INTO THREE-BY-THREE MATRIX THAT OVERLAPS,

8    AND WE'LL TALK A LITTLE BIT ABOUT WHY THAT

9    OVERLAPS.

10             THE USER THEN CAN SELECT ANY OF THOSE

11   SEGMENTS AND THOSE SEGMENTS THEN BECOME CENTERED

12   AND ENLARGED ON THE DISPLAY SCREEN.

13             IF YOU NOTICE ON THE -- IF YOU TAKE THE

14   UPPER RIGHT-HAND SEGMENT, THERE'S A SMALL RECTANGLE

15   TO THE LEFT-HAND SIDE OF THAT SEGMENT.  THE

16   SELECTION OF THAT SEGMENT NOW ALLOWS THE, THE USER

17   INTERFACE TO MOVE TO THE ADJACENT SEGMENT AND HAVE

18   THAT BE CENTERED AND ENLARGED AS WELL.

19             SO THE PATENT MEETS THE LIMITATIONS OF

20   THE FIRST PART OF 50A AND B BECAUSE IT IS A

21   STRUCTURED -- IT'S A PORTABLE ELECTRONIC DEVICE.

22   IT ALLOWS FOR THE ENLARGEMENT OF THE DOCUMENTS,

23   THAT'S 50C.  IT ALLOWS FOR SELECTION OF THE SECOND,

24   A SECOND SPACE, AND THEN THE ENLARGEMENT AND

25   CENTERING OF THAT.  SO IT MEETS ALL THE LIMITATIONS

```
 1    OF THE CLAIM AS WELL.

 2    Q    AND, IN YOUR VIEW, IS CLAIM 50 INVALID IN VIEW

 3    OF THIS REFERENCE?

 4    A    AGAIN, ROBBINS AS WELL, THIS CLAIM COVERS ALL

 5    OF THE CLAIM LIMITATIONS OF '163, CLAIM 50, AND

 6    CONSEQUENTLY IS -- INVALIDATES IT AS WELL.

 7    Q    SHIFTING GEARS BRIEFLY TO INFRINGEMENT,

 8    NON-INFRINGEMENT ISSUE, YOU'VE HEARD THE TERM

 9    "SUBSTANTIALLY CENTERED."  IS THAT CORRECT?

10    A    RIGHT.  ONE OF THE CLAIM ELEMENTS HERE, 50F,

11    FOR EXAMPLE, REFERS TO SOMETHING BEING

12    SUBSTANTIALLY CENTERED.

13    Q    AND WHAT IS YOUR VIEW ON THAT, SIR?

14    A    IN MY OPINION, THE TERM "SUBSTANTIALLY

15    CENTERED" IS AN AMBIGUOUS TERM.  I -- PART OF WHAT

16    A PATENT DOES IS PROVIDE INFORMATION TO AN ENGINEER

17    TO ALLOW THEM TO UNDERSTAND THE SCOPE OF THE PATENT

18    SO THAT THEY CAN AVOID INFRINGING THE PATENT.

19              I DON'T KNOW WHEN SOMETHING IS

20    SUBSTANTIALLY CENTER.  I KNOW WHEN SOMETHING IS

21    FULLY CENTERED OR NOT CENTERED, BUT "SUBSTANTIALLY

22    CENTERED" IS AMBIGUOUS.

23              HOW WOULD A PATENT -- HOW WOULD AN

24    ENGINEER UNDERSTAND HOW TO MAKE SOMETHING

25    SUBSTANTIALLY CENTERED OR NOT?  SO IN MY OPINION,
```

```
 1    "SUBSTANTIALLY CENTERED" IS AN AMBIGUOUS TERM.
 2    Q    AND, FINALLY, SIR, WITH RESPECT TO ELEMENT E,
 3    DETERMINING A FIRST BOX IN THE PLURALITY OF BOXES
 4    AT THE LOCATION OF THE FIRST GESTURE, CAN YOU GIVE
 5    US YOUR OPINION AS IT RELATES TO INFRINGEMENT ON
 6    THAT ELEMENT?
 7    A    AGAIN, 50E TALKS ABOUT IDENTIFYING A BOX IN
 8    PLURALITY OF BOXES AT THE LOCATION OF THE FIRST
 9    GESTURE.
10         WHAT THAT SEEMS TO INTEND, AT LEAST THE
11    WAY I READ THIS CLAIM THE FIRST TIME I READ IT, WAS
12    THAT THERE ARE A PLURALITY OF BOXES.
13         IF YOU THINK ABOUT NESTED BOXES WHERE
14    THERE ARE MULTIPLE BOXES THAT ARE NESTED AND THE
15    USER SELECTS A BOX OR A SPACE, SOME LOCATION WITHIN
16    THAT NESTED BOX, WHAT HAPPENS IS THE SYSTEM WOULD
17    THEN NEED TO DETERMINE WHICH ONE OF THOSE NESTED
18    BOXES THE USER WAS ACTUALLY INTENDING TO HAVE
19    CENTERED AND ENLARGED.
20         SIMILARLY TO THE WAY LAUNCHTILE WORKS.
21    IF YOU RECALL LAUNCHTILE, YOU CAN SELECT ANY ONE OF
22    THE FOUR IN THE QUAD TILES AND THAT WHOLE QUAD TILE
23    GETS ENLARGED AND CENTERED.
24         AGAIN, I'M NOT SEEING ANY EVIDENCE AT ALL
25    SUPPLIED, OR ANYTHING IN ANY OF THE REPORTS THAT
```

```
 1    INDICATE HOW THE ACCUSED PRODUCTS MEET THE

 2    LIMITATION OF SELECTING A -- SOMETHING IN A

 3    PLURALITY OF BOXES.  SO, AGAIN, I'M NOT SEEING IT.

 4              MR. DEFRANCO:  MY TIME IS UP.  THANK YOU,

 5    SIR.

 6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

 7    4:20.  GO AHEAD, PLEASE, WITH ANY CROSS.

 8                      CROSS-EXAMINATION

 9    BY MR. JACOBS:

10    Q    GOOD AFTERNOON, MR. GRAY.

11    A    GOOD AFTERNOON.

12    Q    NOW, YOUR TESTIMONY ON THE SUBJECT OF

13    INVALIDITY WAS PREMISED ON THE IDEA OF

14    ANTICIPATION; CORRECT, SIR?

15    A    THAT'S CORRECT.

16    Q    AND ANTICIPATION IS ALL YOU SPOKE TO; CORRECT?

17    A    THAT'S CORRECT.

18    Q    AND ANTICIPATION REQUIRES THAT EVERY ELEMENT,

19    THE JURY HAS HEARD THIS MANTRA, EVERY ELEMENT OF

20    THE CLAIM BE PRESENT IN THE PROPOSED INVALIDATING

21    REFERENCE; CORRECT, SIR?

22    A    THAT'S CORRECT.

23    Q    AND SO IF THE JURY --

24    A    WELL, WITH A POSSIBLE EXCEPTION THERE.  IT IS

25    EITHER -- IT IS EITHER COVERED OR IS INHERENTLY IN
```

1    THE REFERENCE.

2    Q    AND SO IF THE JURY FINDS THAT IN -- WHEN IT

3    COMES TO INVALIDITY, IF ANY ELEMENT OF THE CLAIM IS

4    NOT PRESENT IN THE PROPOSED INVALIDATING REFERENCE,

5    THEN YOUR OPINION SHOULD BE REJECTED; CORRECT, SIR?

6    A    AGAIN, WITH THE PROVISO THAT IF IT IS AN

7    ELEMENT THAT IS INHERENT OR IMPLIED, THAT'S MY

8    UNDERSTANDING.

9    Q    OTHERWISE YOU AGREE WITH ME, YOUR OPINION

10   RISES AND FALLS ON THE IDEA OF -- THERE'S NO CLOSE

11   HERE, YOU EITHER GOT IT, EVERY ELEMENT IS PRESENT,

12   OR YOU DON'T.  CORRECT, SIR?

13   A    EITHER EVERY ELEMENT IS PRESENT OR IT IS

14   INHERENT AS IS REQUIRED.

15   Q    NOW, I LISTENED CAREFULLY TO THE ANSWER TO THE

16   QUESTION ABOUT YOUR ROLE IN LITIGATION SUPPORT OVER

17   THE LAST COUPLE YEARS, AND YOU SAID YOU SPENT SOME

18   TIME DOING LITIGATION SUPPORT.

19           WHAT DID YOU MEAN BY "SOME TIME," SIR?

20   A    WELL, ACTUALLY SINCE, STARTING IN 1984, I DID

21   SOME LITIGATION SUPPORT, AND THROUGHOUT MY CAREER

22   AS AN ENGINEER, I PERIODICALLY DID LITIGATION

23   SUPPORT ASSIGNMENTS.  SO IT'S BEEN OVER A LONG

24   TIME, SINCE 1984.

25   Q    BUT OVER THE LAST COUPLE OF YEARS, ALMOST ALL

1   OF YOUR TIME HAS BEEN SPENT DOING LITIGATION

2   SUPPORT; CORRECT, SIR?

3   A    I THINK OVER THE LAST FEW YEARS THE MAJORITY

4   OF MY CONSULTING WORK HAS BEEN WITH RESPECT TO

5   LITIGATION SUPPORT, YES.

6   Q    AND IN THIS PARTICULAR CASE -- AGAIN, THE JURY

7   HAS HEARD A LOT ABOUT EXPERT COMPENSATION -- YOU'VE

8   MADE ABOUT $200,000; CORRECT, SIR?

9   A    I THINK THAT SOUNDS HIGH, BUT IT COULD BE.  I

10  DON'T KNOW THE EXACT NUMBER, BUT IT MAY BE.

11  Q    AND YOUR BACKGROUND, SIR, IS IN ECONOMICS;

12  CORRECT?  THAT WAS YOUR UNDERGRADUATE DEGREE?

13  A    THAT'S CORRECT.

14  Q    NO FORMAL TRAINING IN THE SENSE OF ADVANCED

15  DEGREES IN COMPUTER SCIENCE OR ENGINEERING?

16  A    THAT'S CORRECT.

17  Q    AND YOU NEVER TOOK A COURSE IN OBJECT ORIENTED

18  PROGRAMMING?

19  A    THAT'S A QUESTION?  YES, I HAVE NOT TAKEN ANY

20  FORMAL COURSES IN OBJECT ORIENTATION.  I'M AN

21  ENGINEER.  I WAS WORKING, DOING THE WORK, BUT, YES,

22  I'VE NOT TAKEN ANY OBJECT ORIENTED COURSES.

23  Q    AND SINCE THE DATE OF THE INTRODUCTION OF THE

24  IPHONE, JUST TO PICK A POINT IN TIME, YOU HAVEN'T

25  DONE ANY PROGRAMMING FOR TOUCH SENSITIVE DEVICES?

```
 1    A    NO, I HAVE NOT SINCE 2007.  IS THAT WHAT --
 2    Q    YES, SORRY.  WE ALL KNOW IN THIS TRIAL THAT
 3    DATE?
 4    A    SORRY.  I THOUGHT IT WAS 2007, BUT I WASN'T
 5    SURE.
 6    Q    AND YOUR PROGRAMMING EXPERIENCE FOR WRITING
 7    CODE FOR A SENSITIVE DEVICE, THAT WAS ACTUALLY FOR
 8    A PHOTOCOPIER; CORRECT, SIR?
 9    A    IT WAS FOR AN ELECTRONIC REPROGRAPHICS
10    SYSTEMS, SO PHOTOCOPIES AND PRINTERS AND SO ON,
11    SCANNERS.
12    Q    NOW, I WOULD LIKE TO TALK TO YOU ABOUT A
13    COUPLE OF THE REFERENCES THAT YOU DISCUSSED.
14              YOU REFERRED TO THE NOMURA REFERENCE.
15    THAT WAS THAT JAPANESE UNEXAMINED PATENT
16    APPLICATION.  DO YOU RECALL THAT, SIR?
17    A    I DO.
18    Q    AND AGAIN, I LISTENED CAREFULLY TO THE WAY YOU
19    SAID IT.  ON THE QUESTION OF AN EVENT OBJECT, YOU
20    POINTED TO SOMETHING AND YOU SAID THAT WAS THE '915
21    VERSION OF THE EVENT OBJECT.
22              DO YOU RECALL THAT TESTIMONY, SIR?
23    A    I DO.
24    Q    NOW, IN FACT, WHEN YOU SUBMITTED AN EXPERT
25    REPORT IN THIS MATTER, YOU COULD NOT FIND AN EVENT
```

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6            WE, THE UNDERSIGNED OFFICIAL COURT

7     REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

8     THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

9     FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11            THAT THE FOREGOING TRANSCRIPT,

12    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

13    CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

14    SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

15    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16    TRANSCRIPTION TO THE BEST OF OUR ABILITY.

17

18                    /S/
                 _____
19               LEE-ANNE SHORTRIDGE, CSR, CRR
                 CERTIFICATE NUMBER 9595
20

21                    /S/
                 _____
22               IRENE RODRIGUEZ, CSR, CRR
                 CERTIFICATE NUMBER 8074
23

24
                 DATED:  AUGUST 15, 2012
25

# EXHIBIT 9

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

     APPLE INC., A CALIFORNIA      )  C-11-01846 LHK
6    CORPORATION,                  )
                                   )  SAN JOSE, CALIFORNIA
7                  PLAINTIFF,      )
                                   )  AUGUST 16, 2012
8              VS.                 )
                                   )  VOLUME 10
9    SAMSUNG ELECTRONICS CO.,      )
     LTD., A KOREAN BUSINESS       )  PAGES 2966-3386
10   ENTITY; SAMSUNG               )
     ELECTRONICS AMERICA,          )
11   INC., A NEW YORK              )
     CORPORATION; SAMSUNG          )
12   TELECOMMUNICATIONS            )
     AMERICA, LLC, A DELAWARE      )
13   LIMITED LIABILITY             )
     COMPANY,                      )
14                                 )
                   DEFENDANTS.     )
15   _____

16              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22

23   OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24                            IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF        MORRISON & FOERSTER
      APPLE:                   BY:  HAROLD J. MCELHINNY
 3                                  MICHAEL A. JACOBS
                                    RACHEL KREVANS
 4                             425 MARKET STREET
                               SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT  WILMER, CUTLER, PICKERING,
      APPLE:                   HALE AND DORR
 7                             BY:  WILLIAM F. LEE
                               60 STATE STREET
 8                             BOSTON, MASSACHUSETTS  02109

 9                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
10                             PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:   QUINN, EMANUEL, URQUHART,
                               OLIVER & HEDGES
12                             BY:  CHARLES K. VERHOEVEN
                               50 CALIFORNIA STREET, 22ND FLOOR
13                             SAN FRANCISCO, CALIFORNIA  94111

14                             BY:  VICTORIA F. MAROULIS
                                    KEVIN P.B. JOHNSON
15                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
16                             REDWOOD SHORES, CALIFORNIA  94065

17                             BY:  MICHAEL T. ZELLER
                                    WILLIAM C. PRICE
18                             865 SOUTH FIGUEROA STREET
                               10TH FLOOR
19                             LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

```
1                        INDEX OF WITNESSES

2     DEFENDANT'S

3     TIMOTHY SHEPPARD
           DIRECT EXAM BY MR. PRICE          P. 3001
4          CROSS-EXAM BY MR. JACOBS          P. 3012

5     MICHAEL WAGNER
           DIRECT EXAM BY MR. PRICE          P. 3018
6          CROSS-EXAM BY MR. JACOBS          P. 3057
           REDIRECT EXAM BY MR. PRICE        P. 3073
7
      RAMAMIRTHAM SUKUMAR
8          DIRECT EXAM BY MS. MAROULIS       P. 3092
           CROSS-EXAM BY MR. SELWYN          P. 3095
9
      VINCENT O'BRIEN
10         DIRECT EXAM BY MS. MAROULIS       P. 3101
           CROSS-EXAM BY MR. SELWYN          P. 3113
11
      DAVID TEECE
12         DIRECT EXAM BY MS. MAROULIS       P. 3123
           CROSS-EXAM BY MR. MUELLER         P. 3141
13

14    PLAINTIFF'S REBUTTAL:

15    TONY BLEVINS
           DIRECT EXAM BY MR. LEE            P. 3164
16
      EMILIE KIM
17         DIRECT EXAM BY MR. SELWYN         P. 3173
           CROSS-EXAM BY MR. JOHNSON         P. 3185
18
      PAUL DOURISH
19         DIRECT EXAM BY MR. SELWYN         P. 3188

20    TONY GIVARGIS
           DIRECT EXAM BY MR. SELWYN         P. 3220
21
      MANI SRIVASTAVA
22         DIRECT EXAM BY MR. SELWYN         P. 3287
           CROSS-EXAM BY MR. JOHNSON         P. 3317
23         REDIRECT EXAM BY MR. SELWYN       P. 3320

24    HYONG KIM
           DIRECT EXAM BY MR. LEE            P. 3322
25
```

1    TIME.

2                   TURNING TO THE ROYALTY BASE, HOW DID YOU

3    DETERMINE THE NET SALES PRICE OF A PRODUCT WAS THE

4    APPROPRIATE ROYALTY BASE?

5    A    WELL, I LOOKED AT TWO THINGS.  ONE IS INDUSTRY

6    PRACTICE.  IT'S VERY COMMON TO STATE A LICENSE AS A

7    PERIOD OF TIME OF THE SALES PRICE OF THE PRODUCT.

8                   SECONDLY, IN THIS CASE I LOOKED AT UMTS

9    TECHNOLOGY AND HOW IT IMPACTED SALES OF THE PRODUCT

10   AND TOOK THAT INTO ACCOUNT AS WELL.

11   Q    DID YOU PREPARE ANY SLIDES TO ILLUSTRATE THE

12   VALUE CONFERRED BY THE UMTS TECHNOLOGY?

13   A    I DID.

14   Q    LET'S TAKE A LOOK AT SDX 3963.006, PLEASE.

15                  CAN YOU PLEASE DESCRIBE FOR THE JURY WHAT

16   THESE SLIDES ILLUSTRATE.

17   A    YES.  I TRIED TO GET A CONTROL OR AN

18   EXPERIMENT AFTER EXPERIMENT, IF YOU WILL, FOR

19   WHAT'S REALLY THE VALUE OF UMTS TECHNOLOGIES

20   EMBEDDED IN THE APPLE PRODUCTS.

21                  AND FORTUNATELY THE IPOD TOUCH IS A

22   PRODUCT IN THE MARKET THAT HAS MOST OF THE FEATURES

23   IN THE IPHONE BUT WITHOUT THE PHONE FEATURE AND

24   WITHOUT THE CONNECTIVITY ASSOCIATED WITH UMTS

25   TECHNOLOGY.

```
 1              AND AS YOU CAN SEE, THERE'S A SIGNIFICANT

 2    PRICE PREMIUM BETWEEN THE IPOD AND THE IPHONE.  IN

 3    FACT, FOR THE TWO DIFFERENT MODELS I LOOKED AT,

 4    IT'S EXACTLY 400, THAT'S APPLE'S PRICING, THAT'S

 5    NOT TAKING INTO ACCOUNT ANY SERVICE DISCOUNTS OR

 6    DISCOUNTS YOU MAY GET THROUGH A SERVICE PROVIDER.

 7              BUT THERE'S A VERY SUBSTANTIAL PRICE

 8    PREMIUM ASSOCIATED WITH THE UMTS TECHNOLOGY WHICH I

 9    THINK IS WELL CAPTURED BY LOOKING AT THAT PRICE

10    DIFFERENTIAL.

11    Q    AND HAVE YOU PREPARED ANY ADDITIONAL SLIDES

12    WITH RESPECT TO THE IPAD PRODUCT?

13    A    YES.  SO I'VE DONE A SIMILAR COMPARISON WITH

14    RESPECT TO THE IPAD.

15    Q    LET'S TAKE A LOOK AT 3963.07.

16    A    YES.  THE PRICE DIFFERENCE IS NOT QUITE AS

17    GREAT, BUT IF YOU LOOK AT AN IPAD THAT'S JUST GOT

18    THE WI-FI FEATURES OR THE ONE WITH UMTS, THEN

19    THERE'S A $177 OR $180 DIFFERENCE IN PRICE BY

20    HAVING THAT EXTRA FUNCTIONALITY ASSOCIATED WITH THE

21    UMTS TECHNOLOGY.

22    Q    THANK YOU, SIR.

23              TURNING NOW TO ROYALTY RATES, HOW DID YOU

24    DETERMINE THAT THE ROYALTY RATES SHOULD BE BETWEEN

25    2 PERCENT AND TWO AND THREE QUARTERS PERCENT?
```

```
 1    A    AS AN ECONOMIST, I LIKE TO LOOK AT MARKET

 2    TRANSACTIONS.  THAT'S USUALLY THE BEST MEASURE OF

 3    VALUE.  SO I LOOKED AT LICENSING AGREEMENTS THAT I

 4    FOUND IN THE RECORD OF THE CASE TO SEE WHAT I COULD

 5    GLEAN FROM THOSE IN TERMS OF WHAT A REASONABLE

 6    ROYALTY MIGHT BE.

 7    Q    SIR, I'M NOW GOING TO TURN YOUR ATTENTION TO

 8    AN EXHIBIT THAT IS ONLY GOING TO BE SHOWN TO THE

 9    JURY AND THE COURT AND YOURSELF.  IT HAS HIGHLY

10    CONFIDENTIAL INFORMATION OF THIRD PARTIES.

11             PLEASE TURN TO EXHIBIT DX 630 IN YOUR

12    BINDER.

13    A    OKAY.

14    Q    WHAT IS EXHIBIT DX 630?

15    A    I'M THERE.

16    Q    HAVE YOU PREPARED THIS EXHIBIT?

17    A    I HAVE.

18    Q    WHAT DOES IT SUMMARIZE?

19    A    IT SUMMARIZES THE NUMBER OF LICENSING

20    AGREEMENTS, IN THIS CASE I'M LOOKING AT THE SAMSUNG

21    LICENSING AGREEMENTS THAT I WAS ABLE TO FIND

22    INFORMATION ON, THAT I COULD ACTUALLY GET AHOLD OF

23    THE LICENSE AGREEMENT AND DISTILL CERTAIN

24    INFORMATION FROM IT.

25             MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT
```

```
 1    DX 630 INTO EVIDENCE.

 2              THE COURT:  ANY OBJECTION?

 3              MR. MUELLER:  NO OBJECTION.

 4              THE COURT:  IT'S ADMITTED.

 5              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

 6              630, HAVING BEEN PREVIOUSLY MARKED FOR

 7              IDENTIFICATION, WAS ADMITTED INTO

 8              EVIDENCE.)

 9    BY MS. MAROULIS:

10    Q    SIR, TURNING YOUR ATTENTION TO ROW 12 OF

11    CONFIDENTIAL EXHIBIT DX 630, HAVE YOU CONSIDERED

12    THIS LICENSE THAT I'M POINTING YOU TO IN YOUR

13    ANALYSIS?

14    A    YES, I HAVE.

15    Q    WHEN DID THE PARTIES ENTER INTO THIS LICENSE?

16    A    THIS ONE WAS ENTERED INTO IN 2004.

17    Q    WHAT IS BEING LICENSED HERE?

18    A    A NUMBER OF TECHNOLOGIES, INCLUDING UMTS

19    TECHNOLOGY.

20    Q    AND WHERE DID THE JURY FIND THE FINANCIAL

21    TERMS OF THE AGREEMENT?

22    A    IN THE COLUMN SECOND FROM THE RIGHT.

23    Q    OKAY.  DID THOSE TERMS SUPPORT YOUR CONCLUSION

24    THAT THE NET SALE PRICE IS THE APPROPRIATE ROYALTY

25    BASE FOR ASSESSING REASONABLE ROYALTY?
```

```
 1    A    YES, IT DOES.  IT'S --

 2    Q    IT SUPPORT --

 3    A    UNDER THE PAYMENTS SECTION THERE, YES, YOU CAN

 4    HIGHLIGHT IT ON THE TOP LINE, BUT IT'S A PERIOD OF

 5    TIME OF NET SELLING PRICE THAT IS IDENTIFIED THERE

 6    THAT GIVES ME A CLUE, AT LEAST WITH RESPECT TO THAT

 7    PARTICULAR PROVIDER OF UMTS TECHNOLOGY, AS TO WHAT

 8    A REASONABLE ROYALTY RATE IS.  IT'S EXPRESSED AS A

 9    PERIOD OF TIME OF NET SALES.

10    Q    AND DOES IT SUPPORT YOUR ROYALTY RATE AS WELL?

11    A    YES.  IT'S ABOVE THE ROYALTY RATE RANGE THAT I

12    HAVE CHOSEN, BUT IT CERTAINLY IS CONSISTENT WITH

13    THE HIGH END OF IT.

14    Q    PLEASE TAKE A LOOK AT ROW 29 OF DX 630.  HAVE

15    YOU CONSIDERED THIS LICENSE IN SUPPORTING YOUR

16    ANALYSIS?

17    A    YES, I HAVE.

18    Q    HOW DOES THIS LICENSE SUPPORT YOUR

19    DETERMINATION OF ROYALTY BASE AND ROYALTY RATE?

20    A    WELL, ONCE AGAIN, IF YOU LOOK AT THE PAYMENTS

21    SECTION, THERE IS A REASONABLE -- OR THERE IS A

22    ROYALTY RATE AS A PERIOD OF TIME OF SALES IT'S

23    SPECIFIED.

24         MAYBE YOU CAN HIGHLIGHT THAT.  AND IT IS

25    WITHIN THE RANGE, THERE'S A NUMBER IN THE MIDDLE,
```

```
 1     THERE'S A PERCENTAGE.  IT'S A PERCENTAGE OF NET

 2     SALES.  THERE'S A NUMBER THERE THAT IS WITHIN MY

 3     RANGE THAT I DESCRIBED EARLIER TO THE JURY.

 4     Q    OKAY.  YOU CAN TAKE DOWN THE EXHIBIT.

 5            DOES THIS EXHIBIT SET FORTH THE ROYALTY

 6     RATE FOR SAMSUNG'S ESSENTIAL PATENTS?

 7     A    NO, IT DOESN'T.  THESE ARE WHAT SAMSUNG HAS

 8     PAID FOR THE USE OF OTHER PEOPLE'S TS TECHNOLOGY,

 9     SO IT'S NOT IDEAL, BUT I THINK IT'S INDICATIVE.

10     Q    CAN YOU DESCRIBE HOW IT'S NONETHELESS RELEVANT

11     TO YOUR ANALYSIS?

12     A    HOW IT IS RELEVANT TO MY ANALYSIS?

13     Q    YES.

14     A    YES, I MEAN, THERE'S A GENERAL MARKETPLACE OUT

15     THERE FOR TECHNOLOGY, AND WHETHER YOU'RE THE BUYER

16     OR THE SELLER FOR UMTS TECHNOLOGY, THEY TEND TO GO

17     DOWN IN APPROXIMATELY THE SAME RANGE.

18     Q    SO HOW MANY SAMSUNG CROSS-LICENSES HAVE YOU

19     ANALYZED IN THIS CASE?

20     A    WELL, I WAS ABLE TO GET SOME INFORMATION ON

21     TWO SAMSUNG CROSS-LICENSES WHERE SAMSUNG WAS

22     LICENSING OUT ITS UMTS TECHNOLOGY.  THE ONES I

23     LOOKED AT, THOSE WERE LICENSING IN.  BUT I WAS ABLE

24     TO GET INFORMATION ON TWO LICENSES WHERE SAMSUNG

25     WAS LICENSING OUT ITS UMTS.
```

```
 1    Q    WE'RE GOING TO SHOW TO THE JURY NOW THE

 2    CONFIDENTIAL DEMONSTRATIVE 3963.019.  ONCE THE JURY

 3    SEES THAT, AND WE CANNOT SHOW IT TO THE REST OF THE

 4    WORLD, CAN YOU PLEASE EXPLAIN THIS SLIDE TO THE

 5    JURY?

 6    A    YES.  THE FIRST POINT I'VE GOT TO GET ACROSS

 7    IS THAT MOST LICENSES ARE, IN FACT, CROSS-LICENSES,

 8    BY WHICH I MEAN ONE PARTY WILL LICENSE OUT

 9    TECHNOLOGY AND THEY WILL LICENSE BACK IN

10    TECHNOLOGY.

11         MONEY IS USED AS A BALANCING PAYMENT, BUT

12    THE PRIMARY CONSIDERATION IN GOING BACK AND FORTH

13    ISN'T MONEY.  IT'S INTELLECTUAL PROPERTY RIGHTS.

14    IT'S CALLED A CROSS-LICENSE.

15         SO THE CHALLENGE HERE IS FOR ME TO FIGURE

16    OUT, BECAUSE I'M LOOKING AT CALCULATING DAMAGES,

17    WHAT APPLE WOULD PAY SAMSUNG FOR ONE LICENSE, I'VE

18    GOT TO TRY AND FIGURE OUT FROM THE CROSS-LICENSE

19    WHAT THE VALUE OF THE ONE-WAY LICENSE WOULD BE.  SO

20    THERE'S A SIMPLE EQUATION HERE.

21    Q    SIR, IF I MAY REMIND YOU NOT TO MENTION THE

22    NUMBERS PUBLICLY?

23    A    OKAY.

24    Q    THERE'S SOME THIRD PARTIES IN THE AUDIENCE?

25    A    OKAY.
```

```
 1    Q    GO AHEAD.

 2    A    BASICALLY IF I KNOW THE ROYALTY BASE, WHICH I

 3    DO IN THIS CASE, AND IF I KNOW WHAT THE STANDARD

 4    ROYALTY RATE IS FOR THE OTHER PARTY, I CAN ESTIMATE

 5    WHAT SAMSUNG'S RATE IS IF I ALSO KNOW WHAT THE

 6    BALANCING PAYMENT IS.

 7              SO IN THIS CASE, I'VE JUST SET UP THE

 8    PROBLEM.  I'M TRYING TO FIGURE OUT WHAT SAMSUNG'S

 9    IMPLIED RATE IS, AND THAT'S A SIMPLE EQUATION THAT

10    I LOOKED AT, AND THE NEXT SLIDE GIVES THE ANSWER.

11    Q    LET'S TAKE A LOOK AT THE NEXT CONFIDENTIAL

12    SLIDE, 3963.020.  DOES THIS SLIDE SHOW THE ROYALTY

13    RATE THAT YOU ANALYZED?

14    A    YES, THAT IS THE IMPLIED OR ESTIMATED RATE

15    THAT I GET FROM THAT PIECE OF ANALYSIS, THREE

16    PERCENTAGE POINTS OF NET SALES, WHICH IS SLIGHTLY

17    ABOVE MY RANGE OF 2 TO 2.75.

18    Q    IS THIS NUMBER CONSISTENT WITH THE INDUSTRY

19    LICENSES YOU LOOKED AT EARLIER?

20    A    IT IS.

21    Q    SIR, HAVE YOU PREPARED A SLIDE SHOWING WHAT

22    SAMSUNG PROVIDED TO THE -- IN THE CROSS-LICENSE TO

23    THE OTHER SIDE?

24    A    YES.

25    Q    AND IS THAT THE SLIDE, CONFIDENTIAL SLIDE
```

```
 1      3963.022?

 2      A    YES.

 3      Q    CAN YOU PLEASE EXPLAIN TO THE JURY WHAT YOU

 4      EXPRESSED IN THIS SLIDE WITHOUT MENTIONING THE

 5      NUMBERS?

 6      A    YES, THIS ANALYTICAL FRAMEWORK ALSO ENABLES ME

 7      TO VALUE THE LICENSING RIGHTS THAT ARE TRADED AND

 8      TO SHOW IT IN COMPARISON TO THE BALANCING PAYMENTS.

 9           AND AS YOU CAN SEE, THE PAYMENT IN KIND,

10      IF YOU WILL, OF INTELLECTUAL PROPERTY RIGHTS IS WAY

11      GREATER THAN THE BALANCING PAYMENTS.

12           SO I OFTEN SPEAK OF THE BALANCING

13      PAYMENT, THE CASH AMOUNT THAT TRADES HANDS HERE AS

14      JUST THE TIP OF THE ICEBERG.

15           MY CHALLENGE, OF COURSE, HERE IS TO

16      FIGURE OUT THE VALUE OF THE ICEBERG, NOT JUST THE

17      TIP.

18      Q    WHAT IS THE PRIMARY VALUE THAT SAMSUNG WAS

19      PROVIDING TO ITS COUNTER PARTIES IN ITS LICENSING

20      AGREEMENT?

21      A    THE PRIMARY VALUE IN A CROSS-LICENSE, AND

22      CERTAINLY IN THE CASE OF SAMSUNG'S CROSS-LICENSES,

23      I BELIEVE WAS THE LICENSING RIGHT.

24      Q    AND HOW DOES THE BALANCING RATE COMPARE TO THE

25      VALUE OF THE PATENT RIGHTS PROVIDED BY SAMSUNG?
```

```
 1    A    IT'S LOW IN COMPARISON.

 2    Q    DID YOU PREPARE, SIR, EXHIBIT DX 631 TO

 3    EXPLAIN YOUR ANALYSIS?

 4    A    YES.

 5    Q    CAN YOU PLEASE CONFIRM IN YOUR BINDER THAT DX

 6    631, CONFIDENTIAL EXHIBIT, IS WHAT YOU PREPARED.

 7    A    YES.

 8              MS. MAROULIS:  YOUR HONOR, WE MOVE DX 631

 9    UNDER SEAL, REDACTED, INTO EVIDENCE.

10              THE COURT:  ANY OBJECTION?

11              MR. MUELLER:  NO OBJECTION, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

13              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

14              631, HAVING BEEN PREVIOUSLY MARKED FOR

15              IDENTIFICATION, WAS ADMITTED INTO

16              EVIDENCE.)

17    BY MS. MAROULIS:

18    Q    SIR, DID YOU PREPARE ANOTHER SLIDE TO

19    ILLUSTRATE A DIFFERENT CROSS-LICENSE AT 3963.024?

20    A    I DID.

21    Q    LET'S TAKE A LOOK, JUST FOR THE JURY, AT THIS

22    SLIDE.  CAN YOU PLEASE EXPLAIN, WITHOUT REFERENCE

23    TO THE NUMBERS, WHAT IS DEPICTED THERE?

24    A    YES.  THIS IS A CROSS-LICENSE WITH ANOTHER

25    PARTY WHERE I WAS LIKEWISE ABLE TO DETERMINE THE
```

1    ROYALTY BASE, AND I WAS ALSO ABLE TO DETERMINE THE

2    STANDARD RATE FOR THE OTHER PARTY, AS WELL AS THE

3    BALANCING PAYMENT, AND TOOK IN MATHEMATICALLY FOR

4    THIS TO GET AN ESTIMATE OF SAMSUNG'S RIGHT RATE.

5    Q    LET'S TURN TO THE NEXT CONTENTION SLIDE.  IS

6    THAT THE ROYALTY RATES THAT YOU ANALYZED?

7    A    YES.  YOU NEED TO CHANGE THE SLIDE THERE, I

8    THINK.

9    Q    IT'S 3963.021.  IT'S 025.  I'M SORRY.

10   A    YES.  SO THE ESTIMATED RATE THERE IS 1.74,

11   WHICH IS SLIGHTLY BELOW THE LOW END OF MY 2 TO 2.75

12   RANGE.

13   Q    OKAY.  THANK YOU, RYAN.

14        WE CAN TAKE THOSE DOWN.

15        DR. TEECE, HOW DID YOU ACCOUNT FOR THE

16   FACT THAT THERE ARE TWO PATENTS AT ISSUE HERE AND

17   THESE AGREEMENTS COVER MORE THAN TWO PATENTS?

18   A    YES, I'M COGNIZANT OF THE FACT THAT THIS

19   HYPOTHETICAL LICENSE WOULD BE FOR TWO PATENTS, AND

20   TYPICALLY WITH A CROSS-LICENSE, YOU'RE LICENSING A

21   MUCH LARGER PORTFOLIO.  BUT WHAT STUDIES SHOW IS

22   THAT THE VOLUME OF ANY PORTFOLIO, OR GROUPING OF

23   LICENSES USUALLY COMES DOWN TO THE VALUE OF ONE,

24   TWO, OR THREE OR A HANDFUL SO THAT A SMALL

25   PERCENTAGE OF THE PATENTS IN A LICENSE ARE REALLY

```
 1    WHAT DRIVES VALUE IN MOST INSTANCES.
 2    Q    LET'S TAKE A LOOK AT SLIDE 3963.027.  DOES
 3    THIS SLIDE SUMMARIZE WHAT YOU JUST EXPLAINED ABOUT
 4    THE VALUE?
 5    A    YES.  WHAT I'M DOING IN THIS CHART IS LOOKING
 6    AT SOME WHAT ARE CALLED PLUS FACTORS OR MINUS
 7    FACTORS, THINGS THAT WOULD TEND TO PRESS THE RATE
 8    DOWNWARDS OR RAISE IT UPWARDS.
 9             AND IF I BEGIN AT THE BOTTOM THERE, I'M
10    COMPARING A BENCHMARK OF A MARKETPLACE LICENSE AND
11    I'M SAYING, OKAY, HOW DOES THAT INFORM ME WITH
12    RESPECT TO WHAT THE DAMAGES RATE WOULD BE HERE,
13    WHAT THE REASONABLE ROYALTY RATE WOULD BE AND I'M
14    SAYING SINCE THIS IS NOT A FULL PORTFOLIO, THIS
15    WOULD BE SOME DISCOUNT.  THAT'S WHY THERE'S THE RED
16    MINUS SIGN.  BUT AT THE SAME TIME THERE'S TWO
17    OFFSETS FACTORS THAT I THINK FULLY ACCOUNT FOR THAT
18    DISCOUNT OR ESSENTIALLY NEUTRALIZE IT.
19    Q    THANK YOU, SIR.  YOU HEARD DR. O'BRIEN HERE
20    TESTIFYING ABOUT GEORGIA PACIFIC ANALYSIS.  DID YOU
21    DO ONE AS WELL?
22    A    I DID.  BUT CAN I FIRST EXPLAIN THESE OTHER
23    FACTORS.
24    Q    YES, GO AHEAD.
25    A    OKAY.  THE OTHER FACTORS, HERE I'M REQUIRED TO
```

1    ASSUME THE PATENTS ARE VALID AND INFRINGED.

2    TECHNICALLY WHEN THERE'S A MARKET TRANSACTION, YOU

3    DON'T KNOW FOR SURE IF THE PATENTS ARE VALID AND

4    INFRINGED, SO LICENSES, WHAT YOU OBSERVE IN THE

5    BUSINESS WORLD ARE DISCOUNTED RATES BECAUSE YOU'RE

6    UNCLEAR ABOUT VALIDITY AND INFRINGEMENT.

7              HERE IN THE COURTROOM, WE KNOW THE

8    ANSWER.  SO THAT WOULD BE A PLUS FACTOR.

9              AND THEN ALSO THE LICENSING QUESTION

10   WOULD BE A U.S. ONLY LICENSE, AND THEY TYPICALLY

11   COMMAND A PREMIUM OVER A WORLDWIDE LICENSE BECAUSE

12   THE ROYALTY BASE WILL BE SMALLER.

13   Q    THANK YOU, SIR.  TURNING TO MY QUESTION OF

14   GEORGIA PACIFIC ANALYSIS, DID YOU CONDUCT ONE AS

15   WELL?

16   A    YES, I DID.

17   Q    AND DID CONDUCTING GEORGIA PACIFIC ANALYSIS

18   CONFIRM YOUR FINDINGS THROUGH THE MARKET DATA

19   RESEARCH THAT YOU PERFORMED?

20   A    YES, THE GENERAL FRAMEWORK I'M USING IS

21   GEORGIA PACIFIC, BUT I DID LOOK AT SOME OTHER

22   FACTORS SUGGESTED IN THE FRAMEWORK, AND I DO

23   BELIEVE THAT THEY'RE CONFIRMATORY.

24   Q    CAN YOU GIVE US A FEW FACTORS THAT YOU LOOKED

25   AT AND BRIEFLY SUMMARIZE THEM FOR THE JURY?

```
1    A    ONE THING YOU'RE ASKED TO LOOK IS WHETHER

2    THERE ARE ANY CONVOYED SALES, WHETHER THERE'S

3    PROFITABILITY ATTACHED TO THE PRODUCTS IN QUESTION,

4    AND I THINK IT'S WELL KNOWN THAT THE IPHONE AND THE

5    IPOD ARE VERY PROFITABLE PRODUCTS.

6              IT'S WELL KNOWN THAT THERE'S PASS

7    THROUGH, OR THAT SUCCESS WITH THE IPHONE AND THE

8    IPAD, SALES FROM THE ITUNES AND THE APP STORE AND

9    SO ON AND SO FORTH.

10             SO I THINK THERE ARE SOME OTHER PLUS

11   FACTORS IN GEORGIA PACIFIC.  SO I TOOK COMFORT FROM

12   THOSE OTHER FACTORS.

13             CRITICALLY, GEORGIA PACIFIC REQUIRES YOU

14   TO ASK THIS FUNDAMENTAL QUESTION, WHAT WOULD BE THE

15   REASONABLE ROYALTY IN A HYPOTHETICAL NEGOTIATION IF

16   THE PARTIES HAD ACTUALLY NEGOTIATED RATHER THAN

17   INFRINGED, AND THAT IS THE LINCHPIN OF MY ANALYSIS.

18   Q    SIR, TO SUMMARIZE, WHAT ARE THE DAMAGES THAT

19   APPLE WILL OWE TO SAMSUNG IF IT IS FOUND TO

20   INFRINGE SAMSUNG'S STANDARDS PATENTS?

21   A    IF YOU GO BACK TO MY FIRST SLIDE.

22   Q    3963.005?

23   A    YEAH.  AND I'VE GIVEN A RANGE THERE FROM 290

24   MILLION TO 300 MILLION.

25             MS. MAROULIS:  THANK YOU, SIR.  I PASS
```

1    RECORD AND STORE DIGITAL IMAGES, SO IT MIGHT BE

2    MEMORY OR A COMPACT FLASH CARD OR A HARD DRIVE.

3    Q    DOES THE LG PATENT DISCLOSE THAT LIMITATION?

4    A    YES.

5    Q    WHERE?

6    A    IF WE LOOK ON THE NEXT SLIDE, THERE ARE MANY

7    PLACES IN THE LG PATENT THAT TALK ABOUT THE

8    RECORDING MEDIUM, AND IN PARTICULAR THEY TALK ABOUT

9    MEMORY, SO IT SAYS EXPANDED MEMORY ON THAT VERY

10   FIRST LINE THERE.

11        AND THEN IN THAT SECOND PARAGRAPH THAT

12   WE'VE GOT, IN THE FIRST SEGMENT IT SAYS PHOTOGRAPH

13   TAKEN BY THE USE OF THE AFOREMENTIONED CAMERA KEY

14   OR STORED IN THE MOBILE PHONE'S MEMORY.

15        SO HERE WE HAVE A RECORDING MEDIUM STORED

16   IMAGE.

17   Q    LET'S GO TO THE NEXT LIMITATION, A DISPLAY

18   SCREEN FOR DISPLAYING THE IMAGE DATA.  CAN WE FIND

19   THAT IN THE LG PATENT?

20   A    YES, WE CAN.

21   Q    CAN WE HAVE PDX 42.18.

22        CAN YOU EXPLAIN YOUR OPINION WITH RESPECT

23   TO THIS LIMITATION?

24   A    SO WE SEE IN DRAWING 1 HERE, HERE'S THE

25   ILLUSTRATION OF THE MOBILE PHONE AND THERE'S A VERY

3012

```
 1    PROMINENT DISPLAY SCREEN.
 2             THE DISPLAY SCREEN IS ALSO MENTIONED IN
 3    THE TEXT HERE AND ON PAGE 2 AND ON PAGE 4 SUCH AS
 4    THE TEXT THAT SAYS AS ILLUSTRATED IN DRAWING 1,
 5    WHEN MOBILE PHONE IS FLIPPED OPEN, THE CAMERA IS
 6    COMPRISED OF A DISPLAY AREA.
 7    Q    DOES THE LG PATENT DISCLOSE A CONTROLLER?
 8    A    YES, IT DOES.
 9    Q    WHAT IS A CONTROLLER?
10    A    SO A CONTROLLER, AS I SAID A MINUTE AGO, IS
11    SORT OF THE BRAINS OF THE DIGITAL CAMERA, OR THE
12    MOBILE PHONE HERE.
13    Q    AND WHERE WOULD WE FIND THE CONTROLLER IN THE
14    LG PATENT?
15    A    IF WE, IF WE MOVE ON TO ANOTHER -- YES, THE
16    NEXT SLIDE.
17    Q    LET'S GO TO PDX 42.20?
18    A    YEAH.  SO WE FIND THAT RIGHT IN THAT FIRST
19    LINE THERE, ATTRIBUTED TO THE MOBILE PHONE'S
20    DISPLAY CAPABILITIES, INTERNAL PROCESSING
21    CAPABILITIES, EXPANDED MEMORY.  AND INTERNAL
22    PROCESSING CAPABILITIES, THOSE ARE THE CAPABILITIES
23    OF A CONTROL.
24    Q    LET'S PAUSE ON THIS LIMITATION BECAUSE IT
25    REQUIRES MORE THAN JUST A CONTROLLER.  IT SAYS A
```

1    CONTROLLER CONNECTED WITH THE PHOTOGRAPHIC

2    CONVERSION MODULE, PHOTO MEDIUM AND DISPLAY SCREEN.

3    DID YOU FIND THAT IN THE LG PATENT?

4    A    YES, THAT'S HERE IN THE LG PATENT.

5            SO THE CONTROLLER, AS I SAID, IS SORT OF

6    THE BRAINS OF THE IMAGE PROCESSING APPARATUS.  IT'S

7    THE PART THAT CONTROLS EVERYTHING ELSE AND MAKES IT

8    WORK.

9            IF THE CONTROLLER WERE NOT CONNECTED TO

10   AND IN COMMUNICATION WITH MEMORY AND IN

11   COMMUNICATION WITH A CONVERSION MODULE, IT WOULDN'T

12   BE ABLE TO TAKE A PHOTOGRAPH AT ALL.  SO THAT'S HOW

13   IT ALL WORKS.

14   Q    LET'S GO TO THE NEXT LIMITATION, WHICH BEGINS

15   A CONTROLLER BEING OPERATIVE.  WE'RE NOW ON

16   LIMITATION F.  IN YOUR OPINION, DOES THE LG PATENT

17   HAVE THAT LIMITATION?

18   A    YES, IT DOES.

19   Q    CAN WE HAVE THE NEXT DEMONSTRATIVE, PLEASE.

20   WHERE DOES THE LG PATENT DISCLOSE THAT LIMITATION?

21   A    SO THIS PATENT -- THIS LIMITATION IS THE ONE

22   THAT TALKS ABOUT THESE TWO MODES, THE PHOTOGRAPHING

23   MODE AND THE IMAGE DISPLAY MODE.

24           AND THE TEXT THAT WE HAVE HERE SHOWS US

25   THESE TWO MODES UNDER THE DIRECTION OF THE

1    CONTROLLER.

2            SO THE, THE FIRST TEXT FROM PAGE 2, IF

3    YOU LOOK AT THAT BOTTOM LINE, IT SAYS PHOTOGRAPHS

4    TAKEN BY USE OF THE AFOREMENTIONED CAMERA KEY ARE

5    STORED IN THE MOBILE PHONE'S MEMORY.  SO THAT'S

6    WHERE WE FIND THE PHOTOGRAPHING MODE.

7    Q    SO WHERE DOES THE LG PATENT DISCLOSE THE PHOTO

8    IMAGE DISPLAYED LIMITATION?

9    A    SO THE SECOND TEXT SEGMENT I PUT ON THE SLIDE

10   DISCLOSES THE STORED IMAGE DISPLAY MODE.  SO, FOR

11   INSTANCE, IF WE READ THAT BOTTOM PARAGRAPH, IT SAYS

12   SECOND SLIDE SHOW MENU IS SELECTED ON THE SCREEN

13   WITH THE SHORTCUT MENUS AND THE FIRST PHOTOGRAPH

14   STORED IN THE MEMORY IS IMMEDIATELY DISPLAYED ON

15   THE SCREEN.  SO THAT IS THE -- THAT'S THE STORED

16   IMAGE DISPLAY MODE THERE.

17   Q    AND IF WE CAN GO BACK TO OUR CLAIM CHART.  SO

18   WE'RE NOW AT THE LAST ELEMENT, ELEMENT G.  DOES THE

19   LG PATENT DISCLOSE THE MODE SWITCHING OPERATION OF

20   CLAIM 10?

21   A    YES, IT DOES.

22   Q    CAN WE HAVE THESE PDX 42.24 ON THE SCREEN?

23            CAN YOU EXPLAIN, WITH RESPECT TO THIS

24   SLIDE, WHERE YOU'LL FIND THE MODE SWITCHING

25   OPERATION?

1    A    SO ACTUALLY THE ILLUSTRATION HERE, FIGURE 3,

2    SHOWS US MODE SWITCHING.  IT SHOWS HOW WE START UP

3    THE IMAGE DISPLAY MODE, EITHER THE REGULAR VIEW

4    PHOTOGRAPH VERSION OR THE SLIDE SHOW VERSION.

5            AND IF WE LOOK AT THE TEXT, THAT FIRST

6    PARAGRAPH THERE, IT TELLS US HOW TO USE THE MENUS

7    IN ORDER TO SELECT THE VIEW PHOTOGRAPH MODE, AND

8    ONCE THE PHOTOGRAPHS HAVE BEEN SELECTED, IT SAYS

9    THEN THE CORRESPONDING PHOTOGRAPHS APPEAR ON THE

10   SCREEN.

11           SO WE'RE GETTING THE, THE SWITCHING INTO

12   THE STORED IMAGE DISPLAY MODE THERE.

13   Q    DOES THE LG PATENT DISCLOSE SHOWING THE MOST

14   RECENTLY VIEWED IMAGE BEING DISPLAYED WHEN THE USER

15   RETURNS TO THE STORED IMAGE DISPLAY MODE?

16   A    YES, IT DOES.

17   Q    WHERE CAN WE FIND THAT?

18   A    SO THE SECOND PARAGRAPH THAT I CONCLUDED FROM

19   PAGE 4, THE ONE THAT BEGINS NOW IF THE SEC, THAT

20   PARAGRAPH SHOWS US EXACTLY THIS.

21           SO THE TEXT TO LOOK AT IS THE TEXT IN THE

22   SECOND HALF OF THAT PARAGRAPH, THIS IS TEXT WE SAW

23   A MOMENT AGO WHERE IT SAYS A FIRST PHOTOGRAPH

24   DISPLAYED CAN SIMPLY BE THE ONE THAT'S BEEN STORED

25   THE LONGEST OR THE ONE HAVING THE EARLIEST STORED

```
 1    ADDRESS NUMBER, OR IT COULD BE THAT VIEWING CAN

 2    START FROM THE PHOTOGRAPH THAT WAS LAST VIEWED BY

 3    THE VIEWER, SO THE LAST VIEWED IMAGE.

 4    Q    THE LAST QUESTION WITH RESPECT TO THIS

 5    LIMITATION.  DOES THE LG PATENT DISCLOSE

 6    IRRESPECTIVE OF THE DURATION LIMITATION?

 7    A    IT DISCLOSES IT UNDER DR. YANG'S

 8    INTERPRETATION.

 9    Q    CAN YOU EXPLAIN?

10    A    SO DR. YANG ARGUES THAT, THAT IRRESPECTIVE OF

11    THE DURATION MEANS THAT THERE'S NO DEPENDENCE ON

12    TIME.  THERE'S NO TIMER OR OTHER DEPENDENCE ON TIME

13    THAT WILL DETERMINE WHICH PHOTOGRAPH SHOULD BE

14    DISPLAYED WHEN YOU ENTER STORED IMAGE DISPLAY MODE.

15         AND THE PARAGRAPH I JUST READ IS THE ONE

16    THAT SHOWS HOW A DECISION WILL BE MADE ABOUT WHAT

17    PHOTOGRAPH SHOULD BE SHOWN, AND AS YOU CAN SEE,

18    THERE'S NO DEPENDENCE ON TIME IN THERE.

19         SO UNDER DR. YANG'S INTERPRETATION, THAT

20    DOES MEET, OR DISCLOSE IRRESPECTIVE OF THE

21    DURATION.

22    Q    TO SUMMARIZE, WHAT IS YOUR CONCLUSION

23    REGARDING THE LG PATENT?

24    A    THE LG PATENT DISCLOSES ALL THE LIMITATIONS OF

25    CLAIM 10.
```

```
 1    Q    HAVE YOU FORMED ANY OPINION AS TO WHETHER

 2    CLAIM 10 IS OBVIOUS?

 3    A    YEAH.  YES.  MY OPINION IS THAT CLAIM 10, EVEN

 4    IF WE DECIDED THAT THE LG PATENT DIDN'T DISCLOSE

 5    ONE LIMITATION OR ANOTHER, IT STILL RENDERS THE

 6    CLAIM 10 OBVIOUS TO SOMEBODY WHO WAS WORKING IN

 7    THIS AREA AND DEVELOPING A SYSTEM OF THIS SORT.

 8    Q    COULD YOU EXPLAIN YOUR OPINION, PLEASE?

 9    A    WELL, THE LG PATENT MAKES CLEAR THAT DIGITAL

10    IMAGE PROCESSING APPARATUSES ALREADY EXISTED, LIKE

11    CAMERA PHONES.

12            AND IT MAKES CLEAR, TOO, THAT THEY HAVE

13    ALL THE COMPONENTS, THE OPTICAL SYSTEM AND THE

14    CONTROLLER AND YOUR RECORDING MEDIUM AND SO FORTH.

15            AND IT ALSO SHOWS US THAT YOU COULD --

16    AND YOU COULD HAVE BOTH A PHOTOGRAPHING MODE AND A

17    STORED IMAGE DISPLAY MODE IN THE SAME DEVICE AND

18    THAT WOULD BE SOMETHING THAT YOU WOULD WANT TO DO.

19            AND IN PARTICULAR, THAT THOSE TWO

20    FUNCTIONS MIGHT BE IMPLEMENTED USING MODES.

21            AND -- AND FURTHER, THROUGH THE

22    DISCUSSION OF MODE SWITCHING, IT MAKES CLEAR IF YOU

23    HAVE THOSE MODES, YOU HAVE TO BE ABLE TO SWITCH

24    AMONGST THEM, SWITCH FROM ONE TO THE OTHER AND

25    BACK.
```

```
1              AND, FINALLY, IT ALSO MAKES OBVIOUS THE

2     IDEA THAT THERE'S, WELL, ONLY A FINITE NUMBER OF

3     CHOICES YOU CAN MAKE FOR WHICH IMAGE SHOULD BE ON

4     THE SCREEN WHEN YOU RETURN TO THE PHOTOGRAPHING --

5     TO THE IMAGE DISPLAY MODE, AND THAT ONE AMONGST

6     THOSE CHOICES IS TO DISPLAY THE IMAGE THAT WAS LAST

7     VIEWED.

8              AND, YOU KNOW, IT ALSO TELLS US THAT

9     THERE'S, THERE'S NO PARTICULAR -- THAT THAT'S

10    ALWAYS A SENSIBLE CHOICE, THAT WE COULD ALWAYS, WE

11    SHOULD ALWAYS -- THAT'S ALWAYS ONE OF THE CHOICES

12    THAT WE MIGHT WANT TO MAKE ANY TIME THAT WE ENTERED

13    MODE.  SO IT REALLY SORT OF RENDERS ALL THE

14    ELEMENTS OF CLAIM 10 OBVIOUS.

15    Q    IN REACHING YOUR OBVIOUSNESS OPINION, DID YOU

16    CONSIDER WHETHER THERE EXISTS ANY SO-CALLED

17    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS?  AND

18    I'M REFERRING HERE TO THINGS LIKE COPYING,

19    COMMERCIAL SUCCESS, PRAISE IN THE INDUSTRY.

20    A    YES, I DID.

21    Q    AND DID YOU FIND ANY EVIDENCE OF ANY OF THOSE

22    FACTORS?

23    A    I FOUND NO EVIDENCE OF ANY OF THOSE SECONDARY

24    CONSIDERATIONS OF NON-OBVIOUSNESS, AND SAMSUNG

25    HASN'T PRESENTED ANY THAT ARE SORT OF TIED TO THE
```

```
 1    SPECIFIC LIMITATIONS OF CLAIM 10.

 2              MR. SELWYN:  THANK YOU.  NO FURTHER

 3    QUESTIONS.

 4              THE COURT:  ALL RIGHT.  TIME IS NOW 2:11.

 5              GO AHEAD, PLEASE.

 6              MR. JOHNSON:  YOUR HONOR, IN THE INTEREST

 7    OF TIME, NO QUESTIONS.

 8              THE COURT:  OH, OKAY.  ALL RIGHT.

 9              THEN IS THIS WITNESS EXCUSED AND IS IT

10    SUBJECT TO RECALL OR NOT?

11              MR. SELWYN:  HE IS EXCUSED.  HE IS

12    SUBJECT TO RECALL.

13              THE COURT:  HE IS SUBJECT TO RECALL.

14              OKAY.  YOU ARE EXCUSED SUBJECT TO RECALL.

15              THE WITNESS:  THANK YOU.

16              THE COURT:  ALL RIGHT.  CALL YOUR NEXT

17    WITNESS, PLEASE.

18              MR. LEE:  YOUR HONOR, APPLE CALLS

19    PROFESSOR GIVARGIS.  IF WE CAN JUST HAVE A MINUTE

20    TO SWAP THE NOTEBOOKS OUT.

21              THE COURT:  OKAY.  THAT'S FINE.  THAT'S

22    FINE.

23              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

24                    TONY GIVARGIS,

25    BEING CALLED AS A WITNESS ON BEHALF OF THE
```

```
1    STANDALONE APPLICATION THAT RUNS ON ITS OWN.

2    Q     IS MEDIA SERVER D AN APPLET?

3    A     NO.

4    Q     WHY NOT?

5    A     MEDIA SERVER D IS A STANDALONE APPLICATION,

6    AND IT IS NOT DESIGNED TO HAVE AN APPLET RUN WITHIN

7    IT.  THAT WOULDN'T BE POSSIBLE.

8    Q     IS MEDIA SERVER D AN APPLICATION MODULE?

9    A     MEDIA SERVER D IS NOT AN APPLICATION MODULE

10   FOR THE SAME REASON.  IT'S NOT DESIGNED TO HAVE AN

11   APPLET RUN WITHIN IT.

12   Q     HAVE YOU PREPARED A SLIDE TO HELP COMPARE THE

13   ARCHITECTURE OF THE APPLE CODE TO AN ARCHITECTURE

14   THAT USES APPLETS?

15   A     YES.

16   Q     CAN WE HAVE PDX 43.9, AND CAN YOU EXPLAIN YOUR

17   OPINION WITH RESPECT TO THIS SLIDE?

18   A     YES.  THESE ARE THE TWO, THE TWO

19   ARCHITECTURES, SOFTWARE ARCHITECTURES THAT WE'VE

20   BEEN TALKING ABOUT.

21              ON THE RIGHT WE HAVE THE APPLE

22   ARCHITECTURE WHERE YOU HAVE STANDALONE

23   APPLICATIONS, APPLICATIONS THAT RUN DIRECTLY ON THE

24   HARDWARE.

25              AND ON THE LEFT YOU HAVE THIS '711
```

```
 1    ARCHITECTURE, WHICH IS AN APPLET RUNNING WITHIN AN

 2    APPLICATION MODULE.

 3              THESE TWO ARCHITECTURES ARE VERY

 4    DIFFERENT, AND A PERSON WHO'S KNOWLEDGEABLE ABOUT

 5    SOFTWARE SYSTEMS SHOULD BE ABLE TO, AS A MATTER OF

 6    FACT, NOT OPINION, AND THE CODE AND BE ABLE TO TELL

 7    IF A SYSTEM IS USING THE RIGHT ARCHITECTURE OR THE

 8    LEFT ARCHITECTURE.

 9    Q    I WANT TO TURN NOW TO THE SECOND REASON YOU

10    GAVE FOR NON-INFRINGEMENT.  CAN YOU REMIND US WHAT

11    THAT WAS?

12    A    YES.  THE SECOND REASON HAD TO DO WITH THE

13    APPLE PRODUCTS NOT HAVING AN MP3 MODE.

14    Q    LET'S TURN BACK TO THE CLAIM LANGUAGE.  WE

15    HAVE CLAIM 9 ON THE SCREEN.  WHAT REQUIREMENTS DOES

16    CLAIM 9 HAVE WITH RESPECT TO MP3 MODE?

17    A    CLAIM 9 HAS THREE PLACES WHERE IT REQUIRES AN

18    MP3 MODE.  IT REQUIRES THE ABILITY TO SELECT AN MP3

19    MODE, IT REQUIRES THE ABILITY TO PLAY MUSIC IN AN

20    MP3 MODE, AND IT ALSO HAS THE REQUIREMENT OF

21    SWITCHING FROM THE MP3 MODE TO A STANDBY MODE.

22    Q    NOW, WHAT IS AN MP3 MODE?

23    A    A MODE IS A STATE OF OPERATION OF THE DEVICE,

24    AS IT'S BEEN ALREADY TALKED ABOUT.

25              AND AN MP3 MODE IS A STATE OF THE DEVICE
```

```
1    WHERE THE DEVICE IS PLACING MP3.

2    Q    NOW, THE APPLE PRODUCTS PLAY MUSIC, DON'T

3    THEY?

4    A    YES.

5    Q    SO HOW DO THEY PLAY MUSIC WITHOUT USING AN MP3

6    MODE?

7    A    THEY USE APPLICATIONS FOR PLAYING MUSIC.  THEY

8    USE APPS.

9    Q    LET'S TURN NOW TO YOUR INVALIDITY OPINION.

10   AGAIN, REMIND US WHAT YOUR OPINION IS?

11   A    CLAIM 9 OF THE '711 PATENT IS NOT VALID.

12   Q    CAN YOU SUMMARIZE FOR US THE BASIS OF YOUR

13   OPINION?

14   A    YES.  CLAIM 9 OF THE '711 PATENT WOULD HAVE

15   BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE

16   ART PRIOR TO 2005 BECAUSE OF PRIOR ART, INCLUDING

17   SONY ERICSSON K700I DEVICE.

18   Q    SO TAKE US BACK, IF YOU COULD, TO 2005 FOR A

19   MOMENT.

20        WHAT WAS THE STATE OF THE ART FOR MOBILE

21   PHONES WITH MUSIC PLAYERS IN 2005?

22   A    PRIOR TO 2005, MOBILE PHONES COULD DO

23   MULTITASKING.  THEY COULD PLAY MUSIC.  AND THEY DID

24   ALLOW YOU TO PLAY MUSIC WHILE LISTENING TO PHONE --

25   TO LISTEN TO MUSIC WHILE OPERATING SOME OTHER
```

```
 1    FUNCTION OF THE PHONE.

 2    Q    LET ME HAND YOU WHAT'S BEEN MARKED AS --

 3              MAY I, YOUR HONOR?

 4              THE COURT:  YES, PLEASE, GO AHEAD.

 5    BY MR. SELWYN:

 6    Q    I'VE HANDED YOU WHAT'S BEEN MARKED AS PX 125.

 7    DO YOU RECOGNIZE IT?

 8    A    YES.

 9    Q    WHAT IS IT?

10    A    THIS IS THE SONY ERICSSON K700I DEVICE THAT I

11    TALKED ABOUT.

12              MR. SELWYN:  YOUR HONOR, I OFFER PX 125.

13              THE COURT:  ANY OBJECTION?

14              MR. DEFRANCO:  NO OBJECTION.

15              THE COURT:  IT'S ADMITTED.

16              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

17              125, HAVING BEEN PREVIOUSLY MARKED FOR

18              IDENTIFICATION, WAS ADMITTED INTO

19              EVIDENCE.)

20    BY MR. SELWYN:

21    Q    WHEN DID THE PX -- WHEN DID WHAT'S BEEN MARKED

22    AS PX 125 THE SONY K700I DEVICE GO ON SALE OR

23    BECOME PUBLICLY AVAILABLE?

24    A    IN 2004.

25    Q    HOW DO YOU KNOW?
```

```
1     A     FOR THREE REASONS.  THERE WERE A COUPLE OF
2     NEWS RELEASES BY SONY THAT TALKED ABOUT THE SONY
3     ERICSSON K700I, AND THE MANUAL OF THIS PHONE ALSO
4     MENTIONS THE DATE 2004.  AND ALSO SONY PROVIDED
5     SALES NUMBERS FOR 2004 THAT SHOWED SOME UNITS WERE
6     SOLD IN THE U.S. N 2004.
7     Q     AND TURN YOUR BINDER, PLEASE, TO TAB 3, WHICH
8     IS PX 117.
9     A     YES.
10    Q     AND WHAT ARE THOSE DOCUMENTS?
11    A     THESE ARE THE PRESS RELEASES THAT I TALKED
12    ABOUT.  THIS PARTICULAR PRESS RELEASE IS SONY
13    ERICSSON UNVEILING THE K700 CAMERA PHONE IN
14    MARCH OF 2004.
15    Q     AND IF YOU TURN TO THE -- TO THE THIRD PAGE OF
16    PX 117, WHAT DO YOU FIND?
17    A     THIS IS THE SECOND PRESS RELEASE.  THIS IS
18    ALSO FROM SONY ERICSSON WHEN THE K700 CAMERA PHONE
19    IN ATLANTA, IT SHOWCASES THE UNIT.
20            MR. SELWYN:  YOUR HONOR, I OFFER PX 117.
21            THE COURT:  ANY OBJECTION.
22            MR. DEFRANCO:  NO, YOUR HONOR.
23            THE COURT:  THAT'S ADMITTED.
24            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
25             117, HAVING BEEN PREVIOUSLY MARKED FOR
```

```
 1              IDENTIFICATION, WAS ADMITTED INTO

 2              EVIDENCE.)

 3    BY MR. SELWYN:

 4    Q    WHAT IS THE DATE ON EACH OF THE PRESS

 5    RELEASES?

 6    A    ON THE ONE THAT'S BEING DISPLAYED NOW, IT SAYS

 7    MARCH 21ST, 2004.

 8    Q    NOW, IF YOU WOULD, PLEASE, SIR, TURN TO TAB 4

 9    OF YOUR NOTEBOOK.  DO YOU RECOGNIZE THAT DOCUMENT?

10    A    YES.

11    Q    WHAT IS IT?

12    A    THIS IS THE OWNER'S MANUAL OF THE SONY

13    INTERROGATORY RESPONSE ERICSSON K700I PHONE.

14              MR. SELWYN:  YOUR HONOR, WE OFFER PX 116.

15              THE COURT:  ANY OBJECTION?

16              MR. JOHNSON:  NO, YOUR HONOR.

17              THE COURT:  IT'S ADMITTED.

18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19              116, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22              MR. SELWYN:  IF WE CAN SHOW THE DATE OF

23    PUBLICATION ON THE SCREEN, PLEASE.

24    Q    WHAT IS THE DATE OF PUBLICATION SHOWN ON THIS?

25    A    I BELIEVE IT IS MARCH 2004.
```

1    Q    NOW, SIR, IF YOU WOULD TURN TO TAB 5 IN YOUR

2    NOTEBOOK.  CAN YOU TELL US WHAT THESE DOCUMENTS

3    ARE.

4    A    YES.  THIS IS THE SALES RECORD PROVIDED BY

5    SONY.

6              MR. SELWYN:  YOUR HONOR, WE OFFER PX 113.

7              THE COURT:  THAT'S NOT THE AFFIDAVIT, IS

8    IT?

9              MR. SELWYN:  NO.

10             THE COURT:  THAT'S WHAT I SAW ON MY

11   SCREEN.  PX 113, WHAT IS THAT?

12             MR. SELWYN:  WE REMOVED THE AFFIDAVIT

13   FROM WHAT'S IN THE BINDER, AND WE'LL REPLACE THE

14   EXHIBIT TO REMOVE THE AFFIDAVIT.

15             THE COURT:  OKAY.  I SEE IT.  ANY

16   OBJECTION?

17             MR. DEFRANCO:  NO, YOUR HONOR.

18             THE COURT:  I'M GOING TO ADMIT IT.

19             (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

20             113, HAVING BEEN PREVIOUSLY MARKED FOR

21             IDENTIFICATION, WAS ADMITTED INTO

22             EVIDENCE.)

23   BY MR. SELWYN:

24   Q    WE HAVE UP ON THE SCREEN THE FIRST PAGE OF THE

25   DOCUMENT.  WHAT DOES THIS SHOW?

```
 1    A    THIS SHOWS THAT THE K700I DEVICE WAS SOLD IN

 2    2004.  IT SHOWS THE NUMBER OF UNITS SOLD IN 2004.

 3    Q    AND YOU HAVE THE SONY K700I IN FRONT OF YOU,

 4    RIGHT?

 5    A    YES.

 6              MR. SELWYN:  YOUR HONOR, MAY I PUBLISH

 7    THAT TO THE JURY?

 8              THE COURT:  GO AHEAD, PLEASE.

 9    BY MR. SELWYN:

10    Q    CAN YOU BRIEFLY DESCRIBE THE FEATURES OF THE

11    SONY K700I?

12    A    THE SONY K700I IS A POCKET SIZED PHONE.  IT

13    DOES ALLOW YOU TO PERFORM MULTITASKING.  IT DOES

14    PLAY MP3 MUSIC AND IT ALLOWS YOU TO LISTEN TO MUSIC

15    WHILE OPERATING OTHER FUNCTIONS OF THE PHONE.

16    Q    WAS THE SONY K700I CONSIDERED BY THE PATENT

17    OFFICE WHEN REVIEWING THE APPLICATION FOR THE '711

18    PATENT?

19    A    NO.

20    Q    HOW DO YOU KNOW?

21    A    IT IS NOT LISTED ON THE '711 PATENT, AND IT IS

22    ALSO NOT IN THE FILE HISTORY.

23    Q    HAVE YOU PREPARED A VIDEO TO DEMONSTRATE THE

24    FEATURES OF THE SONY K700I?

25    A    YES.
```

```
 1     Q    CAN WE HAVE, PLEASE, PX 43.11, AND WE'LL PLAY
 2    THIS AND AS WE DO, WOULD YOU PLEASE NARRATE FOR US.
 3                (WHEREUPON, A VIDEOTAPE WAS PLAYED IN
 4    OPEN COURT OFF THE RECORD.)
 5                THE WITNESS:  YES.  THIS IS A VIDEO I
 6    MADE OF THE K700I PHONE.  I'M GOING TO SHOW YOU HOW
 7    THIS DEVICE TEACHES OR DETERMINES MANY OF THE SPECS
 8    AS DESCRIBED IN THE CLAIM 9 OF THE '711 PATENT.
 9                I JUST POWERED IT UP AND THE UNIT IS NOW
10    ENTERING STANDBY MODE.
11                I'M GOING TO GO TO THE MENU SYSTEM TO
12    SELECT THE MUSIC PLAYER.  WE CAN SEE THAT THERE'S A
13    BOX AROUND THE MUSIC PLAYER ICON, AND I SELECT THAT
14    AND THE MUSIC PLAYER APPLICATION LAUNCHES.
15                I CAN SCROLL THROUGH A LIST OF SONGS,
16    SELECT A PARTICULAR SONG FOR PLAY BACK.  THE SONG
17    IS PLAYING.  I CAN GO THROUGH A NUMBER OF STEPS TO
18    GO BACK TO THE STANDBY MODE.  I WILL PRESS
19    MINIMIZE, AND I'LL GO BACK TO THE STANDBY MODE.
20                FROM THE STANDBY MODE, I CAN OPERATE ANY
21    NUMBER OF FUNCTIONS.  I'M GOING TO SHOW YOU THREE
22    DIFFERENT FUNCTIONS OF THE PHONE, CONTACTS, I'LL
23    SCROLL THROUGH A LIST OF CONTACTS.  I CAN DO THINGS
24    LIKE SEND A MESSAGE, VIEW SOMETHING AS A CONNECT,
25    EDIT THE CONTACT, I CAN DO THINGS LIKE SEND AN
```

```
 1     E-MAIL.  THE MUSIC IS PLAYING, OF COURSE.
 2             BACK TO THE STANDBY MODE.  AND FROM THE
 3     STANDBY MODE, I CAN GO TO SOME OTHER FUNCTION, LIKE
 4     CALENDAR.  NOTICE THAT NO MATTER WHAT FUNCTION OF
 5     THE PHONE I'M OPERATING, THE MUSIC INDICATOR ON TOP
 6     SHOWS THAT MUSIC IS PLAYING.
 7             I CAN CHANGE THE VIEW OF THE CALENDAR.
 8     BACK TO THE STANDBY MODE, AND STILL THE INDICATOR
 9     THAT INDICATES MUSIC IS PLAYING IS DISPLAYED ON
10     TOP.
11             I'M GOING TO SHOW YOU ONE FINAL FUNCTION
12     OF THE PHONE.  I'LL SELECT THE STOP WATCH FUNCTION.
13     THAT IS GOING.
14             AND BACK TO THE STANDBY MODE.
15     Q    OKAY.  SO NOW I'D LIKE YOU TO COMPARE THE SONY
16     K700I AGAINST CLAIM 9, AND LET'S PUT UP CHECKLIST
17     OF THE ELEMENTS OF CLAIM 9 SO WE CAN KEEP TRACK OF
18     WHERE WE ARE.
19             CAN WE HAVE PDX 43.13.  SO LET'S START
20     WITH THE PREAMBLE, A MULTITASKING APPARATUS IN A
21     POCKET SIZED MOBILE COMMUNICATION DEVICE, INCLUDING
22     AN MP3 PLAYING CAPABILITY.  DOES THE SONY K700I
23     HAVE THOSE FUNCTIONS?
24     A    YES.  AND IF YOU WOULD GO TO THE NEXT SLIDE,
25     HERE I HAVE SCREEN SHOTS OF THE SAME VIDEO THAT I
```

```
1    JUST PLAYED FOR YOU THAT SHOWS THAT THE SONY K700I

2    IS A POCKET SIZED MOBILE COMMUNICATION DEVICE.  IT

3    HAS MP3 PLAYING CAPABILITIES, AND IT'S ALSO

4    MULTITASKING.  HE SHOWED YOU THREE DIFFERENT

5    FUNCTIONS.

6    Q    LET'S GO TO ELEMENT A.  ELEMENT A REQUIRES A

7    CONTROLLER FOR PERFORMING CERTAIN FUNCTIONS.  DO

8    YOU SEE THAT?

9    A    YES.

10   Q    WHAT IS A CONTROLLER?

11   A    A CONTROLLER IS A PROCESSOR.  IT IS WHAT RUNS

12   THE APPLICATIONS.

13   Q    DOES THE SONY K700I HAVE A CONTROLLER?

14   A    YES.

15   Q    HOW DO YOU KNOW?

16   A    I TOOK ONE APART, LOOKED AT THE LOGIC BOARD.

17   IT HAS A PROCESSOR.

18   Q    ELEMENT A ALSO REQUIRES GENERATING A MUSIC

19   PLAYGROUND PLAY OBJECT WHERE IN THE BASIC

20   PLAYGROUND PLAY OBJECT HAS THE APPLICATION MODE.

21   DOES IT HAVE THAT ELEMENT?

22   A    YES, IN THIS SCREEN, YOU SEE THERE IS AN ICON

23   THAT REPRESENTS THE MUSIC PLAY, THE MUSIC PLAYER,

24   AND YOU SAW ME SELECT THAT, THAT IT STARTED PLAYING

25   MUSIC IN THE BACKGROUND.
```

1    Q    LET'S TURN NOW TO ELEMENT B.  CAN WE HAVE PDX

2    43.18.  DOES THE SONY K700I INCLUDE AT LEAST ONE

3    APPLET WITH CLAIMED FUNCTION?

4    A    I DON'T KNOW.  I COULD NOT DETERMINE THAT.

5    Q    WHY NOT?

6    A    TO DETERMINE THAT, I WOULD NEED TO LOOK AT THE

7    SOFTWARE OF THE SONY.

8    Q    SO WE'LL LEAVE THAT BOX BLANK, AND LET'S MOVE

9    ON TO THE NEXT ELEMENT.

10        PROVIDING AN INTERFACE FOR MUSIC PLAY BY

11   THE MUSIC PLAYGROUND PLAY OBJECT.  DOES THE SONY

12   K700I HAVE THAT ELEMENT?

13   A    YES, I ALREADY SHOWED IT HAS A MUSIC

14   BACKGROUND PLAY OBJECT, AND IT HAS BUTTONS THAT I

15   WAS PRESSING TO OPERATE THE USER INTERFACE.

16   Q    LET'S GO TO ELEMENT D.  SELECTING AN MP3 MODE

17   IN A POCKET SIZED MOBILE COMMUNICATION DEVICE USING

18   THE INTERFACE.  WHERE DO WE SEE THAT IN THE SONY

19   K700I?

20   A    YES, YOU SAW ME, BY CLICKING THE ICON, IT

21   LAUNCHED THIS APPLICATION FROM WHICH I COULD

22   ACTUALLY SELECT AN MP3 FILE AND FILE THAT FILE.  IT

23   DOES HAVE THIS ELEMENT.

24   Q    NEXT IS ELEMENT E, FOR SELECTING AND PLAYING A

25   MUSIC FILE IN THE POCKET SIZED MOBILE COMMUNICATION

```
 1    DEVICE IN THE MP3 MODE.
 2              DOES THE SONY K700I MEET THAT
 3    REQUIREMENT?
 4    A    YES, THOSE FILES ON THAT LIST, THEY'RE ALL MP3
 5    FILES.  THAT'S INDICATED IN THE ZOOM FIGURE.  THE
 6    SCREEN SHOT IS FROM THE VIDEO.  AND IT IS CAPABLE
 7    OF PLAYING MP3 FILES.
 8    Q    CAN WE HAVE PDX 43.20, ELEMENT F.  DOES THE
 9    SONY K700I HAVE THE ELEMENT OF SWITCHING FROM THE
10    MP3 MODE TO A STANDBY MODE WHILE THE PLAYING OF THE
11    MUSIC FILE CONTINUES?
12    A    YES.  THESE SCREEN SHOTS FROM THE VIDEO SHOW
13    YOU THAT I WENT THROUGH A FEW, BUTTON PRESSES TO
14    MINIMIZE THE APPLICATION AND GO BACK TO THE STANDBY
15    MODE.
16    Q    LET'S GO TO ELEMENT G, SELECTING AND
17    PERFORMING AT LEAST ONE FUNCTION OF THE POCKET
18    SIZED MOBILE COMMUNICATION DEVICE FROM THE STANDBY
19    MODE WHILE THE PLAYING OF THE MUSIC FILE CONTINUES.
20              WHERE DO WE FIND THAT IN THE SONY K700I?
21    A    IN THE VIDEO I SHOWED YOU THREE DIFFERENT
22    FUNCTIONS, SCREEN SHOTS OF EACH ONE OF THOSE
23    FUNCTIONS WHILE THE MUSIC WAS PLAYING, AND THE SONY
24    K700 DOES ALLOW TO YOU DO THIS.
25    Q    CAN WE HAVE PDX 43.22.  DOES THE SONY K700I
```

1244

```
 1    HAVE A DISPLAY UNIT FOR DISPLAYING AN INDICATION

 2    THAT THE MUSIC FILE IS BEING PLAYED IN THE STANDBY

 3    MODE?

 4    A    YES.  IN THE STANDBY MODE, I POINTED OUT THE

 5    INDICATION.  IT'S ALSO ZOOMED IN THIS PICTURE.

 6    THERE'S AN INDICATION AT THE TOP OF THE SCREEN THAT

 7    SLOWS THAT THE MUSIC IS PLAYING.

 8    Q    LAST ELEMENT, PDX 43.23.  DOES THE SONY K700I

 9    CONTINUE TO DISPLAY THE INDICATION THAT THE MUSIC

10    FILE IS BEING PLAYED WHILE PERFORMING THE SELECTED

11    FUNCTION?

12    A    YES.  IN ALL THOSE THREE MODES, OR ALL THOSE

13    THREE APPLICATIONS THAT I SHOWED YOU, CALENDAR,

14    STOP WATCH, AND CONTACTS, THAT INDICATION ON TOP OF

15    THE SCREEN WAS THERE.

16    Q    LET'S RECAP FOR A MOMENT.  CAN WE HAVE PDX

17    43.24.  WE'VE CHECKED OFF EVERY ELEMENT FOR CLAIM 9

18    EXCEPT FOR THE APPLET ONE, RIGHT?

19    A    YES.

20    Q    IN YOUR OPINION, WOULD THE USE OF AN APPLET

21    HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN

22    THE ART IN 2005?

23    A    YES.

24    Q    WHY?

25    A    APPLETS WERE WELL KNOWN PRIOR TO 2005.  THEY
```

```
 1    OFFERED A NUMBER OF ADVANTAGES THAT WOULD HAVE BEEN

 2    VERY USEFUL TO TAKE, TO EMPLOY IN A CELL PHONE.

 3    Q     WHAT ADVANTAGES?

 4    A     THOSE WOULD BE, TWO EXAMPLES WOULD BE

 5    PORTABILITY AND SECURITY.

 6    Q     WHAT DO YOU MEAN BY SECURITY AND HOW DO

 7    APPLETS HELP WITH THAT?

 8    A     WELL, BY SECURITY, I MEAN BEING CAREFUL ABOUT

 9    AN APPLICATION GAINING ACCESS TO AN APPLICATION

10    THAT'S POSSIBLY MALICIOUS OR BUGGING GAINING ACCESS

11    TO THE DATA STORED ON THE DEVICE, AND APPLETS HELP

12    BY THE FACT THAT THEY RUN WITHIN AN APPLICATION

13    MODULE, IT ALLOWS THE APPLICATION MODULE TO SERVE

14    AS A LAYER OF PROTECTION.  IT LIMITS THE ACCESS OF

15    THE APPLET TO THE DEVICE.

16    Q     DO YOU HAVE ANY OTHER BASIS FOR YOUR

17    CONCLUSION THAT IT WOULD HAVE BEEN OBVIOUS FOR A

18    PERSON OF ORDINARY SKILL TO USE AN APPLET FOR

19    BACKGROUND MUSIC PLAY IN A MOBILE PHONE?

20    A     YES, THERE'S A PATENT BY WONG, W-O-N-G, THAT

21    TEACHES THE USEFULNESS OF APPLETS FOR MOBILE

22    DEVICES.

23    Q     COULD YOU TURN TO TAB 6 IN YOUR BINDER.  DO

24    YOU RECOGNIZE -- WHICH IS PX 91.  DO YOU RECOGNIZE

25    THAT?
```

```
 1    A    I WORK AT CARNEGIE MELLON UNIVERSITY.

 2    Q    WHAT IS YOUR POSITION AT CARNEGIE MELLON

 3    UNIVERSITY?

 4    A    I'M A PERKINS PROFESSOR OF ELECTRICAL AND

 5    COMPUTER ENGINEERING.

 6    Q    HOW LONG HAVE YOU BEEN AT CARNEGIE MELLON?

 7    A    TWENTY-THREE YEARS.

 8    Q    AND ARE YOU A FULL PROFESSOR?

 9    A    YES.

10    Q    WHEN DID YOU BECOME A FULL PROFESSOR?

11    A    1999.

12    Q    DO YOU TEACH AT CARNEGIE MELLON?

13    A    YES.

14    Q    WHAT DO YOU TEACH?

15    A    I TEACH UNDERGRADUATE COURSE IN

16    TELECOMMUNICATION NETWORKS, AND GRADUATE COURSES IN

17    NETWORK, ADVANCED NETWORKS.

18    Q    WHAT KIND OF RESEARCH HAVE YOU DONE?

19    A    I DO RESEARCH IN SWITCHING SYSTEMS, THAT'S THE

20    NETWORK SWITCHING SYSTEM, AND TELECOMMUNICATION

21    NETWORK, CONTROLLER MANAGEMENT AND WIRELESS NETWORK

22    AND RESOURCE ALLOCATIONS.

23    Q    OTHER THAN BEING A PROFESSOR, HAVE YOU HELD

24    ANY OTHER POSITIONS THE CARNEGIE MELLON?

25    A    YES.  I WAS DIRECTOR OF THE CYLAB KOREA FROM
```

```
 1     2004 TO 2007.
 2     Q    WHAT WAS CYLAB KOREA AT CARNEGIE MELLON?
 3     A    IT WAS A RESEARCH INSTITUTE THAT WE CARRIED
 4     OUT RESEARCH IN NETWORK SECURITY, AND IT WAS FUNDED
 5     BY THE KOREAN GOVERNMENT.
 6     Q    CAN YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND
 7     FOR US?
 8     A    I OBTAINED BACHELOR OF ENGINEERING FROM MCGILL
 9     UNIVERSITY IN 1984, IT'S BEEN A WHILE, AND A
10     MASTER'S DEGREE AND PH.D. DEGREE FROM THE
11     UNIVERSITY OF TORONTO, 1987, AND 1990, ALL IN
12     ELECTRICAL ENGINEERING.
13     Q    HAVE YOU AUTHORED ANY SCIENTIFIC PUBLICATIONS?
14     A    YES.
15     Q    ABOUT HOW MANY?
16     A    OVER A HUNDRED.
17     Q    WOULD ANY BE IN PEER REVIEWED JOURNALS?
18     A    YES, THEY WERE ALL PEER REVIEWED.
19     Q    DO YOU HAVE ANY PATENTS?
20     A    YES.
21     Q    HOW MANY?
22     A    TWELVE.
23     Q    ARE ANY OF YOUR PATENTS LICENSED?
24     A    YES.  ONE OF THEM WAS LICENSED TO ADVANCED
25     MICRODEVICES AND SAMSUNG ELECTRONICS.
```

1    Q    TO SAMSUNG?

2    A    YES.

3    Q    NOW, HAVE YOU RECEIVED ANY FUNDING FOR YOUR

4    RESEARCH?

5    A    YES.

6    Q    WHAT GOVERNMENT AGENCIES HAVE SPONSORED YOUR

7    RESEARCH?

8    A    NATIONAL SCIENCE FOUNDATION AND THE DEPARTMENT

9    OF DEFENSE AND SO ON.

10   Q    HAVE ANY COMPANIES FUNDED YOUR RESEARCH?

11   A    YES.

12   Q    WHAT COMPANIES?

13   A    H-P, INTEL, CISCO, NORTEL, LG, SAMSUNG, AND SO

14   ON.

15   Q    SAMSUNG HAS FUNDED YOUR RESEARCH IN THE PAST?

16   A    YES, IN THE PAST.

17   Q    IN ADDITION TO BEING A PROFESSOR, DO YOU HAVE

18   ANY EXPERIENCE IN PRIVATE INDUSTRY?

19   A    YES.

20   Q    WHAT EXPERIENCE DO YOU HAVE?

21   A    I HAD TWO START-UP COMPANIES, ONE IS CALLED

22   SCALABLE NETWORKS, THAT WAS FOUNDED IN 1995, AND WE

23   DEVELOPED FAST ETHERNET SWITCHING SYSTEM.

24        AND IN THE YEAR 2000, I FOUNDED A COMPANY

25   CALLED ACCELIGHT NETWORKS, WHICH DEVELOPED OPTICAL

```
 1    SWITCHING SYSTEMS.
 2              MR. LEE:  YOUR HONOR, I OFFER PROFESSOR
 3    KIM AS AN EXPERT IN WIRELESS COMMUNICATIONS AND
 4    NETWORKS.
 5              MR. VERHOEVEN:  NO OBJECTION.
 6              THE COURT:  ALL RIGHT.  SO CERTIFIED.
 7    BY MR. LEE:
 8    Q    DR. -- PROFESSOR KIM, HAVE YOU EVER TESTIFIED
 9    BEFORE?
10    A    NO.
11    Q    ARE YOU BEING COMPENSATED FOR YOUR TIME
12    WORKING ON THIS CASE?
13    A    YES.
14    Q    WHAT'S YOUR HOURLY RATE?
15    A    IT'S $450.
16    Q    AND HOW MANY HOURS HAVE YOU WORKED ON THIS
17    CASE SO FAR?
18    A    ABOUT 500 HOURS.
19    Q    WHAT OPINIONS HAVE YOU REACHED?
20    A    MY OPINION IS '516 PATENT IS INVALID AND THE
21    APPLE PRODUCT DOES NOT INFRINGE THAT PATENT.
22    Q    NOW, HAVE YOU HAD AN OPPORTUNITY TO READ
23    DR. WILLIAMS' DIRECT AND CROSS-EXAMINATION
24    YESTERDAY IN THIS COURTROOM?
25    A    YES, I READ THEM.
```

1    Q    YOU WERE NOT ABLE TO BE PRESENT; CORRECT?

2    A    NO, I WASN'T HERE.

3    Q    ALL RIGHT.  AT A VERY HIGH LEVEL, WHAT IS THE

4    '516 PATENT ABOUT?

5    A    THE '516 PATENT IS ABOUT A PARTICULAR OR

6    SPECIFIC WAY OF DOING THE POWER CONTROL IN WIRELESS

7    NETWORKS.

8    Q    SO LET'S SEE IF WE CAN EXPLAIN SOME OF THESE

9    CONCEPTS IN A LITTLE BIT MORE DETAIL.

10              CAN I HAVE PDX 35.2 ON THE SCREEN,

11   PLEASE?

12              DO YOU SEE PDX 35.2?

13   A    YES.

14   Q    CAN YOU EXPLAIN TO US WHAT'S SHOWN ON THIS

15   SLIDE?

16   A    SO IT'S SHOWING TWO ELEMENTS IN THE WIRELESS

17   NETWORK, ONE IS THE HANDSET OR THE MOBILE TERMINAL,

18   OR USER EQUIPMENT WE'LL CALL IT, THAT'S BASICALLY

19   YOUR CELL PHONE; AND THERE'S THE BASE STATION,

20   THAT'S THE ANTENNA WITH ROUND CIRCLES.  THAT'S THE

21   BASE STATION THAT'S CONNECTED TO THE NETWORK, FOR

22   INSTANCE, THE INTERNET OR TELECOMMUNICATION

23   NETWORK.

24   Q    WHAT ARE THE UPLINK AND DOWNLINK?

25   A    THE RED ARROW THAT YOU SEE THAT SAYS UPLINK

```
 1    CONSISTS OF CHANNELS THAT TRANSMIT DATA FROM YOUR

 2    HANDSET TO THE BASE STATION.

 3              AND THE DOWNLINK THAT YOU SEE, THE GRAY

 4    ARROW THAT YOU SEE ON THE SLIDE CONSISTS OF A

 5    CHANNEL THAT TRANSMIT DATA FROM BASE STATION TO THE

 6    HANDSET.

 7    Q    WHAT ARE CHANNELS?

 8    A    CHANNELS IS, IS A PART OF THE SPECTRUM.  YOU

 9    CAN THINK OF IT AS A PIPE WHERE YOU SEND THE DATA

10    THROUGH THE PARTICULAR PIPE, AND IN THIS CASE,

11    UPLINK WILL HAVE THAT PIPE THAT SENDS DATA FROM THE

12    HANDSET TO THE BASE STATION.

13    Q    ARE THERE DIFFERENT TYPES OF CHANNELS?

14    A    YES.

15    Q    WHAT TYPES OF CHANNELS?

16    A    BROADLY, THERE ARE TWO DIFFERENT TYPES.  ONE

17    IS A DATE CHANNEL AND ANOTHER ONE IS CONTROL

18    CHANNEL.

19    Q    WHAT IS A DATA CHANNEL?

20    A    DATA CHANNEL IS WHERE YOU SEND USER DATA OR

21    YOU GET THE DATA FROM THE INTERNET, FOR INSTANCE.

22              SO IF YOU ARE TO TALK ON THE PHONE OR

23    UPLOADING A PICTURE TO YOUR FACEBOOK, FOR INSTANCE,

24    IT WILL USE A DATA CHANNEL, UPLINK DATA CHANNEL TO

25    SEND THE CHANNEL TO THE NETWORK.
```

1    Q     WHAT IS A CONTROL CHANNEL?

2    A     SO CONTROL CHANNEL IS TO SET UP THE DATA

3    CHANNEL OR TEAR DOWN THE DATA CHANNEL AND MAINTAIN

4    THE DATA CHANNEL.

5    Q     DO YOU NEED POWER TO TRANSFER INFORMATION OVER

6    THE CHANNEL AS YOU'VE JUST DESCRIBED?

7    A     YES, YOU NEED POWER FOR EACH OF THOSE

8    CHANNELS.

9    Q     CAN A MOBILE PHONE, MY MOBILE PHONE, TRANSMIT

10   ANY AMOUNT OF POWER?

11   A     NO.  YOU WILL HAVE LIMITED POWER.

12   Q     WHAT DETERMINES THE LIMIT ON THE POWER IN MY

13   MOBILE PHONE DEVICE?

14   A     WELL, FIRST OF ALL, THE PHONE ITSELF WILL HAVE

15   A LIMIT.

16        BUT FROM THE WIRELESS NETWORK STANDPOINT,

17   THE NETWORK WILL DICTATE HOW MUCH POWER YOU CAN USE

18   TO TRANSMIT THOSE CHANNELS.

19   Q     SO THERE WILL BE A MAXIMUM POWER?

20   A     YES.

21   Q     AND IF YOU GET TO THE MAXIMUM OR EXCEED IT,

22   ARE THERE DIFFERENT WAYS TO REDUCE IT?

23   A     YES, THERE'S VARIOUS WAYS YOU CAN REDUCE IT.

24        ONE WAY IS NOT SEND ANYTHING THROUGH THE

25   CHANNEL, WHICH MEANS YOU'LL POWER DOWN ALL THE

1

2

3                           CERTIFICATE OF REPORTERS

4

5

6

7                 WE, THE UNDERSIGNED OFFICIAL COURT

8      REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

9      THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

10     FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

11     CERTIFY:

12                 THAT THE FOREGOING TRANSCRIPT,

13     CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

14     CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

15     SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

16     HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

17     TRANSCRIPTION TO THE BEST OF OUR ABILITY.

18

19                         /S/
                  _____
20                LEE-ANNE SHORTRIDGE, CSR, CRR
                  CERTIFICATE NUMBER 9595
21

22                         /S/
                  _____
23                IRENE RODRIGUEZ, CSR, CRR
                  CERTIFICATE NUMBER 8074
24

25                         DATED:  AUGUST 16, 2012

# EXHIBIT 10

3387

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA     )  C-11-01846 LHK
6  CORPORATION,                 )
                                )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,        )
                                )  AUGUST 17, 2012
8         VS.                   )
                                )  VOLUME 11
9  SAMSUNG ELECTRONICS CO.,     )
   LTD., A KOREAN BUSINESS      )  PAGES 3387-3711
10 ENTITY; SAMSUNG              )
   ELECTRONICS AMERICA,         )
11 INC., A NEW YORK             )
   CORPORATION; SAMSUNG         )
12 TELECOMMUNICATIONS           )
   AMERICA, LLC, A DELAWARE     )
13 LIMITED LIABILITY            )
   COMPANY,                     )
14                              )
              DEFENDANTS.       )
15 _____

16          TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE LUCY H. KOH
17        UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24                         IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8074
25

3088

```
 1    A P P E A R A N C E S :

 2    FOR PLAINTIFF        MORRISON & FOERSTER
      APPLE:                   BY:  HAROLD J. MCELHINNY
 3                                  MICHAEL A. JACOBS
                                    RACHEL KREVANS
 4                             425 MARKET STREET
                               SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                  HALE AND DORR
 7                            BY:  WILLIAM F. LEE
                              60 STATE STREET
 8                            BOSTON, MASSACHUSETTS  02109

 9                            BY:  MARK D. SELWYN
                              950 PAGE MILL ROAD
10                            PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                          OLIVER & HEDGES
12                        BY:  CHARLES K. VERHOEVEN
                          50 CALIFORNIA STREET, 22ND FLOOR
13                        SAN FRANCISCO, CALIFORNIA  94111

14                            BY:  VICTORIA F. MAROULIS
                                   KEVIN P.B. JOHNSON
15                            555 TWIN DOLPHIN DRIVE
                              SUITE 560
16                            REDWOOD SHORES, CALIFORNIA  94065

17                            BY:  MICHAEL T. ZELLER
                                   WILLIAM C. PRICE
18                            865 SOUTH FIGUEROA STREET
                              10TH FLOOR
19                            LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

1                          INDEX OF WITNESSES

2       PLAINTIFF'S REBUTTAL

3       HYONG KIM
             DIRECT EXAM BY MR. LEE (RES.)     P. 3414
4            CROSS-EXAM BY MR. VERHOEVEN       P. 3432
             REDIRECT EXAM BY MR. LEE          P. 3434
5       EDWARD KNIGHTLY
             DIRECT EXAM BY MR. MUELLER        P. 3435
6            CROSS-EXAM BY MR. VERHOEVEN       P. 3462
             REDIRECT EXAM BY MR. MUELLER      P. 3464
7       SUSAN KARE
             DIRECT EXAM BY MS. KREVANS        P. 3465
8            CROSS-EXAM BY MR. VERHOEVEN       P. 3474
        MICHAEL WALKER
9            DIRECT EXAM BY MR. MUELLER        P. 3477
             CROSS-EXAM BY MR. VERHOEVEN       P. 3516
10           REDIRECT EXAM BY MR. MUELLER      P. 3526
        RICHARD DONALDSON
11           DIRECT EXAM BY MR. MUELLER        P. 3531
        SEUNG-HO AHN
12           VIDEOTAPED DEPOSITION PLAYED      P. 3547
        JUN WON LEE
13           VIDEOTAPED DEPOSITION PLAYED      P. 3548
        JANUSZ ORDOVER
14           DIRECT EXAM BY MR. MUELLER        P. 3569
        PETER BRESSLER
15           DIRECT EXAM BY MS. KREVANS        P. 3589
             CROSS-EXAM BY MR. VERHOEVEN       P. 3608
16      KARAN SINGH
             DIRECT EXAM BY MR. JACOBS         P. 3614
17      RAVIN BALAKRISHNAN
             DIRECT EXAM BY MR. JACOBS         P. 3629
18
        DEFENDANT'S SURREBUTTAL
19
        DAVID TEECE
20           DIRECT EXAM BY MS. MAROULIS       P. 3643
             CROSS-EXAM BY MR. LEE             P. 3651
21
        TIM WILLIAMS
22           DIRECT EXAM BY MR. VERHOEVEN      P. 3656
             CROSS-EXAM BY MR. LEE             P. 3660
23
        WOODWARD YANG
24           DIRECT EXAM BY MR. VERHOEVEN      P. 3665
             CROSS-EXAM BY MR. LEE             P. 3670
25

1    '516 PATENT, WHICH IS LABELED PRIOR ART.

2    Q    LET'S LOOK AT FIGURE 4 OF THE '516 PATENT JUST

3    FOR A SECOND.

4            THIS IS ALSO LABELED PRIOR ART IN THE

5    PATENT?

6    A    YES.

7    Q    HOW DOES IT TEACH THIS ELEMENT?

8    A    SO IT IS SHOWING THAT THE USE OF CHANNEL

9    CODING, AS YOU SEE IN '305, THE CODING BLOCK, AND

10   THEN THE MODULATOR '306, AND THEN AFTER THAT, YOU

11   WILL BE TRANSMITTING THE SIGNAL.

12   Q    LET'S LOOK AT THE LAST ELEMENT OF CLAIM 15,

13   WHICH IS A GAIN SCALING UNIT.  DO YOU SEE THAT?

14   A    YES.

15   Q    AND WHERE IS THAT IN THE PRIOR ART?

16   A    THAT WOULD BE IN, AGAIN, FIGURE 4 AND FIGURE 5

17   OF THE '516 PATENT.

18   Q    SO DO YOU FIND EACH AND EVERY ELEMENT OF CLAIM

19   15 IN THE PRIOR ART?

20   A    YES.

21   Q    LET'S LOOK BRIEFLY AT CLAIM 16, WHICH ADDS, AS

22   DR. WILLIAMS POINTED OUT, THIS SLOT TO SLOT.  DO

23   YOU SEE THAT?

24   A    YES.

25   Q    WHERE IS THAT ELEMENT TAUGHT IN THE PRIOR ART?

1    A    THAT IS TAUGHT IN FIGURE 5 OF THE '516 PATENT.

2    Q    CAN I HAVE FIGURE 5 ON THE SCREEN, BECAUSE I

3    DON'T THINK WE'VE POINTED THIS OUT TO THE JURY

4    BEFORE.

5             WOULD YOU EXPLAIN TO THE JURY WHERE IN

6    THE DIAGRAM THE PATENT LABELS PRIOR ART YOU CAN

7    FIND SLOT TO SLOT?

8    A    SO IF YOU LOOK AT FIGURE 5, THERE'S A T1, T2

9    AND T3, THAT'S WHAT WE CALL SLOT IN WIRELESS

10   COMMUNICATIONS, AND THEN YOU SEE AS THE CHANGE IS

11   HAPPENING TO THE POWER, IT HAPPENS AT THE

12   SLOT-BY-SLOT BASIS AS YOU SEE HERE.

13   Q    NOW, LET ME TURN TO A RELATED CONCEPT.  THE

14   JURY WILL BE INSTRUCTED NEXT WEEK ON SOMETHING

15   CALLED SECONDARY CONSIDERATIONS OF OBVIOUSNESS.

16   THAT'S A LAWYER CONCEPT, BUT YOU'VE HEARD THEM

17   BEFORE?

18   A    YES.

19   Q    AND I JUST WANT TO ASK YOU ABOUT THOSE

20   CONCEPTS.  DID YOU FIND ANY EVIDENCE THAT ANYONE

21   HAD COPIED THE '516 PATENT?

22   A    NO.

23   Q    ANY EVIDENCE THAT PATENT HAD ENJOYED

24   COMMERCIAL SUCCESS?

25   A    NO.

```
1    Q    ANY EVIDENCE THAT OTHERS HAD TRIED AND FAILED

2    TO MAKE THE INVENTION OF THE '516 PATENT?

3    A    NO.

4    Q    AND ANY PRAISE IN THE INDUSTRY WITH TECHNICAL

5    FIELDS FOR THE PATENT?

6    A    NO.

7    Q    NOW, LAST SUBJECT.  TURN, IF YOU WOULD, TO PX

8    104, WHICH IS VOLUME 2, TAB 8 OF YOUR NOTEBOOK.  DO

9    YOU SEE THIS?

10   A    YES.

11   Q    WHAT IS IT?

12   A    IT'S THE SAMSUNG PROPOSAL TO THE 3GPP STANDARD

13   BY ONE OF THE INVENTORS OF THE '516 PATENT.

14   Q    JUHO LEE?

15   A    YES.

16   Q    WHAT IS THE DATE OF THE DOCUMENT?

17   A    JUNE 18TH, 2004.

18            MR. LEE:  YOUR HONOR, WE OFFER PX 104.

19            THE COURT:  ANY OBJECTION?

20            MR. VERHOEVEN:  NO OBJECTION.

21            THE COURT:  IT'S ADMITTED.

22            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

23            104, HAVING BEEN PREVIOUSLY MARKED FOR

24            IDENTIFICATION, WAS ADMITTED INTO

25            EVIDENCE.)
```

1    BY MR. LEE:

2    Q    AND IF YOU TURN TO PAGE 3 OF THE DOCUMENT, DO

3    YOU SEE ON PAGE 3 DIFFERENT ALTERNATIVE PROPOSAL TO

4    THE 3 -- FOR DEALING WITH THE POWER CONTROL ISSUE?

5    A    YES.

6    Q    AND WHAT ARE THEY?

7    A    SO THE FIRST ONE IT SAYS MUST SEND DATA OVER

8    THE ENHANCED CHANNEL, MEANING YOU POWER DOWN THE

9    ENTIRE CHANNEL.

10           SECOND ONE TALKS ABOUT REDUCING THE POWER

11   OF THE ENHANCED DATA CHANNEL.

12           AND THE THIRD ONE TALKS ABOUT SCALE DOWN

13   EQUALLY, TRANSMIT POWER OVER CHANNELS.

14           MR. LEE:  THANK YOU PROFESSOR KIM.

15           NOTHING FURTHER, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  TIME IS NOW 9:24.

17   GO AHEAD, PLEASE.

18                    **CROSS-EXAMINATION**

19   BY MR. VERHOEVEN:

20   Q    GOOD MORNING.

21   A    GOOD MORNING.

22   Q    MY NAME IS CHARLES VERHOEVEN.

23           YOU -- DID YOU SEE DR. WILLIAMS TESTIMONY

24   ON DIRECT AND CROSS?

25   A    YES.  I DIDN'T SEE IT.  I READ IT.

1      Q      YOU READ IT?

2      A      YES.

3      Q      AND YOU SAW HOW HE WENT THROUGH IN GREAT

4    DETAIL HOW THE CLAIMS READ ON THE INTEL

5    SPECIFICATION AND SOFTWARE?  DO YOU REMEMBER THAT?

6      A      YES.

7      Q      IN YOUR DIRECT EXAMINATION, YOU DIDN'T ADDRESS

8    ANY OF THE INTEL DOCUMENTS, DID YOU?  YES OR NO?

9      A      NO.

10     Q      AND YOU DIDN'T ADDRESS THE INTEL SOURCE CODE,

11   DID YOU?

12     A      NO.

13     Q      YOU DON'T DISPUTE THE ACCURACY OF

14   DR. WILLIAMS' DESCRIPTION OF HOW THOSE DOCUMENTS

15   SHOW THE OPERATION OF THE CHIP, DO YOU, SIR?

16     A      I DON'T QUITE UNDERSTAND YOUR QUESTION.

17     Q      COULD YOU READ THE QUESTION BACK, PLEASE.

18              (WHEREUPON, THE RECORD WAS READ BY THE

19   COURT REPORTER.)

20              THE WITNESS:  YEAH, I BELIEVE HE

21   DESCRIBED THAT --

22   BY MR. VERHOEVEN:

23     Q      YES OR NO, SIR?

24     A      WAIT.  I DON'T DISPUTE.

25              MR. VERHOEVEN:  THANK YOU.  NOTHING

```
1    FURTHER.

2               THE COURT:  ALL RIGHT.  TIME IS NOW 9:25.

3    ANY REDIRECT?

4                    REDIRECT EXAMINATION

5    BY MR. LEE:

6    Q    PROFESSOR KIM, DID YOU REVIEW THE TESTIMONY OF

7    THE INTEL ENGINEER WHERE HE SAID ALL CHANNELS ARE

8    TOTALLED UP IN THE INTEL BASEBAND PROCESSOR?

9    A    YES.

10              MR. LEE:  NOTHING FURTHER, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

12   BE EXCLUDED AND IT IF SO, IS HE SUBJECT TO RECALL?

13              MR. LEE:  HE IS, AND NOT SUBJECT TO

14   RECALL.

15              THE COURT:  DO YOU AGREE WITH THAT?

16              MR. VERHOEVEN:  YES, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  YOU MAY BE

18   EXCUSED.

19              CALL YOUR NEXT WITNESS, PLEASE.

20              MR. LEE:  YOUR HONOR, APPLE CALLS

21   PROFESSOR KNIGHTLY.  AND MR. MUELLER WILL PRESENT

22   DR. KNIGHTLY.

23              THE COURT:  ALL RIGHT.  COME ON UP,

24   PLEASE.

25              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
```

10435

```
 1                        EDWARD KNIGHTLY,

 2     BEING CALLED AS A WITNESS ON BEHALF OF THE

 3     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

 4     EXAMINED AND TESTIFIED AS FOLLOWS:

 5               THE WITNESS:  I DO.

 6               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 7               THE COURT:  ALL RIGHT.  THE TIME IS NOW

 8     9:26.  GO AHEAD.

 9               THE CLERK:  IF YOU CAN PLEASE STATE YOUR

10     NAME AND SPELL IT FOR THE RECORD.

11               THE WITNESS:  EDWARD WILLIAM KNIGHTLY.

12     E-D-W-A-R-D, WILLIAM, W-I-L-L-I-A-M, KNIGHTLY,

13     K-N-I-G-H-T-L-Y.

14                      DIRECT EXAMINATION

15     BY MR. MUELLER:

16     Q    GOOD MORNING, DR. KNIGHTLY.

17     A    GOOD MORNING.

18     Q    COULD YOU PLEASE INTRODUCE YOURSELF TO THE

19     JURY?

20     A    YES.  MY NAME IS EDWARD KNIGHTLY, AND I LIVE

21     IN HOUSTON, TEXAS.

22     Q    AND, SIR, IF YOU WOULD SIT UP JUST A BIT

23     TOWARDS THE MICROPHONE.  THANK YOU.

24               DR. KNIGHTLY, HAVE YOU BEEN RETAINED BY

25     APPLE AS AN EXPERT WITNESS IN THIS CASE?
```

```
1    A    YES, I HAVE.

2    Q    LET'S START BY GOING OVER YOUR EDUCATIONAL

3    BACKGROUND IF WE COULD.

4    A    ALL RIGHT.

5    Q    COULD YOU PLEASE DESCRIBE IT FOR THE JURY?

6    A    SO I RECEIVED MY BACHELOR'S DEGREE IN 1991

7    FROM AUBURN UNIVERSITY AND MY MASTER AND PH.D. FROM

8    THE UNIVERSITY OF CALIFORNIA AT BERKELEY IN '92 AND

9    '96.

10   Q    DR. KNIGHTLY, WHERE DO YOU WORK?

11   A    I'M A PROFESSOR OF ELECTRICAL AND COMPUTER

12   ENGINEERING AT RICE UNIVERSITY IN HOUSTON.

13   Q    FOR HOW LONG HAVE YOU BEEN AT RICE UNIVERSITY?

14   A    SINCE '96.

15   Q    WHAT ARE YOUR DUTIES AT RICE?

16   A    I TEACH COURSES, GRADUATE AND UNDERGRADUATE

17   COURSES, I TEACH SENIOR LEVEL NETWORKING COURSES,

18   AND ADVANCED WIRELESS NETWORKING COURSES AT THE

19   GRADUATE LEVEL.

20          I ALSO TEACH PROJECT COURSES TO SENIORS

21   ON WIRELESS NETWORKING FOR UNDERSERVED REGIONS FOR

22   LOW COST WIRELESS, AND I ALSO RUN A RESEARCH GROUP

23   WITH GRADUATE STUDENTS AND ENGINEERS.

24   Q    COULD YOU PLEASE GIVE US AN OVERVIEW OF YOUR

25   RESEARCH?
```

```
 1    A    YES.  I HAVE TWO MAIN PROJECTS RIGHT NOW.  ONE

 2    IS TERMED SUPER WI-FI WHERE WE'RE DEVELOPING

 3    TECHNOLOGY TO MAKE WI-FI GO FILES INN TED OF TENS

 4    OF FEET BY USING UHF BANDS, TV BANDS.

 5         AND THE SECOND IS MULTI ANTENNA

 6    TECHNOLOGY WHERE WE'RE DEVELOPING TECHNIQUES FOR

 7    WI-FI TO BE ABLE TO GO TO MULTIPLE USERS

 8    SIMULTANEOUSLY.

 9    Q    DR. KNIGHTLY, DO YOU HAVE EXPERIENCE WITH REAL

10    LIFE WIRELESS NETWORKS?

11    A    YES.  WE -- SINCE 2003, WE'VE DESIGNED AND

12    OPERATE A WIRELESS NETWORK IN HOUSTON, TEXAS.  THE

13    NETWORK SERVES THOUSANDS OF USERS AND IT'S A

14    PLATFORM FOR US TO DEMONSTRATE OUR RESEARCH FOR

15    LOW-COST WIRELESS IN UNDERSERVED COMMUNITIES.

16    Q    WHAT IS THIS CALLED?

17    A    TECHNOLOGY FOR ALL WIRELESS.

18    Q    IN ADDITION TO TECHNOLOGY FOR ALL, HAVE YOU

19    BEEN INVOLVED IN ANY OTHER REAL LIFE WIRELESS

20    NETWORKS?

21    A    YES.  WE'RE IN THE DESIGN PROCESS FOR A SUPER

22    WI-FI DEPLOYMENT IN ARGENTINA, WHICH HAS MORE

23    AVAILABLE UHF FACT SPECTRUM.

24    Q    DR. KNIGHTLY, HAVE YOU AUTHORED ANY SCIENTIFIC

25    PUBLICATIONS?
```

```
 1    A    YES, OVER 100 PAPERS AND REFEREED JOURNALS AND

 2    RESEARCH CONFERENCES.

 3    Q    AND HAVE YOU RECEIVED ANY AWARDS?

 4    A    YES.  TWO AWARDS THAT ARE SHOWN ON THE SCREEN.

 5    ONE IS IEEE FELLOW, AND THAT'S THE INSTITUTE OF

 6    ELECTRICAL AND ELECTRONIC ENGINEERS.  THAT'S AN

 7    AWARD GIVEN TO NO MORE THAN .1 PERCENT OF THE

 8    MEMBERS IN ANY ONE YEAR; AND SLOAN FELLOW IS AN

 9    AWARD FOR RESEARCH EXCELLENCE GIVEN TO 128

10    RESEARCHERS ACROSS ALL AREAS FROM CHEMISTRY TO

11    COMPUTER SCIENCE.

12              MR. MUELLER:  YOUR HONOR, I MOVE

13    DR. KNIGHTLY AS AN EXPERT IN WIRELESS COMMUNICATION

14    SYSTEMS AND NETWORKING PROTOCOLS.

15              THE COURT:  ANY OBJECTION?

16              MR. VERHOEVEN:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  SO CERTIFIED.  GO AHEAD,

18    PLEASE.

19    BY MR. MUELLER:

20    Q    DR. KNIGHTLY, WHAT ISSUES WERE YOU ASKED TO

21    CONSIDER IN THIS CASE?

22    A    I WAS ASKED TO CONSIDER THE '941 PATENT AND

23    WHETHER OR NOT THE APPLE PRODUCTS INFRINGE, AND

24    ALSO VALIDITY.

25    Q    AND HAVE YOU REACHED ANY CONCLUSIONS?
```

1    A    YES, I HAVE.

2    Q    AND WHAT ARE THEY?

3    A    THAT IS THAT THE '941 PATENT IS INVALID IN

4    LIGHT OF PRIOR ART THAT I'LL BE DISCUSSING IN A FEW

5    MINUTES, AND ALSO THAT THE APPLE PRODUCTS DO NOT

6    INFRINGE.

7    Q    COULD YOU GIVE US AN OVERVIEW OF THE WORK THAT

8    YOU'VE DONE ON THIS CASE TO REACH THOSE

9    CONCLUSIONS?

10   A    YES.  I'VE REVIEWED THE PATENT APPLICATION,

11   THE FILE HISTORY, DOCUMENTS DESCRIBING INTEL SOURCE

12   CODE, DOCUMENTS DESCRIBING THE STANDARD, AND ALL

13   THAT EVIDENCE THAT I LISTED IN MY EXPERT REPORT.

14   Q    AND HOW MANY HOURS HAVE YOU BEEN WORKING ON

15   THE CASE?

16   A    APPROXIMATELY 300.

17   Q    HAVE YOU BEEN COMPENSATED FOR YOUR TIME?

18   A    YES, I'VE BEEN COMPENSATED AT MY STANDARD RATE

19   OF $475 AN HOUR FOR A TOTAL OF ABOUT $140,000.

20   Q    SIR, AT A HIGH LEVEL, WHAT IS THE SUBJECT OF

21   THE '941 PATENT?

22   A    SO '941 ADDRESSES SEGMENTATION AND REASSEMBLY

23   IN A WIRELESS NETWORK.

24   Q    AND IF YOU NEED TO REFER TO IT, THIS IS JOINT

25   EXHIBIT 1070 WHICH IS AT TAB 2 OF YOUR BINDER, AND

1    THAT'S THE '941 PATENT.

2              BEFORE WE GET INTO THE DETAILS, LET ME

3    ASK YOU A FEW TECHNICAL CONCEPTS.  AND LET ME BRING

4    UP PDX 36.2.  CAN YOU EXPLAIN TO THE JURY WHAT WE

5    SEE HERE?

6    A    SO THIS IS SHOWING A TRANSMITTER, THE USER

7    EQUIPMENT THAT YOU'VE HEARD ABOUT BEFORE, AND THIS

8    IS TRANSMITTING, IN THIS CASE IT'S AN IMAGE OR A

9    VIDEO FRAME.  AND WHEN THAT FRAME COMES FROM THE

10   APPLICATION, IT'S PUT INTO WHAT'S CALLED AN SDU, OR

11   A SERVICE DATA UNIT.

12             AND THEN IN MANY CASES THOSE FRAMES OR

13   IMAGES ARE TOO LARGE TO BE SENT OVER THE WIRELESS

14   NETWORK AS THEY ARE, SO THEY'VE GOT TO BE SEGMENTED

15   OR DIVIDED INTO PROTOCOL DATA UNITS OR PDU'S.

16             SO THAT WHAT'S SHOWN IS OVER THE WIRELESS

17   LINK IS THAT YOU'RE SEEING MANY PROTOCOL DATA UNITS

18   WITH, IN ESSENCE, PART OF THE IMAGE, AND THAT'S

19   SEGMENTATION; AND ON THE RECEIVER SIDE, THE WHOLE

20   PROCESS IS REVERSED WITH REASSEMBLY WHERE THE

21   RECEIVER PUTS IT ALL BACK TOGETHER.

22             MR. MUELLER:  YOUR HONOR, MAY I APPROACH

23   THE SCREEN, PLEASE?

24             THE COURT:  GO AHEAD.

25   BY MR. MUELLER:

1    Q    JUST TO TAKE THAT IN PIECES, DR. KNIGHTLY, THE

2    ORIGINAL IMAGE IS A FLOWER.

3    A    YES.

4    Q    AND THAT FLOWER IS REPRESENTED IN SDU?

5    A    YES, THAT FLOWER COMES IN A UNIT FROM THE

6    HIGHER LAYERS AND WE'RE REFERRING TO THAT AS SDU.

7    Q    AND CAN YOU EXPLAIN TO US ONE MORE TIME THE

8    RELATIONSHIP BETWEEN THE SDU AND THESE PDU'S?

9    A    YES.  SO THE SDU'S, IF IT'S LARGER THAN THE

10   PDU, IS BROKEN UP INTO SEGMENTS.

11   Q    AND I'M SORRY, THE PROCESS OF BREAKING UP THE

12   SDU IS CALLED?

13   A    SEGMENTATION.

14   Q    LET'S TAKE A LOOK AT PDX 36.4.  WHAT DO WE SEE

15   HERE?

16   A    SO THIS IS A ZOOM IN OF ONE OF THOSE PDU'S.

17   ON THE LEFT YOU'RE SEEING AN SDU WITH THE --

18   REPRESENTING THE ENTIRE IMAGE AND THERE'S HEADER

19   INFORMATION ON TOP OF THAT.

20           AND THEN THAT'S SHOWING DIVIDING INTO

21   SOME OF THOSE PDU'S THAT I SHOWED GOING ACROSS THE

22   WIRELESS AIR.

23           AND THEN EACH OF THOSE HAS A HEADER, AND

24   THAT HEADER IS THE CONTROL INFORMATION THAT TELLS

25   THE RECEIVER HOW TO RECONSTRUCT EVERYTHING THAT THE

```
 1    DR. KNIGHTLY, CAN YOU JUST MARK IT, CAN YOU EXPLAIN
 2    THIS PASSAGE IN THAT FIGURE?
 3    A    RIGHT.  SO THIS IS A FLOW CHART OF HOW THE
 4    TRANSMITTER TAKES A CELL OR A PACKET FROM A HIGHER
 5    LAYER AND DOES A CHECK AND SAYS, IS THIS PACKET A
 6    MINIMUM SIZE?
 7              AND IT GIVES AN EXAMPLE IN THE TEXT ABOUT
 8    THAT MINIMUM BEING 53 BYTES.  SO IT LOOKS FOR IT
 9    BEING EXACTLY 53 BYTES.
10              IF IT'S NOT, THEN IT -- IF IT'S NOT THE
11    MINIMUM, THEN IT HAS TO BE SEGMENTED BECAUSE IN
12    THAT CASE IT WOULD BE LARGER, SO IT'S GOT TO BE
13    SEGMENTED INTO MULTIPLE SEGMENTS.  IF IT IS THE
14    MINIMUM, THEN THERE'S NO SEGMENTATION AND THE
15    ENTIRE SDU DOES FIT AND SO THAT'S TRANSMITTED.
16    Q    DR. KNIGHTLY, HAVE YOU CONSIDERED WHETHER THIS
17    PATENT, THE AGARWAL REFERENCE, DISCLOSES EACH AND
18    EVERY LIMITATION OF CLAIMS 10 AND 15 OF THE '941?
19    A    YES, I HAVE CONSIDERED THAT AND IT DOES.
20    Q    I'M SORRY.  WHAT'S YOUR OPINION?
21    A    AND IT DOES.
22    Q    LET'S START WITH CLAIM 10, AND WE'LL WALK
23    THROUGH IT QUICKLY LIMITATION BY LIMITATION.
24              AND LET'S TURN TO PDX 36.15, PLEASE.
25              THE PREAMBLE STATES AN APPARATUS FOR
```

```
 1    TRANSMITTING DATA IN A MOBILE COMMUNICATION SYSTEM.

 2              IS THAT PRESENT IN AGARWAL?

 3    A    YES, IT DOES.  AS I MENTIONED, IT'S WIRELESS

 4    NETWORKS AND SATELLITE WIRELESS NETWORKS ARE

 5    MOBILE.

 6    Q    NEXT ELEMENT BEGINS A TRANSMISSION BUFFER FOR

 7    RECEIVING AN SDU.

 8              AND THEN IT CONTINUES.  IS THAT ELEMENT

 9    DISCLOSED IN AGARWAL?

10    A    YES.  SO IT HAS THE BUFFERING AND WE SAW IN

11    THE FLOW CHART THAT IT WOULD SEE THAT AND THEN MAKE

12    THAT DETERMINATION THAT, YES OR NO WHETHER IT IS

13    SEGMENTED OR NOT.

14    Q    NEXT ELEMENT IS A TRANSMISSION BUFFER FOR

15    RECEIVING A SERVICE DATA UNIT.  IS THAT ELEMENT

16    PRESENT OR DISCLOSED IN AGARWAL?

17    A    THAT WAS THE ONE I WAS JUST REFERRING TO.

18    Q    I'M SORRY.  I MISSPOKE.  THE NEXT ONE IS A

19    HEADER INSERT?

20    A    YES.  SO THE HEADER INSERT WE JUST WENT

21    THROUGH EARLIER THE DIFFERENT PARTS OF THE HEADER,

22    THE SEQUENCE NUMBER, THE ONE BIT FIELD, LENGTH.

23    Q    NEXT ELEMENT IS A ONE BIT FIELD HEADER.  IS

24    THAT PRESENT IN AGARWAL?

25    A    YES.  SO THAT ONE BIT, THAT THIRD BIT OF THE
```

30459

```
1   HEADER, THAT'S THE ONE BIT FIELD THAT'S SET TO
2   WHETHER OR NOT THERE'S AN ENTIRE SDU.
3   Q    AND THE NEXT LIMITATION IS A LENGTH INDICATOR
4   INSERTER.  IS THAT DISCLOSED IN AGARWAL?
5   A    YES.  WE ALSO DISCUSSED THAT, THAT LENGTH
6   INDICATOR, AS WELL AS THE PREDEFINED VALUES.
7   Q    FINAL ELEMENT OF CLAIM 10 IS A TRANSMITTER FOR
8   SENDING PDU'S TO RECEIVER.  IS THAT DISCLOSED IN
9   AGARWAL?
10  A    YES.  SO THE SYSTEM TRANSMITS OVER THE
11  WIRELESS NETWORK AFTER THOSE STEPS.
12  Q    LET'S TURN TO CLAIM 15 IF WE COULD.  THE
13  PREAMBLE SAYS, "AN APPARATUS FOR RECEIVING DATA IN
14  A MOBILE COMMUNICATIONS SYSTEM."  WE'LL PUT THIS ON
15  THE SCREEN.  IT'S PDX 36.22.  IS THAT PRESENT IN
16  AGARWAL, THE PREAMBLE LIMITATION?
17  A    YES.  SO FOR THE SAME REASON, IT'S THE -- IT'S
18  A MOBILE COMMUNICATION SYSTEM, YES.
19  Q    AND ARE THE OTHER LIMITATIONS LISTED HERE IN
20  PDX 36.22 PRESENT IN AGARWAL, AND COULD YOU EXPLAIN
21  BRIEFLY HOW, IF SO?
22  A    YES.  SO CLAIM 15 IS A RECEIVER SIDE ANALOG
23  FOR THE SENDER SIDE IN CLAIM 10.
24       SO AGARWAL ALSO DOES THE RECEIVER SIDE
25  AFTER IT'S SEGMENTED, PUTTING EVERYTHING BACK
```

```
 1    TOGETHER AS IN THIS CLAIM.

 2    Q    DR. KNIGHTLY, IN SUM, WHAT IS YOUR OPINION ON

 3    THE VALIDITY OF THIS PATENT?

 4    A    THAT THE '941 CLAIMS ARE INVALID IN LIGHT OF

 5    AGARWAL.

 6    Q    JUST A FEW MORE QUESTIONS.

 7              LET'S TURN BACK TO THE ALTERNATIVE E-BIT

 8    IN THE UMTS STANDARD, AND I WANT TO PUT THIS INTO

 9    CONTEXT.

10              HOW LARGE IS THE UMTS STANDARD?

11    A    THOUSANDS OF PAGES OF DOCUMENTS.

12    Q    AND HOW MUCH OF THE STANDARD IS DEVOTED TO THE

13    ALTERNATIVE E-BIT?

14    A    ABOUT A PAGE.

15    Q    NOW, AT THE TIME THE ALTERNATIVE E-BIT WAS

16    ADOPTED BY THE UMTS WORKING GROUPS, WERE THERE

17    ALTERNATIVES?

18    A    YES, THERE WERE.

19    Q    WHAT WERE THEY?

20    A    WELL, ONE ALTERNATIVE IS OTHER HEADER

21    STRUCTURES, SUCH AS WHAT WE JUST SAW, THAT THERE

22    ARE OTHER WAYS TO, TO DEFINE HEADERS AS AGARWAL

23    DID.

24              AND THEN ANOTHER ALTERNATIVE IS TO USE

25    THE ORIGINAL E-BIT INTERPRETATION.
```

```
 1      Q    NOW, FOR A PRODUCT LIKE THE IPHONE OR THE

 2      IPAD, DO THOSE PRODUCTS CONTROL WHETHER THE E-BIT

 3      IS USED?

 4      A    NO, THEY DON'T.

 5      Q    WHO DOES?

 6      A    THE NETWORK SERVICE PROVIDER, SUCH AS AT&T,

 7      DECIDES WHETHER OR NOT THE ALTERNATIVE E-BIT IS

 8      USED BECAUSE IT'S AN OPTION TO THE PROVIDER WHETHER

 9      TO USE THE NORMAL E-BIT OR TO TURN ON THIS OPTION

10      FOR ALTERNATIVE E-BIT.

11      Q    NOW, FOR THE PRODUCTS ACCUSED IN THIS CASE,

12      WHICH CARRIER IS THE RELEVANT CARRIER?

13      A    AT&T.

14      Q    HAVE YOU SEEN ANY EVIDENCE THAT AT&T USES THE

15      ALTERNATIVE E-BIT?

16      A    I'VE SEEN NO EVIDENCE THAT THEY EVER TURN IT

17      ON.

18      Q    FINALLY, JUST SO WE'RE CLEAR, WHAT IS YOUR

19      OPINION AS TO WHETHER OR NOT THE '941 PATENT COVERS

20      THE ALTERNATIVE E-BIT?

21      A    MY OPINION IS THAT IT DOES NOT.

22           MR. MUELLER:  NO FURTHER QUESTIONS.

23      THANK YOU.

24           THE COURT:  ALL RIGHT.  TIME IS NOW 9:54.

25      GO AHEAD, PLEASE.
```

1               **CROSS-EXAMINATION**

2       BY MR. VERHOEVEN:

3       Q     GOOD MORNING, DR. KNIGHTLY.

4       A     GOOD MORNING.

5       Q     IN YOUR DIRECT EXAMINATION -- LET ME BACK UP.

6       WERE YOU HERE FOR DR. WILLIAMS' TESTIMONY?

7       A     YES.

8       Q     OKAY.  AND YOU HEARD HIM TESTIFY EXTENSIVELY

9       ABOUT THE INTEL SPECIFICATION?

10      A     THE --

11      Q     YES?

12      A     INTEL SOURCE CODE.

13      Q     AND THE SOURCE CODE.  DO YOU REMEMBER HIM

14      TALKING ABOUT THE DOCUMENTS AND SOURCE CODE?  HE

15      WENT THROUGH IT IN GREAT DETAIL?

16      A     YES.

17      Q     IN YOUR EXAMINATION, YOU DIDN'T MENTION IT?

18      A     I REVIEWED SCORED, BUT I DIDN'T TALK ABOUT IT.

19      Q     YOU DIDN'T GO THROUGH IT, DID YOU?

20      A     NOT TODAY.

21      Q     YOU DON'T DISPUTE THE ACCURACY OF DR.

22      WILLIAMS' DESCRIPTIONS OF HOW THE INTEL CHIP WORKS,

23      DO YOU, SIR?

24      A     I AGREE WITH THE STEPS IN THE INTEL CODE, YES.

25      Q     SO CAN WE PUT UP PDX 36.9?  NOW, IN YOUR

1    DIRECT EXAMINATION, YOU FOCUSSED IN PART ON THIS

2    PHRASE AN ENTIRE SDU IN THE DATA FIELD.  DO YOU

3    REMEMBER THAT?

4    A    YES.

5    Q    NOW, SIR, ISN'T IT TRUE THAT SOMETIMES THE

6    APPLE ACCUSED PRODUCTS TRANSMIT AN ENTIRE SDU?  YES

7    OR NO, SIR?  SOMETIMES THEY DO THAT, DON'T THEY?

8    A    WHEN THEY'RE RUNNING THE, THE -- WELL, DO YOU

9    MEAN WITH OR WITHOUT THE 3G -- THE ALTERNATE E-BIT.

10   Q    CAN YOU ANSWER MY QUESTION?

11   A    WELL --

12   Q    ISN'T IT TRUE THAT SOMETIMES THE APPLE ACCUSED

13   PRODUCTS TRANSMIT AN ENTIRE SDU?  YES OR NO?

14   A    WITHOUT THE ALTERNATIVE E-BIT, DEFINITELY,

15   YES.

16   Q    AND SOMETIMES, IF YOU'RE INFRINGING, YOU'RE

17   STILL INFRINGING, ISN'T THAT TRUE?

18   A    OH, WELL, THERE ISN'T THAT BIT, SO THEY HAPPEN

19   TO HALF AN ENTIRE SDU, BUT NOT WITH THAT BIT.

20   Q    IF SOMETIMES THEY'RE TRANSMITTING AN ENTIRE

21   SDU, THEY'RE TRANSMITTING AN ENTIRE SDU; CORRECT?

22   A    YES, BUT NOT WITH THAT BIT INDICATED.

23   Q    AND IF YOU'RE INFRINGING SOMETIMES, YOU'RE

24   STILL INFRINGING; RIGHT?

25   A    THEY'RE NOT INFRINGING.

1      THE SCREEN?

2               THE COURT:   YES.

3      BY MR. MUELLER:

4      Q    SO, DR. WALKER, JUST SO WE'RE CLEAR, THIS

5      CHRONOLOGY STARTS WITH THE KOREAN APPLICATION THAT

6      SAMSUNG FILED?

7      A    THAT'S CORRECT.

8      Q    AND CONTINUES THROUGH PROPOSALS MADE BY

9      SAMSUNG TO ETSI?

10     A    THAT IS CORRECT.

11     Q    AND CAN YOU EXPLAIN TO THE JURY THE

12     SIGNIFICANCE OF THAT JUNE 1ST THROUGH 3RD, 2005

13     DATE?

14     A    SO THIS IS THE DATE AT WHICH THE PROPOSAL WAS

15     ADOPTED AND BECAME THEN A PART OF THE CURRENT -- OF

16     THE STANDARD OF THAT -- AT THAT POINT IN TIME.

17     Q    LET'S TURN BACK TO TAB 7 IN YOUR BINDER,

18     PLAINTIFF'S EXHIBIT 122.

19     A    YES.

20     Q    PLEASE TURN TO PAGE 122.32.

21     A    YES, I HAVE THAT PAGE.

22     Q    AND DO YOU SEE ANY REFERENCE ON THIS PAGE TO

23     THE U.S. APPLICATION THAT LED TO THE '516 PATENT?

24     A    YES, I DO.  THIS IS -- I'M LOOKING, CREATED

25     PAGE -- THIS IS THE SECOND COLUMN DOWN.

```
 1    Q    AND, SIR, IS THIS THE DISCLOSURE THAT SAMSUNG

 2    MADE --

 3    A    SO THIS IS --

 4    Q    I'M SORRY.  THIS IS THE DISCLOSURE THAT

 5    SAMSUNG MADE TO ETSI?

 6    A    THIS IS THE DISCLOSURE THAT SAMSUNG MADE TO

 7    ETSI, AND AS YOU CAN SEE, IT IDENTIFIES THE U.S.

 8    PATENT APPLICATION, '181, THE KOREAN APPLICATION,

 9    423,000, THE PARTICULAR SPECIFICATION, THAT IT WAS

10    AFFECTING, '214, THE ACTUAL PARAGRAPHS THAT WERE

11    AFFECTED, IN THIS CASE JUST ONE, AND THE VERSION

12    THAT IT WAS NOW ADOPTED INTO.

13    Q    AND IF YOU GO BACK, SIR, TO THE PAGE ENDING,

14    IN THE BATES NUMBER AT THE BOTTOM, 9415, WHAT WAS

15    THE DATE ON WHICH THIS DISCLOSURE WAS MADE?

16    A    SO THE DATE ON WHICH THIS DISCLOSURE WAS MADE

17    WAS THE 16TH OF MAY, 2006.

18    Q    LET'S ADD THAT TO OUR TIMELINE AT PDX 43.12,

19    AND IF YOU LOOK AT THAT, HERE WE HAVE THE

20    DISCLOSURE ON MAY 16TH, 2006.  IS THAT CORRECT,

21    SIR?

22    A    THAT'S CORRECT.

23              MR. MUELLER:  YOUR HONOR, COULD MAY I

24    APPROACH ONE MORE TIME.

25              THE COURT:  GO AHEAD.
```

BY MR. MUELLER:

Q    DR. WALKER, HAVE YOU SEEN ANY EVIDENCE THAT
SAMSUNG DISCLOSED THIS PATENT NUMBER TO ETSI BEFORE
JUNE 1ST, 2005?

A    NONE WHATSOEVER.

Q    WHEN WAS THE DISCLOSURE MADE?

A    THE DISCLOSURE WAS MADE ON THE 16TH OF MAY,
2006.

Q    DR. WALKER, GIVEN THIS CHRONOLOGY, DO YOU HAVE
AN OPINION AS TO WHETHER SAMSUNG COMPLIED WITH ITS
DISCLOSURE OBLIGATIONS WITH RESPECT TO THE '516
PATENT?

A    MY OPINION IS THAT IT DID NOT COMPLY WITH THE
OBLIGATION BECAUSE IT SHOULD HAVE DISCLOSED BEFORE
ADOPTION.

          MR. MUELLER:  THANK YOU, SIR.  I HAVE NO
FURTHER QUESTIONS.

          THE COURT:  ALL RIGHT.  THE TIME IS NOW
11:16.

          PLEASE GO AHEAD.  11:17.  GO AHEAD.

          MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

                    **CROSS-EXAMINATION**

BY MR. VERHOEVEN:

Q    GOOD MORNING, DR. WALKER.

A    GOOD MORNING.

```
 1    Q    AS YOU MAY HAVE NOTICED, WE'RE UNDER SOME

 2    STRICT TIME LIMITS SO IF, AS I'M ASKING YOU

 3    QUESTIONS, IF YOU CAN FAIRLY ANSWER YES OR NO, I'D

 4    APPRECIATE YOU DOING THAT.  OKAY?

 5    A    OKAY.

 6    Q    NOW, SIR, ISN'T IT TRUE THAT TO FALL WITHIN

 7    THE ETSI IPR POLICY, AN INTELLECTUAL PROPERTY RIGHT

 8    NEEDS TO MEET ETSI'S DEFINITION OF IPR?

 9    A    THAT IS CORRECT.

10    Q    CAN WE PUT UP SDX 3916, SLIDE 12.  AND THIS IS

11    THE DEFINITION I HAVE ON THE SCREEN THAT ETSI HAS

12    FOR IPR; RIGHT?

13    A    THAT'S CORRECT.

14    Q    AND IT SAYS, "IPR SHALL MEAN ANY INTELLECTUAL

15    PROPERTY RIGHT CONFERRED BY STATUTE LAW INCLUDING

16    APPLICATIONS THEREFORE OTHER THAN TRADEMARKS."

17          AND THEN IT CONTINUES, SIR, "FOR THE

18    AVOIDANCE OF DOUBT, RIGHTS RELATING TO GET-UP,

19    CONFIDENTIAL INFORMATION, TRADE SECRETS OR THE LIKE

20    ARE EXCLUDED FROM THE DEFINITION OF IPR."

21          DO YOU SEE THAT, SIR?

22    A    YES, I DO.

23    Q    NOW, SO ONE OF THE THINGS THAT'S EXCLUDED FROM

24    IPR IS CONFIDENTIAL INFORMATION; RIGHT?

25    A    THAT IS CORRECT.  IT'S NOT IPR.
```

```
1    Q    AND IF WE CAN PUT UP PDX 45.6.  THIS IS YOUR

2    SLIDE.

3              YOU REFERRED TO THE SAMSUNG KOREAN PATENT

4    APPLICATION; RIGHT?

5    A    YES, I DID.

6    Q    BUT YOU DON'T -- YOU DIDN'T EVEN READ THAT

7    APPLICATION, DID YOU?

8    A    THAT IS CORRECT.

9    Q    YOU DON'T KNOW WHETHER IT'S CONFIDENTIAL, DO

10   YOU?

11   A    I DON'T KNOW WHETHER THEY MADE A CONFIDENTIAL

12   APPLICATION WITH REGARD TO THAT PATENT, NO.

13   Q    NOW, THE JURY, THEY SAW A VIDEO AT THE

14   BEGINNING OF THIS TRIAL THAT TALKED ABOUT THE

15   UNITED STATES, HOW WHEN YOU FILE PATENT

16   APPLICATIONS THEY'RE INITIALLY CONFIDENTIAL.

17             ISN'T IT TRUE, SIR, THAT THE SAME IS TRUE

18   IN THE KOREAN PATENT SYSTEM, THEY'RE CONFIDENTIAL?

19   A    I BELIEVE YOU CAN REQUEST THAT TO BE THE CASE,

20   YES.

21   Q    AND IF THEY'RE CONFIDENTIAL, IT'S NOT WITHIN

22   THE DEFINITION OF IPR AND THERE'S NO DUTY TO

23   DISCLOSE.  ISN'T THAT TRUE, SIR?

24   A    NO, BECAUSE YOU CAN'T USE IT THEN WITHIN THE

25   CONTEXT OF ETSI, BECAUSE IF YOU WISH TO --
```

```
 1    Q    IT'S NOT IPR UNDER THE DEFINITION, IS IT, SIR?

 2    A    IT'S NOT IPR.

 3    Q    NOW, I'LL DIRECT YOUR ATTENTION TO EXHIBIT 613

 4    IN YOUR BINDER.  ARE YOU THERE?

 5    A    NO.  613?

 6    Q    613.

 7              MR. LEE:  HE'S LOOKING AT OUR BINDER.

 8              THE COURT:  IT'S THE BLACK --

 9              THE WITNESS:  I HAVE IT.  YES, THANK YOU.

10    BY MR. VERHOEVEN:

11    Q    OKAY.  YOU'VE SEEN THIS DOCUMENT BEFORE,

12    RIGHT?

13    A    YES, THE ETSI GUIDE ON IPR, YES.

14              MR. VERHOEVEN:  YOUR HONOR, WE MOVE

15    DEFENDANT'S EXHIBIT 613 INTO EVIDENCE.

16              MR. MUELLER:  NO OBJECTION.

17              THE COURT:  IT'S ADMITTED.

18              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

19              613, HAVING BEEN PREVIOUSLY MARKED FOR

20              IDENTIFICATION, WAS ADMITTED INTO

21              EVIDENCE.)

22    BY MR. VERHOEVEN:

23    Q    I'LL DIRECT YOUR ATTENTION TO PAGE 8.  HERE --

24    CAN WE PULL OUT THIS BOTTOM PORTION, SECTION 2.

25              THIS IS THE GUIDELINE; RIGHT?
```

```
 1    A    THAT IS CORRECT.

 2    Q    AND IT'S THE IMPORTANCE OF TIMELY DISCLOSURE

 3    OF ESSENTIAL IPR'S IS THE SECTION; RIGHT?

 4    A    THAT IS CORRECT.

 5    Q    AND NOTE 1, DEFINITIONS FOR TIMELINESS OR

 6    TIMELY CANNOT BE AGREED BECAUSE SUCH DEFINITIONS

 7    WOULD CONSTITUTE A CHANGE TO THE POLICY.

 8           DO YOU SEE THAT, SIR?  IS THAT WHAT THAT

 9    SAYS?

10    A    THAT IS CORRECT, THAT SAYS THAT.

11    Q    AND -- BUT THERE IS A DESCRIPTION OF

12    INTENTIONAL DELAY.  DO YOU SEE THAT, SIR?

13    A    YES, I DO SEE THAT.

14    Q    AN INTENTIONAL DELAY ARISES WHEN IT CAN BE

15    DEMONSTRATED THAT AN ETSI MEMBER HAS DELIBERATELY

16    WITHHELD IPR DISCLOSURES SIGNIFICANTLY BEYOND WHAT

17    WOULD BE EXPECTED FROM NORMAL CONSIDERATIONS OF

18    TIME LIMITS.

19           RIGHT?

20    A    THAT IS CORRECT.

21    Q    YOU'RE NOT OFFERING AN OPINION HERE TODAY THAT

22    SAMSUNG DELIBERATELY OR INTENTIONALLY DELAYED, ARE

23    YOU, SIR?

24    A    I HAVE NOT USED THOSE WORDS, NO.

25    Q    AND YOU'RE NOT OFFERING THAT OPINION, ARE YOU,
```

```
 1    SIR?

 2    A    NO, I AM NOT.

 3    Q    NOW, YOU HAVE A TECHNICAL BACKGROUND, RIGHT?

 4    A    I DO HAVE A TECHNICAL BACKGROUND, YES.

 5    Q    A PH.D. IN MATHEMATICS?

 6    A    YES.

 7    Q    AND FROM 2001 TO 2009, YOU WERE GROUP RESEARCH

 8    AND DEVELOPMENT DIRECTOR FOR THE VODAFONE GROUP OF

 9    COMPANIES; RIGHT?

10    A    THAT IS CORRECT.

11    Q    AND YOU'VE BEEN INVOLVED IN ETSI SINCE 1988

12    THROUGH YOUR WORK AT VODAFONE; RIGHT?

13    A    THAT IS CORRECT.

14    Q    AND YOU STARTED OUT BY PARTICIPATING IN THESE

15    TECHNICAL WORKING GROUPS THAT YOU WERE TALKING

16    ABOUT.  DO YOU REMEMBER?

17    A    THAT'S CORRECT, YES.

18    Q    AND YOU WERE -- YOU WENT TO MANY OF THESE;

19    RIGHT?

20    A    YES, I DID.

21    Q    AND IN ALL OF THOSE MEETINGS WHERE YOU

22    ATTENDED AS A MEMBER OF THE WORKING GROUP, NEVER

23    ONCE DID ANYBODY RAISE THEIR HAND AND SAY, HEY,

24    I'VE GOT ESSENTIAL IPR.  CORRECT?

25    A    THAT IS CORRECT.
```

```
 1   Q    NOW, ETSI ENCOURAGES COMPANIES LIKE SAMSUNG TO

 2   MAKE A GENERAL IPR DECLARATION AS PART OF A CALL

 3   FOR IPR'S; RIGHT?

 4   A    THAT'S CORRECT, ALL COMPANIES ARE ASKED TO DO

 5   THAT.

 6   Q    AND, IN FACT, IN DECEMBER OF 1998, SAMSUNG

 7   SUBMITTED A GENERAL IPR LICENSING DECLARATION TO

 8   ETSI, DIDN'T IT?

 9   A    THEY DID, YES, INDEED.

10   Q    TURN TO EXHIBIT 549.

11            CAN WE PUT THAT --

12            AND I WOULD MOVE THIS INTO EVIDENCE, YOUR

13   HONOR.

14            MR. MUELLER:  NO OBJECTION.

15            THE COURT:  IT'S ADMITTED.

16            (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

17            549, HAVING BEEN PREVIOUSLY MARKED FOR

18            IDENTIFICATION, WAS ADMITTED INTO

19            EVIDENCE.)

20            MR. VERHOEVEN:  CAN WE PUT IT ON THE

21   SCREEN.

22   Q    NOW, THIS IS DECEMBER 1998; RIGHT?

23   A    CORRECT.

24   Q    AND DO YOU SEE HERE IT SAYS SEC, THAT'S THE

25   SAMSUNG COMPANY WHO'S A DEFENDANT IN THIS CASE;
```

```
 1    RIGHT?

 2    A    YES.

 3    Q    SEC IS PREPARED TO GRANT LICENSES TO ITS

 4    SPECIAL IPR'S ON A FAIR, REASONABLE, AND

 5    NON-DISCRIMINATORY BASIS IN ACCORDANCE WITH THE

 6    TERMS AND CONDITIONS SET FORTH IN CLAUSE 6.1 OF THE

 7    ETSI IPR POLICY.

 8              DO YOU SEE THAT?

 9    A    CORRECT.

10    Q    SO SAMSUNG SAID TO ALL THESE MEMBERS OF ETSI,

11    HEY, IF SOMETHING BECOMES ESSENTIAL IN THE FUTURE,

12    WE'RE LETTING YOU KNOW IN ADVANCE, WE WILL LICENSE

13    THAT ON FAIR, REASONABLE, AND NON-DISCRIMINATORY

14    TERMS.  ISN'T THAT WHAT THAT'S SAYING?

15    A    THAT IS CORRECT.  MANY COMPANIES DID THAT.

16    Q    NOW, LET'S GO BACK TO PDX 45.6.

17              NOW, YOU'VE GOT A TIME LINE HERE, SIR,

18    BUT YOU DIDN'T PUT ON THE TIMELINE THIS GENERAL

19    DECLARATION THAT SAMSUNG MADE; ISN'T THAT TRUE,

20    SIR?

21    A    THAT IS TRUE.  THIS TIMELINE RELATED TO

22    DISCLOSURE.

23    Q    SIR, IF YOU COULD PLEASE ANSWER MY QUESTION.

24    A    YES, I HAVE.

25    Q    YOU DIDN'T PUT IT ON THE TIMELINE, DID YOU?
```

```
 1    A    NO, I HAVE NOT.

 2    Q    IN FACT, THAT WOULD BE WAY BEFORE ANY OF THESE

 3    ITEMS ON THE TIMELINE; CORRECT?

 4    A    THAT IS CORRECT.  BUT IT'S NOT RELATED TO

 5    DISCLOSURE.  THESE ARE THE DISCLOSURE EVENTS.

 6    Q    NOW --

 7    A    YOU CITED CLAUSE 6.1.

 8    Q    NOW, SIR, SIR, I'M ON THE CLOCK.

 9         YOU WERE HERE TODAY.  YOU SAW THE

10    TESTIMONY OF DR. KIM; RIGHT?

11    A    I DID, YES.

12    Q    AND DR. KNIGHTLY?

13    A    YES, I DID.

14    Q    AND YOU HEARD BOTH OF THEM TESTIFY THAT THESE

15    TWO PATENTS, THE '941 AND THE '516 PATENTS, ARE NOT

16    ESSENTIAL.

17    A    YES, I DID.

18    Q    DIDN'T YOU, SIR?

19    A    I DID HEAR THEM SAY THAT.

20    Q    AND ISN'T IT TRUE IF A PATENT IS NOT

21    ESSENTIAL, AS APPLE'S OWN SWORN EXPERTS SAID, THEN

22    THERE'S ABSOLUTELY NO DISCLOSURE OBLIGATION, IS

23    THERE, SIR?

24    A    YOU ONLY HAVE TO BELIEVE IT LIKELY TO BE

25    ESSENTIAL.
```

1   Q    NOW, YOU TALKED A LITTLE BIT ABOUT FRAND.

2   ISN'T IT TRUE, SIR, YOU HAVE NO OPINION TO PRESENT

3   TO THIS JURY WITH RESPECT TO WHETHER SAMSUNG HAS

4   MADE A FRAND OFFER OR NOT?

5   A    I'M DEALING WITH DISCLOSURE AT THE MOMENT,

6   YES.

7   Q    SO THE ANSWER IS YES?

8   A    YES.

9   Q    LET'S GO BACK TO THE IPR POLICY.  CAN WE PUT

10  UP SDX 3916.2.  ETSI HAS A SECTION 14 IN THE ETSI

11  IPR POLICY CALLED VIOLATION OF POLICY.  YES OR NO?

12  A    YES, IT HAS.

13  Q    IT SAYS, "ANY VIOLATION OF THE POLICY BY A

14  MEMBER SHALL BE DEEMED TO BE A BREACH BY THAT

15  MEMBER OF ITS OBLIGATIONS TO ETSI.  THE ETSI

16  GENERAL ASSEMBLY SHALL HAVE THE AUTHORITY TO DECIDE

17  THE ACTION TO BE TAKEN, IF ANY, AGAINST THE MEMBER

18  IN BREACH IN ACCORDANCE WITH ETSI STATUTES."

19           DO YOU SEE THAT, SIR?

20  A    YES, I DO.

21  Q    YOU HAVE NO OPINION AS TO WHETHER OR NOT,

22  UNDER SECTION 14, SAMSUNG VIOLATED THE ETSI POLICY;

23  CORRECT?

24  A    CORRECT.  AS FAR AS I KNOW, NO PROCESS HAS

25  TAKEN PLACE WITHIN ETSI TO DECIDE THAT.

1    Q    IF YOU CAN ANSWER ME YES OR NO ON THAT?

2    A    YES, I HAVE NO OPINION AS TO THE HYPOTHETICAL

3    QUESTION.

4    Q    YOU HAVE NO OPINION AS TO WHETHER OR NOT

5    SECTION 14 -- LET ME REPHRASE.  YOU HAVE NO OPINION

6    AS TO WHETHER OR NOT, UNDER SECTION 14, SAMSUNG

7    VIOLATED THE ETSI POLICY?

8    A    THAT'S CORRECT.  SECTION 14 DOESN'T MEAN --

9    Q    EXCUSE ME, SIR.  IS THAT A YES?

10   A    THAT IS A YES BECAUSE --

11         MR. VERHOEVEN:  THANK YOU, SIR.

12         YOUR HONOR, PASS THE WITNESS.

13         THE COURT:  ALL RIGHT.  THE TIME IS

14   11:27.  GO AHEAD, PLEASE.

15                    **REDIRECT EXAMINATION**

16   BY MR. MUELLER:

17   Q    TO YOUR KNOWLEDGE, HAS ETSI CONDUCTED ANY

18   INVESTIGATION INTO SAMSUNG'S DISCLOSURE PRACTICES?

19   A    NO, THEY HAVE NOT.

20         MR. MUELLER:  NOW -- MAY I APPROACH THE

21   WITNESS, YOUR HONOR?

22         THE COURT:  GO AHEAD, PLEASE.

23   BY MR. MUELLER:

24   Q    I'M HANDING YOU PLAINTIFF'S EXHIBIT 75.

25   MR. VERHOEVEN REFERRED YOU TO THE ETSI GUIDE.  IS

1    THIS ANOTHER VERSION OF THAT GUIDE?

2    A    I DIDN'T NOTICE THE ACTUAL VERSION THAT WAS

3    PRESENTED, BUT THIS IS A VERSION, YES.

4              MR. MUELLER:  YOUR HONOR, I OFFER IT.

5              THE COURT:  ANY OBJECTION?

6              MR. VERHOEVEN:  I'VE JUST BEEN HANDED

7    THIS JUST NOW, YOUR HONOR.  I NEED TO CHECK TO SEE

8    WHAT IT IS.  WE HAVE TO CHECK, YOUR HONOR.  WE

9    DON'T BELIEVE THIS WAS DISCLOSED IN THE EXAMINATION

10   EXHIBITS.

11             MR. MUELLER:  YOUR HONOR, I'M RAISING IT

12   BECAUSE IT WAS RAISED ON CROSS AS A NEW SUBJECT.

13             MR. VERHOEVEN:  NO, THIS DOCUMENT WAS

14   NOT, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  MOVE ONTO

16   SOMETHING ELSE.

17             MR. MUELLER:  OKAY, THAT'S FINE.

18   Q    DR. WALKER, DOES A GENERAL DECLARATION SATISFY

19   THE SPECIFIC DISCLOSURE OBLIGATIONS UNDER CLAUSE 4.

20             MR. VERHOEVEN:  OBJECTION, LEADING.

21             THE COURT:  OVERRULED.

22   BY MR. MUELLER:

23   Q    YOU CAN ANSWER, SIR?

24   A    NO, IT DOESN'T BECAUSE IT DOESN'T ADDRESS

25   DISCLOSURE.

```
 1    Q    NEXT SUBJECT, DR. WALKER.  MR. VERHOEVEN ASKED
 2    YOU SOME QUESTIONS ABOUT CONFIDENTIALITY.  DO YOU
 3    RECALL THAT?
 4    A    YES, I DO.
 5    Q    LET'S TAKE A LOOK AT THE ETSI IPR POLICY FROM
 6    1997, WHICH YOU HAVE BEFORE YOU.  PLEASE TURN, IF
 7    YOU COULD, SIR, TO PROVISION 10 AND LET'S PUT THAT
 8    ON THE SCREEN.
 9              SIR, WHAT DOES THIS PROVISION SAY?
10              MR. VERHOEVEN:  OBJECTION.  OUTSIDE OF
11    SCOPE OF THIS WITNESS'S REPORT.
12              MR. MUELLER:  YOUR HONOR, IT'S NOT.  IT
13    WAS DIRECTLY WITHIN THE SCOPE OF THE
14    CONFIDENTIALITY CROSS-EXAMINATION THAT WE JUST
15    HEARD ABOUT.
16              THE COURT:  OVERRULED.  GO AHEAD.
17              THE WITNESS:  WHAT THIS SAYS IS THAT IF
18    YOU HAVE INFORMATION THAT YOU BELIEVE IS
19    CONFIDENTIAL AND YOU WISH TO MAKE IT, CREATE A
20    PROPOSAL FROM IT AND BRING IT TO ETSI, THEN YOU
21    HAVE TO MARK IT AS CONFIDENTIAL.  IT HAS TO BE IN
22    WRITING.  YOU HAVE TO TAKE IT TO THE CHAIRMAN OF
23    THE, OF THE TECHNICAL GROUP.  HE HAS TO AGREE THAT
24    YOU CAN NOW SUBMIT IT TO THAT TECHNICAL BODY.  THE
25    TECHNICAL BODY WILL MAINTAIN CONFIDENTIALITY.  BUT
```

```
 1    THAT IS THE LIMIT.

 2    BY MR. MUELLER:

 3    Q    DR. WALKER, HAVE YOU SEEN ANY EVIDENCE THAT

 4    SAMSUNG FOLLOWED THIS PROVISION?

 5    A    ABSOLUTELY NOT.  ALL THEIR DOCUMENTS THAT I

 6    HAVE SEEN, THEY WERE SUBMITTED WITHOUT ANY

 7    CONFIDENTIAL MARKINGS WHATSOEVER.

 8    Q    AND, DR. WALKER, YOU WALKED US THROUGH THE

 9    WORKING GROUP MEETINGS.  WERE THOSE PUBLIC OR

10    CONFIDENTIAL MEETINGS?

11    A    ALL OF THOSE MEETINGS, 3GPP MEETINGS, ALL OF

12    THE REPORTS, ALL OF THE DOCUMENTATION IS PUBLIC.

13    Q    INCLUDING THE SAMSUNG PROPOSALS?

14    A    INCLUDING THE SAMSUNG PROPOSALS.

15    Q    LAST QUESTION, DR. WALKER.  IF WE LOOK AT

16    CLAUSE 4, MR. VERHOEVEN ASKED YOU SOME QUESTIONS

17    ABOUT THE WORD "TIMELY."

18         I WANT TO FOCUS YOUR ATTENTION ON THAT

19    SECOND SENTENCE, CLAUSE 4.1, "A MEMBER SUBMITTING A

20    TECHNICAL PROPOSAL FOR A STANDARD SHALL, ON A BONA

21    FIDE BASIS, DRAW THE ATTENTION OF ETSI TO ANY OF

22    THAT MEMBER'S IPR WHICH MIGHT BE ESSENTIAL IF THAT

23    PROPOSAL IS ADOPTED."

24         WHAT IS YOUR VIEW ON THE TIMING

25    REQUIREMENT OF THAT SENTENCE?
```

```
 1    A    THAT IF YOU BELIEVE THAT YOUR PROPOSAL

 2    CONTAINS IPR THAT MAY BE ESSENTIAL, THEN YOU SHOULD

 3    DISCLOSE IT BEFORE OR AT THE POINT OF WHICH THAT

 4    PROPOSAL IS ADOPTED.

 5    Q    AND, SIR, IN YOUR OPINION, DID SAMSUNG COMPLY

 6    WITH THAT PROPOSAL?

 7    A    IN NEITHER CASE DID THEY COMPLY WITH IT.

 8              MR. MUELLER:  I HAVE NOTHING FURTHER.

 9              THE COURT:  ALL RIGHT.  IT'S 11:30.  ANY

10    RECROSS.

11              MR. VERHOEVEN:  JUST ONE SECOND, YOUR

12    HONOR.

13              THE COURT:  OKAY.

14              (PAUSE IN PROCEEDINGS.)

15              MR. VERHOEVEN:  YOUR HONOR, IN THE

16    INTEREST OF TIME, I'M NOT GOING TO HAVE ANY FURTHER

17    EXAMINATION.

18              THE COURT:  ALL RIGHT.  MAY THIS WITNESS

19    BE EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?

20              MR. MUELLER:  NOT SUBJECT TO RECALL, YOUR

21    HONOR.

22              THE COURT:  OKAY.  YOU MAY BE EXCUSED.

23              CALL YOUR NEXT WITNESS, PLEASE.

24              MR. LEE:  YOUR HONOR, APPLE CALLS

25    MR. DONALDSON.
```

```
 1              THE COURT:  OKAY.  IF ANYONE WANTS TO
 2     STAND UP AND STRETCH DURING THE TRANSITION TIME,
 3     PLEASE DO SO.
 4              DO WE HAVE PHOTOS OR ANYBODY.
 5              MR. MUELLER:  WE'VE TAKEN THEM, YOUR
 6     HONOR.  WE'LL PASS THEM UP OF THE I THINK THEY'RE
 7     BEING PRINTED.
 8              MR. LEE:  THERE THEY ARE, YOUR HONOR.
 9              THE COURT:  GO AHEAD AND PASS THEM OUT.
10              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
11                      RICHARD DONALDSON,
12     BEING CALLED AS A WITNESS ON BEHALF OF THE
13     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS
14     EXAMINED AND TESTIFIED AS FOLLOWS:
15              THE WITNESS:  I DO.
16              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
17              THE COURT:  CAN YOU PASS THE PHOTOGRAPHS.
18              I WANT PEOPLE TO WRITE NOTES ON THE
19     PHOTOS AND IF YOU GIVE THEM TO US LATE, THEY DON'T
20     GET TO WRITE NOTES ON THE PHOTOS.
21              MR. MUELLER:  SORRY, YOUR HONOR.
22                      DIRECT EXAMINATION
23     BY MR. MUELLER:
24     Q    GOOD MORNING, MR. DONALDSON.  COULD YOU PLEASE
25     INTRODUCE YOURSELF TO THE JURY.
```

1    A    YES.  MY NAME IS RICHARD DONALDSON.

2              THE COURT:  TIME IS 11:32.

3              THE WITNESS:  I LIVE IN PLANO, TEXAS.

4    BY MR. MUELLER:

5    Q    HAVE YOU BEEN RETAINED BY APPLE AS AN EXPERT

6    WITNESS IN THIS CASE?

7    A    YES, SIR, I HAVE.

8    Q    COULD YOU BRIEFLY SUMMARIZE YOUR EDUCATION AND

9    PROFESSIONAL BACKGROUND?

10   A    YES.  I HAVE A DEGREE IN ELECTRICAL

11   ENGINEERING; I HAVE A LAW DEGREE FROM ST. LOUIS

12   UNIVERSITY; AND THEN I HAVE A MASTER'S OF LAW

13   DEGREE FROM GEORGE WASHINGTON UNIVERSITY WHERE I

14   SPECIALIZED IN PATENT AND TRADE REGULATION.

15   Q    WHAT IS YOUR PROFESSIONAL BACKGROUND, SIR?

16   A    YES, FROM MY WORK WITH RESPECT TO PATENTS, I

17   WENT TO WORK FOR TEXAS INSTRUMENTS IN 1969 AS A

18   PATENT ATTORNEY.  I WORKED THERE FOR 31 YEARS,

19   FOCUSSED MOST OF MY TIME AS THE CHIEF LICENSING

20   PERSON AT TEXAS INSTRUMENTS.

21              I BECAME GENERAL PATENT COUNSEL AND

22   RETIRED FROM TEXAS INSTRUMENTS IN 2000 AS GENERAL

23   PATENT COUNSEL AND SENIOR VICE PRESIDENT OF TEXAS

24   INSTRUMENTS.

25   Q    SIR, HOW MANY LICENSES HAVE YOU NEGOTIATED AS

1    MARKET OF THE TECHNOLOGY FOR CONNECTIVITY.

2    Q    AND, SIR, IF YOU COULD, HOW DOES THIS EXAMPLE

3    RELATE TO WHAT YOU DESCRIBED AS HOLD UP?

4    A    WELL, THE WAY THAT IT RELATES, AND AGAIN,

5    PRETTY MUCH STRAIGHTFORWARD TYPE OF CONNECTION THAT

6    I'M MAKING, AND THAT IS THAT IF THERE WAS

7    COMPETITION AND ONE OF THE -- THE GREEN PLUG

8    MANUFACTURER TRIED TO RAISE THE PRICE RELATIVE TO

9    WHAT THE RIVALS WERE CHARGING, WHICH WOULD LOSE

10   BUSINESS.

11         HOWEVER, NOW, IF THE PRICE -- IF THE

12   GREEN TECHNOLOGY GETS OVERPRICED, PEOPLE HAVE

13   NOWHERE TO GO BECAUSE YOU NEED TO HAVE THAT TYPE OF

14   PLUG-IN ORDER TO USE THE TOASTER.

15         THAT GIVES THE MANUFACTURER THE ABILITY,

16   INCREASED ABILITY TO MANIPULATE PRICE RELATIVE TO

17   THE PRE-STANDARD LEVEL.

18   Q    NOW, SIR, ARE YOU FAMILIAR WITH AN

19   ORGANIZATION CALLED THE EUROPEAN TELECOMMUNICATIONS

20   STANDARDS INSTITUTE, OR ETSI?

21   A    YES.

22   Q    AND ARE YOU FAMILIAR WITH THE ETSI

23   INTELLECTUAL PROPERTY RIGHTS POLICY?

24   A    YES, I AM.

25   Q    LET'S PUT UP PDX 44.3.  THIS QUOTES TWO

3577

```
 1    SECTIONS FROM THE ETSI IPR POLICY, CLAUSE 4 AND

 2    CLAUSE 6.

 3              ARE YOU FAMILIAR WITH THESE PROVISIONS?

 4    A    YES, THOSE WERE DISCUSSED ACTUALLY THIS

 5    MORNING EXTENSIVELY.

 6    Q    ARE THESE BINDING ON THE ETSI MEMBERSHIP?

 7    A    THAT'S MY UNDERSTANDING.

 8    Q    FIRST RULE RELATES TO DISCLOSURE OF

 9    INTELLECTUAL PROPERTY RIGHTS.  FROM AN ECONOMIC

10    PERSPECTIVE, WHAT IS THE PURPOSE OF THIS PROVISION?

11    A    WELL, I SEE THAT PROVISION AS BEING REALLY

12    DIRECTED TOWARDS INFORMING THE STANDARD SETTING

13    BODY WHAT KIND OF TECHNOLOGIES ARE AVAILABLE AND

14    WHAT KIND OF INTELLECTUAL PROPERTY RIGHTS ATTACH TO

15    THESE ALTERNATIVE TECHNOLOGIES.

16    Q    THE SECOND RULE, CLAUSE 6, IS WHAT DR. WALKER

17    REFERRED TO AS THE FRAND PROVISION; IS THAT RIGHT?

18    A    YES, THAT'S WHAT IT IS.

19    Q    WHAT ARE THE ECONOMIC IMPLICATIONS OF THE

20    FRAND PROVISION?

21    A    WELL, THAT, I THINK, IS A BIT AT THE HARD OF

22    THE HOLD UP, BECAUSE WHAT FRAND TRIES TO IMPLEMENT

23    IS THE KIND OF RESTRICTION THAT IS A COMPETITIVE

24    MARKET WOULD IMPOSE ON THE OWNER OF TECHNOLOGY ONCE

25    THE STANDARD IS DETERMINED.  ONCE IT'S FROZEN,
```

```
 1   THERE IS NO CHOICE.  YOU HAVE TO USE THE TECHNOLOGY

 2   THAT IS IN THE STANDARD AND THE FRAND PROVISIONS,

 3   THEY REALLY TRY TO MIMIC WHAT THE MARKET,

 4   COMPETITIVE MARKET WILL DELIVER.  THEY CANNOT

 5   ALWAYS DO THAT, BUT THAT'S WHAT THEY TRY TO

 6   ACCOMPLISH.

 7   Q    NOW, SIR, WERE YOU HERE THIS MORNING FOR

 8   DR. WALKER'S TESTIMONY REGARDING WHETHER SAMSUNG

 9   COMPLIED WITH THE DISCLOSURE PROVISION, CLAUSE 4?

10   A    YES.

11   Q    AND WERE YOU HERE THIS MORNING FOR

12   MR. DONALDSON'S TESTIMONY REGARDING WHETHER SAMSUNG

13   COMPLIED WITH THE FRAND PROVISION, CLAUSE 6?

14   A    YES.

15   Q    NOW, THE LADIES AND GENTLEMEN OF THE JURY WILL

16   NEED TO DECIDE FOR THEMSELVES WHETHER THEY AGREE

17   WITH DR. WALKER AND MR. DONALDSON.

18        BUT FOR PURPOSES OF THE QUESTIONS I'M

19   ABOUT TO ASK YOU, I WANT YOU TO ASSUME THEY DO

20   AGREE.

21        DO YOU HAVE THAT IN MIND?

22   A    YES.

23   Q    IF DR. WALKER AND MR. DONALDSON ARE CORRECT,

24   WHAT ARE THE ECONOMIC CONSEQUENCES?

25   A    WELL, LET ME SUMMARIZE THEM AND SORT OF GO
```

```
 1    THROUGH THE TILE.  I THINK THE FIRST CONCEPT WAS
 2    THAT SAMSUNG'S CONDUCT DISTORTED THE DECISION
 3    MAKING PROCESS AT ETSI.
 4           SECOND, THAT DISTORTION HAS LED TO A
 5    CHOICE OF TECHNOLOGY THAT MAY NOT HAVE BEEN CHOSEN
 6    BUT FOR ITS CONDUCT.
 7           NUMBER THREE, IT ENABLED SAMSUNG'S
 8    TECHNOLOGY TO BE INTRODUCED, AT LEAST THEY CLAIM IT
 9    HAS BEEN INTRODUCED, BECOME PART OF THE STANDARD.
10    THEY THINK OF THEMSELVES AS STANDARD ESSENTIAL
11    TECHNOLOGIES.
12           AS A FINAL STEP, BECAUSE THEY ARE NOW
13    STANDARD, PROCEED TO SELL STANDARD ESSENTIAL
14    TECHNOLOGIES FOR THESE TWO TYPES OF FEATURES THAT
15    UMTS IMPLEMENTS, THEY HAVE ACQUIRED WHAT I CALL THE
16    HOLDUP POWER, THE PATENT OWNER HOLDUP POWER, AND
17    THAT IS THE RISK THAT THE STANDARD SETTING CREATES,
18    AND THAT'S THE RISK THAT THE PROVISION 6.1 IS
19    SUPPOSED TO CONTROL.
20    Q   DR. ORDOVER, AS AN ECONOMIST, HOW DO YOU
21    MEASURE THE TYPES OF CONSEQUENCES THAT YOU'VE
22    DESCRIBED?
23    A    WELL, THE -- FIRST OF ALL, YOU CAN LOOK AT THE
24    CONSEQUENCES AN INCENTIVE TO INNOVATE, YOU CAN LOOK
25    AT THE CONSEQUENCES OF THE PRICING OF THE
```

```
 1    TECHNOLOGY, WHICH IS CRITICAL INPUT INTO THE COST

 2    OF MANUFACTURING THESE HANDSETS.

 3              YOU CAN LOOK AT THE OVERALL PRICING IN

 4    THE MARKETPLACE, AND IN PARTICULAR, THE QUESTION

 5    BECOMES THAT OF WHETHER YOU HAVE SEEN AN EMERGENCE

 6    OF MARKET POWER OR MONOPOLY POWER IN THE HANDS OF

 7    THE FIRM THAT IS SUPPLYING THE TECHNOLOGY.

 8    Q    NOW, SIR, ARE YOU FAMILIAR WITH A CONCEPT

 9    CALLED A TECHNOLOGY MARKET?

10    A    YES, I AM.

11    Q    WHAT IS A TECHNOLOGY MARKET?

12    A    WELL, THE PLACE, THE SOURCE CODE FOR IT, THAT

13    IDEA; IN THE UNITED STATES DEPARTMENT OF JUSTICE

14    FEDERAL TRADE COMMISSION GUIDELINES FOR LICENSING

15    OF INTELLECTUAL PROPERTY.

16              AND THESE GUIDELINES DESCRIBE THE

17    TECHNOLOGY MARKET AS CONSISTING OF TECHNOLOGIES

18    THAT A REASONABLE GROUP SUBSTITUTES FOR EACH OTHER.

19    THEY DON'T HAVE TO BE PERFECT SUBSTITUTES, BUT THEY

20    HAVE TO BE GOOD ENOUGH SUBSTITUTES SO THAT IN THE

21    MARKETPLACE, IF ALL OF THEM ARE PRESENT, THEY WILL

22    PRESS DOWN ON THE PRICE OF THE TECHNOLOGY, WHICH IS

23    THE LICENSE PRICES.

24              GOING BACK TO THE PLUGS, THE TECHNOLOGY

25    MARKET WOULD CONSIST OF THE THREE TYPES OF PLUG
```

                                                                3581

1    SOLUTIONS, BUT AFTER THE STANDARD IS SET, IT'S

2    GOING TO BE ONLY ONE TECHNOLOGY IN THE RELEVANT

3    MARKET.

4    Q    NOW, COULD YOU EXPLAIN TO THE JURY, PLEASE,

5    THE DIFFERENCE BETWEEN THE TECHNOLOGY MARKET ON THE

6    ONE HAND AND A PRODUCT MARKET ON THE OTHER?

7    A    YES.  JUST SOME OF THE EXAMPLES I'M GOING TO

8    USE THE ONE THAT I USE IN MY CLASS.  SO YOU MAY

9    HAVE A MARKET FOR TECHNOLOGIES TO MAKE JAM.  THAT

10   TECHNOLOGY MARKET IS BASICALLY, IN THE OLDEN DAYS

11   YOU WOULD TAKE THE CHERRIES AND YOU COULD COOK THEM

12   DOWN IN THE POT.  BUT THESE DAYS, OF COURSE THIS IS

13   NOT THE WAY JAM IS MADE.  AT THE SAME TIME, THERE

14   IS A DOWNSTREAM MARKET FOR JAM.  THERE ARE MANY

15   FIRMS PRODUCING JAM AND THEY COMPETE ON TOP OF THE

16   TECHNOLOGY WITH THEIR OWN INNOVATIONS.

17           SO IN THE TECHNOLOGY MARKET, WE HAVE

18   COMPETING JAM MAKING TECHNOLOGIES, AND ON THE LOWER

19   LEVEL, WHICH IS CALLED THE DOWNSTREAM MARKET IN

20   ECONOMICS, WE HAVE JAMS.

21           AND HOPEFULLY THERE'S A VIBRANT

22   COMPETITION UPSTREAM AND THE TECHNOLOGY MARKET AND

23   HOPEFULLY THERE IS VIBRANT COMPETITION IN THE

24   DOWNSTREAM MARKET, WHICH IS THE JAMS .

25   Q    NOW, SIR, FOR SAMSUNG'S '516 AND '941 PATENTS,

1    HAVE YOU ATTEMPTED TO DETERMINE RELEVANT TECHNOLOGY

2    MARKETS?

3    A    YES.  I THINK THERE WAS RELEVANT TESTIMONY BY

4    DRS. KIM AND KNIGHTLY WHICH DESCRIBE THE RELEVANT

5    TECHNOLOGIES AS CENTERING ON THE TECHNOLOGIES THAT

6    SAMSUNG SPONSORED INTO THE STANDARD, AND ALL THE

7    OTHER TECHNOLOGIES THAT COULD HAVE PERFORMED THE

8    FEATURES ON WHICH THOSE TECHNOLOGIES READ.

9    Q    NOW, ARE YOU REFERRING TO TECHNICAL

10   ALTERNATIVES?

11   A    YES, I AM REFERRING TO TECHNICAL ALTERNATIVES,

12   AND I'M REMINDING MYSELF, AND EVERYONE ELSE, THAT

13   THESE TECHNICAL ALTERNATIVES DO NOT HAVE TO BE

14   PERFECT SUBSTITUTES, BUT THEY HAVE TO BE GOOD

15   ENOUGH SUBSTITUTES THAT PRIOR TO STANDARDIZATION,

16   THEY COULD HAVE BEEN REASONABLE ALTERNATIVES FROM

17   THE STANDPOINT OF THE DESIGNER OF THE STANDARD.

18   Q    NOW, YOU WERE HERE FOR THE TESTIMONY OF

19   DR. KIM AND DR. KNIGHTLY?

20   A    YES.

21   Q    ON THE ISSUE OF TECHNICAL ALTERNATIVES, WE'RE

22   GOING TO LET THE JURY EVALUATE THE TESTIMONY OF

23   DR. KIM AND DR. KNIGHTLY AND I'M NOT GOING TO ASK

24   YOU ABOUT THOSE TECHNICAL ISSUES, OKAY?

25   A    OKAY.  THAT'S GOOD.

1    Q    IF YOU COULD, THOUGH, THE TECHNOLOGY MARKETS

2    THAT YOU'VE DESCRIBED, WHAT IS THE GEOGRAPHIC SCOPE

3    OF THOSE MARKETS?

4    A    I THINK IT'S COMMONLY RECOGNIZED, BY

5    ECONOMISTS AND INTELLECTUAL PROPERTY LICENSES

6    GUIDELINES THAT I REFERENCED ALREADY, THEY

7    GENERALLY REFER TO TECHNOLOGY MARKETS AS BEING

8    GLOBAL.

9         NOW, WHAT IS A TECHNOLOGY MARKET?  WELL,

10   AS I SAID, IT'S A MARKET THAT CONSISTS OF THE

11   ALTERNATIVE TECHNOLOGIES FOR A PARTICULAR FEATURE,

12   AND IT'S QUITE CLEAR THAT THESE TECHNOLOGIES CAN BE

13   PROCURED FROM ANYWHERE IN THE WORLD.

14        THESE -- THESE ARE RECOGNIZED BY ETSI,

15   WHICH IS INVITING PARTICIPATION OF FIRMS LOCATED IN

16   EVERY CONCEIVABLE COUNTRY OF THE WORLD.  IT IS

17   NOT -- EVEN THOUGH IT'S A EUROPEAN ORGANIZATION, WE

18   KNOW THAT MEMBERS ARE GLOBAL FIRMS OR INTERNATIONAL

19   FIRMS.

20        AND, THEREFORE, I WOULD SAY THAT THE

21   TECHNOLOGY MARKET IS GLOBAL, UNLIKE THE MARKET FOR

22   HAIRCUTS.  IF YOU LIVE IN SAN JOSE, YOU'RE NOT

23   LIKELY GOING TO SPEND LOTS OF MONEY TO GO TO

24   SAN FRANCISCO FOR A HAIRCUT, ALTHOUGH SOME PEOPLE

25   HAVE BEEN KNOWN TO DO THAT.

```
 1              SO THE POINT I'M MAKING THAT HOW BROAD IS

 2      THE GEOGRAPHIC MARKET DEPENDS ON THE PRODUCT,

 3      DEPENDS ON THE -- ON HOW COSTLY IT IS TO GET IT

 4      FROM SOMEWHERE ELSE, WHETHER THE QUALITY AS IT

 5      TRAVELS LONG DISTANCES, NONE OF THAT HAPPENS TO

 6      TECHNOLOGY.  IT'S FREE TO TRANSPORT.  IT WAS AS

 7      GOOD AS IT WAS IN KOREA WHEN IT GOT TO THE

 8      UNITED STATES.

 9      Q    NOW, SIR, JUST TO WE'RE CLEAR, YOU'RE DEFINING

10      YOUR TECHNOLOGY MARKETS BY REFERENCE TO FEATURES IN

11      THE STANDARD?

12      A    YES, THE TECHNOLOGY MARKETS IN THIS CASE ARE

13      COEXTENSIVE, YOU CAN THINK OF IT THAT WAY, WITH THE

14      ACTUAL FEATURES THAT I'M DESCRIBING IN THOSE

15      RELEASES THAT PROFESSOR WALKER WALKED US THROUGH

16      THIS MORNING.

17      Q    NOW, DO YOU HAVE AN OPINION AS TO WHETHER

18      SAMSUNG ACQUIRED MONOPOLY POWER IN PARTICULAR

19      TECHNOLOGY MARKETS?

20      A    YES.  BUT BEFORE I EXPLAIN, LET ME STAND BACK

21      FOR A MOMENT AND MAKE A DISTINCTION BETWEEN MARKET

22      POWER AND MONOPOLY POWER.

23              MANY FIRMS HAVE MARKET POWER IN THE

24      ECONOMY.  WHAT DOES THAT MEAN?  THEY CAN MANIPULATE

25      THEIR PRICES UP AND DOWN A LITTLE BIT WITHOUT
```

1    GAINING ALL OF THE BUSINESS FROM EVERYBODY OR

2    LOSING ALL OF THE BUSINESS.

3            SO THE FACT THAT YOU CAN HAVE SOME

4    FLEXIBILITY IN YOUR PRICING IS DEFINED IN ECONOMICS

5    AS MARKET POWER.

6            WHAT DO I MEAN BY MONOPOLY POWER?  WELL,

7    MONOPOLY POWER IS SOMETHING GREATER THAN THAT, IT

8    IS THE ABILITY TO RAISE PROFITABLY, AND THAT'S THE

9    KEY THING, PROFITABLY THE PRICE ABOVE THE BENCHMARK

10   OR COMPETITIVE LEVEL WITHOUT LOSING THE BUSINESS

11   EITHER TO THE EXISTING FIRMS OR INVITING ENOUGH NEW

12   ENTRANTS TO TAKE THE BUSINESS AWAY FROM YOU.  SO IT

13   HAS TO BE A SIGNIFICANT INCREASE FOR A PERSISTENT

14   PERIOD.

15   Q    HAS SAMSUNG EXERCISED MONOPOLY POWER?

16   A    WELL, IT GAINED MONOPOLY PRESENCE IN THESE TWO

17   TECHNOLOGY MARKETS, AND I THINK AS WE HEARD FROM

18   MR. DONALDSON, IT HAS ACTED IN A WAY THAT, THAT

19   EVIDENCES THAT IT HAS GAINED MONOPOLY POWER BY

20   VIRTUE OF MAKING LICENSING DEMANDS TO SAMSUNG -- TO

21   APPLE, AND ONLY TO APPLE, ACTUALLY, THAT ARE

22   INCONSISTENT WITH THE FRAND PRINCIPLE.

23            THAT, TO ME, EVIDENCES THAT THEY'VE

24   GAINED MONOPOLY POWER BECAUSE NOBODY CAN NOW TAKE

25   THEM OUT OF THE STANDARD UP UNTIL SUCH TIME AS THE

```
 1    A    IN MY EXPERIENCE AS A DESIGNER, A DESIGN

 2    COMING OUT DOESN'T HAVE THAT KIND OF IMPACT UNLESS

 3    IT'S TRULY UNIQUE AND NOT OBVIOUS.

 4              MS. KREVANS:  NOTHING FURTHER, YOUR

 5    HONOR.

 6              THE COURT:  ALL RIGHT.  THE TIME IS NOW

 7    2:13.  GO AHEAD, PLEASE.

 8              MR. VERHOEVEN:  THANK YOU, YOUR HONOR.

 9              CAN WE PUT UP SDX 3927.001.

10                    CROSS-EXAMINATION

11    BY MR. VERHOEVEN:

12    Q    THIS IS A SLIDE WE LOOKED AT EARLIER WHEN I

13    WAS CROSS-EXAMINING YOU?

14              MS. KREVANS:  OBJECTION, YOUR HONOR.

15              MR. VERHOEVEN:  YOUR HONOR, IF WE'RE

16    GOING TO HAVE OBJECTIONS TO A SLIDE THAT'S ALREADY

17    BEEN USED AND TAKING MY TIME.

18              THE COURT:  GO AHEAD, OVERRULED.

19              MS. KREVANS:  YOUR HONOR, IF I MAY --

20              MR. VERHOEVEN:  CAN THIS GO OUT OF THEIR

21    TIME, YOUR HONOR.

22              THE COURT:  OVERRULED.  GO, PLEASE.

23              MR. VERHOEVEN:  THANK YOU.

24    Q    THIS IS A SLIDE I ASKED YOU ABOUT LAST TIME

25    YOU TESTIFIED; RIGHT?
```

1    A    CORRECT.

2    Q    AND ON THE LEFT WE HAVE THESE PRIOR ART

3    REFERENCES AND WE HAVE THE LG PRADA, DO YOU SEE

4    THAT?

5    A    I SEE THAT.

6    Q    ALL THESE PRIOR ART DEVICES HAVE A RECTANGULAR

7    SHAPE WITH ROUNDED CORNERS; RIGHT?

8    A    THAT'S WHAT I SAID LAST TIME, USE.

9    Q    THE USE OF A RECTANGULAR SHAPE WITH ROUNDED

10   CORNERS FOR AN ELECTRONIC DEVICE, THAT'S NOT

11   SOMETHING APPLE OWNS, IS IT, SIR?

12   A    THAT GENERAL DESCRIPTION CERTAINLY IS NOT.

13   THE SPECIFIC DESIGN THAT THEY PRODUCED IS.

14   Q    THAT ELEMENT IS NOT SOMETHING THAT APPLE OWNS,

15   IS IT, SIR?

16   A    I'M NOT SURE I UNDERSTAND THE QUESTION.

17   Q    RECTANGULAR SHAPE WITH ROUNDED CORNERS, DOES

18   APPLE OWN THAT?

19   A    APPLE OWNS A -- THE DESIGN OF THE PHONE WITH A

20   RECTANGULAR SHAPE AS DEPICTED IN THEIR PATENT WITH

21   ROUNDED CORNERS.

22   Q    CAN WE PLAY MR. BRESSLER'S APRIL 24TH, 2000

23   TELEPHONE DEPOSITION, PAGE 176, LINES 18 THROUGH

24   85.

25           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

1    OPEN COURT OFF THE RECORD.)

2    BY MR. VERHOEVEN:

3    Q    AND THE USE OF A LARGE -- GO BACK TO THE

4    SLIDE, PLEASE.  EACH OF THESE HAS A LARGE DISPLAY

5    SCREEN; RIGHT?

6    A    THEY'RE DIFFERENT SIZES.

7    Q    BUT THEY'RE ALL LARGE DISPLAY SCREENS, AREN'T

8    THEY, SIR?

9    A    COMPARED TO WHAT?

10   Q    YOU DON'T CONCEDE THESE ARE LARGE DISPLAY

11   SCREENS?

12   A    I WOULD SAY SOME OF THEM ARE LARGE AND SOME OF

13   THEM ARE NOT, YES.

14   Q    WHICH ONE IS NOT LARGE?

15   A    THE 547 I DO NOT BELIEVE IS AS LARGE AS THE

16   '087.

17   Q    OKAY.  SO THESE THREE AT LEAST YOU'LL AGREE

18   ARE LARGE, THE JP'638, JP'383, AND THE LG PRADA?

19   A    THEY ARE LARGE RELATIVE TO THE DESIGNS THEY'RE

20   IN, YES.

21   Q    THE USE OF A LARGE DISPLAY SCREEN ON AN

22   ELECTRONIC DEVICE IS NOT SOMETHING THAT'S

23   PROPRIETARY TO APPLE, IS IT, SIR?

24   A    I'M SORRY.  THE WAY YOU'RE ASKING THAT

25   QUESTION IS NOT APPROPRIATE TO THE EVALUATION I

```
 1    DID.

 2    Q    LET'S PLAY YOUR DEPOSITION, APRIL 24TH, 2012,

 3    PAGE 177, LINES 1 THROUGH 5.

 4              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

 5    OPEN COURT OFF THE RECORD.)

 6    BY MR. VERHOEVEN:

 7    Q    NOW, THAT WAS TRUE TESTIMONY WHEN YOU GAVE IT

 8    AT YOUR DEPOSITION, WASN'T IT, SIR?

 9    A    AS I UNDERSTAND THE QUESTIONS AT THE TIME,

10    YES.

11    Q    NOW, WHEN YOU'RE LOOKING AT THE '889 PATENT,

12    THE TABLET DESIGN PATENT -- ARE YOU WITH ME?

13    A    I AM.

14    Q    YOU NOTICED A LOT OF LITTLE DIFFERENCES;

15    RIGHT?

16    A    A LOT OF LITTLE DIFFERENCES OF WHAT?

17    Q    IN THE FIDLER TABLET VERSUS THE '889?

18    A    I THOUGHT THEY WERE SUBSTANTIAL DIFFERENCES.

19    Q    AND, IN FACT, WHEN YOU COMPARED THE '888 TO

20    THE INITIAL IPAD, IT WAS YOUR BELIEF IT'S NOT AN

21    EMBODIMENT, RIGHT?

22    A    BECAUSE OF THE SHAPE.

23    Q    SO YOU DIDN'T THINK IT WAS AN EMBODIMENT OF

24    THE '889 PATENT; RIGHT?

25    A    THAT REALLY HAS NOT BEEN PART OF MY
```

1    EVALUATION.

2    Q    IS THAT YOUR OPINION?

3    A    NO.

4    Q    OKAY.  LET'S PLAY FROM YOUR DEPOSITION, APRIL

5    24TH, 2012, PAGE 121, LINES 6 THROUGH 13.

6            (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

7    OPEN COURT OFF THE RECORD.)

8            MR. VERHOEVEN:  I'LL JUST READ IT, BUT I

9    DON'T THINK THEY WOULD SEE THEM AS BEING

10   SUBSTANTIALLY THE SAME.

11   Q    YOU SAID THAT, RIGHT, IN ANSWER TO THAT

12   QUESTION AT YOUR DEPOSITION?

13   A    I DID.  AND I SAID THE WORD SIGNIFICANT

14   SIMILARITIES.

15   Q    BUT DID YOU NOT THINK THEY WERE SUBSTANTIALLY

16   THE SAME.  WAS THAT A MISTAKE AT YOUR DEPOSITION?

17   A    NO, THAT'S WHAT I SAID.

18   Q    OKAY.  AND YOU STAND BY IT?

19   A    I BELIEVE THAT THE BACK OF THE ORIGINAL IPAD

20   DOES NOT HAVE THE SAME SHAPES THAT THE '889

21   SUGGESTS.

22   Q    YOU AGREE THAT YOU APPLIED THE SAME TEST FOR

23   INVALIDITY AS YOU APPLY FOR INFRINGEMENT, YOU APPLY

24   THE ORDINARY OBSERVER TEST; RIGHT, SIR?

25   A    I APPLIED THE ORDINARY OBSERVER TEST, IF, IN

1    FACT, I FOUND IN THE CONSTRUCTIONS THAT AS A

2    DESIGNER OF THE ORDINARY SKILL I FELT WERE CLOSE TO

3    OR PRIMARY REFERENCES FOR THE PATENTS, AND I --

4    Q    SO IF?

5    A    I DON'T BELIEVE ANY OF THEM ARE.

6    Q    IF LITTLE DETAILS LIKE THE BEZEL WIDTH OR THE

7    LOCATION OF THE SPEAKER ARE IMPORTANT FOR

8    INVALIDITY, THEY'RE JUST AS IMPORTANT FOR

9    NON-INFRINGEMENT, AREN'T THEY, SIR?

10   A    YES.  BUT I BELIEVE IT ALL COMES DOWN TO THE

11   OVERALL IMPRESSION.

12            MR. VERHOEVEN:  THANK YOU, SIR.

13            PASS THE WITNESS.

14            THE COURT:  ALL RIGHT.  2:18.

15            MS. KREVANS:  NO REDIRECT YOUR HONOR.

16            THE COURT:  ALL RIGHT.  IS THIS WITNESS

17   EXCUSED AND NOT SUBJECT TO RECALL.

18            MS. KREVANS:  HE IS EXCUSED AND NOT

19   SUBJECT TO RECALL.

20            THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

21            THE WITNESS:  THANK YOU.

22            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

23                    **KARAN SINGH,**

24   BEING CALLED AS A WITNESS ON BEHALF OF THE

25   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

1    EXAMINED AND TESTIFIED AS FOLLOWS:

2              THE WITNESS:  I DO.

3              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

4              MR. JACOBS:  YOUR HONOR, APPLE CALLS DR.

5    KARAN SINGH IN REBUTTAL.

6              THE COURT:  OKAY.  TIME IS 2:18.  GO

7    AHEAD, PLEASE.

8                    **DIRECT EXAMINATION**

9    BY MR. JACOBS:

10   Q    WELCOME BACK, DR. SINGH.  THE JURY HEARD

11   WEDNESDAY FROM A MR. GRAY ON BEHALF OF SAMSUNG THAT

12   LAUNCHTILE AND AGNETTA, A PATENT WITH AGNETTA AS

13   THE INVENTOR, EACH OF THEM SEPARATELY ANTICIPATE

14   CLAIM 50 OF THE '163 PATENT.

15             ARE YOU AWARE OF THAT TESTIMONY?

16   A    SURE.  I WAS IN COURT.  I READ HIS TRANSCRIPT.

17   I SAW THE SLIDES.

18   Q    DO YOU AGREE WITH MR. GRAY?

19   A    NO, I DO NOT.

20   Q    AND BEFORE WE GET INTO THE DETAILS, LET'S TAKE

21   KIND OF A HIGH LEVEL LOOK AT THIS.  ARE CLAIM 50 OF

22   THE '163 PATENT ON ONE HAND AND LAUNCHTILE AND

23   AGNETTA, THE REFERENCES MR. GRAY TALKED ABOUT, ARE

24   THEY EVEN DIRECTED TO THE SAME PROBLEM?

25   A    NO, NOT AT ALL.  ONE, THE '163 DEALS WITH

1    FACILITATING THE NAVIGATION AND READABILITY OF THE

2    STRUCTURED ELECTRONIC DOCUMENTS, LIKE WEB PAGES.

3    IF WE LOOK AT THE VIDEO OF THE '163 ON THE APPLE

4    IPHONE AGAIN, YOU SEE TAPPING ON BOXES.

5              AND THEN THIS ENTIRE DOCUMENT BEING

6    ENLARGED AND CENTERED TO IMPROVE THE READABILITY OF

7    THAT DOCUMENT.

8              LAUNCHTILE AND AGNETTA, ON THE OTHER

9    HAND, DEAL WITH A COMPLETELY DIFFERENT PROBLEM,

10   WHICH IS INTERACTING WITH AND LAUNCHING APPLICATION

11   ICONS, SORT OF LIKE THE APPLICATION ICONS FOR

12   LAUNCHING PROGRAMS THAT YOU SEE ON A COMPUTER DESK

13   TOP.

14   Q    SO DO LAUNCHTILE AND AGNETTA ENLARGE AND

15   TRANSLATE A STRUCTURED ELECTRONIC DOCUMENT?

16   A    NO, NOT AT ALL.  AND CERTAINLY NOT THE WAY THE

17   '163 TALKS ABOUT.  THEY ESSENTIALLY REPLACE THE

18   CONCEPT.  THEY PROVIDE DIFFERENT CONTENT.

19   Q    SO DO -- DOES LAUNCHTILE DISCLOSE INSTRUCTIONS

20   FOR DISPLAYING AT LEAST A PORTION OF A STRUCTURED

21   ELECTRONIC DOCUMENT?

22   A    UM --

23   Q    CAN WE HAVE PDX 29.29, PLEASE?

24   A    NO, THEY DON'T.  JUST LOOKING AT THE CLAIM

25   ELEMENTS OVER HERE, LAUNCHTILE, AND AGNETTA,

```
 1    SAYING WE RECEIVED JURY NOTE NUMBER 3.  WOULD THAT

 2    BE HELPFUL?  HE CAN ALSO DO A PHONE TREE.

 3             MR. MINTZ IS HERE FROM THE MERCURY NEWS.

 4    WE CAN NOTIFY AND HE CAN LET -- HE'S THE ONE THAT'S

 5    BASED IN THIS COURTHOUSE, IF HE CAN LET FOLKS KNOW,

 6    JUST IN CASE ECF MAY SOME DOWN, IT HAS IN THE PAST,

 7    AND THAT WAY WE CAN STILL COMMUNICATE WITH YOU.

 8             THE WITNESS:  E-MAIL ME.

 9             THE COURT:  WE DON'T WANT TO BE

10    RESPONSIBLE FOR E-MAILING EVERYBODY.  WE COULD LET

11    MR. MINTZ KNOW AND IF YOU ALL COULD WORK IT OUT.

12             THE WITNESS:  YES, WE'LL WORK ON IT,

13    JUDGE.

14             AUDIENCE:  IS BETTER THAN PHONE TREE.

15             THE COURT:  IS MS. PARKER-BROWN WILL BE

16    BACK NEXT WEEK, AND SHE'LL E-MAIL MR. MINTZ.  WE

17    CAN ALSO FILE THINGS ON ECF SINCE YOU'RE PROBABLY

18    ALSO GETTING ECF NOTICES, AND MAYBE IT WOULD BE

19    EASIER -- WE CAN JUST E-FILE WHEN THE JURY STARTED

20    EACH DAY AND WHEN THEY'VE LEFT, AND IF THERE'S EVER

21    A NOTE OR A VERDICT, WE'LL JUST DO A CLERK'S

22    NOTICE.

23             AUDIENCE:  THANK YOU VERY MUCH.

24             THE COURT:  YOU CAN FIND THAT, BETWEEN

25    THAT AND THE E-MAIL TREE, I THINK WE SHOULD BE
```

```
 1    OKAY.

 2              THE WITNESS:  THANK YOU.

 3              THE COURT:  ALL RIGHT.  LET'S GO AHEAD

 4    AND FINISH UP THEN.

 5              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 6    WERE HELD IN THE PRESENCE OF THE JURY:)

 7              THE COURT:  WELCOME BACK.  WE'RE IN OUR

 8    LAST 36 MINUTES.

 9              ALL RIGHT.  MR. LEE.

10              MR. LEE:  APPLE RESTS, YOUR HONOR.

11              THE COURT:  OH, OKAY.  ALL RIGHT.

12              MR. PRICE:  WE SAVED TIME FOR ME.

13              THE COURT:  ALL RIGHT.  THEN IT'S 3:07.

14    LET'S GO BACK THEN TO SAMSUNG.  WHO WOULD YOU LIKE

15    TO CALL?

16              MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS

17    DR. DAVID TEECE.

18              THE COURT:  YOU KNOW, JUST BELTS AND

19    SUSPENDERS, WE'RE GOING TO RESWEAR IN EVERYONE LIKE

20    WE DID WITH THE OTHER WITNESSES.  OKAY.

21              MS. MAROULIS:  YES.

22              THE COURT:  PLEASE RAISE YOUR RIGHT HAND.

23                       **DAVID TEECE,**

24    BEING RECALLED AS A WITNESS ON BEHALF OF THE

25    DEFENDANTS, HAVING BEEN PREVIOUSLY SWORN, WAS
```

```
 1    EXAMINED AND TESTIFIED AS FOLLOWS:
 2              THE WITNESS:  I DO.
 3              THE CLERK:  THANK YOU.  PLEASE BE SEATED.
 4              THE COURT:  ALL RIGHT.  TIME IS NOW 3:08,
 5    GO AHEAD, PLEASE WITH YOUR DIRECT.
 6                      DIRECT EXAMINATION
 7    BY MS. MAROULIS:
 8    Q    WELCOME BACK.  DO YOU AGREE WITH THE TESTIMONY
 9    OF DR. WALKER THAT DISCLOSURE TO ETSI AFTER THE
10    ADOPTION OF THE STANDARD IS UNTIMELY?
11    A    NO.  BASED ON WHAT I'VE OBSERVED FROM THE
12    PUBLIC DATABASE OF ETSI, I DON'T.
13    Q    HAVE YOU CONDUCTED AN EMPIRICAL STUDY OF HOW
14    THE PARTICIPANTS IN ETSI DISCLOSE THEIR IPR'S TO
15    ETSI?
16    A    I HAVE.
17    Q    LET'S TAKE A LOOK AT SDX 3975.006.  IS THIS
18    THE SLIDE THAT YOU PREPARED TO SUMMARIZE YOUR
19    FINDINGS?
20              MR. LEE:  YOUR HONOR, I OBJECT.  THIS WAS
21    EXCLUDED.
22              MS. MAROULIS:  YOUR HONOR, THE OBJECTION
23    WAS OVERRULED, I BELIEVE.
24              MR. LEE:  NO.  IT WAS SUSTAINED AS TO 06
25    AND THEY WERE ALLOWED TO SHOW WHAT WAS 01 TO 05
```

```
 1    ONLY.
 2              THE COURT:  ALL RIGHT.  LET ME SEE.
 3              MS. MAROULIS:  YOUR HONOR, I'LL MOVE ON
 4    TO 05 WHILE IT'S BEING CHECKED BY MY LEAGUES.
 5              THE COURT:  OKAY.
 6    BY MS. MAROULIS:
 7    Q    LET'S TAKE A LOOK AT 3975.005.  WHAT DOES THIS
 8    SLIDE REPRESENT, MR. TEECE?
 9    A    THIS IS ONE YEAR, 2011, WHERE I WENT INTO THE
10    PUBLIC DATABASE THAT DR. WALKER REFERRED TO AND I
11    MEASURED IN DAYS THE TIME FROM THE ADOPTION OF THE
12    STANDARD TO THE DISCLOSURE BY THREE PARTIES HERE OF
13    INTELLECTUAL PROPERTY POTENTIAL AND AS YOU CAN SEE
14    FOR APPLE, THAT TIME LAPSE WAS ABOUT 250 DAYS ON
15    AVERAGE.
16              FOR HTC, IT WAS ABOUT 700 DAYS ON
17    AVERAGE.  AND FOR NOKIA, IT WAS ACTUALLY NORTH OF A
18    THOUSAND DAYS ON AVERAGE.  SO WE'RE NOT TALKING
19    DAYS, WE'RE ACTUALLY TALKING MONTHS AND YEARS.
20    Q    HAVE YOU ALSO STUDIED SUCH PARTICIPANTS AS
21    ERICSSON AND MOTOROLA FOR THE PURPOSE OF THIS
22    ANALYSIS?
23    A    YES.
24    Q    AND DID THEY EXHIBIT SIMILAR DELAYS?
25    A    YES.
```

160145

```
 1     Q    DO YOU RECALL WHAT DELAYS THEY EXHIBITED ON
 2    AVERAGE?
 3    A    I DON'T RECALL THE NUMBER.  BUT WE'RE TALKING
 4    WEEKS AND MONTHS AND SOMETIMES YEAR.
 5     Q    DR. TEECE, HOW DOES THIS EMPIRICAL STUDY
 6    EFFECT YOUR ANALYSIS OF THE TIME LIMITS OF THE
 7    DISCLOSURE TO ETSI?
 8    A    WELL, WITH RESPECT TO RULES, AS AN ECONOMIST,
 9    I LOOK AT THE WAY PEOPLE BEHAVE.  THAT TELLS ME THE
10    MOST ABOUT WHAT THE RULES ARE.  AND THIS IS THE WAY
11    THAT PARTICIPANTS BEHAVE.  THEY DON'T DISCLOSE, OR
12    THEY DON'T CERTAINLY HARDLY EVER DISCLOSE BEFORE
13    THE PATENTS ARE ISSUES.
14              MR. LEE:  I OBJECT, YOUR HONOR.  THAT'S
15    BEYOND WHAT YOUR HONOR ALLOWED.  HE WAS ALLOWED TO
16    DISCUSS THE DELAYS.  THERE'S NO FOUNDATION FOR --
17              MS. MAROULIS:  YOUR HONOR, THERE WAS
18    OBJECTIONS TO TWO SPECIFIC EXHIBITS, BOTH WERE
19    OVERRULED BY YOUR ORDER.
20              THE COURT:  I KNOW.  THE OBJECTION SO
21    THIS SLIDE WAS OVERRULED.  SO.
22              MR. LEE:  RIGHT, AND I HAVEN'T OBJECTED
23    TO THAT THAT.  THIS TIME I BELIEVE HE'S GOING
24    BEYOND THIS NOW AND TALK ABOUT WHEN THEY DISCLOSE.
25    THESE SLIDES DON'T SHOW ANYTHING ABOUT DISCLOSURE.
```

```
 1    NOW HE'S GIVING OPINION ON WHEN THEY DISCLOSE.
 2    THERE'S NOTHING BEFORE THE COURT ABOUT THAT AND
 3    THERE'S NOTHING --
 4              THE COURT:  OVERRULED.  I'M GOING TO LET
 5    YOU CROSS.  GO AHEAD, PLEASE.
 6    BY MS. MAROULIS:
 7    Q    DR. TEECE, HOW DOES THIS EMPIRICAL STUDY
 8    AFFECT YOUR ANALYSIS.  FINISH YOUR ANSWER, PLEASE.
 9    A    IT SHOWS THAT THE PRACTICE AT ETSI IS THAT
10    COMPANIES FREQUENTLY PROVIDE INFORMATION ABOUT
11    PATENTS CONSIDERABLY AFTER THE STANDARDS ARE
12    ISSUED.
13    Q    THANK YOU, DR. TEECE.  YOU HEARD MR. DONALDSON
14    TESTIFY ABOUT THE FRAND OFFER THAT SAMSUNG MADE TO
15    APPLE.  WERE YOU HERE?
16    A    I WAS.
17    Q    AND IN HIS OPINION, THE RATE THAT SAMSUNG
18    OFFERED TO APPLE WAS NOT FAIR AND REASONABLE.  DO
19    YOU AGREE WITH THAT OPINION?
20    A    NO, I DON'T.
21    Q    WHY DO YOU DISAGREE WITH MR. DONALDSON?
22    A    ONE, IT WAS IN THE RANGE OF RATES THAT I'VE
23    OBSERVED FROM OTHER COMPANIES; AND, TWO, THE LETTER
24    SPECIFICALLY WAS AN INVITATION TO CONSIDER A
25    CROSS-LICENSE, WHICH IF THAT NEGOTIATION HAD BEEN
```

```
 1    PURSUED, COULD HAVE RESULTED THAT THE RATE GOING

 2    AWAY AND POSSIBLY JUST A BALANCING PAYMENT.

 3    Q    WHAT TYPICALLY HAPPENS ONCE SUCH AN OFFER IS

 4    MADE?

 5    A    IT'S USUALLY RESPONDED TO.

 6    Q    TO YOUR KNOWLEDGE, HAS APPLE EVER RESPONDED TO

 7    SAMSUNG WITH A COUNTER OFFER OF ROYALTY RATES?

 8    A    NOT TO MY KNOWLEDGE.

 9    Q    DR. TEECE, MR. DONALDSON ALSO TESTIFIED THAT

10    THE BASE USED IN THE SAMSUNG OFFER LETTER WAS NOT

11    FRAND.

12            DO YOU AGREE WITH THAT CONCLUSION?

13    A    I DISAGREE WITH THAT CONCLUSION.

14    Q    WHY DO YOU DISAGREE WITH THAT CONCLUSION?

15    A    HE BELIEVED THE BASE SHOULD BE THE BASEBAND

16    CHIP AND I LOOKED AT ALL -- ALL THE LICENSES I

17    LOOKED AT, NOBODY ELSE USED THE BASEBAND CHIP.  IT

18    WAS REFERRING EITHER TO SET SALES OR SOME UNIT

19    SALES MEASURE.

20    Q    SIR, WHAT ARE YOU RELYING ON WHEN YOU SAY THAT

21    YOU LOOKED AT LICENSES AND HAVE NOT SEEN THE

22    BASEBAND CHIP USED AS A MEASURE OF BASE?

23    A    I LOOKED AT SAMSUNG'S LICENSES, NOKIA'S

24    LICENSES, AND A NUMBER OF OTHERS REPORTED IN THE

25    PUBLIC DATABASES.
```

```
1    Q    THANK YOU, SIR.

2         WHAT ABOUT -- YOU WERE HERE ALSO FOR

3    DR. ORDOVER'S PRESENTATION; CORRECT?

4    A    I WAS.

5    Q    WHAT IS YOUR OPINION WITH REGARD TO THE MARKET

6    DEFINITION PROPOSED BY DR. ORDOVER?

7    A    VERY UNUSUAL, HIS DEFINITION IS VERY UNUSUAL.

8         AND NOR DID HE DO WHAT AN ECONOMIST IS

9    SUPPOSED TO DO TO ESTABLISH A MARK, WHICH IS LOOK

10   FOR COMMERCIALLY VIABLE SUBSTITUTES.  HE WAS VERY

11   CLEAR IN HIS REPORT THAT HE ASSUMED THAT THERE WAS

12   SUBSTITUTES WHEN, IN FACT, ECONOMIC ANALYSIS

13   REQUIRES THAT YOU PROVE THAT THERE ARE SUBSTITUTES.

14   Q    WHAT IS THE RELEVANCE OF IDENTIFYING

15   SUBSTITUTES TO DEFINING THE MARKET?

16   A    YOU CANNOT DEFINE AN ANTITRUST MARKET, OR A

17   RELEVANT ANTITRUST MARKET WITHOUT DOING A CAREFUL

18   ECONOMIC ANALYSIS OF THE SUBSTITUTES THAT ARE

19   AVAILABLE.

20   Q    WHAT TYPE OF DATA DOES AN ECONOMIST ANALYZE TO

21   ESTABLISH THAT ONE TECHNOLOGY CAN SUBSTITUTE FOR

22   ANOTHER?

23   A    YOU LOOK AT COST DATA, PERFORMANCE DATA, YOU

24   WANT TO SHOW THAT ECONOMICALLY THESE VARIOUS

25   TECHNOLOGIES CAN BE SUBSTITUTED.  IT'S NOT ENOUGH
```

1    FOR A TECHNICAL PERSON TO SAY MAYBE THEY WILL BE

2    TECHNICALLY SIMILAR.  THEY HAVE TO BE ECONOMICALLY

3    AND COMMERCIALLY SIMILAR.

4    Q    DID DR. ORDOVER LOOK AT THAT DATA IDENTIFIED

5    WHAT TECHNOLOGIES HE TALKED ABOUT AS SUBSTITUTE

6    ITSELF?

7    A    HE DID NOT.

8    Q    WHAT DATA DID HE LOOK?

9    A    HE LOOKED AT VARIOUS INFORMATION BY TECHNICAL

10   EXPERTS WHICH WAS COMPLETELY BEREFT OF ANY ECONOMIC

11   ANALYSIS.

12   Q    THEN HOW DOES HE GO ABOUT DEFINING THE MARKET

13   DEFINITION?

14   A    IN ESSENCE HE ASSUMES HIS MARKET BASED ON THE

15   SCOPE OF THE PATENT.

16   Q    IS THIS APPROACH CONSISTENT WITH ECONOMIC

17   PRINCIPLES AS YOU UNDERSTAND THEM?

18   A    IT IS NOT.

19   Q    WHAT ARE THE IMPLICATIONS OF ADOPTING THIS

20   MARKET DEFINITION PROPOSED BY DR. ORDOVER?

21   A    BASICALLY HE ASSUMES HIS RESULT, THAT THERE IS

22   MONOPOLY POWER BECAUSE HE HASN'T DONE THE

23   BACKGROUND WORK THAT'S NECESSARY TO ESTABLISH THAT

24   THERE ARE COMMERCIALLY VIABLE SUBSTITUTES.

25   Q    AND WHAT IS THE CONSEQUENCE OF THAT FOR THE

```
 1    MARKET PARTICIPANTS IN THE STANDARD SETTING

 2    ORGANIZATIONS?

 3    A    IF THE DESIGNER'S CORRECT, EVERYBODY IS A

 4    MONOPOLIST.  ANYBODY WITH A PATENT IS A MONOPOLIST

 5    AND THERE'S THOUSANDS OF MONOPOLISTS OUT THERE

 6    WHICH IS CLEARLY, IN MY VIEW, NOT CORRECT WHY.

 7    Q    SIR, HAS SAMSUNG LICENSED ITS STANDARD

 8    ESSENTIAL PATENTS TO OTHER COMPANIES?

 9    A    I BELIEVE SO, YES.

10    Q    AND HAVE YOU TESTIFIED YESTERDAY REGARDING

11    SAMSUNG'S LICENSING OF THESE PATENTS TO OTHER

12    COMPANIES?

13    A    YES.

14    Q    IS IT CORRECT THAT EXHIBIT 630 CONTAINS THE

15    INFORMATION REGARDING THAT?

16    A    IT DOES.

17    Q    TO YOUR KNOWLEDGE, IS APPLE PAYING ANYTHING TO

18    SAMSUNG FOR SAMSUNG'S DECLARED ESSENTIAL PATENTS?

19    A    NOT TO MY KNOWLEDGE.

20             MS. MAROULIS:  ONE MINUTE, YOUR HONOR.

21             YOUR HONOR, THIS WITNESS CAN BE EXCUSED,

22    OR PASS THE WITNESS.

23             MR. LEE:  I'D LIKE TO ASK A FEW

24    QUESTIONS.

25             THE COURT:  ALL RIGHT.  3:16.  GO AHEAD.
```

**CROSS-EXAMINATION**

BY MR. LEE:

Q    DR. TEECE, I NOTICE YOU NEGLECTED TO TELL THE

JURY ABOUT YOUR EXPERIENCE WITH ETSI.  WHAT

POSITIONS HAVE YOU HELD AT ETSI?

A    I DIDN'T NEGLECT TO TELL THEM BECAUSE I HAVE

NOT HAD A POSITION AT ETSI.

Q    OH.  EVER?

A    THAT IS CORRECT.

Q    HAVE YOU EVER BEEN TO A 3GPP MEETING?

A    NO, I HAVE NOT.

Q    HAVE YOU EVER BEEN TO A 3GPP WORKING GROUP?

A    NOPE.

Q    HAVE YOU EVER SUBMITTED A PROPOSAL TO ETSI?

A    NOPE.

Q    SO UNLIKE DR. WALKER, WHO'S THE CHAIRMAN, YOU

HAVE NO EXPERIENCE WITH ETSI; CORRECT?

A    I'VE OBSERVED IN THE PUBLIC DATABASES THE

FILINGS OF VARIOUS COMPANIES.  I'VE DONE ANALYSIS

ON THE PUBLIC DATABASES.

Q    MY QUESTION WAS DIFFERENT, SIR.  OTHER THAN

GOING TO A PUBLIC DATABASE AND ANALYZING PUBLICLY

AVAILABLE INFORMATION, YOU HAVE NO EXPERIENCE WITH

ETSI, PERIOD?  RIGHT?

A    I HAVE NO DIRECT PARTICIPATORY EXPERIENCE.  I

```
 1    STUDIED ETSI AS A SCHOLAR.
 2    Q    OKAY.  NOW, SIR, YOU UNDERSTAND THAT IN THIS
 3    CASE APPLE ALLEGES THAT SAMSUNG FAILED TO COMPLY
 4    WITH ITS ETSI, WITH THE ETSI IPR POLICY; CORRECT?
 5    A    YES.
 6    Q    AND AS YOU TESTIFIED AT YOUR DEPOSITION, YOU
 7    HAVE NO OPINION ON THAT ISSUE, DO YOU?
 8            MS. MAROULIS:  OBJECTION.  MISLEADING.
 9    BY MR. LEE:
10    Q    WELL, LET ME ASK IT THIS WAY:  DO YOU HAVE AN
11    OPINION ON THAT ISSUE?
12    A    I GAVE YOU AN OPINION WITH RESPECT TO WHAT I
13    OBSERVED AND THE BEHAVIOR OF THE PARTIES, AND SO I
14    INFER FROM THAT THAT THE -- THAT SINCE DELAYS ARE
15    UBIQUITOUS, THAT THE RULE CAN'T BE QUITE WHAT IT'S
16    BEING REPRESENTED BY DR. ORDOVER.
17    Q    LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.
18    CAN I HAVE PAGE 427, LINES 7 TO 13.
19            I'M NOT SURE, I WANT YOU TO HELP ME WITH
20    THIS, WHAT YOU OBSERVED FROM UBIQUITOUS BEHAVIOR.
21    THE LADIES AND GENTLEMEN OF THE JURY HAVE TO
22    TIED --
23            MS. MAROULIS:  OBJECTION TO COUNSEL
24    TESTIFYING.
25            THE COURT:  OVERRULED.
```

```
1    BY MR. LEE:

2    Q    -- DOES SAMSUNG VIOLATE THE RULES, AND YOU

3    WERE ASKED, QUESTION, AND ARE YOU OFFERING ON

4    OPINION THAT IN REGARD TO ANY OR ALL OF THE 7

5    PATENTS HERE, SAMSUNG ON A BONE FIDE BASIS DREW THE

6    ATTENTION OF ETSI TO ANY OF ITS IPR WHICH MIGHT BE

7    SPECIAL TO ANY PROPOSAL THAT IT MADE.

8              "ANSWER:  NO.  AS I SAID BEFORE, MY

9    TESTIMONY WILL RELATE TO INDUSTRY PRACTICE."

10             MS. MAROULIS:  OBJECTION, NOT PROPER

11   IMPEACHMENT.  CONSISTENT WITH THE WITNESS'S

12   STATEMENT.

13             THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

14   BY MR. LEE:

15   Q    WERE YOU ASKED THAT QUESTION AND DID YOU GIVE

16   THAT ANSWER UNDER OATH, SIR?

17   A    I DID.

18   Q    ALL RIGHT.  NOW, I WANT TO ASK YOU ABOUT

19   SOMETHING ELSE YOU SAID TO THE LADIES AND GENTLEMEN

20   OF THE JURY, WHICH WAS THE QUESTION OF WHETHER

21   PEOPLE DISCLOSE THEIR IPR BEFORE A PROPOSAL WAS

22   ADOPTED.

23             IT'S TRUE, IS IT NOT, SIR, THAT YOU HAVE

24   NO EVIDENCE, AND YOU'RE NOT AWARE OF ANY SPECIFIC

25   INSTANCE WHERE SOMEONE MADE A PROPOSAL TO ETSI AND
```

1    FAILED TO DISCLOSE THEIR PATENTS UNTIL AFTER THE

2    PROPOSAL WAS ADOPTED; CORRECT?

3    A    CAN I HAVE THAT BACK, PLEASE.

4    Q    SURE.  I'LL BREAK IT DOWN FOR YOU.  I WANT TO

5    TAKE A SITUATION WHERE AN ETSI MEMBER IS MAKING A

6    PROPOSAL, YOU KNOW THAT CAN HAPPEN, CORRECT?

7    A    YES.

8    Q    I WANT YOU TO TAKE THE SITUATION WHERE THEY

9    HAVE A PATENT, OR A PATENT APPLICATION, DO YOU HAVE

10   THAT IN MIND?

11   A    YES.

12   Q    AND I WANT YOU TO TAKE THE SITUATION WHERE

13   THEY DON'T DISCLOSE IT UNTIL AFTER THE STANDARD HAS

14   BEEN ADOPTED.

15            DO YOU HAVE THAT IN MIND?

16   A    YES.

17   Q    NOW, THE FACT OF THE MATTER IS YOU DON'T KNOW

18   ONE WAY OR ANOTHER OF ANY SPECIFIC INSTANCES WHERE

19   SOMEONE MADE A PROPOSAL, DISCLOSED AND DISCLOSED

20   BEFORE IT WAS FIXED; CORRECT?

21   A    I DON'T HAVE SPECIFIC INFORMATION.  I'VE GOT

22   THE DATA THAT I REFERRED TO AND PRESENTED EARLIER.

23   Q    AND YOU HAVE NO SPECIFIC INSTANCES WHERE

24   PEOPLE, OTHER THAN SAMSUNG, MADE A PROPOSAL, HAD A

25   PATENT AND DIDN'T DISCLOSE UNTIL LATER; CORRECT?

```
 1    A    I HAVE NO SPECIFIC INSTANCES.

 2    Q    AND, IN FACT, DR. TEECE, THE ONLY SPECIFIC

 3    INSTANCES YOU'VE LOOKED AT ARE THE ONES THAT DR.

 4    WALKER TESTIFIED ABOUT; CORRECT?

 5    A    IN TERMS OF SPECIFICS, YES, I'VE LOOKED --

 6    WHAT I SHOWED YOU WAS THE AGGREGATE DATA WHICH

 7    TELLS A COMPELLING STORY.

 8    Q    DR. TEECE, MY QUESTION WAS DIFFERENT.  I'M

 9    TRYING TO LOOK AT THE SPECIFIC QUESTION OF WHETHER

10    SOMEONE BROKE THE RULES.

11              DR. WALKER PUT TWO CHRONOLOGIES ON THE

12    BOARD FOR TWO PATENTS?

13    A    YES.

14    Q    YOU HAVE NO REASON TO DISAGREE WITH THOSE

15    CHRONOLOGIES; CORRECT?

16    A    CORRECT.

17              MR. LEE:  THANK YOU, SIR.  NOTHING

18    FURTHER.

19              THE COURT:  ALL RIGHT.  TIME IS NOW 3:21.

20    ANY REDIRECT?

21              MS. MAROULIS:  YOUR HONOR, NO REDIRECT.

22              BUT FOR THE RECORD, COUNSEL STATED THAT

23    THIS WAS EXCLUDED.  THIS EXHIBIT WAS NOT SUBJECT TO

24    YOUR ORDER.  THE RECORD SHOULD REFLECT THAT.

25              MR. LEE:  NO.  YOUR HONOR, CAN WE TAKE A
```

```
 1    LOOK AT THIS?

 2              MR. VERHOEVEN:  WE DON'T HAVE TIME.

 3              THE COURT:  WE DON'T HAVE TIME.

 4              MR. VERHOEVEN:  SAMSUNG RECALLS

 5    DR. WILLIAMS.

 6              THE CLERK:  RAISE YOUR RIGHT HAND,

 7    PLEASE.

 8                    TIM WILLIAMS,

 9    BEING RECALLED AS A WITNESS ON BEHALF OF THE

10    DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS

11    EXAMINED AND TESTIFIED AS FOLLOWS:

12              THE WITNESS:  I DO.

13              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

14                  DIRECT EXAMINATION

15    BY MR. VERHOEVEN:

16    Q    GOOD AFTERNOON, DR. WILLIAMS.

17              THE COURT:  TIME IS 321.  GO AHEAD,

18    PLEASE.

19              THE WITNESS:  GOOD AFTERNOON.

20    BY MR. VERHOEVEN:

21    Q    YOU HEARD DR. KIM AND DR. KNIGHTLY TESTIFY

22    WITH RESPECT TO VALIDITY OF THE '516 PATENT AND THE

23    '941 PATENT THIS MORNING?

24    A    YES, I DID.

25    Q    HE ALSO TESTIFIED ABOUT INFRINGEMENT.  YOU'VE
```

```
 1      ALREADY PROVIDED YOUR OPINION ON THAT, SO I'M NOT

 2      GOING TO ASK YOU ANY QUESTIONS ON INFRINGEMENT.

 3      LET'S TALK ABOUT THE VALIDITY OPINIONS.  ON THE

 4      '516 PATENT, DR. KIM, HE IDENTIFIED THE HATTA

 5      REFERENCE.  CAN WE PUT UP PX 1002.  DO YOU REMEMBER

 6      THE HATTA REFERENCE, SIR?

 7      A    YES, I DO.

 8      Q    DO YOU REMEMBER DR. KIM TESTIFIED IT WAS HIS

 9      OPINION THAT THAT REFERENCE RENDERS THE '516 PATENT

10      OBVIOUS?

11      A    YES, I DO.

12      Q    DO YOU AGREE OR DISAGREE WITH HIS OPINION?

13      A    I DISAGREE FOR THREE REASONS.  THE FIRST IS

14      HATTA IS TALKING ABOUT THE POWER AMPLIFIER IN A

15      BASE STATION, NOT THE MOBILE DEVICE.

16             SO AS I SHOWED EARLIER THIS WEEK, IN THAT

17      GRAPHIC WITH THE BASE STATION AND MULTIPLE MOBILES,

18      THE BASE STATION WAS TALKING TO MULTIPLE MOBILES AT

19      ONE TIME.  THE MOBILE IS ONLY TALKING TO A SINGLE

20      BASE STATION AT A TIME.  SO IT'S AN ENTIRELY

21      DIFFERENT PROBLEM.

22             ALSO, WITHIN HATTA, THERE'S NO HARQ

23      CHANNEL.  THERE'S NO E-DPDCH CHANNEL.  AND ALSO IN

24      HATTA, IF WE LOOK AT DR. KIM'S SLIDE FROM EARLIER

25      TODAY.
```

```
 1      Q    CAN WE PUT UP PDX 35.16?

 2      A    DR. KIM PUT UP THIS SLIDE, IF YOU LOOK ON THE

 3      BOTTOM, THIS RED RECTANGLE IS ACTUALLY SCALING THE

 4      VOICE CHANNEL.  THAT'S THE PROBLEM THAT THE '516

 5      WAS SOLVING.  SO HATTA ACTUALLY IS CAUSING THE

 6      PROBLEM THAT THE '516 SOLVES.

 7      Q    NOW, DR. KIM REFERENCED PRIOR ART FIGURES FROM

 8      THE '516 PATENTS, FIGURES 5 AND 6, AND SAID, WELL,

 9      YOU COULD COMBINE THOSE AND GET THE INVENTION IF

10      YOU COMBINE THEM WITH HATTA.  DO YOU REMEMBER THAT?

11      A    YES.

12      Q    DO YOU AGREE WITH THAT OPINION?

13      A    ABSOLUTELY NOT.

14      Q    EXPLAIN TO THE JURY WHY?

15      A    HATTA IS DESCRIBING A PROBLEM.  FIGURES 4 AND

16      5 ARE DESCRIBING A PROBLEM.  IF YOU COMBINE TWO

17      PROBLEMS TOGETHER, YOU DON'T GET A SOLUTION.

18      Q    ALL RIGHT.  LET'S TURN QUICKLY TO THE '941

19      PATENT, DR. KNIGHTLY'S TESTIMONY, HE TESTIFIED AS

20      TO THE '658 PATENT, PX 97.1.  DO YOU REMEMBER THAT,

21      SIR?

22      A    YES.

23      Q    AND HE TESTIFIED THAT IN HIS OPINION, THE '658

24      PATENT ANTICIPATED THE '941 PATENT .  DO YOU

25      REMEMBER THAT TESTIMONY?
```

```
 1    A    YES, I DO.

 2    Q    DO YOU AGREE OR DISAGREE?

 3    A     I DISAGREE.  AGARWAL IS ABOUT A FIXED

 4    COMMUNICATION FACILITY THAT TALKS TO A SATELLITE.

 5    SO AGARWAL IS ABOUT BIG SATELLITE ANTENNAS AND

 6    CEMENT BUILDINGS AND AGARWAL WAS NOT ABOUT A MOBILE

 7    COMMUNICATION SYSTEM.

 8              ALSO, IF YOU LOOK AT THE PACKET

 9    HEADERS --

10    Q    LET'S PUT UP PX 97.9 FIGURE 8A, BLOW IT UP.

11    HE SHOWED THIS DURING HIS TESTIMONY; RIGHT?

12    A    HE SHOWED PACKET HEADERS, YES.

13    Q    YEAH.

14    A     IF YOU LOOK AT THE PACKET HEADERS IN AGARWAL,

15    THERE'S NO ONE BIT FIELD, WHICH IS CALLED OUT IN

16    THE CLAIMS OF THE PATENT.  THERE'S NO SERIAL

17    NUMBER.  AND THERE'S NO LENGTH INDICATOR FIELD.

18    Q    SO IN YOUR OPINION, ARE EITHER OF THESE

19    PATENTS INVALIDATED BASED ON THE TESTIMONY YOU'VE

20    HEARD?

21    A    ABSOLUTELY NOT.

22              MR. VERHOEVEN:  THANK YOU, SIR.  NO

23    FURTHER QUESTIONS AT THIS TIME.

24              THE COURT:  ALL RIGHT.  TIME IS 3:25.

25    ANY CROSS?
```

```
1              MR. LEE:  CAN I HAVE PDX 35.16 ON THE

2     SCREEN, PLEASE.

3                    CROSS-EXAMINATION

4     BY MR. LEE:

5     Q    DR. WILLIAMS, YOUR SLIDE IS ON THE TOP HALF OF

6     THIS PDX; CORRECT?

7     A    CORRECT.

8     Q    ON THE LEFT IT'S FIGURE 5 OF THE PATENT;

9     CORRECT?

10    A    YES.

11    Q    IT'S LABELED PRIOR ART; CORRECT?

12    A    IT IS LABELED PRIOR ART.  HOWEVER, IF YOU READ

13    THE SPECIFICATION OF THE '516.

14    Q    DR. WILLIAMS, IS IT LABELED PRIOR ART?

15    A    HOWEVER, IF YOU READ THE SPECIFICATION OF THE

16    '516, THE SPECIFICATION CLEARLY IDENTIFIES THE

17    PRIOR ART ASPECT OF THIS DRAWING AS EQUAL SCALING

18    OF THE CHANNELS.

19    Q    DR. WILLIAMS, MR. VERHOEVEN ASKED OUR

20    WITNESSES RESPECTFULLY TO ANSWER YES OR NO.  I'M

21    GOING TO DO THE SAME TO YOU, ONLY BECAUSE WE'RE

22    NEAR THE END OF THE TRIAL.

23              MY QUESTION IS PRETTY SIMPLE.  IS IT

24    LABELED PRIOR ART?

25    A    IT'S LABELED PRIOR ART, BUT THE PRIOR ART
```

```
1     ASPECT OF THIS DRAWING IS THE EQUAL SCALING OF THE

2     CHANNELS.

3     Q    SO --

4     A    NOT THE EXTRUSION --

5     Q    JUST TELL THE LADIES AND GENTLEMEN OF THE

6     JURY, IS THIS FIGURE PRIOR ART OR NOT?

7     A    THIS FIGURE IS PRIOR ART WITH RESPECT TO THE

8     EQUAL SCALING OF THE CHANNELS, NOT THE INCLUSION OF

9     THE E-DPDCH CHANNEL THAT DR. KIM TALKED ABOUT THIS

10    MORNING.

11    Q    AND FIGURE 4, WHICH IS LABELED PRIOR ART, IS

12    NOT PRIOR ART EITHER?

13    A    LET'S LOOK AT IT.

14    Q    SURE.  FIGURE 4.  THAT SAYS PRIOR ART, TOO,

15    YES OR NO?

16    A    THIS SHOWS THE EQUAL SCALING WOULD BE

17    PERFORMED.

18    Q    DR. WILLIAMS, DOES IT SAY PRIOR ART OR NOT?

19    A    THE WORDS PRIOR ART ARE THERE.

20    Q    OKAY.

21    A    YES.

22    Q    AND THE PATENTEE, YOU KNOW THAT SAMSUNG WROTE

23    THOSE WORDS THERE; CORRECT?

24    A    YES.  BUT THE INVENTORS ALL TESTIFIED THAT

25    THEIR INVENTION WAS WITH REGARDS TO SCALING THE
```

1    HARQ CHANNEL OVER THE NON-HARQ CHANNEL.

2    Q    DR. WILLIAMS, THE '941 PATENT, THE OTHER

3    PATENT YOU TESTIFIED ABOUT JUST A MINUTE AGO?

4    A    YES.

5    Q    THAT'S THE ALTERNATIVE E-BIT PATENT; CORRECT?

6    A    YES.

7    Q    BUT YOU HAD NEVER HEARD OF UNTIL THE LAWYERS

8    CALLED YOU IN THIS CASE; CORRECT?

9    A    YES.  BUT IT'S PART OF THE STANDARD.

10   Q    ALL RIGHT.  NOW, YOU TOLD US THAT YOU BELIEVE

11   IN A STRONG PATENT SYSTEM; CORRECT?  DO YOU

12   REMEMBER THAT?

13   A    THAT'S WHAT I WOULD LIKE TO LEAVE AS A LEGACY

14   TO MY CHILDREN, YES.

15   Q    SURE.  THAT APPLIES TO APPLE'S PATENTS.

16            MR. VERHOEVEN:  OBJECTION.  BEYOND OF

17   SCOPE OF MY DIRECT EXAM.

18            THE COURT:  SUSTAINED.

19   BY MR. LEE:

20   Q    WE JUST TALKED ABOUT THE SAMSUNG PATENTS;

21   CORRECT?

22   A    I'M SORRY.

23   Q    YOU JUST TALKED ABOUT THE VALIDITY OF THE

24   SAMSUNG PATENTS?

25   A    I DID.

```
 1     Q    CORRECT?

 2     A    YES.

 3     Q    AND BEYOND THE OPINIONS YOU'VE JUST OFFERED,

 4     YOU'VE OFFERED NO OTHER OPINIONS ON THE VALIDITY OF

 5     THE PATENTS; CORRECT?

 6     A    NOT IN COURT TODAY.

 7               MR. LEE:  THANK YOU.

 8               THE COURT:  ALL RIGHT.  TIME IS 3:28.

 9     ANY REDIRECT?

10               MR. VERHOEVEN:  NO.

11               THE COURT:  NO?  ALL RIGHT.  THE WITNESS

12     MAY BE EXCUSED.  ALL RIGHT.  APPLE HAS GOT SIX

13     MINUTES -- ACTUALLY YOU BOTH HAVE SIX MINUTES LEFT.

14               MR. JOHNSON:  I DON'T KNOW WHAT TO DO

15     WITH ALL THAT TIME.

16               THE COURT:  AND I WILL STOP YOU WHEN YOUR

17     TIME IS UP.  NO EXTENSIONS, OKAY?

18               MR. LEE:  YOU GO FIRST.

19               MR. JOHNSON:  I FEEL LIKE I HAVE A BATON.

20               THE COURT:  THE OLYMPIC TORCH IS BEING

21     PASSED.

22               MR. JOHNSON:  YOUR HONOR, SAMSUNG IS

23     GOING TO CALL DR. WOODWARD YANG AS OUR LAST

24     WITNESS, AND JUST WHILE HE'S TAKING THE STAND, I'M

25     GOING TO READ INTO THE RECORD REQUEST FOR ADMISSION
```

```
 1    NUMBER 1966, WHICH WAS A --
 2              THE COURT:  ALL RIGHT.  3:29.  THAT WILL
 3    COUNT TOWARDS YOUR TIME.
 4              MR. JOHNSON:  SO THE QUESTION WAS ASKED
 5    OF APPLE, "ADMIT THAT HUNGFUJIN PRECISION
 6    ELECTRONICS," A COMPANY LIMITED IN CHINA, "RECEIVES
 7    INTEL BASEBAND PROCESSORS ON BEHALF OF APPLE."
 8              APPLE'S RESPONSE:  "APPLE ADMITS REQUEST
 9    NUMBER 1966."
10              THANK YOU.  DR. YANG --
11              THE COURT:  OH, LET ME STOP YOUR TIME,
12    3:29.  I'M STOPPING YOUR TIME.  WE'RE JUST
13    RESWEARING PEOPLE IN.  BELTS AND SUSPENDERS.
14              THE COURT:  PLEASE RAISE YOUR RIGHT HAND.
15                       WOODWARD YANG,
16    BEING RECALLED AS A WITNESS ON BEHALF OF THE
17    DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS
18    EXAMINED AND TESTIFIED AS FOLLOWS:
19              THE WITNESS:  YES, I DO.
20              THE COURT:  THANK YOU.  PLEASE BE SEATED.
21              ALL RIGHT.  IT'S 3:29, GO AHEAD, PLEASE
22    MUCH.
23              MR. JOHNSON:  BRIAN, CAN WE PUT UP PDX
24    42.4, PLEASE.
25    /   /   /
```

30665

1              **DIRECT EXAMINATION**

2     BY MR. JOHNSON:

3     Q     THIS WAS A DEMONSTRATIVE, DR. YANG, THAT WAS

4     USED WITH DR. DOURISH, AND I WANT TO ASK YOU, THEY

5     PUT UP A PICTURE OF THE AM/FM RADIO.  DO YOU THINK

6     THIS WAS A PROPER ANALOGY?

7     A     THIS IS AN IMPROPER ANALOGY.  THIS IS A VERY

8     SIMPLE DEVICE, IT HAS ONE FUNCTIONALITY, WHEREAS

9     THE PATENTS --

10              MR. LEE:  YOUR HONOR, I OBJECT.  THIS IS

11    INFRINGEMENT.

12              MR. JOHNSON:  NO, IT'S NOT.  IT'S IN THE

13    CONTEXT OF VALIDITY.

14              THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

15              THE WITNESS:  THIS SPEAKS SPECIFICALLY

16    TO -- THIS IS A VERY SIMPLE DEVICE, IT HAS ONE

17    FUNCTIONALITY, WHEREAS THE PATENTS ARE TALKING

18    ABOUT COMPLEX DEVICES.  THESE ARE DEVICES THAT ARE

19    CAMERAS, PHONES, MP3 PLAYERS TOGETHER.

20              SO WHEN YOU LOOK AT THEM, YOU NEED TO

21    CONSIDER THE MODE HAS MANY SWITCHES AND WHEN YOU

22    CONSIDER WHAT A MODE IS CALLED, YOU NEED TO

23    CONSIDER HOW ALL THOSE SWITCHES ARE SET.

24              SO, IN FACT, THE PATENTS ARE TALKING

25    ABOUT APPS OR APPLICATION PROGRAMS THAT RUN ON

```
1    THESE DEVICES AND WHEN THOSE DEVICES RUN, THEY HAVE
2    MODES.
3    BY MR. JOHNSON:
4    Q    DR. DOURISH ALSO TALKED ABOUT THE LG PATENT
5    APPLICATION.  RYAN, CAN WE PLEASE PUT UP 42.24.
6             DOES THE LG PATENT APPLICATION SATISFY
7    THE LAST LIMITATION OF CLAIM 10 OF THE '893 PATENT,
8    THE BOOKMARKING PATENT?
9    A    NO, THIS PATENT APPLICATION DOES NOT SATISFY
10   THE LAST LIMITATION OF THE '893 PATENT.  THE LAST
11   LIMITATION OF THE '893 PATENT SPECIFICALLY SAYS YOU
12   HAVE TO GO FROM A DISPLAY MODE TO A CAMERA
13   PHOTOGRAPHING MODE BACK TO THE DISPLAY MODE TO SEE
14   THE BOOKMARK.
15            IN FACT, WHEN YOU READ THIS OVER HERE,
16   IT'S JUST TALKING ABOUT WHAT'S GOING ON BETWEEN
17   DIFFERENT DISPLAY MODES.  THERE IS NO TALK ABOUT
18   GOING FROM THE DISPLAY MODE TO A CAMERA MODE BACK
19   TO THE DISPLAY MODE.  THAT'S MUSIC.
20   Q    LET'S TALK ABOUT THE BACKGROUND MUSIC PATENT,
21   THE '711 PATENT.  APPLE'S EXPERT, DR. GIVARGIS,
22   SAID THE K700 PHONE RENDERS THE '711 PATENT OBVIOUS
23   AND IT WASN'T REVIEWED BY THE PATENT OFFICE.  DO
24   YOU AGREE?
25   A    I AGREE THAT THEY DIDN'T LOOK AT THE 700
```

```
 1    PHONE.  BUT THE PATENT OFFICE ACTUALLY CONSIDERED A

 2    MORE ADVANCED PHONE, WHICH IS CALLED THE K750, AND

 3    THE PATENT OFFICE SPECIFICALLY HAD THE USER MANUAL

 4    FOR THAT.

 5            AND THE FUNCTIONALITIES AND CAPABILITIES

 6    OF THE PHONE ARE EXACTLY THE SAME.  AND, IN FACT,

 7    THE THING THAT'S MISSING FROM THE K750 AND K700 IS

 8    THE IMPORTANT PART ABOUT A CONTROLLER GENERATING A

 9    MUSIC BACKGROUND PLAY OBJECT.

10    Q    DO YOU AGREE WITH DR. GIVARGIS THAT THE WONG

11    PATENT PROVIDES MOTIVATION TO INCLUDE AN APPLET?

12    A    NO, NOT AT ALL.  THE WONG PATENT IS ACTUALLY

13    FROM SUN MICROSYSTEMS, THE PEOPLE WHO WROTE JAVA,

14    SO IT'S ALL ABOUT JAVA APPLICATIONS AND JAVA

15    APPLETS.

16            AND SPECIFICALLY THE PATENT OFFICE HAD

17    SEVERAL REFERENCES DISCUSSING JAVA APPLICATIONS AND

18    JAVA APPLETS IN THERE AS WELL, AND JAVA

19    APPLICATIONS AND JAVA APPLETS, AS WE KNOW, ARE

20    DIFFERENT FROM THE APPLET THAT WE HAVE IN THE '711

21    PATENT.

22            THE APPLET WE HAVE IN THE '711 PATENT, AS

23    WE KNOW THE COURT HAS DEFINED FOR US, IS AN

24    APPLICATION DESIGNED TO RUN WITHIN AN APPLICATION

25    MODULE.
```

1    Q    LET'S TALK ABOUT THE '460 PATENT.  IN LOOKING

2    AT THE VALIDITY OF THE '460 PATENT, WHAT'S YOUR

3    OPINION ABOUT WHETHER THE PATENT REQUIRES THAT THE

4    THREE CORE FUNCTIONS BE PERFORMED IN A CERTAIN

5    SEQUENCE?

6    A    THE THREE CORE FUNCTIONS, AS I EXPLAINED MANY

7    TIMESM CAN BE PERFORMED IN ANY ORDER.  AND IN

8    PARTICULAR, I BELIEVE THAT THERE WAS ACTUALLY CLAIM

9    1, IF I COULD HAVE THAT UP, I DON'T KNOW -- THERE

10   WAS THIS IMPLICATION THAT WHEN YOU LOOKED AT THE

11   SECOND E-MAIL MODE, YOU WOULD SEE AN IMAGE, AND THE

12   IDEA THAT AFTER YOU SAW THAT IMAGE, YOU HAVE TO

13   IMMEDIATELY SEQUENTIALLY SCROLL THROUGH THE IMAGES,

14   AND THERE'S AN IMPLICATION THAT C NEEDS TO

15   IMMEDIATELY FOLLOW B.

16          IN FACT, THAT'S NOT TRUE AT ALL.  IN

17   FACT, IF YOU LOOK AT THIS, AND YOU CAN SEE THAT

18   IMAGE AND YOU CAN SEE OTHER IMAGES OVER HERE.

19          YOU CAN ALSO IMAGINE THAT LOGICALLY THIS

20   COULD MAKE SENSE IF C WERE TO FOLLOW E OR IF C WERE

21   TO COME BEFORE B.

22          IN FACT, IF YOU LOOK AT THE PATENT

23   SPECIFICATION IN FIGURE 8, THE FLOW CHART THAT THEY

24   SHOW ACTUALLY SHOWS THE SCROLLING OF IMAGES

25   OCCURRING BEFORE ENTERING THE SECOND E-MAIL

1    TRANSMISSION MODE.

2    Q    NOW, DR. SRIVASTAVA, APPLE'S EXPERT, COMBINED

3    THREE DIFFERENT REFERENCES, THE SUSO, HARRIS, AND

4    YOSHIDA REFERENCE TO SAY THE '460 PATENT WAS

5    OBVIOUS.  DO YOU AGREE WITH HIS OPINION?

6    A    I ABSOLUTELY DISAGREE.  THE FIRST TWO PATENTS,

7    THE SUSO PATENT AND HARRIS PATENT ACTUALLY DO NOT

8    DISCLOSE A SECOND E-MAIL TRANSMISSION MODE WHERE

9    YOU CAN ACTUALLY SEE THE PICTURE AND COMPOSE A

10   MESSAGE THAT YOU WANT TO SEND.

11           AND THEN HE SAYS THAT THE YOSHIDA PATENT

12   ACTUALLY HAS THIS.  BUT IF YOU LOOK AT WHAT HE

13   DISPLAYED UP FOR THE YOSHIDA PATENT, HE'S -- IT'S

14   NOT DISPLAYING THE IMAGE.  IT'S ACTUALLY JUST

15   ATTACHING AN IMAGE FILE, SO THE IMAGE IS NOT

16   VISIBLE IN THE E-MAIL THAT YOU'RE SENDING.  SO THIS

17   IS NOT A SECOND E-MAIL TRANSMISSION MODE.

18           MR. JOHNSON:  YOUR HONOR, NO FURTHER

19   QUESTIONS.

20           THE COURT:  ALL RIGHT.  THE TIME IS

21   EXPIRED.  THANK YOU.

22           MR. JOHNSON:  I CROSSED THE FINISH LINE.

23           THE COURT:  YES, THAT'S LIGHT.

24           ALL RIGHT.  MR. LEE, YOU'VE GOT SIX

25   MINUTES.

```
 1              MR. LEE:  I'M GOING TO TRY TO FOLLOW

 2     ACROSS THE FINISH LINE.

 3              THE COURT:  3:34.  GO AHEAD.

 4                  CROSS-EXAMINATION

 5     BY MR. LEE:

 6     Q    DR. YANG, LET'S GO A LITTLE BIT SLOW SO THE

 7     JURY GETS IT.  ON THE '711 PATENT, IS IT YOUR

 8     TESTIMONY TO THIS JURY THAT THE PATENT OFFICE

 9     ACTUALLY HAD A K700 PHONE?

10     A    NO.  I BELIEVE I SAID THEY HAD THE K750 USER

11     MANUAL.

12     Q    THEY DIDN'T HAVE ANY PHONE AT ALL; CORRECT?

13     A    THEY HAD THE K750 USER MANUAL, WHICH SHOWS THE

14     SAME FUNCTIONALITY AS THE K700 AND K750.

15     Q    DR. YANG, DID THEY HAVE THE PHONE OR NOT?

16     A    THEY HAD THE SAME USER MANUAL WHICH HAS THE

17     SAME FUNCTIONALITY AS THE K700.

18     Q    THAT'S A NO, RIGHT?  THEY DIDN'T HAVE THE

19     PHONE?

20     A    NO.

21     Q    OKAY.  NOW, TURN, IF YOU WOULD, IN YOUR BINDER

22     TO VOLUME 1, TAB 4.

23     A    VOLUME 1, TAB 4.  IT'S A WHITE BINDER?  OR --

24              MR. LEE:  WHITE BINDER?  WHITE BINDER,

25     YES.
```

1      Q      AND YOU'LL FIND THE FILE HISTORY OF THE '460

2      PATENT?

3      A      OKAY.

4      Q      DO YOU SEE THAT?  YOU REVIEWED THAT; CORRECT?

5      A      YES.  I PRESUME THAT YOU'RE REPRESENTING THIS

6      CORRECTLY.  YOU DON'T WANT ME TO LOOK THROUGH

7      EVERYTHING.

8      Q      THAT'S JX 1066?

9      A      YES.

10             MR. LEE:  WE OFFER IT, YOUR HONOR.

11             THE COURT:  ANY OBJECTION?

12             MR. JOHNSON:  YOUR HONOR, I THINK IT'S

13     BEEN OFFERED FOR PURPOSES OF INFRINGEMENT THIS

14     MORNING.

15             MR. LEE:  NO, THIS IS -- THIS GOES TO THE

16     INVALIDITY TESTIMONY, THE FILE HISTORY.

17             THE COURT:  THE FILE HISTORY OF THE '460.

18     IT'S ADMITTED.

19             MR. LEE:  IT'S A JOINT EXHIBIT.

20             MR. JOHNSON:  I DIDN'T ASK ANY QUESTIONS

21     ABOUT THE FILE HISTORY.  IT'S OUTSIDE THE SCOPE,

22     YOUR HONOR.

23             MR. LEE:  THAT IS THE FILE HISTORY OF THE

24     PATENT THAT HE JUST GAVE INVALIDITY ON.

25             THE COURT:  IT'S ADMITTED.

```
 1              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

 2              1066, HAVING BEEN PREVIOUSLY MARKED FOR

 3              IDENTIFICATION, WAS ADMITTED INTO

 4              EVIDENCE.)

 5    BY MR. LEE:

 6    Q    NOW, JUST A COUPLE MORE QUESTIONS.  DR. YANG,

 7    YOU UNDERSTAND THAT THERE'S A CONCEPT CALLED

 8    SECONDARY CONSIDERATION; CORRECT?

 9    A    YES.

10    Q    SECONDARY CONSIDERATIONS ARE REAL WORLD THINGS

11    JURORS CAN LOOK AT TO FIGURE OUT IF THERE'S BEEN AN

12    INVENTION OR NOT; CORRECT?

13    A    YES.

14    Q    RIGHT.  SO ONE OF THE REAL WORLD THINGS YOU

15    CAN LOOK AT IS WHETHER A PRODUCT, BASED UPON THE

16    INVENTION, HAS BEEN COMMERCIALLY SUCCESSFUL;

17    CORRECT?

18    A    THAT IS A SECONDARY CONSIDERATION, YES.

19    Q    BUT WE KNOW FOR THE '893, THE '460 AND THE

20    '711 THAT AS FAR AS YOU KNOW, SAMSUNG TOOK THE

21    POSITION IN THIS CASE THAT IT HAD NO PRODUCT,

22    SUCCESSFUL OR OTHERWISE, THAT PRACTICED THESE

23    PATENTS; CORRECT?

24    A    COULD YOU REPEAT THE QUESTION AGAIN?  I THINK

25    IT'S VERY IMPORTANT.
```

1

2

3

4                        CERTIFICATE OF REPORTERS

5

6

7

8            WE, THE UNDERSIGNED OFFICIAL COURT

9    REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF OUR ABILITY.

19

20                        /S/
                     _____
21                   LEE-ANNE SHORTRIDGE, CSR, CRR
                     CERTIFICATE NUMBER 9595
22

23                        /S/
                     _____
24                   IRENE RODRIGUEZ, CSR, CRR
                     CERTIFICATE NUMBER 8074
25
                     DATED:  AUGUST 17, 2012

# EXHIBIT 11

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5

       APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6      CORPORATION,                )
                                   )  SAN JOSE, CALIFORNIA
7                   PLAINTIFF,     )
                                   )  AUGUST 21, 2012
8             VS.                  )
                                   )  VOLUME 13
9      SAMSUNG ELECTRONICS CO.,    )
       LTD., A KOREAN BUSINESS     )  PAGES 3941-4264
10     ENTITY; SAMSUNG             )
       ELECTRONICS AMERICA,        )
11     INC., A NEW YORK            )
       CORPORATION; SAMSUNG        )
12     TELECOMMUNICATIONS          )
       AMERICA, LLC, A DELAWARE    )
13     LIMITED LIABILITY           )
       COMPANY,                    )
14                                 )
                    DEFENDANTS.    )
15     _____

16            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22

23   OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24                          IRENE RODRIGUEZ, CSR, CRR
                            CERTIFICATE NUMBER 8074
25

```
 1    A P P E A R A N C E S:

 2    FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                     BY:  HAROLD J. MCELHINNY
 3                                    MICHAEL A. JACOBS
                                      RACHEL KREVANS
 4                             425 MARKET STREET
                               SAN FRANCISCO, CALIFORNIA  94105
 5

 6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
      APPLE:                 HALE AND DORR
 7                           BY:  WILLIAM F. LEE
                             60 STATE STREET
 8                           BOSTON, MASSACHUSETTS  02109

 9                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11    FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                          OLIVER & HEDGES
12                        BY:  CHARLES K. VERHOEVEN
                          50 CALIFORNIA STREET, 22ND FLOOR
13                        SAN FRANCISCO, CALIFORNIA  94111

14                           BY:  VICTORIA F. MAROULIS
                                  KEVIN P.B. JOHNSON
15                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
16                           REDWOOD SHORES, CALIFORNIA  94065

17                           BY:  MICHAEL T. ZELLER
                                  WILLIAM C. PRICE
18                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
19                           LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

4943

INDEX OF PROCEEDINGS

CLOSING ARGUMENT BY MR. MCELHINNY       P. 4075

CLOSING ARGUMENT BY MR. VERHOEVEN       P. 4134

REBUTTAL CLOSING ARGUMENT BY MR. LEE    P. 4216

REBUTTAL CLOSING ARGUMENT              P. 4247
    BY MR. VERHOEVEN

```
 1    DESIGN.

 2              IT IS MY JOB AS A JUDGE TO INTERPRET FOR

 3    YOU WHAT IS CLAIMED BY THE PATENTS.  YOU MUST

 4    ACCEPT MY INTERPRETATIONS AS CORRECT.  MY

 5    INTERPRETATIONS SHOULD NOT BE TAKEN AS AN

 6    INDICATION THAT I HAVE AN OPINION ONE WAY OR

 7    ANOTHER REGARDING THE ISSUES OF INFRINGEMENT AND

 8    INVALIDITY.  THE DECISIONS REGARDING INFRINGEMENT

 9    AND INVALIDITY ARE YOURS TO MAKE.

10              WHEN CONSIDERING THE DESIGN PATENTS, YOU

11    SHOULD VIEW CERTAIN FEATURES IN THE DRAWINGS IN

12    THIS WAY:

13              THE D'677 PATENT CLAIMS THE ORNAMENTAL

14    DESIGN OF AN ELECTRONIC DEVICE AS SHOWN IN FIGURES

15    1 THROUGH 8.  THE BROKEN LINES IN THE D'677 PATENT

16    CONSTITUTE UNCLAIMED SUBJECT MATTER.

17              THE USE OF SOLID BLOCK SURFACE SHADING IN

18    THE D'677 PATENT REPRESENTS THE COLOR BLACK.  THE

19    USE OF OBLIQUE LINE SHADING ON THE D'677 PATENT IS

20    USED TO SHOW A TRANSPARENT, TRANSLUCENT OR HIGHLY

21    POLISHED OR REFLECTIVE SURFACE.

22              THE D'087 PATENT COVERS -- I'M SORRY --

23    CLAIMS, EXCUSE ME, THE ORNAMENTAL DESIGN OF AN

24    ELECTRONIC DEVICE AS SHOWN IN FIGURES 1 THROUGH 14.

25    THE BROKEN LINES IN THE D'087 PATENT CONSTITUTE
```

10007

1    UNCLAIMED SUBJECT MATTER.

2            THUS, THE D'087 PATENT CLAIMS THE FRONT

3    FACE, A BEZEL ENCIRCLING THE FRONT FACE OF THE

4    PATENTED DESIGN THAT EXTENDED FROM THE FRONT OF THE

5    PHONE TO ITS SIDES, AND A FLAT CONTOUR OF THE FRONT

6    FACE, BUT DOES NOT CLAIM THE REST OF THE ARTICLE OF

7    MANUFACTURE.

8            THE D'889 PATENT CLAIMS THE ORNAMENTAL

9    DESIGN OF AN ELECTRONIC DEVICE AS SHOWN IN FIGURES

10   1 THROUGH 9.

11           (PAUSE IN PROCEEDINGS.)

12           THE COURT:  THE BROKEN LINES DEPICTING

13   THE HUMAN FIGURE IN FIGURE 9 DO NOT FORM A PART OF

14   THE CLAIMED DESIGN.

15           THE OTHER BROKEN LINE ON THE OTHER

16   FIGURES ARE PART OF THE CLAIMED DESIGN.

17           THE D'889 ALSO INCLUDES OBLIQUE LINE

18   SHADING ON SEVERAL OF THE FIGURES.  THE OBLIQUE

19   LINE SHADING IN FIGURES 1 THROUGH 3 AND FIGURE 9

20   DEPICTS A TRANSPARENT, TRANSLUCENT OR HIGHLY

21   POLISHED OR REFLECTIVE SURFACE FROM THE TOP

22   PERSPECTIVE OF THE CLAIMED DESIGN, THE TOP VIEW OF

23   THE CLAIMED DESIGN, AND THE BOTTOM PERSPECTIVE VIEW

24   OF THE CLAIMED DESIGN.

25           THE D'305 PATENT CLAIMS THE ORNAMENTAL

```
 1    DESIGN FOR A GRAPHICAL USER INTERFACE FOR A DISPLAY

 2    SCREEN OR PORTION THEREOF AS SHOWN IN FIGURES 1

 3    THROUGH 2.  THE BROKEN LINE SHOWING OF A DISPLAY

 4    SCREEN IN BOTH VIEWS FORMS NO PART OF THE CLAIMED

 5    DESIGN.

 6              NUMBER 44.  TO PROVE THAT ANY SAMSUNG

 7    ENTITY INFRINGED ANY OF APPLE'S DESIGN PATENTS,

 8    APPLE MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE

 9    THAT THE SAMSUNG ENTITY HAS INFRINGED THE PATENT.

10              NUMBER 45.  I WILL NOW INSTRUCT YOU AS TO

11    THE RULES YOU MUST FOLLOW WHEN DECIDING WHETHER

12    APPLE HAS PROVEN THAT ONE OR MORE OF THE SAMSUNG

13    ENTITIES (SAMSUNG ELECTRONICS AMERICA, SAMSUNG

14    TELECOMMUNICATIONS AMERICA, AND SAMSUNG ELECTRONICS

15    COMPANY) HAS DIRECTLY INFRINGE THE D'677, D'087,

16    D'305 AND/OR D'889 DESIGN PATENTS.

17              AS WITH UTILITY PATENTS, PATENT LAW GIVES

18    THE OWNER OF A VALID DESIGN PATENT THE RIGHT TO

19    EXCLUDE OTHERS FROM IMPORTING, MAKING, USING,

20    OFFERING TO SELL OR SELLING THE PATENTED DESIGNS

21    WITHIN THE UNITED STATES DURING THE TERM OF THE

22    PATENT.

23              ANY PERSON OR COMPANY THAT HAS ENGAGED IN

24    ANY OF THOSE ACTS WITHOUT THE DESIGN PATENT OWNER'S

25    PERMISSION INFRINGES THE PATENT.
```

1          IN DECIDING WHETHER A SALE HAS TAKEN

2     PLACE WITHIN THE UNITED STATES, YOU MAY FIND THE

3     FOLLOWING GUIDELINES HELPFUL TO YOUR ANALYSIS.  THE

4     LOCATION OF THE SALE DEPENDS ON MANY FACTORS, AND

5     YOU MAY FIND THAT THE SALE OCCURRED IN SEVERAL

6     PLACES.

7          A SALE OCCURS WHERE THE ESSENTIAL

8     ACTIVITIES OF THE SALE TAKE PLACE.  THE ESSENTIAL

9     ACTIVITIES INCLUDE, FOR EXAMPLE, NEGOTIATING THE

10    CONTRACT AND PERFORMING THE OBLIGATIONS UNDER THE

11    CONTRACT.

12         APPLE BEARS THE BURDEN OF PROVING BY A

13    PREPONDERANCE OF THE EVIDENCE THAT EACH DEVICE

14    INFRINGES EACH SEPARATE PATENT.  THEREFORE, YOU,

15    THE JURY, MUST DETERMINE THE INFRINGEMENT FOR EACH

16    PATENT SEPARATELY, CONSIDERING EACH INDIVIDUAL

17    DEVICE SEPARATELY.

18         NUMBER 46.  TO DETERMINE DIRECT

19    INFRINGEMENT OF A DESIGN PATENT, YOU MUST COMPARE

20    THE OVERALL APPEARANCES OF THE ACCUSED DESIGN AND

21    THE CLAIMED DESIGN.

22         IF YOU FIND BY A PREPONDERANCE OF THE

23    EVIDENCE THAT THE OVERALL APPEARANCE OF AN ACCUSED

24    SAMSUNG DESIGN IS SUBSTANTIALLY THE SAME AS THE

25    OVERALL APPEARANCE OF THE CLAIMED APPLE DESIGN

1    PATENT AND THAT THE ACCUSED DESIGN WAS MADE, USED,

2    SOLD, OFFERED FOR SALE OR IMPORTED WITHIN THE

3    UNITED STATES, YOU MUST FIND THAT THE ACCUSED

4    DESIGN INFRINGED THE CLAIMED DESIGN.

5            TWO DESIGNS ARE SUBSTANTIALLY THE SAME

6    IF, IN THE EYE OF AN ORDINARY OBSERVER, GIVING SUCH

7    ATTENTION AS A PURCHASER USUALLY GIVES, THE

8    RESEMBLANCE BETWEEN THE TWO DESIGNS IS SUCH AS TO

9    DECEIVE SUCH AN OBSERVER, INDUCING HIM TO PURCHASE

10   ONE SUPPOSING IT TO BE THE OTHER.

11           YOU DO NOT NEED, HOWEVER, TO FIND THAT

12   ANY PURCHASERS ACTUALLY WERE DECEIVED OR CONFUSED

13   BY THE APPEARANCE OF THE ACCUSED SAMSUNG PRODUCTS.

14           YOU SHOULD CONSIDER ANY PERCEIVED

15   SIMILARITIES OR DIFFERENCES BETWEEN THE PATENTED

16   AND ACCUSED DESIGNS.  MINOR DIFFERENCES SHOULD NOT

17   PREVENT A FINDING OF INFRINGEMENT.

18           THIS DETERMINATION OF WHETHER TWO DESIGNS

19   ARE SUBSTANTIALLY THE SAME WILL BENEFIT FROM

20   COMPARING THE TWO DESIGNS WITH PRIOR ART.  YOU MUST

21   FAMILIARIZE YOURSELF WITH THE PRIOR ART ADMITTED AT

22   TRIAL IN MAKING YOUR DETERMINATION OF WHETHER THERE

23   HAS BEEN DIRECT INFRINGEMENT.

24           YOU MAY FIND THE FOLLOWING GUIDELINES

25   HELPFUL TO YOUR ANALYSIS:

1              THE PLACEMENT AND ORNAMENTATION OF A LOGO

2      MAY ALTER THE OVERALL DESIGN.  HOWEVER, THE USE OF

3      A MARK OR LOGO TO IDENTIFY THE SOURCE OF AN

4      OTHERWISE INFRINGING DESIGN WILL NOT AVOID

5      INFRINGEMENT.

6              WHEN THE CLAIMED DESIGN IS VISUALLY CLOSE

7      TO PRIOR ART DESIGN, SMALL DIFFERENCES BETWEEN THE

8      ACCUSED DESIGN AND THE CLAIMED DESIGN MAY BY

9      IMPORTANT IN ANALYZING WHETHER THE OVERALL

10     APPEARANCES OF THE ACCUSED AND CLAIMED DESIGNS ARE

11     SUBSTANTIALLY THE SAME.

12             IF THE ACCUSED DESIGN INCLUDES A FEATURE

13     OF THE CLAIMED DESIGN THAT DEPARTS CONSPICUOUSLY

14     FROM THE PRIOR ART, YOU MAY FIND THAT FEATURE

15     IMPORTANT IN ANALYZING WHETHER THE OVERALL

16     APPEARANCE OF THE ACCUSED AND CLAIMED DESIGNS ARE

17     SUBSTANTIALLY THE SAME.

18             IF THE ACCUSED DESIGN IS VISUALLY CLOSER

19     TO THE CLAIMED DESIGN THAN IT IS TO THE CLOSEST

20     PRIOR ART, YOU MAY FIND THIS COMPARISON IMPORTANT

21     IN ANALYZING WHETHER THE OVER APPEARANCE OF THE

22     ACCUSED AND CLAIMED DESIGNS ARE SUBSTANTIALLY THE

23     SAME.

24             YOU SHOULD NOT CONSIDER THE SIZE OF THE

25     ACCUSED PRODUCTS IF THE ASSERTED DESIGN PATENT DID

```
 1    SLIGHTLY DIFFERENT NOT SPECIFY THE SIZE OF THE

 2    DESIGN.

 3              WHILE THESE GUIDELINES MAY BE HELPFUL,

 4    THE TEST FOR INFRINGEMENT IS WHETHER THE OVERALL

 5    APPEARANCES OF THE ACCUSED DESIGN AND THE CLAIMED

 6    DESIGN ARE SUBSTANTIALLY THE SAME.

 7              WHETHER SAMSUNG KNEW ITS PRODUCTS

 8    INFRINGED OR EVEN KNEW OF APPLE DESIGN PATENTS DOES

 9    NOT MATTER IN DETERMINING INFRINGE ACTION.

10              47.  IN DECIDING THE ISSUE OF

11    INFRINGEMENT, YOU MUST COMPARE SAMSUNG'S ACCUSED

12    PRODUCTS TO THE DESIGN PATENTS.  IN ADDITION, YOU

13    HAVE HEARD EVIDENCE ABOUT CERTAIN APPLE PRODUCTS

14    AND MODELS.  IF YOU DETERMINE THAT ANY OF APPLE'S

15    PRODUCTS OR MODELS ARE SUBSTANTIALLY THE SAME AS AN

16    APPLE PATENT DESIGN, AND THAT THE PRODUCT OR MODEL

17    HAS NO SIGNIFICANT DISTINCTIONS WITH THE DESIGN,

18    YOU MAY COMPARE THE PRODUCT OR MODEL DIRECTLY TO

19    THE ACCUSED SAMSUNG PRODUCTS.  THIS MAY FACILITATE

20    IF YOU DETERMINE THAT A PARTICULAR APPLE OR PRODUCT

21    DOES NOT EMBODY A PATENTED DESIGN, YOU MAY NOT

22    COMPARE IT TO THE ACCUSED DEVICES.

23              NUMBER 48.  I WILL NOW INSTRUCT YOU ON

24    THE RULES YOU MUST FOLLOW IN DECIDING WHETHER

25    SAMSUNG HAS PROVEN THAT THE APPLE DESIGN PATENTS
```

1    ARE INVALID.  BEFORE DISCUSSING THE SPECIFIC RULES,

2    I WANT TO REMIND YOU ABOUT THE STANDARD OF PROOF

3    THAT APPLIES TO THIS DEFENSE.  TO PROVE INVALIDITY

4    OF ANY DESIGN PATENT, SAMSUNG MUST PERSUADE YOU BY

5    CLEAR AND CONVINCING EVIDENCE THAT THE DESIGN

6    PATENT IS INVALID.

7            49.  BEFORE I DESCRIBE HOW TO ASSESS

8    WHETHER APPLE'S DESIGN PATENTS ARE INVALID, I WILL

9    INSTRUCT YOU ABOUT DOCUMENTS AND THINGS CALLED

10   "PRIOR ART."

11           IN GENERAL, PRIOR ART INCLUDES THINGS

12   THAT EXISTED BEFORE THE CLAIMED DESIGN, THAT WERE

13   PUBLICLY KNOWN IN THIS COUNTRY, OR USED IN A

14   PUBLICLY ACCESSIBLE WAY IN THIS COUNTRY, OR THAT

15   WERE PATENTED OR DESCRIBED IN A PUBLICATION IN ANY

16   COUNTRY.

17           SPECIFICALLY, PRIOR ART INCLUDES ANY OF

18   THE FOLLOWING ITEMS RECEIVED INTO EVIDENCE DURING

19   TRIAL:

20           IF THE CLAIMED DESIGN WAS ALREADY

21   PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS IN THE

22   UNITED STATES BEFORE THE DATE OF THE INVENTION OF

23   THE CLAIMED DESIGN;

24           IF THE CLAIMED DESIGN WAS ALREADY

25   PATENTED OR DESCRIBED IN A PRINTED PUBLICATION

1    ANYWHERE IN THE WORLD BEFORE THE DATE OF INVENTION

2    OF THE CLAIMED DESIGN.  A REFERENCE IS A "PRINTED

3    PUBLICATION" IF IT IS ACCESSIBLE TO THOSE

4    INTERESTED IN THE FIELD, EVEN IF IT IS DIFFICULT TO

5    FIND;

6          IF THE CLAIMED DESIGN WAS ALREADY

7    DESCRIBED ANOTHER IN U.S. PATENT OR PUBLISHED U.S.

8    PATENT APPLICATION THAT WAS BASED ON AN APPLICATION

9    FILED BEFORE THE DATE OF THE INVENTION OF THE

10   CLAIMED DESIGN;

11         IF THE CLAIMED DESIGN WAS ALREADY MADE BY

12   SOMEONE ELSE IN THE UNITED STATES BEFORE THE DATE

13   OF INVENTION, IF THAT OTHER PERSON HAD NOT

14   ABANDONED, SUPPRESSED OR CONCEALED HIS OR HER

15   INVENTION.

16         SINCE THE DATE OF INVENTION OF THE D'677

17   AND D'087 IS IN DISPUTE IN THIS CASE, YOU MUST

18   DETERMINE WHETHER APPLE AS PROVED THE DATES THESE

19   DESIGNS WERE INVENTED.

20         THE DATE OF INVENTION OCCURS WHEN THE

21   INVENTION IS SHOWN IN ITS COMPLETE FORM BY

22   DRAWINGS, DISCLOSE TO ANOTHER OR OTHER FORMS OF

23   EVIDENCE PRESENTED AT TRIAL.

24         IF YOU DETERMINE THAT APPLE HAS NOT

25   PROVED WHEN THE PATENTS WERE INVENTED, YOU MUST

1    ASSUME THAT THE DATE OF THE INVENTION OF THE

2    PATENTED DESIGNS WAS NOT UNTIL THE FILING DATE OF

3    THE PATENT.

4              THE APPLE DESIGN PATENTS HAVE THE

5    FOLLOWING FILING DATES:

6              D'677 PATENT, JANUARY 5, 2007.

7              D'087 PATENT, JANUARY 5, 2007.

8              D'889 PATENT, MARCH 17TH, 2004.

9              D'305 PATENT, JUNE 23RD, 2007.

10             NUMBER 50.  A DESIGN PATENT IS INVALID IF

11   IT IS NOT NEW.  IF A DESIGN PATENT IS NOT NEW, WE

12   SAY IT IS "ANTICIPATED" BY A PRIOR ART REFERENCE.

13   FOR A CLAIMED DESIGN PATENT TO BE INVALID BECAUSE

14   IT IS ANTICIPATED, SAMSUNG MUST PROVE BY CLEAR AND

15   CONVINCING EVIDENCE THAT THERE IS A SINGLE PRIOR

16   ART REFERENCE THAT IS SUBSTANTIALLY THE SAME AS THE

17   CLAIMED DESIGN PATENT.

18             THE SAME STANDARD OF SUBSTANTIAL

19   SIMILARITY THAT APPLIED TO INFRINGEMENT ALSO

20   APPLIES TO ANTICIPATION.  THAT IS, THE SINGLE PRIOR

21   ART REFERENCE IN THE CLAIMED DESIGN PATENT ARE

22   SUBSTANTIALLY SAME IF, IN THE EYE OF AN ORDINARY

23   OBSERVER, GIVING SUCH ATTENTION AS A PURCHASER

24   USUALLY GIVES, THE RESEMBLANCE BETWEEN THE TWO

25   DESIGNS IS SUCH AS TO DECEIVE SUCH AN OBSERVER,

1

2

3

4                        <u>CERTIFICATE OF REPORTERS</u>

5

6

7              WE, THE UNDERSIGNED OFFICIAL COURT

8    REPORTERS OF THE UNITED STATES DISTRICT COURT FOR

9    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

10   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

11   CERTIFY:

12             THAT THE FOREGOING TRANSCRIPT,

13   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

14   CORRECT TRANSCRIPT OF OUR SHORTHAND NOTES TAKEN AS

15   SUCH OFFICIAL COURT REPORTERS OF THE PROCEEDINGS

16   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

17   TRANSCRIPTION TO THE BEST OF OUR ABILITY.

18

19                      /S/
                    _____
20                  LEE-ANNE SHORTRIDGE, CSR, CRR
                    CERTIFICATE NUMBER 9595
21

22                      /S/
                    _____
23                  IRENE RODRIGUEZ, CSR, CRR
                    CERTIFICATE NUMBER 8074
24

25                  DATED:  AUGUST 21, 2012