HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
JENNIFER LEE TAYLOR (CA SBN 161368)
jtaylor@mofo.com
ALISON M. TUCHER (CA SBN 171363)
atucher@mofo.com
RICHARD S.J. HUNG (CA SBN 197425)
rhung@mofo.com
JASON R. BARTLETT (CA SBN 214530)
jasonbartlett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 11-cv-01846-LHK (PSG)<br><br>**DECLARATION OF MARYLEE ROBINSON IN SUPPORT OF APPLE'S MOTIONS FOR A PERMANENT INJUNCTION, FOR DAMAGES ENHANCEMENT, FOR SUPPLEMENTAL DAMAGES AND FOR PREJUDGMENT INTEREST**<br><br>**PUBLIC REDACTED VERSION** |

I, Marylee Robinson, hereby declare as follows:

## I.    BACKGROUND

1.    I am a Director with Invotex Group, a national accounting, economic, financial consulting and intellectual property management firm that specializes in providing financial analyses related to complex financial transactions, disputes and litigation, investigations, reorganizations, insurance and valuations.  I have over 10 years of experience providing a variety of litigation consulting services, including commercial damages, fraud investigation, and forensic accounting, as well consulting on restructuring and insolvency matters.  I was licensed by the State of Maryland as a Certified Public Accountant in 2007.  My resume, attached as **Exhibit 1**, lists my work experience and academic degrees as well as the following designations that I have received from multiple professional associations.

- Association of Insolvency and Restructuring Advisors (AIRA) - designated as Certified Insolvency and Restructuring Advisor (CIRA) in 2007
- American Institute of Certified Public Accountants (AICPA) - designated as Certified in Financial Forensics (CFF) in 2009
- Association of Certified Fraud Examiners (ACFE) - designated as Certified Fraud Examiner (CFE) in 2009

2.    My business address is 1637 Thames Street, Baltimore, Maryland 21231.

3.    I have played a substantial role in Apple's intellectual property dispute with Samsung since September 2011, working closely with Terry Musika at all stages of the case.  I assisted Mr. Musika with the four declarations and three expert reports he issued in this case leading up to trial.  I assisted him in the preparation for his trial testimony.  I attended portions of the trial testimony.  I have provided analysis and supervision with respect to all aspects of Invotex Group's engagement by Apple.  As such, I am intimately familiar with the facts of this case, Mr. Musika's prior analysis, and, in particular, the harm Apple has experienced due to Samsung's conduct.

4.      Terry Musika recently received a medical diagnosis that requires urgent treatment, and that has and will make him unavailable to assist in the engagement for Apple for an uncertain amount of time.  Mr. Musika previously prepared and authorized the declaration dated August 29, 2012, which is being submitted in support of Apple's motion for a permanent injunction, and I affixed his signature to the declaration based on his authorization.   I am submitting this declaration to present the Court with additional information and calculations not included in Mr. Musika's declaration due to events and analysis that occurred after that time.

5.      This declaration is divided into two main sections.  The first section is submitted in support of Apple's request for prejudgment interest and supplemental damages in connection with Apple Inc.'s Motion for Amended Judgment, Judgment as a Matter of Law (Renewed), and New Trial.   The second section is submitted in support of Apple's request for willfulness enhancements and injunctive relief in connection with Apple Inc.'s Motion for Damages Enhancements and Permanent Injunction.

## II.      SUPPLEMENTAL DAMAGES AND PREJUDGMENT INTEREST

### A.      Supplemental Damages

6.      In connection with trial of this matter, Samsung provided sales and financial information current only through June 30, 2012.[1]  As a result, the damages calculations included in Mr. Musika's and Mr. Wagner's testimony and trial exhibits only addressed sales up to this date.[2]

7.      Apple seeks compensation in the form of a supplemental damages award for Samsung's sales of additional infringing and diluting products after June 30, 2012 until the date that a final amended judgment is entered in this action.  The purpose of the following analysis is to prepare a projection of Apple's supplemental damages through December 31, 2012, as well as

---

[1] *See, e.g.*, Exhibit 9 (Sales of Accused Products, **JX1500**).

[2] *See* Dkt. No. 1554 at 3 ("Apple and Samsung by agreement exchanged documents reflecting financial results updated for periods between April and June 2012. . . . Apple and Samsung by agreement exchanged updated plaintiff's and defendant's exhibits that incorporate the Updated Financial Results . . . .").

1    a daily amount that the Court may use to adjust that calculation depending on when the final

2    amended judgment is entered.

3        8.    I was able to confirm that within the last month at least the following eight

4    products continued to be sold in the United States:  Droid Charge, Galaxy Prevail, Galaxy S 4G,

5    Galaxy S II (AT&T Edition, 4G), Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), Galaxy

6    S II (T-Mobile Edition), and Galaxy S Showcase.[3]  I have used this information as a part of the

7    calculation of supplemental damages as described below.

8    _____

[3] I confirmed that Samsung continues to sell these products by visiting the following websites:

9   - Droid Charge.  http://www.verizonwireless.com/b2c/store/controller?&item=phoneFirst&action=
10    viewPhoneDetail&selectedPhoneId=5642 (last visited Sept. 21, 2012) See Exhibit 10. I am also
      informed that Apple purchased a Droid Charge from a Best Buy store on August 26, 2012, and I am in
11    possession of the receipt for that purchase.  See Exhibit 34.

12   - Galaxy Prevail.  http://www.boostmobile.com/shop/phones/samsung-galaxy-prevail/ (last visited Sept.
      21, 2012) See Exhibit 11.  I am also informed that Apple purchased a Galaxy Prevail from a Best Buy
13    store on August 26, 2012, and I am in possession of the receipt for that purchase.  See Exhibit 34.

14   - Galaxy S 4G.  http://www.cellstores.com/eCommerce/SpecialOffer.aspx?cid=36071_0fc2541e942e4
      afc9c856dc2536915f5 (last visited Sept. 21, 2012) See Exhibit 12. I am also informed that Apple
15    purchased a Galaxy S 4G from T-Mobile stores on August 25 and 26, 2012, and I am in possession of
      the receipt for that purchase.  See Exhibits 35 and 36.

16   - Galaxy S II (AT&T Edition).  http://www.bestbuy.com/site/Samsung+-+Galaxy+S+II+4G+Mobile+
      Phone+-+Black+(AT%26T)/3386094.p?id=1218402133088&skuId=3386094&st=galaxy s ii&cp=
17    1&lp=7&contract_desc= (last visited Sept. 21, 2012) See Exhibit 13.  I am also informed that Apple
      purchased a Galaxy S II (AT&T Edition) from a Best Buy store on August 26, 2012, and I am in
18    possession of the receipt for that purchase.  See Exhibit 34.

19   - Galaxy S II (Epic 4G Touch).  http://wireless.amazon.com/Samsung-Galaxy-Epic-Touch-Android/dp/
      B005LHN47S/ref=sh_br_ph_2?ie=UTF8&transaction=INDIVIDUAL_NEW&sr=1-2-
20    entd&qid=1348245140033 (last visited Sept. 21, 2012) See Exhibit 14. I am also informed that Apple
      purchased a Galaxy S II (Epic 4G Touch) from a Best Buy store on August 26, 2012, and I am in
21    possession of the receipt for that purchase.  See Exhibit 34.

22   - Galaxy S II (Skyrocket).  http://www.att.com/shop/wireless/devices/samsung/galaxy-s-ii-skyrocket-
      black.html (last visited Sept. 21, 2012) See Exhibit 15. I am also informed that Apple purchased a
23    Galaxy S II (Skyrocket) from a Best Buy store on August 26, 2012, and I am in possession of the
      receipt for that purchase.  See Exhibit 34.

24   - Galaxy S II (T-Mobile Edition).  http://www.t-mobile.com/shop/phones/Cell-Phone-Detail.aspx?cell-
      phone=T-Mobile-Galaxy-S-II-White (last visited Sept. 21, 2012) See Exhibit 16. I am also informed
25    that Apple purchased a Galaxy S II (T-Mobile Edition) from T-Mobile stores on August 25 and 26,
      2012, and I am in possession of the receipt for that purchase.  See Exhibits 35 and 36.

26   - Galaxy S Showcase.  http://www.cspire.com/shop_and_learn/devices/product_phone_detail.jsp?id=
      prod23560025 (last visited Sept. 21, 2012) See Exhibit 17.  This product is currently listed on the C
27    Spire website without an option to "select" it for purchase.  However, I am informed that Apple was
      able to purchase a Galaxy S Showcase phone from C Spire on August 27, 2012 by visiting a C Spire
28    store, and I am in possession of the receipt for that purchase.  See Exhibit 37.

9.      As a first step in calculating supplemental damages, I calculated an overall damage amount per unit based on the jury's award of $1,049,343,540.  For these purposes, I used all sales of all the products that the jury found to infringe an Apple patent or that diluted an Apple trade dress based on the analysis and dates used to prepare the calculations included in Plaintiff's Exhibit 25A1, which Terry Musika introduced at trial and used as a basis for his damages opinions.  This included all sales for products that diluted an unregistered Apple trade dress, and all sales after August 4, 2010 for products that infringed an Apple patent.  The relevant unit sales by month are listed in **Exhibit 2.1**, attached hereto, and total 20,820,168 units.  Dividing the jury's damages award by the total number of infringing or diluting units yielded an overall damages amount per unit of $50.40.  (***See* Exhibit 2.**)

10.     It would have been possible to calculate a per-unit damages amount based on the alternative scenarios advocated by Samsung at trial, including later dates based on Samsung's contentions regarding when it had notice.  However, those scenarios all would have resulted in a larger per-unit damages amount, and would in turn have increased Apple's overall supplemental damages.  For example, if one were to include all sales that diluted an unregistered Apple trade dress, and only those units infringing an Apple patent subsequent to Apple's complaint, the per-unit damages amount would rise to $59.70, an approximate 18.5% increase per unit.  The calculations presented in this declaration are thus both consistent with Mr. Musika's damages opinions at trial and provide a more conservative estimate of supplemental damages.

11.     The next step in calculating supplemental damages was to prepare a projection of future sales of Samsung's infringing products after June 30, 2012.  To do so, I first identified the unit sales of the eight products identified in paragraph 8 that I confirmed were still being sold.  Using monthly sales data obtained from Samsung, I prepared a calculation of monthly unit sales of these eight products from October 2011 to June 2012.  October 2011 was chosen because it was the first month in which all eight products were sold in the United States.   I then prepared a "best-fit" linear plot of this data to account for the overall downward trend-line for the products.  I next extended this linear plot line for the period from July 2012 to December 2012.  All of this is reflected in **Exhibit 3.2**.  This trend line established a projection for sales for the eight products

ROBINSON DECLARATION ISO APPLE'S MOTION FOR PERMANENT INJUNCTION, DAMAGES ENHANCEMENT, SUPPLEMENTAL DAMAGES, AND PREJUDGMENT INTEREST
CASE NO. 11-cv-01846-LHK (PSG)

4

still being sold for the third and fourth quarters of 2012 of 1,350,684 units and 1,052,046 units, respectively.  (*See* **Exhibit 3**.)  One reason this projection is conservative is that it does not include sales of any units of the remaining 18 infringing products that were included in the jury's verdict and that may have been sold between July 1 and mid-September 2012 when I performed the market check described in paragraph 8 above.

12.     As a final step in calculating supplemental damages, I applied the $50.40 average per unit damage amount to the total projected unit sales to calculate the total supplemental damages amount of $121,098,389 through December 31, 2012 as shown on **Exhibit 3**.

13.     As previously stated, the supplemental damages described above are calculated from July 1, 1012 to December 31, 2012.  In the event the court needs to assess supplemental damages for a date before or after December 31, 2012, I also calculated an average damage per day of $516,197.  As shown on **Exhibit 3.3**, this daily rate derived from the projected daily unit sales in December multiplied by the $50.40 per unit damage figure.  The average daily damage per day may be added to or subtracted from the $121,098,389 to prepare a final supplemental damages figure in the event the final amended judgment is entered before or after December 31, 2012.

### B.     Prejudgment Interest

14.     Apple also seeks an award of prejudgment interest on the damages awarded by the jury and the supplemental damages award.  Prejudgment interest is recognized as an element of complete compensation to the plaintiff.  As outlined in Section 284 of the Patent Act, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[4]  Further, the Litigation Services Handbook states, "court[s] should grant prejudgment interest in the amount that will

---

[4] 35 U.S.C. § 284.

1  compensate the plaintiff for the defendant's use of its funds from the date of injury until the date

2  of judgment."[5]

3      15.    A calculation of prejudgment interest requires an evaluation of the following

4  variables: (1) the interest rate to be applied; and (2) when the damages base was earned.

5      16.    For the interest rate, I used the prime rate compounded annually in the start of each

6  calendar year in preparing a prejudgment interest calculation through December 31, 2012.  The

7  prime rate for 2010 through 2012 remained constant at 3.25%.[6]  The prime rate during this period

8  has reflected historic lows for this measure.  "The prime rate is the most common candidate for an

9  appropriate interest rate, but a higher rate may be used if based on a proper evidentiary

10 showing."[7]  I am aware that some courts in the Northern District of California have used the

11 California state statutory rate when calculating prejudgment interest in patent cases.  That rate is

12 approximately 7%[8] and is well in excess of the prime rate during the relevant period.  I deemed

13 the prime rate to be more appropriate than the California statutory rate.

14     17.    For the second variable, *i.e.*, when the damage base was earned, I used the same

15 20,820,168 in unit sales described in paragraph 9 above.  The timing and amount of the unit sales

16 for the infringing products is reflected in **Exhibit 2.1**.  When calculating the monthly damage

17 amount, I multiplied the monthly unit sales by the $50.40 per-unit damage figure discussed in

18 paragraph 12 and added the total to the prior months' base to calculate the accumulating base.  As

19 a result of this procedure, the total base on June 30, 2012 is $1,049,343,540, which is the amount

20 of the jury's verdict.

21

22

---

23 [5] Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, *Litigation Services Handbook: The Role of the Financial Expert* (4th ed. 2007), p. 9.2.

24 [6] Selected Interest Rates (Daily) - Historical Data, Board of Governors of the Federal Reserve System, http://federalreserve.gov/releases/h15/data.htm (last visited Sept. 20, 2012).

25 [7] John Skenyon, Christopher Marchese & John Land, *Intellectual Property - Patent Damages Law & Practice* § 4:6 (2012 Ed.), pp. 393-94 (Exhibit 38).

26 [8] *See, e.g.*, *In re Hayes Microcomputer Prods., Inc.*, 766 F. Supp. 818, 824 (N.D. Cal. 1991) ("Hayes has failed
27 to convince the court of the necessity to depart from the California statutory interest rate of seven (7) percent in order to fully compensate it.") (footnote omitted).

28

18.     As discussed above, I compounded interest on January 1 of each year by adding accrued interest from the prior year to the relevant damages base as of that time.

19.     Using these methods, total prejudgment interest through December 31, 2012 on the $1,049,349,540 in damages awarded by the jury is $48,969,088, as shown on **Exhibit 4**.

20.     Using these methods, the prejudgment interest on the $121,098,389 of supplemental damages described earlier in this report through December 31, 2012 is $899,201, as shown on **Exhibit 5**.

21.     Summing these two figures yields a total of $49,868,289 in prejudgment interest, assuming judgment is entered on December 31, 2012.

22.     In the event the court needs to assess prejudgment interest for a date before or after December 31, 2012, I also calculated a prejudgment interest amount per day of $108,658.  As shown on **Exhibit 6**, this daily rate is based on the current daily prime rate (3.25% divided by 365 days) applied against a total amount available for interest after December 31, 2012 which includes 1) total verdict damages awarded, 2) prejudgment interest on verdict damages, 3) total supplemental damages, and 4) prejudgment interest on supplemental damages.  The prejudgment interest per day may be added to or subtracted from the total damage award in the event the final amended judgment is entered before or after December 31, 2012.

## III.     APPLE'S   REQUEST   FOR   WILLFULNESS   ENHANCEMENTS   AND PERMANENT INJUNCTION

23.     The following sections reflect calculations and information relevant to Apple's request for an enhancement of the damages award and Apple's request for a permanent injunction.

### A.     Willfulness Enhancements

24.     I understand that Apple is seeking a willfulness enhancement of $535 million, which includes a $400 million enhancement under the Lanham Act, and a $135 million enhancement under the Patent Act.

25.     Since Samsung first launched the infringing and diluting smartphones, Samsung's U.S. smartphone market share has steadily increased from 5% in June 2010, to 10% a year later, to 20% in late 2011, and to over 30% by the second quarter of 2012. (**Exhibit 7.**)

26.     The importance of these market share gains to Samsung can be assessed by modeling what would have happened if Samsung's market share had remained constant at 5% from June 2010 through June 2012. If that were the case, Samsung would have sold only approximately 9.9 million smartphones from July 2010 to June 2012, a decrease of approximately 28.1 million. In **Exhibit 7,** I have calculated this loss both as number of units lost and as the percent of Samsung's total smartphone sales, as reported by IDC, that would be lost.

27.     IDC's data includes both smartphones that are subject to the jury's verdict and smartphones that were not. I therefore took steps to allocate the losses between the infringing and diluting sales and the remaining sales. To be conservative, I used the percentage losses discussed above and assumed that any losses would be experienced proportionally across all of Samsung's smartphone product lines. This leaves a substantial amount of infringing and diluting sales still in the hypothetical market. As shown on **Exhibit 7**, using this approach, Samsung would have sold 13.9 million fewer infringing and diluting smartphones.

28.     Apple's losses due to Samsung's sales of these 13.9 million phones are substantial. To calculate this amount, I have assumed that these 13.9 million sales would be allocated among all market participants according to their unadjusted market share, as reported by IDC. This is itself conservative because in a *Mor-Flo* analysis, each market participant's share commonly rises as the infringer's sales are removed from the market. Using the more conservative assumption, Apple would have sold more than 4 million additional products. To make this calculation even more conservative, I further assumed that Apple would capture only half of these sales. If so, Apple would have obtained 2,089,143 million additional iPhone sales during this period, as reflected in **Exhibit 8**.

29.     In connection with Terry Musika's expert report and testimony, Invotex prepared and disclosed a calculation of Apple's incremental profitability by quarter for sales of the iPhone[9] This information was obtained from Apple's financial data and reports, using information that ties to Apple's audited financial statements. ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

30.     Using the previously disclosed calculations and opinions of Terry Musika and Michael Wagner, I have also calculated the amount that Samsung obtained by the sale of the 13.9 million in additional smartphones identified in paragraph 2.  As shown in **Exhibit 7**, Samsung obtained approximately $5 billion in additional revenue, $1.8 billion in additional gross profits (using the 35.5% gross profit percentage previously calculated and provided by Terry Musika based on Samsung's data[10]), and $599 million in additional operating profits (using the 12% operating profit percentage previously provided by Mr. Wagner[11]).

31.     I have performed a number of different calculations, set forth below, that provide context to the amounts that Apple is seeking as enhancement damages in light of the trial evidence.

- The jury awarded Apple a total of $382 million for the six products that it found to dilute Apple's trade dress rights –  Fascinate ($144 million), Galaxy S 4G ($73 million), Galaxy S Showcase ($22 million), Mesmerize ($53 million), Vibrant ($90 million), and the Galaxy S i9000 ($0).[12]

- Using information reported by Samsung in Defendants' Exhibit 676, which was admitted at trial, Samsung spent about $201.6 million for "sales expenses" at Samsung Telecommunications America LLC and "sales

---

[9] Expert Report of Terry Musika, March 22, 2012 ¶ 134 & Exhibit 34.

[10] Exhibit 18 (Trial Testimony of Terry Musika, Aug. 13, 2012), at 2060:20.

[11] Exhibit 19 (Trial Testimony of Michael Wagner, Aug. 16, 2012), at 3065:8.

[12] Exhibit 20 (Amended Jury Verdict), at p.16.

expense" at Samsung Electronics Company, Ltd for these six products between May 1, 2010 and June 30, 2012.[13]

- Using the information reported by Apple in Plaintiff's Exhibit 16, which was admitted at trial, Apple spent $420 million on advertising from FY 2007 to FY 2010 for the iPhone products.[14]

- Samsung's damages expert, Michael Wagner, prepared a damages calculation as reflected in Defendant's Exhibit 781, which was admitted at trial, in which he presented his opinion regarding Samsung's U.S. operating profit calculation for the six products found to infringe Apple's trade dress rights –  Fascinate ($177.6 million), Galaxy S 4G ($109.1 million), Galaxy S Showcase ($20.8 million), Mesmerize ($64.6 million), Vibrant ($80.9 million), and Galaxy S i9000 ($0).[15]  This calculation reflected his opinion regarding operating profits obtained for sales of these six products from the time that Samsung first introduced them.   Mr. Wagner's combined total for these six products is $453 million.   This figure is $71 million more than the jury's $382 million verdict for those same six products.

- As reported in Samsung's consolidated financial statements (Defendant's Exhibit 753, which was admitted at trial), $400 million is approximately 0.9% of Samsung's 2011 gross profits, which was $45.8 billion.[16]

- As reported in Samsung's consolidated financial statements, $400 million is approximately 0.8% of Samsung's 2011 telecommunication product

---

[13] Exhibit 21 (Samsung financial spreadsheet, **DX676**).  This figure was calculated by summing all expenses identified in the STA – Sales Expense and Manufacturing - Sales Expense line items, *i.e.*, Rows 17 and 60 of the spreadsheet, for the Fascinate ($39.2 million), Galaxy S 4G ($40.1 million), Galaxy S Showcase ($20.7 million), Mesmerize ($39.9 million), Vibrant ($58.7 million), and Galaxy S i9000 ($0).

[14] Exhibit 22 (Apple's iPhone & iPad Advertising Expenditures (U.S.), **PX16**).

[15] Exhibit 23 (Wagner's Damages Summary, **DX781**) at DX781.003.

[16] Exhibit 24 (Samsung's Consolidated Financial Statements, **DX753**) at DX753.005.

ROBINSON DECLARATION ISO APPLE'S MOTION FOR PERMANENT INJUNCTION, DAMAGES ENHANCEMENT, SUPPLEMENTAL DAMAGES, AND PREJUDGMENT INTEREST
CASE NO. 11-cv-01846-LHK (PSG)

10

revenue, which was 55,534,042 million Korean Won, or about $48.2 billion.[17]

- Using the jury's verdict and the sales and revenue information reported by Samsung in Joint Exhibit 1500, $400 million is approximately 5.1% of Samsung's revenues for the products found to infringe, which was about $7.8 billion.[18]

- As reported in Samsung's consolidated financial statements, $400 million is approximately 5.6% of Samsung's telecommunication product profits for 2011, which was 8,269,798 million Korean Won or about $7.2 billion.[19]

- The jury awarded $67,880,583 for the five smartphones and two tablets that it found to infringe only Apple's utility patents.[20]

- Using Mr. Wagner's calculation of Samsung's operating profit at 12%, which he testified to at trial,[21] and applying that figure to the $6.3 billion in revenues that Samsung obtained from products that infringe Apple's design patents, as reported in Joint Exhibit 1500, yields a Samsung profit calculation of $756 million. Subtracting $756 million from the jury's total award leaves $293 million.

- Using Mr. Musika's damages summary, which was admitted at trial as Plaintiff's Exhibit 25A1, the combined amounts sought by Apple in lost

---

[17] Exhibit 24 (Samsung's Consolidated Financial Statements, **DX753**) at DX753.076. For the conversion from Korean Won to U.S. Dollars, I used the same conversion ratio used by Samsung in its reporting of Samsung's total 2011 revenue figures in both Korean Won and U.S. Dollars. See Exhibit __ (Samsung's Consolidated Financial Statements **DX 753**) at DX753.005 and 033.

[18] Exhibit 9 (Sales of Accused Products, **JX1500**).

[19] Exhibit 24 (Samsung's Consolidated Financial Statements, **DX753**) at DX753.076. For the conversion from Korean Won to U.S. Dollars, I used the same conversion ratio used by Samsung in its reporting of Samsung's total 2011 revenue figures in both Korean Won and U.S. Dollars. See Exhibit __ (Samsung's Consolidated Financial Statements **DX 753**) at DX753.005 and 033.

[20] Exhibit 20 (Amended Jury Verdict) at 16.

[21] Exhibit 19 (Trial Testimony of Michael Wagner, August 16, 2012, at 3074:23-3075:1-5).

profits and reasonable royalty damages for the devices that infringed a design or utility patent were more than $495 million.

- Mr. Musika testified at trial that Apple's damages calculated solely as a reasonable royalty would have been $540 million.[22]

## B.    Permanent Injunction

32.    Apple's motion for a permanent injunction seeks to enjoin Samsung from importing, offering to sell, or selling in the United States certain Samsung products that were found to infringe one or more of Apple's intellectual property rights.  These products include the Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S (i9000), Galaxy S 4G, Galaxy S II (AT&T), Galaxy S II (i9100), Galaxy S II (T-Mobile), Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket), Galaxy S Showcase (i500), Galaxy Tab, Galaxy Tab 10.1 (WiFi), Gem, Indulge, Infuse 4G, Mesmerize, Nexus S 4G, Replenish, Transform, and Vibrant.

33.    I have been asked by counsel for Apple to consider whether a substantial causal link exists between the infringed features of U.S. Patent No. 7,469,381 ("the '381 Patent"), U.S. Patent No. ("the '163 Patent"), and U.S. Patent No. 7,844,915 ("the '915 Patent") (collectively, "the User Interface Patents"), and consumer demand for the Galaxy Tab and Galaxy Tab 10.1 (WiFi).

34.    A review of the information in the record and produced in discovery shows that the User Interface Patents drive consumer demand for Samsung's infringing tablets, such that a substantial nexus exists between Samsung's infringement of the User Interface Patents and long-term market share losses that Apple will suffer absent an injunction.

35.    Before Apple launched the iPad in April of 2010, there was no commercially viable tablet market.  As Apple's Phil Schiller testified at trial, the iPad was a "big gamble" for Apple because "this was a new category device. . . . Companies had tried to make tablet products

---

[22] Exhibit 18 (Trial Testimony of Terry Musika, August 13, 2012, at 2093:1-21).

before and failed miserably and there was no category of tablet computers selling in any quantity that mattered."[23]

36.     With the launch of the iPad, all of that changed.  Samsung launched the Galaxy Tab in the fourth quarter of 2010.  News reports called the Galaxy Tab Apple's "fiercest competitor so far, in a long trail of announced and unannounced tablets based on mobile operating systems."[24]  Sales of the Galaxy Tab from launch through June 30, 2012 totaled about 725,000 devices, and generated more than $325 million in revenue.[25]

37.     Samsung began selling the Galaxy Tab 10.1 (WiFi) in the second quarter of 2011. From launch through June 30, 2012, Samsung sold about 585,000 Galaxy Tab 10.1 (WiFi) devices, generating about $237 million in revenue.  In the first two quarters of 2012 alone, Samsung sold about 165,000 Galaxy Tab and Galaxy Tab 10.1 (WiFi) devices, with combined revenues of approximately $55 million.[26]

38.     Evidence that the User Interface Patents have contributed substantially to consumer purchases of the Galaxy Tab and Galaxy Tab 10.1 (WiFi) products comes from a variety of sources.

39.     Apple's conjoint survey expert, John Hauser, testified at trial that he conducted two surveys to "determine how much money, if any, Samsung consumers would pay for the features" associated with the '915, '163, and '381 patents.[27]  His analysis found the following price premiums for the features embodied in the particular patents.  "Price Premium for:  '915 Patent, +$39 Smartphones / +$45 Tablets."  "Price Premium for:  '915 + '163 + '381 Patents,

---

[23] Exhibit 25 (Trial Testimony of Phil Schiller, August 3, 2012, at 620.)

[24] Exhibit 26 (PC World, *How Does the Samsung Galaxy Tab Compare to Rival Tablets*, Sept. 16, 2010, available at http://www.pcworld.com/article/205612/how_does_the_samsung_galaxy_tab_compare_to_rival_tablets.html.)

[25] Exhibit 9 (Sales of Accused Products, **JX1500**).

[26] Exhibit 9 (Sales of Accused Products, **JX1500**).

[27] Exhibit 27 (Trial Testimony of John Hauser August 10, 2012), at 1915.

1    +\$100 Smartphones / +\$90 Tablets."[28]   Dr. Hauser described these results as reflecting

2    "substantial demand for the features associated with the patents at issue in this case."[29]

3        40.   Additionally, Samsung's own internal documents emphasize the importance of the

4    features embodied by the User Interface Patents to the success of its tablet devices.  For example,

5    in an April 2011 internal report, Samsung described one of its tablet products under development

6    as "Lack[ing] Fun, Wow Effect," in part because "movements lack bounce effect."[30]  The report

7    further notes that "In the case of iPad2, there is a fun element from a natural Bounce effect that

8    follows hand gestures."[31]  Samsung marked each of these pages with icon stamps describing the

9    lack of a bounce feature as "Critical" and "Serious" issues.[32]

10        41.   Similar documents were produced by Samsung during the litigation.  For example,

11    Samsung produced a report written in Korean stating that "no Bounce effect is provided" in the

12    Galaxy Tab and "thus is unemotional."[33]   Likewise, an internal Samsung email reflects a

13    discussion held by Samsung employees about how to modify Samsung's tablet software to create

14    a "bounce effect similar to the iPad."[34]

15        42.   Additional examples where Samsung placed value on the infringed features of the

16    asserted User Interface Patents include commercials for the Galaxy Tab and Galaxy Tab 10.1,

17    which feature the pinch-to-zoom, scrolling, and tap-to-zoom navigation.[35]  Taken together, these

18

19    [28] Exhibit 28 (Price Premium for Patented Features, Conjoint Survey Results, Dr. John Hauser, **PX30**).

      [29] Exhibit 27 (Trial Testimony of John Hauser August 10, 2012), at 1916.

20    [30] Exhibit 29 (P5 Usability Evaluation Results, **PX57**) at PX57.19.  *See also* Exhibit __ (Trial Testimony of Dr.

21    Balakrishnan, August 10, 2012, at 1763-1767) (describing how PX57 informed Dr. Balakrishnan's opinion of
      the importance of the patented bounce feature claimed in the '381 Patent).

22    [31] Exhibit 29 (P5 Usability Evaluation Results, **PX57**) at PX57.73.

      [32] Exhibit 29 (P5 Usability Evaluation Results, **PX57**) at PX57.19 and PX57.73.

23
      [33] Exhibit 30 (Translation, Analysis of Galaxy Tab Operation Speed and Screen Effects, SAMNDCA00201771-

24    780, at '773.)

25    [34] Exhibit 31 (10/28/2010 Email from Sangwook Han, **PX195**) at PX195.1.

      [35] Exhibit 32 (Time to Tab - Samsung Galaxy Tab 10.1 Global TV Commercial, available at

26    http://www.youtube.com/watch?v=QL8ePbYsdc8 (showing pinch to zoom and scrolling features in commercial
      for the Galaxy Tab 10.1)); Exhibit 33 (Introducing the Samsung Galaxy Tab - It's Go Time!

27    (http://www.youtube.com/watch?v=yGKthibnyTE) (showing scrolling function in commercial for Galaxy
      Tab)).

28

1   documents establish a substantial nexus exists between Apple's User Interface Patents and

2   consumer demand for Samsung's infringing tablets.

3

4       I declare under penalty of perjury that the foregoing is true and correct and that this

5   Declaration was executed this 21st day of September 2012, at Baltimore, Maryland.

6

7   *Marylee P. Robinson*

8   MARYLEE P. ROBINSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINSON DECLARATION ISO APPLE'S MOTION FOR PERMANENT INJUNCTION, DAMAGES
ENHANCEMENT, SUPPLEMENTAL DAMAGES, AND PREJUDGMENT INTEREST
CASE NO. 11-CV-01846-LHK (PSG)

15