# Estrich Declaration

# Exhibit 7

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA    )  C-11-01846 LHK
6  CORPORATION,                )
                               )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,       )
                               )  AUGUST 13, 2012
8          VS.                  )
                               )  VOLUME 7
9  SAMSUNG ELECTRONICS CO.,     )
   LTD., A KOREAN BUSINESS      )  PAGES 1989-2320
10 ENTITY; SAMSUNG              )
   ELECTRONICS AMERICA,         )
11 INC., A NEW YORK             )
   CORPORATION; SAMSUNG         )
12 TELECOMMUNICATIONS           )
   AMERICA, LLC, A DELAWARE     )
13 LIMITED LIABILITY            )
   COMPANY,                     )
14                              )
              DEFENDANTS.       )
15 _____

16        TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE LUCY H. KOH
17       UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22

23 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                CERTIFICATE NUMBER 9595
24

25

```
1    A P P E A R A N C E S:

2    FOR PLAINTIFF        MORRISON & FOERSTER
     APPLE:                   BY:  HAROLD J. MCELHINNY
3                                  MICHAEL A. JACOBS
                                   RACHEL KREVANS
4                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
5

6    FOR COUNTERCLAIMANT WILMER, CUTLER, PICKERING,
     APPLE:                  HALE AND DORR
7                            BY:  WILLIAM F. LEE
                             60 STATE STREET
8                            BOSTON, MASSACHUSETTS  02109

9                            BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
10                           PALO ALTO, CALIFORNIA  94304

11   FOR THE DEFENDANT:  QUINN, EMANUEL, URQUHART,
                             OLIVER & HEDGES
12                           BY:  CHARLES K. VERHOEVEN
                             50 CALIFORNIA STREET, 22ND FLOOR
13                           SAN FRANCISCO, CALIFORNIA  94111

14                           BY:  VICTORIA F. MAROULIS
                                  KEVIN P.B. JOHNSON
15                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
16                           REDWOOD SHORES, CALIFORNIA  94065

17                           BY:  MICHAEL T. ZELLER
                                  WILLIAM C. PRICE
18                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
19                           LOS ANGELES, CALIFORNIA  90017

20

21

22

23

24

25
```

INDEX OF WITNESSES

PLAINTIFF'S

**BORIS TEKSLER**
    CROSS-EXAM BY MS. MAROULIS (RES.)  P. 2006
    REDIRECT EXAM BY MR. MUELLER      P. 2009
    RECROSS-EXAM BY MS. MAROULIS      P. 2019
    FURTHER REDIRECT EXAM             P. 2022

**JUN WON LEE**
    BY VIDEOTAPED DEPOSITION          P. 2023
                                         2025

**DONG HOON CHANG**
    BY VIDEOTAPED DEPOSITION          P. 2026

**TIMOTHY BENNER**
    BY VIDEOTAPED DEPOSITION          P. 2028
                                         2029

**TIMOTHY SHEPPARD**
    BY VIDEOTAPED DEPOSITION          P. 2030

**TERRY MUSIKA**
    DIRECT EXAM BY MS. KREVANS        P. 2031
    CROSS-EXAM BY MR. PRICE           P. 2098
    REDIRECT EXAM BY MS. KREVANS      P. 2160
    RECROSS-EXAM BY MR. PRICE         P. 2165
    FURTHER REDIRECT EXAM             P. 2171


DEFENDANT'S

**BENJAMIN BEDERSON**
    DIRECT EXAM BY MR. DEFRANCO       P. 2228
    CROSS-EXAM BY MR. JACOBS          P. 2254
    REDIRECT EXAM BY MR. DEFRANCO     P. 2269

**ADAM BOGUE**
    DIRECT EXAM BY MR. JOHNSON        P. 2274
    CROSS-EXAM BY MR. JACOBS          P. 2300

2005

```
 1              MS. MAROULIS:  IT'S THE ONE WE FILED,
 2    YESTERDAY, YOUR HONOR, AROUND NOON.
 3              THE COURT:  OKAY.
 4              MS. MAROULIS:  SO BASICALLY THREE PRIOR
 5    ARTISTS, DEPOSITION DESIGNATIONS, AND THEN
 6    MR. WILLIAMS AND MR. YANG.
 7              THE COURT:  OKAY.  SO MR. PALTIAN,
 8    MR. ZORN, MR. WILLIAMS, AND THEN MR. YANG, HE'LL BE
 9    ON BEFORE?
10              MR. VERHOEVEN:  YES.
11              MS. MAROULIS:  BUT THE THREE OTHER
12    WITNESSES ARE GOING FIRST, BOGUE, FORLINES AND
13    BEDERSON BEFORE THE OTHERS.
14              THE COURT:  I'M SORRY.  GIVE ME YOUR
15    ORDER THEN.  PALTIAN, ZORN --
16              MS. MAROULIS:  NO, YOUR HONOR.  IT'S
17    BOGUE, FORLINES, BEDERSON, PALTIAN, ZORN, WILLIAMS,
18    AND YANG.
19              THE COURT:  OKAY.  THANK YOU.
20              ALL RIGHT.  MR. RIVERA, WOULD YOU PLEASE
21    BRING IN OUR JURY?
22              THE CLERK:  YES, YOUR HONOR.
23              (WHEREUPON, THE FOLLOWING PROCEEDINGS
24    WERE HELD IN THE PRESENCE OF THE JURY:)
25              THE COURT:  ALL RIGHT.  GOOD MORNING AND
```

```
 1    WELCOME BACK.  THE TIME IS NOW 9:05.
 2              GO AHEAD, PLEASE, WITH THE CROSS OF
 3    MR. TEKSLER.
 4              SIR, YOU ARE STILL UNDER OATH.
 5                   BORIS TEKSLER,
 6    BEING CALLED AS A WITNESS ON BEHALF OF THE
 7    PLAINTIFF, HAVING BEEN PREVIOUSLY DULY SWORN, WAS
 8    FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:
 9              CROSS-EXAMINATION (RESUMED)
10    BY MS. MAROULIS:
11    Q    GOOD MORNING, MR. TEKSLER.
12    A    GOOD MORNING.
13    Q    WE'RE GOING TO CONTINUE WITH THE DISCUSSION OF
14    THE ROYALTIES THAT WE STARTED LAST WEEK.
15              DO YOU REMEMBER THAT?
16    A    I DO.
17    Q    LAST WEEK YOU TESTIFIED THAT NO ONE HAS EVER
18    PAID APPLE A ROYALTY OF $2.02 PER UNIT FOR THE '381
19    PATENT.  IS THAT STILL CORRECT?
20    A    YES, THAT'S CORRECT.  THERE'S NO LICENSE FOR
21    THE '381.
22    Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF
23    $2.02 FOR THE '163 PATENT; IS THAT CORRECT AS WELL?
24    A    YES, THAT'S CORRECT.
25    Q    NO ONE HAS EVER PAID APPLE A ROYALTY OF $3.10
```

2007

```
1    FOR THE '916 PATENT AT ISSUE; IS THAT CORRECT?

2    A    YES, THAT'S CORRECT.

3    Q    AND NO ONE HAS EVER PAID APPLE A ROYALTY OF

4    $24 DOLLARS PER UNIT FOR ANY OF THE DESIGN PATENTS

5    AT ISSUE IN THIS CASE; IS THAT RIGHT?

6    A    YES, THAT'S CORRECT.

7    Q    FURTHERMORE, NO ONE HAS EVER PAID APPLE A

8    ROYALTY OF $24 A UNIT FOR ALL FOUR DESIGN PATENTS

9    AT ISSUE IN THIS CASE; RIGHT?

10   A    YES, THAT'S CORRECT.

11   Q    AS A LICENSING PROFESSIONAL, SIR, ARE YOU

12   FAMILIAR WITH THE CONCEPT OF MARKING?

13   A    I AM.

14   Q    MARKING IS PUTTING THE PATENT OR REGISTERED

15   TRADE DRESS NUMBER ON YOUR PRODUCT; CORRECT?

16   A    THAT'S ONE INSTANCE, YES.

17   Q    AND THE PURPOSE OF THAT IS TO LET EVERYONE IN

18   THE MARKET KNOW THAT THE PATENTEE HAS RIGHTS TO A

19   PARTICULAR PATENT; RIGHT?

20   A    YES, I BELIEVE THAT'S CORRECT.

21   Q    AND IT IS CORRECT, SIR, THAT APPLE DOES NOT

22   MARK ITS IPHONES; RIGHT?

23   A    YES, I BELIEVE THAT'S CORRECT.

24   Q    IT'S ALSO CORRECT THAT APPLE DOES NOT MARK ITS

25   IPADS; IS THAT RIGHT?
```

1    A    THAT'S CORRECT.

2    Q    ISN'T IT CORRECT, SIR, THAT PRIOR TO THE

3    FILING OF THIS LAWSUIT, APPLE NEVER TOLD SAMSUNG

4    THAT IT WAS INFRINGING SPECIFIC DESIGN PATENTS BY

5    NUMBER?

6    A    WE TOLD THEM THAT THEY INFRINGED DESIGN

7    PATENTS OF OURS, BUT WE DIDN'T ALLOCATE THOSE

8    NUMBERS TO THEM, THAT'S CORRECT.

9         AS A MATTER OF FACT, SEVERAL OF THOSE

10   PATENTS HADN'T YET ISSUED.

11   Q    MR. TEKSLER, PLEASE ANSWER MY QUESTION.  IS IT

12   CORRECT THAT APPLE NEVER SPECIFIED ANY DESIGN

13   PATENTS TO SAMSUNG THAT IT ALLEGES IN THIS CASE

14   PRIOR TO THE LAWSUIT?

15   A    ANY ENUMERATED NUMBER?  IS THAT WHAT YOU'RE

16   SAYING?

17   Q    YES, MR. TEKSLER.

18   A    YES, I AGREE.

19         MS. MAROULIS:  OKAY.  I DON'T HAVE ANY

20   FURTHER QUESTIONS FOR YOU AT THIS TIME.

21         THE COURT:  OKAY.  THE TIME IS NOW 9:07.

22   IS THERE ANY REDIRECT?

23         MR. MUELLER:  PLEASE, YOUR HONOR.

24         THE COURT:  OKAY.  GO AHEAD, PLEASE.

25         MR. MUELLER:  MAY I PROCEED, YOUR HONOR?

1          THE COURT:  PLEASE, GO AHEAD.

2                 **REDIRECT EXAMINATION**

3    BY MR. MUELLER:

4    Q    JUST A FEW QUESTIONS FOR YOU.  FIRST,

5    MS. MAROULIS ASKED YOU SOME QUESTIONS A MOMENT AGO

6    WITH RESPECT TO LICENSING OF APPLE'S PATENTS.

7              DO YOU HAVE THOSE PATENTS IN MIND?

8    A    I DO.

9    Q    THE '381, THE '163?

10   A    YES.

11   Q    THE '916?

12   A    YES.

13   Q    AND THE DESIGN PATENTS.

14   A    CORRECT.

15   Q    NOW, LET'S BE CLEAR.  HAS APPLE LICENSED ANY

16   OF THOSE PATENTS ON A STANDALONE BASIS AS

17   INDIVIDUAL PATENTS?

18   A    NO.

19              MS. MAROULIS:  OBJECTION.  LEADING.

20              THE COURT:  OVERRULED.

21              THE WITNESS:  SORRY.  NO, IT'S NOT OUR

22   CUSTOMARY PRACTICE TO ENUMERATE SPECIFIC DESIGN

23   PATENTS, OR SPECIFIC PATENT NUMBERS.

24              IN GENERAL, YOU COME UP WITH A PRETTY

25   BROAD CATEGORY OF PATENTS IN A CROSS-LICENSE.  THAT

```
 1    WAY BOTH PARTIES KNOW THAT THEY HAVE SOME PEACE.

 2    BY MR. MUELLER:

 3    Q    NOW, MR. TEKSLER, LAST WEEK YOU EXPLAINED TO

 4    THE JURY HOW APPLE TREATS DIFFERENT CATEGORIES

 5    WITHIN ITS PATENT PORTFOLIO.

 6              CAN YOU REMIND US, WHICH CATEGORY DO

 7    THESE PATENTS FALL INTO?

 8              MS. MAROULIS:  OBJECTION.  BEYOND THE

 9    SCOPE OF CROSS.

10              MR. MUELLER:  YOUR HONOR, THESE ARE

11    EXACTLY THE PATENTS THAT MS. MAROULIS JUST ASKED

12    ABOUT.

13              THE COURT:  OVERRULED.

14              GO AHEAD.

15              THE WITNESS:  SO ALL THESE PATENTS ARE IN

16    APPLE'S UNIQUE USER EXPERIENCE AND NOT ONES THAT WE

17    WOULD LICENSE.

18    BY MR. MUELLER:

19    Q    NOW, MS. MAROULIS ASKED YOU SOME QUESTIONS

20    ABOUT THE LIMITED CIRCUMSTANCES IN WHICH APPLE HAS

21    LICENSED ITS DESIGN PATENTS.  THOSE WERE QUESTIONS

22    ASKED LAST FRIDAY.

23              DO YOU RECALL THAT?

24    A    I DO.

25              MS. MAROULIS:  OBJECTION.  ARGUMENTATIVE.
```

1           THE COURT:  OVERRULED.

2    BY MR. MUELLER:

3    Q    NOW, MR. TEKSLER, ARE YOU FAMILIAR WITH

4    APPLE'S LICENSE WITH MICROSOFT?

5    A    I AM.

6    Q    DOES THAT LICENSE COVER APPLE'S DESIGN

7    PATENTS?

8    A    IT DOES.

9    Q    CAN YOU EXPLAIN TO THE JURY THE FORM OF THE

10   LICENSE GRANT?

11   A    SURE.  SO APPLE AND MICROSOFT'S CROSS-LICENSE

12   DOES COVER THE DESIGN PATENTS.

13         HOWEVER, WE TOOK SPECIAL PROHIBITIONS FOR

14   BOTH PARTIES SO THAT THERE'S WHAT I TERM AN

15   ANTI-CLONING PROVISION IN THE AGREEMENT SO THAT WE

16   WOULDN'T COPY EACH OTHER'S PRODUCTS.

17         AND SO EVEN THOUGH THERE'S PEACE BETWEEN

18   THE COMPANIES WITH RESPECT TO THE PATENTS AS A

19   WHOLE, THERE'S A CLEAR ACKNOWLEDGMENT THAT THERE'S

20   NO COPYING WITH THIS ANTI-CLONING PROVISION.

21   Q    AND MR. TEKSLER, TO BE VERY CLEAR, WHAT RIGHTS

22   WERE NOT GIVEN TO MICROSOFT WITH RESPECT TO THESE

23   DESIGN PATENTS?

24         MS. MAROULIS:  OBJECTION.  LEADING,

25   BEYOND THE SCOPE OF CROSS.

```
 1              WHAT HAVE YOU DEPICTED ON THIS SLIDE,
 2    MR. MUSIKA?
 3    A     I THINK THIS IS GOING TO HELP SHOW AND EXPLAIN
 4    WHAT I WAS JUST BRIEFLY TRYING TO EXPLAIN.
 5              I'VE GOT 22 PHONES AT THE TOP, AND THINK
 6    OF THESE AS EITHER PHONES OR TABLETS, IT DOESN'T
 7    MATTER.  BUT EACH ONE OF THOSE REPRESENTS A MILLION
 8    UNITS TO TRY AND KEEP US ORIENTED ON THE 22 MILLION
 9    TOTAL UNITS.
10              AND SO AS WE JUST WENT THROUGH, I HAVE
11    THREE FORMS OF DAMAGE.  EACH ONE OF THOSE PHONES,
12    EACH ONE OF THOSE 22 MILLION PHONES, HAS TO GO IN
13    ONE OF THOSE CATEGORIES, BUT NOT TWO CATEGORIES.
14    IF WE PUT IT IN TWO CATEGORIES, THEN WE'RE GOING TO
15    END UP WITH DOUBLE COUNTING.
16    Q    OKAY.  CAN YOU JUST WALK US THROUGH,
17    UNDERSTANDING THIS IS A SIMPLIFICATION, WALK US
18    THROUGH THE ALLOCATION THAT YOU MADE.
19    A     WELL, THE ALLOCATION THAT I MADE WAS I, I
20    FIRST -- I THINK THE NEXT SLIDE IS GOING TO SHOW
21    THE AMOUNT OF 17 MILLION UNITS SHOULD SLIDE DOWN,
22    AND I CALCULATED THEM AS SAMSUNG'S PROFITS.  THAT'S
23    THE UNJUST GAIN.  SO I'M USING THAT FORM OF DAMAGES
24    FOR APPROXIMATELY 17 MILLION OF THE TOTAL 22
25    MILLION.
```

```
 1    Q    OKAY.  HOW MANY OF THE 5 MILLION LEFT DID YOU

 2    PUT IN THE APPLE LOST PROFITS DAMAGES CATEGORY?

 3    A    I PUT TWO INTO THE LOST PROFITS CATEGORY, SO

 4    WE SHOULD HAVE TWO OF THOSE SLIDE DOWN, AND 2

 5    MILLION, APPROXIMATELY, COME DOWN THERE.

 6              AND THAT, OF COURSE, LEAVES THE 3

 7    MILLION, AND YOU CAN OF COURSE GUESS WHERE THOSE

 8    GO, DOWN TO THE REASONABLE ROYALTY.

 9              AND WE CAN SEE VERY CLEARLY THAT NO

10    INDIVIDUAL PRODUCT HAS HAD MORE THAN ONE DAMAGE

11    CALCULATED ON IT.

12    Q    OKAY.  THAT LOOKED EASY.

13              CAN YOU DESCRIBE FOR THE JURY THE ACTUAL

14    AMOUNT OF EFFORT THAT IT TOOK TO MAKE THESE

15    ALLOCATIONS AND THEN MAKE THOSE ONE, ONE PHONE BY

16    ONE TABLET DAMAGES CALCULATIONS THAT YOU MADE.

17    A    IT -- I CAN ASSURE YOU, IT'S NOT ME SITTING AT

18    A DESK WITH A CALCULATOR DOING 22 MILLION

19    CALCULATIONS.

20              IN FACT, BECAUSE OF THE VARIOUS

21    COMBINATIONS, THERE ARE LITERALLY HUNDREDS OF

22    MILLIONS OF CALCULATIONS, AND SO THE ONLY WAY,

23    PRACTICALLY, TO DO THIS IS TO WRITE A COMPUTER

24    PROGRAM.

25              AND SO OVER THE LAST YEAR AND A HALF TO
```

```
 1    TWO YEARS, I HAVE HAD A TEAM OF 20 PEOPLE,

 2    ECONOMISTS, PROGRAMMERS, STATISTICIANS AND C.P.A.'S

 3    DEVELOPING A MODEL THAT IS DYNAMIC ENOUGH TO TAKE

 4    IN ALL 22 MILLION AND MAKE CHANGES AND ADJUSTMENTS,

 5    SINCE THIS PROCESS WENT ON FOR A YEAR AND A HALF,

 6    AS NEW PRODUCTS CAME IN AND WENT OUT.

 7              AND ABOUT 7,000 TOTAL PROFESSIONAL HOURS

 8    WERE DEDICATED TOWARDS THE CREATION AND OPERATION

 9    OF THAT COMPUTER MODEL.

10    Q    THAT SOUNDS EXPENSIVE.  WAS IT EXPENSIVE?

11    A    IT WAS VERY EXPENSIVE.

12    Q    WHAT DID IT COST TOTAL FOR YOUR TEAM OF 23

13    PEOPLE?

14    A    20 PEOPLE, OVER MORE THAN A YEAR AND A HALF,

15    THAT 7,000 HOURS, WAS APPROXIMATELY $1,750,000.

16    Q    OKAY.  LET'S GO BACK TO THE FIRST CATEGORY YOU

17    TALKED ABOUT, THE SAMSUNG PROFIT CATEGORY.

18              ONCE YOU HAD ALLOCATED 17 MILLION PHONES

19    AND TABLETS TOTAL INTO THAT CATEGORY, WHAT WAS THE

20    NEXT STEP IN DETERMINING THE DAMAGES FOR THOSE 17

21    MILLION DEVICES?

22    A    WELL, IT'S, IT'S MAKING THE ACTUAL

23    CALCULATIONS.  IT'S FIGURING OUT HOW MUCH -- WE NOW

24    KNOW THE UNITS, BUT HOW MUCH DID SAMSUNG ACTUALLY

25    MAKE ON THOSE 17 MILLION?
```

```
1    Q    OKAY.  IF WE COULD SEE THE NEXT SLIDE.  WE'RE

2    SHOWING $2.241 BILLION HERE.

3              CAN YOU EXPLAIN TO THE JURY HOW YOU CAME

4    UP WITH THAT NUMBER IN CONCEPT?

5    A    IN CONCEPT, KEEP IN MIND THE 17 MILLION UNITS,

6    AGAIN, AND IT'S -- IT'S FIGURING OUT HOW MUCH DID

7    SAMSUNG ACTUALLY MAKE IN PROFIT ON EACH ONE OF

8    THOSE UNITS, AS SIMPLISTICALLY MULTIPLICATION.

9    IT'S THE UNITS TIMES THE PROFITS AND THAT GETS YOU

10   TO $2.2 BILLION.

11   Q    WHAT WAS THE SOURCE OF THE INFORMATION YOU

12   USED FOR THE PURPOSES OF MAKING THESE CALCULATIONS?

13   A    THESE NUMBERS ARE, IN THIS CASE ARE SAMSUNG'S

14   NUMBERS.  WHEN I'M TALKING ABOUT SAMSUNG'S PROFIT,

15   THESE ARE NUMBERS THAT COME DIRECTLY FROM SAMSUNG'S

16   FINANCIAL RECORDS.

17   Q    OKAY.  COULD WE SEE SLIDE 34B.15.

18             STARTING HERE -- I KNOW YOU HAVE A SERIES

19   OF SLIDES HERE, MR. MUSIKA.  CAN YOU WALK US

20   THROUGH THE NATURE OF THE CALCULATION YOU DID TO

21   ARRIVE AT THE $2.24 BILLION PROFIT NUMBER FOR THE

22   $17 MILLION PHONES -- 17 MILLION PHONES?

23   A    YES.  WELL, THERE'S THE $8.1 BILLION NUMBER

24   AGAIN -- PARDON ME -- AND HOPEFULLY WE CAN REMEMBER

25   THAT WAS THE TOTAL OF THE ACCUSED SALES.
```

1         BUT KEEPING IN MIND, I'M CALCULATING

2    THIS, THIS DAMAGE ONLY ON SAMSUNG'S PORTION.

3         SO THE FIRST THING I DO IS I HAVE TO

4    REDUCE THAT NUMBER FOR THE UNITS THAT, THAT OTHER 5

5    MILLION UNITS THAT WENT TO OTHER FORMS OF DAMAGE.

6    SO THAT'S THE FIRST DEDUCTION.  I THINK THAT'S THE

7    NEXT SLIDE.

8         AND I DEDUCT 1.749 BILLION BECAUSE I'M

9    GOING TO CALCULATE DAMAGES ON A REASONABLE ROYALTY

10   TO LOST PROFITS, AND THAT LEAVES ME $6,411,000,000.

11   Q    AND WHAT WAS THE NEXT STEP?

12   A    THE NEXT STEP IS WHAT WE ALL -- REGARDLESS OF

13   WHAT BUSINESS WE'RE IN, ALL OF US INCUR THE SAME

14   THING.  WE HAVE REVENUE BECAUSE WE MAKE A SALE, AND

15   WE HAVE EXPENSES.  NOBODY JUST GIVES US MONEY.  AND

16   SAMSUNG INCURRED EXPENSES TO GENERATE THAT

17   6,411,000,000, SO I HAD TO IDENTIFY HOW MUCH DID IT

18   COST SAMSUNG TO EARN OR GENERATE THAT

19   6,411,000,000.

20   Q    OKAY.  SO LET'S SEE THE NEXT SLIDE.

21   A    AND THERE YOU SEE -- THERE YOU SEE THE COST OF

22   GOODS SOLD, HOW MUCH DID IT COST, WHAT ARE THE

23   DIRECTLY ATTRIBUTABLE COSTS THAT SAMSUNG INCURRED,

24   AND THAT'S 4,170,000,000.

25         IF I SUBTRACT THAT FROM THAT PRIOR

2055

1    NUMBER, THAT GETS US DOWN TO THE BOTTOM,

2    $2,241,000,000.

3    Q    OKAY.  HAVE YOU DONE THIS CALCULATION FOR EACH

4    OF THE DIFFERENT PRODUCTS ACCUSED OF VIOLATING ONE

5    OF APPLE'S DESIGN OR TRADE DRESS PATENT RIGHTS?

6    A    YES.

7    Q    COULD WE SEE SLIDE 34B.19?

8         WHAT IS DEPICTED HERE, MR. MUSIKA?

9    A    THIS IS JUST A, AN ADDITIONAL SLIDE TO HELP

10   THE COURT SEE THAT NOT ONLY DID I DO IT ON AN

11   INDIVIDUAL TABLET-BY-TABLET,

12   SMARTPHONE-BY-SMARTPHONE BASIS, BUT THOSE ARE BY

13   MODEL, TOO.

14        SO HERE IS THAT SAMSUNG'S PROFITS

15   DIVIDED, OR SHOWN BY MODEL, BOTH FOR TABLETS AND

16   SMARTPHONES.

17   Q    OKAY.  HAS SAMSUNG ALSO PROVIDED A CALCULATION

18   IN THIS CASE OF WHAT IT SAYS ARE ITS PROFITS ON

19   THIS SAME GROUP OF 17 MILLION DEVICES?

20   A    WELL, NOT TO CONFUSE ANYONE.  MY NUMBER THAT

21   I'VE JUST GIVEN YOU IS SAMSUNG'S NUMBER, TOO.

22        BUT I DEDUCTED CERTAIN COSTS AND SAMSUNG

23   WOULD -- WOULD AND HAS SAID THAT THEY'VE INCURRED

24   ADDITIONAL COSTS THAT SHOULD BE SUBTRACTED.

25        SO THERE'S NO DISPUTE ABOUT THE NUMBERS

1    THAT I'M USING.  IT'S JUST THAT THERE'S A DISPUTE

2    ABOUT HOW MUCH -- HOW MANY COSTS SHOULD BE INCLUDED

3    IN THE CALCULATION.

4    Q    COULD WE SEE PDX 34B.20.

5              WHAT HAVE YOU SHOWN ON THIS SLIDE,

6    MR. MUSIKA?

7    A    THERE'S NO MATH IN THIS SLIDE.  THERE'S JUST

8    THREE NUMBERS.  THE FIRST NUMBER IS THE FAVORITE

9    NUMBER, OR THE OLD NUMBER WE KNOW, THE 8.1 BILLION

10   TOTAL REVENUE.  SO THAT'S THE REVENUE AT ISSUE.

11             THE MIDDLE NUMBER IS MY NUMBER OF WHAT

12   THE UNJUST GAIN IS.  THAT'S THE SAME $2.2 BILLION

13   NUMBER.

14             BUT THE NUMBER ON THE RIGHT IS ANOTHER

15   SAMSUNG CALCULATION WHICH TAKES MY 2.2 BILLION AND

16   TAKES IT DOWN TO $1,086,000,000.

17   Q    AND WHAT IS -- SINCE YOU BOTH STARTED WITH THE

18   SAME NUMBERS FROM SAMSUNG'S RECORDS, WHAT IS THE

19   REASON FOR THE DIFFERENCE BETWEEN YOUR CALCULATION

20   OF TOTAL PROFITS ON THESE 17 MILLION PHONES AND

21   SAMSUNG'S CALCULATION OF TOTAL PROFITS ON THESE 17

22   MILLION PHONE?

23   A    WE'RE GOING TO SEE IT IN JUST A SECOND, BUT

24   IT'S REAL SIMPLE.  KEEP IN MIND I DEDUCTED COSTS

25   WHICH ARE DIRECTLY ATTRIBUTABLE.

```
 1              SAMSUNG DEDUCTED THOSE COSTS AS WELL, BUT
 2     THEY DEDUCTED ADDITIONAL COSTS WHICH I DID NOT
 3     DEDUCT, AND WE'LL LOOK AT THOSE PRESENTLY.
 4     Q    OKAY.  WHY DON'T WE LOOK AT EXHIBIT 28.  IT'S
 5     IN YOUR BINDER.  AND COULD WE START SIMPLY BY YOU
 6     IDENTIFYING WHAT EXHIBIT 28 IS.
 7     A    EXHIBIT 28 IS A -- THIS IS A SCHEDULE THAT I
 8     PREPARED USING SAMSUNG'S RECORDS, TRANSLATED
 9     RECORDS, FOR SEC AND I USED IT FOR PURPOSES OF
10     LOOKING AT THE TYPES OF COSTS -- THIS WILL LIST ALL
11     THEIR COSTS FROM TOP TO BOTTOM, AND WE'LL SEE THE
12     KIND OF COSTS I DEDUCTED AND THE ADDITIONAL COSTS
13     THAT SAMSUNG DEDUCTED.
14              MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE
15     THE ADMISSION OF EXHIBIT PX 28.
16              MR. PRICE:  NO OBJECTION.
17              THE COURT:  ALL RIGHT.  IT'S ADMITTED.
18              (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
19              28, HAVING BEEN PREVIOUSLY MARKED FOR
20              IDENTIFICATION, WAS ADMITTED INTO
21              EVIDENCE.)
22     BY MS. KREVANS:
23     Q    YOU SAY YOU PREPARED THIS.  WHAT WAS THE
24     SOURCE OF THESE NUMBERS?
25     A    SAMSUNG RECORDS.
```

1    Q    DID YOU CHANGE THE NUMBERS IN ANY WAY WHEN YOU

2    PREPARED THIS SCHEDULE?

3    A    THE NUMBERS ARE -- THEY'RE IMPORTANT, BUT

4    THEY'RE NOT THE NUMBERS.  THEY'RE THE NUMBERS FOR

5    THE OVERALL ENTITY.  SO IT HAS OTHER SALES OF

6    NON-ACCUSED ITEMS.

7          MY FOCUS IS REALLY MORE ON TERMS OF THE

8    TYPES OF ACCOUNTS, BUT I DIDN'T CHANGE THIS.  THIS

9    COMES DIRECTLY -- THIS IS THE TYPE OF ACCOUNTS AND

10   THE NUMBERS COME DIRECTLY FROM SAMSUNG.

11   Q    OKAY.  COULD WE JUST MAKE A LITTLE LARGER,

12   MR. LEE, THE TOP PORTION OF THIS DOWN THROUGH LINE,

13   GROSS SALES PROFIT PERCENTAGE.

14         WHAT'S DEPICTED HERE, MR. MUSIKA?

15   A    SAMSUNG'S RECORDS ARE, ARE THE SAME AS, IN

16   MANY OTHER SOPHISTICATED, SAME AS APPLE'S.  THEY'RE

17   PREPARED BASICALLY IN THE SAME FORMAT.

18         AND THE BASIC FORMAT OF A FINANCIAL

19   STATEMENT, OR A PROFIT AND LOSS STATEMENT, IS NO

20   DIFFERENT THAN OUR PERSONAL PROFIT AND LOSS

21   STATEMENTS.

22         WE START AT THE TOP WITH HOW MUCH DID WE

23   EARN, WHAT'S THE REVENUE?  AND THEN WE DEDUCT

24   EXPENSES.

25         STARTING AT THE TOP, THOSE EXPENSES ARE

```
 1    DIRECTLY ATTRIBUTABLE.  AS YOU MOVE DOWN AND YOU
 2    GET TO WHERE PEOPLE USUALLY REFER TO IT, THE BOTTOM
 3    LINE, THOSE COSTS THAT ARE INCLUDED BECOME LESS AND
 4    LESS SPECIFICALLY ASSOCIATED WITH THE REVENUE.
 5              SO HERE WE SEE REVENUE, QUANTITY AT THE
 6    TOP, AND THEN SALES IN TERMS OF TOTAL DOLLARS.
 7    Q    AND I TAKE IT FROM WHAT YOU SAID A COUPLE
 8    MINUTES AGO, WHERE IT SAYS SALES $30 BILLION, YOU
 9    DIDN'T USE ALL 30 BILLION OF THOSE DOLLARS IN YOUR
10    CALCULATIONS?
11    A    NO.  AGAIN, THIS IS THEIR NUMBERS FROM THE SEC
12    MANUFACTURING ENTITY THAT HAS SALES OF OTHER ITEMS
13    IN THERE, SO I'VE ALREADY PULLED MY -- MY 8
14    BILLION, OR SAMSUNG'S 8 BILLION IS IN THAT $30
15    BILLION NUMBER IN THERE, BUT THERE ARE OTHER THINGS
16    IN THERE AND WE SHOULDN'T BE FOCUSSED ON THOSE
17    NUMBERS.
18    Q    OKAY.  YOU SEE AT THE BOTTOM PORTION OF THIS
19    EXHIBIT 28 THAT WE'RE LOOKING AT ON THE SCREEN
20    RIGHT NOW, THERE ARE TWO LINES THAT SAY "GROSS
21    SALES PROFIT" AND "GROSS SALES PROFIT PERCENTAGE."
22              WHAT ARE THOSE NUMBERS?
23    A    STANDARD ACCOUNTING TERMINOLOGY.  SALES MINUS
24    COST OF GOODS SOLD, THAT'S -- C.O.G.S. STANDS FOR
25    COST OF GOODS SOLD, AND THOSE ARE COSTS WHICH ARE
```

```
 1    DIRECTLY ATTRIBUTABLE TO THE PRODUCTION AND/OR SALE
 2    OF THE ACCUSED DEVICES.
 3              AND THIS IS -- AGAIN, THIS ISN'T MY
 4    CONSTRUCTION.  THIS IS REALLY GENERALLY ACCEPTED
 5    ACCOUNTING PRINCIPALS AND THIS IS DIRECTLY FROM
 6    THEIR STATEMENTS.
 7              AND THAT GETS US, IF WE DEDUCT THE COST
 8    OF GOODS SOLD FROM THE SALES, WE GET A GROSS PROFIT
 9    NUMBER AND PERCENTAGE.
10    Q    AND WHAT'S THE GROSS PROFIT PERCENTAGE?
11    A    GROSS PROFIT PERCENTAGE IS, IN THIS STATEMENT
12    IS 39.2 PERCENT.
13    Q    WHAT WAS THE AVERAGE GROSS PROFIT AMOUNT THAT
14    YOU FOUND IN SAMSUNG'S FINANCIAL RECORDS FOR THE $8
15    BILLION IN SALES OF THE ACCUSED PRODUCTS IN THE
16    UNITED STATES?
17    A    ALL RIGHT.  THE ACCUSED PRODUCTS HAVE SLIGHTLY
18    LOWER GROSS PROFIT PERCENTAGE.  PER MY
19    RECOLLECTION, THE OVERALL GROSS PROFIT PERCENTAGE
20    ON JUST THE ACCUSED PRODUCTS WAS APPROXIMATELY 35.5
21    PERCENT.
22    Q    OKAY.  YOU SAID A COUPLE MINUTES AGO THAT IF
23    WE MOVE DOWN THIS SAME PAGE OF EXHIBIT 28, WE'RE
24    GOING TO SEE SOME OTHER KINDS OF EXPENSES.
25    A    YES.
```

```
 1    Q     DO YOU BELIEVE THAT THOSE OTHER EXPENSES ARE

 2    APPROPRIATE TO BE DEDUCTED IN CALCULATING SAMSUNG'S

 3    TOTAL PROFITS FOR PURPOSES OF DAMAGES IN THIS CASE?

 4    A     FIRST OF ALL, SAMSUNG DEDUCTS ALL THOSE OTHER

 5    EXPENSES.  THEY WERE INCURRED.  I'M NOT DISPUTING

 6    THEY WERE INCURRED.

 7              BUT I DO NOT THINK IT IS APPROPRIATE TO

 8    DEDUCT THOSE TO GET TO THE PROFIT NUMBER WHICH

 9    WOULD REWARD APPLE FOR SAMSUNG'S UNJUST ENRICHMENT.

10              SO REALLY ALL THE EXPENSES BELOW THERE

11    ARE REALLY THE DISAGREEMENT.

12    Q     AND WHY DO YOU THINK THAT THOSE EXPENSES,

13    THOSE OTHER EXPENSES, ARE NOT PROPERLY DEDUCTED IN

14    CALCULATING SAMSUNG'S PROFITS?

15    A     I HAVE TWO VERY SPECIFIC REASONS.

16    Q     WHAT ARE THEY?

17    A     ONE REASON IS THAT THOSE COSTS, BY THEIR VERY

18    NATURE AND HOW THEY'VE BEEN PUT ON THIS FINANCIAL

19    STATEMENT, I KNOW, AS A C.P.A., THAT THEY ARE LESS

20    AND LESS DIRECTLY ASSOCIATED WITH THE PRODUCT AT

21    HAND.  SO I KNOW THAT BASED ON SAMSUNG'S OWN

22    REPRESENTATION.

23              SECONDLY, WHEN I TRIED TO INVESTIGATE HOW

24    THEY WOULD PERHAPS TRY TO ALLOCATE THESE -- AND

25    WHEN I SAY "TRY," DON'T MEAN THAT IN A NEGATIVE
```

 1    WAY, BUT IF YOU HAD A NON-DIRECT COST, THE ONLY WAY

 2    TO ASSIGN IT IS YOU HAVE TO DETERMINE SOME FORM OF

 3    ALLOCATION, AND WHEN I LOOK FOR THE ALLOCATION

 4    BASIS, THE RECORDS WERE UNRELIABLE.

 5            SO FOR THOSE TWO PRIMARY REASONS, NO, I

 6    DID NOT INCLUDE THEM.

 7    Q    OKAY.  CAN YOU GIVE US AN EXAMPLE, FROM

 8    SAMSUNG'S ACTUAL EXPENSE CATEGORIES, OF SOMETHING

 9    THAT SAMSUNG INCLUDED IN ITS CALCULATION WHICH YOU

10    DID NOT INCLUDE AND EXPLAIN WHY YOU THOUGHT IT WAS

11    INAPPROPRIATE.

12    A    YES.  MAY I?

13    Q    PLEASE.

14    A    R&D IS A GOOD EXAMPLE.  R&D STANDS FOR

15    RESEARCH AND DEVELOPMENT, AND CERTAINLY SAMSUNG

16    ENGAGES IN RESEARCH AND DEVELOPMENT, AS DOES APPLE.

17            FROM AN ACCOUNTING STANDPOINT, IT'S

18    CALLED MATCHING.  WE WANT TO MATCH UP THE EXPENSES

19    WITH THE REVENUE.  WE DON'T WANT TO MATCH UP THE

20    EXPENSES FOR PRODUCT A AND SUBTRACT THEM FROM

21    PRODUCT B.

22            AND I KNOW, AGAIN, BASED ON MY OWN

23    ACCOUNTING EXPERIENCE, THAT THE RESEARCH AND

24    DEVELOPMENT COSTS, WHICH ARE INCURRED IN THE

25    CURRENT TIME PERIOD, RELATE TO FUTURE EVENTS, OR

1    FUTURE PRODUCTS, NOT TO THE CURRENT PRODUCTS.

2              AND SO, AGAIN, FOR ANOTHER REASON THERE,

3    IT IS A COST THAT'S NOT A COST THAT'S ASSOCIATED

4    WITH THESE ACCUSED PRODUCTS.

5    Q    OKAY.  LET'S TURN TO THE SECOND REASON THAT

6    YOU SAID YOU THOUGHT IT WAS INAPPROPRIATE TO

7    INCLUDE THESE OTHER CATEGORIES, AND THAT WAS THAT

8    YOU FOUND THE INFORMATION IN SOME WAYS TO BE

9    UNRELIABLE.

10   A    YES, I DID.

11   Q    WHAT LED TO THAT CONCLUSION?

12   A    AS AN AUDITOR FOR THAT FIRST 10, 12 YEARS OF

13   MY LIFE, AND REALLY DOING INVESTIGATIONS

14   AFTERWARDS, WE AS AUDITORS ARE TAUGHT TO, TO APPLY

15   SOMETHING CALLED PROFESSIONAL SKEPTICISM, EXERCISE

16   OUR PROFESSIONAL JUDGMENT.  WE SIMPLY DON'T TAKE

17   FROM OUR CLIENTS OR FROM PARTIES THAT ARE PRODUCING

18   FINANCIAL INFORMATION AND SAY, THAT MUST BE RIGHT.

19             WE GIVE IT -- IN SORT OF LAYMAN'S TERMS,

20   WE GIVE IT A SMELL TEST AND SAY, DOES THIS MAKE

21   SENSE?  AND IN AUDIT LINGO, AGAIN, ARE THERE

22   CERTAIN RED FLAGS?

23             AND I ENCOUNTERED A NUMBER OF RED FLAGS

24   WITH SAMSUNG'S DATA BELOW THE GROSS PROFIT LINE.

25   Q    OKAY.  COULD WE LOOK AT PDX 34B.23, PLEASE.

```
 1              WHAT IS SET OUT IN YOUR SLIDE 23,

 2     MR. MUSIKA?

 3     A    WELL, I WAS GOING TO DO THIS PIECE BY PIECE.

 4     AS A TEACHER, I DON'T LIKE PEOPLE READING AHEAD,

 5     BUT -- GOOD.

 6     Q    THANK YOU, MR. LEE.

 7     A    SO, YES, THERE ARE FOUR RED FLAGS, AS YOU SAW.

 8              IT WAS TAKEN AWAY, BUT THE FIRST ONE IS,

 9     IS THE INFORMATION THAT I'M PRESENTED WITH, DOES

10     THAT TIE TO SOME RELIABLE SOURCE?  SOME OTHER

11     SOURCE, AN AUDITED FINANCIAL STATEMENT, A TAX

12     RETURN, SOMETHING ELSE THAT I KNOW SOMEBODY ELSE IS

13     LOOKING OVER THE COMPANY'S SHOULDER?

14     Q    AND WHAT DID YOU FIND WHEN YOU LOOKED AT THAT

15     ISSUE?

16     A    I'M NOT SAYING IT DIDN'T TIE, BUT NOBODY DID

17     TIE IT.  I COULDN'T TIE IT, AND SAMSUNG DIDN'T

18     RECONCILE OR TIE IT, EITHER.  SO I WAS LACKING WITH

19     THAT LEVEL OF COMFORT.

20     Q    WHAT WAS THE SECOND RED FLAG YOU LOOKED FOR?

21     A    THE SECOND ONE IS, IS THIS INFORMATION THAT'S

22     USED TO RUN THE BUSINESS?  WHEN WE SAY "ORDINARY

23     COURSE," THIS IS INFORMATION THEY USE EVERY DAY.

24     THIS ISN'T SOMETHING THAT'S PRODUCED FOR A SPECIAL

25     PURPOSE.
```

2080

1    COME FIVE YEARS," AND THAT CIRCLE -- NUMBER ONE,

2    THE APPLE IPHONE, THAT'S -- THAT'S THEIR DOCUMENT,

3    I DIDN'T CIRCLE THAT.  I HAVEN'T CHANGED THIS

4    DOCUMENT.  SO SAMSUNG HAS IDENTIFIED THE APPLE

5    IPHONE AS SOMETHING THAT'S GOING TO SHAPE THE NEXT

6    FIVE YEARS.

7    Q    AND THE DATE OF THIS DOCUMENT WAS SEPTEMBER

8    2007?

9    A    2007, YES.

10    Q    OKAY.  COULD YOU TURN TO PAGE 37 OF THIS

11    DOCUMENT.  AND LET ME KNOW AGAIN WHEN YOU'RE THERE.

12    A    I'M THERE.

13    Q    OKAY.  WHAT IS THIS PORTION OF EXHIBIT 34

14    DEPICTING?

15    A    LISTED AT THE TOP IS "IPHONE EFFECT ANALYSIS,"

16    SO WHAT EFFECT THE IPHONE IS EXPECTED TO HAVE.

17    Q    AND, AGAIN, IS THIS FROM SEPTEMBER 2007?

18    A    THIS ENTIRE DOCUMENT IS FROM THAT TIME PERIOD,

19    YES.

20    Q    OKAY.  COULD YOU TURN TO THE SECOND PAGE OF

21    THIS THREE-PAGE SECTION OF EXHIBIT 34 AND TELLS US

22    WHAT IS INDICATED ON THIS PAGE THAT YOU TOOK INTO

23    ACCOUNT IN YOUR OPINION?

24    A    YES.  THE BOX THAT'S SORT OF AT THE RIGHT, THE

25    TOP BOX, THAT'S CORRECT, IT SAYS "FACTORS THAT

1    COULD MAKE IPHONE A SUCCESS."

2              AND THEN THE FIRST BULLET UNDER THAT IS

3    "EASE AND INTUITIVE U/I," USER INTERFACE, "THAT

4    COVERS ALL USER CLASSES, INCLUDING MALE, FEMALE,

5    OLD AND YOUNG," AND THEN THE FIRST BULLET,

6    "BEAUTIFUL DESIGN."

7    Q    AND HOW DID THOSE, THESE PORTIONS OF THE

8    DOCUMENT EFFECT THE DEMAND FOR THE IPHONE?

9    A    WELL, THE FOCUS WAS ON IPHONE AND THE

10   IDENTIFICATION BY SAMSUNG OF IPHONE AS BEING A

11   DRIVER IN THE MARKETPLACE, SO OBVIOUSLY THAT'S

12   REPRESENTATIVE OF DEMAND FOR THE IPHONE, AND

13   IDENTIFYING BEAUTIFUL DESIGN AS BEING FURTHER -- OR

14   EVIDENCE OF, OF DEMAND FOR DESIGN.

15   Q    COULD YOU TURN TO EXHIBIT 194 IN YOUR BINDER,

16   PLEASE, MR. MUSIKA.

17   A    I'M THERE.

18   Q    WHAT IS -- STRIKE THAT.

19              IS EXHIBIT 194 A DOCUMENT THAT YOU

20   CONSIDERED AND RELIED UPON IN FORMING YOUR OPINIONS

21   ABOUT DEMAND FOR THE IPHONE?

22   A    YES.

23              MS. KREVANS:  YOUR HONOR, WE MOVE THE

24   ADMISSION OF EXHIBIT 194.

25              MR. PRICE:  SAME OBJECTIONS, YOUR HONOR.

```
 1   FOUNDATION.
 2            MS. KREVANS:  AGAIN, YOUR HONOR, WE'VE
 3   LAID THE FOUNDATION AND IT'S A SAMSUNG ADMISSION.
 4            THE COURT:  IT'S ADMITTED.
 5            (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER
 6            194, HAVING BEEN PREVIOUSLY MARKED FOR
 7            IDENTIFICATION, WAS ADMITTED INTO
 8            EVIDENCE.)
 9   BY MS. KREVANS:
10   Q    WHAT IS EXHIBIT 194, MR. MUSIKA?
11   A    IT'S A, AN INTERNAL E-MAIL FROM SAMSUNG
12   EXECUTIVES TO OTHER SAMSUNG EXECUTIVES.
13   Q    AND THE DATE OF THIS DOCUMENT IS?
14   A    MARCH 2ND, 2010.
15   Q    AND WHO IS IT -- WHAT IS THE SUBJECT MATTER
16   INDICATING?
17   A    THE SUBJECT SAYS "TO UX," USER EXPERIENCE,
18   "EXECUTIVES."
19   Q    WHAT PART OF THIS MARCH 2ND, 2010 E-MAIL DID
20   YOU FIND RELEVANT TO THE DEMAND OPINIONS THAT YOU
21   FORMED?
22   A    GO DOWN ONE, TWO, THREE, FOUR, FIVE PARAGRAPHS
23   AND HIGHLIGHT THAT.  YES.
24            IT SAYS, "I AM NOT SAYING TO MAKE A UX
25   THAT IS EXACTLY IDENTICAL TO THE IPHONE, BUT I AM
```

```
 1    SAYING TO LEARN THE WISDOM OF THE IPHONE AND
 2    RECOGNIZE THE STANDARD OF THE INDUSTRY WHICH WAS
 3    SET BY THEM ALREADY."
 4    Q    LET'S TURN BACK TO YOUR SLIDE 34B.32, AND LOOK
 5    AT THE SECOND FACTOR YOU CONSIDERED, WHICH WAS
 6    MARKET ALTERNATIVES.
 7              WHAT EVIDENCE DID YOU FIND WHEN YOU
 8    LOOKED AT MARKET ALTERNATIVES?
 9    A    UM --
10    Q    AND LET ME FIRST ASK YOU, WHAT DO YOU MEAN BY
11    "MARKET ALTERNATIVES"?
12    A    SO I THINK YOU PHRASED IT WELL, IS IF SAMSUNG
13    DIDN'T MAKE THE SALE, WOULD APPLE HAVE MADE THE
14    SALE?
15              SO IF, IF THERE WERE OTHER ALTERNATIVES
16    IN THE MARKETPLACE, THEN APPLE WOULDN'T MAKE EVERY
17    ONE OF THOSE 22 MILLION SALES.  OF COURSE I DIDN'T
18    CALCULATE LOST PROFITS ON THE 22 MILLION.  YOU MAY
19    RECALL IT WAS ONLY 2 MILLION.
20              PART OF THE REASON WAS BECAUSE ALTHOUGH
21    I'M NOT OFFERING AN OPINION THAT THERE ARE MARKET
22    ALTERNATIVES, I CONSERVATIVELY SAID, WELL, I'M JUST
23    GOING TO ASSUME AND ACCEPT THAT SAMSUNG'S OTHER
24    PRODUCTS AND THAT EVERY OTHER MARKET PARTICIPANT IS
25    A MARKET ALTERNATIVE.
```

1    Q    COULD YOU EXPLAIN TO US THE EVIDENCE THAT YOU

2    FOUND WHEN YOU LOOKED AT THIS QUESTION.

3    A    I DID TWO, TWO RESTRICTIONS.  ONE, I, I LOOKED

4    AT THE TIME PERIOD AND I TOOK THAT TWO YEARS,

5    BASICALLY THE TWO-YEAR TIME PERIOD OF 2010, 2011,

6    2012, AND I SHRUNK THAT -- SORRY -- I SHRUNK THAT

7    DOWN.  I ASSUMED THAT WITH EACH PATENT OR EACH

8    TRADE DRESS THAT SAMSUNG WOULD SIMPLY NOT LEAVE THE

9    MARKET, THAT THEY WOULD DO SOMETHING TO TRY TO GET

10   BACK INTO THE MARKET.

11        SO I LIMITED MY CALCULATIONS TO LOST

12   PROFITS TO ONLY A TIME PERIOD WHICH WOULD BE

13   ASSOCIATED WITH THE TIME SAMSUNG WOULD BE OUT OF

14   THE MARKET.

15        SO DEPENDING ON THE INTELLECTUAL

16   PROPERTY, IT WAS AS LITTLE AS ONLY ONE MONTH OR AS

17   HIGH AS EIGHT MONTHS, BUT NOT THE ENTIRE TIME

18   PERIOD.  SO THAT 22 MILLION SHRINKS DOWN TO EIGHT

19   MONTHS OR ONE MONTH, RIGHT, BASED ON THAT.

20        AND THERE WAS ONE OTHER THING.

21   Q    YES, THE MARKET SHARE ALLOCATION.  WHAT ARE

22   YOU REFERRING TO THERE?

23   A    MARKET SHARE ALLOCATION, THERE WAS A FURTHER

24   CUT.  ONCE I GOT IT DOWN TO JUST THAT TIME PERIOD,

25   THE SALES THAT WOULD HAVE BEEN MADE IN THAT TIME

1    PERIOD, THEN I DISTRIBUTED THOSE SALES TO ALL THE

2    MARKET PARTICIPANTS.

3            I ONLY PUT IN APPLE'S PILE THEIR MARKET

4    SHARE.  I GAVE BACK TO SAMSUNG THEIR MARKET SHARE.

5    I GAVE NOKIA THEIR MARKET SHARE.  I GAVE MOTOROLA

6    THEIR MARKET SHARE.

7            SO THAT CARVED IT DOWN FURTHER AND THAT'S

8    WHY I ONLY END UP WITH 2 MILLION OUT OF THAT 22

9    MILLION THAT QUALIFY FOR LOST PROFITS.

10   Q    WHAT WAS THE THIRD FACTOR YOU CONSIDERED IN

11   DETERMINING HOW MANY OF THE 22 MILLION UNITS

12   QUALIFIED FOR LOST PROFITS?

13   A    CAPACITY.  COULD APPLE -- DID THEY HAVE THE

14   FACILITIES TO ACTUALLY PRODUCE THIS AND SELL THIS?

15   Q    AND WHAT DID YOU FIND?

16   A    I FOUND THAT THEY DID.  THERE WERE -- THERE

17   WERE LIMITATIONS, AS -- BECAUSE THE DEMAND WAS SO

18   HIGH, FROM TIME TO TIME, APPLE DID HAVE

19   CONSTRAINTS.

20           BUT WITH RESPECT TO THIS 2 MILLION

21   INCREMENTAL UNITS OVER THE TWO YEAR TIME PERIOD,

22   APPLE, I CONCLUDED, DID HAVE THE ABILITY TO MAKE

23   THOSE SALES.

24   Q    WHEN YOU SAY "THE ABILITY TO MAKE THOSE

25   SALES," ARE YOU REFERRING TO MANUFACTURING

1    CAPACITY?

2    A    MANUFACTURING AND MARKETING CAPACITY.  IT

3    COULD BE EITHER OR BOTH.

4    Q    AND WHAT WAS THE FOURTH FACTOR YOU USED IN

5    DETERMINING WHETHER UNITS QUALIFIED FOR LOST

6    PROFITS REMEDY?

7    A    IT'S JUST A CALCULATION OF APPLE'S PROFITS,

8    AND I WAS ABLE TO CALCULATE HOW MUCH APPLE MAKES ON

9    EACH ONE OF ITS SMARTPHONES OR TABLETS.  AND ONCE

10   AGAIN, IT'S SIMPLE MULTIPLICATION, TIMES 2 MILLION

11   UNITS GAVE ME MY LOST PROFITS.

12   Q    LET'S GO BACK TO SLIDE 34B.62.  IF YOU HAD NOT

13   CONCLUDED THAT 2 MILLION OF THE DEVICES DID QUALIFY

14   FOR LOST PROFIT DAMAGES, WHAT WOULD HAVE CHANGED IN

15   YOUR ULTIMATE CONCLUSION?

16   A    WE WOULD JUST SLIDE THOSE PHONES UP BECAUSE

17   THEY'RE ENTITLED -- UNDER THE ASSUMPTION THAT

18   THEY'RE INFRINGING, THEY'RE GOING TO GET SOME FORM

19   OF DAMAGE.  SO I SLIDE IT UP TO SAMSUNG'S

20   PROFITS -- I'M NOT DOUBLE COUNTING -- AND THE

21   RESULT IS, I THINK WE CAN SHOW, WE DON'T HAVE ANY

22   LOST PROFITS, BUT THE INFRINGING PROFITS NOW GOES

23   UP TO $2.481 BILLION.

24   Q    LET'S GO BACK TO YOUR ORIGINAL APPROACH IN

25   WHICH YOU HAVE PHONES AND TABLETS IN ALL THREE

1    CATEGORIES, AND LET ME ASK YOU ABOUT THE LAST

2    CATEGORY, THE REASONABLE ROYALTY CATEGORY.

3              FIRST, COULD YOU EXPLAIN TO THE JURY IN

4    CONCEPT WHAT IS MEANT BY A REASONABLE ROYALTY?

5    A    YES.  I HAVE A SIMPLE LITTLE SLIDE THAT HELPS.

6    Q    34B.42, PLEASE.

7    A    YES.  A ROYALTY PAYMENT IS, IT'S JUST LIKE, AS

8    THE FIRST EXAMPLE, RENT.  SO IF YOU DECIDE TO RENT

9    OUT YOUR HOUSE OR IF YOU HAVE AN APARTMENT AND YOU

10   WANT TO RENT IT, THAT'S YOUR ASSET.  YOU OWN THAT.

11   IT'S A TANGIBLE ASSET.  IF SOMEBODY ELSE IS GOING

12   TO USE IT, YOU WANT TO BE PAID FOR IT.  SO THEY PAY

13   YOU RENT.

14   Q    LET ME STOP YOU RIGHT THERE.  UNDER YOUR REAL

15   ESTATE COLUMN ON THIS GRAPHIC, YOU HAVE WHAT LOOKS

16   LIKE A PICTURE OF TWO HANDS SHAKING.  WHY DO YOU

17   HAVE THAT THERE?

18   A    WELL, IN THE TWO EXAMPLES, REAL ESTATE AND

19   MINERAL RIGHTS, THE PARTIES GET TOGETHER AND

20   ACTUALLY AGREE.

21             BUT HERE, WITHIN THE CONTEXT OF THE

22   LITIGATION, THE REASON WE'RE ALL HERE,

23   UNFORTUNATELY, IS THE TWO PARTIES HAVEN'T AGREED.

24   THEY HAVEN'T SHOOK HANDS AND AGREED.  SO WE DON'T

25   HAVE AN AGREEMENT.

1    BELIEVE SAMSUNG SHOULD PAY IN THIS CASE IF THE JURY

2    FINDS THAT APPLE'S INTELLECTUAL PROPERTY IS VALID

3    AND INFRINGED?

4    A    SUMMING THE THREE UP, THE TOTAL NUMBER COMES

5    TO $2,751,000,000.

6    Q    COULD YOU TURN TO EXHIBIT 25 IN YOUR BINDER.

7    I'M SORRY, THIS IS 25A-1.

8    A    YES.

9    Q    WHAT IS 25A-1, MR. MUSIKA?

10   A    THIS IS A SUMMARY OF SOME OF THE CALCULATIONS

11   THAT I'VE BEEN TALKING ABOUT THIS MORNING.

12   Q    AND WHO PREPARED EXHIBIT 25A-1?

13   A    MY TEAM UNDER MY DIRECTION.

14          MS. KREVANS:  YOUR HONOR, WE OFFER

15   EXHIBIT 25A-1.

16          MR. PRICE:  NO FURTHER OBJECTION.

17          THE COURT:  OKAY.  IT'S ADMITTED.

18          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

19          25A-1, HAVING BEEN PREVIOUSLY MARKED FOR

20          IDENTIFICATION, WAS ADMITTED INTO

21          EVIDENCE.)

22          MS. KREVANS:  OKAY.

23   Q    COULD YOU, JUST BRIEFLY, MR. MUSIKA, WALK THE

24   JURY THROUGH WHAT INFORMATION IS SET OUT ON EACH

25   PAGE OF EXHIBIT 25A-1?

```
1    A    YES.  SO I'LL USE MY BOOK, AND I ASSUME THAT

2    YOU'LL MOVE THE SCREEN AS I TALK.

3              SO PAGE 2 OF 16 IS JUST THE SUMMARY OF

4    DAMAGES, WHAT WE JUST LOOKED AT.

5              PAGE 3 OF 16 --

6    Q    LET ME STOP YOU FOR A MOMENT ON PAGE 3.  YOU

7    SEE AT THE BOTTOM THERE'S A NOTE?

8    A    YES.

9    Q    WHAT DOES THAT NOTE EXPLAIN?

10   A    THAT EXPLAINS THE, THE TIME PERIODS THAT WERE

11   USED FOR THE CALCULATION OF THE DAMAGES.

12   Q    AND WHAT DOES IT INDICATE THOSE TIME PERIODS

13   WERE?

14   A    IT INDICATES THAT THE TIME PERIODS THAT I USED

15   FOR THE REGISTERED TRADE DRESS WAS BASICALLY THE

16   START OF THE INFRINGING TIME PERIOD.

17   Q    THAT'S FOR THE UNREGISTERED TRADE DRESS?

18   A    UNREGISTERED TRADE DRESS.

19   Q    AND FOR THE REST?

20   A    AND FOR THE REST I USED AUGUST 4TH, 2010 AS

21   THE START DATE.

22   Q    THANK YOU.  COULD YOU CONTINUE EXPLAINING TO

23   THE JURY WHAT THE CONTENTS OF PX 25 ARE.

24   A    YES.  PAGE 3 OF 16 IS JUST THE MATRIX.  YOU

25   SEE THE PRODUCTS THERE ON THE LEFT AND ALL THE
```

1    FORMS OF INTELLECTUAL PROPERTY THAT HAVE BEEN

2    IDENTIFIED THERE, WHICH PRODUCTS ARE ACCUSED OF

3    INFRINGING WHICH OF THE INTELLECTUAL PROPERTY.

4              THE NEXT PAGE IS JUST A SUMMARY OF, A

5    MORE DETAILED SUMMARY BY PRODUCT OF THE FOLLOWING

6    PHONES THAT WE WENT THROUGH.  IT'S JUST DIFFERENT

7    CALCULATIONS.

8              THE SAME IS TRUE OF 5 OF 16.

9              6 OF 16 IS A LISTING OF PRODUCTS AND THE

10   CARRIERS THAT ARE ASSOCIATED WITH EACH PRODUCT.

11   Q    SO THE -- THIS IS JUST WHICH PHONE COMPANIES

12   ARE PROVIDING THEIR CUSTOMERS WITH WHICH SAMSUNG

13   PRODUCTS?

14   A    THAT'S CORRECT.

15   Q    THANK YOU.  AND YOU HAVE A SERIES OF PAGES

16   THAT ARE HEADED "MOR-FLO ANALYSIS."

17   A    THAT'S 7 THROUGH 12.

18   Q    WHAT ARE THOSE?

19   A    THAT'S THE MARKET SHARE ALLOCATIONS.  THAT'S

20   WHERE I LIMITED THE NUMBER OF PHONES THAT APPLE

21   WOULD GET BECAUSE I'VE ALLOCATED PERCENTAGES TO THE

22   OTHER MARKET PARTICIPANTS, AND THOSE ARE THOSE

23   CALCULATIONS.

24   Q    THAT TAKES US TO PAGE 13, AND WHAT IS SET OUT

25   ON PAGE 13?

2097

```
 1   A    PAGE 13 IS A STUDY DONE, I THINK IT WAS DONE

 2   BY IBM, BUT IT WAS DONE BY SOMEONE ELSE WHICH

 3   REALLY LOOKED AT THE PERCENTAGE OF USERS THAT WOULD

 4   SWITCH CARRIERS, AND THAT WAS ANOTHER LIMITING

 5   FACTOR THAT I USED.

 6   Q    OKAY.  LET'S -- MR. LEE, DON'T SHOW IT IN

 7   COURT, BUT JUST SHOW THE JURORS PAGES 14 AND 15.

 8            YOUR HONOR, I'D NOTE FOR THE RECORD THAT

 9   THESE TWO PAGES, PER A PRIOR ORDER OF THE COURT,

10   HAVE BEEN PERMITTED TO BE REDACTED AND FILED UNDER

11   SEAL AND WE HAVE PROVIDED BOTH THE REDACTED AND

12   UNREDACTED COPIES TO THE COURT.

13            AND MR. MUSIKA, CAN YOU TELL US WHAT

14   INFORMATION IS SET OUT ON PAGES 14 AND 15?

15   A    YES.  IT'S MY ANALYSIS THAT RELATES TO THE

16   CAPACITY FACTOR, DETERMINING WHETHER OR NOT THERE'S

17   SUFFICIENT CAPACITY.

18   Q    AND FINALLY, PAGE 16.

19   A    16 IS THE RATES THAT WE JUST LOOKED AT, AND IT

20   GIVES A LITTLE MORE DETAILS ABOUT THE THREE

21   VALUATION METHODOLOGIES I USED.

22   Q    JUST TO FINISH UP, MR. MUSIKA, COULD YOU

23   SUMMARIZE FOR THE JURY YOUR OVERALL DAMAGES OPINION

24   IN THIS CASE?

25   A    YES.  WHERE I BEGAN, THE DAMAGES ARE A RANGE
```

1    BETWEEN $2.5 BILLION AND AT THE HIGH END,

2    $2,750,000,000.

3    Q    AND WHAT IS THE DIFFERENCE BETWEEN THE BOTTOM

4    AND THE TOP OF THAT RANGE?

5    A    ONE ASSUMES -- YOU REMEMBER WE WERE SLIDING

6    THE PHONES, THAT WE BASICALLY -- THE LOWER END

7    NUMBER IS JUST ALL OF SAMSUNG'S UNJUST ENRICHMENT,

8    PLUS A REASONABLE ROYALTY.

9          THE HIGHER NUMBER WAS SAMSUNG'S UNJUST

10   ENRICHMENT, LOST PROFIT ON THOSE 2 MILLION, PLUS

11   THE REASONABLE ROYALTY.

12          MS. KREVANS:  THANK YOU.

13          NOTHING FURTHER, YOUR HONOR.

14          THE COURT:  ALL RIGHT.  THE TIME IS NOW

15   11:20.

16                **CROSS-EXAMINATION**

17   BY MR. PRICE:

18   Q    GOOD MORNING, MR. MUSIKA.

19   A    GOOD MORNING.

20   Q    MY NAME IS BILL PRICE.

21          AND I WANTED TO ASK YOU, BEFORE WE GET

22   INTO YOUR METHODOLOGIES, YOU SAID YOU'VE DONE THIS

23   A NUMBER OF TIMES, THIS SORT OF ANALYSIS; CORRECT?

24   A    YES.

25   Q    AND YOU'VE DONE IT IN CONNECTION WITH

1    LITIGATION?

2    A    YES.

3    Q    AND I JUST WANT TO SEE HOW YOU APPROACH THAT

4    AS AN EXPERT.  IT'S YOUR UNDERSTANDING THAT YOU ARE

5    SUPPOSED TO KIND OF APPLY YOUR EXPERTISE IN A

6    NEUTRAL FASHION; CORRECT?

7    A    THAT'S CORRECT.

8    Q    YOU'RE NOT SUPPOSED TO FAVOR ONE PARTY OVER

9    THE OTHER; RIGHT?

10   A    THAT'S CORRECT.

11   Q    YOU'RE GOING TO GIVE THE SAME OPINION

12   REGARDLESS OF WHICH SIDE HIRES YOU?  THAT'S THE

13   IDEA?

14   A    THAT IS THE IDEA.

15   Q    AND IN THAT CONNECTION, YOU KNOW THAT IT WOULD

16   BE INAPPROPRIATE, THEN, FOR YOU AS AN EXPERT TO BE

17   AN ADVOCATE?  THAT IS, YOU'RE SUPPOSED TO BE

18   OBJECTIVE USING YOUR EXPERTISE?

19   A    I WOULD AGREE.

20   Q    AND -- NOW, WE LOOKED AT A LOT OF SLIDES.  I

21   ASSUME THAT YOU REVIEWED THOSE SLIDES BEFORE THEY

22   WERE PRESENTED TO THE JURY.

23   A    YES.

24   Q    AND EITHER YOU CREATED THEM OR, LIKE THE

25   PRESIDENTIAL ADS, YOU APPROVED OF THEM?

```
 1    A    YES.

 2    Q    AND WERE THERE ANY THAT YOU CREATED VERSUS

 3    APPROVED, OR --

 4    A    I DON'T MAKE THAT DISTINCTION, NO.

 5    Q    OKAY.  AND IF WE COULD LOOK AT, FOR EXAMPLE, I

 6    THINK IT WAS SLIDE 34B.2, AND I'M JUST WONDERING,

 7    FOR EXAMPLE, WITH THIS SLIDE -- I'M NOT GETTING

 8    ANYTHING OUT OF THIS.

 9              OKAY.  SO ON THIS SLIDE, YOU SEE ON THE

10    RIGHT HERE THERE'S A SAMSUNG PHONE.  DO YOU SEE

11    THAT?

12    A    I DO.

13    Q    AND DID YOU SELECT THAT PICTURE?

14    A    THE INDIVIDUAL PHONE?

15    Q    YES.

16    A    NO.  I THINK THAT -- THIS -- THE SLIDE ITSELF

17    WAS CONSTRUCTED ORIGINALLY BY ME, BUT THERE'S A

18    TEAM OF, OF GRAPHICS PEOPLE THAT, THAT PUT IN THE

19    ICONS ULTIMATELY.  SO, NO, I DIDN'T SELECT THAT

20    PHONE.

21    Q    I JUST WANT TO -- YOUR UNDERSTANDING IS THAT

22    APPLE IS NOT CLAIMING THAT YOU HAVE TO USE HARD

23    KEYS ON A PHONE; RIGHT?

24    A    THAT IS NOT MY UNDERSTANDING, NO.

25    Q    AND IT'S YOUR UNDERSTANDING THAT APPLE IS NOT
```

1    BY APPLE TO PRESENT TO THE JURY, FOR EXAMPLE, WHAT

2    WOULD BE YOUR OPINION OF THE DAMAGES IF IT WAS JUST

3    A BOUNCE BACK INFRINGEMENT?

4    A    NO.

5    Q    HOW ABOUT IF IT WAS -- I'M TRYING TO THINK OF

6    THE PATENT NOW -- HIT TO ZOOM AND THEN HIT

7    SOMEWHERE ELSE TO CENTER AND ZOOM?

8    A    NO.

9    Q    I'VE GOT THE LIST HERE.  THERE'S THE ONE WHERE

10   YOU, YOU USE ONE FINGER FOR SCROLLING AND THEN

11   THERE'S A PARTICULAR METHOD BY WHICH YOU USE TWO

12   FINGERS TO ZOOM.

13   A    YOU MAY BE MIXING THE THREE UTILITY PATENTS

14   UP, BUT I'M FOLLOWING YOU, AND THE ANSWER IS STILL

15   NO, I DIDN'T DO -- I WASN'T ASKED TO MAKE THAT

16   CALCULATION.

17   Q    OKAY.  AND THESE -- THE LOST PROFITS THAT --

18   THE LOST PROFITS IS A BIG PERCENTAGE OF YOUR

19   NUMBERS; RIGHT?

20   A    NO, THEY'RE NOT.

21   Q    I'M SORRY.  YOU'RE ABSOLUTELY RIGHT.

22          THE INFRINGER'S PROFITS, SAMSUNG'S,

23   THAT'S A BIG PART OF THE NUMBER; RIGHT?

24   A    THAT'S CORRECT.

25   Q    AND, OF COURSE, YOU DON'T GET INFRINGER'S

```
 1    PROFITS IF THERE'S -- IF THE PATENT THAT IS

 2    INFRINGED IS A UTILITY PATENT; RIGHT?

 3    A    THAT'S RIGHT.  THAT'S NOT ONE OF THE FORMS OF

 4    DAMAGES UNDER A UTILITY PATENT, I AGREE.

 5    Q    SO THOSE BIG NUMBERS ALL HAVE SOMETHING TO DO

 6    WITH THE WAY THE PHONE OR THE TABLET LOOKS?

 7    A    WELL, THE ONLY ADDITION, SO THE RECORD IS

 8    CLEAR, IS REMEMBER THE SLIDING PHONES.  SO IF YOU

 9    MOVE THOSE PHONES OUT OF INFRINGER'S PROFITS,

10    YOU'VE GOT TO PUT THEM INTO SOME COLUMN, LOST

11    PROFITS OR REASONABLE ROYALTY.

12         AND SO AT A MINIMUM, YOU WOULD MOVE THEM

13    ALL DOWN TO REASONABLE ROYALTY TO THE EXTENT THAT

14    THEY ALSO INFRINGED THE UTILITY PATENT.

15    Q    AND SO THAT'S, THAT'S WHAT I'M SAYING.  IT'S

16    ONLY -- YOU GET INFRINGER'S PROFITS ONLY IF THERE'S

17    SOME FINDING ABOUT BASICALLY HOW THESE PHONES LOOK?

18    A    RIGHT.

19    Q    THE DESIGN PATENT, THE DESIGN PATENT OR TRADE

20    DRESS INFRINGEMENT; RIGHT?

21    A    I'M AGREEING WITH YOU.  BUT ALL I'M SAYING IS

22    IT'S NOT LIKE YOU SUBTRACT IT.  YOU HAVE TO

23    SUBTRACT IT, BUT YET ADD IT BACK ON THE OTHER FORM.

24    Q    WELL, YOU DON'T ADD IT BACK IF THERE'S A

25    FINDING THAT, YOU KNOW, AN ORDINARY OBSERVER, FOR
```

1    EXAMPLE, IS NOT GOING TO BE CONFUSED OR THERE'S NOT

2    DECEIT OR THAT THE PATENT'S INVALID; RIGHT?

3    A    NO, YOU DO.  THAT'S WHAT'S KEY, BECAUSE THE

4    KEY TO THE CALCULATION IS EVERY PRODUCT -- THE

5    CALCULATION IS DONE ON AN INDIVIDUAL PRODUCT.  SO

6    IN YOUR HYPOTHETICAL, WE HAVE JUST A PHONE, AND

7    THAT PHONE INFRINGES THE UTILITY PATENTS AND IT

8    INFRINGES THE TRADE DRESS AND IT INFRINGES THE

9    DESIGN PATENTS.

10        I'M THINKING THAT YOUR HYPOTHETICAL --

11   AND ON THAT BASIS, THE CALCULATION WOULD BE

12   PRESUMABLY BASED ON THE INFRINGER'S PROFITS.

13        YOU SAY LET'S ASSUME THAT THEY DON'T

14   INFRINGE THE DESIGN PATENTS AND THE TRADE DRESS.

15   LET'S TAKE THAT AWAY.

16        WELL, WE STILL HAVE THE POTENTIAL OF LOST

17   PROFITS ON THE UTILITY AND, AT A MINIMUM, THE

18   REASONABLE ROYALTY.

19        SO WHEN YOU TAKE AWAY THE INFRINGER'S

20   PRODUCTS, YOU'VE TO RECALCULATE THE DAMAGES FOR

21   THAT PARTICULAR PHONE ON ONE OF THOSE OTHER BASES

22   THERE, ASSUMING IT INFRINGES ONE OF THE OTHER

23   UTILITY PATENTS.

24   Q    AND THAT'S WHAT YOU'RE SAYING.  ASSUMING

25   THERE'S SOME OTHER INFRINGEMENT, THERE'S GOING TO

```
1    BE SOME WAY TO CALCULATE IT?

2    A    YES.

3    Q    AND YOU'VE TOLD US THAT YOU WEREN'T ASKED TO

4    CALCULATE ASSUMING THAT, YOU KNOW, ONE OF THESE

5    PATENTS, UTILITY PATENTS WAS INFRINGED ONLY, OR, OR

6    A COMBINATION OF THE UTILITY PATENTS?

7    A    THE COMBINATION -- THAT'S WHY A MODEL WAS

8    REQUIRED -- IS ENDLESS.  THERE ARE REALLY HUNDREDS

9    OF THOUSANDS OF COMBINATIONS GIVEN THE NUMBER OF

10   PATENTS, ET CETERA.

11              AND NO, I WASN'T.  THE ANSWER IS NO, I

12   WASN'T.

13   Q    AND THE ONLY COMBINATIONS I'M TALKING ABOUT

14   ARE THE THREE UTILITY PATENTS.  OKAY?

15   A    YOU'RE RIGHT, I WAS NOT ASKED TO PRESENT THAT.

16   Q    SO THE ASSUMPTIONS, THEN, ARE WE TALKED ABOUT

17   EACH PATENT, DESIGN PATENT IS VALID AND INFRINGED.

18   THAT'S YOUR ASSUMPTION FOR YOUR DAMAGES; RIGHT?

19   A    YES.

20   Q    THAT ALL THE DIFFERENT PRODUCTS THAT APPLE

21   SAYS INFRINGE DO INFRINGE; CORRECT?

22   A    YES.

23   Q    THAT EACH OF THE UTILITY PATENTS IS VALID AND

24   WHATEVER APPLE SAYS INFRINGES INFRINGES; CORRECT?

25   A    UNTIL THE JURY SAYS IT, YES.
```

1    Q    THAT ALL OF APPLE'S TRADE DRESS IS VALID AND

2    EVERYTHING APPLE SAYS INFRINGES INFRINGES; CORRECT?

3    A    YES.

4    Q    AND IT'S GIVEN ALL THOSE ASSUMPTIONS THAT YOU

5    THEN HAVE THIS RANGE OF 2.5 BILLION TO 2.7 BILLION?

6    A    THAT'S CORRECT.

7    Q    SO LET'S TALK ABOUT, FOR EXAMPLE, THE BOUNCE

8    BACK.  ON YOUR LOST PROFITS, I THINK YOU'RE UP

9    AROUND, FOR TOTAL, YOU'RE UP AROUND 400 SOMETHING

10   MILLION?

11   A    488 MILLION.

12   Q    OKAY.  AND THAT OBVIOUSLY ISN'T LOST -- WOULD

13   NOT BE APPLE'S LOST PROFITS WITH RESPECT TO, SAY, A

14   BOUNCE BACK PATENT?

15   A    NOT EXCLUSIVELY, NO.  SAME QUESTION, SAME

16   ANSWER.

17   Q    IN FACT, YOUR ANALYSIS ON THAT, WHEN YOU

18   TALKED -- WHEN YOU THOUGHT IT WOULD TAKE -- IF

19   SAMSUNG WERE TOLD "YOU CAN'T DO THAT ON YOUR

20   PHONE," IT WOULD TAKE THEM A MONTH TO DESIGN AROUND

21   THAT AND DO SOMETHING ELSE?

22   A    AS ONE OF THOSE LIMITING CONDITIONS THAT I

23   TALKED ABOUT, YES, I LIMITED THE CALCULATION TO

24   JUST ONE MONTH OF LOST PROFITS FOR THAT.

25   Q    SO LET'S TALK ABOUT YOUR ANALYSIS ON -- YOU

```
 1    SAID YOU DID ANALYSIS ON BUT-FOR; THAT IS, IF -- IF

 2    SAMSUNG DIDN'T HAVE A FEATURE, WHAT WOULD HAPPEN?

 3              AND FOR BUT-FOR, FOR LOST PROFITS, FOR

 4    APPLE'S LOST PROFITS, OKAY, YOU'RE SAYING THAT IF

 5    THE JURY FOUND INFRINGEMENT ON A UTILITY PATENT,

 6    THEN YOU'VE GOT TO LOOK AT, OKAY, WHAT WOULD APPLE

 7    HAVE MADE IF SAMSUNG DIDN'T HAVE THAT FEATURE;

 8    RIGHT?

 9    A    MADE?  WHAT --

10    Q    WOULD HAVE MADE.

11    A    ALL RIGHT.  I'LL SAY YES.  I'M NOT SURE WHAT

12    YOU MEAN, BUT I'LL SAY YES.

13              THEY'VE ALREADY MADE THEIR PRODUCTS.  THE

14    PRODUCTS ARE THE IPHONES IN YOUR HYPOTHETICAL, SO

15    IT WOULD BE THE IPHONE.  IT'S ALREADY MADE.

16    Q    OKAY.  AND I DIDN'T MEAN MANUFACTURE, BUT THE

17    PROFITS THEY WOULD HAVE EARNED?

18    A    OKAY.  THAT'S WHERE I WAS NOT SURE.

19    Q    AND WHEN YOU'RE DOING THAT, YOU'VE GOT TO ASK

20    YOURSELF, HERE'S A SAMSUNG CUSTOMER, THEY'VE GOT A

21    PHONE, ONE OF THE ACCUSED PHONES, THAT HAS BOUNCE

22    BACK.  NOW, IF BOUNCE BACK ISN'T IN THERE, ARE THEY

23    GOING TO LEAVE SAMSUNG TO GO TO APPLE BECAUSE OF

24    THAT ONE FEATURE?  THAT'S THE BUT-FOR ANALYSIS,

25    ISN'T IT?  THAT -- IS SOMEONE GOING TO SAY, "I
```

2125

1   BOUGHT THIS PHONE.  I LIKED IT.  WELL, DARN.  IT

2   DOESN'T HAVE BOUNCE BACK ANYMORE.  I'M GOING TO GO

3   BUY AN APPLE."

4   A    WELL, THAT'S KIND OF A STATEMENT, BUT I'LL

5   RESPOND TO IT AS A QUESTION.

6   Q    TRUE.

7   A    MY CALCULATION IS THAT THEY WOULD GO TO THEM

8   BECAUSE, REMEMBER, I'VE ONLY TAKEN THE SALE AWAY

9   FOR THE MONTH IT WOULD TAKE FOR SAMSUNG TO

10  BASICALLY REMOVE THE BOUNCE BACK.  THEY'RE GOT

11  TO -- THAT'S JUST A PHYSICAL FACT.  SAMSUNG, WITH

12  THE ASSUMPTION THAT THEY CAN'T USE IT, HAS TO TAKE

13  IT OUT OF THEIR PHONE.  THEY HAVE TO REDESIGN THE

14  PHONE.  THEY HAVE TO NEGOTIATE A DIFFERENT PRICE.

15  THEY NEED TO PUT THE MANUFACTURING FACILITY IN

16  PLACE.  I'VE ALLOWED, FOR EVERYTHING TO HAPPEN, ONE

17  MONTH AND ONLY ONE MONTH.

18          AND DURING THAT PERIOD OF TIME, YES, SOME

19  PORTION OF THE MARKET WOULD CHOOSE AN IPHONE

20  INSTEAD OF SAYING, "OH, WELL, I'M GOING TO WAIT OR

21  DO SOMETHING ELSE."

22  Q    WELL, FOR ONE THING, YOU WOULDN'T HAVE TO

23  START A MANUFACTURING FACILITY TO CHANGE THE BOUNCE

24  BACK.  THAT'S JUST A SOFTWARE UPGRADE, RIGHT?  PLUG

25  IT INTO YOUR COMPUTER AND IT WOULD BE CHANGED?

2126

```
1    A    FAIR ENOUGH, YES.

2    Q    OKAY.  AND MY QUESTION IS DIFFERENT.  WE KNOW

3    SOMETHING ABOUT THE PEOPLE WHO PURCHASE THE SAMSUNG

4    PHONES THAT WE DON'T KNOW ABOUT THE GENERAL PUBLIC,

5    WHICH IS THAT THEY CHOSE A SAMSUNG PHONE; RIGHT?

6    A    YES.

7    Q    OKAY.  SO IF THEY CHOSE A SAMSUNG PHONE, YOU

8    MIGHT WANT TO LOOK AS TO WHY THEY CHOSE THAT PHONE;

9    CORRECT?

10   A    I AGREE, AND I DID.

11   Q    AND IN CONNECTION WITH THAT, YOU'D WANT TO

12   ASK, OR FIND OUT, "OKAY, MR. PURCHASER, IF YOU

13   DIDN'T HAVE BOUNCE BACK, WOULD YOU NOT HAVE CHOSEN

14   THAT PHONE AND GONE SOMEWHERE ELSE?"  THAT'S WHAT

15   THE BUT-FOR CAUSATION IS.  IF NOT FOR WHAT SAMSUNG

16   WAS DOING, IT WOULD HAVE GONE TO APPLE INSTEAD;

17   RIGHT?

18   A    THAT'S CORRECT.

19   Q    AND THERE ARE HUNDREDS AND HUNDREDS OF

20   FEATURES ON A SAMSUNG SMARTPHONE; RIGHT?

21   A    YES.

22   Q    APPLE HAS DONE RESEARCH, ITSELF, ON WHY THE

23   PEOPLE WHO BUY SAMSUNG, OR ANDROID, WHY ARE THEY

24   ATTRACTED TO THAT PRODUCT INSTEAD OF OURS; RIGHT?

25   A    YES.
```

```
 1    DESIGN, IS IT, AS IT'S BEING USED HERE?

 2    A    I DON'T KNOW.

 3    Q    BUT THAT'S ACTUALLY THE PART YOU WERE ASKED TO

 4    LOOK AT.  YOU SAID YOU UNDERSTOOD WHAT YOU WERE

 5    ASKED TO LOOK AT, SO I JUST -- LOOKING AT THIS, YOU

 6    REALIZE THAT THIS DOCUMENT, GIVEN WHERE IT'S COMING

 7    FROM, WHICH IS THE HARDWARE PART OF THE COMPANY

 8    THAT MAKES THESE BRAINS, PROCESSORS, IT'S

 9    DISTINGUISHING BETWEEN THE DESIGN AND THE HARDWARE?

10    IT'S DISTINGUISHING; RIGHT?

11    A    IT'S LISTED SEPARATELY, YES.

12    Q    SO THEY'RE TALKING ABOUT DIFFERENT THINGS?

13    A    I DON'T KNOW.

14               (PAUSE IN PROCEEDINGS.)

15               MR. PRICE:  MY BRAIN TRUST TELLS ME I'M

16    DONE.  THANK YOU.

17               THE WITNESS:  THANK YOU.

18               THE COURT:  ALL RIGHT.  THE TIME IS NOW

19    1:30.

20               IS THERE GOING TO BE ANY RE-REDIRECT OR

21    NO?

22               MS. KREVANS:  THERE IS VERY BRIEF, YOUR

23    HONOR.

24               THE COURT:  OKAY.  IT'S 1:40.  GO AHEAD,

25    PLEASE.
```

```
 1              MS. KREVANS:  MR. LEE, WOULD YOU PUT UP
 2    THAT SAME PAGE?  I THINK THAT WAS EXHIBIT 34 AT
 3    PAGE 38.
 4              FURTHER REDIRECT EXAMINATION
 5    BY MS. KREVANS:
 6    Q    MY FIRST QUESTION IS A VERY QUICK ONE,
 7    MR. MUSIKA.  THE LINE OF -- THIS SAMSUNG DOCUMENT
 8    THAT MR. PRICE JUST POINTED YOU TO THAT STARTS WITH
 9    THE WORDS "SEAMLESS INTEGRATION OF HARDWARE," WHAT
10    DOES THE WHOLE LINE ACTUALLY SAY?
11    A    "SEAMLESS INTEGRATION OF HARDWARE, SW," WHICH
12    I UNDERSTAND TO BE SOFTWARE, "AND CONTENTS USING
13    ITUNES."
14    Q    OKAY.  AND COULD YOU GO BACK TO EXHIBIT 25A-1
15    IN YOUR BINDER?
16              AND MR. LEE, COULD YOU SHOW US THE SECOND
17    PAGE OF THAT EXHIBIT?
18              COULD YOU REMIND US WHAT'S SHOWN ON THIS
19    PAGE?
20    A    YES.  SO THIS IS THE DAMAGE SUMMARY, AND THIS
21    IS THE PAGE THAT SETS FORTH THE NOTICE THAT I WAS
22    RECITING.
23    Q    OKAY.  AND YOU WERE TRYING TO REMEMBER A DATE
24    JUST FROM MEMORY.  CAN YOU TELL US WHAT THIS PAGE,
25    WHAT THE ACTUAL DATE WAS IN AUGUST THAT YOU USED
```

2172

1   FOR NOTICE FOR THINGS OTHER THAN UNREGISTERED TRADE

2   DRESS?

3   A    YES.  IT'S LISTED THERE.  IT IS AUGUST, BUT

4   IT'S AUGUST 4TH, 2010.  I THINK I PROBABLY SAID

5   AUGUST 11TH INCORRECTLY.  BUT IT'S AUGUST 4TH,

6   2010.

7            MS. KREVANS:  THANK YOU VERY MUCH.

8            THE COURT:  ALL RIGHT.  IT'S 1:42.  ANY

9   RE-RECROSS-EXAMINATION?

10           MR. PRICE:  NO, YOUR HONOR.

11           THE COURT:  ALL RIGHT.  MAY THIS WITNESS

12   BE EXCUSED?

13           MS. KREVANS:  HE MAY SUBJECT TO RECALL,

14   YOUR HONOR.

15           THE COURT:  ALL RIGHT.  YOU'RE EXCUSED

16   SUBJECT TO RECALL.

17           THE WITNESS:  THANK YOU, YOUR HONOR.

18           MR. MCELHINNY:  YOUR HONOR, SUBJECT TO

19   STIPULATION AND ORDER OF THE COURT AS TO ORDER AND

20   PRODUCTION OF PROOF, WHICH RESERVES OUR CONTRACT,

21   ANTITRUST, UNFAIR COMPETITION AND DECLARATORY

22   JUDGMENT ACTIONS, SUBJECT TO THAT STIPULATION, WE

23   REST OUR CASE-IN-CHIEF.

24           THE COURT:  OKAY.  ALL RIGHT.

25           SO LADIES AND GENTLEMEN OF THE JURY, WE

```
 1    HAVE TO TAKE CARE OF SOMETHING OUTSIDE YOUR

 2    PRESENCE, SO I'M GOING TO EXCUSE YOU FOR NOW.

 3              AGAIN, PLEASE KEEP AN OPEN MIND.  PLEASE

 4    DON'T DISCUSS THE CASE WITH ANYONE AND PLEASE DON'T

 5    DO ANY OF YOUR OWN RESEARCH.

 6              YOU'RE FREE TO TAKE YOUR JURY BOOKS WITH

 7    YOU INTO THE JURY ROOM.  OKAY?  THANK YOU.

 8              (WHEREUPON, THE FOLLOWING PROCEEDINGS

 9    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

10              THE COURT:  ALL RIGHT.  THANK YOU.  LET'S

11    GO AHEAD WITH THE RULE 50 MOTION, PLEASE.

12              GO AHEAD.

13              MR. ZELLER:  THANK YOU, YOUR HONOR.

14              SAMSUNG DOES MOVE UNDER RULE 50 AT THIS

15    TIME FOR APPLE'S FAILURE TO PROVE ITS CLAIMS, AND

16    WE BELIEVE THIS APPLIES TO EVERYTHING THAT APPLE

17    HAS ASSERTED IN THIS CASE.

18              FOR THE UTILITY PATENTS, APPLE HAS NOT

19    SUBMITTED EVIDENCE LIMITATION-BY-LIMITATION SHOWING

20    INFRINGEMENT.  THEY DIDN'T EVEN ATTEMPT TO DO THAT

21    WITH THEIR EXPERTS, AND WE BELIEVE THAT THAT ALONE

22    SHOWS -- ALSO, WE DID SHOW ON CROSS-EXAMINATION

23    THAT THESE WERE NOT INFRINGING.

24              THE SAME APPLIES FOR THE DESIGN PATENTS.

25    APPLE HAS FAILED TO PROVE INFRINGEMENT.
```

```
 1              IT HAS ALSO FAILED TO TAKE INTO ACCOUNT

 2     THE LACK OF FUNCTIONALITY, OR THE FUNCTIONALITY OF

 3     THE DESIGNS.

 4              AND ALSO ON TRADE DRESS, IT HAS FAILED TO

 5     PROVE THAT TRADE DRESS IS FAMOUS AND THAT IT'S BEEN

 6     INFRINGED AND THAT IT'S NOT FUNCTIONAL.

 7              SO WE MOVE ON ALL THE ELEMENTS OF THE

 8     CLAIMS, YOUR HONOR.

 9              WITH RESPECT TO DAMAGES, THERE'S NO

10     APPORTIONMENT THAT'S BEEN ESTABLISHED.  THERE HAS

11     BEEN NO PRODUCT-BY-PRODUCT DAMAGES THAT HAVE BEEN

12     BROKEN OUT, AND WE BELIEVE THAT THAT'S INSUFFICIENT

13     AS A MATTER OF LAW.

14              THERE'S NO CAUSATION THAT'S BEEN PROVEN,

15     AND ALSO THEY HAVE -- EXCUSE ME -- ONLY HAD

16     DUPLICATIVE DAMAGES THAT THEY'VE ASSERTED.

17              AND SO FOR ALL THE SAME REASONS, WE

18     BELIEVE THE JUDGMENT IS ALSO WARRANTED ON DAMAGES.

19              EXCUSE ME.

20              THE COURT:  OKAY.

21              MR. ZELLER:  AND ALSO, WE MOVE ON THE

22     FAILURE TO PROVE WILLFUL INFRINGEMENT.

23              THE COURT:  ALL RIGHT.

24              MR. ZELLER:  AND THEN FINALLY, YOUR

25     HONOR, ALSO ON THE DAMAGES FRONT, JUST TO BE MORE
```

1      SPECIFIC, THERE WAS A FAILURE TO REALLY ACCOUNT FOR

2      REASONABLE ROYALTY, AND THEY ALSO FAILED TO PROVE

3      THAT THERE WAS SUFFICIENT DEMAND FOR, AND CAPACITY

4      FOR APPLE PRODUCTS.

5              THE COURT:  OKAY.  ANYTHING ELSE THAT

6      YOU'D LIKE TO STATE ON THE RECORD?

7              MR. ZELLER:  WELL, YOUR HONOR, WE WOULD,

8      OF COURSE, LIKE THE OPPORTUNITY TO OUTLINE THESE IN

9      WRITING.  I MEAN, THE COURT DID SAY WE WOULD DO

10     THAT EARLIER.

11             THE COURT:  I HAVE REVIEWED -- EVERY TIME

12     I CHECK OUR ECF, THERE ARE, LIKE, THREE OR FOUR

13     MORE MOTIONS THAT ARE FILED, AND I NEVER HAVE

14     BRIEFING ON RULE 50, NEVER.  NEVER, EVER.  I'VE

15     NEVER HAD BRIEFING ON RULE 50 BEFORE.

16             AND JUST IN TERMS OF KEEPING UP WITH ALL

17     OF THE MOTIONS THAT HAVE BEEN FILED, TO SAY NOW DO

18     ANOTHER ORDER ON RULE 50 WHEN I NEVER HAVE BRIEFING

19     ON RULE 50 MOTIONS, I'M SORRY, I JUST DON'T THINK I

20     CAN.

21             MR. ZELLER:  THIS IS, OF COURSE, AN

22     IMPORTANT MOTION, YOUR HONOR.

23             THE COURT:  UNDERSTOOD.

24             MR. ZELLER:  WE OBVIOUSLY WANT TO DO IT

25     FOR PRESERVATION PURPOSES, BUT THE COURT IS

1    OBVIOUSLY NOT INCLINED TO GRANT IT IN ANY EVENT, WE

2    WOULD ASK FOR THAT OPPORTUNITY.

3              OBVIOUSLY APPLE IS GOING TO ARGUE --

4    WE'RE TRYING TO MAKE OUR GROUNDS SUFFICIENTLY BROAD

5    AT THIS MOMENT MOVING ORALLY IN ORDER TO MAKE SURE

6    THAT WE'VE COVERED EVERYTHING.

7              BUT WE KNOW, OF COURSE, APPLE IS GOING TO

8    ARGUE LATER THERE'S SOME SORT OF PROCEDURAL

9    DEFAULT.

10             OBVIOUSLY OUR VIEW IS THEY HAVE NOT

11   PROVEN THEIR CASE, AND THEY HAVEN'T PROVEN IT AS TO

12   ANY OF THE ELEMENTS THAT ARE REQUIRED HERE.

13             THE COURT SAW THEIR WITNESSES.  THEY PUT

14   THEM UP, FOR EXAMPLE, AND THEY SAID "DID YOU DO A

15   SURVEY?"  "YES, I DID.  THIS IS WHAT IT SHOWED."

16             WE DON'T THINK THAT THAT IS, AS A MATTER

17   OF LAW, SUFFICIENT IN ORDER TO CARRY THEIR BURDEN,

18   AND WE WOULD BE ABLE TO OUTLINE THESE THINGS AND

19   PROVIDE CITATIONS AT LEAST TO THE EVIDENCE, YOUR

20   HONOR, THAT WE BELIEVE SUPPORTS THAT.

21             BUT --

22             THE COURT:  I'M UNDERSTANDING YOUR MOTION

23   TO BE MOVING ON ABSOLUTELY EVERY CLAIM THAT APPLE

24   HAS MADE THAT A REASONABLE JURY WOULD NOT HAVE

25   SUFFICIENT EVIDENCE TO RULE IN THEIR FAVOR.

```
 1                SO I AM ASSUMING THAT YOU ARE, AND I HEAR

 2     YOU, MOVING ON EVERY SINGLE CLAIM THAT APPLE HAS

 3     MADE.

 4                MR. ZELLER:  THAT IS CORRECT, YOUR HONOR.

 5     CERTAINLY WE WILL -- WE DO MOVE ON THAT BASIS.

 6                LET ME GIVE SOME SPECIFIC EXAMPLES, YOUR

 7     HONOR.

 8                FOR EXAMPLE, THEY INTRODUCED ABSOLUTELY

 9     NO EVIDENCE WITH RESPECT TO PARTICULAR PHONES THAT

10     THEY CLAIM WERE SOLD IN THE UNITED STATES.  THERE

11     IS NO EVIDENCE, FOR EXAMPLE, AS TO THE GALAXY ACE,

12     WHICH IS JX 1030, THE GALAXY S I9000, JX 1007, OR

13     THE GALAXY S II I9100, WHICH IS JX 1032.  THERE'S

14     ZERO EVIDENCE THAT'S BEEN ADDUCED IN THIS CASE THAT

15     THOSE HAVE BEEN SOLD IN THE UNITED STATES.  THEY

16     REPRESENTED THAT THEY WERE.  THEY PROVIDED NO

17     EVIDENCE.

18                AND I CAN GO THROUGH A MUCH LONGER LIST

19     OF THESE KINDS OF PARTICULARS, YOUR HONOR.  WE HAD

20     UNDERSTOOD WE WERE GOING TO DO THIS IN WRITING, AND

21     SO WHEN THE COURT ASKED, IS THERE ANYTHING FURTHER

22     WE WANT TO SAY, THERE IS MUCH MORE WE WANT TO SAY.

23                BUT WE THINK THAT IT'S MORE EFFICIENT TO

24     SIMPLY PUT IT IN WRITING.  I CAN GO DOWN THIS LIST

25     AND I'M CERTAINLY HAPPY TO DO IT NOW.
```

```
 1              THE COURT:  DO IT NOW.  I'LL GIVE YOU

 2    FIVE MINUTES.  GO AHEAD.

 3              MR. ZELLER:  YOUR HONOR, WITH ALL

 4    RESPECT, FIVE MINUTES IS NOT ENOUGH WHERE SOMEONE

 5    IS ASKING FOR TWO AND A HALF BILLION DOLLARS ON A

 6    WHOLE HOST OF CLAIMS.

 7              THE COURT:  WELL, WHY DON'T YOU HAVE

 8    WHATEVER YOU HAVE.  GO AHEAD.  I'M GIVING YOU AN

 9    OPPORTUNITY TO MAKE YOUR RECORD.  WHATEVER YOU

10    WOULD LIKE, GO AHEAD.

11              MR. ZELLER:  I MENTIONED THAT THERE WAS

12    NO EVIDENCE THAT WAS PROVIDED AS TO CERTAIN DEVICES

13    BEING SOLD IN THE UNITED STATES BY SAMSUNG.

14              IN ADDITION, APPLE PRESENTED NO EVIDENCE

15    THAT SHOWED THAT THE GEM, THE SAMSUNG GEM PHONE,

16    WHICH IS JX 1020, INFRINGES THE '381 PATENT.

17              AND, IN FACT, THAT WAS NEVER DISCLOSED IN

18    THEIR LOCAL PATENT CONTENTIONS AS REQUIRED.

19              THERE'S NO EVIDENCE OF ACTIVE INDUCEMENT

20    BY SAMSUNG IN THIS CASE.

21              ALL THAT HAS BEEN ADDUCED IN THIS CASE SO

22    FAR BY APPLE IS THAT SAMSUNG, THE PARENT, WAS

23    AWARE.

24              BUT THAT IS INSUFFICIENT AS A MATTER OF

25    LAW FOR ACTIVELY INDUCING INFRINGEMENT.
```

1          AS WE MENTIONED EARLIER, OF COURSE, THERE

2     IS NO EVIDENCE THAT APPLE HAS MET OR PROVEN

3     DECEPTIVE SIMILARITY IN THE CONTEXT OF PURCHASING

4     FOR THE DESIGN PATENTS AS REQUIRED.

5          AS A MATTER OF FACT, APPLE'S EXPERTS

6     ACKNOWLEDGED THAT THAT IS NOT THE ANALYSIS THAT

7     THEY DID.  THEY DIDN'T EVEN ATTEMPT TO APPLY THE

8     PROPER LEGAL STANDARD UNDER THE LAW.

9          IN FACT, THE ONLY WITNESS WHO TESTIFIED

10    ABOUT THE HARDWARE DESIGN PATENT SIMILARITIES WAS

11    PETER BRESSLER, AND HE SPECIFICALLY ACKNOWLEDGED

12    THAT IT WAS HIS UNDERSTANDING THAT IT WAS NOT

13    NECESSARY THAT THE SIMILARITY BE DECEPTIVE.

14         OF COURSE, THE COURT IS AWARE THAT UNDER

15    GORHAM, THE GORHAM STANDARD AS ARTICULATED BY THE

16    SUPREME COURT AND AS CONFIRMED BY EGYPTIAN GODDESS,

17    APPLE HAS TO PROVE THAT THERE -- THAT THE

18    SIMILARITY IS SUCH THAT IT WOULD DECEIVE THE

19    ORDINARY OBSERVER IN THE PURCHASING CONTEXT.

20         AND MR. BRESSLER ACKNOWLEDGED THAT THAT

21    WAS NOT THE STANDARD HE APPLIED.

22         IN FACT, AGAIN, HE WAS THE ONLY PERSON

23    WHO OFFERED ANY TESTIMONY ON THESE ALLEGED

24    SIMILARITIES.

25         APPLE DID, OF COURSE, OFFER VARIOUS

```
 1    HEARSAY BLOG STATEMENTS AND PRESS REPORTS, BUT THE

 2    COURT HAS SAID THAT THAT IS NOT ADMISSIBLE FOR THE

 3    TRUTH, SO IT CANNOT BE RELIED UPON BY APPLE TO

 4    PROVE A SUBSTANTIAL SIMILARITY.

 5              ALSO, MR. BRESSLER ACKNOWLEDGED HE HAD NO

 6    REAL WORLD EVIDENCE OF ANY KIND OF DECEPTION OR

 7    SIMILARITIES BETWEEN THE DESIGNS.

 8              IN ADDITION, THERE WERE DIFFERENCES THAT

 9    WERE SHOWN WITH RESPECT TO THE PRODUCTS AT ISSUE

10    THAT ALSO SHOWED THAT THEY ARE NOT INFRINGED.  I

11    CAN RECITE AS MUCH AS THE COURT WOULD LIKE ON THAT,

12    BUT AN EXAMPLE WOULD BE WITH RESPECT TO THE GALAXY

13    10.1.

14              MR. STRINGER TESTIFIED THAT AN IMPORTANT

15    ASPECT OF THIS DESIGN WAS THAT IT WAS A SINGLE

16    VESSEL ON THE BACK.

17              WE DON'T MEET THAT LIMITATION.  WE DO NOT

18    PRACTICE THAT, AND THAT IS UNDISPUTED.  IT'S NOT A

19    SINGLE VESSEL WHEN YOU'RE TALKING ABOUT THE GALAXY

20    TAB 10.1.  IT IS A DIFFERENT DESIGN.

21              AND THERE HAS BEEN NO REBUTTAL TO THAT

22    POINT WHATSOEVER.

23              SAME THING WITH RESPECT TO THE HARDWARE

24    DESIGNS FOR WHAT WE AT LEAST SHORTHAND CALL THE

25    SMARTPHONES.
```

1          MR. STRINGER TESTIFIED THAT AN INTEGRAL

2     PART OF WHAT WAS NEW AND ORIGINAL ABOUT THOSE

3     DESIGNS WAS THAT THEY WERE FLAT.

4          SAMSUNG DOES NOT HAVE THAT SAME DESIGN,

5     AND AGAIN, THAT IS UNDISPUTED.

6          WITH RESPECT TO THE '305 DESIGN PATENTS,

7     ESSENTIALLY IT'S THE SAME STORY.

8          DR. KARE WAS THE WITNESS WHO TESTIFIED

9     ABOUT THAT DESIGN PATENT.  SHE DID NOT, AND DID NOT

10    EVEN ATTEMPT, TO APPLY THE GORHAM DECEPTION IN

11    PURCHASING STANDARD.

12         IN FACT, ALL SHE OFFERED AN OPINION ON

13    WAS ESSENTIALLY THAT SHE THOUGHT THE OVERALL

14    SIMILARITIES WERE THERE, WHICH IS NOT SUFFICIENT

15    UNDER GORHAM.

16         IN ADDITION, SHE ALSO ACKNOWLEDGED THAT

17    SHE PAID NO ATTENTION AND DID NOT FACTOR INTO HER

18    ANALYSIS ANY KIND OF FUNCTIONALITY.

19         AND OF COURSE THE COURT IS AWARE THAT

20    FUNCTIONALITY HAS TO BE FACTORED OUT OF ANY KIND OF

21    ANALYSIS UNDER RICHARDSON, THE FEDERAL CIRCUIT

22    DECISION IN RICHARDSON, IN ORDER TO FIND

23    INFRINGEMENT.

24         AND ALSO, DR. KARE DID NOT EVEN CONSIDER

25    PRIOR ART, SHE ADMITTED THAT AS WELL, WHICH, OF

2230

```
1              DID OTHERS WORK WITH YOU ON THE
2     DEVELOPMENT OF LAUNCHTILE?
3     A    YES.  I WORKED ON -- WITH A FEW PEOPLE.  MY
4     PH.D. GRADUATE STUDENT, AMY KARLSON; RESEARCH
5     ASSISTANT, AARON CLAMAGE; AND THE WORK WAS DONE IN
6     COLLABORATION WITH MICROSOFT AND THEY SPONSORED THE
7     RESEARCH, THEY PAID FOR IT, SO I WORKED WITH
8     SOMEONE THERE NAMED JOHN SANGIOVANNI.
9     Q    GENERALLY, WHAT LED YOUR TEAM TO COME ABOUT TO
10    DEVELOP LAUNCHTILE?
11    A    WE WERE TRYING TO SOLVE TWO MAJOR PROBLEMS.
12    ONE WAS HOW TO FIT A LOT OF INFORMATION ON A SMALL
13    DEVICE; AND THE SECOND WAS TO DESIGN A USER
14    EXPERIENCE THAT PEOPLE COULD USE WITH JUST A SINGLE
15    HAND RATHER THAN TWO HANDS OR A STYLUS.
16    Q    DID YOU SOLVE THOSE PROBLEMS?
17    A    I BELIEVE WE DID.
18    Q    TELL US HOW YOU DID IT, PLEASE.
19    A    I HAD BEEN WORKED FOR ALMOST TEN YEARS AT THE
20    TIME ON AN INTERFACE APPROACH I CALLED ZOOMABLE
21    USER INTERFACES, AND WE APPLIED THAT TECHNIQUE TO
22    LAUNCHTILE.
23    Q    OKAY.  CAN YOU JUST GIVE US A SENTENCE OR TWO
24    ABOUT WHAT A ZOOMABLE USER INTERFACE IS.
25    A    SURE.  GENERALLY SPEAKING, IT'S AN INTERFACE
```

```
 1      WHERE YOU PRESENT A BIG INFORMATION SPACE AND YOU
 2      CAN ZOOM OUT TO GET SOME CONTEXT, AND ZOOM IN TO
 3      LOOK A LITTLE CLOSER TO GET MORE DETAIL.
 4      Q    OKAY.  WAS THIS THE FIRST TIME IN YOUR CAREER
 5      THAT YOU WORKED WITH ZOOMABLE USER INTERFACES?
 6      A    NO.  AS I SAID, I'VE BEEN DOING IT FOR A
 7      WHILE.  I THINK I STARTED IN 1993.
 8      Q    WHAT, WHAT TYPE OF DEVICE, IN VERY GENERAL
 9      TERMS, WAS YOUR LAUNCHTILE PROGRAM DESIGNED TO RUN
10      ON?
11      A    IT WAS DESIGNED IN GENERAL TO WORK ON ANY KIND
12      OF MOBILE TOUCHSCREEN DEVICE.  IN PARTICULAR, WE
13      BUILT THIS, THIS PARTICULAR SOFTWARE TO RUN ON THE
14      MICROSOFT POCKET P.C. PLATFORM, AND WE WERE USING
15      OFTEN AN H-P IPAQ PDA.
16      Q    IS THAT WHAT THIS IS?
17      A    YES.
18      Q    YOU'VE HAD EXPERIENCE WITH THIS DEVICE, THE
19      H-P IPAQ, SIR?
20      A    YES.
21      Q    LET ME JUST NOTE, I'M HOLDING UP WHAT'S BEEN
22      MARKED AS DX EXHIBIT 518.  WE HAVE A SLIDE OF THIS
23      AND A VIDEO WE'RE GOING TO SHOW.
24           WHY DON'T WE PUT UP, RYAN, PLEASE, THE
25      SLIDE WHICH IS NUMBERED SDX 3951.001.
```

2232

```
1              IS THIS THE SAME AS THE DEVICE I'M

2    HOLDING UP, EXHIBIT 518, DX 518, DOCTOR?

3    A    YES, IT IS.

4    Q    DO US A FAVOR.  I WANT YOU TO NARRATE THE

5    VIDEO.  OBVIOUSLY BEFORE WE START THE VIDEO AND

6    NARRATE IT, CAN YOU JUST TELL US GENERALLY WHAT'S

7    SHOWN ON THE SCREEN ON THE IPAQ DEVICE ITSELF?

8    A    SURE.  THIS IS THE LAUNCHTILE APPLICATION, AND

9    WHAT YOU'RE SEEING HERE IS WHAT WE CALLED AN

10   INTERACTIVE ZOOM SPACE.

11              IT IS A COLLECTION OF 36 TILES WHICH ARE,

12   YOU KNOW, INFORMATION SOURCES.  YOU CAN SEE ON THE

13   BOTTOM RIGHT THERE'S SOME STOCK TILES.  IN THE

14   MIDDLE, YOU MIGHT BE ABLE TO MAKE OUT THAT THERE'S

15   A LITTLE MAP, AND E-MAIL TILE, A CALENDAR, A PHONE.

16   THERE'S ALL KINDS OF INFORMATION SOURCES HERE.

17              AND THEN AS YOU'LL SEE IN THE VIDEO, YOU

18   WOULD -- YOU'LL BE ABLE TO SEE THAT YOU CAN ZOOM IN

19   AND OUT AND INTERACT WITH THESE FILES.

20   Q    LET'S SHOW THE VIDEO, AND WHY DON'T YOU

21   NARRATE IT FOR US AS IT PLAYS.  OKAY?

22              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

23   OPEN COURT OFF THE RECORD.)

24              THE WITNESS:  SURE.  SO FIRST YOU CAN SEE

25   SOMEONE TOUCH THE VIDEO.  IT ZOOMS INTO A REGION I
```

```
 1    CALLED A ZONE.
 2                YOU ZOOM IN FURTHER TO AN APPLICATION
 3    TILE.
 4                YOU CAN TOUCH THE BACK BUTTON.  IT'LL
 5    ZOOM OUT TO THAT MIDDLE ZONE LEVEL, AND YOU CAN
 6    ZOOM OUT FURTHER BACK TO WHERE YOU STARTED WITH
 7    WORLD VIEW IN THE ZOOM SPACE.
 8    BY MR. DEFRANCO:
 9    Q    OKAY.  AND I THINK THERE'S ANOTHER SLIDE THAT
10    GOES ALONG WITH THIS.  THIS IS SDX 3951.003.  CAN
11    YOU DESCRIBE GENERALLY WHAT'S SHOWN ON THIS SLIDE?
12    A    SURE.  SO THIS IS SHOWING YOU WHAT WE SAW ON
13    THE VIDEO.  ON THE LEFT IS THAT WORLD VIEW WHERE WE
14    STARTED.  THIS THE ZOOM SPACE THAT CONTAINS ALL OF
15    THE TILES.
16                YOU CAN TAP ON ANY ONE OF THOSE LITTLE
17    GROUPS OF FOUR TILES CALLED A ZONE, AND IF YOU TAP
18    IN THAT MIDDLE GROUP, THAT MIDDLE ZONE, THAT TAKES
19    YOU TO THE ZONE VIEW WHERE FOUR TILES ARE SHOWN.
20    THERE'S MORE INFORMATION DISPLAYED ABOUT EACH ONE.
21                YOU CAN THEN TAP AGAIN AND IT'LL TAKE YOU
22    INTO THE APPLICATION VIEW.
23    Q    LET'S -- I WANT TO FOLLOW UP WITH A LITTLE
24    DETAIL ON SOME OF THE TERMS, SOME OF THE THINGS YOU
25    EXPLAINED TO US IN THIS DEVICE THAT USES
```

```
 1    LAUNCHTILE.  OKAY?

 2    A    OKAY.

 3    Q    YOU USED -- YOU TALKED ABOUT THE ZOOM SPACE

 4    GENERALLY.  WHAT IS THE ZOOM SPACE AGAIN, PLEASE?

 5    A    SO A ZOOM SPACE IS JUST A SINGLE COHERENT

 6    COLLECTION OF TILES, IN THIS CASE 36 TILES, WHERE

 7    YOU COULD ZOOM IN AND OUT TO OR, AS YOU'LL SEE,

 8    OTHER WAYS TO ACCESS THE INFORMATION.

 9    Q    OKAY.  NOW, THIS, THIS WAS A -- THE SOURCE

10    CODE -- THE CODE ON THIS, FOR LAUNCHTILE, THAT'S

11    SOMETHING THAT YOU ACTUALLY SUPERVISED?

12    A    YES.  I CREATED THE -- I SUPERVISED THE

13    DEVELOPMENT OF THIS APPLICATION.

14    Q    WITH THOSE FOLKS YOU MENTIONED EARLIER THIS

15    MORNING?

16    A    YES.

17    Q    AND FOR EACH ONE OF THOSE TILES, YOU GAVE US

18    SOME EXAMPLES EARLIER ABOUT E-MAIL APPLICATION, THE

19    ABILITY TO OBTAIN STOCK, I THINK I SAW NASCAR IN

20    THE CORNER.

21         WAS THERE ACTUALLY OPERATING CODE

22    UNDERLYING EACH ONE OF THOSE TILES IN THE

23    LAUNCHTILE PROGRAM AT THAT TIME?

24    A    SO, YOU KNOW, EVERY TILE FULLY WAS CAPABLE OF

25    BEING ZOOMED IN AND OUT OF AND NAVIGATING WITHIN
```

1    THE ZOOM SPACE, BUT THE TILES THEMSELVES, IF YOU

2    WENT ALL THE WAY INTO THE APPLICATION VIEW, NO,

3    MANY OF THEM -- MOST OF THEM WERE NOT IMPLEMENTED

4    BECAUSE THE GOAL WAS TO FOCUS NOT ON THE

5    INTERACTING WITH THE DETAILED DATA, BUT WAS TO

6    EXPERIENCE THE NAVIGATION.

7         MR. DEFRANCO:  YOUR HONOR, AT THE MOMENT,

8    BEFORE I FORGET, I'D LIKE TO MOVE IN DX 518 AND

9    SLIDES 3951.001, .002 AND .003.

10         THE COURT:  ANY OBJECTION?

11         MR. JACOBS:  OBJECT TO .003, YOUR HONOR.

12    IT CONTAINS ARGUMENTATIVE CONTENT ON IT RELATED TO

13    CLAIM INTERPRETATION AND THIS WITNESS IS NOT

14    QUALIFIED TO ARGUE THAT.

15         MR. DEFRANCO:  YOUR HONOR, I'LL REPRESENT

16    THE WITNESS IS NOT GOING TO -- THIS WAS A SLIDE

17    THAT WAS ALSO USED IN OPENING.  THAT'S WHY WE

18    WANTED TO USE IT FOR CONTINUITY.

19         BUT THE WITNESS --

20         THE COURT:  THE FIRST BOX AND THE SECOND

21    BOX SHOULDN'T BE ON THIS, SO THAT'S DENIED.

22         BUT DX 518 IS ADMITTED AND SDX 3951.001

23    AND .002 ARE BOTH ADMITTED.

24         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBERS

25         518, 3951.001, 3951.002, HAVING BEEN

1          PREVIOUSLY MARKED FOR IDENTIFICATION,

2          WERE ADMITTED INTO EVIDENCE.)

3          MR. JACOBS:  JUST TO BE CLEAR, YOUR

4    HONOR, YOU SAID DENIED, BUT THE OBJECTION IS

5    SUSTAINED?

6          THE COURT:  YES, .003 IS NOT COMING INTO

7    EVIDENCE.

8    BY MR. DEFRANCO:

9    Q    LET'S TALK ABOUT -- YOU MENTIONED THE ZOOM

10   FUNCTIONALITY?

11         MR. JACOBS:  YOUR HONOR, CAN WE HAVE THAT

12   TAKEN DOWN?

13         THE COURT:  THAT'S FINE.

14   BY MR. DEFRANCO:

15   Q    ZOOM FUNCTIONALITY, DOCTOR, CAN YOU EXPLAIN

16   HOW THE APPEARANCE OF A TILE -- WHAT HAPPENED TO

17   THE APPEARANCE OF A TILE IN YOUR LAUNCHTILE PROGRAM

18   AS YOU WOULD ZOOM IN ON A TILE?

19   A    SURE.  SO AS YOU ZOOM IN, YOU GET MORE AND

20   MORE SPACE AVAILABLE FOR EACH TILE.  AND SO RATHER

21   THAN JUST PURELY GEOMETRICALLY MAKING THE TILES

22   LARGER, WE WOULD USE THE SPACE TO SHOW MORE

23   INFORMATION.

24         SO IN THE E-MAIL TILE, FOR EXAMPLE, WHEN

25   YOU ZOOMED OUT, IT WOULD JUST SAY SOMETHING LIKE 11

1   UNREAD, MEANING 11 UNREAD MESSAGES.  AND IF YOU

2   ZOOM IN FURTHER, IT WOULD SHOW SOME INFORMATION

3   ABOUT THE E-MAIL IN YOUR INBOX; AND THEN WHEN YOU

4   ZOOMED IN ALL THE WAY, THEN YOU GOT A FULL LIST OF

5   E-MAIL MESSAGES, WHO THEY'RE FROM AND THEIR

6   SUBJECTS AND SO ON.

7   Q    WAS THERE A REASON WHY YOU TEAM DECIDED TO

8   CHANGE THE APPEARANCE OF A TILE AS YOU ZOOMED IN ON

9   IT?

10  A    YEAH.  AS I SAID, USING PURE GEOMETRIC ZOOMING

11  WOULD HAVE WORKED, BUT THAT WAS VERY SIMPLE AND

12  WOULD NOT HAVE USED THE SCREEN SPACE VERY

13  EFFECTIVELY.

14       SO THE IDEA OF SHOWING DIFFERENT VISUAL

15  REPRESENTATIONS AS YOU GOT CLOSER WAS A NATURAL WAY

16  TO TAKE ADVANTAGE OF THE SPACE, AND ALSO THE KIND

17  OF THING I'D BEEN TALKING ABOUT IN MY RESEARCH FOR

18  TEN YEARS PREVIOUS.

19  Q    IS THERE A NAME FOR THAT TYPE OF ZOOMING?

20  A    YES.  WE CALLED IT SEMANTIC ZOOMING.

21  Q    AND AGAIN, THE DIFFERENCE BETWEEN GEOMETRIC

22  AND SEMANTIC ZOOMING?

23  A    SO GEOMETRIC IS PURE VISUAL SCALING.  YOU GET

24  CLOSER, IT GETS LARGER.

25       SEMANTIC ZOOMING IS AS IT GETS LARGER,

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8         I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13         THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21                    /S/

                  _____
22                LEE-ANNE SHORTRIDGE, CSR, CRR
                  CERTIFICATE NUMBER 9595
23

24                DATED:  AUGUST 14, 2012

25