Estrich Declaration

Exhibit 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5   APPLE INC., a California

6   corporation,                    CASE NUMBER

7              Plaintiff,        11-CV-01846-LHK (PSG)

8   vs

9   SAMSUNG ELECTRONICS CO., LTD.,

10  a Korean business entity,

11  SAMSUNG ELECTRONICS AMERICA,

12  INC., a New York corporation,

13  et al.,

14              Defendants.

_____

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17    VIDEOTAPED DEPOSITION OF MARYLEE ROBINSON

18             REDWOOD CITY, CALIFORNIA

19             MONDAY, NOVEMBER 5, 2012

20                   VOLUME I

21  REPORTED BY:

22  THOMAS J. FRASIK

23  RPR, CSR No. 6961

    Job No. 1554075

24

25  PAGES 1 - 123

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4               --oOo--

5    APPLE INC., a California

6    corporation,                    CASE NUMBER

7              Plaintiff,      11-CV-01846-LHK (PSG)

8    vs

9    SAMSUNG ELECTRONICS CO., LTD.,

10   a Korean business entity,

11   SAMSUNG ELECTRONICS AMERICA,

12   INC., a New York corporation,

13   SAMSUNG TELECOMMUNICATIONS

14   AMERICA, LLC, a Delaware limited

15   liability company,

16              Defendants.

17   _____

18

19        Confidential Videotaped Deposition of

20   MARYLEE ROBINSON, VOLUME I, at 555 Twin Dolphin Drive,

21   Fifth Floor, Redwood City, California, beginning at 1:01

22   p.m., and ending at 4:47 p.m., on Monday, November 5,

23   2012, before THOMAS J. FRASIK, Registered Professional

24   Reporter, Certified Shorthand Reporter No. 6961.

25

Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF APPLE INC.:

 4           MORRISON & FOERSTER LLP

 5           BY:  ERIC J. OLSON, ESQ.

 6           755 Page Mill Road

 7           Palo Alto, California  94304

 8           650-813-5825

 9           ejolson@mofo.com

10

11

12   FOR DEFENDANTS:

13           QUINN EMANUEL

14           BY:  ANTHONY P. ALDEN, ESQ.

15           865 South Figueroa, Tenth Floor

16           Los Angeles, California  90017

17           213-443-3000

18           anthonyalden@quinnemanuel.com

19

20

21   ALSO PRESENT:

22           GREGORY A. PINSONNEAULT, LitiNomics

23           RAMON PERAZA, Videographer

24

25
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                          I N D E X

2    MARYLEE ROBINSON, VOLUME I                EXAMINATION

3

4              MR. ALDEN                        8

5              MR. OLSON                        110

6              MR. ALDEN                        115

7

8

9        INSTRUCTIONS NOT TO ANSWER/REFUSALS TO ANSWER:

10                        Page    Line

11

12                        16       7

13                        19       17

14                        102      12

15                        104      9

16                        105      22

17

18

19

20

21

22

23

24

25

                                            Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Q.  The court reporter can only transcribe sound,

 2     so when you answer a question, it has to be audible.  We

 3     have a habit to shake our heads up and down or side to

 4     side, and that will be picked up by the video but not by

 5     the court reporter in the transcript.  So it's important   13:04:58

 6     that you answer audibly to questions.

 7          A.  Yes.

 8          Q.  Do you have any questions before we start?

 9          A.  I do not.

10          Q.  Have you ever been qualified as an expert in     13:05:08

11     any case?

12          A.  I have not.

13          Q.  How many patent cases have you worked on?

14          A.  I would have to estimate probably at least 30.

15          Q.  Okay.  Have you worked, prior to this case, on    13:05:41

16     any design patent cases?

17          A.  I have not.

18          Q.  Have you worked on any trade dress cases prior

19     to this case?

20          A.  I have not.                                       13:05:54

21          Q.  Have you worked on any antitrust cases prior to

22     this case?

23          A.  No.

24          Q.  Have you worked on any breach of contract cases

25     prior to this case?                                        13:06:06
```

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Yes.

2      Q.   Are you an expert in the field of marketing?

3      A.   No.

4      Q.   Are you an expert in the field of consumer

5   decision-making?                                    13:06:19

6      A.   No.

7      Q.   Are you an expert in the smartphone market?

8      A.   No.

9      Q.   Are you an expert in the tablet market?

10      A.   No.                                          13:06:30

11      Q.   Have you ever performed any other work for

12   Apple other than this case?

13      A.   I have not.

14      Q.   Have you ever had any engagements for Samsung?

15      A.   I have not.                                   13:06:53

16      Q.   Did you sign the protective order that was

17   entered in this case?

18      A.   I believe that Mr. Musika signed a protective

19   order on behalf of the firm, although I reviewed it.

20   That was quite some time ago.                        13:07:11

21      Q.   Okay.  But you yourself did not sign the

22   protective order?

23      A.   It's my recollection that he signed it and

24   that covered all of our -- all the people at Invotex who

25   worked on the case.  So I don't recall personally       13:07:25

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    signing a protective order, although it's always

2    possible because I've certainly signed protective

3    orders in the past.

4        Q.  Now, you submitted a declaration in this case;

5    is that right?                                      13:07:42

6        A.  That is right.

7        Q.  And I will have the reporter mark as

8    Robinson Exhibit 1 a document entitled "Declaration

9    Of Marylee Robinson In Support Of Apple's Motion For

10   A Permanent Injunction For Damages Enhancement, For   13:08:04

11   Supplemental Damages, And For Prejudgment Interest,"

12   filed under seal.

13           (Deposition Exhibit 1 was marked

14           for identification.)

15           MR. OLSON:  Anthony, I'll just note for the   13:08:32

16   benefit of the record, it appears that this is a copy of

17   the declaration without the exhibits attached.

18           MR. ALDEN:  Correct.

19   BY MR. ALDEN:

20       Q.  Ms. Robinson, have you had a chance to look at   13:08:53

21   the document I just handed to you?

22       A.  Yes.

23       Q.  And is that the declaration you submitted in

24   case?

25       A.  It is.                                       13:09:15

                                                Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Let me be more precise:  A copy of the

2   declaration --

3        A.   Yes.

4        Q.   -- you submitted in this case.

5             When were you asked by counsel to prepare this     13:09:23

6   declaration?

7        A.   Early September, second week of September of

8   2012.

9        Q.   And how long did you spend preparing the

10  declaration?                                                  13:09:43

11       A.   Approximately one week.

12       Q.   You say, I believe -- if I can refer you to

13  paragraph 3 of your declaration, on page 1, "I have

14  played a substantial role in Apple's intellectual

15  property dispute with Samsung since December 2011,            13:10:04

16  working closely with Terry Musika in all stages of

17  the case."

18            Do you see that?

19       A.   I do.

20       Q.   Why did your involvement begin in                  13:10:16

21  September 2011?

22       A.   Terry, Mr. Musika, issued a declaration

23  regarding the preliminary injunction in this case last

24  September, and that's when our work began on this

25  matter.                                                      13:10:33

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  And how long have you been with Invotex?

2        A.  Approximately six years.

3        Q.  You say, at line 23 on page 1, "I assisted him

4    in the preparation for his trial testimony."

5            Do you see that?                          13:10:51

6        A.  Yes.

7        Q.  How did you assist him in preparing for his

8    trial testimony?

9        A.  Reviewing the reports he prepared, preparing

10   trial exhibits, preparing demonstratives, responding to   13:11:07

11   questions as they came up in his preparation.  That

12   would -- I think that's a good summary of the types of

13   things I was doing.

14       Q.  And you then say, in the next line, "I have

15   provided analysis and supervision with respect to all   13:11:23

16   aspects of Invotex Group's engagement by Apple."

17           Do you see that?

18       A.  Yes.

19       Q.  And what kind every analysis did you provide

20   with respect to Invotex's engagement by Apple?          13:11:36

21       A.  I assisted in -- I assisted Mr. Musika in

22   developing the damages model that was presented at

23   trial, the lost profits calculations.  I assisted in

24   research, you know, third-party research or reviewing

25   third-party research, conducting public research on     13:11:57

                                                     Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    not believe is permissible and will instruct not to

2    answer.

3            MR. ALDEN:  So just so I'm clear, you're

4    instructing her not to answer what other types of harm

5    Apple has suffered other than lost sales and loss of          13:19:35

6    market share; is that correct?

7            MR. OLSON:  I am -- so we'd have to go back to

8    the specific question that you asked before.

9            MR. ALDEN:  I'm asking this question now:  Are

10   you instructing her not to answer what other types of         13:19:46

11   harm she was referring to in her declaration other than

12   lost sales and loss of market share?

13           MR. OLSON:  So, I do not recall the rest of the

14   testimony sufficiently as to be able to identify whether

15   the two statements you've made are the sum total of the       13:20:02

16   things that she addressed by way of her declaration.

17   But I will instruct her not to answer with respect to

18   questions of the harm that Apple has suffered that go

19   beyond that which is covered in her declaration and for

20   which she's providing opinions.  If that turns out to be      13:20:20

21   the scope of those elements, then yes, I would be

22   instructing not to answer.

23   BY MR. ALDEN:

24       Q.  If I could ask you to look at the next

25   paragraph, Ms. Robinson?                                      13:20:31

                                                        Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   Sure.

2        Q.   You write there about an unfortunate medical

3   diagnosis that Terry Musika has suffered.  Is that

4   correct?

5        A.   Yes.                                    13:20:45

6        Q.   And do you expect that -- I don't intend to get

7   into the details of it.  I have no intention to question

8   about it other than my client needs to know the extent

9   of Mr. Musika's future involvement potentially in the

10  case, should the case proceed.                    13:21:03

11       So do you expect that with that, all I really

12  am going to ask you is do you expect that Mr. Musika, if

13  necessary, would testify at the hearing on December 6th?

14       A.   I don't foresee Mr. Musika testifying in any

15  future hearings, depositions.                     13:21:27

16       Q.   Okay.  You say on lines 4 and 5 of page 2 of

17  your declaration that you affixed his signature to the

18  declaration based on his authorization.  Do you see

19  that?

20       A.   Um-hum, yes.                            13:21:46

21       Q.   So Mr. Musika himself didn't sign his

22  declaration; is that correct?

23       A.   That is correct.

24       Q.   Did Mr. Musika prepare his declaration?

25       A.   Yes.                                    13:21:55

                                              Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         Q.  And how long did it take Mr. Musika to prepare

 2    his declaration?

 3         A.  Less than a week.

 4         Q.  And did you help Mr. Musika prepare his

 5    declaration?                                      13:22:11

 6         A.  Yes.

 7         Q.  Did he review the declaration that was filed

 8    before you affixed his signature to it?

 9         A.  Yes.

10         Q.  So there were no changes made to the        13:22:22

11    declaration after the last version that he saw and your

12    affixtiture of his signature to it?

13         A.  That is correct.

14         Q.  How often, if you know, does -- do other people

15    attach Mr. Musika's signature to his declarations?  13:22:41

16         A.  I can't speak for other people.  I can speak

17    for my own experience of working with him.

18              It happens on occasion.  He'll be on the West

19    Coast, I'll be on the East Coast, we'll be working

20    together, and I'll submit the final version with a   13:23:05

21    signature.

22         Q.  And so, in your experience, it's happened more

23    than five times?

24         A.  Possibly.

25         Q.  More than ten times?                        13:23:19
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.  Unlikely.

2        Q.  When did Mr. Musika prepare his declaration?

3        A.  Between the date of the jury verdict which I

4   believe was August 24th, and the 29th when -- the date

5   of this report or date of his declaration.          13:23:38

6        Q.  I'd like to turn to paragraph 32 of your

7   declaration, please.

8        A.  Yes.

9        Q.  And this paragraph is dealing with Apple's

10  request for permanent injunction on certain Samsung    13:24:15

11  products; correct?

12       A.  Correct.

13       Q.  And starting at line 9, you say "These products

14  include the Captivate, Continuum, Droid charge," and

15  there's a list of products.                           13:24:28

16           Do you see that?

17       A.  I do.

18       Q.  When you say "These products include," what

19  other products does Apple seek to enjoin?

20       A.  It's my understanding from the filings that    13:24:36

21  Apple is seeking an injunction on other products that

22  may contain or embody some of these intellectual

23  property rights, but they haven't named specifically

24  those products.

25       Q.  So you don't know what the names of those      13:25:01

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    products are?

2        A.  I do not.

3        Q.  Do you know how many other products?

4        A.  I do not.

5        Q.  If I can turn your attention to paragraph 34?    13:25:10

6        A.  Yes.

7        Q.  And it's an important paragraph so I'll read it

8    into the record.

9            "A review of the information in the record and

10   produced in discovery shows that the user interface    13:25:26

11   patents drive consumer demand for Samsung's infringing

12   tablets, such that a substantial nexus exists between

13   Samsung's infringement of the User Interface Patents and

14   long-term market share losses Apple with suffer absent

15   an injunction."                                         13:25:46

16           Did I read that correctly?

17       A.  Yes, appears so.

18       Q.  And what information did you review in the

19   record and produced in discovery?

20       A.  Specific to this point or as a whole,           13:25:57

21   everything that I've reviewed in the case?

22       Q.  Specific to this point.

23       A.  Okay.  Specific to this point, I reviewed --

24   or I reviewed Dr. Hauser's conjoint study, several

25   Samsung internal documents, Samsung commercials         13:26:27

                                                    Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    advertising the user interface patents, and the

 2    testimony of Dr. Balakrishnan.

 3         Q.  Did you review anything else in connection with

 4    this specific point in paragraph 34?

 5              MR. OLSON:  Did she review or did she rely on    13:27:00

 6    anything else?

 7              MR. ALDEN:  My question was review.

 8              MR. OLSON:  Sorry.

 9              THE WITNESS:  It's a fine line because

10    I've reviewed so much over the course of this case.        13:27:10

11    I -- testimony of Bill Schiller from the trial.  I think

12    that's ...

13    BY MR. ALDEN:

14         Q.  Okay.  So just so I'm clear, in connection with

15    paragraph 34, you reviewed Dr. Hauser's study, several     13:28:02

16    Samsung internal documents, Samsung commercials

17    advertising the user interface patents, testimony of

18    Dr. Balakrishnan and testimony of Phil Schiller; is that

19    correct?

20         A.  Yes, that's correct.                              13:28:18

21         Q.  The user interface patents, I take it you're

22    referring to what I'll call the '381 Patent, the '163

23    Patent and the '915 Patent; is that correct?

24         A.  Yes.

25         Q.  What does the '381 Patent cover?               13:28:35
```

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  I'm certainly not a technical expert but I can

2    give you my layman's understanding from my -- the

3    information I've seen in the case.  The '381 is

4    typically referred to as the bounce patent.

5      Q.  And to your understanding, what does it          13:28:59

6    actually cover?

7      A.  When paging to the bottom of a document, a

8    bounce -- the document will bounce back.  I guess it's

9    bounce-back is usually how it's referred.

10      Q.  Does it cover anything else to your mind?         13:29:23

11          MR. OLSON:  Objection.  Calls for a legal

12    conclusion.

13          THE WITNESS:  I couldn't -- yeah.  I

14    couldn't -- there's multiple claims in there.  I

15    certainly could not give a full description of all      13:29:34

16    that's claimed.

17    BY MR. ALDEN:

18      Q.  What claims is Apple asserting of the patent in

19    this case?

20      A.  I do not specifically recall for each of these    13:29:43

21    three patents.

22      Q.  Same question with respect to the '163.  What

23    does the '163 Patent cover?

24          MR. OLSON:  The same objection.  Calls for a

25    legal conclusion.                                       13:29:59

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:  The '163 is the doubletap patent

 2    which involves the doubletap of -- you know, if you're

 3    on a webpage or a document, doubletap and then tap to

 4    center, a follow-up tap, so it enlarges it and then

 5    centers it.                                     13:30:25

 6    BY MR. ALDEN:

 7        Q.  Does it cover anything else to your mind?

 8            MR. OLSON:  Same objection.

 9            THE WITNESS:  Again, I -- I wouldn't be able to

10    give further explanation beyond what I've already given.  13:30:33

11    BY MR. ALDEN:

12        Q.  And, again, you don't recall which claims from

13    that patent Apple has asserted in this case against

14    Samsung?

15        A.  I do not.                                13:30:44

16        Q.  And the '915 Patent, what does that patent

17    cover?

18        A.  The '915 is often referred to as the

19    pinch-to-zoom patent and that is -- covers, my

20    understanding, layman's understanding, is the pinching  13:31:02

21    to zoom on a document followed by a -- it's a

22    differentiation between two-finger and one-finger

23    gestures.

24        Q.  Does the -- and I take it, again, you don't

25    recall which claims from the '915 Patent Apple asserted  13:31:40
```

                                                    Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    against Samsung in this litigation?

 2         A.  I do not.

 3             MR. OLSON:  Make sure you wait until he

 4    finishes.

 5             THE WITNESS:  Sorry.                    13:31:51

 6    BY MR. ALDEN:

 7         Q.  Does the '381 Patent cover all bouncing on a

 8    screen?

 9             MR. OLSON:  Objection.  Calls for a legal

10    conclusion.  Beyond the scope.                  13:32:00

11             THE WITNESS:  I wouldn't -- I wouldn't be able

12    to answer that.

13    BY MR. ALDEN:

14         Q.  You don't know?

15         A.  Yes.  Beyond my area of expertise.     13:32:06

16         Q.  Does the '163 Patent cover all tapping to zoom

17    on a touchscreen?

18             MR. OLSON:  Same objection.  Calls for a legal

19    conclusion.  Beyond the scope.

20             THE WITNESS:  Again, it's beyond my area of    13:32:22

21    expertise.

22    BY MR. ALDEN:

23         Q.  So you don't know?

24         A.  I do not know.

25         Q.  Does the '915 Patent cover all pinching to zoom  13:32:29
```

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    on a touchscreen?

2         MR. OLSON:  Same objections.

3         THE WITNESS:  Again, it's beyond my area of

4    expertise.

5    BY MR. ALDEN:                                    13:32:42

6         Q.  So you don't --

7         A.  I do not know.  Sorry.

8         Q.  What do you understand by the term "substantial

9    nexus"?

10        A.  I understand that to mean that there's    13:32:56

11   considerable importance that links demand between the

12   infringing feature and demand for the product, that the

13   features have considerable importance that links their

14   demand between them.

15        Q.  You say in paragraph 34 that "a substantial   13:33:31

16   nexus exists between Samsung's infringement of the User

17   Interface Patents and long-term market share losses that

18   Apple will suffer absent an injunction."

19        Did I read that correctly?

20        A.  You did.                                 13:33:52

21        Q.  And how long are market share losses that you

22   believe Apple will suffer absent an injunction?

23        MR. OLSON:  Objection.  Vague.

24        THE WITNESS:  I cannot offer a specific time

25   frame or estimate, but it is based on information I've   13:34:10

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   seen in this case and in the record regarding the growth

2   of the market and Apple's loyalty with its customers,

3   that they will suffer losses for quite some time.  But I

4   can't offer a specific amount of -- like I can't

5   quantify how long.                                          13:34:48

6   BY MR. ALDEN:

7       Q.  So you can't say is it longer than six months,

8   for example?

9       A.  I couldn't say.

10      Q.  Could it be less than six months?               13:34:55

11      A.  I have no way of knowing.

12      Q.  So it could be -- you don't know.  You just

13  know it could be some period of time after Samsung stops

14  selling the infringing products; is that correct?

15      A.  Sometime after Samsung stops selling the         13:35:16

16  infringing products, yes.

17      Q.  But it could be three months, could be six

18  months; you don't know?

19      A.  I do not know.

20          THE VIDEOGRAPHER:  Mr. Alden, will you please    13:35:27

21  put your microphone to the collar of your shirt, please.

22  Thank you.

23  BY MR. ALDEN:

24      Q.  What evidence do you -- are you aware of that

25  Apple will suffer long-term market share losses absent   13:35:51

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    an injunction?

2        A.  So this -- these statements relate specifically

3    to the tablets.  And your question -- can you read your

4    question, please?

5        Q.  What evidence do you have or are you aware of      13:36:13

6    that Apple will suffer long-term market share losses

7    absent an injunction?

8        A.  So I think that the -- if you view the market

9    share, historical market share and any loss of market

10   share is an indication that there will be sales -- any     13:36:38

11   sales that have been taken away over time will lead to

12   future losses.

13       Q.  So let's break that down.  Your opinion is that

14   Samsung has taken market share from Apple, is that

15   correct, in the tablet market; is that correct?           13:37:17

16       A.  Any loss of sale that Apple experiences at the

17   expense of Samsung can contribute to loss in market

18   share.

19       Q.  Okay.  And how many lost -- so it's your

20   opinion that Samsung has taken Apple tablet sales; is      13:37:37

21   that correct?

22       A.  Yes.

23       Q.  Okay.  How many?

24       A.  I have not quantified that.

25       Q.  And how many tablet sales do you expect that       13:37:46

                                                    Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Apple will lose as a result of Samsung taking tablet

2    sales away from Apple?

3         A.  I have not quantified that.

4         Q.  Is it possible to quantify?

5              MR. OLSON:  Objection.  Incomplete          13:38:06

6    hypothetical.

7              THE WITNESS:  It would certainly be challenging

8    and would require a series of assumptions for analysis.

9    It's not something I can do sitting here right now.

10   BY MR. ALDEN:                                         13:38:28

11        Q.  I understand.  But you could do it if you were

12   asked to do it?

13             MR. OLSON:  Objection.  Misstates the

14   testimony.

15             THE WITNESS:  I could make an attempt at      13:38:34

16   estimating, but certainly projecting to a reasonable

17   degree of certainty, that -- that -- I'm not certain

18   that you could calculate that to a reasonable degree of

19   certainty.

20   BY MR. ALDEN:                                         13:38:56

21        Q.  It's possible but you're not sure?

22        A.  I'm not sure that it could be done to a

23   reasonable degree of certainty.

24        Q.  If I could turn your attention to paragraph 39,

25   please?  Paragraph 39 discusses the Hauser report; is    13:39:28

                                                        Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that correct?

2         A.  Yes, it does.

3         Q.  And his testimony --

4             MR. OLSON:  Can you actually give her a chance

5    just to let her read it?                          13:39:41

6             MR. ALDEN:  Yes.

7             THE WITNESS:  Okay.

8    BY MR. ALDEN:

9         Q.  And have you read Dr. Hauser's report?

10        A.  Yes.                                      13:40:00

11        Q.  And have you read Dr. Hauser's trial testimony?

12        A.  Yes.

13        Q.  And in paragraph 39, the first sentence states

14   "Apple's conjoint survey expert, John Hauser, testified

15   at trial that he conducted two surveys to determine how   13:40:20

16   much money, if any, Samsung consumers would pay for the

17   features associated with the '915, '163, and '381

18   patents."

19             Did I read that sentence correctly?

20        A.  Yes.                                      13:40:35

21        Q.  And that is what Dr. Hauser tested; is that

22   correct?

23        A.  Yes, that's my understanding.

24        Q.  Dr. Hauser did not test demand for the patented

25   features; correct?                                13:40:51

                                                      Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    I -- I -- I am taking his conclusions on their face.  I

2    understand -- I have no reason to believe that there's

3    any issue with his study.  And I'm not here to offer --

4    I'm unable to or it's not my place, it's beyond my area

5    of expertise, to analyze his report.                    13:44:25

6    BY MR. ALDEN:

7         Q.  I understand.  But you obviously have an

8    opinion or some understanding of what Dr. Hauser did;

9    correct?

10        A.  At a high level.                               13:44:34

11        Q.  Okay.  So what's your understanding of what

12   Dr. Hauser did?

13             MR. OLSON:  Objection.  Asked and answered.

14   Reflects it in the document.

15             THE WITNESS:  I understand that Dr. Hauser    13:44:53

16   surveyed owners of Samsung phones and tablets, he asked

17   them a series of questions about these particular

18   patented features as well as other features.  The

19   respondents answered those questions, and he drew the

20   conclusion that there's substantial demand for the      13:45:11

21   patented features.

22   BY MR. ALDEN:

23        Q.  Is that all you recall at this time?

24        A.  Yes.

25        Q.  And do you recall whether one of the questions  13:45:24

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that he asked respondents to the survey was whether they

2    would still buy a Samsung phone without, for example,

3    the '381 patented feature?

4        A.  I don't recall one way or the other.

5        Q.  Okay.  Do you recall whether Dr. Hauser asked      13:45:39

6    respondents whether they would still buy a Samsung phone

7    without the '163 patented feature?

8        A.  I don't recall one way or the other.

9        Q.  Do you recall whether Dr. Hauser asked

10   respondents whether someone would still buy a Samsung    13:45:57

11   phone without the '915 patented feature?

12       A.  I don't recall one way or the other.

13       Q.  Do you recall whether Dr. Hauser tested if

14   people buy the iPhone or iPad because of the '381

15   patented feature?                                        13:46:13

16       A.  I believe he did not test that.  His population

17   were buyers of Samsung products.

18       Q.  Did Dr. Hauser test whether people buy the

19   iPhone or iPad because of the '163 patented feature?

20       A.  Again, he tested a population of Samsung         13:46:31

21   owners, so no, he did not test that.

22       Q.  Did Dr. Hauser test whether people buy the

23   iPhone or iPad because of the '915 patented feature?

24       A.  It's my understanding he did not as he was

25   surveying owners of Samsung devices.                     13:46:50

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  Does the fact that someone is willing to pay

 2   something for a feature necessarily mean that they won't

 3   buy it without the feature?

 4            MR. OLSON:  Objection.  Beyond the scope.

 5            THE WITNESS:  I don't think it -- no, it        13:47:07

 6   doesn't.  I mean, I believe it is possible that they

 7   could buy it without the feature.

 8   BY MR. ALDEN:

 9        Q.  Are you aware of anyone who has bought a

10   Samsung product because of the '381 patented feature?     13:47:38

11        A.  No.

12        Q.  Are you aware of anyone who has bought a

13   Samsung product because of the '163 patented feature?

14        A.  No.

15        Q.  Are you aware of anyone who has bought a         13:47:57

16   Samsung product because of the '915 patented feature?

17        A.  I am not aware.

18        Q.  Are you aware of anyone who has bought an Apple

19   product because of the '381 patented feature?

20        A.  No, not specifically.                            13:48:13

21        Q.  Are you aware generally?

22        A.  I'm aware of evidence that suggests that Apple

23   customers have bought devices for touch capabilities,

24   and these patents cover touch capabilities, multi-touch.

25        Q.  I understand.  I want to try and focus           13:48:46
```

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    specifically on the '381 Patent.

2        A.  Um-hum.

3        Q.  Are you aware of anyone who's bought an Apple

4    product because of the '381 patented feature?

5        A.  Not specifically, no.                    13:48:57

6        Q.  And the same question with respect to the '163

7    patented feature.

8        A.  Not specifically.

9        Q.  And are you aware of anyone who has bought an

10   Apple product because of the '915 patented feature?    13:49:07

11       A.  Not specifically.

12       Q.  Did you undertake any surveys of consumer

13   demand for the patented features?

14           MR. OLSON:  She personally?

15   BY MR. ALDEN:                                       13:49:27

16       Q.  Did you personally?

17       A.  Did I personally conduct any surveys?

18       Q.  Yes.

19       A.  No.

20       Q.  Did you commission any surveys?           13:49:32

21       A.  I did not.

22       Q.  Why not?

23       A.  Was beyond the scope of the areas in which I'm

24   rendering opinions in this declaration.

25       Q.  Okay.  Do you know what Samsung's share of the  13:49:58

                                                  Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    US tablet market was in 2011?

2        A.  I couldn't specifically say without looking

3    back to a document.

4        Q.  Could you say generally without looking back to

5    a document?                                    13:50:20

6            MR. OLSON:  So here, on "generally," just don't

7    guess.  If you need to refer to something, go ahead, or

8    if you have a general recollection, that's fine, but

9    don't guess.  I don't think that's what he's asking for.

10           You're shaking your head, so that means you are   13:50:40

11   not asking for a guess.

12   BY MR. ALDEN:

13       Q.  I am not asking for a guess.

14           Do you recall -- if you have a general

15   recollection, I'm asking for --                13:50:48

16       A.  I don't have a -- I don't have a general

17   recollection.

18       Q.  Do you know what Samsung's share of the US

19   tablet market is now?

20       A.  I believe it's less than ten percent.   13:50:56

21       Q.  And did Samsung's market share, US tablet --

22   strike that.  Let me ask a better question.

23           Did Samsung's market share or share of the

24   US tablet market in 2011 impact your analysis of

25   consumer demand for the patented features?      13:51:20

                                                    Page 41

1        A.   Specifically in drawing these conclusions, I

2    didn't rely on the market share to draw that -- these

3    specific conclusions, that there's demand for these

4    specific features.

5        Q.   So just so I'm clear, you didn't rely on          13:51:56

6    Samsung's tablet market share in concluding that there's

7    a substantial nexus between the patented features and

8    consumer demand for Samsung's tablets; is that correct?

9        A.   In drawing these conclusions and issuing this

10   declaration, it's --                                       13:52:20

11             (Witness interrupted by the

12             Deposition Reporter.)

13             THE WITNESS:  In drawing these conclusions and

14   issuing this declaration, it's not a specific piece of

15   evidence that I relied upon in reaching my conclusions.    13:52:46

16   BY MR. ALDEN:

17       Q.   Does the Kindle Fire incorporate the patented

18   features?

19       A.   I have not reviewed the Kindle Fire to

20   determine if it includes the patented features and I       13:52:59

21   would defer to a technical expert to opine on that.

22       Q.   Do you know whether the Barnes & Noble Nook

23   incorporates the patented features?

24       A.   Again, I would defer to a technical expert.  I

25   have not reviewed that specific product.                   13:53:17

                                                      Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.  Did you undertake any studies of any other

2    tablets to see what led to their success or failure?

3        A.  No, I did not conduct any studies.

4        Q.  Did you review any literature on the tablet

5    market generally?                                    13:53:43

6        A.  In the course of this -- in the course of

7    working on this matter over the last year, I have

8    reviewed literature on the tablet market.  Specifically

9    to my opinions in this declaration on this point, it's

10   not a specific piece of data or evidence that supports  13:54:02

11   my conclusion.

12       Q.  Have you reviewed any literature on consumer

13   decision-making concerning tablets?

14       A.  Could you give me an example of what you mean

15   by consumer literature on consumer decision-making?    13:54:29

16       Q.  Sure.

17       A.  Is that a common term or --

18       Q.  Well, I guess what I'm getting at is -- it's

19   not a trick question.

20           What I'm getting at is have you read or         13:54:44

21   reviewed any literature on why consumers purchase

22   different tablets?

23           MR. OLSON:  I think we may be missing

24   Anthony's -- you're talking about stuff in the tablet

25   market and now you've talked about something else.  I'm  13:54:58
```

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    not sure that -- well, I'll let the question stand.  I

 2    don't mean to interrupt your question.

 3          THE WITNESS:  I'm just trying to understand

 4    what you mean by consumer literature or literature --

 5    can you rephrase it?  I'm sorry.                    13:55:16

 6    BY MR. ALDEN:

 7       Q.  No, no problem.

 8          Are you aware that there's a body of academic

 9    literature on why people buy things?

10       A.  Yes.                                         13:55:28

11       Q.  And have you reviewed any of that literature

12    that concerns tablets?

13       A.  Specific to tablets, no.

14       Q.  Okay.  Have you reviewed any of that literature

15    concerning electronic consumer goods?               13:55:52

16       A.  I recall, when working on the preliminary

17    injunction, seeing some expert reports on these issues,

18    and in this matter, Samsung's experts' reports on the --

19    you know, who have opined on these areas.  That would be

20    the breadth of what I've reviewed.  I haven't read any  13:56:18

21    of their research or their publications or anything like

22    that.

23       Q.  Did you review any of that literature in

24    connection with preparing your declaration?

25       A.  Not in the -- no.                            13:56:31
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  All right.  If I can ask you to look at

2    paragraph 40, please?

3            If you want to read the whole paragraph, that's

4    fine.  I'm probably going to break it up into sentences,

5    but if you want to review the whole thing now, that's        13:56:54

6    fine.

7            MR. OLSON:  Why don't you go ahead and do that.

8            THE WITNESS:  Okay.

9    BY MR. ALDEN:

10       Q.  So in the first sentence, you say              13:57:16

11   "Additionally, Samsung's own internal documents

12   emphasize the importance of the features embodied by the

13   User Interface Patents to the success of its tablet

14   devices."

15           Do you see that?                               13:57:29

16       A.  Yes.

17       Q.  How does the fact that Samsung documents

18   emphasize the importance of patented features suggest

19   consumer demand for them?

20       A.  I look at this from an economic perspective.    13:57:42

21   And Samsung is motivated to sell units of their devices,

22   specifically tablets, in order to make money, gain

23   market share.  And their emphasis in their own internal

24   documents suggests that they wanted these features in

25   their product.  And, just like every other company,      13:58:08

                                                    Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   they're motivated to make money, so they must have

 2   believed that consumers wanted these features in the

 3   device.

 4       Q.  Does the fact that consumers may want a feature

 5   in a device mean that that feature necessarily drives    13:58:26

 6   consumer demand for the device?

 7       A.  It may or may not.  It's not going to be the

 8   sole reason someone buys a device necessarily.  It may

 9   be for one person but for another person it may be an

10   entirely different reason.                                13:58:52

11       Q.  What reasons would there be for people buying

12   devices, and specifically tablets?

13       A.  There's a variety of features that a tablet --

14   there's lots of features in a tablet that could be

15   appealing to a customer.                                  13:59:08

16       Q.  Could you give me some examples?

17       A.  Screen size, camera, operating system.

18   There's -- those are a couple examples.

19       Q.  Do the internal documents that you refer to in

20   the first sentence of paragraph 40 of your declaration    13:59:38

21   show that consumers actually purchased the tablets

22   because of the patented features?

23       A.  No, it does not.

24       Q.  Do any documents that you -- Samsung documents

25   that you reviewed in this case show that consumers        14:00:10
```

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    actually purchased tablets because of the patented

2    features?

3        A.  No, not -- I'm not aware of any specific

4    documents.

5        Q.  You then go on, in paragraph 40, to say     14:01:04

6    "For example, in April 2011 internal report, Samsung

7    described one of its tablets products under development

8    as, "Lacking Fun, Wow Effect," in part because,

9    "movements lack bounce effect."

10        Did I read that right?                14:01:26

11        A.  Yes.

12        Q.  Does Apple own intellectual property over

13    "fun"?

14        A.  No.

15        Q.  Does Apple own intellectual property over "wow   14:01:37

16    effect"?

17        A.  No.

18        Q.  And I believe you testified before that

19    Apple -- that you don't know whether the '381 Patent

20    covers all bounce effects on a touchscreen; correct?    14:01:50

21        A.  That was my testimony.

22        Q.  You then go on, in the next sentence, to say --

23    well, in the last sentence, so let me rephrase.

24        You say -- in paragraph 40, you say

25    "Samsung marked each of these pages with icon stamps    14:02:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    describing the lack of a bounce feature as "Critical"

2    and "Serious" issues."

3           Did I read that correctly?

4       A.  Yes.

5       Q.  Why did Samsung mark those pages with the icon    14:02:27

6    stamps critical and serious?

7       A.  I can only offer my interpretation of the

8    document.  I'm not the creator of the document.  But it

9    would seem to indicate that these are important items

10   that they want addressed.  Normally, when someone says   14:02:50

11   something's critical or serious, it's important to them.

12      Q.  Did you speak to anyone at Samsung to --

13      A.  I've never spoken to anyone at Samsung.

14          MR. OLSON:  Wait till he finishes his question.

15          If you're pulling a document out, Anthony, is     14:03:10

16   this a good time for a break?

17          MR. ALDEN:  Yes.  That's fine.

18          THE VIDEOGRAPHER:  We are off the record at

19   2:03 p.m.

20          (Recess held.)                                    14:10:37

21          THE VIDEOGRAPHER:  We are back on the record at

22   2:10 p.m.

23   BY MR. ALDEN:

24      Q.  Good afternoon, Ms. Robinson.

25          You appreciate you're still under oath?           14:10:50

                                                     Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  Yes.

 2        Q.  I'd like to mark as Exhibit 2 to Ms. Robinson's

 3   deposition Exhibit 29 to her declaration, which is a

 4   document Bates-numbered SAMNDCA 00176053 through

 5   00176125.                                          14:11:16

 6            (Deposition Exhibit 2 was marked

 7            for identification.)

 8   BY MR. ALDEN:

 9        Q.  I think I misspoke.  It's Exhibit 29 to

10   Ms. Robinson's deposition -- declaration.          14:11:29

11            MR. OLSON:  For the benefit of the record,

12   it was also identified as Plaintiff's Exhibit 57 for

13   purposes of the trial, although I don't have any trouble

14   having it identified as Exhibit 2 for purposes of this

15   deposition.                                        14:11:54

16   BY MR. ALDEN:

17        Q.  Ms. Robinson, let me know when you've had a

18   chance to look at it.

19        A.  Okay.

20        Q.  You see on the cover page it says P5 Usability  14:12:06

21   Evaluation Results?

22        A.  Yes.

23        Q.  What is "P5"?

24        A.  I believe it is the tab 8.9.

25        Q.  Was the tab 8.9 accused by Apple in this case?  14:12:20
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   No.

2        Q.   Do you know who prepared this document?

3        A.   I do not specifically recall offhand, no.

4        Q.   Do you know what the purpose of this document

5   was?                                                    14:12:52

6        A.   It's my understanding that this is a review of

7   a product in development at that time, in April of 2011,

8   that reviewed -- that looked at usability evaluation.

9        Q.   What is "usability evaluation"?

10       A.   I don't specifically have a definition in mind    14:13:25

11   as to usability evaluation.  I could -- it could

12   possibly mean that it's --

13       Q.   I don't want you to guess.

14       A.   Okay.

15       Q.   If you have a basis to say, that's fine.  If     14:13:48

16   you don't know, it's better that you say you don't know.

17       A.   No basis.

18       Q.   What was ultimately done with the information

19   in this document?

20       A.   I don't specifically have information on that.    14:13:58

21       Q.   So you don't know whether the statements or

22   opinions expressed in this document were ever

23   implemented?

24       A.   Specific to the tab 8.9, I do not.

25       Q.   Well, with respect to any other product?         14:14:28

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.  I relied on this document as evidence that

2    Samsung was placing value on patented features asserted

3    in this case.  But I don't know specifically what course

4    was taken in response to this document.

5        Q.  So you don't know whether the bounce effect        14:14:56

6    that is referred to on page 2 of this document was ever

7    implemented by Samsung; is that correct?

8        A.  I have no information.  I don't know if it was

9    or was not.

10       Q.  You can put that aside.                             14:15:24

11           I'd like to mark as Exhibit 3 to Ms. Robinson's

12   deposition Exhibit 30 to Ms. Robinson's declaration.  It

13   is a document Bates-stamped SAMNDCA 0020171 through 773.

14           (Deposition Exhibit 3 was marked

15           for identification.)                                14:16:05

16   BY MR. ALDEN:

17       Q.  Ms. Robinson, let me know when you've had a

18   chance to look at it.

19       A.  Yes.

20       Q.  Okay.  And is this a document that you relied       14:16:25

21   on in preparing your declaration?

22       A.  Yes, it is.

23       Q.  Okay.  And, specifically, you relied on this

24   document in forming your opinion that there's a

25   substantial nexus between the patented features and        14:16:39

                                                    Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    consumer demand for Samsung's tablets; is that correct?

2        A.   Correct.

3        Q.   And if we look at the first page of the

4    document after the cover page, the heading says Analysis

5    of Galaxy tab Operation Speed and Screen Effects.  Do        14:16:56

6    you see that?

7        A.   Yes, I do.

8        Q.   Which Galaxy tab is this document discussing?

9        A.   I do not know.

10       Q.   Was the Galaxy tab that this document is            14:17:07

11   discussing ever released?

12       A.   I don't know one way or another.

13       Q.   What was the purpose of this document?

14       A.   I believe, based on the title, that it's an

15   analysis of the device, the Galaxy tab, it's an analysis    14:17:32

16   of the operation and speed and screen effects.  So

17   there's a variety of applications that were reviewed and

18   comment was given regarding that review.

19       Q.   How do you know that?

20       A.   I'm interpreting the document on its face.         14:17:55

21       Q.   Who prepared this document?

22       A.   I don't specifically know who prepared it.

23       Q.   Was it prepared by Samsung?

24       A.   It was produced by Samsung.  I don't know

25   specifically how it came into their hands.  I would         14:18:32

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    presume that they -- someone at the company prepared it

2    but I don't specifically know.

3        Q.  Do you know what was ultimately done with the

4    information in this document?

5        A.  I do not know.                                    14:18:49

6        Q.  I'd like to mark as Exhibit 4 to Ms. Robinson's

7    Deposition Exhibit 31 to Ms. Robinson's declaration,

8    which is a document Bates-numbered SAMNDCA 10850604.  It

9    was also marked Plaintiff's Exhibit Number 195 at trial.

10           (Deposition Exhibit 4 was marked                   14:19:24

11           for identification.)

12   BY MR. ALDEN:

13       Q.  Ms. Robinson, let me know when you've had a

14   chance to look at this document.

15       A.  Okay.                                              14:20:31

16       Q.  Was this a document that you relied on in

17   forming your substantial nexus opinion?

18       A.  Yes, it is.

19       Q.  Okay.  And you'll see at the top, it says from

20   Sangwook Han; do you see that?                             14:20:47

21       A.  Yes.

22       Q.  Who is Sangwook Han?

23       A.  I do not specifically know.

24       Q.  Does Sangwook Han work for Samsung?

25       A.  I do not know.                                     14:21:01

                                                   Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  You see the email address is

2    whan@nemustech.com; do you see that?

3      A.  Yes.

4      Q.  Who is Nemustech?

5      A.  I do not know.                                    14:21:15

6      Q.  What is Nemustech's relationship to Samsung?

7      A.  I'm not certain.

8          It was my understanding that this was an email

9    involving Samsung employees.  I see on the "to" line

10   there's a Samsung email address.  But I'm not certain of   14:21:34

11   the relationship between Nemustech and Samsung.

12     Q.  You see that the email was addressed to

13   seungyun75.lee@samsung.com; do you see that?

14     A.  Right, yes.

15     Q.  Do you know whose email address that is?          14:21:55

16     A.  It's not ringing any bells, no.

17     Q.  Do you know what his or her role is at Samsung?

18     A.  No, I do not.

19     Q.  Do you know what his or her role was at Samsung

20   at the time of this email?                               14:22:22

21     A.  No, I didn't.

22     Q.  Do you know what product is being discussed in

23   this email?

24     A.  It was my understanding that this document

25   related to tablet software, modification of the tablet   14:23:13

                                                       Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   software.

 2        Q.  And how did you arrive at that understanding?

 3        A.  I don't specifically recall at this time.

 4        Q.  Where in this email does it say that Samsung

 5   wanted to create a bounce effect similar to the iPad?      14:23:38

 6        A.  The words "create" are not in the document.

 7   But this is a descrip -- this email describes two ways

 8   to create an effect of bouncing to models in the

 9   software code that was written, and one of them says

10   it obtains a bounce effect similar to the iPad.           14:24:12

11        MR. OLSON:  I may just be -- we all make

12   mistakes on the record but, for the benefit of the

13   record, the document actually does use the word

14   "create."

15        THE WITNESS:  Oh.                                    14:24:25

16        MR. ALDEN:  Okay.  She -- Ms. Robinson is

17   capable of testifying.

18        MR. OLSON:  Sure, she is.  She made an error in

19   saying "create" wasn't in the document.

20        MR. ALDEN:  It's not typically counsel's role       14:24:34

21   to correct errors in the witness's testimony.

22        MR. OLSON:  Anthony, is it really the case that

23   what you want is testimony that is inconsistent with the

24   actual statement of what the document says?

25        MR. ALDEN:  What I'd like is short, concise          14:24:46
```

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    objections --

2            MR. OLSON:  Well --

3            MR. ALDEN:  -- and not coaching or speaking

4    objections.  That's what I would like.

5            MR. OLSON:  Well, then what I will say is you      14:24:55

6    should make sure that you've read the document carefully

7    before making any representations regarding it.

8            In this case, there isn't any question but the

9    word "created" is right in the middle of the document.

10           I'm sure that neither of us want a record that      14:25:09

11   is inaccurate as to the contents of this document.

12           MR. ALDEN:  Thank you for your testimony,

13   Mr. Olson.

14   BY MR. ALDEN:

15       Q.  Is the bounce effect being referred to in this      14:25:19

16   document the same bounce effect that is patented by '381

17   Patent?

18       A.  It's possible.  I'm not a technical expert so I

19   can't offer an opinion about these technical terms in

20   here.                                                       14:25:39

21       Q.  So you don't know whether it's the same bounce

22   effect that is referred to in the '381 Patent?

23       A.  I can't recall -- I can't specifically say.

24       Q.  Do you know whether -- do you know how the

25   information contained in this email was ultimately used?    14:26:04

                                                         Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.  No, I do not.

2          Q.  Do you know whether it was used?

3          A.  No, I do not.

4          Q.  You can put that away.  Thank you.

5               If I could direct your attention to paragraph     14:26:15

6     42 of your declaration, you say "Additional examples" --

7     well, strike that.

8               In the first sentence, the paragraph says

9     Additional examples where Samsung placed value on the

10    infringed features of the asserted User Interface          14:26:43

11    Patents include commercials for the Galaxy Tab and

12    Galaxy Tab 10.1, which feature the pinch-to-zoom,

13    scrolling, and tap-to-zoom navigation."

14              Did I read that right?

15         A.  Yes.                                              14:26:57

16         Q.  Does Apple have a patent on pinch-to-zoom?

17              MR. OLSON:  Objection.  Asked and answered.

18              Go ahead.

19              THE WITNESS:  The '915 Patent addresses

20    pinch-to-zoom capabilities as my understanding as a       14:27:09

21    layperson.

22    BY MR. ALDEN:

23         Q.  Does the '915 Patent cover all methods of

24    implementing pinch-to-zoom?

25              MR. OLSON:  Objection.  Asked and answered.      14:27:19

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              THE WITNESS:  Again, I'm not a technical

 2     expert.  It would be my understanding as a layperson

 3     that it does not cover all capabilities.

 4     BY MR. ALDEN:

 5         Q.  And I believe you testified before that Apple's   14:27:30

 6     '915 Patent does not cover all scrolling functions; is

 7     that correct?

 8              MR. OLSON:  Objection.  That misstates the

 9     prior testimony.

10              THE WITNESS:  Again, I would say that I'm not a   14:27:44

11     technical expert.  I can't offer an opinion as to

12     whether a specific patent covers all scrolling

13     capabilities.

14     BY MR. ALDEN:

15         Q.  Is it your understanding that the '915 Patent    14:27:58

16     covers all scrolling capabilities?

17              MR. OLSON:  Objection.  Asked and answered.

18              THE WITNESS:  I can't -- I cannot offer an

19     opinion.  I'm not a technical expert.  I cannot offer

20     an opinion specifically as to whether all scrolling     14:28:14

21     capabilities are covered by that patent.

22     BY MR. ALDEN:

23         Q.  You then say -- you use the term "tap-to-zoom

24     navigation."  What do you mean by "tap-to-zoom

25     navigation"?                                             14:28:25
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.  I would call that tap-to-zoom gesturing,

2    navigating on the device with your fingers.

3        Q.  Does Apple have a patent that covers all forms

4    of navigating on a device with fingers?

5        A.  As a nontechnical expert, I do not know if any    14:28:46

6    specific patent, including this patent, covers all

7    tap-to-zoom capabilities.

8        Q.  By "this patent," I take it you mean the '163

9    Patent; is that correct?

10       A.  Correct.                                           14:29:02

11       Q.  I'm going to switch gears a bit, if I can, and

12   go to paragraph 25 of your declaration.

13            Let me know when you're there.

14            MR. OLSON:  Anthony, by virtue of the fact that

15   this refers to Exhibit 7, can we go ahead and mark        14:29:33

16   Exhibit 7?

17            MR. ALDEN:  When I want to use it, we can,

18   sure.

19            MR. OLSON:  Okay.

20   BY MR. ALDEN:                                             14:29:40

21       Q.  So this portion of your declaration, starting

22   at paragraph 24, discusses enhancements to the damages

23   award that Apple seeks; correct?

24       A.  Correct.

25       Q.  And if we look at paragraph 25, it says          14:29:58

                                                    Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    "Since Samsung first launched the infringing and

2    diluting smartphones, Samsung's US smartphone market

3    share has steadily increased from 5% in June 2010, to

4    10% a year later, to 20% in late 2011, and to over 30%

5    by the second quarter of 2012," then it refers to an          14:30:18

6    Exhibit 7.

7            Did I read that correctly?

8        A.   Yes.

9        Q.   What were the reasons for the increases in

10   Samsung's market share that are referred to in paragraph    14:30:32

11   25?

12       A.   I don't believe I've specifically offered an

13   opinion as to why the increases occurred in my

14   declaration.

15       Q.   Do you have an opinion?                             14:31:00

16       A.   I believe the purpose of this statement is

17   that -- and the purpose of this whole section in the

18   report here is to look at the products found guilty of

19   infringing and diluting trade dress, and their launch

20   was -- occurred in the earlier part here, referencing      14:31:29

21   five percent in June 2010, and performing an analysis to

22   see what the impact of their launch was upon market

23   share in the time period.

24       Q.   Okay.  And so what -- do you have an opinion

25   about what caused the increase in market share that you    14:31:54

                                                          Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    referred to in paragraph 25?

2         A.  I don't know that I -- I don't have a specific

3    opinion.  This -- this was an analysis performed based

4    on an assumption.  I didn't offer an opinion as to

5    whether -- and I'm not offering an opinion right now.      14:32:38

6    But this analysis was conducted based on the assumption

7    that the trade dress and products infringing and

8    diluting the trade dress did have an impact on the

9    market share.

10        Q.  Okay.  Was it your assumption that the          14:32:52

11   increases in Samsung market share that are referred to

12   in paragraph 29 were caused solely by Samsung's sales of

13   the infringing and diluting product?

14        A.  I think you may have misspoken.  I heard

15   "paragraph 29."  Are you referring back to 25?           14:33:13

16        Q.  Yes.

17        A.  Okay.  And do I believe that the -- let me just

18   restate so I can make sure I understand the question, or

19   I can read it.

20            No.  My assumption was not that they were       14:33:26

21   "solely" caused.  I recognized in my analysis that there

22   are noninfringing products and other things taking place

23   in the marketplace and built-in adjustments to my

24   analysis to account for that.

25        Q.  So you accept that there are other reasons why  14:34:08

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Samsung's market share increased between June 2010 and

2    the second quarter of 2011; is that correct?

3        A.  I accept that it's possible that there could be

4    other reasons.

5        Q.  Okay.  And what other reasons could there be?    14:34:25

6        A.  I think earlier I stated some reasons that

7    drive consumer demand.  Those same reasons would apply

8    here.

9        Q.  So if you can give me some examples, I'd

10   appreciate it.                                           14:34:53

11       A.  Operating system, brand loyalty.

12       Q.  What about marketing; does marketing -- could

13   marketing potentially have an effect on Samsung's market

14   share in 2010 and 2012?

15       A.  It's possible.                                   14:35:27

16       Q.  Could the release of new products have had an

17   effect on Samsung's market share between 2010 and 2012?

18       A.  I would say yes.  And I would say that this

19   analysis is working under the assumption that

20   products -- new products that came out enjoyed the       14:35:45

21   benefits of these infringing and diluting phones that

22   came before them, and that's the premise of this

23   analysis.

24       Q.  Okay.  And what evidence do you have that

25   phones that came after the infringing phones enjoy the   14:35:58

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    benefits of the infringing phones?

2         A.  I will draw upon the increases in market share

3    in that time frame.  It's not -- it's not a coincidence

4    that products that were found to dilute and infringe

5    were released in a period where the market share jumped    14:36:27

6    from higher than five percent and then maintained their

7    share, and then, you know, new products came out and

8    jumped even higher.

9         Q.  Okay.  And I'm trying to understand.

10        The basis for your assumption that subsequent          14:36:43

11   sales -- that subsequent increases in market share were

12   driven by the infringing sales is the timing of the

13   increase in the original market share when the

14   infringing products were released; is that correct?

15        MR. OLSON:  Objection.  Compound.                      14:37:08

16   BY MR. ALDEN:

17        Q.  And, you know, all I'm -- it's not a

18   trick question.  I'm trying to understand what your

19   assumptions are and what the basis for them is.

20        So you told me that -- and correct me if I'm          14:37:34

21   wrong.  Again, I'm not trying to trick you.  You told me

22   that you've assumed that -- well, why don't we start

23   again.

24        You told me that you've assumed that there are

25   multiple reasons why Samsung's market share could have    14:37:53
```

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    increased between June 2010 and the second quarter of

2    2012.

3            Did I state your testimony accurately?

4       A.  I would just rephrase it to say I think I said

5    I accept that there are multiple reasons.          14:38:09

6       Q.  Okay.

7       A.  I -- okay.

8       Q.  All right.  So what contribution to Samsung's

9    increase in market share did the infringing and diluting

10   products make?                                     14:38:29

11           MR. OLSON:  Objection.  Vague.

12   BY MR. ALDEN:

13      Q.  I'll rephrase.

14           How much did the infringing and diluting

15   products drive the increase in Samsung's market share?  14:38:43

16      A.  It's -- that is a measurable data point, but

17   it's not a data point that I have specific documents in

18   front of me to draw upon.

19      Q.  Okay.  So you, sitting here right now, you

20   cannot tell me how much of an increase in market share  14:39:06

21   that's referred to in paragraph 25 is attributable to

22   Samsung's sales of the infringing and diluting products;

23   is that correct?

24      A.  I can tell you that I looked at the sales of

25   these five products and saw that they represented as  14:39:32

                                                    Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    much as 40 percent of Samsung's total sales during that

2    time period.  So if we can look at the exhibits, I

3    could -- if you'd like, I can make an estimate.  But, I

4    mean, I did look at -- I know that particularly in one

5    specific quarter it was 40 percent and in another          14:39:55

6    quarter it was 30 or 35 percent in which these five

7    specific products made up Samsung's total IDC market

8    share.

9        Q.  And how does the fact that the products make up

10   a certain percentage of Samsung's total product offering   14:40:11

11   show that they drove increases in market share?

12       A.  I'd have to do further analysis amongst the

13   infringing or noninfringing phones to give an accurate

14   answer to that question.

15       Q.  Okay.  So sitting here right now, can you tell      14:41:14

16   me of the, for example, five percent increase in

17   Samsung's market share from June 2010 to one year later,

18   presumably June 2011, can you tell me how much of that

19   ten percent increase was attributable to the infringing

20   and diluting products?                                     14:41:43

21       A.  I don't have enough data in front of me to

22   calculate that.

23       Q.  What would you need?

24       A.  I'd need IDC total units.  I'd need to know the

25   total units for all of the infringing and noninfringing    14:42:07

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    phones in that period.

2        Q.  Is that data that you have?

3        A.  Not in front of me, but yes.

4        Q.  Okay.  Did you perform that analysis?

5        A.  I -- no, I haven't -- I have not performed that    14:42:33

6    specific analysis you're referring to.

7        Q.  Why not?

8        A.  It never -- I wasn't asked to.

9        Q.  And I assume that the same -- you would say

10   the same thing if I asked you to identify the specific    14:43:00

11   proportion of the market share from June, increase in

12   market share from June 2011 to late 2011, your answer

13   would be the same; that you cannot, sitting here,

14   identify the proportion of the ten percent increase that

15   is attributable to the sale of the infringing products;    14:43:24

16   is that correct?

17           MR. OLSON:  Objection.  Misstates the

18   testimony.

19   BY MR. ALDEN:

20       Q.  Well, let me ask a clean question.    14:43:35

21           Can you tell me what proportion of the ten

22   percent increase from June 2010 to -- sorry -- from

23   June 2011 to late 2011 was due to the infringing and

24   diluting products?

25       A.  I can't do it sitting here, with the    14:43:54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    information that's in front of me.

2        Q.  Okay.  You could do it, but you weren't asked

3    to do it; is that correct?

4            MR. OLSON:  Objection.  Misstates the

5    testimony.                                       14:44:07

6            THE WITNESS:  I believe it could be done, yes.

7    BY MR. ALDEN:

8        Q.  But you weren't asked to do it?

9        A.  That's correct.

10       Q.  Could you estimate, sitting here now?      14:44:16

11       A.  I think it would be -- I think I'd need to

12   review the data.  I don't think it would be appropriate

13   to estimate, sitting here.

14       Q.  Okay.  Paragraph 25 is based off IDC market

15   data; is that correct?                           14:44:47

16       A.  Um-hum.

17       Q.  And what Samsung products were included in the

18   IDC data that you used?

19       A.  Smartphones sold by Samsung.

20       Q.  And do you know which smartphones were       14:44:59

21   included?

22       A.  Not specifically.  It's -- not specifically.

23       Q.  Were the five products found by the jury to

24   both infringe at least one design patent and to dilute

25   trade dress included in the IDC data?            14:45:21

                                              Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.  That's my understanding, that they would be

 2   based on the techniques that IDC uses to gather its

 3   data.

 4        Q.  Do you know if they are or not?

 5        A.  Do I what?                              14:45:36

 6        Q.  Do you know if they are or not?

 7        A.  I don't -- I don't know with certainty.  I

 8   don't specifically identify every product captured in

 9   their data sets.

10        Q.  So you're assuming they're included but you   14:45:47

11   don't know?

12             MR. OLSON:  Objection.  Misstates the

13   testimony.

14             THE WITNESS:  It's my understanding they're

15   included, based on the techniques used by IDC, but I   14:46:00

16   don't know with certainty.

17   BY MR. ALDEN:

18        Q.  Did you do anything to check?

19        A.  I'm not aware of anything that you can do to

20   check.                                          14:46:18

21        Q.  So your answer is that you didn't?

22             MR. OLSON:  Objection.

23             Her answer was what she stated.

24             Asked and answered.  Misstates her testimony.

25             THE WITNESS:  I did nothing more than    14:46:30
```

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    background research on how IDC gathers their data, and

2    I understand they are an accepted provider of market

3    share data in this industry.

4         MR. ALDEN:  I'd like to mark as Exhibit 5 to

5    Ms. Robinson's deposition Exhibit 3 to Ms. Robinson's      14:46:57

6    declaration.

7         (Deposition Exhibit 5 was marked

8         for identification.)

9         MR. ALDEN:  I'd also like to mark as Exhibit 6

10   to Ms. Robinson's deposition Exhibit 7 to Ms. Robinson's   14:47:38

11   declaration.

12        (Deposition Exhibit 6 was marked

13        for identification.)

14   BY MR. ALDEN:

15        Q.  Ms. Robinson, I'll first ask you to look at        14:48:17

16   Exhibit 3 to your declaration, which is Exhibit 5 in the

17   deposition, and in particular to page 3.2.

18        A.  Yes.

19        Q.  And could you describe for me what this page

20   shows?                                                     14:48:46

21        A.  This page shows historical sales for eight

22   products that I was able to confirm in September of 2012

23   were still selling in the marketplace, that's the blue

24   line.  The green line is a projection of sales for those

25   eight products.                                            14:49:08

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.  And your projection shows that sales of the

2   eight products were decreasing, is that correct, or will

3   decrease; is that correct?

4       A.  Correct.

5       Q.  So why is it that you believe that sales of the    14:49:20

6   infringing -- of the eight infringing products will

7   decrease that Samsung's market share as a result of

8   sales of the infringing and diluting products will

9   increase?

10      A.  When you say "that Samsung's market share as a    14:49:56

11  result of the infringing and diluting products," you

12  mean their overall market share will increase?

13      Q.  Yes.  So you've opined that -- you projected

14  that Samsung sales of eight infringing and diluting

15  products will decrease until December 2012; correct?    14:50:19

16      A.  Correct.

17      Q.  In paragraph 25 of your declaration, you report

18  IDC data that shows Samsung's market share increasing

19  until December -- well, until the second quarter of

20  2012; correct?    14:50:37

21      A.  Right.

22      Q.  So why is Samsung's overall market share

23  increasing if sales of the eight infringing products are

24  decreasing?

25      A.  So based on the data I've seen for the    14:50:48

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    historical period, and based on my knowledge of

2    Samsung's telecommunication business, it's their pattern

3    to, you know, withdraw products from the market.  And

4    the data is indicating that these particular products

5    are on a downward slope here, that they're going to sell      14:51:08

6    less and less, and anticipate, you know, and ultimate

7    withdrawal from the market, but that is unknown as to

8    when that would happen when this analysis was completed.

9           So as to why it's decreasing, it's based on the

10   historical data and overall knowledge of the                  14:51:30

11   marketplace.

12          But as to why their market share, their overall

13   market share would increase or even, I guess, remain

14   steady in later periods, additional products have been

15   released and continue to be released.  And going back to      14:51:49

16   the initial assumption of this analysis that's described

17   in my declaration, the assumption was built in that the

18   sales of the infringing and diluting phones had an

19   impact on future sales of other devices, that those

20   devices in later periods or other devices were able to        14:52:26

21   have success on the heels of these prior sales.

22      Q.  Okay.  And what evidence is there for that

23   assumption?

24      A.  The only evidence would be growth of mark --

25   you know, increase in market share.  Beyond that, it's        14:52:48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    an assumption.

2        Q.  So, again, I'm trying to understand your

3    assumptions.  You're saying that the evidence that

4    you're aware of for why sales of later phones will

5    increase as a result of sales of the infringing and        14:53:15

6    diluting phones is that Samsung got a market share

7    increase from the sales of the infringing and diluting

8    phones; is that correct?

9        A.  Yes.  The increase in market share would be --

10   would -- my answer's yes.                                   14:53:45

11       Q.  Is it possible that Samsung's market share

12   could go down after it ceases selling the infringing and

13   diluting products?

14       A.  I believe anything's possible.

15       Q.  So that's a "yes"?                                  14:54:00

16       A.  That's a "yes."

17       Q.  And why -- well, strike that.

18           I'd like to mark as Exhibit 7 to Ms. Robinson's

19   deposition a document titled Samsung -- I'm sorry,

20   "Smartphone Shipments and Market Share, US Sales."          14:54:48

21           (Deposition Exhibit 7 was marked

22           for identification.)

23   BY MR. ALDEN:

24       Q.  Let me know when you're ready, Ms. Robinson.

25       A.  I'm ready.                                          14:55:24

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Okay.  I'll represent to you that this document

2   was Exhibit 2 to Mr. Musika's reply declaration in

3   support of Apple's preliminary injunction.

4           Are you familiar with this document?

5        A.   I am.                                    14:55:39

6        Q.   Okay.  And if we look at Samsung's market share

7   in 2007, you see that it was 6.3 percent?

8        A.   I do.

9        Q.   Do you have any reason to dispute that number?

10       A.   No.                                       14:55:57

11       Q.   And that is greater than the five percent

12  market share that Samsung had in June of 2010; correct?

13       A.   That's correct.

14       Q.   And how does that factor into your analysis?

15       A.   It does not factor into my analysis.      14:56:13

16       Q.   Okay.  You see that in the -- in 2008,

17  Samsung's market share or share of the smartphone market

18  was 6.4 percent; do you see that?

19       A.   Um-hum.

20       Q.   Any reason to dispute that number?        14:56:38

21       A.   No.

22       Q.   How does the fact that Samsung's market share

23  prior to introducing the infringing and diluting

24  products was above five percent factor into your

25  analysis?                                           14:56:52

<span style="float:right">Page 73</span>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   What factors into my analysis is what their

2     share was just prior to the introduction of the

3     infringing and diluting phones, that's the indication of

4     how they were selling at that time.  What happened two

5     years before is what happened two years before.          14:57:13

6        Q.   But you would agree, then, that Samsung could

7     gain a market share greater than five percent without

8     the infringing and diluting products; correct?

9        A.   Again, I think -- I've said it's possible.

10       Q.   Well, they did, didn't they?                      14:57:39

11       A.   In that prior period, before they dropped off

12    even further.

13       Q.   Okay.  So you agree that prior to introducing

14    the infringing and diluting products, that Samsung at

15    times did have a market share greater than five percent;  14:58:01

16    correct?

17       A.   Yes.

18       Q.   I'd like to go back to your declaration,

19    please.  And in particular, I'd like to go to paragraph

20    27 and the third sentence in that paragraph, which        14:58:38

21    reads:  "To be conservative, I used the percentage

22    losses discussed above and assumed that any losses would

23    be experienced proportionally across all of Samsung's

24    smartphone product lines."

25            Did I read that correctly?                        14:59:02

                                                          Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  You did.

2      Q.  What evidence do you have that all of Samsung's

3   losses would be experienced proportionally across all of

4   Samsung's product lines?

5      A.  It really goes back to the assumption, which is      14:59:12

6   that the trade dress -- that the other products enjoyed

7   the benefits or had success on the heels of the trade

8   dress, the infringing and diluting products found to

9   infringe the trade dress.

10     Q.  Okay.  And I want to make sure I understand      14:59:53

11  your testimony.

12         The basis for your proportional allocation is

13  that is your assumption that the later products, the

14  products sold after the infringing and diluting

15  products, would benefit from the market share gained by      15:00:19

16  the infringing and diluting products; is that correct?

17     A.  Benefit from the market share and the success

18  of those products, yes.

19     Q.  Okay.  Why didn't you allocate the percentage

20  losses solely to the infringing and diluting products?      15:00:47

21     A.  Can we go to the exhibit?

22     Q.  Yes.  Which exhibit?

23     A.  Exhibit 7.  Is that entered here?

24     Q.  Um-hum.

25     A.  I'd like to explain, if I could, how the      15:01:17

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    analysis actually works.

2         Q.  Okay.

3         A.  Beyond just one sentence.

4         Q.  Okay.

5         A.  So box -- box 2, where you see the percentage    15:01:28

6    decreases going across, those are calculated based on

7    holding the market share constant at five percent.

8         Q.  Um-hum.

9         A.  And those reductions are applied in box 4 to

10   the infringing units.                                      15:01:45

11        Q.  Um-hum.

12        A.  And the difference -- so the difference between

13   the two million -- if you're looking at third-quarter

14   2010, the difference between the infringing units of two

15   million and the lost units of 1.3, that difference, call  15:02:02

16   it six million, is actually going back to Samsung in

17   this analysis to -- you know, based on the belief that,

18   you know, noninfringing phones could have made those

19   sales.  So I think it's -- I just wanted to clarify that

20   point.                                                     15:02:27

21        Q.  Okay.  If we go to paragraph 28, you say

22   "Apple's losses due to Samsung's sales of these 13.9

23   million phones are substantial."

24        A.  Correct.

25        Q.  What evidence do you have that Apple suffered    15:02:42
```

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    any loss as a result of Samsung's gain in market share?

2         A.   Mathematics of it.  If Samsung's market share

3    had stayed at five percent, those sales would have gone

4    somewhere.

5              So this analysis is looking at capturing the      15:03:13

6    magnitude of these units over time in an emerging,

7    growing marketplace, after the infringing and diluting

8    phones were entered into the marketplace.  So we're

9    talking about lots of units, that's where the

10   "substantial" comes in, and the fact that market        15:03:37

11   share -- as Samsung's growing their market share, had

12   they not -- had their market share not grown, those

13   units would have gone elsewhere.

14        Q.   Okay.  What evidence do you have of that?

15        A.   Again, it really goes back to the assumption in   15:04:01

16   the analysis to demonstrate -- I'm just -- it's what I

17   just said.  I think I've already answered the question.

18        Q.   Okay.  Let me ask if I can -- because I'm not

19   really understanding the answer so --

20        A.   Okay.                                              15:04:32

21        Q.   -- let me see if I can ask it a different way.

22             What evidence do you have that Samsung had not

23   sold -- made these 3.9 million in sales, that any of

24   them would have gone to Apple?

25             MR. OLSON:  13.9 million?                          15:04:39

                                                            Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. ALDEN:

2         Q.  Sorry.  13.9, correct.

3         A.  That if Samsung -- the lost units have to go

4    somewhere.  And it's an accepted damage theory that some

5    portion of them would be distributed to the marketplace    15:05:02

6    at the market share of the various market participants.

7         Q.  Is it possible that no one would have

8    purchased, made these 3.9 million dollars in sales?

9         A.  I sup -- I believe that customers had committed

10   to purchase a smartphone and that a smartphone would      15:05:25

11   have been purchased.

12        Q.  Okay.  And what evidence do you have for that?

13        A.  I have data telling me that they purchased a

14   smartphone.

15        Q.  Okay.  And what evidence do you have that they    15:05:36

16   would have -- some of them would have gone to Apple

17   instead of, for example, HTC, Motorola or Nokia?

18        A.  I don't have specific evidence that they would

19   have gone to Apple.  But I'm applying the sales at their

20   market share, at Apple's market share, leaving plenty of   15:05:56

21   units for other participants in the marketplace to grab

22   those sales, including Samsung.

23        Q.  Okay.  In paragraph 28, you reference a

24   "Mor-Flo analysis," correct?

25        A.  Correct.                                          15:06:15

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.  Did you perform a Mor-Flo analysis?

2          A.  I performed a market share distribution of

3     these units.  It's not a true or pure Mor-Flo in that I

4     did not remove Samsung from the market and redistribute

5     those -- the shares.  So in a typical Mor-Flo, you would     15:06:35

6     see an up -- an uptake in the market shares of

7     participants once Samsung's removed.  And in this case

8     I used a pure market share for Apple, which would be

9     more conservative.

10         Q.  Why didn't you use a pure Mor-Flo analysis?      15:06:52

11         A.  In performing this analysis, I took a more

12    simplistic and conservative approach to presenting the

13    market share.

14         Q.  Why did you decide to do that?

15         A.  I felt that performing a more conservative      15:07:11

16    analysis was more appropriate.

17         Q.  Why?

18         A.  To not give -- not assign more units to any of

19    the participants than necessary.  It's just a built-in

20    conservative adjustment.                                 15:07:46

21         Q.  Does doing a pure Mor-Flo analysis allocate

22    more units to the market participants than necessary?

23         A.  No, I'm not saying -- I'm not saying that.  But

24    it's -- this was just one way to build in conservatism

25    to the model that I performed here.                      15:08:12

                                                          Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.   Okay.

2       A.   It's not to say that it's inappropriate to

3    perform a pure Mor-Flo analysis.

4       Q.   Can a pure Mor-Flo analysis itself account for

5    price differences between accused products and embodying    15:08:27

6    products?

7       A.   The market share data does account for consumer

8    preferences for particular devices, thus addressing

9    price concerns.

10      Q.   So did your -- is your testimony that your        15:08:56

11   analysis addressed price differences?

12      A.   Yes.

13      Q.   Did you do a separate analysis of price,

14   concerning price differences?

15      A.   No.                                                 15:09:16

16      Q.   When calculating lost profits, Mr. Musika did a

17   Mor-Flo analysis; correct?

18      A.   Correct.

19      Q.   And he did that by carrier; correct?

20      A.   Correct.                                            15:09:28

21      Q.   Why didn't you do that?

22      A.   In performing this analysis, I took other

23   adjustments that ultimately resulted in a number of

24   units assigned to Apple that was consistent with the

25   percentages of units that Mr. Musika assigned.              15:09:55

                                                    Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  Did you do a carrier adjustment like

2   Mr. Musika?

3        A.  I did not do a specific carrier adjustment, but

4   I feel that my other adjustments captured the necessary

5   overall reductions to units that are necessary.        15:10:11

6        Q.  Do you know -- well, do you know who -- which

7   carrier sold the Galaxy Prevail?

8        A.  Not off the top of my head, no.

9        Q.  Okay.  If I told you it was Sprint and Boost

10  Mobile, would you have any reason to disagree with that?  15:10:43

11       A.  No.

12       Q.  Okay.  Are you aware that Sprint did not carry

13  an iPhone until October 2011?

14       A.  Yes.

15       Q.  Did you do a capacity analysis?              15:10:57

16       A.  I did consider capacity in performing this

17  analysis.

18       Q.  Okay.  Did you do a capacity analysis?

19       A.  I relied upon the analysis that Mr. Musika

20  relied upon in his report.                             15:11:15

21       Q.  Okay.  So if we can go to the fourth sentence

22  in paragraph 28, you say "Using the more conservative

23  assumption, Apple would have sold more than four million

24  additional products."

25           Do you see that?                             15:11:40

                                                         Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   Yes.

2          Q.   Okay.  Did Apple have the capacity to sell four

3     million additional products?

4          A.   I did not -- I did not consider whether they

5     had the capacity or I don't recall whether they had the      15:11:55

6     capacity to sell four million.  I recall considering

7     whether they had capacity to sell two million units.

8          Q.   So you don't know whether they could have sold

9     four million additional units; correct?

10         A.   I do not know one way or the other.             15:12:12

11         Q.   Okay.  Then you say "To make this calculation

12    even more conservative, I further assumed that Apple

13    would capture only half of these sales."

14              Do you see that?

15         A.   Yes.                                            15:12:24

16         Q.   Why did you assume that Apple would only

17    capture half of the sales?

18         A.   To build further conservative adjustment to

19    this analysis and ensure that I wasn't awarding too many

20    units to Apple.                                          15:12:44

21         Q.   Did Apple have the capacity to make 2,089,143

22    additional iPhone sales during the period?

23         A.   Yes.

24         Q.   Are these the same sales that Mr. Musika

25    presented in his lost profits analysis?                  15:12:59

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. OLSON:  Objection.  Vague.

 2            THE WITNESS:  Are the two million lost sales

 3    here the same as what's in Mr. Musika's analysis?

 4    BY MR. ALDEN:

 5        Q.  Mr. Musika testified that Apple would have sold   15:13:18

 6    an additional two million iPhones; correct?

 7        A.  I don't recall the specific number of units

 8    but ...

 9        Q.  Okay.  Well --

10        A.  I --                                              15:13:33

11            MR. OLSON:  Don't guess.  If you've got the

12    number ...

13            MR. ALDEN:  I'll mark as Exhibit 8 excerpts

14    from the Expert Report of Terry L. Musika, CPA.

15            (Deposition Exhibit 8 was marked                  15:14:30

16            for identification.)

17            MR. OLSON:  Anthony, as excerpts, are you able

18    to give any more information about what the scope or

19    nature of the excerpts are?

20            MR. ALDEN:  They go from page 38 to               15:15:01

21    Mr. Musika's March 22nd, 2012 report, to page 46.

22            MR. OLSON:  Perhaps I should put it

23    differently.

24            I take it you've chosen this.  Are you able to

25    give us what that is or maybe it will be obvious when I   15:15:15
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. ALDEN:

 2       Q.  Two million units; correct?

 3       A.  Yes, under this construct, yes.

 4       Q.  Okay.  And how many of the units overlap?  In

 5   other words, what I'm trying to get at is how many of      15:19:12

 6   them are the same units, in essence?  I mean, there are

 7   a certain number of sales during a period --

 8       A.  Right.

 9       Q.  -- correct, whether it's Mr. Musika's period or

10   a period you're using.                                     15:19:23

11           You've said Apple has lost two million units

12   worth of sales and Mr. Musika has said Apple has lost

13   two million units worth of sales.

14           How many of them are the same sales?

15       A.  Well, so on a whole, the two million are          15:19:37

16   similar and overlap.  But my analysis is taking -- you

17   know, is really about these five products that were

18   found guilty of infringing and diluting and looking at

19   the units that weren't found to be guilty of infringing

20   and diluting to see what kind of damage was sustained on   15:20:01

21   the heels of the success of those products.  So if you

22   compare, for instance, just the five products for

23   lost -- that were awarded damage in the case, as

24   Mr. Wagner's looked at in his approach, you would see

25   that there's not a double-counting taking place.            15:20:31
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  So let me unpack this.

2          What was Samsung's sales of the five products?

3      A.  Over this period?

4      Q.  Yes.

5      A.  Can I review back to my declaration, please?    15:21:16

6      Q.  Yes.

7      A.  I don't believe I have that information at my

8   disposal.

9          MR. OLSON:  If you want it, Anthony, it's in

10  Exhibit 9 to her report.                              15:22:03

11  BY MR. ALDEN:

12     Q.  Okay.  Do you know whether Samsung sold more

13  than or less than two million phones during the -- of

14  the five diluting and infringing phones during the

15  period?                                               15:22:16

16     A.  I would have to refer back to the sales data

17  presented in JX 1500.

18     Q.  So Mr. Musika presented an opinion that Apple

19  lost two million sales; correct?

20     A.  Right.                                         15:22:48

21     Q.  Okay.  And you would agree that the jury

22  awarded damages or awarded lost profits on some of those

23  sales; correct?

24     A.  I don't have an opinion as to what specific

25  type of damage the jury awarded for those particular    15:23:03

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    products.

 2        Q.  Okay.  Did you review Mr. Wagner's analysis of

 3    the jury's verdict?

 4        A.  Yes.

 5        Q.  Okay.  Do you disagree with his analysis of the    15:23:15

 6    jury's verdict?

 7        A.  I believe it's mathematically correct, I find

 8    no errors in the math.

 9        Q.  Okay.  Do you -- so would you agree that the

10    jury awarded $91 million in lost profits on these five     15:23:31

11    products that the jury found to infringe and dilute?

12        A.  I don't know specifically whether the jury

13    awarded lost profits.  I don't know what the jury did.

14    I know that on the verdict form they put damage amount

15    for each product.                                          15:23:52

16        Q.  So it's possible that for every product that

17    that the jury found infringed the design patent, for

18    example, the entire amount of the jury's award could be

19    Samsung's profits?

20        A.  I believe that could be possible.                  15:24:08

21        Q.  And it's possible that for the five phones that

22    the jury found infringed the design patent and diluted

23    trade dress, that the jury's entire award could be

24    infringer's profits under Section 289 for design patent

25    infringement; correct?                                     15:24:35
```

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  I believe that's possible.

2      Q.  For the purposes of his lost profits analysis,

3  Mr. Musika assumed that Samsung would have designed

4  around all of Apple's asserted intellectual property by

5  May 2011; correct?                                    15:25:29

6      A.  Correct.

7      Q.  And Mr. Musika assumed that Samsung would have

8  designed around the '381 Patent in one month; correct?

9      A.  I believe that's correct.

10     Q.  Mr. Musika assumed that Samsung would have     15:25:38

11  designed around the '163 Patent in one month; correct?

12     A.  I believe that's correct.

13     Q.  Mr. Musika assumed that Samsung would have

14  designed around the '915 Patent in six months; correct?

15     A.  I believe that is correct.                     15:25:52

16     Q.  Okay.  You didn't make any assumptions

17  concerning design-around; correct?

18     A.  I did not.

19     Q.  Mr. Musika also assumed that Samsung would have

20  reentered the market and obtained a hundred percent of  15:26:05

21  its previous market share after designing around;

22  correct?

23     A.  He did, yes.

24     Q.  Okay.  Your analysis assumed that Samsung's

25  infringing products have an effect on Apple's sales     15:26:18

                                                        Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    after May 2011; correct?

2        A.  Yes.

3        Q.  What other differences are there between

4    Mr. Musika's lost profits analysis and your analysis?

5        A.  I believe you've identified all the          15:26:40

6    differences.

7        Q.  If we go to paragraph 29, the last sentence,

8    you say -- let me know when you're there.

9        A.  Yes.

10       Q.  "Multiplying the lost sales by quarter times    15:27:26

11   per unit."

12           THE VIDEOGRAPHER:  Ms. Robinson, you are

13   covering your mic.

14   BY MR. ALDEN:

15       Q.  "Multiplying the lost sales by quarter times    15:27:40

16   per unit incremental profits by quarter, Apple's lost

17   profits for the 2.1 million in additional sales are

18   702,868,901, as shown on Exhibit 8."

19           Did I read that correctly?

20       A.  Correct.                                        15:27:56

21       Q.  You're aware that, at trial, Mr. Musika opined

22   that Apple's lost profits were approximately $490

23   million; correct?

24       A.  Yes.

25       Q.  And that $490 million is included in the 702     15:28:07

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    million that you have concluded and that you've arrived

 2    at in paragraph 29; correct?

 3           MR. OLSON:  Objection.  Misstates prior

 4    testimony.

 5           THE WITNESS:  I would just say that Mr. Musika    15:28:22

 6    and I did not look at that time exact, same number of

 7    units, so it's not exactly the same number of units but,

 8    yes, there is an overlap.

 9    BY MR. ALDEN:

10        Q.  Given that Apple's, in your opinion, lost      15:28:48

11    profits -- well, it's your opinion that Apple's lost

12    profits were approximately $700 million; correct?

13        A.  It's my opinion, under this analysis and this

14    construct, that that's the amount of lost units that

15    I've calculated under the assumption that after the     15:29:05

16    infringing and diluting products entered the

17    marketplace, that Samsung was able to enjoy success on

18    the heels of those products and, as a result, the damage

19    was 700 million.

20        Q.  So it's your opinion that Apple lost           15:29:39

21    $700 million; correct?

22        A.  Built upon the model that we've described and

23    the assumptions built into it, yes.

24        Q.  Then why is Apple seeking $400 million for the

25    five infringing and diluting products as opposed to     15:30:03
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    $700 million?

2        A.  I can't speak specifically to a determination

3    that was made for the $400 million enhancement.  I'm

4    providing context here as to whether that number is in

5    line with the type of damage that Apple has sustained.    15:30:33

6        Q.  Why didn't Apple seek $700 million in lost

7    profits at trial?

8            MR. OLSON:  Objection.  Asked and answered.

9            Oh, sorry, "at trial."  Sorry.

10           THE WITNESS:  Mr. Musika prepared his opinion    15:30:46

11   of lost profits built upon a construct that was not --

12   you know, that's not 100 percent the same as this

13   analysis.  They're two different types of analysis.

14   BY MR. ALDEN:

15       Q.  Why did you do a different analysis to          15:31:10

16   Mr. Musika?

17       A.  I have facts at my disposal that Mr. Musika

18   didn't have, for instance, that five specific products

19   launched in early -- you know, in the 2010 time frame

20   were found to be infringing trade dress.  Mr. Musika    15:31:29

21   didn't have that information at his disposal when

22   preparing his lost profits analysis.

23       Q.  Well, Mr. Musika made that assumption, didn't

24   he?

25       A.  What assumption?                                 15:31:53

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1    So it's -- I'm trying to provide an analysis that looks

 2    at the magnitude at which Apple was not compensated,

 3    fully compensated at trial.

 4         MR. OLSON:  Anthony, before you ask another

 5    question, we've been going I think it's close to an hour     15:35:08

 6    and a half.  I'd like the benefit of the break.

 7         MR. ALDEN:  Yes, just after I finish this line,

 8    a couple minutes.

 9         MR. OLSON:  Well, I'd actually like to have a

10    break right now, but if you have a couple more              15:35:21

11    questions, let's see what we can do.

12    BY MR. ALDEN:

13         Q.  Okay.  So it's your opinion under this model

14    that Apple lost 700 -- approximately $703 million;

15    correct?                                                    15:35:32

16         A.  Yes.

17         Q.  Okay.  And how much of that -- how do you know

18    that that amount wasn't included in the jury's verdict?

19         MR. OLSON:  Object on asked and answered.

20         THE WITNESS:  I believe I've already answered         15:35:51

21    that question.

22    BY MR. ALDEN:

23         Q.  I'm sorry.  I didn't understand the answer, so

24    if you could explain it to me again?

25         MR. OLSON:  Objection.  Asked and answered.           15:36:06

                                                      Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              THE WITNESS:  Okay.  This amount -- this

2      analysis is providing context for Apple's willfulness

3      request of 400 million --

4      BY MR. ALDEN:

5          Q.  Right.                                    15:36:49

6          A.  -- under the Lanham Act, tied to trade dress.

7      I performed this analysis specific to these five

8      products with the assumption that those five products

9      received a benefit -- or the other products received a

10     benefit over time related to those sales in that initial   15:37:09

11     period, capturing shares -- capturing units here.

12             This number, this 700 million that's here,

13     is providing context to the three -- I believe it's the

14     approximate 382 million and which was awarded on those

15     specific five products.                          15:37:31

16         Q.  So is the 700, approximately 703 million,

17     relating to the lost sales of other products, not the

18     five products; is that correct?

19             MR. OLSON:  Objection.  Misstates the

20     testimony.                                       15:37:46

21             THE WITNESS:  The 700 is going to include units

22     beyond the five products.

23     BY MR. ALDEN:

24         Q.  Okay.  Did the jury already award damages on

25     those units?                                     15:38:05

                                                        Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.  Which units?

 2          Q.  The units --

 3          A.  The five --

 4          Q.  No.  On the units that are included in the 700

 5   million number.                                      15:38:17

 6          A.  On -- the jury provided an award for certain

 7   products based on the findings of infringement.

 8          Q.  And did any of that award -- was any of that

 9   award for units that are -- on which you base

10   $700 million number in paragraph 29?                 15:38:49

11          A.  I don't think I'm in a position to dissect the

12   jury's award.

13          Q.  Okay.  So you don't know?

14          A.  I know they awarded a damage award on -- you

15   know, on certain products, but I don't think I'm in a   15:39:32

16   position to dissect their award.

17          Q.  Okay.  So it's possible that the jury awarded

18   damages on units on which -- at least some units on

19   which you calculated the $700 million; you just don't

20   know?                                                15:39:46

21          MR. OLSON:  Objection.  Asked and answered.

22          THE WITNESS:  Without dissecting the award, I

23   can't offer an opinion as to what specific units the

24   jury gave an award on, beyond taking what I've done in

25   this analysis and what I've done, you know, in this    15:40:42
```

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1    report or this declaration.

 2            As to -- I'm going to take it back again one

 3    more time to what the purpose of this analysis was,

 4    which was to provide context to Apple's request for $400

 5    million and willfulness damages that relate to the        15:41:14

 6    Lanham Act and the five products that were found guilty

 7    of infringing the trade dress.

 8            MR. ALDEN:  Okay.  Let's take a break.

 9            THE VIDEOGRAPHER:  We are off the record at

10    3:51 p.m.                                                  15:41:26

11            (Recess held.)

12            THE VIDEOGRAPHER:  We are back on the record

13    at 3:58 p.m.

14            MR. OLSON:  So, Anthony, just very quickly,

15    because I don't want to take more time:  I told          15:58:52

16    Mr. Alden during the break that I may have some

17    re-direct questions, that I would ask him to reserve

18    time, and because that, if he didn't, I would

19    potentially argue that the record's closed within the

20    three-hour limit.                                         15:59:08

21            I intend to ask a very small number of

22    questions.  My understanding is that reserving all

23    objections to this procedure and that his time shouldn't

24    be docked under the circumstances, that you're asking

25    that the time be identified when you have ten minutes     15:59:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    left and I'll ask my questions.  We'll give the time

 2    back to you and we'll see where we go.

 3              MR. ALDEN:  Correct.

 4              I'll just state for the record that I object

 5    to the redirect under these circumstances.  It's new      15:59:32

 6    testimony, new direct testimony by Ms. Robinson,

 7    potentially not within the scope of her declaration.

 8              The court gave Samsung three hours to depose

 9    Ms. Robinson about her declaration, not about new

10    testimony that's being offered subsequent to her          15:59:49

11    declaration.

12              Having said that, you know, to avoid engaging

13    in dispute right now, as Mr. Olson said, I'll reserve

14    ten minutes to -- for re-cross, if necessary.

15    Otherwise, I'd like -- Mr. Olson has agreed that ten       16:00:09

16    minutes can otherwise be used by me as I see fit if I

17    don't have any re-cross.  We'll take it from there.

18              MR. OLSON:  I think that's fine.  Why don't you

19    pick up the questioning.

20    BY MR. ALDEN:                                             16:00:26

21        Q.  So I'd like to turn now, Ms. Robinson, to

22    supplemental damages.

23        A.  Okay.

24        Q.  And your supplemental damages opinion was based

25    on projected sales for eight products for the third       16:00:35
```

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   quarter of 2012 and the fourth quarter of 2012; correct?

2        A.  Correct.

3        Q.  And have you read Mr. Kerstetter's declaration?

4        A.  Yes.

5        Q.  Would you now accept that your projections are      16:00:55

6   inaccurate?

7            MR. OLSON:  Objection.  Vague.

8            THE WITNESS:  I accept for the three months at

9   which Mr. Kerstetter provided sales for those specific

10  products that his -- the numbers he has presented are      16:01:18

11  different than the numbers I projected for those three

12  months.

13  BY MR. ALDEN:

14       Q.  Do you have any reason to doubt

15  Mr. Kerstetter's numbers for the third quarter of 2012?    16:01:27

16       A.  In light of the record in this case of

17  inaccurate or changing concerns regarding sales data

18  historically, having eight files produced in the course

19  of discovery, it would be my preference not to.  I'm not

20  saying there's -- I'm not saying that Mr. Kerstetter is    16:01:53

21  misrepresenting himself.  But it would be my preference

22  to review ordinary course sales files of Samsung for all

23  of the products, not just the eight products that

24  Mr. Kerstetter has provided sales data for.

25       Q.  Did you ask for that information prior to        16:02:11

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    providing your declaration?

2        A.  I'm not sure if Apple asked for that prior to

3    my declaration or not.  Certainly it would be my

4    preference to have that at hand.

5        Q.  Did you ask counsel to get you third-quarter        16:02:29

6    sales, Samsung sales data prior to preparing your

7    declaration?

8        A.  I believe there was a discussion of "Are we

9    going to get third quarter sales data," and the answer

10   was "No, you're going to need to do a projection."        16:02:49

11       Q.  Okay.  Did you -- my question is a little

12   different.  Did you ask counsel to get you third-quarter

13   sales data?

14           MR. OLSON:  Objection.  Asked and answered.

15           THE WITNESS:  I asked if I was going to receive    16:03:02

16   it.

17   BY MR. ALDEN:

18       Q.  Okay.

19       A.  I don't -- I mean, it's not typical for me --

20   you know, I don't really see the distinction.              16:03:09

21           I asked "Will I be receiving it?"  Of course I

22   want it.  "Will I be receiving it?"  "No" was the

23   answer.

24       Q.  Okay.  Are you aware that Apple never asked for

25   that data --                                               16:03:20

                                                        Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           MR. OLSON:  Objection.  Misstates --
 2    BY MR. ALDEN:
 3        Q.  -- prior to your declaration?
 4        A.  I have no -- I don't have any knowledge one way
 5    or the other.                              16:03:28
 6           MR. OLSON:  So, Mr. Alden, I don't want there
 7    to be any confusion.
 8           We have very distinctly asked for it recently
 9    and it has been refused to us.  Is there a change in
10    Samsung's position on that point?          16:03:39
11           MR. ALDEN:  I'm going to continue with my
12    questioning.
13           Were you aware that Apple did not ask for
14    third-quarter sales data prior to submitting your
15    declaration?                               16:03:48
16           THE WITNESS:  I had no knowledge of whether
17    they asked for it or not.
18    BY MR. ALDEN:
19        Q.  Was it of concern to you that you didn't get
20    third-quarter Samsung sales data?          16:03:58
21        A.  It would be preferred to have the data, but in
22    instances, particularly in a litigation environment
23    where you're not -- you don't have access to
24    information, it's customary to provide projections.
25        Q.  Are you preparing revised projections?  16:04:27
```

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.  Not at this time.

2       Q.  Do you expect to submit a supplemental

3   declaration revising your supplemental damages analysis?

4       A.  I believe if Samsung produces -- I believe I

5   understand that Apple has requested comprehensive sales       16:04:48

6   data for all 26 products.  Should that data be provided,

7   is my understanding I will be asked to update my

8   analysis.

9       Q.  But if that data is not provided, you will not

10  be updating your analysis; is that correct?                   16:05:04

11      A.  Yes, that is my understanding.

12      Q.  Are you -- will you be submitting a

13  supplemental declaration either on the subjects of a

14  permanent injunction or enhancement?

15      A.  I --                                                  16:05:33

16          MR. OLSON:  Let me stop.

17          Is the only information you'd have on that some

18  communication you've had with an attorney at

19  Morrison & Foerster?

20          THE WITNESS:  Yes.                                    16:05:45

21          MR. OLSON:  Okay.  At this point, I would

22  instruct you not to answer pursuant to the parties'

23  stipulation on expert discovery.

24  BY MR. ALDEN:

25      Q.  Do you agree that if the court were to grant         16:06:07

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Samsung's remunerative motion in whole or in part that

2     your supplemental damages calculation would need to be

3     revised?

4              MR. OLSON:  Can I have that read back?

5              I can't read it on here.                    16:06:34

6     BY MR. ALDEN:

7         Q.  I'll ask a different question.

8              If the court grants Samsung's remunerative

9     motion in whole or in part, what impact would that have

10    on your supplemental damages calculation?            16:06:43

11             MR. OLSON:  Objection.  Incomplete

12    hypothetical.

13             THE WITNESS:  I believe there's many things

14    contained in that motion that Samsung has filed and I'm

15    not certain how that would impact my analysis.       16:07:04

16    BY MR. ALDEN:

17        Q.  If the court were to reduce the jury's damages

18    verdict, would that impact your supplemental damages

19    analysis?

20             MR. OLSON:  Objection.  Incomplete           16:07:17

21    hypothetical.

22             THE WITNESS:  I suppose if the total verdict

23    amount was reduced, then the numerator involved in the

24    calculation of the $50.40 per unit could potentially be

25    revised per unit amount.                             16:07:45

                                                    Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. ALDEN:

 2        Q.  Have you ever, prior to this case, performed a

 3    supplemental damages calculation?

 4        A.  I don't -- no, I don't recall working on one.

 5        Q.  Mr. Musika's lost profits calculation assumed    16:08:12

 6    that all of Apple's asserted intellectual property would

 7    be found to be infringed and/or diluted; correct?

 8        A.  Correct.

 9        Q.  If less than all the intellectual -- Apple's

10    asserted intellectual property was found to in fact       16:08:29

11    infringe or dilute, the jury would need to know the

12    length of the design-around period for the IP found to

13    be infringed in order to calculate lost profits;

14    correct?

15            MR. OLSON:  Objection.                             16:08:44

16            Unless you can identify where there's a

17    statement on that subject in her declaration, I would

18    instruct her not to answer.

19            So that's a statement to you.  I've instructed

20    her.  So unless this is a statement that relates          16:09:00

21    to her declaration, and I'm not aware of it -- in fact,

22    I think it's to the contrary, it's think it's just an

23    attempt to reach back to the work of Mr. Musika -- then

24    that's not part of the permissible scope of her

25    deposition, that's not what she's doing.                  16:09:20
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. ALDEN:  I disagree.  And, once again, I

 2    think you're obstructing the deposition for strategic

 3    purposes.

 4              MR. OLSON:  I disagree.

 5    BY MR. ALDEN:                                      16:09:29

 6        Q.  You previously testified that you did not

 7    incorporate a design-around period into your calculation

 8    of an enhancement amount; correct?

 9        A.  Correct.

10        Q.  Mr. Musika's lost profits calculation was based  16:09:39

11    on or did incorporate design-around periods; correct?

12        A.  It did.

13        Q.  And Mr. Musika assumed and the IP, that Apple's

14    asserted IP Mr. Musika assumed would have different

15    design-around periods for each element of intellectual  16:10:09

16    property; correct?

17              MR. OLSON:  Objection.  Asked and answered.

18              THE WITNESS:  He assumed that there -- he

19    assumed or assigned certain design-around periods to

20    each form of intellectual property.                  16:10:23

21    BY MR. ALDEN:

22        Q.  Right.  And it would be necessary for the

23    jury to know those design-around periods in order to

24    calculate lost profits, correct, on a specific -- for a

25    specific IP element; correct?                        16:10:37
```

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Sure.

2      A.   -- or my declaration?

3           I did not specifically state that Samsung's

4      "borrowing rate," but I said the "defendant's use of

5      funds."  And, logically, I think it's a logical assum --    16:13:58

6      connection that if Samsung's using funds, it would have

7      to pay a rate to use those funds.  And if they were

8      borrowing money, they would be borrowing at their -- you

9      know, at a rate within their borrowing rate.

10     Q.   Which documents did you look at to ascertain          16:14:21

11     Samsung's borrowing rate?

12     A.   Their financial statements.

13     Q.   And which entity did you look at?

14     A.   Samsung Electronics.

15     Q.   Which financial statements did you look at?           16:14:32

16     A.   The year ending 2011.

17     Q.   Any others?

18     A.   I'm sorry, first quarter, I'm pretty sure it

19     was the first quarter of 2012, and it shows -- you know,

20     it has multiple periods in there.                          16:14:49

21     Q.   Under what circumstances do you believe that

22     the Treasury rate should be used instead of the prime

23     rate?

24     A.   I don't know that I have an example of a

25     scenario where the Treasury rate would be acceptable,      16:15:24

                                                      Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    but I do understand it can be an acceptable rate.

2         Q.  Do you believe that Samsung, and by that I mean

3    Samsung Electronics, was a default risk at all during

4    the damages period?

5         A.  I would say that, from Apple's perspective,        16:15:40

6    lending money to your fiercest competitor is a risk in

7    itself that would be considered.  It's not typical

8    business practice for fierce competitors to lend money

9    to one another.

10        Q.  If there was a contract between Apple and          16:16:01

11   Samsung, do you have any reason to believe that whereby

12   Apple lent Samsung money, do you have any reason to

13   believe that Samsung wouldn't repay that money?

14        A.  I'm not aware of Samsung having a history of

15   defaulting on loans.                                        16:16:22

16        MR. ALDEN:  All right.  I'll cede, under

17   objection, to Mr. Olson and reserve the remainder of

18   my time.

19        MR. OLSON:  All right.  Can we go off the

20   record for just one minute?                                 16:16:44

21        THE VIDEOGRAPHER:  We are off the record at

22   4:16 p.m.

23        (Recess held.)

24        THE VIDEOGRAPHER:  We are back on the record at

25   4:17 p.m.                                                   16:17:54

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
  1                         EXAMINATION

  2    BY MR. OLSON:

  3        Q.  Ms. Robinson, I'm Eric Olson and I represent

  4    Apple.  I have a number of questions for you based on

  5    comments and questions asked by Mr. Alden today.        16:18:04

  6            Earlier on, there was some discussion about

  7    whether or not bounce and/or doubletap or scroll versus

  8    gesture, the technologies of the '381, '163 and '915

  9    Patent, had been implemented by Samsung in connection

 10    with some specific documents.                           16:18:28

 11            In that context, and with that in mind, are

 12    you -- do you know that Samsung has implemented the

 13    technologies of the '381 Patent in Samsung products?

 14            MR. ALDEN:  Objection.  Leading.  Assumes facts

 15    not in evidence.                                        16:18:44

 16            THE WITNESS:  Yes.

 17    BY MR. OLSON:

 18        Q.  And why do you know that?

 19        A.  The jury found certain products guilty of

 20    infringing the '381 Patent.                             16:18:53

 21        Q.  And does that include tablet products?

 22        A.  Yes.

 23        Q.  Do you know that Samsung implemented the

 24    technology of the '163 Patent in some of its products?

 25        A.  Yes.                                            16:19:08

                                                      Page 110
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    EXAMINATION (CONTINUED)

 2    BY MR. ALDEN:

 3        Q.  How much does Apple seek in supplemental

 4    damages?

 5        A.  Combined, 535 -- I'm sorry.  Supplemental?    16:25:08

 6        Q.  Yes.

 7        A.  Sorry.  I thought you said "enhanced."

 8            Can I refer back to my declaration?

 9        Q.  Sure.  Would it help if I told you it was

10    approximately $121 million?                          16:25:56

11            MR. OLSON:  If it helps, to move things along,

12    I think if you look at paragraph 12.

13            THE WITNESS:  Yes, that's where I'm looking at.

14            It's 121 million.

15    BY MR. ALDEN:                                        16:26:10

16        Q.  And that was for eight products; correct?

17        A.  That calculation was derived off of eight

18    products, but the intent beyond -- the intent of that

19    calculation is to represent all infringing devices.

20        Q.  Okay.  Did Apple ask for any additional amounts  16:26:26

21    beyond $121 million for any other infringing devices?

22        A.  The 121 is intended to capture all infringing

23    devices for the supplemental period.

24        Q.  And you testified that it's your understanding

25    that Samsung refused to provide information for all  16:27:04

                                                    Page 115
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    products; correct?

2        A.  Yes.

3        Q.  How do you have that understanding?

4        A.  From counsel.

5        Q.  What did counsel say to you?                    16:27:11

6        A.  That they -- the information's been requested

7    and Samsung will not -- will not be providing the data.

8        Q.  Did counsel explain to you why Samsung isn't

9    providing the data?

10       A.  We did not discuss that.                         16:27:29

11       Q.  Did counsel explain to you that Apple did not

12   request the data prior to the time you submitted your

13   declaration and Apple moved for $121 million in

14   supplemental damages?

15           MR. OLSON:  Objection.  Asked and answered.     16:27:43

16           THE WITNESS:  I have no knowledge of whether

17   the information was requested prior to the issuance of

18   my report.

19           I had a discussion about whether we would -- I

20   would be receiving the data and I was told no.  There   16:27:59

21   was no discussion about whether it had been requested.

22   BY MR. ALDEN:

23       Q.  I believe you testified in response to

24   Mr. Olson's questions that Samsung's -- in your opinion,

25   Samsung's infringing and diluting sales gave it a       16:28:13

                                                    Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    head-start in the marketplace.  Is that your testimony?

2         A.  Yes.

3         Q.  How much of Samsung's market share increase is

4    attributable to that head-start?

5         A.  As we've discussed, there are multiple factors    16:28:33

6    in this market that could drive sales.  I have not

7    studied nor can I provide a specific percentage that

8    it's attributed to.

9         Q.  I believe you also testified that Samsung's

10   infringing and diluting sales gave it an opportunity to    16:29:02

11   build brand loyalty?

12        A.  Um-hum.

13        Q.  What value in dollar terms was that additional

14   brand loyalty worth?

15        A.  I have not studied that issue.                    16:29:14

16        Q.  How many percentage points of market share did

17   that opportunity to build brand loyalty contribute to

18   Samsung's increase in market share?

19        A.  I can't -- I cannot isolate a percentage point.

20        Q.  I believe you testified that the infringing and   16:29:38

21   diluting sales allowed Samsung to get a greater exposure

22   in the market?

23        A.  Yes.

24        Q.  How much did that greater exposure contribute

25   to Samsung's increase in market share?                     16:29:53
```

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   I mean, similarly, I can't provide a measure.

2   I don't know.

3        Q.   In calculating supplemental damages, you relied

4   on Samsung's historical sales information; correct?

5        A.   Correct.                                16:30:30

6             MR. ALDEN:  Okay.  I'll just take a very short

7   break, see what else I have left to ask.

8             MR. OLSON:  Okay.

9             THE VIDEOGRAPHER:  We are off the record at

10  4:30 p.m.                                           16:30:48

11           (Recess held.)

12            THE VIDEOGRAPHER:  We are back on the record at

13  4:41 p.m.

14  BY MR. ALDEN:

15       Q.   I just want to turn back now to final          16:41:35

16  installment to supplemental damages.

17       A.   Okay.

18       Q.   Your supplemental damages calculation was based

19  on the assumption that Samsung would continue to sell

20  the products through December 31, 2012; correct?         16:41:48

21       A.   Correct.

22       Q.   And you're aware that that assumption is

23  incorrect?

24            MR. OLSON:  Objection.  Misstates the record.

25            THE WITNESS:  I'm aware that Mr. Kerstetter has  16:42:03

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    provided a declaration that's addressed timing of

2    products, last importation and so forth.

3    BY MR. ALDEN:

4        Q.  And you're aware that Mr. Kerstetter has

5    testified that Samsung will not be selling all those      16:42:24

6    eight products through December 30th, 2012?

7            MR. OLSON:  Anthony, did you say "all those

8    eight products"?

9            MR. ALDEN:  Correct.

10           THE WITNESS:  Yes.  I'm aware that he has          16:42:36

11   represented that.

12   BY MR. ALDEN:

13       Q.  Do you have any reason to doubt that

14   representation?

15       A.  I don't have any reason to doubt it.  I would     16:42:42

16   like to verify the sales records -- I would like to

17   verify that representation through the sales records of

18   Samsung.

19       Q.  And to do so, it would be necessary to get

20   those sales records through December 31st, 2012;          16:42:59

21   correct?

22       A.  Yes.

23       Q.  Your projections do not break out projected

24   sales by product; correct?

25       A.  Right.  The projection's done on a whole.         16:43:14

                                                   Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  So there's no way to -- for Samsung to adjust

2   your projections by subtracting out amounts for the

3   specific products Samsung stopped selling prior to

4   December 31st; correct?

5           MR. OLSON:  Objection.  Vague.              16:43:44

6           THE WITNESS:  Can I -- I would agree on the

7   per-product basis.

8   BY MR. ALDEN:

9      Q.  Now, your calculation of supplemental damages

10  assumes that every unit with each of the eight products   16:44:17

11  Samsung sells after June 30th will continue to infringe;

12  correct?

13     A.  Yes.

14     Q.  If that assumption is incorrect, your

15  projections should not be used to calculate supplemental   16:44:32

16  damages; isn't that right?

17     A.  The intent of the projection is to represent

18  the damage for all of the products potentially that

19  would sell during this time frame, not just the eight.

20  So you're referring to just the eight no longer            16:45:13

21  infringing; correct?

22     Q.  Correct.

23     A.  I think it would depend on the circumstances,

24  because many of these devices have been found to

25  infringe multiple forms of intellectual property.  And    16:46:01

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   so if, for instance, one particular feature no longer

2   infringed, it may still infringe other features and the

3   damage would not be impacted.

4       Q.  But did your analysis consider whether any of

5   those eight products would not infringe any of Apple's      16:46:17

6   asserted intellectual property?

7       A.  So did my analysis consider if, for instance,

8   the Droid Charge was no longer infringing at all, not

9   one form of intellectual property that it was found

10  guilty of infringing?                                       16:46:34

11      Q.  Correct.

12      A.  No, my analysis did not consider that.

13      Q.  And it didn't consider it for any of the eight

14  products; correct?

15      A.  That's correct.                                     16:46:42

16      Q.  Now, the blended -- the $5.40 per sale average

17  that you arrived at, that was based on the jury's total

18  award; correct?

19      A.  It's $50.40.

20      Q.  Sorry.  $50.40 --                                   16:47:05

21      A.  That's okay.

22      Q.  -- was based on the jury's total award;

23  correct?

24      A.  Correct.

25          MR. OLSON:  Anthony takes an average advantage.     16:47:12

                                                        Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              Anthony, I think we're very close to, if not

2    already beyond, your time.

3              MR. ALDEN:  Okay.  I'll wrap it up.

4              Thank you for your time.

5              MR. OLSON:  Before you say the end, we'd like      16:47:30

6    this transcript marked "Highly Confidential Under the

7    Protective Order," subject to further review, and I

8    think that is all that I need to say at the end.

9              THE VIDEOGRAPHER:  This is the end of today's

10   deposition of Ms. Marylee Robinson.                          16:47:47

11             We're off the record at 4:47 p.m.

12             Thank you.

13                  (TIME NOTED:  4:47 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              DEPOSITION REPORTER'S CERTIFICATION

2

3          I, the undersigned, a California Certified

4    Shorthand Reporter, do hereby certify:

5          That the foregoing proceedings were taken

6    before me at the time and place herein set forth, at

7    which time the witness was administered the oath; that

8    the testimony of the witness and all objections made by

9    counsel at the time of the proceedings were recorded

10   stenographically by me, and were thereafter transcribed

11   under my direction; that the foregoing transcript

12   contains a full, true, and accurate record of all

13   proceedings.

14         I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or party to this action.

17         IN WITNESS WHEREOF, I have this date subscribed

18   my name, dated this 6th day of November, 2012.

19

20

21

22

23         _____

24         THOMAS J. FRASIK, CSR No. 6961

25

Veritext National Deposition & Litigation Services
866 299-5127