Exhibit 16

Highly Confidential - Attorneys' Eyes Only

Page 1

1              UNITED STATES DISTRICT COURT
           STATE OF CALIFORNIA SAN JOSE DIVISION
2                      - - -
3

   APPLE INC., A CALIFORNIA
4  CORPORATION,
                   Plaintiff,
5

     vs.                    NO. 11-CV-01846-LHK
6

   SAMSUNG ELECTRONICS CO.,
7  LTD., A KOREAN BUSINESS
   ENTITY; SAMSUNG ELECTRONICS
8  AMERICA, INC., A NEW YORK
   CORPORATION; SAMSUNG
9  TELECOMMUNICATIONS AMERICA,
   LLC, A DELAWARE LIMITED
10 LIABILITY COMPANY,
11                  Defendants.
12
13
14

        VIDEOTAPED DEPOSITION OF YORAM (JERRY) WIND
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
              Philadelphia, Pennsylvania
16          Wednesday, November 7, 2012
17
18
19
20
21
22
23 Reported by:
24 Maureen Broderick, RPR
25 JOB NO. 55261

Highly Confidential - Attorneys' Eyes Only

Page 11

1       consumers buy the Samsung phones because of        10:08

2       these features.                                    10:08

3    BY MR. KUWAYTI:                                       10:08

4       Q    And I'm trying to get a little bit more       10:08

5    specific to understand what you mean by "drive        10:08

6    consumer demand" and how you understood your          10:08

7    assignment.                                           10:08

8             Were you trying to determine whether         10:08

9    these features were the sole reason that consumers    10:08

10   bought this product or a substantial reason, or       10:08

11   something else?                                        10:08

12            MR.   RAMOS:  Object to the form.            10:08

13            THE WITNESS:  I didn't look at it as         10:08

14       either sole or substantial.  It is basically to   10:08

15       what extent his study design allows one to        10:08

16       conclude what is the relative importance of       10:08

17       these features in determining consumers'          10:08

18       purchase decisions.                               10:08

19   BY MR. KUWAYTI:                                       10:08

20       Q    So when you say "relative importance,"       10:08

21   determine whether the extent to which they're a       10:08

22   factor in the decision to purchase the product at     10:08

23   all?                                                  10:08

24       A    This, you know, is -- assuming that the      10:09

25   relative importance is zero, then they're not a       10:09

Highly Confidential - Attorneys' Eyes Only

Page 12

1    factor.  But we're not looking at 01.  We're looking    10:09

2    at this in terms of -- typically in marketing you    10:09

3    look in terms of what is the relative importance of    10:09

4    different features, benefits in determining consumer    10:09

5    buying decisions.    10:09

6        Q    Okay.  So if there are some consumers who    10:09

7    are buying the product, a product because of the    10:09

8    features, are those features driving demand?    10:09

9        A    Well, for these respondents, for these    10:09

10   consumers, it will be one of the factors that    10:09

11   determines their purchase.  The question then is,    10:09

12   how important is it?    10:09

13                 (Reporter clarification.)    10:09

14   BY MR. KUWAYTI:    10:09

15       Q    So as you understood the term "driving    10:09

16   demand," which you've used in your report in    10:10

17   paragraph 1, describing your assignment, if you    10:10

18   concluded that there were some consumers who were    10:10

19   buying smartphones or tablets because of these    10:10

20   features that Dr. Hauser tested, then that would    10:10

21   mean that those features were driving consumer    10:10

22   demand to some extent?    10:10

23       A    You cannot look at it without looking at    10:10

24   the relative importance.  It's not an absolutely 01,    10:10

25   as I mentioned before.  Everything in term of    10:10

Highly Confidential - Attorneys' Eyes Only

Page 13

1   consumer behavior is relative.  Consumers don't make      10:10

2   decisions based on a single factor in most cases.         10:10

3   And it's a combination of factors, features,              10:10

4   benefits, experiences, that lead to consumer buying       10:10

5   decision.                                                 10:10

6       Q    So let's probe that a little bit.  You say       10:10

7   consumers don't make decisions based on a single          10:10

8   factor in most cases.  Has that been your experience      10:10

9   in your decades of work in the marketing field?           10:11

10      A    Yes.                                              10:11

11      Q    And how many factors do consumers                10:11

12  typically look at when they're buying a product?          10:11

13      A    It varies all over, depending on the             10:11

14  product, depending on the situation, depending on         10:11

15  the consumers.  You know, you cannot generalize.          10:11

16      Q    Have you ever encountered a situation            10:11

17  where consumers are buying a product because of just      10:11

18  one reason?                                               10:11

19      A    I'm sure there are some consumers in some        10:11

20  context that may buy because of a single factor,          10:11

21  especially if the factor is something like a brand        10:11

22  as opposed to a feature.  But I have a hard time          10:11

23  kind of recalling any study that would show that          10:11

24  there are consumers who buy a product or service          10:11

25  because of one product feature.                           10:11

Highly Confidential - Attorneys' Eyes Only

Page 14

1    Q    So that would be very unusual in your      10:11

2  experience?                                       10:11

3    A    Correct.                                   10:11

4    Q    So if there are some consumers for whom    10:11

5  these features were a contributing factor in their 10:12

6  decision to purchase the product, is that -- under 10:12

7  your understanding, would that be driving consumer  10:12

8  demand?                                            10:12

9    A    Yes, it will qualify as contributing.  The 10:12

10  question then is, how important is it in term of   10:12

11  their decision?                                    10:12

12    Q    Okay.                                      10:12

13    A    And, again, I mentioned a number of times  10:12

14  it's not a 01, basically it's a relative           10:12

15  contribution.  And the question is then empirically, 10:12

16  you know, how important is it relative to other    10:12

17  factors?                                           10:12

18    Q    And how important does it have to be to be 10:12

19  driving consumer demand, in your understanding of  10:12

20  that term?                                         10:12

21    A    It has to be a significant enough factor.  10:12

22  It will, you know, kind of with the presence of this 10:12

23  factor, a consumer -- this will tilt consumer      10:12

24  preference, and they will buy this specific product 10:12

25  compared to another one that does not have this    10:13

Highly Confidential - Attorneys' Eyes Only

Page 19

1    this product versus other products they're            10:18

2    considering.                                          10:18

3       Q    So I just want to make sure that we're a      10:18

4    hundred percent clear, because to me the two things   10:18

5    that you said there are different.                    10:18

6            First, you said that a significant            10:18

7    number of consumers would consider these features to  10:18

8    be significant in their purchase of the product.      10:18

9    And then you went on to say that without these        10:18

10   features, they will not buy the product.              10:18

11           So is that what you were looking to           10:18

12   determine, whether if these features were absent,     10:18

13   consumers would not buy the product?  Is that your    10:19

14   definition of "consumer demand"?                      10:19

15          MR.  RAMOS:  Object to the form.               10:19

16          THE WITNESS:  Well, that's one operational     10:19

17      definition of what I meant by "significant."       10:19

18      So then we look at this as two separate things.    10:19

19      When I said "significant contribution," my         10:19

20      next sentence was explaining what "significant     10:19

21      contribution" means:  that without these           10:19

22      features, people will not buy; with these          10:19

23      features, people will buy them.                    10:19

24      And then you can also obviously try to             10:19

25      look in term of the question of, you know, kind    10:19

Highly Confidential - Attorneys' Eyes Only

Page 20

| | | |
|---|---|---|
| 1 | of, how much more would they be willing to pay | 10:19 |
| 2 | for a product with these features versus a | 10:19 |
| 3 | product without these features? | 10:19 |
| 4 | So these are all ways of measuring | 10:19 |
| 5 | operationally the question of or the statement | 10:19 |
| 6 | that I made concerning significant | 10:19 |
| 7 | contribution. | 10:19 |
| 8 | BY MR. KUWAYTI: | 10:19 |
| 9 | Q    How does the, how does measuring the | 10:19 |
| 10 | willingness to pay for a product with these features | 10:19 |
| 11 | relate to your question of determining whether it is | 10:20 |
| 12 | a feature that makes a significant contribution to | 10:20 |
| 13 | the purchaser's decision to purchase? | 10:20 |
| 14 | A    Well, if the people would be willing to | 10:20 |
| 15 | pay more for a product with the feature and actually | 10:20 |
| 16 | buy a product at a higher price, then obviously it | 10:20 |
| 17 | is indicated that this feature is important for them | 10:20 |
| 18 | and, therefore, it affects their willingness to buy | 10:20 |
| 19 | the product. | 10:20 |
| 20 | Q    To put it into a concrete term in terms | 10:20 |
| 21 | of -- let's say I'm buying a BMW and there are three | 10:20 |
| 22 | things about that BMW that really appeal to me above | 10:20 |
| 23 | everything else.  One is the brand.  One is the fact | 10:20 |
| 24 | that I think it's the best-looking car out there on | 10:20 |
| 25 | the market.  And the other is that I think | 10:21 |

Highly Confidential - Attorneys' Eyes Only

Page 21

1   technically it's a terrific car.  And all three are        10:21

2   leading to my decision to buy the product.                 10:21

3           But, you know, I probably would                    10:21

4   still -- I would still buy that product if                 10:21

5   technically it wasn't quite as good because I think        10:21

6   it looks great and it's a BMW.  Would you say in           10:21

7   that scenario that the fact that the product is            10:21

8   technically good is something that is driving my           10:21

9   demand for the car?                                        10:21

10    A    Well, again, @consumer evaluation are              10:21

11   never done in abstract of other brands and other          10:21

12   options in the marketplace.  So the question is with      10:21

13   respect to the brand name, how do they value it, the      10:21

14   BMW versus Porsche, Mercedes and others; how they         10:21

15   evaluate the design, the look of the BMW versus           10:22

16   others; and how do they value the technical features     10:22

17   of the BMW versus other cars.  It's a relative            10:22

18   evaluation.                                                10:22

19           And then if you're giving me --                   10:22

20   basically in your scenario it sounded like there are      10:22

21   two BMW cars:  One which is a brand look and              10:22

22   superior technology; second option seems to be same       10:22

23   brand, same look, but not as good a technology as         10:22

24   the first one; and then the consumer in the real          10:22

25   world will make a choice, then, between these and         10:22

Highly Confidential - Attorneys' Eyes Only

Page 25

1    and toward experience and away from features.          10:26

2              Features are actually, in increasing          10:26

3    number of studies, are becoming less and less          10:26

4    critical factors in consumer purchases behavior.       10:26

5    And whether you look at a combination of features,     10:26

6    services, benefits, solution, the experience, look     10:26

7    at the totality of this, consumer buying decision is   10:26

8    a combination of a number of these and rarely, if      10:27

9    ever, a factor of one factor, let alone one feature.   10:27

10      Q    So if the test for driving consumer demand      10:27

11   were whether this one factor was the sole item         10:27

12   leading you to the -- leading a consumer to purchase   10:27

13   a product, that test would almost never be met?        10:27

14             MR.  RAMOS:  Object to the form.             10:27

15             THE WITNESS:  I don't think I ever said       10:27

16        that the requirement needs to be a sole           10:27

17        determinant.                                       10:27

18   BY MR. KUWAYTI:                                         10:27

19      Q    Right.                                          10:27

20      A    I think from the beginning I emphasized         10:27

21   we're talking about relative importance.  And the      10:27

22   question then is, is the relative importance strong    10:27

23   enough, significant enough to tilt the decision?  So   10:27

24   when you're confronted with your two BMWs, the one     10:27

25   great brand, great look, superior technology, and      10:27

Highly Confidential - Attorneys' Eyes Only

Page 26

1    the second which is the same brand, the same look,        10:27

2    but somewhat less kind of sophisticated or less good      10:27

3    technology, you know, kind of -- does the difference      10:28

4    in technology between the two change your decision?       10:28

5    And you'll decide, no; now that the level of the          10:28

6    technology is below, it's not good enough and I will      10:28

7    now look at other options in the marketplace.             10:28

8         Q    Right.  And I think, I think I understand       10:28

9    what you're saying.  But if the test for whether          10:28

10   something were driving consumer demand is whether         10:28

11   that was the sole determinant of the reason to            10:28

12   purchase the product, that test could almost never        10:28

13   be met in your experience?                                10:28

14        MR.  RAMOS:  Object to the form.                     10:28

15        THE WITNESS:  I would find it kind of                10:28

16        strange to find a factor that is a sole             10:28

17        determinant.  Perhaps with the exception I           10:28

18        mentioned before of a brand name, that a brand       10:28

19        name represents a totality of images,               10:28

20        associations, perceptions of a consumer of the      10:29

21        brand; and a consumer may decide, you know, BMW      10:29

22        is such a terrific brand; I will just go ahead       10:29

23        and buy a BMW kind of basically because, in         10:29

24        their mind, if you probe further, the BMW is a       10:29

25        very rich set of association with them.  So if       10:29

Highly Confidential - Attorneys' Eyes Only

Page 27

1      you probe further for the association, you'll        10:29
2      find out; and one of them may be technology.         10:29
3   BY MR. KUWAYTI:                                          10:29
4      Q    Okay.  Did you try to do your own conjoint      10:29
5   analysis in this case?                                   10:29
6      A    No.                                              10:29
7      Q    Did anybody on your team try to do an           10:29
8   analysis or a conjoint analysis?                         10:29
9      A    Not that I know.                                 10:29
10     Q    Are you aware of anybody on your team or        10:29
11  not on your team that tried to replicate all or any     10:29
12  part of Dr. Hauser's survey with survey respondents?    10:29
13     A    Not that I know.                                 10:29
14     Q    Did you consider doing another survey          10:29
15  to -- let me step back.                                  10:29
16          You point out in your report that, in          10:30
17  your opinion, there are a number of design flaws        10:30
18  with Dr. Hauser's survey.  Did you consider doing       10:30
19  another survey in revising some of those flaws to       10:30
20  see what would happen?                                   10:30
21     A    No.  We didn't have time.  This was very,      10:30
22  you know, time-compressed.  And there was no way I      10:30
23  could have designed a survey in this time period.       10:30
24     Q    About how much time would have been needed     10:30
25  to do that?                                              10:30

Highly Confidential - Attorneys' Eyes Only

Page 28

1     A     You need, you need time to kind of design          10:30

2   a survey carefully and monitor it with the field and       10:30

3   analyze the results.  The fastest you can do               10:30

4   probably a meaningful conjoint analysis study will         10:30

5   be about six to eight weeks.  And the question is --       10:30

6   and this assumes that I had the time, and I did not        10:30

7   have the time to devote to this.                           10:30

8     Q     Okay.  So if you didn't have anything else         10:31

9   on your plate, sounds like you could have done it.         10:31

10  It would have been tight, but you could have done          10:31

11  it?                                                         10:31

12            MR.  RAMOS:  Object to the form.                  10:31

13  BY MR. KUWAYTI:                                             10:31

14    Q     In the time since you were approached by           10:31

15  Samsung.                                                    10:31

16    A     Yeah.  I was not asked to do the design,           10:31

17  nor did I propose it because I basically had many          10:31

18  other commitment and could not have done it.               10:31

19    Q     Do you know if Dr. Sukumar tried to do his         10:31

20  own conjoint survey testing these patented features,       10:31

21  the ones that were tested in Dr. Hauser's?                 10:31

22    A     I heard his name, but I have no idea what          10:31

23  he did.                                                     10:31

24    Q     Are you aware of any consideration that            10:31

25  was given by Samsung to replicating Dr. Hauser's           10:32

Highly Confidential - Attorneys' Eyes Only

Page 29

1    survey and modifying it to correct any of the flaws?    10:32

2        A    No, I have not heard of anything like    10:32

3    this.    10:32

4        Q    In Paragraph 9 of your report --    10:32

5        A    Yes.    10:32

6        Q    -- you describe your experience with    10:32

7    conjoint analysis.    10:32

8        A    Correct.    10:32

9        Q    A number of the articles that you or    10:32

10   studies that you reference here are 35 years old or    10:32

11   older than that.  Are they still relevant today?    10:32

12       A    Well, if you go back to the original book    10:32

13   that Paul Green, Dr. Rao and I wrote, there's the    10:32

14   first book on conjoint analysis, it studies a lot of    10:32

15   the principles that still kind of hold.  And a lot    10:32

16   of the studies that were used, like if you look at    10:33

17   the Courtyard by Marriott, the design had been    10:33

18   replicated by Courtyard by Marriott a number of    10:33

19   times over the years following this.  And the design    10:33

20   is still applicable.    10:33

21              So the idea of some of the approaches    10:33

22   we used in like hybrid conjoint analysis and others    10:33

23   are still very relevant and are still being used    10:33

24   today.    10:33

25       Q    Are there any of the articles that you    10:33

Highly Confidential - Attorneys' Eyes Only

Page 54

1    number will be five, five different measures.          11:11

2        Q    Now, in any of the real-life studies that    11:11

3    you've done with conjoint analysis, did the people    11:11

4    taking the survey use actual dollars as part of the   11:11

5    survey?                                                11:11

6        A    I don't recall actual dollars, but the way   11:11

7    that the majority of my studies are designed, it's    11:11

8    typically focused on indicating the likelihood of     11:11

9    buying a product or service or whatever we're         11:11

10   looking at as opposed to just selecting kind of       11:12

11   basically a choice-base conjoint.                      11:12

12            So we're looking at the likelihood of        11:12

13   buying.  And we are setting the, the setting in term  11:12

14   of the framing of the questions in a way that try to  11:12

15   make it as realistic as possible within the, kind of  11:12

16   the budget constraint of the individuals involved.    11:12

17       Q    But these are hypothetical transactions      11:12

18   that the consumer is making; they're not actually     11:12

19   paying with actual dollars for the choices, right?    11:12

20       A    Correct.  In most of these cases, that's     11:12

21   correct.  But you're working --                        11:12

22       Q    In fact, in every case that you've been      11:12

23   involved in, it's been a hypothetical transaction.    11:12

24   You've never done a conjoint survey involving actual  11:12

25   dollars where consumers had to spend from money that  11:12

Highly Confidential - Attorneys' Eyes Only

Page 55

| | | |
|---|---|---|
| 1 | they had in making these choices, right? | 11:12 |
| 2 | A    I'm trying to kind of recall the different | 11:13 |
| 3 | studies we've done over the years.  I definitely | 11:13 |
| 4 | would agree that the vast majority of the studies | 11:13 |
| 5 | are not asking for real dollars. | 11:13 |
| 6 | Q    You can't remember even one that you've | 11:13 |
| 7 | ever done -- out of all the conjoint analyses that | 11:13 |
| 8 | you've done, you can't remember even one, sitting | 11:13 |
| 9 | here today, where the consumers used actual dollars? | 11:13 |
| 10 | A    Actually I can remember one. | 11:13 |
| 11 | Q    One.  In how many years you've been doing | 11:13 |
| 12 | this, 35, 40? | 11:13 |
| 13 | A    Since 1970. | 11:13 |
| 14 | Q    So in over 40 years of doing these | 11:13 |
| 15 | studies, there's one that you can remember where | 11:13 |
| 16 | consumers used actual dollars; otherwise, it was | 11:13 |
| 17 | hypothetical transactions? | 11:13 |
| 18 | A    Well, the way we addressed the realism is | 11:13 |
| 19 | through the framing of the question, not by giving | 11:13 |
| 20 | them real dollars. | 11:13 |
| 21 | Q    And my question, Dr. Wind, is in over 40 | 11:13 |
| 22 | years of doing these conjoint analyses, you can only | 11:14 |
| 23 | remember one that you've done where consumers used | 11:14 |
| 24 | actual dollars? | 11:14 |
| 25 | A    But actual dollar is not the only way to | 11:14 |

Highly Confidential - Attorneys' Eyes Only

Page 56

1    assure the reality and the realism of the task as        11:14

2    opposed to play money.                                   11:14

3        Q    Great.  So you don't need to use actual          11:14

4    dollars in a conjoint survey to ensure the reality       11:14

5    and accuracy of the task and results, right?             11:14

6        A    Correct.  I did not say that you have to         11:14

7    use real dollars.                                        11:14

8        Q    And, in fact, you're not alone in this.         11:14

9    It's not as though you're the only person out there      11:14

10   who is not using actual dollars.  In fact, it's          11:14

11   extremely rare for anybody to use actual dollars in      11:14

12   a conjoint analysis, right?                              11:14

13       A    Correct.                                         11:14

14       Q    And despite that, conjoint analyses are         11:14

15   used, as you said, all the time and are a fixture in     11:14

16   the commercial world and real-life decisions are         11:14

17   based on them?                                           11:14

18       A    Because the real dollar is not the measure      11:14

19   of the realism.  The measure of does it represent        11:14

20   market reality and allow consumers to make               11:15

21   meaningful decisions depends on the framing of the       11:15

22   question and the context you're providing them.          11:15

23       Q    Right.  And the fact that real dollars are      11:15

24   not used is not something that impacts the accuracy      11:15

25   or reliability of the study?                             11:15

Highly Confidential - Attorneys' Eyes Only

Page 57

1      A     Correct.  Real dollars is not the factor.      11:15

The real factor is the realism of the framing of the      11:15

questions.      11:15

4         MR. KUWAYTI:  We've been going about an      11:15

5      hour.  Do you want to take a break?      11:15

6         THE WITNESS:  Real quick.      11:15

7         VIDEO OPERATOR:  This ends Videocassette      11:15

8      Tape No. 1 of the November 7, 2012 videotaped      11:15

9      deposition of Dr. Jerry Wind.      11:15

10         We're off the video record at 11:16 a.m.      11:15

11         (Brief recess.)      11:15

12         VIDEO OPERATOR:  This begins Videocassette      11:29

13      No. 2 of the November 7, 2012 videotaped      11:29

14      deposition of Dr. Jerry Wind.      11:29

15         We return to the video record at      11:29

16      11:29 a.m.      11:29

17  BY MR. KUWAYTI:      11:59

18      Q     If you turn to paragraph 12 of your expert      11:29

19  report in this case, Dr. Wind.      11:29

20      A     (Witness complies.)      11:29

21      Q     It is entitled Materials Reviewed and      11:29

22  Research Team.      11:29

23      A     Yes.      11:29

24      Q     And it describes, it says that in      11:29

25  appendix B to your report you list materials that      11:30

Highly Confidential - Attorneys' Eyes Only

Page 58

1   were reviewed and/or relied upon.  And my question   11:30

2   is, are those materials that you reviewed personally   11:30

3   or does it include materials that you reviewed and   11:30

4   that your team may have reviewed that you didn't   11:30

5   see?   11:30

6       A    Let me look at appendix B, and I'll let   11:30

7   you know in a minute.   11:30

8       Q    Sure.   11:30

9       A    I think I've looked at all of these items   11:30

10  listed on appendix B.   11:30

11      Q    You looked at them personally?   11:30

12      A    Yes.   11:30

13      Q    So let's turn to appendix B.   11:30

14      A    (Witness complies.)   11:31

15      Q    And it lists, there's a category of legal   11:31

16  documents that you reviewed.  And it lists some of   11:31

17  the declarations that were submitted with Samsung's   11:31

18  opposition to this motion for a permanent   11:31

19  injunction.  Do you see that?  The declaration of   11:31

20  Dr. Van Dam, the declaration of Dr. Gray.   11:31

21      A    Right.   11:31

22      Q    And you reviewed those, right?   11:31

23      A    Briefly skimmed them.   11:31

24      Q    There's also a declaration from a   11:31

25  Dr. Erdem, E-R-D-E-M.  Did you review her   11:31

Highly Confidential - Attorneys' Eyes Only

Page 75

1    of the factors but not for the other that created       11:53

2    the bias that I'm reporting on.                          11:53

3        Q    And in those animations -- you viewed the       11:53

4    animations, right?                                       11:53

5        A    Yes, I did.                                      11:53

6        Q    And in the animation relating to the '163       11:53

7    patent, the non-infringing alternative that             11:53

8    Dr. Hauser presented was, in fact, exactly the          11:53

9    non-infringing alternative that you describe in your    11:53

10   report, wasn't it?                                       11:53

11       A    And the '163 is -- I must tell you, I           11:53

12   think I found it very confusing the way the             11:53

13   animation was.  And one of the big problems with the   11:53

14   study, which I actually do not mention specifically    11:53

15   in the report, is that there was basically no way      11:53

16   that Dr. Hauser can actually tell if the consumer      11:54

17   really understood the stimuli that they were           11:54

18   presented with.  He relied on a pretest in the        11:54

19   beginning, but he really does not -- could have done  11:54

20   very easily, to ask each respondent to test to what   11:54

21   extent they really understood the context of this.    11:54

22            And I still viewed this animation a           11:54

23   few times to try to figure out what '163 patent is.   11:54

24   Very confusing where presenting it.                    11:54

25       Q    And part of the purpose of the pretest is     11:54

Highly Confidential - Attorneys' Eyes Only

Page 76

1    to make sure that respondents were understanding the          11:54

2    survey, right?                                                 11:54

3         A    Yes.  But pretest is no replacement to --           11:54

4    in a correct survey to include another question.  It          11:54

5    could be done very, very simply to ask the                    11:54

6    respondent for their understanding of the features.           11:54

7    An open-ended question could have easily been                 11:54

8    inserted once the people saw this stimuli to say,             11:54

9    you know, What is your understanding of the specific          11:54

10   features we just discussed?  Or something along this          11:55

11   line.  This was not done.                                     11:55

12              And we have no idea to what extent                 11:55

13   the consumers really understood what they saw there.          11:55

14        Q    And let me go back to my question, which           11:55

15   is the non-infringing alternative that Dr. Hauser             11:55

16   presented in those video animations for the '163             11:55

17   patent is, in fact, exactly what you describe in             11:55

18   your report as the Samsung design-around, the user           11:55

19   double-taps, zooms back out; and if they want to             11:55

20   recenter, they double-tap on that part of the screen         11:55

21   at that point?                                                11:55

22        A    For '163, if consumer understood it, yes.          11:55

23        Q    Okay.  And then for blue glow, for the             11:55

24   rubber-banding patent, do you recall the                     11:55

25   non-infringing alternative that Dr. Hauser presented         11:55

Highly Confidential - Attorneys' Eyes Only

Page 77

1    in the video the animations?                          11:55

2        A    Yeah.  He presented totally different        11:55

3    thing.  He presented red, complete border of red      11:56

4    which is totally different implication than coming     11:56

5    with an elegant, little, blue glow in the corner       11:56

6    when you touch it as opposed to this warning sign of   11:56

7    red all over, red frame.  So I don't think this is a   11:56

8    fair representation of the infringing alternative.     11:56

9        Q    So Dr. Hauser presented a non-infringing     11:56

10   alternative that had a glow of light around the        11:56

11   entire screen when you get to an edge, and Samsung's   11:56

12   non-infringing alternative is to have a glow of        11:56

13   light just around one side of the screen, right?       11:56

14            MR.  RAMOS:  Object to form.                  11:56

15            THE WITNESS:  Yes, but with one kind of --    11:56

16       you omitted one very important factor, that the    11:56

17       Samsung is light blue and the Dr. Hauser kind      11:56

18       of presentation of this is strong-red glow         11:56

19       around the entire frame, which sends a totally     11:56

20       different signal and is not an appropriate kind    11:56

21       of replacement for the Samsung approach.           11:56

22   BY MR. KUWAYTI:                                        11:56

23       Q    And why is it a totally different signal,     11:57

24   in your opinion?                                       11:57

25       A    It's a different stimulus.  When you look     11:57

Highly Confidential - Attorneys' Eyes Only

Page 78

1    at the light-blue glow that you get when you get to     11:57

2    the end, compare it to this red frame, it's a           11:57

3    totally different stimulus.  And we don't know how      11:57

4    consumers would react to the blue glow.                 11:57

5         Q    So your position is that Dr. Hauser needed    11:57

6    to present exactly the Samsung design-around to do      11:57

7    this test?                                              11:57

8              MR.  RAMOS:  Object to form.                  11:57

9    BY MR. KUWAYTI:                                         11:59

10        Q    To value, to determine how people value       11:57

11   the '163, you have to present precisely the same        11:57

12   design-around that Samsung chose to implement?          11:57

13        A    Well, he should have done a few things.       11:57

14   He should have, number one, tried to represent          11:57

15   accurately in the videos the alternative that           11:57

16   Samsung used and make sure that consumers understand    11:58

17   them.                                                   11:58

18              Two, and most importantly, in the            11:58

19   stimuli, the screens, the 16 screens that each          11:58

20   respondent saw, it would have been very important to    11:58

21   include, not kind of to cross over basically to say     11:58

22   or no feature, but rather to present the                11:58

23   alternative.                                            11:58

24              So I think the problem is much more          11:58

25   serious with respect to the 16 screens that             11:58

Highly Confidential - Attorneys' Eyes Only

Page 79

| | | |
|---|---|---|
| 1 | consumers saw and not just the correction of the | 11:58 |
| 2 | videos that people saw once at the beginning.  We | 11:58 |
| 3 | don't know what they understood it to mean. | 11:58 |
| 4 | Q   Do you know how they would access the | 11:58 |
| 5 | videos from that screen of 16 if they wished to see | 11:58 |
| 6 | them again? | 11:58 |
| 7 | A   They could have clicked, but we have no | 11:58 |
| 8 | idea if they did actually watch it or not. | 11:58 |
| 9 | Q   Right.  So they -- if they were confused, | 11:58 |
| 10 | so the alternative was presented to them, explained | 11:58 |
| 11 | to them at the beginning, and then they were the 16 | 11:58 |
| 12 | in the screen, and if they were confused or couldn't | 11:59 |
| 13 | remember what that alternative was, they could click | 11:59 |
| 14 | on the link and be shown the video again, right? | 11:59 |
| 15 | That's your understanding? | 11:59 |
| 16 | MR.  RAMOS:  Object to form. | 11:59 |
| 17 | THE WITNESS:  That's my understanding. | 11:59 |
| 18 | But basically this assumes that respondents and | 11:59 |
| 19 | Internet panel will take the time to do it. | 11:59 |
| 20 | And it also assumes that this will have more of | 11:59 |
| 21 | an impact on them than what they're seeing in | 11:59 |
| 22 | front of them, which is the stimulus, and the | 11:59 |
| 23 | stimulus screens that basically presented | 11:59 |
| 24 | clearly that the alternative is not having | 11:59 |
| 25 | these features at all. | 11:59 |

Highly Confidential - Attorneys' Eyes Only

Page 80

| | | |
|---|---|---|
| 1 | BY MR. KUWAYTI: | 11:59 |
| 2 | Q    Do you know, Dr. Wind, whether at the time | 11:59 |
| 3 | Dr. Hauser constructed his survey these | 11:59 |
| 4 | design-arounds were in the marketplace? | 11:59 |
| 5 | A    I don't know.  I don't know the exact time | 12:00 |
| 6 | when they were lunched. | 12:00 |
| 7 | Q    So your report actually does not make | 12:00 |
| 8 | mention of the fact that Dr. Hauser presented these | 12:00 |
| 9 | non-infringing alternatives in the video animations, | 12:00 |
| 10 | does it? | 12:00 |
| 11 | A    Correct.  Might have been oversight.  I | 12:00 |
| 12 | focused primarily on what I considered to be the | 12:00 |
| 13 | most important factors, which are the screens, the | 12:00 |
| 14 | 16 stimuli screens. | 12:00 |
| 15 | Q    You didn't explain that to the Court, | 12:00 |
| 16 | that, in fact, when you say he didn't -- you say | 12:00 |
| 17 | here his non-infringing alternatives were to remove | 12:00 |
| 18 | the features from the device; you did not in your | 12:00 |
| 19 | report explain to the Court that, in fact, | 12:00 |
| 20 | non-infringing alternatives were presented for each | 12:01 |
| 21 | of the three patents in detail in video animations | 12:01 |
| 22 | to the respondents of this survey, right? | 12:01 |
| 23 |     MR. RAMOS:  Object to the form. | 12:01 |
| 24 | BY MR. KUWAYTI: | 11:00 |
| 25 | Q    Yes or no? | 12:01 |

Highly Confidential - Attorneys' Eyes Only

Page 81

1       A     Correct.  I did not.  I did not mention      12:01

2    it.  It can easily be corrected.  But, again, my      12:01

3    understanding here and my view is that the two        12:01

4    problems that were mentioned before, that the         12:01

5    animation, we don't know how clear it was to the      12:01

6    respondent and, two, that the critical 16 screens     12:01

7    did not include any reference to alternative          12:01

8    designs.                                              12:01

9                    (Reporter clarification.)             12:01

10   BY MR. KUWAYTI:                                       12:01

11      Q     Yeah.  And that's a different problem than   12:01

12   you what describe in your report because here we're   12:01

13   quibbling about whether Dr. Hauser needed to not      12:01

14   just show consumers a detailed animation at the       12:01

15   beginning and when he presented the 16 alternatives,  12:01

16   give them a link if they were confused and wanted to  12:01

17   go back.  That's what we're arguing about, whether    12:02

18   that biased the survey, and not whether he just       12:02

19   failed to present non-infringing alternatives at      12:02

20   all.                                                  12:02

21           MR.  RAMOS:  Object to form.                  12:02

22           THE WITNESS:  I lost you.  I thought that     12:02

23      he did fail --                                     12:02

24   BY MR. KUWAYTI:                                       12:02

25      Q     Let's strike the question.                  12:02

Highly Confidential - Attorneys' Eyes Only

Page 82

1    A    -- that he did fail to mention the         12:02

2  alternative design in the 16 screens.  The       12:02

3  16 screens do not mention, when people are looking 12:02

4  at it -- and if you think about this in term of a 12:02

5  typical respondent to an Internet patent all trying 12:02

6  to work as fast as they can to finish this, they're 12:02

7  focusing on the screens.  And the screens basically 12:02

8  did not mention the alternatives.  That's what I was 12:02

9  referring to.  If it's unclear, I'd be glad to     12:02

10 modify it to include this comment on the animation. 12:02

11 BY MR. KUWAYTI:                                    12:02

12    Q    And this could have been tested, right?   12:02

13 Dr. Hauser presented his results in March of this  12:02

14 year in his report, right?                         12:02

15    A    I did not see his report in March.  I saw  12:02

16 it much later.                                     12:02

17    Q    Right.  But Dr. Sukumar was Samsung's      12:03

18 expert at trial and critiqued Dr. Hauser's survey, 12:03

19 correct?                                           12:03

20    A    That's my understanding.                   12:03

21    Q    And Samsung has had the report since March 12:03

22 of 2012, correct?                                  12:03

23    A    That's my understanding.                   12:03

24    Q    And one way to determine, rather than sit  12:03

25 here and have you speculate as to whether people   12:03

Highly Confidential - Attorneys' Eyes Only

Page 87

1       studies.  I was asked primarily to evaluate        12:07

2       Professor Hauser study to the extent that he        12:07

3       would allow us to assess the statement we read      12:07

4       at the beginning, the objective of the study.       12:07

5           So realistically I could not have done it.      12:07

6   BY MR. KUWAYTI:                                         12:07

7       Q    You could not have done it?                    12:08

8       A    I didn't have the time.  I didn't have the     12:08

9   time, nor was I kind of asked to try to do any other    12:08

10  studies in this area.                                   12:08

11      Q    You didn't have the time because you were      12:08

12  busy doing other things?                                12:08

13      A    Correct.                                        12:08

14      Q    But in the two months you had, that's more     12:08

15  than enough time to have done such a test?              12:08

16      A    Assuming that you kind of draw everything      12:08

17  out of my life, yeah.  I've major other                 12:08

18  responsibilities at the university, and I could not     12:08

19  have devoted the time to do it.                         12:08

20      Q    Since you've referenced it, why don't we       12:08

21  turn to the section of your report beginning with       12:08

22  paragraph 46 where you describe these inconsistent      12:08

23  results or nonsensical predictions, as you describe     12:08

24  them.                                                   12:08

25              Now, in paragraphs -- in this section       12:09

Highly Confidential - Attorneys' Eyes Only

Page 88

1   of your report, B1 and 2, what you are describing          12:09

2   here are predictions that you performed using the          12:09

3   results, right?                                             12:09

4       A    I'm not sure of the use of the word               12:09

5   "predictions."  I replicated basically Professor           12:09

6   Hauser's approach with respect to the other                12:09

7   scenarios and show basically the results we get are        12:09

8   basically counterintuitive, counter common sense,          12:09

9   nonsensical, whatever term you want to use.                12:09

10      Q    So when I use the word "predictions," I'm         12:09

11  actually using your word, sir.  You say in                 12:09

12  paragraph 46 at the very beginning, In order to            12:09

13  further evaluate the reliability and validity of           12:09

14  Professor Hauser's WTP price premium estimates, I          12:09

15  employed the RFC simulation technique underlying           12:10

16  those estimates to evaluate predictions, not               12:10

17  reported by Professor Hauser in his report.                12:10

18      A    You're correct.                                   12:10

19      Q    And then again when you describe Exhibit 9        12:10

20  to your report, you say Exhibit 9 shows specific           12:10

21  predictions of the RFC simulation, right?                  12:10

22      A    You're correct.                                   12:10

23      Q    Okay.  So you're reporting predictions           12:10

24  that you think are nonsensical, not actual results         12:10

25  of the survey, not actual responses from the people        12:10

Highly Confidential - Attorneys' Eyes Only

Page 89

1   who took the survey?                                    12:10

2        A    Correct.  That's what I meant by saying we    12:10

3   replicated his approach.  And if you look at the        12:10

4   actual exhibits, we kind of basically replicated        12:10

5   what he has done, but with respect to these new         12:10

6   scenarios.                                              12:10

7        Q    So when you say at page 25 that 32 percent    12:10

8   of survey respondents would prefer to pay $199          12:10

9   rather than $99 for the benchmark smart phone -- do     12:11

10  you see that?                                           12:11

11       A    Yes.                                          12:11

12       Q    -- you're not saying that 32 percent of       12:11

13  people who took the survey actually preferred to pay    12:11

14  $199 rather than $99 for the benchmark smartphone,      12:11

15  you're saying that you predict, based on the            12:11

16  results, that that would happen?                        12:11

17       A    Correct.  Using his methodology.  And the     12:11

18  inference -- to go back to our previous discussion,     12:11

19  and the reason -- one of the reasons you can get it     12:11

20  is, my inference is basically the consumers, when       12:11

21  they were confronted with the actual task of            12:11

22  choosing one of the product on each one of the          12:11

23  screens, that they were inconsistent in their           12:11

24  judgment when they chose the 16 choices they made.      12:11

25       Q    I'm going to ask you, if you can, to try      12:11

Highly Confidential - Attorneys' Eyes Only

Page 90

1   to limit your responses to my question.  Some of     12:11

2   your responses are quite long, and I understand you  12:11

3   have a view that you want to get out, which is        12:12

4   expressed in the report.  But we have limited time.   12:12

5   If you could try to focus on the question, I would    12:12

6   appreciate it.                                        12:12

7            So when you say similarly in the            12:12

8   second bullet, 43 percent of survey respondents      12:12

9   would prefer to pay $99 rather than $0 for the       12:12

10  benchmark smartphone, you're not saying that         12:12

11  actually happened, that 43 percent of people who     12:12

12  took the survey actually made that choice; you're    12:12

13  saying you predict that that's what would happen?    12:12

14       A    Correct.  Based on Dr. Hauser's           12:12

15  methodology.                                          12:12

16       Q    And that's the same for all of these       12:12

17  bullets on paragraph 25, right?                       12:12

18       A    Correct.                                    12:12

19       Q    And it's the same for the -- when you say   12:12

20  that you have qualitatively similar predictions       12:12

21  associated with Professor Hauser's tablet analysis,   12:12

22  those are also predictions, not actual results?       12:12

23       A    Correct.                                    12:12

24       Q    And it's the same in section 2 of your      12:12

25  report; you say you employed the RFC simulation to    12:12

Highly Confidential - Attorneys' Eyes Only

Page 91

1    generate predictions involving pairs of smartphones    12:12

2    where one is clearly superior to another.  In that    12:13

3    section as well, you're not reporting actual    12:13

4    results; you're reporting predictions that you made,    12:13

5    right?    12:13

6         A    Correct; using Dr. Hauser's methodology.    12:13

7         Q    And if we turn back to paragraph 15 of    12:13

8    your report and we look at the bullet, first bullet    12:13

9    at the bottom of the page, you say, As many as    12:13

10   43 percent of survey respondents chose to purchase    12:13

11   smartphones or tablets that were priced higher than    12:13

12   an identical lower-priced device.    12:13

13              Do you see that?    12:13

14        A    Yes, I see.    12:13

15        Q    In fact, that's not an accurate way to say    12:13

16   that, right?  What you're really saying is that you    12:13

17   predict that 43 percent of survey respondents would    12:13

18   choose to purchase?    12:13

19        A    Correct.  That's, that's what we actually    12:13

20   state explicitly in the paragraphs that I mentioned    12:13

21   there:  See paragraph 46 to 47.  But you're correct;    12:14

22   that should have been more careful in the wording of    12:14

23   this bullet point.    12:14

24        Q    Right.  If you could go back today, you    12:14

25   would change that, right?    12:14

Highly Confidential - Attorneys' Eyes Only

Page 92

| | | |
|---|---|---|
| 1 | A    Correct. | 12:14 |
| 2 | Q    Same thing with the next bullet on | 12:14 |
| 3 | paragraph 9 when you say, As many as 35 percent of | 12:14 |
| 4 | respondents preferred, clearly in theory, yet | 12:14 |
| 5 | identically-priced devices, that also isn't really | 12:14 |
| 6 | phrased accurately; you should have said your | 12:14 |
| 7 | prediction is that as many as 35 percent would | 12:14 |
| 8 | prefer? | 12:14 |
| 9 |          MR.  RAMOS:  Object to form. | 12:14 |
| 10 |          THE WITNESS:  Correct.  The same applies | 12:14 |
| 11 |      to all of these.  Basically, the statement in | 12:14 |
| 12 |      the paragraphs that explain it, the detailed | 12:14 |
| 13 |      paragraphs, 48 to 51, for example, with respect | 12:14 |
| 14 |      to bullet point 2 is correct.  And here I | 12:14 |
| 15 |      probably should have been more careful in | 12:14 |
| 16 |      stating it and stated that a prediction based | 12:14 |
| 17 |      on Professor Hauser's methodology yield the | 12:14 |
| 18 |      following. | 12:14 |
| 19 | BY MR. KUWAYTI: | 11:59 |
| 20 |      Q    Okay.  So here's an important question for | 12:14 |
| 21 | you:  You spend a lot of time with Dr. Hauser's | 12:15 |
| 22 | results, you and your team, correct? | 12:15 |
| 23 |      A    Yes. | 12:15 |
| 24 |      Q    Did you find that any of the predictions | 12:15 |
| 25 | that you're setting out in sections 1 and 2 of your | 12:15 |

Highly Confidential - Attorneys' Eyes Only

Page 93

1    report, did you find that any of those things        12:15

2    actually happened with the thousands of responses    12:15

3    that you had from these surveys?                      12:15

4         MR.  RAMOS:  Object to form.                     12:15

5    BY MR. KUWAYTI:                                       12:15

6      Q    Did you find people actually making these     12:15

7    choices?                                              12:15

8         MR.  RAMOS:  Object to form.                     12:15

9         THE WITNESS:  Let me try to understand the       12:15

10       question.  So the question is, then, to try to    12:15

11       look at the actual unconstrained respondent       12:15

12       judgments to the 16 stimuli.  So you have a       12:15

13       matrix of the -- 400-some respondents by the 16   12:15

14       kind of stimuli, basically the 16 screens; see    12:15

15       their actual choices; identify profiles which     12:16

16       are consistent with these predictions; and see    12:16

17       to what extent consumer actually in the raw       12:16

18       data chose it?  Is this your question?            12:16

19   BY MR. KUWAYTI:                                       11:59

20     Q    You're making my question a lot more          12:16

21   complicated than it has to be.  Let's back up a       12:16

22   second.                                               12:16

23     A    Okay.                                          12:16

24     Q    Okay.  You were given the task of             12:16

25   critiquing Dr. Hauser's report, correct?             12:16

Highly Confidential - Attorneys' Eyes Only

Page 94

1        A      No.   I was given the task to evaluate it.      12:16
2        Q      And so the first thing that you did was,       12:16
3    when you looked at these results before making these      12:16
4    predictions, the first thing you did was you looked       12:16
5    at these results and you looked at, did people            12:16
6    actually make irrational choices, right?  When they       12:16
7    responded to the survey, did any of those people          12:16
8    actually make the wrong choice where they chose a         12:16
9    clearly inferior phone and chose to pay more money        12:16
10   for it?                                                    12:16
11              Did you look at that?                           12:16
12       A      We did not look at that -- I thought            12:16
13   that's exactly what I was driving in my previous          12:17
14   answer.  To look at the actual results, it means          12:17
15   that to look at the actual data for each one of the       12:17
16   respondents, identify -- go back to the actual            12:17
17   stimuli that's presented for each respondent.  So         12:17
18   basically you have for each respondent the 16             12:17
19   screens and in each one of the 16 screens the full        12:17
20   profile of the four products that were presented;         12:17
21   look for specific profiles that match the items that      12:17
22   we identify here as inconsistent and see to what          12:17
23   extent the specific combination existed in the raw       12:17
24   data.  I have not done this.                               12:17
25              What we have done is we primarily               12:17

Highly Confidential - Attorneys' Eyes Only

Page 95

1    looked at the -- we used the same methodology that          12:17

2    Dr. Hauser used and used this, using exactly the            12:17

3    same approach he did, to try to say what will happen        12:17

4    in other situations.  And that's the prediction that        12:18

5    we report in this series of exhibits.                       12:18

6        Q    So you predict that, on page 25,                   12:18

7    32 percent of survey respondents would prefer to pay        12:18

8    a hundred --                                                12:18

9        A    I'm sorry.  Where are you?                         12:18

10       Q    Page 25, first bullet.                             12:18

11       A    Yes.                                               12:18

12       Q    You predict that 32 percent of survey             12:18

13   respondents would prefer to pay $199 rather than $99        12:18

14   for the benchmark smartphone, and you're not aware          12:18

15   of a single instance where anybody taking the survey        12:18

16   actually did that?                                          12:18

17       A    Well, the whole beauty of conjoint                12:18

18   analysis is that you can evaluate combinations              12:18

19   beyond the combinations given to the respondent.           12:18

20       Q    Okay.  I understand that you did that.            12:18

21   You went beyond that and you made predictions.             12:18

22            My question is, you're not aware of               12:18

23   any instance where even one person made the choice         12:18

24   that you're predicting would occur in actual fact?         12:18

25       A    I cannot answer it in terms of we were or         12:19

Highly Confidential - Attorneys' Eyes Only

Page 96

1    not.  We didn't do the analysis.  There may be a lot       12:19

2    of them.  We did not do this analysis.                     12:19

3        Q    You cannot report, you cannot sit here           12:19

4    today and report to the Court that there is even one       12:19

5    person who made that kind of irrational choice in          12:19

6    actual fact?                                               12:19

7        A    But you're missing the point.                    12:19

8        Q    Sorry, sir.  Answer yes or no, and then          12:19

9    you can give an explanation.  That's -- that's             12:19

10   right.                                                     12:19

11       A    Can you repeat the question, please.             12:19

12       Q    Yes.  You cannot sit here today and report        12:19

13   to the Court that there's even one person who made         12:19

14   that kind of irrational choice that you're                 12:19

15   predicting in your report, in actual fact?                 12:19

16       A    Nor can I report to the Court the opposite        12:19

17   of this.  I don't know.  We have not done this             12:19

18   analysis.  All I can report to the Court is                12:19

19   basically that using the methodology that Dr. Hauser       12:19

20   used, if you apply exactly the same methodology to         12:19

21   other combinations, other profiles, you're getting         12:19

22   nonsensical results.                                       12:20

23              And the beauty of conjoint analysis             12:20

24   is that it allows you to deal with any combinations        12:20

25   of the factors and levels presented and not limit          12:20

Highly Confidential - Attorneys' Eyes Only

Page 97

1    them only to the few items in the stimuli.            12:20

2              But what you're asking for, we can go      12:20

3    back and look at the actual individual-level          12:20

4    respondent and see if there were among the random    12:20

5    profiles that Dr. Hauser created, where there were   12:20

6    these type of profiles, and then I'll be able to      12:20

7    report if any or what is the number of respondent    12:20

8    that actually did make these irrational or kind of   12:20

9    basically nonsensical choices in their stimuli.      12:20

10             But this has to be done before he          12:20

11   adjusts this to the constraint.  So we have to look  12:20

12   at the unconstrained responses.                       12:20

13       Q    Right.  And you had those?                  12:20

14       A    Yes, but we didn't do it.                   12:20

15       Q    You could have done it; didn't do it?       12:20

16       A    Because I didn't find the necessary -- it   12:20

17   necessary to do it, given the nature of conjoint     12:20

18   analysis.  I think that given the nature of conjoint 12:20

19   analysis, the beauty of this is that ability to      12:21

20   evaluate all possible combinations of factors        12:21

21   involving all the factors and levels without going   12:21

22   back only to the items which are in the stimulus,    12:21

23   say.  But what you're asking for can easily be done. 12:21

24       Q    Now, to make the predictions that you did   12:21

25   make, you had to make certain assumptions, right?    12:21

Highly Confidential - Attorneys' Eyes Only

Page 101

1    somewhere that he also did a First Choice analysis.    12:25

2        Q    So you said you replicated exactly the    12:25

3    methodology that Dr. Hauser used?    12:25

4        A    Right.    12:25

5        Q    And Dr. Hauser used both Randomized First    12:25

6    Choice and First Choice simulations to test his    12:25

7    model, right?    12:25

8        A    No.  The report that he did, the results    12:25

9    he reports are based on the Randomized First Choice.    12:25

10   There is a footnote that he said that he also did a    12:26

11   First Choice, and he found no difference between the    12:26

12   two.  But the report itself and the numbers he's    12:26

13   relying on are the numbers of the Randomized First    12:26

14   Choice and not the First Choice.    12:26

15       Q    The report describes in the footnote that    12:26

16   he also did the first choice.    12:26

17       A    That's what I just said.    12:26

18       Q    Yes.  And did you do a First Choice    12:26

19   analysis since you were trying to do -- as you have    12:26

20   said many times in your responses, you were trying    12:26

21   to do exactly the methodology that Dr. Hauser used.    12:26

22   Did you also do a First Choice analysis as he did to    12:26

23   see what the difference would be?    12:26

24       A    No.  I basically did only the Randomized    12:26

25   First Choice because that's the one he relies on    12:26

Highly Confidential - Attorneys' Eyes Only

Page 102

1   mostly in his report.                               12:26

2       Q    So would it surprise you, Dr. Wind, to     12:26

3   find out that if you do your predictions and you    12:26

4   don't use a Randomized First Choice simulation where 12:26

5   you add this random error term, if you just use a    12:26

6   First Choice analysis and stick with the first       12:26

7   choices that people actually made in response to the 12:27

8   survey, that all of these nonsensical results        12:27

9   disappear?  Would that surprise you?                 12:27

10      A    It would surprise me, but I have no idea    12:27

11  because I have not done it.                           12:27

12      Q    If that's actually the case, does that      12:27

13  suggest that maybe there's some problem with the RFC  12:27

14  simulation that you did?                              12:27

15      A    If there's a problem with the RFC           12:27

16  simulation I did, then there should be a problem      12:27

17  with Dr. Hauser RFC simulation as well.               12:27

18      Q    How hard would it be for you to do, to run  12:27

19  the software to do the First Choice simulation as     12:27

20  Dr. Hauser did?                                       12:27

21      A    It's doable.                                 12:27

22      Q    I mean, how long does that take?            12:27

23      A    Not that long.  It can be done.            12:27

24      Q    In a day?                                    12:27

25      A    I don't know.  We have to look at the       12:27

Highly Confidential - Attorneys' Eyes Only

Page 103

1    setting of the data.  It can be done.  I have not        12:27

2    done it.                                                 12:27

3        Q    You have not done it.  Is one reason why        12:27

4    you didn't do it, Dr. Wind, because you believe that     12:27

5    if you used the Randomized First Choice method, you      12:27

6    were more likely to get this kind of nonsensical         12:28

7    result?                                                  12:28

8        A    No.  I had absolutely zero prediction when      12:28

9    I did this analysis.  The idea was basically just to     12:28

10   see what we get.  I was very surprised with the          12:28

11   results we got.  I did not expect to get so many         12:28

12   nonsensical responses.                                   12:28

13       Q    Now, in paragraph 52 of your report, you        12:28

14   also talk about the fact that, in your estimation,       12:28

15   the estimates of Professor Hauser of the WTP price       12:28

16   premium associated with the touchscreen features         12:28

17   examined exceed the $152 average smartphone price        12:28

18   paid by survey respondents.                              12:28

19            Do you see that?                                12:28

20       A    Yes.                                            12:28

21       Q    Now, let's just be clear how you get to         12:28

22   that result.  You're including -- in paragraph 52,       12:28

23   you're including the three patents that were at          12:28

24   issue in this lawsuit, the features associated with      12:28

25   them, which are rubber band and tap to recenter and      12:29

Highly Confidential - Attorneys' Eyes Only

Page 116

1    willingness to pay relates directly to demand on the        12:56

2    demand curve, right?                                         12:56

3              MR.  RAMOS:  Object to the form.                   12:56

4              THE WITNESS:  Most of the economic                 12:56

5         literature I'm familiar with talks about price,         12:56

6         not necessarily willingness to pay.                     12:56

7    BY MR. KUWAYTI:                                              12:56

8         Q    Well, do you have any doubt that I could           12:56

9    pull out a half dozen economic textbooks that define        12:56

10   the demand curve in terms of willingness to pay?            12:56

11        A    No.  And I have no doubt that I can find           12:56

12   half a dozen references in economic literature that         12:56

13   use other measures for price.  So it's one way of           12:56

14   measuring it.  It's not the only way of measuring           12:56

15   it.                                                          12:56

16             If you go purely to the economic, the              12:56

17   economic literature, then typically the focus is on         12:56

18   price versus quantity.                                       12:56

19        Q    And willingness to pay is one commonly             12:56

20   used definition in economic literature, one commonly        12:56

21   used method in economic literature for measuring            12:56

22   demand?                                                      12:56

23        A    It's one of the measures used.  I don't           12:56

24   know how common.  And I don't, you know, kind of            12:56

25   read all the current economic literature.  So it is         12:56

Highly Confidential - Attorneys' Eyes Only

Page 117

1   used.                                                          12:56

2              The critical question is, what is the              12:57

3   conceptual and the operational definitions of this            12:57

4   term?                                                          12:57

5      Q    It is an accepted definition -- in                     12:57

6   economic literature, one of the accepted definitions          12:57

7   for demand is based on willingness to pay, correct?           12:57

8      A    Yes.  But the question here -- all it                  12:57

9   does, it presents you a concept.  The question, to           12:57

10  be meaningful, has to go to the next level, two              12:57

11  levels, and ask, one, how is it defined                       12:57

12  conceptually?  And, two, and most critically, how is        12:57

13  it defined operationally?                                     12:57

14             Without these two, this is almost a               12:57

15  meaningless-type question.                                    12:57

16     Q    How you calculate the willingness to pay,            12:57

17  how you measure it?                                           12:57

18     A    Well, I think it's quite clear that we're            12:57

19  talking about what is the concept that you have over         12:57

20  willingness to pay and then what is the methodology          12:57

21  that you use to try to measure it.                            12:57

22     Q    If you look at page 40, page 40 of your              12:58

23  report --                                                     12:58

24     A    Yes.                                                  12:58

25     Q    -- you have a section of your report that           12:58

Highly Confidential - Attorneys' Eyes Only

Page 118

1   I'm going to ask you about that deals with what you      12:58

2   consider to be various design flaws in the scenario,     12:58

3   in Dr. Hauser's surveys.  And those are a subset of      12:58

4   this table, selective use of multi-media animations      12:58

5   in feature descriptions, lack of non-infringing          12:58

6   alternatives in survey design, respondents not           12:58

7   provided with a no-choice option, results are linked     12:58

8   to hypothetical spending scenarios, and survey           12:59

9   excludes several features critical to consumer           12:59

10  purchase decision.                                       12:59

11          Those are the design flaws that you             12:59

12  pointed to in your opinion in Dr. Hauser's study,        12:59

13  right?                                                   12:59

14      A    Correct.                                        12:59

15      Q    Now, in the case -- we've already talked        12:59

16  about a couple of these.  But I want to go to the        12:59

17  effect column that you have here.  For example, you      12:59

18  have in the bottom, the last one, survey excludes        12:59

19  several features critical to consumer purchase           12:59

20  decision.  As the effect there, you say, May bias        12:59

21  WTP upwards?                                             12:59

22      A    Correct.                                        12:59

23      Q    And that's the best you were able to            12:59

24  conclude on your review of Dr. Hauser's report and       12:59

25  the work that you did is that it may bias the WTP        12:59

Highly Confidential - Attorneys' Eyes Only

Page 129

1   willingness to pay, but he's basically trying to        01:12

2   estimate and conclude concerning the impact of these    01:12

3   four -- three features on the demand for the            01:12

4   product.                                                01:12

5               Willingness to pay is only an               01:12

6   intermediary measure.  It's not as critical.  I         01:12

7   think critical, the absolutely fatal flow that you      01:12

8   cannot conclude is if you try to estimate anything      01:12

9   as to the impact the features will have on consumer     01:13

10  demand, and you cannot do it without having             01:13

11  alternative brands in the context.                      01:13

12      Q    One of your other criticisms is that           01:13

13  Dr. Hauser didn't include a no-choice option --         01:13

14      A    Correct.                                        01:13

15      Q    -- measuring willingness to pay in doing       01:13

16  his survey.                                             01:13

17               And you've done conjoint analyses          01:13

18  where you didn't include a no-choice option,            01:13

19  correct?                                                01:13

20      A    If I do not include an explicit no choice      01:13

21  in my studies, I always use as a dependent variable     01:13

22  the likelihood to buy that includes zero, which         01:13

23  would -- basically is I'm not likely to buy it at       01:13

24  all, is the same as no choice, all the way to a         01:13

25  hundred.                                                01:13

Highly Confidential - Attorneys' Eyes Only

Page 130

1    So to rely -- the use of a likelihood   01:13
2  of buying, and especially in the context of a kind   01:13
3  of hybrid design, in a sense, assures that there is   01:14
4  always a no-choice-type option.   01:14
5    Q    Now, Dr. Wind, you know that in the   01:14
6  literature there are many articles that debate   01:14
7  whether including an outside option can bias --   01:14
8  including the outside option can actually bias the   01:14
9  survey and distort the results in some   01:14
10 circumstances, right?   01:14
11   A    I think there is mixed messages, if you   01:14
12 want to, in the literature.  The strongest study   01:14
13 that I think exists in this area is the Arzel [ph]   01:14
14 study that I'm referring to that clearly shows that   01:14
15 not including kind of a no option, none of these is   01:14
16 an option, does affect the price elasticity, which   01:14
17 is the most critical kind of input to our discussion   01:14
18 here, because it directly compares what happened to   01:14
19 the price elasticity with and without this option.   01:15
20   Q    But, as you said, there are mixed messages   01:15
21 in the literature.  There are many articles that   01:15
22 disagree with that.   01:15
23   A    I'm not sure many, but there are articles   01:15
24 that disagree with this in evaluating this area and   01:15
25 Paul Green, Abba Krieger and I have over the years   01:15

Highly Confidential - Attorneys' Eyes Only

Page 131

1   have done a number of studies that addresses this        01:15

2   issue as part of other kind of methodological            01:15

3   studies.  And the general conclusion is, if you're       01:15

4   trying to draw any conclusions concerning consumers      01:15

5   likely to buy a product in term of impact their          01:15

6   market share, which we typically look at, you have       01:15

7   to include this option.                                  01:15

8       Q    Now, Dr. Sukumar did not include an            01:15

9   outside option in his survey that he did?                01:15

10      A    I don't know.  I do not recall his study.       01:15

11      Q    I'm asking you to assume that he didn't.        01:15

12      A    Okay.                                            01:15

13      Q    We know, let's say for Dr. Sukumar's           01:15

14  survey, he only included the Samsung-patented            01:15

15  features.  He had no distraction features at all.        01:16

16  It was using -- it was hypothetical transactions.        01:16

17  It wasn't using actual dollars, and there were no        01:16

18  outside options.  So now you have these three things     01:16

19  combined.                                                01:16

20          Now, knowing those three things                 01:16

21  combined, do you think that Dr. Sukumar's study          01:16

22  cannot be relied upon to determine a willingness to      01:16

23  pay for the patented features in the smartphone and      01:16

24  tablet?  Just knowing those three things, is that        01:16

25  enough to say -- for you to say that study is not        01:16