Exhibit C

Highly Confidential - Attorneys' Eyes Only

1              UNITED STATES DISTRICT COURT
            STATE OF CALIFORNIA SAN JOSE DIVISION
2                       - - -
3

   APPLE INC., A CALIFORNIA
4  CORPORATION,
                  Plaintiff,
5

     vs.                    NO. 11-CV-01846-LHK
6

   SAMSUNG ELECTRONICS CO.,
7  LTD., A KOREAN BUSINESS
   ENTITY; SAMSUNG ELECTRONICS
8  AMERICA, INC., A NEW YORK
   CORPORATION; SAMSUNG
9  TELECOMMUNICATIONS AMERICA,
   LLC, A DELAWARE LIMITED
10 LIABILITY COMPANY,
11                  Defendants.
12
13
14

        VIDEOTAPED DEPOSITION OF YORAM (JERRY) WIND
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
                Philadelphia, Pennsylvania
16              Wednesday, November 7, 2012
17
18
19
20
21
22
23 Reported by:
24 Maureen Broderick, RPR
25 JOB NO. 55261

Highly Confidential - Attorneys' Eyes Only

Page 11

1    consumers buy the Samsung phones because of          10:08

2    these features.                                       10:08

3  BY MR. KUWAYTI:                                         10:08

4    Q    And I'm trying to get a little bit more          10:08

5  specific to understand what you mean by "drive          10:08

6  consumer demand" and how you understood your           10:08

7  assignment.                                             10:08

8            Were you trying to determine whether          10:08

9  these features were the sole reason that consumers      10:08

10 bought this product or a substantial reason, or         10:08

11 something else?                                          10:08

12           MR.  RAMOS:  Object to the form.              10:08

13           THE WITNESS:  I didn't look at it as          10:08

14    either sole or substantial.  It is basically to      10:08

15    what extent his study design allows one to           10:08

16    conclude what is the relative importance of          10:08

17    these features in determining consumers'             10:08

18    purchase decisions.                                  10:08

19 BY MR. KUWAYTI:                                          10:08

20   Q    So when you say "relative importance,"           10:08

21 determine whether the extent to which they're a         10:08

22 factor in the decision to purchase the product at       10:08

23 all?                                                     10:08

24   A    This, you know, is -- assuming that the          10:09

25 relative importance is zero, then they're not a         10:09

Highly Confidential - Attorneys' Eyes Only

Page 12

1   factor.  But we're not looking at 01.  We're looking         10:09

2   at this in terms of -- typically in marketing you            10:09

3   look in terms of what is the relative importance of          10:09

4   different features, benefits in determining consumer         10:09

5   buying decisions.                                            10:09

6       Q    Okay.  So if there are some consumers who          10:09

7   are buying the product, a product because of the             10:09

8   features, are those features driving demand?                 10:09

9       A    Well, for these respondents, for these             10:09

10  consumers, it will be one of the factors that               10:09

11  determines their purchase.  The question then is,           10:09

12  how important is it?                                         10:09

13                 (Reporter clarification.)                    10:09

14  BY MR. KUWAYTI:                                              10:09

15      Q    So as you understood the term "driving             10:09

16  demand," which you've used in your report in                10:10

17  paragraph 1, describing your assignment, if you             10:10

18  concluded that there were some consumers who were           10:10

19  buying smartphones or tablets because of these              10:10

20  features that Dr. Hauser tested, then that would            10:10

21  mean that those features were driving consumer              10:10

22  demand to some extent?                                       10:10

23      A    You cannot look at it without looking at           10:10

24  the relative importance.  It's not an absolutely 01,        10:10

25  as I mentioned before.  Everything in term of               10:10

Highly Confidential - Attorneys' Eyes Only

Page 13

1  consumer behavior is relative.  Consumers don't make      10:10

2  decisions based on a single factor in most cases.          10:10

3  And it's a combination of factors, features,               10:10

4  benefits, experiences, that lead to consumer buying        10:10

5  decision.                                                  10:10

6      Q    So let's probe that a little bit.  You say       10:10

7  consumers don't make decisions based on a single           10:10

8  factor in most cases.  Has that been your experience       10:10

9  in your decades of work in the marketing field?            10:11

10     A    Yes.                                              10:11

11     Q    And how many factors do consumers                10:11

12 typically look at when they're buying a product?           10:11

13     A    It varies all over, depending on the             10:11

14 product, depending on the situation, depending on          10:11

15 the consumers.  You know, you cannot generalize.           10:11

16     Q    Have you ever encountered a situation            10:11

17 where consumers are buying a product because of just       10:11

18 one reason?                                                10:11

19     A    I'm sure there are some consumers in some        10:11

20 context that may buy because of a single factor,           10:11

21 especially if the factor is something like a brand         10:11

22 as opposed to a feature.  But I have a hard time           10:11

23 kind of recalling any study that would show that           10:11

24 there are consumers who buy a product or service           10:11

25 because of one product feature.                            10:11

Highly Confidential - Attorneys' Eyes Only

Page 14

1    Q    So that would be very unusual in your          10:11

2    experience?                                         10:11

3    A    Correct.                                       10:11

4    Q    So if there are some consumers for whom        10:11

5    these features were a contributing factor in their  10:12

6    decision to purchase the product, is that -- under  10:12

7    your understanding, would that be driving consumer  10:12

8    demand?                                             10:12

9    A    Yes, it will qualify as contributing.  The     10:12

10   question then is, how important is it in term of    10:12

11   their decision?                                     10:12

12   Q    Okay.                                          10:12

13   A    And, again, I mentioned a number of times      10:12

14   it's not a 01, basically it's a relative            10:12

15   contribution.  And the question is then empirically, 10:12

16   you know, how important is it relative to other     10:12

17   factors?                                            10:12

18   Q    And how important does it have to be to be     10:12

19   driving consumer demand, in your understanding of   10:12

20   that term?                                          10:12

21   A    It has to be a significant enough factor.      10:12

22   It will, you know, kind of with the presence of this 10:12

23   factor, a consumer -- this will tilt consumer       10:12

24   preference, and they will buy this specific product 10:12

25   compared to another one that does not have this     10:13

Highly Confidential - Attorneys' Eyes Only

Page 19

1   this product versus other products they're            10:18

2   considering.                                          10:18

3       Q    So I just want to make sure that we're a      10:18

4   hundred percent clear, because to me the two things   10:18

5   that you said there are different.                    10:18

6           First, you said that a significant            10:18

7   number of consumers would consider these features to 10:18

8   be significant in their purchase of the product.      10:18

9   And then you went on to say that without these        10:18

10  features, they will not buy the product.              10:18

11          So is that what you were looking to           10:18

12  determine, whether if these features were absent,     10:18

13  consumers would not buy the product?  Is that your    10:19

14  definition of "consumer demand"?                      10:19

15          MR.  RAMOS:  Object to the form.              10:19

16          THE WITNESS:  Well, that's one operational    10:19

17      definition of what I meant by "significant."      10:19

18  So then we look at this as two separate things.       10:19

19      When I said "significant contribution," my        10:19

20      next sentence was explaining what "significant    10:19

21      contribution" means:  that without these          10:19

22      features, people will not buy; with these         10:19

23      features, people will buy them.                   10:19

24      And then you can also obviously try to            10:19

25      look in term of the question of, you know, kind   10:19

Highly Confidential - Attorneys' Eyes Only

Page 20

1    of, how much more would they be willing to pay      10:19

2    for a product with these features versus a          10:19

3    product without these features?                     10:19

4        So these are all ways of measuring              10:19

5    operationally the question of or the statement      10:19

6    that I made concerning significant                  10:19

7    contribution.                                       10:19

8  BY MR. KUWAYTI:                                        10:19

9    Q    How does the, how does measuring the           10:19

10   willingness to pay for a product with these features 10:19

11   relate to your question of determining whether it is 10:20

12   a feature that makes a significant contribution to   10:20

13   the purchaser's decision to purchase?                10:20

14   A    Well, if the people would be willing to         10:20

15   pay more for a product with the feature and actually 10:20

16   buy a product at a higher price, then obviously it   10:20

17   is indicated that this feature is important for them 10:20

18   and, therefore, it affects their willingness to buy  10:20

19   the product.                                         10:20

20   Q    To put it into a concrete term in terms         10:20

21   of -- let's say I'm buying a BMW and there are three 10:20

22   things about that BMW that really appeal to me above 10:20

23   everything else.  One is the brand.  One is the fact 10:20

24   that I think it's the best-looking car out there on  10:20

25   the market.  And the other is that I think           10:21

Highly Confidential - Attorneys' Eyes Only

Page 21

1  technically it's a terrific car.  And all three are          10:21

2  leading to my decision to buy the product.                   10:21

3          But, you know, I probably would                       10:21

4  still -- I would still buy that product if                   10:21

5  technically it wasn't quite as good because I think          10:21

6  it looks great and it's a BMW.  Would you say in             10:21

7  that scenario that the fact that the product is              10:21

8  technically good is something that is driving my             10:21

9  demand for the car?                                          10:21

10     A    Well, again, @consumer evaluation are               10:21

11 never done in abstract of other brands and other             10:21

12 options in the marketplace.  So the question is with         10:21

13 respect to the brand name, how do they value it, the         10:21

14 BMW versus Porsche, Mercedes and others; how they            10:21

15 evaluate the design, the look of the BMW versus              10:22

16 others; and how do they value the technical features         10:22

17 of the BMW versus other cars.  It's a relative               10:22

18 evaluation.                                                  10:22

19          And then if you're giving me --                      10:22

20 basically in your scenario it sounded like there are         10:22

21 two BMW cars:  One which is a brand look and                 10:22

22 superior technology; second option seems to be same         10:22

23 brand, same look, but not as good a technology as           10:22

24 the first one; and then the consumer in the real            10:22

25 world will make a choice, then, between these and           10:22

Highly Confidential - Attorneys' Eyes Only

Page 25

| | | |
|---|---|---|
| 1 | and toward experience and away from features. | 10:26 |
| 2 | Features are actually, in increasing | 10:26 |
| 3 | number of studies, are becoming less and less | 10:26 |
| 4 | critical factors in consumer purchases behavior. | 10:26 |
| 5 | And whether you look at a combination of features, | 10:26 |
| 6 | services, benefits, solution, the experience, look | 10:26 |
| 7 | at the totality of this, consumer buying decision is | 10:26 |
| 8 | a combination of a number of these and rarely, if | 10:27 |
| 9 | ever, a factor of one factor, let alone one feature. | 10:27 |
| 10 | Q    So if the test for driving consumer demand | 10:27 |
| 11 | were whether this one factor was the sole item | 10:27 |
| 12 | leading you to the -- leading a consumer to purchase | 10:27 |
| 13 | a product, that test would almost never be met? | 10:27 |
| 14 | MR. RAMOS:  Object to the form. | 10:27 |
| 15 | THE WITNESS:  I don't think I ever said | 10:27 |
| 16 | that the requirement needs to be a sole | 10:27 |
| 17 | determinant. | 10:27 |
| 18 | BY MR. KUWAYTI: | 10:27 |
| 19 | Q    Right. | 10:27 |
| 20 | A    I think from the beginning I emphasized | 10:27 |
| 21 | we're talking about relative importance.  And the | 10:27 |
| 22 | question then is, is the relative importance strong | 10:27 |
| 23 | enough, significant enough to tilt the decision?  So | 10:27 |
| 24 | when you're confronted with your two BMWs, the one | 10:27 |
| 25 | great brand, great look, superior technology, and | 10:27 |

Highly Confidential - Attorneys' Eyes Only

Page 26

1    the second which is the same brand, the same look,        10:27

2    but somewhat less kind of sophisticated or less good      10:27

3    technology, you know, kind of -- does the difference      10:28

4    in technology between the two change your decision?       10:28

5    And you'll decide, no; now that the level of the          10:28

6    technology is below, it's not good enough and I will      10:28

7    now look at other options in the marketplace.             10:28

8         Q    Right.  And I think, I think I understand       10:28

9    what you're saying.  But if the test for whether          10:28

10   something were driving consumer demand is whether         10:28

11   that was the sole determinant of the reason to            10:28

12   purchase the product, that test could almost never        10:28

13   be met in your experience?                                10:28

14        MR.  RAMOS:  Object to the form.                     10:28

15        THE WITNESS:  I would find it kind of                10:28

16        strange to find a factor that is a sole              10:28

17        determinant.  Perhaps with the exception I           10:28

18        mentioned before of a brand name, that a brand       10:28

19        name represents a totality of images,                10:28

20        associations, perceptions of a consumer of the      10:29

21        brand; and a consumer may decide, you know, BMW      10:29

22        is such a terrific brand; I will just go ahead       10:29

23        and buy a BMW kind of basically because, in          10:29

24        their mind, if you probe further, the BMW is a       10:29

25        very rich set of association with them.  So if       10:29

Highly Confidential - Attorneys' Eyes Only

Page 27

1        you probe further for the association, you'll      10:29

2        find out; and one of them may be technology.       10:29

3    BY MR. KUWAYTI:                                        10:29

4        Q    Okay.  Did you try to do your own conjoint    10:29

5    analysis in this case?                                 10:29

6        A    No.                                           10:29

7        Q    Did anybody on your team try to do an         10:29

8    analysis or a conjoint analysis?                       10:29

9        A    Not that I know.                              10:29

10       Q    Are you aware of anybody on your team or      10:29

11   not on your team that tried to replicate all or any    10:29

12   part of Dr. Hauser's survey with survey respondents?   10:29

13       A    Not that I know.                              10:29

14       Q    Did you consider doing another survey         10:29

15   to -- let me step back.                                10:29

16            You point out in your report that, in        10:30

17   your opinion, there are a number of design flaws       10:30

18   with Dr. Hauser's survey.  Did you consider doing      10:30

19   another survey in revising some of those flaws to      10:30

20   see what would happen?                                 10:30

21       A    No.  We didn't have time.  This was very,     10:30

22   you know, time-compressed.  And there was no way I     10:30

23   could have designed a survey in this time period.      10:30

24       Q    About how much time would have been needed    10:30

25   to do that?                                            10:30

Highly Confidential - Attorneys' Eyes Only

Page 28

1    A    You need, you need time to kind of design    10:30

2  a survey carefully and monitor it with the field and    10:30

3  analyze the results.  The fastest you can do    10:30

4  probably a meaningful conjoint analysis study will    10:30

5  be about six to eight weeks.  And the question is --    10:30

6  and this assumes that I had the time, and I did not    10:30

7  have the time to devote to this.    10:30

8    Q    Okay.  So if you didn't have anything else    10:31

9  on your plate, sounds like you could have done it.    10:31

10  It would have been tight, but you could have done    10:31

11  it?    10:31

12       MR.  RAMOS:  Object to the form.    10:31

13  BY MR. KUWAYTI:    10:31

14    Q    In the time since you were approached by    10:31

15  Samsung.    10:31

16    A    Yeah.  I was not asked to do the design,    10:31

17  nor did I propose it because I basically had many    10:31

18  other commitment and could not have done it.    10:31

19    Q    Do you know if Dr. Sukumar tried to do his    10:31

20  own conjoint survey testing these patented features,    10:31

21  the ones that were tested in Dr. Hauser's?    10:31

22    A    I heard his name, but I have no idea what    10:31

23  he did.    10:31

24    Q    Are you aware of any consideration that    10:31

25  was given by Samsung to replicating Dr. Hauser's    10:32

Highly Confidential - Attorneys' Eyes Only

Page 29

1   survey and modifying it to correct any of the flaws?      10:32

2        A    No, I have not heard of anything like           10:32

3   this.                                                      10:32

4        Q    In Paragraph 9 of your report --                10:32

5        A    Yes.                                             10:32

6        Q    -- you describe your experience with            10:32

7   conjoint analysis.                                         10:32

8        A    Correct.                                         10:32

9        Q    A number of the articles that you or            10:32

10  studies that you reference here are 35 years old or        10:32

11  older than that.  Are they still relevant today?           10:32

12       A    Well, if you go back to the original book        10:32

13  that Paul Green, Dr. Rao and I wrote, there's the          10:32

14  first book on conjoint analysis, it studies a lot of       10:32

15  the principles that still kind of hold.  And a lot         10:32

16  of the studies that were used, like if you look at         10:33

17  the Courtyard by Marriott, the design had been             10:33

18  replicated by Courtyard by Marriott a number of            10:33

19  times over the years following this.  And the design       10:33

20  is still applicable.                                       10:33

21            So the idea of some of the approaches            10:33

22  we used in like hybrid conjoint analysis and others        10:33

23  are still very relevant and are still being used           10:33

24  today.                                                     10:33

25       Q    Are there any of the articles that you           10:33

Highly Confidential - Attorneys' Eyes Only

Page 54

1   number will be five, five different measures.            11:11

2       Q    Now, in any of the real-life studies that      11:11

3   you've done with conjoint analysis, did the people       11:11

4   taking the survey use actual dollars as part of the      11:11

5   survey?                                                   11:11

6       A    I don't recall actual dollars, but the way     11:11

7   that the majority of my studies are designed, it's       11:11

8   typically focused on indicating the likelihood of        11:11

9   buying a product or service or whatever we're            11:11

10  looking at as opposed to just selecting kind of          11:12

11  basically a choice-base conjoint.                        11:12

12             So we're looking at the likelihood of         11:12

13  buying.  And we are setting the, the setting in term     11:12

14  of the framing of the questions in a way that try to     11:12

15  make it as realistic as possible within the, kind of     11:12

16  the budget constraint of the individuals involved.       11:12

17      Q    But these are hypothetical transactions         11:12

18  that the consumer is making; they're not actually        11:12

19  paying with actual dollars for the choices, right?       11:12

20      A    Correct.  In most of these cases, that's        11:12

21  correct.  But you're working --                          11:12

22      Q    In fact, in every case that you've been         11:12

23  involved in, it's been a hypothetical transaction.       11:12

24  You've never done a conjoint survey involving actual     11:12

25  dollars where consumers had to spend from money that     11:12

Highly Confidential - Attorneys' Eyes Only

Page 55

1    they had in making these choices, right?                11:12

2        A    I'm trying to kind of recall the different    11:13

3    studies we've done over the years.  I definitely       11:13

4    would agree that the vast majority of the studies      11:13

5    are not asking for real dollars.                       11:13

6        Q    You can't remember even one that you've       11:13

7    ever done -- out of all the conjoint analyses that     11:13

8    you've done, you can't remember even one, sitting      11:13

9    here today, where the consumers used actual dollars?   11:13

10       A    Actually I can remember one.                  11:13

11       Q    One.  In how many years you've been doing     11:13

12   this, 35, 40?                                          11:13

13       A    Since 1970.                                   11:13

14       Q    So in over 40 years of doing these            11:13

15   studies, there's one that you can remember where       11:13

16   consumers used actual dollars; otherwise, it was       11:13

17   hypothetical transactions?                             11:13

18       A    Well, the way we addressed the realism is     11:13

19   through the framing of the question, not by giving     11:13

20   them real dollars.                                     11:13

21       Q    And my question, Dr. Wind, is in over 40      11:13

22   years of doing these conjoint analyses, you can only   11:14

23   remember one that you've done where consumers used     11:14

24   actual dollars?                                        11:14

25       A    But actual dollar is not the only way to      11:14

Highly Confidential - Attorneys' Eyes Only

Page 56

1    assure the reality and the realism of the task as        11:14

2    opposed to play money.                                   11:14

3         Q    Great.  So you don't need to use actual        11:14

4    dollars in a conjoint survey to ensure the reality       11:14

5    and accuracy of the task and results, right?             11:14

6         A    Correct.  I did not say that you have to       11:14

7    use real dollars.                                        11:14

8         Q    And, in fact, you're not alone in this.        11:14

9    It's not as though you're the only person out there      11:14

10   who is not using actual dollars.  In fact, it's          11:14

11   extremely rare for anybody to use actual dollars in      11:14

12   a conjoint analysis, right?                              11:14

13        A    Correct.                                       11:14

14        Q    And despite that, conjoint analyses are        11:14

15   used, as you said, all the time and are a fixture in     11:14

16   the commercial world and real-life decisions are         11:14

17   based on them?                                           11:14

18        A    Because the real dollar is not the measure     11:14

19   of the realism.  The measure of does it represent        11:14

20   market reality and allow consumers to make               11:15

21   meaningful decisions depends on the framing of the       11:15

22   question and the context you're providing them.          11:15

23        Q    Right.  And the fact that real dollars are     11:15

24   not used is not something that impacts the accuracy      11:15

25   or reliability of the study?                             11:15

Highly Confidential - Attorneys' Eyes Only

Page 57

1      A     Correct.  Real dollars is not the factor.   11:15

The real factor is the realism of the framing of the   11:15

questions.   11:15

4           MR. KUWAYTI:  We've been going about an   11:15

5      hour.  Do you want to take a break?   11:15

6           THE WITNESS:  Real quick.   11:15

7           VIDEO OPERATOR:  This ends Videocassette   11:15

8      Tape No. 1 of the November 7, 2012 videotaped   11:15

9      deposition of Dr. Jerry Wind.   11:15

10          We're off the video record at 11:16 a.m.   11:15

11          (Brief recess.)   11:15

12          VIDEO OPERATOR:  This begins Videocassette   11:29

13     No. 2 of the November 7, 2012 videotaped   11:29

14     deposition of Dr. Jerry Wind.   11:29

15          We return to the video record at   11:29

16     11:29 a.m.   11:29

17   BY MR. KUWAYTI:   11:59

18     Q     If you turn to paragraph 12 of your expert   11:29

19   report in this case, Dr. Wind.   11:29

20     A     (Witness complies.)   11:29

21     Q     It is entitled Materials Reviewed and   11:29

22   Research Team.   11:29

23     A     Yes.   11:29

24     Q     And it describes, it says that in   11:29

25   appendix B to your report you list materials that   11:30

Highly Confidential - Attorneys' Eyes Only

Page 58

1  were reviewed and/or relied upon.  And my question    11:30

2  is, are those materials that you reviewed personally   11:30

3  or does it include materials that you reviewed and     11:30

4  that your team may have reviewed that you didn't       11:30

5  see?                                                   11:30

6      A    Let me look at appendix B, and I'll let      11:30

7  you know in a minute.                                  11:30

8      Q    Sure.                                         11:30

9      A    I think I've looked at all of these items    11:30

10 listed on appendix B.                                  11:30

11     Q    You looked at them personally?               11:30

12     A    Yes.                                          11:30

13     Q    So let's turn to appendix B.                 11:30

14     A    (Witness complies.)                          11:31

15     Q    And it lists, there's a category of legal    11:31

16 documents that you reviewed.  And it lists some of     11:31

17 the declarations that were submitted with Samsung's    11:31

18 opposition to this motion for a permanent             11:31

19 injunction.  Do you see that?  The declaration of     11:31

20 Dr. Van Dam, the declaration of Dr. Gray.             11:31

21     A    Right.                                        11:31

22     Q    And you reviewed those, right?               11:31

23     A    Briefly skimmed them.                         11:31

24     Q    There's also a declaration from a           11:31

25 Dr. Erdem, E-R-D-E-M.  Did you review her             11:31

Highly Confidential - Attorneys' Eyes Only

Page 75

1    of the factors but not for the other that created     11:53

2    the bias that I'm reporting on.                        11:53

3        Q    And in those animations -- you viewed the     11:53

4    animations, right?                                     11:53

5        A    Yes, I did.                                    11:53

6        Q    And in the animation relating to the '163     11:53

7    patent, the non-infringing alternative that            11:53

8    Dr. Hauser presented was, in fact, exactly the         11:53

9    non-infringing alternative that you describe in your   11:53

10   report, wasn't it?                                     11:53

11       A    And the '163 is -- I must tell you, I         11:53

12   think I found it very confusing the way the            11:53

13   animation was.  And one of the big problems with the   11:53

14   study, which I actually do not mention specifically    11:53

15   in the report, is that there was basically no way      11:53

16   that Dr. Hauser can actually tell if the consumer      11:54

17   really understood the stimuli that they were           11:54

18   presented with.  He relied on a pretest in the         11:54

19   beginning, but he really does not -- could have done   11:54

20   very easily, to ask each respondent to test to what    11:54

21   extent they really understood the context of this.     11:54

22            And I still viewed this animation a           11:54

23   few times to try to figure out what '163 patent is.    11:54

24   Very confusing where presenting it.                    11:54

25       Q    And part of the purpose of the pretest is     11:54

Highly Confidential - Attorneys' Eyes Only

Page 76

1    to make sure that respondents were understanding the    11:54

2    survey, right?    11:54

3         A    Yes.  But pretest is no replacement to --    11:54

4    in a correct survey to include another question.  It    11:54

5    could be done very, very simply to ask the    11:54

6    respondent for their understanding of the features.    11:54

7    An open-ended question could have easily been    11:54

8    inserted once the people saw this stimuli to say,    11:54

9    you know, What is your understanding of the specific    11:54

10   features we just discussed?  Or something along this    11:55

11   line.  This was not done.    11:55

12             And we have no idea to what extent    11:55

13   the consumers really understood what they saw there.    11:55

14        Q    And let me go back to my question, which    11:55

15   is the non-infringing alternative that Dr. Hauser    11:55

16   presented in those video animations for the '163    11:55

17   patent is, in fact, exactly what you describe in    11:55

18   your report as the Samsung design-around, the user    11:55

19   double-taps, zooms back out; and if they want to    11:55

20   recenter, they double-tap on that part of the screen    11:55

21   at that point?    11:55

22        A    For '163, if consumer understood it, yes.    11:55

23        Q    Okay.  And then for blue glow, for the    11:55

24   rubber-banding patent, do you recall the    11:55

25   non-infringing alternative that Dr. Hauser presented    11:55

Highly Confidential - Attorneys' Eyes Only

1    in the video the animations?                          11:55

2        A    Yeah.  He presented totally different        11:55

3    thing.  He presented red, complete border of red      11:56

4    which is totally different implication than coming     11:56

5    with an elegant, little, blue glow in the corner       11:56

6    when you touch it as opposed to this warning sign of   11:56

7    red all over, red frame.  So I don't think this is a   11:56

8    fair representation of the infringing alternative.     11:56

9        Q    So Dr. Hauser presented a non-infringing      11:56

10   alternative that had a glow of light around the        11:56

11   entire screen when you get to an edge, and Samsung's   11:56

12   non-infringing alternative is to have a glow of        11:56

13   light just around one side of the screen, right?       11:56

14          MR.  RAMOS:  Object to form.                    11:56

15          THE WITNESS:  Yes, but with one kind of --      11:56

16       you omitted one very important factor, that the    11:56

17       Samsung is light blue and the Dr. Hauser kind      11:56

18       of presentation of this is strong-red glow         11:56

19       around the entire frame, which sends a totally     11:56

20       different signal and is not an appropriate kind    11:56

21       of replacement for the Samsung approach.           11:56

22   BY MR. KUWAYTI:

23       Q    And why is it a totally different signal,     11:57

24   in your opinion?                                       11:57

25       A    It's a different stimulus.  When you look     11:57

Highly Confidential - Attorneys' Eyes Only

Page 78

1   at the light-blue glow that you get when you get to   11:57

2   the end, compare it to this red frame, it's a   11:57

3   totally different stimulus.  And we don't know how   11:57

4   consumers would react to the blue glow.   11:57

5       Q   So your position is that Dr. Hauser needed   11:57

6   to present exactly the Samsung design-around to do   11:57

7   this test?   11:57

8       MR.  RAMOS:  Object to form.   11:57

9   BY MR. KUWAYTI:   11:59

10       Q   To value, to determine how people value   11:57

11   the '163, you have to present precisely the same   11:57

12   design-around that Samsung chose to implement?   11:57

13       A   Well, he should have done a few things.   11:57

14   He should have, number one, tried to represent   11:57

15   accurately in the videos the alternative that   11:57

16   Samsung used and make sure that consumers understand   11:58

17   them.   11:58

18       Two, and most importantly, in the   11:58

19   stimuli, the screens, the 16 screens that each   11:58

20   respondent saw, it would have been very important to   11:58

21   include, not kind of to cross over basically to say   11:58

22   or no feature, but rather to present the   11:58

23   alternative.   11:58

24       So I think the problem is much more   11:58

25   serious with respect to the 16 screens that   11:58

Highly Confidential - Attorneys' Eyes Only

Page 79

1   consumers saw and not just the correction of the        11:58

2   videos that people saw once at the beginning.  We        11:58

3   don't know what they understood it to mean.              11:58

4       Q    Do you know how they would access the          11:58

5   videos from that screen of 16 if they wished to see      11:58

6   them again?                                              11:58

7       A    They could have clicked, but we have no         11:58

8   idea if they did actually watch it or not.               11:58

9       Q    Right.  So they -- if they were confused,       11:58

10  so the alternative was presented to them, explained      11:58

11  to them at the beginning, and then they were the 16      11:58

12  in the screen, and if they were confused or couldn't     11:59

13  remember what that alternative was, they could click     11:59

14  on the link and be shown the video again, right?         11:59

15  That's your understanding?                               11:59

16         MR.  RAMOS:  Object to form.                      11:59

17         THE WITNESS:  That's my understanding.            11:59

18      But basically this assumes that respondents and      11:59

19      Internet panel will take the time to do it.          11:59

20      And it also assumes that this will have more of      11:59

21      an impact on them than what they're seeing in        11:59

22      front of them, which is the stimulus, and the        11:59

23      stimulus screens that basically presented            11:59

24      clearly that the alternative is not having           11:59

25      these features at all.                               11:59

Highly Confidential - Attorneys' Eyes Only

Page 80

1  BY MR. KUWAYTI:                                      11:59

2     Q    Do you know, Dr. Wind, whether at the time  11:59

3  Dr. Hauser constructed his survey these             11:59

4  design-arounds were in the marketplace?             11:59

5     A    I don't know.  I don't know the exact time  12:00

6  when they were lunched.                             12:00

7     Q    So your report actually does not make       12:00

8  mention of the fact that Dr. Hauser presented these 12:00

9  non-infringing alternatives in the video animations,12:00

10 does it?                                             12:00

11    A    Correct.  Might have been oversight.  I     12:00

12 focused primarily on what I considered to be the    12:00

13 most important factors, which are the screens, the  12:00

14 16 stimuli screens.                                 12:00

15    Q    You didn't explain that to the Court,       12:00

16 that, in fact, when you say he didn't -- you say    12:00

17 here his non-infringing alternatives were to remove 12:00

18 the features from the device; you did not in your   12:00

19 report explain to the Court that, in fact,          12:00

20 non-infringing alternatives were presented for each 12:01

21 of the three patents in detail in video animations  12:01

22 to the respondents of this survey, right?           12:01

23         MR.  RAMOS:  Object to the form.            12:01

24 BY MR. KUWAYTI:                                      11:00

25    Q    Yes or no?                                  12:01

Highly Confidential - Attorneys' Eyes Only

Page 81

1      A     Correct.  I did not.  I did not mention        12:01

2  it.  It can easily be corrected.  But, again, my        12:01

3  understanding here and my view is that the two          12:01

4  problems that were mentioned before, that the           12:01

5  animation, we don't know how clear it was to the        12:01

6  respondent and, two, that the critical 16 screens       12:01

7  did not include any reference to alternative            12:01

8  designs.                                                12:01

9                  (Reporter clarification.)              12:01

10  BY MR. KUWAYTI:                                         12:01

11      Q     Yeah.  And that's a different problem than    12:01

12  you what describe in your report because here we're     12:01

13  quibbling about whether Dr. Hauser needed to not        12:01

14  just show consumers a detailed animation at the         12:01

15  beginning and when he presented the 16 alternatives,    12:01

16  give them a link if they were confused and wanted to    12:01

17  go back.  That's what we're arguing about, whether      12:02

18  that biased the survey, and not whether he just         12:02

19  failed to present non-infringing alternatives at        12:02

20  all.                                                    12:02

21              MR. RAMOS:  Object to form.                 12:02

22              THE WITNESS:  I lost you.  I thought that    12:02

23      he did fail --                                      12:02

24  BY MR. KUWAYTI:                                         12:02

25      Q     Let's strike the question.                    12:02

Highly Confidential - Attorneys' Eyes Only

Page 82

1      A     -- that he did fail to mention the        12:02

2    alternative design in the 16 screens.  The        12:02

3    16 screens do not mention, when people are looking  12:02

4    at it -- and if you think about this in term of a  12:02

5    typical respondent to an Internet patent all trying  12:02

6    to work as fast as they can to finish this, they're  12:02

7    focusing on the screens.  And the screens basically  12:02

8    did not mention the alternatives.  That's what I was  12:02

9    referring to.  If it's unclear, I'd be glad to       12:02

10   modify it to include this comment on the animation.  12:02

11   BY MR. KUWAYTI:                                      12:02

12      Q    And this could have been tested, right?     12:02

13   Dr. Hauser presented his results in March of this   12:02

14   year in his report, right?                          12:02

15      A    I did not see his report in March.  I saw   12:02

16   it much later.                                      12:02

17      Q    Right.  But Dr. Sukumar was Samsung's       12:03

18   expert at trial and critiqued Dr. Hauser's survey,  12:03

19   correct?                                            12:03

20      A    That's my understanding.                    12:03

21      Q    And Samsung has had the report since March  12:03

22   of 2012, correct?                                   12:03

23      A    That's my understanding.                    12:03

24      Q    And one way to determine, rather than sit   12:03

25   here and have you speculate as to whether people    12:03

Highly Confidential - Attorneys' Eyes Only

Page 87

| | | |
|---|---|---|
| 1 | studies.  I was asked primarily to evaluate | 12:07 |
| 2 | Professor Hauser study to the extent that he | 12:07 |
| 3 | would allow us to assess the statement we read | 12:07 |
| 4 | at the beginning, the objective of the study. | 12:07 |
| 5 | So realistically I could not have done it. | 12:07 |
| 6 | BY MR. KUWAYTI: | 12:07 |
| 7 | Q    You could not have done it? | 12:08 |
| 8 | A    I didn't have the time.  I didn't have the | 12:08 |
| 9 | time, nor was I kind of asked to try to do any other | 12:08 |
| 10 | studies in this area. | 12:08 |
| 11 | Q    You didn't have the time because you were | 12:08 |
| 12 | busy doing other things? | 12:08 |
| 13 | A    Correct. | 12:08 |
| 14 | Q    But in the two months you had, that's more | 12:08 |
| 15 | than enough time to have done such a test? | 12:08 |
| 16 | A    Assuming that you kind of draw everything | 12:08 |
| 17 | out of my life, yeah.  I've major other | 12:08 |
| 18 | responsibilities at the university, and I could not | 12:08 |
| 19 | have devoted the time to do it. | 12:08 |
| 20 | Q    Since you've referenced it, why don't we | 12:08 |
| 21 | turn to the section of your report beginning with | 12:08 |
| 22 | paragraph 46 where you describe these inconsistent | 12:08 |
| 23 | results or nonsensical predictions, as you describe | 12:08 |
| 24 | them. | 12:08 |
| 25 | Now, in paragraphs -- in this section | 12:09 |

Highly Confidential - Attorneys' Eyes Only

Page 88

| | | |
|---|---|---|
| 1 | of your report, B1 and 2, what you are describing | 12:09 |
| 2 | here are predictions that you performed using the | 12:09 |
| 3 | results, right? | 12:09 |
| 4 | A    I'm not sure of the use of the word | 12:09 |
| 5 | "predictions."  I replicated basically Professor | 12:09 |
| 6 | Hauser's approach with respect to the other | 12:09 |
| 7 | scenarios and show basically the results we get are | 12:09 |
| 8 | basically counterintuitive, counter common sense, | 12:09 |
| 9 | nonsensical, whatever term you want to use. | 12:09 |
| 10 | Q    So when I use the word "predictions," I'm | 12:09 |
| 11 | actually using your word, sir.  You say in | 12:09 |
| 12 | paragraph 46 at the very beginning, In order to | 12:09 |
| 13 | further evaluate the reliability and validity of | 12:09 |
| 14 | Professor Hauser's WTP price premium estimates, I | 12:09 |
| 15 | employed the RFC simulation technique underlying | 12:10 |
| 16 | those estimates to evaluate predictions, not | 12:10 |
| 17 | reported by Professor Hauser in his report. | 12:10 |
| 18 | A    You're correct. | 12:10 |
| 19 | Q    And then again when you describe Exhibit 9 | 12:10 |
| 20 | to your report, you say Exhibit 9 shows specific | 12:10 |
| 21 | predictions of the RFC simulation, right? | 12:10 |
| 22 | A    You're correct. | 12:10 |
| 23 | Q    Okay.  So you're reporting predictions | 12:10 |
| 24 | that you think are nonsensical, not actual results | 12:10 |
| 25 | of the survey, not actual responses from the people | 12:10 |

Highly Confidential - Attorneys' Eyes Only

Page 89

1   who took the survey?                                    12:10

2       A    Correct.   That's what I meant by saying we   12:10

3   replicated his approach.   And if you look at the      12:10

4   actual exhibits, we kind of basically replicated       12:10

5   what he has done, but with respect to these new        12:10

6   scenarios.                                             12:10

7       Q    So when you say at page 25 that 32 percent    12:10

8   of survey respondents would prefer to pay $199         12:10

9   rather than $99 for the benchmark smart phone -- do    12:11

10  you see that?                                          12:11

11      A    Yes.                                          12:11

12      Q    -- you're not saying that 32 percent of       12:11

13  people who took the survey actually preferred to pay   12:11

14  $199 rather than $99 for the benchmark smartphone,     12:11

15  you're saying that you predict, based on the           12:11

16  results, that that would happen?                       12:11

17      A    Correct.   Using his methodology.   And the   12:11

18  inference -- to go back to our previous discussion,    12:11

19  and the reason -- one of the reasons you can get it    12:11

20  is, my inference is basically the consumers, when      12:11

21  they were confronted with the actual task of           12:11

22  choosing one of the product on each one of the         12:11

23  screens, that they were inconsistent in their          12:11

24  judgment when they chose the 16 choices they made.     12:11

25      Q    I'm going to ask you, if you can, to try      12:11

Highly Confidential - Attorneys' Eyes Only

Page 90

| | | |
|---|---|---|
| 1 | to limit your responses to my question.  Some of | 12:11 |
| 2 | your responses are quite long, and I understand you | 12:11 |
| 3 | have a view that you want to get out, which is | 12:12 |
| 4 | expressed in the report.  But we have limited time. | 12:12 |
| 5 | If you could try to focus on the question, I would | 12:12 |
| 6 | appreciate it. | 12:12 |
| 7 | So when you say similarly in the | 12:12 |
| 8 | second bullet, 43 percent of survey respondents | 12:12 |
| 9 | would prefer to pay $99 rather than $0 for the | 12:12 |
| 10 | benchmark smartphone, you're not saying that | 12:12 |
| 11 | actually happened, that 43 percent of people who | 12:12 |
| 12 | took the survey actually made that choice; you're | 12:12 |
| 13 | saying you predict that that's what would happen? | 12:12 |
| 14 | A    Correct.  Based on Dr. Hauser's | 12:12 |
| 15 | methodology. | 12:12 |
| 16 | Q    And that's the same for all of these | 12:12 |
| 17 | bullets on paragraph 25, right? | 12:12 |
| 18 | A    Correct. | 12:12 |
| 19 | Q    And it's the same for the -- when you say | 12:12 |
| 20 | that you have qualitatively similar predictions | 12:12 |
| 21 | associated with Professor Hauser's tablet analysis, | 12:12 |
| 22 | those are also predictions, not actual results? | 12:12 |
| 23 | A    Correct. | 12:12 |
| 24 | Q    And it's the same in section 2 of your | 12:12 |
| 25 | report; you say you employed the RFC simulation to | 12:12 |

Highly Confidential - Attorneys' Eyes Only

Page 91

1    generate predictions involving pairs of smartphones    12:12

2    where one is clearly superior to another.  In that     12:13

3    section as well, you're not reporting actual           12:13

4    results; you're reporting predictions that you made,   12:13

5    right?                                                 12:13

6         A    Correct; using Dr. Hauser's methodology.     12:13

7         Q    And if we turn back to paragraph 15 of       12:13

8    your report and we look at the bullet, first bullet    12:13

9    at the bottom of the page, you say, As many as         12:13

10   43 percent of survey respondents chose to purchase     12:13

11   smartphones or tablets that were priced higher than    12:13

12   an identical lower-priced device.                      12:13

13              Do you see that?                            12:13

14        A    Yes, I see.                                  12:13

15        Q    In fact, that's not an accurate way to say   12:13

16   that, right?  What you're really saying is that you    12:13

17   predict that 43 percent of survey respondents would    12:13

18   choose to purchase?                                    12:13

19        A    Correct.  That's, that's what we actually    12:13

20   state explicitly in the paragraphs that I mentioned    12:13

21   there:  See paragraph 46 to 47.  But you're correct;   12:14

22   that should have been more careful in the wording of   12:14

23   this bullet point.                                     12:14

24        Q    Right.  If you could go back today, you      12:14

25   would change that, right?                              12:14

Highly Confidential - Attorneys' Eyes Only

Page 92

| | | |
|---|---|---|
| 1 | A    Correct. | 12:14 |
| 2 | Q    Same thing with the next bullet on | 12:14 |
| 3 | paragraph 9 when you say, As many as 35 percent of | 12:14 |
| 4 | respondents preferred, clearly in theory, yet | 12:14 |
| 5 | identically-priced devices, that also isn't really | 12:14 |
| 6 | phrased accurately; you should have said your | 12:14 |
| 7 | prediction is that as many as 35 percent would | 12:14 |
| 8 | prefer? | 12:14 |
| 9 | MR.  RAMOS:  Object to form. | 12:14 |
| 10 | THE WITNESS:  Correct.  The same applies | 12:14 |
| 11 | to all of these.  Basically, the statement in | 12:14 |
| 12 | the paragraphs that explain it, the detailed | 12:14 |
| 13 | paragraphs, 48 to 51, for example, with respect | 12:14 |
| 14 | to bullet point 2 is correct.  And here I | 12:14 |
| 15 | probably should have been more careful in | 12:14 |
| 16 | stating it and stated that a prediction based | 12:14 |
| 17 | on Professor Hauser's methodology yield the | 12:14 |
| 18 | following. | 12:14 |
| 19 | BY MR. KUWAYTI: | 11:59 |
| 20 | Q    Okay.  So here's an important question for | 12:14 |
| 21 | you:  You spend a lot of time with Dr. Hauser's | 12:15 |
| 22 | results, you and your team, correct? | 12:15 |
| 23 | A    Yes. | 12:15 |
| 24 | Q    Did you find that any of the predictions | 12:15 |
| 25 | that you're setting out in sections 1 and 2 of your | 12:15 |

Highly Confidential - Attorneys' Eyes Only

Page 93

1   report, did you find that any of those things          12:15

2   actually happened with the thousands of responses      12:15

3   that you had from these surveys?                       12:15

4          MR.  RAMOS:  Object to form.                    12:15

5   BY MR. KUWAYTI:                                         12:15

6      Q    Did you find people actually making these      12:15

7   choices?                                               12:15

8          MR.  RAMOS:  Object to form.                    12:15

9          THE WITNESS:  Let me try to understand the      12:15

10       question.  So the question is, then, to try to    12:15

11       look at the actual unconstrained respondent       12:15

12       judgments to the 16 stimuli.  So you have a       12:15

13       matrix of the -- 400-some respondents by the 16   12:15

14       kind of stimuli, basically the 16 screens; see    12:15

15       their actual choices; identify profiles which     12:16

16       are consistent with these predictions; and see    12:16

17       to what extent consumer actually in the raw       12:16

18       data chose it?  Is this your question?            12:16

19   BY MR. KUWAYTI:                                        11:59

20      Q    You're making my question a lot more          12:16

21   complicated than it has to be.  Let's back up a       12:16

22   second.                                               12:16

23      A    Okay.                                          12:16

24      Q    Okay.  You were given the task of             12:16

25   critiquing Dr. Hauser's report, correct?              12:16

Highly Confidential - Attorneys' Eyes Only

Page 94

```
 1       A     No.  I was given the task to evaluate it.      12:16
 2       Q     And so the first thing that you did was,       12:16
 3   when you looked at these results before making these     12:16
 4   predictions, the first thing you did was you looked      12:16
 5   at these results and you looked at, did people           12:16
 6   actually make irrational choices, right?  When they      12:16
 7   responded to the survey, did any of those people         12:16
 8   actually make the wrong choice where they chose a        12:16
 9   clearly inferior phone and chose to pay more money       12:16
10   for it?                                                  12:16
11              Did you look at that?                         12:16
12       A     We did not look at that -- I thought           12:16
13   that's exactly what I was driving in my previous         12:17
14   answer.  To look at the actual results, it means         12:17
15   that to look at the actual data for each one of the      12:17
16   respondents, identify -- go back to the actual           12:17
17   stimuli that's presented for each respondent.  So        12:17
18   basically you have for each respondent the 16            12:17
19   screens and in each one of the 16 screens the full       12:17
20   profile of the four products that were presented;        12:17
21   look for specific profiles that match the items that     12:17
22   we identify here as inconsistent and see to what         12:17
23   extent the specific combination existed in the raw       12:17
24   data.  I have not done this.                             12:17
25              What we have done is we primarily             12:17
```

Highly Confidential - Attorneys' Eyes Only

Page 95

1  looked at the -- we used the same methodology that      12:17

2  Dr. Hauser used and used this, using exactly the        12:17

3  same approach he did, to try to say what will happen    12:17

4  in other situations.  And that's the prediction that    12:18

5  we report in this series of exhibits.                   12:18

6      Q    So you predict that, on page 25,              12:18

7  32 percent of survey respondents would prefer to pay    12:18

8  a hundred --                                            12:18

9      A    I'm sorry.  Where are you?                    12:18

10     Q    Page 25, first bullet.                         12:18

11     A    Yes.                                           12:18

12     Q    You predict that 32 percent of survey          12:18

13 respondents would prefer to pay $199 rather than $99    12:18

14 for the benchmark smartphone, and you're not aware      12:18

15 of a single instance where anybody taking the survey    12:18

16 actually did that?                                      12:18

17     A    Well, the whole beauty of conjoint             12:18

18 analysis is that you can evaluate combinations          12:18

19 beyond the combinations given to the respondent.        12:18

20     Q    Okay.  I understand that you did that.         12:18

21 You went beyond that and you made predictions.          12:18

22          My question is, you're not aware of            12:18

23 any instance where even one person made the choice      12:18

24 that you're predicting would occur in actual fact?      12:18

25     A    I cannot answer it in terms of we were or      12:19

Highly Confidential - Attorneys' Eyes Only

Page 96

1    not.  We didn't do the analysis.  There may be a lot        12:19

2    of them.  We did not do this analysis.                      12:19

3        Q    You cannot report, you cannot sit here            12:19

4    today and report to the Court that there is even one        12:19

5    person who made that kind of irrational choice in           12:19

6    actual fact?                                                12:19

7        A    But you're missing the point.                     12:19

8        Q    Sorry, sir.  Answer yes or no, and then           12:19

9    you can give an explanation.  That's -- that's              12:19

10   right.                                                      12:19

11       A    Can you repeat the question, please.              12:19

12       Q    Yes.  You cannot sit here today and report        12:19

13   to the Court that there's even one person who made          12:19

14   that kind of irrational choice that you're                  12:19

15   predicting in your report, in actual fact?                  12:19

16       A    Nor can I report to the Court the opposite         12:19

17   of this.  I don't know.  We have not done this              12:19

18   analysis.  All I can report to the Court is                 12:19

19   basically that using the methodology that Dr. Hauser        12:19

20   used, if you apply exactly the same methodology to          12:19

21   other combinations, other profiles, you're getting         12:19

22   nonsensical results.                                        12:20

23                And the beauty of conjoint analysis            12:20

24   is that it allows you to deal with any combinations         12:20

25   of the factors and levels presented and not limit          12:20

Highly Confidential - Attorneys' Eyes Only

Page 97

| | | |
|---|---|---|
| 1 | them only to the few items in the stimuli. | 12:20 |
| 2 | But what you're asking for, we can go | 12:20 |
| 3 | back and look at the actual individual-level | 12:20 |
| 4 | respondent and see if there were among the random | 12:20 |
| 5 | profiles that Dr. Hauser created, where there were | 12:20 |
| 6 | these type of profiles, and then I'll be able to | 12:20 |
| 7 | report if any or what is the number of respondent | 12:20 |
| 8 | that actually did make these irrational or kind of | 12:20 |
| 9 | basically nonsensical choices in their stimuli. | 12:20 |
| 10 | But this has to be done before he | 12:20 |
| 11 | adjusts this to the constraint.  So we have to look | 12:20 |
| 12 | at the unconstrained responses. | 12:20 |
| 13 | Q    Right.  And you had those? | 12:20 |
| 14 | A    Yes, but we didn't do it. | 12:20 |
| 15 | Q    You could have done it; didn't do it? | 12:20 |
| 16 | A    Because I didn't find the necessary -- it | 12:20 |
| 17 | necessary to do it, given the nature of conjoint | 12:20 |
| 18 | analysis.  I think that given the nature of conjoint | 12:20 |
| 19 | analysis, the beauty of this is that ability to | 12:21 |
| 20 | evaluate all possible combinations of factors | 12:21 |
| 21 | involving all the factors and levels without going | 12:21 |
| 22 | back only to the items which are in the stimulus, | 12:21 |
| 23 | say.  But what you're asking for can easily be done. | 12:21 |
| 24 | Q    Now, to make the predictions that you did | 12:21 |
| 25 | make, you had to make certain assumptions, right? | 12:21 |

Highly Confidential - Attorneys' Eyes Only

Page 101

1    somewhere that he also did a First Choice analysis.      12:25

2        Q    So you said you replicated exactly the      12:25

3    methodology that Dr. Hauser used?      12:25

4        A    Right.      12:25

5        Q    And Dr. Hauser used both Randomized First      12:25

6    Choice and First Choice simulations to test his      12:25

7    model, right?      12:25

8        A    No.  The report that he did, the results      12:25

9    he reports are based on the Randomized First Choice.      12:25

10   There is a footnote that he said that he also did a      12:26

11   First Choice, and he found no difference between the      12:26

12   two.  But the report itself and the numbers he's      12:26

13   relying on are the numbers of the Randomized First      12:26

14   Choice and not the First Choice.      12:26

15       Q    The report describes in the footnote that      12:26

16   he also did the first choice.      12:26

17       A    That's what I just said.      12:26

18       Q    Yes.  And did you do a First Choice      12:26

19   analysis since you were trying to do -- as you have      12:26

20   said many times in your responses, you were trying      12:26

21   to do exactly the methodology that Dr. Hauser used.      12:26

22   Did you also do a First Choice analysis as he did to      12:26

23   see what the difference would be?      12:26

24       A    No.  I basically did only the Randomized      12:26

25   First Choice because that's the one he relies on      12:26

Highly Confidential - Attorneys' Eyes Only

Page 102

1    mostly in his report.                              12:26

2       Q    So would it surprise you, Dr. Wind, to     12:26

3    find out that if you do your predictions and you   12:26

4    don't use a Randomized First Choice simulation where 12:26

5    you add this random error term, if you just use a  12:26

6    First Choice analysis and stick with the first     12:26

7    choices that people actually made in response to the 12:27

8    survey, that all of these nonsensical results      12:27

9    disappear?  Would that surprise you?               12:27

10      A    It would surprise me, but I have no idea   12:27

11   because I have not done it.                        12:27

12      Q    If that's actually the case, does that     12:27

13   suggest that maybe there's some problem with the RFC 12:27

14   simulation that you did?                           12:27

15      A    If there's a problem with the RFC         12:27

16   simulation I did, then there should be a problem   12:27

17   with Dr. Hauser RFC simulation as well.            12:27

18      Q    How hard would it be for you to do, to run 12:27

19   the software to do the First Choice simulation as  12:27

20   Dr. Hauser did?                                    12:27

21      A    It's doable.                               12:27

22      Q    I mean, how long does that take?           12:27

23      A    Not that long.  It can be done.            12:27

24      Q    In a day?                                  12:27

25      A    I don't know.  We have to look at the      12:27

Highly Confidential - Attorneys' Eyes Only

Page 103

1    setting of the data.  It can be done.  I have not          12:27

2    done it.                                                   12:27

3         Q    You have not done it.  Is one reason why        12:27

4    you didn't do it, Dr. Wind, because you believe that      12:27

5    if you used the Randomized First Choice method, you       12:27

6    were more likely to get this kind of nonsensical          12:28

7    result?                                                   12:28

8         A    No.  I had absolutely zero prediction when      12:28

9    I did this analysis.  The idea was basically just to      12:28

10   see what we get.  I was very surprised with the           12:28

11   results we got.  I did not expect to get so many          12:28

12   nonsensical responses.                                    12:28

13        Q    Now, in paragraph 52 of your report, you        12:28

14   also talk about the fact that, in your estimation,        12:28

15   the estimates of Professor Hauser of the WTP price        12:28

16   premium associated with the touchscreen features          12:28

17   examined exceed the $152 average smartphone price         12:28

18   paid by survey respondents.                               12:28

19              Do you see that?                               12:28

20        A    Yes.                                            12:28

21        Q    Now, let's just be clear how you get to         12:28

22   that result.  You're including -- in paragraph 52,        12:28

23   you're including the three patents that were at           12:28

24   issue in this lawsuit, the features associated with       12:28

25   them, which are rubber band and tap to recenter and       12:29

Highly Confidential - Attorneys' Eyes Only

Page 116

1    willingness to pay relates directly to demand on the       12:56

2    demand curve, right?                                       12:56

3            MR.  RAMOS:  Object to the form.                   12:56

4            THE WITNESS:  Most of the economic                 12:56

5        literature I'm familiar with talks about price,        12:56

6        not necessarily willingness to pay.                    12:56

7    BY MR. KUWAYTI:                                             12:56

8        Q    Well, do you have any doubt that I could          12:56

9    pull out a half dozen economic textbooks that define       12:56

10   the demand curve in terms of willingness to pay?           12:56

11       A    No.  And I have no doubt that I can find          12:56

12   half a dozen references in economic literature that        12:56

13   use other measures for price.  So it's one way of          12:56

14   measuring it.  It's not the only way of measuring          12:56

15   it.                                                        12:56

16            If you go purely to the economic, the             12:56

17   economic literature, then typically the focus is on        12:56

18   price versus quantity.                                     12:56

19       Q    And willingness to pay is one commonly            12:56

20   used definition in economic literature, one commonly       12:56

21   used method in economic literature for measuring           12:56

22   demand?                                                    12:56

23       A    It's one of the measures used.  I don't           12:56

24   know how common.  And I don't, you know, kind of           12:56

25   read all the current economic literature.  So it is        12:56

Highly Confidential - Attorneys' Eyes Only

Page 117

1   used.                                                    12:56

2            The critical question is, what is the           12:57

3   conceptual and the operational definitions of this       12:57

4   term?                                                     12:57

5       Q    It is an accepted definition -- in              12:57

6   economic literature, one of the accepted definitions     12:57

7   for demand is based on willingness to pay, correct?      12:57

8       A    Yes.  But the question here -- all it           12:57

9   does, it presents you a concept.  The question, to       12:57

10  be meaningful, has to go to the next level, two          12:57

11  levels, and ask, one, how is it defined                  12:57

12  conceptually?  And, two, and most critically, how is     12:57

13  it defined operationally?                                12:57

14            Without these two, this is almost a            12:57

15  meaningless-type question.                               12:57

16      Q    How you calculate the willingness to pay,       12:57

17  how you measure it?                                       12:57

18      A    Well, I think it's quite clear that we're       12:57

19  talking about what is the concept that you have over     12:57

20  willingness to pay and then what is the methodology      12:57

21  that you use to try to measure it.                        12:57

22      Q    If you look at page 40, page 40 of your         12:58

23  report --                                                12:58

24      A    Yes.                                            12:58

25      Q    -- you have a section of your report that       12:58

Highly Confidential - Attorneys' Eyes Only

Page 118

| | | |
|---|---|---|
| 1 | I'm going to ask you about that deals with what you | 12:58 |
| 2 | consider to be various design flaws in the scenario, | 12:58 |
| 3 | in Dr. Hauser's surveys.  And those are a subset of | 12:58 |
| 4 | this table, selective use of multi-media animations | 12:58 |
| 5 | in feature descriptions, lack of non-infringing | 12:58 |
| 6 | alternatives in survey design, respondents not | 12:58 |
| 7 | provided with a no-choice option, results are linked | 12:58 |
| 8 | to hypothetical spending scenarios, and survey | 12:59 |
| 9 | excludes several features critical to consumer | 12:59 |
| 10 | purchase decision. | 12:59 |
| 11 | Those are the design flaws that you | 12:59 |
| 12 | pointed to in your opinion in Dr. Hauser's study, | 12:59 |
| 13 | right? | 12:59 |
| 14 | A    Correct. | 12:59 |
| 15 | Q    Now, in the case -- we've already talked | 12:59 |
| 16 | about a couple of these.  But I want to go to the | 12:59 |
| 17 | effect column that you have here.  For example, you | 12:59 |
| 18 | have in the bottom, the last one, survey excludes | 12:59 |
| 19 | several features critical to consumer purchase | 12:59 |
| 20 | decision.  As the effect there, you say, May bias | 12:59 |
| 21 | WTP upwards? | 12:59 |
| 22 | A    Correct. | 12:59 |
| 23 | Q    And that's the best you were able to | 12:59 |
| 24 | conclude on your review of Dr. Hauser's report and | 12:59 |
| 25 | the work that you did is that it may bias the WTP | 12:59 |

Highly Confidential - Attorneys' Eyes Only

Page 129

1    willingness to pay, but he's basically trying to        01:12

2    estimate and conclude concerning the impact of these    01:12

3    four -- three features on the demand for the            01:12

4    product.                                                01:12

5              Willingness to pay is only an                 01:12

6    intermediary measure.  It's not as critical.  I         01:12

7    think critical, the absolutely fatal flow that you      01:12

8    cannot conclude is if you try to estimate anything      01:12

9    as to the impact the features will have on consumer     01:13

10   demand, and you cannot do it without having             01:13

11   alternative brands in the context.                      01:13

12       Q    One of your other criticisms is that           01:13

13   Dr. Hauser didn't include a no-choice option --         01:13

14       A    Correct.                                       01:13

15       Q    -- measuring willingness to pay in doing       01:13

16   his survey.                                             01:13

17              And you've done conjoint analyses            01:13

18   where you didn't include a no-choice option,            01:13

19   correct?                                                01:13

20       A    If I do not include an explicit no choice      01:13

21   in my studies, I always use as a dependent variable     01:13

22   the likelihood to buy that includes zero, which         01:13

23   would -- basically is I'm not likely to buy it at       01:13

24   all, is the same as no choice, all the way to a         01:13

25   hundred.                                                01:13

Highly Confidential - Attorneys' Eyes Only

Page 130

1          So to rely -- the use of a likelihood     01:13

2    of buying, and especially in the context of a kind    01:13

3    of hybrid design, in a sense, assures that there is    01:14

4    always a no-choice-type option.                01:14

5       Q    Now, Dr. Wind, you know that in the        01:14

6    literature there are many articles that debate    01:14

7    whether including an outside option can bias --    01:14

8    including the outside option can actually bias the    01:14

9    survey and distort the results in some        01:14

10   circumstances, right?                    01:14

11      A    I think there is mixed messages, if you    01:14

12   want to, in the literature.  The strongest study    01:14

13   that I think exists in this area is the Arzel [ph]    01:14

14   study that I'm referring to that clearly shows that    01:14

15   not including kind of a no option, none of these is    01:14

16   an option, does affect the price elasticity, which    01:14

17   is the most critical kind of input to our discussion    01:14

18   here, because it directly compares what happened to    01:14

19   the price elasticity with and without this option.    01:15

20      Q    But, as you said, there are mixed messages    01:15

21   in the literature.  There are many articles that    01:15

22   disagree with that.                    01:15

23      A    I'm not sure many, but there are articles    01:15

24   that disagree with this in evaluating this area and    01:15

25   Paul Green, Abba Krieger and I have over the years    01:15

Highly Confidential - Attorneys' Eyes Only

Page 131

1    have done a number of studies that addresses this        01:15

2    issue as part of other kind of methodological            01:15

3    studies.  And the general conclusion is, if you're       01:15

4    trying to draw any conclusions concerning consumers      01:15

5    likely to buy a product in term of impact their          01:15

6    market share, which we typically look at, you have       01:15

7    to include this option.                                  01:15

8         Q    Now, Dr. Sukumar did not include an            01:15

9    outside option in his survey that he did?                01:15

10        A    I don't know.  I do not recall his study.       01:15

11        Q    I'm asking you to assume that he didn't.        01:15

12        A    Okay.                                           01:15

13        Q    We know, let's say for Dr. Sukumar's           01:15

14   survey, he only included the Samsung-patented            01:15

15   features.  He had no distraction features at all.        01:16

16   It was using -- it was hypothetical transactions.        01:16

17   It wasn't using actual dollars, and there were no        01:16

18   outside options.  So now you have these three things     01:16

19   combined.                                                01:16

20             Now, knowing those three things              01:16

21   combined, do you think that Dr. Sukumar's study          01:16

22   cannot be relied upon to determine a willingness to      01:16

23   pay for the patented features in the smartphone and      01:16

24   tablet?  Just knowing those three things, is that        01:16

25   enough to say -- for you to say that study is not        01:16