Exhibit 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5    APPLE INC., a California

6    corporation,                        CASE NUMBER

7              Plaintiff,         11-CV-01846-LHK (PSG)

8    vs

9    SAMSUNG ELECTRONICS CO., LTD.,

10   a Korean business entity,

11   SAMSUNG ELECTRONICS AMERICA,

12   INC., a New York corporation,

13   et al.,

14              Defendants.

_____

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17      VIDEOTAPED DEPOSITION OF MARYLEE ROBINSON

18             REDWOOD CITY, CALIFORNIA

19             MONDAY, NOVEMBER 5, 2012

20                    VOLUME I

21   REPORTED BY:

22   THOMAS J. FRASIK

23   RPR, CSR No. 6961

     Job No. 1554075

24

25   PAGES 1 - 123

                                            Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4                   --o0o--

5    APPLE INC., a California

6    corporation,                  CASE NUMBER

7              Plaintiff,      11-CV-01846-LHK (PSG)

8    vs

9    SAMSUNG ELECTRONICS CO., LTD.,

10   a Korean business entity,

11   SAMSUNG ELECTRONICS AMERICA,

12   INC., a New York corporation,

13   SAMSUNG TELECOMMUNICATIONS

14   AMERICA, LLC, a Delaware limited

15   liability company,

16              Defendants.

17   _____

18

19        Confidential Videotaped Deposition of

20   MARYLEE ROBINSON, VOLUME I, at 555 Twin Dolphin Drive,

21   Fifth Floor, Redwood City, California, beginning at 1:01

22   p.m., and ending at 4:47 p.m., on Monday, November 5,

23   2012, before THOMAS J. FRASIK, Registered Professional

24   Reporter, Certified Shorthand Reporter No. 6961.

25

                                        Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF APPLE INC.:

 4           MORRISON & FOERSTER LLP

 5           BY:  ERIC J. OLSON, ESQ.

 6           755 Page Mill Road

 7           Palo Alto, California  94304

 8           650-813-5825

 9           ejolson@mofo.com

10

11

12   FOR DEFENDANTS:

13           QUINN EMANUEL

14           BY:  ANTHONY P. ALDEN, ESQ.

15           865 South Figueroa, Tenth Floor

16           Los Angeles, California  90017

17           213-443-3000

18           anthonyalden@quinnemanuel.com

19

20

21    ALSO PRESENT:

22           GREGORY A. PINSONNEAULT, LitiNomics

23           RAMON PERAZA, Videographer

24

25
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1                       I N D E X

2    MARYLEE ROBINSON,  VOLUME I            EXAMINATION

3

4              MR. ALDEN                     8

5              MR. OLSON                     110

6              MR. ALDEN                     115

7

8

9        INSTRUCTIONS NOT TO ANSWER/REFUSALS TO ANSWER:

10                       Page     Line

11

12                       16        7

13                       19        17

14                       102       12

15                       104        9

16                       105       22

17

18

19

20

21

22

23

24

25
```

Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    E X H I B I T S

 2    EXHIBIT NUMBER                              PAGE

 3

 4    Exhibit 1    Declaration Of Marylee Robinson    12

 5                 In Support Of Apple's For A

 6                 Permanent Injunction (16 pgs)

 7

 8    Exhibit 2    Exhibit 29, SAMNDCA 00176053-125   49

 9                 (4 pgs)

10

11    Exhibit 3    Exhibit 30, SAMNDCA 00201771-773   51

12                 (3 pgs)

13

14    Exhibit 4    Exhibit 31, SAMNDCA 10850604       53

15                 (2 pgs)

16

17    Exhibit 5    Exhibit 3, Calculation of          69

18                 Apple's Supplemental Damages

19                 through December 31, 2012

20                 (5 pgs)

21

22    Exhibit 6    Exhibit 7, Calculation of          69

23                 Samsung's Hypothetical Loss

24                 documents (2 pgs)

25
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    E X H I B I T S

2    EXHIBIT NUMBER                              PAGE

3

4    Exhibit 7    Smartphone Shipments and Market    72

5                 Share, US Sales (1 pg)

6

7    Exhibit 8    Expert Report of Terry L. Musika    83

8                 (13 pgs)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              REDWOOD CITY, CALIFORNIA

 2         MONDAY, NOVEMBER 5, 2012, AT 1:01 P.M.

 3

 4         THE VIDEOGRAPHER:  Good afternoon.

 5         We are on the record at 1:01 p.m. on            13:01:36

 6    November 5th, 2012.  This is the videotaped deposition

 7    of Marylee Robinson.

 8         My name is Ramon Peraza, here with court

 9    reporter, Tom Frasik.  We're here from Veritext National

10    Deposition and Litigation Services at the request of     13:01:54

11    counsel for the defendant.  This deposition is being

12    held at Quinn Emanuel in the City of Redwood Shores.

13    The caption of the case is Apple Inc. versus Samsung

14    Electronics Corporation.

15         Please note that audio and video recording will   13:02:08

16    take place unless all parties have agreed to go off the

17    record.  Microphones are very sensitive and may pick up

18    whispers, private conversations, and cellular

19    interference.

20         At this time, counsel, please identify            13:02:20

21    yourselves for the record and state whom you represent.

22         MR. ALDEN:  Anthony Alden from Quinn Emanuel

23    for Samsung.  With me, from LitiNomics, is

24    Greg Pinsonneault.

25         MR. OLSON:  And Eric Olson of Morrison &           13:02:33
```

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Foerster on behalf of Apple as well as on behalf of the

 2    witness.

 3              THE VIDEOGRAPHER:  The court reporter may now

 4    swear in the witness.

 5

 6                    MARYLEE ROBINSON,

 7    having been duly sworn, testified on her oath as

 8    follows:

 9                      EXAMINATION

10    BY MR. ALDEN:                                      13:02:48

11        Q.  Good afternoon, Ms. Robinson.

12        A.  Good afternoon.

13        Q.  Thank you for coming today.

14            Ms. Robinson, have you ever had your deposition

15    taken before?                                      13:02:56

16        A.  I have not.

17        Q.  So we'll go over some ground rules just so it

18    goes as smoothly as possible and we make life easier for

19    the videographer and the court reporter.

20            First of all, you understand that you're under  13:03:13

21    oath and the answers you give must be the truth as if

22    you were in court --

23        A.  Yes.

24        Q.  -- before a jury?

25            If you need to take a break at any particular   13:03:23
```

Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  The court reporter can only transcribe sound,

2  so when you answer a question, it has to be audible.  We

3  have a habit to shake our heads up and down or side to

4  side, and that will be picked up by the video but not by

5  the court reporter in the transcript.  So it's important  13:04:58

6  that you answer audibly to questions.

7      A.  Yes.

8      Q.  Do you have any questions before we start?

9      A.  I do not.

10      Q.  Have you ever been qualified as an expert in  13:05:08

11  any case?

12      A.  I have not.

13      Q.  How many patent cases have you worked on?

14      A.  I would have to estimate probably at least 30.

15      Q.  Okay.  Have you worked, prior to this case, on  13:05:41

16  any design patent cases?

17      A.  I have not.

18      Q.  Have you worked on any trade dress cases prior

19  to this case?

20      A.  I have not.  13:05:54

21      Q.  Have you worked on any antitrust cases prior to

22  this case?

23      A.  No.

24      Q.  Have you worked on any breach of contract cases

25  prior to this case?  13:06:06

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   Yes.

2        Q.   Are you an expert in the field of marketing?

3        A.   No.

4        Q.   Are you an expert in the field of consumer

5   decision-making?                                      13:06:19

6        A.   No.

7        Q.   Are you an expert in the smartphone market?

8        A.   No.

9        Q.   Are you an expert in the tablet market?

10       A.   No.                                          13:06:30

11       Q.   Have you ever performed any other work for

12   Apple other than this case?

13       A.   I have not.

14       Q.   Have you ever had any engagements for Samsung?

15       A.   I have not.                                  13:06:53

16       Q.   Did you sign the protective order that was

17   entered in this case?

18       A.   I believe that Mr. Musika signed a protective

19   order on behalf of the firm, although I reviewed it.

20   That was quite some time ago.                        13:07:11

21       Q.   Okay.  But you yourself did not sign the

22   protective order?

23       A.   It's my recollection that he signed it and

24   that covered all of our -- all the people at Invotex who

25   worked on the case.  So I don't recall personally      13:07:25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    signing a protective order, although it's always

2    possible because I've certainly signed protective

3    orders in the past.

4        Q.  Now, you submitted a declaration in this case;

5    is that right?                                        13:07:42

6        A.  That is right.

7        Q.  And I will have the reporter mark as

8    Robinson Exhibit 1 a document entitled "Declaration

9    Of Marylee Robinson In Support Of Apple's Motion For

10   A Permanent Injunction For Damages Enhancement, For   13:08:04

11   Supplemental Damages, And For Prejudgment Interest,"

12   filed under seal.

13           (Deposition Exhibit 1 was marked

14           for identification.)

15           MR. OLSON:  Anthony, I'll just note for the   13:08:32

16   benefit of the record, it appears that this is a copy of

17   the declaration without the exhibits attached.

18           MR. ALDEN:  Correct.

19   BY MR. ALDEN:

20       Q.  Ms. Robinson, have you had a chance to look at  13:08:53

21   the document I just handed to you?

22       A.  Yes.

23       Q.  And is that the declaration you submitted in

24   case?

25       A.  It is.                                         13:09:15

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    background research on how IDC gathers their data, and

2    I understand they are an accepted provider of market

3    share data in this industry.

4            MR. ALDEN:  I'd like to mark as Exhibit 5 to

5    Ms. Robinson's deposition Exhibit 3 to Ms. Robinson's      14:46:57

6    declaration.

7            (Deposition Exhibit 5 was marked

8            for identification.)

9            MR. ALDEN:  I'd also like to mark as Exhibit 6

10   to Ms. Robinson's deposition Exhibit 7 to Ms. Robinson's   14:47:38

11   declaration.

12           (Deposition Exhibit 6 was marked

13           for identification.)

14   BY MR. ALDEN:

15       Q.  Ms. Robinson, I'll first ask you to look at        14:48:17

16   Exhibit 3 to your declaration, which is Exhibit 5 in the

17   deposition, and in particular to page 3.2.

18       A.  Yes.

19       Q.  And could you describe for me what this page

20   shows?                                                      14:48:46

21       A.  This page shows historical sales for eight

22   products that I was able to confirm in September of 2012

23   were still selling in the marketplace, that's the blue

24   line.  The green line is a projection of sales for those

25   eight products.                                             14:49:08

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1         A.  What factors into my analysis is what their

2    share was just prior to the introduction of the

3    infringing and diluting phones, that's the indication of

4    how they were selling at that time.  What happened two

5    years before is what happened two years before.          14:57:13

6         Q.  But you would agree, then, that Samsung could

7    gain a market share greater than five percent without

8    the infringing and diluting products; correct?

9         A.  Again, I think -- I've said it's possible.

10        Q.  Well, they did, didn't they?                     14:57:39

11        A.  In that prior period, before they dropped off

12   even further.

13        Q.  Okay.  So you agree that prior to introducing

14   the infringing and diluting products, that Samsung at

15   times did have a market share greater than five percent;  14:58:01

16   correct?

17        A.  Yes.

18        Q.  I'd like to go back to your declaration,

19   please.  And in particular, I'd like to go to paragraph

20   27 and the third sentence in that paragraph, which        14:58:38

21   reads:  "To be conservative, I used the percentage

22   losses discussed above and assumed that any losses would

23   be experienced proportionally across all of Samsung's

24   smartphone product lines."

25             Did I read that correctly?                      14:59:02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   You did.

2      Q.   What evidence do you have that all of Samsung's

3   losses would be experienced proportionally across all of

4   Samsung's product lines?

5      A.   It really goes back to the assumption, which is      14:59:12

6   that the trade dress -- that the other products enjoyed

7   the benefits or had success on the heels of the trade

8   dress, the infringing and diluting products found to

9   infringe the trade dress.

10      Q.   Okay.  And I want to make sure I understand      14:59:53

11   your testimony.

12         The basis for your proportional allocation is

13   that is your assumption that the later products, the

14   products sold after the infringing and diluting

15   products, would benefit from the market share gained by      15:00:19

16   the infringing and diluting products; is that correct?

17      A.   Benefit from the market share and the success

18   of those products, yes.

19      Q.   Okay.  Why didn't you allocate the percentage

20   losses solely to the infringing and diluting products?      15:00:47

21      A.   Can we go to the exhibit?

22      Q.   Yes.  Which exhibit?

23      A.   Exhibit 7.  Is that entered here?

24      Q.   Um-hum.

25      A.   I'd like to explain, if I could, how the      15:01:17

Page 75

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    analysis actually works.

2        Q.  Okay.

3        A.  Beyond just one sentence.

4        Q.  Okay.

5        A.  So box -- box 2, where you see the percentage        15:01:28

6    decreases going across, those are calculated based on

7    holding the market share constant at five percent.

8        Q.  Um-hum.

9        A.  And those reductions are applied in box 4 to

10   the infringing units.                                        15:01:45

11       Q.  Um-hum.

12       A.  And the difference -- so the difference between

13   the two million -- if you're looking at third-quarter

14   2010, the difference between the infringing units of two

15   million and the lost units of 1.3, that difference, call    15:02:02

16   it six million, is actually going back to Samsung in

17   this analysis to -- you know, based on the belief that,

18   you know, noninfringing phones could have made those

19   sales.  So I think it's -- I just wanted to clarify that

20   point.                                                       15:02:27

21       Q.  Okay.  If we go to paragraph 28, you say

22   "Apple's losses due to Samsung's sales of these 13.9

23   million phones are substantial."

24       A.  Correct.

25       Q.  What evidence do you have that Apple suffered       15:02:42

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    any loss as a result of Samsung's gain in market share?

2         A.   Mathematics of it.  If Samsung's market share

3    had stayed at five percent, those sales would have gone

4    somewhere.

5             So this analysis is looking at capturing the        15:03:13

6    magnitude of these units over time in an emerging,

7    growing marketplace, after the infringing and diluting

8    phones were entered into the marketplace.  So we're

9    talking about lots of units, that's where the

10   "substantial" comes in, and the fact that market            15:03:37

11   share -- as Samsung's growing their market share, had

12   they not -- had their market share not grown, those

13   units would have gone elsewhere.

14        Q.   Okay.  What evidence do you have of that?

15        A.   Again, it really goes back to the assumption in    15:04:01

16   the analysis to demonstrate -- I'm just -- it's what I

17   just said.  I think I've already answered the question.

18        Q.   Okay.  Let me ask if I can -- because I'm not

19   really understanding the answer so --

20        A.   Okay.                                              15:04:32

21        Q.   -- let me see if I can ask it a different way.

22             What evidence do you have that Samsung had not

23   sold -- made these 3.9 million in sales, that any of

24   them would have gone to Apple?

25             MR. OLSON:  13.9 million?                          15:04:39

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. ALDEN:

 2        Q.  Sorry.  13.9, correct.

 3        A.  That if Samsung -- the lost units have to go

 4    somewhere.  And it's an accepted damage theory that some

 5    portion of them would be distributed to the marketplace    15:05:02

 6    at the market share of the various market participants.

 7        Q.  Is it possible that no one would have

 8    purchased, made these 3.9 million dollars in sales?

 9        A.  I sup -- I believe that customers had committed

10    to purchase a smartphone and that a smartphone would       15:05:25

11    have been purchased.

12        Q.  Okay.  And what evidence do you have for that?

13        A.  I have data telling me that they purchased a

14    smartphone.

15        Q.  Okay.  And what evidence do you have that they     15:05:36

16    would have -- some of them would have gone to Apple

17    instead of, for example, HTC, Motorola or Nokia?

18        A.  I don't have specific evidence that they would

19    have gone to Apple.  But I'm applying the sales at their

20    market share, at Apple's market share, leaving plenty of   15:05:56

21    units for other participants in the marketplace to grab

22    those sales, including Samsung.

23        Q.  Okay.  In paragraph 28, you reference a

24    "Mor-Flo analysis," correct?

25        A.  Correct.                                           15:06:15
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  Did you perform a Mor-Flo analysis?

2        A.  I performed a market share distribution of

3    these units.  It's not a true or pure Mor-Flo in that I

4    did not remove Samsung from the market and redistribute

5    those -- the shares.  So in a typical Mor-Flo, you would        15:06:35

6    see an up -- an uptake in the market shares of

7    participants once Samsung's removed.  And in this case

8    I used a pure market share for Apple, which would be

9    more conservative.

10       Q.  Why didn't you use a pure Mor-Flo analysis?        15:06:52

11       A.  In performing this analysis, I took a more

12   simplistic and conservative approach to presenting the

13   market share.

14       Q.  Why did you decide to do that?

15       A.  I felt that performing a more conservative        15:07:11

16   analysis was more appropriate.

17       Q.  Why?

18       A.  To not give -- not assign more units to any of

19   the participants than necessary.  It's just a built-in

20   conservative adjustment.        15:07:46

21       Q.  Does doing a pure Mor-Flo analysis allocate

22   more units to the market participants than necessary?

23       A.  No, I'm not saying -- I'm not saying that.  But

24   it's -- this was just one way to build in conservatism

25   to the model that I performed here.        15:08:12

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  Okay.

2        A.  It's not to say that it's inappropriate to

3    perform a pure Mor-Flo analysis.

4        Q.  Can a pure Mor-Flo analysis itself account for

5    price differences between accused products and embodying     15:08:27

6    products?

7        A.  The market share data does account for consumer

8    preferences for particular devices, thus addressing

9    price concerns.

10       Q.  So did your -- is your testimony that your        15:08:56

11   analysis addressed price differences?

12       A.  Yes.

13       Q.  Did you do a separate analysis of price,

14   concerning price differences?

15       A.  No.                                                15:09:16

16       Q.  When calculating lost profits, Mr. Musika did a

17   Mor-Flo analysis; correct?

18       A.  Correct.

19       Q.  And he did that by carrier; correct?

20       A.  Correct.                                           15:09:28

21       Q.  Why didn't you do that?

22       A.  In performing this analysis, I took other

23   adjustments that ultimately resulted in a number of

24   units assigned to Apple that was consistent with the

25   percentages of units that Mr. Musika assigned.            15:09:55

                                                       Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.  Did you do a carrier adjustment like

2   Mr. Musika?

3       A.  I did not do a specific carrier adjustment, but

4   I feel that my other adjustments captured the necessary

5   overall reductions to units that are necessary.          15:10:11

6       Q.  Do you know -- well, do you know who -- which

7   carrier sold the Galaxy Prevail?

8       A.  Not off the top of my head, no.

9       Q.  Okay.  If I told you it was Sprint and Boost

10  Mobile, would you have any reason to disagree with that?  15:10:43

11      A.  No.

12      Q.  Okay.  Are you aware that Sprint did not carry

13  an iPhone until October 2011?

14      A.  Yes.

15      Q.  Did you do a capacity analysis?               15:10:57

16      A.  I did consider capacity in performing this

17  analysis.

18      Q.  Okay.  Did you do a capacity analysis?

19      A.  I relied upon the analysis that Mr. Musika

20  relied upon in his report.                               15:11:15

21      Q.  Okay.  So if we can go to the fourth sentence

22  in paragraph 28, you say "Using the more conservative

23  assumption, Apple would have sold more than four million

24  additional products."

25          Do you see that?                                15:11:40

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   Yes.

2        Q.   Okay.  Did Apple have the capacity to sell four

3    million additional products?

4        A.   I did not -- I did not consider whether they

5    had the capacity or I don't recall whether they had the    15:11:55

6    capacity to sell four million.  I recall considering

7    whether they had capacity to sell two million units.

8        Q.   So you don't know whether they could have sold

9    four million additional units; correct?

10       A.   I do not know one way or the other.            15:12:12

11       Q.   Okay.  Then you say "To make this calculation

12   even more conservative, I further assumed that Apple

13   would capture only half of these sales."

14            Do you see that?

15       A.   Yes.                                           15:12:24

16       Q.   Why did you assume that Apple would only

17   capture half of the sales?

18       A.   To build further conservative adjustment to

19   this analysis and ensure that I wasn't awarding too many

20   units to Apple.                                         15:12:44

21       Q.   Did Apple have the capacity to make 2,089,143

22   additional iPhone sales during the period?

23       A.   Yes.

24       Q.   Are these the same sales that Mr. Musika

25   presented in his lost profits analysis?               15:12:59

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. OLSON:  Objection.  Vague.

2          THE WITNESS:  Are the two million lost sales

3    here the same as what's in Mr. Musika's analysis?

4    BY MR. ALDEN:

5        Q.  Mr. Musika testified that Apple would have sold    15:13:18

6    an additional two million iPhones; correct?

7        A.  I don't recall the specific number of units

8    but ...

9        Q.  Okay.  Well --

10       A.  I --                                               15:13:33

11         MR. OLSON:  Don't guess.  If you've got the

12   number ...

13         MR. ALDEN:  I'll mark as Exhibit 8 excerpts

14   from the Expert Report of Terry L. Musika, CPA.

15         (Deposition Exhibit 8 was marked                     15:14:30

16         for identification.)

17         MR. OLSON:  Anthony, as excerpts, are you able

18   to give any more information about what the scope or

19   nature of the excerpts are?

20         MR. ALDEN:  They go from page 38 to                  15:15:01

21   Mr. Musika's March 22nd, 2012 report, to page 46.

22         MR. OLSON:  Perhaps I should put it

23   differently.

24         I take it you've chosen this.  Are you able to

25   give us what that is or maybe it will be obvious when I    15:15:15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    review it but ...

2         MR. OLSON:  I believe it's Mr. Musika's lost

3    profits analysis or narrative explanation of his lost

4    profits analysis.

5         Let me know when you are ready, Ms. Robinson.    15:15:39

6         THE WITNESS:  Okay.

7    BY MR. ALDEN:

8         Q.  So if we go to page 40, paragraph 124?

9         A.  Yes.

10        Q.  And if you wish to read the entire paragraph,    15:16:00

11   that's fine.  Let me know when you're ready.

12        A.  Okay.

13        Q.  So you see at lines 10 to 11, Mr. Musika says,

14   in his report, there are 8,230,472 accused units?

15        A.  I believe it says 18.                         15:16:44

16        Q.  I'm sorry.  18,230,472 accused units.

17        "I calculated lost profits on only 2,197,534 of

18   the total (approximately 12 percent)."

19        A.  Correct.  I see that.

20        Q.  Are the approximately two million lost units    15:17:00

21   that Mr. Musika was referring to and on which he

22   calculated lost profits --

23        A.  Right.

24        Q.  -- the same two million units that you're

25   referring to in paragraph 28 of your declaration?      15:17:19

                                                       Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   They're not, in substance, the same units.

2        Q.   Okay.  How are they different?

3        A.   My analysis covers a longer time period than

4    Mr. Musika's analysis did.  This report was issued in

5    March and based on data through I believe December 31st    15:17:43

6    or possibly February, I can't recall, but it certainly

7    didn't go past March.  And this analysis that I've

8    conducted for this declaration included data, I

9    believe -- yeah, so at least -- yeah, June 30th,

10   June 30th.                                                 15:18:21

11       Q.   Okay.

12       A.   Just drawing attention to the fact that we're

13   not talking about apples to apples.

14       Q.   Okay.  So Mr. Musika opined --

15            MR. OLSON:  Sorry.                                15:18:31

16   BY MR. ALDEN:

17       Q.   Mr. Musika opined that Apple had lost

18   approximately two million units worth of sales; correct?

19       A.   Correct.

20       Q.   And you are opining that Apple has lost          15:18:44

21   approximately two million dollars worth of sales;

22   correct?

23            MR. OLSON:  Objection.  You meant two million

24   units.

25            THE WITNESS:  Two million units.                 15:18:53

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. ALDEN:

 2         Q.  Two million units; correct?

 3         A.  Yes, under this construct, yes.

 4         Q.  Okay.  And how many of the units overlap?  In

 5    other words, what I'm trying to get at is how many of      15:19:12

 6    them are the same units, in essence?  I mean, there are

 7    a certain number of sales during a period --

 8         A.  Right.

 9         Q.  -- correct, whether it's Mr. Musika's period or

10    a period you're using.                                     15:19:23

11         You've said Apple has lost two million units

12    worth of sales and Mr. Musika has said Apple has lost

13    two million units worth of sales.

14         How many of them are the same sales?

15         A.  Well, so on a whole, the two million are        15:19:37

16    similar and overlap.  But my analysis is taking -- you

17    know, is really about these five products that were

18    found guilty of infringing and diluting and looking at

19    the units that weren't found to be guilty of infringing

20    and diluting to see what kind of damage was sustained on  15:20:01

21    the heels of the success of those products.  So if you

22    compare, for instance, just the five products for

23    lost -- that were awarded damage in the case, as

24    Mr. Wagner's looked at in his approach, you would see

25    that there's not a double-counting taking place.          15:20:31
```

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  So let me unpack this.

2          What was Samsung's sales of the five products?

3      A.  Over this period?

4      Q.  Yes.

5      A.  Can I review back to my declaration, please?    15:21:16

6      Q.  Yes.

7      A.  I don't believe I have that information at my

8  disposal.

9          MR. OLSON:  If you want it, Anthony, it's in

10  Exhibit 9 to her report.                                15:22:03

11  BY MR. ALDEN:

12     Q.  Okay.  Do you know whether Samsung sold more

13  than or less than two million phones during the -- of

14  the five diluting and infringing phones during the

15  period?                                                 15:22:16

16     A.  I would have to refer back to the sales data

17  presented in JX 1500.

18     Q.  So Mr. Musika presented an opinion that Apple

19  lost two million sales; correct?

20     A.  Right.                                           15:22:48

21     Q.  Okay.  And you would agree that the jury

22  awarded damages or awarded lost profits on some of those

23  sales; correct?

24     A.  I don't have an opinion as to what specific

25  type of damage the jury awarded for those particular    15:23:03

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    products.

2        Q.  Okay.  Did you review Mr. Wagner's analysis of

3    the jury's verdict?

4        A.  Yes.

5        Q.  Okay.  Do you disagree with his analysis of the      15:23:15

6    jury's verdict?

7        A.  I believe it's mathematically correct, I find

8    no errors in the math.

9        Q.  Okay.  Do you -- so would you agree that the

10   jury awarded $91 million in lost profits on these five      15:23:31

11   products that the jury found to infringe and dilute?

12       A.  I don't know specifically whether the jury

13   awarded lost profits.  I don't know what the jury did.

14   I know that on the verdict form they put damage amount

15   for each product.                                            15:23:52

16       Q.  So it's possible that for every product that

17   that the jury found infringed the design patent, for

18   example, the entire amount of the jury's award could be

19   Samsung's profits?

20       A.  I believe that could be possible.                    15:24:08

21       Q.  And it's possible that for the five phones that

22   the jury found infringed the design patent and diluted

23   trade dress, that the jury's entire award could be

24   infringer's profits under Section 289 for design patent

25   infringement; correct?                                       15:24:35

                                                         Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.  I believe that's possible.

2        Q.  For the purposes of his lost profits analysis,

3   Mr. Musika assumed that Samsung would have designed

4   around all of Apple's asserted intellectual property by

5   May 2011; correct?                                    15:25:29

6        A.  Correct.

7        Q.  And Mr. Musika assumed that Samsung would have

8   designed around the '381 Patent in one month; correct?

9        A.  I believe that's correct.

10       Q.  Mr. Musika assumed that Samsung would have    15:25:38

11  designed around the '163 Patent in one month; correct?

12       A.  I believe that's correct.

13       Q.  Mr. Musika assumed that Samsung would have

14  designed around the '915 Patent in six months; correct?

15       A.  I believe that is correct.                    15:25:52

16       Q.  Okay.  You didn't make any assumptions

17  concerning design-around; correct?

18       A.  I did not.

19       Q.  Mr. Musika also assumed that Samsung would have

20  reentered the market and obtained a hundred percent of  15:26:05

21  its previous market share after designing around;

22  correct?

23       A.  He did, yes.

24       Q.  Okay.  Your analysis assumed that Samsung's

25  infringing products have an effect on Apple's sales    15:26:18
```

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    after May 2011; correct?

2         A.  Yes.

3         Q.  What other differences are there between

4    Mr. Musika's lost profits analysis and your analysis?

5         A.  I believe you've identified all the          15:26:40

6    differences.

7         Q.  If we go to paragraph 29, the last sentence,

8    you say -- let me know when you're there.

9         A.  Yes.

10        Q.  "Multiplying the lost sales by quarter times    15:27:26

11   per unit."

12             THE VIDEOGRAPHER:  Ms. Robinson, you are

13   covering your mic.

14   BY MR. ALDEN:

15        Q.  "Multiplying the lost sales by quarter times    15:27:40

16   per unit incremental profits by quarter, Apple's lost

17   profits for the 2.1 million in additional sales are

18   702,868,901, as shown on Exhibit 8."

19             Did I read that correctly?

20        A.  Correct.                                       15:27:56

21        Q.  You're aware that, at trial, Mr. Musika opined

22   that Apple's lost profits were approximately $490

23   million; correct?

24        A.  Yes.

25        Q.  And that $490 million is included in the 702    15:28:07

                                                          Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    million that you have concluded and that you've arrived

 2    at in paragraph 29; correct?

 3              MR. OLSON:  Objection.  Misstates prior

 4    testimony.

 5              THE WITNESS:  I would just say that Mr. Musika    15:28:22

 6    and I did not look at that time exact, same number of

 7    units, so it's not exactly the same number of units but,

 8    yes, there is an overlap.

 9    BY MR. ALDEN:

10         Q.  Given that Apple's, in your opinion, lost        15:28:48

11    profits -- well, it's your opinion that Apple's lost

12    profits were approximately $700 million; correct?

13         A.  It's my opinion, under this analysis and this

14    construct, that that's the amount of lost units that

15    I've calculated under the assumption that after the      15:29:05

16    infringing and diluting products entered the

17    marketplace, that Samsung was able to enjoy success on

18    the heels of those products and, as a result, the damage

19    was 700 million.

20         Q.  So it's your opinion that Apple lost            15:29:39

21    $700 million; correct?

22         A.  Built upon the model that we've described and

23    the assumptions built into it, yes.

24         Q.  Then why is Apple seeking $400 million for the

25    five infringing and diluting products as opposed to     15:30:03
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1    $700 million?

 2         A.  I can't speak specifically to a determination

 3    that was made for the $400 million enhancement.  I'm

 4    providing context here as to whether that number is in

 5    line with the type of damage that Apple has sustained.     15:30:33

 6         Q.  Why didn't Apple seek $700 million in lost

 7    profits at trial?

 8              MR. OLSON:  Objection.  Asked and answered.

 9              Oh, sorry, "at trial."  Sorry.

10              THE WITNESS:  Mr. Musika prepared his opinion     15:30:46

11    of lost profits built upon a construct that was not --

12    you know, that's not 100 percent the same as this

13    analysis.  They're two different types of analysis.

14    BY MR. ALDEN:

15         Q.  Why did you do a different analysis to           15:31:10

16    Mr. Musika?

17         A.  I have facts at my disposal that Mr. Musika

18    didn't have, for instance, that five specific products

19    launched in early -- you know, in the 2010 time frame

20    were found to be infringing trade dress.  Mr. Musika      15:31:29

21    didn't have that information at his disposal when

22    preparing his lost profits analysis.

23         Q.  Well, Mr. Musika made that assumption, didn't

24    he?

25         A.  What assumption?                                 15:31:53

                                                        Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   That those five products infringed trade dress.

2      A.   He assumed that all intellectual property

3  asserted was valid and infringed, yes.

4      Q.   Okay.  So then what difference does it make?

5      A.   A finding of infringement and an assumption of     15:32:08

6  infringement I believe are two different things.

7      Q.   Okay.  And so why did a finding of infringement

8  lead you to adopt a different methodology for

9  calculating lost profits than Mr. Musika?

10      A.   I'm performing this analysis to demonstrate the     15:32:23

11  magnitude of sales that Apple -- lost sales that Apple

12  was not compensated for under the jury's verdict.

13      Q.   And how do you know that Apple wasn't

14  compensated for them?

15      A.   In -- I know that the jury awarded damages for     15:32:47

16  specifically five products that were found guilty of

17  infringing and diluting the trade dress.  The other

18  products that were asserted as infringing or asserted in

19  this case were found guilty of infringing other types of

20  intellectual property.                                    15:34:19

21          However, what my analysis here is looking at is

22  assuming those products enjoyed success and sales based

23  on the success and the historical sales of these other

24  devices that were found guilty of infringing, those --

25  this is capturing that, the magnitude of those units.     15:34:46

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    So it's -- I'm trying to provide an analysis that looks

2    at the magnitude at which Apple was not compensated,

3    fully compensated at trial.

4          MR. OLSON:  Anthony, before you ask another

5    question, we've been going I think it's close to an hour   15:35:08

6    and a half.  I'd like the benefit of the break.

7          MR. ALDEN:  Yes, just after I finish this line,

8    a couple minutes.

9          MR. OLSON:  Well, I'd actually like to have a

10   break right now, but if you have a couple more              15:35:21

11   questions, let's see what we can do.

12   BY MR. ALDEN:

13       Q.  Okay.  So it's your opinion under this model

14   that Apple lost 700 -- approximately $703 million;

15   correct?                                                    15:35:32

16       A.  Yes.

17       Q.  Okay.  And how much of that -- how do you know

18   that that amount wasn't included in the jury's verdict?

19          MR. OLSON:  Object on asked and answered.

20          THE WITNESS:  I believe I've already answered        15:35:51

21   that question.

22   BY MR. ALDEN:

23       Q.  I'm sorry.  I didn't understand the answer, so

24   if you could explain it to me again?

25          MR. OLSON:  Objection.  Asked and answered.          15:36:06

                                                        Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              THE WITNESS:  Okay.  This amount -- this

2     analysis is providing context for Apple's willfulness

3     request of 400 million --

4     BY MR. ALDEN:

5         Q.  Right.                                    15:36:49

6         A.  -- under the Lanham Act, tied to trade dress.

7     I performed this analysis specific to these five

8     products with the assumption that those five products

9     received a benefit -- or the other products received a

10    benefit over time related to those sales in that initial  15:37:09

11    period, capturing shares -- capturing units here.

12             This number, this 700 million that's here,

13    is providing context to the three -- I believe it's the

14    approximate 382 million and which was awarded on those

15    specific five products.                          15:37:31

16        Q.  So is the 700, approximately 703 million,

17    relating to the lost sales of other products, not the

18    five products; is that correct?

19             MR. OLSON:  Objection.  Misstates the

20    testimony.                                       15:37:46

21             THE WITNESS:  The 700 is going to include units

22    beyond the five products.

23    BY MR. ALDEN:

24        Q.  Okay.  Did the jury already award damages on

25    those units?                                     15:38:05

                                                  Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   Which units?

2          Q.   The units --

3          A.   The five --

4          Q.   No.  On the units that are included in the 700

5    million number.                                        15:38:17

6          A.   On -- the jury provided an award for certain

7    products based on the findings of infringement.

8          Q.   And did any of that award -- was any of that

9    award for units that are -- on which you base

10   $700 million number in paragraph 29?                   15:38:49

11         A.   I don't think I'm in a position to dissect the

12   jury's award.

13         Q.   Okay.  So you don't know?

14         A.   I know they awarded a damage award on -- you

15   know, on certain products, but I don't think I'm in a  15:39:32

16   position to dissect their award.

17         Q.   Okay.  So it's possible that the jury awarded

18   damages on units on which -- at least some units on

19   which you calculated the $700 million; you just don't

20   know?                                                  15:39:46

21              MR. OLSON:  Objection.  Asked and answered.

22              THE WITNESS:  Without dissecting the award, I

23   can't offer an opinion as to what specific units the

24   jury gave an award on, beyond taking what I've done in

25   this analysis and what I've done, you know, in this    15:40:42

                                                    Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    report or this declaration.

2           As to -- I'm going to take it back again one

3    more time to what the purpose of this analysis was,

4    which was to provide context to Apple's request for $400

5    million and willfulness damages that relate to the          15:41:14

6    Lanham Act and the five products that were found guilty

7    of infringing the trade dress.

8           MR. ALDEN:  Okay.  Let's take a break.

9           THE VIDEOGRAPHER:  We are off the record at

10   3:51 p.m.                                                    15:41:26

11          (Recess held.)

12          THE VIDEOGRAPHER:  We are back on the record

13   at 3:58 p.m.

14          MR. OLSON:  So, Anthony, just very quickly,

15   because I don't want to take more time:  I told           15:58:52

16   Mr. Alden during the break that I may have some

17   re-direct questions, that I would ask him to reserve

18   time, and because that, if he didn't, I would

19   potentially argue that the record's closed within the

20   three-hour limit.                                            15:59:08

21          I intend to ask a very small number of

22   questions.  My understanding is that reserving all

23   objections to this procedure and that his time shouldn't

24   be docked under the circumstances, that you're asking

25   that the time be identified when you have ten minutes     15:59:20

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   left and I'll ask my questions.  We'll give the time

2   back to you and we'll see where we go.

3           MR. ALDEN:  Correct.

4           I'll just state for the record that I object

5   to the redirect under these circumstances.  It's new      15:59:32

6   testimony, new direct testimony by Ms. Robinson,

7   potentially not within the scope of her declaration.

8           The court gave Samsung three hours to depose

9   Ms. Robinson about her declaration, not about new

10  testimony that's being offered subsequent to her          15:59:49

11  declaration.

12          Having said that, you know, to avoid engaging

13  in dispute right now, as Mr. Olson said, I'll reserve

14  ten minutes to -- for re-cross, if necessary.

15  Otherwise, I'd like -- Mr. Olson has agreed that ten       16:00:09

16  minutes can otherwise be used by me as I see fit if I

17  don't have any re-cross.  We'll take it from there.

18          MR. OLSON:  I think that's fine.  Why don't you

19  pick up the questioning.

20  BY MR. ALDEN:                                              16:00:26

21      Q.  So I'd like to turn now, Ms. Robinson, to

22  supplemental damages.

23      A.  Okay.

24      Q.  And your supplemental damages opinion was based

25  on projected sales for eight products for the third       16:00:35

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    quarter of 2012 and the fourth quarter of 2012; correct?

2         A.   Correct.

3         Q.   And have you read Mr. Kerstetter's declaration?

4         A.   Yes.

5         Q.   Would you now accept that your projections are       16:00:55

6    inaccurate?

7              MR. OLSON:   Objection.   Vague.

8              THE WITNESS:   I accept for the three months at

9    which Mr. Kerstetter provided sales for those specific

10   products that his -- the numbers he has presented are          16:01:18

11   different than the numbers I projected for those three

12   months.

13   BY MR. ALDEN:

14        Q.   Do you have any reason to doubt

15   Mr. Kerstetter's numbers for the third quarter of 2012?        16:01:27

16        A.   In light of the record in this case of

17   inaccurate or changing concerns regarding sales data

18   historically, having eight files produced in the course

19   of discovery, it would be my preference not to.   I'm not

20   saying there's -- I'm not saying that Mr. Kerstetter is        16:01:53

21   misrepresenting himself.   But it would be my preference

22   to review ordinary course sales files of Samsung for all

23   of the products, not just the eight products that

24   Mr. Kerstetter has provided sales data for.

25        Q.   Did you ask for that information prior to            16:02:11

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    providing your declaration?

 2        A.  I'm not sure if Apple asked for that prior to

 3    my declaration or not.  Certainly it would be my

 4    preference to have that at hand.

 5        Q.  Did you ask counsel to get you third-quarter     16:02:29

 6    sales, Samsung sales data prior to preparing your

 7    declaration?

 8        A.  I believe there was a discussion of "Are we

 9    going to get third quarter sales data," and the answer

10    was "No, you're going to need to do a projection."       16:02:49

11        Q.  Okay.  Did you -- my question is a little

12    different.  Did you ask counsel to get you third-quarter

13    sales data?

14            MR. OLSON:  Objection.  Asked and answered.

15            THE WITNESS:  I asked if I was going to receive   16:03:02

16    it.

17    BY MR. ALDEN:

18        Q.  Okay.

19        A.  I don't -- I mean, it's not typical for me --

20    you know, I don't really see the distinction.            16:03:09

21            I asked "Will I be receiving it?"  Of course I

22    want it.  "Will I be receiving it?"  "No" was the

23    answer.

24        Q.  Okay.  Are you aware that Apple never asked for

25    that data --                                             16:03:20
```

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. OLSON:  Objection.  Misstates --

 2    BY MR. ALDEN:

 3         Q.  -- prior to your declaration?

 4         A.  I have no -- I don't have any knowledge one way

 5    or the other.                                    16:03:28

 6              MR. OLSON:  So, Mr. Alden, I don't want there

 7    to be any confusion.

 8              We have very distinctly asked for it recently

 9    and it has been refused to us.  Is there a change in

10    Samsung's position on that point?                16:03:39

11              MR. ALDEN:  I'm going to continue with my

12    questioning.

13              Were you aware that Apple did not ask for

14    third-quarter sales data prior to submitting your

15    declaration?                                     16:03:48

16              THE WITNESS:  I had no knowledge of whether

17    they asked for it or not.

18    BY MR. ALDEN:

19         Q.  Was it of concern to you that you didn't get

20    third-quarter Samsung sales data?                16:03:58

21         A.  It would be preferred to have the data, but in

22    instances, particularly in a litigation environment

23    where you're not -- you don't have access to

24    information, it's customary to provide projections.

25         Q.  Are you preparing revised projections?  16:04:27
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  Not at this time.

2      Q.  Do you expect to submit a supplemental

3    declaration revising your supplemental damages analysis?

4      A.  I believe if Samsung produces -- I believe I

5    understand that Apple has requested comprehensive sales      16:04:48

6    data for all 26 products.  Should that data be provided,

7    is my understanding I will be asked to update my

8    analysis.

9      Q.  But if that data is not provided, you will not

10   be updating your analysis; is that correct?                  16:05:04

11     A.  Yes, that is my understanding.

12     Q.  Are you -- will you be submitting a

13   supplemental declaration either on the subjects of a

14   permanent injunction or enhancement?

15     A.  I --                                                   16:05:33

16         MR. OLSON:  Let me stop.

17         Is the only information you'd have on that some

18   communication you've had with an attorney at

19   Morrison & Foerster?

20         THE WITNESS:  Yes.                                     16:05:45

21         MR. OLSON:  Okay.  At this point, I would

22   instruct you not to answer pursuant to the parties'

23   stipulation on expert discovery.

24   BY MR. ALDEN:

25     Q.  Do you agree that if the court were to grant           16:06:07

                                                      Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Samsung's remunerative motion in whole or in part that

2    your supplemental damages calculation would need to be

3    revised?

4          MR. OLSON:  Can I have that read back?

5          I can't read it on here.                        16:06:34

6    BY MR. ALDEN:

7       Q.  I'll ask a different question.

8          If the court grants Samsung's remunerative

9    motion in whole or in part, what impact would that have

10   on your supplemental damages calculation?            16:06:43

11         MR. OLSON:  Objection.  Incomplete

12   hypothetical.

13         THE WITNESS:  I believe there's many things

14   contained in that motion that Samsung has filed and I'm

15   not certain how that would impact my analysis.       16:07:04

16   BY MR. ALDEN:

17      Q.  If the court were to reduce the jury's damages

18   verdict, would that impact your supplemental damages

19   analysis?

20         MR. OLSON:  Objection.  Incomplete            16:07:17

21   hypothetical.

22         THE WITNESS:  I suppose if the total verdict

23   amount was reduced, then the numerator involved in the

24   calculation of the $50.40 per unit could potentially be

25   revised per unit amount.                             16:07:45

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           MR. ALDEN:  Objection.  Beyond the scope of her

2      declaration.  Leading.  Lacks foundation.

3           THE WITNESS:  Parties who get a head-start in

4      the marketplace and obtain market share, particularly in

5      a market that's growing like the smartphone market,        16:22:12

6      are -- have an opportunity or are able to capitalize on

7      that early market share.  As more and more adopters come

8      along, they are influenced by those who carry -- who

9      have greater market share in the marketplace.

10     BY MR. OLSON:                                               16:22:40

11         Q.  There were some questions asked to you about

12     some numbers provided by Mr. Kerstetter of Samsung in

13     connection with your supplemental damages analysis.  Do

14     you recall the general area that I'm talking about right

15     now?                                                        16:22:56

16         A.  Yes.

17         Q.  Has Mr. Kerstetter provided the sales

18     information for all of the infringing products?

19         A.  He has not.

20         Q.  Why would it be important to have all of the       16:23:03

21     infringing products?

22         A.  It would be important to verify that -- it

23     would be important because I would want to capture all

24     sales that took place of all of the infringing devices

25     and to verify, particularly based on the record in this    16:23:23

                                                                  Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   case where information that has been presented or

2   provided by Samsung for sales data has had various

3   discrepancies in it over time or concerns.

4   Additionally, we've seen periods where products maybe

5   stopped selling and then came back onto the market.  And   16:23:45

6   we would want to -- I would want to see and verify that

7   the information that Mr. Kerstetter is presenting in his

8   declaration can be verified by and provided for all

9   products.

10       Q.  So do you consider the material provided by   16:24:03

11   Mr. Kerstetter incomplete?

12       A.  It's incomplete as to providing -- it does not

13   provide sales for all infringing devices.

14       Q.  And is it your understanding that Apple has

15   requested the complete information for all the products?   16:24:19

16       A.  Yes.

17       Q.  Is it your understanding that Samsung has

18   refused?

19       A.  Yes.

20           MR. OLSON:  Do you believe -- withdrawn.   16:24:47

21           I'll pass the witness.

22   ///

23   ///

24   ///

25   ///   16:24:52

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                  EXAMINATION (CONTINUED)

 2     BY MR. ALDEN:

 3         Q.  How much does Apple seek in supplemental

 4     damages?

 5         A.  Combined, 535 -- I'm sorry.  Supplemental?    16:25:08

 6         Q.  Yes.

 7         A.  Sorry.  I thought you said "enhanced."

 8             Can I refer back to my declaration?

 9         Q.  Sure.  Would it help if I told you it was

10     approximately $121 million?                           16:25:56

11             MR. OLSON:  If it helps, to move things along,

12     I think if you look at paragraph 12.

13             THE WITNESS:  Yes, that's where I'm looking at.

14             It's 121 million.

15     BY MR. ALDEN:                                         16:26:10

16         Q.  And that was for eight products; correct?

17         A.  That calculation was derived off of eight

18     products, but the intent beyond -- the intent of that

19     calculation is to represent all infringing devices.

20         Q.  Okay.  Did Apple ask for any additional amounts  16:26:26

21     beyond $121 million for any other infringing devices?

22         A.  The 121 is intended to capture all infringing

23     devices for the supplemental period.

24         Q.  And you testified that it's your understanding

25     that Samsung refused to provide information for all    16:27:04
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    products; correct?

2        A.   Yes.

3        Q.   How do you have that understanding?

4        A.   From counsel.

5        Q.   What did counsel say to you?                    16:27:11

6        A.   That they -- the information's been requested

7    and Samsung will not -- will not be providing the data.

8        Q.   Did counsel explain to you why Samsung isn't

9    providing the data?

10        A.   We did not discuss that.                        16:27:29

11        Q.   Did counsel explain to you that Apple did not

12   request the data prior to the time you submitted your

13   declaration and Apple moved for $121 million in

14   supplemental damages?

15             MR. OLSON:  Objection.  Asked and answered.     16:27:43

16             THE WITNESS:  I have no knowledge of whether

17   the information was requested prior to the issuance of

18   my report.

19             I had a discussion about whether we would -- I

20   would be receiving the data and I was told no.  There    16:27:59

21   was no discussion about whether it had been requested.

22   BY MR. ALDEN:

23        Q.   I believe you testified in response to

24   Mr. Olson's questions that Samsung's -- in your opinion,

25   Samsung's infringing and diluting sales gave it a        16:28:13

                                                    Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    provided a declaration that's addressed timing of

 2    products, last importation and so forth.

 3    BY MR. ALDEN:

 4        Q.  And you're aware that Mr. Kerstetter has

 5    testified that Samsung will not be selling all those      16:42:24

 6    eight products through December 30th, 2012?

 7            MR. OLSON:  Anthony, did you say "all those

 8    eight products"?

 9            MR. ALDEN:  Correct.

10            THE WITNESS:  Yes.  I'm aware that he has          16:42:36

11    represented that.

12    BY MR. ALDEN:

13        Q.  Do you have any reason to doubt that

14    representation?

15        A.  I don't have any reason to doubt it.  I would     16:42:42

16    like to verify the sales records -- I would like to

17    verify that representation through the sales records of

18    Samsung.

19        Q.  And to do so, it would be necessary to get

20    those sales records through December 31st, 2012;          16:42:59

21    correct?

22        A.  Yes.

23        Q.  Your projections do not break out projected

24    sales by product; correct?

25        A.  Right.  The projection's done on a whole.         16:43:14
```

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              DEPOSITION REPORTER'S CERTIFICATION

 2

 3         I, the undersigned, a California Certified

 4    Shorthand Reporter, do hereby certify:

 5              That the foregoing proceedings were taken

 6    before me at the time and place herein set forth, at

 7    which time the witness was administered the oath; that

 8    the testimony of the witness and all objections made by

 9    counsel at the time of the proceedings were recorded

10    stenographically by me, and were thereafter transcribed

11    under my direction; that the foregoing transcript

12    contains a full, true, and accurate record of all

13    proceedings.

14              I further certify that I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney or party to this action.

17              IN WITNESS WHEREOF, I have this date subscribed

18    my name, dated this 6th day of November, 2012.

19

20

21

22

23         _____

24         THOMAS J. FRASIK, CSR No. 6961

25
```

Veritext National Deposition & Litigation Services
866 299-5127