1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10              SAN JOSE DIVISION

11   APPLE, INC., a California corporation,        )   Case No.: 11-CV-01846-LHK
                                                  )
12                          Plaintiff,            )   ORDER GRANTING IN PART AND
              v.                                  )   DENYING IN PART MOTION FOR
13                                                )   JUDGMENT AS A MATTER OF LAW
     SAMSUNG ELECTRONICS CO., LTD., A             )
14   Korean corporation; SAMSUNG                  )
     ELECTRONICS AMERICA, INC., a New York        )
15   corporation; SAMSUNG                         )
     TELECOMMUNICATIONS AMERICA, LLC,             )
16   a Delaware limited liability company,        )
                                                  )
17                          Defendants.           )
                                                  )
18   _____         )

19          On August 24, 2012, after a thirteen day trial and approximately three full days of

20   deliberation, a jury in this patent case reached a verdict.  *See* ECF No. 1931.  Apple now seeks

21   judgment as a matter of law to overturn certain of the jury's findings, and judgment as a matter of

22   law as to other issues that the jury did not reach.  *See* ECF No. 2002 ("Mot.").  In the alternative,

23   Apple moves for a new trial on most of the issues on which Apple seeks judgment as a matter of

24   law.  For the reasons discussed below, the Court GRANTS Apple's motion for judgment as a

25   matter of law that claims 10 and 15 of Samsung's U.S. Patent No. 7,675,941 are invalid; DENIES

26
27
28

United States District Court
For the Northern District of California

Apple's motion for judgment as a matter of law in all other respects; and DENIES Apple's motion for a new trial.[1]

## I.   LEGAL STANDARD.

Rule 50 permits a district court to grant judgment as a matter of law "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 881 (9th Cir. 2003).  A party seeking judgment as a matter of law after a jury verdict must show that the verdict is not supported by "substantial evidence," meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Callicrate v. Wadsworth Mfg.,* 427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992)).

A new trial is appropriate under Rule 59 "only if the jury verdict is contrary to the clear weight of the evidence." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010).  A court should grant a new trial where necessary "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

## II.   DISCUSSION

### A.   The Unregistered iPad/iPad2 Trade Dress

Apple moves for judgment as a matter of law that the unregistered iPad/iPad 2 Trade Dress is (1) protectable; (2) infringed; and (3) famous and diluted.  In the alternative, Apple moves for a new trial on the unregistered iPad/iPad 2 Trade Dress.  The jury found that the unregistered iPad/iPad 2 Trade Dress was not protectable and not famous.  Therefore, the jury did not reach the questions of whether Samsung infringed or diluted Apple's unregistered iPad/iPad2 Trade Dress.

#### 1.   Protectability

At trial, Apple had the burden of proving protectability by a preponderance of the evidence. *See* 15 U.S.C.A. § 1125; Final Jury Instruction No. 63.  "The physical details and design of a product may be protected under the trademark laws only if they are nonfunctional and have acquired a secondary meaning." *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 515

---

[1] Apple has also moved for an amended judgment to award additional damages, and for prejudgment interest.  These claims will be addressed in a separate order.

(9th Cir. 1989).  In finding the trade dress not protectable, the jury might have found that either requirement was not met, or that neither was met.  Thus, to establish that its unregistered trade dresses are protectable as a matter of law despite the jury's contrary verdict, Apple would have to show that a reasonable jury would necessarily have found both non-functionality and secondary meaning.

There are two types of functionality: utilitarian functionality and aesthetic functionality.  *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001).  Under the traditional, utilitarian functionality test, a trade dress is functional "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device."  *Id.*  In applying this test, the Ninth Circuit assesses four factors: "(1) whether advertising touts the utilitarian advantages of the design, (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture, (3) whether the design yields a utilitarian advantage and (4) whether alternative designs are available."  *Talking Rain Beverage Co. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998)); *see also Au-Tomotive Gold, Inc., v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006) (acknowledging the four factor test applied by the Ninth Circuit).  Apple argues that the evidence of non-functionality and secondary meaning presented at trial established protectability as a matter of law.

Apple cites evidence attempting to establish utilitarian functionality under all four *Disc Golf* factors.  As to the first factor, "whether advertising touts the utilitarian advantages of the design," Apple points to iPad advertising that presents the iPad design without touting any utilitarian design advantages.  *See* Mot. at 3 (citing PX11; PX128).  As to the second factor, "whether design results from a comparatively simple or inexpensive method of manufacture," Apple cites the testimony of Apple design executive Christopher Stringer that the iPad was not designed to make manufacture cheaper or easier.  *See* Mot. at 3 (citing Tr. 505:18-21).  As to the third factor, whether the design yields utilitarian advantage, Apple cites Mr. Stringer's testimony that the iPad design was chosen for beauty rather than function.  *See* Mot. at 3 (citing Tr. 499:5-6; 504:1-3).  As to the fourth factor, Apple cites expert testimony of Apple's experts Peter Bressler

3

1    and Susan Kare that competitor products with alternative designs can perform the same functions

2    as the iPad.  *See* Mot. at 3 (citing Tr. 1095:10-1096:22 (Bressler); Tr. 1399:24-1401:1 (Kare); Tr.

3    1403:16-1405:12 (Kare).  *See also* PX10 (depicting alternative designs).

4            Although Apple has presented some favorable evidence on each factor, judgment as a

5    matter of law overturning the jury's verdict of nonprotectability is not appropriate here.  It was

6    Apple's burden to prove protectibility of the unregistered iPad trade dress, and Apple has not

7    established that protectability was the only reasonable conclusion.  *See Ostad*, 327 F.3d at 881.

8    Indeed, in its opposition, Samsung cites substantial evidence in the record supporting the jury's

9    finding.  *See* Samsung's Opposition to Apple's Motion for Judgment as a Matter of Law

10   ("Opp'n"), ECF No. 2053, at 1-3.  As to evidence suggesting functionality, Samsung first cites

11   testimony of Samsung's design expert Dr. Itay Sherman that the iPad trade dress is functional.

12   Specifically, Samsung cites Dr. Sherman's testimony that the rectangular shape, rounded corners,

13   and flat front face had "significant benefits" for "usability and economics."  Opp'n at 1 (citing Tr.

14   2603:11-2609:9).  Samsung also cites the testimony of Apple witnesses Dr. Bressler and Dr. Kare

15   that the iPad's clear surface covering the display and familiar icon images served utilitarian

16   functions.  *See id.* (citing Tr. 1199:25-1200:16 (Bressler); 1451:13-1455:25 (Kare)).  Samsung also

17   points to Apple advertisements that tout the iPad's functionality.  *See id.* (citing PX11 ("Thinner.

18   Lighter. . .")).  Finally, Samsung argues that Apple's experts admitted that they failed to seriously

19   consider functionality and offered only conclusory testimony that alternative designs could perform

20   the same functions as the iPad.  *See id.* at 2 (citing Tr. 1469:24-1470:16 (Kare admitting that she

21   did not consider trade dress functionality); Tr. 1206:18-1208:6 (Bressler testifying that his analysis

22   of trade dress functionality was based upon "looking at the packaging and turning the phones on to

23   see their operating system")); Opp'n at 1 (citing Tr. 1079:2-18; Tr. 1094:19-1096:2 (Bressler

24   testimony that alternatives "would provide the same functions")).  A reasonable jury could have

25   weighed this substantial evidence of functionality against the evidence of non-functionality cited

26   by Apple, and concluded that Apple did not carry its burden of showing a lack of utilitarian

27   functionality.

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

Furthermore, there is substantial evidence to support the jury's finding of non-protectability on the theory that the iPad trade dress has "aesthetic" functionality." *See Au-Tomotive Gold*, 457 F.3d at 1072. The asserted iPad Trade Dress has aesthetic functionality if limiting Samsung's use of the iPad Trade Dress would impose "significant non-reputation-related competitive disadvantage" on Samsung. *See id.* (citing *TrafFix*, 532 U.S. at 33). The Supreme Court in *TrafFix* explained that such significant disadvantage arises where there is a "competitive necessity" to infringe or dilute. 532 U.S. at 32-33.

The testimony of Apple's own witnesses supports a finding of aesthetic functionality. Apple industrial designer Christopher Stringer testified that the iPad was designed to be beautiful (Tr. 499:3-8), and Apple executive Philip Schiller also testified that Apple intended the iPad to be "something beautiful." Tr. 617:22-618:1. Mr. Schiller further testified that a primary reason for the iPad's "success" is that the iPad is "absolutely beautiful" (Tr. 626:5-19) and that "customers value beautiful products." Tr. 629:2-9. If the jury accepted Apple's own evidence that Apple had designed an objectively beautiful product desired by consumers for its beauty, the jury could reasonably conclude that excluding Samsung from selling products with this claimed trade dress would impose a "significant non-reputation-related competitive disadvantage." *Au-Tomotive Gold*, 457 F.3d at 1072. Thus, again, substantial evidence in the record supports the jury's finding of non-protectability on a theory of functionality.

Trade dress protectability requires not only non-functionality, but also secondary meaning. A trade dress has secondary meaning if "the purchasing public associates the dress with a particular source." *Clamp*, 870 F. 2d at 517 (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987)). "[F]actors to be assessed in determining secondary meaning include: [1] whether actual purchasers associate [the trade dress] with [the plaintiff]; [2] the degree and manner of [the plaintiff's] advertising; [3] the length and manner of [the plaintiff's] use of the [trade dress]; and [4] whether [the plaintiff's] use of the [trade dress] has been exclusive." *Id*.

As to the first *Clamp* factor, whether actual purchasers associate the trade dress with Apple, Apple cites Apple expert Dr. Hal Poret's survey evidence that 40-65% of respondents associated iPad Trade Dress with Apple. *See* Mot. at 4 (citing Tr. 1585:22-1589:16 (Poret testifying on his

United States District Court
For the Northern District of California

1    survey results)).  As to the second *Clamp* factor, the degree and manner of Apple's advertising,

2    Apple points to its extensive advertising.  *See* Mot. at 4 (citing Tr. 639:13-22 and 649:2-650:19

3    (Schiller testifying on Apple's advertising strategy, including the "product as hero" approach and

4    the various media used by Apple); Tr. 656:4-15 and PX16 (Schiller testimony and supporting

5    documentation that Apple spent $379.5 million on U.S. iPad advertising through June, 2011)).

6    Apple also argues that trade dress recognition may be inferred from the high volume of iPad sales.

7    *See* Mot. at 4.  This argument may have some relevance to the third *Clamp* factor, the length and

8    manner of use.

9           Samsung argues that the jury could reasonably have found non-protectability based upon

10   lack of secondary meaning.  As to the first *Clamp* factor, Samsung argues that Apple did not show

11   that actual purchasers associate the unregistered iPad/iPad2 Trade Dress with Apple.  Instead,

12   Samsung argues that Dr. Poret's survey was deficient because the survey asked whether consumers

13   associated Apple with product images that included features that are not part of the claimed iPad

14   trade dress.  *See* Opp'n at 2 (citing Tr. 1680:19-1682:11).  Furthermore, Samsung argues that the

15   survey was conducted after Samsung began selling the accused tablets, and therefore has no

16   relevance to the question of whether the iPad/iPad 2 Trade Dress had acquired secondary meaning

17   *before* the accused Samsung tablets were released.  *See* Opp'n at 2 (citing Tr. 1601:5-1602:12).

18   Samsung also argues that Dr. Poret's survey evidence lacks credibility and scientific objectivity

19   because Dr. Poret changed his survey methodology at Apple's request.  *See* Opp'n at 3 (citing Tr.

20   1679:15-1680:18).  As to the second *Clamp* factor, the degree and manner of Apple's iPad

21   advertising, Samsung argues that Apple's advertisements are not limited to showing the claimed

22   trade dress.  *See* Opp'n at 3 (citing PX11; PX128 (Apple advertisements)).  Therefore, Samsung

23   reasons, the degree and manner of Apple's advertising do not support a strong inference that

24   Apple's advertising caused the unregistered iPad/iPad 2 Trade Dress to acquire secondary

25   meaning.   Finally, as to the fourth *Clamp* factor, whether Apple had exclusive use of the iPad/iPad

26   2 Trade Dress, Samsung argues that numerous third party products use iPad-like designs.  Opp'n at

27   2 (citing DX687).  Samsung also argues that the iPad's popularity is not necessarily either a cause

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

1    or a result of trade dress recognition by consumers, and thus is not evidence of secondary meaning.

2    *See* Opp'n at 3 (citing 4 *McCarthy on Trademarks and Unfair Competition* 15:47 (4th ed. 1996)).

3    Samsung has demonstrated that substantial evidence in the record supports the jury's

4    finding of no secondary meaning. Specifically, Samsung presented substantial rebuttal evidence to

5    Dr. Poret's survey, along with some evidence on the other relevant factors. Though there is

6    evidence pointing each way, there was substantial evidence to support a conclusion that on balance,

7    Apple failed to establish protectability.

8    In sum, there is substantial evidence in the record to support the jury's finding that Apple's

9    unregistered iPad/iPad 2 Trade Dress is not protectable on any of three independent grounds: (1)

10   utilitarian functionality; (2) aesthetic functionality; and (3) lack of secondary meaning. In light of

11   this finding, the Court also finds that the jury's conclusion was not against the clear weight of the

12   evidence. Accordingly, the Court DENIES Apple's motion for judgment as a matter of law that the

13   unregistered iPad/iPad 2 Trade Dress is protectable, and DENIES Apple's alternative motion for a

14   new trial on the issue of iPad/iPad 2 Trade Dress protectability.

15   **2.    Infringement and Dilution**

16   Apple also moves for judgment as a matter of law that the unregistered iPad/iPad 2 Trade

17   Dress is infringed and diluted. In the alternative, Apple moves for a new trial on the questions of

18   iPad/iPad 2 Trade Dress infringement and dilution. The jury did not reach the question of

19   infringement because it found the iPad/iPad 2 Trade Dress non-protectable. For the reasons

20   discussed above, the Court does not overturn the jury's finding of non-protectability. A non-

21   protectable trade dress cannot be infringed or diluted. Accordingly, the Court does not reach

22   Apple's motion for judgment as a matter of law or a new trial on infringement and dilution.

23   **B.    D'889 Infringement**

24   Apple moves for judgment as a matter of law that the Samsung Galaxy Tab 10.1 infringes

25   U.S. Patent No. D504,889 ("the D'889 Patent"), or, in the alternative, a new trial on the question of

26   D'889 infringement. *See* Mot. at 7-13. A product infringes a design patent if the product's design

27   appears "substantially the same" as the patented design to an "ordinary observer." *Egyptian*

28   *Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc). Comparison of the

*United States District Court*
*For the Northern District of California*

7

1    claimed design to the prior art serves to focus this infringement analysis "on those aspects of [the

2    claimed] design which render [the claimed] design different from prior art designs." *Id.* at 677

3    (internal punctuation omitted).

4         Apple argues that the Galaxy Tab 10.1 infringes the D'889 Patent because the designs

5    would appear substantially the same to an ordinary observer.  Apple first cites this Court's and the

6    Federal Circuit's rulings on the preliminary injunction in this case in which the Federal Circuit

7    implicitly affirmed this Court's finding of a substantial likelihood of success on the merits as to

8    D'889 infringement.  *See* Mot. at 8 (citing *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d

9    1314, 1329 (Fed. Cir. 2012)).  However, the Federal Circuit's ruling was not a finding of actual

10   infringement, and the preliminary injunction order was not binding on the jury.  Indeed, the jury

11   was presented with significant evidence not presented at the preliminary injunction stage, including

12   Apple's admission that the original iPad did not embody the D'889 Patent.  Thus, the prior ruling

13   on the preliminary injunction does not justify judgment as a matter of law or a new trial on

14   infringement.

15        Apple also argues that the evidence at trial established infringement as a matter of law.  The

16   Court does not agree.  Though Apple did present testimony about the similarity of the accused

17   Galaxy Tab 10.1 to the D'889 Patent, Samsung noted a variety of differences.  *See* Opp'n at 6-7.

18   One difference is that the Galaxy Tab 10.1 has a matte back surface rather than a shiny back

19   surface.  Other differences include the Galaxy Tab 10.1's thinner profile than the D'889, the

20   Galaxy Tab 10.1's curved junction between the front surface and the sides in contrast to the

21   D'889's right angle (*see* D'889 at Fig. 5), and the Galaxy Tab 10.1's back surface design with a

22   seam in contrast to the seamless D'889.  Although the Court presumes that the jury followed the

23   Court's instruction to take a gestalt approach to analyzing design patent infringement, these

24   specific differences and others cited by Samsung are sufficient such that their cumulative effect

25   could reasonably render the overall design of the Galaxy Tab 10.1 non-infringing.  The Court thus

26   finds that there was substantial evidence in the record to support the jury's overall conclusion of

27   noninfringement, and that the jury's finding of noninfringement was not against the clear weight of

28   the evidence.

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

1    Apple also argues that the Court's claim construction of the D'889 Patent was erroneous,

2    and that under a correct claim construction, judgment as a matter of law would be warranted.

3    Apple further argues that the claim construction is grounds for a new trial.  Specifically, Apple

4    argues that, contrary to this Court's construction, the D'889 Patent does not require a shiny back

5    surface, and thus, the Galaxy Tab 10.1, with its matte surface, infringes.  However, this Court

6    explicitly ruled, and subsequently instructed the jury, that the oblique lines used to shade the back

7    surface in Figure 2 depict "a transparent, translucent, or highly polished or reflective surface."

8    ECF No. 1425 at 10-11; *see also* Final Jury Instruction No. 43.  These lines are highly similar to

9    those in Figures 1 and 3, which Apple admits show transparent, translucent, or highly polished or

10   reflective surfaces.[2]  Apple argues that although oblique lines "must" be used to indicate any shiny

11   surface, they may also be used for other purposes, such as indicating flatness or curvature, and

12   thus, the presence of oblique lines does not necessarily imply a shiny surface.  *See* MPEP 1503.02.

13   Therefore, Apple argues, the Court should not have construed the oblique lines as representing a

14   shiny surface.  However, flatness or curvature may be indicated by any appropriate surface shading

15   – oblique lines are not required.  *See id.*  As this Court has previously ruled, by using oblique lines

16   in Figure 2 that are highly similar or even indistinguishable from those used in Figures 1 and 3,

17   Apple claimed a transparent, translucent, or highly polished or reflective back surface.  ECF No.

18   1425 at 10-11.  Accordingly, Apple's arguments that judgment as a matter of law would be

19   warranted under a different construction and that a new trial is warranted on the basis of an

20   incorrect construction cannot succeed.

21   Finally, Apple argues that a new trial is warranted on infringement of the D'889 Patent

22   because the jury was incorrectly instructed.  Specifically, Apple argues that the Court erroneously

23   instructed the jury that consumer purchasing confusion was required for design patent

24   infringement.  Although the Court did refer to the concept of confusion in illustrating the test for

25   infringement, the Court also explicitly instructed the jury that "[y]ou do not need . . . to find that

26   any purchasers were actually deceived or confused . . . ."  Final Jury Instruction No. 46.  Thus,

---

[2] Samsung argues that the admitted model for the D'889 Patent has a shiny back, but this fact did not obligate Apple to claim that shiny back as an element of the D'889 design patent.

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

United States District Court
For the Northern District of California

1  Apple's characterization of the jury instruction as requiring the jury to find actual confusion is

2  incorrect.  The Court's instructions provided an accurate description of the test for design patent

3  infringement, and no new trial is warranted on the basis of this instruction.

4         Accordingly, the Court DENIES Apple's motion for judgment as a matter law that

5  Samsung Galaxy Tab 10.1 does not infringe the D'889 Patent, and DENIES Apple's alternative

6  motion for a new trial on the issue of D'889 infringement.

7  **C.      Apple's Remaining Claims**

8         **1.      Non-Infringement of the D'677 Patent and the D'807 Patent**

9         The jury found that the Galaxy Ace phone did not infringe U.S. Patent No. D618,677 (the

10  "D'677 Patent") and that the Galaxy S II and Infuse 4G phones did not infringe U.S. Patent No.

11  D593,087 (the "D'087 Patent").  Apple argues that these findings should be reversed by a grant of

12  judgment as a matter of law.  *See* Mot. at 13-14.  However, the Court finds that there is substantial

13  evidence in the record to support the jury's findings of non-infringement.  Specifically, the Court

14  finds that the phones themselves provide substantial evidence to support the jury's finding of non-

15  infringement.

16         Although specific individual differences or similarities do not themselves determine non-

17  infringement of design patents, individual differences may contribute to the gestalt impression that

18  the jury found non-infringing.  *See Egyptian Goddess*, 543 F.3d at 678-79.  For example, among

19  other differences from the D'677 Patent, the Galaxy Ace phone has a rectangular center button,

20  prominent ornamentation, and wide lateral boarders.  *See* JX1030 (the Galaxy Ace).  *See also* Tr.

21  1119:19-22 (Bressler testimony that the D'677 Patent was distinguished from the prior art based

22  upon button size).  The Galaxy S II phones and the Infuse phone have either bezels distinct from

23  the D'087 Patent's bezel, or no bezel, as well as front-face icons, writing, and logos, and different

24  corner shapes.  *See* JX1027 (Infuse 4G); JX1031 (Galaxy S II – AT&T); JX1032 (Galaxy S II –

25  i9100); JX1034 (Galaxy S II – Epic 4G Touch); JX1035 (Galaxy S II – Skyrocket).  *See also* Tr.

26  1121:7-10 (Bressler testimony that "the absence of a bezel takes you out of substantial similarity");

27  Tr. 1126:22-1127:1 (Bressler testimony that the Infuse 4G lacks a bezel).  The jury could

28  reasonably have concluded that the designs of these phones were not substantially the same as the

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

D'677 and D'087 Patents based on these phones and the testimony about them, and this conclusion was not against the clear weight of the evidence.  Accordingly, the Court DENIES Apple's motion for judgment as a matter of law that the Galaxy Ace does not infringe the D'677, and that the Galaxy S II and the Infuse 4G phones do not infringe the D'807, and DENIES Apple's request for a new trial including these issues.

> **2.    Non-Dilution Findings as to the Registered iPhone Trade Dress and Unregistered iPhone 3G Trade Dresses**

Apple moves for judgment as a matter of law that all the accused products dilute Apple's registered iPhone and unregistered iPhone 3G Trade Dresses.  The jury found these trade dresses protectable and famous, and found dilution as to some devices, but did not find dilution as to every accused device.

Apple cites the testimony of its expert Dr. Russell Winer that "the sale of Samsung's Galaxy S phones is likely to dilute the distinctiveness of Apple's iPhone trade dresses" (Tr. 1528:17-21), and the testimony of its expert Dr. Kent Van Liere that the results of his survey using the Samsung Galaxy Fascinate and the Samsung Galaxy S II Epic 4G show "that it is likely that consumers will associate the look and design of the Samsung Galaxy phones with Apple or with the iPhone, and that would be evidence suggestive of dilution."  Tr. 1695:23-1696:2.  Apple argues that likelihood of dilution was the only reasonable conclusion for the jury to draw upon hearing this evidence.

However, the jury was instructed that the degree of similarity between the accused Samsung phones and Apple's trade dresses was relevant in determining dilution.  *See* Final Jury Instruction No. 67.  The fact that Dr. Winer and Dr. Van Liere testified that all the accused Samsung phones were likely to dilute Apple's phone trade dresses would not preclude the jury from examining the accused phones, which were in evidence, and reaching its own conclusions as to the likelihood of dilution.  Indeed, the accused phones vary in appearance, and Samsung argues that features of these iPhone 3G trade dresses, including a "metallic bezel" and "rounded silver edges," are missing from the accused devices.  *See* Opp'n at 13 (citing JX1011-12, 1016, 1022, 1025, 1027, 1031-35).  Evidence on which to determine that the accused phones were not

11

**United States District Court**
For the Northern District of California

1    sufficiently similar to Apple's trade dresses to give rise to a likelihood of dilution was before the

2    jury.  Accordingly, the jury's findings of non-dilution are consistent with substantial evidence in

3    the record, and the jury's finding of non-dilution was not against the clear weight of the evidence.

4    Apple's motion for judgment as a matter of law or a new trial on dilution of the registered iPhone

5    trade dress and unregistered iPhone 3G trade dresses is DENIED.

6             **3.**     **Dilution of Apple's Unregistered Combination iPhone Trade Dress**

7           Apple moves for judgment as a matter of law that Apple phones dilute the unregistered

8    Combination iPhone Trade Dress, or in the alternative, for a new trial on this basis.  *See* Mot. at 15-

9    16.  Trade dress dilution requires predicate findings that the asserted trade dress is protectable and

10    famous.  The jury found that the unregistered Combination iPhone Trade Dress was not protectable

11    and not famous.  As discussed previously in the context of the iPad/iPad 2 Trade Dress, a trade

12    dress is protectable if it is: (1) non-functional; and (2) has acquired secondary meaning.

13           The evidence cited by Apple in support of its motion for judgment as a matter of law is

14    insufficient to overturn the jury verdict.  As discussed above, Apple bore the burden of establishing

15    protectability of its unregistered trade dress at trial.  In support of non-functionality, Apple cites

16    only Mr. Bressler's testimony that: "It's my opinion that [all] aspects of the iPhone trade dress are

17    not functional."  *See* Mot. at 15 (citing Tr 1094:14-18).  In support of secondary meaning, Apple

18    cites only Dr. Winer's testimony that "Apple trade dresses are among the most distinctive in the

19    world, and particularly in the U.S., and have a very high degree of recognition."  *See* Mot. at 15

20    (citing Tr. 1507:4-9).  A reasonable jury considering this brief and conclusory testimony could find

21    that Apple had not carried its burden of proof on the issue of the Combination iPhone Trade

22    Dress's protectability.  Indeed, the cited testimony regarding secondary meaning was not even

23    specifically about the Combination iPhone Trade Dress, but rather concerned general attributes of

24    "Apple trade dresses."  Tr. 1507:7.  The jury would have been reasonable to conclude that Apple

25    had not established the required non-functionality on the basis of this testimony, and such a finding

26    was not against the clear weight of the evidence.  Accordingly, the Court DENIES Apple's motion

27    for judgment as a matter of law that the unregistered Combination iPhone Trade Dress is

28    protectable, and DENIES Apple's request for a new trial on this basis.  Because a trade dress that is

1    not protectable cannot be famous or diluted, the Court need not reach Apple's motion on these

2    issues.

3         **4.      Infringement of the '163 and '915 Patents**

4         The jury found that 21 of 24 accused Samsung products infringed U.S. Patent No.

5    7,844,915 ("the '915 Patent"), and that 16 of 24 accused Samsung products infringed U.S. Patent

6    No. 7,864,163 ("the '163 Patent").  Apple now argues that *all* of the accused Samsung devices

7    actually infringe these patents, and that judgment as a matter of law should be granted for the

8    products the jury found not to infringe.

9         Apple's one-paragraph motion cites only Apple expert Dr. Karan Singh's testimony at trial

10   that all of the Samsung devices accused of infringement actually infringe.  Apple's broad citations

11   to large blocks of transcript with minimal analysis skirts the limits of the Court's order that parties

12   make all relevant arguments in the body of their motion, and specifically cite and quote the

13   supporting evidence. *See* ECF No. 1945.  Even if Apple's argument were properly presented, the

14   jury was not obligated to credit Dr. Singh's testimony that all of the accused devices infringed.

15   Instead, the jury was entitled to examine the accused devices, all of which were in evidence, and

16   reach its own conclusions.  Additionally, Samsung points to testimony from Samsung's expert

17   Stephen Gray, which also could have provided a basis for the jury's finding of noninfringement.

18   Based on all the evidence presented at trial, the Court finds that there is substantial evidence in the

19   record to support the jury's finding, and the jury's finding was not against the clear weight of the

20   evidence.  Accordingly, the Court DENIES Apple's motion for judgment as a matter of law that all

21   the accused phones infringe the '163 and '915 Patents, and DENIES Apple's request for a new trial

22   on this basis.

23        **D.      Willfulness and Inducement**

24        Apple next moves for judgment as a matter of law that Samsung willfully infringed the

25   D'087 Patent. *See* Mot. at 17.  The Federal Circuit has laid out the relevant standard for the

26   willfulness inquiry for patent infringement: "a patentee must show by clear and convincing

27   evidence that the infringer acted despite an objectively high likelihood that its actions constituted

28   infringement of a valid patent.   The state of mind of the accused infringer is not relevant to this

United States District Court
For the Northern District of California

1   objective inquiry.  If this threshold objective standard is satisfied, the patentee must also

2   demonstrate that this objectively-defined risk. . . was either known or so obvious that it should

3   have been known to the accused infringer." *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371

4   (Fed. Cir. 2007) (internal citation omitted).  Thus, the willfulness inquiry is a two-prong analysis,

5   requiring an objective inquiry and a subjective inquiry.  The objective inquiry is a question for the

6   Court, and the subjective inquiry is a question for the jury.  *Bard Peripheral Vascular, Inc. v. W.L.*

7   *Gore & Associates, Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012).

8   　　　In this case, the jury found that, as a subjective matter, Samsung did not willfully infringe

9   the D'087 Patent.  In other words, the jury considered whether the "objectively-defined risk

10   (determined by the record developed in the infringement proceeding) was either known or so

11   obvious that it should have been known to the accused infringer," *Seagate*, 497 F.3d at 1371, and

12   determined that it was not.  This finding was supported by substantial evidence.  In particular,

13   Samsung cites evidence that the differences between the D'087 Patent and the D'087 prior art were

14   similar in type and scope to the differences between the D'087 Patent and the accused devices.  *See*

15   Tr. 1121:7-1178:25 (discussing varying speaker location, bezel shape, key locations, and number

16   of keys).  This evidence could reasonably have supported the jury's finding that the D'087 Patent

17   was limited in scope, rendering it reasonable for Samsung to believe that its products, while

18   perhaps in some ways similar to the D'087 Patent, did not infringe.  Indeed, the jury's

19   understanding that the D'087 Patent has limited scope is consistent with the jury's finding that 5 of

20   the 8 devices accused of infringing the D'087 Patent were in fact non-infringing.  This evidence of

21   the limited scope of the D'087 Patent is sufficient to support the jury's conclusion that the

22   infringement was not so obvious that Samsung "should have known" that there was a high

23   likelihood of infringement.

24   　　　Moreover, Apple has failed to cite any evidence of actual knowledge of infringement on

25   Samsung's part.  Instead, Apple relies on evidence that Samsung purposely imitated Apple's

26   designs.  *See* Opp'n at 10.  Evidence of copying, however, is not evidence of infringement or

27   knowledge thereof.  *See Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F. 3d 1336, 1351

28   (Fed. Cir. 2002) ("While copying may be relevant to obviousness, it is of no import on the question

14

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

of whether the claims of an issued patent are infringed.").  Given that, as explained above, it would have been reasonable for Samsung to believe that the D'087 Patent was limited in scope, Apple's evidence that Samsung engaged in some copying of Apple's designs does not establish that Samsung knew or should have known it was infringing.  Rather, Samsung may have believed that any elements of Apple's designs that it was copying were not protected by the limited scope of the D'087 Patent.  Apple's evidence thus does little to establish that Samsung knew or should have known it was infringing.  Accordingly, the Court finds that the jury's determination that Samsung's infringement was not willful as a subjective matter is supported by substantial evidence in the record.

As explained above, a finding of willfulness requires both that the jury find subjective willfulness and that the court find objective willfulness.  Here, the jury found that there was no subjective willfulness, and the Court agrees that this finding was supported by substantial evidence in the record.  Therefore, even if the Court were to find the objective prong satisfied, there can be no ultimate willfulness determination.  Accordingly, the Court need not reach the objective analysis.

Apple also moves for judgment as a matter of law that Samsung willfully infringed the D'889 Patent, willfully diluted the unregistered Combination iPhone Trade Dress, and willfully infringed and diluted the unregistered iPad/iPad 2 Trade Dress.  *See* Mot. at 17.  The jury did not find infringement or dilution of any of this intellectual property, and the Court has denied Apple's motion for judgment as a matter law as to infringement and dilution for the reasons explained above.  Accordingly, the Court does not reach Apple's motion for judgment as a matter of law that these alleged acts of infringement and dilution were willful.

Finally, Apple moves for judgment as a matter of law that Samsung Electronics Corp. (SEC) induced infringement of Apple's patents with respect to the products and patents for which the jury found no infringement.[3]  *See* Mot. at 17-18.  However, the jury found no infringement, and

---

[3] For the products and patents on which the jury did find infringement, the jury also uniformly found inducement.  Regarding the '915 Patent, Apple's present motion concerns the Intercept and Replenish phones.  Regarding the '163 patent, Apple's present motion concerns the  Captivate Continuum, Gem, Indulge, Intercept, Nexus S 4G, Transform, and Vibrant phones.

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

United States District Court
For the Northern District of California

1   the Court has denied Apple's motion for judgment as a matter of law on infringement for these

2   products and patents for the reasons explained above.  Without infringement, there can be no

3   inducement.  Accordingly, Apple's motion for judgment as a matter of law that SEC induced these

4   nonexistent acts of infringement is DENIED.

5   **E.      Validity of Samsung's Patents**

6          Apple seeks judgment as a matter of law that all five of Samsung's asserted patents are

7   invalid on grounds of anticipation, obviousness, or both.  A patent claim is invalid by reason of

8   anticipation under 35 U.S.C. § 102 "if each and every limitation is found either expressly or

9   inherently in a single prior art reference."  *Bristol-Myers Squibb Co. v Ben Venue Laboratories,*

10  *Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).  Whether a patent is anticipated is a question of fact.

11  *Green Edge Enterprises, LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1297 (Fed. Cir. 2010).

12  Anticipation must be shown by clear and convincing evidence.  *Id.* at 1292.

13         A patent is invalid for obviousness "if the differences between the subject matter sought to

14  be patented and the prior art are such that the subject matter as a whole would have been obvious at

15  the time the invention was made to a person having ordinary skill in the art to which said subject

16  matter pertains."  35 U.S.C. § 103(a).  "Obviousness is a question of law based on underlying

17  findings of fact."  *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009).  The underlying factual

18  inquiries are: (1) the scope and content of the prior art; (2) the differences between the prior art and

19  the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary

20  considerations, such as commercial success, long felt but unsolved needs, and the failure of others.

21  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co.*, 383

22  U.S. 1, 17-18 (1966)); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1332 (Fed. Cir. 2012).

23  Though obviousness is ultimately a question of law for the Court to decide de novo, in evaluating a

24  jury verdict of obviousness, the Court treats with deference the implied findings of fact made by

25  the jury.  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012).

26  "A party seeking to invalidate a patent on the basis of obviousness must demonstrate by clear and

27  convincing evidence that a skilled artisan would have been motivated to combine the teachings of

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

United States District Court
For the Northern District of California

1    the prior art references to achieve the claimed invention, and that the skilled artisan would have

2    had a reasonable expectation of success in doing so."  *Id.* at 1360.

3        **1.    Claim 10 of U.S. Patent No. 7,456,893 ("the '893 Patent")**

4        Apple moves for judgment as a matter of law that claim 10 of the '893 Patent is invalid.

5    *See* Mot. at 19-20.  Claim 10 claims switching between camera mode and a file displaying mode,

6    such that after switching to the camera mode and back to the file displaying mode, the same image

7    will appear in the file displaying mode that appeared before switching to camera mode.

8    Specifically, claim 10 recites:

> a digital image processing apparatus comprising:
> an optical system for receiving a light reflected from a subject;
> a photoelectric conversion module in optical communication with the optical
> system for converting the light to image data;
> a recording medium for storing the image data in an image file;
> a display screen for displaying the image data; and
> a controller connected with the photoelectric conversion module, the
> recording medium and the display screen, the controller being operative in a
> photographing mode to process the image data for storage in the recording medium
> and, a stored-image display mode, being operative to control the display screen for
> displaying a single image relative to the image data,
> wherein upon a user performing a mode-switching operation defined by
> switching from the stored-image display mode to the photographing mode and back
> to the stored-image display mode the controller causes the display screen to first
> display a single image file that was most recently displayed before the mode-
> switching operation, the single image file being different from a most-recently
> stored image file, and the single image file being first displayed irrespective of a
> duration that the camera was used in the photographing mode during the mode-
> switching operation.

20    '893 Patent, 10:20-47.

21        The prior art Korean Patent No. 10-2004-0013792 (PX112) discloses switching between

22    two display modes, according to the testimony of Apple expert Dr. Paul Dourish -- an image-

23    display mode, and a file-display mode.  Tr. 3206:5-3216:25.  After showing an image in the image-

24    display mode, the prior art can switch back to the file-display mode to show either the earliest file,

25    the oldest file, or the most recently displayed file ("bookmarking"), but does not specifically

26    identify which file should be displayed upon switching back to file-display mode.

27        Regarding anticipation, Apple argues that the Korean Patent discloses every limitation of

28    Claim 10, thus rendering Claim 10 invalid for anticipation.  Mot. at 17.  However, Claim 10 has at

17

United States District Court
For the Northern District of California

1    least two limitations that are not disclosed in the Korean Patent: a photographing mode, and the

2    requirement of bookmarking specifically to the most recently displayed image.  Accordingly, the

3    Court finds that Apple has not shown anticipation by clear and convincing evidence.

4         Regarding obviousness, the parties dispute: (1) whether the prior art switching between

5    image-display and file-display modes renders it obvious to switch between photographing and

6    stored-image display modes; and (2) whether it would have been obvious to switch back to the last-

7    displayed image, rather than to some other image, after being in photograph mode.  Apple argues

8    that the evidence presented renders the patent obvious as a matter of law.

9         At trial, Apple's expert, Dr. Dourish, testified that it would have been obvious to switch

10   back specifically to the last-displayed image, because the combination of bookmarking and mode-

11   switching was already developed in the prior art Korean patent.  Tr. 3217:1-3219:1.  However,

12   Samsung's expert Dr. Woodward Yang testified that the Korean prior art patent did not disclose

13   mode-switching and bookmarking in the context of photography (Tr. 3666:4-19).  Dr. Dourish did

14   not explain why it would be obvious to apply the mode switching and book-marking in the context

15   of photography.  Considering this conflicting testimony, the Court finds that Apple has not

16   presented clear and convincing evidence that it would have been obvious to switch between a

17   photographing mode and a stored-image display mode.  Furthermore, given that camera users may

18   generally be interested in their most recent photographs, it is not at all obvious that bookmarking

19   specifically to the image file last viewed, rather than the most recently recorded photograph or

20   some other file, would necessarily be a desirable user interface feature in the context of an actual

21   photography mode as claimed by the '893 Patent.  Thus, the Court finds that as a matter of law,

22   Apple has not produced clear and convincing evidence that the claimed invention was obvious in

23   light of the prior art.  Accordingly, the Court DENIES Apple's motion for judgment as a matter of

24   law that Apple proved invalidity of the '893 Patent by clear and convincing evidence, and DENIES

25   Apple's motion for a new trial on this basis.

26        **2.      Claim 9 of U.S. Patent No. 7,698,711 ("the '711 Patent")**

27

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

1    Next, Apple moves for judgment as a matter of law that claim 9 of the '711 Patent is

2 invalid.  *See* Mot. at 20.  Claim 9 of the '711 Patent claims using applets to play music on a mobile

3 device.  Specifically, claim 9 recites:

> A multi-tasking apparatus in a pocket-sized mobile communication device including
> an MP3 playing capability, the multi-tasking apparatus comprising:
> a controller for generating a music background play object, wherein the music
>     background play object includes an application module including at least one
>     applet, for providing an interface for music play by the music background
>     play object, for selecting an MP3 mode in the pocket-sized mobile
>     communication device using the interface, for selecting and playing a music
>     file in the pocket-sized mobile communication device in the MP3 mode, for
>     switching from the MP3 mode to a standby mode while the playing of the
>     music file continues and for selecting and performing at least one function of
>     the pocket-sized mobile communication device from the standby mode while
>     the playing of the music file continues; and
> a display unit for displaying an indication that the music file is being played in the
>     standby mode and for continuing to display the indication that the music file
>     is being played while performing the selected function.

'711 Patent, 7:43-8:10.

14    Apple argues that claim 9 is rendered obvious by: (1)  the K700i device (PX125),

15 introduced in 2004, which allegedly discloses all elements except the applet element; and (2) U.S.

16 Patent No. 6,928,948, issued to Wong et al. in 2001 (PX91) (the "Wong Patent"), which discloses

17 using applets with a mobile device.  *See* Mot. at 20.  At trial, Apple's expert Dr. Tony Givargis

18 testified that it would have been obvious to combine the Wong Patent's use of applets with the

19 K700i, because the advantages of applets in mobile devices as described in the Wong Patent were

20 substantial and well known.  Tr. 3244:20-3248:14.  Thus, Apple argues, it would have been

21 obvious to one of skill in the art to combine the well-known applet technology from the Wong

22 Patent with the remaining elements disclosed in the K700i device.

23    The Court does not agree that Apple presented clear and convincing evidence of

24 obviousness for three reasons.  First, there was conflicting expert testimony on the question of

25 whether the combination would in fact have been obvious.  Samsung's expert, Dr. Yang, testified

26 that contrary to what Dr. Givargis said, the Wong Patent would not lead an inventor to include an

27 applet in technology like the K700i.  Tr. 3667:10-15.  The jury could have credited Dr. Yang's

28 testimony over Dr. Givargis's.  Second, Dr. Givargis did not explain why the K700i did not also

19

use the applet technology.  The applet technology disclosed by the Wong Patent had been available for three years at the time the K700i was released.  If its advantages were as obvious as Dr. Givargis claimed, one might have expected the applet technology to be included in the K700i.  The omission of the applet technology from the K700i device thus suggests that the combination was not as obvious as Dr. Givargis claimed.  Third, Dr. Givargis's testimony that there were no secondary indicia of non-obviousness was brief and conclusory: "I did not find anything that would have been, that would have suggested that the claim 9 of the '711 Patent would have been a commercial success."  *See* Mot. at 20 (citing Dr. Givargis's testimony on "secondary considerations" at Tr. 3248:5-14).  Moreover, the jury found the '711 Patent valid, and so implicitly rejected Apple's claim that there were no secondary indicia of non-obviousness.  The Court must defer to this implicit factual finding.  *See Kinetic Concepts*, 688 F.3d at 1356-57.

In sum, when viewed in the context of the record as a whole, Apple's evidence that claim 9 was obvious is of limited weight.  The evidence thus does not rise to the level of clear and convincing evidence.  Accordingly, the Court DENIES Apple's motion for judgment as a matter of law that claim 9 of the '711 Patent is invalid as obvious, and DENIES Apple's motion for a new trial on this basis.

### 3.     Claim 1 of U.S. Patent No. 7,577,460 ("the '460 Patent")

Next, Apple moves for judgment as a matter of law that claim 1 of the '460 Patent is invalid.  *See* Mot. at 20.  Claim 1, the only claim of the '460 Patent, claims:

A data transmitting method for a portable composite communication terminal which functions as both a portable phone and a camera, comprising the steps of:

entering a first E-mail transmission sub-mode upon user request for E-mail transmission while operating in a portable phone mode, the first E-mail transmission sub-mode performing a portable phone function;

entering a second E-mail transmission sub-mode upon user request for E-mail transmission while operating in a display sub-mode, the second E-mail transmission sub-mode displaying an image most recently captured in a camera mode;

sequentially displaying other images stored in a memory through the use of scroll keys;

transmitting the address of the other party and a message received through a user interface in the first E-mail transmission sub-mode; and

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

1  
2  

transmitting the address of the other party and the message received through the  
user interface and the image displayed on the display as an E-mail in the  
second E-mail transmission sub-mode.

3  

'460 Patent, 14:24-44.  Apple argues that this claim is invalid as obvious in view of three patents in

4  

the prior art: U.S. Patent No. 6,069,648, issued to Suso et al. in 2000 (PX119) (the "Suso Patent"),

5  

U.S. Patent No. 6,009,336, issued to Harris  et al. in 1999 (PX118) (the "Harris Patent"), and U.S.

6  

Patent No. 6,690,417, issued to Yoshida et al. in 2004 (PX120) ("the Yoshida Patent").

7  

Samsung asserts that one key element was never identified in any of the prior art: the

8  

element of "displaying an image" in the body of an email.  Apple argues that the Yoshida Patent

9  

does disclose this element.  *See* Mot. at 20.  However, the passages from the Yoshida Patent cited

10  

by Apple merely disclose displaying an image and easily attaching that image file to an email.  The

11  

Yoshida Patent does *not* disclose displaying the image in the email.  *See, e.g.,* PX120 at 20:35

12  

("attach an image file"); 17:63-64 ("transfer of image information by use of electronic mail");

13  

6:38-44 ("send [the image] to a desired party as the electronic mail").  Apple has not presented any

14  

evidence that the key element of displaying an image in the body of an email was disclosed

15  

anywhere in the prior art.  Without prior disclosure of all of the elements in the prior art, the patent

16  

cannot be obvious.  Thus, the evidence in the record supports the jury's finding that Apple has not

17  

proven invalidity by clear and convincing evidence.  Accordingly, the Court DENIES Apple's

18  

motion for judgment as a matter of law that claim 1 of the '460 Patent is invalid, and DENIES

19  

Apple's motion for a new trial on this basis.

20  

### 4.    U.S. Patent No. 7,447,516 ("the '516 Patent")

21  

Apple also moves for judgment as a matter of law that claims 15 and 16 of the '516 Patent

22  

are invalid.  Claims 15 and 16 claim an apparatus for data transmission that can reduce power flow

23  

through a low-priority data transmission channel (the HARQ channel) without reducing power

24  

flow through other higher-priority channels.  Claim 15 recites:

25  

An apparatus for transmitting data of a first channel not supporting Hybrid  
Automatic Repeat reQuest (HARQ) and a second channel supporting the  
HARQ in a mobile telecommunication system which supports an enhanced  
uplink service, the apparatus comprising:

26  
27  

a controller for determining transmit power factors for the channels, determining if  
total transmit power required for transmission of the channels exceeds the

28  

21

maximum allowed power, and scaling down the transmit power factor for the second channel if the total transmit power exceeds the maximum allowed power;

first and second channel generators for generating first and second data frames by performing channel-coding and modulation of the first and second channel data; and

a gain scaling unit for adjusting the transmit powers of the first and second channels, with which the data frames of the first and second channels is transmitted, using the scaled transit power factor for the second channel and the transmit power factor for the first channel.

Claim 16 recites:

The apparatus as claimed in claim 15, wherein the controller scales the transmit power factor for the second channel from slot to slot when the total transmit power exceeds the maximum allowed power.

'516 Patent, 21:11-34.

Apple argues that these two claims are invalid as obvious in view of the prior art. Specifically, the prior art listed in the '516 Patent itself discloses HARQ channels in which power is scaled equally with the power on non-HARQ channels. Tr. 3423:6-3424:19; '516 Patent at Figs. 4-5. Separately, the Hatta Reference (PX100), a Japanese patent application, discloses unequal channel scaling, but not in the context of HARQ channels. Indeed, the Hatta Reference shows scaling of multiple channels, while the '516 Patent limits scaling to the single HARQ channel. *See* PX100, Fig. 5; '516 Pat., Fig. 6. The question, then, is whether it would have been obvious to combine these two. Apple has not presented clear and convincing evidence that such a combination would have been obvious.

Although Apple's expert Dr. Hyong Kim testified that applying scaling of some but not all channels to solve the problem solved by the '516 Patent – the desire to prioritize data transmitted over non-HARQ channels – would be obvious (Tr. 3427:8-20),  Samsung's expert Dr. Tim Williams testified to the contrary (Tr. 3657:3-3658:17).  Furthermore, Dr. Kim failed to explain *why* it would have been obvious to treat the HARQ channel as a separate and lower priority category.  Instead, Dr. Kim testified only that:

if you look at the prior art, Figure 5 [of the '516 Patent], and then the Hatta Patent application, it's quite obvious.  If you think about channels that you have in the 3GPP standard [that allegedly infringes the '516 Patent], multiple channels you have, you could easily classify the channel with a HARQ and a channel without the

United States District Court
For the Northern District of California

1           HARQ.  So Hatta teaches us that if you classify differently, you would scale power of those channels differently.

2  Tr. 3427:11-20.  Dr. Kim's testimony that a HARQ channel *could* be classified differently does not

3  indicate that it would be obvious to do so, or that it would be obvious to prioritize data transmitted

4  over non-HARQ channels.  Dr. Kim also briefly testified that he had not identified any evidence of

5  secondary indicia of non-obviousness, specifically, copying ("No."); commercial success ("No.");

6  failed attempts by others to make the invention ("No."); and praise in the industry ("No.").  Tr.

7  3430:19-3431:6.  Dr. Kim did not describe his investigation methods as to these secondary indicia

8  of non-obviousness.  Moreover, the Court, pursuant to *Kinetic Concepts*, infers from the jury's

9  ultimate finding of validity that the jury implicitly found this testimony of lack of secondary indicia

10  of non-obviousness unpersuasive.  Accordingly, in light of Apple's failure to present evidence as to

11  why it would be obvious to treat the HARQ channel as low-priority, and the jury's rejection of

12  Apple's claim that there were no secondary indicia of non-obviousness, the Court finds that Apple

13  has not established obviousness by clear and convincing evidence.  Accordingly, the Court

14  DENIES Apple's motion for judgment as a matter of law that claims 15 and 16 of the '516 Patent

15  are invalid, and DENIES Apple's motion for a new trial on this basis.

16         **5.**       **Claims 10 and 15 of U.S. Patent No. 7,675,941 ("the '941 Patent")**

17           Claims 10 and 15 of the '941 Patent claim a system for data transmission over wireless

18  systems by chopping up data in discrete packets, with headers containing information needed for

19  data reassembly after transmission.  Specifically, claim 10 recites:

20         An apparatus for transmitting data in a mobile communication system, comprising:

21         a transmission buffer for receiving a service data unit (SDU) from a higher layer, determining whether the SDU can be comprised in one protocol data unit (PDU) segmenting the SDU into a plurality of segments according to a

22             transmittable PDU size if the SDU does not be comprised in one PDU, and

23             constructing one or more PDUs;

24         a header inserter for constructing a header of each PDU, wherein the header comprises a serial number (SN) field, a one-bit field, at least one Length Indicator (LI) field;

25         a one-bit field setter for setting the one-bit field of the at least one PDU to indicate whether the PDU contains an entire SDU in the data field;

26         an LI inserter for inserting an LI field after the one-bit field in the at least one PDU

27             if the SDU is not comprised in one PDU, and setting an LI field to a

28             predefined value indicating that the PDU contains neither a first segment nor

1
          a last segment of the SDU to contain the intermediate segment of the SDU;
              and
2      a transmitter for sending the PDUs to a receiver.

3   '941 Patent, 12:62-13:16.  Claim 15 recites:

4          An apparatus for receiving data in a mobile communication system, comprising:
       a reception buffer for receiving a protocol data unit (PDU) from a transmitter and
5              storing the PDU;
       a reassembly controller for detecting a sequence number (SN) field and a one-bit
6              field indicating whether the PDU contains an entire service data unit (SDU)
               in its data field from the header, detecting the following length indicator (LI)
7              field from the header of the PDU and determining whether the LI field is set
               to a predefined value indicating that the PDU contains an intermediate
8              segment that is neither a first segment nor a last segment of the SDU if the
               one-bit field indicates that the PDU does not contain an entire SDU in its
9              data field;
       a header and LI remover for eliminating the SN field, the one-bit field, and the LI
10             field if the one-bit field indicates that the PDU does not contain the entire
               SDU in its data field,; and
11     a reassembler for receiving the intermediate segment from the header and LI
               remover and constructing the SDU by combining the intermediate segment
12             with at least one previous segment extracted from a data field of at least one
               previous PDU and at least one following segment extracted from a data field
13             of at least one following PDU.

14  '941 Patent, 13:37-14:22.

15         Apple argues that these claims are invalid because they are anticipated by a single prior art

16  reference: U.S. Patent No. 6,819,658 ("the Agarwal Patent").  *See* PX97.  Samsung attempts to

17  distinguish the Agarwal Patent based solely upon Dr. Williams' testimony that the Agarwal Patent

18  occurs in a different context than the '941 Patent (satellites rather than mobile networks), and that

19  several elements of claims 10 and 15 are missing from the Agarwal Patent "if you look."  Opp'n at

20  21 (citing Tr. 3658:18-3659:17).  The three allegedly missing elements that Dr. Williams identified

21  are: (1) "no one bit field"; (2) "no serial number"; and (3) "no length indicator."  *Id.*

22         However, Apple has presented evidence addressing each of these alleged differences.  First,

23  as to the satellite versus mobile network context issue, the Agarwal Patent is explicitly addressed to

24  "satellite *and wireless*" networks.  PX97 at [57] (Agarwal abstract).  Thus, the plain text of the

25  Agarwal Patent is inconsistent with Samsung's suggestion that the Agarwal Patent is limited to the

26  satellite context.  The Court thus finds that there is no significant difference in contexts.

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

As to the three supposedly missing elements, Apple's expert Dr. Edward Knightly walked the jury through the Agarwal Patent's Figure 7(B), which accounts for all three missing elements asserted by Dr. Williams. First, Dr. Knightly explained that the Agarwal Patent discloses a "one bit field." *See* Tr. 3455:23-3456:3; 3456:22-3457:15; 3458:18-3459:2. The '941 invention includes the limitation that each packet-header contains a 1-bit field (0 or 1) that indicates whether the packet is a serviceable data unit (SDU) containing a segment of the transmitted data. In the Agarwal Patent, this feature takes the form of the "V" bit – V for "valid," which indicates whether there is a segment of transmitted data in the packet, and is similarly a one bit field. *See* PX97, 10:25-32 (explaining the V bit in Fig. 7B). Thus, the Court finds that the "one bit field" limitation of the '941 Patent allegedly missing from the Agarwal Patent is, in fact, disclosed in the Agarwal Patent.

Second, Dr. Knightly explained that the Agarwal Patent discloses a sequence number. *See* Tr. 3456:17-21; 3458:18-22. The '941 Patent includes the limitation that packet headers include a sequence number for each packet. In Figure 7(B) of the Agarwal Patent, this is disclosed as the "PKTSEQNO" – the PacKeT SEQuence NO. (packet sequence number) – i.e. the sequence number for each specific packet of data. *See* PX97, 10:12-14; 10:33-37 (explaining the packet sequence number in Fig. 7B). Thus, contrary to Dr. Williams's suggestion, the Agarwal Patent does disclose the sequence number limitation in the '941 Patent.

Third, Dr. Knightly explained that the Agarwal Patent includes a length indicator. *See* Tr. 3456:4-16; 3459:3-6. The '941 Patent includes the limitation of a length indicator that shows whether the segment is the first data segment, the last data segment, or an intermediate segment. The packet header in Figure 7(B) of the Agarwal Patent discloses this limitation as the adjacent F/L fields – first / last, in which 1 0 would indicate the first segment, 0 0 an intermediate segment, and 0 1 would indicate the last segment. *See* PX97, 10:15; 10:18-20 (explaining the F and L fields in Fig. 7B). The adjacent F/L fields are thus exactly the type of length indicator included in the '941 Patent. Therefore, Dr. Williams's statement to the contrary notwithstanding, the Agarwal Patent discloses the length indicator limitation of the '941 Patent. There is no dispute that the remaining elements of these claims are disclosed by the Agarwal Patent.

25

1    "To anticipate, a single reference must teach every limitation of the claimed invention."

2    *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  Each of the three

3    allegedly missing elements identified by Dr. Williams is in fact disclosed by Figure 7B of the

4    Agarwal Patent.  Moreover, at the hearing on December 6, 2012, Samsung conceded that it had no

5    evidence other than Dr. Williams's testimony that the Agarwal Patent did not anticipate the '941

6    Patent, and did not argue that any additional limitations were missing from the Agarwal Patent.

7    *See* Dec. 6 Tr. 66:18-67:6.  Dr. Williams's trial testimony, on which Samsung relies, was brief and

8    conclusory, covering just over one page of transcript, and did not offer any response to any of

9    Apple's arguments.  Tr. at 3658:18-3659:21.  In short, Apple has clearly identified where each of

10   the allegedly missing elements is disclosed in a single prior art reference, as is required for

11   anticipation, and Samsung has failed to respond to these arguments.  The Court finds that Apple

12   has established anticipation by clear and convincing evidence.  Accordingly, the Court GRANTS

13   Apple's motion for judgment as a matter of law that claims 10 and 15 of the '941 Patent are

14   invalid.[4]

15   **F.    Breach of Contract and Antitrust**

16   Finally, Apple argues that Apple is entitled to judgment as a matter of law that Samsung

17   breached the European Telecommunications Standards Institute's ("ETSI's") Intellectual Property

18   Rights ("IPR") Policy, and that in so doing, Samsung violated section 2 of the Sherman Act.

19   Electronics companies often work together to create and adopt technical standards in order

20   to make products that will be able to work together, despite being made by different manufacturers.

21   The Universal Mobile Telecommunications System ("UMTS") is a technical standard pertaining to

22   cellular phone technology.  Several organizations participated in the development of the UMTS,

23   including ETSI.  Apple and Samsung are both members of ETSI.  ETSI has a set of policies

24   concerning the IPRs of its members, including when and how they must be disclosed during the

25   standard-setting process, and what sorts of terms ETSI members must offer for licenses of their

26

27   ───────────────

[4] As the jury found that these claims were not infringed, this ruling does not affect the overall
outcome of this case.

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

United States District Court
For the Northern District of California

1    IPRs that are necessarily infringed by practicing the standards (so-called "essential IPRs").  IPRs

2    include patents and patent applications.

3         In 2005, during the process of designing and finalizing specifications for inclusion in the

4    UMTS, Samsung submitted two technical proposals to ETSI, seeking specific changes to draft

5    specifications that would become part of the standard.  *See* PX72 (report of working group

6    discussing a Samsung proposal);  PX70 (same); PX84 (ETSI document showing formal adoption

7    of specifications including Samsung's proposals).  These two proposals involved the incorporation

8    of new technologies: one corresponding to what became the '941 Patent, and the other

9    corresponding to what became the '516 Patent.  After components of the UMTS incorporating

10   Samsung's two proposals were formally adopted, Samsung declared several patents, including the

11   '941 and '516 Patents, "essential" to the UMTS, meaning that Samsung believed it would be

12   impossible to comply with the standard without infringing the patents.  *See* PX122 (ETSI database

13   showing Samsung's declarations).  Samsung also made both general and patent-specific

14   declarations that it was prepared to license these and other standards-essential patents on fair,

15   reasonable, and non-discriminatory ("FRAND") terms.  *See* PX122.1 (December 14, 1998 general

16   declaration); PX122.41 (August 9, 2007 '941 declaration); PX122.24 (May 19, 2006 '516

17   declaration).

18        The parties do not dispute that the '941 Patent claims priority to a Korean patent application

19   which was filed shortly before Samsung's submission of the proposal incorporating that

20   technology, and that the '516 Patent claims priority to several Korean patent applications, one of

21   which was filed shortly before Samsung's submission of a proposal incorporating the '516

22   technology.  In other words, Samsung had filed patent applications in Korea, which correspond to

23   the two U.S. patents at issue here, covering the technology it sought to work into the standard

24   *before* submitting its proposals to ETSI.

25        On June 30, 2011, Samsung filed its counterclaims against Apple in this case, alleging

26   violation of a range of Samsung patents.  ECF No. 80.  Samsung's primary argument for

27   infringement of the two patents at issue here was that Apple's products that comply with the

28   UMTS necessarily infringe the '516 and '941 Patents.  *See* Tr. 437:19-438:9 (Samsung's opening

27

statement regarding the '516 Patent); *id.* at 440:14-19 (same regarding '941 Patent).  In July of 2011, Samsung offered Apple a license to its portfolio of declared-essential patents, consisting of some 86 patents including the two at issue here, seeking a royalty of 2.4% of the selling price of each Apple product.  *See* Tr. 3145:1-16; PX80 (license offer).

### 1.     Breach of Contract

The jury found that Samsung was not liable to Apple for breach of the ETSI IPR policy.  Apple now moves for judgment as a matter of law that Samsung is liable for breach of contract for two reasons: (1) Samsung's violations of the ETSI IPR Policy's disclosure requirement; and (2) Samsung's violations of the ETSI FRAND licensing requirement.  Apple also moves in the alternative for a new trial on these bases.

Regarding the disclosure requirement, the ETSI IPR Policy requires ETSI members such as Samsung to timely disclose potentially essential IPRs on a good faith ("bona fide") basis.  PX74, Annex 6, Article 4.  There are serious questions about whether Samsung fulfilled its good faith disclosure obligations under the ETSI IPR Policy when Samsung failed to disclose Samsung's Korean patent applications before the inventions were incorporated into the UMTS standard.  However, the Court need not decide whether Samsung actually breached a contractual obligation.  As this Court instructed the jury, to recover for breach of contract, there must be not only a breach, but also a causal link between the breach and the alleged harm.  *See* Final Jury Instruction No. 75.  Apple has not provided sufficient evidence of this required causal link to disturb the jury's finding of no liability for breach of contract.

Apple alleges that the causal link between Samsung's conduct and harm to Apple is that ETSI "may not have" adopted the standard it chose if Samsung had disclosed the disputed IPR (Korean Patent applications), but instead may have adopted some other standard.  *See* Tr. 3579:2-6 (testimony of Apple's expert Janusz Ordover).  The hypothetical alternative standard would not have required standard-users to infringe Samsung's IPR, and thus there would have been no risk of infringement, and Apple would not have been forced to defend this infringement action.

However, Apple's evidence of causation consists of the testimony of three experts, Dr. Ordover, Dr. Kim, and Dr. Knightly, and is not strong.  Dr. Ordover said only that Samsung's non-

28

United States District Court
For the Northern District of California

1  disclosure "led to a choice of technology that may not have been chosen but for [Samsung's]

2  conduct." Tr. at 3579:4-6. Dr. Ordover's conclusory testimony relied on Dr. Kim's testimony that

3  alternatives to the '516 technology were considered, and Dr. Knightly's testimony that alternatives

4  to the '941 technology existed at the time the UMTS was adopted. Tr. 3432:2-15 (Kim); Tr.

5  3460:20-23 (Knightly). However, Dr. Kim failed to address the advantages or disadvantages of the

6  alternative technologies. Thus, Dr. Kim's testimony does not show that these alternative

7  technologies would likely have been chosen but for Samsung's non-disclosure – only that there

8  was an abstract possibility that ETSI could have chosen something different.

9  Dr. Knightly similarly failed to establish causation. He first testified that the Agarwal

10  Patent provides an alternative to the '941 technology. *See* Tr. 3460:20-23. However, Dr. Knightly

11  did not testify as to what alternative technology the Agarwal Patent discloses. *See id.* Indeed, the

12  Agarwal Patent is the reference that Dr. Knightly argued, and this Court has ruled, anticipates the

13  '941 Patent, meaning that it discloses the *same* technology as the '941 Patent, rather than some

14  alternative technology. Though some other part of the Agarwal Patent could theoretically disclose

15  an alternative technology in addition to the technology that anticipates the '941 Patent, Dr.

16  Knightly did not identify any such alternative in the Agarwal Patent. His reliance on the Agarwal

17  Patent thus fails to establish that there was an available alternative. Dr. Knightly also testified that

18  one alternative available at the time of standard-setting – "the original e-bit" – existed in the market

19  at the time of standard-setting. Tr. 3460:24-3461:17. But this testimony, like Dr. Kim's testimony,

20  fails to address whether there are any advantages to one alternative or the other, and thus whether

21  there was a realistic possibility of the adoption of the alternative over the '941 technology.

22  In sum, Apple's evidence in support of its argument that ETSI would likely have adopted

23  an alternative standard had ETSI known of Samsung's IPR is sufficiently equivocal that the jury

24  could reasonably have found that the causation element was not satisfied. This conclusion was not

25  against the clear weight of the evidence. Accordingly, the record is consistent with the jury's

26  finding that there was no breach of contract due to the ETSI disclosure provisions.

27  Apple has also failed to establish that the jury was wrong as a matter of law to find that

28  Samsung did not breach the ETSI policy by its conduct relating to FRAND obligations. Whether

United States District Court
For the Northern District of California

1    Samsung violated its FRAND licensing obligations is a question of fact.  The jury heard conflicting

2    expert testimony as to whether Samsung's offer to license Apple Samsung's entire declared-

3    essential patent portfolio at a 2.4% royalty rate met Samsung's FRAND licensing obligations.

4    *Compare* testimony of Samsung's expert David Teece, Tr. 3145:1-3146:23 (FRAND) *with*

5    testimony of Apple's expert Richard Donaldson, Tr. 3537:12-3538:6; 3539:6-20 (not FRAND).

6    Dr. Teece's testimony represents substantial evidence in the record in support of the jury's finding

7    that Samsung did not violate its FRAND licensing obligation under the ETSI IPR Policy.  Further,

8    given the conflicting nature of the testimony, the jury's finding was not against the clear weight of

9    the evidence.  Thus, the Court DENIES Apple's motion for judgment as a matter law that Samsung

10   is liable to Apple for breach of contract, and DENIES Apple's motion for a new trial on this basis.

11              **2.       Antitrust**

12       The jury found that Samsung did not violate section 2 of the Sherman Act.  The jury was

13   instructed that the elements of the violation are: (1) that the alleged market is a relevant antitrust

14   market; (2) that Samsung possessed monopoly power in that market; (3) that Samsung "willfully"

15   acquired its monopoly power in that market by engaging in anticompetitive conduct; (4) that

16   Samsung's conduct occurred in or affected interstate commerce; and (5) that Apple was injured in

17   its business or property because of Samsung's anticompetitive conduct.  *See* Final Jury Instruction

18   No. 77.  Apple has moved for judgment that Samsung violated the Sherman Act as a matter of law,

19   meaning that the only reasonable conclusion the jury could have drawn from the evidence was that

20   all five elements were met.  Failure to establish any one of these five elements would justify the

21   jury's finding of no liability.

22       Apple's allegations of anticompetitive conduct concern the same behavior that gave rise to

23   the failed breach of contract claim: breach of the disclosure policy, and failure to comply with

24   FRAND obligations.  *See* Mot. at 25-26.  Regarding the disclosure policy, Sherman Act liability,

25   requires that Samsung's conduct have caused Apple harm.  However, as explained above, Apple's

26   evidence that any breach of the disclosure policy by Samsung caused any harm suffered by Apple

27   is not sufficiently strong to require the jury to find for Apple.  Thus, for the reasons explained

28   above in the context of breach of contract, the Court will not upset the jury's determination that

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW

1    there can be no Sherman Act liability for Samsung's alleged failure to abide by ETSI's IPR

2    disclosure policy.

3        Regarding FRAND obligations, Samsung's licensing behavior could only give rise to

4    Sherman Act liability if it constituted anticompetitive behavior.  However, the jury, as discussed

5    above, implicitly found that the conflicting testimony had not established that Samsung had failed

6    to meet its FRAND obligations.  In so finding, the jury could also reasonably have found that

7    Samsung's licensing behavior was not anticompetitive, and thus did not meet the third requirement

8    for Sherman Act liability.  Accordingly, the Court DENIES Apple's motion for judgment as a

9    matter of law that Samsung violated section 2 of the Sherman Act, and DENIES Apple's motion in

10   the alternative for a new trial.

11   **3.      CONCLUSION**

12       For the reasons discussed above, the Court:

13   (1) GRANTS Apple's motion for judgment as a matter of law that claims 10 and 15 of the '941

14       Patent are invalid;

15   (2) DENIES Apple's motion for judgment as a matter of law that Apple's unregistered

16       iPad/iPad 2 trade dress is protectable, infringed, and diluted;

17   (3) DENIES Apple's motion for judgment as a matter of law that the Galaxy Tab 10.1 infringes

18       the D'889 Patent;

19   (4) DENIES Apple's motion for judgment as a matter of law that all accused Samsung phones

20       infringe or dilute all Apple's intellectual property as asserted, and that all acts of

21       infringement or dilution by accused Samsung phones and tablets were willful and induced

22       by SEC;

23   (5) DENIES Apple's motion for judgment as a matter of law that the '893, '711, '460, and '516

24       Patents are invalid; and

25   (6) DENIES Apple's motion for judgment as a matter of law that Samsung is liable to Apple

26       for breach of contract and antitrust violations stemming from breach of the ETSI IPR

27       Policy.

28   **IT IS SO ORDERED.**

31

United States District Court
For the Northern District of California

1   Dated: January 29, 2013

2                                                LUCY H. KOH
                                                 United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 11-CV-01846-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT AS A MATTER OF LAW