# EXHIBIT 12
# FILED UNDER SEAL

Andrew Bright        APPLE CONFIDENTIAL BUSINESS RECORD        June 29, 2010
                     PURSUANT TO PROTECTIVE ORDER              Menlo Park, CA

```
                                                      Page 1
  1        IN THE UNITED STATES INTERNATIONAL TRADE COMMISSION

  2                        WASHINGTON, D.C.

  3                         ---o0o---

  4    _____

  5    In the Matter of:              )

  6    CERTAIN ELECTRONIC DEVICES,    )   Investigation No.

  7    INCLUDING MOBILE PHONES,       )   337-TA-701

  8    PORTABLE MUSIC PLAYERS, AND    )

  9    COMPUTERS                      )

 10    _____

 11             APPLE CONFIDENTIAL BUSINESS RECORD

 12                PURSUANT TO PROTECTIVE ORDER

 13           VIDEOTAPED DEPOSITION OF ANDREW BRIGHT

 14                   Menlo Park, California

 15                   Tuesday, June 29, 2010

 16

 17        Deposition of ANDREW BRIGHT, taken on behalf of

 18    Complainant, at 275 Middlefield Road, Menlo Park,

 19    California, beginning at 9:17 a.m., and ending at 6:15

 20    p.m. on Tuesday, June 29, 2010, before LYNNE LEDANOIS,

 21    CSR 6811.

 22

 23    REPORTED BY:

 24    LYNNE LEDANOIS

 25    CSR No. 6811
```

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248888

Page 2

     1    APPEARANCE OF COUNSEL:

     2

     3    For Complainant Nokia, Inc., and Nokia Corporation:

     4         ALSTON & BIRD LLP

     5         BY: ALAN L. WHITEHURST

     6         The Atlantic Building

     7         950 F Street, N.W.

     8         Washington, D.C. 2006-1404

     9         202.756.3300

    10         alan.whitehurst@alston.com

    11

    12    For Respondent Apple, Inc.:

    13         WILMER CUTLER PICKERING HALE & DORR LLP

    14         BY: MARIA K. VENTO

    15         1117 California Avenue

    16         Palo Alto, California 94303

    17         650.858.6038

    18         maria.vento@wilmerhale.com

    19

    20    VIDEOGRAPHER:

    21         ADAM DEL RIO

    22

    23    ALSO PRESENT: DURAND R. BEGAULT

    24

    25

Highly Confidential - Attorneys' Eyes Only                     APLNDC-Y0000248889

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER               Menlo Park, CA

```
                                                          Page 3
 1                          INDEX

 2    WITNESS                               EXAMINATION

 3    ANDREW BRIGHT

 4        BY MR. WHITEHURST                          6

 5        BY MS. VENTO                             263

 6

 7

 8                        EXHIBITS

 9    BRIGHT                                      PAGE

10    No. 709   Nokia's Notice of Deposition to

11              Andrew Bright;                     150

12    No. 710   Document headed, N18 Lesson Learned,

13              David Tupman, 8/13/09;             150

14    No. 711   E-mail to David Tupman and Jae

15              Lee from Tang Yew Tan dated June 2,

16              2009;                              160

17    No. 712   Document headed, iPhone Acoustics

18              Exec Review, 6/xx/2009;            160

19    No. 713   E-mail to Jae Lee from Andrew Bright

20              dated January 14, 2010;           174

21    No. 714   E-mail to Guy Nicholson from Jae Lee

22              dated January 14, 2010;           182

23    No. 715   Document headed, FATP Acoustics Yield

24              Hitters, MIC1, FACT2, MIC2, FACT1

25              and Loudspeaker;                  185
```

Alderson Reporting Company
1-800-FOR-DEPO

**Highly Confidential - Attorneys' Eyes Only**                **APLNDC-Y0000248890**

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

```
                                                          Page 4

  1                      EXHIBITS

  2    BRIGHT                                              PAGE

  3    No. 716   Document headed, FATP Acoustics Yield

  4              Hitters, MCIC1, FACT2, MIC2, FACT1,

  5              and Loudspeaker;                          202

  6    No. 717   E-mail to Tang Yew Tan from Andrew

  7              Bright dated June 1, 2009;                204

  8    No. 718   Document headed, N90 Acoustics;           206

  9    No. 719   Document headed, Acoustics Report,

 10              Andrew Bright;                            233

 11    No. 720   Document headed, Acoustics Team

 12              Development, Andrew Bright;               246

 13    No. 721   Letter to Nina S. Tallon, Esq., from

 14              T. Hunter Jefferson dated June 29,

 15              2010;                                     262

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000248891

Page 5

1           Menlo Park, California, Tuesday, June 29, 2010

2                   9:17 a.m. - 6:15 p.m.

3                     ---o0o---

4           VIDEOGRAPHER:  Good morning.  We are on the

5   record at 9:17 a.m.  I'm Adam Del Rio from Alderson

6   Court Reporting in Washington, D.C.  The phone number is

7   (202)289-2260.

8           This is the matter pending before the

9   International Trade Commission in the case captioned

10  Certain Electronic Devices, Including Mobile Phones,

11  Portable Music Players, Case Number 337-TA-701.

12          This is the beginning of tape one, Volume 1, of

13  the deposition of Mr. Andrew Bright on June 29th in the

14  year 2010.  We are located at 275 Middlefield Road, in

15  the City of Menlo Park, California.

16          Counsel, would you please identify yourselves

17  for the record, starting with the questioning attorney.

18          MR. WHITEHURST:  Good morning.  My name is Alan

19  Whitehurst.  I'm with the law firm of Alston & Bird, and

20  I represent the Complainants, Nokia Corporation and

21  Nokia, Inc., in this investigation.  With me this

22  morning is Dr. Durand Begault.

23          MS. VENTO:  My name is Maria Vento.  I'm with

24  the law firm of Wilmer, Cutler, Pickering, Hale & Dorr.

25  We represent the Respondents in this matter.

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248892

Page 6

```
 1          VIDEOGRAPHER:  Thank you.

 2          Will the court reporter please swear in our

 3   witness and we may proceed.

 4                      ANDREW BRIGHT,

 5      having been duly sworn, testified as follows:

 6                      ---oOo---

 7                      EXAMINATION

 8   BY MR. WHITEHURST:

 9      Q   Good morning, Mr. Bright.  My name is Alan

10   Whitehurst, and I will be taking your deposition today.

11      A   Good morning.

12      Q   Do you realize that you're under oath?

13      A   Yes.

14      Q   And that your testimony today has the same

15   effect as if it was in a courtroom, before a judge or a

16   jury?

17      A   Yes.

18      Q   Any reason that you're unable to testify

19   truthfully this morning?

20      A   No.

21      Q   It's very important that you answer my

22   questions verbally.  It's very difficult for the court

23   reporter to record nonverbal responses.  Do you

24   understand?

25      A   Yes.
```

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248893

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                          PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 39

1      Q   Did you meet with any members of the acoustics

2   team?

3      A   Yes.

4      Q   Who from the acoustics team did you meet with?

5      A   Phil Tamchina.

6      Q   Anyone else?

7      A   No, I did not.  No, I did not meet with him.

8          I met Cyril Labidi.  He's not a member -- he

9   works in acoustics, but he's not a member of the

10  acoustics team.

11     Q   What group is he in?

12     A   He's in the acoustics validation team.

13     Q   Did you meet with anyone else that was involved

14  in acoustics besides Mr. Labidi?

15     A   Yes.

16     Q   Who else?

17     A   Ed Jordan.

18     Q   Anyone else?

19     A   Not that I can remember.

20     Q   How long did this interviewing trip last?

21     A   The interviews took place over a period of two

22  days, and I believe after that, I stayed one full day

23  over a weekend.

24     Q   What happened after your interviewing trip to

25  Cupertino?

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248926

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                        PURSUANT TO PROTECTIVE ORDER               Menlo Park, CA

Page 40

1       A   I returned to Helsinki.

2       Q   What happened next?

3       A   I received a phone call from the recruiter

4   saying that they were interested, but there was a long

5   delay before they finally made me an offer.

6       Q   Did anything else happen?

7       A   Can you be more specific?

8       Q   Did you have any contact with Apple other than

9   this follow-up phone call from Mr. Cong before Apple

10  gave you an offer?

11      A   Not really.  All of the communication -- I

12  believe I may have had one phone call with David Tupman.

13  It was rather brief.  I am a bit vague on that.  But,

14  really, after my face-to-face interviews, all of the

15  substantive discussion was through Jose.

16      Q   When did you receive an offer from Apple?

17      A   I want to say it was about the end of March

18  2009.

19      Q   So, roughly, one month later?

20      A   Yes, about.

21      Q   What was your offer?

22      A   Can you be more specific?

23      Q   What offer did Apple make to you?

24      A   They offered me the position.

25      Q   What position did they offer you?

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248927

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                              PURSUANT TO PROTECTIVE ORDER          Menlo Park, CA

Page 41

```
 1        A    Head of the iPhone/iPod acoustic design team.

 2        Q    Before you were offered the position, head of

 3   the iPhone/iPod acoustic design team, was there someone

 4   else that was head of the iPhone/iPod acoustic design

 5   team?

 6        A    No.

 7        Q    So this was a new position?

 8        A    Yes.

 9        Q    Who had been head of acoustics before you were

10   made this offer?

11        A    I would have to speculate.

12        Q    What happened after Apple made you the offer?

13        A    Not much.  Can you be any more specific?

14        Q    Did you negotiate with them over salary?

15        A    No.

16        Q    Did you negotiate with them over any other

17   terms?

18        A    Yes.

19        Q    What terms did you negotiate?

20        A    Relocation.

21        Q    Anything else?

22        A    Not that I can remember.  Oh, there was some

23   discussion about start date.

24        Q    Anything else?

25        A    Not that I can remember.
```

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248928

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 42

1       Q   Was the compensation a significant increase?

2       A   Not really.

3       Q   Was it an increase?

4       A   Yes.  Well, my wife was working in Finland.  So

5   it was a slight increase compared to my own salary, but

6   given the fact that my wife would not be working when we

7   moved here, it was actually a significant decrease.

8       Q   Did Apple pay for your relocation?

9       A   Yes.

10      Q   Did Apple pay for anything else?

11          MS. VENTO:  Objection, form.

12          Go ahead.  If you understand the question,

13  answer it.

14          THE WITNESS:  Not really, no.

15  BY MR. WHITEHURST:

16      Q   Was there a signing bonus?

17      A   Yes.

18      Q   Did Apple offer you any stock options?

19      A   No.

20      Q   Other than paying for your relocation, signing

21  bonus, and compensation, was there any additional --

22  strike that.

23          Other than agreeing on a salary, a signing

24  bonus, and paying for your relocation, was there any

25  other compensation from Apple to you?

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248929

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 53

1       Q   So it is possible that you have used the term;

2   correct?

3           MS. VENTO:  Objection to form.

4           THE WITNESS:  It's possible, but, I mean -- but

5   I cannot recall any specific instance of when I've used

6   that.

7   BY MR. WHITEHURST:

8       Q   When you possibly used the term, what did you

9   mean?

10          MS. VENTO:  Objection to form, mischaracterizes

11  testimony.

12  BY MR. WHITEHURST:

13      Q   You can answer that question.  .

14          MS. VENTO:  If you understand and know the

15  answer to the question, you should answer the question.

16          THE WITNESS:  Can you repeat the question?

17  BY MR. WHITEHURST:

18      Q   When you used the term "acoustic

19  characteristic," what did you mean?

20          MS. VENTO:  Objection to form and

21  mischaracterizes testimony.

22          MR. WHITEHURST:  I thought we had a

23  stipulation, just object to form.

24  BY MR. WHITEHURST:

25      Q   When you used the term "acoustic

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248940

Andrew Bright             APPLE CONFIDENTIAL BUSINESS RECORD             June 29, 2010
                          PURSUANT TO PROTECTIVE ORDER                   Menlo Park, CA

Page 54

1   characteristic," what did you mean?

2             MS. VENTO:  Objection to form.

3             THE WITNESS:  It would be more like in the

4   abstract, sort of like -- well, it would be -- it would

5   not be about any specific behavior, maybe some kind of

6   like general property, something very subjective,

7   touchy-feely, not really a hard, cut-and-dry engineering

8   terms.

9   BY MR. WHITEHURST:

10      Q   Could it be used to describe a particular

11  measurement?

12            MS. VENTO:  Objection to form.

13            THE WITNESS:  Not that I am aware of.

14            MR. WHITEHURST:  We can take a break.

15            VIDEOGRAPHER:  The time is 10:32 a.m.  We are

16  off the record.

17                    (Recess Taken.)

18            VIDEOGRAPHER:  The time is 10:44 a.m.  We are

19  back on the record.

20  BY MR. WHITEHURST:

21      Q   Mr. Bright, when you joined Apple in May of

22  2009, were you overseeing any particular Apple products?

23      A   Yes.

24      Q   What products were you overseeing?

25      A   So at the time, we were responsible for N88 and

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248941

Andrew Bright   APPLE CONFIDENTIAL BUSINESS RECORD   June 29, 2010
PURSUANT TO PROTECTIVE ORDER   Menlo Park, CA

1   90 and N33 and also N18.

2       Q   And what aspects of the N88 were you

3   overseeing?

4       A   Very little.  The main thing that we were

5   working on -- the product had really been designed to

6   completion by the time that I arrived, and the only

7   remaining problem was with some earpiece rup and buzz

8   issues.  It's working out details of manufacturing.

9       Q   What aspects of the N90 were you overseeing?

10      A   I did not work too much during my first -- when

11  I first started at Apple on N90.  From memory, the main

12  things we were working on were -- it was about tuning of

13  speech processing algorithms.

14      Q   Were there any other aspects of the N90 that

15  you were overseeing besides the tuning of speech

16  algorithms?

17          MS. VENTO:  Objection to form.

18          THE WITNESS:  Yes.

19  BY MR. WHITEHURST:

20      Q   What other aspects were you overseeing?

21      A   The overall audio performance of the device.

22      Q   So were you overseeing the audio performance of

23  the microphone?

24      A   Yes.

25      Q   Were you overseeing the audio performance of

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248942

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 56

1    the earpiece?

2         A    Yes.

3         Q    Were you overseeing the audio performance of

4    the loudspeaker?

5         A    Yes.

6         Q    As to the loudspeaker, what aspects were you

7    overseeing?

8         A    Mainly just its performance.  Again, the design

9    had mostly been frozen even for that product by the time

10   I had arrived.  There was some discussion about supplier

11   selection.  That's -- that was really about it.

12        Q    What do you mean when you say the design had

13   been frozen?

14        A    The main parts of the shape and size of the

15   components that had been fixed by the time that I had

16   arrived.

17        Q    So the actual loudspeaker itself had been

18   finalized?

19        A    To the best of my understanding.

20        Q    Had the size and shape of the speaker box been

21   finalized?

22        A    I believe so.  I'm not sure that I am

23   completely qualified to say.

24        Q    Why would you not be qualified to say?

25        A    A lot of details of the interior of the speaker

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000248943

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 57

1   box, they are defined by our mechanics team.

2       Q   And who was handling these details?

3       A   Michelle Yu.

4       Q   Anyone else?

5       A   Not that I am aware of.

6       Q   Were you involved in the development of the N90

7   speaker box?

8       A   Not really.

9       Q   Were you involved at all?

10      A   Hard -- can you be more specific?

11      Q   What parts of the N90 speaker box were you

12  involved in developing?

13          MS. VENTO:  Objection to form. .

14          THE WITNESS:  The only thing I was really

15  involved with was how it was integrated with the rest of

16  the device.

17  BY MR. WHITEHURST:

18      Q   So were you involved in the sealing of the

19  front port to the brackets and gaskets in the N90?

20      A   In fact, yes.

21      Q   And when did you get involved in sealing the

22  front port to the housing of the N90?

23      A   I did not really get involved until about

24  November of 2009.

25      Q   And what did you do once you got involved in

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248944

Andrew Bright
APPLE CONFIDENTIAL BUSINESS RECORD
PURSUANT TO PROTECTIVE ORDER
June 29, 2010
Menlo Park, CA

Page 58

1   November of 2009?

2        A    Can you be more specific?

3        Q    You said you did not really get involved until

4   November of 2009.  What did you start doing in November

5   2009?

6        A    Many things.  Most of it was overseeing the

7   work of others.

8        Q    And whose work were you overseeing?

9        A    Phil Tamchina, Shoahai Chen and also Ruchir

10  Dave.

11       Q    Can you spell the last name, please?

12       A    D-A-V-E, with an accent.

13       Q    Did you suggest any changes on how the front

14  port of the N90 speaker box is sealed to the N90

15  housing?

16       A    Yes.

17       Q    What changes did you suggest?

18       A    I don't really remember.  There were quite

19  many.  Difficult for me to recall specifically, but it

20  would involve the general work of brainstorming ideas

21  and trying out solutions.

22       Q    What documents would show these changes and

23  suggestions?

24       A    There would be some reporting documents that

25  would -- on weekly reports, there were general

Alderson Reporting Company
1-800-FOR-DEPO

**Highly Confidential - Attorneys' Eyes Only**

**APLNDC-Y0000248945**

Andrew Bright            APPLE CONFIDENTIAL BUSINESS RECORD            June 29, 2010
                              PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 59

1    presentations about the changes that we were making.

2        Q    What would these reporting documents look like?

3        A    They were keynote presentations.

4        Q    And who were these presentations made to?

5        A    Mainly to the group, to the -- my own team and

6    also to -- they were created by -- well, they were made

7    to my team, presented to my team.

8        Q    I'm confused now.  Who was your team?

9        A    Shaohai Chen, Phil Tamchina and Ruchir Dave.

10       Q    And who was making these presentation?

11       A    Michelle Yu.

12       Q    So Michelle Yu was making weekly presentations;

13   correct?

14       A    No.

15       Q    Who was making these reporting documents that

16   would show these suggestions or changes that you made?

17       A    Michelle Yu.

18       Q    So Michelle Yu was making reporting documents

19   that would show your suggestions and changes?

20       A    Yes.

21       Q    And how often would she make these reporting

22   documents?

23       A    Either daily or weekly, somewhere in between.

24       Q    And what would Michelle Yu do with these

25   reporting documents that she made daily or weekly?

**Highly Confidential - Attorneys' Eyes Only**                    **APLNDC-Y0000248946**

Page 60

    1      A   They would share them with my team.

    2      Q   And how would she share them with your team?

    3      A   E-mail.

    4      Q   So Michelle Yu was sending e-mails on a daily

    5  or weekly basis to you, Mr. Chen, Mr. Tamchina and

    6  Mr. Dave?

    7      A   M-hm.

    8      Q   And these e-mails that she sent daily or weekly

    9  would show your suggestions and changes to how the N90

   10  front port was sealed to the N90 housing?

   11      A   Yes.

   12      Q   What other documents would show the suggestion

   13  or changes that you made to how the N90 port was sealed

   14  to the N90 housing?

   15      A   I would have to speculate, but my guess is that

   16  the mechanical drawings would show these changes.

   17      Q   In the N90, how is the N90 port sealed to the

   18  N90 housing?

   19      A   Not very easily.

   20      Q   Can you be more specific?

   21      A   Yes.  The box has connected to it an adhesive.

   22  On the other side of that adhesive is a foam gasket.  On

   23  the other sides of the foam gasket is an adhesive.  That

   24  adhesive connects to a bracket.  That bracket connects

   25  to another adhesive.  That adhesive connects to an

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248947

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                           PURSUANT TO PROTECTIVE ORDER              Menlo Park, CA

Page 61

```
 1   acoustic mesh.  That acoustic mesh connects to another

 2   adhesive.  That adhesive connects to a wire cosmetic

 3   mesh, which connects to another adhesive, which finally

 4   connects to something we call the band, which is the

 5   outer piece of metal of the N90 device.

 6       Q   What do you mean when you say foam gasket?

 7       A   Gasket made out of foam.

 8       Q   What is a gasket?

 9       A   Device for creating an acoustic seal.

10       Q   What do you mean when you say acoustic seal?

11       A   I would say something which presents a very

12   high acoustic impedence.

13       Q   So it doesn't let air out?

14       A   Correct.

15       Q   So by putting this foam gasket, you were trying

16   to keep air from leaking?

17       A   Yes, at acoustic frequencies.

18       Q   Does it allow air to leak at some frequencies?

19       A   Not that I am aware of.

20       Q   So is it fair to say that this foam gasket

21   would prevent air from leaking at all frequencies?

22       A   No.

23       Q   What frequencies would it allow air to leak?

24       A   It could allow air to leak at very low

25   frequencies.
```

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000248948

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                        PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 62

1      Q   What about high frequencies?

2      A   Unlikely.

3      Q   What did you mean when you said bracket?

4      A   A piece of plastic.

5      Q   And what was the function of this piece of

6  plastic?

7      A   I don't really know.  It's not primarily an

8  acoustic part.

9      Q   Was this bracketed to?

10     A   Not really, no.

11     Q   What did it look like?

12     A   Sort of like a flat doughnut.

13     Q   Kind of like a metal washer?

14     A   It's not round.  It's not metal.

15     Q   So what did you mean when you said flat

16  doughnut?

17     A   Meaning it's round, has a hole in it, but it's

18  annular -- annular in shape, but it's cross-section is

19  not round, it's flat, more like a washer, a

20  racetrack-shaped washer made from plastic.

21     Q   So it looks like a flat oval?

22     A   Yes.

23     Q   And is this flat oval adhered to the foam

24  gasket?

25     A   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                          APLNDC-Y0000248949

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                 Menlo Park, CA

Page 63

1      Q   What did you mean when you said acoustic mesh?

2      A   That is a mesh for providing some acoustic

3   resistance and also to ensure that dust does not get

4   into the device.

5      Q   What do you mean when you say acoustic

6   resistance?

7      A   Device with a significant real acoustic

8   impedence.

9      Q   What do you mean when you say real acoustic

10  impedence?

11     A   Not imaginary.  Say resistive as opposed to

12  reactive.

13     Q   Does it make it more difficult for the air to

14  flow?

15     A   Some, yes.

16     Q   So when you say real acoustic impedence, you

17  mean it makes it more difficult for the air to flow?

18     A   In a certain well-controlled sense.

19     Q   What do you mean in a certain well-controlled

20  sense?

21     A   Meaning that you -- we want to control the

22  airflow through that port.  How to say it.  We want to

23  control it only at high amplitudes.  We don't want it to

24  provide too much resistance at low amplitudes.

25     Q   Why does Apple want to control the airflow

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                          APLNDC-Y0000248950

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 64

1   through the port?

2        A   Because that affects the way the loudspeaker

3   sounds.

4        Q   Is there a higher resistance at low frequencies

5   from the acoustic mesh?

6        A   I honestly don't remember.

7        Q   How does the acoustic mesh affect different

8   frequencies?

9        A   That part of the design, I have to admit I was

10  not very deeply involved with.  So I would really have

11  to speculate.  I can only guess.

12       Q   Who was deeply involved -- strike that.

13           Who was involved in the acoustic mesh?

14       A   I believe it was the supplier of the acoustic

15  box and Shoahai Chen.

16       Q   And who was the supplier of the box?

17           MS. VENTO:  You may answer.

18           THE WITNESS:  AAC.

19  BY MR. WHITEHURST:

20       Q   How does controlling airflow through the port

21  affect the way the loudspeaker sounds?

22       A   It controls undamped resonances.

23       Q   Does the acoustic mesh improve the way that the

24  loudspeaker sounds?

25       A   It can.

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000248951

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 65

```
 1       Q   How can the acoustic mesh improve the way that

 2   the loudspeaker sounds?

 3       A   Reduces undamped resonances.  Undamped

 4   resonances can sound -- make the loudspeaker sound tinny

 5   or thin.  So it removes -- it can remove that kind of

 6   tinny, thin sound.

 7       Q   What do you mean when you say tinny sound?

 8       A   Sounds -- makes a sounds that sounds like it's

 9   a tin can telephone as opposed to a high-quality

10   telephone.

11       Q   Is that due to high frequencies?

12       A   Not necessarily.

13       Q   Is it due to low frequencies?  .

14       A   Not necessarily.

15       Q   What do you mean when you say undamped

16   resonances?

17       A   It's difficult to describe.  It's a rather

18   fundamental term in acoustics and also in vibration

19   dynamics.  It seemly means a vibrating system with -- I

20   would say with an underdamped characteristic, one which

21   is likely to ring or resonate after being excited.

22       Q   So did the front port sometimes resonate

23   certain frequencies?

24       A   It did --

25           MS. VENTO:  Objection to form.
```

Alderson Reporting Company
1-800-FOR-DEPO

**Highly Confidential - Attorneys' Eyes Only**          **APLNDC-Y0000248952**

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER              Menlo Park, CA

Page 119

1          MS. VENTO:  Whenever you get to a good stopping

2    point, lunch would be good.

3          MR. WHITEHURST:  We can take a break for lunch

4    now.

5          VIDEOGRAPHER:  The time is 12:36 p.m. and we

6    are off the record.

7                    (Lunch Recess Taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000249006

Andrew Bright      APPLE CONFIDENTIAL BUSINESS RECORD      June 29, 2010
PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 120

1                    AFTERNOON SESSION

2              VIDEOGRAPHER:  The time is 1:42 p.m. and we are

3    back on the record.

4    BY MR. WHITEHURST:

5        Q   Mr. Bright, turning your attention back to the

6    last page of Exhibit 500 which is in front of you,

7    before the break you testified that the N90 speaker box

8    has a resonance frequency in the 4 kilohertz range;

9    correct?

10       A   Correct.

11       Q   Does the relative size of the gasket to the

12   size of the front cavity affect this resonance frequency

13   in the 4 kilohertz range?

14       A   In the sense that if the gasket size would be

15   different, that 4 kilohertz frequency would be affected.

16       Q   How would the size of the gasket affect this

17   resonance frequency?

18           MS. VENTO:  Objection, form.

19           THE WITNESS:  Hard to say.  If the gasket would

20   be made --

21           MS. VENTO:  Turn that off.

22           THE WITNESS:  If it would be made -- so --

23   BY MR. WHITEHURST:

24       Q   Let me reask my question just so the record is

25   clear.

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000249007

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 121

1          How would the size of the gasket affect this

2    resonance frequency?

3          MS. VENTO:  Objection to form.

4          THE WITNESS:  If the gasket would be made

5    smaller, most likely the resonance frequency would go

6    down.  If the gasket would be made larger than it is

7    right now, it's very difficult to predict how it would

8    affect that resonance frequency.

9    BY MR. WHITEHURST:

10      Q   When you say smaller, do you mean the

11   cross-sectional diameter?

12      A   Cross-sectional area.

13      Q   So if the cross-sectional area of the gasket

14   was made smaller, the resonance frequency would most

15   likely go down?

16         MS. VENTO:  Objection, form.

17         THE WITNESS:  Most likely, yes.

18   BY MR. WHITEHURST:

19      Q   What would happen if the gasket was made

20   thicker?

21         MS. VENTO:  Objection.

22         THE WITNESS:  Well, in one sense, it would not

23   affect anything, because it's -- the gasket is

24   compressed by other parts of the phone.  So if you made

25   the gasket thicker, it would be compressed by the other

Alderson Reporting Company
1-800-FOR-DEPO

**Highly Confidential - Attorneys' Eyes Only**                    **APLNDC-Y0000249008**

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                        PURSUANT TO PROTECTIVE ORDER              Menlo Park, CA

Page 122

1   parts of the phone, and, thus, its shape when assembled

2   would not change.

3   BY MR. WHITEHURST:

4       Q    What if the gasket was made thicker and it was

5   not compressed?

6            MS. VENTO:  Objection.

7            THE WITNESS:  So then it would probably move

8   the resonance frequency down in frequency.

9   BY MR. WHITEHURST:

10      Q    And what would happen if you got rid of the

11  gasket altogether?

12           MS. VENTO:  Objection.

13           THE WITNESS:  Difficult to predict.  The

14  resonance frequency would change in a way that one

15  cannot say because it would be reacting to other parts

16  of the phone.

17  BY MR. WHITEHURST:

18      Q    Could the resonance frequency go up?

19           MS. VENTO:  Objection.

20           THE WITNESS:  It's possible, but not

21  necessarily.

22  BY MR. WHITEHURST:

23      Q    How could the resonance frequency go up if you

24  got rid of the gasket?

25           MS. VENTO:  Objection.

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000249009

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                 Menlo Park, CA

Page 178

1    doing so involves very different engineering

2    compromises.  So it's really a bit of a gray area.

3    BY MR. WHITEHURST:

4        Q   And is it possible to tune speaker boxes to

5    improve performance at lower frequencies, such as 300,

6    500, or 150 hertz?

7            MS. VENTO:  Objection to form.

8            THE WITNESS:  You have to make it bigger.

9    That's the only thing you can do.

10   BY MR. WHITEHURST:

11       Q   How do you make the speaker box bigger?

12       A   More millimeters.

13       Q   Do you make the speaker box bigger in a

14   particular area?

15           MS. VENTO:  Objection to form.

16           THE WITNESS:  No.

17   BY MR. WHITEHURST:

18       Q   Would increasing the back volume improve

19   performance at low frequencies, such as 150 hertz?

20       A   I'm sorry.  Can you repeat the question?

21       Q   Would increasing the back volume of the speaker

22   box improve performance at low frequencies, such as 150

23   hertz?

24       A   Marginally.

25       Q   Would increasing the front volume improve

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000249065

Page 179

1   performance at 150 hertz?

2        A    No.

3        Q    What about changing the Z dimension?

4             MS. VENTO:  Objection to form.

5             THE WITNESS:  Yes.

6   BY MR. WHITEHURST:

7        Q    How does changing the Z dimension improve

8   performance at 150 hertz?

9        A    Assuming you mean the thickness, it would make

10  it bigger, and it would allow the low frequency response

11  to be better.

12       Q    So changing the shape of the speaker box would

13  also improve performance at low frequencies?

14            MS. VENTO:  Objection, form.

15            THE WITNESS:  Just the shape alone, no.  When

16  you say changing the Z, my presumption is that all else

17  would be the same unless the volume would grow.  What's

18  really important for low frequency is the total amount

19  of space that's taken up by the back cavity.

20  BY MR. WHITEHURST:

21       Q    For audio books, what frequencies are

22  important?

23       A    Generally about the same as speech.  You might

24  want to have more high frequencies, because some

25  recordings, they do have more high frequencies than

Alderson Reporting Company
1-800-FOR-DEPO

Andrew Bright          APPLE CONFIDENTIAL BUSINESS RECORD          June 29, 2010
                       PURSUANT TO PROTECTIVE ORDER                Menlo Park, CA

Page 180

1    telephony connections, but that's not necessarily the

2    case.

3        Q    And would increasing the back volume improve

4    performance at high frequencies?

5        A    No.

6        Q    What would improve performance at high

7    frequencies?

8        A    Changing the shape of the front cavity.

9        Q    So when Apple designs speaker boxes, they have

10   to make compromises depending on the application?

11           MS. VENTO:  Objection to form.

12           THE WITNESS:  Yes, but that's kind of generally

13   true with every single function of the device for very

14   many different functions.

15   BY MR. WHITEHURST:

16       Q    For music, what frequencies are important?

17           MS. VENTO:  Objection, form.

18           THE WITNESS:  Again, that's a subject of a lot

19   of debate.  I would say there's not -- there's not very

20   generally-recognized consensus on what is the best.

21   Some would say high, some would say low, some would say

22   both.  It's not -- there's not real consensus there.

23   BY MR. WHITEHURST:

24       Q    So for music, you might want to make the back

25   volume larger and you may also want to change the shape

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000249067

# EXHIBIT 13
# FILED UNDER SEAL

– E R R A T A –

Deposition of Dan Rosckes (October 28, 2010)

*In the Matter of Certain Personal Data and*
*Mobile Communications Devices and Related Software*
International Trade Commission Investigation No. 337-TA-710

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 28 | 9 | SO-DIM | SO - DIMM | Spelling |
| 31 | 23 | CURA CATO | KURA  KATO | Spelling |
| 32 | 1,9 | CURA | KURA | " |
| 32 | 2 | CURA | KURA | " |
| 32 | 4,6 | CATO | KATO | " |
| 33 | 18 | Scarlette | Scarlett | " |
| 33 | 19 | Shaetter | Schafer | " |
| 35 | 16 | SCarlette | Scarlett | " |
| 40 | 15 | KIRK | Kurt | " |
| 42 | 24,25 | CYA | CY YEH | " |
| 43 | 3,4 | Cya | CY YEH | " |
| 45 | 2,22 | Cya | CY YEH | " |
| 48 | 7 | Sync | Sink | " |
| 48 | 15 | Sean | Shawn | " |
| 48 | 17 | Shoeheart | Shurhart | " |
| 49 | 11 | " | " | " |
| 57 | 15 | Kuptin | Curtin | " |
| 58 | 16,24,25 | Kurtin | Curtin | " |
| 64 | 21 | A6 | ASIC | " |
| 96 | 24 | HA | H | incorrect |
| 115 | 22 | iPod | iPad | incorrect |
| 195 | 24 | Diedre | Dierdre | Spelling |
| 199 | 2 | Young | Leung | " |
| 67 | 13 | No No, I said no | I said no | incorrect |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

I, the undersigned, do hereby certify that I have read the foregoing transcript and that, to the best of my knowledge, said testimony is true (with the exception of the following changes listed above).

Signed: _____
Dan Rosckes

Highly Confidential - Attorneys' Eyes Only

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1     IN THE UNITED STATES INTERNATIONAL TRADE COMMISSION

2                    WASHINGTON, D.C.

3          BEFORE THE HONORABLE CARL C. CHARNESKI

4                 ADMINISTRATIVE LAW JUDGE

5

6   In the Matter of:                )

    CERTAIN PERSONAL DATA AND MOBILE  )   Investigation No.

7   COMMUNICATIONS DEVICES AND RELATED)   337-TA-710

    SOFTWARE,                         )

8   _____)

9

10

11

12

13          CONFIDENTIAL - BUSINESS INFORMATION

14         VIDEOTAPED DEPOSITION OF DAN ROSCKES

15            THURSDAY, OCTOBER 28, 2010

16

17

18

19

20

21

22

23

24      Job No. CS295269

25   PAGES 1 - 265

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003121425

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

10   VIDEOTAPED DEPOSITION of DAN ROSCKES,
11   taken on behalf of the Respondents at
12   555 Twin Dolphins Drive, Redwood Shore,
13   California, on Thursday, October 28,
14   2010 commencing at 9:22 a.m. before
15   LINDA VACCAREZZA, CLR, CRP, RPR, CSR
16   NO. 10201.

Page 3

1   APPEARANCE OF COUNSEL:  (continued)
2   By Speakerphone:
3   FOR THE RESPONDENTS NOKIA CORPORATION AND NOKIA, INC.:
4     ALSTON & BIRD, LLP
5     BY:  PETER A. FITCH, ESQUIRE
6     950 F Street, NW
7     Washington, DC 20004-1404
8       (202) 239-3300

24   VIDEOGRAPHER:  Adam Del Rio
25

Page 2

1   APPEARANCE OF COUNSEL:
2
3   FOR THE RESPONDENTS HTC CORPORATION, HTC AMERICA,
     INC., AND EXEDEA, INC.:
4
     QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
5
     BY:  MATTHEW S. WARREN, ESQUIRE
6
     865 S. Figueroa Street, 10th Floor
7
     Los Angeles, California 90017
8
     (213) 43-3000
9
     Matthewwarren@quinnemanuel.com
10
11
     FOR THE COMPLAINANT Apple, INC., NEXT SOFTWARE:
12
     KIRKLAND & ELLIS
13
     BY:  BRYAN S. HALES, P.C. ESQUIRE
14
     300 North LaSalle Street
15
     Chicago, Illinois 60654
16
     (312) 862-2200
17
     bryan.hales@kirkland.com
18
19
20
21
22
23
24
25

Page 4

1   REDWOOD SHORES, CA; THURSDAY, OCTOBER 28, 2010
2   THE VIDEOGRAPHER:  Good morning.  I am Adam
3   Del Rio from Veritext National Deposition and
4   litigation Services.  The date today is Thursday,
5   October 28, 2010 and the time is approximately          09:23a
6   9:22 a.m.  This deposition is being held at the
7   office of Quinn Emanuel located at 555 Twin
8   Dolphin Drive, Redwood City, California.  The
9   case is captioned Certain Personal Data and
10  Mobile Communication Devices and Related          09:23a
11  Software, being held in the United States
12  International Trade Commission.  The name of the
13  witness today is Mr. Dan Rosckes.
14      At this time will attonies and all
15  present identify themselves for the record          09:23a
16  starting with the questioning attorney, please?
17  MR. WARREN:  Hi.  Matthew Warren of Quinn
18  Emanuel Urquhart & Sullivan for the HTC
19  respondents.
20  MR. HALES:  Bryan Hales from Kirkland & Ellis          09:24a
21  on behalf of complainant Apple and Mr. Rosckes.
22  MR. FINCH:  On the phone, this is Patrick
23  Finch from Alston & Bird in Washington, D.C. for
24  respondents Nokia Corporation and Nokia, Inc.
25  THE VIDEOGRAPHER:  Thank you.  Will the court          09:24a

2 (Pages 1 to 4)

Highly Confidential - Attorneys' Eyes Only

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 5

1    reporter administer the oath and we may proceed.
2
3            DAN ROSCKES,
4    having been first duly sworn by the Certified
5    Shorthand Reporter, testified as follows:        09:24a
6
7            EXAMINATION
8    BY MR. WARREN:
9        Q   Good morning, Mr. Rosckes.  Have you
10   ever been deposed before?                         09:24a
11       A   Yes.
12       Q   How often?
13       A   Two times.
14       Q   What was the most recent time you were
15   deposed?                                          09:24a
16       A   Most recent time was earlier this year
17   with -- regarding the Nokia case.
18       Q   And what was the other time besides that
19   that you have been deposed?
20       A   I was deposed when I was at Compaq        09:25a
21   Computer in Houston in the late '90s for a
22   dispute there.
23       Q   What did that dispute concern?
24       A   It involves a supplier of -- it involved
25   a supplier of power supplies to Compaq that had a 09:25a

Page 6

1    dispute with one of their manufacturers that did
2    some work for them.
3        Q   So Compaq wasn't a party to that
4    dispute?
5        A   Compaq was not a party to that dispute.  09:25a
6        Q   And you were not personally a party to
7    that dispute?
8        A   I was not.
9        Q   Have you ever personally been a party to
10   litigation?                                       09:25a
11       A   No.
12       Q   Good for you.
13           Are you represented by counsel here
14   today?
15       A   Yes.                                      09:26a
16       Q   Who is your counsel?
17       A   Bryan Hales.
18       Q   I'll briefly go over the ground rules of
19   a deposition. It's very simple.  As I am sure
20   your counsel has already told you, your answers   09:26a
21   are under oath and can be used in court just as
22   if you were appearing directly in court before
23   the ITCLJ in this matter.  Do you understand
24   that?
25       A   Yes.                                      09:26a

Page 7

1        MR. HALES:  I'll object to the form of the
2    question.  And I'm not going to argue with you
3    but I don't know that that's the right rule, but
4    we don't need to get into it now.
5    BY MR. WARREN:                                    09:26a
6        Q   Perhaps the most important thing about
7    the deposition process is it's very important
8    that if you don't understand a question that I
9    ask, you tell me you don't understand it.  If you
10   answer a question, then I'm going to think that   09:26a
11   you understood my question and answered it to the
12   best of your ability.  Do you understand that?
13       A   Yes.
14       Q   The court reporter is going to write
15   down everything that you and I say today and for  09:26a
16   that reason, it's important that we try not to
17   talk over each other.  Do let me finish my
18   questions if you can.  If I for any reason I
19   interrupt you or cut off your answer, please tell
20   me, because I do not intend to do that and I do   09:27a
21   want you to always give your fullest and most
22   complete answer, and if I interrupt you, you
23   should let me know and I will always let you
24   complete your answer.  Do you understand that?
25       A   Yes.                                      09:27a

Page 8

1        Q   Is there any reason why you cannot give
2    your best and most accurate testimony today?
3        A   No.
4        Q   Do you understand that Apple has
5    designated you to serve to testify on its behalf  09:27a
6    regarding certain topics?
7        A   Yes.
8        Q   Let's mark as Exhibit 1, and,
9    Mr. Rosckes, the parties in this investigation
10   have agreed or at least the respondents are       09:27a
11   proceeding with exhibits that are marked with the
12   name of the deponent, so this will be Rosckes 1
13   and the next one will be Rosckes 2 and so on
14   so forth to separate them from all the other
15   depositions.  However, for clarity, I'm just      09:28a
16   going to refer to Exhibit 1, Exhibit 2, Exhibit
17   3.  Is that all right with you?
18       A   Yes.
19       MR. WARREN:  Let's mark this as Exhibit
20   Rosckes 1.                                        09:28a
21       (Exhibits 1, 2 and 3 were marked for
22   identification.)
23   BY MR. WARREN:
24       Q   Now, Mr. Rosckes, in general when I give
25   you a document, you should take your time to      09:29a

3 (Pages 5 to 8)

Highly Confidential - Attorneys' Eyes Only

APLNDC0003121427

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

1  "procurement"?
2      Q   Well, what -- procurement is one of your
3  responsibilities, correct?
4      A   Yes.  I just want to know if you're
5  covering direct procurement or if you want to      10:53a
6  cover all procurement at Apple.
7      Q   I want to cover all procurement that --
8  withdraw that.
9          I want to cover all procurement for
10  products that Apple sells to consumers.  With      10:53a
11  that limitation in mind, are you able to answer
12  the question?
13      A   Yes.
14      Q   Aside from you and Mr. Blevins and
15  Mr. Forlenza, are there other people at your      10:53a
16  level who have responsibility for procurement as
17  you and I have defined it?
18      A   No.
19      Q   What is Mr. Blevins' title?
20      A   Senior director, procurement.      10:54a
21      Q   What is Mr. Forlenza's title?
22      A   Vice president, enclosure operations.
23      Q   And just for my reference, what is your
24  current title?
25      A   Vice president, procurement.      10:54a

Page 54

1      Q   And to whom does Mr. Blevins report?
2      A   Mr. Jeff Williams.
3      Q   And to whom does Mr. Forlenza report?
4      A   Mr. Jeff Williams.
5      Q   And what are Mr. Williams'      10:55a
6  responsibilities other than procurement?
7      MR. HALES:  Objection, lack of foundation.
8      THE WITNESS:  Mr. Williams has all operations
9  responsibility for Apple.
10  BY MR. WARREN:      10:55a
11      Q   So does that include rent?
12      MR. HALES:  Objection, lack of foundation.
13      THE WITNESS:  I don't know that it includes
14  rent.
15  BY MR. WARREN:      10:56a
16      Q   Thank you.  Just so we are clear, "I
17  don't know" is always an acceptable answer.  If
18  you don't know, please tell me you don't know,
19  because if you answer the question, then I'm
20  going to assume that you know and the court      10:56a
21  reporter is going to write it down as if you know
22  and everyone is going to think you know, so
23  please don't say you know something if you don't
24  know it.
25          So do I correctly understand that if I      10:56a

Page 55

1  go into an Apple store and I buy an Apple
2  product, the procurement for that product has
3  passed through people working for either you,
4  Mr. Blevins, Mr. Forlenza or some combination of
5  those three; is that correct?      10:56a
6      MR. HALES:  Objection to form.
7      THE WITNESS:  For the vast majority of the
8  Apple products, that is correct.  It's not for
9  every product in our retail stores, just to be
10  clear.      10:57a
11  BY MR. WARREN:
12      Q   And are the exceptions the products
13  simply that Apple is buying from other people and
14  selling in the retail store?
15      MR. HALES:  Objection, lack of foundation.      10:57a
16      THE WITNESS:  Yes, for the most part.
17  BY MR. WARREN:
18      Q   Let me ask a simpler question for Apple-
19  branded products that Apple sells itself.  Do I
20  correctly understand that the procurement for      10:57a
21  those products goes through either Mr. Blevins,
22  Mr. Forlenza, or you some combination of those
23  three people?
24      MR. HALES:  Objection to form.
25      THE WITNESS:  Yes, for the most part, yes.      10:57a

Page 56

1  BY MR. WARREN:
2      Q   What are the exceptions to that rule?
3      MR. HALES:  Same objection.
4      THE WITNESS:  Like I mentioned before, there
5  are other products, other nonApple products sold      10:58a
6  through our store that other people within Apple
7  procure, but for what I can remember right now,
8  all of the product procurement would fall under
9  Mr. Blevins, myself and Mr. Forlenza.
10  BY MR. WARREN:      10:59a
11      Q   And how do you and Mr. Blevins and
12  Mr. Forlenza divide up the responsibility for
13  procurement for Apple-branded products?
14      A   I focus primarily on the MacIntosh
15  products, Mr. Forlenza covers the enclosure      10:59a
16  components, and Mr. Blevins covers the iPod and
17  iPhone products and procurement of the items for
18  those products.
19      Q   Okay.  How many people does Mr. Blevins
20  have working for him?      11:00a
21      MR. HALES:  Objection, lacks foundation.
22      THE WITNESS:  I would say roughly 70 people.
23  BY MR. WARREN:
24      Q   How many direct reports does Mr. Blevins
25  have?      11:00a

15 (Pages 53 to 56)

Highly Confidential - Attorneys' Eyes Only

APLNDC0003121439

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1    MR. HALES:  Objection, lacks foundation.
2    THE WITNESS:  Roughly six or seven.  I don't
3  know exactly the number.
4  BY MR. WARREN:
5    Q   Can you tell me who they are?        11:01a
6    A   Yes.
7    Q   Please do.
8    A   Ken Toy, T-o-y; Priya Balasubramaniam,
9  and I don't recall the exact spelling of Priya's
10  last name; Paul Kurtin; Tim Butzow, B-u-t-z-o-w;    11:01a
11  Matt Duffy; JJ Park.  That's all I can remember.
12    Q   What are Mr. Toy's responsibilities?
13    MR. HALES:  Objection, lack of foundation.
14    THE WITNESS:  Contract manufacturer,
15  procurement.                                11:02a
16  BY MR. WARREN:
17    Q   And across all iPod and iPhone products?
18    A   Yes.
19    Q   What is the difference between a
20  contract manufacturer and some other kind of    11:02a
21  manufacturer?
22    A   Specifically he's responsible to work
23  with the manufacturers that make the iPod and
24  iPhone products.
25    Q   So is there a reason you use the term    11:03a

Page 58

1  "contract manufacturers"?
2    A   No specific reason.
3    Q   So Mr. Toy is responsible for the
4  relationship between Apple and the manufacturers
5  of all -- withdraw that.                     11:03a
6    So Mr. Toy is responsible for the
7  relationship between Apple and the manufacturers
8  of all iPod and iPhone products; is that correct?
9    A   Yes.
10    Q   What about Ms. Balasubramaniam, what are    11:03a
11  her responsibilities?
12    A   LCD procurement.
13    Q   And, again, is that across all iPod and
14  iPhone products?
15    A   Yes.                               11:03a
16    Q   What about Mr. Kurtin, what are his
17  responsibilities?
18    A   Flash memory procurement.
19    Q   And is that across all iPhone and iPod
20  products?                                11:04a
21    A   Yes.
22    Q   What about MacIntosh products with flash
23  memory?
24    A   Mr. Kurtin also covers those products.
25    Q   So Mr. Kurtin covers flash memory    11:04a

Page 59

1  procurement for all Apple products that use flash
2  memory; is that correct?
3    MR. HALES:  Objection, lacks foundation.
4    THE WITNESS:  Yes, that's correct.
5  BY MR. WARREN:                             11:04a
6    Q   What about Mr. Butzow, what are his
7  responsibilities?
8    A   Mr. Butzow is responsible for the
9  semiconductor procurement for iPod and iPhone
10  products.                                11:05a
11    Q   And, again, is that responsibility
12  across all iPod and iPhone products?
13    A   Yes.
14    Q   What about Mr. Duffy?
15    A   Mr. Duffy is responsible for printed    11:05a
16  circuit board, flex cable, connector, camera
17  module, and wireless modules procurement.
18    Q   And, again, is that across all iPod and
19  iPhone products?
20    A   Yes.                               11:05a
21    Q   And what is JJ Park -- is that Mr. or
22  Ms. Park?
23    A   Mr. Park.
24    Q   Mr. Park, what are his responsibilities?
25    A   Mr. Park is responsible for battery    11:05a

Page 60

1  procurement and iPod, iPhone accessory
2  procurement.
3    Q   And, again, is that across all iPod and
4  iPhone accessories?
5    A   Yes.  All iPod, iPhone accessories that    11:06a
6  fall within his responsibilities.
7    Q   Actually, it was a stupid question
8  anyway.  What I meant to ask is are Mr. Park's
9  responsibilities across all iPhone and iPod
10  products?                                11:06a
11    A   Yes.
12    Q   Now, you mentioned that some of the iPod
13  and iPhone accessories fall outside Mr. Park's
14  responsibilities.  What are those accessories?
15    A   I don't know.  I just -- I'm not sure    11:07a
16  that every accessory that covers an iPod, iPhone
17  is covered by Mr. Park.  There may be others that
18  are covered by others but he covers the majority
19  of them, but I don't know if there are
20  exceptions.                              11:07a
21    Q   I appreciate your precision.  It's
22  always welcome.
23    Let me direct your attention to --
24  actually, before I do that, let me back up.
25    We have discussed the organization of    11:07a

16 (Pages 57 to 60)

Highly Confidential - Attorneys' Eyes Only

APLNDC0003121440

# EXHIBIT 14
# FILED UNDER SEAL

# In The Matter Of:

*MICROELECTRONICS v. APPLE*

---

*MARK BUCKLEY*

*September 21, 2011*

---

*GROSSMAN & COTTER*

*117 S CALIFORNIA AVE, SUITE D201*

*PALO ALTO, CA 94306*

*650.324.1181*

*www.gandc.com*



Original File BUCKMA092111WO.TXT

Min-U-Script® with Word Index

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000240988

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ELAN MICROELECTRONICS
CORPORATION,

                    Plaintiff,


     -vs-                              No. C-09-01531
                                          RS (PVT)


APPLE, INC.,


                    Defendant.
                                 /


          DEPOSITION OF MARK BUCKLEY

     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

               PAGES 1 to 156

          WEDNESDAY, SEPTEMBER 21, 2011


Reported by:  LOUISE MARIE SOUSOURES, CSR NO. 3575

          Certified LiveNote Reporter

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000240989

2

1                    A P P E A R A N C E S

2

3   FOR ELAN MICROSYSTEMS:

4        ALSTON & BIRD

5        BY: JANE BU,

6             ATTORNEY AT LAW

7        275 MIDDLEFIELD ROAD, STE. 150

8        MENLO PARK, CA  94025

9        650.838.2000

10        jane.bu@alston.com

11

12   FOR APPLE, INC.:

13        WEIL, GOTSHAL & MANGES LLP

14        BY:  DEREK C. WALTER,

15             ATTORNEY AT LAW

16        201 REDWOOD SHORES PARKWAY

17        REDWOOD SHORES,  CA  94065

18        650.802.3000

19        derek.walter@weil.com

20

21   THE VIDEOGRAPHER:

22        CYRUS PRODUCTIONS, GARY BREWER

23

24   ALSO PRESENT:

25        RACHEL M. CAPOCCIA, ALSTON & BIRD, LOS ANGELES

**Highly Confidential - Attorneys' Eyes Only**                    **APLNDC-Y0000240990**

```
                                                          3

1                          I N D E X

2

3    EXAMINATION BY:                              PAGE

4    MS. BU                                        9

5

6

7

8    EXHIBITS:                                    PAGE

9    Exhibit 1    Apple, Inc.'s objections and     10

10               responses to Elan

11               Microelectronics Corporation's

12               third notice of deposition

13               pursuant to Federal Rule of

14               Civil Procedure 30(b)(6) to

15               defendant Apple, Inc.

16   Exhibit 2    Notice of deposition of          10

17               Mark Buckley

18   Exhibit 3    Document production No.           21

19               APEL 0074186

20   Exhibit 4    Document production No.           41

21               APEL 0074177

22

23

24

25
```

4

1          INDEX OF EXHIBITS (CONTINUED):

2

3   EXHIBIT                                        PAGE

4   Exhibit 5   Apple, Inc.'s objections and      52

5               responses to Elan

6               Microelectronics Corporation's

7               notice of deposition pursuant

8               to Federal Rule of Civil

9               Procedure 30(b)(6) to defendant

10              Apple, Inc.

11  Exhibit 6   Document production No.            53

12              APEL 0074053

13  Exhibit 7   Document production No.            73

14              APEL 0074173

15  Exhibit 8   Document production No.            74

16              APEL 0074055

17  Exhibit 9   Document production No.            76

18              APEL 0074056

19  Exhibit 10  Document production No.            77

20              APEL 0074172

21  Exhibit 11  Document production No.            78

22              APEL 0074174

23  Exhibit 12  Document production No.            80

24              APEL 0074175

25

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000240992

5

1               INDEX OF EXHIBITS (CONTINUED):

2

3    EXHIBIT                                        PAGE

4    Exhibit 13  Document production No.            81

5                APEL 0074176

6    Exhibit 14  Document production No.            82

7                APEL 0074187

8    Exhibit 15  Document production No.            85

9                APEL 0074046

10   Exhibit 16  Document production No.            94

11               APEL 0074045

12   Exhibit 17  Document production No.            97

13               APEL 0074048

14   Exhibit 18  Document production No.            98

15               APEL 0074048

16   Exhibit 19  Document production No.            101

17               APEL 0074049

18   Exhibit 20  Document production No.            104

19               APEL 0074044

20   Exhibit 21  Document production No.            112

21               APEL 0074059

22   Exhibit 22  Document production No.            119

23               APEL 0074058

24   Exhibit 23  Document production No.            125

25               APEL 0074739

Highly Confidential - Attorneys' Eyes Only                        APLNDC-Y0000240993

6

1              INDEX OF EXHIBITS (CONTINUED):

2

3   EXHIBIT                                      PAGE

4   Exhibit 24  Document production No.           137

5               APEL 0329818 to 820

6   Exhibit 25  Document production Nos.          139

7               APEL 0776600 to 6772

8   Exhibit 26  Document production Nos.          140

9               APEL 0820444 to 613

10  Exhibit 27  Document production Nos.          142

11              APEL 1056728 to 739

12  Exhibit 28  Document production No.           143

13              APEL 0074185

14  Exhibit 29  Document entitled "Top 100        150

15              paid applications by billings"

16              CY 2010

17  Exhibit 30  Document entitled "Top 100 paid   150

18              apps by billings" CY 2009

19  Exhibit 31  Document entitled "Top 100 paid   150

20              applications by billings"

21              CY 2008

22  Exhibit 32  Document production Nos.           151

23              APEL 0074188 to 206

24

25

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000240994

7

1                    INDEX OF EXHIBITS (CONTINUED):

2

3   EXHIBIT                                              PAGE

4   Exhibit 33  Document production Nos.              153

5               APEL 0074580 to 595

6   Exhibit 34  Document production Nos.              154

7               APEL 0074470 to 500

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000240995

8

1            BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition, commencing at the hour of 9:19

3    a.m. thereof, at 275 Middlefield Road, Menlo Park,

4    California, before me, LOUISE MARIE SOUSOURES, a

5    Certified Shorthand Reporter, the following

6    proceedings were had:

7                       PROCEEDINGS

8            THE VIDEOGRAPHER:  Good morning.  We are

9    going on the record.  Here marks the beginning of

10   videotape number 1 volume 1 in the deposition of Mark

11   Buckley in the matter of Elan Microelectronics

12   Corporation versus Apple, Inc., in the United States

13   District Court, Northern District of California, San

14   Jose Division, case C09-01531 RS (PVT).

15           Today's date is September 21st, 2011 and the

16   time is 9:19 a.m.

17           My name is Gary Brewer of Cyrus Productions,

18   2827 55th Avenue, Oakland, California, telephone

19   number 510-326-9332.

20           The court reporter is Louise Sousoures of

21   Grossman & Cotter.

22           Would counsel please identify themselves and

23   state whom they represent.

24           MS. BU:  Jane Bu from Alston & Bird on

25   behalf of Elan.

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000240996

9

1          MR. WALTER:  Derek Walter of Weil, Gotshal &

2  Manges for defendant Apple.

3          MS. BU:  And here with me is also my

4  colleague, Rachel Capoccia, on behalf of Elan.

5          THE VIDEOGRAPHER:  If there are no

6  stipulations, the court reporter may administer the

7  oath.

8                    --oOo--

9               MARK BUCKLEY,

10        having been first duly sworn by the

11        Certified Shorthand Reporter to tell

12        the truth, the whole truth, and nothing

13        but the truth, testified as follows:

14         THE VIDEOGRAPHER:  Please begin.

15         MS. BU:  Thank you.

16              EXAMINATION BY MS. BU:

17     Q.  Good morning, Mr. Buckley.

18     A.  Good morning.

19     Q.  I have some preliminary questions for you

20  before we start.

21          Have you had your deposition taken before?

22     A.  Yes.

23     Q.  How many times, roughly?

24     A.  Four or five.

25     Q.  Okay.  I'm not going to waste your time and

Highly Confidential - Attorneys' Eyes Only

14

1        Q.   What do you mean by touch solutions?

2        A.   Just chip -- it's the touch layers that

3    start from the glass down to potentially the LCD and

4    cost information.

5        Q.   The touch solution, you said the touch

6    solution in the iOS products, so Apple's iOS

7    products?

8        A.   Yes, iPod touch, iPad, iPhone.

9        Q.   And you spoke with her about the cost

10   information for these chip --

11       A.   Yes, it's my understanding there were some

12   spreadsheets produced in this case and I reviewed

13   those spreadsheets with her.

14       Q.   Do you remember which spreadsheets you

15   reviewed with her?

16       A.   I will when I see them.  I mean I do

17   remember them, but --

18       Q.   What did she tell you about these

19   spreadsheets?

20       A.   Just confirmed information on the

21   spreadsheets.

22       Q.   Same thing with Gloria, did you review

23   spreadsheets with her?

24       A.   Correct.

25       Q.   And you would remember which ones you

                    APLNDC-Y0000241002

15

1    reviewed with her when you see them?

2          A.   Definitely.

3          Q.   What did you review -- what did she tell you

4    about these spreadsheets?

5          A.   Just gave me information about certain names

6    and confirmed what the cost data represents.

7          Q.   Anything else you discussed with Preeti?

8          A.   I can't think off the top of my head what it

9    was.

10         Q.   Did you speak to anyone else in preparation

11   for this deposition?

12         A.   Priya, I'm going to get this name wrong,

13   Balasubramaniam, I'll try to spell it, it's

14   B-A-L-A-S-U-B-R-A-M-A-M-I-A-N -- M at the end, three

15   Ms.

16              I can double-check that later.

17         Q.   I'm not even going to try to pronounce the

18   individual's names.

19              What did you speak to this individual about?

20         A.   Just the case, agreements that were

21   provided.

22         Q.   What kind of agreements?

23         A.   Master supply agreements, statement of

24   works.

25         Q.   Why did you speak to this individual about

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000241003

16

1    these agreements?

2         A.   To get a better understanding of what they

3    represent and ask a few questions.

4         Q.   What did you ask him?

5         A.   It's a she --

6         Q.   Sorry.  What did you ask her?

7         A.   There was some blank sections in the

8    agreements and I was wondering what that was.

9         Q.   What happened -- what was the reason for the

10   blanks?

11        A.   The reason for the blanks, sometimes these

12   agreements get started at an early stage of a

13   development cycle before prices and part numbers are

14   known.

15        Q.   Did you review anything else with her?

16        A.   Not that I can think of, no.

17        Q.   Did you discuss anything else with this

18   individual?

19        A.   That was the primary discussion.

20        Q.   Other than the three individuals that we

21   talked about, did you speak to anyone else at Apple

22   for the preparation of this deposition?

23        A.   Yeah, I can't recall off the top of my head.

24   I speak to a lot of people every day about many

25   cases.  It's hard for me to remember.

**Highly Confidential - Attorneys' Eyes Only**

17

1        Q.   If you remember it later, feel free to tell
2   me.
3        A.   Absolutely.
4        Q.   Did you review any documents on your own for
5   the preparation of this deposition?
6        A.   Yes.
7        Q.   What did you review?
8        A.   There was other information that I supplied
9   in this case and I reviewed those documents.
10       Q.   What information did you supply for this
11  case?
12       A.   The iOS app information, any sales revenue,
13  cost information, exclusive of the spreadsheets that
14  I spoke with Preeti and Gloria about.
15       Q.   And you mean the sales revenue cost
16  spreadsheets for the other -- for the Apple products?
17       A.   Correct.
18       Q.   That's produced for this case?
19       A.   Correct.
20       Q.   Anything else that you reviewed?
21       A.   Not that I can think of, no.
22       Q.   For the iOS app information, what exactly
23  are these information that you reviewed?
24       A.   It was top one hundred, both free or paid
25  apps, and the top 100 paid apps and I believe they

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 1

1
2              IN THE UNITED STATES DISTRICT COURT
3                FOR THE DISTRICT OF MARYLAND
4                    BALTIMORE DIVISION
5                         --oOo--
6  QRG, LTD. d/b/a QUANTUM        )
   RESEARCH GROUP            )
7
        Plaintiff,      )
8                       )
    vs.           ) 1:05-cv-03408-WMN
9                       )
   APPLE, INC., CYPRESS       )
10 SEMICONDUCTOR CORP., CYPRESS  )
   MICROSYSTEMS and FINGERWORKS, )
11 INC.                  )
                        )
12       Defendants.    )
   _____  )
13
14              DEPOSITION OF
15         FREDERICK CHARLES LANCASTER
16 _____
17         Tuesday, October 23, 2007
18
19
20    HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY
21
22
23 REPORTED BY: COREY W. ANDERSON, CSR 4096 (401187)
24
25

Page 3

1        Deposition of FREDERICK CHARLES LANCASTER
2  taken by the Plaintiff at Fish & Richardson, 500
3  Arguello, Redwood City, California, commencing at
4  10:10A.M. on Tuesday, October 23, 2007 before COREY
5  ANDERSON, CSR, pursuant to notice.
6                   --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1             I N D E X
2         INDEX OF EXAMINATIONS
3  EXAMINATION BY MR. ZITO              5
4
5          INDEX OF EXHIBITS
6  Exhibit                    Page
7  Exhibit 188 Single-Page Document entitled USA    7
      Sales Data, Data Through Q2FY07
8     (March '07) (APCY00121559)
9  Exhibit 189 Single-Page Document entitled USA   10
      Sales Data, Data Through Q2FY07
10    (March '07) (APCY00121683)
11 Exhibit 190 Single-Page Document entitled       11
      Worldwide Purchase Data Through
12    CQ3'07, iPod Nano Clickwheel
      (APCY00123575)
13
   Exhibit 191 Two-Page Document, Sense MCU        16
14    Feature Spreadsheet V.01 (initial
      draft) Larry Forsblad 2/16/04
15    (APCY00010605-06)
16 Exhibit 192 Document entitled M19 Itemized Cap  18
      BOM (APCY00015732-734)
17
   Exhibit 193 Single-Page Document entitled       20
18    Mitsumi M19 Quotation Updated
      5/18/2005 (APCY00015735)
19
   Exhibit 194 Document entitled M19 Itemized BOM  20
20    (APCY00015736-738)
21 Exhibit 195 Single-Page Document              21
      (APCY00012471)
22
23
24
25

Page 4

1            A P P E A R A N C E S
2
3  FOR THE PLAINTIFF (BY TELEPHONE):
4     LAW OFFICES OF JOSEPH ZITO
      1250 Connecticut Avenue Northwest, Suite 200
5     Washington D.C.  20036
      BY:  JOSEPH J. ZITO, ESQUIRE
6        202-466-3500
7  FOR THE DEFENDANT APPLE, INC., CYPRESS SEMICONDUCTOR
   CORP., CYPRESS MICROSYSTEMS and FINGERWORKS, INC.:
8
      FISH & RICHARDSON P.C.
9     225 Franklin Street
      Boston, Massachusetts  02110
10    BY:  FRANK E. SCHERKENBACH, ESQUIRE
         617-521-7883
11
   FOR THE DEFENDANT APPLE, INC.:
12
      APPLE CORPORATION
13    1 Infinite Loop, MS 3-SU
      Cupertino, California  95014
14    BY:  V. ELISE BIGELOW, ESQUIRE
         408-974-0054
15
16               --oOo--
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249239

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 5

1    REDWOOD CITY, CALIFORNIA, TUESDAY, OCTOBER 23, 2007
2                        10:10 A.M.
3                        --o0o--
4                   P R O C E E D I N G S
5         MR. ZITO:  Did everybody make appearances?
6         MR. SCHERKENBACH:  I don't think we did,
7    actually.
8         MR. ZITO:  Okay.  This is Joe Zito for
9    plaintiff, QRG.
10        MR. SCHERKENBACH:  Frank Scherkenbach of Fish
11   and Richardson for Apple, Cypress and the witness,
12   Mr. Lancaster.
13        MS. BIGELOW:  And Elise Bigelow, senior
14   litigation counsel, Apple.
15        MR. ZITO:  All right.
16             EXAMINATION BY MR. ZITO
17        MR. ZITO:  Q.  Mr. Lancaster, could you just
18   state your name for the record, please?
19        A.  Name is Frederick Charles Lancaster.
20        Q.  And where are you currently employed?
21        A.  Apple Computer.  Or I'm sorry, Apple, Inc.
22        Q.  What is your position at Apple, Inc.?
23        A.  Director worldwide financial planning and
24   analysis.
25        Q.  All right.  How long have you been the

Page 6

1    director?
2         A.  Three years.
3         Q.  What are your duties generally at Apple?
4         A.  Manage the financial forecast process, monitor
5    with the executive team the quarterly corporate
6    financial objective attainment, and then quarter end
7    reporting and analysis for the executive team and the
8    board of directors.
9         Q.  Do you do any litigation analysis?
10        A.  Yes.
11        Q.  Okay.  What aspects of that are you engaged
12   in?
13        A.  Data retrieval.
14        Q.  Okay.  Anything other than data retrieval?
15        A.  No.
16        Q.  Do you do any evaluation of exposure to
17   litigation or risks of litigation?
18        A.  No.
19        Q.  Are you involved at all in settlement
20   litigation, in determining settlement costs or prices?
21        A.  No.
22        Q.  All right.  What information have you been
23   asked to gather with respect to the current litigation?
24        MR. SCHERKENBACH:  I'll caution the witness in
25   answering that to -- you can talk about work you did to

Page 7

1    prepare to testify on behalf of the company in response
2    to the 30(b)(6) notice.
3         Okay?
4         THE WITNESS:  Okay.  So reviewing the reports
5    for the data that was pulled.
6         MR. ZITO:  Q.  All right.  I have got a few
7    documents that your attorney should have there also.
8    And in particular, we were provided with document
9    No. 121559.
10        MR. SCHERKENBACH:  We have it, Joe.
11        MR. ZITO:  Okay.  Let's go ahead and mark that
12   as 188, I think we said.
13        MR. SCHERKENBACH:  Okay.
14        (Whereupon, Exhibit 188 was marked
15        for identification.)
16        MR. ZITO:  All right.
17        Q.  Did you produce document 188?
18        A.  No, I did not.
19        Q.  Do you know who did?
20        A.  Yes, I do.
21        Q.  Who did?
22        A.  Larry Minter, M-i-n-t-e-r.
23        Q.  Was that at your direction?
24        A.  No, it was not.
25        Q.  Do you know whose direction that was?

Page 8

1         A.  Yes.
2         Q.  Who was that?
3         A.  Who was -- Elise Bigelow.
4         Q.  All right.  Do you know where Mr. Minter
5    got -- let me ask you this.  Is this a document that's
6    ordinarily kept in the ordinary course of business?
7         A.  I'm sorry, would you ask the question again,
8    please?
9         Q.  Sure.  Is this a document that is normally
10   kept by Apple?
11        A.  No, it is not.
12        Q.  Was it produced for this litigation, to your
13   understanding?
14        A.  Yes.
15        Q.  All right.  Do you know the sources of
16   information that were used?
17        A.  Yes, I do.
18        Q.  What source of information did Mr. Minter use?
19        A.  Data warehouse called BW, Business Warehouse.
20   It's an internal data warehouse that we have at Apple.
21        Q.  All right.  And did you discuss how Mr. Minter
22   created this document?
23        A.  Yes, I did.
24        Q.  Okay.  And could you verify the accuracy of
25   the data in this document?

2 (Pages 5 to 8)

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249240

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 9

1    A.  Yes, I can.
2    Q.  Okay.  And is the information accurate through
3  the second quarter or March of '07?
4    A.  Yes, I believe it is.
5    Q.  All right.  What does this document reflect?
6    A.  It reflects unit sales and revenue dollars for
7  iPod nano and Mighty Mouse, the two versions that we
8  sell, the standalone and the wireless beginning in our
9  fiscal Q4, '05 through fiscal Q2, '07.  And this is for
10  the U.S. region, that includes our Apple retail stores.
11    Q.  Does that include online sales?
12    A.  Yes, it does.
13    Q.  Any other source of sales?
14    A.  Reseller in the U.S.
15    Q.  Why does Q4, '05 start as the starting date?
16    A.  That's when those products were announced,
17  introduced and started selling.
18    Q.  Is there any data for iPod videos or iPod
19  mini?
20    A.  No, it does not.
21    MR. ZITO:  The next document we got was
22  121683.
23    MR. SCHERKENBACH:  We have it.
24    MR. ZITO:  All right.
25    Q.  And do you know how that document was created?

Page 10

1    MR. SCHERKENBACH:  Would you like to mark it,
2  Joe?
3    MR. ZITO:  Oh, I'm sorry.  Yeah.  Mark it 189.
4    MR. SCHERKENBACH:  Okay.  Let's do that.
5    (Whereupon, Exhibit 189 was marked
6    for identification)
7    MR. ZITO:  Q.  All right.  Do you know how
8  document 189 was generated?
9    A.  Same way.  Data was pulled by Larry Minter out
10  of BW.
11    Q.  Okay.  And can you verify if the data on that
12  document is correct?
13    A.  It is correct.
14    Q.  And what does that data reflect?
15    A.  It reflects units in revenue for a PowerBook,
16  three PowerBook models that were introed in fiscal Q2 of
17  '05, and then two more PowerBook models that were
18  introed in fiscal Q1 of '06 and data then for all five
19  products through Q2, '07.
20    Q.  Does it reflect any sales for iBook?
21    A.  No, it does not.
22    Q.  Okay.  What about the PowerBook?  Is that what
23  you were referring, to the G4 there?
24    A.  Yes.
25    Q.  Okay.  And what about MacBook sales?  Are

Page 11

1  those referred -- are any of those included?
2    A.  No.
3    Q.  All right.  In quarter 4 of '06, in quarter 1
4  and 2 of '07 it appears at the end, there are negative
5  numbers.  What does that reflect?
6    A.  It reflects returns to the company of those
7  products.
8    Q.  Are those unsold returns, damaged returns?
9  What was the nature of those returns?
10    A.  I do not know the nature of them.
11    Q.  The next document I have got is 123575.
12    MR. SCHERKENBACH:  We have it.
13    MR. ZITO:  All right.  Go ahead and mark that
14  as 190.
15    MR. SCHERKENBACH:  Okay.
16    (Whereupon, Exhibit 190 was marked
17    for identification)
18    MR. ZITO:  Q.  And done how this document was
19  generated?
20    A.  Yes.
21    Q.  How was that?
22    A.  It's a collection of Excel files provided by
23  the vendor on a daily basis into our -- one of the
24  people in our procurement group.
25    Q.  All right.  And who was that person?

Page 12

1    A.  Let's see if I can catch the name or pronounce
2  it correctly.  Prea Balasubmarian.
3    Is that right?
4    MR. ZITO:  Q.  And can you verify the accuracy
5  of the data?
6    A.  No, I did not.
7    Q.  At this time?
8    A.  It's Excel based.
9    Q.  And what does this reflect?
10    A.  (No response).
11    Q.  What does the data in the document show?
12    A.  I'm trying to recall my conversation with
13  Prea.  This is shipments from these two vendors
14  regarding the component click for use in our products on
15  a worldwide basis.
16    Q.  And that's for any products worldwide or only
17  for the iPod nanos that are shown?
18    A.  Only for the iPod nano.
19    Q.  Does not include the iPod video or iPod mini?
20    A.  To my knowledge, no.
21    Q.  The total product purchase is normally 288,273
22  units.
23    Is that correct?
24    A.  That's the data point that I see on the page,
25  yes.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249241

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 13

1    Q.   For '07, and 26 million for '06?
2    A.   That's what I see, yes.
3    Q.   If I look at the data points on Exhibit 188?
4    A.   188? Ah. Okay.
5    Q.   Doing a rough, very rough calculation on the
6    units, I get less than half.  Do you know why?
7    A.   Yeah.  The Exhibit 190 is a worldwide
8    component supply and Exhibit 188 is sales in the U.S.
9    only.
10   Q.   All right.  And is it your understanding that
11   approximately, I'm not going to hold you to that number,
12   half of iPod nanos are sold in the U.S. and the other
13   half somewhere else?
14   A.   Seems reasonable.
15   Q.   Well, other than it seems reasonable, do you
16   have any knowledge from your -- in your position as the
17   director that that's approximately an accurate number?
18   A.   Yeah.  Yes, I would agree that that's
19   approximately an accurate number.
20   Q.   Where are the chips that are shown in
21   Exhibit 190, where are they shipped from?
22   A.   That I do not know.
23   Q.   And do you know where Apple receives those
24   chips?
25   A.   No, I don't.

Page 14

1    Q.   What about -- well, let me -- we'll do it
2    together.  What about cost information?
3         Before that, before that, are there any other
4    documents that you generate or that you reviewed that
5    someone else has generated from Apple reflecting the
6    quantity of sales of products?
7    A.   No.  This was it.
8    Q.   So Apple at this point has not generated any
9    documents for iPod video, iPod mini, iBook and MacBook
10   sales?
11   A.   Not to my knowledge.
12   Q.   Do you have any understanding that those
13   products are also accused of infringement and included
14   in this litigation?
15   A.   No, I am not aware.
16        MR. ZITO:  I'm going to go ahead and state
17   that again for the record as reflected in our Amended
18   Response and as reflective of discussions during the
19   Cypress depositions, and earlier Apple depositions, that
20   those products should be included.  We have been
21   indicating in getting updated information on those
22   products as far as sales go.
23        I direct that towards your counsel, not
24   necessarily towards you, Mr. Lancaster.
25        THE WITNESS:  I understand.

Page 15

1         MR. SCHERKENBACH:  And I understand the
2    request, Mr. Zito.  And if we -- if we work out an
3    agreement on that, the data can be generated, as I
4    understand it, in largely the same form as the data you
5    have.
6         MR. ZITO:  That's fine.  That's fine.
7    Q.   Cost information, did you generate any cost
8    information regarding these products or the components
9    for these products?
10   A.   No.  No, I did not.
11   Q.   Are you aware of anybody else at Apple who has
12   generated any cost information?
13   A.   No.
14        MR. ZITO:  Yeah.  And I received an e-mail
15   late yesterday from Mr. Patel indicating that that had
16   not been gathered yet.
17        Is that still a correct understanding?
18        MR. SCHERKENBACH:  That's one -- yeah, that's
19   one more for me.  Yes, we have some of it, not all of
20   it.  We'd like to, you know, do it in a coherent way,
21   and also get you the proper designee on those issues.
22        As I indicated in my e-mail to you,
23   Mr. Lancaster really has no involvement with the cost
24   side of things.
25        MR. ZITO:  Okay.

Page 16

1         MR. SCHERKENBACH:  But we will provide you a
2    designee who is knowledgeable about the relevant
3    information on the cost side.
4         MR. ZITO:  I also have a document, 10605.
5         MR. SCHERKENBACH:  Okay.  Would you like to
6    mark that?
7         MR. ZITO:  Yeah.  Mark that 191.
8         (Whereupon, Exhibit 191 was marked
9         for identification.)
10        MR. ZITO:  Q.  All right.  Have you seen that
11   document before?
12   A.   No, I have not.
13   Q.   All right.  Are you involved with any elements
14   of royalties or royalty rates or paying royalties?
15   A.   No.
16   Q.   I also sent you what's been previously marked
17   as Exhibit 115.
18        MR. SCHERKENBACH:  We have it.
19        MR. ZITO:  Q.  All right.  Have you seen that
20   document before?
21   A.   No.
22   Q.   Any involvement with the acquisition of
23   FingerWorks?
24   A.   No.
25   Q.   Did you do any financial analysis or prospect

4 (Pages 13 to 16)

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249242

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 17

1  analysis, any sort of analysis at all in connection with
2  the acquisition of FingerWorks?
3      A.  No, not at all.
4      Q.  All right.
5          There is also document, I don't think I sent
6  it to your counsel, but it's Exhibit No. 158 from the
7  Sol deposition.  I gather counsel probably doesn't have
8  it there in front of him.
9          MR. SCHERKENBACH:  I do not.
10         MS. BIGELOW:  Which deposition, Joe?
11         MR. ZITO:  Sol, with Mr. Sol.
12         MS. BIGELOW:  Oh.
13         MR. SCHERKENBACH:  I can try to get it on a
14  break or something if you like.  I assume we can get our
15  hands on it here.  It's Sol 158?
16         MR. ZITO:  Yes.  Actually, no, no, that's
17  fine.  2623 --
18     Q.  Yeah.  Exhibit 190 is just iPod nano.
19  Correct?
20     A.  Yes.
21     Q.  And is there a corresponding exhibit that
22  shows purchases for trackpads or for PowerBooks?
23     A.  No.
24         MR. ZITO:  Yeah, the Sol -- the total on the
25  Sol 158 is for all three.  That's why the different

Page 18

1  numbers.  That's fine.
2          There are some other documents counsel should
3  have in front of him, I'm looking at 15732.
4          MR. SCHERKENBACH:  I have it.
5          MR. ZITO:  All right.
6      Q.  Have you seen that document before?
7          MR. SCHERKENBACH:  Do you want to mark it or
8  not?
9          MR. ZITO:  Yeah, mark it anyway.  191.
10         MR. SCHERKENBACH:  92.
11         MR. ZITO:  92.
12         (Whereupon, Exhibit 192 was marked
13         for identification)
14         MR. ZITO:  All right.
15     Q.  Have you seen that document before,
16  Mr. Lancaster.
17     A.  No, I have not.
18     Q.  I guess my question has been preempted by your
19  counsel's indication, but I'll ask anyway.  Do you have
20  any knowledge of the costs that go into products such as
21  the M19 mouse?
22     A.  No, I do not.
23     Q.  On the second page there is a part, says
24  Microprocessor, says Cap and FSR Sensing?  Do you see
25  that?

Page 19

1      A.  I do.
2      Q.  Do you have any knowledge of the costs of that
3  component to Apple?
4      A.  No, I do not.
5      Q.  All right.  Do you know if that's the
6  component that's reflected in Exhibit 190?
7      A.  No, I do not.
8      Q.  All right.
9          MR. SCHERKENBACH:  190, Joe?
10         MR. ZITO:  Correct, 190 says the iPod Nano
11  Clickwheel Cypress Purchases.
12         MR. SCHERKENBACH:  Right.  But isn't this 192,
13  M19 is Mighty Mouse, isn't it?
14         MR. ZITO:  Correct.  I understand it's the
15  same actual component from --
16         MR. SCHERKENBACH:  Oh.  Okay.
17         MR. ZITO:  Or -- but this witness doesn't know
18  what component that is anyway.
19         MR. SCHERKENBACH:  Okay.
20         MR. ZITO:  Okay.  I have got two other bill of
21  materials for the M19.
22         MR. SCHERKENBACH:  Okay.
23         MR. ZITO:  It's 15736 and 15735.
24         MR. SCHERKENBACH:  Yes, I have them.
25         MR. ZITO:  Okay.  Just to be clear,

Page 20

1  Exhibit 192 is three pages.  Right?
2          MR. SCHERKENBACH:  Yeah.  Let me check.  I
3  think so.  Yes.
4          MR. ZITO:  All right.
5          MR. SCHERKENBACH:  Yes.  Do you want to mark
6  these other two or just ask him about them?
7          MR. ZITO:  Let's mark 15735 and 193.
8          (Whereupon, Exhibit 193 was marked
9          for identification)
10         MR. SCHERKENBACH:  Okay.
11         MR. ZITO:  And 15736 as 194.
12         (Whereupon, Exhibit 194 was marked
13         for identification)
14         MR. ZITO:  All right.
15     Q.  With respect to all three of those exhibits,
16  192, 193, and 194, do you know who at Apple produced
17  those?
18     A.  No, I do not.
19     Q.  Is there a database that this information
20  comes from that you are aware of?
21     A.  I do not know.
22     Q.  Do you know if there are similar documents or
23  similar data for the nano and the trackpads?
24     A.  I do not know.
25         MR. ZITO:  All right.  If we could look at the

5 (Pages 17 to 20)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

Page 21

1  document that starts with 12471?
2      MR. SCHERKENBACH:  What's that one?  Oh, I'm
3  sorry.  I set it aside here.  I got it.
4      MR. ZITO:  Okay.
5      MR. SCHERKENBACH:  Want to mark it?
6      MR. ZITO:  Sure.  Let's go ahead and mark that
7  195.
8      (Whereupon, Exhibit 195 was marked
9          for identification)
10     MR. ZITO:  All right.
11     Q.  Have you seen that document or any of the four
12  pages of that document before?
13     A.  No.  And --
14     MR. SCHERKENBACH:  It's a single -- we have
15  just a single page.
16     MR. ZITO:  Oh.  Should be 12471 through 12474.
17     MR. SCHERKENBACH:  Okay.  Apologize for that.
18  We only have 12471.
19     It's different numbers.
20     THE WITNESS:  Oh.
21     MR. SCHERKENBACH:  But I can represent to you
22  that Mr. Lancaster reviewed -- if it's just a printing
23  error, he did review the complete copies, copy of this
24  document electronically right before we started, and you
25  can ask him, but I don't believe that would change his

Page 22

1  answer.
2      MR. ZITO:  Okay.
3      Q.  Do you recognize anything on the first page?
4      A.  Just from what I -- just from what I saw on
5  the screen of the computer.
6      Q.  So that's no, or --
7      A.  If "recognize" means do I know where this data
8  came from or what it reports, then the answer is no.
9      Q.  Okay.  And that's what I meant by recognize.
10     A.  Okay.
11     Q.  All right.  You don't know what database or
12  where at Apple this kind of information will be stored
13  or found?
14     A.  No.
15     Q.  Let's look at Exhibit 190.
16     A.  Okay.
17     Q.  Okay.  Are you able to confirm the purchase of
18  the 18,260,776 chips from Cypress in 2006?
19     A.  No.
20     Q.  Do you know who could at Apple?
21     A.  No, actually, I don't.
22     Q.  All right.  But you are the official who can
23  confirm the sales reflected on Exhibits 188 and 189?
24     A.  Yeah, I'm sorry, ask the question again,
25  please?

Page 23

1      Q.  You are the individual who can confirm the
2  sales, the figures that are reflected on Exhibits 188
3  and 189?
4      A.  Correct.
5      MR. ZITO:  All right.  I guess pending getting
6  the update, we can waive having to ask him to
7  reauthenticate the documents.  If you can give me just a
8  short declaration that goes with them, depends upon his
9  understanding of where the information comes from and
10  his confirmation that the people that -- I guess that
11  would again be Mr. Minter, I guess, would get the
12  updated information.
13     Q.  Is that correct?
14     A.  Correct.
15     MR. ZITO:  All right.  We don't need to ask
16  him again just to confirm those documents if you can
17  just give us a declaration that goes with them.
18     Is that acceptable?
19     MR. SCHERKENBACH:  Sure, it is.  I don't see
20  the need for another deposition.
21     MR. ZITO:  Okay.  All right.  And then if you
22  find those notes about costs, you'll let me know?
23     MR. SCHERKENBACH:  Yeah, we will.  It will
24  take a day or two to figure out who the right person is.
25  Do you want to do that one by telephone as well?

Page 24

1      MR. ZITO:  Sure.  That's probably the easiest
2  way to do it.
3      MR. SCHERKENBACH:  All right.  Well, either I
4  or Rudhir get back to you in the next few days on
5  scheduling.
6      MR. ZITO:  Yeah.  I had actually intended to
7  be out there, but stuck working on another case,
8  sometimes that happens.
9      MR. SCHERKENBACH:  That's okay.
10     MR. ZITO:  That's all the questions I have for
11  now.
12     MR. SCHERKENBACH:  All right.  We don't have
13  anything.  Thank you.
14     MR. ZITO:  All right.  Thank you.
15     (Whereupon, the deposition was
16         adjourned at 10:41 A.M.)
17         --oOo--
18     I declare under penalty of perjury the
19  foregoing is true and correct.  Subscribed at
20  _____, California, this _____ day of
21  _____ 2007.
22     _____
23         FREDERICK CHARLES LANCASTER
24
25

6 (Pages 21 to 24)

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249244

CONFIDENTIAL DEPOSITION OF FREDERICK CHARLES LANCASTER
CONDUCTED ON TUESDAY, OCTOBER 23, 2007

CERTIFICATE OF REPORTER

I, COREY W. ANDERSON, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED:  October 24, 2007.

_____
COREY W. ANDERSON, CSR 4096

7 (Page 25)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000249245

# EXHIBIT 16
# FILED UNDER SEAL

# In The Matter Of:

*Apple, Inc.*

*vs.*

*Motorola, Inc., et al*

_____

*Louie Sanguinetti*

*March 16, 2012*

_____

# *Confidential  Under Protective Order*

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

Highly Confidential - Attorneys' Eyes Only

Confidential Under Protective Order
Louie Sanguinetti    March 16, 2012

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

--oOo--

APPLE INC., and NeXT SOFTWARE, INC.,
(f.k.a. NeXT COMPUTER, INC.)

          Plaintiff,

  vs.                        No. 1:11-cv-08540

MOTOROLA, INC., and
MOTOROLA MOBILITY, INC.,

          Defendants.

_____/

DEPOSITION OF

LOUIE SANGUINETTI

_____

Friday, March 16, 2012

CONFIDENTIAL UNDER PROTECTIVE ORDER

REPORTED BY: COREY W. ANDERSON, # 4096 (2003-442070)

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003111926

Confidential Under Protective Order
Louie Sanguinetti     March 16, 2012

Page 2

1                    I N D E X

2              INDEX OF EXAMINATIONS

3   EXAMINATION                                    Page

4   EXAMINATION BY MS. WILLIAMSON                    6

5

6

7                  INDEX TO EXHIBITS

8

9   No.              Description              Page

10

11  Exhibit 1    Motorola Mobility's Notice Of      15
                 Deposition Of Apple, Inc.
12               Pursuant To Federal Rule Of Civil
                 Procedure 30(b)(6)
13
    Exhibit 2    Motorola Mobility, Inc.'s Notice   18
14               Of Deposition Of Louie
                 Sanguinetti
15
    Exhibit 3    3GPP TS 44.060 version 5.3.0,      40
16               (2002 through 2009)
                 (MOTO-APPLE-0007143843, 943
17               through 945)

18  Exhibit 4    3GPP TS 25.213 version 3.8.0       58
                 (2002 through 2006)
19               (MOTO-APPLE-0007143817 through
                 842)
20
    Exhibit 5    IEEE Standard for Information      65
21               technology, et al.

22

23

24

25

Merrill Corporation - Chicago

Confidential Under Protective Order
Louie Sanguinetti     March 16, 2012

Page 3

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANTS:

 4          QUINN EMANUEL URQUHART & SULLIVAN LLP
            500 West Madison Street, Suite 2450
 5          Chicago, Illinois  60661
            312-705-7400
 6          BY:  AMANDA WILLIAMSON, ESQ.
            amandawilliamson@quinnemanuel.com
 7

 8   FOR THE DEFENDANT AND COUNTERCLAIM PLAINTIFF:

 9          COVINGTON & BURLING, LLP
            333 Twin Dolphin Drive, Suite 700
10          Redwood Shores, California  94065-1418
            650-632-4702
11          BY:  ROBERT T. HASLAM, ESQ.
            rhaslam@cov.com
12
            APPLE
13          One Infinite Loop, MS 36-3NYJ
            Cupertino, California  95014
14          408-862-4106
            BY:  TOM VIGDAL, ESQ.
15          tvigdal@apple.com

16      ALSO PRESENT:  DAVID OSGOOD, videographer

17                     --oOo--

18

19

20

21

22

23

24

25
```

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003111928

Confidential Under Protective Order
Louie Sanguinetti     March 16, 2012

Page 4

1           BE IT REMEMBERED that pursuant to notice

2    and on Friday, March 16, 2012 commencing at 9:09

3    A.M. thereof, at the Law Offices of COVINGTON &

4    BURLING, LLP, 333 Twin Dolphin Drive, Redwood

5    Shores, California, before me, Corey W. Anderson, a

6    Certified Shorthand Reporter and Realtime Reporter,

7    personally appeared

8                   LOUIE SANGUINETTI

9           _____

10   called as a witness by the DEFENDANT AND

11   COUNTERCLAIM PLAINTIFF, who, having been first duly

12   sworn, was examined and testified as follows:

13                       --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003111929

Confidential Under Protective Order
Louie Sanguinetti    March 16, 2012

Page 47

| | | |
|---|---|---|
| 10:24:06 | 1 | Q.    Were there any deficiencies with respect |
| 10:24:08 | 2 | to the performance? |
| 10:24:12 | 3 | A.    At the time of selection, not that I can |
| 10:24:14 | 4 | recall. |
| 10:24:15 | 5 | Q.    At any subsequent time? |
| 10:24:19 | 6 | A.    During development of the original iPhone? |
| 10:24:20 | 7 | Q.    Yes. |
| 10:24:21 | 8 | A.    Yes, but I can't recall the specifics. |
| 10:24:30 | 9 | Q.    And what did you -- what happened when you |
| 10:24:33 | 10 | discovered a deficiency, this deficiency? |
| 10:24:39 | 11 | A.    We would report it to Infineon and the two |
| 10:24:42 | 12 | companies would work together to resolve the issue. |
| 10:24:45 | 13 | Q.    Was it important that you have full |
| 10:24:47 | 14 | compliance with the mandatory portions of the GSM |
| 10:24:53 | 15 | and EDGE standard? |
| 10:24:54 | 16 | A.    It was important that the product |
| 10:24:56 | 17 | interoperate with the test requirements of the |
| 10:24:59 | 18 | standard. |
| 10:25:01 | 19 | Q.    Would AT&T have carried the product if it |
| 10:25:03 | 20 | failed to meet those standards? |
| 10:25:06 | 21 | MR. HASLAM:    Objection, lacks foundation. |
| 10:25:07 | 22 | Calls for speculation. |
| 10:25:10 | 23 | THE WITNESS:    AT&T would expect us to pass |
| 10:25:12 | 24 | the interoperability test cases of the standard. |
| 10:25:15 | 25 | BY MS. WILLIAMSON: |

Merrill Corporation - Chicago
(312) 386-2000                                    www.merrillcorp.com/law

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003111972

Confidential Under Protective Order
Louie Sanguinetti    March 16, 2012

Page 48

| | | |
|---|---|---|
| 10:25:17 | 1 | Q.   And the original iPhone did in fact pass |
| 10:25:20 | 2 | those test case standards? |
| 10:25:23 | 3 | A.   To the best of my knowledge, yes. |
| 10:25:27 | 4 | Q.   With respect to iPhone 3G, was the process |
| 10:25:32 | 5 | for selecting the chipset, was it similar to the |
| 10:25:37 | 6 | iPhone? |
| 10:25:40 | 7 | A.   (No response). |
| 10:25:41 | 8 | Q.   I'm sorry, did you follow the same |
| 10:25:42 | 9 | procedure? |
| 10:25:43 | 10 | A.   Yes, it was a similar procedure as the |
| 10:25:45 | 11 | original iPhone. |
| 10:25:48 | 12 | However, with Infineon as the incumbent, |
| 10:25:50 | 13 | it was much simpler to continue on their -- their |
| 10:25:56 | 14 | roadmap, if you will. |
| 10:26:02 | 15 | Q.   And during -- did the iPhone -- excuse me. |
| 10:26:06 | 16 | Did the Infineon chip also meet the GSM |
| 10:26:10 | 17 | and EDGE requirements set forth in the standard? |
| 10:26:16 | 18 | A.   The Infineon chipset would meet the |
| 10:26:19 | 19 | interoperability test case as defined in the |
| 10:26:22 | 20 | standard. |
| 10:26:23 | 21 | Q.   Were there any deficiencies during that |
| 10:26:25 | 22 | selection process that you discovered? |
| 10:26:32 | 23 | A.   There were issues during the product |
| 10:26:34 | 24 | development, yes. |
| 10:26:36 | 25 | Q.   Was that during the selection process or |

Merrill Corporation - Chicago
(312) 386-2000                    www.merrillcorp.com/law

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003111973

Confidential Under Protective Order
Louie Sanguinetti    March 16, 2012

Page 49

| | | |
|---|---|---|
| 10:26:38 | 1 | later during the product development? |
| 10:26:39 | 2 | A.   I would not recall issues at the time of |
| 10:26:42 | 3 | the selection. |
| 10:26:43 | 4 | Q.   What were the problems that were |
| 10:26:45 | 5 | discovered during the product development? |
| 10:26:49 | 6 | A.   During the development of the iPhone 3G, |
| 10:26:50 | 7 | we had problems passing a test case called interloop |
| 10:26:56 | 8 | power control. |
| 10:26:59 | 9 | We also identified a bug in the baseband, |
| 10:27:04 | 10 | the specifics of which I do not recall. |
| 10:27:09 | 11 | There was also issues with transmit power |
| 10:27:11 | 12 | accuracy and EVM that were identified during the |
| 10:27:17 | 13 | development that needed to be resolved. |
| 10:27:42 | 14 | Q.   What was the problem with the interloop |
| 10:27:44 | 15 | power control? |
| 10:27:48 | 16 | A.   The interloop power control test is a test |
| 10:27:51 | 17 | that describes the accuracy of the transmit power as |
| 10:27:56 | 18 | it ramps up and ramps down under the commands of the |
| 10:27:59 | 19 | base station, and the accuracy of the transmit power |
| 10:28:03 | 20 | did not pass that -- that test requirement.  It |
| 10:28:07 | 21 | turned out to be a nothing defective in the |
| 10:28:13 | 22 | hardware, it really needed optimization around |
| 10:28:16 | 23 | factory calibration and temperature compensation in |
| 10:28:20 | 24 | the software. |
| 10:28:22 | 25 | Q.   And did that requirement correspond to a |

Merrill Corporation - Chicago

(312) 386-2000                          www.merrillcorp.com/law

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003111974

# EXHIBIT 17
# FILED UNDER SEAL

Stephen Lemay          HIGHLY CONFIDENTIAL          July 9, 2010
                        Menlo Park, CA

Page 1

UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, D.C.


In the Matter of:              )

CERTAIN ELECTRONIC             )

DEVICES, INCLUDING MOBILE      )

PHONES, PORTABLE MUSIC         )  Case No. 337-TA-701

PLAYERS, AND COMPUTERS.        )

_____  )




HIGHLY CONFIDENTIAL

DEPOSITION OF STEPHEN LEMAY

FRIDAY, JULY 9, 2010



    Videotaped deposition of STEPHEN LEMAY, taken on

behalf of Nokia Corporation, at Alston & Bird LLP, 275

Middlefield Road, Menlo Park, California, commencing

at 9:06 a.m., July 9, 2010, before Sandra Lehane,

Certified Shorthand Reporter No. 7372, pursuant to

Notice.


Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242895

Stephen Lemay          HIGHLY CONFIDENTIAL          July 9, 2010
                          Menlo Park, CA

---

Page 2

1     APPEARANCES OF COUNSEL:
2
3     For the Complainant:
4     ALSTON & BIRD LLP
5     CHARLES A. BASINGER, ESQ.
6     950 F Street, N.W.
7     Washington, D.C. 20004
8     (202) 756-3300
9     charles.basinger@alston.com
10
11    For the Respondent:
12    WILMER CUTLER PICKERING HALE and DORR LLP
13    JAMES P. BARABAS, ESQ.
14    399 Park Avenue.
15    New York, New York 10022
16    (212) 295-6440.
17    james.barabas@wilmerhale.com
18
19    Also Present:  Arik Kerhoulas, Video Operator
20
21
22
23
24
25

---

Page 3

1                    INDEX
2     WITNESS:  STEPHEN LEMAY
3     EXAMINATION                        PAGE
4       BY MR. BASINGER                  6
5       AFTERNOON SESSION                91
6
7                  EXHIBITS
8     COMPLAINANT'S                      PAGE
9     Exhibit No. 2047                   43
10    Exhibit No. 2048                   52
11    Exhibit No. 2049                   65
12    Exhibit No. 2050                   68
13    Exhibit No. 2051                   70
14    Exhibit No. 2052                   75
15    Exhibit No. 2053                   104
16    Exhibit No. 2054                   113
17    Exhibit No. 2055                   115
18    Exhibit No. 2056                   116
19    Exhibit No. 2057                   119
20    Exhibit No. 2058                   122
21    Exhibit No. 2059                   128
22    Exhibit No. 2060                   137
23    Exhibit No. 2061                   139
24    Exhibit No. 2062                   140
25    Exhibit No. 2063                   146

---

Page 4

1                   EXHIBITS
2     COMPLAINANT'S                      PAGE
3     Exhibit No. 2064                   148
4     Exhibit No. 2065                   154
5     Exhibit No. 2066                   171
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1     PARK MENLO, CALIFORNIA          JULY 9, 2010
2                 PROCEEDINGS
3     (Time noted as 9:06 a.m.)
4                  ---oOo---
5                STEPHEN LEMAY
6     having been first duly sworn, testified as follows:
7                  ---oOo---
8          THE VIDEO OPERATOR:  Good morning.  We are on
9     the video record, ladies and gentlemen, at 9:06 a.m.
10    I am Arik Kerhoulas, here with our court reporter,
11    Sandy Lehane, for Alderson Court Reporting in
12    Washington, D.C.  The phone number is (202) 289-2260.
13         This is a matter pending before the U.S.
14    International Trade Commission, Washington, D.C., in
15    the matter of Certain Electronic Devices Including
16    Mobile Phones, Portable Music Players, Case Number
17    337-TA-701.
18         This is the beginning of Disk No. 1 of
19    Volume 1 of the deposition of Stephen Lemay on July 9,
20    2010.  We're located at the office of Alston & Bird at
21    275 Middlefield Road in Menlo Park, California.
22         Counsel, would you please identify yourselves
23    starting with the questioning attorney.
24         MR. BASINGER:  This is Charles Basinger with
25    the law firm of Alston & Bird for the complainant,

2 (Pages 2 to 5)

---

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242896

Stephen Lemay       HIGHLY CONFIDENTIAL       July 9, 2010
                    Menlo Park, CA

Page 6

1  Nokia.
2      MR. BARABAS:  Jim Barabas from Wilmer Hale on
3  behalf of Apple, Inc. and the witness.
4      THE VIDEO OPERATOR:  If the court reporter
5  would please swear in the witness, we can proceed.
6      (Oath administered.)
7      THE VIDEO OPERATOR:  You can proceed.
8  EXAMINATION
9  BY MR. BASINGER:
10     Q.  Good morning.
11     A.  Hi.
12     Q.  Could you please state your name and your
13  home address for the record.
14     A.  Stephen Lemay.  I live at 735 Kirkham Street,
15  San Francisco, California.
16     Q.  And, Mr. Lemay, do you go by Steve or
17  Stephen?
18     A.  Steve is fine.  Most people call me Steve.
19     Q.  Have you ever been deposed before?
20     A.  No.
21     Q.  Just -- I want to go through a few ground
22  rules before we get started.  As you understand, you're
23  under oath today.
24     Do you understand that?
25     A.  Yes.

Page 7

1      Q.  I'm going to ask a number of questions.  And
2  for the court reporter's sake, if you can wait until I
3  finish the question before you answer, it will make
4  things much easier.  If for some reason there is a
5  question that you don't understand, just ask for
6  clarification and I would be happy to clarify it.  And
7  if you don't understand a question -- or if you do
8  answer a question, I'll assume that you did understand
9  it.  Is that fair?
10     A.  Sure.
11     Q.  Okay.  And also, for the court reporter's
12  sake, if you answer a question, just make sure that
13  you use a verbal answer and not gestures.
14     Mr. Lemay, have you ever testified at trial
15  before?
16     A.  No.
17     Q.  And have you ever been retained as an expert
18  witness?
19     A.  No.
20     Q.  And when, approximately, did you join Apple?
21     A.  1999.
22     Q.  And before that, what were you doing?
23     A.  I was a student.
24     Q.  So you joined Apple right out of college?
25     A.  Yeah, basically.

Page 8

1      Q.  And where did you go to college?
2      A.  Bowdoin College in Maine.
3      Q.  Maine?
4      A.  Yep.
5      Q.  What did you study at Bowdoin?
6      A.  Studio art.
7      Q.  Did you get a degree in studio art?
8      A.  Yes.  Well, it was my major.  I have a B.A.
9  degree.
10     Q.  Did you study any computer science or take
11  any computer science courses at Bowdoin?
12     A.  Yes.
13     Q.  Can you just briefly describe the computer
14  science exposure you had there?
15     A.  Yes.  My recollection is I took one beginner
16  programming class in computer programming.
17     Q.  What language was that in?
18     A.  I honestly don't recall.  It was -- it
19  probably is a language no longer in use, even if I
20  could remember.
21     Q.  At Apple, have you done any programming?
22     A.  Yes.
23     Q.  And what kind of programming have you done at
24  Apple?
25     A.  Multimedia programming.  The language is

Page 9

1  called Lingo.
2      Q.  And when you joined Apple in 1999, what was
3  your first position?
4      A.  Interface designer.
5      Q.  What exactly is an interface designer?
6      A.  We do the artwork for applications and the
7  interaction model for the application.
8      Q.  What's an interaction model?  What do you
9  mean by that?
10     A.  The workflow for the application, how the
11  customer will achieve the task which is the goal of
12  the application.
13     Q.  Were you working on any specific applications
14  when you first joined Apple?
15     A.  Yes.
16     Q.  And what were those?
17     A.  QuickTime Player.
18     Q.  Was that the only application that you were
19  working on?
20     A.  At that time.
21     Q.  And so, after the QuickTime Player
22  application, did you then move on to another
23  application, or did you move to a different area
24  within Apple?
25     A.  I eventually joined a different team at

3 (Pages 6 to 9)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242897

Stephen Lemay        HIGHLY CONFIDENTIAL        July 9, 2010
                        Menlo Park, CA

---

Page 10

1  Apple.
2      Q.  What team was that?
3      A.  The Human Interface Group.
4      Q.  So, roughly, when did you join the Human
5  Interface Group?
6      A.  It would have been late 2000 or 2001.
7      Q.  And what responsibilities does the Human
8  Interface Group have generally?
9      A.  We do the interface design for OS X, iPhone,
10 iPod Touch, and iPad.
11     Q.  And you say "we do."  More specifically, what
12 are some of your responsibilities or focuses of the
13 interface group?
14     A.  It's pretty broad.  We do the interface
15 design, the look and feel, for all those products and
16 the interaction design for all those products.
17     Q.  So you have the look and the feel and you
18 have the design.  By "design," what do you mean?
19     A.  The look and the feel, I would say, is the
20 design of it.  The interaction is how -- it's like
21 more of a conceptual workflow, how do you get from A
22 to B, and the structure of the application.
23     Q.  Would it be fair to characterize that as sort
24 of the intuitiveness of it for a user?
25     A.  That's an aspect of it.  It's more about how

---

Page 11

1  do you use an application.
2      Q.  What would be an example?
3      A.  If there's an application designed to print
4  things, the interaction model would be how does the
5  customer use the application to print something.  What
6  are the steps.
7      Q.  And when you're working on this interaction,
8  are you working closely with software programmers?
9      A.  Sometimes.
10     Q.  Okay.  Let me just take a step back and go
11 back to the Human Interface Group in general.
12         Now, when you first joined in 2001, roughly
13 2000-2001, how large was the Human Interface Group?
14     A.  Somewhere between 7 to 10 people,
15 approximately.
16     Q.  Has it grown since then?
17     A.  Yes.
18     Q.  After first joining the Human Interface Group
19 in 2000-2001, what would you say was your first
20 responsibility you, personally, within that group when
21 you first started?
22     A.  It was to continue the work I had previously
23 done in QuickTime.
24     Q.  Just generally, what kind of things did you
25 work on with QuickTime?

---

Page 12

1      A.  The player, the QuickTime Player.  The look
2  and feel of the QuickTime Player.
3      Q.  Then after the QuickTime Player, what did you
4  work on after that?
5      A.  I don't recall specifically what the very
6  next project would be at that time.  That was a long
7  time ago.
8      Q.  Now, when did you start working with the
9  iPhone, iPod Touch, and iPad?  Let me break that down.
10         When did you first start working on the
11 iPhone?
12     A.  The specific date would be hard for me to
13 remember exactly.  I was there at the beginning of its
14 inception, I would say.
15     Q.  So you were there from the beginning.  And
16 that would have been 2006-ish?
17     A.  -ish, mm-hmm.
18     Q.  Do you recall what some of your
19 responsibilities were with regard to the iPhone?
20     A.  Overall look and feel, some specific
21 applications.  Address book, I believe I worked on at
22 the time.  The mail application.  Stuff like that.
23     Q.  And when you were working on the iPhone, were
24 you working closely with anyone else?
25     A.  With my team, yes.

---

Page 13

1      Q.  That would be the Human Interface Group?
2      A.  Correct.
3      Q.  And who specifically did you work the most
4  with?
5      A.  It was everybody equally, to be honest.  It
6  was very much a team effort, I would say.
7      Q.  Were you given any specific tasks or goals
8  with regard to your work on the iPhone?
9      A.  I'm sure, yes.
10     Q.  Do you remember -- do you remember generally,
11 when you were working on the iPhone, your goal with
12 regard to the mail application?
13     A.  I don't remember a specific goal other than
14 to design an easy-to-use mail application.
15     Q.  And when you were working on these
16 applications in the iPhone, what type of documents did
17 you normally deal with on a day-to-day basis, if any?
18     A.  Could you be more specific on "documents"?
19     Q.  I mean, how did you record your work, your
20 daily work?
21     A.  Photoshop, primarily.
22     Q.  So you would generate graphics files and
23 visual files then, you know, for the mail application?
24     A.  Correct.
25     Q.  And these files would have been saved, I'm

4 (Pages 10 to 13)

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242898

Stephen Lemay          HIGHLY CONFIDENTIAL          July 9, 2010
                       Menlo Park, CA

---

**Page 14**

1  assuming, on your local computer or on a network
2  drive?
3      A.  Correct.
4      Q.  On both or...
5      A.  Primarily local.  I don't recall a network.
6  Primarily local.
7      Q.  And did you work on the keyboard, the virtual
8  keyboard that the iPhone used?
9      A.  No.
10     Q.  You never worked on the virtual keyboard
11 that's used in the iPhone?
12     A.  Correct.
13     Q.  Do you know what I mean when I refer to the
14 "virtual keyboard" on the iPhone?
15     A.  I believe I do.
16     Q.  What does that mean to you when I say that?
17     A.  The software keyboard that is drawn on the
18 screen.
19     Q.  So that software keyboard that's drawn on the
20 screen, at no point during your work at Apple on the
21 iPhone did you work on that feature?
22     A.  Not as such.  Can you expand your definition
23 of "work"?
24     Q.  Sure.
25         Did you ever draw any graphics files or

---

**Page 15**

1  create any graphics files related to any of the keys
2  or the layout of that keyboard?
3      A.  No.
4      Q.  Would you ever have received e-mails relating
5  to the development of that keyboard using the first
6  iPhone?
7      A.  Probably.
8      Q.  And would those e-mails -- who would those
9  e-mails have been from?
10     A.  I don't recall.
11     Q.  Were other members of the Human Interface
12 Group working on the development of that keyboard for
13 the iPhone?
14     A.  Yes.
15     Q.  And now I'm referring to the first generation
16 iPhone, or the iPhone 2G.
17         And so you did not work on or develop
18 graphics files for the keyboard used in the iPhone 2G.
19 Did you do any work or develop any files for the
20 iPhone 3G, 3GS or 4?
21     A.  With regard to the keyboard?
22     Q.  Yes, with regard to the keyboard.
23     A.  No.  Not that I recall.
24     Q.  Did you ever work with anyone at Apple that
25 was involved in the development of the keyboard?  When

---

**Page 16**

1  I say "work with," I mean did you work with them
2  specifically relating to the development of that
3  keyboard?
4      A.  Yes.
5      Q.  Who would that be?
6      A.  I don't believe I could name everybody.  I
7  could name a couple that I can recall.
8      Q.  Sure, yeah.  Just give me two names.
9      A.  Bas Ording would be one, and Ken Kocienda
10 would be another.
11     Q.  And, now, were Bas Ording and Ken Kocienda in
12 the Human Interface Group at that time during the
13 development of the first iPhone?
14     A.  Bas Ording is a member of my group.  Ken
15 Kocienda is not.
16     Q.  Let me switch gears.
17         Now, with the iPhone, the first generation
18 iPhone, you mentioned that you worked on other aspects
19 of the iPhone in addition to the mail application.
20 What were some of those applications that you worked
21 on?
22     A.  We're talking about the first-generation
23 iPhone --
24     Q.  Yes.
25     A.  -- correct?

---

**Page 17**

1          So I'm trying to remember everything at that
2  period because we released things in a staggered way.
3          For the first release, I would have worked on
4  mail, the address book, Safari web browser, the
5  You Tube application, a little bit of the SMS
6  application.  And I worked on the iTunes store, and
7  I'm not -- my memory -- I can't recall if that shipped
8  with the first version or if it was added after.  The
9  phone application, which I also consider the address
10 book.  It's the same thing.  Those are the
11 applications I was primarily involved with.
12     Q.  With the SMS application -- strike that.
13         Those applications that you mentioned, did
14 you then also work on those same applications for the
15 iPhone 3G, 3GS and 4?  Or did your focus shift?
16     A.  It definitely shifted, and I didn't continue
17 to work on all of those up to the present day.
18     Q.  Right now, what is your position within
19 Apple?
20     A.  I'm an interface designer.
21     Q.  What are some of your responsibilities as an
22 interface designer?
23     A.  I am responsible for various applications on
24 our -- the platform that I described earlier.
25     Q.  So when you say you're responsible, are you

5 (Pages 14 to 17)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9

APLNDC-Y0000242899

Stephen Lemay         HIGHLY CONFIDENTIAL         July 9, 2010
                      Menlo Park, CA

---

Page 18

1  responsible for the look and feel and the design of
2  the interaction with the user?
3      A. Correct.
4      Q. Could you give me an example of the look and
5  feel? Do you basically mean the visual presentation
6  to the user?
7      A. Yes.
8      Q. Is there anything else involved in that
9  aspect of what you do?
10     A. Not -- not more than I've described, no. The
11  look and feel and the interaction. There's, I guess,
12  an animation aspect of it which has to do with the
13  interaction.
14     Q. And during your work on those applications in
15  the iPhone, for any of the iPhones, did you ever do
16  any coding?
17     A. No.
18     Q. How would a specific request for a particular
19  graphic come to you?
20     A. There are a couple ways that might happen.
21  One way is my team might come up with an idea for
22  something, and we would develop it entirely on our
23  team and then hand it over to, let's say, engineering
24  to build. Sometimes engineering comes up with an
25  idea, and then they ask us for our work so they can

---

Page 19

1  build it. And sometimes we work together with
2  engineering and reproduce our work to be built.
3      Q. Are there any specific documents that reflect
4  specific requests? For example, a request that you
5  receive from the engineering group to make a
6  particular graphic, would that be recorded on any type
7  of document?
8      A. Potentially.
9      Q. So what would be some examples of how that
10  could be recorded?
11     A. It could be in an e-mail. That would be the
12  most -- maybe not the most informal way, but it could
13  be an e-mail. It could be more formally recorded in
14  our bug-tracking system called Radar. It would take
15  the form of a request.
16     Q. Does Apple have, as far as you're aware, UI
17  specifications, like user interface specifications,
18  that sort of embody some of these requests and some of
19  these requirements?
20     A. On occasion.
21     Q. And what do you mean by "on occasion"?
22     A. It's not a requirement to have a spec. A
23  formal spec is not a requirement for a project. But
24  occasionally we create them to be absolutely clear
25  about something.

---

Page 20

1      Q. Do you know whether there is a UI, or user
2  interface, specification relating to the keyboard used
3  in the iPhone?
4      A. I don't know.
5      Q. Have you ever seen a UI specification?
6      A. Yes.
7      Q. And so what -- do you remember what that
8  related to?
9      A. No. I've seen many in my time. I don't
10  create them very often myself, and they can take many
11  forms. They can be a verbal description or they could
12  be purely a graphic, an image, showing what something
13  should look like or a combination of both.
14     Q. Have you ever worked with any feature on the
15  iPhone that was internally referred to as either a
16  magnifying glass or a magnifier?
17     A. Yes.
18     Q. And what was that?
19     A. Personally, that would be the -- a UI element
20  that we use that we don't really have a formal name
21  for it. You might call it a magnifier in
22  conversation. It's the UI element that enlarges the
23  content beneath your finger so you can see what you're
24  pressed on.
25     Q. And what applications is that magnifier used

---

Page 21

1  in?
2      A. Primarily text-based. I'm not sure entirely
3  everywhere it can appear. You often see it in -- when
4  you're trying to insert a cursor in text.
5      Q. It's also used in other -- for other
6  purposes; right?
7      A. Excuse me?
8      Q. It's also used for other purposes, right, not
9  for just insertion of the cursor?
10     A. Not that I'm aware of.
11     Q. Now, magnifier, how was that developed?
12  Do you know how that was developed?
13     A. I do not know how it was developed.
14     Q. Did you ever do any work related to that
15  magnifier?
16     A. Yes.
17     Q. What type of work did you do related to that
18  magnifier?
19     A. I did the artwork that made it look nice.
20     Q. And by "nice," what exactly is nice about it?
21     A. It -- it looks like a physical object, the
22  artwork I did.
23     Q. Do you mean it looks like sort of 3D-ish?
24     A. Correct.
25     Q. If you had to describe what it looks like,

---

6 (Pages 18 to 21)

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242900

Stephen Lemay        HIGHLY CONFIDENTIAL        July 9, 2010
Menlo Park, CA

---

Page 22

1  how would you describe it?
2      A.  It looks like a loupe, I would say.
3      Q.  A loupe?  What do you mean by a loupe?
4      A.  A loupe being a real-world object where it's
5  like a magnifying glass or something with a frame
6  around it, and -- that's what it sort of looks like.
7      Q.  Now, was that magnifier developed within your
8  group, or was the request sent from some other group
9  to the Human Interface Group?
10     A.  Can you be specific about the request or...
11     Q.  Do you know who first came up with the idea
12 of using a magnifier?
13     A.  No.
14     Q.  Was it you?
15     A.  No.
16     Q.  Was it anyone within the Human Interface
17 Group?
18     A.  I don't know.
19     Q.  Do you remember how you came to work on the
20 magnifier?
21     A.  Yes.
22     Q.  Can you just describe that?
23     A.  As you can imagine, we live on the product as
24 we're developing it before it was released.  And at
25 some point in the product cycle, it appeared in the

---

Page 23

1  build.  We call it the build.  And I noticed it didn't
2  look very nice, and so I offered to do a nicer-looking
3  one.  That was my own -- of my own accord.
4      Q.  When you say "it didn't look very nice," how
5  did you first become exposed to what it looked like
6  originally?
7      A.  Using the product.
8      Q.  So the first time you actually saw the
9  magnifier was actually using a prototype?
10     A.  I believe so.
11     Q.  Is that typical, then, for the graphics
12 designers to basically come in and be involved after a
13 working prototype is already created?
14     A.  As I said, that's a class of product cycle.
15 That's definitely -- and that was the case here.
16     Q.  And was that point during the development of
17 the first iPhone?
18     A.  I believe so.
19     Q.  And you mentioned it appeared in a build.
20 What exactly is a build?  What were you referring to?
21     A.  I don't feel qualified to answer that
22 technically.  It's basically -- what we refer to as a
23 build is a version of the OS that we're currently
24 living on.
25     Q.  Do you remember what version of the OS it was

---

Page 24

1  that you were working with then?
2      A.  No, I do not.
3      Q.  If you had to guess, would it be Version 1.0,
4  the first version?
5          MR. BARABAS:  Objection to form.
6  BY MR. BASINGER:
7      Q.  You can still answer the question.
8      A.  I don't know.
9      Q.  Do you remember who you were working with
10 when you decided to make the magnifier look nicer?
11     A.  Yes.
12     Q.  And who was that?
13     A.  My team.  I'm not sure I understand your
14 question.
15     Q.  Who did you go to then and say "I can make
16 this look nicer"?
17     A.  Oh.  Honestly, I don't recall.
18     Q.  Have there been other features of the look
19 and feel of the iPhone that you personally or someone
20 within your group has actually created from scratch?
21     A.  Yes.
22     Q.  And what would be some examples of those?
23     A.  Some examples of those?  Lots of examples.
24 The whole -- well, the whole look and feel is
25 generated by our team.  So literally the colors, the

---

Page 25

1  fonts, the spacing, the artwork of all kinds, the
2  icons.  That's the bulk of it.
3      Q.  So when you were working on the magnifier for
4  the first iPhone, did you -- was that your only
5  involvement with the magnifier, or did you work on it
6  later as well?
7      A.  No.  That was my only work on that, is for
8  that.
9      Q.  So your only work on the magnifier, at least
10 related to cursor insertion, was with the first
11 iPhone?
12     A.  As far as I recall, yes.
13     Q.  So at no point during later, subsequent
14 years, subsequent versions, were you involved in
15 anything related to the magnifier?
16     A.  Not substantially, no.
17     Q.  I just want to go back.  You mentioned that
18 you made it look nicer, and you mentioned that you
19 made it look 3D.  What types of -- how did you do
20 that?
21     A.  Using Photoshop.
22     Q.  And when you use Photoshop to make the
23 images, how is that actually then implemented in a
24 product or in the OS?
25     A.  We will draw the image, we illustrate the

7 (Pages 22 to 25)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242901

Stephen Lemay         HIGHLY CONFIDENTIAL         July 9, 2010
Menlo Park, CA

Page 26

1  image in Photoshop and then save it as a desired file
2  type, and post it to a server that engineering then
3  takes down from the server and uses with their code.
4     Q. So you'll alert engineering that you've made
5  a new file and that it's ready to be implemented?
6     A. Typically.
7     Q. Now, are there various versions that you
8  would go through before something is actually
9  implemented by engineering or...
10    A. Yes.
11    Q. Can you describe that process generally?
12 Specifically with the magnifier, do you remember?
13    A. Specifically with the magnifier, I would
14 have -- I worked I think for a few hours in Photoshop
15 on a file, and within that file, I did multiple
16 versions, possibilities for the look of the magnifier
17 or whatever you want to call it.
18    Q. And before whatever you drafted and you
19 created is actually implemented, is there some type of
20 review process internally within your group?
21    A. Typically.
22    Q. What is that?
23    A. Very casual and informal mostly. You know,
24 having someone look over your shoulder at your
25 computer for a few minutes giving you some feedback.

Page 27

1  It could be that. You might send an image of what
2  you're thinking about in an e-mail message to the
3  group, and you might get responses from the group.
4  The most formal way we have is potentially we might
5  have a team meeting in which we might look at the
6  artwork on a screen and discuss as a group.
7     Q. So there's no one outside the Human Interface
8  Group, then, that specifically approves or blesses
9  particular look-and-feel designs?
10    A. Sometimes.
11    Q. Now, do you know now, currently, who composes
12 the Human Interface Group?
13    A. Yes.
14    Q. Who is that?
15    A. It's 21 people right now. Do you need me to
16 list 21?
17    Q. That's okay. Is Bas Ording in the group?
18    A. Yes.
19    Q. Is Mr. Forstall in the group?
20    A. No.
21    Q. And is Ken Kocienda in the group?
22    A. No.
23    Q. We talked about the iPhone. Now, have you
24 worked on the iPod and the iPad?
25    A. I've not worked on iPod proper.

Page 28

1     Q. But the iPod Touch?
2     A. Correct. Yes, I have.
3     Q. So you worked on the iPod Touch and iPad.
4        Have your responsibilities been any different
5  with regard to the iPad and the iPod Touch? And if
6  so, how so?
7     A. Yes, they have been different. How so? They
8  have -- as I said, I have, you know, changed certain
9  projects, handed projects off to other people to
10 continue. Just general shuffling of workloads.
11 That's how I would describe it.
12    Q. So what are some examples of some of the work
13 that you did on the iPad?
14    A. Mail application is my primary
15 responsibility. Otherwise, it would be kind of more
16 generalized design, the look and feel of the UI
17 elements, colors, styles, behaviors. It's hard for me
18 to describe. I would say, you know, art direction. A
19 lot of art direction in addition to being responsible
20 for a lot of apps.
21    Q. When you're developing this art and this look
22 and feel, do you ever do any testing with users to see
23 whether it's -- gains a certain, you know, favorable
24 opinion from users?
25    A. Not typically.

Page 29

1     Q. So there's -- so your group doesn't do
2  testing or surveys of potential customers or users?
3     A. No.
4     Q. Have you ever heard the phrase "usability
5  testing"?
6     A. Yes.
7     Q. And what does that mean to you?
8     A. It means to me what you described, what you
9  were asking about earlier, which is asking individuals
10 outside of the company to review work we have done and
11 get feedback.
12    Q. Okay. With regards to asking individuals
13 within the company, have you done any of that type of
14 usability testing?
15    A. I -- I collaborate with my co-workers every
16 day. I don't know that I would call that usability
17 testing. It's more just like doing our job.
18    Q. When you're working with the mail application
19 or the SMS application or other applications that
20 allow users to enter text, are you involved in any of
21 the graphics relating to entering text?
22    A. No, not that I recall.
23    Q. What about, aside from the magnifier, any
24 other features that allow the user to better visualize
25 particular icons that may be small on the screen?

8 (Pages 26 to 29)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242902

Stephen Lemay        HIGHLY CONFIDENTIAL        July 9, 2010
Menlo Park, CA

Page 30

1    A. No.
2    Q. I mentioned icons --
3    A. I don't recall.
4    Q. -- what about characters or symbols?  Have
5  you worked with any features or visual representations
6  regarding enlarging characters or symbols on the
7  screen in addition to the magnifier?
8    A. Not that I recall.
9    Q. Have you been exposed to any of that work?
10   A. Define "exposed."
11   Q. Have you been copied on e-mails relating to
12  text entry in any application on the iPhone?
13   A. Probably.  Regarding text entry, probably.
14   Q. Do you ever -- but you said you've never had
15  any direct input into that?
16   A. Text entry is not a focus of mine on the
17  team. It's other people's focus.
18   Q. So whose focus would be text entry in the
19  Human Interface Group?
20   A. It varies, and I don't feel qualified to
21  pinpoint any particular person in that regard.  It's
22  not my responsibility, so I don't worry about it.
23  Sorry.
24   Q. I understand it's not your responsibility,
25  but do you have any idea who within the Human

Page 31

1  Interface Group might have that responsibility?
2    A. I can -- yes.  But it would be speculation.
3  I can tell you who -- people who have been involved
4  with it.
5    Q. Sure.  That's fine.
6    A. Bas Ording would be, primarily.  But, as I
7  said, we work very collaboratively, so it's hard...
8    Q. Well, do other people within the Human
9  Interface Group have your similar background in
10  graphics design?
11   A. Yes.
12   Q. Are there coders or software code or
13  computer-science types in the Human Interface Group?
14   A. Not really.  I would have to qualify coding
15  by saying multimedia programming which is not the same
16  as code that runs software.  It's more of a
17  prototyping language.
18   Q. And you mentioned that you've worked with the
19  multimedia programming?
20   A. Yes, I have.
21   Q. I'll take a step back.
22     Now, you mentioned right out of college you
23  went to Apple.  Did you work anywhere before going to
24  Apple?
25   A. That's not true, actually.  I went to

Page 32

1  graduate school after college.
2    Q. So were you in graduate school at Bowdoin?
3    A. No.  I went to Rochester Institute of
4  Technology.
5    Q. What did you study at RIT?
6    A. Computer graphics design.
7    Q. Were you working on user interface in any way
8  during your time at RIT?
9    A. Yes.
10   Q. Was that essentially synonymous with computer
11  graphics design?
12   A. Yes, that's exactly right.  Among other
13  things, but that was my focus.
14   Q. Did you work in industry other than for
15  Apple?
16   A. No.
17   Q. I asked you about the iPhone keyboard.  Were
18  you in any way involved in the development of the iPad
19  keyboard?
20   A. Not directly.
21   Q. Indirectly?
22   A. No.  I did not work on it.  I did not produce
23  work for it.
24   Q. So you never drew any graphics files related
25  to the keyboard on the iPad?

Page 33

1    A. No.
2    Q. What about any type of magnification feature
3  used in the iPad?
4    A. No.
5    Q. What about magnification features used in the
6  iPod Touch?
7    A. The same as the phone.
8    Q. That would be the magnifier?
9    A. Yeah.  What we talked about earlier.
10   Q. And would your work on the iPod Touch, would
11  it have been concurrent with the work on the iPod --
12  the iPhone?
13   A. We -- to be clear, we don't think of it in
14  terms of hardware releases.  We work on the feature,
15  and it basically runs on the various hardware we have.
16  So I did a design initially for iPhone, that was the
17  first product, and it's since migrated to all the
18  other platforms.
19   Q. When you're working in human interface or
20  user interface, do you have weekly meetings as a
21  group?
22   A. Yes, sometimes.  I wouldn't say we're very
23  good about being regular with them but we try to have
24  one.
25   Q. Do these meetings have a name?

9 (Pages 30 to 33)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242903

Stephen Lemay          HIGHLY CONFIDENTIAL          July 9, 2010
Menlo Park, CA

Page 34

1      A.  Not an official name.  It's "HI meeting."
2  "Team meeting."
3      Q.  Does someone take notes during these
4  meetings?
5      A.  Not officially.  It's usually up to the
6  person who is showing work to take down notes -- take
7  their own feedback, record their own feedback.
8      Q.  So you would have recorded notes then from
9  those HI meetings?
10     A.  Not necessarily.  It's not a requirement.  As
11  I said, it's if you feel you need to take notes, you
12  can.  It's more of a conversation we have.
13     Q.  So there's no note-taker or no one circulates
14  notes after the meeting?
15     A.  No, not typically.
16     Q.  Now, as far as like outstanding tasks that
17  are either delegated during that meeting or otherwise,
18  is there some type of way to keep track of those tasks
19  within your group?
20     A.  Yes.
21     Q.  And what is that?
22     A.  We have project managers whose job it is to
23  keep databases of features we're working on and assign
24  them to people in the group and track the progress.
25     Q.  Are you ever exposed to the reasons or the

Page 35

1  sort of higher user interface purposes of particular
2  graphics?
3      A.  I don't think I understand your question.
4      Q.  When you create a graphic, do you have any
5  particular reason for creating the graphic, or some
6  utility to the graphic?
7      A.  Yes.  Generally speaking, yes.
8      Q.  So for the magnifier, for example, what was
9  the utility?  What was the purpose of that?
10     A.  Again, can you be more specific?  The purpose
11  of the artwork or the purpose of the feature?  I don't
12  think I follow you.
13     Q.  Was there any connection between the artwork
14  and the purpose of the feature?
15     A.  Perhaps.  It's not -- it's not crucial.
16     Q.  So when you design your art, you don't
17  necessarily know or you don't have in mind the purpose
18  of the feature?
19     A.  I don't think -- I'm having trouble following
20  you.  The magnifier, or loupe as we referred to it, I
21  made it look like a physical object you might see in
22  the real world because it was somewhat analogous in
23  spirit, in terms of the look and feel.
24     Q.  And so in terms of the spirit of the way a
25  real magnifying glass looks in real life?

Page 36

1      A.  No.  Well, yes.  Not how it behaves, how it
2  looks.
3      Q.  Okay.  So what was the purpose, then, of that
4  feature?
5      A.  To enlarge the text that is directly under
6  your finger so you can insert a cursor between words
7  or letters.
8      Q.  And was that a feature that was developed
9  within the Human Interface Group, or was that a
10  feature that was developed outside of the Human
11  Interface Group?
12     A.  I don't know for certain to be honest.
13     Q.  Do you have any idea of who came up with the
14  idea of using that feature?
15     A.  I -- I do not know who specifically came up
16  with the original idea.  Honestly, I don't.  I
17  remember when I saw it, but I don't remember who
18  invented it.
19     Q.  Are you ever exposed to meetings -- or do you
20  ever go to meeting where they discuss the need for
21  particular user interface features?
22     A.  Yes.
23     Q.  And what meetings are those?
24     A.  General.  We have all-the-time meetings.
25     Q.  So at your weekly HI meetings, then, that

Page 37

1  would certainly come up?
2      A.  That could come up, if it's something our
3  team is creating as opposed to being something being
4  created on the engineering side.
5      Q.  So I want to go back to your work on the
6  original iPhone in the 2G.  Do you remember roughly
7  when you started working on the iPhone 2G?
8      A.  No, I don't remember the exact year.  We --
9  obviously a couple years before it was released to the
10  public.  So you can approximate 2005-ish.  I'm not sure
11  when we started officially.
12     Q.  When you first started working on it, was
13  there already some type of look and feel in place, or
14  was it developed from scratch?
15     A.  It was from scratch.
16     Q.  So let's just take the mail application, for
17  example.  The look and feel of the mail application,
18  who first started developing that feature, the look
19  and feel?
20     A.  I did.  Yeah.
21     Q.  And was that look and feel taken from
22  anything that Apple had done previously, or was it
23  just completely starting from nothing?
24     A.  It was basically started from nothing, but it
25  was inspired by -- I was already working on the mail

10 (Pages 34 to 37)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242904

Stephen Lemay       HIGHLY CONFIDENTIAL       July 9, 2010
                    Menlo Park, CA

---

Page 38

1  application for OS X, so that was a logical starting
2  point to migrate ideas from.
3      Q.  And when you were developing it, did you ever
4  get involved in the source code?  Or were you more
5  focused on just the visual aspects of it?
6      A.  Visual aspects of it.  I don't do source
7  code.
8      Q.  Were there any requirements or restrictions
9  that the engineers would give you that would influence
10  your graphics?
11      A.  Not at that time.
12      Q.  So how would you describe, then, how you
13  would receive particular tasks during that initial
14  development phase for the look and feel of the iPhone?
15      A.  Are you asking me how I would be assigned
16  them?
17      Q.  Yes.
18      A.  Any number of ways.  It could be my manager
19  saying, "Hey, do you want to work on mail?  You worked
20  on mail in the OS X; I think you should work on it on
21  the phone."  Or -- yeah.  We're so informal in that
22  regard, I don't recall any other way that might have
23  happened.  It was very free-form at that point.  Very
24  unstructured is the term I would use.
25      Q.  Was there any influence from -- strike that.

---

Page 39

1      How long did it take, roughly, before they
2  actually had a working prototype of the iPhone?
3      A.  I don't feel qualified to answer that.  You'd
4  have to define "prototype" very specifically.
5      Q.  Sure.
6      The prototype that you referred to earlier
7  that you used and you first saw the magnifier on, do
8  you remember how far along into the development of the
9  iPhone that was?
10      A.  No, not specifically.  I believe it was a
11  fairly mature, you know, point in the development.
12      Q.  Do you know whether there was a magnifier
13  used before that point?
14      A.  I don't recall a magnifier before then.
15      Q.  So had you used a prototype, then, of the
16  iPhone before you noticed that magnifier?
17      A.  Inevitably, because we had to build it from
18  scratch.  So we started with the simple things first
19  and worked our way up.
20      Q.  Sure.
21      So at some point, when you first saw that
22  magnifier, it was a new feature?  It was something you
23  had not seen before?
24      A.  At some point it was, yes.
25      Q.  And because you hadn't seen it before would

---

Page 40

1  indicate to you that it wasn't initially part of the
2  user interface in previous versions?
3      A.  It would have been added at some point, yes,
4  like everything is added incrementally.
5      Q.  Now, have you ever used the text entry on an
6  iPhone?
7      A.  The keyboard?
8      Q.  Yes.
9      A.  Yes.
10      Q.  Do you own an iPhone?
11      A.  Yes.
12      Q.  And when did you first use the keyboard on an
13  iPhone?
14      A.  I don't recall.
15      Q.  Was it before the iPhone was ever released to
16  the public?
17      A.  Absolutely.
18      Q.  Do you remember being involved in any
19  discussions regarding the development of that keyboard
20  in the first iPhone?
21      A.  Yes.  I recall being involved in discussions,
22  but I don't know what those would have been now, it's
23  so many years ago.
24      Q.  Do you know whether the group did any
25  usability testing relating to text entry, for example,

---

Page 41

1  keyboard?
2      A.  Not public, no.  It would have been internal.
3      Q.  So do you know whether they -- do you know
4  for sure whether they did internal usability testing?
5      A.  Not formally.  We don't do formal usability
6  testing that I'm aware of.
7      Q.  Now, you mentioned the loupe and the
8  magnifier.  Are those the same features, or are they
9  different features?
10      A.  I think of them as the same thing.  I don't
11  have an official -- I'm not aware of an official Apple
12  term for this feature.  It could be referred to as a
13  magnifier or a loupe or a callout or -- people use
14  different words to describe it in conversations.  "The
15  circular thing."
16      Q.  Now, do you have any patents?
17      A.  Yes, I believe I've been awarded patents.
18      Q.  Do you know roughly how many patents that you
19  have?
20      A.  As opposed to pending?
21      Q.  Do you know the difference between a
22  pending and --
23      A.  Only vaguely.  I'm not a lawyer.  I
24  understand pending meaning they are not official yet
25  and awarded meaning they are official.  That's my

---

11 (Pages 38 to 41)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242905

Stephen Lemay        HIGHLY CONFIDENTIAL        July 9, 2010
                     Menlo Park, CA

Page 42

1  understanding.
2      Q. So taken together, do you know how many
3  pending and issued applications -- patents you may
4  have?
5      A. A lot, and I don't know the number.
6      Q. Do you have any patents or pending patent
7  applications related to text entry?
8      A. Not that I'm aware of.
9      Q. Do you have any patents or pending patent
10  applications relating to this magnifier we've been
11  talking about?
12      A. I honestly don't know if it was patented or
13  not. I'm not aware.
14      Q. When you say you're not aware whether it was
15  patented, what are you referring to?
16      A. I don't know if it's been awarded or if we
17  applying for a patent. I don't know what the state
18  of it is. I think it's been -- I think we've talked
19  about patenting aspects.
20      MR. BARABAS: Object. I'm going to instruct
21  you not to answer to the extent this is going to get
22  into any of your discussions with your attorneys
23  concerning prosecution.
24      THE WITNESS: Okay.
25  BY MR. BASINGER:

Page 43

1      Q. Do you have any patents or pending patent
2  applications relating to any magnifying feature or
3  loupe in either the iPhone, iPad or iPod Touch?
4      A. Maybe.
5      Q. Can you recall anything about -- strike that.
6      Mr. Lemay, I'm going to show you an exhibit.
7      (Exhibit No. 2047 marked for identification.)
8  BY MR. BASINGER:
9      Q. Mr. Lemay, have you ever seen this document?
10      A. Probably.
11      Q. And what is this document?
12      A. I read that it's an iPhone User Guide.
13      Q. When do you think you've seen this document?
14      A. Specifically, no idea. I have not read it.
15  It's possible I flipped through it like this
16  (gesturing) at some point. But I'm not really
17  familiar with it. I know it exists.
18      Q. I would just like to direct your attention --
19      A. Sure.
20      Q. -- to page 32.
21      A. Okay.
22      Q. I just want to note for the record that you
23  are looking at Exhibit 2047, which is the iPhone User
24  Guide for iPhone OS 3.1 software, Bates numbered
25  701ITC00003559.

Page 44

1      You'll notice on the bottom right-hand
2  corner, Mr. Lemay, that there are Bates numbers. Do
3  you see that?
4      A. I don't understand what you mean by "Bates
5  numbers."
6      Q. That's fine. Do you see the little numbers?
7      A. Yes.
8      Q. I may refer to the last four digits of the
9  Bates number, and that's what I'm referring to when I
10  do that.
11      A. Mm-hmm.
12      Q. Do you see the image there of an iPhone?
13      A. Yes, I do.
14      Q. And does that image look familiar to you?
15  And if so, how?
16      A. It is familiar to me because I use the
17  iPhone.
18      Q. Now, generally, what are iPhone User Guides --
19  what are user guides for in general? For example,
20  this user guide, what is this for?
21      A. I don't really feel qualified to answer with
22  any kind of specifics. It appears to be an
23  instructional manual or a reference manual.
24      Q. Is that an accurate depiction of the iPhone
25  keyboard?

Page 45

1      A. It appears to be.
2      Q. And would you -- how would you characterize
3  the image of the E there that is -- looks to be being
4  pressed by the finger?
5      MR. BARABAS: Objection to form.
6      MR. BASINGER: You can answer the question.
7      THE WITNESS: How would I characterize the
8  appearance? Is that what you're saying?
9  BY MR. BASINGER:
10      Q. Yes.
11      A. It looks like a callout. I would call it a
12  callout or feedback.
13      Q. What do you mean by "feedback"?
14      A. It's verifying that I have pressed -- in this
15  case, that the person has pressed an E, which is not
16  visible because their thumb is obstructing the
17  character.
18      Q. When you press -- excuse me.
19      This keyboard here that's depicted on this
20  page 32, how within the Human Interface Group would
21  this image have been generated?
22      A. I'm not clear that we did generate this
23  image.
24      Q. And I'm not referring actually to the actual
25  image on page 32 --

12 (Pages 42 to 45)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242906

Stephen Lemay        HIGHLY CONFIDENTIAL        July 9, 2010
                    Menlo Park, CA

---

Page 70

1      Q.  And that's shown in the bottom; it's the
2  middle thing you're --
3      A.  Mm-hmm.  Sorry, I'm looking through
4  everything now, too.
5          Obviously, whenever it appears in the context
6  of an application I worked on, then yes.
7      Q.  We can put that aside.
8          (Exhibit No. 2051 marked for identification.)
9  BY MR. BASINGER:
10     Q.  Mr. Lemay, what is in front of you now is
11  Exhibit 2051, ending in Bates number 4414.
12     A.  Mm-hmm.
13     Q.  This is an e-mail on which you were copied.
14  Do you recognize this e-mail?
15     A.  Honestly, I don't recall this e-mail.
16     Q.  Who is Caroline Furches?
17     A.  Caroline Furches is an interface designer on
18  my team.  She works for me now.
19     Q.  She works for you?
20     A.  Now, yes.  She's a report.
21     Q.  I'm sorry, she's a report?
22     A.  She's a direct report to me now.
23     Q.  How many direct reports do you have?
24     A.  Eight, currently.
25     Q.  So there are roughly twenty or so people in

---

Page 71

1  the Human --
2      A.  Roughly, yeah.
3      Q.  -- Interface Group, Eight of which report to
4  you?
5      A.  At this moment, approximately eight, yes.  One
6  was an intern who will be starting soon.
7      Q.  So who do you report to?
8      A.  Greg Christie.
9      Q.  So he's the leader of the Human Interface
10  Group?
11     A.  Correct.  He's the director.
12     Q.  And where does Bas Ording fall in that
13  hierarchy?
14     A.  He also reports to Greg.
15     Q.  So are you sort of co-equals, equals in terms
16  of --
17     A.  You could say that.  We don't really have --
18  we have a pretty flat structure.
19     Q.  Now, if we could turn to the third page,
20  ending in Bates number 4416, does that image look
21  familiar at all to you?
22     A.  Yes.
23     Q.  Okay.  So what would you describe that image
24  as?
25     A.  That's a callout from the keypad when you

---

Page 72

1  press a key.  It's a frame.
2      Q.  So it's like a key cap?  It's a frame of a
3  key?
4      A.  I don't know if you would call it a key.
5  It's a frame for displaying a letter form.
6      Q.  And you did not work on the graphics related
7  to this callout?
8      A.  That's correct.
9      Q.  But it appears that Caroline Furches did?
10     A.  She would have probably worked on this after
11  it had long been established.
12     Q.  So this was established back before the
13  initial release of the iPhone 2G; right?
14     A.  Sorry, what do you mean by "this"?
15     Q.  "This" being the callout that's on --
16     A.  Long before iPhone 4, you said?
17     Q.  Let me just --
18     A.  Sorry.  Repeat the question.
19     Q.  So this -- when I say "this," I'm referring to
20  the image on the third page ending in Bates number
21  4416 -- was developed long before, or before the
22  initial rollout of the iPhone 2G?
23     A.  Yes.
24     Q.  But here, the e-mail is dated 2008, and
25  something is being done with regard to this image.  Do

---

Page 73

1  you have any idea what was being done then?
2      A.  I don't.  I would have to read this e-mail
3  and try to figure it out.
4      Q.  If you could just scan the e-mail and see if
5  it refreshes your memory.
6      A.  Okay.
7          (Witness examines document.)
8          THE WITNESS:  Okay.  I think I understand what
9  is being asked.
10  BY MR. BASINGER:
11     Q.  Okay.  So what is being asked?
12     A.  It looks like Ken Kocienda is trying to be
13  more efficient with his code.  And in order to be more
14  efficient with the code, he needs the artwork he
15  currently has delivered in a new way.  And he's
16  suggesting a method for cutting up the artwork
17  differently than we did originally.
18     Q.  And originally, you mentioned, you didn't work
19  on this particular feature, but someone within your
20  group would have worked on it?
21     A.  Yes.
22     Q.  But Ken Kocienda is not in your group; right?
23     A.  That is correct.  He's an engineer.
24     Q.  So do you believe he would have worked with
25  Bas Ording, then, on the development of this callout?

---

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242913

Stephen Lemay          HIGHLY CONFIDENTIAL          July 9, 2010
                        Menlo Park, CA

Page 74

1    A. I believe that.
2    Q. Was Caroline Furches in the Human Interface
3 Group during the time of the development of the
4 initial iPhone?
5    A. I don't believe so.
6    Q. So she would have joined the group after --
7    A. I'm very vague on that. It would have -- I
8 don't know the exact start date. It probably
9 overlapped, but she wasn't there, I don't think, in the
10 original development of it in the early days, is my
11 memory. I'm foggy about her start date, actually.
12    Q. Now that she reports to you, have you ever
13 reviewed any of this work, any of the images she would
14 have created relating to this callout?
15    A. I might have.
16    Q. Did you?
17    A. I don't know. I mean, I'm usually copied on
18 this stuff. We like to give people a lot of autonomy;
19 and, you know, if someone is doing their job, I don't
20 micromanage their.
21    Q. You see in the e-mail, next to the number
22 heading 2, the term "tube" in quotations. Do you know
23 what that's referring to?
24    A. I have no idea.
25    Q. Have you ever seen that term used in your

Page 75

1 work at Apple?
2    A. It's not a common term. I don't recognize it
3 as such.
4    Q. You recognize "grabber," though, right?
5    A. I've heard the term "grabber." I don't know
6 how he's using it here.
7    Q. When he says, in the line right above the
8 line that starts with the No. 1, "accent popup," do
9 you know what he's referring to there?
10    A. I -- I don't know for certain. I'm reading it
11 for the first time. I would guess he's referring to,
12 if you press and hold on a key, the callout that
13 appears above the key.
14       If it's, let's say, a letter "E," that can
15 contain accents like accent grave, accent acute,
16 umlaut, whatever. I believe we show the choices to
17 pick from in that case. And I believe he means that
18 case when he says "accent."
19    Q. So the accent case -- strike that.
20       Okay. Let's put this aside.
21       (Exhibit No. 2052 marked for identification.)
22 BY MR. BASINGER:
23    Q. Mr. Lemay, what's before you is Exhibit 2052
24 ending in Bates 7270.
25       Do you recognize this e-mail?

Page 76

1    A. I recognize it.
2    Q. Do you know what this e-mail relates to?
3    A. I actually -- to a degree.
4    Q. Can you describe what it relates to?
5    A. It at least partially relates to making
6 something look similar to the look of the loupe
7 artwork that I had created. I'm not sure what that
8 is, but --
9    Q. When you say the loupe artwork that you
10 created, have we seen an image of the loupe artwork
11 that you created?
12    A. Yes. The circular object.
13    Q. So the circular object is the loupe that's
14 being referred to in this e-mail?
15    A. I believe so.
16    Q. Who is Tiffany Jon?
17    A. She was my intern.
18    Q. And what is a PSD?
19    A. That is a Photoshop document. That's the
20 extension.
21    Q. And it's referred to as a magnifying glass,
22 since she says, "see photo attached." That's on the
23 first page. Do you see that?
24    A. I see that.
25    Q. Do you know what file, then, she would have

Page 77

1 been referring to?
2    A. I believe she's referring to the file I
3 created for generating the artwork for the loupe.
4    Q. Do you know why she would have been asking
5 you for that?
6    A. I actually don't recall. It wasn't to do
7 another loupe. I'm guessing she wanted to mimic the
8 quality level of that frame and look for something
9 else she was doing, unrelated, because -- you know.
10    Q. On the second page, ending in Bates number
11 7271, it refers to a gentleman named Raymond. That's
12 Raymond Sepulveda?
13    A. Correct.
14    Q. Who is that?
15    A. He's a user interface designer on my team.
16    Q. Does he report to you?
17    A. No.
18    Q. He mentions that -- he says, "Lemay wants me
19 to mimic this effect on my design." Do you see that?
20    A. Yes.
21    Q. Do you know what he's referring to there?
22    A. That's Tiffany, not Raymond, actually, saying
23 that.
24    Q. Excuse me, right. So Tiffany. Do you know
25 what she's referring to there?

20 (Pages 74 to 77)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242914

Stephen Lemay         HIGHLY CONFIDENTIAL         July 9, 2010
                        Menlo Park, CA

Page 102

1  information in the message?
2      A.  No.
3      Q.  What was your goal, then, with the visual
4  presentation of the options?  What were you trying to
5  accomplish?
6      A.  To create a logical hierarchy of -- a list, if
7  you will, of options, with meaningful -- with a
8  meaningful order.
9      Q.  So how would you give it a meaningful order?
10     A.  I would consider items at the top to be more
11  common.
12     Q.  When you say "items," what are you referring
13  to?
14     A.  Options.  Options at the top of the menu
15  might be more common than options at the bottom of the
16  menu, because they look more prominent.
17     Q.  And were these options that you're referring
18  to, were they always fixed for a particular type of
19  message?
20     A.  Data?
21     Q.  Yes.
22     A.  A particular type of data?
23     Q.  Yes.
24     A.  I believe so.
25     Q.  So they wouldn't vary based on the addition

Page 103

1  of certain data or the subtraction of certain data?
2      A.  They would vary.
3      Q.  They would.  What's an example?
4      A.  The items are completely different between
5  data sets.  So an address versus a phone number is a
6  good example.
7      Q.  So just talking about addresses for the time
8  being, depending on the information that was provided
9  relating to addresses, would the options ever change?
10     A.  Not that I'm aware of.
11     Q.  And same answer for, for example, contacts?
12         So if the information provided relating to
13  contacts changed, the options wouldn't change based on
14  the addition or subtraction of data?
15     A.  I'm a bit confused by your question, because
16  you wouldn't see a contact as an item that was Data
17  Detected, as I understand it.
18         Are you referring to a name, a person's name?
19     Q.  Exactly.
20     A.  I'm not sure that we detect names as items to
21  add.  But I'm not sure.
22     Q.  But did you work on that -- excuse me.
23         Did your work relate to what information was
24  actually used by the Data Detector program?
25     A.  No.

Page 104

1         (Exhibit No. 2053 marked for identification.)
2  BY MR. BASINGER:
3      Q.  So, Mr. Lemay, in front of you is Exhibit 2053
4  ending in Bates number 5771.
5         Do you recognize this e-mail?
6      A.  Vaguely, yes.
7      Q.  If you just take a second and look through
8  this, and I'm going to ask you some questions about
9  it.
10         (Witness examines document.)
11         THE WITNESS:  Okay.
12  BY MR. BASINGER:
13     Q.  Okay.  First, what is "Purple"?
14     A.  It was a code name.
15     Q.  And it's a code name for what?
16     A.  I'm not sure if that's confidential, or --
17         MR. BARABAS:  I guess I'll just instruct you:
18  To the extent that it's a product that's not going to
19  be released by December of 2010, then you can't talk
20  about it.
21         Otherwise, if it's going to be -- if it has
22  been released or if it's going to be released before
23  December 2010, you can talk about it.
24         THE WITNESS:  It was the original code name
25  for iPhone.

Page 105

1         I need to specify:  Our internal code name for
2  HI and software engineering, I believe.  We
3  don't -- the various companies at Apple don't use the
4  same code names for the same product.
5         MR. BASINGER:  That's confusing.
6         THE WITNESS:  Uh-huh.  It's almost by design.
7         MR. BASINGER:  Keep it compartmentalized;
8  right?
9         THE WITNESS:  Mm-hmm.
10  BY MR. BASINGER:
11     Q.  On the second page of this document ending in
12  Bates number 5772, it mentions detectors for contacts
13  and events/meetings that are missing from the mail
14  application.
15     A.  Mm-hmm.
16     Q.  What exactly is this referring to?
17     A.  I mean, as I read it, it's referring to Data
18  Detectors for content -- for contacts and
19  events/meetings.  I don't recall at the time what
20  specifically I was referring to here.
21     Q.  First, what type of document -- what's the
22  purpose of this e-mail?
23     A.  This is an internal list I kept of
24  brainstorming ideas for potential features.
25     Q.  So, I mean, this certainly seems to me to be

                          27  (Pages 102 to 105)

                Alderson Reporting Company
                    1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242921

Stephen Lemay       HIGHLY CONFIDENTIAL       July 9, 2010
Menlo Park, CA

Page 106

1  more than just, I mean, graphical representations and
2  look and feel.  I mean, would you agree?
3      A.  Yes.  This has a lot to do with interface as
4  well, and interaction.
5      Q.  So this would be more of the interaction side
6  of what you do?
7      A.  Not entirely, but it includes that.
8      Q.  So when you say "top HI missing features,"
9  missing --
10     A.  Sorry.  Where are you reading?
11     Q.  Sorry.  On the second page.
12     A.  Still on the second page?
13     Q.  Yep.  See the heading, it says "HI missing
14  features"?  Do you see that?
15     A.  Yep.
16     Q.  And it -- missing from what?  What is that
17  referring to?
18     A.  That refers to not currently in the shipping
19  product.
20     Q.  And these are features, then, that have
21  been -- that have been decided on by someone to use?
22  Or are these --
23     A.  No.
24     Q.  So what are these?
25     A.  These are a list of ideas generated via

Page 107

1  conversations and brainstorms and use of our own
2  products.
3      Q.  What is "threading," under the "Mail" heading?
4      A.  Threading is when you take a series of
5  e-mails in your inbox that are all responses to the
6  same e-mail, grouping them visually together, instead
7  of interspersing them chronologically but not
8  contiguously throughout your inbox.
9      Q.  And so that's -- that is a concept that
10  someone came up with within your group?
11     A.  Yes.  Originally for OS X.
12     Q.  Now, the actual execution of that concept was
13  done outside of your group; right?
14     A.  For OS X or for iPhone?
15     Q.  For iPhone.
16     A.  No.  It was done inside our group.
17     Q.  Does the iPhone currently -- the iPhone 4,
18  does it thread?
19     A.  Yes.
20     Q.  And that's one of the new features; right?
21     A.  Correct.
22     Q.  What's "unified inbox"?
23     A.  If you have multiple mail accounts, having
24  one inbox that has all mail from all accounts.
25     Q.  Now, do you ever get into the details of how

Page 108

1  the mail would actually thread?
2      A.  No.  This is just a bullet point for
3  discussion.
4      Q.  Where did you get the term "thread"?
5      A.  I don't know.  It's an industry term.
6      Q.  Now, on sort of a general level, what can a
7  user do with a detected contact information?
8      A.  I don't know.  I don't know what this means,
9  "Data Detectors for contacts."
10     Q.  Did someone else write this e-mail?
11     A.  I don't know.  As I said, these are notes
12  collected into a single spot.  It's quite possible
13  that these were -- this was someone else's talking
14  point that was captured and then included in this
15  e-mail.
16     Q.  So this e-mail -- I mean, how would you
17  describe the purpose of this e-mail?
18     A.  So that we don't forget our ideas.
19     Q.  So would this e-mail have come, then, from a
20  meeting?
21     A.  No.  It probably just came from a collection
22  of ongoing meetings, and this is a repository, if that
23  makes sense.
24     Q.  It says -- who is Eric -- Erin Rosenthal?
25     A.  Project manager.

Page 109

1      Q.  Is she or he within your group?
2      A.  She.  Yes.
3      Q.  Does she report to you?
4      A.  No.
5      Q.  And why would you send this to her?
6      A.  Because as part of her job as project manager,
7  her job is to coordinate and track features.
8      Q.  Now, if we turn to the next page, ending in
9  Bates number 5773, at the top of the page in red is the
10  line:  "Pressing Link in Mail message slides over
11  Webkit page render in Mail.  Clicking links on that
12  goes to Safari."
13          What was meant by that?
14     A.  Today, if you are in Mail and you have an
15  embedded link, someone copied and pasted and sent to
16  you, if you press it, you will leave Mail and the
17  Safari application will open up and load that link.
18     Q.  When you say "link," you mean a URL?
19     A.  A URL hyperlink.
20          And this is suggesting rather than doing
21  that, we would display the webpage directly in Mail
22  so you don't have to leave the app.
23     Q.  Is that currently a feature on --
24     A.  No.
25          Well, let me clarify.  Third parties

28  (Pages 106 to 109)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

8dec6f84-0c53-4595-bc71-81392e9b5ef9
APLNDC-Y0000242922

# EXHIBIT 18
# FILED UNDER SEAL

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD     May 28, 2010
            PURSUANT TO PROTECTIVE ORDER Palo Alto, CA

<div style="border:1px solid black; padding:1em;">

Page 1

UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, D.C.

_____

In the Matter of:              )
                               )
CERTAIN ELECTRONIC DEVICES,    ) Investigation No.
INCLUDING MOBILE PHONES,       ) 337-TA-701
PORTABLE MUSIC PLAYERS, AND    )
COMPUTERS                      )
_____)


APPLE CONFIDENTIAL BUSINESS RECORD

PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

ACHIM PANTFOERDER

May 28, 2010

Palo Alto, California




Reported by:

KATHERINE E. LAUSTER, RPR, CRR, CLR, CSR No. 1894

Job No. 22102

</div>

Alderson Reporting Company
1-800-FOR-DEPO

**Highly Confidential - Attorneys' Eyes Only**

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243668

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
                    PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 2

1    UNITED STATES INTERNATIONAL TRADE COMMISSION
2              WASHINGTON, D.C.
3
4    _____
5    In the Matter of:            )
6                                 )
7    CERTAIN ELECTRONIC DEVICES,  ) Investigation No.
8    INCLUDING MOBILE PHONES,     ) 337-TA-701
9    PORTABLE MUSIC PLAYERS, AND  )
10   COMPUTERS                    )
11   _____)
12
13      APPLE CONFIDENTIAL BUSINESS RECORD
14         PURSUANT TO PROTECTIVE ORDER
15
16      VIDEOTAPED DEPOSITION OF ACHIM
17   PANTFOERDER, by authority of Section 337 of the
18   Tariff Act of 1930, as amended, and pursuant to 19
19   C.F.R. Section 210.28 of the Rules of Practice and
20   Procedure of the United States International Trade
21   Commission, taken on behalf of the Complainants,
22   at Two Palo Alto Square, 3000 El Camino Real,
23   Suite 400, Palo Alto, California, beginning at
24   9:07 a.m., on May 28, 2010, before me, KATHERINE
25   E. LAUSTER, RPR, CRR, CLR, CSR No. 1894.

Page 3

1              APPEARANCES
2
3    For Complainant Nokia, Inc. and Nokia Corporation:
4        ALSTON & BIRD, LLP
5        BY:  THOMAS W. DAVISON, ESQ.
6        The Atlantic Building
7        950 F Street, N.W.
8        Washington, D.C.  20004-1404
9        t.202.756.3300  f.202.654.4913
10       tom.davison@alston.com
11
12   For Respondent Apple, Inc.:
13       WILMER, CUTLER, PICKERING, HALE and DORR, LLP
14       BY:  SAMUEL J. MASELLI, ESQ.
15       1117 California Avenue
16       Palo Alto, California  94304
17       t.650.858.6148  f.650.858.6100
18       samuel.maselli@wilmerhale.com
19
20   Also Present:
21       Arnold Dizon, Videographer
22
23
24
25

Page 4

1              I N D E X
2    WITNESS:  ACHIM PANTFOERDER
3    EXAMINATION BY:                    PAGE
4        Mr. Davison              9, 111
5
6              EXHIBIT INDEX
7    PANTFOERDER EXHIBIT NOS.:
8    NO.   DESCRIPTION              PAGE
9    300   Purple Executive Review: 7-25-05    26
10       Bates Apple701ITC02090925
11       through -1038, 114 pages
12   301   N90 Design Review:  10-31-08      36
13       Bates Apple701ITC02988001 through
14       -078, 78 pages
15   302   Grape M68: 3-10-06            55
16       Bates Apple701ITC02082570 through
17       -584, 15 pages
18   303   M68 Proximity Sensor Specifications    61
19       and Requirements, Apple Input
20       Engineering,
21       Bates Apple701ITC03191093 through
22       -100, 8 pages
23   304   M68 Sensors: 4-2-06          63
24       Bates Apple701ITC02082683 through
25       -728, 47 pages

Page 5

1          EXHIBIT INDEX (Continued)
2    PANTFOERDER EXHIBIT NOS.:
3    NO.   DESCRIPTION              PAGE
4    305   M68 Sensors and Buttons: 11-20-06,    69
5       Bates Apple701ITC02082757 through
6       -780, 24 pages
7    306   Printout:  9-1-09, N90 From Imager    76
8       Wiki, Bates Apple701ITC02988991
9       through -9005, 5 pages
10   307   Report:  Camera Weekly Status      81
11       3/6 (N88)
12       Bates Apple701ITC02988952
13       through -959, 8 pages
14   308   Camera Exec Review: 6-3-09        83
15       Bates Apple701ITC03205501
16       through -533, 33 pages
17   309   Printout:  9-1-09, Main Page      93
18       From Imager Wiki,
19       Bates Apple701ITC02989006
20       through -9007, 2 pages
21   310   E-mail: 7-12-08, Mike Chang      97
22       to iPhone PM group,
23       Bates Apple701ITC02988826
24       through -830, 5 pages
25

2 (Pages 2 to 5)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243669

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD     May 28, 2010
                PURSUANT TO PROTECTIVE ORDER Palo Alto, CA

Page 6

1         EXHIBIT INDEX (Continued)
2    PANTFOERDER EXHIBIT NOS.:
3    NO.  DESCRIPTION            PAGE
4    311  Engineering Requirements    104
5         Specification, ERS, APPLE UXGA (2M)
6         CAM MOD,M68,
7         Bates Apple701ITC02175769
8         through -799, 31 pages
9    312  Primax Electronics circuit    109
10        diagram:  N88 AF OV3650 PCB,
11        Bates Apple701ITC03229136
12        through -137, 2 pages
13   313  Acoustics Exec Review:  11-12-08    123
14        Bates Apple701ITC03204860
15        through -918, 59 pages
16   314  M68 EVT Acoustics Demo:  10-30-06    139
17        Bates Apple701ITC00167442
18        through -449, 8 pages
19   315  E-mail:  6-18-08, Achim Pantfoerder    159
20        to David Tupman,
21        Bates Apple701ITC02989159
22        through -161, 3 pages
23   316  Image shown on:        159
24        Bates Apple701ITC02989161
25        Bates Apple701ITC02989162, 1 page

Page 7

1         EXHIBIT INDEX (Continued)
2    PANTFOERDER EXHIBIT NOS.:
3    NO.  DESCRIPTION            PAGE
4    317  Image shown on:        159
5         Bates Apple701ITC02989160
6         Bates Apple701ITC02989163, 1 page
7    318  E-mail chain:  6-19-08, Achim    162
8         Pantfoerder to David Tupman,
9         Bates Apple701ITC02989169
10        through -170, 2 pages
11   319  TonyA Line Setup:  Undated    166
12        Bates Apple701ITC00168046
13        through -048, 3 pages
14   320  iPhone Wireless Process Flows and    175
15        Checklists:  11-8-08,
16        Bates Apple701ITC03194532
17        through -657, 126 pages
18
19
20
21
22
23
24
25

Page 8

1              PALO ALTO, CALIFORNIA
2         MAY 28, 2010; 9:07 A.M.
3
4         THE VIDEOGRAPHER:  Good morning.  We're
5    on the video record, ladies and gentlemen, at 9:07
6    a.m.
7         I'm Arnold Dizon from Alderson Court
8    Reporting in Washington, D.C.  The phone number is
9    202.289.2260.
10        This is a matter pending before the
11   United States International Trade Commission,
12   Washington, D.C., in the case captioned:  In the
13   Matter of:  Certain Electronic Devices, Including
14   Mobile Phones, Portable Music Players, and
15   Computers; Case Number:  337-TA-701.
16        This is the beginning of tape number 1,
17   Volume 1 of the deposition of Achim Pantfoerder on
18   May 28, 2010.
19        We're located at 2 Palo Alto Square,
20   Suite 400, Palo Alto, California.
21        This is taken on behalf of the
22   complainant.
23        Counsel, would you please identify
24   yourselves, starting with the questioning
25   attorney.

Page 9

1         MR. DAVISON:  This is Thomas Davison of
2    Alston & Bird on behalf of Nokia, Inc. and Nokia
3    Corp.
4         MR. MASELLI:  Sam Maselli of Wilmer Hale
5    for Apple, Inc. and the witness.
6         THE VIDEOGRAPHER:  Will the -- will the
7    court reporter please swear in the witness.
8         THE REPORTER:  Will you raise your right
9    hand, please.
10        Do you solemnly state, under penalty of
11   perjury, the testimony you are about to give will
12   be the truth, the whole truth, and nothing but the
13   truth?
14        THE WITNESS:  Yes.
15           ACHIM PANTFOERDER,
16        having been duly sworn
17   was examined and testified on his oath as follows:
18             EXAMINATION
19   BY MR. DAVISON:
20        Q.  Good morning, Mr. Pantfoerder.  My name
21   is Thomas Davison.
22        Will you please state your full name for
23   the record?
24        A.  Achim Pantfoerder.
25        Q.  What's your address and phone number?

                              3 (Pages 6 to 9)

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243670

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD       May 28, 2010
                PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 22

1    Q.  Senior?
2        So what does the director of program
3    management do?
4    A.  So I coordinate the engineering efforts,
5    planning, scheduling of development of the iPhone.
6    Q.  Okay.  Have you always worked on the
7    iPhone at Apple?
8    A.  Yes, I have.
9    Q.  So you were involved from, I guess
10   the -- the first iPhone to where it's at currently
11   then?
12   A.  Yes.
13   Q.  Have you worked on any other products
14   other than the iPhone?
15   A.  Yes.
16   Q.  What were those products?
17   A.  The iPods.
18   Q.  Okay.  IPods.
19       All of the iPods, or just --
20   A.  Yes.
21   Q.  How many people do you supervise?
22   A.  About 70.
23   Q.  Seventy?
24   A.  In my entire organization, not directly.
25   Q.  So what organization are you in at

Page 23

1    Apple?
2    A.  I run program management for iPhone and
3    iPod, and this team is -- are project managers for
4    hardware and software development for these two
5    program areas.
6    Q.  So in your organization, is there
7    another term for it, or is that just the broad
8    term?
9    A.  (No audible response.)
10   Q.  I'm trying to understand the core -- the
11   structure of -- of Apple.  So if there may be a
12   parallel organization off to the side, or --
13       MR. MASELLI:  Objection to form.
14       THE WITNESS:  So it's -- in a nutshell,
15   program management and engineering; and program
16   management does what I described before.
17   BY MR. DAVISON:
18   Q.  Okay.  How many people report to you
19   directly?
20   A.  Currently, 15.
21   Q.  Fifteen?
22       So if you -- if we kind of were making
23   a -- a diagram almost, so you're at the top, and
24   there's 15 people that report to you, and then
25   under them would be the rest of, I guess -- what?

Page 24

1    55 people --
2    A.  Uh-huh.
3    Q.  -- or so?
4    A.  Yes.
5    Q.  Who do you report to?
6    A.  I report to Mark Papermaster.
7    Q.  And what is his title?
8    A.  He's EVP for mobile devices.
9    Q.  So is mobile devices then -- that
10   encompasses the iPhone and iPods?
11   A.  Yes, it does.
12   Q.  And then are the computers -- Apple
13   computers another group?
14   A.  Yes.
15   Q.  And what -- what group is that called?
16   A.  Mac hardware group.
17   Q.  So we have mobile devices and Mac
18   hardware group.  Is there a third group that
19   encompasses another set of products at Apple?
20   A.  There is a software group as well.
21   Q.  Software.
22       So those are the three main --
23   A.  Yes.
24   Q.  -- groups?
25       So mobile devices would then handle the

Page 25

1    iPhones, the iPods?
2    A.  Yes.
3    Q.  Does it handle the iPad?
4    A.  No, it doesn't.
5    Q.  IPad would be where?
6    A.  In the Mac group.
7    Q.  In the Mac group.
8        So who in the mobile devices group would
9    be responsible for camera technology for the
10   cameras in those devices?
11   A.  Steven Webster.
12   Q.  Steven Webster.
13       Who would be responsible for the
14   antennas that are used in the iPhones?
15   A.  Rob Schlub, Rob Schlub, S-c-h-l-u-b.
16   Q.  How about for the radio-type circuitry,
17   so the GSM chipsets?
18   A.  Louis Sanguinetti.
19   Q.  And do all three of those report to you?
20   A.  No.
21   Q.  No?
22   A.  Those are in engineering.
23   Q.  Those are in engineering.
24       MR. DAVISON:  I'm going to ask the court
25   reporter to mark this -- I believe it's Exhibit

7 (Pages 22 to 25)

Alderson Reporting Company
1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243674

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD        May 28, 2010
PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 26

```
 1   300.  It's a document entitled --
 2         THE REPORTER:  Can you hang on a second?
 3         MR. DAVISON:  Oh, sorry.
 4         MR. MASELLI:  Can I get a copy of that?
 5         MR. DAVISON:  (Hands document.)
 6         MR. MASELLI:  Thank you.
 7             (Pantfoerder Exhibit Number
 8             300 was marked for
 9             identification.)
10   BY MR. DAVISON:
11     Q.  It's a document entitled "Purple
12   Executive Review."  It's dated July 25th, 2005.
13   It begins with Bates label Apple701ITC02090925,
14   and it ends on -- with Bates label
15   Apple701ITC02091038.
16         Have you seen this document before?
17     A.  I have.
18     Q.  When is the last time you think you
19   looked at it?
20     A.  Probably in July-August of 2005.
21     Q.  A long time ago.
22         What is "Purple"?
23     A.  The code name for the first iPhone.
24     Q.  The first iPhone.
25         And what's an "executive review"?
```

Page 27

```
 1     A.  An executive review is a meeting with
 2   the executive management team where we go through
 3   the status of a program with the goal to make
 4   decisions on the next steps.
 5     Q.  Okay.  So who would have attended that
 6   meeting?
 7     A.  Tony Fadell, who was at the time EVP for
 8   the hardware.  At this time also John Rubenstein
 9   who is Tony Fadell's manager, and the engineering
10   managers, and program management --
11     Q.  Okay.
12     A.  -- myself.
13     Q.  Now, if you flip to the Bates label
14   ending -0928, just the fourth page in.
15     A.  Okay.
16     Q.  This page is I guess entitled "iPod
17   Division M68 Proposed," and it looks kind of like
18   an organization chart.  Is this how the
19   organization was set up at the time for the M68?
20     A.  Yes.
21     Q.  And does the "M68" refer to the original
22   iPhone?
23     A.  It does.
24     Q.  So "Purple" and "M68" mean the same
25   thing?
```

Page 28

```
 1     A.  Yeah.
 2     Q.  So I think you can see your name listed
 3   under "Program," and then there's three blocks
 4   underneath that.
 5     A.  Uh-huh.
 6     Q.  What do those blocks stand for?  We can
 7   start with the first one, "TBH #2370205"?
 8     A.  "TBH" stands for to be hired.  The
 9   number after TBH is a req number that identifies a
10   requisition that we're tracking in our systems.
11     Q.  What about -- it says "EPM-HW"?
12     A.  That stands for engineering program
13   management -- manager, hardware.
14     Q.  So who was hired to fill that role?
15         MR. MASELLI:  Objection -- objection.
16   Foundation.
17         THE WITNESS:  Shawn Fleming.
18   BY MR. DAVISON:
19     Q.  And then what did Shawn Fleming do?  He
20   was just -- strike that.
21         So what was Shawn Fleming's
22   responsibilities?
23     A.  He was responsible for coordinating
24   engineering meetings and builds, prototype builds.
25     Q.  The -- box below that is labeled
```

Page 29

```
 1   "EPM-PD."
 2     A.  Yes.
 3     Q.  What did that stand for?
 4     A.  Engineering project manager, PD, product
 5   design.
 6     Q.  How about the box below that?
 7     A.  "EPS" stands for engineering project
 8   specialist.
 9     Q.  Who was hired for the role of project
10   design?
11         MR. MASELLI:  Foundation.
12         THE WITNESS:  I'm not sure.  Since it
13   doesn't have a req number, I'm not exactly sure.
14   BY MR. DAVISON:
15     Q.  So did the req number above help you
16   remember -- help you remember that Shawn Fleming
17   was hired?
18     A.  Shawn Fleming was the first hire that I
19   had for an approved req.
20     Q.  Okay.
21     A.  And this appears to be the first
22   approved req that I had on my team.
23     Q.  Okay.  Do you happen to recall who was
24   hired as the engineering project specialist?
25     A.  No, I don't.
```

8 (Pages 26 to 29)

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243675

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
                  PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 54

1      MR. MASELLI: Objection. Form.
2      THE WITNESS: I create weekly reports
3  for the management team.
4  BY MR. DAVISON:
5      Q.  And what sort of information is in those
6  weekly reports?
7      A.  An update on the status of all of our
8  programs.
9      Q.  So is it fair to say that one of your
10 main responsibilities is to make sure that
11 deadlines are met?
12     A.  Yes.
13     Q.  Is that really the -- one of the main
14 focuses of your job?
15     MR. MASELLI: Objection to form.
16     THE WITNESS: Yes.
17 BY MR. DAVISON:
18     Q.  Do you own an iPhone?
19     A.  I do.
20     Q.  What type of iPhone do you currently
21 use?
22     A.  The N90.
23     Q.  The N90.  Lucky.
24     Are you familiar at all with how the
25 touchscreen is deactivated in, let's say, the

Page 55

1  iPhone 3GS, when there's a voice call?
2      A.  In very broad terms, I guess.
3      Q.  Are you familiar with it at a user point
4  of view?
5      A.  From my usage experience, sure.
6      Q.  Do you have any sort of engineering
7  insight into it?
8      MR. MASELLI: Vague.
9      THE WITNESS: Very broad engineering
10 insight, I would say, very broad.
11     MR. DAVISON: Let's go ahead and mark
12 the following.  Is it 302?
13     (Pantfoerder Exhibit
14     Number 302 was marked for
15     identification.)
16 BY MR. DAVISON:
17     Q.  I'm marking as Exhibit 302 a document
18 entitled "Grape M68." It's dated March 10th,
19 2006, bearing Bates label Apple701ITC02082570. It
20 would end on page bearing Bates label Apple701ITC
21 02082584.
22     Can you tell me what this document is?
23     A.  Yeah, this was a review of the Grape
24 design for the first iPhone.
25     Q.  And previously I think you said the

Page 56

1  Grape design is the iPhone touch technology?
2      A.  Yes, I did.
3      Q.  If you turn to page -- it ends in
4  -2582 -- you see a list or a page entitled,
5  "Proximity sensor project schedule, task list."
6      MR. MASELLI: Counsel, what -- what did
7  you say that number was?
8      MR. DAVISON: Sorry. It's -2582.
9      MR. MASELLI: -82, sorry.  Thank you.
10 BY MR. DAVISON:
11     Q.  Is this sort of schedule -- is this
12 something you would have created?
13     A.  I may have.  I don't recall.
14     Q.  Okay.  Just generally speaking, though,
15 are these just -- would you create things --
16 project schedules like these?
17     A.  Yes.
18     Q.  Now, you see in the first line it says
19 "Requirement Document."
20     A.  Uh-huh.
21     Q.  Do you know if that document was ever
22 created?
23     A.  I don't know.
24     Q.  What about further down, where it says
25 "Report"?  Do you know if that document was ever

Page 57

1  finished?
2      A.  I don't know.
3      Q.  Do you have any recollection of whether
4  this project schedule was completed?
5      MR. MASELLI: Vague.
6      THE WITNESS: I'm -- I'm not sure.  I
7  mean -- yeah.
8  BY MR. DAVISON:
9      Q.  Were you involved at all in working --
10 or can you tell me what you did related to Grape?
11     A.  I --
12     MR. MASELLI: Overbroad. Objection to
13 form.
14     THE WITNESS: Grape was the technology
15 that was provided into the iPhone actually by an
16 engineering team within the company.  So my role
17 was mostly tracking the milestones around that
18 integration.
19 BY MR. DAVISON:
20     Q.  Okay.  If you turn to the -- the
21 following page, the one that ends in -2583, there
22 are some action items here.
23     A.  Uh-huh.
24     Q.  Number 2 is listed as "NDA"?
25     A.  Uh-huh.

15 (Pages 54 to 57)

035fd614-d081-43c2-b765-fbb847508be6
Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000243682

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
                  PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 58

1      Q.  I think it has your name next to it; is
2  that correct?
3      A.  That is correct.
4      Q.  Do you know what that "NDA" related to?
5      A.  So this is about -- mostly about the
6  ALS.  So I'm pretty sure this NDA was an NDA with
7  one of the ALS component providers at the time.
8      Q.  What about in number 5, it says "TAOS
9  pricing."  Do you know what "TAOS" stands for?
10     A.  I don't know what the letters stand for,
11 but TAOS is a company that provides ambient light
12 sensors.
13     Q.  And number 8, what's a "day in a life"
14 model?
15     A.  A day in a life model is a typical usage
16 model for a phone -- or a product, in this case a
17 phone.
18     Q.  If you turn to the next page, the one
19 ending in -2584, Brian Huppi is listed as the
20 proximity sensor expert.
21     A.  Uh-huh.
22     Q.  Is he still with Apple?
23     A.  No, he -- he left Apple some time ago.
24 I'm not sure if he was rehired though.
25     Q.  Do you know whether the proximity sensor

Page 59

1  in -- let's start with the N82.  Is it connected
2  directly to the processor?
3          MR. MASELLI:  Vague.
4          THE WITNESS:  It is connected to the
5  applications processor, yes, and to Nimbus, the
6  Grape module.
7          MR. DAVISON:  Okay.
8          THE REPORTER:  "And to" --
9          THE WITNESS:  Nimbus, the Grape module.
10 BY MR. DAVISON:
11     Q.  Is Nimbus in the N82, the N88, and the
12 N90?
13     A.  No, Nimbus is our current touch IC, so
14 currently it's connected to this.  I don't recall
15 the code name for M68.
16     Q.  Okay.  So M68 doesn't -- does not use
17 Nimbus?
18     A.  It uses a touch IC, which had another
19 name.
20     Q.  Another name.
21         But the N82, the N88, and the N90 all
22 use Nimbus?
23     A.  No, we had different code names for
24 those ICs.
25     Q.  Okay.  Do you -- do you know if the

Page 60

1  proximity sensor is connected to both the
2  applications processor and the touchscreen
3  controller in all three --
4          MR. MASELLI:  Objection.
5  BY MR. DAVISON:
6      Q.  -- iPhones?
7          MR. MASELLI:  Objection to form.
8  BY MR. DAVISON:
9      Q.  I'm going to rephrase.
10         So this -- I have a proximity sensor in
11 the -- we'll start with the N82.
12     A.  Uh-huh.
13     Q.  Is it connected to the touchscreen
14 controller and the applications processor?
15     A.  I think it is, yeah.
16     Q.  You think so?
17         How about in the N88?  Is the proximity
18 sensor connected to the touchscreen controller?
19     A.  I think it's connected to --
20     Q.  In the --
21     A.  -- in all of them to --
22     Q.  In all of them?
23     A.  -- to the applications processor.
24         MR. DAVISON:  Let's go ahead and mark
25 the following as the next exhibit in order.

Page 61

1          (Pantfoerder Exhibit
2          Number 303 was marked for
3          identification.)
4  BY MR. DAVISON:
5      Q.  So we're marking as Exhibit 303 a
6  document entitled "M68 Proximity Sensor,
7  Specifications and Requirements, Apple
8  Engineering."
9      A.  Uh-huh.
10     Q.  It begins bearing the Bates label
11 Apple701ITC03191093, and ends bearing label
12 Apple701ITC03191100.
13         Do you know what Exhibit 303 is?
14     A.  Yes, I do.
15     Q.  And what is that?
16     A.  It's a document that specifies the
17 requirements for the proximity sensor for the
18 first iPhone.
19     Q.  Would there be a different document for
20 the proximity sensor requirements for the N82?
21     A.  I'm not sure.
22     Q.  Are you -- would you know if there would
23 be a separate requirements document on the
24 proximity sensor for the N90 or the N88?
25         MR. MASELLI:  Objection to form.

                              16  (Pages 58 to 61)

035fd614-d081-43c2-b765-fbb847508be6
Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000243683

Page 62

1  Foundation.
2      THE WITNESS: Yeah, I haven't been
3  involved in ITP with the later programs, so -- so
4  I wouldn't know.
5  BY MR. DAVISON:
6      Q.  Why would you have had a document like
7  this on your computer?
8      MR. MASELLI: Vague.
9      THE WITNESS: First of all, I don't know
10 if I have it on my computer.  If I would have it
11 on my computer, then probably because the
12 engineering team sent it out for a broader review.
13 BY MR. DAVISON:
14     Q.  So would you be copied on all of the
15 correspondence that are broader reviews?
16     A.  Depends on --
17     MR. MASELLI: Foundation.  Vague,
18 overbroad.
19     THE WITNESS: Depends what a broader
20 review is, but yeah.
21 BY MR. DAVISON:
22     Q.  What do you think a broader review is?
23 That was the term you used.
24     A.  Broader review is a review where the
25 executive or management team is reviewing the

Page 63

1  state -- status of a piece of technology that
2  might be impacting the schedule in any way.
3      Q.  Uh-huh.  Do you know when the last time
4  you looked at this document was?
5      A.  I don't recall.
6      MR. DAVISON: Let's go ahead and mark
7  another document.  Exhibit 304?
8      THE REPORTER: Yes.
9          (Pantfoerder Exhibit
10             Number 304 was marked for
11             identification.)
12 BY MR. DAVISON:
13     Q.  Exhibit 304 is entitled "M68 Sensors."
14 It's dated 4/8/2006, bearing Bates label
15 Apple701ITC02082683.  It ends on
16 Apple701ITC02082728.
17     Do you know what Exhibit 304 is?
18     A.  Yes, I do?
19     Q.  What is Exhibit 304?
20     A.  It's a document that we created to
21 review the design of the sensors of the first
22 iPhone.
23     Q.  What sensors were in the first iPhone?
24     MR. MASELLI: Overbroad --
25     THE WITNESS: Yeah, I --

Page 64

1  BY MR. DAVISON:
2      Q.  Okay.  Let's see.  What sensors were --
3      A.  All right.
4      Q.  -- was this document relating to?
5      A.  This document refers to the ambient
6  light sensor and the proximity sensor.
7      Q.  What is the proximity sensor used for in
8  the iPhones?
9      A.  The proximity sensor --
10     MR. MASELLI: Objection.  Overbroad,
11 vague.
12     THE WITNESS: Proximity sensor is used
13 to detect an object in front of the phone.
14 BY MR. DAVISON:
15     Q.  And other than for turning off the
16 touchscreen when there's a -- a phone call, is a
17 proximity sensor used for anything else?
18     MR. MASELLI: That lacks foundation.
19 Objection to form.
20     THE WITNESS: Not that I'm aware of.
21 BY MR. DAVISON:
22     Q.  And if you turn to page -2686, there's a
23 flow chart called "Head Rejection During Call."
24 What does this flow chart show?
25     MR. MASELLI: Overbroad.

Page 65

1      THE WITNESS: As far as I remember, this
2  is showing the flow during a call, and the
3  likeliness of the user having the physical contact
4  of the head and the device.
5  BY MR. DAVISON:
6      Q.  Do you know, is the proximity sensor
7  always on in the iPhones?
8      MR. MASELLI: Vague.
9      THE WITNESS: I don't think it is.
10 BY MR. DAVISON:
11     Q.  Do you know when it's turned on?
12     MR. MASELLI: Foundation.
13     THE WITNESS: I know a few occasions
14 when it's turned on.
15 BY MR. DAVISON:
16     Q.  What are those occasions?
17     A.  When it's -- when I'm listening to my
18 voicemail stored on my device.
19     Q.  Are there any other times it's turned
20 on?
21     A.  When I'm on a phone call it's turned on.
22     Q.  Is it always on when you're on a phone
23 call?
24     A.  I'm not sure.
25     Q.  Not sure.

17 (Pages 62 to 65)

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6

APLNDC-Y0000243684

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
                PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 66

1    A.  Actually, I don't think so.  I mean,
2  it's like speakerphone mode for instance, when I'm
3  on a phone call I press "Speakerphone," and then
4  it's not on.
5    Q.  What about if we look here.  It says,
6  "Call on HS."  Do you know what "HS" means?
7    A.  Headset.
8    Q.  And then "Call on BT"?
9    A.  Bluetooth.
10   Q.  Bluetooth?
11       So do you know if the proximity sensor
12  is turned on only when the call is on receiver?
13       MR. MASELLI:  Foundation.
14       THE WITNESS:  Like I said before, it's
15  on in several occasions, like in phone call
16  during -- when the receiver is being used, or in
17  listening to voicemail.
18  BY MR. DAVISON:
19   Q.  Who would be the best person to talk to
20  about when the proximity sensor is on?
21       MR. MASELLI:  Vague.
22       THE WITNESS:  Someone that's -- someone
23  in the software engineering team.  I'm not
24  familiar with who is -- who is responsible for
25  that.

Page 67

1  BY MR. DAVISON:
2    Q.  Do you know if this flow chart --
3  withdraw that.
4        If you turn to the page that ends in
5  2704, that page is entitled "Grape state during
6  incoming call."
7        In the bottom right-hand corner, there's
8  kind of a little chart here.  It says "Sniff."
9    A.  Uh-huh.
10   Q.  What does that stand for, "Sniff"?
11   A.  The sniff is a stage where Grape is
12  trying to detect the touch of the screen, but it
13  doesn't have full tracking capabilities.
14   Q.  And what is "Active scan"?
15   A.  Active scan is the next step after full
16  touch was detected.  The Grape IC is switching to
17  active scan to pull out full tracking capabilities
18  with full resolution.
19   Q.  So "active scan," then, means it's
20  tracking touches on the screen?
21   A.  Yes.
22   Q.  Okay.  Makes sense.
23       And "Sniff" means that Grape is active
24  but it's not detecting touches?
25       MR. MASELLI:  Asked and answered.

Page 68

1        THE WITNESS:  Yeah, it's -- it's
2  sniffing for a touch, or a much reduced power
3  level, trying to detect the first touch of the
4  screen.
5  BY MR. DAVISON:
6    Q.  So under -- we have the "System State"
7  column here and then the "Grape" column.  Why is
8  it there are two different sets there for when it
9  has "Head detection"?
10   A.  I don't know.
11   Q.  Do you know -- who would you ask to find
12  out why that's listed like that?
13   A.  I really don't -- I -- I don't know -- I
14  think that's -- yeah, I don't know.
15   Q.  Would a document like Exhibit 304 have
16  been created for, say, the N82?  Would there be a
17  document -- strike that.
18       Would there be a document entitled "N82
19  Sensors"?
20   A.  No.
21   Q.  Why not?
22   A.  This was a very early review of
23  different ideas around how trace detection would
24  work and how the sensors would interact.  After
25  M68 -- this is -- after the M68 design was

Page 69

1  finished, we had a design that we were carrying
2  forward into the next generation of the iPhone.
3        MR. DAVISON:  Okay.
4        MR. MASELLI:  Thank you.
5        MR. DAVISON:  You're welcome.
6        (Pantfoerder Exhibit
7        Number 305 was marked for
8        identification.)
9        MR. DAVISON:  305.
10  BY MR. DAVISON:
11   Q.  I've marked as Exhibit 305 a document
12  entitled "M68 Sensors and Buttons," dated
13  November 20th, 2006.  It begins bearing Bates
14  label Apple701ITC02082757.  It ends on Bates label
15  Apple701ITC02082780.
16       Have you seen Exhibit 305 before?
17   A.  I think I did.
18   Q.  Who would have created Exhibit 305?
19   A.  There was a contribution from the
20  cross-functional team, so several people.
21   Q.  Do you know why you would have a copy of
22  Exhibit 305?
23   A.  Yeah, because this was the slide deck
24  that was reviewed and -- with the executive team,
25  so --

18 (Pages 66 to 69)

035fd614-d081-43c2-b765-fbb847508be6

Highly Confidential - Attorneys' Eyes Only              APLNDC-Y0000243685

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
              PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 70

1    Q.  Okay.
2    A.  -- I was part of the review.
3    Q.  Is it also the case, then, that for
4  Exhibit 305 there wouldn't be a "N82 Sensors and
5  Buttons" document?
6        MR. MASELLI:  Vague.
7        THE WITNESS:  No, not with that content.
8  BY MR. DAVISON:
9    Q.  Okay.  If you turn to --
10       MR. MASELLI:  Court reporter, you missed
11  my objection after the question, followed by the
12  answer, "No, not with that content."  I said
13  "Vague."
14  BY MR. DAVISON:
15   Q.  If you turn to the page that ends in
16  -2763, page is titled "Power Saving:  Backlight."
17  Your name appears to be listed under "Battery
18  Life."
19   A.  Uh-huh.
20   Q.  Does that mean you were responsible for
21  updating a portion of this slide?
22   A.  Yes.
23   Q.  Do you recall what you would have added
24  to this subject?
25   A.  Yeah, I mean, the -- the battery light

Page 71

1  for the specific use case.
2    Q.  So you would have just put a time in
3  there?
4    A.  Yeah.
5    Q.  Why was it you that was supposed to
6  update the battery life for that use case?
7    A.  I'm not exactly sure, but I guess that
8  at the time I was sitting together with the
9  cross-functional team, and I was -- since there
10  was no single person that had that information, I
11  was the one who was chasing after it.
12   Q.  If you turn to page 2770, a chart called
13  "Touch state" -- or "Touch states."
14   A.  Uh-huh.
15   Q.  Do you know who made this chart?
16   A.  No, I'm not sure.
17   Q.  Does this chart represent the touch
18  states in the current iPhone OS?
19   A.  I wouldn't know.
20   Q.  You wouldn't know?
21       Up at the top, next to "Locked," there's
22  a -- it says "BL."
23   A.  Yeah.
24   Q.  Do you know what "BL" stands for?
25   A.  Backlight.

Page 72

1    Q.  And then "Touch," does that represent
2  the touchscreen?
3    A.  Yes.
4    Q.  And "Prox," P-r-o-x, is that the
5  proximity sensor?
6    A.  Uh-huh, yes.
7    Q.  If you look down the proximity sensor
8  column, there's an entry that says it's on for --
9  in -- I guess it's row 7, "In Call Receiver."
10   A.  Uh-huh.
11   Q.  And then I guess it's also on in column
12  8.  Does that at all help you in determining when
13  the proximity sensor is turned on?
14   A.  You mean, this table?
15   Q.  (Counsel nods head.)  Would the -- let's
16  just say this.  Other than those two instances in
17  columns -- or rows 7 and 8, are there any other
18  instances when the proximity sensor is turned on?
19   A.  Yeah.
20       MR. MASELLI:  Asked and answered.
21  BY MR. DAVISON:
22   Q.  What are the other -- what's the other
23  instance?
24   A.  When you listen to voicemail.
25   Q.  When you listen to voicemail would it

Page 73

1  have a different state in that "New State" column?
2        MR. MASELLI:  Vague.
3        THE WITNESS:  Probably, but at the time
4  I didn't think of it.
5  BY MR. DAVISON:
6    Q.  Is there a document that would describe
7  these new state numbers?
8    A.  (No audible response.)
9        MR. MASELLI:  Vague.
10       THE WITNESS:  I don't know.
11  BY MR. DAVISON:
12   Q.  Who would you ask to find out if there
13  is an additional document to describe these
14  states?
15   A.  I'm not sure.  It would be someone in
16  the software team.  I'm not sure which person,
17  though, would have that information.
18   Q.  In the N90, does the applications
19  processor have a code name?
20   A.  Yes, it does.
21   Q.  What is that?
22   A.  H4.
23   Q.  H4?
24   A.  Sorry.  Take that back.  H3.
25   Q.  What about the processor in the N88?

                          19 (Pages 70 to 73)

              Alderson Reporting Company
                   1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243686

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD      May 28, 2010
PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 102

1    Q.  Were you able to solve the issues with
2  the flares?
3    A.  Most of them.
4    Q.  What issues still remain?
5        MR. MASELLI:  Overbroad, calls for a
6  narrative, vague.
7        THE WITNESS:  There's what we refer to
8  as "pedal flare" that is still visible.
9  BY MR. DAVISON:
10   Q.  What's a pedal flare?
11   A.  Pedal flare, p-e-d-a-l.
12   Q.  What is a pedal flare?
13   A.  It is the flare that is generated by the
14 reflections between the sensor surface and the IR
15 cut filter.  IR cut filter, infrared filter.
16   Q.  In the N, I guess, 82, when you take
17 a -- a photograph, do you know what resolution
18 it's taken in?
19       MR. MASELLI:  Vague.
20       THE WITNESS:  Two mega pixels.  Two --
21 two mega pixels.
22 BY MR. DAVISON:
23   Q.  Do you know the resolution, such as 1600
24 by 800?
25   A.  No.

Page 103

1    Q.  Do you know if you have an option to
2  take it at a different resolution?
3    A.  You don't.
4    Q.  Do you know if the image sensor in the
5  N90 -- does it have an ISP on the image sensor?
6    A.  No.
7    Q.  Do any of the iPhones contain image
8  sensors that have ISPs?
9    A.  I'm not sure.
10   Q.  What about in the iPod Nano, the N33?
11 Does the image sensor have an ISP on it?
12   A.  I think it does, yeah.
13   Q.  In the N90's image sensor, do you know
14 if it does -- if the image sensor has correlated
15 double sampling and automatic gain control on it?
16       MR. MASELLI:  Objection to form.
17       THE WITNESS:  I don't know.
18 BY MR. DAVISON:
19   Q.  Do you know, at all, the sort of --
20 strike that.
21       Do you know if the image sensor in the
22 N90 is connected to the -- I think it's H3 with a
23 serial bus?
24   A.  Yes.
25   Q.  Is it connected with a serial bus?

Page 104

1    A.  Yeah.
2    Q.  And I think earlier you said you thought
3  it was a MIPI interface, but you weren't sure?
4    A.  MIPI is a data interface.  The control
5  interface is an I2C interface, a serial interface.
6    Q.  So is the data interface bidirectional?
7    A.  I don't know.
8    Q.  Do you know if the control interface is
9  bidirectional?
10   A.  No, the control interface is
11 unidirectional.  It controls the camera module
12 from H3.
13   Q.  So H3 controls the camera module?
14   A.  Yes.
15       (Pantfoerder Exhibit
16        Number 311 was marked for
17        identification.)
18       THE WITNESS:  Thank you.
19       THE REPORTER:  311.
20 BY MR. DAVISON:
21   Q.  We've just marked as Exhibit 311 a
22 document entitled, "ERS Apple UXGA (2M) Cam Mod --
23 Camera -- M68."  It begins with Bates label
24 Apple701ITC02175769, and then it ends with Bates
25 label Apple701ITC02175799.

Page 105

1        Have you seen Exhibit 311 before?
2    A.  I don't recall.
3    Q.  Do you know at all what Exhibit 311 is?
4    A.  Looks like -- it appears to be an
5  engineering requirement specification for the
6  camera module of the first iPhone.
7    Q.  Do you see, near the bottom, we have
8  a -- listed as Dwg number?
9    A.  Uh-huh.
10   Q.  What is a Dwg number?
11   A.  I don't know.
12   Q.  You've never seen a document with a -- a
13 number -- a Dwg number?
14   A.  No.
15   Q.  Do you have any idea why you would
16 have -- have had this document on your computer?
17       MR. MASELLI:  Lacks foundation, calls
18 for speculation.
19       THE WITNESS:  It was probably sent to me
20 in -- in an e-mail.  I'm sure it was.
21 BY MR. DAVISON:
22   Q.  Do you -- on the cover it says "UXGA."
23 Do you know what UXGA stands for?
24   A.  That stands -- I don't know what the
25 abbreviation means, but it indicates resolution

27 (Pages 102 to 105)

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6
APLNDC-Y0000243694

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD     May 28, 2010
            PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 106

1  two mega pixels.
2      Q.  Up at the -- near the top it's -- there
3  are initials.  Looks like a person with initials
4  "TMM" might have worked on this document.  Do you
5  know who that could be?
6          MR. MASELLI:  Calls for speculation,
7  lacks foundation.
8          THE WITNESS:  No.
9  BY MR. DAVISON:
10     Q.  Okay.  Now, this is the ERS for the
11 camera module in the M68?
12     A.  Uh-huh.
13     Q.  Do you know if there would be an ERS for
14 the camera module in the N90?
15     A.  I would think so.
16     Q.  You're not sure, though?
17     A.  No.
18     Q.  What about in the N88?
19     A.  The same.  I would think there is, but I
20 haven't seen it.
21     Q.  And for the N82?
22     A.  The same.
23     Q.  Who would you ask to -- to see -- to
24 find the ERS of -- on the camera modules for the
25 phones other than the -- the iPhones other than

Page 107

1  the M68?
2      A.  Probably Steven Webster, yeah.
3      Q.  If you turn to the page ending -5775.
4      A.  Uh-huh.
5      Q.  Under Section 1.2.4 there's listed some
6  documents.  Some of these have a file name.
7  Specifically, it says "SPEC,RESOLUTIONS
8  CHART,CAMERA," and the file name is 069-1518.
9          Is there a database that you can go to to
10 search for these file names?
11     A.  I don't know.
12     Q.  So you've never interacted with an Apple
13 database where you'd search for a file name that's
14 three digits, a dash, then four digits?
15     A.  No, I think that refers to a database
16 that we call "RFA," and I've never used it.
17     Q.  What does "RFA" stand for?
18     A.  I don't know.
19     Q.  Do you know what type of documents are
20 kept in RFA?
21         MR. MASELLI:  Foundation, speculation.
22         THE WITNESS:  Many, but like PCB
23 drawings, for instance, but I don't know what
24 else.
25 BY MR. DAVISON:

Page 108

1      Q.  What's a PCB drawing?
2      A.  A PCB drawing is a drawing of a printed
3  circuit board in a product.
4      Q.  If you turn to the page -5782, at 5.1 it
5  says "MCO."
6      A.  Uh-huh.
7      Q.  The "MCO for the M68. . . ."  Do you
8  know what -- what's an MCO?
9      A.  MCO is a document that outlines the
10 mechanical dimensions of a system or a
11 subcomponent.
12     Q.  Is "MCO" an abbreviation for something?
13     A.  I think it stands for mechanical change
14 order, but I'm not really -- exactly sure.
15     Q.  If you turn to the second to last page
16 of this document.
17         MR. MASELLI:  -5798?
18         MR. DAVISON:  That's correct.
19         MR. MASELLI:  Ending?
20 BY MR. DAVISON:
21     Q.  Under number 9, where it says
22 "Firmware."
23     A.  Uh-huh.
24     Q.  It says, "See Independent Parameter
25 Specification."  Have you ever seen the

Page 109

1  independent parameter specification document?
2      A.  No.
3      Q.  Moving below to number 11.1 --
4      A.  Uh-huh.
5      Q.  -- it says "PCB markings," and then it
6  says "See 613-xxx"?
7      A.  Uh-huh.
8      Q.  Does that -- would those PCB markings,
9  then, possibly be in this RFA database?
10         MR. MASELLI:  Calls for speculation,
11 asked and answered.
12         THE WITNESS:  Possibly, but I don't
13 know.
14             (Pantfoerder Exhibit
15             Number 312 was marked for
16             identification.)
17         THE WITNESS:  Thank you.
18         MR. DAVISON:  Do you know what number
19 this is?
20         MR. MASELLI:  312.
21 BY MR. DAVISON:
22     Q.  So we've just marked as Exhibit 312 a
23 circuit diagram from Premek Electronics.  Bates
24 label is Apple701ITC03229136, and it ends on Bates
25 Apple701ITC03229137.

                              28  (Pages 106 to 109)

            Alderson Reporting Company
                 1-800-FOR-DEPO

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6

APLNDC-Y0000243695

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD       May 28, 2010
                 PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 138

1  whole directory.  And the categories that you
2  would find there are mostly around functional
3  groups, and then, when you go down from there,
4  it's probably divided into projects.
5       Q.  What do you mean when you say
6  "functional groups"?  Could you give me an
7  example?
8       A.  Yeah, like software, validation and
9  tests, hardware design, program management.
10      Q.  So there would be hardware design, and
11  if you went into that directory maybe there's a
12  folder for N88?
13          MR. MASELLI:  Objection to form.
14          THE WITNESS:  (Nods head.)  Yes.
15  BY MR. DAVISON:
16      Q.  Is it possible to search the server with
17  keywords?
18          MR. MASELLI:  Lacks foundation.
19          THE WITNESS:  It's a file server, so all
20  typical search functionality on files would work.
21  BY MR. DAVISON:
22      Q.  Does Apple have a central location where
23  it stores third-party documents?
24          MR. MASELLI:  Vague.
25          THE WITNESS:  I'm not sure.

Page 139

1           THE REPORTER:  What was the objection,
2  Counsel?
3           MR. MASELLI:  Vague.
4               (Pantfoerder Exhibit
5               Number 314 was marked for
6               identification.)
7  BY MR. DAVISON:
8       Q.  We've just marked as Exhibit 314 a
9  document entitled "M68 EVT Acoustics Demo.  It's
10  dated 10/30/2006.
11      A.  Uh-huh.
12      Q.  Begins with Apple Bates label
13  701ITC00167442, ends with Bates label
14  Apple701ITC00167449.
15          Have you seen Exhibit 314 before?
16      A.  Yes, I have.
17      Q.  What is Exhibit 314?
18      A.  It's a presentation that was given
19  during the development of the first iPhone to
20  demonstrate the acoustics performance of the
21  iPhone.
22      Q.  And so was this presented, then, to the
23  executive committee?
24      A.  I think it was, yeah.
25      Q.  If you flip to the page ending -7448.

Page 140

1       A.  -448?
2       Q.  -448?
3       A.  Yes.
4       Q.  There's a comment there that says,
5  "Pre-EVT SN=2", and then it has your name --
6       A.  Uh-huh.
7       Q.  -- "Unit Used". . . .
8       A.  Uh-huh.
9       Q.  What does that comment mean?
10          MR. MASELLI:  Vague.
11          THE WITNESS:  So there's one unit that
12  was at the time my unit being used for -- for this
13  demo, or the previous demo, and the unit had the
14  serial number 2.
15  BY MR. DAVISON:
16      Q.  When you say your unit, can you be any
17  more specific?
18      A.  A unit that was, after the build,
19  provided to me to use it, basically, for general
20  testing.
21      Q.  So you're talking i- -- a specific
22  iPhone device?
23      A.  Yes.
24      Q.  Okay.  So it wasn't a unit of
25  measurement named after you?

Page 141

1       A.  Oh, no, it was an M68, an iPhone, first
2  generation iPhone.
3       Q.  Would acoustics demo documents like this
4  be kept in a central location?
5       A.  Probably, but also in noncentral
6  locations, i.e., inboxes.
7       Q.  If there was a central location, would
8  it be that engineering server you --
9       A.  Yes.  Yes.
10      Q.  How do you access the engineering server
11  from your work computer?
12      A.  I'd go into finder, connect to that
13  network drive, and I'm connected.
14      Q.  Who has access to that network drive?
15      A.  Pretty much the entire engineering team.
16      Q.  Is there a separate Wiki for acoustics?
17      A.  Yes.
18      Q.  Have you ever visited that Wiki?
19      A.  I may have, yes.
20      Q.  Do you recall about the last time you
21  visited it?
22      A.  Maybe half a year ago.
23      Q.  Would that Wiki be set up in a similar
24  fashion to the image Wiki we looked at earlier?
25      A.  Yes.

                              36 (Pages 138 to 141)

035fd614-d081-43c2-b765-fbb847508be6

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000243703

Achim Pantfoerder APPLE CONFIDENTIAL BUSINESS RECORD       May 28, 2010
PURSUANT TO PROTECTIVE ORDER  Palo Alto, CA

Page 142

1      Q.  So there would be links to documents
2  from that Wiki?
3      A.  Yeah.
4          MR. MASELLI:  Objection to the extent it
5  mischaracterizes the witness's testimony, lacks
6  foundation.
7  BY MR. DAVISON:
8      Q.  If I was looking for detailed drawings
9  of the speaker box assembly, would those be on the
10 engineering server?
11     A.  I'm not sure.
12     Q.  Do you know if they would be on the
13 Wiki?
14         MR. MASELLI:  Lacks foundation.
15         THE WITNESS:  I don't think they would
16 be there.
17 BY MR. DAVISON:
18     Q.  Why do you think they wouldn't be on the
19 Wiki?
20     A.  I would expect them to be in the CAD
21 system of the mechanical engineering system which
22 is not linked to that Wiki.
23         THE REPORTER:  ". . . which is not
24 linked to the" --
25         THE WITNESS:  Not linked to the Wiki.

Page 143

1  BY MR. DAVISON:
2      Q.  Is there a separate CAD network drive?
3      A.  I don't know.
4      Q.  What did you mean when you said "CAD
5  system"?
6      A.  The work stations that the mechanical
7  engineers are using for their drawings.
8      Q.  So the mechanical engineers have
9  specific CAD computers?
10     A.  Correct.
11     Q.  Have you ever seen CAD drawings related
12 to the speaker box assembly?
13     A.  Yes.
14     Q.  Do you know if you had any of those CAD
15 drawings on your computer?
16     A.  Probably copies, like in these
17 presentations, but not any detailed drawings.
18     Q.  So you would not have had the detailed
19 CAD drawings on --
20     A.  Yeah.
21     Q.  If you had to get the detailed CAD
22 drawings on the speaker box assemblies, who would
23 you go to to find them?
24     A.  To a PD engineer.
25     Q.  Is there a specific PD engineer you

Page 144

1  would go to?
2          MR. MASELLI:  Foundation.
3          THE WITNESS:  I would probably go to
4  Tang Tan.
5  BY MR. DAVISON:
6      Q.  Is he responsible for acoustics?
7      A.  No, he's responsible for iPhone
8  mechanical engineering.
9      Q.  Earlier this morning I think you
10 mentioned you'd worked on some of the iPod
11 devices; is that correct?
12     A.  That is correct.
13     Q.  Did you -- have you had any involvement
14 in the clickwheel assembly on the iPod device?
15     A.  No.
16     Q.  What was -- in very general terms, what
17 was your involvement with i- -- the iPod devices.
18     A.  I --
19         MR. MASELLI:  Vague.
20         THE WITNESS:  I took over iPod program
21 management about three months ago, and -- so very
22 recently.  And since then, I'm responsible for
23 managing the iPod programs.
24 BY MR. DAVISON:
25     Q.  The iPod Nano fifth generation is going

Page 145

1  to be -- well, strike that.  Let me start over.
2          When is the iPod fifth generation sales
3  going to be terminated?
4      A.  IPod Nano fifth generation?  You're
5  referring -- you're referring to the iPod Nano
6  currently?
7      Q.  Correct, the N33.
8      A.  Okay.  In September this year.
9      Q.  Do you happen to know the -- sorry, let
10 me start over again.
11         Does that mean in September of this year
12 no more N33s will be produced, or does that mean
13 that no more -- you'll already have exhausted all
14 of the N33s in reserve?
15         MR. MASELLI:  Compound, vague.
16         THE WITNESS:  That means they will
17 have -- we'll try to have them exhausted at that
18 point.
19 BY MR. DAVISON:
20     Q.  So you think that no retail stores will
21 be selling N33s after September of this year?
22         MR. MASELLI:  Foundation, calls for
23 speculation.
24         THE WITNESS:  Roughly.
25 BY MR. DAVISON:

37 (Pages 142 to 145)

Highly Confidential - Attorneys' Eyes Only

035fd614-d081-43c2-b765-fbb847508be6

APLNDC-Y0000243704

# EXHIBIT 19
# FILED UNDER SEAL

Highly Confidential - Attorneys' Eyes Only

Page 1

1                    UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4

5     APPLE, INC., a California

      corporation,

6                              Plaintiff,

7     vs.                                      CASE NO.

                                               11-cv-01846-LHK

8     SAMSUNG ELECTRONICS CO., LTD,

      a Korean business entity;

9     SAMSUNG ELECTRONICS AMERICA,

      inc., A New York corporation;

10    SAMSUNG TELECOMMUNICATIONS

      AMERICA, LLC, a Delaware

11    limited liability company,

12                             Defendants.

      _____/

13

14

15

16         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17           VIDEOTAPED DEPOSITION OF EMILIE KIM

18                    March  7, 2012

19

20

21

22    Job No. 47152

23    Reported by:  LAURA AXELSEN, CSR NO. 6173

                    RMR, CRP, CLR

24

25

Highly Confidential - Attorneys' Eyes Only

## Page 2

1  BE IT REMEMBERED THAT, pursuant to Notice and on
2  Wednesday, March 7, 2012 at 9:15 a.m. thereof at 555 Twin
3  Dolphin Drive, Redwood Shores, California, before me,
4  LAURA AXELSEN, a Certified Shorthand Reporter, personally
5  appeared
6          EMILIE KIM,
7  called as a witness by the Defendants.
8          ---oOo---
9          APPEARANCES
10 FOR THE PLAINTIFF:
11
12     WILMERHALE
13     BY:  VICTOR F. SOUTO, ESQ.
14     DEREK S. LAM, ESQ.
15     399 Park Avenue
16     New York, New York  10022
17
18     There being also present Erica Tierney, Apple
19 in-house counsel, and Tim Zuroff, video operator.
20
21
22          ---oOo---
23
24
25

## Page 3

1          INDEX
2
3                    PAGE
4  EXAMINATION BY MR. STRETCH                    4
5
6          ---oOo---
7
8      INDEX OF EXHIBITS
9
10 EXHIBIT      DESCRIPTION              PAGE
11
12 Exhibit 1  Samsung's Amended first 30(b)(6)      7
13          Deposition Notice to Apple Inc.
14          (Technical Patent Topics)
15 Exhibit 2  E-mail dated February 23, 2012 to Diane   7
16          Hutnyan from Kolovos, Peter
17 Exhibit 3  Notice of deposition of Emilie Kim      7
18
19
20          ---oOo---
21
22
23
24
25

## Page 4

1          VIDEO OPERATOR:  This is the start of disc No. 1  09:13
2  of the videotaped deposition of Emilie Kim in the matter
3  of Apple Incorporated versus Samsung Electronics Company
4  in the U.S. District Court Northern District of
5  California, San Jose division, No. 11 CV 01846 LHK.    09:15
6          This deposition is being held at Quinn Emanuel,
7  555 Twin Dolphin Drive, Redwood Shores, California on
8  March 7th, 2012 at approximately 9:15 a.m.
9          My name is Tim Zuroff.  I'm the legal video
10 specialist from TSG Reporting, headquartered at 747 Third  09:15
11 Avenue, New York, New York.  The court reporter is Laura
12 Axelsen in association with TSG reporting.
13          Will counsel please introduce yourself.
14          MR. STRETCH:  Chris Stretch from Quinn Emanuel
15 Urquhart & Sullivan on behalf of Samsung.    09:15
16          MR. SOUTO:  Vic Souto, WilmerHale, on behalf of
17 the witness and Apple, and with me is my colleague, Derek
18 Lam, also of WilmerHale, and Erica Tierney from Apple.
19          VIDEO OPERATOR:  Will the court reporter please
20 swear in the witness.    09:16
21          EMILIE KIM
22 having been duly sworn, testified as follows:
23          EXAMINATION BY MR. STRETCH
24          MR. STRETCH:  Q.  Good morning, Ms. Kim.
25          A.  Good morning.    09:16

## Page 5

1          Q.  Is it Ms. Kim or Mrs. --    09:16
2          A.  Ms. is fine.
3          Q.  Ms.  Okay.  Uhm, have you ever been deposed
4  before?
5          A.  No.    09:16
6          Q.  Okay.  Well welcome to the fray.  Uhm, could you
7  state and spell your name for the record, please?
8          A.  Emilie Kim, E-m-i-l-i-e, last name Kim, K-i-m.
9          Q.  Okay.  I'm just -- as I'm sure your attorney
10 has gone over with you about generally what to expect    09:16
11 here, but you understand you've just taken an oath to tell
12 the truth, and it's the same oath as if you were
13 testifying in court.  Do you understand that?
14          A.  Yes.
15          Q.  Okay.  Uhm, so as you can see, your testimony --  09:17
16 my questions and your testimony are being recorded both
17 stenographically and by video.  Uhm, it's important for
18 the stenographer to get a verbal response to the question.
19 So then shaking your head or nodding is hard for her to
20 pick up.  So if you could verbally respond to my    09:17
21 questions, I appreciate it.
22          For the same reason, it's important that we
23 don't talk over each other.  It tends to happen, uhm, uhm,
24 but I will try and wait until you have finished and
25 answered my question before I ask you a follow-up    09:17

2

Highly Confidential - Attorneys' Eyes Only

## Page 6

1  question. If you could wait until I'm finished my          09:17
2  question, give your counsel a chance to object, and then
3  answer, things will go smoother.
4        A.  Okay.
5        Q.  Okay. If I ask you a question that you don't     09:18
6  understand, or is not clear to you, just let me know, and
7  I'll try and rephrase it. I'm not an engineer. So you
8  know, it's quite likely to happen. But just let me know,
9  and I'll see if I can form a question that you do
10  understand.                                               09:18
11        As I said, your counsel may object at certain
12  times, but unless he instructs you not to answer a
13  question, you can still go ahead and answer. Do you
14  understand that?
15        A.  Yes.                                            09:18
16        Q.  Okay. Any time you want to take a break, just
17  let me know. I'd prefer we do so, uhm, while -- that we
18  not take a while a question is pending, but if you
19  need to talk to your counsel about whether you can
20  disclose something, that's fine.                         09:18
21        A.  Okay.
22        Q.  Any reason you can't give honest complete
23  truthful testimony here this morning?
24        A.  No.
25        Q.  Okay. I'm going to mark the first two exhibits. 09:19

## Page 7

1        Actually, I think what we'll do is mark the first three   09:19
2  exhibits. The first is Samsung's amended first 30(b)(6)
3  deposition notice to Apple, Inc. will be Exhibit 1. And
4  the court reporter will mark the exhibit that's the copy
5  you should look at because that will be the official      09:19
6  record of the deposition. Okay? So wait until she marks
7  it and you can look at it.
8        (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)
9        MR. STRETCH:  Q.  I'm going to mark as
10  deposition Exhibit 2, an e-mail from Peter Kolovos. Am I  09:20
11  saying that right?
12        MR. SOUTO:  Kolovos, but that's New Jersey
13  talking.
14        MR. STRETCH:  Q.  To Diane Hutnyan designating
15  Ms. Kim to testify on certain topics related to the rule  09:20
16  30(b)(6) notice that we just marked Exhibit 1. So that
17  will be Exhibit 2.
18        (EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)
19        MR. STRETCH:  Q.  And finally, I'm going to
20  mark a Notice of Deposition of Emilie Kim, which we served 09:20
21  yesterday is my understanding, and that will be Exhibit
22  No. 3.
23        (EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)
24        THE WITNESS:  Excuse me.
25        MR. STRETCH:  Q.  Excuse me. Uhm, if I could       09:21

## Page 8

1  ask you to look at Exhibit 1, which is the thick document,  09:21
2  I think, and you can take as much time as you like to look
3  through it, but I just want to make sure that we're all on
4  the same page as to the topics on which you're designated
5  to testify today. Those appear on page 14 of the notice.   09:22
6  Have you had a chance to look at that?
7        A.  I looked through the document.
8        Q.  Okay. If you will turn to page 14 of the
9  document and compare that with what I marked, I think, as
10  deposition Exhibit 2, which is an e-mail designating you   09:24
11  to testify on certain topics. Uhm, do you understand that
12  you've been designated by Apple to testify on behalf of
13  Apple with respect to topics 30, 31, 33, 34, and 36?
14        MR. SOUTO:  Subject to Apple's objections.
15        THE WITNESS:  Yes.                                  09:25
16        MR. STRETCH:  Q.  Okay. Now, uhm, so that
17  we're all on the same page here, each of these topics asks
18  about Apple accused products. Uhm, if you could turn to
19  page 6 of this document, and it's paragraph 28, and by
20  this document, I mean Exhibit 1. You'll see that          09:25
21  paragraph 28 provides a definition of Apple accused
22  products. And you'll see down at the very bottom of that
23  paragraph it identifies a number of Apple products. Are
24  you prepared to testify with respect to the topics we've
25  identified about each of these products that are          09:26

## Page 9

1  identified here?                                           09:26
2        MR. SOUTO:  Subject to Apple's objections and
3  your infringement contentions which identify the
4  particular products for these patents.
5        THE WITNESS:  Yes.                                  09:27
6        MR. STRETCH:  Q.  Okay. What, if anything,
7  did you do to prepare to testify here today?
8        A.  I met with counsel.
9        Q.  Okay. Approximately how long did you meet with
10  counsel?                                                  09:27
11        A.  Approximately one day.
12        Q.  Okay. Aside from that one day, did you do
13  anything else to prepare to testify, and by that I mean,
14  did you call anybody? Did you e-mail anybody? Review any
15  documents or anything else other than meeting with        09:27
16  counsel?
17        A.  To prepare for this deposition, I met with
18  counsel.
19        Q.  Okay. That's it?
20        A.  Uhm, I phoned one person on my team.            09:28
21        Q.  Okay.
22        A.  To get some clarification.
23        Q.  Okay. And who did you phone, and what did you
24  seek clarification about?
25        A.  I phoned Daniel Gobera to clarify some aspects  09:28

Highly Confidential - Attorneys' Eyes Only

---

Page 10

1  of how our code works.                                09:28
2      MR. SOUTO:  Do you want to spell that last name.
3      THE WITNESS:  First name is Daniel, D-a-n-i-e-l,
4  last name Gobera, G-o-b-e-r-a.
5      MR. STRETCH:  Q.  And what aspects of -- I    09:28
6  assume you're talking about the iOS code?
7      A.  Yes.
8      Q.  And what aspects of that code did Mr. Gobera
9  clarify for you?
10     A.  He clarified aspects of the photos application.  09:29
11     Q.  Okay.  Any particular feature of the photos
12 application?
13     A.  Displaying images.
14     Q.  Okay.  Aside from your phone call with
15 Mr. Gobera, did you talk with anybody else or do anything  09:29
16 else aside from meeting with counsel?
17     A.  I spoke to another person on my team.
18     Q.  Who is that?
19     A.  Karl Hsu, K-a-r-l, last name Hsu, H-s-u.
20     Q.  And who is Mr. Hsu?                        09:29
21     A.  He is also a member of my team.
22     Q.  And what did you speak with Mr. Hsu about?
23     A.  I spoke to him about saving images.
24     Q.  Okay.  Did that include the code that is used to
25 save images?                                         09:30

---

Page 11

1      A.  We talked about the process of saving images.  09:30
2      Q.  Okay.  And does that process include the use of
3  iOS code?
4      A.  Yes.
5      Q.  So aside from speaking with Mr. Gobera and    09:30
6  Mr. Hsu, did you do anything else -- and aside from
7  meeting with counsel?
8      A.  I spoke to Ashley Clark.
9      Q.  And who is Ashley Clark?
10     A.  Ashley Clark is another iOS engineer,         09:30
11 A-s-h-l-e-y, last name Clark, C-l-a-r-k.
12     Q.  And what did you speak with Ms. Clark about?
13     A.  Ashley is a male.
14     Q.  Oh, my bad.
15     A.  I spoke to him about how mail works.          09:31
16     Q.  Are all three of the people you've identified --
17 is it Mr. Hsu?
18     A.  Yes.
19     Q.  And Mr. Gobera?
20     A.  Yes.                                          09:31
21     Q.  And Mr. Clark, are they all software engineers?
22     A.  I believe so.
23     Q.  Okay.  Are they all part of your team?
24     A.  No.
25     Q.  Mr. Hsu and Mr. Gobera are?                   09:31

---

Page 12

1      A.  Mr. Hsu and Mr. Gobera are on my team.       09:31
2      Q.  Okay.  And what team is that?
3      A.  The photos and camera application team.
4      Q.  And do you lead that team?
5      A.  Can you please define lead?                  09:32
6      Q.  Are you the head of the team.
7      A.  No.
8      Q.  Okay.  Who is?
9      A.  The manager.
10     Q.  And who is the manager?                      09:32
11     A.  Manager is currently Justin Titi, Justin,
12 J-u-s-t-i-n, last name Titi, T-i-t-i.
13     Q.  And do you report directly to him?
14     A.  I report directly to Justin.
15     Q.  And how many people report to you?           09:32
16     A.  Zero people report to me.
17     Q.  Okay.  So Mr. Hsu and Mr. Gobera are part of
18 your team, uhm, in the way that you're part of the team?
19     A.  Yes.
20     Q.  Okay.  And what team is Ashley Clark a part of?  09:33
21     A.  Ashley works on the mail.
22     Q.  And do you know who a manager for that team is?
23     A.  Yes.
24     Q.  Who is that?
25     A.  The manager is Cristobal Baray.  I believe it's  09:33

---

Page 13

1  spelled C-r-i-s-t-o-b-a-l, last name Baray, B-a-r-a-y.  09:33
2  I'm not positive about that spelling.
3      Q.  Okay.  Uhm, so other than the three people
4  you've identified and meeting with counsel, is there
5  anything else that you do to prepare to testify here    09:34
6  today?
7      A.  I looked at source code.
8      Q.  Okay.  Which -- what source code did you look
9  at?
10     A.  I looked at source code for the photos and     09:34
11 camera application.
12     Q.  Okay.  Is that source code stored on the A4 or
13 A5 chip as the case may be?
14     A.  I don't understand the question.
15     Q.  The -- okay.  It was a bad question.  The code  09:34
16 that is compiled from the source code for the photos and
17 cameras app., is that stored on the A4 or A5 controller
18 chip?
19     A.  I still don't think I understand the question.
20     Q.  Okay.  What don't you understand about it?     09:35
21     A.  I'm not sure it makes sense to me.
22     Q.  Okay.  So the iOS source code is compiled at
23 some point into executable code; is that right?
24     A.  Yes.
25     Q.  Okay.  And the executable code is included in   09:35

---

# EXHIBIT 20
# FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF ILLINOIS

 3

 4    APPLE INC. and NeXT SOFTWARE,

      INC. (f/k/a NeXT COMPUTER,

 5    INC.),

 6                 Plaintiffs,      No. 1:11-CV-08540

 7            vs.

 8    MOTOROLA, INC. and MOTOROLA

      MOBILITY, INC.,

 9

                  Defendants.

10

11    _____

12

13                    CONFIDENTIAL

14        VIDEOTAPED DEPOSITION OF MICHAEL MATAS

15              Palo Alto, California

16           Wednesday, February 15, 2012

17                    Volume I

18

19

20

21

22    Reported by:

      PUA McVAY

23    CSR No. 12868

24    JOB No. 134278A

25    PAGES 1 - 159


                                        Page 1
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

Highly Confidential - Attorneys' Eyes Only                          APLNDC0003110622

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3

4     APPLE INC. and NeXT SOFTWARE,

      INC. (f/k/a NeXT COMPUTER,

5     INC.),

6               Plaintiffs,      No. 1:11-CV-08540

7          vs.

8     MOTOROLA, INC. and MOTOROLA

      MOBILITY, INC.,

9

               Defendants.

10

11

   _____

12

13

14       Videotaped Confidential Deposition of

15     MICHAEL MATAS, Volume I, taken on behalf of

16     Defendant, at 3175 Hanover Street, Palo Alto,

17     California, beginning at 9:54 a.m. and ending

18     at 3:16 p.m. on Wednesday, February 15, 2012,

19     before PUA McVAY, Certified Shorthand

20     Reporter No. 12868.

21

22

23

24

25

                                        Page 2

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003110623

Confidential

```
 1    APPEARANCES:

 2

 3    FOR PLAINTIFF APPLE INCORPORATED:

 4          WEIL GOTSHAL & MANGES LLP

 5          BY:  KEVIN KUDLAC

 6          Attorney at Law

 7          Suite 1600, 700 Louisiana

 8          Houston, Texas  77002

 9          713.546.5020

10          kevin.kudlac@weil.com

11

12    FOR DEPONENT:

13          COOLEY GODWARD KRONISH LLP

14          BY:  REUBEN H. CHEN

15          Attorney at Law

16          3175 Hanover Street

17          Palo Alto, California  94304

18          650.843.5480

19          rchen@cooley.com

20

21

22

23

24

25

                                   Page 3
```

Highly Confidential - Attorneys' Eyes Only

APLNDC0003110624

Confidential

```
 1   APPEARANCES: (Continued)

 2

 3   FOR DEFENDANT MOTOROLA INCORPORATED:

 4        QUINN EMANUEL URQUHART & SULLIVAN LLP

 5        BY:  CHERYL A. BERRY

 6        Attorney at Law

 7        5th Floor, 555 Twin Dolphin Drive

 8        Redwood Shores, California  94065

 9        650.801.5000

10        cherylberry@quinnemanuel.com

11

12        QUINN EMANUEL URQUHART & SULLIVAN LLP

13        BY:  JAMES D. JUDAH

14        Attorney at Law

15        22nd Floor,  50 California Street

16        San Francisco, California  94111

17        415.875.6600

18        jamesjudah@quinnemanuel.com

19

20

21

22

23

24

25

                                        Page 4
```

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003110625

Confidential

```
 1    APPEARANCES: (Continued)

 2

 3    FOR APPLE INCORPORATED:

 4          MORRISON FOERSTER

 5          BY:  ERIC S. WALTERS

 6          Attorney at Law

 7          755 Page Mill Road

 8          Palo Alto, California  94304

 9          650.813.5865

10          ewalters@MOFO.com

11

12    Also Present:

13          SIBRINA KHAN, Quinn Emanuel

14    Videographer:

15          Ray Tyler, VERITEXT

16

17

18

19

20

21

22

23

24

25
```

Page 5

Sarnoff, A VERITEXT COMPANY
877-955-3855

Highly Confidential - Attorneys' Eyes Only                                                                 APLNDC0003110626

Confidential

```
1                    INDEX
2   WITNESS                         EXAMINATION
3   MICHAEL MATAS
    Volume I
4
5
                       BY MS. BERRY              9
6
                       BY MR. KUDLAC            156
7
8
9
10          INSTRUCTION NOT TO ANSWER
11               PAGE         LINE
12               73           17
13               74           12
14               74           19
15               75            1
16               76            9
17
18                 EXHIBITS
19  NUMBER                             PAGE
20  Exhibit 1    Notice of Subpoena to Testify    12
21               at a Deposition to Michael
22               Matas
23
24  Exhibit 2    Subpoena to Testify at a         13
25               Deposition in a Civil Action
```

                                    Page 6

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003110627

Confidential

1   INDEX (Continued)

2                          EXHIBITS

3   NUMBER                                              PAGE

4   Exhibit 3      Subpoena Duces Tecum and Ad          14

5                  Testificandum In the Matter

6                  of Certain Electronic Digital

7                  Media Devices and Components

8                  Thereof

9

10  Exhibit 4      U.S. Patent 7,479,949               21

11

12  Exhibit 5      U.S. Patent 7,479,949;              22

13                 APL-ITC796-0000000001

14

15  Exhibit 6      2-12-2007 e-mail;                   38

16                 WI-Apple1762472

17

18

19

20

21

22

23

24

25

                                            Page 7

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003110628

```
 1     Palo Alto, California, Wednesday, February 15, 2012

 2                     9:54 a.m.

 3                                                 09:53:47

 4          THE VIDEOGRAPHER:  Good morning.  We're on  09:53:47

 5     the record at 9:54 a.m.  Today's date is       09:54:08

 6     February 15, 2012.  This is a video recording of  09:54:13

 7     Michael Matas.                                  09:54:17

 8          My name is Ray Tyler here with court       09:54:18

 9     reporter Pua McVay.  We're here from Sarnoff a   09:54:21

10     Veritext company at the request of counsel for   09:54:24

11     defendant.  This deposition is being held at Cooley  09:54:28

12     in Palo Alto, California.  The caption of the case  09:54:30

13     is Apple Incorporated, et al. vs. Motorola       09:54:34

14     Incorporated, et al.   The case number is       09:54:40

15     1:11-CV-08540.                                   09:54:42

16          Please note that audio and video recording  09:54:45

17     will take place unless all parties agree to go off  09:54:45

18     the record.  Microphones are sensitive and may pick  09:54:45

19     up whispers, private conversations and phone     09:54:45

20     interference.                                    09:54:52

21          At this time will counsel and all present   09:54:52

22     please identify themselves for the record.       09:54:56

23          MS. BERRY:  Cheryl Berry from Quinn         09:54:58

24     Emanuel on behalf of Motorola.                   09:55:00

25          MS. KHAN:  Sibrina Khan, paralegal from     09:55:03
```

                                                    Page 8

Highly Confidential - Attorneys' Eyes Only                          APLNDC0003110629

```
1    Quinn Emanuel.                                    09:55:06

2            MR. JUDAH:   James Judah, Quinn Emanuel on   09:55:08

3    behalf of Samsung.                                09:55:11

4            MR. CHEN:   Reuben Chen representing       09:55:13

5    Mr. Mike Matas.                                   09:55:16

6            MR. KUDLAC:   Kevin Kudlac from Weil,      09:55:18

7    Gotshal & Manges on behalf of Apple Inc. in the   09:55:21

8    Motorola case.                                    09:55:24

9            MR. WALTERS:   Eric Walters of Morrison &  09:55:25

10   Foerster on behalf of Apple Inc. in the Samsung ITC 09:55:29

11   proceeding.                                       09:55:31

12           THE VIDEOGRAPHER:   Thank you.   The witness 09:55:31

13   can be sworn in and we will proceed.              

14

15                   MICHAEL MATAS,

16   having been administered an oath, was examined and

17   testified as follows:

18

19                   EXAMINATION                        09:55:43

20   BY MS. BERRY:                                     09:55:43

21       Q    I would like to start by saying that at  09:55:45

22   the request of the witness to efficiently complete 09:55:47

23   this deposition this deposition will be taken for  09:55:51

24   use in two different cases.   The first case is the 09:55:54

25   Apple vs. Motorola case in the Northern District of 09:55:56
```

                                                    Page 9

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003110630

| | | |
|---|---|---|
| 1 | and Henri would give demos to Steve Jobs. | 11:16:58 |
| 2 | BY MS. BERRY: | 11:17:08 |
| 3 | Q    Who's Henri? | 11:17:09 |
| 4 | A    I believe he was the manager of the | 11:17:12 |
| 5 | engineering team. | 11:17:13 |
| 6 | Q    Would they all give presentations | 11:17:15 |
| 7 | together? | 11:17:17 |
| 8 | A    Yes. | 11:17:17 |
| 9 | MR. CHEN:  I'll just enter an objection | 11:17:19 |
| 10 | that calls for speculation, but... | 11:17:21 |
| 11 | BY MS. BERRY: | 11:17:25 |
| 12 | Q    Do you know -- | 11:17:25 |
| 13 | A    The meetings would be together.  I don't | 11:17:25 |
| 14 | know exactly what was shown and how in the | 11:17:29 |
| 15 | meetings. | 11:17:31 |
| 16 | Q    Do you know approximately how frequently | 11:17:31 |
| 17 | they would give presentations to Steve Jobs? | 11:17:35 |
| 18 | A    Approximately once a week, that group. | 11:17:37 |
| 19 | Q    Did Steve Jobs typically give feedback on | 11:17:42 |
| 20 | the presentations that they showed him? | 11:17:48 |
| 21 | MR. KUDLAC:  Object. | 11:17:50 |
| 22 | MR. CHEN:  Objection.  Calls for | 11:17:52 |
| 23 | speculation. | 11:17:53 |
| 24 | But you can answer. | 11:17:53 |
| 25 | MR. KUDLAC:  Same objection. | 11:17:55 |

Page 67

Highly Confidential - Attorneys' Eyes Only

APLNDC0003110688

```
 1              THE WITNESS:  I wasn't in the meetings but    11:17:56

 2    I was relayed lots of feedback from him.               11:17:58

 3    BY MS. BERRY:                                          11:18:01

 4        Q    So these four or so individuals who would     11:18:02

 5    give the presentations would gather feedback and       11:18:06

 6    then pass it all on to your team?                      11:18:09

 7        A    Correct.                                      11:18:11

 8        Q    You mentioned that you worked on the          11:18:11

 9    Photos application; is that correct?                   11:18:20

10        A    Correct.                                      11:18:21

11        Q    Do you remember specifically any feedback     11:18:21

12    that Steve Jobs gave on the Photos application?        11:18:23

13              MR. KUDLAC:  Objection.  Lacks foundation.   11:18:27

14              THE WITNESS:  Nothing specific pops in my    11:18:30

15    head but there was lots of feedback given.             11:18:37

16    BY MS. BERRY:                                          11:18:42

17        Q    Nothing that you remember sitting here        11:18:43

18    today?                                                 11:18:44

19        A    I can just pull a random piece of             11:18:44

20    feedback.  Is that what you're looking for?            11:18:52

21        Q    Sure.                                         11:18:54

22        A    He didn't -- we decided not to have any       11:18:57

23    sort of indication on screen over the photo that       11:19:01

24    you should swipe to go between photos.                 11:19:05

25        Q    What do you mean by an indication?            11:19:09
```

Page 68

Highly Confidential - Attorneys' Eyes Only                                      APLNDC0003110689

```
 1       A    Some sort of animation or arrow or hit      11:19:13
 2   target over the photo to show you to swipe.          11:19:22
 3       Q    Did you originally have some sort of        11:19:25
 4   indication in the application?                       11:19:28
 5       A    We designed prototypes but it wasn't in     11:19:30
 6   the application.                                     11:19:36
 7       Q    In the prototype did you have indications   11:19:37
 8   to the user that they should swipe?                  11:19:41
 9       A    Yes.                                         11:19:43
10       Q    And what did those look like?                11:19:44
11       A    I don't remember.  Some sort of arrows.      11:19:46
12       Q    Was it an arrow that the user would swipe    11:19:51
13   along the entire arrow in order to make the          11:19:56
14   movement?                                            11:19:59
15            MR. KUDLAC:  Objection.  Lacks foundation.   11:20:00
16            THE WITNESS:  I don't remember.  We had      11:20:02
17   lots of different prototypes.                        11:20:04
18   BY MS. BERRY:                                        11:20:06
19       Q    Did you have any prototypes that did not     11:20:07
20   involve swiping in order for the user to get to the  11:20:09
21   next photo?                                          11:20:12
22            MR. CHEN:  Objection.                        11:20:19
23            THE WITNESS:  All of them.                   11:20:20
24            MR. CHEN:  Calls for speculation.            11:20:21
25            You can answer.                              11:20:22
```

Page 69

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003110690

Confidential

| | | |
|---|---|---|
| 1 | THE WITNESS:  All of them also included | 11:20:23 |
| 2 | arrows along the bottom to tap to go between photos | 11:20:24 |
| 3 | in addition to swiping. | 11:20:28 |
| 4 | BY MS. BERRY: | 11:20:29 |
| 5 | Q    Do you mean, for example, an arrow | 11:20:29 |
| 6 | pointing right that you would tap if you wanted to | 11:20:32 |
| 7 | go to the right? | 11:20:34 |
| 8 | A    Correct. | 11:20:35 |
| 9 | Q    Did you end up using those tap arrows? | 11:20:35 |
| 10 | A    Yes. | 11:20:39 |
| 11 | Q    To go back briefly to our discussion | 11:20:39 |
| 12 | earlier about heuristics, as you sit here today, | 11:21:01 |
| 13 | heuristics does not mean anything to you? | 11:21:07 |
| 14 | A    No. | 11:21:09 |
| 15 | Q    If I were to ask you if you worked on any | 11:21:10 |
| 16 | heuristics on the iPhone would you be able to think | 11:21:20 |
| 17 | of any? | 11:21:23 |
| 18 | MR. KUDLAC:  Object to the extent it calls | 11:21:23 |
| 19 | for a legal conclusion or expert testimony. | 11:21:25 |
| 20 | MR. CHEN:  I'll join the objection. | 11:21:27 |
| 21 | THE WITNESS:  Yeah, I don't fully | 11:21:28 |
| 22 | understand the legal definition of that. | 11:21:30 |
| 23 | BY MS. BERRY: | 11:21:32 |
| 24 | Q    Do you understand a non-legal definition | 11:21:36 |
| 25 | of heuristics? | 11:21:39 |

Page 70

Highly Confidential - Attorneys' Eyes Only

APLNDC0003110691

```
 1             MR. KUDLAC:  Objection.  Form.        11:21:41

 2             THE WITNESS:  I don't really know what  11:21:42

 3    that word means, no.                          11:21:47

 4    BY MS. BERRY:                                 11:21:48

 5        Q    You mentioned earlier that as a founder of  11:21:55

 6    Push Pop Press you worked on a digital book   11:21:59

 7    project?                                      11:22:01

 8        A    Yes.                                 11:22:02

 9        Q    Can you just describe that product a  11:22:02

10    little bit more?                              11:22:05

11             MR. CHEN:  And I'm just going to object to  11:22:07

12    the extent that it's not relevant to this lawsuit.  11:22:10

13             And that I'll instruct the witness not to  11:22:12

14    reveal any confidential information.          11:22:16

15             THE WITNESS:  What specifically are you  11:22:18

16    interested in finding out?                    11:22:24

17    BY MS. BERRY:                                 11:22:25

18        Q    You told me earlier, I believe, that you  11:22:25

19    presented this book at the 2011 TED conference; is  11:22:28

20    that right?                                   11:22:32

21        A    Correct.                             11:22:32

22        Q    So I imagine at least a lot of things  11:22:32

23    about this book is public?                    11:22:35

24        A    Yes.                                 11:22:36

25        Q    And so I'm interested in that type of  11:22:37
```

Page 71

Highly Confidential - Attorneys' Eyes Only                          APLNDC0003110692

Confidential

| | | |
|---|---|---|
| 1 | it says, "Wherein the one or more heuristics | 01:39:46 |
| 2 | comprised," you could just read that to yourself. | 01:39:50 |
| 3 |     A    Okay.  Okay. | 01:39:53 |
| 4 |     Q    Now right after where in the one or more | 01:40:38 |
| 5 | heuristics comprised there's a section that talks | 01:40:44 |
| 6 | about a vertical screen scrolling heuristics.  Do | 01:40:47 |
| 7 | you see that? | 01:40:51 |
| 8 |     A    Yes. | 01:40:52 |
| 9 |     Q    Could you please just read that section to | 01:40:52 |
| 10 | yourself? | 01:40:55 |
| 11 |     A    Yeah, I just did. | 01:40:55 |
| 12 |     Q    You did.  Do you understand what vertical | 01:40:56 |
| 13 | scrolling means? | 01:40:59 |
| 14 |         MR. KUDLAC:  Objection to the extent it | 01:41:00 |
| 15 | calls for a legal conclusion or expert testimony | 01:41:02 |
| 16 | and foundation. | 01:41:03 |
| 17 |         MR. CHEN:  I'll join that objection. | 01:41:04 |
| 18 |         THE WITNESS:  I believe I understand what | 01:41:05 |
| 19 | it means, yes. | 01:41:08 |
| 20 | BY MS. BERRY: | 01:41:09 |
| 21 |     Q    What does it mean to you? | 01:41:09 |
| 22 |         MR. KUDLAC:  Objection, again, to the | 01:41:11 |
| 23 | extent it calls for a legal conclusion, expert | 01:41:13 |
| 24 | testimony. | 01:41:15 |
| 25 |         MR. CHEN:  I'll join that objection. | 01:41:15 |

Page 99

Highly Confidential - Attorneys' Eyes Only

APLNDC0003110720

Confidential

| | | |
|---|---|---|
| 1 | THE WITNESS:  To move something on the | 01:41:17 |
| 2 | screen up and down. | 01:41:20 |
| 3 | BY MS. BERRY: | 01:41:23 |
| 4 | Q    Do you think any iPhone applications use | 01:41:24 |
| 5 | vertical scrolling? | 01:41:27 |
| 6 | MR. KUDLAC:  Objection to the extent it | 01:41:28 |
| 7 | calls for a legal conclusion or expert testimony | 01:41:30 |
| 8 | and lack of foundation. | 01:41:33 |
| 9 | MR. CHEN:  I'll join that objection. | 01:41:34 |
| 10 | THE WITNESS:  Yes, I do. | 01:41:35 |
| 11 | BY MS. BERRY: | 01:41:37 |
| 12 | Q    Which ones? | 01:41:38 |
| 13 | MR. KUDLAC:  Same objections. | 01:41:39 |
| 14 | THE WITNESS:  Lots of screens scroll up | 01:41:41 |
| 15 | and down. | 01:41:45 |
| 16 | BY MS. BERRY: | 01:41:46 |
| 17 | Q    Can you think of some examples of | 01:41:46 |
| 18 | applications that use this? | 01:41:49 |
| 19 | MR. KUDLAC:  Again, object to the extent | 01:41:50 |
| 20 | it calls for a legal conclusion or expert | 01:41:52 |
| 21 | testimony. | 01:41:55 |
| 22 | MR. CHEN:  I'll join that objection. | 01:41:55 |
| 23 | THE WITNESS:  Address Book is one example. | 01:41:56 |
| 24 | BY MS. BERRY: | 01:42:00 |
| 25 | Q    What about the Web browser? | 01:42:00 |

Page 100

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003110721

Confidential

```
 1              MR. KUDLAC:  Same objections and vague.      01:42:03

 2              THE WITNESS:  Yeah, you can scroll           01:42:07

 3    vertically or horizontally in the Web browser.        01:42:10

 4    BY MS. BERRY:                                          01:42:17

 5         Q    What about the Photos application?           01:42:17

 6              MR. KUDLAC:  Same objections and vague.      01:42:22

 7              THE WITNESS:  There's vertical scrolling     01:42:24

 8    in the Album view.                                     01:42:28

 9    BY MS. BERRY:                                          01:42:31

10         Q    Album view.  Is there vertical scrolling    01:42:32

11    in the Calendar application?                           01:42:36

12              MR. KUDLAC:  Object to the extent it calls   01:42:37

13    for a legal conclusion or expert testimony and         01:42:39

14    vague.                                                 01:42:41

15              THE WITNESS:  Yes.                           01:42:42

16    BY MS. BERRY:                                          01:42:43

17         Q    Do any of the applications that you worked   01:42:49

18    on use vertical scrolling?                             01:42:50

19              MR. KUDLAC:  Same objections.                01:42:52

20              THE WITNESS:  I worked on the photos         01:42:53

21    product and, yeah.                                     01:42:56

22    BY MS. BERRY:                                          01:42:57

23         Q    Any others?                                  01:42:57

24              MR. KUDLAC:  Same objections.                01:43:01

25              THE WITNESS:  I believe every application    01:43:02
```

                                                       Page 101

Highly Confidential - Attorneys' Eyes Only                                    APLNDC0003110722

```
 1    that I significantly contributed to has vertical      01:43:05

 2    scrolling.                                            01:43:17

 3    BY MS. BERRY:                                         01:43:17

 4        Q    You testified before that that included     01:43:17

 5    Maps, Settings, Camera and Photos; is that right?    01:43:19

 6        A    Correct.                                     01:43:23

 7        Q    Are there others?                            01:43:23

 8        A    Other apps that have scrolling.              01:43:24

 9        Q    That you contributed to?                     01:43:28

10        A    I contributed to most of the apps on the     01:43:31

11    iPhone.                                               01:43:34

12        Q    Before when you said that you had worked     01:43:35

13    on Photos, Maps, Settings and Camera, was there a    01:43:37

14    reason why you chose those four to mention?           01:43:42

15        A    Because those are the ones that I was in     01:43:44

16    charge of designing or the lead designer on.          01:43:47

17        Q    I see.                                        01:43:49

18        A    But I have contributed to lots of other     01:43:50

19    ones.                                                 01:43:52

20        Q    I see.  Did you develop vertical scrolling  01:43:52

21    for any of those applications?                        01:43:58

22             MR. KUDLAC:  Objection to the form of the   01:43:59

23    question and to the extent it calls for a legal       01:44:02

24    conclusion or expert testimony.                       01:44:05

25             MR. CHEN:  I'll join that objection.        01:44:06
```

Page 102

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003110723

| | | |
|---|---|---|
| 1 | THE WITNESS:  No, I did not. | 01:44:08 |
| 2 | BY MS. BERRY: | 01:44:09 |
| 3 | Q    Whose idea was it? | 01:44:10 |
| 4 | MR. KUDLAC:  Object to the extent it calls | 01:44:11 |
| 5 | for a legal conclusion or expert testimony, vague | 01:44:13 |
| 6 | and lack of foundation. | 01:44:15 |
| 7 | THE WITNESS:  Who invented vertical | 01:44:17 |
| 8 | scrolling or? | 01:44:20 |
| 9 | BY MS. BERRY: | 01:44:22 |
| 10 | Q    Yes. | 01:44:22 |
| 11 | MR. KUDLAC:  Same objections. | 01:44:23 |
| 12 | THE WITNESS:  I'm not sure. | 01:44:26 |
| 13 | BY MS. BERRY: | 01:44:29 |
| 14 | Q    Do you know who worked on the code for | 01:44:29 |
| 15 | vertical scrolling? | 01:44:32 |
| 16 | MR. KUDLAC:  Objection.  Lack of | 01:44:33 |
| 17 | foundation.  Calls for speculation.  And to the | 01:44:36 |
| 18 | extent it calls for a legal conclusion or expert | 01:44:39 |
| 19 | testimony. | 01:44:41 |
| 20 | THE WITNESS:  I do not. | 01:44:42 |
| 21 | BY MS. BERRY: | 01:44:42 |
| 22 | Q    Is that true among all applications, do | 01:44:43 |
| 23 | you know who coded for vertical scrolling in any | 01:44:46 |
| 24 | single application? | 01:44:49 |
| 25 | MR. KUDLAC:  Same objections. | 01:44:50 |

Page 103

Highly Confidential - Attorneys' Eyes Only                    APLNDC0003110724

# EXHIBIT 21
# FILED UNDER SEAL

# In The Matter Of:

*MICROELECTRONICS v.*
*APPLE*

---

*KRISTI BAUERLY*
*August 23, 2011*

---

*GROSSMAN & COTTER*

*117 S CALIFORNIA AVE, SUITE D201*

*PALO ALTO, CA 94306*

*650.324.1181*

*www.gandc.com*



Original File BAUEKR082311WO.TXT

Min-U-Script® with Word Index

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000240225

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ELAN MICROELECTRONICS
CORPORATION,

                    Plaintiff,

    -vs-                          No. C-09-01531
                                  RS (PVT)

APPLE, INC.,

                    Defendant.
                              /

DEPOSITION OF KRISTI BAUERLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PAGES 1 to 82

TUESDAY, AUGUST 23, 2011

Reported by:  LOUISE MARIE SOUSOURES, CSR NO. 3575

Certified LiveNote Reporter

APLNDC-Y0000240226

```
                                                              2

1                    A P P E A R A N C E S

2

3    FOR ELAN MICROSYSTEMS:

4          ALSTON & BIRD

5          BY: SEAN DeBRUINE,

6              ATTORNEY AT LAW

7          275 MIDDLEFIELD ROAD, STE. 150

8          MENLO PARK, CA   94025

9          650.838.2000

10         sean.debruine@alston.com

11

12   FOR APPLE, INC.:

13         WEIL, GOTSHAL & MANGES LLP

14         BY:  DEREK C. WALTER,

15             ATTORNEY AT LAW

16         201 REDWOOD SHORES PARKWAY

17         REDWOOD SHORES,  CA   94065

18         650.802.3000

19         derek.walter@weil.com

20

21   THE VIDEOGRAPHER:

22         CYRUS PRODUCTIONS, GARY BREWER

23

24   ALSO PRESENT:

25         CINDY WHEELER, APPLE CORPORATION
```

**Highly Confidential - Attorneys' Eyes Only**

3

1                             I N D E X

2

3   EXAMINATION BY:                           PAGE

4   MR. DeBRUINE                                 6

5

6

7   EXHIBITS:                                  PAGE

8   1    Plaintiff Elan Microelectronics         24

9        Corporation's notice of deposition

10       pursuant to Federal Rule of Civil

11       Procedure 30(b)(6) to defendant

12       Apple, Inc.

13  2    Document production Nos. APEL 2842147    40

14       to 153

15  3    Document production No. APEL 2842118     44

16  4    Document production No. APEL 0398914     45

17  5    Document production Nos. APEL 1264737    48

18       to 738

19  6    Document production Nos. APEL 1245351    52

20       to 353

21  7    Document production Nos. APEL 1741721    54

22       to 722

23  8    Document production Nos. APEL 2562214    55

24       to 217

25

4

1                    INDEX OF EXHIBITS (CONTINUED)

2

3     EXHIBIT                                              PAGE

4     9     Document production Nos. APEL 2478502       57

5           to 512

6     10    Document production No. APEL 2157946        60

7     11    Document production Nos. APEL 0398103       62

8           to 105

9     12    Document production Nos. APEL 1956595       66

10          to 633

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Highly Confidential - Attorneys' Eyes Only**                    **APLNDC-Y0000240229**

5

1        BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition, commencing at the hour of 10:02

3   a.m. thereof, at 275 Middlefield Road, Menlo Park,

4   California, before me, LOUISE MARIE SOUSOURES, a

5   Certified Shorthand Reporter, the following

6   proceedings were had:

7                        PROCEEDINGS

8        THE VIDEOGRAPHER:  Good morning, we are

9   going on the record.  Here marks the beginning of

10  videotape number 1 in the deposition of Kristi

11  Bauerly in the matter of Elan Microelectronics versus

12  Apple, Inc., in the United States District Court,

13  Northern District of California, San Jose Division,

14  case C09-01531 RS (PVT).

15        Today's date is August 23rd, 2011 and the

16  time is 10:02 a.m.

17        My name is Gary Brewer of Cyrus Productions,

18  2827 55th Avenue, Oakland, California, telephone

19  number 510-326-9332.

20        The court reporter is Louise Sousoures of

21  Grossman & Cotter.

22        Would counsel please identify themselves and

23  state whom they represent.

24        MR. DeBRUINE:  This is Sean DeBruine of

25  Alston & Bird, I represent the plaintiff Elan

1    Microelectronics.

2            MR. WALTER:  Derek Walter, Weil, Gotshal &

3    Manges, for the defendant Apple and here with me from

4    Apple legal is Cindy Wheeler.

5            THE VIDEOGRAPHER:  If there are no

6    stipulations, the court reporter may administer the

7    oath.

8                        --oOo--

9                    KRISTI BAUERLY,

10            having been first duly sworn by the

11            Certified Shorthand Reporter to tell

12            the truth, the whole truth, and nothing

13            but the truth, testified as follows:

14                EXAMINATION BY MR. DeBRUINE:

15    Q.  Good morning, Ms. Bauerly.

16    A.  Good morning.

17    Q.  Could you please state your full name for

18  the record?

19    A.  Kristi Elaine Schmidt Bauerly.

20    Q.  It's a full name.

21        Ms. Bauerly, are you currently employed?

22    A.  I am, yes.

23    Q.  By whom?

24    A.  Apple.

25    Q.  And what is your position at Apple?

60

1      A.  I believe so, yes.  At a minimum that was my

2  intent.

3      Q.  And using some subset of the group of people

4  referred to beginning at page 504, did you, in fact,

5  test the gestures --

6          MR. WALTER:  Objection.

7  BY MR. DeBRUINE:

8      Q.  -- that are listed here?

9          MR. WALTER:  Objection, vague.

10          THE WITNESS:  Again, I believe so, yes,

11  although this document is a planning document rather

12  than a summary document.

13          (Exhibit No. 10 was marked.)

14  BY MR. DeBRUINE:

15      Q.  Exhibit 10 bears production numbers 2157946,

16  appears to be two side-by-side copies of something

17  called M97 user study 7-24-08.

18          Can you tell me what Exhibit 10 is?

19      A.  Exhibit 10 is another example of a user

20  study form that I would create for myself to take

21  notes while observing a user interacting with our

22  devices.

23      Q.  Okay.  And there's a reference there to M97.

24          Did we establish that was the diving

25  board --

61

1        A.   Yes, that's correct.

2        Q.   Did you, in fact, observe users performing

3    these steps using the M97 diving board trackpad?

4             MR. WALTER:   Objection, vague and ambiguous.

5             THE WITNESS:   Yes, I believe so.

6    BY MR. DeBRUINE:

7        Q.   Okay.   And those gestures include the scroll

8    up and down using two fingers?

9        A.   Yes.

10       Q.   And swiping through photos, that's a

11   three-finger gesture, correct?

12       A.   Yes.

13       Q.   Zoom in and out is a two-finger gesture,

14   correct?

15       A.   Yes.

16       Q.   And rotate around, CW and CCW, clockwise and

17   counterclockwise?

18       A.   That's correct.

19       Q.   That's also a two-finger gesture, correct?

20       A.   Yes.

21            MR. DeBRUINE:   I think we are about to run

22   out of tape, so why don't we take a break and let him

23   switch that.   And let me take a look at what I've got

24   real quickly and decide whether, you know, I think we

25   can wrap up or whether it makes sense to take a break

62

1   for lunch here.

2          MR. WALTER:  All right.

3          THE VIDEOGRAPHER:  Going off the record, the

4   time -- I'm sorry.

5          MR. DeBRUINE:  We are kind of on the cusp of

6   lunch time.

7          THE VIDEOGRAPHER:  Off the record, the time

8   is 11:52 a.m., here marks the end of videotape number

9   1 volume 1 in the deposition of Kristi Bauerly.

10          (Recess taken.)

11          THE VIDEOGRAPHER:  We are back on the

12   record, the time is 12:04 p.m., here marks the

13   beginning of videotape number 2, volume 1 in the

14   deposition of Kristi Bauerly.

15          (Exhibit No. 11 was marked.)

16   BY MR. DeBRUINE:

17      Q.  Ms. Bauerly, you've been handed now a

18   document marked as Exhibit 11, bearing production

19   numbers 398103 to 105.

20          Do you see that?

21      A.  Yes.

22      Q.  And if you will turn to the last page, 105,

23   there's an e-mail there from Manjiri Yeravadekar, if

24   I'm in the ballpark?

25      A.  I'm not entirely sure myself, but yes, her

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 22
# FILED UNDER SEAL

# In The Matter Of:

*MICROELECTRONICS v.*
*APPLE*

---

*ERIC JUE*
*September 9, 2011*

---

*GROSSMAN & COTTER*

*117 S CALIFORNIA AVE, SUITE D201*

*PALO ALTO, CA 94306*

*650.324.1181*

*www.gandc.com*



Original File JUEERI090911WO.TXT

*Min-U-Script® with Word Index*

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


ELAN MICROELECTRONICS
CORPORATION,

        Plaintiff,

vs.                              CASE NO. C-09-01531
                                      RS (PVT)
APPLE INC.,

        Defendant.
                          /


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED 30(B)(6) DEPOSITION OF ERIC JUE

Friday, September 9, 2011

Pages 1 - 125




Reported by:  Shelley M. Sailor, CSR #10254

Highly Confidential - Attorneys' Eyes Only

2

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4            ALSTON & BIRD

5            BY:   JANE BU, ESQ.

6            275 Middlefield Road, Suite 150

7            Menlo Park, CA 94025

8            (650) 838-2000

9            jane.bu@alston.com

10  and

11           ALSON & BIRD

12           BY:   RACHEL M. CAPOCCIA, ESQ.

13           333 South Hope Street, 16th Floor

14           Los Angeles, CA 90071

15           (213) 576-1000

16           rachel.capoccia@alston.com

17

18  FOR THE DEFENDANT:

19           WEIL, GOTSHAL & MANGES LLP

20           BY:   SONAL MEHTA, ESQ.

21           201 Redwood Shores Parkway

22           Redwood Shores, CA 94065

23           (650) 802-3000

24           sonal.mehta@weil.com

25  and

Highly Confidential - Attorneys' Eyes Only                              APLNDC-Y0000239676

3

1          A P P E A R A N C E S   (continued)

2

3          APPLE

4          BY:  ERICA TIERNEY, ESQ.

5          1 Infinite Loop, MS 40-PAT

6          Cupertino, CA 95014

7          (408) 974-5332

8          etierney@apple.com

9

10   THE VIDEOGRAPHER:

11          CYRUS PRODUCTIONS

12          BY:  STEVE PATAPOFF

13          2827 55th Avenue

14          Oakland, CA 94605

15          (510) 326-9332

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

4

1                          I N D E X

2   EXAMINATION BY:                               PAGE

3   MS. BU                                         8

4

5

6                        E X H I B I T S

7   EXHIBIT NO.        DESCRIPTION                 PAGE

8    1        Notice of Deposition of Eric Jue       7

9    2        Apple's Objections and Responses       7

10            to Elan's Notice of Deposition

11   3        Apple's Objections and Responses       7

12            to Elan's Third Notice of Deposition

13   4        Introducing iPhone                    17

14            Production Nos. APEL0165319 - 165320

15   5        "iPhone Marketing"                    20

16            Production Nos. APEL0100729 - 100766

17   6        "Macworld Keynote" transcription      30

18            Production Nos. APEL0026420 - 26450

19   7        "Meet iPhone 3G"                      38

20            Production No. APEL0033055

21   8        "iPod touch, The funnest iPod ever"   43

22            Production No. APEL0033665

23   9        "Which iPod are you?"                 47

24            2 pages - no production numbers

25

Highly Confidential - Attorneys' Eyes Only

5

```
 1            E X H I B I T S  (continued)

 2  EXHIBIT NO.       DESCRIPTION                    PAGE

 3  10        "iPad 2 - It's thinner, lighter, and    61

 4            faster than ever"

 5            8 pages - no production numbers

 6  11        "iPad Buyer Survey: Initial US Results" 64

 7            Apple Market Research & Analysis

 8            August 2010

 9            Production Nos. APEL2856125 - 2856191

10  12        Press Release - "Apple Unveils Faster,  74

11            More Affordable PowerBooks" 1/31/05

12            3 pages - no production numbers

13  13        Article - "Apple Portables: Two         81

14            finger trackpad scrolling" 6/9/09

15            3 pages - no production numbers

16  14        Press Release - "Apple Unveils          86

17            Faster iBooks" 7/26/05

18            2 pages - no production numbers

19  15        "Magic Trackpad"                        97

20            6 pages - no production numbers

21  16        "MacBook Pro"                          104

22            Production Nos. APEL0034458 - 34459

23

24

25
```

Highly Confidential - Attorneys' Eyes Only

APLNDC-Y0000239679

```
                                                        6

1               E X H I B I T S  (continued)

2   EXHIBIT NO.        DESCRIPTION                    PAGE

3   17        "Input Device and Gesture Research"    108

4             Apple Market Research & Analysis

5             April 2011

6             Production Nos. APEL2843160 - 2843228

7   18        "Magic Mouse"                           114

8             6 pages - no production numbers

9   19        "Keyboard"                              117

10            4 pages - no production numbers

11  20        Email chain                             122

12            Production No. APEL1153603

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Attorneys' Eyes Only                    APLNDC-Y0000239680

7

1           BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition, and on Friday, September 9,

3    2011 commencing at the hour of 11:13 a.m. thereof at

4    275 Middlefield Road, Suite 150, Menlo Park,

5    California, before me, SHELLEY M. SAILOR, a

6    Certified Shorthand Reporter, there personally

7    appeared

8           (Exhibit Nos. 1 through 3 were marked for

9    identification.)

10          THE VIDEOGRAPHER:  Good morning.  Here

11   marks the beginning of tape number one, Volume I in

12   the deposition of Eric Jue in the matter of Elan

13   Microelectronics versus Apple Inc. in the U.S.

14   District Court, Northern District of San Jose, Case

15   No. C-09-01531 RS.

16          We are located at Alston & Bird, 275

17   Middlefield Road, Suite 150, Menlo Park, California.

18   Today's date is September 9, 2011.  The time is

19   11:14.

20          My name is Steve Patapoff of Cyrus

21   Productions, 2827 55th Avenue, Oakland, California,

22   510-326-9332.  The court reporter is Shelley Sailor

23   of Grossman & Cotter.

24          Would counsel please introduce yourselves

25   for the record.

     APLNDC-Y0000239681

1          MS. BU:  I am Jane Bu on behalf of

2     plaintiff Elan Microelectronics.  Here with me today

3     is my colleague Rachel Capoccia.

4          MS. MEHTA:  Sonal Mehta from Weil Gotshal

5     on behalf of Apple.

6                         ERIC JUE,

7     called as a witness and who, having been by me duly

8     sworn, was thereupon examined and testified as

9     hereinafter set forth.

10                   EXAMINATION BY MS. BU

11        Q.  Welcome back, Mr. Jue.

12        A.  Thank you.

13        Q.  I know you have been deposed before, so I

14    am not going to waste your time going over the basic

15    rules except with one thing, that if at any time you

16    do not understand my question, feel free to ask for

17    clarification or ask me to rephrase.  If you do

18    answer the question, I will assume that you

19    understand my question.  Is that okay?

20        A.  Sure.

21        Q.  I will try not to repeat the questions that

22    we addressed in the ITC case, but sometimes we might

23    have to go into documents that you might have looked

24    at before.  Just to let you know that.

25             So first, are you still the senior product

Highly Confidential - Attorneys' Eyes Only

1      Q.  So how many features would you say an iPad

2  brings to the market -- brings to the consumer?

3          MS. MEHTA:  Objection.  Vague.

4          THE WITNESS:  Yeah, it's --

5  BY MS. BU:

6      Q.  Hundreds of features an iPad can offer to

7  the consumer; would that be an accurate statement?

8          MS. MEHTA:  Objection.  Vague.

9          THE WITNESS:  Maybe.  Probably a hundred.

10  That seems fair.

11  BY MS. BU:

12      Q.  Does the marketing group have input on what

13  the website will look like, what features to

14  advertise on Apple's website?

15      A.  Yes.

16      Q.  So the marketing group is, at least the

17  ones that were making this for iPad, decide that

18  Multi-Touch should be a feature that's included in

19  this list.

20          MS. MEHTA:  Objection.  Vague.

21          THE WITNESS:  Yes, but as I mentioned

22  earlier, Multi-Touch is the name now, is a trademark

23  name that we use to describe our touch display.  The

24  term "Multi-Touch" describes one aspect of our touch

25  display.

**Highly Confidential - Attorneys' Eyes Only**                **APLNDC-Y0000239747**

1  BY MS. BU:

2      Q.  But the iPad still allows you to use more

3  than one fingers, two fingers on a touch input

4  surface.

5      A.  Very similar to iPhone or iPod touch.  Same

6  gesture.  So if you are looking at photos, for

7  example, you sort of swipe with one finger to move

8  between photos.  Or if you are scrolling in a list

9  of songs or e-mails, you scroll one finger up and

10  down.  To launch an application, you double tap on

11  an icon.  Most of the gestures, the tap, the touch,

12  the swipe, the flick, those are all the same.

13      Q.  But also have the same two-finger gestures.

14      A.  Yeah.  It also employs multi-finger, so you

15  can do some of the multi-finger gestures.

16      Q.  Let's look at the next document.

17          (Exhibit No. 12 was marked for

18  identification.)

19  BY MS. BU:

20      Q.  For the record, this is Apple press release

21  downloaded from Apple's website titled "Apple

22  Unveils Faster, More Affordable PowerBooks."

23          So Mr. Jue, does the marketing group at

24  Apple draft press releases for Apple products?

25      A.  So the press releases are generally a

Highly Confidential - Attorneys' Eyes Only          APLNDC-Y0000239748

1  collaboration between our PR department and product

2  marketing.

3      Q.  But the product marketing will have an

4  input as to what features that the press releases

5  should cover.

6      A.  Yes.

7      Q.  Have you seen this particular press release

8  before?

9      A.  I generally read all the press releases, so

10  I probably have read this.  But this is dated

11  January 31st, 2005.  So I probably read it back in

12  2005.

13      Q.  Do you read all of them?

14      A.  I do.  We don't produce that many press

15  releases.

16      Q.  So this document, this press release, like

17  you said, appear to be dated January 31st, 2005.

18  Was that the first time Apple announced the ability

19  to use multiple figures on its PowerBook series of

20  computer products?

21      A.  Yes.  Well, actually -- I believe so.  It's

22  about the right time frame.

23      Q.  Is press release usually released prior to

24  the sales of the products?

25      A.  It can be the same day, or it can be prior.

Highly Confidential - Attorneys' Eyes Only