# Watson Declaration

# EXHIBIT 4

# Filed Under Seal

# APPENDIX A

**Samsung's Responses to Apple's Claims Regarding the Alleged Lack of Email Production By Custodians Included In The Chart In Paragraph 4 Of the Esther Kim Declaration**

| | |
|---|---|
| **Don Joo Lee – Executive Vice President of Global Sales and Marketing for Mobile Communications** | • Apple has not demonstrated that Mr. Lee destroyed any relevant documents with a culpable state of mind.  Mr. Lee received a timely hold notice on May 24, 2011, and declares that he never intentionally deleted any evidence that may have been relevant to this litigation.  (Watson Decl. Ex. 33 at Ex. S, p. 1; Don Joo Lee Decl. ¶ 5.)<br>• The emails Apple cites from other custodians (Mot. at 5) were dated January 12, 2011 and March 8, 2011, before the obligation to preserve documents arose.<br>• Apple has not demonstrated that any of the supposedly destroyed documents would have been relevant.  Mr. Lee is a sales and marketing witness, and was not involved with the design or development strategy of the accused products or features at issue. (Watson Decl., Ex. 12 at 14:15-19, 16:7-15, 17:14-25.)<br>• The supposedly destroyed documents would have been cumulative.  Samsung has produced at least 420 emails where Mr. Lee was either the author or the recipient, and at least an additional 31 documents that refer to him. (Binder Decl. ¶ 19.) |
| **Dong Sub Kim – Principal Engineer in the Samsung Display Lab.** | • There is no evidence that Mr. Kim destroyed evidence with a culpable state of mind.  He was sent a timely litigation hold notice on May 2, 2011.  (Watson Decl. Ex. 33 at Ex. X, p. 3.)<br>• Mr. Kim saved email related to his work and provided his notebook computer during the document collection process. (Watson Decl., Ex. 23 at 42:3-43:14.)  Moreover, while Apple suggests Mr. Kim destroyed documents relevant to Samsung's decision to change from resistive to capacitive touch screens, the decision to change touch screens was made before October 2008 (Watson Decl., Ex. 18 at 18:3-21 and 31:21-32:13.)<br>• Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 124 emails from other custodians that list Mr. Kim as the author or a recipient, and at least an additional 4 documents that refer to him.  (Binder Decl. ¶ 19.)  Apple has deposed, and |

| | |
|---|---|
| | Samsung has produced documents sourced to, at least three other witnesses who work with Mr. Kim in Samsung's Display Lab, including a 30(b)(6) witness on touch screen related topics.  (Binder Decl. ¶ 13.) |
| **Hangil Song – Senior Designer** | • Apple has not demonstrated that Mr. Song destroyed any documents with a culpable state of mind.  He was sent a litigation hold notice on August 8, 2011 (Watson Decl. Ex. 33 at Ex. AA, p. 23), and testified that he took efforts to preserve documents.  (Watson Decl., Ex. 24 at 10:5-11:5.)<br>• Since February 2010, more than a year before Samsung's obligation to preserve documents arose, Mr. Song has worked in Samsung's Future Design Lab on products that have not been released to date.  (Watson Decl., Ex. 19 at 14:13-21, 18:1-16; *id.*, Ex. 24 at 22:10-23:2, 23:22-24:4.)  The fact that Mr. Song has not worked on relevant products since 2010 makes it unsurprising that his production was limited.<br>• Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 77 emails from other custodians that list Mr. Song as the author or a recipient and at least an additional 501 documents that refer to him.  (Binder Decl. ¶ 19.) |
| **Hyoung-Shin Park – Senior Designer** | • Ms. Park received a timely hold notice on May 9, 2011 (Watson Decl. Ex. 33 at Ex. X, p. 19), and Apple has not demonstrated that she destroyed any relevant documents with a culpable state of mind.<br>• Ms. Park worked on the Samsung F700 phone, which was designed in 2006, five years before Samsung's obligation to preserve documents arose.  (Watson Decl. Ex. 20 at 11:19-20.)  Apple has failed to demonstrate that she worked on any relevant product since.<br>• Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 220 emails from other custodians that list Ms. Park as the author or a recipient and at least an additional 128 documents that refer to her.  (Binder Decl. ¶ 19.) |
| **Ioi Lam – Software Engineer for Samsung Telecommunications America** | • Apple has not demonstrated that Mr. Lam destroyed documents with a culpable state of mind.  As an STA employee, he used Outlook, not MySingle, and received litigation hold notices on April 20, 2011 and April 26, 2011.  (Watson Decl., Ex. 33 at 2; Ioi Lam Decl. ¶ 5.)  Even before then, Mr. Lam all of his non-spam email preserved since at least April 15, 2011.  (Finnegan Decl., ¶ 4.)  Mr. Lam saved documents related to his work because he was subject to numerous litigation hold notices while |

| | |
|---|---|
| | he was employed at STA.  (Ioi Lam Decl. ¶ 5.) |
| | • Apple has not demonstrated that Mr. Lam possessed relevant documents, let alone demonstrated that he destroyed them with a culpable state of mind.  It was Google, not Samsung, that developed the baseline source code for the double-tap to zoom feature.  (Watson Decl. Ex. 13 at 33:20-34:4; 45:17-47:6.)  Both the double-tap and "bounce" features were incorporated into the accused Galaxy Tab, which was released on May 3, 2011. (Watson Decl., Ex. 9 at 8.)  Thus, the decisions to implement those features would have been made long before the duty to preserve documents attached. |
| | • Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 159 emails from other custodians that list Mr. Lam as the author or a recipient and at least an additional 89 documents that refer to him.  (Binder Decl. ¶ 19.)  Apple has deposed, and Samsung has produced documents sourced to, at least nine other witnesses who worked on the "bounce" feature, including Qi Ling and Jaegwan Shin, who worked alongside Mr. Lam in Samsung's San Jose Lab.  (Binder Decl. ¶ 12.) |
| **Jong-Dae Park – Engineer** | • Apple has not demonstrated that Mr. Park destroyed documents with a culpable state of mind.  He was sent and received a litigation hold notice on February 13, 2012. (Watson Decl., Ex. 33 at Ex. AA, p. 25; Jong-Dae Park Decl. ¶ 4.)  Mr. Park took steps to preserve his documents in accordance with the litigation hold notice and did not intentionally delete any that may have been relevant to this litigation.  (Jong-Dae Park Decl. ¶¶ 4, 7.) |
| | • Mr. Park worked on the touch screen controller, which was originally implicated by Apple's '607, '129, and '828 patents.  Only a single claim of the '607 patent is still asserted in this case.  The touch screen controller for the Galaxy Tab 10.1, the only product accused of infringing the '607 patent that was released after this litigation was initiated, was approved on February 25, 2011 (*id.* at ¶ 6), before the obligation to preserve documents arose. |
| | • Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 470 emails from other custodians that list Mr. Park as the author or a recipient and at least an additional 150 documents that refer to him.  (Binder Decl. ¶ 19.)  Apple has deposed at least four other witnesses who worked on touch screens, including a 30(b)(6) witness on certain touch screen related topics.  (Binder Decl. ¶ 13.) |

| | |
|---|---|
| **Joon-Il Choi – Senior Manager of Samsung's R&D Development Management Group** | • Apple has made no showing that any relevant documents were destroyed after receiving a litigation hold notice – let alone with a culpable state of mind.<br>• Mr. Choi was sent a litigation hold on July 13, 2011. (Hankil Kang Decl. ¶ 18.)<br>• Mr. Choi has used Outlook to save all emails since approximately late 2010 or early 2011. (Watson Decl., Ex. 11 at 33:21-35:24.) Mr. Choi's emails were not processed by Samsung's vendor. (Raymond Warren Decl. ¶ 6.) This error has since been corrected and Samsung produced 1989 files from the email .pst file that was not originally processed. (*Id.* ¶ 7.)<br>• Apple complains that a duplicate of the document SAMNDCA00513783 was not produced from Mr. Choi's files. (*See* Ester Kim Decl. ¶ 9.) That is not correct. (*See* Binder Decl. ¶ 11.)<br>• Any supposedly destroyed documents would have been cumulative. Samsung has produced at least 112 emails from other custodians that list Mr. Choi as the author or a recipient and at least an additional 42 documents that refer to him. (Binder Decl. ¶ 19.) |
| **Minhyouk Lee – Vice President and formerly Principal Designer in the Product Design Group** | • Apple has made no showing that any relevant documents were destroyed after receiving a litigation hold notice – let alone with a culpable state of mind. Mr. Lee was sent a timely litigation hold notice on May 9, 2011. (Watson Decl. Ex. 33 at Ex. X, p. 19; Mynhyouk Lee Decl. ¶ 4.) He automatically saved all emails and did not delete any emails after receiving the notice. (Watson Decl., Ex. 8 at 86:13-88:18.)<br>• Mr. Lee's work concerning the Galaxy S was completed before the end of 2010. (Minhyouk Lee Decl. ¶ 5.) Thus, relevant documents from Mr. Lee's work designing the Galaxy S would have been generated before the obligation to preserve documents arose. Mr. Lee also never intentionally deleted any evidence that may have been relevant to this litigation. (*Id.* at ¶ 6.)<br>• The supposedly destroyed documents would have been cumulative. Samsung has produced at least 155 emails from other custodians that list Mr. Lee as the author or a recipient and at least an additional 1,036 documents that refer to him. (Binder Decl. ¶ 19.) |
| **Nara Cho – Senior Manager involved in product planning** | • Apple has not demonstrated that Mr. Cho destroyed documents with a culpable state of mind. Mr. Cho was informed of his duty to preserve documents in the fall of 2011. (Nara Cho Decl. ¶ 4.) He preserved documents in accordance with those instructions. (*Id.*) |

4

|  | • Mr. Cho did not have any input into the actual industrial design of Samsung's tablet products.  (Watson Decl., Ex. 14 at 6:20-9:21, 12:12-23; Nara Cho Decl. ¶ 5.)  Further, Mr. Cho's work on the Galaxy 10.1 took place during the second quarter of 2011 and earlier, and had only sent one or more emails regarding the Galaxy Tab each week.  (Nara Cho Decl. ¶ 5.)  He never intentionally deleted evidence that may have been relevant.  (*Id.* at 6.)<br>• Any supposedly destroyed documents would have been cumulative.  Apple has deposed Junho Park, the Director of Product Planning for North America, and Mr. Cho's superior, whose custodial production included 2,358 emails.  (Binder Decl. ¶ 14.)  Samsung has produced at least 1,027 emails from other custodians that list Mr. Cho as the author or a recipient and at least an additional 149 documents that refer to him.  (Binder Decl. ¶ 19.) |
| **Seogguen Kim – Vice President for Mobile Design** | • Apple has not demonstrated that Mr. Kim destroyed any documents with a culpable state of mind.   Mr. Kim was sent a timely hold notice on May 24, 2011.  (Watson Decl. Ex. 33 at Ex. S, p. 1.)<br>• Indeed, over two days of deposition, Apple sought no information on document retention.<br>• Any supposedly destroyed documents would have been cumulative.  Samsung has produced at least 1,030 emails from other custodians that list Mr. Kim as the author or a recipient and at least an additional 319 documents that refer to him.  (Binder Decl. ¶ 19.) |
| **Seunghwan Cho – Executive Vice President of Advanced R&D Team 2** | • Apple has not demonstrated that Mr. Cho destroyed documents with a culpable state of mind.  Mr. Cho received a hold notice May 24, 2011.  (Watson Decl. Ex. 33 at Ex. S, p. 1.)<br>• Mr. Cho testified that he worked on the Galaxy S phone in 2010, and that he never personally compared the iPhone with the Galaxy S.  (Watson Decl., Ex. 21 at 15:25-17:10, 101:3-25.)<br>• Any supposedly destroyed documents would have been cumulative.  Apple obtained discovery from at least 10 hardware designers who would have more direct knowledge about any of the issues in the case and at least 12 other witnesses who would have more direct knowledge about the UX issues in the case.  (Binder Decl. ¶ 16.)  Samsung has produced at least 1,167 emails from other custodians that list Mr. Cho as the author or a recipient and at least an additional 327 documents that refer to him.  (Binder Decl. ¶ 19.) |

| | |
|---|---|
| **Sungsik Lee – Vice President of the Mobile UX Design Team** | • Apple has failed to demonstrate that Mr. Lee destroyed any documents with a culpable state of mind. During his deposition, Apple failed to ask a single question regarding document preservation and Apple cites to no evidence or testimony that reflect any destruction after the obligation to preserve evidence arose. Indeed, if asked, Apple would have been told that most of Mr Lee's work is done via phone or at in-person meetings, not over email. (Sungsik Lee Decl. ¶ 4.)<br>• Mr. Lee received a timely hold notice on May 24, 2011. (Watson Decl. Ex. 33 at Ex. S, p. 1.)<br>• Any supposedly destroyed documents would have been cumulative. Samsung has produced at least 3,102 emails from other custodians that list Mr. Lee as the author or a recipient and at least an additional 807 documents that refer to him. (Binder Decl. ¶ 19.) |
| **Won Pyo Hong – Executive Vice President and Head of Global Product Strategy** | • Apple has made no showing that any relevant documents were destroyed after receiving a litigation hold notice – let alone with a culpable state of mind. Dr. Hong was sent a litigation hold notice on May 24, 2011. (Watson Decl. Ex. 33 at Ex. S, p. 1.) Dr. Hong declares that at no time "did I intentionally delete any evidence that may have been relevant" to this case. (*Id.* at ¶ 6.)<br>• Dr. Hong is not a designer and was not directly involved in the day-to-day design process for the products at issue. (Wong Pyo Hong Decl. ¶ 4.)<br>• Apple has made no showing that any of the purportedly destroyed documents (if that even occurred) would have been relevant. Dr. Hong oversees a team with over 800 employees in nine departments (Dkt. 754-06 Hong Decl. ¶ 6) and his involvement in the products and features at issue is tangential at best. Moreover, the e-mails that Apple claims show comparisons to Apple products (Mot. 4-5) were in fact produced from other custodians' files, so Apple has not been prejudiced.<br>• The supposedly destroyed documents would have been cumulative. Apple has deposed a number of individuals in the product strategy team, including Dong Hoon Chang, head of Samsung Mobile Design Group, and Minhyouk Lee, a Samsung design executive. Samsung has produced at least 65 emails where Dr. Hong was an author or recipient from the files of other custodians and 15 documents that refer to him. (Binder Decl. ¶ 19.) |
| **YoungSoon Lee – Senior Engineer in the Intellectual** | • Apple has not demonstrated that Ms. Lee destroyed any evidence with a culpable state of mind. Ms. Lee was sent a timely litigation hold notice on May 3, 2011. (Watson |

| | |
|---|---|
| **Property Center** | Decl. Ex. 33 at Ex. X, p. 11; Declaration of YoungSoon Lee ¶ 4.)  She used Outlook and took steps to preserve documents after she received the May 3, 2011 notice, and never intentionally deleted any evidence that may have been relevant.  (Declaration of YoungSoon Lee ¶¶ 4, 6.)<br>• Ms. Lee works in Samsung's Intellectual Property Center at the direction of Samsung's in house counsel to assist them with current and pending litigation, as well as in the context of licensing discussions.  (*Id.* at ¶ 5.)  As a result, most all of her business related emails are privileged or work product.  (*Id.*)<br>• Any supposedly destroyed documents would have been cumulative.  Apple has deposed, and Samsung has produced documents from, a number of witnesses with knowledge of licensing negotiations, including Seongwoo Kim, Junwon Lee, Seungho Ahn, Minhyung Chung, and Kenneth Korea.  (Binder Decl. ¶ 17.)  Samsung has produced at least 105 emails from other custodians that list Ms. Lee as the author or a recipient and at least an additional 52 documents that refer to her.  (Binder Decl. ¶ 19.) |

### Samsung's Responses to Apple's Claims Regarding Samsung's Untimely Notices to Preserve Documents

| | |
|---|---|
| **Joo Hyuk Kang** | • Apple has not demonstrated that Mr. Kang destroyed any documents with a culpable state of mind.  Mr. Kang was sent a timely litigation hold notice on May 3, 2011 (Watson Decl. Ex. 33 at Ex. X, p. 18.), and uses Outlook, not MySingle, to preserve his emails.  (Watson Decl. Ex. 26 at 15:9-17:11; Joo Hyuk Kang Decl. ¶¶ 4-6.) |
| **Kang Hyun Lee** | • Apple has not demonstrated that Mr. Lee destroyed any documents with a culpable state of mind.  Mr. Lee received a timely hold notice on  May 3, 2011 (Watson Decl. Ex. 33 at Ex. X, p. 11), and has used Outlook to preserve his emails for at least two years.  (Watson Decl., Ex. 27 at 15:15-17:11; Kang Hyun Lee Decl. ¶¶ 4-6.) |
| **Se-Hyun Cho** | • Apple has not demonstrated that Mr. Cho destroyed any documents with a culpable state of mind.  Mr. Cho received a timely litigation hold on May 3, 2011 (Watson Decl. Ex. 33 at Ex. X, p. 16) and testified that he saved all documents related to the patents in suit, saved emails to his computer, and turned them over to counsel.  (Watson Decl., Ex. 28 at 27:20-28:17, 30:12-14, 33:3-11, 36:3-23; *see also* Se-Hyun Cho Decl. ¶ 4.) |
| **Kyu Hyung Lee** | • Apple has not demonstrated that Mr. Lee destroyed any documents with a culpable state of mind.  Mr. Lee received a timely hold notice on July 13, 2011 (Watson Decl. Ex. 33 at Ex. AA, p. 8) and testified that he has used Outlook to save emails for approximately two years. (Watson Decl., Ex. 29 at 41:18-42:1.) |
| **Junho Park** | • Apple has not demonstrated that Mr. Park destroyed any documents with a culpable state of mind.  Mr. Park received a timely hold notice on May 3, 2011.  (Watson Decl. Ex. 33 at Ex. X, p. 18.)  He testified that he learned of the lawsuit in the middle of 2011 and that he had been preserving emails using Outlook, not MySingle, on his work computer.  (Watson Decl., Ex. 15 at 33:10-13, 35:12-36:4.) |
| **Wooup Kwon** | • Apple has not demonstrated that Mr. Kwon destroyed any documents with a culpable state of mind. Mr. Kwon received a timely litigation hold notice on May 3, 2011 and July 13, 2011 and preserved documents in accordance therewith.  (Watson Decl. Ex. 33 at Ex. X, p. 17; Wooup Kwon Decl. ¶¶ 5.)  In addition, Mr. Kwon has used Outlook to save his emails since 2008.  (Wooup Kwon Decl. ¶ 6.) |

| **Jaehwang Sim** | • Apple has not demonstrated that Mr. Sim destroyed any documents with a culpable state of mind.  Mr. Sim did not receive a litigation hold notice because he is not a relevant document custodian.<br>• Mr. Sim is a vice president in the management support team responsible for SEC's finances and was deposed solely as Samsung's FRCP 30(b)(6) designee on SEC's finances.  (Hankil Kang Decl. ¶ 22.)  He is not a document custodian for this litigation.  (*Id.*) |
|---|---|
| **Corey Kerstetter** | • Apple has not demonstrated that Mr. Kerstetter destroyed any documents with a culpable state of mind.<br>• As an STA employee, Mr. Kerstetter was sent litigation hold notices on April 20, 2011 and April 26, 2011.  (Watson Decl., Ex. 33 at 2.)  Even before then, Mr. Kerstetter has all of his non-spam email preserved since at least April 15, 2011.  (Declaration of Michael Finnegan, ¶ 4.)<br>• Mr. Kerstetter testified that he did not delete anything off his hard drive.  (Watson Decl., Ex. 30 at 9:19-10:1.)  In fact, during his deposition, Apple complained that too many documents – 91,000 pages – were produced from Mr. Kerstetter's files.  (*Id.* at 8:3-5.) |
| **Hyun Goo Woo** | • Apple has not demonstrated that Mr. Woo destroyed any documents with a  culpable state of mind.  Mr. Woo received a timely litigation hold notice on May 20, 2011.  (Watson Decl. Ex. 33 at Ex. X, p. 21.) |

# Watson Declaration

# EXHIBIT 5

# Filed Under Seal

```
                   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                     UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
 2                          SAN JOSE DIVISION

 3              Civil Action No.:  11-CV-01846-LHK


 4
     APPLE, INC., a California corporation,
 5
                 Plaintiff,
 6

 7   vs.

 8   SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
 9   SAMSUNG ELECTRONICS AMERICA, INC.,
     a New York corporation; and
10   SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,
11           Defendants.
     _____/
12

13

14

15                  *** HIGHLY CONFIDENTIAL ***
                       ATTORNEYS' EYES ONLY
16

17             VIDEOTAPED 30(b)(6) DEPOSITION OF:

18                      KYU HYUK LEE

19

20

21                 Thursday, March 8, 2012
                        Kim & Chang
22                   Seoul, South Korea
                   2:08 p.m. to 5:30 p.m.
23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2..5

Page 2

```
1   APPEARANCES:

2

3       ON BEHALF OF PLAINTIFF, APPLE, INC.:

4

5       MORRISON FOERSTER, LLP
        By:  WESLEY OVERSON, ESQ.
6       425 Market Street
        San Francisco, California 94105-2482
7       Phone:  415.268.7339

8

9       ON BEHALF OF DEFENDANT, SAMSUNG:

10

11      QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
        By:  ADAM CASHMAN, ESQ.
12      555 Twin Dolphin Drive
        Redwood Shores, California 94065
13      Phone:  650.801.5005

14

15   Also present:

16      ALBERT S. KIM, LEAD INTERPRETER
        (Replaced by Aeryong Kim after first recess.)
17      KELLY MYUNG, CHECK INTERPRETER
        PAUL HISCHIER, VIDEOGRAPHER
18      TRACEY LOCASTRO, COURT REPORTER
        HANKIL KANG, SAMSUNG
19      STEPHANIE KIM, MORRISON & FOERSTER

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
     WITNESS                          PAGE
2    KYU HYUK LEE
     Examination by Mr. Overson        6
3

4

5                  E X H I B I T S

6    NUMBER      DESCRIPTION           PAGE

7    Exhibit 2324  Notice of 30(b)(6)     8
                   Deposition
8    Exhibit 2325  Korean language       22
                   document retention
9                  notice dated August
                   3rd, 2010
10   Exhibit 2326  English language      22
                   document retention
11                 notice dated October
                   23rd, 2010
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1          P R O C E E D I N G S
2                 -  -  -
3        VIDEOGRAPHER:  My name is Paul Hischier, a
4   videographer with American Realtime Court
5   Reporters/Asia.
6        Today's date is March 8th, 2012.  And the
7   time is approximately 2:08.  This deposition is
8   being held in the office of Kim and Chang
9   located in the Jeongdong building in Seoul,
10  Korea.
11       The caption of the case is Apple versus
12  Samsung Electronics Company, Limited, et al.
13  held in the U.S. District Court, Northern
14  District of California, San Jose Division with a
15  civil action number 11-CV-01846-LHK.
16       The name of the witness is Kyu Hyuk Lee,
17  testifying in his capacity as a 30(b)(6)
18  witness.
19       The court reporter today is Tracey LoCastro,
20  also with American Realtime Court
21  Reporters/Asia.
22       At this time I would ask all counsel and
23  interpreters to please state their appearances
24  and whom they represent for the record.
25       MR. OVERSON:  Wesley Overson of Morrison and
```

Page 5

```
1   Foerster representing Apple, Inc.  And here with
2   me today is Stephanie Kim.
3        MR. CASHMAN:  Adam Cashman from Quinn
4   Emanuel representing the Samsung entities and
5   also on behalf of the witness.
6        MR. KANG:  Hankil Kang for Samsung.
7        LEAD INTERPRETER:  Albert S. Kim,
8   interpreter of record.
9        CHECK INTERPRETER:  Kelly Myung, check
10  interpreter.
11       VIDEOGRAPHER:  Counsel, please state any
12  stipulations or statements for the record at
13  this time.
14       MR. OVERSON:  We understand the court
15  reporter is not authorized to administer oaths
16  in this venue; nevertheless, we request that she
17  administer the oath, and we stipulate that we
18  waive any objection to the validity of the
19  deposition based on the oaths given.
20       MR. CASHMAN:  Agreed.
21       COURT REPORTER:  Do you solemnly swear or
22  affirm that you will well and truly interpret
23  the questions propounded by counsel and the
24  answers given by the witness from Korean to
25  English and English to Korean to the best of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

6..9

Page 6

1        your ability?

2              LEAD INTERPRETER:  I do.

3              CHECK INTERPRETER:  I do.

4                    KYU HYUK LEE,

5    after having been duly sworn by the reporter, pursuant

6    to stipulation of counsel, was examined and testified

7    through the interpreter as follows:

8              THE WITNESS:  I do.

9                    EXAMINATION

10   BY MR. OVERSON:

11       Q.    Good afternoon.

12       A.    Afternoon, sir.

13       Q.    Please state your name.

14       A.    My name is Kyu Hyuk Lee.

15       Q.    Do you currently work for Samsung?

16       A.    Yes, that is right.

17       Q.    What is your position?

18       A.    I serve as a principal engineer.

19       Q.    And what are your job duties?

20       A.    I currently perform analysis as to patents

21   in dispute.

22       Q.    Can you give me an overview of your

23   educational background?

24       A.    I was born here in Korea, and while in

25   college I majored in mechanical engineering.

Page 7

1        Q.    Have you received any particular training on

2    patents?

3              MR. CASHMAN:  Object to the form.

4        A.    Yes, as far as training in the patent area,

5    as far as that is concerned, I have been engaged in

6    that kind of work for quite a while, so basically, yes.

7    BY MR. OVERSON:

8        Q.    Do you work within the legal department at

9    Samsung?

10       A.    Not the legal team as an IP legal team, but

11   I'm with the IP Center.

12       Q.    What is the IP Center?

13       A.    That is a certain department that is within

14   our company that is engaged in the research types of

15   activities as to patent-related problems and conducts

16   patent-related affairs.

17       Q.    How long have you been working in the IP

18   Center?

19       A.    Well, the IP Center was founded in August of

20   2010 and I've been with the center ever since.

21       Q.    How long have you worked for Samsung?

22       A.    I came aboard with Samsung Electronics in

23   1999.

24       Q.    Can you give me an overview of the job

25   positions you've had between 1999 and 2010?

Page 8

1        A.    After coming on board in 1999 I was engaged

2    in patent prosecution and patent analysis related

3    activities throughout.

4        Q.    Have any of your job responsibilities at

5    Samsung related to maintaining the systems used to

6    store electronic documents?

7              MR. CASHMAN:  Object to the form.

8        A.    Are you asking as to system management?

9    BY MR. OVERSON:

10       Q.    Yes.

11       A.    No, I've not engaged in any system

12   management related work.

13             (Exhibit 2324 was marked for

14   identification.)

15   BY MR. OVERSON:

16       Q.    Mr. Lee, I've handed you what we've marked

17   as Exhibit 2324.  This is a notice of deposition from

18   Apple to Samsung, and it asks Samsung to produce for

19   deposition a witness on various topics.

20             Have you seen this before?

21       A.    Yes.

22       Q.    Could you turn to page 9 of the document,

23   please.

24             On page 9 there's a listing of categories

25   under the heading Document Retention.  And there's a

Page 9

1    list going 1 through 5, A through D.  My understanding

2    is that you will speak for Samsung on those topics.

3             Is that your understanding?

4        A.    Yes, that's right.

5        Q.    The first topic listed is the structure of

6    Samsung's e-mail and server systems.  Are you familiar

7    with Samsung's, let's start with the e-mail system; are

8    you familiar with that?

9             MR. CASHMAN:  Object to the form.

10       A.    Well, when you ask if I'm familiar with

11   that, does that mean do I know how to use that well, or

12   do I know what the system is like?  What exactly are

13   you asking about specifically?

14   BY MR. OVERSON:

15       Q.    Can you explain to me what type of e-mail

16   system Samsung uses?

17       A.    Well, since I'm not a system engineer, I

18   don't exactly know, but the particular e-mail system

19   that's used within Samsung is one that's called My

20   Single.

21       Q.    Is My Single the name of a company?

22       A.    No, it's the name of the e-mail system.

23       Q.    Do you know the name of the company that

24   sells the e-mail system?

25       A.    Well, My Single, sir, is the group-wide

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14..17

Page 14

1    A.    The general guideline calls for all e-mails
2  to be automatically deleted after the passage of two
3  weeks.  However, for those individuals to whom a
4  document retention notice is served, they are requested
5  to separately save on their respective hard drives the
6  relevant e-mails.
7    Q.    Has the policy of deleting e-mails after two
8  weeks at My Single, has that gone on the last five
9  years?
10       MR. CASHMAN:  Object to the form.
11   A.    Well, as for the policies associated with My
12 Single, ever since the system was first set up they
13 have not changed to date.
14 BY MR. OVERSON:
15   Q.    Is it possible for the company to designate
16 a business unit and exempt that business unit's e-mails
17 from being deleted by My Single?
18       MR. CASHMAN:  Object to the form.
19   A.    I do not believe there to be any policy to
20 that effect.
21 BY MR. OVERSON:
22   Q.    So for a person's e-mails to be preserved,
23 that person has to move the e-mails onto their hard
24 drive each time that they receive them; is that true?
25       MR. CASHMAN:  Object to the form.

Page 15

1    A.    Well, I'm not quite able to distinguish as
2  to whether you're asking in terms of a document
3  retention notice type situation or whether in general.
4    Q.    Okay.  Let's assume a person wants to retain
5  their e-mail and doesn't want it to be lost after two
6  weeks, and they work at the Mobile Communications
7  Division.  What do they have to do to retain their
8  e-mail?
9    A.    Well, it's actually the same case for both
10 the Mobile Communications Division as well as other
11 units in that for those who desire to save any of their
12 own e-mails they can separately park those in their
13 hard drive.
14   Q.    How do they do that?
15       MR. CASHMAN:  Object to the form.
16   A.    Well, whatever e-mail they desire to move,
17 they can move that over to a directory in their hard
18 drive.
19 BY MR. OVERSON:
20   Q.    If I were to -- if I worked at the Mobile
21 Communications Division and I want to save my e-mail,
22 would I have to move it over to the hard drive within
23 two weeks in order to preserve it?
24       MR. CASHMAN:  Object to the form.
25       You can answer.

Page 16

1    A.    Yes, you would copy it onto your hard disk
2  drive before its deletion.
3  BY MR. OVERSON:
4    Q.    And is there a way to automatically have all
5  of the e-mail that comes into a person who works at the
6  Mobile Communications Division go directly onto a hard
7  drive to be saved?
8    A.    Well, My Single does not have that sort of a
9  feature.  You'd have to do it separately.
10   Q.    So under the My Single system you would have
11 to move each e-mail over from the My Single system into
12 the hard drive in order to preserve it; is that right?
13       MR. CASHMAN:  Object to the form.
14   A.    Yes, that is right as far as the My Single
15 system is concerned.
16 BY MR. OVERSON:
17   Q.    In 2010 are you aware that Samsung issued a
18 document retention notice to employees relating to a
19 potential dispute with Apple?
20       MR. CASHMAN:  I'm just going to ask the
21       witness to answer that yes or no, please.
22   A.    Yes.
23 BY MR. OVERSON:
24   Q.    And did Samsung create a system whereby the
25 relevant people who were involved, or potentially

Page 17

1  involved in the litigation would have their e-mail sent
2  automatically to a place where it would be preserved
3  and not deleted?
4        MR. CASHMAN:  Object to the form.
5    A.    As far as anything having to do with
6  document retention related requests are concerned, the
7  people within our IP legal team, both within and
8  without, basically give proper notice to the
9  individuals who would fall under this.  They inform
10 them as to the particular types of categories that
11 ought to be so preserved as part of the request.  They
12 further explicate what they need thereof and the
13 methodology are.
14       CHECK INTERPRETER:  I did not hear
15       "category."
16 BY MR. OVERSON:
17   Q.    So did Samsung create a system whereby the
18 e-mails that went to people who might receive relevant
19 e-mails to the litigation would automatically be saved
20 as opposed to deleted by the My Single system?
21       LEAD INTERPRETER:  Very quickly so the
22       record is clear.  The interpreter stands by the
23       former rendition, for "category" was included, I
24       think.
25   A.    What I understand to be the case with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18..21

Page 18

1  respect to document retention requests is that our
2  counsel, both within and without the company, fully
3  explain as to the need and the significance, the
4  importance thereof to the people who necessarily have
5  to be informed about such, to whom word is sent and
6  explanations given.  And those persons are further
7  requested that they personally see to it that documents
8  be so preserved.  And it is my further understanding
9  that those individuals have faithfully abided by such.
10 BY MR. OVERSON:
11     Q.    So Samsung has relied on each individual
12 person to move each of their e-mails that would be
13 related to the litigation from the My Single system
14 onto the hard drives of their individual computers; is
15 that true?
16        MR. CASHMAN:  Object to the form.
17     A.    Again, with respect to document retention
18 requests, the overall need for such and the importance,
19 indeed, as well as the methodology for such are
20 explained to our people on numerous occasions by way of
21 the notice as well as explanations and then put into
22 practice.  And it is my understanding that those
23 persons who have been so notified have faithfully
24 abided by said duty.
25 BY MR. OVERSON:

Page 19

1     Q.    And can you tell me just mechanically how
2  the people have abided by their duty?  What have they
3  done to abide by their duty?
4        MR. CASHMAN:  Object to the form.
5     A.    Well, the question is a little vague for my
6  purposes, but, again, with respect to document
7  retention requests, we impress upon our people as to
8  how important that is and how it ought to be carried
9  out.  And, indeed, our counsel within the IP legal team
10 as well as outside counsel all get involved in this,
11 and notices are sent out, people are brought up to
12 speed as to those aspects and the respective department
13 heads are all sufficiently notified as to this.  So it
14 is my understanding that the results thereof are in
15 fact preserved intact.
16 BY MR. OVERSON:
17     Q.    Did you receive a document retention notice
18 relating to the Apple versus Samsung litigation?
19     A.    Yes.
20     Q.    Did you do something to retain your e-mails
21 since the time of receiving that document retention
22 notice?
23        MR. CASHMAN:  Object to the form.
24     A.    Yes, after setting up a separate directory,
25 I stored any and all relevant documents.

Page 20

1  BY MR. OVERSON:
2     Q.    How would you decide what e-mails to put in
3  the separate directory?
4        MR. CASHMAN:  I'll just caution the witness
5     not to reveal the substance of any conversations
6     that he had with counsel.
7     A.    I was provided with a sufficient explanation
8  as to what types of documents are to be preserved by
9  way of counsel, both within the IP legal team and
10 otherwise, our outside counsel, and saw to it that
11 those related documents be exactly stored on my hard
12 drive.
13 BY MR. OVERSON:
14     Q.    How did you see to it that the e-mails made
15 it from the My Single system onto the separate
16 directory?  Can you tell me mechanically how that
17 happens?
18        MR. CASHMAN:  You're still asking about him
19     personally?
20        MR. OVERSON:  Yes.
21     A.    I would click on the respective e-mails and
22 copy it onto the directory.
23 BY MR. OVERSON:
24     Q.    So you would click on each individual e-mail
25 that you wanted to move and then move it into the

Page 21

1  directory.
2     A.    Well, I suppose I could click a bunch of
3  e-mails all together and do things as a group, but I
4  don't think it's quite necessary for me to store spam
5  mail.
6     Q.    So you don't click as a group, you click
7  each one and move it separately into the directory,
8  true?
9     A.    I suppose everybody does things a little
10 differently from one another, but in my case what I do
11 is I click everything all together and then de-click as
12 to spam mails, personal types of e-mails and then move
13 the rest.
14     Q.    How often have you done that since you
15 received the document retention notice?
16     A.    Well, I do that almost on a daily basis with
17 respect to the e-mails that I receive.  I do that every
18 day.
19     Q.    Do -- strike that.
20        Do you know how many employees of Samsung
21 received document retention notices related to the
22 Apple litigation?
23        MR. CASHMAN:  Object to the form.
24     A.    My understanding, sir, is that employees and
25 executives within our company numbering into the

Page 30

1  and Check Interpreter.)
2       LEAD INTERPRETER:  If you render your
3  portion, then, since we heard differently, we
4  just will stand by each position.
5       CHECK INTERPRETER:  Just go forth with this
6  one.
7       MR. CASHMAN:  Do you have clarification you
8  need to make?
9       CHECK INTERPRETER:  Actually, it could be a
10  minor difference, but her rendition was that "in
11  the event that there is a request for document
12  retention," and my rendition is that "a document
13  retention notice has been circulated to the
14  employees and the employees have duly abided by
15  that retention notice."
16       So that's the -- so the "in the event" part
17  should be struck.
18       LEAD INTERPRETER:  It cannot be stricken
19  because we heard differently, and I stand by
20  what I rendered.
21  BY MR. OVERSON:
22       Q.   So, Mr. Lee, you would agree with me,
23  Samsung is one of the most sophisticated technology
24  companies in the world, right?
25       A.   Yes.

Page 31

1       Q.   If Samsung wants to back up information on
2  servers, it can do so, right?
3       MR. CASHMAN:  Object to the form.
4       A.   Since I'm not personnel charged with the
5  company's system, I don't know how the system is to be
6  run.
7  BY MR. OVERSON:
8       Q.   What has Samsung done to make sure that the
9  thousands of employees who received the document
10  retention notice are actually moving their e-mails on
11  their personal computers from the My Single system onto
12  a separate directory within the two-week period that
13  that must occur to prevent the deletion of their
14  e-mails?
15       MR. CASHMAN:  Object to the form, vague and
16  ambiguous as to Samsung.
17       A.   By Samsung are you referring to Samsung
18  Electronics in Korea?  Or to STA or SEA based in United
19  States?
20  BY MR. OVERSON:
21       Q.   Let's start with Korea.
22       A.   At the time the document preservation notice
23  is given by the IP team or outside counsel, upon
24  receipt of such notice by the officers and employees of
25  Samsung, they are fully apprised of the importance, the

Page 32

1  necessity and the methodology that they should go by in
2  preserving such documents pursuant to the notice.  And
3  since IP legal team members sufficiently provide
4  explanations as to development departmental leaders,
5  the recipients conduct good-faith compliance of such
6  notice and therefore it will be difficult to check on
7  to see whether there would be a non-preservation of
8  such notice after the request is given out.
9       Q.   So after the preservation notice is given
10  out, Samsung does not check to make sure that the
11  employees who receive the document retention notice are
12  actually moving e-mails within the two-week period
13  before their automatic deletion, true?
14       MR. CASHMAN:  Object to the form,
15       mischaracterizes.
16       A.   First of all, such document preservation
17  requests will be given to thousands of employees;
18  however, there is no way to check on to see one by one
19  whether document deletion is actually happening.
20       However, since there would be sufficient
21  explanation given for the importance and methodology
22  that the recipient of the notice should go by, I
23  believe that those documents are preserved accordingly.
24  BY MR. OVERSON:
25       Q.   So, Mr. Lee, Samsung does not check to make

Page 33

1  sure that the employees are following the directions in
2  the document retention notice, correct?
3       MR. CASHMAN:  Same objections.
4       A.   Since on numerous occasions that IP legal
5  team attorneys and outside attorneys provided numerous
6  explanations about the notice and also regarding the
7  notice's importance, necessity and methodology of
8  preservation, on that basis I understand that the
9  persons who are required to preserve those documents
10  would precisely save those documents.
11  BY MR. OVERSON:
12       Q.   And so you trust those people to follow the
13  document retention notice and you don't follow up and
14  check with them to make sure that they do so.
15       MR. CASHMAN:  Object to the form.
16       A.   Since there would have been sufficient
17  notification as to the importance and methodologies
18  concerning preservation of documents, one would have a
19  conviction that such relevant document be
20  well-preserved accordingly.  However there is no way to
21  check on to see if such documents are discarded.
22       Q.   Well, you would agree with me that one way
23  to make sure that such e-mails are not deleted would be
24  to back up the e-mail system on a regular basis so that
25  it does not get deleted after two weeks, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

1    A.    I believe the methods and necessity
2 concerning the document preservation was sufficiently
3 notified to people.
4    Q.    If an individual at the Mobile
5 Communications Division receives an e-mail and does not
6 move it from the My Single system to a separate
7 directory and waits for two weeks, that e-mail will be
8 automatically deleted by My Single and it could not be
9 retrieved, correct?
10    A.    That would be true prior to the document
11 preservation notice is given out, but after such
12 notice, all the relevant documents are stored.
13    Q.    So I'm asking you to assume, let's assume
14 someone has, after the document retention notice they
15 forget to do it for two weeks, they forget to move the
16 e-mails over into their directory.  It would -- the
17 e-mails would be automatically deleted after two weeks
18 and they're gone forever, right?
19       MR. CASHMAN:  Object to the form, calls for
20    speculation.
21    A.    Once the document preservation notice is
22 given out, IP legal team counsel and outside counsel
23 provide sufficient explanations about such notice to
24 develop department leaders; therefore, I understand
25 that they will faithfully be in compliance of such a

Page 35

1 notice and thereby save the documents accordingly.
2 BY MR. OVERSON:
3    Q.    There have been individuals from Samsung in
4 this litigation who have had their depositions taken
5 and they've been asked, "Are you aware of any deletion
6 policy or automatic deletion of e-mail?"
7       And they said, "No."
8       So isn't it possible that employees were --
9 assumed that Samsung, the company, would preserve
10 e-mail on their servers so that the employees didn't
11 have to do it themselves?
12       MR. CASHMAN:  Object to the form, calls for
13    speculation.  Object to the extent it
14    mischaracterizes the record, assumes facts not
15    in evidence.
16    A.    I don't know what those people's answers
17 there at their deposition would have been, but with
18 respect to document preservation notice, I understand
19 that such notice had been provided in both English and
20 Korean languages on multiple occasions to people.  And
21 since there have been sufficient explanations given in
22 terms of methodology and necessity surrounding such a
23 notice, I believe all the documents were accordingly
24 preserved by people who are relevant to such a notice,
25 as I understand.

Page 36

1 BY MR. OVERSON:
2    Q.    But you would agree with me that there was
3 no methodology provided for the recipients of the
4 notice concerning creating a separate directory on
5 their own hard drive so that their e-mail would not be
6 automatically deleted, right?
7       MR. CASHMAN:  Object to the form.
8       By the notice you're referring to Exhibits
9    2325 and 2326 specifically?
10       MR. OVERSON:  Any notices.
11       MR. CASHMAN:  Object to the extent it calls
12    for testimony regarding documents that aren't
13    before the witness.
14       But you can answer if you can understand the
15    question.
16    A.    May I have the question one more time,
17 please?
18       MR. OVERSON:  Could you read it back,
19    please?
20       (A portion of the record was read by the
21 reporter.)
22       MR. CASHMAN:  Same objections.
23    A.    Again, there was sufficient explanation
24 provided as to the necessity and importance of the
25 document preservation request.  And as to what type of

Page 37

1 document needs to be preserved is well-informed and
2 clearly informed.
3 BY MR. OVERSON:
4    Q.    I'm going to ask you questions about issues
5 other than e-mail.
6       What other electronic databases does Samsung
7 keep to store electronic documents?
8       MR. CASHMAN:  Object to the form, vague and
9    ambiguous as to Samsung.
10       You can answer.
11    A.    I'm not clear as to what you're referring to
12 by the term "Samsung" in your question, whether you're
13 referring to Samsung group as a whole or Samsung
14 Electronics or just a part of Samsung Electronics to
15 refer to a business unit within Samsung Electronics.
16 BY MR. OVERSON:
17    Q.    I'm interested in the Mobile Communications
18 Division.
19    A.    With respect to Mobile Communications
20 Division alone, there is an organization that is based
21 in Korea and one other based in the U.S. and also in
22 other countries.
23       Are you asking that question comprehensively
24 to refer to all those other region bases?
25    Q.    Let me focus my question on Korea.

Page 58

1  help you testify here today?
2      A.    I have no idea as to how much time I spent
3  on that because I never sat down and calculated the
4  amount of time spent.
5      Q.    We know you spoke with Mr. Joo in the Mobile
6  Communications Division and perhaps others in the
7  Mobile Communications Division and Mr. Park from My
8  Single.  Are those the people that you spoke with in
9  preparation for this deposition?
10          MR. CASHMAN:  Again, are you excluding the
11     lawyers?
12          MR. OVERSON:  Yes.
13     A.    I also spoke with other people as to My
14  Single system.  And I also obtained information from
15  STA and SEA employees by way of counsel.
16  BY MR. OVERSON:
17     Q.    Okay, I don't want you to tell me what you
18  learned from counsel.
19          Who else did you speak with at My Single?
20     A.    Other than Mr. Park, I'm not sure if I have
21  the name correctly, but maybe the name is Jin-Ah Suh.
22          LEAD INTERPRETER:  J-i-n-a S-e-o.
23  BY MR. OVERSON:
24     Q.    And is she the person that told you that the
25  auto delete function occurs after two weeks?

Page 59

1      A.    Yes, she confirmed as to that fact.
2      Q.    Did you discuss anything else with her?
3      A.    No.
4          MR. OVERSON:  Okay.  I have no further
5  questions for Mr. Lee.  We will preserve any
6  objections relating to coverage of the topics,
7  and I think it's probably better if we handled
8  that on paper later.
9          MR. CASHMAN:  Okay, great.  Let's just go
10  off the record for a minute.
11          VIDEOGRAPHER:  Going off the record.  The
12  time is 5:25.
13          (A discussion was held off the record.)
14          VIDEOGRAPHER:  Back on the record.  The time
15  is 5:30.
16          MR. CASHMAN:  And we don't have any further
17  questions.  Our position is the deposition is
18  closed, but obviously if you send us some
19  communication we'll take a look at it and
20  respond accordingly.
21          MR. OVERSON:  Okay.  I think we respectfully
22  disagree about whether it's open or closed, but
23  we can deal with that off the record.
24          VIDEOGRAPHER:  This concludes the deposition
25  of Kyu Hyuk Lee.  Going off the record.  The

Page 60

1  time is 5:30.
2
3      (Time noted:  5:30 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 61

1  (Counsel representing this witness should arrange
   reading and signing and thereafter distribute copies
2  of the signed Errata Sheet to opposing counsel
   without involvement of court reporter.)
3
   STYLE OF CASE:  Apple V Samsung
4  DEPOSITION OF:  KYU HYUK LEE
   DATE TAKEN:  Thursday, March 8, 2012
5
             E R R A T A   S H E E T
6
     LINE          CHANGE            REASON
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  I hereby certify that I have read my deposition and
    that it is true and correct subject to any changes
23  in form or substance entered here.
24  _____
    Date                   KYU HYUK LEE
25

# Watson Declaration

# EXHIBIT 6

# Filed Under Seal

# In The Matter Of:

*APPLE, INC., et al.*
*v.*
*SAMSUNG ELECTRONICS CO., LTD., et al.*

_____

*WON-PYO HONG- Vol. 1*
*April 19, 2012*

_____

*HIGHLY CONFIDENTIAL -  ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

**LegaLink, Inc.**

179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


APPLE, INC., a California corporation, )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    ) Civil Action
                                       ) 11-CV-01846-LHK
SAMSUNG ELECTRONICS CO., LTD.,         )
a Korean business entity;              )
SAMSUNG ELECTRONICS AMERICA, INC.,     )
a New York corporation; and            )
SAMSUNG TELECOMMUNICATIONS AMERICA,    )
LLC, a Delaware limited liability      )
company,                               )
                                       )
            Defendants.                )
_____)



** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **



VIDEOTAPED DEPOSITION OF

WON-PYO HONG

SEOUL, SOUTH KOREA

APRIL 19, 2012





REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 2

```
 1        Videotaped deposition of WON-PYO HONG, taken
 2   in the above-entitled cause pending in the United
 3   States District Court, Northern District of California,
 4   San Jose Division, pursuant to notice, before BRENDA
 5   MATZOV, CA CSR 9243, at Kim & Chang, Jeongdong Building,
 6   17th Floor, 21-15 Jeongdong-gil, Jung-gu, Seoul, South
 7   Korea 100-784, on Thursday, the 19th day of April, 2012,
 8   at 2:05 p.m.
 9
10   APPEARANCE OF COUNSEL:
11   FOR PLAINTIFF:
12        MORRISON & FOERSTER, LLP
             By:  HAROLD J. McELHINNY, ESQ.
13        425 Market Street
             San Francisco, California 94105-2482
14        (415) 268-7000 / Fax (415) 268-7522
             hmcelhinny@mofo.com
15
16   FOR DEFENDANTS:
17        QUINN EMANUEL URQUHART & SULLIVAN, LLP
             By:  JON R. STEIGER, ESQ.
18        865 South Figueroa Street, 10th Floor
             Los Angeles, California 90017
19        (213) 443-3000 / Fax (213) 443-3100
             jonsteiger@quinnemanuel.com
20
21   ALSO PRESENT:
22        JOE CHEUNG, Videographer
23        AERYONG KIM, Korean Interpreter
24        STEPHANIE KIM, Morrison & Foerster
25        JAMES SHIN, Samsung
```

Page 3

```
 1              I N D E X
 2   WITNESS
 3   Won-Pyo Hong
 4
 5   EXAMINATION                          PAGE
 6   By Mr. McElhinney                       8
 7   By Mr. Steiger                        115
 8
 9
10            E X H I B I T S
11   NUMBER     DESCRIPTION              PAGE
12   Exhibit 1551   Document Entitled "SEA Galaxy
     (prev.)        Tablet Launching Strategy,"
13                  Dated January 21, 2011
                    (Bates SAMNDCA10335377 to 10335380)   99
14
15   Exhibit 1562   Korean PowerPoint Presentation
     (prev.)        Printout, Dated October 2009
16                  (Bates SAMNDCA10170873 to 10170907)   96
17   Exhibit 1568   Korean E-mail from Ahyoung Kim,
     (prev.)        Dated August 10, 2010, and Related
18                  E-mail Chain
                    (Bates SAMNDCA10185356 to 10185364)   112
19   Exhibit 1661   PowerPoint Presentation Printout
     (prev.)        Entitled "Premium & Mass, Design
20                  Preference Study," Dated November
                    2010 - January 2011
21                  (Bates SAMNDCA00176172 to 00176202)   90
22   Exhibit 1751   Korean E-mail from Rukas, Dated
     (prev.)        February 22, 2010
23                  (Bates SAMNDCA10167856 to 10167857)   105
24
25
```

Page 4

```
 1            E X H I B I T S (Continued)
 2   NUMBER     DESCRIPTION              PAGE
 3   Exhibit 2006   PowerPoint Presentation Printout
     (prev.)        Entitled "Touch Portfolio, Rollout
 4                  Strategy Recommendation Based on
                    Consumer Insight," Dated December 17,
 5                  2008
                    (Bates SAMNDCA00191811 to 00191987)   45
 6
 7   Exhibit 2019   PowerPoint Presentation Printout
     (prev.)        Entitled "Agenda"
 8                  (Bates SAMNDCA10809734 to 10809875)   76
 9   Exhibit 2144   Korean Organizational Chart,
     (prev.)        Dated January 1, 2012
                    (Bates S-ITC-003006125 to 003006129)  17
10
11   Exhibit 2149   Korean PowerPoint Presentation
     (prev.)        Printout Entitled "SIP
                    (Self-Inspection Program),"
12                  Dated October 2007
                    (Bates SAMNDCA00203092 to 00203179)   24
13
14   Exhibit 2151   Korean PowerPoint Presentation
     (prev.)        Printout Entitled "Touch Portfolio,
15                  Key Takeaways," Dated December 24,
                    2008
16                  (Bates SAMNDCA10805169 to 10805175)   61
17   Exhibit 2152   PowerPoint Presentation Printout
     (prev.)        Entitled "Winning in Smartphones -
18                  It's Now or Never," from Steering
                    Committee Meeting II, Dated
19                  December 10, 2009
                    (Bates SAMNDCA10807316 to 10807387)   62
     Exhibit 2521   Korean PowerPoint Presentation
     (prev.)        Printout, Dated December 2007
21                  (Bates SAMNDCA11394122 to 11394166)   28
22   Exhibit 2640   Korean E-mail from D.J. Koh,
     (prev.)        Dated September 16, 2008, and
23                  Related E-mail Chain
                    (Bates SAMNDCA11374409 to 11374414)   30
24
25
```

Page 5

```
 1            E X H I B I T S (Continued)
 2   NUMBER     DESCRIPTION              PAGE
 3   Exhibit 2705   PowerPoint Presentation Printout
     4             Entitled "AT&T/Samsung Executive
                    Summit, San Antonio, Texas,"
                    Dated August 28, 2009
 5                  (Bates SAMNDCA20006535 to 20006595)   22
 6   Exhibit 2706   Korean E-mail from Jun Ho Park,
                    Dated April 18, 2011, and
 7                  Related E-mail Chain
                    (Bates SAMNDCA00507493 to 00507496)   51
 8
 9   Exhibit 2707   PowerPoint Presentation Printout
                    Entitled "Archetype Design 2009"
                    (Bates SAMNDCA00376530 to 00376584)   74
10
11   Exhibit 2708   Korean E-mail from Jang Kim,
                    Dated July 29, 2010, and
                    Related E-mail Chain
12                  (Bates SAMNDCA10969926 to 10969934)   81
13   Exhibit 2709   Korean E-mail from Hyun Kim,
                    Dated February 16, 2010
14                  (Bates SAMNDCA00044700)               102
15   Exhibit 2710   Korean E-mail from Gihyun Suh,
                    Dated February 22, 2010 (with
16                  Metadata)
                    (Bates SAMNDCA10167856 to 10167857)   105
17
18
19
20
21      Q U E S T I O N S   I N S T R U C T E D
22          N O T   T O   A N S W E R
23              (None.)
24
25
```

2  (Pages 2 to 5)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 6

1          P R O C E E D I N G S
2
14:05:04  3          THE VIDEOGRAPHER:  This is the video operator
14:05:05  4     speaking, Joe Cheung of Merrill Corporation Boston,
14:05:10  5     101 Arch Street, Third Floor, Boston, MA, 02210, U.S.A.
14:05:20  6          Today is April 19th, 2012, and the time is
14:05:26  7     14:05.  We are at the offices of Kim & Chang, 17th
14:05:35  8     Floor, Jeongdong Building, Seoul, South Korea, to
14:05:42  9     take -- to take the -- to -- to take the videotaped
14:05:48 10     deposition of Won-Pyo Hong, in the matter of Apple
14:05:54 11     versus Samsung Electronics Co., Ltd., et al., case --
14:05:57 12     the case number is 11-CV-01846-LB [sic].
14:06:13 13          And will the counsel please introduce
14:06:15 14     themselves.
14:06:18 15          MR. McELHINNY:  Actually, the case number --
14:06:19 16     this is the case number.  (Indicating.)
14:06:25 17          THE VIDEOGRAPHER:  Oh, I got it wrong?
14:06:32 18          MR. McELHINNY:  "LHK."  Yes.  That's the case
14:06:34 19     number.
14:06:35 20          THE VIDEOGRAPHER:  Oh, okay.  Sorry.  I've got
14:06:36 21     the wrong one.  And a correction for the case number.
14:06:40 22     It is 11-CV-01846-LHK.  Okay.
14:06:49 23          And would the counsel please introduce
14:06:51 24     themselves.
14:06:52 25          MR. McELHINNY:  Yes.  My name is Harold

Page 7

14:06:54  1     McElhinny.  Stephanie Kim and I are here from Morrison &
14:06:55  2     Foerster.  We represent the plaintiff Apple, Inc.
14:06:58  3          MR. STEIGER:  Jon Steiger, from Quinn Emanuel,
14:07:00  4     representing Samsung and the witness, Dr. Hong.  With
14:07:04  5     me is James Shin from Samsung.
14:07:08  6          THE VIDEOGRAPHER:  Okay.  Would the court
14:07:10  7     reporter, Brenda --
14:07:10  8          MR. McELHINNY:  Excuse me.  The record should
14:07:12  9     reflect that in -- in the event that it is -- that
14:07:14 10     Dr. Hong asks for one, we have a check translator
14:07:18 11     available.  And the check translator should introduce
14:07:21 12     herself.
14:07:21 13          MR. STEIGER:  Okay.
14:07:22 14          THE INTERPRETER:  Aeryong Kim, serving as
14:07:23 15     check translator.
14:07:26 16          THE VIDEOGRAPHER:  And will the court
14:07:27 17     reporter, Brenda Matzov, please swear the witness
14:07:33 18     and the interpreter.
14:07:35 19          MR. McELHINNY:  Yes.  At this point, we
14:07:36 20     have a stipulation.  We understand the court reporter
14:07:38 21     is not authorized to administer oaths in this venue.
14:07:41 22     Nevertheless, we request that she administer the oaths.
14:07:46 23     And we stipulate that we waive any objection to the
14:07:47 24     validity of the deposition based on the oaths.
14:07:51 25          MR. STEIGER:  Stipulated.

Page 8

1               AERYONG KIM,
2     the interpreter, was duly sworn to
3     translate from English to Korean and
4     from Korean to English.
5
6               WON-PYO HONG,
7     called as a witness, being first duly
8     sworn, was examined and testified as
9     hereinafter set forth:
10
11          (The following proceedings were conducted
12     only in English, unless otherwise indicated.)
13
14               EXAMINATION
15     BY MR. McELHINNY:
14:08:11 16          Q.  Dr. Hong, you heard me introduce myself
14:08:15 17     a minute ago.  My name is Harold McElhinny.  I'm an
14:08:17 18     attorney for Apple in the litigation that's pending
14:08:20 19     against Samsung.
14:08:21 20          A.  Uh-huh.
14:08:21 21          Q.  Would you please state your full name for
14:08:22 22     the record?
14:08:24 23          A.  W-o-n-P-y-o.  H-o-n-g.  Won-Pyo Hong.
14:08:29 24          Q.  Thank you.
14:08:30 25          And, sir, what is your business address?

Page 9

14:08:32  1          A.  416 Maetan-dong, Yeongtong-gu, Suwon,
14:08:32  2     Gyeonggi-do, in Korea.
14:08:41  3          Q.  Sir, have you ever had your deposition taken
14:08:43  4     before in an American litigation?
14:08:45  5          A.  No.  This is the first time.
14:08:46  6          Q.  Have you ever given testimony under oath in
14:08:49  7     any kind of a proceeding prior to this time?
14:08:51  8          A.  No.
14:08:52  9          Q.  Okay.  I -- I'm going to be asking you a
14:08:57 10     series of questions during the time that's been allotted
14:09:00 11     to us today.  I'll ask you the questions.  You'll give
14:09:05 12     your answers.
14:09:06 13          The woman that's sitting to my right is
14:09:08 14     a court reporter.  She is taking down a verbatim
14:09:11 15     transcript of every word that is said in English
14:09:13 16     while we're in the room.
14:09:15 17          A.  Uh-huh.
14:09:15 18          Q.  At the end of that time, at the end of the
14:09:16 19     deposition, she will prepare a booklet that will be your
14:09:19 20     testimony that can be used subsequently in the trial of
14:09:23 21     this case, if necessary.
14:09:25 22          A.  Uh-huh.
14:09:25 23          Q.  You will have a chance to review that booklet.
14:09:28 24     You will have a chance to make changes, if you think
14:09:30 25     that the court reporter misunderstood one of the answers

3  (Pages 6 to 9)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 10

14:09:32  1    that you gave.
14:09:34  2         But if you make changes, we will be able to
14:09:37  3    comment on those changes and the fact that you changed
14:09:40  4    it later.  So it is in your interest and our interest
14:09:42  5    that you understand my questions.  And -- and if you
14:09:46  6    don't understand my questions, then you should ask me
14:09:48  7    for a clarification.  I will be glad to give you one.
14:09:52  8         A.  Okay.
14:09:52  9         Q.  Do you understand that so far?
14:09:53  10        A.  Sure.  I do.
14:09:54  11        Q.  Do you have any questions of me before we
14:09:56  12   begin?
14:09:57  13        A.  That's okay.
14:09:57  14        Q.  Okay.  Sir, by whom are you employed?
14:10:00  15        A.  Samsung Electronics.
14:10:01  16        Q.  And what is your current title?
14:10:04  17        A.  Executive vice president.
14:10:09  18        Q.  And -- and what is the position that you
14:10:10  19   currently hold?
14:10:11  20        A.  Head of our global product strategy.
14:10:31  21        Q.  I understand that you have a Master's in
14:10:34  22   information and communication from SMU; is that correct?
14:10:37  23        A.  No.
14:10:38  24        Q.  Okay.
14:10:39  25        A.  I -- I -- it's not correct.

Page 11

14:10:41  1         Q.  All right.  Let me -- let me -- let me just
14:10:43  2    start off and ask you a question.
14:10:45  3         A.  Okay.
14:10:45  4         Q.  Do you have a college degree?
14:10:47  5         A.  I do.
14:10:47  6         Q.  And -- and what is your college degree?
14:10:49  7         A.  A BS in electronics engineering from --
14:10:53  8         Q.  And where did you get that?
14:10:55  9         A.  Seoul National University.
14:10:57  10        And if I may go on?
14:10:58  11        Q.  Well, let me -- let me break it up, if you
14:10:59  12   don't mind.
14:10:59  13        A.  Sure.
14:11:00  14        Q.  When did you get the -- when did you get
14:11:01  15   your BS?
14:11:02  16        A.  In nine -- 1982.
14:11:08  17        Q.  Okay.  Do you have graduate degrees?
14:11:10  18        A.  Yes, I do.
14:11:11  19        Q.  And -- and what was the first graduate degree
14:11:14  20   that you got?
14:11:15  21        A.  Master degree in double E, electrical
14:11:19  22   engineering, from University of Michigan in 1987 -- '84.
14:11:23  23   I'm sorry.
14:11:27  24        Q.  Do you have additional graduate degrees?
14:11:29  25        A.  I do.

Page 12

14:11:29  1         Q.  And what are those?
14:11:31  2         A.  Ph.D. in -- also double E from same university
14:11:38  3    in 18 -- 1988.
14:11:40  4         Q.  Have you ever attended SMU?
14:11:43  5         A.  I took course through a company, the Satellite
14:11:46  6    Distribution Systems.  So I was registered for a Master
14:11:52  7    degree, but I didn't get the Master degree itself.
14:11:55  8         Q.  Got it.
14:12:01  9         What is your nationality, sir?
14:12:04  10        A.  Korean.
14:12:05  11        Q.  Have you ever been employed in the United
14:12:07  12   States?
14:12:07  13        A.  Yes.
14:12:07  14        Q.  And -- and when were you employed in the
14:12:09  15   United States?
14:12:16  16        A.  I was employed from January 1988 until June
14:12:18  17   1994 by BELCORE, B-E-L-C-O-R-E, Bell Communications
14:12:23  18   Research in New Jersey.
14:12:30  19        Q.  And what was your position when you left that
14:12:33  20   company?
14:12:33  21        A.  I was a program manager -- one of the program
14:12:39  22   managers in research area.
14:12:40  23        Q.  In -- in what year did you join Samsung?
14:12:44  24        A.  In 2007.
14:12:47  25        Q.  And what was your position when you joined

Page 13

14:12:49  1    Samsung?
14:12:50  2         A.  "Position" means "title"?
14:12:53  3         Q.  Yes.  Where were you hired -- what were you
14:12:53  4    hired as?
14:12:55  5         A.  Right.  Advisor.  Formal title was "advisor."
14:13:01  6    And I became executive vice president in exactly one
14:13:07  7    year.
14:13:09  8         Q.  Where did you work immediately before you
14:13:12  9    started to work with Samsung?
14:13:14  10        A.  Korea Telecom.
14:13:17  11        Q.  How long did you work at Korea Telecom?
14:13:21  12        A.  Roughly 13 years.
14:13:23  13        Q.  And what was your position when you left Korea
14:13:25  14   Telecom?
14:13:27  15        A.  Senior vice president.
14:13:35  16        Q.  And are you employed -- you're employed by
14:13:38  17   Samsung Electronics Corporation; is that correct?
14:13:39  18        A.  That's correct.
14:13:40  19        Q.  Okay.  Help me out here.
14:13:43  20        Is it -- is it relatively unusual for Samsung
14:13:47  21   to hire somebody into the company from -- from another
14:13:50  22   company at the senior level which you were hired?
14:13:53  23        MR. STEIGER:  Objection.  Vague and ambiguous.
14:13:54  24   No foundation.  Calls for speculation.
14:13:57  25        THE WITNESS:  There are a number of employees

4  (Pages 10 to 13)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 14

14:14:00  1  like that.
14:14:01  2      Q.  BY MR. McELHINNY:  By whom -- well, who --
14:14:02  3  who was the person that hired you at Samsung?
14:14:07  4      A.  I thought I was hired by a company, not a
14:14:11  5  particular person.
14:14:12  6      Q.  Okay.  Did you negotiate -- did you have a
14:14:13  7  discussion about what your job responsibilities would
14:14:15  8  be with a particular person?
14:14:17  9      A.  I did.
14:14:18 10      Q.  And who is that person?
14:14:19 11      A.  Head of the human resources department.
14:14:23 12      Q.  And -- and what were, generally, your job
14:14:26 13  responsibilities as an advisor?
14:14:31 14      A.  I was advising to head of network -- network
14:14:33 15  infrastructure division.
14:14:39 16      Q.  I'm sorry.  What's the first word?  "Natural"?
14:14:42 17      A.  "Network."
14:14:44 18      Q.  "Network."  Got it.  Sorry.
14:14:44 19      A.  Network infrastructure division.
14:14:46 20      Q.  And who was that at the time?
14:14:48 21      A.  At the time, Mr. Kim.
14:14:52 22      Q.  Do you know his full --
14:14:53 23      A.  Right.  W.S. Kim.
14:15:06 24      Q.  When you were promoted to executive vice
14:15:09 25  president, did your job responsibility change?

Page 15

14:15:14  1      A.  Not at the time.  No.
14:15:15  2      Q.  Okay.  Has your job responsibility changed
14:15:17  3  from network infrastructures?
14:15:20  4      A.  Yes, it did.
14:15:22  5      Q.  And -- and when did it first change?
14:15:24  6      A.  My memory is in March 2008.
14:15:28  7      Q.  And what was your new responsibility, sir?
14:15:30  8      A.  New responsibility is the head of global
14:15:35  9  product strategy.
14:15:37 10      Q.  As the head of global product strategy,
14:15:40 11  what -- what product lines are you responsible for?
14:15:43 12      A.  Mainly mobile portfolios.
14:15:48 13      (Court reporter clarification.)
14:15:48 14      THE WITNESS:  "Portfolios."  Yeah.
14:15:49 15      Q.  BY MR. McELHINNY:  And -- and can you give
14:15:50 16  us just some examples of the products that fall within
14:15:54 17  "mobile portfolios"?
14:15:56 18      A.  We are launching roughly 200 different phones
14:16:00 19  a year.  So my responsibility is to cover -- to segment
14:16:06 20  those portfolios, depending on customer segment and the
14:16:10 21  geographical segment.
14:16:21 22      Q.  Are -- are you involved in -- are -- are you
14:16:24 23  the head of a particular group?
14:16:28 24      A.  What do you mean by that?
14:16:30 25      Q.  Is there a -- did -- is there a group or

Page 16

14:16:36  1  organization --
14:16:36  2      A.  I -- I'm heading department --
14:16:36  3      (Court reporter clarification.)
14:16:40  4      MR. STEIGER:  You -- you need to let him
14:16:41  5  finish his question before you start to answer --
14:16:43  6      THE WITNESS:  Yeah.
14:16:44  7      MR. STEIGER:  -- because she can only take
14:16:44  8  down one voice at a time.
14:16:45  9      Q.  BY MR. McELHINNY:  I -- I -- I'll ask you
14:16:47 10  that way.
14:16:47 11      Are you the head of a particular department
14:16:48 12  at Samsung?
14:16:49 13      A.  Yes, I am.
14:16:50 14      Q.  And what is that department, sir?
14:16:52 15      A.  The name of department is global product
14:16:54 16  strategy.
14:16:56 17      Q.  Does the global product strategy department --
14:16:59 18  is it involved in product design?
14:17:01 19      A.  It does.
14:17:06 20      Q.  Is the glo -- is -- is -- is part of your
14:17:09 21  responsibility for tablets as well as phones?
14:17:12 22      A.  That's correct.
14:17:13 23      Q.  Okay.  I should ask you this question just
14:17:25 24  so that I have it on the record.
14:17:27 25      Are -- are you comfortable having your

Page 17

14:17:29  1  deposition taken in -- in English?
14:17:30  2      A.  So far, yes.
14:17:31  3      Q.  So far.  Okay.
14:17:32  4      And you know that we have a translator here
14:17:34  5  available for you if I --
14:17:34  6      A.  Yeah.
14:17:36  7      Q.  -- if my -- if my English gets so bad that you
14:17:38  8  need to have it translated.
14:17:40  9      A.  If you don't mind, speak a little bit slowly.
14:17:43 10      Q.  Okay.  I'll try that.
14:17:44 11      (Exhibit 2144 marked for identification.)
14:17:45 12      Q.  BY MR. McELHINNY:  Sir, I'm handing you a
14:18:07 13  document --
14:18:07 14      A.  Uh-huh.
14:18:08 15      Q.  -- which has been marked as Exhibit 2144.
14:18:16 16      MR. STEIGER:  Counsel, do you have an English
14:18:20 17  translation of the document?
14:18:20 18      MR. McELHINNY:  We have not had one produced
14:18:23 19  to us, no.
14:18:24 20      MR. STEIGER:  For the record, I would object
14:18:26 21  to questions on this Korean document without an English
14:18:31 22  translation because I don't speak Korean and I can't
14:18:32 23  read the document.
14:18:34 24      Can we agree I have a continuing objection --
14:18:36 25      MR. McELHINNY:  You may.

5  (Pages 14 to 17)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 54

15:26:27 1     MR. STEIGER: Well, I object to the foundation
15:26:29 2  because it doesn't look like that subject first appeared
15:26:33 3  in his own e-mail.
15:26:34 4     THE WITNESS: I have to guess.
15:26:36 5     MR. STEIGER: Calls for speculation.
15:26:38 6     THE WITNESS: There are several keyboard
15:26:41 7  accessories available for iPad.
15:26:45 8     MR. STEIGER: And I'd move to strike his
15:26:50 9  answer as speculation.
15:26:56 10    Q. BY MR. McELHINNY: Can you tell us, please,
15:26:57 11  what you wrote in the -- in the first paragraph of your
15:27:01 12  e-mail? Can you tell us in English, please?
15:27:06 13    A. Do you want me to translate? As --
15:27:07 14    Q. Please.
15:27:08 15    A. As I told you, I don't remember this e-mail.
15:27:10 16    Q. Please.
15:27:10 17    A. First paragraph?
15:27:12 18    Q. Right.
15:27:13 19    MR. STEIGER: Well, I object to the extent
15:27:16 20  you're asking him to function as a translator. If
15:27:18 21  you're asking him just more generally what he wrote,
15:27:22 22  I think he's able to do that. But I can't substitute
15:27:26 23  as an official translation of the document.
15:27:46 24    THE WITNESS: It's a little bit long sentence.
15:27:56 25    "Since our president push our" --

Page 55

15:28:02 1     Q. BY MR. McELHINNY: I'm sorry. Let's make sure
15:28:05 2  we're looking --
15:28:05 3     A. I'm sorry.
15:28:05 4     Q. -- at the same thing.
15:28:06 5     A. Okay.
15:28:06 6     Q. I'm -- I'm just asking --
15:28:07 7     A. Referring to --
15:28:07 8     Q. -- about the sentence that says:
15:28:08 9     "Apple Shop and Accessories."
15:28:13 10    MR. STEIGER: Just make sure the document is
15:28:15 11  not blocking the video screen.
15:28:17 12    MR. McELHINNY: Sorry.
15:28:18 13    Q. BY MR. McELHINNY: We're talking at the
15:28:18 14  bottom -- we're talking about the first page in your
15:28:20 15  e-mail. There's a sentence there that uses the English
15:28:23 16  words:
15:28:24 17    "Apple Shop and Accessories."
15:28:26 18    A. (Reading.)
15:28:31 19    "While I'm traveling in Europe, whenever I
15:28:38 20  visit Apple Shop, there are many accessories available."
15:28:51 21    That's what it says.
15:28:52 22    Q. Do you talk about the quality of the displays,
15:28:56 23  sir?
15:28:59 24    A. Not here.
15:29:00 25    Q. Okay. When you -- when you -- do you from

Page 56

15:29:03 1  time to time visit Apple stores?
15:29:05 2     A. I do.
15:29:06 3     Q. And why do you do that?
15:29:09 4     A. I'm curious about the products coming out from
15:29:14 5  competitors.
15:29:17 6     Q. If you would look, then, on the next page of
15:29:20 7  the document. So that's page 7494. At the very top,
15:29:34 8  you have a section "2" in your e-mail.
15:29:36 9     Do you see that?
15:29:36 10    A. Uh-huh. Yes, I do.
15:29:38 11    Q. And if you read to yourself this time now the
15:29:41 12  third paragraph, the one that uses the word "Apple" in
15:29:45 13  it.
15:29:45 14    Do you see it?
15:29:48 15    I'm not asking you to translate it. Right
15:30:08 16  now, I'm just asking you to read it.
15:30:10 17    Have you read it?
15:30:11 18    A. I did.
15:30:12 19    Q. Okay. Can you tell us what direction you
15:30:14 20  were -- you were giving in that paragraph?
15:30:17 21    MR. STEIGER: Objection. Assumes facts.
15:30:17 22  Mischaracterizes the document.
15:30:20 23    THE WITNESS: Okay. I'm just -- I'm
15:30:20 24  speculating.
15:30:21 25    MR. McELHINNY: Uh-huh.

Page 57

15:30:22 1     MR. STEIGER: At least I think it
15:30:23 2  mischaracterizes it. I can't read it, which is
15:30:26 3  my continuing objection.
15:30:30 4     Q. BY MR. McELHINNY: Let's be sure we're
15:30:32 5  answering and asking the same question, sir.
15:30:33 6     In that paragraph, in what's written here,
15:30:36 7  have you given an order?
15:30:39 8     MR. STEIGER: Vague and ambiguous.
15:30:41 9     THE WITNESS: I'm not giving an order.
15:30:42 10    Q. BY MR. McELHINNY: Are you -- are you --
15:30:43 11    A. I'm giving my opinion.
15:30:45 12    Q. Are you giving an opinion about what should
15:30:47 13  be done in the future?
15:30:48 14    A. The desirable thing to do.
15:30:49 15    MR. STEIGER: Vague and ambiguous.
15:30:49 16    Q. BY MR. McELHINNY: I'm sorry?
15:30:49 17    A. What is the desired -- desirable way to do.
15:30:58 18    Q. And -- and --
15:30:58 19    (Court reporter clarification.)
15:30:58 20    THE WITNESS: What is the desirable way to do.
15:30:58 21    Q. BY MR. McELHINNY: And -- and can you tell us
15:30:59 22  then, please, what it was that you were saying was the
15:31:03 23  desirable way to do it?
15:31:05 24    A. When designers report to -- again, you know,
15:31:11 25  I'm just trying to translate this. But you're asking

Merrill Corporation - Boston
617-542-0039                              www.merrillcorp.com/law

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 58

15:31:16 1  me what I was trying to tell my people?
15:31:18 2      Q.  Yes, please.
15:31:19 3      A.  Is that what you're asking me?
15:31:20 4      Q.  That's what I'm asking.
15:31:21 5      A.  I was suggesting that, when the design is
shown to our president, comparison with product --
15:31:29 6
15:31:35 7  similar product from Apple needs to be provided
15:31:46 8  together.
15:31:46 9      Q.  Okay.  Let me make sure I understand.
15:31:49 10     What you're saying is, when you've got a new
15:31:51 11 product and you're showing it to the president, you want
15:31:54 12 it done side by side in a comparison to Apple; is that
15:31:57 13 correct?
15:31:58 14     MR. STEIGER:  Misstates his testimony.
15:32:00 15 Misstates --
15:32:01 16     THE WITNESS:  We --
15:32:02 17     MR. STEIGER:  -- the document.
15:32:02 18     THE WITNESS:  -- compare with multiple
15:32:05 19 different of the competitor products.  Apple product
15:32:10 20 could be one of them.
15:32:11 21     Q.  BY MR. McELHINNY:  Well, in -- in this
15:32:12 22 paragraph at least, the only one that you talk about
15:32:14 23 is Apple; correct?
15:32:18 24     A.  Yeah.  I state Apple.
15:32:20 25     Q.  Okay.  And -- and and -- why do you

Page 59

15:32:24 1  want that presentation to be made as a comparison?
15:32:28 2      A.  Again, it's my speculation.
15:32:29 3      Q.  Uh-huh.
15:32:31 4      A.  Apple product is one of products in the
15:32:35 5  premium segment.  Also some products from HTC and other
15:32:43 6  manufacturers are also premium products.  So when we
15:32:49 7  design our premium products, possibly Apple will be
15:32:53 8  one of the products to be compared.
15:32:57 9      Q.  And -- and my question is why do you -- why
15:33:00 10 do you -- why do you do that internal presentation as
15:33:02 11 a comparison?
15:33:03 12     MR. STEIGER:  Misstates his testimony.
15:33:05 13 Assumes facts.
15:33:08 14     THE WITNESS:  We look at the several different
15:33:11 15 key aspects of the new product, functions and cost
15:33:19 16 structure, of course performance.  So we want to
15:33:24 17 make sure our product is -- better deliver functions,
15:33:28 18 performance, and also hopefully better cost, which would
15:33:35 19 be benefit to consumers.  Those are the main reasons to
15:33:40 20 compare.
15:33:40 21     Q.  BY MR. McELHINNY:  But -- but when the
15:33:41 22 president is looking at a side-by-side comparison,
15:33:42 23 he can't tell about the cost, can he?
15:33:47 24     MR. STEIGER:  Objection.  Misstates his
15:33:47 25 testimony.  Assumes facts.  Vague and ambiguous.  And

Page 60

15:33:51 1  compound.
15:33:52 2      THE WITNESS:  There's the -- in -- in the
15:33:57 3  Internet, there's always information flowing around
15:34:01 4  about the cost of the competitors' products.  And also,
15:34:07 5  the -- some technical interest group, they demonstrate
15:34:16 6  and they present performance of the competitors'
15:34:19 7  products as well.  So we have data collected from
15:34:24 8  public information.  So we provide data to president
15:34:29 9  whenever comparison is made.
15:34:32 10     Q.  BY MR. McELHINNY:  But -- but in this
15:34:33 11 document, you're simply talking about a side-by-side
15:34:36 12 presentation of the products; correct?
15:34:38 13     MR. STEIGER:  Misstates the document and
15:34:40 14 his prior testimony.
15:34:41 15     THE WITNESS:  Yes.
15:34:42 16     Q.  BY MR. McELHINNY:  And -- and -- and what is
15:34:44 17 the president supposed to tell in that presentation?
15:34:48 18     MR. STEIGER:  No foundation.  Calls for
15:34:48 19 speculation.
15:34:57 20     THE WITNESS:  I cannot speak for my president.
15:34:59 21     Q.  BY MR. McELHINNY:  What was your purpose in
15:35:01 22 having a side-by-side presentation?
15:35:03 23     A.  Again, our product should be better in those
15:35:07 24 three functions -- aspects that I mentioned earlier,
15:35:10 25 so consumer satisfaction, function, performance, and

Page 61

15:35:16 1  hopefully cost structure.
15:35:18 2      Q.  But -- but isn't the reason that you present
15:35:20 3  them side by side so that somebody can compare the
15:35:24 4  design?
15:35:24 5      A.  I don't think --
15:35:25 6      MR. STEIGER:  Vague and ambiguous.  Misstates
15:35:26 7  his prior testimony.
15:35:27 8      THE WITNESS:  I don't think -- "side by side"
15:35:30 9  doesn't mean just side -- physically side by side.
15:35:33 10 So that product should be compared together with
15:35:38 11 competitors.
15:35:40 12     Q.  BY MR. McELHINNY:  So in this document, you
15:35:41 13 were not talking about a physical presentation of the
15:35:45 14 product side by side?
15:35:46 15     A.  I -- I don't remember this particular mail.
15:36:14 16     (Ms. Aeryong Kim exits the proceedings.)
15:36:15 17     MR. McELHINNY:  Okay.  Just for the record,
15:36:16 18 the -- the translator, because you're not needing any
15:36:19 19 help, is going to help in another deposition.  But if
15:36:21 20 you want her back, we can get her back.  All you have
15:36:22 21 to do is just say the word.
15:36:23 22     THE WITNESS:  I understand.
15:36:35 23     (Exhibit 2151 marked for identification.)
15:36:50 24     Q.  BY MR. McELHINNY:  Sir, I'm handing you a
15:36:51 25 document which has been marked as Exhibit 2151.  It's

16  (Pages 58 to 61)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 62

15:37:00  1   a four-page, two-sided document.  It runs from Bates
15:37:05  2   numbers SAMNDCA10805169 through 5175.
15:37:16  3       A.  (Examining.)
15:37:16  4       MR. STEIGER:  Same objections to the Korean
15:37:34  5   portions of the document.  And to be clear, continuing
15:37:46  6   objection to any questions based on that.
15:38:14  7       THE WITNESS:  Okay.
15:38:15  8       Q.  BY MR. McELHINNY:  Have you ever seen this
15:38:16  9   document before?
15:38:17 10       A.  No, I didn't.
15:38:18 11       Q.  See how easy this is?
15:38:25 12       Next one, please.
15:38:28 13       (Exhibit 2152 marked for identification.)
15:38:37 14       Q.  BY MR. McELHINNY:  Sir, I'm handing you a
15:38:38 15   document which has been marked as Exhibit 2152.  It's
15:38:50 16   a multiple-page document.  It bears Bates numbers
15:38:54 17   SAMNDCA10807316 through 387.
15:39:05 18       A.  (Examining.)  Okay.
15:40:40 19       Q.  Sir, have you ever seen this document before?
15:40:42 20       A.  I did.
15:40:44 21       Q.  On the cover, it refers to something called
15:40:46 22   the:
15:40:46 23       "Steering Committee Meeting II."
15:40:48 24       Do you see that?
15:40:49 25       A.  I do.

Page 63

15:40:50  1       Q.  Can you tell us what that was?
15:40:52  2       MR. STEIGER:  Foundation.  Speculation.
15:41:12  3       THE WITNESS:  I don't remember we had a
15:41:15  4   steering committee at all at the time.
15:41:18  5       Q.  BY MR. McELHINNY:  Let me make sure.
15:41:19  6       You don't remember anything that was called
15:41:21  7   a steering committee?
15:41:23  8       A.  There was a steering committee.  But I don't
15:41:25  9   remember this particular steering committee --
15:41:27 10       Q.  Okay.
15:41:27 11       A.  -- that you are referring to.
15:41:28 12       Q.  Does your planning group have a steering
15:41:31 13   committee?
15:41:31 14       A.  We do not.
15:41:32 15       Q.  Okay.  What -- how -- how did it happen that
15:41:37 16   you saw this document for the first time?
15:41:44 17       A.  We had a consulting project with McKinsey.
15:41:48 18   And this is one of the reports.
15:41:51 19       Q.  When you say "we had a project with McKinsey,"
15:41:54 20   who -- who -- who's the "we"?  Who hired you?
15:41:57 21       A.  Samsung Electronics.
15:41:58 22       Q.  And -- and was it -- were you responsible
15:42:00 23   for that?
15:42:01 24       A.  I was not.
15:42:01 25       Q.  Okay.  What -- what group -- who -- who

Page 64

15:42:03  1   was it within Samsung that hired McKinsey to do this
15:42:07  2   consulting project?
15:42:09  3       MR. STEIGER:  No foundation.  Calls for
15:42:09  4   speculation.
15:42:11  5       THE WITNESS:  I have to check --
15:42:11  6       Q.  BY MR. McELHINNY:  Okay.
15:42:12  7       A.  -- who signed the contract.
15:42:12  8       Q.  And in -- did you attend a meeting where
15:42:17  9   this presentation was made?
15:42:18 10       A.  I don't remember.
15:42:21 11       Q.  Do you remember what the nature of the
15:42:25 12   consulting project was with -- what it was that
15:42:29 13   McKinsey was asked to do?
15:42:32 14       MR. STEIGER:  Compound.  Assumes facts.  No
15:42:35 15   foundation.
15:42:35 16       THE WITNESS:  Helping mobile division to
15:42:41 17   better understand dynamics of -- market dynamics of
15:42:45 18   our smartphones.
15:42:47 19       Q.  BY MR. McELHINNY:  And -- and do you -- why
15:42:51 20   did you get a copy of this report?
15:42:53 21       MR. STEIGER:  No foundation.  Calls for
15:42:53 22   speculation.
15:42:53 23       THE WITNESS:  I remember seeing this --
15:42:56 24       MR. STEIGER:  You need to let me finish my
15:42:59 25   objection.

Page 65

15:42:59  1       Assumes facts.
15:42:59  2       (Court reporter clarification.)
15:42:59  3       Q.  BY MR. McELHINNY:  I'm sorry?
15:43:00  4       A.  I remember seeing this document.
15:43:06  5       Q.  Okay.  How -- how does Samsung use documents
15:43:50  6   like this?
15:43:51  7       What -- what do you do with them?
15:43:53  8       MR. STEIGER:  Vague and ambiguous.  No
15:43:53  9   foundation.  Calls for speculation.  Compound.  Overly
15:43:58 10   broad and general.
15:43:59 11       THE WITNESS:  Again --
15:44:00 12       Q.  BY MR. McELHINNY:  Excuse me.  He's right.
15:44:04 13   My question was compound.  So I have to ask you a
15:44:07 14   different one.  All right.  I'm going to ask you a
15:44:09 15   different question.
15:44:10 16       How does Samsung use consultant reports like
15:44:16 17   this?
15:44:17 18       MR. STEIGER:  Same objections I just stated,
15:44:17 19   including compound.
15:44:18 20       THE WITNESS:  Again, the purpose of the
15:44:21 21   consulting project was to help Samsung Electronics
15:44:26 22   understand better market dynamics of a smartphone.
15:44:29 23   And we just use as one of the reference materials
15:44:38 24   to understand better.
15:44:42 25       Q.  BY MR. McELHINNY:  And -- and do you know

17 (Pages 62 to 65)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 110

17:07:37 1    A.  What do you mean by "Section 6"?  (Examining.
17:07:38 2        Oh, you mean the next page?
17:07:45 3    Q.  Yes, please.
17:07:46 4    A.  Oh, okay.  Yeah.  I didn't know there is a
17:07:48 5 next page.  Okay.
17:09:43 6    Q.  Sir, in the first sentence there, it talks
17:09:45 7 about something called the:
17:09:46 8        "S Series design similarity issue."
17:09:52 9        Do you see that?
17:09:53 10   A.  I do.
17:09:53 11   Q.  Do you know what the S Series design
17:09:56 12 similarity issue was?
17:09:57 13       MR. STEIGER:  Assumes facts.  No foundation
17:10:01 14 based on this document.
17:10:02 15       THE WITNESS:  I understand what "S Series"
17:10:07 16 are.
17:10:08 17   Q.  BY MR. McELHINNY:  Right.
17:10:08 18   A.  But I don't understand what "design
17:10:12 19 similarity" means.
17:10:13 20   Q.  What is the "S Series," sir?
17:10:17 21   A.  Our -- one of our device portfolio.
17:10:20 22   Q.  Telephones?
17:10:22 23   A.  Smartphones.  Yes.
17:10:23 24   Q.  Right.  The Galaxy S is one of the S Series?
17:10:27 25   A.  That's correct.

Page 111

17:10:27 1    Q.  It says here to make changes in the CMF.
17:10:31 2        Do you see that?
17:10:33 3        MR. STEIGER:  Objection.  No foundation.
17:10:35 4        THE WITNESS:  Yes.
17:10:35 5    Q.  BY MR. McELHINNY:  What is "CMF"?
17:10:38 6        MR. STEIGER:  Same objection.
17:10:38 7        THE WITNESS:  Stands for "color, material,
17:10:44 8 and finish."
17:10:44 9    Q.  BY MR. McELHINNY:  "Material"?
17:10:44 10   A.  "Material."
17:10:46 11   Q.  Do you recall what changes were made in the
17:10:48 12 S Series CMF following this e-mail in February 2010?
17:10:56 13       MR. STEIGER:  Assumes facts.  No foundation.
17:11:14 14       THE WITNESS:  We change many times that.
17:11:16 15 I don't recall particularly what change was made in
17:11:19 16 that particular time.
17:11:21 17   Q.  BY MR. McELHINNY:  Okay.  Do you see here
17:11:24 18 where it says Google is demanding design differentiation
17:11:30 19 for the P3 in contrast to the iPad?
17:11:35 20       MR. STEIGER:  No foundation based on the
17:11:37 21 document.
17:11:40 22       THE WITNESS:  That's what it says.
17:11:41 23   Q.  BY MR. McELHINNY:  Okay.  And the P3 was what?
17:11:52 24   A.  10.1-inch Galaxy Tab.
17:11:53 25   Q.  All right.  And it says here that the de --

Page 112

17:11:56 1        (Court reporter clarification.)
17:11:56 2        THE WITNESS:  10.1-inch Galaxy Tab.
17:11:57 3    Q.  BY MR. McELHINNY:  And it says here that the
17:11:57 4 decision was not to make any changes; correct?
17:12:00 5        MR. STEIGER:  Same objection.  No foundation.
17:12:02 6 The document speaks for itself.  And it's in Korean.
17:12:19 7        THE WITNESS:  It appears to me that it is
17:12:23 8 trying to mean to maintain design concept.
17:12:30 9    Q.  BY MR. McELHINNY:  Does this refresh your
17:12:31 10 recollection that you did learn that Google had asked
17:12:34 11 for changes in the iPad?
17:12:36 12       MR. STEIGER:  Objection.  No --
17:12:36 13       THE WITNESS:  No.
17:12:36 14       MR. STEIGER:  -- foundation.
17:12:37 15       THE WITNESS:  Again, I don't know what kind
17:12:39 16 of level -- at what kind of level this was discussed
17:12:40 17 in the meeting with Google.
17:12:58 18       (Exhibit 1568 marked for identification.)
17:13:42 19   Q.  BY MR. McELHINNY:  Sir, I'm handing you
17:13:43 20 a document which has been marked as Exhibit 1568.  It
17:13:48 21 is a multiple-page e-mail.  It runs from Bates numbers
17:13:54 22 SAMNDCA10185356 through 85364.
17:14:03 23   A.  (Examining.)
17:14:32 24   Q.  Sir, I want to ask you about an e-mail that
17:14:35 25 is in on page 363.

Page 113

17:15:42 1    A.  Please go ahead.
17:15:44 2    Q.  Sir, this purports to be -- is this an e-mail
17:15:46 3 to you from J.K. Shin in August of 2010?
17:15:51 4        MR. STEIGER:  Objection.  Foundation.  And
17:15:52 5 also objection to the use of this document as an exhibit
17:15:56 6 or questions based on --
17:15:58 7    Q.  BY MR. McELHINNY:  363, sir.
17:15:59 8        MR. STEIGER:  -- or questions based on the
17:16:01 9 document, which is in Korean and I can't read.
17:16:05 10       THE WITNESS:  One second.  Please go ahead.
17:16:24 11   Q.  BY MR. McELHINNY:  Is this an e-mail to you
17:16:25 12 from J.K. Shin?
17:16:28 13       MR. STEIGER:  Same objections.
17:16:29 14       THE WITNESS:  It is.
17:16:30 15   Q.  BY MR. McELHINNY:  And -- and at the time,
17:16:31 16 Mr. Shin was the president of the mobile communications
17:16:34 17 division; correct?
17:16:36 18   A.  That is correct.
17:16:37 19   Q.  And in this, does he tell you that he has
17:16:41 20 ordered that the corners of the Cetus phone be made
17:16:49 21 more round?
17:16:50 22       MR. STEIGER:  Assumes facts.  Misstates the
17:16:52 23 document, plus the same objections I stated earlier.
17:16:54 24       THE WITNESS:  No.  That's not true.  He --
17:16:58 25   Q.  BY MR. McELHINNY:  Go ahead.

29 (Pages 110 to 113)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 114

17:17:01 1     A.  He saw new design of device called the Cetus,
17:17:08 2   which he believes changed by doing something --
17:17:23 3       Just a second.
17:17:27 4       (Brief exchange in Korean between the
17:17:27 5   interpreter and the witness.)
17:17:29 6       THE WITNESS: -- some -- made some change --
17:17:31 7   made -- made some change on all -- or at corner to make
17:17:38 8   more smooth -- smoothly, again corner look better.  So
17:17:53 9   he approved to use the new -- new design.
17:18:01 10      Q.  BY MR. McELHINNY:  Good.  And is the Cetus
17:18:03 11  an internal code?
17:18:04 12      A.  That's correct.
17:18:05 13      MR. STEIGER:  Same objections.
17:18:05 14      Q.  BY MR. McELHINNY:  And -- and was the Cetus
17:18:07 15  ever released as a product?
17:18:09 16      MR. STEIGER:  Same objections.
17:18:10 17      THE WITNESS:  It was released.
17:18:11 18      Q.  BY MR. McELHINNY:  And do you know what the --
17:18:12 19  the market name for the Cetus was?
17:18:17 20      MR. STEIGER:  Same objections to the extent
17:18:21 21  tied to this document.
17:18:23 22      THE WITNESS:  I believe it was called -- no,
17:18:31 23  I don't remember exactly.  Yeah.
17:18:33 24      MR. McELHINNY:  Dr. Hong, you have been very
17:18:36 25  patient.  My three hours are up, and I have no further

Page 115

17:18:39 1   questions of you.
17:18:42 2       MR. STEIGER:  I may have a few questions.  So
17:18:45 3   since he needs to change the tape anyway, let me take
17:18:49 4   a look at my notes, and I'll see.
17:18:52 5       THE VIDEOGRAPHER:  Going off the record.  The
17:18:53 6   time is 17:18.
17:18:55 7       (Recess from 5:18 p.m. to 5:33 p.m.)
17:33:53 8       THE VIDEOGRAPHER:  Okay.  Back on the record.
17:34:07 9   The time is 17:33.
17:34:09 10
17:34:09 11      EXAMINATION
17:34:09 12  BY MR. STEIGER:
17:34:14 13      Q.  Dr. Hong, I have just a few questions for you.
17:34:18 14      I believe that you said, in your earlier
17:34:21 15  testimony, that you yourself are not a product designer.
17:34:23 16  Did I note that correctly?
17:34:25 17      A.  That's correct.
17:34:25 18      MR. McELHINNY:  Leading.
17:34:27 19      THE WITNESS:  I'm not industrial designer.
17:34:28 20      Q.  BY MR. STEIGER:  Have you ever worked as a
17:34:30 21  product designer while you've been at Samsung?
17:34:33 22      A.  No.
17:34:34 23      Q.  You've never designed any of --
17:34:36 24      A.  No.
17:34:36 25      Q.  -- the Samsung products we've been talking

Page 116

17:34:36 1   about here today?
17:34:36 2       A.  That is correct.
17:34:39 3       Q.  Are you familiar with a gentleman by the name
17:34:41 4   of -- if I can pronounce it right -- Min -- Min Hyouk
17:34:43 5   Lee?
17:34:44 6       A.  That's correct.
17:34:44 7       Q.  And who -- who is he --
17:34:45 8       A.  One of --
17:34:46 9       MR. McELHINNY:  Excuse me.
17:34:46 10      Q.  BY MR. STEIGER:  -- in the organization?
17:34:46 11      MR. McELHINNY:  Beyond the scope.
17:34:46 12      Go ahead.
17:34:50 13      THE WITNESS:  One of design executives.
17:34:55 14      (Court reporter clarification.)
17:34:55 15      THE WITNESS:  One of design executives.
17:34:56 16      Q.  BY MR. STEIGER:  And would Mr. Lee be better
17:34:59 17  able to testify than you regarding particular aspects
17:35:02 18  of the product designs in your mobile group?
17:35:07 19      MR. McELHINNY:  Leading.
17:35:08 20      THE WITNESS:  Absolutely.
17:35:08 21      Q.  BY MR. STEIGER:  Are you familiar with a
17:35:09 22  gentleman by the name of Dong Hoon Chang?
17:35:14 23      MR. McELHINNY:  Beyond the scope.
17:35:15 24      THE WITNESS:  Dong Hoon Chang?  Yeah.  Okay.
17:35:15 25  I know him.

Page 117

17:35:15 1       Q.  BY MR. STEIGER:  And what does he do, if you
17:35:18 2   know?
17:35:18 3       A.  He's head of --
17:35:18 4       MR. McELHINNY:  Beyond the scope.
17:35:18 5       THE WITNESS:  -- design group.
17:35:18 6       (Court reporter clarification.)
17:35:18 7       MR. McELHINNY:  I -- I get a chance to make
17:35:18 8   the objections this time.  So you have to give me just
17:35:18 9   a second, please.
17:35:18 10      THE WITNESS:  Aah, okay.
17:35:24 11      Jon, also speak slowly.
17:35:32 12      Q.  BY MR. STEIGER:  All right.  We'll start
17:35:32 13  again, and I'll go slow.  We'll all go slow.
17:35:40 14      Are you familiar with a gentleman by the name
17:35:43 15  of Dong Hoon Chang?
17:35:46 16      MR. McELHINNY:  Beyond the scope.
17:35:48 17      THE WITNESS:  I do know him.
17:35:49 18      Q.  BY MR. STEIGER:  And is he in your
17:35:51 19  organization?
17:35:52 20      MR. McELHINNY:  Same objection.
17:35:53 21      THE WITNESS:  He is.
17:35:54 22      Q.  BY MR. STEIGER:  What does he do in your
17:35:55 23  organization?
17:35:57 24      MR. McELHINNY:  Same objection.
17:35:58 25      THE WITNESS:  He's heading design group.

30 (Pages 114 to 117)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 118

17:36:01  1     Q.  BY MR. STEIGER:  Is he better able to testify
17:36:02  2  than you regarding particular aspects of the designs
17:36:07  3  of products in the mobile group at Samsung?
17:36:11  4        MR. McELHINNY:  Leading and beyond the scope.
17:36:13  5        THE WITNESS:  Absolutely.
17:36:15  6     Q.  BY MR. STEIGER:  In Mr. McElhinny's questions
17:36:20  7  earlier, he asked you a series of questions about R-type
17:36:24  8  and C-type touch technology.
17:36:26  9        Do you recall that?
17:36:27 10     A.  I do.
17:36:28 11     Q.  And he asked you if the -- the Galaxy phone
17:36:35 12  used a C-type touch technology.  And I think you said
17:36:39 13  it does.
17:36:41 14        Is that right?  Did I hear you right?
17:36:43 15     A.  That is correct.
17:36:43 16     Q.  Why does the Galaxy use C-type or capacitive
17:36:47 17  touch technology?
17:36:48 18        Can you explain that, please?
17:36:50 19     A.  So in order to make that kind of decision,
17:36:55 20  so we look into a few different aspects.  Number one,
17:36:59 21  of course, because it's technical decision mainly, so
17:37:06 22  we look at performance.  And second one is the -- the
17:37:12 23  cost to realize that -- that technology.  And also the
17:37:19 24  satis -- level of satisfaction when actually applied
17:37:25 25  to device in which consumer -- when consumer use this

Page 119

17:37:33  1  device, how they feel.
17:37:36  2        So the performance, cost, and also the
17:37:41  3  satisfaction level -- level of satisfaction coming
17:37:44  4  from the consumer experience.  So those are three major
17:37:48  5  factors to make the decision.  Based on also, at the
17:37:51  6  time, we were not the only one company considering the
17:37:57  7  C-type.
17:37:58  8     Q.  What do you mean by that?
17:37:59  9     A.  There were other -- the phone manufacturers
17:38:04 10  were -- that were launching -- selling the C-type based
17:38:09 11  phones.  So we saw this trend moving toward the C-type
17:38:17 12  technology.  So that was input from the market.  And
17:38:22 13  also, internally, we look at three different aspects
17:38:25 14  to make that decision.
17:38:26 15     Q.  You mentioned cost as one of the aspects.
17:38:28 16        Do you know if the cost-effectiveness of the
17:38:31 17  C-type or capacitive technology has changed over time --
17:38:35 18        MR. McELHINNY:  Leading.
17:38:36 19     Q.  BY MR. STEIGER:  -- one way or the other?
17:38:39 20     A.  It did.  It happened.
17:38:40 21     Q.  And -- and how has it changed?  Has it gotten
17:38:42 22  more or less cost-effective over time?
17:38:45 23     A.  Of course, you know, it help us to reduce the
17:38:49 24  cost.
17:38:50 25     Q.  And just to clarify something else you said

Page 120

17:38:53  1  in your earlier answer, from a functional or performance
17:38:57  2  perspective, would the resistive or R-type technology be
17:39:06  3  equivalent in all respects to the capacitive or C-type
17:39:07  4  technology?
17:39:07  5        MR. McELHINNY:  Leading.
17:39:07  6        THE WITNESS:  Depending on what particular
17:39:09  7  functions you are looking at.
17:39:11  8     Q.  BY MR. STEIGER:  Are there -- are there some
17:39:11  9  differences?
17:39:13 10     A.  There are some differences, depending on
17:39:16 11  the size of the phone and some functions that you're
17:39:20 12  referring to.
17:39:20 13     Q.  Just --
17:39:20 14     A.  Like generally, right now, with the larger
17:39:27 15  screens and for more cost-effective performance, the
17:39:31 16  C-type is preferred now compared to R-type.
17:39:35 17     Q.  And let me turn to just another area I want
17:39:38 18  to follow up on.
17:39:39 19        You testified that you are the head of the
17:39:41 20  global product strategy team at Samsung.
17:39:43 21        Did I note that correctly?
17:39:45 22     A.  Right now I am.
17:39:46 23     Q.  And -- and you've had that -- that title and
17:39:50 24  position, I think, for at least three years, if I heard
17:39:53 25  you correctly?

Page 121

17:39:55  1     A.  Little -- yeah.  About three to four years,
17:39:58  2  close to four years.
17:40:00  3     Q.  And -- and focusing on the last three years,
17:40:02  4  then, has Samsung had a -- a global product strategy
17:40:07  5  for its mobile products?
17:40:10  6        MR. McELHINNY:  Beyond the scope.
17:40:10  7        THE WITNESS:  Absolutely.
17:40:11  8     Q.  BY MR. STEIGER:  And does it have a
17:40:12  9  strategy -- a global product strategy for its mobile
17:40:15 10  products now?
17:40:17 11        MR. McELHINNY:  Beyond the scope.
17:40:17 12        THE WITNESS:  We do.
17:40:18 13     Q.  BY MR. STEIGER:  What is Samsung's global
17:40:21 14  product strategy for mobile products?
17:40:23 15        MR. McELHINNY:  Beyond the scope.
17:40:23 16        THE WITNESS:  Although it change, right now,
17:40:28 17  we have two top strategies or top -- two top priorities
17:40:36 18  in the strategy.  That's two aspects.  One, innovation.
17:40:40 19  The other one is customer satisfaction.
17:40:45 20     Q.  BY MR. STEIGER:  Can you explain, please?
17:40:48 21     A.  So why -- "wow experience."
17:40:49 22        Innovation part is comes -- coming from, of
17:40:52 23  course, again, different perspectives.  Best --
17:41:00 24  different perspectives.  Best performance, number one,
17:41:02 25  best-in-class functions.  That function -- we should

31 (Pages 118 to 121)

aebaaea0-abca-46c2-9dd2-308d96b9d283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
WON-PYO HONG - 4/19/2012

Page 126

17:46:31 1    successful business strategy for the company to copy
17:46:34 2    the products of its competitors?
17:46:36 3        MR. McELHINNY:  Leading.
17:46:37 4        THE WITNESS:  No.  It cannot be.
17:46:39 5    Q.  BY MR. STEIGER:  Why not?
17:46:40 6    A.  Just simply making copy --
17:46:41 7        MR. McELHINNY:  Beyond the scope.  Sorry.
17:46:46 8    Q.  BY MR. STEIGER:  I'm sorry.  Why not?
17:46:47 9    A.  We -- we -- we believe we don't get the value
17:46:52 10   from the market, we don't get -- we don't get the value
17:46:56 11   from our consumer, our customer, and we don't create a
17:47:01 12   value by copying the other product.  And also, we have
17:47:07 13   more than 10,000 research -- research engineers and
17:47:13 14   several hundreds of designers.  So --
17:47:15 15   Q.  You said more than 10,000?
17:47:17 16   A.  More than 10,000 engineers in R & D.  And we
17:47:20 17   are spending, you know, a few billion dollars in R & D.
17:47:25 18       And we also have few hundreds of designers.
17:47:28 19   And copying doesn't have to be, number one.  And the --
17:47:34 20   by just simply, you know, copying other product, we
17:47:39 21   cannot reach where we are.
17:47:41 22       And -- and those -- the investment in designs,
17:47:46 23   as well as R & D, will lead the differentiation of our
17:47:52 24   product from our competitors.
17:47:55 25   Q.  Just a couple final questions.

Page 127

17:47:57 1        As head of global product strategy at Samsung,
17:48:00 2    do you believe the company has had success in the mobile
17:48:05 3    marketplace during the several years that you've headed
17:48:08 4    that group?
17:48:09 5        MR. McELHINNY:  Leading.  Beyond the scope.
17:48:11 6        THE WITNESS:  I believe so.
17:48:12 7    Q.  BY MR. STEIGER:  And you believe you've been
17:48:14 8    successful?
17:48:15 9    A.  Yes.
17:48:15 10       MR. McELHINNY:  Same objections.
17:48:17 11   Q.  BY MR. STEIGER:  As head of the global
17:48:17 12   product strategy group, why do you believe you've
17:48:19 13   been successful in the mobile segment?
17:48:21 14       MR. McELHINNY:  Beyond the scope.
17:48:22 15       THE WITNESS:  Again, I have to repeat
17:48:25 16   that our success is based on two key components.
17:48:29 17   One is innovation and customer satisfaction.  That
17:48:34 18   innovation -- part of -- key part of the innovation
17:48:36 19   is from differentiation.
17:48:39 20       Also, too, that happens -- again, we're making
17:48:45 21   billion dollars of investment in both R & D and design
17:48:50 22   of the product and setting up the strategy of the
17:48:53 23   marketing to approach to consumers.
17:48:58 24       MR. STEIGER:  Thank you, Dr. Hong.  No further
17:49:01 25   questions.

Page 128

17:49:02 1        MR. McELHINNY:  Thank you for your time.
17:49:04 2        THE WITNESS:  Thank you very much.
17:49:05 3        THE VIDEOGRAPHER:  Okay.  Here marks the end
17:49:07 4    of Videotape No. 4 in the deposition of Won-Pyo Hong.
17:49:16 5    Going off the record.  The time is 17:48.
6             (The deposition concluded at 5:48 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

1             CERTIFICATE OF WITNESS/DEPONENT
2
3        I, WON-PYO HONG, witness herein, do
4    hereby certify and declare the within and foregoing
5    transcription to be my examination under oath in said
6    action taken on April 19, 2012, with the exception
7    of the changes listed on the errata sheet, if any;
8        That I have read, corrected, and do hereby
9    affix my signature under penalty of perjury to said
10   examination under oath.
11
12
13
14
15   _____
     WON-PYO HONG, Witness          Date
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 to 129)

aebaaea0-abca-46c2-9dd2-308d96b9d283

# Watson Declaration

# EXHIBIT 7

# Filed Under Seal

```
 1                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                        SAN JOSE DIVISION

 3   APPLE, INC., a California
     corporation,
 4                                           CASE NO.
             Plaintiff,                       11cv01846-LHK
 5
     v.
 6
     SAMSUNG ELECTRONICS, CO., LTD.,
 7   a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
 8   INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
 9   AMERICA, LLC, a Delaware limited
     liability company,
10
             Defendants.
11   _____

12   SAMSUNG ELECTRONICS, CO., LTD.,
     a Korean business entity;
13   SAMSUNG ELECTRONICS AMERICA,
     INC., a New York corporation;
14   SAMSUNG TELECOMMUNICATIONS
     AMERICA, LLC, a Delaware limited
15   liability company,

16           Counterclaim-Plaintiffs,

17   v.
     APPLE, INC., a California
18   corporation,

19           Counterclaim-Defendant.

20

21       *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

22             VIDEOTAPED PERSONAL DEPOSITION OF:
                         MINHYOUK LEE
23
                         March 2, 2012
24                       Kim & Chang
                       Seoul, South Korea
25               9:03 A.M. - 3:47 P.M.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2..5

Page 2

```
1   APPEARANCES:

2

3   For the Plaintiff/Counterclaim-Defendant, Apple, Inc.

4                MORRISON & FOERSTER, LLP
                 BY: Peter J. Stern, Esq.
                     Stephanie Kim, Esq.
5                425 Market Street
                 San Francisco, California 94105-2482
6                (415) 268-7000

7

8   For the Defendants/Counterclaim-Plaintiffs, the Samsung
    entities:
9
                 QUINN EMANUEL URQUHART & SULLIVAN, LLP
10               BY: Michael T. Zeller, Esq.
                 865 South Figueroa Street
11               10th Floor
                 Los Angeles, California 90017
12               (213) 443-3000

13

14  Also present:

15               HanKil Kang, Samsung
                 Albert Park, Lead Interpreter
16               Sue Mi Jones, Check Interpreter
                 Marc Friedman, Videographer
17               Michael E. Miller, Court Reporter

18

19

20

21

22

23

24

25
```

Page 3

```
1               I N D E X
    WITNESS:                                      PAGE
2   MINHYOUK LEE

3   EXAMINATION BY MR. STERN                      6

4   EXAMINATION BY MR. ZELLER                     91

5

6           E X H I B I T S

7   NUMBER      DESCRIPTION                       PAGE

8   Exhibit 2105  Organizational Chart            8
                  (S-ITC-003006128)
9
    Exhibit 2106  Galaxy S Project Recommendation 12
10                (SAMNDCA10251326 - SAMNDCA10251344)

11  Exhibit 2107  iF Product Design Award Document 23
                  (SAMNDCA10763590)
12
    Exhibit 2108  Archetype Design 2009 Document   26
13                (SAMNDCA10105070 - SAMNDCA10105124)

14  Exhibit 2109  S Project Document               39
                  (SAMNDCA10806650 - SAMNDCA10806659)
15
    Exhibit 2110  Chain of E-mails                 53
16                (S-ITC-009018052 - S-ITC-009018055)

17  Exhibit 2111  Design Mock-up History Spreadsheet 55
                  (SAMNDCA10144232 - SAMNDCA10144281)
18
    Exhibit 2112  DIA Spreadsheet                  57
19                (S-ITC-007754234 - S-ITC-007754239)

20  Exhibit 2113  Aries (GT-I9000) Global GSM Level 2 58
                  Document
21                (S-ITC-007849424 - S-ITC-007849493)

22  Exhibit 2114  2009 Archetype Design Presentation 67
                  (SAMNDCA00202242 - SAMNDCA00202265)
23
    Exhibit 2115  S1 Project Document              74
24                (SAMNDCA10763492 - SAMNDCA10763495)

25
```

Page 4

```
1           E X H I B I T S

2   NUMBER      DESCRIPTION                       PAGE

3   Exhibit 2116  Mobile Planview Presentation    75
                  (SAMNDCA00530405 - sss00530490)
4
    Exhibit 2117  Flagship Document               81
5                 (SAMNDCA11010883)

6   Exhibit 2118  Photos, Samsung before/after the 85
                  iPhone
7
    Exhibit 2119  Photos, Samsung before/after the iPad 86
8
    Exhibit 2120  Photos, Samsung Packaging       88
9                 before/after the iPhone

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
1                  PROCEEDINGS

2          (March 2, 2012 at 9:03 a.m.)

3          THE VIDEOGRAPHER:  We are on the record, and

4   the time is 9:03 a.m.  Today's date is March 2nd, 2012.

5          My name is Marc Friedman, certified legal

6   videographer with American Realtime Court Reporters Asia.

7          This deposition is being held in the office of

8   Kim & Chang, located in Jeongdong, Seoul, South Korea.

9   The caption of this case is Apple, Inc., a California

10  corporation vs. Samsung Electronics Company, Ltd., et al.

11  in the United States District Court, Northern District of

12  California, San Jose Division, Civil Action 11-CV-01846.

13          This is the personal deposition of MinHyouk

14  Lee.

15          At this time, counsel will identify themselves,

16  state whom they represent, starting with the noticing

17  attorney.

18          MR. STERN:  Peter Stern of Morrison & Foerster

19  for Apple.  With me is Stephanie Kim.

20          MR. ZELLER:  Mike Zeller for Samsung.

21          MR. KANG:  HanKil Kang for Samsung.

22          THE VIDEOGRAPHER:  Counsel, please state any

23  stipulations or agreements on the record.

24          MR. STERN:  I've been asked to read this by the

25  court reporter:
```

Page 6

1           We understand the court reporter is not
2   authorized to administer oaths in this venue.
3   Nevertheless we request that he administer the oath and we
4   stipulate that we waive any objection to the validity of
5   the deposition based on the oaths.
6           THE REPORTER:  Counsel, agreed?
7           MR. ZELLER:  It is.
8           THE VIDEOGRAPHER:  Our court reporter, Mike
9   Miller of American Realtime Court Reporters Asia, will now
10  swear in the interpreters and the witness, and we shall
11  proceed.
12          (Interpreters sworn.)
13                  MINHYOUK LEE,
14      having been duly sworn, testified as follows:
15                  EXAMINATION
16  BY MR. STERN:
17      Q.   Good morning, sir.  Could you please state your
18  name for the record?
19      A.   My name is MinHyouk Lee.
20          LEAD INTERPRETER:  M-I-N-H-Y-O-U-K, L-E-E.
21  BY MR. STERN:
22      Q.   By whom are you employed, Mr. Lee?
23      A.   My employer?
24      Q.   Yes.
25      A.   Samsung Electronics Co.  Is that what you're

Page 7

1   asking?  I don't understand exactly when you say
2   "employer."  Are you asking about the group or the
3   representative?  I'm confused.
4       Q.   By what particular entity of Samsung
5   Corporation are you employed?
6       A.   Samsung Electronics Company.
7       Q.   And what's your current title at Samsung
8   Electronics?
9       A.   I am a vice president.
10      Q.   Vice president of what, Mr. Lee?
11      A.   Mobile Communications Division, Design Team.
12  I'm the vice president there, MinHyouk Lee.
13      Q.   And in that position, you are currently a
14  member of the Design Group; is that correct?
15      A.   That is correct.
16      Q.   And within the Design Group, are you a member
17  of any other particular subgroup or organization?
18      A.   Based on the design team, are you asking of a
19  department above that design team, or below that design
20  team?  Could you clarify, please?
21      Q.   I'm asking you what portion of the Design Group
22  are you a member of.
23      A.   Oh, within the design team, I'm part of the
24  product design team.
25      Q.   When did you assume your current position?

Page 8

1       A.   My current position, December 2010.
2       Q.   So do I understand correctly that since
3   December 2010 you have been vice president of the Mobile
4   Communications Team?
5       A.   That is correct.
6           CHECK INTERPRETER:  "Yes."
7   BY MR. STERN:
8       Q.   Has your title changed since December 2010?
9       A.   No.
10          (MH Lee Deposition Exhibit 2105 marked.)
11  BY MR. STERN:
12      Q.   I'm going to ask the court reporter to mark as
13  Exhibit 2105 a document, which I'll ask you to take a look
14  at, Mr. Lee.  It's a document which bears Bates number
15  S-ITC-003006128.
16          Mr. Lee, do you see your name on Exhibit 2105?
17      A.   Yes.
18      Q.   And does this document accurately reflect your
19  current title and position within Samsung Electronics?
20      A.   Title and position, I believe are the same
21  thing, and this is a list of the team members I had that I
22  led last year.
23          CHECK INTERPRETER: Excuse me.  "Title and
24  position I believe are the same, and this is the list of
25  the team organizations I was a part of at last year."

Page 9

1           MR. STERN:  Understood.
2   BY MR. STERN:
3       Q.   Mr. Lee, prior to December 2010, what was your
4   title at Samsung Electronics?
5           (A discussion was had off the record between
6   Lead Interpreter and Check Interpreter in Korean.)
7       A.   Before December 2010, I was a principal.
8           CHECK INTERPRETER:  "Principal engineer."
9           LEAD INTERPRETER:  I stand by her rendition.
10  BY MR. STERN:
11      Q.   And as principal engineer prior to
12  December 2010, what portion of the Design Group were you a
13  member of?
14      A.   I think it's designer or principal designer.
15          I was a unit leader of the IDC.
16          CHECK INTERPRETER:  "Group."
17  BY MR. STERN:
18      Q.   The IDC is the ID Cluster; is that correct?
19      A.   That is correct.
20      Q.   Okay.  Exhibit 2105 lists you as director of
21  the ID Cluster.  Do you see that?
22      A.   Yes, I see that.  It says "part leader."  I
23  think there's a little bit of a confusion, but it's part
24  leader.
25          CHECK INTERPRETER:  "I think there's a little

Page 10

1  bit of confusion as to how it is expressed in language."
2  BY MR. STERN:
3      Q.    Okay.  Prior to December 2010, do I understand
4  correctly that you were a unit leader of the ID Cluster,
5  but below the level of director, which you hold now?
6      A.    I cannot understand.  Can you do that once
7  again, please?
8      Q.    Sure.
9            Prior to December 2010, you were a member of
10 the ID Cluster, correct?
11     A.    Correct.
12     Q.    And after December 2010, your role within the
13 ID Cluster changed, correct?
14     A.    It's the same.
15     Q.    Okay.  And when did you assume the position
16 that you held until December 2010 within the ID Cluster?
17     A.    So are you asking about when I was a principal?
18     Q.    I am asking about the period during which you
19 were a principal, yes, and when you became a principal
20 engineer.
21     A.    It is a principal designer.
22     Q.    I'm sorry, principal designer.
23           When did you become a principal designer?
24     A.    I'm sorry, I cannot accurately recall.  I've
25 been promoted quite fast, but I remember it to be around

Page 11

1  2007.
2      Q.    Okay.  And between 2007 and 2010, as principal
3  designer, what portion of the Design Group were you a
4  member of?
5      A.    In the Product Design Part 1, there's a
6  subgroup unit, unit subgroup, and I was the unit leader.
7  And along with that, I was the art director for the
8  overall part.
9      Q.    What does it mean to be art director?
10     A.    In our part, regarding all of the designs, I
11 would provide advice or basically generally manage all of
12 the design aspects of our part.
13           CHECK INTERPRETER:  "The position is in that
14 concept."
15 BY MR. STERN:
16     Q.    What does it mean to manage the design aspects
17 of the Product Design Group?
18     A.    Within the design team part, for instance,
19 overall strategic direction, that kind of stuff, you could
20 see the concept is like a director, as we know it.
21     Q.    As a practical matter, on a day-to-day basis,
22 what did your work involve as the art director?
23     A.    Well, I would do design personally myself, also
24 check the quality of the work of junior designers, and I
25 cannot particularly say exactly what, but overall design.

Page 12

1  And another important thing is that if there are issues
2  basically with engineers or so forth in the
3  implementations, I would resolve that with the knowledge I
4  have or through meetings, basically, untangle those
5  issues.
6            CHECK INTERPRETER:  Just one minor
7  interjection:  "If there are issues basically with
8  engineering and/or mechanicals."
9  BY MR. STERN:
10     Q.    Mr. Lee, are you familiar with a product or
11 group of products at Samsung that go under the name of
12 Galaxy S?
13     A.    Yes.
14     Q.    And did you have some involvement in the design
15 of the Galaxy S product at Samsung?
16     A.    Yes.
17           (MH Lee Deposition Exhibit 2106 marked.)
18 BY MR. STERN:
19     Q.    Mr. Lee, the court reporter has handed you a
20 multipage document which we marked as Exhibit 2106, which
21 consists of Bates numbered pages 10251326 through 344.
22     A.    Yes, I see it.
23     Q.    What is this document, Mr. Lee?
24     A.    The first page I'm familiar with, but I'll have
25 to read the content of the others, other pages.  I will do

Page 13

1  that.
2            (Witness reviews document.)
3      A.    Yes.
4  BY MR. STERN:
5      Q.    Mr. Lee, are you able to tell me what
6  Exhibit 2106 is?
7      A.    Well, this is a recommendation, basically, to
8  enter a project for review of the Proud Samsung Employee
9  Award, which is given within Samsung.
10     Q.    So, in other words, this was a recommendation
11 that the Galaxy S -- well, strike that.
12           What is the particular product that is referred
13 to in Exhibit 2106, Mr. Lee?
14     A.    It's the Galaxy S.
15     Q.    And does this document recommend that the
16 design team for the Galaxy S receive a commendation?
17     A.    The people, the core members of designing the
18 Galaxy S are recommended.
19     Q.    And your name appears as a participating
20 designer on the Galaxy S Project, right?
21     A.    That is correct.
22     Q.    Mr. Lee, what was your design philosophy for
23 the Galaxy S product?
24     A.    Well, first of all, in regards with design, we
25 wanted to make this easy to use for users, and then we

Page 18

1  design alone.
2       CHECK INTERPRETER: "Yes, I find it vague
3  myself.  Design is not about only one aspect.  The design
4  has all different aspects involved, and all these come
5  together to become a product.  And there are design
6  engineers who get involved, and maybe one find the design
7  to be a part of it, so -- another one may not, so I don't
8  think you can really make any decision or determination
9  just based on that alone, and I found it vague."
10 BY MR. STERN:
11      Q.    In the paragraph that we've been looking at,
12 the third bullet point in the middle of page 10251327,
13 Mr. Lee, do you see a reference to "emotion"?
14      A.    Yes.
15      Q.    When you were designing the Galaxy S, did you
16 try to create a product that would have emotional appeal
17 for customers?
18      A.    Now, it says here in the paragraph "based on
19 emotional CMF."  That is what we're referring to here.  If
20 you look at the back end, there's new technologies in
21 regards with CMF that we're introducing.  This is going to
22 bring about new emotions.  Basically, CMF stands for
23 color, material, finishing.
24      Q.    In general as a designer, do you believe it's
25 important to design products that will have an emotional

Page 19

1  appeal to customers?
2       MR. ZELLER:  The question is vague, overbroad.
3       A.    Yes, I also feel that is the case.  To give you
4  an example, the first Ford T Model vehicle, whether it's
5  beautiful or not, we can't say; but it has historic
6  meaning, and that is because it was the first ever vehicle
7  to be mass produced.
8            When you evaluate design elements, you cannot
9  just focus on this one part or ask questions that are too
10 broad.  With that alone, we could talk for several days
11 and sort of just focus on one aspect for it to be too
12 broad.  I can't answer.
13 BY MR. STERN:
14      Q.    I understand that different people may find the
15 same object beautiful or not beautiful.  However, when you
16 design a cell phone product, how do you try to design it
17 so that it has emotional appeal for as many people as
18 possible?
19      MR. ZELLER:  Assumes facts, it's vague,
20 overbroad.
21      A.    Your question was too long.  I'm sorry, could
22 you ask it again?
23 BY MR. STERN:
24      Q.    Sure.
25            How do you try to design cell phone products

Page 20

1  that have emotional appeal for as many people as possible?
2       MR. ZELLER:  Assumes facts, vague, overbroad.
3       A.    As I repetitively say, Samsung is a company
4  that mass produces, and we cannot just focus on emotional
5  appeal alone.  Good manufacturing, that's a guideline for
6  design as well you see.  So just one aspect, we talk about
7  did you design towards this or not, I cannot say.
8            CHECK INTERPRETER:  Interjection: "As I
9  repeatedly say, there are many different elements in the
10 design, and Samsung is a company that does mass
11 production, and designers cannot really focus in on
12 emotional appeal only.  The mass production and thorough
13 guideline thereof is an important element, so you cannot
14 really make a judgment based on that alone."
15 BY MR. STERN:
16      Q.    Directing your attention to page 6 of this
17 document, Mr. Lee, with the Bates sequence ending in 333,
18 you see here a number of products listed.  Can you explain
19 to me, please, the relationship between these various
20 products?
21      MR. ZELLER:  The question is overbroad and
22 vague.
23      A.    It's talking about the Galaxy S, yes.  The
24 Galaxy S.
25 BY MR. STERN:

Page 21

1       Q.    Are all of the products listed on this page
2  variants of the Galaxy S design?
3       A.    Yes, Galaxy S products.
4       Q.    Do I understand that all of the products listed
5  on this page derive from a common Galaxy S design?
6       A.    It was not derived from the design, but from
7  the platform.
8       Q.    Do all the products listed on this page share a
9  common original design?
10      MR. ZELLER:  The question is vague.
11      A.    Yes, I believe so as well.
12 BY MR. STERN:
13      Q.    Directing your attention to the page ending in
14 Bates number 335 --
15      MR. ZELLER:  Just for the record, I think he's
16 saying that he agrees with me that the question is vague.
17 I don't think he's agreeing with the question just so we
18 have a clear record.
19      CHECK INTERPRETER:  Yes.
20      MR. STERN:  Okay.  Let me back up then.
21 BY MR. STERN:
22      Q.    Once more, with respect to page ending 333,
23 Mr. Lee, am I correct that you and your team designed a
24 product called the Galaxy S?
25      A.    My team and also another team was also there,

Page 22

1  yeah.
2      Q.    And was that Galaxy S design used to
3  manufacture various cell phone products that were sold in
4  various countries throughout the world?
5          CHECK INTERPRETER:  Correction.
6          (A discussion was had off the record between
7  Lead Interpreter and Check Interpreter in Korean.)
8          MR. ZELLER:  The question is vague.
9      A.    It's hard for me to exactly understand your
10  question regarding that.
11  BY MR. STERN:
12      Q.    This page lists a number of different products
13  under various product names, such as Captivate, Fascinate,
14  Vibrant and so on.  Are all the products listed on this
15  page based on the Galaxy S design?
16      A.    It is based on the Galaxy S platform.
17          CHECK INTERPRETER:  I think it's actually:
18  "Rather, they are based on the Galaxy S platform."
19  BY MR. STERN:
20      Q.    Directing your attention to Bates page ending
21  335, Mr. Lee, you see in the middle of the page, there is
22  a reference to an article from the Financial Times that
23  says, "Hopeful Samsung wheels out a would-be iPhone
24  killer."
25      A.    Yes, I see that.

Page 23

1      Q.    Was the Galaxy S designed to compete with the
2  iPhone?
3      A.    That is not the case.
4          (MH Lee Deposition Exhibit 2107 marked.)
5  BY MR. STERN:
6      Q.    You've been handed a one-page document that's
7  marked as Exhibit 2107, Mr. Lee.  It has Bates number
8  SAMNDCA10763590.  What is this document, Mr. Lee?
9      A.    It is a recommendation for 2010 iF Product
10  Design Awards.
11      Q.    Do you see your name listed as one of the
12  designers on this document for the Galaxy S?
13      A.    Yes.
14      Q.    In the section that is labeled "Concept
15  Summary," about three-quarters of the way down the page,
16  please take a look at that section, if you would.
17          (Witness reviews document.)
18  BY MR. STERN:
19      Q.    Could I ask you to please read the paragraph
20  that is next to the phrase "Concept Summary"?
21      A.    "Instead of dividing the design into several
22  partings, we wanted to express a single structure,
23  structural sense.  From 2-D pattern, Haptic, in the
24  parentheses, that is, 3-D pattern, that we -- this kind of
25  continuous progression through that, this is a progressed

Page 24

1  method -- a one-level progressed method of expression with
2  metallic coating and laser manufacturing, we have realized
3  a pattern with depth, and from a simply superficial
4  feeling, we have expressed a progressed mystique feeling."
5          CHECK INTERPRETER:  I'd like to note that the
6  main interpreter was asked to provide a side translation
7  impromptu.  As to the actual quality of the translation,
8  it will have to be -- undergo further proof work.
9          MR. STERN:  Sure.
10  BY MR. STERN:
11      Q.    Mr. Lee, do you see in the passage that you
12  just read, there's a reference to expression of a mystic
13  feeling in the phone?
14      A.    That is correct.
15      Q.    Does that accurately reflect one thing that you
16  were trying to achieve in the design of the Galaxy S?
17      A.    This one -- this one as well, to explain this,
18  when we say the laser manufacturing, this is talking about
19  the surface of the battery.  To easily explain, we have
20  transparent plastic, plastic transparent materials, and
21  then it's first coated, on the back side it's sprayed, and
22  then if you add laser to that, instead of getting black
23  and white, a simple black and white, you get a
24  multilayered kind of texture.
25          Is it too difficult?  Do you want me to break

Page 25

1  it up?
2          So if it's not just a simple white and black
3  and has multilayers of color and it has that kind of a
4  feeling, that's what I would express as a mystique
5  feeling.
6      Q.    Do you remember receiving this award, Mr. Lee?
7      A.    Yes.
8      Q.    And this document reflects the award that you
9  received?
10          MR. ZELLER:  The question is vague.
11      A.    This is the recommendation template.
12  BY MR. STERN:
13      Q.    But the template was submitted on behalf of
14  your design team to receive the award; is that correct?
15      A.    This is not the team.  I personally did this
16  design, so it's my design, you see.  And working together,
17  there's other ancillary work that has to be taken care of
18  when doing this.  That's why you see the name of another
19  designer.
20          CHECK INTERPRETER:  Just one minor correction:
21  "This is not for the team."
22          THE WITNESS:  Have we been going on for an
23  hour?
24          MR. STERN:  Sure.  Should we take a break?
25          THE WITNESS:  I have to take a restroom break.

Page 34

1  to a massive production or they could not.  Or sometimes
2  the creativity plays a bigger role with a designer or
3  sometime it doesn't.
4         "So when it comes to archetype design, in
5  overall design aspect of it, setting aside what is
6  presented here, archetype design encompasses many
7  different events and many different experiences for the
8  designers."
9      A.   So archetype design should not be limited in
10  any way, you see?  It could be designers traveling or
11  taking trips all over the world, for instance, Egypt,
12  Vietnam, France, the United Kingdom.  That could be
13  archetype design, and it's basically having a new
14  experience, understanding cultures.  That is a part of
15  design.
16         And also, for instance, technology could be
17  included.  Regional characteristics are also a part of
18  that.  In a sense design, all of the aspects in design in
19  general, overall, is what it is.
20  BY MR. STERN:
21      Q.   Was the design for the Galaxy S based on any
22  particular archetype design at Samsung?
23         MR. ZELLER:  The question is vague as to
24  "archetype design."
25      A.   Well, to talk about my experience, and not just

Page 35

1  pertaining to the Galaxy S.  I mean, I started to draw
2  when I was three years old, and in university, I majored
3  and studied in automotive design, product design.  I've
4  been designing automobiles for five years, and now at
5  Samsung it's been ten years doing design work.
6         And that's just a part of my life, all of the
7  experiences that I have, that I have accumulated within
8  me, you know, that is what it is.  Ten -- everything that
9  I've seen ten years ago, yesterday, based on my experience
10  is where it comes out, not some particular archetype
11  design.
12         CHECK INTERPRETER:  "So it's difficult to say
13  what it's based on.  I think it's rather vague and
14  difficult to express it that way."
15  BY MR. STERN:
16      Q.   Okay.  Mr. Lee, were you the lead designer for
17  the Galaxy S?
18      A.   Yes.
19      Q.   How did the design process for the Galaxy S
20  begin?
21         MR. ZELLER:  The question is overbroad.
22      A.   The beginning of the Galaxy S, it's hard to
23  really pinpoint that, where it started in terms of whether
24  it spurred out of design, hardware, product, planning, and
25  so forth.  So it's really hard to pinpoint that.

Page 36

1  BY MR. STERN:
2      Q.   Are you able to identify for me a point in time
3  at which the design process for the Galaxy S began?
4      A.   Although I don't remember the exact date in
5  2009 regarding the hardware specs for design, I think I
6  received that in September 2009, yeah.
7         CHECK INTERPRETER:  "Or thereabouts."
8      A.   So I cannot accurately recall, I don't remember
9  accurately, see, and the reason for that is because I do
10  several projects at the same time.  And when I was working
11  on the Galaxy S, concurrently I was working on other
12  projects, and so exactly when I -- it was -- I was
13  involved, the exact date, I cannot really tell you.
14  BY MR. STERN:
15      Q.   What was the nature of the hardware
16  specifications that you testified to receiving in
17  September 2009?
18         MR. ZELLER:  Misstates the witness' testimony.
19      A.   Hardware specs?  Hmm.  Much earlier than the
20  Galaxy S, my understanding is that there has been
21  discussions about the hardware.
22         CHECK INTERPRETER:  "Hardware specs?  Hmm.
23  Receiving hardware spec?  Hmm.  Much earlier than the
24  design of the Galaxy S, my understanding is that there had
25  been hardware-related discussions."

Page 37

1  BY MR. STERN:
2      Q.   What's the first concrete step that you
3  remember taking in regard to the design of the Galaxy S?
4         (A discussion was had off the record between
5  Lead Interpreter and Check Interpreter in Korean.)
6      A.   The hardware, basically, the size, making it
7  small, to see if it's appropriate.  Also thickness, that's
8  included in hardware specs, so to check if the thickness
9  was okay.  Basically, making it exactly as it is in the
10  hardware specs, that was the first thing that I did, I
11  remember.
12         CHECK INTERPRETER:  "When it comes to this
13  hardware aspect of it, contemplating whether we can make
14  it smaller and if the size would be appropriate.  And also
15  hardware specs could include the thickness, so based on
16  those attempts, trying to make it accordingly with the
17  hardware specs that were provided, trying to come up with
18  something that -- befitting to that, and I think that was
19  what I tried to do first."
20  BY MR. STERN:
21      Q.   Did someone else at Samsung instruct you to
22  begin work on designing the Galaxy S?
23      A.   Someone else at Samsung?
24      Q.   Yes.  For example, one of your superiors.
25      A.   Yes.  At the design team, my superior told me

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

38..41

Page 38

1  to begin review of a design.
2      Q.    What was the name of that person?
3      A.    Senior Vice President DongHoon Chang.
4          LEAD INTERPRETER:  D-O-N-G-H-O-O-N, C-H-A-N-G.
5  BY MR. STERN:
6      Q.    And was Mr. Chang's instruction to you
7  contained in a document?
8      A.    The specs are very private, so it is not
9  conveyed in a document format.  We just talk about
10 dimensions.
11         CHECK INTERPRETER:  "We talked about something
12 to the extent like dimensions."
13 BY MR. STERN:
14     Q.    Apart from the dimensions, did Mr. Chang leave
15 the specifics of designing the phone to you and your team?
16     A.    So he did not do it to my team, but he gave me
17 the instruction, basically, saying, "There is this kind of
18 product, and as the person in charge of design, why don't
19 you make it."  You know, that's the order I received.
20         MR. ZELLER:  Can we do something to bring the
21 temperature down in this room?  It's getting pretty warm
22 now.
23         CHECK INTERPRETER:  Interjection:  "He did not
24 do it to my team, but it was directed to me.  He said that
25 there's this product, and as a design leader or the person

Page 39

1  in charge of designer, basically instructed that, 'Why
2  don't you design it.'"
3  BY MR. STERN:
4      Q.    Can you remember any other specifics about the
5  instructions that Mr. Chang gave you in that regard?
6      A.    No, not really.  When he gives me the phone to
7  design, then all of the mechanics or the hardware parts, I
8  would do that.
9          MR. STERN:  I'd like to ask the reporter to
10 mark next in order, a multipage document, SAMNDCA10806650
11 through 59.
12         (MH Lee Deposition Exhibit 2109 marked.)
13         CHECK INTERPRETER:  Could I give my
14 interjection here?  "No, not really.  When he gives me the
15 phone to design, then all of the aspects related to
16 hardwares and the mechanical side of it, I go about
17 pursuing them."
18 BY MR. STERN:
19     Q.    Mr. Lee, what is Exhibit 2109?
20     A.    Well, it says "S Project."
21     Q.    Is "S Project" a reference to the Galaxy S?
22     A.    It means the project.  It does not mean
23 specifically the Galaxy S.  And let me look at it a little
24 bit.
25         (Witness reviews document.)

Page 40

1  BY MR. STERN:
2      Q.    Mr. Lee, is this exhibit an internal document
3  prepared by Samsung relating to the design that became the
4  Galaxy S?
5          MR. ZELLER:  The question is compound, vague.
6      A.    Well, yes, it is related, but it does not refer
7  exactly to the Galaxy S.
8  BY MR. STERN:
9      Q.    Does this document -- well, strike that.
10         Directing your attention to the page ending
11 652, you see at the top of the page it says
12 "S Project_Aries"?  What does "Aries" refer to?
13     A.    In the S Project, this refers to the project
14 name, basically, what the model was called.  Well, in
15 here, you see there's a platform concept, so basically,
16 Aries or Vesta, Simple Metal, Vega, these here would share
17 the same platform.
18         So this S Project is not pertaining to design
19 alone, but it means the hardware platforms.
20     Q.    What is the relationship, if any, between
21 Vesta, Vega, Aries and the product that ultimately became
22 the Galaxy S?
23         MR. ZELLER:  The question is compound,
24 overbroad.
25     A.    Okay.  Let me use a metaphor.  People will wear

Page 41

1  clothes.  I could wear a suit, a jumper, a pajama.  So
2  basically with the basic hardware platform body at
3  Samsung, you can wear clothes.
4          CHECK INTERPRETER:  Wait a minute.  "Okay.  Let
5  me use a metaphor.  People could use -- people could wear
6  different clothes.  I could wear a suit, a jumper or a
7  pajama.  And so within the basic hardware platform, it
8  could wear many different clothes, so that in lies with
9  Samsung's platform concept."
10 BY MR. STERN:
11     Q.    Was the design for the Galaxy S based on a
12 prior model Samsung mobile phone?
13         MR. ZELLER:  The question is vague.
14     A.    So are you talking about the Galaxy S?
15 BY MR. STERN:
16     Q.    Yes, I'm talking about the design that
17 ultimately became the Galaxy S platform.
18         MR. ZELLER:  The question is vague.
19     A.    There are several designs that became the
20 Galaxy S platform.
21         CHECK INTERPRETER:  "There are several designs
22 that made with Galaxy S platform."
23         MR. STERN:  I don't understand that last
24 translation, "There are several designs that made with
25 Galaxy S platform."  Let me try this again.

Page 94

1  that, to list each one would be very difficult for you to
2  understand, so I just talked -- gave a simple one.
3  BY MR. ZELLER:
4      Q.    What you provided in your answers were examples
5  of ways that you sought to differentiate the Galaxy S?
6          MR. STERN:  Objection to the extent that it
7  purports to be a gloss or modification of his previous
8  answer.  Also object as leading.
9      A.    Differentiating the design, that is to have it
10  different from others and to have the exclusive Samsung
11  heritage, it starts from the inside of the design.  And
12  there are hundreds of considerations and different types
13  that I have given, and I just gave you one single example,
14  an easy talk.
15          But in the design concept, there's various
16  other things, such as materials and weight, so forth.
17  Weight was also an important consideration, heavy, light,
18  how do I make it?  I want it to be to consumers, "Wow,
19  this is the weight that -- it feels like what I've been
20  using."  So I, in designing the Galaxy S, concentrated as
21  well on getting the right weight.  I thought that if it
22  was the weight of a cup of coffee, it would come across as
23  friendly to consumers, what they're used to holding in the
24  morning, so I made it similar to that.
25          Some things that others do not think of, that

Page 95

1  is differentiation.  And in terms of materials, deciding
2  what parts, deciding the size, those are all cases of
3  differentiation, like the cup of coffee.
4      Q.    Do you believe that you were successful in
5  differentiating the Galaxy S in ways other than size?
6      A.    Yes, of course.  I think we succeeded and
7  differentiated in many ways.
8          MR. ZELLER:  I have nothing further.  Thank
9  you.
10          MR. STERN:  Off the record.
11          THE VIDEOGRAPHER:  The time is 3:47.  This is
12  the end of Tape 5.  We are off the record.
13          (Off the record at 3:47 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1  (Counsel representing this witness should arrange for
   reading and signing and thereafter distribute copies of
2  the signed Errata sheet to opposing counsel without
   involvement of the court reporter.)
3
4  STYLE OF CASE:   Apple vs. Samsung (ND CAL)
5  DEPOSITION OF:   MINHYOUK LEE
6  TAKEN:          March 2, 2012
7
8          E R R A T A  S H E E T
9  Page    LineChange          Reason
10  ____  _____
11  ____  _____
12  ____  _____
13  ____  _____
14  ____  _____
15  ____  _____
16  ____  _____
17  ____  _____
18  ____  _____
19  ____  _____
20  ____  _____
21  ____  _____
22
23  I hereby certify that I have read my deposition and that
   it is true and correct subject to any changes in form or
24  substance entered here.
25  _____           _____
    Date                       MINHYOUK LEE

Page 97

1          C E R T I F I C A T E
2  SEOUL          )
                  )
3  SOUTH KOREA    )
4      I, Michael E. Miller, Registered Diplomate
   Reporter, Certified Realtime Reporter, do hereby certify
5  that the aforementioned witness was first duly sworn by me
   pursuant to stipulation of counsel to testify to the
6  truth; that I was authorized to and did report said
   deposition in stenotype; and that the foregoing pages are
7  a true and correct transcription of my shorthand notes of
   said deposition.
8
      I further certify that said deposition was
9  taken at the time and place hereinabove set forth and that
   the taking of said deposition was commenced and completed
10  as hereinabove set out.
11      I further certify that I am not attorney or
   counsel of any of the parties, nor am I a relative or
12  employee of any attorney or counsel of any party connected
   with the action, nor am I financially interested in the
13  action.
14      The foregoing certification of this
   transcript does not apply to any reproduction of the same
15  by any means unless under the direct control and/or
   direction of the certifying reporter.
16
17
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand this March 4, 2012.
20
21
22
23  MICHAEL E. MILLER
   Certified Realtime Reporter
   Registered Diplomate Reporter
24  Realtime Systems Administrator
25

# Watson Declaration

# EXHIBIT 8

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

1

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER
UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

_____

In the Matter of:

CERTAIN ELECTRONIC DIGITAL                Case No.:

MEDIA DEVICES AND COMPONENTS              337-TA-796

THEREOF

_____


        *** CONFIDENTIAL BUSINESS INFORMATION ***
             SUBJECT TO PROTECTIVE ORDER


     VIDEOTAPED 30(b)(6) and PERSONAL DEPOSITION OF:
                  MINHYOUK LEE




              Saturday, March 3, 2012
                   Kim & Chang
                 Seoul, South Korea
              9:14 a.m. to 8:04 p.m.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
 1    APPEARANCES:

 2
      For the Complainant, Apple, Inc.
 3

 4        MORRISON FOERSTER, LLP
          By:  Peter Stern, Esq.
 5        425 Market Street
          San Francisco, California 94105-2482
 6        Phone:  415.268.7339

 7

 8

 9    For the Respondents, the Samsung entities:

10

          QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
11        By:  Michael T. Zeller, Esq.
          865 South Figueroa Street
12        10th Floor
          Los Angeles, California
13        Phone:  213.443-3000

14

15

16    Also present:

17

          AERYONG KIM, LEAD INTERPRETER
18        SUE MI JONES, CHECK INTERPRETER
          INGA KORNEV, VIDEOGRAPHER
19        TRACEY S. LOCASTRO, COURT REPORTER
          STEPHANIE KIM, MORRISON & FOERSTER
20        HANKIL KANG, SAMSUNG

21

22

23

24

25
```

Page 3

```
                        I N D E X
                                            Page
      MINHYOUK LEE
      Examination by Mr. Stern          7
      Examination by Mr. Zeller       168
      Examination by Mr. Stern        170

                     E X H I B I T S

      Exhibit   Description              Page
      1*        Vibrant cell phone        14
      2*        Monte cell phone -        33
      3*        Sidekick cell phone -     39
      4*        Exhibit 4G cell phone -   57
      5*        Galaxy Nexus cell phone   59
      6         Bates numbers SAMNDCA     64
                10763706 through 710
      7         Bates numbers SAMNDCA     71
                00176172 through 202
      8         Bates numbers SAMNDCA     74
                10999199 through 243
      9         Bates numbers SAMNDCA     77
                10257309 through 380
      10        Corrected Notice of       94
                Samsung Electronics
                Company Limited Pursuant
                to Federal Rule of Civil
                Procedure 30(b)(6).
      11        Bates numbers 00202336   101
                through 2380
      12        Color photocopy of       117
                Samsung Jet phone
      13        Bates numbers SAMNDCA    132
                10764554 through 567
      14        Bates numbers            133
                S-ITC-007849424 through
                493
      15        Bates numbers SAMNDCA    136
                10251326 through 344
      16        Bates numbers SAMNDCA    136
                11010883 through 84
      17        Bates numbers SAMNDCA    137
                00197350 through 483
      18        Bates numbers SAMNDCA    145
                10809390 through 460
      19        Bates numbers SAMNDCA    146
                00507493 through 496
      20        Bates numbers SAMNDCA    157
                10247373 through 378
```

Page 4

```
 1    (*Note:  Exhibits 1 through 5 were retained by Peter
      Stern of Morrison & Foerster LLP)
 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
 1            P R O C E E D I N G S

 2                  -  -  -

 3        VIDEOGRAPHER:  My name is Inga Kornev,

 4    videographer with American Realtime Court

 5    Reporters in Asia.

 6        The date today is March 3rd, 2012, and the

 7    time is approximately 9:14.

 8        This video deposition is being held at the

 9    offices of Kim and Chang located at the

10    Jeongdong building in Seoul, Korea.  The caption

11    of this case is In the Matter of:  Certain

12    Electronic Digital Media Devices and Components

13    Thereof in the United States International Trade

14    Commission, Washington, D.C., with the case

15    number of 337-TA-796.

16        The name of the witness is Minhyouk Lee.

17    And he is testifying in his capacity as a

18    30(b)(6) witness and in his personal capacity.

19        The court reporter today is Tracey LoCastro,

20    also with American Realtime Court Reporters in

21    Asia.

22        At this time I'd like to ask all counsel and

23    interpreters to please state their appearances

24    and whom they represent for the record.

25        MR. STERN:  Peter Stern, Morrison and
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

6..9

Page 6

1  Foerster, for Apple.  And with me is Stephanie
2  Kim.
3      A.   I would like to also be interpreted as to
4  the introduction.
5          MR. ZELLER:  Mike Zeller for Samsung.
6          MR. KANG:  Hankil Kang from Samsung.
7          VIDEOGRAPHER:  Sorry, we can't hear you.
8          LEAD INTERPRETER:  Aeryong Kim, lead
9  interpreter.
10         CHECK INTERPRETER:  Sue Mi Jones serving as
11 check interpreter.
12         VIDEOGRAPHER:  And now will counsel please
13 state any stipulations or statement on the
14 record.
15         MR. STERN:  None.
16             Shall I read the paragraph regarding the
17 oaths?
18             We understand the court reporter is not
19 authorized to administer oaths in this venue;
20 nevertheless, we request that she administer the
21 oath, and we stipulate that we waive any
22 objection to the validity of the deposition
23 based on the oaths.
24         MR. ZELLER:  Yes, that's my understanding.
25         COURT REPORTER:  Do you solemnly swear or

Page 7

1  affirm that you will well and truly interpret
2  the questions propounded by counsel and the
3  answers given by the witness from Korean to
4  English and English to Korean to the best of
5  your ability?
6          LEAD INTERPRETER:  I do.
7          CHECK INTERPRETER:  I do.
8              MINHYOUK LEE,
9  after having been duly sworn by the reporter, pursuant
10 to stipulation of counsel, was examined and testified
11 through the interpreter as follows:
12         THE WITNESS:
13             EXAMINATION
14 BY MR. STERN:
15     Q.   Could you please state your name for the
16 record?
17     A.   My name is Minhyouk Lee.
18     Q.   Good morning, Mr. Lee.  My name is Peter
19 Stern.  I represent Apple in an action pending between
20 Apple and Samsung in the International Trade
21 Commission.  And we're here this morning, obviously,
22 for the purpose of taking your deposition.
23             I'm going to be asking you some questions.
24 If you don't understand my question and would like me
25 to rephrase it, please let me know and I'll do my best

Page 8

1  to accommodate you.
2      A.   Yes.
3      Q.   Mr. Lee, is there any reason you can't give
4  your best testimony this morning?
5      A.   No.
6      Q.   Mr. Lee, what's your educational background,
7  beginning with college?
8      A.   Starting from college onwards?
9      Q.   Yes.
10     A.   I was graduated from Kyunghee University,
11 majoring in the field of industrial design.  Well,
12 there are two areas or fields to design field; one of
13 which is product design and the other, automobile
14 design.  Up until my junior year in college I was
15 focusing on industrial design.  And from senior and
16 throughout the senior year I focused my major
17 transferring from the prior product design to now
18 automobile design.
19             And during my freshman and sophomore years I
20 started out by majoring in the field of visual design,
21 and that is because originally I started out with pure
22 art, not product design, from the beginning.
23         CHECK INTERPRETER:  Okay.  "There are two
24     aspects to industrial design; one is product
25     design and the other one is automobile design.

Page 9

1      Until about the junior year of my college I
2      focused on industrial design, but in my fourth
3      year I switched that to car design.  First two
4      years I was studying more in a visual design
5      because I started with fine art, particularly
6      the painting."
7  BY MR. STERN:
8      Q.   In what year did you graduate from college?
9      A.   I graduated in 1999.
10     Q.   After you graduated from college, did you go
11 to work for Samsung?
12     A.   Yes, but more precisely speaking, the actual
13 graduation date from college was approximately February
14 the 16th or around mid February, but I joined the
15 company Samsung in January of the same year, which was
16 approximately one month prior to graduation from
17 college.  So there was some overlapping period.
18     Q.   When you joined Samsung, what was your
19 title?
20     A.   I majored in car design and I was working on
21 car design work.  And I was called designer, to be more
22 precise, an entry level designer.
23     Q.   And how long did you hold the position of
24 entry level designer?
25     A.   For approximately four years.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

78..81

Page 78

1  Productivity Headquarters, and I don't know what
2  relation there would be between this entity and Samsung
3  Electronics.  And I have not been able to figure that
4  out.
5          CHECK INTERPRETER:  Instead of "an entity,"
6      "public organization."
7  BY MR. STERN:
8      Q.   Do you think it's possible, Mr. Lee, that CS
9  stands for customer satisfaction?
10     A.   I find it difficult to state with a level of
11 certainty that it is what it stands for, because it may
12 stand for something else.  I have not seen this before
13 today.
14          I understand that I'm here to provide
15 truthful testimony and not based on any guess.
16     Q.   That's certainly true.
17          Directing your attention to the page that
18 ends in Bates number 319, Mr. Lee.  And you'll see at
19 the top of the page under the heading Key Analysis it
20 states, "Need to recognize the importance of exterior
21 design and screen size as they are customer purchase
22 decision factors."
23          Do you agree with that statement, Mr. Lee?
24     A.   First of all, I don't know about this
25 particular document that well.  And I don't know what

Page 79

1  the people that were subject to this review or report
2  was, whether it was based on the survey of Korean
3  people or over a global people, that I don't know.  I
4  have not been able to figure that out as to this
5  particular report in order to say whether such a
6  statement is correct or incorrect.
7          And the reason for my lack of understanding
8  reliability as to this document is because I don't know
9  about it well nor can I rely on it at the moment.
10     Q.   In your role as a designer at Samsung, do
11 you have any participation in studies or investigations
12 of consumer decision-making with respect to the
13 purchase of cell phones in the United States?
14     A.   I do not have any participation in those.
15     Q.   Are you in a position to give me your
16 opinion on whether the relative importance of exterior
17 design as a factor in consumer decision-making for the
18 purposes -- with respect to cell phones is as important
19 as is indicated in the graph in the middle of this
20 page?
21          MR. ZELLER:  I'm going to object.  It
22      mischaracterizes the document and the question
23      is vague.
24          (Discussion held between Lead Interpreter
25 and Check Interpreter.)

Page 80

1      A.   Well, like I stated before, since I cannot
2  entirely rely upon what's reflected in this document
3  since I don't know where such information was derived
4  from and whether there is any relationship between the
5  company and this Korean Productivity Headquarters, I
6  haven't figured that out.  So I don't know how I can
7  provide my personal opinion on the evaluation that's
8  reflected.
9          I don't think I would be in a position to
10 either evaluate on this or provide my personal opinion
11 on this because I don't know what the clear criteria
12 this information was based upon.  Because, as it states
13 on this page, it says, current smartphone and not
14 limited to any particular phone there, so by that
15 reference I don't know if it's reflecting the entire
16 smartphones out there or just constrained to any
17 particular kind of smartphone, or even if it represents
18 the entire range of phones made by Samsung.
19          Although I would very much like to give my
20 opinion on it, but I still find it difficult to provide
21 my personal opinion solely based on what's reflected
22 here.
23 BY MR. STERN:
24     Q.   Putting aside the document, Mr. Lee, do you
25 believe that exterior design is an important factor in

Page 81

1  consumer decision-making for the purchase of
2  smartphones in the United States?
3          MR. ZELLER:  Asked and answered.
4      A.   If I may repeat myself, design is something
5  that cannot conclusively be determined by its exterior
6  looks alone.  You have to take into consideration many
7  different elements, such as form, functionality,
8  usability and weight factor, among other things.  In
9  order for a certain design to be evaluated as a good
10 design, it has to be comprised of a good software, good
11 manufacturing engineering methodology and an
12 entrepreneurial mind, good material, good color and
13 many other values that a company may seek after.
14          So all those combined comprehensively would
15 result to a consumer's purchase.  One would not just
16 grab something just because it has a good exterior
17 design only.  For instance, when one purchases
18 clothing, for example, one -- a consumer would consider
19 brand image, texture, color and the manufacturer who
20 made that particular piece of clothing.
21          And, again, in simple terms, design is not
22 evaluated by its external looks alone, and that is
23 because there are many different elements that go into
24 a design to have a good design as a result, numerous
25 and countless elements to it.

Page 82

BY MR. STERN:

1  BY MR. STERN:
2      Q.    Mr. Lee, do you recall the first time when
3  you received notice that there was litigation between
4  Apple and Samsung regarding smartphones?
5              MR. ZELLER:  I'm going to caution the
6         witness to answer this question just yes, no or
7         I don't recall.
8      A.    Yes, I have received it.
9  BY MR. STERN:
10     Q.    When did you first receive notice of that
11 litigation?
12             MR. ZELLER:  And, again, I'll caution the
13        witness, so we don't get a narrative, just stick
14        to the question.  Answer this particular
15        question in terms of the date of when you
16        received it.
17     A.    I don't recall as to the exact date.
18 BY MR. STERN:
19     Q.    Do you recall from whom you received that
20 notice?
21     A.    I don't know from whom I received that
22 notice, but I remember receiving it via e-mail.
23     Q.    Was it from someone within Samsung?
24     A.    I don't exactly recall, but I guess maybe it
25 was from legal team.

Page 83

1      Q.    And at some point, Mr. Lee, did you receive
2  a notice to preserve documents relevant to the
3  litigation matter pending between Apple and Samsung?
4      A.    Yes.
5      Q.    Do you remember the date on which you
6  received that preservation notice?
7      A.    I do not remember as to the date.
8      Q.    Was it sometime in 2011?
9      A.    Yes, I think it was.
10     Q.    Can you give me your best estimate as to the
11 month in 2011 when you received the preservation
12 notice?
13     A.    I find it somewhat difficult to specify as
14 to what date that would have been because I received
15 many different letters or notices.  My memory is not
16 that good.
17     Q.    Do you remember from whom you received the
18 notice to preserve relevant documents in the pending
19 litigation between Apple and Samsung?
20     A.    I remember receiving it from the legal team,
21 but as to from whom, I don't remember.
22     Q.    Subsequently after receiving the
23 preservation notice that you just testified about, do
24 you recall receiving any additional notices from any
25 source regarding the preservation of relevant documents

Page 84

1  in the Apple/Samsung litigation?
2              (Discussion held between Lead Interpreter
3         and Check Interpreter.)
4      A.    I don't know about that exactly, I'm not
5  exactly sure, but as I understand, I think it was the
6  same letter or same notice that was being repeated.
7  BY MR. STERN:
8      Q.    Was repeated you said?
9              LEAD INTERPRETER:  Was repeated.
10 BY MR. STERN:
11     Q.    Do you know how many times it was repeated?
12     A.    Maybe two or three times, but I'm not
13 exactly sure.
14     Q.    And are you able to give me the date or
15 dates of any of the subsequent notices?
16     A.    I don't quite recall as to that; although, I
17 remember receiving an e-mail notice for the purposes of
18 Apple litigation preparation.  Since I would receive
19 numerous e-mails throughout the day and per each day, I
20 don't think I opened and reviewed that document,
21 meaning the letter notice.
22             I think what happened was that when the
23 legal team asked me if I received such notice I didn't
24 quite recall receiving it, that's why they repeated
25 sending a notice, I think.

Page 85

1              MR. ZELLER:  I'm going to again caution the
2         witness.  You should not be describing the
3         content of your communications with the lawyers
4         of the legal department.  And I'm going to move
5         to strike that last sentence to the extent it's
6         disclosing content.
7  BY MR. STERN:
8      Q.    After receiving the notice or notices
9  concerning document preservation that you've just
10 testified about, did you take any steps to comply,
11 Mr. Lee?
12     A.    I preserved documents.
13     Q.    Can you please tell me specifically what you
14 did to preserve documents, Mr. Lee?
15             MR. ZELLER:  Question is vague.
16     A.    Well, I thought the documents that were
17 relevant to the design that I personally worked on were
18 subject to that document preservation, whatever that
19 may have been.
20             CHECK INTERPRETER:  "I thought the documents
21        that were relevant to the design that I
22        personally worked on and I have them with me, I
23        thought that -- wouldn't that be the meaning of
24        preservation?"
25 BY MR. STERN:

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

86..89

Page 86

```
1       Q.    Let me put it this way.  After receiving the
2   preservation notice or notices, did you begin saving
3   e-mail to your hard drive on your computer at work,
4   Mr. Lee?
5           MR. ZELLER:  Question assumes facts as to
6       "begin saving."  The question is vague.
7       A.    I don't know what you mean by document
8   preservation in relation with hard drive saving.  I
9   don't know if you're referring to that in the context
10  of the Apple litigation or in the context of the
11  overall job performance within Samsung.
12  BY MR. STERN:
13      Q.    Let me back up for a moment.
14            In the course of your everyday work at
15  Samsung, Mr. Lee, do you use e-mail?
16      A.    Yes.
17      Q.    And as a matter of practice, how do you
18  maintain e-mails that you send and receive on your
19  computer at work?
20      A.    I set automatic save on it.
21      Q.    What does that mean, to set automatic save?
22      A.    Well, I'm asking you about this because I
23  don't understand about this well.  I don't know whether
24  I'm not supposed to delete all the e-mails related to
25  Apple litigation after the notice or all the e-mails
```

Page 87

```
1   that I have on the system after I was contacted by that
2   notice.
3       Q.    After you received the preservation notice,
4   Mr. Lee, have you deleted any e-mails from your
5   computer?
6       A.    No, I have not.  No.  Why?
7       Q.    Do I understand correctly that since
8   receiving the preservation notice you have not deleted
9   any e-mails of any kind from your computer?  Is that
10  correct?
11          MR. ZELLER:  Asked and answered.
12      A.    I have not deleted any.
13            I'd like to ask you this question.  Am I
14  supposed to save all the documents?  I think I had some
15  misunderstanding.  It is my understanding, the concept
16  that I had was that I was to preserve all the e-mails
17  related to this litigation.
18      Q.    Mr. Lee, I'm simply trying to figure out
19  what you did or didn't do.
20          CHECK INTERPRETER:  Interjection.  I'd like
21      to make a correction as to the answers two
22      previous answers -- to the answers two before.
23      I'd like to render the answers two answers ago.
24      "Maybe because it's not that I'm not clear
25      on it I'm not comprehending.  What you're saying
```

Page 88

```
1       is that -- are you asking me whether I was not
2       to delete any e-mail that was related to Apple
3       litigation or I was not to delete anything
4       that -- all the e-mails that I had received
5       after having received that notice?"
6           LEAD INTERPRETER:  No, no, I think that's
7       slightly different.
8           Okay, I just stand by, respectfully.
9   BY MR. STERN:
10      Q.    And I just want to have a clear record on
11  this, Mr. Lee.  When you say you have not deleted any
12  e-mails, that means you have not -- since receiving the
13  preservation notice you have not deleted any e-mails of
14  any kind relating to any subject; is that correct?
15          MR. ZELLER:  Asked and answered for the
16      third time.
17          Asked and answered.
18      A.    I have not deleted any.
19  BY MR. STERN:
20      Q.    What e-mail program do you use, Mr. Lee?
21      A.    Explorer, Samsung Explorer, Samsung Single.
22  The system is called Explorer.
23      Q.    And the e-mails on your computer currently
24  reside in the Samsung Explorer program; is that
25  correct?
```

Page 89

```
1           MR. ZELLER:  Assumes facts and it actually
2       makes no sense.
3       A.    I don't know on a professional level as to
4   what it is, but I am using a Single system that is
5   Samsung's own system that's available to Samsung's
6   employees.  It's a software.
7           CHECK INTERPRETER:  Interjection:  "I am
8       using 'Single,' which is a Samsung's internal
9       software for the employees."
10  BY MR. STERN:
11      Q.    Since receiving the preservation notice or
12  notices, have you personally moved any e-mails from any
13  source on your computer to your hard disk?
14      A.    Well, where there is a review that's on
15  mechanical feasibility testing, those would be moved.
16      Q.    Do you know whether any of the e-mails that
17  you have sent or received relating to mechanical
18  feasibility testing have relevance to the Apple/Samsung
19  litigation?
20          MR. ZELLER:  Calls for a legal conclusion,
21      vague.
22      A.    None.  None whatsoever or in particular.
23  BY MR. STERN:
24      Q.    Mr. Lee, do you use the Microsoft Outlook
25  e-mail program on your work computer?
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

90..93

Page 90

1     A.    I use a system called Single.

2     Q.    In addition to Single or in place of Single,

3  do you also -- have you requested the use of Outlook,

4  Microsoft Outlook e-mail program?

5     A.    I am not using the program nor have I

6  requested for it.

7     Q.    Mr. Lee, do you know whether Samsung has a

8  document retention program whereby e-mails and other

9  electronic documents are deleted at regular intervals

10 within the company?

11          MR. ZELLER:  Question lacks foundation, it's

12     vague.

13     A.    I don't know about that, that system related

14 practice well.

15          CHECK INTERPRETER:  "I don't know about that

16     system-related matter."

17 BY MR. STERN:

18     Q.    Do you know whether there is an automatic

19 delete function for e-mails contained on your work

20 computer?

21          MR. ZELLER:  Lacks foundation, vague.

22     A.    I don't know for sure whether that is there

23 in the system or not.

24 BY MR. STERN:

25     Q.    Has anybody at Samsung told you that an

Page 91

1  automatic delete function for your computer was being

2  turned off in connection with this litigation?

3          MR. ZELLER:  The question assumes facts,

4     vague.

5          And I also caution the witness not to

6     disclose the content of communications with

7     counsel.

8     A.    May I have that question one more time,

9  please?

10          MR. STERN:  Sure.

11 BY MR. STERN:

12     Q.    Let me back up for one moment.

13          I take it, Mr. Lee, that you personally have

14 not turned off any automatic delete function on your

15 work computer; is that correct?

16          MR. ZELLER:  That grossly mischaracterizes

17     the witness' testimony.  You apparently don't

18     like his prior answer.  He told you without any

19     equivocation that he put save on there.  So this

20     is -- it's, frankly, absurd.

21          And you're, you know, now asking him the

22     same questions over and over and deliberately

23     mischaracterizing what he's already said.

24          And do you have a shred of evidence on this,

25     Counsel, or are you just making assertions in

Page 92

1     your questions without any factual foundation

2     whatsoever?  It certainly is contrary to what

3     this witness has already told you.

4     A.    After the e-mail noticing me to preserve

5  documents, I continuously complied with such a request;

6  however, system-wise, although I use tools there, I

7  don't know how the system works.

8  BY MR. STERN:

9     Q.    Do you know whether anybody else at Samsung

10 has turned off any automatic delete function on your

11 work computer?

12          MR. ZELLER:  Assumes facts, vague, lacks

13     foundation.

14     A.    Other people don't have -- it's hard for

15 other people to have access to my personal computer.

16 BY MR. STERN:

17     Q.    So is the answer to my question no?

18          MR. ZELLER:  Counsel, he's already answered

19     that question.  You need to ask a clear

20     question.  And certainly you continue to make

21     assumptions about some automatic deletion

22     function even existing when you have zero

23     evidence of it; it's no wonder that your

24     questions don't make any sense.

25 BY MR. STERN:

Page 93

1     Q.    The question is very simple, and I'm happy

2  to rephrase it.

3          MR. ZELLER:  You keep on asking the same

4     question again and again, and it's already been

5     answered.

6  BY MR. STERN:

7     Q.    Do you have any knowledge of whether anyone

8  else at Samsung has turned off any automatic delete

9  function on your computer?

10     A.    Well, I don't understand as to why you're

11 asking me that question, because I don't know the basis

12 for that from a software perspective or from any

13 perspective.  I have not heard of this before today.

14     Q.    Do you know whether --

15          MR. ZELLER:  We've been going well over an

16     hour now; we're taking a break.  I mean,

17     because, frankly, when I asked earlier today for

18     breaks, you just continued to go on and on and

19     it's making the witness overly tired, for one

20     thing, this morning when you didn't have the

21     courtesy to take normal breaks in this session

22     earlier today.

23          MR. STERN:  Happy to take a break.

24          VIDEOGRAPHER:  This marks the end of disc

25     number 3 in the deposition of Minhyouk Lee.

# Watson Declaration

# EXHIBIT 9

# Filed Under Seal

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
3   San Francisco, California 94111
Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
6   Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
7   555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
8   Telephone: (650) 801-5000
Facsimile: (650) 801-5100
9
Michael T. Zeller (Bar No. 196417)
10   michaelzeller@quinnemanuel.com
865 S. Figueroa St., 10th Floor
11   Los Angeles, California 90017
Telephone: (213) 443-3000
12   Facsimile: (213) 443-3100

13   Attorneys for SAMSUNG ELECTRONICS CO.,
LTD., SAMSUNG ELECTRONICS AMERICA,
14   INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC
15

16                   UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19   APPLE INC., a California corporation,          CASE NO. 11-cv-01846-LHK

20          Plaintiff,                              **SAMSUNG'S AMENDED OBJECTIONS**
                                                    **AND RESPONSE TO APPLE'S SIXTH**
21          vs.                                     **SET OF INTERROGATORIES (NO. 14)**

22   SAMSUNG ELECTRONICS CO., LTD., a              **HIGHLY CONFIDENTIAL –**
Korean business entity; SAMSUNG                     **ATTORNEYS' EYES ONLY**
23   ELECTRONICS AMERICA, INC., a New              **UNDER THE PROTECTIVE ORDER**
York corporation; SAMSUNG
24   TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,
25
          Defendant.
26

27

28

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants Samsung Electronics

2    Co. Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC

3    (collectively, "Samsung") respond to Plaintiff Apple Inc.'s ("Apple") Sixth Set of Interrogatories

4    as follows:

5    **GENERAL STATEMENT**

6    The following responses are based on discovery available as of the date hereof.  Discovery

7    is ongoing and continuing, and these responses are subject to change accordingly.  It is anticipated

8    that further discovery, independent investigation and analysis may lead to the discovery of

9    additional information or documents, supply additional facts and add meaning to known facts, as

10   well as establish entirely new factual conclusions and legal contentions, all of which may lead to

11   additions to, changes to or variations from the responses set forth herein.

12   In addition, the following responses are given without prejudice to Samsung's right to

13   produce or rely on subsequently discovered information, facts or documents.   Samsung

14   accordingly reserves the right to change the responses herein and/or produce or rely on

15   subsequently discovered documents as additional facts are ascertained, analysis is made, legal

16   research is completed and contentions are made.  The responses herein are made in a good faith

17   effort to comply with the provisions of Rules 26 and 33 of the Federal Rules of Civil Procedure,

18   and to supply such responsive information as exists and is presently within Samsung's possession,

19   custody or control, but are in no way to be deemed to be to the prejudice of Samsung in relation to

20   further discovery, research and analysis.

21   An answer to an interrogatory shall not be deemed a waiver of any applicable general or

22   specific objection to an interrogatory.  In responding to the interrogatories, Samsung does not

23   waive any objections that may be applicable to the use, for any purpose, of any information or

24   documents provided in response, or the admissibility, relevance, or materiality of any such

25   information or documents to any issue in this case.

26   Samsung's responses to these interrogatories do not constitute admissions relative to the

27   existence of any documents or information, to the relevance or admissibility of any documents or

28   information, or to the truth or accuracy of any statement or characterization contained in Apple's

**SUBJECT TO PROTECTIVE ORDER**
<u>**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**</u>

1   requests.   All objections as to relevance, authenticity, or admissibility of any document are
2   expressly reserved.

3        Samsung expressly incorporates this General Statement and the following General
4   Objections as though set forth fully in response to each of the following individual interrogatories
5   and, to the extent that they are not raised in any particular response, Samsung does not waive those
6   objections.

7                                    <u>**GENERAL OBJECTIONS**</u>

8        1.       Samsung objects to the "Definitions" and "Instructions" contained in Apple's
9   Sixth Set of Interrogatories to the extent they are inconsistent with the Federal Rules of Civil
10  Procedure.

11       2.       Samsung objects to Apple's Definition of "Samsung," "You," "Your," and
12  "Defendants" as overly broad to the extent it requires Samsung to pursue information from
13  individuals no longer employed by Samsung whose data is not currently in the possession of
14  Samsung. Samsung further objects to Apple's Definition of "Samsung," "You," "Your," and
15  "Defendants" as overly broad, vague, and ambiguous to the extent it does not define "affiliates,"
16  and also to the extent that it requires Samsung to potentially seek information from thousands of
17  people.   Samsung will respond to interrogatories based on a reasonable inquiry of individuals
18  expected to possess the requested information.

19       3.       Samsung objects to Apple's definition of "Apple" as overly broad, vague, and
20  ambiguous.

21       4.       Samsung objects to Apple's definition of "Samsung Covered Product" as overly
22  broad, vague and ambiguous, and irrelevant to the extent it seeks information "at any time" and
23  not limited to the relevant time frame.

24       5.       Samsung objects to the definition of "Defined Wireless Stsandards" [sic] as overly
25  broad and overly burdensome to the extent it asks Samsung to provide information relating to
26  standards and/or wireless standards to which the Samsung Patents-in-Suit have not been declared
27  as Essential or relating to standards and/or wireless standards upon which Samsung does not rely
28  in its infringement contentions.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

6.      Samsung objects to the definition of "Samsung's Alleged Essential Technology" as overly broad, and to the extent it seeks information protected from disclosure by the attorney-client privilege, attorney work product doctrine, community of interest doctrine, joint defense privilege, and/or any other applicable privilege.

7.      Samsung objects to the definition of "Relating," and each and every interrogatory that uses the term "Relating," as overly broad, vague and ambiguous.

8.      Samsung objects to the definition of "Third Party" or "Third Parties" as overly broad.

9.      Samsung objects to these interrogatories as vague and ambiguous to the extent they include terms that are undefined.  Samsung in its responses will identify any terms it believes are vague and ambiguous and will assume a reasonable meaning for each such term.

10.      Samsung objects generally to each interrogatory to the extent that it seeks to elicit information subject to and protected by the attorney-client privilege, the attorney work-product doctrine, the joint defense privilege, the common interest doctrine, and/or any other applicable privilege or immunity.  Any inadvertent disclosure of such information shall not be deemed a waiver of the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity recognized by statute or case law. Samsung will exchange with Apple a log of withheld documents at a time agreed to by counsel for the parties.  Samsung also will not log privileged documents that were created on or after April 15, 2011.

11.      Samsung objects generally to the interrogatories to the extent they seek information from outside a reasonable time period or from a point other than a reasonable time.

12.      Samsung objects to these interrogatories to the extent they seek to compel Samsung to generate or create information and/or documents that do not already exist.

13.      Samsung objects generally to the interrogatories to the extent that they prematurely call for contentions, identification of prior art, or identification of witnesses at this stage of the litigation.

14.      Samsung objects to each interrogatory to the extent it is duplicative or cumulative of another interrogatory.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

15.   Samsung objects to each interrogatory to the extent it is compound and comprises discrete subparts resulting in separate interrogatories.

16.   Samsung expressly reserves the right to respond to any or all of the interrogatories by specifying documents wherein the responsive information may be ascertained pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

17.   Samsung objects generally to the interrogatories to the extent they seek confidential proprietary or trade secret information of third parties.  Samsung will endeavor to work with third parties to obtain their consent, if necessary, before identifying or producing such information and/or documents.

18.   Samsung objects generally to the interrogatories on the grounds that they are overly broad, unduly burdensome, and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

19.   Samsung objects to the interrogatories on the ground that they are overly broad, unduly burdensome and oppressive to the extent they purport to require Samsung to search its facilities and inquire of its employees other than those facilities and employees that would reasonably be expected to have responsive information. Samsung's responses are based upon (1) a reasonable search and investigation of facilities and files that could reasonably be expected to contain responsive information, and (2) inquiries of Samsung's employees and/or representatives who could reasonably be expected to possess responsive information.

20.   Samsung objects to the interrogatories on the grounds that they seek information already in the possession of Apple, publicly available, or as readily available to Apple as it is to Samsung.

21.   Samsung objects to each interrogatory to the extent that it seeks information before Samsung is required to disclose such information in accordance with any applicable law, such as the Northern District of California Patent Local Rules.

22.   Samsung objects to the interrogatories on the grounds and to the extent that they seek legal conclusions or call for expert testimony.  Samsung's responses should not be construed to provide legal conclusions.

**SUBJECT TO PROTECTIVE ORDER**
<u>**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**</u>

1    Subject to and without waiving the foregoing General Statement and General Objections,

2  Samsung responds as follows:

3

4                                    <u>**INTERROGATORIES**</u>

5  <u>**INTERROGATORY NO. 14:**</u>

6    Separately for each of the Samsung Patents-in-Suit, identify each Samsung Covered

7  Product, which Samsung patents is/are embodied in the Samsung Covered Product, the date each

8  Samsung Covered Product was first sold in the United States, and whether each Samsung Covered

9  Product was marked pursuant to 35 U.S.C. section 287 or otherwise, how each product was

10  marked including the location and manner of the marking, the individuals or entities that marked

11  each product, and any interruptions or other changes in the practice of marking the Samsung

12  Covered Product since it was first marked.  The Samsung Covered Products shall be identified by

13  commercial name, commercial model number, telecommunications carrier (if applicable), date of

14  product announcement, date of product release, "code name," and any other identifiers used

15  internally and/or externally to identify or refer to the product at any point during its research,

16  design, development, manufacture, marketing, sale, transfer, distribution, testing, qualification,

17  importation, export, or otherwise.

18  <u>**AMENDED RESPONSE TO INTERROGATORY NO. 14:**</u>

19    In addition to its General Objections above, which it hereby incorporates by reference,

20  Samsung objects to this interrogatory on the grounds that it is vague, ambiguous and overbroad

21  with regard to the terms "Samsung Covered Product" and "interruptions or other changes."

22  Samsung further objects to this interrogatory to the extent that it seeks to elicit information subject

23  to and protected by the attorney-client privilege, the attorney work-product doctrine, the joint

24  defense privilege, the common interest doctrine, and/or any other applicable privilege or

25  immunity.  Samsung also objects to this interrogatory to the extent it is compound and comprises

26  at least 7 discrete subparts resulting in separate interrogatories.  Samsung also objects to this

27  interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the

28  discovery of admissible evidence.  Samsung further objects to this interrogatory to the extent it

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1  seeks information more readily available to Apple than to Samsung, or equally available to Apple

2  as to Samsung, including documents and things that are publicly available.

3       Subject to the foregoing general and specific objections, Samsung responds as follows:

4       Samsung has identified at least the following products as examples of products that

5  embody the inventions disclosed in the Samsung patents-in-suit.

6       The Acclaim was first shipped for sale in the United States on or around June 23, 2010.

7  The Behold was first shipped for sale in the United States on or around October 13, 2008.  The

8  Behold II was first shipped for sale in the United States on or around November 4, 2009.  The

9  Blackjack was first shipped for sale in the United States on or around November 2, 2007.  The

10  Captivate was first shipped for sale in the United States on or around July 9, 2010.  The Captivate

11  Glide was first shipped for sale in the United States on or around November 5, 2011.  The

12  Comeback was first shipped for sale in the United States on or around July 13, 2009.  The

13  Continuum was first shipped for sale in the United States on or around October 29, 2010.  The

14  Dart was first shipped for sale in the United States on or around June 3, 2011.  The DoubleTime

15  was first shipped for sale in the United States on or around November 8, 2011.  The Droid Charge

16  was first shipped for sale in the United States on or around February 17, 2011.  The Epic 4G was

17  first shipped for sale in the United States on or around July 28, 2010.  The Epix was first shipped

18  for sale in the United States on or around October 13, 2008.  The Eternity was first shipped for

19  sale in the United States on or around November 7, 2008.  The Eternity II was first shipped for

20  sale in the United States on or around August 5, 2010.  The Evergreen was first shipped for sale in

21  the United States on or around October 22, 2010.  The Exhibit 4G was first shipped for sale in the

22  United States on or around June 1, 2011.  The Exhibit II 4G was first shipped for sale in the

23  United States on or around October 19, 2011.  The Fascinate was first shipped for sale in the

24  United States on or around August 30, 2010.  The Flight was first shipped for sale in the United

25  States on or around October 28, 2009.  The Flight II was first shipped for sale in the United States

26  on or around July 27, 2010.  The Focus was first shipped for sale in the United States on or around

27  November 1, 2010.  The Focus S was first shipped for sale in the United States on or around

28  October 28, 2011.  The Galaxy Prevail was first shipped for sale in the United States on or around

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1   April 15, 2011.  The Galaxy S II was first shipped for sale in the United States on or around

2   September 15, 2011.  The Galaxy S 4G was first shipped for sale in the United States on or around

3   February 11, 2011.  The Galaxy S (i9000) was never sold in the United States.  The Gem was first

4   shipped for sale in the United States on or around January 18, 2011.  The Gravity T was first

5   shipped for sale in the United States on or around May 26, 2010.  The Gravity TXT was first

6   shipped for sale in the United States on or around August 3, 2011.  The Gravity 2 was first shipped

7   for sale in the United States on or around August 3, 2009.  The Gravity 3 was first shipped for sale

8   in the United States on or around May 26, 2010.  The Gravity Smart was first shipped for sale in

9   the United States on or around June 8, 2011.  The Highlight was first shipped for sale in the

10  United States on or around June 26, 2009.  The Impression was first shipped for sale in the United

11  States on or around March 23, 2009.  The Indulge was first shipped for sale in the United States on

12  or around February 8, 2011.  The Infuse 4G was first shipped for sale in the United States on or

13  around April 30, 2011.  The Intercept was first shipped for sale in the United States on or around

14  June 9, 2010.  The Jack was first shipped for sale in the United States on or around May 15, 2009.

15  The Memoir was first shipped for sale in the United States on or around February 9, 2009.  The

16  Mesmerize was first shipped for sale in the United States on or around October 25, 2010.  The

17  Mythic was first shipped for sale in the United States on or around November 2, 2009.  The Nexus

18  S was first shipped for sale in the United States on or around December 11, 2010.  The Propel was

19  first shipped for sale in the United States on or around October 20, 2008.  The Propel Pro was first

20  shipped for sale in the United States on or around April 3, 2009.  The Replenish was first shipped

21  for sale in the United States on or around April 14, 2011.  The Rugby was first shipped for sale in

22  the United States on or around September 4, 2008.  The Rugby II was first shipped for sale in the

23  United States on or around May 25, 2010.  The Showcase Galaxy S was first shipped for sale in

24  the United States on or around November 11, 2010.  The SGH-A657 was first shipped for sale in

25  the United States on or around April 3, 2009.  The SGH-A777 was first shipped for sale in the

26  United States on or around November 11, 2008.  The SGH-I677 was first shipped for sale in the

27  United States on or around October 24, 2011.  The SGH-I707 was first shipped for sale in the

28  United States on or around March 12, 2010.  The SGH-T528 was first shipped for sale in the

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1   United States on or around June 15, 2011.  The SGH-T259 was first shipped for sale in the United

2   States on or around January 28, 2010.  The SGH-T636 was first shipped for sale in the United

3   States on or around November 11, 2008.  The SGH-T659 was first shipped for sale in the United

4   States on or around August 24, 2009.  The Sidekick was first shipped for sale in the United States

5   on or around April 11, 2011.  The Smiley was first shipped for sale in the United States on or

6   around May 26, 2010.  The Solstice was first shipped for sale in the United States on or around

7   July 23, 2009.  The Solstice II was first shipped for sale in the United States on or around

8   November 2, 2010.  The Strive was first shipped for sale in the United States on or around March

9   10, 2010.  The Vibrant was first shipped for sale in the United States on or around June 25, 2010.

10  The Galaxy Tab was first shipped for sale in the United States on or around May 3, 2011.  The

11  Galaxy Tab 8.9 was first shipped for sale in the United States on or around November 11, 2011.

12  The Galaxy Tab 10.1 was first shipped for sale in the United States on or around May 9, 2011.

13  Samsung has not marked the products listed above with any of the Samsung patents-in-suit.

14          Samsung's investigation is ongoing, and Samsung will supplement this interrogatory after

15  a reasonable investigation.  Samsung is further willing to meet and confer regarding the scope of

16  this interrogatory.

17  DATED:  March 7, 2012                    Respectfully submitted,

18                                           QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
19

20

21                                           By   */s/ Victoria F. Maroulis*

22                                               Charles K. Verhoeven
                                                 Kevin P.B. Johnson
23                                               Victoria F. Maroulis
                                                 Michael T. Zeller
24                                               Attorneys for SAMSUNG ELECTRONICS CO.,
                                                 LTD., SAMSUNG ELECTRONICS AMERICA,
25                                               INC. and SAMSUNG
                                                 TELECOMMUNICATIONS AMERICA, LLC
26

27

28

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on March 7, 2012, I caused **SAMSUNG'S AMENDED**

3  **OBJECTIONS AND RESPONSES TO APPLE INC.'S SIXTH SET OF**

4  **INTERROGATORIES (No. 14)** to be electronically served on the following via email:

5  **ATTORNEYS FOR APPLE INC.**

6  AppleMoFo@mofo.com                          WHAppleSamsungNDCalService@wilmerhale.com
   HAROLD J. MCELHINNY                         WILLIAM F. LEE
7  hmcelhinny@mofo.com                         william.lee@wilmerhale.com
   MICHAEL A. JACOBS                           WILMER CUTLER PICKERING HALE AND
8  mjacobs@mofo.com                            DORR LLP
   JENNIFER LEE TAYLOR                         60 State Street
9  jtaylor@mofo.com                            Boston, Massachusetts 02109
   ALISON M. TUCHER                            Telephone: (617) 526-6000
10 atucher@mofo.com                            Facsimile: (617) 526-5000
   RICHARD S.J. HUNG
11 rhung@mofo.com                              MARK D. SELWYN
   JASON R. BARTLETT                           mark.selwyn@wilmerhale.com
12 jasonbartlett@mofo.com                      WILMER CUTLER PICKERING HALE AND
   MORRISON & FOERSTER LLP                     DORR LLP
13 425 Market Street                           950 Page Mill Road
   San Francisco, California 94105-2482        Palo Alto, California 94304
14 Telephone: (415) 268-7000                   Telephone: (650) 858-6000
   Facsimile: (415) 268-7522                   Facsimile: (650) 858-6100

15

16

17        I declare under penalty of perjury that the foregoing is true and correct.  Executed in

18 Redwood Shores, California on March 7, 2012.

19                                          _____/s/ Melissa N. Chan_____

20

21

22

23

24

25

26

27

28

# Watson Declaration

# EXHIBIT 10

# Filed Under Seal

```
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
2                      SAN JOSE DIVISION

3           Civil Action No.:  11-CV-01846-LHK


4
     APPLE, INC., a California corporation,
5
              Plaintiff,
6

7    vs.

8    SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
9    SAMSUNG ELECTRONICS AMERICA, INC.,
     a New York corporation; and
10   SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,
11           Defendants.
     _____/
12

13

14

15              *** HIGHLY CONFIDENTIAL ***
                    ATTORNEYS' EYES ONLY
16

17      VIDEOTAPED 30(b)(6) and PERSONAL DEPOSITION OF:

18                    JOON-IL CHOI

19

20

21               Thursday, March 8, 2012
                       Kim & Chang
22                 Seoul, South Korea
                 9:07 a.m. to 11:09 a.m.
23

24

25
```

Page 2

```
 1   APPEARANCES:

 2

 3        ON BEHALF OF PLAINTIFF, APPLE, INC.:

 4

 5        MORRISON FOERSTER, LLP
          By:  WESLEY OVERSON, ESQ.
 6        425 Market Street
          San Francisco, California 94105-2482
 7        Phone:  415.268.7339

 8

 9        ON BEHALF OF DEFENDANT, SAMSUNG:

10

11        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
          By:  JOHN S. PURCELL, ESQ.
12        865 South Figueroa Street
          10th Floor
13        Los Angeles, California 90017
          Phone:  213.443.3000

14

15

16   Also present:

17        SUJIN WOO, LEAD INTERPRETER
          JAMES VICTORY, CHECK INTERPRETER
18        PAUL HISCHIER, VIDEOGRAPHER
          TRACEY LOCASTRO, COURT REPORTER
19        STEPHANIE KIM, MORRISON & FOERSTER
          ROSA KIM, SAMSUNG

20

21

22

23

24

25
```

Page 3

```
 1                   I N D E X

 2   Witness                               Page
     JOON-IL CHOI
 3   Examination by Mr. Overson              6

 4

 5

 6                 E X H I B I T S

     NUMBER     DESCRIPTION             PAGE
 7   Exhibit 2320  Notice of Deposition       9
                   Apple, Inc's Fifth Rule
 8                 30(B)(6)

     Exhibit 2321  Bates numbers SAMNDCA     25
 9                 10907803 through 805

     Exhibit 2322  Bates numbers SAMNDCA     31
10                 10911088 through 93

11   Exhibit 2323  Bates numbers SAMNDCA     36
                   513783 through 86

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1            P R O C E E D I N G S
 2                   -  -  -
 3        VIDEOGRAPHER:  My name is Paul Hischier, a
 4   videographer with American Realtime Court
 5   Reporters/Asia.
 6        Today's date is March 8th, 2012, and the
 7   time is approximately 9:07.  This deposition is
 8   being held in the office of Kim and Chang
 9   located in the Jeongdong building in Seoul,
10   Korea.  The caption of this case is Apple versus
11   Samsung Electronics Company, Limited, et al.,
12   held in the U.S. District Court, Northern
13   District of California, San Jose Division, with
14   a civil action number 11-CV-01846-LHK.
15        The name of the witness is Joon-Il Choi,
16   testifying in both his capacities as 30(b)(6)
17   and personal.
18        The court reporter today is Tracey LoCastro,
19   also with American Realtime Court
20   Reporters/Asia.
21        At this time I would ask all counsel and
22   interpreters to please state their appearances
23   and whom they represent for the record.
24        MR. OVERSON:  Wesley Overson of Morrison and
25   Foerster on behalf of Apple.  Also with me here
```

Page 5

```
 1   is Stephanie Kim.
 2        MR. PURCELL:  John Purcell of Quinn,
 3   Emanuel, Urquhart and Sullivan on behalf of
 4   Samsung.
 5        MS. ROSA KIM:  Rosa Kim from Samsung.
 6        LEAD INTERPRETER:  Sujin Woo, lead
 7   interpreter.
 8        CHECK INTERPRETER:  James Victory, check
 9   interpreter.
10        VIDEOGRAPHER:  Counsel, please state any
11   stipulations or statements you have at this time
12   for the record.
13        MR. OVERSON:  Yes.  I've been asked to state
14   the following:  We understand the court reporter
15   is not authorized to administer oaths in this
16   venue; nevertheless, we request that she
17   administer the oath, and we stipulate that we
18   waive any objection to the validity of the
19   deposition based on the oaths.
20        Counsel, do you agree with that?
21        MR. PURCELL:  So stipulated.
22        VIDEOGRAPHER:  At this time can our court
23   reporter please swear in the witness and
24   interpreters and then we can proceed.
25        COURT REPORTER:  Do you solemnly swear or
```

Page 6

1    affirm that you will well and truly interpret
2    the questions propounded by counsel and the
3    answers given by the witness from Korean to
4    English and English to Korean to the best of
5    your ability?
6           LEAD INTERPRETER:  I do.
7           CHECK INTERPRETER:  I do.
8               JOON-IL CHOI,
9    after having been duly sworn by the reporter, pursuant
10   to stipulation of counsel, was examined and testified
11   through the interpreter as follows:
12          THE WITNESS:  I do.
13              EXAMINATION
14   BY MR. OVERSON:
15     Q.    Good morning.
16     A.    Good morning.
17     Q.    Please state your name.
18     A.    My name is Choi, Joon-Il.
19          LEAD INTERPRETER:  Phonetically spelled as
20     J-o-o-n I-l C-h-o-i.
21     A.    I'm a senior manager.
22   BY MR. OVERSON:
23     Q.    Have you ever been in a deposition before?
24     A.    No.
25     Q.    Do you understand that the court reporter

Page 7

1    will take down everything that we say today?
2     A.    Yes, I know.
3     Q.    And do you understand that your testimony
4    today may later be used in a courtroom in the United
5    States?
6     A.    Yes, I understand.
7     Q.    And you understand that you've taken an oath
8    to tell the truth today?
9     A.    Yes, I understand.
10    Q.    Can you tell me your educational background,
11   please?
12    A.    I graduated from a university in Korea.  I
13   majored in electronic and electric engineering, and I
14   also -- I had a minor in business management.
15    Q.    Can you please summarize for me your
16   employment history?
17    A.    I joined Samsung Electronics in 2002.  I've
18   been working for this company for the past 10 years.
19   I've joined the mobile communications division.
20    Q.    What was your first position with Samsung?
21    A.    I was an assistant.
22    Q.    And were you working in the mobile division?
23    A.    Yes.
24    Q.    And at some point did you obtain a new
25   position?

Page 8

1     A.    I was an assistant for three years.  And in
2    2004 I was promoted to an assistant manager.  And then
3    after four years I was promoted as a manager.  And then
4    this year I have become a senior manager.
5     Q.    In 2008 when you became a manager, can you
6    tell me generally what your job duties were?
7     A.    My responsibilities have remained the same
8    since I was an assistant, which is task management.  It
9    is to manage the timeline, the schedules for the
10   development.
11    Q.    So if I understand correctly, you've been
12   doing that since 2004.
13    A.    It was since 2002 when I first joined the
14   company.
15    Q.    And can you tell me who you report to in
16   your current position?
17    A.    All in all there are three people I report
18   to.  Above me is manager Lee -- senior manager Lee,
19   Dong Chang.
20          LEAD INTERPRETER:  Phonetically spelled as
21     D-o-n-g C-h-a-n-g L-e-e.
22    A.    He oversees task management.  And I am part
23   of the development management group which is headed by
24   Mr. Chae, Won Chul.
25          LEAD INTERPRETER:  Phonetically spelled as

Page 9

1     W-o-n C-h-u-l C-h-o-i.
2     A.    And above him is executive vice-president
3    Mr. Koh, Dong Jin.
4           LEAD INTERPRETER:  I would like to respell
5      the name of Mr. Chae, Won Chul.  His last name
6      is C-h-a-e, not C-h-o-i.
7           The phonetical spelling of Mr. Koh, Dong Jin
8      is D-o-n-g J-i-n K-o-h.
9    BY MR. OVERSON:
10    Q.    So Mr. Koh, K-o-h, is he the highest ranking
11   person in your department?
12    A.    Yes, that's correct.
13    Q.    And can you tell me who Mr. Koh reports to?
14    A.    He reports to president Lee, Chul Hwan.
15          LEAD INTERPRETER:  Phonetically spelled as
16     C-h-u-l H-w-a-n L-e-e.
17    A.    He is the head of the Office of Development.
18   And then Mr. Lee reports to the CEO of the mobile
19   communications division, Mr. Shin, Jong Kyun.
20          LEAD INTERPRETER:  Phonetically spelled as
21     J-o-n-g K-y-u-n S-h-i-n.
22          (Exhibit 2320 was marked for
23   identification.)
24   BY MR. OVERSON:
25    Q.    Mr. Choi, we've handed you an exhibit that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1  we've given the number 2320.  And this is Apple's
2  asking of Samsung in a formal legal document for people
3  from Samsung to appear for deposition on various
4  topics.
5         Could I ask you to turn to page 8, please.
6  On page 8 there's a topic under A-3.  And the topic
7  reads, "The organizational structure and composition of
8  Samsung's Office of Development, R&D Management Group
9  and the Product Strategy Team and Product Planning
10 Group of Samsung's mobile communications division."
11        Do you understand that you have been
12 designated to speak for Samsung on the organizational
13 structure and composition of the R&D Management Group?
14     A.    Yes, I understand.
15     Q.    In your work at Samsung, have you always
16 been a member of the R&D Management Group?
17     A.    Yes, that's correct.
18     Q.    So I take it there's a separate R&D group.
19     A.    When you say R&D group, are you referring to
20 R&D -- are you talking about the development team?  Or
21 are you saying that there's a different R&D Management
22 Group?
23     Q.    I'll ask a new question.
24        What does the R&D Management Group do?
25     A.    The main role of the R&D Management Group is

Page 11

1  to manage the timeline, the schedule before the product
2  is released.  The risk factors or the risk points are
3  managed and reported to the management team.
4      Q.    How many Samsung employees are in the R&D
5  Management Group?
6      A.    I understand it to be around 100 to 150.
7      Q.    Do the members of the R&D Management Group
8  need to work with the other groups in order to manage
9  the schedule?
10     A.    Yes, that's correct.
11     Q.    Can you tell me which other groups you work
12 with?
13     A.    Of course I have to work with various teams.
14 In particular there's a need for close cooperation with
15 the software development, hardware development and
16 mechanical development teams.  And I also communicate
17 with the verification teams, and when necessary, I
18 communicate with the marketing team and the sales team
19 as well.
20     Q.    Does the R&D Management Group ever conduct
21 any analysis of competitors' products?
22     A.    For the products that are released in the
23 market, they create feature comparison tables.
24     Q.    Can you tell me why the R&D Management Group
25 would be looking at products already in the market?

Page 12

1  Because I understand that you're usually working on the
2  schedule to release to market.
3      A.    Schedule management is not only about
4  finding out the risks, but it is also about
5  understanding how our products will be impacted when
6  released to the market; therefore, depending on it, the
7  schedule may be delayed or pushed forward, and this is
8  very important to the top management.  Therefore,
9  although looking at the products already released in
10 the market is not the main job; it happens in
11 conjunction with the main job.
12     Q.    So for -- if I understand you correctly, for
13 example, you might look at products already in the
14 marketplace of competitors because they might have a
15 particular feature that Samsung will want to also
16 include in its next product and that might move the
17 schedule faster.  Is that correct?
18        MR. PURCELL:  Objection, vague and
19     ambiguous.
20     A.    It is only natural to analyze competitors'
21 products, and our role ends with reporting it.  Whether
22 to push forward or adjust the schedule is a judgment
23 called by the management.  And we report on the trends
24 of the market.  Of course, this is the main
25 responsibilities of the marketing team, but along with

Page 13

1  the Office of Development, we also report the articles
2  online.
3  BY MR. OVERSON:
4      Q.    Does the R&D Management Group perform
5  teardowns of competitors' products?
6        MR. PURCELL:  Objection, vague and
7     ambiguous.
8      A.    That is not conducted by the R&D Management
9  Group.  For instance, if we make a request to the
10 Office of Development for analysis of competitors such
11 as Nokia or HTC, for example, on the antenna
12 performance and the quality of the reception, then that
13 information is collected.
14 BY MR. OVERSON:
15     Q.    And then in using your example, another
16 group would then do an analysis of the antenna and then
17 send the results to your group.
18        MR. PURCELL:  Objection, calls for
19     speculation.
20     A.    Yes, when necessary, we make a request and
21 collect the analysis results of the development team.
22 BY MR. OVERSON:
23     Q.    And in the example you gave with the
24 antenna, so maybe you get back some information about
25 HTC's antenna from another group.  Can you give me an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

34..37

Page 34

1    Q.    What did you mean by collection or
2    compilation?
3    A.    It means that the analysis reports produced
4    by the development team is compiled into one file.
5    Q.    Do you recall doing that?
6    A.    I cannot exactly remember for this case.
7    There are so many cases.  Whether it be Apple, Nokia or
8    HTC, whenever a new product is released, this type of
9    work is conducted.  So it is difficult for me to
10   remember about a specific product.  But it is correct
11   to say that this is a normal process, but I do not
12   exactly remember about this case in particular.
13   Q.    Are there people within the R&D Management
14   Group assigned to particular competitor companies?
15   A.    No.
16   Q.    So one time you could be compiling a study
17   about Nokia and then a month later you might be doing
18   Apple.
19   A.    Yes, that's correct.
20   Q.    After you compile a report on a new
21   competitive product, where is it typically sent?
22   A.    It is reported to the management.
23   Q.    When you say "the management," can you be
24   more specific?
25   A.    It is difficult to exactly say who in

Page 35

1    particular.  It could be the vice-president or the
2    executive vice-president or the head of the Office of
3    Development.
4    Q.    In the case of analyses of Apple's iPhone or
5    iPad, do you know who in management received
6    compilation reports from your group?
7    A.    I think it is hard to say who exactly and to
8    remember who exactly, because it includes a lot of
9    unspecified people.
10   Q.    On the front sheet of the exhibit, 2322,
11   there's a notation of keeping the e-mail string secret
12   and refraining from forwarding the e-mail string.
13   Do you see that?
14   A.    Yes, I can see it.
15   Q.    Do you recall that there was any particular
16   need for security with respect to this Apple comparison
17   that the head of the Office of Development had
18   requested?
19   A.    Apple's product was already released to the
20   market, whereas Samsung's product was not released and
21   was under development; therefore, it is only right to
22   not -- to refrain from forwarding.
23   Q.    So at this time you were comparing products
24   that were still under development at Samsung to Apple
25   products that had already become public in the

Page 36

1    marketplace, true?
2    A.    Yes, that's right.
3    (Exhibit 2323 was marked for
4    identification.)
5    BY MR. OVERSON:
6    Q.    Okay.  We've marked as 2323 a document
7    that's an e-mail string, and it has the number SAMNDCA
8    513783 through 86.
9    Do you recognize this document?
10   A.    Yes, because it's a document I have written,
11   I think that's right.
12   Q.    Okay.  If you see towards the bottom of the
13   first page there is an e-mail with you listed as the
14   sender.  And it's dated March 5th, 2011.
15   A.    Yes, that's correct.
16   Q.    And the title of the e-mail is "Distribution
17   of conference minutes from the development room
18   critical issue review meeting presided by the CEO and
19   vice-chairman."  Is that right?
20   A.    Yes, that's correct.
21   Q.    And did you attend that meeting?
22   A.    Yes, I would have attended the meeting.
23   Q.    And why did you attend?
24   A.    The R&D Management Group collects
25   information and also holds -- organizes meetings, so I

Page 37

1    believe I have attended the meeting.
2    Q.    Do you recall this meeting?  Sitting here
3    today, can you recall the meeting?
4    A.    Yes, I think I can recall, because it was a
5    meeting with the vice-chairman.
6    Q.    And who was the vice-chairman?
7    A.    It was vice-chairman Choi, Jisung.
8    LEAD INTERPRETER:  Phonetically spelled as
9    J-i-s-u-n-g C-h-o-i.
10   BY MR. OVERSON:
11   Q.    And do you recall how many people attended
12   the meeting?
13   A.    No, I cannot remember.
14   Q.    Was it more than 20?
15   A.    I cannot remember at all.  Perhaps there
16   were a lot, but I'm not sure.
17   Q.    Okay.  In the e-mail that we have from your
18   attorneys it doesn't list who you sent this e-mail to.
19   Do you recall who this e-mail went to?
20   A.    I do not remember.
21   Q.    Did it go outside of the R&D Management
22   Group?
23   A.    I do not remember, so it would be difficult
24   to know whether it went outside of the R&D Management
25   Group.

Page 38

1    Q.    Do you recall why this meeting was called?
2    A.    Yes, I do.
3    Q.    Why was it called?
4    A.    Originally we had announced the Galaxy Tab
5  10.1 inches and we were preparing for its release.
6  Apple then came out with a thinner product, so upon the
7  request from the carrier, we had to redevelop the
8  second version.  And it was a meeting in regards to
9  this matter.
10    Q.    Which carrier received that the tablet 10.1
11  be made thinner or be changed?
12    A.    When I said carrier, I meant generally
13  speaking carriers.  We discuss and consult with many
14  different carriers.  And at that time we were
15  discussing with Vodafone.  So the first 10,000 units
16  were to be sold as developed and the next version was
17  to be redeveloped.  And in regards to other carriers,
18  these kind of discussions are always held.
19    Q.    So at this meeting was it decided to
20  decrease the thickness of the Galaxy tablet so that it
21  would be competitive with the iPad 2?
22    A.    As far as I remember, it was discussed to
23  see whether it is actually possible.  And so a test
24  work sample would have to be produced first in order to
25  make the decision.

Page 39

1    Q.    You mentioned earlier that Samsung had
2  spoken with many carriers.  Do you recall discussion at
3  the meeting about what the carriers wanted to see?
4    A.    This was not during -- it was not during
5  this meeting.  I was referring to after the release
6  situation.  And during this meeting, to discuss
7  something or not with the carrier was not discussed.
8    Q.    Prior to this meeting, had you had
9  discussions about the release of the iPad 2 and the
10  carriers' response to the iPad 2?
11    A.    I do not remember that.
12    Q.    In writing Exhibit 2323, did you try to be
13  as accurate as you could?
14    A.    Yes.
15    Q.    And did you write the summary of the meeting
16  fairly soon after the meeting was over?
17    A.    Yes.  If you look at the time I believe it
18  was right after the meeting.
19    Q.    And was it part of your job duties to write
20  up the summary of the meeting?  Did someone assign that
21  to you?
22    A.    I think it can depend on the situation;
23  however, this was written by me and the meeting was
24  carried out by me, so I also collected the information.
25  And also there were not many meetings that were

Page 40

1  presided by the vice-chairman.
2    Q.    Do you often get the assignment of writing
3  the meeting minutes?
4         MR. PURCELL:  Objection, vague and
5         ambiguous.
6    A.    I think it can depend on the situation.
7  BY MR. OVERSON:
8    Q.    Is it the regular practice of Samsung to
9  have minutes drafted after an important meeting?
10         MR. PURCELL:  Objection, calls for
11         speculation, lack of foundation.
12    A.    That also can depend on the situation.
13  BY MR. OVERSON:
14    Q.    In your experience in the R&D Management
15  Group, after there is an important meeting with
16  high-level executives, are there usually minutes
17  drafted from that meeting?
18    A.    That's what I meant by it depending on the
19  situation.  So in some cases meeting minutes are
20  drafted; whereas in some cases it is not.  If the
21  meeting is about something everyone has well
22  understanding, then it may not be drafted.  However,
23  even if it were a simple meeting, if it needs to be
24  distributed then a conference meeting minutes would be
25  drafted.

Page 41

1    Q.    Are meeting minutes from the R&D Management
2  Group kept in any particular place, stored in a
3  particular place?
4    A.    No, that's not true.
5    Q.    At the meeting with the vice-chairman
6  present, do you recall any discussion of the iPad 2?
7    A.    It is difficult for me to remember exactly,
8  but after the iPad 2 was announced, then it was
9  afterwards that the meeting was held.  And I think it
10  was about:  The iPad 2 is going to be thin; how are we
11  going to respond?
12    Q.    And you recall that discussion happening at
13  this meeting with the vice-chairman?
14    A.    As a matter of fact, I cannot remember
15  accurately, but if you look at the meeting minutes I
16  think that is what was discussed.
17    Q.    Apart from what's written on the meeting
18  minutes, can you remember anything else that was
19  discussed at that meeting as you sit here today?
20    A.    No, I do not remember.
21         MR. OVERSON:  Thank you.  I have no further
22         questions at this time.
23         MR. PURCELL:  We don't have any.
24         VIDEOGRAPHER:  This concludes the deposition
25  of Joon-Il Choi.  Going off the record.  The

# Watson Declaration

# EXHIBIT 11

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

1

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER
UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

_____

In the Matter of:

CERTAIN ELECTRONIC DIGITAL            Case No.:

MEDIA DEVICES AND COMPONENTS          337-TA-796

THEREOF

_____


        *** CONFIDENTIAL BUSINESS INFORMATION ***
            SUBJECT TO PROTECTIVE ORDER


     VIDEOTAPED 30(b)(6) AND PERSONAL DEPOSITION OF:


                    JOONIL CHOI




                    March 20, 2012

                    Kim & Chang

                 Seoul, South Korea

                9:05 a.m. - 7:38 p.m.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

6..9

Page 6

1  I'm the main interpreter for today's deposition.
2          CHECK INTERPRETER: Lee Boese, check
3  interpreter.
4          MR. JAECKEL: Good morning. We understand
5  that the court reporter is not authorized to
6  administer oaths in this venue. Nevertheless, we
7  request that she administer the oath, and we stipulate
8  that we waive any objection to the validity of the
9  deposition based on the oaths.
10          MR. WEINSTEIN: So agreed.
11          (Interpreters sworn.)
12                  JOONIL CHOI,
13  having been first duly sworn to state the whole truth
14  testified as follows:
15                  EXAMINATION
16  BY MR. JAECKEL:
17      Q.   Good morning, Mr. Choi. My name is Jeff
18  Jaeckel, and I'm an attorney representing Apple. I'm
19  going to be asking you questions today in your deposition.
20      A.   Yes.
21      Q.   I know that we asked you earlier to spell your
22  name before we began, but so that we have it in the
23  official record, could you spell your name for me using
24  English characters.
25      A.   J-o-o-n-i-l and C-h-o-i.

Page 7

1      Q.   Have you ever used a different spelling for
2  your name with English characters?
3      A.   No.
4      Q.   Could you state your business address.
5      A.   Samsung Electronics, Suwon business, No. 416,
6  Maetan-dong, Yeongtong-gu, Suwon-si.
7      Q.   You were deposed earlier in March of 2012 in
8  connection with a different piece of litigation between
9  Apple and Samsung; is that correct?
10      A.   Yes. That's correct.
11      Q.   Other than that deposition, have you ever been
12  deposed before?
13      A.   No.
14      Q.   Have you ever testified at a trial?
15      A.   No.
16      Q.   Have you ever learned anything since your first
17  deposition in the Apple-Samsung litigation that causes you
18  to believe that any testimony you offered in that
19  deposition was not accurate?
20          MR. WEINSTEIN: Objection, vague and
21  ambiguous.
22          CHECK INTERPRETER: The check interpreter
23  would like to rerender.
24          (Translation.)
25      A.   Are you asking me whether I checked those --

Page 8

1  any testimony was correct or not?
2          CHECK INTERPRETER: No. "Are you asking me
3  whether I have searched or looked for anything?"
4  BY MR. JAECKEL:
5      Q.   No, I'm not asking whether you have taken any
6  steps to look for information but just whether you have
7  learned anything through any means that causes you to
8  believe the testimony you offered in that first deposition
9  was not accurate.
10          MR. WEINSTEIN: Same objection.
11      A.   No.
12  BY MR. JAECKEL:
13      Q.   The process today is going to be very familiar
14  to you. It will be basically the same process that was
15  used for your first deposition. I'll ask questions in
16  English. They will be interpreted to you in Korean. And
17  then your Korean answer will be re-interpreted back into
18  English. It's important that we all take turns speaking
19  and not speak over each other so that the interpreters can
20  understand my questions and your answers and the
21  stenographer can get an accurate recording of what was
22  said.
23          (A discussion was had off the record between
24  Lead Interpreter and Check Interpreter in Korean.)
25          LEAD INTERPRETER: I will reinterpret.

Page 9

1          (Translation.)
2      A.   Okay.
3  BY MR. JAECKEL:
4      Q.   Your counsel may object to my questions during
5  the course of the deposition today, but unless he
6  specifically instructs you not to answer, you'll still
7  need to provide the best answer that you can.
8      A.   Yes.
9      Q.   Is there any reason today that you are not able
10  to provide accurate and complete answers to my questions?
11      A.   No.
12          (Deposition Exhibit 1 was marked.)
13      Q.   Mr. Choi, the court reporter has handed you a
14  document that is marked Exhibit 1. This is Complainant
15  Apple Inc.'s notice of deposition to Joonil Choi.
16      A.   Yes.
17      Q.   Have you seen Exhibit 1 before?
18      A.   I've heard about deposition notice.
19      Q.   Do you understand that your testimony today is
20  being offered in connection with a proceeding before the
21  International Trade Commission in the United States that
22  is a different legal proceeding than the lawsuit in which
23  you offered deposition testimony earlier this month?
24      A.   Yes.
25      Q.   Do you understand that this deposition notice

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 30

1   wireless telephones that use the CDMA wireless
2   communication standard?
3       A.   Yes.
4       Q.   Do you recall which specific tablets you have
5   worked on?
6       A.   Yes.
7       Q.   Could you identify them?
8       A.   Galaxy Tab 7.0, Galaxy Tab 10.1.
9       Q.   When did you work on the Galaxy Tab 7.0?
10      A.   2010.
11      Q.   When did you work on the Galaxy Tab 10.1?
12      A.   2011.
13      Q.   Do you understand spoken English?
14      A.   Very small.  Very little.
15      Q.   Do you read English?
16      A.   Yes, but I need a dictionary.
17      Q.   Do you use English in connection with your job
18  at SEC?
19      A.   You mean in my company?
20      Q.   Yes.
21      A.   Yes, if required.  And I'm writing e-mail in
22  English and also having a phone call in English.
23      Q.   When are you required to write an e-mail in
24  English?
25      A.   There is a research center in overseas.  And if

Page 31

1   I have any questions to this research center, I wrote an
2   e-mail or made a phone call in English.
3           CHECK INTERPRETER:  For sake of clarity,
4   what has been rendered as "research center" could also
5   be rendered as "lab," l-a-b.
6   BY MR. JAECKEL:
7       Q.   Does that research center or lab have a name?
8       A.   There's a research center or lab in region --
9   in each region, so the name would depend on where that
10  center is located.
11      Q.   Is there a research center or lab in the
12  United States?
13      A.   Yes.
14      Q.   Does the research center or lab in the
15  United States have a name?
16      A.   That is based on the name of location.
17      Q.   Does it have a name?
18      A.   Yes.  When we are talking about that research
19  center or lab, we named it based on its region.
20          CHECK INTERPRETER:  What has been rendered
21  "we named it based on its region," instead of that,
22  "we go by the location."
23  BY MR. JAECKEL:
24      Q.   So you would just call it "Research Center
25  United States"?

Page 32

1       A.   No, that's not the case for research center or
2   lab in the United States.
3       Q.   What would you call it?
4       A.   Since that research center in the United States
5   is located in Dallas, so we called it Dallas Research
6   Center or Dallas Lab.
7           MR. WEINSTEIN:  Counsel, we've been going
8   for over an hour.  Is this a good time for a break?
9           MR. JAECKEL:  Sure.
10          THE VIDEOGRAPHER:  This marks the end of
11  Disk No. 1 in the deposition of Joonil Choi.  Going
12  off the record.  The time is 10:12.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  We are back on the
15  record.  Here begins the beginning -- here begins the
16  -- excuse me.  Here begins Disk No. 2 in the
17  deposition of Joonil Choi.  The time is 10:25.
18  BY MR. JAECKEL:
19      Q.   Welcome back, Mr. Choi.  Do you understand that
20  you continue to be under oath?
21      A.   Yes.
22      Q.   Do you have any formal education after the
23  completion of high school?
24      A.   Yes.
25      Q.   Do you have a college degree?

Page 33

1       A.   Yes.
2       Q.   Where did you attend college?
3       A.   Yonsei University.
4           LEAD INTERPRETER:  Y-o-n-s-e-i.
5   BY MR. JAECKEL:
6       Q.   Did you have a principal area of study in
7   college?
8       A.   Yes.
9       Q.   What was that?
10      A.   Electronics engineering.
11      Q.   What year did you earn your college degree?
12      A.   2002.
13      Q.   Do you have any graduate degree?
14      A.   No.
15      Q.   Did you join Samsung immediately after
16  finishing college?
17      A.   Yes.
18      Q.   Do you use e-mail in connection with your work
19  at SEC?
20      A.   Yes.
21      Q.   Do you know what e-mail software program you
22  use on your computer for your work e-mail?
23      A.   Yes.
24      Q.   What is the name of that program?
25      A.   My Single.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

34..37

Page 34

1    Q.    Do you use any other e-mail software program to
2    manage your work e-mail?
3    A.    Yes.
4    Q.    What is the name of that program?
5    A.    Outlook.
6    Q.    Other than My Single and Outlook, do you use
7    any other e-mail software program to manage your work
8    e-mail?
9    A.    No.
10   Q.    When did you begin to use My Single?
11   A.    Since I joined the company.
12   Q.    When did you begin to use Outlook?
13   A.    I cannot recall exactly, but it seems from the
14   time that I worked at -- it seems from the time that I was
15   associate.
16   Q.    So as far back as 2003 or 2004 you believe you
17   were using Outlook?
18   A.    Yes.
19   Q.    Why do you use two programs to manage your work
20   e-mail?
21   A.    I use My Single because that is the e-mail
22   program for the company.  And I use Outlook in order to
23   save e-mails.
24   Q.    How do you decide what e-mails to save in
25   Outlook?

Page 35

1    A.    I saved all the e-mails.  I save all the
2    e-mails.
3    Q.    Does that mean that you generally believe that
4    the Outlook that is on your computer has all or almost all
5    of your e-mails dating back to 2003 or 2004 when you began
6    to use Outlook?
7          MR. WEINSTEIN:  Objection, vague and
8    ambiguous.
9    A.    No, that's not the case because the size is too
10   big.  I have to -- I have to check it out.
11         (A discussion was had off the record between
12   Lead Interpreter and Check Interpreter in Korean.)
13   A.    I have to organize them.
14   BY MR. JAECKEL:
15   Q.    Do you delete e-mail from your Outlook?
16         MR. WEINSTEIN:  Objection, vague and
17   ambiguous.
18   A.    About the previous mails, I deleted them after
19   I changed my computer, but ever since I changed my
20   computer to the current one, I save all the e-mails.
21   BY MR. JAECKEL:
22   Q.    When did you change to your current computer?
23   A.    Based on my recollection, it was about early
24   last year or early -- about two years ago.  I'm not sure.
25   Q.    Do you have any ability to provide a more

Page 36

1    accurate estimate of the time?
2          MR. WEINSTEIN:  Objection, vague and
3    ambiguous.
4    A.    I'm not sure, but when I -- this is not
5    correct, but when I look into my Outlook, there are some
6    e-mails saved since 2010, but it's not accurate.
7          (A discussion was had off the record between
8    Lead Interpreter and Check Interpreter in Korean.)
9          LEAD INTERPRETER:  May interpreter correct?
10   A.    I'm not sure, but when I look into my Outlook,
11   there are some e-mails saved since 2010, but it's not
12   accurate.
13   BY MR. JAECKEL:
14   Q.    What do you mean when you say "it's not
15   accurate"?
16   A.    As I mentioned before, I saved all the e-mails.
17   And as that is the case, the size of savings are too
18   enormous.  And I saved the e-mails on a monthly basis.
19   And all those e-mails are saved on a yearly basis.  So it
20   is really hard to find a certain e-mail.  And after one
21   year or two, I delete all of them.
22   Q.    Do you use an instant messaging program in
23   connection with your work at SEC?
24   A.    Yes.
25   Q.    What is the name of that program?

Page 37

1    A.    That's the program used in the company, so I'm
2    not sure about the name of that program.
3    Q.    Are messages that you send or receive using
4    that instant messaging program saved in Outlook?
5    A.    I'm not sure.
6    Q.    Do you save messages that you send or receive
7    using that instant messaging program on your hard drive
8    using some other method besides Outlook?
9          MR. WEINSTEIN:  Objection, vague and
10   ambiguous.  Assumes facts not in evidence.
11   A.    I'm not sure either because that is done by --
12   that may be done by system.  So I'm not sure whether it is
13   -- they are saved or not.
14   BY MR. JAECKEL:
15   Q.    Do you personally take any steps to save
16   messages that you send or receive using the instant
17   messaging system?
18   A.    No.
19   Q.    Do you use a mobile wireless device to send or
20   receive work e-mail?
21   A.    Yes.
22   Q.    What type of device is that?
23   A.    Galaxy S II.
24   Q.    For how long have you used that device?
25   A.    I purchased that device last year, so it was

# Watson Declaration

# EXHIBIT 12

# Filed Under Seal

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1           UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA

2             SAN JOSE DIVISION
     Civil Action No.:  11-CV-01846-LHK

3

4 APPLE, INC., a California corporation,
     Plaintiff,

5

vs.

6

SAMSUNG ELECTRONICS CO., LTD.,

7 a Korean business entity, et al.
     Defendants.

8 _____

9    UNITED STATES INTERNATIONAL TRADE COMMISSION
          WASHINGTON, D.C.

10 _____

11 In the Matter of:

12 CERTAIN ELECTRONIC DIGITAL        Case No.:

13 MEDIA DEVICES AND COMPONENTS      337-TA-796

14 THEREOF

15 _____

16

17         *** HIGHLY CONFIDENTIAL ***
        SUBJECT TO PROTECTIVE ORDER

18      VIDEOTAPED PERSONAL DEPOSITION OF:

19           DON-JOO LEE

20

21

22       Friday, February 17, 2012
        Kim & Chang

23       Seoul, South Korea
     9:07 a.m. to 6:24 p.m.

24

25

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
1    APPEARANCES:

2

3    ON BEHALF OF PLAINTIFF, APPLE, INC.:

4

5        MORRISON FOERSTER, LLP
         By:  GRANT L. KIM, ESQ.
             STEPHANIE KIM, ESQ.
6        425 Market Street
         San Francisco, California 94105-2482
7        Phone:  415.268.7339

8

9

10   ON BEHALF OF DEFENDANT, SAMSUNG:

11   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
         By:  VICTORIA MAROULIS, ESQ.
12           BRETT ARNOLD, ESQ.
         555 Twin Dolphin Drive
13       Redwood Shores, California 94065
         Phone:  650.801.5005
14

15

16   Also present:

17       SANGMEE MOON, LEAD INTERPRETER
         KATHY SIM, CHECK INTERPRETER
18       JEFF MENTON, VIDEOGRAPHER
         TRACEY LOCASTRO, COURT REPORTER
19       SAMUEL LEE, ESQ., SAMSUNG
         CINDI MORELAND, SAMSUNG
20

21

22

23

24

25
```

Page 3

```
1                  I N D E X

2                                          PAGE

3    DIRECT EXAMINATION                      7
     BY MR. KIM:

4

5              EXHIBITS

6                                          PAGE

     Exhibit 1550 Organizational Chart, Bates   12
7    SITC 003006130 through 6139
     Exhibit 1551 Bates SAMNDCA 10335377 through 22
8    5380
     Exhibit 1552 Bates SAMNDCA 00516722 through 29
9    728
     Exhibit 1553 Bates SAMNDCA 10460791 through 33
10   797
     Exhibit 1554 Bates SAMNDCA 00515413 through 37
11   423
     Exhibit 1555 Bates SAMNDCA 10422392 through 45
12   398
     Exhibit 1556 Bates SAMNDCA 10434372 through 53
13   382
     Exhibit 1557 Bates SAMNDCA 00514843 through 59
14   851
     Exhibit 1558 Bates SAMNDCA 10444064 through 65
15   072
     Exhibit 1559 Bates SAMNDCA 62702 through 711   72
16   Exhibit 1560 Bates SAMNDCA 00196646 through 73
     196827
17   Exhibit 1561 Bates SAMNDCA 00528092 through 84
     00528145
18   Exhibit 1562 Bates SAMNDCA 10170873 through 90
     10170907
19   Exhibit 1563 Bates SAMNDCA 00202336 through 100
     202380
20   Exhibit 1564 Bates SAMNDCA 10244357 through 110
     412
21   Exhibit 1565 Bates SAMNDCA 00232190 through 115
     2290
22   Exhibit 1566 Bates SAMNDCA 00533129 through 123
     159
23   Exhibit 1567 Bates SAMNDCA 00044768 through 125
     4770 and SITC-00107647 through 649
24   Exhibit 1568 Bates SAMNDCA 10185356 through 130
     5364
25   Exhibit 1569 Bates S-ITC-007769457 through 133
     493
```

Page 4

```
1

2        EXHIBITS (Continued)               Page

3    Exhibit 1570 Bates SAMNDCA 00525528 through  141
     611
4    Exhibit 1571 Bates SAMNDCA 00512692 through  139
     697
5    Exhibit 1572 Bates SAMNDCA 00511554 through  142
     555
6    Exhibit 1573 Bates SAMNDCA 10257309 through  145
     380
7    Exhibit 1574 Bates SAMNDCA 10168598 through  146
     602
8    Exhibit 1575 Bates SAMNDCA 10196852 through  148
     880
9    Exhibit 1576 Printout from website          155
     BusinessInsider.com
10   Exhibit 1577 Article dated March 4th, 2011  160
     Exhibit 1578 Printout from Neighbor News    162
11   Exhibit 1579 Bates SAMNDCA 00532363 through 167
     266
12   Exhibit 1580 Bates SAMNDCA 10198140 through 172
     142
13   Exhibit 1581 Bates SAMNDCA 00512126 through 174
     127
14   Exhibit 1582 Printout from website          175
     FastCompany.com
15   Exhibit 1583 Article dated June 8, 2011     178
     Exhibit 1584 Bates SAMNDCA 00513566 through 183
16   577

17

18

19

20

21

22

23

24

25
```

Page 5

```
1              P R O C E E D I N G S
2                     -  -  -
3        VIDEOGRAPHER:  We are now on the video
4    record.  The time is approximately 9:07 a.m.
5    Today is February the 17th, 2012.
6        This is the videotaped deposition of Don-Joo
7    Lee; that's, D-O-N, hyphen, J-O-O, Lee.
8        This video deposition has been noticed by
9    the law firm of Morrison and Foerster and being
10   taken by attorney Grant L. Kim representing the
11   plaintiff in the matter of Apple, Inc. versus
12   Samsung Electronics Company, Limited, et al. and
13   Samsung Electronics Company, et al.,
14   counterclaim plaintiff versus Apple, Inc.,
15   counterclaim defendants, case number
16   11-CV-01846-LHK in the United States District
17   Court for the Northern District of California,
18   San Jose Division and also case number
19   337-TA-796, In the Matter of:  Certain
20   Electronic Digital Media Devices and Components
21   Thereof in the United States International Trade
22   Commission, Washington, D.C.
23        This deposition is being taken at the
24   offices of Kim and Chang in Seoul, Korea.  The
25   court reporter is Tracey LoCastro from American
```

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

1  Realtime Court Reporters/Asia.  The videographer
2  is Jeff Menton the CCVS of American Realtime
3  Court Reporters/Asia.
4      Would counsel please state their appearance,
5  starting with the noticing attorney, and then
6  will the court reporter please swear the
7  interpreters in and then will the attorneys
8  please make their opening statements.
9      MR. KIM:  Grant Kim for Morrison and
10  Foerster, and with me is Stephanie Kim, also
11  from the same firm.
12      MS. MAROULIS:  Victoria Maroulis with Quinn
13  Emanuel, counsel for Samsung and the witness.
14  And with me are Brett Arnold of Quinn Emanuel
15  and Cindi Moreland and Sam Lee of Samsung.
16      COURT REPORTER:  Would you raise your right
17  hand.
18      Do you solemnly swear or affirm that you
19  will well and truly interpret the questions
20  propounded by counsel and the answers given by
21  the witness from Korean to English and English
22  to Korean to the best of your ability?
23      CHECK INTERPRETER:  I do.
24      INTERPRETER:  I do.
25      COURT REPORTER:  Mr. Lee, can I have you

Page 7

1      raise your right hand, please?
2          DON-JOO LEE,
3  after having been duly sworn by the reporter, pursuant
4  to stipulation of counsel, was examined and testified
5  through the interpreter as follows:
6      THE WITNESS:  I do.
7      MR. KIM:  I've been asked to read the
8      following statement.  We understand the court
9      reporter is not authorized to administer oaths
10      in this venue; nevertheless, we request that she
11      administer the oath and we stipulate that we
12      waive any objection to the validity of the
13      deposition based on the oaths.
14      MS. MAROULIS:  Stipulated.
15          DIRECT EXAMINATION
16  BY MR. KIM:
17      Q.   Good morning, Mr. Lee.
18      Have you had your deposition taken before,
19  Mr. Lee?
20      A.   No.
21      Q.   So I will briefly review the basics.  I
22  imagine your counsel has also mentioned it.  First, do
23  you understand that you have taken an oath to testify
24  truthfully today?
25      A.   Yes, I do.

Page 8

1      Q.   And do you understand that the testimony you
2  give today may be used in court later in the
3  proceedings between Apple and Samsung?
4      A.   Yes, I do.
5      Q.   Is there any -- anything that would make it
6  difficult for you to testify truthfully to the best of
7  your knowledge today?
8      A.   No.
9      Q.   Okay.  I will try to make my questions as
10  simple and clear as possible, but if my question is not
11  clear, please feel free to ask for a clarification.
12      A.   Yes, I understand.
13      Q.   In return -- I know you're very busy, and we
14  appreciate your making yourself available today -- I
15  would appreciate it if you could make your answer as
16  clear and simple as possible.
17      A.   Yes.
18      Q.   And one other comment.  You've been nodding
19  your head, but you've also been answering, which is
20  fine, but just be sure to give an audible response.  If
21  you only nod your head, it may be difficult for the
22  court reporter to pick it up.
23      A.   Yes, I understand.
24      Q.   Mr. Lee, just a couple background questions.
25  Is it correct that you joined Samsung Electronics in

Page 9

1  1977?
2      A.   No, not 1977, but 1979.
3      Q.   Okay.  And what is your current position?
4      A.   I'm the head of the sales and marketing at
5  mobile business unit of Samsung Electronics.
6      Q.   And how long have you held that position?
7      A.   This year marks the fourth year into this
8  position.
9      Q.   So since 1998?
10      I'm sorry.
11      A.   From 2009.
12      Q.   I see.  So you're entering your fourth year.
13      A.   Yes.
14      Q.   And what position did you hold before that?
15      A.   You mean immediately before?
16      Q.   Yes.
17      A.   I was responsible for CIS region for Samsung
18  Electronics.
19      Q.   And what is the CIS region?
20      A.   President of Samsung Electronics CIS.  And
21  CIS covers countries of the Soviet federations,
22  including Russia.
23      Q.   So in that position was that mobile devices
24  only, or was that all Samsung products?
25      MS. MAROULIS:  Objection, vague.

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10..13

Page 10

```
1              THE WITNESS:  I was responsible for all
2       Samsung Electronics products.
3   BY MR. KIM:
4       Q.     And when did you become responsible for all
5   Samsung products for CIS region?
6       A.     I held the position for two years, which
7   means from 2007 to 2008.
8       Q.     What is your educational background?
9       A.     I went to the business school in Columbia
10  University.
11      Q.     Did you -- what degree did you -- you
12  received an MBA; is that right?
13      A.     Yes, correct.
14      Q.     What year?
15      A.     1997.
16      Q.     And what was your undergraduate degree?
17      A.     Electronic engineers from Seoul National
18  University engineering department.
19      Q.     What year?
20      A.     I graduated in the year 1979.
21      Q.     Your MBA coursework at Columbia was in
22  English; is that correct?
23      A.     Yes.
24      Q.     As head of sales and marketing for mobile
25  division, you speak to the media in English sometimes;
```

Page 11

```
1   is that correct?
2              MS. MAROULIS:  Objection, assumes facts.
3              THE WITNESS:  Yes.
4   BY MR. KIM:
5       Q.     You also conduct business meetings in
6   English; is that correct?
7       A.     Yes.
8       Q.     And in the normal course of business you
9   will read documents in English; is that correct?
10      A.     Yes.
11      Q.     Today you are testifying through an
12  interpreter, correct?
13      A.     Yes.
14      Q.     Okay.  I'd like to ask you a few more
15  questions about your current position as head of sales
16  and marketing for Samsung mobile division.
17             MS. MAROULIS:  Counsel, this exhibit is in
18         Korean.  Do you have an English translation for
19         me?
20             MR. KIM:  No, I don't have an English
21         translation.
22             MS. MAROULIS:  I'm going to object to this
23         line of questioning because I would not be able
24         to adequately object and defend the witness
25         without seeing this translation since I
```

Page 12

```
1       personally do not read Korean.
2              (Exhibit 1550 Organizational Chart, Bates
3   SITC 003006130 through 6139 was marked for
4   identification.)
5   BY MR. KIM:
6       Q.     Mr. Lee, I've handed you Exhibit 1550.  This
7   is a document that's been produced by Samsung.  And I
8   believe it's an organizational chart.  And what we've
9   done is we've taken out the pages that seem to show the
10  different people and departments that you are supervising.
11             MS. MAROULIS:  Mr. Lee, please take your
12         time and review the document.
13             MR. KIM:  And just so the record is clear, I
14         didn't ask a question.
15  BY MR. KIM:
16      Q.     My question is:  Is this an organizational
17  chart showing the people and departments that you
18  supervise?
19             MS. MAROULIS:  Objection, lacks foundation.
20             THE WITNESS:  I just had a look at the first
21         page and this shows the part of the divisions
22         that I am supervising.
23             Do you mind if I look at the whole document?
24  BY MR. KIM:
25      Q.     Sure, that's fine.
```

Page 13

```
1       A.     I'll look for it as quickly as possible.
2              MR. KIM:  While the witness is reviewing,
3         I'll note for the record that the Bates numbers
4         are SITC 003006130 to 6139.
5              We've also noted counsel's objection
6         regarding interpretation.  The witness is fluent
7         in Korean and can certainly review it.
8              THE WITNESS:  I have looked through the
9         document and it seems this organization chart
10        shows the big picture of the divisions or
11        business units that I supervise.
12  BY MR. KIM:
13      Q.     The first page of Exhibit 1550 has a
14  reference to insight marketing part; is that correct?
15             MS. MAROULIS:  Objection, document speaks
16         for itself.
17             THE WITNESS:  Yes.
18  BY MR. KIM:
19      Q.     And that's one of the groups that you
20  supervise.
21      A.     Yes.
22      Q.     What is their general purpose or role?
23      A.     They identify and report consumer insight.
24      Q.     And there's one in the middle of the chart
25  on the first page of Exhibit 1550, there's a reference
```

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

```
1   to IMC part; is that correct?
2       A.   Yes.
3       Q.   What does IMC stand for?
4       A.   I don't have precise recollection.
5       Q.   What is their role?
6       A.   It handles the communication with consumers.
7       Q.   The third one on the same page, what is the
8   responsibility of the group that begins with
9   "experience"?
10          MS. MAROULIS:  Objection, vague.
11          THE WITNESS:  This part makes sure that our
12      consumers experience our products at our retail
13      stores.
14  BY MR. KIM:
15      Q.   Mr. Lee, at a high level, what -- can you
16  just describe very briefly your overall role as head of
17  marketing and sales?
18      A.   I promote and sell Samsung Electronics
19  mobile products globally.
20      Q.   And to promote and sell Samsung mobile
21  products, is it important for you to understand what
22  consumers want and what consumers think?
23          MS. MAROULIS:  Objection, vague.
24          THE WITNESS:  It's important.
25  BY MR. KIM:
```

Page 15

```
1       Q.   Is it also important for you to understand
2   the key features of Samsung products, Samsung mobile
3   products?
4           MS. MAROULIS:  Objection, vague.
5           THE WITNESS:  It's important.
6   BY MR. KIM:
7       Q.   To perform your job as head of marketing and
8   sales, is it also important for you to understand the
9   products of competing companies?
10          MS. MAROULIS:  Objection, vague.
11          THE WITNESS:  It is important to understand
12      products of all competitors.
13  BY MR. KIM:
14      Q.   Including Apple, is that correct?
15      A.   Yes.
16      Q.   You mentioned that you're head of sales and
17  marketing.  In various documents I've seen a reference
18  to strategic marketing; is that part of your official
19  title?
20      A.   Yes.
21      Q.   Is it correct that part of your job is to
22  come up with a good marketing strategy that fits
23  Samsung's products?
24          MS. MAROULIS:  Objection, vague.
25          (Discussion held between interpreters.)
```

Page 16

```
1           MR. KIM:  I said Samsung's products.
2           INTERPRETER:  She said I said "Samsung
3       Electronics," not "products."
4           MS. MAROULIS:  Did you note my objection?
5           THE WITNESS:  Yes.
6   BY MR. KIM:
7       Q.   In order to come up with a good marketing
8   strategy that fits Samsung's products, is it important
9   for you to understand Samsung's product design
10  strategy?
11          MS. MAROULIS:  Objection, vague.
12          INTERPRETER:  Design strategy.
13          THE WITNESS:  I am not responsible for
14      design strategy.  It is under a different
15      division.
16  BY MR. KIM:
17      Q.   Who is head of the design strategy division?
18      A.   Product planning team head.
19          CHECK INTERPRETER:  Leader, team leader.
20  BY MR. KIM:
21      Q.   Mr. Lee, do you have a preference at your
22  company for "head" or "team leader," for that word?
23      A.   I don't mind.  Both are fine.
24      Q.   Who is the current head of Samsung's product
25  strategy?
```

Page 17

```
1           (Discussion held between interpreters.)
2           THE WITNESS:  W.P. Hong.
3   BY MR. KIM:
4       Q.   So I understand, Mr. Hong has overall
5   responsibility for product strategy, not you.  But for
6   you to develop a good marketing strategy, is it
7   important for you to understand Samsung's product
8   design strategy?
9           MS. MAROULIS:  Objection, vague, asked and
10      answered.
11          THE WITNESS:  Yes, I'm not responsible, but
12      I need to have a good understanding.
13  BY MR. KIM:
14      Q.   To come up with a good marketing strategy,
15  is it also important for you to understand the product
16  design and marketing strategy of Apple?
17          MS. MAROULIS:  Objection, vague, assumes
18      facts.
19          (Check interpreter spoke in Korean.)
20          THE WITNESS:  It is important to know the
21      product, but I don't have a knowledge on design
22      strategy or I don't conduct an analysis on
23      design strategy.
24          CHECK INTERPRETER:  It is not necessary to
25      understand the design itself.
```

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18..21

Page 18

BY MR. KIM:

2    Q.    Mr. Lee, has Samsung taken steps to
3  understand the design strategy of Apple?
4        MS. MAROULIS:  Objection, calls for
5        speculation, lacks foundation.
6        THE WITNESS:  I'm not aware of it.
7  BY MR. KIM:
8    Q.    Have you ever seen any documents that
9  discuss Apple's design strategy?
10   A.    I don't recall.
11   Q.    Do you have any understanding of Apple's
12 design strategy?
13       MS. MAROULIS:  Objection, asked and
14       answered.
15       THE WITNESS:  Not quite sure.
16 BY MR. KIM:
17   Q.    So is it your testimony that to do your job
18 in preparing a good marketing strategy for Samsung you
19 don't need to know Apple's design strategy?
20       MS. MAROULIS:  Objection, asked and
21       answered.
22       THE WITNESS:  I need to know the design, but
23       I don't know the design strategy, and I don't
24       need to know about the design strategy either.
25 BY MR. KIM:

Page 19

1    Q.    Do you need to know Apple's marketing
2  strategy?
3        MS. MAROULIS:  Objection, vague.
4        THE WITNESS:  It is necessary.
5  BY MR. KIM:
6    Q.    And you have taken steps to understand
7  Apple's marketing strategy; is that right?
8        (Check interpreter spoke in Korean.)
9        THE WITNESS:  We try to capture the general
10       market information.
11 BY MR. KIM:
12   Q.    Samsung competes against Apple in the tablet
13 computer market, correct?
14       MS. MAROULIS:  Objection, vague.
15       THE WITNESS:  Not just Apple, but Samsung is
16       competing with a number of competitors,
17       including Amazon, Motorola and Rim.
18 BY MR. KIM:
19   Q.    Does Samsung view Apple as its most
20 important competitor in the tablet market?
21       MS. MAROULIS:  Objection, calls for
22       speculation, vague.
23       THE WITNESS:  We consider it as one of
24       competitors.
25 BY MR. KIM:

Page 20

1    Q.    Is Apple just one of your competitors, not
2  any more or less important than the others?
3    A.    Yes, one of our competitors.
4    Q.    Samsung also competes against Apple in the
5  smartphone market, correct?
6    A.    Yes, we are competing against a number of
7  competitors, including Nokia, HTC and Motorola.
8    Q.    So Samsung's view is that Apple is no more
9  or less important than any other competitor; is that
10 correct?
11       MS. MAROULIS:  Objection, calls for
12       speculation.
13       THE WITNESS:  We consider it as one of
14       competitors.
15 BY MR. KIM:
16   Q.    Apple's mobile devices, both its tablet and
17 its iPhone, use the IOS operating system; is that
18 correct?
19   A.    That's how I understand it.
20   Q.    Most of Samsung's mobile devices use the
21 Android platform; is that correct?
22       MS. MAROULIS:  Objection, calls for
23       speculation.
24       THE WITNESS:  So we -- mostly we do take
25       Android platforms, but we have Windows on OS and

Page 21

1        also Samsung's own OS.
2  BY MR. KIM:
3    Q.    The Samsung Galaxy Tab uses the Android
4  operating system, correct?
5    A.    Yes.
6    Q.    Samsung's Galaxy S smartphones also use the
7  Android platform, correct?
8    A.    Yes.
9    Q.    Most of Samsung's other competitors besides
10 Apple use the Android platform in their smartphones,
11 correct?
12       MS. MAROULIS:  Objection, vague, calls for
13       speculation.
14       THE WITNESS:  That's not true.  Rim uses its
15       own operating system, and Nokia has recently
16       adopted Microsoft's OS.  And before that, Nokia
17       has been using Symbian.
18       Let me correct myself.  Nokia is using both
19       Window phone Microsoft OS and Symbian.
20 BY MR. KIM:
21   Q.    In terms of marketing share, the platforms
22 with the largest market share are IOS and Android,
23 correct?
24       MS. MAROULIS:  Objection, compound, calls
25       for speculation.

# Watson Declaration

# EXHIBIT 13

# Filed Under Seal

Highly Confidential - Attorneys' Eyes Only

Page 1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4                     --oOo--

5    APPLE, INC., A CALIFORNIA        )

6    CORPORATION,                     )

7                   PLAINTIFF,        ) No.  11-CV-01846-LHK

8        vs.                          )

9    SAMSUNG ELECTRONICS CO.,         )

10   LTD., A KOREAN BUSINESS          )

11   ENTITY; SAMSUNG ELECTRONICS      )

12   AMERICA, INC., A NEW YORK        )

13   CORPORATION; SAMSUNG             )

14   TELECOMMUNICATIONS AMERICA,      )

15   LLC, A DELAWARE LIMITED          )

16   LIABILITY COMPANY,               )

17                  DEFENDANTS.       )

18   _____ )

19

20        VIDEOTAPED DEPOSITION OF IOI KIM LAM

21     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22            San Francisco, California

23            Thursday, March 8, 2012

24    Reported By:

      KATHLEEN WILKINS, CSR #10068, RPR, CRR, CCRR, CLR

25    JOB NO. 47476

Highly Confidential - Attorneys' Eyes Only

Page 2

```
1
2
3
4
5      March 8, 2012
6
7
8         Videotaped Deposition of IOI KIM LAM, held
9  at the offices of MORRISON & FOERSTER, 425 Market
10 Street, San Francisco, California, pursuant to
11 Notice, before Kathleen A. Wilkins, CSR, RPR, CRR,
12 CCRR, CLR, of the State of California.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  A P P E A R A N C E S :
2  For APPLE, INC.:
3         MORRISON & FOERSTER LLP
4         425 Market Street
5         San Francisco, California 94105
6         Telephone:  (415) 268-7588
7         E-mail:  Amonach@mofo.com
8         BY:  ANDREW MONACH, ESQ.
9  For SAMSUNG ELECTRONICS CO., LTD.:
10        QUINN, EMANUEL, URQUHART, OLIVER &
11     HEDGES, LLP
12        555 Twin Dolphin Drive, Suite 560
13        Redwood Shores, California  94065
14        Telephone:  (650) 801-5000
15        E-mail: toddbriggs@quinnemanuel.com
16        BY:  TODD BRIGGS, ESQ.
17 ALSO PRESENT:
18        Michelle W. Yang, Director, Intellectual
19 Property, Samsung Information Systems America,
20 Inc.
21        Cassia Leet, Videographer
22
23
24
25
```

Page 4

```
1  MARCH 8, 2012              10:01 A.M.
2         P R O C E E D I N G S
3     (Whereupon, Deposition Exhibit 2392
4  and Exhibit 2393 were marked for
5  identification.)
6     THE VIDEOGRAPHER:  Good morning.  This   10:01
7  is the start of media labeled number 1 of the   10:01
8  videotaped deposition of Ioi Lam in the matter of   10:01
9  Apple, Inc. versus Samsung Electronics Company, et   10:01
10 al. in the United States District Court, Northern   10:01
11 District of California, San Jose Division, Case   10:01
12 Number 11-CV-01846-LHK.              10:01
13        This deposition is being held at   10:01
14 Morrison & Foerster, 425 Market Street, San   10:01
15 Francisco, California, on March 8th, 2012 at   10:01
16 approximately 10:01 a.m.           10:01
17        My name is Cassia Leet.  I am a   10:02
18 certified legal video specialist from TSG   10:02
19 Reporting, Inc., headquartered at 747 Third   10:02
20 Avenue, New York, New York.  The court reporter is  10:02
21 Kathleen Wilkins in association with TSG   10:02
22 Reporting.                  10:02
23        Would counsel please introduce   10:02
24 yourselves for the record.           10:02
25     MR. MONACH:  Andrew Monach from Morrison  10:02
```

Page 5

```
1  & Foerster representing Apple.           10:02
2     MR. BRIGGS:  Todd Briggs from Quinn   10:02
3  Emanuel representing Samsung and the witness   10:02
4  Mr. Lam, and also with me is Michelle Yang from   10:02
5  Samsung.                   10:02
6     THE VIDEOGRAPHER:  Would the court   10:02
7  reporter please swear in the witness.     10:02
8         IOI KIM LAM,           10:02
9     having been duly sworn,        10:02
10 was examined and testified as follows:      10:02
11        --oOo--             10:02
12     THE VIDEOGRAPHER:  Please begin.     10:02
13     EXAMINATION BY MR. MONACH          10:02
14 BY MR. MONACH:                10:02
15 Q.  Good morning, Mr. Lam.           10:02
16 A.  Good morning.              10:02
17 Q.  Have you ever had your deposition taken   10:02
18 before?                  10:03
19 A.  No.                  10:03
20 Q.  My name is Andrew Monach.  I represent   10:03
21 Apple in a lawsuit against Samsung.  And I'm here   10:03
22 to ask you some questions that will be       10:03
23 transcribed.                10:03
24        Do you understand that?        10:03
25 A.  Yes.                  10:03
```

Highly Confidential - Attorneys' Eyes Only

Page 6

1     Q.   Do you understand that you are under      10:03
2  oath and that your testimony is treated the same   10:03
3  as if you were testifying in court?              10:03
4     A.   Yes.                                    10:03
5     Q.   Could you please state and spell your    10:03
6  name.                                            10:03
7     A.   My name is Ioi Kim Lam, I-O-I, K-I-M,   10:03
8  L-A-M.                                           10:03
9     Q.   What is your current address?           10:03
10    A.   18 Montelena Court, Mountain View,       10:03
11 94040.                                           10:03
12    Q.   Who is your employer?                    10:03
13    A.   Samsung.                                 10:03
14    Q.   Just Samsung or is there more to it than  10:03
15 Samsung?                                          10:03
16    A.   Samsung Telecommunications America.       10:03
17    Q.   And I'll use Samsung as a shorthand --   10:03
18    A.   Okay.                                    10:03
19    Q.   -- throughout.                           10:03
20         How long have you worked for Samsung?    10:03
21    A.   I joined company in September '07.        10:03
22    Q.   And was that your first job out of       10:04
23 school or did you come from another place of     10:04
24 employment?                                       10:04
25    A.   I came from different company.           10:04

Page 7

1     Q.   Why don't you just very briefly tell me  10:04
2  where you went to college -- I expect you did --  10:04
3  and then very briefly your job history after that.  10:04
4     A.   So I went to college in the University   10:04
5  of Pennsylvania in Philadelphia. I went to grad   10:04
6  school in Cornell University. After I graduated,  10:04
7  I went to work with Sun Microsystems for about    10:04
8  nine years, and then I worked with a company      10:04
9  called Applix. I worked there for about one and a  10:04
10 half years. After that, I work -- I joined         10:04
11 Samsung.                                           10:04
12    Q.   What degrees did you get from Penn and   10:04
13 Cornell?                                           10:04
14    A.   I got my bachelor in computer science    10:04
15 from Penn and master's in computer science from   10:05
16 Cornell.                                           10:04
17    Q.   What is your current job title at        10:05
18 Samsung?                                           10:05
19    A.   My current job title is principal        10:05
20 engineer.                                          10:05
21    Q.   Is that the same title you've had since  10:05
22 you started in 2007?                               10:05
23    A.   No.                                      10:05
24    Q.   What was your job title when you         10:05
25 started?                                           10:05

Page 8

1     A.   I started as staff engineer.            10:05
2     Q.   And when did you get promoted to        10:05
3  principal engineer?                                10:05
4     A.   I got promoted earlier this year -- no,  10:05
5  earlier 2011.                                      10:05
6     Q.   In general, what have your job duties    10:05
7  been since you joined Samsung in 2007?             10:05
8     A.   My main job duty is software engineer.   10:05
9     Q.   Do you have any other duties?            10:05
10    A.   I have minor duties in tutoring other    10:05
11 engineers or writing presentations.               10:05
12    Q.   Okay. What products have you worked on   10:06
13 during your time at Samsung starting with 2007 and  10:06
14 moving forward?                                     10:06
15    A.   Our lab is called Mobile Communications  10:06
16 Lab, so we worked on devices that are used in the  10:06
17 mobile communications.                             10:06
18    Q.   Smartphones and tablets?                 10:06
19    A.   Including them.                           10:06
20    Q.   What else, if anything?                  10:06
21    A.   We also worked on feature films. We      10:06
22 worked on other prototypes, not smartphones or    10:06
23 tablets.                                           10:06
24    Q.   And do you work exclusively on the       10:06
25 software for mobile devices?                        10:06

Page 9

1     A.   Yes.                                    10:06
2     Q.   Who is your supervisor?                  10:06
3     A.   My current supervisor is Mr. E.S. Chung.  10:07
4     Q.   How long has Mr. Chung been your        10:07
5  supervisor?                                        10:07
6     A.   For about two months.                    10:07
7     Q.   Who was your supervisor before that?     10:07
8     A.   Ciaran Rochford.                         10:07
9     Q.   Okay. And how long was Ciaran your      10:07
10 supervisor?                                        10:07
11    A.   Since I joined Samsung.                  10:07
12    Q.   Is the Mobile Communications Lab part of  10:07
13 some larger group at Samsung?                       10:07
14    A.   It is.                                   10:07
15    Q.   What's the larger group?                 10:07
16    A.   I am not very familiar with the         10:07
17 corporate structure.                               10:07
18    Q.   Do you have any idea what larger group   10:07
19 Mobile Communications Lab is included in or       10:07
20 reports up to?                                      10:07
21    A.   So our lab is part of STA, Samsung       10:07
22 Telecommunications America.                        10:07
23    Q.   And in your regular job duties, do you   10:07
24 only report to people at the Mobile Communications  10:08
25 Lab, or do you also report to Samsung employees in  10:08

Highly Confidential - Attorneys' Eyes Only

Page 10

| | |
|---|---|
| 1 | Korea?                                          10:08 |
| 2 | A.   For me personally, I just report to the   10:08 |
| 3 | people inside -- inside the lab.                10:08 |
| 4 | Q.   Where is the lab located?                  10:08 |
| 5 | A.   San Jose.                                  10:08 |
| 6 | Q.   Do you sometimes get assignments from      10:08 |
| 7 | Samsung Electronics in Korea?                   10:08 |
| 8 | A.   No.                                        10:08 |
| 9 | Q.   Does your group get assignments from       10:08 |
| 10 | Samsung in Korea?                              10:08 |
| 11 | A.   Yes.                                      10:08 |
| 12 | Q.   And those come through your supervisor    10:08 |
| 13 | to you?                                        10:08 |
| 14 | A.   Yes.                                      10:08 |
| 15 | Q.   Do you know who the individuals are from  10:08 |
| 16 | Samsung Korea who give assignments to your     10:08 |
| 17 | supervisor at the Mobile Communications Lab?   10:08 |
| 18 | A.   I don't know.                             10:08 |
| 19 | Q.   How many engineers are there in the       10:09 |
| 20 | Mobile Communications Lab?                     10:09 |
| 21 | A.   Currently, there are about 100.           10:09 |
| 22 | Q.   Do they all work on software for mobile   10:09 |
| 23 | devices?                                       10:09 |
| 24 | A.   Do they all work on software for mobile   10:09 |
| 25 | devices?                                       10:09 |

Page 11

| | |
|---|---|
| 1 | MR. BRIGGS:  Objection.  Foundation.       10:09 |
| 2 | THE WITNESS:  I'm not sure if all of       10:09 |
| 3 | them work on software for mobile devices.      10:09 |
| 4 | BY MR. MONACH:                                 10:09 |
| 5 | Q.   Do most of them, to your understanding,   10:09 |
| 6 | work on software for mobile devices?           10:09 |
| 7 | MR. BRIGGS:  Same objection.               10:09 |
| 8 | THE WITNESS:  I understand many of them    10:09 |
| 9 | work on such devices.                          10:09 |
| 10 | BY MR. MONACH:                                10:09 |
| 11 | Q.   Is there a group of people who report to  10:09 |
| 12 | you?                                          10:09 |
| 13 | A.   No.                                      10:09 |
| 14 | Q.   Does anyone report to you?               10:09 |
| 15 | A.   No.                                      10:09 |
| 16 | Q.   We've marked as Exhibit 2392 Apple's     10:10 |
| 17 | sixth rule 30(b)(6) deposition notice.  Hand that  10:10 |
| 18 | to the witness, please.                       10:10 |
| 19 | Mr. Lam, I don't need you to read          10:10 |
| 20 | through the whole thing, but I'd like you to focus  10:10 |
| 21 | on the list of topics that start on page 8 and run  10:10 |
| 22 | over to page 11 in this notice of deposition.  My  10:10 |
| 23 | only question to you is whether you've ever seen  10:10 |
| 24 | either this document or the list of topics before.  10:10 |
| 25 | A.   I have not seen this document before.     10:10 |

Page 12

| | |
|---|---|
| 1 | Q.   Okay.  Have you seen the list of          10:10 |
| 2 | topics -- let's start with Topic No. 5 at page 8,  10:11 |
| 3 | the source code for each product that issued   10:11 |
| 4 | relating to scrolling, scroll locking and scaling.  10:11 |
| 5 | Do you see that?                           10:11 |
| 6 | A.   Yes, I see this.                          10:11 |
| 7 | Q.   Okay.  Have you seen that topic before,   10:11 |
| 8 | even if it wasn't in this document?            10:11 |
| 9 | A.   Related to scrolling, scroll locking and  10:11 |
| 10 | scaling?  So I've been informed by my company that  10:11 |
| 11 | I'm responsible for some topics.  And --       10:11 |
| 12 | Q.   Maybe we can speed this up.  I'll show    10:11 |
| 13 | you another list and we can see if you think it's  10:11 |
| 14 | the topics that you think you are responsible for.  10:11 |
| 15 | Can you hand the witness Exhibit 2393, please.  10:11 |
| 16 | For the record, Exhibit 2393 is a letter   10:12 |
| 17 | from Quinn Emanuel, counsel for Samsung, to Mia  10:12 |
| 18 | Mazza, Morrison & Foerster, dated February 8th,  10:12 |
| 19 | 2012 listing various topics for which Ioi Lam has  10:12 |
| 20 | been designated as a 30(b)(6) witness.         10:12 |
| 21 | Mr. Lam, have you seen this letter,        10:12 |
| 22 | Exhibit 2393, before?                          10:12 |
| 23 | A.   I have not seen this letter before.       10:12 |
| 24 | Q.   We can do this either by questioning or   10:12 |
| 25 | perhaps with a stipulation of counsel.         10:12 |

Page 13

| | |
|---|---|
| 1 | Could you look through the topics in       10:12 |
| 2 | 2393, beginning with set 6, Topic 5, the second  10:12 |
| 3 | item through the end and tell me whether it's your  10:12 |
| 4 | understanding that you've been designated as   10:12 |
| 5 | Samsung's corporate witness --                 10:12 |
| 6 | A.   Yes.                                      10:13 |
| 7 | Q.   -- to testify on the matters listed in    10:13 |
| 8 | this letter.                                   10:13 |
| 9 | A.   Yes, I've been told verbally that I'm     10:13 |
| 10 | responsible for No. 5.                        10:13 |
| 11 | Q.   Okay.  What about the ones on the next    10:13 |
| 12 | page?                                         10:13 |
| 13 | A.   I have to read it.                        10:13 |
| 14 | Q.   Sure.                                    10:13 |
| 15 | A.   For each product related ...             10:13 |
| 16 | Okay.  Yes.  My understanding is I'm       10:13 |
| 17 | responsible for the scrolling and scaling in   10:13 |
| 18 | browser application for No. 6, and also -- yes.  10:13 |
| 19 | Q.   What about Nos. 13 and 14 for bounce or   10:13 |
| 20 | rubber-banding functionality; is it your       10:13 |
| 21 | understanding you're Samsung's corporate witness  10:13 |
| 22 | on those topics?                               10:13 |
| 23 | A.   Yes.                                      10:13 |
| 24 | Q.   What about Topic 15, the source code for  10:13 |
| 25 | each product at issue relating to the following  10:13 |

Highly Confidential - Attorneys' Eyes Only

Page 30

1    A.   Scroll?                          10:37
2    Q.   In the context of this e-mail.   10:37
3    A.   Of this e-mail, if you look at the    10:37
4  subheaders, as initial response and smoothness, so   10:37
5  I think it's trying to make sure that -- well,   10:37
6  it's a measurement -- I have to look at the   10:37
7  numbers again to find out what they mean.  138,   10:37
8  155, .28, 100 percent.                  10:37
9         So when we received that e-mail from   10:37
10 Mr. Shin, I remember asking him about what those   10:38
11 numbers mean.  And we were not very clear what the   10:38
12 135, 153, 5 mean ...                    10:38
13        I mean, to me they seem to be    10:38
14 milliseconds, but -- so this thing has a lot of   10:38
15 Korean in it which Mr. Shin did not provide the   10:38
16 translation of.                        10:38
17    Q.   So to back up a step, what does   10:38
18 scrolling mean to you in this context?   10:38
19    A.   Scrolling means you put one finger down,   10:38
20 and -- because the e-mail mentions what site, I   10:38
21 think it means you put one finger down when the   10:38
22 browser is watching -- is displaying the   10:38
23 particular web site and you start to scroll.  So   10:38
24 the initial response is when you start to scroll.   10:39
25    Q.   When you start to move your finger   10:39

Page 31

1  vertically or horizontally as the case may be; is   10:39
2  that your understanding?                10:39
3    A.   Yes.                            10:39
4    Q.   So scrolling is taking one finger and   10:39
5  dragging it on the screen to move the web page in   10:39
6  this case --                           10:39
7    A.   Yes.                            10:39
8    Q.   -- right?                        10:39
9         MR. BRIGGS:  Object to form.      10:39
10 BY MR. MONACH:
11    Q.   What's your understanding of zoom?  Is   10:39
12 that either zooming in or zooming out on the   10:39
13 portion of a web page?                  10:39
14    A.   It -- yeah, that seems to be the case.   10:39
15    Q.   And do you know whether this zoom refers   10:39
16 to zooming by using two fingers to either pinch or   10:39
17 the opposite of pinching as opposed to double   10:39
18 tapping?                               10:39
19    A.   Yeah.  From this document, it's not very   10:39
20 clear what they are talking about.      10:40
21    Q.   Given your recollection, do you -- and   10:40
22 the document, do you know what -- what zoom is   10:40
23 being referred to here?                10:40
24    A.   Well, because one of the other column   10:40
25 says double tap, so this zoom probably means   10:40

Page 32

1  zooming without double tap.             10:40
2    Q.   Zooming without double tapping?   10:40
3    A.   Yes.                            10:40
4    Q.   How is that done in the Samsung mobile   10:40
5  phone?                                 10:40
6    A.   There are many ways that you can do it,   10:40
7  actually.  I mean, you could use two-finger zoom,   10:40
8  but you can also use tilting and also rotating the   10:40
9  device.  Can also -- can also change the scale of   10:40
10 the page.                              10:40
11    Q.   Which do you believe is referred to   10:40
12 here?                                  10:41
13        MR. BRIGGS:  Objection.  Foundation.   10:41
14        THE WITNESS:  I'm not quite sure about   10:41
15 this one.                              10:41
16 BY MR. MONACH:                         10:41
17    Q.   What does double tap mean to you?   10:41
18    A.   Double tap means to tap twice.   10:41
19    Q.   And what are the behaviors on the screen   10:41
20 that you're aware of for the iPhone and for the   10:41
21 Samsung smartphones when you double tap?   10:41
22    A.   So on some pages when you double tap,   10:41
23 they will provide no effect because those are   10:41
24 mobile pages.  On some pages they may change the   10:41
25 scale, the display scale.               10:41

Page 33

1    Q.   Making it either larger or smaller?   10:41
2    A.   That's correct.                  10:41
3    Q.   And is it your understanding that this   10:41
4  chart in Exhibit 1424 refers to the initial   10:42
5  response time in the smoothness of changing the   10:42
6  scale by means of a double tap in the iPhone   10:42
7  device and in the Samsung Galaxy S II prototype?   10:42
8    A.   Yes.  This table seems to list the   10:42
9  initial response time in milliseconds and the   10:42
10 smoothness, but I'm not sure what the smoothness   10:42
11 mean because those -- doesn't seem like   10:42
12 milliseconds to me.                    10:42
13    Q.   Okay.  Did you do any -- by you, I mean   10:42
14 the San Jose lab -- make any modifications to the   10:42
15 code for the Galaxy S II prototype in response to   10:43
16 this e-mail from Mr. Shin?             10:43
17    A.   In response to this e-mail?  I don't   10:43
18 remember whether we made any changes in response   10:43
19 to this e-mail.                        10:43
20    Q.   Do you recall making any changes, even   10:43
21 if it wasn't in response to this e-mail, to the   10:43
22 Galaxy S II code in order to make its performance   10:43
23 closer to the performance of the Apple product?   10:43
24    A.   I remember that for the Galaxy S II   10:43
25 device, I remember that our team was asked to   10:44

Highly Confidential - Attorneys' Eyes Only

Page 34

```
1    improve performance so that our performance will    10:44
2    be better than the source code that Google          10:44
3    provided to us, the baseline source code from       10:44
4    Android.                                            10:44
5        Q.   And was that request made so that the       10:44
6    Samsung phone would perform more like the Apple     10:44
7    products and would have been inferior if you        10:44
8    simply used the base Android code?                  10:44
9        MR. BRIGGS:  Objection.  Vague.                  10:44
10   Foundation.  Compound.                              10:44
11       THE WITNESS:  I don't remember receiving         10:44
12   such request.                                       10:45
13   BY MR. MONACH:                                      10:45
14       Q.   Let me show you what's been previously     10:45
15   marked as Exhibit 1425, which is an e-mail from     10:45
16   Jaegwan Shin to Ioi Lam and Qi Ling dated March     10:45
17   23rd, 2011.                                         10:45
18       A.   Okay.                                      10:45
19       Q.   Is this a copy of an e-mail that you       10:45
20   received from Mr. Shin on or around March 23rd,     10:45
21   2011?                                               10:45
22       A.   It's been a long time ago, so I don't      10:45
23   remember receiving that e-mail, but from the        10:45
24   subject it seems to be an e-mail from Mr. Shin to   10:45
25   myself.                                             10:45
```

Page 35

```
1        Q.   And do you see he refers in the first      10:46
2    line to -- he says, "This is video regarding        10:46
3    rotation speed compared to iPhone"?                 10:46
4        A.   Mh-hmm.                                    10:46
5        Q.   I'm sorry.  You're going to have to say    10:46
6    yes or no.                                          10:46
7        A.   Yes.                                       10:46
8        Q.   Okay.  Do you recall looking at a video    10:46
9    of the iPhone being rotated?                        10:46
10       A.   Of seeing a video of the iPhone being      10:46
11   rotated?  Yes.                                      10:46
12       Q.   Okay.  And was it around this time,        10:46
13   March of 2011?                                      10:46
14       A.   Around this time?  I'm not sure whether    10:46
15   it was around this time because that was one year   10:46
16   ago.                                                10:46
17       Q.   Okay.  Did you work on source code         10:46
18   relating to what happens when a device is rotated   10:46
19   during your work at Samsung?                        10:47
20       A.   When a device is rotated?  Yes.            10:47
21       Q.   In general, what work did you do on        10:47
22   rotation?                                           10:47
23       A.   In general, what did I do on rotation?     10:47
24       We looked at different aspects;                 10:47
25   performance is one of them.  We also -- also work   10:47
```

Page 36

```
1    on bug fixing, in some cases their configuring      10:47
2    effects or other issues, crashes, so we worked on   10:47
3    such issues.                                        10:47
4        Q.   What is U1 that's referred to in           10:47
5    Mr. Shin's e-mail?                                  10:47
6        A.   So U1 is also the code name for the        10:48
7    Galaxy S II.                                        10:48
8        Q.   And so did he have a video comparing       10:48
9    and -- send a video comparing the rotation          10:48
10   performance of the Galaxy S II prototype and the    10:48
11   iPhone?                                             10:48
12       A.   So although it says that in the e-mail,    10:48
13   I don't remember seeing -- are you asking me do I   10:48
14   remember seeing the video associated with this      10:48
15   e-mail?                                             10:48
16       Q.   Well, was a video comparing the rotation   10:48
17   of the Galaxy S II in development and the iPhone    10:48
18   sent to you?                                        10:48
19       A.   Was sent to me?  So we -- we have seen     10:48
20   many videos.  I'm not sure I remember seeing this   10:49
21   particular video because this is one year ago.      10:49
22       Q.   Approximately how many videos have you     10:49
23   personally seen that compare a Samsung product or   10:49
24   product in development with an Apple product?       10:49
25       A.   How many videos have I seen comparing?     10:49
```

Page 37

```
1    I have seen videos side-by-side, but I am not sure  10:49
2    whether they are for comparison.                    10:49
3        Q.   Approximately how many side-by-side        10:49
4    videos have you seen that have a Samsung product    10:49
5    or prototype on one side and an Apple product on    10:49
6    the other side?                                     10:49
7        A.   Of my entire career, five years --         10:49
8        Q.   Yeah.                                      10:49
9        A.   -- at Samsung?                             10:49
10       Well, I don't remember like the earlier         10:50
11   years.  Memory is vague.  If you have to ask me to  10:50
12   count, I think -- I'm not sure whether I can count  10:50
13   precise number --                                   10:50
14       Q.   Why don't you give me your best            10:50
15   estimate.                                           10:50
16       A.   I think from several to a dozen or more,   10:50
17   but I -- I'm not sure whether I can give you a      10:50
18   good estimate.                                      10:50
19       Q.   All right.  Have you seen side-by-side     10:50
20   videos of Samsung products in development and       10:50
21   Motorola products?                                  10:50
22       A.   Samsung product development and Motorola   10:50
23   products?  Yes.                                     10:50
24       Q.   Approximately how many?                    10:50
25       A.   Again, it's hard to count.  From several   10:50
```

Highly Confidential - Attorneys' Eyes Only

Page 42

1    MR. BRIGGS:  Since we've been talking    10:58
2  about highly confidential documents, I'd like to    10:58
3  go ahead and just designate the transcript highly    10:58
4  confidential, attorneys' eyes only.    10:58
5  BY MR. MONACH:    10:58
6    Q.   Mr. Lam, I'm going to hand you a    10:58
7  document that was previously marked as    10:58
8  Exhibit 1334.    10:58
9       Is this a copy of an e-mail that you    10:59
10  received from Jaegwan Shin on or around May 6th,    10:59
11  2011?    10:59
12    A.   Let me review the entire content because    10:59
13  this is a long e-mail.    10:59
14       Yes.  I remember receiving an e-mail    10:59
15  like this one.    10:59
16    Q.   In the first paragraph of Mr. Shin's    10:59
17  e-mail to you on May 6th, 2011, he's referring to    11:00
18  some -- working on fixes for the P4 browser.    11:00
19       Do you see that?    11:00
20    A.   Mh-hmm, yes.    11:00
21    Q.   What's the P4 browser?    11:00
22    A.   P4 is the code name for the Galaxy Tab    11:00
23  10.1.    11:00
24    Q.   And what is SISO?    11:00
25    A.   SISO is the acronym for Samsung India    11:00

Page 43

1  Software Organization.    11:00
2    Q.   Okay.  So was that group working on    11:00
3  improving the P4 browser in May of 2001?    11:00
4    A.   Involved in P4 browser?  From this    11:00
5  e-mail, that seems to be the case.    11:01
6    Q.   All right.  Do you see the third    11:01
7  sentence says, "However, top management is    11:01
8  currently very aggressive to improve performance    11:01
9  compared to iPad"?    11:01
10       Do you see that?    11:01
11    A.   Yes.    11:01
12    Q.   Was that your -- as a corporate    11:01
13  representative of Samsung, was that your    11:01
14  understanding of top management's position in May    11:01
15  of 2011?    11:01
16    A.   My understanding is top management is    11:01
17  very aggressive to make sure that our performance    11:01
18  and other attributes such as weight and screen    11:01
19  brightness, we have to be better than our    11:01
20  competitors.    11:01
21    Q.   Did you understand specifically that    11:01
22  they were very aggressive to improve performance    11:01
23  compared to the iPad?    11:01
24    A.   My understanding is in one instance they    11:01
25  are very aggressive comparing to this -- to iPad,    11:01

Page 44

1  but in many cases they are very aggressive    11:02
2  comparing to many -- many competitors.    11:02
3    Q.   In the next e-mail in the chain from the    11:02
4  same date, from Srirama Mogali to Sangheon Kim --    11:02
5  do you see that?    11:02
6    A.   Yes.    11:02
7    Q.   It says,    11:02
8       "We have made some changes for    11:02
9       improvement in double-tap items    11:02
10       mentioned below."    11:02
11       Do you have any knowledge of what    11:02
12  changes for improvement in double tap were being    11:02
13  made by the Indian software group?    11:02
14    A.   Are you talking about this particular    11:02
15  e-mail?    11:02
16    Q.   Let's start with that, yes.    11:02
17    A.   It's been long time, so I have to review    11:02
18  the entire e-mail clearly to understand what they    11:02
19  were talking about.  Just a matter of fact, we    11:03
20  receive many e-mails from headquarters via    11:03
21  Mr. Shin.  And in many cases, it will require a    11:03
22  few hours or a few days of analysis to find out    11:03
23  exactly what the particular e-mail is describing.    11:03
24  And in many cases, it will involve using the    11:03
25  device.  So I'm not sure whether I can give you    11:03

Page 45

1  all the details about this e-mail.    11:03
2       MR. MONACH:  Okay.  Let's have marked as    11:03
3  the next exhibit, I guess is 2395, an e-mail from    11:03
4  Mr. Lam dated Sunday, April 24th, 2011 to Jaegwan    11:04
5  Shin and Qi Ling.    11:04
6       (Whereupon, Deposition Exhibit 2395    11:04
7       was marked for identification.)    11:04
8       THE WITNESS:  Thank you.    11:04
9  BY MR. MONACH:    11:04
10    Q.   Mr. Lam, Exhibit 2395, a copy of an    11:04
11  e-mail with an accompanying e-mail chain that you    11:04
12  sent to Jaegwan Shin and Qi Ling in April of 2011.    11:04
13    A.   It's a long e-mail, so let me review it    11:05
14  of this entirety.    11:05
15       Yes.  This seems to be an e-mail that I    11:05
16  wrote.    11:05
17    Q.   All right.  Do you see in the first item    11:05
18  at the top of the e-mail it says, "1. Double tap    11:05
19  is not working.    11:05
20    A.   Mh-hmm, yes.    11:05
21    Q.   "Double tap is very poor in the    11:05
22       base HoneyComb source code.  I    11:05
23       will plan to fix double tap for    11:05
24       the next code drop to HQ."    11:05
25       Do you see that?    11:05

Highly Confidential - Attorneys' Eyes Only

Page 46

1     A.   Yes.                          11:05
2     Q.   What -- what double tap are you      11:05
3  referring to there?                    11:05
4     A.   Let me review the rest of the e-mail.   11:05
5     It seems to me from the rest of the      11:06
6  e-mail that double tap here means double tapping   11:06
7  in the browser.                       11:06
8     Q.   For what purpose?              11:06
9     A.   Double tap is not working.       11:06
10    Yeah.  This e-mail doesn't seem to     11:06
11 describe the purpose of the double tapping.  As I   11:06
12 said, the browser could -- sometimes it will zoom,   11:06
13 sometimes it will not zoom.             11:06
14    Q.   Is that -- I'm sorry.          11:06
15    A.   Yes.                         11:06
16    Q.   I didn't mean to interrupt you.   11:06
17    A.   I wrote this e-mail a long time ago and   11:06
18 I'm not very sure about what I meant.    11:06
19    Q.   Is your best recollection that this   11:07
20 refers to double tapping to zoom in or zoom out on   11:07
21 a portion of a web page?                11:07
22    A.   That was one thing that I worked on, so   11:07
23 this could be in that area, but it also could be   11:07
24 other areas because we worked on bug fixes as   11:07
25 well.  So it's not entirely clear to me.   11:07

Page 47

1     Q.   Did you modify or add to the base   11:07
2  Android source code to change double tap to zoom   11:07
3  and unzoom on web pages?                11:07
4     A.   Yes, I did.                   11:07
5     Q.   And is that something you did in 2011?   11:07
6     A.   Yes.                         11:07
7     Q.   What is P5?                   11:07
8     A.   P5 is the code name for Galaxy Tab 8.9.   11:08
9     Q.   If you turn to the next page of this   11:08
10 Exhibit 2395, there's an e-mail from you to   11:08
11 Mr. Shin and others dated April 22nd, 2011.   11:08
12    Do you see that?                 11:08
13    A.   April 22, yes.               11:08
14    Q.   Yes.                         11:08
15    A.   Yes.                         11:08
16    Q.   So this is an e-mail that you sent to   11:08
17 the people listed on or around April 22nd, right?   11:08
18    A.   Yes.                         11:08
19    Q.   It refers to creating a third patch for   11:08
20 the P5 HoneyComb browser.               11:08
21    Do you see that?                 11:08
22    A.   Yes.                         11:08
23    Q.   So this is a patch for the -- a software   11:08
24 patch for the 8.9-inch tab prototype, right?   11:09
25    A.   Yes.                         11:09

Page 48

1     Q.   Then do you see it says,         11:09
2     "The following improvements are     11:09
3     included in the new patch:          11:09
4     Elastic bounce for pinch and        11:09
5     fling."                         11:09
6     Do you see that?                 11:09
7     A.   Yes.                         11:09
8     Q.   What does elastic bounce for pinch and   11:09
9  fling mean?                           11:09
10    A.   So in this case, I think it means when   11:09
11 you pinch and fling.  So those are the actions   11:09
12 that you can -- they can -- the user can perform   11:09
13 on the tab.  There's an elastic bounce effect.   11:09
14    Q.   So pinching refers to moving two fingers   11:10
15 either closer together or depinching, farther   11:10
16 apart, right?                         11:10
17    A.   Yes.                         11:10
18    Q.   And what is flinging?  Is that scrolling   11:10
19 where you go rapidly and lift your finger at the   11:10
20 end of the scroll?                    11:10
21    A.   Yes.                         11:10
22    Q.   So what is the elastic bounce feature   11:10
23 that you were adding to pinch and fling?   11:10
24    A.   Are you talking about in this third   11:10
25 patch for the P5 HoneyComb browser?     11:10

Page 49

1     A.   Yes.                         11:10
2     A.   So I have created many patches.  You   11:10
3  have a copy of my e-mail.  I probably created like   11:10
4  30 different patches, so I'm not sure about what   11:10
5  this particular item is about, because it's one   11:10
6  of -- one item of many items included in this   11:10
7  patch.                                11:10
8     Q.   Do you recall creating elastic bounce   11:10
9  functionality for software on Samsung products?   11:10
10    MR. BRIGGS:  Objection.  Vague.      11:11
11    THE WITNESS:  For Samsung products?   11:11
12 BY MR. MONACH:                         11:11
13    Q.   Yes.                         11:11
14    A.   Yes.                         11:11
15    Q.   All right.  For which products did you   11:11
16 create elastic bounce functionality?    11:11
17    MR. BRIGGS:  Same objection.        11:11
18    THE WITNESS:  For which products.  I   11:11
19 remember doing it for the elastic bounce, elastic   11:11
20 bounce effect.  What's the definition for elastic   11:11
21 bounce effect, if I could?              11:12
22 BY MR. MONACH:                         11:12
23    Q.   What did you mean by elastic bounce in   11:12
24 this e-mail, or what do you mean by it generally   11:12
25 when you use that term at Samsung?      11:12

Highly Confidential - Attorneys' Eyes Only

Page 126

1       MR. BRIGGS: Okay.                02:18
2       THE VIDEOGRAPHER: This concludes       02:18
3    today's deposition of Ioi Lam. The time is     02:18
4    2:18 p.m. We are off the record.       02:18
5    (Time noted: 2:18 p.m.)
6    _____
7              IOI KIM LAM
8       Subscribed and sworn to before me this
9    _____ day of _____ 2012.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1            C E R T I F I C A T E
2    STATE OF CALIFORNIA       )
3                             )
4    COUNTY OF SAN FRANCISCO    )
5       I, KATHLEEN A. WILKINS, RPR, CRR,
6    CCRR, CLR, a Certified Shorthand Reporter in
7    the State of California, hereby certify:
8       That IOI LAM, the witness whose
9    deposition is hereinbefore set forth, was
10    duly sworn by me and that such deposition is
11    a true record of the testimony given by such
12    witness.
13       I further certify that I am not
14    related to any of the parties to this action
15    by blood or marriage; and that I am in no
16    way interested in the outcome of this
17    matter.
18       IN WITNESS WHEREOF, I have hereunto
19    set my hand this 8th day of March, 2012.
20
21
22    _____
23    KATHLEEN WILKINS, RPR, CRR, CCRR, CLR, CSR 10068
24
25

Page 128

1              INDEX
2         INDEX OF EXAMINATIONS
3                    PAGE
4    EXAMINATION BY MR. MONACH ...................5
5    AFTERNOON SESSION ...........................85
6         INDEX OF EXHIBITS
7    EXHIBIT        DESCRIPTION        PAGE
8    Exhibit 2392 Document entitled, ...............4
9       "Apple Inc.'s Deposition
10       Notice"
11    Exhibit 2393 Letter to Mia Mazza ..............4
12       dated February 8, 2012
13    Exhibit 2394 E-mail from Ioi Lam to ..........40
14       Zhinan Zhou, et al, Bates
15       stamped SAMNDCA00525358
16    Exhibit 2395 String of e-mails ...............45
17       beginning with an e-mail
18       from Ioi Lam to Jaegwan
19       Shin, Qi Ling, Bates
20       stamped SAMNDCA00201383
21       through SAMNDCA00201389
22
23
24
25    //

Page 129

1       INDEX OF EXHIBITS (Continued)
2    EXHIBIT        DESCRIPTION        PAGE
3    Exhibit 2396 Document entitled, ..............57
4       "Android Browser
5       Optimizations for Galaxy-S
6       and other Android 2.2
7       platforms, San Jose Mobile
8       Communications Lab, August
9       12th, 2010," Bates stamped
10       SAMNDCA00201621 through
11       SAMNDCA00201641
12    Exhibit 2397 E-mail from Ioi Lam ............69
13       dated January 7, 2011,
14       Bates stamped
15       SAMNDCA00229380 through
16       SAMNDCA00229382
17    Exhibit 2398 Document entitled, ..............78
18       "Android Browser
19       Optimizations for Galaxy-S
20       and other Android 2.1
21       platforms, San Jose Mobile
22       Communications Lab, Apr
23       16th, 2010," Bates stamped
24       SAMNDCA00229348 through
25       SAMNDCA00229362

# ERRATA SHEET

NAME OF CASE:          Apple v. Samsung, No. 11-cv-1846-LHK (ND Cal)

DATE OF DEPOSITION:          March 8, 2012

NAME OF WITNESS:          Ioi Kim Lam

Reason Codes:

    1.     To clarify the record.
    2.     To conform to the facts.
    3.     To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 8 | 22 | feature films | feature phones | 3 |
| 16 | 23 | presenting | presented | 3 |
| 16 | 24 | gather | gathered | 3 |
| 21 | 21 | I had prepared for | I had to be prepared for | 3 |
| 29 | 15 | related | relaying | 3 |
| 30 | 20 | what site | website | 3 |
| 52 | 10 | billion | million | 3 |
| 55 | 15 | the full reason | the reason | 2 |
| 58 | 24 | roll | wrote | 3 |
| 62 | 2 | tabs on | taps on | 3 |
| 66 | 13 | take a device | rotate a device | 3 |
| 70 | 21 | bounce | bounds | 3 |
| 71 | 12 | - - | lab | 3 |
| 76 | 23 | event object | event object, or event instance, or event variable, in general different people use different terms | 2 |
| 107 | 15 | both | thorough | 3 |
| 107 | 25 | now | not | 3 |
| 114 | 8 | Mamadgi | Raj Mamadgi | 3 |
| 115 | 8 | prettiest | previous | 3 |
| 123 | 9 | cut, | cut off, | 3 |
| 124 | 19 – 20 | other translations of the web page? | other translations of the information on a web page? | 3 |

Signed: _Ioi Kim Lam_          Date: 4·27·2012

Ioi Kim Lam

State of California
County of Santa Clara

Subscribed and sworn to (or affirmed) before me on
this 27 day of APRIL 2012,
by IOI KIM LAM,
proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

DAVID JOSEPH BOUSQUET
Commission # 1937711
Notary Public - California
Santa Clara County
My Comm. Expires May 22, 2015

Highly Confidential - Attorneys' Eyes Only

Page 126

1        MR. BRIGGS:  Okay.                          02:18

2        THE VIDEOGRAPHER:  This concludes           02:18

3   today's deposition of Ioi Lam.  The time is      02:18

4   2:18 p.m.  We are off the record.                02:18

5   (Time noted:  2:18 p.m.)

6        _____

7             IOI KIM LAM

8        Subscribed and sworn to before me this

9   27th day of    APRIL    2012, by  IOI KIM LAM,

10

11

        DAVID JOSEPH BOUSQUET
        Commission # 1937711
12      Notary Public - California
        Santa Clara County
13      My Comm. Expires May 22, 2015

Who proved to me on the basis
of satisfactory evidence to be
the person(s) who appeared
before me.

14

15

16

17

18

19

20

21

22

23

24

25

# Watson Declaration

# EXHIBIT 14

# Filed Under Seal

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4    APPLE INC., a California        )

     corporation,                    )

5                                    )

                     Plaintiff,      )

6                                    )

         vs.                         )  No: 11-CV-01846-LHK

7                                    )

     SAMSUNG ELECTRONICS CO., LTD,   )

8    a Korean business entity;       )

     SAMSUNG ELECTRONICS AMERICA,    )

9    INC., a New York corporation;   )

     SAMSUNG TELECOMMUNICATIONS      )

10   AMERICA, LLC, a Delaware        )

     limited liability company       )

11                                   )

                     Defendants.     )

12   _____)

13

14     **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16            DEPOSITION OF NARA CHO

17           San Francisco, California

18           Saturday, January 14, 2012

19

20

21

22

23   Reported By:

24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25   JOB NO. 45309

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 2

```
 1
 2
 3
 4                    January 14, 2012
 5                    9:22 a.m.
 6
 7
 8          Videotaped deposition of
 9   NARA CHO, held at Morrison & Foerster,
10   LLP, 50 California Street , San Francisco,
11   California, pursuant to Subpoena before
12   Linda Vaccarezza, a Certified Shorthand
13   Reporter of the State of California.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S:
 2          QUINN EMANUEL URQUHART & SULLIVAN
 3          Attorneys for Defendants
 4               555 Twin Dolphin Drive
 5               San Francisco, California 94065
 6          BY:  ANNA NEILL, ESQ.
 7               ERIC E. WALL, ESQ.
 8
 9
10
11          MORRISON & FOERSTER
12          Attorneys for Plaintiff
13               425 Market Street
14               San Francisco, California 94105
15          BY:  PATRICK ZHANG, ESQ.
16               COREY CHO, ESQ.
17
18
19
20
21   ALSO PRESENT:  Michelle Yang, Samsung Electronics
22   INTERPRETER:  Ted Kyung-Gi Kim
23   CHECK INTERPRETER:  Phyllis Kim
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  Good morning.
 2   This is the beginning of Disk Number 1 of
 3   the videotaped deposition of Nara Cho in
 4   the matter of Apple Inc. versus Samsung
 5   Electronics, Case Number 11-CV-01846-LHK    09:05
 6   in the United States District Court for
 7   the Northern District of California.
 8          We are located today at 50
 9   California Street in the City of San
10   Francisco, California.  Today is           09:05
11   January 14, 2012; and the time is
12   9:06 a.m.
13          My name is Alan Dias.  I'm
14   from TSG Reporting.  Here with me is
15   Linda Vaccarezza.                          09:05
16          Counsel, would you please
17   identify yourself for the record.
18          MR. ZHANG:  Patrick Zhang from
19   Morrison & Foerster for Apple, and with
20   me is Corey Cho.                           09:06
21          MR. WALL:  Eric Wall from Quinn
22   Emanuel.  With me is Anna Neill and also
23   with me is Michelle Yang from Samsung.
24   And we are here representing the
25   defendants.                                09:06
```

Page 5

```
 1          THE VIDEOGRAPHER:  Will the court
 2   reporter please swear in the interpreters
 3   and the witness.
 4          (Interpreters sworn.)
 5          NARA CHO,                           09:06
 6   called   as a witness, having been duly
 7   sworn by the Certified Shorthand
 8   reporter, was examined and testified as
 9   follows:
10          THE VIDEOGRAPHER:  You may proceed.  09:06
11   BY MR. ZHANG:
12     Q.   Good morning, Mr. Cho.
13     A.   Good morning.
14     Q.   Do you understand that you're
15   testifying under oath here today just as if you   09:07
16   were in a court of law?
17     A.   Yes.  I understand that.
18     Q.   I'm here to ask you questions
19   today, and your attorney may object to my
20   questions.  But do you understand that unless     09:07
21   your attorney instructs you not to answer, that
22   you need to answer my question fully and
23   truthfully?
24     A.   Yes.  I understand that.
25     Q.   And you may take a break at any        09:08
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 6

1  point that you would like; however, I would just
2  ask that if there is a question pending that you
3  answer the question fully before you request a
4  break.
5       Do you understand that?            09:08
6    A.  Yes.  I understand.
7    Q.  Is there any reason you can't give
8  your best testimony here today?  For example, are
9  you under the effects of any medication?
10   A.  In the last few days I had caught   09:09
11  a cold and I did take cold medication; however, I
12  think I'm able to testify.
13   Q.  Are you able to testify -- I'm
14  sorry.  Are you able to give your best testimony
15  here today?                            09:09
16   A.  Yes.
17   Q.  Have you been deposed previously
18  in any U.S. or non-U.S. litigation?
19   A.  No.
20   Q.  What's your current position at    09:10
21  Samsung?
22   A.  Deputy general manager, senior
23  manager.
24   Q.  And what group do you belong to at
25  Samsung?                               09:10

Page 7

1       MR. WALL:  Objection to form.
2       THE WITNESS:  I work for the
3  wireless business division.  It could be
4  wireless or mobile.
5  BY MR. ZHANG:                          09:10
6    Q.  Are you in the Smartphone product
7  planning group at Samsung?
8       MR. WALL:  Objection to form.
9       THE WITNESS:  The previous name
10  used to be Smartphone group; currently    09:11
11  it's called product strategy group.
12  BY MR. ZHANG:
13   Q.  And the product strategy group
14  falls within the wireless business division; is
15  that correct?                          09:11
16   A.  Yes.  That's correct.
17   Q.  And what is your function in your
18  current role at Samsung?
19       MR. WALL:  Objection to form.
20       THE WITNESS:  I would like you to   09:12
21  clarify what you mean by "role."
22  BY MR. ZHANG:
23   Q.  What do you do on a day-to-day
24  basis at Samsung with respect to mobile
25  electronic products?                   09:12

Page 8

1    A.  I'm handling product planning.
2  Mainly my work is dedicated towards Tablets.  And
3  as far as the functions of the products are
4  concerned, I would say that I get to define the
5  functions in consultation with development teams.  09:13
6    Q.  What do you mean when you say that
7  you handle product planning for Tablets?
8       (Discussion in Korean between
9  Interpreters.)
10       MR. WALL:  Objection to form.     09:14
11       THE WITNESS:  Could I re-hear the
12  question, please?
13       MR. ZHANG:  Can you re-translate
14  the question for me, please.
15       (Question re-translated by         09:15
16  interpreter.)
17       THE WITNESS:  So this would apply
18  not only to the current products but the
19  future products as well.  I would get
20  to -- rather I would come to a           09:16
21  determination as to what will be the
22  major functions for the customers, and in
23  terms of how to implement such functions
24  in the future by providing them in -- by
25  providing -- by providing the functions   09:17

Page 9

1  with values, values, and how they will,
2  as far as how they will be incorporated
3  into future products will be discussed
4  with the development teams.
5  BY MR. ZHANG:                          09:17
6    Q.  When you say functions of the
7  products, do you include hardware functions,
8  software functions, and industrial design of the
9  products?
10       MR. WALL:  Objection.  The         09:17
11  question is compound.
12       THE WITNESS:  So mainly it would
13  entail what kind of operating system
14  would be used in that respect, software,
15  and in terms of hardwares, hardware could  09:18
16  be the features.
17       As far as design is concerned,
18  it will be taken up mainly by the design
19  team and as such, the product planning
20  does not have a lot of involvement in     09:18
21  that.
22  BY MR. ZHANG:
23   Q.  Are you involved in marketing of
24  Samsung's Tablet devices?
25   A.  Yes.  If need be, I would get to   09:19

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 10

1  define the function of the product based on the
2  customer surveys done by marketing people.
3      Q.   So would it be fair to say --
4          THE INTERPRETER:  Hold on.
5          (Discussion in Korean between        09:20
6      Interpreters)
7          THE INTERPRETER:  Okay.  One
8      alternative to "function" could be
9      "features."
10 BY MR. ZHANG:                                09:20
11     Q.   Okay.  Would it be fair to say
12 that your role with respect to marketing is
13 limited to the receipt of marketing information?
14         Let me ask a better question,
15     actually.                                09:20
16         Would it be fair to say that your
17 role with respect to marketing is limited to
18 receiving information from the marketing
19 department at Samsung?
20         MR. WALL:  Objection to form.         09:21
21         THE WITNESS:  I do not exactly
22     understand your question.
23 BY MR. ZHANG:
24     Q.   Aside from receiving information
25 from the marketing people at Samsung, do you have  09:21

Page 11

1  any other role with respect to marketing of
2  Samsung's Tablet products?
3          MR. WALL:  Objection to form.
4          THE WITNESS:  I still do not know
5      precisely what I'm to answer.            09:22
6  BY MR. ZHANG:
7      Q.   So you receive information from
8  the marketing people about what consumers want in
9  Tablet devices; is that correct?
10         MR. WALL:  Objection to form.         09:22
11         THE WITNESS:  Yes.  Correct.
12     However, that's not the case as to all
13     the products and as to all the cases.
14     There could be some differences or
15     variances depending on case, case by     09:23
16     case.
17 BY MR. ZHANG:
18     Q.   So aside from that interaction
19 with the marketing people, what other
20 interactions do you have with the marketing       09:23
21 people at Samsung?
22     A.   I would say that what I described,
23 what I told you, would be the main avenues of
24 communication.
25     Q.   Okay.  Regardless of whether it's    09:23

Page 12

1  the main avenue or ancillary avenue, do you have
2  other interactions with the marketing people?
3      A.   Yes.
4      Q.   And what do they involve?
5      A.   So I mainly get to talk with them   09:24
6  while this is alluding to what I told you just a
7  little while ago.
8          So what customers want in products
9  in the future.  And as for the current products,
10 what kind of complaints do they have about the    09:25
11 current products?
12     Q.   Do you recall having input into
13 the industrial design of Samsung's Tablet
14 products?
15         MR. WALL:  Objection to form.         09:25
16         THE WITNESS:  Could that be
17     repeated?
18         MR. ZHANG:  Can you, please,
19     re-interpret the question for me, please.
20         (Question re-interpreted by           09:25
21     translator.)
22         MR. WALL:  Same objection.
23         THE WITNESS:  No.
24 BY MR. ZHANG:
25     Q.   How would you describe the overall  09:26

Page 13

1  role of the product, Smartphone product planning
2  group at Samsung?  And I apologize, I know you
3  told me that the name has changed, but I don't
4  remember what that is right now, so if you could
5  just take that into account when you answer the   09:26
6  question.
7      A.   Yes.  The Smartphone product
8  planning group would set the functions or
9  features for the Smartphone based on which would
10 get to be made based on the future operating      09:28
11 system and how the future products, what the
12 future products would incorporate will be -- they
13 are discussed with the development people.
14     Q.   Is it part of the Smartphone
15 product planning group's function to study        09:28
16 third-party products that are in the market?
17         MR. WALL:  Objection to form.
18         THE WITNESS:  Yes, that is
19     correct.
20 BY MR. ZHANG:                                09:29
21     Q.   Is it part of the Smartphone
22 product planning group's function to compare
23 third-party products against Samsung's existing
24 or planned products?
25         MR. WALL:  Objection to form.         09:29

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 14

1    Vague, compound.  Assumes facts not in
2  evidence.
3       THE WITNESS:  Yes, that is
4  correct.
5  BY MR. ZHANG:                           09:30
6    Q.   Is it part of the Smartphone
7  planning group's function to recommend changes to
8  Samsung's planned products in light of
9  competitors' products in the marketplace?
10       MR. WALL:  Objection to form.    09:30
11    Vague.  Assumes facts not in evidence.
12       THE WITNESS:  So our goal would be
13    to provide better value to customers by
14    doing comparison and analysis of the
15    various products that are out on the   09:31
16    market.
17  BY MR. ZHANG:
18    Q.   How many employees are in the
19  Smartphone product planning group currently?
20    A.   Currently there is no such thing   09:32
21  as a Smartphone planning group.
22    Q.   I'm sorry.  What was the name of
23  the -- what has the name of the group been
24  changed to again?
25    A.   Product strategy group.           09:32

Page 15

1    Q.   How many employees in that group
2  currently?
3    A.   I do not recall exactly, but I
4  think it's around 40.
5    Q.   And how many employees report to   09:33
6  you?
7    A.   Five.
8    Q.   What are their names?
9    A.   J-A-E, G-W-O-N-O-H, a common
10  spelling; S-O-O-N-O-K K-I-M, a common spelling;   09:33
11  S-A-N-G W-O-O J-O-O, a common spelling; H-O-G-O-N
12  K-I-M, a common spelling; I-L H-W-A-N C-H-O,
13  another common spelling.
14    Q.   And who do you currently report
15  to?                                     09:34
16    A.   Han Gil Yoon, H-A-N G-I-L Y-O-O-N,
17  a common spelling.
18    Q.   And what is Mr. Yoon's title?
19    A.   He is the head of the product
20  strategy group.                         09:35
21    Q.   And who does Mr. Yoon report to?
22    A.   Y-O-N P-Y-O H-O-N-G.
23    Q.   And what is Mr. Hong's title?
24    A.   He's the head of the product
25  strategy team.                          09:35

Page 16

1    Q.   Who is the head of the mobile
2  communications division?
3    A.   Jong Yoon Shin, J-O-N-G Y-O-O-N
4  S-H-I-N, a common spelling.
5    Q.   And who is Mr. Geesung Choi?    09:36
6    A.   He is the CEO of the company.
7    Q.   Of Samsung Electronics?
8    A.   That is correct.
9    Q.   Earlier you mentioned that you
10  mostly work on Tablets at your job.  Did you work   09:37
11  on the P1 design?
12       MR. WALL:  Objection to form.
13       THE WITNESS:  Well, you know,
14    that's people P1.  Well, design work is
15    done by the design people.  So the P1   09:37
16    design was mainly done by the design
17    people.
18  BY MR. ZHANG:
19    Q.   Did you work on the P1 product?
20       MR. WALL:  Objection to form.    09:38
21       THE WITNESS:  Could you clarify
22    what did you mean did I work on it?
23  BY MR. ZHANG:
24    Q.   Are you aware of a P1 project at
25  Samsung?                                09:38

Page 17

1    A.   Yes, I am.
2    Q.   And what is that project?
3    A.   This was the project to release a
4  seven-inch Tablet for the first time for us.
5    Q.   Are you aware of a project at    09:39
6  Samsung called P2?
7    A.   I have heard of it.
8    Q.   And what is that project?
9    A.   What I heard is that it was a
10  product that looked like a notebook PC.   09:39
11    Q.   So circling back, were you
12  involved in planning the functions and features
13  of the P1 project?
14    A.   Yes, I was.
15    Q.   What about for the P2 project?   09:40
16    A.   No.
17    Q.   Are you aware of a project at
18  Samsung called P3?
19    A.   Yes, I am.
20       MR. WALL:  Counsel, if I just     09:40
21    might interject here.  I understand that
22    the parties at this point have an
23    agreement not to talk about products that
24    have not been released.  If you can just
25    establish that the project has resulted   09:41

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 94

```
 1   of today's deposition.  We are off the
 2   record at 2:40 p.m.  The master discs
 3   will be held by TSG Reporting.  Thank
 4   you.
 5        (Time noted:  2:40 p.m.)
 6
 7          _____
 8            NARA CHO
 9
10
11   Subscribed and sworn to before me
12   This      day of        , 2012.
13   _____
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 95

```
 1         C E R T I F I C A T E
 2   STATE OF CALIFORNIA    )
 3                          )
 4   COUNTY OF SAN FRANCISCO )
 5        I, LINDA VACCAREZZA, a Certified
 6   Shorthand Reporter for the State of
 7   California, do hereby certify:
 8        That NARA CHO, the witness whose
 9   deposition is hereinbefore set forth, was
10   duly sworn by me and that such deposition
11   is a true record of the testimony given
12   by such witness.
13        I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage; and that I
16   am in no way interested in the outcome of
17   this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 14th day of January,
20   2012.
21
22
23   _____
23   LINDA VACCAREZZA, CSR. NO. 10201
24
25
```

Page 96

```
 1   -------------I N D E X----------------
 2   WITNESS    EXAMINATION BY    PAGE
 3   NARA CHO   MR. ZHANG       5
 4   -------------EXHIBITS----------------
 5   PLAINTIFFS            PAGE LINE
 6   Exhibit 1261
 7   Document Bates stamped
 8   SAMNDCA10154003 through
 9   SAMNDCA10154053.................22  23
10
11   Exhibit 1262
12   CEO Information, Bates stamped
13   SAMNDCA10157413 through
14   SAMNDCA10157434.................48  5
15
16   Exhibit 1263
17   Document Bates stamped
18   SAMNDCA10157573 through
19   SAMNDCA10157617.................51  5
20
21   Exhibit 1264
22   Smartphone Product Planning
23   Document Bates stamped
24   SAMNDCA10158320 through
25   SAMNDCA10158355.................57  10
```

Page 97

```
 1   EXHIBITS (CONT'D)
 2   Exhibit 1265
 3   Email, Bates stamped
 4   SAMNDCA10152980.................72  8
 5
 6   Exhibit 1266
 7   Email from Seung-Jai Lee, Bates
 8   SAMNDCA101515899 through
 9   SAMNDCA00515910.................74  5
10
11   Exhibit 1267
12   Email from Shoneel Kolhatkar,
13   Bates stamped SAMNDCA00514511
14   Through SAMNDCA00514520.........67  21
15
16   Exhibit 1268
17   Email from NaRa Cho, Bates stamped
18   SAMNDCA00516775 through
19   SAMNDCA00516781.................80  14
20
21   Exhibit 1269
22   Competitive Insight Report,
23   Bates stamped SAMNDCA10153221
24   Through SAMNDCA10153228.........87  5
25
```

# Watson Declaration

# EXHIBIT 15

# Filed Under Seal

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 1

1            UNITED STATES DISTRICT COURT            08:33

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5  APPLE INC., a California
   corporation,

6

               Plaintiff,

7

   vs.                        CASE NO.  11-cv-01846-LHK

8

   SAMSUNG ELECTRONICS CO.,

9  LTD., a Korean business
   entity; SAMSUNG ELECTRONICS

10 AMERICA,INC., a New York
   corporation; SAMSUNG

11 TELECOMMUNICATIONS AMERICA,
   LLC, a Delaware limited

12 liability company,

13            Defendants.
   _____/

14                                               09:01

15

16      H I G H L Y    C O N F I D E N T I A L

17      A T T O R N E Y S'   E Y E S    O N L Y

18

19      VIDEOTAPED DEPOSITION OF JUNHO PARK

20         SAN FRANCISCO, CALIFORNIA

21         SATURDAY, JANUARY 14, 2012

22

23 BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24 CSR LICENSE NO. 9830

25 JOB NO. 45310

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 2

1       SATURDAY, JANUARY 14, 2012
2              9:03 a.m.
3
4
5
6       VIDEOTAPED DEPOSITION OF JUNHO PARK,
7       taken at QUINN EMANUEL ERQUHART & SULLIVAN,
8       50 California Street, 22nd Floor,
9       San Francisco, California, pursuant to
10      Notice, before me, ANDREA M. IGNACIO HOWARD,
11      CLR, CCRR, RPR, CSR License No. 9830.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       A P P E A R A N C E S :
2
3       FOR APPLE INC.:
4       MORRISON & FOERSTER
5       By:  JULIA D. KRIPKE, Esq.
6          RICHARD HUNG, Esq.
7          STEPHANIE KIM, Esq.
8       425 Market Street
9       San Francisco, California 94105
10
11
12
13      FOR SAMSUNG ELECTRONICS CO. LTD:
14      QUINN EMANUEL URQUHART & SULLIVAN
15      By:   CARL G. ANDERSON, Ph.D., Esq.
16      50 California Street
17      San Francisco, California 94111
18
19
20
21      ALSO PRESENT:  Jeff Myung, Esq., Samsung
22          Aeryong Chi Kim, Interpreter
23          Ann Park, Check Interpreter
24          Pete Sais, Videographer
25          ---oOo---

Page 4

1          SAN FRANCISCO, CALIFORNIA          09:02
2          SATURDAY, JANUARY 14, 2012          09:02
3              9:03 A.M.          09:02
4                          09:02
5                          09:02
6                          09:02
7          THE VIDEOGRAPHER:  Good morning.  This is the  09:02
8       start of Disc labeled No. 1 in the videotaped          09:02
9       deposition of Junho Park, in the matter of Apple, Inc  09:02
10      versus Samsung Electronics Company, Limited, et al.    09:02
11          In the United States District Court, Northern   09:02
12      District of California, San Jose Division.  Case    09:02
13      No. 11-CV-01846 LHK.          09:02
14          This deposition is being held at          09:02
15      50 California Street in San Francisco, California, on  09:03
16      January 14th, 2012, at approximately 9:03 a.m.   09:03
17          My name is Pete Sais, and I'm the legal video  09:03
18      specialist from TSG Reporting, Inc., headquartered at  09:03
19      747 Third Avenue, New York, New York.          09:03
20          The court reporter is Andrea Ignacio in          09:03
21      association with TSG Reporting.          09:03
22          Will counsel please introduce yourselves, and  09:03
23      the court reporter can swear in the translator, and we  09:03
24      can proceed.          09:03
25          MS. KRIPKE:  Julia Kripke with Morrison &          09:03

Page 5

1       Foerster for Apple.          09:03
2          MS. KIM:  Aeryong Chi Kim, Morrison &          09:03
3       Foerster.          09:03
4          MR. HUNG:  Richard Hung of Morrison &          09:03
5       Foerster, also for Apple.          09:03
6          MR. ANDERSON:  Carl Anderson of Quinn Emanuel  09:03
7       Urquhart & Sullivan for Samsung, and with me is Jeff  09:03
8       Myung of Samsung.          09:03
9                          09:03
10                          09:03
11          AERYONG CHI KIM,          08:46
12      having been sworn as an interpreter
13      by the Certified Shorthand Reporter,
14      interpreted from English to Korean,
15      and from Korean to English, to the
16      best of her ability, as follows:
17
18
19          ANN PARK,
20      having been sworn as a check interpreter
21      by the Certified Shorthand Reporter,
22      interpreted from English to Korean,
23      and from Korean to English, to the
24      best of her ability, as follows:
25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 22

1  marketplace?                                09:42
2      MR. ANDERSON:  Objection; compound.     09:42
3      THE WITNESS:  I do, in part.            09:42
4      THE INTERPRETER:  Strike that.          09:42
5      THE WITNESS:  That's included, in part. 09:42
6      MS. KRIPKE:  Q.  As part of your current job  09:42
7  duties, do you work on strategy for the Galaxy S  09:42
8  phones?                                     09:43
9      A  That aspect is included.             09:43
10     Q  Do you currently work on strategy for the  09:43
11 Galaxy S II phones?                         09:43
12     A  I have not been involved in the Galaxy S II  09:43
13 phones because that has already been launched.  09:43
14     Q  As part of your current job duties, do you  09:43
15 work on strategy for the Galaxy Nexus?      09:43
16     A  Galaxy Nexus is a phone that's already been  09:44
17 launched.                                   09:44
18     Q  Do you only work on products that have yet to  09:44
19 be launched?                                09:44
20     A  In terms of strategy, that does not cover any  09:44
21 work on the models that has already been -- that have  09:44
22 already been launched.                      09:44
23     Q  As part of your job, do you currently do  09:44
24 anything -- do you currently work on anything for the  09:44
25 Galaxy S II phones?                         09:44

Page 23

1      A  Like I stated earlier, I'm -- I'm not charged  09:45
2  with that Galaxy S II at the current time because that  09:45
3  is a product that had already been launched at the  09:45
4  time I was charged with the strategy.       09:45
5      Just to clarify, that's a product that had  09:45
6  already been launched by the time I was charged with  09:46
7  the strategy work.                          09:46
8      Q  What do you do as part of your job, other  09:46
9  than what you have described as strategy?   09:46
10     A  I also am charged with the staff-related  09:46
11 work.                                       09:46
12     CHECK INTERPRETER:  Staffing?            09:46
13     THE INTERPRETER:  Strike that.           09:46
14     THE WITNESS:  I am also charged with      09:46
15 supporting work, support.                   09:46
16     MS. KRIPKE:  Q.  Please provide some more  09:46
17 detail on what you mean by "support" work.  09:47
18     A  That's the type of work that has been     09:47
19 commonly carried out within the group.      09:47
20     Q  So currently, do you ever, as part of your  09:47
21 job, work on products that have already been released  09:47
22 in the U.S. market?                         09:47
23     A  In the past, I had been charged with the  09:48
24 models that had already been released in the market.  09:48
25     Q  And when you were working on models that had  09:48

Page 24

1  already been released, did you work on the  09:48
2  Galaxy S II?                                09:48
3      A  No.                                  09:48
4      Q  And when you were working on models that had  09:48
5  already been released, did you work on the Galaxy  09:48
6  Nexus?                                      09:48
7      A  Yes.                                 09:48
8      Q  What did you do with -- what did you work on  09:48
9  with respect to the Galaxy Nexus?           09:48
10     MR. ANDERSON:  Objection; vague.         09:48
11     THE WITNESS:  I worked on product planning.  09:48
12     MS. KRIPKE:  Q.  And specifically, what was  09:49
13 involved in your work on product planning for the  09:49
14 Galaxy Nexus?                               09:49
15     A  Those involved consultations related to  09:49
16 function or functionality and sometimes about  09:49
17 scheduling.                                 09:49
18     Q  Did you work on strategy for the Galaxy  09:49
19 Tab 10.1?                                   09:49
20     A  The term "strategy" in your question, what do  09:50
21 you mean by that word, please?              09:50
22     Q  I mean how you've used it several times  09:50
23 already in this deposition.                 09:50
24     A  I have been involved, in part, with Galaxy  09:50
25 Tablet 10.1.                                09:50

Page 25

1      Q  Did you work on strategy for the Galaxy  09:50
2  Tab 8.9?                                    09:50
3      A  No.                                  09:50
4      Q  Are all of the smartphones that you work  09:50
5  on -- have all of them been offered for sale in the  09:51
6  United States?                             09:51
7      A  Yes.                                 09:51
8      Q  Can you name all the smartphones that you've  09:51
9  worked on that have been offered for sale in the  09:51
10 United States.                             09:51
11     A  Do you mean all the models?           09:51
12     Q  All the models that have been offered for  09:51
13 sale in the past two years.  Let's start with that.  09:51
14     A  Fascinate, Continuum, Droid Charge, Galaxy  09:52
15 Nexus, Stratosphere, Illusion.  I think that's about  09:52
16 it.                                        09:52
17     Q  Any others?                          09:52
18     A  That's about all that I can remember that  09:52
19 there were over the past two-year period.   09:52
20     Q  Are all of the tablets that you work on --  09:53
21 have all of those been offered for sale in the United  09:53
22 States?                                    09:53
23     A  Yes.                                 09:53
24     Q  And can you please name all of those models.  09:53
25     A  Galaxy Tab.  That's for Verizon.  And Galaxy  09:53

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 30

1  Q  And what does it mean by "primary target,"     10:04
2  the words you see in that arrow on the page?     10:04
3     MR. ANDERSON: Objection; lacks foundation;     10:04
4  calls for speculation.     10:05
5     THE WITNESS: That refers to the first and     10:05
6  major target customer of that given product.     10:05
7     MS. KRIPKE: Q.  As part of your job, how do     10:05
8  you use the information in this document?     10:05
9  A  I define as to who will be the target users     10:05
10  for relevant products.     10:05
11  Q  And do you use the information in this     10:06
12  report -- the other information in this report in any     10:06
13  other way for your job?     10:06
14  A  What specifically are you referring to by     10:06
15  that?     10:06
16  Q  What is the purpose of this report?     10:06
17  A  This report reflects a summary as to the     10:06
18  details just of whom this product will be targeting,     10:07
19  and when this will be developed by, and what     10:07
20  functionality that the product will be.     10:07
21  Q  And do you distribute this report outside of     10:07
22  your group at Samsung?     10:07
23  A  It will be distributed to the groups that are     10:07
24  related to the product.     10:07
25  Q  And what groups are those?     10:07

Page 31

1  A  Hardware development group, software     10:07
2  development group, device --     10:07
3     CHECK INTERPRETER: Mechanical.     10:07
4     THE WITNESS: Mechanical development group,     10:07
5  product design team -- or industry design team,     10:08
6  marketing team, quality team. That's about it.     10:08
7     MS. KRIPKE: Q.  Do you distribute it to the     10:08
8  development office?     10:08
9  A  Yes, it will be distributed to the     10:08
10  development group as well, because the ones that I     10:08
11  stated, such as hardware development, software     10:08
12  development and mechanical development, those are all   10:08
13  development groups.     10:08
14  Q  Is this report distributed to anyone outside   10:08
15  of Samsung?     10:09
16  A  No.     10:09
17  Q  Is it distributed to anybody at Samsung     10:09
18  Telecommunications America?     10:09
19  A  Principally, no.     10:09
20  Q  Is it distributed to anybody at Samsung     10:09
21  Electronics America?     10:09
22  A  In principal, it is not.     10:09
23  Q  Please turn to page '522012.     10:09
24     In the right-hand column, is that your name     10:09
25  in the first row?     10:10

Page 32

1  A  Yes.     10:10
2  Q  And generally, are the names listed in the     10:10
3  right column subordinate employees to the names listed  10:10
4  in the left column?     10:10
5     MR. ANDERSON: Objection; compound.     10:11
6     THE WITNESS: Yes.     10:11
7     MS. KRIPKE: Q.  And why is your name listed   10:11
8  in the right column -- right-hand column?     10:11
9  A  My name is not listed -- listed in the left   10:11
10  column because I'm not the leader of my group.     10:11
11  Q  Why does your name appear on the chart at     10:11
12  all?     10:11
13  A  That's because I'm also involved in the     10:11
14  product side.     10:12
15     MS. KRIPKE: All right.     10:12
16  Why don't we take a short break for now.     10:12
17     MR. ANDERSON: Sure.     10:12
18     THE VIDEOGRAPHER: The time is 10:12 a.m.,    10:12
19  and we are off the record.     10:12
20     (Recess taken.)     10:12
21     THE VIDEOGRAPHER: The time is 10:23 a.m.,    10:14
22  and we are on the record.     10:23
23     MS. KRIPKE: Q.  Do you use a computer at     10:23
24  work?     10:23
25  A  Yes.     10:23

Page 33

1  Q  Do you write e-mails at work?     10:23
2  A  Yes.     10:23
3  Q  Do you write e-mails in English at work?     10:23
4  A  In the event necessary, I write them in     10:23
5  English.     10:23
6  Q  Do you receive e-mails at work?     10:23
7  A  Yes.     10:23
8  Q  Do you receive e-mails in English at work?     10:23
9  A  Yes.     10:23
10  Q  Do you save e-mails on your computer?     10:23
11  A  Yes.     10:23
12  Q  How do you save e-mails on your computer?     10:23
13  A  On the Outlook.     10:24
14  Q  Do you delete e-mails on your computer?     10:24
15     MR. ANDERSON: Objection; vague as to time.    10:24
16     THE WITNESS: Sometimes I delete e-mails that  10:24
17  are not necessary.     10:24
18     MS. KRIPKE: Q.  Do you know if there is an    10:24
19  auto deletion setting on your Outlook at work?     10:24
20  A  Well, it does not only have auto deletion     10:24
21  setting, nor does it have automatic sync function.     10:25
22     CHECK INTERPRETER: Auto. It does not have    10:25
23  auto --     10:25
24     THE WITNESS: It does not have auto deletion   10:25
25  setting, nor does it have auto sync.     10:25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

---

**Page 34**

1    MS. KRIPKE:  Q.  It does not have either of    10:25
2    those settings?                                10:25
3    A  Correct.                                    10:25
4    Q  Do you consult physical copies of documents    10:25
5    at work?                                       10:25
6    A  May I have the question one more time,       10:25
7    please.                                        10:25
8    Q  Do you review physical copies of documents at    10:25
9    work?                                          10:25
10   A  I would only print out documents only in the    10:26
11   event necessary.                               10:26
12   Q  Do you have file drawers for work documents    10:26
13   in your office?                                10:26
14   A  Yes.                                        10:26
15   Q  Do you store printed documents in those      10:26
16   drawers?                                       10:26
17   A  As to the printout -- printed-out documents    10:26
18   that are for personal use, those are stored in the    10:26
19   personal file drawer.                          10:27
20   Q  What about the ones that are printed out for    10:27
21   work use?                                      10:27
22   A  The -- the printed -- printing out copies     10:27
23   that I earlier stated that I keep for personal use, I    10:27
24   meant those are ones that I personally print out for    10:27
25   work purpose.                                  10:27

**Page 35**

1    CHECK INTERPRETER:  Individuals.              10:27
2    MS. KRIPKE:  Q.  Do you review electronic --    10:27
3    do you review electronic copies of documents at work?    10:27
4    A  Yes.                                        10:28
5    Q  Do you store those electronic copies on your    10:28
6    computer?                                      10:28
7    A  Only in the event necessary, I do.          10:28
8    Q  And when would it be necessary to do so?     10:28
9    MR. ANDERSON:  Objection; vague.              10:28
10   THE WITNESS:  That would depend on the        10:28
11   situation.                                     10:28
12   MS. KRIPKE:  Q.  When did you learn about      10:28
13   this lawsuit?                                  10:28
14   MR. ANDERSON:  Let me caution the witness not    10:28
15   to reveal the content of any attorney-client    10:28
16   privileged communications.                     10:28
17   THE WITNESS:  I learned about it last year.    10:29
18   MS. KRIPKE:  Q.  Can you give a specific       10:29
19   month when you learned about it?               10:29
20   A  I don't recall as to exact month.           10:29
21   Q  Do you recall if it was in the first half of    10:29
22   2011?                                          10:29
23   A  As I can recall, I think it was in the       10:29
24   midpart of last year.                          10:29
25   Q  Are you currently preserving any documents at    10:29

**Page 36**

1    work that are potentially related to this litigation?    10:29
2    MR. ANDERSON:  Objection to the extent it      10:29
3    calls for a legal conclusion.                  10:30
4    THE WITNESS:  Yes.                            10:30
5    MS. KRIPKE:  Q.  Did you search for documents    10:30
6    in connection with this case?                  10:30
7    MR. ANDERSON:  Again, I'd caution the witness    10:30
8    not to reveal the content of any attorney-client    10:30
9    privileged information, but you can answer the    10:30
10   question.                                      10:30
11   THE WITNESS:  To my recollection, I don't      10:30
12   think I conducted any personal search job.     10:30
13   MS. KRIPKE:  Q.  Did you direct anybody to     10:30
14   search your documents on your behalf?          10:30
15   A  Well, there was something that was done by    10:31
16   way of consulting with counsel.                10:31
17   Q  Do you know what keywords were run to perform    10:31
18   the searches?                                  10:31
19   A  I have no way of knowing what keywords were    10:31
20   run because I did not personally conduct a search.    10:32
21   Q  What did you do to prepare for this          10:32
22   deposition?                                    10:32
23   A  I handed over my PC to my counsel.          10:32
24   Q  Did you meet with anybody to prepare for this    10:32
25   deposition?                                    10:32

**Page 37**

1    A  I met with counsel.                         10:32
2    Q  When did you meet with counsel?             10:32
3    A  Yesterday and the day before.              10:32
4    Q  And was that here in San Francisco?         10:32
5    A  Yes.                                        10:33
6    MS. KRIPKE:  Please mark this as Exhibit       10:33
7    No. 1237.                                      10:33
8    (Document marked Park Exhibit 1237            10:33
9    for identification.)                           10:33
10   MS. KRIPKE:  Please take a moment to review    10:33
11   the document you've been handed.  What you've been    10:33
12   handed has been marked as Exhibit No. 1237.    10:33
13   Q  Have you seen this document before?          10:34
14   A  I think I will be able to remember by this    10:35
15   time around when this was prepared.            10:35
16   Q  What is this document?                       10:35
17   A  I can see that various details are contained    10:35
18   here.  It appears to contain tablet-related     10:35
19   information.                                   10:35
20   Q  And is this a true and correct copy of the    10:35
21   document?                                      10:35
22   MR. ANDERSON:  Objection; lacks foundation.    10:36
23   THE WITNESS:  It appears to be so.            10:36
24   MS. KRIPKE:  Q.  Do you see your name on       10:36
25   page '516584?                                  10:36

# Watson Declaration

# EXHIBIT 16

# Filed Under Seal

1

```
                 HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                    UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION

 4      _____

 5      APPLE, INC., a California corporation,

 6      Plaintiff,

 7      v.                                    Civil Action No.
                                              11-CV-01846-LHK
 8
        SAMSUNG ELECTRONICS CO., LTD.,
 9      a Korean business entity;
        SAMSUNG ELECTRONICS AMERICA, INC.,
10      a New York corporation; and
        SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
11      a Delaware limited liability company,

12      Defendants.
        _____

13
               *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
14

15

16          VIDEOTAPED PERSONAL AND 30(b)(6) DEPOSITION OF:

17

18                        HEONSEOK LEE

19

20

21                     February 29, 2012

22                        Kim & Chang

23                     Seoul, South Korea

24                    9:06 a.m. - 3:39 p.m.

25
```

**Page 2**

```
1  APPEARANCES:
2
3  For the Plaintiff, Apple, Inc.:
4              MORRISON & FOERSTER, LLP
             By:  Karl J. Kramer, Esq.
             755 Page Mill Road
5            Palo Alto, California 94304-1018
             (650) 813-5600
6
7  For the Defendants, the Samsung entities:
8
             QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
9            By:  Brian E. Mack, Esq.
             50 California Street
10           22nd Floor
             San Francisco, California 94111
11           (415) 875-6600
12
13 Also present:
14           Samantha Kim, Morrison & Foerster, LLP
             Edward Kim, Samsung
15           Albert Kim, Lead Interpreter
             Laura Sunwoo, Check Interpreter
16           Peter Au, Videographer
             Lisa A. Knight, Court Reporter
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                    I N D E X
2  WITNESS:                                      PAGE
   HEONSEOK LEE
3
   Examination By Mr. Kramer                       7
4
5                  E X H I B I T S
   NUMBER     DESCRIPTION                        PAGE
6
7  Exhibit 1790  Apple Inc.'s Sixth Rule 30(b)(6)   7
                 Deposition Notice
8  Exhibit 1791  JTouch Corporation document,      52
                 Bates SAMNDCA00298514 to -644
9  Exhibit 1792  Approval Sheet for Samsung,       55
                 Bates SAMNDCA00298645 to -748
10 Exhibit 1793  Touch Panel document (Korean),    57
                 Bates SAMNDCA00298802 to -9039
11
12 Exhibit 1794  Specifications document,          58
                 Bates SAMNDCA00299313 to -344
13
14 Exhibit 1795  Galaxy Tab 10.1 Structure/Material, 59
                 Bates SAMNDCA00324077
15
16 Exhibit 1796  Touch Panel document - Iljin Display 60
                 (Korean), Bates SAMNDCA00324078 to
17               -4082
18 Exhibit 1797  Specifications document, Bates     61
                 SAMNDCA00324088 to -4093
19 Exhibit 1798  JTouch Part No. Revision document  62
                 (Korean), Bates SAMNDCA00324083 to
20               -4087
21 Exhibit 1799  E-mail string (Korean),           63
                 Bates SAMNDCA10017743 to -746
22
23 Exhibit 1800  Multi-touch TSP IC document (Korean), 63
                 Bates SAMNDCA10280580 to -587
24 Exhibit 1801  Stylus Solution document (Korean), 66
                 Bates SAMNDCA10280602 to -615
25
```

**Page 4**

```
1  Exhibit 1802  Visual_System S/W document (Korean), 67
                 Bates SAMNDCA10280642 to -652
2
3  Exhibit 1803  Atmel maXTouch E Series document,   67
                 Bates SAMNDCA10280704 to -736
4  Exhibit 1804  Handwritten document, No Bates      71
5  Exhibit 1805  Document (Korean),                  73
                 Bates SAMNDCA10280808 to -810
6
7  Exhibit 1806  Apple iPad (Korean),                75
                 Bates SAMNDCA10281010 to -1025
8  Exhibit 1807  Comparison Analysis,               76
                 Bates SAMNDCA10281049 to -1057
9
10 Exhibit 1808  iPhone4 document (Korean),         77
                 Bates SAMNDCA10281778 to -789
11 Exhibit 1809  iPhone 4 Announce Report (Korean),  79
                 Bates SAMNDCA10281790 to -815
12
13 Exhibit 1810  Apple iPad document (Korean),      80
                 Bates SAMNDCA10281869 to -886
14 Exhibit 1811  Apple iPad2 document (Korean),     80
                 Bates SAMNDCA10281887 to -890
15
16 Exhibit 1812  E-mail string (Korean),            81
                 Bates SAMNDCA10282211 to -212
17 Exhibit 1813  E-mail string (Korean),            82
                 Bates SAMNDCA10283530 to -532
18
19 Exhibit 1814  E-mail (Korean), with attachment,   84
                 Bates SAMNDCA10283649 to -656
20 Exhibit 1815  E-mail string, Bates SAMNDCA10283733 86
                 to -734
21
22 Exhibit 1816  E-mail (Korean),                   89
                 Bates SAMNDCA10283735
23 Exhibit 1817  E-mail string (Korean),            90
                 Bates SAMNDCA10283802 to -803
24
25 Exhibit 1818  Document (Korean),                 91
                 Bates SAMNDCA10283919 to -921
```

**Page 5**

```
1  Exhibit 1819  Galaxy tap [sic] 10.1 VS Galaxy S2, 93
                 Bates SAMNDCA10765141
2
3  Exhibit 1820  Document (Korean),                 96
                 Bates SAMNDCA10765465 to -472
4  Exhibit 1821  Galaxy Tab 7.0 Cutting Structure   100
                 document, Bates SAMNDCA10890329 to
5               -334
6  Exhibit 1822  Atmel Quantum, QMatrix CapSense     103
                 Technology of TouchScreen Panel,
7                Rev 0.4, Bates SAMNDCA10903827 to
                 -870
8
9  Exhibit 1823  E-mail string (Korean),            108
                 Bates SAMNDCA10907100 to -107
10 Exhibit 1824  E-mail string (Korean),            110
                 Bates SAMNDCA10907800 to -805
11
12 Exhibit 1825  E-mail (Korean), Bates             115
                 SAMNDCA10909344 to -346
13 Exhibit 1826  mXT224 Algorithm Revision History  116
                 document (Korean and English), Bates
14               SAMNDCA10911250 to -254
15 Exhibit 1827  E-mail string (Korean),            117
                 Bates SAMNDCA10917519 to -533
16
17
18
19
20
21
22
23
24
25
```

Page 6

1           P-R-O-C-E-E-D-I-N-G-S
2           THE VIDEOGRAPHER:  We are now on the record
3  in the matter of Apple Inc. versus Samsung Electronics
4  Company Limited, et al., for the United States
5  District Court, Northern District of California,
6  San Jose Division,
7  Case No. 11-CV-01846-LHK.  Today's date is 29th of
8  February, 2012.  The time now is 9:06.
9           This is the video recorded 30(b)(6) and
10 individual deposition of Mr. HeonSeok Lee.  The
11 deposition is taking place at Kim & Chang, Jeongdong
12 Building.  I am Peter Au, the certified deposition
13 video specialist with American Realtime Court
14 Reporters/Asia.  The court reporter is Ms. Lisa
15 Knight, also with American Realtime Court
16 Reporters/Asia.
17          Will all the attorneys please identify
18 themselves and the parties they represent.
19          MR. KRAMER:  Karl Kramer on behalf of Apple,
20 Inc.
21          MR. MACK:  Brian Mack of Quinn Emanuel on
22 behalf of Samsung and the witness.
23          MR. KRAMER:  We understand the court
24 reporter is not authorized to administer oaths in this
25 venue.  Nevertheless, we request that she administer

Page 7

1  the oath, and we stipulate that we waive any objection
2  to the validity of the deposition based on the oaths.
3           MR. MACK:  We agree.
4           (Interpreters sworn.)
5           HEONSEOK LEE,
6  having been first duly sworn to state the whole truth
7  testified as follows:
8           EXAMINATION
9  BY MR. KRAMER:
10     Q.    Please state your name for the record.
11     A.    My name is HeonSeok Lee.
12     Q.    Let's have marked as Exhibit 1790 Apple Inc.'s
13 Sixth Rule 30(b)(6) deposition notice.
14          (Deposition Exhibit 1790 was marked.)
15     Q.    Sir, have you seen this document before?
16     A.    No, this is the first time.
17          MR. KRAMER:  Counsel, can you confirm for
18 the record that --
19     A.    Oh.  Some of the pages towards the back end, I
20 think I may have seen some of those, but at least the
21 front pages, this is the first time.
22          MR. KRAMER:  Counsel, can you confirm for
23 the record that the witness is here to testify at
24 least as to Topic 7 through 10 and 25 through 34 of
25 the 30(b)(6) notice?

Page 8

1           MR. MACK:  Yes, those are our designations.
2  BY MR. KRAMER:
3      Q.    Sir, do you understand that you are here to
4  testify on behalf of Samsung Electronics?
5      A.    Yes, I am aware of that.
6      Q.    And you understand that at least the topics on
7  which you've been designated are set forth in this
8  document marked as 1790 and as just enunciated in our
9  discussion about specific numbers of topics?
10     A.    And it is correct that, sir, you are referring
11 to topics numbers 7 through 10, 25 through 34, are you
12 not?
13     Q.    Yes.
14     A.    That is correct.
15     Q.    Could you tell us who your employer is,
16 currently.
17     A.    The name of the company that I work for is
18 Samsung Electronics Company Ltd.  And as for my employer,
19 the CEO of our company is Mr. JiSung Choi.
20     Q.    Do you report to that person?
21     A.    No, I don't.
22     Q.    To whom do you report?
23     A.    I currently belong to the display lab.  And I
24 report to the gentleman who serves as the head of said
25 display lab.

Page 9

1      Q.    And what is his name?
2      A.    That would be Principal Engineer DongSub Kim.
3      Q.    How long have you been reported to DongSub Kim?
4      A.    It's been about three years and two months.
5      Q.    So is it fair to say that at the end of
6  December 2009, you were first working under DongSub Kim?
7      A.    It's not 2009; it's actually December of 2008.
8  2008.  December of 2008.
9      Q.    So three years and two months?
10     A.    Yes, that's correct.
11     Q.    What is your job responsibility?
12     A.    I currently have performed work with respect to
13 touch in terms of new structures and in terms of defining
14 performances.
15     Q.    Was that your job responsibility when you first
16 joined in December of 2008, the display lab group?
17     A.    Well, mind you, the display lab as an unit was
18 something that came about as part of our organizational
19 shuffling effective December of last year.  Prior to that,
20 it used to go by the name of Advanced Development Group.
21 And, of course, starting back in December of 2008, I was
22 already working on TSP matters.
23          Now, of course, back then, I worked on both C
24 type as well as R type.  And in an overall sense, I did
25 get to see things.  But it's not that I was then

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

50..53

Page 50

1  BY MR. KRAMER:
2      Q.    What does the X and Y represent in the devices
3  that you, in fact, have worked on, when you say you use X
4  and Y only?
5              MR. MACK:  Objection, beyond the scope as it
6  relates to products not accused in this litigation.
7      A.    That would be in reference to the X/Y
8  coordinates.
9  BY MR. KRAMER:
10     Q.    What X/Y coordinates?
11     A.    Well, when you look at the display, there are
12 pixels.  And, obviously, each pixel is going to have its
13 associated coordinate.  Right?  I'm talking about the
14 coordinates thereof.
15     Q.    Are you talking about LCD pixels?
16     A.    Yes, that's correct.  That's right.
17     Q.    So it's your testimony that the LCD, itself,
18 provides information to the TSP IC about a coordinate
19 location?
20             MR. MACK:  Objection, vague.
21     A.    No.
22 BY MR. KRAMER:
23     Q.    Can you explain how the X/Y coordinates are
24 generated in the Galaxy phones and Galaxy tablets?
25     A.    I would request that you perhaps specify one

Page 51

1  model.
2      Q.    Let's try the 10.1, tablet 10.1.
3      A.    Well, now, I don't happen to know the exact
4  resolution of that particular device, but, for instance,
5  if we say that it's 1280 by 800, let us say, then the
6  respective touch vendor -- the respective touch controller
7  vendor is going to have a certain scope or range as to
8  their analysis.  And what they will do is they will try to
9  coincide or comport things in regard to the number of
10 pixels available.
11             And if a particular position amounting to a
12 particular coordinate happens to be touched, then what
13 they will do is they will provide our way the data
14 pertaining to the same coordinates in terms of the LCD.
15 And that is how the coordinate business goes.
16     Q.    How many RX lines are there in the -- strike
17 that.
18             How many RX -- strike that.
19             How many distinct RX signal readings are
20 provided by your touchscreen in the Galaxy 10.1 device to
21 the TSP IC that's used in that device?
22             MR. MACK:  Objection, vague.
23     A.    I am not quite able to understand the question.
24 BY MR. KRAMER:
25     Q.    How many TSP ICs are present in the Galaxy

Page 52

1  10.1?
2              MR. MACK:  Objection, vague.
3      A.    And this is concerning the Galaxy Tab 10.1,
4  right?
5  BY MR. KRAMER:
6      Q.    Yes.
7      A.    With respect to the TSP aspects, the ICs that
8  we are provided with by Atmel is a total of four.
9      Q.    And each of those TSP ICs receives how many
10 inputs that are distinct RX signals?
11     A.    When it comes to that, I don't quite know.
12     Q.    Is it more than one?
13     A.    I understand it to be more than one.
14     Q.    How many RX lines are there in the Galaxy 10.1?
15             MR. MACK:  Objection, vague, assumes facts.
16     A.    That, I don't quite know.
17 BY MR. KRAMER:
18     Q.    And how many TX lines are there in the Galaxy
19 10.1?
20     A.    Even that, I don't quite recall.
21     Q.    I'm going to show you what's been marked next
22 as Exhibit 1791, Bates stamped SAMNDCA00298514 through
23 -8644.
24             (Deposition Exhibit 1791 was marked.)
25     Q.    Have you seen this document before, sir?

Page 53

1      A.    I have.
2      Q.    Is JTouch a supplier of a particular module or
3  structure for Samsung?
4      A.    Not a structure.  They only provide us with a
5  module.
6      Q.    And what is the module?
7      A.    It's the Galaxy Tab 10.1.
8      Q.    They provide the Galaxy Tab 10.1?
9      A.    No, no, no.  I'm talking about the TSP module
10 thereof.
11     Q.    What does this document represent?
12     A.    This constitutes an approval request for us.
13             CHECK INTERPRETER:  Check interpreter
14 interjection.  Instead of "approval request," it's the
15 "approval sheet."
16 BY MR. KRAMER:
17     Q.    Does this document include the -- strike that.
18             Does this document include a description of the
19 module that's provided by JTouch in connection with the
20 Galaxy Tablet?
21             LEAD INTERPRETER:  Quick interjection as to
22 "approval sheet."  That's ambiguous because that may
23 mean it's something that grants approval.  This is a
24 request.  So an "approval sheet request."
25             CHECK INTERPRETER:  The check interpreter

Page 54

1  stands with the formal "approval sheet."
2        MR. MACK:  Objection, foundation, vague.
3     A.   Run that by me again, please.
4  BY MR. KRAMER:
5     Q.   Does this document include a description of the
6  module that is provided by JTouch for the Galaxy 10.1
7  device?
8        MR. MACK:  Same objections.  Beyond the
9  scope.
10    A.   Well, could you further elaborate perhaps as to
11 what portion or what aspect of the module you might be
12 asking about?  I might better be able to answer you.
13 BY MR. KRAMER:
14    Q.   As I understand it, this is a description of a
15 module that's going to be provided and used -- provided to
16 and used by Samsung in the Galaxy 10.1 tablet, correct?
17       MR. MACK:  Same objections.
18    A.   Well, when you say "description," that's a
19 little unclear to me.  I mean, this entails certain things
20 about the materials used as -- in other words, what it's
21 made of and so forth, but when you just say a description,
22 that's a little vague.  Could you explain it to me again,
23 please?
24 BY MR. KRAMER:
25    Q.   Does this document provide some of the

Page 55

1  specifications of the module that's used in the Galaxy
2  Tablet 10.1?
3        MR. MACK:  Same objections.
4     A.   And when you say "some," that is what?
5  BY MR. KRAMER:
6     Q.   Some.  Not necessarily all, but at least some.
7     A.   Well, I still don't know exactly what you might
8  -- what you're interested in asking about.  But as I said
9  earlier, it does entail certain things about the material
10 used, the things about the external cosmetic design,
11 things like that.
12    Q.   Okay.  Thank you.
13       MR. KRAMER:   Let's mark next in order a
14 document Bates stamped SAMNDCA00298645 through -4747
15 [sic] entitled Approval Sheet for Samsung of
16 ATmXT1386-Z2UIR Touch Sensor IC.
17       (Deposition Exhibit 1792 was marked.)
18    A.   Earlier, I think I said that the TSP IC as
19 employed in a Galaxy Tab 10.1 was 1536.  I think I may
20 have made a mistake.  Now that I look at this, I think the
21 particular TSP IC as employed within the Galaxy Tab 10.1
22 was actually the mXT1386.
23    Q.   Thank you.
24       Do you recognize this document, which has been
25 marked as Exhibit 1792?

Page 56

1     A.   Yes, I have.
2     Q.   What is it?
3     A.   This is an approval request or approval sheet
4  as for an Atmel IC.
5     Q.   And by "approval sheet," does that mean that
6  Samsung has an internal process for approving the use of
7  the IC in some product of Samsung's?
8        MR. MACK:  Objection to form, beyond the
9  scope.
10    A.   Well, on our part, there is something that I
11 forget exactly how it goes, something like R-O-H-S or
12 something.  It has to do with some environmental type of
13 testing.
14       For instance, when you look way up at the right
15 upper corner, it says "lead-free," for instance.  We want
16 to ensure that things are lead-free and what have you.
17       And in this particular IC's case, we want to
18 ensure that it poses no problem in terms of the operation
19 thereof under particular environmental circumstances.  And
20 for such reason, we conduct some testing to see if this IC
21 is in fact something that is usable or not.
22       And as part of that overall determination, this
23 sort of an approval sheet comes to be prepared pursuant to
24 which a way -- if you look way below there, there's
25 something that reads an SEC code.  It gets assigned such

Page 57

1  an SEC code upon being granted an approval.
2  BY MR. KRAMER:
3     Q.   Did, in fact, Samsung purchase and use the AT
4  mXT1386 through the approval of this document,
5  Exhibit 1792?
6        MR. MACK:  Same objections.
7     A.   Well, the Galaxy Tab 10.1 does use this
8  mXT1386.
9        MR. KRAMER:  Okay.  Let's mark next in order
10 a document Bates stamped SAMNDCA00298802 through
11 -299039.
12       (Deposition Exhibit 1793 was marked.)
13 BY MR. KRAMER:
14    Q.   Do you recognize this document?
15    A.   This also is a request sheet concerning a
16 module --
17       LEAD INTERPRETER:  Strike.
18    A.   An approval request sheet concerning a module.
19    Q.   What module is that?
20    A.   It's the 10.1.
21    Q.   And what is this "HFBF" at the top of the page?
22    A.   I understand this to be some international
23 standard.
24    Q.   What is the vendor that is supplying the touch
25 panel for the 10.1?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

58..61

Page 58

1    A.    Well, this document is from Iljin Display.
2    Q.    And does this document describe the touch panel
3 that is being purchased for use in the Samsung 10.1
4 tablet?
5          MR. MACK:  Objection, form, beyond the
6 scope.
7          LEAD INTERPRETER:  The interpreter could not
8 hear the very first part.
9    A.    Well, as I mentioned earlier, this sort of
10 approval request sheet is something that we use for
11 purposes of checking to see if the respective vendor is
12 correctly constructing the module.  It's -- I don't quite
13 know what else to say about it.  It's basically a way we
14 get to ensure that they are doing things properly the way
15 they ought to.  If you will, it's a -- it embodies certain
16 categories as to what we check for.
17 BY MR. KRAMER:
18    Q.    And Samsung approved the purchase of this touch
19 panel as described in Exhibit 1793, did it not?
20          MR. MACK:  Same objections.
21    A.    Yes, that's correct.
22          MR. KRAMER:  Let's mark next in order a
23 document Bates stamped SAMNDCA00299313 through -344.
24          (Deposition Exhibit 1794 was marked.)
25    ///

Page 59

1 BY MR. KRAMER:
2    Q.    Do you recognize this document?
3    A.    Yes, indeed.
4    Q.    What is it?
5    A.    This likewise is an approval request.
6    Q.    Of what?
7    A.    As to the Galaxy Tab 7.0, the TSP module.
8    Q.    Who is the vendor of the TSP module for the
9 7.1 [sic] tablet?
10    A.    It's a company called S-Mac.
11    Q.    Does this specification describe the touch
12 window assembly that you -- that Samsung wished to
13 purchase for use in the 7.1 [sic] tablet?
14          LEAD INTERPRETER:  7.1?
15          MR. KRAMER:  Yes -- 7.0.  Sorry.
16          MR. MACK:  Objection to form, beyond the
17 scope.
18    A.    Yes, that's correct.
19          MR. KRAMER:  Let's mark next in order a
20 document Bates stamped SAMNDCA003240077.
21          (Deposition Exhibit 1795 was marked.)
22 BY MR. KRAMER:
23    Q.    Have you seen this document before?
24    A.    I have.
25    Q.    What is it?

Page 60

1    A.    This would appear to entail things about the
2 structure and material with respect to the module provided
3 to us by a certain module vendor, including the identity
4 of said major vendor -- said major module vendor as to a
5 Galaxy 10.1.
6    Q.    Did, in fact, Samsung use modules from Iljin
7 and JTouch in the Galaxy Tab 10.1 structure?
8          MR. MACK:  Objection, vague.
9    A.    Well, I don't know if we're still purchasing
10 from them at this point in time, but it is correct that at
11 least at the onset, we did purchase product from these
12 companies.
13          MR. KRAMER:  Let's mark next in order
14 document SAMNDCA00324078 through -82.
15          (Deposition Exhibit 1796 was marked.)
16 BY MR. KRAMER:
17    Q.    Have you seen this document before, sir?
18    A.    This strikes me as being perhaps just a portion
19 of an excerpt of that previous 10.1-related Iljin display
20 approval sheet request -- approval request sheet.
21    Q.    If you look at Exhibit 1793 and 1796 together,
22 can you describe the relationship between those two
23 documents?
24    A.    So, in other words, 1793 includes this fully.
25    Q.    And 1793 is later, correct?

Page 61

1    A.    Yes, that's correct.
2          MR. KRAMER:  Let's mark next in order a
3 document Bates stamped SAMNDCA00324803 -- excuse me,
4 083 through -87 -- strike that.
5          Let's mark next in order instead the
6 following document, SAMNDCA00324088 through -93.
7          (Deposition Exhibit 1797 was marked.)
8 BY MR. KRAMER:
9    Q.    What is this document, sir?
10    A.    This, likewise, is an approval request sheet.
11    Q.    For what?
12          MR. MACK:  Objection, beyond the scope.
13    A.    This is an approval request concerning the
14 10.1.
15 BY MR. KRAMER:
16    Q.    And the vendor is S-Mac?
17    A.    That is correct.
18    Q.    Did Samsung approve the acquisition of the
19 module described in Exhibit 1797 and then use it in the
20 tablet 10.1?
21          MR. MACK:  Objection, form, beyond the
22 scope.
23    A.    Well, with respect to the use of an
24 S-Mac-provided module, I don't quite know as to whether
25 there is a current S-Mac-provided module that's being

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

78..81

Page 78

```
1   BY MR. KRAMER:
2        Q.   Look at the page that's internally marked
3   page 10 --
4             CHECK INTERPRETER:  Interjection.
5             (A discussion was had off the record between
6   Lead Interpreter and Check Interpreter in Korean.)
7             CHECK INTERPRETER:  Instead of "visual
8   display," it's "display team."
9   BY MR. KRAMER:
10       Q.   Now, if you'd turn to the page -- internally
11  marked page 10.  Isn't this a summary of evaluation
12  results for the TSP, touch sense -- well, I'll let you
13  define what TSP is.
14            MR. MACK:  Same objection.
15       A.   Are you talking about the overall definition as
16  to TSP?
17  BY MR. KRAMER:
18       Q.   Let me ask it again.
19            At the top, it says TSP and then there's two
20  Korean characters.  Could you explain what that is?
21            MR. MACK:  Objection, foundation, beyond the
22  scope.
23  BY MR. KRAMER:
24       Q.   Sorry.  Let me rephrase.
25            At the top of page 10, there is a chart that
```

Page 79

```
1   includes TSP and then four Korean characters.  Can you
2   explain what that is?
3             MR. MACK:  Same objections.
4        A.   They read "Review Results."
5   BY MR. KRAMER:
6        Q.   What does "TSP" stand for?
7        A.   It stands for touchscreen panel.
8        Q.   Okay.  And what's being compared here is the
9   Galaxy S touchscreen panel with two Apple iPhones?
10  Correct?
11            MR. MACK:  Same objections.
12       A.   That is the way things are expressed here as
13  per what you have told us.
14            MR. KRAMER:  Let's mark the next in order a
15  document SAMNDCA10281790 through -815.
16            (Deposition Exhibit 1809 was marked.)
17  BY MR. KRAMER:
18       Q.   This document has the title iPhone 4 Announce
19  Report.  Do you recognize this document?
20       A.   No, this is the first time I'm seeing it.
21       Q.   Does Samsung have a product planning group?
22       A.   There is -- Samsung does, rather.
23       Q.   Does Samsung have a technology planning group?
24       A.   Yes, Samsung does.
25            MR. KRAMER:  Let's mark next in order a
```

Page 80

```
1   document SAMNDCA10281869 through -86.
2             (Deposition Exhibit 1810 was marked.)
3   BY MR. KRAMER:
4        Q.   Do you recognize this document, sir?
5        A.   This is the first time, likewise.
6        Q.   Do you know who prepared this -- strike that.
7             Do you know which group prepared this report?
8             MR. MACK:  Objection, foundation, beyond the
9   scope.
10       A.   As I mentioned earlier, we have since undergone
11  an organizational change.  And I do not remember one way
12  or another as to whether this development management team
13  is still in existence.
14  BY MR. KRAMER:
15       Q.   Was it at one time in existence?
16       A.   Yes, it was.
17       Q.   Was it in existence on April 30, 2010?
18            MR. MACK:  Same objections.
19       A.   That, I don't quite know.
20            MR. KRAMER:  Let's mark next exhibit
21  SAMNDCA10281887 through -90.
22            (Deposition Exhibit 1811 was marked.)
23  BY MR. KRAMER:
24       Q.   Do you recognize this document?
25       A.   Likewise, I think this is some comparative
```

Page 81

```
1   analysis type material.
2        Q.   Was this prepared jointly between a number of
3   different groups, the first being the Wireless Business
4   Group, the second being the Advanced Hardware Development
5   2 Group, the leading product Development Group, and the
6   Antenna Development Group?
7             MR. MACK:  Foundation, beyond the scope.
8        A.   The thing about this is when you look at the
9   actual contents, all it entails are the things about the
10  LCD and TSP only.
11  BY MR. KRAMER:
12       Q.   On the front page, does it refer to the
13  Advanced Hardware Development 2 Group?
14       A.   That's what it reads there.
15       Q.   Is that group related to your group in any way?
16       A.   As I mentioned earlier, and this goes back to
17  before the organizational change, the group to which I
18  used to belong, was the Advanced Hardware Development
19  Group 2.
20            MR. KRAMER:  Let's mark next in order
21  document SAMNDCA10282211 and -12.
22            (Deposition Exhibit 1812 was marked.)
23  BY MR. KRAMER:
24       Q.   Do you recognize this document, sir?
25       A.   This is an e-mail that I wrote.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1    Q.    At the top, there's a reference to the sender
2  as being knocklee@samsung.com.  Do you see that?
3    A.    Yes, that's correct.
4    Q.    Is that your e-mail address?
5    A.    Yes, that is my e-mail.
6    Q.    Does "knock" refer to anything in particular?
7    A.    Well, it was just something I came up with in
8  order to come up with some meaningful ID.
9        MR. KRAMER:  Mark next in order document
10  SAMNDCA10283530 through -32.
11        (Deposition Exhibit 1813 was marked.)
12  BY MR. KRAMER:
13    Q.    Do you recognize this document?
14    A.    Yes.
15    Q.    Is this a document -- -- strike that.
16        Is this an e-mail string, the last e-mail of
17  which is an e-mail you authored on October 14th, 2008?
18        MR. MACK:  Objection, beyond the scope.
19    A.    Well, I guess it's been a while.  I earlier
20  told you that I did recognize this, seeing as how it
21  appears to be an e-mail of mine.  But quite frankly, in
22  order to know as to what I was really writing about at
23  that time, I think I'd have to read further in order to
24  tell you about it.
25  ///

Page 83

1  BY MR. KRAMER:
2    Q.    My question was more basic.  Did you write this
3  e-mail?
4    A.    It says that I did, so I would suppose.
5    Q.    And was it written on or about October 14,
6  2008?
7    A.    Well, that's what it says there, so . . .
8    Q.    Do you have any reason to doubt that that's
9  true?
10    A.    No, no, no, no, no.  I mean, it says that's
11  what it was -- I'm simply saying that I don't recall.
12    Q.    There's a reference on the first page of this
13  e-mail on the right-hand column, at the top of the column
14  under Section 2.  Do you see?  What does that say?
15    A.    It reads comparison as to sensor chip type --
16        LEAD INTERPRETER:  Strike that.
17    A.    -- capacitive type sensor chip.
18    Q.    At the bottom of the column to the far right,
19  there's a reference to quantum and layer 2.  Can you read
20  us what that says?
21    A.    I'm sorry.  Point to me as to where exactly
22  we're talking about.
23    Q.    It's the bottom, this bottom reference, the far
24  right column under Section 2.
25    A.    So would it suffice if I just read it aloud?

Page 84

1    Q.    Please.
2    A.    It reads --
3        LEAD INTERPRETER:  The interpreter is
4  looking at -3530.
5    A.    -- in the case of # quantum, possible when
6  implementing two layers.
7    Q.    What does "two layers" refer to?
8    A.    I think that's in reference to ITO layers.
9    Q.    Okay.  Thank you.
10        MR. KRAMER:  I'm going to now show you
11  what's been marked as Exhibit 1814.  It is
12  SAMNDCA10283649 through -56.
13        (Deposition Exhibit 1814 was marked.)
14    Q.    Do you recognize this document?
15    A.    Seems to me that it's a comparative analysis as
16  to the LCD.
17    Q.    On the first page, is this an e-mail that you
18  wrote?
19    A.    Well, I did send this e-mail, but as for the
20  pages on the inside, I don't quite have any recollection
21  as to whether I'm the one who wrote those.
22    Q.    It is true, though, that you had forwarded the
23  attachment as a part of your e-mail on December 9th, 2008,
24  correct?
25    A.    Well, how can you tell that?  It doesn't say

Page 85

1  that I was, quote, unquote, forwarding this to somebody
2  else.
3    Q.    Was there an attachment to your e-mail of
4  December 9th, 2008?
5    A.    Well, all I can say about this is it seems that
6  maybe previous to this, I might have received something.
7  And given whatever need -- not that I recall, okay.  Just
8  I'm figuring that maybe there was some need on my part to
9  send something along with my e-mail, something that I
10  already had on hand.
11        (A discussion was had off the record between
12  Lead Interpreter and Check Interpreter in Korean.)
13    Q.    And was what you had on hand the attachment on
14  pages -650 through -656?
15    A.    Well, I guess I would anticipate that that
16  would have been the case because, I mean, after all, this
17  appears to have come out as part of my e-mails.  So . . .
18    Q.    Can you --
19    A.    So that's what I would think.
20    Q.    Can you explain why, on the left-hand portion
21  of the upper portion of the page, and in the date
22  reference, there are Japanese characters?
23    A.    Well, I, myself, don't know about the Japanese
24  portion there.  I wouldn't quite know as to why that's
25  written there.

Page 86

1    Q.    Do you speak Nihongo?
2    A.    Well, of course, I did study it a bit while in
3  high school, but, now I would say I'm -- I have retained
4  virtually none.
5         MR. KRAMER:  Mark next in order document
6  SAMNDCA10283733 and -34.
7         (Deposition Exhibit 1815 was marked.)
8  BY MR. KRAMER:
9    Q.    Is this an e-mail that you wrote, sir?
10   A.    Yes, that's correct.
11   Q.    What is the subject of this e-mail?
12   A.    It's a comparative analysis report on the
13  iPhone.  But now, as I've continually been telling you,
14  our company basically, as a basic matter of course, always
15  -- is always engaged in the analysis as to other
16  companies.  We analyze things as to our competition out
17  there in order that we be able to put out better products
18  than they.  I mean, that is essentially what our team is
19  charged with for ours is the development team.
20        And at that time, and I guess if this happened
21  to be about an iPhone-related analysis, then that's what
22  it is.  And I imagine that we have the other ones
23  pertaining to other companies.  I am certain that you have
24  my e-mails, and when you look there, I have, in fact, you
25  know, figured that you'll find a lot of such material on

Page 87

1  other companies as well.
2    Q.    At the bottom of the page, there's an e-mail
3  sent from you on March 18, 2009.  Do you see that?
4    A.    Yes, I'm looking at it.
5    Q.    Do you see the reference to the recipients?
6    A.    Yes.
7    Q.    What does it say there?
8    A.    It reads to the esteemed recipients.
9  Basically, when we file simple sorts of reports,
10  especially with respect to things destined to maybe one or
11  two people, let's say even one, you know, without my, you
12  know, necessarily addressing a particular individual, the
13  recipient knows that this -- the e-mail will be coming
14  from me.  Right.
15        And, you know, it's the format of these things
16  is such that I don't necessarily have to specify things.
17  This just is something that gets tagged on.  And as to
18  whom this was actually sent, at the moment, at this point,
19  I am not quite able to tell.
20   Q.    If you look at the second page, at the top of
21  the page, it refers to a TSP IC.  What IC is that?
22   A.    TSP IC?  I suppose that's a capacitive type IC.
23   Q.    Okay.  Can you read for us beginning with the
24  word "TSP" that sentence?
25   A.    Are you talking about the very top, sir?

Page 88

1    Q.    Yes.
2         LEAD INTERPRETER:  Interjection.  Maybe do
3  the whole thing because otherwise syntactically --
4  because --
5  BY MR. KRAMER:
6    Q.    Let's have you read the entire section into the
7  record, please.  Yes, out loud.
8    A.    For starters, the TSP IC, itself, was something
9  developed for Apple's dedicated use -- as a chip for
10  Apple's dedicated use (NDA executed), and whereas a
11  request has been put out to Broadcom's Korea branch, TI's
12  branch, it is anticipated that it's going to be difficult
13  to obtain either a chip data sheet or information.
14   Q.    Despite the fact that the TSP IC was developed
15  under NDA for Apple, it's true that Samsung requested
16  further information from the Korean subsidiaries of
17  Broadcom and Texas Instruments, correct?
18        MR. MACK:  Objection, foundation, beyond the
19  scope.
20   A.    Well, as I look at this, I'm not quite sure as
21  to what or why I was writing this, but to be sure -- I
22  mean, you know, there are those comparative report types
23  of things available there on a worldwide basis, let's say,
24  with respect to the iPhone.  And here, basically -- as I told you
25  this concerned Broadcom and TI, it's basically -- as I told you

Page 89

1  earlier, I mean, we are always in a position where we have
2  to do some analysis as to the other companies out there on
3  a global basis as to performance to see as to what kind of
4  features and functionalities or performances their
5  products happen to have.  We look at the pros and cons in
6  that regard.  And if there be any good, then why we always
7  want to up the ante and is it not possible for us to ask
8  for information?
9         I mean, this -- as -- well, as I look at this,
10  at least for now, at this point, I am making a request --
11  I mean, can't you make a request for things?
12        MR. KRAMER:  Let's mark next in order
13  document SAMNDCA10283735 as Exhibit 1816.
14        (Deposition Exhibit 1816 was marked.)
15  BY MR. KRAMER:
16   Q.    Do you recognize this document, sir?
17   A.    I see that it's an e-mail.
18   Q.    Is this an e-mail that you wrote?
19   A.    Yes, that's correct.
20   Q.    On or about April 1st, 2009?
21   A.    Yes.  Well, that's what it indicates.
22   Q.    What is the subject matter of this e-mail?
23   A.    I would perhaps believe that I was sending
24  along some previously prepared material, at least that
25  seems to be the indication here.

Page 90

1    Q.    What did that material relate to?
2    A.    When it comes to that, I don't exactly know.
3    Q.    You seem hesitant to actually read the line on
4  the subject matter which says iPhone touch analysis
5  materials.  Is that what this e-mail relates to?
6          MR. MACK:  Objection, beyond the scope.
7    A.    Well, even if that be the case, I still don't
8  know, wouldn't know as to what this material is about.
9  BY MR. KRAMER:
10   Q.    So you don't know whether it's about the iPhone
11 touch analysis?
12         MR. MACK:  Same objections.  Asked and
13 answered.
14   A.    Right.  As for this, in order to know, I'd have
15 to really actually open up the respective material.
16         MR. KRAMER:  Let's mark next in order
17 SAMNDCA10283802 through -03 as Exhibit 1817.
18         (Deposition Exhibit 1817 was marked.)
19 BY MR. KRAMER:
20   Q.    Do you recognize this document as an e-mail
21 that you wrote on or about July 20, 2009?
22   A.    That would appear to be the case.
23   Q.    Did it forward an e-mail written by JB Kim?
24   A.    It seems to me that senior engineer JaeBeom Kim
25 had posed a few questions to me, and I think I was

Page 91

1  replying to him.
2    Q.    Okay.
3          MR. KRAMER:  Let's mark next in order
4  document SAMNDCA10283919 through -21.
5          (Deposition Exhibit 1818 was marked.)
6  BY MR. KRAMER:
7    Q.    Is this document an analysis of the iPad's
8  overall TSP pattern formation?
9          MR. MACK:  Objection, foundation, beyond the
10 scope.
11   A.    Well, again, it's the same thing as before in
12 that we continued to engage in the analysis as to other
13 companies' products out there, in terms of checking their
14 performances and what have you.  And that's not limited to
15 just the Apple's or others; it would include also
16 Motorola, for instance, HTC, et cetera, et cetera.
17         And -- but it is correct as to the present
18 document appearing to have something to do with the TSP
19 pattern --
20 BY MR. KRAMER:
21   Q.    Why did Samsung --
22   A.    -- analysis.
23   Q.    Excuse me.
24         Why did Samsung prepare the analysis of the
25 iPad's overall TSP pattern formation?

Page 92

1          MR. MACK:  Objection, foundation, beyond the
2  scope, calls for speculation.
3    A.    Well, I, myself, am not entirely certain as to
4  how it came about that this document came to be created,
5  but one way or another, it does appear to be some
6  comparative material as to another company, as to a
7  competitor out there.
8          And my determination is, well, the fact of the
9  matter is generally, when it comes to these controller IC
10 vendors of ours, they basically provide their own
11 respective TSP patterns to us.  And, you know, in that
12 regard, there are many ways, they differ from one another.
13 But even if they so provide us with those things, I really
14 don't know that there is much use on our part for such.
15 And as to that -- in that regard, I'm not too sure as to
16 what my determination would be concerning this.
17 BY MR. KRAMER:
18   Q.    So you can't explain why this analysis was
19 prepared?
20         MR. MACK:  Same objections.
21   A.    Yeah.  I mean, because, I mean, it's possible
22 that maybe a guy wants to see maybe the shape of the
23 patterns, and he can ask that such thing be done.  But,
24 you know, quite frankly, for what?  I don't know.
25         The fact is, I don't think there is going to be

Page 93

1  too much significance to be attributed to something like
2  that because one way or another -- so one way or another,
3  when it comes to the -- again, the capacitive controller
4  IC vendors, they have their own respective patterns for
5  use with their own ICs.
6          And one imagines that those are geared towards
7  resulting in the best performance for their products.  So
8  one way or another -- this, for instance, one imagines is
9  probably the pattern as to the chip for the respective
10 controller IC for the Apple product for which it was
11 optimal for those purposes.  But one way or another, it's
12 not like something we use, so I don't know what the deal
13 would be.
14         MR. KRAMER:  Let's mark next in order
15 Exhibit 1819, a document Bates numbered
16 SAMNDCA10765141.
17         (Deposition Exhibit 1819 was marked.)
18         MR. MACK:  I get the impression there's
19 going to be a lot of these documents.  Is it okay if I
20 make a standing objection to beyond the scope for any
21 line of questioning relating to document
22 authentication or competitive analysis rather than
23 interrupting you for each document?
24         MR. KRAMER:  I've only got a few more
25 documents.

Page 122

1  function of a dummy pattern in a touch sensor?
2      MR. MACK:  Same objections.
3      A.    Well, I would imagine that each of the
4  controller IC companies out there do things differently as
5  to the methodologies employed, but just my common sense
6  general understanding is that the use of the dummy pattern
7  tends to make the touch performance a little better.
8  BY MR. KRAMER:
9      Q.    In what way?
10     MR. MACK:  Same objections.
11     A.    This is something that I've strictly heard.
12  This is sometime -- it's simply something about how the
13  inurity [phonetic] gets better.
14  BY MR. KRAMER:
15     Q.    The "inurity"?
16         (A discussion was had off the record.)
17     Q.    Linearity.  What does "linearity" refer to?
18     A.    Linearity is in reference to when you draw
19  either a diagonal line or a straight line and you don't
20  end up with a zig-zag type of line, literally getting a
21  straight line is what they mean by linearity.
22     Q.    Sir, can you identify for us anyone at Samsung
23  Electronics who knows more than you about the source code
24  for the accused products at issue in this case?
25     A.    Well, when you say "source code," source code

Page 123

1  relating to what?
2      Q.    That relating to interprocess communication,
3  including software for generating, registering, listening
4  for, or otherwise processing messages or events.
5      MR. MACK:  Objection, vague.
6      A.    That's quite broad, so . . .
7         Again, are we talking about things on the touch
8  side, like in terms of the controller IC or -- the reason
9  why I say that is because all we get supplied with from
10  the touch IC are the X/Y coordinates.  And so with respect
11  to that, we do not know anything about the source code
12  concerning the touch IC.
13  BY MR. KRAMER:
14     Q.    Is there anyone at Samsung Electronics who
15  knows more than you about the source code that's used in
16  the application processor for the accused products at
17  issue in this case?
18     A.    Sir, there happen to be as many as 26 accused
19  products here.  And for each respective model, there are
20  the hands-on software guys.  And those hands-on software
21  personnel are further split up in terms of those who
22  handle the drive aspects, those dealing with the kernel
23  aspects, and let's say there's the network frame, and so
24  guys handling things on that side, and the aspects handled
25  in terms of the applications.

Page 124

1         So if you were to, let's say, specify a
2  particular model, then perhaps I can further investigate
3  that and give you a name.
4      Q.    You mentioned a bunch of people who work on
5  software.  Did you contact any of those people after you
6  learned you were going to be deposed with respect to the
7  source code in the accused products in this case to
8  discuss with them and prepare for the deposition?
9      A.    I have not had any communication with the
10  respective software handling folks because one way or
11  another, when it comes to things pertaining to that
12  particular topic, I would believe that counsel on our part
13  is going to be designating the respective handling persons
14  for each of those models.
15     MR. KRAMER:  I didn't have any other
16  questions on the Northern District of California case
17  at this time.  Obviously, we've got issues with the
18  production of materials and quality of materials and
19  the preparation of the witness, so I'm not closing the
20  witness's testimony on 30(b)(6) topics or in his
21  individual capacity, pending resolution of those
22  issues.  Are you designating the deposition as
23  confidential?
24     MR. MACK:  Yeah.  We are going to designate
25  this as highly confidential, attorneys' eyes only, and

Page 125

1  also reserve the right for the witness to review and
2  sign the transcript before it's filed.  And we have no
3  redirect questions.
4      MR. KRAMER:  I've got limited questions on
5  the ITC that will run half hour, 45 minutes.
6      THE VIDEOGRAPHER:  Going off the record.
7  The time now is 15:39.  This is the end of Tape No. 4.
8         (Time noted:  3:39 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

126

```
 1    (Counsel representing this witness should arrange for
      reading and signing and thereafter distribute copies
 2    of the signed Errata sheet to opposing counsel without
      involvement of the court reporter.)
 3
      STYLE OF CASE:    Apple, Inc. v. Samsung Electronics
 4                      Company, Ltd., et al.

 5    DEPOSITION OF:    HEONSEOK LEE

 6    DATE TAKEN:       February 29, 2012

 7                   E R R A T A   S H E E T

 8    Page    Line Change               Reason

 9    ___     ___  _____

10    ___     ___  _____

11    ___     ___  _____

12    ___     ___  _____

13    ___     ___  _____

14    ___     ___  _____

15    ___     ___  _____

16    ___     ___  _____

17    ___     ___  _____

18    ___     ___  _____

19    ___     ___  _____

20    ___     ___  _____

21    ___     ___  _____

22
      I hereby certify that I have read my deposition and that
23    it is true and correct subject to any changes in form or
      substance entered here.
24    _____         _____
      Date  May 11, 2012.          HEONSEOK LEE
25
```

# ERRATA SHEET

NAME OF CASE:   Apple v. Samsung Electronics Co. Ltd., No. 11-cv-1846

DATE OF DEPOSITION:   February 29, 2012

NAME OF WITNESS:   HeonSeok Lee

Reason Codes:

    1.    To clarify the record.
    2.    To conform to the facts.
    3.    To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 8 | 9 | JiSung Choi | Gee-Sung Choi | 2, 3 |
| 19 | 25 | document | documents | 3 |
| 46 | 3 | I'm not able to get to see how all | I wasn't able to see all | 3 |

Signed:   *H.S Lee*   Date:   15 May 2012
           HeonSeok Lee

02198.51855/4755691.1

# Watson Declaration

# EXHIBIT 17

# Filed Under Seal



EXHIBIT
1792
HS Lee   2/29/12
PENGAD 800-631-6989



*Document Title*

# Approval Sheet for Samsung of ATMXT1386-Z2UIR Touch Sensor IC

### SEC Code: 1205-004073

Topside Photo



Bottomside Photo









| Prcess | Site | 1'st Case | 2'nd Case |
|--------|------|-----------|-----------|
| Fab | | ATMEL | UMC |
| Assembly | | ASE | ASE |
| Final test | | ATMEL | ATMEL |

| Document Description | | Document Number | |
|---|---|---|---|
| **Approval Sheet for Samsung ATMXT154-CUR** | | Q-6238 | |
| Issue | Change | Drawn | Date | Checked | Approved |

| Issue | Change | Drawn | Date | Checked | Approved |
|-------|--------|-------|------|---------|----------|
| 3 | | Alvin Ello | 25 February 2011 | | |

Q-6237
Rev. 3
Page 1 of 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          SAMNDCA00298645

# Watson Declaration

# EXHIBIT 18

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

1

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

1                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
2                        SAN JOSE DIVISION

3    _____

     APPLE, INC., a California corporation,
4
     Plaintiff,
5
     v.                                    Civil Action No.
6                                          11-CV-01846-LHK

7    SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
8    SAMSUNG ELECTRONICS AMERICA, INC.,
     a New York corporation; and
9    SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,
10
     Defendants.
11   _____

12          *** CONFIDENTIAL BUSINESS INFORMATION ***
                 SUBJECT TO PROTECTIVE ORDER
13

14          VIDEOTAPED PERSONAL DEPOSITION OF:

15

16                      DONGSUB KIM

17

18

19                   February 28, 2012

20                      Kim & Chang

21                   Seoul, South Korea

22                  9:59 a.m. - 1:27 p.m.

23

24

25

Page 2

```
 1  APPEARANCES:

 2

 3  For the Plaintiff, Apple, Inc.:

 4              MORRISON & FOERSTER, LLP
                By:  Karl J. Kramer, Esq.
 5              755 Page Mill Road
                Palo Alto, California 94304-1018
 6              (650) 813-5600

 7

 8  For the Defendants, the Samsung entities:

 9              QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                By:  Evette D. Pennypacker, Esq.
10              555 Twin Dolphin Drive
                5th Floor
11              Redwood Shores, California 94065
                (650) 801-5000

12

13  Also present:

14              Samantha Kim, Morrison & Foerster, LLP
                Albert Kim, Lead Interpreter
15              Laura Sunwoo, Check Interpreter
                Peter Au, Videographer
16              Lisa A. Knight, Court Reporter

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1              I N D E X

 2  WITNESS:                                    PAGE
    DONGSUB KIM

 3  Examination By Mr. Kramer                      5

 4

 5          E X H I B I T S

 6  NUMBER      DESCRIPTION                     PAGE

 7  Exhibit 1690  Galaxy S 4G User Manual,        27
                  Bates S-ITC-000013673 to -920

 8  Exhibit 1691  Samsung Vibrant User Manual,    55
                  Bates S-ITC-000021070 to -288

 9

10  Exhibit 1692  E-mail string, (Korean),        57
                  Bates SAMNDCA10910671 to -679

11  Exhibit 1693  E-mail string (Korean), with    64
                  attachments, Bates SAMNDCA10910088
12                to -1093

13  Exhibit 1694* E-mail (Korean),                66
                  Bates SAMNDCA10909041 to -9046
14
    Exhibit 1695  C-Type TSP (Korean),            71
15                Bates SAMNDCA10885893 to -895

16  Exhibit 1696  maXTouch E Series PowerPoint,   72
                  Bates SAMNDCA10280704 to -736
17
    Exhibit 1697  Glass Window & Panel PowerPoint 73
18                (Korean), Bates SAMNDCA10283573 to
                  -592
19
    Exhibit 1698  E-mail (Korean),                74
20                Bates S-ITC-008026863 to -870

21

22  (*Note:  Exhibit 1694 was clawed back and retained by
    Evette D. Pennypacker, Esq., of Quinn, Emanuel, Urquhart
23  & Sullivan, LLP)

24

25
```

Page 4

```
 1          P-R-O-C-E-E-D-I-N-G-S

 2          THE VIDEOGRAPHER:  We are now on the record

 3  in the matter of Apple, Inc. versus Samsung

 4  Electronics Company, Ltd., et al., for the

 5  United States District Court, Northern District of

 6  California, San Jose Division, Case No.

 7  11-CV-01846-LHK.

 8          Today's date is 28th of February, 2012.  The

 9  time now is 9:59.  This is the video record individual

10  deposition of Mr. DongSub Kim.  The deposition is

11  taking place at Kim & Chang, Jeongdong building, 9th

12  floor, Jung-gu, Seoul, South Korea.

13          I'm Peter Au, a certified deposition video

14  specialist with American Realtime Court

15  Reporters/Asia.  The court reporter is Ms. Lisa

16  Knight, also with American Realtime Court

17  Reporters/Asia.

18          Will all the attorneys please identify

19  themselves and the parties they represent.

20          MR. KRAMER:  Karl Kramer from Morrison &

21  Foerster, representing Apple, Inc.  With me today is

22  Samantha Kim.

23          MS. PENNYPACKER:  Evette Pennypacker of

24  Quinn Emanuel, representing Samsung.

25          MR. KRAMER:  We understand the court
```

Page 5

```
 1  reporter is not authorized to administer oaths in this

 2  venue.  Nevertheless, we request that she administer

 3  the oath, and we stipulate that we waive any objection

 4  to the validity of the deposition based on the oaths.

 5          MS. PENNYPACKER:  Agreed.

 6          (Interpreters sworn.)

 7          DONGSUB KIM,

 8  having been first duly sworn to state the whole truth

 9  testified as follows:

10          EXAMINATION

11  BY MR. KRAMER:

12      Q.   Please state your name.

13      A.   My name is DongSub Kim.

14      Q.   Have you ever been deposed before?

15      A.   No, sir.

16      Q.   If you have any questions during the deposition

17  today, please ask us to clarify.

18      A.   Thank you.

19      Q.   Do you have any questions?

20      A.   No, not yet.

21      Q.   Who is your employer?

22      A.   That would be Samsung Electronics Company, Ltd.

23      Q.   How long have you been employed by that

24  company?

25      A.   Well, I came on board with the company on
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 6

1   August the 9th, 1993.  So that would be, let's see, about
2   18 years or so.
3       Q.    What is your current position in Samsung
4   Electronics Company?
5       A.    I currently serve as a principal engineer.
6       Q.    Do you supervise a group of employees?
7       A.    That is right.
8       Q.    Is one of those employees HeonSeok Lee?
9       A.    That is right.  He is one of my subordinates.
10      Q.    Could you describe for us your educational
11  background.
12      A.    Did you say my education?
13      Q.    Yes.
14      A.    I am a graduate of the electronics engineering
15  department of HanYang University.
16      Q.    When did you receive that degree?
17      A.    It was in 1993 that I was awarded my degree.
18      Q.    So it's fair to say you've been employed by
19  Samsung Electronics Company since you graduated from
20  HanYang University?
21      A.    That is correct.
22      Q.    Have you had any training in English?
23      A.    Personally I have undertaken some studies in
24  English.
25      Q.    Was that in college?

Page 7

1       A.    I did so likewise during my college years, as
2   well as while I was working for the company.
3       Q.    In your job, do you often read and write in
4   English?
5       A.    I do so on occasion.  Every now and then.
6       Q.    Have you been to the United States?
7       A.    Yes, I have.
8       Q.    When was the last time you were to the
9   United States?
10      A.    It was in December of the year before last.
11      Q.    December of 2010?
12      A.    Yes.
13      Q.    And have you been to the United States as an
14  employee of Samsung doing work for your company?
15      A.    Yes, I have.
16      Q.    About how often since 2005 have you been to the
17  United States on behalf of Samsung?
18      A.    You say ever since 2005?
19      Q.    Yes.
20      A.    If it's since 2005, it's only once.  That time
21  in December of 2010 was the first and last time in that
22  regard.
23      Q.    How long were you in the United States on that
24  trip?
25      A.    Well, my business trip was for basically a

Page 8

1   one-week period, so I think I stayed in the States for
2   about four to five days or so.
3       Q.    Do you own a Samsung telephone?
4       A.    Yes, that's right.
5       Q.    Which one?
6       A.    I have a Galaxy S.
7       Q.    And in December of 2010, did you own a Samsung
8   telephone?
9       A.    Yes, that's right.
10      Q.    Which phone did you own at that time?
11      A.    At that time, I had a slide phone.
12      Q.    Do you own a Galaxy Tab?
13      A.    No, sir.
14      Q.    Do you own any tablet computer?
15      A.    No.
16      Q.    Have you ever owned a tablet computer?
17      A.    No.
18      Q.    Have you ever used an Apple product?
19            MS. PENNYPACKER:  Objection, vague.
20      A.    What product are you specifically referring to?
21  BY MR. KRAMER:
22      Q.    Any Apple product.
23            MS. PENNYPACKER:  Objection, vague.
24      A.    I have not personally used any.
25  ///

Page 9

1   BY MR. KRAMER:
2       Q.    So you, yourself, have never used an Apple
3   iPhone?
4             MS. PENNYPACKER:  Asked and answered.
5       A.    That is right, I have not.
6   BY MR. KRAMER:
7       Q.    Have you ever seen an Apple iPhone used?
8             MS. PENNYPACKER:  Objection, vague.
9       A.    I have.
10  BY MR. KRAMER:
11      Q.    Could you describe for us the nature of the use
12  that you observed when you say you have seen an Apple
13  iPhone used.
14            MS. PENNYPACKER:  Objection, vague.
15      A.    Well, one of my colleagues happened to be using
16  an Apple iPhone, and that person was showing it to me.
17  BY MR. KRAMER:
18      Q.    Which colleague?
19      A.    A colleague of mine at the company.
20      Q.    The name of the colleague?
21      A.    I don't quite recall.
22      Q.    Have you ever seen an iPad used?
23            MS. PENNYPACKER:  Objection, vague.
24      A.    Could you ask me that again, please?
25  ///

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 14

1 you to do so.

2    A.   I have not personally done anything like that.

3 BY MR. KRAMER:

4    Q.   When did Samsung first develop a touchscreen

5 for use with a tablet or telephone?

6         MS. PENNYPACKER:  Objection, vague and

7 compound.

8    A.   I do not precisely recall as to when Samsung

9 came up with a touch phone.

10 BY MR. KRAMER:

11    Q.   Do you know when Samsung came up with a touch

12 tablet?

13         MS. PENNYPACKER:  Objection, vague.

14    A.   Well, I do know for a fact that it was the

15 Galaxy Tab 7.0 that was the very first one, but the time

16 frame thereof, at this moment I do not quite recall.

17 BY MR. KRAMER:

18    Q.   Were there any other Galaxy tablets developed

19 by Samsung other than 7.0?

20    A.   Yes, there is.

21    Q.   What is the name of that tablet?

22    A.   Well, we tend to denote these things by the

23 inch size.  For instance, there has been the 8.9 inch, the

24 10.1 inch.

25    Q.   Was the first touchscreen developed by Samsung

Page 15

1 for use with a phone or tablet?

2         MS. PENNYPACKER:  Objection, vague and

3 compound.

4    A.   To my recollection, it was for a phone that it

5 was first released.

6         LEAD INTERPRETER:  Strike.

7    A.   It was the phone that was first released.

8 BY MR. KRAMER:

9    Q.   Do you recall the name of that phone that first

10 employed a touchscreen?

11    A.   The name, I do not recall.

12    Q.   Do you recall whether that first phone that

13 Samsung produced with a touchscreen was a capacitive

14 touchscreen or was resistive touchscreen?

15    A.   It was the resistive kind.

16    Q.   And at some point did Samsung discontinue its

17 resistive touchscreens for telephones and begin to sell --

18 begin to develop and sell capacitive touchscreens for use

19 with its telephones?

20    A.   Yes, indeed.

21    Q.   Do you recall whether Samsung's decision to

22 change to capacitive touchscreens for its telephones was

23 before or after you found out about the iPhone?

24         MS. PENNYPACKER:  Objection, vague,

25 foundation.

Page 16

1    A.   No, I don't quite -- I don't quite recall as to

2 the time frame.

3 BY MR. KRAMER:

4    Q.   Is it your testimony that the Apple iPhone, the

5 introduction of the Apple iPhone into the marketplace, had

6 nothing to do with Samsung's decision to move to

7 capacitive touchscreens for its phones?

8         MS. PENNYPACKER:  Misstates testimony and

9 lacks foundation.

10    A.   Well, I am not in any position to speak about

11 the company policies because I'm not one of those

12 policy-related decision makers.  I am not able to know

13 about those policies.

14 BY MR. KRAMER:

15    Q.   Is it your testimony that you have no

16 information whatsoever about whether Samsung decided to

17 change to a capacitive touchscreen for its phones because

18 of the introduction of the Apple iPhone in any way?

19         MS. PENNYPACKER:  Vague, foundation,

20 misstates testimony.

21    A.   That's right.  I'm not actually able to give

22 you an exact answer on that because I don't quite recall

23 as to the things in terms of the order between, let's say,

24 the Apple's -- Apple iPhone's release versus our company's

25 decision to change the touch pad to a capacitor type.

Page 17

1 BY MR. KRAMER:

2    Q.   Did the phones that use -- did the Samsung

3 phones that used resistive touchscreens employ a

4 multi-touch capability?

5         MS. PENNYPACKER:  Objection, vague.

6    A.   No, they did not.

7 BY MR. KRAMER:

8    Q.   Did the capacitive touchscreens that you helped

9 Samsung develop for Samsung's telephones and tablets

10 employ a multi-touch capability?

11         MS. PENNYPACKER:  Foundation.

12    A.   Some yes, some no.  Depends on the model.

13 BY MR. KRAMER:

14    Q.   To your knowledge, did the Apple iPhone, when

15 it was first introduced, have multi-touch capability?

16         MS. PENNYPACKER:  Vague, foundation.

17    A.   I don't exactly recall.  I have not used it,

18 so . . .

19 BY MR. KRAMER:

20    Q.   Prior to Samsung's first introduction of a

21 phone using a capacitive touchscreen, had Samsung ever had

22 a telephone or tablet that used mutual capacitance?

23         MS. PENNYPACKER:  Vague, foundation.

24    A.   Could you run that by me again, please?

25    ///

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 18

1  BY MR. KRAMER:
2      Q.   Yes.
3           Prior to Samsung's first introduction of a
4  phone using a capacitive touchscreen, had Samsung ever had
5  a phone or tablet that used mutual capacitance?
6      MS. PENNYPACKER:  Vague, foundation.
7      A.   Well, with respect to that particular time
8  frame, my recollection is that my work was not with
9  respect to things in the display lab.  And so I don't
10 exactly know as to who with what department may or may not
11 have done anything like that.  I'm not in the know.
12 BY MR. KRAMER:
13     Q.   As far as you know, Samsung did not have a
14 mutual capacitance touchscreen prior to the introduction
15 of the Apple iPhone, correct?
16     MS. PENNYPACKER:  Asked and answered.
17     A.   Well, again, I have to repeat myself.  We
18 happen to have a whole lot of engineers, and I have no
19 idea as to what might be going on within what department.
20 I'm not in any position to say yay or nay to that
21 question.
22 BY MR. KRAMER:
23     Q.   Just to be clear.  The question was directed to
24 your state of knowledge with respect to what you know.
25 And the question is:  As far as you know, Samsung did not

Page 19

1  have a mutual capacitance touchscreen prior to the
2  introduction of the Apple iPhone, correct?
3      MS. PENNYPACKER:  Asked and answered,
4  misstates testimony.
5      A.   Well, again, with respect to the particular
6  time frame you're talking about, sir, I was engaged in the
7  development of phones that were oriented towards the
8  Korean domestic market.  And at that time, as it were,
9  what I was working on really were sort of medium- to
10 low-priced feature phone types of models.  And, you know,
11 at least none of the phones -- none of the models that I
12 was working on came with a mutual capacitance touchscreen.
13 That is my answer.
14 BY MR. KRAMER:
15     Q.   You mentioned that you are in charge of a group
16 that works on displays and touch devices.  Do you recall
17 that?
18     A.   That is correct.
19     Q.   Is that department, today, limited to the
20 Korean market or any particular market?
21     A.   To answer your -- well, to further facilitate
22 your understanding, sir, first of all, when I first came
23 on board with the company way back when, I worked on
24 wireless pagers.  And I think I did that for about a good
25 seven years.  I did that out of the Gumi facility in North

Page 20

1  Kyungsang Province here in Korea.
2           And thereafter, for seven to eight years, up
3  until and through October 16th -- no, October 15, 2008, I
4  worked out of Gumi on feature phones -- domestic-bound
5  feature phones.
6           And on October 16th, 2008, out of our Suwon
7  facility, I then embarked upon my present work associated
8  with the display lab.  And, of course, back then, it was
9  not the display lab, per se, it was visual lab or
10 something like that.  And it was then and only then that I
11 began my work concerning touchscreen and displays.
12     Q.   Sir, when you joined the group in October of
13 2008, did you learn of any effort that had been ongoing in
14 that group prior to your joining it to develop a mutual
15 capacitive touchscreen?
16     MS. PENNYPACKER:  Objection, vague.
17     A.   Well, on that occasion, when I first got sent
18 over to the Suwon group, you asked in terms of
19 touchscreen, basically that kind of work was not being
20 performed by the visual lab, itself; rather, that kind of
21 work was being borne out of the specific model teams, the
22 teams responsible for the development of the products.
23 And that being the case, I was not in any position to
24 ascertain as to the overall status of things concerning
25 touch.

Page 21

1  BY MR. KRAMER:
2      Q.   Who do you report to?
3      A.   Let's see.  In terms of our organization, there
4  is a gentleman who is a senior vice president named
5  Mr. Yongman Lee.
6      LEAD INTERPRETER:  Y-o-n-g-m-a-n Lee.
7  BY MR. KRAMER:
8      Q.   And what is his title?
9      A.   He's a senior vice president.
10     Q.   Is he in charge of display devices at Samsung
11 in connection with --
12     MS. PENNYPACKER:  Objection --
13     A.   Yes --
14     LEAD INTERPRETER: One at a time.
15     MS. PENNYPACKER:  -- foundation.
16     A.   As for said gentleman, he came to his present
17 post effective December of 2011.
18 BY MR. KRAMER:
19     Q.   And who was your supervisor prior to
20 December of 2011?
21     A.   That was then senior vice president Taemoon
22 Noh.
23     LEAD INTERPRETER:  T-a-e-m-o-o-n, last name
24 N-o-h.  General spelling by the interpreter.
25     ///

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 26

1  your group specifically look at Apple iPhones or Apple
2  iPad products?
3            MS. PENNYPACKER: Objection. Vague,
4  foundation.
5       A.   Well, we did -- all right. Well, as I said, we
6  did perform some analysis in that -- some analysis in that
7  regard, but it turns out that theirs was in a direction
8  different from the manner in which we wanted to go. And
9  so ultimately we just took it as a reference. That's all.
10 Just strictly for reference purposes.
11 BY MR. KRAMER:
12      Q.   In the process you described earlier of
13 developing a better touchscreen for use in Samsung
14 telephones and tablets, which Apple products did you
15 specifically look at?
16      A.   Right now, I cannot recall. And, again, I'm
17 repeating myself when I say regardless of what the product
18 is, whenever a new product is put out into the market, be
19 it from Apple or whatever other company out there, we
20 basically do a comparative analysis.
21      Q.   In the process you described earlier of
22 developing a better touchscreen for use in Samsung
23 telephones and tablets, did your group look at an Apple
24 iPhone?
25            MS. PENNYPACKER: Vague, foundation.

Page 27

1       A.   We did.
2  BY MR. KRAMER:
3       Q.   Let's show you what's been marked as
4  Exhibit 1690.
5            (Deposition Exhibit 1690 was marked.)
6       Q.   It's a document entitled Galaxy S 4G User
7  Manual, Bates numbers are S-ITC-00001367 [sic] through
8  -13920.
9            Now, this document appears to be a user manual.
10 Have you seen this user manual before?
11      A.   No, I have not.
12      Q.   To your knowledge, does Samsung prepare user
13 manuals for its products?
14      A.   Yes, the company does.
15      Q.   Have all of the touchscreens that you have
16 worked on at Samsung since December -- excuse me, since
17 October of 2008 include mutual capacitive touchscreens?
18            MS. PENNYPACKER: Vague, compound.
19      A.   As I mentioned earlier, it depends on the
20 model. Some yes, some no.
21            CHECK INTERPRETER: Interjection. "As I
22 mentioned earlier, some products were applied and some
23 products were not."
24 BY MR. KRAMER:
25      Q.   Which products of Samsung that you have worked

Page 28

1  on since October of 2008 do not have mutual capacitive
2  touchscreens?
3       A.   I do not recall as to models.
4       Q.   Could you give us the internal Samsung
5  designation for those products?
6       A.   Not even in terms of the internal code names,
7  because it's not really about the models. See, I'm in
8  overall charge of things. In any given year, I'm, what,
9  dealing with 500, 600 phones, so I'm not able to recall
10 all those details.
11      Q.   What is the touch-sensitive technology used in
12 those products that are not mutual capacitive
13 touchscreens?
14            MS. PENNYPACKER: Objection. Vague, assumes
15 facts.
16      A.   Well, there can be two methods. There are some
17 that are done just with one layer, and there are others
18 that employ two layers. And, of course, it all depends on
19 the model.
20 BY MR. KRAMER:
21      Q.   Are all of the touchscreens you've worked on
22 since October of 2008 for Samsung capacitive touchscreens?
23            MS. PENNYPACKER: Objection, vague.
24      A.   Those that I worked on, you say? Yes. That's
25 right.

Page 29

1  BY MR. KRAMER:
2       Q.   And by you working on them, do you mean those
3  that you're aware of that your group was working on while
4  you were in charge of that group?
5       A.   Yes, that is right.
6       Q.   Can you look at the page which has the number
7  at the end -13710.
8       A.   -13710. All right.
9       Q.   If you look on this page, there's a description
10 on the right-hand upper portion of this page of two
11 different gestures, the pinch and spread gesture. Do you
12 see that?
13      A.   Pinch? Well, I'm not sure which is pinch and
14 which is spread. Can you tell me which is which?
15      Q.   Well, the top one reads: Pinch. Pinch the
16 screen using your thumb and forefinger to zoom out when
17 viewing a picture or web page.
18            Do you see that?
19      A.   Yes.
20      Q.   Are these two gestures, the pinch and spread
21 gesture, gestures that employ the multi-touch protocol in
22 Samsung's products?
23            MS. PENNYPACKER: Objection. Vague,
24 foundation. And also let the record reflect that this
25 document is in English. And I'm not certain the

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 30

1  witness can read everything that the document says
2  himself.
3       A.   Well, I don't exactly know about this.  And the
4  reason for that is because I am in overall charge of
5  things from a supervisory perspective.  I conduct
6  management, essentially.  I don't really get down into the
7  trenches and do actual hands-on work.
8            And when I look at this, I think this is
9  perhaps something with a software orientation.  And I
10 further do not believe, as such, that this really would
11 have been something that would have been undertaken by our
12 display lab.
13 BY MR. KRAMER:
14      Q.   Isn't it true, sir, that one of the reasons
15 your group decided to go with the mutual capacitance
16 touchscreen is so that you could perform multi-touch
17 gestures with the Samsung phones and tablets?
18           MS. PENNYPACKER:  Vague, foundation,
19 compound.
20      A.   That, I don't know about.
21 BY MR. KRAMER:
22      Q.   Could you explain for us why your group decided
23 to go with a mutual capacitive touchscreen for those
24 screens that actually use mutual capacitance touchscreens?
25           MS. PENNYPACKER:  Asked and answered.

Page 31

1       A.   Well, as I mentioned earlier, it was not I who,
2  for the first time, implemented a mutual capacitance
3  scheme.  You can't look at things as being that way,
4  because as I mentioned earlier, even before I got there,
5  there being many, many development teams within the
6  company, some were -- some of those or one of those teams
7  was working on the development of those things and
8  implemented those things.  So it was not I who did that.
9            CHECK INTERPRETER:  Interjection.  "Well, as
10 I mentioned it earlier, it was not I who first
11 implemented mutual capacitance.
12           "So as I mentioned it earlier, even before I
13 got there, there were already many development teams
14 out there.  And they may have developed and implement
15 such things.  So I cannot say that I was the first one
16 who came up with it and then implemented it."
17           LEAD INTERPRETER:  I respectfully disagree.
18 Not "may have," but the notion was as stated before.
19 They did.  Somebody did.
20 BY MR. KRAMER:
21      Q.   Sir, when you joined in October of 2008 the
22 visual lab group, was it your understanding that the
23 decision had already been made to use a mutual capacitive
24 touchscreen for telephones at Samsung?
25      A.   Yes, indeed.  Not that I was involved in said

Page 32

1  decision-making process, but it had already been so
2  decided to implement things in such a way as to take
3  things that way and implement it that way.  That's how
4  things were already being underway.
5       Q.   Was it your understanding that one of the
6  reasons for choosing to go with a mutual capacitive
7  touchscreen at that time was that mutual capacitive
8  touchscreens would permit multi-touch capability?
9            MS. PENNYPACKER:  Foundation, asked and
10 answered.
11      A.   Well, as for the decision, itself, not having
12 participated in the process that begat that, I'm not in
13 any position to know as to why.
14 BY MR. KRAMER:
15      Q.   At some point did you learn that one of the
16 features that was going to be supported by the mutual
17 capacitive touchscreens your group was developing was
18 multi-touch capability?
19           MS. PENNYPACKER:  Objection, vague.
20      A.   The question was a little -- I'm sorry.  Could
21 you -- I didn't quite understand it.  Could you repeat
22 that, please?
23 BY MR. KRAMER:
24      Q.   Yes.
25           At some point did you learn that one of the

Page 33

1  features that was going to be supported by the mutual
2  capacitive touchscreens your group was developing was
3  multi-touch capability?
4            MS. PENNYPACKER:  Same objection.  Vague.
5       A.   Well, hmmm, I guess I knew about something like
6  that.  But really, this ability to perform multi-touch was
7  not quite the main thing there.  I mean, I don't believe
8  that I ever recognized that as being, you know, the most
9  critical thing there.
10 BY MR. KRAMER:
11      Q.   Could you tell us, then, the critical things
12 that Samsung determined to be the reasons for developing
13 multi-touch capacitive touchscreens for its telephones?
14           MS. PENNYPACKER:  Foundation, asked and
15 answered.
16      A.   Again, I would not know as to the precise aims
17 and objectives on the part of the company.  But just
18 personally thinking, I wonder if that might not have had
19 something to do with perhaps the fact that the use of
20 multi-touch, or actually a mutual capacitance-type
21 touchscreen, allows you to perform a more -- slightly more
22 refined touch.  I wonder if it's not something like that.
23 BY MR. KRAMER:
24      Q.   Why is it that mutual capacitance permits you
25 to perform a slightly more refined touch function?

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 34

1  A.   No.  You're asking something a little
2  technical.  And nowadays, I'm performing more a managerial
3  function, and so I'm not really too keen on those sorts of
4  technical aspects.
5  Q.   Well, you would agree that at least one
6  technical aspect that is permitted by mutual capacitive
7  touchscreens is true multi-touch functionality, correct?
8  MS. PENNYPACKER:  Objection.  Vague,
9  foundation.
10  A.   I think so.
11  BY MR. KRAMER:
12  Q.   Do the Samsung Galaxy Tab and Galaxy Tab 8.9 --
13  strike that.  Let me start again.
14  You referred earlier to three different Galaxy
15  tablets you're aware of:  7.0, 8.9, and 10.1.  Do you
16  recall it?
17  A.   Yes.
18  Q.   Is there an integrated circuit that is
19  specifically used to process the information that is
20  output from the touchscreen that your group has developed
21  at Samsung for each of those tablets?
22  MS. PENNYPACKER:  Vague, foundation.
23  A.   What are you -- where are you asking if there
24  is such an IC resident on those?
25  ///

Page 35

1  BY MR. KRAMER:
2  Q.   I'm asking whether there are particular
3  controller devices that are integrated circuits that are
4  used in connection with the processing of the display
5  screen output that then transmit that information to a
6  host processor that may be resident in the tablet or the
7  computer.
8  A.   Yes, there is -- there are.
9  MS. PENNYPACKER:  I didn't get a chance to
10  say vague, foundation.
11  BY MR. KRAMER:
12  Q.   Generally, can you describe for us the function
13  of those -- strike that.
14  I've seen in the documentation sometimes
15  they're called TS IC, sometimes TS controller.  How do you
16  refer to those integrated circuits that we just talked
17  about in the last answer?
18  A.   I call them TSP IC.
19  Q.   And isn't it true that most of the TSP ICs that
20  have been used for the Samsung Galaxy Tab devices come
21  from Atmel?
22  A.   Up to now, that is the case, yes.
23  Q.   Okay.  So just up to now, can you think of any
24  other supplier who has supplied TSP ICs for the Samsung
25  tablets other than Atmel?

Page 36

1  A.   And are we talking about the Galaxy Tab?
2  Q.   Yes.
3  A.   Well, if it's the Galaxy Tab, thus far, it's
4  been only the Atmel-supplied parts.
5  Q.   And those Atmel devices have a designation mXT
6  followed by some numbers.  Do you recall that?
7  A.   That's correct.
8  Q.   And those numbers -- do you recall the specific
9  numbers of the Atmel chips?
10  A.   Not as to all.  Some of it, yeah, I can.
11  Q.   Do you recall the mXT154?
12  A.   I don't think there is anything like that.
13  Maybe I'm recollecting incorrectly.
14  Q.   How about the mXT1386, is that one of the Atmel
15  TSP ICs that are used in the Galaxy Tabs?
16  MS. PENNYPACKER:  Foundation.
17  A.   Well, mind you, this is not just one single IC
18  chip.  There's an array of them.  And I would suppose that
19  you are referencing that?
20  BY MR. KRAMER:
21  Q.   Yes, I am.
22  So is the answer yes, that's one of the chips
23  that is used?
24  A.   I do not recall as to the exact number, though.
25  Q.   Which version of Android runs on the Galaxy Tab

Page 37

1  devices?
2  MS. PENNYPACKER:  Foundation.
3  A.   Well, that depends on the version.  So right
4  now, I, you know, don't exactly know.  Basically it all
5  depends on the latest version as is resident there.  And,
6  of course, that all depends on the model.  Meaning it
7  depends on the hardware configuration, too, but, you know,
8  for some, they go all the way to the latest Ice Cream
9  version, but . . .
10  BY MR. KRAMER:
11  Q.   Does Samsung make changes to the publicly
12  distributed Android source code before loading it onto
13  Samsung Galaxy Tab devices?
14  MS. PENNYPACKER:  Foundation.
15  A.   Now, that, I don't quite know about because
16  it's not part of my work.
17  MR. KRAMER:  Okay.  Let's take a break right
18  now.  We've been going for an hour and 20 minutes or
19  so.
20  THE VIDEOGRAPHER:  Going off the record.
21  The time now is 11:21.
22  (Recess taken.)
23  THE VIDEOGRAPHER:  We are now back on the
24  record.  The time now is 11:41.  This is the beginning
25  of Tape No. 2.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 74

1  material via which the folks within the R&D center sought
2  to introduce me as to the goings-on on their part
3  concerning their efforts to do an enhancement as to the
4  overall optical performance.
5  BY MR. KRAMER:
6      Q.    Was their work used in any way in connection
7  with the development by your team at Samsung?
8            MS. PENNYPACKER:  Vague, foundation.
9      A.    Yes.  When you look at this, this entails a
10  series of activities seeking to improve certain
11  characteristics.  And my recollection is that we did,
12  indeed, make use of some of those things.
13           MR. KRAMER:  Let's mark next in order
14  Bates stamped S-ITC-008026863 through -869 -- excuse
15  me, -870.
16           (Deposition Exhibit 1698 was marked.)
17           MS. PENNYPACKER:  Do you have copies?
18           MR. KRAMER:  Oh.  I do.  Thank you.
19           (Pause.)
20  BY MR. KRAMER:
21      Q.    Do you recognize this e-mail?
22      A.    Not that I recall.
23      Q.    Is it an e-mail that you believe you received
24  on or about July 22, 2010?
25      A.    I would believe that to be -- to have been the

Page 75

1  case.
2      Q.    Based on your experience at Samsung, what do
3  you understand the purpose of this e-mail?
4            MS. PENNYPACKER:  Foundation.
5      A.    This is as I previously entailed, in that I
6  think this is probably one of those activities involved in
7  our ascertaining the pros and cons associated with various
8  products and in terms of those competitors' products that
9  are out there in the open market which we go and procure.
10  BY MR. KRAMER:
11      Q.    And which products were being compared in this
12  report?
13           MS. PENNYPACKER:  Foundation.
14      A.    Not that I'm the one who compiled this, but
15  looking at the material, itself, it would appear to be a
16  comparison between our company's Galaxy S, and the iPhone
17  4.
18           MR. KRAMER:  That's all the questions I have
19  today for the witness.
20           MS. PENNYPACKER:  Okay.  I have no
21  questions.
22           MR. KRAMER:  So how do you want to handle
23  the claw back issue?  You'll send a letter?
24           MS. PENNYPACKER:  Yeah.  We can send you a
25  letter, if you require it, to have the document

Page 76

1  returned.
2            MR. KRAMER:  Something in writing would be
3  good.
4            MS. PENNYPACKER:  That's fine.
5            MR. KRAMER:  Okay.
6            THE VIDEOGRAPHER:  Going off the record at
7  13:27.  This brings to close the deposition of
8  Mr. DongSub Kim.
9            (Time noted:  1:27 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 77

1  (Counsel representing this witness should arrange for
   reading and signing and thereafter distribute copies
2  of the signed Errata sheet to opposing counsel without
   involvement of the court reporter.)
3
   STYLE OF CASE:     Apple, Inc. v. Samsung Electronics
4                     Company, Ltd., et al.
5  DEPOSITION OF:     DONGSUB KIM
6  DATE TAKEN:     February 28, 2012
7                  E R R A T A   S H E E T
8  Page   Line  Change              Reason
9  ___    ___  _____
10  ___    ___  _____
11  ___    ___  _____
12  ___    ___  _____
13  ___    ___  _____
14  ___    ___  _____
15  ___    ___  _____
16  ___    ___  _____
17  ___    ___  _____
18  ___    ___  _____
19  ___    ___  _____
20  ___    ___  _____
21  ___    ___  _____
22
23  I hereby certify that I have read my deposition and that
    it is true and correct subject to any changes in form or
    substance entered here.
24  _____              _____
    Date                     DONGSUB KIM
25

# ERRATA SHEET

., NAME OF CASE:      Apple v. Samsung, No. 11-cv-1846-LHK (ND Cal)

DATE OF DEPOSITION:            February 28, 2012

NAME OF WITNESS:                  Dongsub Kim

Reason Codes:

    1.     To clarify the record.
    2.     To conform to the facts.
    3.     To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 10 | 10 | almost | amongst | 3 |
| 24 | 7 | went wanting | want | 1 |
| 48 | 10 | OCO | OCA | 1 |
| 53 | 7 | decent | good | 2 |
| 12 | 22 | learn | check | 3 |
| 18 | 20 | Yay or nay | Yes or no | 1 |
| 25 | 5 | OCL | OCA | 1 |
| 48 | 10 | OCO | OCA | 1 |
| 62 | 11 | learn | check | 3 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Signed: _Dongsub Kim_
      Dongsub Kim

Date: 2012. 5. 23

02198.51855/4769790.1

# Watson Declaration

# EXHIBIT 19

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - PURSUANT TO PROTECTIVE ORDER

1

1          UNITED STATES INTERNATIONAL TRADE COMMISSION
                        WASHINGTON, D.C.
2

3   _____

     In the Matter of:
4    CERTAIN ELECTRONIC DIGITAL            Case No.:
     MEDIA DEVICES AND COMPONENTS          337-TA-796
5    THEREOF

6   _____

7

8

9

10          *** CONFIDENTIAL BUSINESS INFORMATION ***

11            *** PURSUANT TO PROTECTIVE ORDER ***

12

13          VIDEOTAPED PERSONAL DEPOSITION OF:

14              HANGIL SONG - VOLUME 1

15

16

17

18

19

20

21

22                  February 8, 2012

23                    Kim & Chang

24                Seoul, South Korea

25                2:34 P.M. - 5:13 P.M.

CONFIDENTIAL BUSINESS INFORMATION - PURSUANT TO PROTECTIVE ORDER

2..5

Page 2

```
1   APPEARANCES:

2
    For the Plaintiff/Counterclaim-Defendant, Apple, Inc.
3
              MORRISON & FOERSTER, LLP
4             BY: Peter J. Stern, Esq.
                  Stephanie Kim, Esq.
5             425 Market Street
              San Francisco, California 94105-2482
6             (415) 268-7000

7
    For the Defendants/Counterclaim-Plaintiffs, the Samsung
8   entities:

9             QUINN EMANUEL URQUHART & SULLIVAN, LLP
10            BY: Margret Caruso, Esq.
              555 Twin Dolphin Drive
11            Suite 560
              Redwood Shores, California 94065
12            (650) 801-5000

13

14  Also present:

15            HanKil Kang, Samsung
              Jeesoo Jung, Lead Interpreter
16            Phyllis Kim, Check Interpreter
              Peter Au, Videographer
17            Michael E. Miller, Court Reporter

18

19

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
    WITNESS:                              PAGE
2   HANGIL SONG

3   EXAMINATION BY MR. STERN                  5

4

5

6                 E X H I B I T S

7   NUMBER      DESCRIPTION                 PAGE

8   Exhibit 1   Product Sketches/Photos       34
                (SAMNDCA00222529 - SAMNDCA00222584)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1                   PROCEEDINGS
2           (February 8, 2012 at 2:34 p.m.)
3        THE VIDEOGRAPHER:  We are now on the record In
4   the Matter of Certain Electronic Digital Media Devices and
5   Components before the United States International Trade
6   Commission, Washington, D.C., Case No. 337-TA-796.
7   Today's date is 8th of February, 2012.  The time now is
8   1434.
9           This is the video recorded individual
10  deposition of Mr. HanGil Song.  The deposition is taking
11  place at Kim & Chang, Daewoo Building, Jongno-gu, Seoul,
12  South Korea.  I am Peter Au, a certified deposition video
13  specialist with American Realtime Court Reporters Asia.
14  The court reporter is Mr. Mike Miller, also with American
15  Realtime Court Reporters Asia.
16           Will attorneys please identify themselves and
17  the parties they represent.
18        MR. STERN:  Peter Stern with Morrison &
19  Foerster for Apple, and with me is Stephanie Kim.
20        MS. CARUSO:  Margret Caruso, Quinn Emanuel
21  Urquhart & Sullivan, representing Samsung, and with me is
22  HanKil Kang of Samsung.
23        MR. STERN:  I have a statement I've been asked
24  to read by the court reporter.
25           We understand the court reporter is not
```

Page 5

```
1   authorized to administer oaths in this venue.
2   Nevertheless, we request he administer the oath, and we
3   stipulate that we waive any objection to the validity of
4   the deposition based on the oaths.
5        THE REPORTER:  Counsel, agreed?
6        MS. CARUSO:  Yes.
7           (Interpreters sworn.)
8                    HANGIL SONG,
9        having been duly sworn, testified as follows:
10                   EXAMINATION
11  BY MR. STERN:
12      Q.    Could you please state your name for the
13  record?
14      A.    HanGil Song.
15      Q.    And by whom are you employed, Mr. Song?
16      A.    I'm working at Samsung Electronics.
17      Q.    What is your current title at Samsung
18  Electronics?
19      A.    Senior designer.
20      Q.    As a senior designer at Samsung, are you a
21  member of the Design Group?
22        MS. CARUSO:  Objection, vague.
23      A.    Yes.
24  BY MR. STERN:
25      Q.    Is there a subgroup or unit within the larger
```

Page 10

1  answer your question.
2  BY MR. STERN:
3       Q.   With respect to cell phone products, what -- as
4  a member of the ID Cluster, what products did you work on
5  that were subsequently released by Samsung?
6       A.   No, there's none.
7       Q.   As a member of the ID Cluster, did you work on
8  any Samsung cell phone products that were subsequently
9  terminated and determined not to be released by Samsung?
10      MS. CARUSO:  Objection, compound, vague, lacks
11 foundation, calls for speculation.
12      A.   There is no product that I can tell with
13 confidence as to that because, even though they are
14 temporarily us --
15      LEAD INTERPRETER:  Strike that.
16      A.   -- even though they are suspended for now, they
17 could be turned into products later.
18 BY MR. STERN:
19      Q.   Help me understanding something.  On a
20 day-to-day basis, working as a designer in the
21 Product Design Part 1 group versus working as a designer
22 in the ID Cluster, what's the difference in the everyday
23 work that you do?
24      MS. CARUSO:  Objection, vague, lacks
25 foundation.

Page 11

1       A.   There is no significant difference when it
2  comes to actual work that I'm handling.
3  BY MR. STERN:
4       Q.   So the only real difference is that -- well, as
5  a designer in the Product Design Group, you're working on
6  products that have not yet been released, correct?
7       MS. CARUSO:  Objection, vague, vague as to
8  time.
9       A.   When it comes to the unreleased products,
10 whether or not these products would be released wouldn't
11 be known until they are released.
12 BY MR. STERN:
13      Q.   Okay.  That's exactly my point.
14      As a product -- as a designer in the Product
15 Design Group, you don't know whether the product is going
16 to be released, so how is your work, your current work as
17 a senior designer in the Product Design Group, different
18 from what you were doing in the ID Cluster, if it is
19 different?
20      MS. CARUSO:  Objection, vague, compound, lacks
21 foundation.
22      A.   As I mentioned earlier, my real
23 responsibilities are not that different from my previous
24 one.  But if you ask me to find any difference, then there
25 are some discussions taking place with regard to the ideas

Page 12

1  of UX and CMF.
2  BY MR. STERN:
3       Q.   The ID Cluster has responsibility for UX and
4  CMF, whereas the Product Design Group 1 does not; is that
5  correct?
6       MS. CARUSO:  Objection, vague, assumes facts
7  not in evidence, compound.
8       A.   Currently, I'm a member of the Design Group 1,
9  but I began to work here from February this year, so I
10 cannot tell you exactly what kind of responsibilities I
11 would take in this group.
12      But with regard to the responsibility that I
13 had when I was a member of the ID Cluster, last year, as I
14 mentioned earlier, I was responsible for the product
15 design, plus there were occasions for exchanging ideas and
16 having discussions regarding CMF and UX.
17      CHECK INTERPRETER:  "Currently, I belong to
18 Design -- Product Design Group 1 as of the beginning of
19 February this year, so it's hard to tell what's going to
20 take place in the future, so I won't be able to tell you
21 exactly what's going to happen within our group.
22      "However, as to what went on in the ID Cluster
23 last year, as I said earlier, there were some discussions
24 as to the CMF and UX ideas on top of product design."
25 BY MR. STERN:

Page 13

1       Q.   What position did you hold at Samsung
2  Electronics before you became a member of the ID Cluster?
3       A.   If you ask me as to the positions, are you
4  referring to an associate, a senior designer and a
5  designer?
6       Q.   Yes, I'm asking for the title, and I'm also
7  asking for the specific organizational affiliation of the
8  title.
9       A.   Your question is a compound question because
10 when I have a certain title, I belonged to two different
11 groups.  And when I had two different titles, I happened
12 to be a member of two different groups or units.  So are
13 you asking me as --
14      LEAD INTERPRETER:  Strike that.
15      A.   -- are you asking me to tell you all the
16 occasions?
17      CHECK INTERPRETER:  "You're asking -- your
18 question is compound because when I had the same title, I
19 sometimes belonged to the same group, but sometimes I had
20 the same title, but I would belong to different group.
21 Sometimes I had different title with -- but I belonged to
22 same group, and sometimes I had a different title and I
23 belonged to a different group, so..."
24 BY MR. STERN:
25      Q.   Okay.  Before you joined the ID Cluster, what

CONFIDENTIAL BUSINESS INFORMATION - PURSUANT TO PROTECTIVE ORDER

Page 14

1  was your title and what group did you belong to?
2          MS. CARUSO:  Objection, compound.
3      A.    Before the ID Cluster, I was a member of the
4  FDL, and my title was senior engineer.
5          (A discussion was had off the record between
6  Lead Interpreter and Check Interpreter in Korean.)
7          LEAD INTERPRETER:  Strike that.  Strike that.
8      A.    Before the ID Cluster --
9          LEAD INTERPRETER:  Correction.
10     A.    Before the ID Cluster, I was a member of the
11 FDL, and my title was senior designer.
12 BY MR. STERN:
13     Q.    From when to when were you a member of the FDL?
14     A.    From February 2010 to January 2011.
15     Q.    What is the FDL -- or strike that.
16          What was the FDL when you were a member of the
17 FDL?
18     A.    FDL stands for the Future Design Lab, and this
19 lab is responsible for designing future products by
20 bringing together experts who have a specialty on the UX,
21 product design, CMF and design strategy.
22     Q.    Am I correct in thinking that in early 2011,
23 the FDL was folded into the ID Cluster or became the
24 ID Cluster?
25          MS. CARUSO:  Objection, vague, assumes facts

Page 15

1  not in evidence.
2      A.    You can say that.
3  BY MR. STERN:
4      Q.    Did your work as a senior design in the Future
5  Design Lab from February 2010 to February 2011 differ in
6  any significant way from your work as a designer
7  subsequently in the ID Cluster?
8          MS. CARUSO:  Objection, vague.
9      A.    There was --
10          LEAD INTERPRETER:  Strike that.
11     A.    There were some differences, but it was in the
12 same line of work.
13          LEAD INTERPRETER:  Correction.
14     A.    There were some differences, but it was the
15 same line of work.
16 BY MR. STERN:
17     Q.    Do you know whether the work of the ID Cluster
18 today is any different from the work of the ID Cluster
19 during the period when you were a member of the
20 ID Cluster?
21          MS. CARUSO:  Objection, vague.
22     A.    Would you repeat your question?
23          CHECK INTERPRETER:  "You mentioned 'ID Cluster'
24 twice, so can you repeat your question?"
25          MR. STERN:  Yes.

Page 16

1  BY MR. STERN:
2      Q.    I'm asking if there's a difference in the work
3  of the ID Cluster now after January 31st, 2012, as opposed
4  to when you worked in the ID Cluster from February 2011
5  through January 31st, 2012.
6          MS. CARUSO:  Objection, lacks foundation,
7  vague.
8      A.    The current ID Cluster has been in existence
9  only for a short period of time, so it's difficult for me
10 to tell you whether their responsibility is the same or
11 not.
12 BY MR. STERN:
13     Q.    So you don't know, in other words?
14     A.    Correct.
15     Q.    As a member of the FDL, did you work on cell
16 phone products?
17     A.    I didn't work only on cell phones.
18     Q.    Okay.  But did you work on cell phones?
19     A.    Yes.
20     Q.    Did you work on tablets?
21     A.    Correct.
22     Q.    Did you work on product packaging in any way?
23     A.    No.
24     Q.    With respect to cell phones, can you tell me
25 the names of the cell phones that you worked on that

Page 17

1  either have been released or that Samsung has decided not
2  to release?
3          MS. CARUSO:  Objection, vague.
4  BY MR. STERN:
5      Q.    And, I'm sorry, I'm talking about -- I can't
6  remember if I said this, but what I meant to ask about was
7  the cell phones that he worked on as a member of the FDL.
8      A.    The products that I worked on in terms of
9  design have not been released yet, but the subsequent --
10          LEAD INTERPRETER:  Strike that.
11     A.    -- but the subsequent designs have been
12 determined to be released for now, so I don't think I can
13 answer your question.
14 BY MR. STERN:
15     Q.    I'm sorry, I didn't understand the last part of
16 that.  "Subsequent designs have been determined to be
17 released for now," what does that mean?
18     A.    Even though the names have changed, the main
19 concept of those designs were kept, so that's why it's
20 difficult for me to answer your question.
21          CHECK INTERPRETER:  "Even though the names have
22 changed, the main concept of those designs were kept, and
23 they were decided to be released.  That's why it's
24 difficult for me to answer your question."
25 BY MR. STERN:

CONFIDENTIAL BUSINESS INFORMATION - PURSUANT TO PROTECTIVE ORDER

18..21

Page 18

1    Q.    You're not able to give me the name of any
2  phone that was subsequently released based on a concept
3  that you designed as a member of FDL?
4        MS. CARUSO:  Objection, vague.  Just to
5  clarify, Mr. Stern, you're asking him if any of the phones
6  he worked on at the FDL, those concepts resulted in phones
7  that have, as of today, been released?
8        MR. STERN:  Yes.
9        MS. CARUSO:  Okay.
10        (A discussion was had off the record between
11  Lead Interpreter and Check Interpreter in Korean.)
12    A.    There are no products which have been released,
13  but there are products which would be released.
14  BY MR. STERN:
15    Q.    You mean will be released in the future?
16    A.    Yes.
17    Q.    What was your post at Samsung immediately prior
18  to the time when you became a member of the FDL in
19  February 2010?
20        MS. CARUSO:  Objection, vague.
21    A.    I was a designer.
22  BY MR. STERN:
23    Q.    And what group were you a member of?
24    A.    It was the Product Design Group 1.
25    Q.    Before I ask another question about the

Page 19

1  Product Design Group 1, back to your work with FDL for a
2  moment.
3        Can you tell me the names of any tabs that you
4  worked on that were subsequently released or that were
5  terminated by Samsung?
6        MS. CARUSO:  Objection, compound and vague.  If
7  there are tablets that you're aware Samsung has decided
8  permanently never to release, you can identify those, and
9  you can identify any tabs that you worked on that were
10  subsequently released.
11    A.    There is no product which was determined not to
12  be released permanently.  There are only products which
13  will be released in the future.
14  BY MR. STERN:
15    Q.    Back to your work at the -- in the Product
16  Design Group 1 prior to February 2010.  How long did you
17  hold that particular position at Samsung?
18    A.    For four years.
19    Q.    Was that the first position you held when you
20  join Samsung?
21        MS. CARUSO:  Objection, vague.
22    A.    No.
23  BY MR. STERN:
24    Q.    What was the nature of the work that you did
25  during the four years when you were a member of the

Page 20

1  Product Design Group 1 from 2006 to 2010?
2        MS. CARUSO:  Objection, vague.
3    A.    During the period of four years, I didn't
4  belong to the Product Design Group 1 only, and at the
5  time, my responsibility was related to the product design.
6    Q.    What groups were you a member of during those
7  four years?
8    A.    I was a member of the ID Cluster.
9    Q.    During all or a portion of those four years,
10  was the ID Cluster part of Product Design Group 1?
11        (A discussion was had off the record between
12  Lead Interpreter and Check Interpreter in Korean.)
13    A.    To my recollection, no, it was a separate
14  organization.  I think --
15        LEAD INTERPRETER:  Strike that.
16    A.    In order to avoid any misunderstanding, the
17  then ID Cluster was referred to as the Industrial Design
18  Cluster.
19  BY MR. STERN:
20    Q.    And what was the relationship in that period of
21  time, those four years, between the Industrial Design
22  Cluster and the Product Design --
23        (Clarification requested by the reporter.)
24        MR. STERN:  Sure.  Sure.  I'm really just
25  trying to move through this as expeditiously as I can.

Page 21

1  BY MR. STERN:
2    Q.    During the 2006 to 2010 time period when I
3  thought you indicated you were a member of the Product
4  Design Group 1, what was the relationship between the
5  Industrial Design Cluster and Product Design Group 1?
6        MS. CARUSO:  Objection, misstates the prior
7  testimony, vague.
8    A.    Would you repeat your question, please?
9  BY MR. STERN:
10    Q.    Sure.
11        Do I understand correctly that prior to
12  February 2010, when you joined the Future Design Lab, you
13  were a member of Product Design Group 1?
14        MS. CARUSO:  Objection, vague.
15    A.    Correct.
16  BY MR. STERN:
17    Q.    And at what point did you become a member of
18  Product Design Group 1, leading up to that time in 2010
19  when you ceased to be in the group?
20    A.    I'm thinking that I began to work there from
21  around February 2009, but I don't have a precise
22  recollection as to that.
23    Q.    Okay.  And what position -- were you a designer
24  before February 2009?
25        MS. CARUSO:  Objection, vague.

CONFIDENTIAL BUSINESS INFORMATION - PURSUANT TO PROTECTIVE ORDER

Page 22

1    A.    Are you asking me whether I have been a
2  designer up until 2009?
3  BY MR. STERN:
4    Q.    Yes.
5         CHECK INTERPRETER:  "Are you asking me if I was
6  always a designer until 2009?"
7         MR. STERN:  Let me ask it this way.
8  BY MR. STERN:
9    Q.    Prior to February 2009, what was your title and
10  what group did you belong to?
11         MS. CARUSO:  Objection, compound, vague.
12    A.    Prior to 2009, I belonged to the ID Cluster, in
13  other words, Industrial Design Cluster, and my job title
14  was designer.
15  BY MR. STERN:
16    Q.    And you joined the Industrial Design Cluster in
17  2006?
18    A.    No.
19    Q.    When did you join the ID Cluster?
20    A.    I began to work there from around
21  February 2008.
22    Q.    And before 2008, what was your title at Samsung
23  and what group did you belong to?
24    A.    I was a member of the Product Design Group 1
25  before 2008.

Page 23

1    Q.    And when did that work at the Product Design
2  Group 1 start?
3    A.    I began from 2005.
4    Q.    Okay.  Between 2005 and 2010 in the various
5  groups that you were a member of, can you tell me what
6  released or terminated Samsung cell phones and tablets you
7  worked on?
8         MS. CARUSO:  Objection, vague.
9         You can answer as to products that were
10  released or products that, to your knowledge, Samsung made
11  a final determination never to release.
12    A.    There are too many.  Am I supposed to list all
13  the names?
14  BY MR. STERN:
15    Q.    Please tell me everything you can remember.
16         MS. CARUSO:  Objection, calls for a narrative.
17    A.    Chairman; Adonis; Supra-E; Massto, M-A-S-S-T-O,
18  Eclair, E-L-C-A-I-R [sic]; Keystone; Cobblestone; Cobble;
19  Leopard.
20  BY MR. STERN:
21    Q.    Was the Leopard phone subsequently released as
22  the Prevail?
23    A.    Correct.
24    Q.    And did you work on any tablets that were
25  released or that were terminated in this period, 2005 to

Page 24

1  2010?
2         MS. CARUSO:  Objection, vague.
3    A.    No.
4  BY MR. STERN:
5    Q.    Okay.  I want to focus on your work between
6  2010 to the end of January 31st, 2012, in the FDL and the
7  ID Cluster.  In that time period, how did you as a member
8  of the FDL or the ID Cluster work together with designers
9  in the Product Design Group Part 1 or 2, if you did?
10         MS. CARUSO:  Objection, compound, vague.
11    A.    I didn't work with them.
12  BY MR. STERN:
13    Q.    You had no routine involvement with designers
14  in Product Design Group 1 or 2 during that time period?
15         MS. CARUSO:  Objection, vague.
16    A.    In terms of work, I didn't work with them.  But
17  when it comes to personal life, I did have conversations
18  with them and sometimes had coffee with them.
19  BY MR. STERN:
20    Q.    But you were not assigned to work on design
21  teams with individuals from Product Design Group 1 or 2;
22  is that correct?
23         MS. CARUSO:  Objection, vague, vague as to
24  time.
25    A.    In terms of work, I didn't work with them at

Page 25

1  all.
2  BY MR. STERN:
3    Q.    In your work as a designer for the FDL and the
4  ID Cluster, did you have any routine involvement with
5  members of the Design Strategy Group?
6         MS. CARUSO:  Objection, vague.
7    A.    I didn't have a routine involvement with them,
8  but when it comes to a particular project, I used to work
9  with them.
10  BY MR. STERN:
11    Q.    When you worked with them, what was the nature
12  of that work that you did?
13         MS. CARUSO:  Objection, vague, compound.
14    A.    If the Design Strategy team brings a strategy,
15  then based on that guidance, we proceeded with our design
16  work.
17  BY MR. STERN:
18    Q.    What's your understanding of the nature of the
19  work that the Design Strategy Group does?
20         MS. CARUSO:  Objection, vague, vague as to
21  time.
22    A.    The Design Strategy Group has a lot of
23  responsibilities, but as to their work, I don't quite
24  know.
25  BY MR. STERN:

# ERRATA SHEET

NAME OF CASE: _____In the Matter of Certain Electronic Digital Media Devices_

and Components Thereof, No. 337-TA-796_____

DATE OF DEPOSITION: _____February 8-9, 2012_____

NAME OF WITNESS: _____Hangil Song_____

Reason Codes:

  1.   To clarify the record.
  2.   To conform to the facts.
  3.   To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 9 | 8 | There is no product that has been released. | I have not worked on any released products. | 1 |
| 11 | 22 | real | current | 1 |
| 11 | 24 | one. | ones. | 1 |
| 12 | 9 | from February this year | beginning in February of this | 1 |
| 12 | 11 | would take | would have | 1 |
| 30 | 15 | taken. | taken into account. | 1 |
| 31 | 8 | for now. | now. | 1 |
| 39 | 2 | to manufacture. | to manufacture the device. | 1 |
| 39 | 13-14 | that location should be fartherest as far as possible from the user. | the antenna needs to be placed as far as it can from the head of the user. | 1 |
| 41 | 15-17 | This is not referring to a particular phone design. Rather than that, this is referring to the final such size of – with regard to the dimensions of LCD. | This doesn't refer to a particular phone design. Rather, it refers to a diagram of a phone with certain LCD sizes. | 1 |
| 51 | 19 | is significantly related to functional aspects | is determined by functional considerations | 1 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Signed: _____Hangil Song_____          Date: _2012 . 5. 25_
            Hangil Song

# Watson Declaration

# EXHIBIT 20

# Filed Under Seal

```
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2                     SAN JOSE DIVISION

 3          Civil Action No.:  11-CV-01846-LHK


 4
     APPLE, INC., a California corporation,
 5
              Plaintiff,
 6

 7   vs.

 8   SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
 9   SAMSUNG ELECTRONICS AMERICA, INC.,
     a New York corporation; and
10   SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,
11           Defendants.
     _____/
12

13

14

15             *** HIGHLY CONFIDENTIAL ***
                   ATTORNEYS' EYES ONLY
16

17          VIDEOTAPED PERSONAL DEPOSITION OF:

18                 HYOUNG SHIN PARK

19

20

21           Wednesday, February 29, 2012
                   Kim & Chang
22              Seoul, South Korea
               8:15 a.m. to 11:31 a.m.
23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2..5

Page 2

```
1   APPEARANCES:

2

3       ON BEHALF OF PLAINTIFF, APPLE, INC.:

4
        MORRISON FOERSTER, LLP
5       By:  FRANCIS HO, ESQ.
        425 Market Street
6       San Francisco, California 94105-2482
        Phone:  415.268.7339
7

8

9       ON BEHALF OF DEFENDANT, SAMSUNG:

10
        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
11      By:  MARGRET CARUSO, ESQ.
        555 Twin Dolphin Drive
12      Redwood Shores, California 94065
        Phone:  650.801.5005
13

14

15  Also present:

16      JINA OH, LEAD INTERPRETER
        KATHY SIM, CHECK INTERPRETER
17      JEFF MENTON, VIDEOGRAPHER
        TRACEY LOCASTRO, COURT REPORTER
18      DAVID SON, MORRISON FOERSTER

19

20

21

22

23

24

25
```

Page 3

```
1              I N D E X

2                                          Page
    Witness:
3   HYOUNG SHIN PARK
    Examination By Mr. Francis Ho          6
4

5

6

7          E X H I B I T S

8   Exhibit     Description           Page

9   1699        Drawing created by    47
                witness
10  1700        Bates labelled SAMNDCA  52
                10808682 through 758
11  1701        Bates labelled SAMNDCA  57
                00215202 to 205
12  1702        Bates labelled SAMNDCA  61
                10310951 to 978
13  1703        Bates labelled SAMNDCA  61
                10295752 to 778
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1          P R O C E E D I N G S

2               -  -  -

3       VIDEOGRAPHER:  We are now on the video

4   record.  The time is 8:15 a.m.  Today is

5   February the 29th, 2012.

6       This is the videotaped deposition of Hyoung

7   Shin Park, that's H-Y-O-U-N-G S-H-I-N, Park, as

8   an individual.

9       This video deposition has been noticed by

10  the law firm of Morrison and Foerster and being

11  taken by attorney Francis C. Ho, representing

12  the plaintiff in the matter of Apple, Inc.

13  versus Samsung Electronics Company Limited,

14  et al. and Samsung Electronics Company Limited,

15  et al., counterclaim plaintiff, versus Apple,

16  Inc., counterclaim defendants, case number

17  11-CV-01846-LHK in the United States District

18  Court, Northern District of California, San Jose

19  Division.

20      This deposition is being taken at the

21  offices of Kim and Chang in Seoul, Korea.  The

22  court reporter is Tracey LoCastro from American

23  Realtime Court Reporters/Asia.  The videographer

24  is Jeff Menton, certified court video

25  specialist, of American Realtime Court
```

Page 5

```
1   Reporters/Asia.

2       Would counsel please state their appearances

3   for the record and state whom you represent,

4   starting with the noticing attorney.  And then

5   will the court reporter please swear the

6   interpreters in.  And then will the attorneys

7   please make their opening statements.

8       MR. HO:  This is Francis Ho for Apple.  With

9   me is David Son.

10      MS. CARUSO:  Margret Caruso of Quinn,

11  Emanuel, Urquhart and Sullivan for Samsung, et

12  al.

13      COURT REPORTER:  Do you solemnly swear or

14  affirm that you will well and truly interpret

15  the questions propounded by counsel and the

16  answers given by the witness from Korean to

17  English and English to Korean to the best of

18  your ability.

19      LEAD INTERPRETER:  I do.

20      CHECK INTERPRETER:  I do.

21      MR. HO:  We understand the court reporter is

22  not authorized to administer oaths in this

23  venue; nevertheless, we request that she

24  administer the oath.  And we stipulate that we

25  waive any objection to the validity of the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1    depositions based on the oaths.
2  THEREUPON,
3              HYOUNG SHIN PARK,
4  having been first duly sworn, was examined and
5  testified as follows:
6          THE WITNESS:  Yes.
7              EXAMINATION
8  BY MR. HO:
9    Q.   Good morning, Ms. Park.  Can you please
10 state and spell your name for the record?
11   A.   My name is Hyoung Shin Park, H-Y-O-U-N-G
12 S-H-I-N P-A-R-K.
13   Q.   Who is your employer, Ms. Park?
14   A.   Samsung Electronics.
15   Q.   And what is your position at Samsung
16 Electronics?
17   A.   I am the senior designer.
18   Q.   What do you do in your role as senior
19 designer?
20   A.   I am working on product design.
21   Q.   What kind of products?
22   A.   I design a mobile device.
23   Q.   Can you identify any mobile devices that
24 you've designed?
25          MS. CARUSO:  Objection, vague.

Page 7

1    A.   Are you talking about --
2          CHECK INTERPRETER:  Mass production.
3    A.   -- mass production design.
4  BY MR. HO:
5    Q.   I'm unsure of what you're referring to as
6  mass production.
7          You said that you design mobile devices.
8    A.   Yes.
9    Q.   Which mobile devices have you designed?
10         MS. CARUSO:  Objection, vague.  I think the
11     witness is asking you if you're talking about
12     ones that have been released commercially.
13         (Discussion held between Lead Interpreter
14 and Check Interpreter.)
15 BY MR. HO:
16   Q.   Do you have an answer?
17   A.   So I worked on the folder that's destined
18 for U.S.  And also I worked on two MP3 destined
19 for Europe.  And also F700.  And also three types for
20 emerging market.
21         And there were three folders for U.S.  Three
22 bar-type for U.S., not folder.  So bar-type was not for
23 U.S.
24         And also I designed wave three.
25   Q.   By bar-types do you mean bar-type phones?

Page 8

1    A.   Yes, yes, yes.
2    Q.   And what was the F700?
3    A.   It was a QWERTY device slide --
4          COURT REPORTER:  Look on the screen.
5    A.   It was a QWERTY, Q-W-E-R-T-Y, device slide
6  phone with the touch LCD.
7          CHECK INTERPRETER:  Belated correction:  So
8      I worked on three folders that were for U.S.
9      should be replaced with the previous answer, so
10     I worked on folder for U.S.
11         LEAD INTERPRETER:  Corrected.
12 BY MR. HO:
13   Q.   And what are folders?
14   A.   It's a foldable phone.
15   Q.   Do you recall the names of those phones?
16   A.   It's been a while so I don't recall the
17 model names.
18         CHECK INTERPRETER:  Number.
19   A.   Model numbers.
20         However, I did one for Verizon and I did
21 another one for T-Mobile and I did another one for
22 TELUS for Canada.
23 BY MR. HO:
24   Q.   And do you recall the names of the bar-type
25 phones that you designed?

Page 9

1    A.   I'm not sure on the numbers, but I think it
2  was 2114 and also 2114-2.
3          Dash alphabet E, not number 2.
4          And another one was -- let's see what the
5  name was.  It was jewel standby bar-type.
6          LEAD INTERPRETER:  Interpreter's correction,
7      dual.
8  BY MR. HO:
9    Q.   What group at Samsung do you belong to?
10   A.   So currently -- so you're referring to now,
11 right?
12   Q.   Right now.
13   A.   The Product Part 1.
14   Q.   And previously what groups have you been a
15 part?
16   A.   The one right before was ID Cluster.
17   Q.   Does ID stand for industrial design?
18   A.   I think it was meant for integrated design.
19   Q.   In general, what aspects of these phones do
20 you design?
21         (Discussion held between Lead Interpreter
22 and Check Interpreter.)
23         MS. CARUSO:  Objection, vague.
24   A.   Which aspect?  I don't quite understand your
25 question.

Page 10

1   BY MR. HO:
2       Q.   Do you design the user interface of these
3   phones?
4       A.   No.
5       Q.   Do you design the external hardware of these
6   phones?
7            MS. CARUSO:  Objection, vague.
8       A.   So the external hardware, well, I do design
9   for the external case.
10  BY MR. HO:
11      Q.   Did you do the design for the external case
12  of the F700?
13      A.   Yes.
14      Q.   Were there other people who also assisted
15  with the design of the external case of the F700?
16           MS. CARUSO:  Objection, vague.
17      A.   I'm not clear whether you're referring to
18  the time when we were designing or the time when we are
19  mass producing.
20  BY MR. HO:
21      Q.   The time when you were designing.
22      A.   So at that time we had four product designer
23  and three of U.S. related designer and one from package
24  team and two from color CMF designer and one leader and
25  also the product planning team.

Page 11

1            CHECK INTERPRETER:  Replace U.S. with UX.
2            LEAD INTERPRETER:  UX.
3   BY MR. HO:
4       Q.   What was the name of the leader?
5       A.   Sang Min Hyun.
6            LEAD INTERPRETER:  S-A-N-G M-I-N H-Y-U-N,
7       interpreter's spelling.
8   BY MR. HO:
9       Q.   Is he still employed at -- well, first, is
10  Sang Min Hyun a male or female?
11      A.   He's a male.
12      Q.   Is he still employed at Samsung?
13      A.   Yes.
14      Q.   And what is his position?
15      A.   He's a designer.
16           CHECK INTERPRETER:  Principal.
17      A.   Principal designer.
18  BY MR. HO:
19      Q.   When did the project for the F700 start?
20      A.   The kickoff was around May of 2006.
21      Q.   Who gave instructions for the kickoff in May
22  of 2006?
23           MS. CARUSO:  Objection, lacks foundation.
24      A.   Well, it is not accurate.  Well, I can't
25  really recall.

Page 12

1   BY MR. HO:
2       Q.   Do you recall what were the goals of
3   design -- strike that.
4            What were the goals of designing the F700?
5            MS. CARUSO:  Objection, vague, lacks
6       foundation.
7       A.   So at the time the goal for kickoff was to
8   create an iconic design for Samsung.
9   BY MR. HO:
10      Q.   Did the F700 achieve this goal?
11           MS. CARUSO:  Objection, vague.
12      A.   That is not for me to determine so I can't
13  really tell.
14  BY MR. HO:
15      Q.   In your personal opinion.
16      A.   So my personal opinion.
17      Q.   In your personal opinion -- do you have any
18  personal opinion whether the F700 achieved its goal?
19           MS. CARUSO:  Objection, vague.
20      A.   Yes.  I think that the fact that we had
21  emerged our all forces in designing the slide phone
22  with UX team, product design team, package team, and
23  all the other coworkers were very significant.  And for
24  that I think we did a very iconic job.
25  BY MR. HO:

Page 13

1       Q.   And what do you mean by iconic design?
2       A.   In my opinion, the iconic design is
3   something that contains the feel of Samsung and
4   something that can represent Samsung.  However, it is
5   not totally on the product, but when it's marketed to
6   the market that it will include the entire process of
7   being a commercial product.  And for me that is the
8   iconic design.
9            CHECK INTERPRETER:  In my opinion, it gave
10      the Samsung design and it could be a
11      representative of Samsung.  It was a total
12      package of the design.  It wasn't just a product
13      that was worked on, but when it was released to
14      the market, it was introduced as a total design
15      that was considered to be iconic.
16  BY MR. HO:
17      Q.   Was there anything about the external case
18  of the F700 that was representative of Samsung design?
19           MS. CARUSO:  Objection, vague.
20      A.   So at the time that model was one of the 300
21  or 400 models that Samsung came out with.
22           CHECK INTERPRETER:  Per year.
23      A.   Per year.
24  BY MR. HO:
25      Q.   But was there anything about the external

Page 58

BY MR. HO:

1   BY MR. HO:
2       Q.    Do you recognize this document, Ms. Park?
3       A.    This is my first time seeing it.
4       Q.    On the front page do you see pictures of two
5   different phones?
6       A.    Yes.
7       Q.    Is the phone on the left a picture of the
8   F700?
9       A.    Yes.
10      Q.    And is the phone on the right a picture of
11  the original iPhone?
12            MS. CARUSO:  Objection, lacks foundation,
13      calls for speculation.
14      A.    This one.
15  BY MR. HO:
16      Q.    Yes.
17      A.    Based on the picture, I would not be able to
18  tell whether it's 1 or 2.
19      Q.    You mean the first iPhone or the subsequent
20  versions of the iPhone?
21      A.    Yes.  Yes.
22      Q.    Have you done any comparisons between phones
23  that you've designed and the iPhone?
24            MS. CARUSO:  Objection, vague.
25            (Discussion held between Lead Interpreter

Page 59

1   and Check Interpreter.)
2       A.    When you say comparison, I don't know on
3   what kind of comparison you're referring to.
4   BY MR. HO:
5       Q.    Any type of comparison.
6       A.    I don't think I did much comparings.
7       Q.    Did you do any type of comparison between
8   the iPhone and any phones that you designed?
9            MS. CARUSO:  Objection, vague, vague as to
10      time.
11      A.    Are you referring to other designs other
12  than F700?
13  BY MR. HO:
14      Q.    Yes.
15      A.    Well, as for me, I didn't do that kind of
16  comparison.
17      Q.    And did you do any comparisons between the
18  iPhone and the F700?
19            MS. CARUSO:  Objection, vague, vague as to
20      time.
21      A.    Well, I was not able to compare, and the
22  reason is because the iPhone was not available in
23  Korea.
24            CHECK INTERPRETER:  iPhone 1 was not
25      available in Korea.

Page 60

1       A.    iPhone 1 was not available in Korea, so
2   without looking at the actual product, you cannot do
3   the comparison.  On the pictures you cannot do the
4   comparison of the entire -- the part of the product.
5   BY MR. HO:
6       Q.    Did you do any comparisons based on pictures
7   or photos of the iPhone?
8            MS. CARUSO:  Objection, vague.
9       A.    No.
10  BY MR. HO:
11      Q.    Are you aware of any comparisons by anyone
12  else at Samsung between the F700 and the iPhone?
13            MS. CARUSO:  Objection, vague.
14      A.    I don't really know.
15            MR. HO:  Let's take a quick break.  I think
16      I'll just have a few questions.  Let me just
17      take a look at my notes to make sure I've got
18      everything.
19            VIDEOGRAPHER:  Going off the video record.
20      The time is 11:17 a.m.
21            (A recess was taken.)
22            VIDEOGRAPHER:  We're back on the video
23      record.  The time is 11:25 a.m.
24  BY MR. HO:
25      Q.    After the iPhone was released, did you do

Page 61

1   anything to change the way you designed phones in
2   response to the iPhone?
3       A.    Um, no.  I didn't.
4       Q.    Do you know if Samsung did anything in the
5   way it designed the phones in response to the iPhone?
6            MS. CARUSO:  Objection, vague.
7            (Discussion held between Lead Interpreter
8   and Check Interpreter.)
9       A.    No.
10            MR. HO:  I'll mark as Exhibit 1702 document
11      Bates labelled SAMNDCA 10310951 to 978.
12            (Exhibit 1702 was marked for
13  identification.)
14  BY MR. HO:
15      Q.    Do you recognize this document, Ms. Park?
16      A.    This is my first time seeing it.
17            MR. HO:  And I'm going to mark as Exhibit
18      1703 a document Bates labelled SAMNDCA 10295752
19      to 778.
20            (Exhibit 1703 was marked for
21  identification.)
22            MS. CARUSO:  Is there a copy for me?
23            MR. HO:  Sorry.
24  BY MR. HO:
25      Q.    Do you recognize this document, Ms. Park?

Page 62

1    A.    No.
2    Q.    Can you turn to the first page, ending in
3  Bates label 753?
4    A.    Yes.
5        MS. CARUSO:  Do you have an English
6      translation of this document?
7        MR. HO:  We don't have any translation.
8        MS. CARUSO:  I object to the witness being
9      questioned without providing an English
10     translation that I can also review so that I can
11     properly defend the deposition.
12  BY MR. HO:
13   Q.    Are you on the first page, Ms. Park?
14   A.    Yes.
15   Q.    Does it describe the design philosophy of
16  Samsung?
17        MS. CARUSO:  Objection, vague as to time,
18      lacks foundation, calls for speculation.
19   A.    This seems like something that was prepared
20  by the design business center and it was not prepared
21  by our part.  And this is my first time seeing this and
22  so I don't know whether this is Samsung's design
23  strategy or not.
24  BY MR. HO:
25   Q.    Have you ever heard the term "DID

Page 63

1  guideline"?
2    A.    I don't quite recall.  But these things,
3  seems like it's my first time seeing them.
4    Q.    Going back to the F700.  Besides the
5  external case, did you take part in the design of any
6  other aspect of the F700?
7        MS. CARUSO:  Objection, vague.
8    A.    No.
9        MR. HO:  That's all the questions I have for
10     you.  Thank you very much.
11        MS. CARUSO:  Samsung would like to designate
12     the entirety of the transcript as attorneys'
13     eyes only under the protective order.
14        MR. HO:  Off the record.
15        VIDEOGRAPHER:  This concludes the videotaped
16     deposition of Hyoung Shin Park consisting of
17     three video discs.  The time is 11:31 a.m.
18     We're going off the video record.
19
20        (Time noted:  11:31 a.m.)
21
22
23
24
25

Page 64

1  (Counsel representing this witness should arrange
   reading and signing and thereafter distribute copies
2  of the signed Errata Sheet to opposing counsel
   without involvement of court reporter.)
3  STYLE OF CASE:  Apple V Samsung
4  DEPOSITION OF:  HYOUNG SHIN PARK
   DATE TAKEN:  Wednesday, February 29, 2012
5
6        E R R A T A   S H E E T
7    LINE       CHANGE        REASON
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  I hereby certify that I have read my deposition and
   that it is true and correct subject to any changes
23  in form or substance entered here.
24  _____
   Date                    HYOUNG SHIN PARK
25

Page 65

1        C E R T I F I C A T E
2  (Seoul)
3  (South Korea)
4
5        I, Tracey S. LoCastro, Registered
   Professional Reporter, do hereby certify
6  that the aforementioned witness was first duly sworn
   as noted by stipulation of counsel to testify the
   whole truth; that I was authorized to and did report
7  said deposition in stenotype; and that the foregoing
   pages are a true and correct transcription of my
8  shorthand notes of said deposition.
9        I further certify that said deposition was
   taken at the time and place hereinabove set forth
10 and that the taking of said deposition was commenced
   and completed as hereinabove set out.
11        I further certify that I am not attorney
12 or counsel of any of the parties, nor am I a
   relative or employee of any attorney or counsel of
13 party connected with the action, nor am I
   financially interested in the action.
14        The foregoing certification of this
15 transcript does not apply to any reproduction of the
   same by any means unless under the direct control
16 and/or direction of the certifying reporter.
17
18        IN WITNESS WHEREOF, I have hereunto
19 set my hand this 1st day of March, 2012.
20
21
22 _____
   TRACEY S. LOCASTRO,
23 Registered Professional Reporter
24
25

# Watson Declaration

# EXHIBIT 21

# Filed Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

```
                  HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
1                      UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
2                         SAN JOSE DIVISION

3             Civil Action No.:   11-CV-01846-LHK

4

    APPLE, INC., a California corporation,
5
             Plaintiff,
6

7    vs.

8    SAMSUNG ELECTRONICS CO., LTD.,
     a Korean business entity;
9    SAMSUNG ELECTRONICS AMERICA, INC.,
     a New York corporation; and
10   SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
     a Delaware limited liability company,
11           Defendants.
     _____/
12

13

14

15            *** HIGHLY CONFIDENTIAL ***
                  ATTORNEYS' EYES ONLY
16

17        VIDEOTAPED PERSONAL DEPOSITION OF:

18                  SEUNGHWAN CHO

19

20

21              Thursday, April 19, 2012
                     Kim & Chang
22               Seoul, South Korea
                10:16 a.m. to 7:42 p.m.
23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2..5

```
                                    Page 2
1   APPEARANCES:

2

3       ON BEHALF OF PLAINTIFF, APPLE, INC.:

4
        MORRISON FOERSTER, LLP
5       By:  Minn Chung
        425 Market Street
6       San Francisco, California 94105-2482
        Phone:  415.268.7339
7

8

9       ON BEHALF OF DEFENDANT, SAMSUNG:

10      QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
        By:  John B. Quinn
11              Brian E. Mack
        865 South Figueroa Street
12      10th Floor
        Los Angeles, California 90017
13      Phone:  213.443.3100

14

15  Also present:

16      ALBERT S. KIM, LEAD INTERPRETER
        ANN PARK, CHECK INTERPRETER
17      INGA KORNEV, VIDEOGRAPHER
        TRACEY LOCASTRO, COURT REPORTER
18      BRIAN KIM, SAMSUNG

19

20

21

22

23

24

25
```

```
                                              Page 3
1              I N D E X

2   WITNESS:                          PAGE
    Seunghwan Cho
3   Examination by Mr. Minn Chung        6
    Examination by Mr. Quinn           129
4

5

6              E X H I B I T S

7   NUMBER        DESCRIPTION          PAGE

    Exhibit 2675  Bates numbers APLNDC-Y  11
8                 0000147308 through 312
    Exhibit 2676  Bates numbers SAMNDCA   20
9                 00392050 through 2122
    Exhibit 2677  Bates numbers SAMNDCA   44
10                10320161 through 20163
    Exhibit 2678  Bates numbers SAMNDCA   93
11                00391989 through
                  00392011
12  Exhibit 2679  Bates numbers SAMNDCA  106
                  00391917 through
13                00391967
    Exhibit 2680  Bates numbers         109
14                S-ITC-003256096 through
                  003256100
15  Exhibit 2681  Bates numbers         111
                  S-ITC-003006124 through
16                6154
    Exhibit 2682  Bates numbers SAMNDCA  115
17                00531007 through
                  00531016
18  Exhibit 2683  Bates numbers SAMNDCA  122
                  11378499 through
19                11378533

20     PREVIOUSLY MARKED EXHIBITS USED:

21  Exhibit 2242                         71
    (Bates numbers SAMNDCA 00532560 through 532563)
22
    Exhibit 1976                         58
23  (Bates numbers SAMNDCA 10247509 to 10247511)

24  Exhibit 2005                        119
    (Bates numbers SAMNDCA 00176053 through 00176171)
25
```

```
                                    Page 4
1          P R O C E E D I N G S
2              -  -  -
3       VIDEOGRAPHER:  My name is Inga Kornev, a
4   videographer with American Realtime Court
5   Reporters/Asia.
6       The date today is April 19th, 2012.  And the
7   time on the video monitor is 10:16.
8       This video deposition is being held at Kim
9   and Chang located at the Jeongdong Building in
10  Seoul, Korea.
11      The caption of this case is Apple, Inc.
12  versus Samsung Electronics Co., held in the
13  United States District Court, Northern District
14  of California, San Jose Division, with a civil
15  action number of 11-CV-01846-LHK.
16      The name of the witness is --
17      COURT REPORTER:  Seunghwan Cho.
18      VIDEOGRAPHER:  -- testifying in his
19  individual capacity.
20      The court reporter today is Tracey LoCastro,
21  also with American Realtime Court
22  Reporters/Asia.
23      At this time I would like to ask all counsel
24  and interpreters to please state their
25  appearances and whom they represent for the
```

```
                                    Page 5
1   record.
2       MR. MINN CHUNG:  Minn Chung from Morrison
3   and Foerster for Apple.
4       MR. MACK:  Brian Mack of Quinn Emanuel for
5   Samsung and the witness.
6       MR. QUINN:  John Quinn, Quinn Emanuel, for
7   Samsung and the witness.
8       LEAD INTERPRETER:  Albert S. Kim,
9   interpreter of record.
10      CHECK INTERPRETER:  Ann Park, check
11  interpreter.
12      MR. QUINN:  Also with us is Brian Kim,
13  inhouse counsel for Samsung.
14      MR. MINN CHUNG:  And this is a stipulation
15  that have been given to me and that I understand
16  both Samsung and Apple will join.
17      It says:  We understand the court reporter
18  is not authorized to administer oaths in this
19  venue; nevertheless, we request that she
20  administer the oath, and we stipulate that we
21  waive any objection to the validity of the
22  deposition based on the oaths.
23      MR. QUINN:  So stipulated.
24      MR. MINN CHUNG:  Thank you.
25      COURT REPORTER:  Do you solemnly swear or
```

Page 6

```
 1        affirm that you will well and truly interpret
 2        the questions propounded by counsel and the
 3        answers given by the witness from Korean to
 4        English and English to Korean to the best of
 5        your ability?
 6             LEAD INTERPRETER:  I do.
 7             CHECK INTERPRETER:  Yes.
 8                  SEUNGHWAN CHO,
 9   after having been duly sworn by the reporter, pursuant
10   to stipulation of counsel, was examined and testified
11   through the interpreter as follows:
12             THE WITNESS:  I do.
13                  EXAMINATION
14   BY MR. MINN CHUNG:
15        Q.   Please state your full name for the record.
16        A.   My name is Seunghwan Cho.
17        Q.   By whom are you employed?
18        A.   That's Samsung Electronics Company, Limited.
19        Q.   Mr. Cho, I'm an attorney in the United
20   States, and I represent Apple, Inc.  As you may be
21   aware, Apple, Inc. has sued your employer, Samsung
22   Electronics, in a California court.  And today I'll be
23   asking questions that relate to those lawsuit.
24             Do you understand that you have just taken
25   an oath to tell the truth?
```

Page 7

```
 1        A.   Yes.
 2        Q.   Have you ever been deposed before in your
 3   life in any litigation?
 4        A.   This is the first time.
 5        Q.   Then to make it as easiest for you, I will
 6   take a few minutes to explain some of the basic rules
 7   of deposition.
 8             So I will be asking you a series of
 9   questions.  And the interpreter will interpret my
10   question into Korean and your answer into English for
11   the record.  And the lady at the end of the table is
12   taking down your testimony in English verbatim into a
13   transcript of everything that is said in this room.
14             And also please note that your testimony
15   today is being videotaped, and the video recording may
16   be played before a jury in this case in the United
17   States.
18             Do you understand that, sir?
19        A.   I understand.
20        Q.   So if at any time if you don't understand my
21   question, I encourage you to ask me to clarify before
22   you try to answer the question.
23        A.   I appreciate that.  I shall do so.
24        Q.   And when I ask a question, your attorney,
25   Mr. Quinn, may object.  But unless he instructs you
```

Page 8

```
 1   specifically not to answer, you must answer my
 2   question.
 3             Do you understand that, sir?
 4        A.   Yes, I shall do so.
 5        Q.   Is there any reason why you would not be
 6   able to testify truthfully today?
 7        A.   No, sir.
 8        Q.   And as of today, what is your title and
 9   position at Samsung Electronics?
10        A.   I currently serve as executive
11   vice-president.
12        Q.   Are you in charge of any particular division
13   or department at Samsung Electronics?
14        A.   Yes, of course.
15        Q.   And what is that?
16        A.   I currently serve as the team leader for
17   Advanced Software R&D Team 2.
18        Q.   Are there more than one Advanced Software
19   R&D teams at Samsung Electronics?
20        A.   That is right.
21        Q.   How many?
22        A.   About three to four.
23        Q.   And you are in charge of one of those
24   Advanced Software R&D teams.
25        A.   That is right.
```

Page 9

```
 1        Q.   What is the position you held at Samsung
 2   Electronics immediately before your current position?
 3        A.   I was serving as the same, platform and
 4   development software development team, team leader.
 5             (Discussion held between Lead Interpreter
 6   and Check Interpreter.)
 7        A.   Advanced Software Development Team.
 8             Actually not.  Last year it was the Advanced
 9   Development Team.
10   BY MR. MINN CHUNG:
11        Q.   So when did you become the executive
12   vice-president of the Advanced R&D Software Development
13   Team 2?
14        A.   January of this year.
15        Q.   And how long did you hold the position
16   immediately before that at the platform -- advanced
17   platform development team?
18             MR. QUINN:  I object to the question.  I
19        think it mischaracterizes the testimony, assumes
20        facts not in evidence.  With respect, I believe
21        the title he identified was a little bit
22        different.
23             MR. MINN CHUNG:  Okay.  Let me ask the
24        question again.
25   BY MR. MINN CHUNG:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

```
 1     Q.   So before you were executive vice-president,
 2  you were a team leader of the Advanced Development
 3  Team; is that right?
 4     A.   That is right.
 5     Q.   And how long did you hold that position?
 6     A.   One year.
 7     Q.   How long have you been employed at Samsung
 8  Electronics, Mr. Cho?
 9     A.   It's been approximately 27 -- 8 years.
10     Q.   Could you describe to me briefly what you
11  did at Samsung between the first time you joined the
12  company until the beginning of 2011?
13          MR. QUINN:  Objection, overly general.
14          You're asking him to describe what he did
15      over 26 years briefly?
16  BY MR. MINN CHUNG:
17     Q.   Just the best you can answer my question.
18     A.   Prior to working on mobile matters within
19  Samsung, before that I was working on network equipment
20  matters concerning PABX.
21     Q.   When did you first start working on mobile
22  matters at Samsung Electronics?
23     A.   That was probably -- that was probably
24  starting around March of 1998.
25     Q.   And since 1998, since around March 1998, you
```

Page 11

```
 1  have been working on some aspect of mobile devices
 2  until today; is that right?
 3     A.   That is right.
 4     Q.   Mr. Cho, I'm going to ask you a slightly
 5  different line of questions.
 6          When you were promoted to the position of
 7  executive vice-president at the beginning of this year,
 8  were you aware that your employer, Samsung, was going
 9  to send out a press release announcing your promotion
10  to the public?
11     A.   No.  I was not.
12          (Exhibit 2675 was marked for
13  identification.)
14  BY MR. MINN CHUNG:
15     Q.   Mr. Cho, I'm going to hand you a document
16  that's been marked as Exhibit 2675.
17          LEAD INTERPRETER:  Is there a courtesy copy
18      for the interpreters?
19          Thank you.
20  BY MR. MINN CHUNG:
21     Q.   Mr. Cho, Exhibit 2675 is a five-page
22  document bearing Bates numbers APLNDC-Y 0000147308
23  through 312.
24          Mr. Cho, let me represent to you that
25  Exhibit 2675 is a copy of a Samsung press release that
```

Page 12

```
 1  was downloaded from Samsung Electronics' website and
 2  was produced to Samsung in this case.  It bears the
 3  date of December 13, 2011.  And I believe the press
 4  release is still available at the Samsung website today
 5  at the web address indicated at the bottom of each page
 6  of the document.
 7          LEAD INTERPRETER:  Quick interjection.
 8      Counsel said "produced to Samsung."  He surely
 9      meant produced by Samsung?
10          MR. MINN CHUNG:  I said produced to Samsung.
11          LEAD INTERPRETER:  To Samsung.  Thank you.
12      With that understanding.
13          MR. QUINN:  You don't have to say anything.
14      There's no question.
15  BY MR. MINN CHUNG:
16     Q.   Mr. Cho, have you seen this document before
17  today?
18     A.   Yes, indeed.
19     Q.   When did you see this document?
20     A.   I don't exactly recall as to when I got to
21  see this, but to be promoted to EVP within Samsung
22  Electronics is quite an honor, and those acquaintances
23  of mine actually made copies and provided this to me.
24     Q.   So was it around the beginning of 2012?
25     A.   Probably not.
```

Page 13

```
 1          Now, although I don't happen to recall the
 2  exact official date of promotion, as for me, when you
 3  look at this document, it is indicated as being from
 4  the middle of last December, so it was probably around
 5  that time.
 6     Q.   So it must have been a very good Christmas
 7  and New Year's holiday for you last year.
 8     A.   Thank you.
 9     Q.   So, Mr. Cho, if you look at the first page
10  of Exhibit 2675, the title of the press release appears
11  to indicate that the press release is about the
12  promotion of executives at Samsung Electronics; is that
13  right?
14     A.   Yes.
15     Q.   And I'd like to direct your attention to the
16  middle of the first page where there's a bullet point
17  that says "promotion to executive vice-president."
18          Do you see that, sir?
19     A.   Yes, I'm looking at it.
20     Q.   That line appears to indicate that the
21  number of executive vice-president at Samsung
22  Electronics increased from 13 in 2011 to 18 in 2012; is
23  that right?
24          MR. QUINN:  Objection.  It's vague and
25  ambiguous.  I can't tell whether you're asking
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1  him if that's what the line says or whether, in
2  fact, that's true.
3       MR. MINN CHUNG:  I'll take that objection
4  and I'll clarify that I'm asking what the
5  document says.
6  A.    Yes, it seems that that is what it reads.
7  BY MR. MINN CHUNG:
8  Q.    So at the beginning -- at the start of 2012,
9  were you aware that you were one of the 18 executive
10 vice-presidents at Samsung Electronics?
11 A.    I don't know the exact number, but I was
12 aware of the fact that I was an EVP, yes.
13 Q.    Do you know approximately how many executive
14 vice-presidents there are at Samsung today?
15 A.    I must apologize.  Samsung Electronics is a
16 very big company.  I do not know the exact number, but
17 seeing as though this indicates that there were 18 as
18 of that date, I would imagine there to be more than, at
19 least more than 18.
20 Q.    And since your promotion to the position of
21 executive vice-president at the beginning of this year,
22 have you heard any announcement by Samsung Electronics
23 of any other promotion to the position of executive
24 vice-president?
25 A.    No.

Page 15

1  Q.    Mr. Cho, if you look at three paragraphs
2  from the line that we're having a discussion about,
3  there's a paragraph with dash bullet point that starts
4  with the name "Executive Vice-President Seunghwan Cho."
5       Do you see that, sir?
6  A.    Yes.
7  Q.    Is that you?
8  A.    I think that is correct.
9  Q.    And the same paragraph appears to indicate
10 that you were -- you have successfully completed
11 advanced development of strategic models at Samsung
12 such as Galaxy S and Galaxy Tab series; is that right?
13 A.    It appears that that is what it reads.
14 Q.    And is that an accurate description of what
15 you did at Samsung Electronics before 2012?
16 A.    Well, I have been involved in many things,
17 and I would believe that to be one of such things.  But
18 the truth is, there were a lot of other people involved
19 in such endeavors.
20 Q.    So to be clear, you personally worked on the
21 development of Galaxy S and Galaxy Tab products at
22 Samsung Electronics before 2012; is that right?
23 A.    It's but one of the many things that I've
24 undertaken.
25 Q.    So when did you first start working on the

Page 16

1  Galaxy S phone?
2  A.    That was in 2000 -- 2009, but I was working
3  on hardware at that time.  Ah, I apologize, it was in
4  2010 actually.
5  Q.    What aspect of hardware did you work on
6  starting in 2010?
7       Let me rephrase that.
8       What aspect of Galaxy S hardware did you
9  work on starting in 2010?
10      MR. QUINN:  Objection.  I think the record
11      is unclear and that, as phrased, assumes facts
12      not in evidence.
13 BY MR. MINN CHUNG:
14 Q.    Please answer my question.
15 A.    During the year 2010 I was only overseeing
16 hardware.
17 Q.    And what do you mean by hardware?
18 A.    During the year 2010, whereas I was with the
19 platform development team back in 2009 I was working on
20 software only, and so it was in the year 2010 when I
21 was promoted to SVP that I for the first time was put
22 in the role of overseeing hardware.
23 Q.    And by that, all of hardware for Galaxy S
24 phone?
25 A.    I am not quite sure if that -- if I can say

Page 17

1  that, but at least, yes, with respect to some of it.
2  Q.    So could you tell me what aspect of Galaxy S
3  hardware you worked on starting in 2010?
4  A.    Well, in terms of hardware -- my background
5  actually is that of software.  And, again, when I was
6  promoted to SVP within the organization in 2010,
7  although I, as such, actually lacked any expertise on
8  the hardware side of things, when I began working on
9  hardware, it was in terms of the PCB, the board, the
10 board's circuitry design.
11      (Discussion held between Lead Interpreter
12 and Check Interpreter.)
13 BY MR. MINN CHUNG:
14 Q.    And immediately before 2010 when you started
15 working on the Galaxy S hardware, what did you do at
16 Samsung?
17 A.    I developed general normal phones.  I was
18 working on the software side of things.
19 Q.    Could you explain what you mean by normal
20 phones?
21 A.    The other types of phones that are not
22 smartphones, per se.
23      CHECK INTERPRETER:  "The other types of
24      phones that are not smartphones," period.
25      LEAD INTERPRETER:  Stylistically it's the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18..21

Page 18

1      same.
2  BY MR. MINN CHUNG:
3      Q.     Mr. Cho, have you heard -- have you ever
4  heard the term "feature phone"?
5      A.     I have.
6      Q.     Would feature phone, the term "feature
7  phone," mean approximately the same as the "normal
8  phone" that you were referring to?
9      A.     As far as I'm concerned, that is fair.
10     Q.     All right.  So immediately before 2010 when
11 you're working on software for feature phones or normal
12 phones, what aspect of software did you work on?
13     A.     I was in overall charge of Samsung's feature
14 phones on the software side.
15     Q.     And how long did you have that job at
16 Samsung Electronics?
17     A.     Well, that was a while ago, so this may or
18 may not be exact, but I think maybe six to seven years
19 perhaps.
20     Q.     So to clarify, you oversaw the general
21 development of software for feature phones at Samsung
22 for six to seven years.
23     A.     No, that is not the case.
24     Q.     All right.  So when did you start to have
25 the duty at Samsung Electronics to oversee the general

Page 19

1  development of software for feature phones?
2      A.     I would say starting around 2006 or '7.
3      Q.     So between 2006 or '7 to 2009 you were in
4  charge of the software development for feature phones
5  at Samsung Electronics; is that right?
6      A.     Well, I would like to make one thing certain
7  for the sake of accuracy.  Within Samsung Electronics
8  there are a number of feature phone related platforms.
9  I was overseeing one of those feature phone platforms
10 at that time.
11     Q.     And which platform was that?
12     A.     Are you asking as to the name of the
13 platform?
14     Q.     Yes.
15     A.     The platform's name was SHP, Samsung Handset
16 Platform.
17     Q.     So we've been talking about feature phones
18 and smartphones for a while.  In your words, what is
19 your definition of a smartphone?
20     A.     Well, now that, I would say, is somewhat
21 vague.  And it all depends on the person you talk to,
22 but personally speaking, as far as I would contemplate
23 it, I think that is in reference to there being an
24 ecosystem, one involving, for instance, an app store in
25 conjunction with the actual handset terminal.

Page 20

1  Therefore, the terminal and such an ecosystem is what
2  comprises a smartphone, in my opinion.
3          MR. MINN CHUNG:  And let's mark this
4      document as Exhibit 2676.
5          (Exhibit 2676 was marked for
6      identification.)
7  BY MR. MINN CHUNG:
8      Q.     Mr. Cho, I'm handing you a document which
9  has been marked as Exhibit 2676.  It bears the Bates
10 numbers SAMNDCA 00392050 through 2122.  And it bears
11 the date of April 2009.
12         So, Mr. Cho, could you take a look at the
13 first page of Exhibit 2676?
14         Near the top of the first page do you see
15 where the title appears to say, "The strategy for
16 securing ecosystem in order to lead smartphone market"?
17         MR. QUINN:  Objection.  May I make a --
18     you're directing his attention to the first
19     page.  If he's going to be questioned about the
20     document, would it be appropriate for him to
21     have an opportunity to look at it?
22         MR. MINN CHUNG:  Sure.
23 BY MR. MINN CHUNG:
24     Q.     Yes, that's what I wanted to ask you.  I
25 apologize.

Page 21

1          Please take a couple of minutes to look at
2      the document.
3      A.     I appreciate that.
4          MR. QUINN:  Thank you, Counsel.
5  BY MR. MINN CHUNG:
6      Q.     Are you ready, Mr. Cho?
7      A.     Yes.
8      Q.     So on the first page of Exhibit 2676 near
9  the top of the page, do you see where the title appears
10 to indicate that the document is -- relates to "The
11 strategy for securing ecosystem in order to lead
12 smartphone market"?
13         Do you see that, sir?
14     A.     Yes.
15     Q.     Mr. Cho, do you recognize this document
16 marked as Exhibit 2676?
17     A.     Not that I can recall anything about this in
18 detail, but to a certain extent, I think so, yes.
19     Q.     Mr. Cho, I'll represent to you that this
20 document was retrieved from your files at Samsung
21 Electronics and produced to us by your employer in this
22 case.
23         Do you have any reason to doubt that you
24 received, personally received this document while
25 employed at Samsung on or around April 2009?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1  still have the same function as of today?
2       A.    That is right.
3       Q.    And what is the function of the Advanced
4  Software R&D Team 2 that you lead?
5       A.    Our unit is charged with the development of
6  a Windows-based phone, basically with a feature phone.
7             (Discussion held between Lead Interpreter
8  and Check Interpreter.)
9             LEAD INTERPRETER:  "And a feature phone."
10            (Discussion held between Lead Interpreter
11 and Check Interpreter.)
12            LEAD INTERPRETER:  "And feature phones."
13 BY MR. MINN CHUNG:
14      Q.    And Windows phone and feature phones are the
15 products that Samsung has developed; is that right?
16            Strike that characterization.
17            So Advanced Software R&D Team 2 develop
18 Samsung's Windows phone and feature phone products; is
19 that right?
20      A.    That's correct.
21      Q.    And I'm just trying to understand, if the
22 Mobile Office of Development, if the function of the
23 Mobile Office of Development is developing a product,
24 um -- well, let me start that again.
25            Is the Advanced Software R&D Team 2 a sub

Page 99

1  group of the Mobile Office of Development?
2       A.    That is right.
3       Q.    So is it the case that the Mobile Office of
4  Development oversees all of the product development in
5  the mobile unit at Samsung Electronics?
6       A.    That is right.
7       Q.    Mr. Cho, I'd like to direct your attention
8  to the fifth page of Exhibit 2678 bearing the Bates
9  number SAMNDCA 00391993.
10            Do you have that page in front of you, sir?
11      A.    Page 5 of -- is it the fifth page or...
12            MR. QUINN:  I think there's some confusion
13      about whether you're -- confusion about whether
14      you're asking about the internal numbers --
15            MR. MINN CHUNG:  I'll clarify.
16 BY MR. MINN CHUNG:
17      Q.    The page that I'm talking about has number
18 2/17 on the right-hand corner and it bears the Bates
19 number SAMNDCA 00391993.
20            Mr. Cho, do you see at the top of this page
21 where it says, "1.  Wave - comparison of
22 competitiveness against iPhone"?
23      A.    I see it.
24      Q.    Is Wave a Samsung product -- strike that.
25            Was Wave a Samsung product that was being

Page 100

1  developed around May 2010?
2       A.    It appears to have been a product.
3       Q.    Mr. Cho, did you have anything to do with
4  the comparison of the Wave product against the iPhone
5  that's shown on this page?
6       A.    No.
7       Q.    Are you aware of anyone at Samsung
8  Electronics who conducted this comparison on or around
9  May 13th, 2010?
10      A.    There's nothing on my part that I know.
11            CHECK INTERPRETER:  One quick interjection.
12      As to the phrase that says "Comparison of
13      competitiveness of iPhone," actually the way it
14      reads is, "Comparison of competitiveness against
15      iPhone."
16            MR. MINN CHUNG:  Thank you.
17 BY MR. MINN CHUNG:
18      Q.    So let's take a look at the page that bears
19 the number 5/17 on the right bottom corner.  And the
20 page bears the Bates number SAMNDCA 00391996.
21            Do you have that page, Mr. Cho?
22      A.    Yes.
23      Q.    On that page, on the top of the page it
24 says, "2.  Galaxy S - comparison of competitiveness
25 against iPhone."

Page 101

1             Do you see that, sir?
2       A.    I see it.
3       Q.    Mr. Cho, you stated -- you testified earlier
4  that you started working on the Galaxy S product around
5  the beginning of 2010; is that right?
6       A.    I think that's correct, yeah.
7       Q.    Mr. Cho, did you have anything to do with
8  the comparison of the iPhone and Galaxy S that's shown
9  on the page bearing SAMNDCA 00391996 on or around May
10 13, 2010?
11            MR. QUINN:  Objection.  "Anything to do
12      with" is vague and ambiguous.
13      A.    I, being part of the development team, did
14 not involve myself in that.  The development team
15 normally does not create something like this.
16 BY MR. MINN CHUNG:
17      Q.    And by "this" you mean this document,
18 Exhibit 2678.
19      A.    I have no recollection when it comes to this
20 document (indicating).
21      Q.    Mr. Cho, during the time -- strike that.
22            Mr. Cho, during 2010 when you were working
23 on Galaxy S, did you personally compare iPhone with
24 Galaxy S?
25      A.    Personally, no.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

```
 1    Q.   Are you aware of anyone at Samsung
 2  Electronics who conducted a comparison of iPhone and
 3  Galaxy S around May of 2010?
 4    A.   I am not.  Personally I am not aware of such
 5  a person.  But when it comes to benchmarking, that is
 6  something that's always going on --
 7         (Discussion held between Lead Interpreter
 8  and Check Interpreter.)
 9    A.   -- with respect to the competition.
10  BY MR. MINN CHUNG:
11    Q.   Was it part of your duty during 2001 [sic]
12  to oversee the hardware development of Galaxy S to also
13  oversee benchmarking of the competitors' products?
14         Strike that.  I misspoke.
15         Mr. Cho, was it part of your duty during
16  2010 to benchmark competitors' products against
17  Galaxy S phone?
18    A.   Not I, but on the company's part that's
19  always ongoing in order that we come up with the very
20  best product out there.
21    Q.   Was there an organization within Samsung
22  mobile unit that performed benchmarking of competitors'
23  product?  And by that I mean around May 2010.
24    A.   Not to my understanding.  However, that is
25  done by many units.
```

Page 103

```
 1    Q.   What do you mean by many units?
 2    A.   Ranging from the quality department -- from
 3  the quality department from time to time, that is
 4  always ongoing.
 5         (Discussion held between Lead Interpreter
 6  and Check Interpreter.)
 7         LEAD INTERPRETER:  Interjection,
 8  restatement.
 9         "Ranging from the quality department to --
10  well, the quality departments for each
11  respective time is what I mean, that's always
12  ongoing."
13    A.   Let me correct myself.
14         Benchmarking is always done by the quality
15  team.
16         LEAD INTERPRETER:  And, Madam Reporter, the
17  quality departments in that case was meant to be
18  a plural.
19  BY MR. MINN CHUNG:
20    Q.   And does the quality team provide the result
21  of benchmarking to the development teams in the mobile
22  unit at Samsung Electronics?
23    A.   I'm unable to know.
24         CHECK INTERPRETER:  One quick interjection.
25         Here in this regard as well, I'm not sure
```

Page 104

```
 1  whether the witness meant quality team, the
 2  quality team or quality teams.  Singular versus
 3  plural was unclear.
 4         MR. MINN CHUNG:  That's just the nature of
 5  Korean.
 6         MR. QUINN:  This must be an inside
 7  observation.  I'm not understanding what any of
 8  you are saying.
 9         MR. MINN CHUNG:  Korean doesn't have the
10  concept of plural and singular in its language.
11  BY MR. MINN CHUNG:
12    Q.   Mr. Cho, have you -- during the time in 2010
13  when you were overseeing the hardware development of
14  Galaxy S, have you ever received a report from the
15  benchmark quality team regarding the benchmarking of
16  competitors' products?
17         MR. QUINN:  Objection as to "report."  Vague
18  and ambiguous.
19    A.   I don't quite recall.
20  BY MR. MINN CHUNG:
21    Q.   And, Mr. Cho, I'd like to direct your
22  attention to the page of Exhibit 2678 that has the page
23  number 8/17 on the bottom right corner and bears the
24  Bates number SAMNDCA 00391999.
25         Do you have the page, sir?
```

Page 105

```
 1    A.   Yes.
 2    Q.   And on the top of the page do you see where
 3  it says P1-iPad -- let me strike.  Let me start again.
 4         On top of the page do you see where it says
 5  "3. P1 - comparison of competitiveness compared to the
 6  iPad"?
 7    A.   I see it.
 8    Q.   And underneath that there's a table with
 9  three columns.  And the second column is labeled P1.
10         Do you see that, Mr. Cho?
11    A.   I see it.
12    Q.   And there's a picture of what appears to be
13  a tablet product under P1 on that page.
14         Do you see that, sir?
15    A.   I see it.
16    Q.   Looking at that picture, Mr. Cho, do you
17  believe -- do you have understanding that P1 is the
18  Galaxy Tab product from Samsung?
19    A.   When it comes to the expression P1, I don't
20  quite know about that.  I could not vouch for that.
21    Q.   Okay.  Mr. Cho, I'm going to hand you
22  another document.
23         MR. QUINN:  I'm going to object, just note
24  for the record that I think that last question
25  is vague and ambiguous whether the question was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1  thereof, you revert back to the former.
2  BY MR. QUINN:
3      Q.    Then finally, you were asked a number of
4  questions today, particularly this morning, about
5  whether you could categorize something as hardware or
6  software.  Do you recall in general the subject matter
7  of those types of questions coming up?
8      A.    I do.
9          MR. MINN CHUNG:  Objection, mischaracterize
10         previous question by counsel and vague and
11         ambiguous.
12  BY MR. QUINN:
13      Q.    Do you recall being asked, for example,
14  whether it was possible to classify a browser as
15  hardware versus software or, similarly, user interface
16  as hardware or software, as a web page as being
17  hardware or software, or an operating system as being
18  hardware or software?  Do you recall those questions?
19      A.    Yes.
20          MR. MINN CHUNG:  Objection, mischaracterize
21         previous question by counsel and compound.
22         Vague and ambiguous.
23  BY MR. QUINN:
24      Q.    Without purporting to quote your testimony
25  exactly, do you recall saying in those instances that

Page 151

1  you thought it was not possible or difficult to
2  classify those various things as being purely hardware
3  or purely software?  Do you recall that in general?
4          MR. MINN CHUNG:  Objection, mischaracterize
5         the previous testimony and vague and ambiguous.
6      A.    I do.
7  BY MR. QUINN:
8      Q.    Could you explain why you believe it's
9  difficult to classify those various types of things as
10  being either simply hardware or simply software?
11          MR. MINN CHUNG:  Objection, leading, vague
12         and ambiguous and compound.
13      A.    Yes, when it comes to such things as the
14  browser and the operating system, those represent a
15  combination of software plus having to work in close
16  concert with such things as the CPU and memory,
17  hardware components, in other words, in a particular
18  fashion, and therefore, it's very difficult to speak in
19  one sense or the other.
20          MR. MINN CHUNG:  I'll add another objection.
21         This question was asked and answered.
22          MR. QUINN:  I think I'm almost certainly
23         done, but I'd like to go off the record just to
24         double-check.
25          VIDEOGRAPHER:  Going off the record.  The

Page 152

1  time is 7:42.
2
3      (Time noted:  7:42 p.m.)

Page 153

1  (Counsel representing this witness should arrange
   reading and signing and thereafter distribute copies
2  of the signed Errata Sheet to opposing counsel
   without involvement of court reporter.)

   STYLE OF CASE:  Apple V Samsung
4                  Civil Action No.:  11-CV-01846-LHK
   DEPOSITION OF:  SEUNGHWAN CHO
5  DATE TAKEN:  Thursday, April 19, 2012

6          E R R A T A   S H E E T

7  PAGE    LINE        CHANGE              REASON

22  I hereby certify that I have read my deposition and
23  that it is true and correct subject to any changes
    in form or substance entered here.
24
25  Date                    SEUNGHWAN CHO

# ERRATA SHEET

NAME OF CASE:   Apple v. Samsung Electronics Co. Ltd., No. 11-cv-1846

DATE OF DEPOSITION:   April 19, 2012

NAME OF WITNESS:   Seunghwan Cho

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 17 | 5 | is that of software | is in software | 3 |
| 19 | 6 | one thing certain | one thing clear | 3 |
| 45 | 25 | in order that we be able | so that we are able | 3 |
| 49 | 17 | in which that's a | that are a | 3 |
| 148 | 16 | as opposed to | compared to | 3 |

Signed: _____
       Seunghwan Cho

Date: 22-May 2012-
      15 May 2012

02198.51855/4755691.1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

153

1    (Counsel representing this witness should arrange
     reading and signing and thereafter distribute copies
2    of the signed Errata Sheet to opposing counsel
     without involvement of court reporter.)

3
     STYLE OF CASE:  Apple V Samsung
4                    Civil Action No.:  11-CV-01846-LHK
     DEPOSITION OF:  SEUNGHWAN CHO
5    DATE TAKEN:  Thursday, April 19, 2012

6                    E R R A T A   S H E E T

7    PAGE    LINE        CHANGE              REASON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
     I hereby certify that I have read my deposition and
23   that it is true and correct subject to any changes
     in form or substance entered here.
24   _22 May 2012_____        _____/s/_____
25   Date                         SEUNGHWAN CHO

# Watson Declaration

# EXHIBIT 22

# Filed Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

```
             HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                  UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4   _____

 5   APPLE, INC., a California corporation,

 6   Plaintiff,

 7   v.                                     Civil Action No.
                                            11-CV-01846-LHK
 8
     SAMSUNG ELECTRONICS CO., LTD.,
 9   a Korean business entity;
     SAMSUNG ELECTRONICAMERICA, INC.,
10   a New York corporation; and
     SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
11   a Delaware limited liability company,

12   Defendants.
     _____
13

14               *** HIGHLY CONFIDENTIAL ***
                     ATTORNEYS' EYES ONLY
15

16

17           VIDEOTAPED PERSONAL DEPOSITION OF:

18

19                      SUNGSIK LEE

20

21

22                     March 1, 2012

23                     Kim & Chang

24                  Seoul, South Korea

25              9:03 a.m. - 3:28 p.m.
```

Page 2

```
1   APPEARANCES:

2
    For the Plaintiff, Apple, Inc.:
3
              MORRISON & FOERSTER, LLP
4             By:  Karl J. Kramer, Esq.
              755 Page Mill Road
5             Palo Alto, California 94304-1018
              (650) 813-5600
6

7   For the Defendants, the Samsung entities:

8
              QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
9             By:  Rachel Herrick Kassabian, Esq.
              555 Twin Dolphin Drive
10            5th Floor
              Redwood Shores, California 94065
11            (650) 801-5000

12  Also present:
13
              Samantha Kim, Morrison & Foerster, LLP
14            Samuel Lee, Samsung
              Albert Kim, Lead Interpreter
15            Eunice HyeRim Lee, Check Interpreter
              Peter Au, Videographer
16            Lisa A. Knight, Court Reporter

17

18

19

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
    WITNESS:                                       PAGE
2   SUNGSIK LEE
3
    Examination By Mr. Kramer                         8
4

5                  E X H I B I T S

    NUMBER        DESCRIPTION                      PAGE
6
    Exhibit 1970  Article from Korea Economic Daily  19
7                 (2 pages), No Bates

8   Exhibit 1971  Functional Organizational Chart    26
                  (Korean), Bates S-ITC-003006124 to
9                 -6249

10  Exhibit 1972  "How to lead global smart device   31
                  experience" document, Bates
11                SAMNDCA10988469 to -504

12  Exhibit 1973  Emotion Studio (Korean),           32
                  Bates SAMNDCA10999529 to -595
13
    Exhibit 1974  Global CS (Korean),                38
14                Bates SAMNDCA10993206 to -247

15  Exhibit 1975  E-mail string (Korean),            44
                  Bates SAMNDCA10247277 to -278
16
    Exhibit 1976  E-mail string (Korean),            53
17                Bates SAMNDCA10247509 to -511

18  Exhibit 1977  E-mail string (Korean),            54
                  Bates SAMNDCA10247373 to -378
19
    Exhibit 1978  E-mail string (Korean),            54
20                Bates SAMNDCA10318251 to -252

21  Exhibit 1979  E-mail string (Korean),            56
                  Bates SAMNDCA10320161 to -63
22
    Exhibit 1980  E-mail string (Korean),            58
23                Bates SAMNDCA10245965 to -968

24  Exhibit 1981  E-mail string (Korean),            58
                  Bates SAMNDCA10247549 to -552
25
```

Page 4

```
1   Exhibit 1982* iPhone TouchWiz (Korean),         68
                  Bates SAMNDCA10998213 to -248
2
3   Exhibit 1983  TW3.0 vs. iPhone4 document,        73
                  Bates SAMNDCA10992025 to -2071

4   Exhibit 1984  Document (Korean),                 75
                  Bates SAMNDCA10998250 to -253
5
6   Exhibit 1985  Galaxy S UX (Korean),              79
                  Bates SAMDCA10999199 to -243

7   Exhibit 1986  TouchWiz3.0 Message composer UI    83
                  document, Bates SAMNDCA10106612 to
8                 -650

9   Exhibit 1987  iPhone Navigation Analysis document, 83
                  Bates SAMNDCA10998016 to -8035
10
    Exhibit 1988  Document (Korean),                 85
11                Bates SAMNDCA10995432 to -444

12  Exhibit 1989  iPhone OS 3.0 Analysis,            87
                  Bates SAMNDCA10989363 to -379
13
14  Exhibit 1990  iPad GUI Review, Bates             88
                  SAMNDCA10989107 to -179

15  Exhibit 1991  iPhone 4.0 Quick Report & Analysis, 89
                  Bates SAMNDCA10989397 to -430
16
    Exhibit 1992  iPhone GUI Elements, SAMNDCA10997825 89
17                to -904

18  Exhibit 1993  iPhone4 UX document (Korean),      90
                  SAMNDCA10992072 to-131
19
    Exhibit 1994  iPad vs. Honeycomb P5 UX,          92
20                Bates SAMNDCA10991068 to -137

21  Exhibit 1995  Browser UX document (Korean),      92
                  Bates SAMNDCA10999461 to -528
22
    Exhibit 1996  PI document (Korean),              95
23                Bates SAMNDCA10989840 to -941

24  Exhibit 1997  E-mail (Korean), SAMNDCA10245956 to 95
                  -957
25
```

Page 5

```
1   Exhibit 1998  E-mail string (Korean,)           96
                  Bates SAMNDCA10245969 to -977
2
3   Exhibit 1999  E-mail string (Korean),           96
                  Bates SAMNDCA10245981 to -87

4   Exhibit 2000  E-mail (Korean),                  97
                  Bates SAMNDCA10246745 to -47
5
6   Exhibit 2001  E-mail string (Korean),           97
                  Bates SAMNDCA10307123 to -138

7   Exhibit 2002  PI document (Korean),             98
                  Bates SAMNDCA10990627 to -713
8
9   Exhibit 2003* UX document (Korean),             98
                  Bates SAMNDCA10997759 to -768

10  Exhibit 2004* TouchWiz document (Korean), Bates 100
                  SAMNDCA10991639 to -739
11
    Exhibit 2005  P5 document (Korean),             101
12                Bates SAMNDCA00176053 to -171

13  Exhibit 2006  Touch Portfolio, Bates            102
                  SAMNDCA00191811 -987
14
    Exhibit 2007  SI, iPhone document (Korean),     102
15                Bates SAMNDCA00203880 to -4010

16  Exhibit 2008  Behold3 document (Korean),        103
                  Bates SAMNDCA00508318 to -411
17
    Exhibit 2009  Touch Portfolio (Korean),         105
18                Bates SAMNDCA10805169 to -175

19  Exhibit 2010  Winning in Smartphones 12/10/09,  105
                  Bates SAMNDCA10807316 to -387
20
    Exhibit 2011  Winning in Smartphones (12/23/09), 106
21                Bates SAMNDCA10807388 to -458

22  Exhibit 2012  Feasibility Review on Standalone AP 107
                  Business, Bates SAMNDCA10809390 to
23                -460

24  Exhibit 2013  Samsung Mobile UX document, No Bates 107
                  (1-48)
25
```

Page 6

```
 1   Page 71     Line 1
     (*Note:  Exhibit 1982 pages SAMNDCA109928233 to -248
 2   clawed back and retained by Rachel Herrick Kassabian,
     Esq., of, Quinn, Emanuel, Urquhart & Sullivan, LLP)
 3
     99      Line 14
 4   (*Note:  Exhibit 2003 pages SAMNDCA10997765 to -768 clawed
     back and retained by Rachel Herrick Kassabian, Esq., of
 5   Quinn, Emanuel, Urquhart & Sullivan, LLP)
 6   Page 113     Line 11
     (*Note:  Exhibit 2004 page SAMNDCA10991640 clawed back and
 7   retained by Rachel Herrick Kassabian, Esq., of Quinn,
     Quinn, Emanuel, Urquhart & Sullivan, LLP)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We are now on the record
 3   in the matter of Apple, Inc. versus Samsung
 4   Electronics Company Ltd., et al., for the
 5   United States District Court, Northern District of
 6   California, San Jose Division, Case No.
 7   11-CV-01846-LHK.
 8        Today's date is the 1st of March, 2012.  The
 9   time now is 9:03.  This is the video recorded
10   individual deposition of Mr. SungSik Lee.  The
11   deposition is taking place at Kim & Chang, Jeongdong
12   building, Seoul, South Korea.
13        I'm Peter Au, a certified deposition video
14   specialist with American Realtime Court
15   Reporters/Asia.  The court reporter is Ms. Lisa
16   Knight, also with American Realtime Court
17   Reporters/Asia.
18        Will all the attorneys please identify
19   themselves and the parties they represent.
20        MR. KRAMER:  Karl Kramer on behalf of Apple.
21        MS. KASSABIAN:  Rachel Herrick Kassabian on
22   behalf of Samsung.
23        MR. KRAMER:  We understand the court
24   reporter is not authorized to administer oaths in this
25   venue.  Nevertheless, we request that she administer
```

Page 8

```
 1   the oath, and we stipulate that we waive any objection
 2   to the validity of the deposition based on the oaths.
 3        MS. KASSABIAN:  So stipulated.
 4        (Interpreters sworn.)
 5             SUNGSIK LEE,
 6   having been first duly sworn to state the whole truth
 7   testified as follows:
 8             EXAMINATION
 9   BY MR. KRAMER:
10     Q.   Please state your name for the record.
11     A.   Yes.  My name is SungSik Lee.
12     Q.   And by whom are you employed?
13     A.   I currently serve within Samsung Electronics
14   Company Ltd.
15     Q.   Have you been involved in the design of
16   Samsung's telephones and tablets?
17        MS. KASSABIAN:  Objection.  Vague.
18        (A discussion was had off the record.)
19        MS. KASSABIAN:  Maybe we could read the
20   question back.
21        LEAD INTERPRETER:  The interpreter will just
22   reinterpret.
23        (Translation.)
24        LEAD INTERPRETER:  Quick interjection by the
25   interpreter.  When counsel says "design," does he mean
```

Page 9

```
 1   structural design or cosmetic design?
 2        MR. KRAMER:  Any design.
 3        LEAD INTERPRETER:  It diverges into two in
 4   Korean, so we need to disambiguate.  So if counsel
 5   would therefore --
 6   BY MR. KRAMER:
 7     Q.   The question is, have you been involved in any
 8   aspect of the design of Samsung's phones or tablets?
 9        MS. KASSABIAN:  Objection.  Vague and
10   ambiguous.
11     A.   I am currently involved in the design of the
12   UX.
13   BY MR. KRAMER:
14     Q.   What do you mean by "UX"?
15     A.   I could explain that to you by telling you that
16   it's about the design of the interface as seen within the
17   display.
18     Q.   Can you explain to us why Samsung's telephones
19   with respect to the UX design, at least, have evolved
20   dramatically since 2007 to the present?
21        MS. KASSABIAN:  Objection.  Vague and
22   ambiguous as to the term "dramatically" and the term
23   "telephones" and also overbroad as to time, given the
24   witness's length of employment with Samsung.
25        MR. KRAMER:  Counsel, are we going to have
```

Page 10

```
 1   objections during the day where you're going to
 2   identify specific things for the witness to say?  Is
 3   that going to be the routine we're going to have
 4   today?
 5          MS. KASSABIAN:  If you're going to ask vague
 6   questions, I'm going to object to those questions on
 7   the record.  And if you have a problem with my
 8   objections, you can take it up however you wish.
 9          MR. KRAMER:  You can make your objections,
10   but there's no reason to have speaking objections.
11   And I request that you stop it.
12          MS. KASSABIAN:  I will make my objections
13   how I see fit, and you can take it up after the
14   deposition if you have a problem with it.
15          MR. KRAMER:  Now, could we have the question
16   read back for the witness?
17          (The record was read back as requested.)
18          (A discussion was had off the record between
19   Lead Interpreter and Check Interpreter in Korean.)
20          MS. KASSABIAN:  If you could restate my
21   objection.
22          (The record was read back as requested.)
23          MS. KASSABIAN:  And the question is also
24   objectionable because it's compound.
25      A.   I started serving in Samsung starting in 2009.
```

Page 11

```
 1   And, therefore, I do not believe myself to be in any
 2   position to make any comment as to anything stemming from
 3   prior to that.
 4   BY MR. KRAMER:
 5      Q.   So it's your testimony that you have no
 6   knowledge of Samsung's phones and the operation of the UX
 7   in those phones that were distributed prior to 2009?
 8          MS. KASSABIAN:  Objection.  Misstates the
 9   witness's prior testimony.  Vague and ambiguous as to
10   the terms "Samsung's phones" and "distributed," and
11   compound.
12      A.   Well, as I mentioned just a moment ago, I don't
13   think there is really anything for me to tell you about
14   concerning Samsung's UX designs stemming from prior to my
15   coming on board in 2009.
16   BY MR. KRAMER:
17      Q.   Sir -- excuse me.
18      A.   And as for anything post 2009, the way I look
19   at things, we at Samsung have been continually endeavoring
20   to continually provide, oh, some values, certain values to
21   the consumers.
22      Q.   Sir, can you explain why Samsung's phones and
23   tablets look so similar to Apple's phones and the iPad?
24          MS. KASSABIAN:  Objection.  Compound.  Are
25   you speaking about every single phone that Samsung
```

Page 12

```
 1   makes in the world?  And vague and ambiguous.  As I
 2   said, compound.
 3          MR. KRAMER:  Did you say compound?
 4          MS. KASSABIAN:  I just did, yes.
 5          MR. KRAMER:  Okay.  I just want to make
 6   sure.
 7          MS. KASSABIAN:  It's also way beyond the
 8   scope of this case.  And argumentative.
 9          You can answer the question, if you
10   understand it.
11      A.   May I request that I have the question
12   repeated, please.
13   BY MR. KRAMER:
14      Q.   Sure.
15          MR. KRAMER:  Please repeat it.
16          (The record was read back as requested.)
17          MS. KASSABIAN:  Same objections.  Vague and
18   ambiguous, overbroad, compound, argumentative.
19      A.   I do not agree with your statement that
20   Samsung's phones and Apple's phones are similar.
21   BY MR. KRAMER:
22      Q.   So you find no similarity between them?
23          MS. KASSABIAN:  Objection.  Vague and
24   ambiguous, unintelligible, overbroad, argumentative,
25   and misstates the witness's prior testimony.  And
```

Page 13

```
 1   irrelevant.
 2   BY MR. KRAMER:
 3      Q.   I know there's some confusion here.  You're
 4   here to testify and respond to my questions.  When she
 5   says things, she's saying it for the record.  She's not
 6   testifying.  So don't get confused about that.
 7          MS. KASSABIAN:  And, Counsel, I'll advise
 8   you not to misinterpret Mr. Lee's puzzlement with your
 9   question as some sort of confusion regarding the
10   deposition process, which he understands.
11          We can have the question read back for
12   Mr. Lee.  If he believes he can answer it as worded,
13   then he will; and if not, he won't.
14          So, Ms. Reporter, would you mind?
15          (The record was read back as requested.)
16          MS. KASSABIAN:  With all my same objections,
17   you may answer, if you can.
18      A.   As I indicated just a moment ago, I do not see
19   any similarities as between the two, and, therefore, I'm
20   not able to give you any other answer than what I've
21   already given you.
22   BY MR. KRAMER:
23      Q.   So at least with respect to the UX, you agree
24   that there are no similarities whatsoever between the
25   phones that you worked on at Samsung and any Apple iPhone
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1  of an UX, that, you could say, has to do with the
2  interface as seen within the screen or display.
3  BY MR. KRAMER:
4      Q.    What aspects of the interface as seen within
5  the screen or display of the Galaxy S telephones do you
6  believe you were responsible for?
7          MS. KASSABIAN:  Objection.  Vague and
8  ambiguous, compound.
9      A.    What aspects?  Is that what you said?
10 BY MR. KRAMER:
11     Q.    Yes.
12     A.    Well, to explain, that entails designing the
13 interface within the screen or display so as to enable a
14 user to utilize the phone's functions.
15     Q.    Could you describe for us in any way your
16 contribution to those aspects of the Galaxy S telephones?
17         MS. KASSABIAN:  Objection.  Vague and
18 ambiguous as to "aspects" and "telephones"; compound.
19     A.    Well, as I mentioned earlier, this task of
20 going about designing certain functions for the use of the
21 user with respect to the design of the screen is a complex
22 sort of task.  I don't know that I can give you a
23 cut-and-dry answer that it is thus.
24 BY MR. KRAMER:
25     Q.    Can you describe for us which features of the

Page 23

1  Galaxy S telephone interface you were responsible for
2  developing?
3          MS. KASSABIAN:  Objection.  Vague and
4  ambiguous, compound.
5      A.    Well, when you look at the Galaxy S phone, it
6  comes with a number of features or functionalities.
7  Further, amongst those, many of them had previously been
8  already provided such that in terms of providing these for
9  the benefit of the user, this is for the ease of use for
10 the user.  And incrementally, little by little, we've been
11 seeking to improve upon certain things.
12         And, as such, I don't know that I can explain
13 as to what exactly I, for instance, did to contribute.
14 But in an overall sense, what shall I say, you might say
15 that I kind of oversaw the design of the interface,
16 perhaps.
17 BY MR. KRAMER:
18     Q.    As you sit here today, can you recall any
19 specific feature that was new to the Galaxy S phone that
20 you think you contributed?
21         MS. KASSABIAN:  And that's vague and
22 ambiguous, at least as to the terms "new" and
23 "contributed."
24     A.    Well, mind you, my role is not in terms of
25 proposing any new features when you ask as to certain new

Page 24

1  features.  I, as such, did not either propose or devise
2  any such thing.  Rather, in an overall sense, my role, I
3  would say, is to see to it that we garner the necessary
4  level so as to have our customers fully satisfied with
5  respect to the overall usability on the part of the users.
6          And in that regard, I would make requests of
7  our team members, if you will.  Or if there be any ideas
8  that come about by way of such, then basically I would see
9  to it that everything get properly harmonized.  I would
10 say that that's what my role has been.
11 BY MR. KRAMER:
12     Q.    As you sit here today, can you recall any
13 specific feature that you think was a new feature that you
14 contributed to in development of the Galaxy Tab?
15         MS. KASSABIAN:  Objection.  That's the exact
16 question that was just asked and already answered by
17 Mr. Lee.
18         You may answer again.
19     A.    I'm sorry.  Can I just have that repeated,
20 please?
21         MR. KRAMER:  Please.
22         LEAD INTERPRETER:  The interpreter can just
23 do it.
24         (Translation.)
25         MS. KASSABIAN:  Sorry.  My mistake.  I

Page 25

1  thought I heard you say Galaxy S again.  So now you're
2  asking with respect to Galaxy Tab.
3      A.    Well, likewise, even when it comes to the
4  Galaxy Tab, it's not like I would make any proposals as to
5  certain new features.  Such would be on the part of our
6  team members.  And my role has been to harmonize things in
7  an overall sense.  So in that regard, there isn't anything
8  specific that I can tell you in terms of me proposing any
9  new features.
10 BY MR. KRAMER:
11     Q.    So I just want to be absolutely clear.  You
12 have worked on the UI for the Galaxy S and other Galaxy
13 telephones for Samsung as well as the Galaxy Tab line of
14 products, correct?
15         MS. KASSABIAN:  Objection.  Vague,
16 ambiguous, compound, asked and answered.
17     A.    All right.  I participated in the UX design as
18 to the Galaxy S and Galaxy Tab.
19 BY MR. KRAMER:
20     Q.    And it's your testimony, sir, that in -- with
21 that knowledge of the UX of both the Galaxy S and Galaxy
22 Tab product lines, you see no similarity between the UX of
23 those products and any Apple product that you're aware of?
24         MS. KASSABIAN:  Objection.  Vague and
25 ambiguous, compound, asked and answered,

Page 26

1   argumentative.
2        A.    Well, for starters, I am not able to agree as
3   to the premise that there is any similarity.  And,
4   therefore, I am unable to tell you if there is any
5   knowledge or understanding on my part or not.
6            MR. KRAMER:  Let's mark next in order
7   document Bates stamped S-ITC-003006124 through -6249.
8            (Deposition Exhibit 1971 was marked.)
9   BY MR. KRAMER:
10       Q.    This is a rather thick document, but do you
11  agree that the title is the Functional Organizational
12  Chart by Group Team dated January 2012?
13       A.    Yes.  It talks about job delineation, table of
14  organization as to each department.
15           MS. KASSABIAN:  I'll object, again, that a
16  certified translation of this document has not been
17  provided to me today.  And, also, note that we're
18  designating the entire transcript attorneys' eyes
19  only.
20  BY MR. KRAMER:
21       Q.    Sir, at the bottom of the page here you'll see
22  a numbering system that's been used.  Could you turn to
23  the page with the number that ends -6129.  This appears to
24  be an organizational chart on which your name is found, I
25  believe, on the right-hand side at the top under UX Design

Page 27

1   Part.  Do you see that?
2        A.    Yes, I see that my name is there.
3        Q.    Does it list you as a vice president?
4        A.    Yes, I currently serve as a vice president.
5        Q.    Sir, do you have any responsibilities in the UX
6   clusters part?
7            MS. KASSABIAN:  Objection.  Vague.
8        A.    No, I do not.
9   BY MR. KRAMER:
10       Q.    Could you turn to the next page -- I'm sorry.
11  Let's turn back to the page marked -29.  Can you find
12  MinSuk Kim's name?  I think it's the 18th name down
13  underneath your name in that group.
14       A.    Yes, I see it's here.
15       Q.    What are MinSuk Kim's responsibilities?
16           MS. KASSABIAN:  Objection.  Lacks
17  foundation.
18       A.    You ask as to his responsibilities?  What do
19  you mean?
20  BY MR. KRAMER:
21       Q.    In the group, what are his responsibilities?
22       A.    He's charged with the design of GUI.
23       Q.    For Android?
24       A.    Yes, for Android.
25           MS. KASSABIAN:  Objection.  Vague.

Page 28

1   BY MR. KRAMER:
2        Q.    And I think if you look over three columns to
3   the left, you find SangKi Lee's name?
4            THE WITNESS:  (Through Interpreter)  Towards
5   where, Mr. Interpreter?
6        A.    Oh, I see.  I'm here.
7        Q.    What are SangKi Lee's responsibilities?
8            MS. KASSABIAN:  Objection.  Lacks
9   foundation.
10       A.    Are you asking as to what he is charged with
11  nowadays or back then, during this period of time?
12           Basically, in February, the company went
13  through an organizational shuffling, so to say.  As I
14  said, the job delineation has kind of changed.
15  BY MR. KRAMER:
16       Q.    Let me ask you then, before and after.  First,
17  what were SangKi Lee's responsibilities before that
18  shuffling?
19           MS. KASSABIAN:  Objection.  Lacks
20  foundation.
21       A.    Back then, it says as indicated here in that he
22  was charged with handling things in terms of the Bada
23  platform and the Paragon platform for the UI design
24  thereof.
25  BY MR. KRAMER:

Page 29

1        Q.    And after the shuffling, what were SangKi Lee's
2   responsibilities?
3            MS. KASSABIAN:  Same objections.
4        A.    As for now, hmmm.  It's a little tricky to
5   explain.  As for the work, itself, that he is charged
6   with, he is working on improving the next ensuing UX.
7   BY MR. KRAMER:
8        Q.    Yeah.  I want to exclude from your answer
9   information about products that haven't been released.  I
10  know you're sensitive to that issue, and I just wanted to
11  make sure you excluded that from your answer.
12           MS. KASSABIAN:  So I believe the witness has
13  made clear that this individual is working on future
14  products, and I just caution the witness not to
15  testify regarding that work.
16  BY MR. KRAMER:
17       Q.    Let's turn to the same page here at the top.
18  Do you see -- who is listed as the executive director of
19  the design group?
20           MS. KASSABIAN:  I'm going to object that the
21  document speaks for itself.  And I'm not sure that
22  Mr. Kramer's translation is accurate.
23       A.    The gentleman's name is DongHoon Chang, senior
24  vice president.
25       ///

Page 30

BY MR. KRAMER:

2    Q.    And does DongHoon Chang still hold that job
3  after the reshuffling that you mentioned that happened in
4  February?
5    A.    Yes.
6        MS. KASSABIAN:  Objection.  Vague.
7  BY MR. KRAMER:
8    Q.    Sir, have you had any training in English
9  language skills?
10    A.    Well, I've undertaken the, you know, slew of
11  courses as part of the regular school curriculum.
12    Q.    Do you occasionaly read and write in English
13  in connection with your job responsibilities?
14    A.    Well, I guess I would mostly tend to rely on
15  those colleagues of mine who serve within the company
16  alongside me whom, you know, I'm close with who are better
17  at English than I.
18    Q.    How long have you been vice president at
19  Samsung?
20    A.    I was given my notice around, I think, the --
21  perhaps the 8th of -- yeah, the 8th of December, 2010.
22    Q.    And before that date, what was your job
23  responsibility -- excuse me, what was your job title at
24  Samsung?
25    A.    I was a principal engineer.

Page 31

1        LEAD INTERPRETER:  "Mr. Interpreter, not
2  'engineer.'"
3    A.    Principal designer.
4        MR. KRAMER:  I want to mark next in order a
5  document Bates stamped SAMNDCA10988469 through -504.
6        (Deposition Exhibit 1972 was marked.)
7  BY MR. KRAMER:
8    Q.    Sir, do you recognize this document?
9        MS. KASSABIAN:  And I would just ask that
10  you give the witness a moment to leaf through this
11  36-page document before he provides testimony on it.
12        Mr. Lee, please take the time that you need
13  to familiarize yourself with this document.
14    A.    All right.  I do not recall seeing this.
15  BY MR. KRAMER:
16    Q.    Based upon your experience at Samsung, can you
17  tell from this document which group was responsible for
18  preparing it?
19        MS. KASSABIAN:  Objection.  The witness has
20  already testified that he's never seen this document
21  before, so this line of questioning lacks foundation.
22  And I caution the witness not to speculate.
23    A.    Right.  I, just by looking at this, cannot
24  readily tell as to which department.
25        MS. KASSABIAN:  Sir, before you move on to

Page 32

1  the next document, can we take a break?
2        MR. KRAMER:  Sure.
3        MS. KASSABIAN:  We've been going for a
4  little over an hour.
5        THE VIDEOGRAPHER:  Going off the record.
6  The time now is 10:08.  This is the end of Tape No. 1.
7        (Recess taken.)
8        (Deposition Exhibit 1973 was marked.)
9        THE VIDEOGRAPHER:  We are now back on the
10  record.  The time now is 10:26.  This is the beginning
11  of Tape No. 2.
12        MR. KRAMER:  Let's mark next in order a
13  document entitled Emotion Study [sic], Bates stamped
14  SAMNDCA10999529 through -95.  This is Exhibit 1973.
15  BY MR. KRAMER:
16    Q.    Do you recognize this document, sir?
17        MS. KASSABIAN:  And, Mr. Lee, please take a
18  moment to familiarize yourself with the document,
19  which is approximately 40-odd pages long, before you
20  start providing testimony.
21        (Pause.)
22  BY MR. KRAMER:
23    Q.    And the question is, do you recognize this
24  document?
25    A.    I recall seeing this.

Page 33

1    Q.    Is this a document you authored?
2    A.    No, I did not author it.
3    Q.    What do you recall about the circumstances in
4  which you first saw this document?
5        MS. KASSABIAN:  Objection.  Vague.
6    A.    I came on board with the company on
7  January 1st, 2009, after which close to about a month or
8  so, I underwent a sort of a companywide training/education
9  period.  And then thereafter this basically, I would say
10  was around basically a month or so within my being placed
11  within my department.  And there, I underwent further
12  training as to the various affairs and work going on.
13        And as I recall, this is something that I came
14  across as part of what might generally be called OJT in
15  our parlance, in terms of my being introduced as to what
16  this particular department or unit does in its work.
17  BY MR. KRAMER:
18    Q.    What is the emotion studio?
19    A.    It's this department's name.
20    Q.    What is the function of the emotion studio?
21        MS. KASSABIAN:  Objection.  Vague as to
22  time, lacks foundation.
23    A.    Well, at that time, as it were, these arms of
24  the company, the graphic team, the GUI team, the AUI team,
25  these units were handling what you might call the emotive

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

62..65

Page 62

1   time.  So let the counsel speak and then you can talk.
2   I'm ready now.
3           LEAD INTERPRETER:  Interjection.  With due
4   respect to Ms. Kassabian, it is apparent to this
5   interpreter that Ms. Kassabian is not entirely
6   familiar with the way interpretation/translation
7   works.
8           To the extent the gentleman misreads
9   anything, the interpreter will go with however the
10  gentleman reads the document or misreads the document
11  in that case.  To the extent he faithfully reads the
12  document as stated in Korean, it is the one and the
13  same thing.  And I think that's probably sufficient
14  for the -- for these purposes.
15          Further, the interpreter would rather allow
16  the gentleman to read through the entire document or
17  at least through at least one sentence because
18  syntactically Korean and English are different.  So
19  the interpreter will work things the way he sees fit.
20          MS. KASSABIAN:  Mr. Lee, please read the --
21  counsel is asking you to read the second paragraph.
22  And I ask that you read that paragraph one sentence at
23  a time and have it translated one sentence at a time.
24       A.   And by the "second paragraph," are we talking
25  about this one or what?  This one?

Page 63

1   BY MR. KRAMER:
2        Q.   We are talking about this paragraph.  The
3   second paragraph.
4        A.   I shall.
5           LEAD INTERPRETER:  And interjection by the
6   interpreter.  In this instance, the interpreter will
7   necessarily derive the grammatical subject.
8           Korean, for the parties' information, is a
9   language that is prevalent in terms of what's called
10  pro drop, meaning we tend to drop the nominative
11  subjects or the pronoun.  Therefore, the interpreter
12  will use brackets to so derive the missing subjects in
13  that regard.  Okay.  So . . .
14          (A discussion was had off the record.)
15          MS. KASSABIAN:  No.  I'd like an explanation
16  of what -- are you saying you can't translate what he
17  just said?
18          LEAD INTERPRETER:  That is absolutely not
19  what this interpreter has said.  The interpreter has
20  said what he has said.  Okay.
21          Do you know Spanish, madam?
22          MS. KASSABIAN:  Can you explain what you
23  mean?
24          LEAD INTERPRETER:  The interpreter will be
25  happy to explain.  And the interpreter will, you know,

Page 64

1   please request counsel to allow the interpreter to do
2   -- to perform his job as he is required to do under
3   the Federal Rules of Evidence 604.
4           MS. KASSABIAN:  So can you explain to me
5   what you just said?
6           LEAD INTERPRETER:  The interpreter will --
7   Counsel, please.  Please.  The interpreter has to
8   render what the gentleman has read per your request,
9   sentence by sentence.
10       A.   Open bracket.  My, close bracket,
11  interpretation is that the import here is that everything
12  be considered and decided from a -- from the user's
13  perspective.
14          LEAD INTERPRETER:  Shall we do this on or
15  off the record?
16  BY MR. KRAMER:
17       Q.   Let's go on to the next sentence, please.
18          MS. KASSABIAN:  I just -- if Eunice is okay
19  with the translation, I'm okay with that.  I just
20  don't understand what your prefatory comment was
21  about.
22          MR. KRAMER:  It was in English, not Korean.
23          MS. KASSABIAN:  Right.  And it didn't make
24  any sense to me.  So if Eunice is fine with the
25  translation, then I'm fine with it.

Page 65

1           CHECK INTERPRETER:  Yeah, I'm fine with the
2   translation.
3           MS. KASSABIAN:  Great.
4           LEAD INTERPRETER:  Thank you very much.
5   BY MR. KRAMER:
6        Q.   Could we have the second sentence?
7        A.   Next sentence.  Open paren, As opposed to the
8   supplier or carrier dot, dot, dot, close paren.
9           Do I continue?
10          MS. KASSABIAN:  If it's part of the second
11  paragraph, yes.
12       A.   The most exemplary example would, of course, be
13  the iPhone.
14  BY MR. KRAMER:
15       Q.   Now, sir, let's have you look down at the fifth
16  paragraph that has two references to iPhone after another.
17  Could you read that for us, too, please?
18       A.   I shall.
19          The point is not to create the same UX as that
20  of the iPhone, but, rather, to learn from the iPhone's
21  wisdom and to acknowledge the industry standard, open
22  paren, question mark, close paren, as they have already
23  made.
24       Q.   Mr. Lee, what was the Lismore Conference?
25       A.   I would believe that to be an occasion in which

Page 66

1  they were doing quality evaluations as to a product known
2  as Lismore.
3      Q.   What did the CEO mean by saying "Samsung's UX
4  mindset is clinging to the past generation"?
5          MS. KASSABIAN:  Objection, calls for
6  speculation.  And I admonish the witness not to
7  speculate.
8      A.   I'm sorry.  With due apologies, can I ask as to
9  what I'm supposed to be answering?  What was the question,
10 sir?
11 BY MR. KRAMER:
12     Q.   Yeah.  If you look at the first paragraph of
13 this e-mail that you wrote, could you tell us your
14 understanding of what the CEO meant by saying "Samsung's
15 UX mindset is clinging to the past generation"?
16         MS. KASSABIAN:  Objection.  The document
17 speaks for itself.  And the question calls for
18 speculation.  I admonish the witness not to speculate.
19         MR. KRAMER:  The question was directed to
20 the witness's understanding.  That's all I'm asking
21 for.
22         MS. KASSABIAN:  You're asking the witness to
23 tell you what was in someone else's mind, so it calls
24 for speculation.
25     A.   As I indicated earlier, sir, at this present

Page 67

1  moment, I do not recall as to the circumstances under
2  which I wrote this particular e-mail.  And so in answer to
3  your question, would it suffice if I answered your
4  question based upon how I take this to mean at this time,
5  as I read it?
6          MR. KRAMER:  No.  No.  My question is about
7  his existing understanding, and I think he just said
8  he didn't have any.
9  BY MR. KRAMER:
10     Q.   Is that correct?
11         MS. KASSABIAN:  Objection.  That wasn't the
12 question, and I don't think that was the answer.  So
13 can we just clarify for the record what is the current
14 question pending?
15 BY MR. KRAMER:
16     Q.   My question is:  Looking at that first
17 paragraph of Exhibit 1981, do you currently have a
18 recollection of your understanding of what the CEO meant
19 when he said that -- "Samsung's UX mindset of clinging to
20 the past generation"?
21         MS. KASSABIAN:  Same objection.  You're
22 asking Mr. Lee to speculate about someone else's
23 intentions.  Calls for speculation.
24     A.   Well, at this moment, I do not recall as to
25 what I may have meant when I wrote "clinging onto the

Page 68

1  prior generation."
2  BY MR. KRAMER:
3      Q.   Okay.
4          MR. KRAMER:  Let's mark next as Exhibit 1982
5  a document Bates stamped SAMNDCA10998213 through -48.
6          (Deposition Exhibit 1982 was marked.)
7          (Pause.)
8  BY MR. KRAMER:
9      Q.   Do you recognize this document, sir?
10         MS. KASSABIAN:  Sir, take as much time as
11 you need to familiarize yourself with this document
12 before answering questions about it.  It's
13 approximately 35 pages long.
14     A.   Well, not that I precisely recall this
15 particular document, but we have undertaken these sorts of
16 activities.
17 BY MR. KRAMER:
18     Q.   When you say "we," who are you referring to?
19         LEAD INTERPRETER:  Quick interjection.
20 Editorial "we" by the interpreter, but with that
21 understanding.
22         (Translation.)
23     A.   Who?  I'm sorry?  In terms of conducting
24 activities?
25     ///

Page 69

1  BY MR. KRAMER:
2      Q.   You said "we conduct these activities," and I
3  was trying to determine who he included in that "we."
4          LEAD INTERPRETER:  May the interpreter --
5  for counsel's benefit, Korean, being a "pro drop"
6  language ofttimes leaves out the nominative subject,
7  so it's either "we" or "I," but the interpreter
8  employed the editorial "we" in this case.  The
9  interpreter may offer I, but it is either way unclear.
10 It's either/or.  Okay.
11         MS. KASSABIAN:  So maybe you can ask another
12 question.
13         MR. KRAMER:  I did.
14         MS. KASSABIAN:  Right.  But it sounds like
15 he's saying the witness didn't say "we," and then you
16 said, What do you mean by "we"?  But the interpreter
17 is saying the witness does not say "we."
18         LEAD INTERPRETER:  There was no overt "we."
19 Yes, that is correct, Counsel.
20 BY MR. KRAMER:
21     Q.   So the question to the witness is, who
22 conducted the activity you referred to in your answer?
23         MS. KASSABIAN:  Objection, vague and
24 ambiguous.
25     A.   That was something that was undertaken by this

Page 118

1  that thousands and thousands of documents were
2  produced for this witness.
3       MR. KRAMER: That's wrong. Pages. Pages.
4       MS. KASSABIAN: So this morning, I believe
5  you said thousands of pages of documents were produced
6  for this witness a full week ago. So are you saying
7  that you believe there should have been more?
8       MR. KRAMER: Yes.
9       MS. KASSABIAN: On what basis?
10      MR. KRAMER: We'll send you a letter with a
11  follow-up on the issues that we think for this witness
12  and all the other witnesses that we have been deposing
13  this week and next.
14      MS. KASSABIAN: But sitting here at this
15  moment, you can't give me one example of something
16  that you think is missing from Mr. Lee's document
17  production?
18      MR. KRAMER: No. We will provide those to
19  you.
20      MS. KASSABIAN: Right. Because you don't
21  know right now?
22      MR. KRAMER: I have not done all the
23  searching. People on my team tell me there are lots
24  of things missing.
25      MS. KASSABIAN: Okay. Well, I guess we'll

Page 119

1  wait to receive the letter.
2       MR. KRAMER: Okay. Fabulous.
3       THE VIDEOGRAPHER: Going off the record.
4  The time now is 15:28.
5       (Time noted: 3:28 p.m.)

Page 120

1  (Counsel representing this witness should arrange for
  reading and signing and thereafter distribute copies
2  of the signed Errata sheet to opposing counsel without
  involvement of the court reporter.)

3  STYLE OF CASE:   Apple, Inc. v. Samsung Electronics
4             Company, Ltd., et al.

5  DEPOSITION OF:   SUNGSIK LEE

6  DATE TAKEN:     March 1, 2012

7         E R R A T A   S H E E T

8  Page   Line Change        Reason
9  ____  ____ _____
10  ____  ____ _____
11  ____  ____ _____
12  ____  ____ _____
13  ____  ____ _____
14  ____  ____ _____
15  ____  ____ _____
16  ____  ____ _____
17  ____  ____ _____
18  ____  ____ _____
19  ____  ____ _____
20  ____  ____ _____
21  ____  ____ _____
22
23  I hereby certify that I have read my deposition and that
  it is true and correct subject to any changes in form or
24  substance entered here.
25   _____       _____
   Date              SUNGSIK LEE

Page 121

1          C E R T I F I C A T E
2  SEOUL        )
              )
3  SOUTH KOREA   )
4       I, Lisa A. Knight, Registered Merit
  Reporter and Certified Realtime Reporter, do hereby
5  certify that the aforementioned witness was first duly
  sworn by me pursuant to stipulation of counsel to
6  testify to the truth; that I was authorized to and did
  report said deposition in stenotype; and that the
7  foregoing pages are a true and correct transcription
  of my shorthand notes of said deposition.
8
9       I further certify that said deposition was
  taken at the time and place hereinabove set forth and that
10  the taking of said deposition was commenced and completed
  as hereinabove set out.
11      I further certify that I am not attorney or
12  counsel of any of the parties, nor am I a relative or
  employee of any attorney or counsel of any party connected
13  with the action, nor am I financially interested in the
  action.
14      The foregoing certification of this
  transcript does not apply to any reproduction of the same
15  by any means unless under the direct control and/or
  direction of the certifying reporter.
16
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand this 2nd day of March, 2012.
19
20        *Lisa A. Knight*
21   _____
  LISA A. KNIGHT
  Certified Realtime Reporter
22   Registered Merit Reporter
  Realtime Systems Administrator
23
24
25

# Watson Declaration

# EXHIBIT 23

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER
1          UNITED STATES INTERNATIONAL TRADE COMMISSION

2                           WASHINGTON, D.C.

3

4    _____

5    In the Matter of:

6    CERTAIN ELECTRONIC DIGITAL              Case No.:

7    MEDIA DEVICES AND COMPONENTS            337-TA-796

8    THEREOF
     _____
9

10
            *** CONFIDENTIAL BUSINESS INFORMATION ***
11                  SUBJECT TO PROTECTIVE ORDER

12

13              VIDEOTAPED PERSONAL DEPOSITION OF:

14

15                          DONG SUB KIM

16

17

18                        March 21, 2012

19                         Kim & Chang

20                      Seoul, South Korea

21                    9:12 a.m. - 3:56 p.m.

22

23

24

25

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
1  APPEARANCES:

2
   For the Complainant, Apple, Inc.:
3
              MORRISON & FOERSTER, LLP
4             By:  Jeffrey A. Jaeckel, Esq.
              2000 Pennsylvania Avenue, NW
5             Suite 6000
              Washington, D.C. 20006-1888
6             (202) 887-1500

7
8  For the Witness and Respondents, the Samsung entities:

9             QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
              By:  Maxim Price, Esq.
10            51 Madison Avenue
              22nd Floor
11            New York, New York 10010
              (212) 849-7000
12

13 Also present:

14
              Sun Park, Morrison & Foerster
15            Christine Lee, Lead Interpreter
              Laura Sunwoo, Check Interpreter
16            Inga Kornev, Videographer
              Lisa A. Knight, Court Reporter
17

18

19

20

21

22

23

24

25
```

Page 3

```
1              I N D E X

2  WITNESS:                                    PAGE
   DONG SUB KIM
3
   Examination by Mr. Jaeckel                    6
4

5            E X H I B I T S

6  NUMBER      DESCRIPTION                      PAGE

7  Exhibit 1   Complainant Apple, Inc.'s Notice of  8
               Deposition to Dong Sub Kim
8
   Exhibit 2   Organizational chart (Korean),     43
9              Bates S-ITC-003006194

10 Exhibit 3   A Company TSP Comparison,          48
               Bates SAMNDCA11001974
11
   Exhibit 4   E-mail string (Korean),           54
12             Bates SAMNDCA10910090 to -92

13 Exhibit 5   E-mail string (Korean), No Bates  54

14 Exhibit 6   TouchWiz 3.0 & Smartphone UX,     61
               Bates SAMNDCA11001709 to -746
15
   Exhibit 7*  E-mail string (Korean),           63
16             Bates SAMNDCA10909041 to -046

17 Exhibit 8*  E-mail string (Korean), No Bates  63

18 Exhibit 9   iPhone 4 document (Korean),       72
               Bates SAMNDCA11001938 to -940
19
   Exhibit 10  E-mail string (Korean),           77
20             Bates SAMNDCA10911088 to -1093

21 Exhibit 11  E-mail string (Korean), No Bates  77

22 Exhibit 12  E-mail string, (Korean),          89
               Bates SAMNDCA10907800 to -802
23
   Exhibit 13  Domestic Roadmap Report Minutes   98
24             (Korean), Bates SAMNDCA11000904 to -911

25
```

Page 4

```
1  (*Note:  Exhibits 7 and 8 were clawed back and retained by
   Maxim Price, Esq., of Quinn, Emanuel, Urquhart & Sullivan,
2  LLP)
```

Page 5

```
1              P R O C E E D I N G S

2       THE VIDEOGRAPHER:  My name is Inga Kornev,

3  the videographer with American Realtime Court

4  Reporters in Asia.  The date today is March 21st,

5  2012, and the time on the video monitor is 9:12.  This

6  deposition is being held at the offices of Kim &

7  Chang, located at the Jeongdong building in Seoul,

8  Korea.

9       The caption of this case is In the Matter of

10 Certain Electronic Digital Media Devices and

11 Components Thereof, held in the United States

12 International Trade Commission with a case number of

13 337-TA-796.

14      The name of the witness is Dong Sub Kim,

15 testifying in his individual capacity.  The court

16 reporter today is Lisa Knight, also with American

17 Realtime Court Reporters in Asia.  At this time, I'd

18 like to ask all counsel and interpreters to please

19 state their appearances and whom they represent for

20 the record.

21      MR. JAECKEL:  Good morning.  My name is Jeff

22 Jaeckel with Morrison & Foerster, LLP, on behalf of

23 Apple.  And with me today is Sun Park.

24      MR. PRICE:  Maxim Price of Quinn, Emanuel,

25 Urquhart & Sullivan, for the Respondents, the Samsung
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

38..41

Page 38

1          CHECK INTERPRETER:  Interjection.  "Most of
2  the times I do it on a weekly basis, but once in a
3  while, it happens every other week."
4  BY MR. JAECKEL:
5      Q.    Do you send those reports to anybody?
6      A.    Yes, I do.
7      Q.    To whom do you send those reports?
8      A.    I send it to my boss.
9      Q.    Anybody other than your boss?
10     A.    To my boss and to related project leaders, I
11 send them.
12     Q.    Who are the related project leaders?
13     A.    I need to add some explanation to answer to
14 your question.  Like I told you, Roh, Tae Moon, who is the
15 senior vice president, was my boss.  When he was my boss,
16 I worked for Display Lab.  And then under Roh, Tae Moon,
17 senior vice president, there are so many -- there are many
18 project leaders who are in charge of developing models.
19         When I worked in Display Lab with my boss,
20 Roh, Tae Moon, I generated weekly reports to update what
21 Display Lab has been doing for a week to the project
22 leaders working for Roh, Tae Moon.
23         CHECK INTERPRETER:  Interjection.  "I think
24 I need to give some explanation to that.  When senior
25 vice president Roh, Tae Moon was my boss, the part

Page 39

1  that I was involved was Display Lab.  And other than
2  Display Lab, under Tae Moon Roh, there are other
3  project leaders.  And they were in charge of doing the
4  model development.
5          "And I was involved in information exchange
6  as to what Display Lab was doing.  And its purpose was
7  to update as to the work that Display Lab did at that
8  week."
9  BY MR. JAECKEL:
10     Q.    Do you still prepare weekly reports under
11 supervisor Mr. Lee?
12     A.    Yes, I do.
13     Q.    Has the nature of those reports changed since
14 Mr. Lee became your supervisor?
15     A.    No, it's not.
16     Q.    Do any of the employees at Samsung who report
17 to you prepare regular reports about the work that they
18 are doing?
19     A.    Yes, they do.
20     Q.    Does each employee who reports to you prepare a
21 regular report about the work that they are doing?
22     A.    Yes.
23     Q.    Could you describe those reports.
24         MR. PRICE:  Objection, vague.
25     A.    Like I said before, they are reporting to what

Page 40

1  they have been doing in Display Lab.
2          CHECK INTERPRETER:  "Like I said before,
3  they are reporting to what they have been doing in
4  Display Lab in that weekly period."
5  BY MR. JAECKEL:
6      Q.    And do those employees send the reports that
7  they prepare to you?
8      A.    There are some who are sending the reports
9  directly, and then there are some who are not sending --
10 who are not sending the reports directly.
11     Q.    When you say "directly," do you mean directly
12 to you?
13     A.    Yes.  Correct.
14     Q.    For the employees who send reports directly to
15 you, do they send them by e-mail?
16     A.    Yes.  Correct.
17     Q.    And do you send the reports that you prepare by
18 e-mail?
19     A.    Yes.  Correct.
20     Q.    In connection with your work in the Display
21 Lab, do you attend any regularly occurring meetings?
22     A.    It is not on a regular basis, but I do attend.
23     Q.    Could you describe those meetings?
24         MR. PRICE:  Objection, vague.
25     A.    I discuss what members have done for the week,

Page 41

1  and I ordered and then give them directions what they need
2  to do for the next week.
3  BY MR. JAECKEL:
4      Q.    Are you describing a meeting that you have with
5  the employees in the Display Lab who report to you?
6      A.    Yes.  Correct.
7      Q.    Does your supervisor attend those meetings?
8      A.    He doesn't attend oftentimes.  He doesn't.
9      Q.    In connection with your work in the Display
10 Lab, do you attend any regularly occurring meetings with
11 your supervisors?
12     A.    There is no meeting that is occurring on a
13 regular basis.
14     Q.    Does anyone take notes of the meetings that you
15 have with the employees who report to you in the Display
16 Lab?
17     A.    No.
18     Q.    Do you know if Samsung has a corporate policy
19 regarding the retention of documents?
20     A.    Not that I heard of.
21     Q.    Have you received any instructions from Samsung
22 legal counsel about retaining documents that relate to the
23 issues in dispute between Apple and Samsung?
24     A.    Yes, I have.
25     Q.    When did you first receive those instructions?

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 42

1    A.    I don't exactly recall.  Probably last summer,
2   last year.  I don't exactly recall.
3    Q.    Have you taken any steps to preserve your
4   work-related e-mail?
5    A.    I saved work-related -- all of work-related
6   e-mails on my hard drive.
7    Q.    Could you describe the steps that you take to
8   save your work-related e-mail?
9    A.    I don't understand your question.
10   Q.    Do you manually select specific e-mail messages
11  that you will save to the hard drive of your computer?
12   A.    Yes, I do.
13   Q.    How do you determine which e-mail messages you
14  will save to the hard drive of your computer?
15   A.    I saved all of the e-mail messages that is
16  related to my work.
17   Q.    How often do you save the e-mail messages that
18  you have relating to your work?
19   A.    Mostly every day.  Every day.
20   Q.    Have you provided any documents to Samsung
21  legal counsel in connection with this litigation?
22   A.    I haven't provided any documents.  I was so
23  busy at the time, but I got a request from the legal
24  counsels to provide documents, but I didn't have time at
25  that time, so I provided my notebook computers to the

Page 43

1   legal counsel.
2         CHECK INTERPRETER:  Interjection.  Instead
3   of "notebook computers," it's "notebook computer."
4   BY MR. JAECKEL:
5    Q.    When was that?
6    A.    I don't exactly recall the date, but probably
7   the latter part of last year or the first part of this
8   year.
9    Q.    Have you provided any documents to Samsung
10  legal counsel in connection with this litigation since
11  that time?
12        MR. PRICE:  Objection, mischaracterizes the
13  record.
14   A.    No, I haven't.
15        (Deposition Exhibit 2 was marked.)
16  BY MR. JAECKEL:
17   Q.    Mr. Kim, we've handed you a document marked
18  Exhibit 2 with Bates No. S-ITC-003006194.  Have you seen
19  this document before?
20   A.    Yes, I have.
21   Q.    Could you identify this document for me?
22   A.    Yes, I can.
23   Q.    Would you please do so.
24   A.    At the top, there is a development department.
25  And then it's Korean, Lee, Chul Hwan; he's the president.

Page 44

1   And then he's the leader of the development department.
2   And then under that -- under that, there is Lee, Yong-Man,
3   who is my boss.  He is the leader of the Visual
4   Development Group.
5         Under Lee, Yong-Man, there are two groups, one
6   is Display Lab, which I take the lead, and then there is
7   another one which is called Camera Lab, which is led by
8   Chang, Dong Hoon.  Chang, Dong Hoon is a senior vice
9   president.
10        And then under Display Lab, there are words
11  which is in bold.  The first one that is in bold is Shin,
12  Hyun Chang, who is the senior -- who is the principal
13  engineer.  And then he's in charge of medium-to-
14  large-sized -- medium-to-large-sized one.  And then there
15  is another one which is Choi, Jae Seung; he is in charge
16  of small-to-medium-sized ones.  And then another -- now
17  the last one is Choi, Hee-Ryul.  He is the -- he's the
18  senior engineer who is in charge of devices.
19        And then on the right side of that one, there's
20  another one, Kim, Hak-Ryul, who is a senior engineer who
21  is in charge of module.
22   Q.    Does Exhibit 2 accurately reflect the current
23  organizational structure of the Display Lab?
24   A.    The promotion time for our company is starting
25  from the end of February 'til the first part of March.

Page 45

1   This one was just made before the promotion time, so it
2   seems like there might be -- there are some changes in
3   terms of positions, but it seems like they're pretty much
4   describing the organizational structure.
5         CHECK INTERPRETER:  Interjection as to
6   "first part of March," instead of that, it's "last
7   part of March."
8         (Translation.)
9         LEAD INTERPRETER:  Let me just correct it.
10  "From the last part of February 'til the first part of
11  March."
12        CHECK INTERPRETER:  I stand corrected.
13  BY MR. JAECKEL:
14   Q.    Do you know if there is an organizational chart
15  that reflects the positions that are current as of today?
16   A.    Like I said before, the organizational
17  structurewise, it seems like they're pretty much clear
18  one, but there are some changes in the positions.  But
19  this one is pretty accurate organizational structure.
20        CHECK INTERPRETER:  "Like I said before,
21  this is an accurate description of the organizational
22  chart except to the position."
23  BY MR. JAECKEL:
24   Q.    Do you know if there's an organizational chart
25  that reflects changes in people's positions since this

# Watson Declaration

# EXHIBIT 24

# Filed Under Seal

```
 1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2                     SAN JOSE DIVISION

 3   APPLE, INC., a California
     corporation,
 4                                        CASE NO.
             Plaintiff,                    11cv01846-LHK
 5
     v.
 6
     SAMSUNG ELECTRONICS, CO., LTD.,
 7   a Korean business entity;
     SAMSUNG ELECTRONICS AMERICA,
 8   INC., a New York corporation;
     SAMSUNG TELECOMMUNICATIONS
 9   AMERICA, LLC, a Delaware limited
     liability company,
10
             Defendants.
11   _____

12   SAMSUNG ELECTRONICS, CO., LTD.,
     a Korean business entity;
13   SAMSUNG ELECTRONICS AMERICA,
     INC., a New York corporation;
14   SAMSUNG TELECOMMUNICATIONS
     AMERICA, LLC, a Delaware limited
15   liability company,

16           Counterclaim-Plaintiffs,

17   v.
     APPLE, INC., a California
18   corporation,

19           Counterclaim-Defendant.

20

21       *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

22            VIDEOTAPED PERSONAL DEPOSITION OF:
                     HANGIL SONG
23
                   February 8, 2012
24                   Kim & Chang
                 Seoul, South Korea
25              9:02 A.M. - 2:20 P.M.
```

Page 2

1   APPEARANCES:

2

3   For the Plaintiff/Counterclaim-Defendant, Apple, Inc.

                MORRISON & FOERSTER, LLP
4               BY: Peter J. Stern, Esq.
                    Stephanie Kim, Esq.
5               425 Market Street
                San Francisco, California 94105-2482
6               (415) 268-7000

7

8   For the Defendants/Counterclaim-Plaintiffs, the Samsung
    entities:
9
                QUINN EMANUEL URQUHART & SULLIVAN, LLP
10              BY: Margret Caruso, Esq.
                555 Twin Dolphin Drive
11              Suite 560
                Redwood Shores, California 94065
12              (650) 801-5000

13

14  Also present:

15              HanKil Kang, Samsung
                Jeesoo Jung, Lead Interpreter
16              Phyllis Kim, Check Interpreter
                Peter Au, Videographer
17              Michael E. Miller, Court Reporter

18

19

20

21

22

23

24

25

Page 3

1                      I N D E X
    WITNESS:                                        PAGE
2   HANGIL SONG

3   EXAMINATION BY MR. STERN                           5

4
                    E X H I B I T S
5   NUMBER       DESCRIPTION                        PAGE

6   Exhibit 1475    Organizational Chart             20
7                   (S-ITC-003006128)

8   Exhibit 1476    Organizational Chart             26
9                   (S-ITC-003006149)

10  Exhibit 1477    Photos, Samsung before/after the  31
                    iPhone
11
    Exhibit 1478    Photos, Samsung before/after the  39
12                  iPad

13  Exhibit 1479    Photos, Samsung packaging         43
                    before/after the iPhone
14
    Exhibit 1480    E-mail                            46
15                  (SAMNDCA10126953 - SAMNDCA10126957)

16  Exhibit 1481    E-mail                            52
                    (S-ITC-010501478 - S-ITC-010501481)
17
    Exhibit 1482    Product Sketches/Photos           62
18                  (SAMNDCA00222529 - SAMNDCA00222584)

19  Exhibit 1483    Product CAD Drawing               71
                    (SAMNDCA-CAD-000092)
20
    Exhibit 1484    Photos of Samsung Prevail Phone   73
21

22

23

24

25

Page 4

1                    PROCEEDINGS
2            (February 8, 2012 at 9:02 a.m.)
3          THE VIDEOGRAPHER:  We are now on the record in
4   the matter of Apple, Inc. vs. Samsung Electronics
5   Company, Ltd., et al. before the United States District
6   Court, Northern District of California, San Jose Division,
7   Case No. 11-CV-01846-LHK.  Today's date is 8th of
8   February, 2012.  The time now is 9:02.
9          This is the video recorded individual
10  deposition of Mr. HanGil Song.  The deposition is taking
11  place at King & Chang, Daewoo Building, Jongno-gu, Seoul,
12  South Korea.
13          I'm Peter Au, a certified deposition video
14  specialist with American Realtime Court Reporters Asia.
15  The court reporter is Mr. Mike Miller, also with American
16  Realtime Court Reporters Asia.
17          Will all the attorneys please identify
18  themselves and the parties they represent.
19          MR. STERN:  Peter Stern with Morrison &
20  Foerster for Apple.  With me is Stephanie Kim.
21          MS. CARUSO:  Margret Caruso, Quinn Emanuel
22  Urquhart & Sullivan, for Samsung.  With me is a
23  representative of Samsung, HanKil Kang.
24          THE REPORTER:  Counsel have any agreements?
25          MR. STERN:  No, but I need to read a statement

Page 5

1   that I've been handed by the court reporter.
2          We understand the court reporter is not
3   authorized to administer oaths in this venue.
4   Nevertheless, we request that he administer the oath, and
5   we stipulate that we waive any objection to the validity
6   of the deposition based on the oaths.
7          THE REPORTER:  Counsel, do you agree?
8          MS. CARUSO:  Yes.
9          (Interpreters sworn.)
10                    HANGIL SONG,
11          having been duly sworn, testified as follows:
12                    EXAMINATION
13  BY MR. STERN:
14     Q.    Mr. Song, good morning.
15     A.    Good morning.
16     Q.    As I introduced myself off the record, my name
17  is Peter Stern.  I'm an attorney with Apple representing
18  Apple in an action currently pending in California against
19  Samsung.  And we're here this morning for the purpose,
20  obviously, of taking your deposition in that action.
21          I'm going to be asking you some questions that
22  you will answer under oath.  If for any reason you don't
23  understand my question, please let me know and I'll
24  rephrase it.
25          If you'd like to take a break at any time,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

```
 1  please let me know and we'll accommodate you.
 2      A.   Yes.
 3      Q.   Is there any reason you can't give your best
 4  testimony this morning?
 5      A.   No.
 6      Q.   Could you please state your full name for the
 7  record?
 8      A.   HanGil Song.
 9           LEAD INTERPRETER:  H-A-N-G-I-L, S-O-N-G.
10  BY MR. STERN:
11      Q.   Who is your employer, Mr. Song?
12      A.   It is Samsung Electronics.
13      Q.   What is your present title at Samsung
14  Electronics?
15      A.   I'm a senior designer.
16      Q.   Mr. Song, what did you do to prepare for your
17  deposition today?
18           MS. CARUSO:  I instruct the witness not to
19  divulge in his response communications, the substance of
20  any communications he's had with counsel.  But aside from
21  that, he can respond.
22      A.   Yes.  I didn't do anything.
23  BY MR. STERN:
24      Q.   Did you meet with your counsel at any time to
25  prepare for the deposition today, Mr. Song?
```

Page 7

```
 1      A.   Yes.
 2      Q.   On how many occasions did you meet with your
 3  counsel?
 4           MS. CARUSO:  Objection, vague.
 5      A.   Should I say that I met once?
 6  BY MR. STERN:
 7      Q.   When was the first time that you -- well, did
 8  you have -- I'm not asking you about what you discussed.
 9           Did you have a meeting with your counsel to
10  prepare for your deposition today?
11      A.   Yes.
12      Q.   When did that meeting take place?
13      A.   Two days ago and yesterday.
14      Q.   Who was present at the meeting two days ago?
15      A.   I was there, my counsel was there, and
16  Mr. HanKil Kang was there, and there was an interpreter,
17  but I cannot recall as to her name.
18      Q.   How long did the meeting last when you met with
19  Mr. Kang and your counsel two days ago.
20      A.   About five hours.
21      Q.   With regard to the meeting that you had
22  yesterday to prepare for your deposition, who was present
23  at that meeting?
24      A.   It was the same, except the interpreter.  The
25  interpreter was replaced.
```

Page 8

```
 1      Q.   How long did the meeting last yesterday?
 2      A.   Yesterday, it was five hours as well.
 3      Q.   At either of the meetings that you've
 4  described, did you review any documents?
 5           MS. CARUSO:  I instruct the witness not to
 6  answer that question.
 7  BY MR. STERN:
 8      Q.   Mr. Song, at either of the meetings that you
 9  attended yesterday or the day before, did you look at any
10  documents that helped you to remember events relating to
11  your testimony?
12      A.   Would you repeat your question, please?
13      Q.   Yes.
14           At the meeting that you described the day
15  before yesterday or yesterday, did you look at any
16  documents that caused you to remember better events
17  relating to the matters at issue in this litigation?
18      A.   No.
19      Q.   Mr. Song, at any time before your deposition
20  today, did you communicate with anyone in Samsung
21  Electronics other than Mr. Kang regarding your deposition
22  today?
23      A.   I told that --
24           LEAD INTERPRETER:  Strike that.
25      A.   I said that I wasn't able to work today because
```

Page 9

```
 1  I would be deposed today.
 2  BY MR. STERN:
 3      Q.   Did you discuss your deposition with Mr. Bora
 4  Kim prior to today?
 5      A.   No, I didn't.
 6      Q.   Did you discuss your deposition with Nara Cho?
 7      A.   No.
 8      Q.   Did you discuss your deposition with Mr. Jinsoo
 9  Kim?
10      A.   No.
11      Q.   Mr. Song, when did you first become aware that
12  you were going to be giving a deposition in this case?
13      A.   About a month ago.
14      Q.   And was there a time when you first became
15  aware that Apple and Samsung were involved in patent
16  litigation concerning certain cell phone and tablet
17  computer patents?
18      A.   I don't recall exactly.
19      Q.   Was it this year?  Was it last year?  Give me
20  your best guess, please.
21      A.   I became aware last year.
22      Q.   In connection with the litigation that you
23  learned about last year, do you recall receiving any
24  instruction to preserve documents relevant to the
25  litigation?
```

Page 10

1    A.    Yes.
2    Q.    When did you receive that instruction?
3    A.    I don't have a precise recollection as to the
4  time.  I don't recall.
5    Q.    In response to the instruction that you
6  received, what did you do?
7    A.    After receiving such a request, I think I
8  preserved documents.
9    Q.    When you say you "preserved documents," can you
10  please give me more detail on what you mean by that?
11    A.    I collected all the sketches, drawings and
12  printings that I worked on in a personal box and cabinet,
13  and also I didn't destroy any 3-D or --
14    LEAD INTERPRETER:  Strike that.
15    A.    -- and I didn't destroy any 3-D and 2-D data
16  that I had.  I stored them in my hard drive.
17  BY MR. STERN:
18    Q.    In response to the instruction that you
19  received and gave testimony about just now, did you take
20  any steps in relation to e-mail?
21    A.    When it comes to the e-mails, I used to receive
22  a lot of e-mails which were not related to my work, so
23  when I believed that some of them were related to my
24  projects, then I stored them in my hard drive.  But for
25  the rest of them, they tend to be automatically deleted

Page 11

1  over a certain period of time.
2    Q.    Do you know at what interval in the period of
3  time that you're just talking about e-mails were deleted?
4    A.    I don't know exactly, but my understanding is
5  that documents would be stored for about two weeks.
6    Q.    After receiving the instruction to preserve
7  documents that you testified about, did you turn off any
8  automatic delete function for e-mails or other documents
9  on your computer?
10    MS. CARUSO:  Objection, vague.  I just want to
11  clarify:  You're asking him in his personal capacity this
12  question?
13    MR. STERN:  Yes.
14    MS. CARUSO:  Okay.
15    A.    I don't know as to whether or not there is a
16  function as such.
17  BY MR. STERN:
18    Q.    Do you know whether anyone else at Samsung
19  turned off any automatic delete function so that e-mails
20  or other documents on your computer would not be
21  destroyed?
22    A.    As I said earlier, I'm not quite sure whether
23  or not there is a function -- a function like that.
24    Q.    No one at Samsung ever told you that your
25  automatic delete function was being turned off so that

Page 12

1  e-mails and other documents on your computer would not be
2  destroyed?
3    MS. CARUSO:  Objection, asked and answered,
4  lacks foundation.
5    A.    No, no one.
6  BY MR. STERN:
7    Q.    Mr. Song, did you personally ever provide
8  documents to your counsel or to anyone else at Samsung for
9  production to Apple in this litigation?
10    MS. CARUSO:  Objection, vague.
11    A.    I would like to ask you if you're asking me if
12  I directly provided that.
13  BY MR. STERN:
14    Q.    Yes.
15    Did you provide to Samsung or your outside
16  lawyers documents stored by you that relate to the design
17  of Samsung cell phones or tablet computers?
18    MS. CARUSO:  Objection, vague and compound.
19    A.    As for the data that I had, I didn't collect
20  them by myself.  My counsel and Mr. Kang came to me and
21  collected the data on my PC and took it with them.
22    (A discussion was had off the record between
23  Lead Interpreter and Check Interpreter in Korean.)
24    LEAD INTERPRETER:  Correction:  "My counsel and
25  Mr. Kang came to me and collected all the data on my PC

Page 13

1  and took it with them."
2  BY MR. STERN:
3    Q.    Mr. Song, what's the extent of your formal
4  education?
5    MS. CARUSO:  Objection, vague.
6    A.    I obtained my master's degree.
7  BY MR. STERN:
8    Q.    From what university?
9    A.    From Seoul National University.
10    LEAD INTERPRETER:  Seoul, S-E-O-U-L.
11  BY MR. STERN:
12    Q.    What was the subject of your master's degree?
13    A.    It was industrial design.
14    Q.    Did your master's degree in industrial sign
15  have any particular focus with regard to products?
16    A.    No.
17    Q.    In what year did you obtain your master's
18  degree?
19    A.    I obtained it in 2005.
20    Q.    In what year did you join Samsung Electronics?
21    A.    I joined in 2005.
22    Q.    When you joined Samsung Electronics in 2005,
23  what was your title?
24    A.    I was just an associate.
25    Q.    Is that the full extent of the title?

Page 14

1  Associate what?
2          MS. CARUSO:  Objection, compound.
3      A.   Yes, I was just an associate.
4  BY MR. STERN:
5      Q.   Associate.
6          What was the subject of your work as an
7  associate?
8      A.   Are you asking me as to the time when I just
9  joined the company, or -- I'm not quite sure.  Which time
10  frame are you asking when I was an associate?
11     Q.   How long did you work as an associate after
12  joining Samsung Electronics in 2005?
13     A.   For two years.
14     Q.   Between 2005 and 2007, what department in
15  Samsung Electronics were you in?
16          MS. CARUSO:  Objection, vague.
17     A.   I was in the Product Design Group 1.
18  BY MR. STERN:
19     Q.   As an associate in the Product Design Group 1
20  from 2005 to 2007, what products did you work on?
21          MS. CARUSO:  Objection, vague.  Do you mean
22  released products?
23          MR. STERN:  We're talking about 2005 to 2007,
24  so no, I mean any products.
25          MS. CARUSO:  Go ahead and interpret.

Page 15

1          MR. STERN:  Let me phrase it this way.
2  BY MR. STERN:
3      Q.   Mr. Song, in 2005-2007 what types of products
4  did you work on?
5      A.   When it comes to the types of cell phones, I
6  think the concept is quite broad.
7      Q.   Did you work on any types of products other
8  than cell phones in the years 2005 to 2007?
9      A.   No.
10     Q.   You didn't work on tablet computers?
11          MS. CARUSO:  Objection, vague as to time.
12  BY MR. STERN:
13     Q.   I mean in 2005-2007.
14     A.   At the time, I was not involved in the tablet
15  PC design.
16     Q.   Did you work on any packaging for cell phones
17  in the years 2005-2007?
18     A.   No.
19     Q.   Can you remember the names of any products,
20  cell phone products, that you worked on in the years 2005
21  to 2007?
22          MS. CARUSO:  Objection, vague.  Here you're
23  referring to released products?
24          MR. STERN:  No, I'm referring to products that
25  he remembers.

Page 16

1          MS. CARUSO:  In answering this question, I
2  instruct the witness not to identify any products that
3  were not released.
4          MR. STERN:  Counsel, just to be clear, you're
5  instructing him not to answer regarding products that were
6  not released and that, given the amount of time that has
7  passed, are never going to be released; is that correct?
8          MS. CARUSO:  That is not what I said.  It's
9  unclear whether the products that were not released during
10  that time frame will, in fact, never be released.
11          If you'd like to check with your colleagues,
12  Apple has taken the same position.
13          MR. STERN:  You can answer the question.
14     A.   I worked on the project named Chairman, but
15  when it comes to the model numbers, our company combines
16  English characters with numbers, but when it comes to the
17  number, I cannot recall.
18  BY MR. STERN:
19     Q.   Do any other names come to mind besides
20  Chairman?
21          MS. CARUSO:  Objection, vague.
22     A.   At the time, Chairman was the only one.
23  BY MR. STERN:
24     Q.   In 2007, did you move to a new position within
25  Samsung Electronics?

Page 17

1      A.   Yes.
2      Q.   What new position was that?
3      A.   I was an assistant designer --
4          LEAD INTERPRETER:  Strike that.
5      A.   I was a designer.
6  BY MR. STERN:
7      Q.   In what --
8          MS. CARUSO:  Excuse me, I just want the record
9  to be clear here.  When the interpreter says "strike
10  that," that's not something the witness said; that was
11  your own comment to eliminate that as the response and
12  recorrect the witness' response?  All right.
13          LEAD INTERPRETER:  That is correct.
14  BY MR. STERN:
15     Q.   In what group were you a designer beginning in
16  2007?
17     A.   Same group.
18     Q.   Product Design Group 1?
19     A.   Yes.
20     Q.   How long were you a designer within the product
21  Design Group one?
22          MS. CARUSO:  Objection, vague.
23     A.   I worked for four years.
24  BY MR. STERN:
25     Q.   During the four years that you were a designer

Page 18

1  within product Design Group one, what products did you
2  work on?
3         MS. CARUSO:  I instruct the witness not to
4  identify any products that were not released by Samsung.
5     A.    There was a phone called My Music, which was
6  released at Sprint.  And there was folder phones which had
7  the project name Adobe.  And there was a folder phone with
8  the name Supra-E.
9         I would like to correct myself, I think I might
10 have misspoken.  Instead of Adobe, it was Adonis.
11        And there was another project named Keystone.
12 It refers to a bar-type cell phone.
13        I believe there are two more products that I
14 worked on, other than what I mentioned, but I cannot
15 recall.
16 BY MR. STERN:
17    Q.    Are you familiar with Samsung's Galaxy line of
18 cell phones?
19        MS. CARUSO:  Objection, vague.
20    A.    I don't know as to all.
21 BY MR. STERN:
22    Q.    Are you generally familiar -- well, did you
23 work on any phones in the Galaxy line of mobile phones
24 manufactured by Samsung?
25        MS. CARUSO:  Objection, vague.

Page 19

1     A.    Which time frame are you referring to?
2  BY MR. STERN:
3     Q.    In 2007 to 2011.
4     A.    No.
5     Q.    Are you familiar with the phrase "full touch
6  technology"?
7         MS. CARUSO:  Objection, vague.
8     A.    I don't know the scope of familiarity to what
9  extent I should be aware to say that I'm familiar with
10 something.
11 BY MR. STERN:
12    Q.    Did you work on any -- the design of any mobile
13 phones in 2007 to 2011 that you would consider to employ
14 full touch technology?
15        MS. CARUSO:  Objection, vague.
16    A.    No.
17 BY MR. STERN:
18    Q.    In 2007 to 2011, did you work on any tablet
19 computers?
20    A.    No.
21    Q.    In 2011, did you move to another position
22 within Samsung Electronics?
23    A.    Which year?
24    Q.    2011.
25    A.    Yes.

Page 20

1     Q.    What position was that?
2     A.    It was senior designer.
3     Q.    Is that your current position?
4     A.    Yes.
5     Q.    And in what group are you currently a senior
6  designer?
7     A.    Product Design Part 1.
8         (HG Song Deposition Exhibit 1475 marked.)
9  BY MR. STERN:
10    Q.    Mr. Song, the court reporter is going to hand
11 you an exhibit that has been marked as Exhibit 1475.
12        MS. CARUSO:  Mr. Stern, do you have an English
13 translation of this document?
14        MR. STERN:  No, I don't, but this is the same
15 document that I think you may be familiar with, Counsel.
16        MS. CARUSO:  I still haven't learned to speak
17 Korean in the past week, so I still cannot read this
18 document and, therefore, cannot really defend these
19 questions about it and object to the use of Korean
20 documents without certified English translations.
21 BY MR. STERN:
22    Q.    Mr. Song, are you able to identify this
23 document for me?
24    A.    This is an organizational chart of the Design
25 Group.

Page 21

1     Q.    Do you see your name appearing on this
2  document, Mr. Song?
3     A.    Yes.
4     Q.    In what portion of the chart does your name
5  appear?
6     A.    It is in the ID Cluster part.
7     Q.    Earlier you testified that you were a senior
8  designer in the Product Design Group Part 1; isn't that
9  correct?
10        MS. CARUSO:  Objection, mischaracterizes the
11 testimony.
12    A.    Previously you asked me currently which
13 department or division I work in, but this organizational
14 chart indicates the structure of the organization from
15 last year.
16 BY MR. STERN:
17    Q.    Okay.  My understanding was that beginning in
18 2011 and continuing to today, you were a senior designer
19 in the Product Design Group Part 1.  Is that incorrect?
20        MS. CARUSO:  Objection, compound.
21    A.    Incorrect.
22 BY MR. STERN:
23    Q.    Okay.  Could you please explain for me,
24 Mr. Song, the period of time in which you were a member of
25 the ID Cluster?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22..25

Page 22

1    A.    It was one year, last year.  To be more
2  precise, it was from last February -- or actually it's not
3  that accurate.  Actually, it is from February last --
4  around February last year to the end of this year.
5         CHECK INTERPRETER:  "End of January."
6         LEAD INTERPRETER:  Strike that.  "Actually it
7  is from around February last year to the end of January
8  this year."
9  BY MR. STERN:
10    Q.    Between February 2011 and the end of
11  January 2012, you were a designer in the ID Cluster; is
12  that correct?
13         MS. CARUSO:  Objection, vague.
14    A.    Correct.
15  BY MR. STERN:
16    Q.    What was the nature of your work as a designer
17  in the ID Cluster in that period?
18         MS. CARUSO:  Objection, vague.
19    A.    Product design.
20  BY MR. STERN:
21    Q.    Can you be more specific for me?  What type of
22  products were you involved in designing in that time
23  period?
24    A.    It would be somewhat difficult for me to answer
25  your question because the products that I was involved

Page 23

1  during that time involve products which were not released
2  yet.
3    Q.    Mr. Song, generally speaking, what's the
4  difference between the ID Cluster and the Product Design
5  Group Part 1?
6         MS. CARUSO:  Objection, vague.
7    A.    Generally speaking, the name of the ID Cluster
8  part refers to integrated design.
9  BY MR. STERN:
10    Q.    What does "integrated design" mean?
11    A.    When it comes to divisions for product designs,
12  UX, CMF and strategy, they are not in existence
13  separately.  Actually, they are integrated in one place.
14  That's what is referred here.
15    Q.    Do I understand correctly that the role of the
16  ID Cluster is to integrate the various elements of product
17  design, UX, CMF, and strategy?
18         MS. CARUSO:  Objection, vague, vague as to
19  time.
20    A.    Yes, that is correct.
21  BY MR. STERN:
22    Q.    In the period when you were a designer in the
23  ID Cluster, are you able to tell me any products that you
24  worked on?
25         MS. CARUSO:  I instruct the witness not to

Page 24

1  identify any unreleased products that were worked on
2  during that time.
3    A.    As I mentioned earlier, all the products I
4  worked on during the period are unreleased.
5  BY MR. STERN:
6    Q.    You're not aware of the name of a single
7  product that you worked on during the period from
8  February 2011 to the end of January 2012 that has been
9  released?
10    A.    No, not at all.
11    Q.    And your answer covers cell phones and tablets?
12         MS. CARUSO:  Objection, vague, lacks
13  foundation.
14    A.    Would you repeat your question, please?
15  BY MR. STERN:
16    Q.    Sure.
17         When you testified that you are not able to
18  name for me any product that you worked on as a designer
19  in the ID Cluster that was released, does your answer
20  include both cell phones and tablets?
21         MS. CARUSO:  Objection, vague and compound.
22    A.    I don't clearly understand.
23  BY MR. STERN:
24    Q.    As a general matter, does the ID Cluster work
25  on the design of cell phones and tablet computers?

Page 25

1         MS. CARUSO:  Objection, vague as to time.
2    A.    Not necessarily.
3  BY MR. STERN:
4    Q.    What does "not necessarily" mean?  Does the
5  ID Cluster work on tablet design?
6         MS. CARUSO:  Objection, vague as to time.
7    A.    This part is responsible for designing any
8  portable devices which are integrated.
9  BY MR. STERN:
10    Q.    And does that include tablets?
11         MS. CARUSO:  Objection, vague.
12    A.    It includes tablets, and it could include
13  anything.
14  BY MR. STERN:
15    Q.    While you were a designer in the ID Cluster,
16  did you personally work on any tablet computer products?
17         MS. CARUSO:  Even if you worked on a tablet
18  product that was unreleased, you can answer this question
19  yes or no.
20    A.    No.
21  BY MR. STERN:
22    Q.    And do I understand correctly that in -- at the
23  end of January 2012, you returned to the Product Design
24  Group Part 1 as a senior designer?
25         MS. CARUSO:  Objection, compound and vague.

Page 26

1      A.    Actually, the word "return" is quite vague.  I
2  don't believe it to be appropriate here.  But, anyways,
3  that is correct.
4      MR. STERN:  I'm going to ask the reporter to
5  mark another exhibit for you, next in order, which will be
6  Exhibit 1476.
7      (HG Song Deposition Exhibit 1476 marked.)
8  BY MR. STERN:
9      Q.    Mr. Song, directing your attention to the
10  uppermost box on Exhibit 1476, could you read that for me,
11  please?
12      A.    "H Song."  Are you asking me this portion
13  (indicating)?
14      Q.    I'm sorry.  We may have a little
15  misunderstanding.
16          At the center of the page on this exhibit,
17  there is a box, a portion of which is in yellow and a
18  portion of which is in white.
19      MS. CARUSO:  Objection, vague.  Are you
20  referring to the uppermost yellow box?
21      MR. STERN:  Yes.
22  BY MR. STERN:
23      Q.    Does the uppermost yellow box say "Office of
24  Development"?
25      A.    Yes.

Page 27

1      Q.    Do you know what the function of the Office of
2  Development is?
3      A.    I don't know exactly.
4      Q.    Could you tell me what you know, please?
5      MS. CARUSO:  Objection, calls for a narrative.
6      A.    I'm thinking that office is responsible for the
7  design and mass production of overall process to make sure
8  cell phones to be mass produced and operate and function
9  properly as products.
10          CHECK INTERPRETER:  "To my understanding, that
11  department is responsible for the process that's related
12  to cell phone mass production, up to the stage of the cell
13  phone is properly operated, including a series of
14  designing stage, includes -- and the mass production
15  stage."
16  BY MR. STERN:
17      Q.    At any time while you've been working at
18  Samsung Electronics, have you had any interaction with the
19  Office of Development?
20      MS. CARUSO:  Objection, lacks foundation, calls
21  for speculation.
22      A.    What do you mean by the -- would you be more
23  specific?  Are you asking me as to interaction with a
24  particular person at the Office of Development?
25  BY MR. STERN:

Page 28

1      Q.    Yes, interaction with any person at the Office
2  of Development.
3      A.    Yes, there was.
4      Q.    Okay.  What type of interaction have you had
5  with members of the Office of Development?
6      MS. CARUSO:  Objection, compound, vague.
7      A.    When it comes to the types of interaction,
8  actually, there is too many.  So I'm not quite sure to
9  what extent I have to tell you.
10  BY MR. STERN:
11      Q.    Do members of the Office of Development
12  participate in meetings that you attend relating to cell
13  phone design?
14      A.    Not always, but if it is necessary, they do.
15      Q.    On those occasions when members of the Office
16  of Development do participate in such meetings, what is
17  their role?
18      MS. CARUSO:  Objection, vague, lacks
19  foundation, calls for speculation.
20      A.    It depends on the purposes of those meetings.
21  Each division or department is responsible for certain
22  issues.  For example, if this meeting is for the design of
23  equipment or devices, they will discuss such a matter; or
24  if there is a team member who is responsible for antenna,
25  then discussion would be focused on antenna.  So there's

Page 29

1  so many types, so it's difficult to say.
2  BY MR. STERN:
3      Q.    Do members of the Office of Development from
4  time to time -- from time to time provide designers with
5  input on the substance of product design?
6      MS. CARUSO:  Objection, vague, lacks
7  foundation, calls for speculation.
8      A.    When you say the Office of Development provides
9  input, I'm not quite sure to what extent they're providing
10  input.
11  BY MR. STERN:
12      Q.    Do members of the Office of Development ever
13  give designers guidance on the types of designs that
14  Samsung wishes to use in its cell phone products?
15      MS. CARUSO:  Objection, lacks foundation, calls
16  for speculation.
17          (A discussion was had off the record between
18  Lead Interpreter and Check Interpreter in Korean.)
19          CHECK INTERPRETER:  "You mean the guidance from
20  the Office of Development?"
21      A.    Are you asking me as to if there is any
22  guidance from the Office of Development when we work on
23  the design?
24  BY MR. STERN:
25      Q.    Yes.

Page 86

1  (Counsel representing this witness should arrange for
   reading and signing and thereafter distribute copies of
2  the signed Errata sheet to opposing counsel without
   involvement of the court reporter.)

3

4  STYLE OF CASE:     Apple vs. Samsung (ND CAL)

5   DEPOSITION OF:    HANGIL SONG

6  TAKEN:             February 8, 2012

7

8                    E R R A T A   S H E E T

9  Page     LineChange          Reason

10  ___     ___  _____

11  ___     ___  _____

12  ___     ___  _____

13  ___     ___  _____

14  ___     ___  _____

15  ___     ___  _____

16  ___     ___  _____

17  ___     ___  _____

18  ___     ___  _____

19  ___     ___  _____

20  ___     ___  _____

21  ___     ___  _____

22  I hereby certify that I have read my deposition and that
23  it is true and correct subject to any changes in form or
   substance entered here.

24  _____

25  Date                        HANGIL SONG

---

Page 87

1                  C E R T I F I C A T E

2   SEOUL        )

3   KOREA        )

4       I, Michael E. Miller, Registered Diplomate
   Reporter, Certified Realtime Reporter, do hereby certify
5  that the aforementioned witness was first duly sworn by me
   pursuant to stipulation of counsel to testify to the
6  truth; that I was authorized to and did report said
   deposition in stenotype; and that the foregoing pages are
7  a true and correct transcription of my shorthand notes of
   said deposition.

8

9       I further certify that said deposition was
   taken at the time and place hereinabove set forth and that
10  the taking of said deposition was commenced and completed
   as hereinabove set out.

11      I further certify that I am not attorney or
   counsel of any of the parties, nor am I a relative or
12  employee of any attorney or counsel of any party connected
   with the action, nor am I financially interested in the
13  action.

14      The foregoing certification of this
   transcript does not apply to any reproduction of the same
15  by any means unless under the direct control and/or
   direction of the certifying reporter.

16

17

18      IN WITNESS WHEREOF, I have hereunto set my

19  hand this February 9, 2012.

20

21

22  _____
   MICHAEL E. MILLER
23  Certified Realtime Reporter
   Registered Diplomate Reporter
24  Realtime Systems Administrator

25

# ERRATA SHEET

NAME OF CASE: _____ Apple v. Samsung, No. 11-cv-1846-LHK (ND Cal) _____

DATE OF DEPOSITION: _____ February 8, 2012 _____

NAME OF WITNESS: _____ Hangil Song _____

Reason Codes:

  1.   To clarify the record.
  2.   To conform to the facts.
  3.   To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 10 | 7 | I think I | I | 1 |
| 11 | 1 | over a certain period | after a certain period | 1 |
| 11 | 15-16 | there is a function as such | there is such a function | 1 |
| 32 | 22 | it doesn't look similar | they do not look similar | 1 |
| 34 | 3-4 | I don't quite know what aspects that are similar | I don't know any aspects that are similar | 1 |
| 37 | 13 | Based on the picture here | Based on the pictures here, | 1 |
| 38 | 12 | I don't know as to such | I know nothing about that | 1 |
| 39 | 24 | from what aspects | in what respect | 1 |
| 40 | 17 | from what aspects | in what respect | 1 |
| 41 | 22-23 | are you asking me to which set I'm supposed to do grouping? | are you asking me which grouping would be more correct? | 1 |
| 42 | 17 | I don't quite know | I don't know | 1 |
| 43 | 19 | What aspects are you saying | In what respect are you saying | 1 |
| 76 | 16-17 | The location of the rectangular is the upper portion of the half of the entire length. | The center of the rectangle coincides with a point slightly above the center of the entire phone. | 1 |
| 82 | 5-6 | to fix and comfortably fit the plastic window that is covering the screen | to fix and comfortably fit the window that covers the screen. | 1 |

Signed: *Hangil Song*
         Hangil Song

Date: 2012 . 5 . 25

# Watson Declaration

# EXHIBIT 25

# Filed Under Seal

1               UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                    SAN JOSE DIVISION

3   APPLE, INC., A CALIFORNIA
    CORPORATION,
4                                        CASE NO.
         PLAINTIFF,                      11CV01846-LHK
5
    V.
6
    SAMSUNG ELECTRONICS, CO., LTD.,
7   A KOREAN BUSINESS ENTITY;
    SAMSUNG ELECTRONICS AMERICA,
8   INC., A NEW YORK CORPORATION;
    SAMSUNG TELECOMMUNICATIONS
9   AMERICA, LLC, A DELAWARE LIMITED
    LIABILITY COMPANY,
10
             DEFENDANTS.
11  _____

12  SAMSUNG ELECTRONICS, CO., LTD.,
    A KOREAN BUSINESS ENTITY;
13  SAMSUNG ELECTRONICS AMERICA,
    INC., A NEW YORK CORPORATION;
14  SAMSUNG TELECOMMUNICATIONS
    AMERICA, LLC, A DELAWARE LIMITED
15  LIABILITY COMPANY,

16           COUNTERCLAIM-PLAINTIFFS,

17  V.
    APPLE, INC., A CALIFORNIA
18  CORPORATION,

19           COUNTERCLAIM-DEFENDANT.

20

21      *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

22           VIDEOTAPED PERSONAL DEPOSITION OF:
                    YOUNGSOON LEE
23
                    FEBRUARY 7, 2012
24                   KIM & CHANG
                  SEOUL, SOUTH KOREA
25               9:12 A.M. - 12:16 P.M.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2..5

Page 2

```
 1   APPEARANCES:
 2
 3   For the Plaintiff/Counterclaim-Defendant, Apple, Inc.
 4            MORRISON & FOERSTER, LLP
             BY: Patrick Zhang, Esq.
 5               Samantha Kim, Esq.
             425 Market Street
 6           San Francisco, California 94105-2482
             (415) 268-7000
 7
 8   For the Defendants/Counterclaim-Plaintiffs, the Samsung
     entities:
 9
10            QUINN EMANUEL URQUHART & SULLIVAN, LLP
             BY: Charles A. Basinger, Esq.
11           1101 Pennsylvania Avenue
             6th Floor
12           Washington, D.C. 20004
             (202) 756-1950
13
14   Also present:
15            Rosa W. Kim, Samsung
             Jeesoo Jung, Lead Interpreter
16           Ina Kim, Check Interpreter
             Peter Au, Videographer
17           Michael E. Miller, Court Reporter
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
     WITNESS:                                    PAGE
 2   YOUNGSOON LEE
 3   EXAMINATION BY MR. ZHANG                       5
 4   EXAMINATION BY MR. BASINGER                   51
 5
 6            *** NO EXHIBITS MARKED ***
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               PROCEEDINGS
 2        (February 7, 2012 at 9:11 a.m.)
 3        THE VIDEOGRAPHER:  We are now on the record
 4   In the Matter of Apple, Inc. vs. Samsung Electronics
 5   Company, Ltd., et al., before the United States District
 6   Court, Northern District of California, San Jose
 7   Division, Case No. 11-CV-01846-LHK.
 8        Today's date is 7th of February, 2012.  The
 9   time now is 9:12.  This is the video recorded individual
10   deposition of Ms. YoungSoon Lee.  The deposition is
11   taking place at Kim & Chang, Daewoo Building, Jongno-gu,
12   Seoul, South Korea.
13        I am Peter Au, a certified deposition video
14   specialist with American Realtime Court Reporters Asia.
15   The court reporter is Mr. Mike Miller, also with
16   American Realtime Court Reporters Asia.
17        Will all the attorneys please identify
18   themselves and the parties they represent.
19        MR. ZHANG:  Patrick Zhang from Morrison &
20   Foerster on behalf of Apple, and with me is Samantha
21   Kim.
22        MR. BASINGER:  Charles Basinger from Quinn
23   Emanuel representing the Samsung entities and the
24   witness, and with me is Ms. Rosa Kim from Samsung.
25        (Interpreters sworn.)
```

Page 5

```
 1        (Witness sworn.)
 2        MR. ZHANG:  We understand the court reporter
 3   is not authorized to administer oaths in this venue.
 4   Nevertheless, we request that he administer the oath,
 5   and we stipulate that we waive any objection to the
 6   validity of the deposition based on the oaths.
 7        If opposing counsel would stipulate?
 8        MR. BASINGER:  Sure.  Sounds good.
 9               YOUNGSOON LEE,
10        having been duly sworn, testified as follows:
11               EXAMINATION
12   BY MR. ZHANG:
13        Q.   Good morning, Ms. Lee.  Do you understand that
14   there's a lawsuit pending between Apple and Samsung venued
15   in a California court?
16        A.   Yes.
17        Q.   Do you understand that you're here to give
18   testimony in relation to that case?
19        MR. BASINGER:  In her personal capacity, not
20   on behalf of Samsung.
21        A.   Yes.
22   BY MR. ZHANG:
23        Q.   And your attorney will object to my questions
24   from time to time, but you understand that unless he
25   instructs you not to answer the question, you should answer
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1    Q.    What don't you understand about my question?
2    A.    What do you mean by "involvement"?
3    Q.    Have you ever personally attended any meeting
4  between Apple and Samsung employees where intellectual
5  property was discussed?
6          MR. BASINGER:  Same objection.
7    A.    Would you repeat your question, please?
8          MR. ZHANG:  Will you retranslate the
9  question?
10         LEAD INTERPRETER:  Yes.
11   A.    Are you asking me as to if there is even one
12 occasion where I physically or personally attended a meeting
13 between Samsung and Apple?
14 BY MR. ZHANG:
15   Q.    No, I'm asking you whether you have personally
16 attended any meeting between Apple and Samsung employees
17 where intellectual property was discussed.
18         MR. BASINGER:  Vague and ambiguous.
19   A.    I think when it comes to the intellectual
20 property rights, I think that its meaning is somewhat vague.
21 BY MR. ZHANG:
22   Q.    Do you have an understanding of what a patent is?
23         MR. BASINGER:  Vague and ambiguous, and
24 objection to the extent as calling for some type of
25 expert opinion.

Page 11

1    A.    I'm not quite sure as to the scope of what.
2          MR. ZHANG:  So I think, Counsel, we need a
3  break.  Let's take a break.  Can we go off the record?
4          MR. BASINGER:  Sure.
5          MR. ZHANG:  Okay.
6          THE VIDEOGRAPHER:  Going off the record.  The
7  time now is 9:26.
8          (Recess taken, 9:26 a.m. to 9:33 a.m.)
9          THE VIDEOGRAPHER:  We are now back on the
10 record.  The time now is 9:33.
11 BY MR. ZHANG:
12   Q.    Welcome back, Ms. Lee.  Have you ever attended
13 personally any meeting between Apple and Samsung employees?
14   A.    Are you asking me as to meeting I personally
15 attended?
16   Q.    Yes, that was stated in my question.
17   A.    Yes.
18   Q.    How many meetings?
19   A.    I attended once.
20   Q.    Okay.  And when was this meeting?
21   A.    Are you asking me as to the exact date?
22   Q.    An approximate date would be fine, to the best of
23 your recollection.
24   A.    I can't recall as to the exact date.
25   Q.    Do you recall the year of the meeting?

Page 12

1    A.    To my recollection, it was the fall of 2010.
2    Q.    Okay.  And do you recall what was -- do you
3  recall where this meeting was, actually?
4    A.    Are you asking me as to the country?
5    Q.    Yes, I'm asking you just the physical location of
6  the meeting.
7    A.    The meeting took place in the United States.
8    Q.    Did it take place in Cupertino?
9    A.    When it comes to the name of the location, I'm
10 not quite sure.
11   Q.    Did it take place in California?
12   A.    Yes.
13   Q.    Did it take place in a location that was close to
14 San Francisco?
15         MR. BASINGER:  Vague.
16   A.    I cannot determine when it comes to the distance
17 which is close.
18 BY MR. ZHANG:
19   Q.    What airport did you fly into for this meeting?
20   A.    To my recollection, it was the San Francisco
21 airport.
22   Q.    And who attended the meeting on behalf of
23 Samsung?
24   A.    I don't understand what you meant by "on behalf
25 of."

Page 13

1    Q.    Did you go to this meeting with other people from
2  Samsung.
3    A.    Yes.
4    Q.    Who were those people?
5    A.    Are you asking me to list the names of those
6  people?
7    Q.    Yes, please, and their titles as well, if you can
8  recall.
9    A.    I attended with then vice president, Kwang Joon
10 Kim.
11         LEAD INTERPRETER:  Spelling by the
12 interpreter, K-W-A-N-G, space, J-O-O-N, space, K-I-M.
13         CHECK INTERPRETER:  I believe the title was
14 not vice president.
15         (A discussion was had off the record between Lead
16 Interpreter and Check Interpreter in Korean.)
17 BY MR. ZHANG:
18   Q.    Anyone else other than Vice President Kim?
19   A.    Senior engineer JongHee Kim.
20         LEAD INTERPRETER:  Spelling by the
21 interpreter, J-O-N-G-H-U-I, space, K-I-M.  Correction,
22 J-O-N-G-H-E-E, K-I-M.
23 BY MR. ZHANG:
24   Q.    Aside from the two Mr. Kims, anyone else?
25   A.    Principal engineer Jae Hyuk Lee.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1      LEAD INTERPRETER:  Spelling by the
2  interpreter, J-A-E, space, H-Y-U-K, space, L-E-E.
3  BY MR. ZHANG:
4      Q.    Aside from the two Mr. Kims and Mr. Lee, anyone
5  else?
6      A.    There was counsel as well, but I can -- strike
7  that, but I don't know his Korean -- her Korean name.
8      Q.    Was there only one counsel?
9      A.    No.  Vice President Kwang Joon Kim is also
10 counsel; therefore, there were two counsel.
11     Q.    And this counsel for whom you don't know his or
12 her Korean name, was this person counsel for Samsung or from
13 an outside law firm?
14           MR. BASINGER:  Calls for speculation.
15     A.    In-house counsel.
16 BY MR. ZHANG:
17     Q.    Do you know this person's English name?
18     A.    Yes.
19     Q.    What is it?
20     A.    Ki Kim.
21     Q.    And do you know this person's title?
22           MR. BASINGER:  Vague and ambiguous, calls for
23 speculation.
24     A.    What do you mean by his or her title as counsel?
25 I already told you that that person is counsel.

Page 15

1  BY MR. ZHANG:
2      Q.    Okay.  So do I have the full list of everyone who
3  attended that meeting on behalf of Samsung that you can
4  recall, obviously?
5      A.    Yes.
6      Q.    And how many times during this trip to California
7  did you, you personally, meet with Apple employees?
8           MR. BASINGER:  Vague and ambiguous.
9      A.    Yes, I can't exactly understand what you meant by
10 your question.
11 BY MR. ZHANG:
12     Q.    We've just been talking about a trip that you
13 took with one, two, three, four other Samsung personnel to
14 California to meet with Apple; is that correct?
15     A.    Yes.
16     Q.    And how long did this trip last?
17     A.    Are you asking me as to the entire period from my
18 departure from Korea to my arrival in Korea?
19     Q.    Sure.  We can go with that.
20     A.    It was four days.
21     Q.    Okay.  And so during these four days that you
22 were in California and away from Korea, how many times did
23 you personally meet with Apple employees?
24           MR. BASINGER:  Asked and answered.
25     A.    I believe I answered your question.

Page 16

1  BY MR. ZHANG:
2      Q.    No, you didn't, actually.  You said you didn't
3  understand my question.
4           MR. BASINGER:  Argumentative.  She answered
5  your question earlier, but...
6           MR. ZHANG:  Please answer my question.
7           MR. BASINGER:  You can answer his question.
8      A.    I attended a meeting once.
9  BY MR. ZHANG:
10     Q.    Okay.  And who from Apple was present at this
11 meeting that you personally attended?
12     A.    Are you asking me to give you the exact name of
13 those attendees?
14     Q.    If you can remember.
15     A.    When it comes to the names, I cannot recall at
16 all.
17     Q.    How many people from Apple was present at that
18 one meeting that you attended?
19     A.    I can't exactly recall.
20     Q.    Okay.  Was it more than two?
21     A.    Yes.
22     Q.    Was it more than four?
23     A.    I can't recall.
24     Q.    Was it more than ten?
25           MR. BASINGER:  Asked and answered.

Page 17

1      A.    No.
2  BY MR. ZHANG:
3      Q.    So fewer than ten?
4      A.    Correct.
5      Q.    Did you have an understanding of who the
6  employees were that attended this meeting on behalf of
7  Apple?  And by that I mean:  Were they from the legal
8  department?
9           MR. BASINGER:  Vague and ambiguous, calls for
10 speculation.
11     A.    I don't believe I can answer your question by
12 speculating the fact which is not certain.
13 BY MR. ZHANG:
14     Q.    Okay.  So you don't -- you don't know for sure
15 whether there were Apple lawyers at this meeting?
16     A.    Correct.
17     Q.    Okay.  And did you have an understanding whether
18 there were Apple engineers at this meeting?
19     A.    No.
20     Q.    Okay.  Did Apple make a presentation at this
21 meeting?
22     A.    Yes.
23     Q.    And what do you recall from the contents of the
24 presentation?
25     A.    I think when it comes to what, it's a scope that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18..21

Page 18

1  seems to be quite broad.
2      Q.   Do you recall anything from the presentation that
3  was made by Apple at this meeting?
4      A.   Yes, there is something that I can recall
5  approximately.
6      Q.   And what is that?  Can you please tell me?
7      A.   It was a technological field which is very
8  detailed, but at this moment, what I can recall is this was
9  OS-related technology.
10     Q.   Do you recall anything else about Apple's
11 presentation at this meeting?
12     A.   No.
13     Q.   Do you recall anyone from Apple's side making an
14 allegation that Samsung was infringing Apple's patents?
15         MR. BASINGER:  Objection, foundation, vague
16 and ambiguous.
17     A.   Would you repeat your question, please?
18         MR. ZHANG:  Could you please retranslate the
19 question?
20         LEAD INTERPRETER:  Sure.
21         MR. ZHANG:  Thank you.
22         MR. BASINGER:  Same objection.
23     A.   I'm not quite sure.
24 BY MR. ZHANG:
25     Q.   So do you remember or do you not remember someone

Page 19

1  from Apple's side making an allegation that Samsung was
2  infringing Apple's patents?
3          MR. BASINGER:  Same objection, foundation,
4  vague and ambiguous.
5      A.   I don't recall.
6  BY MR. ZHANG:
7      Q.   Do you recall anyone from Apple's side making an
8  allegation that Samsung was infringing Apple's utility
9  patent -- I mean, design patents?
10         MR. BASINGER:  Same objection.
11     A.   No.
12 BY MR. ZHANG:
13     Q.   Do you recall anyone from Apple's side making an
14 allegation that Samsung was infringing on Apple's trademark
15 or trade dress?
16         MR. BASINGER:  Same objection.
17         (A discussion was had off the record between Lead
18 Interpreter and Check Interpreter in Korean.)
19     A.   I cannot clearly understand what the trademark or
20 trade dress is.
21 BY MR. ZHANG:
22     Q.   I see.  So because you don't clearly understand
23 what a trademark or trade dress is, then you can't recall
24 whether or not an allegation was made by Apple's side that
25 Samsung was infringing its trademark or trade dress; is that

Page 20

1  correct?
2          MR. BASINGER:  Objection to the extent it
3  mischaracterizes previous testimony, but you can answer
4  the question.
5      A.   Correct.  I believe you are making too many
6  assumptions on my answer.
7  BY MR. ZHANG:
8      Q.   Do you recall the words "trademark" or "trade
9  dress" being used at this meeting?
10     A.   As for myself, I don't recall.
11     Q.   Okay.  Do you recall anyone from Apple's side at
12 this meeting making an allegation that Samsung was copying
13 Apple's products?
14     A.   No.
15     Q.   Do you recall anyone from Apple's side at this
16 meeting making an offer to license to Samsung Apple's
17 patents?
18         MR. BASINGER:  Vague.
19     A.   I think you need to define the meaning of "any."
20 BY MR. ZHANG:
21     Q.   I'm not seeing the word "any" in my English
22 question, so I'm not quite sure what the witness wants me to
23 clarify.  But is there anything that's unclear about my
24 question?
25     A.   Yes.

Page 21

1      Q.   And what is that?
2      A.   I think I already answered this question, but
3  when it comes to the meaning of "any," it's quite broad.
4      Q.   Do you have --
5      A.   And when it comes to the allegation related to
6  licensing, it is quite broad as well.  So would you be more
7  specific in asking your question, please?
8      Q.   Did anyone from Apple discuss Apple's patents at
9  this meeting that you attended?
10     A.   Yes.
11     Q.   And did they discuss Apple's utility patents at
12 this meeting?
13     A.   Utility?  You're asking me as to utility patents,
14 right?
15     Q.   Yes.
16     A.   I was a little confused because there was some
17 mistake in translation.
18     Q.   Okay.  But your answer is:  Yes, someone did
19 discuss Apple's utility patents at this meeting, correct?
20     A.   Correct.
21     Q.   Do you recall who the person was that discussed
22 Apple's utility patents at this meeting?
23         MR. BASINGER:  Vague.
24     A.   I don't recall as to the name.
25 BY MR. ZHANG:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22..25

Page 22

1    Q.    Do you recall his title?
2         MR. BASINGER:  You're asking about an Apple
3    employee?
4         MR. ZHANG:  Yes.
5    A.    No.
6    BY MR. ZHANG:
7    Q.    Okay.  Do you recall anyone from Apple's side
8    discussing Apple's design patents at this meeting?
9    A.    There was no discussion as such at all.
10   Q.    Okay.  Do you recall anyone from Apple's side
11   discussing Apple's trademark or trade dress at this meeting?
12        MR. BASINGER:  Objection, foundation.
13   A.    Yes, why don't you explain to me what "trademark"
14   or "trade dress" means.
15   BY MR. ZHANG:
16   Q.    Did anyone at Apple -- at this meeting from
17   Apple's side discuss the physical appearance of Apple's
18   products?
19   A.    No.
20   Q.    Did anyone at this meeting from Apple's side
21   offer to allow Samsung to use Apple's utility patent rights?
22        MR. BASINGER:  Vague and ambiguous.
23   A.    To my recollection, no.
24   BY MR. ZHANG:
25   Q.    And did anyone at this meeting from Apple's side

Page 23

1    offer to allow Samsung to use Apple's design patent rights?
2         MR. BASINGER:  Same objection.
3    A.    No.  I believe I gave you the answer to this
4    question.
5    BY MR. ZHANG:
6    Q.    And did anyone from Apple's side offer to allow
7    Samsung to emulate the physical appearance of Apple's
8    products at this meeting?
9         MR. BASINGER:  Objection, vague and
10   ambiguous.
11   A.    No.
12   BY MR. ZHANG:
13   Q.    Was there an allegation made by anyone from
14   Apple's side at this meeting that Samsung's products looked
15   very similar to Apple's products?
16   A.    To my recollection, there was none.
17   Q.    So was the presentation from Apple's side
18   directed to operating system-related technology and its
19   related patents?
20        MR. BASINGER:  Vague and ambiguous, compound.
21   A.    To my recollection, yes.
22   BY MR. ZHANG:
23   Q.    Do you recall any of the specific technologies
24   that were discussed, operating system technologies that were
25   discussed at this meeting?

Page 24

1    A.    Yes.
2    Q.    Can you describe one that you remember?
3    A.    There was object-oriented software technology
4    that is related to Java's operations.
5    Q.    Did Apple present a patent that allegedly covered
6    this technology at the meeting?
7         MR. BASINGER:  Vague and ambiguous.
8         (A discussion was had off the record between Lead
9    Interpreter and Check Interpreter in Korean.)
10   A.    I think the scope of "cover" is quite broad.
11   BY MR. ZHANG:
12   Q.    Okay.  Did Apple present any patent relating to
13   this technology that you just described, object-oriented
14   software technology?
15   A.    Yes.
16   Q.    Do you recall how many?
17   A.    Are you asking me as to the number of patents
18   relating to object-oriented software technology?
19   Q.    Yes.
20   A.    When it comes to the exact number, I can't recall
21   now.
22   Q.    Okay.  So aside from this object-oriented
23   software technology, any other technologies that you recall
24   being presented by Apple at this meeting?
25   A.    I cannot recall anything else for now.  That's

Page 25

1    about it.
2    Q.    Do you recall what Samsung, Samsung's employees,
3    told Apple's employees at this meeting that you attended?
4         MR. BASINGER:  Overbroad.
5    BY MR. ZHANG:
6    Q.    Let's -- we can -- I'm not trying to get you to
7    remember everything that was said.
8         So Apple made a presentation at this meeting, so
9    that was Apple's turn to speak.  What did Samsung say in
10   response to the presentation that was made about Apple's
11   technologies?
12        MR. BASINGER:  And same objection.  I'm just
13   going to caution the witness not to reveal any
14   privileged information.  I think the question was asking
15   for what was said at the meeting, not what was said in
16   general after the meeting.  So to the extent you
17   remember what was said by Samsung in response to Apple's
18   presentation at the meeting to Apple, you can answer the
19   question.
20   A.    I don't have any recollection.
21   BY MR. ZHANG:
22   Q.    So you don't have any recollection of what
23   Samsung's response was to Apple's presentation at this
24   meeting; is that correct?
25   A.    Response?

Page 26

1    Q.    Correct.
2    A.    As for ourselves, we asked the questions --
3    strike that.
4          As for ourselves, we asked the questions with
5    regard to the portions that we couldn't clearly understand
6    regarding the presentation.
7    Q.    Aside from asking for clarification about Apple's
8    presentation, did Samsung make other statements to Apple
9    about the technology that was presented at the meeting?
10   A.    No.
11   Q.    Was the meeting that you attended during your
12   four-day trip to California the only meeting between Apple
13   and Samsung employees during that period?
14         MR. BASINGER:  Calls for speculation.
15   A.    Correct.
16   BY MR. ZHANG:
17   Q.    Were you involved in analyzing Apple's technology
18   or Apple's patents prior to going on this four-day trip to
19   California in the fall of 2010?
20         MR. BASINGER:  And vague and ambiguous.  I'm
21   going to caution the witness not to reveal any
22   privileged information.  And if you have any questions
23   about what might be privileged or not, we can clear that
24   up -- clear those up off the record.
25   A.    I would like to have some explanations on the

Page 27

1    privileged information.
2          MR. ZHANG:  Okay.  Actually this is I think I
3    a good time for a break.
4          MR. BASINGER:  Okay.
5          THE VIDEOGRAPHER:  Going off the record, the
6    time now is 10:13.
7          (Recess taken, 10:13 a.m. to 10:27 a.m.)
8          THE VIDEOGRAPHER:  We are now back on record.
9    The time now is 10:27.
10         MR. ZHANG:  So I believe there was a question
11   pending before we took the break so that counsel could
12   discuss privilege issues with the witness, and I just
13   want to clarify I'm only looking for a yes or no answer
14   to the question that I was -- that was pending.
15         LEAD INTERPRETER:  Would it be okay for me to
16   repeat the translation, Counsel?
17         MR. ZHANG:  Yes, please.
18   A.    There are some vague words in your question.
19   BY MR. ZHANG:
20   Q.    Okay.  What are they?
21   A.    What do you mean by "analysis"?
22   Q.    Reading, studying, understanding.
23         MR. BASINGER:  Vague and ambiguous and
24   compound.  You might have to break those up.
25   BY MR. ZHANG:

Page 28

1    Q.    Given that understanding -- given that definition
2    of "analysis" that I've just provided, can you answer my
3    question?
4    A.    You used the word "analysis," and I think I asked
5    a question regarding the meaning of that word.  I don't
6    believe you answered my question.
7    Q.    No, I believe I answered your question.  Are you
8    refusing to answer the question, my question?
9          MR. BASINGER:  Argumentative.  She's not
10   refusing to answer the question.  Maybe you can just
11   give her the definition that you're using again.
12         MR. ZHANG:  Reading, studying, understanding.
13         CHECK INTERPRETER:  As to whether there's
14   "or" included in this, I'm not sure, whether --
15         MR. ZHANG:  I mean for there to be an "or."
16         Reading, studying or understanding is my
17   definition of "analysis," so please answer my question.
18         MR. BASINGER:  I would caution the witness
19   not to reveal any privileged information, but to the
20   extent you can answer the question and understand the
21   question without revealing privileged information, you
22   may do so.
23   A.    Would you repeat your question in a full
24   sentence?
25   BY MR. ZHANG:

Page 29

1    Q.    Before this four-day fall 2010 trip that you took
2    to California, were you involved in analyzing Apple's
3    patents?
4          MR. BASINGER:  Vague and ambiguous.  And,
5    again, I caution the witness not to reveal any
6    privileged information.
7    A.    Even though the word "involvement" is a little
8    vague, but based on the definition of "analysis" that you
9    have given to me, my answer would be yes.
10   BY MR. ZHANG:
11   Q.    And when did your involvement with analyzing
12   Apple's patents begin?
13         MR. BASINGER:  Mischaracterizes previous
14   testimony, vague and ambiguous.
15         CHECK INTERPRETER:  "Can you please translate
16   the word 'involvement' again?"
17   A.    The word "involvement" you used is related to the
18   analysis that you used in your previous question.
19         MR. ZHANG:  I'll ask a different question.
20   BY MR. ZHANG:
21   Q.    When was the first time you recall analyzing
22   Apple's patents?
23         MR. BASINGER:  Vague and ambiguous.  And I
24   caution the witness not to reveal any privileged
25   information.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1   Q.    Correct.

2   A.    As for ourselves, we asked the questions --

3   strike that.

4         As for ourselves, we asked the questions with

5   regard to the portions that we couldn't clearly understand

6   regarding the presentation.

7   Q.    Aside from asking for clarification about Apple's

8   presentation, did Samsung make other statements to Apple

9   about the technology that was presented at the meeting?

10  A.    No.

11  Q.    Was the meeting that you attended during your

12  four-day trip to California the only meeting between Apple

13  and Samsung employees during that period?

14        MR. BASINGER:  Calls for speculation.

15  A.    Correct.

16  BY MR. ZHANG:

17  Q.    Were you involved in analyzing Apple's technology

18  or Apple's patents prior to going on this four-day trip to

19  California in the fall of 2010?

20        MR. BASINGER:  And vague and ambiguous.  I'm

21  going to caution the witness not to reveal any

22  privileged information.  And if you have any questions

23  about what might be privileged or not, we can clear that

24  up -- clear those up off the record.

25  A.    I would like to have some explanations on the

Page 27

1   privileged information.

2         MR. ZHANG:  Okay.  Actually this is I think I

3   a good time for a break.

4         MR. BASINGER:  Okay.

5         THE VIDEOGRAPHER:  Going off the record, the

6   time now is 10:13.

7         (Recess taken, 10:13 a.m. to 10:27 a.m.)

8         THE VIDEOGRAPHER:  We are now back on record.

9   The time now is 10:27.

10        MR. ZHANG:  So I believe there was a question

11  pending before we took the break so that counsel could

12  discuss privilege issues with the witness, and I just

13  want to clarify I'm only looking for a yes or no answer

14  to the question that I was -- that was pending.

15        LEAD INTERPRETER:  Would it be okay for me to

16  repeat the translation, Counsel?

17        MR. ZHANG:  Yes, please.

18  A.    There are some vague words in your question.

19  BY MR. ZHANG:

20  Q.    Okay.  What are they?

21  A.    What do you mean by "analysis"?

22  Q.    Reading, studying, understanding.

23        MR. BASINGER:  Vague and ambiguous and

24  compound.  You might have to break those up.

25  BY MR. ZHANG:

Page 28

1   Q.    Given that understanding -- given that definition

2   of "analysis" that I've just provided, can you answer my

3   question?

4   A.    You used the word "analysis," and I think I asked

5   a question regarding the meaning of that word.  I don't

6   believe you answered my question.

7   Q.    No, I believe I answered your question.  Are you

8   refusing to answer the question, my question?

9         MR. BASINGER:  Argumentative.  She's not

10  refusing to answer the question.  Maybe you can just

11  give her the definition that you're using again.

12        MR. ZHANG:  Reading, studying, understanding.

13        CHECK INTERPRETER:  As to whether there's

14  "or" included in this, I'm not sure, whether --

15        MR. ZHANG:  I mean for there to be an "or."

16        Reading, studying or understanding is my

17  definition of "analysis," so please answer my question.

18        MR. BASINGER:  I would caution the witness

19  not to reveal any privileged information, but to the

20  extent you can answer the question and understand the

21  question without revealing privileged information, you

22  may do so.

23  A.    Would you repeat your question in a full

24  sentence?

25  BY MR. ZHANG:

Page 29

1   Q.    Before this four-day fall 2010 trip that you took

2   to California, were you involved in analyzing Apple's

3   patents?

4         MR. BASINGER:  Vague and ambiguous.  And,

5   again, I caution the witness not to reveal any

6   privileged information.

7   A.    Even though the word "involvement" is a little

8   vague, but based on the definition of "analysis" that you

9   have given to me, my answer would be yes.

10  BY MR. ZHANG:

11  Q.    And when did your involvement with analyzing

12  Apple's patents begin?

13        MR. BASINGER:  Mischaracterizes previous

14  testimony, vague and ambiguous.

15        CHECK INTERPRETER:  "Can you please translate

16  the word 'involvement' again?"

17  A.    The word "involvement" you used is related to the

18  analysis that you used in your previous question.

19        MR. ZHANG:  I'll ask a different question.

20  BY MR. ZHANG:

21  Q.    When was the first time you recall analyzing

22  Apple's patents?

23        MR. BASINGER:  Vague and ambiguous.  And I

24  caution the witness not to reveal any privileged

25  information.

Page 30

```
 1              And, Counsel, are you asking about the
 2  patents -- or any patents that were discussed during the
 3  meeting or any Apple patents at all?
 4         MR. ZHANG:  Any Apple patents at all.
 5      A.   I don't recall.
 6  BY MR. ZHANG:
 7      Q.   Were you in any way involved with a July 2010
 8  meeting between Apple and Samsung employees concerning
 9  Apple's intellectual property?
10         MR. BASINGER:  Vague and ambiguous.
11      A.   In July 2007?  Just July 2007, that's something
12  I'm not aware of.
13  BY MR. ZHANG:
14      Q.   Did I say "July 2007"?  "July 2010" is what the
15  transcript shows.
16      A.   When it comes to the July meeting, that's
17  something that I'm not aware of.
18      Q.   So your answer is no; is that correct?
19      A.   I forgot your previous question.  Would you
20  repeat your question, please?
21         MR. ZHANG:  Mr. Reporter, will you please
22  mark this passage as an example of Samsung witnesses'
23  misconduct during deposition?
24         MR. BASINGER:  Counsel, that's ridiculous.
25  There's been no misconduct.  The question is vague and
```

Page 31

```
 1  she's having a difficult time understanding your vague
 2  language.  I think she answered your question, and
 3  there's absolutely no misconduct.  So if you want to --
 4  if you don't think she's answering the question, ask it
 5  again.
 6         MR. ZHANG:  I'm going to ask it again.
 7  BY MR. ZHANG:
 8      Q.   Were you in any way involved with the July 2010
 9  meeting between Apple and Samsung employees concerning
10  Apple's intellectual property?
11         MR. BASINGER:  And vague and ambiguous, and
12  it's been asked and answered.
13      A.   There is no recollection of having a meeting in
14  July.
15  BY MR. ZHANG:
16      Q.   Okay.
17         CHECK INTERPRETER:  "So the answer is no."
18      A.   So the answer is no.
19  BY MR. ZHANG:
20      Q.   So you testified previously that you had analyzed
21  Apple's patents prior to your four-day trip to California;
22  is that correct?
23         MR. BASINGER:  Mischaracterizes previous
24  testimony.
25  BY MR. ZHANG:
```

Page 32

```
 1      Q.   When did you come to be involved with analyzing
 2  Apple's patents for purposes of discussions with Apple?
 3         MR. BASINGER:  Vague.
 4      A.   I don't exactly recall as to the exact date.
 5  BY MR. ZHANG:
 6      Q.   Was it in 2010?
 7      A.   Yes.
 8      Q.   Was it before June of 2010?
 9      A.   No.
10      Q.   Were you in any way involved in an August 2010
11  meeting that occurred in Korea between Apple's general
12  counsel and Samsung's Mr. Seungho Ahn regarding Apple's
13  intellectual property?
14         MR. BASINGER:  And vague and ambiguous.  And
15  I'll caution you not to reveal any privileged
16  information.
17      A.   I was involved at all.
18         CHECK INTERPRETER:  "I wasn't."
19      A.   I wasn't.
20  BY MR. ZHANG:
21      Q.   Okay.  And were you involved in any way in an
22  October 2010 meeting between Apple's Bruce Sewell and Boris
23  Tekseler with Samsung's representatives in Washington, D.C.?
24         CHECK INTERPRETER:  As to whether Mr. Boris
25  Tekseler was based in Washington, D.C. or whether the
```

Page 33

```
 1  meeting was in Washington, D.C., that was not clear.
 2         MR. ZHANG:  The meeting is in
 3  Washington, D.C., that's what I'm referring to.
 4         MR. BASINGER:  And vague and ambiguous.  And
 5  I caution you not to reveal any privileged information.
 6      A.   I wasn't involved at all.
 7  BY MR. ZHANG:
 8      Q.   And what about a November 2010 meeting between
 9  Apple's Chip Lutton and Samsung's Seungho Ahn regarding
10  Apple's intellectual property, were you in any way involved
11  in that meeting?
12         MR. BASINGER:  Same objection and same
13  caution.
14      A.   I was not involved at all.
15  BY MR. ZHANG:
16      Q.   Have you received information from any source
17  that indicates -- strike that.
18         Have you received information from any source
19  regarding Apple's allegation that Samsung is infringing its
20  utility patents?
21         MR. BASINGER:  Vague and ambiguous, vague as
22  to time frame.  And I caution the witness not to reveal
23  any privileged information.
24      A.   I would like to ask counsel to be more specific
25  as to the time in asking your question, please.
```

Page 34

1  BY MR. ZHANG:
2      Q.   Yes.  So I'll limit my question to:  Have you
3  received any information from any source since 2010
4  regarding Apple's allegation that Samsung is infringing its
5  utility patents?
6          MR. BASINGER:  Vague and ambiguous.  Again,
7  to the extent you can answer this, I caution you not to
8  reveal any privileged information.
9          MR. ZHANG:  I'm just looking for a yes or no
10 answer.
11         (A discussion was had off the record between Lead
12 Interpreter and Check Interpreter in Korean.)
13     A.   To be more precise, are you asking me as to the
14 time frame after October 2010?
15 BY MR. ZHANG:
16     Q.   No, I'm asking her about 2010, inclusive, going
17 forward to today.
18     A.   From 2010 to now?
19     Q.   January 1, 2010, to today.
20         MR. BASINGER:  Vague and ambiguous,
21 overbroad.  And caution the witness not to reveal any
22 privileged information.
23     A.   Are you asking me as to the -- strike that.
24         Are you indicating the e-mails that I directly
25 received from Apple?

Page 35

1  BY MR. ZHANG:
2      Q.   I asked you about any source, so yes, that would
3  include the e-mails that you directly received from Apple.
4      A.   Yes.
5      Q.   Have you received e-mails from Apple indicating
6  its allegation that Samsung is infringing Apple's utility
7  patents?
8          MR. BASINGER:  And assumes facts, vague and
9  ambiguous.  And caution the witness not to reveal any
10 privileged information, but you can answer the question.
11     A.   I think the answer would be the same as to the
12 one in your previous question.
13 BY MR. ZHANG:
14     Q.   And what is that?  Humor me.
15     A.   Yes.
16     Q.   Have you received information from any source at
17 Samsung alleging that Apple has offered a license to Apple's
18 utility patents to Samsung?
19         MR. BASINGER:  And this question is too vague
20 as it's worded and phrased.  I'm going to instruct the
21 witness not to answer.
22         MR. ZHANG:  I'm looking for a yes or no
23 answer.  Are you going to maintain your objection?
24         MR. BASINGER:  Yes.  So as your question is
25 currently phrased, it's asking for a yes or no

Page 36

1  question -- answer, I understand that; but you have
2  information in the question itself, okay, that would
3  reveal privileged information or could reveal privileged
4  information if answered.  So I'm going to instruct the
5  witness not to answer.
6  BY MR. ZHANG:
7      Q.   Are you going to follow his instruction?
8      A.   I am going to follow my counsel's instruction.
9      Q.   Okay.  And have you heard from any source at
10 Samsung that Apple has offered a license to its design
11 patents to Samsung?
12         MR. BASINGER:  I'm also going to instruct the
13 witness not to answer that question as phrased.
14 BY MR. ZHANG:
15     Q.   And will you follow that instruction?
16     A.   Yes.
17     Q.   Have you heard from any source at Samsung
18 regarding Apple's allegation that Samsung is copying Apple's
19 products?
20         MR. BASINGER:  This is vague and ambiguous
21 and overbroad.  You can answer the question to the
22 extent you're not revealing any communications with
23 attorneys within Samsung.
24     A.   I haven't heard as such.
25         MR. ZHANG:  Okay.  Why don't we take a break

Page 37

1  and I may not have anything, but we'll just finish up
2  when we come back.
3          MR. BASINGER:  Okay.
4          THE VIDEOGRAPHER:  Going off the record, the
5  time now is 10:51.
6          (Recess taken, 10:51 a.m. to 11:02 a.m.)
7          THE VIDEOGRAPHER:  We are now back on the
8  record.  The time now is 11:02.
9  BY MR. ZHANG:
10     Q.   Welcome back, Ms. Lee.  Has anyone at Apple ever
11 told you personally that Apple was offering its utility
12 patents for license?
13         MR. BASINGER:  Vague.
14     A.   No.
15 BY MR. ZHANG:
16     Q.   Has anyone at Apple ever told you personally that
17 Apple was offering its design patents for license?
18         MR. BASINGER:  Vague.
19     A.   No.
20 BY MR. ZHANG:
21     Q.   Has anyone at Apple ever told you personally that
22 Samsung was infringing Apple's utility patents?
23         MR. BASINGER:  Foundation, vague.
24     A.   No, not personally.
25 BY MR. ZHANG:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 38

1    Q.    Has anyone at Apple ever told you personally that
2 Samsung was infringing Apple's design patents?
3         MR. BASINGER:  Same objection.
4         (Interruption off the record.)
5         MR. ZHANG:  Can we go off the record for a
6 second?
7         THE VIDEOGRAPHER:  Going off the record, the
8 time now is 11:04.
9         (Discussion off the record.)
10        THE VIDEOGRAPHER:  We are now back on the
11 record.  The time now is 11:05.
12 BY MR. ZHANG:
13    Q.    Have you ever heard from anyone at Samsung that
14 Apple had told Samsung that Apple was offering its utility
15 patents for license?
16        MR. BASINGER:  Vague and ambiguous.  I'm
17 going to caution the witness not to reveal any
18 information -- or the information that he's asking for
19 if it was received from attorneys or with discussions
20 with attorneys.
21        MR. ZHANG:  I'm asking about a nonprivileged
22 communication that would have come from Apple to
23 Samsung, and so whether that message was relayed or not
24 to Ms. Lee would not be privileged.
25        MR. BASINGER:  That's fine.  If you want to

Page 39

1 ask the question again, I'm going to have the same
2 caution.  And I'm just cautioning you not to reveal any
3 information or communications with counsel within
4 Samsung or outside of Samsung, but you can answer his
5 question.
6    A.    Would you repeat your question, please?  I forget
7 your question.
8         MR. ZHANG:  Yes, could you please read back
9 the question.
10    A.    Are you asking me whether I heard as such
11 directly?
12 BY MR. ZHANG:
13    Q.    I'm asking whether you heard from anyone in
14 conversation or whether you received an e-mail
15 communication, really any communication.
16        MR. BASINGER:  Again, same caution.  You can
17 answer the question to the extent it's regarding a
18 specific communication from Apple that you're aware of.
19    A.    I can't answer your question.
20 BY MR. ZHANG:
21    Q.    Why not?
22    A.    I believe it contains the privileged information.
23    Q.    So I'm going to ask you yes or no, whether anyone
24 at Samsung has ever told you, whether in person or via
25 e-mail communication, that they had been told -- I'm sorry,

Page 40

1 that Apple had said that it was offering to Samsung Apple's
2 patents for license.
3         MR. BASINGER:  And, again, I'm going to
4 caution you not to reveal any communications with
5 in-house or outside counsel.
6         MR. ZHANG:  Okay.  Actually, let me reask my
7 question.
8 BY MR. ZHANG:
9    Q.    Has anyone at Samsung ever told you, whether in
10 person or via e-mail communication, that Apple had
11 communicated to Samsung an offer to license Apple's patents
12 to Samsung?
13    A.    With regard to the offer for license, I haven't
14 heard.
15    Q.    Has anyone at Samsung ever told you, whether in
16 person or via e-mail communication, that Apple had
17 communicated to Samsung a willingness to allow Samsung to
18 use Apple's patented technology?
19        MR. BASINGER:  Vague and ambiguous.  And,
20 again, caution you not to reveal any communications with
21 in-house or outside counsel.
22        MR. ZHANG:  I think that instruction is
23 improper because I am asking about a communication that
24 would have come from Apple to Samsung and would have
25 been merely relayed to Ms. Lee and would not be

Page 41

1 privileged.
2         MR. BASINGER:  Okay.  That's fine.  I
3 disagree.  It wasn't an instruction, it was a caution,
4 but...
5         MR. ZHANG:  And I understand that it was just
6 a caution, but I want to understand what the scope this
7 witness' answer is going to be to my question.
8         So is she allowed to answer as to any
9 in-person or e-mail communication with counsel that
10 would have included this message from Apple to Samsung?
11        MR. BASINGER:  Okay.  First, that wasn't a
12 question.
13        MR. ZHANG:  Do you guys want to confer?
14        MR. BASINGER:  No, that's fine.  I think,
15 number one, your question is extremely vague, and I
16 don't think we understand exactly -- or I don't think
17 the witness understands exactly what e-mail
18 communication or communication you're exactly referring
19 to.  But she's here to testify, so I don't know what the
20 scope of her answer might be.
21        What I'm saying is that she's not going to
22 reveal to you any communications she's had with in-house
23 or outside counsel, and that's what I'm cautioning her
24 not to reveal.  She can answer your question to the
25 extent she can answer it without revealing those

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

42..45

Page 42

1  privileged communications.
2       MR. ZHANG:  So am I correct to understand
3  that her answer will not include any communications with
4  either in-house Samsung counsel or outside Samsung
5  counsel; is that correct?
6       MR. BASINGER:  That's right, I'm cautioning
7  her not to reveal any privileged communications.
8       MR. ZHANG:  Okay.
9       MR. BASINGER:  If you want to ask --
10      MR. ZHANG:  You want me to reask the
11 question?
12      MR. BASINGER:  Yes.
13      MR. ZHANG:  Okay.
14 BY MR. ZHANG:
15     Q.  Has anyone at Samsung ever told you, whether in
16 person or via e-mail communication, that Apple had
17 communicated to Samsung a willingness to allow Samsung to
18 use Apple's patented technology?
19      MR. BASINGER:  Vague and ambiguous.  And,
20 again, I caution the witness not to reveal any
21 privileged communications.
22     A.  I don't think I can answer your question because
23 it contains the privileged information.
24 BY MR. ZHANG:
25     Q.  Okay.  And who was this privileged communication

Page 43

1  with that you would be revealing?
2       MR. BASINGER:  Assumes facts, foundation,
3  vague and ambiguous.
4       A.  It was Vice President Kwang Joon Kim because he
5  was counsel.
6  BY MR. ZHANG:
7       Q.  And when did this communication occur?
8       MR. BASINGER:  Assumes facts, foundation.
9  There's been no discussion of a communication.  And I'm
10 going to instruct the witness not to reveal any
11 privileged communications you may have had with counsel,
12 in-house or outside counsel, for Samsung.
13      MR. ZHANG:  I'm not asking for the content of
14 the communications.  I'm just asking what -- when -- I'm
15 asking the facts around this communication so that we
16 can properly vet the privilege claim.
17      MR. BASINGER:  Yet, what's "this
18 communication," though?  That's not clear.  I mean, it
19 sounds -- for the record, it sounds like you're asking
20 about a privileged communication that may have happened
21 and a substantive privileged communication, so what
22 exactly are you asking when you say "this
23 communication"?
24      MR. ZHANG:  Okay.  So the witness told me
25 that she cannot answer my previous question because it

Page 44

1  was privileged, and so I'm asking her who she had this
2  privileged communication with and when and in what form.
3  I'm entitled to that information.
4       MR. BASINGER:  Okay.  So I think at this
5  point it's unclear.  So -- there's no question pending.
6  I think by "this communication," you are assuming that
7  there was a communication with the vice president, that
8  Apple had communicated to Samsung a willingness to allow
9  Samsung to use Apple's patented technology.  I don't
10 think there's been any testimony to that effect, and if
11 there has, that's privileged communication.
12      So why don't you reask your question, and if
13 we need to take this up off the record, we'll do that.
14      MR. ZHANG:  Let me ask a different question,
15 then.
16 BY MR. ZHANG:
17     Q.  Has anyone at Samsung ever told you, whether in
18 person or via e-mail communication, that Apple had
19 communicated to Samsung a willingness to allow Samsung to
20 use Apple's patented designs?
21      MR. BASINGER:  Vague and ambiguous.  And,
22 again, I caution you not to reveal any privileged
23 information.  If you have any question whatsoever about
24 what might be privileged, we can take a break and
25 discuss it off the record.

Page 45

1       THE WITNESS:  I would like to discuss with
2  our counsel.
3       MR. ZHANG:  Okay.
4       THE VIDEOGRAPHER:  Going off the record, the
5  time now is 11:21.
6       (Recess taken, 11:21 a.m. to 11:43 a.m.)
7       THE VIDEOGRAPHER:  We are now back on the
8  record the time now is 11:43.
9       MR. ZHANG:  So I believe there was a question
10 pending before the break, and if the translator could
11 please read the question back.
12     A.  No.  My answer would be no, but I would like to
13 be more precise in offering my answer, and then my answer
14 would be same as the previous answer in the same context.
15      When it comes to the licensing offer, the reason
16 why I said I wouldn't be able to give you an answer with
17 regard to the e-mail communications with Vice President
18 Kwang Joon Kim was because I believe that information
19 contained the privileged information.  That's why I said I
20 wouldn't be able to give you the answer.  But the e-mail
21 communication that I had with the current senior vice
22 president, Kwang Joon Kim, contained presentation which was
23 made by Apple during the meeting that I attended.
24      CHECK INTERPRETER:  "My answer would be the
25 same as the one to the previous question."

Page 46

1          (A discussion was had off the record between Lead
2   Interpreter and Check Interpreter in Korean.)
3          CHECK INTERPRETER: I'll just present my own
4   rendering: "No, and also my answer would be the same as
5   to the previous question."
6          (A discussion was had off the record between Lead
7   Interpreter and Check Interpreter in Korean.)
8          CHECK INTERPRETER: "As to when it comes to
9   the licensing offer, I did not hear anything regarding
10  the licensing offer."
11         MR. ZHANG: So I think there's been a lot of
12  back and forth, and I just want to reask some of these
13  questions. I apologize, but I just want to be clear as
14  to what counsel's reaction is and objections are and
15  what the witness' answers are.
16  BY MR. ZHANG:
17     Q.   Has anyone at Samsung ever told you, whether
18  in-person or via e-mail communication, that Apple had
19  communicated to Samsung a willingness to allow Samsung to
20  use Apple's patented technology?
21         MR. BASINGER: Vague and ambiguous. And same
22  caution about revealing privileged information, but you
23  can answer the question.
24     A.   No, I have not.
25  BY MR. ZHANG:

Page 47

1      Q.   Are you excluding any communications on the basis
2   of privilege from your answer?
3      A.   No.
4      Q.   Has anyone at Samsung ever told you, whether in
5   person or via e-mail communication, that Apple had
6   communicated to Samsung a willingness to allow Samsung to
7   use Apple's patented designs?
8          MR. BASINGER: And same objection, same
9   caution. But you can answer the question.
10     A.   No, since I'm not the person who's responsible
11  for the design at all, I haven't received any information
12  relating to the design.
13  BY MR. ZHANG:
14     Q.   Aside from Mr. Seungho Ahn and Mr. Ki Kim that
15  we've talked about earlier today, do you work with any other
16  Samsung attorneys? And, actually, I'll narrow my question a
17  little further: I'm only interested in people -- in counsel
18  you've worked with since January 1, 2010.
19     A.   Would you specify the time frame again?
20     Q.   January 1, 2010, since January 1, 2010.
21     A.   Yes.
22     Q.   And can you provide their names?
23     A.   There are so many.
24     Q.   So you don't remember any of their names?
25         MR. BASINGER: Mischaracterizes previous

Page 48

1   testimony. Counsel, do you want her to go through all
2   of the attorneys that she might have worked with since
3   January 1st, 2010?
4          MR. ZHANG: Yes, if you can remember.
5          MR. BASINGER: How is -- how is any of that
6   relevant?
7          MR. ZHANG: I'm not going to explain my
8   questions.
9          Please answer my question.
10         But I can limit it to the matter that she
11  worked on with Apple, with respect to Apple.
12         MR. BASINGER: So vague and ambiguous, and...
13     A.   What do you mean by "relating to Apple"? I think
14  that its meaning is quite broad.
15  BY MR. ZHANG:
16     Q.   Okay. So, then, let's take that restriction off.
17  Just all the Samsung attorneys you've worked with since
18  January 1, 2010.
19         MR. BASINGER: So vague and ambiguous,
20  overbroad, calls for a narrative and completely
21  irrelevant.
22     A.   Am I supposed to list all the names of counsel
23  working within Samsung?
24  BY MR. ZHANG:
25     Q.   No, all the ones that you've worked with

Page 49

1   personally since January 1, 2010. That's my question.
2          MR. BASINGER: Same objection. Vague and
3   ambiguous.
4      A.   Your question is very broad. When you say
5   "personally," it's very broad because I talk to a lot of
6   people.
7          Would you please narrow down the scope of your
8   question?
9   BY MR. ZHANG:
10     Q.   So you can just list the people that you've
11  actually had a conversation with in person or the people
12  that you have had e-mail communications with.
13         MR. BASINGER: Okay. Wait. So by "people,"
14  you're asking about the attorneys that work at Samsung
15  currently?
16         MR. ZHANG: That's right. I'm just trying to
17  clarify my earlier question for the witness.
18         MR. BASINGER: So vague, overbroad, calls for
19  a narrative and irrelevant and compound.
20         MR. ZHANG: Please answer my question.
21     A.   Rosa Kim.
22         LEAD INTERPRETER: R-O-S-A, K-I-M. All the
23  spelling will be made by the interpreter.
24  BY MR. ZHANG:
25     Q.   Any others?

# ERRATA SHEET

NAME OF CASE:＿＿＿＿＿＿Apple v. Samsung, No. 11-cv-1846-LHK (ND Cal)＿＿＿＿＿

DATE OF DEPOSITION: ＿＿＿＿＿＿＿＿＿February 7, 2012＿＿＿＿＿＿＿＿＿＿

NAME OF WITNESS: ＿＿＿＿＿＿＿＿＿＿YoungSoon Lee＿＿＿＿＿＿＿＿＿＿＿

Reason Codes:

    1.     To clarify the record.
    2.     To conform to the facts.
    3.     To correct transcription errors.

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 29 | 9 | yes. | yes, I read Apple's patents. | 1 |
| 35 | 4 | Yes. | Yes, you asked me. | 1 |
| 49 | 5 | because I talk to a lot of people | because I work with a lot of people. | 1 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Signed: ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿     Date: 2012. 5. 25
      YoungSoon Lee

# Watson Declaration

# EXHIBIT 26

# Filed Under Seal

```
            CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER
1                UNITED STATES INTERNATIONAL TRADE COMMISSION
                            WASHINGTON, D.C.
2
3       _____

        In the Matter of:
4
        CERTAIN ELECTRONIC DIGITAL                Case No.:
5
        MEDIA DEVICES AND COMPONENTS              337-TA-796
6
        THEREOF
7       _____

8

9            *** CONFIDENTIAL BUSINESS INFORMATION ***
                    SUBJECT TO PROTECTIVE ORDER
10

11              VIDEOTAPED PERSONAL DEPOSITION OF:

12

13                         JOOHYUK KANG

14

15

16                      February 6, 2012

17                        Kim & Chang

18                    Seoul, South Korea

19                    9:10 a.m. - 4:52 p.m.

20

21

22

23

24

25
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
1   APPEARANCES:

2

3   For the Complainant, Apple, Inc.:

4            MORRISON & FOERSTER LLP
             By:  G. Brian Busey, Esq.
5            By:  David Scannell, Esq.
             2000 Pennsylvania Avenue, NW
6            Washington, D.C.  20006-1888
             (202) 887-1500
7

8   For the Respondents, the Samsung entities:

9            QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
             By:  Eric Huang, Esq.
10           By:  Justin K. Choi, Esq.
             51 Madison Avenue
11           22nd Floor
             New York, New York  10010
12           (212) 849-7000

13

14  Also present:

15           Sun Park, Morrison & Foerster LLP
             Jeff Myung, Samsung Electronics
16           Albert S. Kim, Lead Interpreter
             Laura Sunwoo, Check Interpreter
17           RJ Buckler, Videographer
             Lisa A. Knight, Court Reporter
18

19

20

21

22

23

24

25
```

Page 3

```
1              I N D E X
                                          PAGE
2   WITNESS:
    JOOHYUK KANG

3   Examination by Mr. Busey            6

4

5          E X H I B I T S

6   NUMBER     DESCRIPTION              PAGE

    Exhibit 1   Complainant Apple Inc.'s Notice of    4
7               Deposition to Joohyuk Kang

8   Exhibit 2   Organizational chart (Korean), with   24
                English translation and certification,
9               Bates S-ITC-003006154

10  Exhibit 3   Respondent Samsung Electronics Co.,   28
                Ltd.'s Third Set of Supplemental
11              Responses to Complainant's First Set of
                Interrogatories (Nos. 1-47)
12
    Exhibit 4   Respondent Samsung Electronics Co., Ltd's   28
13              Seventh Set of Supplemental Responses to
                Complainant's First Set of
14              Interrogatories (Nos. 1-47)

15  Exhibit 5*  Source code for Galaxy S 4G SGH-T959   50

16  Exhibit 6*  Source code for Gravity SGH-T589   66

17  Exhibit 7*  Source code for Vibrant SGH-T959   81

18  Exhibit 8   Respondent Samsung Electronics Company's   95
                Ltd.'s Responses to Complainant Fourth
19              Set of Interrogatories (Nos. 57-58)

20  Exhibit 9   (Android-TouchWiz3.0) Internet UI,   99
                Bates S-ITC-00310165 to -258
21

22  (*Note:  Exhibits 5, 6, and 7 were retained by Eric Huang,
            Esq., of Quinn, Emanuel, Urquhart & Sullivan, LLP)
23

24

25
```

Page 4

```
1            P R O C E E D I N G S

2          (Deposition Exhibit 1 was premarked.)

3          THE VIDEOGRAPHER:  My name is RJ Buckler, a
4   certified legal video specialist with American Realtime
5   Court Reporters in Asia.  The date today is
6   February 6th, 2012, and the time is approximately 9:10
7   a.m.

8          This deposition is being held in the office
9   of Kim & Chang located at their Jeongdong office on the
10  16th floor in Seoul, South Korea.  The caption of this
11  case is In the Matter of Certain Electronic Digital
12  Media Devices and Components Thereof held before the
13  International Trade Commission with a case number of
14  337-TA-796.

15         The name of the witness is Joohyuk Kang,
16  testifying in his personal capacity.  The court reporter
17  today is Lisa Knight, also with American Realtime Court
18  Reporters in Asia.

19         At this time, I would ask all counsel and
20  interpreters to please state their appearances and whom
21  they represent for the record.

22         MR. BUSEY:  Good morning.  My name is Brian
23  Busey with the firm of Morrison & Foerster representing
24  Complainant Apple in this ITC investigation.  With me
25  today is David Scannell and Sun Park.
```

Page 5

```
1          MR. HUANG:  Eric Huang of the New York office
2   of Quinn, Emanuel, Urquhart & Sullivan.  With me is
3   Justin Choi, also from the New York office of Quinn,
4   Emanuel, Urquhart & Sullivan for Samsung and the
5   witness.

6          LEAD INTERPRETER:  Good morning.  Albert S.
7   Kim, interpreter of record.

8          CHECK INTERPRETER:  Laura Sunwoo, check
9   interpreter.

10         THE VIDEOGRAPHER:  At this point, will
11  counsel state any stipulations for the record.

12         MR. BUSEY:  Yes.  I would like to read into
13  the record the following statement that I believe both
14  parties have agreed on.

15         We understand the court reporter is not
16  authorized to administer oaths in this venue.
17  Nevertheless, we request she administer the oath.  And
18  we stipulate we waive any objection to the validity of
19  the deposition based on the oath.

20         MR. HUANG:  Samsung agrees.

21         THE VIDEOGRAPHER:  At this time, our court
22  reporter will swear in the witness and interpreters and
23  then we can proceed.

24         (Interpreters sworn.)

25  ///
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 14

1     Q.    And was the -- did you receive that request to
2 preserve documents by e-mail?
3     A.    Yes.
4     Q.    Did you receive more than one request?
5          MR. HUANG:  Objection to the form, vague and
6 ambiguous.
7     A.    Yes.
8 BY MR. BUSEY:
9     Q.    How many requests did you receive?
10     A.    I don't quite recall as to how many times.
11     Q.    After the first request that you received to
12 preserve documents, did you take any steps to preserve
13 documents?
14          MR. HUANG:  Objection to form, vague and
15 ambiguous.
16     A.    Yes.  Pursuant to that request, having been told
17 not to delete anything, I deleted nothing.
18 BY MR. BUSEY:
19     Q.    Mr. Kang, does the IT system that Samsung uses
20 automatically delete documents after a certain period of
21 time?
22          MR. HUANG:  Objection, calls for speculation,
23 lacks foundation.  Also vague and ambiguous.
24     A.    I don't know.
25   ///

Page 15

1 BY MR. BUSEY:
2     Q.    Have you ever tried, Mr. Kang, to retrieve an
3 e-mail, say, that is a month old and found that it has been
4 automatically deleted?
5          MR. HUANG:  Objection to form, vague and
6 ambiguous.
7     A.    I don't quite recall.
8 BY MR. BUSEY:
9     Q.    Did you take any specific steps after receiving
10 notice -- excuse me.  Did you take any specific steps after
11 receiving a request to preserve documents to back up your
12 e-mail?
13          MR. HUANG:  Objection to form, vague and
14 ambiguous.
15     A.    Yes.
16 BY MR. BUSEY:
17     Q.    And what steps did you take?
18     A.    Well, as I was requested to do and that I was
19 told to preserve things, I preserved things.
20     Q.    And how did you do that?
21     A.    Well, in my case, I receive my e-mails via
22 Outlook, so, you know . . .
23     Q.    Mr. Kang, what specific steps did you take to
24 preserve the e-mails that you received via Outlook?
25          MR. HUANG:  Objection to form, vague and

Page 16

1 ambiguous.
2     A.    Well, what I did was not to delete and simply to
3 preserve.
4 BY MR. BUSEY:
5     Q.    How did you go about ensuring that there would be
6 no deletion of your e-mails?
7          MR. HUANG:  Objection to form, vague and
8 ambiguous, lacks foundation.
9     A.    Well, as I mentioned earlier, having been told
10 not to delete anything, I deleted nothing.  And I don't
11 think that there would have been anything beyond that that
12 would have been required of me in terms of steps.
13 BY MR. BUSEY:
14     Q.    Did you take any steps or did anyone in your
15 department take any steps to turn off any automatic deletion
16 of e-mails?
17          MR. HUANG:  Objection to form, assumes facts,
18 vague and ambiguous, compound, calls for speculation.
19     A.    I don't quite understand the question.
20 BY MR. BUSEY:
21     Q.    Did you or anyone else in your department take
22 any steps to turn off any feature of the Samsung e-mail
23 system that involve automatic deletion of e-mails after a
24 certain period of time?
25          MR. HUANG:  Objection to form, assumes facts,

Page 17

1 vague and ambiguous, compound, calls for speculation.
2     A.    I'm not too sure.
3 BY MR. BUSEY:
4     Q.    At a certain point after -- following your
5 receipt of a request to preserve documents in this
6 investigation, were you asked to turn over documents to
7 Samsung legal department?
8          MR. HUANG:  Objection to the form of the
9 question.  I'm going to caution the witness in answering
10 this question not to reveal the substance of any
11 attorney-client privileged communication or work
12 product.
13          You may answer the question yes or no.
14     A.    I don't know.
15 BY MR. BUSEY:
16     Q.    Mr. Kang, just moving on to your -- just a few
17 questions about your background -- educational background.
18 Sir, what is your educational background after high school?
19     A.    I graduated from college.
20     Q.    Okay.  What -- do you have a degree, sir, in a
21 technical area?
22     A.    Yes.
23     Q.    And what is your degree in?
24     A.    Computer software.
25     Q.    And do you have any advanced degrees, sir?

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 18

1    A.    When you say "any advanced degrees," what do you
2    mean?
3    Q.    Such as master's or Ph.D.
4    A.    No.
5    Q.    And, I take it, sir, that you -- strike that.
6          Do you understand the Java language?
7          MR. HUANG:  Objection to form, vague and
8    ambiguous.
9    A.    Yes.
10   BY MR. BUSEY:
11   Q.    Do you use Java in your work at Samsung?
12   A.    Yes.
13   Q.    Turning to your professional experience,
14   Mr. Kang, when did you join SEC -- Samsung Electronics?
15   A.    August of 2005.
16   Q.    And were you employed by another company prior to
17   Samsung?
18   A.    No.
19   Q.    Did you join Samsung from -- after you completed
20   your degree in computer software?
21   A.    Yes.
22   Q.    And what is your position today, sir?
23   A.    I'm an engineer.
24   Q.    And what group within Samsung are you part of?
25   A.    I currently belong to the telecommunications

Page 19

1    division.
2    Q.    And are there subunits within the
3    telecommunications division that you're a part of?
4    A.    Yes.
5    Q.    And what is the -- what are the unit -- what is
6    the unit or units that you're a part of within the
7    telecommunications division?
8    A.    I currently belong to the System Solutions side
9    of things as found within the Advanced Development Group.
10   Q.    And is that -- when you say the "Advanced
11   Development Group," is that the Advanced Software
12   Development Group?
13   A.    Yes.
14   Q.    And how long -- strike that.
15         Since you joined Samsung in 2005, have you been
16   within the same group?
17   A.    No.
18   Q.    What groups -- what group -- let's start with the
19   first group that you joined when you joined Samsung.
20   A.    That was the Americas Software Development Group.
21   And recently, I think maybe within the last one or two
22   months -- it's a little hard to recall -- the team went --
23   well, I was placed within the System Solutions Group.
24   Q.    Was the Americas Software Development Group, was
25   that part of the Advanced Software Development Group?

Page 20

1    A.    No.
2    Q.    What -- within what unit or department or team
3    was the Americas Software Development Group?
4    A.    Well, it did not -- it did not belong to the
5    Advanced Software Development Group.  There existed a
6    separate Americas Development Team, under which there was
7    this Americas Software Development Group.
8    Q.    And was the Americas Development Team within the
9    telecommunications division?
10   A.    Yes.
11   Q.    Do you know who the head of the Americas
12   Development Team is?
13   A.    I don't quite recall as to the name.
14   Q.    How long -- strike that.
15         My understanding, Mr. Kang, is that you joined
16   the -- in 2005, you joined the Americas Software Development
17   Group.  Is that correct?
18   A.    Yes.
19   Q.    And you were with that group, sir, up until a few
20   months ago?
21   A.    Yes.
22   Q.    And what were your job responsibilities within
23   the Americas Software Development Group?
24   A.    I was a software engineer charged with working on
25   browsers.

Page 21

1    Q.    And did you work on browsers for Samsung
2    smartphones?
3    A.    Yes.
4    Q.    And were those smartphones, to your
5    understanding, intended for the North American market?
6          MR. HUANG:  Objection to form, calls for
7    speculation.
8    A.    Yes.
9    BY MR. BUSEY:
10   Q.    Did you work on -- are you familiar, sir, with
11   the different cell phone technology CDMA and GSM?
12         MR. HUANG:  Objection to form, vague and
13   ambiguous, compound.
14   A.    Well, I know about them, but not to any great
15   detail.  I just simply know that there is such.
16   BY MR. BUSEY:
17   Q.    Okay.  And did your work as part of the Americas
18   Software Development Group, did it focus on smartphones for
19   one particular cell phone technology, CDMA or GSM?
20         MR. HUANG:  Objection to form, vague and
21   ambiguous, compound.
22   A.    Yes.
23   BY MR. BUSEY:
24   Q.    Which one?
25         MR. HUANG:  Same objections.

# Watson Declaration

# EXHIBIT 27

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

1

```
 1            UNITED STATES INTERNATIONAL TRADE COMMISSION
                        WASHINGTON, D.C.
 2

 3   _____

     In the Matter of:
 4    CERTAIN ELECTRONIC DIGITAL          Case No.:
      MEDIA DEVICES AND COMPONENTS        337-TA-796
 5    THEREOF

 6   _____

 7

 8

 9            *** CONFIDENTIAL BUSINESS INFORMATION ***

10              *** SUBJECT TO PROTECTIVE ORDER ***

11

12            VIDEOTAPED PERSONAL DEPOSITION OF:

13                      KANGHYUN LEE

14

15

16

17

18

19

20

21

22                    February 3, 2012

23                    Kim & Chang

24                 Seoul, South Korea

25               9:05 a.m. - 6:09 p.m.
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
 1   APPEARANCES:

 2
     For the Petitioner, Apple, Inc.
 3
                 MORRISON & FOERSTER, LLP
 4               BY: G. Brian Busey, Esq.
                     David D. Scannell, Esq.
 5               2000 Pennsylvania Avenue, NW
                 Suite 1600
 6               Washington, D.C. 20006
                 (202) 887-1500
 7
                     -and-
 8
                 MORRISON & FOERSTER, LLP
 9               BY: Sun Park, Esq.
                 555 West Fifth Street
10               Suite 3500
                 Los Angeles, California 90013-1024
11               (213) 892-5200

12
     For the Respondent Samsung entities:
13
                 QUINN EMANUEL URQUHART & SULLIVAN, LLP
14               BY: Eric Huang, Esq.
                     Justin K. Choi, Esq.
15               51 Madison Avenue
                 22nd Floor
16               New York, New York 10010
                 (212) 849-7000
17
18   Also present:

19               Michael Kang, Samsung
                 Albert S. Kim, Lead Interpreter
20               Laura Sunwoo, Check Interpreter
                 RJ Buckler, Videographer
21               Michael E. Miller, Court Reporter

22

23

24

25
```

Page 3

```
 1                      I N D E X
     WITNESS:                                    PAGE
 2   KANGHYUN LEE

 3   EXAMINATION BY MR. BUSEY                       6

 4
                     E X H I B I T S
 5
     NUMBER      DESCRIPTION                      PAGE
 6
     Exhibit 1   Notice of Deposition              4
 7
     Exhibit 2   Organizational Chart             33
 8               (S-ITC-003006154)

 9   Exhibit 3   Respondent Samsung Electronics Co.,   47
                 Ltd's Third Set of Supplemental
10               Responses to Complainant's First Set of
                 Interrogatories (Nos. 1-47)
11
     Exhibit 4   Respondent Samsung Electronics Co.,   58
12               Ltd.'s Seventh Set of Supplemental
                 Responses to Complainant's First Set of
13               Interrogatories (Nos. 1-47), Pages 1-13

14   Exhibit 5 * SCH-R910 WebView.java Source Code   65

15   Exhibit 6 * SCH-I800 WebView.java Source Code   99

16   Exhibit 7   E-mails                           110
                 (S-ITC-003063266 - S-ITC-003063268)
17
     Exhibit 8   E-mails                           128
18               (S-ITC-003062134 - S-ITC-003062143)

19

20   * (Source code exhibit retained by counsel for Samsung)

21

22

23

24

25
```

Page 4

```
 1                 PROCEEDINGS

 2        (February 3, 2012 at 9:05 a.m.)

 3        (KH Lee Deposition Exhibit 1 marked.)

 4        THE VIDEOGRAPHER:  My name is RJ Buckler, a
 5   Certified Legal Video Specialist with American Realtime
 6   Court Reporters in Asia.  The date today is February 3rd,
 7   2012, and the time is approximately 9:05 a.m.

 8        This deposition is being held in the office of
 9   Kim & Chang, located at the Jeongdong office on the 16th
10   floor, Seoul, South Korea.  The caption of this case is In
11   the Matter of Certain Electronic Digital Media Devices and
12   Components Thereof, held before the International Trade
13   Commission, with a case number 337-TA-796.

14        The name of the witness is KangHyun Lee,
15   testifying in his personal capacity.

16        The court reporter today is Mike Miller, also
17   with American Realtime Court Reporters in Asia.

18        At this time, I would ask all counsel and
19   interpreters to please state their appearances and whom
20   they represent for the record.

21        MR. BUSEY:  Good morning.  My name is Brian
22   Busey, a member of the firm of Morrison & Foerster,
23   representing Complainant Apple in this litigation.  With
24   me today is David Scannell and Sun Park.

25        MR. HUANG:  Eric Huang of Quinn Emanuel
```

Page 5

```
 1   Urquhart & Sullivan on behalf of Samsung and the witness.
 2   With me is associate Justin Choi, also of Quinn Emanuel,
 3   as well as Michael Kang of Samsung.

 4        THE VIDEOGRAPHER:  Thank you.  At this point
 5   will counsel please state any stipulations.

 6        MR. BUSEY:  Yes, I'd like to read into the
 7   record a statement that I believe both parties agree with.
 8   We understand the court reporter is not authorized to
 9   administer oaths in this venue.  Nevertheless, we request
10   he administer the oath, and we stipulate that we waive any
11   objection to the validity of the deposition based on the
12   oaths.

13        Is that agreeable, Mr. Huang?

14        MR. HUANG:  Yes, Samsung agrees.

15        MR. BUSEY:  Thank you.

16        LEAD INTERPRETER:  Good morning, Albert S. Kim,
17   interpreter of record.

18        CHECK INTERPRETER:  Laura Sunwoo, check
19   interpreter.

20        THE VIDEOGRAPHER:  At this time the court
21   reporter will swear in the witness and interpreters, and
22   we can proceed.

23        (Interpreters sworn.)

24        ///

25        ///
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

14..17

Page 14

1  question.  Also, objection, I'm going to caution the
2  witness again not to reveal the substance of any
3  attorney-client privileged communications in answering
4  this question, but you may answer.
5          MR. BUSEY:  Let me rephrase the question.
6  BY MR. BUSEY:
7      Q.    Did you take steps after you received the
8  notice to preserve documents?
9          MR. HUANG:  Objection to the form.  And I'd
10  also caution the witness again not to reveal the substance
11  of any attorney-client privileged communications in
12  answering this question, but you may answer the question
13  yes or no.
14      A.    The word given to me to preserve things was the
15  same as saying, "Do not discard or erase," so I did not
16  take any action in that regard.
17  BY MR. BUSEY:
18      Q.    Mr. Lee, in the IT system that you use for
19  e-mail, do your e-mails automatically erase after a
20  certain period of time?
21      A.    Yes.
22      Q.    And after what period of time do they -- are
23  they automatically deleted?
24      A.    To my understanding, I believe after the
25  passage of 20 days, they automatically get deleted.

Page 15

1      Q.    And after you received notice of the need to
2  preserve documents, was the automatic deletion of e-mails
3  turned off?
4          MR. HUANG:  Objection to the form of the
5  question, lacks foundation, calls for speculation.
6      A.    I don't consider myself to be directly related
7  to anything like that, so I did not take any action.
8  BY MR. BUSEY:
9      Q.    Did you take any action to back up the e-mails
10  before they were automatically deleted after 20 days?
11          MR. HUANG:  Objection to the form.
12      A.    Could you just ask me that again, please?
13  BY MR. BUSEY:
14      Q.    Yes.
15          Did you take any action to back up your e-mails
16  before they were automatically deleted after 20 days?
17          MR. HUANG:  Objection to form, assumes facts.
18      A.    Yes.
19  BY MR. BUSEY:
20      Q.    And when did you do that?
21      A.    I as a matter of practice normally have my
22  company-based e-mail system to be automatically backed up.
23      Q.    When did you do that?  Is that -- I'm sorry.
24  Strike that.
25          So your -- is it your testimony, Mr. Lee, that

Page 16

1  the automatic backup was occurring before you received the
2  notice to preserve documents?
3          MR. HUANG:  Objection to form, mischaracterizes
4  prior testimony, vague, ambiguous.
5      A.    Although I don't recall the precise time frame,
6  I would say that from about two years or so ago, I
7  basically set up my e-mail system such that my e-mails, as
8  I have received, get automatically backed up.
9  BY MR. BUSEY:
10      Q.    And how are those e-mails backed up?
11      A.    They get backed up via Microsoft Outlook.
12      Q.    And is the backup to some kind of a hard drive?
13          MR. HUANG:  Objection to form.
14      A.    Are you referring to my computer?
15  BY MR. BUSEY:
16      Q.    Yes.
17      A.    Yes.
18      Q.    And the hard drive is a hard drive associated
19  with your personal computer?
20          MR. HUANG:  Objection to the form.
21      A.    Could you ask me that again, please?
22  BY MR. BUSEY:
23      Q.    Yes.
24          Is the hard drive you're speaking of, is that
25  associated with your personal computer?

Page 17

1          MR. HUANG:  Objection to the form.
2      A.    When you say "personal computer," what do you
3  mean by that?
4  BY MR. BUSEY:
5      Q.    I'm sorry, let me clarify.
6          I'm asking about -- your work e-mail, I assume,
7  is on a -- am I correct that your work e-mail you're doing
8  on a company laptop or personal computer?
9          MR. HUANG:  Objection to the form, vague and
10  ambiguous.
11      A.    It's the computer that I normally use at work.
12  BY MR. BUSEY:
13      Q.    And is that a laptop or some kind of a PC?
14          MR. HUANG:  Objection to the form.
15      A.    What's the difference between a laptop and a
16  PC?
17  BY MR. BUSEY:
18      Q.    A freestanding non-laptop computer.
19          MR. HUANG:  Objection to the form, vague and
20  ambiguous.
21      A.    I don't believe I understand what you're
22  saying.
23  BY MR. BUSEY:
24      Q.    What kind of computer do you use at work?
25      A.    I use a desktop as well as a laptop.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

18..21

Page 18

1    Q.    And when you testified earlier about having
2  your e-mails automatically backed up, were you speaking
3  about one of these computers?
4    A.    Yes.
5    Q.    Which computer were you speaking about?
6    A.    I meant the laptop.
7    Q.    Did you also back up e-mails that you received
8  or sent that were on the desktop computer?
9         MR. HUANG:  Objection to the form.
10   A.    E-mail of what form, do you mean?
11 BY MR. BUSEY:
12   Q.    Just ordinary e-mail that you receive or send
13 at work using the desktop.
14   A.    If something happens to be something that I
15 believe I must remember, something that is important, then
16 I do store that.
17   Q.    Mr. Lee, did you take any specific steps, in
18 response to the notice to preserve documents, to back up
19 the e-mail on your desktop at work?
20        MR. HUANG:  Objection to the form of the
21 question.
22   A.    Would you mind asking me that in a slightly
23 easier fashion, please?
24 BY MR. BUSEY:
25   Q.    I asked you whether you took any specific steps

Page 19

1  in response to the notice to preserve documents to back up
2  the e-mail on your desktop at work.
3         MR. HUANG:  Objection to the form, vague and
4  ambiguous.
5    A.    I do not recall.
6  BY MR. BUSEY:
7    Q.    At some point, Mr. Lee, did you receive a
8  request to turn over relevant e-mails and documents to --
9  that were called for by discovery requests in this case?
10        MR. BUSEY:  Let me rephrase before you
11 translate.  Let me just rephrase it, may make it simpler.
12 BY MR. BUSEY:
13   Q.    At some point, did you receive a request to
14 turn over relevant documents in this case?
15        MR. HUANG:  Objection to the form, vague and
16 ambiguous.  Also, objection, I'm going to caution the
17 witness that in answering this question, he's not to
18 reveal the substance of any attorney-client privileged
19 communications.  He may answer this question yes or no.
20   A.    Yes.
21 BY MR. BUSEY:
22   Q.    Approximately when did you receive that
23 request?
24   A.    It was during 2011.
25   Q.    And was that request received -- do you recall

Page 20

1  approximately what month it was received in?
2    A.    I do not recall as to what month.
3    Q.    Was it in the summer of 2011?
4    A.    I think not.
5    Q.    Okay.  Was it in the fall of 2011?
6    A.    Either during fall or winter.
7    Q.    Did you receive more than one request to turn
8  over documents?
9    A.    Yes.
10   Q.    How many requests?
11   A.    Now, that, I don't recall.
12   Q.    Did you receive any requests to turn over
13 documents in 2012?
14   A.    Yes.
15   Q.    And approximately when did you receive such
16 requests?
17   A.    In January.
18   Q.    Do you recall which week in January?
19   A.    That, I don't know.
20   Q.    Was it during the recent Lunar New Year week?
21        MR. HUANG:  Objection, form.
22   A.    I can't recall.
23 BY MR. BUSEY:
24   Q.    Did you turn over any documents to your counsel
25 in this case during January?

Page 21

1    A.    Yes.
2    Q.    Approximately how many documents or pages of
3  documents do you recall turning over?
4         MR. HUANG:  Objection to the form.
5    A.    I cannot recall.
6  BY MR. BUSEY:
7    Q.    And did you turn over documents in electronic
8  form or also in hard copy?
9         MR. HUANG:  Objection to the form of the
10 question.
11   A.    Could you explain to me once again as to the
12 difference between electronic files versus hard copies?
13 BY MR. BUSEY:
14   Q.    Electronic (indicating), hard copy
15 (indicating).
16        MR. HUANG:  Objection to the form.  Also, let
17 the record reflect Mr. Busey was ambiguously pointing at a
18 document and the computer.  Can you rephrase, please?
19        MR. BUSEY:  Let me clarify.  Let me clarify.
20 BY MR. BUSEY:
21   Q.    I was asking you whether you turned over any
22 hard copies, printed documents, or only electronic
23 documents or both.
24        MR. HUANG:  Objection to the form, compound.
25   A.    As for me, I have not submitted any printout,

# Watson Declaration

# EXHIBIT 28

# Filed Under Seal

```
                CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
1          UNITED STATES INTERNATIONAL TRADE COMMISSION
                          WASHINGTON, D.C.
2

3       _____

4       In the Matter of:

5       CERTAIN ELECTRONIC DIGITAL              Case No.:

6       MEDIA DEVICES AND COMPONENTS            337-TA-796

7       THEREOF

8       _____

9

10

11

12                     *** CONFIDENTIAL ***
                   SUBJECT TO PROTECTIVE ORDER

13

14

15              VIDEOTAPED PERSONAL DEPOSITION OF:
                          SE-HYUN CHO

16

17

18

19                 Monday, February 20, 2012
                          Kim & Chang
20                     Seoul, South Korea
                   9:13 a.m. to 8:08 p.m.

21

22

23

24

25
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
1  APPEARANCES:

2
   For the Complainant, Apple, Inc.
3
        MORRISON & FOERSTER, LLP
4       By:  Deok Keun Matthew Ahn, Esq.
             Brian Park, Esq.
5       425 Market Street
        San Francisco, California 94105-2482
6       (415) 268-6250

7

8
   For the Respondents, the Samsung entities:
9
        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
10      By:  Sung Hoon Kim, Esq.
11      51 Madison Avenue
        22nd Floor
12      New York, New York 10010
        (212) 849-7000

13

14

15 Also present:

16      Edward Kyu Kim, Samsung
        Aeryong Kim, Lead Interpreter
17      Lee Boese, Check Interpreter
        Jeff Menton, Videographer
18      Tracey S. LoCastro, Court Reporter

19

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
   WITNESS:                              PAGE
2  SE-HYUN CHO
   Examination By Mr. Ahn                  6
3
```

```
4                 E X H I B I T S
5  Exhibit  Description                   Page
6  1        Notice of Deposition of         7
            Se-Hyun Cho
7  2        Respondent Samsung             49
            Electronics Company
8           Limited's Sixth Set of
            Supplemental Responses
9           to Complainant's First
            Set of Interrogatories
10 3        Spreadsheet Bates             66
            numbers S-ITC-5436223
11          through 5436279
   4        User guide for the            83
12          TransformBates numbers
            S-ITC 11951 through
13          12194
   5        Service Manuel Bates         112
14          numbers S-ITC-7282652
            through 7282755
15 6        Bates number                 134
            S-ITC-3392873
16 7        Bates numbers                135
            S-ITC-7283153 through
17          7283162
   8        Bates number                 137
18          S-ITC-7283157
   9        Bates numbers                175
19          S-ITC-8068780 through
            8068863
20 10       Bates numbers                194
            S-ITC-7283892 through
21          7284055
```

Page 4

```
1            P R O C E E D I N G S
2                 -  -  -
3      VIDEOGRAPHER:  We are now on the video
4  record.  The time is 9:13 a.m.  Today is
5  February the 20th, 2012.
6      This is the videotaped deposition of
7  Se-Hyun, S-E-H-Y-U-N, Cho, C-H-O.  This video
8  deposition has been noticed by the law firm of
9  Morrison and Foerster, being taken by attorney
10 Matthew Ahn, A-H-N, representing the plaintiff
11 In the Matter of Certain Electronic Digital
12 Media Devices and Components Thereof, case
13 number 337-TA-796, in the United States
14 International Trade Commission, Washington, D.C.
15     This deposition is being taken at the
16 offices of Kim and Chang in Seoul, Korea.  The
17 court reporter is Tracey LoCastro from American
18 Realtime Court Reporters/Asia.  The videographer
19 is Jeff Menton, the certified court video
20 specialist of American Realtime Court
21 Reporters/Asia.
22     Would counsel please state their appearances
23 for the record.  State whom you represent,
24 starting with the noticing attorney.  And will
25 the court reporter please swear the interpreters
```

Page 5

```
1  in.  And then the attorneys can please make
2  their opening statements.
3      MR. AHN:  Matthew Ahn of Morrison and
4  Foerster on behalf of Apple, Inc.  With me today
5  is Brian Park.
6      MR. KIM:  Sung Kim of Quinn Emanuel on
7  behalf of Samsung.  With me is Edward Kim from
8  Samsung.
9      COURT REPORTER:  Do you solemnly swear or
10 affirm that you will well and truly interpret
11 the questions propounded by counsel and the
12 answers given by the witness from Korean to
13 English and English to Korean to the best of
14 your ability?
15     LEAD INTERPRETER:  I do.
16     CHECK INTERPRETER:  I do.
17                 SE-HYUN CHO,
18 after having been duly sworn by the reporter, pursuant
19 to stipulation of counsel, was examined and testified
20 through the interpreter as follows:
21     THE WITNESS:  I do.
22     MR. AHN:  We understand that the court
23 reporter is not authorized to administer oaths
24 in this venue; nevertheless, we request that she
25 administer the oath.  And we stipulate that we
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 26

```
 1            THE WITNESS:  Each individual has his or her
 2      own cabinet, and what I'm saying is I don't have
 3      any paper file or document in my cabinet.  I
 4      don't know as to any others whether they would
 5      have such or not.
 6  BY MR. AHN:
 7      Q.    Do you receive any paper memos or reports?
 8      A.    No.
 9      Q.    Do you primarily work on electronic
10  documents then?
11      A.    Yes.
12      Q.    Where do you save electronic documents?
13      A.    On my PC.
14      Q.    Are they on your computer's hard drive?
15      A.    Yes.
16      Q.    Do you also save documents to a server?
17      A.    No.
18      Q.    Is there a server for the North American
19  Hardware Group 1?
20            MR. KIM:  Objection, lacks foundation, calls
21      for speculation.
22            THE WITNESS:  I don't know.
23  BY MR. AHN:
24      Q.    So all of the documents that you work with
25  are saved onto your computer; is that correct?
```

Page 27

```
 1      A.    Not as to all of the documents.
 2      Q.    Where are these other documents found then?
 3      A.    I don't know as to the documents that I
 4  don't save.  I don't know where they are.
 5      Q.    You previously mentioned that not all of the
 6  documents that you work on are saved to your computer.
 7  If that is the case, where do you save these other
 8  documents?
 9            MR. KIM:  Objection, mischaracterizes the
10      witness' prior testimony, lacks foundation.
11            THE WITNESS:  When you say these other
12      documents, what are you referring to here,
13      please?
14  BY MR. AHN:
15      Q.    Those were your words.  You said that not
16  all of your documents are saved to your PC.
17      A.    What I was referring to was that other than
18  what I saved -- actually, what point in time are you
19  referring to here, please?
20      Q.    Let's say the past two years.
21      A.    In the past, meaning prior to I received
22  instructions from our inhouse legal team to preserve
23  document, I would save necessary files and not save
24  unnecessary files; however, after such instruction came
25  from our legal team, I saved all the documents related
```

Page 28

```
 1  to patent.  And the instruction I was referring to was
 2  instructions regarding patents.
 3            (Discussion held between Lead Interpreter
 4  and Check Interpreter.)
 5            THE WITNESS:  The instruction I was
 6      referring to was the patent-related
 7      instructions.
 8            MR. KIM:  Counsel, we've been going for
 9      about an hour.  Good time for a break?
10            MR. AHN:  Just a few more questions to wrap
11      this right up here.
12  BY MR. AHN:
13      Q.    So just to clarify, after receiving a
14  document retention notice from counsel, you saved all
15  your documents, but have you been saving them all to
16  your computer?
17      A.    Yes.
18            THE WITNESS:  One moment, please.  Can we
19      take a short break, please?
20            MR. AHN:  Do you want to ask your counsel
21      about a question of privilege?
22            THE WITNESS:  First reason is I want to use
23      the restroom.  And the second reason is, yes, I
24      would like to consult with my counsel.
25            MR. AHN:  Okay.  So let's go off the record.
```

Page 29

```
 1            VIDEOGRAPHER:  This will be the end of video
 2      disc number 1.  The time is 10:16 a.m.  We're
 3      going off the video record.
 4            (A recess was taken.)
 5            VIDEOGRAPHER:  We're back on the video
 6      record.  This is video disc number 2.  The time
 7      is 10:31 a.m.
 8  BY MR. AHN:
 9      Q.    Before we went on the break, you had a
10  question of privilege about which you wanted to consult
11  with your counsel.  Were you able to ask him and
12  resolve your concern?
13            MR. KIM:  I caution the witness not to
14      reveal any privileged communications.  You may
15      answer yes or no.
16            THE WITNESS:  Yes.
17  BY MR. AHN:
18      Q.    After receiving the document retention
19  notice, did you save all of your documents to your
20  computer, or is there some other place that you save
21  them to?
22      A.    I saved that on my computer.
23      Q.    Anywhere else?
24      A.    No.
25      Q.    Do you use e-mail at work?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30..33

Page 30

1   A.   Yes.
2   Q.   Is it a program called My Single?
3   A.   Yes.
4   Q.   Do you also use Outlook?
5   A.   No.
6   Q.   Does My Single save files as something like
7   a dot PST file?
8        MR. KIM:  Objection, lacks foundation, calls
9        for speculation.
10       THE WITNESS:  I don't know.
11  BY MR. AHN:
12  Q.   Are those e-mails on My Single saved to your
13  computer, or are they saved on a server?
14  A.   They are saved to my computer.
15  Q.   Is My Single software made by Samsung?
16  A.   I'm not exactly sure.
17  Q.   Did you collect documents for production in
18  this case?
19       MR. KIM:  And, again, I caution the witness
20       not to reveal any privileged communications.
21       You may answer yes or no.
22       THE WITNESS:  Yes.
23  BY MR. AHN:
24  Q.   Let's start with physical hard copy
25  documents.  Did you collect any?

Page 31

1   A.   No.
2   Q.   And that's because you've testified you
3   don't have any physical hard copy documents; is that
4   correct?
5   A.   That is correct.
6   Q.   Did you collect any electronic documents?
7   A.   Yes.
8   Q.   Were those collected from your computer?
9   A.   Yes.
10  Q.   Do you use any keywords to collect those
11  documents?
12       MR. KIM:  Again, I caution the witness not
13       to reveal any privileged communications.  You
14       may answer yes or no.
15       THE WITNESS:  Yes.
16  BY MR. AHN:
17  Q.   What keywords did you use?
18       MR. KIM:  Objection, that calls for a
19       privileged communication.  I instruct the
20       witness not to answer.
21       THE WITNESS:  I will not answer that
22       question.
23  BY MR. AHN:
24  Q.   You're following your attorney's
25  instruction, correct?

Page 32

1   A.   Yes.
2   Q.   If I ask you to identify any of those
3   keywords, will you refuse to answer my question?
4   A.   Yes, I will refuse to answer.
5   Q.   Did you conduct the searches by yourself?
6   A.   Yes, I conduct the search on my PC by
7   myself.
8   Q.   Did anyone from the legal department or any
9   attorney representing Samsung assist you?
10       MR. KIM:  Objection, vague and ambiguous.
11       THE WITNESS:  May I have that question one
12       more time, please?
13  BY MR. AHN:
14  Q.   Let me break it down.
15       Did anyone from the legal department assist
16  you in performing those searches?
17       MR. KIM:  Objection, vague and ambiguous.
18       THE WITNESS:  When you say did anyone assist
19       me, what do you mean by that?
20  BY MR. AHN:
21  Q.   Help you in any way.
22  A.   I conducted the search on my personal PC by
23  myself.
24  Q.   And is your answer the same for any lawyer
25  representing Samsung?

Page 33

1   A.   That's right.  As to the data on my PC, I
2   conducted that search by myself.
3   Q.   What about your e-mail, did you collect any
4   e-mail for production in this case?
5   A.   Yes.
6   Q.   Did you use any keywords to identify those
7   e-mails?
8        MR. KIM:  And, again, I caution the witness
9        not to reveal any privileged communications.
10       You may answer yes or no.
11       THE WITNESS:  Yes.
12  BY MR. AHN:
13  Q.   What keywords did you use?
14       MR. KIM:  Objection, calls for a privileged
15       communication.  I instruct the witness not to
16       answer.
17       THE WITNESS:  I will follow my attorney's
18       instruction.
19       (Discussion held between Lead Interpreter
20  and Check Interpreter.)
21       THE WITNESS:  And not answer.
22  BY MR. AHN:
23  Q.   If I ask you to identify any of the keywords
24  you used to search for e-mails, will you refuse to
25  answer my question?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 34

```
1      A.    I will refuse to answer, right.
2      Q.    Did you search your e-mails using keywords
3  by yourself?
4      A.    Yes, I conducted the search by myself.
5      Q.    Did anyone assist you with that search?
6      A.    I don't know what level of assistance you're
7  referring to here, but I conducted the search on my PC
8  by myself.
9      Q.    Did you ever give your PC to anyone else for
10 purposes of searching for documents for production in
11 this case?
12     A.    No.
13     Q.    When did you receive the document retention
14 notice that you mentioned previously?
15     A.    Last year.
16     Q.    Do you recall when?
17     A.    It was around the fall time.
18     Q.    Did you receive more than one?
19     A.    To my recollection, that's correct.
20     Q.    When was the first one?
21     A.    As far as I recall, it was the fall of last
22 year.
23     Q.    What about the second one?
24     A.    Although I don't precisely recall, I think
25 it would have been around January of this year.  Again,
```

Page 35

```
1  I'm not entirely sure.
2      Q.    But it was this year.
3      A.    That part is not something that I'm entirely
4  sure about.  I don't know if it would have been at the
5  end of last year or around January of this year.
6      Q.    Do you remember if it was before Christmas?
7      A.    I don't precisely recall that.
8      Q.    Was there a third notice?
9      A.    I would like to clarify one thing here.
10 What is a notice you're referring to?  What nature of
11 notice?
12     Q.    You testified previously that you received a
13 document retention notice.  Do you recall that?
14     A.    So you're referring to notice to preserve
15 document in this question?
16     Q.    Yes.
17     A.    As I recall, there has been more than one
18 notice to preserve documents via e-mail, but I don't
19 recall as to what specific number of times those
20 notices would have been.
21     Q.    So more than one, but you don't know how
22 many more than one.
23     A.    Correct.
24     Q.    When was the most recent one?
25     A.    That's what I'm not exactly sure about.
```

Page 36

```
1      Q.    But within the past two months, correct?
2      A.    That's correct.
3      Q.    When did you collect the documents that we
4  previously discussed?
5      A.    I submitted the documents upon receiving a
6  request from our legal team via e-mail in the fall of
7  last year.
8      Q.    Did you collect any more documents after
9  that?
10     A.    Yes.
11     Q.    When was that?
12     A.    Once in January and another time in
13 February, all this year.
14     Q.    When in February?
15     A.    You saying February or January?
16     Q.    February.
17     A.    Last week.
18     Q.    Did you run any additional keyword searches
19 at that time?
20        MR. KIM:  Again, I caution the witness not
21     to reveal any privileged communications.  You
22     may answer yes or no.
23        THE WITNESS:  Yes.
24 BY MR. AHN:
25     Q.    And you will refuse to answer my question
```

Page 37

```
1  about what those keywords are based on privilege; is
2  that correct?
3      A.    I will refuse to answer.
4      Q.    Do you bill your time at Samsung?
5      A.    Are you referring to overtime billing?
6      Q.    No, what I mean is, do you have a journal,
7  for example, or some kind of time note entry that
8  explains what you do every day?
9        MR. KIM:  Objection, vague and ambiguous.
10        THE WITNESS:  No.
11 BY MR. AHN:
12     Q.    Do you know what a patent is?
13     A.    Yes.
14     Q.    Are you an inventor on any patents?
15     A.    No.
16     Q.    Have you ever read a patent?
17        MR. KIM:  I caution the witness not to
18     reveal any privileged communications.  You may
19     answer to the extent you have read a patent
20     aside from at the direction of counsel.
21        THE WITNESS:  Yes.
22 BY MR. AHN:
23     Q.    Tell me about that.
24     A.    At the present time I don't quite recall
25 what that patent would have been; that is because it
```

# Watson Declaration

# EXHIBIT 29

# Filed Under Seal

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

UNITED STATES INTERNATIONAL TRADE COMMISSION

WASHINGTON, D.C.

_____

In the Matter of:

CERTAIN ELECTRONIC DIGITAL                    Case No.:

MEDIA DEVICES AND COMPONENTS            337-TA-796

THEREOF
_____


        *** CONFIDENTIAL BUSINESS INFORMATION ***
             SUBJECT TO PROTECTIVE ORDER


        VIDEOTAPED PERSONAL DEPOSITION OF:


                 KYU HYUNG LEE




                 March 15, 2012

                 Kim & Chang

             Seoul, South Korea

            9:02 a.m. - 5:50 p.m.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

2..5

Page 2

```
 1   APPEARANCES:

 2

 3   For the Complainant, Apple, Inc.:

 4              MORRISON & FOERSTER LLP
                By:  Jeffrey A. Jaeckel, Esq.
 5              2000 Pennsylvania Avenue, NW
                Suite 6000
 6              Washington, D.C.  20006-1888
                (202) 887-1500

 7              MORRISON & FOERSTER, LLP
                By:  Amanda M.F. Bakale, Esq.
 8              1290 Avenue of the Americas
                New York, New York 10104-0050
 9              (212) 336-4338

10   For the Witness and Respondents, the Samsung entities:

11              QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                By:  Sung Hoon Kim, Esq.
12              51 Madison Avenue
                22nd Floor
13              New York, New York  10010
                (212) 849-7000

14

15

16   Also present:

17              Heejin Woo, Morrison & Foerster
                Sun Park, Morrison & Foerster
18              Sujin Woo, Lead Interpreter
                Lee Boese, Check Interpreter
19              Inga Kornev, Videographer
                Lisa A. Knight, Court Reporter
20

21

22

23

24

25
```

Page 3

```
 1                    I N D E X

 2   WITNESS:                                  PAGE
     KYU HYUNG LEE
 3
     Examination by Mr. Jaeckel                   5
 4

 5               E X H I B I T S

 6   NUMBER       DESCRIPTION                   PAGE

 7   Exhibit 1    Complainant Apple Inc.'s Notice of   7
                  Deposition to Kyu Hyung Lee

 8   Exhibit 2    Respondent Samsung Electronics Co.  52
                  Ltd.'s Sixth Set of Supplemental
 9                Responses to Complainant's First Set of
                  Interrogatories (Nos. 1-47), No Bates

10

11   Exhibit 3    Galaxy Prevail User Guide,     58
                  Bates S-ITC-000123398 to -622

12   Exhibit 4    SPH-M820/SCH-M828C Common Service  60
                  Manual, S-ITC-007282470 to -542

13
     Exhibit 5    Transform Ultra User Guide,    66
14                Bates S-ITC-003299435 to -591

15   Exhibit 6    SPH-M930 Service Manual,       69
                  Bates S-ITC-003685851 to -926

16
     Exhibit 7    Technical Specifications,      74
17                Bates S-ITC-001561069

18   Exhibit 8    Circuit diagram, SPH-M820 REV07,   74
                  Bates S-ITC-000124108 to -118

19
     Exhibit 9*   E-mail chain (Korean),         77
20                Bates S-ITC-500106684 to -690

21   Exhibit 10   E-mail chain (Korean),         90
                  Bates S-ITC-500106743 to -749

22
     Exhibit 11   E-mail chain (Korean),        101
23                Bates S-ITC-008048772 to -820

24   (*Note:  Exhibit 9 clawed back and retained by Sung Hoon
     Kim, Esq., of, Quinn, Emanuel, Urquhart & Sullivan, LLP)
25
```

Page 4

```
 1           P-R-O-C-E-E-D-I-N-G-S

 2           THE VIDEOGRAPHER:  My name is Inga Kornev, a

 3   videographer with American Realtime Court Reporters in

 4   Asia.  The date today is March 15th, 2012, and the

 5   time on the video monitor is 9:02.

 6           This deposition is being held at the offices

 7   of Kim & Chang, located at the Jeongdong Building in

 8   Seoul, Korea.  The caption of this case is In the

 9   Matter of Certain Electronic Digital Media Devices and

10   Components Thereof, held in the United States

11   International Trade Commission, with a case number of

12   337-TA-796.

13           The name of the witness today is Kyu Hyung

14   Lee, testifying in his personal capacity.  The court

15   reporter today is Lisa Knight, also with American

16   Realtime Court Reporters in Asia.

17           At this time, I would like to ask all

18   counsel and interpreters to please state their

19   appearances and whom they represent for the record.

20           MR. JAECKEL:  Good morning.  Jeff Jaeckel

21   with Morrison & Foerster LLP on behalf of Apple.

22           MS. BAKALE:  Amanda Bakale with Morrison &

23   Foerster for Apple.

24           MS. PARK:  Sun Park with Morrison & Foerster

25   for Apple.
```

Page 5

```
 1           MS. WOO:  Heejin Woo for Morrison & Foerster

 2   for Apple.

 3           MR. KIM:  Sung Kim from Quinn Emanuel for

 4   Samsung.

 5           LEAD INTERPRETER:  Sujin Woo, lead

 6   interpreter.

 7           CHECK INTERPRETER:  Lee Boese, check

 8   interpreter.

 9           THE VIDEOGRAPHER:  Thank you.

10           The court reporter today is Lisa Knight --

11   I'm sorry.  Counsel, please . . .

12           MR. JAECKEL:  We understand that the court

13   reporter is not authorized to administer oaths in this

14   venue.  Nonetheless, we request that the -- that she

15   administer the oath and we stipulate that we waive any

16   objection to the validity of the deposition based on

17   the oaths.

18           MR. KIM:  Agreed.

19           (Interpreters sworn.)

20           KYU HYUNG LEE,

21   having been first duly sworn to state the whole truth

22   testified as follows:

23               EXAMINATION

24   BY MR. JAECKEL:

25       Q.   Good morning.  My name is Jeff Jaeckel.  I'm an
```

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 38

1    Q.    For what reason have you communicated with that
2    person?
3    A.    Because he speaks Korean and because he's
4    dispatched to the site, I have contacted him regarding the
5    timeline for the carrier and also tests that he manages on
6    site.
7    Q.    What site are you referring to?
8    A.    Kansas.
9          CHECK INTERPRETER:  May the interpreters
10   confer?
11         (A discussion was had off the record between
12   Lead Interpreter and Check Interpreter in Korean.)
13         LEAD INTERPRETER:  Whether it was "time
14   line" or "request" from the carrier.
15         (Translation.)
16         LEAD INTERPRETER:  The lead interpreter
17   would like to stand by that original translation.
18   Q.    Is Kansas -- the site in Kansas the location
19   for Sprint?
20   A.    Do you mean where Sprint is located?
21   Q.    Is the site that Mr. Kim is visiting at Sprint
22   facilities in Kansas?
23   A.    Mr. Kim is not at Sprint.  There is an STA
24   office at Kansas, and he has been dispatched to this
25   office.

Page 39

1    Q.    Did you communicate with the PM and
2    verification team at STA in connection with the
3    development of the SPH-M820?
4    A.    Yes.
5    Q.    Did you communicate with anyone else at STA in
6    connection with the development of the SPH-M820?
7    A.    No.  Because back then, the MNO lab did not
8    exist, so I did not contact anyone at the MNO lab.
9    Q.    Do you have any communication with employees at
10   STA outside the context of these specific projects that we
11   have just been discussing?
12   A.    No.
13   Q.    Do you speak the English language?
14   A.    I speak it a little.  It's -- my reading,
15   speaking, and listening is not perfect, but I can do it a
16   little.
17   Q.    It's much better than I can do in Korean.
18         When you communicate with employees at STA, do
19   you communicate in English or Korean?
20   A.    I communicate in Korean with PM Hwang, Kue Jin,
21   senior engineer Kim, Hyung Chul, and the personnel on the
22   QA team who reads Korean.  However, with the rest, I
23   communicate in English.  And I try to communicate in
24   English as much as possible.
25   Q.    Is the QA team the same thing as the

Page 40

1    verification team?
2    A.    Yes, it's the same.
3    Q.    Do you use a computer at work?
4    A.    Yes, I use one.
5    Q.    Do you have only one computer at work?
6    A.    I have a total of three computers.  However, I
7    recently received a desktop computer, but I cannot connect
8    to the network, so I'm not using it.  And another one is
9    what I received before it was replaced, but I do not use
10   it.
11   Q.    Have you ever used the desktop?
12   A.    No.
13   Q.    And are the other two computers both laptop
14   computers?
15   A.    Yes, that is correct.
16   Q.    If I understood your previous answer correctly,
17   you had been using a laptop computer, and you recently got
18   a new one?
19         MR. KIM:  Objection, mischaracterizes the
20   witness's testimony.
21   A.    I had been using a laptop, and I received a new
22   one as a replacement.  And recently, because I wanted to
23   use a faster computer, I received a desktop, but because I
24   cannot connect to the network, I do not use it.
25   ///

Page 41

1    BY MR. JAECKEL:
2    Q.    When did you receive the laptop as a
3    replacement?
4    A.    It's been a while so I do not remember exactly,
5    but I believe it was about a year and a half ago.
6    Q.    Have you used the first laptop at all since you
7    received the replacement?
8    A.    No.
9    Q.    Do you recall when you received the first
10   laptop?
11   A.    It's been too long.  I do not remember.
12   Q.    Was that first laptop the first computer you
13   received when you started at Samsung?
14   A.    No.
15   Q.    Do you recall how many other computers you have
16   had during the time you have been an employee of Samsung?
17   A.    I do not remember exactly.
18   Q.    What software program do you use to manage your
19   work e-mail?
20   A.    I use Single and Outlook.
21   Q.    Why do you use two separate programs for your
22   work e-mail?
23   A.    I use Outlook because Single automatically
24   deletes mails that are over two weeks old.
25   Q.    When did you start using Outlook?

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Page 42

1    A.    I think it's been about two years.
2    Q.    Do you use a mobile wireless device to send or
3  receive work e-mail?
4    A.    No, I do not.
5    Q.    What e-mail address do you use at work?
6    A.    It's kyuhyung7.lee@samsung.com.
7    Q.    Have you used any other e-mail addresses for
8  your work at Samsung?
9    A.    No.
10   Q.    Do you prepare PowerPoint documents?
11   A.    There are times that I would prepare one.
12   Q.    For what purpose would you prepare a PowerPoint
13 document?
14   A.    I think the question is too broad.
15   Q.    When was the last time you prepared a
16 PowerPoint document?
17   A.    I do not remember.
18   Q.    How often do you prepare PowerPoint documents?
19   A.    I rarely use it.
20   Q.    In your role as PL on the development of the
21 SPH-M930 for Boost, did you prepare any regular reports
22 regarding the status of that project?
23        MR. KIM:  Objection, vague and ambiguous.
24   A.    When you say "regular," what do you mean?
25 ///

Page 43

1  BY MR. JAECKEL:
2    Q.    I'm referring to a report that you would
3  prepare weekly or monthly to send to somebody regarding
4  the status of the project.
5    A.    Yes, I do prepare it.
6    Q.    How often do you prepare those reports?
7    A.    That would depend on the situation.  When the
8  model development is in full swing, then I would prepare
9  it on a daily basis, however, after release, only when
10 there are things to be reported.
11   Q.    To whom would you send those reports?
12   A.    I share it with our -- my team.  The main
13 recipient is principal engineer Jae Bin Kim.
14        LEAD INTERPRETER:  Phonetically spelled as
15 J-a-e B-i-n K-i-m.
16   A.    This is also shared with the team members who
17 are all PLs in order to share the project status.
18   Q.    Was there anyone on the team regarding the
19 development of the M930 for Boost who sent regular reports
20 to you?
21   A.    No, there weren't.
22   Q.    Did you prepare similar reports in connection
23 with the development of the SPH-M930 for Sprint?
24   A.    No.
25   Q.    Did you prepare similar reports in connection

Page 44

1  with the development of the SPH-M820?
2    A.    Wasn't that the same question as the previous
3  question?
4    Q.    The previous question was referring to the
5  SPH-M930 for Sprint.
6    A.    I prepared reports for the M930 after I took on
7  the responsibility of that model.  However, for the M820,
8  when the model was being developed, I was the sub PL so I
9  did not prepare the reports.  However, for the MR task, I
10 was the PL so I did prepare the reports.
11   Q.    For the MR task on the M820?
12   A.    Yes, that is correct.
13   Q.    Which e-mails do you save into Outlook?
14   A.    I save most of the e-mails.
15   Q.    How do you decide which e-mails to save?
16   A.    It is automatically saved.
17   Q.    How does your system know which e-mails to save
18 automatically?
19   A.    When the Outlook system is running, then
20 regular -- it regularly downloads e-mails and
21 automatically saves them.  However, for advertisements or
22 spam mails or mails with unnecessarily large files, these
23 are deleted and the rest are saved.
24   Q.    What do you mean by "e-mail with unnecessarily
25 large files"?

Page 45

1    A.    For example, sometimes a test binary is
2  attached.  However, my Outlook data capacity is 20
3  gigabytes, so if such large e-mails come in, it slows down
4  the system.
5    Q.    Do you use handwritten notebooks in your job at
6  Samsung?
7    A.    No, I do not use one.
8    Q.    Do you keep a diary in your role at Samsung?
9    A.    No.
10   Q.    Other than the laptop computer that you use, do
11 you store work-related files in any other location?
12   A.    Yes.
13   Q.    Where else do you store work-related files?
14   A.    There is a shared bulletin board where the test
15 binaries or files necessary for debugging are stored.
16 Because these file sizes are generally very large, it is
17 very difficult to send over e-mail.
18   Q.    Does that system have any specific name?
19   A.    We just call it America Bulletin Board --
20 Bulletin Board for America.
21   Q.    Why "Bulletin Board for America"?
22   A.    Because we use the bulletin board by each model
23 for the U.S. carriers.
24   Q.    Do you use an instant messaging program for
25 work-related communications?

# Watson Declaration

# EXHIBIT 30

# Filed Under Seal

Highly Confidential - Attorneys' Eyes Only

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

APPLE, INC.,              )
4                               )
         Plaintiff,       )
5                               )
VS                        ) CIVIL ACTION NO.
6                          ) 11-CV-01846-LHK
SAMSUNG ELECTRONICS   )
7  CO., LTD.,              )
                            )
8        Defendant.    )
9    ***********************************************

10           ORAL VIDEOTAPED DEPOSITION OF

11                COREY KERSTETTER

12                MARCH 29, 2012

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14   ***********************************************

15

16   ORAL DEPOSITION OF COREY KERSTETTER, produced as a

17  witness at the instance of the Defendant, and duly

18  sworn, was taken in the above-styled and numbered cause

19  on the 29th of March, 2012, from 9:16 to 12:07, before

20  Susan S. Klinger, RMR-CRR, CSR in and for the State of

21  Texas and California, reported by stenographic method,

22  at 4514 Cole Avenue, Suite 600, Dallas, Texas, pursuant

23  to the Federal Rules of Civil Procedure and the

24  provisions stated on the record or attached hereto.

25

Highly Confidential - Attorneys' Eyes Only

---

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
  Mr. Stuart Plunkett
  MORRISON & FOERSTER, LLP
  425 Market Street
  San Francisco, California  94105
  E-mail: Splunkett@mofo.com
  Phone:  415-268-6145

FOR THE DEFENDANT(S):
  Ms. Melissa Chan
  QUINN EMANUEL URQUHART & SULLIVAN, LLP
  555 Twin Dolphin Drive, Suite 560
  Redwood Shore, California  94065
  E-mail: Melissachan@quinnemanuel.com
  Phone:  650-801-5000

ALSO PRESENT:
  Mr. Richard Rosalez, Samsung
  Mr. Julius Bolton, videographer

---

Page 3

I N D E X

WITNESS                       PAGE
COREY KERSTETTER
EXAMINATION BY MR. PLUNKETT              4

E X H I B I T S

| No. | Page | Description |
| --- | --- | --- |
| Exhibit 2481 | 18 | Q3 Profit simulation, SAMNDCA11173650 |
| Exhibit 2482 | 40 | Profit Simulation, SAMNDCA11193172 |
| Exhibit 2483 | 50 | 2011 Summary & Lessons, SAMNDCA11173802 |
| Exhibit 2484 | 63 | STA 3Q Business Review, SAMNDCA11174330 |
| Exhibit 2485 | 65 | 2012 Business Plan, SAMNDCA00374342 |

---

Page 4

1    VIDEOGRAPHER:  This is the start of tape         09:13:47
2  labeled number 1 in the videotaped deposition of Corey    09:15:09
3  Kerstetter, in the matter Apple, Inc. versus Samsung    09:15:11
4  Electronics Company Limited in the United States    09:15:14
5  District Court for the Northern District of California,    09:15:17
6  number 11-CV-01846-LHK.  This deposition is being held    09:15:19
7  in Dallas, Texas on March 29th, 2012 at approximately    09:15:26
8  9:16 a.m.                                           09:15:29
9    My name is Julius Bolton, the videographer.    09:15:30
10  The court reporter is Susan Klinger.  Will counsel    09:15:32
11  please introduce yourself.                          09:15:35
12    MR. PLUNKETT:  Stuart Plunkett from Morrison    09:15:35
13  and Foerster on behalf of Apple, Inc.               09:15:38
14    MS. CHAN:  Melissa Chan of Quinn Emanuel on    09:15:40
15  behalf of Samsung.  And with me is Richard Rosalez of    09:15:44
16  Samsung Telecommunications America.                 09:15:44
17    COREY KERSTETTER,                                09:15:44
18  having been first duly sworn testified as follows:    09:15:44
19    EXAMINATION                                      09:15:44
20  BY MR. PLUNKETT:                                    09:15:54
21    Q. Can you state your name for the record?    09:15:54
22    A. Corey Kerstetter.                             09:15:58
23    Q. Mr. Kerstetter, my name is Stuart Plunkett.  We    09:15:58
24  met at the first part of your deposition.  Do you    09:16:03
25  understand today that you are under oath?           09:16:05

---

Page 5

1    A. I do.                                          09:16:06
2    Q. And that is the same oath as if you were    09:16:06
3  testifying in court?                                09:16:08
4    A. I do.                                          09:16:09
5    Q. And if you answer a question, I will --    09:16:10
6  understood that you were able to decipher my question?    09:16:14
7    A. I understand.                                 09:16:19
8    Q. If you need me to clarify, just ask.          09:16:20
9    A. I will.                                        09:16:22
10    Q. All right.  Is there anything preventing you from    09:16:23
11  giving complete and accurate testimony today?       09:16:26
12    A. No.                                           09:16:28
13    Q. What did you do to prepare for this second part    09:16:28
14  of your deposition?                                09:16:32
15    A. I met briefly with counsel just to understand why    09:16:33
16  we're doing a second deposition and kind of some of the    09:16:38
17  details and specifics around it.                    09:16:42
18    Q. Okay.  When was that meeting?                 09:16:44
19    A. Due to schedules there were two of them.  One, I    09:16:46
20  think, one was yesterday and one was two days before    09:16:51
21  that.                                               09:16:54
22    Q. Approximately how long were those meetings?    09:16:54
23    A. Overall duration three hours maybe, maybe a    09:16:56
24  little more.                                        09:17:02
25    Q. And who was present?                          09:17:03

---

Highly Confidential - Attorneys' Eyes Only

## Page 6

1    A. They were both video conferences, so Rich,    09:17:04
2    Melissa and I.                                   09:17:10
3    Q. No one else was present?                      09:17:11
4    A. Correct.                                      09:17:12
5    Q. Did you review any documents?                 09:17:13
6        MS. CHAN:  Objection.  I'm going to ask the  09:17:15
7    witness to only answer yes or no and not reveal any  09:17:19
8    privileged information.                          09:17:21
9    A. We reviewed documents, yes.                   09:17:27
10   Q. Approximately how many documents did you review?  09:17:28
11   A. 20.                                           09:17:31
12   Q. Did -- do you recall any specific documents that  09:17:37
13   you reviewed that refreshed your recollection about  09:17:40
14   events from the past?                            09:17:43
15       MS. CHAN:  Caution the witness --            09:17:45
16   A. No.                                           09:17:46
17   Q. Do you recall receiving a notice from your    09:17:48
18   employer in this case regarding the retention of  09:17:55
19   documents related to this litigation?           09:17:59
20       MS. CHAN:  Objection, vague.                 09:18:01
21   A. I receive a lot of document retention notices. I  09:18:04
22   can't recall whether I received one specifically for  09:18:09
23   this case or not.                                09:18:11
24   Q. Do you recall anyone from your employer       09:18:12
25   contacting you about retaining documents specific to  09:18:17

## Page 7

1    this litigation?                                 09:18:21
2        MS. CHAN:  Objection, vague.                 09:18:22
3    A. Again, the same thing.  I get contacted from our  09:18:22
4    legal department to retain documents multiple times, so  09:18:27
5    I don't know whether it would be related to this  09:18:31
6    specific case or not.                            09:18:33
7    Q. Do you recall providing documents to attorneys or  09:18:34
8    others for this litigation?                      09:18:39
9        MS. CHAN:  Objection, vague and compound.    09:18:41
10   Sorry, I'm not seeing anything.                  09:18:41
11       VIDEOGRAPHER:  Off the record at 9:18.       09:18:41
12                                                    09:18:41
13       (Off the record.)                            09:19:17
14       VIDEOGRAPHER:  Back on the record at 9:19    09:19:17
15   a.m.                                             09:19:19
16   Q. Do you recall providing documents to attorneys or  09:19:19
17   others for this litigation?                      09:19:23
18       MS. CHAN:  Objection, vague and compound.    09:19:24
19   A. I'm -- again, for one of the cases, I think it  09:19:26
20   was this one they cloned my hard drive which would  09:19:33
21   contain all of my documents and information.  So that  09:19:37
22   would be the providing of documents and what I did to  09:19:39
23   provide documents.                               09:19:43
24   Q. Can you provide me your best estimate as to when  09:19:44
25   that took place?                                 09:19:48

## Page 8

1    A. Again, an estimate of that would be two to three  09:19:50
2    months ago.                                      09:19:53
3    Q. Well, let me just represent to you that we     09:19:55
4    received about 91,000 pages of documents from your files  09:19:57
5    just a couple of days before your prior deposition.  My  09:20:02
6    question is whether, setting aside any communications  09:20:06
7    you had with counsel, you have an understanding as to  09:20:10
8    why we received those documents at that time?    09:20:12
9        MS. CHAN:  Objection, calls for speculation,  09:20:15
10   argumentative, outside the scope of his deposition.  09:20:18
11   A. I'm not an expert on the legal proceedings, so  09:20:25
12   I'm not sure what the rules and regulations are  09:20:29
13   providing documents.  I can't answer that question.  09:20:33
14   Q. Do you recall providing thousands of pages of  09:20:37
15   documents to attorneys for this litigation just days or  09:20:42
16   weeks prior to your first deposition?            09:20:47
17       MS. CHAN:  Objection, argumentative, calls    09:20:50
18   for speculation, asked and answered.             09:20:53
19   A. Please repeat the question.                   09:20:57
20   Q. Can you read it back?                         09:20:59
21       (Record read.)                               09:21:08
22       MS. CHAN:  Same objections.                  09:21:09
23   A. I mean whose, whose attorneys?                09:21:10
24   Q. Your attorneys, STA's attorneys?             09:21:16
25   A. Again, I get requested for a lot of hold      09:21:21

## Page 9

1    documents we talked about before.  Several cases I get  09:21:29
2    asked for specific documents.  In one of the cases --  09:21:32
3    again, there are times when, say, that there could be  09:21:36
4    hundreds of documents related to a case.  I don't know  09:21:40
5    whether it would be this one or not, so we work through  09:21:42
6    with the legal staff at STA on, you know, how to  09:21:45
7    provide.                                         09:21:49
8        And one of the cases they decided the best thing  09:21:49
9    to do would be to clone my hard drive and use that for  09:21:52
10   whatever they needed to use that for.  Again, whether  09:21:56
11   that is this specific case or not, I don't know.  09:22:00
12   Q. So let me try this again.  We were provided   09:22:03
13   91,000 pages of your documents two days before your  09:22:07
14   prior deposition.  All I'm asking is whether you have  09:22:09
15   any understanding as to why we received that quantity of  09:22:12
16   documents from your files just two days before your  09:22:16
17   deposition?                                      09:22:18
18   A. I have no understanding of that.             09:22:19
19   Q. Do you recall taking any steps to preserve your  09:22:21
20   documents for this litigation --                 09:22:27
21       MS. CHAN:  Objection, vague.                 09:22:31
22   Q. -- after receiving a retention notice?        09:22:31
23   A. My internal process is that I don't delete    09:22:35
24   anything off my hard drive and I deal almost exclusively  09:22:41
25   100 percent electronic.  So to my knowledge, there  09:22:46

Highly Confidential - Attorneys' Eyes Only

Page 10

1  wouldn't have been anything destroyed.        09:22:51
2  Q. Do you work with someone named Joseph Cheong?  09:22:57
3  A. The pronunciation isn't correct, so I'm not  09:23:15
4  exactly sure who you mean.  Joseph is our CFO.  There is  09:23:27
5  -- well, we have a Korean dispatcher who we call Joseph  09:23:34
6  because we can't pronounce his Korean name that I think  09:23:37
7  that is who you are referring to but I'm not sure.  I  09:23:41
8  would have to see the context and the spelling to, to  09:23:43
9  verify that.                                 09:23:45
10  Q. My understanding is the last name is spelled  09:23:46
11  C-h-e-o-n-g?                                 09:23:49
12  A. That would be Joseph who is our CFO, yes.  09:23:52
13  Q. CFO at STA?                              09:23:56
14  A. Correct.                                09:24:05
15  Q. Do you know how long he has held that position?  09:24:07
16      MS. CHAN:  Objection, calls for speculation,  09:24:09
17  foundation.                                 09:24:11
18  A. I'm uncertain for sure.  My assumption is it is  09:24:15
19  approximately three years.                   09:24:20
20  Q. Do you report to Mr. Cheong?             09:24:24
21  A. I do not.                               09:24:27
22  Q. Do you know whether he has any responsibility --  09:24:28
23  withdraw.                                   09:24:33
24      Do you know whether in Mr. Cheong's role as CFO  09:24:34
25  he works with SEC's consolidated profit information?  09:24:37

Page 11

1      MS. CHAN:  Objection, calls for speculation,  09:24:43
2  foundation.                                 09:24:46
3  A. I can only assume that.  I don't know for sure.  09:24:47
4  Q. What do you know about what his responsibilities  09:24:56
5  are?                                        09:24:59
6      MS. CHAN:  Objection, vague.              09:24:59
7  A. I have never had a detailed sit-down discussion  09:25:00
8  with Joseph about what his direct responsibilities are.  09:25:02
9  I can only assume by what I've observed and my  09:25:07
10  understanding of a CFO role and who reports to him what  09:25:10
11  he's responsible for.                        09:25:14
12  Q. Would you say that he has any responsibility for  09:25:15
13  managing STA's communications with SEC?      09:25:18
14      MS. CHAN:  Objection, vague.             09:25:23
15  A. Please repeat the question.              09:25:27
16  Q. Does Mr. Cheong, to your knowledge, have any  09:25:29
17  responsibility for managing STA's communications with  09:25:32
18  SEC?                                        09:25:37
19      MS. CHAN:  Objection, vague.             09:25:38
20  A. I mean I've never sat in on one of his department  09:25:55
21  meetings.  So I, I don't know what he's instructed his  09:25:58
22  staff about communication with SEC.  So I assume you  09:26:01
23  mean Samsung Electronics Company the -- back in Korea,  09:26:07
24  the headquarters organization.  I cannot recall ever  09:26:11
25  seeing a message from Joseph or in any of our meetings  09:26:15

Page 12

1  where he mentioned any protocols for communication.  09:26:19
2  Q. If I use the term SEC HQ or Korea, do those all  09:26:24
3  have the same meaning to you or can we agree on that?  09:26:31
4      MS. CHAN:  Objection, vague.             09:26:34
5  A. You would have to be case specific.       09:26:35
6  Q. Okay.  What do you understand SEC to be?  09:26:37
7  A. In that case, a broad, you know, anything in  09:26:41
8  Korea.                                      09:26:49
9  Q. And HQ, what does that mean to you?       09:26:51
10  A. You can -- the way our organization is setup we  09:26:53
11  have different interfaces with the headquarters  09:26:58
12  organization.  So the interfaces that myself or my team  09:27:02
13  mostly deal with are export team which is kind of our  09:27:10
14  counterpart in Korea as well as some of the operating  09:27:13
15  teams in Korea.  So again, it would have to be case  09:27:17
16  specific.                                   09:27:20
17  Q. Okay.  I think during your last deposition we  09:27:21
18  talked about how you obtained profitability data from  09:27:27
19  HQ?                                         09:27:33
20      MS. CHAN:  Objection, misstates previous  09:27:34
21  testimony.                                  09:27:36
22  Q. Does that misstate your previous testimony?  09:27:37
23  A. I didn't review my previous testimony.  So I came  09:27:39
24  here and I don't recall what the exact detail of what  09:27:45
25  all we discussed during that.                09:27:48

Page 13

1  Q. Is it accurate -- is it accurate that in your  09:27:50
2  work you obtained profitability data from HQ?  09:27:53
3      MS. CHAN:  Objection, vague.             09:27:55
4  A. You know, can you please be more specific on  09:27:56
5  profitability data?                          09:28:03
6  Q. Do you use profitability, profitability of  09:28:04
7  smartphones -- withdraw.                     09:28:07
8      Do you use data regarding the profitability of  09:28:09
9  smartphones in your work?                    09:28:12
10      MS. CHAN:  Objection, vague.             09:28:14
11  A. So from -- so at a high level, we get different  09:28:21
12  estimates of profitability on a handset level that we  09:28:37
13  use in our work to forecast or estimate profitability  09:28:42
14  for a time period or for a specific program.  09:28:48
15  Q. So you get estimates of profitability that you  09:28:56
16  use?                                        09:28:58
17  A. I personally do not receive that, but they filter  09:29:00
18  into my organization.                        09:29:05
19  Q. And where does that information come from?  09:29:07
20      MS. CHAN:  Objection, calls for speculation.  09:29:09
21  Q. Do you know where that information comes from?  09:29:12
22  A. There is a couple of different sources for the  09:29:14
23  profitability data that we receive.  It can come from  09:29:18
24  our finance teams, so that is one conduit.  And then it  09:29:23
25  can also come from direct contact with our export team  09:29:27