# EXHIBIT 4
# FILED UNDER SEAL

1             IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    APPLE, INC., a California Corporation

5    vs.                              CN:11-CV-01846-LHK

6    SAMSUNG ELECTRONICS COMPANY,

7    LTD, a Korean business entity; SAMSUNG

8    ELECTRONICS AMERICA, INC., a New

9    York Corporation; SAMSUNG

10   TELECOMMUNICATIONS AMERICA, LLC,

11   a Delaware Limited Liability Company.

12   _____/

13

14

15        The videorecorded deposition of RAVIN

16   BALAKRISHNAN, PH.D., was held on Friday, April 20,

17   2012, commencing at 9:07 A.M., at the Law Offices of

18   Quinn Emanuel, 1299 Pennsylvania Avenue, N.W., Suite

19   825, Washington, D.C., before Ronda J. Thomas, a

20   Notary Public.

21

22

23   REPORTED BY:

24   Ronda J. Thomas, RPR, CLR

25   JOB NO. 48807

Page 6

| | | |
|---|---|---|
| 1 | Morrison and Foerster on behalf of the plaintiff, | 09:08 |
| 2 | Apple. | 09:08 |
| 3 |       MR. AHN:  Matthew Ahn of Morrison and | 09:08 |
| 4 | Forester on behalf of Apple. | 09:08 |
| 5 |       MR. BUSEY:  And, also, I'm representing the | 09:08 |
| 6 | witness. | 09:08 |
| 7 |       THE VIDEOGRAPHER:  Will the court reporter | 09:08 |
| 8 | please swear the witness. | 09:08 |
| 9 | Whereupon, | 09:08 |
| 10 |       RAVIN BALAKRISHNAN, PH.D., | 09:08 |
| 11 | called as a witness, having been first duly sworn to tell | 09:08 |
| 12 | the truth, the whole truth, and nothing but the truth, was | 09:08 |
| 13 | examined and testified as follows: | 09:08 |
| 14 |       EXAMINATION BY MR. JOHNSON: | 09:08 |
| 15 | Q    Good morning, Dr. Balakrishnan. | 09:08 |
| 16 | A    Good morning. | 09:09 |
| 17 | Q    How many times have you been deposed now? | 09:09 |
| 18 | A    I don't have a precise count.  I would say | 09:09 |
| 19 | somewhere between half a dozen and ten. | 09:09 |
| 20 |       (Brief pause.) | 09:09 |
| 21 | Q    Sorry about that. | 09:09 |
| 22 |       Is the bulk of your consulting work now for | 09:09 |
| 23 | Apple? | 09:09 |
| 24 |       MR. BUSEY:  Objection just to form. | 09:09 |
| 25 | A    The current litigation consulting I'm doing | 09:09 |

Page 59

| | | |
|---|---|---|
| 1 | also accused of infringing the '381, right? | 10:38 |
| 2 | A    Yes, it is.  Or I've accused a Galaxy S4G. | 10:38 |
| 3 | Whether it's the exact same one I don't know. | 10:38 |
| 4 | Q    Take a look at the ThinkFree Office | 10:38 |
| 5 | application and tell me if it infringes the '381 | 10:38 |
| 6 | patent? | 10:38 |
| 7 | A    Sure. | 10:38 |
| 8 | MR. BUSEY:  Can counsel represent what | 10:39 |
| 9 | version of the Galaxy S4G this is? | 10:39 |
| 10 | MR. JOHNSON:  2.3.3. | 10:39 |
| 11 | A    So I've just tried the ThinkFree Office | 10:39 |
| 12 | with two different PDF files and I cannot get it to do | 10:39 |
| 13 | the same functionality that I saw on the Galaxy S4G | 10:39 |
| 14 | with the ThinkFree Office in counsel's office. | 10:40 |
| 15 | Q    So Exhibit 4, the ThinkFree Office | 10:40 |
| 16 | application in Exhibit 4 doesn't infringe the '381 | 10:40 |
| 17 | patent, right? | 10:40 |
| 18 | A    ThinkFree Office that I'm using right now | 10:40 |
| 19 | on Exhibit 4, this particular version does not seem to | 10:40 |
| 20 | infringe. | 10:40 |
| 21 | Q    Is it your understanding that some of the | 10:40 |
| 22 | versions of ThinkFree Office infringe and some don't? | 10:40 |
| 23 | A    ThinkFree Office versions that I tested on | 10:40 |
| 24 | the phones I list in paragraph 37 of my report do | 10:40 |
| 25 | infringe as I've indicated. | 10:41 |

1             Given what I've seen today with this                 10:41
2  version of ThinkFree Office on the Exhibit 4 and the            10:41
3  one I just examined on the earlier exhibit, which I             10:41
4  believe was Exhibit 3, those two do not appear to               10:41
5  infringe.                                                       10:41
6             So as a result at least these two versions           10:41
7  of ThinkFree Office do not.                                     10:41
8       Q     The question I have is:  When you looked at          10:41
9  the phones and products that were at Apple's counsel's          10:41
10 office, did you see any phones that had the ThinkFree           10:41
11 Office application that did not infringe?                       10:41
12      A     I do not recall seeing any ThinkFree Office          10:41
13 applications that I tried that did not infringe the             10:42
14 381.                                                            10:42
15      Q     Do you recall seeing any phones at Apple's           10:42
16 counsel's office or tablets where the Browser                   10:42
17 application did not infringe?                                   10:42
18      A     I believe so, yes.                                   10:42
19      Q     Can you tell me which ones those were?               10:42
20      A     I don't have that on top of my head but I            10:42
21 might have it in the report.  Give me one minute.               10:42
22            (Witness reading.)                                   10:42
23      A     So in my report in paragraph 261 as one              10:43
24 example the Gem, G-E-M, phone did not appear to do the          10:43
25 '381's feature in the Browser and you get a hard stop           10:43

Page 61

| | | |
|---|---|---|
| 1 | instead of the snap back. And the other alternative | 10:43 |
| 2 | that I've seen is what's referred to as the blue glow | 10:43 |
| 3 | effect, which I talk about a little about it in | 10:43 |
| 4 | paragraph 262. | 10:44 |
| 5 | I don't list in this the devices that have | 10:44 |
| 6 | that. My job here was to deal with the infringement | 10:44 |
| 7 | but I definitely have seen devices that do the blue | 10:44 |
| 8 | glow instead of the snap back. | 10:44 |
| 9 | Q    So the devices that exhibit the hard stop | 10:44 |
| 10 | do not infringe the '381 patent? | 10:44 |
| 11 | MR. BUSEY: Objection to the extent it's | 10:44 |
| 12 | ambiguous. It calls for a legal conclusion. Go ahead. | 10:44 |
| 13 | A    So device running the Browser application, | 10:44 |
| 14 | and in the Browser application if it does the hard stop | 10:44 |
| 15 | or not the snap back or rubber-banding, then the | 10:44 |
| 16 | Browser application on that device would not infringe. | 10:44 |
| 17 | There may be other applications, like the | 10:44 |
| 18 | Contacts, that may not have a hard stop and might | 10:44 |
| 19 | infringe. | 10:44 |
| 20 | Q    What do you mean by hard stop? | 10:44 |
| 21 | A    By hard stop, I mean when you hit the edge | 10:44 |
| 22 | of the -- well, let's take it back to the claim. | 10:44 |
| 23 | For example claim element F here, which | 10:45 |
| 24 | says once you've reached the edge of the document, | 10:45 |
| 25 | displaying an area beyond the edge of the document, | 10:45 |

Page 62

1  where it does not do that, and it does not do the          10:45
2  snapback functionality in elements G and H.                10:45
3           And a simple example of that is what I just       10:45
4  saw in the ThinkFree Office on Exhibit 4.                  10:45
5      Q    And the blue glow does not infringe               10:45
6  the '381 patent either?                                    10:45
7      A    If it is only the blue glow and not the           10:45
8  blue glow in additional to the snapback that's in '381,    10:45
9  then a device or an application, having just the blue      10:45
10 glow and not doing the '381 snapback functionality,        10:45
11 would not infringe.                                        10:45
12     Q    Were there any other characteristics of the       10:45
13 Browser on products that you reviewed, besides the hard    10:46
14 stop and blue glow that you believe don't infringe?        10:46
15          MR. BUSEY:  Objection.  Ambiguous.                10:46
16     A    I believe I've seen a Browser that had a          10:46
17 yellow glow, but effectively it's the same                 10:46
18 functionality as the blue glow but a different color.      10:46
19 And that, that would be the same as blue glow from a       10:46
20 functionality point of view.                               10:46
21     Q    Any others?                                       10:46
22          MR. BUSEY:  Same objection.                       10:46
23     A    That's all I can recall right now.                10:46
24     Q    Did you review any products that had a            10:46
25 Contacts application that did not infringe?                10:46

| | | | |
|---|---|---|---|
| 1 | A | You said Contacts application? | 10:46 |
| 2 | Q | Yes. | 10:46 |
| 3 | A | I believe I have seen Contacts applications | 10:47 |
| 4 | on some Samsung phones that had a blue or a yellow glow | | 10:47 |
| 5 | functionality instead of the snapback functionality of | | 10:47 |
| 6 | the '381, and that would not infringe. | | 10:47 |
| 7 | Q | Did you see any Contacts applications on | 10:47 |
| 8 | Samsung phones that exhibited a hard stop? | | 10:47 |
| 9 | A | Honestly, I don't recall offhand. I might | 10:47 |
| 10 | have. | | 10:47 |
| 11 | Q | Okay. Do you remember seeing any Samsung | 10:47 |
| 12 | products that have a Gallery application that do not | | 10:47 |
| 13 | infringe the '381 patent? | | 10:47 |
| 14 | | MR. BUSEY: Objection again to being | 10:48 |
| 15 | ambiguous. Go ahead. | | 10:48 |
| 16 | A | I might have. I don't recall exactly | 10:48 |
| 17 | whether I have or not because many of these, there are | | 10:48 |
| 18 | so many of these phones that I've tried. And I don't | | 10:48 |
| 19 | have a list of the ones that don't do the '381. | | 10:48 |
| 20 | Q | You weren't interested in the ones that | 10:48 |
| 21 | don't infringe, right? | | 10:48 |
| 22 | A | I was not making, keeping track of it. | 10:48 |
| 23 | Q | There are some phones that have a Gallery | 10:48 |
| 24 | application that exhibit a blue glow, right? | | 10:48 |
| 25 | A | That might be true. I, I just don't have a | 10:48 |

Page 64

| | | |
|---|---|---|
| 1 | precise recollection of that. | 10:48 |
| 2 | Q    Do you know which ones? | 10:48 |
| 3 | A    I just said I don't have a precise | 10:48 |
| 4 | recollection. | 10:48 |
| 5 | Q    Do you have any -- do you have an imprecise | 10:48 |
| 6 | recollection? | 10:48 |
| 7 | A    No, unfortunately. | 10:48 |
| 8 | Q    Are there Samsung products that have a | 10:49 |
| 9 | Gallery application that exhibit a hard stop? | 10:49 |
| 10 | A    I have to give the same answer.  I might | 10:49 |
| 11 | have seen them but I don't recall offhand. | 10:49 |
| 12 | Q    Are you aware of any Samsung products in | 10:49 |
| 13 | the Gallery application that exhibit a hold still | 10:49 |
| 14 | phenomenon? | 10:49 |
| 15 | MR. BUSEY:  Objection -- | 10:49 |
| 16 | Q    Sorry -- where the photo doesn't snap in | 10:49 |
| 17 | either direction, it just, if you move it, it stays | 10:49 |
| 18 | put? | 10:49 |
| 19 | MR. BUSEY:  Objection.  Ambiguous and | 10:49 |
| 20 | confusing. | 10:49 |
| 21 | A    When you move it and it stays put?  So you | 10:49 |
| 22 | move it off the edge and it stays put, is that what | 10:49 |
| 23 | you're saying? | 10:49 |
| 24 | Q    Right. | 10:49 |
| 25 | A    I have seen some Samsung products with a | 10:49 |

Page 132

1       MR. BUSEY:  Let me see that, please.                01:59
2   A   Okay.                                               01:59
3   Q   Are we looking at one electronic document           01:59
4   there, two electronic documents, more than that?        01:59
5   A   I'm looking at at least two electronic              01:59
6   documents, yes.                                         01:59
7   Q   And what are the two electronic documents?          01:59
8   A   Well, the first one is this list of stocks.         01:59
9   The second one is this list of looks, like news         02:00
10  headlines at the bottom.                                02:00
11  Q   And where is the edge of the documents?             02:00
12  A   In each case?                                       02:00
13  Q   Yeah.                                               02:00
14  A   The, in the one on the top, the edge is on          02:00
15  the top of the list and the bottom of the list and the  02:00
16  sides of the list.                                      02:00
17      And the same with the bottom, the news,             02:00
18  news feed.  It's at the top of the list of the news     02:00
19  feeds and bottom of the list of the news feeds -- news  02:00
20  feed.                                                   02:00
21  Q   What does elastically attached mean as it's         02:01
22  used in claim 16?                                       02:02
23      (Witness reading.)                                  02:02
24  A   In the context of the claims, it means the,         02:02
25  when moving from, the document from one, one direction  02:02

Page 133

1  to the other direction so the area beyond the edge           02:02
2  disappears, that movement gives the appearance of it         02:02
3  being attached with an elastic band, for example, the        02:03
4  analogies to the physical world.  So it doesn't              02:03
5  instantly snap back, like instantly you see a elastic        02:03
6  movement or an animation.                                    02:03
7       Q     Do the bounce features that you reviewed in       02:03
8  the Samsung products elastically snap back, or do they       02:03
9  instantly snap back?                                         02:03
10            MR. BUSEY:  Objection.  Ambiguous.  Calls         02:03
11 for a legal conclusion.                                      02:03
12      A     They all elastically snap back.                   02:03
13            I'm sorry, the, just to clarify that, the         02:03
14 Gallery and Contacts and Browser accused products            02:03
15 elastically snap back.                                       02:03
16      Q     Your analysis with respect to claims 19 and       02:04
17 20 are, is based upon your analysis of claim 1, right?       02:04
18            MR. BUSEY:  Objection to the extent it            02:04
19 mischaracterizes the witness' prior testimony.               02:04
20            (Witness reading.)                                02:04
21      A     The analysis of the functionality is based,       02:05
22 it's in part based on the analysis I did in claim 1          02:05
23 but, of course, claim 19 talks about things like memory      02:05
24 and programs and instructions, and that is the               02:05
25 additional analysis presented in my report.                  02:05

Page 134

1  Q    Okay.  Well, claim 19, for example,              02:05
2  paragraph 191, you say:                               02:05
3          Because these devices perform the elements    02:05
4  described in claims 1 and 19, they must have          02:05
5  instructions for performing those methods and a storage 02:05
6  medium for those instructions as recited in those     02:05
7  claims.                                               02:05
8          Have you confirmed that the accused devices   02:05
9  actually have those instructions?                     02:05
10 A    Yes, because I looked at the source code on      02:06
11 the machines in Quinn's offices in Redwood Shores.    02:06
12 Q    So why does your report say they must have       02:06
13 as opposed to they do, in fact, have?                 02:06
14         Is there a distinction there in your mind     02:06
15 or no?                                                02:06
16 A    They do have and they must have, because         02:06
17 without, without having it, they wouldn't be able to do 02:06
18 this functionality.                                   02:06
19 Q    Okay.  Now, with respect to section Y of         02:06
20 your report, you talk about the difficulty of design  02:06
21 around?                                               02:06
22 A    I'm sorry, what paragraph is that?               02:06
23 Q    261.                                             02:06
24 A    Yes.                                             02:07
25 Q    Can you list for me, what are the                02:07

Page 135

1  non-infringement alternatives to a '381 patent?                02:07
2       A     That I've seen in the Samsung devices?              02:07
3       Q     Yes.                                                02:07
4       A     Okay.  So the first one that we have                02:07
5  already talked about is what has been referred to as a         02:07
6  hard stop.  And that's discussed in paragraph 261 of my        02:07
7  report.                                                        02:07
8             If there's a hard stop, and there isn't,            02:07
9  the bounceback or snapback effect that's found in the          02:07
10 claims of the '381.                                            02:07
11            Similarly, if it uses the blue glow effect          02:07
12 which we have discussed and I talk about in the 262,           02:07
13 sorry, paragraph 262, again, assuming the blue glow is         02:07
14 there and the functionality that is infringing the             02:07
15 claims, which is the snapback functionality is no              02:07
16 longer there, then that would not be infringing.               02:08
17            And as I said, I think, earlier this                02:08
18 morning, I've seen a yellow glow as well, which would          02:08
19 be effectively the same --                                     02:08
20      Q     Have you seen --                                    02:08
21      A     -- the same as the blue glow.                       02:08
22      Q     Have you seen any other non-infringing              02:08
23 alternatives?                                                  02:08
24            MR. BUSEY:  I'm going to object as                  02:08
25 ambiguous.  Go ahead.                                          02:08

Page 165

1  so --                                                        03:06
2      Q     Okay.  Was a DiamondTouch device with a            03:06
3  tabletop cloth application ever sold to anyone?              03:06
4      A     I do not know.                                     03:06
5      Q     Was a DiamondTouch device with the                 03:06
6  Tablecloth application ever used in public?                  03:06
7      A     I don't know.                                      03:06
8      Q     I think you said you weren't sure whether          03:07
9  the DiamondTouch device that was in the lobby of MERL        03:07
10 had Tablecloth on it, right?                                 03:07
11     A     That's right, at that timeframe.                   03:07
12     Q     Are you aware of any other timeframe in            03:07
13 which the DiamondTouch device in the MERL lobby had          03:07
14 Tablecloth on it?                                            03:07
15     A     I'm not aware of it having it.  It might           03:07
16 have.  But I do not recall ever seeing Tablecloth on         03:07
17 the device in the lobby.                                     03:07
18     Q     Did you work with Mr. Forlines?                    03:07
19     A     Yes.                                               03:07
20     Q     What did you work on together?                     03:07
21     A     We worked on a variety of different                03:07
22 research projects involving user interfaces over the         03:07
23 years.                                                       03:08
24     Q     Can you be any more specific?                      03:08
25     A     Well, I can start from my CV because I've          03:08

Page 166

1  published some papers with him.  I'll make it more                03:08
2  concrete.                                                         03:08
3           And I'm assuming you mean -- are you saying               03:08
4  during that timeframe or in general?                              03:08
5      Q    In general.                                              03:08
6      A    So one project I worked on was on a user                 03:08
7  interface for zooming and pointing using a handheld,              03:08
8  interactive handheld projector.  That was one piece of            03:09
9  research.                                                         03:09
10          Another piece of research was on gesture                  03:09
11 registration on a direct-touch surface.                           03:09
12          Another piece of research was a study,                    03:09
13 experimental evaluation of how it displays position and           03:09
14 the orientation of the user's control space with                  03:09
15 effective user performance and preference.                        03:09
16          Another study was on what we call hybrid                  03:09
17 pointing, a way to switch between absolute and relative           03:09
18 pointing between, with direct input devices.                      03:09
19          Another one was a study, an experimental                  03:10
20 study on the effects of size, group size, the number of           03:10
21 people in a group, and the display configuration on the           03:10
22 visual search tasks.                                              03:10
23          There was another study on the perception                 03:10
24 of elementary graphical elements and tabletop                     03:10
25 environments.                                                     03:10

| | | |
|---|---|---|
| 1 | Another study on direct touch versus mouse | 03:10 |
| 2 | input for tabletop displays. | 03:10 |
| 3 | And yet another study on evaluation of | 03:10 |
| 4 | tactile feedback compared to direct versus indirect | 03:10 |
| 5 | stylus input in pointing and crossing selection tasks. | 03:10 |
| 6 | Q   How about Mr. Bogue?  Did you work with | 03:10 |
| 7 | Mr. Bogue? | 03:10 |
| 8 | A   I did not work with Mr. Bogue on any | 03:10 |
| 9 | research projects per se. | 03:11 |
| 10 | Q   And how about Mr. Wigdoor?  Did you work on | 03:11 |
| 11 | anything in particular with Mr. Wigdoor while at | 03:11 |
| 12 | consulting for Mitsubishi Electric Research Labs? | 03:11 |
| 13 | A   Yes. | 03:11 |
| 14 | Q   Can you tell me what you worked on? | 03:11 |
| 15 | A   Sure. | 03:11 |
| 16 | Some of that overlaps the list I just read. | 03:11 |
| 17 | Mr. Forlines was the co-author on some of that work as | 03:11 |
| 18 | well.  Let me just go through this again. | 03:11 |
| 19 | So this is with Mr. Wigdoor at MERL? | 03:11 |
| 20 | Q   Right. | 03:11 |
| 21 | A   So there was a research, piece of research | 03:11 |
| 22 | done -- yeah, I think this was done at MERL.  I'm not | 03:11 |
| 23 | 100 percent sure whether some of it was done at the | 03:12 |
| 24 | University as well.  It's work in 2005 investigating | 03:12 |
| 25 | the effect of orientation on the readability of text in | 03:12 |

Page 168

1  tabletop displays.   03:12
2          That study I mentioned earlier on display   03:12
3  position and control space orientation and user   03:12
4  performance and preference.   03:12
5          A piece of research called under the table   03:12
6  interaction.   03:12
7          Another piece of research which looked at   03:12
8  the effects of group size and display configuration --   03:12
9          THE COURT REPORTER:  Of what size?   03:12
10         THE WITNESS:  Excuse me -- group size and   03:12
11 display configuration on visual search.   03:12
12    A    Another study, which I believe I mentioned   03:13
13 earlier, perception of elementary graphical elements in   03:13
14 tabletop and multisurface environments.   03:13
15         The study on direct touch versus mouse   03:13
16 input for tabletop displays.   03:13
17         I think that's pretty much it for MERL.   03:13
18    Q    You've reviewed Mr. Van Dam's report,   03:13
19 right?   03:13
20         MR. BUSEY:  Objection.  Ambiguous.   03:13
21    A    The report in this case, '381?  Yes.   03:13
22    Q    Yeah.   03:13
23         And is it your opinion that the prior art   03:13
24 references for the '381 patent have to be manipulated   03:13
25 in just the right way to profuse the allegedly   03:13