Exhibit 18

FILED UNDER SEAL

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

**REBUTTAL EXPERT REPORT OF DR. BRIAN VON HERZEN REGARDING
<u>NON-INFRINGEMENT OF U.S. PATENTS 7,663,607 AND 7,920,129</u>**

*Apple, Inc., vs. Samsung Electronics Co., Ltd., et al.*

Case No. 11-cv-01846-LHK

April 16, 2012

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     PROFESSIONAL BACKGROUND ................................................................... 1

III.    MATERIALS CONSIDERED FOR THIS REPORT ......................................... 2

IV.     APPLICABLE LEGAL PRINCIPLES .............................................................. 3

        A.     Infringement ............................................................................................ 3

        B.     Indirect Infringement.............................................................................. 4

        C.     Doctrine of Equivalents.......................................................................... 5

V.      PERSON OF ORDINARY SKILL IN THE ART ............................................. 8

VI.     PROBLEMS WITH THE TESTING DR. MAHARBIZ RELIES UPON......................... 8

VII.    SUMMARY OF OPINIONS OF NON-INFRINGEMENT OF THE '607
        PATENT....................................................................................................... 9

VIII.   TECHNICAL BACKGROUND PERTINENT TO THE '607 PATENT ....................... 10

IX.     OVERVIEW OF THE '607 PATENT AND THE ASSERTED CLAIMS ................... 18

        B.     The Specification.................................................................................... 19

        C.     The Asserted Claims .............................................................................. 20

        D.     The Prosecution History........................................................................ 22

X.      DISPUTED TERMS FROM THE ASSERTED CLAIMS AND THE PARTIES'
        PROPOSED CONSTRUCTIONS .................................................................... 24

XI.     NON-INFRINGEMENT OPINIONS WITH RESPECT TO THE '607 PATENT .......... 25

        A.     None of the Accused Products are Configured to Detect Near Touches
               (Claims 1-3 and 6-8) ............................................................................. 25

               1.     No Literal Infringement ............................................................. 26

               2.     No Infringement Under the Doctrine of Equivalents ................. 27

        B.     None of the Accused Products Include Capacitive Monitoring Circuitry
               that is Configured to Detect Changes in Charge Coupling Between the

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

First Conductive Lines and the Second Conducive Lines (Claims 1-3 and 6-8) .................................................................................................................. 27

    1.    No Literal Infringement ......................................................... 28

    2.    No Infringement Under the Doctrine of Equivalents ............... 31

C.    The Galaxy Tab 7.0 Does Not Include a First Layer Having a Plurality of Transparent First Conductive Lines (Claims 1-3 and 6-8) .................................. 32

    1.    No Literal Infringement ......................................................... 34

    2.    No Infringement Under the Doctrine of Equivalents ............... 35

D.    The Galaxy Tab 7.0 Does Not Include a Second Layer…Having a Plurality of Transparent Second Conductive Lines (Claims 1-3 and 6-8) ........... 36

    1.    No Literal Infringement ......................................................... 36

    2.    No Infringement Under the Doctrine of Equivalents ............... 37

E.    The Galaxy Tab 7.0 Does Not Include Second Conductive Lines that are Positioned Transverse to the First Conductive Lines (Claims 1-3 and 6-8) ......... 38

    1.    No Literal Infringement ......................................................... 38

    2.    No Infringement Under the Doctrine of Equivalents ............... 39

F.    The Galaxy Tab 7.0 Does Not Include Conductive Lines on Each of the Layers that are Substantially Parallel to One Another (Claim 2) ......................... 40

G.    The Galaxy Tab 7.0 Does Not Include Conductive Lines on Different Layers that are Substantially Perpendicular to One Another (Claim 3) ............... 42

H.    Apple Has Not Shown that the Accused Products Include a Virtual Ground Charge Amplifier (Claim 8) ..................................................... 43

I.    The Accused Products Do Not Include: (1) a First Glass Member Disposed Over the Screen of a Display; or (2) a Second Glass Member Disposed Over the First Conductive Layer (Claims 10 and 11) ......................... 45

    1.    No Literal Infringement ......................................................... 45

    2.    No Infringement Under the Doctrine of Equivalents ............... 47

J.    The Galaxy Tab 7.0 Does Not Include a First Conductive Layer Comprising a Plurality of Spaced Apart Parallel Lines Having the Same Pitch and Linewidths (Claims 10 and 11) ............................................. 49

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

1.  No Literal Infringement ....................................................... 49

2.  No Infringement Under the Doctrine of Equivalents ............................... 51

K.  The Galaxy Tab 7.0 Does Not Include a Second Conductive Layer Comprising a Plurality of Spaced Apart Parallel Lines Having the Same Pitch and Linewidths (Claims 10 and 11) ............................ 51

L.  The Galaxy Tab 7.0 Does Not Include Parallel Lines of the Second Conductive Layer that are Substantially Perpendicular to the Parallel Lines of the First Layer (Claims 10 and 11) .................................... 52

XII.  SUMMARY OF OPINIONS OF NON-INFRINGEMENT OF THE '129 PATENT ................................................................. 53

XIII.  TECHNICAL BACKGROUND PERTINENT TO THE '129 PATENT ....................... 53

XIV.  OVERVIEW OF THE '129 PATENT AND THE ASSERTED CLAIMS ..................... 56

A.  Summary ................................................................... 56

B.  The Asserted Claims ......................................................... 60

C.  The Prosecution History ..................................................... 63

The Claims as Originally Filed .................................................. 63

2.  December 22, 2009 Office Action ............................................ 64

3.  March 5, 2010 Amendments and Remarks ................................... 68

4.  May 26, 2010 Office Action ................................................ 71

5.  July 30, 2010 Amendments and Remarks ..................................... 73

6.  October 15, 2010 Office Action ............................................. 74

7.  October 28, 2010 Interview ................................................. 75

8.  November 8, 2010 Amendments and Remarks ................................. 75

9.  January 14, 2011 Office Action ............................................. 77

10.  February 4, 2011 Amendments and Remarks ................................. 78

11.  February 14, 2011 Notice of Allowance ..................................... 79

D.  Priority Date ............................................................... 80

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

XV.     NON-INFRINGEMENT OPINIONS WITH RESPECT TO THE '129 PATENT .......... 84

        A.      Claim 1 ................................................................................... 84

                1.      Apple has Failed to Show a First Set of Traces Arranged Along A
                        First Dimension of a Two-Dimensional Coordinate System .................. 84

                2.      Apple has Failed to Show that the Accused Products have a
                        Second Set of Traces Arranged Along A Second Dimension of a
                        Two-Dimensional Coordinate System ..................................................... 90

                3.      Apple has Failed to Show that the "minimum width of the second
                        set of traces is substantially greater than the maximum width of the
                        first set of traces at least at an intersection of the first and second
                        set of traces to provide shielding for the first set of traces" ..................... 96

                        (a)     Substantially wider second traces at an intersection .................... 97

                        (b)     Shielding ................................................................................. 100

                4.      Apple has Failed to Show sensors "formed at locations at which
                        the first set of traces intersects with the second set of traces while
                        separated by the dielectric" ................................................................... 103

        B.      Claim 3 ..................................................................................... 105

        C.      Claim 5 ..................................................................................... 105

        D.      Claim 7 ..................................................................................... 105

        E.      Claim 9 ..................................................................................... 106

        F.      Claim 10 ................................................................................... 106

        G.      Claim 12 ................................................................................... 106

        H.      Claim 14 ................................................................................... 106

        I.      Claim 16 ................................................................................... 107

        J.      Claim 24 ................................................................................... 107

                1.      Apple has Failed to Show that the Accused Products Comprised
                        Drive and Sense Traces ......................................................................... 107

                2.      The Galaxy Tab 7.0 Does Not Include Drive Traces Each of
                        "substantially constant width" ............................................................... 108

        K.      Claim 26 ................................................................................... 109

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

L.    Claim 28 ................................................................................................ 110

XVI.   ABUNDANCE OF NON-INFRINGING ALTERNATIVES ........................................ 110

B.    The Single Layer Diamond Pattern Design ........................................ 112

C.    The Single Layer Bar Pattern Design .................................................. 114

XVII.  NO EVIDENCE OF EMULATING APPLE ................................................................ 116

XVIII. MISCELLANEOUS ........................................................................................ 117

A.    Supplementation of Opinions .......................................................... 117

B.    Compensation .................................................................................. 118

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## I.   INTRODUCTION

1.      I have been retained by counsel for the following defendants in this action: Samsung Electronics Co., Ltd., a Korean business entity; Samsung Electronics America, Inc., A New York Corporation; and Samsung Telecommunications America, LLC, a Delaware limited liability company.  I have been retained to give expert opinions related to technical matters at issue in the case *Apple, Inc., vs. Samsung Electronics Co., Ltd., et al.*  I am an independent expert, I have been asked to opine on the infringement of Claims 1-3, 6-8, 10 and 11 of U.S. Patent 7,663,607 (the " '607 patent") and Claims 1-3, 5, 7, 9-12, 14, 16-19, 21, 22, 24-26, and 28 of U.S. Patent 7,920,129 (the " '129 patent") by the Samsung Galaxy Tab 7.0 and Galaxy Tab 10.1 devices (collectively, the "Accused Products").

## II.   PROFESSIONAL BACKGROUND

2.      I received a Bachelor's degree from Princeton University in 1980 in Physics. I received a Master's of Science degree in 1984 and a Ph.D. in 1989 from the California Institute of Technology ("Caltech") in VLSI and Computer Graphics. During and after my graduate studies, part of my research required the design and development of multiple custom integrated circuits.  At Caltech, I was awarded a Hertz Foundation Fellowship and a Hughes Foundation Fellowship.

3.      From 1992 to 1994 I worked for Synaptics, Inc. in the engineering of electronic circuits for human interface devices such as the TouchPad, which was developed by Synaptics in the 1990's.

4.      I am presently the Chief Executive Officer of Rapid Prototypes, Inc., an electronics consultancy specializing in the research, design and development of commercial electronic products, and have been with the company since 1994. Over the past two decades, I

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

have designed dozens of electronic systems for several Fortune 500 companies, including human interface devices, signal processing systems, graphics and video processing systems.

5.      I am the inventor on a dozen electronics patents and a dozen patents pending.

6.      I am a member of the Institute of Electrical and Electronic Engineers (IEEE), and am the author or co-author of published articles related to signal processing and computer graphics. I have given numerous invited seminars at leading conferences and institutions around the world on the topics of digital signal processing, electronic systems engineering, and hardware / software co-design.

7.      Further details of my background, as well as a listing of the cases in which I have provided expert testimony, are set forth in my current curriculum vitae ("CV"), a copy of which is attached as Exhibit A.

8.      I believe that my industry experience in electronic design of human interface devices and other related technologies, along with my academic experience and credentials, qualify me as an expert in the technical areas relevant to the subject matter of the '607 and '129 patents.

## III.   MATERIALS CONSIDERED FOR THIS REPORT

9.      I have reviewed the Expert Report of Michel Maharbiz, Ph.D. Regarding Infringement of U.S. Patent Nos. 7,663,607 and 7,920,129 (hereinafter "Maharbiz Report") as well as the documents cited in Maharbiz Report and the materials listed in Exhibit B in formulating the expert opinions expressed in this report.  As a general matter, I have reviewed and considered every document cited herein and those cited in the attached exhibits.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## IV.   APPLICABLE LEGAL PRINCIPLES

10.     I am not a legal expert and offer no opinions of the law.  However, I have been informed by counsel of the following relevant legal standards that apply with respect to patent law, and I have applied these legal standards in arriving at my conclusions.

### A.   Infringement

11.     18.     I understand that Apple has the burden to prove infringement.  I understand that determination of whether an accused product or process infringes a patent claim is a two-step process.  First, the language of the claim is construed as it would be understood by one of ordinary skill in the art at the time of the filing of the patent application.  Reference is made to the intrinsic evidence of record, which includes the language of the claim itself and other issued claims, the patent specification, and the prosecution history.  Words in a claim will be given their ordinary or accustomed meaning unless it appears that the inventor used them differently.  Words in a claim cannot be ignored.  The prosecution history may limit the interpretation of the claim, particularly to exclude any claim interpretation given up on or disavowed by the patentee in order to obtain allowance of the claim.  To the extent the Court has construed a claim term in its Order Construing Disputed Claim Terms dated April 4, 2012 (Exhibit F), I have applied this construction.  To the extent the parties have submitted differing constructions for certain terms and the Court has not ruled on these terms, I have analyzed infringement under both parties' proposed constructions.

12.     After the claim has been properly construed, the claim is compared with the accused product or process to determine whether all of the limitations of the claim are present literally or by a substantial equivalent.  The evaluation of literal infringement is a process of determining whether the accused product or method has each and every element specified in the properly construed claim.  If even one element is not present, no literal infringement occurs.  I

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

understand that it is the patent owner's burden to prove infringement by a preponderance of the evidence.

13.      I understand that to provide direct infringement of a method claim, a patent owner must prove that the accused product performs each and every step of the method.  If even one step is not performed, the method is not infringed.  I further understand that method claims are only infringed when the claimed method is performed; in other words, it is not infringed by a device that is merely capable of infringing use, unless actual use is also shown.

**B.      Indirect Infringement**

14.      I understand that to infringe a method claim, the accused infringer must have practiced all the steps of the claimed method.

15.      I understand that where a company sells a product that is capable of directly infringing a method claim when operated by customers, the seller can be liable under either an induced infringement or contributory infringement theory.  However, I also understand that such indirect theories of liability require proof of a single, direct infringer in the first instance.  Absent proof that a customer actually operated a device in an infringing manner, an induced or contributory infringement theory is not sustainable.

16.      I understand that to be liable under an induced infringement theory, the defendant must actively induce the infringement of another.  I understand that the United States Supreme Court has interpreted this basis of liability to require the defendant to intend the acts constituting direct infringement with knowledge that such acts constitute patent infringement.  While this standard can be met by a showing of "willful blindness," I understand that "deliberate indifference to a known risk that a patent exists" is not sufficient.  An alleged inducer's "willful blindness" will only give rise to liability when: (1) the inducer subjectively believes that there is

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

a high probability that the induced acts constitute infringement; and (2) the inducer has taken deliberate actions to avoid learning the truth regarded the nature of the induced acts.

17.     I understand that to be liable under a contributory infringement theory, the defendant must sell or offer to sell a component of a patented invention constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent.  As is the case with induced infringement, I understand that a patentee must establish that the defendant had knowledge of the patent and the unlawful character of the acts constituting direct infringement.  I also understand that the sale of any product capable of substantial non-infringing use cannot constitute contributory infringement.

18.     In paragraphs 277-289, Dr. Maharbiz discusses "Samsung's Copying of Apple's Patented Features."  However, this is not an element of patent infringement analysis.  Dr. Maharbiz does not point to any evidence in those paragraphs that discusses or even mentions the '607 or '129 Patents.  I understand that in order to prove either willful infringement or to prove intent to induce infringement, Apple must prove not just knowledge of the patent and intent to cause the acts they allege infringe the patent, but Apple must prove that Samsung had intent to infringe.  The evidence presented in paragraphs 277-289 falls short of what Apple needs to prove.

C.     **Doctrine of Equivalents**

19.     I also understand that if a patent claim is not literally infringed, it might still be infringed under the "doctrine of equivalents."  This means that if there are claim limitations that are not literally present in the accused product, the claim might still be infringed if the differences between the accused product and the claims are insubstantial for each claim limitation.  One test used to determine whether differences are insubstantial is to determine

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

whether a substitute element performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed element.

20.     I have been informed that the doctrine of equivalents does not always apply, such as when doing so would contradict statements made during the patent application process, which is known as prosecution history estoppel.

21.     The range of equivalents is also limited by the prior art to prohibit the patent owner from extending the scope of the claim to cover the prior art.  The range of equivalents cannot include what the prior art anticipates under 35 U.S.C. § 102 or what the prior art renders obvious under 35 U.S.C. § 103.

22.     I also understand that the doctrine of equivalents is subject to the "all elements" rule, which precludes a theory of infringement based on the doctrine of equivalents when the theory would read a limitation completely out of the claim.

23.     I understand that the doctrine of prosecution history estoppel prevents a patent owner from using the doctrine of equivalents to recapture what had been surrendered during prosecution to obtain allowance of the claims.  The claims of the patent cannot be interpreted to cover subject matter which the patent owner argued to the USPTO was beyond the scope of the claims.  Estoppel also arises when an amendment or argument is made to secure the patent and the amendment or argument narrows the patent's scope.  The differences that the patentee disclaimed must be regarded as material.

24.     I understand that if a patentee narrows a claim as a condition for obtaining a patent, a presumption applies that the claims are not entitled to any equivalents.  This presumption applies whether the amendment or argument was made to avoid prior art or to comply with the requirements imposed to avoid indefiniteness.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

25.     I further understand that there are three ways to rebut this presumption: (1) the patentee may demonstrate that the alleged equivalent would have been "unforeseeable" at the time of the claim amendment; (2) the patentee may demonstrate that the rationale underlying the amendment bore no more than a "tangential relation" to the alleged equivalent; (3) the patentee may demonstrate that there was "some other reason" why the patentee could not reasonably be expected to have literally claimed the alleged equivalent.

26.     I understand that the presumption that equivalents are unavailable arises when either a preexisting claim limitation is narrowed by amendment or a new claim limitation is added by amendment.  There is no distinction between the narrowing of an existing limitation and the addition of a new limitation with respect to the availability of equivalents.

27.     I am informed that rewriting a dependent claim into independent form, coupled with the cancelation of the original independent claim, constitutes a "narrowing amendment" creating a presumption that equivalents have been surrendered.  I am informed that the reason for this is that the proper focus of prosecution history estoppel analysis is whether the amendment narrows the overall scope of the claimed subject matter.  Thus, the fact that the scope of the rewritten claim has remained unchanged does not preclude the application of prosecution history estoppel if, by canceling the original independent claims and rewriting the dependent claims into independent form, the scope of subject matter claimed in the independent claim has been narrowed to secure the patent.

28.     Finally, I understand that, pursuant to the "disclosure-dedication rule," when a patent discloses but does not claim subject matter, the unclaimed subject matter is dedicated to the public and cannot be recaptured using the doctrine of equivalents.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## V.      PERSON OF ORDINARY SKILL IN THE ART

29.      I am informed by counsel that when analyzing the claim language of a patent, one does so from the viewpoint of one of ordinary skill in the art at the time of the filing of the patent application.  For the purposes of this report, a person of ordinary skill in the art in May, 2004 (for the '607 patent) and in January, 2007 (for the '129 patent) would have had an undergraduate degree in electrical engineering, physics, computer engineering, or a related field and at least two years of experience working with input devices.

30.      I note that Apple's expert, Dr. Maharbiz, appears to have little or no experience with touchscreens or even input devices generally.  Both his academic background and research interests are focused on synthetic biology and bio-derived fabrication techniques.  In my opinion, Dr. Maharbiz does not qualify as a person of ordinary skill in the art because he has little to no actual experience working with input devices generally and no experience working with mutual capacitance touchscreen devices, such as those described and claimed in the '607 and '129 patents.  As such, it is my opinion that his infringement opinions and claim interpretations are based on little more than his general background in engineering and are speculative.

## VI.      PROBLEMS WITH THE TESTING DR. MAHARBIZ RELIES UPON

31.      Dr. Maharbiz relies heavily, and almost exclusively in the case of the '129 patent, on two Scanning Electron Microscopy ("SEM") reports that are dated March 9, 2012 for his conclusions that the Accused Products infringe the Asserted Claims.  I understand that fact discovery in this case closed on March 8, 2012, and that the two SEM reports on which Dr. Maharbiz now seeks to rely were never produced during the roughly seven months of fact discovery in this case.  I find it very difficult to rebut the many portions of Dr. Maharbiz's infringement analysis that rely on these untimely SEM reports for at least the following reasons.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

32.    I had no opportunity to inspect the devices that were tested and to confirm that they were the Accused Products, or even Samsung products.  I had no opportunity to inspect the testing equipment, the testing setup, or the method by which Evans Analytical conducted the testing and imaging.  I also had no opportunity to perform any analysis on the products that were allegedly tested.  I could not verify that those products are representatives of Samsung products accused of infringement in this action.  I could not test whether Evans Analytical group and/or Ian Ward complied with any relevant standards.  I could not examine the qualifications of the individual(s) conducting the imaging and testing.  I could not determine whether those individual(s) or the laboratory where they imaged/analyzed the alleged accused products had received any relevant industry certifications or accreditations.  I could not analyze any additional data, including raw data, that may have been gathered and tested, and I do not know how extensive the tests were and whether the SEM reports are an exhaustive report regarding the testing conducted by Evans Analytical Group on the products.

33.    For at least the above reasons and the additional reasons I explain below within the asserted limitations (*see, e.g.,* footnote 5), it is my opinion that the SEM reports cannot be a sufficient basis for Dr. Maharbiz and Apple to meet its burden of proving infringement of the Asserted Claims.

## VII.    SUMMARY OF OPINIONS OF NON-INFRINGEMENT OF THE '607 PATENT

34.    It is my opinion that claims 1-3, 6-8, 10, and 11 (the "Asserted Claims") of the '607 patent are not infringed, either literally, under the doctrine of equivalents, or indirectly,[1] by Samsung or the Accused Products.[2]

---

[1]   I note that although Dr. Maharbiz, in his Opening Report, recites the legal standard for indirect infringement in his "Understanding of the Law" section, he does not allege indirect

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

35.     In arriving at my opinions, I have analyzed infringement under both parties' constructions.  In my opinion, the Accused Products do not infringe any claim of the '607 patent under either party's construction.

## VIII.   TECHNICAL BACKGROUND PERTINENT TO THE '607 PATENT

36.     The '607 patent relates to an improved type of touchscreen.  Touchscreens have been commercially available and used in computer systems for at least thirty-five years.  The words touchscreen, touch screen and touch panel are increasingly used interchangeably to describe one or more of the components of an input device for an electronic device that usually consist of: (1) a nominally transparent physical panel with which an intended operation can be initiated by touching with the user's finger or a stylus of some type, (2) electronic circuitry that controls the operation of the panel using some physical principle in combination with the electronic circuitry, and circuitry which also generates a communications signal carrying the result of touch input to the transparent panel, usually in the form of data ("touch data") that includes at least the coordinate pair or pairs of locations touched on the transparent panel; and (3) software that resides on the computer system, whether at the operating system or application program level, which interprets the touch data and performs the action intended by the user.

37.     Although a touchscreen as described above is usually not a display device itself (e.g., a computer video monitor), a touchscreen is most commonly used with a display device, and is sized to match its touch-sensitive area to the viewable area of the display device, and is mechanically mounted in close proximity to the display device, often with transparent adhesives

---

infringement of any claim of the '607 patent.  I therefore do not address indirect infringement in this rebuttal report.

[2]   I further note that claim 11 has only been asserted against the Tab 10.1 and not the Tab 7.0. (*See* Maharbiz Report at 6).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

which minimize internal reflections between the touchscreen and the display.  In this configuration the transparent panel may become indistinguishable from the display device, and indeed, this is a usual design objective for a touchscreen-equipped computer display or other touchscreen controlled device.  As a result, the word touchscreen may be used to refer to the combination of the display device and at least the transparent panel, or the entire touch controlled device itself.

38.     An opaque version of a touchscreen, frequently used in laptop computers and in previously in some desktop computer keyboards, is a touch-operated device generally known as a "touch pad" or "touchpad."  The purpose of a touchpad is usually as an alternative to a mouse or other pointing device.  The technology used in touchpads has been resistive, surface capacitive and projected capacitive, but is most commonly projected capacitive.  These devices may be constructed from materials similar to their touchscreen counterparts, but particularly for the projected capacitive type are more commonly constructed of less expensive materials such as copper and fiberglass printed circuit boards (PCBs).  Some touchpad devices evolved into transparent touchscreens and some touchpads came from their touchscreen counterparts.

39.     Several types of touchscreen systems were commercially available at the time of the filing of the patent application of the present invention, including resistive, capacitive, optical and electromechanical.  All of these touchscreens have design features and limitations that figured into their invention, development and manufacture, and applications for each type often persist based on those design considerations.

40.     Resistive touchscreens are based on the principle of a resistive voltage divider, implemented with a uniform layer or layers of a transparent conductive material coated on two transparent substrates.  The simplest implementation of a resistive touchscreen is known as a

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

four-wire resistive touchscreen.  A voltage applied across the first conductive layer by the electronic circuitry mentioned above (usually referred to as a controller) produces a linear electric field across the substrate.  Voltage in the direction of the field is thus proportional to position.  Two substrates are positioned with the conductive layer facing each other, with a narrow gap between them.  A touch causes the conductive layers to contact, and the second layer picks off the voltage present at the position beneath the touch on the first layer.  A one-axis position sensor is thus created.  In the orthogonal direction (most touchscreens have orthogonal structures for generating and processing touch position) the same process is then implemented with the second layer being driven by the controller, with the first layer picking off the voltage of the second layer.  This sequential detection of position in orthogonal axes (which are aligned with the major axes of the display panel, and are thus generated as familiar X-Y Cartesian coordinates) is incorporated in almost all touchscreen technologies, regardless of the physical principle of operation employed.  A variation on the four-wire resistive touchscreen described here includes only a single uniform conductive substrate, with a pickoff layer positioned above it, and is known as a five-wire resistive touchscreen.  Switched potentials applied to a resistive network connected to the periphery of the uniform conductive substrate allow sequential orthogonal electric fields to be developed on the substrate.  The voltage corresponding to a position is always picked off by the upper conductive layer, which is not required to be uniformly conductive.  Resistive touchscreen controllers are universal—a single controller can operate all four-wire resistive touchscreens, regardless of size or shape, and the same is true for five-wire controllers.  This feature is a significant feature of the relatively low cost of resistive touchscreen systems.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

41.     Early capacitive touchscreens, now referred to as *surface* capacitive touchscreens to differentiate them from the *projected* capacitive touchscreens of the present invention, are similar to five-wire resistive touchscreens, but with no pickoff layer.  An AC potential is applied to the corners of the resistive network attached to a uniform conductive substrate.  The substrate is coated with a thin dielectric layer to prevent damage to the underlying conductive layer and can also be used to improve the optics of the touchscreen.   Contact to the substrate by a conductive object such as the user's finger causes current to flow from each corner of the network.  Various ratios of current in the different "legs" of the resistive network are computed to determine the touch position.  It is essential that the user's body be at least loosely coupled to the ground path of the touchscreen controller for proper function of this touchscreen.  As with resistive touchscreen systems, surface capacitive touchscreen controllers are universal.

42.     One type of electromechanical touchscreen is known as surface acoustic wave (SAW) touchscreen.  Despite the popular interpretation the name suggests, the waves are neither airborne nor audible.  Electromechanical transmit transducers create a vibration in the surface of a glass substrate with short bursts of high frequency (4-10MHz) waves.   These waves propagate across the touch surface by the action of arrays of partial reflectors around the periphery of the touchscreen.  Each axis is driven in sequence.  The summed output from all of the wave paths from one axis is captured by a receive transducer identical to the transmit transducer and converted to an electrical signal, which is digitized and stored in the controller.  When no touch is present, this waveform becomes a reference "map" for subsequent touch detection.  Touch by a user's finger or other soft stylus (which does not have to be electrically conductive) attenuates the wave passing by the touch location, resulting in a locally attenuated response in a new captured waveform.  This new waveform is compared to the reference map to detect the presence

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

of a touch for one axis.  A similar process detects touch in the other axis.  SAW touchscreens do not require the use of a conductive substrate, and many different types of glass may be used to accommodate different application requirements.  SAW touchscreen controllers are universal.

43.     Another type of electromechanical touchscreen is generally known as a bending wave touchscreen.  One touchscreen that operates on this principle computes touch position by computing time of flight a vibration, generated by a touch, to an array of transducers positioned around the periphery of a glass plate.  Another compares the vibration signature of a touch at a given location to a stored map of nominal vibration signatures at the same location.

44.     An early type of optical touchscreen is known as "scanning infrared."  An array of pairs of infrared wavelength (IR) photodiodes and opposing phototransistors is placed near the surface of an intended touch surface or space, with one array in each axis.  The pitch between adjacent pairs of diodes and transistors is usually very small, and in many early touchscreens was limited entirely by the physical size of the IR devices.   When used with a display that has a relatively weak surface, such as a liquid crystal display (LCD), a protective lens is used for the display that also serves as a touch surface, and this lens may be incorporated into the touchscreen structure itself.  Touch is detected by turning on each diode-transistor pair in sequence in each axis, and detecting touch by the blocking of the IR light beam from the transistor by the user's finger or stylus.  Interpolation and processing beams at multiple adjacent transistors extends the resolution of this otherwise rather coarse resolution touchscreen.  Newer versions of this technology use waveguides coupled to a single IR light source to replace all the photodiodes and an integrated circuit-based detector array to replace the discrete phototransistors.  It is unclear whether or not this waveguide technology existed at the time of the filing of the patent application for present invention.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

45.     Many variations of front–mounted optical camera based systems exist today.  An IR light source broadly illuminates the front surface of a display panel in a narrow plane close and parallel to the display surface.  Reflections from the touch object—a finger or generally arbitrary stylus—are detected by optical sensors (cameras) with good azimuth resolution and accuracy mounted in the top left and right corners of the outer surface of the display panel, inside the display bezel.  A single touch is detected and triangulated by the cameras, each of which can "see" the entire display surface.

46.     Other optical systems using rear or edge mounted cameras to sense perturbations of the touch surface also exist.  These touchscreen systems generally did not commercially exist at the time of the filing of the patent application of the present invention.

47.     Another capacitive technology is projected capacitive.  Each axis of this type of touchscreen is typically comprised of arrays of equal width and equally spaced parallel lines (or stripes, or electrodes, etc.) of transparent conductive material such as ITO or conductive polymer such as Orgacon, etc., very small diameter (~10um) metal wire or very narrow lines of printed or deposited conductors, such as silver, copper, carbon nanotubes, graphene and the like.  Some of these materials were not available at the time of the filing of the application for the '607 patent, but serve to illustrate the range of possible implementations in a practical touchscreen electrode array that would be obvious to one of ordinary skill in the art.  Regardless of the specific construction, the intent is to produce essentially invisible lines. The two axes of the touchscreen are deposited on a single transparent substrate or built up from depositions on two substrates with the arrays positioned orthogonally. The arrays are separated in the "Z" axis by a small distance, typically 1mm or less.  The arrays are further separated from the intended touching surface by a similarly small distance by adding another dielectric layer over the upper conductive

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

array.  Controller circuitry to measure capacitance is connected to each line in one or both axes depending on the type of position sensing that is used. Position sensing is usually accomplished by one of the following methods: (1) Driving each stripe in each axis in sequence with an AC signal from the controller and measuring the amplitude of the signal across an appropriate load. When a finger or other conductive stylus approaches or touches the touchscreen surface, capacitive coupling to nearby array stripes attenuates the AC signal.  This attenuation is measured and can be interpreted as a touch in the vicinity of the stripe or stripes.  As the spacing between adjacent stripes is similar or slightly smaller than typical fingers or styli, the finger usually affects the capacitance of more than one stripe.  Interpolation of the magnitudes of the affected stripe capacitances significantly increases the resolution of the touch position.  This type of sensing is usually called "self capacitance" sensing; and (2) Driving each stripe with an AC signal in one axis in sequence and measuring the amplitude of the same signal which is coupled to each of the stripes in the orthogonal axis (the measurement axis).  The coupling is the result of the small capacitor which forms between the crossings of each stripe in one axis with each stripe in the orthogonal axis.  A touch at or near any of the crossed stripe capacitors of the touchscreen forms another capacitor between the stripes and the touch finger or conductive stylus (it must be conductive), which takes coupling away from the measurement stripes.  The signal is reduced on these stripes, which is measured and interpreted as a touch.  This type of sensing is called "mutual capacitance" sensing, as the capacitance is measured between nearby circuit elements (the stripes) rather than between a circuit element and a fixed reference point (*e.g.*, ground).  The same interpolation concept described for self-capacitance applies to mutual capacitance sensing touchscreens.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

48.     Resistive and surface capacitive touchscreens, which are constructed from transparent conductive films sputtered onto plastic and/or glass substrates, generally must be calibrated at least once to the display that they are mounted over, because of variations in the resistivity of the transparent conductive material caused by manufacturing processes in material and assembly. They may also change in touch location/output relationship due to wear and material degradation.  Projected capacitive touchscreen coordinate output resulting from a touch in a given location is virtually identical from unit to unit.  This is a consequence of the sensing method, which references each touch to a specific stripe in a fixed position.  Interpolation among adjacent stripes further refines that position.  This position sensing is essentially unaffected by material variations.  SAW touchscreens nominally produce the same coordinate output for a touch in a specific position.  However, SAW touchscreen controllers may "resize" the touchscreen and alter the touch location/output relationship if contamination that affects touch—especially liquids--stays at one end of a reflector array for a period of time.  Optical touchscreens usually do not require calibration and do not suffer from wear.

49.     Optics of touchscreens can be very important, especially outdoors and indoors near windows, during daylight hours.  The touchscreens most badly affected by these environments are those manufactured with conductive coatings—resistive types, surface capacitive types and projected capacitive types.  Optical and electromechanical types can more easily be enhanced to counter the effects of difficult lighting.

50.     Electromagnetic interference (EMI) is a potential problem in any electronic assembly.  The touchscreens most affected by system EMI are the capacitive types, both surface and projected.  While any source of EMI within a system could potentially affect the operation of the touchscreen, the video display because of its close proximity to the touchscreen is typically

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the most significant source of EMI affecting the touchscreen.  EMI can radiate or capacitively couple directly into the sensing elements of these touchscreens and also into connecting cables and the electronic controller of the touchscreen system.

51.     In addition to single touch technology, multi-touch developed as an effective approach for capturing gestures, distinguishing significant touches from accidental ones, and increasing the expressiveness and power of human computer interactions.  Multi-touch technology enables the identification of multiple simultaneous contact points on or in the proximity of the touch sensitive surface.  Providing these multiple concurrent stimuli to applications enables a richer set of interactions to be performed, i.e. panning, zooming, rotating, that otherwise would be less intuitive with single touch operations.

52.     Operational amplifiers configured to response to charge are key elements of touch sensing.  They sense the change in charge at the input to the operational amplifier or "op-amp," responding to the change in charge with an amplified change in output voltage.

53.     Inherent in many op-amps is associated Miller capacitance, which is the capacitance between the input and the output of the op-amp, increased by the gain of the op-amp.  Absent other feedback, it is the Miller capacitance that provides the capacitive feedback that makes an op-amp respond as a charge amplifier.  The Miller theorem states that the Miller capacitance can be treated as an equivalent pair of capacitors to ground, providing a virtual ground circuit.

## IX.   OVERVIEW OF THE '607 PATENT AND THE ASSERTED CLAIMS

54.     The '607 patent, entitled "Multipoint Touchscreen" was filed on May 6, 2004 and issued on February 16, 2010.  The patent has three named inventors:  Steve Hotelling, Joshua A. Strickon and Brian Q. Huppi.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

**B.**     **The Specification**

55.     The '607 patent is directed toward a touch panel having a "transparent capacitive sensing medium" configured to detect multiple touches or near touches that occur at the same time and at distinct locations on the touch panel and to produce distinct signals representative of those touches.

56.     As shown in Figures 9, below, the touchscreen includes a grid of transparent conductive lines or traces.  These conductive lines are arranged in two layers – one layer of straight horizontal lines (called "rows" in the '607 patent) and one layer of straight vertical lines (called "columns" in the '607 patent).  The conductive lines in each layer are parallel to each other.



FIG. 9

57.     As shown in Figure 10 of the '607 patent, the two layers are physically separated from each other by an insulator other so as to create a weak capacitor at each crossing point of the lines.  Glass is used for each of the layers.  A top, protective cover sheet is disposed over the layers of conductive lines to provide a smooth surface for an object, such as a finger tip, to slide thereon.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



FIG. 10

58.     The '607 patent describes self-capacitive and mutual capacitive embodiments. The mutual capacitive embodiment is described in all the asserted claims.  In this embodiment, during operation, the rows of "driving" conductive lines are charged, sequentially one at a time, while the columns of "sensing" conductive lines all sense, or measure, the change in capacitance at each intersection of the driving and sensing lines.  (*See* '607 patent at 5:47-6:6; 9:22-65). According to the description in the '607 patent, this drive/sense arrangement, which was used in many prior art touchscreens, allows for the detection of multiple touch events that occur at the same time.  (*Id.* at 5:1-14; 5:66-6:2).

**C.     The Asserted Claims**

59.     Apple has asserted claims 1-3, 6-8, 10 and 11 of the '607 patent (the "Asserted Claims") in this case against the Galaxy Tab 10.1 and claims 1-3, 6-8, and 10 against the Tab 7.0.  The Asserted Claims are reproduced here:

> **1.** A touch panel comprising a transparent capacitive sensing medium configured to detect multiple touches or near touches that occur at a same time and at distinct locations in a plane of the touch panel and to produce distinct signals representative of a location of the touches on the plane of the touch panel for each of the multiple touches, wherein the transparent capacitive sensing medium comprises:
>       a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another; and
>       a second layer spatially separated from the first layer and having a plurality of transparent second conductive lines that are electrically isolated from one another, the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

second conductive lines being positioned transverse to the first conductive lines, the intersection of transverse lines being positioned at different locations in the plane of the touch panel, each of the second conductive lines being operatively coupled to capacitive monitoring circuitry;

wherein the capacitive monitoring circuitry is configured to detect changes in charge coupling between the first conductive lines and the second conductive lines.

2. The touch panel as recited in claim 1 wherein the conductive lines on each of the layers are substantially parallel to one another.

3. The touch panel as recited in claim 2 wherein the conductive lines on different layers are substantially perpendicular to one another.

6. The touch panel as recited in claim 1 wherein the conductive lines are formed from indium tin oxide (ITO).

7. The touch panel as recited in claim 1, wherein the capacitive sensing medium is a mutual capacitance sensing medium.

8. The touch panel as recited in claim 7, further comprising a virtual ground charge amplifier coupled to the touch panel for detecting the touches on the touch panel.

10. A display arrangement comprising:

a display having a screen for displaying a graphical user interface; and

a transparent touch panel allowing the screen to be viewed therethrough and capable of recognizing multiple touch events that occur at different locations on the touch panel at a same time and to output this information to a host device to form a pixilated image;

wherein the touch panel includes a multipoint sensing arrangement configured to simultaneously detect and monitor the touch events and a change in capacitive coupling associated with those touch events at distinct points across the touch panel; and

wherein the touch panel comprises:

a first glass member disposed over the screen of the display;

a first transparent conductive layer disposed over the first glass member, the first transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths;

a second glass member disposed over the first transparent conductive layer;

a second transparent conductive layer disposed over the second glass member, the second transparent conductive layer comprising a plurality of spaced apart parallel lines having the same pitch and linewidths, the parallel lines of the second transparent conductive layer being substantially perpendicular to the parallel lines of the first transparent conductive layer;

a third glass member disposed over the second transparent conductive

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

layer; and

             one or more sensor integrated circuits operatively coupled to the lines.

**11.**  The display arrangement as recited in claim 10 further including dummy features disposed in the space between the parallel lines, the dummy features optically improving the visual appearance of the touch screen by more closely matching the optical index of the lines.

### D.    The Prosecution History

60.    I have reviewed the prosecution file history of the '607 patent.  The application that led to the '607 patent was rejected four times by the United Sates Patent and Trademark Office ("USPTO") in view of a variety of prior art references.

61.    On May 14, 2008, the USPTO rejected claims 1, 2, and 13 under § 102(e) as being anticipated by Hill et al. U.S. Pat. App. No. 2005/0146511 ("Hill").  Claim 29 was rejected under § 102(e) as being anticipated by Sharp U.S. Pat. No. 6,856,259 ("Sharp").  Claims 3-12 and 14-26 were objected to as being dependent on a rejected base claim, but would be otherwise allowable.  Claims 27, 28, 30, and 31 were withdrawn as being directed to a non-elected invention.

62.    On August 14, 2008, the applicants filed a response amending claims 1, 7, 13, and 15 and canceling claim 3, 14, and 29.  The applicants also added new claims 32-50.  More specifically, the applicants amended claim 1 to include the allowable features of claim 3 and amended claim 13 to include the allowable features of claim 14.

63.    On December 24, 2008, the USPTO issued a second non-final Office Action rejecting claims 1, 2, 7-9, 12, 13, 33-37, 39, 41-45, and 47-50 under § 102(e) as being anticipated by Vakil et al. U.S. Pat. App. No. 2005/0007349 ("Vakil").  Claims 2, 15-20, 32, 38, 40, and 46 were rejected under § 103(a) as being obvious over Vakil and Westerman et al. U.S. Pap. App.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

No. 2002/0015021 ("Westerman").  Claims 10, 11, and 21-26 were objected to as being

dependent on a rejected base claim, but would be otherwise allowable.

64.     On January 30, 2009, the applicants conducted a personal interview with the

Examiner.  During the in-face interview, claims 1, 7, and 13 were discussed.

65.     On February 20, 2009, a response was filed that amended claims 4-7 and 13 and

canceled claims 3, 14, and 29.  Notably, claim 7 was amended to recite "where the capacitive

monitoring circuitry is configured to detect changed in charge coupling between the first

conductive lines and the second conductive lines."  The applicants then went on to distinguish

Vakil from the claimed invention.  Specifically with respect to independent claim 7, the

applicants stated that "Vakil is only designed to detect a single touch…and cannot accurately

detect multiple touches or produce distinct signals representative of those touches."  *See*

February 20, 2009 Amendment, at 14.  The applicants also explained, again with respect to claim

7, that "Vakil is incapable of detecting near touches" and that "Westerman does not make up for

the deficiencies of Vakil."  *Id.*

66.     On June 2, 2009, the USPTO issued a third Office Action rejecting claims 13 and

47-50 under § 103(a) as being obvious over Hsu et al. U.S. Patent 7,030,860 ("Hsu") and

Fujimoto U.S. Patent 6,061,177 ("Fujimoto ").  Claims 1, 2, 4-12, and 32-45 were allowed and

claims 24-26 and 46 were objected to as being dependent on a rejected base claim, but would be

otherwise allowable.

67.     In response to the Office Action, the applicants filed a response on July 1, 2009

amending claims 10, 15, 19, 21, 23-25, and 46 and canceling claims 13, 27, 28, 30, 31, and 47-

50.  The amendments merely canceled the rejected and withdrawn claims and rewrite the

objected to claims in independent form.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

68.     On November 12, 2009, the USPTO issued a fourth Office Action rejecting

claims 1, 4-6, 24, 33-37, 39, and 41-45 under § 103(a) as being obvious over Aufderheide et al.

U.S. Pat. App. No. 2005/0083307 ("Aufderheide") in view of Fujimoto.  Claims 2, 15-20, 32, 38,

40, and 46 were rejected under § 103(a) as being obvious over Aufderheide, Fujimoto, and

Westerman.  Claims 7-12, 25 and 26 remained allowed and claims 21-23 were objected to as

being dependent on a rejected base claim, but would be otherwise allowable.

69.     On November 30, 2009, the applicants filed a response canceling all rejected and

objected to claims, allowing claims 7-12, 25, 26, and 36-38 to issue.

70.     The application was ultimately allowed on December 16, 2009.  Claim 7 of the

application issued as independent claim 1 of the '607 patent and claim 25 of the application

issued as claim 10 of the '607 patent.

## X.      DISPUTED TERMS FROM THE ASSERTED CLAIMS AND THE PARTIES' PROPOSED CONSTRUCTIONS

71.     The parties disagree about only a single disputed claim term.[3]  The Court recently

issued its Order Construing Disputed Claim Terms dated April 4, 2012 (Exhibit F), and I have

applied the Court's construction for the term below in my analysis.

| '607 Patent Term | Court's Construction |
| --- | --- |
| "glass member" (claim 10) | "a member made of glass" |

72.     I note that the Court agreed with Samsung that the term "glass member" should be

given its plain and ordinary meaning to be exclusive of plastic materials.  (Exhibit F at 28).

---

[3] Although Samsung initially disputed the term "capacitive monitoring circuitry," I understand
that Samsung has dropped this claim term in order to streamline the case.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## XI.    NON-INFRINGEMENT OPINIONS WITH RESPECT TO THE '607 PATENT

73.    For the reasons below, it is my opinion that the Accused Products do not infringe any of the Asserted Claims of the '607 patent, either literally or under the doctrine of equivalents.

### A.    None of the Accused Products are Configured to Detect Near Touches (Claims 1-3 and 6-8)

74.    Independent claim 1 requires "a transparent sensing medium configured to detect multiple touches *or near touches* that occur at a same time and at distinct locations."[4]  *See* Claim 1.  The applicants argued during prosecution of the application that led to the '607 patent that the ability to detect *near touches* was an important distinction between the claimed invention and the Vakil reference.  *See* § VIII(D) above.  In fact, the USPTO allowed then pending claim 6 (which issued as independent claim 1) *immediately after* these remarks by the applicants about the ability of the claimed invention to detect near touches.  A portion of the applicants' arguments is reproduced below:

> As discussed and agreed upon at the interview, this combination of features is neither disclosed nor suggested by Vakil.  Vakil is only designed to detect a single touch on the keypad of a mobile phone, for example, and cannot accurately detect multiple touches or produce distinct signals representative of those touches.  Because pressure is required to short two overlapping pad segments together, Vakil is incapable of detecting near touches.  Because all pad segments on any one layer are connected together via a single trace, Vakil fails to disclose electrodes having individual traces.  Vakil discloses detecting a change in voltage to detect a touch, and therefore the pad segments in Vakil are not coupled to capacitive monitoring circuitry.  Furthermore, Westerman does not make up for the deficiencies of Vakil.

(February 20, 2009 Amendment (emphasis added)).

---

[4]  Apple does not contend that the preamble of claim 1 is not limiting, nor could they because the preamble clearly limits the structure of the claimed invention and is necessary to give "life, meaning, and vitality" to the claim.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

75.     Because the applicants clearly distinguished the Vakil reference from the claimed invention on the ground that Vakil could not detect near touches, it is my understanding that Apple is now estopped from asserting that claim 1 does not require the ability to detect near touches.

1.     **No Literal Infringement**

76.     Dr. Maharbiz cites to absolutely *no* evidence that any of the Accused Products can detect near touches.  In fact, the only mention of near touches in the Maharbiz Report appears in connection with the final limitation of claim 1 where Dr. Maharbiz makes the conclusory statement: "Indeed, all of the accused devices of Samsung I examined detected touches or near touches using mutual capacitance detection circuitry."  (Maharbiz Report at 24-25).

77.     Dr. Maharbiz then cites three documents in support of this statement; however, I have reviewed the cited documents and not one of these documents describes or even suggests the ability of any of the Accused Products to detect near touches.  The first document (ATMEL-HTC00000382) merely describes the sensor construction and electrode configuration at a high level and does not describe or explain the ability to detect near touches.  The second document (ATMEL-SAMSUNG00001188-199) is an Atmel mXT1386 touchscreen controller summary that includes technical specifications and pinouts for the controller, but does not mention any support for the detection of near touches.  The final document (SAMNDCA00298652) is a page from the approval sheet for the Atmel mXT1386 touchscreen controller that merely mentions the ability to "classify and track finger touches with a high degree of accuracy." (SAMNDCA00298652).  The approval sheet is silent as to the ability to detect near touches.

78.     As described above, Apple has presented no evidence whatsoever that the Accused Products contain a transparent sensing medium configured to detect multiple touches *or*

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

*near touches* that occur at a same time and at distinct locations on the touch panel.  For this reason alone, it is my opinion that Apple has not met its burden of proving infringement of claims 1-3 and 6-8.

### 2.     No Infringement Under the Doctrine of Equivalents

79.     Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, I understand that Apple is estopped from claiming equivalency under the doctrine of prosecution history estoppel because of statements made during prosecution that clearly indicate that claim 1 requires the ability to detect near touches.  *See* § IV and discussion above.

80.     Moreover, the ability to detect near touches as well as actual touches is not an insubstantial difference between the Accused Products and the claimed invention.  A transparent sensing medium that cannot detect near touches does not perform substantially the same function in substantially the same way to obtain substantially the same result as a sensing medium that is capable of detecting both actual touches as well as near touches.  The former requires physical contact with the sensing medium, while the latter does not.  For these reasons, it is also my opinion that the Accused Products do not infringe claims 1-3 and 6-8 under the doctrine of equivalents.

### B.     None of the Accused Products Include Capacitive Monitoring Circuitry that is Configured to Detect Changes in Charge Coupling Between the First Conductive Lines and the Second Conducive Lines (Claims 1-3 and 6-8)

81.     Claims 1-3 and 6-8 also require that the claimed capacitive monitoring circuitry be "configured to detect changes in charge coupling between the first conductive lines and the second conductive lines."  I understand that the claimed "first conductive lines" refers to the "plurality of transparent first conductive lines" recited earlier in claim 1 and the claimed "second

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

conductive lines" refers to the "plurality of transparent second conductive lines" also recited earlier in claim 1.

### 1.    **No Literal Infringement**

82.    Unlike certain embodiments described in the '607 patent, the Accused Products scan the touchscreen one row at a time until all rows have been scanned. (*See* "Scanning Sequence" below at SAMNDCA00298655). Rows are scanned by driving a single horizontal drive line and sensing on all intersecting vertical sense lines. After the sensing is completed, the first horizontal line driven is returned to a high impedance state. The next horizontal line is then driven and all intersecting vertical lines are sensed. This process continues until the entire touchscreen is scanned. *Id.* As such, any capacitive monitoring circuitry present in the Accused Products can only detect changes in charge coupling between a single X line and the Y lines that intersect the single driven X line. At no time does the capacitive monitoring circuitry in the Accused Products detect changes in charge coupling between the plurality (or even more than one) of the first conductive lines and the plurality of second conductive lines. If a drive/sense arrangement is to be used, then claim 1 requires driving all the X lines simultaneously and sensing on all the Y lines so that the change in charge coupling between all of the lines is detected. In fact, because of this sequential process, some changes in charge coupling would be missed by the Atmel circuitry, namely a flick or gesture that occurs in phase but offset from the scanning sequence. Such a gesture would be recognized by a device practicing the invention described in claim 1 of the '607 patent.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**3.3 Scanning Sequence**

All channels are scanned in sequence by the chip set. There is full parallelism in the scanning sequence to improve overall response time. The channels are scanned by measuring capacitive changes at the intersections formed between the first X line and all the Y lines. Then the intersections between the next X line and all the Y lines are scanned, and so on, until all X and Y combinations have been measured.

The chip set can be configured in various ways. It is possible to disable some channels so that they are not scanned at all. This can be used to improve overall scanning time.

(SAMNDCA00298655).

83.     The requirement of all the X lines to be driven at the same time is also evident from other language in claim 1.  For example, the preamble of claim 1 recites that the sensing medium is configured to detect multiple touches or near touches "at a same time and at distinct locations in a plane of the touch panel."  In the Accused Products, as described above, the touchscreen is scanned one row at a time.  The only time that the Accused Products can detect two or more touches at the same time is when those touches are both at or near the same drive line.  Essentially, this means that the Accused Products can only detect two or more touches at the same time when these touches are at or near the same horizontal position on the touch panel.

84.     The '607 patent clearly indicates that the advantage of detecting multiple touches is present when touches on *different rows* can be detected at the same time.  Figure 2 shows that the patent is intended to cover a device that can detect touches on different rows at the same time.  Figures 2 and 3 show that the touches that are producing distinct signals as claimed are on different rows.  The patent explains that "[t]he multipoint sensing arrangement is capable of simultaneously detecting and monitoring touches and the magnitude of those touches at distinct points *across* the touch sensitive surface 38 of the touch screen 36."  ('607 patent at 5:2-6 (emphasis added)).  Furthermore, the '607 patent admits that the projection scanning technique in the prior art shown in Figure 1 of the '607 patent (reproduced below) can detect two touches at

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the same time if they are in the same row and distinguished itself over prior art based on this limitation.  (*See, e.g.,* '607 patent at 2:7-22; 4:34-48).



85.     In my opinion, claim 1 requires detecting two or more touches at the same time *anywhere on the touch panel* and not just along one drive electrode.  Anything less is inconsistent with the teachings of the patent.  Detecting two or more touches anywhere on the touch panel at the same time requires detecting the change in charge coupling between more than just a single "drive" line and intersecting "sense" lines at the same time.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



FIG. 2

86. Also, as indicated from the Atmel documentation, it is possible to disable some of the lines or "channels" in the Accused Products so that the disabled channels are not scanned (*e.g.*, driven or sensed) at all. (SAMNDCA00298655). In these cases, the capacitive monitoring circuitry would also not be configured to detect changes in charge coupling between the plurality of first conductive lines and the plurality of second conductive lines.

87. It is therefore my opinion that the Accused Products do not infringe this limitation literally.

2.   **No Infringement Under the Doctrine of Equivalents**

88. Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, I note that this limitation was added via a narrowing amendment during prosecution. *See* § VIII(D) above. I understand, therefore, that equivalency is not available for this limitation.

89. In any event, as I noted earlier in this section, the '607 patent itself highlights the significance of the distinction between detecting simultaneous touches on a single row and detecting simultaneous touches throughout the touch panel. Capacitive monitoring circuitry that scans one line at a time therefore does not perform substantially the same function in

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

substantially the same way to obtain substantially the same result as capacitive monitoring circuitry that drives all the X lines simultaneously and senses on all the Y lines at the same time. The former can only detect multiple touches at or near the same drive line, while the latter can detect multiple touches anywhere across the touch panel.  For instance, if all the rows are driven at different frequencies, the sensors could discriminate multiple signals and detect the capacitance concurrently through filtering or some other selection process.

90.     For these reasons, it is also my opinion that the Accused Products do not infringe claims 1-3 and 6-8 under the doctrine of equivalents.

### C.     The Galaxy Tab 7.0 Does Not Include a First Layer Having a Plurality of Transparent First Conductive Lines (Claims 1-3 and 6-8)

91.     Claims 1-3 and 6-8 also require "a first layer having a plurality of transparent first conductive lines that are electrically isolated from one another."  *See* Claim 1.  The only depicted embodiments in the '607 patent of "conductive lines" are straight electrode strips each with a substantially constant width.  For example, Figure 2, shown above, includes a grid-like array of horizontal and vertical "lines," with each line having a substantially constant width.  Figures 11A and 11B show similar arrangements, where the conductive lines 206 and 208 are strips of conductive material having a constant width that intersect each other at right angles.  Although the specification mentions that the size, shape, and number of the "electrodes" may vary, the reference to conductive "lines" appears in connection with "lines or wires."  (*See, e.g.,* '607 patent at 9:52-52 ("two layer grid of spatially separated lines or wires"); 13:13-15 (same)).  As such, the specification only contemplates a conductive "line" of substantially constant width.  This interpretation comports with the plain meaning of a "line" or "wire" as would be understood by one of ordinary skill in the art.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**



92.     Moreover, the specification uses terms other than "line" to signify geometries other than lines of constant width.  For example, the term "electrode" is used when specifically referring to "squares, circles, ovals, triangles, rectangles, polygons, and the like."  (*Id.* at 11:7-10).  If the patentee wished to claim electrode configurations of non-uniform width, then the term "electrode," "pattern," or some other more generic term would have been used.  I also understand that when there is ambiguity as to the scope of a claim limitation, that limitation is to be construed narrowly and against the drafter.  Moreover, it is my opinion that there is no clear redefinition of the term "line" that would warrant any broader interpretation.

93.     As such, one of ordinary skill in the art at the time the invention was made would understand these "conductive lines" to be "narrow extents of conductive material having substantially constant width."

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

1.    **No Literal Infringement**

94.    Using the proper construction of conductive lines defined above, the Galaxy Tab

7.0 clearly does not include "a first layer having a plurality of transparent first conductive lines

that are electrically isolated from one another."  As shown in Apple's own schematic diagram

and scanning electron micrograph of the first layer below, the electrodes on the first layer are

actually a "saw-tooth" or "ladder" pattern.  These electrodes cannot be considered conductive

"lines" as properly construed because they are not narrow extents of conductive material having

substantially constant width.  In fact, the electrodes in the first layer of the Galaxy Tab 7.0 are

not constant width "lines" or "wires" in traditional sense that would be understood by a person of

ordinary skill in the art.



95.    It is therefore my opinion that the Galaxy Tab 7.0 does not infringe this limitation

literally.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

### 2.    No Infringement Under the Doctrine of Equivalents

96.    Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, I note that this limitation was subject to a narrowing amendment and the doctrine of equivalents is not available for this limitation.  For example, then pending claim 7 (which issued as claim 1) was amended twice during prosecution, once on August 14, 2008 and again on February 20, 2009 in response to rejections made by the USPTO.  The "first layer" limitation was expressly amended in the February 20, 2009 Amendment by the applicants in response to a rejection over the Vakil reference.  *See* § VIII(D) above.

97.    In any event, the use of a saw-tooth electrode pattern is not an insubstantial difference over using conductive "lines" of substantially constant width.  As explained in more detail below and shown and labeled in Apple's schematic above, the electrode pattern used in the Galaxy Tab 7.0 creates a more complicated and discontinuous overlap pattern with the second electrode layer.  Because the points of intersection between the two layers of electrodes are the critical "virtual" capacitor nodes where the change in capacitive coupling is detected and measured, the use of the saw-tooth electrode pattern does not perform substantially the same function in substantially the same way to obtain substantially the same result as the use of the claimed conductive lines.  In fact, the two arrangements operate quite differently, with the arrangement used in the Galaxy Tab 7.0 requiring much more complicated analysis to determine the correct point of contact because of the multiple points of overlap with the second electrode layer.  There are various benefits and advantages of this additional complexity, including the capacity for more accurate location detection, depending on the precise electrode size and shapes used.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

98.     The saw-tooth pattern was implemented instead of straighter lines for a number of reasons.  For example, the saw-tooth pattern will increase the coupling to the finger compared to a straight line.  The saw-tooth pattern can also increase the mutual capacitance with another nearby electrode, depending on the configuration.  It is the reduction in mutual capacitance when the finger is in proximity that is measured in a mutual capacitance sensor.  The pattern can also increase the sensitivity to the touch location for lateral movements of the finger.  For all these reasons, the use of the saw-tooth electrode pattern does not perform substantially the same function in substantially the same way to obtain substantially the same result as the use of the claimed conductive lines.

99.      For these reasons, it is also my opinion that the Galaxy Tab 7.0 does not infringe claims 1-3 and 6-8 under the doctrine of equivalents.

D.     **The Galaxy Tab 7.0 Does Not Include a Second Layer…Having a Plurality of Transparent Second Conductive Lines (Claims 1-3 and 6-8)**

1.     **No Literal Infringement**

100.    For many of the same reasons as described above in connection with the "first layer" limitation, the Galaxy Tab 7.0 also does not include a "second layer…having a plurality of transparent first conductive lines that are electrically isolated from one another."  *See* Claim 1.  For example, as shown in Apple's own schematic diagram and scanning electron micrograph of the second layer below, the electrodes on the second layer are similar to thinner versions of the "saw-tooth" or "ladder" pattern on the first layer.  These electrodes cannot be considered "lines" as properly construed because they are not narrow extents of conductive material having substantially constant width.  In fact, the electrodes in the second layer of the Galaxy Tab 7.0 look nothing like lines or wires in traditional sense or as would be understood by a person of ordinary skill in the art.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



101.    It is therefore my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally.

2.    **No Infringement Under the Doctrine of Equivalents**

102.    Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, I note that this limitation was subject to a narrowing amendment and the doctrine of equivalents is not available.  For example, then pending claim 7 (which issued as claim 1) was amended twice during prosecution, once on August 14, 2008 and again on February 20, 2009 in response to rejections made by the USPTO.  The "second layer" limitation was expressly amended in the February 20, 2009 Amendment by the applicants in response to a rejection over the Vakil reference.  *See* § VIII(D) above.

103.    In any event, as described above in connection with the first layer limitation, the use of a saw-tooth electrode pattern is not an insubstantial difference over using conductive lines.  As explained in more detail below and shown and labeled in Apple's schematic above, the electrode pattern used in the Galaxy Tab 7.0 creates a more complicated and discontinuous

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

overlap pattern with the first electrode layer.  Because the points of intersection between the two layers of electrodes are the critical "virtual" capacitor nodes where the change in capacitive coupling is detected and measured, the use of the saw-tooth electrode pattern does not perform substantially the same function in substantially the same way to obtain substantially the same result as the use of the claimed conductive lines.

104.    For these reasons, it is also my opinion that the Galaxy Tab 7.0 does not infringe claims 1-3 and 6-8 under the doctrine of equivalents.

**E.    The Galaxy Tab 7.0 Does Not Include Second Conductive Lines that are Positioned Transverse to the First Conductive Lines (Claims 1-3 and 6-8)**

**1.    No Literal Infringement**

105.    For many of the same reasons as described above in connection with the "first layer" and "second layer" limitations, the Galaxy Tab 7.0 also does not include "second conducive lines being positioned transverse to the first conductive lines," as required by claim 1. As shown above in Apple's schematic diagram, the "lines" on the first layer take the shape of a saw-tooth pattern.  This pattern is clearly not a "line" and therefore cannot be considered transverse to any other "line."  As would be understood by one of ordinary skill in the art, "transverse" means extending cross-wise at right angles.  This term is meaningless in the context applied here where you have irregular patterns with non-constant width and wings (or other protrusions) already extending perpendicularly from what Apple calls a "line."

106.    The pattern of electrodes used in the Galaxy Tab 7.0 sharply contrasts the arrangement depicted in the '607 patent.   As described above in connection with the "first layer" limitation, the '607 patent only contemplates straight electrode lines having constant width that intersect at right angles with other straight lines having a constant width to form a grid-like array. (*See, e.g.,* '607 patent, Figures 9, 11A, and 11B).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



107.   The use of claim terms such as "lines" and "transverse" were clearly intended to over cover only grid-like arrangements like the one shown above.  These terms are meaningless in an arrangement such as the one used in the Galaxy Tab 7.0.

108.   It is therefore my opinion that the Accused Products do not infringe this limitation literally.

## 2.   No Infringement Under the Doctrine of Equivalents

109.   Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, I note that this limitation was subject to a narrowing amendment and the doctrine of equivalents is not available.  For example, then pending claim 7 (which issued as claim 1) was amended twice during prosecution, once on August 14, 2008 and again on February 20, 2009 in response to rejections made by the USPTO.  Both the "first layer" and "second layer" limitations were expressly amended in the February 20, 2009 Amendment by the applicants in response to a rejection over the Vakil reference.  *See* § VIII(D) above.  I understand, therefore, that equivalents are not available for this limitation.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

110.   In any event, as described above in connection with the first layer and second layer limitations, the use of saw-tooth electrode patterns is not an insubstantial difference over using conductive lines.  As explained in more detail below and shown and labeled in Apple's schematic above, the electrode pattern used in the Galaxy Tab 7.0 creates a more complicated and irregular overlap pattern between the first and second electrode layers.  Because the points of intersection between the two layers of electrodes are the critical "virtual" capacitor nodes where the change in capacitive coupling is detected and measured, the use of the saw-tooth electrode pattern does not perform substantially the same function in substantially the same way to obtain substantially the same result as the use of the claimed conductive lines.

111.   For these reasons, it is also my opinion that the Galaxy Tab 7.0 does not infringe of claims 1-3 and 6-8 under the doctrine of equivalents.

### F.   The Galaxy Tab 7.0 Does Not Include Conductive Lines on Each of the Layers that are Substantially Parallel to One Another (Claim 2)

112.   For similar reasons as those described above, the Galaxy Tab 7.0 does not include "conductive lines on each of the layers [that] are substantially parallel to one another," as recited by claim 2.  Apple provides virtually no explanation of how or why the conductive lines on each of the two layers in the Galaxy Tab 7.0 are substantially parallel to one another.  Dr. Maharbiz merely states in a conclusory fashion that this is so and only provides the two Scanning Electron Micrographs show below as support.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

 

113.     First, the micrograph shown on the left shows a single electrode pattern on the first layer of the Galaxy Tab 7.0 and two partial patterns (one to the left and one to the right).  It is unclear how these three patterns are "substantially parallel to one another" when each "line" takes the form of a saw-tooth pattern.  It is unclear whether Apple is alleging the teeth are substantially parallel or each pattern without the teeth are substantially parallel (or some other portion of the "line" is substantially parallel to some similar portion of an adjacent line).  In any event, as described above, terms such as "lines," "transverse," and "parallel" are meaningless in the context used here.

114.     Apple's analysis of the second layer (shown in the micrograph on the right) suffers from the same flaws.  Dr. Maharbiz merely states in a conclusory fashion that the patterns in this layer are also substantially parallel to one another and cites only the micrograph shown above as support.  It is unclear what exactly in this micrograph Apple is alleging to be substantially parallel.  The narrower "winged" protrusions might be substantially parallel to each other, but these protrusions are positioned at right angles to what Apple is calling the "lines" and are not positioned transverse to the lines on the first layer, as required by the claim.  The "lines" without the winged protrusions might also be considered substantially parallel, but this ignores

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the winged protrusions completely which are clearly part of the "lines." Once again, Apple's application of these claim limitations is clearly strained, as these limitations were not intended to cover electrode arrangements such as the one used in the Galaxy Tab 7.0.

115.   It is therefore my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally. Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, it is my opinion that the Galaxy Tab 7.0 also does not infringe under the doctrine of equivalents for the same reasons as described above in connection with the first and second layer limitations.

### G.   The Galaxy Tab 7.0 Does Not Include Conductive Lines on Different Layers that are Substantially Perpendicular to One Another (Claim 3)

116.   For similar reasons as those described above in connection with claim 2, the Galaxy Tab 7.0 does not include "conductive lines on different layers [that] are substantially perpendicular to one another," as recited by claim 3. Apple merely alleges that the Accused Products contain conductive lines that are "oriented substantially along the X and Y axes, respectively, of a Cartesian grid." (Maharbiz Report at 28-29). As described above, however, the "lines" of the Galaxy Tab 7.0 are not lines at all. It is therefore unclear what lines or portions of lines could be substantially perpendicular to one another. As shown in micrographs above, what Apple calls the "lines" each have perpendicular protrusions (sometimes referred to as "saw-teeth" or "wings"). Because the "lines" themselves have substantially perpendicular components, it is meaningless to say that these lines are substantially perpendicular to some other "lines." Once again, Apple's application of these claim limitations is clearly strained, as the terms were not intended to cover electrode arrangements such as the one used in the Galaxy Tab 7.0.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

117.    It is therefore my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally.  Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, it is my opinion that the Galaxy Tab 7.0 also does not infringe under the doctrine of equivalents for the same reasons as described above in connection with the substantially parallel limitation.

### H.    Apple Has Not Shown that the Accused Products Include a Virtual Ground Charge Amplifier (Claim 8)

118.    Apple initially tries to define the phrase "virtual ground charge amplifier" even though this phrase is not a term of art and not understood outside the context of the '607 patent.  For example, Brian Q. Huppi, an inventor of the '607 patent, confirmed this when he testified that he had never heard this phrase used outside of Apple.  (Huppi Dep. Tr. 98:2-5).  Mr. Huppi explained that this phrase is merely an "operational amplifier [] that was configured such that it held the inputs to be at the same potential as ground."  (*Id.* at 96:19-97:9).  Apple appears to allege that the claimed "virtual ground charge amplifier" is merely an "inverting amplifier" in the configuration shown in Figure 13 of the '607 patent.   (Maharbiz Report at 34).  Apple then alleges that any "charge/current integration" used in connection with the monitoring of a touchscreen would meet this claim limitation.  (*Id.* at 34-35).

119.    Despite applying an amorphous and broad interpretation of this limitation, Apple still does not cite to any evidence that the Accused Products include a virtual ground charge amplifier.  Apple relies entirely on the deposition testimony of an Atmel representative, Mr. Brunet, who merely stated that "we have a system of current integration."  *Id.* at 35.   There was no testimony that this "system" included a virtual ground charge amplifier or even an amplifier at all.  This single response to a question relating to a "charge to voltage amplifier" is wholly insufficient to meet Apple's burden of proving infringement.  (Brunet Dep. Tr. 263:21 – 264:1).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

120.     Moreover, Mr. Brunet specifically testified that the Atmel products do <u>not</u> include a charge amplifier and he was not sure if they even included an operational amplifier.

> Q:     Do the Atmel touch screen controller chips include a charge amplifier?
> A:     ***No, they don't.***
> Q:     Do they include an operational amplifier?
> A:     It really is outside my expertise. I can't say exactly what the implementation of how the integrated circuit is implemented in the device. That would be really -- that would have to be answered by someone else.

(Brunet Dep. Tr. 262:17-263:3 (emphasis added) (objection omitted)).

121.     In light of this testimony from Atmel that the touchscreen controllers in the Accused Products do not contain a charge amplifier, it is puzzling how Apple can rely on the same deposition transcript for support that the Accused Products contain a virtual ground charge amplifier.  In my opinion, the testimony from Atmel clearly indicates that the Accused Products do not infringe this claim limitation and Apple's reliance on other portions of this same deposition transcript is misleading and unfairly characterizes Mr. Brunet's clear and undisputed testimony.

122.     Apple also cites to an Atmel design guide entitled "MaxTouch Sensitivity Effects for Mobile Devices."  (Maharbiz Report at 35-36).  As admitted by Dr. Maharbiz in his report, however, this document merely describes a "preferred configuration."  (*Id.* at 36; ATMEL-SAMSUNG00000286-0301).  Apple has proffered absolutely no evidence that this "preferred configuration" is actually included in the specific touchscreen controller models in the Accused Products.  Rather, as testified by Atmel, the Accused Products do not include a charge amplifier of any kind.  (Brunet Dep. Tr. 262:17-263:3).

123.     It is therefore my opinion that the Accused Products do not infringe this limitation literally.  Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, it is my opinion that the Accused Products do not infringe under

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the doctrine of equivalents as well.  According to Atmel, any operational amplifier used in the Accused Products would not be in a charge amplifier configuration; therefore, any such amplifier would be substantially different than the claimed virtual ground charge amplifier.

**I.      The Accused Products Do Not Include: (1) a First Glass Member Disposed Over the Screen of a Display; and Do Not Include (2) a Second Glass Member Disposed Over the First Conductive Layer (Claims 10 and 11)**

124.    As described above, the Court already agreed with Samsung that the term "glass member" must be construed to mean "a member made of glass" instead of "a glass *or plastic* material."  *See* § IV above.  As such, independent claim 10 and dependent claim 11 require three separate members made of glass: a first glass member disposed over the screen of the display; a second glass member disposed over the first transparent conductive layer; and a third glass member disposed over the second transparent conductive layer.  This construction requires a stacking of three distinct members made of glass above the display screen.

1.       **No Literal Infringement**

125.    It is undisputed that the Accused Products only include one glass protective layer on top of other layers made of plastic.  For example, Apple's own schematic diagram of both the Tab 7.0 and the Tab 10.1 show an LCD screen with a first layer of plastic, a second layer of plastic, and then a single glass cover.



SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

(*See* Maharbiz Report at 41)

126.    This plastic-plastic-glass arrangement is completely consistent with Apple's own Scanning Electron Micrographs and schematic diagrams in their preliminary infringement contentions, reproduced below.  If fact, Apple has never even alleged that any of the Accused Products include more than one glass layer.  (*See* Maharbiz Report at 43-63).





127.    As shown above, the layer labeled "LCD" would correspond to the screen of the display.  What Apple alleges is the "first glass member" is labeled as "plastic"; what Apple alleges is the "second glass member" is labeled as "plastic"; and the "third glass member" is the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

protective cover glass layer.  It is clear, therefore, that the Accused Products actually use two *plastic* layers under a piece of cover glass and not three "members made of glass," as required by this Court's claim construction order.  *See* § IV above.

128.    It is therefore my opinion that the Accused Products do not infringe these limitations literally.

### 2.    No Infringement Under the Doctrine of Equivalents

129.    Interestingly, Apple alleges that to the extent the claimed "glass members" must literally be composed of "just actual glass," then a plastic layer is substantially equivalent.  (*Id.* at 43-44).  This argument fails for several reasons.

130.    First, this Court's claim construction order specifically forecloses the claimed first, second, or third "glass members" from being made of plastic.  As explained above, Apple urged this Court to accept a definition of "glass or plastic material" for the claimed "glass members" and the Court declined to do so.  Instead, this Court agreed with Samsung's proposed construction that a glass member must be made of glass.  (Exhibit F at 28).

131.    Second, both glass and plastic members are clearly described in the specification.  (*See, e.g.,* '607 patent at 12:60-62; 14:60-62).  However, Apple chose only to claim members made of glass.  Therefore, I understand that means Apple has therefore dedicated the use of plastic members to the public.  It is my understanding that subject matter dedicated to the public cannot be infringed.  The use of plastic members is clearly disclosed as an alternative to using glass members, as explained below and conceded by the inventors of the '607 patent.  Hence, it is my understanding that Apple is now foreclosed from alleging the claims cover members made of plastic pursuant to the "disclosure-dedication rule."

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

132.    Third, based on my review of the prosecution history of the '607 patent and my understanding of prosecution history estoppel and the availability of equivalents where a claim is subject to a narrowing amendment, it is my opinion that a presumption of estoppel has been created with respect to this limitation.  For example, then pending claims 13 and 25 of the application that led to the '607 patent (then pending claim 25 was rewritten to include subject matter from claim 13 before issuing as claim 10) were subject to three separate amendments which, in my opinion, narrowed the claimed subject matter, either by adding a limitation to the element itself, narrowing the element itself, or narrowing the scope of the claimed subject matter as a whole.  It is therefore my understanding that the doctrine of equivalents is not available for this limitation.

133.    Fourth, Mr. Maharbiz completely ignores the deposition testimony of several named inventors of the '607 patent who clearly articulated the advantages and disadvantages of using glass versus plastic layers and testified that the two materials have different characteristics and benefits.  (*See* Huppi Dep. Tr. at 89:10-90:9, 91:2-13; Strickon Dep. Tr. at 166:5-167:6).  For example, when Mr. Huppi was asked about the use of glass versus plastic, he testified "some pros to using glass are potentially the durability of glass as far as its scratch resistance, and it has a different dielectric constant than plastic, so there could be a potential pro to using glass.  That's just a couple of examples."  (Huppi  Dep. Tr. at 91:2-13).

134.    I agree with the Apple inventors that glass and plastic are not substantially equivalent materials.  For example, glass and plastic have different physical properties such as weight and scratch resistance.  In addition, the cost of the two materials varies widely.  Moreover, the electrode patterning process on glass is different than the patterning process on plastic, the dielectric constants between the two materials vary widely, and a completely

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

different electrode trace design might be needed when switching from glass to plastic members.

For all these reasons, the use of plastic layers does not perform substantially the same function in

substantially the same way to obtain substantially the same result as the use of glass layers.  An

entirely new electrode design must be formed when switching from glass to plastic or plastic to

glass layers.  (*See* Huppi Dep. Tr. 175:3-12).

135.    Moreover, Apple specifically considered both plastic and glass layers in their

initial prototypes and rejected plastic because there were substantial differences between the two

materials.  Mr. Huppi, when asked about the interchangeability of glass and plastic layers

testified as follows:

> Q:    Were glass and plastic interchangeable in use in your touch –
>         in your multi-touch panel?
> A:    Again, I can tell you that we used glass in our prototypes.
>         **Both glass and plastic were considered.**  I wouldn't say they're exactly
>         interchangeable in that **their dielectric constants are
>         different, so that has to be taken into consideration
>         in the design.**

(Huppi Dep. Tr. 175:3-12 (emphasis added) (objection omitted)).

136.    For all these reasons, it is my opinion that the Accused Products do not infringe

these limitations under the doctrine of equivalents as well.

**J.    The Galaxy Tab 7.0 Does Not Include a First Conductive Layer Comprising
        a Plurality of Spaced Apart Parallel Lines Having the Same Pitch and
        Linewidths (Claims 10 and 11)**

137.    The Galaxy Tab 7.0 does not include a "first conductive layer comprising a

plurality of spaced apart parallel lines having the same pitch and linewidths," as recited by claim

10.

**1.    No Literal Infringement**

138.    First, as described above in connection with claim 2, the so-called "lines" are not

lines at all and are certainly not parallel to each other on either of the two layers.  Second, Apple

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

alleges that the same linewidth is approximately 4.2 mm.[5]  (Maharbiz Report at 49-50).  This linewidth, however, completely ignores the saw-tooth portions of the pattern, as shown in Apple's micrograph.  (*Id.* at 50).  The saw-tooth portions of the pattern add another 4.43 mm according to Apple's micrograph so the actual linewidth varies from 4.21 mm, which Apples labels as the linewidth in the micrograph below, to 4.21 + 4.43 = 8.64 mm.

139.    This claim limitation is clearly intended only to cover "lines" or "wires" of constant width and not the pattern shown below, which is clearly not a "line."



---

5   I have not had a chance to interview Ian Ward or a representative of Evans Analytical Group who was responsible for the measurements contained in the Scanning Electron Microscope (SEM) Laboratory Analysis Reports dated March 9, 2012.  It is my opinion that the methodology used in both of these reports is flawed and inherently unreliable.  As one example, the reports quote a universal uncertainly in SEM measurements of approximately ±10%.  (*See* Maharbiz Report at Exhibit C-4; Exhibit D-4).  I believe the actual uncertainty is much higher and in any event, comparing two SEM measurements with such a high level of uncertainty provides virtually no evidence or support for two measurements having the same or similar values.  Since Apple provides no other evidence or support for these limitations, it is my opinion that Apple has not met its burden of proving infringement.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

140.    Moreover, there is an etch gap (the spacing between the "lines") of only 0.24 mm. While this etch gap appears constant in the micrograph above, this edge gap cannot be considered a "pitch."

141.    It is therefore my opinion that the Accused Products do not infringe this limitation literally.

## 2.    No Infringement Under the Doctrine of Equivalents

142.    Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, it is my opinion that the Galaxy Tab 7.0 does not infringe this limitation under the doctrine of equivalents for at least the same reasons described above in connection with the "first layer" and "second layer" limitations of claim 1.

## K.    The Galaxy Tab 7.0 Does Not Include a Second Conductive Layer Comprising a Plurality of Spaced Apart Parallel Lines Having the Same Pitch and Linewidths (Claims 10 and 11)

143.    It is my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally or under the doctrine of equivalents for the same reasons as described above in connection with the first conductive layer.

144.    Namely,  Apple's expert once again ignores the "wings" and alleged the linewidth is 0.93 mm, as labeled below in Apple's micrograph.  This is clearly not the linewidth of the pattern because the wings extend another 6.22 mm.  As such, the "lines" are not associated with a single linewidth, but rather several linewidths at various points along the "lines."

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**



145.    It is therefore my opinion that the Accused Products do not infringe this limitation literally or under the doctrine of equivalents.

**L.    The Galaxy Tab 7.0 Does Not Include Parallel Lines of the Second Conductive Layer that are Substantially Perpendicular to the Parallel Lines of the First Layer (Claims 10 and 11)**

146.    It is my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally or under the doctrine of equivalents for the same reasons as described above in connection with claim 3.

147.    For the foregoing reasons, it is my opinion that the Accused Products do not infringe any Asserted Claim of the '607 patent, either literally or under the doctrine of equivalents.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## XII.   SUMMARY OF OPINIONS OF NON-INFRINGEMENT OF THE '129 PATENT

148.    It is my opinion that claims 1-3, 5, 7, 9-12, 14, 16, 24, 26, and 28 (the "'129 Asserted Claims") of the '129 patent are not infringed, either literally, under the doctrine of equivalents, or indirectly, by Samsung or the Accused Products.[6]

149.    I understand that Dr. Maharbiz is alleging for the first time that the Galaxy Tab 7.0 infringes claims 1-3, 5, 7, 9-12, 14, and 16.  I reviewed Apple's infringement contentions and Exhibits 17-19 thereto, and to one of ordinary skill in the art, it is my opinion that he did not allege that the Galaxy Tab 7.0 infringed those claims.  To the extent Dr. Maharbiz changes his infringement theories again, I reserve the right to supplement this report and respond to any additional new allegations of infringement by additional products and/or claims.

## XIII.   TECHNICAL BACKGROUND PERTINENT TO THE '129 PATENT

150.    The technical background pertinent to the '607 patent is also relevant to the '129 patent and I hereby  incorporate § VI. above into this section regarding the technical background pertinent to the '129 patent.

151.    I disagree with Dr. Maharbiz's characterization of the '129 patent at ¶¶ 128-129 of his opening report.  There is nothing elegant or innovative about the '129 patent.  I do agree that it is a combination of elements, but all of those elements were well known to one of ordinary skill in the art by at least April 2005, or the time Apple alleges the '129 patent was conceived.

152.    The '129 patent claims describe nothing more than an obvious design modification to the design described in the '607 patent, which was in the public domain more than a year before the '129 patent was filed by virtue of the publication of its international

---

[6]   I note that although Dr. Maharbiz, in his Opening Report, recites the legal standard for indirect infringement in his Understanding of the Law" section, he does not allege indirect infringement of any claim of the '129 patent.  I therefore do not address indirect infringement in this rebuttal report.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

counterpart.  *See* Von Herzen Opening Report and Hotelling '369.  As I described in my opening report, using wider drive traces on bottom of a two-layer touch sensor panel to provide shielding was well known in the art of touchscreens and input devices at least as of April 2005.

153.    Specifically, as explained in my Opening Report, it was well known in the art before 2005 that drive electrodes will shield sense electrodes from noise, because when a drive electrode is connected to a standard low-impedance drive circuit, it will act as a current sink to electromagnetic noise.  That shielding property is inherent in any conductor.

154.    Moreover, one of ordinary skill in the art understands that conductors can shield noise, and that an effective way to shield noise is to place conductors in close proximity to the source of noise.  In fact, even one of the inventors, Brian Land, explained that this was exactly what he had done in other contexts before ever working on touch panels.  When he worked at Gyration, Mr. Land was well aware of shielding, because he "worked on electrical engineering and shielding is sometimes part of that."  Land Dep. at 64:12-14.  Every engineer knows how to shield noise – put a metal object close to the noise and provide a path to ground for the noise – which what is described in the '129 patent and is something that was well-known in the art as Land himself explained:

> Q.  And what were some of the techniques you used to reduce noise and to shield while you were at Gyration?
> A.  Looks like a metal can over the top of an oscillator that was making a lot of noise.
> Q.  How would putting a metal can over an oscillator reduce noise?
> A.  Because the metal can provides a path to ground for noise coming off the oscillator.
> Q.  And how does it do that?
> A.  In technical terms, it provides a lower impedance path to ground than it does to another part of the circuit.
> …
> Q.  And wouldn't you say that's exactly what a wider lower trace is doing to reduce the noise from an LCD display?
> A.  Yes.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

*See* Land Dep. at 64:15-65:22.

155.    It was known to one of ordinary skill in the art well before May 2005 that a good conductor makes a better shield when it has lower resistance and lower impedance.  A higher impedance conductor cannot cancel out the fields caused by stray noise nearly as effectively as a low impedance conductor.  As a result, a sheet with high resistivity will make a mediocre shield compared to a copper ground plane.

156.    Resistivity is a measure of the resistance to conducting electricity that a material has.  For a plane of material of a particular thickness and composition, a plane or sheet of material has a constant resistance per square of material.  The resistance will be the same for a square foot of this material as a square meter of the material, or a square millimeter of the material.  Impedance includes the concept of resistance, but also includes the way a structure or material resists electricity that is varying over time, or AC electricity.  Thus, while resistance is a real number, impedance may be complex, comprising not only DC resistance but also AC impedance to electricity.  Impedance comprises the concepts of inductance and reactance.  A coil of wire or a wound motor exemplifies inductance, while reactance is exemplified by a capacitor.  Electrical structures usually have elements of both, thus making for a generally complex impedance to AC electricity.

157.    In addition to the basic concepts of resistivity and conductive material used for shields, the inventors of the '129 patent admitted they did not invent many portions of the Asserted Claims.   For example, Mr. Land admitted he did not invent Vcom signals and that Vcom signals generally existed in LCDs.  Land Dep. 85:5-19.  Mr. Land also testified that he did not know what Mr. Hotelling invented, if anything.  *Id.* at 87:6-11.  Land also testified that he

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

did not come up with the idea of a two-layer ITO arrangement used in Apple's touchscreen devices, which they commonly refer to as a DITO arrangement.  *Id.* at 100:18-20.

## XIV.   OVERVIEW OF THE '129 PATENT AND THE ASSERTED CLAIMS

### A.   Summary

158.    The '129 patent, entitled "Double-Sided Touch-Sensitive Panel with Shield and Drive Combined Layer" was filed on January 3, 2007, and issued on April 5, 2011.  The '129 patent has two named inventors:  Steve Hotelling and Brian Land.  The patent issued from U.S. Patent Application No. 11/650,182 ("the '182 Application"), filed January 3, 2007.  The '129 Patent does not claim priority to any earlier patent application or provisional application.

159.    The '129 Patent discloses capacitive touch sensor panels having rows and columns separated by a substrate.  '129 Patent at 1:7-10.  These rows can be widened for shielding purposes and for providing a uniform appearance.  *Id.* at 3:24-27; *see also id.* at 11:57-16:6 (claims 1-29).

160.    The "Background of the Invention" section describes prior art touch screens and acknowledges that "[t]ouch screens, in particular, are becoming increasingly popular," and states that "[t]ouch screens can include a touch panel, which can be a clear panel with a touch-sensitive surface."  '129 Patent at 1:17-21.  In addition, the "Background of the Invention" section states that "[c]apacitive touch sensor panels can be formed from rows and columns of traces on opposite sides of a dielectric," and that "[c]onventional touch panels for use over display devices have typically used a top layer of glass upon which transparent column traces of indium tin oxide (ITO) or antimony tin oxide (ATO) have been etched, and a bottom layer of glass upon which row traces of ITO have been etched."  *Id.* at 1:44-53.  Furthermore, unconventional touch panels, "[t]he top and bottom glass layers are separated by a clear polymer spacer that acts as a dielectric

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

between the row and column traces." The traces on both the top and bottom glass layers can have

a spacing of about 5 mm."  *Id*. at 1:58-62.  In such conventional touch panels, "a stimulus can be

applied to one row with all other rows held at DC voltage levels," creating "an analog channel

output value for every pixel (row and column) in the panel." corresponding to the amount of

touch or hover detected at a given location *Id.* at-2:14-18.

161.    These prior art conventional touch screens may generate noise "when a

transparent capacitive touch sensor panel is bonded to a liquid crystal display (LCD)," because

"a modulated Vcom layer in the LCD can couple onto the columns of the sensor panel, causing

noise to appear on the columns."  *Id.* at 2:37-40.

162.    The '129 Patent attempts to address this problem.  The '129 Patent allows "the row

traces can be widened to shield the column traces from a modulated Vcom layer."  Id. at 2:59-60.

Thus, as described in the "Summary of the Invention" section of the '129 Patent:

> The rows of the DITO substrate can also be widened for shielding
> purposes and for providing a uniform appearance according to
> embodiments of this invention.  To prevent the capacitive coupling
> of a modulated Vcom layer onto the columns of the substrate, the
> rows may be widened.  The number of rows does not change, but
> they can be much wider, leaving only about 30 microns of space
> between them.  Because these wider rows are not isolated but are
> instead either held at a DC voltage or stimulated with a stimulation
> voltage, these wider rows act as a shield, preventing a modulated
> Vcom layer from capacitively coupling onto the columns.   In
> addition, because of the narrow spacing between them, the wide
> rows provide a uniform appearance.  Thus, shielding, modulation
> and a uniform appearance can be obtained from a single layer of
> ITO.

'129 Patent at 3:25-38.

163.    The '129 patent devotes little discussion to the claimed methods and apparatuses

for shielding a capacitive touch panel.  In fact, only one paragraph of the disclosure of the '129

Patent actually discusses any specifics regarding widening of drive rows to shield sense columns

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

from display noise.  *See id.* at 10:52-11:8.  Fig. 9 and the corresponding discussion discuss the '129 patent's solution to the noise problem identified in prior art conventional touch screens. The widened columns "prevent the capacitive coupling of a modulated Vcom layer onto columns 938, rows 936 may be widened as showing in Fig. 9.  *See id.* at Fig. 9; *id.* at 10:52-58.  The wider rows "act as a shield, preventing a modulated Vcom layer from capacitively coupling onto columns.  *Id.* at 63-65.

164.    Figure 9 of the '129 Patent, described as "an exemplary DITO substrate 900 (with its thickness greatly exaggerated for purposes of illustration only) illustrating widening of rows 936 for shielding purposes and for providing a uniform appearance according to embodiments of this invention," '129 Patent at 52-56, is shown below:



Fig. 9

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

165.    Notably, the '129 patent does not provide a detailed description as to how a capacitive touch panel is to be integrated into the "exemplary mobile telephone" and the "exemplary digital audio/video player" shown in Figs. 10a and 10b.  *See, e.g.,* Fig. 10a and 10b. The only description relating to shielding in the "exemplary mobile telephone" and "exemplary digital audio/video player" appears at col. 11 lines 20-48:

> FIG. 10*a* illustrates an exemplary mobile telephone 1136 that can include capacitive touch sensor panel 1124 and flex circuit 1134 capable of connecting to both sides of the substrate according to embodiments of this invention. . . . Furthermore, sensor panel 1134 can be fabricated with wide rows to provide modulated Vcom layer shielding as well as uniform appearance.  FIG. 10*b* illustrates an exemplary digital audio/video player 1138 that can include capacitive touch sensor panel 1124 and flex circuit 1134 capable of connecting to both sides of the substrate according to embodiments of this invention. . . . Furthermore, sensor panel 1134 can be fabricated with wide rows to provide modulated Vcom layer shielding as well as uniform appearance.  The mobile telephone and digital audio/video player of FIGs. 10*a* and 10*b* can advantageously benefit from sensor panel 1124 because a single, thinner, smaller-sized sensor panel can be used, and only a single layer of ITO is needed to provide shielding and a uniform appearance.  The overall effect is reduced product size and manufacturing costs.

166.    The '129 patent discusses the alleged problem of noise and the use of wide drive rows as shielding.  However, there is no discussion of specific requirements or improvements necessary to implement a capacitive touch sensor panel with widened drive rows.

167.    The '129 Patent does not describe any unique requirements for implementing a capacitive touch sensor panel above a modulated Vcom display.  The patent discusses the alleged problem of noise from this display and the use of wide drive rows as shielding, but nowhere in the patent is there any discussion of specific requirements or improvements necessary to implement a capacitive touch sensor panel with widened drive rows.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

168.    The patent has twenty-nine claims, nine of which are independent claims. Independent claims 1, 8, 9, and 10 are apparatus claims, and independent claims 17, 21, 24, 25, and 26 are method claims.

## B.    The Asserted Claims

169.    I understand that claims 1-3, 5, 7, 9-12, 14, 16, 24, 26, and 28 of the '129 Patent are at issue in this Investigation against the Galaxy Tab 10.1.[7]  I also understand that claims 24, 26, and 28 are at issue in this Investigation against the Galaxy Tab 7.0.  Dr. Maharbiz and Apple, however, for the first time in this case are now alleging that the Galaxy Tab 7.0 infringes claims 1-3, 5, 7, 9-12, 14, and 16.  *See* Maharbiz Report ¶ 70 and Exhibit F thereto; *see also* Exhibit C ("Apple's Galaxy Tab 7.0 Infringement Contentions").  I understand that claims 1-3, 5, 7, 9-12, 14, and 16 are not properly at issue in this case against the Galaxy Tab 7.0; however, I address each of those newly asserted claims in this report and explain why Apple has failed to establish that the Galaxy Tab 7.0 meets all limitations of those claims.

170.    Claims 1, 9, 10, and 24 are independent apparatus claims.  The remaining asserted claims are dependent claims.  These claims are reproduced in their entirety below.  (The bracketed letter designations do not appear in the original claims and are added only for clarity.)

> 1[a].  A capacitive touch sensor panel, comprising:
>     [b]  a first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the first set of traces having one or more widths including a maximum width; and
>     [c]  a second set of traces of the conductive material spatially separated from the first set of traces by a dielectric and arranged along a second dimension of the two-dimensional

---

[7]    It is my understanding that Dr. Maharbiz and Apple have dropped all method claims that were originally asserted against the Accused Products.  Specifically, they have withdrawn claims 17-19, 21-22, and 25 against the Galaxy Tab 10.1 and claims 25 against the Galaxy Tab 7.0.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

coordinate system, the second set of traces having one or more widths including a minimum width;

[d]  wherein the minimum width of the second set of traces is substantially greater than the maximum width of the first set of traces at least at an intersection of the first and second sets of traces to provide shielding for the first set of traces; and

[e]  wherein sensors are formed at locations at which the first set of traces intersects with the second set of traces while separated by the dielectric.

2.  The capacitive touch sensor panel of claim 1, further comprising a liquid crystal display (LCD) adjacent to the touch sensor panel, the LCD emitting a modulated Vcom signal, and the second set of traces configured for shielding the first set of traces from the modulated Vcom signal.

3.  The capacitive touch sensor panel of claim 1, wherein the second set of traces are widened to substantially electrically isolate the first set of traces from a liquid crystal display (LCD).

5.  The capacitive touch sensor panel of claim 1, further comprising a computing system that incorporates the sensor panel.

7.  The capacitive touch sensor panel of claim 5, further comprising a digital audio player that incorporates the computing system.

9.  [a]  A digital audio player having a capacitive touch sensor panel, the touch sensor panel comprising:

[b]  a first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the first set of traces having one or more widths including a maximum width; and

[c]  a second set of traces of the conductive material spatially separated from the first set of traces by a dielectric and arranged along a second dimension of the two-dimensional coordinate system, the second set of traces having one or more widths including a minimum width;

[d]  wherein the minimum width of the second set of traces is substantially greater than the maximum width of the first set of traces at least at an intersection of the first and second sets of traces to provide shielding for the first set of traces; and

[e]  wherein sensors are formed at locations at which the first set of traces intersects with the second set of traces while separated by the dielectric.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

10[a].  A capacitive touch sensor panel, comprising:

[b]  sense traces having one or more widths including a maximum width; and

[c]  drive traces spatially separated from the sense traces by a dielectric, the drive traces having one or more widths including a minimum width, the minimum width of the drive traces being substantially greater than the maximum width of the sense traces at least at an intersection of the sense and drive traces to provide shielding for the sense traces;

[d]  wherein sensors are formed at locations at which the sense traces intersect with the drive traces while separated by the dielectric.

11.  The capacitive touch sensor panel of claim 10, further comprising a liquid crystal display (LCD) adjacent to the touch sensor panel, the LCD emitting a modulated Vcom signal, and the drive traces configured for shielding the sense traces from the modulated Vcom signal.

12.  The capacitive touch sensor panel of claim 10, wherein the drive traces are widened to substantially electrically isolate the sense traces from a liquid crystal display (LCD).

14.  The capacitive touch sensor panel of claim 10, further comprising a computing system that incorporates the sensor panel.

16.  The capacitive touch sensor panel of claim 14, further comprising a digital audio player that incorporates the computing system.

24[a].  A capacitive touch sensor panel, comprising:

[b]  sense traces formed on a first layer and arranged along a first dimension of a two-dimensional coordinate system; and

[c]  drive traces formed on a second layer spatially separated from the first layer by a dielectric, the drive traces arranged along a second dimension of the two-dimensional coordinate system;

[d]  wherein the drive traces are widened as compared to the sense traces to substantially cover the second layer except for a gap between adjacent drive traces so as to substantially electrically isolate the sense traces from a liquid crystal display (LCD);

[e]  wherein sensors are formed at locations at which the sense traces intersect with the drive traces while separated by the dielectric; and

[f]  wherein each of the drive traces is of a substantially constant width.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

26[a].  A touch sensitive computing system, comprising:
    [b]  a touch processor;
    [c]  a display;
    [d]  a touch sensor panel adjacent to the display and coupled to the touch processor, the touch sensor panel including
    [e]  sense traces formed on a first layer, and
    [f]  drive traces formed on a second layer spatially separated from the first layer, the drive traces widened as compared to the sense traces to substantially cover the second layer except for a gap between adjacent drive traces so as to substantially electrically isolate the sense traces from a liquid crystal display (LCD),
    [g]  wherein sensors are formed at locations at which the sense traces intersect with the drive traces; and
    [h]  wherein each of the drive traces is of a substantially constant width.

28.  The touch sensitive computing system of claim 26, wherein the computing system is incorporated into a media player.

### C.    The Prosecution History

171.  I have reviewed the prior art cited against the claims of the '129 patent by the United Sates Patent and Trademark Office ("USPTO") during prosecution.  The USPTO did not consider *any of the prior art* that I address in this report.  In addition, the USPTO did not have the benefit of the testimony of Samuel Brunet, of Atmel, given in support of the technical documentation of the Velos products.  Mr. Brunet is also a named inventor of U.S. Patent No. 7,932.898.

172.   The '129 Patent issued from U.S. Patent Application 11/650,182 ("the '182 Application"), which was filed on January 3, 2007.

### The Claims as Originally Filed

173.  The '182 Application contained twenty claims, including six independent claims (claims 1, 7-9, 15, and 19).  Claims 1 and 9 in the '182 Application read as follows:

1.    A capacitive touch sensor panel, comprising:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

a substrate formed from a dielectric material;

a first set of non-overlapping traces of conductive material located on a first side of the substrate and arranged along a first dimension of a two-dimensional coordinate system; and

a second set of non-overlapping traces of the conductive material located on a second side of the substrate and arranged along a second dimension of the two-dimensional coordinate system;

wherein the second set of traces are widened as compared to the first set of traces to provide shielding for the first set of traces; and

wherein sensors are formed at locations at which the first set of traces pass over the second set of traces while separated by the dielectric material of the substrate.

9.     A capacitive touch sensor panel, comprising:

sense traces formed on a first side of a dielectric substrate; and

drive traces formed on a second side of the substrate, the drive traces widened as compared to the sense traces to provide shielding for the sense traces;

wherein sensors are formed at locations at which the sense traces cross over the drive traces while separated by the dielectric substrate.

'182 Application at 19; *id.* at 23.  Claims 7 and 8 of the '182 Application contained identical limitations as claim 1, but different preambles. The preambles of claims 7 and 8 described "a mobile telephone having a capacitive touch sensor panel" and "a digital audio player having a capacitive touch sensor panel," respectively.  Claims 15 and 19 of the '182 Application were method claims containing similar limitations to claims 1 and 9.

### 2.     **December 22, 2009 Office Action**

174.    On December 22, 2009, the PTO rejected all twenty claims of the '182 Application as obvious in a non-final office action.

175.    Claims 1, 3, 4, 9, 11, 12, 15, and 17-20 were rejected as obvious based on U.S. Patent 5,942,733 ("Allen") in view of U.S. Patent No. 7,532,205 ("Gillespie").

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

176.    The Allen and Gillespie patents were each assigned to Synaptics, and list Timothy

Allen as an inventor.

177.    Allen was filed October 19, 1995 and relates to "[a] capacitive touch pad

compris[ing] a substrate material . . . having a plurality of first parallel conductive traces running

in a first (X) direction disposed on a first face thereof, and a plurality of second parallel

conductive traces running in a second (Y) direction, usually orthogonal to the first direction,

disposed on an opposed second face thereof."  Allen at Abstract.

178.    The Gillespie patent claiming priority to March 26, 2004, discloses, among other,

things

> a position-sensing transducer comprising a touch-sensitive surface disposed on a substrate, such as a printed circuit board, including a matrix of conductive lines.  A first set of conductive lines run in a first direction and is insulated from a second set of conductive lines running in a second direction generally perpendicular to the first direction.  An insulating layer is disposed over the first and second sets of conductive lines.  The insulating layer is thin enough to promote significant capacitive coupling between a finger placed on its surface and the first and second sets of conductive lines.
>
> Sensing electronics respond to the proximity of a finger, conductive object, or an object of high dielectric constant (i.e., greater than about 5) to translate the capacitance changes of the conductors caused by object proximity into digital information which is processed to derive position and touch pressure information.

Gillespie at 6:16-32.

179.    Figure 1 demonstrates the basic capacitive touch-sensing system disclosed in

Gillespie.  Figure 2C shows the basic two-layer sensor matrix disclosed in Gillespie.  The row

traces 26 and column traces 30 in Figure 2C are on separate layers, separated by a dielectric.  *See*

Gillespie at 10:48-55.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



180.   Gillespie also teaches the use of driving and sensing electrodes to sense

"transcapacitance" (i.e., mutual capacitance) between row and column electrodes on separate

layers.  *See id.* at 5:36-49; 6:36-65.

> 1.

> The December 22, 2009 Office Action found that Allen taught a capacitive touch sensor panel comprising:: a substrate (12) formed from a dielectric material;
> a first set of non-overlapping traces (Y-18) of conductive material located on a first side (20) of the substrate (12) and arranged along a first dimension of a two-dimensional coordinate system; and
> a second set of non-overlapping traces (X-14) of the conductive material located on a second side (16) of the substrate (12) and arranged along a second dimension of the two-dimensional coordinate system (col. 3, line 60 to col. 4., line 9).

Dec. 22, 2009 Office Action at 2.

181.   The PTO also found that although, "Allen does not specifically teach 'wherein the

second set of traces are widened . . . dielectric material of the substrate,'" it would have been

obvious to combine Allen with Gillespie, and Gillespie "teaches wherein the second set (X) of

traces are widened as compared to the first set (Y) of traces to provide shielding for the first set

of traces; and wherein sensors are formed at locations at which the first set of traces pass over the

second set of traces while separated by the dielectric material of the substrate (col. 28, lines 52-

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

62)." *Id.* at 2-3.  The PTO also found that Gillespie teaches a computing system incorporating a sensor panel.  *Id.* at 3(citing Gillespie at col. 1, lines 29-34) of Gillespie.

182.    Furthermore the PTO found that "it would have been obvious to one of ordinary skill in the art at the time the invention was made to incorporate the liquid crystal display (LCD) adjacent to the touch sensor panel as taught by Pak in the system of Allen and Gillespie in order to display the information to the user." *Id.* at 3.  Thus, the PTO rejected claims 2, 10, and 16 of the '182 Application on this basis.

183.    The PTO rejected the remaining claims 5-8, 13, and 14 as obvious based on Allen and Gillespie in view of U.S. Patent Application Publication No. 2003/0231168 ("Bell"). According to the PTO, Allen and Gillespie did not specifically teach a mobile telephone and digital audio player that incorporate the computing system, but it would have been obvious to combine Allen and Gillespie with Bell which taught "a mobile telephone and a digital audio player that incorporates the computing system [0042],""in order to allow a convenient communication for users."  Dec. 22, 2009 Office Action at 3.

184.    The PTO noted that U.S. Patent No. 7,382,139 ("Mackey") and U.S. Patent No. 7,511,702 ("Hotelling '702") were "prior art made of record and not relied upon . . . considered to pertinent *[sic]* applicant's disclosure." *Id.* at 4.

185.    Mackey was filed on June 3, 2004 and also assigned o Synaptics.  Mackey discloses a capacitive sensing apparatus having varying width sensing elements, as shown in figure 8:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



FIG. 8

186.    Hotelling '702, was filed seven months before the filing of the '129 Patent,

discloses a transparent capacitive touch sensor panel with conductive traces oriented in a first

direction and a second direction.  This arrangement is illustrated in Fig. 4::



FIG. 4

### 3.    March 5, 2010 Amendments and Remarks

187.    The applicants made amendments and remarks in a March 5, 2010 response to the

PTO's December 22, 2009 Office Action.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

188.    The term "non-overlapping traces" was amended to "traces" in claims 1, 7, 8, 15. In claims 9, 11, 15, and 17 "dielectric substrate" were amended to "substrate."

189.    The applicants also conducted an in-person interview with the PTO examiner on March 2, 2010 at which they discussed the Allen, Gillespie, Pak, and Bell prior art references. At the meeting, the "the applicant argued that the prior art references did "not specifically teach the claimed limitation 'the second set of traces are widened as compared to the first set of traces.'" '129 Patent File History, Mar. 11, 2010 Summary of Mar. 2, 2010 Interview; see also *id*. at Mar. 5, 2010 Amendments and Remarks.

190.    The applicants focused on only the "the second set of traces are widened as compared to the first set of traces" in distinguishing Gillespie, Allen, Pak, and Bell.  In fact, this limitation was the sole limitation in the twenty pending claims that the applicants argued was not disclosed by the Allen, Gillespie, Pak, and Bell prior art references.

191.    The applicants' remarks with respect to claims 1, 3, 4, 9, 11, 12, 15, and 17-20 are shown below:



'129 Patent File History, Mar. 5, 2010 Amendments and Remarks, at 7-8.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

192.    The applicants' remarks with respect to claims 2, 10, and 16 are shown below:

> **Claims 2, 10 and 16 were rejected under 35 U.S.C. §103(a) as being unpatentable over Allen in view of Gillespie and further in view of Pak.** This rejection is respectfully traversed.
>
> Claim 2 depends from claim 1, claim 10 depends from claim 9, and claim 16 depends from claim 15. As discussed above, neither Allen nor Gillespie, alone or in combination, discloses, teaches or suggests all of the limitations of claims 1, 9, 15. Furthermore, Pak fails to make up for the deficiencies of Allen and Gillespie, because Pak also fails to disclose, teach or suggest a second set of traces that are wider than a first set of traces to provide shielding for the first set of traces. Pak discloses a liquid crystal display including a sensing unit, but contains no disclosure at all related to a second set of traces that are wider than a first set of traces to provide shielding for the first set of traces.

'129 Patent File History, Mar. 5, 2010 Amendments and Remarks, at 8-9.

193.    The applicants' remarks with respect to claims 5 and 6 are shown below:

> **Claims 5-8, 13 and 14 were rejected under 35 U.S.C. §103(a) as being unpatentable over Allen in view of Gillespie and further in view of Bell.** This rejection is respectfully traversed.
>
> Claims 5 and 6 depend from claim 1. As discussed above, neither Allen nor Gillespie, alone or in combination, discloses, teaches or suggests all of the limitations of claim 1. Furthermore, Bell fails to make up for the deficiencies of Allen and Gillespie, because Bell also fails to disclose, teach or suggest a second set of traces that are wider than a first set of traces to provide shielding for the first set of traces. Bell discloses a processing module and a touch screen, but contains no disclosure at all related to a second set of traces that are wider than a first set of traces to provide shielding for the first set of traces.

'129 Patent File History, Mar. 5, 2010 Amendments and Remarks, at 9.

194.    The applicants' remarks with respect to claims 7 and 8 are shown below:

> Claims 1, 7 and 8 recite, in part (emphasis added):
>
> a first set of traces of conductive material located on a first side of the substrate . . . and a second set of traces of the conductive material located on a second side of the substrate . . . wherein *the second set of traces are widened as compared to the first set of traces* to provide shielding for the first set of traces.
>
> For the same reasons discussed above with respect to claim 1, neither Allen nor Gillespie, alone or in combination, discloses, teaches or suggests all of the limitations of claims 7 and 8. Furthermore, Bell fails to make up for the deficiencies of Allen and Gillespie for the reasons discussed above with regard to claims 5 and 6.

'129 Patent File History, Mar. 5, 2010 Amendments and Remarks, at 9-10.

195.    The applicants' remarks with respect to claims 13 and 14 are shown below:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

> Claims 13 and 14 depend from claim 9.  As discussed above, neither Allen nor Gillespie,
> alone or in combination, discloses, teaches or suggests all of the limitations of claim 9.
> Furthermore, Bell fails to make up for the deficiencies of Allen and Gillespie for the reasons
> discussed above with regard to claims 5 and 6.

'129 Patent File History, Mar. 5, 2010 Amendments and Remarks, at 7-8.

196.     These remarks confirm that the "second set of traces are widened as compared to the first set of traces" was the only limitation in any of the twenty pending claims that the applicants argued was not disclosed by Allen, Gillespie, Allen, and Pak.

### 4.     May 26, 2010 Office Action

197.     The PTO again rejected all twenty pending claims of the '182 Application as obvious in a non-final office action dated May 26, 2010.

198.     The PTO found that claims 1-4, 9-12, and 15-20 obvious based on Allen in view of U.S. Patent No. 5,869,791 ("Young").

199.     Young was filed March 1, 1996 and assigned to U.S. Philips Corporation.  The Young patent teaches, among other things, "[a] touch sensing device comprising a plurality of individually operable touch sensing elements having first and second overlapping and spaced conductive layers (12, 15) . . . fabricated by forming on a support a thin film multi-layer structure comprising the first and second conductive layers with an insulating layer (16) therebetween." Young at Abstract.  According to Young, "[t]he device may be used, for example, as a keypad or, with larger numbers of elements arranged in a row and column matrix, as a graphics tablet or display overlay," and "[t]he device can conveniently be integrated with a liquid crystal display panel using a substrate of the panel as the support." *Id.*  Figure 4 of Young illustrates one such touch-sensing device:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



FIG.4

200.     Regarding Figure 4 Young teaches that, "[t]he strips constituting the row and column conductors 30 and 32 need not be of constant width.  Their width in the regions between adjacent sensing elements may be reduced."  *Id.* at 10:26-28.

201.     The PTO found that Allen teaches a capacitive touch sensor panel comprising:

> a substrate (12) formed from a dielectric material;
> a first traces (Y-18) of conductive material located on a first side (20) of the substrate (12) arranged along a first dimension of a two-dimensional coordinate system; and
> a second set of traces (X-14) of the conductive material located on a second side (16) of the substrate (12) and arranged along a second dimension of the two-dimensional coordinate system; and wherein sensors are formed at locations at which the first set of traces pass over the second set of traces while separated by the dielectric material of the substrate (col. 3, line 60 to col. 4, line 9).

'129 Patent File History, May 26, 2010 Office Action, at 2.

202.     The PTO found that, "Young teaches wherein the second set (30) of traces are widened as compared to the first set (32) of traces to provide shielding for the first set of traces (col. 9, line 58 to col. 10, line 28)," and "it would have been obvious to one of ordinary skill in

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the art at the time the invention was made to incorporate the traces as taught by Young in the system of Allen in order to provide a uniform appearance."  *Id.* at 2-3.

203.    Furthermore, the PTO found that  "the combination of Allen and Young teaches a liquid crystal display (LCD) adjacent to the touch sensor panel (col. 3, lines 49-65 of Young)," and "the LCD emitting a modulated Vcom signal is inherent in the LCD; therefore, the combination of Allen and Young obviously teaches the widened second set of traces configured for shielding the first set of traces from the modulated Vcom signal."   Furthermore, Young also "teaches . . . a computing system that incorporates the sensor panel (col. 1, lines 35-30 *[sic]* of Young)." *Id.*

204.    The PTO held that claims 5-8, 13, and 14 were obvious based on Allen and Young in view of Bell, because "Bell teaches a mobile telephone and digital audio player that incorporates the computing system [0042]." The PTO also explained that it would have been obvious to combine bell with Allen and Young "in order to allow a convenient communication for users." *Id.* at 3-4.

205.    In view of the new grounds for objections, the PTO found that the applicant's previous arguments had been mooted.  *Id.* at 4.

5.    **July 30, 2010 Amendments and Remarks**

206.    The applicants responded to the PTO's May 26, 2010 Office Action in a communication to the PTO dated July 30, 2010.

207.    The applicants made only one amendment in response to the May 26, 2010 Office Action .  The amendment was non-substantive and corrected a dependency error.  *See* '129 Patent File History, Jul. 30, 2010 Amendments and Remarks, at 6-7.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

208.    The applicants' July 30, 2010 Amendments and Remarks focused on only a single claim limitation to distinguish Allen, Young, and Bell, "the second set of traces are widened as compared to the first set of traces." *Id.* at 7-10.

209.    The applicants' July 30, 2010 Amendments and Remarks did not contest that Allen, Young, and Bell disclose: drive and sense traces on separate layers that sensed mutual capacitance, an LCD emitting a modulated Vcom signal, drive traces configured for being driven by low-impedance outputs, a computing system, digital audio player, and mobile telephone incorporating a capacitive touch panel, or any other limitation present in the twenty amended claims of the '182 Application other than "the second set of traces are widened as compared to the first set of traces." *Id.*

210.    The applicants admitted that Young discloses that the column conductors on the top layer of conductors could have a narrower width than the bottom row, but argued that these traces would only be wider "in the regions between adjacent sensing elements." *Id.* at 8-9

### 6.    **October 15, 2010 Office Action**

211.    The PTO again rejected all twenty pending claims of the '182 Application as obvious in an October 15, 2010 non-final office action.

212.    The PTO found that claims 1-4, 9-12, and 15-20 were obvious in light of on Allen and Young in view of Gillespie.[8]  According to the PTO, Allen and Young disclosed all of the structural limitations of these claims,, but did not explain the benefit of shielding.  '129 Patent File History, October 15, 2010 Office Action, at 2-3.  However, according to the PTO, Gillespie taught that one set of lines could be used to shield the second set of lines.

---

[8]  The PTO cited a different Gillespie publication, U.S. Patent Application No. 2006/0092142 ("Gillespie '142") than the Gillespie '205 patent the PTO had cited earlier in prosecution, but the disclosure of these two references, each of which is a continuation of the same patent application filed March 26, 2004, is identical.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

213.    The PTO found that claims  5-8, 13, and 14 were obvious based on Allen, Young, Gillespie, and Bell.  *Id.* at 4-5.

214.    According to the PTO, "Young teaches the width of the column conductors may be reduced in regions but the set of traces are still widened as compared to the other set of traces in some reasons so that still *[sic]* read on the claims."  *Id.*

215.    The PTO stated that "it had fully considered the applicants' 7/30/2010 arguments, but did not find them persuasive. *Id.* at 5.

### 7.    **October 28, 2010 Interview**

216.     The applicants proposed amendments to the claims in response to the October 15, 2010 Office Action, and conducted an in-person interview with the PTO examiner on October 28, 2010.  During the interview, the parties discussed the alleged differences between the amended claims and the Allen, Young, Gillespie, and Bell prior art references. *Id.* at Nov. 3, 2010 Summary of Oct. 28, 2010 Interview.

### 8.    **November 8, 2010 Amendments and Remarks**

217.    The applicants made further amendments and remarks in response to the PTO's October 15, 2010 Office Action on October 28, 2010.

218.    The applicants made substantive, limiting amendments to claims 1-3, 7-11, 15, 17, and 19-20, and added new claims 21-33.  Claims 1-17 of the '182 Application correspond to claims 1-17 of the '129 Patent.  Claims 19-21 of the '182 Application correspond to claims 18-20 of the '129 Patent.  Claims 23 and 25 of the '182 Application correspond, respectively, to claims 21 and 22 of the '129 Patent.  Claims 27-33 of the '182 Application correspond to claims 23-29 of the '129 Patent.  *See* '129 Patent File History, Nov. 8, 2010 Amendments and Remarks, at 2-10.  The amendments to claim 1 are representative of the amendments to claims 7 and 8.  The

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

amendments to claim 3 are representative of the amendments to claims 11, 17, and 20.  The

amendments to claim 9 are representative of the amendments to claims 15 and 19. The

amendments to claims 1, 3, and 9 are shown below:

> Claim 1 (currently amended): A capacitive touch sensor panel, comprising:
> a substrate formed from a dielectric material;
> a first set of traces of conductive material located on a first side of the substrate and arranged along a first dimension of a two-dimensional coordinate system, the first set of traces having one or more widths and a maximum width; and
> a second set of traces of the conductive material located on a second side of the substrate spatially separated from the first set of traces by a dielectric and arranged along a second dimension of the two-dimensional coordinate system, the second set of traces having one or more widths and a minimum width;
> wherein the minimum width of the second set of traces are widened as compared to is substantially greater than the maximum width of the first set of traces at least at each intersection of the first and second sets of traces to provide shielding for the first set of traces; and
> wherein sensors are formed at locations at which the first set of traces pass over intersects with the second set of traces while separated by the dielectric material of the substrate.
>
> Claim 3 (currently amended): The capacitive touch sensor panel of claim 1, wherein the second set of traces are widened to substantially cover the second side of the substrate except for a gap of about 30 microns between adjacent traces electrically isolate the first set of traces from a liquid crystal display (LCD).
>
> Claim 9 (currently amended): A capacitive touch sensor panel, comprising:
> sense traces formed on a first side of a dielectric having one or more widths and a maximum width; and
> drive traces formed on a second side of the dielectric spatially separated from the sense traces by a dielectric, the drive traces having one or more widths and a minimum width, the minimum width of the drive traces widened as compared to being substantially greater than the maximum width of the sense traces at least at each intersection of the sense and drive traces to provide shielding for the sense traces;
> wherein sensors are formed at locations at which the sense traces cross over intersect with the drive traces while separated by the dielectric.

*Id.* at 2-4.

219.    The applicants sought to distinguish the amended claims from Allen, Young,

Gillespie, and Bell.  Again, the applicants' November 8, 2010 Amendments and Remarks

focused on *only* the "a minimum width of a second set of (or drive) traces is substantially greater

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

than a maximum width of a first set of (or sense) traces, at least at each intersection of the first and second sets of (or drive and sense) traces" Limitation.  *Id.* at 12.

220.    The applicants' remarks indicated that the limiting amendments to the claims were made specifically to overcome the Young reference.  *Id.* at 12-13.

### 9.    **January 14, 2011 Office Action**

221.    The PTO rejected new claims 21, 23, 25, and 27-29, but allowed claims 1-17, 19, and 20 and new claims 30-33 in a final office action dated January 14, 2011.

222.    Claims 21, 23, and 25 were rejected as obvious based on Allen and Young.  The PTO explained:

> Regarding claims 21, 23, and 25, Allen teaches a capacitive touch sensor (10), comprising:
> sense traces (Y-18) formed on a first layer and arranged along a first dimension of a two-dimensional coordinate system; and
> drive traces (X-14) formed on a second layer spatially separated from the first layer by a dielectric, the drive traces arranged along a second dimension of the two-dimensional coordinate system; and
> wherein sensors are formed at locations at which the sense lines intersect with the drive traces while separated by the dielectric (col. 3, line 60 to col. 4, line 9).

'129 Patent File History, Jan. 14, 2011 Office Action, at 2-3.

223.    The PTO also explained that:

> Young teaches wherein the second set of traces (30) is widened as compared to the first set of traces (32) (regions between adjacent sensing elements maybe reduced) to substantially cover the second layer except for a gap between adjacent drive traces so as to substantially electrically isolate the sense traces from a liquid crystal display (col. 9, line 58 to col. 10, line 28, lines 41-45). Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to incorporate the traces as taught by Young in the system of Allen in order to reduce the weight and density of the touch panel.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

*Id.* at 3.

224.    The PTO also rejected claims 27-29 as obvious based on Allen and Young in view of Bell.

### 10.    February 4, 2011 Amendments and Remarks

225.    The applicants responded to the PTO's January 14, 2011 Office Action by making amendments and remarks to the PTO in a communication dated February 4, 2011.

226.    The applicants amended claims 1, 7-9, 15, 19, 21, 23, and 25.

227.    The amendments to claim 1 are representative of the amendments to claims 1, 7-9, 15, and 19.  These amendments are shown below:

> Claim 1 (currently amended): A capacitive touch sensor panel, comprising:
>
> a first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the first set of traces having one or more widths and including a maximum width; and
>
> a second set of traces of the conductive material spatially separated from the first set of traces by a dielectric and arranged along a second dimension of the two-dimensional coordinate system, the second set of traces having one or more widths and including a minimum width;
>
> wherein the minimum width of the second set of traces is substantially greater than the maximum width of the first set of traces at least at each an intersection of the first and second sets of traces to provide shielding for the first set of traces; and
>
> wherein sensors are formed at locations at which the first set of traces intersects with the second set of traces while separated by the dielectric.

'129 Patent File History, Feb. 4, 2011 Amendments and Remarks, at 2.

228.    The amendments to claim 21 are representative to the amendments to claims 21, 23, and 25, and are shown below:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

> Claim 21 (currently amended):      A capacitive touch sensor panel, comprising:
>
> sense traces formed on a first layer and arranged along a first dimension of a two-dimensional coordinate system; and
>
> drive traces formed on a second layer spatially separated from the first layer by a dielectric, the drive traces arranged along a second dimension of the two-dimensional coordinate system;
>
> wherein the drive traces are widened as compared to the sense traces to substantially cover the second layer except for a gap between adjacent drive traces so as to substantially electrically isolate the sense traces from a liquid crystal display (LCD); and
>
> wherein sensors are formed at locations at which the sense traces intersect with the drive traces while separated by the dielectric; and
>
> wherein each of the drive traces is of a substantially constant width.

*Id.* at 7.

229.    The amendments to claims 21, 23, and 25 sought to overcome the obviousness  in view of Allen and Young.  The applicants explained that, "[c]laims 21, 23 and 25 have been amended to include the limitations of claims, 22, 24 and 26, respectively, which is similar to rewriting claims 22, 24, and 26 into independent form including all of the limitations of the base claim and any intervening claims, a form indicated to be allowable as mentioned above."

230.    The applicants characterized the purpose of the amendments to claims 1, 7-9, as being for clarity."  *Id.* at 11.

### 11.    <u>February 14, 2011 Notice of Allowance</u>

231.    On February 14, 2011, the PTO mailed a notice of allowance stating that allowing claims 1-17, 19-21, 23, 25, and 27-33.

232.    The PTO provided no written explanation regarding the allowability of these claims.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

### D.     Priority Date

233.     First, I disagree with Dr. Maharbiz that the documents he cites in section VI.(B.) of his report show conception or reduction to practice of each element of each asserted claim.[9] As an initial matter, Dr. Maharbiz  states that he intends to rely on inventor testimony and corroborating evidence "such as kept notebooks" to render an opinion concerning an a date of conception and reduction to practice of the claimed invention of the '129 patent.  Dr. Maharbiz, however, fails to identify a *single page* or a *single line* from the testimonies of either inventor in support of his positions regarding the priority date or invention date of the '129 patent.  And other than five pages from Brian Land's notebook, which he incorrectly alleges show "the use of lower impedance ITO layer with small gaps on the bottom-most ITO layer (the drive layer) that obviates the need for a separate shielding layer," Dr. Maharbiz fails to identify any corroborating evidence from notebooks to support his positions regarding priority and invention date.  To the extent Dr. Maharbiz raises inventor testimony and corroborating evidence not cited in his opening report, I reserve the right to supplement this report to address any such new evidence or opinions.

234.     Second, it is telling that Dr. Maharbiz and Apple allege that within only a month of joining Apple, Mr. Land had already "realized that interference cause by a display could be affected by changing the ITO trace patterns of a touch panel," the only feature not explicitly disclosed in the PCT publication of the '607 patent, WO 2005/114369 ("Hotelling '369").   Mr. Land testified that he never worked on touch panels before he joined Apple on April 18, 2005. *See* Land Dep. at 81:16-82:1.  In fact, Mr. Land testified that he "never worked on arrangements

---

[9]     Although  Dr. Maharbiz sets forth infringement opinions with respect to claim 24 (see ¶ 123), he fails to address claim 24 in section VI.B (Priority Date).  If Dr. Maharbiz argues that claim 24 is was also conceived and reduced to practice before the filing date of the '129 patent, I reserve the right to supplement this report to address those new arguments.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

of ITO traces" while he was working at his previous employer, Gyration.  *See id.*  Dr. Maharbiz

and Apple also allege for the first time in Dr. Maharbiz's report that because Mr. Land's

"sketches" show the "use of low impedance ITO layer with small gaps on the bottom-most ITO

layer…that obviates the need for a separate shielding layer," the '129 patent must have been

conceived at least as of May 9, 2005.  If the structures shown in the pages that Dr. Maharbiz cites

in ¶ 126 of his report (APLNDC-Y0000071746-71750) disclose the shielding limitation as Dr.

Maharbiz alleges, then all the prior art I cite in my Opening Report regarding Invalidity of the

'129 patent with wider bottom traces discloses shielding because it is a property of any touch

sensor panel with that structure, as I explained in my opening report.  *See, e.g.,* Exhibits 129-1

through 129-5 to my Opening Report.

235.    For the same reasons I just explained above, because Dr. Maharbiz takes the

position that the documents he identifies in ¶ 127 of the Maharbiz Report evidence reduction to

practice of the '129 patent, he cannot argue that the prior art references I identify in my opening

report that disclose wider lower traces do not disclose the shielding limitation.   None of those

documents cited in ¶ 127 of his Opening Report explicitly describe or explain shielding.  What

they appear to show is a touch sensor panel structure with wider lower electrodes.  If that

structure constitutes reduction to practice of the '129 Asserted Claims, which all require

shielding or substantial electrical isolation, then the prior art I cite in my opening report and the

exhibits thereto that describe wider bottom traces must also disclose shielding.

236.    I also understand that the Brian Land notebook and those pages that Apple

repeatedly cites and now relies upon for proof of conception (i.e., APLNDC-Y0000071746-

71750) were produced *after* the deposition of Brian Land on or about October 22, 2011.

Samsung  had no opportunity to question Mr. Land about the meaning of his calculations on

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

those pages, what the sketches actually show, and exactly how each of the limitations of the asserted claims are shown in that notebook.  I therefore have had no opportunity to review any testimony regarding those notebook pages from Brian Land and that severely prejudices my ability to analyze and rebut Apple's and Dr. Maharbiz's assertions regarding the priority date of the '129 patent.

237.    I also note that after reviewing Mr. Land's deposition transcript, after he was asked multiple times whether there were any documents that might establish a date of conception, he repeatedly said, "I'm not sure" and specifically failed to identify the engineering notebooks as evidence of conception.  *See* Land Dep. at 57:21-58:18; 70:10-72:6

238.    Regardless, I have reviewed APLNDC-Y0000071746-1750[10] and Mr. Land's 5/9/2005 notebook at APLNDC-X0000002077 ("May 2005 Notebook") and have identified the following issues.

239.    As an initial matter, the only page from the May 2005 Notebook that appears to show a structure that could be related to the '129 patent is page 5 (APLNDC-X0000002117/APLNDC-Y0000071750).  Page 5, however, is not dated.  Page 4 is not dated either.  In fact, after page 3, which is dated 5/9/2005, the next dated page in the May 2005 Notebook is page 103.  Page 103 has a date of what appears to be *approximately* July 5, 2005 ("~7/5/2005").  I disagree that the date of page 5 is or even could have been specifically May 9, 2005.  *See* Land Dep. at 55:18, 57:14-20 ("I don't remember the exact date.  It was shortly after I joined Apple.").  I also note the following additional issues on each page that Apple and Dr. Maharbiz not seek to rely on:

---

10    APLNDC-Y0000071746-1750 appears to be a selective excerpt from Mr. Land's engineering notebook dated 5/9/2005 through 8/11/2005, which has bates numbers APLNDC-X0000002111-2126.  APLNDC-Y0000071746-1750 appears to be identical to APLNDC-X0000002113-2117.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

- Page 1 (B, B2, B3) cross section shows a touchscreen with 15 $\Omega/\square$ (ohm/square) ITO on the top layer, 75 $\Omega/\square$ bottom layer, and in addition, a 500 $\Omega/\square$ shield at the bottom of the touchscreen "stack." The lines on both layers are called out as 0.3mm wide, with 0.03mm (30 um) gaps between them. Not only is there no mention of wider traces on the bottom, this pages teaches away from wider traces on the bottom. There is no mention as to which layer is drive or which is sense. The touchscreen is built on a single piece of glass, with ITO deposited on the glass, then an insulating layer, and then another deposited ITO layer. *See* APLNDC-Y0000071746.

- Page 2, Z2 Concept E, shows 15 $\Omega/\square$ ITO on top, 75 $\Omega/\square$ on the bottom. There is no shield layer and shielding is not mentioned or otherwise shown.   The bottom ITO is identified as Drive.  The touchscreen is laminated to an LCD panel, with a cover glass on top. E2 shows the same arrangement, but the touchscreen is not laminated to the LCD.   There is no mention or suggestion of using wider traces on the bottom.  *See* APLNDC-Y0000071747.

- The Page 3, Z2, Concept F now has 15 $\Omega/\square$ ITO on top, 150 $\Omega/\square$ ITO on bottom.  The touchscreen is built up with ITO coated PET layers, laminated to a glass cover sheet.  There is no shield layer and shielding is not mentioned or otherwise shown. F2, F3 show the same concept as F, but the touchscreen is not laminated to the LCD glass. There is no mention or suggestion of using wider traces on the bottom.  *See* APLNDC-Y0000071748.

- Pages 1, 2 and 3 are all dated 5/9/2005.

- Page 4 lists material properties of glass, plastic, copper and coatings.  Of note is that copper is ~100 times more conductive than 15 $\Omega/\square$ ITO, and ~1000 times more conductive than 75 or 150 $\Omega/\square$ ITO.  There is still  no mention of shielding or using wider traces on the bottom.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

• Page 5 appears to show 5mm width top and bottom lines, with 30um spacing.  Top lines have dummy features in the middle of each line.  Note at the top of the page states "Drive nearly full sheet of low impedance ITO."

• Neither pages 4 nor 5 are dated.

## XV.   NON-INFRINGEMENT OPINIONS WITH RESPECT TO THE '129 PATENT

240.    For the reasons below, it is my opinion that the Accused Products do not infringe any of the '129 Asserted Claims, either literally or under the doctrine of equivalents.  Apple has also failed to meet its burden of showing that its own products practice the Asserted Claims.

### A.   Claim 1

#### 1.   Apple has Failed to Show a First Set of Traces Arranged Along A First Dimension of a Two-Dimensional Coordinate System

241.    I disagree that the Samsung Galaxy Tab 7.0 meets claim **[1B]**, "a first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the first set of traces having one or more widths including a maximum width."  What Dr. Maharbiz identifies as the first set of traces (which he also labels as the "sense lines") are not "arranged along a first dimension of a two-dimensional coordinate system."  The first set of traces that Apple identifies in the Galaxy Tab 7.0 are arranged in *two* dimensions of a two-dimensional coordinate system, not one.  Below, I have illustrated the two dimensions of the first set of traces on the image that Dr. Maharbiz uses to incorrectly argue that the traces are in only one-dimension.[11]

---

[11]   By using and rebutting the images provided by Dr. Maharbiz in his Opening Report, I am not agreeing that his images are accurate, correct, or otherwise representative of any conductive traces that may be used in the Accused Devices.  I have not been able to verify the accuracy or credibility of the Scanning Electron Microscopy reports (Exhibits C and D) upon which Dr. Maharbiz relies in his Opening Report, because as I understand, these reports were never disclosed or provided to Samsung before the close of fact discovery in this case.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**



*See* Maharbiz Report at 75.

242.   The trace shape shown in the above Figure is very different than the trace shape described in the '129 patent.  The trace shape described in the '129 patent and the shape that I understand **[1B]** to be within the scope of "arranged along a first dimension of a two-dimensional coordinate system" is shown, for example, in Figure 9 of the '129 patent.  In Figure 9, the top traces (i.e., "Columns") are orthogonal to the bottom traces (i.e., "Rows") and they are each arranged in a dimension perpendicular to the other.



Fig. 9

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

243.     Instead of Columns, the first set of traces Dr. Maharbiz identifies in the Figure at page 75 of his opening report shows the first set of traces as both Columns *and* Rows.  This is quite different than what is described in the '129 patent and is not what one of ordinary skill in the art would understand to be covered by the plain and ordinary meaning "arranged along a first dimension of a two-dimensional coordinate system."  I disagree that the "Galaxy Tab 7.0 show[s] how the electrodes are oriented parallel to one axis on a Cartesian grid."  *See* Maharbiz Report at 76 (Figure caption at ¶136).  One can clearly see that the electrodes are oriented both parallel and perpendicular to one axis on a Cartesian grid.

244.     In addition to the above, I am unable to confirm whether the images Dr. Maharbiz alleges show the conductive traces in a Galaxy Tab 7.0 (e.g., the image at the bottom of page 75 of his report) in fact show the "first set of traces (running horizontally) in a Galaxy Tab 7.0."  *See* Maharbiz Report at 76 (Figure caption at ¶136).  Specifically, one of ordinary skill cannot conclude that those images show (a) conductive traces in a Galaxy Tab 7.0, or (b) a "first set of traces."  Dr. Maharbiz fails to cite a single Samsung or Atmel document (or any other evidence for that matter), that supports the thin assertion that the images from an unverified Scanning Electron Microscopy are in fact those of the conductive traces used in the accused Galaxy Tab 7.0.  I have not had an opportunity to witness or inspect, or otherwise evaluate the testing and imaging by Ian Ward or Evans Analytical Group, nor, to my understanding, has Samsung had the opportunity to witness or inspect.  These images and the reports attached as Exhibits C and D to Dr. Maharbiz's report are insufficient to support Dr. Maharbiz's conclusions that the Galaxy Tab 7.0 has a "first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the fist set of traces having one or more widths including a maximum width."

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

245.    Similarly for the Galaxy Tab 10.1, I am unable to confirm whether the images Dr. Maharbiz alleges show the conductive traces in a Galaxy Tab 10.1 (e.g., the image at the top of page 75 of his report) in fact show the "first set of traces (running vertical) in a Galaxy Tab 10.1." *See* Maharbiz Report at 75 (Figure caption at ¶135).  Specifically, one of ordinary skill in the art cannot conclude that those images show (a) conductive traces, (b) conductive traces in a Galaxy Tab 10.1, or (c) a "first set of traces."  Dr. Maharbiz fails to cite a single Samsung or Atmel document (or any other evidence for that matter), that supports the thin assertion that the images it alleges from an unverified Scanning Electron Microscopy report are in fact those of the conductive traces used in the accused Galaxy Tab 10.1.  I have not had an opportunity to witness or inspect, or otherwise evaluate the testing and imaging by Ian Ward or Evans Analytical Group, nor, to my understanding, has Samsung had the opportunity to witness or inspect.  These images and the reports attached as Exhibits C and D to Dr. Maharbiz's report are insufficient to support Dr. Maharbiz's conclusion that the Galaxy Tab 10.1 has a "first set of traces of conductive material arranged along a first dimension of a two-dimensional coordinate system, the fist set of traces having one or more widths including a maximum width."

246.    For the Galaxy Tab 7.0, Dr. Maharbiz also alleges that the image at D-15 and shown on the bottom of page 75 of his report shows that the "first set of traces has substantially the same width." *Id.* at 76 (Figure caption at ¶136).  I disagree.  From simply looking at the image, which is the basis of Dr. Maharbiz's many conclusions regarding infringement, one can see that the width of the traces clearly varies.  I have tried to illustrate this below.  In the first image, the full width of width 1 cannot be shown because the top of the alleged trace has apparently been cut off.  The full length is illustrated using Dr. Maharbiz's illustration at page 79 of his report.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**





247.    I also note that Dr. Maharbiz is improperly importing a limitation into claim 1 that

is not only nonexistent, but is in fact contrary to the plain language of claim 1.  Dr. Maharbiz is

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

importing the new limitation that the second set of traces must have "substantially the same width – a minimum width along their entire length."  This limitation is not in claim 1, and Apple failed to identify the term "having one or more widths including a minimum width" for construction.   The explicit and clear language of that claim clearly is not limited to a second trace that has "substantially the same width" when it clearly states it covers "one **or more** widths."   Moreover, claims 24-26, for example, specifically and explicitly claim the limitation that Apple and its expert are now trying to improperly import into claim 1 – "wherein each of the drive traces is of a substantially constant width."  Clearly, had the applicant meant for claim 1 to be limited in that way, the limitation in claims 24-26 would have been used.  But the applicant specifically chose not to use that language and limitation, and therefore Apple's and Dr. Maharbiz's construction "one or more widths including a minimum width" is wrong.  Under this wrong construction, the Galaxy Tab 7.0 does not meet this limitation literally or under the doctrine of equivalents.

248.     It is my understanding that "having one or more widths including a minimum width" should be entitled to its plain and ordinary meaning which is not "substantially the same width – a minimum width along their entire length."  Apple has failed to analyze this claim limitation under the plain and ordinary meaning of that term and therefore has failed to meet its burden of showing how the Accused Products infringe this limitation.

249.     It is therefore my opinion that Apple has failed to establish that the Accused Products infringe this limitation literally.  Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation (*see* Maharbiz Report ¶ 159), it is my opinion that the Galaxy Tab 7.0 does not infringe under the doctrine of equivalents

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

because the difference between the way in which the saw-tooth design with traces in two

dimensions detects touch and that claimed in the '129 patent is not insubstantial.

> 2. **Apple has Failed to Show that the Accused Products have a Second Set of Traces Arranged Along A Second Dimension of a Two-Dimensional Coordinate System**

250.    I disagree that the Samsung Galaxy Tab 7.0 meets claim **[1C]**, "a second set of

traces of conductive material spatially separated from the first set of traces by a dielectric and

arranged along a second dimension of the two-dimensional coordinate system, the second set of

traces having one or more widths including a minimum width."  What Dr. Maharbiz identifies as

the second set of traces (which he also labels as the "drive lines") are not "arranged along a

second dimension of a two-dimensional coordinate system."    The second set of traces that

Apple identifies in the Galaxy Tab 7.0 are arranged in both dimensions of a two-dimensional

coordinate system, not just one.  Below, I have illustrated the two dimensions (Y dimension in

yellow and X dimension in green) of the second set of traces that Dr. Maharbiz uses to

incorrectly argue that they are in only one-dimension.[12]

---

[12]    By using and rebutting the images provided by Dr. Maharbiz in his Opening Report, I am not agreeing that his images are accurate, correct, or otherwise representative of any conductive traces that may be used in the Accused Devices.  I have not been able to verify the accuracy or credibility of the Scanning Electron Microscopy reports (Exhibits C and D) upon which Dr. Maharbiz relies in his Opening Report, because as I understand, these reports were never disclosed or provided to Samsung before the close of fact discovery in this case.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**



*See* Maharbiz Report at 79 and 17.

251.   The trace shape shown in the above Figure is very much unlike the trace shape described in the '129 patent.  The trace shape described in the '129 patent and the shape that I understand **[1B]** to be within the scope of "arranged along a first dimension of a two-dimensional coordinate system" is shown, for example, in Figure 9 of the '129 patent.  In Figure 9, the top traces (i.e., "Columns") are orthogonal to the bottom traces (i.e., "Rows") and they are each arranged in a dimension perpendicular to the other.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



Fig. 9

252.    Instead of Rows, the second set of traces Dr. Maharbiz identifies in the Figure at page 79 of his opening report shows the second set of traces as both Rows *and* Columns.  This is quite different than what is described in the '129 patent and is not what one of ordinary skill in the art would understand to be covered by the plain and ordinary meaning "arranged along a second dimension of a two-dimensional coordinate system."  I disagree that the "Galaxy Tab 7.0 show[s] how the electrodes are oriented parallel to one axis on a Cartesian grid."  *See* Maharbiz Report at 79 (Figure caption at ¶139).  One can clearly see that the electrodes are oriented both parallel and perpendicular to one axis on a Cartesian grid.

253.    In addition to the above, I am unable to confirm whether the images Dr. Maharbiz alleges show the conductive traces in a Galaxy Tab 7.0 (e.g., the image at the top of page 79 of his report) in fact show the "second set of traces in a Galaxy Tab 7.0."  *See* Maharbiz Report at 79 (Figure caption at ¶139).  Specifically, one of ordinary skill cannot conclude that those images show (a) conductive traces in a Galaxy Tab 7.0, or (b) a "second set of traces."  Dr. Maharbiz fails to cite a single Samsung or Atmel document (or any other evidence for that

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

matter), that supports the thin assertion that the images from an unverified Scanning Electron Microscopy report is in fact of the conductive traces used in the accused Galaxy Tab 7.0.  I have not had an opportunity to witness or inspect, or otherwise evaluate the testing and imaging by Ian Ward or Evans Analytical Group, nor, to my understanding, has Samsung had the opportunity to witness or inspect.  These images and the reports attached as Exhibits C and D to Dr. Maharbiz's report are insufficient to support Dr. Maharbiz's conclusions that the Galaxy Tab 7.0 has "a second set of traces of conductive material spatially separated from the first set of traces by a dielectric and arranged along a second dimension of the two-dimensional coordinate system, the second set of traces having one or more widths including a minimum width."

254.   Similarly for the Galaxy Tab 10.1, I am unable to confirm whether the images Dr. Maharbiz alleges show the conductive traces in a Galaxy Tab 10.1 (e.g., the image at the top of page 78 of his report) in fact show the "second set of traces (right) in a Galaxy Tab 10.1."  *See* Maharbiz Report at 78 (Figure caption at ¶138).  Specifically, one of ordinary skill in the art can not conclude that those images show (a) conductive traces in a Galaxy Tab 10.1, or (b) a "second set of traces."  Dr. Maharbiz fails to cite a single Samsung or Atmel document (or any other evidence for that matter), that supports the thin assertion that the images it alleges from an unverified Scanning Electron Microscopy report is in fact of the conductive traces used in the accused Galaxy Tab 10.1.  I have not had an opportunity to witness or inspect, or otherwise evaluate the testing and imaging by Ian Ward or Evans Analytical Group, nor, to my understanding, has Samsung had the opportunity to witness or inspect.  These images and the reports attached as Exhibits C and D to Dr. Maharbiz's report are insufficient to support Dr. Maharbiz's conclusion that the Galaxy Tab 10.1 has "a second set of traces of conductive material spatially separated from the first set of traces by a dielectric and arranged along a

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

second dimension of the two-dimensional coordinate system, the second set of traces having one or more widths including a minimum width."

255.    For the Galaxy Tab 7.0, Dr. Maharbiz also alleges that the image at D-11 and shown on the top of page 79 of his report shows that "each of the second set of traces has substantially the same width."  *Id.* at ¶139).  I disagree.  From simply looking at the image, which is the basis of Dr. Maharbiz's many conclusions regarding infringement, one can see that the width of the second set of traces clearly varies.  Below are two images of the what appears to be the same trace Maharbiz identifies at page 79 as being substantially the same width (shaded red), and one can see that the widths vary.



256.    Moreover, Dr. Maharbiz cites no support and provides absolutely not explanation or illustration for his assertion that the second set of traces has substantially the same width.  He simply states: "As shown below, each of the second set of traces has substantially the same width – a minimum width along their entire length."  The image he provides at page 79 of his Opening Report is a faint SEM image of what he is alleging contains the drive traces.  But he fails to

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

identify any widths that are substantially constant.  In fact, he fails to identify any widths at all.

The allegedly second set of traces in Dr. Maharbiz's image include many different widths that

could be considered, as Dr. Maharbiz himself shows, for example, in the below figure from page

164 of the Maharbiz Report.  I have highlighted the various calculated widths in yellow.



257.    I also note that Dr. Maharbiz is improperly importing a limitation into claim 1 that

is not only nonexistent, but is in fact contrary to the plain language of claim 1.  Dr. Maharbiz is

importing the new limitation that the second set of traces must have "substantially the same

width – a minimum width along their entire length."  This limitation is not in claim 1, and Apple

failed to identify the term "having one or more widths including a minimum width" for

construction.   The explicit and clear language of that claim clearly is not limited to a second

trace that has "substantially the same width" when it clearly states it covers "one **or more**

widths."   Moreover, claims 24-26, for example, specifically and explicitly claim the limitation

that Apple and its expert are now trying to improperly import into claim 1 – "wherein each of the

drive traces is of a substantially constant width."  Clearly, had the applicant meant for claim 1 to

be limited in that way, the limitation in claims 24-26 would have been used.  But the applicant

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

specifically chose not to use that language and limitation, and therefore Apple's and Dr.

Maharbiz's construction "one or more widths including a minimum width" is wrong.  Under this

wrong construction, the Galaxy Tab 7.0 does not meet this limitation literally or under the

doctrine of equivalents.

258.    It is my understanding that "having one or more widths including a minimum

width" should be entitled to its plain and ordinary meaning which is not "substantially the same

width – a minimum width along their entire length."  Apple has failed to analyze this claim

limitation under the plain and ordinary meaning of that term and therefore has failed to meet its

burden of showing how the Accused Products infringe this limitation.

259.    For both the Galaxy Tab and the Galaxy Tab 10.1, Apple has failed to show any

evidence of a dielectric spaced between the alleged first and second traces in this specific section

of the report for this limitation.  Apple fails to cite a single document in support of this position.

Instead, Apple and Dr. Maharbiz provide nothing more than a conclusory statement with no

support at all.  If Apple and Dr. Maharbiz seek to supplement their report or cite any evidence

not included in this section VI.D.4., I reserve the right to supplement to address any additional

argument or evidence.

260.    It is therefore my opinion that Apple has failed to establish that the Accused

Products infringe this limitation literally.  Although Apple has not specifically alleged

infringement under the doctrine of equivalents for this limitation (*see* Maharbiz Report ¶ 159), it

is my opinion that the Galaxy Tab 7.0 does not infringe under the doctrine of equivalents

because the difference between the way in which the saw-tooth design with traces in two

dimensions detects touch and that claimed in the '129 patent is not insubstantial.

3.      **Apple has Failed to Show that the "minimum width of the second set
        of traces is substantially greater than the maximum width of the first**

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

set of traces at least at an intersection of the first and second set of traces to provide shielding for the first set of traces"

(a)   Substantially wider second traces at an intersection

261.   Apple has failed to show that the Accused Products meet this limitation.  Apple provides nothing more than one paragraph of conclusory argument without a single citation to any documents or testimony in the Maharbiz Report for this limitation.  *See* Maharbiz Report at ¶ 141 .  The only citation provided is a vague reference to "see Figure, above," but there are many figures cited above.  It is not clear which figure Dr. Maharbiz is referring to.  None of the figures immediately above (i.e., Figures at the top of page 80) show "the width of the traces in the first set of traces is approximately 1.0-1.1 mm and the width of the traces in the second set of traces is approximately 5 mm (see Figure, above)."  *Id.*  And this "see Figure" cite is presumably for only one Figure, and no single figure in the Maharbiz Report shows images for both the Galaxy Tab 7.0 and Galaxy Tab 10.1.  Apple has failed to identify how both the Galaxy Tab 7.0 and Galaxy Tab 10.1 meet the "substantially greater" limitation.

262.   Based on the images provided in the Maharbiz Report, however, the minimum width of the second set of traces in the Galaxy Tab 7.0 is not substantially greater than the maximum width of the first set of traces at an intersection of the two traces.  Looking at the illustration at pages 88 and 92 of the Maharbiz Report, it appears that at the intersection, the width of the second set of traces is not substantially greater than the width of the first set of traces.  For example, in that illustration shown below, Apple highlights the overlapping first set of traces in white.  *See id.* at ¶ 153.  The second set of traces appears to be shaded as well.  But the ***minimum*** width of the shaded second set of traces is narrower than the ***maximum*** width of the first set of traces.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**



263.     Below I have indicated the minimum width of the second set of traces (yellow arrow below) and the maximum width of the first set of traces (green arrow below).  The maximum width of the first set of traces includes both of the "winged" protrusions.  To the extent Apple argues that the width of the second set of traces must be measured perpendicular to the

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

width of the first set of traces, I have also indicated the minimum width of the second set of traces (purple arrow below) that is perpendicular to the maximum width of the first set of traces (green arrow below).



*See* Maharbiz Report at ¶158/pg. 92.

264.    Dr. Maharbiz concedes that each of the above identified widths are relevant widths of the drive traces, and he even includes a third width for the "teeth" of the saw-tooth, which are in the "Y" direction as explained above (one "tooth" width is circled in red below). Dr. Maharbiz also indicates the width of a portion of the "winged" protrusions on the first set of traces (circled in green below).  He fails, however, to include the entire width of the winged protrusion as I indicated in the illustration above.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



See Maharbiz Report at pg 164.

265.     At ¶ 150 of the Maharbiz Report, Dr. Maharbiz again fails to cite a single document or any testimony supporting his conclusion that the width of the second set of traces in the Samsung Galaxy Tab 7.0 are substantially greater than the maximum width of the first set of traces at least at an intersection of the first and second sets of traces to provide shielding for the first set of traces.  He also states, without any support, that "the width of the traces in the first set of traces is approximately 1 mm and the width of the traces in the second set of traces is approximate 4.2 mm." *Id.*  Dr. Maharbiz does not explain where he got these numbers from.

(b)     Shielding

266.     Dr. Maharbiz concludes that the Accused Products meet the shielding limitation based entirely on assumptions and calculations.  He fails to cite a single Samsung document other than a single page showing nothing more than the structure of the "touchscreen stack" in the Galaxy Tab 10.1 (SAMNDCA10890323).  *See* Maharbiz Report at pg. 86.  He also cites no testimony, no testing, or any other evidentiary support.  His conclusions regarding shielding are

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

based entirely on calculations rather than an analysis of any of the evidence produced in this case. To the extent Dr. Maharbiz's assertions regarding shielding that are based entirely on the geometry of the accused trace arrangements is sufficient, all of the references disclosing the same trace geometry anticipate this limitation and invalidate the '129 patent. *See, e.g.,* Von Herzen Opening Report, references Gerpheide '658, Velos, Philipp '898, Tamaru '454, Hotelling '369, and Kazama '118 and the related invalidity charts.

267.    Dr. Maharbiz's analysis rests on at least two large assumptions that he has failed to establish. The first assumption is that the Accused Products use mutual capacitance to detect touch. Dr. Maharbiz concludes the Accused Products use mutual capacitance coupling with nothing more than an analysis of structure. He cites no documents, no deposition testimony, and no controller datasheets or circuit diagrams to reach this conclusion. *See* Maharbiz Report ¶¶ 143-155. If that is sufficient to show mutual capacitance coupling, then all of the prior art references disclosing the same trace arrangement and geometry also show mutual capacitance coupling. Dr. Maharbiz has failed to cite any documents or testimony that even suggests that the Accused Products rely on mutual capacitance. *See, e.g,* Von Herzen Opening Report, references Gerpheide '658, Velos, Philipp '898, Tamaru '454, Hotelling '369, and Kazama '118 and the related invalidity charts.

268.    The second assumption for at least the Galaxy Tab 10.1[13], is that Dr. Maharbiz assumes that the drive lines are perfect shields in the places where they exist, and that the only leakage of electric field is in the slots between adjacent drive lines. This assumption is incorrect.

---

[13]    Dr. Maharbiz does not analyze the shielding effect for the Galaxy Tab 7.0 and therefore I have nothing to rebut or analyze in providing my opinions of noninfringement. *See, e.g.,* Maharbiz Report ¶ 155 (providing nothing more than the conclusory statement that "[t]his results in the shielding effect noted above in my Shielding Calculations"). To the extent Apple provides any substantive analysis or explanation showing that the Galaxy Tab 7.0 meets the shielding limitation, I reserve the right to respond to those new arguments.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

The resistivity of the shield layer has a significant effect on the effectiveness of the shield.  The lower the resistivity, the better the shielding.  Therefore, I disagree with the assumption that the shield resistivity is insignificant and with Dr. Maharbiz's conclusions.

269.    If we assume that Dr. Maharbiz's assumptions are true, the Samsung Galaxy Tab 10.1 calculations shows that the drive layer shield concept can, under perfect conditions (perfect ground connection through the drive electronics, and perfect shielding by the ITO), can achieve -8.2dB attenuation of the noise coupling from the LCD.  However, only a portion of the field intercepted by the drive traces is drained away through the ITO/drive electronics path.  In my experience, and in the "real world," the drive electronics does not typically produce a zero ohm internal impedance.  Also, the field lines from the LCD to the sense electrode are only partially intercepted by the wide drive line and are partially re-radiated from the drive line, and partially squeeze through the gaps.  Dr. Maharbiz ignores these very "real world" conditions.  So for these additional reasons, the attenuation of the field from the LCD is, in my opinion, considerably less that his ideal condition analysis, which only produces -8.2dB attenuation at best.

270.    It is therefore my opinion that Apple has failed to establish that the Accused Products infringe this limitation literally.  It also my opinion that the Galaxy Tab 7.0 does not infringe this limitation literally.  Although Apple has not specifically alleged infringement under the doctrine of equivalents for this limitation, it is my opinion that the Galaxy Tab 7.0 does not infringe under the doctrine of equivalents because the difference between the way in which the saw-tooth design detects touch and that claimed in the '129 patent is not insubstantial.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

4.    **Apple has Failed to Show sensors "formed at locations at which the first set of traces intersects with the second set of traces while separated by the dielectric"**

271.    Again, Dr. Maharbiz concludes there are sensors formed at intersections with nothing more than an analysis of structure.  He cites no documents, no deposition testimony, and no controller datasheets or circuit diagrams to reach this conclusion.  *See* above and Maharbiz Report ¶¶ 1157-159.  If that is sufficient to show sensors, then at least the following prior art references also show mutual capacitance coupling and anticipate this limitation: Gerpheide '658, Velos, Philipp '898, Tamaru '454, Hotelling '369, and Kazama '118.  *See* Von Herzen Opening Report.

272.    Dr. Maharbiz also fails to identify at which intersection the sensors are formed. He identified at least 7 separate white shaded areas where he alleged the traces "overlap" in the Galaxy Tab 7.0.  *See* Maharbiz Report Figure at page 92.  It is not clear whether Apple is alleging that sensors are formed at each of these overlaps, and if not, where exactly the sensor is located.

273.    Apple has also failed to present any opinions regarding infringement under the doctrine of equivalents for any limitation of claim 1.  I disagree with Dr. Maharbiz that he must wait until seeing noninfringement opinions before offering a doctrine of equivalents analysis.  If there were infringement under the doctrine of equivalents, he had sufficient information and should have included them in his opening report.  Because he failed to, I can only guess at what his doctrine of equivalents arguments may be.

274.    To the extent Apple argues infringement under the doctrine of equivalents for any limitation of claim 1, I reserve the right to supplement this report to address any such arguments.

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

I also note that the following limitations were added during prosecution to narrow the claim and overcome prior art and are therefore equivalency is not available:

- "the first set of traces having one or more widths including a maximum width"

- "the second set of traces having one or more widths including a minimum width"

- "the minimum width of the second set of traces is substantially greater than the maximum width of the first set of traces at least at an intersection of the first and second sets of traces"

275.    Apple has also failed to show that Apple's products meet all the limitations of claim 1.  The only support Apple offers for its conclusory statement that all of the Apple iPhone and iPad devices practice the '129 patent is a discussion with the named inventors of the '129 patent and citation to a number of documents.  Apple offers no substantive opinions or explanation regarding how those Apple products practice the '129 patent.  For proof of shielding, Apple apparently relies on statements by the inventors, but cites no documents and no deposition testimony produced or elicited in this case.  It appears that the only evidence of shielding is a private and undisclosed conversation with the inventors of the '129 patent which I understand is improper and insufficient evidence that the accused products meet the shielding limitation of claim 1.  To the extent Dr. Maharbiz is allowed to rely on this conversation, I request an opportunity to learn the details of the conversation and reserve the right to consider this information and supplement my opinions and report accordingly.  To the extent Apple attempts to rely only on the structure of any conductive traces used in the Apple touch panels, that reliance only further highlights that the prior art references and systems disclosing similar structure also disclose the shielding limitation.

276.    Finally, as detailed in my Opening Report, claim 1 is invalid in view of the prior art.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

### B.    Claim 3

277.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 3.  *See* Claim 1 analysis above.  Additionally, Dr. Maharbiz has failed to demonstrate infringement of claim 1 for the reasons set forth above.  Therefore, Dr. Maharbiz and Apple cannot establish that the Accused Products comprise "the capacitive touch sensor panel of claim 1."

278.    Also, as explained in my Opening Report, "substantially electrically isolate" is indefinite.  Therefore, claim 3 is invalid for indefiniteness and in view of the prior art as explained in my Opening Report.

### C.    Claim 5

279.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 5.  *See* Claim 1 analysis above.  Additionally, Dr. Maharbiz has failed to demonstrate infringement of claim 1 for the reasons set forth above.  Therefore, Dr. Maharbiz and Apple cannot establish that the Accused Products comprise "the capacitive touch sensor panel of claim 1."

280.    Also, as detailed in my Opening Report, claim 5 is invalid in view of the prior art.

### D.    Claim 7

281.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 7.  *See* Claim 1 analysis above.  Additionally, Dr. Maharbiz has failed to demonstrate infringement of claim 5 for the reasons set forth above.  Therefore, Dr. Maharbiz and Apple cannot establish that the Accused Products comprise "the capacitive touch sensor panel of claim 5."

282.    Also, as detailed in my Opening Report, claim 7 is invalid in view of the prior art.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

E.     **Claim 9**

283.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 9.  *See* Claim 1 analysis above.

284.    Also, as detailed in my Opening Report, claim 9 is invalid in view of the prior art.

F.     **Claim 10**

285.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 10.  *See* Claim 1 analysis above.

286.    Also, as detailed in my Opening Report, claim 10 is invalid in view of the prior art.

G.     **Claim 12**

287.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 3, Apple fails to show that the Accused Products infringe claim 10.  *See* Claim 1 and Claim 3 analysis above.  Additionally, Dr. Maharbiz has failed to demonstrate infringement of claim 10 for the reasons set forth above and therefore Dr. Maharbiz and Apple cannot establish that the Accused Products comprise "the capacitive touch sensor panel of claim 10."

288.    Also, as explained in my Opening Report, "substantially electrically isolate" is indefinite.  Therefore, claim 12 is invalid for indefiniteness and in view of the prior art as explained in my Opening Report.

H.     **Claim 14**

289.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 14.  *See* Claim 1 analysis above.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

290.   Also, as detailed in my Opening Report, claim 14 is invalid in view of the prior art.

### I.   Claim 16

291.   For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 16.  *See* Claim 1 analysis above.

292.   Also, as detailed in my Opening Report, claim 16 is invalid in view of the prior art.

### J.   Claim 24

293.   For the same reasons that Apple has failed to show that the Accused Products infringe claim 1, Apple fails to show that the Accused Products infringe claim 24.  *See* Claim 1 analysis above.

294.   Additionally, Apple has failed to put forth any support for its assertion that the ***purpose*** of widening the second set of traces was to substantially electrically isolate the first set of traces from the LCD.  Apple provides nothing more than conclusory statements with no citations to documents or testimony.  *See, e.g.*, Maharbiz Report at ¶ 241.

### 1.   Apple has Failed to Show that the Accused Products Comprised Drive and Sense Traces

Dr. Maharbiz puts forth no evidence to support his conclusion that the Accused Products had "sense traces formed on a first layer" and "drive traces formed on a second layer." *See generally* Maharbiz Report ¶¶ 233-250 (failing to cite to a single document produced or deposition taken in this case and instead relying entirely on the SEM reports).  Drive traces and sense traces have specific functions within the context of a touch sensor panel.  Dr. Maharbiz in this section appears to arbitrarily name the traces "drive" and "sense" without any support that

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the touchscreen controller or the associated circuitry is driving one set of traces and using the other set of traces for receiving (or sensing).  Therefore, Dr. Maharbiz has failed to establish the Accused Products practice this limitation either literally or under the doctrine of equivalents.

### 2.   The Galaxy Tab 7.0 Does Not Include Drive Traces Each of "substantially constant width"

295.    Dr. Maharbiz without any support concludes that in the Galaxy Tab 7.0, "the drive traces are each of a substantially constant width, as illustrated below."  I disagree.

296.    First, the image of the alleged drive traces in the Galaxy Tab 7.0 that Dr. Maharbiz refers to include *four* different width: .24mm, 4.21mm, 2.0mm, and 4.43mm.  Four different widths is not a constant width.  If Dr. Maharbiz is alleging that one of those widths represents the "constant width," he fails to state such, and he fails to identify how any of those widths remain constant throughout the length of the trace. *Id.* at pg 157.  Dr. Maharbiz offers no explanation for his incredible leap from four separate widths shown in a very difficult to discern SEM image to concluding the drive trace with is substantially constant.  The images he cites are below.  The image on the right shows the four widths.

 

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

297.    Also, as explained in my Opening Report, "substantially electrically isolate" is indefinite.  Therefore, claim 24 is invalid for indefiniteness and in view of the prior art as explained in my Opening Report.

298.    Apple has also failed to present any opinions regarding infringement under the doctrine of equivalents for any limitation of claim 24.  I disagree with Dr. Maharbiz that he must wait until seeing noninfringement opinions before offering a doctrine of equivalents analysis.  If there were infringement under the doctrine of equivalents, he had sufficient information and should have included them in his opening report.  Because he failed to, I can only guess at what his doctrine of equivalents arguments may be.

299.    To the extent Apple argues infringement under the doctrine of equivalents for any limitation of claim 24, I reserve the right to supplement this report to address any such arguments.  I also note that the limitation "wherein each of the drive traces is of a substantially constant width" was added during prosecution and therefore is not entitled to the full range of equivalents.

**K.    Claim 26**

300.    For the same reasons that Apple has failed to show that the Accused Products infringe claims 1 and 24, Apple fails to show that the Accused Products infringe claim 26.  *See* Claim 1 and 24 analysis above.

301.    Also, as explained in my Opening Report, "substantially electrically isolate" is indefinite.  Therefore, claim 3 is invalid for indefiniteness and in view of the prior art as explained in my Opening Report.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

**L.**   **Claim 28**

302.    For the same reasons that Apple has failed to show that the Accused Products infringe claim 26, Apple fails to show that the Accused Products infringe claim 28.  *See* Claim 26 analysis above.  Additionally, Dr. Maharbiz has failed to demonstrate infringement of claim 26 for the reasons set forth above and therefore Dr. Maharbiz and Apple cannot establish that the Accused Products comprise "the touch sensitive computing system of claim 26."

303.    Also, as explained in my Opening Report, "substantially electrically isolate" is indefinite.  Therefore, claim 3 is invalid for indefiniteness and in view of the prior art as explained in my Opening Report.

## XVI.   ABUNDANCE OF NON-INFRINGING ALTERNATIVES

304.    It is my opinion that there are many alternative touch sensor panel designs that do not use the accused touch sensor panel design.  I disagree with Dr. Maharbiz that "[n]o equivalent alternative, non-infringing touchscreen technologies were in existence when the Samsung Galaxy Tab 10.1 entered the market in early 2011."

305.    Based on my experience with touchscreens and input devices, as well as the experience outlined in Exhibit B to my opening report, as well as discussions with Samsung's touchscreen engineers, I believe the alternatives outlined below can be implemented without substantial cost and effort.  In fact, two designs using a single-layer for driving and sensing have already been implemented by Samsung and one of those designs will be used commercially in a shipping product in approximately three to four months.

306.    First, a diamond shaped, two-layer touch panel design that has been well known in the art and is described in U.S. Patent No. 4,733,222 ("the '222 patent") is at least one example of a noninfringing alternative design to the Asserted Claims of the '129 patent.  The design

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

described in the '222 patent would be feasible and could be implemented in the Accused

Products with similar performance characteristics to the currently accused designs.  An example

of that design is shown in Figure 13 of the '222 patent. As shown below, at the intersection of the

top sense and bottom drive traces, the width of the drive traces is identical to the width of the

sense traces.  Therefore, this design would not meet at least the following limitations:

- "wherein the minimum width of the second set of traces is substantially greater than the maximum width of the first set of traces at least at an intersection of the first and second sets of traces";

- "wherein the drives traces are widened as compared to the sense traces to substantially cover the second layer except for a gap between adjacent drive traces"



See '222 patent at Fig. 13.

307.    I also understand that Samsung has developed the following two designs using a

single-layer for driving and sensing and has created working prototypes using each of the

designs.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

B.      **The Single Layer Diamond Pattern Design**

308.    The single layer diamond pattern design is a single layer capacitive touch sensor panel.  The shield layer is a solid ground plane of ITO with a typical resistivity of 250 ohms per square.  The figures below illustrate this design.



309.    The stackup can be seen in the produced 10.1" G2 Specification, comprising 0.85 mm of G2 glass upon which is sputtered a 150 ohm/square resistivity ITO film with an approximate thickness of 2 um.  *See* Exhibit E, "10.1 G2 Specification" at SAMNDCA00374374.  The sputtered ITO film is patterned lithographically into diamond-shaped drive and sense capacitors.  Alternating diamonds are bridged with a bridge of ITO with insulation underneath.  A shield film of ITO provides a ground plane with 250 ohms/square.  This film is bonded to the G2 glass using an optically clear adhesive approximately 150 um thick.  The shield is a continuous ground plane of transparent conductor with no sense or drive electrodes.  For example, the G2 specification for the 10.1 Tab outlines these dimensions as shown below.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## 10.1" G2 Specification

### ■ G2 Stackup vs GFF Stack up

| Type | G2 | | | |
|------|----|----|----|----|
| Stack up | Rx, Tx — G2 0.85t / OCA 0.15 / Shield Film 0.125 ; Shield — Insulation | | | |
| Total Thickness | 1.125T | | | |
| Material Spec — Glass | Glass / Sheet process | | | |
| Material Spec — Rx,Tx Surface R. | 150Ω/□ (±20%) / ITO Sputter process | | | |
| Material Spec — Bridge ITO | 150Ω/□ (±20%) / ITO sputter porcess | | | |
| Material Spec — Shield Film | P/N : M4012SC By LG Hausys | | | |
| Optical Characteristic | Transmit tance | Reflect ance | Color Diff | Haze |
| | 89.16% | 9.0% | 1.1 | 0.5 |

*See id.*

310. It is my understanding that the single layer, diamond pattern G2 design has also been developed for the Tab 7.0 product using the same specifications shown above for the G2.

311. The sputtered ITO film is patterned lithographically into diamond-shaped drive and sense capacitors. Alternating diamonds are bridged with a bridge of ITO with insulation underneath. A shield film of ITO provides a ground plane with 250 ohms/square. This film is bonded to the G2 glass using an optically clear adhesive approximately 150 um thick. The shield is a continuous ground plane of transparent conductor with no sense or drive electrodes.

312. The diamond pattern does not meet all elements of the Asserted Claims of the '607 patent because, for example, touch driving and sensing are performed in a single layer. The

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

capacitive coupling change is from layer 1 to layer 1.  The diamond pattern does not meet all elements of the Asserted Claims of the '129 patent because, for example, there is no shielding using wider traces.  The shielding is done using a dedicated ground plane as depicted in the figure above.  The diamond pattern does not meet all the elements of the Asserted Claims of the '129 patent for at least these additional reasons:

- the sensors are not formed at locations where the drive and sense traces intersect;

- the drive traces are not widened to as compared to the sense traces to substantially cover the second layer;

- there is no first and second layer wherein the charge coupling change is measured between first and second layers.

313.    Samsung has developed commercially acceptable and working touch sensor panels that implement the single layer, diamond pattern design, and those touch sensor panels using the diamond pattern design do not infringe the Asserted Claims of the '607 and 129 patents.  It is my understanding that those commercially acceptable diamond pattern touch sensor panels are scheduled for commercial sale as early as three to four months from the date of this report.

### C.    The Single Layer Bar Pattern Design

314.    The single layer bar pattern design is a single layer capacitive touch sensor panel. The shield layer is a solid ground plane of ITO with a typical resistivity of 250 ohms per square. The figure below illustrates the bar pattern design.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



315.     The stackup can be seen in the produced "10.1 G2 Specification" above, comprising 0.85 mm of G2 glass upon which is sputtered a 150 ohm/square resistivity ITO film with an approximate thickness of 2 um.  The sputtered ITO film is patterned lithographically into bar-shaped drive and sense capacitors.  Lines are bridged with ITO and insulation underneath.  A shield film of ITO provides a ground plane with 250 ohms/square.  This film is bonded to the G2 glass using an optically clear adhesive approximately 150 um thick.  The shield is a continuous ground plane of transparent conductor with no sense or drive electrodes.

316.     The bar pattern does not meet all elements of the Asserted Claims of the '607 patent because, for example, touch driving and sensing is performed in a single layer. The capacitive coupling change is from layer 1 to layer 1.  The bar pattern does not meet all elements of the Asserted Claims of the '129 patent because, for example, there is no shielding using wider traces.  The shielding is done using a dedicated ground plane as depicted in the figure above.

317.     Samsung has developed working touch sensor panels that implement the single layer bar pattern. The single layer bar pattern does not meet all elements of the Asserted Claims

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

of the '607 patent because, for example, it is a single layer and the capacitance coupling change is from layer 1 to layer 1.  The single layer bar pattern does not meet all elements of the Asserted Claims of the '129 patent because, for example, there is no shielding using wider traces.  The shielding is done using a dedicated ground plane as depicted in the figure above.  The single layer bar pattern does not meet all the elements of the Asserted Claims of the '129 patent for at least these additional reasons:

- the sensors are not formed at locations where the drive and sense traces intersect;

- the drive traces are not widened to as compared to the sense traces to substantially cover the second layer;

- there is no first and second layer wherein the charge coupling change is measured between first and second layers.

318.    Samsung has developed working touch sensor panels that implement the single layer bar pattern.

## XVII.  NO EVIDENCE OF EMULATING APPLE

319.    As explained above at paragraph 18, section VIII of Dr. Maharbiz's report is not relevant to infringement.  And as explained at paragraph 18, Apple fails to show that Samsung had the relevant knowledge and intent to infringe the '129 and '607 patents necessary for willful infringement.  I disagree with Dr. Maharbiz that the documents he cites in section VIII evidence copying the designs claimed in the Asserted Claims.  None of the documents reference the '129 or '607 patent.

320.    I also disagree with Dr. Maharbiz's opinions in paragraph 282 of his opening report.  The Atmel documents are not evidence of copying for a number of reasons.  Namely, Mr. Brunet, Atmel's touch sensor panel designer and one of the inventors of Philipp '898, testified in this case that all the shielding aspects of the accused touchscreens were implemented

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

in the Velos system (see Exhibit 129-3 of my opening report) years before Apple filed its '129

patent.  See the deposition testimony of Samuel Brunet.

321.    Moreover, I am unaware of any deliberate copying of the subject matter of the

Asserted Claims.  Significantly, there can be no copying of Apple's '129 patent, for example,

because the accused touch sensor panels were clearly well known in the art before December

2005.  For example, U.S. Patent No. 4,571,454 ("Tamaru '454"), a Sony patent for a capacitive

touch sensor filed in 1983 and issued in 1986, shows the accused Tab 10.1 design, and even

labels the Tab 10.1 designs as "Prior Art" as of 1983:



*See* Figure 1 of Tamaru '454; Maharbiz Report at 117.


# XVIII. MISCELLANEOUS

### A.    Supplementation of Opinions

322.    I understand that some discovery is still ongoing, and Apple has not yet

articulated its responses to my invalidity opinions.  Therefore, I reserve the right to adjust or

**SUBJECT TO PROTECTIVE ORDER**
**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

supplement my opinions after I have had the opportunity to review further deposition testimony and additional documents that brought to my attention.

      **B.**     <u>**Compensation**</u>

     323.    For purposes of this litigation, I am being compensated for my time at the rate of $575 per hour.  My compensation is not contingent upon my performance, the outcome of this litigation, or any issues involved in or related to this litigation.

Dated:  April 16, 2012

**Dr. Brian Von Herzen**