Exhibit 28

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California corporation,
                              Plaintiff,

        vs.


SAMSUNG ELECTRONICS CO., LTD., a
Korean business entity; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,
                              Defendants.


**EXPERT REPORT OF NICHOLAS P. GODICI**

## I.     INTRODUCTION

1.       I, Nicholas P. Godici, have been retained in connection with the above-referenced matter on behalf of Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung").  I have been asked to provide expert testimony on rules, practices, and procedures before the United States Patent and Trademark Office ("USPTO"),[1] including those related to the examination and prosecution of utility and design patent applications. I have also been asked to opine on the application of those rules, practices, and procedures to the facts in this case and particularly with respect to the scope of U.S. Design Patent Nos. D504,889 ("D'889"), D593,087 ("D'087"), D618,677 ("D'677"), D622,270 ("D'270"), D604,305 ("D'305"), D617,334 ("D'334"), and D627,790 ("D'790") (collectively, the "Asserted Design Patents"), and inequitable conduct with respect to the prosecution of U.S. Patent No. 7,853,891 ("'891 patent"), which are patents asserted against Samsung by Apple Inc. ("Apple").

2.       If asked at hearings or trial, I am prepared to testify regarding the matters I discuss in this report. I also reserve the right to give opinions on facts and other matters arising subsequent to this report, including in rebuttal to any matter raised by the parties or their experts, either prior to or during any hearing or trial in this action.

### A.     *Background And Qualifications*

3.       I am currently the Executive Advisor for the intellectual property law firm of Birch, Stewart, Kolasch and Birch, LLP, located in Falls Church, Virginia.

4.       I have over 39 years of experience in the patent field.  I spent my entire career, until my retirement in March 2005, at the USPTO.  Most recently, I served as the

---

[1]  I may refer to the USPTO as simply the PTO.

Commissioner for Patents at the USPTO from March 2000 to March 2005.  I also served as the Acting Under Secretary of Commerce for Intellectual Property and Director of the USPTO from January to December 2001.  Additionally, in 2009, at the request of the Secretary of Commerce, I accepted a temporary assignment at the USPTO to act as an expert advisor to the Secretary and Acting Under Secretary, prior to Senate confirmation of the new Under Secretary nominated by the President.

5.          I began my career at the USPTO in 1972 as a patent examiner, and held the positions of Supervisory Patent Examiner ("SPE"), Group Director, Deputy Assistant Commissioner for Patents, and Acting Assistant Commissioner for Patents before being named Commissioner for Patents by the Secretary of Commerce on March 29, 2000.  As Commissioner for Patents, I was responsible for all aspects of patent-related operations at the USPTO, including a budget of over $750 million and a staff of over 5,000 employees that included the entire patent examining corps.  I have testified before Congress, both the House and Senate, on various intellectual property matters. During my time at the USPTO, I examined approximately 7,000 patent applications.

6.          As Acting Under Secretary of Commerce for Intellectual Property and Director of the USPTO, I reported to and advised the Secretary of Commerce on all intellectual property matters and was responsible for all managerial aspects of the USPTO.  I retired from the USPTO in March 2005.

7.          I hold a Bachelor of Science degree in Engineering Mechanics from Pennsylvania State University, awarded in 1972, and a Certificate of Advanced Public Management from The Maxwell School of Citizenship and Public Affairs, Syracuse University, in 1999.  My *curriculum vitae* is attached as **Exhibit A** to this report.  I may

testify with respect to my responsibilities and experiences relating to the information listed in **Exhibit A**.

8.          **Exhibit B** attached to this report lists those cases in which I have testified as an expert witness in deposition or trial in the past four years.

9.          In rendering my opinions, I have reviewed and considered the materials listed in **Exhibit C** attached to this report, in whole or in part, in addition to the materials expressly referenced herein.  This report may be supplemented should additional materials be produced in this matter.

10.          Birch, Stewart, Kolasch & Birch, LLP is being compensated at the rate of $750 per hour for my time in this case.  The compensation received from this case is not contingent upon my opinions or performance, the outcome of the case, or any issues involved in or related to the case.

###          *B.          Scope Of My Opinions*

11.          At the present time, I expect to testify on USPTO policies and procedures, on the rules and procedural requirements governing the filing and prosecution of patent applications in the USPTO and the grant of U.S. patents by the USPTO, including the rules and procedures governing the examination of utility and design patent applications, the understanding of PTO examiners when they are examining utility and design patent applications, and on my opinions regarding the same, in view of the evidence surrounding the examination of the D'889, D'087, D'677, D'270, D'305, D'334, D'790, and '891 patents.

12.          The opinions stated in this report are based on information currently available to me.  I reserve the right to continue my investigation and study, which may include a review of documents, expert reports, or other information that may yet be

## II.      THE PATENT EXAMINATION PROCESS

13.      In general terms, a "utility" patent protects the way an article is used and works (35 U.S.C. § 101)[2] while a "design" patent protects the way an article looks (35 U.S.C. § 171)[3].  In design patent protection the ornamental appearance of an article includes its shape, configuration or surface ornamentation applied to the article or both. Both design and utility patents may be obtained on an article if invention resides both in its utility and ornamental appearance.[4]  The vast majority of rules and procedures for examining utility and design patent applications within the USPTO are identical. However USPTO regulations 37 C.F.R. 1.152-1.155 are specific to design patent applications.  Chapter 1500 of the Manual of Patent Examining Procedure ("MPEP") sets forth the procedures and guidance specific to the examination of design patent

---

[2] **35 U.S.C. 101 Inventions patentable.**
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

[3] **35 U.S.C. 171 Patents for designs.**
Whoever invents any new, original, and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.
The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

[4]  *See* MPEP 1502.01.

applications.  Practices and procedures set forth in the other Chapters of the MPEP apply

to both utility and design applications except as particularly pointed out in Chapter 1500.[5]

  14.   An applicant for either a utility or design patent in the United States

initiates the application process by filing an application with the USPTO detailing the

subject matter for which patent protection is sought.  A utility patent application is

required to include a specification, a claim or claims, drawings when necessary, an

inventor's oath or declaration, and the required fees.[6]  A design patent application is

required to include a specification, a single claim, drawings or photographs, an inventor's

oath or declaration, and the required fees.[7]  Drawings or photographs are an essential part

of a design patent application since they constitute the entire visual disclosure of the

claimed invention.[8]  The single claim of a design patent application is to the "ornamental

design for the article (specifying name) as shown or as shown and described" in the

specification and drawings.[9]  The oath or declaration made by the inventor in both utility

and design applications certifies that the inventor believes that he or she is the original

first inventor of the subject matter claimed and for which a patent is sought.  The inventor

also makes various other certifications required by law and various USPTO rules.[10]

  15.   Under certain circumstances, a U.S. utility patent application may be

entitled to claim the benefit of the filing date of an earlier filed application.  For example,

it is possible to claim the benefit of an earlier-filed U.S. nonprovisional application under

35 U.S.C. § 120 or of an earlier-filed provisional application under 35 U.S.C. § 119(e).

---

[5] *See* MPEP 1501.
[6] *See* MPEP 601(a).
[7] *See* MPEP 1503
[8] *See* MPEP 1503.02.
[9] *See* 37 CFR 1.153.
[10] *See* MPEP 602.

This is sometimes called domestic priority.[11] Design patent applications may claim the benefit of an earlier-filed application under 35 U.S.C. § 120 but may not claim the benefit of an earlier-filed provisional application under 35 U.S.C. § 119(e).

16.     After a patent application is received, administrative staff for the USPTO performs a preliminary review to ensure that the application meets the formal requirements established by Congress and the USPTO.  The application is then assigned to an examiner in a particular technological area, who is responsible for examining the application and preparing an Office Action stating his/her conclusions with respect to patentability.  The examiner is required initially to determine whether the claim(s) of the application satisfy the requirements for patentability set forth in the patent statutes and regulations.

17.     The examination of claim(s) in both utility and design patent applications requires an examiner to conduct a search for "prior art" related to the claimed invention.[12]  Prior art may include, for example, patents (both U.S. patents and foreign patents) and non-patent publications (e.g., magazines and trade journals), sometimes called non-patent literature, that pre-date the applicant's invention.[13]  In addition, prior art may include prior public uses, sales, and offers for sale of the invention. [14]

18.     While applicants are not required to conduct a prior art search, they are required to disclose material information of which they are aware to the USPTO under their duty of candor and duty of disclosure.  Material information includes prior art patents and printed publications as well as information on enablement, prior public uses,

---

[11]   *See* MPEP 201.11.
[12]   *See* MPEP 704.01.
[13]   *See* MPEP 706.02(a).
[14]   *See* 35 U.S.C. § 102.

sales or offers for sale, invention by another and/or any other information that would impact the PTO's decision to issue the patent.  Many applicants disclose information of which they are aware to the PTO via an Information Disclosure Statement ("IDS").  If an IDS is filed in compliance with PTO regulations, the examiner will consider the prior art references or other information in the IDS during the examination of the application.

19.     After analyzing the prior art and any other issues, the examiner issues an Office Action rejecting claim(s), objecting to claim(s), or allowing the claim(s) of the application.[15]  Claim(s) may be rejected, for example, because they are not novel in light of the prior art or differ only in obvious ways from the existing prior art.  The references and information relied on by the examiner and the reasons for the rejection are set forth in the Office Action sent to the applicant.

20.     An applicant may reply to rejections and objections set forth in an Office Action by filing a written response that distinctly and specifically points out what the applicant believes are errors in the examiner's action.  The reply by the applicant or patent owner must be reduced to a writing which distinctly and specifically points out the supposed errors in the examiner's Action and must reply to every ground of objection and rejection in the prior Office Action.[16]

21.     The examiner then reviews any amendments and/or arguments submitted by the applicant to determine if the conditions for patentability are met.  The examiner can either allow the application or issue a new Office Action if rejections and/or objections remain.  If the patent application is found to be in allowable condition, a

---

[15]   *See* MPEP 707.

[16]   *See* MPEP 714.02.

Notice of Allowance will be sent to the applicant.  A fee for issuing the patent is due within three months from the date of the Notice.  Once the issue fee is paid, the application will issue as a patent.

22.        By law, all U.S. patents are presumed valid.[17]  This is sometimes called the "presumption of validity."  However, this presumption of validity may be overcome in litigation by presenting clear and convincing evidence of invalidity.[18]

### A.        Functionality vs. Ornamentation

23.        Articles of manufacture may include both functional and ornamental characteristics.[19]  It is therefore possible to obtain both utility and design patents on an article of manufacture that has both functional and ornamental features.

24.        MPEP 1504.01 sets forth guidance to USPTO examiners as well as the public on the distinction between functionality and ornamentation in relation to utility and design patent applications.  An ornamental feature or design has been defined as "one which was created for the purpose of ornamenting and cannot be the result or merely a by-product of functional or mechanical considerations."[20]  Ornamentation of an article must be the result of a conscious act by the inventor, as 35 U.S.C. §171 requires that a patent for a design be given only to "whoever invents any new, original, and ornamental design for an article of manufacture."  Therefore, for a design to be ornamental within the

---

[17]   35 U.S.C. § 282.

[18] *Microsoft Corp. v. i4i L.P. and Infrastructures for Information Inc.,* United States Supreme Court, No. 10-290, decided June 9, 2011.

[19] *See* MPEP 1502.01.

[20]   MPEP 1504.01(c) (internal quotation marks and citations omitted)

requirements of 35 U.S.C. § 171, it *must* be "created for the purpose of ornamenting." *In re Carletti*, 328 F.2d 1020, 1022, 140 USPQ 653, 654 (CCPA 1964).[21]

25.      While ornamentality must be based on the entire design, "[i]n determining whether a design is primarily functional, the purposes of the particular elements of the design necessarily must be considered." *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 240, 231 USPQ 774, 778 (Fed. Cir. 1986).  The court in *Smith v. M & B Sales & Manufacturing*, 13 USPQ2d 2002, 2004 (N. D. Cal. 1990), states that if "significant decisions about how to put it [the item] together and present it in the marketplace were informed by primarily ornamental considerations," this information may establish the ornamentality of a design.

### B.      Design Patents Are Understood By PTO Examiners To Have A Narrow Scope

26.      It is my opinion that design patent examiners consider design patents to have a very narrow scope limited to the exact drawings in the patent.  I base this opinion on the following:

27.      Patent examiners are informed that, unlike utility patents, design patents can only include a single claim.[22]  Design patent examiners therefore must reject design applications that seek to include more than one claim.[23]  Patent examiners are further informed that this single claim cannot protect multiple embodiments unless those embodiments share a "single inventive concept" and are therefore not "patentably distinct" from each other.[24]

---

[21]   MPEP 1504.01(c).
[22]   MPEP § 1504.05.
[23]   *Id.*
[24]   *Id.*  ("Embodiments that are patentably distinct from one another do not constitute a single inventive concept and thus may not be included in the same design application.").

10

28.      Design patent examiners are also instructed that two embodiments of a claim share a single inventive concept only where they "have overall appearances with basically the same design characteristics."[25]   They are further instructed that any "differences between the multiple designs are insufficient to patentably distinguish one design from the other" only where the differences "are *de minimis* or obvious to a designer of ordinary skill in the art."[26]

29.      Design patent examiners are instructed on yet another restriction: even where the differences between two "designs may prove to be obvious in view of the prior art . . . if the overall appearances are not basically the same, the designs remain patentably distinct."[27]   Indeed, in such cases the examiners are informed that "it doesn't matter for restriction purposes[] if the differences between the appearances of the embodiments are shown to be obvious in view of analogous prior art."[28]   Thus, if the designs do not have "overall appearances that are basically the same, restriction must be required since their appearances are patentably distinct."[29]

30.      In sum, patent examiners are informed that different designs must be segregated into separate design patents unless they meet the following three strict criteria: the designs are basically the same design, any differences are only *de minimis*, and the differences are not obvious to a designer of ordinary skill in the art.

31.      Design patent examiners therefore understand as a natural corollary to these restrictions that design patents necessarily encompass only the exact design claimed in the drawing(s) and cannot extend to similar designs that have more than a *de minimis*

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

### III.   MY ANALYSIS AND OPINIONS

32.   I understand that Apple has taken the position that the Asserted Design Patents are broad enough in scope that they are infringed by the Samsung products accused of design patent infringement in Apple's Amended Complaint.  I disagree.[30]

33.   I also understand that Apple did not disclose Mac OS 10.0, an Apple product that is prior art to the '891 patent and discloses all limitations of the claims, during the prosecution of the '891 patent application.

> **A.   *The Scope Of The Asserted Design Patents Is Plainly Narrow Because Apple Has Obtained Subsequent Design Patents On Very Similar Designs***

34.   A design patent may only be granted for a "new, original, and ornamental design."[31]  As design patent examiners are informed, "[t]he standard for determining novelty under 35 U.S.C. 102 was set forth by the court in In re Bartlett,  300 F.2d 942, 133 USPQ 204 (CCPA 1962).  'The degree of difference [from the prior art] required to establish novelty occurs when the average observer takes the new design for a different, and not a modified, already-existing design.'"[32]

---

[30]   Although I am not directly offering an opinion on noninfringement, I have reviewed the Amended Complaint to understand the scope that Apple is attempting to attribute to its Asserted Design Patents.  In my opinion, for Apple to claim that the accused Samsung products infringe its Asserted Design Patents, Apple is necessarily claiming that the scope of each Asserted Design Patent is larger than the exact drawings claimed therein.

[31]   35 U.S.C. § 171.

[32]   MPEP § 1504.02 (citation omitted).

35.    Thus, when design patent examiners allows a design patent to issue, they do so with the understanding that the design claimed by the patent is a different design, and not simply a modification of an already-existing design.

36.    I have reviewed numerous Apple design patents, many of which were applied for since the applications that led to the Asserted Design Patents (the "Apple Subsequently-Issued Design Patents").[33] Because the Apple Subsequently-Issued Design Patents design patents issued after the Asserted Design Patents, they must represent new designs, and not simply modifications of the Asserted Design Patents.

37.    Further, because many of the Apple Subsequently-Issued Design Patents claim designs that appear quite similar to those claimed by the Asserted Design Patents, the scope of the Asserted Design Patents is necessarily very narrow, such that the Apple Subsequently-Issued Design Patents would be understood by the average observer to be different designs.

38.    Furthermore, in signing the oath or declaration that accompanied each application that led to the Apple Subsequently-Issued Design Patents, each inventor of those patents was declaring an oath "that he believes himself to be the original and first inventor" of the design in question, and that he had "invented a new, original, and ornamental design."[34] Thus, in my opinion, each Apple designer who is listed as an inventor on any Apple Subsequently-Issued Design Patent swore that the design in that

---

[33] The additional Apple design patents that I reviewed included the following:  D558,756, D558,758, D580,387, D581,922, D586,800, D613,735, D622,719, D602,015, D622,718, D624,536, D604,297, D601,558, D602,016, D600,241, D602,014, D602,017, D634,319, D613,736, D615,083, D620,004, D622,720, D624,072, D627,343, D627,778, D633,091, D629,799, D630,630, D633,090, D633,092, D633,493, D633,908, D634,742, D636,390, D636,392, D638,835, D642,218, D602,486, D627,777, D637,596, D621,825, D597,101, and D644,239.  I am informed that the majority of these patents have been produced by Samsung at SAMNDCA00373535-SAMNDCA00374040, and that the remaining patents will be produced concurrently with this report.

[34] See MPEP §§ 1503 and 602 (quoting 35 U.S.C. § 115).

13

Apple Subsequently-Issued Design Patent was not encompassed in the scope of any previously-filed design patent applications, including those for the Asserted Design Patents.

### 1.   D'889 Must Have A Narrow Scope In Light Of Subsequently-Issued Design Patents

39.   The D'889 patent was issued to Apple on May 10, 2005.  On November 23, 2010, United States Design Patent No. D627,777 ("D'777) was issued to Apple.  The D'777 patent reveals that the D'889 patent was cited by the examiner during the prosecution of the application that led to the D'777 patent.

40.   The following are some figures from the D'889 and D'777 patents:



|  D'889  |  D'777  |
| --- | --- |

41.        The only differences between the designs shown in D'889 and D'777 appear to be the edge profiles, the thickness of the depicted devices, the presence of a single button on the front of the D'777, and the slightly rounded back panel of the D'777.

42.        Because the D'777 patent issued subsequent to the D'889 patent, the D'777 patent must claim a design that is new and different as compared to that of the D'889.  In other words, the design of the D'777 patent is not included within the scope of the D'889 patent.  In my opinion, this means that the scope of the D'889 patent must be construed narrowly so that it does not encompass the D'777 design.

### 2.        D'087 Must Have A Narrow Scope In Light Of Subsequently-Issued Design Patents

43.        The D'087 patent was issued to Apple on May 26, 2009.  On February 22, 2011, United States Design Patent No. D633,092 ("D'092) was issued to Apple.  The D'092 patent reveals that the D'087 patent was cited by the examiner during the prosecution of the application that led to the D'092 patent.

44.        The following are some figures from the D'087 and D'092 patents:

15



45.      The differences between the D'087 and the D'092 designs appear to be the following:  while the D'087 shows a speaker or earpiece, the D'092 only includes a small detail within that speaker or earpiece since the outline of the earpiece is in broken lines and is assumed to be disclaimed.  In addition, the D'092 claims the back of the device,

16

while the back of the device in the D'087 is depicted in broken lines. Further, the slope along the edge of the bezel may be slightly less in the D'092 than it is in the D'087.

46.     Because the D'092 patent issued subsequent to the D'087 patent, the D'092 patent must claim a design that is new and different as compared to that of the D'087. In other words, the design of the D'092 patent is not included within the scope of the D'087 patent. In my opinion, this means that the scope of the D'087 patent must be construed narrowly so that it does not encompass the D'092 design.

47.     My opinion is further informed by a comparison between D'087 and United States patent D634,319 ("D'319"). The application that led to the D'319 patent was filed on June 21, 2010, almost three years after the D'087 patent application was filed. As can be seen on the face of the D'319 patent, one of the References Cited during prosecution of the D'319 patent was the application for the D'087 patent, U.S. Appl. No. 29/282,833.

48.     The following are some figures from the D'087 and D'319 patents:



49.     The only difference between the D'087 and the D'319 designs appears to be the addition of oblique lines on the front face of the D'319 design.

50.     Because the D'319 patent issued subsequent to the D'087 patent, the D'319 patent must claim a design that is new and different as compared to that of the

D'087.  In other words, the design of the D'319 patent is not included within the scope of the D'319 patent.  In my opinion, this means that the scope of the D'087 patent must be construed narrowly so that it does not encompass the D'319 design.

### 3.     D'677 Must Have A Narrow Scope In Light Of Subsequently-Issued Design Patents

51.     The D'677 patent was issued to Apple on June 29, 2010.  On September 21, 2010, United States Design Patent No. D624,072 ("D'072) was issued to Apple.

52.     The following are some figures from the D'677 and D'072 patents:

19



53.        The only differences between the designs shown in the D'677 and the

D'072 appear to be the following:  while the D'677 claims a speaker (or earpiece) and a

rectangular feature on the front (screen), the D'072 does not appear to have lines

claiming those features; however, there are possibly dashed lines or breaks in the

background indicating where such features would be.  In addition, the D'072 claims the bezel and back of the device, while these features in the D'677 patent are depicted in broken lines.

54.      Because the D'072 patent issued subsequent to the D'677 patent, the D'072 patent must claim a design that is new and different as compared to that of the D'677.  In other words, the design of the D'072 patent is not included within the scope of the D'677 patent.  In my opinion, this means that the scope of the D'677 patent must be construed narrowly so that it does not encompass the D'072 design.

### 4.      D'270 Must Have A Narrow Scope In Light Of Subsequently-Issued Design Patents

55.      The D'270 patent was issued to Apple on August 24, 2010.  On February 2, 2011, United States Design Patent No. D633,091 ("D'091) was issued to Apple.  The D'091 patent reveals that its application was a continuation of application No. 29/344,620, which was the application that led to the D'270 patent.

56.      The following are some figures from the D'270 and D'091 patents:



57.     The only apparent differences between the D'270 and the D'091 designs appear to be that the D'091 patent claims a round feature at the bottom of the front face that is depicted in broken lines in the D'270, and that the D'270 claims a rectangular feature on the front that is depicted in broken lines in the D'091.

58.     Because the D'091 patent issued subsequent to the D'270 patent, the D'091 patent must claim a design that is new and different as compared to that of the D'270.  In other words, the design of the D'091 patent is not included within the scope of the D'270 patent.  In my opinion, this means that the scope of the D'270 patent must be construed narrowly so that it does not encompass the D'091 design.

### 5.     D'305 And D'334 Each Must Have A Narrow Scope In Light Of Each Other And In Light Of Subsequently-Issued Design Patents

59.     The D'305 patent was issued to Apple on November 17, 2009.  The D'334 patent was issued to Apple on June 8, 2010.  As can be seen on the face of the D'334 patent, one of the References Cited during prosecution of the D'334 application was the application for the D'305 patent, U.S. Appl. No. 29/281,460.

60.     The following are figures from the D'305 and D'334 patents:



61.     The only apparent differences between the D'305 and the D'334 designs appear to be as follows:  the D'334 shows an "E" in the upper left-hand corner where the D'305 seems to have the same "E" in a highlighted box; the D'305 shows the time "4:00 PM" in the upper center while the D'334 shows "2:39 PM"; the D'305 shows a "Calendar" icon with the number "6" and the day "Wednesday" while the D'334 shows a "Calendar" icon with the number "14" and the day "Monday"; the D'305 shows a "Calculator" icon with circles depicted inside, while the D'334 claims a "Calculator" icon with rounded squares inside and a thin, light colored border around the perimeter; the D'334 claims two additional icons – labeled with the text "iTunes" and "App Store" – that are not present in the D'305 figure; and, the D'334 shows two dots above the

lowermost row of icons, one small white dot and one small gray dot, while the D'305 does not show these details.  In addition to the figure shown above for D'305, that patent also includes a color version of the same figure.

62.    Because the D'334 patent issued subsequent to the D'305 patent, the D'334 patent must claim a design that is new and different as compared to that of the D'305.  In other words, the design of the D'334 patent is not included within the scope of the D'305 patent.  In my opinion, this means that the scope of the D'305 patent must be construed narrowly so that it does not encompass the D'334 design.

63.    Furthermore, because the design claimed by D'334 must be a new and different design as compared to that claimed by D'305, the design of D'305 must not be within the scope of D'334's claim.  In my opinion, this means that the scope of the D'334 patent must be construed narrowly so that it does not encompass the D'305 design.

### 6.    D'790 Must Have A Narrow Scope In Light Of Subsequently-Issued Design Patents

64.    The D'790 patent was issued to Apple on November 23, 2010.  On August 30, 2011, United States Design Patent No. D644,239 ("D'239) was issued to Apple.  The D'790 patent reveals that its application was a continuation of application No. 29/281,507.  The D'239 patent reveals that its application was a division of that same application, No. 29/281,507.

65.    The following are the figures from the D'790 and D'239 patents:

25



66.     The only differences between the D'790 and the D'239 designs appear to be that the squares in the D'239 patent having drawings inside them and words written below them, and that there is a horizontal line both immediately above and below the bottom row of squares in the D'239 patent.

67.     Because the D'239 patent issued subsequent to the D'790 patent, the D'239 patent must claim a design that is new and different as compared to that of the D'790.  In other words, the design of the D'239 patent cannot be included within the

26

scope of the D'790 patent.  In my opinion, this means that the scope of the D'790 patent must be construed narrowly so that it does not encompass the D'239 design.

**B.       The Scope Of Certain Of The Asserted Design Patents Is Plainly Narrow Because Samsung Has Obtained Design Patents On Its Own Smartphone Designs**

68.        I understand that Samsung was issued a number of design patents for mobile phones[35] after the Asserted Design Patents (and a number of the Apple Subsequently-Issued Design Patents) were issued.  It is my opinion that these Samsung design patents were issued by the design patent examiners because they were found to claim new and original designs.

69.        As one example of such a Samsung design, United States patent D638,815 ("D'815") was filed on Aug. 31, 2010 and was issued on May 31, 2011.  The D'815 patent indicates that the examiner cited at least two of Apple's design patents in issuing the patent:  D558,757 and D615,083.   Below are images of the three designs.

---

[35] I have reviewed the following Samsung design patents:  D548,713, D607,428, D635,540, D635,952, D638,815, D645,017, D645,435, D645,835, D646,249, D646,252, D648,693, D652,008, D652,812, D652,812, D653,230, D653,642, D653,645, D654,041, D654,049, D654,460, D654,461, D654,463, D654,889, D654,890, D654,891, D654,894,  D654,898, D654,899, and D654,900.  I am informed that these patents have been produced by Samsung at SAMNDCA00365613-SAMNDCA00365840.





Apple Design Patent 558,757:

70.        Where a patent indicates that the examiner cited a specific prior art reference, it means that the examiner considered the prior art design in deciding whether the applicant's design was patentably different.  This would have included a comparison of the entire cited reference with the entire design in the patent application.

71.        It is my opinion that the examiner properly granted the D'815 patent over the cited Apple prior art patents because D'815 patent is a distinct and different design from those two cited Apple references.  By way of example only, the D'815 patent includes more ornamentation than the other two designs, including the following:  the four symbols at the bottom of the front surface, two small details next to the earpiece, a button detail on the side perspective, and the camera and other rounded details on the back of the device.  D'815 design also has a differently shaped earpiece than the D'083 patent and the earpiece is positioned higher on the device.  The corners of the D'815 patent are rounded using different radii than the other patents, and the side profile view

shows that the D'815 patent has a boxier, more rectangular shape. The D'815 patent also includes a rectangular display screen that is not present in the other two patents.

72.      As mentioned above, patent examiners must conduct a prior art search before issuing a design patent. The D'815 patent indicates on its face that the field of classification search run for that application included all of the classifications listed on the D'087 and D'677 patents, both of which were issued prior to the D'815 application being filed. Because the PTO database was used to run the search for these field classifications, the examiner understood the D'815 design to be new and different from the D'087 and D'677 patents.

73.      In addition to the D'815 patent discussed above, Samsung has also obtained numerous other U.S. Design Patents.[36] By granting these design patents, the PTO necessarily considered all of these Samsung designs to be new and distinctly patentable designs.

### C.   For Certain Of The Asserted Design Patents, Apple Is Trying To Recapture A Claim Scope That It Expressly Disavowed During Prosecution To Overcome A Prior Art Rejection

74.      I understand that under the doctrine of "prosecution history estoppel" (or "file-wrapper estoppel") patent applicants who have made narrowing amendments to an application to avoid rejection cannot later seek to broaden the scope of their patents to cover the same subject matter they previously ceded. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-734 (2002).

75.      I have reviewed the entire prosecution history of the D'790 patent. While prosecuting the D'790 patent, the applicants originally submitted three figures on August

---

[36] *See supra* n.35.

30

20, 2007 depicting squares in columns and rows, with what appears to be a missing row above the bottom row.  Original Figure 1 was the following:



FIGURE 1

APLPROS0000012063

76.     On April 15, 2009, the applicants submitted a Second Preliminary Amendment that included ten figures, labeled Figure 2 through Figure 11.  These figures also included squares oriented in columns and rows, but with slight variations among the drawings.  For example, Figure 2 included twenty squares, arranged in four columns of five squares.  Figure 3 was identical except that one square was missing from the fourth column:[37]

---

[37] The other figures included additional variations on this grid pattern, including additional missing squares and rows, a 3x4 grid pattern, a 5x4 grid pattern, and squares and rectangles with square corners.



APLPROS0000012140-141

77.        On March 30, 2010, the US PTO issued an office communication to the

applicants rejecting the claim under 35 U.S.C. § 103(a) as being unpatentable in light of a

prior art reference called Wada.[38]  *See* APLPROS0000012212.  Here is the figure from

the Wada reference cited by the examiner:

---

[38] United States Patent Application 2006/0107207, filed Jan. 4, 2005; published May 18, 2006; and
ultimately issued as United States Patent 7,587,680 on Sept. 8, 2009.



*Wada, Fig. 4*

78.     According to the examiner, "[i]t would have been obvious to a designer of ordinary skill in the art at the time the invention was made to have arrived at the claimed design, which is a series of squares lined up in rows and columns." APLPROS0000012213.

79.     On May 14, 2010, the applicant submitted an amendment and reply, asking the PTO among other things to cancel Figures 2 through 11 and to replace Figure 1 with the following image:

REPLACEMENT SHEET
Sheet 1 of 1
Appl. No 29/283,656; Filed: August 20, 2007
Dkt. No 2607.010000C(P5545USC12); Group Unit: 2911
Tel. No. 202-371-2600
For: Graphical User Interface for a Display Screen or
    Portion Thereof



FIGURE

APLPROS0000012232.

The applicant sought to overcome the rejection by distinguishing the Wada reference,

noting that Wada disclosed a matrix of 17 squares in 4 columns.  The first column having

5 squares, and the remaining columns having 4.  The applicant stated that his design was

a matrix of 16 squares, each with rounded corners, provided in 4 columns.

Each column has 4 rounded squares.  The first three rows of rounded

squares in each column are spaced equally apart.   The third and fourth

34

rows of rounded squares in each column is [sic] separated by a space equal

to about one rounded square, giving the impression of a "missing row" of

rounded squares.  Thus, the appearance of the claimed design in [sic] quite

different from the cited reference.  As such, the rejection is improper and

should be withdrawn.

APLPROS0000012230.

80.     On July 21, 2010, the PTO issued a Notice of Allowability for a Design

Application in response to the applicant's May 14, 2010 amendment.

APLPROS0000012238-39.  The examiner allowed the amended claim and accepted the

drawing filed on May 14, 2010.  *Id.*

81.     On November 23, 2010, the PTO granted the application and sent an issue

notification.

82.     Based on the foregoing history from the D'790 file wrapper, it is my

opinion that the applicant overcame the 35 U.S.C. § 103 rejection by amending the patent

claim to no longer include a solid matrix of evenly spaced rows and columns of squares.

Instead, it is my opinion that the May 14, 2010 amendment limited the claim of the patent

application to a matrix of 16 squares where the third and fourth rows are spaced farther

apart than the other rows, giving the impression that there is a row of squares missing

from between them.

83.     It is also my opinion that the patent examiner issued the patent with the

understanding that the claim covered only the amended Figure 1, as described in the

applicant's May 14, 2010 amendment, and that the claim did not cover any other design

alternative or embodiment, including any of the designs reflected in the figures that the

applicant previously submitted and sought to cancel.  Thus, it is my opinion that the scope of the D'790 patent is limited to what is shown in the single patent drawing, and does not include any design that does not give the impression of a missing row of squares between the third and fourth rows.

### D.   The Drawings Of Certain Of The Asserted Design Patents Are Ambiguous Or Unclear

84.   Design patent drawings must comply with 37 CFR 1.152, and the MPEP sets out detailed instructions for complying with this regulation.[39]  Among these guidelines are instructions on the use of broken lines.

85.   In particular, the MPEP's guidelines cover only two uses of broken lines: (1) "to disclose the environment related to the claimed design," and (2) "to define the bounds of the claim."[40]  Both of these usages refer to broken lines that appear outside the claimed design.  There are no instructions on using broken lines within a design.  Indeed, the guidelines generally prohibit broken lines from intruding upon the claimed design.[41] ("In general, when broken lines are used, they should not intrude upon or cross the showing of the claimed design.")  This is because "[s]uch dotted lines may obscure the claimed design and render the disclosure indefinite."[42]

86.   The MPEP also requires that where broken lines showing the environment of a design "must necessarily cross or intrude upon the representation of the claimed design and obscures a clear understanding of the design, such an illustration should be included as a separate figure in addition to the other figures which fully disclose the

---

[39] *See* MPEP 1503.02.
[40] *Id.*
[41] *Id.*
[42] *Id.*

subject matter of the design."[43]   When broken lines are used, it is important that the description in the patent explicitly identifies their purpose.[44]   Also, because "it is possible that broken lines with different purposes may be included in a single application, the description must make a visual distinction between the two purposes."[45]

87.        The MPEP also prohibits broken lines from being used "to indicate the relative importance of parts of a design."[46]   Indeed, "[d]otted lines for the purpose of indicating unimportant or immaterial features of the design are not permitted."[47]

88.        There is no instruction in the MPEP on the proper or permissible use of broken lines within the bounds of a design.  As such, it is my opinion that using dotted or broken lines for a purpose other than showing the environment of the design or showing the boundary of the design is uncommon and unconventional and that even if not expressly prohibited by the MPEP, it could likely cause confusion and render the design indefinite.

89.        The MPEP also prohibits broken lines from being used to show hidden planes and surfaces which cannot be seen through opaque materials.[48]   The USPTO's Guide to Filing a Design Patent further instructs "that elements visible behind transparent surfaces should be shown in light, full lines, not broken lines."[49]

90.        I have reviewed all of the design patents asserted by Apple in this case and confirmed that all of them utilize broken lines.  In addition, all of the patents, except the

---

[43]   *Id.*
[44]   *Id.*
[45]   *Id.*
[46]   *Id.*
[47]   *Id.*
[48]   *Id.*
[49]   USPTO, A Guide to Filing a Design Patent, Drawing Examples, http://www.uspto.gov/web/offices/pac/design/drawing.html.

D'305 and D'334 patents, include broken lines within the outer boundary limits of the design.

91.        In the case of the D'677 patent, broken lines are present in every figure. In figures 1 and 3, there are broken lines both outside and inside the boundaries of the design drawing.  There is no inclusion in the Description section of D'677 describing the purpose or purposes of these broken lines.

92.        It is therefore my opinion that the use of the broken lines in the D'677 patent are not in conformity with the guidelines and requirements of the MPEP and could cause confusion to someone trying to interpret the figures of the patent.  For example, it is unclear whether the circle made of broken lines in Figures 1 and 3 is intruding on the underlying design or otherwise covering the claimed design.  If that is the case, the MPEP requires that a separate figure be included that shows the portion of the design that is intruded upon.[50]

93.        In the D'087 patent, the Description indicates that "The broken lines, within the claimed design, in embodiments 1, 3, and 5 that depict a large rectangular shape, indicate a non claimed shape below the continuous front surface and are for illustrative purposes only."  There is no shading in the D'087 patent drawings that would indicate that any surface is transparent.[51]  ("Oblique line shading must be used to show transparent, translucent and highly polished or reflective surfaces, such as a mirror.").  In figures 11, 27, and 43, there appears to be a rectangular shape shown in regular, full lines that is the same size, shape, and location as the rectangular shape in broken lines in figures 3, 19, and 35.  In none of the patent's figures is there a rectangular shape drawn in

---

[50] *See* MPEP 1503.02
[51] *Id.*

thin, full lines that would indicate that it was behind a transparent surface.  And as indicated above, broken lines cannot be used to show elements that cannot be seen through opaque materials.[52]

94.      It is therefore my opinion that there are inconsistencies in the various drawings of the D'087 patent.  Using the MPEP's guidelines as a reference, I understand that the large rectangular shape in figures 3, 19, and 35 is not below a transparent surface. I also understand that the figures 11, 27, and 43 also do not claim a rectangular shape below a transparent surface, yet the description of the patent indicates that there is a no-claimed rectangular shape below the purportedly continuous front surface.  Figures 11, 27, and 43 do not include a rectangular on or above this purported front surface, however, as do figures 3, 19, and 35.

95.      It is therefore my opinion that the use of broken lines in the D'087 patent is contrary to the prescribed usage described in the MPEP and that this usage creates ambiguity and inconsistency among the drawings.

### E.      MAC OS 10.0 Was Not Disclosed to the Patent Office During Prosecution of the '891 Patent

96.      The '891 patent was filed as application No. 12/012,384 on February 1, 2008, as a continuation of application No. 11/635,847 (filed on December 8, 2006), itself a continuation of application No. 10/193,573 (filed on July 10, 2002).

97.      On February 1, 2008, the Applicant submitted an Information Disclosure Statement including references that were "previously sent to the Patent and Trademark Office during prosecution of" the parent applications.  Of the cited references, ten were issued patents and six were continuations.

---

[52]  *Id.*

98.     As part of the filed application, the Applicant disclosed several "traditional windows."  Figure 2 was a screenshot of a "typical window 210 that has title bar 203 and buttons 205, 207 and 209 for minimizing, maximizing, and closing the window."  '891 file history application at 2-3, Par. 5.  Although the program is not identified in the specification, it is labeled as Microsoft Word 2000.  Figures 3-6 also appear to be Microsoft Windows, though they are not identified in the draft application as such.  Figures 7-11 and 16-21 are labeled as windows displayed "according to one embodiment of the present invention."

99.     On December 4, 2009, the Examiner issued an office action rejecting a number of claims under 35 U.S.C. §102(e) as being anticipated by a reference called "Aoki."

100.     On March 4, 2010, the Applicant amended the claims in response to the office action.  Specifically, the Applicant amended independent claims 1, 19, 26, 44, 51, and 69 to add some variation of the limitation "**wherein the first window has been displayed independently from a position of a cursor on the screen**."  The Applicant also submitted an argument that Aoki fails to disclose this limitation.  Mar. 4, 2010 Amendment at 22.

101.     Also on March 4, 2010, Applicant submitted an Information Disclosure Statement disclosing 13 patents.

102.     On April 8, 2010, a telephonic interview was held with the Examiner.  The Interview Summary notes indicate that the "applicant's representative and examiner discussed the claimed invention in view of Aoki et al but no agreement was reached."  April 8, 2010 Interview Summary.

103.     On June 7, 2010, the Examiner issued a second office action.  The Examiner once again issued a rejection in light of Aoki.  However, some amended claims were allowed.  The Examiner allowed amended independent claims 1, 19, 26, 44, 51, and 69.  The Examiner stated:

> The amended independent claims 1, 19, 26, 44, 51, and 69 include "displaying the first window independently from a position of a cursor on the screen."  Aoki fails to disclose such limitation.  As a result Aoki fails to disclose closing the first window in response to a determination that the timer expired; wherein the first window does not close in response to any input from a user input device of the digital processing system, wherein the first window has been displayed independently from a position of a cursor on the screen, as recited in the above claims.

June 7, 2010 amendment at 5-6. The  Examiner expressly indicated that Aoki failed to disclose "displaying the first window independently from a position of a cursor on the screen."  This limitation is also the only limitation that was added after the previous office action.  Therefore, it is my opinion that the Examiner allowed the independent claims because the limitation "displaying the first window independently from a position of a cursor on the screen" was not in the prior art before the Examiner.

104.     On August 9, 2010, the Applicant responded to the office action by cancelling the remaining rejected claims.

105.     The patent issued on December 14, 2010.

106.     I understand that Mac OS 10.0 was released on March 24, 2001, which means it is prior art to the '891 patent.  I understand that it is a product that was developed, sold, and marketed by Apple, itself.

107.     I did not see any evidence in the '891 prosecution history of the disclosure of Mac OS 10.0.  I also did not see anything in the file history that indicated the Examiner knew about Mac OS 10.0.

108.     As I mention above, Applicants and their representatives are required to disclose material information that they are aware of to the PTO under their duty of disclosure.

109.     The Federal Circuit recently issued an *en banc* opinion in *Therasense Inc. v. Becton Dickinson and Co,*, 649 F.3d 1276 (Fed. Cir. 2011).  In *Therasense*, the Federal Circuit considered issues related to inequitable conduct including materiality and intent.  According to *Therasense*, to prevail on an inequitable conduct claim, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."  *Id.* at 1290.  The Court maintained that materiality and intent are separate elements, but eliminated the "sliding scale" approach that balanced materiality with intent.  *Id.* However, intent may be inferred from indirect and circumstantial evidence.  To meet the clear and convincing standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence," and the evidence "must be sufficient to require a finding of deceitful intent in light of all the circumstances."  *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Company*, 537 F.3d 1357, 1366 (Fed. Cir. 2008); *Kingsdown Med. Consultants, LTD. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed. Cir. 1988)).  That is "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id.* at 1290-91 (citing *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008)).  Further, the court held that

materiality is now to be determined using the "but-for" standard, which means the withheld prior art is material only if the PTO would not have allowed a claim if it had been aware of the undisclosed prior art. *Id.* at 1291. The court also stated that an exception to the "but-for" standard of materiality exists, the so-called "affirmative egregious misconduct" exception. *Id.* at 1292. That determination is made using a preponderance of the evidence standard while giving claims their broadest reasonable construction. I understand the materiality standard set forth in *Therasense* is now the standard to be applied in evaluating the issue of inequitable conduct.

110.     I have considered whether the PTO would have allowed the asserted independent claims "but for" the fact that it was not aware of Mac OS 10.0.

111.     I understand that Samsung's expert, Trevor Darrell, has opined that Mac OS 10.0 renders the claims of the '891 patent invalid as anticipated.

112.     I understand that Dr. Darrell has opined that Mac OS 10.0 includes all of the limitations of the asserted claims, including the limitation "displaying the first window independently from a position of a cursor on the screen."

113.     Because the Examiner allowed the claims because of that limitation, it is my opinion that, had the PTO been aware of Mac OS 10.0, it would not have issued the asserted claims.

114.     I am not rendering an opinion on intent. However, if the Judge or Jury finds intent to deceive on the part of the '891 inventors or their representatives, it is my opinion that they committed inequitable conduct by failing to disclose Mac OS 10.0 to the patent office.

## IV.    CONCLUSIONS

115.        For the reasons stated herein, it is my opinion that all of the Apple Asserted Design Patents are limited to a narrow scope, and do not encompass any designs that are not exactly the same as the designs depicted in the drawings of the Asserted Design Patents.

116.        It is also my opinion that the D'790 patent is limited to what is shown in the single patent drawing, and does not include any design that does not give the impression of a missing row of squares between the third and fourth rows.

117.        It is also my opinion that the drawings of the D'677 and D'087 patents are unclear or ambiguous as they do not use broken lines in accordance with the instructions laid out in the Manual of Patent Examining Procedure.

118.        It is also my opinion that the inventors of the '891 patent and their representatives failed to disclose material and non-cumulative prior art to the patent office during prosecution of the '891 application.  If the Judge or Jury finds intent to deceive, it is my opinion that this failure to disclose rises to the level of inequitable conduct.

Respectfully submitted on March 22, 2012.

*Nicholas P. Godici*
_____
        Nicholas P. Godici