Exhibit 29

FILED UNDER SEAL

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| _____ )<br>APPLE, INC., a California corporation )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>SAMSUNG ELECTRONICS CO., LTD., a )<br>Korean corporation; SAMSUNG )<br>ELECTRONICS AMERICA, INC., a New )<br>York corporation; and SAMSUNG )<br>TELECOMMUNICATIONS AMERICA, )<br>LLC, a Delaware limited liability company, )<br> )<br>Defendants. )<br>_____ ) | Case No. 11-cv-01846-LHK |

**CORRECTED REBUTTAL EXPERT REPORT OF SAM LUCENTE**

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## I.      INTRODUCTION

I, Samuel Lucente, have been retained by Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC (hereinafter "Samsung") to provide opinions and testimony pursuant to Federal Rule of Civil Procedure 26(a)(2) about certain patents, trade dress and trademarks asserted by Apple, Inc. ("Apple") in the above-captioned action.

## II.     BACKGROUND/QUALIFICATIONS

I received my Bachelors of Science in Design (with high distinction) from the College of Design, Architecture, Art and Planning of the University of Cincinnati in 1981. I have worked for over thirty years as an industrial designer in the technology industry. I am currently employed as the Designer and Principal of Lucente Design, LLC. Lucente Design offers consulting and advice to clients on complex design problems. I have previously worked as a designer for IBM Corporation, Netscape Corporation, and Hewlett-Packard Corporation. In addition, I have served as a consultant for numerous other companies in the information technology and consumer electronics industries. A copy of my current *Curriculum Vitae* is attached as **Exhibit 1,** which contains a complete listing of my education and experience.

I am the author of several articles in the area of industrial design and I frequently lecture about design at industry conferences and universities. A partial list of my design-related publications and speaking engagements can be found on my *Curriculum Vitae* attached as **Exhibit 1**.

I am currently a member of the Industrial Designers Society of America (IDSA), and previously served as the At-Large Director from 2009 to 2011.

I am also the named inventor on thirty-five technology-related patents in the United States.

My consulting fee for this case is $650 per hour.

## III.    MATERIALS CONSULTED

Beyond my credentials and experience, I have considered the materials listed in attached **Exhibit 2** in forming the opinions expressed in this report. However, I am informed that depositions and document productions have not yet concluded, and that Apple has continued to produce pertinent documents after the depositions of the inventors, industrial designers, interaction designers, and other witnesses relevant to my analysis. I reserve the right to modify or supplement this report and my opinions based on additional documents, discovery responses, deposition testimony and any other evidence as this matter progresses. If necessary, I will supplement **Exhibit 2** to incorporate such additional materials.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

## IV.   SUMMARY OF OPINIONS

For the reasons set forth in this report, I have formed the following opinions:

(1) An ordinary observer would not find the graphical user interfaces of the Accused Products[1] to be substantially the same as the D627,790, D604,305 and D617,334 patents (together, the "Design Patents").

(2) Consumers would not associate the Accused Products, the icons of the Accused Products, or the graphical user interfaces of the Accused Products with any particular source, sponsorship, affiliation, or connection other than Samsung.

This report serves as a summary of my expert opinions and testimony. I reserve the right to modify or supplement this report and my opinions based on additional documents, discovery responses, deposition testimony, and any other evidence that is introduced as this matter progresses. I further reserve the right to render opinions in response to any rebuttal opinions offered on behalf of Apple.

## V.   RELEVANT LEGAL PRINCIPLES

I am not an expert in the law of design patents, trademarks, or trade dress. However, for the purpose of rendering the opinions set forth in this report, counsel has advised me of certain legal principles relevant to my analysis.

### Design Patent Infringement

I am informed that design patent infringement analysis is a two-step process.

First, the court must construe the claims of the design patent to determine their meaning and scope.[2]  I understand that design patents typically are claimed as shown in drawings, but that courts have an obligation to provide a verbal claim construction as well. I also understand that "[w]here a design contains both functional and nonfunctional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."[3]  I understand that this is because design patents do not protect functional aspects of a design, only the ornamental aspects of the design.[4]

---

[1]  I am informed by counsel that Apple has claimed that the following Samsung products infringe on the D627,790, D604,305 and D617,334 patents (the "Design Patents"): Captivate, Continuum, Droid Charge, Epic 4G, Fascinate, Gem, Galaxy i9000, Galaxy S 4G, Indulge, Infuse 4G, Mesmerize, Showcase, Galaxy S Showcase i500, and Vibrant. I will refer to these products collectively throughout my report as the "Accused Products" or the "Samsung Products."

[2]  *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404-05 (Fed. Cir. 1997).

[3]  *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988)

[4]  *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

Counsel has informed me that courts have articulated tests for functionality of design patents in different ways. One is that a design element is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."[5]  Another is that the design is "deemed to be functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article."[6]

Second, after the functional aspects of the design are removed from the analysis, "the patented and accused designs are compared for overall visual similarity."[7]  This is done pursuant to an "ordinary observer" test:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.[8]

I understand that to prove infringement, Apple "must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental."[9]  I understand that "the deception that arises is a result of similarities in the overall design, not of similarities in ornamental features considered in isolation."[10]

I have been informed that for purposes of an infringement analysis an ordinary observer is "a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent."[11]

I have also been informed that "the ordinary observer is deemed to view the differences between the patented design and the accused product in the context of the prior art. When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art. And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer."[12]

---

[5]  *Amini Innovation Corp. v. Anthony Cal. Inc*., 439, F.3d 1365, 1372 (Fed. Cir. 2006).

[6]  *L.A. Gear, Inc. v. Thom McAn Shoe Co*., 988 F.2d 1117, 1123 (Fed. Cir. 1993) (citation omitted).

[7]  *Elmer v. ICC Fabricating*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

[8]  *Gorham Mfg Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871).

[9]  *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 825 (Fed. Cir. 1992).

[10]  *Amini*, 439 F.3d at 1371.

[11]  *See Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007).

[12]  *Egyptian Goddess Inc. v. Swisa Inc*., 543 F.3d 665, 676 (Fed. Cir. 2008).

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

I have also been informed that when conducting an infringement analysis, it is erroneous to compare an asserted design patent with only a portion of the design of the product accused of infringement.[13]  I have also been informed that the portions of the accused product that are relevant to the ordinary observer analysis include "all ornamental features visible during normal use of the product."[14]

## Trade Dress and Trademark Infringement

I have been informed by counsel that to establish trademark or trade dress infringement, Apple must prove that the accused Samsung products cause a likelihood of confusion among consumers as to the source, sponsorship, affiliation or connection of Samsung's products.[15]

I have also been informed that the Court evaluates eight factors in assessing likelihood of confusion,[16] only several of which are relevant to my analysis. Specifically, I will focus on the strength of the asserted trademarks and trade dress; the similarity in appearance of the parties' trade dress and trademarks and Samsung's intention in selecting the accused trademarks and trade dress. I will evaluate each of the factors listed above as it relates to the GUI elements of the products at issue from the perspective of an expert in graphical user interface design.

I understand that the strength of Apple's asserted trade dress and trademarks is evaluated in the context of the market for smart phones and tablets. In other words, where similar trademarks and trade dress permeate the marketplace, the strength of the asserted trade dress mark decreases.[17]

I understand that the parties' trade dress and trademarks are evaluated as a whole when assessing similarity. I also understand that the display of the parties' respective logos can be effective in helping consumers differentiate between the products, especially when consumers are familiar with the parties' brand names.[18]

---

[13]   *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1379-80 (Fed. Cir. 2002).

[14]   *Id.* at 1780.

[15]   *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1005 (9th Cir.1998).

[16]   These factors are (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers likely exercise in purchasing them; (7) defendant's intention in selecting and using the allegedly infringing trade dress; and (8) the likelihood that the parties will expand their product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979).

[17]   *One Industries, LLC v. Jim O'Neal Distributing, Inc.,* 578 F.3d 1154, 1164 (9th Cir. 2003).

[18]   *Conopco, Inc. v. May Department Stores Co.,* 46 F.3d 1556, 1567-1571 (Fed. Cir. 1994) .

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

I understand that in assessing Samsung's intent, the relevant inquiry is whether Samsung intended to confuse consumers by adopting the accused trade dress and trademarks.[19]

I have been informed that trade dress protection may not be claimed for product features that are functional.[20]  Accordingly, my analysis takes into account the functionality of the features of Apple's asserted trademarks and trade dress.

## VI.    SAMSUNG'S APPROACH TO DESIGN

As part of my analysis of Samsung's accused designs, it is important to study Samsung's approach to design. A company's design principles and processes, or lack thereof, ultimately determine the actual designs that it manufactures and markets.

I studied Samsung's design approach based on several documents listed in Exhibit 2, have considerable experience in assessing design systems as a design manager and have specifically benchmarked various consumer electronics and information technology company's design approaches in the past, including Samsung's.

Based on my research and my experience in the field of consumer electronics and information technology, it is clear that Samsung pursues world-class design grounded in defined principles that are reflected in the visual impression of its offerings in the marketplace and its numerous design awards. Samsung's focus on developing a unique look and feel dates back over 15 years. The company now has over 1000 designers world-wide who have adopted common design principles used to create well-designed products.

One key way to drive the adoption of the Samsung unique design approach was through education. The company initiated programs including, (1) a Design Membership Program to support talented college level students through sponsored projects to increase the design skills of design hires; (2) the Innovative Design Lab of Samsung (IDS) as a full-time, one year long in-house designer training program to increase the skills of designers internally; and (3) the Design Power Program, which exposed high potential internal designers to different cultures and industries in order to encourage creative thinking with a global perspective.[21] These efforts show a commitment to developing strong design and creative skills internally.

---

[19]    *One Industries,* 578 F.3d at 1164.

[20]    *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28-29 (2001).

[21] IDSA National Conference Presentation, Korea Samsung Design,  Sangyeon Lee, September 19, 2006

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

One design publication praised Samsung's effort, and noted the impact of these key features:

> Determined to counter the lackluster reputation of its electronic products, in the mid-'90s Samsung launched the equivalent of a design "race to the moon" by establishing an in-house "university" and putting its designers through an intensive course in global design processes. Today Samsung is acclaimed for its innovation and style."[22]

Previously, Samsung had struggled with its internal visual design style, using several external design firms that produced an array of varying, incoherent design directions. In 2001, Samsung began to address organizational issues by forming a Design Committee to coordinate design activities directly with top management and across various design centers world-wide.[23] Internal designers became more respected and took on major design projects typically done by outside consultants. This allowed a Samsung specific design process and visual look and feel to emerge.

The Samsung design philosophy is called the Balance of Reason and Feeling,[24] which is important to note because it defines not only the Samsung visual identity system, but also how the company perceives its identity relative to other competitors such as SONY or Apple. In one article, one of the Samsung's designers explains the evolution of the design ethos, as follows:

> Samsung's in-house school gave its designers the tools and confidence to risk thinking differently. But there remained an equally vexing challenge: The company lacked a universal design ethos--a measurable, clearly defined set of principles that its designers could replicate and its customers could intuitively understand. Samsung's instinct was to develop a design language that grew out of Korean culture. But that proved equally hard to define. China's Han, Ming, and Tung dynasties, as well as the Mongols, Russians, Japanese, and even American missionaries had all left elements of their cultures on the peninsula. Unearthing a true Korean character proved difficult, but Samsung discovered it in the Tae Kuk--the yin-yang symbol found on the South Korean flag that represents the simultaneous unity and duality of all things. From the Tae Kuk, Samsung developed its touchstone: "Balance of Reason and Feeling."
>
> Reason and feeling are opposites, but they are essential to each other," says Sangyeon Lee, who heads Samsung's San Francisco design studio. "In design terms, 'reason' is rational, sharp-edged, and very geometric. 'Feeling' is soft and organic--it makes an emotional connection with the user. Taken together, reason and feeling give us a way to frame our design identity, which is always evolving."

---

[22] http://www.cdf.org/issue_journal/samsungs_lessons_in_design.html

[23] Samsung: Design Strategy at Samsung Electronics: Becoming a Top-Tier Company, 2008 Design Management Institute and IDSA National Conference Presentation, Korea Samsung Design,  Sangyeon Lee, September 19, 2006

[24] http://www.fastcompany.com/magazine/101/samsung.html?page=0%2C3

7

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

A task force spent a year developing and perfecting a scale, with reason at one end and feeling on the other, which is now used to ensure that every single product design hews to Samsung's brand positioning. That generally falls near the scale's center--thereby striking a balance. Samsung did the same with two other key words: "simplicity" and "complexity."

Here, Samsung generally hews closer to simplicity--it wants its designs to be intuitive and humanistic. Samsung even maps its competitors on the two scales:

In one recent analysis, Apple occupied the "simplicity/feeling" zone, with Sony in the "complexity/reason" field. Samsung seeks out the areas where there are no competitors--that's where opportunity lies.[25]

To make the overall design ethos more useful in day-to-day design activities, designers typically create a master checklist of design principles. These principles can apply to product designs, user interface designs or icon design. The design principles that defined this unique Samsung visual identity were communicated publically in a Samsung presentation at the IDSA National Conference:[26]

Reason is comprised of the principles of: Lifestyling (Comprehend Lifestyle Needs: Problems, Trends, Behavior, Values, Unmet needs); Innovative (Stay One Step Ahead: Differentiation, Fresh, Inspiring, Clever, Unique ideas); Coherent (Balance Consistency and Variety: Identifiable, Unified, Market-sensitive, Integral).

Feeling is comprised of  Harmonious (Harmonize with Environment: Systems, Safety, Green, Appropriateness, Accord); Intuitive (Convey Agreeable Use and Meaning: Instinctive, Direct, Friendly, Simple); Interactive (Design for the Experience: Exciting, Fun, Sensible, Cool, Satisfying.)

The following images, taken from the IDSA presentation, give one a visual sense of the overall Samsung visual design language illustrating the two design principles of Harmonious and Intuitive applied to the areas of digital media. They show the use of functional and simple forms reduced to essential design elements. There is a focus on order and precision with little ornamentation and complexity.

---

[25] http://www.fastcompany.com/magazine/101/samsung.html?page=0%2C3
[26] IDSA National Conference Presentation, Korea Samsung Design, Sangyeon Lee September 19, 2006

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

• Design-driven Innovation (Digital Media)



> Harmonious

• Design-driven Innovation (Digital Media)



> Intuitive (User Interface)

**Samsung Design Principles**[27]

---

[27] IDSA National Conference Presentation, Korea Samsung Design, Sangyeon Lee

9

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

As a world leader in consumer electronics, Samsung's design principles, as defined, result in world-class designs that are recognized by the design profession as good design.

By 2005, Samsung surpassed Apple, Nike and HP by garnering more International Design Excellence Awards (IDEA) than any other corporation.[28] IDEA is the leading product design competition in America and one of the largest internationally. Many of these awards were in the concept design category, showing an increased focus on creativity and innovation. This is a clear indication of Samsung's effort to innovate and differentiate the company through a unique, world-class look and feel.

Samsung is clearly committed to creating a differentiated visual identity in the marketplace. In my opinion, it follows that these same design principles were reflected in the accused product designs, showing that the designs originated from a unique Samsung look and feel based on their own design approach. Based on my experience in design management, the claim that Samsung "slavishly copied" Apple's designs is inconsistent with Samsung's effort to develop its own unique design ethos and identity over the last 15 years.

Furthermore, given the evolution of Samsung's visual identity, it is clear that the alternative designs suggested by Kare (*see* Kare Report ¶¶ 45-52, Exhs. 6-13) do not align to the visual identity of Samsung. It is important to analyze the Samsung designs in the context of Samsung's design language and visual identity. Kare clearly states that one of the fundamentals of icon design is to align to "marketing or design considerations" (*Id.* ¶ 29.) The design solutions of Samsung's accused products align to the Samsung design principles outlined above; obviously a critical "design consideration" of the Samsung designers.

Other factors related to design problem solving also drove Samsung's overall design solution, especially the icon layout, icon container and icon metaphors. For example in referring to other fundamentals of icon design, Kare states that understanding the "target audience" and "competitive landscape" is important. (*Id. ¶ 29.*) Yet, later she references various Samsung documents dated 2008 or later on competitive analysis and icon explorations suggesting that Samsung used these as a guide to create Samsung's solutions. (*Id.* ¶¶ 87-90.)  Using competitive information and understanding customers is a typical part of a good design process and a key step in understanding your target customer and the overall competitive landscape. But to simply use these as a guide for Samsung designs would completely negate all of the work Samsung did to create its own unique look and feel.

In fact, Samsung already had a design with an icon grid layout and icons contained in rectangles with rounded corners well before Apple released the first iPhone or Samsung assessed Apple's competitive design direction. Kare may have been unaware that Samsung designers had created the grid-based icon layout and rounded rectangle icon design in 2006, shown below, prior to the iPhone's release.

September 19, 2006
[28] http://www.businessweek.com/magazine/content/05_27/b3941406.htm

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**2006 Samsung Touchscreen Presentation**[29]

In my opinion, it is design factors such as Samsung's 2006 user interface designs, the established Samsung design principles, and pre-existing functional design elements like the icon dock and other prior art designs from as early as 1992 or even 1981, (discussed at length in my March 22, 2012 invalidity report), that drove the overall design of the accused Samsung products. (*see generally* March 22, 2012 Lucente Opening Report ("Lucente Op. Rep.")  The accused products embody a highly functional and world-class design solution likely derived from a thorough design problem-solving process, which assessed many typical user interface design factors including the "fundamental of icon design " noted by Kare ( Kare ¶¶ 25-32). Indeed, Kare states that "aesthetics are a prime consideration, but issues mandated by a mobile phone environment might include limited real-estate, touch screen 'hit' area space requirements, and the relationship to the industrial design to the user interface." At that time, from an industrial design viewpoint, Samsung had the most advanced display technology for small mobile screens and this particular icon grid layout exploits "the number and density of icons within a space," again, a consideration noted by Kare relevant to "optimizing for a user's perception of ease of use" (*Id. ¶* 31.) I would assume that the Samsung user interface designers had access to this advanced display technology and integrated the technology into their design solution. As discussed in my earlier invalidity report, the use of an icon grid of rectangles with tightly rounded corners provides an optimal and functional user interface design. In my opinion, it is the most functional design for the "touch screen 'hit' area" noted by Kare above.

---

[29]   SAMNDCA00321552, SAMNDCA00321584, SAMNDCA00321593

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

The icon grid layout conveys simplicity, predictability and order, all characteristics that make a design more "Intuitive" – one of the Samsung design principles and most likely why Samsung created the icon grid layout shown above. The alternative designs proposed by Kare convey less simplicity and more complexity. And these alternative designs do not integrate many of the proven icon layout designs noted in my invalidity report, that have been used successfully on desktop screens and some mobile devices for many years. In reference to Apple's "overall, distinctive, graphical consistency," Kare notes that "the uniform shape and precise placement in a grid provides a sense of organization and unity" (*Id.* ¶ 13.) The simple fact is that both Apple and Samsung applied a common, widely used icon grid layout to their designs due to the icon grid's effectiveness as a fundamental, functional element for human-computer interaction.

Although her opinion itself is equivocal, I cannot agree with Kare's conclusion that certain scattered Samsung documents regarding competitive analysis and perceived similarities between Apple and Samsung phones "support the possibility that Samsung used Apple's icon design and layout as a guide in creating the icon designs and layout of the applications screens" of the accused Samsung phones (*Id.* ¶ 51.) Based on my understanding of the Samsung design approach, Samsung's prior design concepts, the access to Samsung's advanced display technology, use of proven, functional elements, and the design considerations and problem-solving required to arrive at a final design, as well as the significant differences between the Apple and Samsung products, it is my opinion that the facts do not support this accusation.

Rather, my opinion is that each company was pursuing world-class design solutions with a common, widely known set of fundamental, functional elements for human-computer interaction such as the icon grid and the icon dock, a shared "target audience," a common display technology, and expert design capabilities. Although the ultimate solutions of each company share many of the same functional elements, both are clearly differentiated in the marketplace and do not confuse customers.[30] Furthermore, other design alternatives proposed by Kare do not align to Samsung's design approach and, in my opinion, are less desirable and less functional design choices. In the end, customers benefit from various easy-to-use solutions in the marketplace.

I will now outline specific differences of the Accused Products as they relate to Apple's design patent, trade dress and trademark allegations.

## VII.   THE ACCUSED PRODUCTS DO NOT INFRINGE THE ASSERTED DESIGN PATENTS

### A.   Design Patent D627,790

The D'790 is entitled "Graphical User Interface for a Display Screen or Portion Thereof." The patent states that the original application was filed June 23, 2007, and it was issued on November 23, 2010.

---

[30] *See* Expert Report of Michael Mazis, PhD, March 22, 2012, pages 4-5; Expert Report of George Mantis, March 22, 2012, page 13.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Figure of Design Patent D 627,790**

Given that this design is for a graphical user interface screen, I will assume for the purposes of this report that the rectangular outline centered within the larger rounded rectangular shapes defines a display area. The rectangular shape of this element is driven by display screen technology. Again, I will assume for this analysis that the upper 12 squares with rounded corners and the lower 4 squares with rounded corners are selectable icons on a screen. The upper 12 icons are arranged in a grid layout. The lower four squares with rounded corners, which also are assumed to be selectable icons, are placed at the lower edge of the graphical user interface screen. Again for purposes of this analysis, I will assume that the lower row of rounded squares represents a dock of frequently-used icons, which are visible on all or most of the menu screens of an interface.

As detailed in my invalidity report (*see, e.g.*, Lucente Op. Rep. at pp. 7-30) it is my opinion that the claimed elements of the D'790 design are all functional, and not decorative, whether taken as individual elements or the design as a whole.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

### B.    Design Patent D604,305

According to the D'305 patent, the patent application was filed on June 23, 2007, and the patent issued on November 17, 2009. The D'305, entitled "Graphical User Interface for a Display Screen or Portion Thereof," shows two variations of the same "design," with one in color and one in black and white. The overall rectangular outline of the D'305 figures matches the rectangular outline that is centered within the larger rounded rectangular shapes in the D'790 Patent.

 

**Figs. 1 and 2 of D604,305**

Given that this patent has the same title as D'790, I once again assume for the sake of this report that the upper 12 squares with rounded corners and the lower 4 squares with rounded corners depict selectable icons on a display screen as defined in the D'790 description above. I will assume for the sake of this report that the symbols and nomenclature at the top of the large rectangular area are status indicators on a display screen.

As detailed in my invalidity report (Lucente Op. Rep. at pp. 19-24) it is my opinion that the graphical user interface design shown in D'305 patent is functional, not decorative, whether taken as individual elements or the design as a whole.

### C.    Design Patent D617,334

The D'334 patent states that the application was filed on July 15, 2008, and that the patent issued on June 8, 2010. The D'334, is entitled "Graphical User Interface for a Display Screen or Portion Thereof" like the other two design patents at issue here. The D'334 patent depicts eight variations of the same design in shades of black and white. The overall rectangular shape of the D'334 matches exactly the outline in the D'790 and D'305 Patents. In comparison

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

to the D'790 Patent and the D'305 Patent, there are changes to the symbols and nomenclature in the status indicators, two or three additional rounded square icons appear in the fourth row of the design for a total of 18-19 icons, and there are minor changes to the Calculator icon. Two dots are also present in the lower portion of the black area and above the shaded gray area.

 

**Figs. 1 and 2 of D617,334**

Given that this is a claim for a graphical user interface screen, I will assume for the sake of this report that the symbols and nomenclature at the top of the large rectangular area are status indicators on a screen, the upper 14 or 15 squares with rounded corners and the lower 4 squares with rounded corners are selectable icons on a screen as defined in the D'305 description above, and that the two dots, one lighter and one darker, are page indicators.

### D.    Functional Elements of the Design Patents, Trademarks, and Trade Dress

In my opening report, I gave numerous reasons for my opinion that Apple's Design Patents, Trademarks, and Trade Dress are functional as a whole and that the individual elements of those designs are functional. (Lucente Op. Rep. at pp. 7-30.) For the sake of avoiding repetition, I incorporate those analyses and conclusions into this report by reference. Still, it is important to restate the fundamental, functional elements that comprise the design patents, trademarks and trade dress in this short summary:

The **rectangular display** for a graphical user interface is a fundamental, functional element for human-computer interaction. Alternative designs would be more expensive and more difficult to develop, and would not have the organizational benefits of the rectangular shape. Thus, the large rectangular element that forms the basic shape of the design is merely functional and not decorative.

15

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

An **icon grid** on a graphical user interface is a fundamental, functional element for human-computer interaction. Thus, the rounded square elements arranged in a grid are merely functional and not decorative.

The **dock** of frequently-used icons on a graphical user interface is another functional element for human-computer interaction.

The relative size of an icon is functional because the relative size allows a person to see the icon and a human finger better to select the icon when used in a touch-screen device. Both the **size and the shape of the icon** is functional because the consistent size and shape conveys the form of a selectable button and communicates that the icons share similar attributes so that they are perceived as a group. The **number of the icons** is functional because the number is determined by the overall area of the rectangular outline, the size of the icon, shape of the icon, the **spacing of the icon** in the grid and the number of icons desired by the user and/or the manufacturer. The spacing, proportions, shape and number of the icons on a graphical user interface are fundamental components of human-computer interaction.

The **status indicators** on a graphical user interface are a fundamental, functional element for human-computer interaction and have no decorative element.

**Icons** themselves are functional because they are metaphors for the function the user wishes to access. In other words, icons are descriptive of the applications and/or features that they activate, and thus they are functional. The icons on a graphical user interface are a fundamental, functional element for human-computer interaction. The rounded square elements with graphics in them are merely functional, and not decorative.

**Labels** underneath icons in a graphical user interface are fundamental, functional elements for human-computer interaction. Thus, the word, or label, elements are merely functional and not decorative.

**Page indicators**, represented as two dots, are purely functional because they visually show which of two pages is displayed. Such page indicators in a graphical user interface are a fundamental, functional element for human-computer interaction. Thus, the dot elements are merely functional and not decorative.

In accordance with my understanding of the relevant legal principles noted above, it is critical that I exclude functional aspects of the design patents in performing an ordinary observer analysis. I also understand that the existence of these same functional elements are relevant to my assessment of the Apple trademarks and trade dress.

**Possibility of Using Apple Designs as a Guide.** I disagree with Kare's conclusion that any perceived similarities between the Samsung Phones and the iPhone devices supports the possibility that Samsung used the Apple icons or devices as a guide. (Kare ¶¶ 72-77.) I believe Kare reaches this incorrect conclusion for a number of reasons, including the following: (1) Kare

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

focused on identifying and magnifying perceived similarities between the Apple and Samsung designs while downplaying or ignoring the many differences as insignificant; (2) Kare neglected to consider or discuss any prior art that would have informed her opinion regarding the field of choice and the general trends within iconography; (3) Kare did not convey, or apparently consider beyond the referenced Samsung documents, any general understanding of Samsung's overall approach to design or its visual identity; and (4) more importantly, Kare also failed to acknowledge key, non-ornamental or non-decorative functional considerations that, in my opinion, dictated the designs because both companies were pursuing essential, fundamental elements of human-computer interaction in their respective designs.

It is my opinion that any perceived similarities between the Apple and Samsung icons discussed in Kare's report are not a result of Samsung's possibly having used the Apple icons as a reference in creating its own icons, as Kare implies, but rather a result of the icons' shared heritage in the world of visual references, and the dictates of function.

It is also my opinion that any perceived similarities between the Apple home screens and the Samsung application screen layouts discussed in Kare's report are not a result of Samsung's possibly having used the Apple home screen layouts as a reference in creating its own layouts, as Kare implies, but rather a result of well-documented prior art, the 2006 user interface design work by Samsung designers and widely used functional aspects of the common designs. As will be discussed below, it is also significant that Kare deemphasizes Samsung's use of a completely different home screen from the Apple home screen noted in the design patents and trade dress.

**Icons and Home Screens.** What follows is an analysis of various icons and screens in which I note similarities and differences between the Apple and Samsung user interfaces and icons. I examined all of the icons and screens, including various alternative designs via screen captures in Photoshop. (*See* Exhibits 4-38.)

**Phone Icon** — Kare states that there are similarities between the Phone icons for the Samsung products and the Apple products. (Kare ¶ 62.). Based on these purported similarities, Kare concludes that users might see them as coming from the same company or source, or representing the same brand. I believe Kare's opinions in this regard are wrong due to her failure to consider any prior art in her report or the functional aspects of the phone metaphor. My opening report on invalidity included numerous examples of icons prior to the iPhone that employed a conventional telephone receiver angled upward at approximately 45 degrees and utilizing the color green. (Lucente Op. Rep. at pp. 27-28, 63-64.) A traditional analog phone receiver displayed at a 45 degree angle with the left side higher than the right is even a commonly used design library symbol used to represent phone calling.[31] This icon is dictated largely by customary practice and practical need. It is also important to note that the actual style of the phone depicted in the widely used design library, updated in 2002, also resembles the original Bell telephone noted as distinctive to Apple by Kare. Images of similar green telephone receivers have been used in cellular telephones and virtually all forms of consumer electronics with phone calling features for well over a decade to mark the button that will initiate a telephone call.

---

[31]  Official Signs and Icons, Ultimate Symbol, Inc. 2002

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

The supposedly comparable alternatives listed by Kare deviate in detrimental ways from the icons that Apple and Samsung have created. As Mr. Anzures testified, a phone receiver placed at 45 degrees with the mouth and ear pieces facing up mimics the position that a physical phone would be in while in use. (Deposition of F. Anzures at 205.) Thus, pointing the phone downward is not a comparable alternative design because it does not communicate as effectively that the icon represents the functional metaphor of initiating rather than terminating a call.  The green color is similarly functional for the reasons mentioned in my prior report. (Lucente Op. Rep. at pp. 22-23.)  The placement at the bottom left of the user interface is functional because that is the most common location for placing the call button on a cell or touchtone phone. Prior to the advent of touchscreen, cell phones predominantly put the button to initiate a call on the left side of the phone just below the display screen, and the end call button (usually associated with the color red) on the opposite side of the phone, just below the display screen. Also, orienting the receiver in the straight up-and-down position is also not an equivalent alternative as Kare suggests (Kare ¶ 54.)  She states that this is how the symbol is used on telephone booths (*Id* 54,) but even if so, it ignores the functional aspects of actively making a call as if the phone is in your hand and there is a much greater space constraint when creating an icon for a touchscreen display; orienting the receiver at an angle allows the image to be larger and more easily visible than a different configuration, and reduces wasted space around the image.

Because of these considerations, I believe that users seeing the Phone icon on the Samsung devices would associate the icon with the call function of the phone, not with a particular brand, company, or source.

I also believe that Kare neglected to note important differences between the Apple and Samsung phone icons that distinguish them, even despite their design being dictated by many of the same functional constraints. Samsung's icon clearly differentiates itself from Apple while effectively applying the fundamental, functional phone metaphor. The Samsung design avoids the inferior alternative designs proposed by Kare and aligns to the Samsung design principles and overall visual identity. For example, although both phones are presented at an angle, the Apple icon appears to be positioned exactly at 45 degrees along an invisible line running from the top left corner to the bottom right. The Samsung icon, however, is at a steeper angle. The Samsung handset is significantly larger relative to the rectangle with rounded corners. The corners or radii of the Samsung container are significantly smaller. [32] The Apple icon features the iOS specific visual effect distinct and specific to the Apple Human Interface Guidelines[33]  The Samsung icon has a faceted, angular visual effect not seen in any of the Apple icon designs. The overall green color appears much darker than the brighter green used by Apple. The Apple icon has a stripped pattern of alternating light and dark greens, while the Samsung icon lacks such a feature. The receiver in the Apple icon appears flat because it lacks shading, whereas the Samsung phone has contour shading, which is particularly visible on the upper portion of the phone because it gives the ear receiver the appearance of a 3-dimensional rounded edge. The

---

[32]  This is true for all the Samsung icons with a rounded rectangular container.
[33]  Apple iOS Human Interface Guidelines, https://developer.apple.com/library/IOs/#documentation/UserExperience/Conceptual/MobileHIG/IconsImages/IconsImages.html#//apple_ref/doc/uid/TP40006556-CH14-SW1

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

overall outline of the Samsung receiver adheres more closely to the standard design library icon noted above whereas the Apple receiver angles in dramatically at both ends of the receiver.

   

**Samsung**                                **Apple**

**Contacts Icon —** I have the same objections regarding Kare's analysis of the Samsung Contacts icons as I do with the Phone icons. The alternative designs put forward by Kare ( Kare ¶ 54) are not true or equivalent alternatives because they diminish the functional utility of the icon. The underlying Contacts program or application in the Samsung devices stores information about numerous people and/or businesses, including names, phone numbers, email addresses, physical addresses, etc. A contact icon displaying a bound book with an "@" symbol on the cover would signify that the underlying program simply stores email information since that symbol is associated with email addresses. Kare appears to admit as much by noting that the "@" sign is "shorthand for contacting someone via email."  (Kare ¶ 54.)  I note that Apple previously used such a symbol for its address book in the Dashboard feature of Mac OS X Tiger, but did not carry that icon over to iOS, despite doing so for other icons, and instead chose the functional and proven head and shoulders silhouette that was prevalent in the prior art dating back to the 1980's (Lucente Op. Rep. at pp.68-69).



**Address Book — Mac OS X Tiger Dashboard**

Moving on to the other presented alternatives, a silhouette with a question mark over the face seems to communicate that there is uncertainty about a person's identity. That is the opposite message that should be conveyed regarding a program that contains information about people. Similarly, an image of a phone on the front of a book could incorrectly communicate that only phone numbers are stored in the Contacts application. The shoulders and head silhouette is the conventional image for contact information. (Lucente Op. Report ¶ 29.)

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

Because of these considerations, and because of the large number of icons that were already using this same metaphor (Lucente Op. Rep. at pp. 68-69), I believe that users seeing the Contacts icon on the Samsung devices would associate the icon with a program or application on the phone that stores personal contact information for multiple people and entities. I do not believe users or observers of the Samsung devices would associate the Samsung Contacts icon with any particular brand, company, or source of goods.

I also believe that Kare failed to account for the numerous differences between the Samsung and Apple Contacts icons, despite the many functional considerations that drove them toward using the common and ideal metaphor of a head and shoulders silhouette on an address book. The Samsung icon has uneven silver grey borders that follow the outline of a book joined with two rings and no tabs. The colors are predominantly orange, white, and grey, with the semi-gloss orange transitioning from light to dark along a faceted gradient from top right to bottom left. The much larger, white head and shoulders silhouette dominates over half of the icon and has the appearance of being set on top of the book cover as a three-dimensional carved relief. The Apple icon, by way of contrast, appears as a cropped view of a larger address book. The book appears to be spiral bound and has several tabs on the right-hand side. The dominant colors are different shades of matte brown and tan with a consistent, smooth light to dark visual effect with a light source centered above the image consistent with other Apple icon rendering treatments. The brown, head and shoulders silhouette, appears to be only approximately one-third the height of the icon and has the appearance of being cut-out and recessed into the cover of the book, despite a crowded field of prior art icons, these differences give the Samsung icon a distinct appearance from the Apple icon:

  

**Samsung**                **Apple**

**Photo Icon —** I believe Kare wrongly concluded that the perceived similarities between the Samsung and Apple Photos icons would contribute similarly to the overall visual impression of the screens in which they appear or that users would see them as coming from the same company or source, or representing the same brand. (Kare ¶ 62.)  The sunflower is a common image associated with photography contrary to Kare stating that it "is an apparently arbitrary choice." (Kare ¶ 53.)  In fact, Adobe Photoshop Elements, the number one consumer photo editing software,[34] has often displayed an image of a sunflower on its packaging and materials. The inventors of the Apple GUI design patents, Imran Chaudhri and Freddy Anzures, both stated

---

[34] Source: The NPD Group/Retail Tracking Service (April 2002 to March 2011) based on units sold (U.S. only) at http://www.adobe.com/products/photoshop-elements.html

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

in their depositions that they used the Adobe Photoshop programs while working on the icon and interface designs.[35] Furthermore, the most prevalent use of the sunflower icon by Adobe in advertising, numerous tutorials on the web, splash screens and as examples within the software itself, was during the time that the noted Apple designers were creating the iPhone icons.

---

[35] Oct. 14, 2011 Deposition of Imran Chaudhri at 180; Oct. 18, 2011 Deposition of Freddy Anzures at 7, 122.)

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Adobe Photoshop Materials**[36]

---

[36]   I understand that Photoshop Elements 2.0 was released in 2002; Version 4.0 was released in 2005; and Version 6.0 was released in October 2007; and Version 9.0 was released in 2010.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Apple's Photos Icon**

In addition to the sunflower images used by Adobe Photoshop, flower icons are often used on cameras to mark the settings for taking close-up photographs. In the context of a smartphone user interface, I believe that using an image of a flower or parts of a flower as an icon is the most useful representative metaphor for photography in the minds of ordinary observers. In light of the above considerations, I do not believe that an ordinary observer would associate the Samsung Gallery icon with any single brand, company, or source. Instead, I believe that an ordinary user would likely associate the icon with photographs and image editing.

I believe the alternative icons that Kare presents all share the same flaw that makes them less suitable — and therefore functionally inferior — to the icons used by Samsung and Apple: using a representation of an actual photograph requires a small, detailed rendering on an already small icon. To quickly and effectively communicate the purpose of an icon, it is better to avoid small, detailed images that cannot be interpreted or processed at a glance such as iconic vacation scenes suggested by Kare (Kare ¶ 23.)  As I explained in my opening report, Apple's own iOS Human Interface Guidelines teach these same principles: "Embrace simplicity. In particular, avoid cramming lots of different images into your icon. Try to use a single object that expresses the essence of your app. Start with a basic shape and add details cautiously. If an icon's content or shape is overly complex, the details become confusing and may appear muddy at smaller sizes."  (Lucente Op. Rep. at p. 13 (quoting the Apple iOS Human Interface Guidelines).)

I also believe that Kare failed to take note of the many distinguishing characteristics between the Samsung and Apple icons that give them readily distinct appearances. For example, the Samsung icon is a smart integration of both a symbol (flower) and a real-world representation of a photograph (printed photos with white borders). In her proposed alternatives, Kare suggests the use of a "sample photographic image," (Kare ¶ 26) which Samsung does, unlike Apple. Samsung's icon features the close up view, typically associated with photography, of what appears to be a mum or sunflower, building on the strong functional metaphor noted above. It is important to note that the flower depiction by the Samsung designers does not appear to be a specific type of flower, but rather an artistic illustration, again, building on a close-up view of the functional metaphor of a flower for photography.

23

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**A combination of mums (left) and two types of sunflowers (middle and right) with different florets.**

This illustrates the apparent differences in the petals depicted in the actual florets of the Apple and Adobe, which are clearly the middle sunflower, while the Samsung design is likely an interpretation of flowers similar to these, but obviously not a direct cropped view of a sunflower as Kare suggest (Kare ¶ 62.)

The orange-to-yellow, elongated oval-shaped flower petals with greenery behind them do not show a blue sky background prominent in the Apple icon and many of the Adobe packaging designs. The top right lighting effect is less faceted and more curvilinear due to the flower as an organic object. The image contains two stacked rectangles with white borders that appear to be photographs of the underlying flower image beneath them. In the middle of the icon, a semi-transparent circle is presented with a green equilateral triangle in the center. The positioning and orientation of the green triangle gives the center element the appearance of a "play" button commonly found on electronic devices and computer programs that play movies or videos. Use of green connotes action. The icon therefore, contains several metaphors that communicate the key functionalities of the underlying application while avoiding the pitfalls of the alternative icons presented by Kare. The Apple icon, by way of contrast, is dominated by a full view of a flower's head as well as the upper stem and leaves on a blue sky background. The dominant colors are yellow, blue, brown and green. The pronounced Apple specific visual effect renders a noticeable arc in the upper half of the image. In my opinion, these characteristics give the icons clearly distinct visual appearances that would be noticed by an ordinary observer.





**Samsung**          **Apple**

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

**Camera Icon** — I believe that Kare also mistakenly concluded that the icon labeled Camera on the Samsung devices was possibly derived from the Apple icon labeled Camera. Aside from the numerous functional considerations that impelled the Samsung icon design in this direction, the Samsung icon looks very similar to actual Samsung and third party cameras that were released in 2010. In addition, the head-on perspective shot of the Samsung icon matches the way these cameras were photographed for their advertisements.



**Samsung Icon**    **Samsung PL200**[37]    **Samsung SL605**[38] **Canon EOS Rebel XS**[39]

Moreover, the dominant color for cameras is black and silver conveying a metallic finish.

I believe the alternative designs presented by Kare highlight that very few metaphors effectively communicate the purpose of the camera application on the phone. (Kare ¶ 54.) Indeed, all of the icons she calls out as alternative designs are images of cameras (like the Samsung icon) or portions of cameras (like the Apple icon). This is consistent with the camera icons I included in my opening report that pre-date the Apple designs. (Lucente Op. Rep. at pp. 77-78). All of these icons use a generic-looking body for a camera. In light of this, I do not believe users would associate these camera images with any particular company.

The Samsung icon has a number of important differences from the Apple camera icon that make them clearly visually distinct. The Samsung icon depicts an entire camera from the front perspective. The Samsung icon includes a large, circular front lens that is offset to the right, a flash above and to the left of the lens, and a button for activating the shutter, all like the Samsung cameras depicted above. The camera image also has the appearance of a grip or extended portion on the left as is common on cameras. The camera image appears to be floating on a blue background with eight lines emanating from a source behind the camera. Blue is a natural choice since it emphasizes the camera and recedes into the background. The typical, faceted visual effect shows lines and color shading giving the impression of eight wedge panels fanning out from the center of the icon, resembling the shutter window of a camera. The Apple icon, by way

[37] (http://www.samsung.com/us/photography/digital-cameras/EC-PL200ZBPSUS) (released Sept. 2, 2010)
[38] (http://www.samsung.com/us/photography/digital-cameras/EC-SL605ZBPSUS) (released March 2010)
[39] http://www.tecca.com/product/canon-eos-digital-rebel-xs-10-1-megapixel-digital-slr-camera-silver/

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

of contrast, depicts only the lens of a camera, which appears to be inset within a plain grey surface. The lens is centered on the icon and its diameter is roughly half the height and width of the icon.

          

**Samsung**          **Apple**

For the reasons stated above, I believe that when users and observers see the Samsung camera icon, they associate the icon with the camera function of the device, and not with any company, brand, or product source.

**Music Icon** — I believe that Kare similarly erred in her analysis of the Samsung Music Player icons as she did for the previous icons. The alternative music player icons put forward by Kare each fail to communicate as effectively as the Samsung icons and are therefore functionally inadequate as alternatives. (Kare ¶ 54.)  Eighth notes are perhaps the most widely understood symbol for music. Treble clef symbols are not nearly as well-known or understood by the average user as a set of eighth notes. Unless the user had some kind of training in reading sheet music, the treble clef symbol would likely not be intuitive. Headphones are also less intuitive across a broader spectrum of users than eighth notes. Also, the alternative icons that depict only notes could lead users to think the application started a radio player. While this may be the best option for smaller icons on smaller display screens, using a set of eighth notes along with a CD clearly and effectively communicates that the application is capable of playing stored music. The prior art is also filled with music player icons coupling a CD and eighth notes dating back to 1995 use on desktop computers.  And both the music and compact disc symbols each are documented as standard icons, and with pervasive prior art the combination of the two symbols became a generic, but well-understood way to show the ability to play and manage music on a computer and now smartphones and tablets. ( Lucente Op. Rep. at pp. 69-71.)

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

    

BeOS Operating System – (1995)    GNOME 2.0 (2002 – "CD Player")    Window NT 3.1 (1993 – "CD Player")    Samsung SCH-X650 (Aug. 2002)    Samsung F300 (Dec. 2006)

**Prior Art for Music Icons**[40]

Several of the key prior art references shown in my opening report are depicted again here to show the pre-existing and common use of the combined eight notes and CD symbol as a powerful functional metaphor. It is important to note that Samsung had created their original music icon for a mobile phone in 2002. Also, the purple color of the Samsung icon and the CD with double eighth notes relate back to earlier Samsung devices (*Id.* at pp. 69-71.)  For example, the Samsung F300 device used this same color as a motif, as well as two musical eighth notes to symbolize the music player function on the device (*Id.* at p. 71.) The use of purple is typical in entertainment metaphors since the purple is a vibrant color and not confused with other colors such as red, yellow or green which have established meanings such as problem or error, caution or warning, and active or good, respectively. Unlike blue, which recedes, purple conveys excitement and energy.

The Samsung icons also have a number of important differences from the iTunes icon such that they create a distinct and unique visual impression on the display screens. The Samsung icons depict a photorealistic CD in the center of the icon. Large red or teal eighth notes appear to float in front of the disc and are offset to the lower right side. The notes are roughly half the height of the icon. The magenta container or background appears as a solid surface with a slight gradation of color that meets at the line in the upper right quadrant of the icon. The color of the icon is brighter and deeper than the soft purple of the iTunes icon, giving the Samsung icon a feeling of energy. The Apple iTunes icon, in contrast, has a white circle centered in the icon, small white eighth notes centered in the circle, and distinct lines radiating out from the circle in all directions. A noticeable visual effect covers the top half of the icon in an arc shape, lightening the color of the background.

---

[40] (*See, e.g.*, Lucente Op. Rep. at pp. 69-71.)

.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

 

**Samsung Music Player Icons**[41]

 

**Apple Music Icons**

Even despite the connection to the color scheme Samsung previously used in its F300 device, I believe that a user who sees the Samsung music player icons will not associate them with a particular brand, company, or source, but solely with the music playing function of the Samsung Products.

**Settings** — I am also of the opinion that the Settings icons for the Samsung and Apple devices do not create the same visual impression on their respective display screens. Both icons utilize a form of the common gear metaphor, now an established convention for utilities, preferences and settings, but do it in very distinct ways. The Samsung icon shows a single wheel gear with short, blunt teeth and a relatively wide pitch. The gear wheel is polished silver with a reflective blue band. The entire gear wheel is visible and it appears to rest on a solid blue background that has a slight spiral gradient transitioning from darker to slightly lighter as it moves clockwise from the upper right hand quadrant. The Apple icon in contrast is a partial view of three gear wheels with sharply pointed teeth and relatively small pitch. The larger wheel appears to be set behind two smaller wheels and has five spokes that radiate from the center.

---

[41] The following Samsung devices us the Music Player icon on the left: Captivate, Droid Charge, Exhibit 4G, Galaxy S (i9000), Galaxy S 4G, Indulge, Infuse 4G, and Vibrant. The following Samsung devices us the Music Player icon on the right: Continuum, Epic 4G, Fascinate, Galaxy S Showcase (i500), Gem, and Mesmerize.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

That wheel is set in the lower two-thirds of the icon. The background of the icon has a matte, brushed aluminum appearance with regularly spaced pinholes. The icon is framed with a matte, silver border. The entire icon is done using varying shades of gray with an arc light treatment across the upper half.

          

**Samsung**                **Apple**

I believe that users who see the Samsung Settings icon do not associate it with any particular brand, company, or source, except perhaps with Samsung. As I already showed in my opening report, there were numerous operating systems and devices, including those made by Samsung, that utilized this same gear metaphor prior to the designs and devices at issue here (Lucente Op. Rep. pp. 64-66.) As a result, if users associate the Samsung gear icon with anything it is with the settings application on the device.

I hold these same opinion when comparing the Samsung Settings icon to Apple's trademarked settings icon (Reg. No. 3,889,685) shown here:



**Messaging —** I also believe the Messages icons for the Samsung and Apple devices do not create the same visual impression on their respective display screens. Both icons utilize a form of the common text or chat bubble metaphor, but do it in distinct ways. The Samsung Messaging icon depicts a rectangular cartoon chat bubble with a triangular tail. The bubble is a solid olive green, distinctly different from the Apple color, and displays a simple smiley face. There is no container surrounding the icon. The trademarked Apple icon, in contrast, displays a white, oval-shaped chat bubble with no content. The background of the icon is an alternating stripe pattern of light and dark green shades that run from bottom left to upper right. The common Apple light treatment gives the appearance of an arc across the upper half. In the version of the Apple icon from the D305 patent and early iOS versions, the chat bubble contains

29

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

the letters SMS. The background is also a solid green color, though still affected by the same arc light treatment.



**Samsung**[42]                    **Apple**[43]

As I showed in my earlier report, Samsung used a very similar icon in early 2005. (Lucente Op. Rep. at p. 71.)  Similar icons were also used in other devices and operating systems. For all these reasons, I believe users will associate the Samsung icon with the text messaging function of the device, not with any particular brand, company, or source.

**Notes/Memo** — I also believe the icons for the Samsung and Apple devices do not create the same visual impression on their respective display screens. Both icons utilize an obvious form of the common note pad metaphor to symbolize a word processing application that can store the user's text files. The various icons approach the metaphor in recognizably distinct ways. The Samsung icon depicts an entire brown message board with a single post-it type note on it. The lower right-hand corner of the note is curling upward to the center of the page. Very faint horizontal lines run across the front of the page. The icon's container is patterned as a piece of yellow lined paper. The Apple icon shows a cropped or cut-out view of a pad of paper. The colors are flatter than the Samsung icon, showing brown across the top of the pad and a pale yellow colored paper. Two parallel lines run down the left side of the page. Just under the brown band across the top there is the appearance of the remainder of several sheets of paper that have been torn from the pad.

---

[42] The lower Samsung Messaging icon was cut from a Droid Charge screen capture.

[43] The upper Apple icon is Trademark Reg. No. 3,889,642.  The lower icon was cut from the D305 patent.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Samsung**                     **Apple**[44]

In light of the common use of a notepad metaphor on devices and operating systems that predate the designs and devices at issue here (Lucente Op. Rep. at pp. 66-68), I believe that users who see the Samsung Memo icon will not associate it with any particular brand, company or source, but rather solely with the application on the device that allows users to create and store text files.

**Samsung Home Screens** — I believe Kare further erred in her report by failing to account for the default home screens on the Samsung devices. All of the user interfaces of the Samsung Phones initially appear, as a default, on a series of screens that are very different in appearance to the Design Patents or the Apple devices. For each phone, there are typically twice as many home screens as there are applications screens. And as Kare admits in her report, the applications screen can only be accessed if the user actively presses one specific icon on the home screen. (Kare ¶ 58.) Thus, for a purchaser or other person sufficiently interested in the item to access the applications screens of the Samsung Phones, they would have to first encounter at least the first default home screen of the Samsung user interface, and possibly more of the home screens if they swipe from screen to screen. The images below show an exemplary screen capture of the default startup screen from the Samsung Captivate. The home screen contains only two rows of icons at the bottom of the display screen, with a large amount of empty space in the middle of the display. The background is a blue gradient with several large semi-translucent circular elements, resembling bubbles, which are rendered at varying levels of focus. There is a long horizontal element near the top of the display bearing the word "Google" and featuring a blue icon with a "g" and a silver icon featuring a microphone. An ordinary observer encountering this home screen would readily recognize the substantial differences between it and the asserted Design Patents.

---

[44] The upper Apple icon is Trademark Reg. No. 3,886,169.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION




**Captivate Home Screen**                    **D305**

I have inspected the default home screens on all the devices listed in Kare's report and all of them share the same design motif as shown in the figure above. The differences in the home screens involve elements that are not shown in the Apple design patents or products and include: different background images, different number of icons, different arrangement of icons, and different content panels for things such as videos, weather, and social network programs. Screenshots of the home screens for all of the Accused Products are included as exhibits to this report (*see* Exhs. 4-16.) An example of the entire array of home screen pages for the Samsung Captivate is shown below:




SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION





**Captivate Home Screens**

**Missing Row —** I believe that Kare further erred in her report by giving no weight whatsoever to the Samsung Phones' not containing a missing row of icons above the bottom row on the Applications screens. I reviewed all of the Samsung devices listed in Kare's report, and I have determined that none of the phones displayed an applications screen with a 3x4 matrix at the top of the display and a 1x4 matrix at the bottom with a missing row (or large blank space) between them. In addition, every accused Samsung phone I examined had at least two applications screens that were filled with icons in a 5x4 grid pattern, with a final applications screen that had a variable number of empty icon slots, but none of the Samsung phones displayed

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

a 5x4 grid with a missing fourth row except one.[45]   Kare further provides no reason why this missing row, or appearance of a missing row, is wholly unimportant to her analysis. In my opinion, the blank space in the D790 and D305 patents provides the important function of visually separating the two sections of the display screen. When that space is filled with icons, the grid becomes a solid 5x4 pattern with no discernible break in the arrangement. The solid set pattern also mimics much of the prior art, including, for example, Finnish design registration application 20030256, published on April 29, 2004, which has the same grid arrangement. (*See* Lucente Op. Rep. at p. 39.) I believe that an ordinary observer familiar with the prior art would notice the blank space feature of the D790 and D305 designs as a noticeable difference from many of the solid set grid patterns found in the prior art and would therefore attach more weight to it than to other features of the designs. In fact, I believe this would be one of the most apparent differences that would come to the attention of the ordinary observer who is most familiar with seeing user interfaces that are a solid set of icons.

**Overall Visual Treatment of Icons**. In addition to the discussion of individual icons, home screens and missing row, I believe that Kare also failed to take notice of important and readily apparent differences between the overall visual treatment of icons in the Samsung devices versus that in the asserted design patents and iPhone devices. I further believe that this error led Kare to the erroneous conclusion that the icons in the Samsung devices — when taken as a whole — create an "overall visual appearance [that] is substantially the same as the overall visual appearance of the designs depicted in the [asserted patents.]"  (Kare, ¶¶ 66; *see also id. ¶¶* 67, 70-71.) Although I have noted many of these specific design details relative to individual icons in earlier sections, the following aspects of the icons' overall visual appearances are summarized in the table below. You can see that the two company's respective visual directions differ significantly:

| Samsung | Apple |
|---|---|
| • Symbols are mostly asymmetrical | • Symbols are all symmetrical |
| • Icons typically show the "full view" of the symbol on a colored background in the shape of a rectangle with tightly rounded corners or without a container at all | • Icons typically show "cropped views" of the symbol creating the impression of a cut-out forming the shape of a rectangle with softly rounded corners, always within a container |
| • Some images have embossed or raised details showing a three-dimensional effect | • Some images are debossed (die-cut-like) with flat stencil-like effects |

---

[45]   The third applications screen of the Droid Charge that I inspected had this pattern. I reviewed all of the images and screenshots attached to the Kare report and noted that none of the phones had any applications pages with a 3x4 grid at the top and a 1x4 row at the bottom. (Kare Exhs 15-33.)

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

- Rendering or visual effects are mostly faceted and linear with varying top left or top right light sources

- Rendering or visual effects are always centered, emphasizing the overall symmetry with a precise, consistent arc shape pattern

- Colors are typically brighter with fragmented tonal gradations and glossy effects

- Colors, though saturated, have smooth tonal gradations and matte finishes

For example, as Kare states in her report, the Apple patents and devices utilize icons that include "illustrations, photographs, and iconic symbols." (Kare ¶ 55.)  Additionally, she says, the Apple icons include those with a "cropped view." (*Id.* ¶ 55.)  This gives the impression of a square image cut out of a larger image (also known as a "cut out").  Kare also notes that the Apple user interfaces include icons that appear to be embossed on or in front of a colored shape, also called a "container". (Kare ¶ 55.)  Kare fails to note that the majority of the icons on the Apple patents and devices follow the cut-out or "cropped view" approach. In contrast, the vast majority of the Samsung icons follow the container approach. Very few Samsung icons are "cropped view" icons or cut outs. This gives the Samsung device user interfaces an additional unifying motif that is absent in the asserted patents and Apple devices. For example, in the figure below, the Samsung calendar icon is shown as a full, ring-bound calendar page showing three weeks of dates. The entire image is visible in the Samsung icon and is set against a square or container of a single color. By way of contrast, the Apple icon appears as a cut-out of a larger calendar page that includes just a single day and the actual image forms the shape of the container.






**Samsung**                                    **Apple**

The use of the "full view" of the image, such as the calendar shown here is a critical difference from the Apple icon designs. This major difference is driven by the overall Samsung interface design which primarily uses a home screen rather than an application screen. These home screens include icons without containers. When the same icon appears in the applications screen, it appears within a container to present an orderly and predictable functional, icon grid layout for the user. For example, the home screen of the Fascinate displays Blockbuster, Bing, Email, and Browser icons, none of which have a rounded square background or container behind them. On the first applications screen, these icons reappear with a colorful square container. Users first encounter the icons in their non-container form, which highlights the container pattern in the applications screen when they reappear. This feature is absent from the Apple Design patents and phones.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

 

**Fascinate Home Screen**        **Fascinate Applications Screen**

**Selective Analysis of Icons**. I also believe Kare selectively analyzed individual icons in the user interfaces of the devices and patents without taking the whole spectrum of icons into account (and therefore failed to take the overall design into account). I believe this was an error because purchasers and users encountering the products would not see isolated icons, but icons in association with one another. Comparing the D305 patent to the first applications screen of the Fascinate device, for example, shows how varied the icon selections are between the designs. Of the 16 images shown in the D305 patent and the 20 images shown on the first applications screens of the Fascinate and Droid Charge devices, only 8 on each device relate to an analogous application: Text/Messaging, Calendar, Photos/Gallery, Camera, Clock, Calculator, Phone, and Mail/Email. The unique icons on the D305 patent are these: YouTube, Stocks, Maps, Weather, Notes, Settings, Safari, iPod. The unique icons on the first Fascinate applications screen are these: 3G Mobile Hotspot, AllShare, Bing, Blockbuster, Browser, Car Cradle, City ID, Daily Briefing, Desk Cradle, Gmail, Contacts, and Home:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**D305**



**Fascinate**[46]

---

[46] The screen capture has been scaled so the width is equal to the width of the D305 design, allowing the different aspect ratios to be accurately reflected.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

The unique icons on the first applications screen of the Droid Charge are these: AllShare, Amazon Kindle, Apps, Backup Assistant, Bitbop, Blockbuster, Browser, City ID, Daily Briefing, Desk Cradle, Contacts, and Home:



**Droid Charge**

These differences are indicative of all the Samsung Products I inspected. As a result, I believe a user who was a purchaser of the iPhone Designs, or sufficiently interested in them, and who has the capability of making a reasonably discerning decision when observing the Samsung devices would not be deceived into buying the Samsung phone thinking it to be the Apple design.

The comparison between the D305 design and the Fascinate screen above also highlights the aspect ratio differences between the Apple designs and devices and the Samsung devices. Kare acknowledges this only by stating the numbers and then dismissing the differences as insignificant (Kare ¶ 60.), but she never puts the displays next to one another to visualize and evaluate the relative and noticeable size difference. Kare is also misleading when she says that "the aspect ratios of the Samsung screens are either the same (1:1.5) or similar (1:1.67) to that of the iPhone devices (1:1.5)." (Kare ¶ 60.)  Her statement does not make clear that of all the accused Samsung devices, only the Indulge has the same aspect ratio as the Apple devices. Nor does Kare take into account the strikingly different aspect ratio of the Continuum phone's display, which has an active area incorporating the four standard soft keys and a secondary display beneath them:

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

          

**D'305**                          **Continuum**

**Kare's Purported Acceptable Alternative Displays**. I also disagree with Kare's assessment that the alternative designs she points to are true and equivalent designs. (Kare ¶¶ 45-52.)[47]  In each case, the purported alternative design is deficient in one or more ways compared to both the Apple and the Samsung designs. I believe this diminished functionality reduces the quality of the user interface as a result. By way of example, the Nokia N9 user interface design contains no dock, which, as I described in my opening report, has been a functionally useful element of touchscreen phones since the IBM Simon in 1992. (Lucente Op. Rep. at pp. 17-18, 33-52.)

---

[47]   I have reviewed the alternative phones discussed in Kare's report and have included screen captures for the designs as Exhibits 17-22.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Nokia N9**[48]

Additionally, the size of the icons on the Nokia N9 reduces their functionality because they create a smaller hit target for the user. By shaving off more of the icon's container in order to create the heavily rounded shape, the size of the icon, and therefore the size of the target for the human finger, is reduced by roughly 20-30%. The figure below is an accurate, proportional comparison of the Calendar icons for the Nokia N9 and the Samsung Captivate. As Kare admits, icon design is influenced, and even "mandated," by "touch screen 'hit' area space requirements." (Kare ¶ 31.)



**Nokia N9**              **Captivate**

The BlackBerry Storm 2 is another user interface put forward by Kare as an equivalent alternative. The Storm 2 suffers from the opposite functional deficiency as the Nokia N9; the lack of spacing between the icons creates a more complicated visual presentation. In my opinion, users cannot process and segregate the information presented in this format as quickly and

---

[48]   *See* Exhibit 17

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

simply as with the Samsung design. The predominant use of black and white may provide an overarching motif, but it fails to provide as much distinction between icons or enhance the functionality of the metaphor of the various icons as do the Samsung designs. In my opinion, the lack of distinction or definition among icons forces the user to take longer to search for and identify the target icon. This diminishes the quality and utility of the user interface.



**BlackBerry Storm 2**[49]

Kare also presents the Sony Ericsson Xperia arc S and neo V phone interfaces as equivalent alternatives to the Samsung designs. While these designs may be an improvement over the two designs previously discussed, they lack the utilitarian functions provided by the rounded square features of the Samsung Products. I described these functions in my initial report. (Lucente Op. Rep. at pp. 18-19.)  This same critique applies to the BlackBerry Torch 9850, also mentioned in Kare's report. (Kare ¶ 48.) As seen in the image below, when an image background is used for the BlackBerry Torch 9850 interface, the irregularly shaped icons blend into the background and become more difficult to discern than if they were bounded by a uniform shape.

---

[49]   *See* Exhibit 18

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION





**Sony Ericsson Xperia arc S**[50]        **BlackBerry Torch 9850**[51]

I also believe that the purported alternative interface designs shown in Exhibit 10 and Figures 9 and 10 of Kare's report are even more inadequate than the other examples. The uncommon, irregular and/or seemingly haphazard arrangements for these icons are not equal alternatives to the uniform, simple, and functional design of the Samsung Products. For most of the alternative interfaces, the user would have to overcome a fairly steep learning curve in identifying where certain icons are located, if the icons even remain static on the screen at all. (*See* Kare, Exhibit 10 at ¶ 4.)  I am also informed that Apple has identified several other purported alternative designs in a written discovery response to Samsung.[52]  I have considered these alternative designs as well, and believe that they are also not valid alternatives for many of the same functional reasons listed above.

Furthermore, no consideration of the Samsung design principles were mentioned when prosing these alternative designs. In my opinion, after assessing Samsung's approach to design and reviewing the various alternative designs, it is clear that none of the alternative designs align to the Samsung design principles.

---

[50]   *See* Exhibit 19
[51]   *See* Exhibit 20
[52]   I am informed that these designs include the following, some of which overlap with Ms. Kare's report: Sony Ericsson Xperia X10, Nokia N8 (*see* screen capture at Ex. 21), Palm Centro, Palm Pixi Plus (Ex. 22), Nokia Lumia 800, Palm Treo 700p, Pantech Hotshot CDM8992VW, Blackberry Torch 9850 (Ex. 20), Blackberry Storm 2 (Ex. 18), and Samsung F700.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

**Other Samsung Device Designs**. Ms. Kare's report appears to conclude that the accused Samsung devices have substantially the same overall appearance as Apple's GUI design patents and trade dress because they share rectangles with rounded corners in an icon grid pattern. I conclude this because Ms. Kare first opines that the Apple patents and devices as well as the Samsung devices use varying graphic styles for the icons and then states that the "consistent use of rounded, square-shaped icons in a grid layout unifies the icons in producing an overall visual appearance as a group." (Kare ¶ 66.) I am informed that Apple has not accused the Galaxy SII devices of infringing Apple's GUI design patents, even though Apple has accused them of infringing Apple's iPhone trade dress. The Galaxy SII design,[53] such as the one found in the Galaxy SII (T-Mobile), is very similar to the accused Samsung phones, including the Fascinate, as shown below. The icons in the SII design still maintain a flat and predominantly square shape, but without the containers behind them.[54] In my opinion, for all the reasons stated above, the SII design would also not appear to be substantially the same design as the D790, D305, or D334 designs when considered by an ordinary observer.[55]

---

[53]    Screen captures from Galaxy SII phones, and other Samsung devices I understand to be accused of trade dress infringement, are attached as Exhibits 23-33 to this report. As with the accused Samsung phones, I have included the default home screens as well, as those would affect the overall visual appearance of the graphical user interface to the ordinary observer.

[54]    I offer no opinion as to whether the user interface layouts of the Galaxy SII phones and other Samsung devices are functionally equivalent to the layout of the Samsung phones accused of infringing Apple's design patents. I reserve the right to supplement my report to make such an assessment in response to Apple, Ms. Kare, or another expert in the event that they undertake such an evaluation.

[55]    I hold this same opinion for all the designs that I understand to be accused of trade dress infringement.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



**Galaxy SII (AT&T)**



**Fascinate**

**Summary**. For the foregoing reasons, I believe Kare fails to show that the user interface designs in the Samsung devices would appear substantially the same to an ordinary observer as the designs in the Apple designs patents. I believe Kare comes to her conclusion by disregarding the numerous differences in the designs, and instead basing her opinion on a few of the shared characteristics of the designs. In my opinion, an ordinary observer who is both conversant with the prior art and a purchaser of the Apple designs, or at least sufficiently interested in them, would not be deceived into buying the Samsung designs thinking them to be the Apple designs. I also believe that Kare fails to offer an equally functional alternative user interface to the one used in the Samsung Products. Each alternative design offered by Kare would diminish the utility of the Samsung user interfaces.

## VII.    ANALYSIS OF APPLE'S ASSERTED TRADE DRESS

### A.    Scope of the Asserted Trade Dress

The Asserted Trade Dress comprises three elements relating to the GUI of the devices. This report will address these aspects of the Asserted Trade Dress, but will not discuss the hardware-related elements.

According to Apple, the GUI-related elements of its Asserted Trade Dress are:

-when the device is on, a matrix of colorful square icons with evenly rounded corners within the display screen;

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

-when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off from the other icons on the display, which does not change as other pages of the interface are viewed;

-and when the device is on, a row of small dots on the display screen.[56]

## B.  Scope of the Asserted Trademarks

The Asserted Trademarks as set forth in Apple's Amended Complaint comprise the following U.S. Registrations:



3,886,196
Icon for
Telephone Calls



3,886,169
Icon for Notes



3,889,642
Icon for Messaging



3,886,197
Icon for Contacts



3,886,200
Icon for Photos



Application No. 85/041,463
(Purple iTunes Store Trademark)

---

[56] *See* Amended Complaint ¶¶ 33, 35, 56, 59.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION



3,889,685
Icon for Settings



2,935,038
(iTunes Eighth Note and CD
Design Trademark)

## C.    Discussion of Relevant *Sleekcraft* Factors

To shed light on the question of consumer confusion, which I understand is the relevant standard for trademark and trade dress infringement, my analysis will focus on certain of the *Sleekcraft* factors most relevant to my expertise, namely, (1) the strength of the asserted trade dress/icons; (2) the similarity in appearance of the parties' trade dress/ icons; and (3) Samsung's intention in designing the accused trade dress/ icons. I will evaluate these factors as they relate to the GUI elements of the products at issue from the perspective of an expert in graphical user interface design. Unless otherwise specified, the analysis below applies to the GUI elements of all the Samsung devices accused of trade dress and trademark infringement.[57]

### 1.    Strength of the Asserted Trademarks and Trade Dress

I understand that the strength of Apple's trademarks and trade dress is evaluated in the context of the marketplace for smart phones and tablets. When many products employ the same or similar trademarks, those marks are considered "weak," in that they do not direct consumers to a particular source.

It is my opinion as an experienced designer of user interfaces for consumer electronics products that all of Apple's asserted icons are "weak" trademarks because third-parties regularly employ similar icons in the GUI of similar products on the market today. Given this crowded field, it is my opinion that consumers would not likely mistake Samsung's icons for Apple icons.

In the expert report of Mazis (Expert Report of Michael Mazis, PhD, March 22, 2012, pages 4-5), findings support my opinion that Apple's asserted icons are "weak" and not distinctive concluding that "the median rate of all respondents identifying Apple as the source of the icons was again about 13%." This "survey was designed to determine whether the phone, messaging, photos, settings, notes, contacts, iTunes, and iTunes on-line music service icons used

---

[57]    The Samsung products accused of trade dress infringement are: Galaxy S 4G; Captivate; Continuum; Droid Charge; Epic 4G; Vibrant; Fascinate; Showcase Galaxy S; Mesmerize; Galaxy Prevail; Infuse 4G; Galaxy Tab 10.1; Galaxy Tab 7.0; Galaxy Ace; Galaxy S i9000; Galaxy SII; Galaxy SII Skyrocket; Galaxy SII i9100; and Galaxy SII Epic 4G Touch. The Samsung products accused of trademark infringement include all of the above and the following: Gem; Gravity Smart; Indulge; Acclaim; Intercept; Nexus S; Nexus S 4G; Replenish; Transform; and Sidekick.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

in Apple's iPhone and iPad products have acquired distinctiveness. Thus, the survey sought to determine whether smart phone and tablet computer owners associate these eight icons with one company and whether that company is Apple."

Other elements of the trade dress claimed by Apple are equally prevalent in today's marketplace for mobile phones. For example, a matrix of colorful icons is practically universal in the mobile phone and tablet categories, while a bottom dock for icons is increasingly common. Because these features are highly functional (Lucente Op. Rep. at p. 7-30) they have been widely adopted by smart phone manufacturers. Attached as **Exhibits 17-22** are images of some of the many phones and tablets employing a colorful matrix of icons and/or an icon docking station. (*See also* Lucente Op. Rep., Exhs. C & D (showing additional electronic devices with these features).)

Considering how commonplace the GUI-related aspects of Apple's trade dress are in the marketplace, it is my opinion that Apple's GUI-related trade dress is not distinctive from a design perspective.

## 2.      Similarity of the Asserted Trademarks and Trade Dress

I understand the Court considers the similarity between the asserted and the accused trademarks/trade dress when evaluating whether there is a likelihood of consumer confusion. My analysis and conclusions concerning the similarity of the accused devices to Apple's design patents set forth above applies with equal force to the question of the similarity between the trademark and trade dress elements of the accused devices, and for the sake of avoiding repetition, I incorporate it here.

Because the consumer marketplace is flooded with descriptive icons that, due to the functions they perform, share some degree of similarity, it is my view that consumers have come to expect a certain degree of similarity among icons across various products and brands.

The findings of the expert report of Mantis (Expert Report of George Mantis, March 22, 2012, page 13) supports my opinion, finding that respondents shown a Samsung phone were not likely to mistakenly identify the phone as made by Apple. This LIKELIHOOD OF CONFUSION STUDY determined whether, and if so, to what extent, relevant consumers are likely to mistakenly believe that Samsung's GALAXY S 4G, INFUSE 4G, GALAXY S SHOWCASE, and GALAXY PREVAIL phones and Samsung's GALAXY TAB 10.1 and GALAXY TAB 7.0 Plus tablet computers are made by or with the approval or authorization of Apple, Inc., ("Apple") or that the maker of these products is connected to or affiliated with Apple.

In fact, to a great extent, the functionality of an icon largely dictates the visual cues consumers have already adopted from past experience as noted in my opening report. As Kare acknowledges in her report, an icon "creates a shortcut for a user in a device interface" (Kare ¶ 26.)  Thus, in order for an icon to perform its function, it must build upon the expectations of consumers. From an icon designer's point of view, it would be entirely counterproductive to deviate significantly from the norms already established for a particular type of icon.

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

To illustrate this point, consider Apple's icon's for the notepad function:



**3,886,169
Icon for Notes**

Compare Apple's icon to the notepad icons used by Samsung and other companies:



| **Samsung** | **DSM Notepad** | **Microsoft** | **NOKIA** |

As this comparison demonstrates, although icon designers have some leeway to alter the details of icon design, they generally stay within the reasonable bounds of consumer expectation so that the icon will perform its "shortcut" function efficiently. Here, Samsung and the other brands shown have done just that. They have taken the well-known and widely employed yellow notepad concept and modified it slightly. The same is true for each of the other trademarked icons asserted by Apple.

Similarly, an icon gird layout or matrix and dock are common to smart phones across many different makes and models, and as such, consumers have come to expect and associate these features as part of the functionality of the phone, and not with any particular manufacturer. Like icons, these features are there to serve a function, and the parameters of their "look and feel" are dictated by utilitarian considerations.

### 3.      Samsung's Intent

I understand that in trademark law, the likelihood of consumer confusion increases if it is established that a party has intentionally tried to confuse consumers into thinking that its products are those of another company.

In her report, Kare implies that whatever similarity exists between Apple and Samsung's icons is due to an intention by Samsung to copy Apple's designs. I disagree with Kare's conclusions, for the reasons stated above. As previously noted, to the extent there is similarity between the parties icons, in my opinion it is likely due to the fact that Apple's icons themselves build upon well-established themes and metaphors for icons that are widely employed in

48

SUBJECT TO PROTECTIVE ORDER
CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

consumer electronics. Likewise, a matrix of icons and an icon dock are largely functional features of the GUI that have been incorporated into most smartphones and tablets on the market today. The fact that the accused products employ these same features in no way suggests that Samsung had an intent to confuse consumers. Rather, Samsung, like many other participants in the marketplace, seeks to offer consumers the functionality they desire and have come to expect.

Signature executed on April 17, 2012

_____

Samuel Lucente