Exhibit 27
(Submitted Under Seal)



# PATENT CROSS LICENSE AGREEMENT

Dated as of August 5, 1997

Between

Apple Computer, Inc.

and

Microsoft Corporation



CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

# PATENT CROSS LICENSE AGREEMENT

THIS PATENT CROSS LICENSE AGREEMENT (this "Agreement") is made as of this 5th day of August, 1997 (the "Effective Date") between Apple Computer, Inc., a California corporation ("Apple"), and Microsoft Corporation, a Washington corporation ("Microsoft").

## RECITALS

WHEREAS, concurrently with this Agreement, Apple and Microsoft are entering into a Common Stock Purchase Agreement and a Technology Agreement of even date herewith (the "Concurrent Agreements"); and

WHEREAS, each of the parties hereto has the right to grant a non-exclusive license to the other party under certain existing and future patent rights of such party and desires to acquire a non-exclusive license under certain existing and future patent rights of the other party.

NOW, THEREFORE, in consideration of the good and valuable consideration provided in this agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1

### Definitions

As used in this Agreement, the following terms shall have the meanings indicated:

1.1   "Apple Licensed Patents" shall mean all Captured Patents, under which Apple or any of its Subsidiaries now has, or hereafter obtains, the ability or right to grant licenses, covenants or releases to Microsoft of or within the scope of this Agreement, with the exception of Conditional Patents.

1.2   "Authorized Licensee" shall mean a third party (including without limitation an Original Equipment Manufacturer (OEM), replicator, distributor, retailer or end user) that is licensed by a party hereto or a Subsidiary of a party hereto, to exercise any legal rights with respect to a Licensed Product of such party or Subsidiary, including without limitation using, selling or otherwise distributing such Licensed Product either alone or in combination with other products.

1.3   "Capture Date" shall mean the date that occurs five (5) years from the Effective Date of this Agreement or such earlier date as may be specified under Section 12.2 below.

1.4   "Effective Filing Date" shall mean the earliest effective priority filing date for a utility patent, utility model, design patents, design registrations (described in Section 1.9(i)) or application therefor, as determined on a claim by claim basis.  By way of example, it is understood that the

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Effective Filing Date for a United States patent is the earlier of (i) the actual filing date of the United States patent application which issued into such patent, or (ii) the priority date of such patent under 35 U.S.C. §§ 119, 120, 121, 363, 365 or like provisions.

1.5   "Licensed Patents" shall mean the Apple Licensed Patents and/or the Microsoft Licensed Patents, as applicable.

1.6   "Licensed Products" shall mean (i) any and all processes or activities performed by a party and (ii) any and all machines, articles of manufacture, compositions of matter and any other products which are designed, developed, duplicated, manufactured, acquired or rendered by or for a party and which are transferred by or made available from a party. Licensed Products shall include, without limitation, Licensed Programs, but shall exclude Clone Products or Foundry Products.

1.7   "Licensed Program" shall mean an unmodified Program, or an unmodified portion of a Program licensed to an Authorized Licensee by a party hereto, or a Subsidiary of a party licensed in accordance with Section 3.

1.8   "Microsoft Licensed Patents" shall mean all Captured Patents, under which Microsoft or any of its Subsidiaries now has, or hereafter obtains, the ability or right to grant licenses, covenants or releases to Apple of or within the scope of this Agreement, with the exception of Conditional Patents.

1.9   "Captured Patents" shall mean (i) all worldwide utility patents, utility models and equivalent rights, and all worldwide design patents and design registrations relating to user-interface components for a computing or information processing device, to the extent granted, issued or issuing on any application entitled to an Effective Filing Date prior to the Capture Date, (ii) all applications for any of the foregoing, and (iii) all reissues, reexaminations, renewals and extensions of any of the foregoing.

1.10   "Program" shall mean a set of instructions capable of being compiled, executed or interpreted by a computing or information processing device, whether or not such instructions are in machine-readable format. Program shall include, without limitation, operating system programs, middleware programs, application programs of any and every type, tool programs such as compilers and utilities, communication programs, components, applets, scripts, macros or individual portions of all of the foregoing.

1.11   "Subsidiary" shall mean, with respect to a given party, a corporation, company or other entity: (i) more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by such given party, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists; or (ii) which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010021

representing the right to make the decisions for such corporation, company or other entity is now or hereafter, owned or controlled, directly or indirectly, by such given party, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as much ownership or control exists.

1.12   "Conditional Patent" shall mean all Captured Patents, under which a granting party or any of its Subsidiaries now has or hereafter obtains, the ability or right to grant license, covenants or releases to the other party or its Subsidiaries under this Agreement, wherein the grant of such license, release or immunity to the other party or its Subsidiary is contingent upon the payment of any additional monetary royalty or other consideration to a third party which is not a Subsidiary of such granting party or an employee of such granting party or its Subsidiary.

1.13   "Foundry Product" shall mean a product which is either (i) owned by a third party, or designed by or for a third party without substantial input from one party hereto (the "Acting Party"), and manufactured, reproduced, sold, leased, licensed or otherwise transferred from the Acting Party to that third party or to customers of or directed by that third party on essentially an exclusive basis; or (ii) designed, manufactured, reproduced, sold, leased, licensed or otherwise transferred through or by the Acting Party for the primary purpose of circumventing any patent rights of the other party to this Agreement.

1.14   "Clone Product" shall mean:

1.14.1   With the exceptions listed in this section 1.14 below, a new product designed or acquired after the Effective Date ("New Product") of one of the Parties that is primarily designed to be and is an identical or substantially identical replacement in functionality and/or user experience of a then-existing Commercialized Product of the other party ("Prior Product") by (i) in the case of a Program, providing all or substantially all of the user commands and/or all or substantially all of the programming interface(s) as the Prior Product or (ii) in the case of a product which is not a Program, providing the same or substantially the same physical form or appearance to the user and electronic and/or mechanical design as the Prior Product.

1.14.2   To the extent that the Parties independently develop new products, without prior, detailed knowledge of each others' products, and such products were both substantially developed prior to the disclosure or release of either of the products, then neither product shall be considered to be a Clone Product of the other.

1.14.3   To the extent that a New Product of a Party implements functionality that any party, including a third party, rightfully and with proper authority (i) licenses as an industry standard, or (ii) otherwise makes available for general use by the industry, the above functionality shall not be considered a factor in the determination of whether such a New Product is a Clone Product.

1.14.4   To the extent that a New Product of a Party implements functionality that is required for the New Product to interoperate or be compatible with (but not replace) the Prior

-3-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Product, the above functionality shall not be considered a factor in the determination of whether such New Product is a Clone Product.

1.14.5 Notwithstanding anything herein to the contrary, the Parties agree that none of their Commercialized Products existing as of the Effective Date are Clone Products.

1.15 "Commercialized Product" shall mean a Program or other product that has been released to third parties for commercial purposes, or for significant beta testing or significant public testing in the context of overall product development, or in the case of hardware products, fully functioning prototypes that have been built and publicly promoted, demonstrated or announced.

1.16 "Current Subsidiaries" shall mean Subsidiaries which are Subsidiaries as of the Effective Date.

1.17 "Change of Control" shall mean (i) an acquisition of Voting Stock by a Person or Group in a purchase or transaction or series of related purchases or transactions if immediately thereafter such Person or Group has Beneficial Ownership of more than fifty percent (50%) of the combined voting power of the party's then outstanding Voting Stock; (ii) the execution of an agreement providing for a tender offer, merger, consolidation or reorganization, or series of such related transactions involving the party, unless the stockholders of the party, immediately after such transaction or transactions are the Beneficial Owners of at least fifty percent (50%) of the Voting Stock; (iii) a change or changes in the membership of the party's Board of Directors which represent a change of a majority or more of such membership during any twelve month period (unless such change or changes in membership are caused by the actions of the then existing Board of Directors and do not occur within twelve months of the commencement, threat or proposal of an Election Contest, tender offer or other transaction which would constitute a Change of Control under (i) or (ii) of this definition); or (iv) a sale of all or substantially all of the party's assets. The term "Voting Stock" in this Section shall mean the Common Stock and any other securities issued by the party having the ordinary power to vote in the election of directors of the party (other than securities having such power only upon the happening of a contingency). The terms "Beneficial Owner," "Beneficial Ownership" and "Group" used in this Section shall have the meaning comprehended by Section 13(d)(3) of the Exchange Act and the rules and regulations promulgated thereunder. The term "Person" used in this Section shall mean any person, individual, corporation, partnership, trust or other non-governmental entity or any governmental agency, court, authority or other body (whether foreign, federal, state, local or otherwise).

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                          APL-ITC796-0000010023

## SECTION 2

### License Grants and Covenants

2.1     Apple to Microsoft.  Subject to the receipt of the fee set forth in Section 5.1 below, Apple, on behalf of itself and its Subsidiaries, agrees to grant, and does hereby grant, to Microsoft a worldwide, nonexclusive, personal right and license, under the Apple Licensed Patents to the fullest extent possible, to exercise any and all legal rights with respect to Microsoft Licensed Products, including without limitation the right and license to make, have made, use, sell, offer for sale, license, promote the commercialization of, and import Microsoft Licensed Products.  Microsoft shall have the right to grant the benefit of such right and license only to its Subsidiaries but only as set forth in Section 3 below.

2.2     Microsoft to Apple.  Subject to receiving the right and license set forth in Section 2.1 above, Microsoft, on behalf of itself and its Subsidiaries, agrees to grant, and does hereby grant, to Apple a worldwide, nonexclusive, personal right and license, under the Microsoft Licensed Patents to the fullest extent possible, to exercise any and all legal rights with respect to Apple Licensed Products, including without limitation the right and license to make, have made, use, sell, offer for sale, license, promote the commercialization of, and import Apple Licensed Products.  Apple shall have the right to grant the benefit of such right and license only to its Subsidiaries but only as set forth in Section 3 below.

2.3     Covenants by Apple.   Apple, on behalf of itself and its Subsidiaries hereby represents, warrants and covenants to Microsoft that users and Microsoft Authorized Licensees of Microsoft Licensed Products shall be immune from any claim or suit under the Apple Licensed Patents for (i) the use, sale, license, importation or other distribution or transfer of any such Licensed Product; (ii) the formation, use, sale, license, importation or other distribution or transfer of any combination which includes any such Licensed Product, provided, however, that such immunity from suit shall not cover or extend to any third party product which itself infringes an Apple Licensed Patent.  Other than the explicit covenant granted in this section, no other license, representation, warranty or covenant is granted or made by Apple hereto with respect to any third parties regarding combinations including Microsoft Licensed Products.

2.4     Covenants by Microsoft.  Microsoft, on behalf of itself and its Subsidiaries hereby represents, warrants and covenants to Apple that users and Apple Authorized Licensees of Apple Licensed Products shall be immune from any claim or suit under the Microsoft Licensed Patents for (i) the use, sale, license, importation or other distribution or transfer of any such Licensed Product; (ii) the formation, use, sale, license, importation or other distribution or transfer of any combination which includes any such Licensed Product, provided, however, that such immunity from suit shall not cover or extend to any third party product which itself infringes a Microsoft Licensed Patent.  Other than the explicit covenant granted in this section, no other license, representation, warranty or covenant is granted or made by Microsoft hereto with respect to any third parties regarding combinations including Apple Licensed Products.

-5-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010024

2.5     The licenses, representations, warrantees and covenants granted in this Section 2 are perpetual and irrevocable except in the instances specifically set forth in Sections 3 and 12.

## SECTION 3

### Extension of Licenses to Subsidiaries

3.1     <u>Subsidiaries</u>.  The licenses granted herein shall include the right of the parties hereto to grant the benefit of the rights and licenses of Section 2 to their respective current and future Subsidiaries.  To obtain such benefit, each Subsidiary shall be bound by the terms and conditions of this Agreement (except for the provisions of Sections 4 and 5 hereof), as if it were named herein in the place of the parent party.  If a Subsidiary ceases to be a Subsidiary during the Term, such cessation shall not affect any licenses granted to a party by that Subsidiary; such licenses will continue for the full term of any and all Licensed Patents.  Any license, rights or covenants granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.

3.2     If a Subsidiary is acquired after the Effective Date of this Agreement, any license granted to or from such Subsidiary shall be effective only as of the date of the acquisition, shall have no retroactive effect, and shall not include any release pursuant to Section 4 below with respect to products made, used, sold, offered for sale, licensed, promoted, or imported by the Subsidiary or party before the date of the acquisition.

3.3     <u>Operating Subsidiaries</u>.

(a)  In the event a Subsidiary of one party hereto (the "Parent") is an Operating Subsidiary (as hereinafter defined) at the time it ceases to be a Subsidiary, and, with the written approval of the Parent, requests in writing from the other party, within one hundred and eighty (180) days after ceasing to be a Subsidiary, a license agreement with the other party hereto upon terms and conditions substantially identical with the terms and conditions of this Agreement (except as hereinafter provided in this Section 3.3) such other party hereto agrees that it will enter into such license agreement forthwith; provided, however, that such other party shall not be required to enter into such a license agreement with more than four (4) such Operating Subsidiaries over the life of this Agreement.  As used herein, the term "Operating Subsidiary" shall mean any Subsidiary of one party hereto which at the time it ceases to be a Subsidiary, has been a Subsidiary of such party for more than four (4) consecutive months, and has all of the following:  (i) marketable products with annual commercial sales in excess of Ten Million U.S. Dollars ($10,000,000); (ii) patents which relate to such marketable products, the ownership of which are being retained by the Subsidiary, and (iii) tangible assets at least equivalent in value to the lesser of Ten Million U.S. Dollars ($10,000,000) or twenty percent (20%) of the total assets of the Parent.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                    APL-ITC796-0000010025

(b)  The license agreement entered into between the Operating Subsidiary and the other party hereto shall contain terms and conditions substantially identical with the terms and conditions of this Agreement except that:

(i) this Section 3.3 and Sections 4, 5, 8.2 and 9.4 below, and all references to the foregoing Sections, shall be omitted;

(ii) the name of the Operating Subsidiary shall be substituted for the name of the Parent; and

(iii) the licenses, rights and covenants granted by the other party hereto to the Operating Subsidiary shall be limited to the Operating Subsidiary Licensed Product which were Commercialized Products prior to the date when the Operating Subsidiary ceases to be a Subsidiary of the party ("Old Operating Subsidiary Products") and any future versions, updates, upgrades, and successors (so long as, for Licensed Programs, they are backward compatible) of the Old Operating Subsidiary Products ("New Versions"), but only to the extent such New Versions use or embody functionality used or embodied in the Old Operating Subsidiary Products.  In such a case, New Versions of the Old Operating Subsidiary Products will not be licensed to the extent they incorporate functionality beyond those which were included in Old Operating Subsidiary Products, and new products of the Operating Subsidiary will also not be licensed.

## SECTION 4

### Releases

4.1   Release of Parties.  Each party, on behalf of itself and its Current Subsidiaries, hereby fully and forever releases and discharges the other party and its Current Subsidiaries from any and all damages, liability, suits, claims, and causes of action of any kind, whether known or unknown, suspect or unsuspected, arising out of the patent infringement or alleged patent infringement occurring prior to the Effective Date.  The release in this Section 4.1 shall not extend to any third parties; any release to any third parties shall be governed exclusively by Section 4.2.

4.2   Release of Authorized Licensees.  Each party, on behalf of itself and its Current Subsidiaries, hereby fully and forever releases and discharges the Authorized Licensees of the other party from any and all damages, liability, suits, claims, and causes of action of any kind arising out of the infringement or alleged infringement of any of its Licensed Patents, whether known or unknown, suspected or unsuspected, with respect to any Licensed Product of such other party or its Current Subsidiaries as of the Effective Date, to the extent that such infringement or alleged infringement would have been licensed, or not subject to suit due to a representation, warranty or covenant hereunder if it had occurred after the Effective Date.

4.3   Unknown Claims.  The parties hereto expressly acknowledge and agree that this Agreement fully and finally releases and forever resolves the Released Claims, including those that

-7-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                      APL-ITC796-0000010026

are unknown, unanticipated or unsuspected or that may hereafter arise as a result of the discovery of new and/or additional facts, and each of the parties expressly waive all rights under Section 1542 of the Civil Code of California, which the parties each acknowledge they have read and understood and which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each of the parties also expressly waive all rights under any other statutes, legal decisions or common law principles of similar effect.

## SECTION 5

### Payment

5.1     Payment to Apple.  As consideration for the licenses, representations, warranties, covenants and other rights granted by Apple to Microsoft herein, Microsoft shall pay to Apple a non-refundable fee in the amount of Ninety-three million, seventy-six thousand, nine hundred and twenty-four U.S. Dollars ($93,076,924) within five (5) days of the Effective Date.  Such payment shall be made in United States Dollars by wire transfer to Apple in accordance with the instructions set forth on Schedule A hereto.

5.2     Paid-Up Licenses and Rights.  All licenses, representations, warranties, covenants, releases and other rights granted by Microsoft to Apple herein shall be fully paid-up and royalty free upon the grant of licenses, rights and covenants, and releases to Microsoft, its Subsidiaries and Authorized Licensees in Sections 2 and 4, respectively.  All licenses, warranties, covenants, releases and other rights granted by Apple to Microsoft herein will become fully paid-up and royalty free when Microsoft has made the entire payment specified in Section 5.1 above.

5.3     Distributions from OTLC.  Apple is the owner of Fifty Percent (50%) of the shares of the issued common stock of Object Technology Licensing Corporation ("OTLC"), a Delaware corporation, and is entitled to receive Fifty Percent (50%) of any distribution of earnings made by OTLC, and Apple shall not enter into any agreements foregoing such entitlement.  Apple agrees that it will pay to Microsoft fifty-two and one-half percent (52.5%) of the total payment made by Microsoft to OTLC for any license, settlement, judgment or other rights under any and all OTLC patents, less one-half of any costs that OTLC incurs in conjunction with such Microsoft patent activities.  Apple agrees to vote for full distribution by OTLC of such payments from Microsoft and further agrees to not object to such distribution.  Payments due to Microsoft under this Section 5.3 will be made to Microsoft within ten (10) days of the receipt of any respective distribution to Apple from OTLC.  All distributions from OTLC to Apple occurring after any payment from Microsoft to

-8-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

OTLC shall be paid first to Microsoft until all payments owed to Microsoft under this Section have been satisfied.

5.4  Late Payment. Microsoft and Apple shall be liable for interest on any overdue payment commencing on the date such payment becomes due, at an annual rate which is the greater of nine percent (9%) or one percentage point higher than the prime interest rate as quoted by the head of office of Citibank N.A., New York, at the close of banking on such date, or on the first business day thereafter if such date falls on an non-business day. If such interest rate exceeds the maximum legal rate in the jurisdiction where a claim therefor is being asserted, the interest rate shall be reduced to such maximum legal rate.

## SECTION 6

### Conditional Patent Rights

6.1  Conditional Patents. Each respective party hereto and its Subsidiaries (each a "Grantor") agrees that, upon written request, it will grant to the other party (the "Grantee"), to the extent and subject to the terms and conditions under which it then has the right to do so, a non-exclusive license, covenant and release under the Conditional Patents or portion thereof as requested by Grantee under the most favorable terms (including minimizing any monetary cost or other required consideration) that Grantor is contractually able to provide to Grantee. Such non-exclusive license, covenant and release shall be of the broadest scope and longest duration (including a full release for activities preceding the grant of the license) which Grantor has the right to grant (unless a lesser scope or duration is requested by Grantee), but need not be of any greater scope or duration than the scope and duration of the licenses, representations, warranties, covenants and releases granted in Sections 2 and 4 above with respect to Grantor's Licensed Patents. Such license shall be granted under a separate agreement by and between Grantor and Grantee which shall contain terms and conditions substantially identical to the terms and conditions of this Agreement except:

(a)  this Section 6.1 and Sections 3.3, 5, 8.2 and 9.4, and all references to the foregoing Sections, shall be omitted;

(b)  the Licensed Patents licensed under such separate agreement shall be limited to the requested Conditional Patents;

(c)  the Grantee shall be required to pay or provide to the Grantor the minimum monetary payment or other required consideration which the Grantor is obligated to pay to a third party as a result of the specific grant of such license to Grantee prior to or at the same time as such payment becomes due to such third party; and

(d)  the terms and conditions of such separate agreement shall be limited to those which Grantor has the right to enter into with Grantee.

-9-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                    APL-ITC796-0000010028

6.2     Notice Regarding Conditional Patents.  Upon written request of one party, the other party shall identify any and all Conditional Patents that are capable of being licensed under Section 6.1 above.  Upon written request identifying specific Conditional Patents, the other party will inform the requesting party of the terms and conditions under which such license may be granted.

## SECTION 7

### Term of Agreement

7.1     Term.  The Term of this Agreement shall commence upon the Effective Date and continue until the expiration of the enforceability of the last to expire of the Licensed Patents and Conditional Patents.

7.2     Survival.  The following provisions will survive the Term of this Agreement: Sections 1 (Definitions), 2 (Licenses), 3 (Subsidiaries), 4 (Releases), 5.3 (Distribution from OTLC), 5.4 (Late Payment), 7 (Term of Agreement),  8 (Representations and Warranties), 9 (Other Obligations and Restrictions Regarding Patent Rights), 10 (Other Proprietary Rights), 11 (Limitation of Liability), 13 (Dispute Resolution), and 14 (General).

## SECTION 8

### Representations and Warranties

8.1     Representations and Warranties.

Each party hereby represents and warrants to the other party that:

(a) It is a corporation duly organized, validly existing and in good standing under the laws of the State of California in the case of Apple, and State of Washington in the case of Microsoft, and has the requisite corporate power to own and license its intellectual properties.

(b) All corporate action on its part necessary for the authorization, execution, delivery and performance of this Agreement by it and the performance of its obligations hereunder has been taken.  This Agreement shall constitute a legal, valid and binding obligation of it enforceable in accordance with its terms.

(c) It has the full right and power to enter into this Agreement and to grant the licenses and rights, and make the representations, warranties, covenants, and releases set forth in Sections 2, 3 and 4 above and that there are no outstanding agreements, assignments or encumbrances inconsistent with the provisions of said Sections or with any other provision of this Agreement.

-10-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

(d) Prior to the execution of this Agreement it has informed in writing the other party of any patents of such party that are deemed to be Conditional Patents.

(e) In the five (5) years prior to the execution of this Agreement, neither party assigned (partially or otherwise) or otherwise committed to assign more than an insignificant portion of its past, present or future patent rights to any third parties.

8.2    Apple and IBM.  Apple hereby represents and warrants that it has entered into no agreements or arrangements with International Business Machines Corporation ("IBM"), the third party joint owner of OTLC, with respect to licensing or enforcement of the OTLC patents to or against Microsoft per se.

8.3    Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY RIGHTS PROVIDED HEREUNDER NOR DOES EITHER PARTY ASSUME ANY LIABILITY IN RESPECT OF ANY INFRINGEMENT OF PATENT RIGHTS OR OTHER RIGHTS OF THIRD PARTIES DUE TO THE OTHER PARTY'S EXERCISE OF THE LICENSES AND RIGHTS GRANTED HEREIN.  NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY THAT THE EXERCISE OF THE LICENSES AND RIGHTS GRANTED HEREIN WILL NOT INFRINGE ANY PATENT OR OTHER RIGHTS OF ANY THIRD PARTIES.

## SECTION 9

### Other Obligations and Restrictions Regarding Patent Rights

9.1    Assignment of Licensed Patents.  Neither party shall assign any of its Licensed Patents or its Conditional Patents unless such assignment is subject to such other party's licenses, covenants, representations, warrantees and releases and other rights under this Agreement; the foregoing shall include without limitation a representation, warranty, and covenant from such an assignee to grant the immunities of Sections 2.3 and 2.4 to Authorized Licensees.  Any assignment of rights to any inventions which either party now has, or hereafter obtains, the ability or right to grant licenses or immunity from suit to the other party, shall be subject to the terms and conditions of this Agreement such that any resulting patents from those inventions shall be licensed to the other party as if they were in fact Licensed Patents.  Any attempted assignment in derogation of the foregoing provisions shall be null and void.

9.2    Validity and Scope.  Nothing contained in this Agreement shall be construed as a warranty or representation by either party as to the validity or scope of any of its Licensed Patents or Conditional Patents.

-11-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

9.3    No Restriction of Other Rights.  Nothing contained in this Agreement shall be construed as limiting the rights which the parties have outside the scope of the licenses granted hereunder, or restricting the right of either party or any of its Subsidiaries to make, have made, use, lease, sell, offer for sale, import or otherwise dispose of any particular product or products not licensed herein.

9.4    OTLC Patent Rights.  In addition to the provisions of Section 5.3, Apple agrees to transmit the letter shown in Exhibit B to OTLC, and to vote Apple's shares of common stock in favor of the grant of licenses, covenants and releases to Microsoft of the scope set forth in Sections 2, 3 and 4 .  The letter will be transmitted within seven (7) days of the Effective Date.  Apple agrees it will not assign its interest in whole or in part in OTLC for seven (7) days from the Effective Date.

9.5    Notice Regarding Potentially Licensed Patents.  Each party shall, upon request from the other party sufficiently identifying any particular patents, inform the other party as to the extent to which any such patents are subject to the licenses and rights granted hereunder.  If such licenses or rights under said patents are restricted in scope or otherwise unavailable, copies of all pertinent provisions of any contract or other arrangement creating such restrictions shall, upon request, be furnished to the party making such request, unless such disclosure is prevented by such contract or other legal obligation, and in that event a statement of the nature of such restriction will be provided to the extent allowed by such contract or other legal obligation.

9.6    Prosecution and Maintenance.  Neither of the parties hereto, nor any of their respective Subsidiaries shall be required hereunder to file any patent application, or to secure any patent or patent rights, or to maintain any patent in force, or to provide copies of patent applications to the other party or its Subsidiaries, or to disclose any inventions described or claimed in such patent applications.

9.7    Enforcement.  Neither party shall have any obligation hereunder to institute any action or suit against third parties for infringement of any of its Licensed Patents or to defend any action or suit brought by a third party which challenges or concerns the validity of any of its Licensed Patents. In addition, neither party shall have any right to institute any action or suit against third parties for infringement of any of the other party's Licensed Patents.

## SECTION 10

## Other Proprietary Rights

10.1    The parties understand and agree that no license or other right is granted herein to either party, directly or by implication, estoppel or otherwise, with respect to any trade secrets, know-how, design patents or registrations or copyright rights and that no such license or other right shall arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation.  Except as specifically provided herein, neither party is required hereunder to furnish or disclose to the other any technical or other information.

-12-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                         APL-ITC796-0000010031

10.2    Nothing contained in this Agreement shall be construed as conferring any right to use in advertising, publicity, or other promotional activities any name, trade name, trademark, or other designation of either party hereto or of its Subsidiaries (including any contraction, abbreviation or simulation or any of the foregoing). Nor shall either party be permitted or required to mark any of its specific Products as "licensed by" the other party or otherwise state or imply that a product of one party is endorsed by the other party, unless specifically authorized to do so by an agreement signed by both parties.

## SECTION 11

### Limitation of Liability

EACH PARTY AGREES THAT THE OTHER PARTY SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR PUNITIVE DAMAGES EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## SECTION 12

### Acquisitions and Change of Control

12.1    Change of Control.

In the event that, during the Term hereof, a party hereto (the "Acquired Party") experiences a Change Of Control (a "Transaction") with respect to a third party (the "Acquiring Party"):

(a) the Acquired Party shall promptly notify the other party (the "Non-Acquiring Party") thereof in writing prior to the Transaction;

(b)  The Capture Date shall be modified to be the earlier of (A) the original Capture Date, or (B) the date immediately prior to the effective date of such Transaction, and accordingly, the licenses, warrantees, representations and covenants granted by the parties in Section 2 and to Conditional Patents under Section 6 shall thereafter be limited to the party's Licensed Patents and Conditional Patents issued or issuing from patent applications having an Effective Filing Date on or before the modified Capture Date;

(c)  The Acquired Party Licensed Products shall be limited to only those Licensed Products of the Acquired Party or its Subsidiaries which were Commercialized Products prior to the effective date of such Transaction ("Old Products") and any future versions, updates, upgrades, and successors (so long as, for Licensed Programs, they are backward compatible) of the Old Products ("New Versions"), but only to the extent such New Versions use or embody inventions used or embodied in the Old Products. In such a case, New Versions of the Old Products will not be licensed to the extent they incorporate inventions beyond those which were included in Old Products, and new

-13-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010032

products of the Acquired Party and any and all products of the Acquiring Party will also not be licensed;

(d)  Such Transaction shall not affect any rights granted to the Non-Acquiring Party by the Acquired Party, such licenses, warrantees, representations and covenants will continue for the full term of the Licensed Patents defined in accordance with the modified Capture Date for all Licensed Products; and

(e)  The releases granted in Section 4 shall survive as to the Non-Acquiring Party and Acquired Party, but such release for the Acquired Party shall not extend to the Acquiring Party;

12.2   Personal Licenses, No Assignment of Rights Under Agreement.  The rights, licenses, representations, warrantees, covenants and releases granted to Microsoft and Apple under this Agreement shall be personal to the parties.  Other than specifically provided for in this Section 12, neither party shall have any rights to assign or otherwise transfer any of its rights or privileges under this Agreement whatsoever to any third party under action of law or otherwise, including in connection with the insolvency or bankruptcy of the party, without the prior written consent of the other party.  Any attempted assignment or transfer in derogation of the foregoing shall be null and void.

## SECTION 13

### Dispute Resolution

13.1   Negotiation.  The parties shall make a good faith attempt to resolve any dispute or claim arising out of or related to this Agreement through negotiation.  In the event that either party hereto believes that the other party has failed to operate in accordance with this Agreement, such party shall give written notice of such failure to the other party.  Such written notice shall describe the basis for such contention in reasonable detail.  Within fifteen (15) days after such written notice is given by any party, the Chief Financial Officers of each of the parties shall meet and make a good faith attempt to resolve such dispute or claim.  Such good faith attempt shall continue for fifteen (15) days after the date of the written notice.

13.2   Mediation.  In the event that any dispute or claim arising out of or related to this Agreement is not settled by the parties within the fifteen (15) day negotiation period set forth above, the parties will attempt in good faith to resolve such dispute or claim by mediation in accordance with the American Arbitration Association Commercial Mediation Rules.  The location of the mediation shall be in King County, Washington, if initiated by Apple, and in Santa Clara County, California, if initiated by Microsoft.  The mediation shall be held within thirty (30) days of the end of the fifteen (15) day negotiation period for a period no longer than two (2) days.  Nothing herein, however, shall prohibit either party from exercising any other rights or remedies, including initiating court proceedings if such party would be substantially prejudiced by a failure to act during the time that such good faith efforts are being made to resolve the dispute or claim through negotiation or

-14-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

mediation; however, the negotiation and mediation efforts shall continue contemporaneously with any such court proceeding.  The costs of mediation shall be shared equally by the parties to the mediation. A settlement reached by mediation shall only be binding on the parties if it is mutually agreeable and voluntarily signed by both parties.

13.3    Governing Law and Court Proceedings.  This Agreement shall be subject to and governed in all respects by the statutes and laws of the State of New York without regard to the conflicts of laws principles thereof, with the exception of disputes related to the non-assignability of this Agreement, which disputes shall be subject to and governed by Federal Law.  The Superior Court of King County and/or the United States District Court residing in Seattle shall have exclusive jurisdiction and venue over all controversies in connection herewith initiated by Apple.  The Superior Court of Santa Clara County and/or the United States District Court residing in San Jose shall have exclusive jurisdiction and venue over all controversies in connection herewith initiated by Microsoft. Each party hereby irrevocably consents to such exclusive and personal jurisdiction and venue.  The parties may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary, without breach of this Section 13.3.

## SECTION 14

## General

14.1    Entire Agreement; Amendment.  This Agreement including the exhibits and attachments hereto, constitute the final, complete and exclusive agreement and understanding between the parties hereto and integrate all prior discussions between them related to their subject matter.  This Agreement supersedes and governs any other prior or collateral agreements with respect to the subject matter hereof.  Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the party against whom enforcement of any such amendment, waiver, discharge or termination is sought.  The construction, performance and enforcement of this Agreement, including the mutual consideration exchanged by the parties hereunder, shall be entirely separate from the Concurrent Agreements.  A breach of any or all of the terms or conditions of the Concurrent Agreements, whether material or not, shall have no affect on the rights and obligations of the parties hereunder.

14.2    Notices.  Any notice or other communication given under this Agreement shall be sufficient if in writing and sent by registered or certified mail, return receipt requested, postage prepaid, to a party at its address set forth below (or at such other address as shall be designated for such purpose by such party in a written notice to the other party hereto):

     (a)    if to Apple, to it at:

        1 Infinite Loop
        Cupertino, CA 95014
        Attention:  Chief Financial Officer

-15-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

with a copy addressed as set forth above but to the attention of:  the General Counsel.

with a copy to:

Larry W. Sonsini
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94306

(b)      if to Microsoft, to it at:

Microsoft Corporation
One Microsoft Way
Building 8
North Office 2211
Redmond, WA 98052
Attention: Chief Financial Officer

with a copy addressed as set forth above but to the attention of:  the General Counsel.

All such notices and communications shall be effective when received by the addressee.

14.3     Force Majeure.  Neither party will be responsible for any failure to perform its obligations under this Agreement due to causes beyond its reasonable control, including but not limited to, acts of God, war, riot, embargoes, acts of civil or military authorities, fire, floods or accidents.

14.4     Waiver.  The waiver, express or implied, by either party of any breach of this Agreement by the other party will not waive any subsequent breach by such party of the same or a different kind.

14.5     Headings.  The headings to the Sections and Subsections of this Agreement are included merely for convenience of reference and shall not affect the meaning of the language included therein.

14.6     Independent Contractors.  The parties acknowledge and agree that they are dealing with each other hereunder as independent contractors. Nothing contained in this Agreement shall be interpreted as constituting either party the joint venturer, employee or partner of the other party or as conferring upon either party the power of authority to bind the other party in any transaction with third parties.

-16-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

14.7    Severablity.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restriction of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

14.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  For purposes hereof, a facsimile copy of this Agreement, including the signature pages hereto, shall be deemed to be an original.  Notwithstanding the foregoing, the parties shall deliver original execution copies of this Agreement to one another as soon as practicable following execution thereof.

14.9    Confidentiality and Public Disclosures.  Except as otherwise provided in this section, the parties agree that the terms and conditions of this Agreement are confidential and will be treated with at least the same care as other confidential information held by the parties.  The timing as to the disclosure of the existence of this Agreement shall be mutually agreed upon between the parties. Unless otherwise agreed in writing, the parties comments on this Agreement shall be limited to substantially the following:  "Apple and Microsoft have entered into a broad patent cross-license agreement.  The terms and conditions of which are confidential."  Under no circumstances shall the parties disclose the financial terms of this Agreement unless required by law or in conjunction with a judicial proceeding, in which case reasonable care will be taken to limit disclosure and dissemination of the terms.  If either party is subsequently required to make such disclosure or a filing with the Securities and Exchange Commission ("SEC Documents"), it shall advise the other party in advance of such a disclosure, and shall otherwise minimize the dissemination of information disclosed by, for example, redacting to the fullest extent permissible the terms and conditions of this Agreement, including the payment information, and not otherwise publicly promoting or disseminating any information disclosed in the SEC Documents.  Apple has determined that the method of recording this Agreement for accounting purposes does not require specific disclosure of the financial terms of

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

APL-ITC796-0000010036

this Agreement. This confidentiality provision shall in all other respects continue to be in force for both parties even if such a disclosure is required. The parties hereby understand and acknowledge that the confidentiality of this Agreement is a material consideration to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers as of the date aforesaid.

APPLE COMPUTER, INC.

By: _____

Name: ___John B. Douglas, III___

Title: ___Senior Vice President___

MICROSOFT CORPORATION

By: _____

Name: ___Greg Maffei___

Title: ___Chief Financial Officer___

-18-

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                                    APL-ITC796-0000010037

SCHEDULE A - Instructions for Payment

The payment required under Section 5.1 above shall be made in United States Dollars by wire transfer to Apple at:

| | |
|---|---|
| Bank: | Bank of America, San Francisco |
| ABA#: | 121-000-358 |
| For Acct Of: | Apple Computer, Inc. |
| Acct No.: | 1233-6-04966 |

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

SCHEDULE B – Letter from Apple re: OTLC

[General Counsel of Apple]
August __, 1997

[IBM]

Re:  License to Microsoft Corporation

I am writing to advise you that Apple Computer, Inc., has entered into a broad patent cross-license with Microsoft Corporation.  As a result of this cross-license agreement, Apple no longer has any financial interest in resolution of any OTLC claims against Microsoft.  Consequently, we wish to step aside and hereby authorize IBM to take any and all necessary steps to grant Microsoft a license to the OTLC patents consistent with both the IBM/Microsoft patent agreement and the Apple/Microsoft patent agreement.  Our authorization includes a royalty free license.

Apple intends to bring this matter before the Board of directors of OTLC at their next meeting and will cooperate fully with IBM and OTLC in this regard.

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

August 11, 1997

Microsoft Corporation
One Microsoft Way
Building 8
North Office
Richmond, WA 98052

Dear Sirs:

     In payment of the fee pursuant to Section 5 of the Patent Cross License Agreement dated as of August 5, 1997 between Apple Computer, Inc. and Microsoft Corporation, we hereby acknowledge receipt of a wire transfer of immediately available funds to our account in the amount of $93,076,924.

Very truly yours,

**APPLE COMPUTER, INC.**

By                                     

        Name:  Fred Anderson
        Title:  Executive Vice President and
                 Chief Financial Officer

BE1::ODMA\PCDOCS\SQL2\406878\2
August 8, 1997

CONTAINS APPLE CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER