Exhibit B
(Submitted Under Seal)

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>　　　　　　　Defendants. | Case No.11-cv-01846-LHK<br><br>**EXPERT REPORT OF TERRY L. MUSIKA, CPA** |

**SUBJECT TO PROTECTIVE ORDER**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| A. | QUALIFICATIONS | 1 |
| B. | ASSIGNMENT | 1 |
| C. | DATA AND OTHER INFORMATION CONSIDERED | 2 |
| D. | APPLE'S UTILITY PATENTS | 3 |
| E. | APPLE'S DESIGN PATENTS | 5 |
| F. | APPLE'S TRADE DRESS REGISTRATIONS | 5 |
| G. | APPLE'S UNREGISTERED TRADE DRESS | 6 |
| H. | APPLE'S TRADEMARK REGISTRATIONS | 9 |
| I. | APPLE'S UNREGISTERED TRADEMARK | 11 |
| J. | APPLE INC | 11 |
| K. | SAMSUNG | 15 |
| L. | INDUSTRY AND MARKET | 16 |
| M. | ASSUMPTIONS | 21 |
| N. | SUMMARY OF CONCLUSIONS AND OPINIONS | 22 |
| O. | IRREPARABLE HARM | 27 |
| P. | MONETARY DAMAGE ANALYSIS | 36 |
| Q. | POSSIBLE REVISIONS TO THIS REPORT | 88 |
| R. | EXHIBITS | 88 |
| S. | PROFESSIONAL ARRANGEMENT | 89 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

124. This decision reflects a matter of judgment that substantially misses a significant portion of the harm that Apple is experiencing. There is ample evidence that Samsung copied Apple's designs and its patented technology. It is also apparent that they did so based on a belief that such actions made the resulting products significantly more desirable to consumers. Empirically, Samsung did not begin to succeed in the smartphone marketplace until products that used Apple's Intellectual Property In Suit entered the market in 2010. There is no support that any alternative design would be commercially acceptable. Nonetheless, it is difficult to obtain a precise measure of that change. My analysis can however, measure the impact that changes in the level of acceptance would have on Apple's damages. My analysis can estimate the amount of lost profits that was available but not claimed as a damage assuming Samsung's design around model was not commercially acceptable. There are 18,230,472 accused units. I calculated lost profits on only 2,197,534 of the total (approximately 12%). Assuming an infringer's profit was awarded on every accused unit in which a lost profit damage was not claimed,

[redacted]

125. My model is similarly conservative in that it assumes that Samsung returns to the market and can achieve similar sales immediately upon its return. Again, this is unlikely in practice and this assumption significantly reduces the amount of lost profits that I calculate on Apple's behalf.

126. The third condition is whether Apple had the demonstrated operational capacity to replace Samsung's accused sales. To evaluate Apple's ability to handle the excess demand created by the need to supply iPhones and iPads in the "but-for" market, I have (1) evaluated a capacity analysis performed by Apple and set forth in two reports that were discussed at the deposition of Mark Buckley, and (2) had discussions with Mr. Buckley and Rory Sexton, Apple's VP of Supply and Demand Management.[116] This analysis represents Apple's actual quarterly manufacturing and sales results as well as Apple's capacity to produce units above what was actually manufactured, referred to by Apple as "Installed Capacity." To calculate the installed capacity, Apple determined the number of manufacturing lines

---

[116] APLNDC Y0000055416 and APLNDC Y0000055417; Deposition of Mark Buckley, February 23, 2012, Exhibits 15 and 16; Discussion with Rory Sexton and Mark Buckley.

EXPERT REPORT OF TERRY L. MUSIKA, CPA
Case No. 11-cv-01846-LHK                                                                                        40

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  which were in place during the 2010 – 2011 period. Next, by applying the maximum manufacturing rates and the number of days and hours in service, the maximum number of units available was calculated. Last, Apple made adjustments to decrease that maximum to accommodate for periods where there were known shortages in parts and materials, product allocated to a particular location, time needed for maintenance, holidays, and other periods in which manufacturing stops, and other factors that affect capacity as well as to adjust for returns, and manufacturing defects.[117]

127. As shown on **Exhibits 26 & 27**, I have used Apple's analysis to calculate the quarterly excess unused capacity for both the iPhone and the iPad. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This created a conservative estimate of Apple's excess capacity available for the sales of units in the "but-for" scenario. Additionally, I made the excess capacity created during a quarter to be available at the start of the following quarter because I did not have timing detail. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As shown on **Exhibit 17.2**, Apple demonstrated its ability to have capacity to accommodate additional units as calculated in this report.

128. The fourth and final factor requires that the calculation be completed to a reasonable degree of certainty. As described in detail below, I have completed a detailed analysis of Apple's sales "but-for" Samsung's alleged infringement. This calculation relies on the parties' document production, sworn testimony and industry analysts who are relied upon by both Apple and Samsung. Additionally, this model is constructed using a series of conservative approaches which are described in detail in this report.

129. The above analysis is intended to provide evidentiary support for the position that Apple would have made Samsung's sales "but-for" Samsung's improper use and reliance on one or more identified items of Apple Intellectual Property In Suit. However, as indicated my methodology adopts an even more conservative premise in that it assumes that Samsung would have developed some conceptual design

---

[117] Discussion with Rory Sexton and Mark Buckley.

investments in R&D to remain competitive."[145] However, Apple does not track the individual research and development costs associated with individual patents, individual features or other forms of intellectual property in the ordinary course.

167. The rates discussed above allocate the total cost of replacement by the number of accused units. Therefore, I do not further apportion the amount when calculating a reference amount.

*The Market Approach*

168. The market approach to the valuation of intellectual property is based on the consideration of other market comparable transactions. I have reviewed and analyzed both Apple and Samsung's licensing activity and searched the public domain for market comparable rates specific to or comparable to the Apple Intellectual Property in Suit. I explain the result of my analysis for each as follows and have summarized my results on **Exhibit 40**.

169. Apple – Based on my review of the evidence produced in this case I have identified the following sources that relate to Apple's licensing of the Apple Intellectual Property In Suit as well as Apple's general licensing policies and procedures.

- Apple's policy is to not license to anyone its design elements as represented by Apple's asserted design patents and trade dress. Accordingly, this sets a very high but un-quantifiable rate for Apple's asserted design patents and trade dress. This policy is reinforced and confirmed by Apple's refusal to offer Samsung a license to design elements and its specific directives regarding copying during the parties' discussions about the Apple Intellectual Property In Suit.[146]

- Apple has not licensed any of the Apple Intellectual Property In Suit outside of the inclusion of some of the patents as a part of a few select global cross licenses and there is no established rate associated with any Apple Intellectual Property In Suit.

- Some of the Apple utility patents in suit are included on a list of patents prepared in recent periods that Apple will not license to other companies.

- Apple's approach is to use its intellectual property to protect proprietary features of its products as opposed to licensing as a means of generating revenue.

---

[145] Apple Inc. Form 10-K, fiscal year ended 9/24/11, pp. 35-36.
[146] Deposition of Chip Lutton, Jr., July 26, 2011, pp. 52, 117.

- There are three agreements that cover, at least in part, some of the Apple Intellectual Property in Suit.

*IBM Cross License*

170. The first agreement between Apple and IBM took place in 1991, where Apple and IBM each licensed their worldwide patents, on a non-exclusive basis, including utility models and design patents for registration of type fonts (but not including any other design patents or registrations), issued by October 1, 1991 and all patent applications with an effective filing date prior to October 1, 1991. ▌.[147] Apple and IBM further engaged in another similar cross-license agreement on December 18, 2002. This cross-license agreement captures patents, owned by either party, issued by October 25, 2012 or all patent applications with an effective filing date prior to October 25, 2012. ▌.[150]

*Microsoft Cross License*

171. Apple entered into a cross-license agreement with Microsoft Corporation on August 5, 1997. Licensed patents include all worldwide utility patents, utility models, and equivalent rights, and all of its worldwide design patents and design registration relating to user-interface components for a computing or information processing device before 2002. The agreement also included an "anti-cloning" provision which kept the parties from copying each other's products. Apple was to pay 52.5% of the total payment made by Microsoft to OTLC, of which Apple owns 50% of the common

---

[147] Patent Cross License Agreement between Apple Inc. and International Business Machines Corporation, dated October 1, 1991 (AppDel0158967 to AppDel0159005).
[148] Patent Cross License Agreement between Apple Inc. and International Business Machines Corporation, dated December 18, 2002 (APLNDC0001221082 to APLNDC0001221113).
[149] License Amendment between Apple Computer, Inc. and International Business Machines Corporation, dated March 31, 2006 (APLNDC00014215 to APLNDC000142224).
[150] Discussion with Boris Teksler.

stock, for any license, settlement, judgment or other rights under any and all OTLC patents, less half of any costs that OTLC incurs in conjunction with such Microsoft patent activities. Microsoft was to pay a one time lump sum payment of $93,076,924 to Apple. The agreement term was five years from the effective date.[151] I understand this cross license covers includes only the '002 and '891 Patents In Suit.[152]

*Nokia Cross License and Settlement*

172. In June 2011, Apple also entered into a provisional license agreement with Nokia in a connection with a settlement of litigation between the parties.[153] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[155]

173. It is my opinion that the three licenses do not provide a relevant comparable reference rate for the Apple Intellectual Property In Suit. The IBM license which includes all of the utility patents in suit also includes a host of other intellectual property that is unrelated to the utility patents in suit. Furthermore, IBM does not compete in the wireless device industry, an important characteristic when establishing a rate as comparable. The Microsoft license is a broad cross license covering two of the utility patents in suit as well as a host of other intellectual property that is unrelated to the utility

---

[151] Patent Cross Licenses Agreement between Apple Inc. and Microsoft Corporation, dated August 5, 1997 (APL-ITC796-0000010019 to APL-ITC796-0000010040).
[152] Discussion with Boris Teksler.
[153] Deposition of Chip Lutton, Jr., July 26, 2011, p. 66.
[154] Patent License Agreement between Nokia and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220 to APLNDC-X0000007335).
[155] Deposition of Chip Lutton, Jr., July 26, 2011, p. 66.

patents in suit. The Nokia license was entered into in settlement of litigation between the parties for numerous patents involved in multiple litigations. Nokia is also differently situated than Samsung and the scope of its infringement of Apple's intellectual property was different. Further, the '381 Patent is just one of many patents given consideration in that settlement and therefore the agreement does not serve as a comparable reference point.

174. Apple participated in a series of licensing negotiations with Samsung that included the utility patents in the Apple Intellectual Property In Suit. I understand that the first meeting between Apple and Samsung regarding Apple's concern that Samsung was "copying Apple's products" occurred in July 2010 in Cupertino, CA.[156] The meeting included Apple's then CEO Steve Jobs and COO Tim Cook as well as Samsung COO J.Y. Lee.[157] The July 2010 meeting was followed up with August and September 2010 meetings between other Apple and Samsung representatives[158] in which Apple provided substantial additional information about the nature and scope of Samsung's infringement of Apple's intellectual property. These discussions led to an October 2010 meeting in Washington, DC between Apple Senior Vice President and General Counsel, Bruce Sewell, Apple Senior Director and former Chief Patent Counsel, Chip Lutton, and Apple Director of Patent Licensing and Strategy, Boris Teksler, as well as Dr. Seung Ahn and KJ Kim from Samsung.[159] The October 2010 licensing discussion yielded a proposed framework for a license by Apple that included a proposed $30 per Samsung licensed smartphone and $40 per licensed touchscreen tablet that would include some but not all of the utility patents in suit and none of the design patents.[160] Chip Lutton testified that the tablet rate of $40 per licensed touchscreen tablet was to be reduced over some period of time to a lesser royalty, proposed initially to be a $30 per unit royalty after two years.[161]

175. Apple indicated on multiple occasions throughout the licensing discussion meetings described above that Apple had no interest in licensing its design patents or trade dress to Samsung and also indicated

---

[156] Deposition of Chip Lutton, Jr., July 26, 2011, pp. 21 and 24.
[157] Deposition of Chip Lutton, Jr., July 26, 2011, p. 23.
[158] Deposition of Chip Lutton, Jr., July 26, 2011, pp. 17 and 118.
[159] Deposition of Chip Lutton, Jr., July 26, 2011, p. 171.
[160] Samsung-Apple Licensing Discussion, October 5, 2010 (APLNDC000010886-917 at APLNDC000010897); Discussion with Boris Teksler.
[161] Deposition of Chip Lutton, Jr., July 26, 2011, p. 192.; Samsung-Apple Licensing Discussion, October 5, 2010 (APLNDC000010886-917 at APLNDC000010897).

that certain utility patents would need to be excluded. When asked whether Samsung was offered a license in the August 4, 2010 meeting, Chip Lutton stated "if Samsung wanted to continue to use Apple's utility patents in its smartphones, as documented in the – in the infringement by the Android – various layers of the Android system, the message to Samsung was that we were willing to work with them on – on that. We were not willing to license them the design patents or the design aspects of our product."[162] Mr. Teksler also confirmed that certain of the utility patents (including the '381, '915, and '163 Patent) that have been asserted in this lawsuit would have been excluded from any arrangement between Apple and Samsung.[163]

176. One reference point I also considered is Apple's Made for iPhone, iPad, and iPod program. Mark Buckley described the program as originating when Apple only sold iPods. The program made it possible for third parties to manufacture an accessory and with Apple's permission place a "Made for iPod" logo on the packaging in exchange for a fee.[164] I reviewed the standard Made for iPod License and Made for iPod License iPhone/iPad Supplement and found that the license grants a third party a limited, non-exclusive license to manufacture Licensed Products incorporating Licensed Technology as well as a non-exclusive right to use the Made for iPod, iPhone, and iPad logos on "product packaging and in the user guide for each Licensed Product, and in any advertisements, web pages, and other collateral materials promoting the Licensed Products."[165] The purpose of the agreement is to create a market for complimentary, not competing products.[166] A Licensed Product is defined as "a Proposed Product that (i) bears Licensee's brand, (ii) controls or interfaces, communicates or otherwise interoperates with Compatible iPod Products in accordance with Documentation and this Use License, and (iii) has been certified in accordance with Section 2."[167] According to the terms of the agreement, the Made for iPhone, iPad, and iPod program requires a royalty payment of $4.00 for each Licensed Product unit sold. Although this license is not a comparable license to any of the Apple Intellectual Property In Suit, I do view this license rate of $4.00 per unit as a floor for the

---

[162] Deposition of Chip Lutton, Jr., July 26, 2011, p. 52.
[163] Discussion with Boris Teklser.
[164] Mark Buckley Deposition, February 23, 2012, p. 58.
[165] Made for iPod License (APLNDC-Y000148459 to APLNDC-Y000148473); Made for iPod License iPhone/iPad Supplement to Contract # (APLNDC-Y000148474 to APLNDC-Y000148478).
[166] Discussion with Boris Teksler.
[167] Made for iPod License (APLNDC-Y000148459-473 at APLNDC-Y000148470).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

license of any single item of intellectual property contained in the asserted design patents, trade dress, and trademarks.

177. I examined other license agreements produced by Apple in this litigation. Given their scope, their timing, the relationship between Apple and Samsung, and the specific intellectual property being asserted by Apple, I concluded that none provide a comparable arrangement to the license that Samsung would need to take for the specific utility patents, design patents and other design rights that are being asserted by Apple in the present case. I state no opinions regarding whether and to what degree that they may be comparable or useful in evaluating any reasonable royalty that Samsung seeks for the patents that it has asserted against Apple.

178. <u>Samsung</u>- Based on my review of the evidence produced in this case I have identified the following sources that relate specifically to Samsung's licensing activities.

179. I have reviewed the licenses that Samsung has produced in this litigation. Given their scope, their timing, the relationship between Apple and Samsung, and the specific intellectual property being asserted by Apple, I concluded that none provide a comparable arrangement to the license that Samsung would need to take for the specific utility patents, design patents and other design rights that are being asserted by Apple in the present case. I state no opinions regarding whether and to what degree they may be comparable or useful in evaluating any reasonable royalty that Samsung seeks for the patents that it has asserted against Apple.

180. I understand Samsung made an offer to Apple prior to the commencement of this litigation. According to Mr. Lutton, Samsung gave a presentation to Apple on November 2, 2010 as part of the on-going licensing discussion between the parties.[168] The presentation identifies a 1 percent royalty rate for both Apple and Samsung under the assumption that "the patent positions for both Apple and Samsung are equal."[169] As the presentation suggests, this offer would have resulted in Apple making a balance payment of $234 million.[170] Mr. Lutton described the circumstances as such, "Samsung took a strange turn of talking about its own intellectual property, and -- and had a view that -- that

---

[168] Deposition of Chip Lutton, Jr., July 26, 2011, p. 332.
[169] Deposition of Chip Lutton, Jr., July 26, 2011, Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.
[170] Deposition of Chip Lutton, Jr., July 26, 2011, Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1　　Apple's intellectual property and Samsung's intellectual property were of similar value, but because Apple was selling more products than Samsung, that Apple should owe Samsung a net balancing payment."[171] To determine the per unit royalty rate that corresponds to Samsung's suggested 1 percent royalty rate, I divided the $67 million in indentified Samsung royalties by the 16.1 million Samsung units also identified by Samsung.[172] This calculation yields a $4.16 per unit royalty rate for Samsung.

181. Industry – Based on my review of licensing information regarding the wireless device industry, there are no directly comparable licenses to the Apple Intellectual Property in Suit in the public domain.

*The Income Approach*

182. The theory behind an income approach is that the value of the patent at issue is equal to the future profitability of the products embodying the patented technology. Although projections of future profits by accused defendants are sometimes used and accepted by the courts as representation of what a defendant expected to make,[173] the actual profits are now known and available and represent a more conservative measure of anticipated profits at the time of the hypothetical negotiation under a "book of knowledge" concept. I have relied on both Apple's and Samsung's actual profits as a starting point for my analysis of the value of the Apple Intellectual Property In Suit and a reasonable royalty thereon based on an income approach.

183. The net operating income produced through the sale of a smartphone and tablet represents a total competitive return to Apple and Samsung for their deployment of all corporate resources after all necessary operating expenses have been paid. This net return is not the result of the deployment of any single asset. Rather, it represents a composite return on all assets. Various income methods exist as acceptable methods to value individual assets as well as a means to use the isolated value as a basis to charge rent or a royalty for the use of that specific asset. For example, "the capitalization of excess earnings method calculates the expected return on all other assets, and attributes any earnings above

---

[171] Deposition of Chip Lutton, Jr., July 26, 2011, p. 151.
[172] Deposition of Chip Lutton, Jr., July 26, 2011, Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.
[173] In *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899 (Fed Cir. 1986), cert. denied, 479 U.S. 852, 107 S. Ct. 183, 93 L. Ed. 2d 117 (1986), a special master computed reasonable royalty damages based on an internal memorandum written by the infringer's management just before it started to infringe. The internal memo identified a future profit that was significantly higher than the profit margin actually realized by the infringer on the accused products.

## S. PROFESSIONAL ARRANGEMENT

265. My work for expert services provided in this matter is charged at a standard billing rate of $550 per hour and is in no way contingent on the outcome of this matter. In addition, I will be reimbursed for all reasonable out-of-pocket expenses incurred in connection with my analyses and testimony in this case.

March 22, 2012                                  Terry L. Musika, CPA

Lost Profits Summary

Apple Inc. v Samsung Electronics Co., LTD, et al

EXH B T 17 2

| | 2010 | | | | | | | | 2011 | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | |
| Total Units Sold - Smartphones 1/ | 0 | 124,940 | 742,962 | 735,760 | 1,193,060 | 1,171,774 | 705,696 | 448,298 | 621,734 | 674,366 | 702,374 | 1,318,814 | 1,742,377 | 1,636,644 | 1,211,086 | 1,027,345 | 710,826 | 895,758 | 927,137 | 493,878 | 17,084,829 |
| Acclaim | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 770 | 258 | 8 | 1,094 | 1,052 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,208 |
| Captivate | 0 | 0 | 133,351 | 130,335 | 74,422 | 76,530 | 19,595 | 67,548 | 56,689 | 53,389 | 28,997 | 22,885 | 14,296 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 678,037 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 119 | 5,226 | 3,342 | 19 | 0 | 2,788 | 4,034 | 6,064 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,592 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75,547 | 35,697 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 111,244 |
| Epic 4G | 0 | 0 | 1 | 15,227 | 11,125 | 8,039 | 7,777 | 672 | 11,043 | 6,821 | 12,969 | 8,967 | 16,368 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99,009 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fascinate | 0 | 0 | 0 | 3,472 | 34,715 | 16,518 | 4,090 | 3,733 | 9,053 | 2,707 | 17,767 | 43,117 | 15,412 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150,584 |
| Galaxy Ace | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,894 | 17,459 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,353 |
| Galaxy S (i9000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,472 | 12,199 | 10,701 | 1,192 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 41,564 |
| Galaxy S (AT&T) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy S (Epic 4G Touch) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy S (i9100) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy S (Skyrocket) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy S (T-Mobile) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 890 | 1,182 | 1,904 | 1,755 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,430 |
| Galaxy S Showcase (i500) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 781 | 1,132 | 1,362 | 5,285 | 4,207 | 1,915 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,277 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,503 | 0 | 3,964 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,067 |
| Gravity Smart | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,067 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,097 | 0 | 2,759 | 128,553 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 131,311 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 143 | 2,531 | 6,020 | 4,312 | 3,147 | 3,125 | 5,347 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,886 |
| Intercept | 0 | 4,255 | 0 | 0 | 0 | 1,633 | 3,443 | 912 | 3,958 | 3,779 | 4,797 | 6,632 | 4,328 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29,482 |
| Mesmerize | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,803 | 944 | 260 | 2,542 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,549 |
| Nexus S | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,044 | 20,946 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,990 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,171 | 15,318 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,489 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,129 | 2,960 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,089 |
| Sidekick | 0 | 0 | 0 | 0 | 0 | 0 | 84 | 782 | 7,719 | 5,502 | 2,664 | 3,748 | 3,115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23,614 |
| Transform | 0 | 315 | 23,427 | 7,659 | 13,688 | 10,868 | 4,865 | 919 | 2,677 | 83 | 664 | 118 | 386 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 65,669 |
| Vibrant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Eligible for LP | 0 | 4,570 | 156,779 | 156,693 | 133,950 | 113,707 | 46,044 | 84,793 | 101,015 | 104,682 | 100,059 | 218,034 | 291,111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,511,436 |
| Beginning Capacity | | | | | | | | | | | | | | | | | | | | | |
| Add'l Excess Capacity 2/ | | | | | | | | | | | | | | | | | | | | | 17,649,000 |
| Total Capacity | | | | | | | | | | | | | | | | | | | | | |
| Actual Units Eligible for LP | 0 | 4,570 | 156,779 | 156,693 | 133,950 | 113,707 | 46,044 | 84,793 | 101,015 | 104,682 | 100,059 | 218,034 | 291,111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,511,436 |
| Ending Capacity | | | | | | | | | | | | | | | | | | | | | |
| Apple Increm. Margin/Unit ($) 3/ | | | | | | | | | | | | | | | | | | | | | |
| Lost Profits ($) | 0 | 120,370 | 586,183 | 579,067 | 1,059,110 | 1,058,067 | 659,652 | 363,505 | 520,719 | 569,684 | 602,315 | 1,100,780 | 1,451,266 | 1,636,644 | 1,211,086 | 1,027,345 | 710,826 | 895,758 | 927,137 | 493,878 | 476,527,821 |
| Units Avail. for Other Remedies | 0 | | | | | | | | | | | | | | | | | | | | 15,573,392 |

Prepared by nvotex Group
Page 1 of 2

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | |
| **Total Units Sold - Tablets 1/** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 51,648 | 37,626 | 176,678 | 93,692 | 81,398 | 50,226 | 159,538 | 99,545 | 56,207 | 1,145,64 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 174 | 187,526 | 20,154 | 24,443 | 13,037 | 18,908 | 38,489 | 23,836 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 326,56 |
| Galaxy Tab 10.1 (4G LTE) | | | | | | | | | | | | | | | | | | | | | |
| Galaxy Tab 10.1 (WiFi) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,203 | 95,059 | 23,618 | 30,019 | 28,140 | 70,820 | 55,033 | 34,638 | 341,53 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 174 | 187,526 | 20,154 | 24,443 | 13,037 | 18,908 | 38,489 | 28,039 | 95,059 | 23,618 | 30,019 | 28,140 | 70,820 | 55,033 | 34,638 | 668,09 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | |
| Add'l Excess Capacity 2/ | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 174 | 187,526 | 20,154 | 24,443 | 13,037 | 18,908 | 38,489 | 28,039 | 95,059 | 23,618 | 30,019 | 28,140 | 70,820 | 55,033 | 34,638 | 668,09 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | |
| Apple Increm. Margin/Unit ($) 3/ | | | | | | | | | | | | | | | | | | | | | |
| **Lost Profits ($)** | 0 | 0 | 0 | 0 | 0 | 46 | 48,939 | 5,260 | 8,929 | 4,762 | 6,907 | 13,159 | 9,587 | 81,619 | 70,074 | 51,379 | 22,086 | 88,718 | 44,512 | 21,569 | 477,54 |
| Units Avail. for Other Remedies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

**Total Lost Profits ($)**    583,191,127

**Sources/Notes:**

1/ Smartphones - Exhibit 37.1, Tablets - Exhibit 38.1
2/ Smartphones - Exhibit 26, Tablets - Exhibit 27
3/ Smartphones - Exhibit 32, Tablets - Exhibit 33

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## iPhone Capacity Analysis



| | BOH | FYQ2'10 | FYQ3'10 | FYQ4'10 | FYQ1'11 | FYQ2'11 | FYQ3'11 | FYQ4'11 | FYQ1'12 |
|---|---|---|---|---|---|---|---|---|---|
| **Units Sold** | 2/ | | | | | | | | |
| iPhone 3G | | | | | | | | | |
| iPhone 3GS | | | | | | | | | |
| iPhone 4 | | | | | | | | | |
| iPhone 4S | | | | | | | | | |
| Total | | 7,089 | 7,900 | 14,103 | 16,234 | 18,648 | 20,337 | 17,073 | 37,049 |

### iPad Capacity Analysis



| | | FYQ3'10 | FYQ4'10 | FYQ1'11 | FYQ2'11 | FYQ3'11 | FYQ4'11 | FYQ1'12 |
|---|---|---|---|---|---|---|---|---|
| **Units Sold** | 2/ | | | | | | | |
| iPad | | | | | | | | |
| iPad 2 | | | | | | | | |
| Total | | 3,270 | 4,187 | 7,303 | 4,651 | 9,184 | 11,092 | 15,289 |