# EXHIBIT X
# PUBLIC REDACTED
# VERSION

**CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

**United States District Court**
**Northern District of California**
**San Jose Division**

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | Civil Action No. 11-CV-01846-LHK |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |
| | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| APPLE INC., a California corporation, | |
| Counterclaim-Defendant. | |

**REBUTTAL EXPERT REPORT OF TONY GIVARGIS, Ph.D.**
**REGARDING NON-INFRINGEMENT**
**OF THE ASSERTED CLAIMS OF U.S. PATENT NO. 7,698,711**

**CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................4

II.     QUALIFICATIONS ..............................................................................4

III.    MATERIALS CONSIDERED ...............................................................5

IV.     UNDERSTANDING OF THE LAW RELATING TO PATENT INFRINGEMENT ...............................................................................5

      A.      Literal Infringement And Infringement Under The Doctrine Of Equivalents...........................................................................5

      B.      Direct Infringement.................................................................7

      C.      Indirect Infringement .............................................................7

V.      LEVEL OF ORDINARY SKILL IN THE ART ....................................8

VI.     SUMMARY OF THE '711 PATENT .....................................................9

VII.    BACKGROUND TECHNOLOGY ........................................................9

VIII.   THE ACCUSED APPLE PRODUCTS ..................................................9

      A.      iPhone 4 ..................................................................................9

      B.      iPhone 3G................................................................................9

      C.      iPhone 3GS ...........................................................................10

      D.      iPod Touch (4th generation) .................................................10

IX.     ANALYSIS AND OPINIONS CONCERNING NON-Infringement of THE '711 PATENT ............................................................................10

      A.      The Accused Apple Products Do Not Perform a Method Comprising "Generating a Music Background Play Object, Wherein the Music Background Play Object Includes an Application Module Including at Least One Applet"...........................................................................11

            1.      Literal Infringement ..................................................11

                  a.      mediaserverd .................................................14

                  b.      MobileMusicPlayer.......................................15

                  c.      Springboard...................................................16

                  d.      EmbeddedAVFoundation ..............................17

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

e.     Source Code Files Cited by Dr. Yang..............................17

2.     Doctrine of Equivalents ..........................................25

3.     Conclusion ..........................................................26

B.     The Accused Devices Do Not Have the Claimed "MP3 Mode" ..........................27

1.     Literal Infringement ..............................................27

2.     Doctrine of Equivalents ..........................................27

3.     Conclusion ..........................................................28

C.     Dr. Yang's Responses to Apple's Non-Infringement Interrogatory
Positions ..........................................................28

X.     DESIGN ALTERNATIVES ..................................................29

XI.    HEARING AND TRIAL EXHIBITS ..........................................31

XII.   SUPPLEMENTATION OF OPINIONS..........................................31

**CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

## I.      INTRODUCTION

1.      I have been retained as an expert in this case by Plaintiff Apple, Inc. ("Apple").  I expect to testify at trial regarding the matters set forth in this report, if asked about these matters by the court or by the parties' attorneys.

2.      I have been asked to review and comment on the "Expert Report of Woodward Yang Regarding the Infringement of U.S. Patent Nos. US 7,577,460, US 7,456,893, US 7,698,711 and US 7,079,871," dated March 22, 2012 ("Yang Report"), in which Dr. Yang asserts that Apple iPhone 3G, iPhone 3GS, iPhone 4, and iPod Touch 4th generation ("the accused Apple products")[1] infringe claims 1, 2, 7-10, and 15-18 of US Patent No. 7,698,711 ("the '711 patent").  I note that at p. 22 of his report, Dr. Yang also lists claim 3 as an asserted claim, but this claim was not asserted in Samsung's September 7, 2011 Disclosure of Asserted Claims and Infringement Contentions under Patent Local Rules 3-1 and 3-2.  Further, Exhibit 3 of Dr. Yang's report provides no alleged evidence showing infringement of claim 3.  It is my understanding that claim 3 is not an asserted claim of the '711 patent.

3.      I disagree with Dr. Yang's conclusions regarding Apple's alleged infringement of the '711 patent.  Based on my understanding of the accused Apple products and the legal standards set forth below, it is my opinion that the accused Apple products do not infringe claims 1, 2, 7-10, or 15-18 of the '711 patent.  It is my understanding that Samsung bears the burden of identifying evidence supporting infringement, and in my opinion Dr. Yang has failed to do so in his report.

## II.      QUALIFICATIONS

4.      A summary of my qualifications, relevant experience, and compensation in this case is provided in Section II of my Expert Report Regarding Invalidity of the Asserted Claims of U.S. Patent No. 7,698,711 ("Invalidity Report"), and in my *curriculum vitae*, which is attached as Exhibit 1 to my Invalidity Report, which are hereby incorporated by reference.

---

[1] I note that Dr. Yang included the iPhone 4S as an accused infringing product.  I understand that the Court denied Samsung's request to add the iPhone 4S to this case.  Therefore, I will not address the iPhone 4S in this report.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

## III. MATERIALS CONSIDERED

5.      In Exhibit 1, I list the materials I considered in reaching my opinions described in this report.  In addition, I have spoken with Apple engineer Greg Chapman regarding the relevant functions and programming in the accused Apple devices, and have reviewed the source code used to program those functions.  I have also reviewed Dr. Yang's Report including all appendices, exhibits, or materials cited in this report relating at least to the '711 patent.

6.      My opinions in this report also rely on my academic qualifications and experience in the field of computer science as described in my *curriculum vitae*.

## IV. UNDERSTANDING OF THE LAW RELATING TO PATENT INFRINGEMENT

7.      I am not an attorney.  I have been informed about the legal standards for patent infringement by counsel for Apple.

8.      I have been informed and understand that an infringement analysis is a two-step process.  First, the patent claims are construed by the Court to ascertain their proper scope. Second, the construed claims are compared to the allegedly infringing product or process to determine whether those products or processes fall within the scope of the claims either literally or under the doctrine of equivalents.

### A. Literal Infringement And Infringement Under The Doctrine Of Equivalents

9.      I have been informed and understand that a patent claim is literally infringed when an accused product includes structures or steps in a process that are identical to each and every element of a patent claim.  If, however, the accused product does not have every requirement in the patent claim, then the accused product does not literally infringe that claim.  I have been informed and understand that the person asserting patent infringement has the burden of proving literal infringement, and thus the burden of establishing that each and every limitation in the asserted claim is met.

10.      I have been informed and understand that if a patent claim uses the term "consisting of," that patent claim is to be understood as a closed claim. To infringe a closed claim, the accused product must have every requirement in the claim and no other parts or steps.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

11.     I have been informed and understand that a patent claim is infringed under the doctrine of equivalents when, for any element recited in the claim that is not contained literally in the accused product or process, there is a corresponding structure or step that is an equivalent of the structure or step recited in the claim, where the equivalent structure or step is only "insubstantially" different from the claimed structure or step.  If the accused product is missing an identical or equivalent part or step to even one requirement of the asserted patent claim, the accused product cannot infringe the claim under the doctrine of equivalents.  Thus, in making a determination under the doctrine of equivalents, one must look at each individual requirement of the asserted patent claim and decide whether the accused product has either an identical or equivalent part or step to that individual claim requirement.

12.     I have been informed and understand that one test to determine whether the difference between a claim element and an accused structure or step is insubstantial is whether the structure or step in the accused product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed structure or step.  I have been informed and understand that the person asserting patent infringement has the burden of proving that there is infringement under the doctrine of equivalents.  Moreover, I have been informed and understand that a patentee cannot use the doctrine of equivalents to vitiate a claim limitation, by raising an infringement theory that would effectively render the claim limitation meaningless.

13.     I have been informed and understand that the doctrine of equivalents may not be used to find infringement if the accused product is the same as what was in the prior art before the application for the patent in suit or what would have been obvious to persons of ordinary skill in the field in light of what was in the prior art.  In other words, a patent holder may not obtain, under the doctrine of equivalents, protection that it could not have lawfully obtained from the Patent and Trademark Office.

14.     I have been informed and understand that arguments made during the prosecution of a patent can limit the range of equivalents available to a patentee, by preventing recapture of

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

subject matter that is effectively surrendered by the inventors during prosecution.  I have been further informed and understand that the presumption of complete surrender of equivalents for a claim limitation amended for reasons related to patentability may be rebutted by showing the alleged equivalent would have been unforeseeable at the time the prosecution argument was made, the rationale underlying the argument bore no more than a tangential relation to the equivalent at issue, or that there was some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent.

## B. Direct Infringement

15.     I have been informed and understand that a patent claim is directly infringed when a person makes, uses, sells, or offers to sell in the United States, or imports into the United States, a product or process that includes each element of the patent claim, either literally or under the doctrine of equivalents.

16.     I have been informed and understand that a dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own. As a result, if an independent claim is not infringed, any of its dependent claims are not infringed.  On the other hand, if an independent claim is infringed, a separate finding must be made as to whether the additional requirements of its dependent claims have also been infringed.

## C. Indirect Infringement

17.     I have been informed and understand that an accused infringer may be liable for contributing to or inducing the infringement of a patent claim.  I have been informed and understand that both contributory infringement and inducement of infringement require proof of direct infringement of a patent claim, and that the person asserting infringement bears the burden of proving direct infringement.

18.     I have been informed and understand that contributory infringement occurs when a person provides a material part or a component to another for use in a product, machine, or process that infringes a patent, and that person (1) knew of the patent; (2) sold or provided a component that is a material component of the claimed invention; (3) knew that the

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

part/component was especially made for use in a manner that infringes the patent claim; and that the component (4) does not have a substantial non-infringing use; and (5) is used in a manner that infringes the patent.  I have been informed and understand that the person asserting contributory infringement has the burden of proving that each of these elements is satisfied.

19.     I have been informed and understand that inducement of patent infringement occurs when a person (1) has intentionally taken action that actually induced direct infringement by another; (2) has been aware of the patent; (3) has known that the acts it was causing would be infringing; and (4) the other person infringed the patent.  I have been informed and understand that the person asserting inducement of infringement has the burden of proving that each of these elements is satisfied.

20.     I have been informed and understand that if the accused infringer did not know of the existence of the patent or that the acts it was inducing were infringing, it cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of a patent and it took intentional acts to avoid learning the truth.  It is not enough that the accused infringer was merely indifferent to the possibility that it might encourage infringement of a patent.  Nor is it enough that the accused infringer took a risk that was substantial and unjustified.

21.     I have been informed and understand that if the alleged infringer was aware of the patent, but believed that the acts it encouraged did not infringe that patent, or that the patent was invalid, the alleged infringer cannot be liable for inducement.

## V.     LEVEL OF ORDINARY SKILL IN THE ART

22.     In the Markman Order dated April 4, 2012, the Court has adopted Samsung's proposed definition of a person of ordinary skill in the art as follows:  "a Bachelor's Degree in computer science/engineering and several years of experience in multi-tasking systems and computer programming, or a Master's Degree with less relevant experience, or a person with equivalent industry experience."  Using this definition of the person of ordinary skill in the art

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

does not change my prior opinion in my report on invalidity of the '711 patent.  My opinions in this report are consistent with this definition.

## VI.   SUMMARY OF THE '711 PATENT

23.     I have provided a summary of the '711 patent in Section VII of my Invalidity Report, which is incorporated here by reference.[2]

## VII.   BACKGROUND TECHNOLOGY

24.     I provided a description of the background technology in Section VI of my Invalidity Report, incorporated here by reference.

## VIII.   THE ACCUSED APPLE PRODUCTS

25. It is my understanding that Samsung accuses Apple's iPhone 4, iPhone 3GS, iPhone 3G, and iPod Touch (4th generation) products (collectively, "the accused Apple products") of infringing claims 1-3, 7-10 and 15-18 of the '711 patent.

### A.     iPhone 4

26.     The iPhone 4 is a fourth generation mobile smart-phone designed and sold by Apple Inc. that combines iPod music features with a mobile cell phone.  The iPhone 4 also contains both a front and rear-facing digital camera, GPS, WiFi and GSM/GPRS/EDGE/CDMA connectivity, a 3.5 inch touch sensitive display, and internal 8, 16, or 32 GB flash storage.  The iPhone 4 runs Apple's iOS operating system on an ARM CPU (with an Apple A4 GPU) with 512 MB of DRAM.  In addition to typical productivity application included with the device, the iPhone 4 supports App Store, iTunes Store, iBooks Store, and MobileMe Internet services.

### B.     iPhone 3G

1.     The iPhone 3G is a second generation mobile smart-phone designed and sold by Apple Inc. combining iPod music play function with phone and other features.  The iPhone 3G contains a 2 MP digital camera, GPS, WiFi and GSM/EDGE connectivity, a 3.5 inch touch sensitive display, and internal 8 or 16 GB flash storage.  The iPhone 3G runs Apple's iOS operating system on an ARM-based CPU with 128 MB of DRAM.  In addition to typical productivity application included with the device, the iPhone 3G supports App Store, iTunes Store, iBook Store, and MobileMe Internet services.

---

[2] Although I incorporate specific sections of my Invalidity Report by reference in this report, it is my intention to incorporate my Invalidity Report by reference in its entirety.  I do not mean to limit such incorporation to instances where it is specifically mentioned.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

### C.   iPhone 3GS

27.   The iPhone 3GS is a third generation mobile smart-phone designed and sold by Apple Inc. which combines the music player functionality of the iPod device with a cell phone. The iPhone 3GS also contains a 3 MP digital camera,GPS, WiFi and GSM/GPRS/EDGE connectivity, a 3.5 inch touch sensitive display, and internal 8, 16, or 32 GB flash storage.  The iPhone 3GS runs Apple's iOS operating system on an ARM-based CPU with 256 MB of DRAM. In addition to typical productivity application included with the device, the iPhone 3G supports App Store, iTunes Store, iBooks Store, and MobileMe Internet services.

### D.   iPod Touch (4th generation)

28.   The iPod Touch is a portable music/media player and personal digital assistant designed and sold by Apple Inc.  The 4th generation iPod Touch offers WiFi and USB connectivity, a front-facing camera for FaceTime and a display similar to the iPhone 4.  The iPod Touch 4th generation runs Apples iOS operating system on an ARM-based CPU with 256 MB of DRAM.  In addition to typical productivity application included with the device, the iPod Touch 4th generation supports App Store, iTunes Store, iBooks Store, and MobileMe Internet services.

### IX.   ANALYSIS AND OPINIONS CONCERNING NON-INFRINGEMENT OF THE '711 PATENT

29.   In his report dated March 22, 2012, Dr. Yang asserts that the accused Apple products infringe claims 1, 2, 7-10, and 15-18 of the '711 patent.[3]  It is my opinion that none of these claims is infringed by the accused Apple products.

30.   Claims 1, 2, 7, and 8 of the '711 patent are method claims requiring a user to perform steps using a device.  Apple does not perform these steps, and Dr. Yang does not suggest that Apple does.  The remaining asserted claims, claims 9, 10, and 15-18, recite an apparatus, but also require the user to perform steps that the apparatus itself will not perform independently, such as "selecting and playing a music file in the pocket-sized mobile communication device in the MP3 mode" as required in claims 9, 17, and dependent claims 10, 15, 16, and 18, which depend on those two independent claims. Again Apple does not perform these steps.

---

[3] As previously stated, I note that at p. 22 of his report, Dr. Yang also lists claim 3 as an asserted claim, but this claim was not asserted in Samsung's September 7, 2011 Disclosure of Asserted Claims and Infringement Contentions under Patent Local Rules 3-1 and 3-2. Further, Exhibit 3 of Dr. Yang's report provides no alleged evidence showing infringement of claim 3.  It is my understanding that claim 3 is not an asserted claim of the '711 patent.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

31.     As described above, it is my understanding of the law relating to infringement that, when the accused infringer does not directly perform the alleged infringing activity, indirect infringement can still be shown, including under an "inducement" theory.  However, I understand that proving inducement of infringement requires both (1) proof of direct infringement (*e.g.*, that a user carries out all of the claimed actions), and (2) evidence that Apple has actively "induced" or encouraged users to perform these steps and infringe these claims.  In his report, Dr. Yang has not provided any allegation of, much less any evidence of, indirect infringement of the '711 patent, including inducement.  In my opinion Dr. Yang has failed to establish infringement by Apple for this reason alone.  I further reserve the right to supplement my response if Dr. Yang or Samsung attempts to set forth any evidence of indirect infringement of the '711 patent at a later date.

32.     In Dr. Yang's report on infringement, he frequently cites to Bates numbers for documents or source code files as supporting his opinion that the accused products infringe the '711 claims, but does so without any explanation for why the specific documents or files are supportive. ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████████████████████ None of the cited documents make any reference to "applet" and it is not clear, in the absence of any explanation by Dr. Yang, why they are relevant to the above analysis.  I understand that Samsung must carry the burden of identifying evidence supporting infringement.  Dr. Yang's report does not meet this burden for any of the accused claims.

A.     **The Accused Apple Products Do Not Perform a Method Comprising "Generating a Music Background Play Object, Wherein the Music Background Play Object Includes an Application Module Including at Least One Applet"**

1.     **Literal Infringement**

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

33.     Dr. Yang fails to identify the "object" alleged to meet the "music background play object" limitation of the asserted claims, choosing instead to simply state that "[i]n Step 1, the initiation of playing of background music requires the creation of some scheduled task to be performed in a multi-tasking environment such that the task involves the use of an application module and applet." Yang report at ¶ 79.

34.     Exhibit 3 of the Yang report, purportedly showing infringement by the accused products, does not identify an object in the accused devices nor does it state what Dr. Yang's understanding of "music background play object" is.  The entire analysis of element [a] of Claim 1 as provided in Exhibit 3A-1 is:



Exhibit 3A-1 chart at element 1[a].

35.     The conclusory analysis above states the accused devices generate a MBPO without ever describing what the MBPO is or where it is located.  Exhibit 6 does not describe the generation of a music background play object.  No cites to the code are provided in support of this conclusion.  Exhibit 3A-2 of Dr. Yang's report purportedly shows claim 1 element [b] ("providing an interface for music play by the music background play object") as met by the home page display itself.[4]  Dr. Yang's corresponding description in Exhibit 3A-1 simply states that "[t]he '711 Accused Devices have an interface, such as a touchscreen interface, and home button which allow the user to interface with the MBPO,"  which is supposedly launched when the Music application icon is selected on the device home screen.

---

[4] I note that Dr. Yang is inconsistent in his characterization of the Apple home screen in the accused devices.  For the purposes of his '711 patent analysis, Dr. Yang refers to the home screen as a "standby mode."  See, e.g, Yang report at Exhibit 3, claim 1, element [e] ["While in the standby mode (i.e. Apple Home screen) the '711 Accused Devices display an icon as an indication that the music file continues to be played."]  Yet in his analysis of the '460 patent, he refers to the Apple home screen as a "portable phone mode."  Id. at Exhibit 1A-1, claim 1 ["Each accused device awaits an incoming phone call in the portable phone mode (i.e., home active screen)."]  Dr. Yang's opinion requires the person of ordinary skill in the art to equate the Apple home screen with a "portable phone mode" when it suits his infringement opinion on one patent and a "standby mode" when it conveniently suits his opinion on a different patent.  The person of ordinary skill in the art would not have understood the meanings of the different terms to cover the identical screen on the accused devices.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

37.     For the above reasons, in my opinion Dr. Yang has failed to establish infringement by Apple at least because he does not clearly explain how Apple's devices allegedly provide the claimed music background play object including an application module or identify these elements in the accused devices.  Indeed, in my opinion Dr. Yang cannot do so because the iOS devices do not have a notion of "music background play object."  Instead, as I discuss in more detail below, the mediaserverd is responsible for audio playback.

38.     Dr. Yang also fails to clearly identify what he believes constitutes the "applet" required by all asserted claims.  The claims require that the "music background play object includes an application module including at least one applet."  In my opinion, the accused devices do not contain the claimed applet.  The term "applet" has been construed by the Court to mean "an application designed to run within an application module."  Markman Order of April 4, 2012 at p. 11.  In the analysis herein regarding "applet," I apply the Court's construction.[5]

---

[5] I provided my previous report on the invalidity of the '711 patent prior to the issuance of the Markman order, but my positions in that report are unchanged and apply equally in view of the Court's construction of "applet."

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

[REDACTED]

42.    These three processes execute concurrently, communicate, and interact to provide the user a convenient and consistent functionality.  However, none of the three "includes" or "runs within" any of the others, even if these concepts are taken very broadly to include one application interpreting the instructions of another or providing a context for execution of the other.  It should be noted that *any* multitasking computing system will include a set of interacting processes.  Interaction (i.e., communications between different processes) cannot and would not be understood by a person of skill in the art as meaning one application is "designed to run within an application module."  If that were the case, essentially all computer applications would be applets.



### a.    mediaserverd

44.    The media server daemon ("mediaserverd") is an independent process that starts execution when the device is powered-up.  This server is one of many processes that are loaded into memory during the boot process and scheduled to execute by the operating system for as

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

long as the device remains "on".  The mediaserverd process is responsible for playing audio and video media, including MP3 files.  Dr. Yang ignores the fact that there is no "background music" function or application in the accused devices, only music applications that communicate with the media server daemon.  The report fails to appreciate that the mediaserverd process is responsible for background audio playback and does not even attempt to label it an applet or identify an applet "running within" this process.

45.     All user-level applications that play audio files are required to do so through the mediaserverd process.  At all times, the mediaserverd is responsible for audio playback through the speaker.  The audio content may originate from any number of processes running within the iOS.  The mediaserverd process enforces priorities (e.g., giving precedence to a received call ringer over an MP3 song) and manages user preferences (e.g., adjusting playback volume according to user volume setting).  An application sends a "message" to the mediaserverd requesting audio playback.  In turn, the mediaserverd sends messages to the applications when the status of playback changes (e.g., the MP3 file playback ends).

46.     The mediaserverd is a single application that is loaded and scheduled for execution by the operating system.  My careful examination of the mediaserverd source code reveals that the mediaserverd is not an applet and does not run within an application module.[6] Likewise, my examination of the source code of the mediaserverd reveals that it does not behave as an application module hosting another application.  Hence, the term "applet," as construed by the Court to mean "an application designed to run within an application module" does not apply to the mediaserverd.



**CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER**



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

e.      **Source Code Files Cited by Dr. Yang**

53.      I have reviewed each source code file Dr. Yang cites in stating that "the Music App contains an application module and including an applet."  See, e.g., Exhibit 3 at footnotes 6, 22, and 37.  Dr. Yang cited to these files, each including hundreds of lines of code, without providing any detail on how each file supports his opinion.  Below, I provide a table describing each of these files, and why none of these could be considered an "applet" as understood to mean "an application designed to run within an application module."  As a preliminary matter, none of these files are applications by themselves.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER



54.     In support of his infringement contention for element [a] in claim 1 and the same "generating a music background play object … include[ing] an application module including at least one applet" limitation in claims 9 and 17, Dr. Yang further cites, in their entirety, three documents produced by Apple: the AV Foundation Programming Guide, the Audio Session

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Programming Guide, and the iPhone Application Programming Guide.  Dr. Yang does not point to any particular part of these documents, which range from 56 to 92 pages in length, or provide any explanation for how these documents support his opinion.  In my opinion, there is nothing in these documents that establish that the accused devices meet the claim limitation "generating a music background play object … includ[ing] an application module including at least one applet."

55.     For all of the above reasons, it is my opinion that the accused devices do not meet the "generating a music background play object … includ[ing] an application module including at least one applet" limitation required by all of the asserted claims of the '711 patent, and for at least this reason Apple does not infringe.

## 2.     Doctrine of Equivalents

56.     Dr. Yang states that the Apple accused products "include or practice each and every element recited in [the asserted claims], either literally or equivalently."  Yang report at ¶85.  However, no further opinion regarding the doctrine of equivalents is provided.  The accused Apple products do not literally meet the claim elements as described above, nor do they perform an "equivalent" as I understand the Doctrine of Equivalents requires.

57.     Samsung is also not entitled to the Doctrine of Equivalents due to "Prosecution History Estoppel" for the claim limitation "wherein the music background play object includes an application module including at least one applet" as required by all asserted claims.  As described in my report on invalidity, this limitation was added to distinguish the claims from the prior art during prosecution of the '711 patent.  It is my understanding, based on the legal standard provided to me by Apple counsel as described above, that Samsung is therefore not entitled to recapture equivalents to this limitation because they are presumed to have surrendered these equivalents.

58.     It is my opinion that even if the Doctrine of Equivalents were to apply in this case, the Apple products do not have anything equivalent to "generating a music background play object, wherein the music background play object includes an application module including at least one applet" where an "applet" is understood to mean "an application designed to run within an application module."  The Apple iOS code, as based on UNIX, is not designed for applications to run "within" application modules as the '711 patent describes and claims.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

Finding infringement under the Doctrine of Equivalents under these circumstances would vitiate this claim limitation by interpreting "wherein the music background play object includes an application module including at least one applet" so broadly that it would cover essentially any conceivable application.  It is my understanding that the patent law, as set forth in the legal standard section of this report, does not permit an interpretation to be so broad that the limitation becomes meaningless.

59.     As I described above and set forth in the chart, I have looked at all of the documents and source code files cited by Dr. Yang as evidence that the accused Apple products allegedly practice the "generating a music background play object, wherein the music background play object includes an application module including at least one applet" limitation. No documents or code cited by Dr. Yang satisfy the "insubstantial differences" standard set forth above, which I have analyzed using the "function-way-result" test.

60.     My analysis of the Apple source code shows that the Apple products do not perform the same function because they do not "generat[e] a music background play object, wherein the music background play object includes an application module including at least one applet."  The Apple products are able to play music files while multitasking in an entirely different way than the '711 patent describes or claims, using the applications described above. The software architecture of the Apple devices represents an entirely different approach to software engineering than the use of "application modules including at least one applet" or any application designed to run within an application module.  For at least these reasons, the differences between Apple's source code and the required programming of the asserted claims are substantial and not "equivalents" of a "music background play object" that "includes an application module including at least one applet."

### 3.     Conclusion

61.     Based on the above analysis, it is my opinion that Dr. Yang incorrectly concludes that the accused Apple products satisfy the limitation  "generating a music background play object" that "includes an application module including at least one applet" as required by all asserted claims.  For at least this reason, Apple's accused devices do not infringe any of the asserted claims literally or under the doctrine of equivalents.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

B.     The Accused Devices Do Not Have the Claimed "MP3 Mode"

1.     Literal Infringement

62.     Elements [c], [d], and [e] of claim 1 and element [a] of both claims 9 and 17 requires the multitasking device to have an "MP3 mode" (e.g., "for selecting an MP3 mode" as recited in each of claims 1, 9, and 17).  Dr. Yang asserts that selecting the Music App from the accused device home screen puts the '711 accused devices in an MP3 mode.  See, e.g., Exhibit 3 at claims 1[c], [d], or [e] or claims 9 or 17 element [a].  The accused devices do not have an "MP3 mode" but rather launch an *application* that can play MP3 files.  Dr. Yang evidently assumes that the person of ordinary skill would have interpreted the launching of an application to be equivalent to a "mode."  I disagree.

63.     The accused Apple products do not operate on the basis of switching back and forth between "modes."  The iPhone, for example, performs a wide variety of different functions by launching standalone application programs, which operate when selected.  The phone itself does not switch into a "mode" as a person of ordinary skill in 2005 would have understood that term.  A mode would be understood to mean a distinct state of operation or setting of a device or of an application.  In the Apple devices, there is no notion of using "modes" for any function related to music playback.  As I described above, music playback is handled only through *applications*, which are distinct pieces of software performing specific functions and can be added by a user.

Therefore, it is my opinion that the accused products do not infringe any asserted claims of the '711 patent for the additional reason that they do not provide the claimed "MP3 mode."

2.     Doctrine of Equivalents

64.     The accused Apple products do not infringe the limitations "MP3 mode" under the "insubstantial differences" standard described above.  The Apple products do not perform the same function as the claimed limitation because they never enter an "MP3 mode" as that term would be understood to the ordinary person in the art.  The Apple products, instead of switching to a different mode, simply launch an application that is used to play music files.  Under the legal standard for substantial difference, this means the way in which the function is carried out is distinct from the claim element.  Finally, the result is different:  the '711 claims result in "switching the MP3 mode to a standby mode" in claim 1 and "switching from the MP3 mode to

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

a standby mode" in claims 9 and 17, whereas the Apple products do not switch modes, they run applications.  When multitasking is necessary, the Apple products simply launch the additional application to perform a different function without ever switching modes.  Therefore, the differences between the claim limitations requiring an "MP3 mode" and the Apple products are substantial.

### 3.      Conclusion

65.      In view of the analysis above, it is my conclusion that the Apple devices do not infringe any asserted claim of the '711 patent, whether literally or under the doctrine of equivalents, because none of the accused devices has an "MP3 mode" which can be selected or switched to a standby mode.

### C.      Dr. Yang's Responses to Apple's Non-Infringement Interrogatory Positions

66.      Paragraphs 88-91 of Dr. Yang's report addresses certain non-infringement positions described in Apple's Supplemental Objections and Responses to Samsung's First Set of Interrogatories (No. 12) as served on March 8, 2012.

67.      In paragraph 89 of Dr. Yang's report, he states: "Apple alleges its products do not infringe because 'background processes' it has identified run in 'its own context, directly on the processor (scheduled individually by the Operating System process scheduler), and each can run without the presence of the other.'"

68.      Dr. Yang continues in paragraph 90:

This non-infringement position is wholly dependent on Apple's own construction of 'applet,' one for which Apple has provided no support. Furthermore, Apple has provided no basis for choosing these 'background processes.'  Apple appears to have picked these for the sole purpose of manufacturing a non-infringement position.

69. The comments above suggest that Dr. Yang either did not make more than a superficial inspection of the available source code or did not understand that code.  The term "manages" is reasonably understood as any function associated with creating, updating, or rendering on the display one of the listed features in response to user input.  For example, managing of a playlist involves adding songs to a list, removing songs from a list, playing songs

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

within the list in some order (e.g., random or sequential) and so on. █████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

███████████████

70.     Dr. Yang goes on to state in paragraph 91:

> Finally, Apple makes a straw man argument by stating that the
> "mediaserverd" background process "manages" the user experience.  As
> an initial matter, Apple has not produced any source code to support its
> claim regarding "mediaserverd".  Furthermore, even if "mediaserverd"
> background processes ran directly on the processor, as Apple alleges,
> other iPhone features utilize "mediaserverd".  Under Apple's own
> definition, these other features would be "applets" within the '711 patent
> because they do not "run in their own context."

71.     As a preliminary matter, ████████████████████████████████
███████████████████████████████████████████████████████████ file, was
available for inspection as of September 20, 2011, October 26, 2011, and February 16, 2012.
Furthermore, Dr. Yang's statement that because "other iPhone features utilize mediaserverd" it
must mean these other features are "applets" is completely without merit.  Dr. Yang is
incorrectly and overbroadly interpreting an "applet" to encompass any interaction between two
processes or code segments.  The Court's construction of applet as "an application designed to
run within an application module" cannot be reconciled with Dr. Yang's stated opinion or with
the understanding of one of ordinary skill in the art.  As I discussed above, when one application
is "running within" an application module, one would expect, for example, to see the application
module interpreting the instruction of the application within it, or in some way providing context
for the application's execution.  That is not the case with any of the applications identified by Dr.
Yang.

X.     DESIGN ALTERNATIVES

72.     The report above details why it is my opinion that the accused Apple products do
not infringe any asserted claim of the '711 patent, whether literally or under the doctrine of
equivalents, and I have previously offered my opinion why I believe the '711 patent is invalid.

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

73.    In the event that the '711 patent is found to be both valid and infringed, I note that a non-infringing alternative could be engineered very simply and without a loss of functionality in the accused devices.

74.    Each claim of the '711 patent requires "displaying an indication that the music file is being played in the standby mode."

75.    The small "▶" icon on the home page status bar of the accused devices is alleged to meet this limitation.  See Yang Report at Exhibit 3A-2, step 5.  The figure from that exhibit showing the allegedly infringing ▶ icon on the iPhone home screen is reproduced below:



76.    This small icon could simply be removed while all music player multitasking functionality is kept the same.  The playing of the music file itself indicates to the user that the music is playing without additionally requiring a visual symbol on the home screen.

77.    This alternative could be implemented solely with a simple modification to the source code without requiring any hardware changes and could likely be completed within hours. No additional costs would be associated with this simple modification.

78.    Removing the play icon could easily have been done at the time the Apple products allegedly first infringed the '711 patent, because it would have required nothing more than leaving out a barely-noticeable graphic feature.

79.    I also note that in the expert report of Dr. R. Sukumar dated March 22, 2012, Dr. Sukumar evidently suggests that a phone with "the ability to listen to music in the background, the phone indicating that music is playing" but that is "slightly larger or thicker or consumes battery power faster" is a non-infringing alternative to the '711 claimed invention.  There is no claim element that relates to consumption of battery power, and the only size limitation is that the devices must be "pocket-sized."  Hence it is entirely unclear why Dr. Sukumar would

- 30 -

CONTAINS INFORMATION DESIGNATED AS APPLE HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO PROTECTIVE ORDER

consider an otherwise infringing phone to be non-infringing if it is either slightly larger or thicker *or* consumes battery power faster.

## XI.   HEARING AND TRIAL EXHIBITS

80.    If called as a witness at trial, I may rely upon visual aids and demonstrative exhibits that illustrate the bases of my opinions.  These visual aids and demonstrative exhibits may include, for example, claim charts, patent drawings, excerpts from patent specifications, file histories, interrogatory responses, deposition testimony, deposition exhibits, published articles, and dictionaries, as well as optical components, charts, diagrams, videos, and animated or computer-generated video.

81.    I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## XII.   SUPPLEMENTATION OF OPINIONS

82.    I reserve the right to adjust or supplement my analysis and opinions in light of any critique of my report or alternative opinions advanced by or on behalf of Samsung, including but not limited to supplemental reports submitted by Samsung.

Dated: April 16, 2012

Tony D. Givargis, Ph.D.