Exhibit B

1  HAROLD J. MCELHINNY (CA SBN 66781)  WILLIAM F. LEE
   hmcelhinny@mofo.com                 william.lee@wilmerhale.com
2  MICHAEL A. JACOBS (CA SBN 111664)   WILMER CUTLER PICKERING
   mjacobs@mofo.com                    HALE AND DORR LLP
3  JENNIFER LEE TAYLOR (CA SBN 161368) 60 State Street
   jtaylor@mofo.com                    Boston, MA 02109
4  ALISON M. TUCHER (CA SBN 171363)    Telephone: (617) 526-6000
   atucher@mofo.com                    Facsimile: (617) 526-5000
5  RICHARD S.J. HUNG (CA SBN 197425)
   rhung@mofo.com
6  JASON R. BARTLETT (CA SBN 214530)   MARK D. SELWYN (SBN 244180)
   jasonbartlett@mofo.com              mark.selwyn@wilmerhale.com
7  MORRISON & FOERSTER LLP             WILMER CUTLER PICKERING
   425 Market Street                   HALE AND DORR LLP
8  San Francisco, California  94105-2482   950 Page Mill Road
   Telephone:  (415) 268-7000          Palo Alto, California 94304
9  Facsimile:  (415) 268-7522          Telephone: (650) 858-6000
                                       Facsimile: (650) 858-6100
10 Attorneys for Plaintiff and
   Counterclaim-Defendant APPLE INC
11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                          SAN JOSE DIVISION

15

16 APPLE INC., a California corporation,   Case No. 11-cv-01846-LHK (PSG)

17              Plaintiff,                  **DECLARATION OF TERRY L.
                                            MUSIKA, CPA IN SUPPORT OF
18       v.                                 APPLE'S OPPOSITION TO
                                            SAMSUNG'S MOTION TO EXCLUDE
19 SAMSUNG ELECTRONICS CO., LTD., a         OPINIONS OF CERTAIN OF APPLE'S
   Korean business entity; SAMSUNG          EXPERTS**
20 ELECTRONICS AMERICA, INC., a New York
   corporation; SAMSUNG
21 TELECOMMUNICATIONS AMERICA, LLC, a
   Delaware limited liability company,
22
                Defendants.
23

24
                      **SUBMITTED UNDER SEAL**
25

26

27

28

I, Terry L. Musika, do hereby declare as follows:

1.      My name is Terry L. Musika.  I am currently a Managing Director of Invotex Group.  My business address is 1637 Thames Street, Baltimore, Maryland 21231.

2.      I have been asked by counsel for Apple to opine on the amount of Apple's damages as well as address the irreparable harm that result from the assumed infringement of Apple's asserted U.S. utility patents, U.S. design patents, U.S. trade dress registrations and rights by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC (collectively, "Samsung") as identified in Apple's Amended Complaint and subsequent submissions.

3.      In this matter, I have previously submitted a Reply Declaration In Support of Apple's Motion for a Preliminary Injunction, dated September 30, 2011.  I also submitted an Expert Witness Report on March 22, 2012 ("Original Expert Report"), a true and correct copy of which is attached to this declaration as **Exhibit A**, a Rebuttal Expert Report on April 16, 2012, and a Supplemental Expert Report on May 8, 2012 ("Supplemental Expert Report"), a true and correct copy of which is attached to this declaration as **Exhibit B**.  These expert reports accurately reflect the testimony that I would be prepared to give under oath, the opinions that I have reached in this matter, and the basis for those opinions.

4.      I provide this declaration to explain in a more focused fashion the opinions and supporting analysis already stated in these reports about which Samsung has raised questions in its Motion to Exclude the Opinions of Certain Apple Experts ("Motion to Exclude").  The information that I provide here has already been disclosed in connection with my expert reports and my deposition in this matter.

5.      I am a CPA with over 37 years of business experience.  I am a former audit and consulting partner for the international accounting firm of Coopers & Lybrand, former Managing Director for Navigant Consulting, Inc. and have previously formed, owned and operated a proprietary database company, a national financial and economic consulting firm, and a merger and acquisition company.  Additionally, I have frequently served the Federal Court system as a

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

1

1    Court Appointed Chapter 11 Operating Trustee, Liquidating Chapter 7 Trustee, Operating

2    Chapter 7 Trustee, Examiner, and Paying Agent.

3         6.       My work has mainly been focused on accounting, auditing, economic damages

4    analysis and the operation of businesses.  During the past 37 years I have provided expert

5    testimony in over 200 separate proceedings before 47 different Federal District Courts throughout

6    the U.S., nine separate state courts, numerous proceedings before the U.S. Court of Federal

7    Claims, four separate U.S. Bankruptcy Courts, numerous arbitration matters and the United States

8    International Trade Commission.  I was accepted as a designated expert in all cases.  The scope

9    and nature of my testimony has included a wide range of financial topics with a particular focus

10   on the investigation, analysis and explanation of complex financial transactions in various

11   industries.

12        7.       A complete list of my qualifications and prior testifying experience are contained

13   in Exhibits 1-2 to my Original Expert Report.

14   **I.     LOST PROFITS**

15        8.       Samsung's Motion to Exclude challenges my lost profits calculations on two

16   grounds, an alleged failure to account for price elasticity and consumer operating platform

17   preferences in my analysis, and an alleged failure to consider and analyze whether and how

18   customer demand is tied to the intellectual property asserted by Apple.  Both statements are

19   incorrect, as I explained to Samsung's attorneys at my deposition and as I explain below.

20        **A.     Overview of Lost Profits Calculation**

21        9.       The manner in which I calculate Apple's lost profits is described in detail at

22   paragraphs 120 to 137 of my Original Expert Report, paragraphs 18 to 24 of my Supplemental

23   Expert Report, and in Exhibits 15-S to 17.4-S of my Supplemental Expert Report.  I summarize

24   my methods at a high level here.

25        10.      The fundamental task begins with an analysis of whether Samsung's infringement

26   was a "but for" cause of lost product sales by Apple and the calculation of those losses to a

27   reasonable probability.  In so doing, I used the non-exclusive but frequently used guideline of the

28

1  *Panduit* test as a part of the analysis.  *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152

2  (6th Cir. 1978.)

3      11.     One factor that I evaluated when considering lost profits is the question whether in

4  light of price, operating system, features, carrier and other considerations, Apple's products and

5  Samsung's products compete with one another, *i.e.* Do they compete for sales from the same

6  customers and do Samsung customers consider Apple's products to be a potential substitute for

7  the products that they purchased?

8      12.     There is ample evidence, as reflected in my reports, that Apple and Samsung both

9  view the other company as a direct competitor in smartphone and tablet sales.  This was

10  confirmed by multiple depositions of senior STA executives and Rule 30(b)(6) witnesses,

11  including STA's Chief Strategy Officer, Chief Marketing Officer, and Chief  Executive Officer.

12  Examples of this testimony are included as **Exhibits C, D, & E** to this declaration.  This was also

13  confirmed by multiple STA and SEC documents, including documents in which Samsung sought

14  to identify a strategy to "Beat Apple" as one of its principle goals in 2010 and 2011 and

15  documents in which Samsung states that the US smartphone market is quickly becoming a "two

16  horse race" between Apple and Samsung.  Examples of these documents are attached as **Exhibits**

17  **F, G, H, & I** to this declaration.

18      13.     I also considered whether and how the asserted technology affects demand for the

19  relevant products.  This is described in more detail in response to Samsung's criticism below.

20      14.     I took steps to ensure that the amount of lost sales was carefully tailored to the

21  specific technology by focusing specifically on the sales that Samsung would have lost and Apple

22  would have gained during a period of time required to design around each of the specific

23  technologies being asserted by Apple.  These design-around times were specific to each asserted

24  technology and derive from documents in the case, discussions with technical experts and with

25  Apple engineers.  This is a very conservative assumption, which eliminates from my calculation a

26  large number of sales that likely would have been gained by Apple, and was used because I

27  wanted to focus on the specific technology at issue and to ensure that the calculation includes

28  only amounts that could be proven within a reasonable probability.

Declaration of Terry L. Musika ISO Apple's Opp. to Samsung's Motion to Exclude Experts
Case No. 11-cv-01846-LHK (PSG)
pa- 1530130

3

15.     Having focused on only the sales lost during limited design-around periods for each patent and technology, I allocated these lost sales to Apple and to other carriers based on a well-known market share approach, previously endorsed by the Federal Circuit in *State Industries Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).  Moreover, to further tailor my analysis and to account for the unique factors, such as price, carrier preference, operating system preference, brand loyalty and other alternatives features present at each carrier, I conducted the market share analysis on a carrier-by-carrier basis.  That is, I did it differently for AT&T, for Verizon, and for each of the major carriers through which Samsung sold products.  By doing so, I addressed the unique ways in which Apple and Samsung compete in each of these market segments, and the differences in price, operating system, and other consumer demand features that existed at each of the carriers.

16.     Based on the outcome of this carrier-specific market share analysis, I then calculated the incremental profit that Apple would have achieved for each of the sales that it would have obtained.  This step in combination with the former steps identified conservatively the amount in profits that Apple lost due specifically to Samsung's infringement of Apple's asserted intellectual property.

### B.     My Analysis Takes Into Account Price and Operating Platform Differences Among Products.

17.     Alleged Price Differences.  In Samsung's Motion to Exclude, Samsung asserts that "Mr. Musika's failure to take price elasticity of demand into consideration, by itself, requires that the Court exclude his lost profits calculation." (Mot. at 2.)

18.     This assertion is false.  Price elasticity was specifically and directly included as a component of my lost profits calculation, as I explained in paragraphs 129 to 132 of my Original Expert Report (attached hereto as Exhibit A) and on page 39 of my deposition (attached as Exhibit A to the Declaration of Mia Mazza in Support of Apple's Opposition to Samsung's Motion to Exclude ("Mazza Decl.")).

19.     First, Samsung's claim regarding differences in the consumer prices between Apple's and Samsung's products is mistaken.  Samsung's motion focuses on differences in

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

4

1    wholesale prices, which include subsidies paid by carriers to each manufacturer and other

2    circumstances unique to each manufacturer's commercial relationship with each carrier. Because

3    of these circumstances, the wholesale price is often much higher than the retail price paid by

4    consumers and is not an accurate reflection of consumer demand for the relevant products.

5          20.    As reflected in his deposition testimony, Samsung's damages expert Michael

6    Wagner agrees with me that the relevant price for evaluating how price would affect demand for

7    the competing products or price elasticity is the retail price that consumers pay for the phone in

8    connection with a two year contract, which is the standard method by which these smartphone

9    products are sold to consumers in the United States. (*See* Mazza Decl. Ex. B at 482:25-483:3.)

10   This price best reflects what product consumers would purchase if Samsung had not included the

11   infringing technology.

12         21.    Both documents and witnesses confirm that Apple's and Samsung's products

13   compete at equivalent price points at the retail level. For example, this was confirmed by

14   Samsung's Chief Marketing Officer, Todd Pendleton, and is confirmed in Samsung documents

15   that identify Apple's products as a direct competitor to Samsung's products at equivalent price

16   points. An example in which Samsung identifies that Apple competes at all relevant price points

17   is included as **Exhibit J** to this declaration. Thus, Samsung's argument depends on a

18   fundamental misstatement about whether Apple's and Samsung's products are being sold at

19   different prices to retail consumers.

20         22.    Samsung is also wrong when it claims that I did not consider price elasticity of

21   demand when determining how many sales Apple would gain if Samsung had not infringed

22   Apple's patents. As noted above, I used a carrier-specific market share to evaluate how many of

23   the sales Apple would have gained from sales previously made by Samsung. By doing this

24   analysis in the specific segment of the market reflected by each carrier, I was able to account for

25   the differences in price (and other considerations) that exist at each carrier and that would affect

26   demand for Apple's products versus Samsung's products. This method uses the "real world"

27   results of actual consumers' choices, and not just hypothetical economic analysis, to reduce the

28   number of sales Apple would receive to an appropriate level based on any price differences that

1    did exist at each carrier at each of these points in time.  In my opinion and experience, this

2    method best accounts for differences in price, product features, and other factors that affect

3    consumer choices when evaluating which consumers would buy Apple products in lieu of

4    Samsung's infringing products.

5         23.    Samsung claims, "Mr. Musika admitted that he would have performed a price

6    elasticity analysis but did not have enough time."  That is inaccurate and misstates my testimony.

7    As I stated at my deposition, I evaluated the question and did not consider a separate and

8    expanded price elasticity study to be warranted in the present circumstances.  (Mazza Decl. Ex. A

9    at 39:1-41:13.)  I explain this further below.

10        24.    One consideration in deciding whether to use an additional price elasticity study is

11   the degree to which prices differ at the relevant level.  As noted above, Apple and Samsung

12   compete at equivalent prices at the retail level, which counsels away from conducting an

13   additional price elasticity study.

14        25.    A second consideration in deciding whether to use an additional price elasticity

15   study is whether another appropriate economic proxy that accounts for price elasticity is available

16   to conduct the analysis.  Here, the ability to conduct a carrier-specific analysis of market share

17   provides an appropriate economic proxy that accounts for price elasticity in the smartphone

18   market.  Because I used this method, I already accounted for price elasticity.

19        26.    At least one additional consideration is the percentage of products that the analysis

20   is attributing to the patentee's products, that is, what percentage of Samsung's products are being

21   allocated to Apple due to the methodology being used.  The lower the percentage, the lower the

22   likelihood that an additional price elasticity study would result in any additional reduction in

23   Apple's percentage of replacement sales.

24        27.    As noted above, my method already eliminates from the analysis of lost profits any

25   sales made by Samsung outside of specific periods of times required to redesign Samsung's

26   products to avoid Apple's asserted technology.  Between these reductions and the reductions due

27   to the carrier-specific market share analysis, I have reduced the percentage of infringing

28   smartphone sales that Apple would have captured to less than 10% of the total infringing sales.

1    Given the lack of significant price differences at the retail level, the manner in which I had

2    accounted for price elasticity in the carrier-specific market share analysis, and the small

3    percentage of sales that were being captured, I evaluated but concluded that an additional and

4    separate price elasticity study would not provide a more reliable conclusion.  These are the

5    "diminishing returns" to which I referred in my answer when I said that "if we have more time,

6    we can do more.  Again, I think you should consider the law of diminishing return again, but

7    yes."  (Mazza Decl. Ex. A at 41:12.)

8         28.    Operating System Differences.  In its motion, Samsung also claims that I "do[] not

9    take [] into account at all" differences in "consumer preference for different platforms," *e.g.,* iOS

10   v. Android.  This statement is incorrect.

11        29.    First, I believe that Samsung's position in its motion is not consistent with the

12   statements of Samsung's own witnesses and Samsung's own documents.  As noted above, despite

13   the use of different operating systems, it is evident that Samsung and Apple view each other as

14   competing directly and vigorously with each other in the same markets.  Android and iOS

15   products do not represent separate and distinct markets.  If so, Samsung would, for example, not

16   see the U.S. smartphone market as becoming a "two horse race" between Apple and Samsung, as

17   reflected in Exhibit F to this declaration.

18        30.    Second, I did address the differences in consumer preferences for these two

19   operating platforms by means of my carrier-specific market share analysis discussed above.

20   More to the point, there likely are different preferences for each platform at AT&T and Verizon,

21   where both Apple and Samsung products have been offered on the same network, as compared to

22   T-Mobile, where Apple does not sell a product.  By calculating the reductions in market share by

23   carrier, I have accounted for these differences and captured fewer sales from T-Mobile customers

24   (in which I capture only a percentage of sales from customers who would be expected to switch

25   carriers).  Thus, contrary to Samsung's suggestion, I have addressed operating platform

26   preferences in the adjustments made for "Carrier Apportionment," "Carrier Switching

27   Apportionment," "Mor-Flo Apportionment for Acceptable Non-Infringing Substitutes," and

28

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

7

"Design Around Apportionment" as reflected in Exhibit 20-S of my Supplemental Expert Report, which I have included separately as **Exhibit K** to this declaration.

### C.     My Lost Profit Analysis Accounts for the Specific Asserted Technology

31.     In Samsung's Motion to Exclude, Samsung asserts that "Mr. Musika fails to meet the but-for test for lost profits because he doesn't identify lost sales attributable to the intellectual property rights before the Court."  (Mot. at 2.)  Once again, this statement is wrong.

32.     First, Samsung ignores a critical step by which my lost profits analysis is specifically tailored to the each of the individual patents – the reduction in lost profits that I make pursuant to the expected time that it would take for Samsung to redesign its products in light of each of the specific asserted technologies.  In forming my opinions, I investigated and formed a conservative conclusion on how long it would take Samsung to design a new smartphone that would avoid Apple's asserted intellectual property.  I conducted this analysis for each of the specific intellectual property for which I am conducting an analysis of lost profits.  As a highly conservative assumption, I include in the lost profits analysis only those sales that would have occurred during the period in which Samsung would have to redesign its products.  The specific time frames used for each form of intellectual property is identified in the column "Design Around Apportionment" in Exhibit 20-S to my Supplemental Expert Report, which is also attached as Exhibit K to this declaration.  This substantially reduces the unit sales that are used in the lost profits analysis and specifically tailors the results to each intellectual property asset being asserted in this case.

33.     Second, I have evaluated and used the results of Dr. John Hauser's study of consumers' willingness to pay for the technology reflected by the individual utility patents being asserted in this case.  Dr. Hauser's study reflects substantial, patent-specific demand for the technology being asserted by Apple.  My consideration of Dr. Hauser's work is reflected in paragraphs 122, 123, and 258 of my Original Expert Report, which demonstrates that consumers are willing to pay a significant price premium for smartphone and tablet products containing the patented features of the '381, '607, '915, and '163 patents.

34.     Third, I conducted an extensive analysis of the discovery record to evaluate whether the specific utility and design intellectual property that is being asserted in the case would affect consumer demand for the smartphones and tablets involved in the case.  Evidence obtained from this analysis is presented in Exhibits 24 and 25 of my Original Expert Report and in Exhibits 24-S and 25-S of Supplemental Expert Report, the latter of which I have included separately as **Exhibits L & M** to this declaration.

35.     Below, I discuss a selection of the evidence included in Exhibits 24-S and 25-S to my Supplemental Expert Report.  This evidence is not meant to be all-inclusive.

- Consumer surveys and market analysis illustrate that consumers desire the iPhone because of:

   o   The '915 patent's "scroll v. gesture" technology – ("Gestures like the two fingered pinch and flick add a game-like quality to interactions").  (*See* **Exhibit N** hereto, at SAMNDCA00191846.)

   o   The '381 patent's "bounceback" technology – ("Lists bounce, icons flitter – the iPhone has a sense of whimsy that shows a thoughtful character in the interface").  (*Id.*)

   o   The '607 patent's accurate multipoint touch-screen – ("Accuracy is the most important factor in a touch screen phone across segments").  (*Id.* at SAMNDCA 00191907.)

   o   The '163 patent's tap-to-zoom technology – ("The most preferred method is "Double-Tap" Zooming . . . Simplicity is the primary reason of the choice").  (**Exhibit O** hereto, at SAMNDCA11104133.)

   o   The beautiful industrial design embodied in 'D087 and 'D667 and Apple's trade dress claims – ("Screen-centric design has set the standard for touch."  "The iPhone has four buttons: home, power, volume, mute." "The iPhone is in some ways 'undesigned,' but its strong, screen-centric design has come to equal what's on trend and cool for many consumers." "It's beautiful." "The whole phone is the screen." "It's sexy." "It's slick.")  (Exhibit N hereto, SAMNDCA00191841.)

- Reports and documents reflect instructions by Samsung management to implement:

   o   The '381 patent's "bounceback" technology ("HQ is asking us to make it for P1 project…. 3. There is no bounce effect in Browser screen.")  (**Exhibit P** hereto, SAMNDCA00525347-49, at 47.)

   o   The '163 patent's tap-to-zoom technology using the iPhone as a benchmark. ("Design & Research Recommendations/Suggestions – Adopt Double-Tap as a supplementary zooming method for up to 2 levels of zooming and back to original in mass market touch devices.  The UX of [the] iPhone can be used as a design benchmark.")  (Exhibit O hereto, at SAMNDCA1104138.)

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

9

o   The GUI layout embodied in the 'D305, 'D790, and 'D334 patents and Apple's trade dress claims. ("Instructions from the CEO – Improve UX, referring to iPhone 3GS. . . Icons have too much space and are strange. . . . Report after making improvements.") (**Exhibit Q** hereto, SAMNDCA10249770.)

o   Redesigns of Samsung's physical phone designs because of the degree to which Apple's design were better than Apple's, including for example a statement that "the difference is truly that of Heaven and Earth." (**Exhibit R** hereto, at SAMNDCA10247377.)

• Apple prominently displayed the industrial designs of the iPhone and iPad and their elegant graphical user interface, which reflect the intellectual property asserted in this lawsuit, in print and TV advertisements. (**Exhibit S, T, & U** hereto.)

36.   Further, Samsung, Apple, and third-party consumer surveys consistently show that attractive design is a highly significant – often the number one factor – affecting purchases of Apple and Samsung smartphones.

• 45% of survey respondents stated that they chose a smartphone manufacturer because they liked the overall design or style (**Exhibit V**, hereto, at SAMNDCA10246394.)

• A "strong trust in Apple and appeal of design swayed many [who considered Android] to purchase iPhone." (**Exhibit W**, hereto at APLNDC-Y0000025060.)

•  32% of those surveyed in the US liked the physical appearance and design as a reason that swayed them to purchase the iPhone over Android, and 46% of those surveyed in the US also listed physical appearance and design as a very important feature in deciding to buy an iPhone. (*Id*. at APLNDC-Y0000025060, 64.)

• "Attractive design" is one of the top three reasons for choosing a smartphone (**Exhibit X**, hereto at SAMNDCA10807326.)

37.   In Samsung's Motion to Exclude, Samsung also asserts: "Mr. Musika admits he cannot quantify one iota of demand for the patented features when he says that if Samsung were to design around Apple's patents, it would immediately recover 100% of its previous market share." (Mot. at 3.)

38.   Samsung mischaracterizes my opinions. As I made it clear to Samsung's counsel at my deposition, the assumption regarding Samsung's ability to capture market share after it designed around Apple's patents in no way offered an opinion that there is a commercially acceptable noninfringing alternative. To the contrary, I believe that the information discussed above justifies a conclusion that Samsung's remaining options are not commercially acceptable alternatives to most consumers. Nonetheless, to make the most conservative assumption possible and to ensure that my calculations only captured lost sales that can be calculated to a reasonable

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

10

1   probability, I did not calculate additional lost sales after the time needed to design around each of

2   the specific technologies.  The remaining sales would be difficult to quantify and reflect a part of

3   the irreparable harm that Apple is suffering due to Samsung's infringement, as I discussed in

4   paragraph 114 of my Original Expert Report.

5   ## II.     REASONABLE ROYALTY

6          39.     Assuming infringement, I have also calculated a reasonable royalty rate as an

7   alternative form of damages.  To calculate the reasonable royalty, I first used each of the three

8   approaches described in my Original Expert Report to determine a reference point for the

9   calculations: (1) the income approach, (2) the cost approach, and (3) the market approach.  The

10  income approach looks at the income each party would expect to receive due to the use of the

11  relevant technology.  The cost approach looks at the out of pocket and opportunity costs that a

12  party would incur if it could not use the asserted technology.  The market approach examines at

13  what prices or for what compensation the same or other parties have transferred the asserted or

14  similar technology to other parties.  These three approaches are regularly used by accountants

15  outside of litigation to value intellectual property.  After obtaining these reference points, I

16  evaluated where within these reference points the reasonable royalty would be in light of analysis

17  of the factors stated in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116

18  (S.D.N.Y. 1970).  My application of these frequently used methods is discussed at paragraphs 161

19  to 190 of my Original Expert Report and Exhibits 20 and 39 to 41.5 of my Original Expert Report

20  and Exhibits 20-S and 39-S to 41.5-S of my Supplemental Expert Report.  Exhibits 20-S and 39-S

21  to 41.5-S of the Supplemental Expert Report reflect my updated, current opinions and I include

22  them as **Exhibits K & Y** to this declaration.  I address each of Samsung's contentions regarding

23  my reasonable royalty analysis below.

24          **A.     My Application of the Income Approach Apportions Profits for Other
                     Intellectual Property and Assets.**

25

26          40.     In its Motion to Exclude, Samsung asserts that I do not apportion the profits of the

27  iPhone and iPad to account for unasserted intellectual property and assets.  Specifically, Samsung

28  claims that "Mr. Musika admits he is attributing the entire premium value of Apple's iPhone and

iPad products to the IP asserted here with no apportionment to other assets," that "Mr. Musika fails to apportion any of the premium for Apple's iPhone and iPad products to any other utility patents or to any other non-patented proprietary technology unique to the iPhone and iPad," and that "Mr. Musika's income methodology assumes the small portion of Apple's IP asserted here reflects the entire proprietary value of the iPhone and iPad." (Mot. at 4-5.)  These assertions are false.

41.     In my analysis of the income approach, I do apportion and make numerous deductions from the profits associated with the iPhone and iPad before reaching a value for the Apple Intellectual Property asserted in this lawsuit.  If I had not done so, the amount of the reference range from the income method would have been many multiples of the range that I calculated, as discussed below.  My apportionment analysis is reflected at paragraphs 184 to 190 of my Original Expert Report and is reflected in Exhibits 41 to 41.5 of my Original Expert Report and updated in Exhibits 41-S to 41.5-S of my Supplemental Expert Report.

42.     My apportionment analysis can perhaps best be seen in summary from Exhibit 41.3-S of my Supplemental Expert Report.  As reflected there, I begin my calculations of Apple's income valuation with █████████████████████████  From this amount, I apply ████ ████ to the utility patents at issue and █████████ to the design rights.  My analysis prior to reaching this conclusion makes all the following deductions and apportionments for other assets and other intellectual property:

- Deduction of royalties paid on other intellectual property used to generate operating margin;

- Deduction for WACC (this reduction of 11.9% includes a return on Apple's capital for the use of other tangible and intangible assets);

- Deduction for income taxes of the tax rate (which is generally not used for damages calculations and provides a substantial cushion to address other intellectual property and assets)

- Deduction for brand/design elements (when accounting for the utility patents); and

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

12

1        • A specific 8.9% deduction for Apple's other intangibles assets (which specifically

2        includes other intellectual property).

3  Thus, Samsung's claims regarding the lack of apportionment are completely inaccurate.

4        43.    As noted above, the references points calculated by the income method are not the

5  end of my analysis.  As noted, I apply the *Georgia Pacific* factors and make an appropriate

6  additional adjustment before arriving at a final reasonable royalty rate.  As reflected in Exhibit

7  46-S to my Supplemental Expert Report, the reasonable royalty rates that I use for Apple's utility

8  patents are half of what would be indicated by the income method alone.  For example, under the

9  income approach, the reference range for the '381 patent tops out at $4.03 per unit, while my final

10  per unit royalty rate is $2.02.  Similarly, the top of the reference range for the '915 patent is $6.20

11  per unit, while the final per unit royalty rate comes to $3.10.  I have separately included Exhibit

12  46-S from my Supplemental Expert Report as **Exhibit Z** to this declaration.

13        44.    As discussed in my Original Expert Report at paragraphs 155-159, I conducted this

14  apportionment and these adjustments in part to address the application of the entire market value

15  rule to the present circumstances.

16        45.    In the attached **Exhibit AA**, I illustrate what would have occurred to the

17  reasonable royalty damages calculations if I had not made the foregoing adjustments.  For

18  example, the difference between damages based on the income reference point versus the actual

19  rate resulting from my *Georgia Pacific* analysis alone result in a nearly 100% increase in the

20  reasonable royalty damages (from $23,325,843 to $46,545,103).  If I removed the specific portion

21  of profit allocated to the "Value of [Apple's] Other Intangibles]," the reasonable royalty would

22  increase by 453% (from $23,325,843 to $129,125,124).

23        46.    When I applied the income method to Samsung's income from use of the asserted

24  technology, I make the same reductions discussed above in paragraph 43.  As shown in Exhibit

25  41.3-S, Samsung's original operating margin is 21.7%, but after apportionment, the final amount

26  attributed to utility patents is only 1.2%.  As a result, I have apportioned a full 95% of Samsung's

27  pretax income to factors other than the utility patents in suit.

28

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

13

47.     Samsung  further asserts that "[w]ith respect to the design patents and trade dress, Mr. Musika similarly assumes the entire rate for the Apple brand value is applicable to Apple's design patents and trade dress." (Mot. at 5.)

48.     This assertion is also incorrect.  I developed my reasonable royalty rate for the design related IP by examining two different approaches.  The first assumed a hypothetical license involving all of Apple's asserted design IP.  The second basis assumed a license for a single individual item of design IP.  In both cases, I limited myself to a license for *asserted* intellectual property and am not hypothesizing a license to asserted and unasserted design rights. A license for all of Apple's asserted design IP would be equal to the rate required for Apple's brand as a whole, because Apple would not and could not license separately a material portion of the brand because to do so would dilute the most valuable brand in the world.  If Apple were to license only one piece of the design IP, I separately evaluate the floor below which Apple would not license such limited rights and conclude that Apple would not license any design rights for less than $4 per unit.  I explain these conclusions in more detail in my Original Expert Report at paragraphs 176 to 177.

49.     Samsung claims that the income approach is my "preferred method."  This mischaracterizes my Original Expert Report.  (Mot. at 4.)  The income approach is a method used by me to develop one of many reference points and not my "preferred method" or my conclusion.

### B.     My Application of the Cost Approach is Consistent with the Record and Does Not Capture All of Samsung's Profits as an Infringer.

50.     Samsung claims that my cost approach is "simply a disguised attempt to recover Samsung's gross profits for every accused device rather than a portion attributable to the intellectual property at issue."  (Mot at 6.)  This is incorrect and mischaracterizes my calculations.

51.     First, the cost approach is not used to calculate the reasonable royalty; it is used to calculate a reference point representing the opportunity cost to Samsung if it could not use Apple's intellectual property.  Thus, it does not translate directly into a royalty rate and does not determine in a quantitative manner the amount of the reasonable royalty.

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

14

52.    Second, the cost approach does not calculate the gross profit for "every accused device" as Samsung erroneously claims.  To the contrary, the cost approach seeks to evaluate the out of pocket and opportunity costs that Samsung would incur if it was unable to use the intellectual property asserted by Apple.  As Mr. Wagner himself recognizes, these opportunity costs include the lost sales and profits that Samsung would experience if it had to redesign its products to avoid Apple's intellectual property.  My application of the cost approach seeks to quantify that figure.

53.    Exhibit 39.4-S to my Supplemental Expert Report, attached hereto as part of Exhibit Z, shows the methodology behind my calculation. The calculation starts with an average monthly gross margin and multiplies that times the average amount of time a product is out of the market for redesign (4 months).  That amount is divided by total unit sales for all accused devices sold in the 22 month damage period resulting in a per unit opportunity cost, which is finally allocated to individual patents.  By including only 4 of 22 months, approximately 18% of gross profit, I have limited the opportunity cost to much less than "Samsung's gross profits for every accused device."  Moreover, I have thereby specifically reduced the size of the opportunity costs in light of the amount of time it would take to avoid infringement of the specific intellectual property that has been asserted in this lawsuit.

54.    When criticizing my application of the cost approach, Samsung makes a number of unsupported factual assertions about the smartphone market, such as "First, Samsung would not have lost all sales of smartphones and tablets while designing around Apple's patents.  Samsung could have quickly designed out the accused features (e.g. turning off the bounceback functionality) or offered one of its non-accused products as a substitute, thus preserving some sales while pursuing a design around," and "Mr. Musika ignores, without justification, the loyalty of Samsung's customers, who would have purchased another Samsung smartphone or waited until the redesigned smartphone was available." (Mot. at 5-6.)  I understand that Samsung is contesting factual claims made by Apple and contests some of the factual basis of my analysis; however, I do not understand that I am limited to a calculation based on undisputed facts alone and I have identified substantial evidence to justify my calculations.

55. For example, I have provided, as summarized in paragraphs 32 to 36 above, ample evidence that that consumers desire the features and technology claimed in the intellectual property asserted in this lawsuit. This supports a conclusion that proposed design-arounds are not complete substitutes for Apple's intellectual property.

56. Further, as I discuss in paragraph 129 and 163 in my Original Expert Report, four months is a reasonable hypothetical design-around period. The four-month time period results from the opinion of Apple's technical experts as identified on Exhibit 20 to my Original Expert Report, and Samsung and Apple evidence regarding the amount of time required in the ordinary course to design, develop, test and implement new smartphone and tablet features. Notably, many documents point to a much longer time frame than I have used. For example, a Mobile Communications Division 2012 Business Strategy document dated October 2011 indicates that the new "development [of] archetype designs" would take "(18-24 months)." A true and correct copy of the Mobile Communications Division 2012 Business Strategy document is attached hereto as Exhibit I (see page SAMNDCA00401930).

57. As a further example, an internal Samsung presentation prepared for a visit by Samsung's Chief Executive Officer, GS Choi, to STA on September 20, 2011, states directly that "Android is 'sticky' but Samsung Android is not yet," with a total smartphone repurchases over a customer's lifetime at only 1.1 (compared to HTC 1.8, and Apple 3.3). A true and correct copy of excerpts from the "GS Choi Visit to STA" presentation is attached hereto as Exhibit H (see page SAMNDCA11514063).

### C. Samsung's Attack on My Other Assumptions.

58. Samsung claims that "[i]n reaching a concluded reasonable royalty, Mr. Musika inflates the royalty further (above all his already improper calculations) based on his conclusions that, as a matter of policy, Apple avoids licensing the IP at issue here." (Mot. at 6.) This statement is incorrect.

59. First, I have not used the fact that Apple is an unwilling licensor to exceed the reference range provided by the three methods I use for my analysis.

60.     Second, while I have considered that Apple is not a willing licensor of the IP at issue in the case, I did so based on the multiple factors of a *Georgia-Pacific* analysis that point directly to this consideration.  For example, Factor 4 of *Georgia-Pacific* requires consideration of: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.  *Georgia-Pacific Corp.*, 318 F. Supp. at 1120.  This factor directly addresses Apple's licensing policy, or unwillingness to license the IP at issue in this suit.  Consideration of this factor is a common step in intellectual property damages analysis.

61.     Samsung additionally asserts that "Mr. Musika also improperly seeks to rely on a license that he admits 'is not a comparable license to any of the Apple Intellectual Property In Suit'" to establish a "floor" for a reasonable royalty. (Mot. at 6.)

62.     Again, Samsung's assertion is wrong.  The limited "Made for iPod" license is not comparable to all of the design items taken as a whole.  However, as stated in my Original Expert Report and deposition testimony, the rate is relevant as a floor for an individual item of design IP.  (*See* Exhibit A hereto at ¶ 176; Mazza Decl. Ex A at 107:22-108:8.)  I describe the "Made for iPod" program and how it compares to the present circumstances at paragraphs 176 to 177 of my Original Expert Report and explained my reasoning at my deposition.  This reflects one limited example of the amount Apple would charge for the use of a trademark in a manner that complements Apple's overall ecosystem.  The limited manner in which I use this information, as a floor below which Apple would not go for a single design right, is consistent with the information produced during discovery about this program and with my conclusion that this program would not be comparable to a license to Apple's remaining design rights.

### III.     MY CONCLUSIONS REGARDING SAMSUNG'S COSTS ARISE FROM ANALYSIS OF DOCUMENTS PRODUCED ON APRIL 30 IN RESPONE TO A COURT ORDER AND MY EXPERTISE AS AN ACCOUNTANT.

63.     In Samsung's Motion to Exclude, Samsung also seeks to prevent me from disputing any costs used by Samsung and Michael Wagner to reduce Samsung's profits.  I understand Samsung to be seeking to this limitation based on a claim that I am not applying expertise from my work as an accountant but merely presenting attorney argument, and because it

DECLARATION OF TERRY L. MUSIKA ISO APPLE'S OPP. TO SAMSUNG'S MOTION TO EXCLUDE EXPERTS
CASE NO. 11-cv-01846-LHK (PSG)
pa- 1530130

17

1    is improper rebuttal material.  Samsung is incorrect.  My conclusion arises directly from my

2    expertise in accounting and from analysis of new information produced to me on April 30

3    pursuant to the Court's April 23 sanctions order.

4            64.     My opinions regarding the reliability of Samsung's costs arise directly from my

5    expertise as an accountant.  In particular, as an accountant and former auditor, I have expertise in

6    applying various accounting methodologies to determine when financial data is reliable, how it

7    can be tied and compared to other financial data and when and to what degree differences

8    identified in connection with the effort to reconcile data are sensible and when they represent a

9    "red flag" that indicates that financial data is not reliable.  I have also used my expertise in

10   understanding when expenses are prepared on a "direct" versus an "indirect" or allocated basis

11   and how to evaluate the reliability of indirect expenses and the degree to which indirect expenses

12   relate to production of specific products.  Further, I have used my expertise in understanding how

13   accountants and economists treat "fixed" and "variable" costs when they are calculating the

14   profitability of a product or groups of products on a stand-alone basis.  These steps and analysis

15   are matters that have arisen from my specialized training and experience in the accounting

16   profession, and they are typical of the types of analysis that I have applied in other auditing or

17   consulting engagements in the real world or other expert witness engagements.  My conclusions

18   are the result of my own analysis, applying principles and standards used by accountants in the

19   regular course of their work.  They are not the result of any directive from counsel.

20           65.     My supplemental opinions regarding Samsung's evidence of its costs are drawn

21   directly from my review and analysis of Samsung documents produced in response to the Court's

22   April 23 sanctions order.  (Docket No. 880.)  That order also stated that "Apple may supplement

23   its expert report(s) on damages, limited to explaining any changes to the initial report(s) that are

24   the result of the additional production." (*Id.*)  As reflected in my Supplemental Expert Report, I

25   did not reach my conclusions regarding the reliability of Samsung's costs until I evaluated the

26   following documents produced on April 30:  (a) a detailed statement of Samsung's alleged costs;

27   (b) a detailed chart of accounts that specifically referred to fixed and variable costs; (c) an attempt

28   to reconcile these documents to Samsung's external and internal financial statements; (d) an

1   attempt to reconcile Samsung's statement of its cost of goods sold to its bills of materials; (e) the

2   inability to tie the financial information in the new production to prior statements by Samsung

3   about its operating margins; and (f) the lack of information within the April 30 production that

4   would support its calculation of its design around costs.  This is further explained at paragraphs

5   32 to 40 and Exhibits 49-S to 53-S of my Supplemental Expert Report.

6   **IV.    MY ANALYSIS IS NOT LIMITED TO EITHER PARTY'S**
        **CONTENTIONS REGARDING WHEN SAMSUNG WAS ON NOTICE OF**
7        **APPLE'S PATENTS.**

8   66.    I understand that Samsung contends that it did not receive actual or constructive

9   notice of its infringement of some of the asserted intellectual property until April or June 2011.  I

10  understand that Apple disputes Samsung's claim, and I have received evidence supporting

11  Apple's position regarding the dates when Samsung received actual notice of its infringement of

12  the asserted intellectual property.   I have not rendered an opinion in this litigation on when notice

13  occurred.

14  67.    Specifically, I created a damages model that will allow me to calculate the impact

15  to Apple's damages given changes to the date on which notice occurred and any resulting effort

16  to design around Apple's intellectual property would begin.  At Samsung's request, I made my

17  damages model available to Samsung in the form of Excel spreadsheets and a native Access

18  database file, which would allow Samsung to perform these alternative calculations as well.

19  68.    I and Invotex are being compensated for my work in connection with the case at

20  the standard rates, which I and the other Invotex professionals involved in this case, charge for

21  our time.

22  I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st

23  day of May, 2012, at Baltimore, Maryland.

24  */s/ Terry L. Musika*
        Terry L. Musika

25

26

27

28

1

**ATTESTATION OF E-FILED SIGNATURE**

2        I, Michael A. Jacobs, am the ECF User whose ID and password are being used to file this

3 Declaration.  In compliance with General Order 45, X.B., I hereby attest that Terry L. Musika has

4 concurred in this filing.

5 Dated:  May 31, 2012                         /s/ Michael A. Jacobs
                                               MICHAEL A. JACOBS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28