1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Charles K. Verhoeven (Cal. Bar No. 170151)
2   charlesverhoeven@quinnemanuel.com
    50 California Street, 22nd Floor
3   San Francisco, California 94111
    Telephone: (415) 875-6600
4   Facsimile: (415) 875-6700

5   Kevin P.B. Johnson (Cal. Bar No. 177129)
    kevinjohnson@quinnemanuel.com
6   Victoria F. Maroulis (Cal. Bar No. 202603)
    victoriamaroulis@quinnemanuel.com
7   555 Twin Dolphin Drive 5th Floor
    Redwood Shores, California 94065
8   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
9
    Michael T. Zeller (Cal. Bar No. 196417)
10  michaelzeller@quinnemanuel.com
    865 S. Figueroa St., 10th Floor
11  Los Angeles, California 90017
    Telephone: (213) 443-3000
12  Facsimile: (213) 443-3100

13  Attorneys for SAMSUNG ELECTRONICS
    CO., LTD., SAMSUNG ELECTRONICS
14  AMERICA, INC. and SAMSUNG
    TELECOMMUNICATIONS AMERICA, LLC
15

16              UNITED STATES DISTRICT COURT

17      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18  APPLE INC., a California corporation,        CASE NO. 11-cv-01846-LHK

19              Plaintiff,                        **SAMSUNG'S NOTICE OF MOTION AND
                                                  MOTION TO EXCLUDE OPINIONS OF
20          vs.                                   CERTAIN OF APPLE'S EXPERTS**

21  SAMSUNG ELECTRONICS CO., LTD., a
    Korean business entity; SAMSUNG
22  ELECTRONICS AMERICA, INC., a New             **Date: June 21, 2012
    York corporation; SAMSUNG                    Time: 1:30 pm**
23  TELECOMMUNICATIONS AMERICA,                  **Place: Courtroom 8, 4th Floor
    LLC, a Delaware limited liability company,   Judge: Hon. Lucy H. Koh**
24
                Defendants.
25

26

27                      **FILED UNDER SEAL**

28

02198.51887/4751862.6                                    Case No. 11-cv-01846-LHK
                    **MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on June 21, 2012 at 1:30 p.m., or as soon thereafter as

3    counsel may be heard before the Honorable Lucy Koh in Courtroom 8 of the above-entitled Court,

4    located at 280 South 1st Street, San Jose, California, Defendants Samsung Electronics Co., Ltd.,

5    Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC

6    (collectively "Samsung") will, and hereby does, move this Court for an order excluding the

7    testimony of the following expert witnesses designated by Apple: Terry L. Musika, Henry Urbach,

8    Susan Kare, Russell Winer, Dr. Sanjay Sood, Dr. John Hauser, Michael Walker and a portion of

9    the testimony of Richard L. Donaldson (the "experts").

10       PLEASE TAKE FURTHER NOTICE that Samsung requests an evidentiary hearing

11   pursuant to *Fed. R. Evid.* 104 on the admissibility of the testimony of each of the experts prior to

12   any testimony by that expert at trial.

13       This Motion is made pursuant to the Federal Rules of Evidence 403 and 702 and *Daubert*

14   *v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), on the grounds that the testimony Apple seeks

15   to elicit from these experts is not relevant to any issue in this matter, and is otherwise unreliable,

16   incorrect, and unhelpful.

17       This Motion is based upon this Notice of Motion and Motion, Memorandum of Points and

18   Authorities in support thereof, the Declaration of Joby Martin dated May 17, 2012, all pleadings

19   and papers on file in this action, such other evidence or arguments as may be presented to the

20   Court, and such other matters of which this Court may take judicial notice.

21

22

23

24

25

26

27

28

1    DATED: May 17, 2012            QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP
2

3

4                                   By /s/ Victoria F. Maroulis
                                       Charles K. Verhoeven
5                                      Kevin P.B. Johnson
                                       Victoria F. Maroulis
6                                      Michael T. Zeller
                                       Attorneys for SAMSUNG ELECTRONICS
7                                      CO., LTD., SAMSUNG ELECTRONICS
                                       AMERICA, INC., and SAMSUNG
8                                      TELECOMMUNICATIONS AMERICA, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.       INTRODUCTION ....................................................................................................... 1

II.      THE COURT SHOULD EXCLUDE THE OPINIONS OF TERRY L. MUSIKA .............. 1

         A.       Mr. Musika's Lost Profits Analysis Should Be Excluded ........................................ 1

                  1.       Mr. Musika's lost profits figures should be excluded because he
                           ignores essential factors in the smartphone market ..................................... 1

                  2.       Mr. Musika's lost profits analysis is not tied to the intellectual
                           property rights at issue in this case .............................................................. 2

         B.       Mr. Musika's Reasonable Royalty Analysis Should Be Excluded .......................... 4

                  1.       Mr. Musika's "income approach" is improper .............................................. 4

                  2.       Mr. Musika's "cost approach" is improper ................................................... 5

                  3.       Mr. Musika's royalty rate improperly relies on the assumption that
                           Apple is an unwilling licensee .................................................................... 6

         C.       Mr. Musika's Critique of Samsung's Evidence of Costs Should be Excluded ......... 7

         D.       If Mr. Musika Is Allowed to Give an Opinion on Damages, His Pre-Notice
                  Damages Should Be Subtracted ............................................................................ 8

         E.       The Court Should Again Reject Mr. Musika's Speculation Regarding
                  Alleged Irreparable Harm For Failure to Show Any Nexus ..................................... 9

III.     THE COURT SHOULD EXCLUDE THE OPINIONS OF JOHN HAUSER .................. 10

IV.      THE COURT SHOULD EXCLUDE THE TESTIMONY OF HENRY URBACH .......... 13

V.       THE COURT SHOULD EXCLUDE THE TESTIMONY OF SUSAN KARE ................ 17

VI.      THE COURT SHOULD EXCLUDE THE TESTIMONY OF RUSSELL WINER .......... 19

VII.     THE COURT SHOULD EXCLUDE THE OPINIONS OF DR. SANJAY SOOD .......... 21

VIII.    THE COURT SHOULD EXCLUDE THE OPINIONS OF MICHAEL WALKER .......... 22

IX.      THE COURT SHOULD EXCLUDE THE LEGAL OPINION OF RICHARD L.
         DONALDSON ......................................................................................................... 25

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

## **Cases**

4

*AMF v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979)...............................................................................19, 20

5

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.,*
6
  6 F.3d 1523 (Fed. Cir. 1993)..........................................................................................8

7

*American Footwear Corp. v. General Footwear Co.,*
  609 F.2d 655 (2d Cir. 1979).........................................................................................22

8

*Apple v Samsung Elecs.,*
9
  No. 12-1105, *Op. Cit.* at 16 (Fed. Cir. May 14, 2012) ..............................................9

10

*Arminak & Assocs., Inc. v. Saint Gobain Calmar, Inc.,*
  501 F.3d 1314 (Fed. Cir. 2007).....................................................................................18

11

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,*
12
  1 F.3d 1214 (Fed. Cir. 1993).....................................................................................1, 2

13

*Baker v. Urban Outfitters, Inc.,*
  254 F. Supp. 2d 346 (S.D.N.Y. 2003) .........................................................................17

14

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.,*
15
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) ......................................................................16

16

*CLRB Hanson Indus., LLC v. Google Inc.,*
  2008 WL 2079200 (N.D. Cal. May 14, 2008) ............................................................25

17

*Coach Inc. v. Asia Pac. Trading Co.,*
18
  676 F. Supp. 2d 914 (C.D. Cal.  2009) .........................................................................8

19

*Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001) .....................................................................................1

20

*DSU Med. Corp. v. JMS Co., Ltd.,*
21
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) ......................................................................16

22

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ...............................................................................1, 4, 7, 14, 16, 21

23

*Dreamworks Production Group, Inc. v. SKG Studio,*
24
  142 F.3d 1127 (9th Cir. 1998) ......................................................................................18

25

*Dreyfus Fund Inc. v. Royal Bank of Canada,*
  525 F. Supp. 1108 (S.D.N.Y. 1981) .......................................................................12, 22

26

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
27
  543 F.3d 665 (Fed. Cir. 2008) ......................................................................................18

28

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

*Gable v. Nat'l Broadcasting Co.*,
  727 F. Supp. 2d 815 (C.D. Cal. 2010) ................................................................16

*Garretson v. Clark*,
  111 U.S. 120 (1884) .............................................................................................4

*General Elec. Co. v. Joiner*,
  522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) .........................................16

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ......................................................................6

*Grain Processing Corp. v. Am. Maize-Prods.*,
  185 F.3d 1341 (1999) ............................................................................................1

*Hendrix v. Evenflo Company, Inc.*,
  255 F.R.D. 568 (N.D. Fla. 2009) .........................................................................20

*Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am., Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000) ..................................................................14

*Jones v. U.S.*,
  933 F. Supp. 894 (N.D. Cal. 1996) .......................................................................14

*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) ...............................................................................4

*Major League Baseball Props., Inc. v. Calvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ................................................................................24

*Mirror Worlds, LLC v. Apple, Inc.*,
  784 F. Supp. 2d 703 (E.D. Tex. 2011) ...............................................................4, 5

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
  476 F. Supp. 2d 1143 (N.D. Cal. 2007) .................................................................1

*Nike, Inc. v. Walmart Stores, Inc.*,
  138 F.3d 1437 (Fed. Cir. 1998) ..............................................................................8

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) .................................................................................17

*OPS2, LLC v. County of Clark*,
  2012 WL 424856 (D. Nev. 2012) ...............................................................8, 19, 25

*Oracle Am. Inc. v. Google, Inc.*,
  798 F. Supp. 2d 1111 (N.D. Cal. 2012) ..............................................................5, 6

*Oracle Am. Inc. v. Google, Inc.*,
  2012 WL 44485 (N.D. Cal. Jan. 9, 2012) ...............................................................7

*Oracle America, Inc. v. Google Inc.*,
  2012 WL 850705 (N.D. Cal. March 13, 2012) .....................................................11

*Radio Steel & Mfg. Co. v. MTD Prods., Inc.*,
   788 F.2d 1554 (Fed. Cir. 1986) ........................................................................6

*Reeves v. Commonwealth Edison Co.*,
   2008 WL 239030 (N.D. Ill. 2008) ..................................................................16

*Rambus Inc. v. Infineon Techs. Ag*,
   318 F.3d 1081 (Fed. Cir. 2003) ......................................................................23

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ..........................................................................6

*Richardson v. Stanley Works, Inc.*,
   597 F.3d 1288 (Fed. Cir. 2010) ......................................................................18

*Rogers v. Raymark Indus., Inc.*,
   922 F.2d 1426 (9th Cir. 1991) ...........................................................8, 20, 21

*Rust Environment & Infrastructure, Inc. v. Teunissen*,
   131 F.3d 1210 (7th Cir. 1997) ........................................................................22

*Textron Inc. By & Through Homelite Div. v. Barber-Colman Co.*,
   903 F. Supp. 1570 (W.D.N.C. 1995) ..............................................................17

*Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
   559 F. Supp. 1189 (E.D.N.Y. 1983) ..........................................................11, 22

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
   532 U.S. 23 (2001) ..........................................................................................18

*U.S. v. 87.98 Acres of Land More or Less in the Cty of Merced*,
   530 F.3d 899 (9th Cir. 2008) ..........................................................................17

*U.S. v. Benson*,
   941 F.2d 598 (7th Cir. 1991) ..........................................................................17

*U.S. v. Chang*,
   207 F.3d 1169 (9th Cir. 2000) ........................................................................17

*U.S. v. Johnson*,
   54 F.3d 1150 (4th Cir. 1995) ..........................................................................17

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ...............................................................4, 6, 8

*United States v. Alisal Water Corp.*,
   431 F.3d 643 (9th Cir. 2005) ..........................................................................21

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ......................................................................21

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
   746 F.2d 112 (2d Cir. 1984) .....................................................................12, 22

*Water Tech. Corp. v. Calco Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988) ........................................................................................3

*ZF Meritor LLC v. Eaton Corp.*,
    646 F. Supp. 2d 663 (D. Del. 2009) ...............................................................................14

### **<u>Statutes</u>**

15 U.S.C. § 1114 .................................................................................................................9

15 U.S.C. § 1125(a) .............................................................................................................9

35 U.S.C. § 287 ...................................................................................................................8

Fed. R. Evid. 104 .................................................................................................................1

Fed. R. Evid. 702..........................................................................................1, 8, 19, 21, 22, 24

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Apple's damages expert, Terry L. Musika, writes in his report that "Apple has built a

4    considerable and at times a cult-like following to all things Apple."   That cult-like following

5    apparently includes several experts who are appearing on Apple's behalf in this case, and may

6    explain why they have cast aside established scientific methods and governing legal principles in

7    favor of slavish adoration of their client and platitudes about its alleged magical and revolutionary

8    products, issues that are of no relevance to the claims and defenses at issue.

9    ## II.    THE COURT SHOULD EXCLUDE THE OPINIONS OF TERRY L. MUSIKA[1]

10              ### A.    Mr. Musika's Lost Profits Analysis Should Be Excluded

11                   #### 1.    Mr. Musika's lost profits figures should be excluded because he ignores essential factors in the smartphone market

12        To show entitlement to lost profits, a patentee must reconstruct the market to show,

13    hypothetically, "likely outcomes with infringement factored out of the economic picture."

14    *Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir.

15    2001) (quoting *Grain Processing Corp. v. Am. Maize-Prods.,* 185 F.3d 1341, 1350 (1999)).   Such

16    market reconstruction, though hypothetical, requires "sound economic proof of the nature of the

17    market."   *Id.*   The hypothetical market must account for how consumers would react to products

18    that have a dissimilar price or significantly different characteristics.   *Id.* at 1356; *see also BIC*

19    *Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1219 (Fed. Cir. 1993).   In *Monolithic*

20    *Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1155-56 (N.D. Cal. 2007), this

21    Court ruled that a patent-damages expert must "account for supply and demand" and make

22    allowances for the impact that a change in price would have on demand, or else be excluded.

23        Mr. Musika is aware that Apple's product prices are significantly higher than the price that

24    Samsung charges its customers.[2]   It is not reasonable to assume that Samsung's customers would

25

26    ───────────────

27    [1]    The party offering challenged expert testimony has the burden of establishing admissibility.   *U.S. v. 87.98 Acres of Land More or Less in the Cty of Merced*, 530 F.3d 899, 904 (9th Cir. 2008).

28

have been willing to spend an additional $277.27 on average more than what they actually paid, especially in light of the large number of alternatives.   Mr. Musika's failure to take price elasticity of demand into consideration, by itself, requires that the Court exclude his lost profits calculation. *BIC Leisure,* 1 F.3d at 1218 (finding clear error in admitting expert testimony that did not account for the price elasticity of demand where patentee's products sold for 60-80% above the price of the infringer's).   Mr. Musika admitted he would have performed a price elasticity analysis but did not have enough time.   (Martin Decl. Ex. 2, Musika Dep. Tr. at 38:21-25; 41:7-13.)

        Beyond his failure to consider price elasticity, Mr. Musika recognized, but failed to consider, consumers' strong connection to their chosen operating platform, whether Apple or Android.   (Martin Decl. Ex. 3, Musika Rpt. at 32).   Because many of Samsung's actual users have chosen Android, any sound consideration of alleged lost profits would have to measure those customer's willingness to switch to Apple's iOS rather than substitute a non-accused Android device from Samsung or another manufacturer.   However, despite recognizing the importance of consumer preference for different platforms, Mr. Musika's lost profits analysis does not take it into account at all.   Mr. Musika's lost profits analysis is unreliable because it ignores what he admits is a "significantly different" characteristic of Apple and Samsung's products.   It should be excluded under *BIC Leisure* and *Kaufman.*

### 2.   Mr. Musika's lost profits analysis is not tied to the intellectual property rights at issue in this case.

        To recover lost profits, "a patent owner must prove a causal relation between the infringement and its loss of profits." *BIC Leisure,* 1 F.3d at 1218.   The burden rests on the patentee to show a reasonable probability that "but for" the infringing activity, the patentee would have made the infringer's sales.   *Water Tech. Corp. v. Calco Ltd.,* 850 F.2d 660, 671 (Fed. Cir. 1988).   Mr. Musika fails to meet the but-for test for lost profits because he doesn't identify lost

---

[2]   Exhibit 41.2S to Mr. Musika's Supplemental Report shows that the average sales price of the accused Samsung products is $348.01 while the average sales price for the Apple products is $625.28.   (Declaration of Joby Martin In Support of Samsung's Motion to Exclude Opinions of Certain of Apple's Experts ("Martin Decl.") Ex. 1.)

1    sales attributable to the intellectual property rights before the Court.   (Martin Decl. Ex. 2 at 34:6-

2    19.)   While he claims to identify "examples of demand for each item of Apple Intellectual

3    Property In Suit for which Apple is seeking a lost profit" (Martin Decl. Ex. 3 at 38), all of his

4    purported evidence of demand for "design" improperly ignores the critical distinction between

5    ornamental design and functional design.   Apple's own vague advertising puffery and surveys

6    that use generic "appearance and design" language are not sufficient to carry Apple's burden of

7    showing demand for the protected ornamental elements.   Nor does Mr. Musika account for the

8    fact that seventy-one percent of iPhone owners prefer to cover their iPhones in cases – clear

9    evidence of the lack of value these iPhone owners place on at least some of the specific design

10   elements at issue.   (Martin Decl. Ex. 4 at APLNDC0000036345.)

11         Likewise, Mr. Musika's analysis fails to show demand for particular features claimed in

12   the utility patents, as opposed to some non-protectable virtue like "ease of use."   (Martin Decl.

13   Ex. 2 at 52:15-53:7.)   The advertisements and documents relied on by Mr. Musika do not promote

14   the specific functionalities claimed in the patents, but rather more general, nonproprietary

15   functional features.   Indeed, in the context of smartphones that include hundreds of distinct

16   features, there is no credible evidence that the very narrow scope of the utility patents asserted

17   here has any but-for effect on consumer choices.[3]   Mr. Musika admits he cannot quantify one iota

18   of demand for the patented features when he says that if Samsung were to design around Apple's

19   patents, it would immediately recover 100% of its previous market share.   (Martin Decl. Ex. 3 at

20   40; Ex. 2 at 21:20-22:1.)

21         Mr. Musika's lost profits analysis is fatally flawed because he (1) ignores the market

22   realities that Samsung's products are much less expensive than Apple's and consumers who prefer

23   the Android platform on which Samsung's products run will tend not to switch to Apple's platform

24

25

----

26        [3]   Mr. Musika also refers to consumer surveys by Dr. Hauser, but Mr. Musika is careful to
     admit he does not rely on these defective surveys, that do not show but-for causation regarding the
27   features claimed in the utility patents.   (Martin Decl. Ex. 3 at 39.)

28

1   and (2) does not identify but-for sales lost due to customer demand for the limited intellectual

2   property features at issue here.    It should be excluded under *Daubert*.

3       **B.**    **Mr. Musika's Reasonable Royalty Analysis Should Be Excluded**

4       A reasonable royalty is determined from the "hypothetical results of hypothetical

5   negotiations between the patentee and infringer (both hypothetically willing) at the time

6   infringement began."    *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1579 (Fed. Cir. 1996).

7       **1.**    **Mr. Musika's "income approach" is improper**

8       Mr. Musika refers to his preferred method as his "income approach," which is based on the

9   premise that "any rate of return in excess of a normal rate of return can be attributed to the patent."

10  (Martin Decl. Ex. 3 at 63).    Thus Mr. Musika admits he is attributing the entire premium value of

11  Apple's iPhone and iPad products to the IP asserted here with no apportionment to other assets.

12  But, according to the Federal Circuit, "the patentee ... must in every case give evidence tending to

13  separate or apportion the defendant's profits and the patentee's damages between the patented

14  feature and the unpatented features."    *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318

15  (Fed. Cir. 2011) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).    Apple knows well that

16  Mr. Musika's methodology is improper under *Uniloc*, having prevailed on this very issue before.

17  *See Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 726 27 (E.D. Tex. 2011) (granting

18  Apple's JMOL to vacate a jury's damages award because of the patentee's failure to apportion as

19  required by *Uniloc*).

20      Mr. Musika's income approach divides the premium value of the iPhone and iPad products

21  between the seven utility patents here ("Value of iPhone and iPad Combined Intangibles") and the

22  design patents plus trade dress here ("Brand/Design Value").    (Martin Decl. Ex. 1 at 41.2S –

23  41.3S).    However, Mr. Musika fails to apportion any of the premium for Apple's iPhone and iPad

24  products to any other utility patents or to any other non-patented proprietary technology unique to

25  the iPhone and iPad.    (Martin Decl. Ex. 3 at 66; Ex. 1 at 41.1S.)    If Mr. Musika's methodology

26  were permissible, the value of Apple's other iPhone and iPad patents – for example the patents

27  Apple has asserted in its second lawsuit against Samsung in this Court – would be zero.

28  According to Mr. Musika's stated methodology, all the value of the unique iPhone and iPad

    Case No. 11-cv-01846-LHK
**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

1   technology "can be attributed to" the seven utility patents asserted in this case.   (Martin Decl. Ex.

2   3 at 63).   That is absurd.

3         With respect to the design patents and trade dress, Mr. Musika similarly assumes the entire

4   rate for the Apple brand value "is applicable to Apple's design patents and trade dress."   (*Id.* at

5   65).   He does not apportion any separate value to Apple's other intangible assets, like the Apple

6   symbol or the names "iPhone" and "iPad."   (Martin Decl. Ex. 2 at 101:16 – 102:5.)   Mr. Musika

7   refuses to isolate the limited value of the IP in suit here because, he claims, "Apple has not and

8   would not agree to allow their brand to be partially eroded."   (*Id.*)   This Court recently excluded

9   expert opinion for just such a refusal to accept the hypothetical restriction to a license limited to

10   only the actual claims in suit on the purported basis of an alleged real-world preference to

11   "license[] on a portfolio basis."   *Oracle Am. Inc. v. Google, Inc.*, 798 F. Supp.2d 1111, 1115

12   (N.D. Cal. 2012).

13         Mr. Musika's income methodology assumes the small portion of Apple's IP asserted here

14   reflects the entire proprietary value of the iPhone and iPad.   Apple itself vacated a jury verdict in

15   the *Mirror Worlds* case for the same prejudicial mistake, and it should not be permitted to pursue

16   this approach here.

17         **2.**    **Mr. Musika's "cost approach" is improper**

18         Under Mr. Musika's "cost approach" to a reasonable royalty, he assumes that Samsung

19   would have had to withdraw every accused product from the market until new products were

20   developed designing around all the IP at issue here.   (Martin Decl. Ex. 3 at 54; Ex. 2 at 118:17-

21   27.)   Mr. Musika's "cost figure" estimates Samsung's total gross profit for the entire time he

22   assumes Samsung would have abandoned the market while designing new products.   (Martin

23   Decl. Ex. 3 at 55).   This methodology is improper and unreliable.   First, Samsung would not

24   have lost all sales of smartphones and tablets while designing around Apple's patents.   Samsung

25   could have quickly designed out the accused features (e.g. turning off the "bounceback"

26   functionality) or offered one of its non-accused products as a substitute, thus preserving some

27   sales while pursuing a design around.   Also, Mr. Musika ignores, without justification, the loyalty

28

1  of Samsung's customers, who would have purchased another Samsung smartphone or waited until

2  the redesigned smartphone was available.

3        A patentee may not base its reasonable royalty analysis on the alleged infringer's profits.

4  *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986) ("The

5  determination of a reasonably royalty, however, is based not on the infringer's profit, but on the

6  royalty to which a willing licensor and a willing licensee would have agreed at the time the

7  infringement began.").   Moreover, the Federal Circuit has made clear that a reasonable royalty

8  may only be based on the technology at issue, not the entire value of the accused products.

9  *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010) ("To be admissible, expert

10  testimony opining on a reasonable royalty rate must "carefully tie proof of damages to the claimed

11  invention's footprint in the market place.");   *Uniloc*, 632 F.3d at 1317 (same); *accord Oracle Am.,*

12  798 F. Supp.2d at 1115-16.[4]

13        Mr. Musika's "cost approach" to calculating a reasonable royalty is simply a disguised

14  attempt to recover Samsung's gross profits for every accused device rather than a portion

15  attributable to the intellectual property at issue.   It should be excluded.

16           **3.**   **Mr. Musika's royalty rate improperly relies on the assumption that**
   **Apple is an unwilling licensee**

17

18        In reaching a concluded reasonable royalty, Mr. Musika inflates the royalty further (above

   all his already improper calculations) based on his conclusions that, as a matter of policy, Apple

19
   avoids licensing the IP at issue here.   (Martin Decl. Ex. 3 at 56; Ex. 2 at 102:21 – 103:25.)

20
   However, as Mr. Musika admits, the entire hypothetical negotiation process must involve the

21  assumption of "a prudent patentee who was willing to grant a license."   (Martin Decl. Ex. 3 at 87)

22  (quoting *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970).)   The

23  requirement of a hypothetical willing licensee cannot be discarded, whatever Apple's actual

24  position.   "Assumptions built into this thought experiment may not be discarded in favor of the

25

26  _____

27     [4]   The lone exception is the Entire Market Value rule, which Mr. Musika admits does not
   apply in this case.   (Martin Decl. Ex. 3 at 53.)

28

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

1   parties' subjective preferences and history."   *Oracle*, 798 F. Supp. 2d at 1115-16 (excluding

2   expert opinion for "fighting the hypothetical").   Mr. Musika's reliance on Apple's actual

3   unwillingness to enter into any license agreement for the intellectual property at issue renders his

4   opinion on a reasonable royalty inappropriate.   It should be excluded.

5          Mr. Musika also improperly seeks to rely on a license that he admits "is not a comparable

6   license to any of the Apple Intellectual Property In Suit" to establish a "floor" for a reasonable

7   royalty.   (Martin Decl. Ex. 3 at 60-61).   "Damages experts cannot use noncomparable licenses,

8   with little relationship to the claimed invention or parties-in-suit, as a basis for calculating

9   reasonable royalties."   *Oracle Am. Inc. v. Google, Inc*., 2012 WL 44485 at *8, (N.D. Cal. Jan. 9,

10   2012).

11          None of Mr. Musika's approaches to calculating a reasonable royalty rate approximate the

12   results of a hypothetical negotiation between willing parties over just the technology at issue.

13   Under no conceivable light are these opinions helpful to the jury.   They must all be excluded

14   under *Daubert*.

15          **C.          Mr. Musika's Critique of Samsung's Evidence of Costs Should be Excluded**

16          In addressing the disgorgement of an alleged infringer's profits, Samsung is entitled to

17   deduct its costs related to accused products.   Mr. Musika declined to offer any opinion on those

18   costs in his initial Report indicating that it was Samsung's burden to do so.   (Martin Decl. Ex. 3 at

19   46).   On May 8, 2012, Apple served a "Supplemental Report" from Mr. Musika.   There, Mr.

20   Musika denied that he was offering a rebuttal to Samsung's expert, Michael J. Wagner.   (Martin

21   Decl. Ex. 5 at 10, n. 10.)   However, Mr. Musika offers approximately ten pages of criticisms of

22   Mr. Wagner's opinions, the data on which Mr. Wagner relied, and Mr. Musika's account of

23   discovery disputes in this case.   (*Id.* at 9-19.)   All of these opinions should be excluded because

24   they are improper attorney argument and a rebuttal report, which was not provided for in the

25   Court's schedule nor the Court's April 23, 2012 order.

26          Mr. Musika declares his intention to testify "it would be appropriate for the jury to award

27   damages [amounting to Samsung's total revenue] due to Samsung's failure to carry its burden of

28   proof."   (*Id.* at 10-11.)   These opinions are simply "closing argument" masquerading as an expert

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

1   opinion.   They do not "assist the trier of fact" and fail to satisfy the requirements of Rule 702.

2   *OPS2, LLC v. County of Clark*, 2012 WL 424856, at *5 (D. Nev. 2012); *Rogers v. Raymark*

3   *Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991).

4          Mr. Musika's advocacy would prejudicially allow him to confuse the jury with a claim to

5   disgorge the entire revenue, not merely profits, of the accused products.   On its face, it is absurd

6   to say that the jury should give Samsung zero credit for the actual costs it incurred in making and

7   selling the accused devices.   Mr. Musika's criticisms of Samsung's cost data – which are easily

8   refuted[5] – are motivated only by the shock value of the resulting dollar amount.   While Mr.

9   Musika admits that he identified at least $4.5 billion in actual costs (Martin Decl. Ex. 2 at 146:2-

10  8), he seeks to advocate to the jury that it disregard those costs and grant Apple a $4.5 billion

11  windfall.   (Martin Decl. Ex. 5 at 7.)   That is improper and highly prejudicial.   The Court in its

12  role as gatekeeper should exclude Mr. Musika from disputing any of Samsung's costs.   *See*

13  *Uniloc*, 632 F.3d at 1320 ("This case provides a good example of the danger of admitting

14  consideration of the entire market value … The disclosure that a company has made $19 billion

15  dollars in revenue from an infringing product cannot help but skew the damages horizon for the

16  jury").

17          **D.    If Mr. Musika Is Allowed to Give an Opinion on Damages, His Pre-Notice**
                    **Damages Should Be Subtracted**

18

19          Apple's claims for damages for infringement are limited to the period after Samsung

20  received actual notice, because Apple admits it does not mark its products.   (Martin Decl. Ex. 8 at

21  1-2.)   35 U.S.C. § 287; *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir.

22  1993); *Nike, Inc. v. Walmart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998) (marking applies

23  to design patents); *Coach Inc. v. Asia Pac. Trading Co.*, 676 F. Supp. 2d 914, 924 (C.D. Cal.

24  _____

25          [5]   In a striking example of the futility of Musika's complaints, his supplemental report makes
        more serious errors.   For example, his first report relied on an Apple document reporting 1st

26      quarter 2012 domestic revenue of $9.358 billion.   (Martin Decl. Ex. 6.)   In his supplemental
        report, he substituted a new Apple document reporting that figure as $9.393 billion -- a difference

27      of $35 million.   (Martin Decl. Ex. 7.)   Mr. Musika did not find it necessary to explain the $35
        million discrepancy in Apple's financial production.

28

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

1   2009) (where plaintiff sues under both 15 U.S.C. §§ 1114 and 1125(a), "the plain language of

2   § 1117(a) and § 1111 indicates that a plaintiff must meet § 1111's 'actual notice requirement' to

3   recover profits or damages").   Samsung received notice of the '381 patent in August 2010, but

4   Samsung did not receive notice of alleged infringement of the '915 patent, 'D677 patent, or the

5   '983 trade dress registration until Apple's Complaint on April 15, 2011.   Samsung did not receive

6   notice of the '607, '163, 'D334, 'D305, 'D889, or 'D087 patents or the remaining trade dress

7   allegations until Apple's First Amended Complaint on June 16, 2011 (Dkt. No. 75.)   (Martin

8   Decl. Ex. 9 at 9-11.)

9          Apple provided Mr. Musika no evidence of when Samsung was on notice of its patents or

10  trade dress prior to Apple's filings in this case.   (*See* Martin Decl. Ex. 3 at 26.)   Despite this, Mr.

11  Musika chose (or was directed) to inflate his damage numbers by calculating back damages for

12  many months before Samsung received notice of Apple's claims.   (*See, e.g.,* Martin Decl. Ex. 10

13  at 17.2S – 17.3S.)   Under these circumstances, if the Court permits Mr. Musika to testify to

14  alleged damages, he should be required to subtract any calculated amount of pre-notice damages

15  in his Report (whether lost profits, disgorgement or reasonable royalty) from his concluded

16  damages figures.

17       **E.**    <u>**The Court Should Again Reject Mr. Musika's Speculation Regarding Alleged**</u>
    <u>**Irreparable Harm For Failure to Show Any Nexus**</u>

18

19          Mr. Musika's Report restates his speculative opinions on alleged irreparable harm from his

20  earlier Reply Declaration in support of Apple's Motion for Preliminary Injunction to Apple.   (*See*

21  Dkt. No. 419).   The Court already rejected those speculative opinions, emphasizing that Apple

22  failed to show the necessary nexus between alleged harm to Apple and Samsung's allegedly

23  infringing conduct.   (Dkt. No. 449 at 33-34.)   The Federal Circuit affirmed the necessity of a

24  showing of nexus and Apple's failure to do so, over Apple's objections.   *Apple v Samsung Elecs*.,

25  No. 12-1105, *Op. Cit.* at 16 (Fed. Cir. May 14, 2012)   Mr. Musika's Report does not address the

26  required nexus showing – even though it was law of the case at the time – and therefore his

27  opinions on irreparable harm are legally insufficient and should be excluded.

28

1    **III.    THE COURT SHOULD EXCLUDE THE OPINIONS OF JOHN HAUSER**

2         John Hauser is an expert hired by Apple "to design and conduct two surveys—one for

3    smartphones and one for tablets—to determine the price premium, if any, that Samsung consumers

4    are willing to pay for the features associated with the patents at issue."   (Martin Decl. Ex. 11,

5    Hauser Report at 6).   The purpose of the Hauser report is purportedly to support Mr. Musika's

6    damages analysis.   Dr. Hauser's opinion should be excluded because (1) he failed to retain and

7    produce raw data on which he relied; and (2) he used utterly unreliable methodology.

8         To design his surveys, Dr. Hauser hired his own company called Applied Marketing

9    Science ("AMS") "to conduct in-depth interviews with current Samsung smartphone and tablet

10   owners."   (*Id.* at 20).   According to Dr. Hauser "[a] total of 20 interviews were conducted [and]

11   were approximately 30 – 45 minutes in length."   (*Id.*).   These interviews took place over the

12   course of approximately two weeks.   (Martin Decl. Ex. 12, Hauser Dep. Tr. at 74:6-16).   After

13   the interviews were completed, the interviewers purportedly relayed their substance to Dr. Hauser,

14   who then allegedly used the interviews to choose the features he included in his surveys and to

15   make them "realistic and minimize[] demand artifacts."   (Martin Decl. Ex. 11 at 21).

16        When Samsung requested all the notes, videos or other materials that were used in or

17   recorded these 20 interviews, it was told there were none – not a single note, email, script, or

18   recording of even one of these 20 interviews, the foundation of Dr. Hauser's surveys.[6]   (*See*

19   Martin Decl. Exs. 13 – 14.)   In fact, Dr. Hauser insists that he directed the interviewers *not* to

20   take any notes, and that the interviewers were able to memorize and accurately convey the

21   substance of twenty 30-45 minute interviews to him over the telephone two weeks after they

22   occurred.   (Martin Decl. Ex. 12 at 55:24-56:19 (Q. Okay. So all your communications with her

23   about the in-depth interviews, they were oral? A. To the best of my recollection, they were oral.),

24   62:7-9, 73:6-74:21.)   Dr. Hauser also insists the interviews were conducted properly, even though

25   he has no written evidence of this, and even though he was unable to identify a single question

26   _____

27   [6]   Nothing is known of these 20 people, including whether they actually owned Samsung
     devices.   (Martin Decl. Ex. 12 at 26:9-13).

28

1   asked.   (*Id.* at 16:20-17:4, 33:10-18, 41:17-19).

2        Dr. Hauser's ignorance of how the interviews were actually conducted or what was asked

3   or what answers were given is sufficient ground alone to exclude the results of his survey.   *See*

4   *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983)

5   (excluding evidence based on survey where expert "conceded that he had no knowledge of what

6   the interviewers actually did in conducting the interviews and that he had no personal knowledge

7   of whether they, in fact, followed the instructions they were given at the briefing session").   Dr.

8   Hauser's opinions are wholly unreliable because the basis of those opinions – purported Samsung

9   customer interviews – is undocumented and unverifiable.

10        What is more, in *Oracle America, Inc. v. Google Inc.*, 2012 WL 850705 (N.D. Cal. March

11  13, 2012), Judge Alsup recently struck survey results as unreliable because the expert did not test

12  features identified as important during pre-interviews.   *Id.* at *11 ("focus-group research

13  discovered 39 features that real-world consumers said they would have considered when

14  purchasing a smartphone [but] instead of testing 39 features in his conjoint analysis, [the] Dr. [ ]

15  selected seven features to be studied.")   Here, not only does Dr. Hauser admit that he did not test

16  all the features identified in the interviews, he does not even know what they are.   (Martin Decl.

17  Ex. 12 at 109:8-25 (It's not everything they spoke about . . . literally hundreds of things would

18  come up, but . . . I don't recall"), 113:1-10).[7]   Indeed, one cannot but think that Dr. Hauser

19  deliberately instructed the surveyors not to keep notes to avoid the same criticism in this case as in

20  *Oracle*: that he did not test the all the features the consumers identified as important.

21        Dr. Hauser employed the same strange methodology with respect to the pre-tests.   Dr.

22  Hauser purportedly had AMS conduct pre-tests on a small sample of respondents to determine

23  whether they understood his surveys.   Although changes were made to the surveys as a result of

24  _____

25  [7]   Apple's surveys of Android users (Samsung phones run the Android OS) identify the
    desire to remain with their current carrier as the most important factor in their purchase decision.
26  (Martin Decl. Ex. 15 at APLNDC-Y0000028926-930. Similarly, over 30% of smartphone buyers
    surveyed identified GPS location and navigation services as important in their purchase.   (*Id.* at
27  APLNDC-Y0000028876).   Dr. Hauser tested none of these features and "inappropriately focused
    consumers on artificially-selected features." *Oracle*, 2012 WL 850705, at *10.

28

these pre-tests, Apple again insists that no notes or other records exist concerning respondents' answers, other than a one page summary.   (Martin Decl. Ex. 11 at 44.)   In other words, Dr. Hauser once again asks the Court and Samsung to believe that not a single note, e-mail, or memo was generated concerning the alleged 20 pre-tests.   (*Id.* at 43; Exs. 16-17.)

Moreover, Dr. Hauser's survey was addressed to recent Samsung purchasers, rather than the proper universe of all potential Samsung purchasers.   This too is independent grounds to exclude Dr. Hauser's surveys and his corresponding opinions.   *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) ("[T]he survey utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."); *Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981).

Finally, Dr. Hauser did not actually test the patented features.   Instead, he tested attributes fed to him by Apple's counsel, but which do not even comport with Apple's experts' descriptions of the patented features.[8]   The table below illustrates this flaw with respect to the '607 patent:

| Patent | Description of the Patented Feature in the Hauser Survey | Description of the Patented Feature by Apple's Technical Expert | Disparity |
|---|---|---|---|
| '607 | "Whether the smartphone accurately carries out what you intend to do when you touch the screen."[9]<br><br>"Whether the tablet is capable of reliably performing a full range of multi-touch operations."[10]<br><br>For a combination without the patented feature, the animation presented to respondents displays "Intended contact not recognized" multiple times, and the | "[T]he claimed inventions of the '607 Patent relate to a specific configuration of conductive lines and layers that make up the touch panel in a display arrangement. The '607 Patent claims recite an innovative combination of elements including the use of a mutual capacitance touch screen in a truly transparent display that can simultaneously detect and generate signals representing distinct multiple points of actual or near contact and the use of "dummy" visual features (that can be made of the same material as the | No connection between the touchscreen "reliably" doing what "you intend" and the '607 patent. |

---

[8]   Samsung does not accept the descriptions provided by Apple's experts, but has used them here to show that Dr. Hauser's survey descriptions do not even comport with Apple's descriptions of the patented features.   A complete illustration of the disparities between Apple's technical experts and the descriptions in Dr. Hauser's surveys are included in Exhibit 18 to the Martin Declaration.

[9]   Martin Decl. Ex. 11, Hauser Report (Ex. F) at QATTR3.

[10]   Martin Decl. Ex. 11, Hauser Report (Ex. G) at QATTR3.

| Patent | Description of the Patented Feature in the Hauser Survey | Description of the Patented Feature by Apple's Technical Expert | Disparity |
|--------|--------|--------|--------|
| | accompanying narration states "This touchscreen is a single touch screen with very limited multi-touch capability. It reliably tracks single-finger operations like scrolling. Some gestures involving two fingers, like pinch-to-zoom, will work, but with poor response. As a result, the touch screen will not always carry out the two-finger gestures you intend."[11] | conductive lines in the display) to enhance the display."   Maharbiz Opening Report at 8. | |

In short, the tested features were not the patented features.   Therefore the resulting survey data has no relevance to the features and issues involved in this case.   Indeed, both Dr. Hauser and another of Apple's experts, Dr. Rossi, admit that if the patented features are not accurately described, the surveys based on those descriptions are irrelevant to the question of damages. (Martin Decl. Ex. 12 at 229:2-15; Ex. 19, Rossi Rebuttal Report at ¶ 3.)

In short, Dr. Hauser (a) designed his surveys based on interviews and pre-tests, but either deliberately kept no records of them or is withholding them.   Because of this, neither the Court nor Samsung can replicate or assess the reliability of Dr. Hauser's surveys; (b) surveyed the wrong population; and (c) tested features that bear virtually no relationship to even Apple's experts' descriptions of the patents at issue in this case.   His opinions, which are based entirely on the reliability of his surveys, should be excluded.

## IV.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF HENRY URBACH

Mr. Urbach works in the field of "design and culture" (Martin Decl. Ex. 20, Urbach Report at ¶ 3) and unquestionably is a loyal devotee of Apple, its designers, its products,[12] and its retail

---

[11]   Hauser Survey animations, *at* http://www.surveyplus.com/survey1202asts/play_video.asp?vid=32; http://www.surveyplus.com/survey1202asps/play_video.asp?vid=32.

[12]   He has owned every version of the iPhone, and possesses the original version of the iPad. With regard to the iPhone 4 he currently uses, he says he likes "almost everything about it." (Martin Decl. Ex. 21 at 54:18).   He believes the design is "pretty damn good."   (*Id.* at 83:4).   As for the iPad, Mr. Urbach calls it "sexy" and "desirable," almost as though he were discussing a romantic partner.   (*Id.* at 57:18-20).   Mr. Urbach is a self-described admirer of the work of lead iPhone and iPad designer Jonathan Ive, and has been for "[a] decade or so."   (*Id.* at 60:19-23).

(footnote continued)

1    stores, which he finds "fascinating . . . very complex and interesting."   (Martin Decl. Ex. 21,

2    Urbach Dep. Tr. at 70:9-10).[13]   In flowery terms, he explains how successfully designed "objects

3    enter the realm of desire, where their allure transcends issues of utility and function" and that

4    "[c]ertain exceptionally alluring products may even reach the status of fetish."   (Martin Decl. Ex.

5    20 ¶ 16).   Acknowledging that he did not "know much about the particularities of the case," Mr.

6    Urbach understood his role was "to offer the opinion that design matters greatly."   (Martin Decl.

7    Ex. 21 at 81:12-19).   Whether or not this is true, it is not relevant to any issue in this case, which

8    requires Apple to prove the validity of its trademark and trade dress rights, and Samsung's

9    infringement.   Here, as Mr. Urbach acknowledged, he is not opining on trademark or trade dress

10   infringement, validity of trademark or trade dress rights, Apple's patents, trademark applications,

11   trade dress registrations, damages, functionality, consumer confusion, the ordinary observer test,

12   marketing, licensing, or FRAND issues.   (*Id.* at 77-78).   His opinions on Apple's achievement of

13   design excellence or the public's appreciation of that achievement (Martin Decl. Ex. 20 at ¶ 12)

14   are not helpful to the jury and should be excluded.[14]

15          Nor do Mr. Urbach's opinions satisfy the reliability requirement for admissibility.   Rather

16   than base his opinions on any scientific methodology, (Martin Decl. Ex. 21 at 93:21-24; 96:10-15;

17   _____

18   He believes Mr. Ive's work is "exceptionally strong" in comparison to work of other
     contemporary designers of consumer products."   (*Id.* at 60: 8-15).

19      [13]   Before being retained by Apple in this matter, Mr. Urbach wrote an essay on the design of
20   Apple's retail stores, entitled *Gardens of Earthly Delights*, describing them as "[q]uasi-religious in
     almost every respect, . . . chapels for the Information Age."   (Martin Decl. Ex. 22 at APLNDC-
21   Y0000151235.)   Mr. Urbach, who refers to former CEO Steve Jobs as "St. Eve" (*Id.* at APLNDC-
     Y0000151235), believes that "Apple stores are a mirror to our time, insofar as they offer up a kind
22   of theater of transcendence that affirms a belief that we might like to hold about ourselves that
     links information to transcendence."   (Martin Decl. Ex. 21 at 69-70).

23      [14]   *See Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993); *ZF Meritor LLC
24   v. Eaton Corp.*, 646 F. Supp. 2d 663, 665-66, (D. Del. 2009) (holding that an expert's opinion
     must "fit the facts of the case"); *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am., Corp.*, 103 F.
25   Supp. 2d 268, 280 (S.D.N.Y. 2000) ("[T]he testimony must not only be reliable, but must be
     relevant in that it 'fits' the facts of the case.").   "Expert testimony which does not relate to any
26   issue in the case is not relevant, and ergo, non-helpful."   *Daubert*, 509 U.S. at 591. The Court
     should "exclude scientific expert testimony under the second prong of the *Daubert* standard unless
27   it is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'"   *Jones v.
     U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (quoting *Daubert*, 43 F.3d at 1321 n. 17).

28

101:10-16),[15] he used what he called a "cultural interpretation" (*Id.* at 93:17) that considered (1) market success; (2) media representations; and (3) museum worthiness.   (*Id.* at 88:9-25).   He did not know whether this methodology had been used by anyone else to assess design excellence. (*Id.* at 95:23-25).   He acknowledged there are "many different frameworks for looking at objects."   (*Id.* at 95:0-11).

Mr. Urbach's methodology not only is unscientific and novel, but is based solely on his say so, rather than any objectively verifiable data.   For example, he opines that Apple's products "allow, and even demand, aesthetic consideration" (Martin Decl. Ex. 20 at ¶ 18), but admits there is no standard used in his industry or line of work to make such a determination."   (Martin Decl. Ex. 21 at 125-26).   In his words, "[i]t's something one asserts."   (*Id.* at 126:3).   And he candidly acknowledges that while "[a]nyone can assert anything," *his* assertion would "carr[y] more weight" because he claims to be "authorized as an expert in the field."   (*Id.* at 126:4-8).[16] Similarly, with respect to the question of public appreciation of Apple's claimed design excellence, Mr. Urbach acknowledged that "[a]ppreciation is a very hard thing to define."   (*Id.* at 101:2-3).   The best he could do is the famous Potter Stewart description of pornography:   "You know it when you see it, and it's compounded when it's public appreciation."   (*Id.* at 101:3-4). "It's that way, you know, a light goes up – on in someone's eyes when they look at something or the excitement someone has when a new Apple product is about to come out or curiosity that someone has.   It's the opposite of indifference."   (*Id.* at 101:5-9).[17]   "[N]othing in either

---

[15]   Mr. Urbach has no expertise in, and did not rely on, "social scientific methodologies" in forming his opinions.   (Martin Decl. Ex. 21 at 96:10-15; 101:10-16).   He conducted no surveys to support his opinion, and admitted he is not a market researcher.   (*Id.* at 87:8-10; 92:2-3).

[16]   As a result, "it can happen" that the aesthetic quality of the object depends on the expert who's asserting aesthetic consideration of it.   (Martin Decl. Ex. 21 at 9-15). "People can have different opinions about what is aesthetically pleasing."   (*Id.* at 127:21-22).

[17]   When asked whether public appreciation is a "measurable quality," Mr. Urbach protested that the question presumed a "social scientific methodology" that he did not employ, and asserted that "you don't have to quantify it for it to be valid."   (*Id.* at 101:10-16).   Mr. Urbach was not aware of any other person who had assessed the public's appreciation of a company's design achievements in the same manner he had employed.   (*Id.* at 108: 17-21).   He was "not sure" there was any industry standard technique for determining whether the public appreciates a company's
(footnote continued)

*Daubert* or the *Federal Rules of Evidence* requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 147, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)).[18]

Mr. Urbach also failed to consider other reasons for the findings he offers.   For example, he offers an opinion on museum worthiness of Apple products in comparison to others, but admits he did not even investigate the extent to which other products appear in museum collections.   He opines that Apple has achieved design excellence based on the market success of its products, but fails to consider whether any factors other than design, such as price, function, advertising, or availability, account for or contributed to that market success.   (Martin Decl. Ex. 21 at 91-93). When an expert ignores key facts or data contradicting his conclusions, the resulting opinion is inadmissible because it is unreliable.   *See, e.g., In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1181, 1184 (N.D. Cal. 2007) (finding an expert opinion unreliable and inadmissible because the expert ignored evidence contradicting her conclusions); *Reeves v. Commonwealth Edison Co.*, 2008 WL 239030, at *5-7 (N.D. Ill. 2008) (precluding expert's opinions because he ignored key facts).

Finally, Mr. Urbach lacks the qualifications to serve as an expert on Apple's "design excellence" or its public appreciation.[19]   His background is in architecture, not product or object

_____

design achievements and to what extent they appreciate them.   (*Id.* at 109:3-8).   He was not aware of any publication that offers a method for determining the level of public appreciation for a company's design achievement.   (*Id.* at 109:15-19).   And he did not consider any alternative explanations for what he had observed regarding the public's appreciation of Apple's design achievement.   (*Id.* at 110:3-5).

[18]   Equally troubling is Mr. Urbach's reliance on personal anecdotal evidence, such as his story about people asking to see his iPhone in Spain (Urbach Report, ¶ 23) or conversations with friends.   (Urbach Depo. at 96:2-18).   This kind of uncorroborated evidence cannot substitute for rigorous survey or formal interviews, which Mr. Urbach acknowledged he did not conduct, because they were not consistent with his approach.

[19]   A witness may be qualified as an expert "by knowledge, skill, experience, training, or education."   Fed. R. Evid. 702.   The party offering the expert's opinions has the burden to prove such qualifications.   *Gable v. Nat'l Broadcasting Co.*, 727 F. Supp. 2d 815, 833 (C.D. Cal. 2010) (footnote continued)

1    design.   (Martin Decl. Ex. 21 at 15:10-11). He has never served as an expert witness, period, let

2    alone in the area of design of smartphones or tablet computers.   (*Id*. at 74:19-22).   He has never

3    designed any product (*id*. at 66:6-11; 82:20-21) ("I'm not a designer of electronic products"), and

4    has no prior experience with industrial design of any kind.   (*Id*. at 66:18-22).   He is not a market

5    researcher.   His devotion to Apple and ability to wax eloquently about its products and retail

6    stores does not make up for his lack of relevant qualifications.[20]

7    **V.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF SUSAN KARE**

8              Susan Kare describes herself as "an icon designer and user interface graphic designer" for

9    her own design studio.   (Martin Decl. Ex. 23, Kare Report at ¶ 2).   She worked for the Plaintiff

10   as a graphic artist and creative director in the 1980s, and then followed Steve Jobs to NeXT, Inc.

11   (*Id*. ¶ 6).   Ms. Kare has opined that certain icons and the applications screen for the Samsung

12   accused products have "similarities" with the icons and home screen in the Apple iPhone products,

13   which "could cause users to see them as coming from the same company or source, or

14   representing the same brand."   (*Id*. ¶¶58-64, 71).   Ms. Kare offers her opinion that the "pattern of

15   similarities supports the possibility that the iPhone Devices' screen graphics influenced and served

16   as a guide for the design of the applications screens of Samsung phones."   (*Id*. ¶ 76).   The

17   problem with her opinions on substantial similarity, likelihood of confusion, and "possible"

18   _____

19   (citing *U.S. v. 87.98 Acres of Land More or Less in the County of Merced*, 530 F.3d 899, 904-05
     (9th Cir. 2008) and *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003)).

20        [20]   Moreover, even if Mr. Urbach could qualify as an expert in something, "not every opinion
     offered by an expert is an expert opinion.   Rule 702 'does not afford the expert unlimited license

21   to testify ... without first relating that testimony to some "specialized knowledge" on the expert's
     part....'.   Put another way, an expert's opinion 'must be an "expert" opinion (that is, an opinion

22   informed by the witness' expertise) rather than simply an opinion broached by a purported
     expert.'"   *Textron Inc. By & Through Homelite Div. v. Barber-Colman Co.*, 903 F. Supp. 1570,

23   1575 (W.D.N.C. 1995) (citing *U.S. v. Johnson*, 54 F.3d 1150, 1157 (4th Cir. 1995) and *U.S. v.
     Benson*, 941 F.2d 598, 604 (7th Cir. 1991)).   Mr. Urbach has admitted he has no experience in

24   product design, or marketing, and therefore any opinions he could offer would be beyond his area
     of expertise.   *See U.S. v. Chang*, 207 F.3d 1169, 1172-1173 (9th Cir. 2000) (district court did not

25   abuse its discretion in precluding expert from testifying regarding matters beyond scope of
     expertise); *Nimely v. City of New York*, 414 F.3d 381, 399, n.13 (2d Cir. 2005) (holding that

26   "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it
     by no means follows that he or she is qualified to express expert opinions as to other fields").

27

28

1    copying, however, is that they are completely divorced from the law that governs these issues.

2    Ms. Kare testified that the only legal principles she applied were those "included in her report"

3    (Martin Decl. Ex. 24, Kare Dep. Tr. at 60:18-61:1), *but her report does not describe any legal*

4    *principles nor cite to any legal authorities*.

5         With regard to substantial similarity, the law requires that any functional aspects of the

6    design are removed from the analysis, because design patents only protect ornamental aspects of

7    the design.   *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).   A trade

8    dress can be "aesthetically functional" where the aesthetics of the trade dress itself drives

9    consumer demand for the product."   *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S.

10   23, 33 (2001).   Ms. Kare did not consider aesthetic functionality in her analysis.   (Martin Decl.

11   Ex. 24 at 203:14-20).

12        Nor did she consider only the novel features of Apple's design patents in comparison to

13   prior art (*Id.* at 78:21-79:8) (" I didn't – I specifically wasn't asked to evaluate [the '334 patent] in

14   light of everything that has come before."), which also is required before evaluating substantial

15   similarity.   *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008)

16   (whether designs are substantially the same is determined from the perspective of a hypothetical

17   "ordinary observer," who is assumed to have familiarity with all relevant prior art and who

18   considers the accused design "giving such attention as a purchaser usually gives").

19        Ms. Kare did not consider (or have the expertise to evaluate) how the ordinary observer

20   would perceive the Apple products or the Samsung accused products.[21]   She admitted she could

21   not speak to – and did not have any deep background on – who the user of Apple's iPhone was.

22   (*Id.* at 94:7-14).   She did not have "anything" to say "about that ordinary person" and did not

---

23

24   [21]    An ordinary observer is "a person who is either a purchase of, or sufficiently interested in,
     the item that displays the patented designs and who has the capability of making a reasonably
25   discerning decision when observing the accused item's design whether the accused item is
     substantially the same as the item claimed in the design patent."   *Arminak & Assocs., Inc. v. Saint*
26   *Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007); *Dreamworks Production Group, Inc.*
     *v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The test for likelihood of confusion is
27   whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the
     origin of the good . . . .").

28

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

"know how the law defines ordinary person."   (*Id.* at 185:24-25; 186:14-15).   She was not aware of any characteristics of a likely purchaser of a Samsung smartphone.   (*Id.* at 187:16-19).   In short, Ms. Kare did not consider the factors required for a design patent infringement analysis.

Ms. Kare's likelihood of confusion opinion is equally untethered to the governing legal principles.   While "similarity in appearance" is but one of eight factors that must be considered in evaluating likelihood of confusion in the trademark and trade dress context, *AMF v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979), it is the *only* factor Ms. Kare considered in her analysis (Martin Decl. Ex. 24 at 183:8-18) and her evaluation of this factor was based solely "on a visual analysis."   (*Id.* at 184:11)   She acknowledged, for example, that she was not asked about sophistication of the purchasers.   (*Id.* at 183:15-18)

Finally, Ms. Kare's opinion that it is "possible" that Samsung used Apple's icon design and layout as a guide in creating the icon designs and layout of the applications screens of the Samsung phones should be excluded because the facts regarding what Samsung did or did not do is not a proper subject of expert testimony.   *See OPS2*, 2012 WL 424856, at *5 (excluding expert testimony containing "recitations of facts of the case").   Even if it were, Ms. Kare is not a psychologist and has no qualifications to support the introduction of her speculative testimony about Samsung's state of mind and what steps it actually took.

## VI.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF RUSSELL WINER

Russell Winer is a marketing expert whose opinions read like a closing argument Apple would make to the jury on the issues of trade dress infringement and dilution.   Rather than apply any particular marketing expertise or the results of his own surveys or other work product, Professor Winer simply acts as a summary witness, reciting argumentative conclusions based upon surveys conducted by other experts designated by Apple, press stories, and various Apple internal documents.   Based on these materials, Professor Winer concludes that Apple's claimed trade dress for the iPhone and iPad is distinctive and famous, and then marches through the *Sleekcraft* and statutory dilution factors to opine that Samsung has engaged in infringement and dilution.

This sort of "closing argument" masquerading as an expert opinion does not "assist the trier of fact" and fails to satisfy the requirements of Rule 702.   *OPS2*, *supra* 2012 WL 424856, at

1   *5 (excluding opinion testimony that "offers nothing more than what defense counsel could argue

2   during closing arguments").   As the Ninth Circuit has held, "a party is not entitled to have an

3   expert testify solely because that witness can eloquently summarize the evidence.   That job

4   belongs to counsel."   *Rogers*, *supra*, 922 F.2d at 1431.   The jury is perfectly capable of

5   considering the facts presented at trial, and counsel's arguments regarding how those facts relate

6   to the relevant legal factors for likelihood of confusion or dilution, and making up its own mind

7   about whether Apple has proven its claims.   Professor Winer's opinions are therefore not helpful

8   and should be excluded.   *Hendrix v. Evenflo Company, Inc.*, 255 F.R.D. 568,579 (N.D. Fla. 2009)

9   (expert should not be permitted to testify about lay matters which a jury is capable of

10   understanding and deciding without the expert's help).   "Otherwise, there is a risk the trier of fact

11   will give the expert testimony undue weight on account of its special status."   *Id.*[22]

12       Beyond his summary testimony on infringement and dilution, Professor Winer offers

13   completely irrelevant generic opinions about brands, including explaining what a brand is, brand

14   identity, brand image, and the benefits of strong brands and brand equity.   (Martin Decl. Ex. 26,

15   Winer Report ¶¶ 25-37).   He then opines that Apple's brand is compelling and very strong, and its

16   brand equity is among the highest in the world.   (*Id.* ¶¶ 38-81).   Apart from being entirely

17   duplicative of the opinions of another expert designated by Apple, Sanjay Sood, these opinions are

18   not relevant to any issue in the case.   The question on Apple's trade dress claims is whether Apple

19   has valid trade dress rights based on the particular aspects it has claimed, and, if so, whether

20   Samsung has infringed or diluted that trade dress.   Professor Winer acknowledges that "a brand is

21   much more than a product" (*Id.* ¶ 26) and that the branding and success he ascribes to Apple's

22   iPhone, iPad, and iPod Touch products is a function not of the trade dress, but of "a combination

23   of a high degree of innovation and cutting-edge technology and a unique and distinctive look and

24

---

25       [22]    Professor Winer lacks any specialized expertise to opine on the application of the

26   *Sleekcraft* factors, as he has never engaged in such analysis before, knows nothing in the peer-
     reviewed literature where these factors are applied, and has never written any kind of scholarly

27   article or published materials where he applied the methodology of these factors.   (Martin Decl.
     Ex. 25, Winer Dep. Tr. at 244-246).

28

feel[.]"   (*Id.* ¶ 81).   Testimony about branding in general, and about Apple's brand in particular, is simply not relevant to Apple's trade dress claims, and will only confuse the jury.

Even if Professor Winer's opinions otherwise satisfied the requirements of Rule 702 and *Daubert*, and they do not, the Court should exclude his testimony under Federal Rule of Evidence 403, as any probative value it might have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence.[23]   Professor Winer's opinions are cumulative of the opinions of other experts Apple has designated, including the two survey experts upon which Professor Winer expressly relies (Hal Poret and Kent Van Liere) (*see* Martin Decl. Ex. 26 at ¶ 23), and Professor Sanjay Sood, who also opines on the irrelevant topic of branding and Apple's branding strategy.   (Martin Decl. Ex. 27, Sood Report at 11-32).   *See United States v. Alisal Water Corp.*, 431 F.3d 643, 660 (9th Cir. 2005) (affirming exclusion of cumulative expert testimony).   Moreover, because Professor Winer simply summarizes other testimony, but with imprimatur of an expert, or otherwise offers opinions on matters that are wholly irrelevant, his opinions are likely to confuse and mislead the jury, and unfairly prejudice Samsung.   They should be excluded under Rule 403.[24]

## VII.   THE COURT SHOULD EXCLUDE THE OPINIONS OF DR. SANJAY SOOD

Dr. Sanjay Sood is an expert hired by Apple to opine that (1) design is important in consumer choice, (2) building a brand is important for a company, (3) the brand "Apple" is particularly strong and closely tied to "design," (4) consumers who are asked why they bought a

---

[23]   "It is particularly appropriate for the trial judge carefully to weigh the potential for confusion in the balance when expert testimony is proffered.   Jurors may well assume that an expert, unlike an ordinary mortal, will offer an authoritative view on the issues addressed; if what an expert has to says is instead tangential to the real issues, the jury may follow the 'expert' down the garden path and thus focus unduly on the expert's issues to the detriment of the issues that are in fact controlling."   *Rogers,* 922 F.2d at 1431.   "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against it potential to mislead or confuse."   *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

[24]   Samsung expressly seeks exclusion for each of the experts addressed in this motion under Rule 403, in addition to Rule 702, as in each case, even if relevant, any minimal relevance is substantially outweighed by the likelihood of jury confusion, and severe prejudice to Samsung.

1   particular product might not identify design as a primary driver of their purchase, and (5) if

2   Samsung's products appear to be substantially similar to Apple's products, they might dilute

3   Apple's brand.   (Martin Decl. Ex. 27, Sood Report at 3-28)   However, **none** of these opinions are

4   tied to the patents or trade dress at issue in this case or **any** of the accused products in this case.

5   As noted above in the discussion of the opinions of Mr. Urbach, expert opinions that are not tied

6   to the matters before the fact finder are not helpful to the jury and should be excluded.

7          Moreover, Dr. Sood bases opinions (1) and (3) on consumer surveys that he had

8   conducted.   However, the products he used for those surveys were not the products at issue in this

9   case; they were tape dispensers, blenders, CD alarm clocks, desk lamps, and wall clocks (*Id.* at 7)

10   – simple, inexpensive devices far different from the smartphones and computer tablets at issue in

11   this case.   Moreover, the populations Dr. Sood surveyed were students at one university.   He

12   made no effort to match the population to potential buyers of any of the products at issue in this

13   case.   (Martin Decl. Ex. 28, Sood Dep. Tr. at 116:17-122:17).   That alone is sufficient reason to

14   exclude Dr. Sood's opinions.[25]   Finally, Dr. Sood's survey-based opinions must be excluded

15   because neither he nor Apple produced the written questionnaires on which they were based.[26]

16   (Martin Decl. Ex. 28 at 90:25 – 91:19; Ex. 29.)

17   **VIII.   THE COURT SHOULD EXCLUDE THE OPINIONS OF MICHAEL WALKER**

18          Dr. Michael Walker is an expert hired by Apple to support its FRAND defense.   Apple

19   relies on Dr. Walker, who has been involved at the ETSI standards body since 1988 and until

---

21   [25]   *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984)
22   (affirming summary judgment despite contrary survey because "the survey utilized an improper
     universe in that it was conducted among individuals who had already purchased or leased Donkey
23   Kong machines rather than those who were contemplating a purchase or lease.") *citing American
     Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 661 n. 4 (2d Cir. 1979);   *Dreyfus Fund
     Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y. 1981).

24   [26]   *See, e.g., Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th
25   Cir. 1997) (affirming district court discounting evidence based on survey where survey "did not
     require recording of verbatim responses"); *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.
26   Supp. 1189, 1205 (E.D.N.Y. 1983) (excluding evidence based on survey where expert "conceded
     that he had no knowledge of what the interviewers actually did in conducting the interviews and
27   that he had no personal knowledge of whether they, in fact, followed the instructions they were
     given at the briefing session").

28

1    recently served as the Chairman of its Board, to support its contention that "Samsung failed to

2    timely disclose its allegedly essential patents in accordance with the requirements of the ETSI IPR

3    Policy."  (Dkt. 381 at ¶ 183.)   Although it is undisputed that Samsung did disclose applications

4    in the families of all the declared essential patents-in-suit to ETSI, Dr. Walker asserts that

5    Samsung was obligated to disclose the original Korean priority applications, and in one case a

6    U.S. application, underlying the declared essential patents-in-suit either on or before the so-called

7    "Freeze Date" when a technical specification based on an allegedly related Samsung proposal was

8    finalized.  (*See* Martin Decl. Ex. 30, Walker Dep. Tr. 166:10-186:12.)   Because these opinions

9    are speculative and unsupported by any factual analysis, they should be excluded.

10          For Samsung to have been obligated to disclose the priority applications underlying the

11   declared essential patents-in-suit to ETSI before the alleged Freeze Date, Samsung must have been

12   aware that they covered or were likely to cover Essential IPRs as defined in the ETSI IPR Policy.

13   (*Id.* at 89:9-25, 138:8-23.)   An IPR within the meaning of the ETSI IPR Policy includes patents

14   and patent applications, but as Dr. Walker agreed, "does not include confidential information or

15   rights relating to confidential information."   (*Id.* at 71:3-72:3; 176:5-178:7.)   Although there are

16   "patent applications that have been published," Dr. Walker agreed there are also patent

17   applications "that are treated as confidential by the Patent Office."   (*Id.* at 244:17-25; 60:8-18;

18   63:21-64:10 (U.S. patent applications), 175:6-25 (Korean patent applications).)   For a non-

19   confidential IPR to be Essential to an ETSI standard, it must not be possible to "actually,

20   physically" practice the standard without infringing that IPR.   (*Id.* at 72:4-74:13; 96:7-16; 109:2-

21   17.)   Dr. Walker agreed that to determine whether you are infringing an IPR, you would "have to

22   look at the claim[s] of that IPR to see what the claims cover."   (*Id.* at 73:4-19; 103:18-107:18;

23   64:11-22.)

24          Accordingly, for Dr. Walker's opinions to have any reliable basis at all, it was up to him to

25   show that each of the priority applications were not confidential and contained at least one claim

26   that should have led Samsung to conclude the IPR was essential or likely to become essential to an

27   ETSI standard, as well as Samsung's awareness of that fact.   *Cf. Rambus Inc. v. Infineon Techs.*

28   *Ag*, 318 F.3d 1081, 1102-03 (Fed. Cir. 2003) (reversing the district court's denial JMOL where,

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

under the SSO's Rules, a SSO member had an obligation to disclose IPR with claims that objectively read on the standards under consideration).   But Dr. Walker never even attempted to do so, admitting during his deposition that he:

- never reviewed a single one of the Korean or U.S. applications underlying the declared essential patents-in-suit (*Id.* at 23:10-24:7, 141:2-20, 174:1-10, 208:1-9, 212:10-22, 223:8-224:2, 229:23-230:5, 239:3-25, 249:19-25, 258:13-17);

- never determined whether any of the underlying applications had been published (or otherwise become non-confidential) as of the freeze date (*id.* at 205:7-25, 209:23-210:1, 233:17-20, 243:23-244:2, 249:16-18, 261:15-19);

- had no way of knowing whether any of these applications contained a claim as of the alleged freeze date that would have rendered them essential or likely essential (*id.* at 209:6-22, 210:2-15, 212:10-22, 232:14-233:16, 243:1-20, 251:6-20, 260:21-261:13); and,

- did not investigate whether Samsung actually had knowledge that the IPR was essential (*id.* at 112:16-114:8, 234:16-235:16, 245:7-25, 252:16-253:8, 263:10-263:24).[27]

Because Dr. Walker's opinions fail to meet the requirements of Rule 702(b), they should be excluded.[28]   *See Major League Baseball Props., Inc. v. Calvino, Inc.*, 542 F. 3d 290, 311 (2d Cir. 2008); Fed. R. Ev. 702(b) (testimony of an expert must be "based on sufficient facts or data").

---

[27]Dr. Walker's testimony concerning his analysis of the '516 patent-in-suit is instructive:

Q.   And can you say whether any of these five Korean patent applications underlying the '516 patent contained the claim as of June 2005 that should have led Samsung to conclude that one or more of these applications was essential or likely to become essential to the 25.214 standard?

A.   Having not read any of them, I cannot say what they may or may not have contained or claimed.

Q.   And do you know whether any of these Korean patent applications were ever published by the Korean Patent Office?

A.   No, I do not know that.

Q.   And so if you wanted to determine whether one or more of these Korean patent applications contained a claim that would have been essential or likely to become essential to the ETSI UMTS standard, you would need to compare the claims of these Korean patent applications to the relevant ETSI standard or proposal; is that correct?

A.   That is correct, yes.

Q.   And as of today, you haven't done that?

A.   No.   As I stated, I've not looked at the patent, so that comparison has not been made by me.

(Martin Decl. Ex. 30 at 209:13-210:12; *see also id.* 233:2-234:2; 234:16-235:19 ('867 patent); 243:14-244:16; 245:7-25 ('410 patent); 249:7-252:5('604 patent); 257:5-258:23; 260:21-261:24 ('941 patent.)

-24-                                        Case No. 11-cv-01846-LHK

**MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**

**IX.    THE COURT SHOULD EXCLUDE THE LEGAL OPINION OF RICHARD L. DONALDSON**

Richard L. Donaldson is an attorney whose opinions are offered by Apple in support of its FRAND defense.   On pages 34 through 37 of Report, Mr. Donaldson asserts that the sales to Apple of the Intel PMB 8878 and PMB 9801 chipsets are authorized under the terms of a licensing agreement between Samsung and Intel, as amended.   (Martin Decl. Ex. 32, Donaldson Report at 34-35).   Under California law, which governs the Agreement (Martin Decl. Ex. 33 at S-794-ITC-000000048), the legal interpretation of a contract is a matter of law for the Court to decide exclusively.   *CLRB Hanson Indus., LLC v. Google Inc.*, 2008 WL 2079200, at *3 (N.D. Cal. May 14, 2008) ("Under California law, interpretation of the language of a contract is a question of law, to be determined exclusively by the court").   This is not a proper subject of expert testimony. *OPS2,* 2012 WL 424856, at *4.[29]

DATED: May 17, 2012

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Victoria F. Maroulis*
Victoria F. Maroulis
Attorneys for SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

---

[28]    Dr. Walker also lacks the requisite expertise and experience for his opinions, admitting he:   1) has no knowledge of the timeliness of the IPR disclosures of any major ETSI member; 2) is unaware of any concerns ever having been expressed within ETSI concerning timeliness of IPR disclosures; 3) is unaware of ETSI ever having specified any consequences for failure to timely disclose an IPR; 4) is not aware of any data collected on this subject; 5) is not aware of anyone including Samsung ever having been accused of failing to timely disclose; and, 6) did not familiarize himself with any industry research studies analyzing the timeliness of patent disclosures as part of his preparation for this case.   (Martin Decl. Ex. 30 at 271:24-272:2, 272:14-275:9, 277:6-12, 313:13-314:18.)

[29]    Apple does not argue that the Agreement is ambiguous such that extrinsic evidence should be admitted to aid in interpreting the Agreement.   However, even if Apple made such an argument, Mr. Donaldson was not involved in negotiating the Agreement and did not speak to anyone who was.   (Martin Decl. Ex. 34, Donaldson Dep. Tr. at 201:1-202:11).   He could not offer any facts pertinent to interpreting the Agreement.