Exhibit 2

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

APPLE INC.,

                  Plaintiff,

    v.

SAMSUNG ELECTRONICS CO., LTD., A
Korean business entity; SAMSUNG
ELECTRONICS AMERICA, INC., a New York
corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC, a
Delaware limited liability company,

                Defendants.

Case No.  11-cv-01846-LHK

**EXPERT REPORT OF JOHN R.
HAUSER**

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS CONFIDENTIAL –
PURSUANT TO A PROTECTIVE ORDER\*\***

**UNITED STATES DISTRICT COURT**

11.   My work is ongoing; I may update and revise my results and conclusions as I review additional data and information. A complete list of materials I have considered to date in connection with this particular assignment is included as Exhibit C. To the extent that I review additional information, I will supplement this list.

### III. Summary of Conclusions

12.   I designed and conducted two separate surveys—one for smartphones and one for tablets— to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue. For smartphones, I tested the '828 Patent, the '915 Patent, and a combination of the '381 Patent, '163 Patent, and '915 Patent.[5] For tablets, I tested the '607 Patent, the '915 Patent, and a combination of the '381 Patent, '163 Patent, and '915 Patent.

13.   My analysis shows that, for both smartphones and tablets, Samsung consumers are willing to pay a significant price premium for the tested features that are covered by the patents at issue. For smartphones with a base price of $199, the estimated price premium is $39 for the '915 Patent alone. In other words, if a Samsung smartphone without the features associated with the '915 Patent is priced at $199, I find that consumers would be willing to pay an additional $39 for an otherwise-identical Samsung smartphone that has the features associated with the '915 Patent. With the same base price of $199, the estimated price premium is $100 for the '915, '163 and

---

[5]   I have been informed by counsel that the '828 Patent is no longer relevant for the purposes of my report. Because I received this information after the survey was conducted, my survey includes functionality associated with the '828 Patent. However, I am not offering any opinions relating to the '828 patent.

'381 Patents taken together.

14.     For tablets with a base price of $499, the estimated price premium is $58 for the '607

        Patent alone, $45 for the '915 Patent alone, and $90 for the '915, '163 and '381 Patents

        taken together.


## IV. Overview of Methodology

15.     The basic survey methodology that I selected is known as web-based conjoint analysis.

        Conjoint analysis is a tool that enjoys wide use in the field of marketing research. It was

        introduced to the field of marketing research in 1971 and is generally recognized by

        marketing science academics and industry practitioners to be the most widely studied

        and applied form of quantitative consumer preference measurement. It has been shown

        to provide valid and reliable measures of consumer preferences, and these preferences

        have been shown to provide valid and reliable forecasts of what consumers will do (or

        would have done) under scenarios related to those measured.[6]

16.     For example, under the auspices of MIT's Virtual Consumer Initiative, my colleagues

        and I undertook large-scale tests of the validity of web-based conjoint analysis.

        Predictions were highly accurate, predicting future choices consumers would make in a

        subsequent test with real money at stake and predicting what would happen in the

        marketplace. One of the scientific papers discussing the validity test received two

        highly prestigious awards as the best paper in the marketing sciences literature for 2003

---

[6]   Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," *Advances in Marketing Research: Progress and Prospects*, Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

8

(awarded in 2004) and for the best paper based on a dissertation (awarded in June 2005).[7] Another scientific paper was a finalist for the best paper in 2002 in the *Journal of Product Innovation Management* and still a third paper was a finalist for the best contribution to the practice of marketing research in 2003.[8] Many successful products, including automobiles, hotel chains, the EZ Pass system, HMOs, and cameras, have been developed using conjoint analysis.[9]

17. The general idea behind conjoint analysis is that consumers' preferences for a particular product are driven by features or descriptions of features embodied in that product. For example, in the smartphone survey I conducted here, I included the following features: (i) capabilities of its touchscreen; (ii) size and weight; (iii) camera; (iv) storage; (v) connectivity; (vi) number of apps; and (vii) price. A feature (sometimes called an attribute), such as storage or capacity, can have different levels of values. In the smartphone survey, for example, the different levels of memory that were included were: (1) 8 gigabytes ("GB"), (2) 16 GB, (3) 32 GB, or (4) 64 GB.

18. There are many forms of conjoint analysis. For this assignment, I selected a form of conjoint analysis known as Choice-Based Conjoint ("CBC") analysis. In CBC, consumers are shown products generated as different combinations of features.

---

[7]   Toubia, Olivier, Duncan I. Simester, John R. Hauser, and Ely Dahan (2003), "Fast Polyhedral Adaptive Conjoint Estimation," *Marketing Science*, 22, 3, (Summer), pp. 273–303.

[8]   Dahan, Ely and John R. Hauser (2002), "The Virtual Customer," *Journal of Product Innovation Management*, 19, 5, (September), pp. 332–354; Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), pp. 116–131.

[9]   Green, Paul E., Abba M. Krieger, and Yoram Wind (2001), "Thirty Years of Conjoint Analysis: Reflections and Prospects," *Interfaces*, 31, 3, (May-June), pp. S53–S76. Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," *Market Research and Modeling: Progress and Prospects,* Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

Respondents are shown these products in sets (called the "choice sets" or "choice tasks") and are asked to choose the product that they most prefer, that is, the profile that they would choose if the choice set described the only products that were available to them. I chose to show respondents four products in each choice set. I have used four-product choice sets in other applications, including award-winning academic articles and in litigation. I have found the data to be both reliable and valid.[10]

19. Conjoint analysis provides respondents with realistic choices among hypothetical products that vary simultaneously on multiple features. This realism enhances the predictive ability and hence reliability and validity of the conjoint analysis task. Furthermore, because multiple features are varying simultaneously, the task does not cause the respondent to focus artificially on a single feature. By avoiding such a focus conjoint analysis minimizes any demand artifacts that might be induced. A demand artifact is akin to a leading question.[11] A multi-feature task discourages respondents from guessing that the researcher is interested in a particular feature, which would, in turn, cause the respondent to believe that the researcher is "demanding" a particular response. A multi-feature conjoint analysis task is likely to be more reliable and valid than a task in which the consumer trades off only a single feature and price as would be

---

[10] See, for example, Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), pp. 116–131; Toubia, Olivier, John Hauser and Rosanna Garcia (2007), "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science*, 26, 5, (September-October), pp. 596–610. TiVo Inc. v. Echostar Communications Corp. et al., Case No. 2:04-CV-1-DF, United States District Court for the Eastern District of Texas, Marshall Division.

[11] Demand artifacts are aspects of the study that influence research results based on the chosen procedure rather than based on the phenomenon under study. For a discussion of demand artifacts, see, e.g., Sawyer, Alan G. (1975), "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, 1, 4, (March), pp. 20–30. Shimp, Terence A., Eva M. Hyatt, and David J. Snyder (1991), "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, 18, 3, (December), pp. 273–283.

10

the case in contingent valuation.

20. CBC analysis is consistent with economic and consumer-behavior theories of approximate utility maximization. That is, if a researcher could measure each and every feature of the product and represent consumer utility as a function of those features, then consumer-behavior theory says that consumers would choose the product that maximizes their utility. In conjoint analysis, utility is modeled as having an observed component that is due to the features being varied and an unobserved component that is due to the impact of unobserved features and factors. The observed utility is the sum of the partial contributions of each feature and price (the effect of price is negative). The partial contribution of a level of a feature is known as a "partworth." These partworths are estimated from the respondents' natural choices by established statistical methods.

21. Partworths measure, in units of utility, the <u>relative</u> partial contribution of a feature. For example, if the partworth for 64 GB on memory is 2.9 units of utility and the partworth of 32 GB of memory is 2.1 units of utility, then we can say that the respondent gets 0.8 more units of utility from a smartphone with 64 GB of memory than he/she would have gotten from a smartphone with 32 GB of memory. (0.8 = 2.9 – 2.1). Because we also measure the partial contribution of price decreases in the units of utility, we can compare the utility of a relative change in a feature (say memory) to the relative decrease in price.

22. We estimate the partworths from consumers' choices. I first provide a conceptual example of how partworths may be estimated from consumers' choices. Imagine that we were trying to measure the incremental value of a digital video recorder (DVR) as part of a satellite television service. We would create profiles, each of which described

11

a possible service. For ease of exposition, the example below has only five features –
DVR or not, price, network, number of channels, and number of premium packages. In
a real conjoint task these five features would all vary and the consumer would choose
among different profiles. Again, for ease of exposition, the illustrative example does
not vary features other than the DVR and price. Now imagine we ask the consumer to
make a choice among only these two services. In Table 1A below the respondent
prefers a service with a DVR even though its price per month is $8 higher ($8 = $20 –
$12). Thus, from this choice alone we know that the consumer is willing to pay a price
premium of <u>at least</u> $8 for the DVR. In other words, with all other features held
constant, the consumer prefers to have a DVR for an additional $8. He or she may be
willing to pay more, but we know from this choice exercise that she is willing to pay at
least an $8 premium for the DVR. We call this an inequality constraint because the
difference in the partworths of DVR minus no-DVR is larger than the difference in
partworths between $12 and $20. (Recall that the partworth of $12 is larger than the
partworth of $20, consistent with consumer-behavior theory.)

12

## Table 1A: Conjoint Analysis – Basic Concept
## Price Premium for DVR is at least $8

|  | Product 1 | Product 2 |
|---|---|---|
| Includes DVR | Yes | No |
| Network | Dish | Dish |
| Number of Channels | 120 | 120 |
| Premium Packages | 3 | 3 |
| Price | $20 | $12 |
|  | Chosen | Not Chosen |

23. Now consider another consumer given the same choice but that consumer chooses the service without the DVR at $12. This situation is depicted in Table 1B below. That consumer is willing to pay a price premium of <u>at most</u> $8 for the DVR. This is because he or she chooses not to buy a DVR for an additional $8, so the premium the consumer is willing to pay is at most $8, since the other features are not varied in the choice exercise. This is a second type of inequality constraint.

13

## Table 1B:  Conjoint Analysis – Basic Concept
## Price Premium for DVR is at most $8

|  | Product 1 | Product 2 |
|---|---|---|
| Includes DVR | Yes | No |
| Network | Dish | Dish |
| Number of Channels | 120 | 120 |
| Premium Packages | 3 | 3 |
| Price | $20 | $12 |
|  | Not Chosen | Chosen |

24. Now imagine we give a respondent sixteen such choice tasks—similar to the methodology in the surveys described in my report—where, in each choice task, he or she is asked to choose among four profiles of satellite television service. From every choice task, we obtain three inequality constraints (an inequality constraint may be thought of as a data point) because the chosen product is preferred to each of the other three products. Therefore, a single respondent's choices give 48 data points. When aggregated over a large number of respondents, the CBC exercise gives a rich set of data from which to estimate the partworths. For example, when aggregated over 500 respondents, this gives 48 x 500 = 24,000 data points.

25. Suppose that the five features in the above example each had four levels (for example, the levels for Number of Channels were 80, 120, 160, and 200 channels). Because partworths are relative, there are three (rather than four) relative partworths that we need to estimate. Thus, with five features and four levels we need 3 x 5 = 15

14

partworths. The large number of data points (24,000) is more than adequate to estimate statistics (medians, means, covariances, etc.) for the 15 partworths. Market-level estimates of median (or mean) values and the market-level variation are statistically quite precise.

26. We can make these estimates even more precise when we use information from consumer-behavior theory. For example we know that the partworth of $8 has to be at least as large as the partworth of $20 and we know that the partworth of "with DVR" has to be at least as large as the partworth of "no DVR." This consumer-behavior-theory information also takes the form of inequality constraints and can be thought of as "prior data" in the academic literature.[12]

27. The illustrative DVR example also shows why we focus on market-level information. Although we allow partworths to vary by consumer because some consumers value DVRs highly and some do not, we want to summarize this variation with a relatively small number of statistics. That is, we would rather base our interpretations on the 24,000 data points along with information from consumer-behavior theory. The following example illustrates this market-level versus individual-consumer level issue.

28. Suppose that I want to estimate the probability that a coin flips to heads by observing two independent flips per consumer. If the coin is really a fair coin, the probability of heads is 0.50. If I observe 500 consumers I observe 1,000 flips. The estimated

---

[12] See, for example, Allenby, Greg, Neeraj Arora, and James Ginter (1995), "Incorporating Prior Knowledge into the Analysis of Conjoint Studies," *Journal of Marketing Research*, 32, 2, pp. 152–162. ("Researchers often possess prior information about the partworths, such as the order and range restrictions of product attribute levels. It is known, for example, that consumers would rather pay less for a specific product given that all other product attribute levels are unchanged.")

probability of heads is very likely very close to 0.50, based on the mean or median of the outcomes of 1,000 coin flips. In fact, the expected mean (and median) is 0.50 and the 95% confidence interval is $0.50 \pm 0.04$. This result is at the market level. However, at the level of the individual respondent, because there are only a small number of observations possible for an individual respondent, the estimated probability of heads for an individual respondent is not as precise. Specifically, the only possible outcomes are HH, HT, TH, and TT – each equally likely with a fair coin.[13] Thus, for approximately 25% of the consumers we would observe a 1.00 probability of heads and for 25% of the consumers we would observe a 0.00 probability of heads. We would only observe 0.50 for approximately half of the consumers. In comparison with respondent-level estimates, we get a precise result ($0.50 \pm 0.04$) if our estimate is based on the full sample of all 500 consumers. As this example shows, while estimates based on a small number of observations for each individual may be less precise, the individual-respondent estimates aggregate to a highly precise estimate of the market-level probability that one can rely upon. The same logic applies to conjoint analysis. Using 24,000 inequality constraints gives precise estimates at the market level even if the estimates and predictions for a particular consumer may not be as statistically precise.

29. Before I address the estimation of partworths, I provide one more example to show the power of the market-based approach. Suppose that there are two types of coins, neither fair. (A fair coin is equally likely to come up head or tail.) Coin A returns a head with

---

[13]   Head = H, Tail = T.

probability 0.60 and Coin B returns a head with probability 0.40. (If the coins are distributed equally among consumers, and I choose a consumer randomly, then, a priori, a head is returned with probability 0.50). Now suppose I observe a consumer flip two heads and I want to estimate what type of coin the consumer has. If the coin types are equally likely among consumers, and consumer had Coin A, he/she would have gotten two heads 36% of the time because 0.36 = 0.60 x 0.60. If the consumer had Coin B, he/she would have gotten two heads only 16% of the time because 0.16 = 0.40 x 0.40. Thus if I observe HH, it is more likely the consumer has Coin A than Coin B. The likelihood is about 70%.[14] In other words, I gain information about the type of coin, which I do not observe directly, by observing the outcomes of the flips. This is analogous to how partworths are estimated. We observe choices and the choices enable us to infer the partworths that led to those choices. However, once again, I could infer precisely the distribution of Coin A vs. Coin B in the market, even though I have less precise estimates for each individual consumer.

30.    I use a well-known Bayesian method in which I estimate the distribution of partworths that best describe the choices that I observe among the 455 consumers in the smartphone survey and the 415 consumers in the tablet survey. The statistical method is known as Hierarchical Bayes for Choice-Based Conjoint analysis ("HB CBC"). HB CBC is commonly used in both academic and industry conjoint analyses. I and other researchers have used the approach both in academic research and in offering expert

---

[14]    According to Bayes' Theorem: 0.692 (or about 70%) = 0.36 / (0.36 + 0.16).

opinion in litigation proceedings.[15]

31.     As in the Coin A vs. Coin B example, HB CBC analysis uses survey data on respondents' choices to update prior beliefs (for example, that the partworth of $8 has to be at least as large as the partworth of $20) such that the estimated distribution of partworth for the respondents is improved based on the choices observed in the data.[16] The "hierarchy" part of HB CBC means that the statistical model of the estimation allows variation (or heterogeneity) and correlation across partworths of different respondents when deriving the distribution of partworths across all respondents. Because of the variation and correlation, the distribution of partworths for a subset of respondents is informed by the data of choices by all respondents. I use HB CBC estimation to derive the distribution of partworths across all respondents (as a sample from the consumer population). That distribution and statistics such as the median partworths, median willingness to pay, or fit and validation measures are statistically precise. I report statistical confidence bounds when appropriate.

32.     Analogous to the coin-flipping example, HB CBC estimation enables me to obtain more precise estimates of market-level distributions from less-precise individual-

---

[15]   For surveys of academic research on HB CBC, see, for example, Allenby, Greg M., and Peter E. Rossi (2003), "Perspectives Based on 10 Years of HB in Marketing Research," Sawtooth Software Research Paper Series. Rossi, Peter E. and Greg M. Allenby (2003), "Bayesian Statistics and Marketing," *Marketing Science*, 22, 3, (Summer), pp. 304–328. Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," Advances in Market Research and Modeling: Progress and Prospects, Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

[16]   In the Coin A vs. Coin B example, the prior belief was that the coins were equally likely. I could have used other prior beliefs. For example, if I knew that 80% of the coins in the population were of the A-type, then I would have been more confident that the HH came from an A-type than a B-type. I would have estimated that there was a 90% chance that the coin was on an A-type. In HB CBC, weakly-informative priors are used such that the priors have little impact on the final estimates. The consumer-behavior-theory constraints play an analogous role to prior information.

18

respondent-level estimates. HB CBC partworth estimates are best suited for calculating statistics at the market level, such as the median value of certain variables of interest, and for simulating the overall, aggregate behavior of the market. This is how I use the HB CBC estimates for in this report.

33. The HB CBC method has proven to provide reliable and valid conjoint analysis estimates of partworths.[17] It is an appropriate method to use to obtain the distribution of partworths across consumers when there are a moderate number of choice sets in the choice task. In the study described in this report I chose to use 16 choice tasks – a number that I have used in both academic studies and studies that I have used in litigation. Using sixteen choice tasks enables me to appropriately balance the number of questions in the survey with the number of partworths for which I need to estimate market-level statistics. In my experience, using sixteen choice tasks limits respondent wear-out.[18]

34. Because HB CBC estimation is based directly on consumer choices and accounts for heterogeneity in consumers' preferences, it is, in my opinion, an ideal method to summarize the price premiums that consumers in the market are willing to pay for various features of consumer electronic devices such as smartphones and tablets. When price is one of the measured features in the survey and estimation, we can estimate the

---

[17] For surveys of academic research on HB CBC, see, for example, Allenby, Greg M., and Peter E. Rossi (2003), "Perspectives Based on 10 Years of HB in Marketing Research," Sawtooth Software Research Paper Series. Rossi, Peter E. and Greg M. Allenby (2003), "Bayesian Statistics and Marketing," *Marketing Science*, 22, 3, (Summer), pp. 304–328. Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," Advances in Market Research and Modeling: Progress and Prospects, Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

[18] If too many questions were asked of a respondent, then the respondent might "wear out," that is, response errors might increase as the respondent tires. In addition to limiting the number of questions in the choice task to minimize wear out, I pretested the questionnaire to assure that respondents did not experience wear out.

19

additional price consumers would pay for having a higher level of a feature. As explained in Section X below, I have estimated the price changes needed to make the market or a median consumer "indifferent" between having and not having a product feature associated with the patents at issue.

### V. Questionnaire Development

35.   I began by identifying usage features that consumers' desire in Samsung smartphones and tablets. I instructed AMS to conduct in-depth interviews with current Samsung smartphone and tablet owners. A total of 20 interviews were conducted in the month of February, 2012. The interviews were approximately 30 – 45 minutes in length and included a mix of males and females of different ages. Conversations with consumers were open-ended, seeking consumers' opinions about Samsung smartphones and tablets and details of their experiences with their devices. The interviewers probed the respondents to better understand their use of smartphones and tablets. I have worked with these interviewers before and participated in their training. I am confident that the interviewers probed deeply to uncover consumers' needs.

36.   There were two purposes of these interviews. The first purpose was to identify a reasonable set of features for the conjoint analysis so that respondents would feel they were making realistic choices among smartphone profiles. Because consumers are told to make choices among profiles assuming "all else equal," as is the standard in conjoint analysis, the set of features does not need to be exhaustive. However, a reasonable set of features makes the choices more realistic and minimizes demand artifacts. (Technically, the additive nature of the utility specification combined with the error

term makes it possible to estimate partworths by holding "all else equal." Indeed, there are forms of conjoint analysis, called partial-profile conjoint analysis, that also predict well and that are based on varying only a few features at a time.) The second purpose was to hear the words and phrases that the consumers use in describing smartphones so that the questionnaire uses language commonly used by consumers. For both of these purposes, I was briefed by AMS. As per my standard procedures all interviews were verbal in nature and were not recorded or transcribed. This was sufficient for my purpose in designing the survey. None of these respondents were included in the final analysis because they were not asked to complete the conjoint-analysis survey.

37.     Under my direction, AMS identified typical smartphone usage by owners of Samsung smartphones and tablets. AMS briefed me so that I could select the features and levels to be used in the conjoint analysis. The interviews informed my selection of the appropriate features to include in CBC and to develop the survey questionnaires (one for smartphones and another one for tablets). These interviews were also informative about what consumers perceive as a reasonable range for the various smartphone and tablet features. This understanding of ranges helped me to identify the appropriate levels of the features to include in the survey.

38.     After having been informed about the comments in the qualitative interviews, I selected the following seven features to be included in CBC for both smartphones and tablets: (i) capabilities of the touchscreen; (ii) size and weight; (iii) camera; (iv) storage; (v) connectivity; (vi) number of apps; and (vii) price. Informed by the qualitative interviews the chosen features were sufficiently independent among themselves and sufficiently independent from "held constant" features that an additive utility model

21

was appropriate.[19] Brand (say Samsung or Apple) is not a feature that varies in the conjoint analysis because all smartphone profiles presented to the consumer were hypothetical <u>Samsung</u> smartphone profiles. Respondents were instructed: "Now imagine that you are in the market to buy another Samsung smartphone. The following questions will involve a series of exercises in which you will be shown four different Samsung smartphones at one time."

39.   My choice of the seven features also has external validity. The seven features I selected are also among the features that are highlighted by Samsung on its website for smartphones and tablets.[20] They are also among the features that are used to compare smartphones and tablets by technology websites.[21]

40.   Qualitative interviews are also useful in determining appropriate words and phrases to be used in the survey questionnaires to describe the features of smartphones and tablets. The interviews conducted by AMS helped to assure that the words used to describe the levels of the features would be understood by consumers.

41.   The questionnaires were programmed into a PC-based software system designed for administering and analyzing such questionnaires.[22] The final questionnaires that respondents were asked to complete are shown in Exhibit D (smartphones) and Exhibit E (tablets). Respondents answered these questions in the web survey via their

---

[19]   I review tests of independence in later paragraphs.

[20]   See, for example, www.samsung.com.

[21]   See, for example, http://cell-phones.toptenreviews.com/smartphones/ and http://tablets-review.toptenreviews.com/ (accessed on March 21, 2012)

[22]   I used Sawtooth Software's SSI Web Version 70.0.26 package, which is a well-known and widely used software system for these types of applications.

computers. Exhibit F (smartphones) and Exhibit G (tablets) show reproductions of the computer screens. These are examples of the types of screens that respondents viewed. Some questions, such as the choice task, were chosen based on algorithms that included appropriate randomization to avoid order effects.  In each choice task for each respondent, the levels of the features were generated randomly subject to order and level balancing using standard methods.

## VI. Pretesting the Surveys

42.  Questionnaires should use language that respondents find easy to understand and relevant to the questions that are being asked. If the questions of interest are ambiguous or otherwise unclear, the results of the survey may be impacted due to guessing or misunderstanding on the part of the respondent. To maximize the clarity of the questionnaire, it is useful to gain insight into, for example, how potential respondents think about issues relevant to the target of the study, the extent to which potential respondents are aware of those issues, and the vocabulary used by potential respondents regarding the study target. Therefore, in addition to the in-depth interviews and prior to administering the final survey, it is important to evaluate (or "pretest") the proposed series of questions with a small sample of "the same type of respondents who would be eligible to participate in the full-scale survey."[23] Such pretests help to assess the potential for, and remove or minimize, demand artifacts and to ensure that all survey

---

[23]  Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 388–389.

questions were understood as intended.[24]

43.  In February, 2012, at my direction, experienced interviewers from AMS pretested the survey questionnaire with 20 people in the United States. To qualify for a pretest interview, the interviewee was required to currently own a Samsung smartphone or tablet. The goal of this evaluation was to ensure that respondents could understand and answer questions as the questions were intended to be asked. These responses were used solely for pretesting and are not included in the final survey results.

44.  The pretest interviews themselves are open-ended verbal debriefs of pretest respondents after the respondents have answered the survey questions.[25] These results were reported to me orally by experienced interviewers who debrief respondents under my direction. I have worked with these interviewers before, participated in their training, and provided instructions on how to carry out these pretests.

45.  Pretesting continues until respondents answer the survey questions easily, do not find the questions difficult or ambiguous, and feel that their answers represent their opinions. In this instance, 20 pretest respondents were sufficient for the purpose of ensuring that the questions were understood.

46.  Pretesting also ensured that appropriate vocabulary was used in the questionnaire. Based on the findings from the pretests, AMS fine-tuned the phrasing and words used in the questionnaire to reflect the way in which consumers think about and understand

---

[24]  Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 387–389.

[25]  Urban, Glen L., and John R. Hauser (1980), *Design and Marketing of New Products*, (Englewood Cliffs, NJ; Prentice-Hall, Inc.), p. 179.

Samsung smartphone and tablets. I am confident that the phrasing of the questionnaire was comprehensible and minimized the potential for guessing. Further, information from pretesting helped with the design of instructions and in resolving any technical issues with the animations and audio. These changes ensured that the data were reliable. A summary list of changes to the questionnaires based on the pretests is presented in Exhibit H.

47. During the pretest debriefs, at my direction, experienced interviewers from AMS tested explicitly for demand artifacts. No demand artifacts were detected in the final phrasing and layout of the questions. Respondents did not find the questions to be leading and respondents were not able to guess that any particular result was desired by the survey designer.

## VII. Identifying the Sample

48. For this survey, potential respondents were identified through Research Now, a company that has pre-recruited potential respondents who have indicated their willingness to participate in market research surveys. Research Now is a well-established international market research service firm that maintains an invitation-only panel of over 3.6 million consumers in the United States and over 6 million panelists worldwide.[26] Research Now manages about 2,000 projects per month for a variety of clients.[27]

---

[26] Research Now ARF QEP Panel Profile Snapshots. Research Now Panel Quality: Our Values.

[27] Research Now Panel Quality: Our Values.

49. Both AMS and I have worked with Research Now on a number of other projects. We have each found them to be consistently reliable and a high quality supplier of qualified survey respondents. Research Now automatically checks new panelists for duplicate email addresses at the time for registration. Following initial registration, there are additional checks to identify fraudulent panelists and there is a regular review of member data to validate identities of panel members.[28] As part of the panel recruitment process, all panel members complete a questionnaire that includes basic demographic information (age, gender, etc.). In addition, panel members have the option to answer questions about their personal habits and behaviors (e.g., drinking habits, cell phone usage).

50. Using this information, Research Now was able to target survey invitations to people who had indicated that they own smartphones and tablets. Respondents received an initial e-mail invitation and one e-mail reminder.[29] The invitation included a link to the actual survey which was hosted on a website maintained by AMS.[30] This link contained an embedded identification number that assured that only invited respondents could answer the survey and that each respondent could only complete the survey once.[31] Respondents who qualified and completed the survey were awarded $11 in e-Rewards (Research Now) currency. In my experience, such honoraria are common in conjoint

---

[28]   Research Now Panel Quality: Our Values.

[29]   The email invitation is provided in Exhibit I.

[30]   AMS programmed and hosted the survey.

[31]   If a respondent was taking the survey on a tablet, smartphone, or any electronic device other than a desktop or laptop computer, he or she was screened and terminated, but was encouraged to start the survey again on a laptop or desktop computer. This restriction was added because tablets, smartphones, and other handheld devices generally have insufficient screen size to view this survey's content without extensive scrolling.

survey research and do not influence the accuracy of the responses. After clicking on the link from the email invitation, respondents were prompted to a browser window with a CAPTCHA challenge to ensure that responses were not computer-generated.[32] After completing the CAPTCHA challenge, respondents moved to the survey.

51. The security steps described above ensure that only panel members receive invitations, that the survey is not answered by a "bot," and that the survey taker cannot take the survey more than once. In addition, Research Now is a reputable panel provider which itself employs security procedures.[33] To provide further validation, each respondent's age and gender were compared to values for those respondents in the panel provider's database. Any respondents whose stated age and gender did not match the values in the database were terminated from the survey.

## VIII. Survey Design and Administration

52. In designing and implementing the survey, I followed standard scientific methods to maximize the reliability of the survey instrument. My survey design adopted the scientific guidelines for surveys conducted for academic, commercial, and litigation

---

[32] A CAPTCHA challenge refers to a program that protects websites against bots (i.e., computer-generated responses) by generating and grading tests that humans can pass, but current computer programs cannot. The acronym CAPTCHA stands for Completely Automated Public Turing Test To Tell Computers and Humans Apart. See, e.g., "CAPTCHA: Telling Humans and Computers Apart Automatically," CAPTCHA, http://www.captcha.net/, visited on March 21, 2012.

[33] Research Now uses several techniques to identify legitimate respondents. They have an extensive panel member verification process, and use "Digital Fingerprinting" to ensure that multiple responses are not obtained from the same computer. They also use "Geo-IP Validation" to identify the geographic location of the respondent. If there is a discrepancy between the targeted location of the survey and the location of the respondent's computer, the respondent is blocked from taking the survey. See, http://www.researchnow.com/engb/Panels/PanelQuality/ResearchIntegrity.aspx (accessed on March 21, 2012).

purposes.[34] I describe my methodology in greater detail below. For the full sequence of survey questions, see Exhibit D and Exhibit E.

53. **Double-blind design.** It is standard survey practice to avoid indicating the sponsor and/or purpose of the survey to ensure respondents' objectivity. According to the *Reference Manual on Scientific Evidence*, "the survey instrument should provide no explicit clues (e.g., a sponsor's letterhead appearing on the survey) and no implicit clues (e.g., reversing the usual order of the yes and no response boxes on the interviewer's form next to a crucial question, thereby potentially increasing the likelihood that *no* will be checked) about the sponsorship of the survey or the expected responses" (emphasis in original; footnote omitted). The goal of the survey design is to make the respondent "blind" to the sponsor and purpose of the survey.[35]

54. The design and administration of my survey can be characterized as blind. Because the survey was administered via the Internet, respondents were not exposed to human interviewers, thereby eliminating the possibility of an interviewer communicating the sponsor or purpose of the survey and influencing the outcome (intentionally or not). An Internet-based survey avoids demand artifacts that might be induced by means of intonation or facial expressions during the delivery of particular questions or answers. An Internet-based survey removes, or at least greatly diminishes, any "interviewer bias" which may arise from the desire of the respondents to please, displease, or impress the interviewer.

---

[34] See, e.g., many of the recommendations in Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423.

[35] See, e.g., Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 410–411.

55. **Introductory/screener questions.** Introductory or "screener" questions help to identify members of the target population and determine whether respondents meet the criteria (qualify) for inclusion. In drafting introductory questions, I was careful not to convey information that would influence responses to the main survey or otherwise provide respondents with information that otherwise would not occur to them.[36]

56.  The inclusion of unrelated answer options in closed-ended respondent qualification questions serves to distract respondents from an item of interest.[37] Such questions and answer options help to conceal from the respondents the intention of the survey and to minimize the potential for demand artifacts. For example, if a survey is conducted to determine whether respondents might be interested in a particular movie, the survey can ask the respondent to select the movies in which he or she is interested, providing a set of movie options including the movie of interest. The other movies within the option set would help mask the target of the survey, and would therefore serve to distract the respondent from the purpose of the study. To restrict the sample to the target group, i.e., owners of the Samsung smartphones, I asked respondents in Question S7 (in the smartphone questionnaire) "In the past two years, which of the following brands of smartphone have you personally owned?" To minimize demand artifacts, I provided unrelated options such as Apple, Blackberry, HTC, LG, Motorola, Nokia, and Sony

---

[36] See, for example, Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–387, at pp. 386–387; Smith, D. M., N. Schwarz, T. R. Roberts, and P. A. Ubel (2006), "Why are you calling me? How study introductions change response patterns," *Quality of Life Research*, 15, pp. 621–630.

[37] "Closed-ended" questions provide the respondent with a set of potential responses (answer options) from which to choose. These are distinct from "open-ended" questions, which allow the respondent to formulate his/her own answers. For a discussion of closed-ended and open-ended questions, see Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 391–394.

Ericsson, in addition to Samsung. Analogous questions were used in the tablet questionnaire.

57.   In addition, participants could not be employed by (or have a member of their household who was employed by) a consumer electronics seller, a marketing or market research firm, a public relations firm, or an advertising agency. These screens are standard security questions and do not bias the results. Respondents were also required to have owned at least one of the Samsung products at issue within the last two years. Because respondents were allowed to select more than one product from the list of products at issue, they were also asked to indicate the most recently purchased product. This product was designated as the "most recent" product for the remainder of the survey.[38] Respondents were also required to have played a role in the decision to purchase their most recent Samsung product. Respondents' answers to these questions allowed me to include only appropriate respondents in the survey.

58.   **Filters.** To avoid influencing respondents' answers and survey results and to minimize answers from uninformed respondents, carefully designed surveys include "filters" and "quasi-filters." Filters are questions and/or answer options that eliminate respondents who are not relevant or who do not have opinions. Quasi-filters avoid speculation and guessing that may arise when a respondent is forced to offer an opinion or answer a question on which he or she has no opinion. For example, typical quasi-filters offer answer options such as "don't know" or "no opinion." Quoting from the Reference Manual on Scientific Evidence, "[b]y signaling to the respondent that it is appropriate

---

[38]   Smartphone survey: "QS7b. Which one of the following Samsung smartphones that you owned was purchased most recently? This will be referred to as your most recent Samsung smartphone for the rest of this survey."

not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply."[39]

59.   I used numerous filters in my survey questions and answer options. For example, appropriate questions in my survey included quasi-filters (i.e., the option of "Don't know/Unsure"). Many of the surveys' screener questions served as full-filters. For example, in Question S7b I ask respondents "Which one of the following Samsung smartphones that you owned was purchased most recently?" Respondents that selected "Don't Know/Unsure" were terminated. By employing filters, I avoided asking questions of respondents that might not be relevant and asking respondents to express a belief when the respondent had none or was not sure.

60.   **Rotation of answer options.** In closed-ended questions with several answer options, respondents might be more likely to choose an option simply because it is first or last on the list. Such phenomena are known as "order effects."[40] To avoid order effects, I rotated answer options so that different respondents see the options in different orders and any possible order effects cancel out across respondents. There are standard exceptions to the rotation rules. For example, certain options – such as "Other," "None of the above," and "Don't know / Unsure" – always come last in order for the question to preserve logical flow. Another exception to answer rotation occurs when answer options come in a certain logical order, such as those for age brackets. In such circumstances, answer options are usually not rotated.

---

[39]   Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 389–391.

[40]   For a discussion of order effects, see Diamond, Shari S. (2011), "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 395–396.

31

61.  I rotated answer options in the introductory questions and closed-ended filter questions, where it was appropriate. For example, in question S7 (smartphone questionnaire) I asked the respondents "In the past two years, which of the following brands of smartphone have you personally owned?" I rotated the order of the various brands of smartphone so that Samsung (the brand of interest) was not appearing first or last for all respondents.

62.  Once respondents passed through the screening questions, they had to go through an animation and audio test to ensure that they would be able to view the animation and hear the audio during the conjoint exercise. If they passed the test, they were introduced to the features and feature levels used in the conjoint analysis.

63.  In order to obtain reliable data from a conjoint exercise, it is important to have clear descriptions of the features and levels. When the features or levels are difficult for a lay person to understand in words or if the descriptions become wordy, an audiovisual or graphical interface should be used.[41] Three of the touchscreen capability levels (for both smartphones and tablets) were chosen such that they would represent a product that included a non-infringing alternative for one or more of the patents at issue.[42] The specific technical descriptions of the touchscreen capability levels and information about their functionality were provided to me by counsel. I have not reviewed or interpreted the patent claims myself and do not have a professional opinion on that

---

[41]  A good conjoint design makes use of graphics. See, for example, Selove, Matthew, and John R. Hauser (2011), "The Strategic Importance of Predictive Uncertainty in Conjoint Design," Working Paper.

[42]  The touchscreen capability levels in the smartphone survey were chosen to capture the following Patents: (i) '828, (ii) '915, and (iii) combination of '915, '381, and '163. The touchscreen capability levels in the tablet survey were chosen to capture the following Patents: (i) '607, (ii) '915, and (iii) combination of '915, '381, and '163.

matter.

64.    In order to make it simple for respondents to understand the levels of the features in the conjoint analysis, I directed Cornerstone Research and AMS to work with a graphics firm, who designed animations (with audio) for these levels.[43] I had direct input into the precise nature of the animations and the content of the audio. Pretesting, done by AMS, showed that respondents found these animations to be useful and easy to understand. Because touchscreen capability is the feature at issue in this patent litigation, I introduced animations for two additional features, camera and connectivity, in order to avoid demand artifacts. Three out of the seven features included in the conjoint had animations. To further minimize potential demand artifacts, I introduced graphics (but not animations) for the remaining four features: size and weight, number of apps, storage/memory, and price. For these features it was natural to have graphics without animations. For example, graphics help the respondent to understand the number of apps, but respondents do not need animations to understand the number of apps.

65.    Before beginning the conjoint choice tasks, the respondents viewed the descriptions of the various features and levels, including animations and graphics. The following sequence for the presentation of features was chosen: (i) camera, (ii) size and weight, (iii) capabilities of the touchscreen (iv) storage/memory (v) connectivity (vi) number of apps (vii) price. The sequence was chosen to avoid order effects, if any, that may arise due to the features with animations appearing together in the introduction. Touchscreen was chosen to be the third feature to avoid any demand artifacts that may arise with the

---

[43]    Fulcrum Legal Graphics was hired for the purpose of doing the animations and audio.

first or the last position. (As described is subsequent paragraphs, features and feature levels were randomized in the choice tasks.)

66.   The sequence of presentation for the levels across features that had a natural order was standardized to be high-to-low, i.e., the highest feature level would appear first and the lowest feature level would appear last. For example, the levels of storage/memory were presented in the following sequence: (i) 64 GB (ii) 32 GB (iii) 16 GB (iv) 8 GB. All the features, except, touchscreen capability followed this sequence. Because touchscreen capability levels are not strictly ordinal, I randomized the presentation between two different sequences to avoid order effects, if any.

67.   For the smartphone survey, the following levels were used for touchscreen capability: (A) reliable touch, auto-switch (1 to 2 fingers), rubberband, tap to re-center after zoom; (B) less reliable touch, auto-switch (1 to 2 fingers), rubberband, tap to re-center after zoom; (C) reliable touch, rubberband, tap to re-center after zoom; and (D) reliable touch. The two sequences used in the initial presentation were (A-B-C-D) and (A-C-D-B). Similarly, for the tablet survey, the following levels were used for touchscreen capability: (A) full multi-touch, auto-switch (1 to 2 fingers), rubberband, tap to re-center after zoom; (B) very limited multi-touch, auto-switch (1 to 2 fingers), rubberband, tap to re-center after zoom; (C) full multi-touch, rubberband, tap to re-center after zoom; and (D) full multi-touch. The two sequences used in the survey were (A-B-C-D) and (A-C-D-B).

68.   After being introduced to the features and the feature levels, respondents were introduced to the conjoint task and shown a series of sixteen screens (choice tasks) containing four alternative smartphone (or tablet) options that were described by

combinations of the features. The order in which features were listed was randomized across respondents (i.e., for some respondents Camera would appear at the top and for other respondents Connectivity would appear at the top). However, for any given respondent, the order was the same across the sixteen choice tasks. Feature levels, in contrast, were randomized across the sixteen choice tasks for each respondent.

69. For each set of four alternative smartphones in a choice task, respondents were asked: "If these were your only options and you were choosing a new smartphone [tablet], which Samsung smartphone [tablet] would you choose?" By explicitly asking respondents to focus only on the four options provided to them, the survey was designed with the goal that respondents would not make comparisons with other devices available in the marketplace.

70. In some instances researchers augment the choice among profiles in the choice task by allowing the respondent to choose an "outside option," that is, to choose not to choose among the options (this is also known as the "no-choice" option). This outside-option design is appropriate when a researcher wishes to estimate primary demand for smartphones. If an outside option is used in the survey, then in the estimation researchers estimate an additional partworth for the outside option. The outside option was neither appropriate nor needed in my conjoint analysis design. It was not needed because I sought to estimate the value of a change in the level of touchscreen capability relative to a change in price. These relative estimates are not affected by an outside option. An outside option was not appropriate because respondents were screened to be Samsung owners and instructed "Now imagine that you are in the market to buy another Samsung smartphone. … You will be asked to choose the smartphone that you

would be most likely to purchase." Because outside options are not universally necessary or appropriate, many researchers design conjoint analysis questionnaires without outside options.[44]

71.     Respondents were also told "Aside from these features below, you should assume that all other smartphone features are the same for every smartphone offering you see." These instructions focus respondents on making relative choices holding all other potential features of smartphones [tablets] constant so that choices are being made with "all else equal." Any additional impact of features not included in the survey is captured by the error term in the respondent utility. The additive nature of the utility function further assures independence. (I describe tests for higher level interactions in a subsequent paragraph.)

72.     Respondents then indicated which of the four options they would choose. The features and feature levels are indicated in the questionnaires in Exhibit D (smartphones) and Exhibit E (tablets).

73.     As discussed above, each choice from a choice task by each respondent provides three inequality constraints because the chosen product is preferred to each of the other three products. Sixteen questions give 48 inequality constraints. For "N" respondents we have 48 x N inequality constraints in groups of 48. For example, with N = 500 we have

---

[44]   Toubia, Olivier, John Hauser and Rosanna Garcia (2007), "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science*, 26, 5, (September-October), pp. 596–610. Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), pp. 116–131. Lenk, Peter J., Wayne S. DeSarbo, Paul E. Green and Martin R. Young (1996), "Hierarchical Bayes Conjoint Analysis : Recovery of Partworth Heterogeneity from Reduced Experimental Designs," *Marketing Science*, 15, 2, pp. 173–191.

24,000 inequality constraints. The inequality constraints derived from respondent choices are used by HB CBC to estimate the market-level distributions of partworths.[45] The profiles in the choice task were chosen randomly in such a way to ensure that they were order and level balanced. The designs were highly efficient in that the designs provided estimates of partworths with high precision.[46]

74. Following these sixteen choice tasks, the survey was concluded. A total of 604 respondents completed the smartphone survey beginning on February 29, 2012 and ending on March 6, 2012. A total of 599 respondents completed the tablet survey beginning on February 29, 2012 and ending on March 6, 2012. The completion rate was 98.4% percent and 99.4% percent for the smartphone and tablet surveys respectively.[47] Details are provided in Exhibit J.

75. Prior to estimating partworths, I set criteria to consider removing respondents who may not have paid sufficient attention during the sixteen choice tasks. Such data screening is common and standard practice to ensure that the final sample is reliable. Specifically, I used the following criteria to consider removing respondents in order to enhance the

---

[45] Technically, this is a Bayesian procedure in which we are obtaining the best update of the partworths based on the data. This means that we represent all of the information about the partworths, including the means, medians, covariances, and other statistics. For brevity I refer to these complicated descriptions as simply the estimates of the partworths.

[46] For more technical descriptions see Sawtooth Software Technical Paper (2008), "The CBC System for Choice-Based Conjoint Analysis." Sawtooth Software Research Paper (2000), "An Overview and Comparison of Design Strategies for Choice-Based Conjoint Analysis." Efficiencies were 100% for the complete-enumeration randomized designs.

[47] Out of the total 38,795 participants invited for the smartphone survey, 8,844 began the survey, resulting in a response rate of 22.8%. Out of the total 8,844 participants who began the smartphone survey, 139 chose to terminate the survey themselves, resulting in a completion rate of 98.4%. Out of the total 8,844 participants who started the smartphone survey, 604 passed through the screening questions and qualified for the choice tasks, resulting in an incidence rate of 6.8%. For the tablet survey, the response rate was 23.8%, the completion rate was 99.4%, and the incidence rate was 2.6%.

reliability of the survey.

    a.   Straight-lining: if a respondent chose the same option (i.e., the first option or the last option) for at least 15 of the 16 choice tasks;

    b.   Devices owned: if a respondent indicated that they owned a total of five or more (Samsung and other) smartphones or tablets;

    c.   Fast respondents: if a respondent was among the fastest 10% of the respondents in terms of the time taken to complete the survey

    d.   Slow respondents: if a respondent was among the slowest 10% of the respondents in terms of the time taken to complete the survey

76.    After applying these criteria, a sample of 455 respondents was obtained for smartphones and a sample of 415 respondents was obtained for tablets. The results that follow are based on these samples. However, the results do not differ substantively with or without the application of these criteria. I undertook sensitivity analysis by estimating partworths based on samples with and without the application of these criteria and used the partworths to estimate the price premiums associated with the patents at issue. The estimated price premiums do not differ substantively (as shown in Section X, footnote 71). I conclude that the application of these criteria does not bias the results.

## IX. Estimation of Partworths

### A. Estimation given the available data and information

77.    I estimate distributions of partworths for the features and feature levels of smartphones

and tablets using software developed by Sawtooth Software. The software uses a Hierarchical Bayes procedure that analyzes the data to obtain the best possible estimate of the distribution of partworths given the data.[48]

78.     The two surveys provide a wealth of information (inequality constraints) regarding the distribution of relative partworths for the different levels of each feature. In the following paragraphs I illustrate the data for the smartphone and tablet surveys using the example in Table 2 below. Suppose a respondent is choosing between the two products provided in Table 2. The respondent's choice of Product 1 tells us that he or she prefers the bundle of feature-levels that describe Product 1 relative to the bundle of feature-levels that describe Product 2.

79.     The two products in Table 2 differ in their levels of connectivity, storage capacity, and the number of available apps. Comparing the levels of these three characteristics across the two products, one may reasonably infer that the average consumer will prefer the connectivity features and storage capacity of Product 2, which include tethering and 32 GB of storage respectively, both above what Product 1 offers. Similarly, one may infer that the average consumer will prefer the 450,000 apps available for Product 1 to the 300,000 apps available for Product 2. That Product 1 was chosen instead of Product 2 provides us with an additional relative partworth inequality that indicates that the advantage Product 1 enjoyed in the number of apps was greater than the advantage Product 2 enjoyed in terms of connectivity and storage capacity. This is, of course, only a choice among two products. We get substantially more information about relative

---

[48]     Sawtooth Software HB CBC Module for Hierarchical Bayes Estimation, Version 5.

partworths from a choice among four products. And even more information when the

respondent makes sixteen such choices.

## Table 2:  A Hypothetical Respondent Choice

|  | Product 1 | Product 2 |
|---|---|---|
| Touchscreen | Reliable Touch | Reliable Touch |
| Connectivity | Cellular and WiFi | Cellular, WiFi, and Tethering |
| Camera | 3 MP Rear Camera, Standard Video Recording, and Autofocus | 3 MP Rear Camera, Standard Video Recording, and Autofocus |
| Storage Capacity | 16 GB | 32 GB |
| Number of Apps | 450,000 | 300,000 |
| Size and Weight | 3.5 inches and 4 oz. | 3.5 inches and 4 oz. |
| Price | $99 | $99 |
|  | Chosen | Not Chosen |

80.     In both the smartphone and tablet surveys, a product profile is characterized by seven

features. Each feature has four levels, which implies three *relative* partworths per

feature. Thus, I need to estimate 21 relative partworths to describe preferences for the

smartphones or tablets. In Bayesian methods we "sample" from the distribution of the

partworths using Bayes' Rule.[49] We can also use certain statistics to describe either the

distribution or the implications of the distribution. For example, we can obtain the

---

[49]   See Gelman, Andrew, John Carlin, Hal Stern, and Donald Rubin (2004), *Bayesian Data Analysis*, at pp. 7–9.

median partworths, the mean partworths, or the variation over the population in those partworths. If we choose to calculate the mean partworths we have 21 means – one mean for each partworth. If we choose to calculate the covariance of the partworths over the population of consumers we have 210 covariances and 21 variances. The data from the smartphone and tablet surveys are sufficient to estimate this number of parameters with reasonable precision with the approximately 20,000 inequality constraints in each of the two surveys from the respondents' answers to the choice tasks.[50]

81. The example in Table 2 above also serves to illustrate another aspect of the information about respondents' partworths that we use in the estimation of the partworths. Notice that when we compared Products 1 and 2 in Table 2, it was natural to assume that the respondent would prefer (or be indifferent to) increased memory storage, more connectivity options, and a higher number of available apps. The marketing literature recognizes that the researcher may frequently have such prior information about the estimated partworths and that incorporating this information can lead to better predictions.[51] In our case, everything else being equal, consumer-behavior theory predicts that consumers prefer to pay less; to have more connectivity options; a higher megapixel camera; more memory capacity; and more available apps. I incorporate this

---

[50] Smartphones: 455 respondents imply 21,840 inequality constraints. Tablets: 415 respondents imply 19,920 inequality constraints.

[51] See, for example, Allenby, Greg, Neeraj Arora, and James Ginter (1995), "Incorporating Prior Knowledge into the Analysis of Conjoint Studies," *Journal of Marketing Research*, 32, 2, pp. 152–162 ("Researchers often possess prior information about the part-worths, such as the order and range restrictions of product attribute levels. It is known, for example, that consumers would rather pay less for a specific product given that all other product attribute levels are unchanged."). Boatwright, Peter, Robert McCulloch, and Peter Rossi (1999), "Account-Level Modeling for Trade Promotion: An Application of a Constrained Parameter Hierarchical Model," Journal of the American Statistical Association, 94, 448, (December), pp. 1063–1073.

information into the estimation using routine options in the Sawtooth Software HB estimation software.

**B. Testing the fit and predictive ability of the model**

82. Based on the number of inequality constraints from the conjoint surveys, we expect reasonably precise estimates of the market-level partworth distributions.[52] I confirm this expectation by testing the predictive ability of the model.

83. In the example of classical linear regression we could fit 10 data points perfectly with 10 parameters to be estimated (and get a fit $R^2$ of 1.0). However, this would be overfitting the data, which usually leads to the model having poor predictive power. We would be more confident in the regression if it fit with fewer parameters (say an intercept and a slope) and if it was developed based on prior theory, even if it had a slightly lower $R^2$. One way to check for overfitting is to test the model's predictive ability. For example, we might estimate the model on a subset of the data and attempt to use those parameters to predict behavior on the remaining "holdout" data. If the model overfit the "estimation" data,[53] it would not predict well on the holdout data.

84. For the purpose of checking the predictive ability of the model I use in this case, I re-estimated the model three separate times, each time using data on only 15 choice tasks from each respondent. I held out one choice task per respondent. I did this for the fourth, eighth, and twelfth choice tasks. I calculated the fit of the model based on the 15

---

[52] Technically, we obtain reasonably precise estimates of the parameters that describe those distributions, such as medians, means, and covariances. For simplicity I refer to these as the market-level partworth distribution.

[53] Estimation data are also called "calibration data."

choice tasks used in estimation (estimation sample). Using the same parameters (without re-estimating) I calculated the predictive ability of the model for the held-out choices. I calculated two standard statistics, the "percent uncertainty explained" ($U^2$) and the "hit rate."[54]

85.  $U^2$ is the more technical of the two statistics. It represents the percentage of uncertainty that is explained by the model.[55] A model that perfectly predicts every choice would have a $U^2$ of 1.00. A model that does no better than chance (predicting that each of the four choices would be chosen with probability equal to ¼) would have a $U^2$ of 0.00. When the fourth, eighth, or twelfth choice tasks were held out in the smartphone survey, the fit $U^2$ was 0.44.[56] These numbers were 0.41 across the three holdout scenarios for the tablet-survey model. These statistics imply that the model is doing significantly better than chance; in other words, it is picking up substantial information from the data to accurately describe consumer behavior in the estimation sample (the fifteen choice tasks used to fit the model). These statistics are similar in magnitude to

---

[54] Although we mechanically use respondent-level estimates to obtain each respondent's contribution to $U^2$ or hit rate, it is the market-level statistics on which we focus, consistently with arguments advanced elsewhere in this report.

[55] Hauser, John R. (1978), "Testing the Accuracy, Usefulness, and Significance of Probabilistic Choice Models: An Information-Theoretic Approach, *Operations Research*, Vol.26, No. 3 (May-June), pp. 406–421.

[56] In calculating $U^2$ for the estimation sample it is appropriate to adjust for the degrees of freedom in the model. This is appropriately conservative because it *lowers* the $U^2$ value. In an HB model we need to estimate the degrees of freedom as affected by the hierarchical constraints. This is a technical calculation involving the Deviation Information Criterion (DIC). We adjust the degrees of freedom by lowering the likelihood value by the degrees of freedom and then computing a $\rho^2$ fit statistic. See Hardie, Bruce G., Eric J. Johnson, and Peter S. Fader (1993), "Modeling Loss Aversion and Reference Dependence Effects on Brand Choice," *Marketing Science*, 12, 4, (Fall), pp. 378–394. Because Hauser (1978) demonstrates that $\rho^2$ is numerically equal to $U^2$ this correction for degrees of freedom can also be used for $U^2$ while retaining the intuitive interpretation of $U^2$. See my backup for calculations.

$U^2$ values reported in research published in academic journals.[57]

86.   In order to examine whether the model can be used successfully to predict consumer behavior, I examined the ability of the model to predict choices that were held out. The average $U^2$ statistic for the holdout choice tasks in the smartphone survey was 0.37 (compared to 0.44 for the estimation samples); in the tablet survey it was 0.32 (compared to 0.41 for the estimation samples). Because $U^2$ statistics for the holdout samples, which were *not* used to estimate the model, are substantially better than chance, the HB CBC model can form a reliable basis for forecasts and predictions of consumer behavior. Moreover, because the $U^2$ statistics for the holdout samples do not drop off sharply relative to the $U^2$ statistics for the estimation samples, the HB CBC model is not "over-fitting" the data.

87.   The second statistic that I examine in the same type of holdout analysis is the hit rate. The hit rate is a more intuitive measure. It reports the frequency with which the product chosen by survey respondents is predicted by the model to be the product most likely to be chosen in the choice task. If the model correctly picks the chosen product in every choice task for every respondent, then the model would have a hit rate of 1.00. If the model *never* picked the chosen product, the model would have a hit rate of 0.00. A model that picked one of the four products with equal probability would have a hit rate of 0.25. For the smartphone survey I find an average hit rate of 0.87 in the estimation sample and 0.67 in the holdout samples. For the tablet model, these numbers are 0.86

---

[57]   For example, a study estimates different specifications of a model and finds $U^2$ ranging between 0.22 and 0.48. See Guadagni, Peter, and John Little (1983), "A Logit Model of Brand Choice Calibrated on Scanner Data," *Marketing Science*, 2, 3, pp. 203–238.

and 0.64 respectively. Once again, the observation to be made is that (a) these statistics are high, and (b) they are high for both the estimation and holdout samples, indicating that the model's results can be used to reliably predict consumer behavior and estimate the price premium that consumers are willing to pay for the product features associated with the patents at issue.[58]

88.    As explained above, the model I use to estimate partworths for smartphones and tablets incorporates information about consumer behavior. Namely, consumer-behavior theory tells us that preferences are monotonic for ordinal levels of attributes, such as memory capacity: all else equal, people prefer more memory capacity to less. If we were to ignore this information and consumer-behavior theory we would be estimating a model that does not use all of the data available to us. Such a model would be a less reliable description of consumer behavior and a less reliable summary of the data available to us.

89.    The importance of incorporating available consumer behavior in this manner has been recognized in marketing research studies. For example, Allenby *et al* (1995) write that: "In summary, we often have prior knowledge about the part-worths in conjoint studies. Failure to use this prior knowledge in estimation frequently results in part-worths that violate the known structure.  … In addition, we demonstrate that the proposed methodology [a Bayesian approach to constrained part-worth estimation] results in part-worth estimates that are more accurate than other approaches across a variety of

---

[58]    Note that the calculation of hit rate uses information at the individual respondent level. The statistic itself, however, is at the aggregate level and accurately interpretable.

conditions."[59]

90.     Indeed, when I estimate the model without incorporating available information about

consumer behavior, I find that this specification does a worse job statistically than the

one that *does* use the available information in predicting consumer behavior.[60] This

evidence is consistent with my opinion to use a model that is based on all of the data

that is available from the sample of respondents. Therefore, the model that I use is the

most appropriate model because it predicts consumer behavior more reliably and

because it is consistent with consumer-behavior theory.[61]

### C. Consumers positively value the patent-related features

91.     Table 3A summarizes the statistics about the distribution of partworths for the various

levels of the touchscreen feature across all respondents in the tablet and smartphone

---

[59]    Allenby, Greg, Neeraj Arora, and James Ginter (1995), "Incorporating Prior Knowledge into the Analysis of
Conjoint Studies," Journal of Marketing Research, 32, 2, pp. 152–162, at p. 161. For another example,  see
Boatwright, Peter, Robert McCulloch, and Peter Rossi (1999), "Account-Level Modeling for Trade Promotion:
An Application of a Constrained Parameter Hierarchical Model," *Journal of the American Statistical
Association*, 94, 448, (December), pp. 1063–1073.

[60]    $U^2$ is 0.15 of smartphones and 0.04 for tablets in the holdout samples for the model that does not incorporate
available information about consumer behavior, compared with a $U^2$ of 0.37 and 0.32 respectively in the
holdout samples for the model that I use. It is good empirical practice to do a logical check on models that do
not expect to predict as well. A model that does not use all of the available data may overfit the estimation
sample when it attempts to adjust parameters to match the limited data. Parameters that are estimated on a
model that ignores data are less reliable than parameters estimated on the model that uses all available data.

[61]    After estimating partworths, I also considered whether adding interactions between different attributes would
do a better job in the estimation. For tablets, I find that adding interactions to the model would likely harm its
ability to reliably predict consumer behavior. For smartphones, I find that the model with added interactions has
statistical properties that are worse than the model without interactions: $U^2$ is 0.21 in the holdout samples for the
smartphone model with interactions, well below the model without interactions, which has a $U^2$ of 0.37. (To
maintain comparability in the model with interactions and the model without interactions, both models used
prior information from consumer-behavior theory.) Therefore the model that incorporates information about
consumer behavior but does not include interactions is the most appropriate model to use for predicting
consumer behavior and calculating the price premiums associated with smartphone or tablet features.

surveys.  This distribution of the partworths is estimated precisely. I provide standard errors of the estimated means and heterogeneity in Exhibit K. The relative partworths, i.e., the differences between partworths of different levels of an attribute, indicate the value in units of utility of switching between different levels of these features.  For example, Table 3A indicates that on average smartphone-survey respondents value switching from "reliable touch, rubberband, and tap to re-center after zoom" to "reliable touch" by 15.3 – (-67.7) = 83.0 units of utility. It is these *relative* partworths that are used in predicting consumer behavior and that can be used to estimate the price premiums associated with a particular feature.[62]

92.    Table 3A also reports the variation of partworths over the market.[63] This variation summarizes the heterogeneity in partworths across respondents; the higher these standard deviations, the more the partworths vary across respondents. Because partworths vary across respondents the HB CBC model takes into account that different respondents value the various features differently.[64] For example, in the smartphone survey, the standard deviation for "reliable touch" (77.8) was greater than the standard deviation for "reliable touch, rubberband, and tap to re-center after zoom" (49.3). This

---

[62]    The reported mean partworths in Tables 3A and 3B are zero centered with respect to the average partworth across different levels of the corresponding feature, i.e., the zero-centered partworths of different levels of the same feature sum up to zero. For example, suppose a feature has four levels, with partworth estimates of 2, 4, 6 and 8.  The average partworth would be 5 and the zero-centered partworths would be -3, -1, 1 and 3. So if the partworth estimate associated with a feature level is below the average partworth across different levels of the feature, the zero-centered partworth of the feature level would be negative.

[63]    This variation over the market should not be confused with the precision by which we estimate the means and standard deviations. For example, the standard errors of the estimated population means are given in Exhibit K and are interpreted differently than the standard deviations that represent population heterogeneity.

[64]    For example, one respondent may value touchscreen features very highly (the difference between the lowest and highest level of touchscreen partworths may be large), while another respondent may be particularly price sensitive (the difference in partworths between different price levels may be very large).

implies that there is greater variation in the partworths for the former than there is for the latter.

## Table 3A:  Touchscreen Partworth Distribution Smartphones

| Touchscreen | Average Market Level Mean | Average Market Level Heterogeneity (Standard Deviation) |
|---|---|---|
| Reliable Touch, Auto-Switch (1 to 2 Fingers), Rubberband, and Tap to Re-center after Zoom | 64.5 | 67.5 |
| Reliable Touch, Rubberband, and Tap to Re-center after Zoom | 15.3 | 49.3 |
| Reliable Touch | -67.7 | 77.8 |

Source:  Smartphone survey data

Note:  The statistics are based on 455 respondents.

93.     The mean partworths reported in Table 3A indicate that, on average, respondents in the smartphone-survey place positive value on the patents in question. In the smartphone survey the average partworth (64.5) for "reliable touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom" is higher than the partworth (15.3) for "reliable touch, rubberband, and tap to re-center after zoom." Thus, on average, respondents value highly the difference between these feature levels: auto-switch (1 to 2 fingers). Similarly, the average partworth (64.5) for "reliable touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom" is higher than the average partworth (-67.7) for "reliable touch." This indicates that, on average, respondents value highly the difference between these feature levels: "auto-switch (1 to 2 fingers), rubberband and tap to re-center after zoom."

48

# Table 3B:  Touchscreen Partworth Distribution Tablets

| Touchscreen | Average Market Level Mean | Average Market Level Heterogeneity (Standard Deviation) |
|---|---|---|
| Full Multi-Touch, Auto-Switch (1 to 2 Fingers), Rubberband, and Tap to Re-center after Zoom | 47.5 | 67.3 |
| Very Limited Multi-Touch, Auto-Switch (1 to 2 Fingers), Rubberband, and Tap to Re-center after Zoom | -7.0 | 63.9 |
| Full Multi-Touch, Rubberband, and Tap to Re-center after Zoom | -0.2 | 51.7 |
| Full Multi-Touch | -40.4 | 63.1 |

Source:  Tablet survey data

Note:  The statistics are based on 415 respondents.

94.     Similarly, the mean partworths reported in Table 3B indicate that, on average, respondents in the tablet-survey place positive value on the patents in question. Specifically, the average partworth (47.5) for the feature level "full multi-touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom" is higher than the average partworth (-7.0) for "very limited multi-touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom." Thus, on average, respondents value highly the difference between the feature levels: the difference between full multi-touch and very limited multi-touch. Similarly, the average partworth (47.5) for "full multi-touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom" is higher than the partworth (-0.2) for "full multi-touch, rubberband, and tap to re-center after zoom." Thus, on average, respondents value highly the difference between these feature levels: auto-switch (1 to 2 fingers). Finally, the average partworth (47.5) for "full multi-touch, auto-switch (1 to 2 fingers), rubberband, and tap to re-center after zoom" is higher than the average partworth (-40.4) for "full multi-touch." This

49

indicates that, on average, respondents value highly the difference between these feature levels: "auto-switch (1 to 2 fingers), rubberband and tap to re-center after zoom."

95.     In summary, the HB CBC model passes standard statistical tests of fit and predictive ability, which confirms that it is appropriate to use the estimated partworths to forecast consumer behavior and estimate the price premiums of product features associated with the patents at issue. My analysis finds that, on average, respondents in both the tablet and smartphone surveys place a substantial value on the touchscreen features associated with the patents in question. In the next section, I quantify the price premium that consumers are willing to pay for these patent-related features.


## X. The Price Premium for the Patent-Related Features

96.     In this section I estimate the price premium, if any, for features associated with the patents at issue. Specifically, I have run a market simulation based on the HB CBC partworth estimates to determine how the market's overall tendency for purchasing a product is affected by the trade-off between the product's price and its features associated with the patents at issue. The market's purchase tendency is simulated using the predicted choices by all the survey respondents. For the purposes of testing the price premium attached to the features covered by the patents at issue, I note that I use the term "market" in a specific way to cover only smartphone and tablet types that I have varied in the survey; I have not tested a market for smartphones or tablets in which consumers choose among various brands of smartphones or tablets (e.g., Samsung vs. Apple). I explained previously that my sample consists of owners of Samsung

50

smartphones or tablets and that the conjoint analysis asked respondents to choose among Samsung smartphones or tablets that varied on the seven features.

97.  I used standard procedures in the Sawtooth Software HB CBC software to run the market simulations. Market simulations using HB CBC partworth estimates are often used by firms to simulate what would happen if a new product were introduced to a market or if a firm decided to change a feature or features for an existing product. Forecasts based on such market simulations are sufficiently accurate that firms routinely make decisions based on the results of these simulations.[65]

98.  The market simulation for a patent of interest considers a scenario with two alternative product options: one option does not have the feature level associated with the patent while the second option has the feature level associated with the patent. All other features of the two products are held at the same levels (e.g., camera, memory, size and weight).[66] The market simulation uses the HB CBC partworth estimates to predict the number of respondents who would choose each of the two products when the second product (the one with the patent-related features) is offered at a higher price than the first product (the one without the features). The simulation adjusts the price of the second product until the price reaches the level under which the model predicts that the market is indifferent between the two products, i.e., 50% of the respondents will choose each of the two products.

---

[65]  For example, see Orme, B (2010), "Chapter 10: Market Simulators for Conjoint Analysis," Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research. Second Edition, Madison, Wis.: Research Publishers LLC.

[66]  In the simulation, the levels of other features do not affect the consumer's choice as long as they are held constant between the two product options.

99.  To predict the respondents' choice among the two products considered in the market simulation, I apply an approach commonly used in marketing research called "Randomized First Choice Simulation" (RFC). Under RFC, a consumer picks the product that gives him/her the highest utility among the available choices (i.e., the first choice), where the consumer's utility from each product is calculated as the sum of the estimated partworths for the product's features plus random draws of the unobserved components in the utility.[67]

100.  When estimating the price premium associated with features related to a patent, it is important to account for the fact the price premium may vary depending on the price level of the products. This is because consumers' price sensitivity may vary over different price ranges. For example, consumers' utility may drop by 110 units if a smartphone's price increases from $199 to $299 but only by 60 units if the price increases from $99 to $199. This difference in price sensitivity makes intuitive sense as a consumer who is evaluating a $99 phone may be willing to spend more to get added functionalities, but a consumer who is evaluating a $199 smartphone may be less willing to spend as much.  This is consistent with the well-established theory of loss aversion, for which Daniel Kahneman won a Nobel Prize in Economics in 2002.[68] The

---

[67]  The Sawtooth Software HB estimation software assumes that the random perturbations on the partworths of each attribute follow a standard Gumbel distribution and the additional random errors at the product level also follow a Gumbel distribution. My estimates do not change significantly if I do not add any random perturbations, in which case the RFC simulation becomes the "First Choice" (FC) simulation.

[68]  Consider a consumer who plans to buy a smartphone with an expectation that he or she would likely pay, say $149. Being loss averse implies that, given the consumer's expected price, he or she cares less about, say, a $20 discount relative to $149 than they do about a $20 price increase from $149. Therefore, if consumers expect that they are likely to pay around $149, they are likely to place more importance on price if comparing two smartphones priced $199, than if they were comparing two smartphones priced at $99. See Kahneman, Daniel, and Amos Tversky (2000), "Prospect Theory: An Analysis of Decision under Risk," in Choices, Values, and

existence of loss aversion has also been documented in the academic literature using real world data.[69] Because of the variation in consumers' price sensitivity over different price ranges, the estimated price premium will also vary over different price ranges.

101. On average, the respondents in the survey sample pay $152 for a smartphone and $390 for a tablet. These are average prices based on actual prices reported by consumers in the survey questionnaires. $152 is between $99 and $199, the two middle price levels in the smartphone survey. As described above, consumers tend to be less price sensitive at lower prices. Therefore, a price range starting with a higher base price ($199 in this case) yields a more conservative (i.e., lower) estimate for the price premium consumers are willing to pay for the features associated with a patent of interest. Thus, I use $199 as the base price (i.e., the price for the product option without the patent-related feature) for the range over which I estimate the patent values for smartphones.

102. For tablets, the $390 average price reported by survey respondents is between $359 and $499 price levels covered in the tablet survey. Again, I use the conservative base price of $499. If I use the lower base price of $359, the estimated patent values are higher.[70]

103. The results of the market-based simulations are presented in Table 4. Specifically, as

---

Frames, eds. Daniel Kahneman and Amos Tversky, Cambridge University Press, at pp. 32–34 and http://www.nobelprize.org/nobel_prizes/economics/laureates/2002/press.html (accessed on March 20, 2012).

[69] See, for example, Hardie, Bruce, Eric Johnson, and Peter Fader (1993), "Modeling Loss Aversion and Reference Dependence Effects on Brand Choice," Marketing Science, 12, 4, (Autumn), pp. 378–394; and Kalyanaram, Gurumurthy, and Russell Winer (1995), "Empirical Generalizations from Reference Price Research," Marketing Science, 14, 3, Special Issue on Empirical Generalizations in Marketing, pp. G161–G169.

[70] With regard to the other two price levels covered in the surveys (the highest and lowest price levels), since I do not have partworths for price above the highest price levels, I can only use those as starting prices if I extrapolate beyond the price levels I have surveyed. Because consumers tend to be less price sensitive at lower prices, I expect that the price premium associated with the lowest price levels to be higher than the ones reported in the tables. Thus, the numbers that I report are conservative.

shown in the smartphones column, if a smartphone without features associated with Patent '915 is priced at $199, the market-based simulation predicts that the price premium consumers are willing to pay for the features associated with the '915 Patent is $39.  In other words, the price of an otherwise identical phone that has the features associated with the '915 Patent could be $39 higher and the market would be indifferent between the two products. The estimated price premium is $100 for features associated with the '915, '163, and '381 Patents combined. For tablets, if the base price is $499, the estimated price premium is $58 for features associated with the '607 Patent, $45 for features associated with the '915 Patent, and $90 for features associated with the '915, '163, and '381 Patents combined.[71]

### Table 4:  Price Premium for Patent-Related Features

| | Patent | Base price without patent-related feature | |
|---|---|---|---|
| | | **Smartphones** **$199** | **Tablets** **$499** |
| 1 | '607 | n/a | $58 |
| 2 | '915 | $39 | $45 |
| 3 | '915 + '163 + '381 | $100 | $90 |

104. As a robustness check, I have also calculated the price premium associated with a patent based on how much more a median consumer is willing to pay for the features

---

[71] Using the sample without filtering out any respondents who are straight-liners, overly fast, overly slow, or claim having owned many smartphones, the smartphone estimates are $39 for Patent '915, and $100 for Patents '915, '163 and '381 combined, and the tablet estimates are $62 for Patent '607, $42 for Patent '915, and $85 for Patents '915, '163 and '381 combined.

associated with the patent.[72] The median-consumer willingness to pay calculation

yields price premium estimates that are similar to what I estimate using the market

simulation method.[73]

105. These market simulation and robustness check results show that, for both smartphones

and tablets, Samsung consumers are willing to pay a significant price premium for the

tested features that are covered by the patents at issue.[74]

---

[72] The Willingness-to-Pay (WTP) of a median consumer means half of the respondents have a WTP above the consumer and half below. The WTP calculation compares the partworth change associated with a price change to the partworth change associated with a product feature change, and uses the comparison to impute the price premium that consumers would be willing to pay for the product feature. Specifically, the method first calculates the dollar amount change in price that corresponds to a one-unit change in consumer utility. For example, suppose a change in smartphone price from $199 to $299 is associated with a decrease of 110 units of consumer utility. This is equivalent to saying that a price change of $0.9 (=$100/110) over the $199–$299 range corresponds a one-unit change in consumer utility. For these same respondents, suppose an average of 50 units of consumer utility are gained for going from not having the features associated with Patent '915 to having the features. Thus, for the utility gain from the features, the average partworths imply that consumers would be willing to pay $45 (= $0.9/unit x 50). If the change in price has to move beyond the measured range in order to "buy" units of utility, then we need to take the new range into account. Any price change above the highest measured partworths would require extrapolation and is done with caution. These calculations are illustrative. I performed these calculations using the estimated distribution of partworths for the market. The HB CBC estimation provides 10,000 samples from the distribution of partworths. For each of these samples, I computed the median WTP for the market. I then computed an overall market-level WTP by taking the median of the 10,000 sample median WTPs. As explained in the earlier coin-flipping examples, reporting WTP for an individual respondent would not be sufficiently precise. However, the overall, market-level WTP is sufficiently precise.

[73] For smartphones, the WTP calculation estimates that at a base price of $199 consumers would be willing to pay $40 more for a smartphone that has the functionality associated with Patent '915, and $100 more for the combination of Patents '915, '163 and '381. For tablets, the WTP calculation estimates that at a base price of $499 consumers would be willing to pay $58 more for a tablet that has the functionality associated with the '607 patent, $46 more for Patent '915 and $97 more for the combination of Patents '915, '163 and '381 combined. Because these median WTPs are based on a large number random draws from the distribution of the respondents' partworths, I also calculate the confidence intervals for these median WTPs. My calculation shows that these median WTPs are estimated with reasonable precision. Specifically, for smartphones, 95% of the sample median WTPs are within $10.5 of the market median WTP of $40 for Patent '915, and within less than $0.5 of the market median WTP of $100 for the combination of Patents '915, '163 and '381. For tablets, 95% of the sample median WTPs are within $15.5 of the market median WTP of $58 for Patent '607, within $13.5 of the market median WTP of $46 for Patent '915, and within $21.5 of the market median WTP of $97 for the combination of Patents '915, '163 and '381.

[74] As discussed in Section IX, the model I use to estimate these price premiums related to the patents at issue incorporate both the survey data and information about consumer behavior.  Both theory and empirical evidence from the data imply that this model is a better and more reliable model than a model without using information about consumer behavior.  For the market simulation method, using the methodology described in detail above,

I, John R. Hauser, declare under penalty of perjury that the statements contained in this report are true and correct to the best of my knowledge, information and belief.


John R. Hauser, SC.D                                    Date

_____                       March 22, 2012