Exhibit 3

Highly Confidential - Attorneys' Eyes Only

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                         SAN JOSE DIVISION
3     -------------------------------x
4     APPLE INC., a California
      corporation,
5
                           Plaintiff,
6                                              Case No.
      vs.                                      11-CV-01846-LHK
7
      SAMSUNG ELECTRONICS CO., LTD, a
8     Korean business entity; SAMSUNG
      ELECTRONICS AMERICA, INC., a New
9     York corporation; SAMSUNG
      TELECOMMUNICATIONS AMERICA, LLC,
10    a Delaware limited liability
      company,
11
                           Defendants.
12
      -------------------------------x
13
14         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15            VIDEOTAPED DEPOSITION OF JOHN HAUSER, a
16         witness called by the Defendants, taken
17         pursuant to the applicable provisions of the
18         Federal Rules of Civil Procedure, before James
19         A. Scally, RMR, CRR, a Notary Public in and
20         for the Commonwealth of Massachusetts, at the
21         offices of WilmerHale, 60 State Street,
22         Boston, Massachusetts, on Friday, April 27,
23         2012, commencing at 9:31 a.m.
24         TSG Job # 48803
25

Highly Confidential - Attorneys' Eyes Only

Page 7

1           Would the reporter please swear in          09:32:03

2       the witness.                                    09:32:05

3           JOHN HAUSER, having been

4       satisfactorily identified by the production

5       of his driver's license and duly sworn by

6       the Notary Public, was examined and

7       testified as follows in answer to direct

8       interrogatories:                                09:32:20

9   BY MR. GALVIN:                                      09:32:20

10      Q.   Good morning, Dr. Hauser.  You have in front of   09:32:22

11  you what's been marked as Exhibits 1 through 12.  Can you   09:32:26

12  look at those for me, please, and identify them.   09:32:29

13      A.   Okay.  Exhibit 1 appears to be a copy of the   09:32:38

14  expert report that I submitted in this case.        09:32:41

15      Q.   Is that your signature on the last page?    09:32:46

16      A.   It's a copy of my signature, yes.           09:32:51

17      Q.   And are Exhibits 2 through 12 the exhibits that   09:32:55

18  were attached to your report?                        09:32:59

19      A.   Exhibits 2 through 12 appear to be copies of the   09:33:29

20  exhibits that were attached to the report.          09:33:32

21      Q.   Thank you.                                  09:33:34

22           So what opinions have you reached in this matter?   09:33:35

23      A.   The opinions are set forth in my expert opinion,   09:33:40

24  expert report, and these opinions relate to market research   09:33:44

25  that I did.  And my opinion is that the market research was   09:33:52

Highly Confidential - Attorneys' Eyes Only

Page 8

| | | |
|---|---|---|
| 1 | done to high professional standards and can be relied upon. | 09:33:55 |
| 2 | In addition, I provide estimates of essentially a | 09:33:59 |
| 3 | price premium or willingness to pay that Samsung consumers | 09:34:04 |
| 4 | would be willing to pay for the features at issue in this | 09:34:11 |
| 5 | case, or, actually, for features of smartphones and tablets | 09:34:14 |
| 6 | that are related to the patents at issue in this case. | 09:34:22 |
| 7 | Q.   Okay.  So is it your opinion that for smartphones | 09:34:25 |
| 8 | with a base price of $199, the estimated price premium is | 09:34:31 |
| 9 | $39 for the '915 patent? | 09:34:35 |
| 10 | A.   Okay.  So for smartphones -- | 09:34:47 |
| 11 | Q.   You can go to paragraph 13 in your report.  It's | 09:34:49 |
| 12 | on page 7. | 09:34:53 |
| 13 | A.   Okay.  Well, I'm looking at the exhibit, but we | 09:34:55 |
| 14 | can go to 13 as well. | 09:34:57 |
| 15 | Q.   And it's the second sentence.  Do you see that? | 09:35:05 |
| 16 | A.   Yes, I do.  Yes, I do. | 09:35:09 |
| 17 | Q.   Okay.  So for smartphones with a base price of | 09:35:11 |
| 18 | $199, the estimated price premium is $39 for the '915 | 09:35:14 |
| 19 | patent alone; correct?  That's your opinion? | 09:35:19 |
| 20 | A.   That's correct. | 09:35:21 |
| 21 | Q.   And if we go to the last sentence on page 7, do | 09:35:22 |
| 22 | you see where it says, "With the same base price of $199, | 09:35:32 |
| 23 | the estimated price premium is $100 for the '915, '163, and | 09:35:36 |
| 24 | '381 patents taken together." | 09:35:42 |
| 25 | Is that your opinion? | 09:35:45 |

Highly Confidential - Attorneys' Eyes Only

Page 9

| | | |
|---|---|---|
| 1 | A.   Yes, that is my opinion. | 09:35:46 |
| 2 | Q.   And if we go to paragraph number 14 in your | 09:35:52 |
| 3 | report, which is on page 8, it says, "For tablets with a | 09:35:55 |
| 4 | base price of $499, the estimated price premium is $58 for | 09:35:59 |
| 5 | the '607 patent alone, $45 for the '915 patent alone, and | 09:36:04 |
| 6 | $90 for the '915, '163, and '381 patents taken together." | 09:36:09 |
| 7 | Is that your opinion? | 09:36:15 |
| 8 | A.   Yes, that -- that is my opinion. | 09:36:17 |
| 9 | Q.   Okay.  And did you form any other opinions about | 09:36:22 |
| 10 | the value of the patents at issue in this case other than | 09:36:25 |
| 11 | what we've just looked at? | 09:36:30 |
| 12 | A.   Yes. | 09:36:34 |
| 13 | Q.   What are those opinions? | 09:36:35 |
| 14 | A.   Well, these are detailed in my report.  I provide | 09:36:37 |
| 15 | standard errors, I provide a number of sensitivity | 09:36:40 |
| 16 | analyses.  And we can go over those one by one in the | 09:36:44 |
| 17 | report, if you would like. | 09:36:48 |
| 18 | Q.   That's after -- that was after you got the results | 09:36:49 |
| 19 | of the survey, correct, you did that analysis? | 09:36:52 |
| 20 | A.   I'm sorry, what was -- | 09:36:57 |
| 21 | Q.   What you just said in terms of the other opinions | 09:37:01 |
| 22 | that you formed, you formed those opinions after the | 09:37:03 |
| 23 | results of the -- after you received the results of the | 09:37:06 |
| 24 | survey; correct? | 09:37:09 |
| 25 | MR. ILLOVSKY:  Objection.  Form. | 09:37:10 |

Highly Confidential - Attorneys' Eyes Only

Page 84

```
 1      A.   Study, survey.  The survey.  But doing a survey, a          11:40:38

 2   specific survey.  I didn't do that, and so this paragraph           11:40:43

 3   is referring to something that's a totally different type           11:40:47

 4   of market research than I did.                                      11:40:49

 5   BY MR. GALVIN:                                                      11:40:49

 6      Q.   Okay.  So you -- you mentioned -- you mentioned an          11:40:55

 7   interviewer effect.  Does -- does the interviewer effect,          11:40:57

 8   does -- does that matter for the in-depth interview?               11:41:02

 9      A.   No.                                                         11:41:04

10      Q.   And is there any -- is there any concern for               11:41:08

11   demand artifacts in in-depth interviews?                           11:41:12

12      A.   In the depth interview, the in-depth interview,            11:41:17

13   the qualitative interview, all kinds of words we're using          11:41:21

14   for the same thing, the -- we're just trying to understand         11:41:26

15   some deep background.  And so I'm not trying to                     11:41:28

16   quantitatively measure a price premium or whatever.  So           11:41:30

17   demand artifact's in fact irrelevant there.  I'm just             11:41:37

18   trying to get background.                                          11:41:40

19      Q.   Okay.  So there's no -- there's no -- is there --          11:41:41

20   is there any kind of bias that you're worried about in            11:41:45

21   in-depth interviews?                                               11:41:50

22      A.   Well, if there were a bias, then we would have             11:41:52

23   picked it up later, and we didn't pick it up.                      11:41:55

24      Q.   And have you seen -- have you seen the different           11:41:59

25   biases that come from in-depth interviews?  Have you seen         11:42:02
```

Page 85

1    that before in your experience?                          11:42:06

2              MR. ILLOVSKY:  Objection.  Form,               11:42:07

3          foundation.                                        11:42:09

4      A.    Yeah.  I mean you're being -- you're being really 11:42:10

5    broad now.  And maybe if you just restate the question a  11:42:12

6    little bit more carefully, or not carefully, but more     11:42:18

7    tightly defined.                                          11:42:22

8      Q.    Do you have any idea how many, the number of --   11:42:28

9    the number of conjoint studies you've done?               11:42:31

10     A.    Oh, different set of questions.  Jeez, a lot.  Are 11:42:35

11   we going to play this more than 50, more than -- probably  11:42:43

12   more than 50, but I don't know, a lot.                     11:42:46

13     Q.    Okay.  And let's just say -- let's just say 50.    11:42:50

14   Of those 50, how many times have you done a qualitative    11:42:56

15   interview as the first step of the study?                  11:43:00

16     A.    Oh, well, if we take away the ones that are just   11:43:06

17   done in class for pedagogical reasons, almost all of them. 11:43:09

18     Q.    Okay.  And have you detected bias in the in-depth  11:43:14

19   interview portion of the studies that you've conducted?    11:43:20

20             MR. ILLOVSKY:  Objection to form.               11:43:24

21         Vague.                                              11:43:25

22     A.    Yeah.  Not that I recall.  Again, it -- the       11:43:26

23   important thing is that if I do the qualitative interviews, 11:43:34

24   they help me write the survey.  And what -- I guess the    11:43:37

25   question is what would be a bias.  And, you know, it might  11:43:43

Highly Confidential - Attorneys' Eyes Only

Page 86

```
1    be that a bias would be that they come up with an attribute        11:43:51
2    that's unimportant.  Well, if I put it in a conjoint               11:43:55
3    analysis and I measure it and it's zero importance, then           11:43:58
4    that's what I pick up.                                             11:44:01
5            Another bias, you might say, well, what if they            11:44:05
6    left something out?  Well, depends what I'm using the              11:44:07
7    conjoint analysis for.  In this particular case, I'm               11:44:10
8    looking for distraction attributes.  So that bias wouldn't         11:44:12
9    affect anything.                                                  11:44:16
10           So I -- I -- you know, it's kind of a funny --             11:44:17
11   you're creating a construct which is really not a construct        11:44:21
12   that would be appropriate to apply to the qualitative              11:44:24
13   interview, because it's -- it's not quantifying anything.          11:44:28
14   The bias is a quantification.  I mean if we define the             11:44:34
15   bias, right, the bias is that the expected value of the --         11:44:36
16   the number I'm getting is going to be different than its           11:44:43
17   true expected, you know, the true value.  But I'm not              11:44:49
18   getting any number.  So bias doesn't apply here.  At least         11:44:53
19   in the technical standpoint.                                       11:44:56
20   Q.   Well, so couldn't there be bias introduced in the            11:44:58
21   in-depth interviews just based on the person that's                11:45:01
22   collecting the data?                                              11:45:07
23   A.    Well, I mean the more I think about it, and this            11:45:09
24   is why I'm struggling with your questions, you're using the        11:45:12
25   word "bias."  So, again, let's say there's a true parameter        11:45:14
```

Highly Confidential - Attorneys' Eyes Only

Page 87

| | | |
|---|---|---|
| 1 | theta, and based on the data, I'm getting the expected | 11:45:20 |
| 2 | value of theta.  If the expected value of theta is | 11:45:23 |
| 3 | different than the true value of theta, then there's a | 11:45:27 |
| 4 | bias.  But I'm not getting a theta here.  So technically | 11:45:31 |
| 5 | bias doesn't apply. | 11:45:35 |
| 6 | Q.   What are -- what are you doing to measure that? | 11:45:36 |
| 7 | How do you measure that?  Is that only picked up in the | 11:45:38 |
| 8 | pretest after the fact? | 11:45:41 |
| 9 | A.   Well, in fact, in the conjoint analysis, there is | 11:45:46 |
| 10 | a theta, and it can get really complicated there, but we're | 11:45:48 |
| 11 | not going to go there yet, probably in the afternoon. | 11:45:52 |
| 12 | That's a quantification.  Okay.  What I'm trying to say is | 11:45:54 |
| 13 | bias as you're defining it is really based upon a | 11:45:59 |
| 14 | quantification.  And that's why it's kind of hard to apply | 11:46:02 |
| 15 | that construct to a qualitative research when there is no | 11:46:06 |
| 16 | quantification. | 11:46:10 |
| 17 | Q.   Okay.  Well, then we can use -- we can use a word | 11:46:12 |
| 18 | other than -- other than "bias."  Do you think that in the | 11:46:16 |
| 19 | collection of the data the -- whatever the -- Ms. Valaquez | 11:46:22 |
| 20 | or Ms. Yanes, you know, based on, you know, their facial | 11:46:30 |
| 21 | expressions, their body language, their dress, anything, | 11:46:35 |
| 22 | that they may have introduced things into the in-depth | 11:46:39 |
| 23 | interview that you weren't aware of? | 11:46:45 |
| 24 | MR. ILLOVSKY:  Objection to form. | 11:46:48 |
| 25 | Vague. | 11:46:50 |

Highly Confidential - Attorneys' Eyes Only

Page 88

```
 1      A.    Yeah.   It's very vague.   There's interaction          11:46:50

 2   between the interviewers and the interviewees.   They're        11:46:56

 3   probing.   And if you've ever seen these -- these               11:47:01

 4   interview -- qualitative interviews, facial impressions,        11:47:06

 5   sometimes the interviewer doesn't have to say anything.         11:47:10

 6   And they just nod or they can get the interviewees              11:47:14

 7   speaking.   So that's all part of the process.                  11:47:18

 8          Now, let's take a hypothetical.   Suppose they           11:47:21

 9   introduce something in there.   Suppose they introduce a        11:47:24

10   feature that wasn't there, and suppose I put it into the        11:47:26

11   conjoint analysis.   Then it would get zero importance.         11:47:29

12      Q.    Okay.   In terms of the seven features that you        11:47:50

13   tested, did the in-depth interviews inform any kind of rank     11:47:53

14   of those features that you're aware of?                         11:48:01

15      A.    I think we've -- we've covered that earlier this       11:48:03

16   morning.   But, you know, I'd be happy to answer it again if    11:48:06

17   you'd like.                                                     11:48:10

18      Q.    Are you able to -- are you able to look at the         11:48:12

19   seven features and tell me which was the most important to      11:48:15

20   the least important based on the in-depth interviews?           11:48:24

21      A.    Based on the in-depth interviews, no.                  11:48:28

22      Q.    Okay.   Would you -- would you agree with me that      11:48:30

23   using -- using the most important features to potential         11:48:50

24   Samsung customers makes your choice -- your choices in your     11:48:57

25   questionnaire more realistic?   Do you agree with that?         11:49:02
```

Highly Confidential - Attorneys' Eyes Only

Page 89

```
 1              MR. ILLOVSKY:  Wait.  Objection.          11:49:07

 2         Vague and ambiguous, ambiguous being          11:49:08

 3         "important."  It can be everyday sense or      11:49:13

 4         technical sense.                               11:49:16

 5    Q.   Would you agree with me that using what Samsung 11:49:29

 6    consumers identified as the most important features to 11:49:37

 7    their purchase makes your choice -- the choices in your 11:49:41

 8    questionnaire more realistic?  Would you agree with that? 11:49:46

 9    A.   Well, you're -- you're being a little bit vague, 11:49:50

10    et cetera, but I guess the answer is not necessarily. 11:49:53

11    Q.   Why not?                                       11:50:00

12    A.   Well, what I'm trying to get in the conjoint   11:50:00

13    analysis questionnaire, the study, is I'm trying to get 11:50:06

14    realistic stimuli, and I'm trying to design a set of 11:50:10

15    stimuli that consumers can make realistic choices among. 11:50:14

16    I -- I don't need to have the most important features in 11:50:20

17    there.  What I do need to have in there, though, is I do 11:50:23

18    have to have at least some reasonable set of distraction 11:50:29

19    features so that I don't have a -- them focusing on just 11:50:31

20    the patent and price features.                      11:50:35

21         So as long as I have a reasonable set of price 11:50:38

22    features, then I've got a constant term in that utility, 11:50:42

23    and that constant term in the utility of the estimation 11:50:46

24    stays constant.  You can have a lot of important features 11:50:49

25    in that constant term as long as it stays constant among 11:50:52
```

Highly Confidential - Attorneys' Eyes Only

Page 90

```
 1   the four profiles that they're given.                    11:50:55

 2      Q.   Well, how -- how did you determine that the       11:51:00

 3   features you tested were reasonable, as you say?          11:51:03

 4      A.   Well, a few things.  Actually, quite a few things. 11:51:10

 5   The first is we had pretests.  And in the pretests,       11:51:15

 6   consumers felt they can answer the questions; they thought 11:51:24

 7   they were realistic; they felt they were comfortable      11:51:26

 8   choices.  All the things that we would expect coming out of 11:51:30

 9   these.                                                    11:51:32

10        Second, we have actual validity data within the      11:51:35

11   conjoint analysis.  And that if we estimate the model on 15 11:51:39

12   choice sets and then try and predict the 16th, we got very 11:51:44

13   strong internal validity, which means that they're making 11:51:47

14   choices that are at least consistent and therefore would be 11:51:50

15   very, very realistic to them.                             11:51:56

16        And, you know, in general, in sort of looking at     11:51:59

17   the features, again, this is sort of relying on my        11:52:04

18   expertise, I think we did a good job of portraying the    11:52:07

19   features to consumers.  And on many of these features, we 11:52:12

20   got definitely significant partworths, which means that   11:52:17

21   they were important.  I think for simplicity, since that's 11:52:23

22   not the focus of the case, I didn't report them, but, you 11:52:25

23   know, they were -- they're in all the files; you can      11:52:28

24   compute them, et cetera.                                  11:52:32

25        So I've got a lot of confidence looking across the   11:52:34
```

Highly Confidential - Attorneys' Eyes Only

```
1    study that we have features that did their job of being        11:52:36

2    distraction features.                                          11:52:41

3       Q.   So it wasn't your goal -- it was not your goal in      11:52:43

4    the questionnaire to include what has been identified as       11:52:48

5    the most important feature to Samsung customers; correct?      11:52:55

6       A.   The --                                                 11:53:01

7            MR. ILLOVSKY:  Objection.  Objection                   11:53:01

8         to form.                                                  11:53:02

9       A.   -- goal -- and this is the conjoint analysis --        11:53:03

10   was to have the five features that -- that -- let me call      11:53:06

11   those distraction features that would -- did not cause a       11:53:11

12   demand artifact.  They should be reasonably important, and     11:53:14

13   they should affect the choice in some way, but they don't      11:53:17

14   have to be the most important.                                 11:53:20

15      Q.   Do you think that -- do you think that leaving out     11:53:25

16   the most important feature might change -- change the          11:53:29

17   coefficients of what's in there?                               11:53:38

18      A.   Oh, absolutely not.  If you take a look at the         11:53:41

19   logit model and you had something that's constant in there,    11:53:43

20   it's E to the utility, and you add a constant to that, so      11:53:47

21   you have a numerator, a denominator, it cancels out.  It in    11:53:51

22   fact, you know, as long as the model is adequately tested      11:53:55

23   for that, by the way, we're fine.  It literally cancels an     11:53:59

24   a numerator and a denominator out in the estimation.          11:54:05

25      Q.   Are you talking about -- are you talking about the     11:54:15
```

Highly Confidential - Attorneys' Eyes Only

Page 163

```
 1      Q.    So do you know how many different hypothetical      14:35:32

 2  products a respondent saw?                                    14:35:35

 3      A.    No.  But we can get that from the data.             14:35:39

 4      Q.    They -- they were generated randomly for -- for     14:35:44

 5  each respondent?                                              14:35:47

 6      A.    Each time we hit a choice task subject to these     14:35:49

 7  criterion -- criteria, they in fact are randomly generated,   14:35:52

 8  yes.                                                          14:35:57

 9      Q.    Okay.  So we did, what was that, we came up with    14:35:57

10  that number of like 4,000 or something --                    14:36:05

11      A.    Well, that's the total number of possible --        14:36:07

12      Q.    Configurations?                                     14:36:14

13      A.    -- configurations, right.  That's just taking 4 to  14:36:15

14  the 7th, which is 2 to the 14th.                              14:36:21

15      Q.    Okay.  So that the standard method of -- of level   14:36:26

16  balancing, that's contained within the Sawtooth software;    14:36:29

17  is that what you said?                                        14:36:32

18      A.    Yes, it is.                                         14:36:33

19      Q.    Okay.  All right.  Let's now go on to pretesting,   14:36:35

20  and you talk about that starting at paragraph 42 of your     14:36:40

21  report, which is on page 23.                                 14:36:43

22      A.    Yes.                                                14:36:51

23      Q.    So how do pretests -- you say that you removed or   14:36:51

24  minimized pretest help to assess the potential for and       14:36:55

25  remove or minimize demand artifacts and to ensure that all   14:37:02
```

Highly Confidential - Attorneys' Eyes Only

Page 164

```
 1    survey questions were understood as intended.  So how do      14:37:06

 2    pretests reduce demand artifacts?                             14:37:10

 3        A.   Well, if we identify them and we rephrase so that    14:37:13

 4    they're not there.                                            14:37:18

 5        Q.   And how do you identify them?                        14:37:21

 6        A.   Well, as the -- these are -- these are serious       14:37:25

 7    pretests.  When -- as the interviewer is going through,       14:37:30

 8    they will ask at the end of completing the survey questions   14:37:33

 9    such as "What was the purpose of the survey?"  You know,      14:37:36

10    "Did the survey indicate to you that you should answer one    14:37:41

11    way or the other?"  It depends upon the actual interviewer,   14:37:48

12    but we -- we want -- people naturally are going to say,       14:37:51

13    "Yes, this feature was about making choices among             14:37:54

14    smartphones," or it might say that, you know, "You varied a   14:37:58

15    number of features, and you made me make a choice."  They     14:38:03

16    may be even smart enough to say, "You want to figure out      14:38:06

17    how much I want to pay for these features."  That's rare,     14:38:09

18    but they may do that.                                         14:38:13

19        What we don't want is we don't want them to               14:38:15

20    realize that we're focusing on the touchscreen feature.  We   14:38:18

21    don't want them to say, "Oh, this is for litigation."  We     14:38:21

22    don't want them to say, "Oh, this is being done to get a      14:38:23

23    high number" or a low number or whatever.  And as long as     14:38:31

24    they sort of say a general statement, because, you know,      14:38:36

25    they are -- they are smart people, by and large, you know,    14:38:38
```

Highly Confidential - Attorneys' Eyes Only

Page 165

1   that's okay.                                                    14:38:43

2          But if there is a demand artifact there, then I'll       14:38:44

3   go back, and I'll rewrite the survey in such a way that we      14:38:48

4   get rid of that demand artifact.  And, you know, then we'd      14:38:52

5   have to do some more pretests where we continue on.  We         14:38:57

6   didn't see any demand artifacts, but we did do a demand         14:39:01

7   artifact test, and we did it explicitly.                        14:39:04

8       Q.   The -- you know, the website printouts that we         14:39:08

9   looked at, they didn't -- none of them, you know, mentioned     14:39:11

10  touchscreen reliability.  So do you think it's possible         14:39:16

11  that by asking them about touchscreen reliability, you          14:39:19

12  focussed them on that feature?                                  14:39:22

13      A.   This definitely is something that the pretests are     14:39:24

14  looking for.  If they said, "Now, this is about touchscreen     14:39:28

15  reliability," we would have said, "Okay, we need to             14:39:32

16  disguise it further," and that did not come up.                 14:39:35

17      Q.   That didn't come up in any of the 20 people that       14:39:37

18  you talked to?                                                  14:39:40

19      A.   That's right.                                          14:39:42

20      Q.   Okay.  Who -- where did you get these 20 people?       14:39:44

21      A.   It's also from Bernett.                                14:39:48

22      Q.   These aren't the same people?                          14:39:50

23      A.   Of course not.                                         14:39:52

24      Q.   And as with the -- the 20 people that Bernett got      14:39:55

25  to -- got for AMS to interview in the -- the in-depth           14:40:03

Highly Confidential - Attorneys' Eyes Only

Page 211

| | | |
|---|---|---|
| 1 | respect to that.  No difference.  And, in fact, the ones | 15:59:10 |
| 2 | we're rich on are the ones that were launched in late 2011, | 15:59:12 |
| 3 | early 2012.  So it's understandable we're rich in that. | 15:59:17 |
| 4 | Q.   Why was it that you looked only at people who'd | 15:59:21 |
| 5 | purchased a Samsung phone or tablet in the last two years? | 15:59:25 |
| 6 | A.   That's a judgment.  You know, could have been last | 15:59:30 |
| 7 | year, could have been last two years.  You get beyond two | 15:59:34 |
| 8 | years, it's difficult.  I'm not particularly -- I don't | 15:59:37 |
| 9 | think it's going to be particularly sensitive to that.  But | 15:59:41 |
| 10 | it just was a judgment.  Certainly people can remember the | 15:59:46 |
| 11 | phones they've -- they've owned over the last two years. | 15:59:51 |
| 12 | If I went to the last ten years, you'd be amazed what we | 15:59:54 |
| 13 | were using ten years ago. | 16:00:02 |
| 14 | Q.   Let's go to Exhibit 1, paragraph 53, which is on | 16:00:10 |
| 15 | page 28.  So do you see the paragraph that's titled | 16:00:19 |
| 16 | "Double-Blind Design"? | 16:00:33 |
| 17 | A.   Yes. | 16:00:34 |
| 18 | Q.   Okay.  So how is it that a web survey could be | 16:00:35 |
| 19 | double-blind? | 16:00:42 |
| 20 | A.   Well, double-blind means we don't want the | 16:00:44 |
| 21 | interviewer to know the sponsor of the survey. | 16:00:48 |
| 22 | Q.   So the computer in this case? | 16:00:52 |
| 23 | A.   The computer in this case does not know the | 16:00:54 |
| 24 | sponsor of the survey. | 16:00:56 |
| 25 | Q.   Okay. | 16:00:57 |

Highly Confidential - Attorneys' Eyes Only

Page 212

1    A.   I mean it's basically implemented.  And part of          16:00:57

2  that is that -- that I've done demand artifact tests,           16:01:03

3  right?  So once I've done demand artifact tests, I'm pretty     16:01:07

4  confident that the survey is not giving the respondent any      16:01:11

5  cues.  So now the survey respondent is also blind to the        16:01:15

6  sponsor of the survey and blind to the hypotheses of the        16:01:20

7  survey.                                                          16:01:24

8    Q.   And then you say that "An Internet-based survey          16:01:34

9  avoids demand artifacts that might be induced by means of       16:01:37

10 intonation or facial expressions during the delivery of         16:01:41

11 particular questions or answers."                               16:01:43

12        So the pretest and the in-depth interviews, those        16:01:44

13 were -- those were not Internet-based or not completely         16:01:53

14 Internet-based; correct?                                        16:01:58

15   A.   They're also not part of the study.  They're            16:01:59

16 pre -- they're prior to the study.                              16:02:02

17   Q.   Okay.  So whatever demand artifacts are present in      16:02:03

18 the in-depth interviews or the pretest, that's -- that          16:02:06

19 doesn't matter?                                                 16:02:10

20        MR. ILLOVSKY:  Objection to form.                        16:02:11

21   A.   Yeah.  That's -- what is it, assuming facts not in      16:02:13

22 evidence or whatever, but I don't know the legal terms.         16:02:18

23 But I never said that there are demand artifacts in either      16:02:20

24 one of those.  If there was any intonation, that's actually     16:02:24

25 part of the process as the interviewers are trying to find      16:02:27

Highly Confidential - Attorneys' Eyes Only

Page 213

| | | |
|---|---|---|
| 1 | out how to word the questionnaire. | 16:02:33 |
| 2 | Q.   Well, isn't there intonations in voice in the | 16:02:34 |
| 3 | videos that you show along with your features? | 16:02:37 |
| 4 | A.   That's right.  And we tested those for demand | 16:02:40 |
| 5 | artifacts.  They don't -- they don't seem to be there. | 16:02:44 |
| 6 | Q.   How did you test those for demand artifacts? | 16:02:46 |
| 7 | A.   I described that before.  You know, we've done | 16:02:49 |
| 8 | pretests.  And in the pretests, consumers are asked after | 16:02:50 |
| 9 | having complete -- taken the survey if they can guess the | 16:02:55 |
| 10 | purpose of the survey, and they're not.  They're not saying | 16:03:00 |
| 11 | things like -- they're definitely not saying, you know, | 16:03:05 |
| 12 | "This is all about the touchscreen features" or "This is -- | 16:03:08 |
| 13 | I want a higher price or a lower price" or anything like | 16:03:11 |
| 14 | that.  So, yeah, it's been tested. | 16:03:14 |
| 15 | Q.   Is there -- can you give me a list of questions | 16:03:19 |
| 16 | that were asked during the pretest interviews? | 16:03:20 |
| 17 | A.   Do we have to go through this again?  I said, you | 16:03:24 |
| 18 | know, it's a set of -- I've given you type of questions | 16:03:27 |
| 19 | that are given; there's -- it's a standard set of | 16:03:31 |
| 20 | questions.  "What does this question mean to you?"  You | 16:03:34 |
| 21 | know, "What -- how did you answer the question?"  "What did | 16:03:37 |
| 22 | you think you were answering when you went over this | 16:03:40 |
| 23 | question?"  "Is there anything that you find difficult?" | 16:03:46 |
| 24 | "Are there words you don't understand?"  "Did you | 16:03:50 |
| 25 | understand the instructions?"  That type of thing. | 16:03:52 |

Highly Confidential - Attorneys' Eyes Only

Page  214

```
 1      Q.   And were these -- were these questions written      16:03:54

 2   down and provided to Patty and Jason?                        16:03:57

 3      A.   I think we've asked -- we've answered that many,     16:04:01

 4   many times.                                                  16:04:04

 5              MR. ILLOVSKY:   Objection.   Asked and            16:04:04

 6          answered.                                             16:04:05

 7      Q.   The answer is no?                                    16:04:05

 8      A.   There are standard procedures that are in, as you    16:04:09

 9   would say, in the DNA of doing this, of doing pretests and   16:04:13

10   qualitative interviews, but, once again, neither the         16:04:18

11   pretests nor the qualitative interviews are the study.  The  16:04:21

12   study is the conjoint analysis.                              16:04:25

13      Q.   So have you looked at -- have you looked at the      16:04:44

14   distribution of the -- of the Samsung models in your final   16:04:47

15   sample and compared that to -- compared that to the -- the   16:04:53

16   actual models that were sold over the last two years in the  16:04:59

17   United States?  Have you looked at that?                     16:05:01

18      A.   Well, no one has given me any data yet whatsoever    16:05:05

19   of the Samsung models that were sold over the period of my   16:05:09

20   survey.                                                      16:05:15

21      Q.   Did you ask for that data when you were             16:05:18

22   conducting -- when you were designing or conducting your     16:05:20

23   survey; did you -- did you seek out that data?               16:05:25

24      A.   No.  But Dr. Sukumar did say, well, jeez, you        16:05:27

25   know, he's got some data, which I think in deposition he's   16:05:32
```

Highly Confidential - Attorneys' Eyes Only

Page 228

```
 1      Q.   Is -- would -- in your touchscreen feature,      16:38:51

 2   isn't -- wouldn't it be important to include a non-      16:38:58

 3   infringing alternative as a control?                     16:39:03

 4      A.   I -- I am here to speak about the conjoint       16:39:09

 5   analysis.  I -- I believe, and it's my opinion, that the 16:39:11

 6   conjoint analysis represents the willingness to pay or the 16:39:18

 7   price premium that people are willing to pay for the     16:39:21

 8   difference between the two function -- two or more       16:39:25

 9   functionalities that I described.  That's the limit of my 16:39:33

10   opinion.  I -- I am relying on someone else to then tell me 16:39:36

11   how these relate to the actual patents.                  16:39:42

12      Q.   Okay.  So is it true that you have no opinion    16:39:46

13   whether the descriptions in the -- in the videos that were 16:39:49

14   presented in your survey are consistent with the claims of 16:39:56

15   the particular patents?                                  16:40:00

16      A.   I am informed that they are and that there's     16:40:02

17   another expert that will testify to that.                16:40:05

18      Q.   But you have no opinion as to that; correct?     16:40:07

19      A.   I have an opinion that the consumers understood  16:40:10

20   those differences, that they were adequately described to 16:40:12

21   the consumers, that the conjoint analysis was accurate in 16:40:16

22   measuring the differences.  But, I -- the adequacy with  16:40:19

23   which they represent the functionality of the opinions, I 16:40:25

24   do not -- sorry -- the patents, I do not have a market   16:40:30

25   research opinion, which is that I'm here as a market     16:40:34
```

Highly Confidential - Attorneys' Eyes Only

Page 254

```
 1   calculations based on whatever it is, a billion different      17:31:40

 2   numbers.                                                       17:31:43

 3       Q.   Did you look at the median of those calculations?     17:31:44

 4       A.   I looked at -- I did the median appropriately.        17:31:48

 5       Q.   So what was the -- what was the median?               17:31:51

 6       A.   The median, as described, it's -- we can look it      17:31:55

 7   up, you know.                                                  17:31:58

 8       Q.   Do you remember?                                      17:31:59

 9       A.   Is it a memory test?                                  17:32:00

10       Q.   No.  It's -- I'm asking you if you remember or        17:32:02

11   not.                                                           17:32:04

12       A.   Do I remember the exact number?                       17:32:05

13       Q.   Uh-huh.                                               17:32:06

14       A.   The exact number's in my report.  We can look it      17:32:07

15   up.                                                            17:32:10

16       Q.   Okay.  Let's go -- let's go there.                    17:32:10

17       A.   (Pause.)  Well, it's basically footnote 72, 73,       17:33:15

18   and you'll note that in 72 it says, "For each of these         17:33:22

19   samples, I computed a median willingness to pay for the        17:33:30

20   market.  I then computed an overall market level               17:33:34

21   willingness to pay by taking the median of the 10,000          17:33:37

22   sample medians," okay?  And then I cautioned, "As explained    17:33:41

23   in the earlier coin-flipping examples, reporting a             17:33:44

24   willingness to pay for an individual respondent would not      17:33:47

25   be sufficiently precise; however, the overall market level     17:33:50
```

Highly Confidential - Attorneys' Eyes Only

Page 255

1    willingness to pay is sufficiently precise."  So I          17:33:54

2    definitely cautioned that.                                  17:33:58

3            Now, in -- in paragraph 73, doing those median      17:34:00

4    calculations, so doing the medians within the sampler,      17:34:04

5    okay, so in the -- getting the posterior distribution of    17:34:08

6    the medians, I then, having gotten that posterior           17:34:11

7    distribution of the medians, we can now say something like  17:34:17

8    the willingness to pay estimates at a base price of 199,    17:34:20

9    customers would be willing to pay $40 more for a smartphone 17:34:25

10   that has the functionality associated with patent '915.     17:34:28

11   And then it goes on from there.                             17:34:32

12           And you'll note that how this, then, is used is up  17:34:35

13   in paragraph 104, and it says, "The median willing --       17:34:39

14   consumer willingness to pay calculation leads price premium 17:34:44

15   estimates that are similar to what I estimate using the     17:34:48

16   market simulation."  So I'm using it for a convergent       17:34:51

17   check.                                                      17:34:54

18       Q.   So if we look at -- if we look at any one          17:34:57

19   respondent's draws, that doesn't really -- that doesn't     17:35:11

20   really tell us their willingness to pay for -- for any of   17:35:17

21   the features?                                               17:35:20

22       A.   Again, let's go back to the coin-flipping example.17:35:23

23   If I end up with two heads, my estimate, you know, for that 17:35:26

24   particular respondent, you know, in fact, my maximum        17:35:31

25   likelihood estimate is 100 percent.  You know, so I'm not   17:35:35

Highly Confidential - Attorneys' Eyes Only

Page 273

1   COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

2

3          I, JAMES A. SCALLY, RMR, CRR, a Certified
    Shorthand Reporter and Notary Public duly commissioned and
4   qualified in and for the Commonwealth of Massachusetts, do
    hereby certify that there came before me on the 27th day of
5   April, 2012, at 9:31 a.m., the person hereinbefore named,
    JOHN HAUSER, who provided satisfactory evidence of
6   identification as prescribed by Executive Order 455 (03-13)
    issued by the Governor of the Commonwealth of
7   Massachusetts, was by me duly sworn to testify to the truth
    and nothing but the truth of his knowledge concerning the
8   matters in controversy in this cause; that he was thereupon
    examined upon his oath, and his examination reduced to
9   typewriting under my direction; and that this is a true
    record of the testimony given by the witness to the best of
10  my ability.
            I further certify that I am neither
11  attorney or counsel for, nor related to or employed by, any
    of the parties to the action in which this deposition is
12  taken, and further, that I am not a relative or employee of
    any attorney or counsel employed by the parties hereto or
13  financially interested in the action.
14  Dated: April 28th, 2012.
15      My Commission Expires:  April 23, 2015
16

17

18                         _____

                           James A. Scally, RMR, CRR
19                         CSR/Notary Public
20

21

22

23

24

25

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

   - - - - - - - - - - - - - - - - - -

5   APPLE, INC.,

6                        Plaintiff,    Case No.

7       v.                        11-cv-01846-LHK

8   SAMSUNG ELECTRONICS CO., LTD., A

9   Korean business entity; SAMSUNG ELECTRONICS

10  AMERICA, INC., a New York corporation;

11  SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,

12  a Delaware limited liability company,

13                        Defendants.

   - - - - - - - - - - - - - - - - - -

14

                      CONFIDENTIAL

15

16    VIDEOTAPED DEPOSITION of JOHN R. HAUSER, Ph.D.,

17  before Michael D. O'Connor, Registered Professional

18  Reporter, and Notary Public in and for the

19  Commonwealth of Massachusetts, at the Offices of

20  Cornerstone Research, 699 Boylston Street, Boston,

21  Massachusetts, on Thursday, November 29, 2012,

22  commencing at 2:00 p.m.

23

24

25  PAGES 274 - 393

                                    Page  274

```
 1    Research on behalf of Apple.                      02:01:50
 2            MR. KUWAYTI:  Ken Kuwayti for the         02:01:52
 3    Plaintiff, Apple.  I want to note for the record the  02:01:55
 4    videographer read the start time as one o'clock.  02:01:58
 5    It's actually two clock.                          02:02:00
 6            VIDEOGRAPHER:  I apologize.  Thank you.    02:02:02
 7    The witness will be sworn in and counsel will begin  02:02:04
 8    the examination.                                  02:02:08
 9
10                   JOHN R. HAUSER, Ph.D.
11
12    having been satisfactorily identified by the
13    production of his driver's license, and duly sworn
14    by the Notary Public, was examined and testified as
15    follows:
16
17                   DIRECT EXAMINATION
18    BY MR. RAMOS:                                     02:02:14
19        Q.   Dr. Hauser, your deposition was taken    02:02:14
20    previously in this matter.  Do you recall that?   02:02:22
21        A.   Yes, I do.                               02:02:24
22        Q.   And I believe at that deposition one of my  02:02:25
23    colleagues ran through the ground rules for       02:02:30
24    depositions.  Are you generally familiar with those  02:02:34
25    ground rules?                                     02:02:36
```

Page 278

1    here?                                                    04:18:11

2         A.   As I said, it's subject to interpretation.    04:18:12

3    But I'm not going to disagree with what's said right    04:18:15

4    here.  In my particular instance, those things can      04:18:21

5    be happening, but I've measured the result of all of    04:18:25

6    those things happening.                                 04:18:29

7         Q.   Turn, if you would, back to your reply        04:18:30

8    declaration, which we marked as an exhibit.  Dr.        04:18:36

9    Hauser, what is the relationship between a              04:19:21

10   consumer's willingness to pay for a given product      04:19:24

11   and the price and availability of substitute           04:19:26

12   products?                                              04:19:30

13              MR. KUWAYTI:  Object to the form.           04:19:31

14        A.   So willingness to pay is how much they're    04:19:32

15   willing to pay for the product.  I think we can        04:19:39

16   agree with that.  That's the demand curve.  And a      04:19:42

17   lot of things influence that demand curve.  We've      04:19:48

18   agreed to that.                                        04:19:51

19              Now, so what do we have?  Those things have 04:19:53

20   influenced the consumers.  Whatever those things       04:19:56

21   have, they've now integrated those when they're        04:19:59

22   answering my questions.                                04:20:03

23              So I'm measuring the demand, which is, of   04:20:03

24   course, a function of all of those things that had     04:20:06

25   been happening in the marketplace.  So I measure the   04:20:09

| | | |
|---|---|---|
| 1 | net result of those. | 04:20:11 |
| 2 | Q.   All else being equal, isn't the willingness | 04:20:12 |
| 3 | to pay for a given product going to be lower when | 04:20:19 |
| 4 | closer substitutes are available? | 04:20:27 |
| 5 | MR. KUWAYTI:  Object to the form. | 04:20:30 |
| 6 | A.   Well, I mean, I'm sure it depends upon a | 04:20:31 |
| 7 | lot of things.  However, it depends upon that, that | 04:20:37 |
| 8 | happens, and did I measure the result of it. | 04:20:40 |
| 9 | Q.   In your surveys, as to what you're | 04:20:44 |
| 10 | testifying in this case, you measured the result of | 04:21:03 |
| 11 | the price and availability of substitute products? | 04:21:09 |
| 12 | A.   Well, let's -- let me try and explain that | 04:21:11 |
| 13 | in a little more detail.  I have consumers who have | 04:21:18 |
| 14 | made choices, and I'm giving them more choices. | 04:21:23 |
| 15 | So they have taken their preferences.  They | 04:21:28 |
| 16 | have a lot of experience.  They know there's | 04:21:31 |
| 17 | available products and all of these things are | 04:21:33 |
| 18 | happening, and they have a certain willingness to | 04:21:35 |
| 19 | pay.  That's a function of whatever the distribution | 04:21:36 |
| 20 | of that is in the marketplace. | 04:21:41 |
| 21 | So I come in and I now make a measurement. | 04:21:43 |
| 22 | That's the measurement of the net result of | 04:21:47 |
| 23 | everything that's going on, including substitute | 04:21:51 |
| 24 | products, including the preferences, presumably | 04:21:54 |
| 25 | we've integrated out some of the other issues.  So | 04:21:57 |

Page 356

```
 1    it's the net result.                              04:22:02

 2            So I'm getting a demand curve, as the     04:22:03

 3    demand curve exists at the time of my survey, and  04:22:06

 4    one of the things that we do in marketing quite a  04:22:09

 5    bit is we measure demand.                          04:22:12

 6            Now, we're very good at measuring demand,  04:22:15

 7    preferences, willingness to pay.  You can use lots  04:22:19

 8    of synonyms here.  That's what we do.              04:22:23

 9        Q.   All right.  You agreed with the statement  04:22:25

10    in Professor Samuelson's and Nordhaus' economics   04:22:35

11    textbook that the prices and availability of related  04:22:41

12    goods influence the demand for a commodity.  In your  04:22:43

13    survey, you did not test prices and availability of  04:22:48

14    competing brands to Samsung brands, correct?       04:22:53

15            MR. KUWAYTI:  Object to the form.          04:22:58

16        A.   The prices and availability of competing  04:23:02

17    brands are what they were or were what they were.  04:23:05

18    I'm not sure of the right verb tense here.         04:23:07

19            At the time of my survey, there was some   04:23:10

20    distribution of those, and I got an accurate measure  04:23:12

21    subject to that distribution.                      04:23:14

22        Q.   How did you get an accurate measure without  04:23:25

23    asking your participants about competing brands?   04:23:27

24        A.   They are what they are.  Let's go back to  04:23:31

25    my automobile example.  We're driving an automobile  04:23:39
```

Page 357

| | | |
|---|---|---|
| 1 | down the street, and somebody, somewhere, the other | 04:23:43 |
| 2 | side of the world, is doing something, flipping a | 04:23:47 |
| 3 | coin.  That flipping coin may or may not affect the | 04:23:50 |
| 4 | automobile's speed. | 04:23:53 |
| 5 | How do I measure the speed of the | 04:23:56 |
| 6 | automobile?  I know the speed of the automobile, | 04:23:58 |
| 7 | subject to everything else that's going on.  I don't | 04:24:00 |
| 8 | have to measure how that coin is affecting the | 04:24:02 |
| 9 | automobile's speed.  I just have to measure the | 04:24:05 |
| 10 | automobile's speed, and that's subject to that | 04:24:08 |
| 11 | environment. | 04:24:10 |
| 12 | So in this case, and I'm not sure that's | 04:24:11 |
| 13 | the best example, but in this case, there are | 04:24:13 |
| 14 | competing products out there.  They have prices, and | 04:24:18 |
| 15 | there's other things they're doing.  That's the | 04:24:22 |
| 16 | marketplace. | 04:24:26 |
| 17 | Now, I come into that marketplace, and I | 04:24:27 |
| 18 | say all of those other things are happening.  Now | 04:24:29 |
| 19 | let me measure the net result of that, and let me | 04:24:32 |
| 20 | measure the result of that, and also ask a few | 04:24:35 |
| 21 | hypotheticals where I'm going to bury things in | 04:24:40 |
| 22 | terms of features and price and other things, so I | 04:24:46 |
| 23 | can measure that variation.  And that variation, of | 04:24:48 |
| 24 | course, is capturing the net effect of all of these | 04:24:51 |
| 25 | other things. | 04:24:56 |

Page 358

| | | |
|---|---|---|
| 1 | So I don't have to predict internally | 04:24:57 |
| 2 | within my model what will happen if one of those | 04:24:59 |
| 3 | other products drop out.  I just have what's | 04:25:02 |
| 4 | happening in that marketplace at that time. | 04:25:05 |
| 5 | Now, the next question, which is very | 04:25:08 |
| 6 | reasonable, is do I feel that that applies today? | 04:25:10 |
| 7 | The answer is yes.  I do feel that those willingness | 04:25:13 |
| 8 | to pay do apply today.  Things haven't changed that | 04:25:18 |
| 9 | much. | 04:25:21 |
| 10 | Q.  But by definition, Dr. Hauser, the | 04:25:22 |
| 11 | marketplace you were testing was the marketplace for | 04:25:24 |
| 12 | Samsung smartphones only, correct? | 04:25:29 |
| 13 | A.  That is not correct. | 04:25:31 |
| 14 | Q.  Your questions did not permit the option of | 04:25:32 |
| 15 | choosing an alternative brand, correct? | 04:25:36 |
| 16 | A.  No.  They did not need to. | 04:25:38 |
| 17 | Q.  I'm not asking you whether they needed to. | 04:25:41 |
| 18 | They didn't do that, correct? | 04:25:43 |
| 19 | A.  You're right, I did not have an outside | 04:25:45 |
| 20 | option. | 04:25:49 |
| 21 | Q.  And were you simply assuming that the | 04:25:50 |
| 22 | respondents, who you surveyed, had full knowledge | 04:26:01 |
| 23 | regarding the other brands that were available and | 04:26:05 |
| 24 | the current prices of those other brands? | 04:26:08 |
| 25 | A.  No.  The other respondents had the | 04:26:10 |

Page 359

1    knowledge they had.  That's the marketplace.          04:26:13

2       Q.   Did you ask them about their knowledge        04:26:16

3    regarding competing brands and the prices of          04:26:20

4    competing brands?                                     04:26:22

5       A.   What's important here is I got a             04:26:23

6    representative sample, and the representative sample  04:26:26

7    now, that's the way it was in the marketplace at the  04:26:30

8    time of my survey.  And likely, that's very, very     04:26:35

9    close to the way it is now.                           04:26:40

10       Q.   When you say "representative sample," it      04:26:41

11   was representative of Samsung owners, correct?        04:26:44

12       A.   Yes.  Those are the people I -- well, it's    04:26:46

13   a little bit more complicated than that.  The         04:26:50

14   samples representative overall, and then we sampled   04:26:53

15   Samsung owners from that representative sample.  So   04:26:57

16   we screened into Samsung owners, but Samsung owners   04:27:01

17   of the devices that are at issue in this case.        04:27:06

18       Q.   Did you ask any of the respondents to your   04:27:08

19   survey whether they also owned or had ever purchased  04:27:19

20   an Apple smartphone?                                  04:27:24

21       A.   We might have.                               04:27:25

22       Q.   You don't recall?                            04:27:35

23       A.   It's easy enough to look up.  The answer to  04:27:36

24   your question is QS7 of Exhibit F.  The question is,  04:28:18

25   "In the past two years, which of the following        04:28:23

| | | |
|---|---|---|
| 1 | brands of smartphones have you personally owned?" | 04:28:25 |
| 2 | Apple, here, it was iPhone 3GS, iPhone 4S, et | 04:28:27 |
| 3 | cetera, and the survey, of course, was done prior to | 04:28:39 |
| 4 | the launch of the iPhone 5. | 04:28:42 |
| 5 | Q.  Do you know of the persons who participated | 04:28:45 |
| 6 | in your survey how many had purchased Apple | 04:28:49 |
| 7 | smartphones? | 04:28:53 |
| 8 | A.  Not sitting here today, but I presume those | 04:28:53 |
| 9 | data have been given to Samsung. | 04:28:57 |
| 10 | Q.  Did you ask any other questions regarding | 04:28:59 |
| 11 | their knowledge of Apple smartphones or the prices | 04:29:06 |
| 12 | of Apple smartphones? | 04:29:09 |
| 13 | A.  No, not that I recall. | 04:29:11 |
| 14 | Q.  What about other brands? | 04:29:13 |
| 15 | A.  Well, we can see that there are other | 04:29:15 |
| 16 | brands in here. | 04:29:18 |
| 17 | Q.  Other than that question, did you ask them | 04:29:18 |
| 18 | anything else about their knowledge of other brands | 04:29:22 |
| 19 | of smartphones? | 04:29:24 |
| 20 | A.  Not that I can recall.  Not that I can | 04:29:25 |
| 21 | recall. | 04:29:28 |
| 22 | Q.  Let's go back to your reply, Dr. Hauser. | 04:29:28 |
| 23 | A.  We have been going for -- | 04:29:50 |
| 24 | Q.  If you want to take a break, it's okay. | 04:29:51 |
| 25 | A.  If it's a new set of questions? | 04:29:53 |

Page 361

| | | |
|---|---|---|
| 1 | Q.   Yes, it will be.  That's fine. | 04:29:56 |
| 2 | A.   Just a short break. | 04:29:59 |
| 3 | VIDEOGRAPHER:  The time is 4:29 p.m.  We | 04:30:01 |
| 4 | are off the record. | 04:30:07 |
| 5 | (Recess) | 04:31:46 |
| 6 | VIDEOGRAPHER:  The time is 4:48 p.m.  We | 04:48:30 |
| 7 | are back on the record. | 04:48:32 |
| 8 | A.   Just one thing I realized, my answer about | 04:48:34 |
| 9 | the slowpokes and the speeders, I think I may have | 04:48:38 |
| 10 | forgot to put a "not" in there.  Whether I did or | 04:48:40 |
| 11 | not, the full description of what happens when you | 04:48:45 |
| 12 | take the slowpokes and the speeders out or put them | 04:48:49 |
| 13 | back in is in Footnote 71, Page 54 of my report.  So | 04:48:53 |
| 14 | just in case I forgot to put that "not" in there. | 04:48:59 |
| 15 | Q.   Dr. Hauser, other than what you have | 04:49:20 |
| 16 | testified about today, and what you said in your | 04:49:22 |
| 17 | report and your reply declaration in your testimony | 04:49:31 |
| 18 | at trial, is there anything else that you have done | 04:49:34 |
| 19 | to account for the availability and price of | 04:49:42 |
| 20 | competing products that is competing with Samsung's | 04:49:47 |
| 21 | smartphones in your analysis? | 04:49:54 |
| 22 | A.   I think I've already testified about the | 04:50:00 |
| 23 | fact that it's an all else equal -- well, basically | 04:50:04 |
| 24 | I'm capturing the background of what's going on. | 04:50:12 |
| 25 | It's kind of a general question, but I've done my | 04:50:16 |

Page 362

| | | |
|---|---|---|
| 1 | best to explain it, explain how we did capture what | 04:50:22 |
| 2 | was going on at the time. | 04:50:26 |
| 3 | Q.   There's nothing else that you can recall | 04:50:27 |
| 4 | that you did in that respect?  I know you've | 04:50:32 |
| 5 | explained it.  I know you've testified about it. | 04:50:36 |
| 6 | A.   Put it this way.  I've done my best to | 04:50:39 |
| 7 | explain it.  Have I, you know, forgotten another | 04:50:41 |
| 8 | different way I could have explained it or have I | 04:50:48 |
| 9 | forgotten something that's in the report, et cetera, | 04:50:49 |
| 10 | perhaps. | 04:50:53 |
| 11 | There's no additional -- I think we have | 04:50:55 |
| 12 | provided Samsung with everything that was done, | 04:50:56 |
| 13 | every set of analyses that was done prior to | 04:51:03 |
| 14 | submitting these reports. | 04:51:08 |
| 15 | Q.   Am I correct that you have not undertaken | 04:51:09 |
| 16 | to determine whether Apple has lost market share as | 04:51:17 |
| 17 | a result of Samsung's offering, the features | 04:51:30 |
| 18 | associated with the patents at issue on its | 04:51:32 |
| 19 | smartphones? | 04:51:35 |
| 20 | MR. KUWAYTI:  Object to the form. | 04:51:36 |
| 21 | A.   Well, I think I've testified that I can't | 04:51:36 |
| 22 | quantify exactly how much, but it's clear that they | 04:51:41 |
| 23 | have.  But I think -- well, it's clear that these | 04:51:43 |
| 24 | features had a substantial influence on the demand | 04:51:46 |
| 25 | for Samsung phones. | 04:51:50 |

Page 363

1        So if these consumers did not buy those          04:51:55

2    phones, they would have bought other phones.  I have  04:51:57

3    not made an estimate of which other phones that they  04:52:01

4    would have purchased.  I believe that Mr. Musika has  04:52:04

5    means to do that.                                     04:52:11

6        Q.   Dr. Hauser, can you say whether consumers    04:52:13

7    buy Samsung smartphones because they're equipped      04:52:22

8    with these features?                                  04:52:28

9             MR. KUWAYTI:   Object to the form.           04:52:29

10       A.   Well, what I can say is that these features   04:52:30

11   have a substantial effect whether or not they buy     04:52:35

12   Samsung phones.                                       04:52:44

13       Q.   Is this the primary draw for consumers to     04:52:46

14   the Samsung smartphones?                              04:52:52

15            MR. KUWAYTI:   Object to the form.            04:52:53

16       A.   I'm not sure what you mean by "primary        04:52:53

17   draw."  What I know is that these features,           04:52:56

18   substantially significant, you know, pick the word,   04:52:59

19   affect demand for these phones in a big way.          04:53:03

20            So now we're going to play with semantics.    04:53:08

21   Is that synonymous with what I just said?  Perhaps.   04:53:11

22       Q.   When you say it affects demand in a big       04:53:16

23   way, am I correct that's based solely on your         04:53:19

24   derivation of willingness to pay figures with regard  04:53:23

25   to the features associated with the utility patents   04:53:26

Page 364

```
 1    at issue?                                            04:53:29

 2         A.    Well, as I've testified earlier, we do know  04:53:30

 3    it's a differentiated, but competitive market, and    04:53:35

 4    as a result, in such a market, if I stop offering     04:53:42

 5    features that consumers value highly, I'm going to    04:53:46

 6    lose market share, and that's what I know.  That's    04:53:51

 7    just based upon, you know, over 35 years of           04:53:54

 8    experience.                                           04:53:56

 9         Q.    Can you say, based on your analysis, that   04:53:56

10    the consumers who bought Samsung smartphones did so   04:54:04

11    primarily because of the features at issue?           04:54:09

12         MR. KUWAYTI:  Object to the form.                04:54:13

13         A.    You know, primarily what do you mean?      04:54:14

14    There is no doubt that these features had an impact,  04:54:18

15    and I think my data shows that they had sort of a     04:54:25

16    $100 impact.                                          04:54:31

17         Now, what words you want to put associated       04:54:32

18    with $100, it's a pretty big impact.                  04:54:35

19         Q.    But do you know that -- strike that.  Do    04:54:38

20    you know that they -- strike that as well.            04:54:46

21         Do you know whether they selected Samsung        04:54:48

22    smartphones over other brands because of these        04:54:55

23    features?                                             04:54:59

24         MR. KUWAYTI:  Object to the form.                04:55:00

25         A.    These features had an effect, a big effect.  04:55:01
```

Page 365

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Now, because it's one of the many things, but they | 04:55:08 |
| 2 | had an effect. | 04:55:12 |
| 3 |     Q.   And you can't quantify that effect? | 04:55:14 |
| 4 |     A.   I can quantify the effect that for | 04:55:17 |
| 5 | smartphones it's $100 worth, and for tablets it's | 04:55:21 |
| 6 | $90 worth.  That much I've quantified. | 04:55:26 |
| 7 |     Q.   And we agree that that's five percent of | 04:55:29 |
| 8 | the overall price, assuming that $2,000 contract? | 04:55:35 |
| 9 |     A.   No.  I mean, we can do a calculation and | 04:55:40 |
| 10 | say $100 is five percent of $2,000.  The particular | 04:55:48 |
| 11 | analyses I've shown is that it's $100. | 04:55:56 |
| 12 |     I did not ask them to parse this out.  I | 04:56:01 |
| 13 | know that very confidently these features are worth | 04:56:05 |
| 14 | $100 to them or they would be willing to pay $100, | 04:56:10 |
| 15 | to be exact. | 04:56:16 |
| 16 |     Q.   Does your study measure price elasticity of | 04:56:17 |
| 17 | demand with respect to the smartphones at issue? | 04:56:35 |
| 18 |     A.   Well, price elasticity is the percentage | 04:56:37 |
| 19 | change in quantity divided by the percentage change | 04:56:45 |
| 20 | in price.  Price elasticity, we also have to talk | 04:56:48 |
| 21 | about point elasticity and elasticity over a range. | 04:56:55 |
| 22 |     I have measured, in essence, the change in | 04:56:58 |
| 23 | probabilities.  That could be gotten -- let me step | 04:57:07 |
| 24 | back and say that if one wants to use the data I | 04:57:12 |
| 25 | have to compute price elasticity, which is a | 04:57:17 |

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL

```
 1                    CERTIFICATE
 2    Commonwealth of Massachusetts
 3    Suffolk, ss.
 4
 5        I, Michael D. O'Connor, Registered Professional
 6    Reporter and Notary Public in and for the
 7    Commonwealth of Massachusetts, do hereby certify
 8    that JOHN R. HAUSER, Ph.D., the witness whose
 9    deposition is hereinbefore set forth, was duly sworn
10    by me and that such deposition is a true record of
11    the testimony given by the witness.
12        I further certify that I am neither related to
13    or employed by any of the parties in or counsel to
14    this action, nor am I financially interested in the
15    outcome of this action.
16        In witness whereof, I have hereunto set my hand
17    and seal this 30th day of November, 2012.
18
19
20                         Notary Public
21
22
23    My commission expires
24    December 3, 2015
25
```

Page 393