# EXHIBIT 7

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2               SAN JOSE DIVISION

3

4

5

6

APPLE INC., A CALIFORNIA      :
7  CORPORATION,                  :
                    PLAINTIFF,   :
8

                                 :
9        VS.                     : CASE NO.
                                 : 11-CV-01846-LHK
10  SAMSUNG ELECTRONICS, CO.,     :
   LTD., A KOREAN BUSINESS       :
11  ENTITY; SAMSUNG ELECTRONICS  :
   AMERICA, INC., A NEW YORK     :
12  CORPORATION; SAMSUNG          :
   TELECOMMUNICATIONS AMERICA,   :
13  LLC, A DELAWARE LIMITED       :
   LIABILITY COMPANY,            :
14
                    DEFENDANTS
15

16

17

18

19

20        VIDEOTAPED DEPOSITION OF ANDRIES VAN
   DAM, an Expert Witness in the above-entitled
21  cause, taken on behalf of the Plaintiff,
   before Barbara Warner, RPR, Notary Public in
22  and for the State of Rhode Island, at the
   offices of Allied Court Reporters, 115-21 Phenix
23  Avenue, Cranston, RI, on May 2, 2012
   at 9:00 A.M.
24
25  TSG Job # 49185

1   Q.  For example, when using Microsoft Excel, if        09:28

2       one wanders into a series of empty squares,        09:28

3       would that be an example of a desert fog           09:28

4       phenomenon?                                         09:28

5           MR. TUNG:  Objection.  Vague.                   09:28

6   A. No, I don't believe it would be.  You're            09:28

7       simply reaching the end of the information in       09:28

8       the spreadsheet, but you know exactly how you       09:28

9       scrolled to get there, and a small movement         09:28

10      in the opposite direction will bring you back       09:28

11      to the last row, or the last column.  The           09:28

12      numbering is indicative of where you are in         09:28

13      the larger spreadsheet.  I think it is a            09:28

14      misappropriation of the term desert fog as a        09:28

15      problem for a particular class of user              09:28

16      interfaces and user experiences for the far,        09:28

17      far simpler case of a constrained                   09:28

18      two-dimensional world where you know how you        09:28

19      got to an edge of a document, and you have          09:29

20      sufficient navigational queues so you can get       09:29

21      back.                                               09:29

22  Q.  Let's begin with your opinions about the Lira       09:29

23      reference.  I believe you begin assessing           09:29

24      those in your report, Exhibit 1, let's start        09:29

25      at paragraph 107.                                   09:29

Page 14

| | | |
|---|---|---|
| 1 | A. I'm there. | 09:29 |
| 2 | Q. So here you state in paragraph 107 that you | 09:29 |
| 3 | believe Lira embodies each and every | 09:29 |
| 4 | limitation of a series of claims of the '381 | 09:30 |
| 5 | patent.  Do you see that? | 09:30 |
| 6 | A. I see that. | 09:30 |
| 7 | Q. The next paragraph, 108, appears to be about | 09:30 |
| 8 | the XNav system.  Maybe that was a mistake? | 09:30 |
| 9 | A. I'm sorry.  Yes, it certainly is.  I'm | 09:30 |
| 10 | going to read 108 and provide you with | 09:30 |
| 11 | real-time corrections, if you would like | 09:30 |
| 12 | that. | 09:30 |
| 13 | Q. That would be lovely, yes. | 09:30 |
| 14 | A. I apologize.  So I think the simple fix | 09:30 |
| 15 | here, although I would have to read through | 09:31 |
| 16 | the entire section lineally to make 1,000 | 09:31 |
| 17 | percent sure, but at a reasonable level of | 09:31 |
| 18 | certainty, this is a simple copy-and-paste | 09:32 |
| 19 | error, and it should have been, in my | 09:32 |
| 20 | opinion, the start of 108, the Lira system. | 09:32 |
| 21 | And then in the next sentence, one of | 09:32 |
| 22 | ordinary skill viewing the Lira system in | 09:32 |
| 23 | operation, using the Lira system.  It's not | 09:32 |
| 24 | that simple, I now recognize, because we talk | 09:32 |
| 25 | about it as used in public, so saying the | 09:32 |

Page 15

1     Lira system as used in public would not be        09:32
2     accurate.  I am really sorry, but I would         09:32
3     need to take more time to figure out how to       09:32
4     remedy the clearly messed up paragraph 108.       09:32
5  Q. Actually, I think I can ask a couple of           09:33
6     clarifying questions that will help.  You are     09:33
7     not offering a view that Lira the system, you     09:33
8     are relying on the patent itself?                 09:33
9     A. That's correct.  That is just why I made       09:33
10    the comment I did, that it is not a simple        09:33
11    substitution of Lira for XNav, because it         09:33
12    says Lira system.                                 09:33
13 Q. Similarly, paragraph 109 about a public use       09:33
14    does not apply to Lira?                           09:33
15    A. That's correct.  I think this is a             09:33
16    copy-and-paste failure to modify the pasted       09:33
17    portion appropriately for Lira.                   09:33
18 Q. The important point I think for our purposes      09:33
19    is that your opinions about Lira are based on     09:33
20    the document itself, not on some other            09:33
21    evidence; is that right?                          09:33
22    A. Correct.                                       09:33
23 Q. And your detailed analysis of that is Exhibit     09:33
24    5?                                                09:33
25    A. That's correct.                                09:33

Page 16

| | | |
|---|---|---|
| 1 | Q. Let's turn to Exhibit 5, then. Can you | 09:33 |
| 2 | explain what constitutes the electronic | 09:34 |
| 3 | document for purposes of your analysis in | 09:34 |
| 4 | Exhibit 5? | 09:34 |
| 5 | MR. TUNG: Objection. Compound. | 09:34 |
| 6 | A. I analyzed the claims of '381 in this | 09:34 |
| 7 | recitation element by element for two | 09:34 |
| 8 | different readings of the electronic | 09:34 |
| 9 | document. One is logical column 1, and the | 09:34 |
| 10 | other is the web page as a whole. | 09:34 |
| 11 | Q. Are you saying that the Lira reference uses | 09:34 |
| 12 | the concept of electronic document | 09:34 |
| 13 | ambiguously? | 09:35 |
| 14 | MR. TUNG: Objection. | 09:35 |
| 15 | Mischaracterizes testimony. | 09:35 |
| 16 | A. The Lira document, like all of the other | 09:35 |
| 17 | art that I examined, doesn't give a | 09:35 |
| 18 | definition of what is and what isn't an | 09:35 |
| 19 | electronic document. Their language says | 09:35 |
| 20 | certainly that the web page is an electronic | 09:35 |
| 21 | document. They further talk about having | 09:35 |
| 22 | logical columns and other kinds of elements, | 09:35 |
| 23 | or components. So Lira does not explicitly | 09:35 |
| 24 | say a column can be viewed as an electronic | 09:35 |
| 25 | document, but it also has no language that | 09:35 |

1    would prohibit such an interpretation.        09:35

2  Q.  Lira describes the entire web page as an     09:35

3    electronic document?                           09:35

4    A. The place where the first mention of        09:35

5    electronic document is, as I recall, and it    09:36

6    would be useful if you could provide me with   09:36

7    Lira so that I can bring you to the right       09:36

8    page.  Do we have a copy of Lira amongst all   09:36

9    of you?                                         09:36

10           MR. TUNG:  Do you want to go off       09:36

11    the record?                                    09:36

12           MR. KREEGER:  Off the record for a     09:36

13    moment.                                        09:36

14           THE VIDEOGRAPHER:  Off the record.     09:36

15    The time is 9:36.                              09:36

16           (OFF THE RECORD)                        09:37

17           THE VIDEOGRAPHER:  Back on the         09:40

18    record.  The time is 9:40.                     09:40

19  Q.  Dr. van Dam, we have managed to look at a   09:40

20    copy of the Lira reference.  Maybe you can     09:40

21    just indicate the Bates numbers, we won't      09:40

22    make it an exhibit, just the Bates numbers of  09:40

23    the document that you have in front of you.    09:40

24    A. I am reading Lira International             09:40

25    Publication Number WO 03/081458 A1, and it's  09:40

Page 18

| | | | |
|---|---|---|---|
| 1 | | Bates number SAMNDCA 00024685. | 09:40 |
| 2 | Q. | The question we were getting to was I asked | 09:41 |
| 3 | | you if Lira refers to the web page as an | 09:41 |
| 4 | | electronic document? | 09:41 |
| 5 | | A. It does.  And in line 6 of that patent's | 09:41 |
| 6 | | page 1, which has Bates number 24687, it | 09:41 |
| 7 | | says, Web pages and other electronic | 09:41 |
| 8 | | documents generally are formatted for viewing | 09:41 |
| 9 | | and navigation in display windows of standard | 09:41 |
| 10 | | sized or oversized displays, et cetera. | 09:41 |
| 11 | Q. | I think you already testified to this, but | 09:41 |
| 12 | | there is no explicit statement in Lira that | 09:41 |
| 13 | | the logical columns themselves are electronic | 09:41 |
| 14 | | documents; is that right? | 09:41 |
| 15 | | MR. TUNG:  Objection. | 09:41 |
| 16 | | Mischaracterizes testimony. | 09:41 |
| 17 | | A. I have not done an exhaustive search, but | 09:41 |
| 18 | | I believe you are correct. | 09:41 |
| 19 | Q. | Doesn't Lira describe the logical column as | 09:41 |
| 20 | | part of the electronic document that is the | 09:41 |
| 21 | | web page? | 09:41 |
| 22 | | MR. TUNG:  Objection. | 09:42 |
| 23 | | Mischaracterizes document. | 09:42 |
| 24 | | A. The language says, Detecting the layout of | 09:42 |
| 25 | | the electronic document, I'm reading now from | 09:42 |

1    line 5 on page 2 of the patent.  The layout      09:42
2    of the electronic may include detecting          09:42
3    logical columns of the electronic document       09:42
4    and reformatting the electronic document, et     09:42
5    cetera.  He was not concerned with a rigorous    09:42
6    definition of what can and cannot be an          09:42
7    electronic document.  And for the purposes of    09:42
8    describing his system, it wasn't necessary to    09:42
9    say such logical columns can also be thought     09:42
10   of as electronic documents.  So literally he     09:42
11   does not make that statement, that a column      09:43
12   is an electronic document, but he does not       09:43
13   exclude that interpretation, and there is        09:43
14   nothing in the claim language, or in the         09:43
15   specification, that would lead one to believe    09:43
16   that he thought you could not have such an       09:43
17   interpretation.                                  09:43
18   Q.  In the portion you just read, doesn't it     09:43
19   describe the logical columns of the document,    09:43
20   in other words, part of the document?            09:43
21   A. Yes, it does, and this then leads us under    09:43
22   the Court's construction that says inner         09:43
23   edges as a term that we have talked about in     09:43
24   previous reports and previous proceedings,       09:43
25   that inner edges can also be construed as        09:43

| | | |
|---|---|---|
| 1 | edges of electronic documents.  And I have | 09:43 |
| 2 | always maintained the belief, and articulated | 09:44 |
| 3 | it, that electronic documents typically are | 09:44 |
| 4 | in the hierarchy and therefore such a view is | 09:44 |
| 5 | completely consistent with just talking about | 09:44 |
| 6 | the behavior of the logical columns and | 09:44 |
| 7 | mechanisms for navigating relative to them | 09:44 |
| 8 | without ever having the need to say, and by | 09:44 |
| 9 | the way, they, too, are electronic documents. | 09:44 |
| 10 | It's irrelevant to describing the | 09:44 |
| 11 | functionality of the patent. | 09:44 |
| 12 | Q.  Sticking with your logical column example, | 09:44 |
| 13 | I'm sure you're familiar with the Court's | 09:44 |
| 14 | order on the preliminary injunction phase | 09:44 |
| 15 | where she construed the claims to inquire | 09:44 |
| 16 | that the documents all snap back; are you | 09:44 |
| 17 | familiar with that? | 09:44 |
| 18 | A. At certain edges, yes. | 09:44 |
| 19 | Q.  In that logical column example that you laid | 09:45 |
| 20 | out here, does the column always snap back? | 09:45 |
| 21 | MR. TUNG:  Objection.  Vague. | 09:45 |
| 22 | A. So the question should be asked for all | 09:45 |
| 23 | scrollable edges, because the column could be | 09:45 |
| 24 | such that some edges are fixed and you can't | 09:45 |
| 25 | scroll to or past them, and some edges are | 09:45 |

Page 21

1       scrollable.                                        09:45

2   Q.  Let me stop you there.  What do you mean by a      09:45

3       scrollable edge?                                   09:45

4       A. It's an edge you can reach by moving the        09:45

5       view so that you come to it no matter how far      09:45

6       away you are from it.  So it's an edge that,       09:45

7       by scrolling to it, you now come to a              09:45

8       decision on what you should do upon                09:45

9       encountering it, and '381 describes a              09:45

10      particular behavior that happens when you          09:45

11      come to the edge.                                  09:46

12  Q.  I know that in your claim chart, when              09:46

13      describing this logical column example, you        09:46

14      preyed on, I believe, figure 2; is that            09:46

15      right?                                             09:46

16      A. Let me first go to the claim chart, and         09:46

17      could you tell me where on the claim chart         09:46

18      you would like me to read?                         09:46

19  Q.  Your claim chart is Exhibit 5 to your              09:46

20      deposition Exhibit 1.                              09:46

21      A. Yes, sir.                                       09:46

22  Q.  And I think you have opinions that are based       09:46

23      both on figure 2 and figure 14B for your           09:46

24      logical column example, but I don't want to        09:46

25      testify for you, but that's just my                09:46

1   understanding, so feel free to look at          09:46

2   whatever you need to look at to answer my        09:46

3   question.  I guess my question is, do you        09:46

4   think figure 2 is an example of a logical        09:46

5   column embodiment?                               09:46

6   A. Figure 2 isn't in the text about anything     09:46

7   more than showing how the web page can be        09:47

8   adaptively formatted to be in the number of      09:47

9   columns of varying width.  And subsequently,     09:47

10  I choose one of those columns to perform my      09:47

11  analysis.                                        09:47

12  Q.  Is that in figure 14B?                       09:47

13  A. In figure 14B, let's see where the first      09:47

14  use of 14B is.  That would be a place where      09:47

15  we talk about the vertical alignment control,    09:47

16  and the analysis here is about what happens      09:47

17  as the view, the display window, moves           09:47

18  relative to that center column.                  09:48

19  Q.  So is figure 14B one of your examples of a   09:48

20  logical column that you think displays the       09:48

21  behavior of the '381 patent?                     09:48

22  A. Figure 14B has logical columns.  The          09:48

23  figure is how illustration describes the         09:48

24  behavior, the general snapping behavior,         09:48

25  relative to that column.  And, indeed, that      09:48

1    would be part of my analysis, that that       09:48
2    column, that middle column, or its            09:48
3    neighboring columns, for that matter, can be  09:48
4    construed as an electronic document, that it  09:48
5    has scrollable edges, and that for those      09:48
6    edges the judge's construction has to apply.  09:48
7  Q.  Maybe on figure 14B you could tell me which 09:48
8    of those edges are scrollable and which of    09:48
9    those edges are not scrollable?               09:48
10   A. Well, for the description, which is in     09:49
11   terms of the vertical alignment control, one  09:49
12   would consider the vertical edges of the      09:49
13   column.                                        09:49
14 Q.  The middle column?                          09:49
15   A. Of the middle come, that's right.          09:49
16 Q.  Are there any edges displayed in figure 14B 09:49
17   that you consider to be not scrollable?       09:49
18   A. Well, in the context of a vertical         09:49
19   alignment control only, one can read that     09:49
20   the patent is not very specific about edge    09:49
21   cases.  One can read it that the behavior he  09:49
22   illustrates is only for horizontal            09:49
23   displacements relative to that center column. 09:49
24   So I would say that the top and the bottom    09:49
25   edges are not scrollable in terms of vertical 09:49

1    alignment.  And the left and right edge are,    09:49
2    but the patent also admits that you could       09:49
3    have both horizontal and vertical alignment     09:50
4    control simultaneously.  I did not analyze      09:50
5    that case.                                       09:50
6  Q. I'm just confused.  I still don't understand    09:50
7    what you mean by an edge being not              09:50
8    scrollable.                                      09:50
9    A. Well, it may be easier to look at a sort     09:50
10   of arbitrary application.  For example, if      09:50
11   you look at a photo album, you may be able to   09:50
12   move through the sequence of images from left   09:50
13   to right, but there is no movement up and       09:50
14   down.  And the left edge and the right edge     09:50
15   would be considered scrollable, and up and      09:50
16   down, where they are fixed and no response to   09:50
17   stylus or finger movement, I would consider     09:50
18   those not scrollable.                            09:50
19  Q. I see.  You are reading of the Judge's order   09:50
20   at the preliminary injunction was if an edge    09:50
21   can be scrolled, then it has to observe this    09:50
22   behavior the '381 patent refers to, or what     09:51
23   you refer to as snapping back?                  09:51
24   A. As general snapping in the case here, out    09:51
25   of which snapping back falls out.               09:51

1  Q.  As to the case you described here of the         09:51
2      middle column, and in the logical column         09:51
3      example, does this always snap back, as you      09:51
4      understand the Judge's construction for          09:51
5      purposes of the preliminary injunction order?    09:51
6               MR. TUNG:  Objection.  Vague.           09:51
7      A. The center column does not always snap         09:51
8      back in the Judge's sense, because if you         09:51
9      move the window past the so-called snap           09:51
10     threshold, you will advance to a neighboring      09:51
11     column.                                           09:51
12  Q.  In this case, it does not literally meet the    09:51
13     Judge's --                                        09:51
14     A. In the choice of the center column, it         09:51
15     does not.                                         09:51
16  Q.  And that's one of your two readings, or one     09:51
17     of your two examples?                             09:52
18     A. One of my two examples of choosing the         09:52
19     electronic document is a column.  Now, if I       09:52
20     were to perform the analysis on the leftmost      09:52
21     column, then the left edge is a scrollable        09:52
22     edge.  And, as I argue in the claim chart,        09:52
23     given the logic that Lira describes, in fact,     09:52
24     the left edge always snaps back.  If you move     09:52
25     past the left edge of that column, as in the      09:52

Page 26

| | | |
|---|---|---|
| 1 | electronic document, you can move an | 09:52 |
| 2 | arbitrary amount.  And if you let go, the | 09:52 |
| 3 | vertical alignment control is enabled, and | 09:52 |
| 4 | you will snap back to look at that column | 09:52 |
| 5 | again. | 09:52 |
| 6 | Q.  And that's the whole web page example that | 09:52 |
| 7 | you have? | 09:52 |
| 8 | A. No.  That is both the whole web page | 09:52 |
| 9 | example and the leftmost vertical column | 09:52 |
| 10 | example.  They coincide in the analysis in | 09:53 |
| 11 | this case. | 09:53 |
| 12 | Q.  Can you show me where in your Exhibit 5 you | 09:53 |
| 13 | show the left column flip? | 09:53 |
| 14 | A. I believe that in this particular | 09:53 |
| 15 | analysis, I only described movement for the | 09:53 |
| 16 | center column and the web page as a whole. | 09:53 |
| 17 | Q.  So I want to stick with the examples you have | 09:53 |
| 18 | in your exhibit, if you don't mind. | 09:53 |
| 19 | A. Okay. | 09:53 |
| 20 | Q.  So we discussed the middle column example? | 09:53 |
| 21 | A. Yes, sir. | 09:53 |
| 22 | Q.  And let me make sure I have this straight. | 09:53 |
| 23 | In the middle column example, which is | 09:53 |
| 24 | illustrated in 14B, the scrollable edge will | 09:53 |
| 25 | sometimes snap back and sometimes will snap | 09:53 |

Page 27

1    forward; is that right?                      09:53

2    A. The edge doesn't snap.  It's the display  09:53

3    window.  If I translate your question to,    09:53

4    does the display window exhibit the general  09:54

5    snapping behavior, then for interior columns, 09:54

6    the answer is yes, the general snapping      09:54

7    behavior, which includes '381 style snap     09:54

8    back, if you are within the threshold.       09:54

9    Q. But in the Judge's sense in the PI order, the 09:54

10   middle column example you have here, will not 09:54

11   always snap back?                            09:54

12   A. That's correct.                           09:54

13   Q. Now let's speak about the whole web page   09:54

14   example, your second example in Exhibit 5.   09:54

15   A. Yes, sir.                                  09:54

16   Q. In this case, you're treating the entire web 09:54

17   page as an electronic document?              09:54

18   A. Yes, sir.                                  09:54

19   Q. By the way, if a user were actually using the 09:54

20   system as described in Lira, would a user    09:54

21   have any way of knowing what was the         09:54

22   electronic document?                         09:54

23            MR. TUNG:  Objection.  Vague.       09:54

24   Incomplete hypothetical.                     09:54

25   A. I believe the user might never have heard  09:55

1    of the word electronic document and would        09:55

2    simply say, I'm looking at a web page.  It is     09:55

3    formatted in columns, and I can move my           09:55

4    display window over the web page, or              09:55

5    equivalently move my web page underneath my       09:55

6    display window.  Those are completely             09:55

7    equivalent ways of thinking about it.  And in     09:55

8    doing so, I can look at any portion of this       09:55

9    web page, which is bigger than what I can see     09:55

10   on my screen.                                     09:55

11   Q.  So treating the entire web page as an         09:55

12   electronic document, you explain in your         09:55

13   exhibit how the web page can be scrolled in       09:55

14   such a way that an area beyond the edge of        09:55

15   the page is displayed; is that right?             09:55

16   A. That's correct.                                09:55

17   Q.  I believe you show that on page 12 of your    09:55

18   Exhibit 5; is that right?  Actually, I take       09:56

19   that back, I meant to say page 19; is that        09:56

20   the right spot?  Let me withdraw the question     09:56

21   and give a clearer question.                      09:56

22   A. I will come to it, but for example, if you     09:57

23   go, this is not the right place, but it also      09:57

24   shows what you are asking about.  If you go       09:57

25   to page 15, you will see that there is a          09:57

1    portion that is just a white stripe, a white   09:57

2    vertical stripe, and that is area beyond the   09:57

3    edge, beyond the left edge.  We will, in due   09:57

4    course, come to a place where that will be   09:57

5    evident in another figure.  But, yes, I do   09:57

6    show area beyond the edge.   09:57

7  Q.  On page 19 of your exhibit?   09:57

8    A. Yes, sir.   09:57

9  Q.  I believe there you show the first portion,   09:57

10    the third portion, and an area beyond the   09:57

11    edge?   09:57

12    A. Yes, sir.   09:57

13  Q.  Let me see if I have this right.  In order to   09:57

14    demonstrate the behavior that you think   09:57

15    infringes the '381 patent, you first would   09:57

16    move the entire web page, shift it to the   09:58

17    right, so that an area to its left, that is   09:58

18    beyond the edge to its left, would be   09:58

19    displayed?   09:58

20    A. And that's a byproduct of this particular   09:58

21    view, but that, of course, is not mandated by   09:58

22    the claim language, and it is not labeled as   09:58

23    area beyond the edge.   09:58

24  Q.  Then you would have to take the entire web   09:58

25    page and move it to the right, past the   09:58

1   center point, so that then an area to the          09:58

2   right of the web page beyond the edge would          09:58

3   be displayed; is that right?                          09:58

4   A. That's correct.                                    09:58

5   Q. And the language that you are relying on from     09:58

6   Lira that displays this behavior is in figure         09:58

7   16?                                                   09:58

8            MR. TUNG:  Objection.  Vague.               09:58

9   A. No.  It's not restricted to figure 16.            09:58

10  There are a number of elements that go into          09:58

11  this analysis.                                        09:58

12  Q. Maybe you could explain to me where in Lira       09:58

13  you think it describes this behavior where an         09:59

14  area beyond the edge of the entire web page           09:59

15  is displayed?                                         09:59

16  A. My answer will be in multiple parts,              09:59

17  because there is not a simple, please go to           09:59

18  this sentence.                                        09:59

19  Q. Okay.                                             09:59

20  A. The first point in my reasoning is that           09:59

21  Lira doesn't discuss edge cases or corner             09:59

22  cases.  That's a term of art in computer              09:59

23  science that says you can teach what an               09:59

24  algorithm does in general, but if you want to         09:59

25  be truly specific and exhaustive, you should          09:59

1     also say whether anything special needs to      09:59
2     happen for the edge cases the first time and     09:59
3     last time through a loop, what happens at the    09:59
4     edges of a screen, in a pool table              09:59
5     simulation, et cetera.                          09:59
6  Q.  Let me stop you there.  I do want to hear      09:59
7     your whole answer, but --                        10:00
8     A. Lira does not talk about the edge cases,     10:00
9     so one has to turn to other evidence within     10:00
10    the document itself to look for how what         10:00
11    happens at the edge can be deduced.  Well,       10:00
12    there are multiple ways in which to do this.     10:00
13    One is to look at the figures.  And you will     10:00
14    see that there are multiple figures that, in     10:00
15    fact, show display window that has area          10:00
16    beyond the edge.  So, for example, and this      10:00
17    is just one of many examples, figure 8B, you     10:00
18    will see that the display window extrudes        10:00
19    quite far to the left of what can be             10:00
20    construed as the left edge of the column as      10:00
21    electronic document, and we see a classical,     10:01
22    vertical stripe of background.  And that         10:01
23    repeats in figure 8C.                            10:01
24 Q.  Wait, let me just stop you there for a          10:01
25    minute.  Where is the area beyond the edge in    10:01

Page 32

1       figure 8B?                                        10:01

2       A. If you look at the leftmost position of        10:01

3       the display window labeled 700 with               10:01

4       navigation button 710 at the bottom, it is        10:01

5       looking at a list of URLs under books, and to     10:01

6       the left of the column edge, indicated here       10:01

7       by a line, there is an empty area that could      10:01

8       be the background of the page, but it's           10:01

9       clearly indicating that it is displayed this      10:02

10      way inside the display window, so it's a          10:02

11      white or a gray vertical stripe to the left       10:02

12      of the left edge of the column.                   10:02

13  Q.  You can continue, please.                         10:02

14      A. Another sequence of figures is shown in        10:02

15      figure 10, and you will notice that the           10:02

16      starting position of this sliding display         10:02

17      window starts far left, beyond the left edge      10:02

18      of the left column.                               10:02

19              And figure 16, we, again, have a          10:02

20      white vertical stripe on the far left of the      10:02

21      leftmost column.  So pictorially, a person        10:03

22      would certainly be led to believe that you        10:03

23      can move the display window in such a way         10:03

24      that you go a bit beyond the edge and see         10:03

25      area beyond the edge in some kind of              10:03

Page 33

1    background color.                                    10:03

2              Equally important to this                  10:03

3    figure-way of looking at what the patent             10:03

4    teaches, I would like to go to page 15, Bates        10:03

5    number 24701, where paragraph 8 first defines        10:04

6    a particular embodiment in which the vertical        10:04

7    alignment control operates to have the               10:04

8    display window ride on rails, is an                  10:04

9    expression sometimes used.  It means                 10:04

10   vertically constrained, so that a horizontal         10:04

11   wobble within a threshold is ignored, and            10:04

12   that is illustrated in figure 14A.                   10:04

13             That is not the one I am using for         10:04

14   my analysis, but I want to compare what I am         10:04

15   using for my analysis to that mode, because          10:04

16   it discloses a vertical alignment control,           10:04

17   and it says, here's one way of doing it.  I          10:04

18   am using the paragraph below, referring to           10:05

19   figure 14B.                                          10:05

20             In another implementation, the            10:05

21   vertical alinement control is not enabled            10:05

22   until, is how that should be read.  Is               10:05

23   enabled only when the user lifts the bend, my        10:05

24   insertion of only.  This causes the logical          10:05

25   column 1220 to snap into alignment with the          10:05

Page 34

1    display window.  As the user stops scrolling,    10:05

2    we can adjust the snap sensitivity.  And here    10:05

3    is a really important sentence, part of the    10:05

4    sentence, Setting the alignment control to    10:05

5    snap to the nearest logical column based on    10:05

6    the user-defined threshold.    10:05

7              If you do that analysis continuing    10:05

8    down, if you do not exceed the threshold,    10:05

9    which indicates an intention to continue    10:05

10   where you are, then you keep being on top of    10:06

11   your current column.  Whereas if you exceed    10:06

12   the threshold, then you go to the nearest    10:06

13   logical column.    10:06

14             What is the nearest logical    10:06

15   column, that is what the analysis hinges on.    10:06

16   My reading of this is that you look at where    10:06

17   you are.  Case one, you're at an interior    10:06

18   column.  You, either below the threshold,    10:06

19   stay on that column, or, above the threshold,    10:06

20   snap to the next column, as we previously    10:06

21   discussed.  But if you carry on that same    10:06

22   analysis on an extreme column, that is, a    10:06

23   leftmost or a rightmost column, let's pick    10:06

24   the leftmost column, what does this    10:06

25   algorithm tell you to do?    10:06

1    Let's say, case one, I stay within    10:07

2    the snap threshold.  It says you should snap    10:07

3    back.  Okay, I will snap back.  The key    10:07

4    question is, what happens on snap forward    10:07

5    where you exceed the threshold?  When you are    10:07

6    on an interior column, this clearly teaches    10:07

7    there is an adjacent column that you move to.    10:07

8    But if there is no, in the common sense of    10:07

9    the term adjacent column, and you go past the    10:07

10   snap threshold, what does the logic do?  It    10:07

11   says, Find the nearest logical column.  What    10:07

12   is that test?  It is a comparison, for    10:07

13   example, between edges or, let's say, between    10:07

14   centers.    10:07

15   Well, the minimum center-to-center    10:07

16   distance is the column you just came from.    10:07

17   That is the nearest column.  In some, below    10:07

18   the threshold you will snap back using the    10:08

19   snap-back action.  Above the threshold, you    10:08

20   will use the snap-forward threshold, but the    10:08

21   logic dictates find the minimum distance,    10:08

22   because that defines what the nearest logical    10:08

23   column is.  Therefore, the conclusion is you    10:08

24   will always snap back to the extreme column.    10:08

25   I'm sorry to have been longwinded,    10:08

Page 36

1    but it takes a bit to see what the basis for    10:08
2    the argument for the edge behavior is.    10:08
3  Q. All right.  I think I have your explanation.    10:08
4    First of all, what you just laid out is not    10:08
5    actually in Exhibit 5; isn't that right?    10:08
6         MR. TUNG:  Objection.    10:08
7    Mischaracterizes the document.    10:08
8    A. You mean is this lengthy, full explanation    10:08
9    word for word in the claim chart, no, it    10:08
10    isn't.    10:08
11  Q. I don't mean word for word, Doctor.  I mean    10:08
12    that concept for reasoning that you just    10:09
13    articulated in the case of the entire web    10:09
14    page, is that spelled out anywhere in Exhibit    10:09
15    5?    10:09
16    A. So I believe it is there on page 23, where    10:09
17    I say there is no nearest logical column in    10:09
18    the areas to the right or the left of these    10:09
19    extreme, of these extreme columns, or off the    10:09
20    web page.  So the snap must occur to the    10:09
21    column nearest to the edge of the electronic    10:09
22    document, and that causes the snap-back that    10:09
23    we always want, whether you read it on web    10:10
24    page as the electronic document, or left or    10:10
25    rightmost columns of the electronic document.    10:10

Page 37

| | | |
|---|---|---|
| 1 | That sentence does exactly express the | 10:10 |
| 2 | somewhat more verbose version I went through | 10:10 |
| 3 | with you just now. | 10:10 |
| 4 | Q. I understand where you are pointing to to | 10:10 |
| 5 | describe the behavior of snapping within | 10:10 |
| 6 | columns, but what are you relying on for | 10:10 |
| 7 | evidence that the entire web page itself will | 10:10 |
| 8 | be snapped? | 10:10 |
| 9 | A. The logic is a column-alignment logic, and | 10:10 |
| 10 | it has inevitably also a reading on how you | 10:10 |
| 11 | move the view relative to the outermost | 10:10 |
| 12 | electronic document, the web page.  They are | 10:11 |
| 13 | not independent.  If you move to the right | 10:11 |
| 14 | relative to a current column, you move to the | 10:11 |
| 15 | right relative to the web page. | 10:11 |
| 16 | Q. In page 19 of Exhibit 5 to your report, you | 10:11 |
| 17 | quote from a section of the Lira reference | 10:11 |
| 18 | describing figure 16; do you see that? | 10:11 |
| 19 | A. Yes, I do. | 10:11 |
| 20 | Q. Referring to figure 16, touch-and-drag | 10:11 |
| 21 | scrolling of a display window 1600 may be | 10:11 |
| 22 | limited to the width and length of the | 10:11 |
| 23 | display window.  For example, if the user | 10:11 |
| 24 | scrolls from left to right across the entire | 10:11 |
| 25 | width 1605 of the display 1600 -- | 10:11 |

Page 38

1    A. Yes, by the way, I am convinced that is an          10:11
2    error, and it should say display window 1600.          10:11
3    Q.  An error in Lira itself?                            10:11
4    A. Yes.                                                 10:11
5    Q.  The document slides across the screen a             10:12
6    distance that is equal to the width 1605 of             10:12
7    the display window 1600?                                10:12
8    A. Window 1600.                                         10:12
9    Q.  You think that should say window?                   10:12
10   A. Yes, I do.                                           10:12
11   Q.  Thus movement up, down, left or right is            10:12
12   limited to the distance that is equal to the            10:12
13   length 1620 or width 1605, display 1600?               10:12
14   A. Yes.                                                 10:12
15   Q.  That should probably say window, too?               10:12
16   A. I believe so.                                        10:12
17   Q.  The user must then lift 25, the pin, or the         10:12
18   stylus, from the screen and repeat the                  10:12
19   scrolling operation.  There's nothing in                10:12
20   that, what I just read, the portion you cite            10:12
21   in your report, that discusses the snapping             10:12
22   behavior; do you agree?                                 10:12
23   A. I agree.  This is a read on the                      10:12
24   correspondence between object movement and              10:12
25   document movement.  The patent is very                  10:12

1    general about the rules for that            10:12

2    correspondence, and I believe that what     10:13

3    figure 16 and the steps are about is        10:13

4    describing one particular implementation,    10:13

5    which we would call pinning your finger to   10:13

6    the content and moving with a one-to-one     10:13

7    correspondence, a very specific style of     10:13

8    correspondence.                             10:13

9              If you do that, then you can only 10:13

10   move the document as much as the maximum    10:13

11   finger travel in a particular direction.  It 10:13

12   does not tell you what happens at the edge.  10:13

13   It is a reading purely on what is the        10:13

14   correspondence rule between finger movement  10:13

15   and content movement.  So you have to read   10:13

16   this in conjunction with the text that tells 10:13

17   you the algorithm's operation.               10:13

18   Q.  So your analysis assumes that the algorithms 10:13

19   that are applied to columns will be applied  10:14

20   in the case of the document as a control?    10:14

21   A. They have to be, because columns are part, 10:14

22   columns are part of the larger web page.  So 10:14

23   if I translate the larger web page, I        10:14

24   translate the columns.  If I translate the   10:14

25   columns, I translate the web page.           10:14

Page 40

1    Q.   Where it says, The user must lift the pin or      10:14
2         stylist from the screen and repeat the            10:14
3         scrolling operation, that sentence only makes     10:14
4         sense if the document is not snapping,            10:14
5         correct?                                          10:14
6         A. There is an assumption that you are being      10:14
7         told what's going to happen when you are not      10:14
8         moving so far that you're going to be             10:15
9         displaced and the snapping behavior takes         10:15
10        over.  It could run simultaneously with this      10:15
11        particular correspondence, and then you would     10:15
12        have to say that the snapping behavior would      10:15
13        dominate, so you could move with more than        10:15
14        just direct gesturing yourself.  Essentially      10:15
15        the system could move you over a certain          10:15
16        amount.                                           10:15
17   Q.   If I am moving the screen a certain amount,       10:15
18        lifting up my stylus or finger and then           10:15
19        repeating the gesture, doesn't that assume        10:15
20        the document will not snap against me and         10:15
21        impede my movement?                               10:15
22        A. I think that's a perfectly reasonable          10:15
23        interpretation, but I haven't thought about       10:15
24        that particular case enough to be able to say     10:16
25        you're right, under no circumstances would        10:16

Page 41

1    this defeat the snapping behavior.  I would      10:16
2    have to think about that.                        10:16
3               MR. KREEGER:  Off the record for a    10:16
4    moment.                                          10:16
5               THE VIDEOGRAPHER:  We are going       10:16
6    off the record.  The time is 10:16.              10:16
7               (OFF THE RECORD)                      10:16
8               THE VIDEOGRAPHER:  We are back on     10:26
9    the record.  The time is 10:27.                  10:27
10 Q.  Would you agree with me that a central goal    10:27
11    of the Lira reference is teaching how to        10:27
12    format documents with columns to aid in their   10:27
13    display on devices?                             10:27
14    A. I wouldn't call it central.  I would say     10:27
15    it's the assumption that one can, and should.   10:27
16    Most of the Lira specification and the claims   10:28
17    have no specificity about formatting, except    10:28
18    to say you should do it in columns.  The        10:28
19    columns should be in some correspondence with   10:28
20    the width of the display window, and then the   10:28
21    bulk of it is talking about the navigation,     10:28
22    how you move the display window over the web    10:28
23    page, or the web page underneath the display    10:28
24    window.  Speeds that you can role.  The         10:28
25    snapping behavior, which is most relevant to    10:28

Page 42

1     us, and so on.                                          10:28

2  Q.  If I could direct your attention to page 26      10:28

3      of Exhibit 5 attached to your report,             10:29

4      deposition Exhibit Number 1.                       10:29

5      A. I'm on page 25.                                 10:29

6  Q.  26, please.                                        10:29

7      A. Sorry.  Yes, sir.                               10:29

8  Q.  At the bottom part of the page you discuss        10:29

9      claim 7, which involves an electronic              10:29

10     document that has a digital image.  Are you       10:29

11     with me?                                            10:29

12     A. Yes, sir.                                        10:29

13 Q.  You say, Lira does not specifically disclose      10:29

14     applying its methods to a digital image.  Why     10:29

15     do you think it would have been obvious to         10:29

16     apply Lira to the case of an electronic            10:29

17     document that is a digital image?                  10:29

18     A. Summarizing what I say in my                    10:29

19     argumentation, my support for saying Lira can     10:30

20     be read using an obviousness line of               10:30

21     reasoning, what Lira is about is not the           10:30

22     reformatting primarily, as I said in my            10:30

23     previous answer.  What it is really about are     10:30

24     the navigation controls for moving a               10:30

25     relatively small display window over a             10:30

Page 43

1    relatively larger content, such as a web       10:30
2    page, or, in this case, a particular image.    10:30
3            So one would say, what does Lira        10:30
4    tell me about what I can do about exploring     10:30
5    this image.  And, in particular, one can use    10:31
6    Lira's teaching about the various               10:31
7    correspondence rules between object movement    10:31
8    and image movement.  And one can also say,      10:31
9    oh, and what happens if, say, in zoomed-in      10:31
10   mode on the image, I come to a scrollable       10:31
11   edge, what should I do?  Then if you read the   10:31
12   language, and interpret it properly, then you   10:31
13   say, oh, I can scroll beyond the edge of the    10:31
14   digital image and I'll snap back.  So I think   10:31
15   it is very easy to see that Lira is helpful     10:31
16   in teaching you how to navigate a single        10:31
17   image.                                          10:31
18           MR. KREEGER:  May I have this           10:33
19   marked as the next exhibit.                     10:33
20       (EXHIBIT 2 MARKED FOR IDENTIFICATION)       10:33
21  Q.  I am showing you a copy of the '381 patent we 10:33
22   have been discussing.                           10:33
23   A. Yes, sir.                                    10:33
24  Q.  If I could direct your attention to the      10:33
25   claims, please, and in particular claim 15.     10:33

Page 44

1       A. Yes, sir.                                          10:33

2   Q.  The computer-implemented method of claim 1,           10:33

3       wherein translating the document in the              10:33

4       second direction is a damped motion.  Now            10:33

5       translating the document is the second               10:33

6       direction, that's the snapping back?                 10:33

7       A. Yes, sir.                                          10:33

8   Q.  What do you take it to mean when it says,             10:33

9       translating the document in a second                 10:34

10      direction is a damped motion?                         10:34

11              MR. TUNG:  Objection.  Vague.                 10:34

12      A. Damped motion in a beginning physics               10:34

13      course would be interpreted as a movement             10:34

14      that is not constant velocity, but that slows         10:34

15      down and eventually stops.                            10:34

16  Q.  Now, Lira does not say anything about                 10:34

17      translating the document in a damped motion,          10:34

18      does it?                                              10:34

19      A. I don't believe that it uses that term.            10:34

20      It does not without my doing a literal search         10:35

21      using a search function on the electronic             10:35

22      copy.  I believe you are correct, and that            10:35

23      the word damped motion does not occur.                10:35

24  Q.  I didn't mean just the literal words.  The            10:35

25      concept of translating back using damped              10:35

Page 45

1    motion is not disclosed in Lira; is that          10:35
2    right?                                            10:35
3              MR. TUNG:  Objection.  Vague.           10:35
4    A. Not explicitly.  But if you go to page 5       10:35
5    and look at the sentence starting, 13, Moving     10:35
6    the page of information, and we know that he      10:36
7    means moving the electronic document,            10:36
8    whatever it is, May include moving the page a     10:36
9    distance equal to a change in the coordinate      10:36
10   information of the input tool, multiplied by      10:36
11   a factor based on the acceleration or the         10:36
12   velocity of the input tool.  He clearly has       10:36
13   different laws of physics in mind.                10:36
14             And although he doesn't tell you        10:36
15   in the snap-back section that we analyzed         10:36
16   earlier, I believe, at a minimum, it would be     10:36
17   obvious that you can use simple physics in        10:36
18   the snap-back.  And the very term snap-back       10:36
19   implies that there has to be some kind of         10:36
20   damp motion, because you have an initial          10:36
21   velocity and you have a stop when you have        10:37
22   reached the home position, the                    10:37
23   snapped-back-to position.  So by definition,      10:37
24   there has to be a deceleration in the style       10:37
25   of damp motion.                                   10:37

Page 46

1    Q.  Couldn't you just translate back at constant      10:37
2        velocity and stop when you reached the end of      10:37
3        the move?                                          10:37
4        A. You could, but since this sentence allows       10:37
5        you to do it with acceleration, the case of        10:37
6        damped motion is specifically included.            10:37
7    Q.  Because that's deceleration?                       10:37
8        A. That's deceleration, or negative                10:37
9        acceleration.                                       10:37
10   Q.  Can you take a look at claim 16 of the '381        10:37
11       patent, please?  Are you with me?                  10:37
12       A. I'm reading it.                                  10:38
13   Q.  Thank you.                                          10:38
14       A. Yes, sir.                                        10:38
15   Q.  This is discussing translating in the first       10:38
16       direction?                                          10:38
17       A. Well, actually it is discussing changing        10:38
18       from translating in the first direction.           10:38
19   Q.  Fair point, yes.  Changing from the first          10:38
20       direction to the second direction so that the      10:38
21       document appears to be elastically attached        10:38
22       to the edge of the touch screen?                   10:38
23       A. Yes, sir.                                        10:38
24   Q.  In Lira, the document can either snap forward      10:38
25       or back; isn't that right?                          10:38

Page 47

1    A. That's correct.  For interior columns.        10:38

2  Q.  Right.  And in such a case, the document will   10:38

3      not appear to be elastically attached to         10:39

4      either edge, would it?                           10:39

5      A. I believe the answer is that you can have    10:39

6      it snap back with whatever motion you like.      10:39

7      The term snap in itself connotes that there      10:39

8      is a movement like that of snapping an           10:39

9      elastic.  I think the language of the patent     10:39

10     is extremely indicative of the kind of effect    10:39

11     that he has in mind.  So I would say it reads     10:39

12     beautifully on elastically attached.             10:39

13 Q.  So do you think the concept of elastically       10:39

14     attached to the edge of the screen doesn't       10:39

15     add anything to claim 1?                         10:39

16            MR. TUNG:  Objection.                     10:39

17     Mischaracterizes testimony.                      10:39

18     A. Snapping suggests a certain style of          10:39

19     movement, which certainly involves some kind     10:39

20     of deceleration, I would think.  The constant    10:40

21     movement that you mentioned last time, as a      10:40

22     layman, I wouldn't call that snapping.  I        10:40

23     would call that kind of auto correction going    10:40

24     back.  There are many kinds of decelerations     10:40

25     that you can describe using different laws of     10:40

Page 48

1    physics.  This happens to be the physics of a    10:40

2    rubber band or of a spring, so it is a    10:40

3    particular instance of simulating snap    10:40

4    physics, so it adds specificity.    10:40

5    Q.  I would like to move to LaunchTile.    10:40

6    A. Um-hum.    10:41

7         THE WITNESS:  May I give Lira back    10:41

8    to someone?    10:41

9         MR. KREEGER:  Let's make a pile of    10:41

10   exhibits right here, we will put the ones we    10:41

11   are not using right now.    10:41

12   Q.  So for LaunchTile, your analysis begins on    10:41

13   paragraph 103; is that right?    10:41

14   A. Well, the first mention of LaunchTile, I    10:41

15   believe, is earlier.  Using the index, not    10:42

16   searching, I found a reference to LaunchTile    10:42

17   and XNav in paragraph 82 on page 43.    10:42

18   Q.  Had you used LaunchTile or XNav before your    10:42

19   work in this case?    10:42

20   A. I don't believe I have, but I can't be    10:42

21   absolutely sure, because I played with the    10:42

22   user interface layer at some point, either at    10:42

23   Brown or at Microsoft.    10:42

24   Q.  What do you mean by the user interface layer?    10:43

25   A. As all applications, it is built on a    10:43

Page 49

1    stack of software, and there is a user          10:43
2    interface system that I believe this is         10:43
3    running on top of.  And I did see that at       10:43
4    some point.  And one of the applications they   10:43
5    may have shown me would have been this one,     10:43
6    but to be correct, and for the record, I have   10:43
7    no recollection of having seen this             10:43
8    application before I saw it in preparation      10:43
9    for the first expert report I wrote.            10:43
10   Q.  And by the way, what about Lira, had you read  10:43
11   that patent application before your work in     10:43
12   this case?                                       10:43
13   A.  I had not.                                   10:43
14   Q.  So I know you have some views about          10:43
15   LaunchTile and XNav as a system.  Do you have   10:43
16   any opinion about when that system was          10:44
17   publicly available?                              10:44
18   A.  I don't remember whether I opined.  I        10:44
19   certainly know that there were publications,    10:44
20   and that during one of the presentations at     10:44
21   CHI it was demoed, but I would have to look     10:44
22   through here to find out what the date on       10:44
23   that was.  It looks like it is CHI 2005,        10:44
24   April 2-7, where it says, Showed a video        10:44
25   demonstration of the software, brought a        10:44

Page 92

1        from his or her prior knowledge.                    12:06

2                 MR. KREEGER:  Off the record.              12:06

3                 THE VIDEOGRAPHER:  Off the record.         12:06

4        The time is 12:06.                                  12:06

5                 (OFF THE RECORD)                           12:13

6                 THE VIDEOGRAPHER:  Back on the             12:13

7        record.  The time is 12:16.                         12:13

8    Q.  If we could take a look at claim 17 and your        12:16

9        analysis of that with respect to                    12:16

10       DiamondTouch, I believe it is on page 16 of         12:16

11       your Exhibit 8.                                     12:16

12       A. Yes, sir.                                        12:17

13   Q.  Your analysis here says, To the extent that         12:17

14       the DiamondTouch table running Tablecloth, DT       12:17

15       Flash does not disclose this claim, and you         12:17

16       go on to articulate why, the obvious.  Do you       12:17

17       agree that the DiamondTouch table running the       12:17

18       Tablecloth application does not disclose this       12:17

19       claim?                                              12:17

20       A. It does not literally disclose it.               12:17

21   Q.  So why would it have been obvious?                  12:17

22       A. In reading Lira, or having ever had to           12:17

23       deal with the problem of translating an             12:17

24       electronic document in response to stylus, or       12:17

25       finger, or mouse movement, you would have           12:17

Page 93

1    thought about the correspondence, and you        12:17
2    would have thought about whether that should     12:17
3    be a fixed correspondence, or whether there      12:17
4    could be conditions that would cause it to       12:17
5    change.  So an obvious question might be when    12:17
6    you come to an edge, should the                  12:18
7    correspondence change, or should it be the       12:18
8    same.  And we have seen all kinds of             12:18
9    different implementations.  Ones where you       12:18
10   stay pinned, as, indeed, happens in the          12:18
11   trivial demo.  Others where the further you      12:18
12   move, the more laggy, the further behind the     12:18
13   document gets, and everything in between.  So    12:18
14   I think it's one of the design choices that      12:18
15   you have to consider, and there are both         12:18
16   simple and more complex answers to it.           12:18
17          MR. KREEGER:  Let's mark this as          12:19
18   the next exhibit.                                12:19
19      (EXHIBIT 3 MARKED FOR IDENTIFICATION)         12:19
20 Q.  I have marked as Exhibit 3 a printout of the   12:19
21   New York Times web page.  I was hoping you       12:19
22   could tell me how many different electronic      12:19
23   documents are displayed there?                   12:19
24          MR. TUNG:  I object to the extent         12:19
25   that this is asking on a paper document, and     12:19

Page 94

| | |
|---|---|
| 1 | it is vague. | 12:19 |
| 2 | A. Well, this feels a lot like, can you tell | 12:19 |
| 3 | how many triangles there are in this picture. | 12:19 |
| 4 | I can't enumerate them all, because there are | 12:19 |
| 5 | so many possibilities.  Starting the top, | 12:19 |
| 6 | down, you can say the entire web page is an | 12:19 |
| 7 | electronic document.  Alla on my analysis of | 12:19 |
| 8 | Lira, you can say any of the columns are | 12:19 |
| 9 | electronic documents.  Alla Apple's own | 12:19 |
| 10 | construction, an individual image could be an | 12:19 |
| 11 | electronic document.  And, for example, in | 12:20 |
| 12 | the second column over, you could subdivide, | 12:20 |
| 13 | in the first column even, you could subdivide | 12:20 |
| 14 | and, in fact, they have typographically | 12:20 |
| 15 | introduced a division that there are two | 12:20 |
| 16 | pieces to that first column, and they might | 12:20 |
| 17 | be considered electronic documents.  So I | 12:20 |
| 18 | have answered your question in the sense of | 12:20 |
| 19 | A, as was pointed out, I am doing the | 12:20 |
| 20 | analysis as if you were showing this to me on | 12:20 |
| 21 | the screen, no problem.  And second of all, | 12:20 |
| 22 | saying independent of any '381 style | 12:20 |
| 23 | analysis, I would be comfortable with naming | 12:20 |
| 24 | many electronic documents in this image. | 12:20 |
| 25 | Q.  Is there any way to note whether a particular | 12:21 |

Page 95

1    portion of that page constitutes an              12:21

2    electronic document, or is it an arbitrary       12:21

3    choice that you can impose on the web page?      12:21

4         MR. TUNG:  Objection.  Vague.               12:21

5    A. It depends on who is doing the analysis       12:21

6    and for what purpose.  If I'm an ordinary        12:21

7    user, my wife, and I put this page in front      12:21

8    of her, and I would say, can you show the        12:21

9    electronic documents, she would say, what are    12:21

10   electronic documents.  She has never used the    12:21

11   term.  It does not come up as she does her       12:21

12   daily browsing of the on-line New York Times.    12:21

13        So to ordinary users of our                 12:21

14   systems, the term has no particular meaning.     12:21

15   As implementers, we might not use the term       12:22

16   either.  We might say what we have here is a     12:22

17   web page.  There as an HTML description.         12:22

18   HTML is a hierarchical description.  It has      12:22

19   elements, including, just go to Lira and you     12:22

20   can see a partial itemization.  Body, and        12:22

21   colophon, and column, and image, and URL, and   12:22

22   any number of things.  And then you could       12:22

23   decide that the entire HTML file is an          12:22

24   electronic document.  You could pick            12:22

25   something interior and call that an             12:22

Page 96

| | | |
|---|---|---|
| 1 | electronic document. | 12:22 |
| 2 | So an implementer, if you explain | 12:22 |
| 3 | what you mean by electronic document, could | 12:22 |
| 4 | pick out any number.  Then if you wrote the | 12:22 |
| 5 | code, the question is, does it even matter | 12:23 |
| 6 | what you call electronic document if what you | 12:23 |
| 7 | want, for example, is snapping behavior from | 12:23 |
| 8 | column to column so that you can stay | 12:23 |
| 9 | relatively local. | 12:23 |
| 10 | Or if you don't want snapping | 12:23 |
| 11 | behavior alla '381, you could get constrained | 12:23 |
| 12 | vertical scrolling, for example, using the | 12:23 |
| 13 | way Lira teaches you a vertical alignment | 12:23 |
| 14 | control that has the thing riding on rails, | 12:23 |
| 15 | and you might still not think of it as I am | 12:23 |
| 16 | writing code to manipulate an electronic | 12:23 |
| 17 | document of a particular type. | 12:23 |
| 18 | Q. Doctor, let me see if I can focus, because I | 12:23 |
| 19 | am not so much interested in what people | 12:23 |
| 20 | outside the scope of the field may think.  I | 12:23 |
| 21 | am asking you as you understand the claim | 12:23 |
| 22 | term electronic document as used in the '381 | 12:23 |
| 23 | patent, is there some way to know, one could | 12:24 |
| 24 | know, looking at that web page, how many | 12:24 |
| 25 | electronic documents are there? | 12:24 |