HAROLD J. MCELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
MICHAEL A. JACOBS (CA SBN 111664)
mjacobs@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
ERIK J. OLSON (CA SBN 175815)
ejolson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.    11-cv-01846-LHK (PSG)<br><br>**APPLE'S BRIEF ON EVIDENCE OF COPYING OR DEMAND**<br><br>Date:        October 17, 2013<br>Time:        1:30 PM<br>Place:       Courtroom 8, 4th Floor<br>Judge:       Hon. Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

I.   RELEVANT LAW ................................................................................................ 2

    A.   Evidence of Demand, Both Generally and with Respect to the Particular Patented Features, Is Relevant to Apple's Lost Profits Claim. ............................ 2

        1.   The First Panduit Factor Requires Only Demand for the Patented Products Generally, Not Demand for the Particular Patented Features. ...................................................................................... 3

        2.   Generalized Evidence of Demand for the Patented Products and Designs Is Also Relevant to the Second Panduit Factor. ........................ 5

    B.   Evidence of Demand, Both Generally and with Respect to the Particular Patented Features, Is Relevant to Apple's Reasonable Royalty Claim. ................ 6

    C.   Evidence of Demand for Patented Products and Evidence of Demand for Patented Features Are Not Cumulative. ...................................................... 8

    D.   Generalized Evidence of Demand Is Also Circumstantial Evidence of Demand for the Particular Patented Features and Designs, Which Is Relevant to Apple's Lost Profits and Reasonable Royalty Claims. ...................... 9

II.   SUMMARY OF TESTIMONY ............................................................................ 10

    A.   Witnesses Designated For Live Trial Testimony. ........................................... 10

        1.   Julie Davis ......................................................................................... 10

        2.   John Hauser ........................................................................................ 23

        3.   Ravin Balakrishnan ............................................................................ 25

        4.   Karan Singh ........................................................................................ 27

        5.   Phil Schiller ........................................................................................ 29

        6.   Greg Joswiak ...................................................................................... 33

        7.   Boris Teksler ...................................................................................... 35

        8.   Mark Buckley ..................................................................................... 36

        9.   BJ Watrous ......................................................................................... 37

    B.   Designated Deposition Testimony Related to Demand. ................................... 37

        1.   Timothy Benner .................................................................................. 37

        2.   Dong Hoon Chang .............................................................................. 38

        3.   Gee Sung Choi .................................................................................... 39

        4.   Cira Conley ......................................................................................... 39

        5.   Wong Pyo Hong .................................................................................. 39

        6.   Wookyun Kho ..................................................................................... 40

        7.   Ioi Lam ............................................................................................... 40

        8.   MinHyouk Lee .................................................................................... 41

        9.   Junho Park ........................................................................................... 41

**TABLE OF CONTENTS**
(continued)

Page

      10.   Todd Pendleton ....................................................................... 41

      11.   DongSeok Ryu ........................................................................ 41

      12.   Jaegwan Shin .......................................................................... 42

III.     EXHIBITS PRESENTING EVIDENCE RELATED TO DEMAND. ............................ 42

    A.    Exhibits That Samsung Seeks To Exclude Are Material Evidence Regarding Demand. ............................................................................................ 43

    B.    Other Exhibits on Apple's Trial Exhibit List Also Provide Evidence Regarding Demand. ............................................................................................ 44

CONCLUSION ............................................................................................................ 44

# TABLE OF AUTHORITIES

**Page**

CASES

*Clark v. Linzer Prods. Corp.*,
   No. 95 C 1744,
   1996 U.S. Dist. LEXIS 9252 (N.D. Ill. July 2, 1996) ............................................................. 4

*Datascope Corp. v. SMEC, Inc.*,
   879 F.2d 820 (Fed. Cir. 1989) .................................................................................................. 6

*DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009) ............................................................................................ 3, 4

*Fonar Corp. v. Gen. Elec. Co.*,
   107 F.3d 1543 (Fed. Cir. 1997) ................................................................................................ 6

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010) ................................................................................................ 9

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................................... 2, 7, 8

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...................................................................................... *passim*

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012) ......................................................................................... 3, 4, 5

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) (en banc)............................................................................ 2, 3, 4

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   953 F.2d 1360 (Fed. Cir. 1991) ................................................................................................ 5

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
   96 F.3d 1409 (Fed. Cir. 1996) .................................................................................................. 6

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
   222 F.3d 958 (Fed. Cir. 2000) .............................................................................................. 2, 5

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013) ................................................................................................ 3

**INTRODUCTION**

One question in this case is whether it is more probable than not that, in the absence of infringing Samsung products, consumers would have purchased more iPhones and iPads.  Any evidence that helps answer that question should be admissible.  Evidence that there was a general demand for iPhones and iPads goes to the heart of that question.  Similarly, evidence that there was demand for the specific patented features is directly on point.

Samsung has moved to exclude 31 exhibits on the ground that they relate to "copying," and are not relevant to the issues in the new trial.  The Court has recognized that evidence of copying can be relevant to demand, and has directed Apple to address the evidence of demand, and applicable law, without limitation to those 31 exhibits.  This brief identifies and discusses testimony and exhibits relevant to demand that Apple will present in its case in chief.  The accompanying appendices address each exhibit in detail.

To be sure, evidence of demand for particular patented features is relevant to damages.  Such demand evidence supports both Apple's lost profits damages claim and its reasonable royalty damages claim.  But importantly, evidence of demand for the particular patented features is not the *only* type of demand evidence that is relevant to Apple's damages claims.  Evidence of demand for Apple's patented products and designs more generally is also relevant to Apple's lost profits and reasonable royalty claims in multiple ways:

- Generalized evidence of demand for Apple's patented products, or for products that compete directly with the infringing products, is sufficient by itself to demonstrate the "demand" required by the first *Panduit* factor in a lost profits analysis.

- Generalized evidence of demand for Apple's patented products, where the patented feature is available only from the patented and infringing products, is relevant to demonstrate a lack of suitable non-infringing alternatives as required by the second *Panduit* factor in a lost profits analysis.

- Generalized evidence of demand for Apple's designs, user interfaces, and overall user experience, where other alleged alternatives do not provide the same advantages as Apple's patented features, is relevant to demonstrate a lack of suitable non-infringing alternatives as

1    required by the second *Panduit* factor in a lost profits analysis.

2    • Generalized evidence of demand for Apple's patented products and designs is relevant to

3      *Georgia-Pacific* Factors 6, 8, 9, 10, and 11 in a reasonable royalty analysis.

4    Apple should accordingly be permitted at trial to introduce testimony and evidence concerning

5    not only demand for the particular patented features but also, more generally, demand for the

6    patented products and products that compete directly with Samsung's infringing products.

7          In addition, evidence showing demand for Apple's products and designs generally is

8    circumstantial evidence of demand for the particular patented features.  Apple intends to

9    introduce a collection of evidence showing, for example, that (i) consumers value attractive

10   design and ease of use generally when purchasing electronic devices, (ii) consumers value and

11   demand Apple's products and designs generally, (iii) Apple's products incorporate the particular

12   patented features and designs, and (iv) Samsung studied, evaluated, and incorporated particular

13   Apple user interface and design features when developing its own products.  Taken together, this

14   collection of evidence demonstrates demand for Apple's particular patented features and

15   designs—which is unquestionably relevant to Apple's lost profits and reasonable royalty damages

16   claims.  The jury should be permitted to hear and consider the totality of such evidence.

17   **I.    RELEVANT LAW**

18        **A.    Evidence of Demand, Both Generally and with Respect to the Particular
               Patented Features, Is Relevant to Apple's Lost Profits Claim.**
19

20         Lost profits are appropriate whenever there is a "reasonable probability that, 'but for' the

21   infringement, [the patentee] would have made the sales that were made by the infringer."  *Rite-*

22   *Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).  The Federal Circuit has

23   held that "[a] useful, but non-exclusive, way for a patentee to prove entitlement to lost profits is

24   provided by the four-factor *Panduit* test."  *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222

25   F.3d 958, 971 (Fed. Cir. 2000) (citing *Rite-Hite*, 56 F.3d at 1545).  The *Panduit* factors include

26   "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3)

27   manufacturing and marketing capability to exploit the demand, and (4) the amount of profit [the

28   patentee] would have made."  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152,

1   1156 (6th Cir. 1978).

2   None of the *Panduit* factors ***requires*** a patentee to prove a direct correlation between

3   consumer demand and the specific infringing features of a product, and no Federal Circuit

4   decision has ever held as much.  On the contrary, the Federal Circuit has recently confirmed that

5   demand under the *Panduit* factors may be established with generalized evidence of demand that

6   does not relate to the particular patented features:

> The *Panduit* factors do not require showing demand for a particular
> embodiment of the patented functionality, here Versata's Pricer software.
> *See Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d
> 1351, 1360 (Fed. Cir. 2012).  Nor does it require any allocation of
> consumer demand among the various limitations recited in a patent claim.
> *DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330
> (Fed. Cir. 2009).  In other words, ***the Panduit factors place no qualitative***
> ***requirement on the level of demand necessary to show lost profits***.

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013) (emphasis added).

Accordingly, as discussed in more detail below, any evidence of demand—whether general

demand for the patented product or specific demand for the infringing features—is relevant to

establishing Apple's lost profits.

### 1.   The First Panduit Factor Requires Only Demand for the Patented Products Generally, Not Demand for the Particular Patented Features.

17   To satisfy the first *Panduit* factor—*i.e.*, demand for the patented product—a patentee need

18   only establish general demand for the patented (or infringing) product.  Of course, a patentee may

19   also meet the first *Panduit* factor with evidence that the specific infringing features contribute to

20   demand for the patented (or infringing) product.  But such a correlation ***is not required*** to

21   establish "but for" causation under *Panduit*.  Indeed, the Federal Circuit has consistently and

22   repeatedly rejected the argument that evidence of demand in the lost profits context must be

23   limited to evidence showing demand for the particular patented features.

24   For example, in *Rite-Hite*, the Federal Circuit considered a lost profits damages award

25   where the patentee sold an unpatented product that directly competed with the product accused of

26   infringement.  56 F.3d at 1543.  The accused infringer in *Rite-Hite* made the same argument that

27   Samsung makes here, namely that "the intrinsic value of the patent in suit is the only proper basis

28   for a lost profits award."  *Id.* at 1548.  The Federal Circuit explicitly rejected that premise,

1   holding that the infringer's "concern that lost profits must relate to the 'intrinsic value of the

2   patent' is subsumed in the 'but for' analysis" of the *Panduit* factors.  *Id.*  Where, as in *Rite-Hite*,

3   sales of the patentee's product would have been higher but for sales of the infringing product, that

4   suffices for this element of the *Panduit* test for lost profits—even for a patentee's product that

5   does not itself include the claimed features.  *Id.*

6       The Federal Circuit further explained this principle of lost profits in *Depuy Spine, Inc., v.*

7   *Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009).  There, Medtronic asked the

8   court "to hold that the requisite demand under the first *Panduit* factor is demand for the specific

9   feature (*i.e.*, claim limitation) that distinguishes the patented product from a noninfringing

10   substitute, not simply demand for the patented product."  *Id.* at 1330.  The court rejected

11   Medtronic's argument, and held that the first *Panduit* factor "***does not require any allocation of***

12   ***consumer demand among the various limitations recited in a patent claim***."  *Id.*  (emphasis

13   added).   Relying on its decision in *Rite-Hite*, the Federal Circuit reaffirmed that "the first *Panduit*

14   factor simply asks whether demand existed for the 'patented product,' *i.e.*, a product that is

15   'covered by the patent in suit' or that 'directly competes with the infringing device.'"  *Id.*; *see*

16   *also id.* at 1331 (holding that "the focus on particular features corresponding to individual claim

17   limitations is unnecessary when considering whether demand exists for a patented product under

18   the first *Panduit* factor" in a lost profits damages analysis); *Clark v. Linzer Prods. Corp.*, No. 95

19   C 1744, 1996 U.S. Dist. LEXIS 9252, at *6-8 (N.D. Ill. July 2, 1996) (concluding that the first

20   *Panduit* factor does not require showing "specific demand for the patented feature").

21       Last year in *Presidio Components Inc. v. American Technical Ceramics Corp.*, 702 F.3d

22   1351 (Fed. Cir. 2012), the Federal Circuit reaffirmed that demand under the first *Panduit* factor

23   does not require a valuation of patented features.  The court thus rejected the accused infringer's

24   argument that the evidence must "link market demand" with the particular patented feature.  *Id.* at

25   1360.  The court further held that "[t]he demand in question in the first *Panduit* factor ***is not***

26   ***limited to demand for the patented products***."  *Id.* (emphasis added).  Instead, the court explained

27   that "demand may also arise from a product that 'directly competes with the infringing device.'"

28   *Id.* (quoting *Depuy Spine*, 567 F.3d at 1330).  Applying these principles, the Federal Circuit

APPLE'S BRIEF ON EVIDENCE OF COPYING OR DEMAND
Case No. 11-CV-01846-LHK (PSG)
sf-3343040

4

affirmed the jury's lost profits damages award in *Presidio* because the record contained evidence showing demand for the patentee's products (which did not practice the asserted patent) coupled with evidence showing that the patentee's products competed directly with the infringing device. *Id.*

As illustrated above, the law on this point is well-settled.  Both demand for the patented products and demand for Apple's products that compete directly with Samsung's infringing products support Apple's claim for lost profits damages.  Apple and Ms. Davis should accordingly be permitted to present such evidence of demand to the jury.

### 2.   Generalized Evidence of Demand for the Patented Products and Designs Is Also Relevant to the Second Panduit Factor.

Evidence of demand is also relevant to (though not necessary to prove) the second *Panduit* factor—*i.e.*, the absence of acceptable non-infringing alternatives.  As an initial matter, the existence of consumer demand for the specific infringing feature may demonstrate that simply removing the infringing feature would not be an acceptable substitute (because consumer demand would be unmet).  Evidence that an infringer affirmatively chose to adopt an infringing feature over other alternatives is similarly probative that the infringing feature has unique value and advantages over other known modes.

But again, while evidence of demand for the specific patented features is relevant to the lack of suitable alternatives, it is not ***required*** to prove this factor of the *Panduit* test.  Rather, evidence of general demand for the patented product is also probative to establish the lack of suitable alternatives where the patented feature is available only from the patented and infringing products, because "products without such features—even if otherwise competing in the marketplace—would not be acceptable noninfringing substitutes."  *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991); *see also Tate Access*, 222 F.3d at 971 (affirming lost profits damages award because substantial evidence showed that the infringing product and the commercial embodiment of the patented invention were the only two products on the market with the patented feature, thus the jury could infer that "but for" the infringement the patentee would have made the infringer's sales).

Further, a patentee can establish a lack of suitable non-infringing alternatives by showing that the alleged alternatives do not have the advantages of the patented features—without reference to demand for those specific features themselves.  *See, e.g.*, *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1553 (Fed. Cir. 1997) (affirming lost profits damages award where the alleged substitute MRI machines possessed "a significant compromise . . . in comparison to using" the patented device); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 825 (Fed. Cir. 1989) (alleged substitute was not an acceptable alternative where there were doubts about the substitute's efficacy, the product did not have FDA approval permitting its sale, and the patented invention was considered medically superior to the substitute); *see also Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1418 (Fed. Cir. 1996) ("[A] product on the market which lacks the advantages of the patented product can hardly be termed an acceptable substitute.").  Here, Apple's patented features and designs provide numerous advantages, including, for example, contributing to the sleek design of Apple's products, improving the fun and ease-of-use of the user interface, and enhancing the overall user experience.  Thus, evidence showing demand for the design, user interface, or user experience of Apple's patented products generally is relevant to showing the value that consumers place on the advantages achieved by the patented features.  A non-infringing alternative that does not meet the high standards of Apple's product designs and user interfaces would not be an "acceptable" alternative under the second *Panduit* factor.

Because demand for the patented products and demand for Apple's designs, user interfaces, and user experience generally are relevant to the second *Panduit* factor, they support Apple's claim for lost profits damages.  Apple and Ms. Davis should be permitted to present evidence of demand to the jury on this basis as well.

### B.    Evidence of Demand, Both Generally and with Respect to the Particular Patented Features, Is Relevant to Apple's Reasonable Royalty Claim.

Apple also seeks reasonable royalty damages for Samsung's infringement.  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity

first began.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Evidence of demand, including both demand for Apple's patented features specifically and demand for Apple's patented products and designs generally, is relevant to several of the *Georgia-Pacific* factors that the jury will be asked to consider:

**Factor 6.**  *Georgia-Pacific* Factor 6 is "the effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales."  *Id*. at 1120.  Evidence of demand for the particular patented features and designs is relevant to showing the value created by the inventions with respect to sales of other products.

**Factor 8.**  *Georgia-Pacific* Factor 8 is "the established profitability of the product made under the patent; its commercial success; and its current popularity."  *Id*.  Evidence of demand for the particular patented features and designs is relevant to the commercial success of Apple's patented products.  Evidence of demand for Apple's patented products and designs generally is likewise relevant to show the commercial success and popularity of products embodying Apple's patented inventions.

**Factor 9.**  *Georgia-Pacific* Factor 9 is "[t]he utility and advantages of the patent[ed] property over the old modes or devices, if any, that had been used for working out similar results."  *Id*.  Evidence of demand for the particular patented features and designs demonstrates that Apple's patents provide significant advantages over older devices.  At the same time, evidence of demand for Apple's design, user interface, and user experience more generally is relevant to show the utility and advantages that Apple's patented products and Samsung's infringing products achieve by incorporating the patented features.

**Factor 10.**  *Georgia-Pacific* Factor 10 is "the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."  *Id*.  Evidence of demand for the particular patented features and designs demonstrates the nature and benefits of the patented invention.  Additionally, evidence of demand for Apple's design, user interface, and user experience more

generally is relevant to show the benefits to consumers who have used Apple's patented inventions.

**Factor 11.**  *Georgia-Pacific* Factor 11 is "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."  *Id.*  Evidence of demand for the particular patented features and designs is relevant to showing the extent to which Samsung has used the patented invention.  In addition, evidence of demand for Apple's design, user interface, and user experience more generally is probative of the value that Samsung has obtained by using and incorporating Apple's patented features and designs into its own products.

In addition to the *Georgia-Pacific* factors, evidence of demand for the product and demand for the patented feature are each explicitly referenced ("in a circumstance in which the patented feature is the reason customers buy the whole product") in Final Jury Instruction No. 41, in the third paragraph, relating to the Entire Market Value Rule.  (Dkt. No. 1903 at 55.)

### C.    Evidence of Demand for Patented Products and Evidence of Demand for Patented Features Are Not Cumulative.

Evidence regarding demand for patented products and evidence regarding demand for specific patented features are not cumulative.  If cumulative, the second would make the conclusions no more or less likely on the *Panduit* factors and reasonable royalty considerations affected by demand evidence.  But of course that is not the case.  Even if it were conclusively established that there is demand for the patented product, that standing alone would not answer a number of questions identified above regarding a lack of suitable non-infringing alternatives, for lost profits, and reasonable royalty considerations that turn on the demand for and value of the specific patented features.

If Samsung offers to stipulate only that there is demand for the patented products, that would not eliminate disputes about whether the *Panduit* tests are satisfied, or about the weight to give to the reasonable royalty factors discussed above.  Accordingly, such a stipulation by Samsung would not by any means render evidence of demand for the patented features unnecessary or cumulative.

1
2

**D.     Generalized Evidence of Demand Is Also Circumstantial Evidence of Demand for the Particular Patented Features and Designs, Which Is Relevant to Apple's Lost Profits and Reasonable Royalty Claims.**

3      Apple expects that, as in the first trial, the jury for the damages trial will be instructed that

4    it must consider circumstantial evidence and must give it the same weight as direct evidence.

5    (Dkt. No. 1903 at 17 (Final Jury Instruction No. 10) ("Circumstantial evidence is proof of one or

6    more facts from which you could find another fact.  You should consider both kinds of evidence.

7    The law makes no distinction between the weight to be given to either direct or circumstantial

8    evidence."); *see also* Dkt. No. 2513 at 52 (Joint Proposed Final Jury Instruction No. 8) (proposing

9    same instruction for damages trial).)  Thus, where Apple seeks to prove either lost profits or

10    reasonable royalty damages through evidence of demand for the specific infringing features, it

11    can do so through *either* direct or circumstantial evidence.

12      Generalized evidence of demand is not only direct evidence supporting Apple's damages

13    claim (as explained above); it is also circumstantial evidence of demand for the particular

14    patented features.  Apple intends to introduce a collection of evidence showing that (i) consumers

15    value attractive design and ease of use generally when purchasing electronic devices, (ii)

16    consumers value and demand Apple's products and designs generally, (iii) Apple's products

17    incorporate the particular patented features and designs, and (iv) Samsung studied, evaluated, and

18    incorporated particular Apple user interface and design features when developing its own

19    products.  Through a logical chain of inferences, this entire collection of evidence demonstrates

20    demand for Apple's patented features and designs—which is highly relevant to Apple's lost

21    profits and reasonable royalty damages claims.  The jury should be permitted to hear and consider

22    the totality of such evidence.  *See, e.g., Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357,

23    1375-1376 (Fed. Cir. 2010) (affirming lost profits award where "[t]he evidence at trial portrayed

24    *general industry demand* for smaller, cheaper, faster, and more reliable VCRs, and Funai

25    presented evidence that the patented technology furthers these goals" (emphasis added)).

26      For example, Apple intends to introduce evidence that consumers generally demand the

27    iPhone's intuitive and easy-to-use interface.  While that evidence, by itself, may not establish

28    consumer demand for a particular patented feature, when considered along with evidence that

1    Samsung targeted the iPhone's "bounce effect" and directly incorporated that feature into its

2    products to achieve a "Fun, Wow Effect" (PX57.19), it becomes strong evidence of demand for

3    the particular patented features that Apple should be permitted to present to the jury.

4        As another example, Apple intends to introduce internal Samsung documents evidencing,

5    in Samsung's own words, a "crisis of design."  (PX40.5.)  When considered along with internal

6    Samsung documents praising the iPhone's "innovative UI, design, and performance that appeal to

7    consumers" (PX34.39), it becomes strong evidence that Samsung was aware of consumer demand

8    for the particular patented features and adapted its phones to meet that demand.  Again, the jury

9    should be permitted to consider all this evidence in determining lost profits and reasonable

10   royalty damages.

11   **II.    SUMMARY OF TESTIMONY.**

12       **A.    Witnesses Designated For Live Trial Testimony.**

13           **1.    Julie Davis**

14       Julie Davis is Apple's expert witness on damages, replacing Terry Musika, who testified

15   in the first trial.  Ms. Davis is a CPA with over 35 years of experience and is a principal with

16   Davis & Hosfield Consulting LLC.  Her fields of expertise include accounting, finance, valuation,

17   business planning, and economic damages analysis.  She has testified on intellectual property

18   matters in well over 50 patent trials.

19       Ms. Davis has reached the same opinions regarding demand as Mr. Musika, although her

20   testimony will focus on the New Trial Patents, the New Trial Products, and the new damages

21   periods arising from the notice dates determined by the Court.[1]

22       **Mr. Musika's Opinions and Discussion of Evidence Regarding Demand in Expert**

23   **Reports, Deposition and First Trial Testimony:**  Mr. Musika addressed demand in extensive

24   detail in his expert reports and in his testimony in the first trial.

25

26

27

28        [1] As the Court requested, Apple is separately submitting a statement regarding Ms.
     Davis's trial testimony regarding copying.

Mr. Musika's opening expert report explicitly discussed his analysis of evidence of both

demand for products and demand for patented features with regard to lost profits.  Paragraph 121

of his opening report stated:

> The first condition is whether demand existed for the patented
> product during the period of infringement. It is fair to say that the
> demand for both Apple and Samsung's smartphones and tablets is
> driven by a combination of factors and not just the benefits
> associated with the individual items of Apple's Intellectual Property
> In Suit for which Apple is claiming a lost profit. However, the
> evidence collected and the material that shows Apple and
> Samsung's commercial success reflects a demonstrated demand for
> benefits associated with the Apple Intellectual Property In Suit for
> which Apple is seeking a lost profit damage. I have identified and
> documented numerous examples of demand for each item of Apple
> Intellectual Property In Suit for which Apple is seeking a lost profit
> on **Exhibits 24 and 25**. The numerous examples of evidence
> involving demand include Samsung strategy and product planning
> documents prepared in the ordinary course, survey data, third party
> market and consumer analysis, Samsung and Apple advertising
> materials and other evidence that relate to the claimed technology.

(3/22/2012 Musika Rpt. ¶ 121.)  Mr. Musika relied on and discussed the survey evidence of

demand prepared by Dr. John Hauser (whose evidence is summarized below) in Paragraph 122.

He stated:  "This evidence strongly supports a conclusion that there is demand for the specific

patented features in suit and that their presence (or absence) will affect consumer decision

making. It is therefore additional support of this element of a lost profits calculation." (3/22/2012

Musika Rpt. ¶ 122.)

Mr. Musika's Supplemental Expert Report added specific reference to evidence regarding

"demand for design patents and . . . utility patents," incorporating the newly available evidence in

Exhibit 24-S, 25-S, and 53-S to his Supplemental Expert Report.  (*Id.* ¶ 43.)

Mr. Musika's Exhibits 24, 25, and 53-S each presents, in the "Comment" column, a

concise quotation from or explanation about contents of each document that are relevant to

demand issues.  All of the exhibits in Mr. Musika's Exhibits 24, 25, and 53-S that Apple has

included in its Trial Exhibit List are specifically identified as such (as the Court instructed) in

Appendices 1 and 2 to this brief discussing Apple's specific exhibits relevant to demand.  Those

subsections identify specifically the portions relevant to demand and quote or discuss why they

are relevant.

Mr. Musika's report also addressed demand for products and for the specific patented feature as relevant to reasonable royalties.  He discussed the entire market value rule, and apportionment for specific patented features as compared to features of the product as a whole that customers value.  (3/22/2012 Musika Rpt. ¶¶ 157-159.)  He discussed demand for the specific design elements as a consideration for reasonable royalties in Paragraphs 225, 246, and 247, and presented evidence in Exhibit 24 to his report.

Mr. Musika also consulted with Apple experts such as Dr. Balakrishnan, Dr. Hauser, and Dr. Singh, and Apple engineers such as Henri Lamiraux and Tang Tan, on issues relevant to demand, including the benefits of the patented features, qualitative value estimates, and design-around periods.  (*See* 3/22/2012 Musika Rpt. ¶¶ 7, 260; *see also* Exhibit 39.3 n.5; Exhibit 45 nn.1-2.)

In the first trial, Mr. Musika testified that he had considered both demand "on a phone, iPhone-by-iPhone basis and tablet basis" and at demand for "the individual intellectual property." On the latter, specifically, "was there demand for the features that are included in the utility patents?  Was there demand for the design that's incorporated into the design patents?"  (Trial Tr. 2075:18-24.)  He testified that Professor Hauser's conjoint survey (discussed below) provides specific evidence of demand for the features covered by the three utility patents.  (Trial Tr. 2077:1-8.)  The Court overruled Samsung's objection to his testimony.  (Trial Tr. 2077:9-24.)

Mr. Musika also testified that he had used internal Samsung documents as evidence in evaluating demand for Apple products, including PX34, a Samsung smartphone analysis that he testified was "a feasibility review or analysis of the smartphone market by Samsung . . . when Apple had first entered the market with its smartphones."  (Trial Tr. 2078:4-14, 2079:7-12.)  The Court overruled Samsung's objection to his testimony regarding PX34.  (Trial Tr. 2078:20-25.) Mr. Musika testified that Samsung reported "Factors that could make iPhone a success" including "'ease and intuitive u/i,' user interface, 'that covers all user classes, including male, female, old and young' and then the first bullet, 'beautiful design.'"  (Trial Tr. 2080:20-2018:6.)  He testified that this was evidence that the iPhone was "a driver in the marketplace, so obviously that's representative of demand for the iPhone."  (Trial Tr. 2081:9-14.)  Mr. Musika also testified about

1  PX194 (an internal email among Samsung executives recognizing that the iPhone had set the

2  "standard of the industry") as evidence of demand for the iPhone and its user interface.  (Trial Tr.

3  2081:19-22, 2082:11-2083:3.)  Again, the Court overruled Samsung's objection to this evidence.

4  (Trial Tr. 2081:19-22, 2082:11-2083:3.)

5           This evidence was clearly, directly relevant to demand for iPhone's products; and it is

6  undisputed that Apple's products practice the claims of the New Trial patents.  Evidence, such as

7  Mr. Musika discussed, that demand for the iPhone stemmed from ease of use of the user interface

8  also provides relevant evidence, in combination with other admitted evidence, that the patented

9  features drive demand.  Dr. Hauser's survey evidence, for example, shows that the particular

10  features provided by practicing the '381, '163, and '915 patents are important to customers'

11  purchasing decisions.  This evidence shows demand for the Apple products, and also that the

12  patented features, specifically, generate at least part of that demand.

13           In his testimony about the amount of reasonable royalty damages that he ascribes to any

14  infringing sale that practices any one or all design patents or trade dress, Mr. Musika referred

15  again to the fact that "Apple has come into the market on the basis of its design . . . and the

16  designs are of critical economic importance to Apple."  (Trial Tr. 2089:3-2090:2.)

17           **Ms. Davis's Expected New Trial Testimony Related To Demand:**  Ms. Davis's report

18  and exhibits covered all the same topics as Mr. Musika regarding demand, and Apple expects her

19  to present testimony on all those same topics.  In her discussion of demand for the patented

20  products and the specific patented features related to the first *Panduit* factor (8/23/2013 Davis

21  Rpt. ¶¶ 103-111), Ms. Davis's report began her discussion with evidence of demand for the

22  patented products.  For example, Ms. Davis observed that there was substantial demand for

23  iPhones and iPads, and both products were extremely popular in the marketplace. Exhibits

24  reflecting such demand for the patented product that Ms. Davis may offer into evidence include

25  PX15, PX102, PX103, PX181, JX1500A, Davis Exhibits 32-S and 33-S to her expert report, and

26  other documents reflecting iPhone and iPad sales and the success of those products.

27           She also explained, as Mr. Musika did, why evidence showing demand for the patented

28  features is especially strong proof of the "but for" causation element of lost profits damages:

1
2
3
4
5

> I am also aware of substantial evidence that illustrates the demand for the particular benefits of the New Trial Patents for which a claim of lost profits is being made. As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 25-PT** details examples of demand for technology of the '381, '915, and '163 Patents as they relate to both smartphones and tablets. As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 24-PT** details examples of demand for and importance of design in selling smartphones.

6    (8/23/2013 Davis Rpt. ¶ 103.)

7         Ms. Davis included in her Expert Report the same Exhibits 24 and 25 as Mr. Musika had

8    included as his Exhibits 24-S and 25-S with no substantive additions, and no changes except that

9    translations have been revised to reflect agreements reached between the parties during the course

10   of the first trial, and that content in Mr. Musika's exhibits has been "greyed out" to reflect the

11   reduction in the scope of the patents at issue in the new damages trial.  Ms. Davis stated:

12
13
14
15
16

> The sources of evidence summarized in these exhibits include the following: Apple advertising materials, Samsung advertising materials, Samsung product development and planning documents, Samsung strategy documents, survey data, third-party market and consumer analysis, testimony and email from representatives of the parties, and other evidence related to the patents and products for which lost profits are claimed. I agree with Mr. Musika's conclusion that these documents reflect substantial demand for the iPhone and the patented features.

17   (8/23/2013 Davis Rpt. ¶ 103.)

18        Documents relevant to demand also exist on Ms. Davis's Exhibit 53-PT, which is identical

19   in format and content to Mr. Musika's Exhibit 53-S, except for updated translations agreed upon

20   by the parties during the course of the first trial.

21        Ms. Davis also relied upon communications with the same Apple experts and Apple

22   engineers with whom Mr. Musika consulted (Dr. Balakrishnan, Dr. Hauser, Dr. Singh, Mr.

23   Lamiraux, and Mr. Tan) on issues relevant to demand, including the problems the patents were

24   trying to solve, the benefits associated with the patented features, the time needed to design

25   around Apple's patents, and the problems that may result from the absence of Apple's patented

26   features.  (*See* 8/23/2013 Davis Rpt. ¶¶ 22-23, 230-238; *see also* Exhibit 39.3-S n.5; Exhibit 45

27   nn.1-2.)  Exhibit 45 to the Davis Report includes a summary of Ms. Davis's opinions on these

28   issues.

1    Each of the three exhibits contains a "Comment" column including comments originally

2    made by Mr. Musika regarding, among other things, information about demand contained in the

3    listed exhibits.  Those comments include Mr. Musika and Ms. Davis's specific explanations of

4    how portions of the exhibits that are listed related to demand for patented products and specific

5    patented features.  (The particularized references to the relevant portions of those Exhibits are

6    identified and explained in Appendices 1 and 2 to this brief.)  Apple fully expects that Ms. Davis

7    will use any selection of documents contained in Exhibits 24-PT, 25-PT, and 53-PT as part of her

8    testimony relating to demand for the patented products and patented features.

9    For example, the P5 Usability Evaluation Results (admitted at trial as PX57) was not

10   specifically discussed in this section of the report, but was included in Exhibits 24-PT (as item

11   57) and 25-PT (as item 36).  (Ms. Davis, however, did discuss this exhibit later in her report when

12   commenting on Dr. Balakrishnan's trial testimony.  *See infra.*)  This document shows that

13   Samsung studied and adopted Apple's bounce feature when developing certain Galaxy tablet

14   products.  (*See also* 8/23/2013 Davis Rpt. ¶ 136.)

15   Ms. Davis discussed many examples of evidence of demand as relevant to her damages

16   opinions in the text of her report, drawing from documents contained in Exhibits 24-PT, 25-PT,

17   and 53-PT, and from sources outside these exhibits, including her review of the results of Dr.

18   Hauser's conjoint survey and her communications with him.  (8/23/2013 Davis Rpt. ¶ 104.)  A

19   summary of Dr. Hauser's survey results were admitted at trial as PX30.

20   For example, Ms. Davis stated:

21           I have also spoken with Dr. Hauser.  For both smartphones and
             tablets, Dr. Hauser was asked "to determine the price premium, if
22           any, that Samsung consumers are willing to pay for the features
             associated with the patents at issue."   Using conjoint analysis, Dr.
23           Hauser concluded that "for both smartphones and tablets, Samsung
             consumers are willing to pay a significant price premium for the
24           tested features that are covered by the patents at issue."   These test
             results support the conclusion that there is demand for the
25           technology of the utility patents at issue in this trial.

26   (8/23/2013 Davis Rpt. ¶ 104.)

27   Ms. Davis also stated:

28

As one example of the evidence that reflects demand for the iPhone and patented features in the product, consider a report by Gravity Tank discussed as item 61 of **Exhibit 25-PT** and item 69 of **Exhibit 24-PT**. Gravity Tank was a consultant hired by Samsung to evaluate the strategy for introducing a touchscreen smartphone in the United States and elsewhere. Gravity Tank told Samsung in 2008 that "[p]undits tell us that the iPhone is a revolution" that was hailed for "its beauty and functionality."120 It praised Apple's "screen centric design" that "has set the standard" in the category.121 Consumers described the product and interface as "whimsical," in part because "lists bounce," and "fun" because of its "two fingered pinch" functionality.  Consumers also commented that iPhone "changed their notion of what a phone can and should be" and that they see the phone as "enjoyable, engaging and cool."

(8/23/2013 Davis Rpt. ¶ 105, citing PX36 at 20, 31, 36.)  Ms. Davis referred to a similar Gravity Tank document by Bates number in footnote 121 of her report, which is the same document listed as PX37 on Apple's exhibit list.

In the text of her report, Ms. Davis discussed, as an example, PX34—the same internal Samsung document that Mr. Musika testified about at trial on issues of demand, and which Samsung now seeks to exclude—stating that the iPhone was a key factor expected to "shape handsets in the coming five years," identifying that the iPhone's "beautiful design" and "easy and intuitive UI" could contribute to its success in the future, and that "competing with iPhone one way or the other is inevitable."  (8/23/2013 Davis Rpt. ¶ 106.)

Ms. Davis also discussed an email chain re: "Relaying the CEO's opinions on touch method and call to a meeting" in the text of her report.  This document is listed as PX9 on Apple's exhibit list.  Ms. Davis points to the following exemplary language from this exhibit in support of her opinions regarding demand for Apple's patented features:

[I]n September 2008, a Samsung executive stated in an email that "implementation of sleek product design as shown by iPhone would be what is considered by product planning and sales as the greatest appealing factor,"

(8/23/2013 Davis Rpt. ¶ 106.)  She also cites to a document called "2009 Mobile UXForecast: M.T.O.C.," which is listed on Apple's exhibit list as PX178, with similar commentary that the iPhone's user experience was regarded as "highly innovative." (*Id.* n.125)

Ms. Davis also quotes from a Samsung email admitted at trial as PX40, and cited in Exhibit 24-PT, written by Samsung's Head of Mobile Division shortly Samsung began

1    incorporating Apple's infringing patented features into its products.  In his email, Samsung's

2    Head of Mobile Division compared Samsung's current offering with the iPhone, and observed

3    that the difference was "truly that of Heaven and Earth."  He also pronounced a "crisis of design"

4    at Samsung.  (8/23/2013 Davis Rpt. ¶ 106.)

5          Ms. Davis also discussed another email by Samsung CEO G.S. Choi that Samsung was

6    "clinging to the past generation" and needed to "learn the wisdom of the iPhone and recognize the

7    standard of the industry which was set by them already."  This document was admitted at the first

8    trial as PX194, and was also discussed in Exhibit 24-PT, as indicated in her report.  (8/23/2013

9    Davis Rpt. ¶ 106.)

10          Ms. Davis further discussed in the text of her report two internal Samsung surveys—(1)

11    the 2011 Smartphone CS Project Final Report, included on Apple's exhibit list as PX185, and (2)

12    the Premium & Mass Design Preference Study, included on Apple's exhibit list as PX196.  (*Id.*)

13    About these reports, Ms. Davis says:

14               By late 2010 and early 2011, other Samsung presentations
                 emphasized the "[n]eed to recognize the importance of exterior
15               design" as a customer purchase-inducing factor and referred to
                 iPhone 3GS and 4 as "most trendy" and "premium."
16
     (*Id.*)
17
           Against this backdrop, Ms. Davis further explained, in reference to PX44, which was
18
     admitted at trial, and cited in Exhibits 24-PT and 25-PT, that:
19
               [I]n March 2010, Samsung's internal product development team
20             prepared a detailed 132-page feature-by-feature comparison of
               Samsung's proposed smartphone, then known as the S1, to Apple's
21             iPhone. This document is discussed as item 49 of **Exhibit 24-PT**
               and item 38 of **Exhibit 25-PT**. During development of the S1
22             phone, Samsung's designers compared the icon layout and various
               user interface functions of the S1 to the iPhone point by point, and
23             recommended adoption of Apple's features. Thus, on page 58 of the
               report, Samsung's product development team recommended that
24             Samsung adopt the use of "double tapping" to view web pages.[131]
               At page 122, Samsung recommended adopting an icon layout
25             design that looks more similar to Apple's designs.[132] In context, all
               this evidence reflects Samsung's conclusion that Apple's patented
26             design elements and user interface technology were attractive to
               consumers.
27

28

1   (8/23/2013 Davis Rpt. ¶ 107, citing PX44 and, specifically at 58 and 122; *see also id.* ¶ 110 at

2   n.138.)

3        Ms. Davis then moved on to a discussion of the second Panduit factor—the absence of

4   acceptable, non-infringing substitutes.  (8/23/2013 Davis Rpt. ¶ 108.)  This section also included

5   numerous examples of evidence of demand for the patented products and features.

6        For example, Ms. Davis further discussed the results of Mr. Hauser's conjoint survey.  (*Id.*

7   ¶ 109.)  She also further discussed PX44, and included a reference to PX46.  PX46 was a

8   Samsung study entitled "Behold3 Usability Evaluation Results," and recommended adding

9   bounce to a developing Samsung phone to generate a "fun visual effect" like the iPhone."  (*Id.*

10   ¶ 110 n.138.)  Again, Ms. Davis noted that these documents discussed in the text of her report

11   were only exemplary of the items included in Exhibits 24-PT and 25-PT.  (*Id.*)

12        Based on this evidence and other evidence discussed and referenced in her reports,[2] Ms.

13   Davis presented the conclusion regarding the first *Panduit* factor that "Apple's patented design

14   elements and user interface technology were attractive to consumers."  (8/23/2013 Davis Rpt. ¶

15   107.)  She also specifically noted the way in which the method that Mr. Musika and she both used

16   to adjust market shares to attribute infringing sales to Apple and other market participants "takes

17   into account major consumer demand factors including the following: alternative features, brand

18   loyalty, carrier preference, operating system preference, and price. (8/23/2013 Davis Rpt. ¶ 123.)

19        Ms. Davis asserted the same points as Mr. Musika had regarding the significance of

20   evidence of demand for the patented product and the patented features to establishing the

21   reasonable royalty amounts.  She noted the significance of demand evidence to the entire market

22   value rule criteria (8/23/2013 Davis Rpt. ¶ 174), and to *Georgia Pacific* factors (8/23/2013 Davis

23   Rpt. ¶¶ 213-219, 222, 234-238.)

24        Ms. Davis also relied upon communications with the same Apple experts and Apple

25   engineers that Mr. Musika consulted with—*e.g.*, Dr. Balakrishnan, Dr. Hauser, Dr. Singh, Mr.

26

27       [2] For example, Ms. Davis cites elsewhere many additional exhibits relevant to demand, including:  PX3, PX6, PX7, PX8, PX11, PX12, PX13, PX17, PX21A, PX38, PX39 (cited as SAMNDCA20012936), PX52, PX57, PX69, PX127, PX128, PX133, PX134, PX135, PX141,

28   PX142, PX143, PX144, PX145, PX146, PX174, JX1091.

1    Lamiraux, and Mr. Tan—regarding the same issues relevant to demand disclosed in Mr. Musika's

2    expert reports—*e.g.*, the benefits of the patented features, qualitative value estimates, and design-

3    around periods.  (*See* 8/23/2013 Davis Rpt. ¶¶ 22, 23; Exhibit 39.3-S n.5; Exhibit 45 nn.1-2.)

4         Ms. Davis's report mentioned evidence of copying by Samsung:

5              [T]here is evidence that the designs and technology of Apple's New
               Trial Patents were copied by Samsung with the belief that
6              consumers would find the resulting infringing products to be more
               desirable. Further, and as discussed above, Samsung experienced
7              large gains in market share during the period when it was selling
               infringing products. These two points suggest that Samsung may
8              not have been able to return to the market with products that were
               just as desirable to consumers.
9

10   (8/23/2013 Davis Rpt. ¶ 110, citing PX44 and PX46.)  Evidence that Samsung decided to

11   incorporate features into products it was developing is evidence that it had determined that

12   demand existed for those features.  Ms. Davis, in this and all her other testimony, will not use the

13   word "copying" to describe Samsung's actions or intentions.

14         Ms. Davis's expert report also discussed evidence from trial testimony that was available

15   to Mr. Musika before he testified, including evidence she considered corroborating of her

16   opinions relating to demand.  (8/23/2013 Davis Rpt. ¶¶ 131-139.)  "For example, evidence was

17   introduced at trial regarding public acclaim for and consumer demand for the iPhone and iPad and

18   the patented features of the New Trial Patents, confirming my opinion that Samsung's

19   infringement caused Apple to lose sales."  (8/23/2013 Davis Rpt. ¶ 132.)  She discussed Mr.

20   Schiller's testimony (described below), iPhone and iPad sales numbers in PX15, news articles and

21   magazine articles in PX17, PX133, PX134, PX135, PX141, PX142, television and print

22   advertisements in PX11, PX12, PX13, PX127, PX128, and consumer survey evidence in PX34,

23   PX143, PX144, PX145, PX146.  (8/23/2013 Davis Rpt. ¶¶ 133-134 and related footnotes.)  She

24   also discussed the MacWorld video admitted at trial as JX1091.  (*Id.* ¶ 133.)

25         Ms. Davis also discussed the deposition testimony of Mr. Benner played at trial.  (*Id.*

26   ¶ 134.)  Mr. Benner, STA's 30(b)(6) witness on consumer surveys, testified that the physical

27   appearance of a smartphone is "an aspect of choice in almost every [customer] decision," and

28   discussed surveys purchased by STA showing that 45% of respondents stated "Liked overall

1   design/style" as a reason for choosing a handset brand, which was the highest-ranked factor

2   among all factors tested.  (*See id.*).

3        Ms. Davis also discussed the substance of Christopher Stringer's trial testimony, and the

4   time and effort Apple devoted to creating the patented features at issue and the benefits associated

5   with those features.  (*Id.* ¶ 135.)  For example, Mr. Stringer testified at trial that it took him

6   "years" to develop the design of the iPhone, which has since been awarded many professional

7   awards for design, including the DNAD and Gold Pencil, and has been displayed in the San

8   Francisco Museum of Modern Art and the Smithsonian Institution in Washington, D.C.  (*Id.*)  Ms.

9   Davis similarly discussed the trial testimony of Scott Forstall, Apple's then-Senior Vice President

10  of iOS, and one of the named inventors on the '163 patent, who testified to the problem he was

11  trying to solve, the difficulty in solving that problem, and the improvement to the user experience

12  resulting from his invention.  (*Id.*)  She also discussed Dr. Balakrishnan's testimony relating to

13  the '381 patent and Dr. Singh's testimony relating to the '163 and '915 patents, about the

14  problems the inventions were meant to overcome, the benefits associated with the invention, and

15  the problems that would occur in the absence of the invention.  (*Id.*)  Ms. Davis stated that

16  "evidence at trial showing the economic and corporate investment in time and effort devoted to

17  creating the patented features at issue and the benefits associated with those features, all of which

18  support the conclusion that Apple believes these factors affect consumers' choice."  (*Id.*)

19        Paragraph 136 of Ms. Davis's Expert Report states:

20              In addition, evidence was introduced at trial that Samsung referred
21              to and used the features of the iPhone and the New Trial Patents in
                the process of creating the designs and the user interface that are
22              included in Samsung's products. This further corroborates my
                conclusion that the patented features are important to consumer
23              demand and are perceived by designers, engineers, and consumers
                as being an improvement over other non-infringing options.

24  (*Id.*)[3]  As Ms. Davis summarized this evidence, "The scope of the similarity between the patented

25  technology and Samsung's products and the decision by Samsung to adopt user interface

26  ─────────────────────────

27  [3]  The cited evidence included:  Justin Denison Trial Testimony 790:5-791:4, 816:10-832:9;
    PX40 ("I hear things like this: Let's make something like the iPhone . . . . It's a crisis of design.");
28  PX44: Relative Evaluation Report on S1, iPhone (comparing S1 to iPhone side-by-side, with
    directions for improvement, e.g., "Double Tap zoom in/out function needs to be supplemented"),

1  technology and designs used by Apple after direct comparisons to Apple's products support the

2  conclusion that there is substantial demand for Apple's patented designs . . . ." (8/23/2013 Davis

3  Rpt. ¶ 136.)

4       Ms. Davis also discussed Mr. Schiller's trial testimony, which Ms. Davis stated

5  "corroborates my opinions that Apple and Samsung compete directly in the smartphone and tablet

6  markets, and that Samsung's infringement caused Apple to lose sales it otherwise would have

7  made "but for" the infringement." (8/23/2013 Davis Rpt. ¶ 137.)  Ms. Davis noted that Mr.

8  Schiller "testified to his belief that some customers were choosing to buy a Samsung product

9  because it looked like Apple's products." (*Id.*)

10       Ms. Davis also noted numerous documents testified to by Mr. Denison relevant to

11  competition between Apple and Samsung and the importance of Apple's technology and design

12  in connection with that competition.  For example, Ms. Davis referred to the "crisis of design"

13  email in PX40 discussed above.  (8/23/2013 Davis Rpt. ¶ 137.)  She also testified to Samsung

14  documents showing that the Samsung viewed the smartphone market as a "two player race"

15  between Apple and Samsung.

16

17  PX44.127 (comparing S1 icons to iPhone icons); PX54: Lessons from Apple ("Apple is
18  universally regarded as being a master of innovation . . . Innovative hardware design & intuitive
    user experience"); PX58: Beat Apple Response ("Thoroughly understand who Apple is?
19  Operational, Design, … Invite Apple 'experts'"); PX60: STA Competitive Situation – Paradigm
    Shift ("US Market Becoming a Two Horse Race Between Apple and Samsung"); PX62: iPhone
20  Counter Strategy; Jinyeun Wang Trial Testimony 2542:22-2547:3; PX55: Samsung mobile icon
    design for 2011; PX2261 (same, in black and white); Michael Wagner Trial Testimony 3066:24-
21  3068:6, 3070:10- 3071:6; PX186 ("in browser scroll, there is no latex effect of having the screen
    follow along and then returning when you are moving paste the edge. (Refer to the Ipad)");
22  PX195 ("With regards to bounce, we use the Mass Spring Damper model . . . and obtained the
    bounce effect that is similar to the iPad . . . ."); Dong Hoon Chang Trial Testimony 2026:3-5 (*see*
23  Dkt. No. 1887-2 at 2); Dr. Ravin Balakrishnan Trial Testimony 1724:5-1724:21, 1757:22-
24  1769:10; PX46: Behold3 Usability Evaluation Results; PX57: P5 Usability Evaluation Results;
    Dr. Karan Singh, Trial Testimony 1845:21-1848:13; PX38: Browser Zooming Methods UX
25  Exploration Study; PX44: Relative Evaluation Report on S1, iPhone; Dr. Peter Bressler Trial
    Testimony 1002:22-1003:5, 1020:8-1022:8, 1048:10-1056:5, 1072:1-1073:15, and 1074:8-
26  1075:4; PX3: Summary exhibit depicting Apple and Samsung phones; PX7: Summary exhibit
27  depicting Samsung devices; PX8: Summary exhibit depicting Apple devices; PX174: Gadget
    Lab, "First Look: Samsung Vibrant Rips Off iPhone 3G Design"; Dr. Russell Winer Trial
28  Testimony 1521:14-1525:6; PX6: Summary of press reports regarding Samsung phones.

1    Ms. Davis also specified the trial testimony of Mr. Teksler, Mr. Stringer, Mr. Forstall, Dr.

2    Bressler, Dr. Balakrishnan, Dr. Kare, Dr. Singh, and Dr. Winer—all of which was available to

3    Mr. Musika—that she considered to be evidence of demand as relevant to the determination of

4    reasonable royalty damages.  (8/23/2013 Davis Rpt. ¶¶ 253-256.)  In the reasonable royalty

5    section of Ms. Davis's report, Ms. Davis also discussed a New York Times article focusing on

6    demand for Apple's user experience.  In paragraph 240 of her report, for example, she quoted

7    from this article as follows:

8    Apple's presence is more subtle as well.  Take one tech buzzword –
9    'user experience' – that was particularly prominent in the product
     presentations this year.  The expression refers to a concern for how
10   all the elements of a technology product – hardware, software and
     services – work together so that people actually enjoy using it.
11   Apple was among the earliest and best-known practitioners of that
     philosophy in its product design.  The company's late chief
12   executive, Steven P. Jobs, long insisted that Apple make its own
     computer software and hardware to ensure that the two would run
13   smoothly together.  As it entered the era of iPods, iPhones and
     iPads, Apple went a step further with online services, including
14   iTunes and iCloud, that make it simple to buy entertainment and
     back up data from the devices.

15   (8/23/2013 Davis Rpt. ¶ 240.)

16   Ms. Davis concluded in this section of her report that "the commercial embodiment of the

17   asserted Apple Intellectual Property and the importance of the overall user experience have

18   produced considerable sales and profits for Apple and provided consumers that use the products

19   that include the asserted Apple Intellectual Property with a better user experience."  (8/23/2013

20   Davis Rpt. ¶ 240.)

21   At Ms. Davis's deposition, Samsung's counsel asked whether she will offer opinion

22   testimony on what drives demand for the patented products.  She answered in the affirmative; and

23   follow-up questions established that the evidence underlying her testimony is cited and discussed

24   in her report.  (Declaration of Nathan Sabri in Support of Apple's Brief on Evidence of Copying

25   or Demand ("Sabri Decl.") Ex. 1 at 18:7-22:5.)  Samsung's lawyer asked additional questions

26   about whether the patents cover a particular feature that actually drives consumer demand; and

27   Ms. Davis answered by referring to the same evidence that was discussed in her reports.  (Sabri

28   Decl. Ex. 1 at 38:4-41:3, 51-80:1, 86:7-14, 102:24-109:4.)  She confirmed that she had considered

1   both demand for the patented products and demand for the patented features, and has found ample

2   evidence of both. (Sabri Decl. Ex. 1 at 41:8-42:19.)

3               **2.      John Hauser**

4         John Hauser is a nationally recognized expert from MIT's Sloan School of Management.

5   Dr. Hauser conducted two choice-based conjoint surveys (one for smartphones and one for

6   tablets) that demonstrate that Samsung purchasers are willing to pay more for the individual

7   patented features that Samsung has been found to infringe.

8         **Dr. Hauser's Opinions and Discussion of Evidence Regarding Demand in Expert**

9   **Report, Depositions, and First Trial Testimony:** Dr. Hauser's surveys, and his expert report

10  and testimony, are all directed to the issue of consumer demand for the specific patented features

11  of Apple's three utility patents.

12        Dr. Hauser testified as to the methodology, results, and validation of the conjoint surveys

13  at trial. (PX30; Trial Tr. 1914:3-1947:15.) Specifically, he presented his conclusion that his

14  surveys, which rely on the same methods that major companies use outside of litigation, show

15  that Samsung consumers who purchased the infringing products would be willing to pay $39

16  more for a smartphone or $45 for a tablet that included the technology of all three of the utility

17  patents. (PX30; Trial Tr. 1929:12-16, 1946:4-9.) These calculations were based on a smartphone

18  with a base price of $199 and a tablet with a base price of $499. (PX30.) Dr. Hauser testified

19  that the surveys show that "Samsung consumers are willing to pay a substantial price premium for

20  the features that are associated with the patents that are at issue in this case" and that "[t]he results

21  reflect that there is substantial demand for the features associated with the patents." (Trial Tr.

22  1916:2-13.)

23        The methodology and data underlying the surveys are comprehensively presented in Dr.

24  Hauser's expert report. The methodology is discussed in detail in the expert report at Paragraphs

25  15-76. Dr. Hauser discusses the descriptions that were included for the '915, '381 and '163

26  patents, and how non-infringing alternatives were included for the patented features. (*See* Sabri

27  Decl. Ex. 2 ¶¶ 63 & n.2, 67.) Dr. Hauser testified at trial that the descriptions of the patented

28  features included in the surveys were vetted by Drs. Singh and Balakrishnan. (Trial Tr. 1922:22-

1923:22.)  The survey questionnaires and screenshots of the surveys are attached to Dr. Hauser's

expert report as exhibits E-H.  Samsung was also provided with the animations that were created

to explain the tested features, which are identified in PX30.  (*See* PX30 at 2.)  Dr. Hauser's report

includes an extensive explanation of the methods he used to calculate the price premium that

Samsung consumers were willing to pay for the patented features and the methods he used to

validate the results at Paragraphs 77-104.  Dr. Hauser presents the results of the surveys at

Paragraphs 13-14, 103-104 and Table 4, setting forth the same conclusions that he presented at

trial, and concluding that, "My analysis shows that, for both smartphones and tablets, Samsung

consumers are willing to pay a significant price premium for the tested features that are covered

by the patents at issue."  The files containing the survey data and the statistical calculations

performed by Dr. Hauser were all produced and are identified in PX30.  (*See* PX30 at 2.)

      Dr. Hauser was extensively questioned about the methodology underlying his surveys at

his first deposition.  He was asked at length, for example, about the extent to which that

methodology may have created "demand artifacts" that influenced the choices respondents made

among the different alternatives described in the surveys, distorting the survey results.  (*See, e.g.*,

Sabri Decl. Ex. 3 at 84:10-91:14, 163:20-165:19, 211:18-214:14.)  Dr. Hauser testified at that

deposition that his survey accurately measured Samsung's consumers' willingness to pay for "the

features of smartphones and tablets that are related to the patents at issue in this case," and

confirmed that the survey results were those set forth in his report—the same figures he later

presented at trial.  (*See id.* at 7:22-9:17, 228:1-11, 254:17-255:17.)

      Dr. Hauser was questioned at length about the extent to which his surveys measured

consumer demand at his second deposition.  (*See, e.g.,* Sabri Decl. Ex. 3 at 355:7-366:15.)  Dr.

Hauser again testified that "it's clear that these features had a substantial influence on the demand

for Samsung phones."  (*Id.* at 363:23-25; s*ee also id.* at 365:9-16; 365:21-366:12.)

      **Expected New Trial Testimony Related To Demand:**  Dr. Hauser will testify, as he did

in the first trial, regarding the methodology, results, and validation consumer surveys that he

prepared and analyzed that measure the willingness to pay of Samsung consumers for the features

of the utility patents in suit.  Willingness to pay is an economic measure of consumer demand.

1    Dr. Hauser is expected to present PX30, which summarizes the results of his survey.  All this

2    testimony is relevant to demand for Apple's products practicing the asserted Apple patents, and

3    for the features those patents provide.

4              **3.      Ravin Balakrishnan**

5              Dr. Balakrishnan testified in the first trial as an expert in the field of computer science and

6    human computer interaction.  He provided an expert report, deposition testimony, and trial

7    testimony regarding the '381 patent.

8              **Opinions and Discussion of Evidence Regarding Demand in Expert Reports,**

9    **Deposition and First Trial Testimony:**  Dr. Balakrishnan's expert reports also described the

10   problems that the '381 patent solved and emphasized the value and importance of the invention,

11   explaining, for example, that the patent "significantly enhances the user's experience in viewing

12   photos, web pages, lists, and other electronic documents . . . . the inventions of the '381 patent

13   make possible a user interface that is more visually appealing and intuitive in its handling of the

14   display of electronic documents."  (Sabri Decl. Ex. 4 ¶ 43; *see also* Sabri Decl. Ex. 5 ¶¶ 45-46.)

15   Similarly, he testified extensively at deposition about the value of the '381 patent and its

16   connection to the popularity of the iPhone, including that it was "part of the overall experience,"

17   and that "you cannot divorce the rubber banding or snap back action as part of that user interface .

18   . . . an integral part of the user interface of the iPhone," and recalling that the audience's response

19   to Steve Jobs' first demonstration of the rubber banding effect at the 2007 Mac World, "was the

20   reaction of wow or, you know, gasp, of that nature."  (Sabri Decl. Ex. 6 at 219:11-220:22,

21   221:23-222:2.)

22             Further, Dr. Balakrishnan testified at the first trial about his review of two Samsung

23   usability evaluation analysis documents:  PX46, which compared the quality of different

24   applications in Samsung's Behold 3 device (the Vibrant smartphone) with the iPhone; and PX57,

25   which did the same comparison between Samsung's tablet and the iPad2.  (Trial Tr. 1759:2-

26   1769.10.)  Dr. Balakrishnan testified about the Samsung documents' comparisons finding the

27   Apple devices superior to the competing Samsung devices with respect to the bounce effect that

28   was not present in the Samsung devices.  (*Id.*)  He testified about the confirmation those exhibits

1   provide of the importance of the bounce effect, including Samsung's explicit labeling of the

2   bounce effect as "critical" to user interface.  (*Id.* 1765:12-1766:17, *see also id.* 1767:7-15.)  He

3   testified about the documents' recommendations that Samsung implement a bounce effect like

4   Apple's and the fact that subsequent versions of Samsung's devices did implement the bounce

5   functionality.  (*Id.* 1761:10-25, 1766: 8-1767:6; *see also id.* 1714:15-1757:21 (testimony re

6   Samsung devices' infringement of the '381).)  Based on his review of those and other Samsung

7   documents, Dr. Balakrishnan testified that Samsung had "studied the problem, recognized a

8   solution provided by the iPhone and the iPad2 as being a good solution to the problem, and the

9   resulting devices . . . show that the solution that they implemented was, indeed, the bouncing

10  functionality of the '381 patent."   (*Id.* at 1769:2-10.)  Dr. Balakrishnan's report discussed these

11  same documents and more, reporting that the evidence informed him that Samsung "recognized

12  the benefits of the '381 patent, and implemented the features of the '381 patent in Samsung

13  products."  (Sabri Decl. Ex. 5 ¶¶ 51-60.)

14      Dr. Balakrishnan also addressed in his expert report and trial testimony that Apple

15  practices the '381 patent.  (Trial Tr. 1740:13-1741:13; Sabri Decl. Ex. 5 ¶ 48.)

16      **Expected New Trial Testimony Related To Demand:**  Consistent with the first trial, Dr.

17  Balakrishnan will give testimony as described above.  His descriptions of the desert fog and

18  frozen screen problems and how the patented functionality solved them, and the importance and

19  value of the '381 feature to the iPhone user experience, support the jury's understanding of

20  reasons for demand for Apple's products directly arising from practice of the '381 patent.  His

21  testimony regarding the reaction of consumers to the specific patented features is evidence of

22  demand.  Prior testimony regarding Samsung's study of Apple's patented feature, and the

23  Samsung documents that Dr. Balakrishnan discussed, are tied to demand for the '381's bounce

24  function because they demonstrate that Apple's bounce feature was an important feature of the

25  user experience; that Apple's implementation of the bounce feature made Apple's user experience

26  superior to Samsung's; and that Samsung added the bounce feature to its competing products

27  because it recognized the importance and superiority of Apple's patented feature.  Apple's

28

1   practice of the patent is relevant to show that Apple would make additional sales of its products

2   while Samsung was out of the market attempting to design-around the patented feature.

3   **4.   Karan Singh**

4   Dr. Singh was certified in the first trial as an expert in computer programming, and

5   human/computer interfaces, and computer graphics.  He provided an expert report, deposition

6   testimony, and trial testimony regarding the '915 and '163 patents.

7   **Opinions and Discussion of Evidence Regarding Demand in Expert Reports,**

8   **Deposition and First Trial Testimony:**

9   **'163 Patent:**  Dr. Singh's trial testimony discussed that the '163 patent solved a problem

10  regarding how to view a document, such as a newspaper, on a small smartphone screen by

11  allowing a user to "simply tap on a story" so that the browser "enlarges and positions the

12  document . . .to make that information readable."  (Trial Tr. 1831:9-1833:19.)  He explained that

13  the '163 performs this function better than zooming and pinching does, because the '163 "makes

14  a key insight" to exploit the inherent structure in documents, such as web pages, and allows the

15  document to be resized, enlarged, and positioned, with just a tap on the screen.  (*Id.* 1833:4-20.)

16  Dr. Singh's deposition also testimony addressed the value of the '163 patent, describing it as "a

17  wonderful design" and "question[ing] the motivation to even—even want to design around it."

18  (Sabri Decl. Ex. 7 at 163:1-3, 163:13-15.)  He further testified that the claims of the '163 "are

19  certainly in part responsible [for] the success of Apple products" and that the '163 invention was

20  "useful and powerful."  (*Id.* at 191:4-192:18.)

21  Further, Dr. Singh testified about his review of PX38, a Samsung exploration study

22  comparing methods for zooming on browsers.  (Trial Tr. 1844:16-1846:21.)  He testified that the

23  study found that "double tap zooming functionality in general was superior to their other

24  alternatives that they studied and that this functionality should be adopted as a supplementary

25  zooming method," and that "the user experience of the iPhone could be used as a design

26  benchmark in whatever functionality" they used.  (*Id.* 1846:12-21.)  Dr. Singh also testified about

27  PX44, a Samsung relative evaluation report that compared Samsung's Galaxy S phones then in

28  development, with the iPhone functionality.  (*Id.* 1846:22-1848:13.)  He testified that the

1    Samsung report found that the performance of Samsung's older phones was poorer that the

2    iPhone's double tap to zoom, and suggested an improvement to add the double tap zoom function

3    to Samsung's newer devices." (*Id.*) He further testified that the newer Samsung devices did

4    modify their functionality to incorporate the way double tap to zoom worked on the iPhone. (*Id.*

5    1848:6-13.) Dr. Singh's expert report also discusses these and additional Samsung documents,

6    and concluded that they show that Samsung "recognized the benefits of the '163 patent, and

7    implemented the features of the '163 patent in Samsung products." (Sabri Decl. Ex. 8 ¶¶ 275-280

8    (citing, *inter alia*, PX38 and PX44; *see also* Sabri Decl. Ex. 7 at 157:24-159:5.)

9        Dr. Singh also addressed in his trial testimony and expert report that Apple practices the

10   '163 patent. (Trial Tr. 1832:23-1833-3; Sabri Decl. Ex. 8 ¶¶ 33-35.)

11       **'915 Patent:** Dr. Singh's trial testimony discussed that the '915 patent addressed a

12   problem of viewing an image on a small touchscreen, and how to allow a user to "directly reach

13   in" to a touchscreen to use his or her fingers to "position and resize" an image. (Trial Tr.

14   1817:22-1818:22.) He testified that the '915 addressed that problem by giving access to "various

15   view operations in a natural and fluid manner." (*Id.*) He explained that the '915 distinguishes

16   between the "common scrolling operation," which is mapped to a single finger input, and a "more

17   complex operation, such as a scale or rotate" operation, which is mapped to two or more fingers,

18   so that the user can perform both of them "satisfactorily [and] intuitively." (*Id.*) The result is that

19   the users have a "direct feel" in moving and scaling an object. (*Id.* 1827:12-13.)

20       Dr. Singh also testified regarding Samsung's infringement of the '915 patent. (*Id.* at

21   1818:23-1830:21; *see also* Sabri Decl. Ex. 8 ¶¶ 301-449.) Dr. Singh's expert report explained

22   how important the '915 features are to the operation of Samsung's infringing products. (Sabri

23   Decl. Ex. 8 ¶¶ 456-58.) He explained that the '915's "functionality is highly intuitive; indeed,

24   many users who experiment with devices equipped with this functionality immediately

25   understand how to use them without any explanation." (*Id.* ¶ 457.) He opined that the absence of

26   that functionality would make Samsung's infringing products "less useable, render them

27   inconvenient for users, and deprive them of intuitive functionality that smartphone and tablet

28   users have come to expect," and that alternatives would provide a much less satisfying user

1   experience than devices that practice the '915 patent." (*Id.* ¶¶ 456-58.) Dr. Singh also explained

2   that Samsung "appear[e]d to have modeled the scrolling, pinch zoom and rotation features in its

3   products after those in Apple's iOS." (*Id.* ¶¶ 450-55.)

4       Dr. Singh also addressed in his expert report and trial testimony that Apple practices the

5   '915 patent. (Trial Tr. 1818:7-22 (demonstrating '915 patent's functionality with iPhone 4),

6   1827:12-17; Sabri Decl. Ex. 8 ¶¶ 295-98.)

7       **Expected New Trial Testimony Related To Demand:** Consistent with the first trial, Dr.

8   Singh will give testimony as described above. His description of the problems and solved by the

9   '915 and '163 patents, and the significance of those patents, helps to demonstrate reasons for

10  demand for Apple's products directly arising from practice of the patents and that the patents are

11  valuable inventions. His testimony regarding Samsung's evaluation of Apple's patented feature,

12  and the Samsung documents that Dr. Singh discussed, are tied to demand for the '163's double

13  tap to zoom function because they demonstrate that Apple's patented feature was an important

14  feature of the user experience; that Apple's implementation of the feature made Apple's user

15  experience superior to Samsung's; and that Samsung added the feature to its competing products

16  because it recognized the importance and superiority of Apple's patented feature. The testimony

17  establishing the fact of infringement of the '915 patent, coupled with testimony regarding

18  Samsung's need to provide the patented functionality, supports the jury's understanding of

19  reasons for demand for Apple's products directly arising from practice of the '915 patent.

20  Apple's practice of the patents is relevant to show that Apple would make additional sales of its

21  products while Samsung was out of the market attempting to design-around the patented features.

22              **5.    Phil Schiller**

23      Mr. Schiller is the Senior Vice President of Worldwide Marketing at Apple.

24      **First Trial Testimony Related To Demand:** Mr. Schiller's trial testimony relevant to

25  demand issues in this retrial is summarized as follows:

26      Apple's marketing and product development group have accumulated over the years a

27  wealth of experience from interactions with customers, product reviewers, and others in the

28  industry about the design and features of new products. (Trial Tr. 544:5-546:2.) After the iPod

1    came out, Apple started looking at whether it could create a single device providing the customer

2    movies, pictures, music, and a phone, using multitouch technology to provide a good user

3    experience using gestures to control the device – this led to both the iPhone and the iPad.  (Trial

4    Tr. 595:10-597:15.)  Although there was initial industry skepticism about the iPhone, and as a

5    brand new concept it had to be introduced and explained to consumers, it was hugely successful

6    when launched, both with reviewers and with customers.  (*Id.* 597:19-611:20 (discussing PX133

7    (NY Times review stating that the iPhone was "beautiful," and calling the shiny black face and

8    design of rim around it "gorgeous"), PX17 (a summary of news articles about the success of the

9    launch and excitement about the product discussing its design and user interface features), PX134

10   (review by the eminent industry reviewer Walter Mossberg of the Wall Street Journal which was

11   an "over-the-top positive reaction" to the design and features of the iPhone), PX135 (Time

12   Magazine "named the iPhone the number one invention of the year in 2007 and placed it on the

13   cover"), PX142 (NY Times 2011 article about the PTO Inventors Hall of Fame exhibit on Steve

14   Jobs Inventions using the "distinctive" iPhone itself as the displays for the exhibition).)  All these

15   exhibits are discussed in Appendices 1 and 2.

16       Sales of the iPhone were excellent—for each model they exceeded expectations.  (Trial

17   Tr. 611:23-613:12; Exhibit PX15 (sales data).)  The introduction and success of the iPhone

18   changed the market for cell phones—it was "a new generation of smartphone" that changed what

19   had been previously a two-segment market, one segment being feature phones and one being

20   smartphones.  When the iPhone was introduced, it created a new dynamic in the smartphone

21   segment in which "ecosystems" or "halo effects" developed which created customer loyalties, not

22   just to their current smartphone but to a line of phones, which was hugely valuable commercially.

23   (Trial Tr. 613:13-617:6.)

24       The "number one" reason for the iPhone's success was that "people find the iPhone

25   designs beautiful."  (Trial Tr. 625:1-15.)  The iPhone design was "unique" and "distinctive"—"its

26   rounded corners, its rectangular shape, its full glass face with the black screen and black area

27   around the screen just seen as one," as well as "the colorful icons, the applications, the squares

28   with their rounded corners" and "the box along the bottom that we were known for."  (Trial Tr.

626:20-627:20 (discussing PDX8, photos of iPhones in evidence).)  All iPhones (as of 2012) incorporated these features.  (Trial Tr. 628:6-8.)  Customers value beautiful products and so design contributes to the success of products.  (Trial Tr. 629:3-9.)  Apple does customer ("buyer") surveys regularly on the iPhones.  (Trial Tr. 629:13-635:22 (discussing survey excerpts introduced as PX143, PX144, PX145, and PX146 and explaining the survey methodology and how results are shown).)  A summary of the results of a number of those buyer surveys shows that "attractive appearance and design" was important to over 80% of iPhone buyers.  (Trial Tr. 635:23-637:7; PX143.7, 144.7, 145.6, 146.7.)  "[O]ne of the things the market looks for from Apple is beautiful products." (Trial Tr. 637:11-12.)  Apple's advertising for the iPhone also featured its patented designs in what Apple referred to as "product as hero" ads.  (Trial Tr. 639:8-640:3, 642:6-22; PX127 (video of iPhone advertisement showing "distinctive design very clearly").)

The "number two" reason for the iPhone's success was that "it's an incredibly easy-to-use device with all our software inventions integrated to make it intuitive and simple."  (Trial Tr. 625:16-19.)  The buyer surveys mentioned above also show that "ease of use" was important to over 90 percent of  iPhone buyers.  (Trial Tr. 637:16-638:8; PX143.6, 144.6, 145.5, 146.6.)  Again, the ads for the iPhone showed the customer how this new kind of device would work, "flicking and scrolling and tapping and all these multitouch ideas."  (Trial Tr. 642:23-643:2; PX127.)  In 2010, Apple launched the iPad, which was a whole new category of device, again with emphasis on ease of use as one of its key features.  Like the iPhone, it was launched to great critical acclaim and was very successful, again in part due to the fact that it was very easy to use.  (Trial Tr. 617:10-624:23 (discussing commercial success (as evidenced by sales numbers in PX15) of iPad), 626:5-13.)  Advertising for the iPad similarly emphasized these ease-of-use features.  (Trial Tr. 645:4-646:20; PX128 (iPad advertisement video).)

Since the launch of the iPhone, Apple and Samsung have been competitors in the smartphone market.  Apple and Samsung sold smartphones through many of the same channels during the damages period at issue here.  Apple and Samsung also compete head to head in the tablet market.  (Trial Tr. 656:18-658:25.)  When Mr. Schiller first saw the Galaxy S phone, his

1   reaction as a marketer was shock at the appearance of the phone and the extent to which it

2   appeared to copy the iPhone.  That created a huge problem for Apple on many levels.  Apple's

3   marketing was about the distinctive, unique design and when a competitor copies that, consumers

4   get confused about whose product is whose.  "A simple example. We have shown our products on

5   outdoor billboards.  If you're driving down the highway 55 miles an hour, you have a split second

6   to see a phone on a billboard.  If it looks very very similar and is copied, whose phone was that?"

7   "So we went from having something easy to market because it was so distinctive and so famous

8   to now being more challenging to market because something looks a lot like it and can confuse

9   consumers." (Trial Tr. 659:21-22.)  Apple thinks competition is great, when each competitor

10  comes up with its own unique ideas and the customer decides what they like better.  Copying is

11  not fair competition, because when one company copies the ideas of another company, they are

12  trading off all the good will and investment that the second company built on its own ideas, and

13  taking all that investment for itself.  Samsung's actions have had a large impact on the

14  smartphone market, by diminishing the value of Apple's ideas, particularly its unique designs,

15  and negatively impacting Apple's sales, both by initial purchasers and because purchasers enter

16  the Samsung ecosystem rather than Apple's.  (Trial Tr. 662:1-665:24.)

17       **Expected New Trial Testimony Related To Demand:**  Mr. Schiller will testify on the

18  topics summarized above, each of which is relevant to the demand for the patented features and

19  products at issue in the retrial.  Specifically, the perception of Apple among industry insiders and

20  commentators, as well as consumers, is probative of the value of the inventions here and the

21  demand for those inventions and products incorporating them.  For example, evidence regarding

22  initial acclaim for the iPhone directly reflects customer demand for the patented products, and in

23  combination with other evidence shows demand for patented features.  Evidence of the

24  importance of ease of use to smartphone and tablet customers in general is relevant to demand

25  issues here because three of the New Trial Patents, the '915, '381, and '163, one or more of

26  which is infringed by all the New Trial Products, go to ease of use of both smartphones and

27  tablets.  Evidence of the importance of ease of use to Apple purchasers in particular is also

28  relevant because the Apple products incorporate the specific ease of use features covered by those

three patents.  Evidence of importance of the design of the iPhone, and of the icon design of its user interface, is relevant to demand for the patented features of the D'677 and D'305 and of products incorporating them such as Apple's iPhones and a number of the infringing products at issue.  The commercial success of the Apple products is also relevant to demand for the patents and for products incorporating them, for the same reasons.  Evidence that Samsung's adoption of the patented features in its own products impacted the sales of Apple devices is also evidence of consumer demand for those features.  Finally, the but-for causation of lost profits is strongly supported by Mr. Schiller's testimony about how closely the Apple and Samsung products competed, and the resemblance to iPhones that Samsung incorporated in its products, with respect to the patented features—that other evidence shows was done after Samsung had noted the demand for Apple's products and those specific features.

### 6.    Greg Joswiak

Mr. Joswiak is the Vice President for iPhone, and iOS Product Marketing at Apple.

**Previous Testimony Related To Demand:**  Mr. Joswiak was on Apple's final witness list but was not called in the first trial.  Mr. Joswiak was disclosed in discovery on the topics of "iPhone & iOS product marketing; history and business of Apple."  (Sabri Decl. Ex. 9 at 5.)  He was also designated as Apple's 30(b)(6) witness on topics related to demand, including: "Marketing and promotion relating to the APPLE ACCUSED PRODUCTS, including: (a) sales and marketing strategies and methods relating to the APPLE ACCUSED PRODUCTS; (b) development of sales and marketing materials relating to the APPLE ACCUSED PRODUCTS; and (c) content of sales and marketing materials relating to the APPLE ACCUSED PRODUCTS"; "Industry, market, and competition analysis performed by APPLE or on APPLE's behalf for the APPLE ACCUSED PRODUCTS"; "Historical, current, and projected market share of, and market demand for, the APPLE ACCUSED PRODUCTS," and "APPLE's advertising and marketing for all iPhone, iPad, and iPod Touch versions, including strategy, budget, channels, content, media, return-on-investment analysis, and analysis, studies, data and commentary relating to the effectiveness of, or consumer reaction to, that advertising and marketing."  (*See* Sabri Decl. Ex. 10 at 34-47 (designated on Topics 1-3, 5, 10, and 13 of Exhibit 3 and Topics 6-10

of Exhibit 4.)  Mr. Joswiak was also disclosed on these topics in the Joint Pretrial Statement for the original trial and again in the damages trial.[4]  Mr. Joswiak was deposed at length by Samsung on February 23 and 24, 2012, and Samsung had ample opportunity to question him about these topics.  To the extent they chose to do so in their cross-examination, exemplary deposition cites are included in the discussion below of his expected new trial testimony and the cited transcript excerpts are submitted herewith.  Apple does not believe, however, that Samsung's choices about what lines of questioning to pursue in Mr. Joswiak's deposition should limit the scope of his testimony at trial.

**Expected New Trial Testimony Related To Demand:**  Mr. Joswiak has participated in the marketing and sale of the iPhone and of the iOS operating system since the first iPhone was in development.  (*See, e.g.*, Sabri Decl. Ex. 10 at 56-57, 73-78.)  Mr. Joswiak also receives and uses the market share and customer survey information discussed by Mr. Schiller at trial, which is also discussed above.  (*See, e.g.*, *id.* at 82-101.)  Mr. Joswiak may testify regarding how Apple seeks to distinguish its products in the marketplace.  His testimony may include how product design affects those efforts, how the iPhone's exterior appearance contributes to Apple's ability to distinguish its products, and how the utility patent inventions contribute to a product that is easy to use, intuitive and desirable to consumers, which is important to Apple's market strategy.  (*See, e.g.*, *id.* at 285-297, 346-356.)  Mr. Joswiak may testify to how Apple has used these features in its advertising and other promotional materials.  (*See, e.g.*, *id.* at 285-287.)  Mr. Joswiak may also testify to how the erosion of these distinctive features that occurs when other competitors use Apple's intellectual property affects demand for Apple's products and undermines the investment Apple has made in its products.  (*See, e.g.*, *id.* 273-277, 472-473.)  Apple may offer Mr. Joswiak's testimony to discuss how Samsung's launch of the infringing Galaxy line of

---

[4] Apple's disclosure for Mr. Joswiak's testimony in the first trial stated:  "Mr. Joswiak may testify regarding Apple's marketing for Apple's iOS devices such as the iPhone, including Apple's advertising strategy and expenditures, sales figures, other publicity for these products, and internal market research, and the marketing, advertising, and retail channels for both Apple's and competitors' products.  Mr. Joswiak also may testify regarding the competitive market for mobile devices, such as smartphones."  (Dkt. No. 1287 at 15.)  The disclosure for the current trial is identical.  (Dkt. No. 2486-2 at 5.)

1    smartphones and tablets, including certain of the products in the new trial, affected sales and

2    market share as consumers adopted these products in competition with Apple's products. (*See,*

3    *e.g.*, *id.* at 126-134, 472-473.)

4        Mr. Joswiak's experience in light of his role and history with the products is relevant to

5    consumer demand for the patented features and designs.  The perceptions of third parties and

6    consumers are all probative of the value of the inventions here and the demand for those

7    inventions and products incorporating them.  For example, evidence of the importance of ease of

8    use to those who purchase Apple iPhones and iPads is relevant to demand issues here because

9    three of the patents at issue, the '915, '381, and '163, one or more of which is infringed by all

10   products at issue, contribute to a buyer's ability to navigate and use the product effectively.

11   Evidence of importance of the design of the iPhone, and of the icon design of its user interface, is

12   relevant to demand for the patented features of the D'677 and D'305 and of products

13   incorporating them such as Apple's iPhones and a number of the infringing products at issue.

14   Evidence regarding whether Apple uses these features to distinguish its products is relevant to

15   whether they contribute to consumer choices between competing smartphones.  The commercial

16   success of the Apple products is also relevant to demand for the patents and for products

17   incorporating them, for the same reasons.  Evidence that Samsung adopted the patented features

18   in its own products, and that doing so reduced the sales of Apple devices, directly ties demand

19   evidence to the but for causation of Apple's lost profits.

20                      **7.    Boris Teksler**

21        Mr. Teksler was the Director of Patent Licensing and Strategy at Apple at the time of the

22   first trial.

23        **First Trial Testimony Related To Demand:**  Mr. Teksler testified about Apple's

24   practices with respect to licensing its patents, including patents that fall in the category of

25   "Apple's unique user experience I.P."  (Trial Tr. 1952:16-1956:1.)  He characterized Apple's

26   unique user experience I.P. as "that which makes [Apple's] brand identity and keeps [Apple]

27   unique in the marketplace" (*id.* 1956:2- 1957:9), which in combination with other evidence shows

28   customer demand for Apple's products arising from its intellectual property.  He referred to this

1   market value of Apple's intellectual property as giving rise to, and as demonstrated by, Apple's

2   "strong[] desire" to not license such I.P. and to do so only in a "rare exception" and only when

3   Apple knows it's "not enabling someone to build a clone product." (*Id.*)

4        Mr. Teksler also testified about PX52, an Apple presentation to Samsung in which Apple

5   addressed Samsung's use of Apple's patents in smartphones, including the '381 patent. (Trial Tr.

6   1958:17-1962:5.) Mr. Teksler testified that the '381 patent falls in the category of Apple's unique

7   user experience (*id.* 1962:3-1964:8), which provides reason for, and supports the conclusion that,

8   demand for Apple's product related to the features that the '381 patent provides. He also

9   explained that an Apple cross-license with Microsoft that included Apple design patents had an

10  anti-cloning provision, (*id.* 2010:3-2012:16), which tends to confirm Apple's understanding that

11  the design patents inspire customer demand and therefore market value.

12       **Expected New Trial Testimony Related To Demand:** Mr. Teksler will testify on

13  substantially the same topics he addressed in the first trial. Use of intellectual property as a

14  distinguishing characteristic of a product is relevant to whether the intellectual property forms a

15  part of consumer demand for the product. Mr. Teksler may use PX52 as a part of the foregoing

16  evidence.

17             **8.**    **Mark Buckley**

18       Mr. Buckley is a financial analyst at Apple.

19       **Previous Testimony Related To Demand:** Mr. Buckley was on Apple's final witness

20  list but he did not testify in the first trial. He had been designated as an Apple 30(b)(6) witness on

21  industry, market, and competition analyses performed by APPLE or on APPLE'S behalf;

22  business plans, strategies, forecasts, studies, or reports; sales, pricing, and revenue relating to the

23  Apple accused products, including actual and forecasted unit prices, shipments of each Product

24  from January 1, 2007 to the present, amount and value of sales from January 1, 2007 to the

25  present, and revenue and profits derived by APPLE from each Product; Historical, current and

26  projected market share of, and market demand for Apple products; products or services marketed,

27  purchased, sold, or offered for sale in conjunction with the sale, purchase, rental, lease or other

28  distribution of Apple products. Samsung did not question him on demand issues.

**Expected New Trial Testimony Related To Demand:**  Mr. Buckley is able to testify to Apple's sales, selling prices, revenues and profitability during the infringing periods, which reflect consumer demand for Apple's products.  He may testify, for example, about the following exhibits that reflect information on these subjects: PX102, PX103, PX181 & PX182.  The relevance of these exhibits to demand issues is discussed in Appendices 1 and 2.

### 9.    BJ Watrous

Mr. Watrous is the Vice President & Chief IP Counsel at Apple.

**Previous Testimony Related To Demand:**  Mr. Watrous was on Apple's final witness list but did not testify at trial.  Mr. Watrous was disclosed in Apple's March 4, 2012 Supplemental disclosures as a witness who would speak to "Apple licensing and licenses."  He was deposed by Samsung on March 8, 2012 but Samsung choose not to question him about Apple's licensing policies and practices other than in the context of standard essential patents and thus the treatment of Apple's design patents and Apple's utility patents in suit did not arise.  Mr. Watrous was disclosed on in the Joint Pretrial Statement for the original trial and again in the damages trial on the topic of "Apple's licensing negotiations with Samsung."  (Dkt. Nos. 1287 at 12, 2486-2 at 7.)

**Expected New Trial Testimony Related To Demand:**  Mr. Watrous can testify to the same subject matter regarding demand as is described in Section II.A.7 above regarding Mr. Teksler's expected testimony.  Mr. Watrous can testify that the patents in suit represent unique intellectual property, which Apple seeks to retain for itself.  Apple does so because consumer demand for these features distinguishes Apple's products from other competitors' products in the marketplace.  Because the intellectual property distinguishes Apple's products, it contributes to consumers' reasons to purchase an Apple product and not a competitor's product.  Use of intellectual property as a distinguishing characteristic of a product is also relevant to whether the intellectual property forms a part of consumer demand for the product.

### B.    Designated Deposition Testimony Related to Demand.

#### 1.    Timothy Benner

Mr. Benner is STA's Senior Manager of Consumer Insights and Analytics.

1   **Designated Deposition Excerpts Related to Demand:** Mr. Benner testified that physical

2   design affects consumer purchasing decisions for smartphones.  He testified regarding Samsung

3   and third party surveys and other internal documents, which indicate that physical design is a

4   significant factor in the appeal of smartphones and which indicate that Apple's intuitive user

5   interface, which includes the utility patents at issue, is valuable to consumers.  (Sabri Decl. Ex. 11

6   at **30**, **37-38**, 45, 56-57, **59-61**, 64, 73-74, 112-115 (testimony from bolded pages was presented at

7   first trial).)

8               **2.    Dong Hoon Chang**

9       Mr. Chang is a senior vice president at Samsung and head of SEC's mobile design group.

10      **Designated Deposition Excerpts Related to Demand.** Mr. Chang testified regarding

11  PX34, a Samsung report that addresses in part the effect that the iPhone was having on the

12  smartphone market after its launch and offers reasons why the iPhone could succeed.  (Sabri

13  Decl. Ex. 12 at 61-63.)  Mr. Chang testified regarding Samsung's belief that its design capabilities

14  were inferior to Apple's prior to the introduction of the Galaxy line of phones.  (*Id.* at 70 to 72,

15  76-77.)  Mr. Chang testified regarding the Gravity Tank study, PX36 & PX37.  (*Id.* at 96 to 104.)

16  Included in this testimony are comments regarding the "screen centric design" that made the

17  iPhone the standard for design in the industry.  (*Id.* at 98.)  Mr. Chang testified regarding PX40, a

18  February 2010 e-mail describing a meeting among executives at Samsung.  (*Id.* at 112-122.)  That

19  testimony includes comments regarding the "crisis of design" at Samsung, based on comments

20  from Samsung's customers that Samsung's user experience was inferior to the user experience

21  and design Apple's products, indicating consumer demand for Apple's patented technology.

22  (Sabri Decl. Ex. 12 at 115-117, 120-122.)  Mr. Chang testified regarding PX194, a March 2010 e-

23  mail describing "the wisdom of the iPhone" and how it has set "the standard in the industry."  (*Id.*

24  at 122-125.)  Mr. Chang testified regarding the perceived inadequacy of Samsung's user interface

25  in comparison to Apple's user interface.  (*Id.*)  Mr. Chang testified regarding PX44, a side-by-side

26  comparison of Samsung's S1 prototype to the iPhone with repeated recommendations to adopt

27  features of the iPhone.  (Sabri Decl. Ex. 12 at 126-133.)  The document and testimony include

28  specific references to Apple patented features.  (*Id.* at 129-133.)  Mr. Chang testified regarding

whether Samsung believed the Galaxy products looked similar to the iPhone in its physical design.  (*Id.* at 154-157.)  Mr. Chang testified that Samsung was aware of Apple's user experience patents, including the "bounce effect" patent, when it designed its smartphone products.  (Sabri Decl. Ex. 12 at **157-159** (testimony presented at first trial).)  Mr. Chang testified regarding the incorporation of the bounce effect covered by Apple's patents into the Galaxy tablet products.  (Sabri Decl. Ex. 12 at 177-181.)

### 3.     Gee Sung Choi

Mr. Choi is the head of Samsung Group's corporate strategy and recently served as CEO and Vice Chairman of Samsung Electronics.

**Designated Deposition Excerpts Related to Demand.**  Mr. Choi testified regarding whether in 2008, the iPhone was becoming the "*de facto* standard" in the smartphone market, reflecting demand for the iPhone.  (Sabri Decl. Ex. 13 at 38-40.)  Mr. Choi testified regarding whether Samsung decided in 2009 to make the iPhone a standard for comparison when preparing and presenting ideas for product development, reflecting consumer demand for the iPhone and iPad.  (*Id.* at 43-46.)  Mr. Choi testified regarding PX194, a March 2010 e-mail describing "the wisdom of the iPhone" and how it has set "the standard in the industry."  (Sabri Decl. Ex. 13 at 48-52.)

### 4.     Cira Conley

Ms. Conley is a corporate representative for Gravity Tank.

**Designated Deposition Excerpts Related to Demand.**  Ms. Conley testified concerning Gravity Tank's services for Samsung, which led to the preparation of two market research reports regarding what smartphone consumers desire (PX36 & PX37).  (Sabri Decl. Ex. 14 at 10-12, 28-31, 35-40, 44-48.)

### 5.     Wong Pyo Hong

Mr. Hong is an Executive Vice President and the head of SEC's global product strategy.

**Designated Deposition Excerpts Related to Demand.**  Mr. Hong testified regarding the Gravity Tank study, PX36 & PX37.  (Sabri Decl. Ex. 15 at 45-46.)  Included in this testimony are comments regarding the popularity of the "screen centric design" that made the iPhone the

1  standard in the industry.  (*Id*. at 46-47.)  Mr. Hong testified on his directive to Samsung

2  employees to provide comparison's to the iPhone when presenting their ideas to more senior

3  executives in light of positive consumer reaction to Apple's products.  (*Id*. at 57-60.)  Mr. Hong

4  testified on reports he received from third parties that they believed Samsung had copied the

5  iPhone when creating the initial Galaxy S line of phones, which includes at least two of the new

6  trial products.  (Sabri Decl. Ex. 15 at 81-88.)

7  **6.    Wookyun Kho**

8  Mr. Kho is an engineer in SEC's Advanced Development Software Group 1.  He

9  participated extensively in the creation of the bounce effect in the Galaxy

10  **Designated Deposition Excerpts Related to Demand.**  Mr. Kho testified to his use of the

11  iPhone and iPad as a part of his design of the "bounce" functionality for the Galaxy line of

12  smartphones and the Galaxy Tab 7.0, which are among the products in the new trial.  (Sabri Decl.

13  Ex. 16 at 38-44, 48-51, 69-70, 105-108.)  Mr. Kho testified to the use by a Samsung consultant,

14  NemusTech, of the iPad as a part of its design and implementation of the "bounce" functionality

15  in the Galaxy Tab 7.0, a new trial product.  (*Id*. at 77-83.)  Mr. Kho testified that he used the iPad

16  as a basis for comparison to Samsung's "bounce" function in the Galaxy Tab, when he

17  demonstrated his work to supervisors.  (*Id*. at 90-96.)  Mr. Kho testified regarding implementation

18  of "bounce" in the Behold smartphone, which became one of the Galaxy S line of phones, as

19  described in PX46, which is also described further below.  (*Id*. at 124-131.)  Mr. Kho testified to

20  the use of the "bounce" source code that he wrote in other Android phones marketed by Samsung,

21  including smartphones included in the new trial.  (*Id*. at 157-164.)

22  **7.    Ioi Lam**

23  Mr. Lam is a principal engineer at Samsung.

24  **Designated Deposition Excerpts Related to Demand.**  Mr. Lam testified regarding

25  Samsung's side-by-side comparisons of Apple's products to Samsung's products with respect to

26  the implementation of the "scroll, zoom and double-tap" functions in Galaxy line of smartphones.

27  (Sabri Decl. Ex. 17 at 27-29, 33-34.)  Mr. Lam testified to his awareness of the patented iPhone

28  "bounce" effect at the time he wrote code to implement the "bounce" effect in Samsung's

1    products and his belief that the existing alternatives were inferior.  (*Id*. at 50-51, 55-56.)  Mr. Lam

2    testified regarding the effort to optimize "bounce," "pinching and depinching," and "tap to zoom"

3    performance, which are all features of the patents in suit, because Samsung believed these

4    features to be important in addressing Samsung's competition.  (*Id*. at 123-125.)

5    **8.    MinHyouk Lee**

6    Mr. Lee is vice president of the Mobile Communications Division Design Team at SEC.

7    **Designated Deposition Excerpts Related to Demand.**  Mr. Lee testified regarding

8    PX40, a February 2010 e-mail describing a meeting among executives at Samsung.  (Sabri Decl.

9    Ex. 18 at 157-167.)  His testimony includes information about the "crisis of design" at Samsung

10   in light of customer praise for the user interface of the iPhone, which includes among other things

11   the features of Apple's utility patents.  (*Id*. at 165-167.)

12   **9.    Junho Park**

13   Mr. Park is a director of product planning at Samsung.

14   **Designated Deposition Excerpts Related to Demand.**  Mr. Park testified regarding

15   PX38, which is discussed below and provides specific direction to use the iPhone user interface

16   as a design benchmark when adopting this patented feature.  (Sabri Decl. Ex. 19 at 175-177.)

17   **10.    Todd Pendleton**

18   Mr. Pendleton is STA's Chief Marketing Officer.

19   **Designated Deposition Excerpts Related to Demand.**  Mr. Pendleton testified that the

20   Apple iPhone had an exceptionally well done exterior design, which Mr. Pendleton agrees is a

21   factor that creates an emotional connection with customers.  (Sabri Decl. Ex. 20 at 167, 190.)

22   **11.    DongSeok Ryu**

23   Mr. Ryu is responsible for user experience/interface negotiations with carriers at SEC.

24   **Designated Deposition Excerpts Related to Demand.**  Mr. Ryu will testify about the

25   Gravity Tank study, PX36 & PX37, and his personal knowledge of criticisms of Samsung's user

26   interfaces that were mentioned in the study.  (Sabri Decl. Ex. 21 at 27:20-34:9.)  Mr. Ryu will

27   also testify that Samsung's use of the Android platform did not restrict Samsung's ability to

28   modify the appearance of the user interface, including color and shape of icons, background

APPLE'S BRIEF ON EVIDENCE OF COPYING OR DEMAND
Case No. 11-CV-01846-LHK (PSG)
sf-3343040

41

1   colors, the dock of icons on the bottom, and that Samsung customized elements of the user

2   interface.  (Sabri Decl. Ex. 21 at 14:5-17, 35:23-38:17, 39:18-40:2, 53:13-54:20, 55:15-21, 56:4-

3   10, 57:16-23, 63:12-65:6.)  Further, Samsung's choice to make its user interface more like the

4   iPhone was not driven by functional or use considerations.  (*Id.* at 46:5-17, 54:2-55:21, 59:5-22,

5   60:18-61:13.)  He also will testify about PX179, a Samsung report that compares the home screen

6   and graphical user interface ("GUI") with Apple's, which reports in part that Samsung's GUI

7   feels like Apple's.  (*Id.* at 74:2-77:16.)

8                       **12.     Jaegwan Shin**

9           Mr. Shin is an engineer at Samsung.

10          **Designated Deposition Excerpts Related to Demand.**  Mr. Shin will testify about an

11  email he wrote reporting on a request from Samsung headquarters regarding a Samsung 7-inch

12  tablet under development in October 2010, stating that the device "does not provide a bounce

13  effect on the browser screen so it is not emotionally appealing" along with a video comparing

14  Samsung's device with another device with bounce effect.  (Sabri Decl. Ex. 22 at 38:13-45:17,

15  SAMNDCA00525347-49, & SAMNDCA00201281 (CD).)  He will testify about comparisons

16  that Samsung did between three Samsung products under development and the iPad and iPad2.

17  (Sabri Decl. Ex. 22 at 78:11-80:1, 81:4-82:8, 95:18-25, 97:24-98:18, 108:7-109:17.)

18  **III.    EXHIBITS PRESENTING EVIDENCE RELATED TO DEMAND.**

19          Samsung's damages expert, Michael Wagner, admitted that evidence of demand is

20  relevant to determining lost profits and a reasonable royalty.  During his deposition, he testified

21  that there are several ways to establish such demand, including from a number of the same

22  internal Samsung documents that Samsung seeks to strike from the new trial.  According to Mr.

23  Wagner, internal documents evidencing that consultants told Samsung that consumers want

24  certain types of functionality (Sabri Decl. Ex. 23 at 466:5-13), or that Samsung instructed its

25  engineers to design products to look a certain way (*id.* at 466:14-20), were "rational evidence of

26  demand."  (*Id.* at 466:5-13.)

27          Mr. Wagner agreed that PX38, a Samsung consultant's report evaluating browser zooming

28  methods, recommends that Samsung "adopt the double tap as supplementary zooming method for

1   up to two levels of zooming."  (*See* PX38; Sabri Decl. Ex. 23 at 770:12-25, 771:4-772:4).)  Under

2   Mr. Wagner's own methodology, such evidence is relevant to demand.  (Sabri Decl. Ex. 23 at

3   466:5-13.)  Mr. Wagner admitted that evidence that a Samsung executive instructed the

4   company's engineers to "learn the wisdom" of the iPhone user interface because it was the

5   "standard of the industry" (*see* PX194; Sabri Decl. Ex. 23 at 748:24-749:5) could provide a

6   "suggestion of what consumers are demanding."  (Sabri Decl. Ex. 23 at 750:16-22.)   Mr. Wagner

7   admitted that evidence that the lack of a bounce effect in Samsung's phones was characterized by

8   Samsung's engineers as a "critical" problem.  (*See* PX57; Sabri Decl. Ex. 23 at 764:17-21,

9   765:24, 766:9-22 (could reflect what Samsung "thought consumers would care about," *i.e.*,

10   demand), 766:16-22.)

11          Despite these admissions, Mr. Wagner's report made no mention of the evidence that

12   Samsung copied Apple's patented products, designs, and features.  At his 2013 deposition, he

13   insisted that he was "agnostic on the question" and that he had "not been asked to address that

14   issue in this case."  (Sabri Decl. Ex. 23 at 704:4-7; 710:12-13; 750:6-8 (testifying that the "issue

15   of copying is completely unrelated to demand").)  Yet, at his deposition, Mr. Wagner also

16   admitted that if a successful profit maximizing company like Samsung decided to copy Apple's

17   features, that it would be relevant to consumer demand.  (*Id.* at 953:14-21.)

18          Samsung's motion to strike this evidence as allegedly irrelevant "copying" evidence runs

19   directly contrary to the admissions of its own damages expert.

20          **A.      Exhibits That Samsung Seeks To Exclude Are Material Evidence Regarding
21                    Demand.**

22          As directed by the Court, Apple submits as Appendix 1 to this brief an exhibit-by-exhibit

23   explanation of how each exhibit on Apple's Trial Exhibit List that Samsung has moved to strike

24   is relevant to demand.

25

26

27

28

1

**B.      Other Exhibits on Apple's Trial Exhibit List Also Provide Evidence Regarding Demand.**

2

The Court instructed Apple to identify all other exhibits that are relevant to demand or

3

copying, and to discuss how they relate to those issues.  Appendix 2 to this brief presents that

4

discussion.

5

### CONCLUSION

6

For the reasons presented above and in Appendices 1 and 2, the evidence and testimony

7

that Apple has identified is relevant to the issues at the damages trial and Apple should be

8

permitted to present it to the jury.

9

10

MORRISON & FOERSTER LLP

Dated: October 13, 2013

11

12

By:  */s/ Harold J. McElhinny*
        HAROLD J. MCELHINNY

13

14

Attorneys for Plaintiff
APPLE INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28