# EXHIBIT A

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California corporation, )
)
Plaintiff, )
)
vs. ) No: 11-CV-01846-LHK
)
SAMSUNG ELECTRONICS CO., LTD, a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company )
)
Defendants. )
______________________________)

DEPOSITION OF TONY BLEVINS
Redwood Shores, California
Tuesday, April 3, 2012

Reported By:
LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
JOB NO. 48289

April 3, 2012
9:10 a.m.

Videotaped deposition of TONY BLEVINS, held at held at Quinn Emanuel Urquhart & Sullivan LLP, 555 Twin Dolphin Drive, Suite 500, Redwood Shores, California, pursuant to Subpoena before Linda Vaccarezza, a Certified Shorthand Reporter of the State of California.

A P P E A R A N C E S:

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Defendants
50 California Street
San Francisco, California 94111
BY: DAVID C. CURRIE, ESQ.

WILMER CUTLER PICKERING HALE AND DORR
Attorneys for Plaintiff
60 State Street
Boston, Massachusetts 02109
BY: JOSEPH J. MUELLER, ESQ.

ALSO PRESENT: Erica Tierney, Apple Inc.

VIDEOGRAPHER: Alan Dias

THE VIDEOGRAPHER: Good morning. This is the beginning of Disk Number 1 of the videotaped deposition of Tony Blevins in the matter of Apple Inc. versus Samsung Electronics Company. This is a matter pending before the United States District Court, Northern District of California. We are located today at 555 Twin Dolphin Drive in the city of Redwood Shores, California. Today is April 3rd, 2012, and the time is 9:01 a.m. I am Allen Dias from TSG Reporting. With me is Linda Vaccarezza, a court reporter, also from TSG.

Counsel, would you please identify yourself for the record.

MR. CURRIE: This is David Currie from Quinn Emanuel for Samsung Electronics Co., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

MR. MUELLER: Joe Mueller, Wilmer Hale, on behalf of Apple. With me is Erica Tierney, in-house counsel for Apple. And just at the beginning, let me

state for the record a couple of housekeeping things.

My understanding is that we're here for a half day of Mr. Blevins, and in return, we have agreed to designate for use in this case, the Northern District California case, his transcript from the 794 investigation. I don't have the full caption at my fingertips; is that right?

MR. CURRIE: Yeah. Can you just clarify what he's designated on?

MR. MUELLER: He's designated on certain 30(b)(6) topics generally relating to supply issues in the ITC case, and also in the Northern District of California case as well, Topic Number 5 from Samsung's second 30(b)(6) notice in particular, and I believe we also designated him for other topics insofar as they relate to supply issues.

MR. CURRIE: Okay. The only thing I have to say is, you know, there's been kind of an ongoing discussion about how witnesses are being designated and

whether they're being properly designated on the topics that Samsung has served versus topics Apple has described. We don't have to get into back and forth, but I just want to note that for the record.

MR. MUELLER: Fair enough.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

TONY BLEVINS,

Having been duly sworn, by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MR. CURRIE:

**Q. Good morning, Mr. Blevins.**

A. Good morning.

**Q. Am I saying your name correctly?**

A. Yes.

**Q. Could you please state your full name?**

A. My name is Tony J. Blevins.

**Q. I understand that you were deposed sometime around February 23rd. Does that sound right?**

A. I don't remember the exact date,

but that seems roughly correct.

**Q. Have you been deposed since that time?**

A. I have not.

**Q. Since you were -- sat for a deposition relatively recently, I think you're pretty familiar with the ground rules of how a deposition works?**

A. I'm not an attorney, but I think I'm reasonably familiar.

**Q. You understand you're here to testify under oath?**

A. Yes.

**Q. So it's important to tell the truth as if you were in court. Do you understand that?**

A. I understand that.

**Q. You understand that we have a court reporter here who is writing down everything that we say?**

A. Yes.

**Q. So because she's writing everything down, it's important that we don't talk over each other. Does that make sense?**

A. Yes.

**Q. So I will do my best not to interrupt you when you're giving an answer. If you can try to wait for me to finish my questions before you provide an answer, even if you already are pretty sure what the question is going to be and what the answer is. Does that make sense?**

A. Yes.

**Q. You can take a break whenever you want to for any reason, with one exception, which is if I have a question pending, I would like you to answer the question before we take a break. Does that sound okay?**

A. Yes.

**Q. Is there any reason you can think of that you cannot provide competent testimony today?**

A. No.

**Q. You're not on any medications that would impair your ability to tell the truth or anything like that, right?**

A. No, I'm not.

**Q. Let's mark this as Blevins 1.**

**(Exhibit 1 was marked for identification.)**

MR. CURRIE: Do you want to go off

the record for a second?

MR. MUELLER: Actually, we are good. Let's keep going.

MR. CURRIE: Mr. Blevins, I've put before you the Notice of Deposition of Tony Blevins. Do you see that?

THE WITNESS: Yes, I see it.

**Q. And you understand you're here to testify in the case that's on the first page of this document?**

A. I do.

**Q. You can put that aside.**

**Let's mark this as Blevins 2.**

**(Exhibit 2 was marked for identification.)**

BY MR. CURRIE:

**Q. Mr. Blevins, I would like you to take a look at Exhibit 2. Let me know if you recognize this document.**

A. Yes, I do recognize this document.

**Q. What is it?**

A. This was a statement that was taken back in around, according to the date, October 13th, 2011.

**Q. If you turn to the second page and**

**look at the first paragraph, do you see it starts, "I am senior director of operations at Apple."**

A. Yes.

**Q. Does that remain true today?**

A. No.

**Q. What is your title now?**

A. I am vice president of procurement.

**Q. What are your duties as vice president of procurement?**

A. Acquisition of parts.

**Q. Parts for what?**

A. Parts that we use to assemble Apple products.

**Q. Is that all Apple products?**

A. Yes.

**Q. So that includes the iPhone and the iPad?**

A. Yes.

**Q. What were your duties as senior director of operations?**

A. They were actually analogous.

**Q. Did your duties change at all when you became vice president of procurement?**

A. No.

**Q. Was that a promotion?**

A. Yes.

**Q. So you were promoted, but --**

A. The title changed, but the job functions were quite the same.

**Q. Before you became vice president of procurement -- strike that.**

**When you were senior director of operations, was there someone else who was vice president of procurement?**

A. No.

**Q. So the second sentence of your declaration says, "My duties include managing supply chain issues and dealing with suppliers."**

**Do you see that?**

A. Yes.

**Q. Is that still accurate that your duties include managing supply chain issues and dealing with suppliers?**

A. Yes, it is.

**Q. If you skip down to Paragraph 3, do you see where it says, "As of the date of this declaration, Apple has no backlog in orders for the iPhone 4 and has all versions in stock**

**available for shipment."**

**Do you see that?**

A. Yes, I do.

MR. MUELLER: Can I just pause for a second? Let me just note that to the extent that these questions go out to issues other than supply and issues for which we have designated him as a 30(b)(6) witness, these are not corporate answers; they're just individual answers.

**Q. Was there a time when Apple had backlog orders for the iPhone 4?**

A. I believe there probably was.

**Q. If you skip down to Paragraph 5, do you see the second sentence?**

A. Uh-huh.

**Q. It says, "For example, when the iPhone 4 was released in June of" -- strike that.**

**"June of 2010, the extremely high level of demand resulted in a temporary backlog of orders, but this was resolved by November 2010."**

**Do you see that?**

A. Yes.

**Q. So does that refresh your recollection as to whether there was a backlog of orders for the iPhone 4 at some point?**

A. Yes. This would indicate that there was a backlog of orders at launch, which is quite typical.

**Q. And the backlog lasted -- strike that.**

**When was launch?**

A. I don't recall the specific date. It's public information. I'm sure we could look it up.

**Q. Does June of 2010 sound about right for the iPhone 4 as a launch date?**

A. That sounds about right.

**Q. So there was a backlog of orders for the iPhone 4 from June of 2010 until November of 2010; is that correct?**

A. This indicates that there was no backlog by November 2010.

**Q. Okay. So was there a backlog of orders for the iPhone from June of 2010 until November of 2010?**

A. This indicates by October, the waiting time was a week. So the term "backlog"

is somewhat subjective.

**Q. What did you mean by "backlog" when you used it in this sworn declaration?**

A. "Backlog" would be an excessive waiting period.

**Q. So from June of 2010 until November of 2010, at least according to your declaration, there was an excessive waiting period for the iPhone 4; is that right?**

A. This indicates there was no backlog by November, and there was a one-week waiting period in October. One week is quite typical and standard.

**Q. So when, to your knowledge, was there a backlog of orders for the iPhone 4?**

A. My recollection is through September, there was a backlog; in October, the waiting period was about a week, and by November, they were shipping immediately.

**Q. When you say "by November," can you be more specific?**

A. No.

**Q. So it could be November 1st, but it could be November 30th. You don't remember one way or the other?**

A. I don't recall.

**Q. So from June through September 2010, why was there a backlog of orders for the iPhone 4?**

A. Because demand exceeded our ability to produce them.

**Q. When you say your ability to produce them, can you be a little bit more specific about what you mean?**

A. Our ability to supply them to consumers who were willing to buy them.

**Q. During that time period, did you do anything to try to increase supply of the iPhone 4?**

A. Yes.

**Q. What did you do to try to increase supply of the iPhone 4 from about June of 2010 until September of 2010?**

A. We increased our orders to component suppliers.

**Q. What else did you do?**

A. We would expedite shipping, for example, where possible. Where possible, we would expedite shipping.

**Q. Did you do anything else to try to**

**increase supply of the iPhone 4 from June of 2010 until about September of 2010?**

A. I'm sure we did everything that we could, but those are the things that come to mind.

**Q. When you say you're sure you did everything you could to increase supply of the iPhone 4 from June of 2010 until September of 2010, why do you say that?**

A. Could you repeat the question? I'm not sure I understand it.

**Q. Can you read it back, please.**

**(Record read as follows:**

**Question: When you say you're sure you**

**did everything you could to increase**

**supply of the iPhone 4 from June of 2010**

**until September of 2010, why do you say**

**that?)**

THE WITNESS: That's our job and function is to increase supply where necessary.

**Q. From about June of 2010 until about September 2010, did Apple have excess supply of the iPhone 4?**

A. No.

**Q. What about in October of 2010, did Apple have excess supply of the iPhone 4?**

A. No.

**Q. What about in November of 2010, did Apple have excess supply of the iPhone 4?**

A. How do you define "excess"?

**Q. What does "excess supply" mean to you? Is that something, a term that you use in your work at Apple?**

A. No.

**Q. In November of 2004, was Apple selling fewer iPhone 4s than it was producing?**

A. We weren't selling iPhones in November of 2004.

**Q. I'm sorry. In November of 2010, was Apple selling fewer iPhones than it was producing?**

A. I don't recall the exact statistics.

**Q. In your declaration, which is Exhibit 2, when you discuss the backlog of orders**



**with respect to the iPhone 4, were you speaking worldwide, or just in the United States?**

A. Is there a specific point here that you're addressing? I want to answer your question specifically.

**Q. Well, do you see in Paragraph 5, you say in the second sentence, "For example, when the iPhone 4 was released in June 2010, the extremely high level of demand resulted in a temporary backlog of orders"?**

A. Uh-huh.

**Q. Do you see that?**

A. Yes.

**Q. When you say it resulted a backlog of orders, did you mean -- were you trying to be specific to the United States or were you speaking worldwide?**

A. In June, the product was released only in the United States.

**Q. Was there a point, to your knowledge, when Apple stopped taking orders for the iPhone 4 because of supply problems?**

A. No, not to my knowledge.

**Q. Okay. Let's go to Paragraph 6.**

**Do you see the first sentence, it**

**Q. Do you recall that there was a backlog of orders for the iPad 2?**

A. Yes, I recall that.

MR. MUELLER: Objection.

THE WITNESS: Could you rephrase that question, please? I'm not sure I understand it.

MR. CURRIE: Counsel, when you make an objection, can you tell me why you're objecting in the future?

Page 22

MR. MUELLER: I can say "objection."

MR. CURRIE: It's not helpful to me in terms of rephrasing my question.

MR. MUELLER: Actually, most attorneys prefer non-speaking objections. I'm just going to say "objection."

MR. CURRIE: Okay.

Can you read the question back?

TSG Reporting - Worldwide 877-702-9580

Page 23

TSG Reporting - Worldwide 877-702-9580

Page 24

TSG Reporting - Worldwide 877-702-9580

Page 25

**Q. So if you look at the bottom of Page 3 above your signature, do you see it says September 30th, 2011?**

A. Okay.

**Q. Is that roughly when you remember --**

A. It is.

**Q. -- executing this?**

A. Okay. I'm sorry. Can you repeat the question?

TSG Reporting - Worldwide 877-702-9580



**Q. So when you say you have no recollection of a shortage, you seem to kind of seize on that word. Is that something that has particular meaning to you, "shortage"?**
A. Yes.
**Q. What does "shortage" mean?**
A. Well, as a supply chain group, our goal is to always have every product in stock a consumer would ever want to buy in every configuration available. That's our goal and objective. So "shortage" is a charged word.
**Q. Can you just tell me what "shortage" means to you?**
A. At any point in time, if a consumer wants to buy something that we don't have in stock, that's a shortage. Even if they have to wait one day.
**Q. So going back to Paragraph 5 of your declaration. We talked earlier about in October of 2010, there was a one-week waiting period for the iPhone 4. Do you see that?**
A. Yes, I do.
**Q. So to your mind, at that time, there was a shortage of the iPhone 4 because of**

**the one-week waiting period?**
A. From a purely supply chain point of view, yes.

**Q. Do you understand what I'm trying to ask, though?**
A. Yes. I'm just explaining that's not something I would have knowledge of.
**Q. So you don't know one way or the other?**
A. No.

MR. MUELLER: I made this point earlier, but any testimony on all issues like this and others that have been asked about are outside the scope to the extent that they don't fall within the supply topics that Mr. Blevins has been designated for.

BY MR. CURRIE:

[redacted]

[redacted]

[redacted]

[redacted]

**Q. Shortly after you signed this declaration on September 30th of 2011, Apple released the iPhone 4S, right?**

A. Correct.

MR. MUELLER: Let me just pause you here. We are not going to get into the 4S today because it's not in the case. If you want to ask questions, we will shut it down and seek a protective order.

MR. CURRIE: So I just want to be clear. Apple is not seeking any lost profits for the 4S in this case?

MR. MUELLER: Is the 4S in the case?

MR. CURRIE: You're asking me?

MR. MUELLER: It's not.

MR. CURRIE: So I just wanted to be clear. Apple is not seeking any lost profits for the 4S.

MR. MUELLER: I'm not going to speak to the damages theories. The 4S isn't in the case. I'm not going to let you ask questions of the witness.

MR. CURRIE: If you seek lost

profits for the 4S after --

MR. MUELLER: I'm not going to get into this on the record. I'm just telling you, I'm not going to let the witness answer questions about the 4S.

MR. CURRIE: You're going to instruct him not to answer?

MR. MUELLER: I'm not going to instruct him not to answer. I'm going to shut it down, and we'll seek a protective order because the 4S is not in the case.

MR. CURRIE: So I just want to be clear. You can appreciate that if you were to later try to seek lost profits for the 4S, that would be a problem for me, given that you're not letting me question him about it.

MR. MUELLER: I'm not going to get into this on the record. I'm just telling you that I'm not going to let the witness answer questions about the 4S. Not going to instruct him not to answer. I'm going to shut it down, and we'll seek a protective order on the basis that the 4S is not an accused product in the case.

MR. CURRIE: You guys want to take a quick break?

MR. MUELLER: Sure.

THE VIDEOGRAPHER: We are off the record at 9:41 a.m.

(Recess taken from 9:41 a.m. to 9:54 a.m.)

THE VIDEOGRAPHER: We are back on the record at 9:54 a.m. You may proceed.

MR. MUELLER: I'm just going to make a quick statement on the record to echo what I said off the record. I am not involved in the damages case with respect to Apple's claims against Samsung, and I'm not going to make any statements on the record as to what is or -- in or out of the damages contentions that Apple is making in that case.

But I will say that we're going to, after conferring on the break, allow Mr. Blevins to testify on capacity issues as they relate to the iPhone 4S. The same sorts of issues that you've been asking about with respect to earlier

products this morning. So you can ask those questions, and we will not shut down the deposition and seek a protective order on those capacity questions.

If you do, however, go beyond those questions into areas that relate to defenses that Apple might have asserted to Samsung claims against the iPhone 4S, we will shut it down and seek a protective order on the ground that the judge has excluded iPhone 4S as an accused product for Samsung's infringement claims against Apple.

MR. CURRIE: So if Apple is seeking damages with respect to iPhone 4S, then we obviously need to be able to ask whatever kind of questions we need to relating to the 4S insofar as they relate to our defense to Apple's damages claims, and of course, to get all related discovery. So I think what you've proposed may be fine, so let's see how it goes.

MR. MUELLER: Yeah, we can see how it goes.

BY MR. CURRIE:

**Q. Mr. Blevins, during the break, did you speak with your attorney?**

A. Yes.

**Q. Did you discuss the substance of your testimony?**

MR. MUELLER: I'm going to instruct you not to answer as to the conversations you had with me on break.

MR. CURRIE: Just to be clear, I'm only asking yes or no. Are you still going to instruct him not to answer?

MR. MUELLER: I'm going to instruct you not to answer.

MR. CURRIE: All right.

**Q. So I think where we left off was I asked you shortly after you signed this declaration on September 30th of 2011, the iPhone 4 was released, and I think you said yes?**

A. Yes.

**Q. Do you remember about what date the iPhone 4S was released?**

A. I don't remember the exact date.

**Q. Since the iPhone 4S has been released, has the demand for the 4S ever exceeded**

**supply, to your knowledge?**

A. Yes. Demand exceeded our expectation.

**Q. What did you do to prepare for today's deposition, Mr. Blevins?**

A. I met with counsel.

**Q. When did you meet with counsel?**

A. Yesterday.

**Q. Is that the only time you've met with counsel to prepare for this deposition?**

A. Yes.

MR. MUELLER: Let me just note for the record, too. As I mentioned at the beginning, we have cross-designated his deposition from the 794 case, and Mr. Blevins prepared for that as well.

MR. CURRIE: Okay. And I'll just be clear. When I talk about this deposition, I mean this deposition here

today.

THE WITNESS: Okay.

**Q. So you met with counsel once to prepare for this deposition today?**

A. Yes.

**Q. And that was yesterday?**

A. That's correct.

**Q. Approximately how long did you meet with counsel?**

A. I believe it was for a couple of hours.

**Q. And who specifically did you meet with?**

A. It was the people in this room with me currently.

**Q. Anyone else?**

A. No.

**Q. What else did you do to prepare for today's deposition?**

A. That was it.

**Q. I think you mentioned earlier looking at some statistics?**

A. At that time this was signed, back in September, I reviewed the statistics very carefully to make certain this was accurate.

**Q. So when you were talking about reviewing statistics, you were talking about -- you were talking in reference to the declaration that's Exhibit 2?**

A. That's correct.

**Q. Do you recall if any of your documents were collected in connection with this litigation at some point?**

A. My documents have been collected multiple times, so no doubt they were a part of this as well.

**Q. When was the last time you remember your documents being collected for this litigation?**

A. I believe it was a couple months ago. I don't recall an exact date.

**Q. So January of 2012?**

A. My documents are collected on a very frequent basis, and I'm certain they were collected before the last deposition in February.

**Q. Do you know if they were collected before that deposition in connection with this case? I'm sorry. Strike that.**

**Do you know if they were -- before the time they were collected right before your**

**deposition, do you know if they had been collected in this case earlier than that?**

A. I don't know for which case they were collected, but I know that they were collected quite frequently.

**Q. Did you receive a document retention notice at some point in connection with this litigation?**

A. I received many document retention notices, and I don't pay particular attention to which case they are.

**Q. So you don't know one way or the other whether you received a retention notice for this case?**

A. I'm suggesting that I receive document retention notices very frequently, and I don't pay particular attention to which case because it's not relevant to me.

**Q. So you don't know one way or the other whether you received a retention notice for this case, right?**

A. I'm told that as part of the collection, it was to do with the Samsung case, but there are multiple Samsung cases, so I don't know the difference between -- I'm not a lawyer

-- between this case and the other case.

**Q. Roughly what kinds of documents did you preserve for collection in this case?**

A. I attempt to preserve everything.

**Q. Do you know if your documents relating to the iPhone 4S were collected in this case?**

A. I know that I turned my computer over, and that anything and everything that could be a possibility, I assume was collected, but I don't know precisely what was and was not collected.

**Q. Going back to Exhibit 2, you discuss the iPhone 4 and the iPad 2 in this declaration, right?**

A. Yes.

**Q. You don't talk about, for instance, the original iPad, right?**

A. Correct.

**Q. Why did you not discuss the original iPad in this declaration?**

MR. MUELLER: Let me caution you not to answer the question to the extent that it requires you to disclose communications with counsel that led up

to this declaration. If you can answer without referring to such communications, you can, but if you can't, you shouldn't.

THE WITNESS: In that case, I can't answer.

**Q. Okay. With respect to the -- strike that.**

**When I say "the original iPad," will you understand that I'm talking about basically the version of the iPad before the iPad 2?**

A. Uh-huh.
**Q. Is that what you called it at Apple, the original iPad or, do you have a name for it?**
A. For the purposes of this, just "iPad" will suffice.
**Q. If I say "original iPad," does that work, too?**
A. Yeah, that works.
**Q. Just so it's clear. With respect to the original iPad, was there ever a time or were there times when demand exceeded supply?**
A. Yes.

**Q. Do you know who at Apple would that?**
A. I don't know.
**Q. Do you know if there's anyone at Apple who would know that?**
A. I would imagine someone must.
**Q. But you have no idea who that person would be?**
A. I don't know who it is.
**Q. Is there someone who instructs you as to -- strike that.**
**Who do you report to?**
A. I report to Jeff Williams.
**Q. Who is he?**

A. He's senior vice president of operations.
**Q. Do you know if he's involved in managing demand?**
A. I don't know.
**Q. Who does Jeff Williams report to?**
A. He reports to Tim Cook.
**Q. Is Tim Cook involved in managing demand?**
A. I don't know.
**Q. Do you know -- so you used the phrase "managing demand" earlier. Do you remember that?**
A. Uh-huh.
**Q. Can you tell me what you mean by that?**
A. Two aspects. One would be predicting demand, and then number two would be allocating constrained products?

MR. MUELLER: Objection.
THE WITNESS: I said I don't know the name of a person.
**Q. I just want to be clear. You just don't know who it is?**
A. Correct. I'm sure someone must do it.
**Q. Okay. And that person would eventually report to Tim Cook, right? I mean, everybody reports to Tim Cook.**
MR. MUELLER: Objection.
THE WITNESS: They would have to work at Apple.
**Q. Okay. Can you tell me Rory Sexton's position?**





A. He is vice president of demand planning.
**Q. And who does he report to?**
A. Dierdre O'Brien.
**Q. What is her position?**
A. She is in the demand management organization. I don't recall her exact title.
**Q. Who does she report to?**
A. Jeff Williams.

**Q. Let's mark this as Blevins 3.**
**(Exhibit 3 was marked for identification.)**
BY MR. CURRIE:
**Q. Mr. Blevins, do you see at the top of this document, it says "Apple Inc. F3Q10"?**
A. Yes, I see it.
**Q. Do you have an understanding of**

**what "F3Q10" means?**
A. Yes.
**Q. What does it mean?**
A. Apple fiscal quarter 3 of 2010.
**Q. And then in parentheses, it says, "Quarter end 6-26-10." Do you see that?**
A. Yes.
**Q. So Apple's third fiscal quarter for 2010 ended on June 26th of 2010; is that --**
A. That's correct.
**Q. Do you know when Apple's third fiscal quarter for 2010 started?**
A. I would have to look it up on my calendar, but it would have started at the very end of March or beginning of April.
**Q. And then do you see this is a transcript of an earnings call?**
A. Yes.
**Q. Do you have an understanding as to what an earnings call is?**
A. I do.
**Q. What is an earnings call?**
A. An earnings call is a call that takes place between senior executives and the analysts to review a quarter.

**Q. When you say "review the quarter," can you be a little bit more specific?**
A. Discuss results.
**Q. Apple's results, right?**
A. I wouldn't think we would be discussing anyone else's results.
**Q. So can you turn to Page -- I'm going to give you -- well, sorry. Strike that.**
**I'll state for the record this document has Bates number APL-ITC 796-0000071024. That's the first page. I'm going to give the last five numbers.**
A. Okay.
**Q. That way, we can get through this document. Does that sound okay?**
A. Yes.
**Q. Can you turn to Page 71047?**
A. Okay.
**Q. Do you see at the bottom of the page where says "Tim Cook"?**
A. Yes.
**Q. And if you look at the second sentence, it's a little long, but it says, "You know, that question is very difficult to answer, because the way that you truly find out what it**

**is, at least from my own experience and perspective, is you have enough supply to serve the demand, and then you know what the demand is. And today, we don't have enough from either iPhone 4 or iPad, and so I truly don't know."**

**Do you see that?**

A. Yes.

**Q. So does that refresh your recollection as to when demand for the iPad was exceeding supply?**

MR. MUELLER: Now, before you ask him about a snippet of a quote from another person, you can read the whole document if you want to have the context for that quotation to understand what was being said on that earnings call. And again, this is somebody else on the earnings call, not you.

BY MR. CURRIE:

**Q. So this document, for the record, is 24 pages long. I think you can get the context by looking at part of this page.**

MR. MUELLER: No way. If you're going to ask him about a snippet of a quote from somebody else, read the whole

thing. If you don't want to ask him about it, we are not going to burn time on this. But if you want to ask him about a snippet of a quote that somebody else said on an earnings call, read the whole thing, understand the context.

MR. CURRIE: Well, again, I'm also just asking whether this refreshes your recollection. Do you understand that?

MR. MUELLER: No. Again, I'm not going to let you ask him a snippet of a quote from somebody else on an earnings call unless he has an opportunity to read the entire document.

MR. CURRIE: So looking at Page 71047, does that refresh your recollection as to when there was -- when demand for the iPad was exceeding supply?

MR. MUELLER: Same thing. Read the whole thing before you answer that question, because I'm not going to let you ask this witness a snippet of a quote from another witness in an earnings call without giving him an opportunity to read

the whole document, understand what's being said.

MR. CURRIE: So this is completely improper. You cannot instruct the witness how to answer my questions.

MR. MUELLER: You have got to give him an opportunity to read the document.

MR. CURRIE: Let me finish. Don't interrupt me. You cannot instruct the witness how to answer my questions. You can make your objections. You said that you just want to make --

MR. MUELLER: Right.

MR. CURRIE: You don't want to make speaking objections. You said that earlier. Now you're instructing the witness how to answer my questions.

MR. MUELLER: Let's be clear.

MR. CURRIE: I'm entitled to ask the witness whatever questions I want.

MR. MUELLER: Let's -- let's be -- let me again point out.

MR. CURRIE: No, no, no, no, no, no, no, no, no.

MR. MUELLER: Are you going to let

the witness --

MR. CURRIE: Don't talk over me.

MR. MUELLER: Are you going to let the witness review the document or not?

MR. CURRIE: Are you going to let the witness answer my questions, or are you going to tell him how to answer my questions?

MR. MUELLER: I'm not.

MR. CURRIE: Because right now, that's what you're doing.

MR. MUELLER: I actually haven't said a word to him about how he should answer the question. What I said is, read the document. Are you going to give him the opportunity to read the document?

MR. CURRIE: You can't instruct -- I'm going to ask the questions that I want to ask.

MR. MUELLER: This is going to be a really short deposition if you don't let the witness review the documents. Okay.

MR. CURRIE: You know, the witness

didn't even ask to review the documents.

MR. MUELLER: I'm telling him, review the document.

MR. CURRIE: Exactly. You're telling him how to answer.

MR. MUELLER: No, I'm not telling him how to answer. Sure. I'm not telling him how to answer. I'm saying, review the document in full. If you're not going to give him that opportunity, we'll be out of here. Okay. That's your choice.

MR. CURRIE: It's completely improper for you to tell him what to do to answer my questions. If you want to make an objection, make your objection. Just say "objection." That's what you were doing earlier.

MR. MUELLER: Mr. Currie, I'm going to say it again. If you're not going to give the witness the opportunity to review documents that you want him to testify to, we are out of here. It's your choice. He can either review the document in full. I'm not telling him

how to answer. I'm saying just review the document. If you don't want to give him that opportunity, we are done.

MR. CURRIE: What you're telling the witness is that he has to review a 20-page document in order to answer any question I asked him about it. That's improper. That's instructing the witness how to answer my questions --

MR. MUELLER: It's not.

MR. CURRIE: -- and the court is going to hear about it.

MR. MUELLER: It's not. You asked him about a random quote from another person midway through an earnings call. The witness is entitled to review the transcript of the call to understand what was being said. If you're going to give him the opportunity to do that, he can answer your questions. You can ask him whatever you want, I will let him answer.

I'm not telling him a word about how to say the substance in his responses. But he has to be afforded

that opportunity. That's fair notice to the witness as to what you're asking him.

So the question is, will you let him review the context of the statement that you want him to testify to? If so, he can review it and then answer your question. If not, we are done.

BY MR. CURRIE:

**Q. So Mr. Blevins, we looked a moment ago at the second sentence of the paragraph below where it says "Tim Cook."**

A. Yes.

**Q. It says, "Today, we don't have enough from either iPhone 4 or iPad, so I truly don't know." Do you see that?**

A. Yes.

**Q. So again, my question is, does that refresh your recollection as to whether or not demand was exceeding supply with respect to the iPhone, or when demand was exceeding supply?**

A. This document information is from almost two years ago. May I review it before I answer any questions about it?

**Q. Why don't you take a look at the question that Tim Cook is answering, and then look at his whole answer, and then let me know if you can answer the question.**

MR. MUELLER: And I will say again, if you need to review more, Mr. Currie has to give you the opportunity to review more. So if you feel like you need to review more, review more.

THE WITNESS: The thing I can answer is as of the date of this call, Tim Cook said that demand was greater than supply. That doesn't indicate to me how long of a period that occurred to. It indicates as of the time that statement was said that particular day, because supply demand is a daily event, an occurrence.

**Q. Do you remember roughly when the original iPad was released?**

A. Could you describe what you mean by "released"?

**Q. When was it first available? When did it first ship in the United States?**

A. I'm not certain.

**Q. Do you remember roughly?**
A. I think it was roughly the end of CQ 1-2010.
**Q. Can you just translate CQ 1-2010 for me?**
A. Calendar quarter 2010. Julian calendar.
**Q. Can you just tell me the month?**
A. Between January and March of 2010.
**Q. So let's go to Page 71026?**
A. Okay.
**Q. Actually, let's start on the previous page, 71025. Do you see at the bottom of the page where it says "Richard Gardner, Citigroup"?**
A. Yes.
**Q. And he says, "Tim, I wanted to start by asking you to give us a supply demand breakdown for each of the product categories, if you would, and talk about any notable supply constraints within each product line and how severe they are, and when you expect them to be alleviated."**
**Do you see that?**
A. Yes.

**Q. And then at the top of Page 71026, do you see where it says "Tim Cook"?**
A. Yes.
**Q. Okay. And then if you skip down to the fourth sentence, see where it says, "Both of these products, the iPad and specifically the iPhone, we had backlog at the end of last quarter that we were not able to fill, and currently, we are still selling both of those products as fast as we can make them."**
**Do you see that?**
A. Yes.
**Q. Does that refresh your recollection as to when demand for the iPad exceeded supply?**
MR. MUELLER: I'll say it again. Let me just make my statement on the record. I'll say it again. If you need to review more of this document to understand the context, go ahead and do so. Mr. Currie has to afford you the opportunity to review as much as you want to before you answer his questions.
MR. CURRIE: And I'll also note for the record, we are on the third page

of this document. So.
THE WITNESS: If we are going to be reviewing multiple snippets out of this document that's two years old, I would like to request the opportunity to read it in its entirety so that I may comment intelligently.
**Q. So we are on a clock. I don't have time for you to read all.**
MR. MUELLER: Then we are not going to do this.
MR. CURRIE: Let me finish. Stop cutting me off.
MR. MUELLER: Look, you can't -- I'll let you say your peace, but let me just preface it by saying this: Asking a witness questions about what other people have said in earnings call is fine if you want to do that, but you have to give him the opportunity to review the context. If you feel like you don't have time to let him have that opportunity, don't ask the questions.
MR. CURRIE: Mr. Blevins, you understand that this is a transcript of

an earnings call, right?
THE WITNESS: I understand that.
**Q. So why don't you read from the beginning of the document up until where it says "Richard Gardner, Citigroup" on Page 71026. And then I will ask you my question again.**
A. (Document review.)
**Q. Mr. Blevins, I can see from the page that's facing me that you've read a little bit beyond what I asked you to.**
A. Correct. I'm missing context. This is only the Q and A. We actually made prepared remarks and quoted statistics and data of what we are trying to communicate, and it's difficult to follow the Q and A without having that context, and this is two years ago.
**Q. Okay. So now that you've read from the beginning of the document up through the section that I was asking you about I want to go back to Page 71026. We looked at the fourth sentence, this is really the fifth sentence, under where it says "Tim Cook," at the top of the page. He says, "Both of these products, the iPad and specifically the iPhone, we had backlog at the end of last quarter that we were not able to**

**fill and currently we are still selling both of these products as fast as we can make them."**

**Do you see that?**

A. Yes.

**Q. Does that refresh your recollection as to when demand for the iPad exceeded supply of the iPad?**

A. It refreshes my recollection on the date that that statement was made that demand exceeded supply, but it gives me no indication or context for how long in the future or how long in the past that statement would have been true. It makes me think on the date that statement was made it was true.

**Q. Well, you see where it says "the iPad and specifically the iPhone we had backlog at the end of last quarter"?**

A. Yes.

**Q. Does that refresh your recollection at all as to when demand for the iPad exceeded supply in the past?**

A. That statement means that as of 90 days previously at a point in time there was backlog. It doesn't give me any indication if during that 90-day period of time it was in

backlog the entire time or if it came into equilibrium and then went into a shortage.

**Q. Do you recall one way or the other?**

A. I don't.

**Q. Let's mark this as Blevins 4.**

**(Exhibits 4 and 5 were marked for identification.)**

**Q. I apologize, I've now gotten confused which one is which. Would you mind if I just, so I can see?**

A. Sure.

MR. MUELLER: I'm sorry, I have the vertical one as Exhibit 4 and the horizontal as 5; is that right?

MR. CURRIE: Yeah.

**Q. So Mr. Blevins, I've handed you two, one-page documents. Exhibit 4 is Bates labeled APLNDC-Y 0000055417. Exhibit 5 is Bates labeled APLNDC-Y 0000055416.**

A. Yes, I have them.

**Q. Do you recognize either of these documents?**

A. No.

**Q. Have you ever seen these documents**

**before?**

A. No.

**Q. Were you involved in the preparation of either of these documents?**

A. No.

**Q. Do you know who was?**

A. I don't. I've never seen it before.

**Q. Okay. Put those aside for now.**

**Have you ever heard of something called an Availability Widget?**

A. I'm sorry, I didn't understand the second word.

**Q. Availability Widget, with a W.**

A. I've never heard of that.

**Q. Let's mark this as Blevins 6.**

**(Exhibit 6 was marked for identification.)**

**Q. So Mr. Blevins, I've given you Exhibit 6, which is a printout of a CNNMoney article. Do you see at the headline it says, "Apple runs short of iPhones"?**

A. Yes.

**Q. And then do you see in the first page of the article it says, "The iPhone**

**Availability Widget is back, new and improved, and is showing spot shortages of selected phones at Apple stores across the United States"?**

**Do you see that?**

A. I see it.

**Q. And below that it says, "The Availability Tool which appears on Apple's website in times of scarcity was last seen in the summer of 2008, when the demand for the iPhone 3G was heavy and supplies short."**

**Do you see that?**

A. Yes.

**Q. So are you familiar with the Availability Widget described in this -- these first two paragraphs?**

A. No.

**Q. You have never heard of this Availability Widget before?**

A. No.

**Q. So if you go down to the paragraph that starts "This year's model," do you see that?**

A. Yes.

**Q. It says, "This year's model of the widget is considerably more accurate than the original."**

**Do you see that?**

A. Yes.

**Q. Do you know anything about this widget becoming more accurate -- strike that.**

**Okay. Looking at the last sentence of that paragraph. It says, "This year according to IFO Apple store the page is linked directly to Apple's internal point-of-sale computers allowing hourly updates for each store."**

**Do you see that?**

A. No, I'm sorry, where is that again?

Oh, I see "this year according." I am sorry. I see that sentence now.

**Q. It references Apple's internal point-of-sale computers. Do you have an understanding as to what Apple's internal point-of-sale computers are?**

A. No.

**Q. You don't -- your work does not involve Apple's internal point-of-sale computers?**

A. No.

**Q. Do you see if you look right under where it says "Apple runs short of iPhones," do**

**you see that it's dated June 28th, 2009?**

A. Yes.

**Q. Do you have a recollection of the iPhone 3GS having shortage issues around June of 2009?**

A. I don't recall the specifics or the dates, but I do know near launch demand exceeded supply. I do recall that. I just don't recall the specifics.

**Q. Do you remember -- I know you don't remember exactly, but do you remember roughly when the iPhone 3GS launched?**

A. I believe it was around June of 2009.

**Q. Do you remember roughly how long after launch demand exceeded supply?**

A. I don't.

**Q. You don't remember roughly?**

A. No.

**Q. Do you remember if it was a year after launch?**

A. I just don't recall.

**Q. So demand could have exceeded supply for a full year after the iPhone 3GS launched, you don't know one way or the other?**

A. I don't know. I would be simply speculating, which I don't think would be productive.

**Q. Going back to the second paragraph of the article, it mentions that this Availability Tool was last seen in the summer of 2008, when demand for the iPhone 3G was heavy and supplies short.**

**Do you see that?**

A. Yes.

**Q. Is that consistent with your recollection as to whether the demand for the iPhone 3G exceeded supply around the summer of 2008?**

A. I'm unfamiliar with this tool as we talked about before, but my general recollection is that demand exceeded supply for the 3G when it launched.

**Q. Did it launch -- did the 3G launch in the summer of 2008?**

A. To the best of my knowledge it did.

**Q. Do you remember how long after launch demand exceeded supply for the 3G?**

A. I don't recall.

**Q. Do you know if Apple came out with a version of the iPhone that works on the Verizon network?**

A. Yes.

**Q. Do you remember roughly when the Verizon iPhone came out?**

A. That was approximately January of 2011, I believe.

**Q. Do you remember whether the demand for the Verizon iPhone specifically ever exceeded supply?**

A. I don't recall.

**Q. You don't recall one way or the other?**

A. No.

**Q. Let's mark this as Blevins 7.**

**(Exhibit 7 was marked for identification.)**

**Q. Mr. Blevins, I've put in front of you Exhibit 7, which is an article printed from the website of Mobile Marketing Watch.**

**Do you see on the first page the headline says, "Verizon iPhone 4 Sold Out"?**

A. Yes.

**Q. Then if you look at the -- strike**

**that.**

**Do you see below that it says, "February 4th, 2010"?**

A. Yes.

**Q. Is that around the time the Verizon iPhone launched?**

A. I believe it is.

**Q. So if you go to the next page, do you see where it says -- do you see the paragraph starting "By Friday morning"?**

A. Yes.

**Q. And it says, the second sentence in that paragraph says, "Remaining emblazoned across the Verizon webpage is the headline: 'We are no longer taking pre-sale orders.'"**

A. Yes.

**Q. Do you recall there being a time when Verizon was no longer taking pre-sale orders for the iPhone?**

A. I don't recall that specifically because that would be their decision not Apple's.

**Q. If a particular retailer were running low on an Apple product, would that generally be brought to your attention?**

A. A specific retailer, no.

**Q. I want to be clear about what I mean by specific retailer. I don't mean a particular Best Buy store for instance. I mean if Best Buy generally were running low. So with that understanding of what I mean by particular retailer is your answer the same, that if, for instance, Best Buy were generally running low on an Apple product that would not be brought to your attention?**

A. No. We would manage supply/demand in the aggregate from my perspective.

**Q. Who at Apple would deal with that type of issue where -- that is to say -- strike that.**

**Who at Apple would deal with supply shortages on the retailer side?**

A. To be specific, as we discussed before, I'm not certain who allocates constrained products to specific customers. But I know that I'm responsible for closing supply to aggregate demand.

**Q. Do you know whether Apple tracks the supply of the Verizon iPhone separately from, for instance, the AT&T iPhone?**

A. I know that we have data and

statistics on what network all phones are activated on.

**Q. When you say "data and statistics," do you mean with respect to supply?**

A. I know how many phones would be activated on a specific network and a specific geography or Apple would know.

**Q. Is the supply of the Verizon iPhone managed separately from the supply of the AT&T iPhone?**

A. I'm not certain I understand what you mean by supply.

**Q. So let me give you an example. The Verizon iPhone has different components than the AT&T iPhone, right?**

A. That is correct.

**Q. So when you manage the supply of the iPhone -- strike that.**

**So the -- it's necessary to supply the Verizon iPhone with different components than the AT&T iPhone, right?**

A. That is correct.



Page 78

**Q. Okay. So give me your clarification.**

A. Okay.

**Q. Does Foxconn manufacture any Apple products?**

A. Foxconn is a trade name for Hon Hai.

**Q. So when you say Hon Hai, you're referring to the same thing as Foxconn?**

A. Correct.

**Q. Does Apple -- are you familiar**

TSG Reporting - Worldwide 877-702-9580

Page 79

**with Apple's agreements with Hon Hai/Foxconn and Apple's other suppliers?**

A. What do you mean by "other suppliers"?

**Q. So you mentioned Hon Hai and the other was Advanced Electronics?**

A. I didn't say that.

**Q. Okay. Sorry.**

**Q. So let's just take Hon Hai. Does -- does Apple's agreements with Hon Hai require that Apple only get -- strike that.**

A. So allow me to try to restate the question to make sure I understand it.

TSG Reporting - Worldwide 877-702-9580

Page 80

**Q. Let's take another quick break.**

THE VIDEOGRAPHER: This is the end of Disk Number 1, Volume 1. We are off the record at 10:48 a.m.

(Recess taken from 10:48 a.m. to 11 a.m.

THE VIDEOGRAPHER: This is the beginning of Disk Number 2, Volume 1. We are back on the record at 11 a.m.

You may proceed.

BY MR. CURRIE:

**Q. Good morning again, Mr. Blevins.**

A. Good morning.

**Q. Did you speak with your attorney during the break?**

TSG Reporting - Worldwide 877-702-9580

Page 81

A. Yes.

**Q. Did you discuss the substance of your testimony?**

MR. MUELLER: I'm going to instruct you not to answer again as to communications you had with your counsel.

**Q. Mr. Blevins, you understand that you've been designated by Apple to testify about supply and capacity issues?**

A. Yes.

**Q. To prepare for your deposition, did you do any research or review any documents to determine when supply exceeded demand for any versions of the iPad or the iPhone?**

MR. MUELLER: Just to be clear, he has not been designated on capacity issues. If you want to show him the topics he's been designated on, then he can affirm that he has, in fact, been designated on those topics.

It's Number 5 in Samsung's second notice.

MR. CURRIE: This is getting really confusing, because at the beginning of the deposition you

TSG Reporting - Worldwide 877-702-9580

referenced Topic 5 and then you also said he was designated on supply and capacity issues.

MR. MUELLER: I said supply. I've said supply the whole day.

MR. CURRIE: Okay.

MR. MUELLER: You've been asking questions about capacity. In fact, I've repeatedly said that those questions are outside the scope of the notice. I let you ask those questions anyway in his individual capacity.

I never once said he was a 30(b)(6) witness on those issues.

MR. CURRIE: So what is he designated on?

MR. MUELLER: Topic Number 5 in the second notice, like I said at the beginning. It was said in correspondence prior to Mr. Blevins' deposition in the 794 case.

It's been said in correspondence, I think, since then as well.

Here, I can read it. This is,

in fact, the topic.

MR. CURRIE: Whoa, whoa, whoa.

MR. MUELLER: No, let me make the record clear. "The chain of possession, custody or commerce of the Intel baseband processors from their manufacture to their provision to Apple, including all intermediaries and Apple manufacturers, including but not limited to the entities that incorporate the baseband processors into the Apple accused products.

"We also said that we designate Mr. Blevins to testify to any other 30(b)(6) topic insofar as it relates to identification, sourcing and related supply issues for the components in the accused products, including the baseband processor chipsets, but not including the contractual provisions of any supply agreements as to which Samsung has refused to provide reciprocal discovery."

We have told you that in writing. It was said on the record at his first deposition and remains true

today.

I haven't said today "capacity." That's your word not mine, and he's not a corporate witness on that issue. I'm letting you ask questions, but he's not a corporate witness.

MR. CURRIE: The reason I want to clarify this is that at the beginning of the deposition, I'm not saying you said capacity, but I think you did say supply generally.

MR. MUELLER: Look, I just read to you what we designated him on precisely. That's the designation.

MR. CURRIE: That's what I am trying to understand, what precisely is your position that you're designating him on.

MR. MUELER: Mr. Currie, we gave this to you in writing. We have not changed it. It's exactly what we told you a while back before the 794 deposition. It remains true today. That's the designation.

I just read it verbatim.

MR. CURRIE: I appreciate your doing that, because it's different from what you said at the beginning of the deposition, that's all I'm saying.

MR. MUELLER: I was referring to what we said. I said supply issues. This refers to supply issues. In fact the second statement says, "Apple hereby designates Tony Blevins to testify to 5, Topic Number 5, and any other 30(b)(6) topics insofar as it relates to identification, sourcing and related supply issues."

That's what I was referring to. That's the more specific wording, which I just read, and that's what he's the witness on.

MR. CURRIE: So is he designated on supply issues? Can we say that or is he designated on exactly the words in that letter?

I just need you to tell me yes or no, so I can be clear.

MR. MUELLER: To be totally precise, he's designated on the words

that I just read to you from that letter. I was using the shorthand supply issues to refer to that, but what he's designated on is Topic Number 5, and I won't read it again. I don't want to burn your time, but it's what was said in correspondence with Samsung with respect to identification, sourcing and related supply issues for the components of the accused products.

BY MR. CURRIE:

**Q. So, Mr. Blevins, I think earlier in your testimony you used the phrase "SKU." Do you remember that?**

A. Yes.

**Q. Can you tell me what a SKU is?**

A. It's a salable unit. It' the number used to refer to something you would find on a retail shelf.

**Q. Maybe for the court reporter's benefit, is that S-K-U?**

A. Yeah.

**Q. And what are SKUs used for your in work at Apple?**

A. That would be how things are

inventoried at the retail level. For example, an eight-gigabyte iPhone 4 would have a different SKU number than a 16-gigabyte as an example.

**Q. So when Apple tracks its inventory, does it do it at the SKU level?**

A. Yes.

**Q. Does the Verizon iPhone have a different SKU from the AT&T iPhone?**

A. Yes.

**Q. And then it sounds like there's actually a higher level of granularity than that. There's a separate SKU for the eight-gigabyte iPhone than the 16-gigabyte iPhone, for instance?**

A. Yes.

**Q. Does Apple order products from its manufacturers by SKU number?**

A. In a manner of speaking, not exactly, we would have internal part numbers, but in a manner of speaking.

**Q. Does Apple track its orders to its manufacturers internally by SKU number?**

A. Not SKU number, but as a manner of speaking, we have a similar method.

**Q. Is it -- is the level of**

**granularity analogous to --**

A. It is.

**Q. -- what it is at the inventory level?**

A. Correct.

[redacted]

**Q. With respect to the iPhone 4, do you know whether Apple has ever, for instance, stopped taking pre-orders for that product for supply reasons?**

A. I don't recall specifically.

**Q. You don't remember one way or the other?**

A. No.

**Q. With respect to any Apple products -- strike that.**

**With respect to any version of the iPhone or any version of the iPad do you know if Apple has ever stopped taking pre-orders or orders for that product for supply reasons?**

A. I don't know. That would be a decision made by sales not from the supply organization.

**Q. So you don't know one way or the other?**

A. No. I don't know.

[redacted]

**Q. You understand what I'm trying to ask, though?**

A. No.
**Q. So sometimes you get asked to increase supply, right?**
A. Yes.
**Q. And then you take particular -- well, let me ask you that.** [redacted]
**Q. I have no more questions at this time.**
MR. MUELLER: Just a couple questions myself.
EXAMINATION
BY MR. MUELLER:
**Q. Mr. Blevins, Mr. Currie asked**

**you --**
MR. CURRIE: I'm sorry. I think -- did you want to switch sides?
MR. MUELLER: It's fine. I only have like a minute worth of questions here.
MR. CURRIE: Are you sure?
MR. MUELLER: That's fine. Thank you, though.
MR. CURRIE: Okay.
MR. MUELLER: Mr. Currie asked you some questions about supply and demand issues for the Apple iPhones and iPads. Do you have that subject matter in mind?
THE WITNESS: Yes.
**Q. Now, let me first ask you, are you involved in projecting demand for Apple iPhones and iPads?**
A. No.
**Q. Are you involved in planning supply for Apple iPhones and iPads?**
A. Yes.
[redacted]

[redacted]
**Q. Now, I want to distinguish between projected demand and actual demand. Do you have that distinction in mind?**
A. Yes.
[redacted]

[redacted]
MR. CURRIE: Objection. Leading.
**Q. Each and every case?**
MR. CURRIE: Objection. Leading.
THE WITNESS: Yes.
[redacted]





**Q. True for the iPhone 3G?**

MR. CURRIE: Objection. Vague.

THE WITNESS: Yes.

**Q. True for the iPhone 3GS?**

MR. CURRIE: Objection. Vague.

THE WITNESS: Yes.

**Q. True for the iPhone 4?**

A. Yes.

MR. CURRIE: Objection. Vague.

**Q. True for the iPhone 4S?**

MR. CURRIE: Objection. Vague.

THE WITNESS: Yes.

**Q. True for the iPad, original iPad?**

MR. CURRIE: Same objection.

THE WITNESS: Yes.

**Q. True for the iPad 2?**

MR. CURRIE: Same objection.

THE WITNESS: Yes.

MR. MUELLER: No further questions. Thank you.

BY MR. CURRIE:

**Q. So when you say "the products we were speaking about," that includes the iPad 2?**

A. That does include the iPad 2.

**Q. Does that include the iPad?**

A. Yes.

**Q. And the iPhone 4S?**

A. It includes it, yes.

**Q. The iPhone 4?**

A. Yes.

**Q. iPhone 3GS?**

A. Yes.

MR. MUELLER: Object to the form of the question.

**Q. Okay.**

MR. CURRIE: That's all I have.

MR. MUELLER: Nothing further. Thank you.

THE VIDEOGRAPHER: This is the end of today's deposition. We are off the record at 11:17 a.m. The master disk will be held by TSG Reporting.

(Time noted: 11:17 a.m.)

____________________

TONY BLEVINS

Subscribed and sworn to before me

This day of , 2012.

______________________________

C E R T I F I C A T E

STATE OF CALIFORNIA )
)
COUNTY OF SAN FRANCISCO )

I, LINDA VACCAREZZA, a Certified Shorthand Reporter for the State of California, do hereby certify:

That TONY BLEVINS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of April, 2012.

______________________________

LINDA VACCAREZZA, CSR. NO. 10201

-------------I N D E X----------------

WITNESS EXAMINATION BY PAGE
T. BLEVINS MR. CURRIE 6
MR. MUELLER 90

--------------EXHIBITS----------------

DEFENDANTS PAGE

Exhibit 1
Notice of Deposition of Tony Blevins............................8

Exhibit 2
Declaration of Tony Blevins in Support of Apple's Motion for a Joint Preliminary Injunction..........................9

Exhibit 3
Email from Greg Joswiak with attached "Earnings call transcript" attachment dated July 22, 2010, Bates stamped APL-ITC796-0000071024 through APL-ITC796-0000071048...............51

EXHIBITS (CONT'D)

Exhibit 4
Iphone supply and Sales 2010 - 2011 K Units, BAtes stamped APLNDC-Y0000055417..................67

Exhibit 5
IPad Supply and Sales: 2010 - 2011: K Units, Bates stamped APLND-Y000005416....................67

Exhibit 6
CNN Money Website Printout: "Apple runs short of iPHones"..................68

Exhibit 7
MobileMarketingWatch Website Printout...........................73

INSTRUCTIONS NOT TO ANSWER
Page 38 Line 8

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Apple Inc VS. Samsung Electronics
Dep. Date: April 3, 2012
Deponent: Tony Blevins

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |
| __ | __ | ____________ | ______________ | ______ |

__________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS_____ DAY OF___________, 2012.

_____________________________

(Notary Public) MY COMMISSION

EXPIRES:______