# Exhibit A

AUSCRIPT AUSTRALASIA PTY LIMITED

ABN 72 110 028 825



Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)      **F:** 1300 739 037
**E:** clientservices@auscript.com.au      **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

O/N H-263532

### FEDERAL COURT OF AUSTRALIA

### NEW SOUTH WALES REGISTRY

### BENNETT J

### No. NSD 315 of 2013

### SAMSUNG ELECTRONICS COMPANY LIMITED and ANOTHER

### and

### APPLE INCORPORATED and ANOTHER

### SYDNEY

### 10.33 AM, THURSDAY, 24 OCTOBER 2013

### DAY 1

**MR N.J. YOUNG QC appears with MS K. WILLIAMS and MR I.S. WYLIE for the applicants**
**MR S.C.G. BURLEY SC appears with MR C.A. MOORE SC and MR C. DIMITRIADIS for the respondents**

Copyright in Transcript is owned by the Commonwealth of Australia. Apart from any use permitted under the Copyright Act 1968 you are not permitted to reproduce, adapt, re-transmit or distribute the Transcript material in any form or by any means without seeking prior written approval from the Federal Court of Australia.

MR N.J. YOUNG QC:   If your Honour please, I appear with MR I. WYLIE and MS K. WILLIAMS.  Ms Williams is here in relation to the confidentiality breach issues that are for mention.  She has been briefed with Mr Hutley in relation to confidentiality breach issues.

5

HER HONOUR:  When you say they're for mention, I think I made it clear in correspondence that came from my associate that I believe that they are potentially intrinsically related to the entire question of whether or not these declarations – and the extent to which these new affidavits, I should say - - -

10

MR YOUNG:   Yes, I'm going to address the lack of connection between confidentiality issues and the issues that we're agitating on our motion, but if your Honour needs further information about what steps have been taken - - -

15   HER HONOUR:  It's more than what steps have been taken.  I see the confidentiality issues as – while initially on the last occasion I took the view that the confidentiality issues could be put aside to a degree because of the importance of getting the – I hadn't appreciated the relationship between those issues and the matter before me today, because it is a serious matter and I didn't – when I say "put it aside"
20   I meant deal with it, but not necessarily today.  When I had a further look at it I realised they were more important, it is a matter of great importance and we may wish to enter into a discussion of that and of course it will be up to the parties to make an application as to whether or not the court is closed in relation to some of those issues.  But I do not want there to be any misapprehension that this is a
25   tangential matter to today's application, or a tangential matter to my interest in the matters today.

MR YOUNG:   No, I understand that, your Honour, but we apprehended your Honour may also wish some further information about what steps have been taken.

30
HER HONOUR:  I certainly will.

MR YOUNG:   And Mr Hutley and Ms Williams have been in charge of that aspect of it.
35
HER HONOUR:  Thanks, Mr Young.

MR YOUNG:   Hence her presence.

40   HER HONOUR:  I understand that.  That's so far for the appearances concerned.

MR YOUNG:   Yes, your Honour.

HER HONOUR:  We've made stage 1.
45
MR YOUNG:   Yes, your Honour.

HER HONOUR:   Mr Burley.

MR S.C.G. BURLEY SC:   Your Honour, I appear with my learned friend MR C. MOORE SC, who's not present yet but coming shortly, and MR C. DIMITRIADIS.

5

HER HONOUR:   Thanks, Mr Burley.  Yes, Mr Young.

MR YOUNG:   Mr Burley reminds me, I should have said that MR J. MARSHALL is going to come later too, because there are some housekeeping matters that fall into
10  his providence and they will be the same sort of matters that Mr Moore is addressing, your Honour.  Now, your Honour, this is the hearing of our application for leave to rely upon the evidence of Mr Kim and Mr Korea.  We rely upon three affidavits. They are the affidavits of Mr Wen Ts'ai Lim, sworn 3 October 2013, and a very short affidavit sworn 24 October 2013.

15

HER HONOUR:   I haven't seen the 24 October one.

MR YOUNG:   Can I provide your Honour with a copy of it.

20  HER HONOUR:   When was it served?

MR YOUNG:   Either late, very late yesterday or first thing this morning.  This morning.

25  HER HONOUR:   Mr Burley, have you had a chance to have a look at the affidavit that is now to be filed?

MR BURLEY:   I'm holding it now, your Honour, that's the first time that I've seen it.  So - - -
30
HER HONOUR:   Well, perhaps we can read it together.

MR BURLEY:   Yes.

35  HER HONOUR:   Well, I grant leave to Samsung to file in court the affidavit of Wen Ts'ai Lim sworn 24 October 2013.

MR YOUNG:   Your Honour, I - - -

40  HER HONOUR:   In terms of reading of it, are there any objections to that affidavit?

MR BURLEY:   Your Honour, can I make a notation.  As I'm instructed there's a reference in paragraph 3 to a report filed by Mr Richard Donaldson of the United States District – Northern District of California, and in paragraph 4 there's a
45  reference to the content of that report.  As I'm instructed, that's subject to a confidentiality - - -

---

HER HONOUR:   Confidentiality.

MR BURLEY:   - - - regime which is not one to which the parties – or the representatives in this proceeding has access.

5

MR YOUNG:   That's not correct.

MR BURLEY:   And as a result we wish to investigate that, but - - -

10   HER HONOUR:   Is paragraph 4 itself confidential?  Bearing in mind all the redacted matters that I've seen in other documents that have gone forward.  Mr Young, do you take the view that paragraph 4 is confidential?

MR BURLEY:   I wonder if I could take instruction on that.

15

MR YOUNG:   Yes, can I answer that, your Honour.  Apple supplied Samsung's US counsel with a redacted version of Mr Donaldson's report for supply directly to Samsung with no restrictions on the provision of that redacted copy.  We have the redacted copy available, it is not the subject of any confidentiality regime, I can

20   provide it to Mr Burley.

HER HONOUR:   I don't think Mr Burley has seen it.

MR YOUNG:   No, well, what he said was inaccurate to your Honour, concerning

25   - - -

HER HONOUR:   All right.  But my first question is, is the subject matter of paragraph 4 itself confidential?  Is paragraph 4 of this affidavit confidential?

30   MR YOUNG:  No, your Honour.

HER HONOUR:   Mr Burley, is paragraph 4 of this affidavit confidential, in your view?

35   MR BURLEY:   Your Honour - - -

HER HONOUR:   Bearing in mind all the other confidential matters that have been made.

40   MR BURLEY:   I'm simply unable to answer that.  My learned friend mentioned - - -

HER HONOUR:   The fact in paragraph 4 I thought itself was the subject of some confidentiality.

45   MR BURLEY:   The contents of the Donaldson affidavit - - -

HER HONOUR:   That's not the question.

MR BURLEY:   I appreciate that.

HER HONOUR:   Before we get to it paragraph 4 itself.

5   MR BURLEY:   I don't have sufficient instructions to respond to that, your Honour. But can I make the observation that Mr Lim's affidavit doesn't refer to a redacted - - -

HER HONOUR:   No, I noted that.

10   MR BURLEY:   - - - of that version.

MR YOUNG:   Your Honour, we didn't want to exhibit the document without making the statement I did a moment ago.  We can provide it to - - -

15   HER HONOUR:   Well, at the moment there's no exhibit referred to there, all we have of this affidavit.

MR YOUNG:   No, your Honour, but we would submit that that is – paragraph 4 is
20   neither confidential nor in issue between the parties.  We can supply the redacted copy that we were supplied.

HER HONOUR:   No, but the redacted copy is a second thing.  My first question was a very simple one:  whether the fact in lines 2 and 3 of paragraph 4 – not the report
25   - - -

MR YOUNG:   Yes.

HER HONOUR:   - - - whether that fact was confidential.

30   MR YOUNG:   No.

HER HONOUR:   You say that's not confidential?

35   MR YOUNG:   That's not.

HER HONOUR:   Right.

MR YOUNG:   It's apparent on the face of what we've been provided.

40   HER HONOUR:   Right.  Then we get to Mr Donaldson's report.  The totality of the report is confidential.

MR YOUNG:   Yes.

45   HER HONOUR:   What really paragraph 4 should import is "in a redacted copy of that report", etcetera, because that's all you've seen.

MR YOUNG:   Yes.  But what appears from the redacted copy is that the subject matter of the report is a consideration of negotiations.

HER HONOUR:   Yes.  No, I understand that.  But I think just for clarification the report that you're referring to is actually a redacted copy of a full report.

MR YOUNG:   Yes, your Honour.

HER HONOUR:   Now, Mr Burley, you haven't – I know you've just got this affidavit – you have not seen that redacted copy of that report?

MR BURLEY:   That's correct, your Honour.

HER HONOUR:   Well, Mr Young says he has got a copy of it and he can make that available to you.

MR BURLEY:   Very well.

HER HONOUR:   Okay.  Why don't you have someone do that now so someone can be looking at it - - -

MR YOUNG:   Yes.

MR BURLEY:   Yes.

HER HONOUR:   - - - while this matter proceeds.

MR YOUNG:   Yes, we will have that done, your Honour.  Your Honour, I mentioned Mr Lim's two affidavits.

HER HONOUR:   Yes, are there any objections to the first affidavit, Mr Burley, the one sworn on 3 October?

MR BURLEY:   No, your Honour.

HER HONOUR:   Thank you.

MR YOUNG:   The other affidavit we rely upon is an affidavit of Mr Zaurrini of Ashurst, dated 23 October.

HER HONOUR:   Do I have that?

MR YOUNG:   Your Honour should have it.  We can provide a – I'm corrected, your Honour.  We attempted to provide a copy and we were asked to provide it today.

HER HONOUR:   When was this?  Was this what we were offered – yes, I think this was something that was referred to in an email dated 10 pm, or time 10 pm last night.

MR YOUNG:   Something like that, your Honour, yes.

HER HONOUR:   And the question was did I want it in court this morning, and seeing I was in court at 9.30 the answer was no.

5

MR YOUNG:   Yes.  This is Mr Zaurrini's affidavit, your Honour.

HER HONOUR:   Has Mr Burley seen that?

10   MR YOUNG:   He has, I understand.

HER HONOUR:   Actually, you can't answer that, can you?  That's one of those questions that you can't answer.

15   MR YOUNG:   Well, I would expect so, I should have said.  Your Honour, here's a working copy of the same thing.

HER HONOUR:   Thank you.

20   MR YOUNG:   I'm sorry, I should have handed them both together.

HER HONOUR:   No objection to that being filed, Mr Burley?

MR BURLEY:   No, your Honour.

25
HER HONOUR:   I grant leave to Samsung to file in court the affidavit of Rossano Zaurrini, RO-S-S-A-N-O Z-A-U-R-R-I-N-I, sworn or affirmed – sworn on 23 October 2013.  Any object to the contents of that affidavit?

30   MR BURLEY:   No, your Honour.

HER HONOUR:   Do you want me to read it?

MR BURLEY:   Your Honour, I should indicate that my lack of objection doesn't
35   constitute a waiver of privilege in the contents of it.  Your Honour appreciates that there are a number of matters that arise from these affidavits which your Honour will be receiving on the voir dire in connection with the question of privilege communications, we have an application under section 131.  I just wish to make it clear that we're not objecting that your Honour receive it for the purpose of this
40   application without any consensual waiver to the privilege that we argue attaches to the materials.

HER HONOUR:   I don't even know what this affidavit is about yet, so - - -

45   MR BURLEY:   That's a blanket observation in relation to those affidavits.

HER HONOUR:   Yes, I understand.

MR YOUNG:   Yes, your Honour, I will take your Honour through the affidavits. Before I do that may I simply return to the reference to the Donaldson report for a moment.  The document provided to us for supply to Samsung was redacted of Apple confidential information by Apple.  The report still contains highly confidential Samsung information that hasn't been redacted.  So the document is still subject to that - - -

HER HONOUR:   So who can see it on Apple's side?

MR YOUNG:   No, no, it's within the restricted regime - - -

HER HONOUR:   I see, it's Apple's documents.

MR YOUNG:   - - - when I hand it over I'm just making that clear, because it contains unredacted Samsung information.

HER HONOUR:   Right.

MR YOUNG:   Apple only redacted it's own information.

HER HONOUR:   Is there anybody on the Apple side who can't see that?

MR YOUNG:   I'm just - - -

HER HONOUR:   It's Apple's report.

MR YOUNG:   It's Apple's report about Samsung's confidential information and its own.

HER HONOUR:   Right.

MR YOUNG:   From which it has redacted the Apple side of things.

HER HONOUR:   So is it external legal advisor only level of confidentiality?

MR YOUNG:   Yes, your Honour, it is, yes.

HER HONOUR:   Mr Burley, are you able to throw any light on it?

MR BURLEY:   On the run.  We're very concerned that it also contains third-party confidential information to which we would not be permitted to have access.  I wonder if my friend can - - -

HER HONOUR:   You mean the Australian lawyers may not be permitted to have access?

MR BURLEY:   Yes.

HER HONOUR:   Well, the Australian lawyers on Samsung's side are seeming to have had access.

MR BURLEY:   That doesn't answer the question, with respect, your Honour.  We don't want to see something which may be in breach of a third-party confidentiality order in the United States, and we simply don't know, but we would need to get instructions from the United States to be confident that this is material we're permitted to see.

HER HONOUR:   Well, I wouldn't want to be involved in something that was in breach of a confidentiality order in the United States either without more – look, at this stage I think we just can't deal with that report until Apple – maybe someone on the Apple side, or maybe someone on the Samsung side can make inquiries, it's still a good time on the west coast, to understand exactly what the confidentiality regime was in relation to that report, both with respect to Samsung confidentiality, Apple confidentiality and third-party confidentiality.

MR YOUNG:   Yes, your Honour, we can do that.  The point of the evidence is simply to say that Mr Donaldson has addressed the subsequent negotiations as between Apple and Samsung.  So to the extent to which caution dictates that we further excise anything that might be in that third-party realm, we can do that.

HER HONOUR:   Yes.  I'm assuming that – I think Mr Burley's concern is – and this is a matter for you of course – as to whether or not even having that matter handed over in Australia at all without redactions of third-party confidentiality could be an issue.

MR YOUNG:   I don't believe so, your Honour, because of the terms on which Apple provided it, but - - -

HER HONOUR:   No, but Apple provided it within a confidentiality regime that existed in the United States.

MR YOUNG:   No, it provided it for supply to the client, Samsung.

HER HONOUR:   Well, do you know something, this is a matter for you - - -

MR BURLEY:   Yes.

HER HONOUR:   - - - and you and your solicitors to work out.  I think it would be helpful to have, if possible, to have the relevant aspect of the confidentiality order in the United States, if there's any issue, have someone transmit that.

MR YOUNG:   Yes, we will address those matters, your Honour.

HER HONOUR:   In the meantime, Apple have not received it, and I have not received it.

MR YOUNG:   Your Honour, I will need to take your Honour through the affidavits to indicate what they contain.  May I inquire whether your Honour has read Mr Wen's first affidavit?

5   HER HONOUR:   I've read it and I've skimmed but not digested everything in the exhibits or annexures.

MR YOUNG:   Yes.

10   HER HONOUR:   I mean, when I say "read it" I'm not – I couldn't pass an – I'm not saying – there's a lot of material that I've been handed in the last recent while for this application and I have had a look through it, but you might want to take me through the parts that you emphasise.

15   MR YOUNG:   Yes, I will do that, your Honour, and I will take the same course with Mr Zaurrini's affidavit.

HER HONOUR:   Well, that I haven't even had a chance to skim.

20   MR YOUNG:   I understand, your Honour.  Now, I'm not sure what course your Honour would like to follow.  I'm more than happy to read our material in the way I've just indicated and then to have Apple read its material, and then we proceed with submissions, which would be the ordinary New South Welsh way of proceeding.  And so I will take that course - - -
25
HER HONOUR:   How is it different in Victoria?

MR YOUNG:   In Victoria, we would tender all of the evidence and then separately explain the significance of the evidence.
30
HER HONOUR:   Just simply hand it all that and then do it, in effect, in submissions?

MR YOUNG:   In submissions.
35
HER HONOUR:   No, no.  I think I prefer our system.

MR YOUNG:   All right.  If your Honour please.  Your Honour, can I go to Mr Wen Ts'ai Lim's first affidavit.  Paragraph 3 indicates the dates of service of the two 40   relevant witness statements of Mr Kim and Mr Korea, 5 and 6 August respectively.  The evidence was foreshadowed much earlier, but they were debates of service.

HER HONOUR:   Well, when you say much earlier, and can I just raise this question with you so you can address it as we go through the affidavit?
45
MR YOUNG:   Yes.

HER HONOUR:   As I read it, the material in Mr Kim's affidavit is of some history, in that it's – it all took – takes place in about 2011?

MR YOUNG:   No.  It's 2010.

5

HER HONOUR:   Well, whatever.  It's early.

MR YOUNG:   It's early.

10   HER HONOUR:   And yet it wasn't filed till 5 August.  When you say some time earlier, the evidence in Mr Korea's affidavit tracks through until the much more recent time.  So I don't know how much earlier you could have told them it was coming.

15   MR YOUNG:   No, it – what I was indicating was that Ashurst foreshadowed that it wanted to file evidence of the kind addressed by Mr Kim and Mr Korea some – in the months leading up to August.

HER HONOUR:   I see.  When you said some time earlier, I didn't know how far
20   back you were doing.

MR YOUNG:   No. The subject matter of the evidence is a different thing.  Mr Kim addressed - - -

25   HER HONOUR:   No, no.  You told me in August that you were going to put on more evidence.

MR YOUNG:   Well, we told Apple before August, in July and earlier, that we were going to put on evidence for further negotiations.  The – can I just indicate what the
30   two affidavits – statements deal with.  May I inquire whether your Honour has had a chance to read them?  Mr Kim deals with some negotiations that took place before the institution of proceedings by Apple.  Those negotiations took place in October and November of 2010.  Mr Korea, on the other hand, deals with negotiations and correspondence that took place at a later period of time after September of 2012.
35   Apple had, before the Korea affidavit, filed evidence of discussions and correspondence running up until 12 September 2012.  So that's the - - -

HER HONOUR:   September or December?

40   MR YOUNG:   September, Apple went to.  And that was addressed by Mr Teksler in his affidavit of 1 October 2012, so he updated negotiations right up until when he provided his third affidavit.  Now, your Honour, I'm going to necessarily have to refer to material which is claimed by Apple to be confidential and/or privileged, and therefore, to that extent, your Honour will have to close the court.  I'm not going to
45   the extreme regime, but I'm going to confidential communications and communications that are now alleged to be the subject of privilege.

HER HONOUR:   Yes.  It seems to me that – I thought about that also in advance, because Mr Burley, you agree that it's probably better that we, rather than having anything said at all, that we simply have the whole hearing, I think.  So I'm going to close the court.  Anyone who is not party to – now, you had better tell me exactly which level of confidentiality we're now talking about.

5

MR YOUNG:   It's called General, the general level of confidentiality which - - -

HER HONOUR:   Mr Burley, you're happy with that level of confidentiality?  Is this people on both sides?

10

MR YOUNG:   Yes, it applies to both sides.  Now, we of course say that privilege has been waived, your Honour, so – but that's a different issue.  For the time being, it's subject to that general regime for both parties.

15

MR BURLEY:   We agree that the court should be closed on that basis, your Honour.

HER HONOUR:   So anyone who is not subject to the general confidentiality regime will now please leave the court.  And would you close the court please, officer.

20

**CONTINUED IN TRANSCRIPT-IN-CONFIDENCE**

©Commonwealth of Australia                                                                    MR BURLEY

**CONTINUED FROM TRANSCRIPT-IN-CONFIDENCE**

**RESUMED**                                                                                            **[2.16 pm]**

5

MR YOUNG:   Your Honour, I want to attempt to summarise submissions I've made in the course of going to the material.

10    HER HONOUR:   I need to know first what the position is as far as the confidentiality question is concerned, in terms of timing.  If Ms Williams can't be here tomorrow - - -

MR YOUNG:   No, no, she can, your Honour.

15

MS WILLIAMS:   I can now until lunchtime tomorrow if that's convenient, your Honour.

HER HONOUR:   Just one question while you're on your feet.  Has the American
20    court been told about the breaches in Australia?

MS WILLIAMS:   I don't know the answer to that, your Honour, but I will find out while Mr Young is continuing and endeavour to address that question.

25    HER HONOUR:   You don't know?

MS WILLIAMS:   No, I don't know that, your Honour.

HER HONOUR:   And is one of the other jurisdictions and was named in the
30    American proceedings as having had the confidentiality – the American breach extend to other jurisdictions, is Australia included in that?

MS WILLIAMS:   Australia has not been named, as I understand it.

35    HER HONOUR:   That's not – I know it hasn't been, I've read the judgment.  I want to know whether or not the evidence in the United States that obviously disclosed that there had been disclosures of the American confidential information to lawyers in other jurisdictions.  Did that extend to lawyers in Australia?  Samsung lawyers.

40    MS WILLIAMS:   Your Honour, not so far as I'm aware, and my instructions are that Ashurst does not have a copy of the draft US Teece report that is referred to in - - -

HER HONOUR:   Was any Australian lawyer, Samsung lawyer, made aware of
45    earlier than the notification here, or received the confidential – the American confidential information in breach of the American confidentiality order?

MS WILLIAMS:   Your Honour, my understanding is no, but I would like to seek some instructions to clarify that while Mr Young is continuing.

HER HONOUR:   Can I just make one observation?  I cannot believe – I really
5 cannot believe that Samsung has not put itself in a position of being able to answer virtually any question – these are obvious questions – whether Samsung has not put itself in a position to be able to answer those questions immediately in Australia.  I find that incomprehensible.  I would have thought Samsung would have been – Ashurst would have been bending over backwards to ensure that everything about
10 these confidentiality breaches was known and available and the information be made available to this court, and it would have been offered to the American court.

MS WILLIAMS:   Your Honour - - -

15 HER HONOUR:   I want to know whether the American court is aware that the similar – similar confidential information was breached in Australia in relation to the same person's report.

MS WILLIAMS:   Your Honour, I will seek - - -
20
HER HONOUR:   Or a different report perhaps, but by the same person, and you must – surely you know that.

MS WILLIAMS:   It is a different report.  I don't personally know that and I will
25 seek instructions.

HER HONOUR:   It's also Professor Teece.  You don't know?

MS WILLIAMS:   Yes, it is, your Honour, it is Professor Teece, the same person.
30
HER HONOUR:   And you don't know whether the American court has been informed about a breach in relation to the same – a report by the same person?  Of all the other documents you don't know whether the American court has been told that?

35 MS WILLIAMS:   I apologise, your Honour, I don't know that.

HER HONOUR:   Well, I expect to know that by first thing tomorrow morning, thank you.

40 MS WILLIAMS:   As your Honour pleases.

HER HONOUR:   Yes, Mr Young.


45 **CONTINUED IN TRANSCRIPT-IN-CONFIDENCE**

**CONTINUED FROM TRANSCRIPT-IN-CONFIDENCE**

HER HONOUR:   Well, while – you can have a look while I ask Ms Williams about
the confidentiality – or about – let's start with the depositions of Mr Korea.

MS WILLIAMS:   Yes, your Honour.  The position is, and we've written to my
learned friend's instructing solicitors about this yesterday, the position is that Ashurst
do not have copies of those deposition transcripts.  We have requested copies from
Quinn Emanuel for the purpose of providing them to Apple's counsel in Australia.  It
is our understanding that those deposition transcripts may contain third party
confidential information.  Quinn Emanuel have requested consent from Apple and
Nokia, who are the relevant third parties, for the transcripts to be provided to Ashurst
for the purpose of being passed onto Herbert Smith Freehills in Australia.  They have
not, as at this morning, which is the latest update I have had, Quinn Emanuel have
not had a response to that.

HER HONOUR:   But I take it that, from what you've said, that Samsung consents to
having the Korea depositions on the confidentiality breach released under the
suitable aura of confidentiality to Apple, subject to the third party, because Apple is
– forget Apple's – subject to any questions of Nokia confidentiality, you're happy to
have those released to Apple's legal advisors in Australia?

MS WILLIAMS:   That is so, and subject to one other thing of a similar nature, and
that is we have asked Quinn Emanuel whether either the confidentiality regime or
any implied undertaking or similar thing in the US proceedings creates a difficulty,
and we're waiting on a response to that.  If it does create a difficulty, we need to
think about ways of overcoming that.  May I, if it's convenient, hand up a copy of
the letter written to Herbert Smith Freehills yesterday, which outlines - - -

HER HONOUR:   Well, the main thing is that Samsung is – provides – Samsung
itself provides full consent and will instruct its American lawyers accordingly.

MS WILLIAMS:   Yes, our instructors are to provide the documents as soon as
we're able to overcome these hurdles and get there.  It I might hand that up, your
Honour.  My learned friends

HER HONOUR:   Do you any objection to me receiving this correspondence, Mr
Burley?

MS WILLIAMS:   I have a copy for my learned friends.

HER HONOUR:   This, I see, actually goes beyond Mr Korea.

MS WILLIAMS:   Yes, it does, your Honour.  It relates to all of the Samsung
employees who have been deposed under this process ordered by Grewal J.  Now,
your Honour will see it also deals with Herbert Smith Freehills' request for - - -

HER HONOUR:   It would extend to Dr Ahn, as well, wouldn't it, for example?

MS WILLIAMS:   Yes, it's my understanding that he is one of those witnesses who has been deposed.

5

HER HONOUR:   Thank you.

MS WILLIAMS:   So that's the position in relation to all of the US material that has been requested at this stage of Samsung, your Honour.

10

HER HONOUR:   And you will – you're finding out the answers to my other questions in due course?

MS WILLIAMS:   I am finding out the answers to your Honour's questions.

15

HER HONOUR:   It's a tough time now in America, I think.

MS WILLIAMS:   Yes.  I also have an update which can be dealt with tomorrow so as not to interrupt things about what we're doing in relation to providing – preparing
20  some further evidence for your Honour in relation to the Australian inadvertent breach, but I will deal with that tomorrow, if that's convenient.

HER HONOUR:   Well, actually, while you're on your feet, so you are proposing to put on further evidence in relation to that, are you?

25

MS WILLIAMS:   Yes, your Honour.

HER HONOUR:   Because there are some question marks.  I mean, there really are some question marks that arise.  Some of them have been highlighted by Apple's
30  document they handed up before lunch.  And the explanations to date are not complete.  I must say one thing I noted, and I don't know if – how – and it's something that I did note, and I'm not sure – I haven't got it – my – in front of me at the moment, but the original letter that went to Freehills that talked about what use was made of the confidential information, I – as I read it, there was a distinction
35  between what was said about the disclosures to Samsung employees and the disclosures to Quinn Emanuel.

The one to the Samsung employee said, "I've been informed or believe words to the effect that no use was made of the confidential information."  The one from Quinn
40  Emanuel said, "I'm informed or believe that no use was made of the confidential information in this document."  Now, it was words to that effect, "arising from the receipt of this document", it was either very carefully drafted or was just happened to be drafted that way, but it does not deal – it's a bit – if you don't – on one view of it, it could be said that it's carefully stated, because if that's the same confidential
45  information that Quinn Emanuel got – had itself from another source, and dealt with it – and made use of the – let's say, for example, the same information was available

to them in the US and they used that confidential information as – and disclosed that to Samsung employees.

5    Saying then that they didn't make use of what might be exactly the same information arising out of – or similar information arising out of the Australian breach doesn't – isn't really forthcoming, if you know what I mean, in terms of a uberrimae fidei sort of obligation once the breach had occurred.  That's what I just raise with you.

MS WILLIAMS:   Yes

10

HER HONOUR:   You might want to look at that.

MS WILLIAMS:   May I take your Honour's comment on board, and I apologise if I've misunderstood, but just to be clear, I don't think there's any suggestion that
15    Quinn Emanuel were not entitled to see the information.

HER HONOUR:   No, it's use made – it's use made by Quinn Emanuel of the disclosure.  It's there's somewhere.  It's – it distinguishes between use made of the confidential information itself, and use made of confidential information arising from
20    this particular document.

MS WILLIAMS:   May I take your Honour's question on notice.

HER HONOUR:   Do you understand the distinction I'm drawing?
25

MS WILLIAMS:   I do understand the distinction.  I think I need to look carefully at the part of the letter your Honour is referring to and take it on notice.

HER HONOUR:   I think you do.
30

MS WILLIAMS:   But I can assure your Honour that there's no intention not to be forthcoming with the court, and that is why we're going through this careful, meticulous process of preparing some further evidence.

35    HER HONOUR:   Well, I hope so.  The other thing that I think needs to be addressed is, as I said before the coincidence of the document.  But also the dates seem to be quite – quite extraordinary.  I would – the way in which it happened.  That may not all be in Ashurst's hands, but I would have thought Ashurst would be in a position of giving a bit more information from Quinn Emanuel and Samsung in relation to it.
40

MS WILLIAMS:   Yes.  I do understand from those instructing me that there has been difficulty obtaining information from Quinn Emanuel, merely because they are very preoccupied with what is going on in the United States proceedings.

45    HER HONOUR:   Yes, but I would have thought that work that they're doing with what's happening in overseas – in the overseas situation would be having them look into all aspects of it.  And I would have thought, quite frankly, from their perspective

that it is an important matter that Australia also had a disclosure of the same area of
subject matter, if not the same precise document.  And I would be – I mean, I would
be surprised if, in their obligations in the United States they haven't made that
disclosure.

5

MS WILLIAMS:   Yes.  And that's a matter I very much would like to be able to
inform your Honour about tomorrow.  Those inquiries have been made.

HER HONOUR:   I think, while you're there – I think that one of the matters in the
10   chronology that Mr Burley handed up is – has a comment against 8 August, which
points out that the affidavits from the Samsung recipients doesn't mention that they
were also in receipt of confidential information from another source.  It is not the sort
of evidence that one would have thought would be advanced in response to an
attempt, fully, to explain everything arising from something that is so fundamental a
15   flaw in what occurred.

MS WILLIAMS:   I certainly take that comment on board, your Honour, and that is
something that we wish to address in the supplementary affidavits that are now being
prepared.
20

HER HONOUR:   Well, yes.  That goes with the fact that someone is saying, "I don't
remember whether I saw the Australian document or not."  To say that, in light of the
fact that the same person may have seen the same sort of information in another
document – to just say, "I didn't remember what happened as to the Australian
25   document" – well, perhaps they didn't, because they already had it from elsewhere.  I
mean, that's just incomplete.  That's deliberately incomplete, I would have thought,
without a further explanation.

MS WILLIAMS:   My submission will be there has certainly been no deliberately
30   incomplete explanation provided.  But, your Honour, may I just note this.

HER HONOUR:   Well, a person who says, "I know I had Apple's confidential
licensing information, and I just" – sorry, "I can't recall whether I saw any
confidential information as to Apple's confidential licensing information, although I
35   happen to have used it in other" – "because I've got it in another jurisdiction."

MS WILLIAMS:   Your Honour, may I just say this.  At this point, as I understand
it, there is no evidence that any of the four Samsung employees who received the
Australian information, three of whom were lawyers, two of whom say they didn't
40   read the email that contained the attachment – there's no evidence as to whether they
actually read the United States information.  And that is one of the matters about
which we need to make further inquiries.  As I understand it, they had access to an
FTP site, file transfer protocol site, from which they could access the information.
But those instructing me do not, at this stage, know whether or not those four people
45   actually did access that draft report, and inquiries are being made about that.

HER HONOUR:   Well, somebody did.  Somebody did, because the allegations are it was used in negotiations with Nokia.

MS WILLIAMS:   I understand that's the allegation made in the US, and I'm addressing your Honour about the four Samsung employees.

HER HONOUR:   Well, two of them were Mr Korea and Dr Ahn, weren't they?

MS WILLIAMS:   No, your Honour.  Mr Korea and Dr Ahn did not receive the Australian information.  May I just – since your Honour has raised it and it's clearly troubling your Honour, may I just outline this.

HER HONOUR:   It is troubling me.

MS WILLIAMS:   Yes, and I can understand that, your Honour.  We are taking the matter extremely seriously.  The Australian information, if I can use that summary term, was transmitted by Ashurst to two Samsung employees, one of whom is the lawyer responsible for instructing Ashurst in this proceeding, one of whom is not a lawyer but who is providing logistical assistance to that other Samsung lawyer.

HER HONOUR:   I thought the other one was a licensing person.

MS WILLIAMS:   He is an engineer.  He is broadly within the licensing group.  He - - -

HER HONOUR:   Well, why would it have been sent to a licensing person?  I can understand it going to the lawyer who's instructing you.  I can understand that.  Why on Earth would it go to somebody – a Samsung licensing executive from Ashurst?

MS WILLIAMS:   As I understand it – and this is a matter that needs to be carefully explained in the affidavits, and I don't want to pre-empt the affidavits.  But as I understand it, it is as a result – is because of the role that he has had in this litigation, in assisting and providing instructions and logistical assistance, locating documents to be discovered, etcetera.  The non-lawyer Samsung employee says he didn't read it.

HER HONOUR:   The licensing person - - -

MS WILLIAMS:   Yes, your Honour.  Those are my instructions, and that has been sent out in the 10 July letter to Herbert Smith Freehills.  The lawyer, Mr Kim, forwarded the email on to two other Samsung employees, one of whom, Mr Shim - - -

HER HONOUR:   Without reading it - - -

MS WILLIAMS:   No, he read it, but says that he does not now recall the contents.  Those are my instructions.

HER HONOUR:   Is he a person who also received the US confidential information?

MS WILLIAMS:   Yes, he is, but we don't know whether he actually accessed it at this point.

5

HER HONOUR:   Is he a person to whom information as to the American confidentiality breach was passed by the American lawyers?

MS WILLIAMS:   Again, your Honour - - -

10

HER HONOUR:   Lawyers in other jurisdictions, referred to in the American decision – there was a statement in the American decision that the information was passed by Quinn Emanuel to Samsung lawyers in other jurisdictions.  Now, I don't know whether that would include the lawyer instructing Ashurst in the Australian litigation.  I've got no idea what was encompassed by the other lawyers to whom Quinn Emanuel, or someone within Samsung, sent the American confidential information.

15

MS WILLIAMS:   Your Honour, as I understand it, the way in which Samsung employees, including internal Samsung lawyers, are said to have received the information from Quinn Emanuel is either by an email – and we are making inquiries as to whether the email went to any of the four Samsung employees who received the Australian information – or by - - -

20

HER HONOUR:   Or someone with whom they spoke.

25

MS WILLIAMS:   - - - having access to the relevant FTP website.

HER HONOUR:   Or someone in Australia – I mean, are you saying that Quinn Emanuel, knowing that Samsung in Australia is preparing a – was preparing evidence in the same – concurrently, in the same subject matter – didn't send that confidential information?  They sent it around the world, but not to Australia.

30

MS WILLIAMS:   Your Honour, I don't know whether it was sent around the world and I do need to find out whether it was sent to Australia.  My understanding is that it wasn't, and I say that subject to further instructions.  But I say that because what I do know is that Australia does not now – Ashurst in Australia do not have the draft US Teece report that is the subject of the American confidentiality breach.  Ashurst - - -

35

HER HONOUR:   And Ashurst in Australia have checked with all of the lawyers handling this case, and not one person became aware of the US breach at the time, or the contents of the breach.

40

MS WILLIAMS:   What I can say to your Honour confidently is that Ashurst in Australia was aware, on 4 July this year, that there was an allegation of breach made in the context of the US proceedings, and that is what, in fact, prompted Ashurst to conduct the investigation that revealed the Australian breach.  But I don't know at

45

what point Ashurst became aware of the subject matter of the alleged – of the disclosure in the United States.

HER HONOUR:   When is your evidence on this – it's not yet complete;  is that correct?

MS WILLIAMS:   No, it's not yet complete and - - -

HER HONOUR:   Will it be complete by tomorrow morning?

MS WILLIAMS:   No, it won't be, your Honour.

HER HONOUR:   What is the nature of the further evidence?

MS WILLIAMS:   Can I hand up to your Honour a letter which was also sent to my learned friend's instructing solicitor, yesterday, about that subject matter, which indicates that there will – we anticipate the evidence will include affidavits of two Ashurst partners, supplementary affidavits of the four Samsung employees, and an affidavit from a representative of Quinn Emanuel.  And we anticipate that the evidence will be ready by 7 November, following which we would seek to relist the matter.  I know that it will take some time, your Honour, but we are concerned to do this meticulously and carefully.  And, because of our reliance on some information from Quinn Emanuel, we do need that time.  May I hand up the letter.

HER HONOUR:   Well, don't worry about it.  Don't worry about handing up the letter now.  I will deal with it tomorrow morning, because we've got to get on with this hearing.  But you do appreciate that it's at that time that there are no days out of court on which to deal with this.  I'm in the 657 hearing every day from that moment on, and then we go straight into – till 20 December.  Were you aware of that?

MS WILLIAMS:   I wasn't aware of it, because I'm not involved in the balance of the proceedings.  But I have to – it doesn't - - -

HER HONOUR:   Well, those instructing you are.

MS WILLIAMS:   Yes, and I'm not surprised by it, your Honour.  We have, to date, been working with, and continuing a dialogue with, my learned friend's instructing solicitors about this.  We are hopeful that the further information – further evidence that will be provided will mean that a lengthy hearing about this is not necessary.

HER HONOUR:   Well, it's going to have to be provided so that we can come back in this matter, if necessary.  I don't know what the parties are doing, whether or not other – because you're handling it and you're not in the other main proceeding.  I don't know about the Apple side.  But Wednesday, the 6th, is an out of court day.  I don't know whether Apple's people can deal with it, on their face, also preparing for the 657.  But I would want to have the evidence on by Monday, the 4th, at the very latest – preferably, on Friday, the 1st, so that Apple can get some instructions over the

weekend and prepare their position.  It will just have to.  It just has to be brought forward.  There's no other way I can deal with it.

MS WILLIAMS:   I take that on board.  And may I consult with those instructing me overnight and come back to this issue in the morning?

HER HONOUR:   Thank you.

MS WILLIAMS:   I fear I've derailed the other subject matter already.

HER HONOUR:   Thank you.  No, no, no.  It's relevant because it forms a fair part of Mr Burley's submissions in this part of the case.  So I need to have a little bit of an understanding of it at this stage.

MS WILLIAMS:   Yes, your Honour.

HER HONOUR:   Thank you.

MR YOUNG:   Your Honour, can I - - -

MR BURLEY:   Before my learned friend goes on, I wonder, your Honour, that exchange with my learned friend Ms Williams was one which we would like to report back to the United States about, and the court is closed at present.

HER HONOUR:   Yes.  No, I would have thought Samsung would have no objection to this part of the material being, in effect, in open court.  We haven't discussed anything confidential.

MS WILLIAMS:   Yes, that's correct, your Honour.

HER HONOUR:   They can report back to the Americans.

MS WILLIAMS:   Yes, your Honour.

HER HONOUR:   And get instructions?

MS WILLIAMS:   Yes, your Honour.

MR BURLEY:   We would like to take it more step.  Would your Honour mind removing the confidentiality limitation on that exchange - - -

HER HONOUR:   Yes.

MR BURLEY:   - - - so that we can provide it, if necessary, to the court in the United States .....

HER HONOUR:   Are you happy with that?

MS WILLIAMS:   Yes, your Honour.

HER HONOUR:   All right.  Well, then the transcript from the time I start asking Ms Williams some questions about the confidentiality issue will not be marked confidential, but we will now go back into confidential marking.  Thank you.

5

**CONTINUED IN TRANSCRIPT-IN-CONFIDENCE**

**CONTINUED FROM TRANSCRIPT-IN-CONFIDENCE**

MS WILLIAMS:   Yes.  May I just raise one matter.  It relates to a statement that I
5    made to your Honour earlier.  Your Honour may recall is that Ashurst does not have
a copy of the draft Teece reports referred to in the United States judgment.  That is
correct, Ashurst does not have a copy of a draft report of Professor Teece emanating
from the United States.  We do, however, have a final report of Professor Teece
signed emanating from the United States, which is redacted.  That's a matter of
10   which I understand my learned friend's instructing solicitors are aware.  I'm
instructed that that final report, Ashurst became aware last week, has incomplete
redactions.

HER HONOUR:   This being the American report or the Australian report?
15

MS WILLIAMS:   This being the final American report signed by Professor Teece.

HER HONOUR:   As purportedly redacted?

20   MS WILLIAMS:   Redacted, but I'm told Ashurst became aware during the course
of last week, on the – about 16 October, to be precise, that those redactions are
incomplete.  I don't know, and I understand Ashurst does not know whether the
problem with those redactions is the same as the problem with the redactions of the
draft report referred to in the United States proceeding.  But I just wanted to raise
25   that with your Honour, so that your Honour wasn't - - -

HER HONOUR:   Okay.  So just sorry, to clarify, it has redactions?

MS WILLIAMS:   Yes, it does, your Honour.
30
HER HONOUR:   This is the American Teece report, not the Australian one?

MS WILLIAMS:   Yes.  Final.

35   HER HONOUR:   It's the American Teece report, or the copy that Ashurst has here
that is - - -

MS WILLIAMS:   Yes, your Honour.

40   HER HONOUR:   - - - redacted?

MS WILLIAMS:   Yes, your Honour.

HER HONOUR:   But Ashurst, on reading it, with its knowledge of what is meant to
45   be confidential and not-confidential sees it as incompletely redacted?

MS WILLIAMS:   Ashurst has been informed by Quinn Emanuel - - -

HER HONOUR:   I see.

MS WILLIAMS:   That it is in – last week, informed by Quinn Emanuel that it is incompletely redacted.

5

HER HONOUR:   Do we know how that figures into the scheme of things?

MS WILLIAMS:   Not yet, your Honour, and we need to work that through.  One thing I do know, though, on my instructions, is that that is a report – the US report is

10  one that relates to the issue of damages.  As I understand it, there is no issue as to damages in the Australian proceedings.  So whilst - - -

HER HONOUR:   Yes, but there was – all right.  Just one other question, do we know if this incompletely redacted report, is that the subject of the American

15  confidentiality proceedings, or is it one that wasn't redacted at all?

MS WILLIAMS:   As I understand it, the report that is the subject of the American confidentiality proceedings was an incompletely redacted report, but it is referred to repeatedly as a draft report, whereas the report emanating from the US that Ashurst

20  have is clearly a final report.  It is signed.  It's – it is something that we will need to work through and address in due course, but I just wanted to raise it this afternoon, having told your Honour that Ashurst did not have the draft report, I didn't want that information to be incomplete.

25  HER HONOUR:   No, thank you.  All right, well, thanks for that information.

MS WILLIAMS:   May it please the court.

MR BURLEY:   I wonder if your Honour may open the court for that exchange also,

30  so we can report on that and - - -

HER HONOUR:   Yes.  The transcript from the time Ms Williams rose until now is not confidential.

35  MR BURLEY:   Please the court.

HER HONOUR:   As I understand it.


40  **CONTINUED IN TRANSCRIPT-IN-CONFIDENCE**

©Commonwealth of Australia                                               MR YOUNG