# Exhibit D
# (Submitted Under Seal)



1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT
9                 NORTHERN DISTRICT OF CALIFORNIA
10                       SAN JOSE DIVISION
11

12   APPLE INC., a California corporation,          Case No.   11-cv-01846-LHK

13                                                  **EXPERT REPORT OF**
                                                    ~~TERRY~~JULIE **L.** ~~MUSIKA~~DAVIS,
14                    Plaintiff,                     **CPA** (AS OF 8/23/2013)

15          v.

16   SAMSUNG ELECTRONICS CO., LTD., a
     Korean business entity; SAMSUNG
17   ELECTRONICS AMERICA, INC., a New York
     corporation; SAMSUNG
18   TELECOMMUNICATIONS AMERICA, LLC, a
     Delaware limited liability company,
19
20                    Defendants.

21
22
23                  SUBJECT TO PROTECTIVE ORDER
24
25          HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
26
27
28

# TABLE OF CONTENTS

**Page**

A.   QUALIFICATIONS ............................................................. 1
B.   ASSIGNMENT .................................................................. 1
C.   DATA AND OTHER INFORMATION CONSIDERED ............ 2
D.   APPLE'S UTILITY PATENTS .............................................. 3
E.   APPLE'S DESIGN PATENTS ............................................... 5
F.   APPLE'S TRADE DRESS REGISTRATIONS ........................ 5
G.   APPLE'S UNREGISTERED TRADE DRESS ......................... 6
H.   APPLE'S TRADEMARK REGISTRATIONS ......................... 9
I.   APPLE'S UNREGISTERED TRADEMARK ......................... 11
J.   APPLE INC .................................................................... 11
K.   SAMSUNG ..................................................................... 15
L.   INDUSTRY AND MARKET ............................................... 16
M.   ASSUMPTIONS ............................................................... 21
N.   SUMMARY OF CONCLUSIONS AND OPINIONS ............... 22
O.   IRREPARABLE HARM ..................................................... 27
P.   MONETARY DAMAGE ANALYSIS ................................... 36
Q.   POSSIBLE REVISIONS TO THIS REPORT .......................... 88
R.   EXHIBITS ...................................................................... 88
S.   PROFESSIONAL ARRANGEMENT .................................... 89

**APPLE INC.**

I.      BACKGROUND AND EXPERIENCE .................................................... 1
II.     ASSIGNMENT ..................................................................................... 2
    A.   Case Background and Procedural History ...................................... 2
    B.   Products, Patents, Infringement Findings, and Notice Periods ........... 5
    C.   Limitations from Case Management Order ...................................... 5
    D.   Scope of Assignment and Issues to Be Addressed ........................... 6
III.    MATERIALS CONSIDERED ................................................................ 7
IV.     BACKGROUND ................................................................................... 8
    A.   Summary of Apple's Patents that Are the Subject of the New Trial ..... 8
    B.   Summary of the Parties and the Relevant Market ........................... 10
        1.   Apple ............................................................................ 10
            a.   iPhone ................................................................... 11
            b.   iPad ....................................................................... 12
            c.   Apple Sales of iPhone and iPad ................................ 13
        2.   Samsung ........................................................................ 13
            a.   SEC ....................................................................... 13
            b.   SEA ....................................................................... 14
            c.   STA ....................................................................... 14
            d.   Samsung's Infringing Products ................................. 15
        3.   The Wireless Device Industry ........................................... 15
            a.   Smartphones .......................................................... 16

b.      Tablets ................................................................... 18

c.      The Ecosystem ....................................................... 19

V.      ASSUMPTIONS .................................................................. 21

~~SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC~~

~~EXPERT WITNESS REPORT OF~~

~~TERRY L. MUSIKA, CPA~~

~~A.   QUALIFICATIONS~~

VI.     SUMMARY OF CONCLUSIONS AND OPINIONS ......................... 22
    A.      Summary of Damages Calculations and Results ......................... 22
    B.      Summary of Alternative Damages Calculations and Results ............. 25

VII.    IRREPARABLE HARM ...................................................... 26
    A.      Background ......................................................... 26
    B.      Apple's Loss of Goodwill ............................................ 27
    C.      Erosion and Dilution of Apple's Brand ................................ 29
    D.      Apple's Loss of Market Share ........................................ 31
    E.      Difficulty of Calculating Damages ................................... 33

VIII.   MONETARY DAMAGES .................................................. 34
    A.      Use of Mr. Musika's Methodology .................................... 34
    B.      Legal Overview of Monetary Damages Remedies ....................... 37
    C.      Apple's Lost Profits ................................................. 38
        1.      Panduit Factors .............................................. 39
            a.      Demand for the Patented Product ......................... 39
            b.      Absence of Acceptable Non-Infringing Substitutes ........ 43
            c.      Marketing and Manufacturing Capability to Exploit
                    Demand ................................................ 46
            d.      Amount of Profit Apple Would Have Made Absent
                    Infringement ........................................... 48
        2.      Evidence Introduced at Trial Confirms These Opinions ......... 54
    D.      Samsung's Profits ................................................. 62
        1.      Samsung's Revenues from Infringing Sales ..................... 63
        2.      Deduction of Costs to Calculate Total Profit .................. 63
        3.      The Reliability of Samsung's Financial Data .................. 64
        4.      Calculation of Samsung's Profits Using Samsung's Classification
                of Costs as Fixed and Variable ............................... 72

5.     Evidence Introduced at Trial Confirms These Opinions...................73

E.     Reasonable Royalty.........................................................................................75

    1.     Royalty Structure ......................................................................77

    2.     Royalty Base .............................................................................77

    3.     Royalty Rates ...........................................................................78

    4.     Market Reference Points ..........................................................79

        a.     International Business Machines Corporation ("IBM")/Apple Cross License ........................................80

        b.     Nokia Corporation/Apple Cross License ....................81

    5.     Cost and Income Reference Points ..........................................85

    6.     The Hypothetical Negotiation ..................................................86

        a.     Factor #1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty ..........................................88

        b.     Factor #2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit ..................89

        c.     Factor #3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold ...................................................89

        d.     Factor #4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly ...............90

        e.     Factor #5: The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter ..............................................91

        f.     Factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales ...........................................93

        g.     Factor #7: The duration of the patent and the term of the license ...........................................................................96

        h.     Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity .................................................................98

        i.     Factor #9: The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.................................99

        j.     Factor #10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention ..................................................103

k.  Factor #11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use ................................................................... 104

l.  Factor #12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. ........................................................ 104

m.  Factor #13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.................................................................................. 104

n.  Factor #14: The opinion testimony of qualified experts ............ 105

o.  Factor #15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license................................ 106

7.  Evidence Introduced at Trial Confirms These Opinions........................ 107

IX.  POSSIBLE REVISION.................................................................................... 110

## I.      BACKGROUND AND EXPERIENCE

1.      I ~~am a CPA with over 37 years of business experience.  I am a former audit and consulting partner for the international accounting firm of Coopers & Lybrand which is today named PricewaterhouseCoopers, former Managing Director for Navigant Consulting, Inc. and have previously formed, owned and operated a proprietary database company, two national financial and economic consulting firms, and a merger and acquisition company.  Additionally, I have frequently served the Federal Court system as a Court Appointed Chapter 11 Operating Trustee, Liquidating Chapter 7 Trustee, Operating Chapter 7 Trustee, Examiner, and Paying Agent.  My resume, attached as **Exhibit 1**, lists my work experience, academic degrees, and publications.~~ have been providing audit and financial consulting services to attorneys and corporate clients for over thirty-five years.  The early part of my career was devoted to directing and performing independent financial audits of private and publicly held companies ranging from manufacturing entities to financial institutions at Touche Ross & Co., which at the time was one of the Big 8 accounting firms.  Drawing upon that background, I have spent the last twenty-five years consulting extensively with companies involved in business and intellectual property disputes.  Prior to starting my own firm, Davis & Hosfield Consulting LLC, I served as the Co-Managing Partner of the National Intellectual Property Practice at KPMG LLP and prior to that served as the Partner-in-Charge of the Global Intellectual Asset Consulting Practice at Andersen LLP.

2.      ~~My business address is 1637 Thames Street, Baltimore, Maryland 21231.~~ I have worked on numerous intellectual property cases during my career and have conducted complex studies of damages related thereto.  These studies have included evaluations of lost sales, lost profits, incremental profits, manufacturing and marketing capacities, fixed and variable costs, product line profitability, price erosion, reasonable royalty, unjust enrichment, and prejudgment interest.  I have testified in matters related to these studies.

3.      During the ~~past 37 years I have provided expert testimony in over 200 separate proceedings before 47 different Federal District Courts throughout the U.S., nine separate state courts, numerous proceedings before the U.S. Court of Federal Claims, four separate U.S. Bankruptcy Courts, numerous arbitration matters and the United States International Trade Commission.  I was accepted as a~~

1  ~~designated expert in all cases.  **Exhibit 2** lists the cases in which I have testified as an expert witness in~~

2  ~~deposition and at trial from 2007 to the present.~~course of my career, I have worked on at least 300

3  intellectual property disputes.  I have been qualified as an expert in the field of intellectual

4  property damages and testified at trial in more than 50 of those matters, including in the Northern

5  District of California.

6       4.    In addition to intellectual property disputes, I have assisted companies in

7  developing intellectual property strategies and managing their intellectual property portfolios.  I

8  have also conducted studies related to those portfolios, including patent portfolio analyses,

9  competitive assessments, licensing analyses, cost studies, and benchmarking studies.  In addition,

10  I have co-authored a book, *Edison in the Boardroom*, on the best practices used by leading

11  companies in managing their intellectual property.

12       5.    I graduated in 1978, *summa cum laude*, from Kansas State University with a

13  Bachelor of Science degree in Business Administration and Accounting.  In the same year, I

14  earned the Gold Key in the State of Kansas for the highest score in the state on the CPA exam.  In

15  2000, I was inducted into the Kansas State University Accounting Hall of Fame.  I am a licensed

16  CPA in California, Illinois, Kansas, Missouri, and Texas.  I am a member of the American

17  Institute of Certified Public Accountants, American Bar Association, and Licensing Executives

18  Society.  My curriculum vitae, which is attached as **Exhibit 1-PT**, and my prior case experience,

19  which is attached as **Exhibit 2-PT**, describe in more detail my professional credentials, including

20  other publications and prior testimony experience as required under Federal Rules of Civil

21  Procedure Rule 26(a)(2)(B).

22  **II.**   ~~**B.**~~**ASSIGNMENT**

23       **A.**    **Case Background and Procedural History**

24       6.  ~~**4.**~~In ~~the matter of Apple Inc. v.~~this lawsuit, Apple Inc. ("Apple") claimed that

25  Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and

26  Samsung Telecommunications America, LLC~~, I have been asked by counsel for Apple Inc. ("Apple")~~

27  ~~to determine the amount of damages as well as address the irreparable harm that result from the assumed~~

28  ("STA") (collectively "Samsung") deliberately copied the design and certain user interface

features of Apple's iPhone and iPad devices in violation of Apple's protected intellectual property, resulting in the infringement of Apple's ~~asserted U.S.~~ design and utility patents~~, U.S. design patents, U.S. trademark registrations/applications, and U.S. trade dress registrations/applications by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC (collectively, "Samsung") as identified in Apple's Amended Complaint.[1] Apple's intellectual property described above and identified in detail below is collectively referred to herein as the "Apple Intellectual Property In Suit." The 32 Samsung products which Apple asserts infringe the Apple Intellectual Property In Suit ("Samsung Accused Products") are identified on **Exhibit 4**~~ and the dilution of Apple's trade dress.

~~5.    I am prepared to explain my opinions in testimony at deposition and at trial.~~

~~C.    DATA AND OTHER INFORMATION CONSIDERED~~

~~6.    In arriving at the testimony outlined below, I have based my opinions on my expertise in accounting, auditing, financial and damage analysis, independent research of publicly available information, and my review of various documents and pleadings produced thus far by both the Plaintiff and the Defendants. I considered the documents identified in **Exhibit 3** to this report in forming the opinions expressed in this report.~~

7.    ~~In addition, I discussed this matter with the following Apple representatives:~~ The case was tried to a jury beginning on July 31, 2012. In the trial, Apple accused 28 Samsung products of violating three Apple utility patents and four Apple design patents, and diluting and/or infringing Apple's registered and unregistered trade dresses.

8.    The jury issued its verdict on August 24, 2012. The jury found that 26 of the 28 Samsung products infringed various combinations of Apple's three asserted utility patents and three design patents, and that the patents were valid. The jury also found that six Samsung products diluted Apple's unregistered and registered trade dresses and that those trade dresses were famous. The jury awarded Apple $1,049,393,540 in damages.[1]

---

[1] ~~Apple Inc. Amended Complaint dated June 16, 2011, pp.7-9, 16-17, and 21-24.~~

[1] Samsung had accused Apple of infringing five Samsung utility patents. The jury found in favor of Apple on Samsung's claims.

9.      The parties filed various post-trial motions, including a motion by Samsung seeking a new trial on damages.  The Court confirmed the jury's verdict that Apple's intellectual property was valid and infringed.  On March 1, 2013, the Court issued an Order re:  Damages ("March 1 Order").  The March 1 Order affirmed the damages methodology applied by Apple, with one exception – the manner in which the damages calculations accounted for the date on which Samsung had actual notice of its infringement of the utility and design patents.[2]  The March 1 Order specifically determined the correct notice dates for each of Apple's patents that the jury found Samsung had infringed, and included a chart showing "the correct notice dates, available remedies, and infringing products for each form of IP."[3]  The Court confirmed the damages awarded by the jury with respect to 12 products that were first sold after the notice dates determined by the Court.  For 14 other products that the Court concluded were on sale before April 15, 2011, or June 16, 2011 – dates on which the Court determined Apple had given notice to Samsung with respect to specific patents – the Court ordered "a new trial on damages" only.[4]  The Court also determined the manner in which prejudgment interest and supplemental damages should be calculated and concluded that Apple should receive prejudgment interest and supplemental damages for the products that are the subject of the confirmed award, but then deferred a decision on the specific amounts.

10.      Apple filed a motion asking the Court to reconsider the order granting a new trial on damages as to two infringing Samsung products:  the Galaxy S II AT&T and the Infuse 4G.  The Court granted Apple's motion as to the Galaxy S II AT&T, reinstating the jury's award of $40,494,356 for that product.[5]  In combination, the March 1 Order and the order as to the Galaxy S II AT&T removed $410,020,294 from the original verdict, and left 13 products subject to the new trial on damages.  The Court set November 12, 2013, for the new trial.

---

[2] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013.
[3] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, pp. 18-21.
[4] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 26.
[5] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 2.

11.     Apple originally retained Terry Musika as its testifying expert on damages for this lawsuit.  Mr. Musika's curriculum vitae and prior testimony experience were attached as **Exhibits 1** and **2** to his prior expert reports.  Mr. Musika was a principal at Invotex Group ("Invotex") and received substantial assistance from others at Invotex in preparing his analysis.  Mr. Musika prepared an initial report on March 22, 2012 (the "Original Expert Report") and a supplemental report on May 8, 2012 (the "Supplemental Expert Report"), further supplemented his analysis for additional data in July 2012, and then testified at trial after the Court denied a *Daubert* motion directed at Mr. Musika's analysis.  I have read Mr. Musika's expert reports, deposition, declarations, and trial testimony (as well as the trial testimony relating to Apple's claims against Samsung).  Unfortunately, Mr. Musika passed away after the trial was completed.  As a result, Apple needed to substitute a new damages expert and retained me to be its testifying expert on damages for the new trial.

12.     On May 8, 2013, Apple disclosed that I would testify as its expert with respect to the damages that Apple should receive for Samsung's infringement of 5 utility and design patents with respect to the 13 products that are the subject of the new trial on damages.  I was cleared under the protective order on May 21, 2013.  I provide this expert report to reflect my qualifications, my conclusions regarding damages, and the reasons for them.

13.     In preparing my conclusions and this expert report, I worked with Invotex to prepare calculations and provide quantitative analysis of damages based on the documents produced previously in the case, testimony of various witnesses, interviews with Apple employees and experts, and the damages methodology and models (as reflected, for example, in previously created Access databases and Excel spreadsheets) used by Mr. Musika.  Invotex acted under my direction, and I have discussed with Invotex personnel their work and procedures to ensure that they were consistent with my directions and that the work product was prepared in accordance with the high professional standard to which I hold my own staff.  I worked with Invotex on this project, among other reasons, to ensure continuity with the methods used in connection with the first trial based on the instructions from the Court, to obtain the complete benefit of the prior models and technical aids that already had been prepared, and to obtain the

1    benefit of Invotex's knowledge of the record in discovery and through the prior trial.  Additional

2    information about Invotex can be found in **Exhibit 1** to the Original Expert Report and at

3    Invotex's website.

4           14.    My project team and I have been engaged for this assignment at the hourly billing

5    rates of the individuals assigned plus expenses.  My hourly billing rate is $675.  The amount of

6    our fees is not contingent upon the opinions expressed herein or on the outcome of this matter and

7    I have no other personal or financial interest in the outcome of this case.

8           **B.    Products, Patents, Infringement Findings, and Notice Periods**

9           15.    The Court's March 1 Order, as modified by its order on Apple's motion for

10   reconsideration, directs a new trial on damages for Galaxy Prevail, Gem, Indulge, Infuse 4G,

11   Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Galaxy Tab, Nexus S 4G, Replenish,

12   and Transform (collectively the "Infringing Products").[6]  Each of these products infringes one or

13   more of the following 5 patents:  U.S. Patent Nos. 7,469,381 ("the '381 Patent"); 7,844,915 ("the

14   '915 Patent"); 7,864,163 ("the '163 Patent"); D604,305 ("the D'305 Patent"); and D618,677 ("the

15   D'677 Patent") (collectively the "New Trial Patents").[7]  A chart setting out which product

16   infringes which patent(s) is attached as **Exhibit 4-PT**.[8]

17          16.    The Court also specified the dates on which the Court found that Apple gave

18   Samsung notice of infringement for each of Apple's asserted patents:  August 4, 2010, for the

19   '381 Patent; April 15, 2011, for the '915 Patent and the D'677 Patent; and June 16, 2011 for the

20   '163 Patent and the D'305 Patent.[9]

21

22          [6] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 26; Dkt. 2316: Case Management
     Order, dated Apr. 29, 2013, p. 2.
23
            [7] Dkt. 1931: Amended Verdict Form, dated Aug. 24, 2012, pp. 2-7.
24
            [8] Consistent with Mr. Musika's practice of using an "-S" suffix at the end of certain
25   exhibits to signify that they were created or updated for use in his "supplemental" report, I have
     used a "-PT" suffix to signify exhibits in which either the formatting or substantive information
26   was created or updated for use in my "post-trial" expert report.  Exhibits that have no suffix or
     have an "-S" or "-S2" suffix, therefore, have not been modified from the prior versions prepared
27   by Mr. Musika.
            [9] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 18.
28

**C.     Limitations from Case Management Order**

17.     The Court conducted a Case Management Conference on April 29, 2013.  That same day, the Court issued a Case Management Order that memorialized rulings that the Court had made on the record, including the following:

> "The Court's prior rulings on the parties' *Daubert* motions, motions in limine, discovery disputes, and evidentiary objections will remain in effect as law of the case.  The parties may not relitigate these issues."[10]

> "The Court ORDERED that the new trial on damages will be extremely limited.  The sole purpose of the trial is to correct the erroneous notice dates.  The Court will not permit the parties to expand the scope of the damages trial by relying upon: (1) new sales data, including any sales after June 30, 201[2]; (2) new products; and (3) new methodologies or theories.  Consequently, Apple's new damages expert may not include different methodologies in his or her expert report, and may not draw upon new data."[11]

18.     As discussed below, I have followed these Court rulings in preparing this analysis.

**D.     Scope of Assignment and Issues to Be Addressed**

19.     I have been asked by counsel to evaluate Apple's damages for the 13 products and 5 patents identified above.  To do so, I have evaluated three types of damages discussed in Mr. Musika's prior reports and supplements:  Apple's lost profits, Samsung's infringer's profits, and reasonable royalty damages.

20.     I am aware that Apple is entitled to obtain only one type of remedy for each infringing unit sold.  I have carefully reviewed the damages model prepared by Mr. Musika in connection with the first trial in this matter and discussed it with Invotex.  Mr. Musika's methodology was careful to distinguish among remedies.  For example, Mr. Musika calculated either Apple's lost profits or a reasonable royalty, but not both, for any specific unit sale that infringed a valid Apple utility patent.  Likewise, Mr. Musika calculated either Apple's lost profits or Samsung's profits or a reasonable royalty for any specific unit sale that infringed a valid design

---

[10] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 2.
[11] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 3.

patent.  Thus, Mr. Musika ensured that no specific unit sale would be assigned to more than one theory of recovery.  **Exhibit 16-PT** (read together with **Exhibits 15-PT** and **20-PT**) describes the overall approach used to achieve this result.  I have adopted and followed Mr. Musika's methodology.  Thus, for any unit that infringed a valid patent and for which I calculated damages under one theory (e.g., Apple's lost profits), I did not also calculate an award of damages under a different theory (e.g., Samsung's profits or a reasonable royalty).

**III.    MATERIALS CONSIDERED**

21.    My opinions are based upon information available to me as of the date of this report.  I, and professionals working under my direction, have relied upon and examined documents produced by the parties, testimony, transcripts, and exhibits, along with publicly available information.  I and the professionals working under my direction have reviewed the expert reports and supplements prepared by Mr. Musika and the documents cited in the text and exhibits of those reports.  I have reviewed Mr. Musika's trial testimony and demonstrative aids.  In combination, the staff at Invotex and/or my staff have also considered all the documents identified in **Exhibits 3** and **3-S** to Mr. Musika's reports.  **Exhibit 3-PT** lists additional documents, including the trial transcripts and trial exhibits, not previously identified that were also considered in connection with the preparation of this report.

22.    In connection with forming my conclusions, I spoke with the following current or former Apple employees.

- Mark Buckley, ~~Financial Analyst V~~ [2] Finance Manager II;
- ~~Rory Sexton, Vice President of Supply Demand Management~~
- ~~Anuj Saigal, Director of Supply Demand Management~~
- Elisa De Martel, Senior Manager of Worldwide FP&A;
- ~~Tang Tan, Senior Director iPhone Product Design~~
- Henri Lamiraux, Vice President of Engineering for iOS;
- Anuj Saigal, Director of Supply Demand Management;

---

[2] ~~Deposition of Mark Buckley, February 23, 2012, p. 33.~~

- Rory Sexton, Vice President of Supply Demand Management;
- ~~Steve Hotelling~~Tang Tan, Senior Director ~~Touch Sensitive Hardware~~of iPhone Product Design; and
- Boris Teksler, former Director~~,~~ of Patent Licensing & Strategy~~.~~

~~8.~~ ~~I have considered and evaluated the reliability of the underlying data and the degree to which my assumptions are supported by the record.  The techniques I used to calculate damages are generally accepted within and reliable according to the standards of my profession, and are sufficiently explained and disclosed to permit a review of my work.~~

~~D.~~ ~~APPLE'S UTILITY PATENTS~~

~~9.~~ ~~It is my understanding that Samsung is accused of infringing the following U.S. utility patents:~~

~~10.~~ ~~U.S. Patent No. 6,493,002 ("the '002 Patent") covers, for example, a system that generates and displays a window region (e.g., a status bar) having multiple display areas that are associated with independent programming modules.  These modules may provide status information.³~~

23.	In addition, I held discussions with the following experts retained on behalf of Apple.

- Ravin Balakrishnan ('381 Patent);
- John Hauser (conjoint analysis; '381, '915, '163 Patents); and
- Karan Singh ('915 and '163 Patents).

24.	My opinions are based on my skills, knowledge, experience, education, and training, as well as information gathered by and/or provided to me as of the date of this report.  It is usual and customary for experts to consider and/or rely upon sources of information such as those identified above in forming damages opinions.

25.	Mr. Musika testified at trial after having the benefit of hearing and reading the testimony of witnesses during the trial.  With this in mind, I have reviewed the trial testimony and trial exhibits from the August 2012 trial as a part of preparing this report.

---

³ ~~Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 2.~~

26.     I understand that I may be asked to testify regarding my opinions contained herein as well as related matters, including those raised on cross examination; those necessary to address matters raised by Samsung's witnesses who testify concerning damages issues; or those otherwise raised at trial by Samsung's attorneys or witnesses or the Court in relation to matters set forth in this report.  I expect to elaborate and expand on the content of my report as necessary to make my testimony understandable to the Court and the jury.  To the extent helpful to explain, or to put in context, the subject matters discussed throughout my report, I also expect to provide further general explanations of the matters I discuss.  In connection with any testimony, I may rely on materials referenced in this report and in the attachments and demonstrative exhibits to be prepared and identified before my testimony.

## IV.     BACKGROUND

### A.     Summary of Apple's Patents that Are the Subject of the New Trial

27.     11. U.S. Patent No. 7,469,381 ("the 'The '381 Patent") covers, for example, a method, on a device with a touch screen display, covers a device with a "rubber banding" or "bounce back" function, an effect that users associate with Apple's user interface.  It relates to letting a user know when he or she has reached the edge of an electronic document on a screen.  For example, it covers a method for displaying an electronic document and translating the document in response to object movement detected on the display (e.g., a finger, such as a gesture) from a finger.  When the user drags a document is translated in a direction that causes an past the edge of the document to be reached with a finger, an area beyond the edge is displayed.  The '381 Patent discloses that this This provides a visual indicator to a the user that one or more edges of an electronic the user reached the edge of the document are being displayed.  When the user releases the finger such that the device no longer detects the movement of the object, the document is translated page snaps back so that the area beyond the edge is no longer displayed. [4]  This effect, sometimes referred to as a "bounce" effect, is commonly associated with Apple products.

---

[4] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 3.

1 | ~~**12.** U.S. Patent No. 7,663,607 ("the '607 Patent") covers, for example, a touch panel capable of detecting~~

2 | ~~multiple touches that occur at or near the same time at distinct locations on the panel. The touch~~

3 | ~~panel has a transparent capacitive sensing medium that includes a first layer having multiple~~

4 | ~~conductive lines and a second layer, spatially separated from the first layer, having multiple~~

5 | ~~conductive lines arranged at right angles from the conductive lines of the first layer. The touch panel~~

6 | ~~also includes capacitive monitory circuitry to detect changes in charge coupling between the~~

7 | ~~conductive lines of the first and second layers.~~ [5]

8 | 28.     ~~**13.**~~ U.S. Patent No. 7,844,915 ("the '~~The~~ '915 Patent~~")~~ ~~covers, for example, a method~~

9 | ~~for~~ covers a device with a "scroll vs. gesture" function on a touchscreen display.  It relates to

10 | scrolling on a touch-sensitive display ~~of a device~~ ~~and~~ ~~for~~ distinguishing between scrolling and

11 | other actions.  ~~The~~For example, it covers a method that includes creating an "event object" in

12 | response to ~~receiving a~~the user~~input on the display and determining whether the event object invokes a~~

13 | ~~scroll (e.g., a window scroll) or a gesture operation (e.g., scaling the view) by~~'s touch, and

14 | distinguishing between a single input point ~~(interpreted as~~from the user, which the device

15 | interprets as invoking a "scroll operation~~) or,~~" and two or more input points ~~(interpreted as a gesture~~

16 | ~~operation).~~ [6]  ~~These actions, viewed by users as involving actions such as scrolling, pinching and zooming,~~

17 | ~~are commonly associated with Apple products.~~ from the user, which the device interprets as

18 | invoking a "gesture operation."  A scroll operation scrolls (e.g., translates) the view associated

19 | with the event without scaling (zooming in or out), while a "gesture operation" scales the view

20 | but may do more than that (e.g., "rotate").  One example of a gesture operation is "pinch to

21 | zoom."  A two-finger movement that combines scaling and scrolling is a "gesture operation"

22 | because it can scale.  Users see these actions as scrolling, pinching, and zooming, and associate

23 | them with Apple's user interface.

24 | ~~**14.** U.S. Patent No. 7,853,891 ("the '891 Patent") covers, for example, a method to display a user~~

25 | ~~interface window for a digital processing system. The method includes displaying a window that~~

26 |

---

27 | [5] ~~Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 6.~~
     [6] ~~Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 4.~~

1  ~~closes after a timer expires and in some embodiments does not close in response to any inputs from a~~

2  ~~user input device of the system.  In some embodiments, the window is translucent.  The '891 Patent~~

3  ~~discloses that the window may be a volume window, for example.[7]~~

4  <u>29.</u>  **~~15.~~** ~~U.S. Patent No. 7,864,163 ("the '163 Patent") covers, for example, a method for~~

5  ~~displaying and manipulating a structured electronic document (e.g., an HTML web page) on a device with~~

6  ~~a touch screen display.  The method~~<u>The '163 Patent covers a device with a "tap-to-zoom" function.</u>

7  <u>It relates to allowing a user to double tap to enlarge and center on one portion of a document, then</u>

8  <u>gesture on a different portion of the document to center on that portion.  For example, it covers a</u>

9  <u>method that</u> includes enlarging and translating ~~the~~<u>a</u> document to substantially center <u>on</u> a first box

10  ~~of the document~~ based on detecting a ~~first touch~~ gesture at ~~the first~~<u>that</u> box's location ~~and~~<u>,</u> then

11  translating the document so that a second box is substantially centered based on detecting a

12  second ~~touch~~ gesture at ~~the second box's location.  The patent also claims various other touches and~~

13  ~~gestures for restoring a web page to its original size, matching a page width to the display width, rotating a~~

14  ~~web page in portrait and landscape modes, and translating and scaling pages using swipes and~~

15  ~~gestures.[8]~~<u>that second box's location.</u>

16  **~~16.~~**  ~~U.S. Patent No. 7,920,129 ("the '129 Patent") covers, for example, a capacitive touch sensor panel~~

17  ~~that includes a first set of conductive traces and a second set of conductive traces spatially separated~~

18  ~~from the first set of traces.  The minimum width of the second set of traces is substantially greater~~

19  ~~than the maximum width of the first set of traces at least at an intersection of the first and second set~~

20  ~~of traces.  This width difference provides shielding for the first set of traces.[9]~~

21  **~~17.~~**  ~~See **Exhibit 5** for a summary of Apple's utility patents asserted in this case.~~

22  **~~E.~~**    **~~APPLE'S DESIGN PATENTS~~**

23  **~~18.~~**  ~~It is my understanding that Samsung is accused of infringing the following U.S. design patents:~~

24  ~~•    U.S. Patent No. D627,790 ("the D'790 Patent")~~

25  ~~•    U.S. Patent No. D617,334 ("the D'334 Patent"~~

26  _____

27  ~~[7] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 5.~~
   ~~[8] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 7.~~

28  ~~[9] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 8.~~

1            ●                                                                    the D'305 Patent")

2            ●        U.S. Patent No. D618,677 ("the D'677 Patent")

3            ●        U.S. Patent No. D504,889 ("the D'889 Patent")

4            ●        U.S. Patent No. D593,087 ("the D'087 Patent")

5            ●        U.S. Patent No. D622,270 ("the D'270 Patent")

6    **19.**    See **Exhibit 6** for a summary of Apple's seven design patents asserted in this case.

7    **F.      APPLE'S TRADE DRESS REGISTRATIONS**

8    **20.**    It is my understanding that Samsung is accused of infringing the following U.S. trade dress

9            registrations:

10   **21.**    The trade dress shown in U.S. Registration No. 3,470,983 is described as follows:  "The color(s)

11           black, blue, brown, brown gray, gray green, green, orange, red, silver, tan, white and yellow is/are

12           claimed as a feature of the mark.  The mark consists of the configuration of a rectangular handheld

13           mobile digital electronic device with rounded silver edges, a black face, and an array of 16 square

14           icons with rounded edges.  The top 12 icons appear on a black background, and the bottom 4 appear

15           on a silver background. The first icon depicts the letters "SMS" in green inside a white speech bubble

16           on a green background; the second icon is white with a thin red stripe at the top; the third icon depicts

17           a sunflower with yellow petals, a brown center, and a green stem in front of a blue sky; the fourth

18           icon depicts a camera lens with a black barrel and blue glass on a silver background; the fifth icon

19           depicts a tan television console with brown knobs and a gray green screen; the sixth icon depicts a

20           white graph line on a blue background; the seventh icon depicts a map with yellow and orange roads,

21           a pin with a red head, and a red and  blue road sign with the numeral "280" in white; the eighth icon

22           depicts an orange sun on a blue background, with the temperature in white; the ninth icon depicts a

23           white clock with black and red hands and numerals on a black background; the tenth icon depicts

24           three brown gray circles and one orange circle on a black background with a white border, with the

25           mathematical symbols for addition, subtraction, multiplication, and the equal sign displayed in white

26           on the circles; the eleventh icon depicts a portion of a yellow notepad with blue and red ruling, with

27           brown binding at the top; the twelfth icon depicts three silver gears over a thatched black and silver

28           background; the thirteenth icon depicts a white telephone receiver against a green background; the

fourteenth icon depicts a white envelope over a blue sky with white clouds; the fifteenth icon depicts a white compass with a white and red needle over a blue map; the sixteenth icon depicts the distinctive configuration of applicant's media player device in white over an orange background."[10]

22. The trade dress shown in U.S. Registration No. 3,457,218 is described as follows: "Color is not claimed as a feature of the mark. The mark consists of the configuration of a rectangular handheld mobile digital electronic device with rounded corners."[11]

23. The trade dress shown in U.S. Registration No. 3,475,327 is described as follows: "The color(s) gray, silver and black is/are claimed as a feature of the mark. The mark consists of the configuration of a handheld mobile digital electronic device. The material shown in dotted lines, namely, the buttons and openings on the device show the position of the mark in relation to the device and are not considered a part of the mark. The color gray appears as a rectangle at the front, center of the device. The color black appears on the front of the device above and below the gray rectangle and on the curved corners of the device. The color silver appears as the outer border and sides of the device. The color white is shown solely to identify placement of the mark and is not claimed as a part of the mark."[12]

24. See **Exhibit 7** for a summary of the registered trade dresses asserted in this case.

**G.   APPLE'S UNREGISTERED TRADE DRESS**

25. The following elements of Apple's product designs comprise the "Original iPhone Trade Dress" at issue in this case:

• a rectangular product with four evenly rounded corners;

• a flat clear surface covering the front of the product;

• the appearance of a metallic bezel around the flat clear surface;

• a display screen under the clear surface;

• under the clear surface, substantial black borders above and below the display screen and narrower black borders on either side of the screen;

---

[10] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 16.
[11] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 17.
[12] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 18.

1    • when the device is on, a matrix of colorful square icons with evenly rounded corners within the

2    display screen; and

3    • when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off

4    from the other icons on the display, which does not change as other pages of the user interface are

5    viewed.[13]

6    26.   The following elements of Apple's product designs comprise the "iPhone 3G Trade Dress" at issue in

7    this case:

8    • a rectangular product with four evenly rounded corners;

9    • a flat clear surface covering the front of the product;

10    • the appearance of a metallic bezel around the flat clear surface;

11    • a display screen under the clear surface;

12    • under the clear surface, substantial black borders above and below the display screen and narrower

13    black borders on either side of the screen;

14    • when the device is on, a row of small dots on the display screen;

15    • when the device is on, a matrix of colorful square icons with evenly rounded corners within the

16    display screen; and

17    • when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off

18    from the other icons on the display, which does not change as other pages of the user interface are

19    viewed.[14]

20    27.   The following elements of Apple's product designs comprise the "iPhone 4 Trade Dress" at issue in

21    this case:

22    • a rectangular product with four evenly rounded corners;

23    • a flat clear surface covering the front of the product;

24    • a display screen under the clear surface;

25

26

27    [13] Apple Inc. Amended Complaint dated June 16, 2011, p. 17, ¶ 57.
      [14] Apple Inc. Amended Complaint dated June 16, 2011, pp. 18-19, ¶ 59.

28

1     •  under the clear surface, substantial neutral (black or white) borders above and below the display

2        screen and narrower black borders on either side of the screen;

3     •  a thin metallic band around the outside edge of the phone;

4     •  when the device is on, a row of small dots on the display screen;

5     •  when the device is on, a matrix of colorful square icons with evenly rounded corners within the

6        display screen; and

7     •  when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off

8        from the other icons on the display, which does not change as other pages of the user interface are

9        viewed.[15]

10   **28.**  The following elements of Apple's product designs comprise the "iPhone Trade Dress" at issue in

11     this case:

12     •  a rectangular product with four evenly rounded corners;

13     •  a flat clear surface covering the front of the product;

14     •  a display screen under the clear surface;

15     •  under the clear surface, substantial black borders above and below the display screen and narrower

16        black borders on either side of the screen;

17     •  when the device is on, a matrix of colorful square icons with evenly rounded corners within the

18        display screen; and

19     •  when the device is on, a bottom dock of colorful square icons with evenly rounded corners set off

20        from the other icons on the display, which does not change as other pages of the user interface are

21        viewed.[16]

22   **29.**  The following elements of Apple's product designs comprise the "iPad Trade Dress" at issue in this

23     case:

24     •  a rectangular product with four evenly rounded corners;

25     •  a flat clear surface covering the front of the product;

26

27   [15] Apple Inc. Amended Complaint dated June 16, 2011, p. 19, ¶ 61.

28   [16] Apple Inc. Amended Complaint dated June 16, 2011, pp. 19-20, ¶ 63.

1

- the appearance of a metallic rim around the flat clear surface;

2

- a display screen under the clear surface;

3

- under the clear surface, substantial neutral (black or white) borders on all sides of the display

4

    screen; and

5

- when the device is on, a matrix of colorful square icons with evenly rounded corners within the

6

    display screen.[17]

7

     30.     The ~~following elements of Apple's product designs comprise the "iPad 2 Trade Dress" at~~

8

~~issue in this case:~~ D'305 Patent claims the design included in the drawings in the patent, including

9

the one pictured below:

10

- a rectangular product with four evenly rounded corners;

11

- a flat clear surface covering the front of the product;

12

- the appearance of a metallic rim around the flat clear surface;

13

- a display screen under the clear surface;

14

- under the clear surface, substantial neutral (black or white) borders on all sides of the display

15

    screen; and

16

- when the device is on, a matrix of colorful square icons with evenly rounded corners within the

17

    display screen.[18]

18

19

20



21

22

23

24

25

26

27

[17] Apple Inc. Amended Complaint dated June 16, 2011, p. 20, ¶ 65.
[18] Apple Inc. Amended Complaint dated June 16, 2011, pp. 20-21, ¶ 67.

28

31.   ~~See **Exhibit 8** for a summary of the common law trade dresses asserted in this case.~~ The D'677 Patent claims the design included in the drawings in the patent, including the one pictured below:

~~**H.    APPLE'S TRADEMARK REGISTRATIONS**~~

~~**32.**   It is my understanding that Samsung is accused of infringing the icon trademark in the following U.S. trademark registrations:~~

~~**33.**   The mark in U.S. Registration No. 3,886,196 is described as follows: "The color(s) green, light green, dark green and white is/are claimed as a feature of the mark.  The mark consists of a rectangle with rounded corners depicting a stylized white telephone receiver against a striped green and dark green background.  A shade of light green covers the upper half of the rectangle design."[19]~~

~~**34.**   The mark in U.S. Registration No. 3,889,642 is described as follows: "The color(s) green, dark green and light green is/are claimed as a feature of the mark.  The mark consists of a rectangle with rounded corners depicting a stylized speech bubble on a diagonal striped background.  The color white appears in the speech bubble design; the colors green and dark green appear in the diagonal stripes in the background of the rectangle design; and the color light green appears in the upper half of the rectangle design."[20]~~

~~**35.**   The mark in U.S. Registration No. 3,886,200 is described as follows: "The color(s) yellow, blue, green, brown, black, gray and white is/are claimed as a feature of the mark.  The mark consists of a gray, white, and blue rectangle with rounded corners depicting a stylized flower in the colors green, yellow, brown, black, white and gray."[21]~~

~~**36.**   The mark in U.S. Registration No. 3,889,685 is described as follows:  "The color(s) gray, white, silver and black is/are claimed as a feature of the mark.  The mark consists of partial images of three gears shown in gray, white and silver, on a background of gray with black dots, all contained within a rectangular grey and white frame with rounded corners."[22]~~

---

~~[19] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 23.~~
~~[20] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 24.~~
~~[21] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 25.~~
~~[22] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 26~~

1   37.   The mark in U.S. Registration No. 3,886,169is described as follows:  "The color(s) yellow, brown

2         and gray is/are claimed as a feature of the mark.  The mark consists of a rectangle with rounded

3         corners depicting a stylized cross section of a page of notebook paper.  The color yellow appears in

4         the notebook paper; the color brown appears at the top above the notebook paper and in the vertical

5         lines on the left side of the notebook paper; and the color gray appears in the horizontal lines across

6         the notebook paper."[23]

7   38.   The mark in U.S. Registration No. 3,886,197is described as follows:  "The color(s) brown, white and

8         gray is/are claimed as a feature of the mark.  The mark consists of a brown rectangle with rounded

9         corners depicting a stylized wire bound book with the silhouette of a man in the middle.  The wire

10        binding appears in white and gray.  There are brown tabs on the right of the book with the letters

11        'ABCDEF' in gray and white."[24]

12  39.   The mark in U.S. Registration No. 2,935,038is described as follows:  "The mark consists of a design

13        of a compact disc with two musical notes."[25]

14  40.   See **Exhibit 9** for a summary of registered trademarks asserted in this case.

15  **I.    APPLE'S UNREGISTERED TRADEMARK**

16  41.   Apple also asserts an icon with a purple background color with a circle and a silhouette of two white

17        eighth notes within the white circle (the "Purple iTunes Store Trademark").  This mark is shown in

18        pending U.S. Application No. 85/041,463.[26]

19  42.   See **Exhibit 8** for a summary of the unregistered trademark asserted in this case

20  **J.    APPLE INC.**

21

22

23



24

25

26  ---
    [23] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 27.
    [24] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 28.
27  [25] Apple Inc. Amended Complaint dated June 16, 2011, Exhibit 30.
    [26] Apple Inc. Amended Complaint dated June 16, 2011, p.23, ¶ 77, Ex. 29.
28

### B.      Summary of the Parties and the Relevant Market

#### 1.      Apple

32.      ~~43.~~ Established in 1977, Apple Inc. is a California corporation ~~which was established in 1977 and is headquartered~~ with a principal place of business in Cupertino, California.[27] ~~The company is traded on the NASDAQ Global Select Market under the symbol AAPL.[28]  From its inception, innovation has been at the core of Apple's existence. Steve Jobs' uncompromising focus on innovation and the pursuit of a unique corporate design has resulted in the development of Apple's entire ecosystem of products.   Apple's Form 10-K states, "The Company's~~ [12] Apple's "overall business strategy is to control the design and development of the hardware and software for all of its products, including the personal computer, mobile communications and consumer electronics devices.  ~~The Company's~~[Its] business strategy leverages its unique ability to design and develop its own operating system, hardware, application software, and services to provide its customers new products and solutions with superior ease-of-use, seamless integration, and innovative industrial design."[~~29~~13]

33.      ~~44.~~ Apple "designs, manufactures and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications."[30] ~~Apple's direct involvement in the design and manufacture of both the hardware and the operating software distinguishes Apple from other market competitors that are only directly involved with the design and manufacture of hardware or the operating software but not both. Apple's enhanced control of the design and manufacturing process of its entire product offering allows Apple to incorporate a highly integrated and reinforcing relationship between the method of operation and appearance of the various products within the Apple ecosystem. The company's "products and services include~~[14] Included among

---

~~[27] Apple Inc. Form 10-K, fiscal year ended 9/24/11, pp. 1 and 20.~~
~~[28] Apple Inc. Form 10-K, fiscal year ended 9/24/11, p. 22.~~
  [12] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, cover and p. 1.
[~~29~~13] Apple Inc. ~~Amended~~ Form 10-K ~~-~~ for the fiscal year ended ~~9/26/09~~ Sept. 26, 2009, p. 4.
~~[30] Apple Inc. Form 10-K, fiscal year ended 9/24/11, p. 1.~~
  [14] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

1  the products and services sold by Apple are the "iPhone®, iPad®, Mac®, iPod®, Apple TV®, a

2  portfolio of consumer and professional . . . software applications, the iOS and Mac OS® X operating

3  systems, iCloud®, and a variety of accessory, service and support offerings. The Company"[15]

4  Apple also "sells and delivers digital content and applications through the iTunes Store®, App

5  Store, iBookstore Store[SM], iBookstore[SM], and Mac App Store. The Company sells its"[16] These

6  products and services are sold worldwide by Apple through its retail stores, online stores, and

7  direct sales force, as well as through and by third-party parties, including cellular network carriers,

8  wholesalers, retailers, and value-added resellers. In addition, the Company sells a variety of third-

9  party iPhone, iPad, Mac and iPod compatible products, including application software, printers, storage

10  devices, speakers, headphones, and various other accessories and peripherals, through its online and retail

11  stores."[31][17]

12  **45.**  Apple's worldwide sales in fiscal year 2011 were $108 billion, an increase of 66% over the prior

13  year.  iPhone and iPad sales made up $47.1 billion and $20.4 billion, respectively, of Apple's total

14  sales.[32]  Combined, the two products represented approximately 62.5% of Apple's 2011 fiscal year

15  sales.  As of December 31, 2011, Apple records show that it had sold a cumulative 238 million

16  iPhone and iPad devices; approximately 91 million units were sold in the United States.[33]

17  **a.   iPhone**

18  34.  **46.** Apple first introduced its announced the iPhone on January 9, 2007 2007, and

19  began selling it on June 29, 2007.[34] 2007.[18]  At In the January product launch announcement, Steve

---

[15] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

[16] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

[31][17] Apple Inc. Form 10-K. for the fiscal year ended 9/24/11. Sept. 24, 2011, p. 1.

[32] Apple Inc. Form 10-K, fiscal year ended 9/24/11, p. 30.

[33] GAAP Line of Business Report, iPad (APL794-F0000008233 to APL794-F0000008236); GAAP Line of Business Report, iPhone (APL794-F0000008237 to APL794-F0000008240); Apple Billings Report (US) – iPod Touch and iPad, Q4 FY07 through Q1 FY12 (APLNDC-Y0000051605); Apple Billings Report (US) – iPhone, Q3 FY07 through Q1 FY12 (APLNDC-Y0000051362).

[34] Apple Inc [18] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html; http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html. Press Release, 1/9/07 (http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html) ; Apple Inc. Press Release, 6/28/07 (http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html).

1  Jobs, CEO of Apple, described the iPhone as "a revolutionary and magical product that is literally

2  five years ahead of any other mobile phone."³⁵¹⁹  At the time When announcing the on-sale date for

3  the iPhone, Apple stated the following regarding its newest product: believed that the

4         "iPhone introduces an entirely new user interface based on a
         revolutionary multi-touch display and pioneering new software that

5         allows users to control iPhone with just a tap, flick or pinch of their
         fingers.  iPhone combines three products into one small and

6         lightweight handheld device — — a revolutionary mobile phone, a
         widescreen iPod®, and the Internet in your pocket with best-ever

7         applications on a mobile phone for email, web browsing and maps.
         iPhone ushers in an era of software power and sophistication never

8         before seen in a mobile device, which completely redefines what
         users can do on their mobile phones."³⁶²⁰

9         35.      47. As summarized below, between From June 2007 and until October 2011 2011,

10 Apple released four updated models of its five versions of the iPhone:

| Product | Release Date | Carrier |
|---|---|---|
| iPhone³⁷ | 06/29/07 | AT&T |
| iPhone 3G³⁸ | 07/11/08 | AT&T |
| iPhone 3GS³⁹ | 06/09/09 | AT&T |
| iPhone 4⁴⁰ | 06/24/10 | AT&T |
|  | 02/03/11 | Verizon |
| iPhone 4S⁴¹ | 10/14/11 | AT&T, Verizon & Sprint |

48.     By December 31, 2011, Apple had sold more than 183 million iPhone units worldwide, of which

---

³⁵ Apple Inc¹⁹ http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html. Press Release, 1/9/07 (http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html).

³⁶ Apple Inc²⁰ http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html. Press Release, 6/28/07 (http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html).

³⁷ Apple Inc. Press Release, 6/28/07 (http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html).

³⁸ Apple Inc. Press Release, 7/10/08 (http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html).

³⁹ Apple Inc. Press Release, 6/8/09 (http://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html).

⁴⁰ Apple Inc. Press Release, 6/7/10 (http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html);  Apple Inc. Press Release, 2/2/11 http://www.apple.com/pr/library/2011/02/02iPhone-4-on-Verizon-Wireless-Available-for-Pre-Order-Tomorrow.html.

⁴¹ Apple Inc. Press Release, 10/4/11 (http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html). http://newsroom.sprint.com/article_display.cfm?article_id=2073.

approximately 67 million units were sold in the United States.[42]   The products, U.S. release dates, and carriers are summarized below:[21]

| Product | Release Date | Carrier |
|---------|--------------|---------|
| iPhone | June 29, 2007 | AT&T |
| iPhone 3G | July 11, 2008 | AT&T |
| iPhone 3GS | June 19, 2009 | AT&T |
| iPhone 4 | June 24, 2010 | AT&T |
| | February 3, 2011 | Verizon |
| iPhone 4S | October 14, 2011 | AT&T, Verizon, Sprint |

### b.    iPad

36.    49. On Apple first announced the iPad on January 27, 2010, Apple introduced to the public the iPad and described it and began selling it on April 3, 2010.[22]  In the January product announcement, the iPad was described as "a revolutionary device for browsing the web, reading and sending email, enjoying photos, watching videos, listening to music, playing games, reading e-books and much more.  iPad's responsive high-resolution Multi-Touch™ display lets users physically interact with applications and content.  iPad is just 0.5 inches thick and weighs just 1.5 pounds — – thinner and lighter than any laptop or netbook."[43][23]  Steve Jobs further described noted that the "iPad as "our is [Apple's] most advanced technology in a magical and revolutionary device at an unbelievable price….  iPad creates and defines an entirely new category of devices

---

[42]  GAAP Line of Business Report, iPhone (APL794-F0000008237 to APL794-F0000008240); Apple Billings Report (US)  iPhone, Q3 FY07 through Q1 FY12 (APLNDC-Y0000051362)[21] http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html; http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html; http://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html; http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html; http://www.apple.com/pr/library/2011/02/02iPhone-4-on-Verizon-Wireless-Available-for-Pre-Order-Tomorrow.html; http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html.

[22] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html; http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html.

[43]  Apple Inc[23] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html. Press Release, 1/27/10 (http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html).

1  that will connect users with their apps and content in a much more intimate, intuitive and fun way

2  than ever before."[44][24]

3       37.  50. The iPad launched on From April 3, 2010 and, as 2010 until March 2012, Apple

4  released three versions of the iPad.  The U.S. products and release dates are summarized below.

5  Apple has since released two updated models.[25]

| Product | Release Date |
| --- | --- |
| iPad[45] | 4/3/10 |
| iPad 2[46] | 3/10/11 |
| iPad (3rd generation)[47] | 3/16/12 |

| Product | Release Date |
| --- | --- |
| iPad | April 3, 2010 |
| iPad 2 | March 11, 2011 |
| iPad (3rd generation) | March 16, 2012 |

### c.    Apple Sales of iPhone and iPad

16       38.  51. Apple sold 3 million iPads in the first 80 days on the market[48] and by December 31,

17  2011 had's worldwide sales in fiscal year 2011 totaled approximately $108.2 billion, a 66%

18  increase over the approximately $65.2 billion in sales during fiscal year 2010.[26]  In fiscal year

19  2012, sales increased yet again to $156.5 billion,[27] with $120.5 billion of those sales coming in

---

[44] Apple Inc.[24] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html. Press Release, 1/27/10 (http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html).

[25] http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html; http://www.apple.com/pr/library/2011/03/10iPad-2-Arrives-Tomorrow.html; http://www.apple.com/pr/library/2012/03/07Apple-Launches-New-iPad.html.

[45] Apple Inc. Press Release, 3/5/10 (http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html).

[46] Apple Inc. Press Release, 3/10/11 (http://www.apple.com/pr/library/2011/03/10iPad-2-Arrives-Tomorrow.html).

[47] Apple Inc. Press Release, 3/7/12 (http://www.apple.com/pr/library/2012/03/07Apple-Launches-New-iPad.html).

[48] Apple Inc. Press Release, 6/22/10 (http://www.apple.com/pr/library/2010/06/22Apple-Sells-Three-Million-iPads-in-80-Days.html).

[26] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 30.

[27] Apple Inc. Form 10-K for the fiscal year ended Sept. 29, 2012, p. 30.

1   the three quarters ending June 30, 2012.[28]  During fiscal year 2011, iPhone and iPad sales

2   (including related products and services) accounted for $47.1 billion and $20.4 billion,

3   respectively, of Apple's $108.2 billion in total sales.[29]  From product launch through December

4   31, 2011, Apple sold 183 million iPhones and 55 million iPads worldwide.  Of these, of which

5   approximately 67 million iPhones and 24 million unitsiPads were sold in the United States.[49][30]  In

6   the first three quarters of fiscal 2012, Apple sold more than 50 million iPhones and iPads in the

7   United States.[31]

8

9   **K.    SAMSUNG**

10                    **2.    Samsung**

11                        **a.    SEC**

12        39.    52. As previously mentioned, throughout this report the three named defendants are

13   collectively referred to as Samsung.  Samsung Electronics Co., Ltd. ("SEC") is "South Korea's largest

14   company and one of Asia's SEC is among the largest electronics companies."[50] in Asia and is the

15   largest company in South Korea.[32] SEC " "SEC designs, manufactures and provides to the U.S.

16   and world markets a wide range of products, including consumer electronics, computer

17   components, and mobile and entertainment products."[51][33]  Samsung Electronics America, Inc.

18   ("SEA") is a New York Corporation formed in 1978 and is a U.S. sales subsidiary of SEC.  SEA "offers a

19   full range of award-winning consumer electronics and IT products including, but not limited to,

20            [28] Apple Inc. Form 10-Q for the quarterly period ended June 30, 2012, p. 26.

21            [29] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 30.

22            [49][30] GAAP Line of Business Report, iPhone (APL794-F0000008237–APL794-
     F0000008240); Apple Billings Report U.S., iPhone, FY2007 – FY2012 (APLNDC-
23   Y0000051357–APLNDC-Y0000051362); GAAP Line of Business Report, iPad (APL794-
     F0000008233 to –APL794-F0000008236); Apple Billings Report (US) U.S., iPod Touch and iPad,
24   Q43 FY07 through 2007 – Q1 FY12 (2012 (APLNDC-Y0000051599–APLNDC-Y0000051605).

            [31] JX 1500: STA and SEA U.S. Sales of Accused Smartphones and Tablets; **Exhibits 32-**
25   **S2 and 33-S2.**

26            [50][32] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
     Amended Complaint, and Demand for Jury Trial, 6/30/11;, dated June 30, 2011, p. 2.

27            [51][33] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
     Amended Complaint, and Demand for Jury Trial, 6/30/11;, dated June 30, 2011, p. 2.

28

1  televisions, Blu-ray disc players, digital cameras and camcorders, certain memory storage devices,

2  portable audio devices, printers, and monitors."[52]SEC reported revenues of $134.1 billion in 2010 and

3  $143.1 billion in 2011.[34]

### b.   SEA

5  40.   SEA, a subsidiary of SEC, is a New York corporation and was formed in 1978.[35]

6  SEA distributes Samsung's tablet computer products.[53]  Samsung Telecommunications America, LLC

7  ("STA") was formed in 1996, is an affiliate of SEA, and a U.S. salesoffers consumer electronics and IT

8  products, including "televisions, Blu-ray disc players, digital cameras and camcorders, certain

9  memory storage devices, portable audio devices, printers and monitors."[36]  SEA sells Samsung

10  tablets that do not connect to a cellular carrier's network.[37] ███████████████████████

11  ████████████████ █████████

### c.   STA

13  41.   STA, a subsidiary of SEC, and affiliate of SEA, was formed in 1996.[39]  STA

14  "researches, develops, markets, sells and offers for sale a variety of personal and business

15  communications products throughout North America, including handheld wireless phones,

16  wireless communications infrastructure systems, fiber optics and enterprise

17  communicationcommunications systems."[54]40]

18  53.  I understand that the three named defendants all fall under the corporate parent known as the

---

[34] 2011 Samsung Electronics Annual Report, p. 34.

[52]35 Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Amended Complaint, and Demand for Jury Trial, 6/30/11,, dated June 30, 2011, p. 2.
[53] Deposition of Brian Rosenberg, January 27, 2012, pp. 17-18.

[36] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Amended Complaint, dated June 30, 2011, p. 2.

[37] Deposition of Timothy Sheppard, dated Jan. 24, 2012, pp. 27-28; Deposition of Tim Sheppard, dated Dec. 21, 2011, p. 77.

[38] Samsung Electronics America, Inc. Financial Statements Dec. 31, 2011 and 2010, p. 3 (SAMNDCA00322398–SAMNDCA00322445 at SAMNDCA00322402).

[39] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Amended Complaint, dated June 30, 2011, p. 2.

[54]40 Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Amended Complaint, and Demand for Jury Trial, 6/30/11,, dated June 30, 2011, p. 2.

~~Samsung Group.  The Samsung Group is a family owned conglomerate, known as a chaebol in South Korea.[55]  The Samsung Group reported net sales of $220.1 billion in 2010.[56]  SEC reported revenues of $119.7 billion and $135.8 billion for the calendar years ended 2009 and 2010, respectively.[57]~~ ███

███████████████████████████████████████████████████████████

████████████████████████████[8]  "STA is authorized to sell devices in the US market on behalf of SEC."[41]  These devices include tablets that can connect to a carrier's network, as well as mobile phones.[42]  Timothy Sheppard, STA's controller, describes it as primarily a sales organization in that SEC ██████████████████████████

█████████████████████████████     ██████████████████████████████

████████████  ███  ███████████████████████

~~**54.**    Samsung competes with Apple in both the smartphone and tablet markets.  The 32 Samsung products accused of infringing the Apple Intellectual Property In Suit are summarized on~~ ~~**Exhibit 10.**~~

~~**L.    INDUSTRY AND MARKET**~~

### d.    Samsung's Infringing Products

42.    As discussed above, Samsung has been found to infringe the New Trial Patents.  The 13 Samsung products for which damages have been calculated in this report are identified in **Exhibits 4-PT and 10-PT.**

---

~~[55] Yahoo Finance, Samsung Group Company Profile (http://biz.yahoo.com/ic/41/41463.html).~~
~~[56] Samsung Profile 2011, p. 58.~~
~~[57] Samsung Electronics 2010 Annual Report, p. 32.~~

[41] Deposition of Tim Sheppard, dated Dec. 21, 2011, p. 74.

[42] Deposition of Tim Sheppard, dated Dec. 21, 2011, p. 77; Deposition of Timothy Sheppard, dated Jan. 24, 2012, p. 27.

~~[58] Samsung Electronics America, Inc. Financial Statements, December 31, 2011~~[43] Deposition of Timothy Sheppard, dated Jan. 24, 2012, pp. 24 and ~~2010, p. 3 (SAMNDCA00322398-445 at SAMNDCA00322402); and Samsung Electronics America, Inc. Financial Statements, December 31, 2010, p. 3 (SAMNDCA00322239-83 at SAMNDCA00322243).~~ 28.

~~[59]~~44 Samsung Telecommunications America, L.L.C. Financial Statements, ~~December~~Dec. 31, 2010 and 2009 and 322~~January~~Jan. 1, 2009, p. 5 (SAMNDCA00322209 ~~38~~–SAMNDCA00322238 at SAMNDCA00322214).

[45] Samsung Telecommunications America, L.L.C. Financial Statements, Dec. 31, 2011 and 2010, p. 5 (SAMNDCA00396980–SAMNDCA00397009 at SAMNDCA00396985).

### 3.   The Wireless Device Industry

43.   55.  This lawsuit involves two specific wireless device categories that are referred to by Apple and Samsung as smartphones and tablets. Smartphones and tablets each constitute a specific submarket within the broader wireless device industry. The U.S. Department of Justice defines the wireless device industry as follows. "Today's wireless device industry, which includes smartphones and tablets, relies The wireless device industry is described by the United States Department of Justice as including the smartphone and tablet markets and "rely[ing] on complex operating systems that allow seamless interaction with wireless communications technologies while providing audio, video and computer functionalities." These categories include products that have completely reshaped the form and content of our daily communications and the way we create, store and distribute digital content.  One significant characteristic of the wireless device industry is the formation of a common ecosystem of products.  Both categories are characterized by very high current growth in sales.[46]  Apple and Samsung each offer products in the smartphone and tablet markets.  January 2011 Apple presentations note that the iPhone competes in the smartphone market, while Apple's iPad competes in the tablet market.[47]  In a series of Samsung documents summarized in **Exhibit 53-PT**, including presentations in 2011 and 2012 presentations, Samsung notes that it is competing in both the smartphone and tablet markets and is competing directly with Apple in those markets.[48]

---

[60] "Smartphone Market Study US," January 2011, Apple Market Research & Analysis (APLNDC-Y0000028850 to APLNDC-Y0000028861 at APLNDC-Y0000028854); "Media tablet forecast comparison," January 2011, John Brown, Market research and analysis (APLNDC0001525699 to APLNDC0001525699 at APLNDC0001525700); "STA Report to GS Choi," January 2011 (SAMNDCA00258612 to SAMNDCA00258673 at SAMNDCA00258654 and SAMNDCA00258648).

[45] The United States Department of Justice Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google Inc.'s Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple In., Microsoft Corp. and Research in Motion Ltd," dated 2/13/12.

[46] http://www.justice.gov/opa/pr/2012/February/12-at-210.html.

[47] Smartphone Market Study US, dated Jan. 2011, Apple Market Research & Analysis (APLNDCY0000028850–APLNDCY0000028861 at APLNDCY0000028854); Media tablet forecast comparison, dated Jan. 2011, John Brown, Market research and analysis (APLNDC0001525699–APLNDC0001525699 at APLNDC000152700, APLNDC0001525703, and APLNDC0001525710).

[48] **Exhibit 53-PT**; 2012 Business Strategy, dated Oct. 2011, Mobile Communications Division (SAMNDCA00401905–SAMNDCA00401989 at SAMNDCA00401910); PX62: iPhone 5 Counter Strategy, dated Mar. 25, 2011 (S-ITC-003351732–S-ITC-003351759); PX60: STA Competitive Situation Paradigm Shift, dated Feb. 16, 2012 (SAMNDCA11547401–

(Footnote continues on next page.)

44.    The New Trial Patents are incorporated into both smartphones and tablets sold by Samsung.  **Exhibit 4-PT** summarizes the infringing Samsung products at issue and identifies which of the New Trial Patents the jury found each product infringed.  Additional information concerning the smartphone and tablet markets is discussed below.

**a.**    **Smartphones**

45.    ~~56. I have reviewed and analyzed market share data from~~Smartphones have been defined by International Data Corporation ("IDC")~~, a "global provider of market intelligence, advisory services, and events for the information technology, telecommunications and consumer technology markets."[62]  IDC defines smartphones (also referred to by IDC as converged mobile devices)[49]~~ as a "subset of mobile phones~~"~~,[which] "feature a high-level operating system that enables the device to run third-party applications in addition to voice telephony.  Examples of high-level operating systems include Android, ~~BlackBerry~~Blackberry, Linux, Mac OS X, Palm, Symbian, and Windows Mobile."[63]

46.    ███████████████████████████████████████████
███████████████████[50]

~~57.   In the Samsung Electronics 2010 Annual Report, the company stated, "By launching GALAXY S II, our flagship strategy smartphone, we will emphasize our category leadership and provide readily available lineup options for global customers."[64]  As described in more detail below, Samsung has recently focused its efforts in this product category in recognition of the tremendous opportunities that exist in the developing smartphone market.~~  During this period, smartphones' share of the expanding mobile phone market was growing.  ███████████████████████████

---

(Footnote continued from previous page.)

SAMNDCA11547470 at SAMNDCA11547408); STA Report to GS Choi, dated Jan. 2011 (SAMNDCA00258612–SAMNDCA00258673 at SAMNDCA00258654 and SAMNDCA00258648).

[62] ~~IDC's website: About IDC (http://www.idc.com/about/about.jsp?t=1317217596273, accessed 9/28/2011).~~

[49] IDC describes itself as "the premier global provider of market intelligence, advisory services, and events for the information technology, telecommunications and consumer technology markets."  See http://www.idc.com/about/about.jsp.

[63]~~[50]~~ ~~Hamblen, Matt. "Cell phone, smartphone—what's the difference?" ComputerWorld, 3/14/09.~~  **Exhibit 12.1**

[64] ~~Samsung Electronics 2010 Annual Report, p. 17.~~

[black redacted bars]

[black redacted]<sup>53</sup> An Oppenheimer Equity Research Industry Update projected that smartphones would take over the mobile phone market even quicker and represent 82% of the North American mobile phone market by 2014.<sup>54</sup> **Exhibit 53-PT** also reflects numerous examples of Samsung's recognition of this trend.

47. **58.** ~~In 2007~~ Apple ~~revolutionized the~~ released its first smartphone ~~market with the introduction of,~~ the iPhone. ~~An,~~ on June 29, 2007.<sup>55</sup>  A June 2011 FBN Securities analyst ~~stated,~~ "~~With its 2007~~ report noted that the launch of the iPhone, ~~[ provided~~ Apple~~] obtained~~ "a first-mover advantage with 'game-changing' smartphones (app store, touchscreen, eventually 3G), and it has used this position along with continued innovations to further distance itself from the competition."~~65~~<sup>56</sup>  Samsung launched its first infringing smartphones in 2010.<sup>57</sup>

48. **59.** ~~Samsung has seen an increase in market share in the~~ Apple's share of the U.S. smartphone market ~~since~~ has generally increased from 19.3% in the second quarter of 2010 ~~following the first sales of the Samsung Accused Products.  Multiple third party analysts specifically noted the design to which the Samsung products introduced in this period copied Apple's phones.~~<sup>66</sup>  ~~Samsung's market share jumped~~ to 45.3% in the fourth quarter of 2011, then decreased to 38.1% in the first

---

<sup>51</sup> **Exhibit 12.1**

<sup>52</sup> **Exhibit 12.1**

<sup>53</sup> **Exhibit 12.1**

<sup>54</sup> Oppenheimer Equity Research Update, 2Q11 Wireless and Tablet Snapshot, dated Aug. 2, 2011, pp. 15 and 17.

<sup>55</sup> http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html.

<sup>65</sup><sup>56</sup> FBN Securities~~,~~ Initiation of Coverage on Large-Cap IT Hardware Companies – ~~APPL~~ AAPL, IBM, DELL, and HPQ, ~~6/21/11,~~ dated June 21, 2011, p. 3.

<sup>57</sup> **Exhibit 37.1-PT.**  See also Dkt. 1931: Amended Verdict Form, dated Aug. 24, 2012, p. 2; Samsung's Objections and Responses to Apple's Sixth Set of Interrogatories (No. 14), dated Jan. 6, 2012, pp. 6-8; Samsung's Amended Objections and Responses to Apple's Sixth Set of Interrogatories (No. 14), dated Mar. 7, 2012, pp. 6-8.

<sup>66</sup> ~~Apple Inc. Amended Complaint dated June 16, 2011, Exhibits 32 to 35.~~

quarter of 2012.[58]  Samsung's market share during this period also increased—from 5% in the second quarter of 2010 to ~~14% in the third quarter of 2010. This increase occurred after the release of the Galaxy S in the summer of 2010.[67]~~19.2% in the fourth quarter of 2011, then increased further to 21.7% in the first quarter of 2012.[59]  During this period, Samsung saw its largest increase in market share occur between the second (5%) and third (14.2%) quarters of 2010.[60]  It is during this period of time, summer 2010, that Samsung's infringing Galaxy S line of phones was launched.[61] ~~One analyst stated that in the worldwide mobile phone market,~~ Prior to this time, Samsung's market share in the smartphone market had been declining significantly since the launch of the iPhone.[62]  Samsung's overall increase in market share from Q2 2010 to Q4 2011 coincided with its launch and sales of infringing smartphones.  More specifically, an Oppenheimer Equity Research Industry Update from June 2011 noted that Samsung's sales "growth is coming entirely from smartphones with the Galaxy line (Samsung's Android OS phones) as the main driver."~~[68]~~[63]  Further, at least one product reviewer noted that the Vibrant, a Samsung phone launched during this time, closely resembled the iPhone.[64]  As of Q4 2011, Apple and Samsung were the largest participants in the smartphone market, holding a combined 64.5% of the market.[65]

~~60.   In the fourth quarter of 2011, IDC data showed the top market players in the U.S. smartphone market were Apple, Samsung, HTC, LG, Research In Motion, and Motorola.   Together these companies make up over 92% of the market (Exhibits 11 and 11.1).  In the same period, Apple and Samsung were the top two participants having 45.3% and 19.2% market share respectively.~~

---

[58] **Exhibit 11; Exhibit 29-PT.**
[59] **Exhibit 11; Exhibit 29-PT.**
[60] **Exhibit 11.**
~~[67]~~[61] **Exhibit 11.2-PT.**  See also http://www.cnet.com/8301-19736_1-20008968-251.html.
[62] **Exhibit 11.2.**
~~[68]~~[63] Oppenheimer Equity Research Industry Update, Mixed 2Q11 Wireless Checks, ~~6/7/11,~~dated June 7, 2011, p. 5.
[64] Apple Inc. Amended Complaint, dated June 16, 2011, at Exhibit 32.
[65] **Exhibit 11.1**

**61.** At the present time, competition for market share in the smartphone market is especially intense due to the current and projected growth of the market. As depicted in the **Exhibit 12 and 12.1**, the overall smartphone market in the United States is expanding rapidly. Based on IDC data, from 2004 to 2011 smartphones have gone from a 3% share of the mobile phone market to a 55.1% share with almost 105 million smartphones being sold in 2011 alone.  This growth has come at the expense of feature phones, which lack sophisticated operating systems, and also occurred while the overall mobile phone market has grown. In 2004 there were 143 million mobile phone devices in the U.S. market, a number which grew to a high of approximately 190 million in 2011.  The substantial growth of the smartphone market is projected to continue. IDC projects that smartphones will have an 83% share of the U.S. mobile device market by 2015 with 154 million smartphone devices sold in the market. Oppenheimer Equity Research projects that smartphones will have a similar market share of 82% in North America in 2014.[69]  As a result, the period between 2010 and 2012 reflects a vitally important period for Apple and Samsung.

**62.** The first full year of Apple iPhone sales took place in 2008. As shown on **Exhibit 12.1,** from the end of 2007 through 2011, approximately 44% of mobile phone users switched from feature phones to smartphones.  Despite this dramatic shift in the marketplace, the mobile phone market remains in a critical period of transition as manufacturers jockey for the sales of the 27% of mobile phone users who are projected to switch to smartphones over the next few years.  Put another way, manufacturers are pursuing the 135 million additional smartphones expected to be sold in the market between 2012 and 2015 as compared to a total existing smartphone market of 105 million units in 2011.[70]  Shifts in market share during this period, when combined with the loyalty consumers show to Apple and its operating system, will have outsized impacts on future dynamics in the market, making loss of market share now very detrimental to a company's future success.

---

[69]  Oppenheimer Equity Research Industry Update, "2Q11 Wireless and Tablet Snapshot", 8/2/11, pp. 15 and 17.

[70]  See **Exhibit 12.1.** 135 million additional smartphones calculated by subtracting the 105 million total smartphone units for 2011 from each subsequent annual forecast for the market. The difference for each year for 2012 to 2015 sums to approximately 135 million units.

**b.**      **Tablets**

49.   63.  Apple revolutionized the tablet market in 2010 with the release of the original iPad. "The big story in this year's ranking [the BrandZ Top 100 Most Valuable Global Brands survey] is the power of the tablet."[71]  In May 2010, IDC definedAs of May 2010, tablets "as tablet were defined by IDC as "form factor devices with 7-12 in. color displays. They [Tablets] are currently based on ARM processors and run lightweight operating systems such as Apple's iPhone OS and Google's Android OS."[72]  This definition was further updated in December 2011 to "[66]  By Q3 2011, IDC "updated its taxonomy to move LCD-based devices such as Barnes & Noble's Nook Color [and Amazon's Kindle Fire] into the media tablet category" from the e-reader category.  This change was implemented in the third quarter of 2011.[73]  Further, while the Barnes & Noble Nook Color and the Kindle Fire have changed the dynamics of the market, these products by and large...."[67]  Although IDC believes these products impact the tablet market, Mr. Musika concluded that the Nook Color and Kindle Fire compete in a different segment of the tablet market than Apple and Samsung and Apple.  Accordingly, I have removed their corresponding units from my analysis of IDC's media tablet data. based on their limited functionality and the use of a less versatile version of Android software.  Therefore, when analyzing IDC's tablet market data, Mr. Musika did not include these products.  I note that the inclusion or the exclusion of the Kindle Fire in the tablet market share analysis would not affect the calculation of lost profits presented in this report.  I understand the Kindle Fire was first introduced in late 2011.  Since I have only calculated lost profits for the Galaxy Tab 7.0 through June 2011, the introduction of the Kindle Fire does not affect my analysis.  While the Nook Color was introduced in late 2010, I understand that it did not compete

---

[71] Deposition of Michael Wagner, September 14, 2001, Exhibit 169, Lucas, Louise, and Jopson, Barney, "Global Brands: Big names fly high despite the gloom," Financial Times, 5/19/11 (WAGNER0000334–WAGNER0000341).

[72] Business Wire, "IDC Forecasts 7.6 Million Media Tablets to be Shipped Worldwide in 2010," dated May 20, 2010.

[66] http://www.businesswire.com/news/home/20100520005121/en/IDC-Forecasts-7.6-million-media-tablets-shipped.

[73] IDC  Press Release: Media Tablet Shipments Miss Third Quarter Targets, But New Entrants and Holiday Demand Will Spark Fourth Quarter Growth, According to IDC, 12/15/11 (http://www.idc.com/getdoc.jsp?containerId=prUS23228211).

[67] http://www.idc.com/getdoc.jsp?containerId=prUS23228211.

in the same market segment with the iPad and Galaxy Tab 7.0, and I agree with Mr. Musika's exclusion of the Nook Color from the tablet market share analysis.

50. 64. Since Apple's iPad's entrance it has been number one in tablet market share. Beginning in the second quarter of 2010, Apple had a commanding market share in the tablet market of 96.8% of a market size of approximately 2.3 million units.  By the fourth quarter of 2011, the market had grown substantially to ██████████████████████████ ███████████████████, ███████████████ a 265% increase since the second quarter of 2010. As new market participants per quarter.[68]  During this period, numerous competitors entered the tablet market, Apple's market share according to IDC dropped and both Apple and Samsung saw their share of the market decrease.  Though Apple has consistently held the largest share of the tablet market, its share has decreased from 96.8% in the second quarter of 2010 to a low of 60% in the third quarter of 2011 before rebounding to 73.7% in the fourth quarter of 2011 as illustrated on Exhibits 13 and 13.1.  Meanwhile, that year.[69]  Samsung's market share dropped from a high of was 11.6% in the fourth quarter of 2010 and fell to a low of 2.0 2% in by the fourth quarter of 2011. 2011.[70]

### c.    The Ecosystem

51.    A February 2012 *New York Times* article quoted Michael Gartenberg, an analyst with Gartner, as saying "[i]t's not about brands or devices or platforms anymore.  It's about the ecosystem.  The idea is to get consumers tied into that ecosystem as tightly as possible so they and their content are locked into one system."[71]  The article further described the development of the ecosystem concept.

65.    The market participants within the wireless device industry have placed an emphasis in recent years on establishing an ecosystem.  The development of an ecosystem has been described as signaling "the general adoption of a trend pioneered by Apple and Blackberry-maker Research

---

[68] Exhibit 13.1
[69] Exhibit 13.1
[70] Exhibit 13.1
[71] http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html?_r=0.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

~~in Motion – the packaging of hardware, software and, to a lesser extent, marketing."[74]  A New York Times article further described the ecosystem concept as follows, "~~Before the advent of coordinated systems, executives at consumer technology companies babbled endlessly about connected homes and convergence.  They tried to make that happen, but no one had the pieces of hardware and content that would fit together seamlessly.  The pioneer – and perhaps the inspiration – was Steven P. Jobs, the late Apple chief executive who made creating devices look easy with the iPad and iPhone.  Dream them up, then make the software complement the hardware, outsource the production, sell at a premium and watch your company become the most valuable on earth."[75][72]

~~66.    Developing products that reinforce an entire ecosystem is not strictly an Apple phenomenon.  Samsung agrees with the value of this strategic concept and has also copied this aspect of Apple's operation.  A 2011 Samsung document stated "Capturing 1st time smartphone buyers is critical to success in the US market in the next few years."[76]  Following Apple's lead Samsung lists three reasons why "building Eco-Systems Benefits Samsung."~~

52.    The ecosystem concept has been broadly described as "the general adoption of a trend pioneered by Apple and . . . Research in Motion – the packaging of hardware, software and, to a lesser extent, marketing."[73]

53.    While the press has discussed Apple's role in the development of a technological ecosystem, Samsung too recognizes the importance of the concept.  A May 2010 STA Product and Strategy presentation concerning the 2011 Smartphone Portfolio Strategy identified the following benefits to Samsung of building an ecosystem:

- "1. Allows Samsung to set the agenda for market innovation against the competition."

- "2. Consumers identify widely deployed features as "must have", not the other way around."

---

[74] ~~http://rttnews.com/Story.aspx?type=es&Id=1714714&Category=ScienceTechnology&SimRec=1&Node=&pageNum=1~~

[75][72] ~~The New York Times, "Erasing the Boundaries," by David Streitfeld, dated February 12, 2012 (http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html)~~ http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html?_r=0.

[76] ~~SAMNDA00261215-291 at SAMNDA00261238.~~

[73] http://www.rttnews.com/story.aspx?ID=1714714&Category=ScienceTechnology&SimRec=1&Node=&pageNum=1.

"3. Defining an eco-system creates positive sales momentum in moving along the adoption curve."[77] [74]

54.    67. Furthermore, Samsung's Don Joo Lee The practical implication of the ecosystem concept is that once a consumer chooses a particular brand, the consumer is likely to continue purchasing that brand's products.  Samsung recognized this.  An August 2011 presentation discussing the STA 2012 strategy noted that "capturing 1st time smartphone buyers is critical to success in the US market in the next few years."[75]  The same presentation noted that Apple was successful with this strategy: "[o]nce a consumer buys a[n] Apple product they are likely to use [Apple's] services, and subsequently become locked into Apple's offering."[76]  Similarly, Don-Joo Lee, the head of sales and marketing at Samsung Electronics, agreed in his deposition that one of Samsung's strategies "is a Samsung strategy is "to win customers who will be loyal to Samsung and will not only buy a first product but will buy future Samsung products."[78][77]

68.   The wireless device industry is extremely competitive due in part to the relationship of each individual product sale to the larger ecosystem market share, the fact that the wireless device industry is currently experiencing explosive growth, and the acknowledged fact by both Apple and Samsung that consumers are more loyal to Apple once an initial Apple product is purchased.

69.   The degree of competition between Apple and Samsung is particularly acute due to Samsung's acknowledgment of Apple's competitive success and Samsung's consequential preoccupation with beating Apple. A Samsung designated representative testifying under oath stated "So   The difference between Apple's and Samsung's ecosystems was discussed by Brian Rosenberg, STA's Senior Vice President of Sales for Mobile, who testified that "the way I [he] would characterize it  — and I'm not sure it's depicted the same way here — . . . is that once Apple gets

---

[77] SAMNDCA00530591-672 at SAMNDCA00530609.

[74] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010 (SAMNDCA00530591-SAMNDCA00530672 at SAMNDCA00530609).

[75] STA 2012 Winning Strategy, dated Aug. 2011 (SAMNDCA00261215–SAMNDCA00261291 at SAMNDCA00261238).

[76] STA 2012 Winning Strategy, dated Aug. 2011 (SAMNDCA00261215–SAMNDCA00261291 at SAMNDCA00261277).

[78][77] Deposition of Don-Joo Lee, February dated Feb. 17, 2012, p. 69.

1　someone into the ecosystem, the bucket doesn't have any holes.  They – they tend to keep

2　them in the bucket.  With Samsung, the concern is there's a hole in the bucket, and so you

3　add people in, but you're still losing people out of the Samsung world."[79][78]

4　　　　55.　　**70.** Samsung's use of Apple was indeed identified as a target of Samsung in a

5　September 2008 as a standard of comparison is likely due to the competitive nature of the

6　companies.  In fact, a Mercator Partners presentation to Samsung entitled: "Support to in September

7　2008 was focused on "STA's Counter-Apple Strategy."[79]  The presentation identified one challenge

8　as noted that "Apple is a serious threat to Samsung's leadership in the U.S. The US" and that "[t]he

9　iPhone, by all accounts, has been the most disruptive and successful new entrant in the history of

10　the mobile device market."[80]

11　　　　56.　　**71.** Accordingly As discussed further below, Apple and Samsung are directly and

12　aggressively competing for the same sales of smartphones and tablets. However, more significantly,

13　Apple and Samsung are competing for sales of as a means of securing consumer loyalty and the ongoing

14　participation of these consumers in their much larger ecosystem of Each company recognizes that a

15　sale of one of these products has the ability to pull that consumer into the company's ecosystem,

16　resulting in sales of additional products and services. Further, given the number of consumers who

17　are adopting smartphones and abandoning feature phones, the present competition and platform loyalty

18　means that the results of competition in the next few years will have outsized impacts on the future

19　marketplace.

20　**72.**　The Apple Intellectual Property In Suit is utilized in both smartphones and tablets. **Exhibit 4** sets

21　forth each accused Samsung product and the specific item of Apple Intellectual Property In Suit that

22　each accused product is accused of infringing, and, in the case of the Apple trade dress, each specific

23

24

---

25　　　　[79][78] Deposition of Brian Rosenberg, January dated Jan. 27, 2012, pp. 101-102.

26　　　　[79] Mercator Partners Presentation, Support to STA's Counter-Apple Strategy, dated Sept. 18, 2008 (SAMNDCA10036081–SAMNDCA10036204).

27　　　　[80] Mercator Partners presentation, September 18, 2008, " Presentation, Support to STA's Counter-Apple Strategy", dated Sept. 18, 2008 (SAMNDCA10036081 to – SAMNDCA10036204 at SAMNDCA10036087 and SAMNDCA10036095. ).

28

1    ~~item of Apple Intellectual Property In Suit that each accused product is accused of diluting. Apple's~~

2    ~~trade dress and trademarks.~~

3    **V.**    ~~**M. ASSUMPTIONS**~~**ASSUMPTIONS**

4    ~~**73.**    Although I understand that Samsung disputes the validity of the Apple Intellectual Property In Suit~~

5    ~~and infringement and dilution thereof, I have been asked to assume that each of the design and utility~~

6    ~~patents as well as the trademarks and trade dress is enforceable and not invalid.~~

7    ~~**74.**    There are 32 different Samsung products accused of violating one or more of Apple's 22 separate~~

8    ~~claims as set forth~~

9        57.    I have reviewed the assumptions made by Mr. Musika in his report at paragraphs

10   73-78.  As is typical for this type of report, Mr. Musika assumed that all the Apple intellectual

11   property asserted in the lawsuit was enforceable, infringed, and not invalid.

12       58.    Mr. Musika also assumed that each of the 32 Samsung products accused in

13   Apple's Amended Complaint~~.~~

14   ~~**75.**    I have been asked to assume that Samsung's Accused Products practice at least one asserted claim of~~

15   ~~each of the accused utility patents as provided on **Exhibit 5.**~~

16   ~~**76.**    I have also been asked to assume that Samsung's Accused Products embody the claim of each of the~~

17   ~~design patents as provided on **Exhibit 6.**~~  violated at least one of Apple's 22 claims in that

18   complaint.  He further assumed that Samsung's accused products practiced at least one

19   asserted claim from each utility patent and each design patent, and that the accused products

20   infringed or diluted at least one of the asserted Apple trade dresses and infringed at least one

21   of Apple's trademarks.

22       59.    ~~**77.** I have also been asked to assume that Samsung's Accused Products infringe and/or~~

23   ~~dilute at least one of the asserted Apple trade dresses as provided on **Exhibits 7 and 8.**~~Generally, those

24   assumptions will not be necessary because of the jury's verdict.  The intervening trial, jury

25   verdict, and the Court's post-trial rulings confirm the validity of the Apple New Trial Patents in

26   the new trial and lay out which Accused Products infringe which patent claims and dilute Apple's

27   trade dresses.  Except where discussed below in the context of the hypothetical negotiations

28   resulting in a reasonable royalty, I have not had a need to resort to assumptions regarding

1  infringement or validity, and my opinions arise from the jury's infringement and validity

2  determinations.

3  78.   I similarly have been asked to assume that Samsung's Accused Products infringe at least one of the

4     asserted Apple trademarks as provided on Exhibits 8 and 9.

5  **VI.**  ~~N.~~ **SUMMARY OF CONCLUSIONS AND OPINIONS**

6     **A.    Summary of Damages Calculations and Results**

7        60.   **79.** As ~~discussed above, the Apple Intellectual Property In Suit consists of four separate~~

8  ~~categories of intellectual property (i.e., utility patents, design patents, trade dress, and trademarks) that~~

9  ~~each contain a number of individual items of intellectual property. Further, Apple has asserted twenty-two~~

10  ~~separate claims.[81]  The legal remedies available to Apple as compensation for damages suffered as a~~

11  ~~consequence of Samsung's accused infringement of each item of Apple Intellectual Property In Suit and~~

12  ~~the separate claims varies depending on the specific category of intellectual property and the individual~~

13  ~~claims. Exhibit 14 sets forth the type of remedy available under each category of intellectual property.~~

14  ~~Exhibit 15 identifies the specific form of damage remedy calculated in this matter for each item of Apple~~

15  ~~Intellectual Property In Suit. Exhibit 15 also makes a distinction between smartphones and tablets because~~

16  ~~not every individual item of Apple Intellectual Property In Suit covers both smartphones and~~

17  ~~tablets.~~explained above, I have evaluated Apple's damages for the 13 products and 5 patents for

18  which the Court ordered a new trial on damages.  The New Trial Patents include utility patents

19  and design patents.  The legal remedies available to Apple as compensation for Samsung's

20  infringement of the New Trial Patents are set forth in **Exhibit 14**.  **Exhibit 15-PT** identifies the

21  specific types of remedy used to calculate Apple's damages.  As shown in **Exhibit 15-PT**,

22  Samsung's infringement of the utility patents at issue in the new trial gives rise to damages on

23  sales of both smartphone and tablet products, whereas Samsung's infringement of the design

24  patents at issue in the new trial gives rise to damages only on sales of smartphones.  This is

25  because the D'305 and D'677 Patents are specific to smartphones.

26  **80.**   The guiding principle in the determination of damages resulting from patent infringement of a utility

27  _____

28  [81]  Apple Inc. Amended Complaint dated June 16, 2011, p. 59.

1   patent is that the amount of "damages [are] adequate to compensate for the assumed infringement."[82]
2   A patent owner may seek monetary relief from infringement of a utility patent under two theories:
3   lost profits and/or a reasonable royalty. I have considered both damage theories and concluded that
4   damages adequate to compensate for the assumed infringement of Apple's utility patents in this
5   matter should be based on both a reasonable royalty and a lost profits damage award. The specific
6   application of one or both remedies to each utility patent as it relates to both smartphones and tablets
7   is identified on **Exhibit 15**.

8   **81.**   I have also considered both a lost profits and/or a reasonable royalty remedy for each design patent.
9   However, I have also considered a third remedy for the assumed infringement of Apple's design
10   patents under 35 U.S.C. §289. A damage amount based on an infringer's total profit is an acceptable
11   form of remedy for the infringement of a design patent. The specific application of each of the three
12   remedies to each design patent as it relates to both smartphones and tablets is identified on **Exhibit**
13   **15**.

14   **82.**   Infringer's profits and plaintiff's damages are both acceptable forms of remedies for the infringement
15   or dilution of a trade dress or trademark. Plaintiff's damages include the profits lost by the trade dress
16   holder due to infringement by the defendant and I calculate an amount reflecting that as a part of my
17   report.  Unlike 35 U.S.C. § 289, the infringer's profit remedy regarding trade dress and trademarks
18   involves an apportionment of the infringer's profit.  However, I understand that the defendant bears
19   the burden of that apportionment.  Accordingly, I have not apportioned infringer's profits but intend
20   to comment on and provide an opinion on any apportionment for which Samsung argues in its
21   opening report.  Finally, I understand that a reasonable royalty is an acceptable form of damages for
22   the infringement of design patents and is an acceptable form of damages for trade dress, and
23   trademarks in circumstances where no other form of damages is available.  Accordingly, I have
24   calculated a reasonable royalty amount for those accused products that infringe a design patent, and
25   those products which infringe or dilute a trade dress or trademark for which no other damage remedy
26   was available.  The specific application of each of the three remedies to each group of design patents,

27

28   [82] 35 U.S.C. § 284.

1   ~~trade dress, and trademarks as it relates to both smartphones and tablets is identified on **Exhibit 15**~~

2   **83.**   ~~Each item of Apple Intellectual Property In Suit is entitled to only one damage remedy (i.e., either~~

3   ~~lost profits, infringer's profits where appropriate or a reasonable royalty). Further, once lost profits or~~

4   ~~infringer's profits have been awarded for the unit sale of an accused product, no further damages are~~

5   ~~appropriate even though the same item may infringe multiple items of Apple Intellectual Property In~~

6   ~~Suit. However, if no lost profits or infringer's profits is awarded for a unit sale of an accused product,~~

7   ~~then that particular accused item may qualify for a reasonable royalty award based on each item of~~

8   ~~Apple Intellectual Property In Suit that the particular accused product is accused of infringing.~~

9   **84.**   ~~The aforementioned structural restrictions imposed by law on the calculation of damages involving~~

10  ~~multiple categories of intellectual property results in the need to approach the calculation of damages~~

11  ~~for each unit sold of the Samsung Accused Products~~

12          61.    For infringement of a utility patent, the patent holder may seek damages under two

13  theories: lost profits and/or a reasonable royalty.  The guiding rule in each case is that the amount

14  of damages must be adequate to compensate for the infringement.[81]  I have considered each

15  theory in connection with Samsung's infringement of Apple's utility patents at issue in the new

16  trial, and concluded that an award of damages adequate to compensate Apple for that

17  infringement should be based on both a lost profits and a reasonable royalty damages award.

18          62.    For infringement of a design patent, the patent holder may seek damages under

19  three theories: lost profits, infringer's profits, and/or a reasonable royalty.[82]  I understand that in

20  calculating damages under an infringer's profits theory, it is acceptable to calculate damages

21  based on the infringer's "total profits."[83]  I have considered each of these three theories in

22  connection with Samsung's infringement of Apple's design patents at issue in the new trial, and

23  concluded that an award of damages for that infringement should be based on Apple's lost profits

24  and Samsung's profits.  To address a dispute regarding the size of Samsung's profits for these

---

[81] See **Exhibit 14**.  See also 35 U.S.C. § 284.
[82] See **Exhibit 14**.  See also 35 U.S.C. §§ 289 and 284.
[83] See **Exhibit 14**.  See also 35 U.S.C. § 289.

1  products after Apple gave notice of Samsung's infringement, I have also identified a per unit

2  reasonable royalty for Apple's design patents.

3       63.    While Apple is entitled to compensation in accordance with the multiple different

4  theories of recovery available to Apple under the law, Apple is not entitled to recover under more

5  than one theory with respect to the same infringing unit sale.[84]  In other words, if a particular

6  infringing unit sale is awarded one form of monetary recovery (e.g., Apple's lost profits), that

7  same infringing unit sale cannot be awarded another form of monetary recovery (e.g., Samsung's

8  profits or a reasonable royalty).

9       64.    I have carefully reviewed the damages model prepared by Mr. Musika in

10  connection with the first trial in this matter.  In accordance with the legal principles discussed in

11  paragraph 83 of the Original Expert Report, Mr. Musika's model eliminated the possibility that

12  any particular unit sale could be assigned to more than one theory of recovery.  Mr. Musika

13  accomplished this by approaching the calculation of damages for each infringing unit sale in a

14  sequential manner. ~~Further, there is an inherent hierarchy of damage remedies that I apply due to the~~

15  ~~variation in per unit damages associated with each remedy. First, I consider whether an accused item~~

16  ~~qualifies for lost profits. If a unit sale of an accused item qualifies for lost profits, no other form of damage~~

17  ~~remedy is awarded. If a unit sale of an accused item does not qualify for lost profits, then my next~~

18  ~~consideration is whether the accused item qualifies for damages under an infringer's profit calculation.~~

19  ~~Once again, if the unit sale of an accused item qualifies for an infringer's profit, no other form of damage~~

20  ~~remedy is possible. Finally, if neither a lost profit or an infringer's profit damage is assigned to a unit sale~~

21  ~~of an accused unit, then the damage calculation would be based on a reasonable royalty for every item of~~

22  ~~Apple Intellectual Property In Suit that the Samsung product is accused of infringing.~~ **~~Exhibit 16~~** ~~is a~~

23  ~~simple hypothetical illustration of the aforementioned sequential approach to the calculation of damages.~~

24  **~~85.~~**   ~~Using this method, I have calculated the damages that can be reasonably calculated for Samsung's~~

25  ~~sales of the individual units of various models identified as Samsung Accused Products in light of~~

26

27  [84] Dkt. 1903 at 96; Final Jury Instruction No. 74, Monetary Remedies—Only One
Recovery Per Accused Sale.

28

1   ~~each element of the Apple Intellectual Property In Suit and summarized the results on~~ **~~Exhibits 17~~**
2   **~~and 17.1~~** ~~and as further summarized in the table below. I have made the calculation on a product by~~
3   ~~product basis because the limitation on damages is product specific. I determined the amount of~~
4   ~~damage on each individual product that was subject to lost profits, infringer's profits and a reasonable~~
5   ~~royalty because I wanted to make sure that I did not calculate more than the allowable damages on~~
6   ~~any given product.~~ First, Mr. Musika considered whether an infringing sale qualified for lost
7   profits damages.  If so, that unit was counted as a lost sale, and no other form of remedy was
8   awarded to that unit.  If that unit did not qualify for a lost profits award, Mr. Musika next
9   considered whether that unit qualified for an award of infringer's profits.  If so, that form of
10   remedy and no other was applied.  If, on the other hand, that unit did not qualify for an award
11   of either lost profits or infringer's profits, it was assigned a reasonable royalty.  **Exhibit 16-**
12   **PT** illustrates the sequential approach that Mr. Musika adopted to avoid impermissibly
13   assigning the same infringing unit sale to more than one form of damages recovery.  I have
14   adopted and applied this same methodology.
15         65.    Using the same methodology and damages model that Mr. Musika used, as
16   adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs
17   89–96, I have calculated an award of damages adequate to compensate Apple for Samsung's
18   infringement with respect to the 13 products at issue and the 5 New Trial Patents.  The results of
19   that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 17-PT-**
20   **H and 17.1-PT-H.**  A summary of these damages follows:
21
22
23
24
25
26
27
28

|  | Revenue Basis | | Gross Profit Basis |
|---|---|---|---|
| Apple's Lost Profits | $~~583,191,122~~<br>419,029,253 | | $~~583,191,122~~<br>419,029,253 |
| ~~Infringer~~Samsung's Profits—<br>~~Design Patents, Trade Dress &~~<br>~~Trademarks~~ | ~~5,510,092,347~~$<br>624,318,925 | | ~~2,008,994,149~~$<br>168,675,798 |

| | | | |
|---|---|---|---|
| Reasonable Royalty | ~~0~~$       33,172,781 | | ~~0~~$       33,172,781 |
| Total Damages | ~~$6,093,283,469~~<br>1,076,520,959 | | ~~$2,592,185,271~~<br>620,877,833 |

~~86.   In the alternative, I assumed that all Apple Intellectual Property In Suit was valid and infringed by all Samsung Accused Products. However, I removed any lost profits remedy from the damage calculation. The results of this calculation are summarized on~~

66.     Mr. Musika also calculated a separate measure of damages after having removed Apple's lost profits from the damages calculation.  I have prepared the same damages calculation based on Mr. Musika's methodology and damages model, as adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs 89–96.  The results of that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 18 PT-H** and **18.1** ~~and in the table below.~~ **PT-H**.  A summary of these damages follows:

| | Revenue Basis | | Gross Profit Basis |
|---|---|---|---|
| ~~Infringer~~Samsung's Profits— ~~Design Patents, Trade Dress & Trademarks~~ | $~~6,424,701,038~~<br>911,036,260 | | ~~$2,337,518,680~~<br>251,778,375 |
| Reasonable Royalty | ~~0~~$       35,660,213 | | ~~0~~$       35,660,213 |
| Total Damages | $~~6,424,701,038~~<br>946,696,473 | | ~~$2,337,518,680~~<br>287,438,588 |

~~87.   As a second alternative, I have assumed that all Apple Intellectual Property In Suit was valid and infringed by all Samsung Accused Products. However, I removed infringer's profits from the damage calculation. The results of this calculation are displayed on Exhibit 19 and summarized in the table below.~~

67.     Mr. Musika also calculated a second separate measure of damages after having removed Samsung's profits from the damages calculation.  I have prepared the same calculation

based on Mr. Musika's methodology and damages model, as adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs 89–96.  The results of that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 19-PT-H and 19.1-PT-H**.  A summary of these damages follows:

| | |
|---|---|
| Apple's Lost Profits | $~~583,191,122~~   419,029,253 |
| Reasonable Royalty | ~~511,999,442~~$    87,780,642 |
| Total Damages | $~~1,095,190,564~~   506,809,895 |

88.   ~~I could calculate the damage amount based on other combinations of remedies, such as lost profits alone or reasonable royalty alone and as describe further below, I have prepared the damages model in such as way that it can accommodate changes in what products remain in the case or are infringed, what patents remain in the case and are infringed, when Samsung was aware that Apple was asserting claims against it and corresponding changes regarding when Samsung might begin an effort to redesign its products in light of the Apple Intellectual Property in Suit.~~

89.   ~~Although~~ **~~Exhibits 17, 18, and 19~~** ~~provide a separate analysis of the amount of damages that would result under the various forms of remedy available to Apple assuming all categories and items of Apple Intellectual Property In Suit are valid and violated, the results present a damage calculated for only some of the many possible outcomes that may result from a trial. Based on the fact there are multiple logical and permissible categories of damages (e.g., as described above), 31 different individual items of Apple intellectual property, 22 separate claims, 32 different accused products at issue, a very large number of potential scenarios exist.  I also understand that Samsung contends that they did not receive actual or constructive notice of some of the asserted patents until approximately April of 2011. Although Apple disputes Samsung's claim, I am able to calculate the impact to Apple's damages of changes to the date on which notice occurred and any resulting effort to design around would begin.   Given these variables, there are more than tens of thousands of possible outcomes.   It is not practical or even possible to submit a report reflecting the damage outcome~~

1  associated with every possible outcome.  However,  the damage model used to calculate the damages

2  reported herein is capable of calculating a final damage amount based on different combinations of

3  these variables in connection with a Court decision or the evidence at trial. Therefore, I am prepared

4  to calculate and render an opinion on the amount of damages if less than the total number of Samsung

5  Accused Products  proceeds to trial, if less than all patents proceed to trial, if damages are limited to

6  any particular period for any of the Intellectual Property in Suit, or if Samsung was on notice of the

7  intellectual property and began an effort to design around the patents at a different date, if and when

8  requested to do so by counsel or the Court or based on the evidence presented at trial.  I am also

9  prepared to produce both the results of any calculation and the complete Access database model used

10  to perform my calculation if asked to do so.

11  **90.**  I have provided a description of my calculation of lost profits, infringer's profits and reasonable

12  royalty in a separate section for each form of remedy. **Exhibit 20** is a summary of the organization

13  and calculation of each form of damage based on each item of Apple Intellectual Property In Suit.

14  **91.**  The foregoing calculations are necessarily limited by the information available to me at this time.

15  Two comments on this subject are noteworthy.  First, information on sales and financial performance

16  for both Apple and Samsung, as well as other relevant metrics discussed below are available only

17  through December 31, 2011.  Before trial, I would expect to receive some, if not all of the relevant

18  information through June 30, 2012 and would update accordingly.  Second, Samsung refused to

19  produce certain information relevant to my calculations in response to a Court order and other

20  discovery requests prior to the close of discovery.  Apple has sought such materials from the Court.

21  If such materials become available, I would review and update my analysis accordingly.  My current

22  opinion therefore may change and my calculations will certainly rise as additional sales of Samsung

23  Accused Products occur.

24  **92.**  I am also prepared to calculate and render an opinion on the amount of pre judgment interest

25  connected with the above damages if and when requested to do so by counsel or the Court.

26      68.  **Exhibit 20-PT** provides a description of how damages were calculated for each

27  form of remedy discussed above—*i.e.*, Apple's lost profits, Samsung's profits, and a reasonable

28  royalty.

1

## **B.      Summary of Alternative Damages Calculations and Results**

2      69.      I have also prepared alternative calculations of damages using the same

3   methodologies and inputs used by Mr. Musika to address certain disputes that I have been

4   informed may arise between the parties relating to dates relevant to the damages calculations.

5   Specifically, I have prepared alternative calculations that vary the date on which Samsung would

6   begin to design around Apple's patents.

7      70.      [Reserved]

8      71.      Samsung's damages expert, Michael Wagner, has suggested that Samsung's

9   efforts to design around a particular patent would begin on the date of first infringement whether

10   or not Samsung had actual notice of the patent at that time.  I have prepared alternative lost profits

11   calculations that reflect this hypothetical assumption.  This assumption is contrary to how Mr.

12   Musika reconstructed the "but for" marketplace and does not reflect the analysis he used in his

13   Original Expert Report and Supplemental Expert Report.  Given that this approach requires

14   Samsung to begin designing around the New Trial Patents before Samsung actually became

15   aware of Apple's patents, I believe this approach to be illogical.  I have nonetheless prepared

16   these calculations so that they will be available in the event the Court adopts Mr. Wagner's

17   suggestion.  With the exception of this change, these alternative calculations otherwise use the

18   same methodology and inputs used by Mr. Musika and by me as described further below.

19      72.      Finally, I have prepared alternative calculations using Samsung's incremental

20   profitability to measure Samsung's total profits under 35 U.S.C. § 289.  These calculations use

21   the same methodology that Mr. Musika disclosed and used to determine Samsung's incremental

22   profits in his Supplemental Expert Report at paragraphs 38 to 40 and **Exhibit 50-S** (admitted at

23   trial as PX28), and are limited to the seven products in the new trial that infringe a design patent,

24   with damages calculated from and after the notice dates provided in the March 1 Order.

25      73.      A complete set of each of these alternative calculations with supporting schedules

26   can be found in the Appendix to this report in the exhibits labeled **Exhibits 17-PT-I** to **19-PT-I**

27   through **17-PT-K** to **19-PT-K**.

28

**VII.** ~~O. IRREPARABLE HARM~~ **IRREPARABLE HARM**

~~93.~~ ~~As discussed above, I have been asked by counsel for Apple to determine the amount of damages, if any, that would be adequate to compensate Apple as a result of the assumed infringement of Apple's Intellectual Property In Suit. Although my opinions contained herein are consistent with this objective and were developed to a reasonable degree of certainty, the damage amounts expressed herein do not represent a complete measure of the total damages that Apple has and will continue to experience due to Samsung's conduct. Further, absent permanent and immediate injunctive relief, the ongoing damages that will be incurred by Apple in the future will cause Apple irreparable harm that cannot be adequately compensated through the award of monetary damages.~~

~~94.~~ ~~I previously issued a Reply Declaration of Terry L. Musika, CPA in Support of Apple's Motion for a Preliminary Injunction dated October 13, 2011 ("Reply Declaration"). The opinions expressed in my Reply Declaration were directed to Apple's Motion for a Preliminary Injunction which involved a subset of the Apple Intellectual Property In Suit covered in this report. My opinions as expressed in my Reply Declaration are unchanged.~~

~~95.~~ ~~Apple has and will continue to suffer irreparable harm in spite of the damages quantified herein because the monetary damages included herein and measured to a reasonable degree of certainty represent only a portion of the total harm that Apple has suffered and will suffer as a consequence of Samsung's acts absent a permanent injunction. The following factors reinforce Apple's ongoing irreparable harm absent a permanent injunction.~~

- ~~Apple practices each of the items of Apple Intellectual Property In Suit as a means of growing and protecting Apple's market share, reputation and goodwill.[83]~~
- ~~Samsung's conduct is injuring and diluting Apple's market share, reputation, and goodwill.~~
- ~~Apple has been unwilling to license any of the individual items of Apple Intellectual Property In Suit and has used the Apple Intellectual Property In Suit as a means of creating and maintaining a unique market identity in the wireless device industry.[84]~~

---

~~[83] BusinessWire, "Apple Rises to the Top as Worldwide Smartphone Market Grows 65.4% in the Second Quarter of 2011, IDC Finds", 8/4/2011.~~
~~[84] Deposition of Chip Lutton, Jr., July 26, 2011, p. 331. ; Discussion with Boris Teksler.~~

1  • ~~Apple and Samsung are direct competitors with respect to the Samsung Accused Products In~~
2  ~~Suit. Apple is not a non practicing entity seeking only to extract a royalty from Samsung's~~
3  ~~commercial success.[85]~~

**A.   Background**

4

5      74.   I understand that, after the first trial in this matter, Apple moved to enjoin

6  Samsung from engaging in the following activities:

7      Infringing the '381, '915, '163, D'305, D'087, and D'677 patents
       by making, using, offering to sell, selling within the United States,
8      or importing into the United States, any of the following products:
       Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G,
9      Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S, Galaxy S 4G,
       Galaxy S II (AT&T), Galaxy S II (i9000), Galaxy Tab, Galaxy Tab
10     10.1 (Wi-Fi), Gem, Indulge, Infuse 4G, Mesmerize, Nexus S 4G,
       Replenish, Vibrant, Galaxy S II (T-Mobile), Transform, Galaxy S
11     Showcase, Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket),
       or any other product not more colorably different from any of these
12     products as to a feature or design found to infringe; and

13     • ~~Apple has previously sought a preliminary injunction in the U.S.~~
       ~~and around the world.[86]~~ Diluting Apple's registered iPhone trade dress
14     (U.S. Trademark Registration No. 3,470,983) and Apple's
       unregistered iPhone 3G trade dress by selling or offering to sell in
15     the United States any of the following products:  Galaxy S 4G,
       Galaxy S Showcase, Fascinate, Mesmerize, Vibrant, Galaxy S
16     (i9000).[85]

17  ~~96.   Additional evidence of the ongoing irreparable harm incurred by Apple includes the following.~~

18     75.   I further understand that the Court denied Apple's motion for a permanent

19  injunction, and that Samsung subsequently appealed that decision and is currently waiting for the

20  Federal Circuit to issue a decision on that appeal.

21     76.   I have been asked by counsel to provide an opinion as to whether Apple will suffer

22  irreparable harm if Apple does not obtain permanent injunctive relief similar to the relief Apple

23  requested from the Court on September 21, 2012.  I understand that I would only be asked to

24

25  ---

[85] ~~Deposition of Brian Rosenberg, January 27, 2012, pp. 72-73 & 77; Strategy Analytics, "Competitor Profile: Apple," July 20, 2011 (SAMNDCA00177805 of SAMNDCA00177800-07); Ipsos OTX MediaCT, "Are we going to take to the tablet?" March 2011 (SAMNDCA00237354 of SAMNDCA00237349-60).~~

26  [~~86~~][85] Dkt. 2133 at 1-2: [Proposed] Order Granting Apple ~~Inc.~~'s Motion for a ~~Preliminary~~
27  ~~Injunction, United States District Court Northern District of California San Jose Division~~ Permanent Injunction and
    Damages Enhancement, dated ~~7/1/2011; Reuters, "Samsung says alters tablet design to avoid German sales ban,"~~
    ~~11/17/2011~~ Nov. 10, 2012.

1   offer my opinion on this issue to the extent that additional evidence is needed following a remand

2   from the Federal Circuit.  Mr. Musika addressed the irreparable harm Apple would suffer from

3   Samsung's infringement at paragraphs 93 to 116 of the Original Expert Report.  I have reviewed

4   Mr. Musika's analysis and agree with his opinions that the monetary damages, calculated in the

5   methods discussed below, will not fully compensate Apple for the harm that Apple has suffered

6   and will suffer from Samsung's infringement.  I incorporate the foregoing paragraphs by

7   reference and discuss these opinions further below.

8          **B.**     **Apple's Loss of Goodwill**

9          77.     97. Business goodwill is considered an intangible asset within Generally Accepted

10  Accounting Principles.  I understand that harm to business goodwill has traditionally been viewed

11  by courts as irreparable because of the difficulty in quantifying a company's goodwill and the

12  precise monetary value of any diminution of that goodwill.  The irreparable harm due to a loss of

13  goodwill is may be illustrated at least in part in the portion of a company's by reference to the value

14  assigned to their a company's intangible versus tangible assets : "In 2003, the market value (stock

15  prices times number of shares outstanding) of U.S. publicly traded companies was five times

16  larger than their balance sheet value, which reflects primarily the net worth of physical and

17  financial (stocks, bonds) assets.  Thus, about three-quarters of the value of public companies, as

18  perceived by investors, reflects non-physical and nonfinancial assets.  Much of this huge value

19  constitutes intangible assets, which are absent from corporate balance sheets."[86]  The difference in

20  value between Apple's reported net worth and its market capitalization illustrates this very point:

21  As of December 31, 2011, Apple had an estimated net worth of $90.05 billion versus an estimated

22  market capitalization of $377.5 billion.[87] This fact is even more relevant today and is significantly

23

---

24  [86] Intangible Assets:  Concepts and Measurements, Baruch Lev, New York University,
    New York, USA, Encyclopedia of Social Measurement, Volume 2, 2005.

25  [87] Intangible Assets: Concepts and Measurements, Baruch Lev, New York University, New York, USA,
    Encyclopedia For Apple's market capitalization, see

26  http://www.wolframalpha.com//?i=appl+++as++12%2F31%2F11.  Apple's net worth as of Social
    measurement, Volume 2, 2005. Dec. 31, 2011 equals total assets of $138.7 billion less total liabilities of

27  $48.6 billion (see Apple Inc. Form 10-Q for the quarter ended Dec. 31, 2011, p. 3).

28

1   illustrated in the value of Apple's balance sheet net worth versus Apple's current capitalized market

2   value.[88]

3       78.   **98.** The prior facts demonstrate the equity market's recognition of the significance of

4   intangible assets to the overall net worth of today's most innovative companies. Although goodwill is an

5   intangible asset within generally accepted accounting principles, it is only recognized and recorded when

6   acquired through an acquisition. Accordingly, unless goodwill is acquired as a component of an

7   acquisition, this asset is not reported even though the equity market identifies goodwill as one of the most

8   valuable assets within the company. The equity market assignsAs these facts illustrate, the equity

9   market may assign a real economic value to a company's goodwill and other intangible assets that

10  is based on the market's expectation of future earnings.[89], as reflected in that company's substantially

11  higher market capitalization value versus its balance sheet value.  In an efficient market, the

12  market capitalization of a publicly traded company will generally reflect the market's prediction

13  of the company's future cash flows and profitability.  Thus, a decrease in a company's expected

14  future earnings will have a negative effect on the company's overall market value, and hence the

15  value of its goodwill and other intangible assets.  Therefore, any diminution in theof Apple's

16  expected future earnings of Apple as a consequence ofdue to actual or the perceived infringement by

17  Samsung of any of the Apple Intellectual Property In Suit reduces Apple's goodwill and overall market

18  value. As discussed below, I have calculatedthe '381, '915, '163, D'305, D'087, and D'677 patents,

19  Apple's registered iPhone trade dress (U.S. Trademark Registration No. 3,470,983), and Apple's

20  unregistered iPhone 3G trade dress by the products for which Apple is seeking an injunction will

21  reduce the value of Apple's market capitalization, and hence the value of Apple's goodwill and

22  other intangible assets.  Since the present damages model only captures a portion of the lost

23  earnings that Apple has suffered as a consequence of Samsung's accused acts. Further, I emphasize

24  that the lost profits calculations represents only a small portion of the lost earnings that Apple has suffered.

25  Apple's historical and prospective lost profits therefore have a significant and identifiable negative impact

26  [88] As of 12/31/11, Apple Inc. had a net worth of $90.05 billion versus a market cap of $377.5 billion
27  (http://www.wolframalpha.com/input/?i=aapl+market+cap+as+of+12%2F31%2F11).  Net worth as of 12/31/11 equals total assets
    of $138.7 billion less total liabilities of $48.6 billion (Apple Inc. Form 10-Q, for the quarter ended 12/31/11, p. 3).
    [89] SFAS 142, paragraphs 21 to 23.

28

1   ~~on Apple's goodwill.~~ infringement, even if the jury were to award Apple all its claimed lost profits,

2   such an award would still not fully compensate Apple for the diminution of its overall market

3   value, and hence the value of its goodwill and other intangible assets.

**C.      Erosion and Dilution of Apple's Brand**

5   79.      ~~99.  Another measureable portion of the intangible value included in Apple's capitalized~~

6   ~~market value is the value of Apple's brand.[90]  There are numerous facts in evidence that illustrate the~~

7   ~~irreparable harm to Apple's brand~~ ~~that has and will continue to occur absent injunctive relief. In 2011, the~~

8   ~~Apple brand was identified as the most valuable brand in the world.[91]  Samsung's own damage expert~~

9   ~~stated in his declaration that "It's no secret that Apple's extensive marketing efforts have created one of~~

10  ~~the most valuable brands worldwide."[92]~~ The value attributed to a company's brand also constitutes a

11  measurable portion of the overall value of the company's goodwill and other intangible assets.  In

12  recent years, the Apple brand has been recognized as one of the most valuable brands in the

13  world.  For example, a company named Interbrand Corp., which specializes in brand value

14  analysis, ranked Apple's brand as number 8 on its list of the Top 100 brands in 2011.[88]

15  80.      ~~100.  Apple's exponential growth in brand value comes~~ Samsung's continued

16  infringement of Apple's patents, absent an injunction, would cause irreparable harm to Apple's

17  brand.  Apple's brand value derives in part from the ~~strategic interrelationship of all Apple products.~~

18  ~~As discussed above, this is the result of Apple's focus on the Apple ecosystem and not simply Apple~~

19  ~~individual products. Therefore, winning the competition for undecided consumers is made even more~~

20  ~~important by the subsequent effects upon consumers' future purchasing decisions. A study done~~ Apple

21  ecosystem, which is a source of substantial revenue generation as customers who buy Apple

22  products will tend also to purchase additional interrelated Apple products.  ████████████

---

[90] ~~Interbrand ranked Apple's brand as number 8 on its "2011 Ranking of Top 100 Brands." (http://www.interbrand.com/en/best-global-brands/best-global-brands-2008/best-global-brands-2011.aspx).~~

[91] ~~Business News Express Business News Daily, "Apple Knocks off Google as Number One Brand," by Steve Petrovich, dated 5/10/11 (http://businessnewsexpress.com/apple-knocks-off-google-as-number-one-brand/8778546/).~~

[~~92~~88]  Interbrand 2011 Ranking of the Top 100 Brands, http://www.interbrand.com/en/best-global-brands/previous-years/best-global-brands-2011.aspx.  *See also* Declaration of Michael J. Wagner In Support of Samsung's Opposition to Apple's Motion ~~For~~ for a Preliminary Injunction, dated ~~8/21/11~~ Aug. 21, 2011, p. ~~5~~ 5 ("It's no secret that Apple's extensive marketing efforts have created one of the most valuable brands worldwide.").

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████[89] ~~Purchasers also buy various content, apps.~~ Consumers who

6 purchase Apple products also tend to purchase interrelated content and ~~other~~ services from Apple

7 through its ~~iTunes store, App store, retail store, on-line store~~online stores, including music,

8 applications, and services such as iCloud.  Apple ~~also loses sales on advertising and~~customers also

9 generate additional revenue for Apple through other elements of ~~its business.  Due to the complexity~~

10 ~~of the calculation and uncertainty regarding the specific amounts tied to new purchases of Apple's~~

11 ~~products, almost none of the Apple ecosystem sales are captured in the damage calculation.~~ Apple's

12 business, such as advertising sales.  Any lost sale due to Samsung's infringement will therefore

13 lead to downstream revenue losses beyond the lost sale itself.  Almost none of the Apple

14 downstream revenue losses associated with its ecosystem is captured in the damages model

15 prepared by Mr. Musika and used by me below, which measures primarily the loss of profits on

16 the lost smartphone or tablet product itself.  These additional downstream revenue losses would

17 be very difficult to quantify to a reasonable certainty given the complexity involved in attributing

18 specific amounts of these revenue losses to the initial lost sale.

19 ~~**101.**  Another effect of the purchasing decision is customer loyalty, which is particularly important to~~

20 ~~Apple's brand value and expected future sales. Surveys confirm Apple customers' loyalty.~~

21 81.     Apple's brand value also derives in part from Apple customers' high sense of

22 loyalty to Apple, which is an additional source of revenue generation for Apple.  A study by

23 Strategy Analytics found that "Apple iPhone owners are not only most satisfied with their phones,

24 they are most likely to buy their next phone from Apple~~…as well."[94]~~  ~~These repeat purchases are not~~

---

~~93~~89 Apple Market Research & Analysis "iPad Tracking Study: FY11-Q3 Report," ~~August 2011~~dated Aug. 2011 (APLNDC-Y0000024130 ~~-333~~ –APLNDC-Y00000241333 at APLNDC-Y0000024143).

~~94 Strategy Analytics, "Apple iPhone Owners Most Likely to Repeat Purchase," by Paul Brown, dated 03/09/10 (http://www.strategyanalytics.com/default.aspx?mod=pressreleaseviewer&a0=4870).~~

1  limited to smartphones, but also apply across iPads, Macs, and other Apple products.[95] In addition to the
2  effects on downstream accessory purchases or additional Apple products, winning over undecided
3  consumers is important for generating interest and economic power with third parties, such as third-party
4  developers and carriers. Similarly, Apple's market share lead and reputation for innovation and design
5  provide Apple with economic power in, as well."[90]  Apple's iPhone customers are also more likely to
6  purchase additional products from Apple, such as iPads and Macs.[91]  For the same reason that
7  losses of ecosystem revenue are difficult to quantify to a reasonable certainty, so too are the
8  revenue losses associated with the diversion of loyal customers from Apple to Samsung due to
9  Samsung's ongoing infringement.

10       82.    A portion of Apple's brand value also derives from Apple's position as a market
11  leader and its reputation for innovation and design.  Many consumers purchase Apple's products
12  in the first instance, and anticipate and purchase new Apple products when they are launched
13  because of Apple's position as a market leader and its reputation for innovation and design.  The
14  sale of competing products that copy Apple's product designs and features diminishes Apple's
15  ability to position itself as a market leader and its reputation for innovation and design, and
16  threatens to turn Apple's unique products into something commonplace.  This type of harm
17  cannot be compensated by damages.  Another advantage of Apple's market leadership position
18  and reputation for innovation and design is to confer on Apple increased leverage during its
19  negotiations with wireless carriers, who want to be in a position to offer one of Apple's products on
20  their network and expand their subscriber network. There is no adequate amount in monetary damages I

---

[95] CNN Money, "Piper Jaffray survey of iPad buyers: 74% owned Macs; 66% had iPhones," by Philip Elmer-DeWitt, dated 04/05/10 (http://tech.fortune.cnn.com/2010/04/05/piper-jaffray-survey-of-ipad-buyers-74-owned-macs-66-had-iphones/); "Apple iPad 2 sales: New customers buying; Analysts see big launch," by Larry Dignan, dated 03/13/11 (http://www.zdnet.com/blog/btl/apple-ipad-2-sales-new-customers-buying-analysts-see-big-launch/46030).

[90] Strategy Analytics, "Apple iPhone Owners Most Likely to Repeat Purchase," by Paul Brown, dated Mar. 9, 2010 (http://www.strategyanalytics.com/default.aspx?mod=pressreleaseviewer&a0=4870).

[91] CNN Money, "Piper Jaffray survey of iPad buyers:  74% owned Macs; 66% had iPhones," by Philip Elmer-DeWitt, dated Apr. 5, 2010 (http://tech.fortune.cnn.com/2010/04/05/piper-jaffray-survey-of-ipad-buyers-74-owned-macs-66-had-iphones/); "Apple iPad 2 sales: New customers buying; Analysts see big launch," by Larry Dignan, dated Mar. 13, 2011 (http://www.zdnet.com/blog/btl/apple-ipad-2-sales-new-customers-buying-analysts-see-big-launch/46030).

1  have calculated that compensates Apple for the diminution of Apple's reputation as a leading innovator

2  and the consequential loss of brand value. since those carriers benefit from the increased

3  consumption of their network services driven by the use of Apple products on their networks.

4  Samsung's ongoing infringement will continue to impair Apple's market leadership position and

5  reputation for innovation, which in turn will have economic consequences for Apple that are

6  difficult if not impossible to quantify with reasonable certainty.  The present damages model does

7  not and cannot adequately compensate Apple for those types of harms either.

8        **D.**    **Apple's Loss of Market Share**

9  **102.** Exhibits 11 and 11.1 demonstrate that since entering the smartphone market, Apple has climbed to

10  number one in market share with 45.3 percent of the market as of the fourth quarter of 2011 but has

11  been in a continuing battle with Samsung for market share. "With its 2007 launch of the iPhone,

12  [Apple] obtained a first mover advantage with 'game changing' smartphones (app store, touchscreen,

13  eventually 3G), and it has used this position along with continued innovations to further distance

14  itself from the competition."[96] In the fourth quarter of 2011, IDC data showed the top market players

15  in the smartphone market were Apple, Samsung, HTC, LG, Research In Motion, and Motorola

16  (Exhibit 11.1).

17  **103.** Samsung saw a sudden increase in market share since the second quarter of 2010 following the first

18  sales of the Samsung Accused Products, including the Galaxy S which Apple has alleged copied

19  Apple's design's and Intellectual Property In Suit. One analyst stated that in the worldwide mobile

20  phone market, Samsung's "growth is coming entirely from smartphones with the Galaxy line

21  (Samsung's Android OS phones) as the main driver."[97]  The evidence as a whole, including matters

22  discussed later in my report, points to Samsung taking market share from Apple.

23        83.    **104.** At the present time, the competition for market share in the smartphone market is

24  especially intense due to the current and projected growth. It is a unique moment in this market that will

25  not be repeated.  As depicted on **Exhibits 12 and 12.1,** the overall smartphone market in the United States

26

27  [96] FBN Securities, Initiation of Coverage on Large Cap IT Hardware Companies - APPL, IBM, DELL, and HPQ, 6/21/11, p. 3.

28  [97] Oppenheimer Equity Research, Mixed 2Q11 Wireless Checks, 6/7/11, p. 5.

1   is expanding rapidly. Based on IDC data, from 2004 to 2011 smartphones have gone from a 3% share of

2   the mobile phone market to a 55.1% share with approximately 105 million smartphones. This growth has

3   come at the expense of feature phones, which lack sophisticated operating systems, and also occurred

4   while the overall mobile phone market has grown. In 2004 there were 143 million mobile phone devices,

5   and that number grew to a high of nearly 191 million in 2011.  The substantial growth of the smartphone

6   market is projected to continue. IDC projects that smartphones will have an 83% share of the U.S. mobile

7   device market by 2015 with 154 million smartphone devices sold in the market.  In comparison

8   Oppenheimer Equity Research projects that smartphones will have a similar market share of 82% in North

9   America in 2014.[98]Samsung's ongoing infringement will also continue to take market share away

10  from Apple at a critical time in the growth of the smartphone and tablet markets.  **Exhibits 12** and

11  **12.1** illustrate the rapid past and projected expansion of the smartphone market in the United

12  States from 2004 to 2015.  Based on market research and analysis by IDC ██████████

13  ███████████████████████████████████████████████████████

14  ███████████████████████████ Oppenheimer Equity Research

15  similarly projected that smartphones would have a market share of 82% in North America in

16  2014.[92]  To put this in perspective, an estimated 135 million new smartphones are expected to

17  enter the market between 2012 and 2015, as compared to a total smartphone market of 105

18  million in 2011.

19  **105.**  The first full year of Apple iPhone sales took place in 2008. As shown on **Exhibit 12.1,** from the end

20      of 2007 through 2011, approximately 44% of mobile phone users switched from feature phones to

21      smartphones.  Despite this dramatic shift in the marketplace, the mobile phone market remains in a

22      critical period of transition as manufacturers jockey for the sales of the 27% of mobile phone users

23      who are projected to switch to smartphones over the next few years.  Put another way, manufacturers

24      are pursuing the 135 million additional smartphones expected to be sold in the market between 2012

25

26

---

27      [98][92] *See also* Oppenheimer Equity Research Industry Update, "2Q11 Wireless and Tablet
        Snapshot," 8/2/11 dated Aug. 2, 2011, pp. 15 and 17.

28

1   and 2015 as compared to a total smartphone market of 105 million units in 2011.[99]   These shifts will

2   be amplified by consumer loyalty and the resulting likelihood of purchasers to stay with Apple (or the

3   Android platform) with respect to their next purchase of a smartphone or tablet.   Shifts in market

4   share during this period will have outsized impacts on future dynamics in the market, making loss of

5   market share now very detrimental to a company's future success.   These impacts are very difficult to

6   calculate and impose an irreparable harm for Apple.

7   **106.**   The tablet market was revolutionized by Apple. "The big story in this year's ranking (the BrandZ Top

8   100 Most Valuable Global Brands survey) is the power of the tablet."[100] IDC defines tablets "as tablet

9   form factor devices with 7-12in. color displays. They are currently based on ARM processors and run

10   lightweight operating systems such as Apple's iPhone OS and Google's Android OS." [101]

11   **107.**   Since Apple's iPad's entrance it has been number one in tablet market share.   Beginning in the

12   second quarter of 2010, Apple had a commanding market share in the tablet market of 96.8% of a

13   market size of approximately 2.3 million units.   By the fourth quarter of 2011, the market had grown

14   substantially to approximately 8.4 million units, a 265% increase since the second quarter of 2010.

15   As new market participants entered the tablet market, Apple's market share according to IDC

16   dropped to 73.7% in the fourth quarter of 2011 as illustrated on **Exhibits 13 and 13.1**.   Meanwhile,

17   Samsung's market share dropped from a high of 11.6% in the fourth quarter of 2010 to a low of 2.0%

18   in the fourth quarter of 2011. **Exhibit 21** is a Global Tablet OS Market Share chart referred to by

19   Samsung's damage expert that clearly shows that the share of tablets using Apple's iOS (only the

20   iPad line of products) has fallen while the share of those using Android has risen.

21   84.   Loss of market share during this critical window of opportunity in the smartphone

22   market will have long-term consequences beyond the lost revenue associated with the initial sale.

23   First-time smartphone purchasers who choose an infringing Samsung smartphone over an Apple

24   smartphone, for example, represent not just a lost sale to Apple, but the loss of a loyal customer

25   [99] See **Exhibit 12.1**.135 million additional smartphones calculated by subtracting the 105 million total smartphone units for 2011
26   from each subsequent annual forecast for the market. The difference for each year for 2012 to 2015 sums to approximately 135 million units.
    [100] Deposition of Michael Wagner, September 14, 2011, Exhibit 169, "Global Brands: Big names fly high despite the gloom,"
27   Financial Times, 5/19/11 (WAGNER0000334--WAGNER0000341).
    [101]  Business Wire, "IDC Forecasts 7.6 Million Media Tablets to be Shipped Worldwide in 2010," dated May 20, 2010.

28

1   who would support Apple's entire ecosystem of products.  As Apple's former Senior Director and

2   Chief Patent Counsel testified at deposition:

3   ~~108.   Apple's loss of market share is not confined to its market share in~~
~~the respective smartphone and tablet product markets. As discussed~~
4   ~~above, Apple and Samsung's strategy is to develop a loyal customer~~
~~following that supports each company's entire ecosystem of products. The~~
5   ~~loss of a single smartphone or tablet sale has an exponential impact on~~
~~Apple's overall market share in the wireless device industry. Apple~~
6   ~~Senior Director and former Chief Patent Counsel testified,~~ "Secondly,
there's another form of harm, which is harm to the iOS ecosystem
7   generally, that the eco——the health of the ecosystem depends on
market share, maybe growing market share; and if Apple is losing
8   market share of momentum or market share generally to Samsung,
then it's losing not just the incremental sales and the revenue
9   associated with them, but also the impact on the ecosystem
generally, which could be application developer mind share and
10  attention.  It could be other forms of services that are provided into
the ecosystem, either by Apple or by third parties, and those could
11  have impacts not only on the vitality of Apple's iOS platform, but
also even on revenue that Apple makes in areas like iTunes and the
12  App store." ~~102~~93

13

14  These downstream losses and negative effects on the Apple ecosystem are very difficult to

15  calculate and constitute an irreparable harm to Apple.

16      85.     The tablet market is experiencing a similar period of intense competition for new

17  market participants.  As shown in **Exhibits 13** and **13.1**, after Apple revolutionized the tablet

18  market with the launch of the iPad in 2010, purchases of tablet devices rose from abou█

19  ████████  in the second quarter of 2010 to about ███████████  in the fourth quarter of

20  2011—a ████████  in sales.  **Exhibit 21** is a Global Tablet OS Market Share chart used by

21  Samsung's damages expert that shows that the share of tablets operating on Apple's iOS platform

22  fell between 2010 and 2011, while the share of tablets running on the Android operating platform

23  has risen.  Loss of tablet market share to Samsung in the future will lead to similar downstream

24  losses and negative effects on the Apple ecosystem as will losses in the smartphone market,

25  causing harm that is similarly difficult to quantify with reasonable certainty.

26

27      ~~102~~93 Deposition of Chip J. Lutton, Jr., dated July 26, 2011, pp. 328-329.

28

86.    Samsung has already demonstrated its ability to capture market share at Apple's expense through the sale of smartphones that infringe Apple's patents and dilute Apple's trade dress.  As shown in **Exhibits 11** and **11.1**, Samsung's smartphone market share in the second quarter of 2010—before the launch of the first Samsung phone that Apple accused of violating its intellectual property—was about 5%.  After Samsung launched its infringing Galaxy S line of products, Samsung's market share jumped to 14.2% by the third quarter of 2010.  By the third and fourth quarters of 2011, Samsung's smartphone market share had risen even further to 19.2%.  That represents a 284% increase in Samsung's market share following Samsung's launch of its infringing smartphones.  As one analyst stated, in the worldwide mobile phone market, Samsung's "growth is coming entirely from smartphones with the Galaxy line (Samsung's Android OS phones) as the main driver."[94]

**E.**    **Difficulty ~~in~~of Calculating Damages**

~~109.  As discussed elsewhere, I have concluded that the full amount of harm caused by Samsung's products cannot be adequately measured or compensated through monetary damages.  One of the reasons that the full measure of economic loss cannot be fully calculated is due to the fact that the scope and nature of the economic loss incurred by Apple is more extensive than what may be reasonably calculated and awarded as a damage award.~~

~~110.  The irreparable harm claimed by Apple due to Samsung's alleged infringement involves potential loss of present sales and market share, loss of future sales and market share, present or future price erosion, increased Apple costs, and the impairment of Apple's goodwill and brand. The economic remedies associated with the recovery of damages caused by Samsung's accused sales are limited to one or more of the four damage remedies identified earlier and the need for a reasonable basis on which to quantify those amounts.~~

~~111.  The damage remedies discussed below are intended to ensure that the injured party is "made whole through quantifiable means." However, as illustrated on **Exhibit 14**, not all forms of damage~~

---

[94] Oppenheimer Equity Research, "Mixed 2Q11 Wireless Checks," dated June 7, 2011, p. 5.

recovery are available for patent infringement. Additionally, the various forms of damage recovery listed do not directly consider nor adequately account for the critical point of transition that both the smartphone and tablet markets are experiencing. As discussed above, both product markets are poised for explosive growth now that Apple's innovative products have gained phenomenal market acceptance to the point where they have redefined the mobile phone market and revolutionized the tablet market. A loss of market share by Apple at this critical time in the market's development rewards the market followers and denies Apple, the complete and appropriate measure of damages for their creative and intellectual property contribution.

87.   112. As noted in **Exhibit 14**, one aspect of damages for which the patent laws offer no remedy is discussed above, Apple will suffer irreparable harm due to Samsung's ongoing infringement, in the form of harm to Apple's goodwill, erosion and dilution of Apple's brand, and potential loss of present and future sales and market share.  These harms cannot be adequately measured or compensated through monetary damages.  As illustrated in **Exhibit 14**, not all forms of damage recovery are available for patent infringement.  For example, patent law offers no remedy for the decrease in the value of Apple's intangible assets.[103] Injury to intangible assets, in particular brand value and goodwill, is not fully captured in a lost profits calculation. The issue of brand value or loss of brand value is no more important for any company than Apple as the owner of the most valuable brand in the world. In spite of their recognized value, including harm to Apple's goodwill and brand value, even though the impairment in value may be substantial.  In spite of the recognized value of intangible assets, such assets are difficult to measure.  In the words of one analyst:  "For many accountants, the absence of markets disqualifies intangibles from being considered as assets in corporate balance sheets.  Intangibles thus differ inherently from physical and financial assets, and the management, valuation and financial reporting of intangible assets are challenging."[104][95] The difficulties inherent in measuring both the value and the change in value in

---

[103] General intangible assets are comprised of numerous identifiable intangible assets such as a patent, trademark and trade secret and unidentifiable intangible assets that are generally categorized as goodwill.

[104][95] Intangible Assets: Concepts and Measurements, Baruch Lev, New York University, New York, USA, *Encyclopedia of Social measurement Measurement*, Volume 2, 2005.

1    such assets makes it very difficult to quantify and obtain as monetary damages an award that reflects the

2    full value of the losses that Apple will experience from unfair copying due to the alleged infringement by

3    Samsung of Apple's Intellectual Property In Suit.

4    113. Further, as discussed above, a lost profits calculation herein does not fully compensate Apple for the

5    full scope of its lost sales. Based on my experience in calculating patent damages in over 100 patent

6    cases, I understand the calculation of patent damages need not be calculated to absolute precision but

7    should be calculated to a reasonable degree of certainty. Additionally, patent damages cannot be

8    speculative. Accordingly, I have based my calculation of lost profits on a conservative model that

9    ensures compliance with the reasonable certainty standard, but this means Apple will not receive

10   money sufficient to compensate for the full measure of the damages and harm it is incurring.

11   114. For example, I have divided my lost profits calculation into two initial groups of lost sales, accused

12   sales made to carriers that did not offer an Apple product and carriers that did offer an Apple product.

13   I first limit the accused sales made through carriers that did not offer an Apple product to 26% of the

14   sales based on the percent of purchasers who would switch carriers. The support for this conservative

15   deduction is discussed in the lost profits section of this report. I further reduce both accused sales

16   bases to Apple's market share percent within the carriers that offer an Apple product. Additionally,

17   my lost profits calculation does not include the numerous ecosystem products that both Samsung and

18   Apple indicate would have been sold in the past and would be sold in the future. My lost profits

19   calculation also assumes that Samsung will return to the market with an acceptable non-infringing

20   substitute at a level of sales equal to its actual sales of accused products. All of these assumptions

21   favor Samsung but were made to ensure that the damages herein are calculated conservatively and to

22   a reasonable degree of certainty. However, it also means Apple's monetary recovery of damages has

23   been materially reduced and Apple is being irreparably harmed.

24   115. Even if the full measure lost profits for sales of iPhones, iPads, and immediate convoyed sales, as

25   described above could be measured, the full extent of Apple's harm is not limited to these lost profits.

26   Apple's lost market share would include lost sales relating to other Apple products that do not qualify

27   as convoyed sales but nevertheless are part of the established product relationship that Apple enjoys

28   based on Apple's customer loyalty and Apple's customers desire to maintain a standardized product

1   experience. These are derivative lost sales within the broader Apple ecosystem. Even Samsung's own

2   damage expert demonstrated the strength of the pull through sales element during his deposition. Mr.

3   Wagner indicated that when he purchased his iPhone he did not buy just one – he purchased six

4   iPhones because he wanted his entire family to be able to communicate more easily.[105] Further, Apple

5   iPhone users will be more likely to purchase other Apple products such as desktops, laptops, and

6   iPods after the initial purchase of an iPad and iPhone. My lost profit calculation does not compensate

7   Apple for this significant element of lost market share and future sales of related products.

8   　　　　88.   116. Finally, as part of Apple's ecosystem, the Accused Products are causing losses for

9   Apple related to the loss of sales of accessories Further, for at least the reasons discussed above, the

10   present damages calculation will not fully compensate Apple for its loss of market share at this

11   critical juncture in the growth of the smartphone and tablet markets.  The present damages model

12   also does not account for lost revenue that Apple could reasonably expect from ecosystem

13   purchases, accessory sales, music and videos video sales, mobile advertising, and revenue from

14   search engine royalties. iTunes, iAdd, and the App store are examples of these losses.[106] For each Apple

15   product that is not sold, Apple has lost the opportunity to sell both Apple branded and third party

16   accessories such as cases, screen protectors, headphones and car chargers.  These items are discussed in

17   more detail in the Lost Profits section of my report.  Next, Apple has lost sales of applications and media

18   (e.g. music, video and Apps) sold through iTunes to iPhone and iPad users. revenue, search engine

19   revenue, and downstream sales of future Apple products.  **Exhibit 22** shows that Apple has

20   reported iTunes revenue of $11 billion from fiscal year 2010 through first quarter 2012 2012,

21   ██████████████████████████.  Another source of revenue directly related to the iPhone

22   and iPad is mobile advertising. Mobile advertising is displayed to iOS users through Apps.[107] From fiscal

23   year 2010 through first quarter 2012, Apple has earned $161 million in revenue and ████████

24   ████████████████████ see **Exhibit 22**. Another category of additional revenue generated

25   by Apple through iPhone and iPad usage is search engine royalties. When an iPad or iPhone user conducts

26

27   [105] Deposition of Michael J. Wagner, September 14, 2011, pp. 61-62.
     [106] Deposition of Chip J. Lutton, Jr., July 26, 2011, pp. 328 – 329.

28   [107] Deposition of Mark Buckley, February 23, 2012, pp. 153 – 156.

1   a search on Google, Microsoft Bing, or Yahoo, Apple receives revenue for each of those searches.[108]

2   Exhibit 23 shows that revenue related to search engine royalties for all iOS devices has grown to over $75

3   million quarterly, and that Apple has earned $161 million in revenue and ██████████████████

4   ████████ on mobile advertising.  Exhibit 23 shows that Apple earned over $75 million in each

5   of the third and fourth quarterquarters of 2011 from search engine royalties, and saw a dramatic

6   increase in search engine royalties since the second quarter of 2010, the same quarterwhen the iPad

7   was released.  All of these forms of revenue sources are extremely difficult to tiemeasure in

8   relation to a specific iPhone or iPad lost sale and therefore they are not included in my calculation of

9   monetary damages.

10   **VIII.   P.MONETARY DAMAGE ANALYSIS DAMAGES**

11        **A.      Use of Mr. Musika's Methodology**

12        89.     In preparing this report, I have been mindful of the Court's ruling in the April 29

13   Case Management Order that the new trial on damages will be limited to "correct[ing] the

14   erroneous notice dates," and that the parties must not "expand the scope of the damages trial by

15   relying upon: (1) new sales data, including any sales after June 30, 201[2]; (2) new products; and

16   (3) new methodologies or theories."[96]  I have therefore prepared a calculation of the money

17   damages to which Apple is entitled for Samsung's infringement of the New Trial Patents for the

18   products-at-issue using the same damages model and methodologies described in the expert

19   reports and supplements prepared by Mr. Musika.  I have used the same models and software

20   tools, including certain Access databases and Excel spreadsheets prepared previously by Invotex

21   in connection with the preparation of Mr. Musika's reports, supplements, and trial testimony.  I

22   have worked with the same staff at Invotex that Mr. Musika used to support him in his analysis of

23   Apple's damages.  And, except as described below, I have used as inputs the same data that Mr.

24   Musika used as inputs to his model.

25

26

27        [108] Deposition of Mark Buckley, February 23, 2012, pp. 146 - 152.

28        [96] Dkt. 2316 at 3: Case Management Order, dated Apr. 29, 2013.

90.     As Mr. Musika noted in his Original Expert Report, he created a methodology and a model that could be adjusted to address differences regarding which products were included, which intellectual property was included, and the date on which Samsung had actual notice of Apple's patent and began any effort to design around it.[97]  Thus, it was possible, working with Invotex, to use Mr. Musika's methods and the tools he had prepared to update the calculation of damages to address the circumstances presented in the new trial.

91.     In preparing the calculation of money damages presented in this report, the only changes I have made to Mr. Musika's calculations are the changes described below, each of which arose from the jury's August 24, 2012 amended verdict, the Court's March 1 Order, or the April 29, 2013 Case Management Order.

92.     Mr. Musika's report was based on the assumption that all intellectual property asserted by Apple at trial would be found to be infringed and/or diluted by the products accused for each intellectual property asset.  On August 24, 2012, the jury found that most, but not all, of the intellectual property asserted by Apple was infringed or diluted and that all of Apple's patents were valid.[98]  At my direction, Invotex replaced Mr. Musika's assumptions with the actual jury findings, and thus modified the calculation of damages to reflect the findings of the jury regarding infringement and validity for the accused products as follows:

- Calculated damages for the 13 products that are the subject of the new trial only with respect to intellectual property found by the jury to be infringed by those products, eliminating damages for other asserted intellectual property (such as Apple's trade dress) that the jury found not to be violated.[99]  A table of the intellectual property that I used in the calculation is found in **Exhibit 4-PT**.  In comparison, **Exhibit 4-S2** reflects all the intellectual property and all the products against which Apple's intellectual property was asserted in the August 2012 trial.

---

[97] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, pp. 25-26, ¶ 89.

[98] Dkt. 1931 at 2-15: Amended Verdict Form, dated Aug. 24, 2012.

[99] Dkt. 1931 at 2-15: Amended Verdict Form, dated Aug. 24, 2012.  Questions 15 and 16 of the Amended Verdict Form address Apple's trade dress claims.

1      • Adjusted the *Mor-Flo* calculations to account for the jury's verdict that the

2         Intercept did not infringe Apple's utility patents.[100]

3      • Adjusted the calculation of Apple's lost profits with respect to Samsung's sale of

4         the infringing Galaxy Tab 7.0 to account for the jury's finding that the Galaxy Tab

5         10.1 LTE 4G, which was introduced in July 2011, did not infringe Apple's

6         intellectual property.[101]

7      93.    In the March 1 Order, the Court made specific findings regarding the dates on

8  which Samsung had actual notice of the relevant patents.[102]  As a result, the Court ordered a new

9  trial on certain products.[103]  At my direction, Invotex modified the calculation of damages to

10  reflect the March 1 Order as follows:

11      • Adjusted the calculations to include only the 13 products for which a new trial has

12         been ordered.[104]

13      • Adjusted the calculation of Samsung's profits based on Samsung's gross profits

14         and incremental profits overall and for each of the seven products that infringed

15         one or more Apple design patents (Captivate, Continuum, Droid Charge, Epic 4G,

16         Gem, Indulge, and Infuse 4G) to start no earlier than the first date on which the

17         Court found Samsung had actual notice of the design patents.[105]

18

19

20

---

[100] Dkt. 1931 at 2-4: Amended Verdict Form, dated Aug. 24, 2012.  Questions 1, 2, and 3 reflect the jury's findings that the Intercept did not infringe any Apple utility patent.

[101] Dkt. 1931 at 7 and 10: Amended Verdict Form, dated Aug. 24, 2012.  Questions 8, 9, 14, and 18 reflect the jury's findings with respect to the Galaxy Tab 10.1 LTE 4G.

[102] Dkt. 2271 at 15-20 and 26: Order re: Damages, dated Mar. 1, 2013.

[103] Dkt. 2271 at 26: Order re: Damages, dated Mar. 1, 2013.

[104] Dkt. 2271 at 26: Order re: Damages, dated Mar. 1, 2013 (ordering retrial on fourteen products, including the Galaxy S II AT&T); Dkt. 2316 at 2: Case Management Order, dated Apr. 29, 2013 (granting Apple's motion for reconsideration with respect to the Galaxy S II AT&T and reinstating the jury's award for that product).

[105] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013.

- Adjusted the calculation of Apple's reasonable royalty damages so that any reasonable royalty for any infringed utility patent did not accrue before the date on which the Court found Samsung had actual notice of that patent.[106]

- Adjusted the calculation of Apple's lost profits so that lost profits damages did not accrue, and the period during which Samsung would attempt to design around a patent did not start, before the date on which the Court found that Samsung had actual notice of the patents.[107]

94.     [Reserved][108] [109]

95.     The alternative calculations discussed above are available in the Appendix.

96.     Beyond the changes resulting from the foregoing items, I have not made any changes to the damages model prepared by Mr. Musika.

**B.     Legal Overview of Monetary Damages Remedies**

97.     I have reviewed the legal principles applied by Mr. Musika in paragraphs 117-119 of his report, and the methodologies that he used to calculate damages in connection with the first trial. I have applied those same principles and methodologies here and incorporate these portions of his report and the related exhibits by reference.

98.     117. The economic remedies associated with the recovery of damages caused by Samsung's sales accused of violating one or more forms of Apple's Intellectual Property In Suit falls within one or more of the following four damage remedies identified by the American Institute of

---

[106] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013.

[107] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013. As discussed further in connection with the calculation of Apple's lost profits and in anticipation of a possible argument by Samsung that was suggested in Mr. Wagner's report, I have also prepared alternative calculations of Apple's lost profits damages based on a different assumption of when Samsung's efforts to design around Apple's patents would begin. Using the same tools and overall methods disclosed by Mr. Musika, I changed one assumption to hypothesize that Samsung would attempt to design around a patent from the first date that Samsung infringed a patent, even though Samsung did not have actual notice of Apple's patents from which to start making modifications. In my opinion, this approach is illogical and does not reflect the methods that Mr. Musika used in his reports.

[108] [Reserved]

[109] [Reserved]

1  ~~Certified Public Accountants.~~ As Mr. Musika noted, the American Institute of Certified Public

2  Accountants identifies four types of economic damages remedies. Taken together, these damages

3  remedies provide the quantifiable means by which an injured party is made whole after

4  infringement. Each of Samsung's sales that infringed one or more New Trial Patents can be

5  placed into one or more of these buckets.

6        99.    These "quantifiable" buckets include:

7        •  Compensatory Damage Recovery – "Compensatory actual damages for intellectual

8        property infringement or misappropriation, accordingly, are intended to

9        compensate the plaintiff for economic loss caused by the infringement. Examples

10        of compensatory damages include lost profits (i.e., profits lost on sales that would

11        have been made 'but for' the infringement ~~[or due to trade dress dilution]~~) and

12        reasonable royalty (i.e., royalty income that the plaintiff would have earned had it

13        entered into an agreement to license the intellectual property in suit to defendant),

14        among other measures."[~~109~~110]

15        •  General Damage Recovery (Market Value Measure) – "The market value measure

16        is what courts most often refer to when they use the term *general damages*. The

17        market value measure determines the market value of the intellectual property 'as

18        is' and the market value 'as if it were not injured.' The difference between these

19        two values is the damage that the defendant's wrongful act inflicted on the owner

20        of the intellectual property."[~~110~~111]

21        •  Special or Consequential Damages (Lost Opportunity Measure) – "The lost

22        opportunity measure quantifies the decrease in market value or the impact on

23        market value that the intellectual property owner is deprived of by reason of the

24

25  _____

26  [~~109~~110] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 20.

27  [~~110~~111] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, pp. 20-21.

28

infringement.  This lost opportunity measure is often referred to by the courts as *special* or *consequential damages*."~~111~~112

- Unjust Enrichment and Prejudgment Interest – "Unjust enrichment is an alternative damage measure to compensatory damages."~~112~~113  An "unjust enrichment award seeks to deprive the defendant of whatever gain or benefit was obtained from the wrongful act."~~113~~114

~~118.  The aforementioned damage remedies are intended to ensure that the injured party is "made whole through quantifiable means." The damages available under each of these remedies can be measured by one or more methods of calculating damages. However, as illustrated on **Exhibit 14**, the methods of damages available under each of the various forms of Apple intellectual property vary.~~

~~119.  **Exhibit 20** provides a description of the methods of damages asserted for each item of intellectual property and the key variables of each method.  I have provided below a description of my approach to the calculation of damages for each of the damage methods.~~

~~*Lost Profits*~~

~~120. To prove entitlement to lost profits, Apple must demonstrate that the Samsung infringement was a "but for" cause of Apple's losses. To prove causation, Apple must demonstrate to~~

**C.     Apple's Lost Profits**

100.    I have examined Mr. Musika's methodology for determining Apple's lost profits, which is described in more detail in his Original Expert Report at paragraphs 120 to 137 and the exhibits cited in those paragraphs.  Among other things, Mr. Musika concluded that Apple had suffered lost sales due to Samsung's infringement, and using methods associated with the *Panduit* factors, evaluated the size and scope of Apple's damages.  His calculation accounted for non-infringing alternatives available at individual wireless carriers through an analysis of Apple's

---

~~111~~112 AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

~~112~~113 AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

~~113~~114 AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

1  market share at each carrier and by separately accounting for the time required for Samsung to

2  design and market an alternative that does not use Apple's patented technology.  As discussed

3  more completely below, I agree with Mr. Musika's approach to calculating Apple's lost profits,

4  have applied the same methodology for the infringing products that will be the subject of the new

5  trial, and incorporate these portions of his report and exhibits by reference.

6      101.    As discussed above, I am aware that an owner of design or utility patents can

7  recover lost profits as a measure of damages.  In order to be entitled to damages calculated in the

8  form of lost profits, though, "Apple must show that but for the infringement, there is a reasonable

9  probability that, "but for" Samsung's conduct, it would have made the sales that were originally made by

10 Samsung. **Exhibit 15** identifies each item of Apple Intellectual Property In Suit for which a lost profits

11 damage amount is claimed. As illustrated on **Exhibit 15**, lost profits is claimed for only certain items. The

12 *Panduit* test is a non-inclusive but frequently used guideline to evaluate the amount and nature of sales that

13 the patentee would have replaced the infringer's sales absent infringement.[114] I have used it to help guide

14 my evaluation.  The *Panduit* test evaluates the following four economic conditions.

15 **121.** The first condition is whether demand existed for the patented product during the period of

16 infringement. It is fair to say that the demand for both Apple and Samsung's it would have made

17 sales that [Samsung] made of the infringing products.  Apple must show the share of

18 Samsung's sales that it would have made if the infringing products had not been on the

19 market."[115]  One approach used to satisfy this "but for" test is by meeting four criteria,

20 commonly referred to as the *Panduit* factors.[116]

21      **1.    *Panduit* Factors**

22      102.    When applying the *Panduit* test, the patentee must establish that each of the

23 following four *Panduit* factors is met in order to obtain an award of lost profits:

24

25 [114] *Panduit Corp. v Stahlin Bros. Fibre Works, 575 F.2nd 1152 (6th Cir. 1978).*

26 [115] Dkt. 1903 at 50: Final Jury Instruction No. 36, Utility Patents—Infringement Burden
of Proof.

27 [116] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *See
also* Dkt. 1903 at 51: Final Jury Instruction No. 37.

28

1.   Demand for the patented product;

2.   Absence of acceptable non-infringing substitutes;

3.   Manufacturing and marketing capability to exploit demand; and

4.   Amount of profit that the patentee would have made absent the infringement.[117]

### a.      Demand for the Patented Product

103.    Mr. Musika concluded that there is significant demand for Apple's and Samsung's smartphones and tablets that practice the technology of the New Trial Patents for which Apple is making a claim of lost profits.  I agree.  There is substantial demand in the U.S. marketplace for iPhones and iPads, each of which was among the most popular mobile devices sold in the marketplace between 2010 and 2012.  Although it is likely that demand for the parties' smartphones and tablets is driven by a ~~combination of factors and not just the benefits associated with the individual items of Apple's Intellectual Property In Suit for which Apple is claiming a lost profit. However, the evidence collected and the material that shows Apple and Samsung's commercial success reflects a demonstrated demand for benefits associated with the Apple Intellectual Property In Suit for which Apple is seeking a lost profit damage. I have identified and documented numerous examples of demand for each item of Apple Intellectual Property In Suit for which Apple is seeking a lost profit on Exhibits 24 and 25. The numerous examples of evidence involving demand include Samsung strategy and product planning documents prepared in the ordinary course, survey data, third party market and consumer analysis, Samsung and Apple advertising materials and other evidence that relate to the claimed technology.~~ multitude of factors, I am also aware of substantial evidence that illustrates the demand for the particular benefits of the New Trial Patents for which a claim of lost profits is being made. As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 25-PT** details examples of demand for technology of the '381, '915, and '163 Patents as they relate to both smartphones and tablets. As reflected in Mr. Musika's Original and Supplemental Report, **Exhibit 24-PT** details examples of demand for and importance of design in selling smartphones.  The sources of

---

[117] Dkt. 1903 at 51: Final Jury Instruction No. 37, Utility Patents—Direct Infringement.

evidence summarized in these exhibits include the following:  Apple advertising materials, Samsung advertising materials, Samsung product development and planning documents, Samsung strategy documents, survey data, third-party market and consumer analysis, testimony and email from representatives of the parties, and other evidence related to the patents and products for which lost profits are claimed.  I agree with Mr. Musika's conclusion that these documents reflect substantial demand for the iPhone and the patented features.

104.   ~~122.~~ In addition,~~ I have received~~ to the evidence discussed in **Exhibits 24-PT and 25-PT**, Mr. Musika and I have reviewed the results of two consumer surveys ~~prepared~~performed by Dr. John Hauser, a professor at Massachusetts Institute of Technology.  ~~His surveys are based on conjoint analysis, a widely studied and applied form of quantitative consumer preference measurement.~~ ~~Professor Hauser used conjoint analysis~~ I have also spoken with Dr. Hauser.  For both smartphones and tablets, Dr. Hauser was asked "to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue.  ~~His work demonstrates that respondents are willing to pay a high price premium for the patented features covered by the utility patents that were tested, the '607, the '915, the '381 and the '163 Patents.  This evidence strongly supports a~~"[118]   Using conjoint analysis, Dr. Hauser concluded that "for both smartphones and tablets, Samsung consumers are willing to pay a significant price premium for the tested features that are covered by the patents at issue."[119]  These test results support the conclusion that there is demand for the ~~specific patented features in suit and that their presence (or absence) will affect consumer decision making.  It is therefore additional support of this element of a lost profits calculation.~~technology of the utility patents at issue in this trial.

105.   As one example of the evidence that reflects demand for the iPhone and patented features in the product, consider a report by Gravity Tank discussed as item 61 of **Exhibit 25-PT** and item 69 of **Exhibit 24-PT**.  Gravity Tank was a consultant hired by Samsung to evaluate the

---

[118] For both smartphones and tablets, Dr. Hauser tested the '915 patent alone, and a combination of the '381, '163, and '915 Patents.  *See* Expert Report of John R. Hauser, dated Mar. 22, 2012, pp. 6-7.

[119] Expert Report of John R. Hauser, dated Mar. 22, 2012, p. 7.

1    strategy for introducing a touchscreen smartphone in the United States and elsewhere.  Gravity

2    Tank told Samsung in 2008 that "[p]undits tell us that the iPhone is a revolution" that was hailed

3    for "its beauty and functionality."[120]  It praised Apple's "screen centric design" that "has set the

4    standard" in the category.[121]  Consumers described the product and interface as "whimsical," in

5    part because "lists bounce," and "fun" because of its "two fingered pinch" functionality.[122]

6    Consumers also commented that iPhone "changed their notion of what a phone can and should

7    be" and that they see the phone as "enjoyable, engaging and cool."[123]

8            106.    Other examples include internal Samsung emails and documents recognizing that

9    the iPhone revolutionized the industry with its beautiful design and superior functionality.  A

10   September 2007 Samsung document, for example, discussed in items 68 and 95 of **Exhibit 24-**

11   **PT**, noted that the iPhone was a key factor expected to "shape handsets in the coming five years,"

12   identifying that the iPhone's "beautiful design" and "easy and intuitive UI" could contribute to its

13   success in the future, and that "competing with iPhone one way or the other is inevitable."[124]  One

14   year later, in September 2008, a Samsung executive stated in an email that "implementation of

15   sleek product design as shown by iPhone would be what is considered by product planning and

16   sales as the greatest appealing factor," and shortly thereafter an internal Samsung UX

17   presentation referred to Apple's user interface as "highly innovative."[125]  By February 2010,

---

[120] PX36.20: Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

[121] PX36.31: Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).  *See also* Gravity Tank, Touch Portfolio: Key Takeaways, dated Dec. 24, 2008 (SAMNDCA10805169–SAMNDCA10805175 at SAMNDCA10805170) ("recognize iPhone's screen-centric design as the touch phone standard").

[122] PX36.36: Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

[123] PX36.22, 36:  Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

[124] PX34: Feasibility Review on Standalone AP Business for Smart Phone Market, dated Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at SAMNDCA10809402 and SAMNDCA10809427); *see also* PX34.37: Feasibility Review on Standalone AP Business for Smart Phone Market, dated Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at SAMNDCA10809426) (observing about the iPhone "HW portion: easy imitation").

[125] See **Exhibit 24-PT**, item 90:  Email chain re: "Relaying the CEO's opinions on touch method and call to a meeting" (SAMNDCA11374409–SAMNDCA11374414 at

(Footnote continues on next page.)

1  Samsung's Head of Mobile Division pronounced a "crisis of design" at Samsung as reflected in
2  the email discussed in item 21 of **Exhibit 24-PT**.[126]  Specifically, Samsung's Head of Mobile
3  Division observed that the difference between the iPhone and Samsung's phones was "truly that
4  of Heaven and Earth."[127]  While yet another email, discussed in item 22 of **Exhibit 24-PT**,
5  recorded a statement by Samsung CEO G.S. Choi that Samsung was "clinging to the past
6  generation" and needed to "learn the wisdom of the iPhone and recognize the standard of the
7  industry which was set by them already."[128]  By late 2010 and early 2011, other Samsung
8  presentations emphasized the "[n]eed to recognize the importance of exterior design" as a
9  customer purchase-inducing factor and referred to iPhone 3GS and 4 as "most trendy" and
10 "premium."[129]

11      107.    Against this backdrop, in March 2010, Samsung's internal product development
12 team prepared a detailed 132-page feature-by-feature comparison of Samsung's proposed
13 smartphone, then known as the S1, to Apple's iPhone.[130]  This document is discussed as item 49
14 of **Exhibit 24-PT** and item 38 of **Exhibit 25-PT**.  During development of the S1 phone,
15 Samsung's designers compared the icon layout and various user interface functions of the S1 to
16 the iPhone point by point, and recommended adoption of Apple's features.  Thus, on page 58 of
17 the report, Samsung's product development team recommended that Samsung adopt the use of

18

19 (Footnote continued from previous page.)
20 SAMNDCA11374410); 2009 Mobile UX Forecast:  M.T.O.C., dated Nov. 10, 2008,
   SAMNDCA00214969–SAMNDCA00215201 at SAMNDCA00215128.
21     [126] PX40: Email chain re: Summary of Executive-Level Meeting Supervised by Head of
   Division (February 10) (SAMNDCA10247373–SAMNDCA102473 at SAMNDCA102477.)
22     [127] PX40: Email chain re: Summary of Executive-Level Meeting Supervised by Head of
23 Division (February 10) (SAMNDCA10247373–SAMNDCA102473 at SAMNDCA102477.)
       [128] PX194: Email chain re: To UX Executives…, dated Mar. 2, 2010
24 (SAMNDCA10247549–SAMNDCA10247552 at SAMNDCA10247549).
25     [129] 2011 Smartphone CS Project Final Report, dated Apr. 28, 2011,
   SAMNDCA10257309–SAMNDCA10257365 at SAMNDCA10257319; Premium & Mass
26 Design Preference Study, dated Nov. 2010 to Jan. 2011, SAMNDCA00176172–
   SAMNDCA00176202 at SAMNDCA00176192.
27     [130] PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–
   SAMNDCA00204010).
28

"double tapping" to view web pages.[131]  At page 122, Samsung recommended adopting an icon layout design that looks more similar to Apple's designs.[132]  In context, all this evidence reflects Samsung's conclusion that Apple's patented design elements and user interface technology were attractive to consumers.

### b.   Absence of Acceptable Non-Infringing Substitutes

108.   The second factor that must be proven in order to claim lost profits under the *Panduit* framework is the absence or effect of products that the marketplace would find acceptable as a substitute for the patented product.  In order to be an acceptable substitute, a product must have the advantages of the patented invention that were important to customers, and must not infringe the New Trial Patents.  If no such products are deemed available, then an absence of acceptable non-infringing substitutes exists.  Mr. Musika and I agree that the availability of non-infringing substitutes does not render a claim of lost profits moot.  Rather, even if non-infringing substitutes are available, Apple can still claim lost profits on "the number of the sales of each product made by [Samsung] that Apple would have made despite the availability of other non-infringing substitutes."[133]  Mr. Musika assumed that non-infringing substitutes did exist in some periods for certain consumers.  I have adopted the same approach. Mr. Musika sought information on and adjusted the lost profits calculations to account for the time it would take to identify, implement, and market a non-infringing alternative to Apple's patented inventions.  I pursued and obtained the same information from the same sources.  I also understand that the *State Industries, Inc. v. Mor-Flo Industries, Inc.*[134] case is used in connection with the second *Panduit* factor in situations where the market includes acceptable substitutes for the patented product.  This case provides guidance in calculating the market share by the patent

---

[131] PX44.58: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

[132] PX44.122: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

[133] Dkt. 1903 at 51: Final Jury Instruction No. 37, Utility Patent Damages—Lost Profits—Factors to Consider.

[134] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577-80 (Fed. Cir. 1989).

1  owner as a percentage of the total market as represented by the patent holder and other market

2  participants using non-infringing substitute technology.[135]  As discussed further below and as

3  detailed in the attached exhibits, I have adjusted my lost profits calculation for the 13 products in

4  the present trial in a manner that I understand is consistent with the *Mor-Flo* case to account for

5  the possibility that smartphones and tablets not at issue in this case would be acceptable non-

6  infringing alternatives.

7  109.  123. A second condition is what acceptable non-infringing substitutes exist in what

8  periods. I concluded that non-infringing substitutes did exist in some periods.  Further, I have

9  conservatively prepared my damage calculation as if other non-accused smartphones in the market

10  generally represented an acceptable non-infringing substitute for some consumers. I have done this even

11  though Apple has sued many of the other smartphone makers for violation of patents and has in some

12  circumstances already won with respect to certain smartphones and certain intellectual property.[115] The

13  manner in which the second *Panduit* factor has been accounted for in the lost profits damages

14  calculation is conservative for a number of reasons.  First, assuming that all non-infringing

15  smartphones are acceptable substitutes ignores the fact that Apple has litigated other patents

16  against other smartphone manufacturers and has won.[136] I have made these assumptions even though

17  the conjoint analysis by Dr. Hauser shows that many of the noninfringing substitutes would be valued

18  significantly less by surveyed respondents.  It is significant to note that the *Panduit* test is not a required

19  test and merely represents one way in which to evaluate whether the patentee would have made the

20  infringing sales absent infringement. Therefore, proof that one or more non-infringing substitutes might

21  exist and might be acceptable to some degree to consumers does not resolve whether Apple has lost sales

22  as a result of Samsung's accused infringement. The actual issue is whether there were sales that Apple

23  would have made assuming no infringement accounting for any non-infringing substitutes. To be

24  conservative in my assessment, I have significantly reduced the number of accused units that would have

25
26  [135] Dkt. 1903 at 53: Final Jury Instruction No. 39, Utility Patent Damages—Lost Profits—Amount of Profit.

27  [115] U.S. [136] United States International Trade Commission Investigation No. 337-TA-710: ; Notice of the Commission's Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order; Termination of the Investigation, December 19, 2011, pp. 2-3. 2.

28

1   ~~been sold by Apple based on an assumption that Samsung could have returned to the market after~~

2   ~~removing and/or replacing the accused technology and that the products that use the alternative form of~~

3   ~~technology would be desirable to consumers.~~  Second, as discussed above, Dr. Hauser's study found

4   that "Samsung consumers are willing to pay a significant price premium for the tested features

5   that are covered by the patents at issue."[137]  The implication of his finding is that the non-

6   infringing alternatives available to the surveyed respondents would be valued significantly less.

7   Third, the lost profits calculation assumes that Samsung would have returned to the market with a

8   designed-around, non-infringing alternative that is just as desirable to consumers as the infringing

9   smartphones and tablets and could do so immediately upon the reintroduction of the product into

10   the market.

11   ~~124.~~ ~~This decision reflects a matter of judgment that substantially misses a significant portion of the harm~~

12   ~~that Apple is experiencing.  There is ample evidence that Samsung copied Apple's designs and its~~

13   ~~patented technology.  It is also apparent that they did so based on a belief that such actions made the~~

14   ~~resulting products significantly more desirable to consumers.  Empirically, Samsung did not begin to~~

15   ~~succeed in the smartphone marketplace until products that used Apple's Intellectual Property In Suit~~

16   ~~entered the market in 2010.  There is no support that any alternative design would be commercially~~

17   ~~acceptable.  Nonetheless, it is difficult to obtain a precise measure of that change.  My analysis can~~

18   ~~however, measure the impact that changes in the level of acceptance would have on Apple's damages.~~

19   ~~My analysis can estimate the amount of lost profits that was available but not claimed as a damage~~

20   ~~assuming Samsung's design around model was not commercially acceptable.  There are 18,230,472~~

21   ~~accused units.  I calculated lost profits on only 2,197,534 of the total (approximately 12%).  Assuming~~

22   ~~an infringer's profit was awarded on every accused unit in which a lost profit damage was not claimed,~~

23   ██████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████  ██████████

26   ~~125.~~ ~~My model is similarly conservative in that it assumes that Samsung returns to the market and can~~

---

[137] Expert Report of John R. Hauser, dated Mar. 22, 2012, p. 7.

1   ~~achieve similar sales immediately upon its return.   Again, this is unlikely in practice and this~~

2   ~~assumption significantly reduces the amount of lost profits that I calculate on Apple's behalf.~~

3          110.    This third conservatism is contrary to certain evidence in this case.  For example,

4   there is evidence that the designs and technology of Apple's New Trial Patents were copied by

5   Samsung with the belief that consumers would find the resulting infringing products to be more

6   desirable.[138]  Further, and as discussed above, Samsung experienced large gains in market share

7   during the period when it was selling infringing products.  These two points suggest that Samsung

8   may not have been able to return to the market with products that were just as desirable to

9   consumers.

10         111.    To the extent that either the available non-infringing alternatives or Samsung's

11  redesigned non-infringing products were not found by consumers to be acceptable, then the

12  calculation of lost profits could result in a potential understatement of the harm experienced by

13  Apple.  For example, as shown on **Exhibit 17.2-PT-H**, of the 11,441,157 infringing smartphones

14  and tablets, lost profits have only been calculated on 1,322,751 units, or about 11.6% of

15  infringing sales.  This is substantially less than Apple's unadjusted market share in all periods.  If

16  I simply used Apple's unadjusted market share to calculate lost profits, the damage amount

17  attributed to Apple's lost profits would have more than doubled.

18

19

---

20  [138] For example, an internal Samsung document dated March 2, 2010, shows a side-by-side comparison of the iPhone and a pre-launch version of a Samsung Galaxy S phone.  The
21  document notes with respect to the double-tap-to-zoom feature:  "iPhone:  After the screen has been expanded and another point is Double tapped, it moves to another screen and expands that screen.
22  S1:  After the screen has been expanded and another point is Double tapped, the screen reduces to the original size. . . . Improvement: Double Tap zoom in/out function needs to be supplemented."
23  PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00203937).  That same document notes with respect to the
24  GUI feature:  "iPhone:  It maximizes a 3 dimensional effect utilizing light and the curve of icon frames is smooth.  S1:  There is no feeling of receiving light, and deficient feeling of softness in
25  the curvature of icon corners. . . . Directions for Improvement:  Insert effects of light for a softer, more luxurious icon implementation."  PX44: Relative Evaluation Report on S1, iPhone, dated
26  Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010).  *See also* PX46: Behold3 Usability Evaluation Results, dated May 10, 2010 (SAMNDCA00508318–
27  SAMNDCA00508411 at SAMNDCA00508383) (recommending adding bounce for a "fun visual effect" like the iPhone).  Other examples are set forth in **Exhibits 24-PT** and **25-PT**.

28

### c.      Marketing and Manufacturing Capability to Exploit Demand

112.    The third *Panduit* factor considers that the patentee is only entitled to lost profits for those sales it would have been capable of making.  The patentee must prove it had the capacity to manufacture and market the additional products in order to ensure the sale.

113.    From an analysis initially prepared by Mr. Musika and confirmed by me, I understand that Apple had sufficient capacity to produce the additional iPhones and iPads that would have resulted from capturing sales lost to Samsung.  To confirm this determination, I discussed Apple's manufacturing capacity with Mark Buckley, Apple's Finance Manager; Anuj Saigal, Apple's Director of Americas Supply Management; and Rory Sexton, Apple's Vice President of Supply Demand Management.  Messrs. Saigal and Sexton were responsible for compiling two reports related to Apple's sales and supply capabilities for the iPhone and iPad during 2010 and 2011.[139]

114.    126. The third condition is whether Apple had the demonstrated operational capacity to replace Samsung's accused sales. To evaluate Apple's ability to handle the excess demand created by the need to supply iPhones and iPads in the "but-for" market, I have (1) evaluated a capacity analysis performed by Apple and set forth in two reports that were discussed at the deposition of Mark Buckley, and (2) had  discussions with Mr. Buckley and Rory Sexton, Apple's VP of Supply and Demand Management.[116] This analysis represents Apple's actual quarterlyThese reports capture information related to Apple's actual manufacturing and sales results[140] as well as Apple's unused capacity to produce units above what was actually manufactured, referred to by Apple as "Installed Capacity." To

---

[139] iPad and iPhone Supply and Sales: 2010-2011: K Units (APLNDC-Y0000055416– APLNDC-Y0000055416); Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton. [116] APLNDC-Y0000055416 and APLNDC-Y0000055417; Deposition of Mark Buckley, February 23, 2012, Exhibits 15 and 16; Discussion with Rory Sexton and Mark Buckley.

[140] Actual Saleable Units = units actually manufactured and available for sale.  Units Sold In = units sold by Apple to a third party.  Actual Units Unsold = Actual Saleable Units – Units Sold In.  Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

1  calculate the installed capacity, Apple determined [141] during each calendar quarter from January 2010

2  to December 2011.  When calculating the maximum number of units Apple could produce each

3  quarter during this time period, Messrs. Saigal and Sexton took into consideration a number of

4  factors.  Among these were the following: the number of manufacturing lines which were in place

5  during the 2010 – 2011 period.  Next, by applying the maximum manufacturing rates and the number of

6  days and hours in service, the maximum number of units available was calculated.  Last, Apple made

7  adjustments to decrease that maximum to accommodate for periods where there were known shortages in

8  parts and materials, product allocated to a particular location, time needed 2010 and 2011, the

9  capabilities of those lines, average manufacturing line uptimes of 20 hours per day for six days

10  per week, known part shortages, and downtime for maintenance, holidays, and other periods in

11  which manufacturing stops, and other factors that affect capacity as well as to adjust for returns, and

12  manufacturing defects.[117] and other reasons.[142]  The capacity reports also took into consideration

13  necessary adjustments for defective products and returns.[143]

14          115.    These reports were also discussed at Mr. Buckley's February 23, 2012

15  deposition.[144]  Mr. Buckley testified that the capacity reports were based on the existing

16  manufacturing lines and they detailed the additional units that Apple could have manufactured.[145]

17  He further testified that the capacity reports were based on what Apple "had in those

18  manufacturing plants, and [took] into consideration known parts constraints, . . . six-day

19  workweeks, [and] maintenance being involved."[146]

20

21

---

22      [141] Installed Capacity Saleable Units = maximum number of units that Apple could have

23  made with its installed capacity.  Installed Capacity Units Unsold = Installed Capacity Saleable
    Units – Units Sold In.  Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.
    [117] Discussion with Rory Sexton and Mark Buckley.

24      [142] Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

25      [143] Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

26      [144] Deposition of Mark Buckley, dated Feb. 23, 2012, Exhibits 15 and 16.

27      [145] Deposition of Mark Buckley, dated Feb. 23, 2012, p. 197.

28      [146] Deposition of Mark Buckley, dated Feb. 23, 2012, p. 197.

116. 127. As shown on **Exhibits 26 & 27**, I have usedIn the same manner that Mr. Musika did in paragraph 127 of his report and **Exhibits 26-S** and **27-S**, I have used these reports as the starting point for my evaluation of Apple's capacity to manufacture a sufficient quantity of additional iPhones and iPads to cover those sales lost to Samsung. As shown on **Exhibits 26-S** and **27-S**, Invotex calculated Apple's analysis to calculate the quarterly excess unused capacity for both the iPhone and the iPad. [redacted] iPhones and iPads from 2010 to 2011. This calculation is conservative for a number of reasons. First, [redacted] tries [redacted] keep [redacted] on hand. Based on [redacted] Invotex [redacted] This created a conservative estimate of Apple's excess capacity available for the sales of units in the "but-for" scenario. Additionally, I made the excess capacity created during a quarter to be Second, since Invotex did not know when during a quarter excess inventory would actually be created, Invotex made the excess inventory available only at the startbeginning of the following quarter because I did not have timing [redacted]. [redacted] . As shown on **Exhibit 17.2**, Apple demonstrated its ability to have capacity to accommodate additional units as calculated in this report.[148]

**128.** The fourth and final factor requires that the calculation be completed to a reasonable degree of certainty. As described in detail below, I have completed a detailed analysis of Apple's sales "but for" Samsung's alleged infringement. This calculation relies on the parties' document production, sworn testimony and industry analysts who are relied upon by both Apple and Samsung. Additionally, this model is constructed using a series of conservative approaches which are described in detail in this report.

---

[147] **Exhibit 26-S.**

[148] **Exhibit 27-S.**

**129.** The above analysis is intended to provide evidentiary support for the position that Apple would have made Samsung's sales "but for" Samsung's improper use and reliance on one or more identified items of Apple Intellectual Property In Suit. However, as indicated my methodology adopts an even more conservative premise in that it assumes that Samsung would have developed some conceptual design alternative to the asserted intellectual property, returned to the market once such conceptual alternative was designed, tested, manufactured and distributed to sell an equivalent number of units with the redesigned product. All these assumptions are conservative. Accordingly, Apple's lost sales are based on the amount of lost sales only during the number of months Samsung is removed from the market. **Exhibit 20** identifies the number of months to design, test, manufacture and distribute an alternative smartphone and tablet that does not embody the accused element of each item of Apple Intellectual Property In Suit. This period begins at the later of the issuance of the item of Apple Intellectual Property In Suit or the date in which Samsung first sold the product embodying the Apple Intellectual Property In Suit and assumes that Samsung had notice of the patents on that date. I understand that Samsung contends that it lacked actual or constructive notice of its infringement for at least some of the patents until suit was filed. To the extent that Samsung succeeds with respect to this claim, the calculations done to determine the amount of time that Samsung would be unable to sell products should begin at the date in which notice is proven. As noted above, the model can be adjusted to provide the Court, counsel or the jury an alternative calculation reflecting this change.

**130.** I then reduced the number of remaining Samsung accused smartphone units that would have been sold by Apple "but for" Samsung's reliance on Apple's intellectual property by removing all but 26% of the remaining accused smartphones that were sold to carriers that did not, at the time of the accused sale by Samsung, include a replacement Apple product. I include 26% of the sales made by carriers that did not include an Apple product at this stage of my lost profits calculation based on a Google survey that is displayed on **Exhibit 28.** The Google survey found that 26% of 2,961 respondents questioned in 2010 that recently purchased a cell phone indicated that they had chosen a new carrier for their purchase. The basis of this conservative reduction in removing 74% of the sales made to carriers that did not carry an Apple product is also reflected on **Exhibit 20**.

**131.** I next reduced the number of remaining Samsung accused units that would have been sold by Apple

~~"but for" Samsung's reliance on Apple's intellectual property by removing all remaining accused~~
~~items that would have been sold by other~~

117.    As part of each version of **Exhibit 17.2-PT**, Invotex compared the number of additional units for which lost profits would be calculated to the available capacity in existing or available inventory.  These comparisons show that, through a combination of Apple's excess manufacturing capacity and inventory on hand, Apple had the ability to make and sell the additional iPhones and iPads that would have resulted from capturing sales lost to Samsung.  I have reviewed this calculation and found the results to be reliable.

### d.    Amount of Profit Apple Would Have Made Absent Infringement

118.    To calculate the amount of lost profits suffered by the patentee, the appropriate sales revenues must be determined and the costs associated with making those sales should be deducted.  This calculation should consider only the costs that would have increased with the production and sale of additional product.  These costs are often referred to as incremental costs, and the resulting margin is called an incremental profit margin.  Mr. Musika provided a calculation of Apple's incremental profit margin in **Exhibits 32-S2 and 33-S2**.  I have reviewed those calculations, agree with them, and have used them in my analysis.

119.    It is my opinion that Apple is entitled to damages in the form of lost profits on a certain portion of Samsung sales.  The following section discusses the components of my lost profits calculations.

### (i)    Units Subject to Lost Profits

120.    As discussed above and consistent with Mr. Musika's methodology, the lost profits calculation assumes that Samsung would have returned to the market with a designed-around, non-infringing alternative that was just as desirable to consumers as the infringing smartphones and tablets.  As such, lost profits are only calculated on units that Samsung sold during the months when it would have been out of the market designing, testing, manufacturing, and preparing to distribute the theoretical non-infringing smartphones and tablets.  The number of months that Samsung would have been out of the market for each of the remaining New Trial

Patents is detailed in **Exhibit 20-PT**.  The design-around period for each of the New Trial Patents begins on the latest of the date of issuance of the patent, the date Samsung first sold a product that infringed that patent, or the date on which Samsung received actual notice of its infringement of the specific patent.  I obtained the dates on which Samsung actually learned of the patents being asserted from the table provided by the Court in the March 1 Order.  Because these dates are all later than the dates that the patents issued and the date on which Samsung first sold a product that infringed the patents, the dates included in the Court's March 1 Order control in this analysis.[149]

121.    Not all units sold during the design-around period are subject to lost profits.  As discussed above, I have adjusted my lost profits calculation in a manner that is consistent with the *Mor-Flo* case to account for the possibility that smartphones and tablets not at issue in this case would be acceptable non-infringing alternatives.  The first such market share adjustment was made for Samsung's sales of smartphones that occurred at carriers that did not at the time of the sale offer Apple products.  Of these sales, I have considered only 26% to be eligible for lost profits.  The exclusion of 74% of these sales is based on a survey performed by ThinkTech with Google Inc. ("Google").[150]  This Google survey, a portion of which is presented in **Exhibit 28**, found that "26% of Phone Purchasers Chose a New Carrier."[151]  This reduction of 74% of Samsung's sales made to carriers that did not offer Apple products is also captured on **Exhibit 20-PT**, which summarizes the damages calculation methodology.  These steps are the same as Mr. Musika conducted.

---

[149] As previously noted and as an alternative analysis with respect to Apple's lost profits, I requested that Invotex prepare calculations of Apple's lost profits based on the later of when the relevant patent issued or the date Samsung first sold a product that infringed the New Trial Patents.  This calculation assumes that Samsung would have been in a position to redesign its products to avoid Apple's asserted patents even before it had actual notice of these patents.  Thus, this approach is not consistent with what occurred in the real world based on the findings of the Court in the March 1 Order.  Nonetheless, because I understand that Samsung may contend that this approach should be applied to the calculations, I did this calculation to determine the impact if Samsung's argument were adopted.  The alternative calculations that use this method are provided in the attached Appendix.

[150] ThinkTech with Google, Wireless Shoppers 2.0, How Consumers Shop for Wireless Phones, Google Compete, Clickstream and Survey Based Study, U.S., dated Feb. 2010.

[151] ThinkTech with Google, Wireless Shoppers 2.0, How Consumers Shop for Wireless Phones, Google Compete, Clickstream and Survey Based Study, U.S., dated Feb. 2010, p. 6.

122.    The remaining infringing units were then adjusted so that lost profits would be calculated only on those units that would have likely been sold by Apple "but for" Samsung's infringement.  This step of the calculation ensures that Apple claims lost profits only on its share of the relevant market.  As referenced above, Mr. Musika calculated an adjusted market share for each of the Original Equipment Manufacturers ("OEMs") that offered non-accused smartphones or tablets at the time of the accused sale. The basis of the sales that would have been made by other OEMs that offered non-accused smartphones or tablets at the time of the accused sales is the adjusted market share of each OEM. The adjusted market share of each OEM is different for the 26% of accused sales that were made to carriers that did not offer an Apple smartphone versus the accused sales that were made to carriers that did offer an Apple smartphone that embodied the protected intellectual property. In each case, I calculated a *Mor-Flo* market share percentage that removes Samsung's accused sales from the relevant market and distributes the accused sales to the remaining market participants on the basis of their respective market share after removing Samsung's accused sales.[118] The relevant market for the 26% of sales that were made to carriers that did not offer an Apple product is the overall smartphone market. **Exhibits 29 and 30** outline the *Mor-Flo* analysis I conducted for both smartphones and tablets.  The relevant market for the accused sales made by carriers that offered an Apple smartphone that embodied the intellectual property is the OEM's market share for the carriers that offered an Apple smartphone. **Exhibits 31 and 31.1 to 31.3** outline smartphone carrier market share and my *Mor-Flo* analysis of Apple's and Samsung's market share within each carrier where iPhones are sold. infringing smartphones or tablets at the time that Samsung was making its infringing sales.  The implementation of this methodology varies slightly for those units sold at carriers that did not offer Apple products (i.e., the 26% of phone purchasers that chose a new carrier) as compared to those units sold by carriers that did offer Apple products.  For the 26% of sales that occurred at a carrier that did not offer Apple products, Mr. Musika utilized an adjusted OEM market share that is based on the overall smartphone market.  A similar calculation was performed for tablets.  The smartphone and tablet market share calculations are detailed in **Exhibits 29-PT** and **30-PT**, respectively.  For those

---

[118] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577, 12 U.S.P.Q.2d 1026, 1028 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

infringing sales that were made at carriers that did offer Apple products, Mr. Musika utilized an adjusted market share that is based on the OEM's market share at the particular carrier.  **Exhibit 31-S** and the related market share schedules (**Exhibits 31.1-PT** through **31.3-PT**) summarize and calculate the adjusted market share for each OEM by carrier.  Based on the jury's findings, I asked Invotex to adjust the market share calculations to add the Intercept back into the market share analysis as a non-infringing alternative smartphone.  Similarly, I asked Invotex to stop the accumulation of lost profits for the Galaxy Tab 7.0 product in July 2011 based on the jury's findings that Samsung's Galaxy Tab 10.1 4G LTE did not infringe Apple's patents.  Otherwise, I used the same methodology and sources of data to prepare the market share calculations as Mr. Musika used.

123.    ~~132.~~ By ~~allocating the accused~~utilizing an adjusted market share that attributes sales to all other smartphone and tablet ~~market participants, I have factored into my damage calculation all other~~manufacturers, the foregoing approach takes into account major consumer demand factors ~~such as price~~including the following:  alternative features, brand loyalty, carrier preference, operating system preference, ~~brand loyalty, and other alternative features. The basis of these conservative reductions in quantifying lost sale units is also identified on **Exhibit 20**~~and price.  The application of the adjusted market share is also captured on **Exhibit 20-PT**, which summarizes the damages calculation methodology.

### (ii)     Capacity Constraints

124.    ~~133. Finally, I compared the number of remaining Samsung accused units that would have been sold by Apple "but-for" Samsung's reliance on Apple's intellectual property to Apple's potential excess capacity of iPhones and iPads.  In the event of insufficient capacity, I have removed all remaining accused items that would not have been sold due to a limitation of capacity by Apple to make all of the remaining accused sales after making all of the other adjustments previously discussed. My capacity analysis is based on Apple's capacity disclosures discussed above. In his deposition, Mr. Buckley testified that the capacity analysis was conservatively based on the use of only existing Apple~~



1  manufacturing capacity.[119] He agreed that the construction of additional capacity was an available option.

2  Further, the Apple capacity analysis was limited to six day work weeks, 19 to 20 hour work days, factored

3  in historical parts shortages, and adjusted for manufacturing defects, other factors, and returns.[120]

4

5

6

7

8  [121] However, because Apple carried forward excess capacity from prior quarters, I have determined

9  that in the "but-for" analysis, Apple had the capacity to make all of the identified sales (see **Exhibit 17.2**).

10  The basis of this conservative reduction in qualifying lost sale units is also identified on **Exhibit 20.** As

11  discussed above, a condition for lost profits to be appropriately awarded is that the patent holder

12  must have sufficient capacity to make the additional sales.  Therefore, having calculated the

13  number of units of infringing Samsung sales, a comparison to Apple's capacity is necessary.  In

14  the event that Apple did not have sufficient capacity, the units subject to lost profits would need

15  to be limited to Apple's capacity.  As referenced above, Mr. Musika performed an analysis of

16  Apple's capacity based on reports generated by Apple.  This work shows that Apple had

17  inventory or capacity to make the additional sales identified in the steps above.

18

19

20  I agree with Mr.

21  Musika that Apple had the available capacity to make the "but for" sales that were actually made

22  by Samsung for the 13 products at issue in this analysis.  Each version of **Exhibit 17.2-PT**

23

24

25  [119] Deposition of Mark Buckley, February 23, 2012, pp. 197-199.

26  [120] Discussion with Rory Sexton and Mark Buckley.

    [121] APLNDC-Y0000055416; Deposition of Mark Buckley, February 23, 2012, Exhibit 15.

27  [152] See, for example,

28  (APLNDC-Y0000055416).

1   reflects the implementation of this analysis on the lost profits calculation.[153]  The application of

2   potential capacity constraints is also captured on **Exhibit 20-PT**, which summarizes the damages

3   calculation methodology.

### (iii)   "But For" Incremental Profit

5   125.   Apple's lost incremental profits are calculated by multiplying the number of

6   Samsung unit sales that would have been captured by Apple "but for" the infringement (as

7   described above) by the per unit incremental profit earned by Apple on its sales of iPhone and

8   iPad.

9   126.   134. The final amount of lost profits is then calculated by multiplying the remaining

10  accused Samsung sales that would have been replaced by Apple "but-for" Samsung's reliance on Apple's

11  intellectual property times Apple's incremental profit margin earned on the Apple replacement product.

12  The Apple replacement product embodies the claimed Apple Intellectual Property In Suit. The

13  AppleApple's incremental profit margin is identified on Exhibits 33 and 34 and was determinedwas

14  calculated by deducting Apple's sales expense and distribution expenseexpenses from the gross

15  profit forprofits earned by Apple's on sales of the iPhones and iPads. In order to be conservative and

16  based on This deduction was taken in light of Mr. Buckley's deposition testimony where he stated

17  that distribution expense expenses "could possibly be variable.[122] I have removed sales and distribution

18  expenses from Apple's gross margin to calculate an incremental margin. Additionally, I have used

19  Apple'sbe variable."[154]  Since Apple cannot provide information as granular as revenue per month

20

21  ───────────────

22  [153] In analyzing whether Apple had the capacity necessary to sell the additional units
    reflected in my analysis, I have also taken into consideration the possibility that the jury's prior
    damages award for the products not subject to the new damages trial included an award of
23  Apple's lost profits.  Apple had substantial excess capacity in the relevant time periods – enough
    to make all the lost sales calculated in this report plus all the lost sales calculated by Mr. Musika
24  and presented to the jury for the products not subject to the new damages trial (compare, e.g.,
    **Exhibit 17.2-PT-H** with **Exhibit 17.2-S2**).  Thus, whether the jury awarded some, all, or none of
25  the lost profits calculated by Mr. Musika with respect to the products not subject to this new trial,
    sufficient excess capacity existed to make the lost sales derived from the 13 products that are the
26  subject of the new trial and reflected in the analysis above.
    [122] Deposition of Mark Buckley, February 23, 2012, pp. 125-126. "[…] I would say most of these are—would be fixed, in my
27  mind. Maybe some advertising. I would think of that as fixed, too. Distribution, possibly, could – could be variable, but…"

    [154] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 125-126.

per model per product,[155] Mr. Musika used the average incremental profit for all models of iPhones combined and ~~iPads as opposed to individual models because Apple does not keep records at the level of the individual models. Mr. Buckley stated that Apple~~all models of iPads combined.  I used the same approach and the same calculations.  Using a blended profit margin of all models of the respective Apple products takes into account the actual product mix experienced by Apple.  It also accounts for the fact that Apple does not and cannot track net revenue ~~to~~at the model level because carrier subsidies and commissions are not ~~tracked in~~recorded at that level of detail.[~~123~~156] ~~Therefore, profits cannot be calculated on a model by model basis. Furthermore, using an average incremental profit rate accounts for the mix of products sold by Apple into the smartphone and tablet markets.~~ The calculation of Apple's per unit incremental profit is detailed further in **Exhibits 32-S2 and 33-S2**.

### (iv)    Reasons This Analysis Is Conservative

127.    ~~135. It should be noted that~~The calculation of lost profits is conservative in a number of ways.  In addition to those items mentioned above, the following conservatisms also warrant mentioning.  First, Apple's ~~sales of iPhones and iPads as described in their~~ GAAP Line of Business Reports, which form the basis for the incremental profit calculation discussed above, include ~~some~~ revenue deferrals~~/amortization.~~ and amortizations.[157]  According to Mr. Buckley, ~~Apple defers a small portion of product revenue~~these deferrals are amortized over the life of the product "so that ~~they~~[Apple] can offer free software updates.[124]  ~~For the purposes of my calculation, I have not made any adjustments to reflect those deferrals.  In doing so, Apple's product revenue has been deflated and in turn, so have its margins.  This is another contributing factor to the conservative basis of my lost profit calculation~~ over the life of the product."[158]  This deferral results in a lower selling price and

---

[155] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 82-83.  The inability to perform this calculation relates in part to carrier subsidies, price protection, and other financial adjustments that are not tracked on a model by model basis.

[~~123~~156] Deposition of Mark Buckley, ~~February~~dated Feb. 23, 2012, pp. 82-84.

[157] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 92-93.

[124] ~~Deposition of Mark Buckley, February 23, 2012, p. 93. Deferral amounts can be seen on APLNDC-Y0000066932-3 and range from $10 - $30 for iPhones and iPads.~~

[158] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 92-93.

1    consequently a lower incremental margin.  No adjustment has been made in the calculation of lost

2    profits related to this deferral.

3         128.    A second conservatism relates to Apple's lost sales of convoyed or derivative

4    products and services.  An STA 2011 Smartphone Portfolio Strategy presentation noted that

5    "Smart Phones Drive Higher Accessory Purchases."[159]  Samsung estimated that the 50 million

6    iPhones sold through March 2010 resulted in $7.5 billion in aftermarket accessories and that the

7    first 450,000 iPads sold resulted in approximately $54 million in accessory sales.[160]  I understand

8    that such accessories include car chargers, cases, headphones, and screen protectors.  Apple's

9    incremental profit per iPhone or iPad from its sales of accessories is estimated on **Exhibits 34** and

10   **35**.  As illustrated on those exhibits, Apple earns an estimated ▮▮▮ per iPhone and ▮▮▮ per

11   iPad sold.  Neither Mr. Musika nor I included these additional incremental lost profits in the

12   damages calculation.  As discussed previously in the irreparable harm section of this report, there

13   are other forms of income that Apple earns related to iPhone and iPad sales.  This additional

14   income is also not included in the calculation of lost profits.

15        129.    A third conservatism relates to the impact on Samsung's sales due to its being out

16   of the market during the period of redesign.  Being out of the market for an extended period of

17   time could result in Samsung having difficulty in reaching the same level of market penetration as

18   it enjoyed with the infringing phones.  An article concerning Microsoft's late arrival with a

19   quality phone illustrates this point.  "[T]his year [2012] is crucial; it will show whether a

20   respected product is enough to help Microsoft make up for lost time.  Even if it feels good to be a

21   favorite of tech critics for a change, Microsoft needs a blockbuster in the mobile business, not a

22   cult hit.  'Entering the market so late with this experience has created some special challenges for

23   us,' Mr. Myerson said.  'I think if [Microsoft] were there earlier it would be different.'"[161]  I am

---

24        [159] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010
25   (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).
26        [160] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010
     (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).
27        [161] http://www.nytimes.com/2012/01/08/technology/microsoft-defying-image-has-a-
     design-gem-in-windows-phone.html?pagewanted=2&_r=0
28

not aware of sufficient evidence to calculate the impact of this delay on Samsung and therefore have not included it in my calculation of lost profits.

### (v)    Alternative Calculations of Lost Profits

130.    Each version of the exhibits labeled **Exhibits 17-PT** and **19-PT** and the relevant supporting schedules reflect a calculation of damages that include Apple's lost profits.  The methodology used and the manner in which these numbers are presented are the same as what Mr. Musika used for his expert report and supplements in May and July 2012.  The Appendix to my report includes the alternative calculations of Apple's lost profits and other damages based on alternative assumptions regarding the date on which damages begin to accrue as described above.

### 2.    Evidence Introduced at Trial Confirms These Opinions.

131.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial testimony.  However, before he testified, Mr. Musika was present for or was able to review the transcript of the proceedings, and I have that record available to me and have considered it in forming my opinions.  The trial testimony confirms the opinions regarding Apple's lost profits already stated above.

132.    For example, evidence was introduced at trial regarding public acclaim for and consumer demand for the iPhone and iPad and the patented features of the New Trial Patents, confirming my opinion that Samsung's infringement caused Apple to lose sales.  Phil Schiller, Apple's Senior Vice President of Worldwide Marketing, testified to the success of the iPhone and iPad in the United States market.  Mr. Schiller discussed the 2007 iPhone launch at MacWorld and a video of the same.  (JX1091.)[162]  Mr. Schiller testified that the sales numbers for the original iPhone when it launched "were extremely good" and "exceeded our expectation,"[163] while public perception of the iPad when it launched was "fantastic."[164]  Indeed, a summary exhibit of Apple's iPhone and iPad sales (PX15) introduced at trial through Mr. Schiller shows

---

[162] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 709:23-710:19.
[163] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 611:21-612:2.
[164] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 621:11-621:12.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1  cumulative iPhone sales from 2007 through fiscal Q2 2012 of over 77 million, and cumulative

2  iPad sales from 2010 through fiscal Q2 2012 of over 28 million.[165]

3  　　　　133.　　Mr. Schiller also testified to numerous press articles reflecting industry praise for

4  the iPhone and iPad,[166] including a Time Magazine cover story naming the iPhone as the number

5  one invention of the year in 2007 (PX135),[167] a *New York Times* article written by David Pogue

6  that had commented on the beautiful appearance of the iPhone (including its shiny black face) as

7  a relevant demand factor (PX133),[168] and a summary exhibit featuring extensive unsolicited news

8  coverage praising the iPhone (PX17).[169]  In addition, Mr. Schiller testified about the iPhone's and

9  iPad's print and television advertisements (PX11, PX12, PX13), some of which included

10 references to the patented features at issue, which further corroborates my conclusion that the

11 patented features have a substantial effect on consumer demand for Apple's and Samsung's

12 products.[170]  For example, Mr. Schiller testified about an early television advertisement for the

13 iPhone (PX127) showing the distinctive design of the phone and demonstrating multitouch

14 gestures such as flicking, scrolling, and tapping.[171]  Mr. Schiller also testified about an iPad

15

16

17 　　[165] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 612:6-612:18; PX15: Cumulative Unit Sales (U.S.) – iPhone & iPad.

18 　　[166] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 604:23-606:4, 606:8-607:22, 609:10-612:2, 621:13-622:16; PX17: Summary of iPhone news coverage; PX134: Wall Street Journal, "Testing Out the iPhone" (APLNDC-Y0000234932–APLNDC-Y0000234936); PX141: Wall Street Journal, "Laptop Killer? Pretty Close" (APLNDC-Y0000233381–APLNDC-Y0000233385); PX142:  *New York Times Bits*, "Patent Office Highlights Jobs's Innovations."

21 　　[167] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 607:23-609:9; PX135: Time, "Best Inventions of 2007" (APLNDC-Y0000146961–APLNDC-Y0000146962).

22 　　[168] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 601:5-602:19; PX133: *New York Times*, "Apple Waves Its Wand at the Phone," APLNDC-Y0000235973–APLNDC-Y0000235976 at APLNDC-Y0000235973.

24 　　[169] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 604:23-606:4; PX17: Summary exhibit of iPhone and iPad news coverage.

25 　　[170] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 641:3-643:11, 643:12-645:13, 646:23-648:16; PX12: Table of iPhone television advertisements; PX13: Table of iPad television advertisements; PX127: Video – "How To" television advertisement for the iPhone.

27 　　[171] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 641:3-643:11; PX127: Video – "How To" television advertisement for the iPhone.

1  television advertisement that gave "a taste of the rich depth of the software" on the device.[172]  In

2  addition, Mr. Schiller introduced a summary exhibit with several iPad and iPhone print

3  advertisements, which supported his testimony (PX11).[173]  All this evidence corroborates my

4  opinion that consumers want and demand Apple's products and Apple's patented technology.

5  Mr. Schiller's testimony was reinforced by evidence from Samsung's files.  A September 2007

6  study of the smartphone market by Samsung showed contemporaneously the influence of the

7  iPhone on the smartphone market.[174]  The study identified the "Apple iPhone" as one of "the

8  factors that have the greatest influence on customer demand."[175]  Among "the factors that could

9  make the iPhone a success" were "beautiful design" and "easy and intuitive UI that covers all

10  user classes."[176]

11          134.    Consumer survey evidence introduced at trial also corroborates my conclusion that

12  the patented features are important to consumer demand.  For example, Mr. Schiller testified to

13  the results of Apple's own market research showing demand for the patented features of the New

14  Trial Patents.  Mr. Schiller testified to reasons that the iPhone has been a success, which included

15  the iPhone's beautiful design and Apple's software inventions that made it easy to use.[177]  Mr.

16  Schiller likewise testified that the iPad's easy to use software contributed to the iPad's success.[178]

17  Apple survey results introduced by Mr. Schiller at trial showed that the physical appearance and

18  ease of use of the iPhone were rated by consumers as important features driving their decision to

19

20  _____

21      [172] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 645:14-646:20; PX128: "iPad Is Iconic" television advertisement for the iPad.

22      [173] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 649:15-650:2; PX11: Summary exhibit of iPad and iPhone print advertisements.

23      [174] PX34: Feasibility Review on Standalone AP Business for Smart Phone Market, dated

24  Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at SAMNDCA10809402 and SAMNDCA10809427).

25      [175] PX34.13.

26      [176] PX34.38; Samsung also concluded, with respect to the hardware, "HW: easy imitation."  PX34.37.

27      [177] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 624:24-626:4.

28      [178] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 626:5-626:19.

purchase the iPhone.[179]  Timothy Benner, STA's 30(b)(6) witness on the topic of consumer surveys, likewise testified via deposition at trial that the physical appearance of a smartphone is "an aspect of choice in almost every [customer] decision."[180]  One survey admitted through Mr. Benner's deposition testimony at trial showed that 45% of respondents stated "Liked overall design/style" as a reason for choosing a handset brand, which was the highest-ranked factor among those tested.[181]  Similarly, Dr. Hauser, Apple's conjoint expert, provided testimony and evidence at trial showing that Samsung consumers were willing to pay a substantial price premium for the features associated with the utility patents at issue in the new trial (PX30).[182]

135.    Apple also introduced evidence at trial showing the economic and corporate investment in time and effort devoted to creating the patented features at issue and the benefits associated with those features, all of which support the conclusion that Apple believes these factors affect consumers' choices.  For example, Christopher Stringer, an industrial designer at Apple for at least 17 years and a named inventor on the D'677 patent, testified at trial that it took him "years" to develop the design of the iPhone, which has since been awarded many professional awards for design, including the DNAD and Gold Pencil, and has been displayed in the San Francisco Museum of Modern Art and the Smithsonian Institution in Washington, D.C.[183]  Likewise, Scott Forstall, Apple's then-Senior Vice President of iOS, and one of the named

---

[179] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 629:10-638:8; PX143 (iPhone Buyer Survey FY10-Q4, APLNDC-Y0000027256–APLNDC-Y0000027259 at APLNDC-Y0000027266, APLNDC-Y0000027269, APLNDC-Y0000027277); PX144 (iPhone Buyer Survey FY11-Q1, APLNDC-Y0000027341–APLNDC-Y0000027344 at APLNDC-Y0000027356, APLNDC-Y0000027358, APLNDC-Y0000027362); PX145 (iPhone Buyer Survey FY11-Q2, APLNDC-Y0000027423–APLNDC-Y0000027426 at APLNDC-Y0000027442, APLNDC-Y0000027450); PX146 (iPhone Buyer Survey FY11-Q3, APLNDC-Y0000027506–APLNDC-Y0000027509 at APLNDC-Y0000027523, APLNDC-Y0000027565, APLNDC-Y0000027572).

[180] Timothy Benner Trial Testimony, dated Aug. 13, 2012, pp. 2028:9-11 (*see* Dkt. 1887-2 at 2, deposition excerpts played at trial).

[181] PX69: J.D. Power March 2011 Wireless Smartphone Satisfaction Study (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246395).

[182] Dr. John Hauser Trial Testimony, dated Aug. 10, 2012, pp. 1915:4-1916:13; PX30: Summary of results from Dr. Hauser's conjoint survey.

[183] Christopher Stringer Trial Testimony, dated July 31, 2012, pp. 469:15-469:25, 474:1-474:24, 484:1-485:4, 493:6-495:17, and 508:4-510:21.

1   inventors on the '163 patent, testified to the problem he was trying to solve, the difficulty in

2   solving that problem, and the dramatic improvement the invention made for his web browsing

3   experience on touch products like the iPhone and iPad.[184]  Apple's technical experts, Dr. Ravin

4   Balakrishnan ('381 Patent) and Dr. Karan Singh ('163 and '915 Patents), also testified to the

5   benefits associated with the invention and the problems that would occur in the absence of the

6   patented features.[185]

7        136.   In addition to Apple's lost profits due to the loss of iPhone and iPad sales, Apple has lost

8   sales of other convoyed and derivative products/services.  One area of losses comes in the form of iPhone

9   and iPad accessories. Samsung directly recognizes the importance of accessory sales as they relate to

10   smartphones and tablets.  In a strategy presentation, Samsung states that "Smart Phones Drive Higher

11   Accessory Purchases" and notes that Apple had 50 million in iPhones sales through the first quarter of

12   2010 and there were "~ $7.5B in aftermarket accessories sales" in three years and likewise, there were 450

13   thousand iPads sold in the first weekend with "~ $54M in Accessory Sales."[125] Apple's accessory sales

14   include items such as cases, screen protectors, headphones and car chargers. **Exhibits 34 and 35** show a

15   calculation of the incremental profit for accessories per iPhone or iPad unit sold.  This demonstrates that

16   Apple could be losing approximately $4.20 in revenue and ██████████ per iPhone and $32.60 in

17   revenue and ██████████ per iPad in accessory sales.  These numbers are estimates given the potential

18   timing differences between the initial device purchase and an accessory purchase and therefore I have not

19   calculated Apple's total loss due to Apple's inability to sell accessories to customers who purchased the

20   accused Samsung phones. In addition, Apple earns other sources of income related to the sale of iPhones

21   and iPads, that are further described in the irreparable harm section of my report.  These have not been

22   included in my lost profits calculations., evidence was introduced at trial that Samsung referred to

23   and used the features of the iPhone and the New Trial Patents in the process of creating the

24

25      [184] Scott Forstall Trial Testimony, dated Aug. 3, 2012, pp. 724:8-724:11, 751:15-752:21, and 758:16-759:15.

26      [185] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21,

27   1736:16-1740:15; Dr. Karan Singh Trial Testimony, dated Aug. 10, 2012, pp. 1815:12-1816:24, 1817:22-1818:22, 1831:13-1833:3.

  [125] 2011 Smartphone Portfolio Strategy, STA Product and Strategy, May 2010 (SAMNDCA00530591 - 672 at 612).

28

1  designs and the user interface that are included in Samsung's products.  This further corroborates

2  my conclusion that the patented features are important to consumer demand and are perceived by

3  designers, engineers, and consumers as being an improvement over other non-infringing options.

4  Testimony by STA's Chief Strategy Officer, Justin Denison, included references to multiple

5  internal Samsung documents which showed that Samsung referred to the iPhone and Apple's

6  patented features when Samsung was creating its smartphones, including, among other features,

7  the inventions described in Apple's '163 Patent and the icon layout design claimed in Apple's

8  D'305 Patent.[186]  Jinyeun Wang, a Samsung UX Creative Director and former Senior Designer,

9  discussed an internal Samsung document that showed the evolution of Samsung's icons over a

10  number of years and that included Apple icons as a "reference."[187]  Mr. Wagner discussed an

11  internal Samsung email in which Samsung engineers discussed "obtain[ing] the bounce effect that

12  is similar to the iPad," and another in which individuals at Samsung note that the Samsung

13  product lacks "latex effect" in browser scroll and instructs readers to "(Refer to the iPad)."[188]

14  Dong Hoon Chang, SEC's head of the Mobile Design Group, likewise testified via deposition that

15  Samsung developers considered Apple utility patents, such as the bounce patent (*i.e.*, the '381

16  Patent), when designing the Samsung Galaxy phone.[189]  Dr. Balakrishnan testified extensively

17

18  [186] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 790:5-791:4, 816:10-832:9;
PX40 ("I hear things like this:  Let's make something like the iPhone . . . . It's a crisis of
19  design."); PX44:  Relative Evaluation Report on S1, iPhone (comparing S1 to iPhone side-by-
side, with directions for improvement, e.g., "Double Tap zoom in/out function needs to be
20  supplemented"), 44.127 (comparing S1 icons to iPhone icons); PX54:  Lessons from Apple
("Apple is universally regarded as being a master of innovation . . . Innovative hardware design &
21  intuitive user experience"); PX58:  Beat Apple Response ("Thoroughly understand who Apple is?
Operational, Design, … Invite Apple 'experts'"); PX60:  STA Competitive Situation – Paradigm
22  Shift ("US Market Becoming a Two Horse Race Between Apple and Samsung"); PX62:  iPhone
Counter Strategy.

23  [187] Jinyeun Wang Trial Testimony, dated Aug. 14, 2012, pp. 2542:22-2547:3; PX55:
Samsung mobile icon design for 2011; PX2261 (same, in black and white).
24
[188] Michael Wagner Trial Testimony, dated Aug. 16, 2012, pp. 3066:24-3068:6, 3070:10-
25  3071:6; PX186 ("in browser scroll, there is no latex effect of having the screen follow along and
then returning when you are moving paste the edge.  (Refer to the Ipad)"); PX195 ("With regards
26  to bounce, we use the Mass Spring Damper model . . . and obtained the bounce effect that is
similar to the iPad . . . .").

27  [189] Dong Hoon Chang Trial Testimony, dated Aug. 13, 2012, p. 2026:3-5 (*see* Dkt. 1887-2
at 2).
28

about internal Samsung documents (PX46, PX57) showing that Samsung studied and adopted

Apple's bounce feature when developing certain Galaxy smartphone and tablet products.[190]  Dr.

Balakrishnan also noted that Samsung's documents described Samsung's lack of a bounce feature

as a "critical" issue, resulting in "dull" behavior in Samsung's products in comparison with the

"fun" visual effect in Apple's products.[191]  Dr. Singh testified regarding internal Samsung

documents (PX38, PX44) showing that Samsung had deliberately adopted the double tap to zoom

feature used in Apple's products as a part of Samsung's user interface design.[192]  Dr. Susan Kare,

Apple's design expert with respect to graphical user interfaces ("GUI"), testified to documents

showing that Samsung directly compared and then adopted Apple's patented GUI design, and

also presented an exhibit with screenshots of Samsung's infringing GUI interface compared to the

D'305 Patent, which showed the substantial similarity between the designs (PX21A).[193]  Dr. Peter

Bressler, Apple's industrial design expert, testified to the substantial, strong similarity between

the Samsung products and the overall appearance of the D'677 Patent, which is embodied in

Apple's products, introduced exhibits showing Apple's products and Samsung's products that

reflected this comparison (PX7, PX8), and introduced an exhibit comparing Apple and Samsung

smartphones over time, which also reflected the greater visual similarity of Samsung's products

---

[190] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21, 1757:22-1769:10; PX46: Behold3 Usability Evaluation Results (SAMNDCA00508318–SAMNDCA00508411 at SAMNDCA00508383); PX57: P5 Usability Evaluation Results (SAMNDCA00176053–SAMNDCA00176171 at SAMNDCA00176071 and SAMNDCA00176125).

[191] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21 and 1757:22-1769:10; PX46: Behold3 Usability Evaluation Results (SAMNDCA00508318–SAMNDCA00508411 at SAMNDCA00508383); PX57: P5 Usability Evaluation Results (SAMNDCA00176053–SAMNDCA00176171 at SAMNDCA00176071 and SAMNDCA00176125).

[192] Dr. Karan Singh, Trial Testimony, dated Aug. 10, 2012, pp. 1845:21-1848:13; PX38: Browser Zooming Methods UX Exploration Study (SAMNDCA11104115–SAMNDCA11104139); PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

[193] Dr. Susan Kare Trial Testimony, dated Aug. 7, 2012, pp. 1410:22-1412:18, 1479:12-1481:25, 1485:8-1488:4, and 1492:3-1493:10; PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

1  and Apple's products after Apple introduced the iPhone (PX3).[194]  Dr. Russell Winer testified that

2  disinterested third parties, including the business press, also perceived the similarity of

3  Samsung's products to Apple's products, and he introduced summary documents with quotations

4  reflecting this perception (PX6).[195]  The scope of the similarity between the patented technology

5  and Samsung's products and the decision by Samsung to adopt user interface technology and

6  designs used by Apple after direct comparisons to Apple's products support the conclusion that

7  there is substantial demand for Apple's patented designs and technology and that the non-

8  infringing alternatives are not as desirable in the mobile device market.  This evidence confirms

9  my opinions about the nature and scope of Apple's lost profits discussed above.

10      137.  ~~Finally, with Samsung's removal from the market and return after the redesign of their~~

11  ~~products, Samsung would experience a lower level of sales due to its late re-entry to the market.~~

12  ~~Microsoft's late entry into the smartphone market illustrates this point.  An article in the New York Times~~

13  ~~which details positive critical reviews of Microsoft's smartphone states, "[but] this year [2012] is crucial;~~

14  ~~it will show whether a respected product is enough to help Microsoft make up for lost time.~~ Even if it feels

15  good to be a favorite of tech critics for a change, Microsoft needs a blockbuster in the mobile business, not

16  a cult hit. 'Entering the market so late with this experience has created some special challenges for us,' Mr.

17  Myerson said. 'I think if we were there earlier it would be different.'"[126] ~~Samsung's removal of the~~

18  ~~accused products from the market for redesign would cause similar problems upon their return.  However,~~

19  ~~with the difficulty in quantifying the magnitude of the delay's effects on Samsung's sales, I have not~~

20  ~~quantified the amount of "but-for" sales that Apple would have made and continued to keep my~~

21  ~~calculation conservative.~~Other evidence presented at trial corroborates my opinions that Apple and

22  Samsung compete directly in the smartphone and tablet markets, and that Samsung's

---

[194] Dr. Peter Bressler Trial Testimony, dated Aug. 7, 2012, pp. 1002:22-1003:5, 1020:8-1022:8, 1048:10-1056:5, 1072:1-1073:15, and 1074:8-1075:4; PX3: Summary exhibit depicting Apple and Samsung phones; PX7: Summary exhibit depicting Samsung devices; PX8: Summary exhibit depicting Apple devices; PX174: Gadget Lab, "First Look: Samsung Vibrant Rips Off iPhone 3G Design" (APLNDC-Y0000236157–APLNDC-Y0000236159).

[195] Dr. Russell Winer Trial Testimony, dated August 7, 2012, pp. 1521:14-1525:6; PX6: Summary of press reports regarding Samsung phones.

~~[126] New York Times, "The Critics Rave … for Microsoft?" by Nick Wingfield, dated 1/8/12.~~

infringement caused Apple to lose sales it otherwise would have made "but for" the infringement. For example, Mr. Schiller testified that Samsung and Apple compete in the smartphone and tablet markets, and that Samsung sells products in the majority of sales channels through which Apple sells its products.[196]  Mr. Schiller also testified to his belief that some customers were choosing to buy a Samsung product because it looked like Apple's products.[197]  Mr. Denison's testimony also included multiple documents related to competition between Apple and Samsung and the importance of Apple's technology and design in connection with that competition.  These included testimony and internal documents that showed how Samsung focused on Apple and the iPhone as a competitor, the "crisis of design" that Samsung experienced because of the iPhone, Samsung's focus on directly competing with the iPhone, and its view that the smartphone market was a "three player race becoming a two player race" between Apple and Samsung.[198]  This evidence confirms my opinions that Apple would obtain sales in the "but for" world in which Samsung did not infringe Apple's patents and had to implement a non-infringing alternative.

*Infringer*

138.    Further, as reflected in his testimony at trial, Mr. Wagner indicated that he did not disagree in significant measure with the proposed amount of time needed to design around the '381 Patent and the '163 Patent used by Mr. Musika.[199]  Further, while Mr. Wagner and Mr. Musika disagreed regarding the amount of time it would take to design around the '915 Patent, Samsung did not introduce any evidence that it had identified and successfully implemented any

---

[196] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 656:18-659:1.

[197] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 663:20-665:24.

[198] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 790:5-791:4, 809:24-819:8, and 831:9-834:6; Justin Denison Trial Testimony, dated Aug. 6, 2012, pp. 987:1-997:12; PX40 ("I hear things like this:  Let's make something like the iPhone . . . . It's a crisis of design."); PX44:  Relative Evaluation Report on S1, iPhone (comparing S1 to iPhone side-by-side, with directions for improvement, e.g., "Double Tap zoom in/out function needs to be supplemented"); PX54:  Lessons from Apple ("Apple is universally regarded as being a master of innovation . . . Innovative hardware design & intuitive user experience"); PX58:  Beat Apple Response ("Thoroughly understand who Apple is?  Operational, Design, … Invite Apple 'experts'"); PX60:  STA Competitive Situation – Paradigm Shift ("US Market Becoming a Two Horse Race Between Apple and Samsung"); PX62:  iPhone Counter Strategy.

[199] Michael Wagner Trial Testimony, dates Aug. 16, 2013, pp. 3055:9-3056:15.

1  design-around for that patent or any technical evidence to suggest that Mr. Musika's

2  understanding, which is discussed further above, was wrong.[200]  This confirms the methodology

3  described above that was used by Mr. Musika and by me.

4      139.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

5  further supports the opinions regarding lost profits that I have stated in this report.

6      **D.    Samsung's Profits**

7      140.    138. I understand that assuming infringement, a design patent owner may choose to

8  recover the infringer's profit under §289 or one of the remedies relating to utility patents that were

9  discussed above under 35 U.S.C. §284. However, the design patentee's damages are limited to only one

10  form of damage and the patentee may not recover both a lost profit and infringer's profit for the same unit.

11  The infringer's total profits are equal to the total sales of infringing product less the costs directly

12  associated with the accused sales. It is the patentee's burden to establish the sales of accused products and

13  the infringer's burden to establish the costs related to the accused sales.[127]As discussed above, I am

14  aware that, as an alternative to lost profits or reasonable royalty, a design patent owner may

15  choose to recover the infringer's total profits under 35 U.S.C. § 289.  Each unit of sale, though, is

16  subject to only one form of recovery.  I understand that the infringer's profits are defined as the

17  total sales of infringing product less the costs "directly attributable to the sale or manufacture of

18  the infringing items."[201]  I further understand that "Apple has the burden of proving [Samsung's]

19  gross revenue" and "Samsung has the burden of proving deductible expenses."[202]

20  139. An owner of trade dress and trademark rights has the ability to recover the profits obtained by a

21  person who violates those rights.  It is the plaintiff's obligation to prove the revenues obtained for

22  products that use the relevant intellectual property and the defendant's obligation to prove any costs

23  and other allocations associated with the product and the relevant intellectual property.

---

[200] Michael Wagner Trial Testimony, dates Aug. 16, 2013, pp. 3055:9-3056:15.

[127] Weil, Frank, Huges, and Wagner, Litigation Services Handbook, Fourth Edition, 2007, p[201] Dkt. 1903 at 72:
Final Jury Instruction No. 54, Design Patent Infringement Damages—Defendant's Profits. 22.32.

[202] Dkt. 1903 at 72: Final Jury Instruction No. 54, Design Patent Infringement Damages—
Defendant's Profits.

1  ~~140.  As previously discussed, I have approached the overall damage calculation in a sequential manner to~~

2  ~~avoid an incorrect duplication of damages. I first calculated a lost profits remedy on accused products~~

3  ~~that qualified for a lost profits remedy. Next, I calculated an infringer's profits remedy on all accused~~

4  ~~products that qualify for an infringer's profit for which a previous lost profits amount has not been~~

5  ~~calculated.~~

6  141.    I have reviewed Mr. Musika's methodology and analysis used to calculate

7  Samsung's total profits under 35 U.S.C. § 289, which is reflected at paragraphs 138 to 151 of his

8  Original Expert Report and paragraphs 26 to 42 of his Supplemental Expert Report and the

9  exhibits referred to in those passages.  I agree with his approach and his conclusions, and I have

10  applied the same methodology to calculate Apple's damages with respect to the seven products

11  that infringe a design patent at issue in the new trial.  I incorporate the foregoing passages of his

12  report and exhibits by reference.  I have only calculated Samsung's profits with respect to sales

13  that occurred as of April 15, 2011, with respect to the D'677 Patent and as of June 16, 2011, with

14  respect to the D'305 Patent to comply with the Court's March 1 Order.

15  142.    Consistent with Mr. Musika's methodology, I have calculated Samsung's profits in

16  two ways that are reflected on the schedules labeled **Exhibits 17-PT-H** and **18-PT-H**.  With

17  respect to the calculation presented in the schedules labeled **Exhibit 17-PT-H** and following,

18  Apple's lost profits are first calculated for units that qualify based on the criteria and method

19  discussed above.  For those units for which no lost profits were awarded, I calculated Samsung's

20  profits for the sales of the products that infringed a design patent and occurred after the date on

21  which Samsung had actual notice of the design patents based on the Court's March 1 Order.

22  With respect to schedules labeled **Exhibit 18-PT-H** and following, I calculated Samsung's profits

23  based on the same criteria as the prior sentence, but I have assumed that no recovery for Apple's

24  lost profits was being awarded.  This repeats what Mr. Musika did in his expert reports.

25  **1.     Samsung's Revenues from Infringing Sales**

26  143.    ~~141.~~ The first step in the ~~calculation of infringer's profits was identifying the Samsung~~

27  ~~units accused of infringing the design patents and the revenue associated with those. The individual~~

28  ~~Samsung products accused of infringing the individual Apple design patents are identified on **Exhibit 4**.~~

1   ~~Next, I determined the actual number of units that qualified for infringer's profits after removing those~~
2   ~~units for which a lost profit damage was calculated. The determination of the units available for infringer's~~
3   ~~profits after removing the units for which a lost profits remedy was calculated is displayed on **Exhibit**~~
4   ~~**17.2.**~~ calculations was to determine Samsung's revenues.  I used Samsung's financial production
5   and Mr. Musika's calculations to determine the total number of units and the related revenues for
6   those Samsung products that are the subject of this trial, that meet the notice date requirement,
7   that have been found to infringe Apple's design patents, and that were not accounted for using
8   another form of damages.  **Exhibit 4-PT** identifies which Samsung products are included in that
9   group.  **Exhibit 17.2-PT-H** then calculates the number of units that are available for the
10  infringer's profits analysis after subtracting those units already included in lost profits.  **Exhibit**
11  **17.3-PT-H** captures the sales revenues for those units that infringe the design patents but have not
12  already been included in lost profits.  **Exhibit 18.1-PT-H** provides the revenues in the alternative
13  calculation in which no damages are awarded in the form of Apple's lost profits.  As reflected in
14  Mr. Musika's report, these figures are taken directly from spreadsheets provided by Samsung.
15  They are also taken from the same source that was used to create JX1500, which Samsung agreed
16  was an accurate statement of its sales.

17  ~~**142.**  Next, the sales amounts from **Exhibit 17.2** are listed on **Exhibit 17.3** as Samsung's infringing profit~~
18  ~~for each product. As stated above, Apple has the burden of identifying the accused revenue portion of~~
19  ~~infringer's profits. It is Samsung's burden to identify any related costs.~~

20  ~~**143.**  I have reviewed Samsung's document production and testimony concerning any alleged costs~~
21  ~~associated with the sale of accused items and have provided my own calculation of the costs~~
22  ~~associated with the accused revenue. Although the document production in this matter by both Apple~~
23  ~~and Samsung has been voluminous, I understand that Samsung's production of an Excel spreadsheet~~
24  ~~on February 3, 2012, bates numbered SAMNDCA00323946, that was also marked as Exhibit 1920[128]~~
25  ~~to the Timothy Sheppard's 30(b)(6) deposition on February 29, 2012, constituted Samsung's first~~
26  ~~representation of the sales and profits of the accused devices. Based on my independent review of this~~

27  ~~[128] Counsel for Samsung stated at the Deposition of Timothy Sheppard on February 29, 2012 that Exhibit 1920 was superseded by~~
    ~~additional production. Deposition of Timothy Sheppard, February 29, 2012, pp. 37-38.~~
28

1 ~~document, I determined that it was mathematically incorrect in that the reported detailed sales by~~

2 ~~product did not equal the reported total sales for all products. Additionally, this document failed to~~

3 ~~include sales for all of the models accused by Apple. The excluded models were Samsung's Galaxy S~~

4 ~~II (AT&T edition, 4G), Galaxy S II (T Mobile edition), Galaxy S II Epic 4G Touch, Galaxy S II~~

5 ~~Skyrocket (4G LTE), Galaxy S Showcase, Galaxy Tab 7.0, Galaxy Tab 10.1 LTE and Mesmerize.~~[129]

6 ## 2. Deduction of Costs to Calculate Total Profit

7 144. Once the revenues have been established, Samsung bears the burden of proving the

8 costs that should be deducted.[203] To satisfy that burden, Samsung must prove that it has provided

9 reliable information on the alleged costs, that any costs that do not reflect the direct material and

10 manufacturing costs for the products have been reliably and accurately allocated to the products,

11 and that the alleged costs are all directly attributable to the sale and manufacturing of the

12 infringing smartphones.

13 145. Between January 2012 and July 2012, Samsung produced multiple spreadsheets

14 related to Samsung's costs and expenses pursuant to two Court orders that compelled production

15 of financial data and sanctioned Samsung for non-compliance with a Court order relating to the

16 production of financial data. The facts surrounding these events are discussed in Mr. Musika's

17 Original Expert Report at paragraphs 143 to 149 and his Supplemental Expert Report at

18 paragraphs 27 to 42. Based on the information included in his report, Mr. Musika reached two

19 conclusions. First, he concluded that Samsung's production did not reflect a reliable measure of

20 the costs and expenses that are directly related to the manufacture and sale of the infringing

21 products. Second, Mr. Musika concluded that a calculation of Samsung's incremental profits,

22 that is, profits that included costs and expenses labeled by Samsung to reflect variable or direct

23 costs and excluded expenses categorized by Samsung to be fixed or indirect costs, resulted in a

24 calculation of Samsung's profits that agreed closely with the calculation of Samsung's profits

25

26 [129] ~~I am aware that Apple has sought documents and other materials through a motion. As noted above, my work is limited by the material presently available and I would incorporate additional information after it is received.~~

27 [203] Dkt. 1903 at 72: Final Jury Instruction No. 54, Design Patent Infringement Damages—

28 Defendant's Profits.

based on Samsung's gross margin, as reflected in **Exhibit 50-S**.  I agree with Mr. Musika's conclusions.  Accordingly, I have calculated Samsung's profits based on Samsung's gross profits and, using the same materials used by Mr. Musika to prepare **Exhibit 50-S**, I have calculated Samsung's profits for the products at issue in the new trial to show Samsung's incremental profits (**Exhibits 50.1-PT** to **50.9-PT**).

### 3.     The Reliability of Samsung's Financial Data

146.     Mr. Musika examined the evidence regarding Samsung's production of financial data and comparisons of that data to other documents produced by Samsung and to external reports on Samsung's profitability to evaluate the reliability of the data.  This analysis was prepared by Invotex and is reflected in Mr. Musika's Original Expert Report at paragraphs 143 to 149 and his Supplemental Expert Report at paragraphs 29 to 37 and 40 to 41.  I have reviewed the report and information supporting the analysis and agree with it.

147.     The chronology of Samsung's production is long but important to understand when evaluating the reliability of the expense information that Samsung provided.  It begins in January 2012.  On January 27, 2012, the Court ordered Samsung to produce consolidated financial data from which Apple could calculate Samsung's profits, including information on Samsung's revenues, materials costs, costs of manufacture, and expenses, by February 3, 2012.[204] Despite this order, Samsung's first production pursuant to this order was unreliable by standard accounting measures.[205]  It contained mathematical errors.[206]  It combined results for various infringing products without explanation or reason.  One spreadsheet was identified as reflecting a total, but it did not match the sum of the remaining spreadsheets.[207]  Products were excluded

---

[204] Dkt. 673 at 15: Order re Discovery Motions, dated Jan. 27, 2012.

[205] *See* Samsung-produced financial spreadsheet, dated Feb. 3, 2012 (SAMNDCA00323946); *see also* Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5) ("Roberts Decl.").

[206] Declaration of Timothy Sheppard, dated Mar. 12, 2012, p. 6, ¶¶ 17, 19; Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[207] Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

1   without explanation.  Standard financial information regarding expenses was omitted.  The

2   financial information also was not presented on a consolidated basis.[208]  Despite the obvious

3   nature of the errors, Samsung refused to replace the file; Apple then filed a motion to enforce the

4   Court's order and for sanctions on February 28, 2012.[209]

5        148.   144. Samsung subsequently produced a second version of the same spreadsheet on or

6   about February 28, 2012, Bates numbered SAMNDCA00354292, that was marked as Exhibit 1922 to the

7   Timothy Sheppard 30(b)(6) deposition on February 29, 2012. Although I determined that the reported

8   detailed sales by product did now equal the reported total sales for all products, this document also failed

9   to include sales for all of the models accused by Apple and included sales of other models not accused by

10  Apple. The excluded models were Samsung's Galaxy S II (AT&T edition, 4G), Galaxy S II (T-Mobile

11  edition), Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket (4G LTE), and Galaxy Tab 10.1 LTE. The

12  Galaxy Tab 8.9 was added while not being accused. Based on the deposition testimony of Timothy

13  Sheppard from January and February, I confirmed that the reported profit for two of the accused Samsung

14  entities, SEA and STA, did not represent actual profits on the accused items. Timothy Sheppard testified

15  that the cost of goods sold amount for each entity was based on an internal transfer price that transferred

16  the accused product profits to the manufacturing entity owned by SEC in Korea.[130] On February 29, a

17  U.S. financial executive for Samsung was scheduled to be deposed.  The day before the

18  deposition, on February 28, Samsung produced a new Excel spreadsheet.[210]  This version

19  continued to leave out sales for products that were the subject of Apple's claims of

20  infringement.[211]  It also removed information about the companies that were the sources of the

21

22

23        [208] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 151-152; Declaration of Eric
24   R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents,
     dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.
25        [209] Dkt. 759: Apple's Rule 37(b)(2) Motion, dated Feb. 28, 2012.
26        [210] See Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 37-38; Samsung
     produced financial spreadsheet, dated Feb. 28, 2012 (SAMNDCA00354292–
27   SAMNDCA00354385).
          [211] Deposition of Timothy Sheppard, dated Mar. 30, 2012, pp. 21-22.
28

financial data.[212]  It reduced the information available regarding Samsung's cost of goods sold.[213]  Moreover, the testimony of Timothy Sheppard confirmed that the information on the profit of SEA and STA that was included in the spreadsheet did not reflect the consolidated profits of the company but a tax-based profit prepared using a transfer pricing model, which does not accurately reflect the total profits that Samsung earned on the sale of the products in the United States.[214]  ~~Timothy Sheppard was unable to speak on behalf of SEC.[131]~~  Mr. Sheppard also stated that he could not provide testimony regarding or verify the accuracy of the financial spreadsheet with respect to revenues, costs, expenses, and profits at Samsung Electronics Company, Ltd., the Korean parent.[215]

149.  ~~145. Samsung next offered Jae Huang Sim as the Samsung witness that would testify to the actual sales, costs and profits associated with the accused products including the manufacturing entity SEC in Korea. Mr. Sim's deposition was scheduled to take place in Seoul, Korea on March 10, 2012. Less than 24 hours before his~~ On March 10, 2012, Samsung scheduled the deposition of a financial executive in Korea to speak to its revenues, costs, and profits, Mr. Jae Hwang Sim.  Less than 24 hours prior to the deposition, Samsung produced a third and different version of the ~~aforementioned spreadsheet, Bates numbered SAMNDCA00372946, that was subsequently marked as Exhibit 2440 to Mr. Sim's deposition. Prior to Mr. Sim's deposition, I determined that this~~ Excel spreadsheet.[216]  This spreadsheet also failed to include sales for ~~all of the models accused by Apple and included sales of other models not accused by Apple. The excluded models were Samsung's Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket (4G LTE), and Galaxy Tab 10.1 LTE. The Galaxy Tab 8.9 was included while not being accused. Additionally, I noted that $177,059 (500 units) of Galaxy Tab 10.1 sales~~

---

[212] *See* Samsung-produced financial spreadsheet, dated Feb. 28, 2012 (SAMNDCA00354292–SAMNDCA00354385).

[213] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 92-93.

~~[130]~~[214] Deposition of Timothy Sheppard, ~~February~~dated Feb. 29, 2012, pp. 123-124 and ~~pp.~~ 128-129.

~~[131]~~[215] Deposition of Timothy Sheppard, ~~February~~dated Feb. 29, 2012, ~~pp~~p. 15.

[216] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 5-6; *see* Samsung-produced financial spreadsheet, dated Mar. 8, 2012 (SAMNDCA00372946–SAMNDCA00373138).

1  ~~were added, $195,794,628 of Hercules sales were added, SECA sales but not costs were removed from the~~

2  ~~other~~ ████████████████████████████████ █████ three

3  infringing products and included sales for a product that was not accused.[217]  The totals in units

4  and revenues for two products included in the spreadsheet changed without explanation.[218]

5  Information about a subsidiary of SEC, known as SECA, was added, again without

6  explanation.[219]  The profit amounts for the Continuum product changed without explanation.[220]

7  Perhaps most significant, Samsung's new spreadsheet added ████████████████████

8  ██ ████████ ████████████████ ████████████

9  ███████████████ █████████████████████████

10  ██████ ~~the Continuum model, and finally certain levels of details~~an equivalent amount.[221]  Details

11  that had previously been ~~reported~~provided regarding certain expenses were ~~now removed and new~~

12  ~~levels of detail were provided that had not existed before. In summary,~~ removed for at least one

13  product, errors were made in stating certain other expenses, and requested detail about other line

14  items was added.[222]  As Mr. Musika, who attended the deposition in Korea, stated, "Samsung's

15  representations concerning the revenue, cost and profit associated with the accused devices had

16  changed radically for the third time within 24 hours of Mr. Sim's deposition."[223]

17  ~~146.  Mr. Sim was asked about many of the aforementioned changes during his deposition and was either~~

18  ~~unaware of many of the changes or provided answers that were incorrect and admittedly incomplete~~

19  ~~in terms of providing a complete representation of Samsung's accounting for the actual revenue, cost~~

---

[217] Deposition of Timothy Sheppard, dated Mar. 30, 2012, pp. 21-22; Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

[218] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

[219] *See* Samsung produced financial spreadsheet, dated Mar. 8, 2012 (SAMNDCA00372946–SAMNDCA00373138).

[220] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

[221] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 35-36; Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145; Supplemental Expert Report of Terry L. Musika, dated May 9, 2012, pp. 12-13, ¶ 32 and **Exhibit 49-S**.

[222] *See* Samsung-produced financial spreadsheet, dated Mar. 8, 2012 (SAMNDCA00372946–SAMNDCA00373138).

[223] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 49, ¶ 145.

and profit of the accused devices. He admitted however that the changes to the cost of goods sold was a decision made by him and Samsung's lawyers to exclude profits obtained by Samsung subsidiaries. Samsung's decision to increase the cost of goods sold by the amount of the Chinese manufacturing subsidiary's profit restates the profit and loss for the accused products to a transfer price adjusted amount. Based on my professional experience as a CPA, the reporting of a profit and loss on a transfer price basis fails to eliminate the results of intercompany transactions, distorts the actual results of operations, and is not in accordance with Generally Accepted Accounting Principles (GAAP).

**147.** Finally, on March 12, 2012, after the third version was produced, Timothy Sheppard submitted a declaration with the intent of explaining some of the discrepancies in the foregoing spreadsheets. Mr. Sheppard stated, "with respect to the Galaxy S II (T Mobile edition) and the Galaxy S II (AT&T edition), these models are in fact included in both the Original Spreadsheet and the Revised Spreadsheet under the heading "Galaxy S II/2 (GT I9100)."[132] According to Samsung's web site the Galaxy S II (T Mobile edition) uses the model number SGH T989[133] and the Galaxy S II (AT&T edition) uses the model number SGH I777.[134] In the third version of Samsung's spreadsheet, the Galaxy S II/2 (GT I9100) was relisted as "Galaxy S II/2 (GT I9100, GT I9108, SGH I177, SGH N033, SHW M250K, SHW M250S)" with STA sales of $179,853,039 matching the prior versions of the spreadsheet. According to Mr. Sheppard this data includes the AT&T edition and not the T Mobile edition. As previously noted, the third version of the financials includes sales for the "Hercules (SGH T989)" which matches the T Mobile edition's model number. The Hercules [Galaxy S II (T Mobile edition)] had $195,794,628 in sales through STA. This is inconsistent with Mr. Sheppard's statement that the T Mobile edition sales are included within the Galaxy S II/2 (GT I9100) given that the sales of the Galaxy S II (T Mobile edition) are approximately $16 million greater than those disclosed under the Galaxy S II/2 (GT I9100) name.

---

[132] Declaration of Timothy Sheppard in Support of Samsung's Opposition to Apple's Motion for Rule 37(b)(2) Sanctions for Samsung's Alleged Violation of January 27, 2012 Damages Discovery Order, dated April 3, 2012, p.5.
[133] http://www.samsung.com/us/mobile/cell phones/SGH T989ZKBTMB?
[134] http://www.samsung.com/us/mobile/cell phones/SGH I777ZKAATT?

**148.** Due to the inaccurate and incomplete nature of Samsung's disclosures relative to the revenue, cost and profits of the accused devices, it was not possible to calculate a true consolidated profit using the information disclosed.  In light of these deficiencies, I have used Samsung's reported manufacturing gross profit of the accused products on a worldwide basis as the starting point for determining the most accurate representation of Samsung's incremental profits on accused devices. As shown on **Exhibit  36**, in the third version of financials, Samsung has reported that the worldwide

represents the profit earned by Samsung on the sale of the accused devices in the U.S. and transferred to a Chinese subsidiary of Samsung under a transfer pricing agreement to avoid U.S. taxation.[135] This

reduce this gross profit percentage for tablets on the basis of the difference between the tablets reported gross profit versus Samsung's smartphone reported gross profit. My calculation of the smartphone and tablet adjusted gross profit is displayed on **Exhibits 37 and 38**.

**149.** Samsung's confusing and incomplete spreadsheets provides some limited information on other expenses that it allegedly allocates to the Samsung Accused Products.  Very little by way of detail or information is provided.  Ultimately it is Samsung's burden to identify which expenses are directly associated with the product.  Nonetheless, I have looked at the categories provided and based on the information that I have, I would not include them in a calculation of the incremental profit Samsung has earned because they are primarily indirect costs and appear to be fixed costs, non marginal costs that do not vary with new units.  More information would be needed to carry Samsung's burden.

150.   My use of Samsung's worldwide manufacturing gross profit percentage is conservative and is potentially prejudicial to Apple in that it ignores any profits that may have been earned at the individual sales subsidiaries, SEA and STA. Therefore, it presumes that the higher retail sales amount reported by the U.S. sales subsidiaries is offset by both the cost of goods sold at a transfer price level and additional costs borne only at the U.S. sales subsidiary level. I expect to adjust my calculation and opinion

---

[135] Deposition of Jaehwang Sim, March 10, 2012, pp. 35-36 and 44.

1   ~~regarding Samsung's profits on accused devices should additional information become available.~~ At his

2   deposition, Mr. Sim was not aware of many of the changes described above and provided

3   responses that were incorrect and incomplete regarding Samsung's accounting and its

4   spreadsheets despite being designated as a representative of the company who was supposed to be

5   knowledgeable about Samsung's spreadsheets.[224]  Further, Mr. Sim testified that the changes to

6   cost of goods sold reflected a decision made by Mr. Sim and Samsung's lawyers to exclude

7   profits earned by one of Samsung's subsidiaries.[225]  The addition of profits obtained at a

8   subsidiary by including it as a cost within Samsung's cost of goods sold is not consistent with

9   Generally Accepted Accounting Principles and distorts Samsung's actual profits.

10          151.   ~~My final calculation of the resulting infringer's profit damage amount is displayed on~~

11   ~~Exhibits 17 and 17.1 where I have calculated Samsung's accused revenue and adjusted gross profit.~~ After

12   the third version of the Excel spreadsheet was produced by Samsung, Mr. Sheppard submitted a

13   declaration that sought to explain certain of the discrepancies in the prior spreadsheets.[226]  He

14   indicated that prior spreadsheets had been mislabeled, combining data from more than one

15   product even though they had not been labeled to include those products.[227]  However, the

16   internal spreadsheets still did not reconcile with respect to these products even in light of the

17   information provided.[228]

18          152.   Fact discovery had closed on March 7, 2012, and at that time, the deadline

19   indicated by the Court's January 27 order had passed by 28 days.  As noted, Samsung had already

20   produced two versions of the spreadsheet after the Court deadline.  Without explanation,

21   Samsung produced a fourth spreadsheet within 24 hours of Mr. Musika's submission of his

22

23

24          [224] *See, e.g.*, Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 30:24-35:5.

25          [225] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 35:13-36:25.

26          [226] Declaration of Timothy Sheppard in Opposition to Apple's Motion for Rule 37(b)(2) Sanctions, dated Mar. 12, 2012 (Dkt. 801-22).

27          [227] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 49, ¶ 147; Declaration of Timothy Sheppard, Mar. 12, 2012, p. 5, ¶ 14.

28          [228] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, pp. 49-50, ¶ 147.

Original Expert Report.[229]  In my experience as an expert, this step was itself highly unusual and highly questionable in its timing.  Mr. Sim later testified that the March 21 versions were created to correct human errors that were introduced by Samsung into the Excel spreadsheet.[230]

153.    Following the preparation of Mr. Musika's Original Expert Report and prior to issuance of a Court order sanctioning Samsung for its financial productions, Samsung produced two additional versions of the spreadsheet on March 29 and April 16.[231]  Notably, one version of the spreadsheet was produced either very late the night before or early in the morning of April 16, the same day that Mr. Wagner produced his report.  Mr. Wagner himself characterized this production as occurring "at the very last minute."[232]  Mr. Wagner later testified that the data set that was produced on April 16 was allegedly prepared on a different basis focusing on U.S. sales only, although Apple had no opportunity to obtain testimony from a Samsung witness regarding how it was prepared or any explanation as to why it was withheld until more than a month after discovery closed.[233]

154.    On April 23, 2012, the Court entered an order imposing sanctions on Samsung based on its conduct related to the production of the foregoing financial spreadsheets.[234] As a part of this order, the Court questioned the accuracy of Samsung's financial data, writing, "Although Samsung explains this failure to be the result of the manner and timing by which Samsung's products move through its global chain of companies, the court agrees with Apple that as a matter of basic accounting, such discrepancies call into question the accuracy of the data or at least the manner in which Samsung has chosen to report it," and "[l]ate-produced and never-produced

---

[229] *See* Samsung-produced financial spreadsheet, dated Mar. 21, 2012 (SAMNDCA00376623–SAMNDCA00376901).

[230] Deposition of Jae Hwang Sim, dated Mar. 31, 2012, pp. 208-211.

[231] *See* Samsung-produced financial spreadsheet, dated Mar. 29, 2012 (SAMNDCA00380019–SAMNDCA00380081); Samsung-produced financial spreadsheet, dated Apr. 16, 2012 (SAMNDCA00396884–SAMNDCA00396916).

[232] Deposition of Michael Wagner, dated May 12, 2012, p. 279.

[233] Deposition of Michael Wagner, dated May 12, 2012, p. 279.

[234] Dkt. 880: Order Granting in Part Apple Motion for 37(B)(2) Sanction Re September 28 and December 22 Discovery Orders, Granting in Part Apple's Motion for 37(B)(2) Sanctions Re Damages Discovery, dated Apr. 23, 2012.

product data, inconsistent presentations regarding the cost of goods sold and total profits that result in improper witness instructions during deposition, and errors that require additional iterations of what Samsung insists was an accurate and complete spreadsheet, are indicative of a failure to provide damages data that accurately and fully complied with the court's order by the indicated date."[235]  As a part of the remedy for Samsung's violations, Samsung was required to produce substantially more detail regarding its financial information, which resulted in a seventh version of the Excel spreadsheet, additional financial schedules, a more detailed presentation of information on Samsung's accounts, and a supplemental expert report by Mr. Musika.  I have reviewed Mr. Musika's May 8 Supplemental Expert Report and agree with its conclusions based on the analysis contained in it regarding Samsung's further production.

155.    As reflected in Mr. Musika's Original and Supplemental Expert Reports, Samsung's production raises substantial concerns, and there are significant reasons to conclude that Samsung's Excel spreadsheets, which form the basis for the deductions that Samsung requests that the jury make when calculating its total profits under 35 U.S.C. § 289, do not meet the standards for reliability applied in the field of accounting.

- The materials were prepared by Samsung solely for use in this litigation, using a format only created for this litigation and at the direction of Samsung's attorneys.[236]

- Little care was taken when the spreadsheets were initially prepared and the materials did not undergo the type of routine review and checks that are expected in connection with the preparation of financial schedules, were prepared by low-level employees with minimal supervision, and were not used by any Samsung executives for business purposes.[237]

- As discussed in greater detail in Mr. Musika's Supplemental Expert Report at paragraphs 34 to 35, the materials could

---

[235] Dkt. 880: Order Granting in Part Apple Motion for 37(B)(2) Sanction Re September 28 and December 22 Discovery Orders, Granting in Part Apple's Motion for 37(B)(2) Sanctions Re Damages Discovery, dated Apr. 23, 2012, pp. 12-13 and 14-15.

[236] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 15-18; Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 39 and 44.

[237] Deposition of Jae Hwang Sim, Mar. 10, 2012, pp. 15-18; Deposition of Jae Hwang Sim, dated Mar. 31, 2012, p. 206.

not be tied to or reconciled to other external or routinely used internal financial reporting or directly to any routinely kept internal accounting records, and Samsung provided no documents that would support any claim that the numbers could be reconciled.

• The spreadsheets contained multiple errors created by human actions and mistakes.  This is not consistent with the claim that the material is a direct and unmodified extract from Samsung's financial systems.[238]

• ████████████████████████████████████████████ the products based on a reclassification of profits as cost of goods sold.[239]

• Samsung witnesses refused to give testimony, and at times gave conflicting testimony, on key information, such as the manner in which cost of goods sold is calculated, leaving key discrepancies unexplained.[240]

• Information was repeatedly produced at the very last minute in violation of Court deadlines and in a manner that prevented review by Apple or Samsung prior to the date set for expert reports.  Both Apple and Mr. Wagner had substantial difficulty obtaining the necessary data to prepare a calculation of Samsung's profits.[241]

• As described in **Exhibit 49-S** and in Mr. Musika's Supplemental Expert Report, the reporting repeatedly changed between various versions and between later versions and Mr. Wagner's calculations of profit in his April expert report, which is not consistent with a claim that the material came directly from Samsung's financial system.

• The cost-of-goods-sold calculations included in the material produced by Samsung reflected significant and sharp upward and downward changes that undermine their reliability, as shown in **Exhibit 51-S**.

• The material cost calculations for the products varied substantially from the material costs indicated by an analysis of Samsung's bills of materials as reflected in **Exhibit 52-S**.

---

[238] Deposition of Jae Hwang Sim, dated Mar. 31, 2012, pp. 209-211; Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[239] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, p. 36:16-24; **Exhibit 49-S**.

[240] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 95-96 and 131-132.

[241] Deposition of Michael Wagner, dated May 12, 2012, pp. 262:17-262:23, 279:3-280:1, 283:4-283:21.

- Despite Court orders, Samsung failed to provide any reliable data or documents that reflect research and development expenses specific to the infringing products or related to any claim that it could design around any patents, and limited its production to an overall allocation of ongoing general research and development expenses, which are not directly related to the infringing products.

156.    In light of these indications regarding the lack of reliability of Samsung's production of cost and expense data, Mr. Musika concluded that Samsung had not met its obligation to provide a reliable statement of its expenses and that the jury should award damages based either on Samsung's revenues or its gross profits.  I agree.

157.    Therefore, like Mr. Musika, I have prepared two calculations related to Samsung's profits:

- Schedules labeled as **Exhibit 17-PT-H** reflect damages calculated using Samsung's sales revenues as the measure of Samsung's profits.

- Schedules labeled as **Exhibit 17.1-PT-H** reflect damages calculated using Samsung's gross profits as the measure of Samsung's profits.

158.    In my calculations of gross profits on the infringing products, I have relied upon Samsung's reported manufacturing profits.  Samsung did not provide sufficient information to determine Samsung's consolidated gross profits, which would include SEC's manufacturing profits plus the profits earned by STA and SEA.  Relying upon the manufacturing gross profits likely understates Samsung's total consolidated profits since it assumes that the higher prices charged by STA and SEA to their customers are offset by additional costs experienced by those

the design-patent infringing products that will be the subject of the new trial.[242]

### 4.    Calculation of Samsung's Profits Using Samsung's Classification of Costs as Fixed and Variable

159.    Subsequent to the submission of Mr. Musika's first report and pursuant to a Court order, Samsung also produced two encrypted files (SAMNDCA-D-00000012 and SAMNDCA-

---

[242] *See* **Exhibit 50.1-PT**

D-00000013) that provided more detailed information, including names of and the amounts for various accounts used to track costs and expenses. These files were produced as a result of the April 23 order that imposed sanctions on Samsung for its deficient production discussed above.

160. Mr. Musika reported in paragraph 38 of his Supplemental Expert Report that SAMNDCA-D-00000012 "explicitly labels many of these accounts as involving either fixed or variable costs and expenses."[243] I have received a certified copy of the translations that contain these classifications. Fixed costs and variable costs have standard meanings in financial accounting. Mr. Musika also determined that the file "provides the foundation for the file labeled SAMNDCA00402075, which reflects Samsung's alleged calculation of operating profit" for the infringing products as of the end of March 2012.[244] I have confirmed the relationship between the files through discussions with Invotex and examination by my staff of the underlying files.

161. I agree with Mr. Musika that a "fixed cost has no direct relationship to the volume of product produced or sold. In order for a fixed cost to be assigned to a product, the cost must be allocated on some systematic and rational basis."[245] Samsung, though, has provided no means by which Mr. Musika or I could validate, or even replicate, its fixed cost allocations. Because of the fixed nature of these costs and the inability to identify or explain the allocation of these costs, I have concluded that the fixed costs reported by Samsung are not directly associated with the sale of the infringing products and should not be deducted in the calculation of Samsung's profits.

162. Mr. Musika also reported in paragraph 39 of his Supplemental Expert Report that SAMNDCA-D-00000012 "provides more detailed information on accounts related to two additional non-product cost categories (general research and development and general maintenance)."[246] I understand that those costs and expenses were not specifically labeled as either fixed or variable. However, judging by the expense category name and the lack of evidence or support for the assignment of such costs to the infringing products, Samsung has not

---

[243] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.
[244] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.
[245] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.
[246] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.

1   met its burden of proving that they are properly deductible in this case, and I do not incorporate

2   them into a calculation of Samsung's profits.

3          163.    The data contained in the encrypted file, SAMNDCA-D-00000012, for all accused

4   products is summarized in **Exhibit 50-S**, which includes a calculation of Samsung's incremental

5   profits applying the criteria discussed above.  Because the present trial involves fewer products

6   and shorter periods, I asked Invotex to use the same data file and same methods disclosed at

7   paragraphs 39 to 41 of Mr. Musika's Supplemental Expert Report and in **Exhibit 50-S** to prepare

8   new versions of **Exhibit 50-S** that reflect the seven design-patent infringing products at issue in

9   the new trial and to prepare calculations of Samsung's profits using the previously disclosed

10  methods for calculating incremental profits while limiting the damages to periods that came after

11  the notice dates established in the Court's March 1 Order.  The results are reflected in **Exhibits**

12  **50.1-PT** to **50.9-PT** and **Exhibit 17.1-PT-I**.  The incremental profit margin for the seven

13  ███████████████████████████████████████████████

14  █████████████████████████████

15                  **5.     Evidence Introduced at Trial Confirms These Opinions.**

16         164.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial

17  testimony.  However, before he testified, Mr. Musika was present for or was able to review the

18  transcript of the proceedings, and I have that record available to me and have considered it in

19  forming my opinions.  The trial testimony confirms the opinions regarding Samsung's profits

20  already stated above.

21         165.    At trial, Mr. Sheppard provided evidence related to Samsung's financial

22  information.[247]  For example, Mr. Sheppard pointed to Samsung's operating profits for its overall

23  business and its global telecommunications and networking business as reflected in Samsung's

24

25

---

26  [247] Tim Sheppard Trial Testimony, dated Aug. 16, 2012, pp. 3001:25-3017:7; DX676:
    Samsung-produced financial spreadsheet, dated Jul. 25, 2012; DX753: Samsung consolidated
27  financial statement, dated Feb. 22, 2012; PX180: Samsung-produced financial spreadsheet, dated
    Jul. 25, 2012 (SAMNDCA4875335–SAMNDCA4875335).

28

1    overall public financial statements as evidence in support of a lower damages calculation.[248]

2    These sources and measures are not an appropriate basis for comparing or calculating Samsung's

3    total profits or the costs and expenses that are directly attributable to sale and manufacture of the

4    products that infringe Apple's patents.  They include multiple different types of products

5    (including products that are not mobile devices).  Moreover, the calculation of operating profit

6    reflected at the pages to which Mr. Sheppard referred includes all expenses incurred by Samsung

7    of every type.  This is not consistent with an effort to isolate directly attributable expenses.  Mr.

8    Sheppard's testimony that he sought to verify STA's expenses is also an insufficient basis to

9    overcome the concerns raised above regarding Samsung's financial production.[249]  The expenses

10   that drive the calculation of gross profits, incremental profits, and operating profits are

11   predominately found in the sections of the spreadsheets that relate to SEC, not STA.  Mr.

12   Sheppard's testimony provides no reason to alter the opinions stated above.

13          166.    Mr. Sheppard introduced two financial spreadsheets relating to the products that

14   are the subject of the new trial, PX180 and DX676.[250]  These spreadsheets agree regarding the

15   units and revenues attributed to sales in the United States.  Further, for the products that are the

16   subject of the new trial, the data in PX180 was used to prepare the analysis regarding Samsung's

17   total profits described above.  Similarly, the information that I have used to calculate the units and

18   revenues for the products that are the subject of the new trial was the source for JX1500, which

19   both parties submitted as an accurate record of Samsung's sales in the United States.  This

20   information from trial confirms the opinions stated above.

21          167.    Mr. Denison testified at trial that SEC makes all the phones in Korea and ships

22   product directly to the United States, using STA as a sales entity here.[251]  This testimony confirms

23          [248] Tim Sheppard Trial Testimony, dated Aug. 16, 2012, pp. 3008:3-3011:11; DX753:
24   Samsung consolidated financial statement, dated Feb. 22, 2012.
             [249] *See* Tim Sheppard Trial Testimony, Aug. 16, 2012, pp. 3005:3-3007:7.
25           [250] Tim Sheppard Trial Testimony, Aug. 16, 2012, pp. 3004:16-3005:1 and 3016:5-
26   3017:3; PX180: Samsung-produced financial spreadsheet, dated July 25, 2012
     (SAMNDCA4875335–SAMNDCA4875335), DX676: Samsung-produced financial spreadsheet,
27   dated Jul. 25, 2012.
             [251] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 794:3-795:12.
28

1   my opinion that the cost of goods sold recorded at SEC reflects the proper basis on which to

2   calculate Samsung's total profits.

3        168.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

4   further supports the opinions regarding Samsung's total profits that I have stated in this report.

5        **E.**    **Reasonable Royalty**

6        169.    ~~152. As indicated above, assuming infringement, a utility or design patent owner is~~

7   ~~entitled to an award of "damages adequate to compensate for the infringement, but in no event less than a~~

8   ~~reasonable royalty."[136]~~ Because Samsung infringed the New Trial Patents, Apple should recover

9   "damages adequate to compensate for the infringement, but in no event less than a reasonable

10  royalty for the use made of the invention by the infringer."[252]  "~~Importantly, *no* single accepted~~

11  ~~method exists for how a court must determine 'reasonable royalty' *damages*."[137]  There are various~~

12  ~~methods (e.g., "established royalty," "hypothetical negotiation," "the analytical method" and "discounted~~

13  ~~cash flow analysis")[138]~~ A reasonable royalty is the payment for the license that would have resulted

14  from a hypothetical negotiation between the patent holder and the infringer taking place at the

15  time when the infringing activity first began."[253]  There is no single method for how reasonable

16  royalty damages must be determined.[254]  Acceptable methods include an established royalty, the

17  analytical method, and the hypothetical negotiation framework.[255] ~~that are frequently used to~~

18  ~~determine a reasonable royalty amount.  Further, the final royalty amount may be expressed in various~~

19  ~~forms (e.g., through a running royalty, a one-time lump-sum payment or a combination of both).  The~~

20  ~~important and necessary aspect of a reasonable royalty damage amount is that the amount is adequate to~~

21  ~~compensate for the alleged infringement.  The adequacy of the damage compensation is measured by the~~

22

---

23      ~~136~~252 35 U.S.C. § 284.

24  ~~137  John M. Skenyon, Christopher Marchese & John Land.  Intellectual Property - Patent Damages Law & Practice. §1:12.~~

25      [253] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable
    Royalty—Definition.  *See also* Dkt. 1903 at 74: Final Jury Instruction No. 56, Design Patent
    Damages—Reasonable Royalty.

26      [254] Skenyon, et al., "Intellectual Property – Patent Damages Law and Practice," § 1:12.

27      ~~138~~255 AICPA Practice Aid 06-1, Calculating Intellectual Property Patent Infringement
    Damages, pp. 48-60.

1   ~~value of the claimed patent benefits.~~ Reasonable royalty damages must "compensate for the alleged

2   infringement,"[256] and are based on the value of the benefits of the New Trial Patents.  The benefit

3   provided by a particular patent may vary.  For example, a patent may provide the alleged

4   infringer early market entry, greater market share, and/or improvements in manufacturing, among

5   others.  A significant measure of the value of the patent is the profits generated by its use.  These

6   profits may come in the form of increased sales volume, increased sales price, and/or lower costs.

7   **153.** ~~A benefit conveyed through a patent or other form of intellectual property may initially take various~~

8   ~~forms (e.g., early market entrance, increased market share, enhanced product visibility, a reduction in~~

9   ~~manufacturing time, etc.).  However, the alleged patent benefit(s) is ultimately measured by the~~

10  ~~profits such benefits produce.  Increased profits basically result from one or more of the following:~~

11  ~~increased sales volume, increased sales price~~ ~~and/or reduced costs.  If the patent is unable to generate~~

12  ~~future profits to a reasonable degree of certainty, the patent's value is speculative.~~

13  **154.** ~~Reasonable royalties are commonly used to calculate damages for patents.  Less commonly, they can~~

14  ~~be used to calculate damages for infringement of trademark and trade dress.  In this context, they~~

15  ~~apply where other forms of damages are not available or cannot be proved with reasonable certainty.~~

16  ~~This is another reason that I apply a reasonable royalty only after an evaluation of other forms of~~

17  ~~damages.~~

18         170.    In the hypothetical negotiation over this matter, Apple and Samsung would

19  negotiate over rights to use the intellectual property asserted by Apple in the original and

20  amended complaints for all the products included in the lawsuit.  The monetary royalties that I

21  calculate for purposes of the new trial represent compensation only for the 5 patents and 13

22  products identified on **Exhibit 4-PT,** which reflects a subset of the intellectual property and

23  products that were included in the amended complaint and trial.  I have also prepared the

24  calculations so that no reasonable royalty is calculated before the date on which Samsung

25  obtained actual notice of Apple's patents as established in the Court's March 1 Order.

26

27

28

[256] 35 U.S.C. § 284.

171.    Mr. Musika explained his approach to determining a reasonable royalty for the asserted intellectual property in paragraphs 152 to 262 of his Original Expert Report and in **Exhibits 39-S** to **47-S**.  Mr. Musika adopted the commonly used method of analyzing the expected outcome of a hypothetical negotiation between Apple and Samsung at the time that Samsung's infringement first began, based on 15 factors commonly known as the *Georgia-Pacific* factors.  This method is also what I have most frequently used when calculating reasonable royalties in patent cases.  Mr. Musika summarized the results of the analysis in **Exhibits 46-S** and **47-S** of his Supplemental Expert Report.  With respect to the New Trial Patents, Mr. Musika concluded the following reflects the appropriate per unit reasonable royalties:

| Apple Patents-in-Suit | Final Per Unit Royalty Rate |
|---|---|
| U.S. Patent No. 7,844,915 | $3.10 |
| U.S. Patent No. 7,469,381 | $2.02 |
| U.S. Patent No. 7,864,163 | $2.02 |
| U.S. Patent No. D618,677 U.S. Patent No. D604,305 | $24.00 |

As explained more fully below, I agree that these represent appropriate reasonable royalties for the Apple New Trial Patents, and I have used them for purposes of my calculation of Apple's damages.  In addition to the explanation below, I incorporate the foregoing passages of Mr. Musika's reports and exhibits by reference.

### 1.    Royalty Structure

172.    Patent licenses are structured in different ways.  Some require lump sum amounts paid upfront or periodically during the term of the license.  Others incorporate a "running royalty," which is typically calculated based upon the number of units sold of the licensed products or their net sales value expressed in monetary (dollar) amounts.  Running royalties

require the determination of the royalty base as well as the running royalty that will be applied to that base.[257]

## 2. Royalty Base

~~155.~~ ~~Most reasonable royalty damage amounts are expressed as a reasonable royalty rate times an accused base. The rate may be expressed as a percent of accused sales dollars, as a per unit dollar amount or a lump sum. Regardless of the form, reasonable royalty damages are often calculated on a "base" of sales of a particular infringing product or uses of a particular infringing process.[139]~~

173. ~~156.~~ The ~~use~~measure of ~~accused~~ sales that should be used as a royalty base for determining ~~a reasonable royalty is not always a straight forward determination, even assuming a specific identification of accused product sales. The accused product may contain and the relevant revenue may result from~~reasonable royalty damages is not routine.  For example, a product may include multiple ~~other~~features in addition to ~~the protected by the intellectual property element at issue.~~features enabled by the New Trial Patents.  Therefore, ~~the accused~~an infringing element of ~~an accused~~a product may represent only a portion of the total value of the ~~total accused~~ product. ~~The use of~~ Using the total revenues ~~obtained from sales~~ of an ~~accused~~infringing product ~~as the royalty base~~ when the ~~accused~~patented element ~~of the accused product represents~~is only a portion of the ~~total~~value of an infringing product is ~~referred to~~ an application of ~~the entire market value rule~~what is referred to as the Entire Market Value Rule ("EMVR").

174. ~~157.~~ ~~The Federal Circuit has considered the historical and ongoing use of the EMVR.~~ ~~"For~~Courts have considered when the EMVR should apply.  The Federal Circuit has stated that "[f]or the entire market value rule to apply, the patentee must prove that the ~~patented~~patent related feature is the basis for customer demand" of the ~~entire accused product.[140]~~infringing product.[258] The Federal Circuit ~~rulings "do not allow~~ also does not allow "consideration of the entire market

---

[257] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable Royalty—Definition.

~~[139] Rite-Hite, 56 F.3d at 1554, see also Del Mar Avionics v. Quinton Instrument Co., 836 F.2nd 1320 (Fed. Cir. 1987).~~

~~[140]~~[258] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

value of accused products for minor improvements simply by asserting a low enough royalty rate."[141][259]  A ~~recent~~2009 case applied ~~the following on~~ a three-~~prong~~factor test. ~~"The~~:

> [t]he entire market value rule in the context of royalties requires adequate proof of three conditions: (1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention; (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are part of a complete machine or single assembly of parts; and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit.  It is not enough that the infringing and non-infringing parts are sold together for mere business advantage.[142][260]

175. ~~158. Alternatives to the use of the entire market value rule exist.  One method of establishing a royalty base that relates only to the patented components within an entire market is through an apportionment of the entire market value. An apportionment of the entire market value seeks to identify the portion of the entire market value that relates only to the protected element. There~~Other alternatives to using the EMVR are available.  For example, one method would be to apportion the revenues in order to identify revenues related to the patented element.  However, there are no ~~predefined~~defined or required methods ~~to accomplish an~~that must be used in order to perform the apportionment. ~~Similarly, a party~~ Parties may ~~also~~ elect to structure a royalty ~~on a per unit basis rather than using revenues as a basis for the calculation.  The guiding principle in allocating costs and revenues within the accounting profession is that such allocations~~as a per unit amount.  Whatever approach is used should be systematic and rational.  In this matter, I agree with Mr. Musika that the appropriate royalty would be a per unit amount applied to the unit sales of Samsung smartphones and tablets at issue.  Such a structure is, for example, consistent with the structure proposed in discussions between Apple and Samsung.

176. ~~159. The individual accused smartphone and tablet products of Samsung are comprised of a number of patented and un-patented elements. Accordingly, I have~~Mr. Musika recognized, as I do,

---

[141][259] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).

[142][260] *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, ~~268~~286-87 (N.D.N.Y. 2009~~) ("Cornell II") (internal citations omitted~~).

1   that the infringing Samsung products include a number of features and functionality, not all of

2   which are covered by the New Trial Patents.  Mr. Musika considered the effect of the entire

3   market value of the products and elected to structure my royalty damage on an individual per unit basis

4   and not the total revenue of the accused products. Further, as discussed below, I take steps to apportion the

5   overall royalty rate when considering the total profit contributions of the accused products.  As reflected in

6   **Exhibit 20,** I use the number of accused units sold and not revenue as the basis on which to calculate a

7   royalty for each asserted item of Apple Intellectual Property In Suit. in structuring the reasonable

8   royalties on a per unit basis.  I agree that structuring the royalty as a per unit fee is appropriate,

9   and I have used these royalties and Samsung's unit sales in calculating Apple's reasonable royalty

10  damages.

11              **3.**     *Royalty Rate* **Royalty Rates**

12  **160.**  The determination of the appropriate reasonable royalty rate was completed on the basis of each

13          individual item of Apple Intellectual Property In Suit. As previously disclosed, I have assumed that

14          every item of Apple Intellectual Property In Suit is both valid and infringed. However, the final

15          decision by the Court may involve a determination of validity and infringement of only a subset of

16          the total number of asserted items of Apple's Intellectual Property In Suit. For this reason it is

17          necessary that a rate be assigned individually to every item of Apple Intellectual Property In Suit. In

18          this way, once the Court has made a final determination concerning which items of Apple Intellectual

19          Property In Suit are valid and infringed, the Court can then add up the resulting damages associated

20          with each valid and infringed item of intellectual property. The individual rates for each item of

21          Apple Intellectual Property In Suit are displayed on **Exhibit 20**. The rates were determined as

22          follows.

23  **161.**  I began my determination of the appropriate reasonable royalty rate for each item of the Apple

24          intellectual property by considering the value of economic benefits associated with the alleged use of

25          each item. I developed reference points for each item of Apple Intellectual Property In Suit through

26          the consideration of three standard valuation methods referred to as the cost, income and market

27

28

1    approaches.[143]

2    *The Cost Approach*

3    **162.** The cost basis approach is generally based on the cost to an entity to develop or replace the specific

4    technology in question. The basis of my cost reference point for Samsung is the total cost of replacing

5    or removing the accused element from Samsung's accused smartphones and tablets when and if

6    deemed possible. I have conservatively limited my calculation of this cost to the opportunity cost

7    represented by the amount of lost operating profits incurred by Samsung during the period of time

8    Samsung would have been out of the market developing, designing, testing and implementing an

9    acceptable non infringing substitute. There would be additional out of pocket costs associated with

10   the development, design, testing and implementation of an acceptable non infringing substitute and I

11   intend to add such costs to my calculation should they become available in the future.

12   **163.** I have based the period of time Samsung would have been out of the market developing, designing,

13   testing and implementing an acceptable non infringing substitute on the opinion of Apple's technical

14   experts as identified on **Exhibit 20** and Samsung and Apple evidence regarding the amount of time

15   required in the ordinary course to design, develop, test and implement new smartphone and tablet

16   features.

17   **164.** As discussed throughout my report, I have performed my calculations on an item by item basis for

18   Apple Intellectual Property In Suit.  Additionally, I make an ultra conservative assumption and

19   assume that the individual time required to replace each individual item of Apple Intellectual

20   Property In Suit would occur at the same time.

21   **165.** Accordingly, I calculate the total number of smartphones and tablets that would not have been sold

22   by Samsung during the period of time they would have been out of the market replacing all accused

23   Apple Intellectual Property In Suit. I derive the total opportunity cost by multiplying the average

24   gross profit for a Samsung Smartphone and Tablet over the total accused time period times the

25   number of units not sold while Samsung would have been out of the market. Next, I divide that total

26   opportunity cost amount for smartphones and tablets by the total number of accused smartphones and

27

28   ───────────────────────
[143] AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), pp. 32, 38, and 41.

1   tablets to produce a per unit opportunity cost for smartphones and tablets. Finally, I allocate the

2   overall opportunity cost for smartphones and tablets between the individual items of Apple

3   Intellectual Property In Suit based on the number of categories involved. The calculation of the

4   individual per unit Samsung opportunity cost is illustrated on **Exhibits 39.1 to 39.4** and the final

5   results are summarized on **Exhibit 39.**

6   **166.** There are no cost basis rates available for Apple. I have interviewed various Apple representatives as

7   identified elsewhere in my report and understand that the amount of research and development costs

8   that were required to design, develop, test and implement the embodiment of the various Apple

9   Intellectual Property In Suit was significant. Over the past three years Apple has spent between two

10  and three percent of net sales on research and development with expenses of $2.4 Billion, $1.7

11  Billion, and $1.3 Billion in 2011, 2010, and 2009 respectively.[144] The importance of research and

12  development is echoed in the following statement from Apple's 10-k, "The Company continues to

13  believe that focused investments in R&D are critical to its future growth and competitive position in

14  the marketplace and are directly related to timely development of new and enhanced products that are

15  central to the Company's core business strategy. As such, the Company expects to make further

16  investments in R&D to remain competitive."[145] However, Apple does not track the individual

17  research and development costs associated with individual patents, individual features or other forms

18  of intellectual property in the ordinary course.

19  **167.** The rates discussed above allocate the total cost of replacement by the number of accused units.

20  Therefore, I do not further apportion the amount when calculating a reference amount.

21      177.   I evaluated the royalty rate that should be applied for the patents that are at issue in

22  the new trial.  The fundamental construct for a reasonable royalty is to evaluate what royalty rates

23  would have emerged if the parties had negotiated a royalty at the time that Samsung's

24  infringement began.  It is assumed that both parties would have acted rationally and believed that

25  the patent was valid and infringed.  This evaluation is structured around consideration of 15

26

---

27  [144] Apple Inc. Form 10-K, fiscal year ended 9/24/11, pp. 35-36.
    [145] Apple Inc. Form 10-K, fiscal year ended 9/24/11, pp. 35-36.

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1 factors initially described in *Georgia-Pacific Corp. v U.S. Plywood Corp.*, 318 F. Supp. 1116,

2 1120 (S.D.N.Y. 1970), *modified by* 446 F.2d 295 (2d Cir. 1971).  Mr. Musika did this, and I have

3 adopted the same approach.

4      178.    As an initial step before reviewing the 15 *Georgia-Pacific* factors, Mr. Musika

5 considered different reference points, labeled as market, cost, and income reference points, as a

6 part of evaluating the results of the parties' hypothetical negotiation.  I discuss these reference

7 points below.

### 4.    ~~*The*~~ Market ~~*Approach*~~ **Reference Points**

9     179.    **168.** The market ~~approach to the valuation of intellectual property is based on the~~

10 ~~consideration of other market~~reference point considers whether other comparable transactions ~~exist~~

11 that may be used to evaluate the proper royalty rate.  Mr. Musika and I have reviewed and

12 analyzed ~~both Apple and Samsung's~~the license agreements and licensing activity ~~and searched the~~

13 ~~public domain for market comparable rates specific to or comparable to the Apple Intellectual Property in~~

14 ~~Suit. I explain the result of my analysis for each as follows and have summarized my results on~~ **Exhibit**

15 ~~40.~~ of both Apple and Samsung.

16 **169.   Apple**   ~~Based on my review of the evidence produced in this case I have identified the following~~

17 ~~sources that relate to Apple's licensing of the Apple Intellectual Property In Suit as well as Apple's~~

18 ~~general licensing policies and procedures.~~

19     180.    The following observations regarding Apple's practices in licensing intellectual

20 property are relevant to this analysis:

21     • Apple's policy is ~~to~~ not to license ~~to anyone its design elements as~~
22     ~~represented by Apple's asserted design patents and trade dress.~~
    ~~Accordingly, this sets a very high but un-quantifiable rate for Apple's~~
23     ~~asserted design patents and trade dress~~its design intellectual property,
including its design patents.  This ~~policy is reinforced and~~is
24 confirmed by Apple~~'s refusal~~ refusing to offer ~~Samsung~~ a license to
its design elements ~~and~~as well as its ~~specific~~ directives regarding
25 Samsung's copying during ~~the parties'~~ discussions ~~about the~~between
Apple ~~Intellectual Property In Suit.~~[146]and Samsung.[261]  Apple's policy
26 sets a high, but un-quantifiable, rate for the design patents at issue
in the new trial.

27

28     [146][261] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. ~~52,~~52 and 117.

- Apple has not licensed any of the ~~Apple Intellectual Property In Suit outside of the inclusion of some of the patents as a~~ New Trial Patents except as part of ~~a few select~~ certain global cross licenses ~~and there~~ or certain litigation settlements.  There is no established rate ~~associated with any Apple Intellectual Property In Suit.~~ for any of the New Trial Patents.

- Similar to its policy regarding design elements, Apple was unwilling to grant Samsung a license to specific utility patents at issue in the new trial (which include the utility patents included in my damages calculations).

- ~~Some of the Apple~~ The utility patents ~~in suit are included on a list of patents prepared in recent periods that Apple will not license to other companies~~ for which a reasonable royalty is being sought are among a group of patents that Apple considers to be associated with its unique user experience and that it has licensed only on very limited occasions.

- Apple's ~~approach  is to use~~ overall policy regarding its intellectual property is to protect the proprietary features of its products as opposed to licensing ~~as a means of generating revenue.~~ its intellectual property in order to generate revenues.

- ~~There are three agreements that cover, at least in part, some of the Apple Intellectual Property in Suit.~~

181.   Like Mr. Musika, as a part of my analysis, I also considered licenses produced in discovery that included in some way the patents for which damages are being sought in the new trial.

### a.   ~~IBM~~ **International Business Machines Corporation ("IBM")/Apple** Cross License

182.   ~~170. The first agreement between Apple and IBM took place in 1991, where Apple and IBM each licensed their worldwide patents, on a non-exclusive basis~~ IBM and Apple entered into a cross license agreement in 1991.  As part of that agreement, Apple and IBM each granted the other a worldwide, nonexclusive, nontransferable license (through the life of the patents)[262] to "all patents throughout the world, including utility models and ~~. . .~~ design patents and registrations for ~~registration of~~ type fonts (but not including any other design patents or registrations), issued ~~by October 1, 1991 and all~~ or issuing on patent applications ~~with~~ entitled to an effective filing date prior

---

[262] Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041–APL-ITC796-0000010079 at APL-ITC796-0000010053, APL-ITC796-0000010055, and APL-ITC796-0000010069).

to October 1, ~~1991.~~ ██ ██ 1996."²⁶³ ████████████

████ ████ ████ ████████

████████████.¹⁴⁷  ~~Apple and IBM further engaged in another~~

██ ²⁶⁴  In December 2002, Apple and IBM entered into a similar cross- license agreement ~~on~~

~~December 18, 2002.  This cross-license agreement captures patents, owned by either party, issued by~~

~~October 25, 2012 or all~~which included rights to all patents "issued or issuing on patent applications

~~with~~entitled to an effective ~~filing~~ date prior to October 25, 2012."²⁶⁵ ████████

█ ████████ the ██, and ████████ ████████

ex████████████ date ████████ ─█

████ ██ ████████ in ████████

2006 █████ in ████████

████████ █ ████████

████████ ████████████

████ ─█ ████ ████ █fthat ████████

---

²⁶³ Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041–APL-ITC796-0000010079 at APL-ITC796-0000010043–APL-ITC796-0000010044).

¹⁴⁷ ~~Patent Cross License Agreement between Apple Inc. and International Business Machines Corporation, dated October 1, 1991 (AppDel0158967 to AppDel0159005).~~

²⁶⁴ Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041-APL-ITC796-0000010079 at APL-ITC796-0000010067–APL-ITC796-0000010068).

²⁶⁵ Teskler Deposition Exhibit 23: Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Dec. 18, 2002 (APLNDC0001221082–APLNDC0001221113 at APLNDC0001221083–APLNDC0001221084).

¹⁴⁸ ~~Patent Cross License Agreement between Apple Inc. and International Business Machines Corporation, dated December 18, 2002 (APLNDC0001221082 to APLNDC0001221113).~~

²⁶⁶ Teskler Deposition Exhibit 23: Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Dec. 18, 2002 (APLNDC0001221082-APLNDC0001221113 at APLNDC0001221088, APLNDC0001221090, and APLNDC0001221103).

¹⁴⁹ ~~License Amendment between Apple Computer, Inc. and International Business Machines Corporation, dated March 31, 2006 (APLNDC00014215 to APLNDC00014224).~~

²⁶⁷ License Amendment between International Business Machines Corporation and Apple Computer, Inc., dated Mar. 31, 2006 (APLNDC00014215-APLNDC00014224 at APLNDC00014215-APLNDC00014216).



1 ██████████████████████     ████████████████████████████████████

2 ██.

3 *Microsoft Cross License*

4 ~~171.~~ ~~Apple entered into a cross license agreement with Microsoft Corporation on August 5, 1997.~~

5 ~~Licensed patents include all worldwide utility patents, utility models, and equivalent rights, and all of~~

6 ~~its worldwide design patents and design registration relating to user interface components for a~~

7 ~~computing or information processing device before 2002. The agreement also included an "anti-~~

8 ~~cloning" provision which kept the parties from copying each other's products. Apple was to pay~~

9 ~~52.5% of the total payment made by Microsoft to OTLC, of which Apple owns 50% of the common~~

10 ~~stock, for any license, settlement, judgment or other rights under any and all OTLC patents, less half~~

11 ~~of any costs that OTLC incurs in conjunction with such Microsoft patent activities. Microsoft was to~~

12 ~~pay a one time lump sum payment of $93,076,924 to Apple. The agreement term was five years from~~

13 ~~the effective date.[151]  I understand this cross license covers includes only the '002 and '891 Patents In~~

14 ~~Suit.[152]~~

15                          **b.**      **Nokia Corporation/Apple Cross License** ~~*and Settlement*~~

16          **183.**    ~~**172.**~~ In June 2011, Nokia and Apple ~~also~~ entered into a provisional license

17 agreement ~~with Nokia in a connection with a~~ as part of settlement of litigation between the parties.[183]

18 ████████████████████████████████████████████████████████████████

19 ████████████████████████████      █      ████████████████████████

20 ████████████████████████████████████████████████████████

21 ██████████████████████████████████      ████████████████████

22 ████████████████████████████████████████████████████

23

24 ~~[150] Discussion with Boris Teksler.~~

25 ~~[151] Patent Cross Licenses Agreement between Apple Inc. and Microsoft Corporation, dated August 5, 1997 (APL-ITC796-0000010019 to APL-ITC796-0000010040).~~
~~[152] Discussion with Boris Teksler.~~

26 ~~[153] Deposition of Chip Lutton, Jr., July 26, 2011, p. 66.~~

27 [268] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 66; Patent License Agreement by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220-APLNDC-X0000007355).

28



1

2

3

4

5

6

7

8

9

10

11 273

12

13

14     184. ~~173. It is my opinion that the three licenses do not provide a relevant comparable~~

15 ~~reference rate for the Apple Intellectual Property In Suit.  The IBM license which includes all of the utility~~

16 ~~patents in suit also includes a host of other intellectual property that is unrelated to the utility patents in~~

17 ~~suit.  Furthermore, IBM does not compete in the wireless device industry, an important characteristic when~~

18 ~~establishing a rate as comparable.  The Microsoft license is a broad cross license covering two of the~~

19 ~~utility patents in suit as well as a host of other intellectual property that is unrelated to the utility patents in~~

20

21 [269] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007230).

22
23 [270] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007226-APLNDC-X0000007230).

24
25 [271] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007232-APLNDC-X0000007233).

26 [~~154~~272] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-X0000007220 ~~to~~ –APLNDC-X~~0000007335~~0000007355 at APLNDC-X0000007225).

27

28 [~~155~~273] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 66.



1   ~~suit.~~ ██████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ███████████  Consistent with Mr. Musika's analysis, it is my opinion that Apple's agreements

6   with IBM and Nokia do not provide reference points for the asserted design and utility patents.

7   While the IBM agreements include rights to the utility patents at issue in the new trial, they also

8   includes rights to other intellectual property unrelated to the New Trial Patents.  It is not possible

9   to ascribe value to any particular patent or piece of intellectual property.  Further, the relationship

10  between IBM and Apple is different from that between Apple and Samsung.  Unlike Apple and

11  IBM, Apple and Samsung are head-to-head competitors in the wireless device industry, which is

12  an important factor in determining if a license is comparable.

13      185.   ██████████████████████████████████████

14  ██████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ████████████████████████████████████████

17  ██████████████████████████████████████████

18  ████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████████████████████████████████████████████

22  ██████████████████████████████████  ██

---

274  In November 2012, Apple entered into a license and settlement agreement with HTC
America, Inc., HTC Corporation, and SC Graphics Co., Ltd. (collectively, "HTC") (ALPNDC-
Y0000408242–ALPNDC-Y0000408383).  I received this license.  However, pursuant to the
Court's April 29, 2013 Order, I have not included this license in the analysis set forth in this
report.  If I had included this agreement in this analysis, my opinion would be unchanged because
I do not consider the license to be comparable to the hypothetical negotiation here in light of the
fact that, like the Nokia agreement, it was a settlement of ongoing litigation involving multiple
patents, includes a cross license of a broad portfolio of rights, and has a number of unique
provisions arising from that settlement.

186.   174. Apple participated in a series of licensing negotiations with Samsung that included the utility patents in the Apple Intellectual Property In Suit.  I understand that the first meeting As a part of this analysis, Mr. Musika and I also evaluated the discussions between Apple and Samsung in the summer and fall of 2010.  Apple and Samsung first met in July 2010 regarding Apple's concern that Samsung was "copying Apple's products" occurred in July 2010 in Cupertino, CA.[156][275]  The attendees at the meeting included Apple's then CEO, Steve Jobs, and then COO, Tim Cook, as well as Samsung's COO, J.Y. Lee.[157][276]  The July 2010 meeting was followed up with August Further discussions were held on August 4, 2010, and in September 2010 meetings between other Apple and Samsung representatives[158] in of that year, at which Apple provided substantial Samsung with additional information about the nature and scope of regarding Samsung's infringement of Apple's intellectual property.  These discussions led to an October 2010 meeting in Washington, DC between Apple Senior Vice President and General Counsel, including specific reference to the '381 Patent.[277]  In October 2010, Bruce Sewell, Apple's Senior Director Vice President and former Chief Patent General Counsel, Chip Lutton, and Apple's former Chief Patent Counsel, and Boris Teksler, Apple's Director of Patent Licensing and Strategy, Boris Teksler, as well as met with Dr. Seung Ahn and KJ K.J. Kim from Samsung.[159][278]  The October 2010 licensing discussion yielded These discussions resulted in a proposed framework for a license by Apple that included a proposed royalty of $30 per Samsung licensed smartphone and $40 per Samsung licensed touchscreen tablet that would include some but not all of the utility patents in suit and none of the design patents.[160]  Chip Lutton testified that the tablet rate of $40 per licensed touchscreen tablet was

---

[156][275] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 21 and 24.

[157][276] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 23.

[158] Deposition of Chip Lutton, Jr., July 26, 2011, pp. 17 and 118.

[277] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 17, 48, and 118; Lutton Ex. 5 (APLNDC0000001103–APLNDC0000001125).

[159][278] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 171.

[160] Samsung Apple Licensing Discussion, October 5, 2010 (APLNDC000010886-917 at APLNDC000010897); Discussion with Boris Teksler.

1   to be reduced over some period of time to a lesser royalty, proposed initially to be a $30 per unit royalty

2   after(reducing to $30 per tablet over two years).[161][279]

3   187.   175. Apple indicated on multiple occasions throughout the licensing discussion meetings

4   described above that Apple had no interest in licensing its design patents or trade dress to Samsung and

5   also indicated that certainImportantly, this license offer excluded rights to *any* design patents or

6   design aspects of Apple's products as well as the utility patents would need to be excludedincluded

7   in my damages calculation.  When asked whether it was Apple's intent to offer Samsung was

8   offered a license inat the August 4, 2010 meeting, Chip between the parties, Mr. Lutton

9   statedtestified that "if Samsung wanted to continue to use Apple's utility patents in its

10   smartphones, as documented in the – in the infringement by the Android – various layers of the

11   Android system, the message to Samsung was that we were willing to work with them on – on

12   that.  We were not willing to license them the design patents or the design aspects of our

13   product."[162][280] I understand from my discussion with Mr. Teksler also confirmed that certain of the

14   utility patents (including the '381, '915, and '163 Patent) that have been asserted in this lawsuitat issue

15   in the new trial are considered to be part of Apple's unique user experience and that Apple would

16   have beenalso excluded these patents from any arrangement between Apple andlicense with

17   Samsung.[163]

18   176. One reference point I also considered is Apple's Made for iPhone, iPad, and iPod program.  Mark

19   Buckley described the program as originating when Apple only sold iPods.  The program made it

20   possible for third parties to manufacture an accessory and with Apple's permission place a "Made for

21   iPod" logo on the packaging in exchange for a fee.[164] I reviewed the standard Made for iPod License

22   and Made for iPod License iPhone/iPad Supplement and found that the license grants a third party a

---

[161] Deposition of Chip Lutton, Jr., July 26, 2011, p. 192.; Samsung Apple Licensing Discussion, October 5, 2010 (APLNDC000010886-917 at APLNDC000010897).

[279] Samsung-Apple Licensing Discussion, dated Oct. 5, 2010 (APLNDC000010886–APLNDC000010897 at APLNDC000010897); Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 192.

[162][280] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 52.

[163] Discussion with Boris Teklser.

[164] Mark Buckley Deposition, February 23, 2012, p. 58.

1    limited, non exclusive license to manufacture Licensed Products incorporating Licensed Technology
2    as well as a non exclusive right to use the Made for iPod, iPhone, and iPad logos on "product
3    packaging and in the user guide for each Licensed Product, and in any advertisements, web pages,
4    and other collateral materials promoting the Licensed Products."[165]  The purpose of the agreement is
5    to create a market for complimentary, not competing products.[166]  A Licensed Product is defined as
6    "a Proposed Product that (i) bears Licensee's brand, (ii) controls or interfaces, communicates or
7    otherwise interoperates with Compatible iPod Products in accordance with Documentation and this
8    Use License, and (iii) has been certified in accordance with Section 2."[167]  According to the terms of
9    the agreement, the Made for iPhone, iPad, and iPod program requires a royalty payment of $4.00 for
10   each Licensed Product unit sold.  Although this license is not a comparable license to any of the
11   Apple Intellectual Property In Suit, I do view this license rate of $4.00 per unit as a floor for the
12   license of any single item of intellectual property contained in the asserted design patents, trade dress,
13   and trademarks.

14   **177.**  I examined other license agreements produced by Apple in this litigation.  Given their scope, their
15   timing, the relationship between Apple and Samsung, and the specific intellectual property being
16   asserted by Apple, I concluded that none provide a comparable arrangement to the license that
17   Samsung would need to take for the specific utility patents, design patents and other design rights that
18   are being asserted by Apple in the present case.  I state no opinions regarding whether and to what
19   degree that they may be comparable or useful in evaluating any reasonable royalty that Samsung
20   seeks for the patents that it has asserted against Apple.

21   **178.**  Samsung  Based on my review of the evidence produced in this case I have identified the following
22   sources that relate specifically to Samsung's licensing activities.

23   **179.**  I have reviewed the licenses that Samsung has produced in this litigation.  Given their scope, their
24   timing, the relationship between Apple and Samsung, and the specific intellectual property being
25

26   [165] Made for iPod License (APLNDC-Y000148459 to APLNDC-Y000148473); Made for iPod License iPhone/iPad Supplement
     to Contract # (APLNDC-Y000148474 to APLNDC-Y000148478).
27   [166] Discussion with Boris Teksler.
     [167] Made for iPod License (APLNDC-Y000148459 473 at APLNDC-Y000148470).
28

asserted by Apple, I concluded that none provide a comparable arrangement to the license that Samsung would need to take for the specific utility patents, design patents and other design rights that are being asserted by Apple in the present case.  I state no opinions regarding whether and to what degree they may be comparable or useful in evaluating any reasonable royalty that Samsung seeks for the patents that it has asserted against Apple.

188.   180. I understand Samsung made an offer to Apple prior to the commencement of this litigation.  According to Mr. Lutton, Samsung gave a presentation to Apple on November 2, 2010 as part of the on-going licensing discussion between the parties.[168]  TheA November 2010 presentation given by Samsung to Apple identifies a 1 percent, in an illustration of hypothetical royalty mechanics, a 1% royalty rate for both Apple and Samsung underbased on the assumption that "the patent positions for both Apple and Samsung are equal."[169][281]  As the presentation suggests, this offer would have resulted in Apple making a balanceIn this scenario, according to Samsung, Apple would have paid Samsung a balancing payment of $234 million.[170][282]  Regarding this presentation, Mr. Lutton described the circumstances as such.testified that "Samsung took a strange turn of talking about its own intellectual property, and — and had a view that — that Apple's intellectual property and Samsung's intellectual property were of similar value, but because Apple was selling more products than Samsung, that Apple should owe Samsung a net balancing payment."[171][283] To determine the Mr. Musika converted the 1% royalty rate in this scenario to a per unit royalty rate that corresponds to Samsung's suggested 1 ██████████████ ██████████

██████ ████████████████████ ████████████████

---

[168] Deposition of Chip Lutton, Jr., July 26, 2011, p. 332.

[169][281] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 332; Lutton Deposition Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

[170][282] Lutton Deposition of Chip Lutton, Jr., July 26, 2011, Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

[171][283] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 151.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████

3 **181.** ~~Industry    Based on my review of licensing information regarding the wireless device industry, there~~

4 ~~are no directly comparable licenses to the Apple Intellectual Property in Suit in the public domain.~~

5 *~~The Income Approach~~*

6 **182.** ~~The theory behind an income approach is that the value of the patent at issue is equal to the future~~

7 ~~profitability of the products embodying the patented technology. Although projections of future~~

8 ~~profits by accused defendants are sometimes used and accepted by the courts as representation of~~

9 ~~what a defendant expected to make,[173] the actual profits are now known and available and represent a~~

10 ~~more conservative measure of anticipated profits at the time of the hypothetical negotiation under a~~

11 ~~"book of knowledge" concept. I have relied on both Apple's and Samsung's actual profits as a~~

12 ~~starting point for my analysis of the value of the Apple Intellectual Property In Suit and a reasonable~~

13 ~~royalty thereon based on an income approach.~~

14 **183.** ~~The net operating income produced through the sale of a smartphone and tablet represents a total~~

15 ~~competitive return to Apple and Samsung for their deployment of all corporate resources after all~~

16 ~~necessary operating expenses have been paid.  This net return is not the result of the deployment of~~

17 ~~any single asset. Rather, it represents a composite return on all assets. Various income methods exist~~

18 ~~as acceptable methods to value individual assets as well as a means to use the isolated value as a basis~~

19 ~~to charge rent or a royalty for the use of that specific asset. For example, "the capitalization of excess~~

20 ~~earnings method calculates the expected return on all other assets, and attributes any earnings above~~

21 ~~and beyond this return to the intangible asset in question."[174] Another income method referred to as a~~

22 ~~"profit split" involves the identification of "the potential stream of income associated with the asset~~

23

24 ───────────────

[172] ~~Deposition of Chip Lutton, Jr., July 26, 2011, Exhibit 23: Apple Samsung Licensing Discussion, p. 5.~~

25 [284] Lutton Deposition Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

26 [173] ~~In *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed Cir. 1986), cert. denied, 479 U.S. 852, 107 S. Ct. 183, 93 L. Ed. 2d~~
~~117 (1986), a special master computed reasonable royalty damages based on an internal memorandum written by the infringer's~~
27 ~~management just before it started to infringe. The internal memo identified a future profit that was significantly higher than the~~
~~profit margin actually realized by the infringer on the accused products.~~

[174] ~~AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999). p. 49.~~

28

that could be hypothetically split between the prospective parties."[175] Finally, "the analytical method is based on the premise that any rate of return in excess of a normal rate of return can be attributed to the patent. This method takes the profits of the infringer, subtracts the infringer's normal profit, and awards some portion of the remainder to the patent owner."[176]

**184.** The following income approach employed and described herein is based on the income approaches identified in the preceding paragraph. I began my analysis by reviewing the work performed by the international company Interbrand. Interbrand was established in 1974 and identifies itself as the "world's largest brand consultancy."[177] Additionally, Interbrand lists Samsung as one of its clients and claims that it "helped Samsung raise its brand value to US 16.8 billion."[178] Interbrand is also the author of an annual valuation and ranking of the top 100 brands in the world.[179] Interbrand's approach to the valuation of Samsung and other top 100 brands in the world is an income based approach. Interbrand starts with a company's overall financial performance and separates the portion of a company's overall performance that relates to the intangible brand. Interbrand explains that "Financial performance measures an organization's raw financial return to the investors. For this reason, it is analyzed as economic profit, a concept akin to Economic Value Added (EVA). To determine economic profit, we remove taxes from net operating profit to get to net operating profit after tax (NOPAT). From NOPAT, a capital charge is subtracted to account for the capital used to generate the brand's revenues; this provides the economic profit for each analyzed year.  For purposes of the rankings, the capital charge rate is set by the industry weighted average cost of capital (WACC)."[180] Interbrand's actual calculation is: operating profits less taxes less an industry weighted average cost of capital (WACC) equals economic value added (EVA). Interbrand then applies its own proprietary factor to the total EVA to determine the role of and ultimately the value of a company's brand.

---

[175]  AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), p. 47.
[176]  AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 59.
[177]  http://www.interbrand.com/en/about-us/Interbrand-about-us.aspx.
[178]  http://www.interbrand.com/en/our-work/Samsung.aspx.
[179]  http://www.interbrand.com/en/best-global-brands/Best-Global-Brands-2011.aspx.
[180]  http://www.interbrand.com/en/best-global-brands/best-global-brands-methodology/Overview.aspx.

**185.** The Interbrand approach is an income based approach that seeks to isolate the residual benefit associated with the use of the brand asset. The calculated EVA is "defined as the net operating profit of a company before interest, less taxes paid, less a charge for debt and equity tied up in the business. The remaining amount then is a measure of the company's performance after satisfying the opportunity cost of all resources employed by the company."[181]

**186.** I have adopted the Interbrand approach as a means of identifying income based reference rates associated with Apple's design patents, trade dress and utility patents. **Exhibits 41 and 41.1 to 41.5** set forth the calculations performed to derive the rates associated with the design patents and trade dress and the utility patents. I begin with Apple's overall company profits and determine that Apple has reported a companywide operating profit for 2010 and 2011 of 30%.[182] I then deduct Apple's effective tax rate to produce a net operating profit after tax for Apple as a whole. Next, consistent with the Interbrand approach, I deduct the weighted average cost of capital for the industries in which Apple is a participant. The identification of the WACC is identified on **Exhibit 41.4**. The net result of the prior calculations is the identification of a company wide economic value added amount for Apple. Given the considerable success of Apple in recent years, it is not surprising to see that Apple has earned a considerable premium over the amount required to satisfy the opportunity cost of all resources employed by the company. Finally I deduct the amount of the premium earnings that Interbrand has calculated that are due to the value of Apple's overall brand. I explain my conversion of Interbrand's reported value of Apple's brand to an annual profit percentage on **Exhibit 41.5**. The remaining residual profit percentage represents the amount of Apple premium profit earned on all products sold after deducting all operating expenses, taxes, all amounts required to provide a return necessary to satisfy the opportunity cost of all resources employed by the Apple, and the return associated with Apple's brand.

**187.** After completing my analysis of Apple's overall results, I performed a similar calculation for Apple's iPhone and iPad products and Samsung's Accused Products. **Exhibit 41.3** details the same

---

[181] Wiley Finance – Financial Valuation – Applications and Models, Second Edition, James R. Hitchner, Page 1127.
[182] Apple Inc. Form 10-K, fiscal year ended 9/24/11, p. 43.

1   calculations for the products at issue that were described above for Apple as a whole. However, there

2   are several additional steps involved in reaching a final per unit rate for the design patents and trade

3   dress and the utility patents. I make an additional adjustment to the residual profit for both Apple and

4   Samsung. The Apple companywide profit premium is a blended premium for all Apple products. I

5   compared Apple's premium profit on the iPhone and iPads with Apple's companywide blended

6   premium profit and determined that ███████████████████████████████████████

7   ███████████████████████████████████████. To further isolate the premium residual

8   margin on just the iPhone and iPad products, I deducted the companywide premium margin from the

9   total residual premium on the iPhones and iPads. This resulted in the isolation of a residual premium

10  on just the iPhones and iPads. A similar calculation was made to Samsung's accused products using

11  Apple's ratio of brand and residual to total operating margin as a means of allocating Samsung's

12  accused product EVA or residual premium profit on accused products.

13  **188.** I next converted the premium residual profit rates to per unit royalty amounts. **Exhibit 41.2** displays

14  the results of multiplying the Interbrand brand rate times the average selling price of Apple's

15  combined iPhones and iPads to produce a final per unit royalty reference amount for Apple's design

16  patents and trade dress of $22.00. The final per unit royalty reference amount for Samsung for the use

17  of Apple's design patents and trade dress is $9.00. These rates, as previously explained, are based on

18  the value assigned by Interbrand to Apple's brand. The entire rate is applicable to the design patents

19  and trade dress because Apple has not and would not agree to allow their brand to be partially eroded.

20  Apple's brand, as discussed elsewhere in this report, is considered one of the most valuable brands in

21  the world. Apple has built a distinctive brand identity through its revolutionary and distinctive design

22  applied across the entire Apple ecosystem. Further, Apple has consistently refused to consider

23  allowing anyone, let alone a direct competitor, to confuse the market and license any aspect of its

24  product design.[183] Finally, the design patent and trade dress rate is the same rate for each of the

25  individual design patents and items of trade dress as well as the total. The economic impact of an

26  infringement of one of the items is equal to the impact of the design patents and trade dress as a

27

28

---

[183] Deposition of Chip Lutton, Jr., July 26, 2011, p. 52.; Discussion with Boris Teksler.

1    whole. Therefore, the reasonable royalty damage calculation for the design patents and trade dress

2    treat all design patents and trade dress as if they were licensed as a bundle at one rate. That rate is

3    applied only once for all accused products and not for every design patent and item of trade dress.

4    This avoids any duplication in the overall calculation of damages. However, the rate would be the

5    same for only one design patent or item of trade dress should the final trial outcome involve only one

6    of the individual design patents or items of trade dress.

7         189.   ~~Exhibit 41.2~~ also displays the results of multiplying the residual premium profit rate

8    associated with just the iPhones and iPads to the average selling price of the combined products. The

9    iPhone and iPad products were combined to reflect the economic association of the two products. As

10   discussed throughout my report, Apple and Samsung develop, market and sell these products as part of an

11   overall ecosystem. A customer gained through a smartphone sale represents a likely future or

12   contemporaneous sale of a tablet and other related products within the ecosystem. Because of this close

13   economic association, Apple would not license the patents on a product by product basis to a direct

14   competitor. Consistent with Mr. Musika's conclusions, my review of the licenses and discussions

15   detailed above did not identify any license that is comparable to the license that Samsung would

16   need to enter into for the asserted Apple Intellectual Property.  I did not identify any other directly

17   comparable licenses.  This is consistent with the testimony of Mr. Jun Won Lee of Samsung, my

18   discussions with Mr. Boris Teksler, and Mr. Teksler's testimony at trial.[285]

19                    **5.    Cost and Income Reference Points**

20        190.   I determined the Apple reference rate for Apple's utility patents by multiplying the

21   residual profit premium for combined iPads and iPhones times the average selling price of Apple's

22   combined iPhones and iPads to produce a final per unit royalty reference amount for Apple's utility

23   patents of $40.00. The final per unit royalty reference amount for Samsung for the use of Apple's utility

24   patents is $7.00. The reference rates for Apple and Samsung were then allocated between the various

25   utility patents based on the relative strength of each utility patent and is summarized on Exhibit 41 Mr.

26

27   [285] Deposition of Jun Won Lee, dated Mar. 5, 2012, pp. 79:2-81:15; discussions with
     Boris Teksler; Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2006:13-2007:10, 2009:4-
     18, and 2011:3-2012:16.

28

1    Musika prepared two additional sets of reference points in connection with his analysis of

2    reasonable royalties.  A first, which he refers to as a cost approach reference point, reflects the

3    economic losses that Samsung would experience if it designed, tested, manufactured, and

4    prepared to distribute theoretical non-infringing smartphones and tablets that did not use the

5    technology claimed in Apple's patents.  A second, which he refers to as an income approach

6    reference point, provides calculations that identify the additional income that arises from use of

7    the patented technology.  Calculation of cost and income reference points is a widely accepted

8    method when valuing intellectual property.[286]

9    *Hypothetical negotiation*

10          191.   ~~After identifying the above conceptual range of benefit values associated with the alleged~~

11    ~~use of the accused utility patents, design patents, trademark registrations, and trade dress registrations by~~

12    ~~Samsung, I next~~ ~~performed a hypothetical license analysis.~~  I have examined the manner in which Mr.

13    Musika calculated cost value reference points, which were described in paragraphs 162 to 167 of

14    his Original Expert Report and in **Exhibits 39-S** to **39.4-S**.  Mr. Musika prepared a calculation of

15    the gross profits that Samsung would lose if it were forced to remove the infringing products that

16    would be the subject of a hypothetical negotiation.  Mr. Musika converted these losses to a per

17    unit amount and allocated these amounts among the basket of intellectual property rights that

18    Apple asserted in the amended complaint.  I find Mr. Musika's analysis to be well-reasoned and

19    robust.  As such, I have considered these reference points when examining the results of a

20    hypothetical negotiation based on the factors described below.

21          192.   I have also examined the manner in which Mr. Musika calculated income value

22    reference points, which are described in paragraphs 182 to 190 of his Original Expert Report and

23    in **Exhibits 41-S** to **41.5-S**.  Mr. Musika prepared an analysis of the difference in profitability

24    between the iPad and iPhone and Apple's other products and an analysis of the profitability of the

25    Samsung products.  Mr. Musika revised these amounts downward to calculate a measure of

26

27          [286]  AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement
      Damages, (1999), pp. 38 to 42.

28

1  economic value added associated with Apple's intellectual property.  Mr. Musika also converted a
2  valuation of Apple's brand from a well-known brand consulting firm, Interbrand, into a measure
3  of profitability.  Mr. Musika then allocated the resulting measure of economic value added among
4  the basket of intellectual property rights that Apple asserted in the amended complaint.  Again, I
5  find Mr. Musika's analysis to be well-reasoned and robust.  As such, I have considered these
6  reference points when examining the results of a hypothetical negotiation based on the factors
7  described below.

8                    **6.      The Hypothetical Negotiation**

9        193.   192. I based the hypothetical negotiation on a proper negotiation at the date that Samsung
10  first began to infringe Apple's patents in June of 2010, consistent with my understanding of the legal
11  criteria applied in the present circumstances.  I assume that the parties would negotiate over all patents at
12  that time even though some patents issued later in 2010 and 2011.  Given the scope of competition
13  between the parties, the reasonable royalty arising from a hypothetical negotiation regarding these later
14  patents would only increase the reasonable royalty that would result from the analysis that I have
15  performed.  I also assume that the parties would have negotiated regarding all products at the same
16  time. After consideration of the information discussed above, Mr. Musika performed a
17  hypothetical negotiation analysis.  Mr. Musika concluded that the hypothetical negotiation would
18  take place in June 2010, just prior to the date of first infringement by Samsung.  I agree.  It is
19  reasonable to assume that Apple and Samsung would negotiate at that time for all the intellectual
20  property asserted by Apple in the amended complaint, whether issued or not.  Samsung would be
21  interested in obtaining rights to all intellectual property necessary for it to sell all the infringing
22  products.  Mr. Musika therefore assumed that this negotiation would cover all the infringing
23  products (whether or not they had been introduced as of June 2010).  I agree with this approach
24  and have used it when evaluating reasonable royalties.

25  193. I approached the hypothetical negotiation by first considering the economic expectations of the
26        Plaintiff and the Defendants within a hypothetical setting.  The above reference range information
27        provided a meaningful starting point in considering the hypothetical negotiation between the
28        licensee and the licensor. The reference range is part of the negotiation framework.

194. When preparing his reasonable royalty calculations, Mr. Musika also evaluated and considered the effect of all the following Apple intellectual property rights on the royalty rate for the 5 New Trial Patents: U.S. Patent Nos. 6,493,002; 7,663,607; 7,853,891; 7,920,129; D627,790; D617,334; D504,889; D593,087; and D622,270; registered trade dress with U.S. Trademark Registration Nos. 3,470,983; 3,457,218; and 3,475,327; unregistered iPhone, iPhone 3G, iPhone 4, iPhone / iPhone 3G / iPhone 4, and iPad / iPad 2 trade dress; an unregistered iTunes Store common law trademark; and U.S. Trademark Registration Nos. 3,886,196; 3,889,642; 3,886,200; 3,889,685; 3,886,169; 3,886,197; and 2,935,038. This intellectual property was asserted in Apple's amended complaint against Samsung. Mr. Musika provided a description of this intellectual property in his Original Expert Report in paragraphs 10, 12, 14, 16, 18, 20-42 and **Exhibits 5** to **8**, and I incorporate those descriptions here. Inclusion of the foregoing intellectual property in the analysis led to an allocation of costs or value to intellectual property not raised in the new trial. I agree with Mr. Musika that the intellectual property included in the amended complaint would be evaluated as a part of a hypothetical negotiation. When I calculate damages, I am using only the royalties that relate to the specific New Trial Patents, and the damages that I calculate are limited to compensation for infringement of those five patents by the 13 products that are the subject of the new trial.

195. ~~194.~~ The reference ~~range information calculated above should not be considered as~~ranges identified by Mr. Musika are not a floor or ~~a~~ceiling~~, but rather as a framework for the determination of the~~ on what a reasonable royalty ~~damage amount under a~~may be. They help provide some framework by which to evaluate the hypothetical negotiation. ~~A licensor (~~ and potential outcomes. Apple~~)~~ would ~~prefer~~enter the hypothetical negotiation preferring to receive the maximum ~~they could achieve~~amount, and ~~the licensee (~~Samsung~~)~~ would prefer to pay nothing at all. ~~The resulting reference range is based on the minimum a licensor should be willing to consider and the maximum a licensee should consider paying based on the relevant valuation data. The determination of these conceptual reference points is discussed in~~As noted by Mr. Musika, the American Institute of Certified Public Accountants' intellectual property consulting guide, "Valuing Intellectual

Property and Calculating Infringement Damages.”[184]  The,” indicates that a licensee (in this matter, Samsung) should be willing to consider paying up topay a maximum amount that would still provide for “an acceptable economic return on all resources used in the production, distribution, selling, management, and financing of the product.”[185][287]  The minimum a licensor (in this matter, Apple) should be willing to receive would be equalequivalent to the next best alternative to the use of the patent at issue.New Trial Patents.

**195.  I performed a Georgia Pacific analysis (*Georgia Pacific Corp. v. United States Plywood Corp.*) before determining the final amount of royalty adequate to compensate for infringement.[186]  The Georgia Pacific case identified 15 factors that are frequently used when determining the appropriate reasonable royalty rate in the context of a hypothetical negotiation.**

*Georgia-Pacific Analysis*

196.   TheMr. Musika analyzed the *Georgia-Pacific* case is an often-cited approachfactors[288] as part of his determination of the appropriate royalty rates for the New Trial Patents.  These factors are often used in developing athe reasonable royalty damage amount resultingdamages that would result from the hypothetical negotiation. The Georgia Pacific factors provide a listing of criteria that a willing licensor and willing licensee would be likely to consider in negotiating a royalty.  I have used the Georgia Pacific factors as a framework in which to consider the starting conceptual reference points and ultimately determine an amount adequate to compensate for the infringement. The 15 Georgia Pacific factors and the consideration that I gave each are described below. All categories of asserted Apple intellectual property qualify for damages in the form of

---

[184]  AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), p. 78.

[185][287] AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), p. 78.

[186]  *Georgia Pacific Corp. v U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified by* 446 F.2d 295 (2d Cir. 1971).

[288]  *Georgia-Pacific v. United States Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y.), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971); Dkt. 1903 at 55-56: Final Jury Instruction No. 41, dated Aug. 21, 2012.  *See also* Dkt. 1903 at 74: Final Jury Instruction No. 56, dated Aug. 21, 2012.

1  reasonable royalties.[289]  I also considered these factors for the relevant patents as applied to

2  smartphones and tablets.

3       197.  ~~All four categories of intellectual property (i.e., utility patents, design patents, trade dress~~

4  ~~and trademarks) qualify for a reasonable royalty form of damage, although it is considered an alternative~~

5  ~~basis for trade dress and trademarks when other methods are not available. I have analyzed each category~~

6  ~~of damage separately and considered the relevance of each item of intellectual property within each~~

7  ~~category on smartphones and tablets. My analysis of each category of intellectual property and the~~

8  ~~individual items within each category to the extent necessary resulted in the following conclusion~~

9  ~~concerning the application of a specific rate for each item to smartphones and tablets.~~ Mr. Musika

10  considered the results of a hypothetical negotiation for Apple's design rights as part of a package

11  of intellectual property related to design that included design patents, trade dress, and trademarks.

12  As Mr. Musika concluded, these intellectual property rights overlap with one another and are

13  associated with Apple's brand and design identity.  Design is very important to Apple's efforts to

14  distinguish itself in the marketplace.  One reason that Apple has consistently refused to license its

15  design intellectual property to other parties is because of the importance and value of its brand.  I

16  agree with Mr. Musika that Apple would not agree to allow its brand identity to be diluted or

17  partially diluted by licensing its distinctive designs or design elements.  The potential economic

18  impact of licensing even part of its design identity would be similar to or equal to the impact of

19  licensing the whole.  As a result, I agree with Mr. Musika that the reasonable royalty calculation

20  would treat the design patents (or trade dresses, although those are not at issue in the retrial) as a

21  bundle at one rate.  The rate would apply only once for any element, but it would be the same

22  whether one or more than one element was infringed or used.

23  • ~~Utility Patents—Five of the seven utility patents relate to both smartphones and tablets and all seven~~

24     ~~relate to tablets. I have evaluated the five utility patents that apply to both smartphones and tablets~~

25     ~~on an individual patent-by-patent basis and determined one rate that would be applicable to both~~

26

27  [289] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable
   Royalty—Definition, dated Aug. 21, 2012.  *See also* Dkt. 1903 at 74: Final Jury Instruction No.
   56, Design Patent Damages—Reasonable Royalty, dated Aug. 21, 2012.

28

1  smartphones and tablets. I evaluated the two utility patents that applied only to tablets individually

2  and determined the rate that would apply to only tablets for each of these two patents.

3  • Design Patents, Trade Dress, and Trademarks— Each of the design patents and each of the trade

4  dress relate specifically to either smartphones or tablets but not both. The trademarks relate to both

5  smartphones and tablets. I have evaluated the group of design patents, trade dress, and trademarks

6  both individually and as a group. I have determined one rate that applies to the entire group of

7  design patents, trade dress, and trademarks for smartphones and tablets.

8  198.    The Mr. Musika summarized the results of his views regarding each *Georgia-*

9  *Pacific* factor and its impact on each item of Apple Intellectual Property In Suit is reflected on of the

10  New Trial Patents in **Exhibits 42** and **43**. I agree with his conclusions, and each is discussed

11  further below.

12      **a.**     **Factor #1:     The royalties received by the patentee for**
                    **the licensing of the patent-in-suit, proving or tending to**
13                  **prove an established royalty.**

14  199.    I have reviewed Apple's disclosed the licenses and determined Apple has produced in

15  this matter. It is my opinion that there are no royalties received by Apple for any of the Apple

16  Intellectual Property In Suit that would prove or tend to prove an established royalty for this specific

17  intellectual property. The three disclosed licenses are settlements and/ or cross licenses of patent portfolios

18  wherein Apple licenses a portfolio of licenses in return for the right to practice the licensee's portfolio of

19  licenses. The licenses are based on an even exchange wherein no royalty is paid or a combination of lump

20  sum and limited running royalty payments for the portfolio of patents or are a the asserted Apple

21  Intellectual Property. As discussed in more detail above, Apple has only licensed the New Trial

22  Patents as part of broad cross-licenses and/or settlement of litigation.

23  **200.** I understand from my discussion on March 20, 2012, with Boris Teksler, Director of Patent

24  Licensing & Strategy for Apple that it is Apple's policy not to license this specific Apple's

25  Intellectual Property In Suit as individual patents. This point is particularly true with respect to any

26  direct competitors of Apple as evidenced further in the license negotiations with Samsung.

27  Therefore, it is not possible to ascribe a value to any particular piece of intellectual property

28  that was included in these licenses. This is consistent with Mr. Musika's analysis.

200. ~~201.~~ This factor ~~demonstrates~~ supports that there is no established ~~license~~ royalty for any of the asserted Apple ~~intellectual~~ Intellectual Property ~~In Suit~~.

**b.      Factor #2:      The rates paid by the licensee for the use of other patents comparable to the ~~patents~~ patent-in-suit.**

~~Utility Patents applicable to both smartphones and tablets ('002, '381, '915, '891, and '163)~~

201. ~~202.~~ ~~I have reviewed Samsung's disclosed license and determined~~ Following review of Mr. Musika's analysis and the discussion described above, I concur in Mr. Musika's conclusion that there are no royalties paid by Samsung for ~~the~~ use of ~~other intellectual property~~ patents that would be comparable to the ~~specific~~ asserted Apple Intellectual Property ~~In Suit~~ in the manner ~~discussed above. Further I understand that Mr. Lee.~~  In fact, Samsung's own Director of Licensing, Mr. Lee, testified that Samsung ~~has no~~ did not have any licenses that would be comparable to the license that Samsung would need from Apple for the asserted Apple Intellectual Property ~~in Suit.[187]~~ [290]

202. ~~203.~~ This factor ~~demonstrates~~ supports that there are no rates paid by Samsung for ~~the~~ use of other ~~intellectual property~~ patents comparable to the asserted Apple Intellectual Property ~~In Suit.  I state no opinions regarding whether and to what degree they may be comparable or useful in evaluating any reasonable royalty that Samsung seeks for the patents that it has asserted against Apple~~.

**c.      Factor #3:      The nature and scope of the license, as exclusive or ~~nonexclusive~~ non-exclusive; or as restricted or ~~nonrestricted~~ non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

203. ~~204.~~ The ~~terms of a license for all categories of intellectual property for both smartphones and tablets would be~~ hypothetical negotiation would have been for a license that was non-exclusive and unrestricted in terms of ~~sales of products developed and/or sold/provided~~ the sale of the infringing smartphones and tablets that were sold in the ~~U.S.  The~~ United States.  Typically, the rate ~~on~~ for a non-exclusive and unrestricted license is ~~generally~~ lower than ~~an~~ for a license that is exclusive ~~license~~.

---

[187][290] Deposition of Jun Won Lee, ~~March~~ dated Mar. 6, 2012, pp. 174-175.

204. ~~205. This factor does not provide support for a specific rate for the Apple Intellectual Property In Suit. The assertion of the Apple intellectual Property In Suit~~ While this matter is based on U.S. law. ~~However~~, I agree with Mr. Musika's observation that Samsung and Apple would recognize that there are international ~~economic~~ benefits ~~associated with~~ from using the ~~use of the~~ asserted Apple Intellectual Property ~~In Suit in smartphones and tablets~~ in the U.S.  As I discussed ~~earlier in this report, both~~ above, Apple and Samsung ~~pursue~~ both sell their products in a global ecosystem ~~approach wherein the sale~~, and sales of one product ~~promotes the sale of additional items within the ecosystem throughout the world. Accordingly,~~ can help to sell additional products worldwide.  Even though the scope of the license is ~~limited based on the geographic restrictions resulting from the application of U.S. law. However, there are international economic benefits to Apple and to Samsung for the use of the relevant technology. Consequently, the scope of the hypothetical license for the~~ based on United States law, both Samsung and Apple would recognize the international benefits received for use of the asserted Apple Intellectual Property ~~In Suit~~ in the United States. Therefore, consistent with Mr. Musika's analysis, this factor is neutral.

**d.     Factor #4:     The licensor's established policy and marketing program to maintain ~~its~~ his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

205. ~~206. I am~~ Apple does not ~~aware of any~~ have an established or written policy concerning ~~Apple's~~ the licensing of the ~~Apple Intellectual Property In Suit or other Apple~~ New Trial Patents or its other intellectual property ~~to others outside of~~ except in the context of licensing ~~of~~ its technology that is declared essential to certain standards.  I ~~further understand from my discussion with Boris Teksler~~ understand from my discussion ~~with Boris Teksler that Apple has never licensed any~~ have confirmed the following observations made by Mr. Musika regarding Apple's practice as it relates to the licensing of its intellectual property ~~as individual patents. The only licenses that Apple has~~ considered or executed were cross licenses involving ~~the exchange of a portfolio of patents and such cross licenses have never included design patents, trade dress or trademarks for mobile devices such as smartphones or tablets.~~:

- I understand from my discussion with Mr. Teksler as well as from review of the licenses that Apple has produced in this matter that Apple has never licensed any of its patents individually.  The only

1   licenses that Apple has entered into related to the utility patents at
2   issue in the new trial, and were broad cross licenses involving large
    portfolios of patents, often with anti-cloning provisions.

3   •   Apple's policy is not to license its design elements, including the
        design-related asserted Apple Intellectual Property.  This is
4       confirmed by Apple refusing to offer a license to its design
        elements, as well as its directives regarding copying during
5       discussions between Apple and Samsung.[291]

6   •   207. Further, I understand that Apple's overall policy is to use
        theregarding its intellectual property it generatesis to protect the
7       proprietary features of its products and designs.  Apple therefore does
        not have a practice of permitting others to useas opposed to licensing its
8       intellectual property and primarily generates revenue using its
        intellectual property from product sales and not from licensing activities.
9       in order to generate revenues.

10  •   208. Further I understand that Apple currently maintains a list of
        patents that Apple will notit is unwilling to license to other
11      companies.  This list has been disclosed in negations with other
        competitors and includes certain of the Apple Intellectual Property In Suit
12      including the '915, '381 and '163 utility patents, all design patents, and its
        trade trade dress and trademarks.includes all of the New Trial Patents.
13

14  •   In licensing discussions with Samsung, Apple was unwilling to
        grant Samsung a license to any of the New Trial Patents.

15      206.   209. This factor does not provide support for a specific rate but does strongly indicate

16  Apple's unwillingness to negotiate a license at essentially any price versus holding the Apple Intellectual

17  Property In Suit for Apple's exclusive useidentify a specific rate for the New Trial Patents.  While I

18  have assumed that both Apple and Samsung are a willing licensor and a willing licensee,

19  respectively, Apple's overall policies and practice regarding the licensing of the New Trial

20  Patents indicate Apple's preference for using its patents exclusively as opposed to licensing its

21  patents (no matter the price of the license).

22          e.      Factor #5:      The commercial relationship between the
                    licensor and the licensee, such as, whether they are
23                  competitors in the same territory in the same line of
                    business; or whether they are inventor and promoter.

24      207.   210. Consistent with Mr. Musika's conclusions, I agree that Apple and Samsung

25  directly and aggressively compete in bothare vigorous direct competitors in the smartphone and

26

27  _____

28  [291] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 52 and 117.

tablet ~~markets. In deposition,~~market.  Brian Rosenberg, ~~Samsung Telecom Americas'~~STA's Senior Vice President of Sales for Mobile, [188] ~~stated~~testified that "every Samsung phone competes" against the iPhone 3GS.[189][292] ~~When asked "What Samsung products compete against the iPad 2," Mr. Rosenberg responds, "So I would say the products we have in the market today on the tablet are [sic] the 8.9-inch tablet and the~~ Regarding tablets, Mr. Rosenberg testified that Samsung's 8.9-inch tablet and 10.1-inch tablet.~~"[190]~~ compete with the iPad 2.[293] ~~The opposing expert,~~ Mr. Wagner~~,~~ also ~~acknowledges in his deposition~~testified that Samsung is~~currently~~ a key competitor ~~to~~of Apple~~both~~'s with respect to the iPhone and iPad.[191][294] ~~Both stock analysts and other market analysts identify these two companies as being direct competitors.[192]~~ Numerous documents produced by Samsung and summarized in **Exhibit 53-PT** also reflect this competition.

208.    The competitive relationship between the parties is also acknowledged by industry analysts and stock analysts.[295] ~~According to Strategy Analytics,~~ Strategy Analytics stated that "Apple's key competitors include Nokia, Samsung, RIM, HTC in Smartphones."[193] ~~For the tablet market, the Samsung Galaxy Tab is listed among the "contender[s]~~[296] Ipsos identified the Galaxy Tab as a "contender" ~~to the iPad" by Ipsos.[194] RBC Capital Markets Equity Research states regarding the tablet market, "After,~~"[297] Regarding the tablet market, RBC Capital Market Equity Research stated

---

[188] ~~Deposition of Brian Rosenberg, January 27, 2012, p. 8.~~

[189][292] Deposition of Brian Rosenberg, ~~January~~dated Jan. 27, 2012, pp. 72-73.

[190][293] Deposition of Brian Rosenberg, ~~January~~dated Jan. 27, 2012, p. 77.

[191][294] Deposition of Michael J. Wagner, ~~September~~dated Sept. 14, 2011,  pp. 149-150 and~~pp.~~ 182-183.

[192][295] *See, e.g.,* Gartner Press Release~~,~~ "Gartner Says Worldwide Mobile Phone Sales Grew 35 Percent in Third Quarter 2010; Smartphone Sales Increased 96 Percent," ~~November~~dated Nov. 10, ~~2010~~2010; J.D. Power, "2009 Wireless Consumer Smartphone Satisfaction Study Volume I," ~~April~~dated Apr. 30, 2009 (SAMNDCA00190144–SAMNDCA00190243 at SAMNDCA00190150 and ~~156 of SAMNDCA00190144-243~~SAMDCNA00190156).

[193] ~~Strategy Analytics, "Competitor Profile: Apple," July 20, 2011 (SAMNDCA00177805 of SAMNDCA00177800-07).~~

[296] Strategy Analytics Competitors Profile – Apple, dated July 20, 2011 (SAMNDCA00177800–SAMNDCA00177807 at SAMNDCA00177805).

[194] ~~Ipsos OTX MediaCT, "Are we going to take to the tablet?" March 2011 (SAMNDCA00237354 of SAMNDCA00237349-60).~~

[297] Ipsos OTX MediaCT, "Are we going to take to the tablet," dated Mar. 2011 (SAMNDCA00237349–SAMNDCA00237360 at SAMNDCA00237354).

1  that "[a]fter Apple's expected continued leadership, we see RIM, HTC, Motorola, Samsung, and

2  HP as strong contenders."[195][298]

3       209.    The level of competition between Samsung and Apple is also evidenced by

4  Samsung's focus on beating Apple.  A Gravity Tank presentation dated December 24, 2012,

5  suggested that Samsung might want to build a strategy around "preventing the inflow of new

6  customers" to Apple.[299]  The Samsung Mobile Marketing Group stated in a presentation that

7  "Apple is a main competitor of Samsung in terms of touch phone."[300]  In a presentation titled

8  "Beat Apple," Samsung stated that its "Beat Apple" strategy was centered around three

9  initiatives:  "1) Divert Apple's inflow of subscribers (divert Apple net adds); 2) Increase Apple's

10  outflow of subscribers (increase Apple churn); [and] 3) Plug STA's leak (increase STA

11  loyalty)."[301]  In a 2011 Strategic Planning presentation, the Wireless Terminal department's goal

12  was to be "#1 in Smartphones (Beat Apple)."[302]

13       210.    211. The significant level of competition is also represented by the obsessive focus

14  Samsung has on beating Apple. Samsung's view of its competition with Apple is reflected in both its

15  internal documents and its actions. The Samsung Mobile Marketing Group stated in its presentation,

16  "Apple is the main competitor of Samsung in terms of touch phone."[196] In another internal presentation

17  titled "Beat Apple," STA proposes a "Beat Apple" strategy framed around three initiatives: "(1) Divert

18  Apple's inflow of subscribers (divert Apple net adds) (2) Increase Apple's outflow of subscribers (increase

19

20     [195][298] RBC Capital Markets, "Wireless Industry – Tablet Wars: Differentiate, Scale…,...,
   or Die," March dated Mar. 3, 2011 (SAMNDCA00501719 of –SAMNDCA0056806 at
   SAMNDCA00501719–806).
22     [299] PX37: Gravity Tank, Touch Portfolio: Key Takeaways, dated Dec. 24, 2008
   (SAMNDCA10805169–SAMNDCA10805175, at SAMNDCA10805171).
23
24     [300] Samsung Mobile – Mobile Marketing Group Presentation, "Global Segmentation
   Update – Focused on Smartphone & Tablet U&A," dated Aug. 2011 (SAMNDCA10056653–
   SAMNDCA10056710 at SAMNDCA10056663).
25     [301] Denison Deposition Exhibit 1266: Beat Apple Presentation, dated Dec. 9, 2011
   (SAMNDCA10374460–SAMNDCA10374498 at SAMNDCA10374461).
26     [302] 2011 Strategic Planning Presentation (SAMNDCA00256503–SAMNDCA00256551 at
   SAMNDCA00256507).
27     [196] Samsung Mobile – Mobile Marketing Group, "Global Segmentation Update – Focused on Smartphone & Tablet U&A,"
   August 2011 (SAMNDCA10056663 of SAMNDCA10056653–710).
28

1   Apple churn) (3) Plug STA's leak (increase STA loyalty)."[197] In fact, in a slide titled "STA 2011 Goals for

2   All Departments," the first goal listed for Wireless Terminals is "#1 in Smartphones (Beat Apple)."[198] Also

3   significant is the tone of Samsung's advertising campaigns also position Samsung against Apple.

4   Samsung's advertising campaign launched around Thanksgiving of 2011. Mr. Rosenberg admitted

5   that 2011 was referred to by Samsung calls the campaign as the "Fanboys campaign" or the "Next

6   Great Thing campaign." He describes[303] Mr. Rosenberg testified that "Fanboys" as are "the people

7   who blindly buy Apple products because they're Apple products."[199][304]  Younghee Lee, who runs

8   global marketing for at Samsung Mobile globally,[200], stated in an email regarding the Apple Fanboys

9   campaign, "For that "[f]or STA to be truly successful in beating Apple in FY' 12 we need to

10  showcase our relentless product innovation stories (GS II, Galaxy Nexus, Galaxy note Note,

11  Midas) so we can continue to deposition Apple as a leader and position Samsung as a the brand of

12  choice for consumers/retailers."[201][305]

13      211.   212. The I agree with Mr. Musika that the timing of the hypothetical negotiation is

14  significant as well in June 2010 would also be an important consideration.  As discussed

15  earlier above, the market and adoption of smartphone technology by consumers was were increasing

16  rapidly in 2010 and early 2011.  The industry was undergoing a transition in which millions of

17  consumers would purchase This dynamic is identified in many of the internal presentations and

18  communications reflected in **Exhibit 53-PT**.  Millions of consumers were purchasing

19  smartphones during that period, and these devices would become were becoming the

20  pervasive dominant form of mobile device.  Similarly, the tablet computer market was growing

21  dramatically following expanding with the introduction of the iPad.  These circumstances, combined

22  with With the rapid expansion of the market, the loyalty that consumers tend to show to the their

---

[197] Deposition of Justin Denison, January 25, 2012, Exhibit 1266 (SAMNDCA10374461 of SAMNDCA10374460-98).

[198]  Samsung Electronics, "2011 Strategy Planning" (SAMNDCA00256507 of SAMNDCA00256503-51).

[303] Deposition of Brian Rosenberg, dated Jan. 27, 2012, p. 56.

[199][304] Deposition of Brian Rosenberg, January dated Jan. 27, 2012, p. 56.

[200] Deposition of Brian Rosenberg, January 27, 2012, p. 58.

[201][305] Rosenberg Deposition of Brian Rosenberg, January 27, 2012. Exhibit 1281: Email re: "Next Best Thing, Again" Scripts, dated Dec. 19, 2011 (SAMNDCA10453262 of SAMNDCA10453260-5 SAMNDCA10453265 at SAMNDCA10453262).

chosen operating system ~~platform that they choose~~, and the efforts of Apple and Samsung to build ~~broader~~their respective global ecosystems, ~~makes this an important period for both companies in the marketplace.  Under these circumstances, Apple would be even more reluctant to permit a competitor to use~~Apple would be particularly reluctant to license intellectual property that it considered proprietary and important to ~~promoting~~ its own ~~brand and products~~success to a direct competitor like Samsung.

212.    ~~213.~~ This factor does not ~~provide support for~~identify a specific rate ~~but~~for the asserted Apple Intellectual Property, but it does confirm ~~and reinforce~~that Apple~~'s unwillingness~~ would be reluctant to license ~~its proprietary assets thereby enabling~~ a direct competitor ~~with the number one goal of beating Apple.~~ whose goal was to beat Apple at a critical time in the market's adoption of smartphones.

**f.      Factor #6:    The effect of selling the patented specialty in promoting ~~the~~ sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of ~~his~~its non-patented items; and the extent of such derivative or convoyed sales.**

213.    ~~214. The focus of this~~This factor ~~is~~considers the extent to which ~~Samsung's use~~sales of the ~~accused~~Samsung infringing products ~~generated~~are used to generate additional sales of ~~Samsung's other products.  An element of this economic~~other Samsung products.  It also considers the value of the asserted Apple Intellectual Property in promoting sales of additional products by Apple.  One consideration in this factor is the strength of ~~any causal~~the relationship between the ~~sale of~~asserted Apple Intellectual Property and the non-patented items ~~and the accused technology~~. The royalty rate and the total amount of damages ~~in this case~~ would increase based on the ~~extent of a demonstrated causal connection between Samsung's non-patented revenue sources and the use of the accused features. On this point, there is little to no disagreement between Apple and Samsung. Both litigants~~strength of this relationship.  Mr. Musika concluded that both Apple and Samsung have built a ~~comprehensive~~ strategy ~~around the extent to~~in which ~~the sale~~sales of smartphones and tablets contribute to the sale of additional products in the future ~~and the sale~~, including sales of non-patented items such as convoyed and derivative sales.  Based on my review of the evidence and information provided, I agree.

1  214.  ~~215.~~ Samsung is ~~well~~ aware of the ~~beneficial~~positive impact ~~that~~ sales of the ~~accused~~
2  ~~devices~~infringing products have on ~~the sale of~~ Samsung's entire ecosystem of products. ~~Samsung~~
3  ~~documented the strong economic relationship between the sale of accessories and smartphones in a~~
4  ~~document entitled~~ In a presentation, Samsung stated that "Smart Phones Drive Higher Accessory
5  Purchases."~~202~~ ~~Another Samsung document referenced the increase in Apple brand loyalty due to the use~~
6  ~~of iPhone, iPhone 3G and the iPhone 3GS accessories. The document~~[306] In that same document,
7  Samsung stated that "Accessory Reuse Creates Brand Stickiness" and ~~indicated that the use of~~
8  ~~iPhone accessories~~that accessory reuse was a ~~"compelling~~"[c]ompelling reason for consumer[s] to
9  stay with their current brand."~~203~~ ~~Another Samsung document indicated that "accessories enhance user~~
10 ~~experience" by facilitating the~~[307] In addition to creating brand loyalty, Samsung's presentation also
11 stated that "Accessories Enhance User Experience" by facilitating use of the ~~device~~smartphone
12 and accessories in the home~~,~~ and in the car~~,~~ and as entertainment and through ~~increasing~~increased
13 productivity.~~204~~308

14  215.  ~~216.~~ ~~As discussed elsewhere in this report, Apple's pursuit of the Apple~~Apple also
15 considers its ecosystem ~~is~~to be a ~~central~~major component of ~~Apple's~~its overall business strategy.
16 ~~Chip~~ Mr. Lutton testified ~~to the following~~as follows:

Q  :    What do you mean by ~~"~~'the ecosystem~~"~~'?

A  :    I mean ~~—~~— by ~~"~~'ecosystem,~~"~~' I mean generally ~~the     the~~...
        the set of services and related products that are sold either by Apple
        or by third parties that are made to work with or on iPhone devices.

Q  :    What are some of the examples of those other Apple
        products and services~~—~~

        ~~A        So for Apple   Q~~                      ...as part of the ecosystem?

---

~~202~~ ~~2011 Smartphone Portfolio Strategy, STA Product and Strategy, May 2010 (SAMNDCA00530591 - 672 at 615).~~

[306] 2011 Smartphone Portfolio Strategy STA Product & Strategy Presentation, dated May 2010 (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).

~~203~~ ~~2011 Smartphone Portfolio Strategy, STA Product and Strategy, May 2010 (SAMNDCA00530591 - 672 at 615).~~

[307] 2011 Smartphone Portfolio Strategy STA Product & Strategy Presentation, dated May 2010 (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530615).

~~204~~308 2011 Smartphone Portfolio Strategy~~,~~ STA Product ~~and~~& Strategy~~,~~ Presentation, dated May 2010 (SAMNDCA00530591 ~~- 672~~–SAMNDCA00530672 at ~~614~~SAMNDCA00530614).

A  :   So for Apple, it would be iTunes, iAdd, the App store.  For third parties, it would be third-party apps that run on the iPhone or other iOS devices, and in competing for attention from ~~those~~these third-party App developers, one of the key things that matters to them is the vitality and market share of the platform.  So sales that go to a different platform instead of to Apple~~'~~'s iPhone platform damage Apple ~~in—~~. . .  in that way, too.[309] [205]

216.   Third-party analysts also recognize the significance of Apple's ecosystem.  In a document regarding the competitive landscape for mobile devices, Gartner stated that:

~~217.   Third party analysts have also commented on the significance of apple's ecosystem.~~ "Apple's dramatic expansion of iOS with the iPad, and the continuing success of the iPod Touch, are important sales achievements in their own right with both consumers and enterprises.  But more importantly they contribute to the strength of Apple's ecosystem and the iPhone in a way that smartphone-only manufacturers cannot compete with….  While Android is increasingly available on media tablets and media players like the Galaxy Player, it lags far behind iOS's multi-device presence.  Apple claims it is activating around 275,000 iOS devices per day on average – that's a compelling market for any developer.  And developers' applications in turn attract users."[206][310]

217.   ~~218.~~Another ~~independent~~ market research firm stated ~~the following: "Currently~~that "[c]urrently Apple has the strongest potential of creating the most compelling consumer market ecosystem by evolving into a wireless multimedia ~~"~~"hub~~"~~" for the consumer.  In addition to its efforts to expand its content offerings beyond music into the area of movies/videos and streaming content, it is also building an ecosystem for wireless distribution connected via Wi-Fi in the LAN and cellular in the WAN."[207][311]

218.   ~~219. The far reaching~~I agree with Mr. Musika that the many benefits associated with the growing ~~success and~~ acceptance of Apple's operating system, which was achieved, in part, through ~~the~~Apple's introduction of ~~Apple's innovative smartphone and tablet product offerings is~~

---

[309] Deposition of Chip J. Lutton, Jr., dated July 26, 2011, pp. 328-329.
~~[205] Deposition of Chip J. Lutton, Jr., July 26, 2011, pp. 328-329.~~

[206][310] Gartner Dataquest, "Competitive Landscape: Mobile Devices, Worldwide, 3Q10, ~~November~~" dated Nov. 9, 2010 (SAMNDCA00235579 ~~596 at 593 594~~ SAMNDCA00233596 at SAMNDCA00233593-SAMNDCA00233594).

[207][311] Strategy Analytics, "Nokia, RIM & Apple Thrive With ~~value~~Value Added Services In Complex Handset Landscape, ~~Strategy Analytics,~~" dated May 2008 (SAMNDCA00189104 ~~115~~ SAMNDCA00189115 at ~~113~~SAMNDCA00189113).

reflected in~~the iPhone and iPad, include~~ Apple's growing ~~inroads into~~acceptance in the business computing world. ~~Apple's Mac sales were once dismissed as a cult following or educational niche market. Today, as a result of Apple's dominant role in the wireless device market, Apple is challenging Microsoft in an area once considered untouchable. USA Today recently reported that Apple is moving into the business market segment once dominated by Microsoft. USA Today reported~~ In the past, Apple's Mac computer has typically not been used in the business environment.  According to a USA Today article, "Microsoft has traditionally dominated the corporate workplace, and more than 85% of corporate computers still run some version of Windows software.  But products based on Apple operating systems – including Macintosh computers, iPads and iPhones – are increasing in demand."[312]  The article also stated that "Microsoft's corporate Windows business is losing ground to Apple.  Apple is hiring sales ~~executive~~executives across the U.S. to get more of its products into Fortune 1,000 companies."[~~208~~313]  The ~~following~~chart below from Forrsights Hardware Survey provides further ~~proof of Apple's~~evidence for the growing ~~success~~demand for Apple's products in the business market~~ segment~~:



___

[313] USA Today, "Apple carving into Microsoft's niche: Corporate workplace," dated Jan. 30, 2012.

[~~208~~313] USA Today, "Apple carving into Microsoft~~'~~'s niche: Corporate workplace," ~~by Scott Martin,~~ dated ~~1/30/12.~~ Jan. 30, 2012.

219.  ~~220. Earlier in my~~In the lost profits section of this report, I discussed ~~my lost profits calculation and discussed~~Mr. Musika's and my conclusions regarding the impact of convoyed sales ~~to~~on Apple.  The ~~presence and significance~~importance of convoyed sales to Apple is ~~reinforced~~evidenced by the fact that Apple accounts for some, but not all, of the accessories sold as a consequence of ~~Apple's smartphones~~sales of the iPhone and ~~tablets~~iPad that embody the asserted Apple Intellectual Property ~~In Suit in the ordinary course of business~~.  As discussed in the lost profits section of my report, I did not include convoyed sales in my lost profits calculation ~~due to the complexity of the calculation and my inability~~because it was not possible to segregate the convoyed sales ~~made with and/or~~ for current sales versus ~~prior~~past sales. ~~Nonetheless, the economic relationship exists, even if the quantification to a reasonable degree of certainty is much harder. The inability to calculate and include convoyed sales in my lost profit damages is one of the reasons that Apple has been irreparably harmed and will continue to be irreparably harmed absent injunctive relief.~~ However, this relationship does exist, even though it may not be quantifiable.  Further, while it is not possible to capture all ~~of~~the lost convoyed profits in a ~~damage~~my reasonable royalty ~~damage~~damages calculation, the ~~very strong and~~ acknowledged connection by both ~~parties of~~Samsung and Apple between the sale of smartphones and tablets ~~with~~and the sale of non-patented products ~~supports~~would support a higher ~~reasonable~~ royalty rate that ~~reflects~~would be reflective of this ~~major economic~~ benefit.

          **g.**       **Factor #7:**     **The duration of the ~~patents~~patent and the term of the license.**

~~221.  I have reviewed~~

220.    Mr. Musika summarized in **Exhibit 44-S** the duration and term of license for ~~each item of intellectual property. The issuance dates and legal lives are reflected on **Exhibit 44**.~~

~~222.  I have summarized my conclusion by each category because the remaining legal and economic lives of each item within the respective categories is generally the same.~~

~~Utility Patents applicable to both smartphones and tablets ('002, '381, '915, '891, and '163)~~all of the

1  asserted Apple Intellectual Property used in his analysis.

2  221.    ~~223. This factor does~~For the asserted utility patents that relate to both smartphones

3  and tablets, this factor would not provide a specific rate. ~~However, the length of~~The remaining

4  legal life of ~~each of~~the utility patents ~~reinforces~~relates to the other economic benefits ~~identified~~that

5  I have discussed in ~~the~~other *Georgia-Pacific* factors. ~~The~~I agree with Mr. Musika's analysis that

6  the legal life ~~is~~of a patent, though, may not ~~be~~the ~~sole determining factor of~~same as the economic

7  life of a patent.  The ~~steady~~pace of technological development in the ~~wireless device industry has~~

8  ~~lead~~market for smartphones and tablets has led to short product life cycles (one ~~to~~or two years)

9  and ~~the consequential~~, therefore, an increased risk of technological obsolescence. ~~On the other hand~~

10  However, the pace of ~~the~~technological development ~~reinforces~~also supports the need for ~~each~~new

11  ~~development~~developments to be legally enforced and respected ~~to permit the~~so that intellectual

12  property ~~owner~~owners are given the opportunity to ~~capture~~realize the full economic benefit of their

13  intellectual property within~~the~~ shortened time periods. ~~The~~I agree with Mr. Musika that overall,

14  the long legal life ~~coupled~~of the asserted utility patents along with the risk of a ~~shortened~~shorter

15  economic life ~~in a rapidly expanding market places~~would place upward pressure on the royalty rate

16  because the parties would want to avoid missing the window of economic opportunity ~~related to~~for

17  each ~~patent.~~ of the asserted utility patents.

18  ~~Utility Patents applicable to only tablets ('607 and '129)~~

19  ~~224. I reach the same conclusion as the smartphone conclusion above.~~

20  ~~Design Patents and Trade Dress applicable to smartphones (Design Patents: '790, '334, '305, '677, '087,~~

21  ~~and '270 Trade Dress: Original iPhone, iPhone 3G, iPhone 4, iPhone Combo)~~

22  222.    ~~225. This factor does~~I agree with Mr. Musika's conclusion that, for the asserted

23  design patents and trade dress related to smartphones, this factor would not provide a specific

24  rate. ~~However, the length of remaining legal life of each of the design patents reinforces the other~~

25  ~~economic benefits identified in the other factors. The legal life is not the sole determining factor of the~~

26  ~~economic life. Design patents'~~ The remaining legal life of the asserted design patents and trade

27  dress relates to the other economic benefits that I have discussed in other *Georgia-Pacific* factors.

28  However, as with the utility patents discussed above, the legal life of design intellectual property

1   may not be the same as the economic life of that intellectual property.  The economic power stems

2   from the extent of of a design patent or trade dress is related to the market place acceptance of and

3   demand for a particular design.  Apple has built a considerable and at times a cult-like following to

4   all things Apple. As discussed throughout this report, Apple's success is the result of a number of factors.

5   However, one of significant factors is Apple's obsessive attention to design details following for its

6   products in part due to its attention to design.   John Maeda, the President of the Rhode Island

7   School of Design, recently addressed the importance of design to Apple when he and stated that

8   Steve Jobs' the single greatest design achievement of Steve Jobs "is the Apple organization, an

9   organization that actually cares about design more than technology."[209][314]  I agree with Mr.

10   Musika that the long legal life along with the commercial success and importance of design to

11   Apple would place upward pressure on the royalty rate so as to preserve the value of the asserted

12   design patents and trade dress.

13   226.  The long legal life coupled with the established commercial success and emphasis on design by

14        Apple places upward pressure on the royalty rate to preserve the established value of these valuable

15        design patents.

16   Design Patents and Trade Dress applicable to tablets (Design Patent '889 and Trade Dress iPad and iPad2)

17   227. I reach the same conclusion as the design patent conclusion above.

18   Trademarks for smartphones and tablets

19   228. I reach the same conclusion as the design patent conclusion above.

20          **h.        Factor #8:    The established profitability of the**
           **product made under the patent.; its commercial success.;**
21          **and its current popularity.**

22          223.      229. This factor highlights one of addresses the most significant aspects of

23   the commercial success Apple and Samsung have enjoyed from products made under embodying

24

25

26   [209][314] How Steve Jobs Changed the World of Design, October 7, 2011
     (http://www.npr.org/2011/10/07/141144758/remembering-how-steve-jobs-changed-the-design-
27   world) http://www.npr.org/2011/10/07/141144758/remembering-how-steve-jobs-changed-the-
     design-world.

1   the <u>asserted</u> Apple Intellectual Property ~~In Suit. Both~~ Apple and Samsung ~~have enjoyed significant~~

2   ~~commercial success by any measure of the term.~~

3        224.   ~~230. Both~~<u>As Mr. Musika showed, both</u> Apple and Samsung~~'s smartphones and~~

4   ~~tablets~~ have ~~consistently produced~~<u>realized</u> high profit margins ~~for~~<u>on</u> both ~~companies.~~<u>smartphones</u>

5   <u>and tablets.</u> 

<p style="text-align:right">. <del>Exhibit 37</del></p>

8   <del>displays a Samsung gross</del>

19        225.   ~~231.~~ **Exhibit 12** ~~dramatically~~<u>to Mr. Musika's Original and Supplemental Expert</u>

20   <u>Reports</u> demonstrates the overall growth of ~~smartphones in~~ the U.S. <u>smartphone market.  Within</u>

21   <u>that market, as shown in</u> **Exhibit ~~11.1 indicates that~~11.1,** Apple and Samsung are ~~number one and~~<u>the</u>

22   <u>top</u> two ~~respectively,~~ <u>participants</u> in terms of market share ~~for smartphones. Significantly, Apple's~~

23   ~~market share for the most recent quarter available.~~<u>.  **Exhibit 11.2-PT** shows Samsung's market share</u>

---

<del>210 Deposition of Timothy Sheppard, February 29, 2012, p. 127-128.</del>

1   rapidly increasing following the introduction of the infringing Galaxy S phone in July 2010.  For

2   the fourth quarter of 2011, is approximatelyApple was still more than twice the size of Samsung's

3   (45.3% for Apple versus 19.2% for Samsung). However, the line chart on **Exhibit 11** demonstrates that in

4   terms of market share (45.3% vs. 19.3%), but as shown in **Exhibit 11**, it appears that during the

5   last three quarters of 2011, Samsung has appeared to have taken smartphone market share away

6   from Apple during three quarters of 2011. **Exhibit 13.1** confirms that Apple has revolutionized and

7   dominated the tablet market since the beginning of 2010. Apple's fourth quarter 2011 market share is 73.7

8   percent while Samsung's is only 2.0 percent. As to be expected, the line chart on **Exhibit 13** demonstrates

9   that as additional parties have entered the market, Apple has begun to lose market share.from Apple.

10      226.    As shown in **Exhibit 13.1**, Apple is the dominant participant in the tablet market,

11   with a market share for the fourth quarter of 2011 of 73.7%, compared to Samsung's market share

12   for the same quarter of 2.0%.  However, **Exhibit 13** shows that, as new parties have entered the

13   tablet market, Apple has begun to lose market share.

14      227.    **232.** The above market share and profit statistics demonstrate Apple's commercial

15   success is apparent from the above statistics and confirmed by.  Samsung's own strategy documents

16   also support Apple's success.  In a July 2011 "STA Report to Headquarters,HQ," Samsung stated,

17   "Focus[f]ocus on preventing smartphone buyers from becoming Apple 'loyalists.'  Apple loyalty

18   is strong, which provides challenges to get iPhone users to switch."[212] Further,[316]  In a Samsung

19   "iPhone 4.0 Quick Report & Analysis," Samsung stated, the that "Buzz[b]uzz for iPhone still

20   dwarfs all other competitor products."[213][317]

21      228.    Finally, Apple's commercial success and popularity are evidenced by the fact that

22   Apple's product launches are closely followed and monitored by leading world news

23   organizations.  In June 2010, CNN reported that

24

25   [212] Deposition of Justin Denison, December 16, 2011, Exhibit 8 (S-ITC-001016096-144 at 110).

26   [316] Denison Deposition Exhibit 8: STA Report to Headquarters Presentation, dated July
     2011 (S-ITC-001016096–S-ITC-001016144 at S-ITC-001016110).

27   [213] Samsung "[317] iPhone 4.0 Quick Report & Analysis," dated June 2010
     (SAMNDCA10390235-304–SAMNDCA10390304 at 290SAMNDCA10390290).

28

233.   Finally, leading world news organizations have consistently followed and reported on each Apple product launch. CNN recently reported "…the scene outside Apple's New York City flagship store did have something of the air of a religious event on Thursday.  An hour before the iPhone 4 was slated to go on sale, more than 600 aspiring buyers filled the plaza outside the iconic Fifth Avenue glass cube — and a line of hundreds more stretched on behind them, filling an entire city block.  Passersby chattered with the gathered throngs while marketers circled:  AOL (AOL) . . . earned fans by handing out 500 Magnolia Bakery cupcakes.  Vuvuzelas blared, and the crowd cheered and applauded as opening hour neared."214 318

229.   234. As demonstrated above, I agree with Mr. Musika that this factor provides strong support in the present case for a reasonable royalty rate that weighs in favor of the income approach and calculated as a part of my reference point analysis. favoring a higher royalty.

          **i.**      **Factor #9:**   **The utility and advantages of the patentpatented property over the old modes or devices, if any, whichthat had been used for working out similar results.**

235.   Due to the nature of this factor, I have evaluated and concluded on each utility patent separately. I discuss my evaluation and conclusion regarding the design patents, trade dress and trademarks as a group.

230.   236. My analysis of the utility and advantages of the patented property over the old modes or devices is based on my understanding of the various technical experts' opinions regarding this factor. During my discussion with each technical expert, I asked each expert to provide an opinion concerning the relative significance of each patent within their own field of expertise and the extent to which the patent contributes to the functionality of the wireless device. I have summarized my understanding of the utility and benefits on **Exhibit 45.** **Exhibit 45** summarizes Mr. Musika's understanding of the utility and benefits of the patents, and his discussion of each of the patents infringed by the products included in the new trial is provided below.

---

214 "Thousands flock for iPhone 4 debut" David Goldman and Stacy Cowley, CNNMoney, dated June 24, 2010. (http://money.cnn.com/2010/06/24/technology/apple_iphone/index.htm#)

318 http://www.money.cnn.com/2010/06/24/technology/apple_iphone.

**(i)**   237. Utility '381 Patent Conclusions

238. '002   Based on my discussion with Apple's technical expert, Alex Snoeren, I understand that the patent helps to provide a cohesive experience for the user when there are many different applications running.   The '002 teaches a way for different applications to give information to the user in an unobtrusive way.   As a result, this feature enhances the ease of use and value of a smartphone or tablet computer.

239. '891   Based on my discussion with Apple's technical expert, Karan Singh, I understand that the patent provides useful ways for providing unobtrusive visual feedback to the user input in a digital processing system, such as a desktop or laptop computer, a smartphone, or a tablet computer.   It does so by conveying information on a new window for the user that automatically disappears without the need for action by the user.   As a result, this feature enhances the user interface and experience in smartphones and tablets.

231.   240. '381   Based on my discussiondiscussions with Henri Lamiraux from Apple and Apple's technical expert, Ravin Balakrishnan, I understandMr. Musika understood that thisthe '381 patent provides an elegant and appealing form of visual feedback to a user that there is no more of an electronic document to be seen.  For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image.  Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display.  When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen.  This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction.  As a result, the inventionsinvention of the '381 patentPatent make possible a user interface that is more visually appealing and intuitive in its handling of the display of electronic documents.  This provides a major enhancement to the quality of the user interface.  Apple also considers this invention to be closely associated with Apple products in the marketplace.  I also spoke with Mr. Lamiraux and Dr. Balakrishnan.  Their descriptions of the '381 Patent were consistent with the descriptions provided by Mr. Musika and I agree with Mr. Musika's description of the patent.

### (ii)    '915 Patent

232.    241. '915  Based on my discussiondiscussions with Henri Lamiraux from Apple and Apple's technical expert, Karan Singh, I understandMr. Musika understood that the patent'915 Patent provides functionality that is central to the accusedinfringing products:  the ability to distinguish automatically between a one-finger scroll call and a two-finger gesture such as a zoom or rotate gesture.   This functionality is highly intuitive.  Scrolling, zooming, and rotating are among the most common actions users take with touchscreens and smartphones, and are used in multiple applications.  IHe further understandunderstood that any effort to redesign would make products that infringe the '915 Accused ProductsPatent much less useable, render them inconvenient for users, and deprive them of intuitive functionality that smart phone and tablet users have come to expect.  The alternatives would provide a much less satisfying user experience than devices that practice the '915 patentPatent.  Further, given how frequently the functions are used in the interface, I understand it would be difficult and time -consuming to replace.  I also spoke with Dr. Singh and Mr. Lamiraux; their descriptions of the patent were consistent with Mr. Musika's description, and I agree with Mr. Musika's description of the patent.

### (iii)    '163 Patent

233.    242. '163  Based on mya discussion with Apple's technical expert, Karan Singh I understand, Mr. Musika understood that the patent'163 Patent provides for an efficient means for users to navigate structured electronic documents on a touchscreen display.  I further understand it is possible to implement other methods to navigate in structured electronicselectronic documents using touch gestures, but they would not have been as elegant or intuitive.  I also understoodunderstand that Samsung evaluated alternatives and concluded that they were inferior and instead revised the user interface to include the ''163 patentPatent's features.  It is my understanding that the invention significantly enhances the user interface of a touchscreen smartphone and tablet.  I also spoke with Dr. Singh.  His description of the patent was consistent with Mr. Musika's description, and I agree with Mr. Musika's description of the patent.

243. '607  Based on my discussion with Apple's technical expert, I understand that the patent provides technology for a touchscreen used to obtain accurate information on multiple touches on a

1    touchscreen device.  This patent is being asserted by Apple only with respect to Samsung's tablet

2    computers.  I understand from my discussions with the Apple technical expert that no commercially

3    viable, alternative, non-infringing touchscreen technologies were in existence when the Samsung

4    Galaxy Tab devices entered the market.  None of the alternative available touchscreen technologies

5    afforded true multi-touch functionality.    For these reasons, Samsung did not have a commercially

6    viable alternative to these technologies embodied in the Apple iPad and iPhone products for a ten-

7    inch tablet.  I understand that Samsung introduced a 7.7 inch tablet with an AMOLED display in

8    early 2012, which was released in Australia in or around January 2012 that does not make use of the

9    '607 technology, but that it was not released in the United States until this month.

10   **244.**  '129   Based on my discussion with Apple's technical expert, I understand that the patent provides

11   technology for a touchscreen display to address the issue of interference from the LCD display

12   sensing multitouch inputs.  Through the use of the patent, the device can be thinner, and the screen

13   requires fewer layers.  I understand that this patent is being asserted by Apple only with respect to

14   Samsung's tablet computers.  I understand from my discussions with Apple's technical expert that

15   there would be significant disadvantages to designing without using the patent's technologies when

16   the Samsung Galaxy Tab devices entered the market.  None of the alternative display technologies

17   to LCD was mature enough for use in tablet size devices, and using a touchscreen on top of an LCD

18   panel was problematic because the display needed to have an extra layer of shielding to protect the

19   sensitive touch screen electrodes from the electrical interference from the LCD.  Adding this extra

20   layer would result in a less visually desirable screen, increased manufacturing costs, and a heavier

21   and thicker device.

22   **245.**  Design Patent, Trade Dress and Trademark Conclusion

23                          **(iv)      Design patents, trade dress, and trademark**
                                  **conclusion**

24        234.    **246.** Design patents, trade dress Design patents, trade dress, and trademarks relate to

25   the aesthetics of the a product, but not to core functionality.  However, design elements can

26   contribute to the demand for a product and the quality of the consumer user's experience and

27   demand for the product. Because of the nature of.  In considering the design patents, trade dress and

1  ~~trademarks, I~~elements, Mr. Musika did not rely ~~on~~upon the ~~opinions~~opinion of technical experts. ~~I~~

2  ~~did, however, investigate and note~~ However, he did consider the extent to which the design elements

3  ~~represented by~~of the asserted design patents, trade dress, and trademarks were demanded by ~~the~~

4  ~~consumer~~consumers and ~~referred to~~were cited in material ~~produced by~~from Samsung. ~~I further~~

5  ~~investigated~~ He also considered the extent to which ~~Apple and~~ Samsung and Apple identified

6  ~~Apple's~~the smartphone and tablet ~~design~~designs as important factors in the sale of ~~these~~the devices.

7  Finally, ~~I investigated~~he also considered the extent of information that is available in the public

8  domain concerning the ~~extent to which~~relative importance of Apple's smartphone and tablet ~~design~~

9  ~~as important factors~~designs in the sale of ~~these devices.~~those devices.  I considered the same

10  evidence, focusing particularly on materials included in **Exhibit 24-PT**.

11      235.   **Exhibit 24-PT** cites examples from Apple and Samsung that show the importance

12  of design to the demand for smartphones and tablets.  There are many public articles that address

13  the importance of design.  An Internet website titled "Smart Social Branding" described Apple's

14  design focus.  According to the site:

15      ~~247.   **Exhibit 24** is a list of examples from both Apple and Samsung~~
    ~~that demonstrate~~ the importance of design ~~in consumer demand. There are~~

16  ~~numerous public articles that discuss the importance of design to Apple.~~
    ~~For example, an internet website entitled "Smart Social Branding"~~

17  ~~described Apple's focus on design as follows. "It~~[i]t's a known fact
    around Apple that ~~'~~"design is everything~~'. "~~. "  Most companies don't

18  have a design culture, but for Apple it's a different story.  Steve
    Jobs knows the importance of design and its impact on the business

19  community.  For him, design can make or break a company.  With
    this kind of mentality, all the designs of Apple products have to go

20  through its CEO for approval.  Out of all the companies under
    Fortune 500, Apple is the only company where every design has to

21  be approved by its leader.  Experts say that this strategy worked
    well for the company because Steve Jobs is a systems designer and

22  thinker.  He opted to simplify intricacies."~~215~~319  ~~John Sculley, the~~
    ~~former CEO of Apple, described his experience with Apple and design as~~

23  ~~follows. "A friend of mine was at meetings at Apple and Microsoft on the~~
    ~~same day and this was in the last year, so this was recently. He went into~~

24  ~~the Apple meeting (he's a vendor for Apple) and when he went into the~~
    ~~meeting at Apple as soon as the designers walked in the room, everyone~~

25  ~~stopped talking because the designers are the most respected people in the~~

26  ―――――――――――――

27  ~~215~~319 ~~"Apple: The Secret Behind its Success", Smart Social Branding (http://smartsocialbranding.com/business-in-~~
    ~~general/apple-the-secret-behind-its-success)~~ http://www.smartsocialbranding.com/business-in-
    general/apple-the-secret-behind-its-success/.

1
2
3
4
5

organization. Everyone knows the designers speak for Steve because they have direct reporting to him. It is only at Apple where design reports directly to the CEO.  Later in the day he was at Microsoft. When he went into the Microsoft meeting, everybody was talking and then the meeting starts and no designers ever walk into the room. All the technical people are sitting there trying to add their ideas of what ought to be in the design. That's a recipe for disaster."[216] Finally, a recent New York Times article paid tribute to Steve Jobs and his passion for design.

6
7
8
9
10
11

236.   A *New York Times* article also supports the importance of design to Apple and its founder, Steve Jobs.  "His design legacy may be chiefly remembered for Apple's immaculate styling, but Jobs constantly stressed the importance of more topical issues, such as usability and the relationship between tiny objects like iPods and iPhones, and a vast virtual network like iTunes."[217][320] Design is closely associated with Apple, with its success and with its brand. It is clear that design is an important part of Apple's identity and the success of the brand.

12
13
14
15
16
17
18
19

237.   The evidence cited in **Exhibit 24-PT** that Samsung adopted Apple's patented design technology further supports the conclusion that Apple's patents provided significant advantages over older devices.  Many of these documents have been discussed previously, as for example the 132-page Relative Evaluation Report dated March 2010, which shows Samsung's direct comparison of its products to Apple's iPhone GUI and recommendations that Samsung adopt the iPhone features.[321]  Other examples include a document entitled "Alkon: Instructions from the CEO," which says, "Improve UX with reference to iPhone 3GS," and contains side-by-side comparisons of Samsung and Apple GUI interfaces.[322]

20
21
22

238.   248. ThisMr. Musika concluded that this factor does not provideidentify a specific rate for any of the items ofasserted design patents, trade dress, and trademarks.  However, based on the acute focus by AppleMr. Musika also concluded that it is clear that Apple focuses on the design

23
24
25
26
27
28

[216] "John Sculley on Steve Jobs, The Full Interview Transcript" Leander Kahney, Cult of Mac, dated October 14, 2010. (http://www.cultofmac.com/63295/john-sculley-on-steve-jobs-the-full-interview-transcript/).

[217][320] "From Apple to Occupy, the Design Honors List for 2011", Alice Rawsthorn, The2011," *New York Times*, dated DecemberDec. 25, 2011.

[321] PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010).

[322] Alkon: Instructions from the CEO (SAMNDCA20012936–SAMNDCA20012942 at SAMNDCA20012936 and SAMNDCA20012940).

elements of its products~~, the significant degree of success as evidenced by consumer demand and acceptance for Apple's design elements, Apple's design elements included in the design patents, trade dress and trademarks give Apple a distinct~~ and that these elements are in demand by consumers. These design elements provide Apple with a significant advantage over competitors and ~~strongly~~ support a higher royalty rate.  ~~Similarly the strength of~~Regarding Apple's utility patents, ~~its importance~~Mr. Musika concluded that these patents are important to the user interface of Apple's products, ~~and~~ ~~the degree to which~~ Apple treats these aspects of its products as proprietary, ~~all strongly support~~therefore supporting a higher royalty rate for these patents.  I agree with Mr. Musika's conclusions.

> **i.    Factor #10:   The nature of the patented invention~~,~~; the character of the commercial embodiment of it as owned and produced by the licensor~~,~~; and the benefits to those who have used the invention.**

239.    ~~249.~~ The ~~character of the commercial embodiment of each category of~~asserted Apple Intellectual Property ~~In Suit is either a smartphone, a tablet~~is embodied in smartphones, tablets, or both.  ~~As~~ I discussed ~~at length~~ above~~, both products produce~~ the substantial profits ~~for both~~earned by Apple and Samsung ~~and are commercially successful~~from the sale of smartphones and tablets and the commercial success of those products.

240.    I agree with Mr. Musika that Apple, as a company, focuses on the users' experience with its products.  A *New York Times* article reported that, although Apple did not display any products at the high-tech CES trade show, Apple's presence was still noticeable.  The article stated that:

~~250.    Apple has consistently focused on the user experience. A New York Times article explains that although Apple did not display product in the latest high-tech CES trade show, Apple's presence was very noticeable. "But~~Apple's presence is more subtle as well.  Take one tech buzzword ~~—~~"~~‘~~user experience~~"~~'~~—~~ that was particularly prominent in the product presentations this year.  The expression refers to a concern for how all the elements of a technology product ~~—~~ hardware, software and services ~~—~~ work together so that people actually enjoy using it.  Apple was among the earliest and best-known practitioners of that philosophy in its product design.  The company's late chief executive, Steven P. Jobs, long insisted that Apple make its own computer software and hardware to ensure that the two would run smoothly together.  As it entered the era of iPods, iPhones and iPads, Apple went a step further with online

services, including iTunes and iCloud, that make it simple to buy entertainment and back up data from the devices.”[218]

241. ~~251. As discussed above,~~ I agree with Mr. Musika that the commercial embodiment of ~~all categories of~~the asserted Apple Intellectual Property ~~In Suit~~ and ~~Apple's focus on~~ the ~~quality~~importance of the overall user experience ~~has~~have produced considerable ~~financial rewards~~sales and profits for Apple and provided ~~an enhanced user experience to the~~ consumers that use the products that ~~embody the claimed technology. Accordingly~~include the asserted Apple Intellectual Property with a better user experience.  Therefore, the royalty rate should ~~reflect~~consider the economic benefits ~~to~~that Apple receives and the market advantages associated with the benefits provided to ~~the consumer.~~ consumers.

**k.**      **Factor #11:   The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

242. ~~252.~~ I have discussed ~~at some length~~ in Factor 8 above the benefit (both technological and financial ~~benefits obtained~~) received by Samsung ~~resulting from its sale of the accused products. Samsung has obtained an additional economic benefit not available to Apple that results from Samsung's sale of the accused products. The additional value is the fact that Samsung pays an effective tax rate of less than 1% in the U.S. on its sale of accused products. STA and SEA use an artificial transfer price to establish the cost of goods sold on the sales of the accused~~from the sales of the infringing products ~~in the U.S.~~.

~~Q.  Right.  This — this doesn't reflect the actual cost to manufacture the phones?~~

~~A. No, it does not.~~

~~Q.  All right.  It reflects a number based on transfer pricing, correct?~~

~~A. Correct, it does.~~

~~Q.  And that number is used for tax purposes with the United States government, correct?~~

~~A. Correct, yes.[219]~~

~~253.  The result of Samsung's use of a transfer price is that the actual profits are transferred to Korea~~

---

[218] ~~New York Times, "At C.E.S., Living Up to Apple's Standards," January 12, 2012.~~
[219] ~~Deposition of Timothy Sheppard, January 24, 2012, pp 62-63.~~

1    where they are taxed at a lower rate and the tax revenue is paid to the Korean government and not

2    the U.S. Samsung will rightfully claim it has permission from the IRS to use this artificial transfer

3    price. However, the pre approval does not change the fact that it pays virtually no U.S. income taxes

4    on the accused sales while Apple pays an effective tax rate of 24% on all U.S. sales.[220] This provides

5    a significant price advantage to Samsung.

6        243.   254. Based on the fact that Samsung is assumed to have used Apple's Intellectual

7    Property In Suit to make significant profits through the sale of the accused devices that are virtually

8    untaxed in the U.S. and transferred to Korea. As discussed above, Samsung has used the asserted

9    Apple's Intellectual Property In Suit to build market share in the smartphone and tablet markets at

10   Apple's expense, and has used Apple's Intellectual Property In Suit to gain the expense of Apple.

11   Further, Samsung has been able to earn additional profits through on the sale of both convoyed and

12   derivative products tied to Samsung's ecosystem, this factor would support that, along with the

13   infringing products, are part of Samsung's ecosystem.  The infringing products were introduced at

14   a critical time in the growth of the smartphone market.  Therefore, I agree with Mr. Musika that

15   this factor supports the need for the a royalty rate to reflect that appropriately reflects the full

16   measure of Samsung's financial gain and Apple's loss benefits Samsung has realized.

17                    **l.    Factor #12:   The portion of the profit or of the selling**
                         **price that may be customary in the particular business**
18                       **or in comparable businesses to allow for the use of the**
                         **invention or analogous inventions.**
19

20       244.   255. There is no Mr. Musika did not identify any evidence that relates to the portion

21   of the profit or of the selling price that may be customary in this business to allow for the use of

22   the invention or analogous invention inventions for any of the categories of Apple Intellectual Property

23   In Suit with the exception of the trademark category the New Trial Patents.  My review did not

24   identify anything Mr. Musika overlooked.  Therefore, I agree with Mr. Musika that this factor

25   would not provide an indication as to an appropriate royalty rate.

26   256.  This factor is not applicable to any of the categories of Apple Intellectual Property In Suit with the

27   ――――――――――――――――――
     [220] Apple Inc. Form 10 K for the fiscal year ended 9/14/11, p. 63.

28

limited exception of trademarks to some degree. Based on the "Made for iPad" agreements, one example of a value placed on the right by a third party to use a trademark that referenced Apple is $4 per unit in a circumstance involving a complementary use.   This is not analogous to a license to a competitor such as Samsung.   Nonetheless, I view this amount as setting a floor below which Apple would not license any of its trademarks.   While the ultimate rate for multiple trademarks or trade dress would be higher for the reasons discussed above, it certainly would not be less than the amount that Apple charges to use a trademark in a context that results in additional benefits through expansion of the number and variety of accessories that work with its products.

              **m.**       **Factor #13:   The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

**257.** I have previously evaluated the portion of the realizable profit that should be credited to the invention as distinguished from the non-patented elements in my discussion of the income reference point and as illustrated on **Exhibit 41.2.**

245.   **258.** The In my discussion of the income method above, I have addressed the portion of the realizable profit that should be credited to each utility patent represented by the amount of profit identified with each category of Apple Intellectual Property In Suit as reflected in the income based reference range summarized on in **Exhibit 41.** Dr. Hauser's **41-S**.  Mr. Musika found that the conjoint survey study and results are conducted by Dr. Hauser also supportive of support the conclusion that consumers customers are willing to pay a premium for the features enabled by the '607, '915, '681, and '163 utility patents as discussed earlier.  I agree.

246.   **259.** The Mr. Musika concluded that the portion of the realizable profit that relates to the asserted design patents, trade dress, and trademarks is based in part on the portion of Apple's realizable profit that is due attributable to Apple's its brand.  The amount of the realizable profit associated with attributed to the brand is the same amount for each individual item design element as the total group of design patents and trade dress items. The degree of asserted design-related intellectual property.  The dilution of to Apple's brand due to an the infringement of Apple's distinctive design is the same regardless if whether it is caused by one or the group of

1  design -related intellectual property. ~~As a result, it would be incorrect~~ Therefore, it is inappropriate
2  to accumulate additional damages based on each ~~additional~~ act of infringement ~~on each item~~ of the
3  design -related intellectual property because each ~~related~~ design element ~~is tied to~~has the same
4  economic benefit associated with Apple's ~~overall~~ brand.  ~~Accordingly, the hypothetical~~The license
5  ~~involving~~for the asserted design ~~patent~~patents, trade dress, and trademarks would be negotiated on
6  ~~the~~a total portfolio ~~and not~~as opposed to an individual ~~items~~basis.  As discussed above and for the
7  reasons stated in Mr. Musika's report, I agree.

8

9              **n.**      **Factor #14:    The opinion testimony of qualified experts.**

9          247.    ~~260. Listed below are the individual experts that I have consulted with and upon whose~~
10 ~~opinions I rely in reaching my final conclusions.~~This report reflects my opinions in this matter.  I
11 have also spoken to the following experts and have read their expert reports and trial testimony:

12

| ~~Technical Expert Name~~ | ~~Specialty~~ | ~~Apple Patent(s) Opined On~~ |
|---|---|---|
| ~~Ravin Balakrishnan~~ | ~~Human Computer Interaction~~ | ~~'381~~ |
| ~~John Hauser~~ | ~~Conjoint Analysis~~ | ~~'607,'915, '381 and '163~~ |
| ~~Michel Maharbiz~~ | ~~Micro-fabrication and Miniature Circuit Design~~ | ~~'129, '607~~ |
| ~~Karan Singh~~ | ~~Human Computer Interaction~~ | ~~'163, '891, '915~~ |
| ~~Alex Snoeren~~ | ~~Networking and Distributed System Design~~ | ~~'002~~ |

18

19      •      Ravin Balakrishnan, Specialty – Human Computer Interaction – '381 Patent;

20      •      John Hauser, Specialty – Conjoint Analysis – '915 Patent, '381 Patent, and '163 Patent; and

22      •      Karan Singh, Specialty – Human Computer Interaction – '163 Patent and '915 Patent.

23          248.    I have also reviewed the expert reports and declarations, deposition testimony, and
24 trial testimony of Mr. Musika and Mr. Wagner.

25

**o.**   **Factor #15:** **The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee — who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention — would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

249.   ~~261.~~ The hypothetical negotiation date is the ~~intersection of the date of the~~date of first infringement, which is the point at which the date of first sale and the issuance of ~~each~~the asserted Apple Intellectual Property ~~In Suit.  I consider~~intersect.  I agree with Mr. Musika that the market circumstances ~~impacting or influencing~~that would impact or influence each potential hypothetical negotiation date ~~to~~would be ~~relatively~~ the same.  **Exhibit 44-S** outlines ~~each of these intersection points or~~the issue date, date of first sale, and hypothetical negotiation dates. for each element of the asserted Apple Intellectual Property.

~~262.  I have~~

250.   In **Exhibits 42 and 43,** Mr. Musika summarized ~~my~~his conclusions on each of the ~~above factors and the impact on each item of Apple Intellectual Property In Suit on Exhibits 42 and 43.  Further, I have accumulated the results of my reference point analysis and the results of my Georgia Pacific analysis on Exhibits 46 and 47 and displayed my final~~*Georgia-Pacific* factors and the impact on each item of the asserted Apple Intellectual Property.  In **Exhibits 46-S** and **47-S,** Mr. Musika accumulated the results of his analysis and his ultimate conclusion as to the appropriate royalty for each item of the asserted Apple Intellectual Property~~In Suit.~~.

251.   Mr. Musika's overall methodology is consistent with the legal instructions, as I understand them, and with practice in this field.  He has used the format of determining the outcome of a hypothetical negotiation between Apple and Samsung at the time Samsung's infringement began.  I find the manner in which he calculates reference points to be well reasoned and robust.  Moreover, I agree with his analysis regarding the 15 factors discussed above.  After review of his report and the evidence reflected in it, I agree that the reasonable royalty rates stated

in paragraph 173 above reflect appropriate reasonable royalty rates for the New Trial Patents.  I have therefore used them to prepare the calculations of damages reflected in the exhibits identified as **Exhibits 17-PT-H**, **18-PT-H**, and **19-PT-H** and the relevant supporting schedules.

### 7.      Evidence Introduced at Trial Confirms These Opinions.

252.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial testimony.  However, before he testified, Mr. Musika was present for or was able to review the transcript of the proceedings, and I have that record available to me and have considered it in forming my opinions.  The trial testimony confirms the opinions regarding reasonable royalty already stated above.

253.    At paragraphs 131 to 139 above, I discuss testimony of witnesses and trial exhibits that reflect public acclaim for and consumer demand for the patented features, the effort Apple put into the design of the iPhone and the creation of the technology reflected in the utility patents, the effect that the iPhone and the patented technology had on the market when it was introduced, the scope and intensity of competition between Apple and Samsung, and the steps that Samsung took to incorporate elements of the iPhone into its products after numerous direct comparisons.  This testimony, which is relevant to the existence of and size of Apple's lost profits, also confirms the opinions stated about the factors that would be considered in a hypothetical negotiation, including at a minimum the discussion regarding factors 4-6, 8-10, 11, and 13.  I incorporate the discussion above by reference.

254.    The trial testimony of Boris Teksler, Apple's then-Director of Patents and Licensing Strategy, also confirmed the description of Apple's licensing practices discussed above and the description of the discussions between Apple and Samsung in the summer and fall of 2010 that I have discussed above.[323]  For example, Mr. Teksler discussed Apple's overall licensing philosophy and the importance to Apple of retaining and using its proprietary technology to differentiate its products in the marketplace.[324]  He confirmed that the design

---

[323] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1951:19-1973:14; Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2006:11-2023:1.

[324] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1952:16-1957:9.

1   patents-at-issue and the utility patents-at-issue reflect elements of Apple's market identity and are

2   part of the unique user experience that Apple is not willing to license to competitors.[325]

3   Specifically, he testified that the New Trial Patents comprise part of Apple's "unique user

4   experience I.P." that Apple "strongly desire[s] not to license" to others.[326]  Mr. Teksler further

5   testified that, for those "rare exceptions" where Apple had licensed its unique user experience

6   I.P., Apple did so "consciously knowing that [it was] not enabling somebody to build a clone

7   product."[327]  Similarly, Mr. Teksler testified regarding the importance to Apple that Samsung stop

8   copying Apple's products and designs (as reflected, for example, in PX52.17) and stated that

9   Apple did not intend to license the New Trial Patents to Samsung in Apple's prior discussions

10  with Samsung, which confirms my understanding.[328]  This testimony confirms my opinions

11  regarding the hypothetical negotiation between the parties and the factors that would be

12  considered in it, including at least the discussion regarding factors 1 to 5.

13          255.    The trial testimony of Mr. Stringer, Mr. Forstall, Dr. Bressler, Dr. Balakrishnan,

14  Dr. Kare, and Dr. Singh also confirmed the discussions stated above about the nature and scope of

15  the inventions, their utility over other preexisting technology, and Samsung's use of those

16  inventions in its infringing products—testimony relevant to at least factors 9 to 11.  For example,

17  Mr. Stringer testified regarding how important the process of design is internally at Apple and the

18  care that went into the design of the original iPhone that is reflected in the two design patents at

19  issue in the new trial.[329]  Mr. Forstall testified regarding the effort Apple put into designing a new

20  user interface for the iPhone and the benefits to a user of the technology, using as an example the

---

[325] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1963:21-1964:8; Boris
Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2013:9-2014:6.

[326] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1953:4-1957:9.

[327] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1955:22-1957:9.  *See, e.g.*,
Patent Cross Licenses Agreement between Apple Inc. and Microsoft Corp., dated Aug. 5, 1997
(APL-ITC-0000010019–APL-ITC-0000010040 at APL-ITC-0000010021) (containing anti-
cloning provision).

[328] Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2013:9-2014:6; PX52: Apple
Presentation re: Samsung's Use of Apple's Patents in Smartphones.

[329] Christopher Stringer Trial Testimony, dated July 31, 2012, pp. 469:15-537:19.

1  double-tap technology of the '163 Patent.[330]  Dr. Bressler testified to the unique design elements

2  of the D'677 Patent, the revolutionary nature of the design and the impact it had when it was

3  introduced, how the Infuse 4G and other Samsung products infringed that design, and the manner

4  in which Samsung's designs followed Apple's industrial design.[331]  Dr. Kare identified the design

5  elements of the D'305 Patent, the nature and extent of Samsung's infringement of the D'305

6  Patent, and the steps taken by Samsung to adopt Apple's patented design elements after a direct

7  comparison between a proposed design (known as the S1) and the iPhone.[332]  Dr. Balakrishnan

8  discussed the claim elements reflected in the invention of the '163 Patent, how it was an

9  improvement over prior technology, how it was present in the Samsung's products that are the

10 subject of the new trial, and how Samsung studied and adopted Apple's implementation of this

11 user interface feature.[333]  Dr. Singh did the same with respect to the '915 Patent and the '163

12 Patent.[334]  This testimony confirms my opinions regarding the hypothetical negotiation between

13 the parties and the factors that would be considered, including at least the discussion regarding

14 factors 9 to 11.

15        256.   Dr. Winer testified to the importance of Apple's brand and the significant

16 association between Apple's brand and its designs, including, for example, his explanation of

17 how the Gravity Tank study commissioned by Samsung reflected this association (PX36).[335]  This

18 testimony further reinforces the conclusions stated above regarding the hypothetical negotiation

19 and the design patent royalty.  Dr. Winer identified the significance of Apple's brand to its

---

[330] Scott Forstall Trial Testimony, dated Aug. 3, 2012, pp. 724:4-729:17, 738:6-789:1.

[331] Dr. Peter Bressler Trial Testimony, dated Aug. 6, 2012, pp. 1002:16-1024:21, 1044:21-1082:10, 1085:20-1166:15, 1173:13-1212:14, and 1223:17-1241:11; Dr. Peter Bressler Trial Testimony, dated Aug. 7, 2012, pp. 1337:2-1355:19.

[332] Dr. Susan Kare Trial Testimony, dated Aug. 7, 2012, pp. 1356:18-1456:21, 1467:1-1495:11; PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

[333] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1723:23-1732:13, 1736:16-1802:10, 1806:16-1814:8.

[334] Dr. Karan Singh Trial Testimony, dated Aug. 10, 2012, pp. 1815:12-1889:16, and 1899:20-1913:5.

[335] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1496:12-1545:10 and 1565:12-1576:14; PX36: Gravity Tank, Touch Portfolio (SAMNDCA00191811– SAMNDCA00191987).

1   success in the marketplace and how the look and feel of the iPhone product contributes to that

2   brand.[336]  He further testified regarding how other third-party studies recognized the importance

3   of these elements to the iPhone's success and consumer appeal.[337]  His testimony confirms my

4   opinions regarding the per unit design patent royalty rate, the hypothetical negotiation between

5   the parties, and the factors that would be considered in it, including at least the discussion

6   regarding factors 4, 5, 10, and 13.

7          257.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

8   further supports the opinions regarding reasonable royalties that I have stated in this report.

9   **IX.**    ~~Q.~~ POSSIBLE ~~REVISIONS TO THIS REPORT~~REVISION

10         258.    ~~263.~~ I intend to review ~~and consider~~ any ~~additional~~new information provided ~~to me~~

11  after the production of this report and ~~will~~would supplement ~~my analysis and conclusions~~this report

12  if asked to do so.

13

14  ~~R.   EXHIBITS~~

15  ~~264.   Exhibits 4 through 47 are attached to this report and support my damage analyses and opinions in~~

16     ~~this matter.~~

17         259.    I intend to read or attend the deposition of Mr. Wagner and intend to respond to

18  any criticisms that he raises regarding my analysis.

19

20

21  ~~S.   PROFESSIONAL ARRANGEMENT~~

22  ~~265.   My work for expert services provided in this matter is charged at a standard billing rate of $550 per~~

23     ~~hour and is in no way contingent on the outcome of this matter.  In addition, I will be reimbursed for~~

24     ~~all reasonable out-of-pocket expenses incurred in connection with my analyses and testimony in this~~

25     ~~case.~~

26         [336] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1498:19-1508:16.

27         [337] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1525:7-1528:21; PX36:
    Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

28

1

2   March 22, 2012                          Terry L. Musika, CPA

3

4   Dated:  August 23, 2013

5                                           JULIE L. DAVIS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Document comparison by Workshare Professional on Monday, August 26, 2013
9:59:45 AM

| Input: | |
|---|---|
| Document 1 ID | file://\\PAUsers.mofo.com\users\PEOPLE\CXR6\My Documents\temp\2013-08-26\redline\TLM Damages Report 3.22.12_FINAL VERSION.docx |
| Description | TLM Damages Report 3.22.12_FINAL VERSION |
| Document 2 ID | file://\\PAUsers.mofo.com\users\PEOPLE\CXR6\My Documents\temp\2013-08-26\redline\SAN_FRANCISCO-#3323719-v2-AvSS___Expert_Report_of_Julie_Davis_(As_Of_8_23_2013).DOC |
| Description | SAN_FRANCISCO-#3323719-v2-AvSS___Expert_Report_of_Julie_Davis_(As_Of_8_23_2013) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 2349 |
| Deletions | 1900 |
| Moved from | 80 |
| Moved to | 80 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 4409 |
|---|---|