# EXHIBIT 1
# FILED UNDER SEAL

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

APPLE INC., a California corporation,

Case No.    11-cv-01846-LHK

13

Plaintiff,

**EXPERT REPORT OF JULIE L. DAVIS, CPA (AS OF 8/23/2013)**

14

v.

15

SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

16

17

18

19

Defendants.

20

21

22

SUBJECT TO PROTECTIVE ORDER

23

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND AND EXPERIENCE ................................................................. 1

II.   ASSIGNMENT .................................................................................................... 2

    A.    Case Background and Procedural History ................................................ 2
    B.    Products, Patents, Infringement Findings, and Notice Periods ................ 5
    C.    Limitations from Case Management Order ............................................... 5
    D.    Scope of Assignment and Issues to Be Addressed .................................. 6

III.  MATERIALS CONSIDERED ............................................................................. 7

IV.   BACKGROUND .................................................................................................. 8

    A.    Summary of Apple's Patents that Are the Subject of the New Trial ......... 8
    B.    Summary of the Parties and the Relevant Market .................................. 10

        1.    Apple ............................................................................................ 10

            a.    iPhone ................................................................................ 11

            b.    iPad .................................................................................... 12

            c.    Apple Sales of iPhone and iPad ........................................ 13

        2.    Samsung ....................................................................................... 13

            a.    SEC .................................................................................... 13

            b.    SEA .................................................................................... 14

            c.    STA .................................................................................... 14

            d.    Samsung's Infringing Products ......................................... 15

        3.    The Wireless Device Industry ..................................................... 15

            a.    Smartphones ...................................................................... 16

            b.    Tablets ............................................................................... 18

            c.    The Ecosystem .................................................................. 19

V.    ASSUMPTIONS ................................................................................................ 21

VI.   SUMMARY OF CONCLUSIONS AND OPINIONS ........................................ 22

    A.    Summary of Damages Calculations and Results .................................... 22
    B.    Summary of Alternative Damages Calculations and Results ................. 25

VII.  IRREPARABLE HARM .................................................................................... 26

    A.    Background ............................................................................................. 26
    B.    Apple's Loss of Goodwill ...................................................................... 27
    C.    Erosion and Dilution of Apple's Brand ................................................. 29
    D.    Apple's Loss of Market Share ................................................................ 31
    E.    Difficulty of Calculating Damages ........................................................ 33

VIII. MONETARY DAMAGES ................................................................................. 34

    A.    Use of Mr. Musika's Methodology ........................................................ 34
    B.    Legal Overview of Monetary Damages Remedies ................................. 37
    C.    Apple's Lost Profits ............................................................................... 38

        1.    Panduit Factors ............................................................................ 39

a. Demand for the Patented Product ................................. 39

b. Absence of Acceptable Non-Infringing Substitutes...................... 43

c. Marketing and Manufacturing Capability to Exploit Demand ............................................................ 46

d. Amount of Profit Apple Would Have Made Absent Infringement............................................................ 48

2. Evidence Introduced at Trial Confirms These Opinions ........................ 54

D. Samsung's Profits ................................................................................. 62

1. Samsung's Revenues from Infringing Sales ............................. 63

2. Deduction of Costs to Calculate Total Profit ............................. 63

3. The Reliability of Samsung's Financial Data ............................. 64

4. Calculation of Samsung's Profits Using Samsung's Classification of Costs as Fixed and Variable ............................. 72

5. Evidence Introduced at Trial Confirms These Opinions ........................ 73

E. Reasonable Royalty............................................................................... 75

1. Royalty Structure ................................................................. 77

2. Royalty Base ....................................................................... 77

3. Royalty Rates ...................................................................... 78

4. Market Reference Points ....................................................... 79

a. International Business Machines Corporation ("IBM")/Apple Cross License........................................ 80

b. Nokia Corporation/Apple Cross License ..................................... 81

5. Cost and Income Reference Points ........................................... 85

6. The Hypothetical Negotiation .................................................. 86

a. Factor #1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty ....................................... 88

b. Factor #2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit ..................... 89

c. Factor #3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold .................................... 89

d. Factor #4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly............... 90

e. Factor #5: The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter ........................................... 91

f.      Factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales .......................................................... 93

g.      Factor #7: The duration of the patent and the term of the license.................................................................................... 96

h.      Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity .............................................................................. 98

i.      Factor #9: The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results............................................. 99

j.      Factor #10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention ................................................................ 103

k.      Factor #11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use ..................................................................................... 104

l.      Factor #12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions................................................................ 104

m.      Factor #13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer................................................................................... 104

n.      Factor #14: The opinion testimony of qualified experts ............. 105

o.      Factor #15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license................................ 106

7.      Evidence Introduced at Trial Confirms These Opinions ........................ 107

IX.      POSSIBLE REVISION.................................................................................... 110

## I.      BACKGROUND AND EXPERIENCE

1.      I have been providing audit and financial consulting services to attorneys and corporate clients for over thirty-five years.  The early part of my career was devoted to directing and performing independent financial audits of private and publicly held companies ranging from manufacturing entities to financial institutions at Touche Ross & Co., which at the time was one of the Big 8 accounting firms.  Drawing upon that background, I have spent the last twenty-five years consulting extensively with companies involved in business and intellectual property disputes.  Prior to starting my own firm, Davis & Hosfield Consulting LLC, I served as the Co-Managing Partner of the National Intellectual Property Practice at KPMG LLP and prior to that served as the Partner-in-Charge of the Global Intellectual Asset Consulting Practice at Andersen LLP.

2.      I have worked on numerous intellectual property cases during my career and have conducted complex studies of damages related thereto.  These studies have included evaluations of lost sales, lost profits, incremental profits, manufacturing and marketing capacities, fixed and variable costs, product line profitability, price erosion, reasonable royalty, unjust enrichment, and prejudgment interest.  I have testified in matters related to these studies.

3.      During the course of my career, I have worked on at least 300 intellectual property disputes.  I have been qualified as an expert in the field of intellectual property damages and testified at trial in more than 50 of those matters, including in the Northern District of California.

4.      In addition to intellectual property disputes, I have assisted companies in developing intellectual property strategies and managing their intellectual property portfolios.  I have also conducted studies related to those portfolios, including patent portfolio analyses, competitive assessments, licensing analyses, cost studies, and benchmarking studies.  In addition, I have co-authored a book, *Edison in the Boardroom*, on the best practices used by leading companies in managing their intellectual property.

5.      I graduated in 1978, *summa cum laude*, from Kansas State University with a Bachelor of Science degree in Business Administration and Accounting.  In the same year, I earned the Gold Key in the State of Kansas for the highest score in the state on the CPA exam.  In

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1

1    2000, I was inducted into the Kansas State University Accounting Hall of Fame.  I am a licensed

2    CPA in California, Illinois, Kansas, Missouri, and Texas.  I am a member of the American

3    Institute of Certified Public Accountants, American Bar Association, and Licensing Executives

4    Society.  My curriculum vitae, which is attached as **Exhibit 1-PT**, and my prior case experience,

5    which is attached as **Exhibit 2-PT**, describe in more detail my professional credentials, including

6    other publications and prior testimony experience as required under Federal Rules of Civil

7    Procedure Rule 26(a)(2)(B).

8    **II.     ASSIGNMENT**

9         **A.     Case Background and Procedural History**

10        6.     In this lawsuit, Apple Inc. ("Apple") claimed that Samsung Electronics Co., Ltd.

11   ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications

12   America, LLC ("STA") (collectively "Samsung") deliberately copied the design and certain user

13   interface features of Apple's iPhone and iPad devices in violation of Apple's protected

14   intellectual property, resulting in the infringement of Apple's design and utility patents and the

15   dilution of Apple's trade dress.

16        7.     The case was tried to a jury beginning on July 31, 2012.  In the trial, Apple

17   accused 28 Samsung products of violating three Apple utility patents and four Apple design

18   patents, and diluting and/or infringing Apple's registered and unregistered trade dresses.

19        8.     The jury issued its verdict on August 24, 2012.  The jury found that 26 of the 28

20   Samsung products infringed various combinations of Apple's three asserted utility patents and

21   three design patents, and that the patents were valid.  The jury also found that six Samsung

22   products diluted Apple's unregistered and registered trade dresses and that those trade dresses

23   were famous.  The jury awarded Apple $1,049,393,540 in damages.[1]

24        9.     The parties filed various post-trial motions, including a motion by Samsung

25   seeking a new trial on damages.  The Court confirmed the jury's verdict that Apple's intellectual

26   

27       [1] Samsung had accused Apple of infringing five Samsung utility patents.  The jury found

28   in favor of Apple on Samsung's claims.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

property was valid and infringed.  On March 1, 2013, the Court issued an Order re:  Damages ("March 1 Order").  The March 1 Order affirmed the damages methodology applied by Apple, with one exception – the manner in which the damages calculations accounted for the date on which Samsung had actual notice of its infringement of the utility and design patents.[2]  The March 1 Order specifically determined the correct notice dates for each of Apple's patents that the jury found Samsung had infringed, and included a chart showing "the correct notice dates, available remedies, and infringing products for each form of IP."[3]  The Court confirmed the damages awarded by the jury with respect to 12 products that were first sold after the notice dates determined by the Court.  For 14 other products that the Court concluded were on sale before April 15, 2011, or June 16, 2011 – dates on which the Court determined Apple had given notice to Samsung with respect to specific patents – the Court ordered "a new trial on damages" only.[4]  The Court also determined the manner in which prejudgment interest and supplemental damages should be calculated and concluded that Apple should receive prejudgment interest and supplemental damages for the products that are the subject of the confirmed award, but then deferred a decision on the specific amounts.

    10.    Apple filed a motion asking the Court to reconsider the order granting a new trial on damages as to two infringing Samsung products:  the Galaxy S II AT&T and the Infuse 4G.  The Court granted Apple's motion as to the Galaxy S II AT&T, reinstating the jury's award of $40,494,356 for that product.[5]  In combination, the March 1 Order and the order as to the Galaxy S II AT&T removed $410,020,294 from the original verdict, and left 13 products subject to the new trial on damages.  The Court set November 12, 2013, for the new trial.

    11.    Apple originally retained Terry Musika as its testifying expert on damages for this lawsuit.  Mr. Musika's curriculum vitae and prior testimony experience were attached as **Exhibits 1** and **2** to his prior expert reports.  Mr. Musika was a principal at Invotex Group ("Invotex") and

---

[2] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013.

[3] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, pp. 18-21.

[4] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 26.

[5] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 2.

1  received substantial assistance from others at Invotex in preparing his analysis.  Mr. Musika

2  prepared an initial report on March 22, 2012 (the "Original Expert Report") and a supplemental

3  report on May 8, 2012 (the "Supplemental Expert Report"), further supplemented his analysis for

4  additional data in July 2012, and then testified at trial after the Court denied a *Daubert* motion

5  directed at Mr. Musika's analysis.  I have read Mr. Musika's expert reports, deposition,

6  declarations, and trial testimony (as well as the trial testimony relating to Apple's claims against

7  Samsung).  Unfortunately, Mr. Musika passed away after the trial was completed.  As a result,

8  Apple needed to substitute a new damages expert and retained me to be its testifying expert on

9  damages for the new trial.

10        12.     On May 8, 2013, Apple disclosed that I would testify as its expert with respect to

11  the damages that Apple should receive for Samsung's infringement of 5 utility and design patents

12  with respect to the 13 products that are the subject of the new trial on damages.  I was cleared

13  under the protective order on May 21, 2013.  I provide this expert report to reflect my

14  qualifications, my conclusions regarding damages, and the reasons for them.

15        13.     In preparing my conclusions and this expert report, I worked with Invotex to

16  prepare calculations and provide quantitative analysis of damages based on the documents

17  produced previously in the case, testimony of various witnesses, interviews with Apple

18  employees and experts, and the damages methodology and models (as reflected, for example, in

19  previously created Access databases and Excel spreadsheets) used by Mr. Musika.  Invotex acted

20  under my direction, and I have discussed with Invotex personnel their work and procedures to

21  ensure that they were consistent with my directions and that the work product was prepared in

22  accordance with the high professional standard to which I hold my own staff.  I worked with

23  Invotex on this project, among other reasons, to ensure continuity with the methods used in

24  connection with the first trial based on the instructions from the Court, to obtain the complete

25  benefit of the prior models and technical aids that already had been prepared, and to obtain the

26  benefit of Invotex's knowledge of the record in discovery and through the prior trial.  Additional

27  information about Invotex can be found in **Exhibit 1** to the Original Expert Report and at

28  Invotex's website.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

14.     My project team and I have been engaged for this assignment at the hourly billing rates of the individuals assigned plus expenses.  My hourly billing rate is $675.  The amount of our fees is not contingent upon the opinions expressed herein or on the outcome of this matter and I have no other personal or financial interest in the outcome of this case.

### B.     Products, Patents, Infringement Findings, and Notice Periods

15.     The Court's March 1 Order, as modified by its order on Apple's motion for reconsideration, directs a new trial on damages for Galaxy Prevail, Gem, Indulge, Infuse 4G, Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G, Galaxy Tab, Nexus S 4G, Replenish, and Transform (collectively the "Infringing Products").[6]  Each of these products infringes one or more of the following 5 patents:  U.S. Patent Nos. 7,469,381 ("the '381 Patent"); 7,844,915 ("the '915 Patent"); 7,864,163 ("the '163 Patent"); D604,305 ("the D'305 Patent"); and D618,677 ("the D'677 Patent") (collectively the "New Trial Patents").[7]  A chart setting out which product infringes which patent(s) is attached as **Exhibit 4-PT**.[8]

16.     The Court also specified the dates on which the Court found that Apple gave Samsung notice of infringement for each of Apple's asserted patents:  August 4, 2010, for the '381 Patent; April 15, 2011, for the '915 Patent and the D'677 Patent; and June 16, 2011 for the '163 Patent and the D'305 Patent.[9]

### C.     Limitations from Case Management Order

17.     The Court conducted a Case Management Conference on April 29, 2013.  That same day, the Court issued a Case Management Order that memorialized rulings that the Court had made on the record, including the following:

---

[6] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 26; Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 2.

[7] Dkt. 1931: Amended Verdict Form, dated Aug. 24, 2012, pp. 2-7.

[8] Consistent with Mr. Musika's practice of using an "-S" suffix at the end of certain exhibits to signify that they were created or updated for use in his "supplemental" report, I have used a "-PT" suffix to signify exhibits in which either the formatting or substantive information was created or updated for use in my "post-trial" expert report.  Exhibits that have no suffix or have an "-S" or "-S2" suffix, therefore, have not been modified from the prior versions prepared by Mr. Musika.

[9] Dkt. 2271: Order Re: Damages, dated Mar. 1, 2013, p. 18.

"The Court's prior rulings on the parties' *Daubert* motions, motions in limine, discovery disputes, and evidentiary objections will remain in effect as law of the case.  The parties may not relitigate these issues."[10]

"The Court ORDERED that the new trial on damages will be extremely limited.  The sole purpose of the trial is to correct the erroneous notice dates.  The Court will not permit the parties to expand the scope of the damages trial by relying upon: (1) new sales data, including any sales after June 30, 201[2]; (2) new products; and (3) new methodologies or theories.  Consequently, Apple's new damages expert may not include different methodologies in his or her expert report, and may not draw upon new data."[11]

18.     As discussed below, I have followed these Court rulings in preparing this analysis.

**D.     Scope of Assignment and Issues to Be Addressed**

19.     I have been asked by counsel to evaluate Apple's damages for the 13 products and 5 patents identified above.  To do so, I have evaluated three types of damages discussed in Mr. Musika's prior reports and supplements:  Apple's lost profits, Samsung's infringer's profits, and reasonable royalty damages.

20.     I am aware that Apple is entitled to obtain only one type of remedy for each infringing unit sold.  I have carefully reviewed the damages model prepared by Mr. Musika in connection with the first trial in this matter and discussed it with Invotex.  Mr. Musika's methodology was careful to distinguish among remedies.  For example, Mr. Musika calculated either Apple's lost profits or a reasonable royalty, but not both, for any specific unit sale that infringed a valid Apple utility patent.  Likewise, Mr. Musika calculated either Apple's lost profits or Samsung's profits or a reasonable royalty for any specific unit sale that infringed a valid design patent.  Thus, Mr. Musika ensured that no specific unit sale would be assigned to more than one theory of recovery.  **Exhibit 16-PT** (read together with **Exhibits 15-PT** and **20-PT**) describes the overall approach used to achieve this result.  I have adopted and followed Mr. Musika's methodology.  Thus, for any unit that infringed a valid patent and for which I calculated damages

---

[10] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 2.

[11] Dkt. 2316: Case Management Order, dated Apr. 29, 2013, p. 3.

under one theory (e.g., Apple's lost profits), I did not also calculate an award of damages under a different theory (e.g., Samsung's profits or a reasonable royalty).

## III.    MATERIALS CONSIDERED

21.    My opinions are based upon information available to me as of the date of this report.  I, and professionals working under my direction, have relied upon and examined documents produced by the parties, testimony, transcripts, and exhibits, along with publicly available information.  I and the professionals working under my direction have reviewed the expert reports and supplements prepared by Mr. Musika and the documents cited in the text and exhibits of those reports.  I have reviewed Mr. Musika's trial testimony and demonstrative aids. In combination, the staff at Invotex and/or my staff have also considered all the documents identified in **Exhibits 3** and **3-S** to Mr. Musika's reports.  **Exhibit 3-PT** lists additional documents, including the trial transcripts and trial exhibits, not previously identified that were also considered in connection with the preparation of this report.

22.    In connection with forming my conclusions, I spoke with the following current or former Apple employees.

- Mark Buckley, Finance Manager II;
- Elisa De Martel, Senior Manager of Worldwide FP&A;
- Henri Lamiraux, Vice President of Engineering for iOS;
- Anuj Saigal, Director of Supply Demand Management;
- Rory Sexton, Vice President of Supply Demand Management;
- Tang Tan, Senior Director of iPhone Product Design; and
- Boris Teksler, former Director of Patent Licensing & Strategy.

23.    In addition, I held discussions with the following experts retained on behalf of Apple.

- Ravin Balakrishnan ('381 Patent);
- John Hauser (conjoint analysis; '381, '915, '163 Patents); and
- Karan Singh ('915 and '163 Patents).

24.     My opinions are based on my skills, knowledge, experience, education, and training, as well as information gathered by and/or provided to me as of the date of this report.  It is usual and customary for experts to consider and/or rely upon sources of information such as those identified above in forming damages opinions.

25.     Mr. Musika testified at trial after having the benefit of hearing and reading the testimony of witnesses during the trial.  With this in mind, I have reviewed the trial testimony and trial exhibits from the August 2012 trial as a part of preparing this report.

26.     I understand that I may be asked to testify regarding my opinions contained herein as well as related matters, including those raised on cross examination; those necessary to address matters raised by Samsung's witnesses who testify concerning damages issues; or those otherwise raised at trial by Samsung's attorneys or witnesses or the Court in relation to matters set forth in this report.  I expect to elaborate and expand on the content of my report as necessary to make my testimony understandable to the Court and the jury.  To the extent helpful to explain, or to put in context, the subject matters discussed throughout my report, I also expect to provide further general explanations of the matters I discuss.  In connection with any testimony, I may rely on materials referenced in this report and in the attachments and demonstrative exhibits to be prepared and identified before my testimony.

## IV.     BACKGROUND

### A.     Summary of Apple's Patents that Are the Subject of the New Trial

27.     The '381 Patent covers a device with a "rubber banding" or "bounce back" function, an effect that users associate with Apple's user interface.  It relates to letting a user know when he or she has reached the edge of an electronic document on a screen.  For example, it covers a method for displaying an electronic document and translating the document in response to object movement, such as a gesture from a finger.  When the user drags a document past the edge of the document with a finger, an area beyond the edge is displayed.  This provides a visual indicator to the user that the user reached the edge of the document.  When the user releases the finger such that the device no longer detects movement, the page snaps back so the area beyond the edge is no longer displayed.

28. The '915 Patent covers a device with a "scroll vs. gesture" function on a touchscreen display. It relates to scrolling on a touch-sensitive display and distinguishing between scrolling and other actions. For example, it covers a method that includes creating an "event object" in response to the user's touch, and distinguishing between a single input point from the user, which the device interprets as invoking a "scroll operation," and two or more input points from the user, which the device interprets as invoking a "gesture operation." A scroll operation scrolls (e.g., translates) the view associated with the event without scaling (zooming in or out), while a "gesture operation" scales the view but may do more than that (e.g., "rotate"). One example of a gesture operation is "pinch to zoom." A two-finger movement that combines scaling and scrolling is a "gesture operation" because it can scale. Users see these actions as scrolling, pinching, and zooming, and associate them with Apple's user interface.

29. The '163 Patent covers a device with a "tap-to-zoom" function. It relates to allowing a user to double tap to enlarge and center on one portion of a document, then gesture on a different portion of the document to center on that portion. For example, it covers a method that includes enlarging and translating a document to substantially center on a first box based on detecting a gesture at that box's location, then translating the document so that a second box is substantially centered based on detecting a second gesture at that second box's location.

30. The D'305 Patent claims the design included in the drawings in the patent, including the one pictured below:



31. The D'677 Patent claims the design included in the drawings in the patent, including the one pictured below:

### B.    Summary of the Parties and the Relevant Market

#### 1.    Apple

32.    Established in 1977, Apple Inc. is a California corporation with a principal place of business in Cupertino, California.[12]  Apple's "overall business strategy is to control the design and development of the hardware and software for all of its products, including the personal computer, mobile communications and consumer electronics devices.  [Its] business strategy leverages its unique ability to design and develop its own operating system, hardware, application software, and services to provide its customers new products and solutions with superior ease-of-use, seamless integration, and innovative industrial design."[13]

33.    Apple "designs, manufactures and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications."[14]  Included among the products and services sold by Apple are the "iPhone®, iPad®, Mac®, iPod®, Apple TV®, . . . software applications, the iOS and Mac OS® X operating systems, iCloud®, and a variety of accessory, service and support offerings."[15]  Apple also "sells and delivers digital content and applications through the iTunes Store®, App Store℠, iBookstore℠, and Mac App Store."[16]  These products and services are sold worldwide by Apple

---

[12] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, cover and p. 1.

[13] Apple Inc. Form 10-K for the fiscal year ended Sept. 26, 2009, p. 4.

[14] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

[15] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

[16] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

through its retail stores, online stores, and direct sales force and by third parties, including cellular network carriers, wholesalers, retailers, and value-added resellers.[17]

<div align="center">

**a.     iPhone**

</div>

34.     Apple first announced the iPhone on January 9, 2007, and began selling it on June 29, 2007.[18]  In the January product announcement, Steve Jobs, CEO of Apple, described the iPhone as "a revolutionary and magical product that is literally five years ahead of any other mobile phone."[19]  When announcing the on-sale date for the iPhone, Apple believed that the

> iPhone introduces an entirely new user interface based on a revolutionary multi-touch display and pioneering new software that allows users to control iPhone with just a tap, flick or pinch of their fingers.  iPhone combines three products into one small and lightweight handheld device – a revolutionary mobile phone, a widescreen iPod®, and the Internet in your pocket with best-ever applications on a mobile phone for email, web browsing and maps. iPhone ushers in an era of software power and sophistication never before seen in a mobile device, which completely redefines what users can do on their mobile phones.[20]

35.     From June 2007 until October 2011, Apple released five versions of the iPhone. The products, U.S. release dates, and carriers are summarized below:[21]

---

[17] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 1.

[18] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html; http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html.

[19] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html.

[20] http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html.

[21] http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html; http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html; http://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html; http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html; http://www.apple.com/pr/library/2011/02/02iPhone-4-on-Verizon-Wireless-Available-for-Pre-Order-Tomorrow.html; http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

11

| Product | Release Date | Carrier |
|---------|--------------|---------|
| iPhone | June 29, 2007 | AT&T |
| iPhone 3G | July 11, 2008 | AT&T |
| iPhone 3GS | June 19, 2009 | AT&T |
| iPhone 4 | June 24, 2010 | AT&T |
| | February 3, 2011 | Verizon |
| iPhone 4S | October 14, 2011 | AT&T, Verizon, Sprint |

### b.    iPad

36.     Apple first announced the iPad on January 27, 2010, and began selling it on April 3, 2010.[22]  In the January product announcement, the iPad was described as "a revolutionary device for browsing the web, reading and sending email, enjoying photos, watching videos, listening to music, playing games, reading e-books and much more.  iPad's responsive high-resolution Multi-Touch display lets users physically interact with applications and content.  iPad is just 0.5 inches thick and weighs just 1.5 pounds – thinner and lighter than any laptop or netbook."[23]  Steve Jobs noted that the "iPad is [Apple's] most advanced technology in a magical and revolutionary device at an unbelievable price….  iPad creates and defines an entirely new category of devices that will connect users with their apps and content in a much more intimate, intuitive and fun way than ever before."[24]

37.     From April 2010 until March 2012, Apple released three versions of the iPad.  The U.S. products and release dates are summarized below:[25]

| Product | Release Date |
|---------|--------------|
| iPad | April 3, 2010 |
| iPad 2 | March 11, 2011 |
| iPad (3rd generation) | March 16, 2012 |

---

[22] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html; http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html.

[23] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html.

[24] http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html.

[25] http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html; http://www.apple.com/pr/library/2011/03/10iPad-2-Arrives-Tomorrow.html; http://www.apple.com/pr/library/2012/03/07Apple-Launches-New-iPad.html.

### c.   Apple Sales of iPhone and iPad

38.    Apple's worldwide sales in fiscal year 2011 totaled approximately $108.2 billion, a 66% increase over the approximately $65.2 billion in sales during fiscal year 2010.[26]  In fiscal year 2012, sales increased yet again to $156.5 billion,[27] with $120.5 billion of those sales coming in the three quarters ending June 30, 2012.[28]  During fiscal year 2011, iPhone and iPad sales (including related products and services) accounted for $47.1 billion and $20.4 billion, respectively, of Apple's $108.2 billion in total sales.[29]  From product launch through December 31, 2011, Apple sold 183 million iPhones and 55 million iPads worldwide.  Of these, approximately 67 million iPhones and 24 million iPads were sold in the United States.[30]  In the first three quarters of fiscal 2012, Apple sold more than 50 million iPhones and iPads in the United States.[31]

### 2.   Samsung

### a.   SEC

39.    SEC is among the largest electronics companies in Asia and is the largest company in South Korea.[32]  "SEC designs, manufactures and provides to the U.S. and world markets a wide range of products, including consumer electronics, computer components, and

---

[26] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 30.

[27] Apple Inc. Form 10-K for the fiscal year ended Sept. 29, 2012, p. 30.

[28] Apple Inc. Form 10-Q for the quarterly period ended June 30, 2012, p. 26.

[29] Apple Inc. Form 10-K for the fiscal year ended Sept. 24, 2011, p. 30.

[30] GAAP Line of Business Report, iPhone (APL794-F0000008237–APL794-F0000008240); Apple Billings Report U.S., iPhone, FY2007 – FY2012 (APLNDC-Y0000051357–APLNDC-Y0000051362); GAAP Line of Business Report, iPad (APL794-0000008233–APL794-F0000008236); Apple Billings Report U.S., iPod Touch and iPad, Q3 FY2007 – Q1 FY2012 (APLNDC-Y0000051599–APLNDC-Y0000051605).

[31] JX 1500: STA and SEA U.S. Sales of Accused Smartphones and Tablets; **Exhibits 32-S2** and **33-S2**.

[32] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Amended Complaint, dated June 30, 2011, p. 2.

1   mobile and entertainment products."[33]  SEC reported revenues of $134.1 billion in 2010 and

2   $143.1 billion in 2011.[34]

3   **b.    SEA**

4        40.    SEA, a subsidiary of SEC, is a New York corporation and was formed in 1978.[35]

5   SEA offers consumer electronics and IT products, including "televisions, Blu-ray disc players,

6   digital cameras and camcorders, certain memory storage devices, portable audio devices, printers

7   and monitors."[36]  SEA sells Samsung tablets that do not connect to a cellular carrier's network.[37]

8   ███████████████████████████████████████████████████████

9   **c.    STA**

10        41.    STA, a subsidiary of SEC and affiliate of SEA, was formed in 1996.[39]  STA

11   "researches, develops, markets, sells and offers for sale a variety of personal and business

12   communications products throughout North America, including handheld wireless phones,

13   wireless communications infrastructure systems, fiber optics and enterprise communications

14   systems."[40]  "STA is authorized to sell devices in the US market on behalf of SEC."[41]  These

15   devices include tablets that can connect to a carrier's network, as well as mobile phones.[42]

16   _____

17        [33] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
Amended Complaint, dated June 30, 2011, p. 2.

18        [34] 2011 Samsung Electronics Annual Report, p. 34.

19        [35] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
Amended Complaint, dated June 30, 2011, p. 2.

20        [36] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
Amended Complaint, dated June 30, 2011, p. 2.

21        [37] Deposition of Timothy Sheppard, dated Jan. 24, 2012, pp. 27-28; Deposition of Tim
22   Sheppard, dated Dec. 21, 2011, p. 77.

23        [38] Samsung Electronics America, Inc. Financial Statements Dec. 31, 2011 and 2010, p. 3
(SAMNDCA00322398–SAMNDCA00322445 at SAMNDCA00322402).

24        [39] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
Amended Complaint, dated June 30, 2011, p. 2.

25        [40] Samsung Entities' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s
Amended Complaint, dated June 30, 2011, p. 2.

26        [41] Deposition of Tim Sheppard, dated Dec. 21, 2011, p. 74.

27        [42] Deposition of Tim Sheppard, dated Dec. 21, 2011, p. 77; Deposition of Timothy
28   Sheppard, dated Jan. 24, 2012, p. 27.

1   Timothy Sheppard, STA's controller, describes it as primarily a sales organization in that SEC

2   

3   

4   #### d.   Samsung's Infringing Products

5   42.   As discussed above, Samsung has been found to infringe the New Trial Patents.

6   The 13 Samsung products for which damages have been calculated in this report are identified in

7   **Exhibits 4-PT and 10-PT**.

8   ### 3.   The Wireless Device Industry

9   43.   The wireless device industry is described by the United States Department of

10  Justice as including the smartphone and tablet markets and "rely[ing] on complex operating

11  systems that allow seamless interaction with wireless communications technologies while

12  providing audio, video and computer functionalities."[46]  Apple and Samsung each offer products

13  in the smartphone and tablet markets.  January 2011 Apple presentations note that the iPhone

14  competes in the smartphone market, while Apple's iPad competes in the tablet market.[47]  In a

15  series of Samsung documents summarized in **Exhibit 53-PT**, including presentations in 2011 and

16  2012 presentations, Samsung notes that it is competing in both the smartphone and tablet markets

17  and is competing directly with Apple in those markets.[48]

18  _____

[43] Deposition of Timothy Sheppard, dated Jan. 24, 2012, pp. 24 and 28.

19  [44] Samsung Telecommunications America, L.L.C. Financial Statements, Dec. 31, 2010
20  and 2009 and Jan. 1, 2009, p. 5 (SAMNDCA00322209–SAMNDCA00322238 at
    SAMNDCA00322214).

21  [45] Samsung Telecommunications America, L.L.C. Financial Statements, Dec. 31, 2011
    and 2010, p. 5 (SAMNDCA00396980–SAMNDCA00397009 at SAMNDCA00396985).

22  [46] http://www.justice.gov/opa/pr/2012/February/12-at-210.html.

23  [47] Smartphone Market Study US, dated Jan. 2011, Apple Market Research & Analysis
    (APLNDCY0000028850–APLNDCY0000028861 at APLNDCY0000028854); Media tablet
24  forecast comparison, dated Jan. 2011, John Brown, Market research and analysis
    (APLNDC0001525699–APLNDC0001525699 at APLNDC000152700, APLNDC0001525703,
25  and APLNDC0001525710).

26  [48] **Exhibit 53-PT**; 2012 Business Strategy, dated Oct. 2011, Mobile Communications
    Division (SAMNDCA00401905–SAMNDCA00401989 at SAMNDCA00401910); PX62: iPhone
27  5 Counter Strategy, dated Mar. 25, 2011 (S-ITC-003351732–S-ITC-003351759); PX60: STA
    Competitive Situation Paradigm Shift, dated Feb. 16, 2012 (SAMNDCA11547401–
    SAMNDCA11547470 at SAMNDCA11547408); STA Report to GS Choi, dated Jan. 2011

28                                                (Footnote continues on next page.)

1    44.    The New Trial Patents are incorporated into both smartphones and tablets sold by

2  Samsung.  **Exhibit 4-PT** summarizes the infringing Samsung products at issue and identifies

3  which of the New Trial Patents the jury found each product infringed.  Additional information

4  concerning the smartphone and tablet markets is discussed below.

5                              **a.    Smartphones**

6    45.    Smartphones have been defined by International Data Corporation ("IDC")[49] as a

7  "subset of mobile phones, [which] feature a high-level operating system that enables the device to

8  run third-party applications in addition to voice telephony.  Examples of high-level operating

9  systems include Android, Blackberry, Linux, Mac OS X, Palm, Symbian, and Windows Mobile."

10    46.    ███████████████████████████████████████

11  █████████████████.[50]  During this period, smartphones' share of the expanding mobile

12  phone market was growing.  ████████████████████████████

13  ████.[51] ██████████████████████████████████

14  ██████████████████████████████[52] █████████████

15  ███████████████████████████████████████████

16  ████.[53]  An Oppenheimer Equity Research Industry Update projected that smartphones would

17  take over the mobile phone market even quicker and represent 82% of the North American

18  mobile phone market by 2014.[54]  **Exhibit 53-PT** also reflects numerous examples of Samsung's

19  recognition of this trend.

---

(Footnote continued from previous page.)

(SAMNDCA00258612–SAMNDCA00258673 at SAMNDCA00258654 and
SAMNDCA00258648).

[49] IDC describes itself as "the premier global provider of market intelligence, advisory
services, and events for the information technology, telecommunications and consumer
technology markets."  See http://www.idc.com/about/about.jsp.

[50] **Exhibit 12.1**.

[51] **Exhibit 12.1**.

[52] **Exhibit 12.1**.

[53] **Exhibit 12.1**.

[54] Oppenheimer Equity Research Update, 2Q11 Wireless and Tablet Snapshot, dated Aug.
2, 2011, pp. 15 and 17.

47.     Apple released its first smartphone, the iPhone, on June 29, 2007.[55]  A June 2011 FBN Securities analyst report noted that the launch of the iPhone provided Apple "a first-mover advantage with 'game-changing' smartphones (app store, touchscreen, eventually 3G), and it has used this position along with continued innovations to further distance itself from the competition."[56]  Samsung launched its first infringing smartphones in 2010.[57]

48.     Apple's share of the U.S. smartphone market has generally increased from 19.3% in the second quarter of 2010 to 45.3% in the fourth quarter of 2011, then decreased to 38.1% in the first quarter of 2012.[58]  Samsung's market share during this period also increased—from 5% in the second quarter of 2010 to 19.2% in the fourth quarter of 2011, then increased further to 21.7% in the first quarter of 2012.[59]  During this period, Samsung saw its largest increase in market share occur between the second (5%) and third (14.2%) quarters of 2010.[60]  It is during this period of time, summer 2010, that Samsung's infringing Galaxy S line of phones was launched.[61]  Prior to this time, Samsung's market share in the smartphone market had been declining significantly since the launch of the iPhone.[62]  Samsung's overall increase in market share from Q2 2010 to Q4 2011 coincided with its launch and sales of infringing smartphones. More specifically, an Oppenheimer Equity Research Industry Update from June 2011 noted that Samsung's sales "growth is coming entirely from smartphones with the Galaxy line (Samsung's

---

[55] http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html.

[56] FBN Securities Initiation of Coverage on Large-Cap IT Hardware Companies – AAPL, IBM, DELL, and HPQ, dated June 21, 2011, p. 3.

[57] **Exhibit 37.1-PT**.  See also Dkt. 1931: Amended Verdict Form, dated Aug. 24, 2012, p. 2; Samsung's Objections and Responses to Apple's Sixth Set of Interrogatories (No. 14), dated Jan. 6, 2012, pp. 6-8; Samsung's Amended Objections and Responses to Apple's Sixth Set of Interrogatories (No. 14), dated Mar. 7, 2012, pp. 6-8.

[58] **Exhibit 11; Exhibit 29-PT**.

[59] **Exhibit 11; Exhibit 29-PT**.

[60] **Exhibit 11**.

[61] **Exhibit 11.2-PT**.  See also http://www.cnet.com/8301-19736_1-20008968-251.html.

[62] **Exhibit 11.2**.

Android OS phones) as the main driver."[63]  Further, at least one product reviewer noted that the Vibrant, a Samsung phone launched during this time, closely resembled the iPhone.[64]  As of Q4 2011, Apple and Samsung were the largest participants in the smartphone market, holding a combined 64.5% of the market.[65]

### b.    Tablets

49.    As of May 2010, tablets were defined by IDC as "form factor devices with 7-12 in. color displays.  [Tablets] are currently based on ARM processors and run lightweight operating systems such as Apple's iPhone OS and Google's Android OS."[66]  By Q3 2011, IDC "updated its taxonomy to move LCD-based devices such as Barnes & Noble's Nook Color [and Amazon's Kindle Fire] into the media tablet category…."[67]  Although IDC believes these products impact the tablet market, Mr. Musika concluded that the Nook Color and Kindle Fire compete in a different segment of the tablet market than Apple and Samsung based on their limited functionality and the use of a less versatile version of Android software.  Therefore, when analyzing IDC's tablet market data, Mr. Musika did not include these products.  I note that the inclusion or the exclusion of the Kindle Fire in the tablet market share analysis would not affect the calculation of lost profits presented in this report.  I understand the Kindle Fire was first introduced in late 2011.  Since I have only calculated lost profits for the Galaxy Tab 7.0 through June 2011, the introduction of the Kindle Fire does not affect my analysis.  While the Nook Color was introduced in late 2010, I understand that it did not compete in the same market segment with the iPad and Galaxy Tab 7.0, and I agree with Mr. Musika's exclusion of the Nook Color from the tablet market share analysis.

---

[63] Oppenheimer Equity Research Industry Update, Mixed 2Q11 Wireless Checks, dated June 7, 2011, p. 5.

[64] Apple Inc. Amended Complaint, dated June 16, 2011, at Exhibit 32.

[65] **Exhibit 11.1**.

[66] http://www.businesswire.com/news/home/20100520005121/en/IDC-Forecasts-7.6-million-media-tablets-shipped.

[67] http://www.idc.com/getdoc.jsp?containerId=prUS23228211.

50. ███████████████████████████████████████

███████████████████████████.[68]  During this period, numerous competitors entered the tablet market, and both Apple and Samsung saw their share of the market decrease.  Though Apple has consistently held the largest share of the tablet market, its share has decreased from 96.8% in the second quarter of 2010 to a low of 60% in the third quarter of 2011 before rebounding to 73.7% in the fourth quarter of that year.[69]  Samsung's market share was 11.6% in the fourth quarter of 2010 and fell to 2% by the fourth quarter of 2011.[70]

### c.   The Ecosystem

51.     A February 2012 *New York Times* article quoted Michael Gartenberg, an analyst with Gartner, as saying "[i]t's not about brands or devices or platforms anymore.  It's about the ecosystem.  The idea is to get consumers tied into that ecosystem as tightly as possible so they and their content are locked into one system."[71]  The article further described the development of the ecosystem concept.

> Before the advent of coordinated systems, executives at consumer technology companies babbled endlessly about connected homes and convergence.  They tried to make that happen, but no one had the pieces of hardware and content that would fit together seamlessly.  The pioneer – and perhaps the inspiration – was Steven P. Jobs, the late Apple chief executive who made creating devices look easy with the iPad and iPhone.  Dream them up, then make the software complement the hardware, outsource the production, sell at a premium and watch your company become the most valuable on earth.[72]

---

[68] **Exhibit 13.1**.

[69] **Exhibit 13.1**.

[70] **Exhibit 13.1**.

[71] http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html?_r=0.

[72] http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html?_r=0.

1      52.      The ecosystem concept has been broadly described as "the general adoption of a

2    trend pioneered by Apple and . . . Research in Motion – the packaging of hardware, software and,

3    to a lesser extent, marketing."[73]

4      53.      While the press has discussed Apple's role in the development of a technological

5    ecosystem, Samsung too recognizes the importance of the concept.  A May 2010 STA Product

6    and Strategy presentation concerning the 2011 Smartphone Portfolio Strategy identified the

7    following benefits to Samsung of building an ecosystem:

8            1.      Allows Samsung to set the agenda for market innovation
                     against the competition.
9

10           2.      Consumers identify widely deployed features as "must
                     have", not the other way around.

11           3.      Defining an eco-system creates positive sales momentum in
                     moving along the adoption curve.[74]
12

13     54.      The practical implication of the ecosystem concept is that once a consumer

14   chooses a particular brand, the consumer is likely to continue purchasing that brand's products.

15   Samsung recognized this.  An August 2011 presentation discussing the STA 2012 strategy noted

16   that "capturing 1st time smartphone buyers is critical to success in the US market in the next few

17   years."[75]  The same presentation noted that Apple was successful with this strategy: "[o]nce a

18   consumer buys a[n] Apple product they are likely to use [Apple's] services, and subsequently

19   become locked into Apple's offering."[76]  Similarly, Don-Joo Lee, the head of sales and marketing

20   at Samsung Electronics, agreed that a Samsung strategy is "to win customers who will be loyal to

21   Samsung and will not only buy a first product but will buy future Samsung products."[77]  The

22   _____

23   [73]http://www.rttnews.com/story.aspx?ID=1714714&Category=ScienceTechnology&SimR
     ec=1&Node=&pageNum=1.

24   [74] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010
     (SAMNDCA00530591-SAMNDCA00530672 at SAMNDCA00530609).

25   [75] STA 2012 Winning Strategy, dated Aug. 2011 (SAMNDCA00261215–
     SAMNDCA00261291 at SAMNDCA00261238).

26   [76] STA 2012 Winning Strategy, dated Aug. 2011 (SAMNDCA00261215–
     SAMNDCA00261291 at SAMNDCA00261277).

27   [77] Deposition of Don-Joo Lee, dated Feb. 17, 2012, p. 69.

28

1    difference between Apple's and Samsung's ecosystems was discussed by Brian Rosenberg,

2    STA's Senior Vice President of Sales for Mobile, who testified that "the way [he] would

3    characterize it . . . is that once Apple gets someone into the ecosystem, the bucket doesn't have

4    any holes.  They – they tend to keep them in the bucket.  With Samsung, the concern is there's a

5    hole in the bucket, and so you add people in, but you're still losing people out of the Samsung

6    world."[78]

7        55.    Samsung's use of Apple as a standard of comparison is likely due to the

8    competitive nature of the companies.  In fact, a Mercator Partners presentation in September 2008

9    was focused on "STA's Counter-Apple Strategy."[79]  The presentation noted that "Apple is a

10   serious threat to Samsung's leadership in the US" and that "[t]he iPhone, by all accounts, has

11   been the most disruptive and successful new entrant in the history of the mobile device market."[80]

12       56.    As discussed further below, Apple and Samsung are directly competing for the

13   same sales of smartphones and tablets.  Each company recognizes that a sale of one of these

14   products has the ability to pull that consumer into the company's ecosystem, resulting in sales of

15   additional products and services.

16   **V.    ASSUMPTIONS**

17       57.    I have reviewed the assumptions made by Mr. Musika in his report at paragraphs

18   73-78.  As is typical for this type of report, Mr. Musika assumed that all the Apple intellectual

19   property asserted in the lawsuit was enforceable, infringed, and not invalid.

20       58.    Mr. Musika also assumed that each of the 32 Samsung products accused in

21   Apple's Amended Complaint violated at least one of Apple's 22 claims in that complaint.  He

22   further assumed that Samsung's accused products practiced at least one asserted claim from each

23

24

25       [78] Deposition of Brian Rosenberg, dated Jan. 27, 2012, pp. 101-102.

26       [79] Mercator Partners Presentation, Support to STA's Counter-Apple Strategy, dated Sept. 18, 2008 (SAMNDCA10036081–SAMNDCA10036204).

27       [80] Mercator Partners Presentation, Support to STA's Counter-Apple Strategy, dated Sept. 18, 2008 (SAMNDCA10036081–SAMNDCA10036204 at SAMNDCA10036087).

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

21

1   utility patent and each design patent, and that the accused products infringed or diluted at least
2   one of the asserted Apple trade dresses and infringed at least one of Apple's trademarks.

3        59.    Generally, those assumptions will not be necessary because of the jury's verdict.
4   The intervening trial, jury verdict, and the Court's post-trial rulings confirm the validity of the
5   Apple New Trial Patents in the new trial and lay out which Accused Products infringe which
6   patent claims and dilute Apple's trade dresses.  Except where discussed below in the context of
7   the hypothetical negotiations resulting in a reasonable royalty, I have not had a need to resort to
8   assumptions regarding infringement or validity, and my opinions arise from the jury's
9   infringement and validity determinations.

10  **VI.    SUMMARY OF CONCLUSIONS AND OPINIONS**

11       **A.    Summary of Damages Calculations and Results**

12       60.    As explained above, I have evaluated Apple's damages for the 13 products and 5
13  patents for which the Court ordered a new trial on damages.  The New Trial Patents include
14  utility patents and design patents.  The legal remedies available to Apple as compensation for
15  Samsung's infringement of the New Trial Patents are set forth in **Exhibit 14**.  **Exhibit 15-PT**
16  identifies the specific types of remedy used to calculate Apple's damages.  As shown in **Exhibit**
17  **15-PT**, Samsung's infringement of the utility patents at issue in the new trial gives rise to
18  damages on sales of both smartphone and tablet products, whereas Samsung's infringement of the
19  design patents at issue in the new trial gives rise to damages only on sales of smartphones.  This
20  is because the D'305 and D'677 Patents are specific to smartphones.

21       61.    For infringement of a utility patent, the patent holder may seek damages under two
22  theories:  lost profits and/or a reasonable royalty.  The guiding rule in each case is that the amount
23  of damages must be adequate to compensate for the infringement.[81]  I have considered each
24  theory in connection with Samsung's infringement of Apple's utility patents at issue in the new
25  trial, and concluded that an award of damages adequate to compensate Apple for that
26  infringement should be based on both a lost profits and a reasonable royalty damages award.

27
28       [81] See **Exhibit 14**.  See also 35 U.S.C. § 284.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

62.     For infringement of a design patent, the patent holder may seek damages under three theories:  lost profits, infringer's profits, and/or a reasonable royalty.[82]  I understand that in calculating damages under an infringer's profits theory, it is acceptable to calculate damages based on the infringer's "total profits."[83]  I have considered each of these three theories in connection with Samsung's infringement of Apple's design patents at issue in the new trial, and concluded that an award of damages for that infringement should be based on Apple's lost profits and Samsung's profits.  To address a dispute regarding the size of Samsung's profits for these products after Apple gave notice of Samsung's infringement, I have also identified a per unit reasonable royalty for Apple's design patents.

63.     While Apple is entitled to compensation in accordance with the multiple different theories of recovery available to Apple under the law, Apple is not entitled to recover under more than one theory with respect to the same infringing unit sale.[84]  In other words, if a particular infringing unit sale is awarded one form of monetary recovery (e.g., Apple's lost profits), that same infringing unit sale cannot be awarded another form of monetary recovery (e.g., Samsung's profits or a reasonable royalty).

64.     I have carefully reviewed the damages model prepared by Mr. Musika in connection with the first trial in this matter.  In accordance with the legal principles discussed in paragraph 83 of the Original Expert Report, Mr. Musika's model eliminated the possibility that any particular unit sale could be assigned to more than one theory of recovery.  Mr. Musika accomplished this by approaching the calculation of damages for each infringing unit sale in a sequential manner.  First, Mr. Musika considered whether an infringing sale qualified for lost profits damages.  If so, that unit was counted as a lost sale, and no other form of remedy was awarded to that unit.  If that unit did not qualify for a lost profits award, Mr. Musika next considered whether that unit qualified for an award of infringer's profits.  If so, that form of

---

[82] See **Exhibit 14**.  See also 35 U.S.C. §§ 289 and 284.

[83] See **Exhibit 14**.  See also 35 U.S.C. § 289.

[84] Dkt. 1903 at 96: Final Jury Instruction No. 74, Monetary Remedies—Only One Recovery Per Accused Sale.

remedy and no other was applied.  If, on the other hand, that unit did not qualify for an award of either lost profits or infringer's profits, it was assigned a reasonable royalty.  **Exhibit 16-PT** illustrates the sequential approach that Mr. Musika adopted to avoid impermissibly assigning the same infringing unit sale to more than one form of damages recovery.  I have adopted and applied this same methodology.

65.     Using the same methodology and damages model that Mr. Musika used, as adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs 89–96, I have calculated an award of damages adequate to compensate Apple for Samsung's infringement with respect to the 13 products at issue and the 5 New Trial Patents.  The results of that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 17-PT-H** and **17.1-PT-H.**  A summary of these damages follows:

|  | Revenue Basis | Gross Profit Basis |
|---|---|---|
| Apple's Lost Profits | $   419,029,253 | $   419,029,253 |
| Samsung's Profits | $   624,318,925 | $   168,675,798 |
| Reasonable Royalty | $     33,172,781 | $     33,172,781 |
| Total Damages | $ 1,076,520,959 | $   620,877,833 |

66.     Mr. Musika also calculated a separate measure of damages after having removed Apple's lost profits from the damages calculation.  I have prepared the same damages calculation based on Mr. Musika's methodology and damages model, as adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs 89–96.  The results of that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 18-PT-H** and **18.1-PT-H**.  A summary of these damages follows:

|  | Revenue Basis | Gross Profit Basis |
|---|---|---|
| Samsung's Profits | $   911,036,260 | $   251,778,375 |

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

| Reasonable Royalty | $    35,660,213 | $    35,660,213 |
|---|---|---|
| Total Damages | $   946,696,473 | $   287,438,588 |

67.     Mr. Musika also calculated a second separate measure of damages after having removed Samsung's profits from the damages calculation.  I have prepared the same calculation based on Mr. Musika's methodology and damages model, as adjusted to address the jury's verdict and the Court's post-trial orders as discussed in paragraphs 89–96.  The results of that damages calculation on a product-by-product basis are set forth in detail in **Exhibits 19-PT-H** and **19.1-PT-H**.  A summary of these damages follows:

| Apple's Lost Profits | $    419,029,253 |
|---|---|
| Reasonable Royalty | $     87,780,642 |
| Total Damages | $    506,809,895 |

68.     **Exhibit 20-PT** provides a description of how damages were calculated for each form of remedy discussed above—*i.e.*, Apple's lost profits, Samsung's profits, and a reasonable royalty.

### B.     Summary of Alternative Damages Calculations and Results

69.     I have also prepared alternative calculations of damages using the same methodologies and inputs used by Mr. Musika to address certain disputes that I have been informed may arise between the parties relating to dates relevant to the damages calculations.  Specifically, I have prepared alternative calculations that vary the date on which Samsung would begin to design around Apple's patents.

70.     [Reserved]

71.     Samsung's damages expert, Michael Wagner, has suggested that Samsung's efforts to design around a particular patent would begin on the date of first infringement whether or not Samsung had actual notice of the patent at that time.  I have prepared alternative lost profits

1   calculations that reflect this hypothetical assumption.  This assumption is contrary to how Mr.

2   Musika reconstructed the "but for" marketplace and does not reflect the analysis he used in his

3   Original Expert Report and Supplemental Expert Report.  Given that this approach requires

4   Samsung to begin designing around the New Trial Patents before Samsung actually became

5   aware of Apple's patents, I believe this approach to be illogical.  I have nonetheless prepared

6   these calculations so that they will be available in the event the Court adopts Mr. Wagner's

7   suggestion.  With the exception of this change, these alternative calculations otherwise use the

8   same methodology and inputs used by Mr. Musika and by me as described further below.

9       72.    Finally, I have prepared alternative calculations using Samsung's incremental

10  profitability to measure Samsung's total profits under 35 U.S.C. § 289.  These calculations use

11  the same methodology that Mr. Musika disclosed and used to determine Samsung's incremental

12  profits in his Supplemental Expert Report at paragraphs 38 to 40 and **Exhibit 50-S** (admitted at

13  trial as PX28), and are limited to the seven products in the new trial that infringe a design patent,

14  with damages calculated from and after the notice dates provided in the March 1 Order.

15      73.    A complete set of each of these alternative calculations with supporting schedules

16  can be found in the Appendix to this report in the exhibits labeled **Exhibits 17-PT-I** to **19-PT-I**

17  through **17-PT-K** to **19-PT-K**.

18  **VII.    IRREPARABLE HARM**

19      **A.    Background**

20      74.    I understand that, after the first trial in this matter, Apple moved to enjoin

21  Samsung from engaging in the following activities:

> Infringing the '381, '915, '163, D'305, D'087, and D'677 patents
> by making, using, offering to sell, selling within the United States,
> or importing into the United States, any of the following products:
> Captivate, Continuum, Droid Charge, Epic 4G, Exhibit 4G,
> Fascinate, Galaxy Ace, Galaxy Prevail, Galaxy S, Galaxy S 4G,
> Galaxy S II (AT&T), Galaxy S II (i9000), Galaxy Tab, Galaxy Tab
> 10.1 (Wi-Fi), Gem, Indulge, Infuse 4G, Mesmerize, Nexus S 4G,
> Replenish, Vibrant, Galaxy S II (T-Mobile), Transform, Galaxy S
> Showcase, Galaxy S II (Epic 4G Touch), Galaxy S II (Skyrocket),
> or any other product not more colorably different from any of these
> products as to a feature or design found to infringe; and

Diluting Apple's registered iPhone trade dress (U.S. Trademark Registration No. 3,470,983) and Apple's unregistered iPhone 3G trade dress by selling or offering to sell in the United States any of the following products:  Galaxy S 4G, Galaxy S Showcase, Fascinate, Mesmerize, Vibrant, Galaxy S (i9000).[85]

75.      I further understand that the Court denied Apple's motion for a permanent injunction, and that Apple subsequently appealed that decision and is currently waiting for the Federal Circuit to issue a decision on that appeal.

76.      I have been asked by counsel to provide an opinion as to whether Apple will suffer irreparable harm if Apple does not obtain permanent injunctive relief similar to the relief Apple requested from the Court on September 21, 2012.  I understand that I would only be asked to offer my opinion on this issue to the extent that additional evidence is needed following a remand from the Federal Circuit.  Mr. Musika addressed the irreparable harm Apple would suffer from Samsung's infringement at paragraphs 93 to 116 of the Original Expert Report.  I have reviewed Mr. Musika's analysis and agree with his opinions that the monetary damages, calculated in the methods discussed below, will not fully compensate Apple for the harm that Apple has suffered and will suffer from Samsung's infringement.  I incorporate the foregoing paragraphs by reference and discuss these opinions further below.

**B.     Apple's Loss of Goodwill**

77.      Business goodwill is considered an intangible asset within Generally Accepted Accounting Principles.  I understand that harm to business goodwill has traditionally been viewed by courts as irreparable because of the difficulty in quantifying a company's goodwill and the precise monetary value of any diminution of that goodwill.  The irreparable harm due to loss of goodwill may be illustrated at least in part by reference to the value assigned to a company's intangible versus tangible assets:  "In 2003, the market value (stock prices times number of shares outstanding) of U.S. publicly traded companies was five times larger than their balance sheet value, which reflects primarily the net worth of physical and financial (stocks, bonds) assets.

---

[85] Dkt. 2133 at 1-2: [Proposed] Order Granting Apple's Motion for a Permanent Injunction and Damages Enhancement, dated Nov. 10, 2012.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1    Thus, about three-quarters of the value of public companies, as perceived by investors, reflects

2    non-physical and nonfinancial assets.  Much of this huge value constitutes intangible assets,

3    which are absent from corporate balance sheets."[86]  The difference in value between Apple's

4    reported net worth and its market capitalization illustrates this very point:  As of December 31,

5    2011, Apple had an estimated net worth of $90.05 billion versus an estimated market

6    capitalization of $377.5 billion.[87]

7        78.    As these facts illustrate, the equity market may assign a real economic value to a

8    company's goodwill and other intangible assets, as reflected in that company's substantially

9    higher market capitalization value versus its balance sheet value.  In an efficient market, the

10   market capitalization of a publicly traded company will generally reflect the market's prediction

11   of the company's future cash flows and profitability.  Thus, a decrease in a company's expected

12   future earnings will have a negative effect on the company's overall market value, and hence the

13   value of its goodwill and other intangible assets.  Therefore, any diminution of Apple's expected

14   future earnings due to actual or perceived infringement by Samsung of the '381, '915, '163,

15   D'305, D'087, and D'677 patents, Apple's registered iPhone trade dress (U.S. Trademark

16   Registration No. 3,470,983), and Apple's unregistered iPhone 3G trade dress by the products for

17   which Apple is seeking an injunction will reduce the value of Apple's market capitalization, and

18   hence the value of Apple's goodwill and other intangible assets.  Since the present damages

19   model only captures a portion of the lost earnings that Apple has suffered as a consequence of

20   Samsung's infringement, even if the jury were to award Apple all its claimed lost profits, such an

21   award would still not fully compensate Apple for the diminution of its overall market value, and

22   hence the value of its goodwill and other intangible assets.

23

24   _____

25   [86] Intangible Assets:  Concepts and Measurements, Baruch Lev, New York University, New York, USA, Encyclopedia of Social Measurement, Volume 2, 2005.

26   [87] For Apple's market capitalization, see http://www.wolframalpha.com/input/?i=appl+
27   market+cap+as+of+12%2F31%2F11.  Apple's net worth as of Dec. 31, 2011 equals total assets of $138.7 billion less total liabilities of $48.6 billion (see Apple Inc. Form 10-Q for the quarter ended Dec. 31, 2011, p. 3).

28

**C.      Erosion and Dilution of Apple's Brand**

79.      The value attributed to a company's brand also constitutes a measurable portion of the overall value of the company's goodwill and other intangible assets.  In recent years, the Apple brand has been recognized as one of the most valuable brands in the world.  For example, a company named Interbrand Corp., which specializes in brand value analysis, ranked Apple's brand as number 8 on its list of the Top 100 brands in 2011.[88]

80.      Samsung's continued infringement of Apple's patents, absent an injunction, would cause irreparable harm to Apple's brand.  Apple's brand value derives in part from the Apple ecosystem, which is a source of substantial revenue generation as customers who buy Apple products will tend also to purchase additional interrelated Apple products. ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████.[89]  Consumers who purchase Apple products also tend to purchase interrelated content and services from Apple through its online stores, including music, applications, and services such as iCloud.  Apple customers also generate additional revenue for Apple through other elements of Apple's business, such as advertising sales.  Any lost sale due to Samsung's infringement will therefore lead to downstream revenue losses beyond the lost sale itself.  Almost none of the Apple downstream revenue losses associated with its ecosystem is captured in the damages model prepared by Mr. Musika and used by me below, which measures primarily the loss of profits on the lost smartphone or tablet product itself.  These additional downstream revenue losses would be very difficult to quantify to a reasonable certainty given the complexity involved in attributing specific amounts of these revenue losses to the initial lost sale.

---

[88] Interbrand 2011 Ranking of the Top 100 Brands, http://www.interbrand.com/en/best-global-brands/previous-years/best-global-brands-2011.aspx.  *See also* Declaration of Michael J. Wagner In Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, dated Aug. 21, 2011, p. 5 ("It's no secret that Apple's extensive marketing efforts have created one of the most valuable brands worldwide.").

[89] Apple Market Research & Analysis "iPad Tracking Study: FY11-Q3 Report," dated Aug. 2011 (APLNDC-Y0000024130–APLNDC-Y00000241333 at APLNDC-Y0000024143).

81.     Apple's brand value also derives in part from Apple customers' high sense of loyalty to Apple, which is an additional source of revenue generation for Apple.  A study by Strategy Analytics found that "Apple iPhone owners are not only most satisfied with their phones, they are most likely to buy their next phone from Apple, as well."[90]  Apple's iPhone customers are also more likely to purchase additional products from Apple, such as iPads and Macs.[91]  For the same reason that losses of ecosystem revenue are difficult to quantify to a reasonable certainty, so too are the revenue losses associated with the diversion of loyal customers from Apple to Samsung due to Samsung's ongoing infringement.

82.     A portion of Apple's brand value also derives from Apple's position as a market leader and its reputation for innovation and design.  Many consumers purchase Apple's products in the first instance, and anticipate and purchase new Apple products when they are launched because of Apple's position as a market leader and its reputation for innovation and design.  The sale of competing products that copy Apple's product designs and features diminishes Apple's ability to position itself as a market leader and its reputation for innovation and design, and threatens to turn Apple's unique products into something commonplace.  This type of harm cannot be compensated by damages.  Another advantage of Apple's market leadership position and reputation for innovation and design is to confer on Apple increased leverage during its negotiations with wireless carriers, since those carriers benefit from the increased consumption of their network services driven by the use of Apple products on their networks.  Samsung's ongoing infringement will continue to impair Apple's market leadership position and reputation for innovation, which in turn will have economic consequences for Apple that are difficult if not

---

[90] Strategy Analytics, "Apple iPhone Owners Most Likely to Repeat Purchase," by Paul Brown, dated Mar. 9, 2010 (http://www.strategyanalytics.com/default.aspx?mod=pressreleaseviewer&a0=4870).

[91] CNN Money, "Piper Jaffray survey of iPad buyers:  74% owned Macs; 66% had iPhones," by Philip Elmer-DeWitt, dated Apr. 5, 2010 (http://tech.fortune.cnn.com/2010/04/05/piper-jaffray-survey-of-ipad-buyers-74-owned-macs-66-had-iphones/); "Apple iPad 2 sales: New customers buying; Analysts see big launch," by Larry Dignan, dated Mar. 13, 2011 (http://www.zdnet.com/blog/btl/apple-ipad-2-sales-new-customers-buying-analysts-see-big-launch/46030).

1  impossible to quantify with reasonable certainty.  The present damages model does not and

2  cannot adequately compensate Apple for those types of harms either.

3  **D.    Apple's Loss of Market Share**

4  83.    Samsung's ongoing infringement will also continue to take market share away

5  from Apple at a critical time in the growth of the smartphone and tablet markets.  **Exhibits 12** and

6  **12.1** illustrate the rapid past and projected expansion of the smartphone market in the United

7  States from 2004 to 2015.  Based on market research and analysis by IDC, ████████

8  ████████████████████████████████████████████████████

9  ████████████████████████.  Oppenheimer Equity Research

10  similarly projected that smartphones would have a market share of 82% in North America in

11  2014.[92]  To put this in perspective, an estimated 135 million new smartphones are expected to

12  enter the market between 2012 and 2015, as compared to a total smartphone market of 105

13  million in 2011.

14  84.    Loss of market share during this critical window of opportunity in the smartphone

15  market will have long-term consequences beyond the lost revenue associated with the initial sale.

16  First-time smartphone purchasers who choose an infringing Samsung smartphone over an Apple

17  smartphone, for example, represent not just a lost sale to Apple, but the loss of a loyal customer

18  who would support Apple's entire ecosystem of products.  As Apple's former Senior Director and

19  Chief Patent Counsel testified at deposition:

20  >  Secondly, there's another form of harm, which is harm to the iOS
21  >  ecosystem generally, that the eco—the health of the ecosystem
     >  depends on market share, maybe growing market share; and if
22  >  Apple is losing market share of momentum or market share
     >  generally to Samsung, then it's losing not just the incremental sales
23  >  and the revenue associated with them, but also the impact on the
     >  ecosystem generally, which could be application developer mind
24  >  share and attention.  It could be other forms of services that are
     >  provided into the ecosystem, either by Apple or by third parties, and
25  >  those could have impacts not only on the vitality of Apple's iOS
     >  platform, but also even on revenue that Apple makes in areas like

26  

27  [92] *See also* Oppenheimer Equity Research Industry Update, "2Q11 Wireless and Tablet
    Snapshot," dated Aug. 2, 2011, pp. 15 and 17.

28

1

iTunes and the App store.[93]

2

3

These downstream losses and negative effects on the Apple ecosystem are very difficult to

calculate and constitute an irreparable harm to Apple.

4

5

85.     The tablet market is experiencing a similar period of intense competition for new

market participants.  As shown in **Exhibits 13** and **13.1**, after Apple revolutionized the tablet

6

market with the launch of the iPad in 2010, purchases of tablet devices rose from about ▉

7

▉ in the second quarter of 2010 to about ▉ units in the fourth quarter of

8

2011—a ▉ in sales.  **Exhibit 21** is a Global Tablet OS Market Share chart used by

9

Samsung's damages expert that shows that the share of tablets operating on Apple's iOS platform

10

fell between 2010 and 2011, while the share of tablets running on the Android operating platform

11

has risen.  Loss of tablet market share to Samsung in the future will lead to similar downstream

12

losses and negative effects on the Apple ecosystem as will losses in the smartphone market,

13

causing harm that is similarly difficult to quantify with reasonable certainty.

14

86.     Samsung has already demonstrated its ability to capture market share at Apple's

15

expense through the sale of smartphones that infringe Apple's patents and dilute Apple's trade

16

dress.  As shown in **Exhibits 11** and **11.1**, Samsung's smartphone market share in the second

17

quarter of 2010—before the launch of the first Samsung phone that Apple accused of violating its

18

intellectual property—was about 5%.  After Samsung launched its infringing Galaxy S line of

19

products, Samsung's market share jumped to 14.2% by the third quarter of 2010.  By the third

20

and fourth quarters of 2011, Samsung's smartphone market share had risen even further to 19.2%.

21

That represents a 284% increase in Samsung's market share following Samsung's launch of its

22

infringing smartphones.  As one analyst stated, in the worldwide mobile phone market,

23

Samsung's "growth is coming entirely from smartphones with the Galaxy line (Samsung's

24

Android OS phones) as the main driver."[94]

25

26

[93] Deposition of Chip J. Lutton, Jr., dated July 26, 2011, pp. 328-329.

27

[94] Oppenheimer Equity Research, "Mixed 2Q11 Wireless Checks," dated June 7, 2011, p.

28

5.

### E.   Difficulty of Calculating Damages

87.     As discussed above, Apple will suffer irreparable harm due to Samsung's ongoing infringement, in the form of harm to Apple's goodwill, erosion and dilution of Apple's brand, and potential loss of present and future sales and market share.  These harms cannot be adequately measured or compensated through monetary damages.  As illustrated in **Exhibit 14**, not all forms of damage recovery are available for patent infringement.  For example, patent law offers no remedy for the decrease in value of Apple's intangible assets, including harm to Apple's goodwill and brand value, even though the impairment in value may be substantial.  In spite of the recognized value of intangible assets, such assets are difficult to measure.  In the words of one analyst:  "For many accountants, the absence of markets disqualifies intangibles from being considered as assets in corporate balance sheets.  Intangibles thus differ inherently from physical and financial assets, and the management, valuation and financial reporting of intangible assets are challenging."[95]

88.     Further, for at least the reasons discussed above, the present damages calculation will not fully compensate Apple for its loss of market share at this critical juncture in the growth of the smartphone and tablet markets.  The present damages model also does not account for lost revenue that Apple could reasonably expect from ecosystem purchases, accessory sales, music and video sales, mobile advertising revenue, search engine revenue, and downstream sales of future Apple products.  **Exhibit 22** shows that Apple has reported iTunes revenue of $11 billion from fiscal year 2010 through first quarter 2012.⬛⬛⬛⬛⬛⬛⬛⬛⬛, and that Apple has earned $161 million in revenue and⬛⬛⬛⬛⬛⬛⬛⬛ on mobile advertising.  **Exhibit 23** shows that Apple earned over $75 million in each of the third and fourth quarters of 2011 from search engine royalties, and saw a dramatic increase in search engine royalties since the second quarter of 2010, when the iPad was released.  All these revenue sources are extremely difficult to measure in relation to a specific iPhone or iPad lost sale.

---

[95] Intangible Assets: Concepts and Measurements, Baruch Lev, New York University, New York, USA, *Encyclopedia of Social Measurement*, Volume 2, 2005.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1

## VIII.  MONETARY DAMAGES

2

### A.     Use of Mr. Musika's Methodology

3       89.     In preparing this report, I have been mindful of the Court's ruling in the April 29

4 Case Management Order that the new trial on damages will be limited to "correct[ing] the

5 erroneous notice dates," and that the parties must not "expand the scope of the damages trial by

6 relying upon: (1) new sales data, including any sales after June 30, 201[2]; (2) new products; and

7 (3) new methodologies or theories."[96] I have therefore prepared a calculation of the money

8 damages to which Apple is entitled for Samsung's infringement of the New Trial Patents for the

9 products-at-issue using the same damages model and methodologies described in the expert

10 reports and supplements prepared by Mr. Musika.  I have used the same models and software

11 tools, including certain Access databases and Excel spreadsheets prepared previously by Invotex

12 in connection with the preparation of Mr. Musika's reports, supplements, and trial testimony.  I

13 have worked with the same staff at Invotex that Mr. Musika used to support him in his analysis of

14 Apple's damages.  And, except as described below, I have used as inputs the same data that

15 Mr. Musika used as inputs to his model.

16       90.     As Mr. Musika noted in his Original Expert Report, he created a methodology and

17 a model that could be adjusted to address differences regarding which products were included,

18 which intellectual property was included, and the date on which Samsung had actual notice of

19 Apple's patent and began any effort to design around it.[97]  Thus, it was possible, working with

20 Invotex, to use Mr. Musika's methods and the tools he had prepared to update the calculation of

21 damages to address the circumstances presented in the new trial.

22       91.     In preparing the calculation of money damages presented in this report, the only

23 changes I have made to Mr. Musika's calculations are the changes described below, each of

24 which arose from the jury's August 24, 2012 amended verdict, the Court's March 1 Order, or the

25 April 29, 2013 Case Management Order.

26

27       [96] Dkt. 2316 at 3: Case Management Order, dated Apr. 29, 2013.

28       [97] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, pp. 25-26, ¶ 89.

92.     Mr. Musika's report was based on the assumption that all intellectual property asserted by Apple at trial would be found to be infringed and/or diluted by the products accused for each intellectual property asset.  On August 24, 2012, the jury found that most, but not all, of the intellectual property asserted by Apple was infringed or diluted and that all of Apple's patents were valid.[98]  At my direction, Invotex replaced Mr. Musika's assumptions with the actual jury findings, and thus modified the calculation of damages to reflect the findings of the jury regarding infringement and validity for the accused products as follows:

- Calculated damages for the 13 products that are the subject of the new trial only with respect to intellectual property found by the jury to be infringed by those products, eliminating damages for other asserted intellectual property (such as Apple's trade dress) that the jury found not to be violated.[99]  A table of the intellectual property that I used in the calculation is found in **Exhibit 4-PT**.  In comparison, **Exhibit 4-S2** reflects all the intellectual property and all the products against which Apple's intellectual property was asserted in the August 2012 trial.

- Adjusted the *Mor-Flo* calculations to account for the jury's verdict that the Intercept did not infringe Apple's utility patents.[100]

- Adjusted the calculation of Apple's lost profits with respect to Samsung's sale of the infringing Galaxy Tab 7.0 to account for the jury's finding that the Galaxy Tab 10.1 LTE 4G, which was introduced in July 2011, did not infringe Apple's intellectual property.[101]

---

[98] Dkt. 1931 at 2-15: Amended Verdict Form, dated Aug. 24, 2012.

[99] Dkt. 1931 at 2-15: Amended Verdict Form, dated Aug. 24, 2012.  Questions 15 and 16 of the Amended Verdict Form address Apple's trade dress claims.

[100] Dkt. 1931 at 2-4: Amended Verdict Form, dated Aug. 24, 2012.  Questions 1, 2, and 3 reflect the jury's findings that the Intercept did not infringe any Apple utility patent.

[101] Dkt. 1931 at 7 and 10: Amended Verdict Form, dated Aug. 24, 2012.  Questions 8, 9, 14, and 18 reflect the jury's findings with respect to the Galaxy Tab 10.1 LTE 4G.

93.     In the March 1 Order, the Court made specific findings regarding the dates on which Samsung had actual notice of the relevant patents.[102]  As a result, the Court ordered a new trial on certain products.[103]  At my direction, Invotex modified the calculation of damages to reflect the March 1 Order as follows:

- Adjusted the calculations to include only the 13 products for which a new trial has been ordered.[104]

- Adjusted the calculation of Samsung's profits based on Samsung's gross profits and incremental profits overall and for each of the seven products that infringed one or more Apple design patents (Captivate, Continuum, Droid Charge, Epic 4G, Gem, Indulge, and Infuse 4G) to start no earlier than the first date on which the Court found Samsung had actual notice of the design patents.[105]

- Adjusted the calculation of Apple's reasonable royalty damages so that any reasonable royalty for any infringed utility patent did not accrue before the date on which the Court found Samsung had actual notice of that patent.[106]

- Adjusted the calculation of Apple's lost profits so that lost profits damages did not accrue, and the period during which Samsung would attempt to design around a patent did not start, before the date on which the Court found that Samsung had actual notice of the patents.[107]

---

[102] Dkt. 2271 at 15-20 and 26: Order re: Damages, dated Mar. 1, 2013.

[103] Dkt. 2271 at 26: Order re: Damages, dated Mar. 1, 2013.

[104] Dkt. 2271 at 26: Order re: Damages, dated Mar. 1, 2013 (ordering retrial on fourteen products, including the Galaxy S II AT&T); Dkt. 2316 at 2: Case Management Order, dated Apr. 29, 2013 (granting Apple's motion for reconsideration with respect to the Galaxy S II AT&T and reinstating the jury's award for that product).

[105] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013.

[106] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013.

[107] Dkt. 2271 at 19-20: Order re: Damages, dated Mar. 1, 2013.  As discussed further in connection with the calculation of Apple's lost profits and in anticipation of a possible argument by Samsung that was suggested in Mr. Wagner's report, I have also prepared alternative calculations of Apple's lost profits damages based on a different assumption of when Samsung's efforts to design around Apple's patents would begin.  Using the same tools and overall methods disclosed by Mr. Musika, I changed one assumption to hypothesize that Samsung would attempt to design around a patent from the first date that Samsung infringed a patent, even though

(Footnote continues on next page.)

94.     [Reserved][108][109]

95.     The alternative calculations discussed above are available in the Appendix.

96.     Beyond the changes resulting from the foregoing items, I have not made any changes to the damages model prepared by Mr. Musika.

**B.     Legal Overview of Monetary Damages Remedies**

97.     I have reviewed the legal principles applied by Mr. Musika in paragraphs 117-119 of his report, and the methodologies that he used to calculate damages in connection with the first trial.  I have applied those same principles and methodologies here and incorporate these portions of his report and the related exhibits by reference.

98.     As Mr. Musika noted, the American Institute of Certified Public Accountants identifies four types of economic damages remedies.  Taken together, these damages remedies provide the quantifiable means by which an injured party is made whole after infringement.  Each of Samsung's sales that infringed one or more New Trial Patents can be placed into one or more of these buckets.

99.     These "quantifiable" buckets include:

- Compensatory Damage Recovery – "Compensatory actual damages for intellectual property infringement or misappropriation, accordingly, are intended to compensate the plaintiff for economic loss caused by the infringement.  Examples of compensatory damages include lost profits (i.e., profits lost on sales that would have been made 'but for' the infringement) and reasonable royalty (i.e., royalty income that the plaintiff would have earned had it entered into an agreement to license the intellectual property in suit to defendant), among other measures."[110]

(Footnote continued from previous page.)

Samsung did not have actual notice of Apple's patents from which to start making modifications.  In my opinion, this approach is illogical and does not reflect the methods that Mr. Musika used in his reports.

[108] [Reserved]

[109] [Reserved]

[110] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 20.

- General Damage Recovery (Market Value Measure) – "The market value measure is what courts most often refer to when they use the term *general damages*.  The market value measure determines the market value of the intellectual property 'as is' and the market value 'as if it were not injured.'  The difference between these two values is the damage that the defendant's wrongful act inflicted on the owner of the intellectual property."[111]

- Special or Consequential Damages (Lost Opportunity Measure) – "The lost opportunity measure quantifies the decrease in market value or the impact on market value that the intellectual property owner is deprived of by reason of the infringement.  This lost opportunity measure is often referred to by the courts as *special* or *consequential damages*."[112]

- Unjust Enrichment and Prejudgment Interest – "Unjust enrichment is an alternative damage measure to compensatory damages."[113]  An "unjust enrichment award seeks to deprive the defendant of whatever gain or benefit was obtained from the wrongful act."[114]

## C.     Apple's Lost Profits

100.    I have examined Mr. Musika's methodology for determining Apple's lost profits, which is described in more detail in his Original Expert Report at paragraphs 120 to 137 and the exhibits cited in those paragraphs.  Among other things, Mr. Musika concluded that Apple had suffered lost sales due to Samsung's infringement, and using methods associated with the *Panduit* factors, evaluated the size and scope of Apple's damages.  His calculation accounted for non-infringing alternatives available at individual wireless carriers through an analysis of Apple's

---

[111] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, pp. 20-21.

[112] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

[113] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

[114] AICPA Practice Aid 06-1, Calculating Intellectual Property Infringement Damages, p. 21.

1   market share at each carrier and by separately accounting for the time required for Samsung to

2   design and market an alternative that does not use Apple's patented technology.  As discussed

3   more completely below, I agree with Mr. Musika's approach to calculating Apple's lost profits,

4   have applied the same methodology for the infringing products that will be the subject of the new

5   trial, and incorporate these portions of his report and exhibits by reference.

6        101.    As discussed above, I am aware that an owner of design or utility patents can

7   recover lost profits as a measure of damages.  In order to be entitled to damages calculated in the

8   form of lost profits, though, "Apple must show that but for the infringement, there is a reasonable

9   probability that it would have made sales that [Samsung] made of the infringing products.  Apple

10  must show the share of Samsung's sales that it would have made if the infringing products had

11  not been on the market."[115]  One approach used to satisfy this "but for" test is by meeting four

12  criteria, commonly referred to as the *Panduit* factors.[116]

**1.    *Panduit* Factors**

14       102.    When applying the *Panduit* test, the patentee must establish that each of the

15  following four *Panduit* factors is met in order to obtain an award of lost profits:

16          1.  Demand for the patented product;

17          2.  Absence of acceptable non-infringing substitutes;

18          3.  Manufacturing and marketing capability to exploit demand;
            and
19

20          4.  Amount of profit that the patentee would have made absent
            the infringement.[117]

**a.      Demand for the Patented Product**

22       103.    Mr. Musika concluded that there is significant demand for Apple's and Samsung's

23  smartphones and tablets that practice the technology of the New Trial Patents for which Apple is

---

[115] Dkt. 1903 at 50: Final Jury Instruction No. 36, Utility Patents—Infringement Burden of Proof.

[116] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *See also* Dkt. 1903 at 51: Final Jury Instruction No. 37.

[117] Dkt. 1903 at 51: Final Jury Instruction No. 37, Utility Patents—Direct Infringement.

1  making a claim of lost profits.  I agree.  There is substantial demand in the U.S. marketplace for

2  iPhones and iPads, each of which was among the most popular mobile devices sold in the

3  marketplace between 2010 and 2012.  Although it is likely that demand for the parties'

4  smartphones and tablets is driven by a multitude of factors, I am also aware of substantial

5  evidence that illustrates the demand for the particular benefits of the New Trial Patents for which

6  a claim of lost profits is being made.  As reflected in Mr. Musika's Original and Supplemental

7  Report, **Exhibit 25-PT** details examples of demand for technology of the '381, '915, and '163

8  Patents as they relate to both smartphones and tablets. As reflected in Mr. Musika's Original and

9  Supplemental Report, **Exhibit 24-PT** details examples of demand for and importance of design in

10 selling smartphones.  The sources of evidence summarized in these exhibits include the

11 following:  Apple advertising materials, Samsung advertising materials, Samsung product

12 development and planning documents, Samsung strategy documents, survey data, third-party

13 market and consumer analysis, testimony and email from representatives of the parties, and other

14 evidence related to the patents and products for which lost profits are claimed.  I agree with Mr.

15 Musika's conclusion that these documents reflect substantial demand for the iPhone and the

16 patented features.

17          104.    In addition to the evidence discussed in **Exhibits 24-PT** and **25-PT**, Mr. Musika

18 and I have reviewed the results of two consumer surveys performed by Dr. John Hauser, a

19 professor at Massachusetts Institute of Technology.  I have also spoken with Dr. Hauser.  For

20 both smartphones and tablets, Dr. Hauser was asked "to determine the price premium, if any, that

21 Samsung consumers are willing to pay for the features associated with the patents at issue."[118]

22 Using conjoint analysis, Dr. Hauser concluded that "for both smartphones and tablets, Samsung

23 consumers are willing to pay a significant price premium for the tested features that are covered

24

25

26 _____

27       [118] For both smartphones and tablets, Dr. Hauser tested the '915 patent alone, and a
   combination of the '381, '163, and '915 Patents.  *See* Expert Report of John R. Hauser, dated
28 Mar. 22, 2012, pp. 6-7.

1    by the patents at issue."[119]  These test results support the conclusion that there is demand for the

2    technology of the utility patents at issue in this trial.

3        105.    As one example of the evidence that reflects demand for the iPhone and patented

4    features in the product, consider a report by Gravity Tank discussed as item 61 of **Exhibit 25-PT**

5    and item 69 of **Exhibit 24-PT**.  Gravity Tank was a consultant hired by Samsung to evaluate the

6    strategy for introducing a touchscreen smartphone in the United States and elsewhere.  Gravity

7    Tank told Samsung in 2008 that "[p]undits tell us that the iPhone is a revolution" that was hailed

8    for "its beauty and functionality."[120]  It praised Apple's "screen centric design" that "has set the

9    standard" in the category.[121]  Consumers described the product and interface as "whimsical," in

10   part because "lists bounce," and "fun" because of its "two fingered pinch" functionality.[122]

11   Consumers also commented that iPhone "changed their notion of what a phone can and should

12   be" and that they see the phone as "enjoyable, engaging and cool."[123]

13       106.    Other examples include internal Samsung emails and documents recognizing that

14   the iPhone revolutionized the industry with its beautiful design and superior functionality.  A

15   September 2007 Samsung document, for example, discussed in items 68 and 95 of **Exhibit 24-**

16   **PT**, noted that the iPhone was a key factor expected to "shape handsets in the coming five years,"

17   identifying that the iPhone's "beautiful design" and "easy and intuitive UI" could contribute to its

18   success in the future, and that "competing with iPhone one way or the other is inevitable."[124]  One

19   _____

20       [119] Expert Report of John R. Hauser, dated Mar. 22, 2012, p. 7.

21       [120] PX36.20: Gravity Tank, Touch Portfolio (SAMNDCA00191811–
     SAMNDCA00191987).

22       [121] PX36.31: Gravity Tank, Touch Portfolio (SAMNDCA00191811–
     SAMNDCA00191987).  *See also* Gravity Tank, Touch Portfolio: Key Takeaways, dated Dec. 24,
23   2008 (SAMNDCA10805169–SAMNDCA10805175 at SAMNDCA10805170) ("recognize
     iPhone's screen-centric design as the touch phone standard").

24       [122] PX36.36: Gravity Tank, Touch Portfolio (SAMNDCA00191811–
     SAMNDCA00191987).

25       [123] PX36.22, 36:  Gravity Tank, Touch Portfolio (SAMNDCA00191811–
26   SAMNDCA00191987).

27       [124] PX34: Feasibility Review on Standalone AP Business for Smart Phone Market, dated
     Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at SAMNDCA10809402 and
     SAMNDCA10809427); *see also* PX34.37: Feasibility Review on Standalone AP Business for
28
                                                          (Footnote continues on next page.)

1   year later, in September 2008, a Samsung executive stated in an email that "implementation of

2   sleek product design as shown by iPhone would be what is considered by product planning and

3   sales as the greatest appealing factor," and shortly thereafter an internal Samsung UX

4   presentation referred to Apple's user interface as "highly innovative."[125]  By February 2010,

5   Samsung's Head of Mobile Division pronounced a "crisis of design" at Samsung as reflected in

6   the email discussed in item 21 of **Exhibit 24-PT.**[126]  Specifically, Samsung's Head of Mobile

7   Division observed that the difference between the iPhone and Samsung's phones was "truly that

8   of Heaven and Earth."[127]  While yet another email, discussed in item 22 of **Exhibit 24-PT**,

9   recorded a statement by Samsung CEO G.S. Choi that Samsung was "clinging to the past

10  generation" and needed to "learn the wisdom of the iPhone and recognize the standard of the

11  industry which was set by them already."[128]  By late 2010 and early 2011, other Samsung

12  presentations emphasized the "[n]eed to recognize the importance of exterior design" as a

13  customer purchase-inducing factor and referred to iPhone 3GS and 4 as "most trendy" and

14  "premium."[129]

15          107.    Against this backdrop, in March 2010, Samsung's internal product development

16  team prepared a detailed 132-page feature-by-feature comparison of Samsung's proposed

17

---

18  (Footnote continued from previous page.)

19  Smart Phone Market, dated Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at
    SAMNDCA10809426) (observing about the iPhone "HW portion: easy imitation").

20          [125] See **Exhibit 24-PT**, item 90:  Email chain re: "Relaying the CEO's opinions on touch
    method and call to a meeting" (SAMNDCA11374409–SAMNDCA11374414 at

21  SAMNDCA11374410); 2009 Mobile UX Forecast:  M.T.O.C., dated Nov. 10, 2008,
    SAMNDCA00214969–SAMNDCA00215201 at SAMNDCA00215128.

22          [126] PX40: Email chain re: Summary of Executive-Level Meeting Supervised by Head of

23  Division (February 10) (SAMNDCA10247373–SAMNDCA102473 at SAMNDCA102477.)

24          [127] PX40: Email chain re: Summary of Executive-Level Meeting Supervised by Head of
    Division (February 10) (SAMNDCA10247373–SAMNDCA102473 at SAMNDCA102477.)

25          [128] PX194: Email chain re: To UX Executives…, dated Mar. 2, 2010
    (SAMNDCA10247549–SAMNDCA10247552 at SAMNDCA10247549).

26          [129] 2011 Smartphone CS Project Final Report, dated Apr. 28, 2011,
    SAMNDCA10257309–SAMNDCA10257365 at SAMNDCA10257319; Premium & Mass

27  Design Preference Study, dated Nov. 2010 to Jan. 2011, SAMNDCA00176172–
    SAMNDCA00176202 at SAMNDCA00176192.

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1   smartphone, then known as the S1, to Apple's iPhone.[130]  This document is discussed as item 49

2   of **Exhibit 24-PT** and item 38 of **Exhibit 25-PT**.  During development of the S1 phone,

3   Samsung's designers compared the icon layout and various user interface functions of the S1 to

4   the iPhone point by point, and recommended adoption of Apple's features.  Thus, on page 58 of

5   the report, Samsung's product development team recommended that Samsung adopt the use of

6   "double tapping" to view web pages.[131]  At page 122, Samsung recommended adopting an icon

7   layout design that looks more similar to Apple's designs.[132]  In context, all this evidence reflects

8   Samsung's conclusion that Apple's patented design elements and user interface technology were

9   attractive to consumers.

10                                **b.**      **Absence of Acceptable Non-Infringing Substitutes**

11          108.    The second factor that must be proven in order to claim lost profits under the

12   *Panduit* framework is the absence or effect of products that the marketplace would find

13   acceptable as a substitute for the patented product.  In order to be an acceptable substitute, a

14   product must have the advantages of the patented invention that were important to customers, and

15   must not infringe the New Trial Patents.  If no such products are deemed available, then an

16   absence of acceptable non-infringing substitutes exists.  Mr. Musika and I agree that the

17   availability of non-infringing substitutes does not render a claim of lost profits moot.  Rather,

18   even if non-infringing substitutes are available, Apple can still claim lost profits on "the number

19   of the sales of each product made by [Samsung] that Apple would have made despite the

20   availability of other non-infringing substitutes."[133]  Mr. Musika assumed that non-infringing

21   substitutes did exist in some periods for certain consumers.  I have adopted the same approach.

22   Mr. Musika sought information on and adjusted the lost profits calculations to account for the

---

23          [130] PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–
24   SAMNDCA00204010).

          [131] PX44.58: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–
25   SAMNDCA00204010).

26          [132] PX44.122: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–
     SAMNDCA00204010).

27          [133] Dkt. 1903 at 51: Final Jury Instruction No. 37, Utility Patent Damages—Lost Profits—
     Factors to Consider.
28

1    time it would take to identify, implement, and market a non-infringing alternative to Apple's

2    patented inventions.  I pursued and obtained the same information from the same sources.  I also

3    understand that the *State Industries, Inc. v. Mor-Flo Industries, Inc.*[134] case is used in connection

4    with the second *Panduit* factor in situations where the market includes acceptable substitutes for

5    the patented product.  This case provides guidance in calculating the market share by the patent

6    owner as a percentage of the total market as represented by the patent holder and other market

7    participants using non-infringing substitute technology.[135]  As discussed further below and as

8    detailed in the attached exhibits, I have adjusted my lost profits calculation for the 13 products in

9    the present trial in a manner that I understand is consistent with the *Mor-Flo* case to account for

10   the possibility that smartphones and tablets not at issue in this case would be acceptable non-

11   infringing alternatives.

12       109.    The manner in which the second *Panduit* factor has been accounted for in the lost

13   profits damages calculation is conservative for a number of reasons.  First, assuming that all non-

14   infringing smartphones are acceptable substitutes ignores the fact that Apple has litigated other

15   patents against other smartphone manufacturers and has won.[136]  Second, as discussed above, Dr.

16   Hauser's study found that "Samsung consumers are willing to pay a significant price premium for

17   the tested features that are covered by the patents at issue."[137]  The implication of his finding is

18   that the non-infringing alternatives available to the surveyed respondents would be valued

19   significantly less.  Third, the lost profits calculation assumes that Samsung would have returned

20   to the market with a designed-around, non-infringing alternative that is just as desirable to

21   consumers as the infringing smartphones and tablets and could do so immediately upon the

22   reintroduction of the product into the market.

---

[134] *State Indus., Inc. v. Mor-Flo Indus., Inc*., 883 F.2d 1573, 1577-80 (Fed. Cir. 1989).

[135] Dkt. 1903 at 53: Final Jury Instruction No. 39, Utility Patent Damages—Lost Profits—Amount of Profit.

[136] United States International Trade Commission: Notice of the Commission's Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order; Termination of the Investigation, p. 2.

[137] Expert Report of John R. Hauser, dated Mar. 22, 2012, p. 7.

110.    This third conservatism is contrary to certain evidence in this case.  For example, there is evidence that the designs and technology of Apple's New Trial Patents were copied by Samsung with the belief that consumers would find the resulting infringing products to be more desirable.[138]  Further, and as discussed above, Samsung experienced large gains in market share during the period when it was selling infringing products.  These two points suggest that Samsung may not have been able to return to the market with products that were just as desirable to consumers.

111.    To the extent that either the available non-infringing alternatives or Samsung's redesigned non-infringing products were not found by consumers to be acceptable, then the calculation of lost profits could result in a potential understatement of the harm experienced by Apple.  For example, as shown on **Exhibit 17.2-PT-H**, of the 11,441,157 infringing smartphones and tablets, lost profits have only been calculated on 1,322,751 units, or about 11.6% of infringing sales.  This is substantially less than Apple's unadjusted market share in all periods.  If I simply used Apple's unadjusted market share to calculate lost profits, the damage amount attributed to Apple's lost profits would have more than doubled.

---

[138] For example, an internal Samsung document dated March 2, 2010, shows a side-by-side comparison of the iPhone and a pre-launch version of a Samsung Galaxy S phone.  The document notes with respect to the double-tap-to-zoom feature:  "iPhone:  After the screen has been expanded and another point is Double tapped, it moves to another screen and expands that screen.  S1:  After the screen has been expanded and another point is Double tapped, the screen reduces to the original size. . . . Improvement: Double Tap zoom in/out function needs to be supplemented."  PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00203937).  That same document notes with respect to the GUI feature:  "iPhone:  It maximizes a 3 dimensional effect utilizing light and the curve of icon frames is smooth.  S1:  There is no feeling of receiving light, and deficient feeling of softness in the curvature of icon corners. . . . Directions for Improvement:  Insert effects of light for a softer, more luxurious icon implementation."  PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010 (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010).  *See also* PX46: Behold3 Usability Evaluation Results, dated May 10, 2010 (SAMNDCA00508318–SAMNDCA00508411 at SAMNDCA00508383) (recommending adding bounce for a "fun visual effect" like the iPhone).  Other examples are set forth in **Exhibits 24-PT** and **25-PT**.

1

### c.    Marketing and Manufacturing Capability to Exploit Demand

2

3      112.    The third *Panduit* factor considers that the patentee is only entitled to lost profits

4    for those sales it would have been capable of making.  The patentee must prove it had the

5    capacity to manufacture and market the additional products in order to ensure the sale.

6      113.    From an analysis initially prepared by Mr. Musika and confirmed by me, I

7    understand that Apple had sufficient capacity to produce the additional iPhones and iPads that

8    would have resulted from capturing sales lost to Samsung.  To confirm this determination, I

9    discussed Apple's manufacturing capacity with Mark Buckley, Apple's Finance Manager; Anuj

10   Saigal, Apple's Director of Americas Supply Management; and Rory Sexton, Apple's Vice

11   President of Supply Demand Management.  Messrs. Saigal and Sexton were responsible for

12   compiling two reports related to Apple's sales and supply capabilities for the iPhone and iPad

13   during 2010 and 2011.[139]

14     114.    These reports capture information related to Apple's actual manufacturing and

15   sales[140] as well as Apple's unused capacity[141] during each calendar quarter from January 2010 to

16   December 2011.  When calculating the maximum number of units Apple could produce each

17   quarter during this time period, Messrs. Saigal and Sexton took into consideration a number of

18   factors.  Among these were the following:  the number of manufacturing lines in place during

19   2010 and 2011, the capabilities of those lines, average manufacturing line uptimes of 20 hours per

20   day for six days per week, known part shortages, and downtime for maintenance and other

21

22

23   _____

24   [139] iPad and iPhone Supply and Sales: 2010-2011: K Units (APLNDC-Y0000055416–
     APLNDC-Y0000055416); Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

25   [140] Actual Saleable Units = units actually manufactured and available for sale.  Units Sold
     In = units sold by Apple to a third party.  Actual Units Unsold = Actual Saleable Units – Units
26   Sold In.  Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

27   [141] Installed Capacity Saleable Units = maximum number of units that Apple could have
     made with its installed capacity.  Installed Capacity Units Unsold = Installed Capacity Saleable
28   Units – Units Sold In.  Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

reasons.[142]  The capacity reports also took into consideration necessary adjustments for defective products and returns.[143]

115.    These reports were also discussed at Mr. Buckley's February 23, 2012 deposition.[144]  Mr. Buckley testified that the capacity reports were based on the existing manufacturing lines and they detailed the additional units that Apple could have manufactured.[145] He further testified that the capacity reports were based on what Apple "had in those manufacturing plants, and [took] into consideration known parts constraints, . . . six-day workweeks, [and] maintenance being involved."[146]

116.    In the same manner that Mr. Musika did in paragraph 127 of his report and **Exhibits 26-S** and **27-S**, I have used these reports as the starting point for my evaluation of Apple's capacity to manufacture a sufficient quantity of additional iPhones and iPads to cover those sales lost to Samsung.  As shown on **Exhibits 26-S** and **27-S**, Invotex calculated Apple's excess unused capacity for iPhones and iPads from 2010 to 2011.  This calculation is conservative for a number of reasons.  First, according to Mr. Sexton, ██████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████ Second, since Invotex did not know when during a quarter excess inventory would actually be created, Invotex made the excess inventory available only at the beginning of the following quarter.  ████████████████████████████ ███████████████████████████████████████████████████.[147]  During this same period, ████████████████████████████████████████████████████████████████ ██.[148]

---

[142] Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

[143] Discussions with Mark Buckley, Anuj Saigal, and Rory Sexton.

[144] Deposition of Mark Buckley, dated Feb. 23, 2012, Exhibits 15 and 16.

[145] Deposition of Mark Buckley, dated Feb. 23, 2012, p. 197.

[146] Deposition of Mark Buckley, dated Feb. 23, 2012, p. 197.

[147] **Exhibit 26-S**.

[148] **Exhibit 27-S**.

117.    As part of each version of **Exhibit 17.2-PT**, Invotex compared the number of additional units for which lost profits would be calculated to the available capacity in existing or available inventory.  These comparisons show that, through a combination of Apple's excess manufacturing capacity and inventory on hand, Apple had the ability to make and sell the additional iPhones and iPads that would have resulted from capturing sales lost to Samsung.  I have reviewed this calculation and found the results to be reliable.

> **d.      Amount of Profit Apple Would Have Made Absent Infringement**

118.    To calculate the amount of lost profits suffered by the patentee, the appropriate sales revenues must be determined and the costs associated with making those sales should be deducted.  This calculation should consider only the costs that would have increased with the production and sale of additional product.  These costs are often referred to as incremental costs, and the resulting margin is called an incremental profit margin.  Mr. Musika provided a calculation of Apple's incremental profit margin in **Exhibits 32-S2** and **33-S2**.  I have reviewed those calculations, agree with them, and have used them in my analysis.

119.    It is my opinion that Apple is entitled to damages in the form of lost profits on a certain portion of Samsung sales.  The following section discusses the components of my lost profits calculations.

> **(i)      Units Subject to Lost Profits**

120.    As discussed above and consistent with Mr. Musika's methodology, the lost profits calculation assumes that Samsung would have returned to the market with a designed-around, non-infringing alternative that was just as desirable to consumers as the infringing smartphones and tablets.  As such, lost profits are only calculated on units that Samsung sold during the months when it would have been out of the market designing, testing, manufacturing, and preparing to distribute the theoretical non-infringing smartphones and tablets.  The number of months that Samsung would have been out of the market for each of the remaining New Trial Patents is detailed in **Exhibit 20-PT**.  The design-around period for each of the New Trial Patents begins on the latest of the date of issuance of the patent, the date Samsung first sold a product that

1    infringed that patent, or the date on which Samsung received actual notice of its infringement of

2    the specific patent.  I obtained the dates on which Samsung actually learned of the patents being

3    asserted from the table provided by the Court in the March 1 Order.  Because these dates are all

4    later than the dates that the patents issued and the date on which Samsung first sold a product that

5    infringed the patents, the dates included in the Court's March 1 Order control in this analysis.[149]

6        121.    Not all units sold during the design-around period are subject to lost profits.  As

7    discussed above, I have adjusted my lost profits calculation in a manner that is consistent with the

8    *Mor-Flo* case to account for the possibility that smartphones and tablets not at issue in this case

9    would be acceptable non-infringing alternatives.  The first such market share adjustment was

10   made for Samsung's sales of smartphones that occurred at carriers that did not at the time of the

11   sale offer Apple products.  Of these sales, I have considered only 26% to be eligible for lost

12   profits.  The exclusion of 74% of these sales is based on a survey performed by ThinkTech with

13   Google Inc. ("Google").[150]  This Google survey, a portion of which is presented in **Exhibit 28**,

14   found that "26% of Phone Purchasers Chose a New Carrier."[151]  This reduction of 74% of

15   Samsung's sales made to carriers that did not offer Apple products is also captured on **Exhibit**

16   **20-PT**, which summarizes the damages calculation methodology.  These steps are the same as

17   Mr. Musika conducted.

18       122.    The remaining infringing units were then adjusted so that lost profits would be

19   calculated only on those units that would have likely been sold by Apple "but for" Samsung's

20   _____

21   [149] As previously noted and as an alternative analysis with respect to Apple's lost profits, I
     requested that Invotex prepare calculations of Apple's lost profits based on the later of when the
22   relevant patent issued or the date Samsung first sold a product that infringed the New Trial
     Patents.  This calculation assumes that Samsung would have been in a position to redesign its
23   products to avoid Apple's asserted patents even before it had actual notice of these patents.  Thus,
     this approach is not consistent with what occurred in the real world based on the findings of the
24   Court in the March 1 Order.  Nonetheless, because I understand that Samsung may contend that
     this approach should be applied to the calculations, I did this calculation to determine the impact
25   if Samsung's argument were adopted.  The alternative calculations that use this method are
     provided in the attached Appendix.

26   [150] ThinkTech with Google, Wireless Shoppers 2.0, How Consumers Shop for Wireless
     Phones, Google Compete, Clickstream and Survey Based Study, U.S., dated Feb. 2010.

27   [151] ThinkTech with Google, Wireless Shoppers 2.0, How Consumers Shop for Wireless
     Phones, Google Compete, Clickstream and Survey Based Study, U.S., dated Feb. 2010, p. 6.

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1  infringement.  This step of the calculation ensures that Apple claims lost profits only on its share

2  of the relevant market.  As referenced above, Mr. Musika calculated an adjusted market share for

3  each of the Original Equipment Manufacturers ("OEMs") that offered non-infringing

4  smartphones or tablets at the time that Samsung was making its infringing sales.  The

5  implementation of this methodology varies slightly for those units sold at carriers that did not

6  offer Apple products (i.e., the 26% of phone purchasers that chose a new carrier) as compared to

7  those units sold by carriers that did offer Apple products.  For the 26% of sales that occurred at a

8  carrier that did not offer Apple products, Mr. Musika utilized an adjusted OEM market share that

9  is based on the overall smartphone market.  A similar calculation was performed for tablets.  The

10 smartphone and tablet market share calculations are detailed in **Exhibits 29-PT** and **30-PT**,

11 respectively.  For those infringing sales that were made at carriers that did offer Apple products,

12 Mr. Musika utilized an adjusted market share that is based on the OEM's market share at the

13 particular carrier.  **Exhibit 31-S** and the related market share schedules (**Exhibits 31.1-PT**

14 through **31.3-PT**) summarize and calculate the adjusted market share for each OEM by carrier.

15 Based on the jury's findings, I asked Invotex to adjust the market share calculations to add the

16 Intercept back into the market share analysis as a non-infringing alternative smartphone.

17 Similarly, I asked Invotex to stop the accumulation of lost profits for the Galaxy Tab 7.0 product

18 in July 2011 based on the jury's findings that Samsung's Galaxy Tab 10.1 4G LTE did not

19 infringe Apple's patents.  Otherwise, I used the same methodology and sources of data to prepare

20 the market share calculations as Mr. Musika used.

21      123.   By utilizing an adjusted market share that attributes sales to all other smartphone

22 and tablet manufacturers, the foregoing approach takes into account major consumer demand

23 factors including the following:  alternative features, brand loyalty, carrier preference, operating

24 system preference, and price.  The application of the adjusted market share is also captured on

25 **Exhibit 20-PT**, which summarizes the damages calculation methodology.

26                          **(ii)      Capacity Constraints**

27      124.   As discussed above, a condition for lost profits to be appropriately awarded is that

28 the patent holder must have sufficient capacity to make the additional sales.  Therefore, having

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1  calculated the number of units of infringing Samsung sales, a comparison to Apple's capacity is

2  necessary.  In the event that Apple did not have sufficient capacity, the units subject to lost profits

3  would need to be limited to Apple's capacity.  As referenced above, Mr. Musika performed an

4  analysis of Apple's capacity based on reports generated by Apple.  This work shows that Apple

5  had inventory or capacity to make the additional sales identified in the steps above. ███████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████.[152]████████████████████████████████████████

8  ████████████████████████████████████████████████████ I agree with Mr.

9  Musika that Apple had the available capacity to make the "but for" sales that were actually made

10  by Samsung for the 13 products at issue in this analysis.  Each version of **Exhibit 17.2-PT**

11  reflects the implementation of this analysis on the lost profits calculation.[153]  The application of

12  potential capacity constraints is also captured on **Exhibit 20-PT**, which summarizes the damages

13  calculation methodology.

14                **(iii)**    **"But For" Incremental Profit**

15      125.    Apple's lost incremental profits are calculated by multiplying the number of

16  Samsung unit sales that would have been captured by Apple "but for" the infringement (as

17  described above) by the per unit incremental profit earned by Apple on its sales of iPhone and

18  iPad.

19      126.    Apple's incremental profit margin was calculated by deducting Apple's sales and

20  distribution expenses from the gross profits earned by Apple on sales of the iPhones and iPads.

21  ───────────────────

22      [152] See, for example, ████████████████████████████████████████████
████████████████████████████ (APLNDC-Y0000055416).

23      [153] In analyzing whether Apple had the capacity necessary to sell the additional units

24  reflected in my analysis, I have also taken into consideration the possibility that the jury's prior
damages award for the products not subject to the new damages trial included an award of

25  Apple's lost profits.  Apple had substantial excess capacity in the relevant time periods – enough
to make all the lost sales calculated in this report plus all the lost sales calculated by Mr. Musika
and presented to the jury for the products not subject to the new damages trial (compare, e.g.,

26  **Exhibit 17.2-PT-H** with **Exhibit 17.2-S2**).  Thus, whether the jury awarded some, all, or none of
the lost profits calculated by Mr. Musika with respect to the products not subject to this new trial,

27  sufficient excess capacity existed to make the lost sales derived from the 13 products that are the
subject of the new trial and reflected in the analysis above.

28

1   This deduction was taken in light of Mr. Buckley's testimony that distribution expenses "could be

2   variable."[154]  Since Apple cannot provide information as granular as revenue per month per

3   model per product,[155] Mr. Musika used the average incremental profit for all models of iPhones

4   combined and all models of iPads combined.  I used the same approach and the same

5   calculations.  Using a blended profit margin of all models of the respective Apple products takes

6   into account the actual product mix experienced by Apple.  It also accounts for the fact that Apple

7   does not and cannot track net revenue at the model level because carrier subsidies and

8   commissions are not recorded at that level of detail.[156]  The calculation of Apple's per unit

9   incremental profit is detailed further in **Exhibits 32-S2 and 33-S2**.

10                              **(iv)      Reasons This Analysis Is Conservative**

11          127.     The calculation of lost profits is conservative in a number of ways.  In addition to

12   those items mentioned above, the following conservatisms also warrant mentioning.  First,

13   Apple's GAAP Line of Business Reports, which form the basis for the incremental profit

14   calculation discussed above, include revenue deferrals and amortizations.[157]  According to Mr.

15   Buckley, these deferrals are amortized over the life of the product "so that [Apple] can offer free

16   software updates over the life of the product."[158]  This deferral results in a lower selling price and

17   consequently a lower incremental margin.  No adjustment has been made in the calculation of lost

18   profits related to this deferral.

19          128.     A second conservatism relates to Apple's lost sales of convoyed or derivative

20   products and services.  An STA 2011 Smartphone Portfolio Strategy presentation noted that

21   "Smart Phones Drive Higher Accessory Purchases."[159]  Samsung estimated that the 50 million

22   ───────────────────

           [154] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 125-126.

23         [155] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 82-83.  The inability to perform

24   this calculation relates in part to carrier subsidies, price protection, and other financial
     adjustments that are not tracked on a model by model basis.

25         [156] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 82-84.

           [157] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 92-93.

26         [158] Deposition of Mark Buckley, dated Feb. 23, 2012, pp. 92-93.

27         [159] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010
     (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1   iPhones sold through March 2010 resulted in $7.5 billion in aftermarket accessories and that the

2   first 450,000 iPads sold resulted in approximately $54 million in accessory sales.[160]  I understand

3   that such accessories include car chargers, cases, headphones, and screen protectors.  Apple's

4   incremental profit per iPhone or iPad from its sales of accessories is estimated on **Exhibits 34** and

5   **35**.  As illustrated on those exhibits, Apple earns an estimated ▮▮▮ per iPhone and ▮▮▮ per

6   iPad sold.  Neither Mr. Musika nor I included these additional incremental lost profits in the

7   damages calculation.  As discussed previously in the irreparable harm section of this report, there

8   are other forms of income that Apple earns related to iPhone and iPad sales.  This additional

9   income is also not included in the calculation of lost profits.

10          129.    A third conservatism relates to the impact on Samsung's sales due to its being out

11  of the market during the period of redesign.  Being out of the market for an extended period of

12  time could result in Samsung having difficulty in reaching the same level of market penetration as

13  it enjoyed with the infringing phones.  An article concerning Microsoft's late arrival with a

14  quality phone illustrates this point.  "[T]his year [2012] is crucial; it will show whether a

15  respected product is enough to help Microsoft make up for lost time.  Even if it feels good to be a

16  favorite of tech critics for a change, Microsoft needs a blockbuster in the mobile business, not a

17  cult hit.  'Entering the market so late with this experience has created some special challenges for

18  us,' Mr. Myerson said.  'I think if [Microsoft] were there earlier it would be different.'"[161]  I am

19  not aware of sufficient evidence to calculate the impact of this delay on Samsung and therefore

20  have not included it in my calculation of lost profits.

21                          **(v)     Alternative Calculations of Lost Profits**

22          130.    Each version of the exhibits labeled **Exhibits 17-PT** and **19-PT** and the relevant

23  supporting schedules reflect a calculation of damages that include Apple's lost profits.  The

24  methodology used and the manner in which these numbers are presented are the same as what Mr.

---

[160] 2011 Smartphone Portfolio Strategy, STA Product & Strategy, dated May 2010
(SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).

[161] http://www.nytimes.com/2012/01/08/technology/microsoft-defying-image-has-a-design-gem-in-windows-phone.html?pagewanted=2&_r=0

1  Musika used for his expert report and supplements in May and July 2012.  The Appendix to my

2  report includes the alternative calculations of Apple's lost profits and other damages based on

3  alternative assumptions regarding the date on which damages begin to accrue as described above.

4          **2.      Evidence Introduced at Trial Confirms These Opinions.**

5       131.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial

6  testimony.  However, before he testified, Mr. Musika was present for or was able to review the

7  transcript of the proceedings, and I have that record available to me and have considered it in

8  forming my opinions.  The trial testimony confirms the opinions regarding Apple's lost profits

9  already stated above.

10       132.    For example, evidence was introduced at trial regarding public acclaim for and

11  consumer demand for the iPhone and iPad and the patented features of the New Trial Patents,

12  confirming my opinion that Samsung's infringement caused Apple to lose sales.  Phil Schiller,

13  Apple's Senior Vice President of Worldwide Marketing, testified to the success of the iPhone and

14  iPad in the United States market.  Mr. Schiller discussed the 2007 iPhone launch at MacWorld

15  and a video of the same.  (JX1091.)[162]  Mr. Schiller testified that the sales numbers for the

16  original iPhone when it launched "were extremely good" and "exceeded our expectation,"[163]

17  while public perception of the iPad when it launched was "fantastic."[164]  Indeed, a summary

18  exhibit of Apple's iPhone and iPad sales (PX15) introduced at trial through Mr. Schiller shows

19  cumulative iPhone sales from 2007 through fiscal Q2 2012 of over 77 million, and cumulative

20  iPad sales from 2010 through fiscal Q2 2012 of over 28 million.[165]

21       133.    Mr. Schiller also testified to numerous press articles reflecting industry praise for

22  the iPhone and iPad,[166] including a Time Magazine cover story naming the iPhone as the number

23   

24      [162] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 709:23-710:19.

24      [163] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 611:21-612:2.

25      [164] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 621:11-621:12.

26      [165] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 612:6-612:18; PX15:
Cumulative Unit Sales (U.S.) – iPhone & iPad.

27      [166] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 604:23-606:4, 606:8-607:22,
28  609:10-612:2, 621:13-622:16; PX17: Summary of iPhone news coverage; PX134: Wall Street

(Footnote continues on next page.)

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

1   one invention of the year in 2007 (PX135),[167] a *New York Times* article written by David Pogue

2   that had commented on the beautiful appearance of the iPhone (including its shiny black face) as

3   a relevant demand factor (PX133),[168] and a summary exhibit featuring extensive unsolicited news

4   coverage praising the iPhone (PX17).[169]  In addition, Mr. Schiller testified about the iPhone's and

5   iPad's print and television advertisements (PX11, PX12, PX13), some of which included

6   references to the patented features at issue, which further corroborates my conclusion that the

7   patented features have a substantial effect on consumer demand for Apple's and Samsung's

8   products.[170]  For example, Mr. Schiller testified about an early television advertisement for the

9   iPhone (PX127) showing the distinctive design of the phone and demonstrating multitouch

10  gestures such as flicking, scrolling, and tapping.[171]  Mr. Schiller also testified about an iPad

11  television advertisement that gave "a taste of the rich depth of the software" on the device.[172]  In

12  addition, Mr. Schiller introduced a summary exhibit with several iPad and iPhone print

13  advertisements, which supported his testimony (PX11).[173]  All this evidence corroborates my

14  opinion that consumers want and demand Apple's products and Apple's patented technology.

15  Mr. Schiller's testimony was reinforced by evidence from Samsung's files.  A September 2007

(Footnote continued from previous page.)

Journal, "Testing Out the iPhone" (APLNDC-Y0000234932–APLNDC-Y0000234936); PX141: Wall Street Journal, "Laptop Killer? Pretty Close" (APLNDC-Y0000233381–APLNDC-Y0000233385); PX142:  *New York Times Bits*, "Patent Office Highlights Jobs's Innovations."

[167] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 607:23-609:9; PX135: Time, "Best Inventions of 2007" (APLNDC-Y0000146961–APLNDC-Y0000146962).

[168] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 601:5-602:19; PX133: *New York Times*, "Apple Waves Its Wand at the Phone," APLNDC-Y0000235973–APLNDC-Y0000235976 at APLNDC-Y0000235973.

[169] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 604:23-606:4; PX17: Summary exhibit of iPhone and iPad news coverage.

[170] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 641:3-643:11, 643:12-645:13, 646:23-648:16; PX12: Table of iPhone television advertisements; PX13: Table of iPad television advertisements; PX127: Video – "How To" television advertisement for the iPhone.

[171] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 641:3-643:11; PX127: Video – "How To" television advertisement for the iPhone.

[172] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 645:14-646:20; PX128: "iPad Is Iconic" television advertisement for the iPad.

[173] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 649:15-650:2; PX11: Summary exhibit of iPad and iPhone print advertisements.

1   study of the smartphone market by Samsung showed contemporaneously the influence of the

2   iPhone on the smartphone market.[174]  The study identified the "Apple iPhone" as one of "the

3   factors that have the greatest influence on customer demand."[175]  Among "the factors that could

4   make the iPhone a success" were "beautiful design" and "easy and intuitive UI that covers all

5   user classes."[176]

6          134.    Consumer survey evidence introduced at trial also corroborates my conclusion that

7   the patented features are important to consumer demand.  For example, Mr. Schiller testified to

8   the results of Apple's own market research showing demand for the patented features of the New

9   Trial Patents.  Mr. Schiller testified to reasons that the iPhone has been a success, which included

10  the iPhone's beautiful design and Apple's software inventions that made it easy to use.[177]  Mr.

11  Schiller likewise testified that the iPad's easy to use software contributed to the iPad's success.[178]

12  Apple survey results introduced by Mr. Schiller at trial showed that the physical appearance and

13  ease of use of the iPhone were rated by consumers as important features driving their decision to

14  purchase the iPhone.[179]  Timothy Benner, STA's 30(b)(6) witness on the topic of consumer

15  surveys, likewise testified via deposition at trial that the physical appearance of a smartphone is

16

17

---

18     [174] PX34: Feasibility Review on Standalone AP Business for Smart Phone Market, dated
19   Sept. 2007 (SAMNDCA10809390–SAMNDCA10809460 at SAMNDCA10809402 and
     SAMNDCA10809427).

20     [175] PX34.13.

21     [176] PX34.38; Samsung also concluded, with respect to the hardware, "HW: easy
     imitation." PX34.37.

22     [177] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 624:24-626:4.

23     [178] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 626:5-626:19.

24     [179] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 629:10-638:8; PX143 (iPhone
     Buyer Survey FY10-Q4, APLNDC-Y0000027256–APLNDC-Y0000027259 at APLNDC-
25   Y0000027266, APLNDC-Y0000027269, APLNDC-Y0000027277); PX144 (iPhone Buyer
     Survey FY11-Q1, APLNDC-Y0000027341–APLNDC-Y0000027344 at APLNDC-
26   Y0000027356, APLNDC-Y0000027358, APLNDC-Y0000027362); PX145 (iPhone Buyer
     Survey FY11-Q2, APLNDC-Y0000027423–APLNDC-Y0000027426 at APLNDC-
27   Y0000027442, APLNDC-Y0000027450); PX146 (iPhone Buyer Survey FY11-Q3, APLNDC-
     Y0000027506–APLNDC-Y0000027509 at APLNDC-Y0000027523, APLNDC-Y0000027565,
28   APLNDC-Y0000027572).

"an aspect of choice in almost every [customer] decision."[180]  One survey admitted through Mr.

Benner's deposition testimony at trial showed that 45% of respondents stated "Liked overall

design/style" as a reason for choosing a handset brand, which was the highest-ranked factor

among those tested.[181]  Similarly, Dr. Hauser, Apple's conjoint expert, provided testimony and

evidence at trial showing that Samsung consumers were willing to pay a substantial price

premium for the features associated with the utility patents at issue in the new trial (PX30).[182]

135.    Apple also introduced evidence at trial showing the economic and corporate

investment in time and effort devoted to creating the patented features at issue and the benefits

associated with those features, all of which support the conclusion that Apple believes these

factors affect consumers' choices.  For example, Christopher Stringer, an industrial designer at

Apple for at least 17 years and a named inventor on the D'677 patent, testified at trial that it took

him "years" to develop the design of the iPhone, which has since been awarded many

professional awards for design, including the DNAD and Gold Pencil, and has been displayed in

the San Francisco Museum of Modern Art and the Smithsonian Institution in Washington, D.C.[183]

Likewise, Scott Forstall, Apple's then-Senior Vice President of iOS, and one of the named

inventors on the '163 patent, testified to the problem he was trying to solve, the difficulty in

solving that problem, and the dramatic improvement the invention made for his web browsing

experience on touch products like the iPhone and iPad.[184]  Apple's technical experts, Dr. Ravin

Balakrishnan ('381 Patent) and Dr. Karan Singh ('163 and '915 Patents), also testified to the

---

[180] Timothy Benner Trial Testimony, dated Aug. 13, 2012, pp. 2028:9-11 (*see* Dkt. 1887-2 at 2, deposition excerpts played at trial).

[181] PX69: J.D. Power March 2011 Wireless Smartphone Satisfaction Study (SAMNDCA10246338–SAMNDCA10246445 at SAMNDCA10246395).

[182] Dr. John Hauser Trial Testimony, dated Aug. 10, 2012, pp. 1915:4-1916:13; PX30: Summary of results from Dr. Hauser's conjoint survey.

[183] Christopher Stringer Trial Testimony, dated July 31, 2012, pp. 469:15-469:25, 474:1-474:24, 484:1-485:4, 493:6-495:17, and 508:4-510:21.

[184] Scott Forstall Trial Testimony, dated Aug. 3, 2012, pp. 724:8-724:11, 751:15-752:21, and 758:16-759:15.

1    benefits associated with the invention and the problems that would occur in the absence of the

2    patented features.[185]

3          136.    In addition, evidence was introduced at trial that Samsung referred to and used the

4    features of the iPhone and the New Trial Patents in the process of creating the designs and the

5    user interface that are included in Samsung's products.  This further corroborates my conclusion

6    that the patented features are important to consumer demand and are perceived by designers,

7    engineers, and consumers as being an improvement over other non-infringing options.  Testimony

8    by STA's Chief Strategy Officer, Justin Denison, included references to multiple internal

9    Samsung documents which showed that Samsung referred to the iPhone and Apple's patented

10   features when Samsung was creating its smartphones, including, among other features, the

11   inventions described in Apple's '163 Patent and the icon layout design claimed in Apple's D'305

12   Patent.[186]  Jinyeun Wang, a Samsung UX Creative Director and former Senior Designer,

13   discussed an internal Samsung document that showed the evolution of Samsung's icons over a

14   number of years and that included Apple icons as a "reference."[187]  Mr. Wagner discussed an

15   internal Samsung email in which Samsung engineers discussed "obtain[ing] the bounce effect that

16   is similar to the iPad," and another in which individuals at Samsung note that the Samsung

17   product lacks "latex effect" in browser scroll and instructs readers to "(Refer to the iPad)."[188]

---

18       [185] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21,

19   1736:16-1740:15; Dr. Karan Singh Trial Testimony, dated Aug. 10, 2012, pp. 1815:12-1816:24, 1817:22-1818:22, 1831:13-1833:3.

20       [186] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 790:5-791:4, 816:10-832:9;

21   PX40 ("I hear things like this:  Let's make something like the iPhone . . . . It's a crisis of design."); PX44:  Relative Evaluation Report on S1, iPhone (comparing S1 to iPhone side-by-

22   side, with directions for improvement, e.g., "Double Tap zoom in/out function needs to be supplemented"), 44.127 (comparing S1 icons to iPhone icons); PX54:  Lessons from Apple

23   ("Apple is universally regarded as being a master of innovation . . . Innovative hardware design & intuitive user experience"); PX58:  Beat Apple Response ("Thoroughly understand who Apple

24   is?  Operational, Design, … Invite Apple 'experts'"); PX60:  STA Competitive Situation – Paradigm Shift ("US Market Becoming a Two Horse Race Between Apple and Samsung");

25   PX62:  iPhone Counter Strategy.

    [187] Jinyeun Wang Trial Testimony, dated Aug. 14, 2012, pp. 2542:22-2547:3; PX55:

26   Samsung mobile icon design for 2011; PX2261 (same, in black and white).

27       [188] Michael Wagner Trial Testimony, dated Aug. 16, 2012, pp. 3066:24-3068:6, 3070:10-3071:6; PX186 ("in browser scroll, there is no latex effect of having the screen follow along and

28   then returning when you are moving paste the edge.  (Refer to the Ipad)"); PX195 ("With regards

(Footnote continues on next page.)

1   Dong Hoon Chang, SEC's head of the Mobile Design Group, likewise testified via deposition that

2   Samsung developers considered Apple utility patents, such as the bounce patent (*i.e.*, the '381

3   Patent), when designing the Samsung Galaxy phone.[189]  Dr. Balakrishnan testified extensively

4   about internal Samsung documents (PX46, PX57) showing that Samsung studied and adopted

5   Apple's bounce feature when developing certain Galaxy smartphone and tablet products.[190]  Dr.

6   Balakrishnan also noted that Samsung's documents described Samsung's lack of a bounce feature

7   as a "critical" issue, resulting in "dull" behavior in Samsung's products in comparison with the

8   "fun" visual effect in Apple's products.[191]  Dr. Singh testified regarding internal Samsung

9   documents (PX38, PX44) showing that Samsung had deliberately adopted the double tap to zoom

10  feature used in Apple's products as a part of Samsung's user interface design.[192]  Dr. Susan Kare,

11  Apple's design expert with respect to graphical user interfaces ("GUI"), testified to documents

12  showing that Samsung directly compared and then adopted Apple's patented GUI design, and

13  also presented an exhibit with screenshots of Samsung's infringing GUI interface compared to the

14  D'305 Patent, which showed the substantial similarity between the designs (PX21A).[193]  Dr. Peter

15  _____

16  (Footnote continued from previous page.)

17  to bounce, we use the Mass Spring Damper model . . . and obtained the bounce effect that is
    similar to the iPad . . . .").

18  [189] Dong Hoon Chang Trial Testimony, dated Aug. 13, 2012, p. 2026:3-5 (*see* Dkt. 1887-2
    at 2).

19  [190] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21,
    1757:22-1769:10; PX46: Behold3 Usability Evaluation Results (SAMNDCA00508318–

20  SAMNDCA00508411 at SAMNDCA00508383); PX57: P5 Usability Evaluation Results
    (SAMNDCA00176053–SAMNDCA00176171 at SAMNDCA00176071 and

21  SAMNDCA00176125).

22  [191] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1724:5-1724:21 and
    1757:22-1769:10; PX46: Behold3 Usability Evaluation Results (SAMNDCA00508318–

23  SAMNDCA00508411 at SAMNDCA00508383); PX57: P5 Usability Evaluation Results
    (SAMNDCA00176053–SAMNDCA00176171 at SAMNDCA00176071 and

24  SAMNDCA00176125).

25  [192] Dr. Karan Singh, Trial Testimony, dated Aug. 10, 2012, pp. 1845:21-1848:13; PX38:
    Browser Zooming Methods UX Exploration Study (SAMNDCA11104115–
    SAMNDCA11104139); PX44: Relative Evaluation Report on S1, iPhone

26  (SAMNDCA00203880–SAMNDCA00204010).

27  [193] Dr. Susan Kare Trial Testimony, dated Aug. 7, 2012, pp. 1410:22-1412:18, 1479:12-
    1481:25, 1485:8-1488:4, and 1492:3-1493:10; PX44: Relative Evaluation Report on S1, iPhone
    (SAMNDCA00203880–SAMNDCA00204010).

28

Bressler, Apple's industrial design expert, testified to the substantial, strong similarity between the Samsung products and the overall appearance of the D'677 Patent, which is embodied in Apple's products, introduced exhibits showing Apple's products and Samsung's products that reflected this comparison (PX7, PX8), and introduced an exhibit comparing Apple and Samsung smartphones over time, which also reflected the greater visual similarity of Samsung's products and Apple's products after Apple introduced the iPhone (PX3).[194]  Dr. Russell Winer testified that disinterested third parties, including the business press, also perceived the similarity of Samsung's products to Apple's products, and he introduced summary documents with quotations reflecting this perception (PX6).[195]  The scope of the similarity between the patented technology and Samsung's products and the decision by Samsung to adopt user interface technology and designs used by Apple after direct comparisons to Apple's products support the conclusion that there is substantial demand for Apple's patented designs and technology and that the non-infringing alternatives are not as desirable in the mobile device market.  This evidence confirms my opinions about the nature and scope of Apple's lost profits discussed above.

137.    Other evidence presented at trial corroborates my opinions that Apple and Samsung compete directly in the smartphone and tablet markets, and that Samsung's infringement caused Apple to lose sales it otherwise would have made "but for" the infringement. For example, Mr. Schiller testified that Samsung and Apple compete in the smartphone and tablet markets, and that Samsung sells products in the majority of sales channels through which Apple sells its products.[196]  Mr. Schiller also testified to his belief that some customers were choosing to buy a Samsung product because it looked like Apple's products.[197]  Mr. Denison's testimony also

---

[194] Dr. Peter Bressler Trial Testimony, dated Aug. 7, 2012, pp. 1002:22-1003:5, 1020:8-1022:8, 1048:10-1056:5, 1072:1-1073:15, and 1074:8-1075:4; PX3: Summary exhibit depicting Apple and Samsung phones; PX7: Summary exhibit depicting Samsung devices; PX8: Summary exhibit depicting Apple devices; PX174: Gadget Lab, "First Look: Samsung Vibrant Rips Off iPhone 3G Design" (APLNDC-Y0000236157–APLNDC-Y0000236159).

[195] Dr. Russell Winer Trial Testimony, dated August 7, 2012, pp. 1521:14-1525:6; PX6: Summary of press reports regarding Samsung phones.

[196] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 656:18-659:1.

[197] Phil Schiller Trial Testimony, dated Aug. 3, 2012, pp. 663:20-665:24.

1  included multiple documents related to competition between Apple and Samsung and the

2  importance of Apple's technology and design in connection with that competition.  These

3  included testimony and internal documents that showed how Samsung focused on Apple and the

4  iPhone as a competitor, the "crisis of design" that Samsung experienced because of the iPhone,

5  Samsung's focus on directly competing with the iPhone, and its view that the smartphone market

6  was a "three player race becoming a two player race" between Apple and Samsung.[198]  This

7  evidence confirms my opinions that Apple would obtain sales in the "but for" world in which

8  Samsung did not infringe Apple's patents and had to implement a non-infringing alternative.

9       138.    Further, as reflected in his testimony at trial, Mr. Wagner indicated that he did not

10  disagree in significant measure with the proposed amount of time needed to design around the

11  '381 Patent and the '163 Patent used by Mr. Musika.[199]  Further, while Mr. Wagner and Mr.

12  Musika disagreed regarding the amount of time it would take to design around the '915 Patent,

13  Samsung did not introduce any evidence that it had identified and successfully implemented any

14  design-around for that patent or any technical evidence to suggest that Mr. Musika's

15  understanding, which is discussed further above, was wrong.[200]  This confirms the methodology

16  described above that was used by Mr. Musika and by me.

17       139.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

18  further supports the opinions regarding lost profits that I have stated in this report.

19

20

21

22  [198] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 790:5-791:4, 809:24-819:8, and 831:9-834:6; Justin Denison Trial Testimony, dated Aug. 6, 2012, pp. 987:1-997:12;

23  PX40 ("I hear things like this:  Let's make something like the iPhone . . . . It's a crisis of design."); PX44:  Relative Evaluation Report on S1, iPhone (comparing S1 to iPhone side-by-

24  side, with directions for improvement, e.g., "Double Tap zoom in/out function needs to be supplemented"); PX54:  Lessons from Apple ("Apple is universally regarded as being a master of

25  innovation . . . Innovative hardware design & intuitive user experience"); PX58:  Beat Apple Response ("Thoroughly understand who Apple is?  Operational, Design, … Invite Apple

26  'experts'"); PX60:  STA Competitive Situation – Paradigm Shift ("US Market Becoming a Two Horse Race Between Apple and Samsung"); PX62:  iPhone Counter Strategy.

27  [199] Michael Wagner Trial Testimony, dates Aug. 16, 2013, pp. 3055:9-3056:15.

28  [200] Michael Wagner Trial Testimony, dates Aug. 16, 2013, pp. 3055:9-3056:15.

### D.   Samsung's Profits

140.   As discussed above, I am aware that, as an alternative to lost profits or reasonable royalty, a design patent owner may choose to recover the infringer's total profits under 35 U.S.C. § 289.  Each unit of sale, though, is subject to only one form of recovery.  I understand that the infringer's profits are defined as the total sales of infringing product less the costs "directly attributable to the sale or manufacture of the infringing items."[201]  I further understand that "Apple has the burden of proving [Samsung's] gross revenue" and "Samsung has the burden of proving deductible expenses."[202]

141.   I have reviewed Mr. Musika's methodology and analysis used to calculate Samsung's total profits under 35 U.S.C. § 289, which is reflected at paragraphs 138 to 151 of his Original Expert Report and paragraphs 26 to 42 of his Supplemental Expert Report and the exhibits referred to in those passages.  I agree with his approach and his conclusions, and I have applied the same methodology to calculate Apple's damages with respect to the seven products that infringe a design patent at issue in the new trial.  I incorporate the foregoing passages of his report and exhibits by reference.  I have only calculated Samsung's profits with respect to sales that occurred as of April 15, 2011, with respect to the D'677 Patent and as of June 16, 2011, with respect to the D'305 Patent to comply with the Court's March 1 Order.

142.   Consistent with Mr. Musika's methodology, I have calculated Samsung's profits in two ways that are reflected on the schedules labeled **Exhibits 17-PT-H** and **18-PT-H**.  With respect to the calculation presented in the schedules labeled **Exhibit 17-PT-H** and following, Apple's lost profits are first calculated for units that qualify based on the criteria and method discussed above.  For those units for which no lost profits were awarded, I calculated Samsung's profits for the sales of the products that infringed a design patent and occurred after the date on

---

[201] Dkt. 1903 at 72: Final Jury Instruction No. 54, Design Patent Infringement Damages—Defendant's Profits.

[202] Dkt. 1903 at 72: Final Jury Instruction No. 54, Design Patent Infringement Damages—Defendant's Profits.

1    which Samsung had actual notice of the design patents based on the Court's March 1 Order.

2    With respect to schedules labeled **Exhibit 18-PT-H** and following, I calculated Samsung's profits

3    based on the same criteria as the prior sentence, but I have assumed that no recovery for Apple's

4    lost profits was being awarded.  This repeats what Mr. Musika did in his expert reports.

5                    **1.    Samsung's Revenues from Infringing Sales**

6            143.    The first step in the calculations was to determine Samsung's revenues.  I used

7    Samsung's financial production and Mr. Musika's calculations to determine the total number of

8    units and the related revenues for those Samsung products that are the subject of this trial, that

9    meet the notice date requirement, that have been found to infringe Apple's design patents, and

10   that were not accounted for using another form of damages.  **Exhibit 4-PT** identifies which

11   Samsung products are included in that group.  **Exhibit 17.2-PT-H** then calculates the number of

12   units that are available for the infringer's profits analysis after subtracting those units already

13   included in lost profits.  **Exhibit 17.3-PT-H** captures the sales revenues for those units that

14   infringe the design patents but have not already been included in lost profits.  **Exhibit 18.1-PT-H**

15   provides the revenues in the alternative calculation in which no damages are awarded in the form

16   of Apple's lost profits.  As reflected in Mr. Musika's report, these figures are taken directly from

17   spreadsheets provided by Samsung.  They are also taken from the same source that was used to

18   create JX1500, which Samsung agreed was an accurate statement of its sales.

19                    **2.    Deduction of Costs to Calculate Total Profit**

20           144.    Once the revenues have been established, Samsung bears the burden of proving the

21   costs that should be deducted.[203]  To satisfy that burden, Samsung must prove that it has provided

22   reliable information on the alleged costs, that any costs that do not reflect the direct material and

23   manufacturing costs for the products have been reliably and accurately allocated to the products,

24   and that the alleged costs are all directly attributable to the sale and manufacturing of the

25   infringing smartphones.

26

27           [203] Dkt. 1903 at 72: Final Jury Instruction No. 54, Design Patent Infringement Damages—
     Defendant's Profits.

28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

145.     Between January 2012 and July 2012, Samsung produced multiple spreadsheets related to Samsung's costs and expenses pursuant to two Court orders that compelled production of financial data and sanctioned Samsung for non-compliance with a Court order relating to the production of financial data.  The facts surrounding these events are discussed in Mr. Musika's Original Expert Report at paragraphs 143 to 149 and his Supplemental Expert Report at paragraphs 27 to 42.  Based on the information included in his report, Mr. Musika reached two conclusions.  First, he concluded that Samsung's production did not reflect a reliable measure of the costs and expenses that are directly related to the manufacture and sale of the infringing products.  Second, Mr. Musika concluded that a calculation of Samsung's incremental profits, that is, profits that included costs and expenses labeled by Samsung to reflect variable or direct costs and excluded expenses categorized by Samsung to be fixed or indirect costs, resulted in a calculation of Samsung's profits that agreed closely with the calculation of Samsung's profits based on Samsung's gross margin, as reflected in **Exhibit 50-S**.  I agree with Mr. Musika's conclusions.  Accordingly, I have calculated Samsung's profits based on Samsung's gross profits and, using the same materials used by Mr. Musika to prepare **Exhibit 50-S**, I have calculated Samsung's profits for the products at issue in the new trial to show Samsung's incremental profits (**Exhibits 50.1-PT** to **50.9-PT**).

### 3.     The Reliability of Samsung's Financial Data

146.     Mr. Musika examined the evidence regarding Samsung's production of financial data and comparisons of that data to other documents produced by Samsung and to external reports on Samsung's profitability to evaluate the reliability of the data.  This analysis was prepared by Invotex and is reflected in Mr. Musika's Original Expert Report at paragraphs 143 to 149 and his Supplemental Expert Report at paragraphs 29 to 37 and 40 to 41.  I have reviewed the report and information supporting the analysis and agree with it.

147.     The chronology of Samsung's production is long but important to understand when evaluating the reliability of the expense information that Samsung provided.  It begins in January 2012.  On January 27, 2012, the Court ordered Samsung to produce consolidated financial data from which Apple could calculate Samsung's profits, including information on

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

64

Samsung's revenues, materials costs, costs of manufacture, and expenses, by February 3, 2012.[204]

Despite this order, Samsung's first production pursuant to this order was unreliable by standard accounting measures.[205]  It contained mathematical errors.[206]  It combined results for various infringing products without explanation or reason.  One spreadsheet was identified as reflecting a total, but it did not match the sum of the remaining spreadsheets.[207]  Products were excluded without explanation.  Standard financial information regarding expenses was omitted.  The financial information also was not presented on a consolidated basis.[208]  Despite the obvious nature of the errors, Samsung refused to replace the file; Apple then filed a motion to enforce the Court's order and for sanctions on February 28, 2012.[209]

148.   On February 29, a U.S. financial executive for Samsung was scheduled to be deposed.  The day before the deposition, on February 28, Samsung produced a new Excel spreadsheet.[210]  This version continued to leave out sales for products that were the subject of Apple's claims of infringement.[211]  It also removed information about the companies that were the sources of the financial data.[212]  It reduced the information available regarding Samsung's

---

[204] Dkt. 673 at 15: Order re Discovery Motions, dated Jan. 27, 2012.

[205] *See* Samsung-produced financial spreadsheet, dated Feb. 3, 2012 (SAMNDCA00323946); *see also* Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5) ("Roberts Decl.").

[206] Declaration of Timothy Sheppard, dated Mar. 12, 2012, p. 6, ¶¶ 17, 19; Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[207] Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[208] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 151-152; Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[209] Dkt. 759: Apple's Rule 37(b)(2) Motion, dated Feb. 28, 2012.

[210] *See* Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 37-38; Samsung produced financial spreadsheet, dated Feb. 28, 2012 (SAMNDCA00354292–SAMNDCA00354385).

[211] Deposition of Timothy Sheppard, dated Mar. 30, 2012, pp. 21-22.

[212] *See* Samsung-produced financial spreadsheet, dated Feb. 28, 2012 (SAMNDCA00354292–SAMNDCA00354385).

1  cost of goods sold.[213]  Moreover, the testimony of Timothy Sheppard confirmed that the

2  information on the profit of SEA and STA that was included in the spreadsheet did not reflect the

3  consolidated profits of the company but a tax-based profit prepared using a transfer pricing

4  model, which does not accurately reflect the total profits that Samsung earned on the sale of the

5  products in the United States.[214]  Mr. Sheppard also stated that he could not provide testimony

6  regarding or verify the accuracy of the financial spreadsheet with respect to revenues, costs,

7  expenses, and profits at Samsung Electronics Company, Ltd., the Korean parent.[215]

8        149.  On March 10, 2012, Samsung scheduled the deposition of a financial executive in

9  Korea to speak to its revenues, costs, and profits, Mr. Jae Hwang Sim.  Less than 24 hours prior

10  to the deposition, Samsung produced a third and different version of the Excel spreadsheet.[216]

11  This spreadsheet also failed to include sales for three infringing products and included sales for a

12  product that was not accused.[217]  The totals in units and revenues for two products included in the

13  spreadsheet changed without explanation.[218]  Information about a subsidiary of SEC, known as

14  SECA, was added, again without explanation.[219]  The profit amounts for the Continuum product

15  changed without explanation.[220]  Perhaps most significant, Samsung's new spreadsheet added

16  ███████████████████████████████████████████████████████████████

17  by an equivalent amount.[221]  Details that had previously been provided regarding certain expenses

18

---

19       [213] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 92-93.

20       [214] Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 123-124 and 128-129.

21       [215] Deposition of Timothy Sheppard, dated Feb. 29, 2012, p. 15.

     [216] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 5-6; *see* Samsung-produced

22  financial spreadsheet, dated Mar. 8, 2012 (SAMNDCA00372946–SAMNDCA00373138).

     [217] Deposition of Timothy Sheppard, dated Mar. 30, 2012, pp. 21-22; Expert Report of

23  Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

24       [218] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

     [219] *See* Samsung produced financial spreadsheet, dated Mar. 8, 2012

25  (SAMNDCA00372946–SAMNDCA00373138).

26       [220] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145.

     [221] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 35-36; Expert Report of Terry

27  L. Musika, CPA, dated Mar. 22, 2012, p. 48, ¶ 145; Supplemental Expert Report of Terry L.
Musika, dated May 9, 2012, pp. 12-13, ¶ 32 and **Exhibit 49-S**.

28

were removed for at least one product, errors were made in stating certain other expenses, and requested detail about other line items was added.[222]  As Mr. Musika, who attended the deposition in Korea, stated, "Samsung's representations concerning the revenue, cost and profit associated with the accused devices had changed radically for the third time within 24 hours of Mr. Sim's deposition."[223]

150.    At his deposition, Mr. Sim was not aware of many of the changes described above and provided responses that were incorrect and incomplete regarding Samsung's accounting and its spreadsheets despite being designated as a representative of the company who was supposed to be knowledgeable about Samsung's spreadsheets.[224]  Further, Mr. Sim testified that the changes to cost of goods sold reflected a decision made by Mr. Sim and Samsung's lawyers to exclude profits earned by one of Samsung's subsidiaries.[225]  The addition of profits obtained at a subsidiary by including it as a cost within Samsung's cost of goods sold is not consistent with Generally Accepted Accounting Principles and distorts Samsung's actual profits.

151.    After the third version of the Excel spreadsheet was produced by Samsung, Mr. Sheppard submitted a declaration that sought to explain certain of the discrepancies in the prior spreadsheets.[226]  He indicated that prior spreadsheets had been mislabeled, combining data from more than one product even though they had not been labeled to include those products.[227] However, the internal spreadsheets still did not reconcile with respect to these products even in light of the information provided.[228]

---

[222] *See* Samsung-produced financial spreadsheet, dated Mar. 8, 2012 (SAMNDCA00372946–SAMNDCA00373138).

[223] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 49, ¶ 145.

[224] *See, e.g.*, Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 30:24-35:5.

[225] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 35:13-36:25.

[226] Declaration of Timothy Sheppard in Opposition to Apple's Motion for Rule 37(b)(2) Sanctions, dated Mar. 12, 2012 (Dkt. 801-22).

[227] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, p. 49, ¶ 147; Declaration of Timothy Sheppard, Mar. 12, 2012, p. 5, ¶ 14.

[228] Expert Report of Terry L. Musika, CPA, dated Mar. 22, 2012, pp. 49-50, ¶ 147.

1    152.    Fact discovery had closed on March 7, 2012, and at that time, the deadline

2    indicated by the Court's January 27 order had passed by 28 days.  As noted, Samsung had already

3    produced two versions of the spreadsheet after the Court deadline.  Without explanation,

4    Samsung produced a fourth spreadsheet within 24 hours of Mr. Musika's submission of his

5    Original Expert Report.[229]  In my experience as an expert, this step was itself highly unusual and

6    highly questionable in its timing.  Mr. Sim later testified that the March 21 versions were created

7    to correct human errors that were introduced by Samsung into the Excel spreadsheet.[230]

8    153.    Following the preparation of Mr. Musika's Original Expert Report and prior to

9    issuance of a Court order sanctioning Samsung for its financial productions, Samsung produced

10   two additional versions of the spreadsheet on March 29 and April 16.[231]  Notably, one version of

11   the spreadsheet was produced either very late the night before or early in the morning of April 16,

12   the same day that Mr. Wagner produced his report.  Mr. Wagner himself characterized this

13   production as occurring "at the very last minute."[232]  Mr. Wagner later testified that the data set

14   that was produced on April 16 was allegedly prepared on a different basis focusing on U.S. sales

15   only, although Apple had no opportunity to obtain testimony from a Samsung witness regarding

16   how it was prepared or any explanation as to why it was withheld until more than a month after

17   discovery closed.[233]

18   154.    On April 23, 2012, the Court entered an order imposing sanctions on Samsung

19   based on its conduct related to the production of the foregoing financial spreadsheets.[234]  As a part

20   of this order, the Court questioned the accuracy of Samsung's financial data, writing, "Although

---

[229] *See* Samsung-produced financial spreadsheet, dated Mar. 21, 2012 (SAMNDCA00376623–SAMNDCA00376901).

[230] Deposition of Jae Hwang Sim, dated Mar. 31, 2012, pp. 208-211.

[231] *See* Samsung-produced financial spreadsheet, dated Mar. 29, 2012 (SAMNDCA00380019–SAMNDCA00380081); Samsung-produced financial spreadsheet, dated Apr. 16, 2012 (SAMNDCA00396884–SAMNDCA00396916).

[232] Deposition of Michael Wagner, dated May 12, 2012, p. 279.

[233] Deposition of Michael Wagner, dated May 12, 2012, p. 279.

[234] Dkt. 880: Order Granting in Part Apple Motion for 37(B)(2) Sanction Re September 28 and December 22 Discovery Orders, Granting in Part Apple's Motion for 37(B)(2) Sanctions Re Damages Discovery, dated Apr. 23, 2012.

Samsung explains this failure to be the result of the manner and timing by which Samsung's products move through its global chain of companies, the court agrees with Apple that as a matter of basic accounting, such discrepancies call into question the accuracy of the data or at least the manner in which Samsung has chosen to report it," and "[l]ate-produced and never-produced product data, inconsistent presentations regarding the cost of goods sold and total profits that result in improper witness instructions during deposition, and errors that require additional iterations of what Samsung insists was an accurate and complete spreadsheet, are indicative of a failure to provide damages data that accurately and fully complied with the court's order by the indicated date."[235]  As a part of the remedy for Samsung's violations, Samsung was required to produce substantially more detail regarding its financial information, which resulted in a seventh version of the Excel spreadsheet, additional financial schedules, a more detailed presentation of information on Samsung's accounts, and a supplemental expert report by Mr. Musika.  I have reviewed Mr. Musika's May 8 Supplemental Expert Report and agree with its conclusions based on the analysis contained in it regarding Samsung's further production.

155.    As reflected in Mr. Musika's Original and Supplemental Expert Reports, Samsung's production raises substantial concerns, and there are significant reasons to conclude that Samsung's Excel spreadsheets, which form the basis for the deductions that Samsung requests that the jury make when calculating its total profits under 35 U.S.C. § 289, do not meet the standards for reliability applied in the field of accounting.

- The materials were prepared by Samsung solely for use in this litigation, using a format only created for this litigation and at the direction of Samsung's attorneys.[236]

- Little care was taken when the spreadsheets were initially prepared and the materials did not undergo the type of routine review and checks that are expected in connection with the preparation of financial schedules, were prepared by low-level employees with minimal supervision, and were

---

[235] Dkt. 880: Order Granting in Part Apple Motion for 37(B)(2) Sanction Re September 28 and December 22 Discovery Orders, Granting in Part Apple's Motion for 37(B)(2) Sanctions Re Damages Discovery, dated Apr. 23, 2012, pp. 12-13 and 14-15.

[236] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 15-18; Deposition of Timothy Sheppard, dated Feb. 29, 2012, pp. 39 and 44.

not used by any Samsung executives for business purposes.[237]

- As discussed in greater detail in Mr. Musika's Supplemental Expert Report at paragraphs 34 to 35, the materials could not be tied to or reconciled to other external or routinely used internal financial reporting or directly to any routinely kept internal accounting records, and Samsung provided no documents that would support any claim that the numbers could be reconciled.

- The spreadsheets contained multiple errors created by human actions and mistakes.  This is not consistent with the claim that the material is a direct and unmodified extract from Samsung's financial systems.[238]

the products based on a reclassification of profits as cost of goods sold.[239]

- Samsung witnesses refused to give testimony, and at times gave conflicting testimony, on key information, such as the manner in which cost of goods sold is calculated, leaving key discrepancies unexplained.[240]

- Information was repeatedly produced at the very last minute in violation of Court deadlines and in a manner that prevented review by Apple or Samsung prior to the date set for expert reports.  Both Apple and Mr. Wagner had substantial difficulty obtaining the necessary data to prepare a calculation of Samsung's profits.[241]

- As described in **Exhibit 49-S** and in Mr. Musika's Supplemental Expert Report, the reporting repeatedly changed between various versions and between later versions and Mr. Wagner's calculations of profit in his April expert report, which is not consistent with a claim that the material came directly from Samsung's financial system.

---

[237] Deposition of Jae Hwang Sim, Mar. 10, 2012, pp. 15-18; Deposition of Jae Hwang Sim, dated Mar. 31, 2012, p. 206.

[238] Deposition of Jae Hwang Sim, dated Mar. 31, 2012, pp. 209-211; Declaration of Eric R. Roberts in Support of Motion to Enforce January 27, 2012 Order as to Financial Documents, dated Feb. 28, 2012 (Dkt. 759-5), pp. 2-3, ¶ 5.

[239] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, p. 36:16-24; **Exhibit 49-S**.

[240] Deposition of Jae Hwang Sim, dated Mar. 10, 2012, pp. 95-96 and 131-132.

[241] Deposition of Michael Wagner, dated May 12, 2012, pp. 262:17-262:23, 279:3-280:1, 283:4-283:21.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

- The cost-of-goods-sold calculations included in the material produced by Samsung reflected significant and sharp upward and downward changes that undermine their reliability, as shown in **Exhibit 51-S**.

- The material cost calculations for the products varied substantially from the material costs indicated by an analysis of Samsung's bills of materials as reflected in **Exhibit 52-S**.

- Despite Court orders, Samsung failed to provide any reliable data or documents that reflect research and development expenses specific to the infringing products or related to any claim that it could design around any patents, and limited its production to an overall allocation of ongoing general research and development expenses, which are not directly related to the infringing products.

156.    In light of these indications regarding the lack of reliability of Samsung's production of cost and expense data, Mr. Musika concluded that Samsung had not met its obligation to provide a reliable statement of its expenses and that the jury should award damages based either on Samsung's revenues or its gross profits.  I agree.

157.    Therefore, like Mr. Musika, I have prepared two calculations related to Samsung's profits:

- Schedules labeled as **Exhibit 17-PT-H** reflect damages calculated using Samsung's sales revenues as the measure of Samsung's profits.

- Schedules labeled as **Exhibit 17.1-PT-H** reflect damages calculated using Samsung's gross profits as the measure of Samsung's profits.

158.    In my calculations of gross profits on the infringing products, I have relied upon Samsung's reported manufacturing profits.  Samsung did not provide sufficient information to determine Samsung's consolidated gross profits, which would include SEC's manufacturing profits plus the profits earned by STA and SEA.  Relying upon the manufacturing gross profits likely understates Samsung's total consolidated profits since it assumes that the higher prices charged by STA and SEA to their customers are offset by additional costs experienced by those

the design-patent infringing products that will be the subject of the new trial.[242]

### 4. Calculation of Samsung's Profits Using Samsung's Classification of Costs as Fixed and Variable

159.    Subsequent to the submission of Mr. Musika's first report and pursuant to a Court order, Samsung also produced two encrypted files (SAMNDCA-D-00000012 and SAMNDCA-D-00000013) that provided more detailed information, including names of and the amounts for various accounts used to track costs and expenses.  These files were produced as a result of the April 23 order that imposed sanctions on Samsung for its deficient production discussed above.

160.    Mr. Musika reported in paragraph 38 of his Supplemental Expert Report that SAMNDCA-D-00000012 "explicitly labels many of these accounts as involving either fixed or variable costs and expenses."[243]  I have received a certified copy of the translations that contain these classifications.  Fixed costs and variable costs have standard meanings in financial accounting.  Mr. Musika also determined that the file "provides the foundation for the file labeled SAMNDCA00402075, which reflects Samsung's alleged calculation of operating profit" for the infringing products as of the end of March 2012.[244]  I have confirmed the relationship between the files through discussions with Invotex and examination by my staff of the underlying files.

161.    I agree with Mr. Musika that a "fixed cost has no direct relationship to the volume of product produced or sold.  In order for a fixed cost to be assigned to a product, the cost must be allocated on some systematic and rational basis."[245]  Samsung, though, has provided no means by which Mr. Musika or I could validate, or even replicate, its fixed cost allocations.  Because of the fixed nature of these costs and the inability to identify or explain the allocation of these costs, I have concluded that the fixed costs reported by Samsung are not directly associated with the sale of the infringing products and should not be deducted in the calculation of Samsung's profits.

---

[242] *See* **Exhibit 50.1-PT**.

[243] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.

[244] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.

[245] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.

162.    Mr. Musika also reported in paragraph 39 of his Supplemental Expert Report that SAMNDCA-D-00000012 "provides more detailed information on accounts related to two additional non-product cost categories (general research and development and general maintenance)."[246]  I understand that those costs and expenses were not specifically labeled as either fixed or variable.  However, judging by the expense category name and the lack of evidence or support for the assignment of such costs to the infringing products, Samsung has not met its burden of proving that they are properly deductible in this case, and I do not incorporate them into a calculation of Samsung's profits.

163.    The data contained in the encrypted file, SAMNDCA-D-00000012, for all accused products is summarized in **Exhibit 50-S**, which includes a calculation of Samsung's incremental profits applying the criteria discussed above.  Because the present trial involves fewer products and shorter periods, I asked Invotex to use the same data file and same methods disclosed at paragraphs 39 to 41 of Mr. Musika's Supplemental Expert Report and in **Exhibit 50-S** to prepare new versions of **Exhibit 50-S** that reflect the seven design-patent infringing products at issue in the new trial and to prepare calculations of Samsung's profits using the previously disclosed methods for calculating incremental profits while limiting the damages to periods that came after the notice dates established in the Court's March 1 Order.  The results are reflected in **Exhibits 50.1-PT** to **50.9-PT** and **Exhibit 17.1-PT-I**.  The incremental profit margin for the seven

**5.      Evidence Introduced at Trial Confirms These Opinions.**

164.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial testimony.  However, before he testified, Mr. Musika was present for or was able to review the transcript of the proceedings, and I have that record available to me and have considered it in forming my opinions.  The trial testimony confirms the opinions regarding Samsung's profits already stated above.

---

[246] Supplemental Expert Report of Terry L. Musika, dated May 8, 2012, p. 17.

1    165.    At trial, Mr. Sheppard provided evidence related to Samsung's financial

2    information.[247]  For example, Mr. Sheppard pointed to Samsung's operating profits for its overall

3    business and its global telecommunications and networking business as reflected in Samsung's

4    overall public financial statements as evidence in support of a lower damages calculation.[248]

5    These sources and measures are not an appropriate basis for comparing or calculating Samsung's

6    total profits or the costs and expenses that are directly attributable to sale and manufacture of the

7    products that infringe Apple's patents.  They include multiple different types of products

8    (including products that are not mobile devices).  Moreover, the calculation of operating profit

9    reflected at the pages to which Mr. Sheppard referred includes all expenses incurred by Samsung

10   of every type.  This is not consistent with an effort to isolate directly attributable expenses.  Mr.

11   Sheppard's testimony that he sought to verify STA's expenses is also an insufficient basis to

12   overcome the concerns raised above regarding Samsung's financial production.[249]  The expenses

13   that drive the calculation of gross profits, incremental profits, and operating profits are

14   predominately found in the sections of the spreadsheets that relate to SEC, not STA.  Mr.

15   Sheppard's testimony provides no reason to alter the opinions stated above.

16   166.    Mr. Sheppard introduced two financial spreadsheets relating to the products that

17   are the subject of the new trial, PX180 and DX676.[250]  These spreadsheets agree regarding the

18   units and revenues attributed to sales in the United States.  Further, for the products that are the

19   subject of the new trial, the data in PX180 was used to prepare the analysis regarding Samsung's

20   total profits described above.  Similarly, the information that I have used to calculate the units and

---

22   [247] Tim Sheppard Trial Testimony, dated Aug. 16, 2012, pp. 3001:25-3017:7; DX676:
     Samsung-produced financial spreadsheet, dated Jul. 25, 2012; DX753: Samsung consolidated
23   financial statement, dated Feb. 22, 2012; PX180: Samsung-produced financial spreadsheet, dated
     Jul. 25, 2012 (SAMNDCA4875335–SAMNDCA4875335).

24   [248] Tim Sheppard Trial Testimony, dated Aug. 16, 2012, pp. 3008:3-3011:11; DX753:
     Samsung consolidated financial statement, dated Feb. 22, 2012.
25
     [249] *See* Tim Sheppard Trial Testimony, Aug. 16, 2012, pp. 3005:3-3007:7.
26
     [250] Tim Sheppard Trial Testimony, Aug. 16, 2012, pp. 3004:16-3005:1 and 3016:5-
27   3017:3; PX180: Samsung-produced financial spreadsheet, dated July 25, 2012
     (SAMNDCA4875335–SAMNDCA4875335), DX676: Samsung-produced financial spreadsheet,
28   dated Jul. 25, 2012.

1    revenues for the products that are the subject of the new trial was the source for JX1500, which

2    both parties submitted as an accurate record of Samsung's sales in the United States.  This

3    information from trial confirms the opinions stated above.

4          167.    Mr. Denison testified at trial that SEC makes all the phones in Korea and ships

5    product directly to the United States, using STA as a sales entity here.[251]  This testimony

6    confirms my opinion that the cost of goods sold recorded at SEC reflects the proper basis on

7    which to calculate Samsung's total profits.

8          168.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

9    further supports the opinions regarding Samsung's total profits that I have stated in this report.

10         **E.    Reasonable Royalty**

11         169.    Because Samsung infringed the New Trial Patents, Apple should recover

12   "damages adequate to compensate for the infringement, but in no event less than a reasonable

13   royalty for the use made of the invention by the infringer."[252]  "A reasonable royalty is the

14   payment for the license that would have resulted from a hypothetical negotiation between the

15   patent holder and the infringer taking place at the time when the infringing activity first

16   began."[253]  There is no single method for how reasonable royalty damages must be determined.[254]

17   Acceptable methods include an established royalty, the analytical method, and the hypothetical

18   negotiation framework.[255]  Reasonable royalty damages must "compensate for the alleged

19   infringement,"[256] and are based on the value of the benefits of the New Trial Patents.  The benefit

20   provided by a particular patent may vary.  For example, a patent may provide the alleged

21   infringer early market entry, greater market share, and/or improvements in manufacturing, among

22         [251] Justin Denison Trial Testimony, dated Aug. 3, 2012, pp. 794:3-795:12.

23         [252] 35 U.S.C. § 284.

24         [253] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable
     Royalty—Definition.  *See also* Dkt. 1903 at 74: Final Jury Instruction No. 56, Design Patent
25   Damages—Reasonable Royalty.

           [254] Skenyon, et al., "Intellectual Property – Patent Damages Law and Practice," § 1:12.
26
           [255] AICPA Practice Aid 06-1, Calculating Intellectual Property Patent Infringement
27   Damages, pp. 48-60.

28         [256] 35 U.S.C. § 284.

1   others.  A significant measure of the value of the patent is the profits generated by its use.  These

2   profits may come in the form of increased sales volume, increased sales price, and/or lower costs.

3       170.   In the hypothetical negotiation over this matter, Apple and Samsung would

4   negotiate over rights to use the intellectual property asserted by Apple in the original and

5   amended complaints for all the products included in the lawsuit.  The monetary royalties that I

6   calculate for purposes of the new trial represent compensation only for the 5 patents and 13

7   products identified on **Exhibit 4-PT,** which reflects a subset of the intellectual property and

8   products that were included in the amended complaint and trial.  I have also prepared the

9   calculations so that no reasonable royalty is calculated before the date on which Samsung

10   obtained actual notice of Apple's patents as established in the Court's March 1 Order.

11       171.   Mr. Musika explained his approach to determining a reasonable royalty for the

12   asserted intellectual property in paragraphs 152 to 262 of his Original Expert Report and in

13   **Exhibits 39-S** to **47-S**.  Mr. Musika adopted the commonly used method of analyzing the

14   expected outcome of a hypothetical negotiation between Apple and Samsung at the time that

15   Samsung's infringement first began, based on 15 factors commonly known as the *Georgia-*

16   *Pacific* factors.  This method is also what I have most frequently used when calculating

17   reasonable royalties in patent cases.  Mr. Musika summarized the results of the analysis in

18   **Exhibits 46-S** and **47-S** of his Supplemental Expert Report.  With respect to the New Trial

19   Patents, Mr. Musika concluded the following reflects the appropriate per unit reasonable

20   royalties:

| Apple Patents-in-Suit | Final Per Unit Royalty Rate |
|---|---|
| U.S. Patent No. 7,844,915 | $3.10 |
| U.S. Patent No. 7,469,381 | $2.02 |
| U.S. Patent No. 7,864,163 | $2.02 |
| U.S. Patent No. D618,677 | $24.00 |
| U.S. Patent No. D604,305 | |

1

2   As explained more fully below, I agree that these represent appropriate reasonable royalties for

3   the Apple New Trial Patents, and I have used them for purposes of my calculation of Apple's

4   damages.  In addition to the explanation below, I incorporate the foregoing passages of

5   Mr. Musika's reports and exhibits by reference.

6   ### 1.      Royalty Structure

7       172.    Patent licenses are structured in different ways.  Some require lump sum amounts

8   paid upfront or periodically during the term of the license.  Others incorporate a "running

9   royalty," which is typically calculated based upon the number of units sold of the licensed

10  products or their net sales value expressed in monetary (dollar) amounts.  Running royalties

11  require the determination of the royalty base as well as the running royalty that will be applied to

12  that base.[257]

13  ### 2.      Royalty Base

14      173.    The measure of sales that should be used as a royalty base for determining

15  reasonable royalty damages is not routine.  For example, a product may include multiple features

16  in addition to features enabled by the New Trial Patents.  Therefore, an infringing element of a

17  product may represent only a portion of the total value of the product.  Using the total revenues of

18  an infringing product when the patented element is only a portion of the value of an infringing

19  product is an application of what is referred to as the Entire Market Value Rule ("EMVR").

20      174.    Courts have considered when the EMVR should apply.  The Federal Circuit has

21  stated that "[f]or the entire market value rule to apply, the patentee must prove that the patent

22  related feature is the basis for customer demand" of the infringing product.[258]  The Federal

23  Circuit also does not allow "consideration of the entire market value of accused products for

24

25

26      [257] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable
    Royalty—Definition.

27      [258] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

28

minor improvements simply by asserting a low enough royalty rate."[259]  A 2009 case applied a

three-factor test:

> [t]he entire market value rule in the context of royalties requires adequate proof of three conditions: (1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention; (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are part of a complete machine or single assembly of parts; and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit.  It is not enough that the infringing and non-infringing parts are sold together for mere business advantage.[260]

175.    Other alternatives to using the EMVR are available.  For example, one method would be to apportion the revenues in order to identify revenues related to the patented element.  However, there are no defined or required methods that must be used in order to perform the apportionment.  Parties may also elect to structure a royalty as a per unit amount.  Whatever approach is used should be systematic and rational.  In this matter, I agree with Mr. Musika that the appropriate royalty would be a per unit amount applied to the unit sales of Samsung smartphones and tablets at issue.  Such a structure is, for example, consistent with the structure proposed in discussions between Apple and Samsung.

176.    Mr. Musika recognized, as I do, that the infringing Samsung products include a number of features and functionality, not all of which are covered by the New Trial Patents.  Mr. Musika considered the effect of the entire market value of the products in structuring the reasonable royalties on a per unit basis.  I agree that structuring the royalty as a per unit fee is appropriate, and I have used these royalties and Samsung's unit sales in calculating Apple's reasonable royalty damages.

### 3.    Royalty Rates

177.    I evaluated the royalty rate that should be applied for the patents that are at issue in the new trial.  The fundamental construct for a reasonable royalty is to evaluate what royalty rates

---

[259] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).

[260] *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009).

1    would have emerged if the parties had negotiated a royalty at the time that Samsung's

2    infringement began.  It is assumed that both parties would have acted rationally and believed that

3    the patent was valid and infringed.  This evaluation is structured around consideration of

4    15 factors initially described in *Georgia-Pacific Corp. v U.S. Plywood Corp.*, 318 F. Supp. 1116,

5    1120 (S.D.N.Y. 1970), *modified by* 446 F.2d 295 (2d Cir. 1971).  Mr. Musika did this, and I have

6    adopted the same approach.

7        178.    As an initial step before reviewing the 15 *Georgia-Pacific* factors, Mr. Musika

8    considered different reference points, labeled as market, cost, and income reference points, as a

9    part of evaluating the results of the parties' hypothetical negotiation.  I discuss these reference

10   points below.

## 4.    Market Reference Points

12       179.    The market reference point considers whether other comparable transactions exist

13   that may be used to evaluate the proper royalty rate.  Mr. Musika and I have reviewed and

14   analyzed the license agreements and licensing activity of both Apple and Samsung.

15       180.    The following observations regarding Apple's practices in licensing intellectual

16   property are relevant to this analysis:

- Apple's policy is not to license its design intellectual property, including its design patents.  This is confirmed by Apple refusing to offer a license to its design elements as well as its directives regarding Samsung's copying during discussions between Apple and Samsung.[261]  Apple's policy sets a high, but un-quantifiable, rate for the design patents at issue in the new trial.

- Apple has not licensed any of the New Trial Patents except as part of certain global cross licenses or certain litigation settlements. There is no established rate for any of the New Trial Patents.

- Similar to its policy regarding design elements, Apple was unwilling to grant Samsung a license to specific utility patents at issue in the new trial (which include the utility patents included in my damages calculations).

- The utility patents for which a reasonable royalty is being sought are among a group of patents that Apple considers to be associated

---

[261] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 52 and 117.

with its unique user experience and that it has licensed only on very limited occasions.

- Apple's overall policy regarding its intellectual property is to protect the proprietary features of its products as opposed to licensing its intellectual property in order to generate revenues.

181.    Like Mr. Musika, as a part of my analysis, I also considered licenses produced in discovery that included in some way the patents for which damages are being sought in the new trial.

### a.    International Business Machines Corporation ("IBM")/Apple Cross License

182.    IBM and Apple entered into a cross license agreement in 1991.  As part of that agreement, Apple and IBM each granted the other a worldwide, nonexclusive, nontransferable license (through the life of the patents)[262] to "all patents throughout the world, including utility models and . . . design patents and registrations for type fonts (but not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to October 1, 1996."[263] ███████████████████████████████

███████████████████████████.[264]  In December 2002, Apple and IBM entered into a similar cross license agreement which included rights to all patents "issued or issuing on patent applications entitled to an effective date prior to October 25, 2012."[265] ███████████████

██████████████████████████████████

---

[262] Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041–APL-ITC796-0000010079 at APL-ITC796-0000010053, APL-ITC796-0000010055, and APL-ITC796-0000010069).

[263] Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041–APL-ITC796-0000010079 at APL-ITC796-0000010043–APL-ITC796-0000010044).

[264] Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Oct. 1, 1991 (APL-ITC796-0000010041-APL-ITC796-0000010079 at APL-ITC796-0000010067–APL-ITC796-0000010068).

[265] Teskler Deposition Exhibit 23: Patent Cross License Agreement between International Business Machines Corporation and Apple Computer, Inc., dated Dec. 18, 2002 (APLNDC0001221082–APLNDC0001221113 at APLNDC0001221083–APLNDC0001221084).

1

2

3

4

5         **b.**     **Nokia Corporation/Apple Cross License**

6      183.    In June 2011, Nokia and Apple entered into a provisional license agreement as part

7 of settlement of litigation between the parties.[268]

8

9

10

11

12

13

14

15

16 _____

17   [266] Teskler Deposition Exhibit 23: Patent Cross License Agreement between International
Business Machines Corporation and Apple Computer, Inc., dated Dec. 18, 2002
18 (APLNDC0001221082-APLNDC0001221113 at APLNDC0001221088, APLNDC0001221090,
and APLNDC0001221103).

19   [267] License Amendment between International Business Machines Corporation and Apple
Computer, Inc., dated Mar. 31, 2006 (APLNDC00014215-APLNDC00014224 at
20 APLNDC00014215-APLNDC00014216).

21   [268] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 66; Patent License Agreement
by and between Nokia Corporation and Apple Inc., dated June 12, 2011 (APLNDC-
22 X0000007220-APLNDC-X0000007355).

  [269] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated
23 June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007230).

24   [270] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated
June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007226-
25 APLNDC-X0000007230).

  [271] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated
26 June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007232-
APLNDC-X0000007233).

27   [272] Patent License Agreement by and between Nokia Corporation and Apple Inc., dated
June 12, 2011 (APLNDC-X0000007220–APLNDC-X0000007355 at APLNDC-X0000007225).

28

1

2

3

4      184.    Consistent with Mr. Musika's analysis, it is my opinion that Apple's agreements

5   with IBM and Nokia do not provide reference points for the asserted design and utility patents.

6   While the IBM agreements include rights to the utility patents at issue in the new trial, they also

7   includes rights to other intellectual property unrelated to the New Trial Patents.  It is not possible

8   to ascribe value to any particular patent or piece of intellectual property.  Further, the relationship

9   between IBM and Apple is different from that between Apple and Samsung.  Unlike Apple and

10  IBM, Apple and Samsung are head-to-head competitors in the wireless device industry, which is

11  an important factor in determining if a license is comparable.

12      185.

13

14

15

16

17

18

19

20

21                                                              . [274]

22  _____

23      [273] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 66.

24      [274] In November 2012, Apple entered into a license and settlement agreement with HTC
    America, Inc., HTC Corporation, and SC Graphics Co., Ltd. (collectively, "HTC") (ALPNDC-
    Y0000408242–ALPNDC-Y0000408383).  I received this license.  However, pursuant to the
25  Court's April 29, 2013 Order, I have not included this license in the analysis set forth in this
    report.  If I had included this agreement in this analysis, my opinion would be unchanged because
26  I do not consider the license to be comparable to the hypothetical negotiation here in light of the
    fact that, like the Nokia agreement, it was a settlement of ongoing litigation involving multiple
27  patents, includes a cross license of a broad portfolio of rights, and has a number of unique
    provisions arising from that settlement.

28

186.    As a part of this analysis, Mr. Musika and I also evaluated the discussions between Apple and Samsung in the summer and fall of 2010.  Apple and Samsung first met in July 2010 regarding Apple's concern that Samsung was "copying Apple's products."[275]  The attendees at the meeting included Apple's then CEO, Steve Jobs, and then COO, Tim Cook, as well as Samsung's COO, J.Y. Lee.[276]  Further discussions were held on August 4, 2010, and in September of that year, at which Apple provided Samsung with additional information regarding Samsung's infringement of Apple's intellectual property, including specific reference to the '381 Patent.[277]  In October 2010, Bruce Sewell, Apple's Senior Vice President and General Counsel, Chip Lutton, Apple's former Chief Patent Counsel, and Boris Teksler, Apple's Director of Patent Licensing and Strategy, met with Dr. Seung Ahn and K.J. Kim from Samsung.[278]  These discussions resulted in a proposed framework for a license that included a royalty of $30 per Samsung licensed smartphone and $40 per Samsung licensed touchscreen tablet (reducing to $30 per tablet over two years).[279]

187.    Importantly, this license offer excluded rights to *any* design patents or design aspects of Apple's products as well as the utility patents included in my damages calculation. When asked whether it was Apple's intent to offer Samsung a license at the August 4, 2010 meeting between the parties, Mr. Lutton testified that "if Samsung wanted to continue to use Apple's utility patents in its smartphones, as documented in the – in the infringement by the Android – various layers of the Android system, the message to Samsung was that we were willing to work with them on – on that.  We were not willing to license them the design patents or the design aspects of our product."[280]  I understand from my discussion with Mr. Teksler that the

---

[275] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 21 and 24.

[276] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 23.

[277] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 17, 48, and 118; Lutton Ex. 5 (APLNDC0000001103–APLNDC0000001125).

[278] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 171.

[279] Samsung-Apple Licensing Discussion, dated Oct. 5, 2010 (APLNDC000010886–APLNDC000010897 at APLNDC000010897); Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 192.

[280] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 52.

utility patents at issue in the new trial are considered to be part of Apple's unique user experience and that Apple would have also excluded these patents from any license with Samsung.

188.    A November 2010 presentation given by Samsung to Apple identifies, in an illustration of hypothetical royalty mechanics, a 1% royalty rate for both Apple and Samsung based on the assumption that "the patent positions for both Apple and Samsung are equal."[281]  In this scenario, according to Samsung, Apple would have paid Samsung a balancing payment of $234 million.[282]  Regarding this presentation, Mr. Lutton testified that "Samsung took a strange turn of talking about its own intellectual property, and – and had a view that – that Apple's intellectual property and Samsung's intellectual property were of similar value, but because Apple was selling more products than Samsung, that Apple should owe Samsung a net balancing payment."[283]  Mr. Musika converted the 1% royalty rate in this scenario to a per unit royalty rate

189.    Consistent with Mr. Musika's conclusions, my review of the licenses and discussions detailed above did not identify any license that is comparable to the license that Samsung would need to enter into for the asserted Apple Intellectual Property.  I did not identify any other directly comparable licenses.  This is consistent with the testimony of Mr. Jun Won Lee of Samsung, my discussions with Mr. Boris Teksler, and Mr. Teksler's testimony at trial.[285]

---

[281] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 332; Lutton Deposition Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

[282] Lutton Deposition Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

[283] Deposition of Chip Lutton, Jr., dated July 26, 2011, p. 151.

[284] Lutton Deposition Exhibit 23: Apple-Samsung Licensing Discussion, p. 5.

[285] Deposition of Jun Won Lee, dated Mar. 5, 2012, pp. 79:2-81:15; discussions with Boris Teksler; Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2006:13-2007:10, 2009:4-18, and 2011:3-2012:16.

### 5.     Cost and Income Reference Points

190.     Mr. Musika prepared two additional sets of reference points in connection with his analysis of reasonable royalties.  A first, which he refers to as a cost approach reference point, reflects the economic losses that Samsung would experience if it designed, tested, manufactured, and prepared to distribute theoretical non-infringing smartphones and tablets that did not use the technology claimed in Apple's patents.  A second, which he refers to as an income approach reference point, provides calculations that identify the additional income that arises from use of the patented technology.  Calculation of cost and income reference points is a widely accepted method when valuing intellectual property.[286]

191.     I have examined the manner in which Mr. Musika calculated cost value reference points, which were described in paragraphs 162 to 167 of his Original Expert Report and in **Exhibits 39-S** to **39.4-S**.  Mr. Musika prepared a calculation of the gross profits that Samsung would lose if it were forced to remove the infringing products that would be the subject of a hypothetical negotiation.  Mr. Musika converted these losses to a per unit amount and allocated these amounts among the basket of intellectual property rights that Apple asserted in the amended complaint.  I find Mr. Musika's analysis to be well-reasoned and robust.  As such, I have considered these reference points when examining the results of a hypothetical negotiation based on the factors described below.

192.     I have also examined the manner in which Mr. Musika calculated income value reference points, which are described in paragraphs 182 to 190 of his Original Expert Report and in **Exhibits 41-S** to **41.5-S**.  Mr. Musika prepared an analysis of the difference in profitability between the iPad and iPhone and Apple's other products and an analysis of the profitability of the Samsung products.  Mr. Musika revised these amounts downward to calculate a measure of economic value added associated with Apple's intellectual property.  Mr. Musika also converted a valuation of Apple's brand from a well-known brand consulting firm, Interbrand, into a measure

---

[286] AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), pp. 38 to 42.

1   of profitability.  Mr. Musika then allocated the resulting measure of economic value added among

2   the basket of intellectual property rights that Apple asserted in the amended complaint.  Again, I

3   find Mr. Musika's analysis to be well-reasoned and robust.  As such, I have considered these

4   reference points when examining the results of a hypothetical negotiation based on the factors

5   described below.

6              **6.        The Hypothetical Negotiation**

7          193.     After consideration of the information discussed above, Mr. Musika performed a

8   hypothetical negotiation analysis.  Mr. Musika concluded that the hypothetical negotiation would

9   take place in June 2010, just prior to the date of first infringement by Samsung.  I agree.  It is

10  reasonable to assume that Apple and Samsung would negotiate at that time for all the intellectual

11  property asserted by Apple in the amended complaint, whether issued or not.  Samsung would be

12  interested in obtaining rights to all intellectual property necessary for it to sell all the infringing

13  products.  Mr. Musika therefore assumed that this negotiation would cover all the infringing

14  products (whether or not they had been introduced as of June 2010).  I agree with this approach

15  and have used it when evaluating reasonable royalties.

16         194.     When preparing his reasonable royalty calculations, Mr. Musika also evaluated

17  and considered the effect of all the following Apple intellectual property rights on the royalty rate

18  for the 5 New Trial Patents: U.S. Patent Nos. 6,493,002; 7,663,607; 7,853,891; 7,920,129;

19  D627,790; D617,334; D504,889; D593,087; and D622,270; registered trade dress with U.S.

20  Trademark Registration Nos. 3,470,983; 3,457,218; and 3,475,327; unregistered iPhone, iPhone

21  3G, iPhone 4, iPhone / iPhone 3G / iPhone 4, and iPad / iPad 2 trade dress; an unregistered

22  iTunes Store common law trademark; and U.S. Trademark Registration Nos. 3,886,196;

23  3,889,642; 3,886,200; 3,889,685; 3,886,169; 3,886,197; and 2,935,038.  This intellectual property

24  was asserted in Apple's amended complaint against Samsung.  Mr. Musika provided a description

25  of this intellectual property in his Original Expert Report in paragraphs 10, 12, 14, 16, 18, 20-42

26  and **Exhibits 5** to **8**, and I incorporate those descriptions here.  Inclusion of the foregoing

27  intellectual property in the analysis led to an allocation of costs or value to intellectual property

28  not raised in the new trial.  I agree with Mr. Musika that the intellectual property included in the

1    amended complaint would be evaluated as a part of a hypothetical negotiation.  When I calculate

2    damages, I am using only the royalties that relate to the specific New Trial Patents, and the

3    damages that I calculate are limited to compensation for infringement of those five patents by the

4    13 products that are the subject of the new trial.

5         195.    The reference ranges identified by Mr. Musika are not a floor or ceiling on what a

6    reasonable royalty may be.  They help provide some framework by which to evaluate the

7    hypothetical negotiation and potential outcomes.  Apple would enter the hypothetical negotiation

8    preferring to receive the maximum amount, and Samsung would prefer to pay nothing at all.  As

9    noted by Mr. Musika, the American Institute of Certified Public Accountants' intellectual

10   property consulting guide, "Valuing Intellectual Property and Calculating Infringement

11   Damages," indicates that a licensee (in this matter, Samsung) should be willing to pay a

12   maximum amount that would still provide "an acceptable economic return on all resources used

13   in the production, distribution, selling, management, and financing of the product."[287]  The

14   minimum a licensor (in this matter, Apple) should be willing to receive would be equivalent to

15   the next best alternative to the use of the New Trial Patents.

16        196.    Mr. Musika analyzed the *Georgia-Pacific* factors[288] as part of his determination of

17   the appropriate royalty rates for the New Trial Patents.  These factors are often used in developing

18   the reasonable royalty damages that would result from the hypothetical negotiation.  All

19   categories of asserted Apple intellectual property qualify for damages in the form of reasonable

20   royalties.[289]  I also considered these factors for the relevant patents as applied to smartphones and

21   tablets.

22

23        [287] AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement
     Damages (1999), p. 78.

24
          [288] *Georgia-Pacific v. United States Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y.),
25   *modified and aff'd,* 446 F.2d 295 (2d Cir. 1971); Dkt. 1903 at 55-56: Final Jury Instruction No.
     41, dated Aug. 21, 2012.  *See also* Dkt. 1903 at 74: Final Jury Instruction No. 56, dated Aug. 21,
26   2012.

27        [289] Dkt. 1903 at 55: Final Jury Instruction No. 41, Utility Patent Damages—Reasonable
     Royalty—Definition, dated Aug. 21, 2012.  *See also* Dkt. 1903 at 74: Final Jury Instruction No.
     56, Design Patent Damages—Reasonable Royalty, dated Aug. 21, 2012.

28

197.    Mr. Musika considered the results of a hypothetical negotiation for Apple's design rights as part of a package of intellectual property related to design that included design patents, trade dress, and trademarks.  As Mr. Musika concluded, these intellectual property rights overlap with one another and are associated with Apple's brand and design identity.  Design is very important to Apple's efforts to distinguish itself in the marketplace.  One reason that Apple has consistently refused to license its design intellectual property to other parties is because of the importance and value of its brand.  I agree with Mr. Musika that Apple would not agree to allow its brand identity to be diluted or partially diluted by licensing its distinctive designs or design elements.  The potential economic impact of licensing even part of its design identity would be similar to or equal to the impact of licensing the whole.  As a result, I agree with Mr. Musika that the reasonable royalty calculation would treat the design patents (or trade dresses, although those are not at issue in the retrial) as a bundle at one rate.  The rate would apply only once for any element, but it would be the same whether one or more than one element was infringed or used.

198.    Mr. Musika summarized the results of his views regarding each *Georgia-Pacific* factor and its impact on each of the New Trial Patents in **Exhibits 42** and **43**.  I agree with his conclusions, and each is discussed further below.

a.    **Factor #1:    The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

199.    I have reviewed the licenses Apple has produced in this matter.  It is my opinion that there are no royalties received by Apple that would prove or tend to prove an established royalty for the asserted Apple Intellectual Property.  As discussed in more detail above, Apple has only licensed the New Trial Patents as part of broad cross-licenses and/or settlement of litigation.  Therefore, it is not possible to ascribe a value to any particular piece of intellectual property that was included in these licenses.  This is consistent with Mr. Musika's analysis.

200.    This factor supports that there is no established royalty for any of the asserted Apple Intellectual Property.

**b.      Factor #2:      The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.**

201.     Following review of Mr. Musika's analysis and the discussion described above, I concur in Mr. Musika's conclusion that there are no royalties paid by Samsung for use of patents that would be comparable to the asserted Apple Intellectual Property.  In fact, Samsung's own Director of Licensing, Mr. Lee, testified that Samsung did not have any licenses that would be comparable to the license that Samsung would need from Apple for the asserted Apple Intellectual Property.[290]

202.     This factor supports that there are no rates paid by Samsung for use of other patents comparable to the asserted Apple Intellectual Property.

**c.      Factor #3:      The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

203.     The hypothetical negotiation would have been for a license that was non-exclusive and unrestricted in terms of the sale of the infringing smartphones and tablets that were sold in the United States.  Typically, the rate for a non-exclusive and unrestricted license is lower than for a license that is exclusive.

204.     While this matter is based on U.S. law, I agree with Mr. Musika's observation that Samsung and Apple would recognize that there are international benefits from using the asserted Apple Intellectual Property in the U.S.  As I discussed above, Apple and Samsung both sell their products in a global ecosystem, and sales of one product can help to sell additional products worldwide.  Even though the scope of the license is based on United States law, both Samsung and Apple would recognize the international benefits received for use of the asserted Apple Intellectual Property in the United States.  Therefore, consistent with Mr. Musika's analysis, this factor is neutral.

---

[290] Deposition of Jun Won Lee, dated Mar. 6, 2012, pp. 174-175.

1

2

3

**d.      Factor #4:      The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

4      205.      Apple does not have an established or written policy concerning the licensing of

5   the New Trial Patents or its other intellectual property except in the context of licensing its

6   technology that is declared essential to certain standards.  I have confirmed the following

7   observations made by Mr. Musika regarding Apple's practice as it relates to the licensing of its

8   intellectual property:

9
10
11
12

- I understand from my discussion with Mr. Teksler as well as from review of the licenses that Apple has produced in this matter that Apple has never licensed any of its patents individually.  The only licenses that Apple has entered into related to the utility patents at issue in the new trial, and were broad cross licenses involving large portfolios of patents, often with anti-cloning provisions.

13
14
15

- Apple's policy is not to license its design elements, including the design-related asserted Apple Intellectual Property.  This is confirmed by Apple refusing to offer a license to its design elements, as well as its directives regarding copying during discussions between Apple and Samsung.[291]

16
17

- Apple's overall policy regarding its intellectual property is to protect the proprietary features of its products as opposed to licensing its intellectual property in order to generate revenues.

18
19

- Apple currently maintains a list of patents that it is unwilling to license to other companies.  This list includes all of the New Trial Patents.

20

- In licensing discussions with Samsung, Apple was unwilling to grant Samsung a license to any of the New Trial Patents.

21      206.      This factor does not identify a specific rate for the New Trial Patents.  While I

22   have assumed that both Apple and Samsung are a willing licensor and a willing licensee,

23   respectively, Apple's overall policies and practice regarding the licensing of the New Trial

24   Patents indicate Apple's preference for using its patents exclusively as opposed to licensing its

25   patents (no matter the price of the license).

26

27

28

---

[291] Deposition of Chip Lutton, Jr., dated July 26, 2011, pp. 52 and 117.

e.      **Factor #5:      The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

207.    Consistent with Mr. Musika's conclusions, I agree that Apple and Samsung are vigorous direct competitors in the smartphone and tablet market. Brian Rosenberg, STA's Senior Vice President of Sales for Mobile, testified that "every Samsung phone competes" against the iPhone 3GS.[292] Regarding tablets, Mr. Rosenberg testified that Samsung's 8.9-inch tablet and 10.1-inch tablet compete with the iPad 2.[293] Mr. Wagner also testified that Samsung is a key competitor of Apple's with respect to the iPhone and iPad.[294] Numerous documents produced by Samsung and summarized in **Exhibit 53-PT** also reflect this competition.

208.    The competitive relationship between the parties is also acknowledged by industry analysts and stock analysts.[295] Strategy Analytics stated that "Apple's key competitors include Nokia, Samsung, RIM, HTC in Smartphones."[296] Ipsos identified the Galaxy Tab as a "contender to the iPad."[297] Regarding the tablet market, RBC Capital Market Equity Research stated that "[a]fter Apple's expected continued leadership, we see RIM, HTC, Motorola, Samsung, and HP as strong contenders."[298]

209.    The level of competition between Samsung and Apple is also evidenced by Samsung's focus on beating Apple. A Gravity Tank presentation dated December 24, 2012,

---

[292] Deposition of Brian Rosenberg, dated Jan. 27, 2012, pp. 72-73.

[293] Deposition of Brian Rosenberg, dated Jan. 27, 2012, p. 77.

[294] Deposition of Michael J. Wagner, dated Sept. 14, 2011, pp. 149-150 and 182-183.

[295] *See, e.g.*, Gartner Press Release, "Gartner Says Worldwide Mobile Phone Sales Grew 35 Percent in Third Quarter 2010; Smartphone Sales Increased 96 Percent," dated Nov. 10, 2010; J.D. Power, "2009 Wireless Consumer Smartphone Satisfaction Study Volume 1," dated Apr. 30, 2009 (SAMNDCA00190144–SAMNDCA00190243 at SAMNDCA00190150 and SAMDCNA00190156).

[296] Strategy Analytics Competitors Profile – Apple, dated July 20, 2011 (SAMNDCA00177800–SAMNDCA00177807 at SAMNDCA00177805).

[297] Ipsos OTX MediaCT, "Are we going to take to the tablet," dated Mar. 2011 (SAMNDCA00237349–SAMNDCA00237360 at SAMNDCA00237354).

[298] RBC Capital Markets, "Wireless Industry – Tablet Wars: Differentiate, Scale . . . or Die," dated Mar. 3, 2011 (SAMNDCA00501719–SAMNDCA0056806 at SAMNDCA00501719).

1    suggested that Samsung might want to build a strategy around "preventing the inflow of new

2    customers" to Apple.[299]  The Samsung Mobile Marketing Group stated in a presentation that

3    "Apple is a main competitor of Samsung in terms of touch phone."[300]  In a presentation titled

4    "Beat Apple," Samsung stated that its "Beat Apple" strategy was centered around three

5    initiatives:  "1) Divert Apple's inflow of subscribers (divert Apple net adds); 2) Increase Apple's

6    outflow of subscribers (increase Apple churn); [and] 3) Plug STA's leak (increase STA

7    loyalty)."[301]  In a 2011 Strategic Planning presentation, the Wireless Terminal department's goal

8    was to be "#1 in Smartphones (Beat Apple)."[302]

9         210.    Samsung's advertising campaigns also position Samsung against Apple.

10   Samsung's advertising campaign launched around Thanksgiving 2011 was referred to by

11   Samsung as the "Fanboys campaign" or the "Next Great Thing campaign."[303]  Mr. Rosenberg

12   testified that "Fanboys" are "the people who blindly buy Apple products because they're Apple

13   products."[304]  Younghee Lee, who runs global marketing at Samsung, stated in an email that

14   "[f]or STA to be truly successful in beating Apple in FY' 12 we need to showcase our relentless

15   product innovation stories (GS II, Galaxy Nexus, Galaxy Note, Midas) so we can continue to

16   deposition Apple as a leader and position Samsung as the brand of choice for

17   consumers/retailers."[305]

18

19

20        [299] PX37: Gravity Tank, Touch Portfolio: Key Takeaways, dated Dec. 24, 2008
     (SAMNDCA10805169–SAMNDCA10805175, at SAMNDCA10805171).

21
          [300] Samsung Mobile – Mobile Marketing Group Presentation, "Global Segmentation
22   Update – Focused on Smartphone & Tablet U&A," dated Aug. 2011 (SAMNDCA10056653–
     SAMNDCA10056710 at SAMNDCA10056663).

23        [301] Denison Deposition Exhibit 1266: Beat Apple Presentation, dated Dec. 9, 2011
     (SAMNDCA10374460–SAMNDCA10374498 at SAMNDCA10374461).
24
          [302] 2011 Strategic Planning Presentation (SAMNDCA00256503–SAMNDCA00256551 at
25   SAMNDCA00256507).

          [303] Deposition of Brian Rosenberg, dated Jan. 27, 2012, p. 56.
26
          [304] Deposition of Brian Rosenberg, dated Jan. 27, 2012, p. 56.

27        [305] Rosenberg Deposition Exhibit 1281: Email re: "Next Best Thing, Again" Scripts, dated
     Dec. 19, 2011 (SAMNDCA10453260–SAMNDCA10453265 at SAMNDCA10453262).
28

211.    I agree with Mr. Musika that the timing of the negotiation in June 2010 would also be an important consideration.  As discussed above, the market and adoption of smartphone technology were increasing in 2010 and early 2011.  This dynamic is identified in many of the internal presentations and communications reflected in **Exhibit 53-PT**.  Millions of consumers were purchasing smartphones during that period, and these devices were becoming the dominant form of mobile device.  Similarly, the tablet market was expanding with the introduction of the iPad.  With the rapid expansion of the market, the loyalty consumers show to their chosen operating system, and the efforts of Apple and Samsung to build their respective global ecosystems, Apple would be particularly reluctant to license intellectual property that it considered proprietary and important to its own success to a direct competitor like Samsung.

212.    This factor does not identify a specific rate for the asserted Apple Intellectual Property, but it does confirm that Apple would be reluctant to license a direct competitor whose goal was to beat Apple at a critical time in the market's adoption of smartphones.

        f.      **Factor #6:    The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.**

213.    This factor considers the extent to which sales of the Samsung infringing products are used to generate additional sales of other Samsung products.  It also considers the value of the asserted Apple Intellectual Property in promoting sales of additional products by Apple.  One consideration in this factor is the strength of the relationship between the asserted Apple Intellectual Property and the non-patented items.  The royalty rate and the total amount of damages would increase based on the strength of this relationship.  Mr. Musika concluded that both Apple and Samsung have built a strategy in which sales of smartphones and tablets contribute to the sale of additional products in the future, including sales of non-patented items such as convoyed and derivative sales.  Based on my review of the evidence and information provided, I agree.

214.    Samsung is aware of the positive impact sales of the infringing products have on Samsung's entire ecosystem of products.  In a presentation, Samsung stated that "Smart Phones

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

93

1    Drive Higher Accessory Purchases."[306]  In that same document, Samsung stated that "Accessory

2    Reuse Creates Brand Stickiness" and that accessory reuse was a "[c]ompelling reason for

3    consumer[s] to stay with their current brand."[307]  In addition to creating brand loyalty, Samsung's

4    presentation also stated that "Accessories Enhance User Experience" by facilitating use of the

5    smartphone and accessories in the home and in the car and as entertainment and through

6    increased productivity.[308]

7         215.    Apple also considers its ecosystem to be a major component of its overall business

8    strategy.  Mr. Lutton testified as follows:

9              Q:    What do you mean by 'the ecosystem'?

10             A:    I mean – by 'ecosystem,' I mean generally . . . the set of
                  services and related products that are sold either by Apple or by
11                third parties that are made to work with or on iPhone devices.

12             Q:    What are some of the examples of those other Apple
                  products and services…as part of the ecosystem?
13
               A:    So for Apple, it would be iTunes, iAdd, the App store.  For
14                third parties, it would be third-party apps that run on the iPhone or
                  other iOS devices, and in competing for attention from these third-
15                party App developers, one of the key things that matters to them is
                  the vitality and market share of the platform.  So sales that go to a
16                different platform instead of to Apple's iPhone platform damage
                  Apple . . . in that way, too.[309]
17
          216.    Third-party analysts also recognize the significance of Apple's ecosystem.  In a
18
     document regarding the competitive landscape for mobile devices, Gartner stated that:
19
               Apple's dramatic expansion of iOS with the iPad, and the
20                continuing success of the iPod Touch, are important sales
                  achievements in their own right with both consumers and
21                enterprises.  But more importantly they contribute to the strength of
                  Apple's ecosystem and the iPhone in a way that smartphone-only
22                manufacturers cannot compete with….  While Android is
                  increasingly available on media tablets and media players like the
23

24        [306] 2011 Smartphone Portfolio Strategy STA Product & Strategy Presentation, dated May
     2010 (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530612).

25        [307] 2011 Smartphone Portfolio Strategy STA Product & Strategy Presentation, dated May
     2010 (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530615).
26
          [308] 2011 Smartphone Portfolio Strategy STA Product & Strategy Presentation, dated May
27   2010 (SAMNDCA00530591–SAMNDCA00530672 at SAMNDCA00530614).

28        [309] Deposition of Chip J. Lutton, Jr., dated July 26, 2011, pp. 328-329.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

94

Galaxy Player, it lags far behind iOS's multi-device presence. Apple claims it is activating around 275,000 iOS devices per day on average – that's a compelling market for any developer.  And developers' applications in turn attract users.[310]

217.    Another market research firm stated that "[c]urrently Apple has the strongest potential of creating the most compelling consumer market ecosystem by evolving into a wireless multimedia 'hub' for the consumer.  In addition to its efforts to expand its content offerings beyond music into the area of movies/videos and streaming content, it is also building an ecosystem for wireless distribution connected via Wi-Fi in the LAN and cellular in the WAN."[311]

218.    I agree with Mr. Musika that the many benefits associated with the growing acceptance of Apple's operating system, which was achieved, in part, through Apple's introduction of the iPhone and iPad, include Apple's growing acceptance in the business computing world.  In the past, Apple's Mac computer has typically not been used in the business environment.  According to a USA Today article, "Microsoft has traditionally dominated the corporate workplace, and more than 85% of corporate computers still run some version of Windows software.  But products based on Apple operating systems – including Macintosh computers, iPads and iPhones – are increasing in demand."[312]  The article also stated that "Microsoft's corporate Windows business is losing ground to Apple.  Apple is hiring sales executives across the U.S. to get more of its products into Fortune 1,000 companies."[313]  The chart below from Forrsights Hardware Survey provides further evidence for the growing demand for Apple's products in the business market:

---

[310] Gartner Dataquest, "Competitive Landscape: Mobile Devices, Worldwide, 3Q10," dated Nov. 9, 2010 (SAMNDCA00235579–SAMNDCA00233596 at SAMNDCA00233593-SAMNDCA00233594).

[311] Strategy Analytics, "Nokia, RIM & Apple Thrive With Value Added Services In Complex Handset Landscape," dated May 2008 (SAMNDCA00189104–SAMNDCA00189115 at SAMNDCA00189113).

[312] USA Today, "Apple carving into Microsoft's niche: Corporate workplace," dated Jan. 30, 2012.

[313] USA Today, "Apple carving into Microsoft's niche: Corporate workplace," dated Jan. 30, 2012.

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

95

**Enterprise likes Apple**

Percentage of enterprise companies issuing personal computers running Mac OS X:

30% 2009
37% 2010
46% 2011

Sources: Forrsights Hardware Survey, 2009-2011

219.    In the lost profits section of this report, I discussed Mr. Musika's and my conclusions regarding the impact of convoyed sales on Apple.  The importance of convoyed sales to Apple is evidenced by the fact that Apple accounts for some, but not all, of the accessories sold as a consequence of sales of the iPhone and iPad that embody the asserted Apple Intellectual Property.  As discussed in the lost profits section of my report, I did not include convoyed sales in my lost profits calculation because it was not possible to segregate the convoyed sales for current sales versus past sales.  However, this relationship does exist, even though it may not be quantifiable.  Further, while it is not possible to capture all the lost convoyed profits in my reasonable royalty damages calculation, the acknowledged connection by both Samsung and Apple between the sale of smartphones and tablets and the sale of non-patented products would support a higher royalty rate that would be reflective of this benefit.

        **g.**     **Factor #7:**     **The duration of the patent and the term of the license.**

220.    Mr. Musika summarized in **Exhibit 44-S** the duration and term of license for all of the asserted Apple Intellectual Property used in his analysis.

221.    For the asserted utility patents that relate to both smartphones and tablets, this factor would not provide a specific rate.  The remaining legal life of the utility patents relates to

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

the other economic benefits that I have discussed in other *Georgia-Pacific* factors.  I agree with

Mr. Musika's analysis that the legal life of a patent, though, may not be the same as the economic

life of a patent.  The pace of technological development in the market for smartphones and tablets

has led to short product life cycles (one or two years) and, therefore, an increased risk of

technological obsolescence.  However, the pace of the technological development also supports

the need for new developments to be legally enforced and respected so that intellectual property

owners are given the opportunity to realize the full economic benefit of their intellectual property

within shortened time periods.  I agree with Mr. Musika that overall, the long legal life of the

asserted utility patents along with the risk of a shorter economic life would place upward pressure

on the royalty rate because the parties would want to avoid missing the window of economic

opportunity for each of the asserted utility patents.

222.    I agree with Mr. Musika's conclusion that, for the asserted design patents and trade

dress related to smartphones, this factor would not provide a specific rate.  The remaining legal

life of the asserted design patents and trade dress relates to the other economic benefits that I have

discussed in other *Georgia-Pacific* factors.  However, as with the utility patents discussed above,

the legal life of design intellectual property may not be the same as the economic life of that

intellectual property.  The economic power of a design patent or trade dress is related to the

market place acceptance of and demand for a particular design.  Apple has built a considerable

following for its products in part due to its attention to design.  John Maeda, the President of the

Rhode Island School of Design, addressed the importance of design to Apple and stated that the

single greatest achievement of Steve Jobs "is the Apple organization, an organization that actually

cares about design more than technology."[314]  I agree with Mr. Musika that the long legal life

along with the commercial success and importance of design to Apple would place upward

pressure on the royalty rate so as to preserve the value of the asserted design patents and trade

dress.

---

[314] http://www.npr.org/2011/10/07/141144758/remembering-how-steve-jobs-changed-the-design-world.

h.   **Factor #8:   The established profitability of the product made under the patent; its commercial success; and its current popularity.**

223.   This factor addresses the significant commercial success Apple and Samsung have enjoyed from products embodying the asserted Apple Intellectual Property.

224.   As Mr. Musika showed, both Apple and Samsung have realized high profit margins on both smartphones and tablets. ███████████████████████

███████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

225.   **Exhibit 12** to Mr. Musika's Original and Supplemental Expert Reports demonstrates the overall growth of the U.S. smartphone market.  Within that market, as shown in **Exhibit 11.1**, Apple and Samsung are the top two participants in terms of market share.  **Exhibit 11.2-PT** shows Samsung's market share rapidly increasing following the introduction of the infringing Galaxy S phone in July 2010.  For the fourth quarter of 2011, Apple was still more than twice the size of Samsung in terms of market share (45.3% vs. 19.3%), but as shown in **Exhibit 11**, it appears that during the last three quarters of 2011, Samsung has taken smartphone market share from Apple.

226.   As shown in **Exhibit 13.1**, Apple is the dominant participant in the tablet market, with a market share for the fourth quarter of 2011 of 73.7%, compared to Samsung's market share for the same quarter of 2.0%.  However, **Exhibit 13** shows that, as new parties have entered the tablet market, Apple has begun to lose market share.

_____

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

227.     The above market share and profit statistics demonstrate Apple's commercial success.  Samsung's own documents also support Apple's success.  In a July 2011 "STA Report to HQ," Samsung stated, "[f]ocus on preventing smartphone buyers from becoming Apple 'loyalists.'  Apple loyalty is strong, which provides challenges to get iPhone users to switch."[316]  In a Samsung "iPhone 4.0 Quick Report & Analysis," Samsung stated that "[b]uzz for iPhone still dwarfs all other competitor products."[317]

228.     Finally, Apple's commercial success and popularity are evidenced by the fact that Apple's product launches are closely followed and monitored by leading world news organizations.  In June 2010, CNN reported that

> the scene outside Apple's New York City flagship store did have something of the air of a religious event on Thursday.  An hour before the iPhone 4 was slated to go on sale, more than 600 aspiring buyers filled the plaza outside the iconic Fifth Avenue glass cube – and a line of hundreds more stretched behind them, filling an entire city block.  Passersby chattered with the gathered throngs while marketers circled:  AOL . . . earned fans by handing out 500 Magnolia Bakery cupcakes.  Vuvuzelas blared, and the crowd cheered and applauded as opening hour neared.[318]

229.     I agree with Mr. Musika that this factor provides strong support favoring a higher royalty.

**i.       Factor #9:       The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.**

230.     **Exhibit 45** summarizes Mr. Musika's understanding of the utility and benefits of the patents, and his discussion of each of the patents infringed by the products included in the new trial is provided below.

---

[316] Denison Deposition Exhibit 8: STA Report to Headquarters Presentation, dated July 2011 (S-ITC-001016096–S-ITC-001016144 at S-ITC-001016110).

[317] iPhone 4.0 Quick Report & Analysis, dated June 2010 (SAMNDCA10390235–SAMNDCA10390304 at SAMNDCA10390290).

[318] http://www.money.cnn.com/2010/06/24/technology/apple_iphone.

### (i)    '381 Patent

231.    Based on discussions with Henri Lamiraux from Apple and Apple's technical expert, Ravin Balakrishnan, Mr. Musika understood that the '381 patent provides an elegant and appealing form of visual feedback to a user that there is no more of an electronic document to be seen.  For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image.  Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display.  When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen.  This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction.  As a result, the invention of the '381 Patent make possible a user interface that is more visually appealing and intuitive in its handling of the display of electronic documents.  This provides a major enhancement to the quality of the user interface.  Apple also considers this invention to be closely associated with Apple products in the marketplace.  I also spoke with Mr. Lamiraux and Dr. Balakrishnan.  Their descriptions of the '381 Patent were consistent with the descriptions provided by Mr. Musika and I agree with Mr. Musika's description of the patent.

### (ii)    '915 Patent

232.    Based on discussions with Henri Lamiraux from Apple and Apple's technical expert, Karan Singh, Mr. Musika understood that the '915 Patent provides functionality that is central to the infringing products:  the ability to distinguish automatically between a one-finger scroll call and a two-finger gesture such as a zoom or rotate gesture.  This functionality is highly intuitive.  Scrolling, zooming, and rotating are among the most common actions users take with touchscreens and smartphones, and are used in multiple applications.  He further understood that any effort to redesign would make products that infringe the '915 Patent much less useable, render them inconvenient for users, and deprive them of intuitive functionality that smart phone and tablet users have come to expect.  The alternatives would provide a much less satisfying user experience than devices that practice the '915 Patent.  Further, given how frequently the functions are used in the interface, I understand it would be difficult and time-consuming to replace.  I also

1    spoke with Dr. Singh and Mr. Lamiraux; their descriptions of the patent were consistent with Mr.

2    Musika's description, and I agree with Mr. Musika's description of the patent.

3                              **(iii)    '163 Patent**

4          233.    Based on a discussion with Apple's technical expert, Karan Singh, Mr. Musika

5    understood that the '163 Patent provides for an efficient means for users to navigate structured

6    electronic documents on a touchscreen display.  I further understand it is possible to implement

7    other methods to navigate in structured electronic documents using touch gestures, but they

8    would not have been as elegant or intuitive.  I also understand that Samsung evaluated

9    alternatives and concluded that they were inferior and instead revised the user interface to include

10   the '163 Patent's features.  It is my understanding that the invention significantly enhances the

11   user interface of a touchscreen smartphone and tablet.  I also spoke with Dr. Singh.  His

12   description of the patent was consistent with Mr. Musika's description, and I agree with Mr.

13   Musika's description of the patent.

14                          **(iv)    Design patents, trade dress, and trademark**
                                     **conclusion**
15

16         234.    Design patents, trade dress, and trademarks relate to the aesthetics of a product,

17   but not to core functionality.  However, design elements can contribute to the demand for a

18   product and the quality of the user's experience.  In considering the design elements, Mr. Musika

19   did not rely upon the opinion of technical experts.  However, he did consider the extent to which

20   the design elements of the asserted design patents, trade dress, and trademarks were demanded by

21   consumers and were cited in material from Samsung.  He also considered the extent to which

22   Samsung and Apple identified the smartphone and tablet designs as important factors in the sale

23   of the devices.  Finally, he also considered the extent of information that is available in the public

24   domain concerning the relative importance of Apple's smartphone and tablet designs in the sale

25   of those devices.  I considered the same evidence, focusing particularly on materials included in

26   **Exhibit 24-PT**.

27         235.    **Exhibit 24-PT** cites examples from Apple and Samsung that show the importance

28   of design to the demand for smartphones and tablets.  There are many public articles that address

1    the importance of design.  An Internet website titled "Smart Social Branding" described Apple's

2    design focus.  According to the site:

3            [i]t's a known fact around Apple that "design is everything."  Most
         companies don't have a design culture, but for Apple it's a different
4            story.  Steve Jobs knows the importance of design and its impact on
         the business community.  For him, design can make or break a
5            company.  With this kind of mentality, all the designs of Apple
         products have to go through its CEO for approval.  Out of all the
6            companies under Fortune 500, Apple is the only company where
         every design has to be approved by its leader.  Experts say that this
7            strategy worked well for the company because Steve Jobs is a
         systems designer and thinker.  He opted to simplify intricacies.[319]

8

9        236.    A *New York Times* article also supports the importance of design to Apple and its

10   founder, Steve Jobs.  "His design legacy may be chiefly remembered for Apple's immaculate

11   styling, but Jobs constantly stressed the importance of more topical issues, such as usability and

12   the relationship between tiny objects like iPods and iPhones, and a vast virtual network like

13   iTunes."[320]  It is clear that design is an important part of Apple's identity and the success of the

14   brand.

15       237.    The evidence cited in **Exhibit 24-PT** that Samsung adopted Apple's patented

16   design technology further supports the conclusion that Apple's patents provided significant

17   advantages over older devices.  Many of these documents have been discussed previously, as for

18   example the 132-page Relative Evaluation Report dated March 2010, which shows Samsung's

19   direct comparison of its products to Apple's iPhone GUI and recommendations that Samsung

20   adopt the iPhone features.[321]  Other examples include a document entitled "Alkon: Instructions

21   from the CEO," which says, "Improve UX with reference to iPhone 3GS," and contains side-by-

22   side comparisons of Samsung and Apple GUI interfaces.[322]

---

23           [319] http://www.smartsocialbranding.com/business-in-general/apple-the-secret-behind-its-success/.

24

25           [320] "From Apple to Occupy, the Design Honors List for 2011," *New York Times*, dated
     Dec. 25, 2011.

26           [321] PX44: Relative Evaluation Report on S1, iPhone, dated Mar. 2, 2010
     (SAMNDCA00203880–SAMNDCA00204010 at SAMNDCA00204010).

27           [322] Alkon: Instructions from the CEO (SAMNDCA20012936–SAMNDCA20012942 at
     SAMNDCA20012936 and SAMNDCA20012940).

28

238.     Mr. Musika concluded that this factor does not identify a specific rate for any of the asserted design patents, trade dress, and trademarks.  However, Mr. Musika also concluded that it is clear that Apple focuses on the design elements of its products and that these elements are in demand by consumers.  These design elements provide Apple with a significant advantage over competitors and support a higher royalty rate.  Regarding Apple's utility patents, Mr. Musika concluded that these patents are important to the user interface of Apple's products, and Apple treats these aspects of its products as proprietary, therefore supporting a higher royalty rate for these patents.  I agree with Mr. Musika's conclusions.

   j.    **Factor #10:   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

239.     The asserted Apple Intellectual Property is embodied in smartphones, tablets, or both.  I discussed above the substantial profits earned by Apple and Samsung from the sale of smartphones and tablets and the commercial success of those products.

240.     I agree with Mr. Musika that Apple, as a company, focuses on the users' experience with its products.  A *New York Times* article reported that, although Apple did not display any products at the high-tech CES trade show, Apple's presence was still noticeable.  The article stated that:

> Apple's presence is more subtle as well.  Take one tech buzzword – 'user experience' – that was particularly prominent in the product presentations this year.  The expression refers to a concern for how all the elements of a technology product – hardware, software and services – work together so that people actually enjoy using it. Apple was among the earliest and best-known practitioners of that philosophy in its product design.  The company's late chief executive, Steven P. Jobs, long insisted that Apple make its own computer software and hardware to ensure that the two would run smoothly together.  As it entered the era of iPods, iPhones and iPads, Apple went a step further with online services, including iTunes and iCloud, that make it simple to buy entertainment and back up data from the devices.

241.     I agree with Mr. Musika that the commercial embodiment of the asserted Apple Intellectual Property and the importance of the overall user experience have produced considerable sales and profits for Apple and provided consumers that use the products that

1   include the asserted Apple Intellectual Property with a better user experience.  Therefore, the

2   royalty rate should consider the economic benefits that Apple receives and the market advantages

3   associated with the benefits provided to consumers.

4              **k.**      **Factor #11:**   **The extent to which the infringer has**
                        **made use of the invention; and any evidence probative of**

5                           **the value of that use.**

6       242.   I have discussed in Factor 8 above the benefit (both technological and financial)

7   received by Samsung from the sales of the infringing products.

8       243.   As discussed above, Samsung has used the asserted Apple Intellectual Property to

9   build market share in the smartphone and tablet markets at the expense of Apple.  Further,

10  Samsung has been able to earn additional profits on the sale of convoyed and derivative products

11  that, along with the infringing products, are part of Samsung's ecosystem.  The infringing

12  products were introduced at a critical time in the growth of the smartphone market.  Therefore, I

13  agree with Mr. Musika that this factor supports the need for a royalty rate that appropriately

14  reflects the full financial benefits Samsung has realized.

15             **l.**      **Factor #12:**   **The portion of the profit or of the selling**
                        **price that may be customary in the particular business**

16                          **or in comparable businesses to allow for the use of the**
                        **invention or analogous inventions.**

17

18      244.   Mr. Musika did not identify any evidence that relates to the portion of the profit or

19  of the selling price that may be customary in this business for the use of the invention or

20  analogous inventions for the New Trial Patents.  My review did not identify anything Mr. Musika

21  overlooked.  Therefore, I agree with Mr. Musika that this factor would not provide an indication

22  as to an appropriate royalty rate.

23             **m.**      **Factor #13:**   **The portion of the realizable profit that**
                        **should be credited to the invention as distinguished from**

24                          **non-patented elements, the manufacturing process,**
                        **business risks, or significant features or improvements**

25                          **added by the infringer.**

26      245.   In my discussion of the income method above, I have addressed the portion of the

27  realizable profit that should be credited to each utility patent in **Exhibit 41-S**.  Mr. Musika found

28

1   that the conjoint study and results conducted by Dr. Hauser also support the conclusion that

2   customers are willing to pay a premium for the features enabled by the utility patents.  I agree.

3        246.   Mr. Musika concluded that the portion of the realizable profit that relates to the

4   asserted design patents, trade dress, and trademarks is based on the portion of Apple's profit that

5   is attributable to its brand.  The realizable profit attributed to the brand is the same amount for

6   each individual design element as the total group of asserted design-related intellectual property.

7   The dilution to Apple's brand due to the infringement of Apple's distinctive design is the same

8   whether it is caused by one or the group of design-related intellectual property.  Therefore, it is

9   inappropriate to accumulate additional damages based on each act of infringement of the design-

10  related intellectual property because each design element has the same economic benefit

11  associated with Apple's brand.  The license for the asserted design patents, trade dress, and

12  trademarks would be negotiated on a total portfolio as opposed to an individual basis.  As

13  discussed above and for the reasons stated in Mr. Musika's report, I agree.

14

15            **n.**    **Factor #14:**    **The opinion testimony of qualified experts.**

16       247.   This report reflects my opinions in this matter.  I have also spoken to the following

    experts and have read their expert reports and trial testimony:

17

18      •     Ravin Balakrishnan, Specialty – Human Computer Interaction –
             '381 Patent;

19      •     John Hauser, Specialty – Conjoint Analysis – '915 Patent, '381

20           Patent, and '163 Patent; and

21      •     Karan Singh, Specialty – Human Computer Interaction – '163
             Patent and '915 Patent.

22       248.   I have also reviewed the expert reports and declarations, deposition testimony, and

23  trial testimony of Mr. Musika and Mr. Wagner.

24

25

26

27

28

o.    **Factor #15:    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

249.    The hypothetical negotiation date is the date of first infringement, which is the point at which the date of first sale and the issuance of the asserted Apple Intellectual Property intersect.  I agree with Mr. Musika that the market circumstances that would impact or influence each potential hypothetical negotiation date would be the same.  **Exhibit 44-S** outlines the issue date, date of first sale, and hypothetical negotiation dates for each element of the asserted Apple Intellectual Property.

250.    In **Exhibits 42** and **43,** Mr. Musika summarized his conclusions on each of the *Georgia-Pacific* factors and the impact on each item of the asserted Apple Intellectual Property. In **Exhibits 46-S** and **47-S,** Mr. Musika accumulated the results of his analysis and his ultimate conclusion as to the appropriate royalty for each item of the asserted Apple Intellectual Property.

251.    Mr. Musika's overall methodology is consistent with the legal instructions, as I understand them, and with practice in this field.  He has used the format of determining the outcome of a hypothetical negotiation between Apple and Samsung at the time Samsung's infringement began.  I find the manner in which he calculates reference points to be well reasoned and robust.  Moreover, I agree with his analysis regarding the 15 factors discussed above.  After review of his report and the evidence reflected in it, I agree that the reasonable royalty rates stated in paragraph 173 above reflect appropriate reasonable royalty rates for the New Trial Patents.  I have therefore used them to prepare the calculations of damages reflected in the exhibits identified as **Exhibits 17-PT-H**, **18-PT-H**, and **19-PT-H** and the relevant supporting schedules.

### 7.    Evidence Introduced at Trial Confirms These Opinions.

252.    At the time he prepared his report, Mr. Musika did not have the benefit of the trial testimony.  However, before he testified, Mr. Musika was present for or was able to review the transcript of the proceedings, and I have that record available to me and have considered it in forming my opinions.  The trial testimony confirms the opinions regarding reasonable royalty already stated above.

253.    At paragraphs 131 to 139 above, I discuss testimony of witnesses and trial exhibits that reflect public acclaim for and consumer demand for the patented features, the effort Apple put into the design of the iPhone and the creation of the technology reflected in the utility patents, the effect that the iPhone and the patented technology had on the market when it was introduced, the scope and intensity of competition between Apple and Samsung, and the steps that Samsung took to incorporate elements of the iPhone into its products after numerous direct comparisons. This testimony, which is relevant to the existence of and size of Apple's lost profits, also confirms the opinions stated about the factors that would be considered in a hypothetical negotiation, including at a minimum the discussion regarding factors 4-6, 8-10, 11, and 13.  I incorporate the discussion above by reference.

254.    The trial testimony of Boris Teksler, Apple's then-Director of Patents and Licensing Strategy, also confirmed the description of Apple's licensing practices discussed above and the description of the discussions between Apple and Samsung in the summer and fall of 2010 that I have discussed above.[323]  For example, Mr. Teksler discussed Apple's overall licensing philosophy and the importance to Apple of retaining and using its proprietary technology to differentiate its products in the marketplace.[324]  He confirmed that the design patents-at-issue and the utility patents-at-issue reflect elements of Apple's market identity and are

---

[323] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1951:19-1973:14; Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2006:11-2023:1.

[324] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1952:16-1957:9.

1    part of the unique user experience that Apple is not willing to license to competitors.[325]

2    Specifically, he testified that the New Trial Patents comprise part of Apple's "unique user

3    experience I.P." that Apple "strongly desire[s] not to license" to others.[326]  Mr. Teksler further

4    testified that, for those "rare exceptions" where Apple had licensed its unique user experience

5    I.P., Apple did so "consciously knowing that [it was] not enabling somebody to build a clone

6    product."[327]  Similarly, Mr. Teksler testified regarding the importance to Apple that Samsung

7    stop copying Apple's products and designs (as reflected, for example, in PX52.17) and stated that

8    Apple did not intend to license the New Trial Patents to Samsung in Apple's prior discussions

9    with Samsung, which confirms my understanding.[328]  This testimony confirms my opinions

10   regarding the hypothetical negotiation between the parties and the factors that would be

11   considered in it, including at least the discussion regarding factors 1 to 5.

12          255.    The trial testimony of Mr. Stringer, Mr. Forstall, Dr. Bressler, Dr. Balakrishnan,

13   Dr. Kare, and Dr. Singh also confirmed the discussions stated above about the nature and scope of

14   the inventions, their utility over other preexisting technology, and Samsung's use of those

15   inventions in its infringing products—testimony relevant to at least factors 9 to 11.  For example,

16   Mr. Stringer testified regarding how important the process of design is internally at Apple and the

17   care that went into the design of the original iPhone that is reflected in the two design patents at

18   issue in the new trial.[329]  Mr. Forstall testified regarding the effort Apple put into designing a new

19   user interface for the iPhone and the benefits to a user of the technology, using as an example the

20   double-tap technology of the '163 Patent.[330]  Dr. Bressler testified to the unique design elements

---

[325] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1963:21-1964:8; Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2013:9-2014:6.

[326] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1953:4-1957:9.

[327] Boris Teksler Trial Testimony, dated Aug. 10, 2012, pp. 1955:22-1957:9.  *See, e.g.,* Patent Cross Licenses Agreement between Apple Inc. and Microsoft Corp., dated Aug. 5, 1997 (APL-ITC-0000010019–APL-ITC-0000010040 at APL-ITC-0000010021) (containing anti-cloning provision).

[328] Boris Teksler Trial Testimony, dated Aug. 13, 2012, pp. 2013:9-2014:6; PX52: Apple Presentation re: Samsung's Use of Apple's Patents in Smartphones.

[329] Christopher Stringer Trial Testimony, dated July 31, 2012, pp. 469:15-537:19.

[330] Scott Forstall Trial Testimony, dated Aug. 3, 2012, pp. 724:4-729:17, 738:6-789:1.

of the D'677 Patent, the revolutionary nature of the design and the impact it had when it was introduced, how the Infuse 4G and other Samsung products infringed that design, and the manner in which Samsung's designs followed Apple's industrial design.[331]  Dr. Kare identified the design elements of the D'305 Patent, the nature and extent of Samsung's infringement of the D'305 Patent, and the steps taken by Samsung to adopt Apple's patented design elements after a direct comparison between a proposed design (known as the S1) and the iPhone.[332]  Dr. Balakrishnan discussed the claim elements reflected in the invention of the '163 Patent, how it was an improvement over prior technology, how it was present in the Samsung's products that are the subject of the new trial, and how Samsung studied and adopted Apple's implementation of this user interface feature.[333]  Dr. Singh did the same with respect to the '915 Patent and the '163 Patent.[334]  This testimony confirms my opinions regarding the hypothetical negotiation between the parties and the factors that would be considered, including at least the discussion regarding factors 9 to 11.

256.    Dr. Winer testified to the importance of Apple's brand and the significant association between Apple's brand and its designs, including, for example, his explanation of how the Gravity Tank study commissioned by Samsung reflected this association (PX36).[335]  This testimony further reinforces the conclusions stated above regarding the hypothetical negotiation and the design patent royalty.  Dr. Winer identified the significance of Apple's brand to its success in the marketplace and how the look and feel of the iPhone product contributes to

---

[331] Dr. Peter Bressler Trial Testimony, dated Aug. 6, 2012, pp. 1002:16-1024:21, 1044:21-1082:10, 1085:20-1166:15, 1173:13-1212:14, and 1223:17-1241:11; Dr. Peter Bressler Trial Testimony, dated Aug. 7, 2012, pp. 1337:2-1355:19.

[332] Dr. Susan Kare Trial Testimony, dated Aug. 7, 2012, pp. 1356:18-1456:21, 1467:1-1495:11; PX44: Relative Evaluation Report on S1, iPhone (SAMNDCA00203880–SAMNDCA00204010).

[333] Dr. Ravin Balakrishnan Trial Testimony, dated Aug. 10, 2012, pp. 1723:23-1732:13, 1736:16-1802:10, 1806:16-1814:8.

[334] Dr. Karan Singh Trial Testimony, dated Aug. 10, 2012, pp. 1815:12-1889:16, and 1899:20-1913:5.

[335] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1496:12-1545:10 and 1565:12-1576:14; PX36: Gravity Tank, Touch Portfolio (SAMNDCA00191811– SAMNDCA00191987).

1  that brand.[336]  He further testified regarding how other third-party studies recognized the

2  importance of these elements to the iPhone's success and consumer appeal.[337]  His testimony

3  confirms my opinions regarding the per unit design patent royalty rate, the hypothetical

4  negotiation between the parties, and the factors that would be considered in it, including at least

5  the discussion regarding factors 4, 5, 10, and 13.

6       257.    The foregoing evidence confirms the accuracy of Mr. Musika's opinions and

7  further supports the opinions regarding reasonable royalties that I have stated in this report.

8  **IX.    POSSIBLE REVISION**

9       258.    I intend to review any new information provided after the production of this report

10  and would supplement this report if asked to do so.

11       259.    I intend to read or attend the deposition of Mr. Wagner and intend to respond to

12  any criticisms that he raises regarding my analysis.

16  Dated:  August 23, 2013

                                                     JULIE L. DAVIS

---

[336] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1498:19-1508:16.

[337] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1525:7-1528:21; PX36: Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

## Exhibit Table of Contents

| Exhibit | Title |
|---|---|
| 1-PT | Curriculum Vitae for Julie L. Davis, CPA |
| 2-PT | Julie L. Davis Testimony Experience |
| 3-PT | Documents Considered List |
| 4-PT | Samsung Infringing Products vs. Apple's Infringed Intellectual Property |
| 5 | Apple's Asserted Utility Patents |
| 6 | Apple's Asserted Design Patents |
| 7 | Apple's Asserted Trade Dress Registrations |
| 8 | Apple's Asserted Unregistered Trade Dress and Trademark |
| 9 | Apple's Asserted Trademark Registrations |
| 10-PT | Summary of Samsung Infringing Products |
| 11 | U.S. Smartphone Market Shares |
| 11.1 | U.S. Smartphone Shipments and Market Share |
| 11.2-PT | Samsung U.S. Smartphone Market Share |
| 12 | U.S. Mobile Phone Market |
| 12.1 | U.S. Mobile Phone Shipments and Market Share |
| 13 | U.S. Media Tablet Market Shares |
| 13.1 | U.S. Media Tablet Shipments and Market Share |
| 14 | Intellectual Property Damage Types By Form Of IP |
| 15-PT | Identification of Appropriate Forms of Damages |
| 16-PT | Sequential Consideration & Application of the Various Forms of IP Remedy |
| 17-PT | Reserved |
| 17.1-PT | Reserved |
| 17.2-PT | Reserved |
| 17.3-PT | Reserved |
| 17.4-PT | Reserved |
| 18-PT | Reserved |
| 18.1-PT | Reserved |
| 18.2-PT | Reserved |
| 18.3-PT | Reserved |
| 19-PT | Reserved |
| 19.1-PT | Reserved |
| 20-PT | Summary of Damage Calculation Methodology |
| 21 | Wagner Declaration Page 18 - Global Tablet OS Market Share |
| 22 | Apple Other Line of Business P&L Summary |
| 23 | Worldwide Apple iOS Search Revenue |
| 24-PT | Demand for Design Patents and Trade Dress |
| 25-PT | Demand for Utility Patents |
| 26-S | iPhone Capacity Analysis |
| 27-S | iPad Capacity Analysis |
| 28 | 26% of New Purchasers Chose a New Carrier |
| 29-PT | Mor-Flo Analysis - Smartphones |
| 30-PT | Mor-Flo Analysis - Tablets |
| 31-S | Smartphone Market Share by Carrier |
| 31.1-PT | Smartphone Mor-Flo Analysis - AT&T |
| 31.2-PT | Smartphone Mor-Flo Analysis - Verizon Wireless |
| 31.3-PT | Smartphone Mor-Flo Analysis - Sprint |
| 32-S2 | Apple iPhone P&L Summary |
| 33-S2 | Apple iPad P&L Summary |
| 34 | Apple iPhone Accessories P&L Summary |
| 35 | Apple iPad Accessories P&L Summary |
| 37-PT | P&L for Samsung Infringing Smartphones (12 Products) |
| 37.1-PT | STA and SEA U.S. Sales of Infringing Smartphones |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

| Exhibit | Title |
|---------|-------|
| 38-PT | P&L for Samsung Infringing Tablet (Galaxy Tab) |
| 38.1-PT | STA and SEA U.S. Sales of Infringing Tablets |
| 39-S | Cost Value Reference Points for Samsung |
| 39.1-S | Accused Smartphone Cost Value Analysis for Samsung |
| 39.2-S | Accused Tablet Cost Value Analysis for Samsung |
| 39.3-S | Weighted Cost Value per Unit Apportionment |
| 39.4-S | Samsung's Cost Value per Unit Due To Redesign |
| 40-S | Market Value Reference Points |
| 41-S | Income Value Reference Points |
| 41.1-S | Weighted Utility Income Value Reference Point for Utility Patents |
| 41.2-S | Per Unit Reference Rate Calculations for Smartphones and Tablets Combined |
| 41.3-S | Value of Intangibles Calculations |
| 41.4 | Industry Weighted Average Cost of Capital |
| 41.5 | Apple Brand Value as Percentage of Market Capitalization |
| 42 | Georgia-Pacific Analysis for Apple's Intellectual Property - Tablets |
| 43 | Georgia-Pacific Analysis for Apple's Intellectual Property - Smartphones |
| 44-S | Apple's Asserted Intellectual Property |
| 45 | Description of Apple's Asserted Utility Patents |
| 46-S | Reasonable Royalty Rates - Smartphones |
| 47-S | Reasonable Royalty Rates - Tablets |
| 49-S | Comparison of Samsung Sales Data |
| 50-S | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 |
| 50.1-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (7 Products) |
| 50.2-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Captivate) |
| 50.3-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Continuum) |
| 50.4-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Droid Charge) |
| 50.5-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Epic 4G) |
| 50.6-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Gem) |
| 50.7-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Indulge) |
| 50.8-PT | Analysis of Fixed & Variable and Product & Non-Product Costs Through March 2012 (Infuse 4G) |
| 50.9-PT | Summary of Analysis of Fixed & Variable and Product & Non-Product Costs on a Product by Product Basis Through March 2012 |
| 51-S | Samsung's Gross Margin for Sample Accused Products |
| 51.1-S | Analysis of Samsung's Manufacturing Gross Margins |
| 52-S | Material Cost Source Comparison |
| 52.1-S | Comparison of BOM to Manufacturing Material Cost |
| 53-PT | Information Obtained Subsequent to Original Expert Report |

Submitted Under Seal; Highly Confidential;

Outside Counsel Eyes' Only

# Julie L. Davis, CPA

20 North Wacker Drive – Suite 2150
Chicago, Illinois 60606

Tel:  312-506-1505
Fax: 312-506-1510
jdavis@dhllc.com

## Employment

| | |
|---|---|
| June 2003 – Present | Davis & Hosfield Consulting LLC – Principal |
| May 2002 – May 2003 | KPMG LLP – Partner-in-Charge, National Intellectual Property Practice |
| September 1991 – May 2002 | Andersen – Co-Managing Partner, Global Intellectual Asset Consulting Practice |
| November 1987 – August 1991 | Andersen – Chicago office:  Senior Manager in Specialty Consulting |
| July 1978 – November 1987 | Touche Ross & Co. – Kansas City office:  Audit practice |

## Educational Background

| | |
|---|---|
| September 2000 | Inducted into Kansas State University Accounting Hall of Fame |
| July 1980 and subsequent | Certified Public Accountant (CPA) and licensed in California, Illinois, Kansas, Missouri, and Texas |
| May 1978 | Gold Key-State of Kansas CPA Examination (Highest score in state) |
| May 1978 | B.S. in Business Administration and Accounting Kansas State University Summa Cum Laude |

## Litigation Consulting Experience

Testified at trial (bench and jury) and through deposition as expert witness.

Conducted complex damages studies involving lost sales, lost profits, incremental profits, manufacturing and marketing capacity, fixed and variable costs, product line profitability, price erosion, reasonable royalty, unjust enrichment and prejudgment interest.

Cases have involved patent, trademark, trade dress, trade secret and copyright infringement, antitrust, false advertising, dealership termination, fraudulent conveyance, breach of contract, professional malpractice, and other types of business disputes.

Industries have included apparel, aerospace, automotive, biotechnology, carpet, chemicals, computer hardware and software, construction, consumer products, electronics, financial institutions, food, hospitality, industrial equipment, internet, medical products, military equipment, office equipment, pharmaceuticals, power tools, real estate, sporting goods, and transportation.

## Other Financial Consulting Experience

Assisted global companies with development of intellectual property strategy.

Developed competitive assessment capabilities for major consumer products company using patent portfolio analyses.

Directed analyses of a Fortune 50 company's portfolio of over 25,000 patents, including review of prosecution and maintenance fees, trends, and patent department processes.

Assisted with licensing analyses, including whether the company should license its intellectual property and at what rates.

Supervised review of royalty payments for compliance with license agreements.

Directed and performed independent financial audits of private and publicly held companies ranging from manufacturing enterprises to financial institutions.

Developed insurance claims for business interruption losses in such industries as retail, processing, hospitality, fine arts, and professional services.

Performed due diligence services for potential acquisitions in the cosmetics and automotive parts industries.

Assisted consumer products company with analysis of operations and purchasing practices to improve productivity and profitability.

Developed and implemented comprehensive turnaround plan for national wholesale grocer experiencing financial crisis.

Investigated numerous fraud and negligence claims related to failed savings and loans.

**Membership in Trade Associations**

American Institute of Certified Public Accountants

Illinois CPA Society – past Chairperson of statewide Litigation Services Committee

American Bar Association

Licensing Executives Society

**Publications**

*Edison in the Boardroom:  How Leading Companies Realize Value from Their Intellectual Assets* – Julie L. Davis, Suzanne S. Harrison – Wiley/Andersen Intellectual Capital Series, June 2001.  (Also translated into Chinese and Japanese.)

"Tapping Into Your Company's Hidden Resources" – *U.S. Industry Today*, July 1999.

"An Update on Patent Damages – A Closer Look at Lost Profits and Reasonable Royalty Decisions from 1982 through June 1998" – *Licensing Law and Business Report*, January-February 1999 (Vol. 21, No. 1).

"Emerging Trends in Patent Infringement Damage Awards 1982-June 1997" – *Intellectual Property Infringement Damages*, 1999, Chapter 14.

"Using Your IP to Increase Shareholder Value" – *Managing Intellectual Property*™, Patent Yearbook 1998.

"Emerging Trends in Patent Infringement Damage Awards" – *Intellectual Property Infringement Damages*, 1998 Cumulative Supplement, Chapter1.4A.

"Reaching for the Sky and Beyond" – *Managing Intellectual Property*™, March 1997 (Issue 67).  Provided summary of damages cases and related data only.

"Patent Infringement Damages Awards" – *Licensing Law and Business Report*, May-June, 1995 (Vol. 17, No. 7).

"An Historical Look at Patent Infringement Damage Awards" – *Intellectual Property Infringement Damages*, 1995 Cumulative Supplement, Chapter 1.4A.

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Tessera, Inc. v. Sony Corporation<br>Case No. 5:11-cv-04399-EJD (HRL) | U.S. District Court for the Northern District of California, San Jose Division | Irell & Manella LLP | Breach of contract | Dep: 2013<br>Report(2): 2013 |
| Tomita Technologies USA LLC, and Tomita Technologies International, Inc. v. Nintendo Co., Ltd., and Nintendo of America, Inc.<br>Case No. 1:11-cv-04256-JSR | U.S. District Court for the Southern District of New York | Kaye Scholer LLP | Patent infringement | Trial: 2013<br>Dep: 2012<br>Report: 2012<br>Declaration: 2013 |
| Dyson, Inc. v. Bissell Homecare, Inc.<br>Case No. 10-cv-8126 | U.S. District Court for the Northern District of Illinois, Eastern Division | Kirkland & Ellis LLP | False advertising | Dep: 2013<br>Report(2): 2012 |
| Life Technologies Corporation, et al. v. Illumina, Inc., et al.<br>Case No. 3:11-cv-00703-CAB-DHB | U.S. District Court Southern District of California (San Diego) | Paul, Weiss, Rifkind, Wharton & Garrison LLP | Patent infringement | Dep: 2012<br>Report: 2012<br>Declaration: 2012 |
| AM General v. BAE Systems, Inc., et al.<br>Case No. 71D07-0907-PL-00195 | State of Indiana, County of St. Joseph | Wilmer Cutler Pickering Hale and Dorr LLP | Trade secret misappropriation and breach of contract | Trial: 2012<br>Report(4): 2012 |
| Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products LLC, First Quality Products, Inc., First Quality Retail Services LLC, and First Quality Hygienic, Inc.<br>Case No. 1:09-cv-01685-WWC | U.S. District Court for the Middle District of Pennsylvania | Banner & Witcoff, Ltd. | Patent infringement | Dep: 2012<br>Report(3): 2012 |
| Coloplast A/S v. Generic Medical Devices, Inc.<br>Case No. CV 10-227 BHS | U.S. District Court for the Western District of Washington at Tacoma | Faegre & Benson LLP | Patent infringement | Trial: 2012<br>Dep: 2011<br>Report: 2011<br>Declaration(2): 2012 |
| MedImmune LLC v. Henry M. Jackson Foundation for the Advancement of Military Medicine, Inc. and Virion Systems, Inc., et al.<br>Civil Action No. 351304-V | U.S. Circuit Court for Montgomery County, Maryland | McKool Smith, PC | Breach of license agreement | Dep: 2012 |
| Realtime Data LLC d/b/a IXO v. Morgan Stanley, et al. (Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC)<br>Case No. 6:09-cv-326 | U.S. District Court for the Southern District of New York | Wilmer Cutler Pickering Hale and Dorr LLP | Patent infringement | Dep: 2012<br>Report: 2012 |
| Mformation Technologies, Inc. v. Research In Motion, Ltd. and Research In Motion Corporation<br>Case No. 5:08-cv-04990 | U.S. District Court for the Northern District of California, San Jose Division | Kirkland & Ellis LLP | Patent infringement | Trial: 2012<br>Dep: 2011<br>Report(4): 2011, 2012<br>Declaration(3): 2011, 2012 |
| Abbott GmbH & Co., KG and Abbott Biotechnology, Ltd. v. Centocor Ortho Biotech, Inc. and Centocor Biologics LLC<br>Civil Action No. 4:09-cv-11340-FDS | U.S. District Court for the District of Massachusetts | Wilmer Cutler Pickering Hale and Dorr LLP | Patent infringement | Dep: 2011<br>Report(2): 2011, 2012 |

underline indicates client

1

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Carefusion 303, Inc. v. B. Braun Medical, Inc. Case No. 8:11-CV-01264 PA (ANx) | U.S. District Court for the Central District of California, Western Division | Greenberg Traurig LLP | Patent infringement | Dep: 2012 Report: 2012 |
| AVM Technologies LLC v. Intel Corporation Civil Action No. 10-610-RGA | U.S. District Court for the District of Delaware | Wilmer Cutler Pickering Hale and Dorr LLP | Patent infringement | Report: 2012 |
| EON Corp. IP Holdings LLC v. T-Mobile USA, Inc., et al. (Nokia, Inc.) Civil Action No. 6:10-CV-00379-LED | U.S. District Court for the Eastern District of Texas, Tyler Division | King & Spalding LLP | Patent infringement | Report: 2012 |
| Cook Incorporated v. Endologix, Inc. Case No. 1:09-cv-1248-TWP-DKL | U.S. District Court for the Southern District of Indiana | Brinks Hofer Gilson & Lione | Patent infringement | Dep: 2012 Report(2): 2011, 2012 |
| General Electric Company v. Mitsubishi Heavy Industries, Ltd. and Mitsubishi Power Systems Americas, Inc. Case No. 3:10-cv-00276-F | U.S. District Court for the Northern District of Texas, Dallas Division | Weil, Gotshal & Manges LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP | Patent infringement | Trial: 2012 Dep: 2011 Report: 2011 |
| Kruse Technology Partnership v. Daimler AG; Mercedes-Benz USA LLC; Detroit Diesel Corporation; Western Star Truck Sales, Inc.; Volkswagen AG; Volkswagen Group of America, Inc., d/b/a Audi Of America, Inc.; Chrysler Group LLC; Daimler Trucks North America LLC; Mercedes-Benz U.S. International, Inc.; and Daimler Vans Manufacturing LLC Civil Action No. SACV 10-1066 JVS (RNBx) | U.S. District Court for the Central District of California, Southern Division (Santa Ana) | Shearman & Sterling, LLP | Patent infringement | Report: 2012 Declaration: 2011 |
| Eolas Technologies, Inc., et al. v. Adobe Systems, Inc., et al. (Staples, Inc.) Case No. 6:09-cv-00446-LED | U.S. District Court for the Eastern District of Texas, Tyler Division | Wilmer Cutler Pickering Hale and Dorr LLP | Patent infringement | Dep: 2012 Report(2): 2011, 2012 |
| Broadcom Corporation v. Emulex Corporation Case No. SACV-09-01058-JVS (ANx) consolidated SACV 10-03963-JVS (ANx) | U.S. District Court for the Central District of California, Southern Division | Wilmer Cutler Pickering Hale and Dorr LLP | Patent infringement | Dep(2): 2011, 2012 Declaration: 2012 Trial: 2011 Report(2): 2011 |
| Mitsubishi Heavy Industries, Ltd. v. General Electric Company Civil Action No: 6:10-cv-00812-JA-GJK | U.S. District Court for the Middle District of Florida, Orlando Division | Weil, Gotshal & Manges LLP | Patent infringement | Dep: 2012 Report: 2011 |
| Novozymes A/S and Novozymes North America, Inc. v. Danisco A/S; Genencor International Wisconsin, Inc., Danisco US, Inc., and Danisco USA, Inc. Case No. 3:10-cv-00251-bbc | U.S. District Court for the Western District of Wisconsin | Fenwick & West LLP | Patent infringement | Declaration(2): 2011 Trial: 2011 Dep: 2011 Report(2): 2011 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---------|-------|----------|------|-----------|
| Solvay, S.A. v. Honeywell Specialty Materials LLC and Honeywell International, Inc. Case No. 06-557-SLR | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Trial:  2011 Dep(2):  2008, 2011 Report(4):  2007, 2011 |
| Server Technology, Inc. v. American Power Conversion Corporation Civil Action No. 3:06-CV-00698-LRH (VPC) | U.S. District Court, District of Nevada | Jenner & Block LLP | Patent infringement | Dep:  2011 Report(2):  2011 |
| Novartis Vaccines and Diagnostics, Inc. v. Wyeth and Wyeth Pharmaceuticals, Inc. 2:08-cv-00067-TJE-CE | U.S. District Court for the Eastern District of Texas, Marshall Division | McKool Smith, PC; O'Melveny & Myers LLP | Patent infringement | Dep:  2011 Report(2):  2011 |
| WiAV Solutions LLC v. Motorola Mobility, Inc., Nokia Corporation, Nokia, Inc., Sony Ericsson Mobile Communications AB, and Sony Ericsson Mobile Communications (USA), Inc. Case No. 3:09-cv-447-LO-JFA | U.S. District Court for the Eastern District of Virginia, Alexandria Division | Winston & Strawn LLP; Alston & Bird LLP; Andrews Kurth LLP | Patent infringement | Dep:  2011 Report:  2011 |
| Triangle Software LLC v. Garmin International, Inc.; TomTom, Inc.; Volkswagen Group of America, Inc.; and Westwood One, Inc. Civil Action No. 1:10-cv-01457-CMH-TCB | U.S. District Court for the Eastern District of Virginia, Alexandria Division | Morrison Foerster LLP | Patent infringement | Report(2):  2011 |
| Nordyne, Inc. v. RBC Manufacturing Corporation Case No. 4:09-cv-00203 | U.S. District Court for the Eastern District of Missouri, Eastern Division | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Dep:  2011 Report:  2011 |
| Osmose, Inc. v. Arch Chemicals, Inc., Arch Wood Protection, Inc., Arch Treatment Technologies, Inc., Cox Industries, Inc., and Rocky Top Building Products, Inc. and Madison Wood Preservers, Inc. Civil Action No. 2:10-cv-00108 | U.S. District Court for the Eastern District of Virginia, Norfolk Division | Kilpatrick Townsend & Stockton LLP | Patent infringement | Report:  2011 |
| GE Healthcare UK, Ltd. v. Beckman Coulter, Inc. and Beckman Coulter Genomics, Inc. Civil Action No. 09-974-RK | U.S. District Court for the District of Delaware | Weil, Gotshal & Manges LLP | Patent infringement | Dep:  2011 Report:  2010 |
| CIVIX-DDI LLC v. Hotels.com, LP and Hotels.com GP LLC Case No. 05 C 6869 | U.S. District Court for the Northern District of Illinois | Kirkland & Ellis LLP | Patent infringement | Report:  2011 |

underline indicates client

3

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| i2 Technologies, Inc. and i2 Technologies US, Inc. v. <u>Oracle Corporation and Oracle USA, Inc. Oracle Corporation, Oracle America, Inc., and Oracle International Corporation</u> v. i2 Technologies, Inc., i2 Technologies US, Inc., and JDA Software Group, Inc. Civil Action No. 6:09-cv-194 (LED) | U.S. District Court for the Eastern District of Texas, Tyler Division | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Dep: 2011 Report(2): 2010, 2011 |
| <u>Brake Parts, Inc.</u> v. David Lewis, Satisfied Brake Products, Inc., and Robert Case No. 5:09-cv-00132 | U.S. District Court for the Eastern District of Kentucky, Central Division at Lexington | Seyfarth Shaw LLP | Trade secret | Hearing: 2010 |
| Bruce J. Brumfield, Jr. and Jerry Caulder, as Members of the Advanced Stent Technologies, Inc. Stockholder Representative Committee and <u>Boston Scientific Corporation</u> Case No. 65-180-Y-00290-08 Case No. 65-489-292-08 | American Arbitration Association | Howrey LLP | Post acquisition dispute | Dep: 2010 Report: 2010 |
| Tyco Healthcare Group LP d/b/a <u>VNUS Medical Technologies</u> v. Biolitec, Inc., Dornier Medtech America, Inc., New Star Lasers, Inc. d/b/a Cooltouch, Inc. Case No. C08-03129 MMC | U.S. District Court for the Northern District of California, San Francisco Division | Davis Polk & Wardwell LLP | Patent infringement | Trial: 2010 Report(2): 2010 |
| Beneficial Innovations, Inc. v. <u>Google, Inc., and YouTube LLC</u> Case No. 2:07-CV-555-TJW-CE | U.S. District Court for the Eastern District of Texas Marshall Division | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Report: 2010 |
| The Chamberlain Group, Inc., and Johnson Controls Interiors LLC v. <u>Lear Corporation</u> Civil Action No. 1:05-CV-3449 | U.S. District Court for the Northern District of Illinois, Eastern Division | Winston & Strawn LLP | Patent infringement | Dep: 2010 Report: 2010 |
| Riddell, Inc. v. <u>Schutt Sports, Inc.</u> Case No. 03:08-cv-00711-BBC | U.S. District Court for the Western District of Wisconsin | Kirkland & Ellis LLP | False advertising and patent infringement | Trial: 2010 Dep: 2010 Report(3): 2010 |
| Ronald A. Katz Technology Licensing, LP v. Time Warner Cable, Inc., et al. (on behalf of defendants <u>Charter Communications, Inc., Charter Communications Holding Company LLC, Charter Communications Operating LLC and Charter Communications Entertainment I LLC</u>) Case No. 1:06-cv-00546-GMS | U.S. District Court for the District of Delaware (Wilmington) | Alston & Bird LLP | Patent infringement | Dep(2): 2008, 2010 Report(2): 2008, 2009 |
| <u>Baxter Healthcare Corporation, et al.</u> v. Fresenius Medical Care Holdings, Inc., et al. Case No. C 07-01359 PJH(JL) | U.S. District Court for the Northern District of California, San Francisco Division | Kirkland & Ellis LLP | Patent infringement | Trial: 2010 Dep: 2009 Report(3): 2009, 2010 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Network-1 Security Solutions, Inc. v. Cisco Systems, Inc., Cisco-Linksys LLC, ADTRAN, Inc., Enterasys Networks, Inc., Extreme Networks, Inc., Foundry Networks, Inc., and 3Com Corporation<br>Case No. 6:08cv030 | U.S. District Court for the Eastern District of Texas, Tyler Division | Wilmer Cutler Pickering Hale & Dorr LLP; Fulbright & Jaworski, LLP; Jones Day; Howrey LLP; Simpson Thacher & Bartlett LLP | Patent infringement | Trial: 2010<br>Dep: 2010<br>Report(4): 2010 |
| Affinity Labs of Texas LLC v. BMW North America LLC, et al. (Mercedes-Benz USA LLC)<br>Case No. 9:08-cv-00164-RC | U.S. District Court for the Eastern District of Texas, Lufkin Division | Crowell & Moring LLP | Patent infringement | Dep: 2010<br>Report: 2010 |
| WiAV Solutions LLC v. Nokia Corporation, and Nokia, Inc., et al.<br>Case No. 3:09cv447 REP | U.S. District Court for the Eastern District of Virginia, Richmond Division | Alston & Bird LLP | Patent infringement | Dep: 2010<br>Report: 2010 |
| Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd., S-LCD Corporation, Samsung Electronics America, Inc., Samsung Telecommunications America LLC, and Samsung Mobile Display Co., Ltd.<br>Case No. 3:09-CV-00001 | U.S. District Court for the Western District of Wisconsin | Jenner & Block LLP | Patent infringement | Dep: 2010<br>Report(2): 2010 |
| Dr. David Kannar v. Alticor, Inc., Amway Corp., Quixtar, Access Business Group LLC, Nutrilite<br>Case No. 2:09-cv-02500-PSG-VBK | U.S. District Court for the Central District of California, Western Division – Los Angeles | Brinks Hofer Gilson & Lione | Patent infringement | Report: 2010 |
| Tessera, Inc. v. United Test and Assembly Center, Ltd., and UTAC America, Inc.<br>Case No. RG08410327 | Superior Court of the State of California for the County of Alameda | Irell & Manella LLP | Breach of contract | Dep: 2010<br>Report(2): 2010 |
| 3M Innovative Properties Company and 3M Company v. Louis M. Gerson Co., Inc. and Gerson Professional Products, Inc.<br>Civil No. 08-04960 JRT/FLN | U.S. District Court for the District of Minnesota | Faegre & Benson LLP | Patent infringement | Dep: 2010<br>Report: 2009 |
| Zamora Radio LLC v. Pandora Media, Inc., et al.<br>Case No. 1:09-cv-20940-EGT | U.S. District Court for the Southern District of Florida, Miami | Banner & Witcoff, Ltd. | Patent infringement | Report: 2010 |
| DuPont Air Products NanoMaterials LLC v. Cabot Microelectronics Corporation Cabot Microelectronics Corporation v. Precision Colloids, LLC and The Virkler Company<br>Case No. CV06-2952-PHX-ROS | U.S. District Court for the District of Arizona | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Report(2): 2008, 2010 |
| IP Innovation LLC, and Technology Licensing Corporation v. Google, Inc.<br>Case No. 2:07cv503-RRR | U.S. District Court for the Eastern District of Texas, Marshall Division | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Report: 2010 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---------|-------|----------|------|-----------|
| Ledergerber Medical Innovations LLC and Dr. Walter Ledergerber v. W.L. Gore & Associates, Inc. Case No. 07-C-1593 | U.S. District Court for the Northern District of Illinois, Eastern Division | Locke Lord Bissell & Liddell LLP | Patent infringement | Report: 2009 |
| Diagnostic Systems Corporation v. Symantec Corporation, et al. (Microstrategy, Inc.) Case No. 8:06-cv-01211 DOC (ANx) | U.S. District Court for the Central District of California, Southern Division | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Dep: 2009 Report: 2009 |
| United States Gypsum Company v. Lafarge North America, Inc., et al. Civil Action No. 03-CV-6027 | U.S. District Court for the Northern District of Illinois, Eastern Division | Leydig, Voit & Mayer, Ltd. | Patent infringement and trade secret misappropriation | Dep(2): 2007, 2009 Report(7): 2007, 2008, 2009 |
| Honeywell International, Inc., and Honeywell Intellectual Properties, Inc. v. Nikon Corporation, et al. (Fuji Film Report) C.A. No. 04-1337-JJF (Consolidated) | U.S. District Court for the District of Delaware | Robins, Kaplan, Miller & Ciresi L.L.P. | Patent infringement | Dep: 2009 Report(2): 2009 |
| Alexsam, Inc. v. Humana, Inc. Case No. 2:07-cv-00288-DF | U.S. District Court for the Eastern District of Texas, Marshall Division | Standley Law Group LLP | Patent infringement | Report: 2009 |
| Monolithic Power Systems, Inc. v. O2 Micro International Ltd., and related counterclaims Case No. C 08-4567 | U.S District Court for the Northern District of California, Oakland Division | Latham & Watkins LLP | Patent infringement | Dep: 2009 Report: 2009 |
| Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. v. Nikon Corporation, et al. (Samsung SDI Report) C.A. No. 04-1337-JJF (Consolidated) | U.S. District Court for the District of Delaware | Robins, Kaplan, Miller & Ciresi L.L.P. | Patent infringement | Dep: 2009 Report: 2009 |
| Wisconsin Alumni Research Foundation v. Intel Corporation Case No. 08-C-78-C | U.S. District Court for the Western District of Wisconsin | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Dep: 2009 Report(2): 2009 |
| Robin Singh d/b/a TestMasters v. Duane Morris LLP Case No. 2008-49090 | U.S. District Court for Harris County, Texas – 164th Judicial Court | Vinson & Elkins LLP | Negligence | Dep: 2009 Report: 2009 |
| Synovis Life Technologies, Inc. v. W.L. Gore & Associates, Inc. Case No. 07 CV 1396 (DWF/SRN) | U.S. District Court for the District of Minnesota | Paul, Hastings, Janofsky & Walker LLP | Patent infringement | Report: 2009 Declaration: 2009 |
| Motorola, Inc. and GMP Wireless Medicine, Inc. v. Nonin Medical, Inc. Case No. 04 CV 05944 | U.S. District Court Northern District of Illinois Eastern Division | Dykema Gossett Rooks Pitts PLLC | Patent infringement | Report: 2009 |
| Santarus, Inc. and The Curators of the University of Missouri v. Par Pharmaceutical, Inc. C.A. No. 07-551 (GMS) | U.S. District Court for the District of Delaware | Irell & Manella LLP | Patent infringement | Trial: 2009 Dep: 2009 Report: 2009 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---------|-------|----------|------|-----------|
| Ring Plus, Inc. v. StoneTurn Group LLP, et al. No. SC096962 | Superior Court for the State of California for the County of Los Angeles – West District | Caldwell Leslie & Proctor, PC | Breach of contract, professional negligence and rescission | Dep: 2009 |
| LG Electronics, Inc. v. Hitachi, Ltd.; Hitachi Automotive Products (USA), Inc.; Clarion Co., Ltd; Clarion Corporation of America; and Xanavi Informatics Corporation Case No. 5:07-cv-00090-DF | U.S. District Court for the Eastern District of Texas, Texarkana | Kirkland & Ellis LLP | Patent infringement | Dep: 2009 Report: 2009 |
| Drew Heriot and Drew Pictures Pty, Ltd. v. Simon & Schuster, Inc. Case No. 1:08-cv-04386 | U.S. District Court for the Northern District of Illinois, Eastern Division | Squire, Sanders & Dempsey L.L.P. | Copyright infringement | Report: 2009 |
| MOAEC, Inc. v. Pandora Media, Inc., et al. Civil Action No. 07-C-0654-BBC | U.S. District Court for the Western District of Wisconsin | Banner & Witcoff, Ltd. | Patent infringement | Dep: 2009 Report: 2009 |
| Medinol, Ltd. against Boston Scientific Corp., et al. WIPOA030807 | World Intellectual Property Organization | Cravath Swaine & Moore LLP | Patent infringement | Dep: 2009 Report: 2008 |
| Ameritox, Ltd. and U.D. Testing, Inc. v. Aegis Sciences Corp. Case No. 07-80498 | U.S. District Court for the Southern District of Florida, West Palm Beach Division | Bell, Boyd & Lloyd LLP | Unfair and deceptive trade practices | Dep: 2009 Report(4): 2008, 2009 |
| CIF Licensing LLC d/b/a GE Licensing v. Agere Systems, Inc. Case No. 07-170-JJF | U.S. District Court of the District of Delaware | McDermott Will & Emery LLP | Patent infringement | Trial: 2009 Dep: 2008 Report(3): 2008, 2009 |
| Spectralytics, Inc. v. Cordis Corporation and Norman Noble, Inc. Civil Action No. 05-1464 (PJS/RLE) | U.S. District Court for the District of Minnesota | Carlson, Caspers, Vandenburgh & Lindquist | Patent infringement | Trial: 2009 Dep: 2007 Report(2): 2007, 2008 |
| MarcTec LLC v. Johnson & Johnson and Cordis Corporation Case No. 3:07-cv-825-DRH-CJP | U.S. District Court for the Southern District of Illinois | Kirkland & Ellis LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Freedom Wireless, Inc. v. Cricket Communications, Inc., et al. Civil Action No. 2-06-CV-504 (TJW-CE) | U.S. District Court for the Eastern District of Texas, Marshall Division | Latham & Watkins LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Honeywell International, Inc., and Honeywell Intellectual Properties, Inc. v. Universal Avionics Systems Corp. and Sandel Avionics, Inc. Civil Action No. 02-359-MPT | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP and Mayer, Brown, Rowe & Maw LLP | Patent infringement and antitrust | Trial(2): 2003, 2008 Dep: 2003 Report(7): 2003, 2008 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| *Lawsuit* | *Court* | *Law Firm* | *Type* | *Testimony* |
|---|---|---|---|---|
| Ronald A. Katz Technology Licensing, LP, v. Cincinnati Bell, Inc., Cincinnati Bell Wireless LLC, Cincinnati Bell Any Distance, Inc., Cincinnati Bell Entertainment, Inc., Cincinnati Bell Extended Territories LLC, Cincinnati Bell Telephone Company LLC, Brcom, Inc., and IXC Internet Services, Inc. Case No. 07-ML-01816-C-RGK | U.S. District Court, Central District of California, Western Division | Standley Law Group | Patent infringement | Dep: 2008 Report: 2008 |
| Hologic, Inc., Cytyc Corporation and Hologic LP v. SenoRx, Inc. Civil Action No. 08-CV-0133 RMW | U.S. District Court for the Northern District of California, San Jose Division | Howrey LLP | Patent infringement | Dep(2): 2008 Declaration(2): 2008 |
| Safe Auto Insurance Company v. State Automobile Mutual Insurance Company Case No. 2:07-cv-01121-EAS-NMK | U.S. District Court, Southern District of Ohio (Columbus) | Standley Law Group LLP | Trademark infringement | Report: 2008 |
| Ronald A. Katz Technology Licensing, LP v. Time Warner Cable, Inc., et al. (on behalf of defendants Time Warner Cable, Inc., Time Warner NY Cable LLC and Time Warner Entertainment Company LP) Case No. 1:06-cv-00546-GMS | U.S. District Court for the District of Delaware (Wilmington) | Alston & Bird LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Ronald A. Katz Technology Licensing, LP v. Time Warner Cable, Inc., et al. (on behalf of defendants AOL LLC, Compuserve Interactive Services, Inc. and Netscape Communications Corporation) \ Case No. 1:06-cv-00546-GMS | U.S. District Court for the District of Delaware (Wilmington) | Alston & Bird LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Ronald A. Katz Technology Licensing, LP v. Humana, Inc. (on behalf of defendants Humana, Inc. and Humana Military Healthcare Services, Inc.) Case No. 9:06-cv-199-RC | U.S. District Court for the Eastern District of Texas (Lufkin) | Standley Law Group LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Ronald A. Katz Technology Licensing, LP v. TD Banknorth, Inc., et al. (on behalf of defendants Dillard's, Inc. and Dillard Investment Co., Inc.) Case No. 1:06-cv-00544-GMS | U.S. District Court for the District of Delaware (Wilmington) | Alston & Bird LLP | Patent infringement | Report: 2008 |
| Ronald A. Katz Technology Licensing, LP v. Ahold USA, Inc., et al. (on behalf of defendants Ahold USA, Inc., Stop & Shop Supermarket Company LLC, Giant Food Stores LLC and Giant Food, Inc.) Case No. 1:06-cv-00545-GMS | U.S. District Court for the District of Delaware (Wilmington) | Alston & Bird LLP | Patent infringement | Report: 2008 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Auction Management Solutions, Inc. v. Manheim Auctions, Inc., et al. Auction Management Solutions, Inc. v. ADESA, Inc. Case No. 1:05-CV-0639 Case No. 1:05-CV-0638 | U.S. District Court for the Northern District of Georgia, Atlanta Division | Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. | Patent infringement | Dep: 2008 Report: 2008 |
| ExonHit Therapeutics S.A. and ExonHit Therapeutics, Inc. v. Jivan Biologics, Inc. Case No. C07 1427 WHA | U.S. District Court for the Northern District of California, San Francisco Division | Hogan & Hartson LLP | Patent infringement | Report: 2008 |
| 3M Company and 3M Innovative Properties Company v. Vita Zahnfabrik H. Rauter GmbH & Co. KG and Vident, Inc. Case No. 0:05-CV-01875 ADM/JJG | U.S. District Court of Minnesota | Fish & Richardson P.C. | Patent infringement | Report: 2008 |
| Herman Miller, Inc. v. Teknion Corporation and Okamura Corporation Civil Action No. 05-CV-2761 | U.S. District Court Northern District of Illinois, Eastern Division | Howrey LLP Michael Best & Friedrich LLP | Patent infringement | Dep: 2008 Report: 2008 |
| Taurus IP LLC v. DaimlerChrysler Corporation, et al. Civil Action No. 07-C-158-C | U.S. District Court for the Western District of Wisconsin | Kilpatrick Stockton LLP | Patent infringement | Dep: 2008 Report(2): 2008 |
| Repligen Corporation and The Regents of the University of Michigan v. Bristol-Myers Squibb Company Case No. 2:06-CV-004-TJW | U.S. District Court for the Eastern District of Texas, Marshall Division | Fish & Richardson PC | Patent infringement | Dep: 2008 Report: 2007 |
| PUMA AG Rudolf Dassler Sport and PUMA North America v. Payless Shoesource, Inc. and Payless Shoesource Worldwide, Inc. Civil Action No. 06-cv-11943 | U.S. District Court for the District of Massachusetts | Kirkpatrick & Lockhart Preston Gates Ellis LLP | Trademark infringement | Report: 2008 |
| Rowe International Corp. and Arachnid, Inc. v. Ecast, Inc., Rock-Ola Manufacturing Corp., and View Interactive Entertainment Corp. Case No.: 1:06-cv-02703 | U.S. District Court for the Northern District of Illinois, Eastern Division | Dickstein Shapiro LLP | Patent infringement | Dep: 2008 Report(3): 2007 |
| Abbott Diabetes Care, Inc. and Abbott Laboratories v. Roche Diagnostics Corp., Roche Diagnostics Operations, Inc. and Bayer Healthcare LLC Case No.: C05-3117 MJJ | U.S. District Court for the Northern District of California | Barnes & Thornburg LLP | Patent infringement | Dep: 2008 Report: 2007 |
| Volumetrics Medical Imaging LLC v. GE Healthcare, Ltd., GE Medical Systems, Inc., GE Medical Systems, LLC, GE Medical Systems Kretztechnik GMBH & Co. OHG, Toshiba America Medical Systems, Inc., Medison America, Inc., and Siemens Medical Solutions USA, Inc. Civil Action No. 1:05CV00955 | U.S. District Court for the Middle District of North Carolina | McDermott, Will & Emery LLP | Patent infringement | Report: 2007 |

underline indicates client

9

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Kathleen Adams and Snap-Saver LLC v. <u>Newell Rubbermaid, Inc. and Target Corporation</u> Civil Action No. 07 C 0313 S | U.S. District Court for the Western District of Wisconsin | Schiff Hardin LLP | Patent infringement | Report:  2007 |
| <u>O'Gara-Hess & Eisenhardt Armoring Company, LLC</u> v. Paul Bartock and Ibis Tek LLC and Thomas G. Buckner and John P. Buckner Case No. CV 2006 04 1157 | Common Pleas Court of Butler County, Ohio | Sebaly Shillito and Dyer | Trade secret | Dep:  2007 Report(2):  2007 |
| Pergo, Inc. and Pergo (Europe) AB v. <u>Alloc, Inc., Armstrong World Industries, Inc. and Berry Finance NV</u> Civil Action No. 02-CV-0736V | U.S. District Court for the Eastern District of Wisconsin | Baker & McKenzie | Patent infringement | Trial:  2007 Dep:  2007 Report:  2007 |
| <u>Intermatic Incorporated</u> v. TayMac Corporation Civil Action No. 00-CV-50224 | U.S. District Court for the Northern District of Illinois, Western Division | Brinks Hofer Gilson & Lione | Patent infringement | Report(2):  2001, 2007 |
| <u>Johnson Controls, Inc.</u> v. InnerWireless, Inc. Arbitration No. 51 181 Y 284 07 | American Arbitration Association | Banner & Witcoff, Ltd. | Breach of contract | Dep:  2007 Report(2):  2007 |
| <u>Medinol Ltd.</u> against Boston Scientific Corp., et al. WIPOA200206 | World Intellectual Property Organization | Cravath Swaine & Moore LLP | Patent infringement | Arbitration:  2007 Dep:  2007 Report(2):  2007 |
| <u>Donaldson Company, Inc.</u> v. Baldwin Filters, Inc. Civil Action No. 04-2679 | U.S. District Court for the District of Minnesota | Merchant & Gould | Patent infringement | Dep:  2007 Report(2):  2007 |
| <u>3M Company and 3M Innovative Properties Company</u> v. Kerr Corporation Case No. 07-C-0087-C | U.S. District Court for the Western District of Wisconsin | Kirkland & Ellis LLP | Patent infringement | Report(2):  2007 |
| <u>Calphalon Corporation</u> v. Meyer Corporation, US Case No. 2:05-CV-00971-WBS-DAD | U.S. District Court Eastern District of California, Sacramento Division | Sheppard, Mullin, Richter & Hampton LLP | Patent infringement and unfair competition | Trial:  2007 Dep:  2006 Report(2):  2006, 2007 |
| <u>911EP, Inc.</u> v. Whelen Engineering Company, Inc. and Tomar Electronics, Inc. Case No. 2-05 CV-137 | U.S. District Court for the Eastern District of Texas, Marshall Division | McKool Smith | Patent infringement | Report:  2007 |
| <u>Atlanta Attachment Company</u> v. Leggett & Platt, Inc. Civil Action File No. 1:05-cv-01071-ODE | U.S. District Court for the Northern District of Georgia, Atlanta Division | Troutman Sanders LLP | Patent infringement and breach of contract | Trial:  2007 Dep:  2006 Report(2):  2005, 2007 |
| <u>Through the Country Door, Inc.</u> v. JC Penney Company, Inc., et al. Case No. 06-C-0540 | U.S. District Court for the Western District of Wisconsin, Madison Division | Barnes & Thornburg LLP | Copyright infringement | Report:  2007 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Honeywell International and Honeywell Intellectual Properties, Inc. v. The United States, et al. No. 02-1909C | U.S. District Court of Federal Claims | Paul, Hastings, Janofsky & Walker LLP | Patent infringement | Trial: 2007 Dep: 2007 Report(3): 2006, 2007 |
| Textron Innovations, Inc. v. The Toro Company Civil Action No. 05-486 (GMS) | U.S. District Court for the District of Delaware | Merchant & Gould | Patent infringement | Dep: 2007 Report(2): 2007 |
| DE Technologies, Inc. v. Dell, Inc. Civil Action No. 7:04 CV 00628 | U.S. District Court for the Western District of Virginia | Robins, Kaplan, Miller & Ciresi L.L.P. | Patent infringement | Dep: 2007 Report: 2006 |
| Cummins-Allison Corp. v. Glory, Ltd., Glory Shoji Co., Ltd. and Glory (USA), Inc. Civil Action No. 02 C 7008 | U.S. District Court for the Northern District of Illinois, Eastern Division | Hogan & Hartson LLP | Patent infringement | Report(2): 2004, 2006 |
| The Holmes Group, Inc. v. West Bend Housewares LLC and Focus Products Group LLC Civil Action No. 05-CV-11367 WGY | U.S. District Court for the District of Massachusetts | Michael Best & Friedrich LLP | Patent infringement | Report(2): 2006 |
| Novozymes A/S v. Genencor International, Inc. and Enzyme Development Corporation Civil Action No. 05-160-KAJ | U.S. District Court for the District of Delaware | Darby & Darby PC | Patent infringement | Trial: 2006 Dep: 2006 Report(2): 2006 |
| One World Technologies, Ltd. and Ryobi Technologies, Inc. v. Robert Bosch Tool Corporation, Rexon Industrial Corp., Ltd., Rexon USA, Corp., and Power Tool Specialists, Inc. Civil Action No. 04 C 0833 | U.S. District Court for the Northern District of Illinois, Eastern Division | Brinks Hofer Gilson & Lione, P.C. | Patent infringement | Dep: 2006 Report: 2006 |
| InLine Connection Corporation v. AOL Time Warner Incorporated and America Online, Inc. Civil Action No. 02-272 | U.S. District Court for the District of Delaware | Latham & Watkins LLP | Patent infringement | Dep: 2006 Report: 2006 |
| Archer Daniels Midland Company v. Vogelbusch USA, Inc. and UOP LLC Case No. 98L 008240 | Circuit Court of Cook County, Illinois County Department, Law Division | Winston & Strawn LLP and McDermott Will & Emery LLP | Breach of implied warranty | Trial: 2006 Dep: 2004 Report: 2004 |
| Maytag Corporation v. Electrolux Home Products, Inc., d/b/a Frigidaire Civil Action No. C 04-4067-MWB | U.S. District Court for the Northern District of Iowa, Western Division | Alston & Bird LLP | Patent infringement | Dep: 2006 Hearing: 2006 Report(2): 2006 |
| One World Technologies, Ltd. and Ryobi Technologies, Inc. v. Rexon Industrial Corp., Ltd., Rexon USA, Corp., Power Tool Specialists, Inc., Porter-Cable Corp., Delta International Machinery Corp., and Pentair, Inc. Civil Action No. 04C-4337 | U.S. District Court for the Northern District of Illinois, Eastern Division | Brinks Hofer Gilson & Lione, P.C. | Patent infringement | Dep: 2005 Report(2): 2005, 2006 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| OPTi, Inc. v. nVidia Corporation<br>Civil Action No. 2-04CV-377 | U.S. District Court for the Eastern District of Texas, Marshall Division | Winston & Strawn LLP | Patent infringement | Report: 2006 |
| Medinol, Ltd. v. Guidant Corporation and Advanced Cardiovascular Systems, Inc.<br>Civil Action No. 03 Civ. 2604 (SAS) | U.S. District Court for the Southern District of New York | Cravath, Swaine & Moore LLP and Morgan & Finnegan, L.L.P. | Patent infringement | Dep: 2005<br>Report(2): 2004, 2006 |
| Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc., v. Advanced Medical Optics, Inc.<br>Civil Action No. 4-05CV-496-A | U.S. District Court for the Northern District of Texas, Fort Worth Division | Rader, Fishman & Grauer PLLC | Patent infringement | Dep: 2006<br>Report: 2006 |
| International Truck and Engine Corporation v. Kile International Trucks, Inc.<br>Case No. 2004L000580 | Circuit Court of Eighteenth Judicial Circuit, DuPage County, Illinois, Law Division | Seyfarth Shaw LLP | Breach of contract | Dep: 2006<br>Report(2): 2005 |
| Versus Technology, Inc. v. Radianse, Inc.<br>Civil Action No. 04-1231 | U.S. District Court for the District of Delaware | Lahive & Cockfield LLP | Patent infringement | Dep: 2006<br>Report: 2005 |
| PowerOasis, Inc. and PowerOasis Networks LLC v. Wayport, Inc.<br>Civil Action No. 04-12023 RWZ | U.S. District Court for the District of Massachusetts | Wilmer Cutler Pickering Hale & Dorr LLP | Patent infringement | Dep: 2006<br>Report: 2005 |
| Cummins-Allison Corp. v. Glory, Ltd., Glory Shoji Co., Ltd. and Glory (USA), Inc.<br>Civil Action No. 2-03-CV-358 (TJW) | U.S. District Court for the Eastern District of Texas, Marshall Division | Hogan & Hartson LLP | Patent infringement | Dep: 2005<br>Report(2): 2005, 2006 |
| Mandy N. Haberman v. Playtex Products, Inc., Gerber Products Company and Wal-Mart Stores, Inc.<br>Civil Action No. 05-C-0224-S | U.S. District Court for the Western District of Wisconsin | Latham & Watkins LLP | Patent infringement | Dep: 2005<br>Report: 2005 |
| SMART Technologies, Inc. v. Polyvision Corporation and Paragram Sales Company, Inc.<br>Civil Action No. 1:04-cv-0713 | U.S. District Court for the Western District of Michigan, Southern Division | Katten Muchin Rosenman LLP | Patent infringement | Report(2): 2005 |
| Kmart Corporation v. Capital One Bank, Capital One F.S.B., Capital One Services, Inc.<br>Case No. 03-055092-CK | State of Michigan Circuit Court for the County of Oakland | Kirkland & Ellis LLP | Breach of contract and trade secret | Dep: 2005 |
| PolyVision Corporation v. SMART Technologies, Inc. and SMART Technologies Corporation<br>Civil Action No. 1:03-cv-0476 | U.S. District Court for the Western District of Michigan, Southern Division | Katten Muchin Rosenman LLP | Patent infringement | Report: 2005 |
| Solutions for Women LLC v. Warner Health Care, Inc., Berkeley Premium Nutraceuticals, Inc. and Vitaquest International, Inc. d/b/a Garden State Nutritionals, Inc.<br>Case No. CV04-10357 JFW (RCX) | U.S. District Court for the Central District of California, Western Division | Wood, Heron and Evans LLP | Patent infringement and trade secret | Report: 2005 |

underline indicates client

12

# Julie L. Davis
## Testimony Experience

| *Lawsuit* | *Court* | *Law Firm* | *Type* | *Testimony* |
|---|---|---|---|---|
| <u>Flexi-Mat Corporation</u> v. Dallas Manufacturing Company, Inc., BJ's Wholesale Club, Inc., and Doskocil Manufacturing Company, Inc. Civil Action No. 04 10162 DPW | U.S. District Court for the District of Massachusetts | Michael Best & Friedrich LLP | Patent infringement | Dep: 2005 Report: 2005 |
| <u>Morton Grove Pharmaceuticals, Inc.</u> v. Pharmaceutical Resources, Inc. and Par Pharmaceuticals, Inc. Civil Action No. 04 C 7007 | U.S. District Court for the Northern District of Illinois, Eastern Division | Winston & Strawn LLP | Patent infringement | Dep: 2005 Report: 2005 |
| Windy City Innovations LLC v. <u>America Online, Inc.</u> Civil Action No. 04 C 4240 | U.S. District Court for the Northern District of Illinois, Eastern Division | Banner & Witcoff, Ltd. | Patent infringement | Dep: 2005 Report: 2005 |
| <u>Amersham PLC, et al.</u> v. Applera Corporation's Applied Biosystems Division File No. G-04-40 | Center for Public Resources Institute for Dispute Resolution | Howrey LLP | Breach of license agreement | Arbitration: 2005 Dep: 2005 Report: 2005 |
| <u>Honeywell International, Inc. and Honeywell Intellectual Properties, Inc.</u> v. Hamilton Sundstrand Corp. Civil Action No. 03-1153 | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Trial: 2005 Dep(2): 2005 Report(2): 2005 |
| Advanced Medical Optics, Inc. v. <u>Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd.</u> Civil Action No. 03-1095-KAJ | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Trial: 2005 Dep: 2004 Report(4): 2004, 2005 |
| <u>Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco</u> v. Watson Pharmaceuticals, Inc. <u>Unimed Pharmaceuticals, Inc. and Laboratories Besins Iscovesco</u> v. Paddock Laboratories, Inc. Case No. 1:03-CV-2501 Case No. 1:03-CV-2503 | U.S. District Court for the Northern District of Georgia, Atlanta Division | Mayer, Brown, Rowe & Maw LLP | Patent infringement | Dep: 2005 Report: 2005 |
| Deere & Company v. <u>The Toro Company</u> Civil Action No. 99-4100 | U.S. District Court for the Central District of Illinois, Rock Island Division | Merchant & Gould | Patent infringement | Arbitration: 2005 Dep: 2004 Report(3): 2001, 2004, 2005 |
| Dr. Marc L. Kozam, d/b/a MLK SOFTWARE and DATASCI LLC v. <u>Phase Forward Incorporated and Quintiles, Inc.</u> Civil Action No. 04-CV-1787 (MJG) | U.S. District Court, District of Maryland, Greenbelt Division | Kirkpatrick & Lockhart Nicholson Graham LLP | Patent infringement | Dep: 2005 Report: 2005 |
| <u>Travel Tags, Inc.</u> v Digital Replay, Inc. Case No. 02-4726 MJD/JGL | U.S. District Court for the District of Minnesota | Merchant & Gould, P.C. | Patent infringement | Dep: 2005 Report: 2004 |

underline indicates client

## Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Mars, Inc., et al. v. H.J. Heinz Co., LP Heinz Management Co., and Del Monte Corporation<br>Case No. CV-01-10961 RGK | U.S. District Court for the Southern District of California, Western Division | Covington & Burling and Kirkland & Ellis LLP | Patent infringement | Trial: 2005<br>Dep: 2003<br>Report(3): 2003, 2004 |
| Rodeo Cold Marketing Company and Wyoming West Designs LLC v. Coors Brewing Company<br>Case No. Civ: F-03-5280-AWI DLB | U.S. District Court for the Eastern District of California | Featherstone DeSisto LLP | Trademark infringement | Dep: 2004<br>Report(2): 2004, 2005 |
| Richard J. Ditzik v. Planar Systems, Inc., et al.<br>Civil Action No. 03 – 74043 | U.S. District Court for the Eastern District of Michigan, Southern Division | Shaw Pittman LLP | Patent infringement | Report: 2005 |
| Savient Pharmaceuticals, Inc., et al. v. Duramed Pharmaceuticals, Inc. and Barr Laboratories, Inc.<br>Civil Action No. 00-4509-DMC | U.S. District Court District of New Jersey | Winston & Strawn LLP | Patent infringement | Dep: 2004<br>Report: 2004 |
| 3M Innovative Properties Company and 3M Company v. Dentsply International, Inc.<br>Civil Action No. 04 C 0564 S | U.S. District Court for the Western District of Wisconsin | Kirkland & Ellis LLP | Patent infringement | Dep: 2004<br>Report(2): 2004 |
| Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. v. Universal Avionics Systems Corp. and Sandel Avionics, Inc.<br>Civil Action No. 03-242-MPT | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP and Mayer, Brown, Rowe & Maw LLP | Patent infringement | Trial: 2004<br>Dep: 2004<br>Report(4): 2004 |
| QinetiQ, Ltd. v. Samsung Telecommunications America, LP<br>Civil Action No. 2-03CV-221 | U.S. District Court for the Eastern District of Texas, Marshall Division | Latham & Watkins LLP | Patent infringement | Trial: 2004<br>Report: 2004 |
| Dow AgroSciences LLC v. Crompton Corporation and Uniroyal Chemical Company, Inc.<br>Civil Action No. 1:03-CV-0654-SEB-JPG | U.S. District Court Southern District of Indiana, Indianapolis Division | Barnes & Thornburg LLP | Patent infringement | Dep: 2004<br>Report: 2004 |
| Collaboration Properties, Inc. v. Polycom, Inc. and Polycom, Inc. v. Collaboration Properties, Inc. and Avistar Communications Corp.<br>Case No. C02-49591 | U.S. District Court for the Northern District of California, San Francisco Division | Keker & Van Nest LLP | Patent infringement | Report: 2004 |
| Yoon Ja Kim v. ConAgra Foods, Inc.<br>Civil Action No. 01 CV 2467 | U.S. District Court for the Northern District of Illinois, Eastern Division | Bingham McCutchen LLP | Patent infringement | Trial: 2004<br>Report(2): 2003, 2004 |
| PSN Illinois LLC v. Oil-Dri Corporation of America<br>Civil Action No. 04C 0915 | U.S. District Court for the Northern District of Illinois | Wildman, Harrold, Allen & Dixon LLP | Patent infringement | Report: 2004 |

underline indicates client

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---------|-------|----------|------|-----------|
| Motorola, Inc. v. Analog Devices, Inc. Civil Action No. 1:03-CV-0131 | U.S. District Court Eastern District of Texas, Beaumont Division | Wilmer Culter Pickering Hale and Dorr LLP | Patent infringement | Dep: 2004 Report(3): 2004 |
| Syngenta Seeds, Inc. v. Monsanto Company, et al., Pioneer Hi-Bred, et al. Civil Action No. 02-1331 (SLR) | U.S. District Court for the District of Delaware | Kaye Scholer LLP | Patent infringement | Dep: 2004 Report: 2004 |
| Pinpoint Incorporated v. Amazon.com, Inc., et al. Civil Action No. 03C-4954 | U.S. District Court for the Northern District of Illinois, Eastern Division | Bartlit Beck Herman Palenchar & Scott LLP | Patent infringement | Dep: 2004 Report(3): 2004 |
| Riverwood International Corporation v. R.A. Jones & Company, Inc. No. 1:98-CV-2840-BBM | U.S. District Court for the Northern District of Georgia, Atlanta Division | Wood, Herron & Evans, LLP and Powell, Goldstein, Frazer & Murphy, LLP | Patent infringement | Trial: 2001 Dep: 2001 Report(2): 2001, 2004 |
| Do It Best Corp. v. Passport Software, Inc. Case No. 01 C 7674 | U.S. District Court for the Northern District of Illinois, Eastern Division | Barnes & Thornburg LLP | Copyright infringement | Dep: 2004 Report: 2004 |
| Arthur D. Little Enterprises, Inc. and The Gillette Company Civil Action No. 11 133 00735 00 | American Arbitration Association Northeast Case Management Center Riverside, Rhode Island | Morgan & Finnegan and Niro, Scavone, Haller & Niro | Licensing dispute | Dep: 2002 Report(2): 2001, 2004 |
| Milliken & Company v. Interface, Inc., et al. Civil Action No. 7:02-3633-20 | U.S. District Court for the District of South Carolina, Spartanburg Division | Kilpatrick Stockton LLP | Patent infringement | Trial: 2004 Dep: 2003 Report(4): 2003 |
| Haggerty Enterprises, Inc. v. Creative Motion Industries, Inc. Case No. 02C 8578 | U.S. District Court for the Northern District of Illinois, Eastern Division | Michael Best & Friedrich LLP | Trademark and trade dress infringement | Report: 2004 |
| Sanyo Energy (USA) Corporation v. BYD Company, Ltd. Case No. 02-CV01900B (JMA) | U.S. District Court for the Southern District of California | Hogan & Hartson LLP | Patent infringement | Dep: 2004 Report: 2004 |
| Loegering Mfg., Inc. v. Grouser Products, Inc. and Ronald J. Hoffart Civil Action No. A3-02-008 | U.S. District Court for the District of North Dakota, Southeastern Division | Merchant & Gould | Patent infringement | Dep: 2004 Report(2): 2003, 2004 |
| Rambus, Inc. v. Infineon Technologies AG, et al. Civil Action No. 3:00CV524 | U.S. District Court for the Eastern District of Virginia | Kirkland & Ellis LLP | Patent infringement, antitrust, breach of contract, fraud and RICO | Dep: 2001 Report(4): 2000, 2001, 2004 |
| Waters Technologies Corporation, et al. v. Applera Corporation Civil Action No. 02-1285-GMS | U.S. District Court for the District of Delaware | Shaw Pittman LLP | Patent infringement | Dep: 2003 Report(2): 2003, 2004 |

underline indicates client

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---------|-------|----------|------|-----------|
| United States Filter Corporation v. Met-Pro Corporation Civil Action No. 02-1491-GMS | U.S. District Court for the District of Delaware | Hale and Dorr LLP | Patent infringement | Report: 2003 |
| John Mezzalingua Associates, Inc. d/b/a PPC, Inc. v. Arris International, Inc. Civil Action No. 03 C 0353 C | U.S. District Court for the Western District of Wisconsin | Bartlit Beck Herman Palenchar & Scott | Patent infringement | Trial: 2003 Dep: 2003 Report(3): 2003 |
| T. Andrew Janes v. Bose Corporation Civil Action No. 02C3886 | U.S. District Court for the Northern District of Illinois, Eastern Division | Fish & Richardson | Patent infringement | Report: 2003 |
| Johnson Controls Technology Company and Johnson Controls Interiors LLC v. Donnelly Corporation Case No. 1:02-CV-419 | U.S. District Court for the Western District of Michigan | Foley & Lardner | Patent infringement | Report: 2003 |
| France Telecom, et al. and RSA Security, Inc. Arbitration No. 11899/DB | International Chamber of Commerce, International Court of Arbitration, Paris, France | Testa, Hurwitz & Thibeault, LLP | Breach of license agreement | Arbitration: 2003 Report: 2003 |
| In re: Application of: Curt H. Appelgren, et al. | U.S. Patent and Trademark Office | Fitzpatrick, Cella, Harper & Scinto | Patent application | Declaration: 2003 |
| Clinical Center Pharmacy, et al. v. IMS Health Incorporated, et al. Case No. 94-L-654 | U.S. Circuit Court, Twentieth Judicial Circuit, St. Clair County, Illinois | Mayer, Brown, Rowe & Maw | Trade secret | Dep: 2003 Report: 2003 |
| Tanox, Inc. and Genentech, Inc. Civil Action No. 74 Y181 01113 99 | American Arbitration Association International Center for Dispute Resolution, San Francisco, California | Latham & Watkins | Trade secret, breach of contract and unfair competition | Arbitration: 2003 Dep: 2002 Report: 2002 |
| Leon Stambler v. RSA Security, Inc., VeriSign, Inc., First Data Corporation, Openwave Systems, Inc., OmniSky Corporation, and Certicom Corp. Civil Action No. 01-0065 | U.S. District Court for the District of Delaware | Hale and Dorr LLP | Patent infringement | Dep: 2003 Report(2): 2002, 2003 |
| Susan M. Maxwell v. Meijer, Inc., et al. Civil Action No. IP95-870-C-Y/F | U.S. District Court for the Southern District of Indiana | Baker & Daniels | Patent infringement | Report: 2002 |
| Honeywell International, Inc. and Honeywell Intellectual Property, Inc. v. Solutia, Inc. Civil Action No. 01-423 | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Report: 2002 |
| BorgWarner, Inc. and BorgWarner TorqTransfer Systems, Inc. v. New Venture Gear, Inc. No. 00-C-7470 | U.S. District Court for the Northern District of Illinois, Eastern Division | Brinks Hofer Gilson & Lione | Patent infringement | Dep: 2002 Report: 2002 |

underline indicates client

16

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| ACTV, Inc. and HyperTV Networks, Inc. v. The Walt Disney Co., ABC, Inc. and ESPN, Inc.<br>Civil Action No. 00CIV 9622 JSR | U.S. District Court for the Southern District of New York | Weil, Gotshal & Manges LLP | Patent infringement | Dep: 2002<br>Report: 2002 |
| Hill-Rom, Inc. v. Ohmeda Medical, Inc.<br>No. C.A. IP001500-CY/G | U.S. District Court for the Southern District of Indiana, Indianapolis Division | Barnes & Thornburg | Patent infringement | Dep: 2002<br>Report(2): 2002 |
| Bancorp Services, LLC v. Hartford Life Insurance Company and International Corporate Marketing Group, Inc.<br>No. 4:00-CV-0070 | U.S. District Court for the District of Missouri, Eastern Division | Akin, Gump, Strauss, Hauer & Feld, LLP | Patent infringement and trade secret | Trial: 2002<br>Dep: 2001 |
| Pechiney Plastic Packaging, Inc. v. Continental PET Technologies, Inc.<br>Civil Action No. B90-558 (EBB) | U.S. District Court for the District of Connecticut | Akin, Gump, Strauss, Hauer & Feld, LLP | Patent infringement | Dep: 2002<br>Report: 2002 |
| TV/Com International, Inc. v. MediaOne of Greater Florida, Inc., Canal Plus Technologies SA, Canal Plus US Technologies, Inc. and Société Européene de Contrôle d' Accés<br>No. 3:00-CV-1045-J-21 A | U.S. District Court for the Middle District of Florida, Jacksonville Division | Oblon, Spivak, McClelland, Maier & Neustadt | Patent infringement | Report: 2001 |
| Residential Funding Corporation v. DeGeorge Financial Corp., et al.<br>No. 3:00CV202 (JBA) | U.S. District Court for the District of Connecticut | Bartlit Beck Herman Palenchar & Scott | Breach of contract and unfair trade practices | Trial: 2001<br>Dep: 2001<br>Report: 2001 |
| Soitec, SA and CEA v. Silicon Genesis Corporation<br>Civil Action No. 99-CV-10826 NG | U.S. District Court for the District of Massachusetts | Winston & Strawn LLP | Patent infringement | Dep: 2001<br>Report(2): 2000, 2001 |
| Caterpillar, Inc. v. Deere & Company<br>No. 96C 5355 | U.S. District Court for the Northern District of Illinois | Mayer, Brown & Platt | Patent infringement | Dep: 1999<br>Report(4): 1998, 1999, 2001 |
| Zevo Golf Co., Inc. v. Karsten Manufacturing Corp., et al.<br>No. 99-CV-2310-H | U.S. District Court for the Southern District of California | Bryan Cave LLP | Patent infringement | Dep: 2001<br>Report: 2001 |
| Roxane Laboratories, Inc. v. Unimed Pharmaceuticals, Inc.<br>No. C2 00 125 | U.S. District Court for the Southern District of Ohio, Eastern Division | Sonnenschein Nath & Rosenthal | Breach of contract | Dep: 2001<br>Report(2): 2001 |
| Pharmacia & Upjohn AB v. Genentech, Inc.<br>No. 10295/AMW/KGA | International Chamber of Commerce Arbitration | Latham & Watkins | Breach of contract | Arbitration: 2001<br>Report(3): 2000, 2001 |
| Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. v. Hamilton Sundstrand Corporation<br>Civil Action No. 99-309 (GMS) | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Trial: 2001<br>Dep: 2001<br>Report(2): 2000, 2001 |
| MorphoSys AG v. Cambridge Antibody Technology, Ltd.<br>No. 1:99CV01012 | U.S. District Court for the District of Columbia | Katten Muchin Zavis | Patent infringement | Dep: 2000<br>Report(4): 2000, 2001 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| CCL Container (Hermitage), Inc. v. Exal Corp. Civil Action No. 98-1786 | U.S. District Court for the Western District of Pennsylvania | Laff, Whitesel & Saret Ltd. | Patent infringement | Dep: 2001 Report: 2000 |
| TorPharm, Inc. v. Ranbaxy Pharmaceuticals, Inc., et al. No. 99-714 (JCL) | U.S. District Court for the District of New Jersey | Lord, Bissell & Brook | Patent infringement | Report: 2000 |
| Xu Liu v. Price Waterhouse LLP and Computer Language Research, Inc. No. 97 C 3093 | U.S. District Court for the Northern District of Illinois, Eastern Division | Kirkland & Ellis LLP | Copyright infringement | Trial: 2000 Dep: 1998 Report(3): 1998 |
| Curtis P. Bryant, Kim R. Bryant and Rebecca Meloan v. American Greetings Corporation No. 99-WM-1819 | U.S. District Court for the District of Colorado | Merchant & Gould | Trademark and copyright infringement | Report: 2000 |
| Rotec Industries, Inc. v. Mitsubishi Corporation No. 99-2080 | U.S. District Court for the Central District of Illinois | Mayer, Brown & Platt | Trade secret | Report: 2000 |
| Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Company No. 98-CV-2855 | U.S. District Court for the Northern District of Ohio, Eastern Division | Seyfarth Shaw | Patent infringement | Report: 2000 |
| Newell Operating Company, doing business as and through its division, EZ Paintr Company v. Linzer Products Corporation No. 98-C-0864 | U.S. District Court for the Eastern District of Wisconsin | Winston & Strawn LLP | Patent infringement | Report: 2000 |
| Keith S. Champlin, PhD and Midtronics, Inc. v. Actron Manufacturing Company Inc. Civil Action No. 98-CV-06441 | U.S. District Court for the Northern District of Illinois | Sidley & Austin | Patent infringement | Report: 2000 |
| Joseph Serfecz & First Chicago Trust Co. v. Jewel Foods Stores, Inc., et al. No. 92 C 4171 | U.S. District Court for the Northern District of Illinois, Eastern Division | Rock Fusco Reynolds Crowe & Garvey Lynda J. Khan & Associates | Antitrust restraint of trade and breach of contract | Dep(2): 1993, 1997 Report(3): 1993, 1997, 2000 |
| First Health Group Corp., formerly known as HealthCare Compare Corp., d/b/a The First Health AFFORDABLE Medical Networks v. United Payors & United Providers, Inc. No. 9 C 2518 | U.S. District Court for the Northern District of Illinois, Eastern Division | Kirkland & Ellis LLP | Unfair competition | Dep(2): 1999 Report(2): 1999 |
| Goody Products, Inc. v. The New L&N Sales & Marketing, Inc. and Rommy Hunt Revson Civil Action No. 99C-0724 | U.S. District Court for the Northern District of Illinois, Eastern Division | Schiff Hardin & Waite | Patent infringement | Dep: 1999 Report: 1999 |
| Lucent Technologies, Inc. v. Newbridge Networks Corporation and Newbridge Networks Inc. No. 97-347 | U.S. District Court for the District of Delaware | Kirkland & Ellis LLP | Patent infringement | Trial: 1999 Dep: 1999 Report(2): 1999, 2000 |

underline indicates client

## Julie L. Davis
## Testimony Experience

| *Lawsuit* | *Court* | *Law Firm* | *Type* | *Testimony* |
|---|---|---|---|---|
| EMI Group North America, Inc. v. Cypress Semiconductor Corporation No. 98-350-RRM | U.S. District Court for the District of Delaware | Sidley & Austin and Morris, Nichols, Arsht & Tunnell | Patent infringement | Trial: 1999 Dep: 1999 Report: 1999 |
| Precor Incorporated v. Life Fitness, et al. No. C94-1586C | U.S. District Court for the Western District of Washington at Seattle | Lane Powell Spears & Lubersky and Bartlit Beck Herman Palenchar & Scott | Patent infringement and unfair competition | Trial: 1999 Dep(3): 1995, 1996, 1999 Report(3): 1995, 1996, 1999 |
| The Regents of the University of California v. Genentech, Inc. No. C 90-2232 CAL | U.S. District Court for the Northern District of California | Rogers & Wells | Patent infringement | Dep: 1998, 1999 Report(2): 1997, 1999 |
| AMP Incorporated and The Whitaker Corporation v. Teradyne, Inc. No. 4:CV-98-0975 | U.S. District Court for the Middle District of Pennsylvania | Brinks Hofer Gilson & Lione | Patent infringement and trade secret | Dep: 1999 Report: 1999 |
| Investment Holdings, Inc., and its wholly-owned subsidiaries Surface Technical Systems, Inc., Electrolizing, Inc. and ME-92 Operations, Inc. v. Smith & Nephew, Inc. and Harry E. Corl, III Case No. 97-3021 | U.S. District Court for the Western District of Tennessee | Fulbright & Jaworski | Trade secret | Dep: 1999 Report: 1999 |
| LePage's Incorporated and LePage's Management Co. LLC v. Minnesota Mining and Manufacturing Company (3M) No. 97-CV-3983 | U.S. District Court for the Eastern District of Pennsylvania | Collier, Shannon, Rill & Scott | Antitrust | Trial: 1999 Dep: 1998 Report: 1998 |
| Micro Solutions, Inc. v. Hewlett-Packard Company, Micro Solutions, Inc. v. Computer Connections America, Inc., and H45 Technology Corporation Civil Action No. 98 C 50135 | U.S. District Court for the Northern District of Illinois, Western Division | Brinks Hofer Gilson & Lione | Patent infringement | Dep: 1999 Report: 1999 |
| Ferndale Laboratories, Inc. v. Block Drug Company, Inc., Reed & Carnrick Division and Schwarz Pharma, Inc. No. 95-CV-12796-DT | U.S. District Court for the Eastern District of Michigan, Southern Division | Dickinson, Wright, Moon, Van Dusen & Freeman | Breach of contract | Trial: 1999 Dep: 1997 Report(2): 1997, 1999 |
| Hilgraeve Corporation v. McAfee Associates, Inc. (Network Associates) No. 97-74695 | U.S. District Court for the Eastern District of Michigan, Southern Division | Wilson, Sonsini, Goodrich & Rosati | Patent infringement | Report: 1998 |
| Dade Behring Marburg GmbH Syva Company and Dade Behring, Inc. v. Biosite Diagnostics, Inc. No. 97-501 | U.S. District Court for the District of Delaware | Kaye, Scholer, Fierman, Hays & Handler | Patent infringement | Dep: 1998 Report: 1998 |
| United Technologies Motors Systems, Inc. v. Borg Warner Automotive, Inc. No. 97-71706 | U.S. District Court for the Eastern District of Michigan, Southern Division | Brinks Hofer Gilson & Lione | Patent infringement | Report: 1998 |

underline indicates client

## Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| F.C. Cycles International, Inc. v. FILA Sport S.p.A. No. AMD 96-107 | U.S. District Court for the District of Maryland | Dickstein Shapiro Morin & Oshinsky | Wrongful termination of a license | Dep: 1998 Report: 1998 |
| Videojet Systems International, Inc. v. Eagle Inks, Inc. and Frank M. Quaglia, Jr. No. 97 C 4505 | U.S. District Court for the Northern District of Illinois | Jones, Day, Reavis & Pogue | Patent infringement | Report: 1998 |
| Smith & Nephew Richards, Inc. v. Zimmer, Inc. No. 94-2479 GBRO | U.S. District Court for the Western District of Tennessee | Pravel Hewitt Kimball & Krieger | Patent infringement | Dep: 1998 Report(4): 1998 |
| Alumax, Inc. v. Hot Metal Molding, Inc., Hot Metal Technologies, Inc., Buhler, Inc., Buhler AG, and Ormet Primary Aluminum Corporation No. LR-C-95-486 | U.S. District Court for the Eastern District of Arkansas, Little Rock Division | Jones & Askew | Patent infringement | Dep: 1998 Report(3): 1998 |
| Time Inc. v. Petersen Publishing Company, LLC Civil Action No. 97 Civ. 5879 (HB) | U.S. District Court for the Southern District of New York | Kirkland & Ellis LLP | Trademark infringement | Trial: 1998 Dep: 1998 Report(2): 1998 |
| Donald E. Haney v. Timesavers, Inc., et al. No. CV-93-151-HA (Lead) | U.S. District Court for the District of Oregon | Bartlit Beck Herman Palenchar & Scott | Patent infringement | Trial: 1998 Dep: 1997 Report: 1997 |
| Stryker Corporation v. Davol, Inc. Davol, Inc. v. Stryker Corporation No. 96CV191 | U.S. District Court for the Western District of Michigan, Southern Division | Winston & Strawn LLP | Patent infringement | Trial: 1998 Dep(2): 1998 Report(6): 1997, 1998 |
| Caterpillar, Inc. v. Detroit Diesel Corporation No. 3:95 CV0489 RM | U.S. District Court for the Northern District of Indiana, South Bend Division | Ungaretti & Harris, Barnes & Thornburg, and Howrey & Simon | Patent infringement | Dep(2): 1997, 1998 Report(2): 1997, 1998 |
| Mattel, Inc. v. Thomas Lowe Ventures, Inc., et al. and Thomas Lowe Ventures, Inc., et al. v. Mattel, Inc. No. CV 96-7872 CBM (CWx) | U.S. District Court for the Central District of California | Laff, Whitesel, Conte & Saret | Copyright, trademark and trade dress infringement, unfair competition, and false advertising | Report(2): 1997 |
| Genentech, Inc. v. Boehringer Mannheim GmbH, and Boehringer Mannheim Corporation No. 96-11090 PBS | U.S. District Court for the District of Massachusetts | Rogers & Wells | Patent infringement | Dep: 1997 Report: 1997 |
| C&F Packing Co., Inc. v. IBP, Inc., and Pizza Hut, Inc. No. 93 C 1601 | U.S. District Court for the Northern District of Illinois, Eastern Division | Schiff Hardin & Waite and Seyfarth Shaw | Patent infringement and trade secret | Trial: 1998 Dep: 1997 Report: 1996 |
| Industrial Wire Products, Inc. v. Lee/Rowan Company and Gary Lee No. 4:95 CVO1705CAS | U.S. District Court for the Eastern District of Michigan | Schiff Hardin & Waite | Patent and trademark infringement | Report: 1997 |

underline indicates client

# Julie L. Davis
## Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| Newell Operating Company, doing business as and through its division, EZ Paintr Company v. Wooster Brush Company No. 96-C-511 | U.S. District Court for the Eastern District of Wisconsin | Schiff Hardin & Waite | Patent infringement | Dep: 1997 Report(2): 1997 |
| Albert L. Wokas v. Dresser Industries, Inc. d/b/a Wayne Dresser No. 1:96 CV0297 | U.S. District Court for the Northern District of Indiana, Fort Wayne Division | Bartlit Beck Herman Palenchar & Scott | Patent infringement | Dep: 1997 Report: 1997 |
| Discovision Associates v. Disc Manufacturing, Inc. consolidated with Disc Manufacturing, Inc. v. Pioneer Electronic Corp., Pioneer Electronics (USA) Inc., Pioneer Electronics Capital, Inc., and Discovision Assoc. No. 95-345-SLR No. 95-21-SLR | U.S. District Court for the District of Delaware | Brinks Hofer Gilson & Lione | Antitrust and unfair competition | Dep: 1997 Report: 1997 |
| PPG Industries, Inc. v. Guardian Industries Corporation No. 94-1112 | U.S. District Court for the Western District of Pennsylvania | Kirkland & Ellis LLP | Patent infringement | Trial: 1997 Report(2): 1997 |
| Gossen Corporation v. Marley Mouldings, Inc. No. 96-C-0351 | U.S. District Court for the Eastern District of Wisconsin | Leydig, Voit & Mayer, Ltd. | Patent infringement | Dep(2): 1997 Report: 1997 |
| Sextant Avionique, S.A. v. Analog Devices, Inc. No. C95 2838 SI | U.S. District Court for the Northern District of California | Fried, Frank, Harris, Shriver & Jacobson | Patent infringement | Dep: 1997 Report: 1997 |
| NeXstar Pharmaceuticals, Inc. v. The Liposome Company, Inc. The Liposome Company, Inc. v. NeXstar Pharmaceuticals, Inc. and Fujisawa USA, Inc. Civil Action No. 93-232 (RRM) | U.S. District Court for the District of Delaware | Rogers & Wells | Patent infringement | Report(2): 1997 |
| Avon Products, Inc. v. S.C. Johnson & Son, Inc. 94 Civ. 3958 (AGS) | U.S. District Court for the Southern District of New York | Pattishall, McAuliffe, Newbury, Hilliard & Geraldson LLP | False advertising | Trial: 1997 Dep: 1996 Report(3): 1996 |
| Symtron Systems, Inc. v. Contraves, Inc. No. 94-4109 (AMW) | U.S. District Court for the District of New Jersey | Graham, Curtin & Sheridan | Patent infringement | Report: 1996 |
| Ajinomoto Co., Inc. v. Archer Daniels Midland Co. No. 95-218 (SLR) | U.S. District Court for the District of Delaware | Laff, Whitesel, Conte & Saret and Williams & Connolly | Patent infringement | Trial: 1996 Dep: 1996 Report: 1996 |
| General Signal Corporation v. Applied Materials, Inc. No. 94-461 | U.S. District Court for the District of Delaware | Rogers & Wells | Patent infringement | Report: 1996 |
| Dade International, Inc. v. Electronic Data Systems Corporation No. 95-1293 | U.S. District Court for the Southern District of Florida | Holleb & Coff | Breach of contract | Arbitration: 1996 Dep: 1996 Report(3): 1996, 1997 |

underline indicates client

# Julie L. Davis
# Testimony Experience

| Lawsuit | Court | Law Firm | Type | Testimony |
|---|---|---|---|---|
| O.I. Corporation v. Tekmar Company No. G-95-113 | U.S. District Court for the Southern District of Texas, Galveston Division | Fish & Neave | Patent infringement | Report: 1996 |
| Cistron Biotechnology, Inc. v. Immunex Corp. No. C93-1742WD | U.S. District Court for the Western District of Washington | Kirkland & Ellis LLP | Trade secret | Report(2): 1996 |
| Monon Corporation v. Stoughton Trailers, Inc. No. 95C0511 | U.S. District Court for the Northern District of Illinois | Lee F. Grossman & Associates | Patent infringement | Report: 1996 |
| Lull Industries, Inc. v. Pettibone Corporation and Traverse Lift Company No. 4-94-227 | U.S. District Court for the District of Minnesota, 4th Division | Sperling, Slater & Spitz | Patent infringement and antitrust | Report(2): 1995 |
| Dorr-Oliver Incorporated v. Fluid-Quip, Inc., Andrew Franko, and Pic Tek, Inc. No. 93 C 0842 | U.S. District Court for the Northern District of Illinois, Eastern Division | Felfe & Lynch | Trademark and trade dress infringement | Trial: 1995 Report: 1995 |
| Richardson-Vicks, Inc. v. Upjohn Company, McNeil-PPC, Inc. and Johnson & Johnson No. 93-556SLR | U.S. District Court for the District of Delaware | Brinks Hofer Gilson & Lione | Patent infringement | Trial: 1995 Dep: 1995 Report: 1995 |
| Storck USA, LP, and August Storck v. Farley Candy Company, Inc. No. 92-C 0552 | U.S. District Court for the Northern District of Illinois, Eastern Division | Laff, Whitesel, Conte & Saret | Trade dress and false advertising | Trial: 1995 Dep: 1995 Report(4): 1994, 1995 |
| Al-Site Corp. v. Opti-Ray, Inc. No. CV-91-1770 (ILG) and No. CV-92-4205 (ILG) | U.S. District Court for the Eastern District of New York | Schiff Hardin & Waite | Patent infringement | Trial: 1995 Dep(2): 1994, 1995 Report(2): 1994, 1995 |
| The Dow Chemical Co. v. The United States No. 19-83C | U.S. Court of Federal Claims | Lieberman & Nowak | Patent infringement | Trial: 1994 Dep: 1994 |
| Imax Corporation v. World Odyssey, Inc. and the Jefferson National Expansion Historical Association, Inc. No. 4:93 V001285 GFG | U.S. District Court for the Eastern District of Missouri | Laff, Whitesel, Conte & Saret | Patent infringement | Dep: 1994 |
| Morton International, Inc. v. Thomas E. Nowakowski, et al. No. 93-CV-2967 | U.S. District Court for the Eastern District of Pennsylvania | Jones, Day, Reavis & Pogue | Trade secret | Dep: 1994 Report: 1994 |
| BHI Corporation, et al. v. Mesirow Realty Management, Inc. No. 89 CH 3332 | Circuit Court of Cook County, Illinois, Chancery Division | Clausen, Miller, Gorman Caffrey & Witous, P.C. | Business interruption | Dep: 1994 Report: 1990 |
| Charles C. Allenson v. Hoyne Savings Bank No. 90 CH 10351 | Circuit Court of Cook County, Illinois, Chancery Division | Ruff, Weidenaar & Reidy, Ltd. | Deceptive business practice and consumer fraud | Dep: 1994 |

underline indicates client

## Julie L. Davis
## Testimony Experience

| *Lawsuit* | *Court* | *Law Firm* | *Type* | *Testimony* |
|---|---|---|---|---|
| Brent Thomas Smith, et al. v. <u>Kansas City Power and Light Co. d/b/a KPL Gas Service Co.</u> CV91-0873-CV-W-3 | U.S. District Court for the Western District of Missouri, Kansas City Division | Hillix, Brewer, Hoffhaus, Whittaker & Wright | Business interruption | Trial: 1992 Dep: 1992 Report: 1992 |
| Electronic Business Systems, Inc. v. <u>Omron Business Systems, Inc.</u> | U.S. District Court for the District of Kansas | Mayer Brown & Platt | Dealership termination | Dep: 1988 |

underline indicates client

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                          **EXHIBIT 3-PT**
Documents Considered List

| Bates Beg. | Bates End | Documents Description |
|---|---|---|
| **Trial Documents** | | |
| n/a | n/a | Transcripts dated July 31 and August 3, 6, 7, 10, 13, 16, and 21, as well as the direct and cross demonstratives for those days, and the deposition excerpts for those days (see Dkt. 1850, 1887) |
| n/a | n/a | Plaintiff's Exhibits: 3, 5-8, 11-13, 15, 16-17, 21A, 25A1, 26-30, 33, 34, 36, 38, 40, 42-44, 46, 52, 54-58, 60, 62, 69, 80, 89, 127-128, 133-135, 141-146, 174, 180, 184, 186, 194-195, 2261, 2519 Defendant's Exhibits: 562, 572, 578, 586, 647-648, 676, 684, 687, 712, 753-754, 781 Joint Exhibits: 1042-1046, 1091, 1500 Note: Many of these exhibits were previously identified by Bates number, but without the trial label sticker, and disclosed on Mr. Musika's list of materials considered in Exhibits 3 and 3-S to his prior reports. |
| **Apple Production** | | |
| ALPNDC-Y0000408242 | ALPNDC-Y0000408383 | License and settlement agreement between Apple Inc. and HTC America, Inc., HTC Corporation, and SC Graphics Co., Ltd. (collectively, "HTC") |
| **Expert Reports** | | |
| n/a | n/a | Expert Report of Terry L. Musika, CPA, March 22, 2012 (along with the accompanying Excel spreadsheets and Access databases previously produced in native format to Samsung) |
| n/a | n/a | Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012 (along with the accompanying Excel spreadsheets and Access databases previously produced in native format to Samsung) |
| n/a | n/a | Terry L. Musika's Damages Model Updates, July 28, 2012 |
| n/a | n/a | Expert Report of Michael J. Wagner, April 16, 2012 |
| n/a | n/a | Corrected Expert Report of Michael J. Wagner, April 20, 2012 |
| n/a | n/a | Michael J. Wagner's Damage Model Updates, May 7, 2012 |
| n/a | n/a | Supplemental Expert Report of Michael J. Wagner, May 11, 2012 |
| n/a | n/a | Michael J. Wagner's Damage Model Updates, July 28, 2012 |
| n/a | n/a | Expert Report of John R. Hauser, March 22, 2012 (along with the accompanying survey animations previously produced in native format to Samsung) |
| n/a | n/a | Expert Report of Ravin Balakrishnan, Ph.D. Regarding Infringement of U.S. Patent No. 7,469,381, March 22, 2012 |
| n/a | n/a | Expert Report of Ravin Balakrishnan, Ph.D. Regarding Infringement of U.S. Patent No. 7,812,828, March 22, 2012 |
| n/a | n/a | Expert Report of Karan Singh, Ph.D. Regarding Infringement of U.S. Patent No. 7,864,163, 7,844,915 and 7,853,891, March 22, 2012 |
| **Depositions** | | |
| n/a | n/a | Deposition Transcript of Terry Musika, May 14, 2012 |
| n/a | n/a | Deposition Transcript of Michael Wagner, May 12, 2012 |
| n/a | n/a | Deposition Transcript of Michael Wagner, July 17, 2012 |
| **Legal** | | |
| n/a | n/a | May 31, 2012 Declaration of Terry L. Musika, CPA ISO Apple's Opp. to Samsung's Mot. to Exclude Opinions of Certain of Apple's Experts (Dkt. 991) |
| n/a | n/a | May 31, 2012 Declaration of Terry L. Musika, CPA ISO Apple's Opp. to Samsung's Mot. to Strike Expert Testimony Based on Undisclosed Facts and Theories (Dkt. 996) |
| n/a | n/a | May 31, 2012 Declaration of John R. Hauser ISO Opp. to Samsung Daubert Motion (Dkt. 1336) |
| n/a | n/a | June 7, 2012 Declaration of Michael J. Wagner ISO Samsung's Motion to Strike Expert Testimony Based on Undisclosed Facts and Theories (Dkt. 1060-35) |
| n/a | n/a | June 30, 2012 Order Granting-in-Part and Denying-in-Part Motions to Exclude Expert Testimony (Dkt. 1157) |
| n/a | n/a | Aug. 19, 2012 Samsung's Notice of Lodging Deposition Testimony (Dkt. 1850) |
| n/a | n/a | Aug. 21, 2012 Apple's Notice of Lodging Deposition Testimony (Dkt. 1887) |
| n/a | n/a | Aug. 21, 2012 Final Jury Instructions (Dkt. 1903) |
| n/a | n/a | Aug. 24, 2012 Amended Verdict Form (Dkt. 1931) |
| n/a | n/a | Sept. 21, 2012 Declaration of Terry Musika ISO Apple's Mot. for Permanent Injunction (Dkt. 1982-2) |
| n/a | n/a | Sept. 21, 2012 Declaration of Marylee Robinson ISO Apple's Mot. for Permanent Injunction (Dkt. 1982-71) |
| n/a | n/a | Sept. 21, 2012 Declaration of Michael J. Wagner ISO Samsung's Motion for Judgment as a Matter of Law, New Trial and/or Remittitur Pursuant to Federal Rules of Civil Procedure 50 and 59 (Dkt. 1990-20) |
| n/a | n/a | Oct. 19, 2012 Declaration of Michael J. Wagner ISO Samsung's Opp. to Apple's Mot. for Judgment as a Matter of Law (Renewed), New Trial, and Amended Judgment (Dkt. 2059) |
| n/a | n/a | Oct. 19, 2012 Declaration of Corey Kerstetter ISO Samsung's Opp. to Apple's Mot. for a Permanent Injunction (Dkt. 2060) |
| n/a | n/a | Oct. 19, 2012 Declaration of Hee-Chan Choi ISO Samsung's Opp. to Apple's Mot. for a Permanent Injunction (Dkt 2055) |
| n/a | n/a | Oct. 19, 2012 Declaration of Sukumar ISO Samsung's Opp. to Apple's Mot. for a Permanent Injunction (Dkt. 2054-3) |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                  **EXHIBIT 3-PT**
Documents Considered List

| Bates Beg. | Bates End | Documents Description |
|---|---|---|
| n/a | n/a | Oct. 19, 2012 Declaration of Tim Rowden ISO Samsung's Opp. to Apple's Mot. for a Permanent Injunction (Dkt. 2075) |
| n/a | n/a | Oct. 19, 2012 Declaration of Michael J. Wagner ISO Samsung's Opp. to Apple's Mot. for a Permanent Injunction (Dkt. 2065) |
| n/a | n/a | Nov. 9, 2012 Reply Declaration of John R. Hauser ISO Apple's Mot. for a Permanent Injunction (Dkt. 2130) |
| n/a | n/a | Nov. 9, 2012 Reply Declaration of Marylee Robinson ISO Apple's Mot. for a Permanent Injunction (Dkt. 2129) |
| n/a | n/a | Nov. 10, 2012 [Proposed] Order Granting Apple's Motion for a Permanent Injunction and Damages Enhancement (Dkt. 2133) |
| n/a | n/a | Dec. 6, 2012 Hearing transcript regarding post-trial motions |
| n/a | n/a | Mar. 1, 2013 Order re: Damages (Dkt. 2271) |
| n/a | n/a | Apr. 29, 2013 Case Management Order (Dkt. 2316) |
| n/a | n/a | Apr. 29, 2013 Hearing transcript regarding case management conference (Dkt. 2320) |
| n/a | n/a | June 13, 2013 Statement of Recent Decision Regarding Confirmation of Claim 19 of U.S. Patent 7,449,381 (Dkt. 2323 and 2323-1) |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 4-PT**

## Samsung Infringing Products vs. Apple's Infringed Intellectual Property 1/

| # | Infringing Products | Utility Patents | | | Design Patents | |
|---|---------------------|------|------|------|--------|--------|
|   |                     | '163 | '381 | '915 | 'D305 | 'D677 |
| 1 | Captivate      |   | x | x | x |   |
| 2 | Continuum      |   | x | x | x |   |
| 3 | Droid Charge   | x | x | x | x |   |
| 4 | Epic 4G        | x | x | x | x |   |
| 5 | Exhibit 4G     | x | x | x |   |   |
| 6 | Galaxy Prevail | x | x | x |   |   |
| 7 | Galaxy Tab     | x | x | x |   |   |
| 8 | Gem            |   | x | x | x |   |
| 9 | Indulge        |   | x | x | x |   |
| 10 | Infuse 4G     | x | x | x | x | x |
| 11 | Nexus S 4G    |   | x | x |   |   |
| 12 | Replenish     | x | x |   |   |   |
| 13 | Transform     |   |   | x |   |   |

**Sources/Notes:**

1/     Per Amended Verdict Form, 8/24/12; Order re: Damages, 3/1/13; and Case Management Order, 4/29/13.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## Apple's Asserted Utility Patents 1/

| Patent No. | Referenced As | Title | File Date | Issue Date | Expiration Date | 2/ |
|---|---|---|---|---|---|---|
| 6,493,002 | '002 Patent | Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System | 3/20/1997 | 12/10/2002 | 9/30/2014 | |
| 7,469,381 | '381 Patent | List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display | 12/14/2007 | 12/23/2008 | 12/14/2027 | |
| 7,663,607 | '607 Patent | Multipoint Touchscreen | 5/6/2004 | 2/16/2010 | 3/29/2028 | 3/ |
| 7,844,915 | '915 Patent | Application Programming Interfaces for Scrolling Operations | 1/7/2007 | 11/30/2010 | 8/12/2028 | 4/ |
| 7,853,891 | '891 Patent | Method and Apparatus for Displaying a Window for a User Interface | 2/1/2008 | 12/14/2010 | 3/14/2023 | 5/ |
| 7,864,163 | '163 Patent | Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents | 9/4/2007 | 1/4/2011 | 7/23/2029 | 6/ |
| 7,920,129 | '129 Patent | Double-Sided Touch-Sensitive Panel with Shield and Drive Combined Layer | 1/3/2007 | 4/5/2011 | 1/23/2030 | 7/ |

**Sources/Notes:**

1/ Apple Inc. Amended Complaint, 6/16/11, Exhibits 2 to 8.

2/ In general, a (other than design) patent's term begins on the date on which the patent is issued and ends 20 years from the date on which the application for the patent was filed in the United States. 35 U.S.C. 154 (a)(2)

3/ Certificate of Correction for US Patent No.7,663,607, dated 2/16/10, there is a Patent Term Adjustment of 1423 days.

4/ Issue Notification for US Patent No.7,844,915, dated 11/10/10, there is a Patent Term Adjustment of 583 days.

5/ Issue Notification for US Patent No.7,853,891, dated 11/23/10, there is a Patent Term Adjustment of 247 days.

6/ Issue Notification for US Patent No.7,864,163, dated 12/15/10, there is a Patent Term Adjustment of 688 days.

7/ Issue Notification for US Patent No.7,920,129, dated 3/16/11, there is a Patent Term Adjustment of 1116 days.

Submitted Under Seal; Highly Confidential;

Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 6

**Apple's Asserted Design Patents** 1/

| Patent No. | Referenced As | Title | Design | File Date | Issue Date | Expiration Date 2/ |
|---|---|---|---|---|---|---|
| D627,790 | D'790 Patent | Graphical User Interface for a Display Screen or Portion Thereof | | 8/20/2007 | 11/23/2010 | 11/23/2004 |
| D617,334 | D'334 Patent | Graphical User Interface for a Display Screen or Portion Thereof | | 7/15/2008 | 6/8/2010 | 6/8/2024 |
| D604,305 | D'305 Patent | Graphical User Interface for a Display Screen or Portion Thereof | | 6/23/2007 | 11/17/2009 | 11/17/2023 |
| D618,677 | D'677 Patent | Electronic Device | | 11/18/2008 | 6/29/2010 | 6/29/2024 |
| D504,889 | D'889 Patent | Electronic Device | | 3/17/2004 | 5/10/2005 | 5/10/2019 |
| D593,087 | D'087 Patent | Electronic Device | | 7/30/2007 | 5/26/2009 | 5/26/2023 |
| D622,270 | D'270 Patent | Electronic Device | | 10/1/2009 | 8/24/2010 | 8/24/2024 |

**Sources/Notes:**
1/  Apple Inc. Amended Complaint, 6/16/11, Exhibits 9 to 15.
2/  In general, a design patent's term begins on the date on which the patent is granted and ends 14 years from that date.  35 U.S.C. 173
    (http://www.uspto.gov/web/offices/pac/mpep/consolidated  laws.pdf).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 7**

## Apple's Asserted Trade Dress Registrations 1/

| U.S. Registration No. | Mark | Filing Date | Registration Date | Expiration Date 2/ |
|---|---|---|---|---|
| 3,470,983 |  | 10/12/2007 | 7/22/2008 | 7/22/2018, subject to renewal. |
| 3,457,218 |  | 10/12/2007 | 7/1/2008 | 7/1/2018, subject to renewal. |
| 3,475,327 |  | 10/12/2007 | 7/29/2008 | 7/29/2018, subject to renewal. |

**Sources/Notes:**

1/   Apple Inc. Amended Complaint, 6/16/11, Exhibits 16 to 18.

2/   Federal trademark registrations issued on or after 11/6/1989 remain in force for 10 years, and may be renewed for 10
     year periods (http://www.uspto.gov/trademarks/process/maintain/prfaq.jsp).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 8

**Apple's Asserted Unregistered Trade Dress and Trademark**

| Name | Trade Dress 1/ | Release Date |
|---|---|---|
| iPhone |  | 6/29/2007 3/ |
| iPhone 3G |  | 7/11/2008 4/ |
| iPhone 4 |  | 6/24/2010 5/ |
| iPhone / iPhone 3G / iPhone 4 |  | 6/29/2007 3/ |
| iPad and iPad 2 |  | 4/3/2010 6/ |

| Name | Trademark 2/ | Filing Date |
|---|---|---|
| Purple iTunes Store Common Law Trademark ('85/041,463 App. Pending) |  | 5/18/2010 |

**Sources/Notes:**
1/  Apple Inc. Amended Complaint, 6/16/11, pp. 18-21.
2/  Apple Inc. Amended Complaint, 6/16/11, Exhibit 29.
3/  Apple Inc. Press Release, 6/28/07
     (http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html).
4/  Apple Inc. Press Release, 7/10/08
     (http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html).
5/  Apple Inc. Press Release, 6/7/10
     (http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html).
6/  Apple Inc. Press Release, 3/5/10 (http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 9

**Apple's Asserted Trademark Registrations** 1/

| U.S. Registration No. | Mark | Filing Date | Registration Date | Expiration Date 2/ |
|---|---|---|---|---|
| 3,886,196 | | 4/21/2010 | 12/7/2010 | 12/7/2020, subject to renewal. |
| 3,889,642 | | 4/21/2010 | 12/14/2010 | 12/14/2020, subject to renewal. |
| 3,886,200 | | 4/21/2010 | 12/7/2010 | 12/7/2020, subject to renewal. |
| 3,889,685 | | 4/21/2010 | 12/14/2010 | 12/14/2020, subject to renewal. |
| 3,886,169 | | 4/21/2010 | 12/7/2010 | 12/7/2020, subject to renewal. |
| 3,886,197 | | 4/21/2010 | 12/7/2010 | 12/7/2020, subject to renewal. |
| 2,935,038 | | 3/11/2004 | 3/22/2005 | 3/22/2015, subject to renewal. |

**Sources/Notes:**
1/  Apple Inc. Amended Complaint, 6/16/11, Exhibits 23 to 28 and 30.
2/  Federal trademark registrations issued on or after 11/6/1989 remain in force for 10 years, and may be renewed
    for 10 year periods (http://www.uspto.gov/trademarks/process/maintain/prfaq.jsp).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 151 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 10-PT

## Summary of Samsung Infringing Products

| # | Infringing Products 1/ | New Trial Products | Model No. 1/ | Model No. per Samsung Sales Data 2/ | Carrier 3/ |
|---|---|---|---|---|---|
| 1 | Captivate | X | SGH-I897 | Captivate (SGH-I897) | AT&T |
| 2 | Continuum | X | SCH-I400 | Continuum (SCH-I400) | Verizon |
| 3 | Droid Charge | X | SCH-I510 | Droid Charge (SCH-I510) | Verizon |
| 4 | Epic 4G | X | SPH-D700 | Epic 4G (SPH-D700) | Sprint |
| 5 | Exhibit 4G | X | SGH-T759 | Exhibit 4G (SGH-T759) | T-Mobile |
| 6 | Fascinate | | SCH-I500 | Fascinate (SCH-I500) | Verizon |
| 7 | Galaxy Ace | | GT-S5830 | Galaxy Ace (GT-S5830, GT-S5838, SCH-I579, SCH-I589, SHW-M240S) | n/a |
| 8 | Galaxy Prevail | X | SPH-M820 | Galaxy Prevail (SPH-M820) | Sprint & Boost |
| 9 | Galaxy S (i9000) | | GT-I9000 | Galaxy S (I9000) (GT-I9000, GT-I9001, GT-I9008, GT-I9018, SCH-I909, SGH-N013, SHW-M110S) | n/a |
| 10 | Galaxy S 4G | | SGH-T959 | Galaxy S 4G (SGH-T959) | T-Mobile |
| 11 | Galaxy S II (AT&T) | | SGH-I777 | Galaxy S II/2 (GT-I9100, GT-I9108, SGH-I777, SGH-N033, SHW-M250K, SHW-M250S) | AT&T |
| 12 | Galaxy S II (i9100) | | GT-I9100 | 4/ | 4/ |
| 13 | Galaxy S II (T-Mobile) | | SGH-T989 | Hercules (SGH-T989) | T-Mobile |
| 14 | Galaxy S II (Epic 4G Touch) | | SPH-D710 | Epic 4G Touch (SPH-D710) | Sprint |
| 15 | Galaxy S II (Skyrocket) | | SGH-I727 | Galaxy S2 Skyrocket (SGH-I727) | AT&T |
| 16 | Galaxy S Showcase (i500) | | SCH-I500 | Showcase (SCH-I500) | Cell South & Other |
| 17 | Galaxy Tab | X | P1, P2 | Galaxy Tab 7.0 (3G) (P1, P2) | AT&T, Sprint, T-Mobile, Verizon, USC, Other |
| 18 | Galaxy Tab 10.1 (WiFi) | | GT-P7510 | Galaxy Tab 10.1 (GT-P7510, GT-P7511, SHW-M380W) | Sprint, Verizon, Other |
| 19 | Gem | X | SCH-I100 | Gem (SCH-I100) | Verizon, USC, Others |
| 20 | Indulge | X | SCH-R910 | Indulge (SCH-R910) | Metro PCS |
| 21 | Infuse 4G | X | SGH-I997 | Infuse 4G (SGH-I997) | AT&T |
| 22 | Mesmerize | | SCH-I500 | Mesmerize (SCH-I500) | USC |
| 23 | Nexus S 4G | X | SPH-D720 | Nexus S 4G (SPH-D720) | Sprint |
| 24 | Replenish | X | SPH-M580 | Replenish (SPH-M580) | Sprint & Boost |
| 25 | Transform | X | SPH-M920 | Transform (SPH-M920) | Sprint |
| 26 | Vibrant | | SGH-T959 | Vibrant (SGH-T959) | T-Mobile |

**Source/Notes:**

1/  Per Amended Verdict Form, 8/24/12; Order re: Damages, 3/1/13; and discussion with Counsel.

2/  SAMNDCA00402075.

3/  SAMNDCA00402076.

4/  Galaxy S II (AT&T edition, 4G)'s model number is listed along with the Galaxy S II (i9100) in Samsung's financial data.  I understand that the i9100 model is not sold in the
    U.S. and all other models listed were not found on Samsung's North America Web Site.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 11**

# U.S. Smartphone Market Shares



**Source:** See Exhibit 11.1.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 11.1

**U.S. Smartphone Shipments and Market Share**

| | 2010 Q2 | | 2010 Q3 | | 2010 Q4 | | 2011 Q1 | | 2011 Q2 | | 2011 Q3 | | 2011 Q4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share |

**Sources/Notes:**
1/  IDC Worldwide Quarterly Mobile Phone Tracker, Q4 2011, tab "Historical Pivot." Pivot table was filtered setting "Country" equal to "USA" and "Device Type" equal to "Smartphone" (APLNDC-Z0000000001).

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only



Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 11.2-PT

# Samsung U.S. Smartphone Market Share

Galaxy S
Jul. 2010

Source: IDC Worldwide Quarterly Mobile Phone Tracker, Q1-2012

Prepared by Invotex Group

PDX 34B.9

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 12



**Source**:  See Exhibit 12.1.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 12.1

**U.S. Mobile Phone Shipments and Market Share**
*(In Units)*

| Device Type | ACTUAL 1/ | | | | | | | | PROJECTIONS 2/ | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | |

**Sources/Notes:**
1/   APLNDC-Z0000000001, IDC Worldwide Quarterly Mobile Phone Tracker, Q4 2011 Final Data, tab "Historical Pivot."  Pivot table was filtered setting "Country" equal to "USA."
2/   APLNDC00009656.xlsx, IDC Worldwide Quarterly Mobile Phone Tracker, Q1 2011 Forecast Data, June 1, 2011, tab "Pivot."  Pivot table was filtered setting "Country" equal to "USA."
3/   New Smartphones Entering Market is calculated by summing the differences between the projected units shipped for 2012-2015, and 2011 actual units shipped.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.



## U.S. Media Tablet Market Shares

Source: See Exhibit 13.1.

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 13.1

**U.S. Media Tablet Shipments and Market Share**
*(In Units)*

| | 2010 Q2 | | 2010 Q3 | | 2010 Q4 | | 2011 Q1 | | 2011 Q2 | | 2011 Q3 | | 2011 Q4 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share | Units | Market Share |



**Sources/Notes:**
1/   IDC Worldwide Quarterly Media Tablet Tracker, Q4 2011 , tab "Pivot Table. Pivot table was filtered setting "Country" equal to "USA" and "Product Category" equal to "Media Tablet" (APLNDC Z0000000003). As
     described in my report, I have removed the Amazon.com Inc. and Barnes & Noble from this calculation.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 14**

## Intellectual Property Damage Types By Form Of IP

| | Patent | | | Trademark | Copyright | Trade Secret |
|---|---|---|---|---|---|---|
| | Utility Patent | Plant Patent | Design Patent | | | |
| **Lost Profits** | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ |
| **Price Erosion** | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ |
| **Corrective Advertising** | | | | ☑ | | |
| **Unjust Enrichment** | | | ☑ | ☑ | ☑ | ☑ |
| **Reasonable Royalty** | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ |
| **Decrease in Value** | | | | ☑ | ☑ | ☑ |
| **Statutory** | | | | ☑ | ☑ | |

<u>**Source:**</u> AICPA Practice Aid 06-1 - Calculating Intellectual Property Infringement Damages, p.20.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 15-PT

## Identification of Appropriate Forms of Damages  3/

| IP Type | Patent No. | Form of Damages | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Lost Profits | | Infringer's Profits | | Reasonable Royalty | |
| | | Smartphones | Tablets | Smartphones | Tablets | Smartphones | Tablets |
| Utility Patents | 7,469,381 | Calculated | Calculated | n/a 1/ | n/a 1/ | Calculated | Calculated |
| | 7,844,915 | Calculated | Calculated | n/a 1/ | n/a 1/ | Calculated | Calculated |
| | 7,864,163 | Calculated | Calculated | n/a 1/ | n/a 1/ | Calculated | Calculated |
| Design Patents | D604,305 | n/a | n/a | Calculated | n/a 2/ | Calculated | n/a 2/ |
| | D618,677 | Calculated | n/a 2/ | Calculated | n/a 2/ | Calculated | n/a 2/ |

**Sources/Notes:**

1/ Form of intellectual property is not appropriate for the damages remedy.

2/ Intellectual property relevant to smartphones only.

3/ Apple patents-in-suit identified per Amended Verdict Form, 8/24/12 and Order re: Damages, 3/1/13.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## Sequential Consideration & Application of the Various Forms of IP Remedy

Apple Patents: Utility Patent A, Utility Patent B, and Design Patent C
Samsung Infringing Products: 10 units of a Smartphone named Epic 4G

Total Damages = $1264

**Note**: All amounts portrayed are for demonstration purposes only.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

Exhibits 17-PT through 19.1-PT Reserved

**Summary of Damage Calculation Methodology**

| IP Type | Patent No. | Product Type | Available Remedy | Apple Average Sales Price | Apple Incremental Profit per Unit | Apple Incremental Profit Margin | Carrier Apportionment | Carrier Switching Apportionment | Mor-Flo Apportionment For Acceptable Non-Infringing Substitutes | Design Around Apportionment (Months Out of Market) | Capacity | Available Remedy | Samsung's Profit per Device | Available Remedy | Basis of Royalty Base | Reasonable Royalty per Unit Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1/ 2/ | 3/ 4/ | 5/ | | | 6/ | | | | | | | |
| Utility Patents | '163 | Smartphone | Yes | $ 642 | | | Carrier apportionment applied when the infringing smartphone was sold at a carrier that also sold iPhone(s) during the same period. | 26% | Distribute Samsung's sales among other smartphone manufacturers available at a specific carrier. 8/ Alternatively distribute carrier switchers between market participants using market share for the entire smartphone market. 9/ | 1 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 46-S |
| | | Tablet | Yes | $ 568 | | | N/A | N/A | Distribute Samsung's sales among other tablet manufacturers. 10/ | 1 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 47-S |
| | '381 | Smartphone | Yes | $ 642 | | | Carrier apportionment applied when the infringing smartphone was sold at a carrier that also sold iPhone(s) during the same period. | 26% | Distribute Samsung's sales among other smartphone manufacturers available at a specific carrier. 8/ Alternatively distribute carrier switchers between market participants using market share for the entire smartphone market. 9/ | 1 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 46-S |
| | | Tablet | Yes | $ 568 | | | N/A | N/A | Distribute Samsung's sales among other tablet manufacturers. 10/ | 1 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 47-S |
| | '915 | Smartphone | Yes | $ 642 | | | Carrier apportionment applied when the infringing smartphone was sold at a carrier that also sold iPhone(s) during the same period. | 26% | Distribute Samsung's sales among other smartphone manufacturers available at a specific carrier. 8/ Alternatively distribute carrier switchers between market participants using market share for the entire smartphone market. 9/ | 6 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 46-S |
| | | Tablet | Yes | $ 568 | | | | | Distribute Samsung's sales among other tablet manufacturers. 10/ | 6 13/ | | No | N/A | Yes | Infringing units sold | See Exhibit 47-S |
| Design Patents | 'D305 | Smartphone | N/A | N/A | | | N/A | N/A | N/A | N/A | | Yes | Evaluated on a revenue basis  gross profit basis and incremental profit basis. | Yes | Infringing units sold | See Exhibits 46-S and 47-S |
| | 'D677 | Smartphone | Yes | $ 642 | | | Carrier apportionment applied when the infringing smartphone was sold at a carrier that also sold iPhone(s) during the same period. | 26% | Distribute Samsung's sales among other smartphone manufacturers available at a specific carrier. 8/ Alternatively distribute carrier switchers between market participants using market share for the entire smartphone market. 9/ | 8 7/ | | Yes | Evaluated on a revenue basis  gross profit basis and incremental profit basis. | Yes | Infringing units sold | See Exhibits 46-S and 47-S |

**Sources/Notes:**
1/  Apple Average Sales Price for iPhone = (Total Worldwide iPhone Revenues from Q210 through Q212) / (Total Worldwide iPhone Units sold from Q210 through Q212).  See Exhibit 32-S2.
2/  Apple Average Sales Price for iPad = (Total Worldwide iPad Revenues from Q410 through Q212) / (Total Worldwide iPad Units sold from Q410 through Q212).  See Exhibit 33-S2.
3/  Apple Incremental Profit per Unit for iPhone = (Total Worldwide iPhone Gross Profit from Q210 through Q212) - (Total iPhone Sales and Distribution Expense from Q210 through Q212).  See Exhibit 32-S2.
4/  Apple Incremental Profit per Unit for iPad = (Total Worldwide iPad Gross Profit from Q410 through Q212) - (Total  iPad Sales and Distribution Expense from Q410 through Q212).  See Exhibit 33-S2.
5/  Apple Incremental Profit Margin = Apple Incremental Profit per Unit / Apple Average Sales Price.
6/  Some Samsung smartphone units are not sold at a carrier selling iPhone units. Based on a ThinkTech with Google presentation  I have assumed that 26% of units sold at a carrier not selling iPhone units would be subject to carrier switching and are available for lost profits.  See Exhibit 28.
7/  Discussion with Tang Tan.
8/  See Exhibits 31.1-PT  31.2-PT  and 31.3-PT.
9/  See Exhibit 31-S.
10/  See Exhibit 30-PT.
11/  See Exhibit 26-S.
12/  See Exhibit 27-S.
13/  See Exhibit 45.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., Ltd., et al.

**Wagner Declaration Page 18**



Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 22

**Apple Other Line of Business P&L Summary** 1/

| (Revenue in Millions USD) | | FY 2010 | | | | FY Total | FY 2011 | | | | FY Total | FY 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | | Q1 | Q2 | Q3 | Q4 | | Q1 | |
| **iTunes** 2/ | Revenue | 923 | 1,108 | 1,015 | 1,023 | 4,069 | 1,157 | 1,387 | 1,359 | 1,444 | 5,347 | 1,697 | 11,113 |
| | | | | | | | | | | | | | |
| **Mobile Advertising** 3/ | Revenue | | 0 | 11 | 16 | 27 | 30 | 23 | 18 | 26 | 97 | 37 | 161 |
| | | | | | | | | | | | | | |

**Sources/Notes:**

1/  Fiscal year ending September 31.

2/  Apple "GAAP Line of business Reporting   iTS", APLNDC Y0000051616   1617.

3/  Apple "GAAP Line of Business Reporting   Mob.Adv", APLDNC Y0000051620. Per Deposition of Mark Buckley, 2/23/12, p.153 156, mobile advertising revenues include selling advertisements from third party companies within apps from the App Store installed on iOS devices (iPhone, iPad, and iPod Touch).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple, Inc. v. Samsung Electronics Co., LTD., et al.

**EXHIBIT 23**

## Worldwide Apple iOS Search Revenue



**Source/Notes:**
1/ Search Revenue includes revenue share paid by Google (APLNDC-Y0000232431-2433), Microsoft Bing (APLNDC-Y0000232434-2444) and Yahoo (APLNDC-Y0000232445-2446) for searches performed on iOS devices.

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

Apple Inc. v Samsung Electronics Co., LTD., et al.

**Demand for Design Patents and Trade Dress** 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 1 | Deposition of Eric Jue, Product Line Manager for iPod at Apple, 2/24/12 | N/A, page in document: 100-101 | Apple | "the look and feel of iPhone, both physical, you know, dimensions and materials, and also the look and feel of the user interface, the icons that you see, are all part of what people associate with Apple and iPhone." | x | |
| 2 | Deposition of Stanley Ng, Senior Director of iPhone Product Marketing, Worldwide Product Marketing Group at Apple, 2/21/12 | N/A, page in document: 55 | Apple | "Q When you say "**design** and aesthetics," what do you mean by that? A I think customers love the look of the product. They love how beautiful the product appears. Q Any particular aspect of the look of the product that you think customers like in particular? A Not specifically. I think they love the overall look and beauty of the products that we [Apple] create." | x | x |
| 3 | Deposition of Philip Schiller, VP of Product Marketing at Apple, 2/17/12 | N/A, page in document: 185 | Apple | "I think it is very possible that  consumers who have never owned any Apple product whatsoever still might recognize this icon [phone call] as associated with Apple and even the iPhone, given how distinctive it is and how much marketing there has been..." | x | |
| 4 | Deposition of Michael Tchao, VP of Product Marketing for iPad at Apple, 2/21/12 | N/A, page in document: 63 | Apple | "Q. Do you recall any feedback specifically as to the shape of the original iPad? A. I believe there was feedback on specifically comfortable to hold, which would, in my mind, include -- incorporate shape. Q. How so? A. That the contours of the device and the way the housing and screen came together made it easy to hold on to." | | x |
| 5 | Deposition of Michael Tchao, VP of Product Marketing for iPad at Apple, 2/21/12 | N/A, page in document: 67 | Apple | Q. What about the physical **design** of the product makes it [the iPad] comfortable to hold? A. The shape of the back housing, the area of the -- around the screen, the bezel around the screen, the weight of the product and the distribution of that weight, the balance of the product. | | x |
| 6 | Various iPhone Buyer Surveys, by Apple Market Research & Analysis | 1/ | Apple | Between Q4 2010 and Q4 2011, 44-50% of those surveyed noted attractive appearance and design as a very important attribute in the iPhone purchase decision. | x | |
| 7 | iPhone Owner Study, by Apple Market Research & Analysis, May 2011 | APLNDC-Y0000025024 - 5147, at 5060 and '5064 | Apple | "Strong trust in Apple and appeal of **design** swayed many who considered Android to purchase iPhone." 32% of those surveyed in the U.S. liked the physical appearance and **design** as a reason that swayed them to purchase iPhone over Android. 46% of those surveyed in the U.S. also listed physical appearance and **design** as a very important feature in deciding to buy the iPhone. | x | |
| 8 | Smartphone Market Study, Apple Market Research & Analysis, January 2011 | APLNDC0001434059 - 4154, at '4144 | Apple | The 7th top reason for buying an iPhone is for better appearance/**design** (37%); better appearance/**design** is listed 10th top reason for buying an Android-based smartphone (27%). | x | |
| 9 | iPhone Early Buyer Wave 1 Final Report, Apple Market Research & Analysis, July 2007 | APLNDC-Y0000029092 - 9135, at '9125 | Apple | The 4th top feature leading to an iPhone purchase is appearance and **design** (78%). | x | |
| 10 | iPhone 4S Early Buyer Survey, Apple Market Research & Analysis, November 2011 | APLNDC-Y0000026096 - 6137, at '6116 | Apple | 64% of iPhone 4S buyers are very satisfied with the physical appearance and **design**, and 25% are somewhat satisfied. | x | |
| 11 | Exhibit 7 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple  7/1/11 | N/A, time in video: 00:00 | Apple | Back of phone is shown with logo. | x | |
| 12 | Exhibit 20 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/1/11 | N/A, time in video: 0 01 | Apple | iPad 2 frontal **design** shown. | x | |
| 13 | Exhibit 37 to Deposition of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/27/11 | N/A, page in document: 116 | Apple | Advertisement on the **design** of the iPad 2.  "Thinner. Lighter. Faster." | | x |
| 14 | Exhibit 40 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/27/11 | N/A | Apple | Advertisement showing two fingers picking up the iPad 2. | | x |
| 15 | Exhibit D to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10257319 | Samsung | In a graph titled "[Samsung] Biggest Reason for Purchasing their Current Smartphone (%)," "Exterior **Design**" was chosen by 28.6%-40.8% of the customers depending on age group. Above the graph is the statement "Key Analysis: Need to recognize the importance of exterior design and screen size as customer purchase-inducing factors." | x | |
| 16 | Exhibit D to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10257322 | Samsung | In a slide titled "Proposals for Improving Exterior Design Factors," there is the statement "There is a need for improvement in terms of luster 'Glossiness on the iPhone is reinforced glass on the front and the back gives it a luxurious feel.'" | x | |
| 17 | Exhibit E to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA00202379 | Samsung | In the chart, "Comparison between Samsung Mobile Phone and iPhone," "iPhone is on average 5.9 points higher compared to Samsung mobile phone." | x | |
| 18 | Exhibit F to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA00229020 | Samsung | "Although released nearly a year ago, the Apple iPhone has maintained its position as the most inspired mobile handset on the market.... The iPhone is a delight to the eye as well as a highly usable device." | x | |
| 19 | Exhibit G to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10247537 | Samsung | T-Mobile's comments to Samsung about their phones include: "Please explore other design alternatives here, including lighter backgrounds and colors throughout. For example, the iPhone has been successful at achieving a light and airy aesthetic...." | x | |
| 20 | Exhibit G to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10247538 | Samsung | T-Mobile's comments to Samsung about their phones also include: "iPhone maintains a lively, vivid experience largely due to the 'pop' of their icons. We should be able to create similar magic here." | x | |
| 21 | Exhibit H to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10247377 | Samsung | Samsung's Head of Mobile Division stated, "When our UX is compared to the unexpected competitor Apple's iPhone, the difference is truly that of Heaven and Earth. It's a crisis of **design**." | x | |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Demand for Design Patents and Trade Dress** 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 22 | Exhibit I to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10247549 | Samsung | "CEO Gee Sung Choi strongly pointed out Samsung UX's mindset of 'clinging to the past generation,'... I am not saying to make a UX that is exactly identical to the iPhone, but I am saying to learn the wisdom of the iPhone and recognize the standard (?) of the industry which was set by them already." | X | |
| 23 | Exhibit J to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10252809 | Samsung | In the chart, "Evaluation results of **design** quality/luxury brand recognition," iPhone scores 90% on attractiveness, while Galaxy S phone scores 79%. | X | |
| 24 | Exhibit J to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10252818 | Samsung | When compared with the GA3, iPhone 4's "icon illustrations look professional and luxurious." | X | |
| 25 | Exhibit J to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10252832 | Samsung | "The border is **designed** with metal silver, providing a futuristic and luxurious feeling." | X | |
| 26 | Exhibit K to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA10244368 | Samsung | In a slide titled, "Apple has overtaken Samsung as the most stylish brand overall," there is a quote from London: "I think Apple is so successful because they have come out with a unique product [and] you see all other mobile phone providers are trying to copy each other. Apple came out with something different and that's why everyone likes Apple - because it's different" | X | |
| 27 | Exhibit P to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA00249046 | Samsung | "The impact on the category is likely to be material because the product [iPhone] will affect consumer expectations for **design**, user interface and presumably cell phone music capabilities." | X | |
| 28 | Exhibit Q to Declaration of Minn Chung, Attorney at Morrison & Foerster LLP, counsel of record for Apple, 2/8/12 | SAMNDCA00232256 | Samsung | In a Market Intelligence Group Survey for Samsung, iPhone scores high in items such as "Sensual **Design**," "Stylish," "Prestigious," "Contemporary," "Young," "Passionate," and "Imaginative." Above the chart of survey results, there is the statement "iPhone generally shows a distinctive image compared to Samsung." Apple generally outperformed Samsung in almost every category. | X | |
| 29 | iPhone 4.0 Quick Report & Analysis | SAMNDCA00024872-4941, at '4908 | Samsung | In a Samsung presentation titled, "iPhone 4.0 Quick Report and Analysis, there is a side to side comparison of the back of Galaxy S phone and the iPhone with a check on the iPhone side and the comment, "Apple logo on back." | X | |
| 30 | Corrected Exhibit C to Declaration of Francis Ho, 11/7/11 (Title of document: STA Post Launch Consumer Insights) | SAMNDCA00025016 - 5079, at '5031 | Samsung | "**Design** on the Galaxy Tab 10.1 was and is the main sales driver for the device." | | X |
| 31 | Samsung Galaxy Tab 10.1 & 8.9 Competitive Product Experience | SAMNDCA00027944 - 8005, at '7948 | Samsung | "Apple iPad 2 was rated significantly higher in overall **design** than Samsung Galaxy Tab 10.1, Blackberry Playbook and HP Touchpad." | | X |
| 32 | Samsung, part 1. Endless opportunities. | SAMNDCA00176269 - 6897, at '6343-'7644 | Samsung | "The halo effect. If you can own one attribute, the prospect is inclined to give many others. The proof of the principle. Apple's focus on **design** has built a powerful brand." | X | X |
| 33 | Samsung Lovemark Mobile & Web Research: Lovemarks. | SAMNDCA00207695 - 7765, at '7731 | Samsung | Apple was rated "among the best" while Samsung was rated "about average" for "Physical **Design**." | X | |
| 34 | Business & Messaging Users Qualitative Research Results | SAMNDCA00218063 - 8130, at '8099 | Samsung | In a slide titled, "Comparison between Current and Wish Phones_**Design**," Samsung states "Apple iPhone users rate design satisfaction higher than the others." The chart below shows Apple ratings that are higher in terms of easy to carry, color, size of phone, form factor, material, button to input text easily, and keypad type. | X | |
| 35 | 2009 Samsung Umbrella Brand Architecture | SAMNDCA00230535 - 0645, at '0571 | Samsung | "Sony is known for quality, trust and worth; Apple for buzz, **design**, and innovation..." | X | X |
| 36 | BAS H1 2010 Final Report USA | SAMNDCA00236017 - 6112, at '6077 | Samsung | "Apple distinguishes itself on Expertise, Sensual **Design**, and Endorsement." | X | X |
| 37 | Brand Attitude Survey 2010 2H - Main Module: USA | SAMNDCA00245494 - 5611, at '5584 | Samsung | A chart titled "Performance on BE attributes - Samsung vs. Apple" rates Apple higher in "Sensual **Design**" compared to Samsung. | X | X |
| 38 | Brand Attitude Survey H2 2009 Country Report: USA | SAMNDCA00232190 - 2290, at '2256 | Samsung | "iPhone generally shows a distinctive image compared to Samsung." | X | |
| 39 | COO Visit to STA - September, 2011 | SAMNDCA00259131 - 9239, at '9167 | Samsung | Samsung's draft presentation includes a quote from Fox News, "The hype isn't without substance. Though each carrier alters its phone a bit, all three Galaxy S II smartphones have some specs in common: a 4.3-inch, Super AMOLED 800x480 screen, a dual core 1.2-GHz processor, fast 4G network connectivity, and a sleek, simple **design** evocative of the iPhone." | X | |
| 40 | Samsung, European Telecommunication Operation, P5 vs. iPad2, 18th May, 2011 | S-ITC-010617659 - 7694, at '7663 | Samsung | In a slide of side to side comparison of the iPad 2 and P5, Samsung comments that on the iPad2, "icons are big and the gap between the applications are ideal!!!" "Due to the big size of Icons and the big gap between applications, it is easier to find applications." | | X |
| 41 | Samsung, European Telecommunication Operation, P5 vs. iPad2, 18th May, 2011 | S-ITC-010617659 - 7694, at '7670 | Samsung | Samsung comments that the contacts function on the iPad 2 has "very nice UI **design** and easy to edit contacts because Edit button is always visible!!! Very nice Book **design** and the editing is easy and intuitive." | | X |
| 42 | Samsung Galaxy S Launch Event (http://www.youtube.com/watch?v=Pnx fnFmOWb8) | N/A | Samsung | 9.9 mm thickness and 4 inch screen are described in a video clip about the Galaxy S. | X | |
| 43 | [GALAXY Tab 10.1] Official Demo - HD | N/A | Samsung | Describes tablet **design** as "revolutionary". | | X |
| 44 | [GALAXY S II] Official Live Demo - Viewing | N/A | Samsung | **Design** of the phone seen from every angle. | X | |
| 45 | Samsung Galaxy S II Presentation | SAMNDCA10775587 - 5624, at '5594, '5599, '5607, '5619, '5621, '9831 | Samsung | Samsung describes "**Design**" as a main feature of the Galaxy S II and notes the phone's "Slim and Light **Design**." Diagrams show "a double tap and tilt of the device will zoom in and out" and "tap and pan will move the user from widgets to menus." Samsung in its 30 second pitch described the screen as "wrapped in the sleekest **design** you can find anywhere." and highlights Design in its 3 minute pitch guidelines. Picture at the CTIA Unpacked event with **Design** on a powerpoint slide. | x | |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

Demand for Design Patents and Trade Dress 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 46 | Samsung Galaxy Tab 10.1 - Official Commercial (http://www.youtube.com/watch?v=OM1Pt0AXSal) | N/A, time in video: 00:30 | Samsung | Apple comparison is shown between a Galaxy Tab 10.1 and iPad. | | x |
| 47 | [Blank Title], by Design Management center, 10/8/7 (Translated) | SAMNDCA00202336 - 2380, at '2358, '2363, '2379 | Samsung | From a **Design** Competitiveness Evaluation, Samsung notes that "the [iPhone] **design** has simple appearance, but becomes more and more attractive as it is used)," and "out of the evaluation items for Delight, Total **Design** Uniformity and **Design** appearance are more than 6 points higher than our company's mobile phones." "Deliver overall consistent images over the entire process of product use in addition to the product itself. Provide reliability by implementing Identity that involves integration of brand, **design** and marketing." [Slide shows Apple marketing items] "Intuitive Interface...Advanced Technology that simplifies complicated external function keys and thus enhances usability." [Shows picture of iPod] | x | |
| 48 | Experts' Evaluation Result, Self Inspection Program - Major Status on Global Design Competitiveness Evaluation, October 2007 (Translated) | SAMNDCA00203016 - 3040, at '3033 | Samsung | "When it comes to **design**, advance market dominance is important. The **design** that lost market dominance may appear to be an imitation." "iPhone GUI appears to be alive. There is a lack of GUI that is more vivid and attractive GUI." | x | |
| 49 | Relative Evaluation Report on S1, iPhone, 3/2/10 (Translated) | SAMNDCA00203880 - 4010, at '4006 and '4010 | Samsung | After comparing iPhone and i9000 icons, directions for improvement include "change replicate icons and select and use highly intuitive icons" and "remove a feeling that iPhone s menu icons are copied by differentiating design." | x | |
| 50 | Email from Kim Ah-young RE Octopus 3/17 Report Result, 3/17/10 (Translated) | SAMNDCA00507826 - 7827 | Samsung | "These are confirmed items and comments resulting from the presentation to the Head of Division that was reported this morning. The summary is as follows: 7. Proceed with iPhone/Droid type of packaging." | x | |
| 51 | Expert Evaluation Result [Cell Phone], October '07 (Translated) | SAMNDCA00203092 - 3179, at '3137 | Samsung | Apple's Desire, Intrigue, and Delight scores are consistently higher than Samsung's. "There are more significant differences in 'intrigue" and "**design** leadership." | x | |
| 52 | Competitive Tablets Product Experience: Form Factor & Display Size / Aspect Ratio validation Research Report, 8/28/11 | SAMNDCA00237976 - 8036, at '7978 | Samsung | Survey contain user preferences of tablets: "consumers ranked Apple iPad (41%), Galaxy Tab 10.1" (26%) and 8.9 (17%) as most preferred tablet based on overall preference, taking into consideration form factor AND display size." | | x |
| 53 | Critical Findings Brief: Competitive UX Evaluation of Atlas, Victory, Supersonic and Vegas with HTC Incredible and Apple iPhone 3GS | SAMNDCA00238251 - 8277, at '8254 | Samsung | "Overall, the iPhone 3GS was rated better than other devices in overall **design**, life needs and values, touchscreen, general usability and users satisfaction across the sessions." | x | |
| 54 | Email chain from Shoneel Kolhatkar, RE "Changes of Tablet Spec", 3/7/11 (Translated) | SAMNDCA00514511 - 4520, at '4512 | Samsung | In response to requests to change tablet specs, YK Yongki Min noted it was "intending the improvement of product competitiveness against i-PAD 2, to my understanding." | | x |
| 55 | Email chain between Yong Il Lee and others, RE "About Galaxy Tab 10.1 Inch Introduction Strategy", 3/11/11 (Translated) | SANDCA00514571 - 4578, at '4576 | Samsung | Don Ju Lee: "The bottom line is that our P3 should go head-to-head against I-Pad II [sic] this time. First, the problem is strengthening the quality of the product. 1. We will proceed on the premise that the thickness of the P3 that is already in the process of being reviewed should be less than 8.8mm." | | x |
| 56 | North America P4(P7510 Wifi) BBY Retail Store Visit T/F Report, August 2011 (Translated) | SANDCA10154003 - 4053, at '4013 | Samsung | Samsung conducted a survey of customer returns, and 15% were attributed to design, of which 4% was attributable to appearance alone. | | x |
| 57 | P5 Usability Evaluation Results - 4/9/11 (Translated) | SAMNDCA00176053 - 6171, at '6057 | Samsung | A major problem area "Legibility [for P5] is not iPad 2] as the icon label is too small in proportion to the large screen." | | x |
| 58 | Competitor Analysis Design & Layout - 2009 GUI Framework, 04/2008 | SAMNDCA00228887 - 8933, at '8900, '8905, '8915 | Samsung | A side by side comparison of secondary icons from various phones, including the iPhone, is listed. In reviewing iPhone's secondary icons, "many icon metaphors are simple vector shapes which are easy to understand.... Icons are very ownable and can easily be identified as part of the Apple family." The reported recommended "maintaining a strong link between the visual style of main menu icons helps maintain a family feel." | x | |
| 59 | Competitor Analysis Design & Layout - 2009 GUI Framework, 04/2008 | SAMNDCA00228934 - 8980, at '8947, '8964, '8969, and '8979 | Samsung | A side by side comparison of the main menu layout and main menu icons is listed. The Apple iPhone's "iconography used is very ownable - even icons for third party applications or features seem very iPhone-like... Visual language of iconography fits into the overall Apple family identity." The report recommended "maintain consistent visual application of icon style within the brand." | x | |
| 60 | Analysis of Relative Strengths and Weaknesses P1 vs. iPad App, 4/20/10 (Translated) | SAMNDCA00203727 - 3768, at '3728 | Samsung | "Detailed functionality and variegated settings make for certain portions that are better in comparison to iPad, but also lends to a cluttered and stuffy feeling. Graphic Detail inadequate compared to the iPad, lacks realness. Insufficient Visual Effect leads to deficiencies in fun factor and user comfort level." | | x |
| 61 | iPad vs. Honeycomb P5 UX Comparison of Competitiveness, 2/10/11 (Translated) | SAMNDCA00203811 - 3879, at '3878 | Samsung | "Because P3 [Honeycomb] GED is inferior to Samsung s TouchWiz in terms of maneuverability, intuitiveness and so forth, table UI/UX optimized to the comparable level as that of iPad has to be applied. Black UI appears somewhat less refined, actually hinders visibility and readability... The way menu is presented, pop-up location, consistency of icons, and uniformity are poor." | | x |
| 62 | The Cambridge Group - Developing an Optimized Positioning Strategy for Samsung's U.S. Mobile Phone Business, Positioning Strategy Recommendation. Final Report. 1/30/07 | SAMNDCA00249029 - 9120, at '9046 and '9049 | Samsung | The Cambridge Group notes that the iPhone "will affect consumer expectations for **design**, user interface and presumably cell phone music capabilities." the report also notes that reviewers are "most impressed with the uniqueness of the form...." | x | |
| 63 | European Telecommunication Operation P5 vs. iPad 2, 5/18/11 | S-ITC-010617659 - 7694, at '7663 | Samsung | The P5 "Icons are too small and too close to each other," while the iPad 2 "icons are big and the gap between the applications are ideal." | | x |
| 64 | Acme, July 2008 | SAMNDCA10275576 - 5646, at '5593 | Samsung | "Overall, they were quick to compare it to the iPhone. Uniformly, people felt Acme was a copy of the iPhone." | x | |

Apple Inc. v Samsung Electronics Co., LTD., et al.

**EXHIBIT 24-PT**

**Demand for Design Patents and Trade Dress** 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 65 | Global Evaluation Criteria For Tier 1 **Design** | SAMNDCA00221705 - 1818, at '1708, '1709, '1713, '1718 | Samsung | "Research suggests that brands that engage people emotionally can command prices as much as 20% to 200% higher than competitors', and sell in far higher volumes." "Samsung products were considered commodities. Samsung focus was on low cost manufacturing. Samsung products provided good value at low cost. But people neither loved nor respected the Samsung brand or its products." "Now Samsung must move from a well respected brand to a brand whose products are designed to make people love them…. This also necessitates moving from **design** as an expression of only form and function to designing an emotional, multi-sensory experience for the consumer." "We must add a higher level of inspired and inspiring **design**. **Design** cannot be only  focused on the traditional role of the invention of new product architectures and the elegant expression of contemporary forms in conjunction with improved ease of use. This is not only because conventional **design** standards have been raised by all of the major competitors but because this type of **design**, no matter how good, is not longer sufficiently engaging. For design to emotionally engage the consumer and command the attention of media, one must love to **design** as theater.  This type of design is based upon the stimulation of all of the senses, the creation of mystery and the engagement of the viewer and user in a more intimate relationship." | x | |
| 66 | Agenda [table of contents in Korean] | SAMNDCA10809734 - 9875, at '9838 - '9840 | Samsung | "Start with materials…. Iconic Beauty that others cannot easily copy. Cost Innovation that makes bigger profit. Value creator that maximizes product concept." On the next slide, it shows the iPhone. | x | |
| 67 | '10 US Archetype Design Input, 10/23/08 | SAMNDCA10202899 - 2983, at '2925 | Samsung | "Touch device is being positioned as a premium phone… stylish and characteristic **design** for touch device is needed…. Stylish touch phone need to focus on the **design** itself to appeal self-esteemed people. With the design identity, large screen, easily usability, and multimedia functionality will be weighed in as a state of the art device." | x | |
| 68 | Feasibility Review on Standalone AP Business for Smart Phone Market (Untranslated document) | SAMNDCA10809390 - 9460, at '9402 | Samsung | "Our research has identified four key factors that we expect will shape handsets in the coming five years. Those factors are: 1. the iPhone…." | x | |
| 69 | Touch Portfolio, Rollout Strategy, 12/17/08 | SAMNDCA00191811 - 1987, at '1830, '1838, '1841, '1842 | Samsung | "Pundits tell us that the iPhone is a revolution…. 'Apple Inc's iPhone… widely hailed for its beauty and functionality….' -Walter Mossberg" "The iPhone has delivered on the promise of touch, permanently altering a consumer's mental model of a mobile phone across key product dimensions. [**Design** is shown as a dimension]." "The iPhone is in some ways 'undesigned' but its strong ,screen-centric **design** has come to equal what's on trend and cool for many consumers." "For State of the Art, Apple has overtaken Samsung as the most stylish brand overall." | x | |
| 70 | Final Report - i920 Usability Test & iPhone Benchmarking - UT1, 9/25/09 | S-ITC-009302888 - 2969, at '2894 | Samsung | "When [Omnia II] compared with the iPhone, it fell short in some cases, and was on par in others. The main advantage of the iPhone was its perceived simplicity." | x | |
| 71 | Email chain from Sang Hung to YK Tongki Min, et al. RE Competitive Touch UX design consumer usability report, 12/4/09 | SAMNDCA10175266 - 5267 | Samsung | Findings of the final report on competitive touch UX **design** between the iPhone 3GS and other phones include "home screen preference - iPhone 3GS has the highest ranking…. We should use iPhone 3GS (for the time being until another best-of-the-class in usability) as benchmark/goal for improvement in any of our products. In the Android platform, we will want to make sure any of the enhanced **designs** should at least match the default UX supported by the platform through user-centered research and consumer usability testing…." | x | |
| 72 | Winning in Smartphones - It's now or never, by McKinsey&Co, 12/10/09 | SAMNDCA10807316 - 7387, at '7358 | Samsung | Strategic plays for Samsung include, "UI on par with iPhone….. Match the iPhone UI within the next 12 months." | x | |
| 73 | Support to STA's Counter-Apple Strategy, Mercator Partners, 9/18/08 | SAMNDCA10036081 - 6204, at '6089, '6094, '6103, '6106 | Samsung | "The iPhone is in direct competition with a large number of Samsung devices (Form Factor view)" "Apple (in combination with RIM) is creating a growing threat to Samsung's market share." "State-of-the-Art were driven by the Apple brand and **design**." "iPhone segments are very distinct in terms of why they bought the iPhone…" under State-of-the-art, "Key buying factors - high on **Design** & Appearance." "Recommendation #1 - Contain Apple by 'encircling the iPhone' through systematically targeting the under-served needs of different iPhone segments" an arrow points to "State-of-the-art = Style + Apple - Price." | x | |
| 74 | Results of Global Segmentation 2.0 Study, Mobile Marketing Group / Strategy & MI party, March 2010 | SAMNDCA00196646 - 6827, at '6658 | Samsung | "Changes in high-end consumers' awareness of styles" include: "focus not only on the external design but on the UX **design** and usability." "Customized **Design**" points to "Personalized Experience" "Recognize touch screen as the best tool to ensure intuitiveness/style/visibility." "Style = In & Out + Trendy + Latest."  Same slide also depicts different pictures of the iPhone. | x | |
| 75 | Samsung Mobile Philosophy, Analysis of Survey Results, Mobile UX Group Samsung Electronics, 8/13/07 | SAMNDCA 00217372 - 7388, at '7380 | Samsung | Samsung is compared with Apple and Sony. Apple is described as "simple, innovation, new, easy, minimal" and Samsung as "techy, balance, wide & deep, reason & feeling, absence of consistency." | x | |

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

Apple Inc. v Samsung Electronics Co., LTD., et al.

**Demand for Design Patents and Trade Dress** 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 76 | Final Report, Galaxy S Market Response Survey (US), October 6 | SAMNDCA 00521309 - 1396, at '1316, '1318, '1374 | Samsung | "Vibrant users value the product's features over the product's brand and **design**.... There were not many Apple users who purchased Samsung products. In contrast, many Samsung users purchased Apple products subsequently." "Brand and **Design** were the main reasons consumers purchased the iPhone 4, which is the main competing product to Samsung Phones." **Design** is the fourth most important reason for buying the Samsung Vibrant. | x | |
| 77 | 3G iPhone Counter Plan, 6/14/08 | SAMNDCA00251457 - 1505, at '1460 | Samsung | iPhone has "Innovative UI," "touch screen," and "focusing emotional benefits." | x | |
| 78 | iPhone 3G UX Analysis, 7/12/08 | SAMNDCA00251538 – 1565, at '1561 | Samsung | iPhone strengths include "user friendly," "usability," "touch-screen," and "cool factor." "While it has no immediate competition in terms of usability and style, it [iPhone] will undoubtedly create a world of copycat products and competitors. Competitors' new technologies, business model and/or creative user interface have been and will be launched to compete with iPhone." | x | |
| 79 | Design Strategy of Apple, Concept Planning Unit, 3/16/11 | SAMNDCA10808165 - 8199, at '8174 and '8175 | Samsung | Samsung outlines iPhone and iPad **design** history. | x | x |
| 80 | Touch Devices Browser User Experience Best Practices, STA UX, 2/13/09 | SAMNDCA10166661 - 6742, at '6683 | Samsung | "Apple iPhone browser url/search UX provides one of the best reference **designs** in the market." | x | |
| 81 | "Premium & Mass Design Preference Study" | SAMNDCA00176172 - 6202, at '6178, '6192 | Samsung | "iPhone design = Premium/Good Design" The "Most Trendy" phone is the iPhone 3GS and 4. "It's simple, it looks like it's more skinny and it's enough space to navigate it. It's everything that you need in a phone." | x | |
| 82 | Email from Nandakumar Ramachandran, 11/16/09 RE: Competitive Intelligence on 2010 TMO Android Product Roadmap against Samsung 2H10 Android Product Roadmap Strategy for TMO | SAMNDCA10410283 - 0293, at '0283 | Samsung | "iPhone 3GS still scored best across virtually all the tasks tested (and in some cases by a wide margin), the home screen **design** and the general interaction **design**." | x | |

| | Supplement | | | | | |
|---|---|---|---|---|---|---|
| 83 | Lessons From Apple | SAMNDCA00274819 (Cheong Exhibit 2652) | Samsung | '4831: "Apple's sleek and intuitive user interface has been a key driver of its value proposition . . . Clean, beautiful interface.  Clean menu screens. Intuitive, user-friendly navigation & visual elements . . . ." '4838: "Apple has a strong, clear brand promise consisting of compelling brand attributes that resonate with consumers. . . . Apple's brand promise consists of compelling brand attributes valued by consumers. . . . Brand promise: 'Cool, innovative products offering superior **design** and usability." | x | x |
| 84 | N/A | SAMNDCA10247509 (Cho Exhibit 1976) | Samsung | "The president ordered that we place the entire UI on the wall page by page and change the UI perfectly." "We need to improve the UI of the frequently used functions so that they are absolutely superior compared to the iPhone." | x | |
| 85 | Ecosystem Procuring Strategy to Take the Lead in the Smartphone Market | SAMNDCA00392050 (Cho Exhibit 2676) | Samsung | '2112: In text above pictures of OMNIA v. iPhone 3Gs:  "iPhone: With the exception of one H/W key, entire menu replaced by icons of consistent size and shape." "By applying an intuitive menu, easy to figure out how to use." In text above graphic on '2117":  " design' operates as the most important factor by a wide margin compared to others." '2118:  **Design** ranked 61.8%, important points influencing a smartphone buying decision besides the device specs by Japanese users. | x | |
| 86 | Palm Pre, Apple iPhone, HTC Magic US: UI Weakness/Strength Report - August 5, 2009 - R&D Management Group | SAMNDCA00391937 (Cho Exhibit 2679) | Samsung | 1951: Strengths of Apple iPhone 3GS include "Screen switch & scrolling smooth & fast" and "Intuitive UX + emotion-inducing/sensible graphic effects provided" | x | |
| 87 | Phase 2 Design Strategy | SAMNDCA00202336 (Choi Exhibit 2150) | Samsung | 2379: Survey on **design** metrics such as Desire, Intrigue, Delight, "iPhone is on average 5.9 points higher compared to Samsung mobile phones" '2342 Samsung **design** philosophy:  "Create an Emotional Journey.  **Design** an emotional experience.  Desire / Intrigue / Delight." | x | |
| 88 | Alkon Instructions from the CEO | SAMNDCA20012936 (Choi Exhibit 2641)  Translations Beg Bates: SAMNDCA20012936 | Samsung | '2936:  Report entitled "Alkon Instructions from the CEO," noting "Improve UX with reference to iPhone 3GS." '2940:  Side-by-side photographs of Samsung and iPhone GUI. | x | |
| 89 | Expert Evaluation Result [Mobile Phone] | SAMNDCA203092 (Hong Exhibit 2149) | Samsung | 3152: In survey, Apple iPhone ranked higher in Desire, Intrigue, and Delight (Gestalt) attributes:  "The harmony of UI and HW makes this product shine." "Unique, fresh, and an outstanding product that deserves the best score - the main issue for future products is how much buzz can be created by instilling emotions into the items." | x | |
| 90 | Email from Dong Jin Koh to Dong Hoon Chang, et al., "Conveyance of the President's views on touch method and call to meeting" | SAMNDCA11374409 (Hong Exhibit 2640) | Samsung | '4410:  Email from Dong Hoom Chang re: "CEO s opinions on touch method." "The C-type has 3 advantages: sleek exterior appearance in product design; better sensitivity of the touch screen; and multi-touch. Of these, I am thinking that the implementation of sleek product design as shown by iPhone would be what is considered by product planning and sales as the greatest appealing factor." | x | |

Apple Inc. v Samsung Electronics Co., LTD., et al.

**Demand for Design Patents and Trade Dress** 2/

| # | Document Description | Bates Number | Party | Comment | Smartphone | Tablets |
|---|---|---|---|---|---|---|
| 91 | Email from Yu Shin Kim to Lead Dae Woon Myeong. | SAMNDCA10969926 (Hong Exhibit 2708) | Samsung | '9932:  Email from MH Cho to WP Hong re: "Galaxy S Review":  "Overall, it is unable to surpass the limitations of the iPhone. I get the feeling that engineers led the design of UI and Look and feel. As a result, they can t do anything other than imitating the iPhone... IF you remain content because it was a huge success in Korea then you will always be No.2. Shouldn t you make it so iPhone copies Samsung?" | x | |
| 92 | Email from Hyun Kim, "MWC (2/15) - P1/p3 Division Head Design Report Meeting Minutes | SAMNDCA00044700 (Hong Exhibit 2709) | Samsung | '4700:  Email from H Kim:  "To pass along a few comments from Senior Designer Cho who went into the Google meeting yesterday, P1, P3: - Since it is too similar to Apple, make it noticeably different, starting with the front side." | | x |
| 93 | Gravity Tank:  Touch Portfolio: Rollout Strategy - Recommendation Based on Consumer Insight | SAMNDCA00191811 (Sohn Exhibit 1654) | Samsung | 1834, '1841, '1842:  Survey/market research.  Regarding iPhone: "Consumers applaud the iPhone's ease of use and simplicity." "Screen-centric **design** has set the standard for touch." " Apple has overtaken Samsung as the most stylish brand overall. . . . 'I think Apple is so successful because they have come out with a unique product [and] you see all other mobile phone providers are trying to copy each other.  Apple came out with something different and that's why everyone likes Apple - because it's different."<br><br>'1870:  Regarding Samsung's phones:  "While liked, no phone makes a **design** statement - Consumers feel they look too plain, too extreme or too much like other Samsung phones." | x | |
| 94 | Support to STA's Counter-Apple Strategy | SAMNDCA10036081 (Sohn Exhibit 2715) | Samsung | 6145:  Survey, "Key Buying Factors (rank 1-16) - amongst iPhone owners":  **Design** and appearance is ranked second. | x | |
| 95 | Feasibility Review on Standalone AP business for Smart Phone Market | SAMNDCA10809390 | Samsung | 9427:  "Factors That Could Make the iPhone a Success - Easy and intuitive UI that covers all user classes, including male, female, old and young - Beautiful **design**." | x | |
| 96 | STA Marketing: CFO Update | SAMNDCA11547471 (Cheong Exhibit 2653) | Samsung | 7475:  STA marketing report.  "2012 Objectives:  Overcome Fast Follower Status & Establish Samsung as Challenger Brand to Apple." | x | |
| 97 | (Gravity Tank) Touch Portfolio: Key Takeaways | SAMNDCA10805169 (Sohn Exhibit 2714) | Samsung | '5170:  Executive Summary - Consumer Needs:  "It appears that the biggest motivating factor in purchasing touch phones is intuitive/easy use of a variety of functions and the phone s modern image."<br><br>'5171:  Executive Summary - iPhone Feedback:  "-It appears that the iPhone is the most preferred touch phone brand in all 5 high value segments. - Consumers recognize iPhone s screen-centric design as the touch phone standard... . -[In our company s main target segment "state of the art," Apple is first in the "Most Stylish Brand" category and our company is second.]"<br><br>'5172:  Executive Summary - Samsung Touch Feedback:  "With regard to external design and PUI, the consistency among individual products and a design Group statement that permeates throughout the touch portfolio are evaluated to be inadequate." | x | |

Sources/Notes:
1/ (a) iPhone Buyer Survey, Apple Market Research & Analysis, FY11 - Q4, APLNDC-X0000006548 - 6647, at '6566 and '6620;
   (b) iPhone Buyer Survey, Apple Market Research & Analysis, FY11 - Q3, APLNDC0000036172 - 6265, at '6189 and '6238;
   (c ) iPhone Buyer Survey, Apple Market Research & Analysis, FY11 - Q2, APLNDC0000036266 - 6348, at '6293;
   (d) iPhone Buyer Survey, Apple Market Research & Analysis, FY11 - Q1, APLNDC-Y0000027341 - 7422, at '7362;
   (e) iPhone Buyer Survey, Apple Market Research & Analysis, FY10 - Q4, APLNDC-Y0000027256 - 7340, at '7277.
2/ Updated only to reflect translations agreed to by Samsung and Apple before trial. Shaded material reflects documents and columns that address patents
   other than the new trial patents.

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Demand for Utility Patents** 1/

| # | Title of Document | Bates Beg - End | Page in Document | Party | Relevant Patent or Feature | Comments on Utility | '381 | '915 | '163 | '607 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Deposition of Tamara Whiteside, Worldwide Advertising Manager at Apple, 2/28/12 | N/A | P. 124 | Apple | Scroll or Gesture/Zoom and Refocus/Multi-touch | Multi-touch is focused on because "it's the way that you interact with the product...you can pinch to zoom in or out, tap to zoom." There are "various ways that you can interact with this product that are unique to it." | | x | x | x |
| 2 | Deposition of Tamara Whiteside, Worldwide Advertising Manager at Apple, 2/28/12 | N/A | P. 158 | Apple | Bounce Effect | Apple featured the bounceback functionality in ads because "nobody else had...the ability to do that in their software." | x | | | |
| 3 | Deposition of Eric Jue, Product Line Manager for iPod at Apple, 2/24/12 | N/A | P. 49 | Apple | Bounce Effect | "Q Do you think the bounceback feature was revolutionary? A Absolutely" | x | | | |
| 4 | "Apple: iOS - Powering the Mobility Revolution", BernsteinResearch | APL-ITC796-0000071960 - 2051 | APL-ITC796-0000071990 | Apple | Multi-touch | "Apple has pioneered multi-touch and focuses on ease-of-use of the phone (for example, the 3 MP camera in the iPhone 3GS wasn't cutting-edge, but featured revolutionary user functionality such as touch-to-focus)." | | | | x |
| 5 | iPad Buyer Survey: Initial US Results, August 2010 | APLNDC-Y000023361 - 3427 | APLNDC-Y000023387 | Apple | Multi-touch | When asked what was the most important features that prompted purchase of an iPad, multi-touch was the most important reason for 2% of those surveyed (4% choose this feature as second-most important, and 3% choose as third-most important). | | | | x |
| 6 | Exhibit 6 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/1/11 | N/A | 0:01; 0:19 | Apple | Scroll or Gesture | Scrolling function is shown during commercial for the iPhone. | | x | | |
| 7 | Exhibit 8 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/1/11 | N/A | 0:01; 0:11; 0:17 | Apple | Scroll or Gesture | Scrolling function is shown during commercial for the iPhone 3G. | | x | | |
| 8 | Exhibit 10 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/1/11 | N/A | 0:06 0:14; 0:20 | Apple | Scroll or Gesture/Zoom and Refocus/Multi-touch | In the commercial for the iPhone 4, double tap feature is shown once; pinch to zoom feature is shown multiple times. | | x | x | x |
| 9 | Exhibit 19 to Declaration of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/1/11 | N/A | 0:01 0:10; 0:15; 0:26 | Apple | Scroll or Gesture/Multi-touch | In the commercial for the iPad, multi-point touch feature shown; scrolling function is shown during commercial. | | x | | x |
| 10 | Exhibit 29 to Deposition of Sissie Twiggs, Director of Worldwide Advertising at Apple, 7/27/11 | N/A | p.66 | Apple | Scroll or Gesture | "Touching is Believing": advertisement depicting the ease of use of iPhone with its touchscreen feature. | | x | | |
| 11 | DJ Koh Review - 3/16/11 | SAMNDCA00236805 - 6847 | SAMNDCA00236817 | Samsung | Scroll or Gesture/Multi-touch | Mentions iPad 2 rumors "expect thinner, lighter device" with "new multi-touch gestures." | | x | | x |
| 12 | Latest Mobile Phone Usage and Satisfaction Survey - T-Mobile Vibrant MRS Questionnaire | SAMNDCA00247578 - 7604 | SAMNDCA00247594 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | Survey asks if the Samsung Vibrant is "easy to use with multi-touch function (lets you enlarge/minimize everything using only your fingers)" | | x | x | x |
| 13 | VZW "SCH-i905(P4_LTE)" - Product Planning Group 3/31/2011 | SAMNDCA00522001 - 2025 | SAMNDCA00522009 | Samsung | Multi-touch | Mentions iPad4 LTE  is "Easy and Fast to Use" with "10 Finger Multi-touch" | | | | x |
| 14 | Samsung Equaliser - UX Forecast 2012-13 | SAMNDCA00190881 - 1029 | SAMNDCA00190971 | Samsung | Scroll or Gesture | Document mentions increase in input methods (such as scrolling on an iPhone) as a trend in mobile platforms | | x | | |
| 15 | Touch Portfolio - Rollout Strategy - Recommendation Based on Consumer Insight - 12/17/08 | SAMNDCA00178021 - 8112 | SAMNDCA00178036 SAMNDCA00178056 | Samsung | Bounce Effect/Scroll or Gesture | Survey shows consumers are concerned about "accidental touches" and "lack of pinpoint control" on their touch screens; Survey found touch gestures and the "bounce" feature as "fun" and "whimsical" features of the iPhone | x | x | | |
| 16 | Touchscreen Mobile Browsers: Best Practice Guidelines and Browser Evaluations - November 2009 | SAMNDCA00190046 - 0093 | SAMNDCA00190053 | Samsung | Scroll or Gesture/Zoom and Refocus | The iPhone "meets user needs very well for zooming." | | x | x | |
| 17 | ARIES (GT -I8700) Product Proposal Document 12/14/2009 | S-ITC-001012125 - 2139 | S-ITC-001012133 | Samsung | Zoom and Refocus/Multi-touch | Document mentions "Multi-touch" and "One Finger Zoom" as part of the "Cutting-Edge Technology" selling point. | | | x | x |
| 18 | Analysis of Galaxy tab Operation Speed and Screen Effects (Translated) | SAMNDCA00201771 - 1780 | SAMNDCA00201772-1780 | Samsung | Bounce Effect | Document compares Galaxy Tab's Bounce feature to the iPad's. Bounce effect is listed as unintentional in several areas. | x | | | |
| 19 | VZW News Release - 6/28/10 | SAMNDCA00312249 - 2251 | SAMNDCA00312250 | Samsung | Scroll or Gesture/Zoom and Refocus | Samsung Fascinate features "advanced touch screen gesture capabilities", including different zoom methods and horizontal swiping. | | x | x | |
| 20 | Verizon Wireless Weekly Report - Week 38 - 9/26/11 | S-ITC-005218927 - 8984 | S-ITC-005218936 | Samsung | Bounce Effect | Document states that VCAST apps in Model I510 (Droid Charge) have bounce effect. | x | | | |
| 21 | Samsung Epic 4G, America's First 4G-Capable Phone with Slide-out QWERTY Keyboard and Brilliant Super AMOLED Touchscreen, Coming to Sprint - 6/28/10 | SAMNDCA00312245 - 2251 | SAMNDCA00312246 | Samsung | Scroll or Gesture | Samsung Epic 4G "supports a series of advanced touch screen gestures including multi-touch pinch" and "vertical and horizontal swiping." | | x | | |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 25-PT

Demand for Utility Patents 1/

| # | Title of Document | Bates Beg - End | Page in Document | Party | Relevant Patent or Feature | Comments on Utility | Patent '381 | '915 | '163 | '607 |
|---|---|---|---|---|---|---|---|---|---|---|
| 22 | Samsung Mobile and U.S. Cellular Announce Availability of the Samsung Mesmerize, a Galaxy S Smartphone, at CTIA Enterprise & Applications - 10/6/10 | SAMNDCA00312263 - 2266 | SAMNDCA00312264 | Samsung | Scroll or Gesture | Samsung Mesmerize "supports a series of advanced touch screen gestures including multi-touch pinch" and "vertical and horizontal swiping" | x | | | |
| 23 | AT&T and Samsung Mobile Announce Upcoming Availability of the Samsung Captivate, a Galaxy S Smartphone - 6/17/10 | SAMNDCA00312274 - 2279 | SAMNDCA00312275 | Samsung | Scroll or Gesture | Samsung Captivate "supports a series of advanced touch screen gestures including multi-touch pinch" and "vertical and horizontal swiping." | x | | | |
| 24 | Samsung Gem(SCH-i100) Sales Point | SAMNDCA10173553 - 3573 | SAMNDCA10173564 - 3565 | Samsung | Scroll or Gesture/Multi-touch | Document states "multi-touch enhances type accuracy" and that "pinch-zoom enabled android browser can give convenience while browsing." | x | | | x |
| 25 | Samsung 'THOR' '11 Hero Proposal - 7/12/10 | SAMNDCA10138344 - 8429 | SAMNDCA10138389 | Samsung | Scroll or Gesture | Document states "Touch is History - Gesture Input is Innovative." | x | | | |
| 26 | Competitor Benchmarking Samsung Qbowl 09/07 | SAMNDCA00219766 - 9880 | SAMNDCA00219878 | Samsung | Scroll or Gesture | Document recommends that "traditional scroll bar aesthetics is not used but the iPhones' scrolling mechanism instead." | x | | | |
| 27 | Mobile Internet User Research - 1/18/08 | SAMNDCA00220591 - 0672 | SAMNDCA00220603 | Samsung | Scroll or Gesture | Document states the iPhone's "Zoom and Scroll are simple and intuitive using finger gestures." | x | | | |
| 28 | Samsung Galaxy Tab Official Commercial (http://www.youtube.com/watch?v=GHPJdqgsJ9g) | N/A | 0:14 | Samsung | Scroll or Gesture | Scrolling function is shown in commercial for the Galaxy Tab. | x | | | |
| 29 | Time to Tab - Samsung Galaxy Tab 10.1 Global TV Commercial (http://www.youtube.com/watch?v=QL8ePbYsdc8) | N/A | 0:04 | Samsung | Scroll or Gesture/Multi-touch | Pinch to zoom and scrolling features are shown in the commercial for the Galaxy Tab 10.1. | x | | | x |
| 30 | Introducing the Samsung Galaxy Tab - It's Go Time! (http://www.youtube.com/watch?v=yGKthibnyTE) | N/A | 0:09 | Samsung | Scroll or Gesture | Scrolling function is shown in commercial for the Galaxy Tab. | x | | | |
| 31 | Samsung Continuum - A Galaxy S Phone (Verizon) (http://www.youtube.com/watch?v=Kii32R3yciY) | N/A | 0:30; 1:12 | Samsung | Scroll or Gesture | Scrolling function is shown in commercial for the Galaxy S - Continuum. | x | | | |
| 32 | Samsung Mobile USA, [Jo Videos] Samsung Galaxy S II Tips & Tricks - Email (http://www.youtube.com/watch?v=EhwW3cjsbAM&list =PLB06411CFD33597A3&feature=plcp&context=C337f15f PDOEgsToPDskIFIi7kLjB29rSJhGXwKF67) | N/A | 1:08 | Samsung | Scroll or Gesture/Multi-touch | Pinch to zoom and scrolling features are shown in the commercial for the Galaxy S II. | x | | | x |
| 33 | [GALAXY Tab 10.1] Official Demo - HD (http://www.youtube.com/watch?v=7tfX3Vlz0nI&feature =related) | N/A | 0:51 3:49; 4 00 8:32 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | In the commercial for Galaxy Tab 10.1, pinch to zoom and scrolling features are shown; tap to zoom and navigate feature shown. Tablet design is described as "revolutionary." | x | x | x | |
| 34 | [GALAXY S II] Official Live Demo - Viewing (http://www.youtube.com/watch?v=LP38KF-LR0U&feature=BFa&list=PL3F63929F54D9A90A&lf=plpp_ video) | N/A | 0:24 1:01 | Samsung | Scroll or Gesture/Multi-touch | In the commercial for the Galaxy S II, pinch to zoom and scrolling features are shown. | x | | | x |
| 35 | Samsung Galaxy S II Presentation | SAMNDCA10775587 - 5624 | SAMNDCA10775607 | Samsung | Scroll or Gesture/Zoom and Refocus | Diagrams showing "a double tap and tilt of the device will zoom in and out" and "Tap and Pan will move the user from widgets to menus." | x | x | | |
| 36 | P5 Usability Evaluation Results - 4/9/11 (Translated) | SAMNDCA00176053 - 6171 | SAMNDCA00176125 | Samsung | Bounce Effect | Samsung notes their current browser has no Bounce effect, and for the iPad, "there is a text element from a natural Bounce effect that follows hand gestures." There is a text screen noting that the GA Lab Evaluation will evaluate the Bounce effect. | x | | | |
| 37 | WOW Project - July 2007 (Translated) | SAMNDCA00202212 - 2225 | SAMNDCA00202221 | Samsung | Multi-touch | Samsung compares the Samsung Optical Joystick, with 'Multi Touch' next to an Apple logo. | | | | x |
| 38 | Relative Evaluation Report on S1, iPhone, 3/2/10 | SAMNDCA00203880 - 4010 | SAMNDCA00203909, '3928, and '3944 | Samsung | Scroll or Gesture/Zoom and Refocus | After comparing the web browser of the i9000 and iPhone, Samsung notes iPhone's drag and Double Tap feature, and recommend "add various functions for moving up and down that userse can easily recognize." | x | x | | |
| 39 | 3G iPhone US Market Impact, July 2008 | SAMNDCA00251506 - 1512 | SAMNDCA00251508 and '1513 | Samsung | Multi-touch | Two options to deal with the iPhone: "Option 1: match the iPhone on mainly one dimension (product)…. Option 2: match the iPhone on multiple dimensions." Under the Samsung short/medium term plan for Product, under User Interface, it lists "Multi Finger Touch." | | | | x |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Demand for Utility Patents 1/

| # | Title of Document | Bates Beg - End | Page in Document | Party | Relevant Patent or Feature | Comments on Utility | '381 | '915 | '163 | '607 |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | Behold3 Usability Evaluation Results, 5/10/10 (Translated) [Chung Exhibit B] | SAMNDCA00508318 - 8411 | SAMNDCA00508344, and '8383 | Samsung | Bounce Effect/Scroll or Gesture | On the Behold3, "unintentional unlock occurs because the sliding action works on any part of the screen." "The document notes, "No visual effects provided when a web page is dragged to its end point" and describes that it is "Dull because no special effects are provided when dragging web page to the bottommost or side edges." | x | x | | |
| 41 | Email from Jaegwan Shin to Ioi Lam et al., RE" "[P1 Browser] Request for Implementation of Additional Effects", 10/6/10 (Translated) | SAMDCA00525347 - 5349 | SANDCA00525347 | Samsung | Bounce Effect | Samsung HQ requested for the implementation of the Bounce effect: "HQ is asking us to make it for P1 project…. 3. There is no bounce effect in Browser screen." | x | | | |
| 42 | Email from Sangwook Han of Nemustech to Seungyun Lee of Samsung RE "[List Bouncing] Questions regarding bouncing", 10/28/10 (Translated) | SAMNDCA10850604 - 0607 | SAMNDCA10850604 | Samsung | Bounce Effect | "With regards to bounce, we used the Mass Spring Damper model which was modeled after the actual physical effect and obtained the bounce effect that is similar to the iPad." | x | | | |
| 43 | Email from Sangwook Han of Nemustech to Seungyun Lee of Samsung RE: "[Tiffany Effect] P1 Application Case / Additional Review Items Inquiry", 7/21/10 (Translated) | SAMNDCA10850822 - 0824 | SAMNDCA10850822 | Samsung | Bounce Effect | "There is a request to put Bouncing in GridView." | x | | | |
| 44 | Email from Jaegwan Shin to Arum Kumar et al., RE: "P4 Browser Touch performance problems", 5/7/11 | SAMNDCA00201351 - 1356 | SAMNDCA00201351 - 1523 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | HQ reported problems regarding: "2. Scroll not respond…. 3. Touch performance fail… 1) Pinch zoom in: focus time slow than iPad 2; 2) Double Tap: zoomout time is slow than iPad 2. 4. While Scroll/DoubleTap, checkboarder is showing too much vs iPad 2." | | x | x | x |
| 45 | Email from Jaegwan Shin to Ioi Lam et al., RE: "[San Jose] Request for update of P5/P4 zoom/scroll progress", 4/19/11 (Translated) | SAMNDCA00229399 - 9409, SAMNDCA00229410 | SAMNDCA00229399, and '9410 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | Performance test results after applying patch for scroll/zoom on P5 benchmarked against various models of the iPad. | | x | x | x |
| 46 | GT-P7500/P7510_Browser_Touch Performance Test (Translated) | SAMNDCA00229410 - 9415 | SAMNDCA00229410 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | Browser Touch Performance Test of P7510 benchmarked against various models of the iPad. | | x | x | x |
| 47 | Email chain between Ioi Lam and Jaegwan Shin, RE: "U1 browser scrolling patch", 3/3/11 | SAMNDCA00229440 - 9448 (chart shown more clearly on SAMNDCA00229449 - 9451) | SAMNDCA00229440 - 9442 (chart shown more clearly on SAMNDCA00229449 - 9451) | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | "Here is some test result from HW regarding zoom/scroll. As we has been asked, HQ wants us to improve initial response for zoom especially." Email then lists results for Pinch Zoom, Scroll, and DoubleTap between the i9100, Optimus 2x, and iPhone4. | | x | x | x |
| 48 | Email chain between Jaegwan Shin and Ioi Lam et al., RE: "[San Jose - Urgent] [U1] zoom/scroll performance", 3/20/11 (Translated) | SAMNDCA00229396 - 9397 | SAMNDCA00229396 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | HQ requested for various performance improvements regarding the zoom in and scrolling feature. | | x | x | x |
| 49 | i900 Improvement Points | SAMNDCA10042955 - 2984 | SAMNDCA10042979 and '2981 | Samsung | Scroll or Gesture | On the SMS-manager and Contact list overview, it is noted "scrolling up/down by vertical finger dragging (just like it is realized on iPhone)." | x | | | |
| 50 | European Telecommunication Operation P5 vs. iPad 2, 5/18/11 | S-ITC-010617659 - 7694 | S-ITC-010617661 and '7691 | Samsung | Scroll or Gesture | The P5 "touch respond is slow, especially, if you scroll fast, it follows the fingers with delay." | x | | | |
| 51 | Acme, July 2008 | SAMNDCA10275576 - 5646 | SAMNDCA10275618 | Samsung | Scroll or Gesture | "…the up and down scrolling action is seen as fun…" | | x | | |
| 52 | Browser Zooming Methods UX Exploration Study, 4/17/09 | SAMNDCA11104115 - 4139 | SAMNDCA11104133, '4134, '4138 | Samsung | Zoom and Refocus | "The most preferred method is "Double-Tap" Zooming… Simplicity is the primary reason of the choice." "The least preferred methods were split between u960 Browser and TouchWiz designs." "Too many steps…""dislike of long press, perception of reliability issues and complicated interactions were reasons given…." "Suggestions - Adopt Double-Tap as a supplementary zooming method… the UX of iPhone can be used as a design benchmark. Apply double-tap method consistently in other applications supporting zoom….." | | | x | |
| 53 | Touch Devices Browser User Experience Comparison, November 2008 | SAMNDCA11082242 - 2299 | SAMNDCA11082273 | Samsung | Multi-touch | Document compares the Browser functionality across several different phones. "Rendering is among the most accurate among all browsers with dynamic magnification and reduction with multi-touch." | | | | x |
| 54 | Apple iPad (untranslated document), 1/28/10 | SAMNDCA10806707 - 6720 | SAMNDCA10806713 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | Diagrams showing the iPad with Panning, Pinching and Double Tap features. | | x | x | x |
| 55 | Email from Seung Yun Lee to Meeso Kim et al., RE: "Today's Conference Call - Action Items", 10/12/10 | SAMNDCA00533366 - 3373 | SAMNDCA00533366 | Samsung | Bounce Effect | "List Bouncing effect is applied to all the applications." | x | | | |

Demand for Utility Patents 1/

| # | Title of Document | Bates Beg - End | Page in Document | Party | Relevant Patent or Feature | Comments on Utility | '381 | '915 | '163 | '607 |
|---|---|---|---|---|---|---|---|---|---|---|
| 56 | Touch Devices Browser User Experience Best Practices, STA UX, 2/13/09 | SAMNDCA10166661 - 6742 | SAMNDCA1016698, '6708, '6721 | Samsung | Scroll or Gesture/Zoom and Refocus/Multi-touch | "Touch screen is very responsive and accurate." "Multi-touch user interface is a competitive advantage for finger touch interaction design." "There is no widget needed to zoom in and out - users interact with screen objects directly." "Scrollbars appear when scrolling but will time out quickly after." | | x | x | x |
| 57 | 3G iPhone Counter Plan, 6/14/08 | SAMNDCA00251457 - 1505 | SAMNDCA00251472, '1473, '1503 | Samsung | Multi-touch | In a product competitive chart, "What is inferior? Less sophisticated User Interface.. No multi-touch UI." Instinct Action Item, "Touchwiz UI." Product competitive analysis for the OMNIA also includes "no multitouch UI." | | | | x |
| 58 | iPhone 3G UX Analysis, 7/12/08 | SAMNDCA00251538 – 1565 | SAMNDCA00251545 | Samsung | Scroll or Gesture | Shows screenshots of the iPhone "sweep horizontally and delete email." | | x | | |
| 59 | Email chain between Jee Won Lee and others, RE Q1] Email Body, 8/17/11 | SAMNDCA10524415 - 4420 | SAMNDCA10524416 | Samsung | Gesture | "The tablet team will check with the development team to see if the technology identical to that of the iPad (lining-up within the screen without scrolling left-to-right in test view/ fit to screen in the image web view) to email that is fit to screen." | | x | | |

| | Supplement | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 60 | McKinsey Report - Winning in smartphones: It's now or never | SAMNDCA10807316 (Hong Exhibit 2152) | SAMNDCA10807332, and '7358 | Samsung | Scroll or Gesture/Zoom and Refocus | '7332: Above chart showing consumer rating of user interface: "Samsung is weak in user interface compared to key competitors, and this is affecting the user experience of smartphone features. . . . E.g., interacting with the browser: 'The way the zoom on web pages and ability to scroll around is very bad and hard to do on this phone.' . . . E.g., the UI decisions made in the browser design: 'the resizing of web pages is poor.'" <br><br> '7358: "Strategic plays for Samsung . . . Match the iPhone UI within the next 12 months. Build Samsung brand credibility in smartphone around user experiences." | | x | x | |
| 61 | Gravity Tank:  Touch Portfolio: Rollout Strategy - Recommendation Based on Consumer Insight | SAMNDCA00191811 (Sohn Exhibit 1654) | SAMNDCA00191846, '1907, and '1928 | Samsung | Scroll or Gesture/Zoom and Refocus/Multitouch/Bounce Effect | '1846: "The iPhone isn't just easy to use, 'it's sexy to use' - Fun: Gestures like the two fingered pinch and flick add a game-like quality to interactions . . . "With the multi-touch function you can zoom in and zoom out and move photos, and that's great" - Whimsical: Lists bounce, icons flitter - the iPhone has a sense of whimsy that shows a thoughtful character in the interface - "You play with it because it's simply fun to handle" - Dramatic - . . . "It's sexy to use." <br><br> '1907, '1928: "Accuracy is the most important factor in a touch screen phone across segments." "A highly responsive, compelling UI is critical to delivering promise of touch - Addressing input deficiency is key user pain point." | x | x | x | x |
| 62 | Palm Pre, Apple iPhone, HTC Magic US:  UI Weakness/Strength Report - August 5, 2009 - R&D Management Group | SAMNDCA00391937 - 1960 | SAMNDCA00391958 | Samsung | Multi-touch/Gesture | Under Apple iPhone 3GS, Multi touch, Multi-touch "enhances usability of Application with Multi-touch support. Allows to operate instruments, 2-person game play, etc. with use of Multi-touch. Samsung - we use one finger zoom." | | x | | x |

**Sources/Notes:**
1/ Updated only to reflect translations agreed to by Samsung and Apple before trial. Shaded material reflects documents and columns that address patents other than the new trial patents.

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 177 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.
Exhibit 26-S

## iPhone Capacity Analysis
*(Units in Thousands)*



| | BOH | FYQ2'10 | FYQ3'10 | FYQ4'10 | FYQ1'11 | FYQ2'11 | FYQ3'11 | FYQ4'11 | FYQ1'12 |
|---|---|---|---|---|---|---|---|---|---|
| **Units Sold** | 2/ | | | | | | | | |
| iPhone 3G | | | | | | | | | |
| iPhone 3GS | | | | | | | | | |
| iPhone 4 | | | | | | | | | |
| iPhone 4S | | | | | | | | | |
| Total | | 8,752 | 8,398 | 14,103 | 16,234 | 18,648 | 20,337 | 17,072 | 37,049 |

**Adjustments for Capacity Available for Lost Profits 4/**

**Sources/Notes:**

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

Exhibit 27-S

**iPad Capacity Analysis**
*(Units in Thousands)*



| | FYQ3'10 | FYQ4'10 | FYQ1'11 | FYQ2'11 | FYQ3'11 | FYQ4'11 | FYQ1'12 |
|---|---|---|---|---|---|---|---|
| **Units Sold** | | | | | | | |
| iPad | | | | | | | |
| iPad 2 | | | | | | | |
| **Total** | 3,270 | 4,187 | 7,303 | 4,651 | 9,184 | 11,092 | 15,289 |

**Adjustments for Capacity Available for Lost Profits**

**Sources/Notes:**

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    **EXHIBIT 28**

# 26% of Phone Purchasers Chose a New Carrier



## Most Recently Purchased Cell Phone

| | |
|---|---|
| It was an upgrade/replacement phone with my existing provider | 59% |
| It was a new phone/line of service that I added w/ my existing provider | 13% |
| It was a new phone with a new provider | 19% |
| It was a gift for someone not on my wireless plan | 4% |
| It was my first cell phone | 3% |

**26%**

Q. Which of the following statements best describes your most recently purchased cell phone? (Total Respondents=2961)
Source: Google/Compete Wireless Shopper 2.0 Study, January 2010.



Google Confidential and Proprietary

**Source**: ThinkTech with Google Presentation, "Wireless Shoppers 2.0 How Consumers Shop for Wireless Phones Google Compete Clickstream and Survey Based Study. U.S. Feb 2010," pp. 6.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**Mor-Flo Analysis - Smartphones**

| (Units in Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 | 2012 Q1 |
|---|---|---|---|---|---|---|---|---|---|
| **Smartphone Market Share** 1/ | | | | | | | | | |
| Apple Units Sold | 2,550 | 2,772 | 4,924 | 3,776 | 6,830 | 6,256 | 4,807 | 14,757 | 10,722 |
| *Apple Market Share %* | *20.2%* | *19.3%* | *23.7%* | *17.2%* | *29.5%* | *24.7%* | *20.0%* | *45.3%* | *38.1%* |
| | | | | | | | | | |
| Samsung Units Sold | 720 | 714 | 2,950 | 2,750 | 2,328 | 3,750 | 4,597 | 6,251 | 6,118 |
| *Samsung Market Share %* | *5.7%* | *5.0%* | *14.2%* | *12.5%* | *10.1%* | *14.8%* | *19.2%* | *19.2%* | *21.7%* |
| | | | | | | | | | |
| Other Manufacturer Units Sold | 9,383 | 10,873 | 12,933 | 15,409 | 14,001 | 15,341 | 14,595 | 11,561 | 11,306 |
| *Other Manufacturer Market Share %* | *74.2%* | *75.7%* | *62.2%* | *70.2%* | *60.5%* | *60.5%* | *60.8%* | *35.5%* | *40.2%* |
| | | | | | | | | | |
| Total Market Units Sold | 12,653 | 14,359 | 20,806 | 21,935 | 23,158 | 25,347 | 23,999 | 32,569 | 28,146 |
| *Total Market Share %* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| **Samsung Infringing Smartphone Unit Sales to Be Deducted** 2/ | | | | | | | | | |
| Samsung Infringing Unit Sales | - | 6 | 2,073 | 1,920 | 1,777 | 4,126 | 2,670 | 2,905 | 2,486 |
| *% of Samsung IDC Estimates* | *0.0%* | *0.9%* | *70.3%* | *69.8%* | *76.3%* | *110.0%* | *58.1%* | *46.5%* | *40.6%* |
| *% of Total Market* | *0.0%* | *0.043%* | *9.963%* | *8.8%* | *7.7%* | *14.8%* | *11.1%* | *8.9%* | *8.8%* |
| **Smartphone Market Share After Mor-Flo Adjustment** 3/ | | | | | | | | | |
| Apple Units Sold | 2,550 | 2,772 | 4,924 | 3,776 | 6,830 | 6,256 | 4,807 | 14,757 | 10,722 |
| *Apple Market Share %* | *20.2%* | *19.3%* | *26.3%* | *18.9%* | *31.9%* | *29.0%* | *22.5%* | *49.7%* | *41.8%* |
| | | | | | | | | | |
| Samsung Units Sold | 720 | 707 | 877 | 830 | 551 | - | 1,927 | 3,346 | 3,632 |
| *Samsung Market Share %* | *5.7%* | *4.9%* | *4.7%* | *4.1%* | *2.6%* | *0.0%* | *9.0%* | *11.3%* | *14.2%* |
| | | | | | | | | | |
| Other Manufacturer Units Sold | 9,383 | 10,873 | 12,933 | 15,409 | 14,001 | 15,341 | 14,595 | 11,561 | 11,306 |
| *Other Manufacturer Market Share %* | *74.2%* | *75.8%* | *69.0%* | *77.0%* | *65.5%* | *71.0%* | *68.4%* | *39.0%* | *44.1%* |
| | | | | | | | | | |
| Total Market Units Sold | 12,653 | 14,353 | 18,733 | 20,015 | 21,381 | 21,597 | 21,329 | 29,664 | 25,660 |
| *Total Market Share %* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

Sources/Notes:

1/ IDC Worldwide Quarterly Mobile Phone Tracker, Q1 2012 Final Data, tab "Historical Pivot" (APLNDC-Y00000408211). Data was filtered by setting
   Country to "USA" and Device Type to "Smartphone."

2/ See Exhibit 37.1-PT.

3/ Smartphone Market Share after Mor-Flo is calculated after subtracting infringing Samsung smartphone units from the Samsung units in the market. For
   2011 Q2, there are more Samsung infringing smartphone units than IDC estimates, thus Samsung units sold after the deduction of infringing units was
   changed to 0 (from a negative units calculation).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**Mor-Flo Analysis - Tablets**

| *(Units in Thousands)* | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|
| **Tablet Market Share** 1/ | | | | | | | |
| Apple Units Sold | 2,217 | 1,957 | 3,606 | 1,941 | 4,308 | 3,791 | 6,173 |
| *Apple Market Share %* | *96.8%* | *79.1%* | *75.0%* | *71.2%* | *73.0%* | *60.0%* | *73.7%* |
| | | | | | | | |
| Samsung Units Sold | - | - | 560 | 235 | 121 | 135 | 166 |
| *Samsung Market Share %* | *0.0%* | *0.0%* | *11.6%* | *8.6%* | *2.1%* | *2.1%* | *2.0%* |
| | | | | | | | |
| Other Manufacturer Units Sold | 72 | 518 | 643 | 551 | 1,473 | 2,392 | 2,036 |
| *Other Manufacturer Market Share %* | *3.2%* | *20.9%* | *13.4%* | *20.2%* | *25.0%* | *37.9%* | *24.3%* |
| | | | | | | | |
| Total Market Units Sold | 2,289 | 2,476 | 4,809 | 2,728 | 5,901 | 6,318 | 8,375 |
| *Total Market Share %* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

| | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|
| **Samsung Infringing Tablet Unit Sales to Be Deducted** 2/ | | | | | | | |
| Samsung Infringing Unit Sales | - | - | 262 | 77 | 266 | 225 | 315 |
| *% of Samsung IDC Estimates* | *0.0%* | *0.0%* | *46.8%* | *32.8%* | *219.3%* | *166.3%* | *190.1%* |
| *% of Total Market* | *0.0%* | *0.0%* | *5.4%* | *2.8%* | *2.1%* | *2.1%* | *2.0%* |

| | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|
| **Tablet Market Share After Mor-Flo Adjustments** 3/ | | | | | | | |
| Apple Units Sold | 2,217 | 1,957 | 3,606 | 1,941 | 4,308 | 3,791 | 6,173 |
| *Apple Market Share %* | *96.8%* | *79.1%* | *79.3%* | *73.2%* | *74.5%* | *61.3%* | *75.2%* |
| | | | | | | | |
| Samsung Units Sold | - | - | 298 | 158 | - | - | - |
| *Samsung Market Share %* | *0.0%* | *0.0%* | *6.6%* | *6.0%* | *0.0%* | *0.0%* | *0.0%* |
| | | | | | | | |
| Other Manufacturer Units Sold | 72 | 518 | 643 | 551 | 1,473 | 2,392 | 2,036 |
| *Other Manufacturer Market Share %* | *3.2%* | *20.9%* | *14.1%* | *20.8%* | *25.5%* | *38.7%* | *24.8%* |
| | | | | | | | |
| Total Market Units Sold | 2,289 | 2,476 | 4,547 | 2,651 | 5,780 | 6,183 | 8,209 |
| *Total Market Share %* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

**Sources/Notes:**

1/ IDC Worldwide Quarterly Media Tablet Tracker, Q4 2011 , tab "Pivot Table" (APLNDC-Z0000000003). Data was filtered by 'Product Category: Media Tablet' and 'Region: USA'.

2/ See Exhibit 38.1-PT.

3/ Tablet Market Share after Mor-Flo is calculated after subtracting infringing Samsung tablet units from Samsung units in the market. For 2011 Q2, 2011 Q3 and 2011 Q4, there are more Samsung infringing tablet units than IDC estimates, thus Samsung units sold after the deduction of infringing units was changed to 0 (from a negative units calculation).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                    **EXHIBIT 31-S**

**Smartphone Market Share by Carrier** 1/ 2/

| Carrier & Manufacturer | | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|---|
| **AT&T** | Apple | 60% | 65% | 68% | 63% | 58% | 52% | 44% | 63% |
| | Samsung | 3% | 0% | 4% | 6% | 6% | 10% | 11% | 12% |
| | Others | 37% | 35% | 29% | 32% | 36% | 38% | 45% | 24% |
| | *AT&T Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| **Verizon Wireless** | Apple | 0% | 0% | 0% | 0% | 38% | 32% | 34% | 54% |
| | Samsung | 3% | 3% | 2% | 16% | 9% | 13% | 13% | 12% |
| | Others | 97% | 97% | 98% | 84% | 53% | 55% | 53% | 34% |
| | *Verizon Wireless Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| **T-Mobile** | Apple | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| | Samsung | 6% | 4% | 13% | 15% | 15% | 28% | 33% | 45% |
| | Others | 94% | 96% | 87% | 85% | 85% | 72% | 67% | 55% |
| | *T-Mobile Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| **Sprint** | Apple | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 36% |
| | Samsung | 21% | 22% | 39% | 28% | 25% | 42% | 41% | 32% |
| | Others | 79% | 78% | 61% | 72% | 75% | 58% | 59% | 32% |
| | *Sprint Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| **Other Carriers** | Apple | 0% | 0% | 0% | 0% | 0% | 1% | 1% | 3% |
| | Samsung | 7% | 13% | 20% | 10% | 8% | 15% | 10% | 20% |
| | Others | 93% | 87% | 80% | 90% | 92% | 84% | 89% | 77% |
| | *Other Carriers Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

<u>**Sources/Notes:**</u>

1/  Strategy Analytics, "USA Smartphone Vendor & OS Shipments by Operator: Q4 2010" and "USA Smartphone Vendor & OS
   Shipments by Operator: Q4 2011."

2/  According to a Strategy Analytics representative, Sprint CMDA does not include their iDEN network which has been included in
   Other Carriers.  Additionally, carriers such are Boost Mobile and Virgin Mobile are included within their parent company Sprint.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## Smartphone Mor-Flo Analysis - AT&T

| (Units In Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturer Market Share** 1/ | | | | | | | | |
| Apple Units Sold | 2,800 | 3,300 | 5,400 | 4,400 | 3,700 | 3,600 | 2,750 | 6,500 |
| *Apple Market Share* | *59.9%* | *64.5%* | *67.6%* | *62.8%* | *58.4%* | *51.6%* | *44.4%* | *63.4%* |
| | | | | | | | | |
| Samsung Units Sold | 150 | - | 300 | 400 | 350 | 700 | 650 | 1,250 |
| *Samsung Market Share* | *3.2%* | *0.0%* | *3.8%* | *5.7%* | *5.5%* | *10.0%* | *10.5%* | *12.2%* |
| | | | | | | | | |
| Others Units Sold | 1,723 | 1,814 | 2,290 | 2,209 | 2,281 | 2,681 | 2,790 | 2,500 |
| *Others Market Share* | *36.9%* | *35.5%* | *28.7%* | *31.5%* | *36.0%* | *38.4%* | *45.1%* | *24.4%* |
| | | | | | | | | |
| AT&T Total Units Sold | 4,673 | 5,114 | 7,990 | 7,009 | 6,331 | 6,981 | 6,190 | 10,250 |
| *AT&T Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | | | | | | | | |
| **Samsung Infringing Smartphone Unit Sales To Be Deducted** 2/ | | | | | | | | |
| Total Units | - | - | 481 | 251 | 229 | 458 | 652 | 882 |
| *% of Strategy Analytic Estimates* | *0.0%* | *0.0%* | *160.5%* | *62.8%* | *65.5%* | *65.4%* | *100.3%* | *70.5%* |
| *% of Total Market* | *0.0%* | *0.0%* | *3.8%* | *3.6%* | *3.6%* | *6.6%* | *10.5%* | *8.6%* |
| | | | | | | | | |
| **Manufacturer Market Share After Mor-Flo Adjustment** 3/ | | | | | | | | |
| Apple Units Sold | 2,800 | 3,300 | 5,400 | 4,400 | 3,700 | 3,600 | 2,750 | 6,500 |
| *Apple Market Share* | *59.9%* | *64.5%* | *70.2%* | *65.1%* | *60.6%* | *55.2%* | *49.6%* | *69.4%* |
| | | | | | | | | |
| Samsung Units Sold | 150 | - | - | 149 | 121 | 242 | - | 368 |
| *Samsung Market Share* | *3.2%* | *0.0%* | *0.0%* | *2.2%* | *2.0%* | *3.7%* | *0.0%* | *3.9%* |
| | | | | | | | | |
| Others Units Sold | 1,723 | 1,814 | 2,290 | 2,209 | 2,281 | 2,681 | 2,790 | 2,500 |
| *Others Market Share* | *36.9%* | *35.5%* | *29.8%* | *32.7%* | *37.4%* | *41.1%* | *50.4%* | *26.7%* |
| | | | | | | | | |
| AT&T Total Units Sold | 4,673 | 5,114 | 7,690 | 6,758 | 6,102 | 6,523 | 5,540 | 9,368 |
| *AT&T Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

**Sources/Notes:**

1/ Strategy Analytics, "USA Smartphone Vendor & OS Shipments by Operator: Q4 2010" and "USA Smartphone Vendor & OS Shipments by Operator: Q4 2011."

2/ Sales limited to smartphones sold at AT&T, which include Captivate, Galaxy S II (Skyrocket), Galaxy S II (AT&T Edition, 4G) and Infuse 4G (see Exhibit 10-PT). See Exhibit 37.1-PT.

3/ Manufacturer Market Share percentage after Mor-Flo adjustment is calculated by subtracting infringing Samsung AT&T smartphone units from AT&T sales estimated by Strategy Analytics. For the third quarter of 2010 and 2011, Samsung sold more AT&T smartphone units than Strategy Analytics estimates, thus Samsung Units Sold after infringing unit deductions was changed to 0 (from a negative units calculation).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    EXHIBIT 31.2-PT

## Smartphone Mor-Flo Analysis - Verizon Wireless

| (Units In Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturer Market Share** 1/ | | | | | | | | |
| Apple Units Sold | - | - | - | - | 2,600 | 2,200 | 2,000 | 4,300 |
| *Apple Market Share* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *38.1%* | *31.7%* | *33.6%* | *53.8%* |
| | | | | | | | | |
| Samsung Units Sold | 100 | 100 | 100 | 800 | 600 | 900 | 800 | 950 |
| *Samsung Market Share* | *2.8%* | *2.6%* | *2.4%* | *15.7%* | *8.8%* | *13.0%* | *13.4%* | *11.9%* |
| | | | | | | | | |
| Others Units Sold | 3,447 | 3,714 | 4,040 | 4,295 | 3,630 | 3,830 | 3,150 | 2,750 |
| *Others Market Share* | *97.2%* | *97.4%* | *97.6%* | *84.3%* | *53.1%* | *55.3%* | *52.9%* | *34.4%* |
| | | | | | | | | |
| Verizon Total Units Sold | 3,547 | 3,814 | 4,140 | 5,095 | 6,830 | 6,930 | 5,950 | 8,000 |
| *Verizon Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

| | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Samsung Infringing Smartphone Unit Sales To Be Deducted** 2/ | | | | | | | | |
| Total Units | - | - | 541 | 660 | 168 | 710 | 283 | 92 |
| *% of Strategy Analytic Estimates* | *0%* | *0%* | *541.0%* | *82.5%* | *28.0%* | *78.9%* | *35.4%* | *9.6%* |
| *% of Total Market* | *0%* | *0%* | *2.4%* | *12.9%* | *2.5%* | *10.2%* | *4.8%* | *1.1%* |

| | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturer Market Share After Mor-Flo Adjustment** 3/ | | | | | | | | |
| Apple Units Sold | - | - | - | - | 2,600 | 2,200 | 2,000 | 4,300 |
| *Apple Market Share* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *39.0%* | *35.4%* | *35.3%* | *54.4%* |
| | | | | | | | | |
| Samsung Units Sold | 100 | 100 | - | 140 | 432 | 190 | 517 | 858 |
| *Samsung Market Share* | *2.8%* | *2.6%* | *0.0%* | *3.2%* | *6.5%* | *3.1%* | *9.1%* | *10.9%* |
| | | | | | | | | |
| Others Units Sold | 3,447 | 3,714 | 4,040 | 4,295 | 3,630 | 3,830 | 3,150 | 2,750 |
| *Others Market Share* | *97.2%* | *97.4%* | *100.0%* | *96.8%* | *54.5%* | *61.6%* | *55.6%* | *34.8%* |
| | | | | | | | | |
| Verizon Total Units Sold | 3,547 | 3,814 | 4,040 | 4,435 | 6,662 | 6,220 | 5,667 | 7,908 |
| *Verizon Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

**Sources/Notes:**

1/ Strategy Analytics, "USA Smartphone Vendor & OS Shipments by Operator: Q4 2010" and "USA Smartphone Vendor & OS Shipments by Operator: Q4 2011".

2/ Sales limited to smartphones sold at Verizon include Continuum, Droid Charge and Fascinate (see Exhibit 10-PT). See Exhibit 37.1-PT.

3/ Manufacturer Market Share percentage after Mor-Flo adjustment is calculated by subtracting infringing Samsung Verizon smartphone units from Verizon sales estimated by Strategy Analytics.  For the third quarter of 2010, Samsung sold more Verizon smartphone units than Strategy Analytics estimates, thus Samsung Units Sold after infringing unit deductions was changed to 0 (from a negative units calculation).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.          **EXHIBIT 31.3-PT**

**Smartphone Mor-Flo Analysis - Sprint**

| (Units In Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturer Market Share** 1/ | | | | | | | | |
| Apple Units Sold | - | - | - | - | - | - | - | 1,800 |
| *Apple Market Share* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *36.0%* |
| | | | | | | | | |
| Samsung Units Sold | 300 | 400 | 900 | 800 | 700 | 1,700 | 1,600 | 1,600 |
| *Samsung Market Share* | *21.2%* | *22.3%* | *38.7%* | *27.7%* | *25.4%* | *42.0%* | *41.0%* | *32.0%* |
| | | | | | | | | |
| Others Units Sold | 1,112 | 1,391 | 1,425 | 2,085 | 2,055 | 2,343 | 2,300 | 1,600 |
| *Others Market Share* | *78.8%* | *77.7%* | *61.3%* | *72.3%* | *74.6%* | *58.0%* | *59.0%* | *32.0%* |
| | | | | | | | | |
| Sprint Total Units Sold | 1,412 | 1,791 | 2,325 | 2,885 | 2,755 | 4,043 | 3,900 | 5,000 |
| *Sprint Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

| (Units In Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Samsung Infringing Smartphone Unit Sales To Be Deducted** 2/ | | | | | | | | |
| Total Units | - | - | 416 | 525 | 557 | 2,142 | 1,005 | 977 |
| *% of Strategy Analytic Estimates* | *0.0%* | *0.0%* | *46.2%* | *65.6%* | *79.5%* | *126.0%* | *62.8%* | *61.1%* |
| *% of Total Market* | *0.0%* | *0.0%* | *17.9%* | *18.2%* | *20.2%* | *42.0%* | *25.8%* | *19.5%* |

| (Units In Thousands) | 2010 Q1 | 2010 Q2 | 2010 Q3 | 2010 Q4 | 2011 Q1 | 2011 Q2 | 2011 Q3 | 2011 Q4 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturer Market Share After Mor-Flo Adjustment** 3/ | | | | | | | | |
| Apple Units Sold | - | - | - | - | - | - | - | 1,800 |
| *Apple Market Share* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *44.7%* |
| | | | | | | | | |
| Samsung Units Sold | 300 | 400 | 484 | 275 | 143 | - | 595 | 623 |
| *Samsung Market Share* | *21.2%* | *22.3%* | *25.3%* | *11.6%* | *6.5%* | *0.0%* | *20.5%* | *15.5%* |
| | | | | | | | | |
| Others Units Sold | 1,112 | 1,391 | 1,425 | 2,085 | 2,055 | 2,343 | 2,300 | 1,600 |
| *Others Market Share* | *78.8%* | *77.7%* | *74.7%* | *88.4%* | *93.5%* | *100.0%* | *79.5%* | *39.8%* |
| | | | | | | | | |
| Sprint Total Units Sold | 1,412 | 1,791 | 1,909 | 2,360 | 2,198 | 2,343 | 2,895 | 4,023 |
| *Sprint Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |

**Sources/Notes:**

1/ Strategy Analytics, "USA Smartphone Vendor & OS Shipments by Operator: Q4 2010" and "USA Smartphone Vendor & OS Shipments by Operator: Q4 2011."

2/ Sales limited to smartphones sold at Sprint, which include Epic 4G, Galaxy Prevail, Galaxy S II (Epic 4G Touch), Nexus S 4G, Replenish, and Transform (see Exhibit 10-PT). See Exhibit 37.1-PT.

3/ Manufacturer Market Share percentage after Mor-Flo is calculated by subtracting infringing Samsung Sprint smartphone units from Sprint sales estimated by Strategy Analytics. For the second quarter of 2011, Samsung sold more Sprint smartphone units than Strategy Analytics estimates, thus Samsung Units Sold after infringing unit deductions was changed to 0 (from a negative units calculation).

Submitted Under Seal; Highly Confidential;

Outside Counsel Eyes' Only

Exhibit 32-S2

**Apple iPhone P&L Summary** 1/

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2010 | | | Q2 - Q4 | 2011 | | | | Total | 2012 | | Q1 & Q2 | Grand |
| | | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | | Q1 | Q2 | Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **U.S. Sales** 2/, 3/ | | | | | | | | | | | | | | |
| Units | | 2,778 | 4,912 | 3,767 | 11,457 | 6,810 | 5,670 | 4,820 | 15,073 | 32,372 | 10,687 | 8,342 | 19,029 | 62,858 |
| Revenue | | $ 1,562 | $ 2,841 | $ 2,102 | $ 6,505 | $ 4,256 | $ 3,438 | $ 2,850 | $ 9,393 | $ 19,937 | $ 6,678 | $ 5,137 | 11,815 | $ 38,257 |
| | | | | | | | | | | | | | | |
| **Worldwide Sales** 4/ | | | | | | | | | | | | | | |
| Units | [a] | 8,398 | 14,102 | 16,235 | 38,735 | 18,647 | 20,338 | 17,073 | 37,044 | 93,103 | 35,064 | 26,028 | 61,093 | 192,931 |
| Revenue | [b] | $ 5,271 | $ 8,776 | $ 10,388 | $ 24,435 | $ 12,225 | $ 13,312 | $ 10,836 | $ 24,267 | $ 60,640 | $ 22,582 | $ 16,150 | $ 38,732 | $ 123,807 |

Sources/Notes:
1/  Data is displayed in calendar years/quarters.  Apple operates on a fiscal year ending September 31.
2/  Apple iPhone Units / Revenue Report APLNDC0003149809 - 9814 and APLNDC-Y0000408219.  Revenue = "Total Handset Billings."
3/  Apple does not prepare GAAP Line of Business reports for product lines on a US geographic segment basis.
4/  "GAAP Line of Business Reporting - iPhone", APLNDC-Y0000408220 .  Unit and Revenue figurs agree to Apple's Forms 10-K and 10-Q as reported
    for the periods ending 12/25/10, 3/26/11, 6/25/11, 9/24/11, 12/31/11, and 3/31/12 and 8-K reported on 7/24/12.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

Exhibit 33-S2

**Apple iPad P&L Summary**

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2010 Q4 | Q4 Total | 2011 Q1 | Q2 | Q3 | Q4 | Total | 2012 Q1 | Q2 | Q1&Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **U.S. Sales** 2/, 3/ | | | | | | | | | | | | |
| Units | | 3,597 | 3,597 | 1,914 | 4,293 | 3,795 | 5,967 | 15,969 | 4,460 | 5,713 | 10,173 | 29,740 |
| Revenue | | $ 2,065 | $ 2,065 | $ 1,067 | $ 2,583 | $ 2,172 | $ 3,240 | $ 9,062 | $ 2,387 | $ 2,891 | $ 5,277 | $ 16,404 |
| | | | | | | | | | | | | |
| **Worldwide Sales** 4/ | | | | | | | | | | | | |
| Units | [a] | 7,331 | 7,331 | 4,694 | 9,246 | 11,123 | 15,434 | 40,497 | 11,799 | 17,042 | 28,841 | 76,669 |
| Revenue | [b] | $ 4,397 | $ 4,397 | $ 2,663 | $ 5,660 | $ 6,634 | $ 8,875 | $ 23,833 | $ 6,382 | $ 8,915 | $ 15,296 | $ 43,526 |

**Sources/Notes:**

1/  Data is displayed in calendar years/quarters.  Apple operates on a fiscal year ending September 31.

2/  Apple iPod Touch and iPad Units / Revenue Report, APLNDC-Y0000408212 - 218.  Revenue = "Total Handset Billings."

3/  Apple does not prepare GAAP Line of Business reports for product lines on a US geographic segment basis.

4/  "GAAP Line of Business Reporting - iPad", APLNDC-Y0000408221-22.  Unit and Revenue figures agree to Apple's Forms 10-K and 10-Q as reported for the preriods ending 12/25/10, 3/26/11, 6/25/11, 9/24/11, 12/31/11, and 3/31/12 and 8-K reported on 7/24/12.

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 188 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 34

**Apple iPhone Accessories P&L Summary** 1/, 3/

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | FY 2010 | | Q3 - Q4 | FY 2011 | | | | FY Total | FY 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | | Q1 | |
| **iPhone Units Sold** 2/ | [a] | 8,398 | 14,102 | 22,501 | 16,235 | 18,647 | 20,338 | 17,073 | 72,294 | 37,044 | 131,838 |
| **Revenue** | [b] | 63 | 46 | $    109 | 80 | 74 | (2) | 145 | $    297 | 150 | $    556 |

**Sources/Notes:**
1/  Fiscal year ending September 31.
2/  See Exhibit 32.
3/  "GAAP Line of Business Reporting   Ph.Acc", APLNDC Y0000051606   1609, at '1607.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 189 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 35

## Apple iPad Accessories P&L Summary 1/, 3/

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | FY 2011 | | | | FY Total | FY 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | | Q1 | |
| **iPad Units Sold** 2/ | [a] | 7,331 | 4,694 | 9,246 | 11,123 | 32,395 | 15,434 | 47,829 |
| **Revenue** | [b] | 211 | 172 | 385 | 234 | 1,002 | 278 | $  1,562 |

**Sources/Notes:**
1/  Fiscal year ending September 31.
2/  See Exhibit 33.
3/  "GAAP Line of Business Reporting - iPad.Acc", APLNDC-Y0000051606 - 1609, at '1606.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**P&L for Samsung Infringing Smartphones (12 Products)** 1/

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2010 | | | | | | | | | YE Total | 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2Q | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | 1Q | Apr | May | Jun | 2Q |
| **U.S. Sales - STA and SEA** 2/ | | | | | | | | | | | | | | | | | | | |
| **Units** | | - | 190 | 401 | 306 | 898 | 410 | 340 | 200 | 950 | 1,848 | 335 | 348 | 351 | 1,034 | 763 | 1,469 | 1,150 | 3,383 |
| Revenue | | $ - | $ 83 | $ 194 | $ 143 | $ 421 | $ 176 | $ 154 | $ 77 | $ 407 | $ 828 | $ 129 | $ 132 | $ 129 | $ 390 | $ 273 | $ 518 | $ 323 | $ 1,113 |
| **Manufacturing - SEC** | | | | | | | | | | | | | | | | | | | |

**Sources/Notes:**
1/  STA and SEA sales included for infringing smartphone sales, for June 2010 through June 2012 (SAMNDCA00402075 and '4875335_1_Highly Confidential Attorneys Eyes Only Worldwide Accused Modell 2012 2Q update.xls').
2/  See Exhibit 37.1-PT.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**P&L for Samsung Infringing Smartphones (12 Products) 1/**

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2011 | | | | | | | | YE Total | 2012 | | | | | | | | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | Q1 | Apr | May | June | Q2 | | |
| **U.S. Sales - STA and SEA 2/** | | | | | | | | | | | | | | | | | | | | |
| **Units** | | 853 | 679 | 384 | 1,916 | 343 | 551 | 158 | 1,051 | 7,385 | 394 | 313 | 267 | 974 | 317 | 136 | 56 | 509 | 1,483 | 10,716 |
| Revenue | | $ 243 | $ 191 | $ 68 | $ 502 | $ 78 | $ 158 | $ 31 | $ 268 | $ 2,273 | $ 80 | $ 60 | $ 63 | $ 203 | $ 69 | $ 28 | $ 10 | $ 107 | $ 310 | $ 3,412 |
| **Manufacturing - SEC** | | | | | | | | | | | | | | | | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 37.1-PT

**STA and SEA U.S. Sales of Infringing Smartphones 1/**
Units in Thousands, Revenue in Millions USD

| Infringing Smartphones | Data | 2010 | | | | | | | | | YE Total | 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2Q | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | 1Q | Apr | May | Jun | 2Q |
| Captivate | Units | - | 190 | 186 | 106 | 481 | 118 | 30 | 104 | 251 | 733 | 93 | 88 | 48 | 229 | 41 | 28 | 101 | 170 |
| | Revenue | - | 84 | 83 | 48 | 215 | 52 | 13 | 46 | 110 | 325 | 34 | 36 | 14 | 84 | 15 | 3 | 30 | 48 |
| | Gross Profit | - | 36 | 36 | 22 | 94 | 23 | 6 | 19 | 47 | 141 | 16 | 14 | 5 | 35 | 5 | 1 | 6 | 13 |
| Continuum | Units | - | - | - | - | - | 2 | 104 | 67 | 174 | 174 | 0 | (0) | 7 | 7 | 11 | 18 | 30 | 60 |
| | Revenue | - | (0) | (0) | (0) | (0) | 1 | 45 | 28 | 73 | 73 | (0) | (1) | 1 | 1 | 2 | 6 | 8 | 15 |
| | Gross Profit | - | - | 0 | 0 | 0 | 0 | 20 | 10 | 31 | 31 | 0 | - | 1 | 2 | 0 | 1 | 4 | 5 |
| Droid Charge | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 214 | 108 | 131 | 452 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 117 | 57 | 68 | 241 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 39 | 20 | 25 | 84 |
| Epic 4G | Units | - | 0 | 216 | 158 | 373 | 161 | 155 | 13 | 329 | 703 | 132 | 81 | 155 | 367 | 119 | 232 | 169 | 521 |
| | Revenue | - | (1) | 111 | 83 | 193 | 85 | 82 | 3 | 170 | 363 | 66 | 38 | 75 | 179 | 48 | 99 | 69 | 216 |
| | Gross Profit | - | (1) | 44 | 34 | 78 | 35 | 33 | 1 | 69 | 147 | 26 | 14 | 29 | 68 | 16 | 37 | 26 | 80 |
| Exhibit 4G | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0) | 118 | 118 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0) | 32 | 32 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10 | 10 |
| Galaxy Prevail | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 105 | 248 | 313 | 666 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | (0) | (0) | 0 | (0) | 19 | 45 | 57 | 122 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 7 | 17 | 21 | 46 |
| Gem | Units | - | - | - | - | - | - | - | - | - | - | 18 | 16 | 63 | 97 | 56 | 27 | 70 | 153 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | 3 | 3 | 11 | 18 | 10 | 5 | 13 | 28 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | 1 | 0 | 1 | 1 | 1 | 1 | 2 | 4 |
| Indulge | Units | - | - | - | - | - | - | - | - | - | - | - | 96 | 47 | 144 | (0) | (0) | (0) | (0) |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | 39 | 19 | 59 | (1) | (1) | (1) | (4) |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | 16 | 8 | 24 | - | - | - | - |
| Infuse 4G | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5 | 249 | 34 | 288 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2 | 121 | 15 | 138 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45 |
| Nexus S 4G | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 80 | 297 | 23 | 401 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 36 | 134 | 8 | 178 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12 | 45 | 3 | 61 |
| Replenish | Units | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 82 | 217 | 139 | 439 |
| | Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 14 | 38 | 20 | 72 |
| | Gross Profit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5 | 13 | 3 | 21 |
| Transform | Units | - | - | - | 43 | 43 | 130 | 50 | 16 | 196 | 239 | 92 | 66 | 32 | 189 | 50 | 44 | 22 | 116 |
| | Revenue | - | - | - | 13 | 13 | 38 | 14 | 1 | 54 | 66 | 26 | 16 | 8 | 50 | 11 | 10 | 3 | 25 |
| | Gross Profit | - | - | - | 5 | 5 | 15 | 5 | 0 | 20 | 25 | 8 | 4 | (11) | 1 | 3 | 3 | 24 | 31 |
| **Total Infringing Smartphones (12 Products)** | **Units** | - | 190 | 401 | 306 | 898 | 410 | 340 | 200 | 950 | 1,848 | 335 | 348 | 351 | 1,034 | 763 | 1,469 | 1,150 | 3,383 |
| | **Revenue** | - | 83 | 194 | 143 | 421 | 176 | 154 | 77 | 407 | 828 | 129 | 132 | 129 | 390 | 273 | 518 | 323 | 1,113 |
| | **Gross Profit** | - | 36 | 80 | 61 | 178 | 73 | 63 | 31 | 167 | 344 | 50 | 49 | 34 | 134 | 92 | 178 | 131 | 400 |

**Sources/Notes:**

1/  STA and SEA sales of infringing smartphones (SAMNDCA00402075 and '4875335_1_Highly Confidential Attorneys Eyes Only Worldwide Accused Modell 2012 2Q update.xls').

2/  Galaxy S II (AT&T edition, 4G)'s model number is listed along with the Galaxy S II (i9100) in Samsung's financial data.  I have counted sales through STA and SEA as sales of the Galaxy S II (AT&T edition, 4G) because I understand that the i9100 model is not sold in the US and all other models listed were not found on Samsung's North America Web Site.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**STA and SEA U.S. Sales of Infringing Smartphones 1/**

Units in Thousands, Revenue in Millions USD

| Infringing Smartphones | Data | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | YE Total | Jan | Feb | Mar | Q1 | Apr | May | Jun | 2Q | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Captivate | Units | 84 | 77 | 20 | 181 | 25 | 32 | 22 | 78 | 658 | (1) | (0) | (0) | (1) | (0) | 0 | (0) | (0) | (1) | 1,390 |
| | Revenue | $25 | $23 | $3 | $51 | $5 | $7 | $3 | $15 | $199 | (0) | (0) | 0 | 0 | (0) | 1 | (0) | 1 | 1 | 525 |
| | Gross Profit | $4 | $5 | $1 | $10 | $1 | $1 | $1 | $4 | $61 | - | - | - | - | - | - | - | - | - | 202 |
| Continuum | Units | 51 | 18 | 10 | 79 | (0) | (0) | 0 | (0) | 147 | (0) | (0) | - | (0) | (0) | - | - | (0) | | 320 |
| | Revenue | $14 | $5 | $3 | $21 | (0) | (0) | $2 | 1 | $39 | (0) | (0) | - | (0) | (0) | - | - | (0) | | 112 |
| | Gross Profit | $2 | $1 | $1 | $3 | - | - | - | | $10 | - | - | - | - | - | - | - | - | | 41 |
| Droid Charge | Units | 95 | 53 | 7 | 155 | 28 | 32 | 32 | 92 | 699 | 10 | 12 | 36 | 58 | 23 | 19 | 7 | 49 | 107 | 806 |
| | Revenue | $47 | $26 | $2 | $76 | $11 | $12 | $11 | $35 | $351 | $6 | $4 | $15 | $25 | $9 | $7 | $2 | $18 | $43 | 395 |
| | Gross Profit | $15 | $9 | - | $24 | - | $3 | $2 | $5 | $113 | $2 | $1 | $4 | $7 | $3 | $2 | $1 | $6 | $14 | 127 |
| Epic 4G | Units | 67 | 2 | - | 69 | 37 | 61 | 38 | 136 | 1,093 | 24 | 21 | 8 | 64 | 38 | - | 0 | 38 | 102 | 1,897 |
| | Revenue | $25 | ($3) | ($6) | $16 | $10 | $24 | $14 | $47 | $459 | $11 | $7 | $2 | $20 | $14 | - | 0 | $14 | $33 | 855 |
| | Gross Profit | $10 | - | - | $10 | $3 | $5 | $3 | $11 | $169 | $2 | $1 | $5 | $5 | $4 | - | - | $4 | $9 | 325 |
| Exhibit 4G | Units | 27 | 61 | 44 | 132 | 15 | 18 | (0) | 33 | 283 | (0) | (0) | 14 | 14 | 0 | 6 | (0) | 6 | 20 | 303 |
| | Revenue | $7 | $16 | $11 | $34 | $3 | $4 | (1) | $7 | $73 | (0) | (0) | $2 | $2 | 0 | $1 | (0) | $1 | $3 | 76 |
| | Gross Profit | $2 | $4 | $3 | $9 | $1 | - | - | 1 | $20 | - | (0) | 0 | 0 | - | - | - | - | - | 20 |
| Galaxy Prevail | Units | 262 | 202 | 75 | 539 | 100 | 185 | 47 | 332 | 1,537 | 175 | 165 | 77 | 417 | 152 | 100 | 50 | 301 | 718 | 2,255 |
| | Revenue | $47 | $36 | $4 | $82 | $17 | $31 | $7 | $55 | $259 | $30 | $28 | $13 | $70 | $25 | $16 | $8 | $49 | $120 | 378 |
| | Gross Profit | $19 | $14 | (0) | $32 | $7 | $10 | $3 | $20 | $98 | $10 | $11 | $5 | $26 | $11 | $6 | $4 | $21 | $47 | 145 |
| Gem | Units | 48 | 29 | 25 | 102 | 18 | 4 | (0) | 22 | 374 | 1 | (0) | (0) | 0 | (0) | 0 | - | 0 | 0 | 374 |
| | Revenue | $8 | $4 | $3 | $15 | $3 | $1 | (0) | $3 | $64 | $0 | (0) | (0) | 0 | (0) | 1 | - | 1 | 1 | 64 |
| | Gross Profit | $1 | $1 | $1 | $3 | $1 | $1 | - | - | $10 | - | - | - | - | - | - | - | - | - | 10 |
| Indulge | Units | 20 | 31 | 15 | 66 | 18 | 25 | 18 | 61 | 271 | - | - | (0) | (0) | - | - | - | - | (0) | 271 |
| | Revenue | $7 | $11 | $5 | $23 | $6 | $9 | $6 | $21 | $98 | (0) | (0) | (0) | (0) | - | - | - | - | (0) | 98 |
| | Gross Profit | $2 | $4 | $3 | $8 | $3 | $3 | $2 | $8 | $40 | - | - | - | - | - | - | - | - | - | 40 |
| Infuse 4G | Units | 90 | 130 | 140 | 360 | 87 | 113 | 2 | 202 | 851 | 40 | 55 | 59 | 154 | 39 | 1 | (0) | 40 | 194 | 1,045 |
| | Revenue | $44 | $62 | $49 | $155 | $29 | $40 | (1) | $67 | $361 | $11 | $16 | $17 | $44 | $12 | 0 | (0) | 12 | $56 | 417 |
| | Gross Profit | $12 | $15 | $13 | $40 | $9 | $12 | (0) | $20 | $106 | $2 | - | $2 | $5 | $1 | 0 | (0) | 2 | $6 | 112 |
| Nexus S 4G | Units | 17 | 6 | - | 23 | - | 80 | (0) | 80 | 504 | 8 | (18) | 18 | 8 | - | - | - | - | 8 | 512 |
| | Revenue | $5 | (2) | (8) | (5) | (5) | $33 | (8) | $20 | $193 | $3 | (7) | $7 | $3 | 0 | $1 | - | - | $3 | 196 |
| | Gross Profit | $2 | - | - | $2 | (1) | $8 | - | 6 | $69 | - | - | - | - | - | - | - | - | - | 69 |
| Replenish | Units | 60 | 43 | 47 | 149 | 15 | 0 | 0 | 15 | 603 | 126 | 78 | 56 | 260 | 65 | 10 | - | 75 | 336 | 938 |
| | Revenue | $9 | $6 | $8 | $23 | 0 | (1) | (2) | (3) | $92 | $20 | $12 | $9 | $40 | $10 | $1 | (0) | $11 | $51 | 144 |
| | Gross Profit | $3 | $2 | $10 | $15 | 0 | (0) | (0) | 0 | $36 | $6 | $4 | $3 | $12 | $3 | - | - | $3 | $16 | 52 |
| Transform | Units | 32 | 28 | - | 60 | - | - | - | - | 365 | (0) | (0) | (0) | (0) | - | - | - | - | (0) | 604 |
| | Revenue | $6 | $6 | (1) | $11 | - | (0) | (0) | (0) | $86 | (1) | (0) | (0) | (1) | - | 0 | - | 0 | (1) | 152 |
| | Gross Profit | $2 | $2 | - | $4 | - | - | - | - | $36 | - | - | - | - | - | - | - | - | - | 61 |
| **Total Infringing Smartphones (12 Products)** | Units | 853 | 679 | 384 | 1,916 | 343 | 551 | 158 | 1,051 | 7,385 | 394 | 313 | 267 | 974 | 317 | 136 | 56 | 509 | 1,483 | 10,716 |
| | Revenue | $243 | $191 | $68 | $502 | $78 | $158 | $31 | $268 | $2,273 | $80 | $60 | $63 | $203 | $69 | $28 | $10 | $107 | $310 | 3,412 |
| | Gross Profit | $74 | $56 | $30 | $160 | $22 | $43 | $10 | $75 | $768 | $23 | $18 | $15 | $56 | $22 | $9 | $5 | $35 | $92 | 1,204 |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 37.1-PT

**STA and SEA U.S. Sales of Infringing Smartphones 1/**
Units in Thousands, Revenue in Millions USD

| Infringing Smartphones | Data | 2010 | | | | | | | | | YE Total | 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2Q | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | 1Q | Apr | May | Jun | 2Q |
| Fascinate | Units | - | - | 49 | 492 | 541 | 330 | 82 | 75 | 486 | 1,027 | 108 | 7 | 46 | 161 | 122 | 47 | 29 | 198 |
| | Revenue | $ - | $ - | $ (0) | $ 23 | $ 226 | $ 249 | $ 151 | $ 36 | $ 219 | $ 469 | $ 47 | $ 1 | $ 20 | $ 68 | $ 41 | $ 15 | $ 8 | $ 65 |
| | Gross Profit | $ - | $ - | $ (0) | $ 10 | $ 96 | $ 106 | $ 67 | $ 16 | $ 13 | $ 202 | $ 21 | $ 0 | $ 19 | $ 40 | $ 14 | $ 5 | $ 3 | $ 22 |
| Galaxy Ace | Units | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S (I9000) | Units | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S 4G | Units | - | - | - | - | - | - | - | - | - | | - | 208 | 145 | 354 | 142 | 17 | 94 | 253 |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ 92 | $ 60 | $ 152 | $ 53 | $ 3 | $ 34 | 90 |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ 39 | $ 22 | $ 61 | $ 18 | $ 1 | $ 8 | 27 |
| Galaxy S II (AT&T Edition, 4G) 2/ | Units | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S II (Epic 4G Touch) | Units | - | - | - | - | - | - | - | - | - | | | | - | - | - | - | - | - |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | | | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | | | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S II (Skyrocket) | Units | - | - | - | - | - | - | - | - | - | | | | | - | - | - | - | - |
| | Revenue | $ | | | | | | | | | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ | | | | | | | | | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S II (T-Mobile edition) | Units | - | - | - | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Galaxy S Showcase | Units | - | - | - | - | - | - | 16 | 16 | 32 | 32 | 14 | 11 | 14 | 38 | 25 | 25 | 28 | 78 |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ 8 | $ 8 | $ 16 | $ 16 | $ 7 | $ 5 | $ 6 | $ 18 | $ 9 | $ 10 | $ 11 | 30 |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ 4 | $ 3 | $ 7 | $ 7 | $ 3 | $ 3 | $ 2 | $ 8 | $ 4 | $ 4 | $ 4 | 12 |
| Mesmerize | Units | - | - | - | - | - | 33 | 69 | 18 | 120 | 120 | 47 | 45 | 57 | 149 | 88 | 61 | 57 | 206 |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ 16 | $ 32 | $ 9 | $ 57 | $ 57 | $ 21 | $ 20 | $ 25 | $ 67 | $ 34 | $ 25 | $ 22 | 81 |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ 8 | $ 16 | $ 4 | $ 27 | $ 27 | $ 10 | $ 9 | $ 10 | $ 29 | $ 13 | $ 10 | $ 9 | 32 |
| Vibrant | Units | 6 | 332 | 109 | 194 | 634 | 217 | 97 | 18 | 333 | 973 | 32 | 1 | 8 | 41 | 2 | 5 | (0) | 7 |
| | Revenue | $ 3 | $ 148 | $ 46 | $ 85 | $ 279 | $ 98 | $ 42 | $ 7 | $ 147 | $ 429 | $ 12 | $ (1) | $ 1 | $ 13 | $ 0 | $ 4 | $ (1) | 3 |
| | Gross Profit | $ 1 | $ 62 | $ 20 | $ 38 | $ 120 | $ 41 | $ 17 | $ 3 | $ 62 | $ 183 | $ 5 | $ (0) | $ 1 | $ 6 | $ 0 | $ - | $ - | 0 |
| **Total Infringing Smartphones** | **Units** | 6 | 332 | 158 | 686 | 1,175 | 580 | 264 | 127 | 970 | 2,152 | 200 | 272 | 270 | 743 | 379 | 155 | 209 | 743 |
| **Affirmed** | **Revenue** | $ 3 | $ 148 | $ 69 | $ 311 | $ 528 | $ 265 | $ 118 | $ 56 | $ 439 | $ 969 | $ 87 | $ 117 | $ 112 | $ 317 | $ 138 | $ 56 | $ 75 | 268 |
| | **Gross Profit** | $ 1 | $ 62 | $ 29 | $ 134 | $ 226 | $ 116 | $ 53 | $ 23 | $ 192 | $ 419 | $ 39 | $ 50 | $ 54 | $ 143 | $ 49 | $ 20 | $ 24 | 93 |

| Total Infringing Smartphones | Units | 6 | 522 | 559 | 992 | 2,073 | 990 | 604 | 326 | 1,920 | 3,999 | 536 | 620 | 622 | 1,777 | 1,142 | 1,624 | 1,359 | 4,126 |
| | Revenue | $ 3 | $ 231 | $ 263 | $ 454 | $ 949 | $ 441 | $ 272 | $ 133 | $ 846 | $ 1,797 | $ 217 | $ 249 | $ 241 | $ 707 | $ 411 | $ 574 | $ 397 | $ 1,382 |
| | Gross Profit | $ 1 | $ 98 | $ 110 | $ 195 | $ 403 | $ 189 | $ 116 | $ 54 | $ 359 | $ 763 | $ 89 | $ 99 | $ 89 | $ 277 | $ 141 | $ 197 | $ 155 | $ 493 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**STA and SEA U.S. Sales of Infringing Smartphones 1/**
Units in Thousands, Revenue in Millions USD

| Infringing Smartphones | Data | 2011 Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | YE Total | 2012 Jan | Feb | Mar | Q1 | Apr | May | Jun | 2Q | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fascinate | Units | 34 | 6 | 8 | 48 | (0) | (0) | 0 | (0) | 407 | (0) | (0) | (0) | (0) | (0) | (0) | - | (0) | (0) | 1,434 |
| | Revenue | $11 | $2 | $3 | $15 | (0) | (0) | $3 | $3 | $150 | (0) | $0 | (0) | $0 | (0) | (0) | $- | (0) | (0) | $619 |
| | Gross Profit | $3 | $1 | $- | $3 | $- | $- | $- | $- | $66 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $268 |
| Galaxy Ace | Units | - | - | | | | | | | - | | | | | | | | | - | - |
| | Revenue | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| | Gross Profit | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Galaxy S (i9000) | Units | - | - | | | | | - | | - | | | | | | | - | | - | - |
| | Revenue | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| | Gross Profit | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Galaxy S 4G | Units | 95 | 137 | 70 | 302 | 45 | 73 | 119 | 237 | 1,146 | 98 | 40 | 45 | 184 | 65 | 2 | 50 | 118 | 301 | 1,447 |
| | Revenue | $29 | $45 | $17 | $91 | $9 | $9 | $34 | $62 | $395 | $27 | $9 | $10 | $47 | $17 | $1 | $13 | $31 | $78 | $473 |
| | Gross Profit | $8 | $12 | $5 | $25 | $3 | $6 | $11 | $20 | $133 | $7 | $3 | $3 | $13 | $5 | $0 | $5 | $10 | $23 | $155 |
| Galaxy S II (AT&T Edition, 4G) 2/ | Units | - | - | 110 | 110 | 156 | 101 | 16 | 273 | 384 | (0) | (0) | 69 | 68 | 51 | 41 | 30 | 122 | 190 | 574 |
| | Revenue | $- | $- | $53 | $53 | $73 | $47 | $6 | $126 | $180 | (7) | (3) | $26 | $16 | $19 | $14 | $11 | $44 | $60 | $240 |
| | Gross Profit | $- | $- | $23 | $23 | $34 | $18 | $2 | $54 | $77 | (3) | (1) | $11 | $7 | $8 | $5 | $5 | $18 | $24 | $101 |
| Galaxy S II (Epic 4G Touch) | Units | - | 0 | 165 | 165 | 139 | 204 | 71 | 414 | 579 | 226 | 127 | 163 | 516 | 251 | 148 | 182 | 581 | 1,097 | 1,675 |
| | Revenue | (0) | $0 | $79 | $79 | $66 | $97 | $33 | $196 | $275 | $107 | $58 | $75 | $240 | $118 | $62 | $68 | $249 | $489 | $764 |
| | Gross Profit | $- | $0 | $28 | $28 | $22 | $29 | $12 | $63 | $91 | $29 | $20 | $27 | $76 | $40 | $23 | $21 | $84 | $160 | $251 |
| Galaxy S II (Skyrocket) | Units | | | | | 14 | 149 | 165 | 328 | 328 | 65 | 14 | 68 | 147 | 42 | 52 | 66 | 161 | 309 | 636 |
| | Revenue | | | | | $7 | $73 | $81 | $160 | $160 | $27 | $7 | $32 | $65 | $16 | $22 | $27 | $64 | $129 | $289 |
| | Gross Profit | $- | | $- | | $3 | $24 | $12 | $38 | $38 | $6 | $2 | $10 | $18 | $6 | $7 | $11 | $24 | $42 | $81 |
| Galaxy S II (T-Mobile edition) | Units | - | - | - | - | 257 | 60 | 115 | 432 | 432 | 168 | 140 | 206 | 514 | 219 | 82 | 5 | 305 | 819 | 1,252 |
| | Revenue | $- | $- | $- | $- | $116 | $26 | $53 | $196 | $196 | $77 | $64 | $96 | $237 | $94 | $32 | $2 | $128 | $365 | $561 |
| | Gross Profit | $- | $- | $- | $- | $43 | $9 | $17 | $68 | $68 | $27 | $26 | $37 | $90 | $38 | $13 | $1 | $52 | $142 | $209 |
| Galaxy S Showcase | Units | 29 | 34 | 11 | 74 | 3 | 26 | 13 | 42 | 233 | 30 | 18 | 25 | 73 | 39 | 29 | 12 | 80 | 153 | 417 |
| | Revenue | $10 | $12 | $4 | $26 | $1 | $9 | $4 | $14 | $88 | $9 | $5 | $8 | $22 | $11 | $8 | $3 | $22 | $44 | $148 |
| | Gross Profit | $3 | $4 | $1 | $8 | $- | $3 | $1 | $4 | $32 | $2 | $2 | $2 | $6 | $3 | $3 | $1 | $8 | $14 | $54 |
| Mesmerize | Units | 0 | 23 | 31 | 55 | 56 | 60 | 11 | 127 | 537 | (0) | (0) | 10 | 10 | 91 | 29 | 1 | 121 | 131 | 788 |
| | Revenue | (0) | $9 | $10 | $19 | $17 | $18 | $3 | $38 | $205 | (0) | $- | $3 | $3 | $24 | $8 | $0 | $32 | $35 | $296 |
| | Gross Profit | $3 | $3 | $2 | $5 | $5 | $4 | $1 | $10 | $77 | $- | $- | $1 | $1 | $7 | $2 | $0 | $10 | $10 | $114 |
| Vibrant | Units | (0) | | (1) | (0) | 0 | (0) | (0) | 0 | 17 | (1) | (0) | - | (2) | - | - | - | 0 | (1) | 1,021 |
| | Revenue | (1) | | 0 | 0 | (0) | 0 | (0) | 0 | 6 | (0) | $- | $- | $- | $- | $- | $- | 0 | (1) | 444 |
| | Gross Profit | $- | | $- | $- | $- | $- | $- | $- | 6 | $- | $- | $- | $- | $- | $- | $- | $- | $- | 189 |
| **Total Infringing Smartphones Affirmed** | **Units** | 159 | 200 | 395 | 754 | 670 | 674 | 509 | 1,854 | 4,093 | 587 | 339 | 586 | 1,512 | 758 | 382 | 346 | 1,487 | 2,999 | 9,244 |
| | **Revenue** | $48 | $67 | $170 | $285 | $289 | $289 | $218 | $795 | $1,666 | $238 | $141 | $249 | $628 | $298 | $148 | $124 | $570 | $1,198 | $3,834 |
| | **Gross Profit** | $14 | $20 | $59 | $93 | $110 | $92 | $55 | $257 | $587 | $68 | $51 | $90 | $210 | $107 | $55 | $43 | $205 | $415 | $1,421 |

| Total Infringing Smartphones | Data | Jul | Aug | Sep | 3Q | Oct | Nov | Dec | 4Q | YE Total | Jan | Feb | Mar | Q1 | Apr | May | Jun | 2Q | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Infringing Smartphones** | **Units** | 1,012 | 879 | 779 | 2,670 | 1,013 | 1,225 | 667 | 2,905 | 11,478 | 981 | 652 | 854 | 2,486 | 1,075 | 519 | 403 | 1,996 | 4,483 | 19,960 |
| | **Revenue** | $291 | $258 | $238 | $788 | $367 | $447 | $249 | $1,063 | $3,939 | $318 | $201 | $312 | $831 | $368 | $175 | $135 | $678 | $1,509 | $7,245 |
| | **Gross Profit** | $87 | $76 | $89 | $253 | $132 | $134 | $66 | $333 | $1,355 | $91 | $69 | $106 | $266 | $129 | $64 | $48 | $240 | $507 | $2,625 |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**P&L for Samsung Infringing Tablet (Galaxy Tab)** 1/

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2010 | | | | YE Total | 2011 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | 1Q | Apr | May | Jun | 2Q | Jul | Aug | Sep | 3Q |
| **U.S. Sales - STA and SEA** 2/ | | | | | | | | | | | | | | | | | | |
| Units | | 0 | 236 | 25 | 262 | 262 | 33 | 18 | 26 | 77 | 52 | 32 | 49 | 133 | 55 | 32 | 4 | 92 |
| Revenue | $ 0 | $ 141 | $ 14 | 154 | $ 154 | $ 15 | $ 6 | $ 2 | 22 | $ 18 | 11 | 19 | 49 | 22 | 13 | 2 | 37 |
| **Manufacturing - SEC** | | | | | | | | | | | | | | | | | | |

**Sources/Notes:**

1/  STA and SEA sales included for infringing tablet sales, for October 2010 through June 2012 (SAMNDCA00402075 and '4875335_1_Highly Confidential Attorneys Eyes Only Worldwide Accused Modell 2012 2Q update.xls').

2/  See Exhibit 38.1-PT.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**P&L for Samsung Infringing Tablet (Galaxy Tab) 1/**

| (Units in Thousands, Revenue in Millions USD) | Calculation Steps | 2011 | | | | YE Total | 2012 | | | | | | | | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct | Nov | Dec | 4Q | | Jan | Feb | Mar | Q1 | Apr | May | June | Q2 | | |
| **U.S. Sales - STA and SEA** 2/ | | | | | | | | | | | | | | | | |
| **Units** | | 65 | 26 | 10 | 102 | 404 | 11 | 14 | 10 | 35 | 5 | 5 | 15 | 25 | 60 | 725 |
| **Revenue** | | 26 | 10 | 4 | 40 | 148 | 4 | 6 | 4 | 14 | 2 | 2 | 6 | 9 | $ 23 | $ 325 |
| **Manufacturing - SEC** | | | | | | | | | | | | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**STA and SEA U.S. Sales of Infringing Tablets 1/**
Units in Thousands, Revenue in Millions USD

| Infringing Tablet | Data | Oct (2010) | Nov (2010) | Dec (2010) | 4Q (2010) | YE Total | Jan (2011) | Feb (2011) | Mar (2011) | 1Q (2011) | Apr (2011) | May (2011) | Jun (2011) | 2Q (2011) | Jul (2011) | Aug (2011) | Sep (2011) | 3Q (2011) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Galaxy Tab | Units | 0 | 236 | 25 | 262 | 262 | 33 | 18 | 26 | 77 | 52 | 32 | 49 | 133 | 55 | 32 | 4 | 92 |
| | Revenue | $ 0 | $ 141 | $ 14 | $ 154 | $ 154 | $ 15 | $ 6 | $ 2 | $ 22 | $ 18 | $ 11 | $ 19 | $ 49 | $ 22 | $ 13 | $ 2 | $ 37 |
| | Gross Profit | $ 0 | $ 58 | $ 4 | $ 62 | $ 62 | $ 4 | $ (1) | $ 0 | $ 3 | $ 6 | $ 1 | $ 13 | $ 21 | $ 5 | $ 4 | $ 1 | $ 10 |
| **Total Infringing Tablet (1 Product)** | **Units** | **0** | **236** | **25** | **262** | **262** | **33** | **18** | **26** | **77** | **52** | **32** | **49** | **133** | **55** | **32** | **4** | **92** |
| | **Revenue** | **$ 0** | **$ 141** | **$ 14** | **$ 154** | **$ 154** | **$ 15** | **$ 6** | **$ 2** | **$ 22** | **$ 18** | **$ 11** | **$ 19** | **$ 49** | **$ 22** | **$ 13** | **$ 2** | **$ 37** |
| | **Gross Profit** | **$ 0** | **$ 58** | **$ 4** | **$ 62** | **$ 62** | **$ 4** | **$ (1)** | **$ 0** | **$ 3** | **$ 6** | **$ 1** | **$ 13** | **$ 21** | **$ 5** | **$ 4** | **$ 1** | **$ 10** |
| Galaxy Tab 10.1 | Units | - | - | - | - | - | - | - | - | - | - | 6 | 128 | 133 | 39 | 49 | 46 | 133 |
| | Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2 | $ 61 | $ 63 | $ 16 | $ 22 | $ 20 | $ 58 |
| | Gross Profit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 0 | $ 7 | $ 7 | $ 2 | $ 2 | $ 3 | $ 7 |
| **Total Infringing Tablets Affirmed** | **Units** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **6** | **128** | **133** | **39** | **49** | **46** | **133** |
| | **Revenue** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 2** | **$ 61** | **$ 63** | **$ 16** | **$ 22** | **$ 20** | **$ 58** |
| | **Gross Profit** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 0** | **$ 7** | **$ 7** | **$ 2** | **$ 2** | **$ 3** | **$ 7** |
| **Total Infringing Tablets** | **Units** | **0** | **236** | **25** | **262** | **262** | **33** | **18** | **26** | **77** | **52** | **38** | **177** | **266** | **94** | **81** | **50** | **225** |
| | **Revenue** | **$ 0** | **$ 141** | **$ 14** | **$ 154** | **$ 154** | **$ 15** | **$ 6** | **$ 2** | **$ 22** | **$ 18** | **$ 14** | **$ 80** | **$ 112** | **$ 38** | **$ 34** | **$ 23** | **$ 95** |
| | **Gross Profit** | **$ 0** | **$ 58** | **$ 4** | **$ 62** | **$ 62** | **$ 4** | **$ (1)** | **$ 0** | **$ 3** | **$ 6** | **$ 1** | **$ 21** | **$ 28** | **$ 7** | **$ 5** | **$ 4** | **$ 17** |

**Sources/Notes:**
1/ STA and SEA sales of infringing tablets for October 2010 through June 2012 (SAMNDCA00402075 and '4875335_1_Highly Confidential Attorneys Eyes Only Worldwide Accused Modell 2012 2Q update.xls').

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## STA and SEA U.S. Sales of Infringing Tablets 1/
Units in Thousands, Revenue in Millions USD

| Infringing Tablet | Data | 2011 Oct | Nov | Dec | 4Q | YE Total | 2012 Jan | Feb | Mar | Q1 | Apr | May | June | Q2 | Q1 & Q2 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Galaxy Tab | Units | 65 | 26 | 10 | 102 | 404 | 11 | 14 | 10 | 35 | 5 | 5 | 15 | 25 | 60 | 725 |
| | Revenue | $ 26 | $ 10 | $ 4 | $ 40 | $ 148 | $ 4 | $ 6 | $ 4 | $ 14 | $ 2 | $ 2 | $ 6 | $ 9 | $ 23 | $ 325 |
| | Gross Profit | $ 9 | $ 2 | $ 1 | $ 12 | $ 46 | $ 1 | $ 1 | $ 1 | $ 3 | $ 1 | $ 0 | $ (0) | $ 1 | $ 4 | $ 112 |
| **Total Infringing Tablet (1 Product)** | **Units** | **65** | **26** | **10** | **102** | **404** | **11** | **14** | **10** | **35** | **5** | **5** | **15** | **25** | **60** | **725** |
| | **Revenue** | **$ 26** | **$ 10** | **$ 4** | **$ 40** | **$ 148** | **$ 4** | **$ 6** | **$ 4** | **$ 14** | **$ 2** | **$ 2** | **$ 6** | **$ 9** | **$ 23** | **$ 325** |
| | **Gross Profit** | **$ 9** | **$ 2** | **$ 1** | **$ 12** | **$ 46** | **$ 1** | **$ 1** | **$ 1** | **$ 3** | **$ 1** | **$ 0** | **$ (0)** | **$ 1** | **$ 4** | **$ 112** |
| Galaxy Tab 10.1 | Units | 94 | 73 | 46 | 213 | 480 | 47 | 39 | 17 | 104 | (2) | 5 | (2) | 1 | 105 | 585 |
| | Revenue | $ 42 | $ 31 | $ 12 | $ 85 | $ 206 | $ 17 | $ 14 | $ 5 | $ 36 | $ (3) | $ (0) | $ (1) | $ (5) | $ 32 | $ 237 |
| | Gross Profit | $ 9 | $ 5 | $ 1 | $ 15 | $ 29 | $ 3 | $ 2 | $ 1 | $ 7 | $ (1) | $ (0) | $ (0) | $ (1) | $ 5 | $ 35 |
| **Total Infringing Tablet Affirmed** | **Units** | **94** | **73** | **46** | **213** | **480** | **47** | **39** | **17** | **104** | **(2)** | **5** | **(2)** | **1** | **105** | **585** |
| | **Revenue** | **$ 42** | **$ 31** | **$ 12** | **$ 85** | **$ 206** | **$ 17** | **$ 14** | **$ 5** | **$ 36** | **$ (3)** | **$ (0)** | **$ (1)** | **$ (5)** | **$ 32** | **$ 237** |
| | **Gross Profit** | **$ 9** | **$ 5** | **$ 1** | **$ 15** | **$ 29** | **$ 3** | **$ 2** | **$ 1** | **$ 7** | **$ (1)** | **$ (0)** | **$ (0)** | **$ (1)** | **$ 5** | **$ 35** |
| **Total Infringing Tablets** | **Units** | **160** | **100** | **56** | **315** | **884** | **59** | **53** | **27** | **139** | **3** | **9** | **13** | **26** | **165** | **1,311** |
| | **Revenue** | **$ 68** | **$ 41** | **$ 16** | **$ 125** | **$ 353** | **$ 21** | **$ 20** | **$ 9** | **$ 50** | **$ (1)** | **$ 2** | **$ 4** | **$ 5** | **$ 55** | **$ 562** |
| | **Gross Profit** | **$ 18** | **$ 7** | **$ 2** | **$ 27** | **$ 75** | **$ 4** | **$ 4** | **$ 2** | **$ 10** | **$ (0)** | **$ 0** | **$ (0)** | **$ (0)** | **$ 9** | **$ 146** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.       **EXHIBIT 39-S**

## Cost Value Reference Points for Samsung

| IP Type | Patent/Registration No. | Cost Value per Unit | |
|---|---|---|---|
| | | **Smartphones** 1/ | **Tablets** 2/ |
| Utility Patents | 6,493,002 | $ 0.46 | $ 0.53 |
| | 7,469,381 | $ 0.85 | $ 0.98 |
| | 7,663,607 | $ 1.76 | $ 2.03 |
| | 7,844,915 | $ 1.30 | $ 1.50 |
| | 7,853,891 | $ 0.46 | $ 0.53 |
| | 7,864,163 | $ 0.85 | $ 0.98 |
| | 7,920,129 | $ 0.85 | $ 0.98 |
| Design Patents | D627,790 | | |
| | D617,334 | | |
| | D604,305 | | |
| | D618,677 | | |
| | D504,889 | | |
| | D593,087 | | |
| | D622,270 | | |
| Trade Dress | iPhone | $ 19.50 | $ 22.50 |
| | iPhone 3G | | |
| | iPhone 4 | | |
| | iPhone / iPhone 3G / iPhone 4 | | |
| | iPad and iPad 2 | | |
| | 3,470,983 | | |
| | 3,457,218 | | |
| | 3,475,327 | | |
| Trademarks | 3,886,196 | | |
| | 3,889,642 | | |
| | 3,886,200 | | |
| | 3,889,685 | | |
| | 3,886,169 | | |
| | 3,886,197 | | |
| | 85/041,463 (Pending) | | |
| | 2,935,038 | | |
| | **Grand Total** | **$ 26.00** | **$ 30.00** |

**Sources/Notes:**

1/ See Exhibit 39.1-S. The '607 and '129 Patents do not cover smartphones.

2/ See Exhibit 39.2-S.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**Accused Smartphone Cost Value Analysis for Samsung**

| IP Type | Patent/Registration No. | Patent Qualitative Ranking 1/ | % of Total Ranking 2/ | Weighted Cost Value per Unit 3/ |
|---|---|---|---|---|
| Utility Patents | 6,493,002 | 1 | 7% | $    0.46 |
| | 7,469,381 | 2 | 13% | $    0.85 |
| | 7,663,607 | 4 | 27% | $    1.76 |
| | 7,844,915 | 3 | 20% | $    1.30 |
| | 7,853,891 | 1 | 7% | $    0.46 |
| | 7,864,163 | 2 | 13% | $    0.85 |
| | 7,920,129 | 2 | 13% | $    0.85 |
| | Utility Patent Total | 15 | 100% | $    6.50  4/ |

| IP Type | Patent/Registration No. | | | Weighted Cost Value per Unit |
|---|---|---|---|---|
| Design Patents | D627,790 | | | |
| | D617,334 | | | |
| | D604,305 | | | |
| | D618,677 | | | |
| | D504,889 | | | |
| | D593,087 | | | |
| | D622,270 | | | |
| Trade Dress | iPhone | n/a | n/a | $    19.50 |
| | iPhone 3G | | | |
| | iPhone 4 | | | |
| | iPhone / iPhone 3G / iPhone 4 | | | |
| | iPad and iPad 2 | | | |
| | 3,470,983 | | | |
| | 3,457,218 | | | |
| | 3,475,327 | | | |
| Trademarks | 3,886,196 | | | |
| | 3,889,642 | | | |
| | 3,886,200 | | | |
| | 3,889,685 | | | |
| | 3,886,169 | | | |
| | 3,886,197 | | | |
| | 85/041,463 (Pending) | | | |
| | 2,935,038 | | | |

Grand Total        $        26.00  4/

**Sources/Notes:**

1/  For Qualitative Rankings for Utility Patents, see Exhibit 45.  Design Patents, Trade Dress and Trademarks are grouped together, no ranking is necessary.

2/  % Of Total Ranking is calculated by dividing Patent Qualitative Ranking for each patent/registration by the Subtotal of Patent Qualitative Ranking by IP Type.

3/  Weighted Cost Value per Unit is calculated by multiplying % of Total Ranking by the Total Weighted Cost Value per Unit by IP Type (see Exhibit 39.3-S). The '607 and '129 Patents do not cover smartphones.

4/  See Exhibit 39.3-S.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    **EXHIBIT 39.2-S**

## Accused Tablet Cost Value Analysis for Samsung

| IP Type | Patent/Registration No. | Patent Qualitative Ranking 1/ | % of Total Ranking 2/ | Weighted Cost Value per Unit 3/ |
|---------|------------------------|------------------------------|----------------------|--------------------------------|
| Utility Patents | 6,493,002 | 1 | 7% | $ 0.53 |
| | 7,469,381 | 2 | 13% | $ 0.98 |
| | 7,663,607 | 4 | 27% | $ 2.03 |
| | 7,844,915 | 3 | 20% | $ 1.50 |
| | 7,853,891 | 1 | 7% | $ 0.53 |
| | 7,864,163 | 2 | 13% | $ 0.98 |
| | 7,920,129 | 2 | 13% | $ 0.98 |
| Utility Patent Total | | 15 | 100% | $ 7.50  4/ |

| IP Type | Patent/Registration No. | | | Weighted Cost Value per Unit |
|---------|------------------------|---|---|--------------------------------|
| Design Patents | D627,790 | | | |
| | D617,334 | | | |
| | D604,305 | | | |
| | D618,677 | | | |
| | D504,889 | | | |
| | D593,087 | | | |
| | D622,270 | | | |
| Trade Dress | iPhone | n/a | n/a | $ 22.50 |
| | iPhone 3G | | | |
| | iPhone 4 | | | |
| | iPhone / iPhone 3G / iPhone 4 | | | |
| | iPad and iPad 2 | | | |
| | 3,470,983 | | | |
| | 3,457,218 | | | |
| | 3,475,327 | | | |
| Trademarks | 3,886,196 | | | |
| | 3,889,642 | | | |
| | 3,886,200 | | | |
| | 3,889,685 | | | |
| | 3,886,169 | | | |
| | 3,886,197 | | | |
| | 85/041,463 (Pending) | | | |
| | 2,935,038 | | | |

**Grand Total**                                      **$                    30.00**  4/

**Sources/Notes:**

1/  For Qualitative Rankings for Utility Patents, see Exhibit 45.  Design Patents, Trade Dress and Trademarks are grouped together, no ranking is necessary.

2/  % Of Total Ranking is calculated by dividing Patent Qualitative Ranking for each patent/registration by the Subtotal of Patent Qualitative Ranking by IP Type.

3/  Weighted Cost Value per Unit is calculated by multiplying % of Total Ranking by the Total Weighted Cost Value per Unit by IP Type (see Exhibit 39.3-S).

4/  See Exhibit 39.3-S.

Submitted Under Seal; Highly Confidential;

Outside Counsel Eyes' Only

Prepared by Invotex Group

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                    **EXHIBIT 39.3-S**

**Weighted Cost Value per Unit Apportionment**

| Product Type | IP Type | Cost Value per Unit 1/ | Design Around Allocation 2/ | Weighted Cost Value per Unit by IP Type 3/ |
|---|---|---|---|---|
| **Smartphones** | Utility Patents | $            26.00 | 25% | $                  6.50 |
| | Design Patents, Trade Dress, and Trademarks | | 75% | $                19.50 |
| | **Smartphone Total** | | **100%** | **$                26.00** 1/ |
| **Tablets** | Utility Patents | $            30.00 | 25% | $                  7.50 |
| | Design Patents, Trade Dress, and Trademarks | | 75% | $                22.50 |
| | **Tablet Total** | | **100%** | **$                30.00** 1/ |

| IP Type | Patent/Registration No. | Design Around Time (Months) 5/ | Design Around Allocation 2/ |
|---|---|---|---|
| Utility Patents | 6,493,002 | 0.5 | 25% |
| | 7,469,381 | 1.0 | |
| | 7,663,607 | 12.0 | |
| | 7,844,915 | 6.0 | |
| | 7,853,891 | 0.5 | |
| | 7,864,163 | 1.0 | |
| | 7,920,129 | 0.5 | |
| Design Patents | D627,790 | 0.5 | 75% |
| | D617,334 | 0.5 | |
| | D604,305 | 0.5 | |
| | D618,677 | 8.0 | |
| | D504,889 | 8.0 | |
| | D593,087 | 8.0 | |
| | D622,270 | 8.0 | |
| Trade Dress | iPhone | 8.0 | |
| | iPhone 3G | 8.0 | |
| | iPhone 4 | 8.0 | |
| | iPhone / iPhone 3G / iPhone 4 | 8.0 | |
| | iPad and iPad 2 | 8.0 | |
| | 3,470,983 | 8.0 | |
| | 3,457,218 | 8.0 | |
| | 3,475,327 | 8.0 | |
| Trademarks | 3,886,196 | 0.5 | |
| | 3,889,642 | 0.5 | |
| | 3,886,200 | 0.5 | |
| | 3,889,685 | 0.5 | |
| | 3,886,169 | 0.5 | |
| | 3,886,197 | 0.5 | |
| | 85/041,463 (Pending) | 0.5 | |
| | 2,935,038 | 0.5 | |

**Average Design Around Time** 4/      **4.0**

**Sources/Notes:**
1/  See Exhibit 39.4-S.
2/  Design Around Allocation is assigned based on number of IP Types. Of the four IP Types, utility patents receive one quarter of the weight and the group of design patents, trade dress, and trademarks receive three quarters of the weight.
3/  Weighted Cost Value per Unit by IP Type is calculated by multiplying Design Around Allocation by Cost Value per Unit.
4/  Rounded to the nearest whole month.
5/  See Exhibit 45 for design around time for Utility Patents. All design patents and trade dress were assigned an 8 month design around time based on my discussions with Apple representative Tang Tan (with the exception of the GUI design patents). The 3 GUI design patents (D'790, D'334, and D'305) and all Trademarks had no assigned design around time. Accordingly, I have assumed a design around time of less than a month (i.e. 0.5).

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                        **EXHIBIT 39.4-S**

**Samsung's Cost Value per Unit Due To Redesign**

| Calculation Steps | Smartphones | | Tablets | |
|---|---|---|---|---|
| Average Gross Profit per Month for Accused Products | $ 132,810,395 | 1/ | $ 10,651,325 | 2/ |
| x  No. of Months Out Of Market | 4 | 3/ | 4 | 3/ |
| =  Samsung's Total Loss Due to Redesign | $ 531,241,580 | | $ 42,605,301 | |
| ÷  Total Accused Units Sold | 20,589,328 | 4/ | 1,400,965 | 5/ |
| =  **Samsung's Cost Value per Unit Due To Redesign** | $ **26.00** | 6/ | $ **30.00** | 6/ |

**Sources/Notes:**

1/  'Average Gross Profit per Month for Accused Products' for Smartphones is calculated by averaging the monthly 'U.S. Revenue (by STA and SEA)' multiplied by the 'Manufacturing Gross Margins' for June 2010 through March 2012. See note 4 on Exhibit 37-S.

2/  'Average Gross Profit per Month for Accused Products' for Tablets is calculated by averaging the monthly 'U.S. Revenue (by STA and SEA)' multiplied by the 'Manufacturing Gross Margins' for October 2010 through March 2012. See note 4 on Exhibit 38-S.

3/  See Exhibit 39.3-S.

4/  'Total Accused Units Sold' for Smartphones by STA & SEA entities, see Exhibit 37-S.

5/  'Total Accused Units Sold' for Tablets by STA & SEA entities, see Exhibit 38-S.

6/  Amounts are rounded to the nearest dollar.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## Market Value Reference Points

| IP Type | Patent/Registration No. | | | | |
|---|---|---|---|---|---|
| Utility Patents | 6,493,002<br>7,469,381<br>7,663,607<br>7,844,915<br>7,853,891<br>7,864,163<br><br>7,920,129 | | | | |
| Design Patents | D627,790<br>D617,334<br>D604,305<br>D618,677<br>D504,889<br>D593,087<br>D622,270 | Not to be Licensed 2/ | Not to be Licensed 2/ | No Comparable License Rate | No Comparable License Rate |
| Trade Dress | iPhone<br>iPhone 3G<br>iPhone 4<br>iPhone / iPhone 3G / iPhone 4<br>iPad and iPad 2<br>3,470,983<br>3,457,218<br>3,475,327 | Not to be Licensed 2/ | Not to be Licensed 2/ | No Comparable License Rate | No Comparable License Rate |
| Trademarks | 3,886,196<br>3,889,642<br>3,886,200<br>3,889,685<br>3,886,169<br>3,886,197<br>85/041,463 (Pending)<br>2,935,038 | Not to be Licensed 2/ | Not to be Licensed 2/ | No Comparable License Rate | No Comparable License Rate |

**Sources/Notes:**

1/  Samsung-Apple Licensing Discussion, October 5, 2010 (APLNDC000010886-917 at APLNDC000010897).

2/  Chip Lutton Deposition, July 26, 2011, p. 52



Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    **EXHIBIT 41-S**

## Income Value Reference Points

| IP Type | Patent/Registration No. | Apple | | Samsung | |
|---------|------------------------|-------|---|---------|---|
| | | **Smartphones** | **Tablets** | **Smartphones** | **Tablets** |
| Utility Patents 1/ | 6,493,002 | $ 2.17 | $ 2.17 | $ 0.28 | $ 0.28 |
| | 7,469,381 | $ 4.03 | $ 4.03 | $ 0.52 | $ 0.52 |
| | 7,663,607 | $ 8.37 | $ 8.37 | $ 1.08 | $ 1.08 |
| | 7,844,915 | $ 6.20 | $ 6.20 | $ 0.80 | $ 0.80 |
| | 7,853,891 | $ 2.17 | $ 2.17 | $ 0.28 | $ 0.28 |
| | 7,864,163 | $ 4.03 | $ 4.03 | $ 0.52 | $ 0.52 |
| | 7,920,129 | $ 4.03 | $ 4.03 | $ 0.52 | $ 0.52 |
| Design Patents 2/ | D627,790 D617,334 D604,305 D618,677 D504,889 D593,087 D622,270 | | | | |
| Trade Dress 2/ | iPhone iPhone 3G iPhone 4 iPhone/iPhone 3G/iPhone 4 iPad and iPad 2 3,471,983 3,457,218 3,475,327 | $ 24.00 | $ 24.00 | $ 9.00 | $ 9.00 |
| Trademarks 2/ | 3,886,196 3,889,642 3,886,200 3,889,685 3,886,169 3,886,197 85/041,463 (Pending) 2,935,038 | | | | |

**Sources/Notes:**
1/   See Exhibit 41.1-S.
2/   See Exhibit 41.2-S.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    **EXHIBIT 41.1-S**

**Weighted Utility Income Value Reference Point for Utility Patents**

| IP Type | Patent/Registration No. | Patent Qualitative Ranking 1/ | % of Total Ranking 2/ | Apple 3/ | Samsung 3/ |
|---|---|---|---|---|---|
| | 6,493,002 | 1 | 7% | $ 2.17 | $ 0.28 |
| | 7,469,381 | 2 | 13% | $ 4.03 | $ 0.52 |
| | 7,663,607 | 4 | 27% | $ 8.37 | $ 1.08 |
| Utility Patents | 7,844,915 | 3 | 20% | $ 6.20 | $ 0.80 |
| | 7,853,891 | 1 | 7% | $ 2.17 | $ 0.28 |
| | 7,864,163 | 2 | 13% | $ 4.03 | $ 0.52 |
| | 7,920,129 | 2 | 13% | $ 4.03 | $ 0.52 |
| Utility Patent Total | | 15 | 100% | $ 31.00 | $ 4.00 |

**Sources/Notes:**

1/  See Exhibit 45.

2/  % Of Total Ranking is calculated by dividing Patent Qualitative Ranking for each Apple Utility Patent by the Total Utility Patent Qualitative Ranking.

3/  Weighted Rate per Unit is calculated by multiplying % of Total Ranking by the Total Rate for Utility Patents. The Total Utility Rate per Unit is based on Apple's and Samsung's average selling price times the value of intangible value assigned to the utility patents listed above (see Exhibit 41.2-S).

4/  See Exhibit 41.2-S.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                    **EXHIBIT 41.2-S**

## Per Unit Reference Rate Calculations for Smartphones and Tablets Combined

| Calculation Steps | Apple | | Samsung | |
|---|---|---|---|---|
| Per unit rate for utility patents | | | | |
| Average Product Selling Price | $ | 625.28 1/ | $ | 348.01 2/ |
| x  Value of Intangibles | | 4.9% 3/ | | 1.2% 3/ |
| =  Per Unit Rate | $ | **31.00** 4/ | $ | **4.00** 4/ |
| | | | | |
| Per unit rate for design patents, trade dress, and trademarks | | | | |
| Average Product Selling Price | $ | 625.28 1/ | $ | 348.01 2/ |
| x  Value of Brand/Design Rate | | 3.9% 5/ | | 2.6% 5/ |
| =  Per Unit Rate | $ | **24.00** 6/ | $ | **9.00** 6/ |

**Sources/Notes:**

1/  Average Product Selling Price for Apple is a weighted average of Apple iPhone and iPad ASPs. The worldwide ASPs are calculated between Q3 FY2010 and Q2 FY2012 for smartphones and Q1 FY2011 and Q2 FY2012 for tablets and are weighted by the respective units sold into the U.S. during those time periods (see Exhibits 32-S and 33-S).

2/  Average Product Selling Price for Samsung is a weighted average of Samsung smartphone and tablet ASPs. The worldwide ASPs are calculated between Q2 2010 and Q1 2012 for smartphones and Q4 2010 and Q1 2012 for tablets and are weighted by the respective units sold into the U.S. during the same time period (see Exhibits 37-S and 38-S).

3/  Value of Intangibles includes the iPhone and iPad combined for Apple, and the Accused Products combined for Samsung (see Exhibit 41.3-S).

4/  The Per Unit Rate for Utility Patents is calculated by multiplying the ASP by the Value of Intangibles. Rounded to the nearest dollar.

5/  See Exhibit 41.3-S.

6/  The Per Unit Rate for Design Patents and Trade Dress is calculated by multiplying the ASP by the Value of Brand/Design rate. Rounded to the nearest dollar.

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

## Value of Intangibles Calculations
### 2010 to 2011 Time Period

| Calculation Steps | Apple | | Samsung |
| --- | --- | --- | --- |
| | Company Wide | iPhone and iPad | Accused Products |
| Operating Margin | 32.8% 1/ | | 21.7% 3/ |
| x   Reduction from taxes | 75.4% 4/ | | 99.5% 5/ |
| =   Net Operating Profit after tax (NOPAT) | 24.7% | | 21.5% |
| -   Industry Weighted Average Cost of Capital (WACC) | 11.9% 6/ | | 11.9% 6/ |
| =   Economic Value Added (EVA) 7/ | 12.8% | | 9.7% |
| -   Brand/Design Value | 3.9% 8/ | | 2.6% 9/ |
| =   EVA net of Brand Value | 8.9% | | 7.1% |
| -   Value of the Company's Other Intangibles | | | 5.9% 10/ |
| =   **Value of iPhone and iPad Combined/ Accused Products Combined Intangibles** | | | **1.2%** |

**Sources/Notes:**

1/   Average operating margins for Apple Companywide in 2010 through Q2 2012 are calculated per Apple Inc. Form 10-K for fiscal year ended September 24, 2011, p. 43; and Form 10-Q for fiscal quarter ended 12/31/11 and 3/31/12, p. 2. The combined margin over the time period is weighted by net sales of each respective period.

2/   Operating margin is a weighted average of Apple iPhone and iPad operating margins. Worldwide operating margins are calculated between Q3 FY2010 and Q2 FY2012 for iPhones and Q1 FY2011 and Q2 FY2012 for iPads and are weighted by the respective units sold into the US during the same time period (see Exhibits 32-S and 33-S).

3/   Operating margin is a weighted average of Samsung accused smartphone and tablet operating margins. Worldwide operating margins are calculated between Q2 2010 and Q1 2012 for smartphones and Q4 2010 and Q1 2012 for tablets and are weighted by the respective accused units sold into the U.S. sold during the same time period (SAMNDCA00402075).

4/   Apple's effective tax rate is 24.4% in FY 2010, 24.2% in FY 2011, per Apple Inc. Form 10-K for the fiscal year ended September 24, 2011, p. 63; 25.3% in Q1 FY12, and 25.2% in Q2 FY 2012, per Apple Inc. Form 10-Q for the quarters ended 12/31/11 and 3/31/12, p. 2. Apple's aggregate effective tax rate is 24.6%. Accordingly, Apple's Reduction from Taxes is 75.4% (100% - 24.6%).

5/   STA applies a Berry Ratio (deposition of Timothy Sheppard, dated February 29, 2012, pp. 123-124) to its 2010 income statement (SAMNDCA00322209-238 at SAMNDCA00322214), which results in a ratio of gross margin to total revenue of 3.3% . SEC's actual gross margin for manufacturing is 39.1% from 2010 through Q2 of 2012 (see SAMNDCA00402075). This margin is used to adjust STA's gross profit to actual levels. This adjustment factor (39.1% divided by 3.3%) is applied to STA's gross profit, after which all expenses (per SAMNDCA00322209-238 at SAMNDCA00322214) are deducted to derive an actual operating profit before taxes. STA's income tax expense is then divided by actual operating profit before taxes to derive STA's effective tax rate and subtracted from 100% to derive its Reduction from Taxes above, 99.5% (100% - 0.5%).

6/   See Exhibit 41.4-S.

7/   Economic Value Added (EVA) measures return to investors (Interbrand's brand valuation methodology, http://www.interbrand.com/en/best-global-brands/best-global-brands-methodology/Overview.aspx).

8/   Apple's (the company) Brand/Design Value is calculated by multiplying its operating profit by the ratio of its brand value to market capitalization (see Exhibit 41.5). Apples iPhone and iPad Combined are assigned the same Brand/Design Value.

9/   The Brand/Design Value of Samsung is calculated by multiplying the operating margin of Samsung's Accused Products Combined by the ratio of Apple's Brand/Design Value to Apple's companywide operating margin.

10/  The EVA net of the Brand Value of the Company for Samsung is calculated by multiplying the operating margin of Samsung's Accused Products Combined by the ratio of Apple's EVA net of the Brand Value of the Company to Apple's companywide operating margin.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 210 of 299
Apple Inc. v Samsung Electronics Co., LTD., et al.

EXHIBIT 41.4

## Industry Weighted Average Cost of Capital
### 2010 to 2011 Time Period

| Interbrand Top Global Brands 1/ | Sector (Interbrand Classification) 1/ | SIC Code | SIC Description | 2010 Weighted Average Cost of Capital 2/, 4/ | 2011 Weighted Average Cost of Capital 3/, 4/ |
|---|---|---|---|---|---|
| Hewlett Packard | Electronics | 3570 | Computer and Office Equipment | 13.08% | 12.26% |
| Apple, Dell | Electronics | 3571 | Electronic Computers | 13.27% | 11.77% |
| Xerox | Electronics | 3577 | Computer Peripheral Equipment, Not Elsewhere Classified | 11.68% | 11.24% |
| Intel | Electronics | 3674 | Semiconductors and Related Devices | 13.44% | 12.77% |
| Amazon.com | Internet Services | 5961 | Catalog and Mail-Order Houses | 12.38% | 12.05% |
| Google | Internet Services | 7370 | Computer Programming, Data Processing, and Other Computer Services | 11.65% | 11.05% |
| Microsoft, Adobe | Computer Software | 7372 | Prepackaged Software | 11.51% | 11.22% |
| Yahoo | Internet Services | 7373 | Computer Integrated Systems Design | 11.54% | 10.95% |
| eBay | Internet Services | 7389 | Business Services, Not Elsewhere Classified | 10.98% | 10.89% |

| | | |
|---|---|---|
| Average WACC | 12.17% | 11.58% |

| | |
|---|---|
| Average 2010-2011 WACC | 11.87% |

**Sources/Notes:**

1/   Brands that make up "industry" were selected on the following criteria:

   a) Appear in the 2010 or 2011 Interbrand "Ranking of the Top 100 Brands" (http://www.interbrand.com/en/best-global-brands/best-global-brands-2008/best-global-brands-2010.aspx and http://www.interbrand.com/en/best-global-brands/best-global-brands-2008/best-global-brands-2011.aspx);

   b) United States brands (as categorized by Interbrand);

   c) Limited to the following sectors (as categorized by Interbrand): computer software, electronics, and internet services.

2/   Ibbotson Cost of Capital 2010 Yearbook (data through March 2010).

3/   Ibbotson Cost of Capital 2011 Yearbook (data through March 2011).

4/   Weight average cost of capital, using median CAPM.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

**Apple Brand Value as Percentage of Market Capitalization**
2010 to 2011 Time Period

| 2010 Global Brand Rank 1/ | 2011 Global Brand Rank 2/ | Brand 1/ 2/ | 2010 | | | 2011 | | | 2010-2011 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Brand Value ($bn) 1/ | Market Cap ($bn) 3/ | Brand Value: Market Cap Ratio | Brand Value ($bn) 2/ | Market Cap ($bn) 3/ | Brand Value: Market Cap Ratio | Total Brand Value ($bn) 2/ 3/ | Total Market Cap ($bn) 3/ | Weighted Brand Value: Market Cap Ratio |
| 17 | 8 | Apple | 21.1 | 177.4 | 11.9% | 33.5 | 282.6 | 11 9% | 54 6 | 460.0 | 11.9% |

**Sources/Notes:**

1/   Interbrand's "2010 Ranking of the Top 100 Brands," dated September 15, 2010. Interbrand's financial analysis run from June 2009 to June 2010. Dollar amounts converted from millions to billions.
    http://www.interbrand.com/en/best-global-brands/best-global-brands-2008/best-global-brands-2010.aspx.

2/   Interbrand's "2011 Ranking of the Top 100 Brands," dated October 4, 2011. Interbrand's financial analysis run from June 2009 to June 2010. Dollar amounts converted from millions to billions.
    http://www.interbrand.com/en/best-global-brands/best-global-brands-2008/best-global-brands-2011.aspx.

3/   Market Capitalization figures per http://www.wolframalpha.com. The 2010 market capitalization is recorded between June 1, 2009 and June 1, 2010; the 2011 market capitalization is recorded between June 1, 2010 and June 1, 2011.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

## Georgia-Pacific Analysis for Apple's Intellectual Property - Tablets

| IP Type | Patent/Registration No. | Georgia-Pacific Factor | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Utility Patents | 6,493,002 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This feature enhances the ease of use and value of a smartphone or tablet computer. 13/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,469,381 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This provides a major enhancement to the quality of the user interface. 14/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,663,607 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Provides technology for a touchscreen used to obtain accurate information on multiple touches on a touchscreen device. 15/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,844,915 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Provides functionality that is central to the accused products. 16/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,853,891 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This feature enhances the user interface and experience in smartphones and tablets. 17/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,864,163 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | The invention significantly enhances the user interface of a touchscreen smartphone and tablet. 18/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,920,129 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Provides technology for a touchscreen display to address the issue of interference from the LCD display sensing multitouch inputs. 19/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |

| IP Type | Patent/Registration No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Design Patents | D504,889 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 8/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Apple's design elements included in the design patents, trade address and trademarks give Apple a distinct advantage over competitors. 20/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | I view this amount as setting a floor below which Apple would not license. 12/ | See Income Reference Range on Exhibit 41. |
| Trade Dress | iPad and iPad 2 | | | | | | | | | | | | | |
| Trademarks | 3,886,196 | | | | | | | | | | | | | |
| | 3,889,642 | | | | | | | | | | | | | |
| | 3,886,200 | | | | | | | | | | | | | |
| | 3,889,685 | | | | | | | | | | | | | |
| | 3,886,169 | | | | | | | | | | | | | |
| | 3,886,197 | | | | | | | | | | | | | |
| | 85/041,463 (Pending) | | | | | | | | | | | | | |
| | 2,935,038 | | | | | | | | | | | | | |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Sources/Notes:**

1/  This factor demonstrates that there is no established license for any of the asserted Apple intellectual Property In Suit.

2/  This factor demonstrate that there are no rates paid by Samsung for the use of other intellectual property comparable to the Apple Intellectual Property in Suit.

3/  Accordingly, the scope of the license is limited based on the geographic restrictions resulting from the application of U.S. law. However, there are international economic benefits to Apple and to Samsung for the use of the relevant technology. Consequently, the scope of the hypothetical license for the Apple Intellectual Property In Suit is neutral.

4/  This factor does not provide support for a specific rate but does strongly indicate Apple's unwillingness to negotiate a license at essentially any price versus holding the Apple Intellectual Property In Suit for Apple's exclusive use.

5/  This factor does not provide support for a specific rate but does confirm and reinforce Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor with the number one goal of beating Apple.

6/  While it is not possible to capture all of the lost convoyed profits in a reasonable royalty damage, the very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products supports a higher reasonable royalty rate that reflects this major economic benefit.

7/  The long legal life coupled with the risk of a shortened economic life in a rapidly expanding market places upward pressure on the royalty rate to avoid missing the window of economic opportunity related to each patent.

8/  The long legal life coupled with the established commercial success and emphasis on design by Apple places upward pressure on the royalty rate to preserve the established value of these valuable design patents.

9/  This factor provides strong support in the present case for a reasonable royalty rate that weighs in favor of the income approach and calculated as a part of my reference point analysis.

10/ The commercial embodiment of all categories of Apple Intellectual Property In Suit and Apple's focus on the quality of the overall user experience has produced considerable financial rewards for Apple and provided an enhanced user experience to the consumers that use  the products that embody the claimed technology. Accordingly, the rate should reflect the economic benefits to Apple and the market advantages associated with the benefits provided to the consumer.

11/ Based on the fact that Samsung is assumed to have used Apple's Intellectual Property In Suit to make significant profits through the sale of the accused devices that are virtually untaxed in the U.S. and transferred to Korea, has used Apple's Intellectual Property In Suit to build market share in the smartphone and tablet markets at Apple's expense, and has used Apple's Intellectual Property In Suit to gain additional profits through the sale of both convoyed and derivative products tied to Samsung's ecosystem, this factor would support the need for the royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss.

12/ Based on the "Made for iPod" agreements, one example of a value placed on the right by a third party to use a trademark that referenced Apple is $4 per unit in a circumstance involving a complementary use.  This is not analogous to a license to a competitor such as Samsung.  Nonetheless, I view this amount as setting a floor below which Apple would not license any of its trademarks.  While the ultimate rate for multiple trademarks or trade dress would be higher for the reasons discussed above, it certainly would not be less than the amount that Apple charges to use a trademark in a context that results in additional benefits through expansion of the number and variety of accessories that work with its products.

13/ I understand that the patent helps to provide a cohesive experience for the user when there are many different applications running.  The '002 teaches a way for different applications to give information to the user in an unobtrusive way.  As a result, this feature enhances the ease of use and value of a smartphone or tablet computer.

14/ I understand that this patent provides an elegant and appealing form of visual feedback to a user that there is no more of an electronic document to be seen.  For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image.  Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display.  When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen.  This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction.  As a result, the inventions of the '381 patent make possible a user interface that is more visually appealing and intuitive in its handling of the display of electronic documents.  This provides a major enhancement to the quality of the user interface.  Apple also considers this invention to be closely associated with Apple products in the marketplace.

15/ I understand that the patent provides technology for a touchscreen used to obtain accurate information on multiple touches on a touchscreen device.  This patent is being asserted by Apple only with respect to Samsung's tablet computers.  I understand from my discussions with the Apple technical expert that no commercially viable, alternative, non-infringing touchscreen technologies were in existence when the Samsung Galaxy Tab devices entered the market.  None of the alternative available touchscreen technologies afforded true multi-touch functionality.   For these reasons, Samsung did not have a commercially viable alternative to these technologies embodied in the Apple iPad and iPhone products for a ten inch tablet.  I understand that Samsung introduced a 7.7 inch tablet with an AMOLED display in early 2012, which was released in Australia in or around January 2012 that does not make use of the '607 technology, but that it was not released in the United States until this month.

16/ I understand that the patent provides functionality that is central to the accused products: the ability to distinguish automatically between a one-finger scroll call and a two-finger gesture such as a zoom or rotate gesture.  This functionality is highly intuitive. Scrolling, zooming and rotating are among the most common actions users take with touchscreens and smartphones, and are used in multiple applications.  I further understand that any effort to redesign would make the '915 Accused Products much less useable, render them inconvenient for users, and deprive them of intuitive functionality that smart phone and tablet users have come to expect.  The alternatives would provide a much less satisfying user experience than devices that practice the '915 patent. Further, given how frequently the functions are used in the interface, I understand it would be difficult and time consuming to replace.

17/ I understand the patent provides useful ways for providing unobtrusive visual feedback to the user input in a digital processing system, such as a desktop or laptop computer, a smartphone, or a tablet computer.  It does so by conveying information on a new window for the user that automatically disappears without the need for action by the user.  As a result, this feature enhances the user interface and experience in smartphones and tablets.

18/ I understand that the patent provides for an efficient means for users to navigate structured electronic documents on a touchscreen display.  I further understand it is possible to implement other methods to navigate in structured electronics documents using touch gestures, but they would not have been as elegant or intuitive.  I also understood that Samsung evaluated alternatives and concluded that they were inferior and instead revised the user interface to include the '163 patent's features.  It is my understanding that the invention significantly enhances the user interface of a touchscreen smartphone and tablet.

19/ I understand the patent provides technology for a touchscreen display to address the issue of interference from the LCD display sensing multitouch inputs.  Through the use of the patent, the device can be thinner, and the screen requires fewer layers.  I understand that this patent is being asserted by Apple only with respect to Samsung's tablet computers.  I understand from my discussions with Apple's technical expert that there would be significant disadvantages to designing without using the patent's technologies when the Samsung Galaxy Tab devices entered the market.  None of the alternative display technologies to LCD was mature enough for use in tablet-size devices, and using a touchscreen on top of an LCD panel was problematic because the display needed to have an extra layer of shielding to protect the sensitive touch screen electrodes from the electrical interference from the LCD.  Adding this extra layer would result in a less visually desirable screen, increased manufacturing costs, and a heavier and thicker device.

20/ This factor does not provide a specific rate for any of the items of design patents, trade dress and trademarks. However, based on the acute focus by Apple on the design elements of its products, the significant degree of success as evidenced by consumer demand and acceptance for Apple's design elements, Apple's design elements included in the design patents  trade dress and trademarks give Apple a distinct advantage over competitors and strongly support a higher royalty rate.  Similarly the strength of Apple's utility patents, its importance to the user interface and the degree to which Apple treats these aspects as proprietary, all strongly support a higher royalty rate.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                                            EXHIBIT 43

**Georgia-Pacific Analysis for Apple's Intellectual Property - Smartphones**

| IP Type | Patent/Registration No. | Georgia-Pacific Factor | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Utility Patents | 6,493,002 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This feature enhances the ease of use and value of a smartphone or tablet computer. 13/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,469,381 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This provides a major enhancement to the quality of the user interface. 14/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,844,915 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Provides functionality that is central to the accused products. 15/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,853,891 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | This feature enhances the user interface and experience in smartphones and tablets. 16/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| | 7,864,163 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 7/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | The invention significantly enhances the user interface of a touchscreen smartphone and tablet. 17/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | Factor does not apply. | See Income Reference Range on Exhibit 41. |
| Design Patents | D627,790 D617,334 D604,305 D618,677 D593,087 D622,270 | No established license. 1/ | No rates paid by Samsung for the use of other intellectual property comparable. 2/ | Neutral. 3/ | The Apple Intellectual Property In Suit for Apple's exclusive use. 4/ | Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor. 5/ | Very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products. 6/ | Upward pressure on the royalty rate. 8/ | Weighs in favor of the income approach and calculated as a part of my reference point analysis. 9/ | Apple's design elements included in the design patents, trade address and trademarks give Apple a distinct advantage over Samsung. 18/ | Economic benefits to Apple and the market advantages associated with the benefits provided to the consumer. 10/ | Royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss. 11/ | I view this amount as setting a floor below which Apple would not license. 12/ | See Income Reference Range on Exhibit 46. |
| Trade Dress | iPhone iPhone 3G iPhone 4 iPhone/iPhone 3G/iPhone 4 3,470,983 3,457,218 3,475,327 | | | | | | | | | | | | | |
| Trademarks | 3,886,196 3,889,642 3,886,200 3,889,685 3,886,169 3,886,197 85/041,463 (Pending) 2,935,038 | | | | | | | | | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Sources/Notes:

1/   This factor demonstrates that there is no established license for any of the asserted Apple intellectual Property In Suit.

2/   This factor demonstrate that there are no rates paid by Samsung for the use of other intellectual property comparable to the Apple Intellectual Property in Suit.

3/   Accordingly, the scope of the license is limited based on the geographic restrictions resulting from the application of U.S. law. However, there are international economic benefits to Apple and to Samsung for the use of the relevant technology. Consequently, the scope of the hypothetical license for the Apple Intellectual Property In Suit is neutral.

4/   This factor does not provide support for a specific rate but does strongly indicate Apple's unwillingness to negotiate a license at essentially any price versus holding the Apple Intellectual Property In Suit for Apple's exclusive use.

5/   This factor does not provide support for a specific rate but does confirm and reinforce Apple's unwillingness to license its proprietary assets thereby enabling a direct competitor with the number one goal of beating Apple.

6/   While it is not possible to capture all of the lost convoyed profits in a reasonable royalty damage, the very strong and acknowledged connection by both parties of the sale of smartphones and tablets with the sale of non-patented products supports a higher reasonable royalty rate that reflects this major economic benefit.

7/   The long legal life coupled with the risk of a shortened economic life in a rapidly expanding market places upward pressure on the royalty rate to avoid missing the window of economic opportunity related to each patent.

8/   The long legal life coupled with the established commercial success and emphasis on design by Apple places upward pressure on the royalty rate to preserve the established value of these valuable design patents.

9/   This factor provides strong support in the present case for a reasonable royalty rate that weighs in favor of the income approach and calculated as a part of my reference point analysis.

10/   The commercial embodiment of all categories of Apple Intellectual Property In Suit and Apple's focus on the quality of the overall user experience has produced considerable financial rewards for Apple and provided an enhanced user experience to the consumers that use  the products that embody the claimed technology. Accordingly, the rate should reflect the economic benefits to Apple and the market advantages associated with the benefits provided to the consumer.

11/   Based on the fact that Samsung is assumed to have used Apple's Intellectual Property In Suit to ability to make significant profits through the sale of the accused devices that are virtually untaxed in the U.S. and transferred to Korea, has used Apple's Intellectual Property In Suit to build market share in the smartphone and tablet markets at Apple's expense, and has used Apple's Intellectual Property In Suit to gain additional profits through the sale of both convoyed and derivative products tied to Samsung's ecosystem, this factor would support the need for the royalty rate to reflect the full measure of Samsung's financial gain and Apple's loss.

12/   Based on the "Made for iPod" agreements, one example of a value placed on the right by a third party to use a trademark that referenced Apple is $4 per unit in a circumstance involving a complementary use.  This is not analogous to a license to a competitor such as Samsung.  Nonetheless, I view this amount as setting a floor below which Apple would not license any of its trademarks.  While the ultimate rate for multiple trademarks or trade dress would be higher for the reasons discussed above, it certainly would not be less than the amount that Apple charges to use a trademark in a context that results in additional benefits through expansion of the number and variety of accessories that work with its products.

13/   I understand that the patent helps to provide a cohesive experience for the user when there are many different applications running.  The '002 teaches a way for different applications to give information to the user in an unobtrusive way.  As a result, this feature enhances the ease of use and value of a smartphone or tablet computer.

14/   I understand that this patent provides an elegant and appealing form of visual feedback to a user that there is no more of an electronic document to be seen.  For example, if a user is zoomed in on one part of a large photo, he may continue to scroll the photo as he looks at other parts of the image.  Not knowing exactly where the photo ends, he may continue to scroll in a direction even when there is no more of the photo to display.  When this happens, an area beyond the edge of the photo will be displayed, and once the user lifts his finger, the photo will "bounce" or "rubber band" back to fill the screen.  This form of visual feedback is readily understood and makes clear to the user that he cannot continue to scroll in that direction.  As a result, the inventions of the '381 patent make possible a user interface that is more visually appealing and intuitive in its handling of the display of electronic documents.  This provides a major enhancement to the quality of the user interface.  Apple also considers this invention to be closely associated with Apple products in the marketplace.

15/   I understand that the patent provides functionality that is central to the accused products:  the ability to distinguish automatically between a one-finger scroll call and a two-finger gesture such as a zoom or rotate gesture.  This functionality is highly intuitive.  Scrolling, zooming and rotating are among the most common actions users take with touchscreens and smartphones, and are used in multiple applications.  I further understand that any effort to redesign would make the '915 Accused Products much less useable, render them inconvenient for users, and deprive them of intuitive functionality that smart phone and tablet users have come to expect.  The alternatives would provide a much less satisfying user experience than devices that practice the '915 patent.  Further, given how frequently the functions are used in the interface, I understand it would be difficult and time consuming to replace.

16/   I understand that the patent provides useful ways for providing unobtrusive visual feedback to the user input in a digital processing system, such as a desktop or laptop computer, a smartphone, or a tablet computer.  It does so by conveying information on a new window for the user that automatically disappears without the need for action by the user.  As a result, this feature enhances the user interface and experience in smartphones and tablets.

17/   I understand that the patent provides for an efficient means for users to navigate structured electronic documents on a touchscreen display.  I further understand it is possible to implement other methods to navigate in structured electronics documents using touch gestures, but they would not have been as elegant or intuitive.  I also understood that Samsung evaluated alternatives and concluded that they were inferior and instead revised the user interface to include the '163 patent's features.  It is my understanding that the invention significantly enhances the user interface of a touchscreen smartphone and tablet.

18/   This factor does not provide a specific rate for any of the items of design patents, trade dress and trademarks. However, based on the acute focus by Apple on the design elements of its products, the significant degree of success as evidenced by consumer demand and acceptance for Apple's design elements, Apple's design elements included in the design patents  trade dress and trademarks give Apple a distinct advantage over competitors and strongly support a higher royalty rate.  Similarly, the strength of Apple's utility patents, its importance to the user interface and the degree to which Apple treats these aspects as proprietary, all strongly support a higher royalty rate.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 216 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 44-S

**Apple's Asserted Intellectual Property 17/**

| IP Type | Patent/Registration No. | Issue Date | In Commerce Date | Expiration Date | Years to Expiration 1/ | Date of First Accused Samsung Sale | Hypothetical Negotiation Date |
|---|---|---|---|---|---|---|---|
| Utility Patents 2/ 3/ | 6,493,002 | 12/10/2002 | | 9/30/2014 | 2.5 | 6/1/2010 | 6/1/2010 |
| | 7,469,381 | 12/23/2008 | | 12/14/2027 | 15.7 | 6/1/2010 | 6/1/2010 |
| | 7,663,607 | 2/16/2010 | | 3/29/2028 4/ | 16.0 | 10/1/2010 | 10/1/2010 |
| | 7,844,915 | 11/30/2010 | | 8/12/2028 5/ | 16.4 | 6/1/2010 | 11/30/2010 |
| | 7,853,891 | 12/14/2010 | | 3/14/2023 6/ | 11.0 | 6/1/2010 | 12/14/2010 |
| | 7,864,163 | 1/4/2011 | | 7/23/2029 7/ | 17.3 | 6/1/2010 | 1/4/2011 |
| | 7,920,129 | 4/5/2011 | | 1/23/2030 8/ | 17.8 | 10/1/2010 | 4/5/2011 |
| Design Patents 9/ 10/ | D627,790 | 11/23/2010 | | 11/23/2024 | 12.7 | 6/1/2010 | 11/23/2010 |
| | D617,334 | 6/8/2010 | | 6/8/2024 | 12.2 | 6/1/2010 | 6/8/2010 |
| | D604,305 | 11/17/2009 | | 11/17/2023 | 11.7 | 6/1/2010 | 6/1/2010 |
| | D618,677 | 6/29/2010 | | 6/29/2024 | 12.3 | 6/1/2010 | 6/29/2010 |
| | D504,889 | 5/10/2005 | | 5/10/2019 | 7.1 | 5/1/2011 | 5/1/2011 |
| | D593,087 | 5/26/2009 | | 5/26/2023 | 11.2 | 6/1/2010 | 6/1/2010 |
| Trade Dress 11/ | iPhone 3G | | 7/11/2008 14/, 16/ | | | 6/1/2010 | 6/1/2010 |
| | iPhone / iPhone 3G / iPhone 4 | | 6/29/2007 14/, 15/ | | | 6/1/2010 | 6/1/2010 |
| | iPad and iPad 2 | | 4/3/2010 14/, 18/ | | | 10/1/2010 | 10/1/2010 |
| | 3,470,983 | 7/22/2008 | 6/29/2007 19/ | 7/22/2018 12/ | 6.3 | 6/1/2010 | 6/1/2010 |
| | 3,457,218 | 7/1/2008 | 6/29/2007 19/ | 7/1/2018 12/ | 6.3 | 6/1/2010 | 6/1/2010 |
| Trademark 13/ | 3,886,196 | 12/7/2010 | 6/29/2007 20/ | 12/7/2020 12/ | 8.7 | 6/1/2010 | 6/1/2010 |
| | 3,886,200 | 12/7/2010 | 6/29/2007 20/ | 12/7/2020 12/ | 8.7 | 6/1/2010 | 6/1/2010 |
| | 3,886,169 | 12/7/2010 | 6/29/2007 20/ | 12/7/2020 12/ | 8.7 | 6/1/2010 | 6/1/2010 |
| | 3,886,197 | 12/7/2010 | 6/19/2009 20/ | 12/7/2020 12/ | 8.7 | 6/1/2010 | 6/1/2010 |
| | 85/041,463 (Pending) | n/a | 6/00/2008 20/ | Pending | n/a | 6/1/2010 | 6/1/2010 |
| | 2,935,038 | 3/22/2005 | 1/9/2001 20/ | 3/22/2015 12/ | 3.0 | 6/1/2010 | 6/1/2010 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 217 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.
EXHIBIT 44-S

**Sources/Notes:**

1/   Years to expiration as of 3/22/2012.

2/   Apple Inc. Amended Complaint, 6/16/11, Exhibits 2 to 8.

3/   In general, a (other than design) patent's term begins on  the date on which the patent is issued and ends 20 years from the date on which the application for the patent was filed in the United
     States.  35 U.S.C. 154 (a)(2) (http://www.uspto.gov/web/offices/pac/mpep/consolidated_laws.pdf).

4/   Certificate of Correction for US Patent No.7,663,607, dated 2/16/10, there is a Patent Term Adjustment of 1423 days.

5/   Issue Notification for US Patent No.7,844,915, dated 11/10/10, there is a Patent Term Adjustment of 583 days.

6/   Issue Notification for US Patent No.7,853,891, dated 11/23/10, there is a Patent Term Adjustment of 247 days.

7/   Issue Notification for US Patent No.7,864,163, dated 12/15/10, there is a Patent Term Adjustment of 688 days.

8/   Issue Notification for US Patent No.7,920,129, dated 3/16/11, there is a Patent Term Adjustment of 1116 days.

9/   Apple Inc. Amended Complaint, 6/16/11, Exhibits 9 to 15.

10/  In general, a design patent's term begins on the date on which the patent is granted and ends 14 years from that date.  35 U.S.C. 173
     (http://www.uspto.gov/web/offices/pac/mpep/consolidated_laws.pdf).

11/  Apple Inc. Amended Complaint, 6/16/11, paragraphs 57-88 and Exhibits 16 to 18.

12/  Subject to renewal; federal trademark registrations issued on or after 11/6/1989 remain in force for 10 years, and may be renewed for 10-year periods
     (http://www.uspto.gov/trademarks/process/maintain/prfaq.jsp).

13/  Apple Inc. Amended Complaint, 6/16/11, Exhibits 23 to 30.

14/  Unregistered trade dress do not have an issue date, therefore the issue date is based on the commercial release date of the relevant product.

15/  Apple Inc. Press Release, 6/28/07
     (http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html).

16/  Apple Inc. Press Release, 7/10/08
      (http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html).

17/  Joint Case Management Conference Statement, dated 5/1/12.

18/  Apple Inc. Press Release, 3/5/10 (http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html).

19/  Apple Inc. Amended Complaint, 6/16/11, Exhibits 16 to 18.

20/  Apple Inc. Amended Complaint, 6/16/11, Exhibits 23 to 30.

21/  Per Joint Case Management Conference Statement, dated 5/1/12, the following Intellectual Properties are no longer asserted by Apple: Design Patent 'D270, Trade Dress Registrations for iPhone,
     for iPhone 4, and '327, and Trademarks '685 and '642.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Description of Apple's Asserted Utility Patents**

| Patent | Title | Apple Technical Expert | Infringing Product Type 1/ | Detailed Description | Patent Qualitative Ranking 2/ | Benefits of Patent 1/ | Potential Design Around | Number of Months Out of Market 3/ |
|---|---|---|---|---|---|---|---|---|
| '002 | Method and Apparatus for Displaying and Accessing Control and Status Information in a Computer System | Alex Snoeren | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 1 | User friendly and non-intrusive basis of displaying information. | See Georgia Pacific Factor 9. | No time given; assumed less than a month. |
| '891 | Method and Apparatus for Displaying a Window for a User Interface | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 1 | Non-obtrusive way to convey information to the user. | See Georgia Pacific Factor 9. | No time given; assumed less than a month. |
| '381 | List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display | Ravin Balakrishnan | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 2 | Solves two problems; (1) differentiates reaching the edge of an electronic document versus a frozen screen, and (2) preventing navigation away from data and ending up in blank space often referred to as the "dessert fog." | See Georgia Pacific Factor 9. | 1 Month 4/ |
| '915 | Application Programming Interfaces for Scrolling Operations | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 3 | Interpretation of multiple touches to perform different functions. | See Georgia Pacific Factor 9. | 6 months |
| '163 | Portable Electronic Device, Method, and Graphical User Interface for Displaying Structured Electronic Documents | Karan Singh | Smartphones and Tablets | See report section titled Apple's Utility Patents. | 2 | Quick and effective basis to refocus the display. | See Georgia Pacific Factor 9. | 1 month |
| '607 | Multipoint Touchscreen | Michel Maharbiz | Tablets | See report section titled Apple's Utility Patents. | 4 | Allows for the interpretation of multiple simultaneous touches. | See Georgia Pacific Factor 9. | Products with screens 10 inches or larger: no design around. Products with screens 8 inches or less: design around after 12/31/10. |
| '129 | Double-Sided Touch-Sensitive Panel with Shield and Drive Combined Layer | Michel Maharbiz | Tablets | See report section titled Apple's Utility Patents. | 2 | Shields touch sensors from noise created by LCD screen. | See Georgia Pacific Factor 9. | Products with screens 10 inches or larger: no design around. Products with screens 8 inches or less: design around after 12/31/10. |

**Sources/Notes:**
1/ Discussions with counsel as well as Apple's technical experts: Ravin Balakrishnan, Michel Maharbiz, Karan Singh, and Alex Snoeren.
2/ I have assigned a rating of 1 through 4 on each patent based on my discussions with technical experts and representatives of Apple (Henri Lamiraux on the '381, '915, and '163 patents; Steve Hotelling on the '607 and '129 patents). A rating of 4 is of greatest relative weight and 1 is the lowest relative weight. In assigning a rating, I have considered and used my discussions with experts, discussions with Apple personnel, the design around time, degree of program integration, and the results of the John Hauser's Conjoint Analysis (with respect to the '607, '915, '163, and '381 patents).
3/ Design around times were provided by Apple representatives identified in note 2. No design around is deemed to be commercially acceptable by any expert. Design around or removal of the infringing aspect is based on an option with the purpose of establishing a degree of difficulty in attempting to work around the patent and not whether it was suitable or acceptable.
4/ On August 24th, 2011, a Dutch court ruled that Samsung was guilty of infringing one of Apple's patents (EP 868) pertaining to user interface for scrolling and moving digital objects on the Galaxy S, S II and Ace. Samsung announced on October 12, 2011 that an upgraded version of the three Galaxy smartphones will be released to avoid the infringement. I have used 1 month for the purpose of the design around period to be conservative.
Judgment, District Court The Hague, The Netherlands, 24 August 2011, docket numbers: 396957 / KG ZA 11-730 and 396959 / KG ZA 11-731 of Apple Inc. v. Samsung Electronics Co. LTD et al. and
http://www.reuters.com/article/2011/10/12/us-samsung-smartphones-netherlands-idUSTRE79B1W020111012.

Submitted Under Seal; Highly Confidential; Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 46-S

**Reasonable Royalty Rates - Smartphones**

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| 6,493,002 | No Market Rate 3/ | $0.28-$2.17 | $ 0.46 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 1.09 |
| 7,469,381 | No Market Rate 3/ | $0.52-$4.03 | $ 0.85 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 2.02 |
| 7,663,607 | | | | | |
| 7,844,915 | No Market Rate 3/ | $0.80-$6.20 | $ 1.30 | The quantitative reference points range from $0.80-$6.20 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 3.10 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 46-S

**Reasonable Royalty Rates - Smartphones**

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| 7,853,891 | No Market Rate 3/ | $0.28-$2.17 | $    0.46 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    1.09 |
| 7,864,163 | No Market Rate 3/ | $0.52-$4.03 | $    0.85 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    2.02 |
| 7,920,129 | | | | | |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 221 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 46-S

## Reasonable Royalty Rates - Smartphones

| Patent/Registration # | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| D627,790<br>D617,334<br>D604,305<br>D618,677<br>D504,889<br>D593,087<br>D622,270<br>iPhone<br>iPhone 3G<br>iPhone 4<br>iPhone / iPhone 3G /<br>iPhone 4<br>iPad and iPad 2<br>3,470,983<br>3,457,218<br>3,475,327<br>3,886,196<br>3,889,642<br>3,886,200<br>3,889,685<br>3,886,169<br>3,886,197<br>85/041,463 (Pending)<br>2,935,038 | No Market Rate. See Exhibit 40-S | $9.00-$24.00 per Unit. See Exhibit 41-S. | $   19.50 | The quantitative reference points range from $9.00-$24.00 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the design patents, trade dress, and trademarks are of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for the design patents, trade dress, and trademarks as a whole is the high end of the reference range. 5/ | $   24.00 |

**Sources/Notes:**

1/ See Exhibit 41-S.

2/ See Exhibit 39-S.

3/ No market rate provided for Apple utility patents. Licensing discussions and proposals by both Apple and Samsung involved a portfolio of unspecific patents. See Exhibit 40-S.

4/ The U.S. Treasury Department utilizes an interquartile range methodology in evaluating an accepting royalty rates that are considered comparable and acceptable for use in transfer pricing. A range of proposed data points are divided into four quartiles and the highest and lowest quartiles are removed to produce a resulting range of acceptable comparable royalty rates. The 50 percent is the mid point in the range and still leaves 50% of excess profits.

5/ Due to the extreme importance of Apple's design to its corporate success and future, I have assigned the high end of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements. Therefore, although Apple has refused to license any of its design related assets and would consider the license of one as injurious as licensing the group, the "Made for iPod" program rate of $4.00 per unit is considered a floor royalty for the license of any individual item within this group.

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 47-S

**Reasonable Royalty Rates - Tablets**

| Apple IP Number | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
| | Market | Income 1/ | Cost 2/ | | |
|---|---|---|---|---|---|
| 6,493,002 | No Market Rate 3/ | $0.28-$2.17 | $ 0.53 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 1.09 |
| 7,469,381 | No Market Rate 3/ | $0.52-$4.03 | $ 0.98 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 2.02 |
| 7,663,607 | No Market Rate 3/ | $1.08-$8.37 | $ 2.03 | The quantitative reference points range from $1.08-$8.37 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $ 4.19 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 47-S

**Reasonable Royalty Rates - Tablets**

| Apple IP Number | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
| --- | --- | --- | --- | --- | --- |
| | Market | Income 1/ | Cost 2/ | | |
| 7,844,915 | No Market Rate 3/ | $0.80-$6.20 | $    1.50 | The quantitative reference points range from $0.80-$6.20 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    3.10 |
| 7,853,891 | No Market Rate 3/ | $0.28-$2.17 | $    0.53 | The quantitative reference points range from $0.28-$2.17 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    1.09 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 224 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 47-S

**Reasonable Royalty Rates - Tablets**

| Apple IP Number | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| 7,864,163 | No Market Rate 3/ | $0.52-$4.03 | $    0.98 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    2.02 |
| 7,920,129 | No Market Rate 3/ | $0.52-$4.03 | $    0.98 | The quantitative reference points range from $0.52-$4.03 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the patent at issue is of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for this patent on a standalone basis is at least 50 percent of the high end of the reference range. 4/ | $    2.02 |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 47-S

## Reasonable Royalty Rates - Tablets

| Apple IP Number | Reference Range | | | Georgia-Pacific Results | Final Per Unit Royalty Rate |
|---|---|---|---|---|---|
| | Market | Income 1/ | Cost 2/ | | |
| D627,790 | No Market Rate. See Exhibit 40-S. | $9.00-$24.00 per Unit. See Exhibit 41-S. | $ 22.50 | The quantitative reference points range from $9.00-$24.00 per unit. There is no additional specific rate suggested by the results of the Georgia Pacific analysis that is outside the reference range. The qualitative results of the Georgia Pacific analysis overwhelmingly emphasize the significant financial advantages lost by Apple and gained by Samsung as a result of the assumed infringement. There are no results that support or suggest that the design patents and trade dress are of low financial importance. There is only one neutral factor and I have derived the income based reference point after apportioning the profit for an allowed return on existing tangible and intangible assets consistent with a desired return by investors in the industry, a return for all other intellectual property licensed in, and a return for all other companywide based intellectual property. As a result I have concluded that the appropriate reasonable royalty for the design patents and trade dress as a whole is the high end of the reference range. 5/ | $24.00 6/ |
| D617,334 | | | | | |
| D604,305 | | | | | |
| D618,677 | | | | | |
| D504,889 | | | | | |
| D593,087 | | | | | |
| D622,270 | | | | | |
| iPhone | | | | | |
| iPhone 3G | | | | | |
| iPhone 4 | | | | | |
| iPhone / iPhone 3G / iPhone 4 | | | | | |
| iPad and iPad 2 | | | | | |
| 3,470,983 | | | | | |
| 3,457,218 | | | | | |
| 3,475,327 | | | | | |
| 3,886,196 | | | | | |
| 3,889,642 | | | | | |
| 3,886,200 | | | | | |
| 3,889,685 | | | | | |
| 3,886,169 | | | | | |
| 3,886,197 | | | | | |
| 85/041,463 (Pending) | | | | | |
| 2,935,038 | | | | | |

Sources/Notes:

1/ See Exhibit 41-S.

2/ See Exhibit 39-S.

3/ No market rate provided for Apple utility patents. Licensing discussions and proposals by both Apple and Samsung involved a portfolio of unspecific patents. See Exhibit 40-S.

4/ The U.S. Treasury Department utilizes an interquartile range methodology in evaluating an accepting royalty rates that are considered comparable and acceptable for use in transfer pricing. A range of proposed data points are divided into four quartiles and the highest and lowest quartiles are removed to produce a resulting range of acceptable comparable royalty rates. The 50 percent is the mid point in the range and still leaves 50% of excess profits.

5/ Due to the extreme importance of Apple's design to its corporate success and future, I have assigned the high end of the range for the licensing of all design related assets as a whole. Further, Apple has consistently and emphatically rejected any consideration of allowing a competitor to utilize Apple's proprietary design elements. Therefore, although Apple has refused to license any of its design related assets and would consider the license of one as injurious as licensing the group, the "Made for iPod" program rate of $4.00 per unit is considered a floor royalty for the license of any individual item within this group.

6/ I assume that Apple and Samsung would agree to one rate for both smartphones and tablets.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only



Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                      EXHIBIT 50-S

**Analysis of Fixed & Variable and Product & Non-Product Costs**
**Through March 2012**

| Classification 1/ | Unadjusted P&L 2/ | Adjusted P&L 3/ |
|---|---|---|
| Quantity | 87,185,275 | |
| Sales | $ 30,420,751,548 | $ 30,420,751,548 |
| COGS (Cost of Goods Sold) | $ 18,510,093,503 | |
|   COGS – Materials Cost | $ 15,710,030,714 | $ 15,710,030,714 |
|   COGS – Expenses | $ 2,800,062,790 | |
|     COGS – Direct Cost – Labor Cost (Variable) | $ 448,866,331 | $ 448,866,331 |
|     COGS – Direct Cost – Royalty (Variable) | $ 1,494,808,709 | $ 1,494,808,709 |
|     COGS – Direct Cost – Depreciation Cost (Fixed) | $ 212,627,291 | |
|     COGS – Direct Cost – Processing Cost (Variable) | $ 131,591,584 | $ 131,591,584 |
|     COGS – Direct Cost – Molds Cost (Fixed) | $ 125,166,977 | |
|     COGS – Expenses – Others | $ 387,001,899 | |
|       COGS – Direct Cost – Utility Cost (Variable) | $ 16,283,320 | $ 16,283,320 |
|       COGS – Direct Cost – Others (Variable) | $ 199,501,450 | $ 199,501,450 |
|       COGS – Indirect Cost – Expenses (Operation Division) | $ 171,217,129 | |
| *Gross Sales Profit* | *$ 11,910,658,202* | |
| *Gross Sales Profit %* | *39.2%* | |
| Distribution Cost | $ 2,734,284,770 | |
|   Direct Commercial Sales – Marketing | $ 639,067,580 | |
|     Direct Commercial Sales – Advertising Cost (Fixed) | $ 396,071,232 | |
|     Direct Commercial Sales – Sales Promotion Cost (Fixed) | $ 242,996,348 | |
|   Direct Commercial Sales – Paid Commission (Variable) | $ 573,517,247 | $ 573,517,247 |
|   Direct Commercial Sales – Insurance Cost (Variable) | $ 12,876,318 | $ 12,876,318 |
|   Direct Commercial Sales – Others | $ 1,508,823,622 | |
|     Direct Commercial Sales –Logistics Cost (Variable) | $ 96,000,000 | $ 96,000,000 |
|     Direct Commercial Sales –Paid Commission (Variable) | | |
|     Direct Commercial Sales –Debt Expenses (Fixed) | $ 16,259,416 | |
|     Direct Commercial Sales –SVC Proxy (Fixed) | $ 247,447,866 | |
|     Direct Commercial Sales –Others (Variable) | $ 2,351,527 | $ 2,351,527 |
|     Direct Commercial Sales –Others (Fixed) | $ 1,146,764,814 | |
| *Incremental Profit* | | *$ 11,734,924,349* |
| *Incremental Profit %* | | *38.6%* |
| R&D Cost | $ 2,022,927,531 | |
|   R&D Cost – Labor Cost | $ 739,107,882 | |
|   R&D Cost – Depreciation Cost | $ 51,894,020 | |
|   R&D Cost – Others | $ 1,231,925,627 | |
|     R&D Cost – Supply Expenses | $ 28,449,017 | |
|     R&D Cost – Others | $ 345,053,807 | |
|     R&D Cost – Molds Cost | $ 23,998,856 | |
|     R&D Cost – Technological Fees | $ 47,942,220 | |
|     R&D Cost – Subcontracting Fee | $ 531,510,803 | |
|     R&D Cost – Materials Cost | $ 254,970,925 | |
| General Maintenance Costs | $ 574,635,441 | |
|   General Maintenance Cost – Labor Cost (Operation Division) | $ 183,871,466 | |
|   General Maintenance Cost – Depreciation Cost | $ 46,220,993 | |
|   General Maintenance Cost – Expenses (Operation Division) | $ 344,542,980 | |
| *Operating Profit* | *$ 6,578,810,302* | |
| *Operating Profit %* | *21.6%* | |
| Non-operating Profit | $ 1,179,086,561 | |
|   Non-operating Profit – Interest Income | $ 250,725,100 | |
|   Non-operating Profit – Foreign Exchange Profit | $ 840,162,147 | |
|   Non-operating Profit – Others | $ 88,199,304 | |
| Non-operating Expenses | $ 924,384,567 | |
|   Non-operating Expenses – Interest Payment | $ (123,798,757) | |
|   Non-operating Expenses – Foreign Exchange Loss | $ 877,257,413 | |
|   Non-operating Expenses – Others | $ 170,925,904 | |
| Pre-tax Profit | $ 6,833,512,454 | |

**Sources/Notes:**
1/ SAMNDCA-D-0000013 with translation.
2/ SAMNDCA-D-0000012. The Galaxy Tab 8.9 and Galaxy Tab 7.0 Plus (GT-P6210) have been removed because they are not accused. Items in blue have been calculated.
3/ Includes only cost categories which Samsung has designated as "Variable.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

















Apple Inc. v Samsung Electronics Co., LTD., et al.

EXHIBIT 53-PT

**Information Obtained Subsequent to Original Expert Report** 1/ 2/

| # | Document | Document Title | Beg Bates | Document Date | Comment | Category |
|---|---|---|---|---|---|---|
| 1 | Benner Exhibit 2579 | STA Next Big Thing Campaign Impact Measured | SAMNDCA0035 3414 | 2/14/2012 | Survey results showing positive effect of Next Big Thing advertisement campaign on Samsung brand, and corresponding negative effect on Apple brand. <br><br>'3429: "NBT Is Not Only Upgrading Samsung's Overall Mobile Brand Stature, It Is Also Helping De-Positioning Apple." | Competition |
| 2 | Cheong Exhibit 2650 | STA Presentation to COO Lee | SAMNDCA1154 9523 | 7/22/2010 | '9544: Graph from internal Samsung presentation shows predicted increase in smartphone v. mobile phone install base (CAGR of 36% for smartphones), text above graph states: "Consumer adoption of smartphones is expected to explode" <br><br>'9559: Internal Samsung presentation stating that "Galaxy S sales will drive significant ASP/API growth in 2H2010 and into 2011." | Smartphone Growth / Importance |
| 3 | Cheong Exhibit 2651 | Cover Email ("GS Choi's Direction and Request to STA") & Beat Apple Presentation | SAMNDCA1037 5640 | 6/17/2011 | '5642: Apple has "Extremely loyal customer base." <br><br>'5644: "STA must respond with a plan to beat Apple by Q3-11 or Q4-11 with a longer-term goal of growing Super-Premium ASPs to match Apple in 2012." <br><br>'5653: Graph showing Galaxy S Captivate and stating that GM% = 48% <br><br>'5655: "Apple continues to expand it's [sic] installed based [sic] of extremely loyal consumers.  How can this be disrupted?" | Competition; Financial Results; Loyalty |
| 4 | Cheong Exhibit 2652 | BCG: Lessons from Apple | SAMNDCA0027 4819 | 11/3/2010 | '4838: "Apple has a strong, clear brand promise consisting of compelling brand attributes that resonate with consumers" - Brand promise: "Cool, innovative products offering superior design and usability." | Loyalty |
| 5 | Cheong Exhibit 2653 | STA Marketing: CFO Update | SAMNDCA1154 7471 | 2/15/2012 | '7475: One of Samsung's 2012 Objectives is to "Manage customer base to foster brand Loyalty and Retention." <br><br>'7478: "STA's Next Big Thing Campaign Has Been Well Received by the Industry and the Public, Creating Positive Buzz for Samsung's Brand in the US," and "Samsung's snarky TV ads have harshed the iPhone's vibe." <br><br>'7479: "After Only One Week, the Next Big Thing Campaign Shifted the Online Conversation Away from iPhone Toward Samsung and Introduced Galaxy as a Top Term." | Competition; Loyalty |
| 6 | Cheong Exhibit 2654 | STA Product Strategy | SAMNDCA1154 7506 | 2/16/2012 | '7507: Internal Samsung presentation stating that "[d]ramatic shift to Smartphones challenged the traditional model of operations." | Smartphone Growth / Importance |
| 7 | Cheong Exhibit 2655 | AT&T: For HQ CFO | SAMNDCA1154 7521 | 2/16/2012 | '7523: Internal Samsung presentation noting "[n]eed to compete with Apple at free." | Competition |
| 8 | Cho Exhibit 2676 | Ecosystem Securing/Procuring Strategy to take the lead in the Smartphone Market. | SAMNDCA0039 2050 | 4/1/2009 | '2054: Projection that smartphone will take up more than 26% of the smartphone demand in the wor'd by 2012.  A chart shows that the increase rate of the importance/weight increases from 13% in 2008 to 26% in 2012. <br><br>'2056-59: Discussing importance of ecosystem (e.g., "Securing Ecosystem Is Urgent"). <br><br>'2058: Table showing projected increase in smartphone (weight/ratio) from 2008 to 2012 compared to mobile phone. | Loyalty; Smartphone Growth / Importance |
| 9 | Hong Exhibit 2152 | McKinsey Report - Winning in smartphones: It's now or never | SAMNDCA1080 7316 | 12/10/2009 | '7321: "Smartphone growth will likely exceed analyst expectation." <br><br>'7322: "Premium smartphone segment ($>300) will expand to 18% of units but 40-45% of profits." <br><br>'7350: "Consumer research confirms that smartphone penetration poised to double in next ~2 years." | Smartphone Growth / Importance |
| 10 | Sohn Exhibit 1654 | (Gravity Tank) Touch Portfolio: Rollout Strategy - Recommendation Based on Consumer Insight | SAMNDCA0019 1811 | 12/17/2009 | '1856: "iPhone's strong lock-in levers...drive annuity revenue...and tie consumers to product." | Loyalty |
| 11 | Sohn Exhibit 2647 | STA Competitive Situation: Paradigm Shift | SAMNDCA1154 7401 | 2/16/2012 | '7405: "STA Missed Expectations Relative to Apple But Did Reach Key Milestones," stated above a graphic showing "3Yrs of >$1B consolidated profits." <br><br>'7408: Internal Samsung presentation noting that "US [Smartphone] Market Becoming a Two Horse Race Between Apple and Samsung" <br><br>'7409: "Apple Continues to Show Sales Growth Due to Strong Loyalty, Carrier Agreements and Dominant Retail Presence" <br><br>'7418: "Apple Marketing, Portfolio Expansion and Platform Evolution Resulting in Very Sticky / Loyal Subscribers" <br><br>'7419:  "Apple Subscriber Trajectory May Result in Apple Overtaking Samsung's Entire US Install Base by YE2013" <br><br>'7424: One of the listed STA Goals in 20112 is to "Double Profit >2B consolidated profit" | Competition; Financial Results; Loyalty |
| 12 | Sohn Exhibit 2714 | (Gravity Tank) Touch Portfolio: Key Takeaways | SAMNDCA1080 5169 | 12/24/2006 | '5171: Summary of key points from Touch Portfolio study states, "Through Apple s brand power and deliberate hard lock-in system, iPhone user s loyalty is very high and inducing consumers to break away is difficult -> rather than the strategy of stealing iPhone users, the strategy of preventing the inflow of new customers appears more effective." | Loyalty |
| 13 | Sohn Exhibit 2720 | VZW iPhone Announcement | SAMNDCA1037 3422 | 1/11/2010 | '3436: Survey Results note that customers of other carriers are 22% "somewhat likely" to switch to VZW to buy an iPhone, while 5% note they are "very likely" and 4% notes extremely likely. <br><br>'3438: "Among all WSP subscribers with the exception of Verizon, knowing that Verizon will offer the iPhone in early 2011," a graph below shows that 25% (net) said yes to switching carriers, either right away or after a waiting period. | Carrier Switching |

Submitted Under Seal; Highly Confidential;<br>Outside Counsel Eyes' Only

Apple Inc. v Samsung Electronics Co., LTD., et al.

| # | Document | Document Title | Beg Bates | Document Date | Comment | Category |
|---|---|---|---|---|---|---|
| 14 | Sohn Exhibit 2725 | STA Factbook | S-ITC-003353288 | 8/1/2011 | '3305: "Android & Apple Ecosystems are 'Sticky' (High Repeat Purchases).  Within Android, HTC Appears to Be Building a More Loyal Following." | Competition; Financial Results; Loyalty; Smartphone Growth / Importance |
| | | | | | '3324: "Lock-In Mechanisms Part of Apple's Approach to N-Services." | |
| | | | | | '3334: "Need to Slow the Rapidly Growing Apple Install Base at VZW and Reduce the Sizable Apple Base at ATT." | |
| | | | | | '3436: "Drive Customer Loyalty: Investing in Services and Developers/Content Providers." | |
| | | | | | '3346: "In 4Q11, Premium Smartphones Represent 26% of SAM Smartphone," noting "28% YOY growth in Premium Smartphones (sell-in)." | |
| | | | | | '3385: Executive Summary states, "From 1st Half of 2011 to 1st Half of 2012, STA is completing the transition from a Majority Feature Phone provider to a Majority Smartphone Provider and becoming more aligned to the market." | |
| | | | | | '3293: Samsung document states "Smartphones To Be 90% of Mobile Phone TAM by 2015 (Android at 55% of TAM)," above a graphic showing projected growth of smartphone/mobile market over time. | |
| | | | | | '3294: "Smartphone Revenue to Drive 90%+ of the US Mkt by 2012 (Android Rev at 50% of market)." | |
| | | | | | '3376:  "Results Trended from 2009 Show That Samsung Successfully Stole MPSA Share from Apple After the Galaxy S Campaign But Was Unable to Hold This | |
| 15 | Sohn Exhibit 2727 | GS Choi Visit to STA | SAMNDCA11513944 | 9/20/2011 | '3957: "STA Must Pass and Sustain the Lead Over Apple While Building the New Businesses to Drive Future Growth." | Competition; Loyalty |
| | | | | | '3961: Presentation states "Key Challenges/Lessons Learned Through First 3 Quarters," including: "1. Apple is aggressively growing share - future success is dependent on blunting Apple ..." | |
| | | | | | '4000: Under "FY'12 Key Marketing Strategies," Samsung's presentation states: "Attacking Consumer Segments & Business Opportunities."  Under this heading is "Loyalty" and "Increase consumer loyalty to STA..." above a graphic showing Apple has high loyalty repurchase numbers compared to HTC and Samsung. | |
| | | | | | '4001: Heading is: "Consumer Loyalty: Samsung Brand & Products," and beneath heading is subheading: "Building Long-Term Consumer Loyalty." | |
| | | | | | '4046: "Ways to achieve our GOALS...(1) S>2H ... (2) S>A," where "S" is Samsung, "H" is HTC, and "A" is Apple. | |
| | | | | | '4060: "S>A requires us to think differently." | |
| 16 | Sohn Exhibit 2728 | Email from Dale Sohn to gschoi@samsung.com, et al., "(Report) 1Q Mobile Phone Business" | SAMNDCA00381800 | 2/8/2012 | '1800: "There is a structural problem in that A Company takes away 50~70% of smartphone shares of ATT/VZW/Sprint.  The reason is that the carriers are promoting sales in order not to pay penalties to A Company and consumers consistently are looking for Apple brand." | Financial Results; Loyalty |
| | | | | | '1800 - 1801: "STA 2012 1Q Business Performance - 1. Performance forecast analysis compared to prior year - 1Q Sales $2.2B, Volume is forecasted at 10.7 million units." | |
| 17 | Sohn Exhibit 2729 | Samsung Q4'11 Deep Dive | SAMNDCA00380801 | 2/14/2012 | '0806: Samsung presentation, with two headings: "Continue capitalizing on the strength and momentum of the Galaxy line . . . ," and "Continue putting pressure directly on Apple by clearly communicating what makes the Galaxy different (and therefore better)."  Below, it states: "This is critical right now because though Samsung is making gains, Apple continues to build as well and the competitive set within mobile is looking to be more and more of a two-horse race." | Competition; Loyalty |
| | | | | | '0822, '0823, '0827, '0829, '0844, '3845: Survey results showing positive effect of Galaxy awareness on Samsung purchase intent and Samsung brand imagery. | |
| 18 | April 30, 2012 Production | 2011 Business Strategy, Mobile Communications Division | SAMNDCA00401853 | December, 2010 | Business plan giving comprehensive overview of financial results and projections as well as strategy to compete with Apple in smartphones and tablets | Competition; Financial Results |
| | | | | | '1860: "Galaxy S, Global Big Hit -> 'The only real competitor of Apple iPhone'" | |
| | | | | | '1864: Chart directly comparing the features of the iPad and Galaxy Tab | |
| 19 | April 30, 2012 Production | 2012 Business Strategy, Mobile Communications Division | SAMNDCA00401905 | October, 2011 | Business plan giving comprehensive overview of financial results and projections as well as strategy to compete with Apple in smartphones and tablets | Competition; Financial Results |
| | | | | | '1916: "Preemptively respond to iPhone 5 with continued success of 2012 Flagship model" | |
| | | | | | '1916: "Keep iPad 3 in check by introducing a 10" follow-up model" | |

**Sources/Notes:**

1/  Information provided in this exhibit is exemplary and not intended to be comprehensive.

2/  Updated only to reflect translations agreed to by Samsung and Apple before trial.

Apple Inc. v. Samsung Electronics Co., LTD., et al.

**Table of Contents for Damages Appendices**
**(In all cases damages start no earlier than notice dates per March 1 Order)**

| Damages Model | Damages Starting Point | Design Around Start Date | Samsung's Profit |
|---|---|---|---|
| PT-H | **Infuse 4G:** as of First Sale per Financial Spreadsheet; **Remaining Infringing Products:** as of First Sale per Financial Spreadsheet | Actual Notice | Gross Profit |
| PT-I | | Actual Notice | Incremental Profit |
| PT-J | | First Infringement | Gross Profit |
| PT-K | | First Infringement | Incremental Profit |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Second Page of Table of Contents for Damages
Appendices Reserved

Exhibits 17-PT-A through 19.1-PT-G Reserved

| | Reasonable Royalty 3/ |
|---|---|
| | $1,580,337 |
| | $509,964 |
| | $1,209,689 |
| | $4,013,035 |
| | $1,928,648 |
| | $14,390,528 |
| | $2,727,419 |
| | $688,586 |
| | $290,148 |
| | $3,327 |
| | $2,363,714 |
| | $3,023,346 |
| | $444,040 |
| | **$33,172,781** |

| Reasonable Royalty 3/ |
| --- |
| $1,580,337 |
| $509,964 |
| $1,209,689 |
| $4,013,035 |
| $1,928,648 |
| $14,390,528 |
| $2,727,419 |
| $688,586 |
| $290,148 |
| $3,327 |
| $2,363,714 |
| $3,023,346 |
| $444,040 |
| **$33,172,781** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-H

## Apple's Lost Profits Summary
See Damages Period Below 1/

| | 2010 May | June | July | Aug | Sept | Oct | Nov | Dec | 2011 Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | 2012 Jan | Feb | Mar | Apr | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units Sold - Smartphones 2/** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 763,181 | 1,469,129 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,715,858 |
| Captivate | 0 | 0 | 0 | 117,722 | 7,442 | 0 | 0 | 0 | 0 | 0 | 0 | 12,205 | 15,281 | 55,485 | 41,715 | 38,304 | 9,970 | 7,723 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 305,847 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,151 | 6,482 | 10,660 | 18,104 | 6,355 | 3,587 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,339 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40,292 | 38,159 | 46,183 | 33,545 | 18,848 | 2,457 | 6,996 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 186,480 |
| Epic 4G | 0 | 0 | 0 | 13,314 | 1,076 | 0 | 0 | 0 | 0 | 0 | 0 | 4,782 | 17,497 | 12,736 | 3,934 | 110 | 0 | 2,509 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55,958 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,870 | 1,581 | 3,581 | 2,591 | 883 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,506 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,210 | 18,663 | 23,598 | 15,369 | 11,813 | 4,393 | 6,856 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 84,902 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,243 | 2,047 | 5,303 | 2,785 | 1,683 | 1,490 | 1,057 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16,608 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,168 | 1,800 | 879 | 1,063 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,910 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,471 | 137,419 | 18,891 | 44,692 | 64,558 | 69,495 | 60,541 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 476,095 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,223 | 22,391 | 1,739 | 996 | 352 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,701 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,241 | 1,692 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,933 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,999 | 3,330 | 1,660 | 1,891 | 1,624 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,504 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 131,036 | 8,518 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 261,269 | 190,366 | 167,472 | 149,028 | 94,862 | 87,628 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 1,241,783 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Add'l Excess Capacity 3/ | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Capacity | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 131,036 | 8,518 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 261,269 | 190,366 | 167,472 | 149,028 | 94,862 | 87,628 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 1,241,783 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Apple Increm. Margin/Unit ($) 4/ | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Apple's Lost Profits ($) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 189,922 | 270,290 | 297,934 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 690,605 | 1,207,860 | 960,049 | 685,800 | 529,972 | 289,233 | 255,176 | 472,426 | 157,025 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 9,474,075 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                                   EXHIBIT 17.2-PT-H

# Apple's Lost Profits Summary
See Damages Period Below 1/

| | 2010 May | June | July | Aug | Sept | Oct | Nov | Dec | 2011 Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | 2012 Jan | Feb | Mar | Apr | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units Sold - Tablets 2/** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 51,648 | 31,986 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 725,299 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 31,121 | 8,150 | 12,515 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 644,331 |

**Apple's Total Lost Profits ($)  419,029,253**

**Sources/Notes:**
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.
2/ Smartphones - Exhibit 37.1-PT, Tablets - Exhibit 38.1-PT.
3/ Smartphones - Exhibit 26-S, Tablets - Exhibit 27-S.
4/ Smartphones - Exhibit 32-S2, Tablets - Exhibit 33-S2.

Submitted Under Seal; Highly Confidential:
Outside Counsel Eyes' Only

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |



Apple Inc. v. Samsung Electronics Co., LTD., et al.                    EXHIBIT 19-PT-H

# Apple's Damages Per Samsung Product
# (Apple's Lost Profits and Reasonable Royalty)
### See Damages Period Below 1/

| Product | Lost Profits 2/ | Reasonable Royalty 3/ | Total |
|---|---|---|---|
| Captivate | $95,135,464 | $6,919,809 | $102,055,273 |
| Continuum | $15,520,436 | $2,288,104 | $17,808,540 |
| Droid Charge | $62,164,253 | $11,616,802 | $73,781,055 |
| Epic 4G | $18,092,726 | $15,785,076 | $33,877,801 |
| Exhibit 4G | $5,792,327 | $1,928,648 | $7,720,975 |
| Galaxy Prevail | $28,218,228 | $14,390,528 | $42,608,756 |
| Galaxy Tab | $12,448,830 | $2,727,419 | $15,176,249 |
| Gem | $5,521,317 | $5,035,882 | $10,557,199 |
| Indulge | $1,602,282 | $3,842,337 | $5,444,618 |
| Infuse 4G | $159,045,355 | $17,414,938 | $176,460,293 |
| Nexus S 4G | $9,682,088 | $2,363,714 | $12,045,802 |
| Replenish | $2,315,039 | $3,023,346 | $5,338,386 |
| Transform | $3,490,907 | $444,040 | $3,934,947 |
| **Total** | **$419,029,253** | **$87,780,642** | **$506,809,895** |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.
2/ EXHIBIT 17.2-PT-H.
3/ EXHIBIT 19.1-PT-H.

EXHIBIT 19.1-PT-H

**Reasonable Royalty Summary - for Units not Eligible for Lost Profits**

In USD

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | 2012 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | |
| Captivate | 0 | 0 | 0 | 123,855 | 199,051 | 237,431 | 60,794 | 209,565 | 188,840 | 177,847 | 96,594 | 107,493 | 63,534 | 771,290 | 1,232,446 | 1,131,691 | 294,607 | 492,856 | 927,472 | 629,225 | -20,588 | -1,019 | -1,310 | -1,340 | 87 | -612 | 6,919,809 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 4,826 | 210,890 | 134,875 | 465 | -42 | 14,431 | 33,997 | 60,652 | 333,515 | 966,638 | 339,306 | 191,522 | -1,485 | -2,766 | 1,805 | -262 | -87 | 0 | -175 | 0 | 0 | 2,288,104 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 636,618 | 357,023 | 1,530,063 | 1,915,235 | 1,076,105 | 140,348 | 669,354 | 989,224 | 984,740 | 297,480 | 365,179 | 1,131,036 | 730,420 | 585,993 | 207,984 | 11,616,802 |
| Epic 4G | 0 | 0 | 0 | 369,293 | 316,199 | 324,392 | 313,817 | 27,129 | 265,820 | 164,186 | 312,171 | 419,818 | 1,099,894 | 2,835,061 | 1,968,235 | 55,429 | 0 | 1,059,725 | 1,909,505 | 1,178,867 | 1,068,725 | 659,545 | 256,002 | 1,181,296 | 0 | -31 | 15,785,076 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 667,624 | 181,392 | 410,886 | 297,238 | 101,631 | 127,613 | -236 | -114 | -100 | 99,903 | 7 | 42,869 | -64 | 1,928,648 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 369,574 | 1,173,181 | 1,775,996 | 1,763,016 | 1,355,079 | 503,920 | 663,906 | 1,323,756 | 334,152 | 1,251,785 | 1,177,243 | 547,495 | 1,082,138 | 714,571 | 354,715 | 14,390,528 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 444 | 477,659 | 51,336 | 67,411 | 35,954 | 52,146 | 114,318 | 41,728 | 76,717 | 393,907 | 231,579 | 30,895 | 466,628 | 188,182 | 72,407 | 81,460 | 99,896 | 68,623 | 36,700 | 33,115 | 106,315 | 2,727,419 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,198 | 32,805 | 127,212 | 196,968 | 128,712 | 1,114,752 | 1,303,062 | 787,434 | 697,424 | 496,205 | 119,508 | -11,648 | 15,958 | -10,134 | -2,533 | -2,504 | 6,465 | 0 | 5,035,882 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,898 | 95,417 | -26 | -56 | -565 | 546,699 | 842,529 | 411,233 | 499,117 | 733,940 | 520,083 | 0 | 0 | -932 | 0 | 0 | 0 | 0 | 3,842,337 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58,134 | 3,249,122 | 462,164 | 1,411,981 | 2,039,639 | 2,195,619 | 831,999 | 1,076,915 | 45,215 | 1,258,772 | 1,718,835 | 1,822,375 | 1,220,563 | 24,819 | -1,214 | 17,414,938 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 282,946 | 1,407,534 | 109,368 | 81,940 | 29,020 | 0 | 0 | 411,648 | -10 | 41,344 | -92,160 | 92,083 | 0 | 0 | 0 | 2,363,714 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 165,519 | 439,168 | 405,850 | 234,272 | 171,898 | 190,870 | 59,226 | 81 | 800 | 510,494 | 317,059 | 224,462 | 261,590 | 42,056 | 0 | 3,023,346 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78,981 | 126,759 | 63,209 | 94,280 | 80,898 | 0 | 0 | 0 | 0 | 0 | -12 | 0 | 0 | 0 | 0 | 444,040 |
| **Total Reasonable Royalty ($)** | 0 | 0 | 0 | 493,148 | 515,249 | 567,093 | 1,063,160 | 422,905 | 558,734 | 605,647 | 697,971 | 2,464,340 | 8,147,250 | 10,145,044 | 12,093,027 | 8,551,492 | 4,953,676 | 5,339,161 | 7,805,078 | 3,755,401 | 4,505,055 | 4,234,244 | 4,237,204 | 4,508,696 | 1,449,975 | 667,092 | 87,780,642 |

Note: Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| | Reasonable Royalty 3/ |
|---|---|
| | $1,580,337 |
| | $509,964 |
| | $1,209,689 |
| | $4,013,035 |
| | $1,928,648 |
| | $14,390,528 |
| | $2,727,419 |
| | $688,586 |
| | $290,148 |
| | $3,327 |
| | $2,363,714 |
| | $3,023,346 |
| | $444,040 |
| | **$33,172,781** |

| | Reasonable Royalty 3/ |
|---|---|
| | $1,580,337 |
| | $509,964 |
| | $1,209,689 |
| | $4,013,035 |
| | $1,928,648 |
| | $14,390,528 |
| | $2,727,419 |
| | $688,586 |
| | $290,148 |
| | $3,327 |
| | $2,363,714 |
| | $3,023,346 |
| | $444,040 |
| | **$33,172,781** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-I

# Apple's Lost Profits Summary
See Damages Period Below 1/

| | | | | 2010 | | | | | | | | 2011 | | | | | | | | | | | | | 2012 | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Total |
| **Total Units Sold - Smartphones 2/** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 763,181 | 1,469,129 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,715,858 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Captivate | 0 | 0 | 0 | 117,722 | 7,442 | 0 | 0 | 0 | 0 | 0 | 0 | 12,205 | 15,281 | 55,485 | 41,715 | 38,304 | 9,970 | 7,723 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 305,847 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,151 | 6,482 | 10,660 | 18,104 | 6,355 | 3,587 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 47,339 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40,292 | 38,159 | 46,183 | 33,545 | 18,848 | 2,457 | 6,996 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 186,480 |
| Epic 4G | 0 | 0 | 0 | 13,314 | 1,076 | 0 | 0 | 0 | 0 | 0 | 0 | 4,782 | 17,497 | 12,736 | 3,934 | 110 | 0 | 2,509 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55,958 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,870 | 1,581 | 3,581 | 2,591 | 883 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,506 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,210 | 18,663 | 23,598 | 15,369 | 11,813 | 4,393 | 6,856 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 84,902 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,243 | 2,047 | 5,303 | 2,785 | 1,683 | 1,490 | 1,057 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16,608 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,168 | 1,800 | 879 | 1,063 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,910 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,471 | 137,419 | 18,891 | 44,692 | 64,558 | 69,495 | 60,541 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 476,095 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,223 | 22,391 | 1,739 | 996 | 352 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28,701 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,241 | 1,692 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,933 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,999 | 3,330 | 1,660 | 1,891 | 1,624 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,504 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 131,036 | 8,518 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 261,269 | 190,366 | 167,472 | 149,028 | 94,862 | 87,628 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 1,241,783 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 131,036 | 8,518 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 261,269 | 190,366 | 167,472 | 149,028 | 94,862 | 87,628 | 78,366 | 662 | 0 | 0 | 0 | 0 | 0 | 0 | 1,241,783 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 189,922 | 270,290 | 297,934 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 690,605 | 1,207,860 | 960,049 | 685,800 | 529,972 | 289,233 | 255,176 | 472,426 | 157,025 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 9,474,075 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-I

# Apple's Lost Profits Summary
See Damages Period Below 1/

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | 2012 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | |
| **Total Units Sold - Tablets 2/** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 51,648 | 31,986 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 725,299 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 23,836 | 36,605 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,968 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 31,121 | 8,150 | 12,515 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 644,331 |

**Apple's Total Lost Profits ($)419,029,253**

**Sources/Notes:**
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.
2/ Smartphones - Exhibit 37.1-PT, Tablets - Exhibit 38.1-PT.
3/ Smartphones - Exhibit 26-S, Tablets - Exhibit 27-S.
4/ Smartphones - Exhibit 32-S2, Tablets - Exhibit 33-S2.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                              EXHIBIT 19-PT-I

# Apple's Damages Per Samsung Product
## (Apple's Lost Profits and Reasonable Royalty)
See Damages Period Below 1/

| Product | Lost Profits 2/ | Reasonable Royalty 3/ | Total |
|---|---|---|---|
| Captivate | $95,135,464 | $6,919,809 | $102,055,273 |
| Continuum | $15,520,436 | $2,288,104 | $17,808,540 |
| Droid Charge | $62,164,253 | $11,616,802 | $73,781,055 |
| Epic 4G | $18,092,726 | $15,785,076 | $33,877,801 |
| Exhibit 4G | $5,792,327 | $1,928,648 | $7,720,975 |
| Galaxy Prevail | $28,218,228 | $14,390,528 | $42,608,756 |
| Galaxy Tab | $12,448,830 | $2,727,419 | $15,176,249 |
| Gem | $5,521,317 | $5,035,882 | $10,557,199 |
| Indulge | $1,602,282 | $3,842,337 | $5,444,618 |
| Infuse 4G | $159,045,355 | $17,414,938 | $176,460,293 |
| Nexus S 4G | $9,682,088 | $2,363,714 | $12,045,802 |
| Replenish | $2,315,039 | $3,023,346 | $5,338,386 |
| Transform | $3,490,907 | $444,040 | $3,934,947 |
| **Total** | **$419,029,253** | **$87,780,642** | **$506,809,895** |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

2/ EXHIBIT 17.2-PT-I.

3/ EXHIBIT 19.1-PT-I.

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 19.1-PT-I

**Reasonable Royalty Summary - for Units not Eligible for Lost Profits**

In USD

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | 2012 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | |
| Captivate | 0 | 0 | 0 | 123,855 | 199,051 | 237,431 | 60,794 | 209,565 | 188,840 | 177,847 | 96,594 | 107,493 | 63,534 | 771,290 | 1,232,446 | 1,131,691 | 294,607 | 492,856 | 927,472 | 629,225 | -20,588 | -1,019 | -1,310 | -1,340 | 87 | -612 | 6,919,809 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 4,826 | 210,890 | 134,875 | 465 | -42 | 14,431 | 33,997 | 60,652 | 333,515 | 966,638 | 339,306 | 191,522 | -1,485 | -2,766 | 1,805 | -262 | -87 | 0 | -175 | 0 | 0 | 2,288,104 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 636,618 | 357,023 | 1,530,063 | 1,915,235 | 1,076,105 | 140,348 | 669,354 | 989,224 | 984,740 | 297,480 | 365,179 | 1,131,036 | 730,420 | 585,993 | 207,984 | 11,616,802 |
| Epic 4G | 0 | 0 | 0 | 369,293 | 316,199 | 324,392 | 313,817 | 27,129 | 265,820 | 164,186 | 312,171 | 419,818 | 1,099,894 | 2,835,061 | 1,968,235 | 55,429 | 0 | 1,059,725 | 1,909,505 | 1,178,867 | 1,068,725 | 659,545 | 256,002 | 1,181,296 | 0 | -31 | 15,785,076 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 667,624 | 181,392 | 410,886 | 297,238 | 101,631 | 127,613 | -236 | -114 | -100 | 99,903 | 7 | 42,869 | -64 | 1,928,648 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 369,574 | 1,173,181 | 1,775,996 | 1,763,016 | 1,355,079 | 503,920 | 663,906 | 1,323,756 | 334,152 | 1,251,785 | 1,177,243 | 547,495 | 1,082,138 | 714,571 | 354,715 | 14,390,528 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 444 | 477,659 | 51,336 | 67,411 | 35,954 | 52,146 | 114,318 | 41,728 | 76,717 | 393,907 | 231,579 | 30,895 | 466,628 | 188,182 | 72,407 | 81,460 | 99,896 | 68,623 | 36,700 | 33,115 | 106,315 | 2,727,419 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,198 | 32,805 | 127,212 | 196,968 | 128,712 | 1,114,752 | 1,303,062 | 787,434 | 697,424 | 496,205 | 119,508 | -11,648 | 15,958 | -10,134 | -2,533 | -2,504 | 6,465 | 0 | 5,035,882 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,898 | 95,417 | -26 | -56 | -565 | 546,699 | 842,529 | 411,233 | 499,117 | 733,940 | 520,083 | 0 | 0 | -932 | 0 | 0 | 0 | 3,842,337 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58,134 | 3,249,122 | 462,164 | 1,411,981 | 2,039,639 | 2,195,619 | 831,999 | 1,076,915 | 45,215 | 1,258,772 | 1,718,835 | 1,822,375 | 1,220,563 | 24,819 | -1,214 | 17,414,938 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 282,946 | 1,407,534 | 109,368 | 81,940 | 29,020 | 0 | 0 | 411,648 | -10 | 41,344 | -92,160 | 92,083 | 0 | 0 | 0 | 2,363,714 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 165,519 | 439,168 | 405,850 | 234,272 | 171,898 | 190,870 | 59,226 | 81 | 800 | 510,494 | 317,059 | 224,462 | 261,590 | 42,056 | 0 | 3,023,346 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78,981 | 126,759 | 63,209 | 90,898 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -12 | 0 | 0 | 0 | 0 | 444,040 |
| **Total Reasonable Royalty ($)** | 0 | 0 | 0 | 493,148 | 515,249 | 567,093 | 1,063,160 | 422,905 | 558,734 | 605,647 | 697,971 | 2,464,340 | 8,147,250 | 10,145,044 | 12,093,027 | 8,551,492 | 4,953,676 | 5,339,161 | 7,805,078 | 3,755,401 | 4,505,055 | 4,234,244 | 4,237,204 | 4,508,696 | 1,449,975 | 667,092 | 87,780,642 |

Note: Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| Reasonable Royalty 3/ |
| --- |
| $1,957,240 |
| $539,394 |
| $1,340,523 |
| $4,077,884 |
| $2,044,683 |
| $14,815,746 |
| $2,959,682 |
| $702,838 |
| $290,148 |
| $3,327 |
| $2,386,918 |
| $3,046,062 |
| $460,749 |
| **$34,625,193** |

| Reasonable Royalty 3/ |
| --- |
| $1,957,240 |
| $539,394 |
| $1,340,523 |
| $4,077,884 |
| $2,044,683 |
| $14,815,746 |
| $2,959,682 |
| $702,838 |
| $290,148 |
| $3,327 |
| $2,386,918 |
| $3,046,062 |
| $460,749 |
| **$34,625,193** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                                                           EXHIBIT 17.2-PT-J

# Apple's Lost Profits Summary
See Damages Period Below 1/, 5/

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | | | 2012 | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | |
| **Total Units Sold - Smartphones 2/** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 763,181 | 1,469,129 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,715,858 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Captivate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,205 | 14,296 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,501 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,151 | 6,064 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,215 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40,292 | 35,697 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75,989 |
| Epic 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,782 | 16,368 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,150 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,210 | 17,459 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,669 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,243 | 1,915 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,158 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,471 | 128,553 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 130,024 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,223 | 20,946 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24,169 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,999 | 3,115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,114 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 244,413 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 316,989 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Beginning Capacity** | ■ | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 244,413 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 316,989 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 690,605 | 1,224,716 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,398,869 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-J

# Apple's Lost Profits Summary
See Damages Period Below 1/, 5/

| | 2010 May | June | July | Aug | Sept | Oct | Nov | Dec | 2011 Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | 2012 Jan | Feb | Mar | Apr | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units Sold - Tablets 2/** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 51,648 | 31,986 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 725,299 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 31,121 | 9,688 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 682,474 |

**Apple's Total Lost Profits ($) 113,777,344**

**Sources/Notes:**
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.
2/ Smartphones - Exhibit 37.1-PT, Tablets - Exhibit 38.1-PT.
3/ Smartphones - Exhibit 26-S, Tablets - Exhibit 27-S.
4/ Smartphones - Exhibit 32-S2, Tablets - Exhibit 33-S2.
5/ Design around period starting before actual notice.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| Reasonable Royalty 2/ |
| --- |
| $2,075,269 |
| $578,343 |
| $1,671,298 |
| $4,179,254 |
| $2,044,683 |
| $14,920,600 |
| $3,149,250 |
| $720,882 |
| $290,148 |
| $4,713 |
| $2,506,000 |
| $3,046,062 |
| $473,711 |
| **$35,660,213** |

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                    EXHIBIT 19-PT-J

# Apple's Damages Per Samsung Product
## (Apple's Lost Profits and Reasonable Royalty)
### See Damages Period Below 1/

| Product | Lost Profits 2/, 4/ | Reasonable Royalty 3/ | Total |
|---|---|---|---|
| Captivate | $8,961,578 | $10,949,947 | $19,911,526 |
| Continuum | $2,777,984 | $3,289,443 | $6,067,427 |
| Droid Charge | $25,696,440 | $14,392,590 | $40,089,030 |
| Epic 4G | $7,152,084 | $16,252,285 | $23,404,369 |
| Exhibit 4G | $0 | $2,044,683 | $2,044,683 |
| Galaxy Prevail | $7,327,589 | $14,815,746 | $22,143,335 |
| Galaxy Tab | $6,584,344 | $2,959,682 | $9,544,026 |
| Gem | $1,406,069 | $5,331,622 | $6,737,691 |
| Indulge | $0 | $3,985,316 | $3,985,316 |
| Infuse 4G | $43,968,916 | $28,154,599 | $72,123,515 |
| Nexus S 4G | $8,172,989 | $2,386,918 | $10,559,907 |
| Replenish | $0 | $3,046,062 | $3,046,062 |
| Transform | $1,729,350 | $460,749 | $2,190,100 |
| **Total** | **$113,777,344** | **$108,069,641** | **$221,846,985** |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

2/ EXHIBIT 17.2-PT-J.

3/ EXHIBIT 19.1-PT-J.

4/ Design around period starting before actual notice.

Case 5:11-cv-01846-LHK   Document 2607-3   Filed 10/29/13   Page 287 of 299
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 19.1-PT-J

## Reasonable Royalty Summary - for Units not Eligible for Lost Profits

In USD

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | 2012 | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Total |
| Captivate | 0 | 0 | 0 | 338,641 | 214,084 | 237,431 | 60,794 | 209,565 | 188,840 | 177,847 | 96,594 | 107,493 | 68,577 | 1,721,193 | 2,447,187 | 2,247,103 | 584,933 | 717,750 | 927,472 | 629,225 | -20,588 | -1,019 | -1,310 | -1,340 | 87 | -612 | 10,949,947 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 4,826 | 210,890 | 134,875 | 465 | -42 | 14,431 | 33,997 | 62,792 | 516,014 | 1,493,827 | 524,364 | 295,976 | -1,485 | -2,766 | 1,805 | -262 | -87 | 0 | -175 | 0 | 0 | 3,289,443 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 636,618 | 369,628 | 2,367,361 | 2,959,826 | 1,663,032 | 216,859 | 887,210 | 989,224 | 984,740 | 297,480 | 365,179 | 1,131,036 | 730,420 | 585,993 | 207,984 | 14,392,590 |
| Epic 4G | 0 | 0 | 0 | 393,585 | 318,372 | 324,392 | 313,817 | 27,129 | 265,820 | 164,186 | 312,171 | 419,818 | 1,105,674 | 3,065,964 | 2,090,740 | 58,855 | 0 | 1,137,856 | 1,909,505 | 1,178,867 | 1,068,725 | 659,545 | 256,002 | 1,181,296 | 0 | -31 | 16,252,285 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721,998 | 192,680 | 436,454 | 315,738 | 107,935 | 127,613 | -236 | -114 | -100 | 99,903 | 7 | 42,869 | -64 | 2,044,683 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 369,574 | 1,179,346 | 1,920,652 | 1,872,751 | 1,439,424 | 535,286 | 712,858 | 1,323,756 | 334,152 | 1,251,785 | 1,177,243 | 547,495 | 1,082,138 | 714,571 | 354,715 | 14,815,746 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 444 | 477,659 | 51,336 | 67,411 | 35,954 | 52,146 | 114,318 | 49,603 | 301,106 | 393,907 | 231,579 | 30,895 | 466,628 | 188,182 | 72,407 | 81,460 | 99,896 | 68,623 | 36,700 | 33,115 | 106,315 | 2,959,682 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,198 | 32,805 | 127,212 | 196,968 | 129,388 | 1,205,539 | 1,384,161 | 836,443 | 740,813 | 526,985 | 119,508 | -11,648 | 15,958 | -10,134 | -2,533 | -2,504 | 6,465 | 0 | 5,331,622 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,898 | 95,417 | -26 | -56 | -565 | 580,711 | 894,945 | 436,829 | 530,071 | 733,940 | 520,083 | 0 | 0 | -932 | 0 | 0 | 0 | 0 | 3,985,316 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58,134 | 3,507,300 | 1,031,350 | 2,803,690 | 4,049,975 | 4,359,693 | 2,717,245 | 3,517,232 | 65,830 | 1,258,772 | 1,718,835 | 1,822,375 | 1,220,563 | 24,819 | -1,214 | 28,154,599 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 282,946 | 1,414,932 | 118,272 | 87,040 | 30,822 | 0 | 0 | 411,648 | -10 | 41,344 | -92,160 | 92,083 | 0 | 0 | 0 | 2,386,918 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 165,519 | 439,168 | 421,731 | 241,107 | 171,898 | 190,870 | 59,226 | 81 | 800 | 510,494 | 317,059 | 224,462 | 261,590 | 42,056 | 0 | 3,046,062 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78,981 | 127,416 | 68,355 | 100,068 | 85,932 | 0 | 0 | 0 | 0 | 0 | -12 | 0 | 0 | 0 | 0 | 460,749 |
| **Total Reasonable Royalty ($)** | 0 | 0 | 0 | 732,226 | 532,456 | 567,093 | 1,063,160 | 422,905 | 558,734 | 605,647 | 697,971 | 2,464,340 | 8,453,777 | 13,458,969 | 16,647,693 | 12,670,825 | 7,707,892 | 7,862,278 | 10,245,395 | 3,776,016 | 4,505,055 | 4,234,244 | 4,237,204 | 4,508,696 | 1,449,975 | 667,092 | **108,069,641** |

Note: Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| | Reasonable Royalty 3/ | |
|---|---|---|
| | $1,957,240 | |
| | $539,394 | |
| | $1,340,523 | |
| | $4,077,884 | |
| | $2,044,683 | |
| | $14,815,746 | |
| | $2,959,682 | |
| | $702,838 | |
| | $290,148 | |
| | $3,327 | |
| | $2,386,918 | |
| | $3,046,062 | |
| | $460,749 | |
| | **$34,625,193** | |

| Reasonable Royalty 3/ |
|---|
| $1,957,240 |
| $539,394 |
| $1,340,523 |
| $4,077,884 |
| $2,044,683 |
| $14,815,746 |
| $2,959,682 |
| $702,838 |
| $290,148 |
| $3,327 |
| $2,386,918 |
| $3,046,062 |
| $460,749 |
| **$34,625,193** |

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-K

# Apple's Lost Profits Summary
See Damages Period Below 1/, 5/

| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **2010** | | | | | | | | | | **2011** | | | | | | | | | | **2012** | | | | |
| **Total Units Sold - Smartphones 2/** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 763,181 | 1,469,129 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,715,858 |
| Captivate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,205 | 14,296 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26,501 |
| Continuum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,151 | 6,064 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,215 |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40,292 | 35,697 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75,989 |
| Epic 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,782 | 16,368 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,150 |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,210 | 17,459 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,669 |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,243 | 1,915 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,158 |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,471 | 128,553 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 130,024 |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,223 | 20,946 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24,169 |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,999 | 3,115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,114 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 244,413 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 316,989 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 72,576 | 244,413 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 316,989 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 189,922 | 401,326 | 306,452 | 410,269 | 340,262 | 199,565 | 335,209 | 347,586 | 351,465 | 690,605 | 1,224,716 | 1,150,415 | 853,272 | 679,000 | 384,095 | 342,804 | 550,792 | 157,687 | 393,867 | 313,060 | 267,117 | 316,760 | 136,334 | 56,289 | 10,398,869 |

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 17.2-PT-K

## Apple's Lost Profits Summary
See Damages Period Below 1/, 5/

| | 2010 May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | 2011 June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | 2012 Apr | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units Sold - Tablets 2/** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 51,648 | 31,986 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 725,299 |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Total Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Beginning Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Add'l Excess Capacity 3/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Actual Units Eligible for LP** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,527 | 22,298 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,825 |
| **Ending Capacity** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple Increm. Margin/Unit ($) 4/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Apple's Lost Profits ($)** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Units Avail. for Other Remedies** | 0 | 0 | 0 | 0 | 0 | 220 | 236,465 | 25,414 | 33,372 | 17,799 | 25,815 | 31,121 | 9,688 | 49,120 | 55,169 | 32,434 | 4,327 | 65,354 | 26,356 | 10,141 | 11,409 | 13,991 | 9,611 | 5,140 | 4,638 | 14,890 | 682,474 |

**Apple's Total Lost Profits ($) 113,777,344**

Sources/Notes:
1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.
2/ Smartphones - Exhibit 37.1-PT, Tablets - Exhibit 38.1-PT.
3/ Smartphones - Exhibit 26-S, Tablets - Exhibit 27-S.
4/ Smartphones - Exhibit 32-S2, Tablets - Exhibit 33-S2.
5/ Design around period starting before actual notice.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

| | Reasonable Royalty 2/ |
|---|---|
| | $2,075,269 |
| | $578,343 |
| | $1,671,298 |
| | $4,179,254 |
| | $2,044,683 |
| | $14,920,600 |
| | $3,149,250 |
| | $720,882 |
| | $290,148 |
| | $4,713 |
| | $2,506,000 |
| | $3,046,062 |
| | $473,711 |
| | **$35,660,213** |

# Apple's Damages Per Samsung Product
# (Apple's Lost Profits and Reasonable Royalty)

### See Damages Period Below 1/

| Product | Lost Profits 2/, 4/ | Reasonable Royalty 3/ | Total |
|---|---|---|---|
| Captivate | $8,961,578 | $10,949,947 | $19,911,526 |
| Continuum | $2,777,984 | $3,289,443 | $6,067,427 |
| Droid Charge | $25,696,440 | $14,392,590 | $40,089,030 |
| Epic 4G | $7,152,084 | $16,252,285 | $23,404,369 |
| Exhibit 4G | $0 | $2,044,683 | $2,044,683 |
| Galaxy Prevail | $7,327,589 | $14,815,746 | $22,143,335 |
| Galaxy Tab | $6,584,344 | $2,959,682 | $9,544,026 |
| Gem | $1,406,069 | $5,331,622 | $6,737,691 |
| Indulge | $0 | $3,985,316 | $3,985,316 |
| Infuse 4G | $43,968,916 | $28,154,599 | $72,123,515 |
| Nexus S 4G | $8,172,989 | $2,386,918 | $10,559,907 |
| Replenish | $0 | $3,046,062 | $3,046,062 |
| Transform | $1,729,350 | $460,749 | $2,190,100 |
| **Total** | **$113,777,344** | **$108,069,641** | **$221,846,985** |

**Sources/Notes:**

1/ Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

2/ EXHIBIT 17.2-PT-K.

3/ EXHIBIT 19.1-PT-K.

4/ Design around period starting before actual notice.

EXHIBIT 19.1-PT-K

**Reasonable Royalty Summary - for Units not Eligible for Lost Profits**

In USD

| | 2010 | | | | | | | | 2011 | | | | | | | | | | | | 2012 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | |
| Captivate | 0 | 0 | 0 | 338,641 | 214,084 | 237,431 | 60,794 | 209,565 | 188,840 | 177,847 | 96,594 | 107,493 | 68,577 | 1,721,193 | 2,447,187 | 2,247,103 | 584,933 | 717,750 | 927,472 | 629,225 | -20,588 | -1,019 | -1,310 | -1,340 | 87 | -612 | **10,949,947** |
| Continuum | 0 | 0 | 0 | 0 | 0 | 4,826 | 210,890 | 134,875 | 465 | -42 | 14,431 | 33,997 | 62,792 | 516,014 | 1,493,827 | 524,364 | 295,976 | -1,485 | -2,766 | 1,805 | -262 | -87 | 0 | -175 | 0 | 0 | **3,289,443** |
| Droid Charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 636,618 | 369,628 | 2,367,361 | 2,959,826 | 1,663,032 | 216,859 | 887,210 | 989,224 | 984,740 | 297,480 | 365,179 | 1,131,036 | 730,420 | 585,993 | 207,984 | **14,392,590** |
| Epic 4G | 0 | 0 | 0 | 393,585 | 318,372 | 324,392 | 313,817 | 27,129 | 265,820 | 164,186 | 312,171 | 419,818 | 1,105,674 | 3,065,964 | 2,090,740 | 58,855 | 0 | 1,137,856 | 1,909,505 | 1,178,867 | 1,068,725 | 659,545 | 256,002 | 1,181,296 | 0 | -31 | **16,252,285** |
| Exhibit 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 721,998 | 192,680 | 436,454 | 315,738 | 107,935 | 127,613 | -236 | -114 | -100 | 99,903 | 7 | 42,869 | -64 | **2,044,683** |
| Galaxy Prevail | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 369,574 | 1,179,346 | 1,920,652 | 1,872,751 | 1,439,424 | 535,286 | 712,858 | 1,323,756 | 334,152 | 1,251,785 | 1,177,243 | 547,495 | 1,082,138 | 714,571 | 354,715 | **14,815,746** |
| Galaxy Tab | 0 | 0 | 0 | 0 | 0 | 444 | 477,659 | 51,336 | 67,411 | 35,954 | 52,146 | 114,318 | 49,603 | 301,106 | 393,907 | 231,579 | 30,895 | 466,628 | 188,182 | 72,407 | 81,460 | 99,896 | 68,623 | 36,700 | 33,115 | 106,315 | **2,959,682** |
| Gem | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,198 | 32,805 | 127,212 | 196,968 | 129,388 | 1,205,539 | 1,384,161 | 836,443 | 740,813 | 526,985 | 119,508 | -11,648 | 15,958 | -10,134 | -2,533 | -2,504 | 6,465 | 0 | **5,331,622** |
| Indulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,898 | 95,417 | -26 | -56 | -565 | 580,711 | 894,945 | 436,829 | 530,071 | 733,940 | 520,083 | 0 | 0 | -932 | 0 | 0 | 0 | 0 | **3,985,316** |
| Infuse 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58,134 | 3,507,300 | 1,031,350 | 2,803,690 | 4,049,975 | 4,359,693 | 2,717,245 | 3,517,232 | 65,830 | 1,258,772 | 1,718,835 | 1,822,375 | 1,220,563 | 24,819 | -1,214 | | **28,154,599** |
| Nexus S 4G | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 282,946 | 1,414,932 | 118,272 | 87,040 | 30,822 | 0 | 0 | 411,648 | -10 | 41,344 | -92,160 | 92,083 | 0 | 0 | 0 | **2,386,918** |
| Replenish | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 165,519 | 439,168 | 421,731 | 241,107 | 171,898 | 190,870 | 59,226 | 81 | 800 | 510,494 | 317,059 | 224,462 | 261,590 | 42,056 | 0 | **3,046,062** |
| Transform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78,981 | 127,416 | 68,355 | 85,932 | 0 | 0 | 0 | 0 | 0 | -12 | 0 | 0 | 0 | 0 | 0 | **460,749** |
| **Total Reasonable Royalty ($)** | 0 | 0 | 0 | 732,226 | 532,456 | 567,093 | 1,063,160 | 422,905 | 558,734 | 605,647 | 697,971 | 2,464,340 | 8,453,777 | 13,458,969 | 16,647,693 | 12,670,825 | 7,707,892 | 7,862,278 | 10,245,395 | 3,776,016 | 4,505,055 | 4,234,244 | 4,237,204 | 4,508,696 | 1,449,975 | 667,092 | **108,069,641** |

Note: Damages calculated from August 4, 2010 for the '381 patent; April 15, 2011 for '915 patent and 'D677 design patent; and June 16, 2011 for the '163 patent and 'D305 design patent.

Prepared by Invotex Group

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only