UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation, | Case No.: 11-CV-01846-LHK |
| Plaintiff, | |
| v. | ORDER CONDITIONALLY GRANTING APPLE'S MOTION TO EXCLUDE HTC SETTLEMENT AGREEMENT AND TO STRIKE EXPERT OPINION REGARDING SAME |
| SAMSUNG ELECTRONICS CO., LTD., A Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| | [REDACTED] |
| Defendants. | |

On November 11, 2012, Plaintiff, Apple, Inc. ("Apple"), entered into a patent license and settlement agreement with non-parties HTC America, Inc.; HTC Corporation; and S3 Graphics Co., Ltd. (collectively, "HTC"). Through that agreement (the "HTC Agreement"), Apple and HTC settled certain worldwide patent litigation, and each granted the other a license to certain patents in their patent portfolios. Apple has moved to exclude the HTC Agreement from the upcoming partial retrial on damages, *see* ECF No. 2415 at 5, and to strike related portions of Defendants' expert report on damages, *see* ECF No. 2381 at 4:13-15, 19-21, 6:3-5. Defendants, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC's (collectively, "Samsung"), seek to introduce the HTC Agreement to establish a maximum

1

Case No.: 11-CV-01846-LHK
ORDER RE: HTC SETTLEMENT AGREEMENT & LICENSE

reasonable royalty for the utility patents at issue in the new trial.[1] *See* ECF No. 2573. In light of the nature of the HTC Agreement, the parties' experts' opinions regarding it, and the unique procedural posture of this case, the Court concludes that the probative value of the HTC Agreement is substantially outweighed by the dangers of introducing it at trial, including confusion of the issues and wasting time. *See* Fed. R. Evid. R. 403. Accordingly, the Court GRANTS Apple's motions, PROVIDED that Apple does not elicit testimony or argue at trial that it has not or will not license the '381, '915, or '163 patents.

I.   BACKGROUND

   A.   Procedural Background

Last year, a jury in this case awarded over $1 billion to Apple for Samsung's infringement of Apple's intellectual property rights. *See* ECF No. 1931 (amended jury verdict). On March 1, 2013, this Court issued an Order granting a partial retrial limited to the issue of damages for certain products and patents. ("March 1 Order") ECF No. 2271 at 26. The purpose of the retrial, which is set to begin in less than a week, is to determine damages for this narrower subset of products and patents based on corrected assumptions about the dates on which Samsung first had notice that its products infringed Apple's intellectual property and thus became liable for infringement damages under 35 U.S.C. § 287(a). *See also* March 1 Order at 15-26 (concluding that the 2012 jury's damages award was based, in part, on incorrect notice dates and analyzing which portions of the award had to be vacated as a result).

The Court has ruled that the evidence to be presented at the upcoming retrial should hew as closely as possible to that presented at the original trial—with the exception of the corrected notice dates—and has thus generally barred the parties from conducting supplemental discovery or attempting to present exhibits or witnesses that were not timely disclosed and admissible at the previous trial. *See*, *e.g.*, ECF No. 2369 at 2; ECF No. 2316 at 2-3. But because Apple's damages

---

[1] The utility patents at issue in the upcoming trial are U.S. Patent Nos. 7,469,381 (the "'381 Patent"); 7,844,915 (the "'915 Patent"); and 7,864,163 (the "'163 Patent"). Two design patents will also be at issue: U.S. Patent Nos. D604,305 (the "D'305 Patent") and D618,677 (the "D'677 Patent").

expert, Terry Musika ("Musika"), passed away in December 2012, the Court has permitted Apple to substitute a new damages expert, Julie Davis ("Davis"), for Musika. ECF No. 2316 at 3. The Court has also permitted Samsung's damages expert, Michael Wagner ("Wagner"), to serve an Updated Report rebutting Davis's conclusions. *Id.* In allowing the parties to serve new expert reports, the Court made clear that it was not granting either side an opportunity to expand the scope of the retrial. As "[t]he sole purpose of the [re]trial is to correct the erroneous notice dates," the Court prohibited the parties from relying on "(1) new sales data . . . (2) new products; and (3) new methodologies or theories." *Id.*

### B. The HTC Agreement

Apple and HTC entered into a patent license and settlement agreement on November 11, 2012, thereby ending 50 worldwide patent infringement litigations as well as other patent proceedings between the parties. *See* ECF No. 2182-5 (redacted version of HTC Agreement). That agreement includes a cross-license of some of the parties' patents, through which Apple received a "fully paid up, royalty-free" license to the covered HTC patents. *See* Article 2.1.

The scope of the Apple patents and HTC products covered by the HTC Agreement is not entirely clear. This much appears undisputed: the agreement settled litigations between Apple and HTC that involved 32 of Apple's U.S. patents, including the '381 and '915 patents, *see* Updated Rebuttal Expert Report of Michael J. Wagner for New Trial on Damages, August 26, 2013, ¶ 353 ("Wagner Updated Rebuttal Report"), and the agreement explicitly does *not* cover Apple's design patents, *see* Article 5.1. But the parties' experts do not necessarily agree on whether the agreement also exempts the '381, '915, or '163 patents, as applied to HTC's smartphones. *Compare* Wagner Updated Rebuttal Report ¶ 344 ("[T]he [HTC Agreement] explicitly provided a license to [the '381

3

and '915] patents, in addition to an implicit license to the '163 Patent.") *with* Videotaped Deposition of Julie Davis, August 26, 2013, at 227 (ECF No. 2573-5) ("I don't know if [those patents] are [included] or are not.").

The reason for the lack of clarity appears to be due to the agreement's "anti-cloning" provision. In overly simplistic terms, but sufficient for current purposes, the anti-cloning provision exempts from HTC's license any product for which HTC copied the patented design and related functionality of an Apple product, regardless of whether HTC intended to copy that product. *See* HTC Agreement, Articles 5.1 & 12, Exhibit A. Although the anti-cloning provision expressly does not exempt pure functionality, such as "pinch to zoom," from HTC's license, *id.*, Exhibit A, Apple does not concede that the HTC Agreement gives HTC a license to the utility patents at issue in the retrial, *see*, *e.g.*, 10/27/2013 Hearing Tr. at 134 ("How you would apply that license to this IP is very complicated. It carves out portions of the IP that have been found to be infringed here.").

### C.     The Parties' Positions

In their reports for the retrial, both parties' experts addressed the HTC Agreement to varying degrees. Davis acknowledged the agreement in a footnote, but stated that she did not include it in her analysis because this Court prohibited the parties from introducing new data and theories in the retrial. *See* Expert Report of Julie Davis ¶ 185, n.274. In the same footnote, Davis briefly addressed the agreement on the merits, stating,

> had I included this agreement in this analysis, my opinion would be unchanged because I do not consider the license to be comparable to the hypothetical negotiation here in light of the fact that ... it was a settlement of ongoing litigation involving multiple patents, includes a cross license of a broad portfolio of rights, and has a number of unique provisions arising from that settlement.

Wagner analyzed the HTC Agreement in more detail, concluding that it shows that Davis's suggested royalty rate is too high. Nevertheless, Wagner concludes that the agreement is "not probative" to his primary conclusion. Wagner Updated Rebuttal Report ¶437. In particular, Wagner's report includes the following summary:

> I conclude that the [HTC Agreement] ███████████████████████████████████████████████████████████████ However, given the availability to Samsung of acceptable, noninfringing alternatives, I conclude that this license is not probative of a reasonable royalty for the patents at issue in the New Trial.

*Id.*

Apple moved to strike Wagner's opinions related to the HTC Agreement on August 30, 2013, *see* ECF 2381, and, shortly thereafter, timely moved to exclude the HTC Agreement from Samsung's exhibit list, *see* ECF 2415. In both motions, Apple argued the HTC Agreement should stay out of the retrial because of the Court's prohibition of new opinions, sources, and data. Samsung originally opposed Apple's motions only on the basis that, by including the HTC Agreement in her report, Davis opened the door to Samsung's reliance on it. *See* ECF No. 2399 (opposition to motion to strike); ECF No. 2440 (opposition to motion to exclude). At the Pretrial Conference, however, Samsung told the Court that Samsung expects to rely on the HTC Agreement directly. 10/17/2013 Hr'g Tr. at 128. Apple maintained that neither side should be allowed to rely on the agreement. *Id.* at 128-29. The Court tentatively granted Apple's motions, but allowed Samsung to file a proffer and Apple to file a response. *See* ECF No. 2552 at 3. After considering those submissions, *see* ECF Nos. 2573 & 2583; the parties' other submissions and arguments on this issue; and the record in this case, the Court now confirms its tentative ruling granting Apple's motions.

## II.  STANDARD OF REVIEW

This Court has already addressed other issues raised by the parties' motions to strike and motions to exclude in light of the unique procedural posture of this case. *See Apple, Inc. v. Samsung Electronics Co.*, No. 11-1846, 2013 WL 5737310 (N.D. Cal. Oct. 22, 2013). As stated in that Order and as noted above, this Court's March 1 Order granted a limited retrial to correct the notice dates for damages for certain products and certain patents. To create a consistent record for appellate review of the 2012 trial and the upcoming limited retrial, the Court has attempted to ensure that the issues and evidence in both the 2012 trial and upcoming limited retrial are substantially the same. In order to do so, the discovery deadlines for the upcoming limited retrial have been set, to the fullest extent possible, as of the beginning of the first trial. This evidentiary cut-off was also set in the interest of fairness to the parties and in light of the need to make efficient use of the Court's limited resources.

While the Court acknowledges that imposing this cut-off inevitably results in the exclusion of some amount of relevant, probative evidence, the Court has found that fairness, efficiency, and the need for a coherent record on appeal outweigh any harm caused by this exclusion for the majority of categories of new trial and post-trial evidence the parties have sought to introduce. The Court has broad discretion to manage the conduct of a trial and the evidence presented by the parties—both under the Federal Rules of Evidence and as part of the Court's inherent authority to control its docket—and the Court has previously found that the exercise of this discretion to exclude the parties' experts' reliance on certain evidence is necessary for the efficient management of this trial and is in the interests of justice. *See id.* at *2 (citing Fed. R. Evid. 403 and related cases). The Court has applied the same balancing test here.

### III.  DISCUSSION

#### A.  The Relevance of the HTC Agreement Is Substantially Outweighed by the Risk of Undue Prejudice, Waste of Time, and Confusion of the Issues

The Patent Act requires that damages for patent infringement "in no event [be] less than a reasonable royalty for the use of the invention by the infringer." 35 U.S.C. § 284. "In litigation, a reasonable royalty is often determined on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011). The hypothetical negotiation tries "to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement" assuming "that the asserted patent claims are valid and infringed." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

A number of other considerations, often called the "*Georgia-Pacific* factors," also frame the reasonable royalty inquiry. *Id.* at 1317 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Several *Georgia-Pacific* factors implicate the patentee's past or existing licenses, including factor one ("[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty") and factor four ("[t]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to

6

Case 5:11-cv-01846-LHK   Document 2667   Filed 11/07/13   Page 7 of 11

preserve that monopoly"). *Georgia-Pacific*, 318 F. Supp. at 1120. But in allowing a jury to consider actual licenses in reconstructing a hypothetical negotiation or evaluating any of the other *Georgia-Pacific* factors, a court must ensure there is "a basis in fact to associate the royalty rates used [in the licenses] . . . to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317. The Federal Circuit has repeatedly warned that licenses do not help a jury if they offer "'little more than a recitation of royalty numbers.'" *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (quoting *Lucent*, 580 F.3d at 1329).

With guidance from this authority, the Court concludes that the HTC Agreement is insufficiently related to the parties' hypothetical negotiation to give it a role in the retrial. As an initial matter, the HTC Agreement does not fully or clearly quantify the benefit Apple received. It includes a broad cross license through which Apple receives not only royalty payments, but also a fully paid-up license to practice certain HTC patents. Neither the HTC Agreement itself nor the parties' experts attempt to place a dollar amount on the value of the license to Apple. Even for the quantified benefit Apple received for the license to HTC, the agreement does not specify how much of that benefit, if any, is due to the utility patents-in-suit. To the contrary, Wagner estimates that the royalty rate covers 32 Apple patents, including the '381 and '915 patents, and only "indirectly" covers the '163 patent. Furthermore, because of the complicated anti-cloning provision—a provision that Wagner acknowledged in his deposition would not be part of the hypothetical negotiation, *see* ECF No. 2573-4 at 912—the HTC Agreement fails to exemplify clearly the type of license Samsung arguably needed for its products at the time of the hypothetical negotiation. *See* ECF No. 2552 at 2 (denying without prejudice Samsung's motion to exclude evidence of copying). Moreover, the agreement's effective date is over two years after the date of the hypothetical negotiation, a significant lapse given the "changing technological and financial landscape in the market" for smartphones. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 78 (Fed. Cir. 2012).

Even the parties' experts discount the HTC Agreement's relevance. Davis concluded that, if she had included it in her analysis, the agreement would not change her opinion. More

7

Case No.: 11-CV-01846-LHK
ORDER RE: HTC SETTLEMENT AGREEMENT & LICENSE

importantly, Samsung's expert concluded that the agreement was "not probative" to his primary analysis, which he based on the cost to Samsung of implementing an acceptable noninfringing alternative rather than the amount Apple sought through other licenses. Nor did Wagner find the HTC Agreement helpful in a more abstract sense. Instead, Wagner concluded that the existence of this single license to the utility patents-in-suit did not provide a sufficient basis to disagree with Davis that "Apple values the profits it has an opportunity to earn by selling its products, more than it valued the royalty it could earn by licensing to a competitor." Wagner Updated Rebuttal Report ¶ 442.

In the further briefing on this issue, Samsung contends that the HTC Agreement is important because the competitive relationship between Apple and HTC is more similar to that of Samsung and Apple than the relationship between Apple and IBM or Nokia, two parties to licenses that were in the original trial record. The Court is not persuaded that the general relationship between HTC and Apple outweighs the more concrete problems with the HTC Agreement outlined above, especially where Samsung's primary argument that "[t]he HTC Agreement is highly probative evidence," Proffer at 3, conflicts with its own expert's conclusion that the agreement is "not probative" to his primary analysis.

Even if highlighting Apple's relationship with HTC had some abstract value, the probative value of that relationship and the HTC Agreement is substantially outweighed by the danger of confusing the issues, wasting time, and misleading the jury. Introduction of the HTC Agreement may necessitate a discussion, among many other things, of the 50 worldwide patent infringement litigations and other patent proceedings between HTC and Apple that were resolved by the HTC Agreement and the 30 Apple U.S. patents covered by the HTC Agreement that are not at issue in the retrial in the instant case. Although Samsung disputes that Apple would need to present anything more to the jury than the short analysis Davis already compiled, the Court could not in fairness restrict Apple from revising and developing Davis's opinions on this subject, where Apple and Davis previously rightly recognized that the Court's prohibition against new evidence very likely would keep the HTC Agreement out of the case. *See Datatreasury Corp. v. Wells Fargo &*

*Co.*, No. 06-cv-72 DF, 2010 WL 903259, *2 (E.D. Tex. Mar. 4, 2010) (granting plaintiff's request to admit litigation-related licenses but also granting defendants discovery into the negotiations surrounding those licenses). The Court must be mindful of the importance of uniformly applying, where possible, the Court's rule against introducing new evidence and argument in the retrial. The parties have been operating under this ground rule throughout their pretrial preparation, and the Court will not penalize Apple for doing so.

In addition to these Rule 403 balancing considerations, the Court recognizes the general debate over the relevance of settlement agreements to the hypothetical negotiation. *Compare LaserDynamics,* 694 F.3d at 77 ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable.") *with In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."). In *LaserDynamics*, the Federal Circuit reversed a district court's decision to admit a settlement agreement at trial, concluding that the settlement "ostensibly reflects not the value of the claimed invention but the strong desire to avoid further litigation under the circumstances." 694 F.3d at 78. In contrast, *MSTG* speaks favorably of settlement agreements, but only in dicta. That case required the court to decide not whether a settlement agreement was admissible, but whether documents related to the patentee's negotiation of a prior settlement agreement should be discoverable. *See* 675 F.3d at 1348. The court's reference to the pertinence of settlement agreements was therefore made in the broader context of discovery. *See* 675 F.3d at 1346 n.4 ("[W]e have not yet decided the extent to which evidence of settlement negotiations would be admissible under [Federal Rules of Evidence] Rule 408.").

Another recent case, *ResQNet.com, Inc. v. Lansa, Inc.*, did address a settlement agreement in the context of admissibility and called it the "most reliable license in this record." 594 F.3d 860, 872 (Fed. Cir. 2010) (per curiam). But even that case acknowledged that "litigation can skew the results of the hypothetical negotiation." 594 F.3d at 872. Moreover, *LaserDynamics* clarified that *ResQNet* set out a "limited scope of circumstances under which" a settlement agreement is "admissible and probative." 694 F.3d at 78.

This Court need not wade into this debate because Samsung's expert concluded that the HTC Agreement was "not probative" to his primary conclusion and Apple's expert did not consider the HTC Agreement to be comparable to a hypothetical negotiation. With such limited probative value, as acknowledged by both sides' experts, the Court finds that the HTC Agreement is certainly not the most reliable evidence of a hypothetical negotiation as was the case in *ResQNet*. Moreover, in addition to the Rule 403 concerns discussed above, in this particular case, the Court questions whether the benefit to Apple and to HTC of eliminating the risks and costs of 50 worldwide patent infringement litigations and other patent proceedings between HTC and Apple could even be quantified in the HTC Agreement and thus could further obscure the true value of the rights Apple granted to HTC. Moreover, there are far too many aspects of the HTC Agreement that are wholly unrelated to and vastly different from the hypothetical negotiation between Apple and Samsung, set more than three years ago, that forms the basis of a proper reasonable royalty analysis. Like *LaserDynamics*, the Court concludes that "[t]he probative value of the [HTC Agreement] is dubious in that it has very little relation to the demonstrated economic demand for the patented technology, and its probative value is greatly outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury." 694 F.3d at 78.

### B. Testimony or Argument Related to Apple's Licensing Practice

Samsung does raise one legitimate concern. Samsung notes that the "HTC Agreement is compelling evidence that Apple is willing to license its utility patents, a fact contradicted by testimony of Apple witnesses at the first trial." Proffer at 2. In particular, Samsung points to the testimony of Apple's then-Director of Patents and Licensing Strategy at Apple that all the patents-in-suit (including the utility patents) are "in Apple's unique user experience and not ones that we would license," Trial Tr. at 2009-10, and Musika's testimony that "there has not been a license of intellectual property, utility or design, and Apple doesn't want to license it," *id.* at 2090. The HTC Agreement calls this testimony sharply into question, and the Court concludes it would be unjust to allow Apple to suggest to the jury that it has never or would never license its utility patents when in fact it appears to have included at least two of the utility patents-in-suit in the HTC Agreement.

Accordingly, Samsung will be allowed to introduce the HTC Agreement and Wagner's analysis of it solely to rebut any testimony or argument by Apple that Apple has never or would never license the utility patents-in-suit.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Apple's motion to strike Wagner's opinions related to the HTC Agreement and Apple's motion to exclude the HTC Agreement itself. No party may rely on the HTC Agreement in the retrial unless Apple elicits testimony or makes arguments that it has not or would not license the '381, '915, or '163 patents.

**IT IS SO ORDERED.**

Dated: November 7, 2013

*Lucy H. Koh*
LUCY H. KOH
United States District Judge