1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      SAN JOSE DIVISION

4

5

|   |   |
|---|---|
| APPLE INC., A CALIFORNIA CORPORATION, | ) C-11-01846 LHK |
|  | ) |
|  | ) SAN JOSE, CALIFORNIA |
| PLAINTIFF, | ) |
|  | ) NOVEMBER 13, 2013 |
| VS. | ) |
|  | ) VOLUME 2 |
| SAMSUNG ELECTRONICS CO., LTD., A KOREAN BUSINESS ENTITY; | ) |
|  | ) PAGES 309-558 |
| SAMSUNG ELECTRONICS AMERICA, INC., A NEW YORK CORPORATION; | ) |
| SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, A DELAWARE LIMITED LIABILITY COMPANY, | ) |
|  | ) |
| DEFENDANTS. | ) |
| _____ | ) |

16      TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE LUCY H. KOH
17      UNITED STATES DISTRICT JUDGE

18

19

20      APPEARANCES ON NEXT PAGE

21

22      OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                    CERTIFICATE NUMBER 9595
23

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
        TRANSCRIPT PRODUCED WITH COMPUTER

1

2     A P P E A R A N C E S:

3     FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:   HAROLD J. MCELHINNY
4                                  RACHEL KREVANS
                                   NATHANIEL B. SABRI
5                            425 MARKET STREET
                             SAN FRANCISCO, CALIFORNIA  94105
6

7                            WILMER, CUTLER, PICKERING,
                             HALE AND DORR
8                            BY:   WILLIAM F. LEE
                                   LAUREN B. FLETCHER
9                            60 STATE STREET
                             BOSTON, MASSACHUSETTS  02109
10

                             BY:   MARK D. SELWYN
11                           950 PAGE MILL ROAD
                             PALO ALTO, CALIFORNIA  94304
12

13    FOR DEFENDANT          QUINN, EMANUEL, URQUHART,
      SAMSUNG:               OLIVER & HEDGES
14                           BY:   WILLIAM C. PRICE
                                   JON C. CEDERBERG
15                           865 SOUTH FIGUEROA STREET
                             10TH FLOOR
16                           LOS ANGELES, CALIFORNIA  90017

17                           BY:   VICTORIA F. MAROULIS
                                   KEVIN B. JOHNSON
18                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
19                           REDWOOD SHORES, CALIFORNIA  94065

20

21

22

23

24

25

1                    INDEX OF PROCEEDINGS

2     OPENING STATEMENT BY MR. MCELHINNY       P. 334

3     OPENING STATEMENT BY MR. PRICE           P. 364

4

5

6                    INDEX OF WITNESSES

7     PLAINTIFF'S

8     **RAVIN BALAKRISHNAN**
              DIRECT EXAM BY MR. MCELHINNY       P. 404
9             CROSS-EXAM BY MR. JOHNSON          P. 423
              REDIRECT EXAM BY MR. MCELHINNY     P. 436
10

11    **KARAN SINGH**
              DIRECT EXAM BY MS. KREVANS         P. 438
12            CROSS-EXAM BY MR. JOHNSON          P. 453
              REDIRECT EXAM BY MS. KREVANS       P. 482
13            RECROSS-EXAM BY MR. JOHNSON        P. 486

14    **TONY BLEVINS**
              DIRECT EXAM BY MR. LEE             P. 488
15            CROSS-EXAM BY MR. CEDERBERG        P. 500
              REDIRECT EXAM BY MR. LEE           P. 508
16            RECROSS-EXAM BY MR. CEDERBERG      P. 509

17    **JOHN HAUSER**
              DIRECT EXAM BY MS. KREVANS         P. 511
18            CROSS-EXAM BY MR. PRICE            P. 530

19

20

21

22

23

24

25

312

1

2                          INDEX OF EXHIBITS

3                                  MARKED        ADMITTED

4        PLAINTIFF'S

5        46                                      413
         57                                      420
6        38                                      449
         44                                      451
7        182                                     508
         30                                      529
8

9

10
         JOINT
11
         1000, 1001, 1002, 1003, 1004,           403
12            1005, 1011, 1012, 1014,
              1016, 1019, 1020, 1022,
13            1023, 1024, 1025, 1026,
              1027, 1028, AND 1036
14       1045                                    407
         1044                                    441
15       1046                                    445
         1009                                    470
16       1030                                    481

17

18

19

20

21

22

23

24

25

```
 1     SAN JOSE, CALIFORNIA                    NOVEMBER 13, 2012

 2                      P R O C E E D I N G S

 3        (JURY OUT AT 9:02 A.M.)

 4           THE COURT:  I HAVE ONE ISSUE THAT I HAVE TO PLACE ON

 5     THE RECORD, BUT ARE THERE OTHERS THAT YOU HAVE AS WELL?

 6           MR. PRICE:  YES, YOUR HONOR.  IF I MAY?

 7        THIS IS IMPORTANT FOR THE OPENING.  YOU RULED LAST NIGHT,

 8     YOUR HONOR, ON SOME DOCUMENTS CONCERNING MS. DAVIS, AND I WANT

 9     TO SHOW YOU THE DOCUMENT, AND I DON'T PLAN TO USE THE DOCUMENT

10     IN OPENING, BUT I WOULD LIKE TO EXPLAIN TO THE COURT WHY THE

11     ISSUE MATTERS AND IS CRITICAL TO THE DAMAGES, PARTICULARLY THE

12     LOST PROFITS CALCULATION, AND THAT'S EXHIBIT 8008.027 SDX.

13     THAT'S ACTUALLY A DEMONSTRATIVE.  IF WE CAN PULL THAT UP?  I

14     THOUGHT IT WAS READY TO GO.

15        BUT LET ME EXPLAIN WHAT IT IS, YOUR HONOR.  IT'S THAT

16     CHART -- HERE WE GO.  IT'S THE CHART WHICH TALKS ABOUT USING

17     THE BOUNCE BACK EFFECT IN THE BROWSER.  THAT'S THE INTERNET

18     PART OF THE PHONE.

19        AND THE REASON THAT'S IMPORTANT, YOUR HONOR, IS THEY'RE

20     SEEKING LOST PROFITS SAYING THAT CONSUMERS BOUGHT THESE PHONES,

21     THESE SPECIFIC PHONES BECAUSE OF THE '381 FEATURE, AND WE'RE

22     NOT GOING TO DENY, IN FACT, WE'RE GOING TO SHOW, THAT, YES,

23     THAT FEATURE EXISTS IN THE PHONE.  IT DOES INFRINGE.

24        BUT THE PHONE DOESN'T PROVIDE THE SAME EXPERIENCE AS THE

25     IPHONE BECAUSE YOU DON'T HAVE BOUNCE BACK IN THE BROWSER, AND
```

```
1    IF YOU RECALL THE EVIDENCE AS TO THE IMPORTANCE OF BOUNCE BACK,

2    ONE OF THE THINGS IS BOUNCE BACK IS IMPORTANT BECAUSE IT TELLS

3    YOU YOU'RE AT THE END OF THE DOCUMENT, AND YOU IF RECALL THE

4    DEMONSTRATIONS THAT WERE USED BY MR. HAUSER WERE ALL OF THE

5    BROWSER WHEN HE DID HIS CALCULATIONS, BECAUSE YOU MIGHT THINK

6    YOU'RE AT THE END OF THE DOCUMENT.

7         WITH CONTACTS, IF YOU'RE ZEBROWSKI, THEN YOU KIND OF KNOW

8    YOU'RE AT THE END OF THE DOCUMENT.

9         AND WITH THE GALLERY, IF YOU RECALL FOR BOUNCE BACK, IF

10   YOU RECALL, YOU NEED TO BLOW IT UP FIRST BEFORE IT BOUNCES

11   BACK.

12        SO THIS IS NOT A NON-INFRINGING ALTERNATIVE AT ALL.  WHAT

13   WE'RE SAYING IS APPLE IS SAYING THAT PEOPLE BOUGHT THESE PHONES

14   BECAUSE OF THE '381 PATENT BEING IN IT.

15        BUT ON, ON MOST OF THESE PHONES, IT'S NOT USED IN THE MOST

16   IMPORTANT PLACE WHERE A CONSUMER WOULD WANT TO FIND IT, WHICH

17   IS THE BROWSER.

18        IN ADDITION, YOUR HONOR, YOU REMEMBER ALL OF THOSE --

19   THOSE HIGHLIGHTED COPYING DOCUMENTS WHERE IT HAS THE INTERNAL

20   SAMSUNG DOCUMENT SAYING "THIS IS A GREAT FEATURE, WE SHOULD PUT

21   IT IN --"

22            THE COURT:  OKAY.  I'M SORRY.  I'M GOING TO INTERRUPT

23   YOU, MR. PRICE BECAUSE I HAVE RULED ON THESE OBJECTIONS

24   MULTIPLE DAYS NOW.  IT'S THE SAME ISSUE.  I'M NOT GOING TO HAVE

25   A RETRIAL TO SAY "LET'S LOOK AT GALLERY AND CONTACTS, THAT
```

```
 1      INFRINGES.  BUT LET'S GO TO BROWSER, IT DOESN'T INFRINGE."

 2      THESE PRODUCTS WERE FOUND TO INFRINGE THE '381.

 3              MR. PRICE:  YES.

 4              THE COURT:  I DON'T WANT TO RELITIGATE THAT AND I'VE

 5      ALREADY RULED MULTIPLE TIMES.  SO IF THIS IS A THIRD MOTION FOR

 6      RECONSIDERATION, IT'S DENIED.  ALL RIGHT?

 7              MR. PRICE:  YEAH.

 8              THE COURT:  PLEASE.  PLEASE.  I'VE LAID OUT THE

 9      REASONS.  YOU KNOW, MOST ORDERS, YOU DON'T GET THIS KIND OF

10      REASONING IN AN EVIDENTIARY RULING.  WE'VE LAID IT ALL OUT

11      THERE.  PLEASE.  I'VE MADE THE 403 BALANCING ANALYSIS.  IT'S

12      EXCLUDED.  THE OBJECTION IS SUSTAINED.

13              MR. PRICE:  VERY WELL, YOUR HONOR.

14              THE COURT:  OKAY.  THANK YOU.

15              MS. MAROULIS:  CAN I HAVE JUST TWO LOGISTICAL ISSUES?

16         THERE WILL BE SOME DESIGNATION DEPOSITIONS PLAYED TODAY.

17      WE ASSUME IT'LL BE THE SAME WAY WHERE APPLE PLAYS ITS

18      DESIGNATION AND SAMSUNG PLAYS ITS COUNTER AND AT THE END OF THE

19      DAY WE'LL SUBMIT CLIP REPORTS INTO THE RECORD.  CORRECT, YOUR

20      HONOR?

21              THE COURT:  THAT'S FINE.  YOU CAN DO IT LIKE LAST

22      TIME.  LAST TIME I THINK YOU GAVE ME THE SPLIT OF TIME.

23              MR. MCELHINNY:  WE DID, YOUR HONOR.

24              THE COURT:  CAN YOU DO THAT THIS TIME AS WELL?

25              MR. MCELHINNY:  THE CLIP REPORTS INCLUDE THE SPLIT OF
```

```
 1        TIME.

 2              MS. MAROULIS:  THE CLIP REPORTS HAVE THE TIME ON

 3        THEM.  SAMSUNG IS UNDER A MINUTE.

 4              THE COURT:  OKAY.  THAT'S FINE, THANK YOU.

 5              MS. MAROULIS:  SECONDLY, THE PARTIES FILED YESTERDAY

 6        DOCKET NUMBER 2724, COMPETING JURY INSTRUCTIONS FOR LIMITING

 7        INSTRUCTIONS ON EXHIBITS 1500A AND 29A, WE JUST WANT TO LET YOU

 8        KNOW WE THINK THE FIRST WITNESS TO ADDRESS THAT WILL BE

 9        TOMORROW, PROBABLY JULIE DAVIS, SO IF WE CAN GET A RULING FROM

10        THE COURT BEFORE THEN, WE WOULD GREATLY APPRECIATE IT.

11           THE PARTIES SUBMITTED THE INSTRUCTIONS WITHOUT THE

12        ARGUMENT.  WE'RE PREPARED TO ARGUE IT NOW OR LATER IF NEEDED.

13        BUT I JUST WANTED TO FLAG THAT.

14              THE COURT:  YOUR COMPETING PRELIMINARIES ARE 2724-1

15        AND 2724-2; CORRECT?

16              MS. MAROULIS:  YEAH.  IT'S EXHIBITS A AND B --

17              THE COURT:  A AND B.

18              MS. MAROULIS:  -- TO 27.

19              THE COURT:  OKAY.  I'M INCLINED TO DENY BOTH OF

20        THOSE, BUT I WILL GIVE YOU A RULING LATER TODAY, AND YOU'LL

21        DEFINITELY GET THE RULING TODAY VERSUS, YOU KNOW, TOO LATE

22        TOMORROW.

23              MR. MCELHINNY:  WELL, THE ONLY THING I WOULD LIKE TO

24        ADD IS WE DON'T KNOW HOW LONG THE CROSSES WILL GO.  THERE IS

25        SOME CHANCE THAT JULIE DAVIS WILL START TODAY.  THERE JUST IS A
```

1     CHANCE.  I DON'T KNOW WHETHER WE'LL GET TO THIS PARTICULAR

2     EXHIBIT.

3              THE COURT:  OKAY.  I'LL GIVE YOU A RULING BY LUNCH.

4              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

5              THE COURT:  THE RULING IS GOING TO BE DENIED.  I

6     DON'T FIND EITHER ONE -- WELL, I'LL TELL YOU MORE LATER, BUT

7     I'M INCLINED AT THIS POINT TO DENY BOTH PROPOSED LIMITING

8     INSTRUCTIONS AND WE CAN HANDLE THE FINAL INSTRUCTIONS LATER.

9         I JUST DON'T THINK WE NEED TO GIVE THIS KIND OF INTERIM,

10    EFFECTIVELY FINAL JURY INSTRUCTION.  I THINK SOME OF THESE

11    INSTRUCTIONS, ADDITIONAL INSTRUCTIONS THAT YOU'VE PROPOSED

12    MISSTATE THE LAW, ARE CONFUSING, ARE NOT PARTICULARLY HELPFUL

13    TO THE JURY.

14        BUT WE CAN TALK ABOUT THAT LATER.

15             MS. MAROULIS:  YOUR HONOR, WE'RE SIMPLY FOLLOWING THE

16    COURT'S ORDER AND REQUESTING AN INSTRUCTION TO THE EXHIBITS,

17    AND WE DO RESPECTFULLY SUBMIT THAT HAVING THOSE LARGE NUMBERS

18    IN THE RECORD WITHOUT THE JURY KNOWING THAT SOME OF THEM ARE

19    RELEVANT MIGHT BE PREJUDICIAL TO SAMSUNG.

20             THE COURT:  OKAY.  AND THE ONLY ARGUMENT THAT WAS

21    SUBMITTED WAS WITH REGARD TO THE FINAL INSTRUCTION; CORRECT?

22             MS. MAROULIS:  YES, YOUR HONOR, THE FINAL

23    INSTRUCTIONS --

24             THE COURT:  ALL RIGHT.

25             MS. MAROULIS:  BOTH PARTIES BRIEFED THAT.

```
 1              THE COURT:  OKAY.  ALL RIGHT.  WELL, THE FINAL
 2     INSTRUCTIONS WE'LL HANDLE TOWARDS THE END OF THE EVIDENCE.
 3              MS. MAROULIS:  THANK YOU.
 4              THE COURT:  OKAY.  I WANT TO STATE SOMETHING ON THE
 5     RECORD AS WELL.
 6          YESTERDAY I DID STRIKE THE 11 JURORS WHO APPEARED, AT
 7     LEAST SOME OF WHOM, PERHAPS ALL OF WHOM DEPENDING ON WHOSE
 8     RENDITION IS CORRECT, VIOLATED THE COURT'S INSTRUCTION NOT TO
 9     DISCUSS THE CASE.
10          AND I JUST WANTED TO NOTE THAT ULTIMATELY STRIKING THOSE
11     11 HAD NO IMPACT ON THE JURY THAT WAS SELECTED BECAUSE THE
12     FIRST OF THAT 11 WAS MR. DUNAVEN, WHO WAS IN SEAT NUMBER 18.
13          THE LAST JUROR TO MAKE IT ON TO OUR JURY IS
14     MS. AGUILAR-BLAKE, WHO WAS SEATED IN SEAT NUMBER 17, AND THAT
15     WAS WITH BOTH SIDES EXERCISING ALL THREE OF THEIR PEREMPTORIES.
16          SO HAD YOU NOT EXERCISED YOUR PEREMPTORIES, THE EIGHT THAT
17     WOULD CONSTITUTE THE JURY WOULD HAVE BEEN SELECTED EVEN MUCH
18     FURTHER THAN SEAT -- FURTHER UP TOWARDS SEAT 1 THAN SEAT 17,
19     WHICH WAS MS. AGUILAR-BLAKE'S SEAT, BECAUSE HAD YOU NOT
20     EXERCISED THAT PEREMPTORY, THEN THAT JUROR WOULD HAVE BEEN
21     SEATED, SUCH AS MR. LEVAY IN SEAT 2, MS. SMITH, SEAT 5,
22     MS. KELLER, SEAT 11, MR. DE MOL, SEAT 14, MS. CABANAYAN, SEAT
23     15, AND MR. WANG, SEAT 16.
24          SO, YOU KNOW, MR. DUNAVEN WAS SEAT 18, MR. YAOCHING WANG
25     WAS SEAT 19, AND MR. ANDREW GRUBBS WAS SEAT 21.
```

```
1          SO I KNOW THAT APPLE STATED THAT STRIKING THOSE 11 WOULD

2     EFFECTIVELY GIVE SAMSUNG THREE ADDITIONAL PEREMPTORIES.  THOSE

3     WOULD BE IRRELEVANT BECAUSE WE NEVER WOULD HAVE GOTTEN TO SEAT

4     18.

5          OKAY.  SO UNDER NO SET OF CIRCUMSTANCES WOULD MR. DUNAVEN,

6     MR. WANG, OR MR. GRUBBS, OR ANY OF THOSE ON THE RANDOMIZED LIST

7     AFTER SEAT NUMBER 18, WOULD HAVE EVER SERVED ON THE JURY.

8          OKAY.  WITH THAT, WHY DON'T WE BRING IN OUR --

9          DO WE HAVE THE JURY BINDERS?

10             THE CLERK:  THEY'RE ON THEIR CHAIRS.

11             THE COURT:  OKAY, GREAT.

12         (JURY IN AT 9:12 A.M.)

13             THE COURT:  GOOD MORNING, WELCOME BACK.  PLEASE TAKE

14     A SEAT.

15         WAS EVERYTHING OKAY WITH THE METAL DETECTORS AND GETTING

16     IN TODAY?  OKAY, GREAT.

17         SO EACH OF YOU HAS ON YOUR CHAIR A JURY BINDER THAT THE

18     PARTIES HAVE JOINTLY PUT TOGETHER FOR YOU, AND IT INCLUDES A

19     CALENDAR WHICH SHOWS WHEN WE'LL BE IN SESSION AND THE LIST OF

20     THE ATTORNEYS WHO WILL APPEAR BEFORE YOU, THE LIST OF POTENTIAL

21     WITNESSES.

22         IT ALSO HAS THE PRELIMINARY JURY INSTRUCTIONS, WHICH I

23     HAVE TO READ TO YOU, EVEN THOUGH YOU HAVE A HARD COPY.

24         IT INCLUDES A GLOSSARY OF TERMS; ALL OF THE PATENTS AT

25     ISSUE IN THIS CASE; AND BECAUSE YOU'LL SEE DIFFERENT WITNESSES
```

```
1    AND MAY NOT REMEMBER WHO SAID WHAT, THE PARTIES ARE ACTUALLY

2    GOING TO GIVE YOU A PHOTO OF EACH OF THE WITNESSES WHO WILL

3    EITHER TESTIFY LIVE OR BY DEPOSITION, AND IT SHOULD HAVE THE

4    SAME HAIR-DO AND EYEWEAR AND EVERYTHING ELSE SO THEY LOOK LIKE

5    THE PERSON THAT YOU SAW EITHER ON VIDEO OR LIVE.

6         ALSO, FINAL JURY INSTRUCTIONS, WHICH I WILL NOT GIVE YOU

7    UNTIL THE END OF THE CASE, BUT I WILL GIVE YOU A HARD COPY

8    BEFORE I READ THEM TO YOU AND BEFORE THE PARTIES ACTUALLY GIVE

9    CLOSING ARGUMENT.

10        AND THEN FINALLY, THERE ARE A LOT OF BLANK LINED PAPERS IF

11   YOU'D LIKE TO TAKE NOTES.

12        ALL RIGHT.  SO LET'S GO WITH THE PRELIMINARY JURY

13   INSTRUCTIONS.  AFTER I READ THESE, YOU WILL HEAR THE OPENING

14   STATEMENTS.

15        ALL RIGHT.  INSTRUCTION NUMBER 1.

16        LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE.

17   IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.  THESE INSTRUCTIONS

18   ARE PRELIMINARY INSTRUCTIONS TO HELP YOU UNDERSTAND THE

19   PRINCIPLES THAT APPLY TO CIVIL TRIALS AND TO HELP YOU

20   UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.

21        YOU WILL BE ALLOWED TO KEEP THIS SET THROUGHOUT THE TRIAL

22   TO WHICH TO REFER.  THIS SET OF INSTRUCTIONS IS NOT TO BE TAKEN

23   HOME AND MUST REMAIN IN THE JURY ROOM WHEN YOU LEAVE IN THE

24   EVENINGS.  ACTUALLY, YOUR ENTIRE JURY BINDER SHOULD REMAIN IN

25   THE JURY ROOM.  PLEASE DON'T TAKE THOSE HOME.
```

1    AT THE END OF THE TRIAL, I WILL GIVE YOU A FINAL SET OF

2    INSTRUCTIONS.  IT IS THE FINAL SET OF INSTRUCTIONS WHICH WILL

3    GOVERN YOUR DELIBERATIONS.

4    YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

5    ANYTHING I MAY SAY OR DO AS INDICATING THAT I HAVE AN OPINION

6    REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.  IT IS

7    YOUR DUTY TO FIND THE FACTS FROM ALL THE EVIDENCE IN THE CASE.

8    TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO YOU.  YOU

9    MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER YOU AGREE WITH

10   IT OR NOT, AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES

11   OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS

12   THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE

13   YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

14   IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

15   AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL

16   IMPORTANT.

17   NUMBER 2.  WHAT IS EVIDENCE.

18   THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

19   FACTS ARE CONSISTS OF:

20   1.  THE SWORN TESTIMONY OF ANY WITNESS;

21   2.  THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE; AND

22   3.  ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

23   NUMBER 3.  WHAT IS NOT EVIDENCE.

24   IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

25   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING

WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

NUMBER 1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID

IN THEIR OPENING STATEMENTS, WILL SAY IN THEIR CLOSING

ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET

THE EVIDENCE, BUT IT IS NOT EVIDENCE.  IF THE FACTS AS YOU

REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM,

YOUR MEMORY OF THEM CONTROLS.

2.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY

BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.

YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S

RULING ON IT.

3.  TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN, OR THAT

YOU HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND MUST

NOT BE CONSIDERED.  IN ADDITION, SOMETIMES TESTIMONY AND

EXHIBITS ARE RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I GIVE A

LIMITING INSTRUCTION, YOU MUST FOLLOW IT.

4.  ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS

NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

4.  EVIDENCE FOR LIMITED PURPOSE.

SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE ONLY.

WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN

1    ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR

2    THAT LIMITED PURPOSE AND FOR NO OTHER.

3        5.  DIRECT OR CIRCUMSTANTIAL EVIDENCE.

4        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

5        DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS

6    TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW

7    OR HEARD OR DID.

8        CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

9    WHICH YOU COULD FIND ANOTHER FACT.

10       YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES

11   NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

12   OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

13   WEIGHT TO GIVE TO ANY EVIDENCE.

14       NUMBER 6.  RULING ON OBJECTIONS.

15       THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

16   RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

17   OFFERS AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE

18   THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT

19   LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION

20   MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE

21   OBJECTION, THE QUESTION CANNOT BE ANSWERED AND THE EXHIBIT

22   CANNOT BE RECEIVED.

23       WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

24   IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT

25   HAVE BEEN.

1          SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

2     RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

3     MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

4     CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

5          NUMBER 7.  CREDIBILITY OF WITNESSES.

6          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

7     WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

8     YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

9     NONE OF IT.

10          PROOF OF A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER

11     OF WITNESSES WHO TESTIFY ABOUT IT.

12          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

13     INTO ACCOUNT:

14          1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

15     HEAR OR KNOW THE THINGS TESTIFIED TO;

16          2.  THE WITNESS'S MEMORY;

17          3.  THE WITNESS'S MANNER WHILE TESTIFYING;

18          4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE AND

19     ANY BIAS OR PREJUDICE;

20          5.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

21     TESTIMONY;

22          6.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

23     OF ALL THE EVIDENCE; AND

24          7.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

25          THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

1    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

2    IT.

3         8.   IMPEACHMENT EVIDENCE -- WITNESS.

4         THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

5    DIFFERENT TESTIMONY ON A PRIOR OCCASION MAY BE CONSIDERED,

6    ALONG WITH ALL OTHER EVIDENCE, IN DECIDING WHETHER OR NOT TO

7    BELIEVE THE WITNESS AND HOW MUCH WEIGHT TO GIVE THE TESTIMONY

8    OF THE WITNESS AND FOR NO OTHER PURPOSE.

9         9.   CONDUCT OF THE JURY.

10        I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

11        FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL, AND DO NOT

12   DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

13   JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

14   CASE.

15        SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

16   THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

17   THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

18   INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

19   THE COURSE OF YOUR JURY DUTY.  THUS, UNTIL THE END OF THE CASE

20   OR UNLESS I TELL YOU OTHERWISE:

21        DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

22   ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

23   THE CASE OR ANYTHING TO DO WITH IT.

24        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

25   BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL, TEXT MESSAGES, OR ANY

1    INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FEATURE.

2        THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

3    UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

4    COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

5    MEMBERS, YOUR EMPLOYER, AND THE PEOPLE INVOLVED IN THE TRIAL,

6    ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND YOUR EMPLOYER THAT YOU

7    HAVE BEEN SEATED AS A JUROR IN THE CASE.

8        BUT, IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

9    JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT

10   YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT

11   THE CONTACT TO THE COURT.

12       BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

13   INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT, DO

14   NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

15   COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT; DO NOT DO

16   ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

17   INTERNET OR USING OTHER REFERENCE MATERIALS; AND DO NOT MAKE

18   ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

19   CASE ON YOUR OWN.

20       THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

21   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

22   HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

23   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND

24   A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

25   PROCESS TO START OVER.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE

1    INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

2         NUMBER 10.  NO TRANSCRIPT AVAILABLE/TAKING NOTES.

3         DURING DELIBERATIONS, YOU WILL HAVE TO MAKE YOUR DECISION

4    BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL NOT HAVE A

5    TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE ATTENTION TO

6    THE TESTIMONY AS IT IS GIVEN.

7         IF AT ANY TIME YOU CANNOT HEAR OR SEE THE TESTIMONY,

8    EVIDENCE, QUESTIONS, OR ARGUMENTS, LET ME KNOW SO THAT I CAN

9    CORRECT THE PROBLEM.

10        IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

11   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

12   UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

13   THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU.

14        WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE JURY

15   ROOM.  NO ONE WILL READ YOUR NOTES.  THEY WILL BE DESTROYED AT

16   THE CONCLUSION OF THE CASE.

17        WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

18   MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

19   YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

20   YOUR FELLOW JURORS.

21        11.  STIPULATIONS OF FACT.

22        THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT WILL BE READ

23   TO YOU.  YOU SHOULD, THEREFORE, TREAT THESE FACTS AS HAVING

24   BEEN PROVED.

25        NUMBER 12.  DEPOSITION IN LIEU OF LIVE TESTIMONY.

1        A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

2    BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

3    TRUTH AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

4    QUESTIONS AND ANSWERS ARE RECORDED.

5        YOU SHOULD CONSIDER DEPOSITION TESTIMONY, PRESENTED TO YOU

6    IN COURT IN LIEU OF LIVE TESTIMONY, INSOFAR AS POSSIBLE, IN THE

7    SAME WAY AS IF THE WITNESS HAD BEEN PRESENT TO TESTIFY.

8        13.  USE OF INTERROGATORIES OF A PARTY.

9        EVIDENCE MAY BE PRESENTED TO YOU IN THE FORM OF ANSWERS OF

10   ONE OF THE PARTIES TO WRITTEN INTERROGATORIES SUBMITTED BY THE

11   OTHER SIDE.  THESE ANSWERS WERE GIVEN IN WRITING AND UNDER

12   OATH, BEFORE THE ACTUAL TRIAL, IN RESPONSE TO QUESTIONS THAT

13   WERE SUBMITTED IN WRITING UNDER ESTABLISHED COURT PROCEDURES.

14   YOU SHOULD CONSIDER THE ANSWERS, INSOFAR AS POSSIBLE, IN THE

15   SAME WAY AS IF THEY WERE MADE FROM THE WITNESS STAND.

16       14.  EXPERT OPINION.

17       SOME WITNESSES, BECAUSE OF EDUCATION OR EXPERIENCE, ARE

18   PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE OPINIONS.

19       OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY OTHER

20   TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH

21   WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

22   EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

23   AND ALL THE OTHER EVIDENCE IN THE CASE.

24       15.  FOREIGN LANGUAGE TESTIMONY.

25       LANGUAGES OTHER THAN ENGLISH MAY BE USED DURING THIS

1    TRIAL.

2         WITNESSES WHO DO NOT SPEAK ENGLISH OR ARE MORE PROFICIENT

3    IN ANOTHER LANGUAGE TESTIFY THROUGH AN OFFICIAL COURT

4    INTERPRETER.  SOME OF YOU KNOW -- SOME OF YOU MAY KNOW KOREAN

5    OR JAPANESE.  IT IS IMPORTANT THAT ALL JURORS CONSIDER THE SAME

6    EVIDENCE.  THEREFORE, YOU MUST ACCEPT THE INTERPRETER'S

7    TRANSLATION OF THE WITNESS'S TESTIMONY.  YOU MUST DISREGARD ANY

8    DIFFERENT MEANING.

9         16.  USE OF INTERPRETERS IN THE COURT.

10        YOU MUST NOT MAKE ANY ASSUMPTIONS ABOUT A WITNESS OR A

11   PARTY BASED SOLELY UPON THE USE OF AN INTERPRETER TO ASSIST

12   THAT WITNESS OR PARTY.

13        17.  BENCH CONFERENCES AND RECESSES.

14        FROM TIME TO TIME DURING THE TRIAL, IT MAY BECOME

15   NECESSARY FOR ME TO TALK WITH THE ATTORNEYS OUT OF THE HEARING

16   OF THE JURY, EITHER BY HAVING A CONFERENCE AT THE BENCH WHEN

17   THE JURY IS PRESENT IN THE COURTROOM, OR BY CALLING A RECESS.

18   PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE WORKING.

19        THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT

20   INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

21   BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION

22   AND ERROR.

23        OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

24   LENGTH OF THESE CONFERENCES TO A MINIMUM.

25        I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A

1    CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST

2    FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

3    OF WHAT YOUR VERDICT SHOULD BE.

4         18.  WHAT A PATENT IS.

5         THIS CASE INVOLVES DISPUTES RELATING TO UNITED STATES

6    UTILITY AND DESIGN PATENTS.  BEFORE SUMMARIZING THE POSITIONS

7    OF THE PARTIES AND THE LEGAL ISSUES INVOLVED IN THE DISPUTE,

8    LET ME TAKE A MOMENT TO EXPLAIN WHAT PATENTS ARE AND HOW THEY

9    ARE OBTAINED.

10        PATENTS ARE GRANTED BY THE UNITED STATES PATENT AND

11   TRADEMARK OFFICE (SOMETIMES CALLED "THE PTO").  THERE ARE TWO

12   BASIC TYPES OF PATENTS IN THE UNITED STATES:  UTILITY PATENTS

13   AND DESIGN PATENTS.

14        IN GENERAL TERMS, A "UTILITY PATENT" PROTECTS THE WAY AN

15   ARTICLE IS USED AND WORKS.  IT ALSO PROTECTS A METHOD OR

16   PROCESS OF MAKING OR DOING SOMETHING.

17        ON THE OTHER HAND, A "DESIGN PATENT" PROTECTS THE WAY AN

18   ARTICLE LOOKS.  A DESIGN PATENT PROTECTS THE ORNAMENTAL DESIGN

19   OF AN ARTICLE OF MANUFACTURE.

20        "ORNAMENTAL DESIGN" MEANS THE SHAPE OF THE DESIGN AND/OR

21   THE SURFACE DECORATION ON THE DESIGN.

22        A VALID UNITED STATES PATENT GIVES THE PATENT OWNER THE

23   RIGHT TO PREVENT OTHERS FROM MAKING, USING, OFFERING TO SELL,

24   OR SELLING THE PATENTED INVENTION WITHIN THE UNITED STATES, OR

25   FROM IMPORTING IT INTO THE UNITED STATES, DURING THE TERM OF

 1   THE PATENT WITHOUT THE PATENT HOLDER'S PERMISSION.  A VIOLATION

 2   OF THE PATENT OWNER'S RIGHTS IS CALLED INFRINGEMENT.

 3         A PATENT INCLUDES WHAT IS CALLED A "SPECIFICATION."  FOR A

 4   UTILITY PATENT, THE SPECIFICATION MUST CONTAIN A WRITTEN

 5   DESCRIPTION OF THE CLAIMED INVENTION TELLING WHAT THE INVENTION

 6   IS, HOW IT WORKS, HOW TO MAKE IT AND HOW TO USE IT SO OTHERS

 7   SKILLED IN THE FIELD WILL KNOW HOW TO MAKE OR USE IT.

 8         THE SPECIFICATION CONCLUDES WITH ONE OR MORE NUMBERED

 9   SENTENCES.  THESE ARE THE PATENT "CLAIMS."  WHEN THE PATENT IS

10   EVENTUALLY GRANTED BY THE PTO, THE CLAIMS DEFINE THE BOUNDARIES

11   OF ITS PROTECTION AND GIVE NOTICE TO THE PUBLIC OF THOSE

12   BOUNDARIES.

13         FOR A DESIGN PATENT, THE SPECIFICATION MUST CONTAIN ONE OR

14   MORE DRAWINGS OF THE DESIGNS, AS WELL AS A DESCRIPTION OF THE

15   DRAWINGS, AND IT SERVES AS A SINGLE CLAIM.

16         THE "CLAIM" FOR DESIGN PATENTS GENERALLY REFERS TO THE

17   DRAWINGS AND HOW THEY ARE DESCRIBED.

18         19.  PATENTS AT ISSUE.

19         THERE ARE THREE APPLE UTILITY PATENTS INVOLVED IN THIS

20   TRIAL:  UNITED STATES PATENT NUMBER 7,469,381; 7,844,915; AND

21   7,864,163.  UTILITY PATENTS ARE OFTEN REFERRED TO BY THEIR LAST

22   THREE DIGITS, SO APPLE'S UTILITY PATENTS MAY BE REFERRED TO IN

23   SHORTHAND AS THE '381, '915, AND '163 PATENTS.

24         THERE ARE TWO APPLE DESIGN PATENTS INVOLVED IN THIS TRIAL:

25   UNITED STATES PATENT NUMBERS D618,677 AND D604,305.  DESIGN

1    PATENTS ARE OFTEN REFERRED TO BY THEIR LAST THREE DIGITS, SO

2    THE DESIGN PATENTS HERE MAY -- I'M SORRY, THERE'S A TYPO THERE.

3    IT SHOULD BE BE -- REFERRED TO IN SHORTHAND AS THE D'677 AND

4    D'305 PATENTS.

5         20.  THE PARTIES AND QUESTIONS TO BE DECIDED.

6         TO HELP YOU FOLLOW THE EVIDENCE, I WILL NOW GIVE YOU A

7    SUMMARY OF THE POSITIONS OF THE PARTIES WITH RESPECT TO THE

8    PATENT CLAIMS.

9         THE PARTIES IN THIS CASE ARE APPLE, INC., TO WHICH I WILL

10   REFER AS "APPLE," AND SAMSUNG ELECTRONICS COMPANY LIMITED,

11   SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG

12   TELECOMMUNICATIONS AMERICA LLC, TO WHICH I WILL REFER

13   COLLECTIVELY AS "SAMSUNG" UNLESS I THINK IT IS IMPORTANT TO

14   DISTINGUISH BETWEEN THESE ENTITIES FOR THE PURPOSES OF A

15   SPECIFIC INSTRUCTION.

16        THE CASE INVOLVES THREE UNITED STATES UTILITY PATENTS AND

17   TWO UNITED STATES DESIGN PATENTS OWNED BY APPLE.

18        DURING A PRIOR PROCEEDING, A JURY FOUND THE '381, '915,

19   '163, D'677, AND D'305 PATENTS VALID AND THAT EACH OF THESE

20   PATENTS IS INFRINGED BY A PRODUCT MARKED BELOW WITH AN X.  YOUR

21   SOLE JOB IN THIS TRIAL IS TO DETERMINE THE AMOUNT OF DAMAGES TO

22   BE AWARDED TO APPLE FOR SAMSUNG'S INFRINGEMENT OF THESE

23   PATENTS.

24        21.  OUTLINE OF TRIAL.

25        THE TRIAL WILL NOW BEGIN.  FIRST, EACH SIDE MAY MAKE AN

1    OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.  IT

2    IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THAT PARTY

3    EXPECTS THE EVIDENCE WILL SHOW.

4         THE PRESENTATION OF EVIDENCE WILL THEN BEGIN.  WITNESSES

5    WILL TAKE THE WITNESS STAND AND THE DOCUMENTS WILL BE OFFERED

6    AND ADMITTED INTO EVIDENCE.

7         APPLE WILL START BY PRESENTING ITS DAMAGES CONTENTIONS.

8    APPLE'S WITNESSES WILL BE QUESTIONED BY APPLE'S COUNSEL IN WHAT

9    IS CALLED DIRECT EXAMINATION.  AFTER THE DIRECT EXAMINATION OF

10   A WITNESS IS COMPLETED, SAMSUNG HAS AN OPPORTUNITY TO

11   CROSS-EXAMINE THE WITNESS.

12        APPLE HAS THE BURDEN TO PERSUADE YOU OF ITS DAMAGES BY A

13   PREPONDERANCE OF THE EVIDENCE.  PROOF BY A PREPONDERANCE OF THE

14   EVIDENCE MEANS THAT YOU MUST DECIDE WHETHER SOMETHING IS MORE

15   LIKELY TRUE THAN NOT.

16        AFTER APPLE HAS PRESENTED ITS WITNESSES, SAMSUNG WILL CALL

17   ITS WITNESSES, WHO WILL ALSO BE EXAMINED AND CROSS-EXAMINED.

18   SAMSUNG WILL PRESENT ITS EVIDENCE OF WHAT IT BELIEVES APPLE'S

19   DAMAGES TO BE.

20        APPLE WILL HAVE THE OPTION TO PUT ON REBUTTAL EVIDENCE TO

21   ANY EVIDENCE OFFERED BY SAMSUNG.

22        BECAUSE THE EVIDENCE IS INTRODUCED PIECEMEAL, YOU NEED TO

23   KEEP AN OPEN MIND AS THE EVIDENCE COMES IN AND WAIT FOR ALL THE

24   EVIDENCE BEFORE YOU MAKE ANY DECISIONS.  IN OTHER WORDS, YOU

25   SHOULD KEEP AN OPEN MIND THROUGHOUT THE ENTIRE TRIAL.

1              AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL GIVE YOU

2      FINAL INSTRUCTIONS ON THE LAW THAT APPLIES TO THE CASE AND THE

3      ATTORNEYS WILL MAKE CLOSING ARGUMENTS.  CLOSING ARGUMENTS ARE

4      NOT EVIDENCE.

5              AFTER THE INSTRUCTIONS AND CLOSING ARGUMENTS, YOU WILL

6      THEN DECIDE THE CASE.

7              22.  EVIDENCE SEALED FROM THE PUBLIC.

8              SOME EVIDENCE MAY BE SEALED FROM THE PUBLIC BECAUSE IT

9      CONTAINS HIGHLY CONFIDENTIAL BUSINESS INFORMATION OF THE

10     PARTIES.  YOU MUST NOT DRAW ANY INFERENCES ABOUT THE NATURE OF

11     THE EVIDENCE OR GIVE ANY GREATER OR LESSER WEIGHT TO THE

12     EVIDENCE BASED ON WHETHER IT WAS SEALED.

13             ALL RIGHT.  SO EACH SIDE MAY MAKE AN OPENING STATEMENT,

14     BUT IS NOT REQUIRED TO DO SO.  I REMIND YOU THAT AN OPENING

15     STATEMENT IS NOT EVIDENCE.

16             EACH SIDE WILL HAVE ONE HOUR FOR THEIR OPENING STATEMENT.

17             ALL RIGHT.  GO AHEAD, PLEASE.  TIME IS NOW 9:35.

18             **(MR. MCELHINNY GAVE HIS OPENING STATEMENT ON BEHALF OF THE**

19     **PLAINTIFF.)**

20              MR. MCELHINNY:  GOOD MORNING, YOUR HONOR.  MAY IT

21      PLEASE THE COURT.

22             WHERE WERE YOU ON JANUARY 9TH, 2007?

23             THERE ARE A LOT OF DIFFICULT THINGS ABOUT LAWSUITS, BUT

24     ONE OF THE DIFFICULT THINGS IS THAT IT TAKES SO LONG TO

25     ACTUALLY GET TO TRIAL THAT BY THE TIME WE'RE TRYING FACTS,

1    YEARS HAVE PASSED FROM THE DATE WHEN THE ACTUAL DAMAGE AND THE

2    INJURY WAS DONE, AND SO ONE OF THE THINGS WE WILL BE ASKING YOU

3    TO DO IS TO PUT YOURSELF BACK IN TIME AND TO REMEMBER HOW

4    THINGS WERE AT THE TIME WHEN OUR INJURIES OCCURRED, AND SO

5    THAT'S WHY I START OFF AND ASK YOU, WHERE WERE YOU ON

6    JANUARY 9TH, 2007?

7        WE KNOW THAT ON JANUARY 9TH, 2007, HUNDREDS OF PEOPLE IN

8    THE BAY AREA AND FROM AROUND THE WORLD WERE AT A MACWORLD

9    CONFERENCE IN SAN FRANCISCO AT THE MOSCONE CENTER, AND WE KNOW

10   THAT BECAUSE WE HAVE A VIDEOTAPE OF WHAT HAPPENED AT THAT

11   CONFERENCE AND I'D LIKE TO SHOW YOU THAT NOW.

12       (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

13       MR. MCELHINNY:  MY NAME IS HAROLD MCELHINNY AND WITH

14   MY FRIENDS, RACHEL KREVANS AND BILL LEE, WE HAVE THE HONOR OF

15   REPRESENTING APPLE IN THIS TRIAL TODAY AND FOR THE COMING WEEK.

16       AND WHILE -- I WANT TO ANSWER A QUESTION THAT WAS ASKED

17   YESTERDAY ACTUALLY.  IT IS OUR JOB TO BRING YOU THE EVIDENCE

18   THAT YOU WILL NEED TO DO YOUR JOB AND TO ANSWER THE QUESTIONS

19   THAT JUDGE KOH WILL ASK YOU AT THE END OF THE CASE, AND THAT'S

20   OUR JOB AND WE INTEND TO DO IT TO THE BEST OF OUR CAPABILITIES.

21       WHILE I'M ON INTRODUCTIONS, I WOULD LIKE TO INTRODUCE TWO

22   OTHER PEOPLE.  IN THE FRONT ROW IS MR. BRUCE SEWELL, WHO'S THE

23   GENERAL COUNSEL OF APPLE; AND NEXT TO HIM, YOU MET HER

24   YESTERDAY, IS MS. NOREEN CRAWL, WHO IS THE VICE-PRESIDENT AND

25   CHIEF OF LITIGATION AT APPLE.  NOREEN IS MY BOSS.

1          ALMOST SEVEN YEARS AGO TODAY, THE IPHONE LITERALLY CHANGED

2     THE WAY THAT PEOPLE IN THIS COUNTRY AND AROUND THE WORLD

3     COMMUNICATED.  JUST LAST WEEK I HAD SOMEBODY MY AGE SAY TO ME,

4     "DO YOU REMEMBER WHEN PEOPLE USED TO TALK ON PHONES?"

5          AND NOW, BECAUSE OF THIS INVENTION, THEY DON'T.  THEY USE

6     THEIR FINGERS TO COMMUNICATE.  I GOT IN AN ELEVATOR TODAY -- IT

7     MAY NOT BE A GOOD THING -- I GOT IN AN ELEVATOR TODAY WITH SIX

8     PEOPLE.  NOT ONE OF THEM LOOKED UP BECAUSE THEY WERE ALL

9     SITTING THERE COMMUNICATING ON THEIR IPHONES.

10          BUT I ASK YOU TO REMEMBER WHAT IT WAS LIKE WHEN THAT

11     INVENTION WAS FIRST MADE.

12          YOU DON'T NEED TO TAKE MY WORD FOR WHAT A GREAT INVENTION

13     THE IPHONE WAS BECAUSE YOU WILL HAVE THE EVIDENCE BEFORE YOU.

14          YOU WILL HAVE THIS DOCUMENT, WHICH IS THE PLAINTIFF'S

15     EXHIBIT 133.  THIS IS A REVIEW THAT WAS PUBLISHED IN THE

16     "NEW YORK TIMES" BY DAVID POGUE, THE WORLD FAMOUS CRITIC AND

17     REVIEWER OF TECHNOLOGY EQUIPMENT.  JUST AFTER THE INTRODUCTION,

18     YOU CAN SEE THAT HE SAID, "REMEMBER THE FAIRY GODMOTHER IN

19     'CINDERELLA'?  SHE'D WAVE HER WAND AND TURN SOME HOMELY AND

20     UTILITARIAN OBJECT, LIKE A PUMPKIN OR A MOUSE, INTO SOMETHING

21     GLAMOROUS OR AMAZING, LIKE A CARRIAGE OR A FULLY ACCESSORIZED

22     COACHMAN.

23          "AT THE ANNUAL MACWORLD EXPO IN SAN FRANCISCO, MR. JOBS

24     DEMONSTRATED THE LATEST RESULT OF GODMOTHER WAND-WAVING.  HE

25     GRANTED THE WISHES OF MILLIONS OF APPLE FOLLOWERS AND

```
 1    RUMORMONGERS BY TURNING THE ORDINARY CELLPHONE INTO THE"

 2    EXTRAORDINARY, "THE IPHONE."

 3         YOU'LL ALSO SEE THIS DOCUMENT, WHICH FROM THAT YEAR WAS

 4    "TIME MAGAZINE" WHICH PUT THE IPHONE ON THE COVER, AND YOU'LL

 5    HAVE THE ENTIRE ARTICLE, BUT YOU'LL SEE THAT IT SAYS, "FROM THE

 6    PHONE THAT HAS CHANGED PHONES FOREVER, A DAZZLING DISPLAY OF

 7    INGENUITY."

 8         AND THEY SAID "THE IPHONE IS PRETTY."

 9         AND YOU'LL NOTICE ON THE COVER, IT'S SPELLED OUT "BEST

10    INVENTIONS OF 2007" USING THAT ICONS THAT APPLE HAD INTRODUCED

11    INTO THE MARKETPLACE.

12         AND FINALLY, YOU'LL HAVE THIS DOCUMENT, WHICH WAS FROM

13    LAST YEAR WHEN THE UNITED STATES PATENT AND TRADEMARK OFFICE,

14    THE GOVERNMENT OFFICE THAT ACTUALLY ISSUES PATENTS, PUT ON A

15    DISPLAY TO EDUCATE THE PUBLIC ABOUT ITS WORK AND SOME OF ITS

16    SUCCESSES, AND THE DISPLAY FROM LAST YEAR WAS CALLED "THE

17    PATENTS AND TRADEMARKS OF STEVE JOBS -- ART AND TECHNOLOGY THAT

18    CHANGED THE WORLD."

19         AT THE SAME TIME THAT MR. JOBS INTRODUCED THE IPHONE, AT

20    THE SAME CONFERENCE, HE WARNED APPLE'S COMPETITORS THAT APPLE

21    HAD APPLIED FOR PATENT PROTECTION TO PROTECT ALL OF THE NEW

22    INVENTIONS THAT HAD GONE INTO THE IPHONE.

23         YOU WILL HEAR FROM PEOPLE WHO WERE ACTUALLY THERE THAT THE

24    IPHONE, ALTHOUGH IT WAS INTRODUCED IN 2007, WAS THE RESULT OF A

25    THREE YEAR TOP SECRET RESEARCH AND DEVELOPMENT CAMPAIGN THAT
```

1    TOOK PLACE IN CLOSED BUILDINGS TEN MILES DOWN THE ROAD FROM

2    HERE IN CUPERTINO.

3         THOUSANDS AND THOUSANDS OF ENGINEER HOURS AND TIME WENT

4    INTO THE DEVELOPMENT OF THE IPHONE.  THAT'S RESEARCH AND

5    DEVELOPMENT PUT INTO AN IDEA WHOSE TIME WOULD COME IN THE

6    FUTURE WHO PEOPLE DID NOT KNOW AT THE TIME WOULD BE A SUCCESS.

7         YOU WILL HEAR THAT ALTHOUGH -- AGAIN, IN TODAY'S MIND WITH

8    TODAY'S EXPERIENCE, IT SEEMS HARD TO BELIEVE -- BUT AT THE TIME

9    APPLE MADE THE DETERMINATION TO INVEST ALL OF THESE DOLLARS,

10   ALL OF THIS TIME, ALL OF THIS ENGINEERING WORK, IT WAS

11   CONSIDERED AN EXTRAORDINARILY RISKY INVENTION, EXTRAORDINARILY

12   RISKY PLACE TO PUT THEIR MONEY AT THE TIME, BECAUSE ALTHOUGH

13   APPLE WAS KNOWN AS A COMPUTER COMPANY AT THE TIME, IT WAS NOT

14   IN THE PHONE BUSINESS.  THE PHONE BUSINESS AT THE TIME WAS

15   DOMINATED BY MAJOR COMPANIES, MOTOROLA, NOKIA, SAMSUNG.

16        AND SO APPLE HAD THIS IDEA THAT THEY WERE GOING TO INVEST

17   THIS MONEY, HOPE TO COME UP WITH A PRODUCT, AND HOPE THAT THAT

18   PRODUCT WOULD COMPETE SUCCESSFULLY.

19        BUT THE PEOPLE WHO MADE THAT DECISION REALIZED THAT THEY

20   WERE BETTING THEIR COMPANY.  IF THEY HAD INVESTED ALL THAT TIME

21   AND MONEY AND THE PRODUCT HAD NOT WORKED, IT WOULD HAVE BEEN A

22   MAJOR BLOW TO APPLE.

23        SO WHEN THEY DID COME UP WITH A PRODUCT AND WHEN THEY DID

24   COME UP WITH THESE INVENTIONS, THEY WERE NOT WILLING TO SIMPLY

25   GIVE THEM AWAY TO THEIR COMPETITORS.

```
 1              WHAT THEY DID, AS ALL OF THE COMPANIES AROUND HERE IN THE

 2     VALLEY DO, WAS THEY APPLIED TO THE UNITED STATES GOVERNMENT FOR

 3     PATENT PROTECTION, AND AS YOU NOW KNOW, THEY RECEIVED

 4     PROTECTION FOR MANY OF THE PATENTS, THE INVENTIONS THAT THEY

 5     HAD MADE.

 6              THIS CASE IS ABOUT FIVE OF THE PATENTS THAT APPLE WAS

 7     AWARDED.  I WANT TO SHOW THEM TO YOU.  THE FIRST THREE PATENTS

 8     ARE WHAT THE JUDGE JUST TOLD US ARE CALLED UTILITY PATENTS.

 9     THEY PROTECT A DEVICE OR SOFTWARE THAT MAKES A DEVICE WORK.

10              THE FIRST ONE I WANT TO SHOW YOU IS WHAT WE WILL CALL BY

11     THE THREE NUMBERS, THE '915 PATENT.  THIS IS AN EXCERPT OF THE

12     FACE OF THE PATENT.  YOU HAVE IT IN YOUR BINDER.  YOU CAN SEE

13     THE FULL PATENT NUMBER AND YOU SEE THE '915 AT THE END AND

14     THAT'S THE SHORTHAND THAT WE USE.  WE CALL THIS PATENT, FOR

15     SHORTHAND, THE SCROLL VERSUS GESTURE PATENT.

16              THIS PATENT ALLOWS, TEACHES AND ALLOWS A MACHINE, AND

17     ALLOWS A USER TO SCROLL IMAGES BY USING A SINGLE -- OR LISTS BY

18     USING A SINGLE FINGER ON A TOUCHSCREEN.

19              BUT IT ALSO ALLOWS THEM TO ZOOM AND ROTATE THOSE IMAGES

20     USING TWO OR MORE FINGERS AS THOUGH YOU WERE REACHING INTO THE

21     GLASS AND ACTUALLY TURNING THE OBJECT THAT YOU'RE WORKING WITH,

22     AN APPLE INVENTION.

23              IT'S NOT AN EXAGGERATION, I THINK, TO SAY THAT THE

24     TOUCHSCREEN TECHNOLOGY THAT WE ARE ALL SO ACCUSTOMED TO TODAY,

25     OR THAT MANY OF US ARE -- MY GRANDDAUGHTER IS.  I'M NOT AS
```

1    ACCUSTOMED TO IT AS SHE IS -- BUT IT COMES ABOUT BECAUSE OF HOW

2    INTUITIVE IT IS TO ACTUALLY BE ABLE TO REACH IN AND TURN

3    DOCUMENTS AND TO MAKE THOSE LISTS MOVE FASTER AND SLOWER BASED

4    ON HOW YOU SCROLL.

5        HERE'S A VIDEO THAT JUST POINTS OUT THE INVENTION ON AN

6    APPLE PHONE.

7        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

8        MR. MCELHINNY:  THAT'S THE ONE FINGER SCROLLING.

9        AND THAT'S THE TWO OR MORE FINGERS, IN THIS CASE USING AN

10   EXPANSION GESTURE, WHAT THEY CALL A FLICK IN ORDER TO MAKE THE

11   PICTURE LOOK LARGER.

12       THIS IS WHAT THE SAME INVENTION LOOKS LIKE ON THE SAMSUNG

13   INFUSE 4G PHONE.

14       (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

15       MR. MCELHINNY:  THAT'S THE SCROLL VERSUS GESTURE

16   PATENT, THE '915.

17       THE SECOND ONE -- IF YOU'VE USED APPLE, YOU'LL KNOW THIS

18   ONE IMMEDIATELY -- IS WHAT WE CALL THE '381 PATENT, AND WE CALL

19   THIS THE BOUNCE BACK OR THE RUBBER BANDING PATENT.  THIS IS THE

20   ONE THAT WHEN YOU GET TO THE END OF A LIST, OR A ROLL OF

21   PICTURES IF YOU'RE LOOKING THROUGH, IF YOU GET TO THE END OF

22   THE PAGE, IT HAS THIS ELASTIC SENSATION WHERE IT PULLS OUT PAST

23   THE END, AND THEN WHEN YOU LIFT YOUR FINGER, IT BOUNCES BACK.

24       AND IT TURNS OUT THAT'S A REALLY IMPORTANT INVENTION

25   BECAUSE IF YOU'RE TRYING TO USE THESE MACHINES INTUITIVELY AND

1      YOU DIDN'T HAVE THAT -- IT'S IMPORTANT FOR TWO REASONS.

2          ONE, IF YOU DIDN'T HAVE IT, YOU RUN INTO TWO PROBLEMS THAT

3      HAD BEEN RECOGNIZED IN THE TECHNOLOGY.  ONE IS IF YOU GET TO

4      THE END AND IT SIMPLY STOPS, THE USER DOESN'T KNOW WHY IT HAS

5      STOPPED.  THEY DON'T KNOW WHETHER THE SCREEN HAS FROZEN.  THEY

6      DON'T KNOW IF THERE'S A PROBLEM.  THEY DON'T REALIZE WHY IT IS

7      THAT IT'S NO LONGER MOVING.

8          OR THE OTHER VERSION IS THAT IF YOU CAN MOVE THE THING

9      THAT YOU'RE LOOKING AT AND IT MOVES ALL THE WAY OFF THE SCREEN,

10     YOU END UP ON THESE SMALL SCREENS WITH WHAT'S A COMPLETELY

11     BLANK SCREEN, WHICH PEOPLE IN THE INDUSTRY CALLED THE DESERT

12     FOG PROBLEM.  YOU WOULD HAVE A COMPLETELY BLANK SCREEN AND YOU

13     WOULDN'T KNOW WHICH WAY THE MATERIAL HAD GONE, SO YOU WOULDN'T

14     KNOW HOW TO NAVIGATE BACK TO THAT.

15         AND SO THE RUBBER BANDING PATENT -- I SAID THERE'S TWO

16     REASONS.  ONE, THE RUBBER BANDING PATENT, A, TELLS YOU THIS

17     INFORMATION:  YOUR MACHINE IS WORKING.  YOU'RE AT THE END OF

18     THE LIST.  YOU KNOW HOW TO USE IT.

19         BUT, TWO, IT DOES IT IN A WAY THAT PEOPLE FOUND FUN.  IT

20     WAS COOL.  IT WAS SORT OF INTERESTING TO HAVE THIS ELASTIC

21     THING ON THE GLASS ON A PHONE.

22         AND, AGAIN, I'LL COME BACK TO THIS AGAIN, BUT PUT YOURSELF

23     BACK IN TIME.  THE IPHONE DID NOT COME WITH AN INSTRUCTION

24     MANUAL.  IN ORDER TO USE IT, IN ORDER TO LEARN HOW TO USE IT,

25     YOU HAD TO WANT TO PICK IT UP AND YOU HAD TO TEACH YOURSELF HOW

```
 1    TO USE IT.

 2           AND WE NOW KNOW THAT PEOPLE DO THAT BECAUSE IT DRAWS YOU

 3    IN.  IT TEACHES YOU HOW TO USE IT ONCE YOU START DOING IT.

 4           IT TEACHES YOUNG PEOPLE HOW TO DO IT A LOT FASTER.  I JUST

 5    FOUND OUT LAST WEEK MY YOUNGEST GRANDDAUGHTER'S FIRST WORD WAS

 6    "MORE" -- SHE'S ONE AND A HALF YEARS OLD -- AND SHE USED THAT

 7    WORD WHEN HER MOTHER TOOK THE IPAD AWAY FROM HER AFTER SHE WAS

 8    DONE WATCHING A MOVIE.  I DON'T WANT TO GET INTO WHETHER OR NOT

 9    MY ONE AND A HALF YEAR OLD GRANDDAUGHTER SHOULD BE WATCHING

10    MOVIES ON AN IPAD, BUT "MORE" WAS HER FIRST WORD BECAUSE SHE

11    TAUGHT HERSELF HOW TO USE IT.

12           IT DRAWS YOU INTO IT AND THAT'S WHAT MADE IT SUCCESSFUL.

13           THIS IS A DEMONSTRATION OF THE BOUNCE BACK OR RUBBER

14    BANDING PATENT ON AN APPLE INVENTION.

15           (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

16           MR. MCELHINNY:  THIS WAS CONSIDERED SO IMPORTANT THAT

17    MR. JOBS ACTUALLY DEMONSTRATED IT AT THE ORIGINAL MACWORLD

18    CONVENTION, AND I'LL SHOW YOU A PART OF THAT.

19           (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

20           MR. MCELHINNY:  AND THIS IS WHAT THE RUBBER BANDING

21    PATENT LOOKS LIKE ON THE SAMSUNG INFUSE 4G PHONE.

22           (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23           MR. MCELHINNY:  THE THIRD UTILITY PATENT, THE '163

24    PATENT, WE CALL THE TAP TO ZOOM AND CENTER PATENT.  THIS PATENT

25    ALLOWS A USER TO READ A WEB PAGE ON A SMALL TOUCHSCREEN VERY
```

1      EASILY SIMPLY BY TAPPING ON THE AREA OF THE SCREEN.  THE WEB

2      PAGE ZOOMS IN AND CENTERS ON A FIRST ARTICLE AND THEN MOVES TO

3      A DIFFERENT ARTICLE IF YOU WANT TO MOVE TO THE NEXT WITH AN

4      ADDITIONAL TAP.

5           THIS PATENT WAS CRITICAL TO BROWSING THE WEB.  IF YOU

6      THINK ABOUT IT -- AGAIN, WE'RE TALKING ABOUT SMALL SCREENS --

7      AND YOU WANT TO PUT A WEB PAGE, YOU WANT TO PUT THE

8      "NEW YORK TIMES," YOU WANT TO PUT "THE SAN JOSE MERCURY" ON

9      YOUR PHONE, AND THERE ARE SO MANY ARTICLES, IT WOULD BE CLUNKY

10     IF YOU HAD TO EXPAND IN AND EXPAND OUT AND TRY TO MOVE IT FROM

11     A LARGE PAGE.  IT WOULD BE VERY DIFFICULT TO USE.  BUT THIS

12     INVENTION ALLOWED YOU TO NEGOTIATE AND NAVIGATE THE WEB.

13          AND REMEMBER, WHAT MR. JOBS TOLD US WAS THAT BEING A WEB

14     PORTAL WAS ONE OF THE THREE CRITICAL PURPOSES OF THIS

15     INVENTION.

16          THIS IS A VIDEO OF IT ON AN APPLE PHONE.

17          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

18          MR. MCELHINNY:  HE SCANS WITH THE FIRST TAP AND THEN

19     MOVES OVER TO A SECOND ARTICLE WHEN YOU WANT TO CHANGE AND MOVE

20     AROUND THE WEB.  IT'S ALL EXPANDED IN SO THAT YOU CAN READ IT

21     AT THE SAME TIME.

22          AND THIS IS THE SAME INVENTION ON THE SAMSUNG EPIC 4G.

23          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

24          MR. MCELHINNY:  THE LAST TWO PATENTS THAT WE'RE

25     TALKING ABOUT ARE CALLED DESIGN PATENTS, AND THEY ARE EXACTLY

1        WHAT THEIR NAME SUGGESTS, PATENTS THAT PROTECT NOVEL DESIGNS.

2            THE FIRST IS THE D -- FOR DESIGN -- '677 PATENT, WHICH

3    PROTECTS THE BASIC DESIGN OF THE IPHONE.

4            AND HERE'S A COMPARISON CHART SHOWING THE IPHONE, THE

5    DESIGN FROM THE D'677 PATENT, AND THE INFUSE 4G PHONE.

6            AND FINALLY, THE FIFTH PATENT, ANOTHER DESIGN PATENT, THE

7    D'305, AND THIS ONE PROTECTS THE USE OF THE APPLE USER

8    INTERFACE WITH ITS DISTINCTIVE APPLE ICONS.

9            HERE'S THE PATENT.

10            HERE'S A COMPARISON CHART BETWEEN THE IPHONE, THE D'305,

11    AND THE INFUSE 4G.

12            I HAVE ALREADY SHOWN YOU AT LEAST A LITTLE BIT, A TASTE,

13    OF HOW THE WORLD IN GENERAL, ARTISTS, CRITICS, PEOPLE IN

14    GENERAL REACTED TO THE INTRODUCTION OF THE IPHONE.

15            BUT WE ARE HERE TODAY NOT BECAUSE OF HOW THE WORLD REACTED

16    TO THE INTRODUCTION OF THE IPHONE, BUT BECAUSE OF HOW ONE

17    PARTICULAR COMPETITOR, SAMSUNG ELECTRONICS, CHOSE TO REACT TO

18    IT.

19            AS I PREVIOUSLY MENTIONED, SAMSUNG HAD BEEN A PLAYER IN

20    THE HANDHELD PHONE BUSINESS LONG BEFORE JANUARY 2007.  THIS

21    SLIDE SHOWS YOU A SELECTION OF WHAT SAMSUNG'S PHONES LOOKED

22    LIKE BEFORE THE IPHONE WAS ANNOUNCED.

23            AT FIRST, THE EVIDENCE WILL TELL US THAT SAMSUNG WAS NOT

24    IMPRESSED WITH THE IPHONE.  THEY DIDN'T KNOW WHO APPLE WAS.

25    THEY DIDN'T KNOW WHERE THEY WERE COMING FROM.  THEY DIDN'T

1          THINK THEY WOULD BE SUCCESSFUL.

2               AND THIS SLIDE SHOWS US WHAT SAMSUNG'S PHONES LOOKED LIKE

3          IN THE YEAR FOLLOWING THE IPHONE INTRODUCTION.

4               BUT PRETTY QUICKLY, THE EVIDENCE WILL SHOW US, SAMSUNG

5          RECOGNIZED TWO THINGS:  FIRST, THAT THE IPHONE WAS, IN FACT,

6          TAKING THE WORLD BY STORM; AND THAT THE PHONES, FOLLOWED

7          SHORTLY BY THE IPAD, WERE LITERALLY FLYING OFF THE SHELVES.

8          YOU'VE HEARD ABOUT THE LINES.  YOU PROBABLY SAW THE LINES.  YOU

9          PROBABLY HEARD ABOUT SAMSUNG MAKING FUN OF THE PEOPLE WHO STOOD

10         IN LINES TO BUY THE IPHONE.  THEY WERE FLYING OFF THE SHELVES.

11              AND SECOND, YOU WILL SEE FROM THE EVIDENCE THAT SAMSUNG

12         REALIZED THAT IT SIMPLY DID NOT HAVE A PRODUCT THAT COULD

13         COMPETE SUCCESSFULLY AGAINST THE IPHONE.

14              AND SO BY FEBRUARY 10TH, 2010, SAMSUNG HAD REACHED A

15         CRISIS POINT.  "CRISIS" IS NOT MY WORD.  "CRISIS" IS SAMSUNG'S

16         WORD.

17              ON FEBRUARY 10TH, 2010, J.K. SHIN, WHO WAS THE HEAD OF THE

18         ENTIRE PHONE DIVISION AT SAMSUNG, CALLED A HUGE MEETING OF ALL

19         OF SAMSUNG'S SENIOR MANAGERS AND SCOLDED THEM.  HE TOLD THEM

20         THAT SAMSUNG WAS SUFFERING -- HIS WORDS -- "A CRISIS OF

21         DESIGN."

22              HE SAID THE DIFFERENCE IN USER EXPERIENCE, ALL OF THESE

23         USER INTERFACE, ALL OF THE WAY THAT IT WORKED -- HE CALLS IT

24         UX -- THE DIFFERENCE IN USER EXPERIENCE BETWEEN THE IPHONE AND

25         THE SAMSUNG PHONES WAS -- AGAIN, HIS WORDS -- "THE DIFFERENCE

1       BETWEEN HEAVEN AND EARTH."

2            AND HE TOLD THEM THAT THE U.S. PHONE CARRIERS, AT&T AND

3       VERIZON, THE PEOPLE WHO ACTUALLY SELL PHONES IN THE

4       UNITED STATES, WERE TELLING HIM TO, QUOTE, "MAKE SOMETHING LIKE

5       THE IPHONE," BECAUSE, QUOTE, "THE IPHONE HAS BECOME THE

6       STANDARD."

7            SAMSUNG'S WORDS.

8            AND, AS WE NOW KNOW, THAT IS EXACTLY WHAT SAMSUNG

9       PROCEEDED TO DO.

10           THIS NEXT SLIDE SHOWS YOU WHAT SAMSUNG'S PHONES LOOKED

11      LIKE AFTER SAMSUNG INTRODUCED ITS NEW LINES OF TELEPHONES IN

12      JUNE OF 2010.

13           SO YOU'LL SEE THE EVOLUTION, LET'S SEE THOSE THREE SLIDES

14      AGAIN.  BEFORE THE IPHONE; THE YEAR IMMEDIATELY FOLLOWING THE

15      IPHONE; AND AFTER JUNE 2010.

16           WE NOW KNOW, A PRIOR JURY TOLD US, THAT SAMSUNG CHOSE TO

17      MAKE AND SELL IN THE UNITED STATES PHONES AND A TABLET THAT

18      INFRINGED THE FIVE APPLE PATENTS I SHOWED YOU.

19           THIS CASE IS ABOUT 12 OF THE PHONES AND ONE OF THEIR

20      INFRINGING TABLETS.

21           HERE'S THE CHART FROM YOUR PRELIMINARY JURY INSTRUCTIONS.

22      WE'LL GO INTO THIS IN MORE DETAIL, BUT I WANT TO NOTE, AS YOU

23      CAN SEE, THAT NOT EVERY SAMSUNG PRODUCT INFRINGES EVERY PATENT.

24      NOT EVERY PRODUCT LOOKS JUST LIKE AN IPHONE.

25           BUT EVERY PRODUCT IN THIS CASE INFRINGED AT LEAST ONE

1        PATENT, AND THE INFUSE 4G INFRINGED ALL FIVE.

2             WE ALSO KNOW, AS THE JUDGE JUST TOLD US, THAT ALL FIVE OF

3        THOSE PATENTS WERE VALIDLY ISSUED BY THE UNITED STATES PATENT

4        AND TRADEMARK OFFICE.

5             THIS TRIAL IS ABOUT A SINGLE QUESTION:  WHAT DAMAGES MUST

6        SAMSUNG PAY APPLE IN RETURN FOR USING APPLE'S INTELLECTUAL

7        PROPERTY IN VIOLATION OF THE PATENT LAWS OF THE UNITED STATES

8        TO COMPETE AGAINST APPLE IN THE MARKETPLACE?

9             IN ORDER TO THINK ABOUT THAT QUESTION, YOU HAVE TO PUT IT

10       IN CONTEXT.  THE EVIDENCE WILL SHOW YOU THAT SAMSUNG SOLD

11       AROUND 10.7 MILLION INFRINGING PRODUCTS IN THE UNITED STATES

12       AND THAT THEY TOOK IN APPROXIMATELY $3.5 BILLION FROM THOSE

13       SALES.  LARGE NUMBERS IN THIS CASE.  PEOPLE ARE GOING TO TALK

14       ABOUT HOW MUCH MONEY THE DAMAGES ARE, WHETHER THAT'S A LARGE

15       NUMBER.  YOU HAVE TO HAVE THE CONTEXT.  $3.5 BILLION FROM

16       SELLING INFRINGING PHONES AND TABLETS.

17            WE ALSO KNOW THAT SAMSUNG -- SO WE KNOW THAT SAMSUNG, THE

18       COMPANY THAT BROKE THE LAW, TOOK IN $3.5 BILLION.

19            WHO SAYS THAT PATENT INFRINGEMENT DOESN'T PAY?

20            AT THE END OF THIS CASE, YOU WILL DECIDE HOW MUCH OF THAT

21       3.5 BILLION SAMSUNG SHOULD RIGHTFULLY RETURN TO APPLE FOR THE

22       DAMAGE THAT IT HAS DONE TO US.

23            TO HELP YOU ANSWER THAT QUESTION, YOU'RE GOING TO HEAR

24       EVIDENCE ABOUT THREE DIFFERENT KINDS, I THINK OF THEM AS

25       BUCKETS, BUT THREE DIFFERENT BUCKETS OF DAMAGES.

1          THE FIRST TYPE IS WHAT THE PATENT LAW CALLS PATENT OWNER'S

2     LOST PROFITS.  TO DETERMINE WHETHER OR NOT APPLE IS ENTITLED TO

3     LOST PROFITS, YOU'RE GOING TO ASK YOURSELF A PRETTY

4     STRAIGHTFORWARD QUESTION:  IF THE INFRINGING SAMSUNG PHONE AND

5     TABLETS HAD NOT BEEN AVAILABLE, HOW MANY OF THE PEOPLE WHO

6     ACTUALLY BOUGHT ONE OF THOSE INFRINGING DEVICES WOULD HAVE

7     BOUGHT EITHER AN IPHONE OR AN IPAD INSTEAD?  HOW MANY SALES DID

8     APPLE LOSE?

9          HERE AGAIN, WE'RE GOING TO HAVE REAL SAMSUNG DOCUMENTS

10    FROM THE RELEVANT TIME PERIOD TO GUIDE US.  WHAT WAS IT THAT

11    THE SAMSUNG SALES PEOPLE AT THE TIME WERE TELLING THEIR BOSSES

12    ABOUT EXACTLY THIS KEY QUESTION?

13         YOU WILL HAVE PLAINTIFF'S EXHIBIT 60 TO LOOK AT.  THIS IS

14    A DOCUMENT, THE TITLE OF IT IS "STA COMPETITIVE SITUATION

15    PARADIGM SHIFT."  I CAN'T TRANSLATE ALL OF THAT FOR YOU BECAUSE

16    I DON'T KNOW WHAT ALL OF IT MEANS, BUT THE STA IS SAMSUNG

17    TELECOMMUNICATIONS OF AMERICA.  IT'S ONE OF THE AMERICAN

18    SUBSIDIARIES OF THE KOREAN SAMSUNG COMMUNICATIONS COMPANY.

19         YOU'LL ALSO SEE THAT BELOW THAT IT SAYS HQ CFO, SO THIS

20    DOCUMENT WAS A REPORT TO THE CHIEF FINANCIAL OFFICER AT

21    SAMSUNG'S HEADQUARTERS.

22         AND FINALLY, YOU'LL SEE IN THE LOWER RIGHT-HAND CORNER

23    THAT THIS DOCUMENT WAS CONSIDERED TOP SECRET.

24         SO WHAT WERE SAMSUNG'S VIEWS ABOUT THE MARKETPLACE AT THE

25    CRITICAL TIME?

1          WELL, LOOK AT PAGE 8 OF THIS DOCUMENT.  IN SHORT, SAMSUNG

2     WAS SAYING, TELLING ITS BOSSES, SAMSUNG AMERICA WAS TELLING ITS

3     KOREAN BOSSES THAT THE AMERICAN MARKET WAS BECOMING A TWO HORSE

4     RACE BETWEEN APPLE AND SAMSUNG, AND THAT ANDROID AND IOS WERE

5     THE ONLY RELEVANT PLATFORMS.

6          ON THE NEXT PAGE, SAMSUNG RECOGNIZED THAT APPLE WAS

7     CONTINUING TO SHOW SALES GROWTH DUE TO STRONG LOYALTY, CARRIER

8     AGREEMENTS, AND DOMINANT RETAIL PRESENCE.

9          REMEMBER THIS DOCUMENT, PLAINTIFF'S EXHIBIT 60.

10          DURING THIS TRIAL, YOU WILL HEAR A LOT FROM SAMSUNG TRYING

11     TO CONVINCE YOU THAT NO ONE WOULD HAVE PURCHASED AN APPLE

12     PRODUCT.

13          BUT AT THE TIME, DEEP IN THEIR TOP SECRET HEARTS, THIS WAS

14     THE TRUTH.  IT WAS A TWO HORSE RACE.  IF A PERSON DIDN'T,

15     COULDN'T BUY ONE OF THESE INFRINGING PRODUCTS, THE SALE WOULD

16     HAVE GONE TO APPLE.

17          THIS DOCUMENT IS CONCLUSIVE EVIDENCE THAT APPLE LOST SALES

18     BECAUSE SAMSUNG WAS SELLING INFRINGING PHONES.

19          I'M PRETTY SURE, I'M POSITIVE, THAT IN THIS CASE WE'RE

20     GOING TO HEAR A LOT OF WHAT WE ALL CALL WOULDA, COULDA, SHOULDA

21     EVIDENCE FROM SAMSUNG.  YOU'RE GOING TO HEAR THAT THEY WERE

22     WHAT THEY'RE GOING TO CALL NON-INFRINGING ALTERNATIVES, OTHER

23     PEOPLES THAT PEOPLE MIGHT HAVE BOUGHT.

24          THEY'RE GOING TO SAY THAT THEY COULD HAVE DONE THINGS

25     DIFFERENTLY.  THEY COULD HAVE COME UP WITH OTHER DESIGNS.  THEY

1      COULD HAVE FOLLOWED THE LAW.

2          BUT ONE FACT DOESN'T CHANGE.  THERE WERE A MILLION OTHER

3      THINGS THAT THEY COULD HAVE DONE.  BUT, IN FACT, THEY SOLD 10.7

4      MILLION INFRINGING DEVICES AND THEY TOOK IN $3.5 BILLION

5      BECAUSE, INSTEAD OF DOING ALL THOSE MILLIONS OF OTHER THINGS,

6      THEY INFRINGED OUR PATENTS.

7          IN A FAIR FIGHT, IN A FAIR COMPETITION, THE MONEY THEY GOT

8      WOULD HAVE AND SHOULD HAVE COME TO APPLE.

9          BASED ON THE EVIDENCE -- THIS IS JUMPING WAY AHEAD SO

10     IT'LL MAKE MORE SENSE AT THE END WHEN WE TALK TO YOU -- BUT

11     BASED ON THE EVIDENCE, WE WILL ASK YOU TO CONCLUDE THAT

12     CONSUMERS WHO BOUGHT SAMSUNG PRODUCTS WOULD HAVE PURCHASED

13     360,000 APPLE PRODUCTS IF THE INFRINGING PRODUCTS HAD NOT BEEN

14     ON THE MARKET.

15         THAT'S NOT A VERY HIGH PERCENTAGE.  THAT'S JUST A LITTLE

16     OVER 3 PERCENT OF THE 11 -- 10.8 MILLION PRODUCTS THAT WE'RE

17     TALKING ABOUT, 3 OUT OF 100.

18         BUT IT'S IMPORTANT.  CRITICALLY IMPORTANT.  BECAUSE IN

19     THOSE 360,000 SALES, APPLE WOULD HAVE MADE APPROXIMATELY $114

20     MILLION, AT LEAST $114 MILLION THAT APPLE LOST TO SAMSUNG'S

21     INFRINGEMENT.

22         THAT'S THE FIRST BUCKET, LOST SALES.

23         THE SECOND KIND OF DAMAGES THAT WILL COME UP ARE WHAT THE

24     LAW CALLS INFRINGER'S PROFITS, OR IN THIS CASE SAMSUNG'S

25     PROFITS.

MCELHINNY OPENING

1           IT TURNS OUT THAT CONGRESS HAS RECOGNIZED THAT DESIGN

2      PATENTS ARE PARTICULARLY VALUABLE AND THE MEASURE -- BECAUSE

3      DESIGN, YOU'LL HEAR THE EVIDENCE, TENDS TO DRIVE CONSUMER

4      DECISIONS AND THE MEASURE OF DAMAGES FOR INFRINGING DESIGN

5      PATENTS IS DIFFERENT THAN THE MEASURE FOR INFRINGING UTILITY

6      PATENTS.

7           IF A PERSON, SUCH AS SAMSUNG, COPIES A PATENTED DESIGN,

8      THE MEASURE OF DAMAGES IS THE PROFITS THEY MADE BY SELLING

9      THEIR OWN INFRINGING PRODUCTS.

10          SO FOR THIS BUCKET -- IN THE FIRST BUCKET, WE'LL BE

11     LOOKING AT APPLE'S PROFITS.  IN THE SECOND BUCKET, WE'LL BE

12     LOOKING AT WHAT SAMSUNG'S PROFITS WERE ON THEIR INFRINGING

13     DEVICES.

14          I WANT TO MAKE IT CLEAR, FOR ANY ONE SALE, WE ONLY GET ONE

15     PROFIT.  WE ONLY GET ONE MEASURE OF DAMAGES.  IT'S EITHER IN

16     ONE BUCKET OR THE OTHER.  THERE'S NO DOUBLE COUNTING.  YOU'LL

17     HEAR THAT FROM OUR EXPERT.

18          FOR OUR PHONE, IT'S EITHER OUR PROFITS IF WE WOULD HAVE

19     MADE THE SALE.

20          IF IT'S THE DESIGN PATENT INFRINGEMENT, IT'S THEIR PROFITS

21     SO WE TALK ABOUT THEIR BUCKET.

22          BUT WE'RE NOT PUTTING ANY ONE SALE IN MORE THAN ONE

23     BUCKET.

24          ON THE QUESTION OF SAMSUNG'S PROFITS, THE ISSUE THAT'S

25     GOING TO BE BEFORE YOU IS QUITE STRAIGHTFORWARD.

1          IN ORDER TO CALCULATE SAMSUNG'S PROFITS, WE TOOK THEIR

2     REVENUES ON THE SALES THAT INFRINGED DESIGN PATENTS -- IT'S NOT

3     ALL OF THEM, IT'S JUST THE ONES THAT THEY INFRINGED THE DESIGN

4     PATENTS -- AND THAT REVENUE IS ABOUT $854 MILLION.

5          AND THEN, FROM THEIR BOOKS AND RECORDS, WE DEDUCTED WHAT'S

6     CALLED -- AND YOU'LL HEAR AN EXPLANATION FROM THIS IF YOU DON'T

7     KNOW IT ALREADY -- THEIR COST OF GOODS SOLD IN ORDER TO GET TO

8     THEIR PROFIT NUMBER, AND THAT IS THE CORRECT WAY TO FIGURE IT

9     OUT.  YOU TAKE THEIR REVENUES, WE DEDUCT THEIR COST OF GOODS

10    SOLD, AND WE GET TO THE PROFIT THAT THEY MADE ON THESE

11    PRODUCTS.

12         SAMSUNG IS GOING TO ASK YOU TO GO A LOT FURTHER.  SAMSUNG

13    IS GOING TO GIVE YOU A LONG, LONG LIST OF ADDITIONAL EXPENSES

14    THAT THEY WOULD LIKE YOU TO DEDUCT IN ORDER TO REDUCE THEIR

15    PROFIT NUMBER AND REDUCE THE DAMAGES THEY HAVE TO PAY TO US, SO

16    YOU'RE GOING TO HEAR ABOUT THINGS LIKE GENERAL ADMINISTRATIVE

17    EXPENSES, SALES EXPENSES, ADVERTISING COMMISSIONS, R&D.

18         BUT AS YOU HEAR THAT EVIDENCE, THE THING TO LOOK FOR IS

19    CAN THEY TIE ANY OF THOSE ADDITIONAL EXPENSES TO THE 13 PHONES?

20    BECAUSE THEY CAN'T.  AND THEY WON'T.  BUT THAT'S THE THING

21    THAT, AT THE END OF THE DAY, YOU WILL BE LOOKING FOR, WHETHER

22    THESE EXPENSES ARE TIED DIRECTLY TO THE 13 PHONES AT ISSUE IN

23    THIS CASE.

24         THE THIRD AND LAST BUCKET IS WHAT THE LAW CALLS A

25    REASONABLE ROYALTY.  THE BEST WAY TO THINK ABOUT THIS IS RENT.

1    IF YOU USE SOMEBODY ELSE'S PROPERTY, YOU HAVE TO PAY MONEY FOR

2    IT.  IF YOU USE SOMEBODY'S INTELLECTUAL PROPERTY, YOU HAVE TO

3    PAY RENT FOR IT, AND THE NAME OF THAT RENT IS A ROYALTY.

4         A REASONABLE ROYALTY IS THE MINIMUM LEVEL OF DAMAGES THAT

5    YOU MUST AWARD APPLE IN THIS CASE.  EVEN IF YOU DON'T AWARD ANY

6    LOST PROFITS OR ANY OF SAMSUNG'S PROFITS, IF YOU ACCEPT ALL OF

7    THEIR ARGUMENTS, AT A MINIMUM WE GET A ROYALTY FOR EVERY ONE OF

8    THEIR SALES.

9         SO AS I SAY, WE PUT SOME SALES IN THE LOST PROFITS

10   CATEGORY, WE PUT SOME SALES IN THE SAMSUNG'S PROFITS CATEGORY,

11   AND WE PUT THE REST IN THE ROYALTY, AND OUR ROYALTY NUMBER IS

12   $34.6 MILLION.

13        IN TOTAL, AT THE END OF THIS CASE AFTER YOU HAVE HEARD ALL

14   THE EVIDENCE, WE WILL ASK YOU TO AWARD APPLE $379 MILLION IN

15   DAMAGES.  WE WILL ASK YOU TO ORDER SAMSUNG TO TAKE 379 MILLION

16   OUT OF THE 3.5 BILLION IT EARNED AND TO GIVE THAT AMOUNT BACK

17   TO APPLE.

18        SAMSUNG IS GOING TO ADMIT THAT THEY HAVE TO PAY US

19   DAMAGES.  YOU HEARD THEIR LAWYER SAY THAT YESTERDAY.

20        BUT IT WILL ASK YOU TO AWARD APPLE SOMEPLACE BETWEEN 9 AND

21   $50 MILLION, INCLUDING, YOU'LL HEAR, LESS THAN $30,000 FOR

22   ROYALTIES.  MILLIONS AND MILLIONS OF SALES AND THEY THINK IT'S

23   FAIR TO ASK YOU TO AWARD US $30,000.

24        NEEDLESS TO SAY, IT WILL BE A VERY HAPPY DAY AT SAMSUNG IF

25   YOU ACCEPT THAT ARGUMENT.

MCELHINNY OPENING

1          JUDGE KOH HAS GIVEN EACH SIDE EIGHT HOURS IN WHICH TO HELP

2     YOU DECIDE THE PROPER AMOUNT OF DAMAGES.  TO DO THAT, WE INTEND

3     TO CALL EXPERTS TO TESTIFY ABOUT THE IMPORTANCE OF THESE

4     INVENTIONS.

5          WE'RE GOING TO CALL PEOPLE FROM APPLE TO TESTIFY TO THE

6     INVESTMENT THAT APPLE MADE, THE RISKS IT TOOK, AND THE DEMAND

7     FOR APPLE'S PRODUCTS IN THE MARKETPLACE.

8          WE'RE GOING TO CALL A MAN BY THE NAME OF JOHN HAUSER.

9     HE'S A PROFESSOR OF MARKETING AT THE MASSACHUSETTS INSTITUTE OF

10    TECHNOLOGY -- I KNEW I COULD SAY THAT -- M.I.T., WHO CONDUCTED

11    SURVEYS TO SHOW HOW MUCH PEOPLE WOULD PAY TO OBTAIN THESE

12    PARTICULAR FEATURES.

13         AND FINALLY, WE'LL CALL JULIE DAVIS.  MS. DAVIS IS ONE OF

14    THE COUNTRY'S MOST EXPERIENCED EXPERTS IN THE ASSESSMENT OF

15    DAMAGES FOR THE INFRINGEMENT OF INTELLECTUAL PROPERTY AND

16    SHE'LL GIVE YOU HER OPINION AS TO THE PROPER MEASURE OF DAMAGES

17    AND THE EVIDENCE THAT SUPPORTS THAT OPINION.

18         EXCUSE ME JUST ONE MOMENT.

19         I THINK WHEN THIS TRIAL IS OVER, YOU WILL FIND -- I DON'T

20    WANT TO BE ARROGANT HERE -- BUT I THINK YOU WILL FIND AT THE

21    END THAT THERE ARE TWO BASIC QUESTIONS THAT UNDERLIE THE ISSUES

22    OF LOST PROFITS AND REASONABLE ROYALTY.

23         THE FIRST IS GOING TO BE, WAS THERE A DEMAND FOR APPLE'S

24    IPHONES AND IPADS?  WERE PEOPLE INTERESTED IN BUYING THEM SUCH

25    THAT THEY WOULD HAVE BOUGHT THEM IF THE INFRINGING DEVICES WERE

1      NOT AVAILABLE?

2           AND THE SECOND QUESTION IS GOING TO BE, WERE THE

3      INVENTIONS AND DESIGNS COVERED BY APPLE'S PATENTS VALUABLE?

4           THOSE ARE THE TWO SORT OF INFORMATIVE QUESTIONS THAT WILL

5      HELP YOU DECIDE THE PROPER MEASURE OF DAMAGES.

6           MANY WITNESSES ARE GOING TO TALK ABOUT EXACTLY THOSE

7      ISSUES IN DIFFERENT WAYS AND FORMS, BUT THOSE ARE THE ISSUES

8      THAT THEY'LL BE TALKING ABOUT.

9           BUT ON THOSE TWO QUESTIONS, OUR STAR WITNESS IS GOING TO

10     BE SAMSUNG.  SAMSUNG.

11          USING THE SUBPOENA POWER OF THIS COURT, WE WERE ABLE TO

12     GET, IN THIS LITIGATION, COPIES OF MANY OF SAMSUNG'S INTERNAL

13     DOCUMENTS AND THOSE DOCUMENTS SPEAK CLEARLY TO WHAT SAMSUNG WAS

14     SAYING AND DOING INTERNALLY AT THE TIMES THAT ARE CRITICAL TO

15     THIS QUESTION.

16          I'VE ALREADY SHOWN YOU TWO EXAMPLES, BUT I WANT TO SHOW

17     YOU A COUPLE MORE.

18          THIS IS A DOCUMENT THAT WAS CREATED FOR SAMSUNG BY A

19     MARKETING CONSULTING FIRM CALLED GRAVITY TANK.  YOU WILL HAVE

20     THIS ENTIRE DOCUMENT IN EVIDENCE PHYSICALLY.  IT'LL BE

21     PLAINTIFF'S EXHIBIT 36.

22          IT'S DATED DECEMBER 2008.  IT WILL GO INTO EVIDENCE AS

23     PLAINTIFF'S EXHIBIT 36.

24          YOU CAN SEE AT THE VERY TOP THERE, IT SAYS "GRAVITY TANK

25     COLLABORATES WITH SAMSUNG."  YOU CAN'T SEE IT VERY CLEARLY ON

1    THAT SCREEN.

2         THE DOCUMENT IS 177 PAGES LONG AND IT WAS A ROLL OUT

3    STRATEGY FOR A POSSIBLE NEW DESIGN OF SAMSUNG TOUCHSCREEN

4    PHONES -- THIS IS 2008, A YEAR AFTER THE IPHONE WAS

5    INTRODUCED -- AND IT'S BASED ON INTERVIEWS WITH CONSUMERS THAT

6    WERE TAKEN ALL AROUND THE WORLD.

7         THIS IS NOT MY DOCUMENT.  THIS IS A DOCUMENT WE GOT FROM

8    SAMSUNG.

9         YOU'LL HAVE THE ENTIRE DOCUMENT IN EVIDENCE, BUT FOR NOW I

10   WANT TO SHOW YOU THE SECTION THAT STARTS ON PAGE 19.  IT'S

11   CALLED "IPHONE FEEDBACK AND ANALYSIS."

12        WHAT WAS THE FEEDBACK THAT SAMSUNG GOT FROM THIS WORLDWIDE

13   SURVEY IN DECEMBER OF 2008?  WAS THERE CONSUMER DEMAND FOR THE

14   IPHONE?

15        THE ANSWER TO THAT IS ON PAGE 20.  THE HEADLINE SAYS

16   "PUNDITS TELL US THAT THE IPHONE IS A REVOLUTION."

17        AND THEY CROSS -- AGAIN, PUNDITS ARE NEWSPAPER ARTICLES,

18   CRITICS, PEOPLE WHO REVIEW TECHNOLOGY INFORMATION -- AND THEY

19   QUOTE WALTER MOSSBERG, ANOTHER VERY FAMOUS CRITIC FROM THE

20   "WALL STREET JOURNAL," AND HE SAYS "APPLE'S IPHONE HAS BEEN THE

21   WORLD'S MOST INFLUENTIAL SMARTPHONE SINCE ITS DEBUT A YEAR AGO,

22   WILDLY HAILED FOR ITS BEAUTY AND FUNCTIONALITY, IT IS A TRUE

23   HAND-HAND COMPUTER THAT RAISED THE BAR FOR ALL ITS

24   COMPETITORS."

25        THAT'S WHAT THE PUNDITS WERE SAYING.

1          WHAT WERE THE PEOPLE WHO ACTUALLY USED IPHONE SAYING?

2     THAT'S ON PAGE 21.

3          BRIEFLY, THEY SAID IT CHANGED HOW THEY LIVED THEIR LIVES.

4     THEY QUOTED A PERSON FROM SAN FRANCISCO WHO SAYS, "MY IPHONE IS

5     THE MOST IMPORTANT THING IN MY LIFE."

6          THEY QUOTED A PERSON FROM NEW YORK WHO SAID, "I HAVE AN

7     EMOTIONAL RELATIONSHIP WITH IT."

8          SOMEBODY FROM CHICAGO WHO SAID, "OH, I ADORE IT."

9          AND ON THE OTHER SIDE, THEY QUOTED A THING THAT SAID, "I

10    FIRST SAW MY FRIEND PLAYING AROUND WITH IT" FROM LONDON "AND I

11    HAD A GO WITH IT," THAT'S HOW THEY TALK IN LONDON, I HAD A GO

12    WITH IT, "AND IT WAS LIKE MAGIC."

13         YOU MAY NOT FEEL THIS WAY.  YOU MAY NOT FEEL THIS WAY

14    ABOUT ELECTRONICS.  BUT THE QUESTION ABOUT WHETHER THERE WAS A

15    DEMAND FOR THIS PRODUCT, WHETHER PEOPLE IN THE MARKETPLACE WERE

16    INTERESTED IN IT COMES TO US IN CONSUMER REPORTS, CONSUMER

17    INTERVIEWS, PRIVATE CONSUMER INTERVIEWS FINANCED AND REPORTED

18    BACK TO SAMSUNG.

19         IF WE LOOK AT PAGE 26, WE SEE THAT IT WASN'T ONLY APPLE

20    USERS WHO LIKED THE PRODUCT.  THE ENTHUSIASM HAD SPREAD FAR

21    BEYOND APPLE'S CUSTOMER BASE.  THE SURVEY CALLED IT "THE MOST

22    PREFERRED TOUCH BRAND ACROSS HIGH VALUE SEGMENTS."

23         WHY WAS THAT?  LOOK AT PAGE 31.  THEY SAID IT HAD A

24    "SCREEN-CENTRIC DESIGN THAT HAD SET THE STANDARD FOR TOUCH."

25    THE EMPHASIS ON DESIGN.

```
1         AND THEN CRITICALLY TO THIS CASE, CRITICALLY TO THIS CASE

2    ON PAGE 36, THEY SAID, "IT ISN'T JUST EASY TO USE."  WE'LL TALK

3    ABOUT EASE OF USE A LOT BECAUSE THAT'S WHAT THESE INVENTIONS GO

4    TO, "IT ISN'T JUST EASY TO USE.  IT'S SEXY TO USE."

5         THAT'S NOT THE CRITICAL PART.

6         THE CRITICAL PART IS DOWN BELOW WHERE IT SAYS "FUN."  AND

7    UNDER "FUN," IT SAYS "GESTURES LIKE THE TWO FINGERS PINCH AND

8    FLICK ADD A GAME-LIKE QUALITY TO INTERACTIONS.  THE FLIP ADDS A

9    LEVEL OF COOL."

10        UNDER "WHIMSICAL," IT SAYS, "LISTS BOUNCE, ICONS FLITTER."

11        IN 2008, THIS SAMSUNG SURVEY CALLED TO THE ATTENTION OF

12   SAMSUNG'S MANAGEMENT AS THE REASONS WHY, AMONG THE REASONS WHY

13   CONSUMERS WERE SAYING THEY LOVED THE IPHONE, THE EXACT PATENTS

14   THAT ARE AT ISSUE IN THIS CASE.

15        WE HAVE ANOTHER DOCUMENT.  AGAIN, I DON'T HAVE TIME TO

16   SHOW YOU ALL THIS.  IN EIGHT HOURS, I DON'T HAVE TIME TO SHOW

17   YOU MUCH OF IT.

18        BUT THIS IS A DOCUMENT THAT WILL COME INTO EVIDENCE AS

19   PX 44.  IT'S HARD TO SEE IT, BUT IT IS -- THE TITLE OF IT IS A

20   "RELATIVE EVALUATION REPORT ON THE S1 AND THE IPHONE," AND IT'S

21   DATED MARCH 2, 2010.  SO THIS IS FOUR MONTHS BEFORE THEY

22   INTRODUCED THE FIRST OF THEIR NEW LEVEL OF PHONES.

23        AND THIS, THIS DOCUMENT HAS 132 PAGES IN IT.  YOU'LL HAVE

24   THE ORIGINAL KOREAN.  YOU'LL HAVE AN AGREED ENGLISH TRANSLATION

25   OF IT, SO YOU'LL BE ABLE TO LOOK AT THE WHOLE THING.  YOU DON'T
```

1      HAVE TO TAKE THE PARTS I'M SHOWING YOU.

2           BUT ON EVERY PAGE, IT RUNS BY -- IT RUNS ACCORDING TO THE

3      SAME FORMAT.  ON EVERY PAGE -- IF I CAN HAVE PAGE 58, PLEASE --

4      ON EVERY PAGE OF THIS 132, IT CALLS OUT AN ISSUE AT THE TOP,

5      AND THEN IT HAS A SIDE-BY-SIDE COMPARISON BETWEEN THE IPHONE,

6      WHICH IS HERE ON THE LEFT, AND THE SAMSUNG DEVELOPMENT PHONE,

7      WHICH IS ON THE RIGHT, HERE CALLED THE S1.

8           AND THEN IN EVERY PAGE -- BUT ON THIS ONE I'VE PULLED OUT

9      BECAUSE IT TALKS ABOUT ONE OF THE THINGS WE'RE TALKING ABOUT IN

10     THIS CASE -- IN BLUE AT THE TOP IT REPORTS A PROBLEM, WHY THE

11     SAMSUNG DEVELOPMENT PHONE WASN'T AS GOOD AS THE IPHONE.  132

12     PAGES, PAGE AFTER PAGE.

13          AND ON THIS PAGE, IT SAYS "DOUBLE TAP ONLY SUPPORTS

14     EXPANSION/REDUCTION, THEREFORE IT'S NOT POSSIBLE TO MOVE

15     QUICKLY FROM THE EXPANDED SCREEN MODE."

16          REMEMBER, DOUBLE TAP TO CENTER.  ON OUR PHONE YOU TAP, IT

17     EXPANDS, YOU TOUCH ANOTHER ARTICLE, IT MOVES TO THAT OTHER

18     ARTICLE.

19          ON THE SAMSUNG PHONE, YOU DOUBLE TAP, IT EXPANDS.  YOU

20     TOUCH IT AGAIN AND IT WENT BACK TO THE ORIGINAL.  IT DIDN'T

21     MOVE.

22          AND THEIR REVIEWER SAID THIS WAS A PROBLEM, AND SO THEY

23     POINT OUT HOW IT WORKS ON THE IPHONE ON THE LEFT, THEY POINT

24     OUT HOW IT WORKS ON THE SAMSUNG PHONE ON THE RIGHT.

25          AND THEN AT THE BOTTOM, WHAT ACTION DO THEY TAKE?  THEY

1    SAY, "THE DOUBLE TAP ZOOM IN/OUT FUNCTION NEEDS TO BE

2    SUPPLEMENTED."

3         THEY NEEDED TO CHANGE IT, AND THEN, AS WE KNOW, THEY

4    INFRINGED OUR PATENT.

5         WE'LL HAVE ONE MORE OF THESE KINDS OF DOCUMENTS.  THIS IS

6    GOING TO BE PLAINTIFF'S EXHIBIT 46, AND THIS ONE IS DATED

7    MAY 10TH, 2010, SO TWO MONTHS BEFORE THEY ISSUED.

8         AND, AGAIN, A SIDE-BY-SIDE COMPARISON.  AND HERE I WANT TO

9    SHOW YOU PAGE 66 WHERE THEY'RE TALKING ABOUT AESTHETICS FOR

10   BROWSING, AND THE PROBLEM THAT'S CALLED OUT IS "NO VISUAL

11   EFFECTS PROVIDED WHEN A WEB PAGE IS DRAGGED TO ITS ENDPOINT."

12        THEY'VE FLIPPED THE PHONES HERE, SO THE IPHONE IS ON THE

13   RIGHT.  IT SAYS, "IF A WEB PAGE IS DRAGGED TO THE EDGE AND THE

14   HAND IS RELEASED, A BOUNCING VISUAL EFFECT IS PROVIDED."

15        FOR THEIRS THEY SAY IT'S PLAIN "BECAUSE NO SPECIAL EFFECTS

16   ARE PROVIDED WHEN DRAGGING THE WEB PAGE TO THE BOTTOMMOST OR

17   SIDE EDGES."

18        THEIR DIRECTION OF IMPROVEMENT:  "PROVIDE A FUN VISUAL

19   EFFECT WHEN DRAGGING A WEB PAGE."

20        THEY DID THEIR DEVELOPMENT AROUND THE IPHONE.  THEY LOOKED

21   AT THE FEATURES IN THE IPHONE THAT THEY THOUGHT WERE IMPORTANT

22   AND THEN THEY PROCEEDED TO PUT THEM INTO THEIR PHONES AND TO

23   INFRINGE OUR PATENTS.

24        WHEN IN THIS CASE YOU HEAR SAMSUNG'S LAWYERS DESCRIBE OUR

25   INVENTIONS AS TRIVIAL OR UNIMPORTANT OR WHEN THEY SAY, "WELL,

1    WE COULD HAVE EASILY DONE SOMETHING DIFFERENT, WE COULD HAVE

2    DESIGNED AROUND, WE COULD HAVE DONE IT IN A DIFFERENT WAY," I

3    HOPE THAT WHEN YOU'RE LISTENING TO THAT EVIDENCE, YOU WILL BE

4    ASKING YOURSELVES, "REALLY?  THEN WHY DID YOU COPY IT?"

5         WHAT YOU ARE GOING TO SEE, IRONICALLY, IS THAT THIS TRIAL

6    IS ACTUALLY GOING TO END UP TO BE A BATTLE BETWEEN WHAT SAMSUNG

7    WAS SAYING IN ITS INTERNAL DOCUMENTS AT THE TIME IT WAS

8    DESIGNING ITS PHONES AND WHAT IT IS GOING TO BE SAYING HERE IN

9    THE NEXT FOUR DAYS STARTING AS SOON AS I SIT DOWN.

10        NOW THAT IT'S TIME TO PAY THE PIPER, SAMSUNG IS GOING TO

11   CALL OUR INVENTIONS TRIVIAL, THEY'RE GOING TO SAY THEY'RE

12   UNIMPORTANT, THEY'RE GOING TO SAY THEY COULD HAVE DESIGNED

13   AROUND THEM.

14        BUT AS YOU'VE SEEN THIS MORNING, AND AS YOU WILL SEE AGAIN

15   DURING THE TRIAL, THAT IS NOT WHAT THEY WERE SAYING WHEN THEY

16   WERE FACING THEIR CRISIS OF DESIGN.

17        EIGHT HOURS PER SIDE, NO MORE THAN FOUR DAYS.  THE

18   EVIDENCE IS GOING TO COME IN VERY FAST, BUT YOU SHOULD NOT BE

19   BORED.

20        NEXT WEEK, AFTER ALL THE EVIDENCE IS IN, WE WILL GET TO

21   ADDRESS YOU AGAIN AND TO EXPLAIN OUR VIEW OF THE EVIDENCE AND

22   TO ASK YOU TO DO JUSTICE.  WE ARE GOING TO ASK YOU TO RENDER A

23   VERDICT THAT MAKES APPLE WHOLE FOR THE INJURY THAT SAMSUNG HAS

24   DONE.

25        THANK YOU.

```
 1                THE COURT:  THE TIME IS NOW 10:22.  I SUGGEST THAT WE

 2     TAKE OUR BREAK NOW.

 3                MR. PRICE:  I APPRECIATE THAT.

 4                THE COURT:  OKAY.  RATHER THAN BREAKING UP YOUR

 5     OPENING STATEMENT.

 6           SO IT'S 10:22.  LET'S TAKE A 15 MINUTE BREAK.  OKAY?

 7           AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS OR

 8     RESEARCH THE CASE.

 9           THANK YOU.

10           (RECESS FROM 10:23 A.M. UNTIL 10:38 A.M.)

11           (JURY OUT AT 10:38 A.M.)

12                THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

13                MR. PRICE:  YOUR HONOR.

14                THE COURT:  YES?

15                MR. PRICE:  IF I MAY?  A QUICK POINT ABOUT APPLE'S

16     OPENING, AND IF YOU BELIEVE THAT THIS IS FRIVOLOUS, PLEASE

17     DEDUCT IT FROM THE EIGHT HOURS I HAVE.

18           BUT YOU RECALL THEY SHOWED THIS SLIDE, WHICH IS

19     AESTHETICS, BROWSING, AND TALKED ABOUT THAT BOUNCE BACK AND

20     THEN SAID WE COPIED THAT.

21                THE COURT:  YES.

22                MR. PRICE:  OKAY.  WELL, THE POINT I WOULD LIKE TO BE

23     ABLE TO MAKE TO THE JURY WAS THAT APPLE NEVER ACCUSED 12 OF

24     THESE 13 PRODUCTS OF DOING THAT IN THE BROWSER.  IT NEVER

25     ACCUSED THEM.
```

```
 1           THEIR EXPERT DID NOT GIVE TESTIMONY ON THAT.  IT JUST

 2    STOPS.  THERE'S NOT A DESIGN.  IT JUST STOPS, LIKE ALL PHONES

 3    DID BEFORE APPLE.

 4              THE COURT:  WELL, YOU KNOW, I HAVE RULED A NUMBER OF

 5    TIMES, SO I THINK IF WE START RETRYING INFRINGEMENT, AS TO

 6    WHETHER THAT WAS INFRINGEMENT IN THE CONTACTS APPLICATION,

 7    WHETHER THERE WAS INFRINGEMENT IN THE GALLERY APPLICATION,

 8    WHETHER THERE WAS INFRINGEMENT FOR THE BROWSER APPLICATION, I

 9    DON'T WANT TO RETRY THE PREVIOUS TRIAL, AND I THINK THAT'S

10    EXTREMELY CONFUSING IF WE START SAYING, OKAY, WELL, ALL

11    THESE -- YOU KNOW, I'VE ALREADY LET YOU GET IN ALL OF THE

12    NON-INFRINGING VERDICTS.

13         IF YOU NOW WANT TO UNDERMINE ALL OF THE INFRINGING

14    VERDICTS -- WHICH IS WHAT I THINK YOU'RE DOING, YOU'RE SAYING

15    THIS JURY FOUND INFRINGEMENT OF '381 AND ALL THESE PRODUCTS,

16    BUT LET ME SHOW THESE APPLICATIONS OF THESE SAME PRODUCTS THAT

17    DON'T INFRINGE THE PATENT -- I THINK THAT'S GOING TO BE VERY

18    CONFUSING TO THE JURY AND I DON'T WANT TO RELITIGATE THE ISSUE

19    OF INFRINGEMENT, WHICH WE WILL HAVE TO DO BECAUSE THEN APPLE

20    WILL HAVE TO RESPOND AND SAY, "LOOK AT GALLERY.  LOOK AT

21    CONTACTS.  THOSE INFRINGE '381 AND THE" --

22              MR. PRICE:  AND WE STIPULATE.

23              THE COURT:  HM?

24              MR. PRICE:  AND WE WOULD STIPULATE TO THAT.

25              THE COURT:  NO.  I MEAN, DON'T MAKE ME RECONSIDER NOT
```

```
1     GETTING THE NON-INFRINGEMENT RIGHTS, BECAUSE THAT'S WHERE THIS

2     IS GOING TO GO.  IF WE'RE GOING TO KEEP GOING BACK AND FORTH AS

3     TO WHAT WAS FOUND BY THE PREVIOUS JURY WITH THE ISSUE OF

4     INFRINGEMENT, THEN EVENTUALLY I MAY SAY HANDS UP, LET'S NOT

5     TOUCH IT AT ALL, BECAUSE I DON'T REALLY WANT TO KEEP

6     RELITIGATING WHETHER THERE WAS INFRINGEMENT OR NOT AND

7     UNDERMINING THE PREVIOUS JURY'S VERDICT.  THAT'S NOT THE

8     PURPOSE.

9          THIS IS JUST TO CORRECT THE NOTICE DATES THAT YOU ALL

10    RAISED IN YOUR POST-TRIAL MOTION.  I DON'T WANT TO RELITIGATE

11    AND RETRY THE ISSUE OF INFRINGEMENT.

12         MR. PRICE:  I WANTED TO MAKE SURE I ARTICULATED MY

13    RATIONALE, AND I THINK I DID.  THANK YOU.

14         THE COURT:  OKAY.  ALL RIGHT.  ANYTHING ELSE?

15         MR. PRICE:  NOT FROM US.

16         THE COURT:  OKAY.  THEN CAN WE BRING OUR JURY IN?

17         MR. PRICE:  YES.

18         THE COURT:  OKAY.

19      (JURY IN AT 10:41 A.M.)

20         THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

21      ALL RIGHT.  TIME IS NOW 10:42.  GO AHEAD, PLEASE.

22         MR. PRICE:  THANK YOU, YOUR HONOR.

23      (MR. PRICE GAVE HIS OPENING STATEMENT ON BEHALF OF THE

24    DEFENDANTS.)

25         MR. PRICE:  LADIES AND GENTLEMEN, GOOD MORNING.  I
```

```
 1        INTRODUCED MYSELF YESTERDAY, BILL PRICE, AND I'M GOING TO TRY

 2    TO GET RIGHT INTO I'D WHAT LIKE TO TELL YOU ABOUT THIS CASE.

 3        YOU KNOW, I KNOW YOU'VE BEEN ASKED AND TOLD YOU NEED TO

 4    KEEP AN OPEN MIND UNTIL YOU'VE HEARD BOTH SIDES OF THE

 5    EVIDENCE, AND AFTER THAT PRESENTATION, I KIND OF FEEL LIKE I'M

 6    STARTING OUT WITH ONE FOOT IN THE GRAVE AND ONE FOOT ON A

 7    BANANA PEEL, BECAUSE IT'S KIND OF HARD NOT TO START LEANING ONE

 8    WAY OR THE OTHER.

 9        AND I ASK YOU TO KEEP AN OPEN MIND BECAUSE, BECAUSE IF YOU

10    LOOK AT THE EVIDENCE, YOU'RE GOING TO FIND THAT APPLE IS SIMPLY

11    ASKING FOR MUCH MORE MONEY THAN IT'S ENTITLED TO.

12        NOW, SAMSUNG, I STAND BEFORE YOU, AND A JURY FOUND THAT ON

13    THESE SMARTPHONES, THESE VERY COMPLICATED PRODUCTS WITH

14    HUNDREDS AND HUNDREDS OF FEATURES, THAT SAMSUNG, THAT ITS

15    PHONES INFRINGED FIVE OF APPLE'S PATENTS, AND I'M GOING TO TALK

16    TO YOU ABOUT THOSE PATENTS.

17        AND THE QUESTION IS, AS A RESULT OF THAT INFRINGEMENT, YOU

18    KNOW, WHAT ARE THE APPROPRIATE DAMAGES?  BECAUSE THERE'S NO

19    QUESTION THAT SAMSUNG, YOU KNOW, FOR THIS TRIAL, THE JURY FOUND

20    IT, THAT SAMSUNG INFRINGED THOSE FIVE PATENTS.

21        THE QUESTION IS, WHAT DOES THE LAW AND THE EVIDENCE SAY

22    THEN SAMSUNG SHOULD PAY?  AND WHAT I'M GOING TO PRESENT TO YOU,

23    WHAT I'M GOING TO PROVE IN THIS TRIAL IS THAT WHAT SAMSUNG

24    SHOULD PAY IS $52 MILLION, NOT A TRIVIAL SUM AT ALL.

25        AND YOU'RE GOING TO HEAR EVIDENCE IN THIS TRIAL THAT, YOU
```

1    KNOW, WHEN COMPETITORS COMPETE WITH EACH OTHER, THEY EXAMINE

2    THE OTHER'S PRODUCTS.  THEY TAKE THEM APART.  THEY TRY TO SEE

3    WHAT'S GOOD.  THEY TRY TO SEE WHAT'S BAD.  YOU KNOW, AND THEY

4    TRY TO COMPETE IN THE MARKETPLACE.

5         AND THAT'S WHAT HAPPENED WHEN THE IPHONE CAME OUT.  THE

6    IPHONE WAS A -- I MEAN, WHAT I -- I MEAN, GREAT PRODUCT.  THE

7    IPHONE, WHEN IT CAME OUT, YOU WERE TOLD THAT THERE WAS AN ISSUE

8    OF WHETHER THERE WAS DEMAND FOR THE IPHONE.

9         OH, GOSH.  WE DON'T DENY THAT.  THE IPHONE HAD TREMENDOUS

10   DEMAND.  IT REALLY SPARKED SOMETHING.

11        BUT, YOU KNOW, YOU CAN'T PATENT FUN.  YOU CAN'T PATENT

12   SEXY.  YOU CAN'T PATENT WHIMSICAL, A WORD YOU HEARD.

13        YOU CAN PATENT SPECIFIC THINGS.

14        AND WHAT SAMSUNG DID, IN TRYING TO COME UP WITH A

15   COMPETITIVE PHONE, IS -- IN THIS CASE FOR THESE PRODUCTS, THERE

16   WERE FIVE PATENTS THAT IT WENT, YOU KNOW, ACCORDING TO THE

17   PRIOR JURY, THAT IT WENT OVER THE LINE, THAT IT TURNS OUT THAT

18   WHAT THEY DID APPLE OWNS.

19        AND SO WHAT YOU NEED TO DO, YOUR JOB AT THIS PHASE IS TO

20   SAY, OKAY, LET'S LOOK AT THOSE PATENTS.  LET'S SEE EXACTLY WHAT

21   IT WAS THAT APPLE OWNED AND LET'S LOOK AT THE SAMSUNG PHONE.

22        AND, WITH RESPECT TO THE LOST PROFITS, WHAT YOU NEED TO

23   ASK YOURSELF IS, WELL, IF THESE FEATURES HADN'T BEEN IN THE

24   SAMSUNG PHONE -- IN OTHER WORDS, A PHONE WHICH HAS LARGER

25   SCREEN, WHICH HAS AN ANDROID OPERATING SYSTEM, WHICH HAS

PRICE OPENING

1    REMOVABLE BATTERIES, WHICH HAS 4G, YOU KNOW, WHICH HAS SO MANY

2    DIFFERENCES FROM APPLE AND THE APPLE ECOSYSTEM -- YOU KNOW, IF

3    THESE FEATURES WEREN'T IN THIS PHONE, THESE FEATURES, THEN

4    WOULD THE SAMSUNG CUSTOMER, A CUSTOMER WHO CHOSE ANDROID,

5    LARGER SCREEN, YOU KNOW, A PHONE THAT HAS BATTERIES, WOULD THAT

6    CUSTOMER HAVE GONE TO APPLE?  IS THAT WHY THEY CHOSE THESE

7    PHONES?  DID APPLE LOSE PROFITS BECAUSE OF THESE FEATURES?

8         WITH RESPECT TO INFRINGER'S PROFITS, AND THAT'S HOW MUCH

9    SAMSUNG MADE, THAT'S ON THE DESIGN PATENTS, THEN YOU HAVE TO

10   ASK YOURSELF, WELL, YOU KNOW, THEY'RE ENTITLED TO SAMSUNG'S

11   PROFITS, ALL OF THEM, FOR THOSE PHONES THAT INFRINGED THE

12   DESIGN, EVEN IF SAMSUNG CONTRIBUTED GREAT INTELLECTUAL PROPERTY

13   TO THIS PHONE, EVEN IF IT'S DIFFERENT IN SO MANY WAYS.  THE LAW

14   IS VERY STRICT.  YOU HAVE TO, YOU HAVE TO AWARD WHAT SAMSUNG

15   MADE IN TOTAL PROFITS.

16        AND ON THAT YOU NEED TO ASK YOURSELF, WELL, SHOULD YOU DO

17   AS EVERY ACCOUNTANT AT EVERY FIRM IN THE WORLD DOES AND DEDUCT

18   FROM YOUR REVENUE REAL EXPENSES WHICH ARE SHARED ACROSS PRODUCT

19   LINES?  THAT IS, IF YOU'RE STARTING A FACTORY AND IF YOU'RE

20   STARTING A COMPANY AND YOU'RE GOING TO MAKE THREE PHONES,

21   YOU'VE GOT TO HAVE A FACTORY, YOU'VE GOT TO HAVE A MANAGER,

22   YOU'VE GOT TO HAVE EMPLOYEES, YOU'VE GOT TO ADVERTISE THOSE

23   PHONES.  THOSE ARE REAL EXPENSES AND THE QUESTION IS, SHOULD

24   YOU SUBTRACT THOSE?

25        APPLE DOES IN ITS AUDITED FINANCIAL STATEMENTS.  IT

1    SUBTRACTS THOSE KINDS OF EXPENSES.

2          BUT WHAT APPLE HAS DONE IN THIS CASE IS SAID DON'T EVEN

3    LOOK AT THOSE AND GIVE US AN EXTRA 200 MILLION, AND THAT'S NOT

4    WHAT THE LAW ALLOWS OR REQUIRES.

5          AND THEN THE THIRD CATEGORY, WHICH IS ROYALTIES, THE

6    QUESTION IS IF WE ALL GOT TOGETHER, SITTING ACROSS A TABLE AT

7    THE TIME THAT THERE WAS INFRINGEMENT THAT WAS STARTED AND WE'RE

8    SAYING, OKAY, SAMSUNG, WHAT WILL YOU PAY US FOR THIS?  AND THEN

9    SAMSUNG SAYS, I'LL PAY YOU THIS, AND APPLE SAYS, I'LL PAY YOU

10   THAT, IN THIS HYPOTHETICAL NEGOTIATION, WHAT WOULD THE PARTIES

11   AGREE TO?

12         AND IN ANSWERING THAT YES, YOU'RE REQUIRED TO SAY, WELL,

13   YOU KNOW, WOULD SAMSUNG HAVE PAID APPLE, IN THIS CASE APPLE'S

14   CLAIM IS $24 PER PHONE IN CONNECTION WITH THE DESIGN PATENTS,

15   IN CONNECTION WITH THE FACE AND THE ICONS?  WOULD SAMSUNG HAVE

16   PAID APPLE THAT WHEN THERE WERE FREE WAYS OF DOING IT THAT WERE

17   JUST AS GOOD?

18         THAT'S WHAT YOU'RE REQUIRED TO ASK, BECAUSE OBVIOUSLY IF

19   SAMSUNG SAYS, WELL, BUT WE CAN, AND DID, DO IT THIS OTHER WAY

20   IN OTHER PHONES, WE DON'T NEED YOURS.  YOU KNOW.

21         SO YOU'VE GOT TO ASK YOURSELF, WHAT, THEN, WOULD THEY

22   AGREE TO GIVEN WHAT ELSE COULD BE DONE?  THAT'S WHAT THE LAW

23   STATES.  AND THAT IS WHAT THE LAW SAYS YOU NEED TO GIVE AS

24   DAMAGES.

25         SO YOU HAVE TO LOOK AT THE PATENTS, LOOK AT THE LAW, AND

1        LOOK AT THE EVIDENCE.

2             AND BEFORE DOING ALL THAT, OR MAYBE NOT BEFORE, BUT TO

3        GIVE YOU CONTEXT, YOU HAVE TO LOOK AT THE PATENTS AND SEE WHAT

4        THEY ARE.  I MEAN, YOU SAW, YOU KNOW, A GREAT VIDEO OF MR. JOBS

5        AND I THINK, YOU KNOW, OBVIOUSLY HIS PASSING WAS TRAGIC BECAUSE

6        HE CONTRIBUTED SO MUCH.

7             AND YOU SAW, YOU KNOW, SOME DOCUMENTS SAYING HOW GREAT

8        APPLE WAS.  AND APPLE WAS.  THE IPHONE WAS A GREAT PRODUCT.

9             BUT THE QUESTION IS, WHAT DID THEY OWN?  WHAT INTELLECTUAL

10       PROPERTY DID THEY OWN THAT'S NOT AVAILABLE TO THEIR COMPETITORS

11       OR TO THE REST OF THE WORLD?

12            YOU KNOW, WHEN APPLE INTERNALLY WAS ASKING ITSELF, YOU

13       KNOW, WE WANT TO TELL THE WORLD, WHAT ARE OUR FIRSTS,

14       INTERNALLY THEY RECOGNIZED THAT EVEN THOUGH THEY CREATED A

15       GREAT PRODUCT, THEY WEREN'T THE FIRST AT A LOT OF THINGS.

16            SO, FOR EXAMPLE, IF YOU LOOK AT -- I THINK WE'LL DO SLIDE

17       141 -- THIS WAS AN E-MAIL INTERNALLY FROM APPLE FROM

18       MR. SINCLAIR, WHO WAS IN MARKETING, AND THEY WERE TRYING TO

19       COME UP WITH SOME MARKETING TO SAY APPLE WAS FIRST IN THINGS.

20            AND WHAT HE SAYS:  "IT'S TOUGH TO APPROACH THIS WITH THE

21       CRITERIA OF BEING 'FIRST.'  I DON'T KNOW HOW MANY THINGS WE CAN

22       COME UP WITH THAT YOU COULD LEGITIMATELY CLAIM WE DID FIRST.

23       CERTAINLY WE HAVE THE FIRST COMMERCIALLY SUCCESSFUL VERSIONS OF

24       MANY FEATURES, BUT THAT'S DIFFERENT THAN LAUNCHING SOMETHING TO

25       MARKET FIRST."

1          AND THEY GIVE THE EXAMPLE THE FIRST TO INCORPORATE THE

2     FULL TOUCHSCREEN FACE, AND THEY REFER TO A WIKIPEDIA PAGE THAT

3     TALKS ABOUT A PHONE CALLED THE LG PRADA.

4          SO YOU MIGHT BE SURPRISED TO KNOW, FOR EXAMPLE, THAT APPLE

5     DID NOT INVENT THE CAPACITIVE TOUCH, IT'S CALLED, TOUCHSCREEN

6     WHERE YOU TOUCH IT AND IT REACTS TO YOUR FINGER.  THAT'S NOT A

7     CLAIMED INVENTION.

8          THERE ARE MANY, MANY THINGS THAT APPLE MARKETED THAT OTHER

9     PEOPLE CAN DO, AND YOU NEED TO LOOK AT THE SPECIFIC PATENTS TO

10    SEE, WELL, WHAT DOES APPLE OWN EXCLUSIVELY?  AND WHAT'S THAT

11    WORTH COMPARED TO WHAT YOU CAN DO ELSEWHERE?

12         FOR EXAMPLE, THAT D'677 PATENT, THAT'S A DESIGN PATENT

13    THAT MR. MCELHINNY SHOWED YOU.

14         IF WE CAN SHOW SLIDE 58.

15         AND WHAT -- THE EVIDENCE YOU'LL HEAR, IT'S UNDISPUTED, IS

16    THAT WHAT THIS PATENT IS, THE FACE HERE, YOU SEE THE FACE OF

17    THE PHONE, THOSE DOTTED LINES MEAN THAT IT'S NOT PART OF THE

18    PATENT.  SO WHAT APPLE IS PATENTING IS JUST THE WAY THAT FACE

19    LOOKS, AND YOU CAN'T COME TOO CLOSE TO THAT WITHOUT INFRINGING

20    THEIR PATENT.

21         BUT THAT'S ALL IT PATENTS.

22         SO IF YOU LOOK AT -- AND BY THE WAY, YOU SEE THERE WAS

23    TALK ABOUT SCREEN-CENTRIC DESIGN.  THEY DON'T HAVE A PATENT ON

24    SCREEN-CENTRIC DESIGN.  THAT MEANS WHERE MOST OF THE FRONT IS

25    THE SCREEN.

1            AND IF YOU LOOK AT THE PRODUCTS IN THIS CASE THAT WERE

2       FOUND TO INFRINGE VARIOUS OF APPLE'S PATENTS -- AND LET'S DO

3       SLIDE 74 HERE -- THESE ARE THE PRODUCTS THAT INFRINGED SOME

4       APPLE PATENT.  RIGHT NOW I WANT TO TALK JUST ABOUT THE '677

5       PATENT, THAT IS, THE FACE OF THE PHONE.

6            NOW, IF YOU WEREN'T ALREADY GIVEN THE ANSWER IN

7       MR. MCELHINNY'S OPENING, YOU MIGHT ASK YOURSELF, HUH, WHICH OF

8       THESE WOULD INFRINGE THAT PATENT?  MAYBE THE INDULGE.  THAT

9       SLIDING PART OF IT DIDN'T MATTER.  THE QUESTION IS THE FACE OF

10      THE PHONE.  OKAY?

11           OR MAYBE THE EPIC.  OR HOW ABOUT THE PREVAIL?  OR THE

12      TRANSFORM?  AGAIN, IMAGINE THAT'S NOT PART, THAT PART THERE.

13      LOOK AT THE FACE OF THAT PHONE.  DOES THAT INFRINGE?  OR THE

14      INFUSE?

15           I MEAN, CLEARLY THE REPLENISH DOESN'T, YOU KNOW, AND

16      CLEARLY THE GEM DOESN'T.

17           WELL, JUST IN CASE YOU DON'T REMEMBER FROM THE OPENING,

18      I'LL SHOW YOU WHERE WALDO IS.  IF WE CAN GO TO SLIDE 173.

19           THE ONLY PHONE HERE THAT INFRINGES THAT PATENT, THE DESIGN

20      ON THE FACE THAT APPLE OWNED THE RIGHT TO IS THE INFUSE 4G,

21      WHICH MEANS THAT THESE DESIGNS WERE AVAILABLE FREE TO SAMSUNG

22      TO USE BECAUSE THOSE DESIGNS, APPLE DOESN'T OWN THOSE DESIGNS.

23           AND LOOK AT, YOU KNOW, ARE YOU GOING TO PAY APPLE $24 PER

24      PHONE FOR A ROYALTY WHEN INSTEAD OF DOING THIS, YOU CAN SIMPLY

25      USE THE NEXUS S4 OR YOU COULD DO THE PREVAIL.  I'M LOOKING JUST

1    AT THE PHONES, THE SHAPES.

2        IN FACT, YOU'RE GOING TO SEE EXHIBIT, IT'S 1030, I

3    BELIEVE, THE SAMSUNG ACE, AND THAT IS GOING TO BE -- DO WE HAVE

4    A SLIDE FOR THAT?  IF NOT, I CAN PUT IT ON THE -- AH, THE

5    SAMSUNG ACE.

6        THE JURY FOUND SPECIFICALLY THIS PHONE DOES NOT INFRINGE

7    THE '677 PATENT.  LOOK AT THE SHAPE.  LOOK AT THE FACE.

8        AND SO ONE OF THE QUESTIONS YOU HAVE TO ASK IS, IF APPLE

9    SAID, WE WANT A ROYALTY ON THAT, WE WANT YOU TO PAY $24 SO THAT

10   YOU CAN MAKE AN IPHONE SHAPE INSTEAD OF THIS FACE, WOULD

11   SAMSUNG EVER DO THAT WHEN THEY COULD USE THIS WHICH APPLE DOES

12   NOT OWN?  THEY DON'T OWN THE RIGHTS.

13       SO YOU HAVE TO LOOK AND SEE WHAT THESE PATENTS REALLY

14   COVER.

15       ANOTHER EXAMPLE IS THE DESIGN '305 PATENT.  THOSE ARE

16   THOSE ICONS WHICH YOU'RE NOW FAMILIAR WITH BECAUSE ALMOST

17   EVERYONE HERE HAS AN APPLE, AN IPHONE.

18       THIS IS THE PATENT.  AND AGAIN, PATENTS CLAIM SPECIFIC

19   THINGS.  SO I'M GOING TO SHOW YOU, THEN, A PHONE THAT THE JURY

20   FOUND INFRINGES THAT PATENT.

21       AND IF WE CAN GO TO -- I'M SORRY.  WHAT I'M GOING TO SHOW

22   YOU IS A PHONE THAT INFRINGES AND ONE THAT'S NOT ACCUSED OF

23   INFRINGEMENT, ONE THAT DOES NOT INFRINGE THAT PATENT.

24       AND IF WE CAN DO SLIDE 162.

25       SO HERE WE HAVE THE SAMSUNG CAPTIVATE, THIS IS THE SCREEN,

1    AND THE JURY FOUND THIS INFRINGES APPLE'S PATENT, THAT IS,

2    SAMSUNG SHOULD NOT HAVE DONE THAT.

3         THE ONE ON THE RIGHT, WHICH IS THE SAMSUNG GALAXY S II

4    FROM T-MOBILE, THAT IS FREE; THAT IS, ANYONE CAN DO THAT.

5    SAMSUNG DID THAT, ACTUALLY.  MR. MCELHINNY SAYS, ASK THEM WHY

6    THEY DIDN'T.  THE POINT IS WE DID.

7         BUT THIS ONE INFRINGES ON THE LEFT AND THE ONE ON THE

8    RIGHT DOES NOT.

9         SO AGAIN SAYING, ARE YOU WILLING TO PAY $24 PER PHONE TO

10   USE THIS IF YOU WERE NEGOTIATING WITH SOMEBODY?  YOUR RESPONSE

11   WOULD BE, NO, I'M GOING TO USE THIS, THE ONE ON THE RIGHT

12   BECAUSE IT'S FREE.

13        IN FACT, IF WE CAN SHOW YOU THE SLIDE 152, YOU CAN SEE

14   THIS IS THE PATENT ON THE LEFT; THE ONE IN THE MIDDLE IS THE

15   PHONE WHICH THE JURY FOUND PRACTICED THAT PATENT; AND THE ONE

16   ON THE RIGHT IS THE ONE WHICH IS NOT ACCUSED OF PRACTICING THAT

17   PATENT.

18        YOU MAY ASK YOURSELF, LOOKING AT THESE, WHAT THE HECK IS

19   THE DIFFERENCE?  AND A BIG ONE, WHICH YOU SEE, IS APPLE'S ALL

20   HAVE THESE TILES, EVERY ICON HAS A TILE, A LITTLE ROUNDED TILE

21   AROUND IT.  YOU SEE?

22        WHEREAS IF YOU DON'T HAVE THAT -- YOU SEE THAT THOSE DON'T

23   HAVE THE LITTLE ROUNDED TILES?  THAT'S ONE OF THE DIFFERENCES.

24   THAT SMALL DIFFERENCE IS NOT WORTH $24 PER PHONE.

25        NOW, LET ME TALK TO YOU A LITTLE BIT ABOUT WHAT YOU HEARD

1    AS THE UTILITY PATENTS BECAUSE, AGAIN, YOU'VE GOT TO LOOK AT

2    THESE PATENTS AND SAY YOU'VE GOT THESE PHONES THAT HAVE

3    HUNDREDS AND HUNDREDS OF FEATURES, RIGHT?

4         SO WOULD A CONSUMER NOT BUY THIS PHONE IF IT DIDN'T HAVE

5    THIS PARTICULAR FEATURE?

6         AND THEN, IN THE ROYALTY ANALYSIS AND IN LOST PROFITS, YOU

7    NEED TO ASK YOURSELF, WELL, AGAIN, IS THERE SOMETHING THAT'S

8    REAL CLOSE THAT CONSUMERS WOULD LIKE AS WELL?

9         SO LET ME TALK TO YOU A LITTLE BIT ABOUT THOSE PATENTS,

10   AND I'M GOING TO START WITH THE BOUNCE BACK.  YOU REMEMBER THAT

11   BOUNCE BACK PATENT, IT'S THE '381.

12        NOW, LET ME SHOW YOU, FIRST OF ALL, YOU'RE GOING TO HEAR

13   EVIDENCE AS TO EXACTLY WHAT THAT PATENT IS, AND YOU'VE GOT

14   TO -- YOU'VE GOT TO CONSIDER WHAT WAS DONE BEFORE THAT, YOU

15   KNOW, THAT WAS OUT IN THE WORLD THAT MIGHT GIVE YOU SOME IDEA

16   OF WHAT MARGINAL BENEFIT THAT PATENT IS.

17        AND I'M GOING TO SHOW YOU A VIDEO.  THIS IS AN INVENTION

18   THAT WAS CALLED THE TABLECLOTH INVENTION.  IT'S A VIDEO WHICH

19   SHOWS SOMETHING SIMILAR TO BOUNCE BACK.  IT WAS SOMETHING WHICH

20   WAS KNOWN IN THE PUBLIC BEFORE THE IPHONE PATENT CAME OUT.

21   IT'S SOMETHING WHICH IPHONES -- I'M SORRY -- WHICH APPLE'S

22   EXPERT LOOKED AT AND SAID, WELL, THIS IS DIFFERENT THAN WHAT WE

23   DO, AND I'LL TELL YOU WHAT HE SAID AS TO WHY IT WAS DIFFERENT

24   SO YOU CAN KIND OF SEE WHAT THE MARGINAL VALUE IS OF THESE

25   PATENTS, THAT IS, THEIR VALUE, WHICH IS WHAT YOU CAN DO FOR

1      FREE?

2             IF WE CAN SHOW THAT VIDEO?

3             (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4                MR. PRICE:  YOU SEE THAT, THAT KIND OF FUN FACTOR YOU

5       SEE THERE?

6             WELL, APPLE'S EXPERT SAYS, WELL, THE DIFFERENCE BETWEEN

7      THIS AND WHAT WE DO IS THAT THIS, WHEN YOU RELEASE IT, IT'LL

8      BOUNCE BACK, BUT IT BOUNCES BACK TO THE CENTER AND NOT THE

9      EDGE.

10            SO ONE WAY, FOR EXAMPLE, NOT TO PRACTICE THE PATENT IS NOT

11     TO BOUNCE ALL THE WAY TO THE EDGE.  SO, FOR EXAMPLE -- IF WE

12     CAN SWITCH TO THE ELMO HERE, RYAN -- THIS IS THE -- IT'S

13     EXHIBIT 1009.  IT'S THE INTERCEPT.  IT IS A PHONE THAT IS NOT

14     ACCUSED OF INFRINGING THE BOUNCE BACK PATENT.

15            AND WHAT YOU SEE IS THAT WHEN YOU SLIDE IT, IT DOESN'T GO

16     ALL THE WAY BACK TO THE EDGE.  IT LEAVES A PART, A LITTLE

17     SLIVER BEYOND THE DOCUMENT THAT YOU CAN SEE.

18            LET ME SHOW YOU AGAIN.

19            YOU GO HERE TO THAT GRAY AREA, AND IT BOUNCES BACK.  YOU

20     SEE IT DOESN'T GO ALL THE WAY TO THE EDGE.

21            APPLE DOESN'T OWN THAT.  THEIR PATENT REQUIRES THAT YOU GO

22     ALL THE WAY FLUSH WITH THE EDGE.

23            SO WHEN YOU'RE NEGOTIATING A ROYALTY, FOR EXAMPLE, AND

24     APPLE SAYS, HEY, WE'RE GOING TO CHARGE YOU A GREAT DEAL OF

25     MONEY FOR USING OUR PATENT, SO IN A NEGOTIATION, YOU WOULD SAY,

```
 1        NO, I DON'T THINK SO, BECAUSE I CAN DO THIS FOR FREE.

 2             ALSO WITH RESPECT TO, WITH RESPECT TO PICTURES, YOU

 3     REMEMBER THEY SHOWED YOU, I GUESS WE ONLY FOUND ONE WITH ONE,

 4     YOU CAN, AGAIN, WITHOUT INFRINGING APPLE'S PATENTS -- THERE'S

 5     ONLY ONE PICTURE ON THIS AND I CAN'T TAKE PICTURES, I DON'T

 6     THINK, BECAUSE IT WOULD ALTER THE EXHIBIT.

 7             UNLESS I COULD?  CAN I TAKE A PICTURE OF THE FLOOR?

 8             MR. MCELHINNY:  I'M SORRY?

 9             MR. PRICE:  ANY OBJECTION IF I TAKE A PICTURE OF THE

10     FLOOR?

11             MR. MCELHINNY:  THOSE ARE THE ONES THAT ARE IN

12     EVIDENCE.  THE COURT -- WE HAVE A LOT OF HISTORY WITH THEM.

13     THEY'RE SUPPOSED TO STAY IN THE SAME CONDITION.

14             MR. PRICE:  OKAY.  IF THERE WERE MORE THAN ONE

15     PICTURE, YOU COULD SLIDE THROUGH THE PICTURES, JUST SLIDE

16     THROUGH THEM.  THAT DOESN'T INFRINGE THE PATENT.

17             WHAT DOES, IT'S A PROCESS.  YOU HAVE TO DO THIS, SEE?  YOU

18     FIRST -- THIS IS APPLE'S EXPERT EXPLAINING THIS.  FIRST YOU

19     HAVE TO ENLARGE THE PHOTO, AND THEN -- SEE HOW IT BOUNCES BACK

20     AT THAT POINT?  THAT, A JURY FOUND, THAT INFRINGES.

21             SO YOU HAVE TO ASK YOURSELF, NOW THAT YOU KIND OF KNOW

22     WHAT THE PATENT IS, ASK YOURSELF, IS THAT GOING TO SELL A

23     PHONE, THAT IS, WHERE YOU HAVE TO DO THAT TWO-STEP PROCESS?

24             IF THAT WAS A PART OF THE PHONE, IF IT DIDN'T BOUNCE BACK

25     TO THE EDGE AS OPPOSED TO, SAY, BOUNCE BACK TO THE MIDDLE,
```

1    WOULD THAT CHANGE YOUR MIND AS TO WHETHER YOU WOULD BUY A

2    SAMSUNG PHONE AND THEN GO BUY AN APPLE PHONE?

3         BECAUSE THAT'S WHAT THIS TRIAL IS ABOUT, ABOUT, YOU KNOW,

4    WHAT'S THE EFFECT ON CONSUMERS?

5         AND THE EVIDENCE WILL BE THAT THAT'S NOT GOING TO MAKE

6    SOMEONE WHO CHOSE A SAMSUNG PHONE FOR ALL THESE UNIQUE

7    FEATURES, THEY'RE NOT GOING TO SAY, JEEZ, I'M GOING TO GO BUY

8    AN IPHONE BECAUSE SAMSUNG'S PHONE DOESN'T SNAP TO THE EDGE WHEN

9    YOU ENLARGE THE PHOTO.

10        AND SAMSUNG WOULDN'T HAVE PAID MUCH FOR IT BECAUSE YOU CAN

11   JUST, YOU CAN JUST BOUNCE BACK TO THE MIDDLE AND STILL HAVE

12   THAT FUN BOUNCE BACK FEATURE.

13        AND FINALLY, ON THE UTILITY PATENTS, YOU RECALL THERE'S

14   THE, THE -- NOT FINALLY.  THERE ARE TWO MORE.

15        NEXT TO FINALLY, THERE'S THE TAP TO ZOOM AND THEN CENTER

16   PATENT, AND RECALL THAT'S A TWO-STAGE PATENT.  YOU HAVE TO DO

17   TWO THINGS.  TAPPING TO ZOOM, THAT'S NOT -- THAT'S NOT COVERED

18   BY THE PATENT.  IF YOU DO THAT, YOU DO NOT INFRINGE THE PATENT.

19        WHAT YOU -- WHAT INFRINGES THE PATENT, ACCORDING TO THE

20   JURY, IS WHEN YOU TAP TO ZOOM AND THEN YOU TOUCH OFF TO THE

21   SIDE AND THEN IT CENTERS THAT, AND I THINK YOU SAW THE VIDEO ON

22   THAT.

23        AND THOSE IDEAS, AGAIN, WERE SORT OF IN -- OUT IN THE

24   MARKET AND APPLE'S EXPERT LOOKED AT THEM AND THEY'RE DIFFERENT.

25   BUT IT'LL KIND OF SHOW YOU WHAT THE APPLE INVENTION IS COMPARED

1      TO WHAT WAS OUT THERE SO YOU CAN SEE THE VALUE OF IT.

2           AND THAT'S -- IF WE CAN SHOW, IT'S 99, I THINK.

3           (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4           MR. PRICE:  THIS WAS, AGAIN, BEFORE APPLE'S PATENT

5      WAS ISSUED.  YOU SEE HOW IT TAPS AND ZOOMS, AND THEN YOU TAP

6      AND THEN IT WENT TO THAT AREA AND ZOOMED AGAIN?

7           THE DIFFERENCE, THE REASON THIS ISN'T THE SAME AS APPLE'S

8      PATENT IS BECAUSE -- IF YOU CAN GO BACK -- IS THAT IN THIS

9      ONE -- THIS IS ACTUALLY AN H-P IPAQ, WHICH IS IN THE MARKET.

10     IT'S, YOU KNOW, BEEN IN THE WORLD -- IS THAT WHEN YOU TAP TO

11     ZOOM, IT ACTUALLY CHANGES THIS LIST HERE, FOR EXAMPLE, AND ADDS

12     MORE INFORMATION, ALTHOUGH IT JUST ZOOMED THE MAP.  THIS ONE

13     ACTUALLY ADDS MORE INFORMATION.

14          AND THEN WHEN YOU TAP THE UPPER RIGHT, IT AGAIN ADDS MORE

15     INFORMATION.  THAT'S THE DISTINCTION BETWEEN JUST TAP TO ZOOM

16     AND GO TO THE CORNER.

17          SO YOU CAN KIND OF SEE HOW APPLE'S PATENTS ARE LIMITED,

18     THAT THEY'RE NOT -- YOU KNOW, THEY DON'T OWN THIS TAP TO ZOOM

19     AND TAP TO MOVE OVER.

20          AND MOREOVER, SAMSUNG DID THIS IN OTHER WAYS THAT A JURY

21     HAS FOUND THAT THE TECHNOLOGY DOES NOT INFRINGE, AND

22     SPECIFICALLY, FOR EXAMPLE, ONE PHONE WHICH SAMSUNG MADE IS

23     CALLED THE CONTINUUM, AND LET ME SHOW YOU VISUALLY WHAT IT

24     LOOKS LIKE.

25          AND, AGAIN, A JURY HAS FOUND THIS TECHNOLOGY IN THIS PHONE

1        DOES NOT INFRINGE THE '163 PATENT.

2             SO LET'S SHOW THE VIDEO.  IT'S A BIT GRAINY.  IT WAS

3        ACTUALLY DONE BY APPLE'S EXPERT.  THAT'S SLIDE 95.

4             (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

5                  MR. PRICE:  NOW, THIS INFRINGES, THE EXHIBIT 4G.  SEE

6        HOW IT ZOOMS WHEN YOU TAP IT?  AND THEN WHEN YOU TAP ON THE

7        SIDE, IT MOVES OVER AND CENTERS?  THE JURY FOUND THAT THAT

8        INFRINGED.

9             NOW, WATCH THE CONTINUUM, WHICH THE JURY FOUND DID NOT

10       INFRINGE THIS TECHNOLOGY.  TAP, IT ZOOMS, TAP IN THE CORNER, IT

11       MOVES OVER AND CENTERS.  VISUALLY VERY, VERY SIMILAR.

12            WHAT IS ALLOWED AND WHAT ISN'T.

13            AND SO, AGAIN, YOU'RE ASKING, WHAT'S THE VALUE OF THIS?

14       SAMSUNG CAN DO IT THE WAY IT DID ON OTHER PHONES, WHICH A JURY

15       FOUND DOES NOT INFRINGE.

16            ANOTHER THING LIMITING ON THIS PARTICULAR PATENT, BY THE

17       WAY, IS THAT TAP TO ZOOM, TAP TO CENTER, YOU KIND OF ASK

18       YOURSELF, HOW OFTEN DO YOU USE THAT?

19            AND I ASK THAT BECAUSE MOBILE SITES OF, LIKE, NEWSPAPERS

20       AND THINGS DON'T ALLOW IT.  THE SITE HAS TO ALLOW IT WHEN YOU

21       GO INTO IT.  IN FACT, APPLE'S EXPERT COULD ONLY NAME ONE

22       WEBSITE WHICH IT ACTUALLY WORKED ON, WHICH WAS THE

23       "NEW YORK TIMES."  HE SAID HE FOUND THREE OTHERS, I THINK, BUT

24       HE COULD ONLY NAME THAT ONE.

25            IT'S NOT USED THAT MUCH.  IT'S NOT SOMETHING WHICH YOU CAN

```
 1        USE ON ALL WEBSITES.  IN FACT, VERY FEW.

 2             AND, AGAIN, THE QUESTION IS THE SAMSUNG CUSTOMERS,

 3        SOMEBODY WHO CHOSE SAMSUNG, IF THAT FEATURE WASN'T IN THE

 4        PHONE, OR IF INSTEAD TECHNOLOGY THAT DOES NOT INFRINGE WAS IN

 5        IT THAT DOES A VERY SIMILAR THING, WOULD THEY SAY, I'M GOING TO

 6        GO TO APPLE, WHEN THEY'VE CHOSEN A SAMSUNG, AN ANDROID PHONE.

 7             AND THAT'S THE QUESTION THAT'S BEEN IN THIS CASE.  IT'S

 8        NOT ABOUT PUNISHMENT.  IT'S ABOUT THE REAL WORLD EFFECT OF THE

 9        JURY'S FINDING THAT THESE FIVE PATENTS ON THESE VERY COMPLEX

10        PHONES WERE INFRINGED.

11             WE'RE NOT SAYING THE PATENTS ARE TRIVIAL.  WHAT WE'RE

12        SAYING IS DO PEOPLE BUY SAMSUNG PHONES BECAUSE OF THESE

13        PATENTS?

14             AND, SECONDLY, FOR REASONABLE ROYALTY, IF YOU'RE SITTING

15        ACROSS THE TABLE NEGOTIATING WHETHER YOU'RE GOING TO RENT THESE

16        PATENTS, YOU KNOW, WOULD YOU PAY ANYTHING IF, INSTEAD OF DOING

17        WHAT'S IN EXHIBIT 4G, YOU COULD SIMPLY DO WHAT THE CONTINUUM

18        DOES?  IF APPLE HAD DEMANDED THAT, YOU WOULD SAY, I'M NOT GOING

19        TO PAY FOR THAT.  I CAN DO IT WITHOUT INFRINGING YOUR PATENTS.

20             AND, YOU KNOW, COMPETITION, YOU'RE ALLOWED, IN FACT,

21        ENCOURAGED, TO PUT SOMETHING IN THE MARKET THAT COMPETES.

22             WHAT YOU CAN'T DO, YOU CAN'T STEP OVER THE LINE OF USING

23        PROPERTY THAT SOMEONE ELSE OWNS EXCLUSIVELY, AND THE JURY HAS

24        FOUND THAT SAMSUNG DID THAT ON THESE PHONES WITH THESE FIVE

25        PARTICULAR PATENTS.
```

```
 1          BUT YOU CAN TRY.  YOU CAN TRY TO GIVE THE CONSUMER A GOOD

 2    EXPERIENCE, YOU KNOW?  IF YOU -- IF YOU'RE FOUND TO CROSS THE

 3    LINE, THEN YOU GET DAMAGES.

 4          BUT THEN HOW MUCH ARE THOSE DAMAGES?  YOU HAVE TO LOOK AT,

 5    YOU KNOW, WHAT ELSE YOU DID, WHAT APPLE DOESN'T OWN.

 6          AND THEN WHETHER OR NOT CONSUMERS WOULD -- WHO BOUGHT

 7    SAMSUNG, WHO ALREADY MADE THAT CHOICE, YOU KNOW -- WOULD SWITCH

 8    TO AN APPLE.

 9          SO LET ME TALK TO YOU THEN ABOUT THE EVIDENCE AS TO WHY

10    CONSUMERS BUY SAMSUNG PHONES, BECAUSE THAT'S REALLY THE ISSUE

11    HERE.  YOU KNOW, NOW, I KNOW A LOT OF YOU FOLKS LOVE APPLE, AND

12    THEY MAKE A GREAT PRODUCT.

13          YOU KNOW, THERE ARE A LOT OF PEOPLE WHO ARE DIE HARD

14    SAMSUNG FANS, OR MORE APPROPRIATELY, DIE HARD ANDROID FANS WHO,

15    YOU KNOW, LOVE THOSE FEATURES AND DO NOT LIKE APPLE.

16          SO WHAT WE'RE ASKING HERE IS ABOUT THE SUBSET OF PEOPLE

17    WHO ALREADY CHOSE SAMSUNG.  WOULD THEY SWITCH TO APPLE?

18          AND YOU'RE GOING TO HEAR EVIDENCE THAT SAMSUNG PHONES ARE

19    DIFFERENT THAN APPLE IN INCREDIBLY IMPORTANT WAYS.  THERE ARE

20    FEATURES THAT YOU JUST CAN'T GET ON AN IPHONE, AND IPHONE HAS

21    FEATURES YOU CAN'T GET ON A SAMSUNG, AND THERE ARE OTHER

22    FACTORS, A MULTITUDE OF FACTORS THAT GO INTO WHY SOMEONE WOULD

23    CHOOSE SAMSUNG.

24          I MEAN, JUST TO GIVE YOU A QUICK LIST, THERE'S BRAND -- GO

25    TO SLIDE 2.  WE MADE NICE SLIDES FOR YOU TO SAY THE WORDS.
```

1          YOU SAY, OKAY, THAT'S THE BRAND.  A LOT OF PEOPLE LOVE

2     BUYING APPLE BECAUSE THEY LIKE THE EXPERIENCE IN THE STORES,

3     THOSE APPLE STORES.  THAT'S SLIDE 5.  YOU KNOW, APPLE HAS THESE

4     COOL STAND-ALONE STORES.  SAMSUNG DOESN'T.  SO APPLE GETS A LOT

5     OF SALES THAT WAY.

6          SAMSUNG IS NOT GOING TO SELL A PHONE THAT WAY.  THEY DON'T

7     HAVE THOSE STAND-ALONE STORES.

8          THERE'S PRICE.  THERE'S HOW MUCH THE PHONE COSTS.

9     J.D. POWER SURVEY -- WE CAN SHOW SLIDE, LET'S GO TO 75 --

10    J.D. POWER SURVEY, MARCH 2011 -- THOSE ARE THE GUYS YOU READ

11    ABOUT HOW THEY TELL YOU HOW HAPPY YOU ARE WITH YOUR CARS --

12    J.D. POWER, THEY'RE A MARKET RESEARCH FIRM, FOUND THAT THE

13    AVERAGE SELLING PRICE OF SAMSUNG WAS $139 AND THE AVERAGE WAS

14    206, THIS IS TO THE CONSUMERS AFTER SUBSIDIES TO THE CARRIER.

15    A LOT OF PEOPLE BUY SAMSUNG BECAUSE IT'S CHEAPER AND THEY WON'T

16    GO TO APPLE BECAUSE THEY THINK THEY ARE TOO EXPENSIVE.

17         THE TABLET, THERE'S ONE TABLET THAT'S INVOLVED IN THIS

18    CASE.  IF WE GO TO -- THIS IS EXHIBIT 7, OR SLIDE 7, I'M

19    SORRY -- SLIDE 7.  I'M SORRY.  7.  OH, IT HAD THE SAME THING,

20    SO I GOT CONFUSED.

21         HERE'S THE TABLET.  THE SAMSUNG TABLET AVERAGED $447.

22    APPLE, 612.  APPLE'S ANALYSIS DOESN'T TAKE THAT INTO ACCOUNT AT

23    ALL THAT PEOPLE SOMETIMES WANT TO BUY CHEAPER THINGS.

24         SO THAT SAMSUNG TABLET DIDN'T HAVE THE TAP TO ZOOM AND TAP

25    TO MOVE OVER, PEOPLE THEY SAID WOULD GO BUY AN APPLE.  AND

1          THERE'S NO EVIDENCE OF THAT.

2               YOU'VE GOT OTHER THINGS TO TAKE INTO ACCOUNT.  SUPPLY.

3     I'M GOING TO GO THROUGH THESE FAIRLY QUICKLY.  IN THE TIME

4     PERIOD THAT APPLE IS ASKING FOR DAMAGES ON ITS IPAD AND WHEN

5     THE IPAD 2 WAS IN THE MARKET, YOU KNOW, THE IPAD 2 WAS NOT IN

6     THE MARKET BECAUSE THERE WAS A BACKLOG AND APPLE COULDN'T EVEN

7     GET PHONES TO PEOPLE WHO WANTED THEM.

8               SO WOULD SOMEONE GO AND SWITCH TO AN IPAD 2 FROM THE

9     TABLET BECAUSE IT DOESN'T HAVE THE FEATURES WHEN THEY COULDN'T

10    EVEN BUY AN IPAD 2?

11              YOU'VE GOT SCREEN SIZE.  SAMSUNG PHONES TEND TO BE BIGGER.

12    PEOPLE WANT TO GET BIGGER SCREEN SIZE.

13              OTHER PEOPLE DON'T.  OTHER PEOPLE WANT TO HAVE THE ONE

14    THUMB ABILITY ON THEIR PHONE.  SOME PEOPLE LIKE THAT.

15              PEOPLE WHO ARE GOING TO BUY SAMSUNG, YOU KNOW, WANT

16    SOMETHING ELSE.  WOULD THEY SWITCH TO AN APPLE AND GET THAT

17    SMALLER PHONE?

18              YOU'VE GOT BATTERY.  SAMSUNG PHONES, YOU CAN REMOVE THE

19    BATTERY.  APPLE'S ARE CONTAINED.  YOU CAN'T.

20              SAMSUNG PHONES ARE -- LAST LONGER, AT LEAST IN THIS TIME

21    FRAME.  THIS IS EXHIBIT 153.  THIS IS AN APPLE STUDY WHICH THEY

22    DID WITHIN APPLE, WHICH IS LIKE A STATE OF MOBILE, AND IF WE GO

23    TO 164, IT TALKS ABOUT, YOU KNOW, THE BATTERY CAPACITY FOR THE

24    IPHONE VERSUS THE SAMSUNG, FOR EXAMPLE.  THAT'S IMPORTANT TO A

25    LOT OF PEOPLE.

1           I MENTIONED THE SCREEN SIZE, BY THE WAY.  APPLE ALSO,

2      THEIR STUDY ALSO TALKED ABOUT SCREEN SIZE, AND THAT'S SLIDE

3      106, AND YOU SEE THAT APPLE IS 3.5 AND THEN YOU'VE GOT THE

4      SAMSUNG INFUSE AT 4.5.  THOSE ARE, ON THOSE SIZE PHONES, A BIG

5      DIFFERENCE.

6           YOU'VE GOT -- THEY'RE TOTALLY DIFFERENT OPERATING SYSTEMS.

7      APPLE IS IOS.  THERE ARE PEOPLE WHO LOVE IOS.  SOME OF YOU LOVE

8      IOS.

9           SAMSUNG AND OTHERS ARE ANDROID AND IT'S AN ENTIRELY

10     DIFFERENT OPERATING SYSTEM WITH OPEN SOURCE CODE, WHICH WE'LL

11     EXPLAIN TO YOU LATER WHEN WE HAVE MORE TIME.

12          AND, AGAIN, YOU KNOW, PEOPLE WHO BUY SAMSUNG, WHO CHOSE

13     THAT, ARE GOING TO ASK -- THEY'RE GOING TO SWITCH OPERATING

14     SYSTEMS WHEN THEY MADE THEIR CHOICE?

15          YOU KNOW, THERE'S A DIFFERENT APP MARKET FOR THESE TWO

16     PHONES, YOU KNOW?  IF YOU ARE AN APPLE, YOU'RE IN THAT WHOLE

17     ECOSYSTEM AND EVERYTHING WORKS TOGETHER AND YOU GET APPS FROM

18     THE ITUNES STORE.

19          IF YOU'RE AT SAMSUNG, THE ANDROID MARKET IS DIFFERENT.

20     THERE IS AN ITUNES KIND OF STORE.  BUT YOU CAN ALSO GET APPS

21     FROM MANY OTHER PLACES.

22          THERE'S ALSO AT THIS TIME FRAME, THE BIG DIFFERENCE

23     BETWEEN THE PHONES IS YOU REMEMBER BACK IN THOSE DAYS WHEN YOU

24     WANTED TO WATCH A VIDEO ON A WEBSITE?  WITH YOUR IPHONE, A LOT

25     OF THE TIME IT WOULDN'T PLAY BECAUSE YOU DON'T HAVE A FLASH

1        PLAYER BECAUSE APPLE DIDN'T SUPPORT IT.

2             WELL, AT THAT TIME THE ANDROID PHONES DID SO THAT YOU

3        COULD ACTUALLY, YOU KNOW, WATCH THE VIDEOS THAT WERE ON YAHOO

4        OR, YOU KNOW, WHATEVER YOU'RE WATCHING, ESPN OR WHATEVER.

5             SO THE EVIDENCE IS GOING TO SHOW THAT THE PEOPLE WHO

6        BOUGHT SAMSUNG PHONES IN THIS TIME FRAME, YOU KNOW, WHO CHOSE

7        SAMSUNG DIDN'T CHOOSE SAMSUNG BECAUSE OF THESE APPLE APPS,

8        BECAUSE OF THOSE FEATURES.  THEY CHOSE SAMSUNG BECAUSE OF THE

9        DIFFERENCES.

10            AND NOT ONLY DOES COMMON SENSE TELL YOU THAT, BUT SO DOES

11       APPLE'S RESEARCH.

12            SO LET ME SHOW YOU SLIDE 84.  THIS IS A MARKET STUDY THAT

13       APPLE DID IN 2011, JANUARY 2011, AND LET ME SHOW YOU SLIDE 17.

14            THEY ASKED, WHAT WERE THE TOP REASONS FOR BUYING AN

15       ANDROID AMONG THOSE WHO CONSIDERED IPHONE?  SO THEY DID THIS

16       SURVEY.

17            AND THREE-QUARTERS OF THE PEOPLE WHO BOUGHT AN ANDROID

18       PHONE, A SAMSUNG PHONE, THREE-QUARTERS DID NOT EVEN CONSIDER AN

19       IPHONE.  HERE YOU SEE, THIS IS -- THIS STUDY IS ONLY THE 25

20       PERCENT WHO CONSIDERED, EVEN CONSIDERED AN IPHONE.  AND THEN

21       THE OTHER -- SO 75 PERCENT DON'T CONSIDER IT AT ALL BECAUSE OF

22       THE DIFFERENCES.

23            THE 25 PERCENT WHO DID CONSIDER IT, I'LL CONSIDER IT, AND

24       THEN CHOSE SAMSUNG, SO WHEN YOU ASK THEM WHY, THEY SAY THINGS

25       LIKE THE SERVICE PROVIDER, AT&T, VERIZON, T-MOBILE.  A LOT OF

1     THIS PERIOD, YOU KNOW, SOME OF THOSE PROVIDERS DID NOT PROVIDE

2     IPHONES AT ALL.  I DON'T KNOW IF YOU RECALL THAT.  I THINK

3     T-MOBILE AND SPRINT DID NOT PROVIDE IT AT ALL.

4          THEY TRUSTED THE GOOGLE BRAND, SO SOME BRAND ELEMENT HERE.

5     GOOGLE CREATES THE ANDROID SOFTWARE.

6          THEY PREFER A LARGER SCREEN.  THEY PREFER THE MARKET FOR

7     APPS.  THEY WANT BETTER INTEGRATION.

8          THEY DIDN'T CHOOSE SAMSUNG BECAUSE OF THE BOUNCE BACK, NOT

9     THE PEOPLE WHO BOUGHT SAMSUNG.  THEY DIDN'T CHOOSE IT BECAUSE

10    OF BEING ABLE TO ZOOM.

11         OH, YOU KNOW SOMETHING?  IN MY ZEAL TO GET THROUGH THIS, I

12    THINK I SKIPPED ONE OF THE UTILITY PATENTS, AND THAT WAS THE

13    '915.  THAT'S THE SCROLL AND THE ZOOM, THE ONE YOU CAN SCROLL

14    AND ZOOM AT THE SAME TIME, AND LET ME SHOW YOU WHAT'S BEEN DONE

15    BEFORE ON THAT, AND THAT'S SLIDE 6.

16         THIS IS AN INFRINGING PHONE THAT THE JURY FOUND, AND

17    WATCH.

18         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

19         MR. PRICE:  HE SLID IT UP, AND THEN YOU CAN USE TWO

20    FINGERS.

21         OKAY.  NOW, THIS IS THE PHONE THAT WILL BE IN THE EVIDENCE

22    OF SAMSUNG TECHNOLOGY IN THIS PHONE THAT DOES NOT INFRINGE THAT

23    PATENT.  THE JURY FOUND THAT.

24         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

25         MR. PRICE:  YOU SEE HOW IT SCROLLS UP?  AND IT ZOOMS.

1        THE LOOK -- THE LOOK IS VERY SIMILAR.  ONE INFRINGES, ONE DOES

2    NOT.  SO YOU NEED TO -- WHEN YOU'RE UNDERSTANDING THE SCOPE OF

3    THESE VERY TECHNICAL PATENTS, WHAT THEY REALLY MEAN, YOU'VE GOT

4    TO -- IT'S NOT JUST SCROLL AND ZOOM.  SAMSUNG DID, COULD HAVE

5    USED THE TECHNOLOGY IN THE REPLENISH.

6        AND AS TO WHAT'S BEEN DONE BEFORE BY THE WAY, AND THE

7    REASON, YOU KNOW, THESE PATENTS ARE READ A CERTAIN WAY AND WHEN

8    YOU LOOK AT THE TECHNOLOGY BEFORE -- LET ME SHOW YOU WHAT HAD

9    BEEN DONE BEFORE THE PATENT CAME OUT, BEFORE APPLE CAME OUT

10   WITH THE IPHONE.  THAT'S SLIDE 6.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12        MR. PRICE:  NOTICE WHAT HE DID IS HE USED TWO

13   FINGERS, BUT ON SEPARATE HANDS TO DO THAT.  SO, AGAIN, YOU CAN

14   EASILY UNDERSTAND, APPLE, AS MR. SINCLAIR FIRST SAID, WHEN THEY

15   FIRST WENT TO MARKET ON, YOU KNOW, NOT A LOT.

16        THE PATENTS ARE LIMITED.  THEY HAVE BOUNDARIES I THINK IS

17   ACTUALLY THE WORD YOU HEARD IN THE OPENINGS.  THE PATENTS HAVE

18   BOUNDARIES, AND YOU CAN SEE WHAT THOSE BOUNDARIES ARE TO SEE

19   WHETHER OR NOT SAMSUNG COULD HAVE USED A DIFFERENT TECHNOLOGY

20   FOR THESE PARTICULAR PHONES, AND TECHNOLOGY ACTUALLY USED IN

21   OTHER PHONES THAT GIVE THE SAME SORT OF EFFECT.

22        AND YOU'LL ALSO SEE -- YOU'RE GOING TO SEE PHONES FROM

23   OTHER MAKERS, THAT IS, FROM OTHER MANUFACTURERS THAT, THAT HAVE

24   THE SIZE AND SHAPE, YOU KNOW, THAT WOULD APPEAL TO CONSUMERS,

25   BUT WHICH ARE NOT ACCUSED, HAVE NOT BEEN ACCUSED OF INFRINGING

1       APPLE'S PATENTS.

2             SO ALL THAT YOU NEED TO TAKE INTO ACCOUNT WHEN YOU'RE

3       GOING TO SAY HOW MUCH WOULD SOMEONE PAY APPLE FOR USING THAT

4       PARTICULAR BOUNDARY, I GUESS, PATENT.

5             NOW, WITH RESPECT TO WHY PEOPLE BUY, MR. MCELHINNY SAID

6       THAT HE HAD A, A -- SOME PROFESSOR HAUSER WHO'S GOING TO COME

7       FROM M.I.T. AND HE DID A STUDY.

8             HE GOT OVER 800 SAMSUNG PURCHASERS TO PARTICIPATE IN THE

9       STUDY, PEOPLE WHO HAD BOUGHT PHONES THAT ARE ACCUSED, THAT THE

10      JURY FOUND INFRINGED.  THEY ACTUALLY HAD THESE VERSIONS OF

11      THESE PHONES.

12            HE PICKED THEM FOR THAT REASON.  HE WANTED TO PICK PEOPLE

13      WHO ACTUALLY HAD PURCHASED THE PHONES THAT, YOU KNOW, THIS JURY

14      FOUND INFRINGED.

15            AND WHEN HE GOT THEM TOGETHER AND HE DID A SURVEY, HE

16      DIDN'T ASK THEM, WHY DID YOU BUY THE SAMSUNG?  HE DIDN'T EVEN

17      ASK THEM, ARE YOU AWARE THAT THESE THREE FEATURES ARE ON YOUR

18      PHONE?  WHICH WOULD DIRECTLY ANSWER THE QUESTION THAT YOU FOLKS

19      ARE SUPPOSED TO ANSWER, WHICH IS, WHY DO PEOPLE BUY THESE

20      PHONES?  IS IT BECAUSE OF THESE FEATURES?

21            HE DIDN'T ASK THEM, OKAY, IF THESE WEREN'T ON YOUR PHONE,

22      WOULD YOU BUY AN APPLE PHONE WHICH HAS MUCH DIFFERENT FEATURES,

23      DIFFERENT SCREEN SIZE AND DIFFERENT, NON-REMOVABLE BATTERY AND

24      DIFFERENT OPERATING SYSTEM?  HE DIDN'T ASK THEM.

25            WHAT HE DID, IT'S CALLED A CONJOINT STUDY WHERE HE SHOWS

1     THEM 16 SCREENS WITH EACH HAVING THESE SETS OF FEATURES, EACH

2     SET HAS 28 HYPOTHETICAL PHONES AND DESCRIPTIONS, AND YOU THEN

3     SAY, I WANT THAT, I PREFER THAT, I PREFER THAT, AND YOU DO IT

4     IN 20 OR 25 MINUTES.

5          AND WHAT HE SAYS IS, AFTER DOING ALL THAT -- AND THIS IS

6     SLIDE 77 -- WHAT HE SAYS IS THAT -- FIRST HE FOUND THE AVERAGE

7     PRICE PEOPLE PAID FOR THE SAMSUNG PHONE IS $152.

8          AND THEN HE SAYS, IF YOU LOOK AT THESE PATENTS AND BASED

9     ON THIS, PEOPLE WOULD PAY $100 MORE FOR A PHONE IF IT HAD THESE

10    THREE FEATURES.

11         NOW, WHAT THE EVIDENCE IS GOING TO SHOW IS THAT IF YOU DO

12    THAT ANALYSIS ON EVERY FEATURE IN THE PHONE, YOU'RE GOING TO

13    HAVE A PHONE THAT WOULD COST, THAT PEOPLE WOULD BE WILLING TO

14    PAY THOUSANDS AND THOUSANDS OF DOLLARS FOR, BECAUSE THESE

15    AREN'T THE MAIN FEATURES ON THE PHONE.  YOUR PHONE HAS HUNDREDS

16    OF FEATURES.

17         IN FACT, HE ASKED THESE SURVEY RESPONDENTS ABOUT OTHER

18    FEATURES.  HE GOT THE DATA FOR THOSE OTHER FEATURES -- AND THIS

19    IS SLIDE 113 -- CAMERA, WEIGHT AND SIZE, STORAGE, CONNECTIVITY,

20    ET CETERA.

21         HE GOT THE DATA.  HE INTENTIONALLY CHOSE NOT TO CALCULATE

22    WHAT A CONSUMER WOULD PAY FOR THOSE.  NOT PRESENTED IN HIS

23    REPORT.  HE DIDN'T DO IT.

24         AND THE EVIDENCE WILL SHOW THE REASON WHY IS, BOY, THAT

25    WOULD ADD UP TO A TON OF MONEY AND YOU KNOW CONSUMERS AREN'T

1      GOING TO PAY THAT MUCH FOR A PHONE.

2            IN FACT, HE DIDN'T ASK ABOUT FEATURES THAT APPLE THINKS

3      ARE IMPORTANT IN A PHONE.  YOU REMEMBER THAT APPLE SURVEY I

4      SHOWED YOU ABOUT ANDROID PHONES?  ANOTHER DOCUMENT HERE, THE

5      SMARTPHONE STUDY -- AND LET'S GO TO SLIDE 116 -- AND THEY TALK

6      ABOUT THE THINGS THAT ARE IMPORTANT IN THE PURCHASING DECISION,

7      LIKE ACCESS TO THE WEB, SCREEN QUALITY, COMBINING FEATURES,

8      BRAND, TOUCHSCREEN, GPS LOCATION DEVICES.  I MEAN, THEY TALK

9      ABOUT A TON OF FEATURES.

10            AND IF WE LISTED THOSE -- 159 I THINK IS THE DEMONSTRATIVE

11      THAT WE HAVE -- IF WE LISTED THOSE AND IF MR. HAUSER HAD DONE

12      THE STUDY AND CONCLUDED FOR ALL OF THESE, WHAT WOULD YOU PAY

13      FOR THAT?  WHAT WOULD YOU PAY FOR THAT?  WHAT WOULD YOU PAY FOR

14      THAT?  CAN YOU IMAGINE HOW MUCH HIS CONCLUSION WOULD BE?

15            HE DIDN'T EVEN ASK ABOUT FEATURES ON THE TOUCHSCREEN.  THE

16      TOUCHSCREEN HAS A LOT OF FEATURES, TOO, RIGHT?  THAT'S 97.  HE

17      DIDN'T ASK ABOUT UP/DOWN SCROLL, SIDE/SIDE SCROLL, VIRTUAL

18      KEYBOARD, ET CETERA.

19            YOU WILL SEE NO EVIDENCE IN THIS CASE THAT PEOPLE WHO

20      CHOSE SAMSUNG AND ANDROID FOR ALL OF ITS UNIQUE FEATURES WOULD

21      HAVE CHOSEN APPLE IF THESE THREE UTILITY FEATURES WEREN'T ON

22      IT.

23            SO LET ME GO, THEN, TO -- THAT EVIDENCE PERTAINS LARGELY

24      TO WHETHER OR NOT APPLE LOST PROFITS, WOULD THOSE SALES HAVE

25      GONE TO APPLE?

```
 1          LET ME TALK TO YOU ABOUT THE CLAIM TO SAMSUNG'S PROFITS.

 2          AND BY THE WAY, THE PROFITS ON THESE PHONES -- THE GROSS

 3   REVENUE ON THESE PHONES IS NOT 3.5 BILLION AND APPLE'S EXPERT

 4   IS NOT GOING TO SAY IT'S ANYWHERE CLOSE TO THAT.  THAT NUMBER

 5   IS THROWN OUT THERE SO THAT YOU'LL THINK, OH, MY GOSH, I'VE GOT

 6   TO GIVE A PERCENTAGE OF THAT.

 7          THIS CASE IS ABOUT DAMAGES ON THESE 13 PRODUCTS, LOOKING

 8   AT, YOU KNOW, SAMSUNG'S PROFITS, SAMSUNG'S REVENUE ON THESE 13

 9   PRODUCTS, WHICH REALLY IS UNDISPUTED.  IT'S NOWHERE CLOSE TO

10   3.2 BILLION OR EVEN A BILLION.

11          BUT APPLE MISLEADS YOU HERE.  IF YOU DO A FAIR EXAMINATION

12   OF WHAT THESE, WHAT SAMSUNG'S PROFITS WERE, THEY'RE ABOUT

13   $52 MILLION.

14          AND YOU'RE GOING TO HEAR FROM TWO EXPERTS.  YOU'RE GOING

15   TO HEAR FROM MR. WAGNER -- THAT'S 27 -- AND MR. WAGNER HAS A

16   NUMBER OF DEGREES.  HE'S AN ACCOUNTANT.  HE HAS AN MBA.  HE'S A

17   MEMBER OF THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC

18   ACCOUNTANTS, WHICH IS THE BIGGEST ORGANIZATION OF ACCOUNTANTS.

19          HE'S CERTIFIED IN FINANCIAL FORENSICS, YOU KNOW, LOOKING

20   FOR THINGS TO SEE IF THEY'RE SUSPICIOUS OR WHATEVER IN

21   FINANCIAL STATEMENTS, ET CETERA.

22          MS. DAVIS, THAT'S APPLE'S EXPERT -- IF WE CAN GO TO 85,

23   JUST GO TO 85 -- YOU'LL BE ABLE TO COMPARE THE QUALIFICATIONS.

24   MR. WAGNER IS THE CHAIRPERSON OF CALIFORNIA SOCIETY OF CPA'S

25   LITIGATION SERVICES COMMITTEE.  HE'S BEEN ON A NUMBER OF
```

 1    COMMITTEES, INCLUDING THE CREDENTIAL COMMITTEE FOR THE AMERICAN

 2    INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  HE HAS 29

 3    PROFESSIONAL PUBLICATIONS AND HE HAS BEEN AN EXPERT AT TRIAL,

 4    QUALIFIED AS AN EXPERT AT TRIAL ABOUT 130 TIMES.  AND I ASKED

 5    HIM, THAT ACTUALLY IS -- THAT'S NOT AN ESTIMATE.  IT ACTUALLY

 6    IS 130 AND IT'S NOT 129 OR 131.

 7        WHEREAS MS. DAVIS, AT LEAST AS OF THE TIME WE ASKED HER,

 8    HAD DONE THIS 53 TIMES.

 9        AND HIS METHODOLOGY CALCULATION IS SIMPLE.  IT'S THE

10    METHODOLOGY THAT ACCOUNTANTS USE TO DETERMINE WHAT PROFITS ARE.

11        IF WE GO TO SLIDE 31?  HE TAKES THE TOTAL REVENUE AND

12    SUBTRACTS THE COSTS AND YOU HAVE TOTAL PROFITS.

13        AND THOSE COSTS INCLUDE COSTS OF GOODS SOLD.  YOU'VE GOT

14    TO BUY PLASTIC AND YOU'VE GOT TO BUY METAL AND YOU'VE GOT TO

15    BUY THINGS THAT GO INTO THE PRODUCT.

16        AND HE ALSO SUBTRACTS OPERATING EXPENSES, SALES EXPENSES.

17    YOU NEED PEOPLE TO SELL THE PRODUCT.  YOU KNOW, YOU'RE NOT

18    GOING TO BUILD A COMPANY WITHOUT PEOPLE SELLING THE PRODUCT.

19    YOU NEED MARKETING.  YOU NEED TO ADVERTISE THE PRODUCTS.  YOU

20    NEED, THERE'S RESEARCH AND DEVELOPMENT EXPENSES.

21        AND THEN THERE'S GENERAL ADMINISTRATIVE BECAUSE, YES, YOU

22    DO NEED MANAGERS.  YOU DO NEED AN H.R.  AS HE'LL TELL YOU, IF

23    YOU'RE -- AN EXAMPLE IS IF A COMPANY WERE GOING TO START TO

24    MAKE THESE 13 PRODUCTS, RIGHT, IF YOU'RE GOING TO START A

25    COMPANY FOR THAT, I WANT TO SELL THE PRODUCTS LIKE THIS, THEN

1    YOU'RE GOING TO HAVE TO, YOU KNOW, GET A BUILDING; YOU'RE GOING

2    TO HAVE TO HAVE A MANUFACTURER FACILITY; YOU'RE GOING TO HAVE

3    TO GET PEOPLE TO MANAGE; GET SALES PEOPLE; YOU'RE GOING TO HAVE

4    TO ADVERTISE.  THOSE ARE REAL EXPENSES.  THOSE AREN'T MADE UP

5    FOR THE TRIAL.

6         AND THEY ARE SHARED RESOURCES, AND WHAT MR. WAGNER DOES IS

7    WHAT EVERY MAJOR COMPANY IN THE WORLD DOES, INCLUDING APPLE,

8    WHICH IS THEY SHARE THOSE ALLOCATED COSTS.

9         SO FOR THOSE 13 PHONES, FOR EXAMPLE, WITH THAT NEW

10   COMPANY, THEN EACH PHONE, YOU KNOW, WOULD BE -- YOU'D DEDUCT

11   FROM ITS REVENUE A SHARE OF THE SALESMAN'S COSTS, HIS SALARY.

12   THAT'S HOW EVERYONE DOES IT, INCLUDING APPLE.

13        IN FACT, LET'S GO TO SLIDE 83.  APPLE'S STATEMENTS AND

14   SAMSUNG'S DEDUCT ALL THESE COSTS IN ARRIVING AT WHAT THEIR

15   PROFITS ARE.

16        YOU CAN GO TO 144.  THIS IS APPLE'S.  IT HAS COST OF

17   SALES, AND THEN A GROSS MARGIN.  THAT IS SUBTRACTING THE COSTS

18   OF GOODS SOLD, AND THAT'S WHERE MS. DAVIS STOPS.

19        BUT APPLE, BEFORE GETTING TO ITS OPERATING INCOME, WHICH

20   IS THE TOTAL PROFIT BECAUSE THE ONLY OTHER STUFF YOU HAVE IS

21   OTHER INCOME EXPENSE, WHICH WOULD BE UNRELATED TO YOUR MAIN

22   PRODUCTS, AND THEN -- WHICH WOULD GIVE YOU INCOME BEFORE TAXES

23   AND WE'RE NOT SUBTRACTING TAXES.

24        BUT APPLE, WHEN WE'RE GETTING TO THAT TOTAL PROFIT, TAKES

25   OUT RESEARCH AND DEVELOPMENT, SELLING, GENERAL, AND

1          ADMINISTRATIVE TO GET TO ITS TOTAL OPERATING EXPENSES.

2              SO WHEN NOT IN COURT, APPLE DEDUCTS OPERATING EXPENSES TO

3     GET TO ITS PROFIT BEFORE IT'S GOING TO PAY TAX ON THE PROFIT.

4              AND AS I SAID, THESE ARE SHARED EXPENSES, SO THEY'RE

5     ALLOCATED.  BUT THERE IS A NEXUS BETWEEN THOSE EXPENSES AND

6     MAKING THESE PHONES.

7              AS TO THE DATA ITSELF, WHAT YOU'RE GOING TO HEAR IS THAT

8     SAMSUNG HAS SOMETHING CALLED AN S.A.P. MANAGEMENT SYSTEM, WHICH

9     IS A SOFTWARE COMPANY AND, IN MANAGEMENT CIRCLES, THAT COMPANY

10    IS LIKE THE MICROSOFT OF SOFTWARE.  IT IS A, A SOFTWARE THAT'S

11    USED BY MANY, MANY MAJOR COMPANIES IN THE WORLD, INCLUDING

12    APPLE.

13             AND WHAT IT ALLOWS YOU TO DO, WHAT YOU DO IS THAT ON A

14    DAILY BASIS, NOT FOR THE TRIAL, ON A DAILY BASIS YOU INPUT, YOU

15    KNOW, YOUR SALES.  YOU INPUT YOUR COSTS.  YOU DO IT ON A DAILY

16    BASIS, AND THEN USE THAT SOFTWARE TO COMPILE REPORTS, INCLUDING

17    THE REPORTS THAT YOUR AUDITORS, YOU KNOW, PRESENT TO THE

18    PUBLIC, INCLUDING REPORTS TO THE SECURITIES AND EXCHANGE

19    COMMISSION.  I MEAN, THIS IS ABOUT HOW EVERY COMPANY DOES IT.

20             AND WHAT SAMSUNG DID HERE WAS USED THAT SOFTWARE TO LOOK

21    AT ITS RAW DATA AND ASK, WHAT ARE THE COSTS OF THESE PARTICULAR

22    PHONES?  BECAUSE SAMSUNG NORMALLY, THEIR REPORTED DOCUMENTS

23    DON'T GO INTO THAT DETAIL.  APPLE'S DON'T EITHER.  APPLE, IN

24    FACT, DOESN'T EVEN KEEP TRACK OF ITS U.S. EXPENSES ON THE

25    PHONES.  YOU'RE GOING TO HEAR THEIR EXPERT TESTIFY ABOUT LOST

1    PROFITS AND SAY, I COULDN'T USE THE U.S. EXPENSES BECAUSE APPLE

2    DOESN'T HAVE THEM.  WE USE IT WORLDWIDE.

3         SO THE DATA IS DATA THAT IS, THE DATA THAT WAS CREATED

4    BEFORE THE TRIAL, AND MR. WAGNER WILL EXPLAIN TO YOU THAT WHEN

5    YOU LOOK AT THAT DATA AND YOU DO THE CORRECT CALCULATIONS,

6    HERE'S WHAT HAPPENS.

7         AND THIS IS SLIDE 35.  THIS IS THE METHODOLOGY.

8         AND, MR. WAGNER, REVENUES, SUBTRACTS COSTS OF GOODS SOLD,

9    SUBTRACTS OPERATING EXPENSES, AND COMES TO A PROFIT, AS APPLE

10   DID WHEN IT WAS TELLING THE PUBLIC WHAT ITS PROFIT WAS.

11        MS. DAVIS DOESN'T SUBTRACT A PENNY OF ADVERTISING, OF

12   SALES EXPENSE EVEN THOUGH THAT MONEY IS REALLY SPENT.

13        SO IF WE GO TO SLIDE 30 -- I'M SORRY, SLIDE 29 -- WHEN YOU

14   DO THAT CALCULATION THAT YOU SHOULD DO ON THESE PHONES,

15   SAMSUNG'S PROFIT WAS NOT A TRIVIAL AMOUNT, WAS $52 MILLION,

16   52.7, AND GIVEN THE JURY'S FINDING, SAMSUNG IS ENTITLED TO -- I

17   MEAN APPLE IS ENTITLED TO THAT BECAUSE YOU REMEMBER THE LAW ON

18   DESIGN PATENT INFRINGEMENT IS YOU GET THE INFRINGER'S PROFITS.

19   EVEN IF PEOPLE DIDN'T BUY THE PHONE BECAUSE OF THAT, IT DIDN'T

20   MATTER.  YOU GET THE INFRINGER'S PROFITS, AND SO THAT'S WHAT WE

21   SHOULD PAY IN THIS CASE.

22        AND THE DIFFERENCE, THEN -- IF YOU GO TO 132 -- BETWEEN

23   WHAT MS. DAVIS DOES IS SHE DOESN'T SUBTRACT ABOUT $234 MILLION

24   IN MONEY THAT WAS REALLY PAID, YOU KNOW, BY SAMSUNG AND,

25   THEREFORE, SHOULD NOT BE PART OF THIS PROFIT.

1          WHAT SHE DOES IS ADD THOSE EXPENSES INTO REVENUES.

2          AND SO THIS IS A CASE NOT WHERE WE'RE DISPUTING THAT THE

3     13 PHONES INCORPORATE SOME ELEMENTS OF APPLE'S PROPERTY.  WE'RE

4     NOT DISPUTING THAT, IN COMING OUT WITH THESE PHONES, THAT

5     SAMSUNG DIDN'T PUT INTO THESE THINGS WHICH THE JURY FOUND IT

6     SHOULDN'T.

7          BUT THAT DOESN'T MEAN APPLE GETS TO COME IN HERE AND ASK

8     FOR A WINDFALL, MORE THAN IT KNOWS IT IS ENTITLED TO AND

9     ATTEMPT TO GET AN ADVANTAGE IN THE MARKETPLACE.

10         LET ME TALK TO YOU FINALLY A LITTLE BIT ABOUT THE ROYALTY

11    SECTION.

12         REMEMBER I SAID THAT THE REASONABLE ROYALTY IS -- CAN I

13    HAVE SLIDE 57 -- IT'S WHERE YOU'RE -- IT'S A HYPOTHETICAL

14    NEGOTIATION WHERE IT'S THE AMOUNT THAT APPLE AND SAMSUNG WOULD

15    HAVE AGREED UPON IF BOTH OF THEM REASONABLY AND VOLUNTARILY

16    WERE TRYING TO REACH AN AGREEMENT, SITTING AROUND, RIGHT FROM

17    THE BEGINNING OF THINGS WHEN THESE PRODUCTS CAME OUT.

18         AND FOR THE DESIGN PATENTS, YOU KNOW, THAT'S THE FACE AND

19    THE ICONS, I SHOWED YOU THE SIMILARITIES BETWEEN WHAT'S

20    INFRINGING AND WHAT HAS BEEN FOUND NOT TO INFRINGE.  FOR

21    EXAMPLE, THE ACE DOESN'T INFRINGE THE IPHONE D'677 PATENT, AND

22    I SHOWED YOU THOSE ICONS THAT DIDN'T HAVE THE TILE.

23         AND SO, AGAIN, THE EVIDENCE IS GOING TO SHOW THAT FOR

24    THOSE, THE AMOUNT THAT MR. WAGNER SAYS, WELL, YOU WOULD BE

25    WILLING TO PAY HIM ROYALTY," WHICH IS AN AMOUNT OF HOW MUCH

1    WOULD IT COST YOU TO CHANGE TO THESE OTHER WAYS OF DOING IT,

2    WHICH ARE VERY SIMPLE, AND LOOK A LOT LIKE WHAT THE WORLD CAN

3    DO.  IT'S WHAT THE WORLD CAN DO WITHOUT PAYING ANYTHING, LOOKED

4    SIMILAR LIKE THE IPHONE BECAUSE THE IPHONE'S INVENTED ONLY IN

5    VERY SPECIFIC WAYS.

6         AND APPLE'S EXPERT SAYS THAT, BY THE WAY, THAT $24 THAT IT

7    WOULD PAY WOULD BE, WOULD GIVE YOU THE RIGHTS NOT JUST TO THE

8    FACE AND TO THOSE ICONS, BUT ALSO -- WE CAN PUT UP, I GUESS

9    IT'S 137.  PUT IT UP -- IT MEANS THAT YOU CAN PUT ON YOUR

10   PHONE, FOR THAT AMOUNT OF MONEY, PUT ON YOUR PHONE, IPAD.  YOU

11   CAN PUT THAT ON YOUR SAMSUNG PHONE.  ON THE SAMSUNG PHONE FOR

12   THAT, $24 DOLLARS.  YOU COULD PUT UP IPOD.  YOU COULD USE THE

13   APPLE LOGO.  THAT'S HOW MUCH IT WOULD COST IF YOU GOT THE

14   RIGHTS TO DO ALL OF THAT, SAMSUNG.

15        BUT WE'RE GOING TO CHARGE YOU THAT JUST FOR THE SHAPE OF

16   THE FRONT OF THE IPHONE EVEN THOUGH YOU CAN USE OTHER SHAPES

17   THAT ARE SCREEN-CENTRIC SO THERE CAN BE COMPETITION.

18        AND THE EVIDENCE IS GOING TO SHOW THAT THAT'S ABSURD AND

19   THAT WHAT SAMSUNG WOULD HAVE PAID AND WHAT REASONABLY WOULD

20   HAVE BEEN PAID IN ROYALTY FEES IS AN AMOUNT TO JUST SWITCH

21   OTHER.

22        FOR THE UTILITY PATENTS, AGAIN, THE AMOUNT THAT YOU WOULD

23   PAY FOR THE UTILITY PATENTS, THE COST OF REPLACING, YOU KNOW,

24   SWITCHING FROM, FROM, YOU KNOW, THAT TECHNOLOGY I SHOWED YOU

25   THAT DID INFRINGE VERSUS THE TECHNOLOGY THAT DID NOT INFRINGE

1        AND PROVIDED A VERY, VERY, VERY SIMILAR USER EXPERIENCE.

2            AND IF WE CAN GO TO THAT, SLIDE 131, AND SO THE --

3    MR. WAGNER CALCULATES THE TIME TO DO THAT, TO DESIGN AROUND,

4    AND COMES UP WITH A COST TO IMPLEMENT THOSE REPLACEMENTS, IT'S

5    ACROSS THE PHONES.

6            SO IN OTHER WORDS, SWITCHING FROM ONE PHONE WHICH DOES

7    THIS AND THEN ZOOMING THAT INFRINGES TO ONE THAT DOESN'T

8    INFRINGE AND, AND LOOKS LIKE IT DOES SOMETHING VERY, VERY

9    SIMILAR, AND YOU SAW THE VIDEO, AND YOU'LL HAVE ACTUALLY THOSE

10   PHONES WITH YOU SO YOU CAN SAY, OKAY, THIS ISN'T ALLOWED, THIS

11   IS.

12           REALLY WHAT WOULD YOU PAY TO, TO DO IT THIS WAY WHEN

13   YOU'RE DOING IT THIS WAY AND THIS WAY DOESN'T INFRINGE AND IT

14   PROVIDES THE SAME USER EXPERIENCE?

15           AND SO THE TOTAL AMOUNT THAT, THAT APPLE IS ENTITLED TO IN

16   THIS CASE -- GO TO 16 -- IS THE LOST PROFITS WE HAVE IS 0

17   BECAUSE YOU'RE NOT GOING TO HEAR ANY EVIDENCE THAT SOMEONE

18   BOUGHT A SAMSUNG PHONE WITH ALL THOSE UNIQUE FEATURES WHO WOULD

19   HAVE SWITCHED TO APPLE THAT DIDN'T HAVE THESE FEATURES.  IN

20   FACT, YOU'LL FIND THAT APPLE HAD A CHANCE TO DO A SURVEY THAT

21   MIGHT ANSWER THAT QUESTION AND INTENTIONALLY CHOSE NOT TO ASK

22   IT.

23           AND YOU'LL HAVE TO DECIDE WHY THEY CHOSE NOT TO ASK ALL

24   THOSE SAMSUNG BUYERS, WHY DID YOU BUY THE PHONE?  WOULD YOU

25   SWITCH TO APPLE IF THESE THREE WEREN'T THERE?  THERE'S NO

1      EVIDENCE OF THAT.

2          WITH RESPECT TO PROFITS, I EXPLAINED TO YOU IT'S GOING TO

3      BE ABOUT 52.7 MILLION WHEN YOU DEDUCT THE COSTS THAT EVERYONE

4      IN THE WORLD DEDUCTS FOR MAKING PRODUCT AND THE REASONABLE

5      ROYALTY OF 28,452, SO YOU GET ABOUT $52.7 MILLION, AND YOU GET

6      THAT WAY NOT BY BRINGING IN THE, YOU KNOW, PITCHFORKS AND

7      TRYING TO PUT SOMEONE IN THE FIRE AND BURN THEM.  THAT'S NOT

8      WHAT THIS PHASE IS ABOUT.

9          WHAT THIS PHASE IS ABOUT IS, OKAY, THE JURY HAS FOUND THAT

10     THESE FIVE SPECIFIC FEATURES WITH THESE PATENTS WHICH ARE

11     BORDERLINE BY WHAT WAS ALREADY OUT THERE WERE USED, AND SO HOW

12     DID IT AFFECT APPLE?  AND WHAT'S THAT REALLY WORTH?

13         AND LET ME SHOW YOU JUST, I GUESS, AN EXAMPLE OF THAT.

14     THIS IS ONE OF THE ACCUSED PHONES, THE INDULGE.  APPLE IS

15     TELLING YOU THAT, THAT IF THIS PHONE DIDN'T HAVE THE ACCUSED

16     PATENTS -- AND BY THE WAY, ALL OF THESE PHONES DON'T HAVE ALL

17     OF THEM -- THAT IF IT DIDN'T, THE PURCHASER OF THIS PHONE IS

18     LIKELY TO GO BUY AN IPHONE.

19         SEE THE PHONE?  I THINK THE EVIDENCE WOULD SHOW THAT

20     SOMEONE WHO PURCHASED THIS PHONE LIKES REAL KEYBOARDS.  I MEAN,

21     THAT'S THE REASON SOME OF US, DINOSAURS, STILL HAVE

22     BLACKBERRIES.

23         THAT -- BUT APPLE'S EXPERT IS GOING TO TELL YOU, NO, NO,

24     BECAUSE WE'VE GOT TO PUMP UP THAT APPLE DAMAGES NUMBER, A LOT

25     OF PEOPLE WHO BOUGHT THIS PHONE, BOY, IF IT DIDN'T HAVE THOSE

1    THREE FEATURES, THEY'RE GOING TO GO BUY AN APPLE WITH A

2    DIFFERENT OPERATING SYSTEM, WITH A NON-REMOVABLE BATTERY, YOU

3    KNOW, WITH 4G AND NOT 4G, YOU KNOW, THAT THEY'RE GOING TO MAKE

4    THAT SWITCH.

5             AND YOU'RE GOING TO BE ASKED TO USE NOT JUST -- NOT JUST

6    LISTEN TO THE EXPERTS, BUT LISTEN TO YOUR COMMON SENSE, BECAUSE

7    YOU'RE GOING TO HAVE ALL THE PHONES BACK THERE, AND ASK

8    YOURSELF IS THAT WHY PEOPLE BOUGHT THESE PHONES, THE SAMSUNG

9    PURCHASERS?  AND WOULD THEY LEAVE FOR APPLE IF THEY DIDN'T HAVE

10   THESE FEATURES ON THEM?

11            SO WHAT WE ASK YOU TO DO IS WHAT YOU TOLD US THAT YOU

12   WOULD DO, WHAT YOU CAME IN HERE WHEN YOU WERE SWORN, AND THAT

13   IS TO LISTEN TO THE EVIDENCE AND THE LAW AND APPLY THAT AND,

14   YOU KNOW, WITHOUT BIAS, ANSWER THE QUESTIONS, YOU KNOW, WHAT

15   ARE THE CORRECT DAMAGES UNDER THE LAW IN THIS CASE?

16            AND IF YOU DO THAT WITHOUT BIAS, AND I KNOW YOU WILL, AND

17   IF YOU LISTEN TO THE EVIDENCE, YOU'RE GOING TO COME BACK WITH A

18   HUGE SUM OF MONEY, WHICH IS ABOUT $52 MILLION, AND A FEW

19   HUNDRED THOUSAND ON TOP OF THAT.

20            SO THANK YOU VERY MUCH FOR YOUR ATTENTION, AND I LOOK

21   FORWARD TO SEEING YOU -- I CAN'T TALK TO YOU AGAIN UNTIL THE

22   END, YOU KNOW, BUT I LOOK FORWARD TO PRESENTING THE DAMAGES TO

23   YOU.

24            THANKS.

25                 THE COURT:  CALL YOUR FIRST WITNESS, PLEASE.

```
1           MR. MCELHINNY:  MAY I HAVE A MINUTE TO MOVE THE
2   COURTROOM AROUND JUST A BIT?
3           THE COURT:  THAT'S FINE.
4           MR. MCELHINNY:  THANK YOU, YOUR HONOR.
5       (PAUSE IN PROCEEDINGS.)
6           THE COURT:  WE'LL JUST GO UNTIL NOON.  IF YOU'D LIKE
7   TO STAND UP NOW OR GET SOME WATER, YOU'RE FREE TO DO THAT.
8       (PAUSE IN PROCEEDINGS.)
9           MR. MCELHINNY:  THANK YOU.
10          THE CLERK:  MR. MCELHINNY, DO YOU HAVE THE PHOTOS?
11          MR. MCELHINNY:  I'M SORRY?
12          THE CLERK:  THE PHOTOS OF THE WITNESS FOR THE JURY
13  BINDERS?
14          MS. KREVANS:  WE HAVE THEM.
15          MR. MCELHINNY:  WE HAVE THEM.  THEY'RE JUST NOT
16  PUNCHED, YOUR HONOR.
17          THE COURT:  OKAY.  DO YOU HAVE A HOLE PUNCHER?
18          MS. KREVANS:  WE DO.
19          THE COURT:  OKAY, GREAT.
20          MR. MCELHINNY:  WE HAVE 17 HOLE PUNCHERS, YOUR HONOR.
21          THE COURT:  OKAY.  WE HAVE ONE IF YOU NEED ONE.
22      (PAUSE IN PROCEEDINGS.)
23          THE COURT:  YOU READY?
24          MR. MCELHINNY:  YOUR HONOR, BEFORE I CALL MY FIRST
25  WITNESS -- I'M READY, BUT BEFORE I CALL MY FIRST WITNESS, I
```

1    WOULD LIKE TO MOVE INTO EVIDENCE 20 PHYSICAL EXHIBITS.

2              THE COURT:  THIS IS GOING TO BE ON YOUR TRIAL TIME.

3              MR. MCELHINNY:  I UNDERSTAND, YOUR HONOR, WHICH IS

4    WHY I'M DOING IT QUICKLY.

5              THE COURT:  OKAY.  TIME IS NOW 11:45.

6              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

7         WE WOULD MOVE JX 1000, WHICH IS THE IPHONE; JX 1001, WHICH

8    IS THE IPHONE 3G; JX 1002, WHICH IS THE IPHONE 3GS; JX 1003,

9    WHICH IS THE IPHONE 4; JX 1004, WHICH IS THE IPAD; JX -- WHICH

10   BY THE WAY STANDS FOR JOINT EXHIBIT -- JX 1005, WHICH IS THE

11   IPAD 2; JX 1011, WHICH IS THE GALAXY S CAPTIVATE; JX 1012, THE

12   GALAXY EPIC 4G; JX 1014, THE TRANSFORM; JX 1016, THE GALAXY S

13   CONTINUUM; JX 1019, THE GALAXY S 4G; JX 1020, THE GEM; JX 1022,

14   THE GALAXY PREVAIL; JX 1023, THE NEXUS S 4G; JX 1024, THE

15   REPLENISH; JX 1025, THE DROID CHARGE; JX 1026, THE INDULGE;

16   JX 1027, THE INFUSE 4G; JX 1028, THE EXHIBIT 4G; AND JX 1036,

17   THE GALAXY TAB S -- I'M SORRY -- THE GALAXY TAB 7.0.

18        EACH OF THE PHYSICAL EXHIBITS IS ON THE CART.  THEY'VE

19   EACH BEEN INSPECTED BY SAMSUNG, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  LET ME JUST RECAP THAT.

21        JX 1000 IS THE IPHONE; 1001 IS THE IPHONE 3; 1002 IS

22   IPHONE 3GS; 1003 IS THE IPHONE 4; 1004 IS THE IPAD; 1005 IS THE

23   IPAD 2.

24        WHAT WAS THE NUMBER FOR THE CAPTIVATE?

25              MR. MCELHINNY:  1011, THE GALAXY S CAPTIVATE.

```
1              THE COURT:  AND THE EPIC 4G WAS JX?

2              MR. MCELHINNY:  12, 1012.

3              THE COURT:  OKAY.  AND THEN JX 1014 WHICH WAS WHICH

4      EXHIBIT?

5              MR. MCELHINNY:  THE TRANSFORM.

6              THE COURT:  OKAY.  AND THEN 16 WAS THE CONTINUUM?

7              MR. MCELHINNY:  IT WAS.

8              THE COURT:  19 WAS THE?

9              MR. MCELHINNY:  S 4G.

10             THE COURT:  OKAY.  20 WAS THE GEM; 22 WAS THE

11     PREVAIL; 23 WAS THE NEXUS S 4G; 24, THE REPLENISH; 25, THE

12     DROID CHARGE; 26 THE INDULGE; 27, INFUSE 4G; 28, THE

13     EXHIBIT 4G.

14             MR. MCELHINNY:  YES, YOUR HONOR.

15             THE COURT:  AND THE -- WHAT WAS THE NUMBER FOR THE

16     TAB 7?

17             MR. MCELHINNY:  THE JX 1036.

18             THE COURT:  1036.

19         ANY OBJECTION?

20             MR. JOHNSON:  NO, YOUR HONOR.

21             THE COURT:  OKAY.  THOSE ARE ALL ADMITTED.

22         (JOINT EXHIBITS 1000, 1001, 1002, 1003, 1004, 1005, 1011,

23             1012, 1014, 1016, 1019, 1020, 1022, 1023, 1024, 1025,

24             1026, 1027, 1028, AND 1036 WERE ADMITTED IN EVIDENCE.)

25             THE COURT:  GO AHEAD, PLEASE.
```

```
 1              MR. MCELHINNY:  YOUR HONOR, WE WOULD CALL

 2    DR. RAVIN BALAKRISHNAN.

 3              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE?

 4         (RAVIN BALAKRISHNAN, PLAINTIFF'S WITNESS, SWORN.)

 5              THE WITNESS:  I DO.

 6              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

 7              THE WITNESS:  THANK YOU.

 8              THE CLERK:  WOULD YOU PULL THE MICROPHONE TOWARD YOU

 9    AND STATE YOUR NAME AND SPELL IT.

10              THE WITNESS:  MY NAME IS RAVIN BALAKRISHNAN.  IT'S

11    SPELLED R-A-V-I-N, LAST NAME SPELLED B-A-L-A-K-R-I-S-H-N-A-N.

12              THE CLERK:  THANK YOU.

13              THE COURT:  QUICK QUESTION.  YOU ALL DID NOT WANT AN

14    EXCLUSION OF WITNESSES, OR YOU DID?  DO YOU WANT AN EXCLUSION

15    OF TESTIFYING WITNESSES?

16              MR. MCELHINNY:  WE WANT AN EXCLUSION OF TESTIFYING

17    WITNESSES OTHER THAN EXPERTS, YOUR HONOR.

18              THE COURT:  OKAY.  THANK YOU.  GO AHEAD, PLEASE.

19                        DIRECT EXAMINATION

20    BY MR. MCELHINNY:

21    Q.  DOCTOR, COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

22    A.  SURE.  MY NAME IS RAVIN BALAKRISHNAN.  I'M A PROFESSOR OF

23    COMPUTER SCIENCE AT THE UNIVERSITY OF TORONTO, DEPARTMENT OF

24    COMPUTER SCIENCE, WHERE I ALSO HOLD A CANADA RESEARCH CHAIR IN

25    HUMAN INTERFACES AND I DIRECT THE COMPUTER GRAPHICS AND USER
```

1        INTERFACE RESEARCH LAB.

2                MR. MCELHINNY:  YOUR HONOR, WE HAVE PDX 104.1 ON THE

3        SCREEN, A CHART OF DR. BALAKRISHNAN'S RESUME.

4            CAN YOU TELL US ABOUT YOUR EDUCATIONAL BACKGROUND, PLEASE.

5        A.   YES.  I HAVE THREE DEGREES IN COMPUTER SCIENCE, A

6        BACHELOR'S DEGREE, A MASTER'S, AND A PH.D., ALL IN COMPUTER

7        SCIENCE, WITH THE MASTER'S AND PH.D.'S FOCUSSING ON THE AREA OF

8        HUMAN COMPUTER INTERACTION, WHICH IS THE RESEARCH I WORK IN.

9        Q.   HOW LONG HAVE YOU BEEN TEACHING?

10       A.   I'VE BEEN TEACHING AT THE UNIVERSITY OF TORONTO SINCE

11       2001, SO THAT WOULD BE ALMOST 12 YEARS, JUST OVER 12 YEARS

12       RIGHT NOW.

13       Q.   DO YOU CONDUCT RESEARCH IN ADDITION TO YOUR TEACHING

14       RESPONSIBILITIES?

15       A.   YES, I DO.  I CONDUCT RESEARCH IN THE BROAD FIELD OF HUMAN

16       COMPUTER INTERACTION.

17       Q.   LET'S GET RIGHT TO THAT.  WHAT IS HUMAN COMPUTER

18       INTERACTION?

19       A.   HUMAN COMPUTER INTERACTION IS THE FIELD THAT STUDIES HOW

20       HUMANS INTERACT WITH DIFFERENT KINDS OF COMPUTATIONALLY ENABLED

21       TECHNOLOGY.  THIS INCLUDES USER INTERFACES FOR MOBILE DEVICES,

22       AMONG OTHER THINGS, AND MY SPECIFIC RESEARCH WITHIN THAT AREA

23       IS LOOKING AT HOW DO WE BUILD NEW KINDS OF INTERFACES FOR

24       DEVICES THAT ARE COMING DOWN THE PIPELINE?

25            AND OVER THE YEARS I'VE DONE WORK ON TOUCHSCREEN

1    INTERFACES, MOBILE DEVICES, DIFFERENT KINDS OF DISPLAY

2    TECHNOLOGIES.

3        I ALSO LOOK AT HOW YOU EVALUATE THE INVENTIONS THAT WE DO

4    TO SEE THEIR EFFECTIVENESS WHEN USED BY THE HUMAN POPULATION.

5    Q.  SIR, ARE YOU ON THE EDITORIAL STAFF OF ANY OF THE JOURNALS

6    IN YOUR FIELD?

7    A.  YES.  I'M AN ASSOCIATE EDITOR OF "THE ACM TRANSACTIONS ON

8    HUMAN COMPUTER INTERACTIONS," WHICH THE PREMIER JOURNAL IN THE

9    FIELD; AND I'VE PREVIOUSLY BEEN ON THE EDITORIAL BOARD OF

10   ANOTHER JOURNAL, "THE IEEE TRANSACTIONS ON VISUALIZATIONS AND

11   COMPUTER GRAPHICS."

12   Q.  ARE YOU NAMED AS THE INVENTOR ON ANY PATENTS IN YOUR

13   FIELD?

14   A.  YES.  I'M A NAMED INVENTOR ON 17 ISSUED U.S. PATENTS, ALL

15   IN THE AREA OF USER INTERFACE.

16   Q.  SIR, ARE YOU BEING COMPENSATED FOR YOUR TIME IN THIS

17   LITIGATION?

18   A.  YES, I AM.  I AM BEING COMPENSATED AT MY STANDARD RATE OF

19   $430 AN HOUR.

20   Q.  DO YOU HAVE A BINDER OF EXHIBITS IN FRONT OF YOU?

21   A.  YES, I DO.

22   Q.  THAT'S GOOD.  COULD YOU TURN TO THE TAB, PLEASE, FOR

23   JX 1045 IN YOUR BINDER.

24   A.  I'M THERE.

25   Q.  SIR, WHAT IS JX, JOINT EXHIBIT 1045?

1    A.   THIS IS THE U.S. PATENT WHICH WE ARE CALLING THE '381

2    PATENT ISSUED TO BAS ORDING.

3              MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE THE

4    ADMISSION OF JX 1045.

5              THE COURT:  ANY OBJECTION?

6              MR. JOHNSON:  NO, YOUR HONOR.

7              THE COURT:  IT'S ADMITTED.

8         (JOINT EXHIBIT 1045 WAS ADMITTED IN EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10             MR. MCELHINNY:  CAN WE SEE IT?  YES, PLEASE.

11   Q.   SIR, WE'VE BEEN REFERRING TO THIS PATENT AS THE BOUNCE

12   BACK OR RUBBER BANDING PATENT.  ARE THERE OTHER NICKNAMES THAT

13   YOU'RE AWARE OF?

14   A.   YES.  OTHER NICKNAMES INCLUDE THE LATEX EFFECT OR ELASTIC

15   EFFECT OF THE PATENT.  THEY ALL REFER TO THE MOTION THAT YOU

16   SEE WHEN THE CONTENT BOUNCES ON THE SCREEN WHEN YOU LET GO.

17   Q.   CAN YOU EXPLAIN TO US WHAT, WHAT, WHAT PROBLEMS THIS

18   PATENT SOLVES?

19   A.   WELL, AT A VERY HIGH LEVEL, BASICALLY WHEN YOU'RE LOOKING

20   AT A SMALL DEVICE, SMALL SCREEN DEVICE, LIKE A MOBILE DEVICE,

21   ONE TYPICALLY WANTS TO LOOK AT CONTENT THAT IS USUALLY LARGER

22   THAN CAN FIT ON THE SCREEN, FOR EXAMPLE A LARGER WEB PAGE, A

23   PHOTOGRAPH THAT YOU MAY ZOOM INTO.

24             AND WHEN YOU CANNOT FIT THE ENTIRETY OF THE CONTENT ON TO

25   THE SMALL SCREEN, THE USER HAS TO NAVIGATE AROUND IN ORDER TO

```
 1       SEE DIFFERENT PARTS OF THAT CONTENT.

 2               AND TWO PROBLEMS ARISE WHEN YOU TRY TO NAVIGATE THE

 3       CONTENT ON A SMALL -- LARGE CONTENT ON A SMALL SCREEN.  THE

 4       FIRST PROBLEM IS WHEN YOU REACH THE END OF THE CONTENT, SO THE

 5       END OF THE PAGE OR END OF THE PHOTOGRAPH, TRADITIONALLY THE

 6       SYSTEM SIMPLY WOULD STOP AT THE EDGE, AND THIS LEADS TO A

 7       PROBLEM CALLED THE FROZEN SCREEN PROBLEM OR HARD STOP PROBLEM

 8       WHERE THE USER IS NOT SURE WHETHER THEY'VE ACTUALLY REACHED THE

 9       END OF THE CONTENT OR IF THE SCREEN HAS SOMEHOW STOPPED

10       RESPONDING TO THEM.

11               AND YOU'VE GOT TO REMEMBER, BACK WHEN TOUCHSCREENS WERE

12       EARLY AND NOT TODAY, THE SCREENS ARE NOT VERY GOOD SO THE

13       TRACKING TECHNOLOGY WAS NOT ALWAYS PERFECT.  SOMETIMES THE

14       SYSTEM WOULD SIMPLY FREEZE AND NOT RESPOND TO THE USER.

15               SO WHEN YOU HIT THIS END OF THE DOCUMENT AT ISSUE AND THE

16       SYSTEM SIMPLY FROZE, THE USER IS LEFT WITH THIS QUANDARY, YOU

17       KNOW, IS THE SYSTEM ACTUALLY WORKING?  IS IT FROZEN?  AM I AT

18       THE END OF THE DOCUMENT?  THEY DIDN'T KNOW THAT.

19               ANOTHER SOLUTION WOULD BE TO SIMPLY LET THEM CONTINUE

20       SCROLLING, GO BEYOND THE EDGE OF THE DOCUMENT, AND THIS LEADS

21       TO THE SITUATION WHERE THE DOCUMENT CAN BE SCROLLED OFF THE

22       SCREEN COMPLETELY AND YOU END UP INTO WHITE SPACE, OR DESERT

23       FOG IS THE TERMINOLOGY USED IN THE FIELD, AND THEN YOU END UP

24       IN THE SITUATION WHERE YOU DON'T KNOW WHERE YOUR DOCUMENT IS

25       ANYMORE.  YOU'RE OFF IN WHITE SPACE.
```

1          SO THE PATENT ACTUALLY SOLVES THIS PROBLEM IN A VERY

2     ELEGANT WAY, WHICH I'M GOING TO SHOW IN A MINUTE.

3     Q.   HAVE YOU PREPARED ANIMATIONS OF THESE TWO PROBLEMS FOR US?

4     A.   YES, I HAVE.

5     Q.   COULD WE SHOW THE FIRST ONE, PLEASE, WHICH IS PDX 104.3?

6     A.   SO WHAT THIS ANIMATION IS GOING TO SHOW YOU, SO IF I HAVE

7     A PIECE OF CONTENT, LET'S SAY THIS STICK FIGURE IMAGE, AND I

8     HAVE A MOBILE DEVICE WHERE THE SCREEN IS SMALLER THAN THE IMAGE

9     ITSELF -- SO IF I CAN HAVE THE NEXT PART OF THE ANIMATION --

10    SO, FOR EXAMPLE, A MOBILE PHONE WHERE ONLY A PORTION OF THE

11    IMAGE CAN FIT ON THE SCREEN AT ANY ONE TIME, THE USER HAS TO

12    NAVIGATE, SCROLL AROUND THE IMAGE IN ORDER TO SEE ALL THE

13    DIFFERENT PARTS.

14         SO IF YOU CAN RUN THE ANIMATION, YOU'LL SEE THE USER USING

15    A FINGER IN THE TOUCHSCREEN, FOR EXAMPLE, AND THEY'LL MOVE

16    AROUND ON THE DOCUMENT.

17         NOW, WHEN THEY COME TO THE EDGE OF THE DOCUMENT, IT JUST

18    STOPS WORKING, SO THERE'S NO FEEDBACK TO THE USER, AND THIS IS

19    KNOW AS THE FROZEN SCREEN PROBLEM.  HAVE THEY REACHED THE END

20    OF THE DOCUMENT?  OF THE EDGE OF THE DOCUMENT?  OR HAS THE

21    SCREEN SIMPLY STOPPED RESPONDING TO THEM?  THE USER IS UNSURE

22    AND DOES NOT KNOW WHAT THE ANSWER IS AT THAT POINT.

23    Q.   AND DO YOU HAVE AN ANIMATION OF THE DESERT FOG PROBLEM?

24    A.   YES.  THE NEXT SCREEN SHOWS ONE POSSIBLE SOLUTION IS TO

25    CONTINUE TO ALLOW THE USER TO SCROLL BEYOND THE EDGE, WHICH IS

1    WHAT'S HAPPENING HERE, ALLOW THE USER TO CONTINUE SCROLLING,

2    AND YOU END UP IN WHITE SPACE -- IN THIS CASE BLACK SPACE --

3    WHICH IS REFERRED TO AS DESERT FOG.  YOU'RE LOST IN THE DESERT,

4    BASICALLY, AND NOW VERY QUICKLY YOU DON'T KNOW HOW TO GET BACK

5    TO THAT DOCUMENT.

6    Q.   AND HOW DOES THE '381 PATENT RESOLVE THESE PROBLEMS?

7    A.   THE '381 PATENT SOLVES THESE PROBLEMS IN ONE FELL SWOOP IN

8    A VERY ELEGANT WAY.

9         SO IF WE LOOK AT THE NEXT ANIMATION, WHAT IT DOES IS IT

10   DOES NOT STOP THE MOVEMENT WHEN YOU REACH THE EDGE OF THE

11   DOCUMENT.  IT ALLOWS THE USER TO CONTINUE MOVING PAST THE EDGE,

12   BUT NOT FOREVER.  IT ALLOWS YOU TO MOVE BEYOND THE EDGE A

13   LITTLE BIT, AND WHEN YOU LET GO, IT BOUNCES BACK.

14        SO BY BOUNCING BACK, IT MAXIMIZES THE AMOUNT OF CONTENT

15   THAT CAN BE SEEN ON THE SCREEN WHEN YOU'RE NOT INTERACTING WITH

16   IT.  BUT BY SHOWING THE AREA BEYOND THE EDGE IN THE FIRST

17   PLACE, JUST A LITTLE BIT OF IT, IT TELLS THE USER, A, YOU'VE

18   REACHED THE END OF THE DOCUMENT, B, THE SYSTEM IS NOT FROZEN,

19   AND BY LETTING YOU NOT GO FOREVER, IT SAYS "I'M NOT GOING TO

20   LET YOU GO INTO DESERT FOG."

21        SO IT SOLVES BOTH PROBLEMS IN ONE WAY.

22   Q.   WHAT, IN YOUR OPINION, AND BASED ON YOUR EXPERIENCE, IS

23   THE VALUE OR THE IMPORTANCE OF THIS PARTICULAR INVENTION?

24   A.   THE IMPORTANCE OF THIS INVENTION IS THAT, A, IT SOLVES

25   THOSE TWO PROBLEMS IN ONE GO.

1        BUT I THINK MORE IMPORTANTLY, IT SOLVES IT IN A VERY FUN,

2   WHIMSICAL WAY THAT THE USER ACTUALLY LIKES USING IT.  IT

3   DOESN'T BREAK THE FLOW OF WHAT THEY'RE TRYING TO DO.  THEY'RE

4   TRYING TO NAVIGATE THE DOCUMENT.  THEY'RE SCROLLING IN A

5   PARTICULAR DIRECTION.  IT CONTINUES TO ALLOW THEM TO SCROLL IN

6   THAT DIRECTION.

7        IT DOESN'T MAKE A BIG BEEP SOUND OR SOMETHING JARRING THAT

8   IRRITATES THE USER.  IT LETS THEM CONTINUE WHAT THEY WOULD

9   NORMALLY DO, BUT VERY GENTLY TELLS THEM, IN THE CONTEXT OF

10  DOING WHAT THEY WERE DOING, WHICH IS SCROLLING, TELLS THEM,

11  "HEY, YOU'VE REACHED THE END OF THAT DOCUMENT.  YOU CAN LET GO

12  NOW AND IT'LL COME BACK TO THE END."

13  Q.   AS PART OF YOUR PREPARATION FOR THIS CASE, HAVE YOU

14  REVIEWED SAMSUNG PHONES AND INTERNAL DOCUMENTATION?

15  A.   YES, I HAVE, OF COURSE.

16  Q.   DID SAMSUNG INCORPORATE THE FEATURES OF CLAIM 19 OF THE

17  '381 PATENT INTO ITS PRODUCTS?

18  A.   YES, IT DID.

19  Q.   AND WHICH OF THE SAMSUNG PRODUCTS THAT ARE AT ISSUE IN

20  THIS CASE INFRINGE THE '381 PATENT?

21  A.   TWELVE OF THE 13 PRODUCTS AT ISSUE IN THIS CASE INFRINGE

22  THE '381 PATENT.

23  Q.   CAN WE SEE PDX 104.6, PLEASE?

24       THIS IS THE -- THIS IS THE CHART THAT THE JURY HAS IN

25  THEIR BINDER.  HAVE YOU HIGHLIGHTED THIS TO HELP US WITH THE

1      '381 PATENT?

2      A.   YES, WHAT I'VE DONE HERE IS HIGHLIGHTED IN YELLOW THE 12

3      PHONES, 12 DEVICES, ONE OF THEM IS A TABLET, THAT INFRINGES THE

4      '381 PATENT.

5      Q.   SIR, YOU SAID THAT YOU HAVE HAD A CHANCE TO LOOK AT

6      SAMSUNG INTERNAL DOCUMENTS.  IS THAT CORRECT?

7      A.   THAT'S CORRECT.

8      Q.   YOU DON'T READ KOREAN?

9      A.   NO, I DON'T.

10     Q.   SO YOU SAW TRANSLATIONS OF THESE DOCUMENTS; RIGHT?

11     A.   THAT'S CORRECT.

12     Q.   DID ANY OF THE DOCUMENTS THAT YOU REVIEWED ACTUALLY

13     DISCUSS THE FEATURES AND INVENTION OF THE '381 PATENT?

14     A.   YES, SEVERAL OF THEM DID.

15     Q.   WOULD YOU LOOK AT PLAINTIFF'S EXHIBIT 46 IN YOUR BINDER,

16     PLEASE.

17     A.   YES, I'M THERE.

18     Q.   CAN YOU TELL US WHAT THE TITLE OF PX 46 IS, PLEASE?

19     A.   THE TITLE OF THIS DOCUMENT IS THE "BEHOLD3, USABILITY

20     EVALUATION RESULTS."

21          MR. MCELHINNY:  YOUR HONOR, I MOVE PLAINTIFF'S

22     EXHIBIT 46 INTO EVIDENCE.

23          THE COURT:  ANY OBJECTION.

24          MR. JOHNSON:  NO, YOUR HONOR, NOT AT THIS POINT.

25          THE COURT:  IT'S ADMITTED.  GO AHEAD, PLEASE.

BALAKRISHNAN DIRECT

1          (PLAINTIFF'S EXHIBIT 46 WAS ADMITTED IN EVIDENCE.)

2               MR. MCELHINNY:  SO WE CAN SEE IT ON THE SCREEN.

3     Q.   WHAT IS THE DATE OF THIS DOCUMENT?

4     A.   THE DATE OF THIS DOCUMENT IS THE 10TH OF MAY, 2010.

5     Q.   IF YOU LOOK IN YOUR BINDER AT PAGE 46.14 -- AND IF WE

6     COULD PULL THAT UP ON THE SCREEN, PLEASE -- DO YOU SEE THIS

7     SECTION THERE THAT'S CALLED THE EVALUATION SUMMARY?

8     A.   JUST ONE SECOND.  I'M TRYING TO FIND THAT PAGE.  YEAH,

9     IT'S ON THE SCREEN.

10    Q.   THE PAGE NUMBERS ARE AT THE TOP, SO IT'S 46.14.

11    A.   OKAY.

12    Q.   LOOKING AT THE EVALUATION SUMMARY, CAN YOU TELL US WHAT

13    THE SUBJECT MATTER OF THIS DOCUMENT WAS?

14    A.   THE SUBJECT MATTER OF THIS DOCUMENT IS BASICALLY AN

15    EVALUATION, USABILITY EVALUATION, THAT SAMSUNG DID THAT

16    COMPARES THE BEHOLD3, WHICH IS A SAMSUNG DEVICE UNDER

17    DEVELOPMENT AT THAT TIME, TO THE IPHONE.

18    Q.   AND WHO DID THIS EVALUATION?

19    A.   THE EVALUATION WAS DONE BY SAMSUNG USING 30, 3-0,

20    EVALUATORS WHO WERE FROM THE POWER USER COMMUNITY.

21    Q.   WHAT IS A USER COMMUNITY?

22    A.   A USER COMMUNITY BASICALLY WOULD BE A SET OF PEOPLE WHO

23    ARE USING PARTICULAR KINDS OF TECHNOLOGY, IN THIS CASE,

24    SMARTPHONES.

25    Q.   IF YOU WOULD GO, PLEASE, TO PAGE 66.

1    A.    OKAY.

2    Q.    WHAT, IF ANYTHING, DID YOU FIND OF INTEREST ON THIS PAGE?

3    A.    WELL, THIS PAGE DOES A COMPARISON OF THE BOUNCE BACK

4    FEATURE IN THE BROWSER, THE WEB BROWSER, OF THE BEHOLD3 IN

5    COMPARISON TO THE IPHONE.

6          AND WHAT THIS DOES, IT SUMMARIZES WHAT ARE SOME OF THE

7    ISSUES.  AND THE FIRST POINT I SEE HERE IS IT MAKES -- ON THE

8    TOP BULLET, IT SAYS "NO VISUAL EFFECTS PROVIDED WHEN A WEB PAGE

9    IS DRAGGED TO ITS ENDPOINT," AND THIS REFERS TO THE BEHOLD3,

10   WHICH IS THE IMAGE ON THE LEFT OF THE SLIDE, AND BASICALLY IT

11   EMBODIES THAT HARD STOP VALUE.  YOU COME TO THE END AND IT JUST

12   STOPS.

13         IN CONTRAST, IT TALKS ABOUT THE IPHONE AND IT SAYS IT

14   "GENERATES FUN FOR THE USER WITH A VISUAL ELEMENT THAT SEEMS TO

15   BOUNCE."

16         AND IF YOU LOOK AT THE IMAGE ON THE RIGHT, IT SHOWS THE

17   WEB PAGE BEING SCROLLED BEYOND THE EDGE A LITTLE BIT, AND THE

18   CAPTION THERE SAYS "IF A WEB PAGE IS DRAGGED TO THE EDGE AND

19   THE HAND IS RELEASED, A BOUNCING VISUAL EFFECT IS PROVIDED,"

20   WHICH IS BASICALLY DESCRIBING THE '381 PATENT'S FUNCTIONALITY.

21   Q.    IN THE UPPER RIGHT-HAND CORNER --

22         THE COURT:  THE TIME IS NOW 12:021.  I'M SORRY TO

23   INTERRUPT YOU.  WHY DON'T WE GO AHEAD NOW AND BREAK FOR LUNCH?

24         MR. MCELHINNY:  MAY I ASK HIM ONE MORE QUESTION, TWO

25   MORE QUESTIONS AND I'LL BE DONE WITH THIS PAGE?

```
 1                 THE COURT:  GO AHEAD.

 2      BY MR. MCELHINNY:

 3      Q.   IF YOU LOOK AT THE UPPER RIGHT-HAND CORNER WHERE IT SAYS

 4      "PERCEIVED SATISFACTION INTERVIEW RESULTS," WHAT DID YOU

 5      UNDERSTAND THAT TO MEAN?

 6      A.   WHAT I UNDERSTAND THAT TO BE IS THE 30 EVALUATORS OF THE

 7      STUDY, THEY WERE ASKED QUESTIONS AS TO WHICH ONE IS MORE

 8      SATISFACTORY?

 9      Q.   SAMSUNG USERS?

10      A.   SAMSUNG USERS.

11      Q.   AND JUST TELL US WHAT THE DIRECTION OF IMPROVEMENT WAS.

12      A.   THE DIRECTION OF IMPROVEMENT, THE CONCLUSION OF THIS, THE

13      SLIDE IS TO SAY "PROVIDE A FUN USUAL EFFECT WHEN DRAGGING A WEB

14      PAGE."  IN OTHER WORDS, IT'S SAYING THEY SHOULD GO AHEAD AND DO

15      THIS.

16                 MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17                 THE COURT:  ALL RIGHT.  TIME IS NOW 12:02.

18           WE'RE GOING TO TAKE OUR LUNCH BREAK NOW.  AGAIN, PLEASE

19      KEEP AN OPEN MIND.  DON'T DISCUSS OR RESEARCH THE CASE.

20           OKAY.  THANK YOU.  WE'LL SEE YOU BACK AT 1:02.

21           (JURY OUT AT 12:03 P.M.)

22                 THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL TAKE OUR

23      BREAK NOW.

24                 MR. MCELHINNY:  THANK YOU, YOUR HONOR.

25           (LUNCH RECESS TAKEN FROM 12:03 P.M. TO 1:10 P.M.)
```

| | |
|---|---|
| 1 | **AFTERNOON SESSION** |
| 2 | (JURY OUT AT 1:10 P.M.) |
| 3 | THE COURT:  I'M GOING TO RULE ON THE LIMITING |
| 4 | INSTRUCTIONS FIRST. |
| 5 | OKAY.  ALL RIGHT.  WITH REGARD TO APPLE'S PROPOSED |
| 6 | LIMITING INSTRUCTION REGARDING USE OF PRODUCTS FOUND NOT TO |
| 7 | INFRINGE BY THE PRIOR JURY AS EVIDENCE OF THE AVAILABILITY OF |
| 8 | ACCEPTABLE NON-INFRINGING ALTERNATIVES, THAT, THAT LIMITING |
| 9 | INSTRUCTION IS DENIED.  I THINK THAT IT HAS SEVERAL |
| 10 | MISSTATEMENTS OF THE LAW. |
| 11 | FIRST, IT'S APPLE'S BURDEN INITIALLY TO SHOW ABSENCE OF |
| 12 | ACCEPTABLE NON-INFRINGING ALTERNATIVES.  THAT'S NOWHERE IN |
| 13 | THERE. |
| 14 | THIS SAYS ONLY THAT IT'S SAMSUNG'S BURDEN TO PROVE THAT A |
| 15 | SAMSUNG PRODUCT THAT WAS FOUND NOT TO INFRINGE WAS AN |
| 16 | ACCEPTABLE NON-INFRINGING ALTERNATIVE. |
| 17 | SO I ALSO HAVE ALREADY SET FORTH IN MY ORDER WHY THE -- |
| 18 | NUMBER 1, WHETHER THE PRODUCT WAS FOUND TO INFRINGE OTHER APPLE |
| 19 | PATENTS.  I THINK AS A MATTER OF LAW THAT'S NOT CORRECT AND I |
| 20 | DISAGREE WITH HOW APPLE IS ARGUING THE RITE-HITE DECISION. |
| 21 | WITH REGARD TO BULLET 2, BULLET 2 ASKS THE JURY TO |
| 22 | CONSIDER WHETHER THE PATENT PRACTICES THE TECHNICAL FEATURE |
| 23 | ENTIRELY, WHICH IS INVITING THE RETRIAL JURY TO RECONSIDER THE |
| 24 | 2012 JURY'S VERDICTS, WHICH I THINK IS IMPROPER. |
| 25 | AND WITH REGARD TO NUMBER 4, WHETHER THE PRODUCT WAS |

1    AVAILABLE DURING THE RELEVANT DAMAGES PERIOD, UNDER

2    GRAIN PROCESSING, THERE'S NO REQUIREMENT THAT A PRODUCT THAT

3    INCORPORATED THE NON-INFRINGING ALTERNATIVE ACTUALLY HAVE BEEN

4    ON THE MARKET OR SOLD.

5         SO I THINK JUST THIS LIMITING INSTRUCTION HAS A LOT OF

6    MISSTATEMENTS OF THE LAW, IT'S CONFUSING, IT'LL MISLEAD THE

7    JURY, AND IT WON'T BE HELPFUL TO THE JURY.  SO THE REQUEST FOR

8    THIS INSTRUCTION IS DENIED.

9         NOW, BOTH PARTIES HAVE ALSO REQUESTED INSTRUCTION AS TO

10   THE DATES OF WHEN PRODUCTS THAT WERE SOLD WOULD BE SUBJECT TO

11   DAMAGES, AND I'M GOING TO REJECT BOTH PRELIMINARY INSTRUCTIONS,

12   BUT ASK THAT OBVIOUSLY YOU MAKE IT CLEAR IN YOUR DIRECT AND

13   YOUR CROSS WHAT -- FOR WHAT PERIOD YOU'RE REQUESTING DAMAGES.

14        AND I'M GOING TO PROPOSE IN THE FINAL JURY INSTRUCTION

15   THAT WE INCLUDE A CHART LIKE THE ONE THAT WAS INCLUDED IN MY

16   MARCH 1 DAMAGES ORDER THAT LAYS OUT -- BECAUSE IT'S NOT AS

17   SIMPLE AS APPLE'S PROPOSAL OF JUST HAVING THE AUGUST 4TH DATE

18   OF 2010, AND THE APRIL 15TH, 2011, DATE.  IT DEPENDS ON THE

19   PATENT.

20        AND SO I WOULD LIKE TO INCLUDE A CHART LIKE THE MARCH 1

21   CHART THAT LAYS OUT SPECIFICALLY THE DATES FOR EACH PATENT,

22   LAYS OUT WHICH PRODUCTS INFRINGE THAT PATENT, LAYS OUT THE

23   NOTICE DATE FOR THAT PATENT, AND THEN THE AVAILABLE REMEDIES

24   FOR THAT PARTICULAR PATENT, THAT PARTICULAR NOTICE DATE, AND

25   THAT FILE.

BALAKRISHNAN DIRECT

1          WE CAN HAVE THAT CONVERSATION LATER DURING OUR FINAL JURY

2     INSTRUCTION CONFERENCE.

3          OKAY.  SO ALL THREE PRELIMINARY INSTRUCTIONS, LIMITING

4     INSTRUCTIONS ARE DENIED.

5          NOW, I DID WANT TO ASK ONE MORE THING OF APPLE.  THIS IS

6     IN LINE WITH MR. PRICE'S OBJECTIONS THIS MORNING, OR REQUEST TO

7     RECONSIDER RULING ON OBJECTIONS.

8          IF YOU FOCUS A LOT ON THE BROWSER APPLICATION, THEN AT

9     SOME POINT YOU MAY OPEN THE DOOR FOR US TO GET INTO THE BROWSER

10    APPLICATION.

11         SO AS LONG AS YOU STAY FOCUSSED ON THE FUNCTIONALITY AND

12    NOT COPYING IN A SPECIFIC APPLICATION, THEN I THINK ALL OF MY

13    RULINGS ON THIS ISSUE STILL STAND.  YOU SHOULD BE FOCUSSED ON

14    THE FEATURE AND NOT ON THE SPECIFIC APPLICATION.

15         BUT I JUST WANTED TO PUT YOU ON NOTICE OF THAT.

16         MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17         THE COURT:  OKAY.  ALL RIGHT.  LET'S BRING IN OUR

18    JURY, PLEASE.

19         THANK YOU.

20         (JURY IN AT 1:14 P.M.)

21         THE COURT:  YES, YOU CAN TAKE YOUR BINDERS BACK IN

22    THE JURY ROOM DURING BREAKS.

23         JUROR:  THANK YOU.

24         THE COURT:  OKAY.  THE TIME -- TIME IS NOW 1:15.  GO

25    AHEAD, PLEASE.

```
 1              MR. MCELHINNY:  YOUR HONOR, BASED ON HIS EDUCATION,

 2     TRAINING AND EXPERIENCE, I TENDER DR. BALAKRISHNAN TO THE COURT

 3     AS AN EXPERT IN COMPUTER SCIENCE AND HUMAN COMPUTER

 4     INTERACTION.

 5              THE COURT:  ANY OBJECTION OR ANY ADDITIONAL VOIR

 6     DIRE?

 7              MR. JOHNSON:  NO, YOUR HONOR.

 8              THE COURT:  ALL RIGHT.  SO CERTIFIED.

 9        GO AHEAD, PLEASE.

10              MR. MCELHINNY:  THANK YOU.

11     Q.   DOCTOR, IF YOU WOULD LOOK IN YOUR BINDER AT TAB PX 57.

12     A.   YES, I'M THERE.

13     Q.   57, YOU GOT IT?

14     A.   YES.

15     Q.   CAN YOU TELL US WHAT THAT DOCUMENT IS?

16     A.   THIS IS A DOCUMENT DETAILING THE USABILITY EVALUATION

17     RESULTS FOR ANOTHER SET OF STUDIES THAT SAMSUNG DID INTERNALLY

18     TO COMPARE THE P5 TABLET UNDER DEVELOPMENT TO THE IPAD 2.

19     Q.   WHAT IS THE DATE OF THIS DOCUMENT?

20     A.   THE DATE IS THE 9TH OF APRIL, 2011.

21     Q.   THIS IS ONE OF THE INTERNAL SAMSUNG DOCUMENTS THAT YOU

22     REVIEWED TO HELP YOU FORMULATE YOUR OPINIONS?

23     A.   THAT IS CORRECT.

24              MR. MCELHINNY:  YOUR HONOR, WE WOULD MOVE THE

25     ADMISSION OF PX 57.
```

```
1              THE COURT:  ANY OBJECTION?

2              MR. JOHNSON:  NO, YOUR HONOR.

3              THE COURT:  IT'S ADMITTED.

4          (PLAINTIFF'S EXHIBIT 57 WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD.

6    BY MR. MCELHINNY:

7    Q.   IF YOU WOULD TURN, PLEASE, TO PAGE 73 IN THIS DOCUMENT.

8    A.   OKAY.

9    Q.   WHAT I WANT TO FOCUS ON HERE IS THE FUNCTIONALITY THAT

10   THEY'RE TALKING ABOUT.  OKAY?  ARE YOU WITH ME ON THAT?

11   A.   YES, I AM.

12   Q.   OKAY.  WHAT IS THE FUNCTIONALITY THAT'S DESCRIBED ON THIS

13   PAGE?

14   A.   THE FUNCTIONALITY THAT THIS PAGE IS TALKING ABOUT IS THE

15   BOUNCE EFFECT THAT'S FOUND IN THE IPAD 2 THAT RELATES TO THE

16   '381 PATENT IN THIS CASE.

17   Q.   AND HOW DO YOU KNOW THEY'RE TALKING ABOUT THE BOUNCE BACK

18   EFFECT IN THE IPAD 2?

19   A.   WELL, I KNOW THAT FROM LOOKING AT THE DOCUMENT, THIS PAGE

20   OF THE DOCUMENT WHERE FIRST OF ALL, THE TOP BULLET SAYS "DURING

21   TOPMOST/BOTTOM-MOST DIAGONAL MOVEMENTS, THERE'S NO SPRINGING

22   BOUNCE EFFECT," AND THIS REFERS TO THE FUNCTIONALITY IN THE P5

23   SAMSUNG TABLET WHERE YOU SEE AN IMAGE ON THE LEFT-HAND SIDE

24   THERE.

25              IN OTHER WORDS, IT BASICALLY JUST STOPS WHEN YOU REACH THE
```

1      END OF THE DOCUMENT.

2      Q.   AND YOU --

3      A.   IN CONTRAST, THE IPAD 2 ON THE RIGHT-HAND SIDE, THE IMAGE

4      ON THE RIGHT, IT VERY CLEARLY SHOWS THE IMAGE MOVING AWAY FROM

5      THE EDGE AND THE CAPTION THERE SAYS "IN THE CASE OF IPAD 2,

6      THERE IS A FUN ELEMENT FROM A NATURAL BOUNCE EFFECT THAT

7      FOLLOWS HAND GESTURES."

8           AND BECAUSE IT'S TALKING ABOUT THE IPAD 2, WE KNOW IT'S

9      THAT BOUNCE EFFECT THAT'S IN THE '381 PATENT.

10     Q.   AGAIN, JUST TO SET THE CONTEXT, INTERNAL RESEARCH AND

11     DEVELOPMENT DOCUMENT FROM SAMSUNG; IS THAT CORRECT?

12     A.   THAT IS CORRECT.

13     Q.   DATED APRIL 9TH, 2011; IS THAT CORRECT?

14     A.   THAT IS CORRECT.

15     Q.   AND, SIR, ON THIS PAGE WHERE IT TALKS ABOUT THE BOUNCE

16     EFFECT, WHAT DOES IT SAY IN THE TITLE RIGHT NEXT TO IPAD 2?

17     A.   IN THE TITLE NEXT TO THE IPAD?

18     Q.   THE BLUE BAR ABOVE THE PICTURE.

19     A.   IT SAYS A PROPOSED IMPROVEMENT.

20     Q.   PROPOSED IMPROVEMENT.

21          ARE YOU ABLE TO DETERMINE, BY LOOKING AT THIS DOCUMENT,

22     THE LEVEL OF IMPORTANCE THAT SAMSUNG ATTACHED TO THIS SPECIFIC

23     FEATURE?

24     A.   YES.   ON THE TOP RIGHT-HAND SIDE OF THIS PARTICULAR PAGE

25     OF THE DOCUMENT, IT TAGS THIS ISSUE, P51, AS A SERIOUS ISSUE.

1     Q.    WE'VE ONLY TALKED ABOUT TWO DOCUMENTS.

2           IN YOUR REVIEW, DID YOU SEE OTHER DOCUMENTS AT SAMSUNG

3     THAT REFERS TO THE BOUNCE EFFECT?

4                 MR. JOHNSON:  OBJECTION.  LEADING, YOUR HONOR.

5                 THE COURT:  OVERRULED.

6           GO AHEAD, PLEASE.

7                 THE WITNESS:  YES, I DID.

8     BY MR. MCELHINNY:

9     Q.    SIR, WHAT CONCLUSION DID YOU DRAW FROM LOOKING AT

10    SAMSUNG'S RESEARCH AND DEVELOPMENT DOCUMENTS ABOUT SAMSUNG'S

11    UNDERSTANDING OF THE BOUNCE EFFECT?

12    A.    WELL, THE CONCLUSIONS I DREW FROM THE DIFFERENT DOCUMENTS

13    THAT I LOOKED AT IS THAT SAMSUNG HAD CAREFULLY STUDIED THE

14    BOUNCE FEATURE OF THE '381 PATENT IN PHONES AND IN THE PADS,

15    AND IN SEVERAL CASES THEIR DOCUMENTATION INDICATES THAT THEY

16    SHOULD IMPLEMENT THIS FUNCTIONALITY.

17          AND WE SEE FROM THE SUBSEQUENT PRODUCTS THAT APPEARED ON

18    THE MARKET THAT THAT FUNCTIONALITY ACTUALLY WAS IMPLEMENTED IN

19    MANY OF THEIR PRODUCTS.

20                MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

21                THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:19.

22                MR. JOHNSON:  YOUR HONOR, COULD WE JUST HAVE A MINUTE

23    TO DISTRIBUTE THE BINDERS?

24                THE COURT:  SURE, GO AHEAD.  THIS IS NOT COUNTING

25    TOWARDS YOUR TIME.

```
 1              MR. JOHNSON:  THANK YOU.

 2         (PAUSE IN PROCEEDINGS.)

 3              MR. JOHNSON:  MAY IT PLEASE THE COURT?

 4              THE COURT:  ALL RIGHT.  1:20.  GO AHEAD, PLEASE.

 5                          CROSS-EXAMINATION

 6    BY MR. JOHNSON:

 7    Q.   GOOD AFTERNOON, DR. BALAKRISHNAN.  MY NAME IS

 8    KEVIN JOHNSON.

 9    A.   GOOD AFTERNOON.

10    Q.   NOW, I WANT TO TALK A LITTLE BIT ABOUT THE PATENT, THE

11    BOUNCE BACK PATENT, AND LET ME START BY FIRST ASKING YOU,

12    PATENTS HAVE CLAIMS AT THE END OF THE PATENT; RIGHT?

13    A.   OF COURSE.

14    Q.   OKAY.  AND YOU UNDERSTAND THAT THE PATENT CLAIMS ARE WHAT

15    DEFINE THE BOUNDARIES OF THE INVENTION; CORRECT?

16    A.   TAKEN IN CONTEXT WITH THE SPECIFICATION, YES.

17    Q.   EXACTLY, TAKEN IN CONTEXT WITH THE SPECIFICATION.

18         SO MUCH LIKE A FENCE DEFINES THE BOUNDARIES OF A PIECE OF

19    REAL ESTATE, OR YOUR HOME, THE CLAIM LANGUAGE DEFINES THE SCOPE

20    OF THE INVENTION WHEN READ IN LIGHT OF THE SPECIFICATION?

21              MR. MCELHINNY:  OBJECTION, YOUR HONOR.  RELEVANCE.

22    THIS GOES TO INFRINGEMENT.

23              THE COURT:  OVERRULED.

24         GO AHEAD, PLEASE.

25              MR. JOHNSON:  THANK YOU, YOUR HONOR.
```

1     Q.   YOU CAN ANSWER THE QUESTION.

2     A.   IF YOU DON'T MIND ASKING THAT AGAIN, PLEASE?

3     Q.   SURE.  I'M JUST ASKING, MUCH LIKE A FENCE DEFINES THE

4     PERIMETER OF YOUR HOME, THE CLAIMS DEFINE THE PERIMETER OF THE

5     INVENTION; RIGHT?

6     A.   I'M NOT SURE I COMPLETELY AGREE WITH THE ANALOGY, BUT I

7     WOULD SAY THE CLAIMS DO DEFINE WHAT THE INVENTION IS.

8     Q.   YOU'VE HEARD A FENCE USED AS AN ANALOGY TO BASICALLY -- AS

9     AN ANALOGY TO DEFINE THE SCOPE OF AN INVENTION; RIGHT?

10    A.   I HAVE HEARD THAT BEFORE, YES.

11    Q.   OKAY.  SO, AND IF YOU'RE OUTSIDE THE FENCE, YOU'RE NOT

12    USING THE PATENT; RIGHT?

13    A.   IF YOU DON'T INFRINGE THE CLAIMS, YOU DON'T USE THE

14    PATENT.

15    Q.   AND IF YOU'RE OUTSIDE THE FENCE, YOU'RE NOT USING THE

16    PATENT, ARE YOU?

17    A.   IF YOU DON'T INFRINGE THE CLAIMS, YOU DON'T USE THE

18    PATENT.

19    Q.   OKAY.  WELL, I WANT TO TALK ABOUT THE SCOPE AND THE

20    NARROWNESS OF THE BOUNCE BACK PATENT.

21         NOW, THERE ARE ALL KINDS OF BOUNCE EFFECTS AND RUBBER

22    BANDING EFFECTS THAT ARE NOT COVERED BY THE '381 BOUNCE BACK

23    PATENT; RIGHT?

24    A.   THAT COULD EXIST HYPOTHETICALLY, YES.

25    Q.   NOT EVEN COULD EXIST HYPOTHETICALLY.  THAT DO EXIST;

1    RIGHT?  THERE ARE ALL KINDS OF BOUNCE EFFECTS AND RUBBER

2    BANDING EFFECTS THAT ARE NOT COVERED BY THE '381 PATENT; RIGHT?

3    A.   IN GENERAL, YES.

4    Q.   OKAY.  SO YOU RECALL DURING THE FIRST TRIAL WE DISCUSSED

5    TWO PRIOR ART SYSTEMS?  ONE WAS CALLED THE TABLECLOTH AND ONE

6    WAS CALLED LAUNCHTILE.  DO YOU REMEMBER THAT?

7         MR. MCELHINNY:  OBJECTION, YOUR HONOR.  THIS -- BY

8    DEFINITION, THIS IS ABOUT THE FIRST TRIAL NOW.

9         MR. JOHNSON:  I'M GOING RIGHT TO THE SCOPE OF THE

10   CLAIMS, YOUR HONOR.

11        THE COURT:  OVERRULED.

12   GO AHEAD, PLEASE.

13   BY MR. JOHNSON:

14   Q.   SO AGAIN, SIR, YOU REMEMBER THAT THERE ARE TWO PRIOR ART

15   SYSTEMS THAT WE PREVIOUSLY DISCUSSED, ONE CALLED TABLECLOTH AND

16   THE OTHER ONE CALLED LAUNCHTILE.

17   DO YOU REMEMBER THAT?

18   A.   YES, I DO.

19   Q.   OKAY.  AND LAUNCH -- TABLECLOTH WAS A SYSTEM THAT WAS

20   DEVELOPED BY MITSUBISHI'S ELECTRONIC RESEARCH LAB; RIGHT?

21   A.   MITSUBISHI ELECTRIC RESEARCH LABS.

22   Q.   OKAY.  MITSUBISHI ELECTRIC.

23   AND LAUNCHTILE WAS DEVELOPED BY PROFESSOR BEN BEDERSON AT

24   THE UNIVERSITY OF MARYLAND; RIGHT?

25   A.   THAT'S CORRECT.

1    Q.   OKAY.  AND THE BOUNCE BACK FEATURES IN BOTH TABLECLOTH AND

2    LAUNCHTILE ARE DIFFERENT FROM THE BOUNCE BACK FEATURES IN THE

3    '381 PATENT; RIGHT?

4    A.   THE LAUNCHTILE AND TABLECLOTH DO NOT HAVE BOUNCE BACK

5    FEATURES AS DEFINED BY THE '381 PATENT.

6    Q.   OKAY.  LET'S TAKE A LOOK AT SDX 3964.003A.  THIS IS A

7    VIDEO OF TABLECLOTH THAT'S RUNNING ON THE MITSUBISHI DEVICE,

8    AND I KNOW YOU'VE SEEN THIS BEFORE, BUT JUST FOR SHOWING THE

9    JURY, THIS IS THE TABLECLOTH VIDEO; RIGHT?

10   A.   IF YOU REPRESENT THAT, SURE.

11   Q.   OKAY.  LET'S TAKE A LOOK AT THE VIDEO AS IT'S RUNNING.

12        AND HERE YOU SEE A FINGER MOVING UP, MOVING UP A LITTLE

13   FURTHER ON THE DEVICE, AND GOING EVEN FURTHER STILL SO THAT IT

14   EXTENDS AND OPENS UP AND DISPLAYS A WHITE AREA BEYOND THE EDGE,

15   AND THEN IT BOUNCES BACK.

16        AND YOU, SIR, AGREE THAT IS NOT COVERED BY THE '381

17   PATENT; RIGHT?

18   A.   THAT DOES NOT INVALIDATE THE '381 PATENT.

19   Q.   NOT ONLY DOES IT NOT INVALIDATE IT, IT'S NOT COVERED BY

20   IT?  IT'S DIFFERENT THAN THE '381 PATENT; RIGHT?

21   A.   IT IS DIFFERENT.

22   Q.   OKAY.  LET'S LOOK AT THE LAUNCHTILE VIDEO.  THIS IS SDX

23   3964.0004A, AND THIS IS A HEWLETT-PACKARD DEVICE CALLED THE

24   IPAQ, SMALL HANDHELD, WHERE LAUNCHTILE WAS RUNNING ON IT.

25        AND THIS SHOWS AGAIN SOMEBODY USING THE DEVICE, SCROLLING

1    OVER AND ULTIMATELY LIFTING THE FINGER OFF, AND WE'LL SEE IT

2    BOUNCES BACK.

3         DO YOU SEE THAT?

4    A.   I SEE IT BOUNCING, BUT NOT IN THE WAY OF THE '381 PATENT.

5    Q.   AND THAT'S MY POINT.  THE LAUNCHTILE SYSTEM IS DIFFERENT

6    FROM THE BOUNCE BACK FEATURE IN THE '381 PATENT; RIGHT?

7    A.   YES.

8    Q.   OKAY.  NOW, ONE OF THE APPLICATIONS THAT WAS ULTIMATELY

9    FOUND TO INFRINGE IN SOME OF THE SAMSUNG PHONES WAS THE GALLERY

10   APPLICATION.  IT'S USED TO STORE PHOTOS AND IMAGES; RIGHT?

11   A.   YES.

12   Q.   OKAY.  THE -- I'M GOING TO TRY MY HAND AT USING THE ELMO.

13        THIS IS JX 1027, AND IT'S THE -- IT'S THE GALLERY INFUSE.

14        AND I THINK YOU SHOWED -- I FEEL LIKE A HAND MODEL NOW,

15   LIKE GEORGE IN "SEINFELD."

16        WE SAW THIS STICK FIGURE BEFORE; RIGHT?

17   A.   A VERSION OF IT, YES, OF COURSE.

18   Q.   OKAY.  AND MY POINT IS THAT SIMPLY USING AN IMAGE LIKE IS

19   ON HERE AND HAVING IT BOUNCE BACK, LIKE I JUST DID ON THE ELMO,

20   THAT'S NOT COVERED BY THE '381 PATENT, IS IT?

21   A.   YOU MEAN ALL THE STEPS IN '381 PATENT?

22   Q.   I'M TALKING ABOUT THE -- I'M TALKING ABOUT FOR THE

23   PURPOSE, FOR THE SCOPE OF THE '381 PATENT, WHAT I JUST DID,

24   WHICH IS TO PULL THE IMAGE OVER AND HAVING IT BOUNCE BACK, JUST

25   LIKE THAT (INDICATING), THAT'S NOT COVERED BY THE '381 PATENT,

1    IS IT?

2    A.   YOU'RE TALKING ABOUT CLAIM 19 OF THE '381 PATENT?

3    Q.   I'M TALKING ABOUT CLAIM 19, THE ONE THAT WAS ASSERTED IN

4    THE FIRST TRIAL, YES.

5    A.   TO THE EXTENT THAT'S NOT A ZOOMED IN IMAGE, YES, THAT DOES

6    NOT COVER IT.

7    Q.   I'M SORRY.  IT'S BECAUSE IT'S NOT A ZOOMED IN IMAGE?

8    A.   YES.

9    Q.   DID YOU SAY YES?

10   A.   YES.

11   Q.   OKAY.  SO YOUR POINT IS THAT THE IMAGINE MUST FIRST BE

12   ZOOMED IN BEFORE THE '381 PATENT COVERED IT; RIGHT?

13   A.   IN THIS PARTICULAR APPLICATION ON THE SAMSUNG PHONES, THAT

14   HAS TO OCCUR FIRST, YES.

15   Q.   OKAY.  SIR, YOU'VE NOT CONDUCTED ANY TYPE OF SURVEY TO

16   DETERMINE HOW OFTEN THE BOUNCE BACK FEATURE IS USED IN

17   SAMSUNG'S PHONES; RIGHT?

18   A.   I PERSONALLY HAVE NOT DONE THAT.

19   Q.   AND YOU HAVEN'T DONE A SURVEY TO DETERMINE HOW OFTEN A

20   USER ZOOMS IN ON THE IMAGE, LIKE I DID ON THE ELMO, BEFORE

21   BOUNCING; RIGHT?

22   A.   NO, I HAVE NOT.

23   Q.   OKAY.  I WANT TO TALK A LITTLE BIT MORE ABOUT THE SCOPE

24   AND NARROWNESS OF THE PATENT.

25        AS I THINK YOU WERE -- CLAIM 19 HAS A LOT OF LIMITATIONS

1     IN IT; RIGHT?

2     A.   THERE ARE SEVERAL LIMITATIONS, YES.

3     Q.   AND, FOR EXAMPLE, THE CLAIM REQUIRES THAT WHEN YOU BOUNCE

4     BACK, THE AREA BEYOND THE EDGE IS NO LONGER DISPLAYED; RIGHT?

5     A.   THE AREA BEYOND THE EDGE OF THE ELECTRONIC DOCUMENT IS NO

6     LONGER DISPLAYED.

7     Q.   OKAY.  SO LET'S PUT UP -- LET'S TRY AND UNDERSTAND WHAT

8     THAT MEANS.

9          LET'S PUT UP, PLEASE, RYAN, SDX 8008.24.

10         DO YOU RECOGNIZE THE FIGURE, AT LEAST AS IT STANDS RIGHT

11    HERE, IS FROM THE PATENT, RIGHT, THE '381 PATENT?

12    A.   YES, IT IS.

13    Q.   OKAY.  SO WHEN THE DOCUMENT IS SCROLLED, AS WE SEE ON THE

14    LEFT, IF WE RUN THE VIDEO -- PLEASE, RYAN -- WE CAN SEE THE

15    AREA BEYOND THE EDGE, THE BLACK AREA EXPOSED, AND WHEN IT'S

16    RELEASED, IT BOUNCES BACK, AND YOU SEE IT UP HERE, TO THE BLACK

17    AREA, THAT'S THE AREA BEYOND THE EDGE, AND WHEN THE FINGER IS

18    RELEASED, IT BOUNCES BACK SO THAT THERE'S NO LONGER ANY AREA

19    BEYOND THE EDGE THAT'S DISPLAYED; RIGHT?

20    A.   IN THAT EXAMPLE.

21         I JUST WANT TO BE CLEAR, THAT ANIMATION IS NOT IN THE

22    PATENT.  IT'S SOMETHING YOU'VE CREATED.

23    Q.   THE ANIMATION IS NOT IN THE PATENT, BUT THAT'S A FAIR

24    DEPICTION OF HOW THE PATENT AND CLAIM 19 DESCRIBES THE

25    INVENTION WORKING; ISN'T IT?

1    A.   IT'S ONE EXAMPLE, RIGHT.

2    Q.   OKAY.  BUT IT'S AN ACCURATE EXAMPLE; RIGHT?

3    A.   TO THE EXTENT I CAN DISCERN IT FROM THE VIDEO, YES.

4    Q.   OKAY.  I'M REALLY FOCUSSING ON THE AREA BEYOND THE EDGE.

5         SO THE PATENT REQUIRES THAT WHEN THE IMAGE BOUNCES BACK,

6    THERE'S NO AREA BEYOND THE EDGE THAT'S DISPLAYED OF THE

7    ELECTRONIC DOCUMENT; RIGHT?

8    A.   THAT'S RIGHT.

9    Q.   OKAY.  SO IF WE LOOK AT THE FIGURE AND THE ANIMATION ON

10   THE RIGHT-HAND SIDE OF THIS EXHIBIT -- IF WE CAN RUN THAT,

11   PLEASE, RYAN -- SIMILARLY, A FINGER SCROLLS UP TO DISPLAY AN

12   AREA BEYOND THE EDGE, AND IF WE STOP THERE, HERE THE BLACK AREA

13   IS AN AREA THAT IS STILL DISPLAYED THAT'S BEYOND THE EDGE.

14        SO JUST THE FACT THAT IT SHOWS AN AREA DISPLAYED BEYOND

15   THE EDGE, THAT'S NOT COVERED BY THE '381 PATENT, THE BOUNCE

16   BACK PATENT; RIGHT?

17   A.   I WOULD DISAGREE WITH THAT.

18   Q.   LET'S LOOK AT -- LET'S LOOK AT YOUR, YOUR TESTIMONY, OKAY,

19   FROM THE FIRST TRIAL.

20        YOU REMEMBER YOU TESTIFIED IN THE FIRST TRIAL; RIGHT?

21   A.   SURE.

22   Q.   AND I ASKED YOU, OR YOU WERE ASKED, I THINK ON DIRECT, AND

23   THIS IS PAGE 1747, LINES 1 TO 10.  OKAY?

24        MR. MCELHINNY:  MAY I HAVE A MINUTE TO SEE IT?

25        MR. JOHNSON:  SURE.

```
1              (PAUSE IN PROCEEDINGS.)

2                   MR. MCELHINNY:  THANK YOU.

3                   MR. JOHNSON:  OKAY.

4      Q.   YOU WERE ASKED THE QUESTION, "LET'S GO TO THE SIXTH

5      ELEMENT OF CLAIM 19.  WHAT DOES THIS ELEMENT REQUIRE?"

6           AND YOUR ANSWER WAS:  "THIS ELEMENT DEALS WITH WHAT

7      HAPPENS WHEN THE OBJECT OR FINGER IS RELEASED FROM THE SCREEN,

8      IT'S NO LONGER DETECTED BY THE TOUCHSCREEN, AND THIS REQUIRES

9      THAT WHEN THAT HAPPENS, THE DOCUMENT IS TRANSLATED IN A SECOND

10     DIRECTION, IT'S MOVED IN A SECOND DIRECTION, SUCH THAT THE AREA

11     BEYOND THE EDGE OF THE SCREEN PREVIOUSLY DISPLAYED IS NO LONGER

12     DISPLAYED."

13          THAT WAS YOUR SWORN TESTIMONY IN THE FIRST TRIAL; RIGHT?

14     A.   THAT'S RIGHT.

15     Q.   OKAY.  LET'S GO BACK TO THE ANIMATION.

16                  MR. MCELHINNY:  WELL --

17     BY MR. JOHNSON:

18     Q.   ON THE RIGHT-HAND SIDE --

19                  MR. MCELHINNY:  THE ANSWER THAT HE'S SHOWING GOES ON

20     FOR ANOTHER THREE PARAGRAPHS.  HE JUST SHOWED PART OF THE

21     ANSWER.

22                  MR. JOHNSON:  YOU CAN ASK HIM ABOUT IT ON REDIRECT.

23                  MR. MCELHINNY:  WELL, NO.  THIS IS PART OF AN ANSWER,

24     SHOWING THE JURY PART OF AN ANSWER ON THE SCREEN IN THE MIDDLE

25     OF AN EXAMINATION.
```

```
 1              MR. JOHNSON:  YOUR HONOR, THE REST OF IT DOESN'T

 2   PERTAIN TO THE PORTION --

 3              THE COURT:  WELL, I DON'T WANT ARGUMENT ON THIS.

 4        GO AHEAD.

 5   BY MR. JOHNSON:

 6   Q.   SO, AGAIN, LOOKING BACK ON THE FIGURE ON THE RIGHT-HAND

 7   SIDE OF SDX 8008.024, THE BLACK AT THE TOP DISPLAYS AN AREA

 8   BEYOND THE EDGE; RIGHT?

 9   A.   IT DEPENDS.  IT MAY -- IT ALL DEPENDS ON WHAT THE

10   ELECTRONIC DOCUMENT IS.

11   Q.   AND THAT'S MY POINT.  IT GOES TO THE SCOPE TO HOW NARROW

12   THIS PATENT IS; RIGHT?

13   A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

14   Q.   OKAY.

15   A.   DEPENDS ON HOW YOU DEFINE THE ELECTRONIC DOCUMENT.

16   Q.   OKAY.  LET'S TALK MORE GENERALLY.

17        DURING THE TRIAL, THERE WERE THREE DIFFERENT APPLICATIONS

18   ON THE SAMSUNG DEVICES THAT WERE ACCUSED; RIGHT?  THERE WAS THE

19   PHOTO GALLERY, THERE WAS THE INTERNET BROWSER, AND THERE WAS

20   THE CONTACTS APPLICATION; RIGHT?

21   A.   THAT'S RIGHT.

22   Q.   OKAY.  SO THE INTERNET BROWSER LETS PEOPLE GET ON THE

23   INTERNET AND LOOK AT THINGS ON THE INTERNET; THE CONTACTS

24   BROWSER LETS YOU ORGANIZE YOUR CONTACTS; AND THE PHOTO GALLERY

25   LETS YOU ORGANIZE YOUR PHOTOS; RIGHT?
```

1    A.   SURE.

2    Q.   THAT'S FAIR?  BUT OBVIOUSLY THERE ARE LOTS OF OTHER

3    FEATURES ON THE ACCUSED PHONES BEYOND JUST THE GALLERY, THE

4    INTERNET BROWSER, AND THE CONTACTS APPLICATION.

5              MR. MCELHINNY:  YOUR HONOR, THIS IS BEYOND THE SCOPE

6    OF MY DIRECT.

7              MR. JOHNSON:  YOUR HONOR, THIS GOES RIGHT TO THE

8    HEART OF THE ISSUE AS TO THE NARROWNESS OF THE PATENT AND THE

9    DEMAND FOR THE FEATURES.

10             THE COURT:  IT'S BEYOND THE SCOPE.  IT'S BEYOND THE

11   SCOPE OF DIRECT.  SUSTAINED.

12             MR. JOHNSON:  WELL, YOUR HONOR, I CAN BRING HIM BACK

13   IN OUR CASE-IN-CHIEF THEN.  I'M TRYING TO --

14             THE COURT:  I GUESS YOU'LL HAVE TO DO THAT THEN.  GO

15   AHEAD WITH YOUR QUESTION.

16        WE'RE NOT GOING TO RETRY THE INFRINGEMENT VERDICT FROM

17   LAST YEAR.

18             MR. JOHNSON:  OKAY.  THANK YOU, YOUR HONOR.

19             THE COURT:  I'VE ALREADY SAID THAT A NUMBER OF TIMES.

20             MR. JOHNSON:  OKAY.  THANK YOU, YOUR HONOR.

21   Q.   LET'S LOOK AT -- THERE WERE SOME DOCUMENTS THAT YOU

22   TESTIFIED ABOUT IN YOUR DIRECT THAT RELATE TO SAMSUNG'S

23   EVALUATION OF THE BROWSER IN APPLE'S IPHONE; RIGHT?

24   A.   IT RELATES TO SAMSUNG'S EVALUATION OF THE BOUNCE BACK

25   FEATURE.

1     Q.   IN THE BROWSER; RIGHT?

2     A.   IN THOSE TWO EXAMPLES, YES.

3     Q.   OKAY.  LET'S PUT UP EXHIBIT 57, PLEASE.  RYAN, PAGE 73.

4          THIS WAS A DOCUMENT THAT YOU JUST TESTIFIED ABOUT; RIGHT?

5     A.   YES.

6     Q.   AND THIS IS AN EVALUATION OF THE BOUNCE FEATURE IN

7     CONNECTION WITH THE BROWSER; RIGHT?  THAT'S WHAT IT SAYS HERE?

8     A.   THAT'S RIGHT, ABSOLUTELY.

9     Q.   OKAY.  LET'S LOOK AT EXHIBIT 46, PLEASE, RYAN.  PAGE 66.

10         THIS AGAIN WAS A DOCUMENT YOU REFERRED TO; RIGHT?

11    A.   YES.

12    Q.   AND AGAIN, THIS WAS A PAGE THAT YOU REFERRED TO?

13    A.   YES, IT WAS.

14    Q.   AND THIS IS AGAIN EVALUATING THE BOUNCE BACK FEATURE IN

15    CONNECTION WITH THE BROWSER; RIGHT?  AESTHETICS BROWSING;

16    RIGHT?

17    A.   IN THIS EXAMPLE, YES.

18    Q.   OKAY.  YOU HAVEN'T -- YOU'RE NOT AWARE OF ANY DOCUMENTS --

19    STRIKE THAT.

20         IN THE DISCUSSION WITHIN YOUR DIRECT TESTIMONY, YOU DIDN'T

21    TALK ABOUT ANY DOCUMENTS THAT EVALUATE THE BOUNCE FEATURE AS

22    IT'S USED IN THE CONTACTS APPLICATION OR IN THE GALLERY

23    APPLICATION, DID YOU?

24    A.   I DID NOT PRESENT THAT IN MY DIRECT.

25    Q.   OKAY.  YOU DID SHOW, GOING BACK TO EXHIBIT 46 -- THE FRONT

```
 1        PAGE, PLEASE, RYAN -- THIS WAS THE DOCUMENT THAT REFERS TO THE

 2        BEHOLD3 USABILITY EVALUATION RESULTS; RIGHT?

 3        A.   YES.

 4        Q.   NOW, THE BEHOLD3 IS NOT PART OF THIS TRIAL, IS IT?

 5        A.   NOT -- NO.  THIS WAS AN EARLIER VERSION UNDER DEVELOPMENT.

 6        Q.   IT'S NOT PART OF THIS TRIAL, IS IT, SIR?

 7        A.   I JUST SAID NO.

 8        Q.   OKAY.  AND IF WE GO, PLEASE -- YOU REFERRED TO PAGE 14 IN

 9        THIS EXHIBIT.  DO YOU REMEMBER REFERRING TO THIS PAGE IN YOUR

10        DIRECT TESTIMONY?

11        A.   YES, I DO.

12        Q.   OKAY.  WELL, WHAT I DIDN'T HEAR YOU TALK ABOUT IN YOUR

13        DIRECT TESTIMONY AND WHAT I DIDN'T HEAR YOU TELL THE JURY ABOUT

14        WAS PAGE 17.

15             LET'S GO TO PAGE 17.

16             AND, AGAIN, THIS IS A SURVEY ANALYSIS, RIGHT, WHERE WHEN

17        YOU ZOOM IN HERE AND YOU LOOK AT THE BEHOLD3 BEING COMPARED TO

18        THE IPHONE AND YOU LOOK AT IT IN CONNECTION WITH THE BROWSER

19        APPLICATION, ON THE RIGHT-HAND SIDE -- PLEASE, RYAN -- YOU

20        ACTUALLY SEE THAT THE BEHOLD3 SCORED HIGHER WITH THE BROWSING

21        APPLICATION THAN THE IPHONE DID; RIGHT?

22        A.   IN THIS PARTICULAR SLIDE.  IT'S UNCLEAR WHICH

23        FUNCTIONALITY THE BROWSER WAS BEING TESTED ON.

24        Q.   THIS IS TALKING ABOUT THE OVERALL BROWSING FEATURE, ISN'T

25        IT?  YOU'VE READ THIS DOCUMENT MANY, MANY TIMES, HAVEN'T YOU?
```

1    A.   THIS IS THE OVERALL BROWSING, NOT THE BOUNCE FEATURE IN

2    THE BROWSER.

3    Q.   AND WHEN YOU LOOK AT PAGE 18, RIGHT AFTER THIS ONE, AND

4    YOU LOOK AT THE AESTHETIC QUALITY BETWEEN THE BEHOLD3 AND THE

5    IPHONE AND WHAT THE RESULTS WERE, YOU AGAIN SEE IT'S BASICALLY

6    A DEAD HEAT.  85.1 PERCENT FOR THE BEHOLD3, AND 84.9 PERCENT

7    FOR THE IPHONE; RIGHT?

8    A.   SURE.

9    Q.   YOU DIDN'T REFER TO THOSE PAGES DURING YOUR DIRECT

10   TESTIMONY, DID YOU?

11   A.   NO.

12        MR. JOHNSON:  NO FURTHER QUESTIONS, YOUR HONOR.

13        AND --

14        THE COURT:  OKAY.  OKAY.  IT'S 1:36.  ANY REDIRECT?

15        MR. MCELHINNY:  CAN I HAVE THE PLAINTIFF'S EXHIBIT

16   FOR THE BEHOLD3?  THANK YOU.

17                        **REDIRECT EXAMINATION**

18   BY MR. MCELHINNY:

19   Q.   YOU WERE SPEAKING A LITTLE SOFTLY, SO I WANT TO HEAR THIS.

20   THE BEHOLD3 WAS --

21        THE COURT:  THE TIME IS 1:37.  GO AHEAD.

22        MR. MCELHINNY:  THANK YOU.

23   Q.   THE BEHOLD3 WAS THE PHONE THAT WAS UNDER DEVELOPMENT; IS

24   THAT CORRECT?

25   A.   THAT IS CORRECT.

1    Q.   AND DID THAT PHONE EVENTUALLY GET RELEASED?

2    A.   IT BECAME THE VIBRANT.

3    Q.   AND IN THE FIRST TRIAL, DID THE JURY FIND THAT THE VIBRANT

4    PHONE INFRINGED THIS PATENT?

5    A.   ABSOLUTELY.

6    Q.   BUT IT'S NOT AT ISSUE IN THIS CASE; IS THAT CORRECT?

7    A.   IT IS NOT AT ISSUE.

8              MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

9              THE COURT:  OKAY.  THE TIME IS 1:37.  ANY RECROSS?

10             MR. JOHNSON:  NO, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  WOULD YOU LIKE THIS WITNESS

12   EXCUSED SUBJECT TO RECALL?

13             MR. JOHNSON:  SUBJECT TO RECALL, YES, YOUR HONOR.

14             THE COURT:  ALL RIGHT.  YOU ARE EXCUSED SUBJECT TO

15   RECALL.

16             THE WITNESS:  THANK YOU.

17             THE COURT:  ALL RIGHT.  CALL YOUR NEXT WITNESS,

18   PLEASE.

19             MS. KREVANS:  YOUR HONOR, APPLE CALLS

20   DR. KARAN SINGH.

21             THE COURT:  OKAY.  TIME IS 1:37.

22             MS. KREVANS:  WE JUST NEED A MOMENT TO --

23             THE COURT:  YOU NEED A MINUTE TO SET UP?

24             MS. KREVANS:  YES, PLEASE.

25             THE CLERK:  PHOTOS?

```
 1              MS. KREVANS:  WE'VE ALREADY TAKEN HIS PICTURE.

 2         (PAUSE IN PROCEEDINGS.)

 3              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE?

 4         (KARAN SHER SINGH, PLAINTIFF'S WITNESS, SWORN.)

 5              THE WITNESS:  I DO.

 6              THE COURT:  TIME IS 1:38.  GO AHEAD, PLEASE.

 7              THE CLERK:  WOULD YOU STATE YOUR NAME, PLEASE, AND

 8    SPELL IT?

 9              THE WITNESS:  SURE.  IT'S K-A-R-A-N, S-H-E-R, THAT'S

10    KARAN SHER, AND MY LAST NAME IS SINGH, S-I-N-G-H.

11                           DIRECT EXAMINATION

12    BY MS. KREVANS:

13    Q.   GOOD AFTERNOON, DR. SINGH.

14    A.   GOOD AFTERNOON.

15    Q.   COULD YOU PLEASE MAKE SURE, BECAUSE YOU SOMETIMES SPEAK

16    RATHER SOFTLY, THAT THE MICROPHONE IS NEAR ENOUGH TO YOU THAT

17    THEY'RE GOING TO BE ABLE TO HEAR YOU.  OKAY?

18    A.   OKAY.

19    Q.   ALL RIGHT.  FIRST, COULD YOU PLEASE INTRODUCE YOURSELF TO

20    THE JURY?

21    A.   SURE.  MY NAME IS KARAN SHER SINGH, BUT I TYPICALLY GO BY

22    KARAN SINGH.

23    Q.   AND DR. SINGH, WHAT DO YOU DO FOR A LIVING?

24    A.   I'M A PROFESSOR OF COMPUTER SCIENCE AT THE UNIVERSITY OF

25    TORONTO WHERE I CO-DIRECT THEIR GRAPHICS AND HUMAN COMPUTER
```

1    INTERACTION LAB.  I DO RESEARCH, I TEACH CLASSES, I SUPERVISE

2    GRADUATE STUDENTS.

3         OVER THE YEARS I'VE ALSO EXTENSIVELY DESIGNED AND

4    PROGRAMMED A NUMBER OF GRAPHICAL INTERFACES FOR PRIVATE

5    COMPANIES.

6    Q.   OKAY.  COULD YOU TELL THE JURY A LITTLE BIT ABOUT YOUR

7    BACKGROUND, STARTING WITH YOUR EDUCATION?

8    A.   WELL, I HAVE A NUMBER OF COMPUTER SCIENCE DEGREES.  I HAVE

9    A BACHELOR'S IN COMPUTER SCIENCE FROM THE INDIAN INSTITUTE OF

10   TECHNOLOGY, AND A MASTER'S AND PH.D. IN COMPUTER SCIENCE AS

11   WELL FROM THE OHIO STATE UNIVERSITY.

12   Q.   COMPUTER SCIENCE, DOES THAT MEAN THAT YOU ARE A COMPUTER

13   PROGRAMMER?

14   A.   I HAVE PROGRAMMED EXTENSIVELY.  I KNOW SEVERAL PROGRAMMING

15   LANGUAGES.  THESE DAYS I HAVE MANY, MANY OTHER

16   RESPONSIBILITIES, BUT I TRY TO KEEP MYSELF ACTIVE.

17   Q.   OKAY.  HAVE YOU AUTHORED ANY PROFESSIONAL PUBLICATIONS?

18   A.   SURE.  I HAVE WELL OVER 50 ARTICLES IN PEER REVIEWED

19   JOURNALS AND ACADEMIC CONFERENCES IN MY FIELD.

20   Q.   TELL US A LITTLE BIT ABOUT THE RESEARCH THAT YOU DO AT THE

21   UNIVERSITY.

22   A.   BROADLY, MY AREA OF RESEARCH IS IN ARTIST DRIVEN

23   INTERACTIVE GRAPHICS.  RECENTLY MY FOCUS HAS BEEN MORE ON

24   INTERACTIVE TECHNIQUES FOR PEN AND TOUCH-BASED DEVICES.

25   Q.   HOW LONG HAVE YOU BEEN A PROFESSOR AT THE UNIVERSITY OF

1     TORONTO?

2     A.    ELEVEN YEARS.

3     Q.    WHAT DID YOU DO BEFORE THAT?

4     A.    WELL, AFTER MY PH.D. IN 1995, I JOINED A TORONTO COMPANY

5     CALLED ALIAS WHERE I HELPED DESIGN THE FIRST VERSION OF, OF AN

6     ANIMATION SYSTEM CALLED MAYA; AND LATER HERE IN CALIFORNIA I

7     WAS ALSO INVOLVED WITH THE DESIGN AND PROGRAMMING OF A SYSTEM

8     CALLED PARAFORM THAT TRANSFORMED SCANNED PHYSICAL OBJECTS INTO

9     DIGITAL MODELS.

10         I'VE ALSO WORKED IN VARIOUS PARTS OF THE WORLD AS A

11    VISITING RESEARCHER.

12    Q.    WHAT DID THE MAYA SYSTEM DO?

13    A.    WELL, THE MAYA SYSTEM HAS BEEN THE INDUSTRY STANDARD FOR

14    WELL OVER A DECADE FOR COMMERCIAL ANIMATION AND FILM EFFECTS,

15    AND FOR THIS IT RECEIVED A TECHNICAL OSCAR IN 2003.

16    Q.    THE MAYA PROGRAM THAT YOU WORKED ON WON AN ACADEMY AWARD?

17    A.    YES.

18    Q.    OKAY.

19         MS. KREVANS:  YOUR HONOR, WE WOULD TENDER DR. SINGH

20    AS AN EXPERT IN COMPUTER SCIENCE PROGRAMMING, HUMAN COMPUTER

21    INTERFACES, AND GRAPHICS.

22         THE COURT:  ANY OBJECTION OR ADDITIONAL VOIR DIRE?

23         MR. JOHNSON:  NO, YOUR HONOR.

24         THE COURT:  ALL RIGHT.  SO CERTIFIED.

25         GO AHEAD, PLEASE.

1      BY MS. KREVANS:

2      Q.   DR. SINGH, WHAT PATENTS THAT ARE AT ISSUE IN THIS TRIAL

3      WERE YOU ASKED TO LOOK AT?

4      A.   THE '915 AND THE '163 PATENTS.

5      Q.   OKAY.  LET'S START WITH THE '915.

6           COULD YOU TURN TO PX 1044 IN YOUR BINDER?

7      A.   YES.

8      Q.   WHAT IS PX 1044?

9      A.   IT IS THE '915 PATENT.

10          MS. KREVANS:  OKAY.  YOUR HONOR, WE WOULD MOVE THE

11     ADMISSION OF PX 1044.

12          THE COURT:  ANY OBJECTION?

13          MR. JOHNSON:  I THINK IT'S JX ACTUALLY, YOUR HONOR.

14     NO OBJECTION, THOUGH.

15          MS. KREVANS:  OKAY.

16          THE COURT:  OKAY.  THAT'S ADMITTED.

17       (JOINT EXHIBIT 1044 WAS ADMITTED IN EVIDENCE.)

18          THE COURT:  GO AHEAD, PLEASE.

19          MS. KREVANS:  THANK YOU, YOUR HONOR.

20     Q.   DR. SINGH, FIRST AT A CONCEPTUAL LEVEL, CAN YOU EXPLAIN TO

21     THE JURY WHAT THE '915 PATENTED INVENTION RELATES TO?

22     A.   SURE.  IN GENERAL, THE '915 PATENT ADDRESSES THE PROBLEM

23     OF VIEWING CONTENT, SUCH AS AN IMAGE, ON A GENERAL PURPOSE

24     COMPUTER WITH AN INTEGRATED TOUCHSCREEN, SUCH AS A SMARTPHONE

25     OR TABLET.

1          AND IT ALLOWS A USER TO DIRECTLY REACH INTO THE

2     TOUCHSCREEN, SO TO SPEAK, AND THEN USE THEIR FINGERS TO

3     POSITION AND RESIZE AND MANIPULATE THAT CONTENT.

4          AND IT DOES THIS VERY ELEGANTLY USING OBJECT ORIENTED

5     PROGRAMMING WITHIN AN EVENT AND VIEW-BASED FRAMEWORK.

6     Q.   OKAY.  YOU WERE HERE WHEN MR. JOHNSON WAS CROSS-EXAMINING

7     DR. BALAKRISHNAN; RIGHT?

8     A.   YES, I WAS.

9     Q.   YOU RECALL HE ASKED HIM SOME QUESTIONS ABOUT WHAT THE

10    CLAIMS OF THE PATENT ARE ABOUT?

11    A.   THAT IS CORRECT.

12    Q.   OKAY.  COULD YOU EXPLAIN TO THE JURY WHAT THE CLAIMS OF

13    THE '915 PATENT THAT ARE AT ISSUE IN THIS CASE REQUIRE IN TERMS

14    OF THE SORTS OF MANIPULATION THAT A USER CAN DO ON A

15    TOUCHSCREEN WITH THEIR FINGERS?

16    A.   YES.

17         SO THE '915, IT DRAWS A VERY CLEAR DISTINCTION BETWEEN --

18    A VERY COMMONLY PERFORMED OPERATION CALLED A SCROLLING

19    OPERATION, AND ALL OTHER KINDS OF MORE COMPLEX OPERATIONS THAT

20    IT CALLS GESTURE OPERATIONS, EXAMPLES BEING SCALING OR

21    ROTATIONS.

22         AND HAVING CREATED THIS DISTINCTION, IT MAPS SINGLE TOUCH

23    INPUT TO PERFORM SCROLLING, AND TWO OR MORE INPUT TOUCHES TO

24    PERFORM GESTURE OPERATIONS, SUCH AS SCALING.

25         AND THIS DESIGN IS, IS PARTICULARLY WELL SUITED TO SMALL

1      TOUCHSCREEN DEVICES WHICH RUN, YOU KNOW, A VARIETY OF

2      APPLICATION PROGRAMS USING AN OBJECT-ORIENTED FRAMEWORK THAT

3      SUPPORTS EVENTS AND VIEWS.

4      Q.   YOU USED A COUPLE TERMS THAT I KNOW ARE EVERY DAY LANGUAGE

5      TO YOU, DR. SINGH, BUT LET'S MAKE SURE THAT THE REST OF US

6      UNDERSTAND THEM.

7           WHAT DO YOU MEAN BY "SCROLLING"?

8      A.   WELL, SCROLLING IN THIS CASE IS MOVING, SLIDING, OR

9      PANNING AN IMAGE OR CONTENT ON A SCREEN.

10     Q.   AND WHAT DID YOU MEAN BY "SCALING"?

11     A.   SCALING IS RESIZING, ENLARGING OR ZOOMING.  AS YOU SAW

12     DURING THE OPENING STATEMENTS, YOU SAW CONTENT, IMAGES BEING

13     SCROLLED, MOVED, AND YOU ALSO SAW SORT OF USING A PINCH

14     GESTURE.  YOU SAW IMAGES BEING RESIZED OR SCALED.

15     Q.   "RESIZED" MEANING GETTING SMALLER OR LARGER ON THE SCREEN?

16     A.   YES, SMALLER OR LARGER DEPENDING ON WHETHER YOUR FINGERS

17     WERE MOVING APART OR COMING TOGETHER.

18     Q.   OKAY.  WE'RE ALL USING THESE THINGS TODAY.  WHEN WAS THE

19     APPLICATION FOR THIS PATENT FILED?

20     A.   I'M SORRY?

21     Q.   WHEN WAS THE APPLICATION FOR THIS PATENT FILED?

22     A.   WHEN?  IT WAS FILED, I BELIEVE, IN 2007, JANUARY 7TH OF

23     2007.

24     Q.   OKAY.  WHAT, DR. SINGH, IN YOUR VIEW, WERE THE MAJOR

25     INNOVATIONS IN THE '915 PATENT WHEN THE APPLICATION WAS FILED

1        IN JANUARY 2007?

2        A.   WELL, TRADITIONALLY, OR TYPICALLY COMPUTER, GENERAL

3        COMPUTER INTERFACES, THEY OFTEN USE DEDICATED -- THEY REQUIRE

4        THAT THE USERS MOVE DEDICATED SLIDERS OR OFTEN PROVIDE

5        ADDITIONAL INPUT, LIKE BUTTON PRESSES TO SWITCH BETWEEN

6        SCROLLING AND SCALING.

7             WITH THE '915, BY ASTUTELY MAPPING THIS DISTINCTION, THIS

8        DISTINCTION BETWEEN SCROLLING AND MORE COMPLEX GESTURE

9        OPERATIONS TO YOUR TOUCH INPUT, YOU ARE ABLE -- USERS ARE ABLE

10       TO PERFORM BOTH OPERATIONS VERY FLUIDLY, VERY SATISFACTORILY,

11       AND YET, THEY ARE DISTINGUISHABLE FROM EACH OTHER.

12       Q.   DOES APPLE USE THE '915 INVENTION IN ITS OWN PRODUCTS?

13       A.   YES, IT DOES.  ALL APPLE MOBILE TOUCHSCREEN DEVICES,

14       IPHONES, IPADS, IPOD TOUCHES USE THE PATENT.

15       Q.   OKAY.  WHICH OF THE SAMSUNG PRODUCTS THAT ARE AT ISSUE IN

16       THIS TRIAL WERE FOUND BY THE PRIOR JURY TO INFRINGE THE '915

17       PATENT?

18       A.   I'VE HIGHLIGHTED THEM ON A CHART.

19       Q.   OKAY.

20            WE'RE LOOKING AT PDX 105, PAGE 3, YOUR HONOR.

21       A.   SO AS YOU CAN SEE ON THIS CHART, 12 OF THE 13 DEVICES IN

22       THIS TRIAL, ALL EXCEPT THE REPLENISH, WERE FOUND BY THE JURY TO

23       INFRINGE THE '915 PATENT.

24       Q.   OKAY.  LET'S TURN TO THE SECOND PATENT THAT YOU WERE ASKED

25       TO LOOK AT, THE '163 PATENT.

```
 1              COULD YOU FIRST TURN TO JX 1046 IN YOUR BINDER.  WHAT IS

 2      JX 1046?

 3      A.   IT'S THE '163 PATENT.

 4              MS. KREVANS:  YOUR HONOR, WE'D MOVE THE ADMISSION OF

 5      JX 1046.

 6              THE COURT:  ANY OBJECTION?

 7              MR. JOHNSON:  NO, YOUR HONOR.

 8              THE COURT:  IT'S ADMITTED.

 9         (JOINT EXHIBIT 1046 WAS ADMITTED IN EVIDENCE.)

10              THE COURT:  GO AHEAD, PLEASE.

11              MS. KREVANS:  OKAY.

12      Q.   COULD YOU GIVE THE JURY, DR. SINGH, A HIGH LEVEL

13      EXPLANATION OF WHAT THE '163 PATENT RELATES TO?

14      A.   SURE.  THE '163, IT COVERS AN INVENTION TO, TO HELP WITH

15      THE READABILITY AND THE BROWSING EXPERIENCE OF STRUCTURED

16      ELECTRONIC DOCUMENTS, LIKE WEB PAGES, ON MOBILE TOUCHSCREEN

17      DEVICES, LIKE SMARTPHONES OR TABLETS.

18              BASICALLY WHAT IT DOES IS IT ALLOWS USERS TO USE TAP

19      GESTURES TO INDICATE REGIONS OR BOXES OF INTEREST, AND THEN THE

20      INVENTION ENLARGES AND REPOSITIONS THE WEB PAGE OR THE

21      DOCUMENT, THE STRUCTURED ELECTRONIC DOCUMENT, SUCH THAT THOSE

22      BOXES ARE AS LEGIBLE AS POSSIBLE.

23      Q.   WHAT IS A STRUCTURED ELECTRONIC DOCUMENT?

24      A.   WELL, WEB PAGES THAT YOU TYPICALLY SEE, IF YOU BROWSE THE

25      INTERNET, ARE STRUCTURED ELECTRONIC DOCUMENTS.  THEY INTERNALLY
```

```
 1        HAVE ELEMENTS CALLED TAGS THAT SORT OF CAPTURE THIS STRUCTURE.

 2             IF YOU LOOK AT THEM VISUALLY, YOU CAN SEE THAT STRUCTURE

 3        AS WELL.  THINGS SEEM TO BE LAID OUT IN SORT OF VISUAL BOXES,

 4        LIKE IF YOU HAPPEN TO LOOK AT A NEWSPAPER.

 5        Q.   CAN YOU GIVE US AN EXAMPLE OF HOW THE '163 PATENT

 6        INVENTION MIGHT BE USED IN VIEWING A WEB PAGE?

 7        A.   YES.  I CAN SHOW YOU ON A SAMSUNG EPIC 4G.

 8        Q.   OKAY.

 9             AND, YOUR HONOR, FOR THE RECORD, WE'RE LOOKING AT PDX

10        105.5.

11        A.   SO THIS IS THE SAMSUNG EPIC 4G, WHICH IS A PHONE THAT

12        INFRINGES THE '163 PATENT.

13             IF YOU WANTED TO, SAY, READ AN ON-LINE NEWSPAPER ON THIS

14        SAMSUNG DEVICE, ON THE FRONT PAGE, YOU KNOW, YOU CAN SEE A

15        NUMBER OF NEWS ARTICLES, YOU CAN SEE SOME IMAGES, AND THEY'RE

16        ALL SORT OF NICELY LAID OUT IN VARIOUS BOXES.

17             YOU MIGHT BE ABLE TO READ SOME OF THE HEADLINES, GET A

18        GENERAL SENSE OF THE CONTENT.

19             BUT IF YOU REALLY WANTED TO READ AN ARTICLE, YOU WOULD

20        WANT TO ZOOM INTO IT.

21             AND AS YOU CAN SEE, IF THE USER TAPS ON THE ARTICLE, THE,

22        THE -- CAN WE SEE THAT ONE MORE TIME?  IT SEEMED LIKE IT SORT

23        OF WENT BACK.

24             SO AS YOU --

25        Q.   I THINK WE HAVE TO GIVE MR. LEE A MOMENT.
```

1        A.   OKAY.

2             WELL, AS YOU WILL SEE IN A MINUTE, WHEN THE USER TAPS ON

3        AN ARTICLE OF INTEREST, WHAT HAPPENS IS THAT THE WEB PAGE IS

4        ENLARGED AND IT IS MOVED TO SUBSTANTIALLY CENTER THAT ARTICLE

5        SO YOU CAN READ IT.

6             AND THEN ONCE YOU'VE READ THAT ARTICLE AND YOU WANT TO

7        READ ANOTHER ARTICLE, YOU TAP ON THAT, AS YOU SEE HERE, AND THE

8        WEB PAGE SHIFTS OVER TO BRING THE SECOND ARTICLE INTO VIEW AND

9        MAKE IT READABLE.

10            THAT IS THE '163.

11       Q.   OKAY.  IN THE VIDEO THAT YOU JUST SHOWED THE JURY OF THE

12       EPIC 4G, WAS THERE A SINGLE TAP OR A DOUBLE TAP TO MAKE THE

13       SECOND ARTICLE MOVE TO THE CENTER?

14       A.   WELL, THE FIRST TAP WAS A DOUBLE TAP.  IN THIS PARTICULAR

15       INSTANCE, THE SECOND TAP WAS A SINGLE TAP.

16            BUT THE '163 PATENT COVERS ALL TAP GESTURES.  IT COVERS

17       DOUBLE TAPS AND SINGLE TAPS.

18       Q.   OKAY.  THE '163 PATENT WAS ALSO FILED IN 2007; RIGHT?

19       A.   I BELIEVE IT WAS FILED ON SEPTEMBER 4, 2007.

20       Q.   OKAY.  PUTTING YOUR MIND BACK TO 2007, SO BACK TO THE

21       STATE OF TECHNOLOGY AT THAT TIME --

22       A.   SURE.

23       Q.   -- WHAT WAS THE -- WHAT WAS THE INNOVATIVE ASPECT?  WHAT

24       MADE THIS A USEFUL, NEW INVENTION IN 2007?

25       A.   WELL, THE PROBLEM OF VIEWING VERY LARGE CONTENT, SUCH AS A

```
 1        NEWSPAPER, THROUGH SOMETHING THE SIZE OF, SOMETHING THE SIZE OF

 2        A POSTCARD IS A TRICKY PROBLEM.

 3             AND IT BASICALLY -- WHAT THE '163 DOES IS IT MAKES THIS,

 4        THIS BROWSING EXPERIENCE REALLY EFFICIENT AND STREAMLINED.

 5             WHAT IT DOES IS IT MAKES A VERY KEY INSIGHT.  THE INSIGHT

 6        IS THE VISUAL STRUCTURE THAT WE SEE ON WEB PAGES, SUCH AS THE

 7        "NEW YORK TIMES" THAT YOU SAW OVER HERE, ACTUALLY INHERENTLY

 8        EXISTED IN THESE DOCUMENTS, AND SO YOU CAN EXPLOIT THIS.

 9             AND THE WAY THE '163 INVENTION EXPLOITS THIS IS THAT THE

10        USER DOESN'T HAVE TO MANUALLY RESIZE THEIR CONTENT TO

11        CONSTANTLY READ DIFFERENT THINGS.  THEY SIMPLY TAP ON IT AND

12        THE INVENTION, USING THE STRUCTURE THAT EXISTS, FIGURES OUT HOW

13        TO ENLARGE THE DOCUMENT, HOW TO POSITION IT SUCH THAT IT IS

14        CONVENIENTLY READABLE.

15        Q.   DOES APPLE USE THE '163 INVENTION IN ITS OWN PRODUCTS?

16        A.   ABSOLUTELY.  ALL APPLE MOBILE TOUCHSCREEN DEVICES,

17        IPHONES, IPOD TOUCHES, IPADS USE THE INVENTION.

18        Q.   WHICH OF THE SAMSUNG PRODUCTS AT ISSUE IN THIS TRIAL WERE

19        FOUND TO INFRINGE THE '163 PATENT?

20        A.   I'VE HIGHLIGHTED THEM AS WELL ON A CHART.  OUT HERE YOU

21        SEE SEVEN OF THE 13 DEVICES, THE DROID CHARGE, EPIC 4G,

22        EXHIBIT 4G, GALAXY PREVAIL, GALAXY TAB, INFUSE 4G, AND

23        REPLENISH INFRINGE THE '163 PATENT.

24        Q.   IN WORKING ON THIS CASE, HAVE YOU HAD THE OPPORTUNITY TO

25        REVIEW SOME OF THE SAMSUNG INTERNAL DOCUMENTS WHICH WERE
```

```
 1       PRODUCED UNDER SUBPOENA IN THE CASE?

 2       A.   YES.

 3       Q.   DID YOU FIND THAT ANY OF THEM DISCUSSED THE FEATURES OF

 4       THE '915 OR THE '163 PATENT?

 5       A.   YES, THEY DID.

 6       Q.   AND COULD YOU TURN TO PX 38 IN YOUR BINDER?

 7       A.   YES.

 8       Q.   AND FOCUSSING ON THE '163 PATENT, FIRST, COULD YOU TELL US

 9       WHAT PX 38 IS?

10       A.   IT'S A SAMSUNG DOCUMENT TITLED "BROWSER ZOOMING METHODS,

11       UX," THAT'S USER EXPERIENCE, "EXPLORATION STUDY" FROM, I GUESS,

12       APRIL 17TH OF 2009.

13               MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

14       PX 38.

15               THE COURT:  ANY OBJECTION?

16               MR. JOHNSON:  NO, YOUR HONOR.

17               THE COURT:  IT'S ADMITTED.

18          (PLAINTIFF'S EXHIBIT 38 WAS ADMITTED IN EVIDENCE.)

19               THE COURT:  GO AHEAD, PLEASE.

20               MS. KREVANS:  OKAY.

21       Q.   WHAT ARE THE CONTENTS OF PX 38 GENERALLY ABOUT?

22       A.   WELL, PX 38 IS, AS THE TITLE SAYS, IS LOOKING AT

23       COMPARATIVE TECHNIQUES FOR BROWSING, ESSENTIALLY FOR --

24       PARTICULARLY FOR ZOOMING METHODS SO THAT YOU CAN VIEW CONTENT

25       ZOOMED UP IN A BROWSER.
```

```
 1            AND WHAT IT IS, IS IT'S AN EXPLORATION STUDY.  SO IT'S A

 2   STUDY THAT IS BEING CONDUCTED BY SAMSUNG TO LOOK AT A NUMBER OF

 3   DIFFERENT ALTERNATIVES TO ZOOMING IN A BROWSER.

 4   Q.   COULD YOU TURN TO PAGE 24 OF THIS SAMSUNG DOCUMENT?

 5   A.   PAGE 24.  SORRY ABOUT THAT.  I GOT IT NOW.

 6   Q.   OKAY.  WHAT RECOMMENDATIONS DID THE SAMSUNG STUDY MAKE ON

 7   PAGE 24?

 8   A.   WELL, THE STUDY CONCLUDED WITH A SUGGESTION THAT DOUBLE

 9   TAP, ADOPT DOUBLE TAP AS A SUPPLEMENTARY ZOOMING METHOD.

10            AND FURTHER, THAT THE USER EXPERIENCE OF THE IPHONE CAN BE

11   USED AS A DESIGN BENCHMARK.

12   Q.   OKAY.  AND WHEN YOU SEE "UX," THAT MEANS USER EXPERIENCE?

13   A.   USER EXPERIENCE, YES.

14   Q.   OKAY.  COULD YOU TURN TO PX 44 IN YOUR BINDER?

15   A.   SURE.

16   Q.   ARE YOU THERE?

17   A.   YES.

18   Q.   WHAT IS PX 44?

19   A.   WELL, IT IS ALSO A SAMSUNG DOCUMENT TITLED "RELATIVE

20   EVALUATION REPORT ON S1" AND THE IPHONE.

21   Q.   DATED?

22   A.   DATED MARCH THE 2ND, 2010.

23            MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

24   PX 44.

25            THE COURT:  ANY OBJECTION?
```

```
 1              MR. JOHNSON:  NO, YOUR HONOR.

 2              THE COURT:  IT'S ADMITTED.

 3         (PLAINTIFF'S EXHIBIT 44 WAS ADMITTED IN EVIDENCE.)

 4              THE COURT:  GO AHEAD, PLEASE.

 5    BY MS. KREVANS:

 6    Q.   IN GENERAL, WHAT IS PX 44, THIS INTERNAL SAMSUNG DOCUMENT,

 7    ABOUT, DR. SINGH?

 8    A.   THIS IS A COMPARATIVE EVALUATION REPORT BETWEEN THE IPHONE

 9    AND A PHONE IN DEVELOPMENT AT THE TIME CALLED THE S1 WHICH

10    EVENTUALLY BECAME THE GALAXY S SERIES OF SAMSUNG PHONES.

11    Q.   SO THE S1 WAS -- BECAME ONE OF THE PHONES IN THE GALAXY S

12    SERIES?

13    A.   THAT IS CORRECT.

14    Q.   OKAY.  COULD YOU LOOK AT PAGE 58 OF THIS DOCUMENT?  THIS

15    IS A LITTLE CONFUSING BECAUSE THE DOCUMENT HAS A PAGE NUMBER,

16    WHICH IS 58 --

17    A.   RIGHT.

18    Q.   -- BUT EACH OF THE PAGES ALSO HAS AN ITEM NUMBER, AND IN

19    THIS CASE IT'S 53.

20    A.   I THINK I'LL FIND 58.

21    Q.   OKAY.

22    A.   GOT IT.

23    Q.   OKAY.  COULD YOU JUST, FIRST USING THIS PAGE, EXPLAIN TO

24    THE JURY WHAT THE FORMAT OF THIS DOCUMENT WAS?

25    A.   SURE.  SO THIS DOCUMENT WAS, AS I SAID, A COMPARATIVE
```

1    EVALUATION.  VARIOUS ASPECTS OF THESE PHONES WERE BEING

2    COMPARED.

3         THIS PARTICULAR PAGE DEALS WITH BROWSING ON THE WEB

4    BROWSER, AND WHAT YOU SEE IS THE FUNCTIONALITY FOR BROWSING AS

5    DEFINED ON THE IPHONE ON THE LEFT-HAND SIDE, BOTH -- AND ON THE

6    RIGHT-HAND SIDE, YOU SEE THE S1, WHICH WAS THE SAMSUNG PHONE IN

7    DEVELOPMENT.

8    Q.   OKAY.  WHAT -- WHAT DOES THE -- WHAT IS THE FEATURE THAT

9    IS BEING DISCUSSED ON THIS PARTICULAR PAGE OF THE DOCUMENT?

10   A.   SO THE FEATURE IS ESSENTIALLY DISCUSSING THE FUNCTIONALITY

11   OF THE '163.

12        AS YOU CAN SEE, IT'S TALKING ABOUT ESSENTIALLY THE POINT

13   AT WHICH YOU WOULD BE LOOKING TO READ THE SECOND ARTICLE.

14        SO YOU'VE ALREADY TAPPED IN, AS IT SAYS, AFTER THE SCREEN

15   HAS ALREADY BEEN EXPANDED.

16        AND ANOTHER POINT IS DOUBLE TAP.  IT MOVES AS IF IT WAS

17   POINTED TO THE SECOND ARTICLE.  THAT'S ON THE IPHONE SIDE.

18        ON THE S1 SIDE, IT SAYS AFTER THE SCREEN HAS BEEN

19   EXPANDED, A SUBSEQUENT DOUBLE TAP TAKES THE SCREEN BACK TO ITS

20   ORIGINAL SIZE.  SO ESSENTIALLY WHAT IT'S DOING IS IT'S JUST

21   ZOOMING IN AND OUT, NOT MOVING OVER.

22        AND SO THAT WAS THE COMPARISON, AND BASED ON THAT

23   COMPARISON, I GUESS THEY HAD A RECOMMENDATION, OR A RECOMMENDED

24   IMPROVEMENT, WHICH IS DESCRIBED BELOW THAT.

25   Q.   ARE YOU TALKING ABOUT THE BOTTOM OF THE PAGE WHERE THERE'S

```
 1        THE BOX THAT SAYS "IMPROVEMENT"?

 2    A.   YES.

 3    Q.   OKAY.  WHAT DOES IT SAY ON THE RIGHT?

 4    A.   "DOUBLE TAP ZOOM IN/OUT FUNCTION NEEDS TO BE

 5    SUPPLEMENTED."

 6    Q.   AND DID SAMSUNG, IN FACT, SUPPLEMENT ITS DOUBLE TAP

 7    FUNCTION?

 8    A.   YEAH, I THINK -- YES, THEY DID.

 9    Q.   AND HOW DID THEY DO THAT?

10    A.   THEY MADE IT TO FUNCTION EXACTLY AS YOU SEE DESCRIBED ON

11    THE LEFT-HAND SIDE, WHICH IS THE WAY THE IPHONE PERFORMS.

12             MS. KREVANS:  NO FURTHER QUESTIONS, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:00 O'CLOCK.

14             MR. JOHNSON:  YOUR HONOR, MAY WE APPROACH TO HAND OUT

15    BINDERS?

16             THE COURT:  PLEASE, GO AHEAD.

17             MR. JOHNSON:  THANK YOU.

18        (PAUSE IN PROCEEDINGS.)

19             THE COURT:  OKAY.  ARE YOU READY?

20             MR. JOHNSON:  YES.  THANK YOU, YOUR HONOR.

21             THE COURT:  ALL RIGHT.  TIME IS 2:01.  GO AHEAD,

22    PLEASE.

23                         **CROSS-EXAMINATION**

24    BY MR. JOHNSON:

25    Q.   GOOD AFTERNOON, DR. SINGH.
```

1    A.   GOOD AFTERNOON.

2    Q.   MY NAME IS KEVIN JOHNSON.  I WANT TO ASK YOU A FEW

3    QUESTIONS STARTING WITH THE '915 PATENT.

4         LET'S TALK ABOUT THE SCOPE AND MY VIEW OF THE NARROWNESS

5    OF THE PATENT.

6         YOU WOULD AGREE, SIR, THAT THE '915 PATENT DOES NOT COVER

7    ALL THE WAYS TO SCROLL WITH ONE FINGER AND ZOOM WITH TWO

8    FINGERS; RIGHT?

9    A.   SORRY.  COULD YOU REPEAT YOUR QUESTION, PLEASE?

10   Q.   SURE.  YOU AGREE THAT THE '915 PATENT DOES NOT COVER ALL

11   THE DIFFERENT WAYS THAT YOU CAN SCROLL WITH ONE FINGER AND ZOOM

12   WITH TWO FINGERS; RIGHT?

13   A.   THE '915 PATENT TALKS ABOUT HOW TO --

14   Q.   SIR?

15   A.   SORRY.

16   Q.   YES OR NO?  PLEASE.  I'M GOING TO ASK YOU AGAIN.

17   A.   OKAY.

18   Q.   YOU AGREE THAT THE '915 PATENT DOES NOT COVER ALL OF THE

19   DIFFERENT WAYS THAT YOU CAN SCROLL WITH ONE FINGER AND ZOOM

20   WITH TWO FINGERS?

21   A.   SURE.

22   Q.   OKAY.  THERE ARE OTHER WAYS TO SCROLL WITH ONE FINGER AND

23   ZOOM WITH TWO FINGERS THAT DON'T INFRINGE THE '915 PATENT;

24   RIGHT?

25   A.   YES.

1      Q.   LET'S TALK A LITTLE BIT ABOUT SOME OF THOSE.

2           YOU'VE HEARD OF THE TED CONFERENCE; RIGHT?

3      A.   I HAVE HEARD OF IT.

4      Q.   AND IT'S A CONFERENCE THAT STARTED IN MONTEREY ABOUT 25

5      YEARS AGO, 24 YEARS AGO; RIGHT?

6      A.   PERHAPS.

7      Q.   OKAY.  WELL, YOU UNDERSTAND THAT IT'S A CONFERENCE WHERE

8      LUMINARIES IN DIFFERENT FIELDS COME TO TALK ABOUT IDEAS THAT

9      ARE WORTH SPREADING; RIGHT?

10          MS. KREVANS:  OBJECTION, YOUR HONOR.  BEYOND THE

11     SCOPE.

12          THE COURT:  OVERRULED.

13          GO AHEAD, PLEASE.

14     BY MR. JOHNSON:

15     Q.   YOU UNDERSTAND THAT IT'S A CONFERENCE WHERE LUMINARIES IN

16     DIFFERENT FIELDS COME TO TALK ABOUT NEW IDEAS THAT ARE WORTH

17     SPREADING; RIGHT?

18     A.   SURE.

19     Q.   OKAY.  YOU'RE FAMILIAR WITH NYU'S, NEW YORK UNIVERSITY'S

20     JEFFERSON HAN, RIGHT?  YOU'VE HEARD OF HIM BEFORE?

21     A.   YES, I HAVE.

22     Q.   AND ARE YOU AWARE, SIR, THAT HE GAVE A TALK AT THE TED

23     CONFERENCE IN 2006, WHICH IS BEFORE THE 2 -- WHEN THE '915

24     PATENT WAS FILED HERE; RIGHT?

25     A.   I SAW IT DURING THE OPENING STATEMENT, YES.

```
1     Q.   IS THAT THE FIRST TIME YOU'VE SEEN IT?

2     A.   NO.  I'VE SEEN IT BEFORE.

3     Q.   YOU'VE SEEN IT MANY TIMES BEFORE; RIGHT?

4     A.   YES.

5     Q.   SO LET'S TAKE A LOOK AT IT.  THIS IS SDX 8003.003.  I JUST

6     WANT TO MAKE SURE WE'RE TALKING ABOUT THE SAME THING.

7          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

8     BY MR. JOHNSON:

9     Q.   SIR, YOU AGREE THAT THE '915 PATENT DOES NOT COVER THE WAY

10    JEFFERSON HAN SCROLLED WITH ONE FINGER AND ZOOMED WITH TWO

11    FINGERS; RIGHT?

12    A.   YES.  JEFFERSON HAN'S SYSTEM DOES NOT --

13    Q.   IT'S DIFFERENT?

14    A.   -- DOES NOT INFRINGE -- IT'S DIFFERENT FROM THE '915

15    PATENT, YES.

16    Q.   IT'S DIFFERENT; RIGHT?

17    A.   YES.

18    Q.   OKAY.  LET'S LOOK AT ANOTHER PIECE OF PRIOR ART THAT I

19    KNOW YOU'RE FAMILIAR WITH.  THE NOMURA PATENT, YOU'RE AWARE

20    THAT THAT WAS PUBLISHED BEFORE THE '915 PATENT WAS FILED;

21    RIGHT?

22    A.   YES.

23    Q.   LET'S LOOK AT SDX 8003.007, PLEASE, AND THIS IS AN

24    ANIMATION OF THE NOMURA PATENT.

25         LET'S TAKE A LOOK AT THIS.  WE SEE ON ONE SIDE SCROLLING
```

1    WITH ONE FINGER, AND THESE ARE FIGURES FROM THE NOMURA PATENT

2    THAT HAVE BEEN ANIMATED.  WE'VE ANIMATED THEM.

3         BUT YOU SEE TWO FINGERS ON THE RIGHT-HAND SIDE BEING USED

4    TO PINCH AND TO ZOOM?  DO YOU SEE THAT?

5    A.   YES, THAT'S CORRECT.

6    Q.   AND YOU BELIEVE THAT THE NOMURA PATENT AND THE METHOD OF

7    USING ONE FINGER TO SCROLL AND TWO FINGERS TO PINCH AND TO ZOOM

8    IS DIFFERENT FROM THE '915 PATENT; RIGHT?

9    A.   ABSOLUTELY.

10   Q.   OKAY.  YOU'VE HEARD OF THE -- OF ANOTHER PIECE OF PRIOR

11   ART CALLED FRACTAL ZOOM; RIGHT?

12   A.   YES.

13   Q.   AND THAT WAS A PROGRAM THAT RAN ON THE MITSUBISHI ELECTRIC

14   RESEARCH LABS DIAMONDTOUCH SYSTEM; RIGHT?

15   A.   I BELIEVE SO.

16   Q.   OKAY.  AND LET'S TAKE A LOOK AT THE VIDEO THAT'S AT SDX

17   8003.005.

18        AND, AGAIN, THIS IS A VIDEO I KNOW YOU'VE SEEN BEFORE, BUT

19   LET'S LOOK AT IT AGAIN HERE.

20        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

21        MR. JOHNSON:  LET'S STOP RIGHT THERE.

22   Q.   THERE IS AN INTRODUCTORY SLIDE TO THE VIDEO, RIGHT, THAT

23   SAYS "TOUCH THE TABLE WITH 2 FINGERS AND SPREAD THEM APART TO

24   ZOOM IN.  TOUCH THE TABLE WITH 2 FINGERS AND PULL THEM TOGETHER

25   TO ZOOM OUT.  TOUCH THE TABLE WITH 1 FINGER OR GRAB THE IMAGE

1      AND PULL TO PAN."

2          DO YOU SEE THAT?

3      A.   YES.

4      Q.   OKAY.  LET'S PLAY THE VIDEO, PLEASE.

5          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

6      BY MR. JOHNSON:

7      Q.   SO WE SEE ONE FINGER BEING USED TO SCROLL UP?  DO YOU SEE

8      THAT?  YES?

9      A.   YES, I DO.

10     Q.   OKAY.  TWO FINGERS BEING USED TO ZOOM IN?  TWO FINGERS

11     BEING USED TO ZOOM OUT?

12     A.   YES.

13     Q.   AND THIS WAS BEFORE THE '915 PATENT; RIGHT?

14     A.   YES.

15     Q.   AND YOU BELIEVE THIS SYSTEM IS DIFFERENT AND NOT COVERED

16     BY APPLE'S '915 PATENT; RIGHT?

17     A.   THAT IS CORRECT.

18     Q.   OKAY.  AND, IN FACT, ONE OF THE WAYS THAT I THINK YOU

19     DISTINGUISHED THIS SYSTEM IS THAT BECAUSE INSTEAD OF SCROLLING

20     WITH TWO FINGERS, THIS PARTICULAR SYSTEM SCROLLS WITH THREE

21     FINGERS; RIGHT?

22     A.   THAT IS CORRECT.

23     Q.   SO IF I USE THREE FINGERS TO SCROLL INSTEAD OF TWO

24     FINGERS, THEN THAT, IN YOUR VIEW, THAT'S ENOUGH TO MAKE IT

25     DIFFERENT FROM APPLE'S '915 PATENT; RIGHT?

1    A.   WELL, YOU KNOW, YOU FOCUSSED ON THE INSTRUCTIONS --

2    Q.   IS THAT RIGHT, SIR?

3    A.   SORRY?

4    Q.   IS THAT RIGHT?  THREE FINGERS?

5    A.   I'M ANSWERING YOUR QUESTION.

6    Q.   I'M JUST TRYING TO -- I'M UNDER TIME HERE, SO I'M TRYING

7    TO GET AN ANSWER TO MOVE THINGS ALONG.

8    A.   IF YOU WANT AN ANSWER, I'LL ANSWER THE QUESTION.

9         MS. KREVANS:  MAY I SUGGEST THAT MR. JOHNSON NOT

10   INTERRUPT THE WITNESS?  HE WAS TRYING TO ANSWER.

11        THE COURT:  GO AHEAD AND ANSWER, PLEASE.

12        THE WITNESS:  I SAID THAT IF YOU LOOK AT THE

13   INSTRUCTIONS THAT YOU SHOWED ME AND YOU READ OVER THERE, IT

14   SAID USE ONE FINGER OR GRAB THE IMAGE, AS IN YOU COULD TREAT

15   YOUR ENTIRE ARM AS LIKE ONE BIG FINGER GIVEN THAT THIS WAS A

16   BIG SCREEN.

17      SO, YES, YOU COULD -- THREE FINGERS WOULD SCROLL IN THE

18   DIAMONDTOUCH.  IT'S A VERY DIFFERENT DESIGN.

19   BY MR. JOHNSON:

20   Q.   THAT'S MY POINT.  THE FACT THAT YOU USE THREE FINGERS TO

21   SCROLL INSTEAD OF TWO, IN YOUR VIEW, THAT'S A VERY DIFFERENT

22   DESIGN; RIGHT?

23   A.   YES, IT IS.

24   Q.   OKAY.  LET'S TALK ABOUT THE '163 PATENT.

25        NOW, THAT'S THE -- I THINK YOU CALLED IT, THAT USES TAP

```
 1      GESTURES TO INDICATE REGIONS OF INTEREST ON A, ON THE WEB

 2      BROWSER; RIGHT?

 3      A.   EXCUSE ME?

 4      Q.   I'M TRYING TO -- I TOOK VERY CAREFUL NOTES WHEN YOU WERE

 5      TESTIFYING.

 6      A.   YES.

 7      Q.   AND I BELIEVE YOU SAID THE '163 PATENT USES TAP GESTURES

 8      TO INDICATE REGIONS OF INTEREST AND THE INVENTION ENLARGES AND

 9      REAPPORTIONS THE WEB PAGE OF THE DOCUMENT SUCH THAT THE BOXES

10      ARE AS LEGIBLE AS POSSIBLE.

11      A.   YEAH, THAT'S A GENERAL HIGH LEVEL DESCRIPTION.

12      Q.   OKAY.  YOU'RE NOT SAYING, AND YOU'RE NOT TELLING THIS

13      JURY, THAT THE '163 PATENT COVERS ALL TAP GESTURES, ARE YOU?

14      A.   OH, NO, CERTAINLY NOT.

15      Q.   AND YOU'RE NOT TELLING THIS JURY THAT THE '163 PATENT

16      COVERS THE NOTION OF TAPPING TO ZOOM IN ON A WEB PAGE BY

17      ITSELF; RIGHT?

18      A.   NO.

19      Q.   AND THE '163 PATENT DOESN'T COVER TAPPING TO ZOOM OUT OF A

20      WEB PAGE; RIGHT?

21      A.   NO, IT DID NOT.

22      Q.   LET'S TALK A LITTLE BIT ABOUT WHAT IT DOES COVER.

23           IN YOUR VIEW, TWO TAPS, TWO DIFFERENT GESTURES ARE

24      REQUIRED IN THE '163 PATENT; RIGHT?

25                MS. KREVANS:  YOUR HONOR, OBJECTION.  THIS IS A
```

```
 1      QUESTION THAT GOES DIRECTLY TO INFRINGEMENT WHICH HAS BEEN

 2      DECIDED.

 3               MR. JOHNSON:  YOUR HONOR --

 4               THE COURT:  OVERRULED.

 5           GO AHEAD, PLEASE.

 6               MR. JOHNSON:  THANK YOU, YOUR HONOR.

 7               THE COURT:  YOU MAY ANSWER THE QUESTION.

 8               THE WITNESS:  CERTAINLY.

 9               MR. JOHNSON:  I HAVE IT READ BACK, PLEASE?

10          (THE RECORD WAS READ BY THE COURT REPORTER.)

11               THE WITNESS:  TWO DIFFERENT GESTURES ARE PART OF THE

12      '163 CLAIMS, YES.

13      BY MR. JOHNSON:

14      Q.   YEAH.  TWO DIFFERENT GESTURES ARE REQUIRED; RIGHT?  THAT'S

15      WHAT WE SAW IN YOUR DIRECT TESTIMONY?

16      A.   YES.

17      Q.   LET'S PUT UP, PLEASE, PDX 1033.  THAT WAS A DEMONSTRATIVE

18      THAT I THINK YOU USED DURING YOUR DIRECT TESTIMONY.

19      A.   SURE.

20      Q.   DO YOU REMEMBER TALKING ABOUT THIS?

21      A.   YES.

22      Q.   OKAY.  SO IF WE PLAY IT FROM THE BEGINNING, OKAY, WE SAW A

23      TAP -- LET'S GO BACK A SECOND, RYAN.  THAT'S A LITTLE TOO FAR.

24          OKAY.  SO THAT ONE GESTURE RIGHT THERE THAT WE SAW --

25      PAUSE IT, PLEASE -- THAT'S NOT ENOUGH TO MEET THE '163 PATENT;
```

1    RIGHT?

2    A.   THAT IS CORRECT.

3    Q.   OKAY.  AND NOW WE'RE GOING TO SEE THE FINGER TAP ON THE

4    RIGHT SIDE OF THE SCREEN, RIGHT, AND IT'S GOING TO ZOOM IN ON

5    THE RIGHT SIDE OF THE SCREEN?

6    A.   UH-HUH.

7    Q.   SO THAT SECOND GESTURE IS ALSO REQUIRED TO INFRINGE THE

8    '163 PATENT; RIGHT?

9    A.   THAT IS CORRECT.

10   Q.   IF I JUST DID THE FIRST GESTURE AND THEN I SCROLLED OVER

11   TO THAT OTHER PART OF THE SCREEN, THAT WOULDN'T INFRINGE THE

12   '163 PATENT; RIGHT?

13   A.   YOU WOULDN'T INFRINGE, BUT YOU WOULDN'T GET BENEFITS OF

14   THE BROWSING EXPERIENCE --

15   Q.   MY POINT IS --

16   A.   -- OF THE '163 PATENT.

17   Q.   MY POINT IS I WOULDN'T INFRINGE; RIGHT?  IT'S DIFFERENT

18   FROM THE '163 PATENT SCROLLING OVER?

19   A.   IT WOULD BE DIFFERENT IF YOU NEVER DID PERFORM THE SECOND

20   TOUCH AFTER THAT EITHER.

21   Q.   AND IF I DON'T HAVE THAT SECOND TOUCH, THERE'S NO

22   INFRINGEMENT; RIGHT?

23   A.   THERE IS NO INFRINGEMENT, YES.

24   Q.   SO IF I -- AGAIN, IF I TAP WITH NOTHING MORE, I DON'T

25   INFRINGE; RIGHT?

```
1    A.   WHAT DO YOU MEAN IF YOU TAP WITH NOTHING MORE?

2    Q.   IF I JUST TAP IT ONCE --

3    A.   YES.

4    Q.   -- I DON'T INFRINGE JUST WITH THAT SINGLE GESTURE; RIGHT?

5    A.   AND AS LONG AS THE SOURCE CODE FOR DEALING WITH A SECOND

6    TAP, SHOULD ANYBODY EVER TAP ON IT, DIDN'T EXIST, THEN, YES,

7    YOU WOULD NOT INFRINGE.

8    Q.   AND IF WE GO BACK AND WE LOOK AT THE VIDEO WHERE YOU

9    TAPPED ON -- WHERE THE SECOND GESTURE THEN TAPPED ON THE SIDE

10   AND IT ZOOMED IN, INSTEAD OF IT ZOOMING IN, IF IT ZOOMED OUT,

11   THAT WOULDN'T INFRINGE EITHER; WOULD IT?

12   A.   NO, IT WOULDN'T INFRINGE.

13   Q.   SO, AGAIN, THERE ARE LOTS OF WAYS TO MANIPULATE WEB PAGES

14   AND LOOK AT WEB PAGES IN A BROWSER ON A SAMSUNG PHONE WITHOUT

15   USING THE '163 PATENT; RIGHT?

16   A.   NOT AS COOL AS THE '163, THOUGH.

17   Q.   NOT AS COOL.  NOT AS COOL.  SO I THINK YOU HEARD -- YOU

18   WERE HERE THE OPENINGS; RIGHT?

19   A.   YES.

20   Q.   THE '163 PATENT, THE PATENTS DON'T COVER COOL, DO THEY?

21   A.   THE PATENTS COVER WHAT'S THERE IN THE CLAIM LIMITATIONS.

22   Q.   AGAIN, THEY DON'T COVER COOL, DO THEY?

23   A.   NO.

24   Q.   OKAY.  NOW, IN YOUR INFRINGEMENT ANALYSIS, YOU FOCUSSED ON

25   A PARTICULAR WEB PAGE, THE "NEW YORK TIMES" WEB PAGE?
```

```
 1    A.   THAT IS CORRECT.

 2    Q.   OKAY.  AND I THINK YOU SAID YOU TESTED MAYBE THREE OR FOUR

 3    OTHERS BESIDES THE "NEW YORK" --

 4    A.   NO.  I THINK I SAID I TESTED SEVERAL OTHERS.

 5    Q.   DO YOU RECALL BEING ASKED THE QUESTION AND SAYING THAT YOU

 6    TESTED MAYBE THREE OR FOUR OR FIVE WEBSITES?

 7    A.   PERHAPS.

 8    Q.   YOU DON'T REMEMBER THAT?

 9    A.   WELL, IF -- I REMEMBER BEING ASKED SOME KIND OF QUESTION

10    LIKE THAT, BUT IF YOU -- THIS IS OVER A YEAR BACK.  IF I WANT

11    TO KNOW EXACTLY WHAT I WAS ASKED, PLEASE READ IT BACK TO ME.

12    Q.   OKAY.  YEAH, LET'S -- LET ME REFRESH YOUR RECOLLECTION.

13         THIS IS DEPOSITION TESTIMONY FROM APRIL 26TH, 2012, AT

14    PAGE 138, LINES 21 TO 25.

15         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

16              MS. KREVANS:  MR. JOHNSON, COULD I HAVE THE PAGE?

17              MR. JOHNSON:  SURE.  IT'S PAGE 138.

18              THE WITNESS:  AM I IN A POSITION TO SEE WHAT WE'RE

19    HEARING?

20              MR. JOHNSON:  HOPEFULLY RIGHT THERE.

21              THE WITNESS:  OH, OKAY.

22         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23    BY MR. JOHNSON:

24    Q.   THAT WAS YOUR TESTIMONY?

25    A.   SURE.
```

1      Q.   OKAY.  NOW, YOU WOULD AGREE WITH ME THAT SOME WEBSITES,

2    LIKE MOBILE WEBSITES, DON'T USE THE '163 PATENT EITHER, DO

3    THEY?

4      A.   WELL, MOBILE WEBSITES ARE A COMPLETELY DIFFERENT KIND OF

5    WEBSITE, AS IN MOST -- EVEN THE "NEW YORK TIMES" WEB PAGE,

6    WHICH I DID CLEARLY USE IN MY, IN MY ANALYSIS, HAS -- OR

7    THEY'VE CREATED A MOBILE VERSION.

8         ONLY SOME SITES CREATE THESE MOBILE WEBSITES.

9      Q.   I'M GOING TO GO BACK AND ASK THE QUESTION AGAIN, SIR.

10        YOU WOULD AGREE WITH ME THAT SOME WEBSITES, LIKE MOBILE

11   WEBSITES, DON'T USE THE '163 PATENT, DO THEY?

12     A.   THEY ARE NOT DESIGNED TO USE THE '163 PATENT.

13     Q.   AND NOT ONLY ARE THEY NOT DESIGNED TO USE IT, THEY DON'T

14   USE IT; RIGHT?

15     A.   THAT'S CORRECT.

16     Q.   OKAY.  SO IF WE LOOK AT -- LET'S TRY MY HAND AGAIN AT THE

17   ELMO.  THIS IS SDX 1027 WITH THE "NEW YORK TIMES" WEB PAGE

18   LOADED ON IT, AND ALL I DID WAS TYPE IN NYTIMES.COM AND IT WENT

19   STRAIGHT TO THE MOBILE WEBSITE.

20        SO YOU'RE AWARE, SIR, THAT MOBILE WEBSITES ARE WEBSITES

21   THAT ARE SPECIALLY PROGRAMMED TO BE SEEN ON MOBILE DEVICES;

22   RIGHT?

23     A.   MOBILE WEBSITES ARE SPECIALLY PROGRAMMED BY SOME PEOPLE

24   WHO CREATE WEBSITES TO BE SEEN ON, YEAH, MOBILE DEVICES.

25     Q.   LIKE -- THIS IS THE MOBILE WEBSITE OF THE

```
1        "NEW YORK TIMES;" RIGHT?

2   A.   THAT'S RIGHT.

3   Q.   ESPN HAS A MOBILE WEBSITE?

4   A.   THAT'S RIGHT.

5   Q.   CNN HAS A MOBILE WEBSITE.  WE COULD SPEND THE REST OF THE

6   AFTERNOON TALKING ABOUT ALL THE DIFFERENT MOBILE WEBSITES THERE

7   ARE; RIGHT?

8   A.   I COULD ALSO SPEND THE REST OF THE AFTERNOON TALKING ABOUT

9   HOW MANY DO NOT HAVE MOBILE WEBSITES.

10  Q.   SO THE LAYOUT FROM THE MOBILE WEBSITE IS DIFFERENT THAN

11  WHAT YOU SEE ON YOUR DESKTOP COMPUTER; RIGHT?

12  A.   THAT'S CORRECT.

13  Q.   AND MOBILE WEBSITES ARE OFTEN THE DEFAULT WEBSITES;

14  CORRECT?

15  A.   THEY CAN BE.

16  Q.   AND WHEN YOU'RE ON A MOBILE WEBSITE, YOU CAN'T DOUBLE TAP

17  TO ZOOM AND USE THE '163 PATENT; RIGHT?

18  A.   YES.

19  Q.   SO IT DOESN'T INFRINGE THE '163 PATENT?

20  A.   NO, IT DOES NOT.

21  Q.   IN FACT, IF YOU'RE TRYING TO GET TO THE FULL DESKTOP

22  VERSION OF THE WEBSITE, YOU HAVE TO SCROLL ALL THE WAY DOWN --

23  KEEP GOING, KEEP GOING -- UNTIL YOU GET TO THIS AREA ALL THE

24  WAY ON THE RIGHT HERE THAT SAYS "VIEW DESKTOP VERSION" AND YOU

25  CLICK ON THAT?
```

1    A.   RIGHT.

2    Q.   THEN IT LOADS THE DESKTOP VERSION; RIGHT?

3    A.   CORRECT.

4    Q.   NOW, YOU DON'T KNOW WHAT PERCENTAGE OF PEOPLE WHO OWN A

5    SAMSUNG PRODUCT HAVE ACTUALLY USED THE BROWSER APPLICATION, DO

6    YOU?

7    A.   NO.

8    Q.   AND YOU AREN'T PROVIDING ANY SURVEY ESTIMATE OF THE USAGE

9    TO BACK UP YOUR TESTIMONY; RIGHT?

10   A.   NO.  I'M A TECHNICAL EXPERT.

11   Q.   YOU ARE A TECHNICAL EXPERT, RIGHT.

12        SO IF A USER USES ONE OF THE OTHER APPLICATIONS ON A

13   PHONE, LIKE CONTACTS, PHONE, TEXT MESSAGES, CAMERA, GAMES,

14   DIFFERENT APPS, THEY'RE NOT USING THE '163 PATENT, ARE THEY?

15   A.   THEY ARE NOT USING -- THEY ARE USING A DEVICE THAT

16   PRACTICES THE '163 PATENT.

17   Q.   BUT WHEN THEY USE THOSE FEATURES, THEY'RE NOT USING THE

18   '163 PATENT, ARE THEY?

19   A.   NO, THEY'RE NOT.

20   Q.   AND IF A USER GOES TO A BROWSER AND THE BROWSER TAKES THEM

21   TO A MOBILE WEBSITE, THEY'RE NOT USING THE '163 PATENT?

22   A.   UNLESS THEY GO TO THE DESKTOP VERSION AS YOU JUST DID.

23   Q.   AND YOU, YOU HAVE NOT TRIED TO DETERMINE HOW MANY PEOPLE

24   THEN GO TO A DESKTOP VERSION, HOW OFTEN THAT'S USED FOR THE

25   THREE OR FOUR OR FIVE WEBSITES THAT YOU LOOKED AT?

 1      A.   WELL, YOU KNOW, I MAY NOT HAVE, BUT "NEW YORK TIMES"

 2   PROBABLY DID, WHICH IS WHY THEY HAVE THE ABILITY TO GO TO THE

 3   DESKTOP VERSION.

 4      Q.   BUT YOU DIDN'T ANALYZE THAT; RIGHT?

 5      A.   NO, I DIDN'T ANALYZE THAT.

 6      Q.   OKAY.  AND, AGAIN, IF A USER DOUBLE TAPS TO ZOOM IN,

 7   THEY'RE NOT USING THE '163 PATENT?

 8      A.   SAY THAT --

 9      Q.   IF A USER SIMPLY DOUBLE TAPS TO ZOOM IN, THIS IDEA RIGHT

10   THERE --

11      A.   YES.

12      Q.   -- THAT'S NOT ENOUGH?  THAT DOESN'T INFRINGE; RIGHT?

13      A.   THAT'S CORRECT.

14      Q.   AND IF -- WHEN I HIT IT AGAIN, IF IT ZOOMS BACK OUT, THAT

15   DOESN'T INFRINGE EITHER?

16      A.   THAT IS CORRECT.

17      Q.   OKAY.  I WANT TO SHOW YOU A PHONE CALLED THE INTERCEPT.

18   THIS IS JX 1009.

19           YOU'VE SEEN THIS BEFORE; RIGHT?

20      A.   SURE.

21      Q.   I'M GOING TO ASK A COLLEAGUE JUST TO PUT IT ON THE

22   "NEW YORK TIMES" WEBSITE WHILE I ASK YOU A QUESTION.

23           AND WHILE WE'RE DOING THAT, I WANT TO LOOK AT SOME OF THE

24   DEMONSTRATIVES YOU PREPARED QUICKLY THAT WERE USED.

25           LET'S PULL UP PDX 29.21, PLEASE.  RYAN, PDX 29.21.

SINGH CROSS

```
1          OKAY.  THESE ARE DEMONSTRATIVES THAT YOU PREPARED; RIGHT?

2     A.   THAT IS CORRECT.

3     Q.   OKAY.  AND YOU ACCUSE ALL OF THESE DEVICES OF

4     INFRINGEMENT?

5     A.   YES.

6     Q.   RIGHT?  AND THE JURY IN THE FIRST CASE FOUND ULTIMATELY

7     THAT THE ACE DID NOT INFRINGE THE '915 PATENT; RIGHT?

8     A.   YES.

9     Q.   THE JURY FOUND THAT THERE WERE DIFFERENCES BETWEEN THE ACE

10    AND THE '915 PATENT; RIGHT?

11    A.   YES.

12    Q.   LET'S PLAY THE VIDEO, PLEASE, THAT YOU PREPARED.

13         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

14    BY MR. JOHNSON:

15    Q.   THIS IS SHOWING, IN YOUR VIEW, THE '915 PATENT AND HOW

16    IT'S USED IN THE VARIOUS SAMSUNG DEVICES, AND IF YOU FOCUS ON

17    THE ACE AND YOU COMPARE IT TO THE OTHER ONES, THERE ARE NOT A

18    LOT OF DIFFERENCES THERE, RIGHT, IN YOUR VIEW?

19    A.   YES.

20    Q.   LET'S GO TO PDX 29.22.  THIS IS ANOTHER VIDEO THAT YOU

21    PREPARED, RIGHT, AND ACCUSED ALL THESE PHONES OF INFRINGING?

22    A.   THAT'S CORRECT.

23    Q.   AND THE FIRST JURY FOUND THAT THE INTERCEPT, WHICH IS THE

24    PHONE THAT I'VE MARKED -- WHICH IS JX 1009 DID NOT INFRINGE;

25    RIGHT?
```

1       A.   YES.

2       Q.   AND IF WE FOCUS AGAIN, IF WE RUN IT AGAIN, IF WE LOOK AT

3       HOW THE INTERCEPT WORKS IN CONNECTION WITH HOW THE OTHER

4       DEVICES WORK, THERE ARE NOT A LOT OF DIFFERENCES THERE IN YOUR

5       VIEW; RIGHT?  RIGHT?

6       A.   YES.  I --

7       Q.   OKAY.

8       A.   I ALLEGED THAT THEY INFRINGE, DIDN'T I?

9       Q.   AND YOU AGREE THAT THE JURY ULTIMATELY FOUND THAT THE

10      INTERCEPT DID NOT INFRINGE THOUGH?

11      A.   THAT IS CORRECT.

12      Q.   OKAY.

13           MR. JOHNSON:  YOUR HONOR, WE'D MOVE EXHIBIT JX 1009

14      INTO EVIDENCE, PLEASE.

15           THE COURT:  OKAY.  WHAT IS THAT?

16           MR. JOHNSON:  IT'S THE INTERCEPT PHYSICAL DEVICE.

17      IT'S ONE OF THE ONES THAT MR. MCELHINNY DID NOT READ IN.  WE

18      JUST WANT TO --

19           THE COURT:  ALL RIGHT.  ANY -- YOU DON'T HAVE TO SAY

20      MORE.

21        ANY OBJECTION?

22           MS. KREVANS:  NO, YOUR HONOR.

23           THE COURT:  IT'S ADMITTED.

24      (JOINT EXHIBIT 1009 WAS ADMITTED IN EVIDENCE.)

25           THE COURT:  GO AHEAD, PLEASE.

1     BY MR. JOHNSON:

2     Q.   LET'S LOOK AT THE '163 VIDEOS THAT YOU PREPARED.

3          RYAN, PLEASE, PDX 14.22.

4          AGAIN, THIS IS A VIDEO THAT YOU PREPARED FOR THE '163 AS

5     AN INFRINGING DEVICE; RIGHT?

6     A.   YES.

7     Q.   AND THE JURY ULTIMATELY FOUND THAT THE CAPTIVATE AND THE

8     CONTINUUM DEVICES DO NOT INFRINGE; RIGHT?

9     A.   RIGHT.

10    Q.   CAN WE PLAY THAT AGAIN, PLEASE?

11         AGAIN, THERE ARE NOT A LOT OF DIFFERENCES IN YOUR VIEW

12    BETWEEN THE CAPTIVATE AND THE CONTINUUM AND THE OTHER DEVICES,

13    YET THE JURY FOUND CAPTIVATE AND CONTINUUM NOT TO INFRINGE;

14    RIGHT?

15    A.   RIGHT.

16    Q.   LET'S LOOK AT PDX 29.43.

17            THE COURT:   AFTER THIS WE'RE GOING TO TAKE OUR BREAK.

18    OKAY?

19            MR. JOHNSON:   OKAY.  I'M ALMOST DONE, YOUR HONOR.

20    Q.   IF WE RUN THESE, WE SEE THAT YOU ACCUSED ALL THESE DEVICES

21    OF INFRINGING, AND THE JURY ULTIMATELY FOUND THAT THE GEM, THE

22    INDULGE, AND THE INTERCEPT DON'T INFRINGE; RIGHT?

23    A.   YES.

24    Q.   OKAY.  SO I THINK YOU STARTED THE AFTERNOON BY SAYING

25    YOU'RE A PH.D. COMPUTER SCIENTIST, SIR; RIGHT?

1    A.   YES.

2    Q.   YOU'RE NOT A CONSUMER DEMAND OR MARKET SURVEY EXPERT;

3    RIGHT?

4    A.   I'M NOT.

5    Q.   OKAY.  WE'LL HEAR FROM ONE OF THOSE A LITTLE BIT LATER IS

6    YOUR UNDERSTANDING; RIGHT?

7    A.   SORRY?

8              MR. JOHNSON:  STRIKE THAT.

9         THANK YOU, YOUR HONOR.

10             THE WITNESS:  OKAY.

11             THE COURT:  OKAY.  THE TIME IS NOW 2:24.  LET'S GO

12   AHEAD AND TAKE OUR FIRST TEN MINUTE BREAK FOR THE AFTERNOON.

13        AGAIN, PLEASE KEEP AN OPEN MIND AND DON'T DISCUSS OR

14   RESEARCH THE CASE.

15        THANK YOU.

16        WE'LL TAKE A 15 MINUTE BREAK.

17        (JURY OUT AT 2:24 P.M.)

18             THE COURT:  YOU MAY STEP DOWN.  PLEASE TAKE A SEAT.

19        I JUST WANTED TO STATE A COUPLE OF THINGS ADDITIONALLY ON

20   THE RECORD AND ASK ONE FOLLOW UP QUESTION.

21        ONE IS REGARDING ONE ADDITIONAL REASON TO NOT GIVE THE

22   PRE-NOTICE SALES LIMITING JURY INSTRUCTION IS THAT THE FULL

23   DAMAGES INSTRUCTIONS WILL BE GIVEN AT THE END AND GIVING AN

24   INCOMPLETE DAMAGES INSTRUCTION IN THE MIDDLE OF THE EVIDENCE

25   PORTION OF THE CASE I THINK WILL POTENTIALLY BE MORE CONFUSING

1        AND NOT HELPFUL FOR THE JURY.

2             SECOND, WITH REGARD TO -- LET ME ASK, DO YOU INTEND THEN

3        TO GET INTO THE GALLERY, BROWSER, AND CONTACTS APPLICATIONS IN

4        YOUR CASE-IN-CHIEF?

5             BECAUSE I HAVE ISSUED SO MANY RULINGS ON THAT, SO I'M A

6        LITTLE BIT UNCLEAR.  I'VE ALREADY TOLD YOU THAT YOU HAVE A

7        PRODUCT THAT WAS NEVER ACCUSED OF THE '381, THE TRANSFORM, AND

8        THAT WOULD BE A GREAT EXAMPLE OF A NON-INFRINGING ALTERNATIVE,

9        BUT YOU KEEP INSISTING ON WANTING TO USE THE PHONES THAT WERE

10       FOUND TO INFRINGE IN THE GALLERY AND THE CONTACTS APPLICATIONS

11       AND FOCUS ON THE BROWSER APPLICATIONS.

12            SO WHAT IS IT THAT YOU INTEND TO DO WHEN YOU CALL

13       MR. BALAKRISHNAN, OR DR. BALAKRISHNAN IN YOUR CASE-IN-CHIEF?

14       CAN YOU CLARIFY THAT?

15            BECAUSE I'VE ALREADY ISSUED, WHAT, TWO OR THREE RULINGS ON

16       THIS, SO I'M A LITTLE BIT UNCLEAR WHY THIS KEEPS COMING UP.

17                 MR. JOHNSON:  IT'S A SEPARATE ISSUE.

18                 THE COURT:  OKAY.

19                 MR. JOHNSON:  THE ONLY ISSUE I REALLY WANT TO TAKE

20       HIM THROUGH, AND IT WAS JUST A FEW QUESTIONS, IS TO ASK HIM

21       ABOUT THE FACT THAT THERE ARE LOTS OF OTHER FEATURES ON THESE

22       PHONES THAT GO TO POTENTIALLY THE DEMAND OF WHY PEOPLE BUY

23       THESE PHONES.

24            LIKE, FOR EXAMPLE, MR. PRICE DEMONSTRATED DURING THE

25       OPENING THAT THERE'S A KEYBOARD, OR THAT THERE ARE OTHER

1      APPLICATIONS THAT ARE ON THERE, SO THAT WHEN IT COMES TIME TO

2      EVALUATE THE VALUE OF THE PATENTS, BECAUSE WE HEARD BOTH

3      DR. BALAKRISHNAN AND DR. SINGH TALK ABOUT THE VALUE OF THE

4      INVENTION, WHEN YOU --

5              THE COURT:  YOU CAN STEP DOWN, SIR, AND GO TO THE

6      REST ROOM OR WHATEVER YOU'D LIKE TO DO.

7              THE WITNESS:  OKAY.

8              MR. JOHNSON:  WHEN YOU COMPARE THAT TO THE PHONE AND

9      THE AMOUNT OF MONEY THAT APPLE IS ASKING FOR ON THE PHONE AND

10     THE FACT THAT THERE ARE A LOT OF OTHER FEATURES IN THE PHONE,

11     LIKE TEXT MESSAGING AND THE FACT THAT YOU CAN USE IT TO PLAY

12     MUSIC OR THE CAMERA --

13             THE COURT:  OKAY.  BUT YOU KEEP GOING BACK TO PHOTO

14     GALLERY, INTERNET BROWSER, AND CONTACTS.  THOSE ARE THREE

15     APPLICATIONS THAT WERE ACCUSED.

16             MR. JOHNSON:  YEAH, AND I PROBABLY --

17             THE COURT:  YOU KNOW, THE JURY FOUND INFRINGEMENT ON

18     SOME OF THOSE APPLICATIONS.

19             MR. JOHNSON:  RIGHT.

20             THE COURT:  AND SO I REALLY DON'T WANT TO KEEP GOING

21     BACK TO PHONES THAT HAVE BEEN FOUND TO INFRINGE THAT PATENT AND

22     SAYING, WELL, BUT THERE'S ONE APPLICATION IN WHICH IT WASN'T

23     INFRINGED.

24         I REALLY THINK THAT WOULD NOT BE HELPFUL AND I'M NOT SURE

25     WHY WE'RE CONTINUING TO HAVE THIS CONVERSATION AFTER I'VE

```
 1        ALREADY ISSUED SO MANY EVIDENTIARY RULINGS ON THIS QUESTION.

 2             I RULED ON IT AGAIN THIS MORNING WITH MR. PRICE, AND THEN

 3        THE FIRST WITNESS THAT COMES UP, WE'RE STEPPING INTO IT AGAIN.

 4             NOW YOU WANT TO BRING IT IN YOUR CASE-IN-CHIEF.

 5             SO YOU'RE TELLING ME THERE'S LOTS OF OTHER FEATURES.

 6        OKAY.  BUT YOU CAN'T TALK ABOUT ANY FEATURE OTHER THAN THE

 7        ACCUSED BROWSER FEATURE?

 8             I'M JUST -- I'M NOT CLEAR.  WHY ARE WE CONTINUING TO HAVE

 9        THIS CONVERSATION?

10                  MR. PRICE:  YOUR HONOR, THIS IS BILL PRICE.

11             I -- FOR THE CASE, WHAT WE WANT TO SHOW IS THAT SAMSUNG --

12        THESE DOCUMENTS OF SAMSUNG ARE BEING USED TO SHOW DEMAND, OKAY,

13        DEMAND.  AND ALL WE'RE GOING TO ARGUE, GIVEN YOUR --

14                  THE COURT:  WHAT DOCUMENTS OF SAMSUNG?

15                  MR. JOHNSON:  THE COPYING DOCUMENTS.

16                  MR. PRICE:  THE COPYING DOCUMENT.

17                  THE COURT:  OKAY.  NO, NO, NO.  I'VE ALREADY SAID

18        THAT WHAT IT GOES TO IN THE DAVIS REPORT ARE THE FOLLOWING

19        THREE FACTORS:  THE EXTENT TO WHICH THE INFRINGER HAS MADE USE

20        OF THE INVENTION AND THE VALUE OF SUCH USE, THAT'S

21        GEORGIA PACIFIC FACTOR NUMBER 11; NUMBER 9, UTILITY AND

22        ADVANTAGES OF PATENT PROPERTY OVER OLD MODES AND DEVICES,

23        GEORGIA PACIFIC FACTOR NUMBER 9; GEORGIA PACIFIC FACTOR NUMBER

24        8, ESTABLISHED PROFITABILITY OF THE PRODUCTS MADE UNDER THE

25        PATENT, ITS COMMERCIAL SUCCESS AND ITS CURRENT POPULARITY.
```

1              NOW, I WILL AGREE THAT CURRENT POPULARITY CERTAINLY

2       DOESN'T COUNT AS DEMAND.

3              BUT CERTAINLY NUMBER 11, EXTENT TO WHICH THE INFRINGER HAS

4       MADE USE OF THE INVENTION, THOSE INTERNAL DOCUMENTS ARE

5       PROBATIVE OF THAT GEORGIA PACIFIC FACTOR.

6              SO -- YOU KNOW, I'VE RULED ON THIS AND IF I CONTINUE TO

7       HEAR QUESTIONS OF WITNESSES THAT ARE IN VIOLATION OF MY ORDER,

8       THEN I'M GOING TO HAVE TO THINK ABOUT HOW TO DEAL WITH THAT.

9              SO I'M JUST ASKING YOU, CAN WE PLEASE NOT CONTINUE TO HAVE

10      THE SAME CONVERSATION?  YOU'VE BRIEFED IT A NUMBER OF TIMES IN

11      THE OBJECTIONS.  YOU'VE BEEN GETTING EVIDENTIARY RULINGS EVERY

12      SINGLE NIGHT.

13             SO WHAT MORE -- WHAT MORE NEEDS TO BE DONE HERE?

14                MR. JOHNSON:  I JUST WANT TO MAKE SURE -- I DON'T

15       THINK THERE'S ANYTHING ELSE THAT NEEDS TO BE DONE.

16             THE QUESTIONS THAT I WAS TRYING TO ELICIT, AND I PROBABLY

17      SHOULDN'T HAVE STARTED BY IDENTIFYING CONTACTS, BROWSER, AND --

18                THE COURT:  AND GALLERY.

19                MR. JOHNSON:  -- GALLERY.

20             BUT WHAT I WAS TRYING TO ESTABLISH -- I MEAN, IN THE

21      OPENING WE HEARD MR. MCELHINNY -- MR. MCELHINNY PUT THE WHOLE

22      REVENUE STREAM FROM THESE PHONES AT ISSUE.  WE HEARD THE

23      NUMBERS, 10.7 MILLION UNITS, 3.5 BILLION.

24             ALL I WAS TRYING TO SAY WITH THIS WITNESS IS THAT PEOPLE

25      BUY PHONES FOR DIFFERENT REASONS, THE FACT THAT YOU CAN SEND

1      TEXT MESSAGES, THE FACT THAT YOU CAN USE IT FOR THE CAMERA, THE

2      FACT THAT YOU CAN USE IT TO PLAY MUSIC BACK.

3           AND THAT IS -- ALL THOSE -- AND I ASKED HIM THIS DURING

4      HIS DEPOSITION AND I ASKED HIM THIS THE LAST TIME.  THERE ARE

5      OTHER FEATURES IN THESE PHONES THAT HAVE NOTHING TO DO WITH

6      THESE PATENTS.  THAT WAS THE ONLY POINT.

7                MR. MCELHINNY:  TWO ISSUES, YOUR HONOR.

8                THE COURT:  YES.

9                MR. MCELHINNY:  ONE, ON YOUR ISSUE, WE'VE BEEN TRYING

10     TO FIGURE OUT THE RIGHT OBJECTION TO MAKE.  I MEAN, THIS IS

11     BEHAVIOR WE SAW IN THE FIRST TRIAL, WE SAW IT IN THE SECOND,

12     WHICH IS THE RULINGS DON'T -- WE JUST KEEP TESTING THE LIMIT OF

13     WHAT YOUR HONOR IS GOING TO CONTINUE TO SUSTAIN THEM.

14          WE ARE MAKING THOSE OBJECTIONS AND WE'RE TRYING TO DO

15     THAT.

16          BUT ON BALAKRISHNAN, I DIDN'T WANT TO RAISE THIS IN FRONT

17     OF THE JURY BECAUSE IT WASN'T THE RIGHT TIME, BUT TO BE CLEAR,

18     THEY CANNOT CALL DR. BALAKRISHNAN.  HE WAS NOT ON THEIR WITNESS

19     LIST.

20          YOUR HONOR HAS ALREADY RULED ON THIS.  WE HAD A PRETRIAL,

21     AND THEY TRIED TO ADD HIM BECAUSE HE WAS ON OUR WITNESS LIST,

22     AND IN ECF 2552, YOUR HONOR SUSTAINED THAT THEY DON'T HAVE THE

23     POWER TO CALL DR. BALAKRISHNAN IN THEIR CASE-IN-CHIEF.

24          AND HE IS A PROFESSIONAL.  I MEAN, HE SHOULDN'T HAVE TO

25     SIT HERE FOR FOUR DAYS.

```
 1            IF YOUR HONOR WANTS BRIEFING ON IT, I'D LIKE TO RAISE IT,

 2       BECAUSE --

 3            THE COURT:  WAS HE ON YOUR WITNESS LIST?

 4            MR. JOHNSON:  YOUR HONOR, I DON'T KNOW THE ANSWER TO

 5       THAT.

 6            MS. MAROULIS:  YOUR HONOR, WE LISTED HIM FOR PRIOR

 7       TRIAL TESTIMONY, BUT BECAUSE HE WAS ON APPLE'S LIST, WE RELIED

 8       ON THEIR LIST.  HE WAS NOT ON OURS.

 9            THE COURT:  I'VE ALREADY RULED THAT YOU HAVE TO

10       HAVE -- I MEAN, YOU ALL IDENTIFIED HUNDREDS AND HUNDREDS OF

11       WITNESSES ON YOUR WITNESS LISTS.  I ASKED YOU TO LIMIT IT TO

12       CLOSE TO A HUNDRED.  I THINK YOU HAD 99 WITNESSES ON YOUR LIST

13       FOR THE FIRST TRIAL.

14            IF HE WAS NOT ONE OF YOUR 99, THEN YOU ARE PRECLUDED FROM

15       CALLING HIM.  I THINK 99 WITNESSES IS MORE THAN ENOUGH THAT YOU

16       HAD PLENTY OF OPPORTUNITY TO DESIGNATE HIM AS A WITNESS IF YOU

17       WANTED TO CALL HIM IN YOUR CASE-IN-CHIEF.

18            MR. JOHNSON:  AND YOUR HONOR, I DIDN'T WANT TO GET

19       INTO AN ARGUMENT ON THE FIRST WITNESS OUT OF THE GATE IN FRONT

20       OF THIS JURY ABOUT WHETHER OR NOT THAT TESTIMONY WAS OUTSIDE OR

21       INSIDE THE SCOPE OF THE DIRECT AND SAYING THAT SUBJECT TO

22       RECALL --

23            THE COURT:  WELL, I GUESS I'M UNCLEAR.  WE ALREADY

24       HAD A CONVERSATION THIS MORNING, AND IN MULTIPLE EVIDENTIARY

25       RULINGS, THAT YOU ARE NOT GOING TO RELITIGATE WHETHER GALLERY,
```

```
 1          CONTACTS, AND BROWSER INFRINGE OR THEY DON'T INFRINGE.

 2                MR. JOHNSON:  THAT'S RIGHT.

 3                THE COURT:  THE LAST JURY FOUND THEY INFRINGE.

 4          SO THEN YOU START OFF RIGHT WITH THE FIRST WITNESS WANTING

 5      TO GET INTO GALLERY, CONTACTS, AND BROWSER AFTER I'VE ISSUED

 6      MULTIPLE RULINGS.  I MAY HAVE TO SANCTION YOU IF YOU DO THAT

 7      AGAIN.  PLEASE.

 8          IF BALAKRISHNAN WAS NOT ON YOUR LIST, THEN YOU ARE

 9      PRECLUDED FROM CALLING HIM.

10                MR. MCELHINNY:  AND IS HE EXCUSED, YOUR HONOR?

11                MR. JOHNSON:  YOUR HONOR, I -- THERE WERE -- THERE

12      WERE THREE QUESTIONS ABOUT THE FACT THAT THERE ARE OTHER

13      FEATURES ON THIS PHONE.  THAT WAS IT.  THAT WAS ALL THE SET UP

14      WAS.

15                MR. MCELHINNY:  WE STAND --

16                MR. JOHNSON:  AND IT WAS TO GO TO THE POINT AND

17      DIRECTLY TAKE ON WHAT MR. MCELHINNY SAID IN THE OPENING, WHICH

18      THIS JURY NOW HEARS --

19                THE COURT:  THAT WASN'T WHAT YOUR QUESTION WAS.  YOUR

20      QUESTION WAS, DO YOU REMEMBER IN THE LAST TRIAL THESE

21      APPLICATIONS WERE ACCUSED?

22                MR. JOHNSON:  RIGHT.

23                THE COURT:  OKAY.  THAT IS NOT SAYING THERE ARE

24      MULTIPLE FEATURES.

25                MR. JOHNSON:  THE VERY NEXT QUESTION WAS THERE ARE
```

1      LOTS OF OTHER FEATURES.  I STARTED TO GET THAT OUT WHEN

2      MR. MCELHINNY OBJECTED.

3                MR. MCELHINNY:  IN FAIRNESS, YOUR HONOR, THEY DON'T

4      LISTEN, THEY VIOLATE THE ORDER, AND THEN THEY EXCUSE THEMSELVES

5      BY SAYING WHY THEY WERE TRYING TO VIOLATE THE ORDER.  THIS IS

6      REPETITIVE BEHAVIOR ON THIS CASE.

7                MR. JOHNSON:  THERE IS --

8                THE COURT:  I DON'T NEED TO HEAR MORE OF THAT.

9          ALL RIGHT.  IF DR. BALAKRISHNAN WAS NOT ON YOUR 99 LIST OF

10     WITNESSES TO BE CALLED, THEN YOU ARE PRECLUDED FROM CALLING HIM

11     IN YOUR CASE-IN-CHIEF.  THAT'S CONSISTENT WITH ALL OF MY OTHER

12     RULINGS THAT THE PERSON HAS TO HAVE BEEN ON YOUR WITNESS LIST.

13     OKAY?

14               MR. MCELHINNY:  AND IS HE EXCUSED?  YOU HAVE HIM

15     SUBJECT TO RECALL AND HE'S A PROFESSIONAL AND HE NEEDS TO GO

16     OTHER PLACES.

17               THE COURT:  I'M GOING TO --

18               MR. JOHNSON:  THAT'S FINE, YOUR HONOR.

19               THE COURT:  OKAY.  SO HE'S EXCUSED, NOT SUBJECT TO

20     RECALL.

21               MR. MCELHINNY:  THANK YOU, YOUR HONOR.

22               THE COURT:  ALL RIGHT.  YOU KNOW, THE TRANSFORM WAS

23     NOT ACCUSED OF THE '381.  I'VE REPEATEDLY SAID THAT YOU SHOULD

24     POINT TO THAT AS A NON-INFRINGING ALTERNATIVE.  IT DOES NOT

25     RAISE ALL THESE 403 ISSUES OF HAVING TO RELITIGATE THE 2012

```
1         JURY'S INFRINGEMENT VERDICTS.

2              SO, ALL RIGHT, LET'S GO AHEAD AND TAKE OUR BREAK.  THANK

3     YOU.

4              (RECESS FROM 2:34 P.M. UNTIL 2:44 P.M.)

5                   THE COURT:  DID YOU HAVE AN ISSUE?

6                   MR. JOHNSON:  I'M TOLD BY MY TEAM THAT I NEGLECTED TO

7     MOVE IN --

8                   THE COURT:  OKAY.  THAT'S GOING AGAINST YOUR TRIAL

9     TIME.  WAIT A SECOND, PLEASE.

10                  THE CLERK:  ARE WE READY FOR THEM?

11                  THE COURT:  YES, PLEASE.

12             (JURY IN AT 2:45 P.M.)

13                  THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

14             IT IS 2:45.  GO AHEAD, PLEASE.

15                  MR. JOHNSON:  YOUR HONOR, JUST AS A HOUSEKEEPING

16    MATTER, WE ASK THAT WE MOVE IN JX 1030, THE SAMSUNG ACE PHONE.

17                  MS. KREVANS:  NO FURTHER OBJECTIONS, YOUR HONOR.

18                  THE COURT:  OKAY.  JX 1030, THE ACE, THAT'S ADMITTED.

19             (JOINT EXHIBIT 1030 WAS ADMITTED IN EVIDENCE.)

20                  MR. JOHNSON:  THANK YOU.

21                  THE COURT:  OKAY.  THANK YOU.

22             ALL RIGHT.  TIME IS NOW 2:45.

23                  MS. KREVANS:  SORRY, YOUR HONOR.  I HAD TO GET SET

24    BACK UP.

25                  THE COURT:  NO PROBLEM.
```

1                        **REDIRECT EXAMINATION**

2       BY MS. KREVANS:

3       Q.   I WANT TO JUST FOLLOW UP ON A FEW THINGS, DR. SINGH.

4            FIRST, ON THE '915 PATENT, MR. JOHNSON ASKED YOU A NUMBER

5       OF QUESTIONS ABOUT SOME THINGS THAT WERE SHOWN TO THE JURY IN

6       THE PRIOR CASE, THE HAN SYSTEM, THE GUY AT THE SHOW WHO WAS

7       KIND OF EXCITED AND HE WAVED HIS ARMS OVER THE BIG TOUCHSCREEN,

8       THE BIG TABLE.

9       A.   YES.

10      Q.   WAS THAT A TOUCHSCREEN?

11      A.   IT HAD A TOUCHSCREEN WITH THE COMPUTER AND OTHER

12      PERIPHERALS.  IT WASN'T AN INTEGRATED GENERAL PURPOSE COMPUTER

13      LIKE A SMARTPHONE OR A TABLET.

14      Q.   OKAY.  THE THING THAT HE SHOWED THAT HE CALLED FRACTAL

15      ZOOM, THAT WAS ANOTHER THING FROM THE FIRST TRIAL.  WAS THAT AN

16      INTEGRATED DEVICE THAT COULD BE USED ON A MOBILE DEVICE,

17      LIKE -- WITH A TOUCHSCREEN LIKE A LAPTOP OR A TABLET?

18      A.   NO.  IT WAS ALSO A VERY LARGE SYSTEM WITH A PROJECTOR AND

19      A SURFACE AND A COMPUTER, AND IT WAS HERE AT THE LAST TRIAL.

20      Q.   OKAY.  AND NOMURA, ANOTHER THING HE ASKED YOU ABOUT WITH

21      RESPECT TO THE '915, WAS THAT A GENERAL PURPOSE COMPUTER THAT

22      COULD BE USED TO DO THE TECHNIQUES OF THE CLAIM 8 OF THE '915

23      PATENT?

24      A.   NO.  IT -- THE PATENT APPLICATION WAS FOR A VERY DEDICATED

25      DEVICE THAT WAS SPECIFICALLY SET UP FOR, I BELIEVE IT WAS FOR,

1    AS AN E-BOOK READER AND MAYBE FOR BROWSING MAPS.  EVERYTHING

2    WAS SORT OF HARD CODED INTO IT.

3    Q.  DID THE JURY IN THE PRIOR TRIAL THAT FOUND THE '915 VALID

4    AND INFRINGED SEE ALL THOSE SAME VIDEOS THAT MR. JOHNSON SHOWED

5    YOU TODAY?

6    A.  YES, THEY DID.

7    Q.  OKAY.  LET'S TALK ABOUT THE '163 FOR A SECOND.

8        I THINK MR. JOHNSON PUT THE, PUT THE INFUSE 4G -- WHICH I

9    THINK, YOUR HONOR, IS EXHIBIT 1027 -- ON THE ELMO HERE AND DID

10   A BUNCH OF DEMONSTRATIONS WITH IT FOR YOU.

11       DO YOU RECALL THAT?

12   A.  YES.

13   Q.  LET ME FIRST ASK YOU, IS THE INFUSE 4G ONE OF THE PHONES

14   THAT THE JURY FOUND INFRINGED THE '163 PATENT?

15   A.  I BELIEVE SO.

16   Q.  OKAY.  IF YOU WERE USING THE INFUSE 4G AND YOU WENT TO A

17   MOBILE WEBSITE OF THE KIND THAT MR. JOHNSON ASKED YOU ABOUT AND

18   SHOWED YOU, WOULD YOU SEE THE TAP ONCE TO ZOOM AND CENTER, TAP

19   TWICE -- TAP A SECOND TIME, BRING IN ANOTHER PIECE AND CENTER

20   BEHAVIOR?

21           MR. JOHNSON:  OBJECTION.  LEADING.

22           MS. KREVANS:  THIS IS THE EXACT SAME QUESTION THAT

23   MR. JOHNSON ASKED HIM ABOUT.  I'M JUST FOLLOWING UP.

24           THE COURT:  OKAY.  OVERRULED.

25       GO AHEAD.  YOU MAY ANSWER.

1          THE WITNESS:  YOU WOULD NOT SEE THE BEHAVIOR, BUT

2     THAT IS BECAUSE MOBILE WEBSITES KIND OF DISABLED THIS

3     FUNCTIONALITY.

4          HOWEVER, ON THE SAME DEVICE, IT WOULD INFRINGE BECAUSE THE

5     CODE THAT WOULD PERFORM THAT FUNCTIONALITY ON JUST A NORMAL, A

6     TYPICAL WEB PAGE WOULD STILL EXIST.

7          SO IT'S ABOUT THE CODE THAT EXISTS ON THAT DEVICE, NOT

8     WHETHER YOU'RE ABLE TO OBSERVE IT.

9     BY MS. KREVANS:

10    Q.   INFRINGEMENT IS ABOUT THE CODE THAT'S ON THE DEVICE?

11    A.   SPECIFICALLY IN THE CASE OF THESE PATENT CLAIMS THAT ARE

12    AT STAKE, YES.

13    Q.   OKAY.  SO JUST SO WE'RE CLEAR ABOUT THESE QUESTIONS THAT

14    MR. JOHNSON ASKED YOU, USING THE INFUSE 4G, WHICH HAS THE

15    CODE --

16    A.   YES.

17    Q.   -- AND THE JURY FOUND IT INFRINGED, SOME APPLICATIONS THAT

18    A PERSON MIGHT DO WITH THAT PHONE WOULD NOT EXHIBIT THIS TAP

19    ONCE, TAP TWICE ZOOM TO CENTER AND THEN CENTER AGAIN BEHAVIOR?

20    A.   OF COURSE IF YOU --

21          MR. JOHNSON:  OBJECTION.  LEADING.

22          THE COURT:  OVERRULED.

23     GO AHEAD, PLEASE.

24          THE WITNESS:  IF YOU ABSOLUTELY DID NOTHING WITH THE

25     PHONE, YOU WOULDN'T OBSERVE INFRINGING BEHAVIOR.  YOU HAVE TO

1    PERFORM THE INSTRUCTIONS AS IS EXPECTED, AS IS DESCRIBED BY THE

2    PATENT.

3        HOWEVER, THE INFRINGEMENT EXISTS IN THE SOURCE CODE THAT

4    PROCESSES THAT INPUT.

5    BY MS. KREVANS:

6    Q.    OKAY.  IF SOMEONE WAS USING THE INFUSE 4G, THE INFRINGING

7    PHONE, AND THEY WENT TO A MOBILE WEBSITE, VISUALLY WOULD THEY

8    SEE WHAT LOOKED LIKE INFRINGEMENT?

9    A.    NO.

10    Q.    OKAY.  LET ME ASK YOU ANOTHER QUESTION AGAIN FOLLOWING UP

11    ON SOMETHING MR. JOHNSON ASKED YOU.

12        IF YOU HAD A DEVICE LIKE THE HYPOTHETICAL DEVICE

13    MR. JOHNSON DESCRIBED TO YOU WHERE, WHEN YOU TAPPED AND THEN

14    TAPPED AGAIN, THE DEVICE ONLY ZOOMED IN AND THEN ZOOMED BACK

15    OUT --

16    A.    YES.

17    Q.    -- DO YOU RECALL THAT HE ASKED YOU ABOUT THAT?

18    A.    YES.

19    Q.    WOULD THAT -- WOULD SUCH A DEVICE PROVIDE THE USER WITH

20    THE BENEFITS OF THE '163 PATENT?

21    A.    NO, NOT AT ALL, BECAUSE THE IDEA IS IF YOU'RE READING

22    ARTICLES, YOU TAP ONCE, YOU'RE ALREADY UP, ZOOMED UP CLOSE, AND

23    YOU TAP TO THE NEXT ARTICLE.

24        IF YOU HAVE TO TAP IN AND OUT, IT'S LIKE TAKING THE

25    HIGHWAY TO DRIVE TO THE NEXT BLOCK.  YOU TAP TO ZOOM IN AND

1    THEN YOU TAP TO GO BACK OUT AND THEN YOU CAN LOOK AT THE

2    ARTICLE SOMEWHERE ELSE AGAIN.

3          IT'S NOT NEARLY AS EFFICIENT A TECHNIQUE.

4              MS. KREVANS:  THANK YOU, DR. SINGH.

5              THE COURT:  ALL RIGHT.  TIME IS 2:51.  ANY RECROSS?

6              MR. JOHNSON:  VERY QUICKLY, YOUR HONOR.

7              THE COURT:  GO AHEAD, PLEASE.

8                         **RECROSS-EXAMINATION**

9    BY MR. JOHNSON:

10   Q.   DR. SINGH, THE PRIOR ART SYSTEMS WE TALKED ABOUT, FRACTAL

11   ZOOM, THE JEFFERSON HAN TED CONFERENCE VIDEO, THE NOMURA

12   PATENT, ALL THOSE DISCLOSED DIFFERENT WAYS OF USING THE APPLE

13   INVENTION THAT DON'T INFRINGE THE APPLE PATENT; RIGHT?  THEY'RE

14   ALL DIFFERENT?

15   A.   THEY DISCLOSE COMPLETELY DIFFERENT FUNCTIONALITY.

16   Q.   OKAY.  AND, AGAIN, YOU TALKED A LITTLE BIT ABOUT CODE JUST

17   A FEW MINUTES AGO?

18   A.   YES.

19   Q.   CONSUMERS BUY THE EXPERIENCE.  THEY BUY THE PHONE.

20   THEY'RE NOT BUYING THE CODE; RIGHT?

21              MS. KREVANS:  OBJECTION.  SCOPE.

22              THE COURT:  OVERRULED.

23          GO AHEAD.  YOU MAY ANSWER.

24              THE WITNESS:  CONSUMERS BUY THE EXPERIENCE, YOU ARE

25   CORRECT.

```
 1            THE EXPERIENCE COMES FROM THE CODE.  SO WHILE THEY MAY NOT

 2     UNDERSTAND THE CODE BELOW IT, IT'S THE CODE THAT IS

 3     PRESENTING -- GIVING THEM THE EXPERIENCE THEY HAVE.

 4     BY MR. JOHNSON:

 5     Q.   AND, AGAIN, YOU HAVEN'T DONE ANY WORK TO DETERMINE THE

 6     PERCENTAGE OF PEOPLE WHO OWN A SAMSUNG PRODUCT THAT HAVE

 7     ACTUALLY USED THE BROWSER APPLICATION IN AN INFRINGING WAY;

 8     RIGHT?

 9     A.   NO.  I'M A TECHNICAL EXPERT.  I HAVE NOT DONE ANY RESEARCH

10     SURVEYS.

11            MR. JOHNSON:  THANK YOU.

12         THANK YOU, YOUR HONOR.

13            THE COURT:  ALL RIGHT.  2:52.  MAY THIS WITNESS BE

14     EXCUSED AND IS IT SUBJECT TO RECALL OR NOT?

15            MS. KREVANS:  HE MAY BE EXCUSED AND NOT SUBJECT TO

16     RECALL, YOUR HONOR.

17            THE COURT:  DO YOU AGREE, MR. JOHNSON?

18            MR. JOHNSON:  YES, YOUR HONOR.

19            THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

20            THE WITNESS:  OKAY.

21            MR. LEE:  YOUR HONOR, OUR NEXT WITNESS IS A FACT

22     WITNESS, SO WE HAVE TO GET HIM FROM THE HALLWAY.

23            THE COURT:  OKAY.

24            MR. LEE:  HE'S BEEN OUTSIDE.

25            THE COURT:  ALL RIGHT.
```

```
 1            (PAUSE IN PROCEEDINGS.)

 2            MR. LEE:  YOUR HONOR, BECAUSE HE WAS A FACT WITNESS

 3    DOWNSTAIRS, WE HAVEN'T HAD A CHANCE TO TAKE HIS PICTURE, SO

 4    WE'LL TAKE HIS PICTURE AFTER HE'S DONE AND GIVE IT TO THE

 5    JURORS.

 6            THE COURT:  THAT'S FINE.

 7            THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

 8       (TONY BLEVINS, PLAINTIFF'S WITNESS, SWORN.)

 9            THE WITNESS:  YES, I DO.

10            THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

11            THE COURT:  ALL RIGHT.  TIME IS NOW 2:54.  GO AHEAD,

12    PLEASE.

13                        DIRECT EXAMINATION

14    BY MR. LEE:

15    Q.   GOOD AFTERNOON, MR. BLEVINS.

16    A.   GOOD AFTERNOON, MR. LEE.

17    Q.   CAN YOU PULL THE MICROPHONE CLOSER TO YOU?

18            THE COURT:  WOULD YOU STATE YOUR NAME, PLEASE, AND

19    SPELL IT?

20            THE WITNESS:  YES.  MY NAME IS TONY BLEVINS, AND THE

21    LAST NAME IS SPELLED B-L-E-V-I-N-S.

22            THE CLERK:  AND YOUR FIRST NAME AGAIN?  I'M SORRY.

23            THE WITNESS:  TONY.

24    BY MR. LEE:

25    Q.   MR. BLEVINS, WHAT IS YOUR CURRENT POSITION AT APPLE?
```

1      A.    I'M VICE-PRESIDENT OF PROCUREMENT.

2      Q.    WHEN DID YOU JOIN APPLE?

3      A.    I JOINED APPLE APPROXIMATELY THE FALL OF 2000.  I WAS

4      RESPONSIBLE FOR WHAT WE TERM CORPORATE PROCUREMENT, WHICH WAS

5      PROCUREMENT OF INDIRECT MATERIALS.

6            AND HOW WE DISTINGUISH THAT WOULD BE MATERIALS THAT WE

7      DON'T SELL DIRECTLY TO CONSUMERS.  RATHER, WE NEED THEM TO RUN

8      OUR DAILY BUSINESS.  IT WOULD BE THINGS LIKE LAB EQUIPMENT OR

9      MATERIALS THAT WE WOULD USE TO DO RESEARCH AND DEVELOPMENT.

10     Q.    NOW, COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE

11     JURY, BEGINNING AT THE TIME YOU JOINED APPLE, WHAT POSITIONS

12     YOU HAVE HELD UP UNTIL TODAY?

13     A.    OKAY.  AS I MENTIONED PREVIOUSLY, I JOINED APPLE IN 2000

14     AS DIRECTOR OF CORPORATE PROCUREMENT.

15           AT THE INCEPTION OF THE IPOD, WHICH WAS AROUND 2001, I RAN

16     OUR OPERATIONS TEAM.

17           IN 2005, MY RESPONSIBILITIES WERE INCREASED AND I RAN OUR

18     GLOBAL LOGISTICS AND TRANSPORTATION TEAMS.

19           AND APPROXIMATELY -- AND DURING THAT TIME PERIOD, I WAS

20     PROMOTED TO SENIOR DIRECTOR, AND THEN I WAS ACTUALLY PROMOTED

21     TO VICE-PRESIDENT IN THE FALL OF 2011.

22     Q.    AND BEGINNING IN 2007, DID YOU HAVE SOME RESPONSIBILITIES

23     FOR APPLE'S IPHONE?

24     A.    YES, I DID.

25     Q.    AND WHAT WERE YOUR RESPONSIBILITIES?

```
 1      A.   I WAS RESPONSIBLE --

 2               MR. CEDERBERG:  EXCUSE ME, YOUR HONOR.  COULD WE HAVE

 3      MR. BLEVINS TALK INTO THE MICROPHONE?  I'M HAVING A HARD TIME

 4      HEARING.

 5               THE COURT:  WOULD YOU PLEASE TALK INTO THE

 6      MICROPHONE?  MOVE IT CLOSER TO YOUR FACE.

 7               MR. LEE:  YES, MY APOLOGIES.  IS THAT ALL RIGHT?

 8               MR. CEDERBERG:  MUCH BETTER, THANK YOU.

 9      BY MR. LEE:

10      Q.   LET ME GO BACK.  BEGINNING IN 2007, DID YOU HAVE SOME

11      RESPONSIBILITIES FOR THE IPHONE?

12      A.   YES.  I WAS RESPONSIBLE FOR PROCUREMENT OF ALL MATERIALS

13      USED, MATERIALS AND COMPONENTS FOR THE IPHONE.

14      Q.   TO WHOM DO YOU REPORT TO TODAY?

15      A.   I REPORT TO MR. JEFF WILLIAMS, WHO IS SENIOR

16      VICE-PRESIDENT OF OPERATIONS.

17      Q.   AND TO WHOM DOES HE REPORT?

18      A.   MR. WILLIAMS REPORTS TO MR. TIM COOK, WHO'S CEO OF APPLE.

19      Q.   AND WHAT ARE YOUR RESPONSIBILITIES TODAY AS VICE-PRESIDENT

20      OF PROCUREMENT?

21      A.   I'M RESPONSIBLE FOR PROCURING ALL OF THE MATERIALS AND

22      COMPONENTS THAT WE NEED TO BUILD ALL APPLE PRODUCTS.

23           I'M ALSO RESPONSIBLE FOR MANAGING THE SUPPLY ISSUES AND

24      MANAGING RELATIONSHIPS WITH OUR SUPPLIERS.

25      Q.   DO YOU WORK WITH MANUFACTURING AND MANUFACTURING PLANNING
```

1    OPERATIONS?

2    A.   YES.  I WORK VERY CLOSELY WITH THEM ON A DAILY BASIS.  THE

3    RELATIONSHIP IS THAT GROUP WOULD PROJECT OR PLAN DEMAND, AND

4    THEN MY JOB WOULD BE TO SUPPLY THAT DEMAND.

5    Q.   WOULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

6    IN GENERAL TERMS HOW APPLE PLANS FOR SUPPLY OF ITS PRODUCTS,

7    IPHONES, IPODS, IPADS?

8    A.   SO GENERALLY SPEAKING, WE WOULD HAVE A PROJECTED DEMAND

9    STATEMENT, AND SO WE WOULD PLAN MATERIALS AND CAPACITY TO

10   SUPPORT THAT.

11       BECAUSE THE VERY NATURE OF CONSUMER ELECTRONICS IS VERY

12   DIFFICULT TO PREDICT, WE WOULD ALSO PLAN SOME DEGREE OF SAFETY

13   STOCKS ON TOP OF THE NOMINAL DEMAND, SO THAT IF OUR PROJECTION

14   IS IMPRECISE, WHICH IT OFTEN IS, THAT WE'RE ABLE TO SUPPLY

15   CONSUMERS.

16   Q.   DOES APPLE -- HAS APPLE HAD THE FLEXIBILITY TO INCREASE

17   SUPPLY IF DEMAND FOR ITS PRODUCTS HAS BEEN HIGHER THAN YOU

18   EXPECTED?

19   A.   WE HAVE BEEN.  I THINK THAT'S A VERY ROUTINE AND NORMAL

20   OCCURRENCE FOR US, THAT I MENTIONED THE TERM "SAFETY STOCK,"

21   THAT GENERALLY WE WOULD PLAN TWO WEEKS OF SAFETY STOCK IN ANY

22   GIVEN QUARTER.

23       AND SO GIVEN THAT THERE ARE 13 WEEKS IN A QUARTER, THEN WE

24   GENERALLY POSITION OURSELVES WITH THE OBJECTIVE OF BEING ABLE

25   TO FLEX UPWARDS BY AT LEAST AROUND 15 PERCENT.

1          NOW, IN OTHER CASES WE'VE BEEN SUCCESSFUL IN FLEXING

2     GREATER THAN THAT BY THE USE OF BURST CAPACITY FOR ADDITIONAL

3     MEASURES THAT WE MIGHT BE ABLE TO PUT IN PLACE SO THAT WE'RE

4     ABLE TO SATISFY CONSUMERS IN CASE OUR PROJECTION DEMANDS ARE

5     MORE THAN ACTUALLY NEEDED.

6     Q.   WHAT IS BURST CAPACITY?

7     A.   BURST CAPACITY IS A CONCEPT WE WOULD USE WHEN WE KNOW

8     WE'RE REACHING CRITICAL PERIODS THAT COULD BE RELATED TO

9     HOLIDAYS, OR IN THE SPRING WE KNOW THAT A LOT OF APPLE PRODUCTS

10    ARE GIVEN AS GIFTS AROUND GRADUATION TIME.

11         SO IN THOSE CASES, WE ANTICIPATE THERE WOULD BE GREATER

12    DEMAND THAN PROJECTED AND PLAN WHAT WE TERM BURST CAPACITY,

13    WHICH IS ADDITIONAL SHIFTS AND ADDITIONAL ABILITY TO SUPPLY.

14    Q.   HAS APPLE EVER HAD TO INCREASE SUPPLY TO MEET CONSUMER

15    DEMAND?

16    A.   YES, WE DO THAT VERY OFTEN, ESPECIALLY AT THE FRONT END OF

17    OUR INTRODUCTION OF A PRODUCT.

18         AS MANY OF US KNOW, WHEN APPLE FIRST LAUNCHES A PRODUCT,

19    WE TYPICALLY STRUGGLE TO SUPPLY ALL OF THE DEMAND THAT MAY BE

20    OUT THERE, AND THAT OVER A COURSE OF WEEKS OR MONTHS, THEN WE

21    TYPICALLY ARE ABLE TO CATCH THAT DEMAND.

22    Q.   AND HAS APPLE WON ANY AWARDS FOR ITS MANUFACTURING

23    OPERATIONS AND ITS SUPPLY CHAIN OPERATIONS?

24    A.   WE DON'T NECESSARILY DWELL ON THAT.  OUR INTENT IS TO

25    REMAIN HUMBLE AND AGGRESSIVE.

1           BUT I CAN'T HELP BUT READ SOME OF THE THIRD PARTY REPORTS,

2      THE MOST RESPECTED AND INFLUENTIAL OF WHICH IS "THE GARDENER

3      GROUP."

4           SO THEY DO AN ANNUAL STUDY OF EVERY COMPANY AND EVERY

5      INDUSTRY AND EVERY COUNTY IN THE WORLD, AND FROM THAT THEY DO A

6      TOP 25 RANKING OF WHAT THEY THINK ARE THE MOST EFFICIENT, THE

7      MOST FLEXIBLE SUPPLY CHAIN COMPANIES IN THE WORLD.

8           AND SO I'M PROUD TO SAY THAT THIS YEAR, 2013, APPLE WAS

9      ACTUALLY RANKED NUMBER 1 IN THAT SURVEY; AND AS A MATTER OF

10     FACT, IN 2012, WE WERE NUMBER 1; 2011, WE WERE NUMBER 1; 2010,

11     WE WERE NUMBER 1; AS WAS THE CASE IN 2009 AND 2008.

12          AND PREVIOUS TO THAT, I DON'T RECALL SPECIFICALLY, BUT I

13     THINK WE WERE WHERE IN THE TOP 25.

14     Q.   NOW, LET ME TAKE YOU BACK IN TIME, NOT ALL THE WAY TO

15     2007, BUT JUST TO 2011.  CAN YOU DO THAT FOR ME?

16     A.   YES, SIR.

17     Q.   WHAT IPHONE MODELS DID APPLE SELL IN THE UNITED STATES IN

18     2011?

19     A.   IN 2011, WE WERE SELLING THE IPHONE 4S, THE IPHONE 4, AND

20     THE IPHONE 3GS.

21     Q.   AND APPROXIMATELY HOW MANY IPHONES IN TOTAL WAS APPLE

22     MANUFACTURING AND SELLING IN THE UNITED STATES THAT YEAR?

23     A.   IN 2011, WE SOLD APPROXIMATELY 93 MILLION UNITS.

24     Q.   APPROXIMATELY HOW MANY IPAD UNITS DID APPLE MANUFACTURE

25     AND SELL IN THAT YEAR?

1       A.   IN 2011, WE SOLD JUST A BIT MORE THAN 40 MILLION UNITS.

2       Q.   COULD APPLE HAVE MANUFACTURED MORE IPHONE 4 DEVICES IN

3       EACH CALENDAR QUARTER OF 2011?

4       A.   YES, CERTAINLY.

5       Q.   HOW MANY MORE, APPROXIMATELY?

6       A.   WELL, THE GENERAL RULE OF THUMB THAT I GAVE WAS WE HAVE

7       ENOUGH, IN YOUR TERM, FLEXIBILITY TO DO ABOUT 15 PERCENT MORE.

8       THAT'S BASED ON US HOLDING ABOUT TWO WEEKS OF SAFETY STOCK.

9            IF WE HAD OCCASION OR IF WE THOUGHT THE DEMAND WAS

10      SIGNIFICANTLY GREATER THAN THAT, WE COULD CERTAINLY BUILD MORE

11      THAN THAT.

12           BUT IT'S SOMEWHAT A THEORETICAL NUMBER, THAT WE KNEW WE

13      ALWAYS HAD THE ABILITY TO FLEX UPWARDS OF 15 PERCENT.

14           IF WE HAD BEEN ASKED TO DO SIGNIFICANTLY MORE, I THINK

15      THERE'S A GOOD CHANCE THAT WE COULD HAVE DONE IT.

16      Q.   AND WE COULD MEASURE THAT 15 PERCENT AGAINST THE 90

17      MILLION UNITS -- OR THE 90 MILLION UNITS DIVIDES BY FOUR FOR A

18      QUARTER; CORRECT?

19      A.   YES.

20      Q.   AND WAS THE SAME TRUE FOR THE THREE OTHER CALENDAR

21      QUARTERS IN 2011, YOU COULD HAVE INCREASED YOUR CAPACITY?

22      A.   YES, THAT'S TRUE, WE COULD HAVE FLEXED UPWARDS AT LEAST 15

23      PERCENT.

24      Q.   IN 2011, AGAIN, IF APPLE WAS REQUIRED TO INCREASE ITS

25      CAPACITY FOR THE IPHONE 4 BY ONE OR TWO MILLION UNITS, COULD

1    YOU HAVE DONE THAT?

2    A.   ONE OR TWO MILLION IN A QUARTER?

3    Q.   IN A QUARTER.

4    A.   THAT WOULD HAVE BEEN QUITE TRIVIAL OR ROUTINE.  THAT WOULD

5    BE A VERY SMALL PERCENTAGE OF OUR BASE.

6    Q.   COULD YOU HAVE INCREASED THE IPHONE 4 CAPACITY BY 10

7    PERCENT IN EACH CALENDAR QUARTER IN 2011?

8    A.   YES, I THINK WE COULD HAVE.

9    Q.   APPROXIMATELY HOW MANY ADDITIONAL IPHONE DEVICES WOULD A

10   10 PERCENT INCREASE IN CAPACITY HAVE BEEN IN 2011?

11   A.   GIVEN THAT WE BUILD APPROXIMATELY 93 MILLION UNITS, 10

12   PERCENT WOULD BE APPROXIMATELY 9.3.

13   Q.   NOW, HAS APPLE EVER HAD A BACKLOG, A CUSTOMER BACKLOG FOR

14   THE IPHONE 4?

15   A.   YES.  UNFORTUNATELY, WE HAVE HAD SEVERE CUSTOMER BACKLOGS

16   AT THE INTRODUCTION OF ALMOST EVERY NEW PRODUCT THAT WE'VE

17   OFFERED, AND IT'S ACTUALLY QUITE A SIMPLE PHENOMENON.

18        IF YOU THINK OF SUPPLY AND DEMAND, THAT BECAUSE APPLE

19   PRODUCTS ARE VERY SOPHISTICATED, THEY'RE VERY COMPLEX, IT TAKES

20   US SOME TIME TO GET LEARNING IN THE MANUFACTURING PROCESS AND

21   MATURITY.

22        AND WHAT I MEAN BY THAT IS THAT IN WEEK NUMBER 5, WHAT WE

23   TERM A PRODUCT RAMP, THAT WE CLEARLY BUILD MORE THAN WE DID IN

24   WEEK NUMBER 1.  IN FACT, THE VERY TERM "RAMP" WE DESCRIBE AS

25   BEING HOW MANY PRODUCTS YOU'VE BUILT OVER A GIVEN TIME PERIOD.

BLEVINS DIRECT

1       SO IT INCREASES LIKE THIS (INDICATING), WHICH IS WHY WE

2    USE THE TERM "RAMP."  SO EACH SUCCESSIVE WEEK WE BUILD MORE

3    THAN WE DID THE PREVIOUS WEEK.  AND IN FACT, IT'S NOT UNCOMMON,

4    IN THAT EXAMPLE I GAVE, THAT WE MIGHT BUILD AS MANY UNITS IN

5    WEEK NUMBER 5 AS WE BUILT IN THE FIRST FOUR WEEKS COMBINED.

6       SO YOU HAVE A SUPPLY PROFILE THAT IS GAINING MATURITY AND

7    INCREASING OVER TIME.

8       UNFORTUNATELY, THE DEMAND PROFILE IS EXACTLY THE OPPOSITE,

9    AND THAT'S OUR BIGGEST CHALLENGE, THAT WHEN WE ANNOUNCE NEW

10   PRODUCT, WE HAVE MAXIMUM DEMAND FOR ALL THE CONSUMERS THAT WANT

11   THE PRODUCT.  NO ONE HAS ONE THE DAY THAT WE LAUNCH THEM.

12      AND SO OVER SUCCESSIVE DAYS AND WEEKS, THAT DEMAND

13   DECREASES TO THE DEGREE THAT WE'VE ALREADY FULFILLED THAT

14   DEMAND AND PEOPLE ARE SATISFIED WITH THEIR PRODUCT, AND SO THE

15   QUEUE GOES DOWN.

16      AND SO THAT WOULD BE THE REASON THAT, FOR EXAMPLE, THE DAY

17   WE LAUNCH A PRODUCT, YOU SEE LINES OUTSIDE APPLE STORES THAT

18   CAN BE HUNDREDS OR THOUSANDS OF PEOPLE LONG.

19      BUT IF IT'S A DAY WHERE WE'VE NOT ANNOUNCED A PRODUCT, YOU

20   SEE PEOPLE WALKING INTO THE STORE AND JUST CHOOSING THE PRODUCT

21   THEY WANT AND EXITING VERY QUICKLY.

22      SO THAT'S THE PHENOMENON THAT WE HAVE, THAT THE LAUNCH OF

23   A PRODUCT, WE HAVE BEEN ALMOST ALWAYS SHORT OF SUPPLY FOR SOME

24   PERIOD OF TIME.

25   Q.   AND UPON THE LAUNCH OF THE IPHONE 4 IN 2010, WAS THERE A

1    PERIOD OF TIME DURING WHICH SUPPLY WAS SHORT?

2    A.   THERE WAS.  WE LAUNCHED THAT PRODUCT, AS I RECALL, IN JUNE

3    AND DEMAND WAS ABSOLUTELY STAGGERING, AND SO WE HAD SUPPLY

4    SHORTAGES FROM THE LAUNCH IN JUNE THROUGH ABOUT THE END OF

5    OCTOBER WHEN WAITING TIME HAD BEEN DECREASED TO ABOUT A WEEK,

6    AND THEN BY NOVEMBER WE WERE SHIPPING PRODUCTS AS CUSTOMERS

7    WANTED THEM.

8         BUT PRIOR TO THAT, THERE WERE DEFINITELY BACKLOGS THAT WE

9    STRUGGLED, JUST LIKE THE PHENOMENON I DESCRIBED EARLIER, UNTIL

10   WE HAD FULFILLED A LARGE PORTION THE DEMAND.

11   Q.   DURING THAT PERIOD WHEN THERE WAS A BACKLOG FOR THE

12   IPHONE 4, WERE THERE OTHER IPHONE PRODUCTS AVAILABLE WITHOUT A

13   BACKLOG TO CUSTOMERS?

14   A.   YES.  AT THAT POINT IN TIME THE IPHONE 3GS HAD LAUNCHED

15   ABOUT A YEAR EARLIER AND WE WERE IN SUPPLY AND DEMAND

16   EQUILIBRIUM, SO THEY WERE READILY AVAILABLE.  SO A CUSTOMER WHO

17   MIGHT CHOSE TO WALK OUT OF THE STORE IMMEDIATELY WITH A 3GS

18   INSTEAD OF WAITING FOR A 4 COULD EASILY DO THAT.

19   Q.   OTHER THAN THIS PERIOD OF TIME YOU'VE DESCRIBED TO THE

20   JURY BETWEEN LAUNCH AND THE FALL OF 2010, WERE THERE ANY OTHER

21   TIMES IN 2010 AND 2011 WHERE APPLE COULD NOT MEET THE DEMAND

22   FOR IPHONE 4S?

23   A.   NO.  ONCE WE RECOVERED AFTER THE LAUNCH, WHICH WAS AROUND

24   LATE OCTOBER OR EARLY NOVEMBER, 2010, THEN WE HAD AMPLE SUPPLY

25   OF THE IPHONE 4.

1          THE ONLY EXCEPTION WOULD BE ON A DAILY BASIS, WE WOULD

2     STRUGGLE TO MAKE CERTAIN THAT WE HAD THE RIGHT COLOR OR THE

3     RIGHT MEMORY CONFIGURATION OR THE RIGHT CARRIER IN ANY

4     PARTICULAR STORE ON ANY GIVEN DATE BECAUSE WE HAVE 30,000

5     POINTS OF SALE THAT WE'RE TRYING TO FULFILL.

6          BUT THERE WERE NO MACRO SHORTAGES.  SO IF THE PRODUCT

7     WASN'T ON A STORE ON A GIVEN DAY, CHANCES ARE IT WAS GOING TO

8     BE THERE THE NEXT DAY BECAUSE THERE WAS NO SHORTAGE.

9     Q.   LET ME GO TO THE IPAD 2.  WERE THERE ANY BACKLOGS FOR THE

10    IPAD 2 UPON INTRODUCTION?

11    A.   THERE ABSOLUTELY WAS, AND IT WAS SEVERE.  I RECALL WE

12    LAUNCHED THAT PRODUCT IN APPROXIMATELY MARCH OF 2011, AND JUST

13    LIKE THE IPHONE, CONSUMER DEMAND WAS STAGGERING.  WE WERE SOLD

14    OUT IN THE MONTHS OF MARCH, APRIL.  BY SOMETIME AROUND THE

15    MAY/JUNE TIME FRAME, WE WERE ABLE TO WHITTLE THE WAIT TIME DOWN

16    TO A WEEK OR TWO.  AND THEN, JUST LIKE THE IPHONE, BY JULY IT

17    WAS SHIPPING VERY FREELY.

18         BUT IT TOOK US SEVERAL MONTHS TO GET INTO SUPPLY DEMAND

19    EQUILIBRIUM FOR EXACTLY THE PHENOMENON I DESCRIBED EARLIER.

20    Q.   AND DURING THAT PERIOD OF TIME, WERE THERE ANY OTHER IPADS

21    AVAILABLE TO CONSUMERS?

22    A.   YES.  THE IPAD 1, WHICH HAD LAUNCHED A YEAR PREVIOUS, WAS

23    IN SUPPLY DEMAND EQUILIBRIUM AND WE HAD THE ABILITY TO SUPPLY

24    HOWEVER MANY WE NEEDED TO.

25    Q.   EXCEPT FOR THIS PERIOD FROM LAUNCH THROUGH JUNE OR JULY OF

```
1    2010, WERE THERE ANY OTHER TIMES WHEN APPLE DID NOT HAVE

2    SUFFICIENT SUPPLY TO MEET CUSTOMER DEMAND FOR THE IPAD 2 IN THE

3    UNITED STATES?

4    A.   IN AGGREGATE, WE HAD MORE THAN ENOUGH SUPPLY TO FULFILL

5    THE DEMAND.  THE ONLY PHENOMENA THAT COULD BE POSSIBLE IN ANY

6    EVEN APPLE STORE, WE MIGHT BE OUT OF A PARTICULAR COLOR OR A

7    PARTICULAR MEMORY CONFIGURATION FOR ONE DAY.  OF COURSE WE GET

8    DAILY DELIVERIES, SO IT WOULD BE REPLENISHED THE NEXT DAY,

9    BECAUSE WE'RE ALWAYS GUESSING THE MIX BETWEEN BLACK AND WHITE

10   AS AN EXAMPLE, AND IT CAN VARY FROM DAY-TO-DAY.

11        BUT THERE WERE NO MAJOR SHORTAGES THAT WE WERE CONTINUING

12   WITH.

13   Q.   LET ME FOCUS YOU ON THE THIRD AND FORTH CALENDAR REPORTS

14   FOR 2011, WHICH THE JURY WILL HEAR ABOUT LATER.  CAN YOU FOCUS

15   ON THAT PERIOD?

16   A.   YES.

17   Q.   DURING THAT PERIOD OF TIME, COULD APPLE HAVE INCREASED ITS

18   CAPACITY TO MANUFACTURE IPAD 2 UNITS BY 100,000 UNITS?

19   A.   IN THAT TIME, WE WERE SHIPPING APPROXIMATELY 10 MILLION

20   IPAD 2'S PER QUARTER, AND BASED ON WHAT I DESCRIBED EARLIER

21   WHERE WE MAINTAINED AT LEAST 15 PERCENT FLEXIBILITY, A 100,000

22   UNIT INCREASE WOULD BE QUITE TRIVIAL.  IT WOULD BE SOMETHING

23   THAT WOULDN'T EVEN CATCH OUR ATTENTION.  IT WAS ROUTINELY DONE.

24        MR. LEE:  THANK YOU, MR. BLEVINS.

25        NO FURTHER QUESTIONS.
```

BLEVINS CROSS

```
 1              THE COURT:  ALL RIGHT.  TIME IS NOW 3:08.

 2         GO AHEAD WITH CROSS-EXAMINATION.

 3              MR. CEDERBERG:  YOUR HONOR, MAY I HAVE A MINUTE TO

 4    GET THE NOTEBOOKS?

 5              THE COURT:  THAT'S FINE.

 6              MR. LEE:  YOUR HONOR, WE HAVE THE PHOTOS.

 7              THE COURT:  OH, GREAT.  THANK YOU.

 8         (PAUSE IN PROCEEDINGS.)

 9              THE COURT:  READY, MR. CEDERBERG?

10              MR. CEDERBERG:  YES.

11              THE COURT:  OKAY.  TIME IS NOW 3:09.  GO AHEAD,

12    PLEASE.
```

<b>CROSS-EXAMINATION</b>

```
14    BY MR. CEDERBERG:

15    Q.   MR. BLEVINS, YOU TALKED ABOUT WITH THE IPHONE 4 THAT THERE

16    WAS A PERIOD FROM JULY TO OCTOBER WHERE THERE WAS A SHORTAGE;

17    CORRECT?

18    A.   YES, THAT'S CORRECT.

19    Q.   YOU DIDN'T HAVE THE CAPACITY TO MEET THE DEMAND OF WHAT

20    PEOPLE WANTED, OF PEOPLE WHO WANTED THE IPHONE 4; RIGHT?

21    A.   WE DIDN'T HAVE ENOUGH SUPPLY TO MEET CONSUMER DEMAND,

22    THAT'S CORRECT.

23    Q.   OKAY.  AND THAT WENT ON FOR ABOUT FOUR MONTHS; RIGHT?

24    A.   THAT'S APPROXIMATELY CORRECT.

25    Q.   NOW, YOU'VE TOLD THE JURY THAT THE IPHONE 3GS WAS
```

```
 1    AVAILABLE DURING THAT TIME PERIOD; RIGHT?

 2    A.   WITH THE EXCEPTION THAT THERE COULD BE A PARTICULAR COLOR

 3    OR MODEL, YES, GENERALLY SPEAKING, YES.

 4    Q.   THAT HAD BEEN OUT IN THE STORES FOR A LONG TIME; CORRECT?

 5    A.   AT THAT POINT IN TIME, IT HAD BEEN OUT ALMOST A YEAR.

 6    Q.   SO PEOPLE WEREN'T STANDING IN LINE TO TRY AND GET IPHONE

 7    3GS, WE THEY?

 8    A.   GENERALLY SPEAKING, NO.

 9    Q.   AND YOU UNDERSTAND APPLE CUSTOMERS ALWAYS WANT THE NEWEST

10    AND THE BEST; CORRECT?

11    A.   THAT'S A VERY LIKELY SCENARIO.

12    Q.   OKAY.  SO WHEN THEY CAME TO THE STORE BETWEEN JULY AND

13    OCTOBER LOOKING FOR YOUR NEWEST AND BEST, THE IPHONE 4, YOU

14    DIDN'T HAVE IT TO SELL TO THEM, DID YOU, SIR?

15    A.   IN MANY CASES, WE DID NOT.

16    Q.   OKAY.  NOW, I WANT TO TALK ABOUT THE IPAD 2 IN 2011.  THAT

17    WAS A NEW AND IMPROVEMENT OVER THE IPAD, THE ORIGINAL IPAD;

18    CORRECT?

19    A.   WE FELT SO, YES.

20    Q.   AND YOUR CUSTOMERS FELT SO, TOO; RIGHT?

21    A.   IT WAS AN EXTREMELY POPULAR DEVICE AND HAD STAGGERING

22    DEMAND.

23    Q.   SO MUCH DEMAND THAT YOU DIDN'T HAVE THE CAPACITY TO FILL

24    THAT DEMAND IN MARCH AND APRIL AND THROUGH PARTS OF MAY AND

25    JUNE OF 2011; CORRECT?
```

1   A.   I WOULDN'T USE THE TERM "CAPACITY" SO TO SPEAK.   WE DIDN'T

2   HAVE ENOUGH SUPPLY.   WE PLANNED MASSIVE CAPACITIES THAT WOULD

3   COME ON LINE LATER.

4   Q.   OKAY.   AND THE PEOPLE WHO WERE COMING TO THE STORES

5   LOOKING FOR YOUR NEW AND IMPROVED IPAD 2, THEY WEREN'T

6   INTERESTED IN IPAD 1, THE ORIGINAL IPAD, WERE THEY, SIR?

7   THAT'S NOT WHY THEY WERE STANDING IN LINE; RIGHT?

8   A.   I WOULDN'T SAY THAT.   THE PHENOMENON THAT WE SEE IS WHEN

9   WE ANNOUNCE A NEW PRODUCT AND SOMEONE COMES IN THE STORE, WE

10   OFFER THEM A WAIT TIME TO ACQUIRE THE LATEST DEVICE, OR

11   TYPICALLY WE HAVE THE PREVIOUS DEVICE IN STOCK AND WE SEE

12   PEOPLE MAKE BOTH DECISIONS, WHICH WHY IS WE CARRY BOTH DEVICES.

13   Q.   OKAY.   NOW, YOU TOLD THIS JURY ON DIRECT EXAMINATION THAT

14   IN ORDER TO FULFILL THIS DEMAND AND INCREASE YOUR SUPPLY, APPLE

15   WOULD MANUFACTURE MORE IPAD 2'S; CORRECT?

16   A.   YES, WE INCREASED OUR CAPABILITY FOR IPAD 2'S.

17   Q.   IN TRUTH AND FACT, APPLE DOESN'T MANUFACTURE THE IPHONE 2,

18   DO THEY, SIR?

19   A.   WE USE A CONTRACT MANUFACTURER TO DO THAT ON OUR BEHALF.

20   Q.   AND THAT CONTRACTOR'S LOCATED IN CHINA; CORRECT?

21   A.   WE USE MORE THAN ONE CONTRACTOR IN MORE THAN ONE LOCATION,

22   BECAUSE ALL ARE IN CHINA, YOU'RE CORRECT.

23   Q.   OKAY.   SO WHEN YOU WANT TO INCREASE THE MANUFACTURING

24   SUPPLY, YOU HAVE TO DEAL WITH THE ACTUAL MANUFACTURER; RIGHT?

25   A.   YES.   MORE SPECIFICALLY, WE DEAL WITH THE MANUFACTURERS OF

1    ALL THE COMPONENTS.  APPLE DOES ALL THE DESIGNS IN CUPERTINO

2    AND WE WORK WITH OVER A THOUSAND COMPANIES TO DO ACTUAL

3    MANUFACTURING.  WE DON'T DO IT OURSELVES.  WE MANAGE IT.

4    Q.   RIGHT.  AND YOU HAVE TO TAKE THEIR PROBLEMS AND THEIR

5    INTERESTS INTO ACCOUNT; CORRECT, SIR?

6    A.   WE WORK WITH ALL OF OUR SUPPLIERS TO DELIVER OUR PRODUCT.

7    Q.   OKAY.  IN OTHER WORDS, APPLE DOESN'T JUST SAY, "I WANT

8    MORE IPAD 2'S" AND JUST START TURNING THEM OUT; CORRECT?

9    A.   I'M NOT SURE I UNDERSTAND WHAT YOU MEAN, BECAUSE WE

10   ACTUALLY DO INCREASE THE DEMAND SIGNAL FOR THE PRODUCT AND ALL

11   THE COMPONENTS THAT MAKE IT UP, AND WE DO THAT ELECTRONICALLY.

12   Q.   WELL, WHEN YOU HAVE A BACKLOG OF ORDERS LIKE YOU DID FOR

13   THE IPAD 2, YOU WANT TO FULFILL THOSE; RIGHT?

14   A.   OH, ABSOLUTELY.

15   Q.   BUT IT TOOK YOU MONTHS IN ORDER TO GET WHERE THEY WERE ON

16   THE SHELVES AND READY TO GO; CORRECT?

17   A.   YES.  AS I DESCRIBED EARLIER, EVERY SUCCESSIVE WEEK WE

18   WERE BUILDING MORE AND MORE PRODUCT, AND AS WE BUILT MORE,

19   CONSUMERS CONTINUED TO BUY THEM AND IT TOOK US SEVERAL MONTHS

20   TO SUPPLY AS MANY AS THEY WANTED, THAT'S CORRECT.

21   Q.   AND BY THE WAY, GOING BACK TO THE ORIGINAL IPAD AND THE

22   IPAD 2, WHEN THE IPAD 2 CAME OUT, APPLE QUIT MANUFACTURING THE

23   FIRST IPAD, DIDN'T THEY, SIR?

24   A.   NO, WE DIDN'T STOP MANUFACTURING.  WE CONTINUED

25   MANUFACTURING IT.

BLEVINS CROSS

1    Q.   YOU CONTINUED MANUFACTURING THE ORIGINAL IPHONE?

2    A.   I'M SORRY.  I THOUGHT YOU SAID IPAD.

3    Q.   IPAD?

4    A.   MY APOLOGIES.  COULD YOU REPEAT THE QUESTION?

5    Q.   MY MISTAKE.

6         YOUR TESTIMONY IS YOU CONTINUED TO MANUFACTURE THE

7    ORIGINAL IPAD ONCE IPAD 2 WAS RELEASED INTO THE MARKET?

8    A.   YES.

9    Q.   OKAY.  DO YOU KNOW THAT FOR A FACT, SIR?

10   A.   YES.  WE HAD LARGE ORDERS TO SCHOOL SYSTEMS AND VARIOUS

11   OTHER PLACES THAT WE HAD TO FULFILL.

12            MR. CEDERBERG:  YOUR HONOR, I HAVE A DOCUMENT WHICH

13   HAS A SEALING ISSUE.

14            THE COURT:  ALL RIGHT.

15            MR. CEDERBERG:  IF I COULD JUST HAVE A MOMENT WITH

16   COUNSEL?  I'VE ALERTED THEM.

17            THE COURT:  OKAY.

18        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

19            MR. LEE:  YOUR HONOR, IS IT ALL RIGHT IF WE WON'T PUT

20   IT ON THE PUBLIC SCREEN?  WE'LL DO IT AS WE DID IT THE LAST

21   TIME, PUT IT ON YOUR SCREEN AND THE JURORS SCREEN.

22            THE COURT:  THAT'S FINE.  I'M GIVING YOU THE OPTION

23   TO SEAL THE COURTROOM IF YOU'D LIKE.  WOULD YOU LIKE ME TO DO

24   THAT?

25            MR. LEE:  NO.  WE'LL FILE A SEALING MOTION AT THE END

```
1       OF THE DAY TO COVER THIS DOCUMENT.

2              THE COURT:  ALL RIGHT.

3          (PAUSE IN PROCEEDINGS.)

4              MR. CEDERBERG:  YOUR HONOR, MAY I HAVE PUT ON THE

5       SCREEN FOR EVERYONE, BUT NOT THE BIG SCREEN, THE FIRST PAGE OF

6       EXHIBIT 182?

7              THE COURT:  IS THAT A DX 182?

8              MR. CEDERBERG:  I BELIEVE SO, YES, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  THANK YOU.

10             MR. CEDERBERG:  AND MAY I APPROACH, YOUR HONOR, SO I

11      DON'T DESCRIBE IT TOO MUCH?

12             THE COURT:  GO AHEAD, PLEASE.  THAT'S FINE.

13      BY MR. CEDERBERG:

14      Q.  MR. BLEVINS, I WANT TO DIRECT YOUR ATTENTION HERE TO WHERE

15      IT SAYS FINANCIAL QUARTERS, IPAD 2 SALEABLE UNITS.

16          DO YOU SEE THAT?

17      A.  YES.

18      Q.  DO YOU SEE HERE WHERE IT SAYS FYQ 2ND 11?  THAT'S THE

19      SECOND QUARTER OF 2011; CORRECT?

20      A.  YES, OUR SECOND FISCAL QUARTER.

21      Q.  AND THEN IT GIVES YOU A NUMBER OF HOW MANY IPAD 2'S WERE

22      MANUFACTURED; CORRECT?

23      A.  YES.

24      Q.  OKAY.  AND THEN IF YOU LOOK FOR THE THIRD QUARTER, 2011,

25      IT GIVES YOU A NUMBER; CORRECT?
```

BLEVINS CROSS

```
1    A.   YES, THAT'S CORRECT.

2    Q.   AND THESE ARE CUMULATIVE TOTALS, AREN'T THEY, SIR?

3    A.   YES, THAT'S CORRECT.

4    Q.   AND IS THIS THE SAME FOR THE SECOND QUARTER AS THE THIRD

5    QUARTER; CORRECT?

6    A.   YES.  MAY I CLARIFY?  BECAUSE I THINK THERE'S A

7    MISUNDERSTANDING.

8    Q.   I'LL -- BECAUSE OF MY TIME LIMIT, I'M SURE COUNSEL WILL

9    CLARIFY.

10   A.   OKAY.

11   Q.   I THINK IT'LL BE FASTER THAT WAY.

12        IT'S ALWAYS BEEN APPLE'S POSITION TO TRY AND SOLVE ITS

13   SHORTAGES AND DO EVERYTHING IT COULD TO STOP THE SHORTAGES;

14   RIGHT?

15   A.   YES.

16   Q.   OKAY.  IT WOULD EXPEDITE ORDERS FROM CHINA; CORRECT?

17   A.   YES, WE WOULD.

18   Q.   TO SOLVE THAT PROBLEM?

19        SO DESPITE APPLE'S BEST EFFORTS WITH REGARD TO IPHONE 4

20   AND IPAD 2, THERE WERE MONTHS WHEN THERE WASN'T ENOUGH ON THE

21   SHELVES FOR PEOPLE TO MAKE THE SALES; CORRECT?

22   A.   YES, I WOULD AGREE WITH THAT.

23             MR. CEDERBERG:  MAY I HAVE A MOMENT, YOUR HONOR?

24             THE COURT:  YES.  GO AHEAD, PLEASE.

25        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)
```

BLEVINS CROSS

```
1        BY MR. CEDERBERG:

2        Q.   AND YOU MENTIONED WITH REGARD TO IPAD 4, OR IPHONE 4 AND

3        IPAD 2, THAT WHEN YOU STARTED, THERE WAS SUCH A DEMAND IT WAS

4        TYPICAL THAT THERE WAS A SHORTAGE; CORRECT?

5        A.   I'M SORRY.  I'M CONFUSED.  I THINK YOU SAID IPAD 4.

6        Q.   NO, IPHONE 4, IPAD 2.  THERE WAS SUCH A DEMAND THAT THERE

7        WAS A SHORTAGE; CORRECT?

8        A.   AT THE LAUNCH FOR EACH PRODUCT, THAT'S ABSOLUTELY TRUE.

9        Q.   OKAY.  AND THERE WAS THIS SHORTAGE WHEN IPAD WAS RELEASED,

10       TOO; RIGHT?

11       A.   YOU MEAN THE IPAD 2?

12       Q.   NO, THE ORIGINAL IPAD.

13       A.   THE ORIGINAL IPAD, YES.  IN FACT, ALMOST EVERY APPLE

14       PRODUCT I'VE BEEN ASSOCIATED WITH, THE DEMAND IS SO HIGH AT

15       LAUNCH THAT WE TYPICALLY NEED SOME PERIOD OF TIME TO CATCH UP

16       WITH DEMAND.

17       Q.   THERE WAS A SHORTAGE WHEN THE 4S WAS RELEASED; CORRECT?

18       A.   THERE WAS.

19       Q.   AND THERE WAS A SHORTAGE WHEN THE 3GS AS RELEASED;

20       CORRECT?

21       A.   YES, THERE WAS.

22              MR. CEDERBERG:  NOTHING FURTHER, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  DO YOU WANT TO ADMIT DX 182?

24              MR. LEE:  YES, WE OFFER PX 182.

25              THE COURT:  OH, IT'S A PX OR DX?
```

1              MR. LEE:  PX.

2              MR. CEDERBERG:  PX.

3              THE COURT:  I ASSUME NO OBJECTION TO THAT.

4              MR. CEDERBERG:  NO OBJECTION.

5              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

6         (PLAINTIFF'S EXHIBIT 182 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  ALL RIGHT.  THE TIME IS 3:19.  GO AHEAD,

8    PLEASE.

9                        **REDIRECT EXAMINATION**

10   BY MR. LEE:

11   Q.   MR. BLEVINS, JUST ONE QUESTION.  YOU WERE GOING TO EXPLAIN

12   SOMETHING ABOUT THE EXHIBIT 182 THAT WAS SHOWN TO YOU TO

13   CLARIFY?

14   A.   YES.

15   Q.   TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT YOU MEAN BY

16   CLARIFICATION?

17   A.   YES.  THE QUESTION WAS WHETHER WE MANUFACTURED IPAD 1'S AT

18   THE SAME TIME WE WERE MANUFACTURING IPAD 2S AND I ANSWERED YES,

19   WE WERE.

20        THE REPORT I WAS SHOWN CLEARLY INDICATES WE WERE

21   MANUFACTURING BOTH IN THE SECOND FISCAL QUARTER.

22        SO WE HAD ONE QUARTER, OR THREE MONTHS, IN WHICH WE

23   ABSOLUTELY MANUFACTURED MILLIONS OF EACH, WHICH WAS THE ANSWER

24   THAT I WAS GIVING.

25        NOW, WE DIDN'T MANUFACTURE BOTH INDEFINITELY.  THE

1    FOLLOWING QUARTER WE STOPPED MANUFACTURING THE IPAD 1.

2         BUT I UNDERSTOOD THE QUESTION TO BE, WERE YOU

3    MANUFACTURING THEM AT THE SAME TIME?

4         AND THE ANSWER IS ABSOLUTELY YES, DURING THE THREE MONTH

5    PERIOD, WE WERE.  IF WE HAD HAD DEMAND FOR THE IPAD 1 THAT

6    CONTINUED FOR MORE QUARTERS, WE COULD HAVE CONTINUED

7    MANUFACTURING.

8         BUT AT THAT POINT IN TIME, WE'D ALREADY SOLVED THE DEMAND

9    FOR THE IPAD 2, WHICH WAS PREFERABLE, SO WE SIMPLY INCREASED

10   PRODUCTION FOR THAT.

11             MR. LEE:  NOTHING FURTHER.

12             THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:20.  ANY --

13             MR. CEDERBERG:  VERY QUICKLY, YOUR HONOR.

14             THE COURT:  GO AHEAD, PLEASE.

15                       **RECROSS-EXAMINATION**

16   BY MR. CEDERBERG:

17   Q.   WHEN THE IPAD 2 CAME OUT, THE IPAD 1 WAS DISCONTINUED;

18   CORRECT?

19   A.   FOR A THREE MONTH PERIOD, WE CONTINUED MANUFACTURING BOTH.

20   Q.   THAT WOULD BE THE FIRST QUARTER?

21   A.   FQ2.

22   Q.   FQ2?

23   A.   THE CHART THAT YOU SHOWED ME THAT WE'RE NOT GOING TO TALK

24   ABOUT THE SPECIFIC NUMBERS SHOWED MILLIONS OF UNITS OF EACH

25   BEING MANUFACTURED IN THE EXACT SAME QUARTER, WHICH WAS THE

```
 1      QUESTION I WAS ATTEMPTING TO ANSWER.

 2      Q.   DIDN'T Q2 AND Q3 HAVE THE EXACT SAME NUMBERS, SIR?

 3      A.   Q3 WE STOPPED.

 4           MR. CEDERBERG:  NOTHING FURTHER.

 5           THE COURT:  ALL RIGHT.  TIME IS 3:20.

 6      MAY THIS WITNESS BE EXCUSED AND IS IT SUBJECT TO RECALL OR

 7      NOT?

 8           MR. LEE:  EXCUSED, NOT SUBJECT TO RECALL.

 9           THE COURT:  DO YOU AGREE WITH THAT, MR. CEDERBERG?

10           MR. CEDERBERG:  YES.

11           THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED.

12           THE WITNESS:  THANK YOU, YOUR HONOR.

13      (PAUSE IN PROCEEDINGS.)

14           THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

15      **(JOHN HAUSER, PLAINTIFF'S WITNESS, SWORN.)**

16           THE WITNESS:  I DO.

17           THE CLERK:  WOULD YOU STATE YOUR NAME, PLEASE, AND

18      SPELL IT.

19           THE WITNESS:  MY NAME IS JOHN HAUSER, H-A-U-S-E-R.

20           THE COURT:  TIME IS 3:21.  GO AHEAD, PLEASE.

21           MS. KREVANS:  YOUR HONOR, MAY I GIVE THE JURORS TIME

22      TO PUT THE PICTURE IN THEIR BINDERS?

23      (PAUSE IN PROCEEDINGS.)

24           THE COURT:  JUST TO KEEP IT THE SAME ALWAYS, WHY

25      DON'T YOU WAIT AND ASK PEOPLE TO SPELL THEIR NAME AFTER WE'RE
```

```
1    READY TO GO?  SO THAT WAY THE TIMING WILL BE THE SAME FOR EVERY

2    SINGLE WITNESS.

3         OKAY.  3:22.  GO AHEAD, PLEASE.

4                      DIRECT EXAMINATION

5    BY MS. KREVANS:

6    Q.   GOOD AFTERNOON, DR. HAUSER.  COULD YOU PLEASE INTRODUCE

7    YOURSELF TO THE JURY?

8    A.   HI.  MY NAME IS JOHN HAUSER.  I'M THE KIRIN, K-I-R-I-N,

9    PROFESSOR OF MARKETING AT THE M.I.T. SLOAN SCHOOL OF

10   MANAGEMENT.

11   Q.   DR. HAUSER, I THINK YOU'VE ALREADY HEARD A COUPLE OTHER

12   WITNESSES BE TOLD TO MAKE SURE YOU SPEAK INTO THE MIKE, OKAY?

13   A.   YES, THANK YOU.

14   Q.   IF YOU COULD DO THAT FOR US TOO, THAT WOULD BE GREAT.

15        DR. HAUSER, WERE YOU RETAINED TO TESTIFY AS AN EXPERT IN

16   THIS CASE?

17   A.   YES, I WAS.

18   Q.   WHAT QUESTION WERE YOU ASKED TO ANALYZE?

19   A.   I WAS ASKED TO DETERMINE WHETHER OR NOT THERE'S A PRICE

20   PREMIUM FOR THE FEATURES THAT ARE ENABLED BY THE PATENTS AT

21   ISSUE IN THIS CASE.

22   Q.   WHAT SPECIFIC PATENTS DID YOU LOOK AT?

23   A.   THE SPECIFIC PATENTS I LOOKED AT WERE THE '915 PATENT, THE

24   '381 PATENT, AND THE '163 PATENT.

25   Q.   AND WHAT WAS THE METHODOLOGY YOU USED TO PERFORM THIS
```

```
1      ANALYSIS?

2      A.   I USED A METHODOLOGY KNOWN AS CHOICE-BASED CONJOINT

3      ANALYSIS.

4      Q.   AND WHAT PRODUCTS DID YOU LOOK AT?

5      A.   I LOOKED AT THE -- BASICALLY THE SAMSUNG SMARTPHONES AND

6      IPADS THAT WERE AT ISSUE IN THE LITIGATION.

7      Q.   SMARTPHONES AND TABLETS?

8      A.   SMARTPHONES AND TABLETS.

9      Q.   OKAY.  I THINK YOU SAID IPADS.

10     A.   I SAID IPADS.  I'M SORRY.

11     Q.   YOU ACTUALLY WERE LOOKING AT SAMSUNG PRODUCTS?

12     A.   I WAS LOOKING AT SAMSUNG PRODUCTS.

13     Q.   OKAY.  BEFORE WE GET TO THE DETAILS OF THE ANALYSIS YOU

14     DID, LET ME ASK YOU A FEW QUESTIONS ABOUT YOUR EDUCATION AND

15     EXPERIENCE, AND WE HAVE A SLIDE UP HERE ON THE SCREEN THAT

16     MIGHT HELP YOU WALK THROUGH.

17          COULD YOU START WITH YOUR EDUCATIONAL BACKGROUND?

18     A.   YES.  I HAVE FOUR DEGREES FROM M.I.T.  I HAVE A BACHELOR

19     OF SCIENCE AND A MASTER OF SCIENCE IN ELECTRICAL ENGINEERING;

20     MASTER OF SCIENCE IN CIVIL ENGINEERING; AND A DOCTOR OF SCIENCE

21     IN OPERATIONS RESEARCH.

22     Q.   IS IT DOCTOR OF SCIENCE A PH.D.?

23     A.   YES, IT IS.  IT'S EQUIVALENT TO IT.

24     Q.   OKAY.  WHAT IS OPERATIONS RESEARCH?

25     A.   OPERATIONS IS THE USE OF MATHEMATICS IN SCIENCE TO ADDRESS
```

1      BUSINESS PROBLEMS.

2      Q.   NOW, WHAT'S THE SLOAN SCHOOL OF MANAGEMENT?

3      A.   THE SLOAN SCHOOL OF MANAGEMENT IS M.I.T.'S BUSINESS

4      SCHOOL.

5      Q.   HOW LONG HAVE YOU BEEN TEACHING THERE?

6      A.   I'VE BEEN TEACHING THERE SINCE 1980.

7      Q.   IS CONDUCTING ACADEMIC RESEARCH ALSO A PART OF YOUR JOB?

8      A.   OH, ABSOLUTELY.

9      Q.   CAN YOU GIVE US AN IDEA OF SOME OF THE RESEARCH YOU'VE

10     DONE IN YOUR CAREER AT M.I.T.?

11     A.   MY PRIMARY EXPERTISE IS MARKETING, MARKETING RESEARCH AND

12     PRODUCT DEVELOPMENT.

13     Q.   HAVE YOU DONE ANY PUBLISHING IN THE AREA OF MARKETING

14     RESEARCH AND CONSUMER SURVEYS RELATED TO MARKETING RESEARCH?

15     A.   YES.  I'VE DONE -- IN ADDITION TO FOUR TEXTBOOKS, I'VE

16     PUBLISHED OVER 90 ARTICLES AND PAPERS ON MARKETING AND

17     MARKETING RESEARCH.

18     Q.   FOR THOSE OF US WHO ARE NOT IN YOUR FIELD, DR. HAUSER, CAN

19     YOU JUST EXPLAIN TO US HOW YOU APPLY YOUR MATHEMATICS

20     BACKGROUND TO THE FIELD OF MARKETING.  I THINK TO LAY PEOPLE

21     LIKE US IT SOUNDS LIKE PEOPLE WHO DESIGN ADS.

22     A.   WELL, PRIMARILY -- NO.  MY PRIMARY EXPERTISE IS

23     UNDERSTANDING CONSUMERS, UNDERSTANDING THE PRICES THAT

24     CONSUMERS WOULD PAY FOR PRODUCTS, UNDERSTANDING THE FEATURES

25     THAT FIRMS WOULD LIKE TO PUT IN PRODUCTS TO BE PROFITABLE, AND

```
 1      BASICALLY BUILDING -- ASKING CUSTOMERS QUESTIONS AND BUILDING

 2      ANALYSES THAT CAN HELP ME UNDERSTAND THESE QUESTIONS, TO HELP

 3      ME ADVISE FIRMS, OR TO HELP OTHERS ADVISE FIRMS TO MAKE BOTH

 4      PRODUCT DECISIONS, PRICING DECISIONS, AND MARKETING DECISIONS.

 5      Q.   HAS YOUR EXPERIENCE IN THIS KIND OF MARKETING RESEARCH

 6      BEEN PURELY ACADEMIC?

 7      A.   NO, IT HAS NOT.

 8      Q.   WHAT KINDS OF THINGS HAVE YOU DONE THAT HAVE NOT BEEN

 9      PURELY ACADEMIC?

10      A.   WELL, FOR APPROXIMATELY 40 YEARS I'VE BEEN WORKING WITH

11      FIRMS, DEFINITELY IN PRODUCT DEVELOPMENT, DEFINITELY IN

12      UNDERSTANDING CONSUMERS IN TERMS -- SOMETIMES IN TERMS OF

13      PRICING AND OTHER MARKETING ACTIVITIES.

14      Q.   WHAT KINDS OF COMPANIES HAVE YOU WORKED WITH?

15      A.   OH, I'VE WORKED WITH QUITE A FEW COMPANIES.  I THINK WE

16      HAVE A SLIDE OF SOME OF THESE COMPANIES I'VE WORKED WITH.

17           THESE ARE JUST A FEW OF THE THOUSANDS OF COMPANIES THAT

18      USE CONJOINT SURVEYS TO MAKE REAL BUSINESS DECISIONS WHEN

19      THEY'RE TRYING TO DECIDE WHAT PRODUCT, FEATURES TO PUT IN

20      PRODUCTS OR HOW TO PRICE THOSE PRODUCTS OR TO PREDICT MARKET

21      DEMAND.

22      Q.   NOW, YOU SAID BEFORE THE KIND OF ANALYSIS YOU DID IN THIS

23      CASE WAS A CHOICE-BASED CONJOINT SURVEY.  IS THAT RIGHT?

24      A.   YES, CHOICE-BASED BECAUSE CONSUMERS MAKE CHOICES, AND

25      CONJOINT ANALYSIS IS A, SORT OF A TECHNICAL TERM, BUT IT'S A
```

1       WAY TO MEASURE CONSUMER PREFERENCES.

2       Q.   IS THE KIND OF CHOICE-BASED CONJOINT SURVEY THAT YOU DID

3       FOR LAPTOPS AND SMARTPHONES -- I'M SORRY -- TABLETS AND

4       SMARTPHONES IN THIS CASE THE SAME KIND OF CHOICE-BASED CONJOINT

5       SURVEY THAT YOU'VE DONE WHEN YOU'VE BEEN WORKING WITH

6       BUSINESSES?

7       A.   YES, IT IS.  I'VE USED CONJOINT ANALYSIS IN NON-LITIGATION

8       CONSULTING.

9       Q.   IN THE CHOICE-BASED CONJOINT SURVEY -- BOY, THAT'S HARD TO

10      SAY.

11      A.   YOU CAN SAY CBC.

12      Q.   IN THE CHOICE-BASED CONJOINT SURVEY THAT YOU DID FOR THIS

13      CASE, DID YOU ASK THE CONSUMERS TAKING THE SURVEY TO USE REAL

14      DOLLARS WHEN THEY MADE THEIR CHOICES?

15      A.   NO, I DID NOT.  THAT'S ALMOST NEVER DONE.

16      Q.   IN THE CHOICE-BASED CONJOINT SURVEYS THAT YOU'VE DONE FOR

17      BUSINESSES, COMPANIES THAT YOU'VE CONSULTED WITH, WERE THE

18      CONSUMERS ASKED TO USE REAL DOLLARS WHEN THEY MADE THEIR

19      CHOICES IN THE SURVEY?

20      A.   NO.  THEY'RE -- THAT'S, AGAIN, ALMOST NEVER DONE.

21      Q.   DOES THE FACT THAT PEOPLE AREN'T USING REAL DOLLARS WHEN

22      THEY MAKE THEIR CHOICES IN THIS KIND OF SURVEY AFFECT THE

23      ACCURACY OF THE RESULTS OF THE ANALYSIS IN DETERMINING

24      CONSUMERS' PREFERENCE FOR CERTAIN FEATURES?

25      A.   NO.  A CONJOINT ANALYSIS IS QUITE ACCURATE WITH

1      HYPOTHETICAL PROFILES.

2      Q.   HOW DO YOU KNOW THAT THE FACT THAT YOU DON'T USE REAL

3      DOLLARS IN THESE KINDS OF SURVEYS IS NOT IMPACTING THE RESULTS?

4      A.   WELL, THERE ARE REALLY TWO REASONS.  ONE IS THAT WE DO

5      KNOW THAT FIRMS USE THIS METHODOLOGY, THEY DESIGN PRODUCTS,

6      THEY LAUNCH THE PRODUCTS, THE PRICE HAS BEEN QUITE SUCCESSFUL.

7           ANOTHER REASON IS THAT IN A STUDY FUNDED BY THE NATIONAL

8      SCIENCE FOUNDATION, I UNDERTOOK AN EFFORT TO TRY AND VALIDATE

9      CONJOINT ANALYSIS PREDICTIONS.

10     Q.   OKAY.  COULD WE SEE SLIDE PDX 103.3?

11          COULD YOU EXPLAIN TO THE JURY THE NATURE OF THIS NATIONAL

12     SCIENCE FOUNDATION STUDY YOU DID THAT LOOKED AT WHETHER USING

13     REAL DOLLARS AFFECTS CONSUMER CHOICES IN THE TYPE OF SURVEY

14     THAT YOU'RE TALKING ABOUT?

15     A.   OKAY.  THIS IS A STUDY I DID.  IT TESTED A FEW FORMS OF

16     CONJOINT ANALYSIS.  THE ACTUAL APPLICATION WAS FOR LAPTOP BAGS,

17     AND WE FIRST ASKED CONSUMERS TO COMPLETE THE SURVEY AND THEN

18     ANALYZED IT IN SIMILAR WAYS TO WHAT WE'RE DOING IN THIS CASE,

19     AND WE THEN PREDICTED WHAT THEY WERE GOING TO DO.

20          I HAD SOME GOOD FUNDING AT THAT POINT, SO PARTICIPANTS

21     WERE GIVEN $100 TOWARDS PURCHASING A LAPTOP BAG, AND IF THEY

22     PURCHASED THE LAPTOP BAG THAT WAS LESS THAN $100, THEY GOT THE

23     CHANGE.

24          SO WE THEN LOOKED AT THE PREDICTIONS FROM CONJOINT

25     ANALYSIS WITH WHAT THEY REALLY DID AND THE PREDICTIONS WERE

```
 1        REALLY QUITE ACCURATE.

 2               MS. KREVANS:  YOUR HONOR, WE OFFER DR. HAUSER AS AN

 3        EXPERT IN THE FIELD OF CONSUMER SURVEYS, CHOICE-BASED CONJOINT

 4        ANALYSIS, AND MARKETING RESEARCH AND ANALYSIS.

 5               THE COURT:  ANY OBJECTION OR ADDITIONAL VOIR DIRE?

 6               MR. PRICE:  NO OBJECTION.

 7               THE COURT:  ALL RIGHT.  SO CERTIFIED.

 8          GO AHEAD.

 9        BY MS. KREVANS:

10        Q.   DR. HAUSER, TURNING TO WHAT YOU DID IN THIS CASE, WHAT

11        WERE THE SPECIFIC FEATURES FOR WHICH YOU DID A SURVEY OF

12        CONSUMERS' WILLINGNESS TO PAY IN SMARTPHONES AND TABLETS?

13        A.   THE SPECIFIC FEATURES I WAS ASKED TO STUDY WERE THE

14        FEATURES ENABLED BY THE THREE PATENTS THAT I NAMED, THE '915,

15        THE '381, AND THE '163 PATENTS.

16        Q.   OKAY.  COULD WE SEE SLIDE 103.5, MR. LEE?

17               COULD YOU JUST EXPLAIN BRIEFLY TO THE JURY WHAT THE

18        FEATURES WERE THAT YOU TESTED?

19        A.   WELL, THE '915 IS THE FEATURE THAT ENABLES AUTOMATICALLY

20        SWITCHING BETWEEN SINGLE AND MULTITOUCH.

21               THE '381 PATENT IS A PATENT THAT ENABLES THE RUBBER BAND

22        OR BOUNCE EFFECT.

23               AND THE '163 PATENT IS THIS PATENT THAT ENABLES THE TAP TO

24        ZOOM AND CENTER.

25        Q.   AND WHAT DID YOU DO TO LOOK AT CONSUMER PREFERENCES AND
```

```
 1      CONSUMER WILLINGNESS TO PAY FOR THESE FEATURES?

 2      A.   I UNDERTOOK A CHOICE-BASED CONJOINT ANALYSIS FOR BOTH

 3      SMARTPHONES AND TABLETS.

 4      Q.   WERE THESE TWO SEPARATE SURVEYS?

 5      A.   THEY WERE TWO SEPARATE SURVEYS, YES.

 6      Q.   OKAY.  CAN YOU EXPLAIN HOW A CHOICE-BASED CONJOINT

 7      ANALYSIS SURVEY IS ACTUALLY DONE?

 8      A.   YES.  I'VE PREPARED A SLIDE IF WE CAN SEE IT.

 9      Q.   OKAY.  THIS IS GOING TO BE 103.6.

10      A.   OKAY.  THIS IS AN EXTREMELY SIMPLIFIED EXAMPLE.  SO

11      IMAGINE WE GAVE THE CONSUMER A DESCRIPTION OF TWO DIFFERENT

12      PROFILES, AND THIS IS FOR SATELLITE TELEVISION, AND YOU CAN SEE

13      THE PROFILE ON THE RIGHT HAS A DVR AND IT COSTS $40.  THE

14      PROFILE ON THE LEFT DOES NOT HAVE A DVR AND COSTS $35.

15          IN THIS SIMPLIFIED EXAMPLE, THERE ARE THREE OTHER FEATURES

16      AND I'VE HELD THEM CONSTANT BETWEEN THE TWO PROFILES.

17          NOW, SUPPOSE THE CONSUMER CHECKS THAT THEY PREFER THE

18      SECOND PROFILE.  WELL, WHAT THIS TELLS ME IS THEY'RE WILLING TO

19      PAY AT LEAST $5 FOR THE ADDITION OF A DVR TO THAT PROFILE, AND

20      THAT WOULD BE A PRICE PREMIUM OF $5 OR MORE.

21          NOW, WE CAN SEE IN THE NEXT SLIDE, THIS IS A CASE WHERE

22      SUPPOSE A CONSUMER CHECKED THE PROFILE ON THE LEFT, AND IN THIS

23      CASE, YOU CAN SEE THEY PREFERRED TO NOT HAVE THE DVR AT $35, SO

24      THAT SAYS THAT THEY'RE NOT GOING TO PAY $5 FOR THE DVR IN

25      ADDITION TO THE SATELLITE SERVICE THAT THEY HAVE.
```

1           AND THIS IS JUST ONE OF MANY QUESTIONS THAT I COULD ASK,

2      AGAIN, IN A VERY SIMPLIFIED VERSION.

3      Q.   NOW, WHEN YOU SAY THIS IS SIMPLIFIED, WHAT DO YOU MEAN?

4      A.   WELL, IN THIS CASE THERE'S ONLY A DVR AND THE PRICES ARE

5      VARYING AT A TIME.

6           YOU CAN IMAGINE IF I DID THAT, PEOPLE MIGHT FOCUS JUST ON

7      THE DVR, SO I WOULD HAVE MORE FEATURES THAN THIS, I WOULD HAVE

8      ALL THE FEATURES VARYING SIMULTANEOUSLY, I MAY HAVE MORE THAN

9      TWO PROFILES.

10          FOR EXAMPLE, IN THIS CASE WE HAVE FOUR PROFILES, AND I

11     WOULD RANDOMLY VARY THE PROFILES ACROSS CONSUMERS.  IN THIS

12     CASE WE HAVE 455 CONSUMERS ANSWERING 16 QUESTIONS TIMES FOUR

13     PROFILES EACH, I THINK THAT'S SOMETHING LIKE 24,000 DIFFERENT

14     PROFILES.

15          BUT REALLY IT COMES DOWN TO THE SIMPLE IDEA HERE.  MUCH OF

16     THE REST IS JUST MAKING SURE THAT THE CHOICE IS VERY REALISTIC

17     TO THE CONSUMERS AND THAT THEY DON'T FOCUS SPECIFICALLY IN THIS

18     CASE ON THE DVR.

19     Q.   NOW, YOU MENTIONED THE TERM "PRICE PREMIUM" WHEN YOU WERE

20     TALKING ABOUT YOUR SIMPLIFIED EXAMPLE.  WHAT'S A PRICE PREMIUM?

21     A.   WELL, A PRICE PREMIUM IS REALLY A WILLINGNESS TO PAY.

22     IT'S MARKET DEMAND.

23     Q.   IS THE AMOUNT THAT CONSUMERS ARE WILLING TO PAY FOR A

24     FEATURE THE SAME AS THE MARKET PRICE FOR THAT FEATURE?

25     A.   NO, IT ISN'T.  WHEN A FIRM DECIDES TO PRICE A PRODUCT,

1      THEY'LL TAKE INTO CONSIDERATION WHAT PEOPLE ARE WILLING TO PAY

2      WITH RESPECT TO DEMAND.

3          BUT THERE ARE OTHER THINGS, OF COURSE, THAT THE FIRM HAS

4      TO TAKE INTO ACCOUNT, INCLUDING THEIR OWN COSTS, HOW MUCH

5      THEY'RE WILLING TO SUPPLY, AND A NUMBER OF CHARACTERISTICS.

6          SO MARKET DEMAND IS AN INPUT TO THE MARKET PRICE, BUT IT'S

7      NOT THE MARKET PRICE.

8      Q.   OKAY.  LET'S LOOK AT THE SPECIFIC FEATURES THAT YOU TESTED

9      AND THE SURVEYS THAT YOU DID FOR THIS CASE.

10         YOU SAID YOU TESTED FEATURES ABOUT THE PATENTS AT ISSUE.

11     ARE THOSE THE ONLY FEATURES YOU TESTED?

12     A.   NO, THEY'RE NOT.  AS YOU SEE, THE TOUCHSCREEN FEATURE

13     INCLUDED THE PATENTED FEATURES, AND OF COURSE PRICE IS HERE AS

14     WELL.

15         BUT I HAVE FIVE OTHER FEATURES, AND WE'LL CALL THESE

16     DISTRACTION FEATURES.  JUST AS IN THE DVR EXAMPLE, THE

17     SATELLITE TELEVISION SERVICE, ALL THESE OTHER FEATURES ARE

18     GOING TO BE VARYING SIMULTANEOUSLY WITH THE TOUCHSCREEN AND

19     PRICE, AND THE WHOLE PURPOSE OF THESE OTHER FEATURES IS SO THAT

20     THE CONSUMER DOES NOT FOCUS SPECIFICALLY ON TOUCHSCREEN

21     FEATURES.

22     Q.   ALL RIGHT.  LET ME FOLLOW UP ON A COUPLE THINGS BECAUSE I

23     WANT EVERYTHING TO BE CLEAR.

24         FIRST OF ALL, THE ICON ON THE SCREEN THAT SAYS TOUCHSCREEN

25     ACTUALLY HAS FOUR TOUCHSCREEN FEATURES ON IT.

1      A.    YES.

2      Q.    WHICH ARE THE THREE THAT ARE RELEVANT TO THIS CASE?

3      A.    OH.  I CAN READ IT HERE.  OKAY.  IT'S AUTO SWITCH, RUBBER

4      BAND, TAP TO ZOOM AND RECENTER.

5            NOW, I THINK IT'S IMPORTANT TO RECOGNIZE THAT THESE ARE

6      DESCRIBED TO CONSUMERS WITH TEXT, WITH LONG DESCRIPTIONS, WITH

7      GRAPHICS, AND IN SOME CASES ACTUALLY WITH ANIMATIONS, SO IT'S

8      MORE SO THAN JUST THE LITTLE ICONS THAT YOU'RE SEEING HERE.

9      Q.    SO THESE ICONS ARE A LITTLE SHORTHAND, BUT YOU GAVE BIGGER

10     DESCRIPTIONS?

11     A.    YES, THAT'S CORRECT.

12     Q.    ALL RIGHT.  LET'S GO BACK TO THE OTHER THING YOU

13     MENTIONED, DISTRACTION FEATURES.

14           WHAT IS A DISTRACTION FEATURE?

15     A.    WELL, AGAIN, IT'S -- IMAGINE I JUST ASKED ABOUT

16     TOUCHSCREEN VERSUS PRICE.  NOW A CONSUMER IS FOCUSSING ON THAT.

17     THEY MAY GUESS THAT I'M INTERESTED IN TOUCHSCREEN.

18           I WANT THEM TO MAKE REALISTIC CHOICES, AND SO I'M GOING TO

19     HAVE OTHER FEATURES VARYING.

20           ANOTHER IMPORTANT LINE UP HERE ON THE SLIDE IS THAT ALL

21     OTHER FEATURES ARE HELD CONSTANT, AND NATURALLY A SMARTPHONE

22     HAS MANY OTHER FEATURES.

23           SO WHEN I'M GIVING THE CHOICE TO THE CONSUMER, I'M TELLING

24     THEM, HERE ARE FOUR FEATURES.  ALL OF THESE OTHER FEATURES, THE

25     SIZE, THE OPERATING SYSTEM, ET CETERA, ET CETERA, ARE CONSTANT,

1    AND THEY'RE MAKING CHOICES AMONG THOSE.  THEY'RE JUST MAKING

2    CHOICES AMONG THE FEATURES THAT ARE VARYING, PLUS THE PRICE.

3         IT'S REALLY MEANT TO BE A VERY REALISTIC DESCRIPTION TO

4    THE CONSUMER.  IT'S SOMETHING THAT WE'VE BEEN USING FOR A LONG

5    TIME AND THEY FIND REALISTIC AND THEY FIND IT VERY COMFORTABLE

6    TO ACTUALLY MAKE CHOICES.

7    Q.   WHY DID YOU NOT WANT CONSUMERS TO FOCUS ONLY ON THE PATENT

8    RELATED FEATURES?

9    A.   WELL, IF THEY FOCUSSED ON THE PATENT RELATED FEATURES,

10   THEY MIGHT GIVE A WILLINGNESS TO PAY THAT WAS TOO HIGH.  AND I

11   DON'T KNOW THAT FOR SURE, BUT I WANT TO BE SURE THAT THEY'RE

12   GIVING WHAT THEIR REALISTIC DECISIONS -- REALISTIC DECISIONS

13   THAT THEY'RE MAKING SO I CAN INFER WILLINGNESS TO PAY RATHER

14   THAN ASK IT DIRECTLY.

15        THE COURT:  MS. KREVANS, IT'S 3:37.  CAN WE GO AHEAD

16   AND TAKE OUR BREAK NOW?

17        MS. KREVANS:  THIS IS A GOOD TIME FOR A BREAK, YES.

18        THE COURT:  OKAY.  IT'S 3:37.  LET'S TAKE A TEN

19   MINUTE BREAK.

20        AND TODAY WE WILL ONLY GO UNTIL 4:30, AND THEN WE'LL

21   RESUME TOMORROW MORNING AT 9:00 O'CLOCK.  OKAY?

22        SAME ADMONITIONS.  PLEASE KEEP AN OPEN MIND.  DON'T

23   RESEARCH OR DISCUSS THE CASE.

24        THANK YOU.

25        (RECESS FROM 3:38 P.M. UNTIL 3:46 P.M.)

```
 1              (JURY OUT AT 3:46 P.M.)

 2                   THE COURT:  WELCOME BACK, TAKE A SEAT.

 3              GO AHEAD AND TAKE A SEAT, PLEASE.

 4                   THE CLERK:  ARE WE GOOD?

 5                   THE COURT:  YEAH, I THINK WE'RE GOOD.

 6              (JURY IN AT 3:47 P.M.)

 7                   THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

 8              TIME IS NOW 3:47.  GO AHEAD, PLEASE.

 9    BY MS. KREVANS:

10    Q.   I THINK WHEN WE TOOK THE BREAK, DR. HAUSER, YOU HAD JUST

11    EXPLAINED WHY YOU DIDN'T WANT CONSUMERS TO FOCUS ONLY ON THE

12    PATENT RELATED FEATURES AND YOU INCLUDED, THEREFORE, OTHER

13    FEATURES OF SMARTPHONES.

14    A.   YES, I DID.

15    Q.   DO YOU RECALL THAT?

16    A.   YES.

17    Q.   OKAY.  DID YOU INCLUDE EACH AND EVERY POSSIBLE OTHER

18    FEATURE OF A SMARTPHONE IN YOUR SURVEY?

19    A.   NO.  THAT WOULD NOT BE FEASIBLE.

20    Q.   WHY NOT?

21    A.   WELL, IF I DID, IT WOULD BE A VERY DIFFICULT TO SURVEY TO

22    TAKE, AND IT'S IMPORTANT THERE THAT THE CONSUMERS DO KEEP ALL

23    THE OTHER FEATURES CONSTANT IN THEIR MIND.

24              AND THIS IS THE WAY THAT WE DO IT IN THE INDUSTRY.  IT'S A

25    VERY ACCEPTED FORM OF DOING A CONJOINT ANALYSIS.
```

1    Q.   HOW DID YOU DECIDE WHAT OTHER FEATURES TO INCLUDE?

2    A.   WELL, THERE WERE A NUMBER OF WAYS.  I FAMILIARIZED MYSELF

3    WITH THE CATEGORY, I LOOKED AT THE INTERNET, I WAS BRIEFED BY A

4    MARKET RESEARCH COMPANY ON SOME CONVERSATIONS THEY HAD WITH

5    CONSUMERS, ALSO KNOWN AS QUALITATIVE INTERVIEWS.

6         AND FROM THAT, I CHOSE DISTRACTION FEATURES THAT WOULD BE

7    REASONABLY IMPORTANT AND THAT WOULD SERVE THE PURPOSE OF

8    DISTRACTING CONSUMERS.  THEY DON'T HAVE TO BE THE MOST

9    IMPORTANT FEATURES, THEY JUST HAVE TO BE SUFFICIENTLY IMPORTANT

10   THAT THEY'RE GOING TO ACT AS DISTRACTING FEATURES.

11   Q.   WHO ACTUALLY CONDUCTED THE QUALITATIVE INTERVIEWS?

12   A.   THE QUALITATIVE INTERVIEWS WERE CONDUCTED BY A COMPANY

13   KNOWN AS APPLIED MARKETING SCIENCE.  IT'S A COMPANY THAT I

14   HELPED FOUND.  I'VE BEEN WORKING WITH THEM FOR ALMOST 25 YEARS

15   NOW.  THEY'RE A HIGHLY QUALITATIVE -- HIGHLY QUALIFIED

16   INTERVIEWERS.

17   Q.   OKAY.  LET'S TALK ABOUT A LITTLE BIT MORE DETAIL ABOUT THE

18   MECHANISMS OF THE SURVEY.

19        CAN WEE SEE PDX 103.9.

20        COULD YOU BRIEFLY EXPLAIN TO THE JURY, HOW WAS THE SURVEY

21   CARRIED OUT?

22   A.   THIS WAS AN INTERNET SURVEY.

23   Q.   IS THAN AN UNUSUAL WAY TO DO A CHOICE-BASED CONJOINT

24   ANALYSIS?

25   A.   NOT AT ALL.  FIRMS TEND TO USE INTERNET SURVEYS THESE

1      DAYS.  THEY TEND TO PROVIDE QUALITY INFORMATION, AND BUSINESSES

2      MAKE LARGE DECISIONS BASED UPON INTERNET SURVEYS, OR DATA FROM

3      INTERNET SURVEYS.

4      Q.   WHO WERE THE PEOPLE WHO PARTICIPATED IN THE SURVEY?

5      A.   THE PEOPLE WERE BASICALLY U.S. CONSUMERS WHO HAD PURCHASED

6      SAMSUNG TELEPHONES OR TABLETS IN THE PAST TWO YEARS.

7      Q.   AND HOW DID YOU FIND THESE PEOPLE?

8      A.   THESE PEOPLE WERE SELECTED FROM A LEADING GLOBAL COMPANY

9      CALLED RESEARCH NOW.  RESEARCH NOW MAINTAINS A PANEL OF

10     CONSUMERS FROM WHICH WE CAN SAMPLE.  IT'S A LARGE, RESPECTED

11     FIRM.  I'VE USED -- I'VE WORKED WITH THEM MANY TIMES.

12     Q.   NOW, YOU TALKED A LITTLE BIT ABOUT IN GENERAL ABOUT THE

13     SURVEY AND YOU SAID THERE WERE -- IT WAS A LOT MORE COMPLICATED

14     THAN THE SIMPLIFIED ONE AND THERE WERE FOUR SETS OF 16 -- FOUR

15     THINGS AND 16 QUESTIONS.  I'D LIKE TO MAKE THAT A LITTLE

16     CLEARER TO THE JURY.

17          CAN WE SEE PDX 103.10?

18          USING THIS SLIDE, CAN YOU EXPLAIN TO THE JURY HOW THIS

19     SURVEY WAS ACTUALLY DONE?

20     A.   YES.

21     Q.   WHAT DID THE PERSON TAKING THE SURVEY SEE AND WHAT DID

22     THEY DO?

23     A.   OKAY.  NOW, REMEMBER THAT BEFORE CONSUMERS GET TO THIS

24     SCREEN, THEY'VE SEEN DESCRIPTIONS OF THE SURVEY, OF THE

25     FEATURES.  THEY'VE ALSO SEEN ANIMATIONS FOR SOME OF THESE

```
 1          FEATURES.  AND AT ANY POINT THEY CAN SEE THOSE ANIMATIONS

 2          AGAIN.  THEY CAN RUN THE MOUSE OVER AND GET LONGER

 3          DESCRIPTIONS.

 4               SO WHAT WE'RE SEEING HERE IS ONE OF 16 CHOICES THAT

 5          CONSUMERS ARE ASKED TO MAKE, AND IF WE FOCUS IN ON ONE OF THE

 6          COLUMNS, THIS IS A DESCRIPTION OF A PARTICULAR SMARTPHONE.  IT

 7          HAS 32 GIGABYTES OF MEMORY, 3.5 INCHES, AND 4 OUNCES, AND YOU

 8          CAN READ THE OTHER ASPECTS.

 9               NOW, IF WE FOCUS IN ON A ROW, YOU CAN SEE THAT ACROSS THE

10          FOUR CHOICES, THIS STATES THE TOUCHSCREEN FEATURES VARY AMONG

11          THE FOUR PHONES.

12               SO IF WE CAN GET BACK UP TO THE OVERALL QUESTION, THE ONLY

13          THING THE CONSUMER IS ASKED TO DO IS TO CHOOSE ONE OF THE FOUR

14          PHONES.  AND THIS IS -- ONCE THEY'RE INTRODUCED AND THEY GET

15          FAMILIAR WITH THE ICONS, THEY CAN MAKE THESE CHOICES AND THESE

16          CHOICES WOULD REFLECT WHAT THEY WOULD WANT WITH RESPECT TO

17          THESE FEATURES.

18          Q.   AND FOR EACH PERSON WHO TOOK THE SURVEY, HOW MANY SETS OF

19          FOUR PROFILES DID THEY GET?

20          A.   EACH CONSUMER GETS 16 SETS OF FOUR PROFILES.

21          Q.   I THINK YOU SAID BEFORE ABOUT 400 PEOPLE, 400-PLUS PEOPLE

22          TOOK EACH OF THE SURVEYS?

23          A.   YEAH, OVER 400 PEOPLE TOOK EACH OF THE SURVEYS.

24          Q.   DID EACH OF THE 400 PEOPLE GET THE SAME SET OF 16

25          QUESTIONS WITH THE SAME SET OF PROFILES?
```

1    A.   NO.  THEY'RE RANDOM.  THEY'RE VARIED RANDOMLY ACROSS

2    CHOICE SETS AND ACROSS CONSUMERS.

3    Q.   SO IN THE END, HOW MANY DIFFERENT PROFILES WERE PRESENTED

4    TO THE 400-SOME PEOPLE WHO TOOK, FOR EXAMPLE, THE SMARTPHONE

5    SURVEY?

6    A.   OH, I THINK WHEN YOU START MULTIPLYING THESE NUMBERS

7    TOGETHER, IT'S LIKE 24,000.

8    Q.   AND THEN WHAT DID YOU DO WITH THIS HUGE AMOUNT OF DATA?

9    A.   WELL, IF YOU LOOK BACK TO THE DVR, WE DON'T NEED TO SEE

10   THE SLIDE, BUT IF YOU THINK BACK TO THE DVR EXAMPLE, EACH TIME

11   A CONSUMER ANSWERS ONE OF THESE QUESTIONS, THEY'RE GIVING ME A

12   LITTLE BIT OF INFORMATION ABOUT THEIR PREFERENCES.

13        SO I HAVE TO ANALYZE THESE PREFERENCES ACROSS ALL OF THESE

14   CHOICES, AND SO I'M GOING TO USE A SOFTWARE PROGRAM THAT PULLS

15   OUT WHAT THE WILLINGNESS TO PAY IS THAT'S GOING TO BEST

16   DESCRIBE THE CHOICES THEY'RE MAKING.

17   Q.   AND DID YOU WRITE THAT SOFTWARE YOURSELF?

18   A.   NO, I DIDN'T.  I USED THE INDUSTRY STANDARD SOFTWARE.

19   Q.   OKAY.  DR. HAUSER, WHY DID YOU GO THROUGH ALL THIS EFFORT

20   WITH THIS ELABORATE SURVEY AND ALL THIS DATA AND RUNNING IT

21   THROUGH SOFTWARE INSTEAD OF JUST ASKING EACH OF THESE PEOPLE,

22   HOW MUCH MORE WOULD YOU PAY FOR THIS FEATURE?

23   A.   WELL, MUCH AS WE SAW, IF I ONLY HAD ONE FEATURE HERE,

24   WHICH IS SOMEWHAT EQUIVALENT TO ASKING WILLINGNESS TO PAY

25   DIRECTLY, IT WOULD FOCUS PEOPLE ABNORMALLY ON THE PARTICULAR

```
 1        FEATURE, SO IT'S A HARD QUESTION TO ASK.

 2             AND IF I DID IT, IT MIGHT GIVE ME A WILLINGNESS TO PAY

 3        THAT'S TOO LARGE.

 4        Q.   "TOO LARGE" MEANING TOO HIGH A NUMBER?

 5        A.   WELL, HIGH -- I GUESS TOO WHAT WE MEAN IS IT WOULD BE

 6        LARGER THAN WHAT THEY REALLY FEEL.  THERE WOULD BE THE TRUE

 7        WILLINGNESS TO PAY AND THEN SOMETHING THAT I WOULD HAVE CAUSED

 8        BY THE WAY I ASKED THE QUESTIONS.

 9             SO IF I USE A CHOICE-BASED CONJOINT ANALYSIS, IT'S A MORE

10        NATURAL QUESTION AND WE GET A MORE REALISTIC, ACTUALLY A VERY

11        ACCURATE, NUMBER-WISE, ANSWER TO WHAT THEY WOULD BE WILLING TO

12        PAY FOR THE FEATURE BECAUSE THEY'RE JUST MAKING CHOICES.

13        Q.   BASED ON THE WORK THAT YOU CONDUCTED WITH THESE CONSUMERS

14        WHO BOUGHT SAMSUNG SMARTPHONES AND SAMSUNG TABLETS, DID YOU

15        COME TO ANY CONCLUSIONS ABOUT WHETHER OR NOT SAMSUNG SMARTPHONE

16        AND TABLET CONSUMERS WERE WILLING TO PAY A PRICE PREMIUM FOR

17        THE '915, '163, AND '381 PATENTED FEATURES?

18        A.   YES, I DID.

19        Q.   WHAT WAS THAT CONCLUSION?

20        A.   THAT CONCLUSION WAS THAT CONSUMERS WERE WILLING TO PAY A

21        SUBSTANTIAL PRICE PREMIUM FOR THE FEATURES ENABLED BY THE

22        PATENTS AT ISSUE IN THIS CASE.

23        Q.   COULD YOU LOOK AT PX 30 IN THE BINDER THAT'S IN FRONT OF

24        YOU, DR. HAUSER?  I HOPE YOU HAVE A BINDER.

25        A.   YES.
```

1    Q.   WHAT IS PX 30?

2    A.   PX 30 IS AN EXHIBIT I CREATED THAT DESCRIBES THE BASIC

3    RESULTS OF THE CHOICE-BASED CONJOINT ANALYSIS STUDY.

4         MS. KREVANS:  YOUR HONOR, WE MOVE PX 30 INTO

5    EVIDENCE.

6         THE COURT:  ANY OBJECTION?

7         MR. PRICE:  I BELIEVE IT'S A DEMONSTRATIVE, YOUR

8    HONOR.

9         MS. KREVANS:  IT IS NOT A DEMONSTRATIVE, YOUR HONOR.

10   IT IS THE SAME EXHIBIT THAT WAS PREVIOUSLY ADMITTED IN THE

11   FIRST TRIAL AT DOCKET NUMBER 1695, PAGE 1915, LINES 12 TO 25.

12        MR. PRICE:  IN THAT CASE, YOUR HONOR, NO OBJECTION.

13        THE COURT:  ALL RIGHT.  GO AHEAD.  IT'S ADMITTED.

14        (PLAINTIFF'S EXHIBIT 30 WAS ADMITTED IN EVIDENCE.)

15        MS. KREVANS:  OKAY.  COULD WE SHOW THAT TO THE JURY?

16   THANK YOU, MR. LEE.

17   Q.   COULD YOU BRIEFLY DESCRIBE THE RESULTS OF YOUR SURVEY TO

18   THE JURY?  I SHOULD SAY TWO SURVEYS.

19   A.   TWO SURVEYS, SO LET'S FOCUS ON THE SMARTPHONES SURVEY.

20        WHAT THIS SAYS IS THAT FOR SMARTPHONES WITH A BASE PRICE

21   OF $199, CONSUMERS WOULD BE WILLING TO PAY AN ADDITIONAL $39

22   FOR THE FEATURES ENABLED BY THE '915 PATENT.

23        AND FOR SMARTPHONES THAT ARE PRICED AT $199, THEY WOULD BE

24   WILLING TO PAY AN ADDITIONAL $100 FOR FEATURES ENABLED BY THE

25   '915, '163, AND '381 PATENTS.

1     Q.   AND WHAT WERE THE RESULTS WITH RESPECT TO THE SURVEY OF

2     CUSTOMERS WHO HAD BOUGHT TABLETS FROM SAMSUNG?

3     A.   OKAY.  USING A SIMILAR METHODOLOGY FOR TABLETS RATHER THAN

4     SMARTPHONES, CONSUMERS ARE WILLING TO PAY $45 FOR THE FEATURES

5     ENABLED BY THE '915 PATENT.  THAT'S FOR A TABLET PRICE AT 499.

6          THEY'D BE WILLING TO PAY AN INITIAL $90 FOR THE

7     COMBINATION OF THE '915, '163, AND '381 PATENTS, AND AGAIN FOR

8     THE TABLET PRICE AT 499.

9     Q.   AND WHAT DO THE RESULTS OF THE SURVEY SHOW REGARDING THE

10    DEMAND FOR THE FEATURES?

11    A.   THIS SURVEY REFLECTS THAT THERE'S A SUBSTANTIAL DEMAND FOR

12    THE FEATURES ENABLED BY THE PATENTS IN THIS CASE.

13               MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

14               THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:57.

15               MR. PRICE:  IF WE COULD HAND OUT THE USUAL BINDERS?

16               THE COURT:  PLEASE, GO AHEAD.

17          (PAUSE IN PROCEEDINGS.)

18               MR. PRICE:  YOUR HONOR.

19               THE COURT:  YOU READY?

20               MR. PRICE:  I AM, YOUR HONOR.

21               THE COURT:  OKAY.  TIME IS 3:58.  GO AHEAD, PLEASE.

22                         **CROSS-EXAMINATION**

23    BY MR. PRICE:

24    Q.   GOOD AFTERNOON, DR. HAUSER.  I WANT TO ASK YOU ABOUT THE

25    FIRST PART, YOU SAID, OF THE STUDY.

1          YOU SAID THAT THERE WERE THESE PRE-INTERVIEWS WITH PEOPLE

2     THAT WERE CONDUCTED BY A COMPANY IN WHICH YOU HAVE THE GREATEST

3     CONFIDENCE; CORRECT?

4     A.   WELL, THIS ISN'T PART OF THE STUDY.  THIS WAS ACTUALLY TO

5     HELP ME DESIGN THE QUESTIONNAIRE.

6     Q.   OKAY.  BUT YOU MENTIONED TO THE JURY, I THINK, THAT THERE

7     WERE INTERVIEWS PRIOR TO THE STUDY THAT YOU JUST TALKED ABOUT

8     THAT WERE CONDUCTED BY THIS COMPANY IN WHICH YOU, I THINK YOU

9     HAVE AN OWNERSHIP INTEREST IN, AND YOU HAVE CONFIDENCE IN THOSE

10    FOLKS?

11    A.   I HAVE A -- I HAVE A VERY SMALL SET OF STOCK IN THE

12    COMPANY.

13         BUT I -- AGAIN, THESE WERE JUST CONVERSATIONS WITH

14    CONSUMERS TO SORT OF HELP ME UNDERSTAND THE CATEGORY AND -- YOU

15    KNOW, WHEN YOU WRITE A QUESTIONNAIRE, YOU WANT THE

16    QUESTIONNAIRE TO BE WRITTEN IN THE LANGUAGE OF THE CONSUMERS,

17    SO THINK OF THESE CONVERSATIONS AS DEEP BACKGROUND THAT'S JUST

18    GOING TO HELP ME BRING A QUESTIONNAIRE.

19         SO IT'S NOT A STUDY, PER SE.  IT'S WHAT I'M DOING TO HELP

20    ME DESIGN THE STUDY.

21    Q.   OKAY.  AND I'M ON THE CLOCK, SO I GUESS MY QUESTION IS

22    THIS:  WERE THERE PRE-INTERVIEWS WITH ABOUT 20 SUBJECTS?  YES

23    OR NO?

24    A.   WE HAD -- AT MY DIRECTION, THERE WERE 20, I WOULD SAY,

25    CONVERSATIONS WITH CONSUMERS TO HELP ME ESSENTIALLY UNDERSTAND

1        THE WAY THEY DESCRIBE SMARTPHONES AND FEATURES.

2        Q.   SO THE ANSWER TO THAT WAS YES?

3        A.   OH, YES.  YES.

4        Q.   OKAY, GOOD.  IF YOU COULD DO THAT, THAT MIGHT -- I WON'T

5        BURN UP SO MUCH TIME.

6             AND YOU -- I THINK YOU SAID YOU HAD GREAT CONFIDENCE IN

7        THE PEOPLE WHO WERE CONDUCTING THESE INTERVIEWS.  CORRECT?

8        A.   YES, I DO.

9        Q.   AND YOU'VE DESCRIBED THESE INTERVIEWS AS BEING IN-DEPTH;

10       IS THAT RIGHT?

11       A.   WELL, IN-DEPTH IN THE SENSE THAT THEY'RE LONG

12       CONVERSATIONS, YES.  THEY CAN BE AS LONG AS A HALF HOUR.

13       Q.   AND BY -- YOU SAID THE CONVERSATIONS FOR THESE 20 PEOPLE

14       WITH THESE INTERVIEWERS COULD BE BETWEEN 45 MINUTES AND AN HOUR

15       IN LENGTH?

16       A.   A FEW MIGHT BE THAT LONG IF THE CONSUMER LIKES TO TALK

17       ABOUT SMARTPHONES, SURE.

18       Q.   AND YOU'RE CONFIDENT THAT THE INTERVIEWERS PROBED DEEPLY

19       TO UNCOVER THE CONSUMER'S NEEDS; IS THAT RIGHT?

20       A.   YES.  THESE ARE CONVERSATIONS.  I'M REALLY TRYING TO

21       UNDERSTAND HOW THEY DESCRIBE IT, THE WORDS THEY USE, THAT'S

22       CORRECT.

23       Q.   AND THESE CONVERSATIONS WERE WITH CONSUMERS, THEY WERE

24       OPEN-ENDED QUESTIONS SEEKING THEIR OPINIONS ABOUT SAMSUNG

25       SMARTPHONES AND TABLETS AND DETAILS OF THEIR EXPERIENCES WITH

1    THOSE DEVICES; CORRECT?

2    A.   YES, THEIR EXPERIENTIAL INTERVIEWS.  WHAT WE'RE TRYING TO

3    DO IS UNDERSTAND THE EXPERIENCE OF CONSUMERS.

4    Q.   SO THE ANSWER TO THAT QUESTION WAS YES; CORRECT?

5    A.   THEY WERE EXPERIENTIAL INTERVIEWS, YES.

6    Q.   YOU ACTUALLY WROTE IN YOUR REPORT "CONVERSATIONS WITH

7    CONSUMERS WERE OPEN-ENDED SEEKING CONSUMER'S OPINIONS ABOUT

8    SAMSUNG SMARTPHONES AND TABLETS AND DETAILS OF THEIR

9    EXPERIENCES WITH THEIR DEVICES."  CORRECT?

10   A.   YES.  THAT DESCRIBES THE INTERVIEWS, SURE.

11   Q.   AND IT WOULD NOT HAVE BEEN ATYPICAL TO ASK -- IN THESE

12   IN-DEPTH INTERVIEWS WITH THESE EXPERIENCED INTERVIEWERS, IT

13   WOULD NOT HAVE BEEN ATYPICAL TO ASK, HOW DID YOU DECIDE ON HOW

14   YOU PURCHASED YOUR SAMSUNG PHONE?  THAT WOULD BE A TYPICAL

15   QUESTION; RIGHT?

16   A.   NOT REALLY.  THEY WERE DESCRIBING HOW THEY USE THE PHONE,

17   WHAT THEY GET FROM IT.  WE WERE REALLY -- YOU KNOW, IT MIGHT

18   COME UP, BUT THAT'S NOT REALLY THE FOCUS, NO.

19   Q.   PARDON?

20   A.   THAT'S REALLY NOT THE FOCUS.

21   Q.   WOULD YOU AGREE THAT QUESTIONS SUCH AS, HOW DID YOU DECIDE

22   ON PURCHASING THIS?  WHAT FEATURES ARE IMPORTANT TO YOU?

23   AREN'T THOSE THE TYPE OF QUESTIONS THAT WOULD HAVE BEEN ASKED

24   BY THESE EXPERIENCED INTERVIEWERS TO THESE 20 PEOPLE WHO HAD

25   PURCHASED SAMSUNG PHONES?

1     A.   THESE 20 PEOPLE WERE ASKED A WHOLE SERIES OF QUESTIONS.

2     IT'S BACK AND FORTH.

3          THEY'RE NOT REALLY ASKED QUESTIONS.  IT'S MORE OF A

4     CONVERSATION.

5               MR. PRICE:  YOUR HONOR, IF I COULD READ FROM MR. --

6     I'M SORRY -- DR. HAUSER'S DEPOSITION.  THIS IS PAGE 42,

7     QUESTION 24 -- I'M SORRY.  PAGE 42, LINE 24 THROUGH 43, LINE

8     10.

9               MS. KREVANS:  YOUR HONOR, MAY I ASK THAT THE WITNESS

10    BE PROVIDED WITH A COPY OF HIS DEPOSITION?

11    BY MR. PRICE:

12    Q.   DO YOU HAVE A COPY IN FRONT OF YOU, SIR?

13    A.   IF YOU'D TELL ME WHICH NUMBER THEY ARE.

14    Q.   YOU DO, AND IT'S IN THE BINDER.  IT'S IN YOUR BINDER.  AND

15    THIS IS FROM APRIL 27TH, 2012.

16    A.   SURE.  IF YOU CAN PLEASE TELL ME THE PAGE AND --

17    Q.   42, LINE 24 TO 43, LINE 10.

18         AND IF I MAY READ IT?

19    A.   HOLD ON A SECOND.  42?

20    Q.   YES.  AND I'M REQUESTING HER HONOR, NOT YOU.  NO OFFENSE.

21    I'M ASKING JUDGE KOH IF I CAN READ THIS.

22              THE COURT:  OH, GO AHEAD, PLEASE.  BUT LET'S LET HIM

23    FIND IT.

24              MR. PRICE:  SURE.

25              THE WITNESS:  OKAY.  SO WHAT LINE AGAIN?

```
 1        BY MR. PRICE:

 2        Q.   42, LINE 24 TO 43, LINE 10.

 3               THE COURT:  GO AHEAD, PLEASE.

 4               MR. PRICE:  "QUESTION:  SO AM I CORRECT TO -- WHEN I

 5        SAY THAT THE FOCUS OF THESE IN-DEPTH INTERVIEWS WAS ON HOW THE

 6        OWNERS" USED -- "USED THE DEVICES?

 7               "ANSWER:  WELL, IT'S -- IT'S THEIR EXPERIENCE WITH THE

 8        DEVICES, YES.  CERTAINLY THAT IT'S NOT ATYPICAL AT SOME POINT,

 9        'HOW DID YOU DECIDE ON PURCHASING THIS?  WHAT FEATURES ARE

10        IMPORTANT TO YOU?'  YOU KNOW, 'HOW DID YOU REACT TO THE PRICE?

11        WAS IT TOO HIGH, TOO LOW?'  BECAUSE WE ULTIMATELY WANT TO ASK

12        PRICE QUESTIONS AS WELL.

13               "SO THEY -- THE INTERVIEWERS WORKING AT MY DIRECTION ARE

14        REALLY JUST PROBING CONSUMERS ON A VARIETY OF ISSUES."

15               NOW, IN THESE INTERVIEWS, I THINK YOU SAID THAT HUNDREDS

16        OF THINGS WOULD COME UP.  CORRECT?

17        A.   YES.  THESE ARE OPEN-ENDED -- AND THIS TRANSCRIPT, THE

18        QUESTION RIGHT BEFORE IT DOES SAY CONVERSATION.  YES, THEY'RE

19        CONVERSATIONS AS WITH A NORMAL CONVERSATION WITH ANYBODY.

20        Q.   SO YOU UNDERSTAND THAT ONE OF THE IMPORTANT ISSUES IN THIS

21        CASE IS WHY A SAMSUNG CONSUMER WOULD BUY THEIR PHONE; CORRECT?

22        A.   WELL, YES.  I MEAN, WOULD THE FEATURES AT ISSUE IN THIS

23        CASE AFFECT THEIR PURCHASING?  THAT'S WHAT I UNDERSTAND TO

24        BE --

25        Q.   NO.  WE'RE ACTUALLY TALKING ABOUT PEOPLE WHO BOUGHT, IN
```

1      THE REAL MARKETPLACE, THEY'RE PEOPLE WHO BOUGHT SAMSUNG PHONES.

2      YOU UNDERSTAND THAT?

3      A.   YES, AND I SAMPLED PEOPLE WHO BOUGHT SAMSUNG PHONES,

4      YOU'RE CORRECT.

5      Q.   AND WHAT WE'RE LOOKING AT OR TRYING TO FIND OUT FOR THOSE

6      PEOPLE WHO BOUGHT THE PHONES IN THE REAL MARKETPLACE, WHY DID

7      THEY BUY THE SAMSUNG PHONES; CORRECT?

8      A.   THAT'S PART OF WHAT I'M -- WELL, WHAT I AM ASKED TO DO IS

9      DO THE FEATURE AS EFFECT PURCHASING, YES.

10     Q.   THAT WASN'T MY QUESTION.  I'M ASKING YOU -- YOU UNDERSTAND

11     THAT AN IMPORTANT ISSUE IN THIS CASE IS WHY THE PEOPLE WHO

12     ACTUALLY BOUGHT THEIR SAMSUNG PHONES BOUGHT THEM; CORRECT?  YOU

13     UNDERSTAND THAT'S A QUESTION?

14     A.   THAT'S PART OF AN ISSUE, YES.

15     Q.   OKAY.  AND YOU HAD THESE 20 PEOPLE, YOU HAD THESE IN-DEPTH

16     INTERVIEWS, THEY HAD ALL BOUGHT SAMSUNG PHONES.  DID YOU ASK

17     THEM, WHY DID YOU BUY THESE PHONES?  WHY NOT PICK AN APPLE?

18     A.   DID I ASK THOSE?

19     Q.   YOU OR THE PEOPLE WORKING FOR YOU?

20     A.   THE PEOPLE --

21     Q.   IN DOING THESE INTERVIEWS, WAS THAT --

22     A.   THE PEOPLE WORKING FOR ME -- AGAIN, THIS IS AN ONGOING

23     CONVERSATION.  THEY'RE ASKING LOTS OF QUESTIONS.  THEY MAY HAVE

24     ASKED THOSE QUESTIONS.  THEY HELPED ME DESIGN THE SURVEY.

25     Q.   OKAY.  SO DO YOU KNOW WHETHER OR NOT, WHEN YOU GOT THESE

1       20 SAMSUNG PHONE OWNERS AND WERE ABLE TO ASK THEM QUESTIONS IN

2       AN IN-DEPTH INTERVIEW LASTING UP TO AN HOUR, DO YOU KNOW

3       WHETHER ANY OF THEM WERE ACTUALLY ASKED, WHY DID YOU BUY YOUR

4       PHONE?

5       A.   THEY MIGHT HAVE BEEN ASKED THAT.  20 IS A SMALL SAMPLE FOR

6       THOSE PURPOSES.

7            IT'S A LARGE SAMPLE IF I JUST WANT TO UNDERSTAND THE

8       CONVERSATIONS AND HOW THEY DESCRIBE PHONES.

9       Q.   OKAY.  SO 20 WOULD BE TOO SMALL TO, YOU SAY, MAKE ANY

10      SCIENTIFIC CONCLUSION FROM THESE SORTS OF QUESTIONS?  IS THAT

11      WHAT YOU'RE SAYING?

12      A.   NO.  20 -- 20 IS ENOUGH IF MY WHOLE PURPOSE IS TO

13      UNDERSTAND WORDS AND PHRASES TO DESIGN A SURVEY.

14      Q.   DID YOU ASK THE PEOPLE WORKING FOR YOU NOT TO ASK THAT

15      QUESTION?

16      A.   NO.

17      Q.   DON'T ASK THEM WHY THEY BOUGHT THEIR PHONES?

18      A.   NO, NO.  IF IT CAME UP IN THE CONVERSATION, SURE, THEY

19      WOULD PROBE.  IF IT'S GOING TO HELP THEM UNDERSTAND THE WAY

20      CONSUMERS DESCRIBE PHONES, THEY'D PROBE.  THAT'S WHAT THEY'RE

21      TRYING TO DO.

22      Q.   OKAY.

23      A.   THEY'RE TRYING TO HELP ME WRITE A QUESTIONNAIRE.

24      Q.   WELL, ONE OF THE THINGS, OF COURSE, THAT YOU WOULD DO AS A

25      PROFESSIONAL, A SCIENTIST OF SORTS, IS YOU WANT TO MAKE SURE

1   THAT YOU HAVE A RECORD OF WHAT HAPPENED; RIGHT?

2   A.   I HAVE A COMPLETE RECORD OF THE SURVEY I HAD.

3        BUT I -- I WAS JUST BRIEFED ORALLY ABOUT THESE

4   CONVERSATIONS BECAUSE THE ONLY PURPOSE WAS TO UNDERSTAND THE

5   WORDS AND PHRASES.

6   Q.   OKAY.  SO LET ME UNDERSTAND THIS.  THE IN-DEPTH INTERVIEWS

7   OF THESE 20 SAMSUNG PHONE OWNERS WHERE YOU WERE ASKING THEM

8   OPEN-ENDED QUESTIONS, LIKE WHY DID YOU BUY YOUR PHONE OR HOW

9   DID YOU REACT TO SOMETHING, THERE'S NOT A SINGLE NOTE THAT

10  SHOWS US WHAT TOOK PLACE IN THOSE CONVERSATIONS?  IS THAT

11  RIGHT?

12  A.   OF COURSE NOT.  THIS IS STANDARD PRACTICE.  ANY TIME I TRY

13  AND DESIGN A SURVEY, I REALLY WANT TO UNDERSTAND THE WAY

14  CONSUMERS, THE LANGUAGE THEY'RE USING, AND ONCE I HAVE THAT

15  LANGUAGE, THEN I'M GOING TO WRITE A SURVEY.

16       AND THEN, AS YOU POINTED OUT, WE PRE-TESTED IT AND BRIEFED

17  ON THOSE, AND THEN WE HAVE THE FINAL SURVEY, AND IT'S THE FINAL

18  SURVEY THAT I'M GOING TO BE USING TO MAKE DECISIONS ON IT.

19       BUT, NO, IT'S STANDARD PRACTICE TO HAVE ORAL INTERVIEWS.

20  THEY'RE JUST ORAL.

21  Q.   SO --

22  A.   I'M SORRY, ORAL DESCRIPTIONS FROM THE --

23  Q.   OKAY.  SO WE HAVE NOTHING THAT WE CAN SHOW THE JURY AS TO

24  WHAT THESE ACTUAL SAMSUNG PHONE OWNERS SAID IN THESE IN-DEPTH

25  INTERVIEWS IF THEY WERE ASKED, AS WOULD BE NOT ATYPICAL, WHY

1      DID YOU BUY THE PHONE AND USE IT?  THERE'S NOTHING THAT WE CAN

2      LOOK AT TO SEE WHAT THOSE ANSWERS WERE?  IS THAT CORRECT?

3      A.   OH, OF COURSE.  THEY'RE ORAL INTERVIEWS, STANDARD

4      PROCEDURE.  I'M TRYING TO GET WORDS AND PHRASES.

5      Q.   WELL, SOMETIMES DURING ORAL INTERVIEWS YOU TAKE NOTES,

6      RIGHT, LIKE THEY SAID THIS?  RIGHT?

7      A.   IF I WAS DOING A STUDY AND I WANTED TO PROJECT FROM THAT

8      STUDY, CERTAINLY I WOULD TAKE NOTES.

9          IF I'M TRYING TO GET THE WORDS AND PHRASES, I WANT MY

10     INTERVIEWER TO MAINTAIN RAPPORT WITH THESE CONSUMERS.  I WANT

11     THEM TO LISTEN.  IN SOME SENSE I WANT MY INTERVIEWERS, YOU

12     KNOW, TO BE ABLE TO SPEAK THE LANGUAGE BECAUSE THESE

13     INTERVIEWERS ARE GOING TO HELP ME WRITE THE QUESTIONNAIRE AND

14     SPEAKING THE LANGUAGE.

15         SO, NO, YOU KNOW, THEY MAY HAVE ASKED THOSE QUESTIONS, BUT

16     TO HELP UNDERSTAND THE LANGUAGE.

17     Q.   ALMOST ALL OF THESE INTERVIEWS WERE OVER THE PHONE;

18     CORRECT?  IS THAT RIGHT?

19     A.   YES, ALMOST ALL OF THEM WERE OVER THE PHONE.

20     Q.   OKAY.  SO IN TERMS OF KEEPING RAPPORT, THESE PROFESSIONAL

21     INTERVIEWERS, WHILE TALKING OVER THE PHONE, YOU THOUGHT IT

22     WOULD HAVE BEEN A DISTRACTION FOR THEM TO ACTUALLY TAKE DOWN

23     NOTES OF WHAT THESE SAMSUNG CUSTOMERS WERE SAYING WITH RESPECT

24     TO ISSUES SUCH AS WHY DID YOU BUY YOUR PHONE?

25     A.   I WANTED THEM TO LISTEN CAREFULLY.

1   Q.   AND ALTHOUGH YOU HAVE CONFIDENCE IN THEM AND THESE PEOPLE

2   ARE PROFESSIONALS, YOU DON'T THINK THEY COULD LISTEN CAREFULLY

3   IF THEY TOOK DOWN NOTES OF THE IMPORTANT THINGS THAT THE

4   CONSUMERS WERE SAYING ABOUT WHY THEY BOUGHT PHONES?

5   A.   YOU'RE ABSOLUTELY RIGHT.   THESE ARE STANDARD

6   PROFESSIONALS -- NOT STANDARD PROFESSIONALS.   THESE ARE

7   PROFESSIONALS AND THEY'VE BEEN TRAINED TO TRY AND UNDERSTAND

8   WHAT'S GOING ON.

9        AND IF YOU'VE EVER DONE A QUALITATIVE INTERVIEW, AND I'VE

10  DONE THEM, IT'S ACTUALLY HARD.   IT'S HARDER THAN YOU WOULD

11  THINK BECAUSE YOU'VE GOT TO LISTEN VERY CAREFULLY.   YOU'VE GOT

12  TO GO BACK AND FORTH.

13       AND, YOU KNOW, IT'S -- IT'S LIKE LEARNING A LANGUAGE, LIKE

14  LEARNING A FOREIGN LANGUAGE.   AND THAT'S WHAT I WANT THEM TO

15  DO.   I WANT THEM TO IMMERSE THEMSELVES.

16  Q.   WELL, LET ME ASK YOU THEN, SIR, ABOUT THE SURVEY THAT YOU

17  DID AFTER THESE IN-DEPTH INTERVIEWS.

18       AND IF I HEARD YOU CORRECTLY, IN FACT, IF I READ YOUR

19  REPORT CORRECTLY, YOU HAD ABOUT 870 SAMSUNG CUSTOMERS; CORRECT?

20  455 FOR THE PHONE SURVEY AND 415 --

21  A.   THAT'S RIGHT.   TWO SURVEYS.

22  Q.   -- FOR THE TABLETS?

23  A.   YOU'RE CORRECT.

24  Q.   SO YOU HAD ABOUT 870, AND THESE WERE ALL CUSTOMERS WHO HAD

25  ACTUALLY PURCHASED PHONES THAT ARE ACCUSED IN THE CASE, THAT

1    IS, PEOPLE WHO WOULD HAVE HAD, YOU KNOW, THE FEATURES THAT ARE

2    ACCUSED IN THIS CASE ON THEIR PHONES; CORRECT?

3    A.   YES, THAT'S CORRECT.

4    Q.   AND AS A MARKETING EXPERT, IS IT YOUR VIEW THAT MOST

5    CONSUMERS, YOU KNOW, MIGHT TAKE MORE THAN 25 MINUTES IN

6    DECIDING WHICH PHONE THEY'RE GOING TO BUY?

7    A.   YES.  THEY MIGHT, SURE.

8    Q.   AND CERTAINLY IN YOUR STUDY THAT YOU DID, THE PERSON

9    FILLING OUT THESE FORMS ON THE INTERNET, YOU TOLD THEM IT

10   SHOULD TAKE BETWEEN 20 AND 25 MINUTES?

11   A.   YES, THAT'S CORRECT.

12   Q.   OKAY.  AND IN REAL LIFE, YOU KNOW, LIKE WITH THESE 870

13   PEOPLE WHO BOUGHT PHONES OR THE TABLET, IN REAL LIFE YOU WOULD

14   EXPECT A CONSUMER TO SPEND MORE TIME IN CHOOSING WHICH PHONE

15   THEY'RE GOING TO BUY?

16   A.   I -- I THINK WHAT YOU'RE INDICATING IS WHY DIDN'T I

17   HAVE -- WHY DID I LIMIT MYSELF TO SEVEN FEATURES.

18   Q.   NO, THAT'S NOT -- THAT WASN'T MY QUESTION.

19   A.   OH, OKAY.

20   Q.   THAT'S NOT WHERE I'M GOING THERE.  MY QUESTION IS, YOU

21   WOULD EXPECT PEOPLE IN REAL LIFE, CHOOSING BETWEEN PHONES AND

22   LOOKING AT ALL THE FEATURES, TO TAKE MORE THAN 25 MINUTES?

23   A.   THEY MIGHT, YES.

24   Q.   YOU'RE AN EXPERT IN MARKETING.  YOU WOULD EXPECT THEM TO

25   ON AVERAGE; RIGHT?

1    A.   IT'S QUITE POSSIBLE, SURE.  I'M QUITE HAPPY TO AGREE WITH

2    THAT.

3         BUT I HAVEN'T DONE THE STUDY, SO I'M BEING A LITTLE BIT

4    CAREFUL.

5    Q.   SO IN THESE 870 CUSTOMERS THAT YOU HAD, SAMSUNG CUSTOMERS

6    WHO BOUGHT PHONES AND TABLETS THAT ACTUALLY HAD THESE ACCUSED

7    FEATURES IN THEM, DID YOU ASK THEM HOW MANY OF THEM WERE EVEN

8    AWARE WHEN THEY BOUGHT THEIR PHONE THAT THESE FEATURES WERE IN

9    THEM?

10   A.   NO.  I DIDN'T NEED TO.  SORRY.  I DIDN'T NEED TO.

11   Q.   WELL, AN ANSWER TO THAT MIGHT GIVE YOU AN IDEA OF WHETHER

12   OR NOT THESE SAMSUNG CUSTOMERS WERE EVEN AWARE THAT THESE

13   PHONES HAD THEIR FEATURES WHEN THEY BOUGHT THEM.  WOULDN'T THAT

14   GIVE YOU AN ANSWER TO THAT, 870 PEOPLE ANSWERING?

15   A.   WELL, I HAVE ANOTHER WAY TO DETERMINE THAT FROM WITHIN THE

16   CONJOINT ANALYSIS SURVEY.

17   Q.   SO YOU DON'T THINK IT WOULD HAVE BEEN USEFUL TO ASK THESE

18   870 PEOPLE WHO ACTUALLY HAD SAMSUNG PRODUCTS WITH THE ACCUSED

19   FEATURES, YOU KNOW, WHETHER OR NOT, WERE YOU AWARE THAT THOSE

20   FEATURES WERE IN THE PHONE AT THE TIME YOU PURCHASED THEM?

21   A.   IF THEY THOUGHT THOSE FEATURES WERE -- IF THEY WEREN'T

22   AWARE OF THEM, YOU KNOW, IN ANSWERING THESE QUESTIONS, THEY

23   WOULDN'T BE WILLING TO PAY ANYTHING FOR THEM.  SO -- AND MY

24   SURVEY IS GOING TO -- IF PEOPLE WEREN'T WILLING TO PAY ANYTHING

25   FOR THESE PARTICULAR FEATURES, THEY'RE GOING TO IGNORE THOSE

 1        FEATURES WHEN THEY ANSWER THE QUESTIONS.

 2             SO I'M KIND OF BACKING SOME OF THAT OUT AND, YEAH, THEY'RE

 3        GOING TO BE -- AS IS THE CASE IN SURVEYS, SOME PEOPLE REALLY

 4        CARED A LOT ABOUT THESE FEATURES, SOME PEOPLE CARED A LITTLE

 5        BIT ABOUT THE FEATURES.

 6             SO WHEN I BUILD A MARKET, MY MARKET SAYS THAT BASICALLY IF

 7        I WERE TO RAISE THE PRICE -- WELL, IT'S A LITTLE BIT -- WE

 8        HAVEN'T QUITE GOTTEN INTO THE ACTUAL TECHNOLOGY, BUT IT'S

 9        BASICALLY IF THE METHODOLOGY RAISED THE PRICE, SAY, $39, THEN

10        SAMSUNG WOULD HAVE BEEN ABLE TO MAINTAIN ESSENTIALLY ITS MARKET

11        SHARE.

12             IT'S A LITTLE BIT MORE COMPLICATED THAN THAT, BUT THAT'S

13        SORT OF A LAY DESCRIPTION OF IT, WHAT WE GOT.

14        Q.   BY THE WAY, IN YOUR REPORT -- AND YOUR REPORT WAS PREPARED

15        FOR THIS CASE; CORRECT?

16        A.   OKAY, SURE.

17        Q.   AND YOU KNEW THAT IT WAS AN IMPORTANT DOCUMENT; RIGHT?

18        A.   YES, CORRECT.

19        Q.   AND YOU KNEW YOU HAD TO LET US KNOW YOUR OPINIONS IN

20        ADVANCE; RIGHT?

21        A.   YES, THAT'S CORRECT.

22        Q.   AND THERE'S NOTHING IN YOUR REPORT, NO OPINION WHATSOEVER

23        REGARDING SAMSUNG'S MARKET SHARE; CORRECT?

24        A.   THAT'S NOT QUITE RIGHT.

25        Q.   YOU HAVE AN OPINION IN YOUR REPORT SOMETHING ABOUT HOW

```
 1        THIS AFFECTS SAMSUNG'S MARKET SHARE?

 2        A.   WELL, LET'S TALK ABOUT --

 3        Q.   I'M ASKING YOU A LIMITED QUESTION BECAUSE I'M TRYING TO

 4        LIMIT YOU TO YOUR REPORT.

 5             IN YOUR REPORT, DO YOU SAY ANYTHING ABOUT HOW ANY OF THIS

 6        AFFECTS, WOULD AFFECT SAMSUNG'S MARKET SHARE?  YES OR NO?

 7        A.   IT'S A COMPLICATED QUESTION.

 8        Q.   NO, IT'S A PRETTY SIMPLE ONE --

 9        A.   NO, IT'S NOT.

10        Q.   -- BECAUSE I'M ASKING WHAT YOU WROTE.

11        A.   WELL, WHAT WE DID IN THE SIMULATION IS WE CHANGED THE

12        PRICE SO THAT WE HAD ONE TELEPHONE WITH THE FEATURES, ONE

13        TELEPHONE WITHOUT THE FEATURES.

14        Q.   MY QUESTION WAS --

15        A.   AND WE HAD A PRICE.

16        Q.   -- IN YOUR REPORT -- MY QUESTION WAS, IN YOUR REPORT, DID

17        GIVE ANY OPINION ABOUT HOW ANYTHING YOU FOUND WOULD AFFECT

18        SAMSUNG'S MARKET SHARE?  AND IF YOU DID, SHOW IT TO ME.

19        A.   WELL, I JUST TESTIFIED THAT IT'S GOING TO AFFECT DEMAND

20        AND DEMAND IS PART OF WHAT GOES INTO MARKET SHARE.

21             BUT THE WORDS "MARKET SHARE" APPEAR IN MY REPORT WHEN WE

22        DESCRIBE EQUILIBRATING, MAKING THEM EQUAL, THE MARKET SHARE.

23        SORRY I WASN'T CLEAR.

24        Q.   AND THAT'S IT?  YOU JUST TOLD ME WHAT YOUR REPORT SAID

25        ABOUT MARKET SHARE; RIGHT?
```

```
 1     A.    YES.   IT'S TRYING TO EQUILIBRATE IT.

 2     Q.    OKAY.   AND SO NOW MY QUESTION IS, DID YOU ASK THE 870

 3     PEOPLE IN FRONT OF YOU WHO BOUGHT THESE PHONES, DID YOU ASK

 4     THEM WHETHER OR NOT THEY BOUGHT THESE PHONES IN PART BECAUSE

 5     THE THREE ACCUSED FEATURES HERE WERE IN THE PHONES, EITHER ONE

 6     OR TWO OR THREE OF THEM?   DID YOU ASK THESE PEOPLE, DID THAT

 7     AFFECT YOUR PURCHASING DECISION?

 8     A.    WELL, AS YOU'VE INDICATED, THOSE ARE ADDITIONAL QUESTIONS

 9     THAT I COULD HAVE PUT IN.

10          THE QUESTIONS THAT I DID PUT IN WHERE I HAD PEOPLE MAKE

11     CHOICES AMONG THE PHONES WITH RESPECT TO THE FEATURES VARYING,

12     AND WHEN THESE FEATURES ARE NOT THERE, THEY'RE WILLING TO PAY

13     LESS OF A PRICE AMONG THE CHOICES THEY'RE MAKING.

14          BUT THOSE PARTICULAR QUESTIONS YOU ASKED, THAT'S ANOTHER

15     SURVEY.   THAT'S NOT A SURVEY I DID.

16     Q.    WELL, CERTAINLY IT WOULD HAVE GIVEN YOU ADDITIONAL

17     INFORMATION OF HAVING THESE 870 PEOPLE WHO WERE THERE THAT

18     BOUGHT PHONES THAT HAD THE ACCUSED FEATURES IN THEM, IF YOU

19     ASKED THEM, DID YOU KNOW THE FEATURES WERE THERE, DID YOU BUY

20     THE PHONES BECAUSE OF THIS, THAT WOULD HAVE BEEN A BIG HELP IN

21     DIRECTLY ANSWERING THE QUESTION THAT THE JURY IS GOING TO

22     DECIDE?   YOU WOULD AGREE WITH THAT?

23     A.    WELL, I HOPE, AND ONLY THE JURY CAN DECIDE WHETHER MY

24     STUDY IS ACTUALLY HELPFUL OR NOT.   IT DOES TELL WILLINGNESS TO

25     PAY.   IT VALUES THE FEATURES.
```

1    Q.   THE QUESTION IS --

2    A.   THERE'S NOT ADDITIONAL QUESTIONS IN THERE.

3    Q.   IT WASN'T ABOUT WHAT YOU TOLD THEM.  I'M SAYING, WOULD IT

4    HAVE HELPED THEM IF YOU HAD ASKED THAT?  WOULDN'T IT HAVE BEEN

5    USEFUL TO THE JURY IF YOU HAD 870 PEOPLE ANSWERING THE

6    QUESTION, DID YOU EVEN KNOW THESE FEATURES WERE IN THERE AND

7    DID YOU BUY THE PHONE BECAUSE OF IT THAT?  WOULDN'T THAT HAVE

8    GIVEN YOU ADDITIONAL INFORMATION THAT WOULD HAVE BEEN VERY,

9    VERY USEFUL?

10   A.   YOU'RE ABSOLUTELY RIGHT.  THERE'S OTHER SURVEYS ONE CAN

11   DO.  I COULD HAVE ASKED THOSE ADDITIONAL QUESTIONS.

12        BUT, REMEMBER, SOME PEOPLE HAVE -- WILL INDICATE, IF THEY

13   DON'T VALUE THE FEATURES, THEY'LL PUT NO IMPORTANCE ON THE

14   FEATURES IN MAKING THE CHOICE.

15        SO MAYBE, YOU KNOW, IT'S ANOTHER SURVEY THAT ONE CAN

16   WRITE.  IT'S NOT THE SURVEY I DID.

17   Q.   ARE YOU AWARE OF ANYONE WHO WAS EVER ASKED TO DO THAT KIND

18   OF SURVEY IN THIS CASE, TO ASK PEOPLE DIRECTLY, WHY DID YOU BUY

19   THE PHONES?  DID YOU KNOW THESE FEATURES WERE THERE?  AND DID

20   YOU BUY BECAUSE OF THESE FEATURES?  HAVE YOU SEEN ANYTHING IN

21   WHAT YOU REVIEWED WHERE SOMEONE HAS DONE THAT?

22   A.   THE SPECIFIC QUESTIONS?  NOT THAT I RECALL.

23   Q.   YEAH.  AND BY THE WAY, WHETHER OR NOT YOU'RE AWARE OF

24   FEATURES COULD BE, IN PART, DEPENDING UPON ADVERTISING, WHAT

25   KIND OF INVESTIGATION YOU DO, ET CETERA; CORRECT?

1    A.    AWARENESS CAN BE INFLUENCED BY A LOT OF THINGS, YES.

2    Q.    AND, FOR EXAMPLE, THESE PHONES HAVE HUNDREDS OF FEATURES;

3    RIGHT?

4    A.    YES, THEY DO.

5    Q.    AND DO YOU THINK THAT PEOPLE ARE PROBABLY DISCOVERING

6    FEATURES, YOU KNOW, EVERY DAY AFTER THEY BUY THE PHONES?  GOSH,

7    I DIDN'T KNOW IT DID THAT?

8    A.    YOU'RE RIGHT.  THESE PEOPLE OWN THESE PHONES FOR UP TO TWO

9    YEARS AND CHANCES ARE THEY DISCOVER A LOT OF FEATURES.

10   Q.    WELL, BUT YOU DON'T KNOW WHAT THEY KNEW WHEN THEY BOUGHT

11   THE PHONE TWO YEARS AGO, DO YOU?  YOU DIDN'T ASK THAT?  YOU

12   DIDN'T STUDY THAT?

13   A.    NO, I DID NOT STUDY THAT.  I DO KNOW THEY VALUED THE

14   FEATURES AND THAT'S ALL I CAN TELL YOU.

15   Q.    NOW, HOW ABOUT DID YOU ASK THESE 870 SAMSUNG CUSTOMERS WHO

16   HAD FEATURES, THESE PHONES WITH ACCUSED FEATURES, DID YOU ASK

17   THEM WHETHER OR NOT IF THOSE FEATURES WEREN'T AVAILABLE, IF

18   THEY WOULD HAVE SWITCHED PLATFORMS, GONE TO IOS, GIVEN UP

19   UNIQUE SAMSUNG FEATURES, AND BOUGHT AN IPHONE?  870 PEOPLE, DID

20   YOU ASK THEM THAT?

21   A.    WELL, I GUESS ARE YOU ASKING ME -- AS YOU KNOW, AS YOU

22   POINTED OUT, IT'S ALREADY A LONG SURVEY, SO I'M AWARE I DON'T

23   WANT TO ASK TOO MANY QUESTIONS IN THE SURVEY.  THEY MIGHT WEAR

24   OUT.

25        BUT EVERYBODY IN MY SURVEY PURCHASED A SAMSUNG PHONE.

1              WHAT I DO KNOW IS BUT FOR THESE FEATURES, THERE IS MANY OF

2      THEM THAT WOULD NOT BUY THE SAMSUNG PHONES.

3              BUT I DON'T KNOW TO WHAT PHONES THEY'RE GOING TO SWITCH

4      TO.

5              I DO UNDERSTAND THERE'S ANOTHER EXPERT IN THIS CASE THAT'S

6      GOING TO BE TESTIFYING, SHE'S GOING TO BE USING MY STUDY IN

7      PART TO DETERMINE TO WHAT PHONES THEY WERE GOING TO BE

8      SWITCHING TO.

9      Q.   AND YOU'RE TALKING ABOUT THE EXPERT OF MS. DAVIS WHO'S AN

10     ACCOUNTANT?

11     A.   SHE'S THE, THE DAMAGES EXPERT IN THIS CASE, YES.

12     Q.   AND HER EXPERTISE IS IN ACCOUNTING; RIGHT?

13     A.   I BELIEVE HER EXPERTISE IS ACCOUNTING.

14     Q.   OKAY.

15     A.   I UNDERSTAND SHE'S ACTUALLY IN THE HALL OF FAME OF

16     ACCOUNTING.

17     Q.   AT KANSAS STATE.  NOT TO -- NOT TO DISPARAGE, BUT SHE'S IN

18     THE HALL OF FAME OF ACCOUNTING AT HER COLLEGE IN KANSAS STATE;

19     RIGHT?

20     A.   PRETTY IMPRESSIVE HONOR.

21     Q.   AND YOU HAVE TO BE FROM KANSAS STATE?

22     A.   IT'S STILL A PRETTY IMPRESSIVE HONOR.

23     Q.   I'M GLAD YOU'RE IMPRESSED BY IT.

24             BUT IT'S NOT A QUALIFICATION THAT WOULD TELL YOU WHERE

25     PEOPLE ARE GOING TO GO IN THE MARKETPLACE, IS IT?

1    A.   I AM -- I REALLY CANNOT GO TO MS. DAVIS'S EXPERTISE.

2    Q.   OKAY.  WELL, YOU BROUGHT HER UP.  THAT'S WHY I ASKED.

3         SO LET ME ASK YOU, THOUGH, YOU'RE A SURVEY EXPERT; RIGHT?

4    SO MY QUESTION IS, IN A SURVEY WITH THESE 870 PEOPLE, DID YOU

5    ASK THEM, YOU OWN A SAMSUNG PHONE, IF THESE FEATURES HAD NOT

6    BEEN IN A SAMSUNG PHONE, WOULD YOU HAVE SWITCHED OR INSTEAD

7    PURCHASED AN APPLE PHONE?

8    A.   THOSE WOULD BE -- I PROBABLY COULDN'T HAVE DONE IT IN THE

9    SAME SURVEY BECAUSE I'D RUN INTO THIS WEAR OUT PROBLEM.  IF YOU

10   ASK CONSUMERS TOO MANY QUESTIONS, THEY GET TIRED AND THEY CAN'T

11   PAY ATTENTION AND THINGS LIKE THAT.

12        BUT, YOU KNOW, THAT COULD HAVE BEEN ANOTHER SURVEY.  IN

13   FACT, THERE WOULD HAVE BEEN OTHER SURVEYS THAT ONE COULD HAVE

14   DONE.

15   Q.   DO YOU HAVE ANY EXPLANATION AS TO WHY APPLE WOULD NOT HAVE

16   COMMISSIONED YOU TO DO THAT KIND OF MARKETING SURVEY THAT

17   DIRECTLY ASKED PEOPLE WHO ACTUALLY BOUGHT PHONES, YOU KNOW, DID

18   YOU BUY BECAUSE OF THESE FEATURES AND WOULD YOU SWITCH TO

19   APPLE?

20   A.   I WAS ASKED TO DO A SURVEY.  I DID IT TO THE BEST OF MY

21   ABILITY.  I REALLY DON'T KNOW WHAT OTHER SURVEYS THEY WERE

22   THINKING OF AT THE TIME.

23   Q.   WOULD YOU HAVE BEEN QUALIFIED TO DO THAT SURVEY?

24   A.   OH, YES.  I BELIEVE I HAVE THE QUALIFICATIONS TO DO THAT.

25   Q.   WELL, SO LET ME ASK YOU ABOUT THE CONJOINT SURVEYS THEN,

1    AND I NOTICED THE NAMES YOU HAD PUT UP THERE OF COMPANIES THAT

2    HAVE USED THEM.

3         DOES APPLE USE CONJOINT SURVEYS?

4    A.   YOU KNOW, I DON'T KNOW.  APPLE IS PRETTY -- THEY TEND NOT

5    TO TALK A LOT ABOUT WHAT MARKET RESEARCH THEY DO.

6    Q.   OKAY.  BUT YOU HAVEN'T DONE ANY CONJOINT SURVEYS FOR

7    APPLE, APART FROM THIS CASE; CORRECT?

8    A.   YES.  APART FROM THIS CASE, I HAVEN'T -- I HAVEN'T DONE

9    ANY NON-LITIGATION SURVEYS FOR APPLE.

10   Q.   EXCUSE ME.  SORRY.

11        SO LET ME LOOK AT A LITTLE BIT AT WHAT YOU DID SO WE CAN

12   KIND OF UNDERSTAND IT A LITTLE BETTER.

13        SO THE PEOPLE IN THE SURVEY DIDN'T GET TO ACTUALLY PICK UP

14   AND TEST OUT A REAL PHONE; IS THAT CORRECT?

15   A.   I'M SORRY.  I JUST DIDN'T HEAR YOU.

16   Q.   SURE.  THE PEOPLE IN THE SURVEY DIDN'T HAVE THE

17   OPPORTUNITY TO ACTUALLY PICK UP AND TEST A REAL PHONE; CORRECT?

18   A.   NO.  WE USED GRAPHICS.  WE USED ANIMATIONS.  WE USED

19   DESCRIPTIONS.  BUT IT --

20   Q.   SO THEY DIDN'T --

21   A.   IT'S AN INTERNET SURVEY.  IT WOULD BE HARD TO PHYSICALLY

22   GIVE THEM PHONES OTHER THAN THE ONE THAT THEY ACTUALLY OWN.

23   Q.   AND THEY DIDN'T SEE REAL PRODUCTS OR REAL IMAGES?  THESE

24   WERE HYPOTHETICAL PRODUCTS THAT YOU PUT IN FRONT OF THEM?

25   A.   YES, ABSOLUTELY.  THESE ARE PROFILES.  THESE ARE

1       DESCRIPTIONS OF PRODUCTS, AND PARTIAL DESCRIPTIONS WHEN THEY'RE

2       HOLDING EVERYTHING ELSE CONSTANT.

3       Q.   AND YOU SAY THEY'RE HOLDING EVERYTHING ELSE CONSTANT.

4       YOUR SURVEY INTENTIONALLY DIDN'T TEST THE MARKET TO SEE, YOU

5       KNOW, WHETHER OR NOT CONSUMERS WOULD PICK A CERTAIN BRAND?

6       A.   WELL, MY -- EVERYBODY IN MY SAMPLE BOUGHT A SAMSUNG PHONE,

7       AND I HAVE NOBODY IN MY SAMPLE WHO BOUGHT OTHER BRANDS.

8            IF I WANTED TO DO A BRAND SWITCHING STUDY, WHICH WOULD BE

9       A DIFFERENT STUDY, IT WOULD INCLUDE A MUCH BROADER SAMPLE, A

10      SAMPLE OF ALL PHONES.  I WOULD HAVE BRAND SPECIFIC CONSTANTS IN

11      THE SURVEY.  I WOULD HAVE TO ACCOUNT FOR BRAND DIFFERENCES.

12      IT'S A DIFFERENT SURVEY.

13      Q.   YOU HAVEN'T TESTED A MARKET FOR SMARTPHONES OR TABLETS IN

14      WHICH CONSUMERS CHOOSE AMONG VARIOUS BRANDS OF SMARTPHONES OR

15      TABLETS, FOR EXAMPLE, SAMSUNG VERSUS APPLE?  YOU DID NOT TEST

16      THAT; CORRECT?

17      A.   ALL I KNOW IS THAT BUT FOR THESE FEATURES, A LOT OF THESE

18      PEOPLE WOULD NOT BUY THE PHONES AT ISSUE IN THIS CASE.

19                MR. PRICE:  I MOVE TO STRIKE AS NONRESPONSIVE.

20                THE COURT:  OVERRULED.

21      BY MR. PRICE:

22      Q.   WELL, LET ME HAVE YOU TURN TO YOUR REPORT, PARAGRAPH 96.

23      IT'S PAGE 50.  IT'S EXHIBIT S2703.050, AND IF YOU LOOK AT THE

24      THIRD LINE FROM THE BOTTOM.

25      A.   I'M NOT AS FAST AS YOU ARE.  I'M SORRY.

```
1    Q.   LET ME -- LET ME READ IT TO YOU AND SEE IF THIS REFRESHES

2    YOUR RECOLLECTION.

3    A.   I'D LIKE TO LOOK AT IT THOUGH.

4    Q.   "I HAVE NOT TESTED A MARKET FOR SMARTPHONES OR TABLETS IN

5    WHICH CONSUMERS CHOOSE AMONG VARIOUS BRANDS OF SMARTPHONES OR

6    TABLETS (E.G. SAMSUNG VERSUS APPLE)."

7         MS. KREVANS:  YOUR HONOR, THE WITNESS IS STILL TRYING

8    TO FIND THE PAGE.

9         THE WITNESS:  I -- SORRY.  I JUST CAN'T FIND MY

10   REPORT IN HERE.

11   BY MR. PRICE:

12   Q.   IT'S EXHIBIT 2703.

13   A.   OH, 2703, OKAY.  AND I REALLY APOLOGIZE.

14        NOW, WHAT PAGE AGAIN?

15   Q.   IT'S PAGE 50, PARAGRAPH 96.  AND SO I'LL ASK YOU, DID I

16   READ --

17   A.   PAGE 50.

18   Q.   PAGE 50?

19   A.   I APOLOGIZE FOR TAKING SO LONG.  EXCUSE ME.

20        OKAY.  PAGE 50, YES.

21   Q.   PARAGRAPH 96.  YOU WROTE, THIRD LINE FROM THE BOTTOM, "I

22   HAVE NOT TESTED A MARKET FOR SMARTPHONES OR TABLETS IN WHICH

23   CONSUMERS CHOOSE AMONG BRANDS OF SMARTPHONES OR TABLETS (E.G.

24   SAMSUNG VERSUS APPLE)."

25        THAT'S WHAT YOU WROTE IN YOUR REPORT THAT YOU CREATED FOR
```

1     THIS CASE; IS THAT CORRECT?

2     A.   WELL, THIS PARAGRAPH -- I'M SORRY.  THIS PARAGRAPH IS

3     DESCRIBING THE MARKET SIMULATIONS THAT WE DID DO, AND WHAT IT'S

4     SAYING IS THAT THESE PARTICULAR SIMULATIONS ARE AMONG SAMSUNG

5     PHONES.

6          SO I THINK YOU'VE READ IT A LITTLE BIT OUT OF CONTEXT.

7          BUT YOU ARE ABSOLUTELY RIGHT THAT I HAVE NOT TRIED TO

8     FORECAST WHETHER OR NOT PEOPLE WOULD BUY A SPECIFIC BRAND.

9          I JUST KNOW THAT THEY'RE NOT GOING TO BUY THE SAMSUNG

10    PHONES AT ISSUE IN THIS CASE.  THAT'S ALL I -- THAT'S REALLY

11    WHAT MY SURVEY TELLS ME WITH RESPECT TO THAT QUESTION.

12    Q.   BY THE WAY, WHAT YOU JUST SAID ABOUT NOT BUYING SAMSUNG

13    PHONES, NOT A WORD ABOUT THAT IN YOUR REPORT.  YOU'RE JUST

14    ADDING THAT NOW, ISN'T IT?  I MEAN, LOOK AT YOUR REPORT AND

15    TELL ME WHERE IT SAYS PEOPLE AREN'T GOING TO BUY SAMSUNG PHONES

16    WHEN YOU DON'T EVEN KNOW THAT THE CUSTOMERS KNOW THESE FEATURES

17    ARE IN THEM.  DOES YOUR REPORT SAY THAT ANYWHERE?

18    A.   MY REPORT IS PRIMARILY ABOUT WILLINGNESS TO PAY.  IF

19    CONSUMERS ARE WILLING TO PAY QUITE A BIT --

20    Q.   NO, NO.  MY QUESTION IS VERY SPECIFIC.  YOU KNOW YOU'RE

21    REQUIRED TO GIVE YOUR OPINIONS IN YOUR REPORT.  YOU KNOW THAT;

22    RIGHT?

23    A.   YES.

24    Q.   CORRECT?  AND AN OPINION THAT SAMSUNG CUSTOMERS WOULDN'T

25    BUY THE PHONES OUT THERE WITHOUT THESE FEATURES, THAT WOULD BE

1      AN IMPORTANT OPINION IN THIS CASE; RIGHT?

2      A.   WILLINGNESS TO PAY IS SYNONYMOUS WITH MARKET DEMAND.

3      Q.   IN FACT, YOU SAY THAT --

4      A.   I WROTE ABOUT WILLINGNESS TO PAY.

5      Q.   DO YOU SAY THAT IN YOUR REPORT, THAT WILLINGNESS TO PAY IS

6      THE SAME AS MARKET DEMAND?  THAT WOULD BE AN IMPORTANT OPINION.

7      IS THAT IN YOUR REPORT WHERE YOU SAY THAT?

8      A.   I THINK THAT'S PRETTY WELL UNDERSTOOD IN THE MARKETING

9      PROFESSION.

10     Q.   BUT YOU'RE GIVING THIS REPORT TO PEOPLE WHO ARE GOING TO

11     TALK TO A JURY AND YOU'RE SUPPOSED TO GIVE YOUR PROFESSIONAL

12     OPINIONS; CORRECT?

13     A.   WELL, OKAY.  I MEAN, I GUESS I DID NOT DEFINE EVERY TERM

14     THAT I USE.  IT'S -- WILLINGNESS TO PAY REALLY DOES INDICATE

15     MARKET DEMAND.

16     Q.   BUT YOU DIDN'T PUT THAT IN YOUR REPORT FOR US TO REVIEW;

17     CORRECT?

18     A.   NO.  THE FACT THAT IT'S A CINNAMON -- SYNONYM, NOT A

19     CINNAMON -- A SYNONYM IS NOT IN MY REPORT, YOU'RE CORRECT.

20     Q.   AND THERE'S NOWHERE IN YOUR REPORT DO YOU SAY SAMSUNG

21     WOULD HAVE LOST SALES?  THAT'S AN IMPORTANT OPINION.  IT'S NOT

22     IN YOUR REPORT; CORRECT?

23     A.   THERE'S A HIGH WILLINGNESS TO PAY.  TO MY MIND, THAT'S THE

24     SAME AS MARKET DEMAND.  MARKET DEMAND INDICATES THEY'D LOSE

25     SALES.

1          BUT I DID NOT MAKE THAT TRANSLATION IN THE REPORT, YOU'RE

2     CORRECT.

3     Q.   WELL, THAT JUMP WOULD BE A PROFESSIONAL OPINION AS A

4     PROFESSIONAL; CORRECT?

5     A.   IT'S A PROFESSIONAL OPINION I HOLD.

6     Q.   RIGHT.  AND YOU'RE SUPPOSED TO PUT YOUR PROFESSIONAL

7     OPINIONS, PARTICULARLY IF THEY'RE CRITICAL TO THE CASE, IN YOUR

8     REPORT; RIGHT?

9     A.   I GUESS I ASSUME THAT -- AND YOU'RE PERHAPS RIGHT.  I

10    ASSUME THAT THAT WILLINGNESS TO PAY WOULD BE UNDERSTOOD AS

11    MARKET DEMAND, AND THAT'S, YOU KNOW, KIND OF A TECHNICAL -- NOT

12    A TECHNICAL TERM, IT'S JUST THE WAY WE TALK ABOUT THINGS.

13         AND YOU'RE CORRECT, MAYBE I MADE THAT ASSUMPTION.

14    Q.   LET ME TALK ABOUT THE SURVEY YOU DID DO.

15         THE COURT:  IT'S 4:30.  SHOULD WE RESUME THIS

16    TOMORROW?

17         MR. PRICE:  THAT'S PROBABLY A GOOD IDEA.

18         THE COURT:  OKAY.  LET'S GO AHEAD, BECAUSE I DID

19    PROMISE THIS JURY THAT I WOULD LET THEM OUT EVERY DAY AT 4:30.

20         (AUDIO RECORDING PLAYING.)

21         THE COURT:  OKAY.  I DON'T KNOW WHAT THAT WAS.

22         BUT IT'S 4:30.  I WANT TO THANK YOU FOR YOUR PATIENCE AND

23    YOUR SERVICE.

24         AGAIN, PLEASE NO RESEARCH, NO DISCUSSIONS ABOUT ANYTHING

25    RELATED TO THE CASE, PHONES, TABLETS, THOSE KIND OF THINGS, ET

1        CETERA.

2             YOU CAN LEAVE YOUR --

3             MARTHA, WOULD YOU PREFER THEM HERE OR IN THE JURY ROOM?

4             IF YOU WOULD TAKE THEM IN THE JURY ROOM, IT'S PROBABLY

5        BETTER.  IF YOU WOULD TAKE YOUR JURY BINDERS IN THE JURY ROOM

6        SINCE THEY MAY HAVE YOUR HANDWRITTEN NOTES ON THEM, AND THIS

7        WILL BE LOCKED UP, BUT IT'S PROBABLY BETTER.  ALL RIGHT?  BUT

8        IF YOU WOULD PLEASE LEAVE YOUR JURY BINDERS IN THE ROOM WHEN

9        YOU LEAVE.

10            THANK YOU.  WE'LL SEE YOU AT 9:00 O'CLOCK TOMORROW.

11            SAME ADMONITIONS.  KEEP AN OPEN MIND.  DON'T RESEARCH OR

12       TALK ABOUT THE CASE.

13            THANK YOU.

14            YOU MAY STEP DOWN.

15             THE WITNESS:  THANK YOU.

16            (JURY OUT AT 4:31 P.M.)

17             MR. PRICE:  YOUR HONOR, MAY I REQUEST THE COURT TO

18       INSTRUCT THE EXPERT WITNESS NOT TO TALK TO COUNSEL OVERNIGHT

19       BECAUSE HE'S ON THE STAND?  AND THEN, OF COURSE, THAT WOULD

20       APPLY TO OURS AS WELL.

21             THE COURT:  ANY OBJECTION TO THAT?

22             MS. KREVANS:  YOUR HONOR, WE'VE NEVER HAD THAT RULE

23       AT ANY POINT IN THIS CASE AND I SEE NO REASON THAT WE'RE

24       STARTING NOW.  NEVER BEEN THE RULE.  IT'S NOT A RULE OF THIS

25       COURT THAT I KNOW OF.

```
1              THE COURT:  WELL, YOU CAN ALWAYS CROSS-EXAMINE HIM AS

2    TO WHETHER HE SPOKE WITH HIS COUNSEL AND HOW LONG THEY SPOKE.

3    YOU KNOW, YOU CAN CROSS-EXAMINE NOT INTO THE CONTENT OF IT, BUT

4    THE FACT THAT THEY DID HAVE THOSE CONVERSATIONS AND THE LENGTH

5    OF TIME AND WHO WAS PRESENT.  OKAY?

6              MR. PRICE:  I UNDERSTAND.

7              THE COURT:  ALL RIGHT.  THEN WE'LL BE IN RECESS UNTIL

8    9:00 O'CLOCK -- OH, NO.  WHAT TIME WOULD YOU LIKE TO COME BACK?

9    8:45?  8:30?  WHAT WOULD YOU PREFER?

10         AND YOU CAN TAKE A SEAT.  NO NEED TO STAND.  THANK YOU.

11             MS. MAROULIS:  8:45 IS FINE, YOUR HONOR.

12             THE COURT:  OKAY.  I'LL SEE EVERYONE BACK AT 8:45.

13   WE'LL GET YOU THE RULINGS TONIGHT.

14             MR. LEE:  8:45 IS FINE.

15             THE COURT:  OKAY.  WERE YOU GOING TO SAY SOMETHING?

16             MR. LEE:  NO, NO, NO.  I THINK WE WERE SAYING 8:45 IS

17   FINE.

18             THE COURT:  OKAY.  THAT'S FINE.

19         OKAY.  THANK YOU.

20         OH, EXCUSE ME.  DID YOU ALL -- THERE WAS SOME ISSUE ABOUT

21   TAMPERING WITH DEVICES DURING THE LAST TRIAL.  WOULD YOU LIKE

22   US TO KEEP THE ACTUAL DEVICES AT THE END OF EACH DAY?  OR I

23   REMEMBER LAST TIME I THINK --

24             MR. MCELHINNY:  YES, YOUR HONOR.  THE ANSWER IS WE

25   WOULD, YOUR HONOR.
```

```
 1              THE COURT:  OKAY.  THEN WE'RE GOING TO LOCK THEM IN

 2    JUDGE INGRAM'S CHAMBERS.

 3              MS. MAROULIS:  YOUR HONOR, MAY I ASK FOR THE TIME?  I

 4    MEANT TO ASK YOU.

 5              THE COURT:  OH, YES.  OKAY.  GIVE ME ONE SECOND,

 6    PLEASE.

 7         (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  OKAY.  I HAVE TIME TOTALS IF YOU'D LIKE

 9    THEM.

10              MR. MCELHINNY:  PLEASE, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  SO APPLE HAS USED 98 MINUTES,

12    WHICH IS 1 HOUR AND 38 MINUTES; SAMSUNG HAS USED 89 MINUTES,

13    WHICH IS 1 HOUR AND 29 MINUTES.

14         I CAN GIVE YOU FURTHER BREAKDOWNS IF YOU NEED THAT.

15              MS. KREVANS:  THAT'S VERY HELPFUL, YOUR HONOR.  THANK

16    YOU.

17              THE COURT:  ALL RIGHT.  IS THAT SUFFICIENT?

18         THANK YOU.  WE'LL SEE YOU TOMORROW.

19              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

20         (THE EVENING RECESS WAS TAKEN AT 4:34 P.M.)

21

22

23

24

25
```

1

2

3                         CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18            DATED:  NOVEMBER 13, 2013

19

20

21

22

23

24

25