# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>                Plaintiff,<br><br>   v.<br><br>SAMSUNG ELECTRONICS CO., LTD., A Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>                Defendants. | Case No.   11-cv-01846-LHK<br><br>**EXPERT REPORT OF JOHN R. HAUSER** |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS CONFIDENTIAL – PURSUANT TO A PROTECTIVE ORDER\*\***

UNITED STATES DISTRICT COURT

indicates that, on average, respondents value highly the difference between these feature levels: "auto-switch (1 to 2 fingers), rubberband and tap to re-center after zoom."

95. In summary, the HB CBC model passes standard statistical tests of fit and predictive ability, which confirms that it is appropriate to use the estimated partworths to forecast consumer behavior and estimate the price premiums of product features associated with the patents at issue. My analysis finds that, on average, respondents in both the tablet and smartphone surveys place a substantial value on the touchscreen features associated with the patents in question. In the next section, I quantify the price premium that consumers are willing to pay for these patent-related features.

## X. The Price Premium for the Patent-Related Features

96. In this section I estimate the price premium, if any, for features associated with the patents at issue. Specifically, I have run a market simulation based on the HB CBC partworth estimates to determine how the market's overall tendency for purchasing a product is affected by the trade-off between the product's price and its features associated with the patents at issue. The market's purchase tendency is simulated using the predicted choices by all the survey respondents. For the purposes of testing the price premium attached to the features covered by the patents at issue, I note that I use the term "market" in a specific way to cover only smartphone and tablet types that I have varied in the survey; I have not tested a market for smartphones or tablets in which consumers choose among various brands of smartphones or tablets (e.g., Samsung vs. Apple). I explained previously that my sample consists of owners of Samsung

smartphones or tablets and that the conjoint analysis asked respondents to choose among Samsung smartphones or tablets that varied on the seven features.

97. I used standard procedures in the Sawtooth Software HB CBC software to run the market simulations. Market simulations using HB CBC partworth estimates are often used by firms to simulate what would happen if a new product were introduced to a market or if a firm decided to change a feature or features for an existing product. Forecasts based on such market simulations are sufficiently accurate that firms routinely make decisions based on the results of these simulations.[65]

98. The market simulation for a patent of interest considers a scenario with two alternative product options: one option does not have the feature level associated with the patent while the second option has the feature level associated with the patent. All other features of the two products are held at the same levels (e.g., camera, memory, size and weight).[66] The market simulation uses the HB CBC partworth estimates to predict the number of respondents who would choose each of the two products when the second product (the one with the patent-related features) is offered at a higher price than the first product (the one without the features). The simulation adjusts the price of the second product until the price reaches the level under which the model predicts that the market is indifferent between the two products, i.e., 50% of the respondents will choose each of the two products.

---

[65] For example, see Orme, B (2010), "Chapter 10: Market Simulators for Conjoint Analysis," Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research. Second Edition, Madison, Wis.: Research Publishers LLC.

[66] In the simulation, the levels of other features do not affect the consumer's choice as long as they are held constant between the two product options.

99. To predict the respondents' choice among the two products considered in the market simulation, I apply an approach commonly used in marketing research called "Randomized First Choice Simulation" (RFC). Under RFC, a consumer picks the product that gives him/her the highest utility among the available choices (i.e., the first choice), where the consumer's utility from each product is calculated as the sum of the estimated partworths for the product's features plus random draws of the unobserved components in the utility.[67]

100. When estimating the price premium associated with features related to a patent, it is important to account for the fact the price premium may vary depending on the price level of the products. This is because consumers' price sensitivity may vary over different price ranges. For example, consumers' utility may drop by 110 units if a smartphone's price increases from $199 to $299 but only by 60 units if the price increases from $99 to $199. This difference in price sensitivity makes intuitive sense as a consumer who is evaluating a $99 phone may be willing to spend more to get added functionalities, but a consumer who is evaluating a $199 smartphone may be less willing to spend as much. This is consistent with the well-established theory of loss aversion, for which Daniel Kahneman won a Nobel Prize in Economics in 2002.[68] The

---

[67] The Sawtooth Software HB estimation software assumes that the random perturbations on the partworths of each attribute follow a standard Gumbel distribution and the additional random errors at the product level also follow a Gumbel distribution. My estimates do not change significantly if I do not add any random perturbations, in which case the RFC simulation becomes the "First Choice" (FC) simulation.

[68] Consider a consumer who plans to buy a smartphone with an expectation that he or she would likely pay, say $149. Being loss averse implies that, given the consumer's expected price, he or she cares less about, say, a $20 discount relative to $149 than they do about a $20 price increase from $149. Therefore, if consumers expect that they are likely to pay around $149, they are likely to place more importance on price if comparing two smartphones priced $199, than if they were comparing two smartphones priced at $99. See Kahneman, Daniel, and Amos Tversky (2000), "Prospect Theory: An Analysis of Decision under Risk," in Choices, Values, and

52

existence of loss aversion has also been documented in the academic literature using real world data.[69] Because of the variation in consumers' price sensitivity over different price ranges, the estimated price premium will also vary over different price ranges.

101. On average, the respondents in the survey sample pay $152 for a smartphone and $390 for a tablet. These are average prices based on actual prices reported by consumers in the survey questionnaires. $152 is between $99 and $199, the two middle price levels in the smartphone survey. As described above, consumers tend to be less price sensitive at lower prices. Therefore, a price range starting with a higher base price ($199 in this case) yields a more conservative (i.e., lower) estimate for the price premium consumers are willing to pay for the features associated with a patent of interest. Thus, I use $199 as the base price (i.e., the price for the product option without the patent-related feature) for the range over which I estimate the patent values for smartphones.

102. For tablets, the $390 average price reported by survey respondents is between $359 and $499 price levels covered in the tablet survey. Again, I use the conservative base price of $499. If I use the lower base price of $359, the estimated patent values are higher.[70]

103. The results of the market-based simulations are presented in Table 4. Specifically, as

---

Frames, eds. Daniel Kahneman and Amos Tversky, Cambridge University Press, at pp. 32–34 and http://www.nobelprize.org/nobel_prizes/economics/laureates/2002/press.html (accessed on March 20, 2012).

[69] See, for example, Hardie, Bruce, Eric Johnson, and Peter Fader (1993), "Modeling Loss Aversion and Reference Dependence Effects on Brand Choice," Marketing Science, 12, 4, (Autumn), pp. 378–394; and Kalyanaram, Gurumurthy, and Russell Winer (1995), "Empirical Generalizations from Reference Price Research," Marketing Science, 14, 3, Special Issue on Empirical Generalizations in Marketing, pp. G161–G169.

[70] With regard to the other two price levels covered in the surveys (the highest and lowest price levels), since I do not have partworths for price above the highest price levels, I can only use those as starting prices if I extrapolate beyond the price levels I have surveyed. Because consumers tend to be less price sensitive at lower prices, I expect that the price premium associated with the lowest price levels to be higher than the ones reported in the tables. Thus, the numbers that I report are conservative.

shown in the smartphones column, if a smartphone without features associated with Patent '915 is priced at $199, the market-based simulation predicts that the price premium consumers are willing to pay for the features associated with the '915 Patent is $39. In other words, the price of an otherwise identical phone that has the features associated with the '915 Patent could be $39 higher and the market would be indifferent between the two products. The estimated price premium is $100 for features associated with the '915, '163, and '381 Patents combined. For tablets, if the base price is $499, the estimated price premium is $58 for features associated with the '607 Patent, $45 for features associated with the '915 Patent, and $90 for features associated with the '915, '163, and '381 Patents combined.[71]

**Table 4: Price Premium for Patent-Related Features**

|   | Patent | Base price without patent-related feature | |
|---|---|---|---|
|   |   | **Smartphones** $199 | **Tablets** $499 |
| 1 | '607 | n/a | $58 |
| 2 | '915 | $39 | $45 |
| 3 | '915 + '163 + '381 | $100 | $90 |

104. As a robustness check, I have also calculated the price premium associated with a patent based on how much more a median consumer is willing to pay for the features

---

[71] Using the sample without filtering out any respondents who are straight-liners, overly fast, overly slow, or claim having owned many smartphones, the smartphone estimates are $39 for Patent '915, and $100 for Patents '915, '163 and '381 combined, and the tablet estimates are $62 for Patent '607, $42 for Patent '915, and $85 for Patents '915, '163 and '381 combined.

54

associated with the patent.[72] The median-consumer willingness to pay calculation yields price premium estimates that are similar to what I estimate using the market simulation method.[73]

105. These market simulation and robustness check results show that, for both smartphones and tablets, Samsung consumers are willing to pay a significant price premium for the tested features that are covered by the patents at issue.[74]

---

[72] The Willingness-to-Pay (WTP) of a median consumer means half of the respondents have a WTP above the consumer and half below. The WTP calculation compares the partworth change associated with a price change to the partworth change associated with a product feature change, and uses the comparison to impute the price premium that consumers would be willing to pay for the product feature. Specifically, the method first calculates the dollar amount change in price that corresponds to a one-unit change in consumer utility. For example, suppose a change in smartphone price from $199 to $299 is associated with a decrease of 110 units of consumer utility. This is equivalent to saying that a price change of $0.9 (=$100/110) over the $199–$299 range corresponds a one-unit change in consumer utility. For these same respondents, suppose an average of 50 units of consumer utility are gained for going from not having the features associated with Patent '915 to having the features. Thus, for the utility gain from the features, the average partworths imply that consumers would be willing to pay $45 (= $0.9/unit x 50). If the change in price has to move beyond the measured range in order to "buy" units of utility, then we need to take the new range into account. Any price change above the highest measured partworths would require extrapolation and is done with caution. These calculations are illustrative. I performed these calculations using the estimated distribution of partworths for the market. The HB CBC estimation provides 10,000 samples from the distribution of partworths. For each of these samples, I computed the median WTP for the market. I then computed an overall market-level WTP by taking the median of the 10,000 sample median WTPs. As explained in the earlier coin-flipping examples, reporting WTP for an individual respondent would not be sufficiently precise. However, the overall, market-level WTP is sufficiently precise.

[73] For smartphones, the WTP calculation estimates that at a base price of $199 consumers would be willing to pay $40 more for a smartphone that has the functionality associated with Patent '915, and $100 more for the combination of Patents '915, '163 and '381. For tablets, the WTP calculation estimates that at a base price of $499 consumers would be willing to pay $58 more for a tablet that has the functionality associated with the '607 patent, $46 more for Patent '915 and $97 more for the combination of Patents '915, '163 and '381 combined. Because these median WTPs are based on a large number random draws from the distribution of the respondents' partworths, I also calculate the confidence intervals for these median WTPs. My calculation shows that these median WTPs are estimated with reasonable precision. Specifically, for smartphones, 95% of the sample median WTPs are within $10.5 of the market median WTP of $40 for Patent '915, and within less than $0.5 of the market median WTP of $100 for the combination of Patents '915, '163 and '381. For tablets, 95% of the sample median WTPs are within $15.5 of the market median WTP of $58 for Patent '607, within $13.5 of the market median WTP of $46 for Patent '915, and within $21.5 of the market median WTP of $97 for the combination of Patents '915, '163 and '381.

[74] As discussed in Section IX, the model I use to estimate these price premiums related to the patents at issue incorporate both the survey data and information about consumer behavior. Both theory and empirical evidence from the data imply that this model is a better and more reliable model than a model without using information about consumer behavior. For the market simulation method, using the methodology described in detail above,

55

if I perform the price premium calculations using estimates from a model *without* incorporating information about consumer behavior, I get the following results with a base price of $199 for smartphones and $499 for tablets: the price premium for smartphones is $41 for the '915 Patent and $100 for the '915, '163, and '381 Patents combined, and the price premium for tablets is $58 for the '607 Patent, $46 for the '915 Patent, and $94 for the '915, '163, and '381 Patents combined. For the WTP calculation, if I perform the price premium calculation using estimates from a model *without* incorporating information about consumer behavior, but use the same methodology described in footnote 72, the price premium for smartphones is $23 for the '915 Patent and $74 for the '915, '163, and '381 Patents combined, and the price premium for tablets is $35 for the '607 Patent, $27 for the '915 Patent, and $60 for the '915, '163, and '381 Patents combined.

I, John R. Hauser, declare under penalty of perjury that the statements contained in this report are true and correct to the best of my knowledge, information and belief.

John R. Hauser, SC.D                                                  Date

*[signature]*                                                         March 22, 2012