1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4

5

APPLE INC., A CALIFORNIA          )  C-11-01846 LHK
6    CORPORATION,                      )
                                       )  SAN JOSE, CALIFORNIA
7               PLAINTIFF,             )
                                       )  NOVEMBER 14, 2013
8          VS.                         )
                                       )  VOLUME 3
9    SAMSUNG ELECTRONICS CO., LTD.,    )
     A KOREAN BUSINESS ENTITY;         )  PAGES 559-809
10   SAMSUNG ELECTRONICS AMERICA,      )
     INC., A NEW YORK CORPORATION;     )
11   SAMSUNG TELECOMMUNICATIONS        )
     AMERICA, LLC, A DELAWARE          )
12   LIMITED LIABILITY COMPANY,        )
                                       )
13              DEFENDANTS.            )
     _____ )

14

15

16         TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20         APPEARANCES ON NEXT PAGE

21

22   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

1

2      A P P E A R A N C E S:

3      FOR PLAINTIFF          MORRISON & FOERSTER
       APPLE:                 BY:   HAROLD J. MCELHINNY
4                                   RACHEL KREVANS
                                    NATHANIEL B. SABRI
5                             425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA  94105
6

7                             WILMER, CUTLER, PICKERING,
                              HALE AND DORR
8                             BY:   WILLIAM F. LEE
                                    LAUREN B. FLETCHER
9                             60 STATE STREET
                              BOSTON, MASSACHUSETTS  02109
10

                              BY:   MARK D. SELWYN
11                            950 PAGE MILL ROAD
                              PALO ALTO, CALIFORNIA  94304
12

13     FOR DEFENDANT          QUINN, EMANUEL, URQUHART,
       SAMSUNG:               OLIVER & HEDGES
14                            BY:   WILLIAM C. PRICE
                                    JON C. CEDERBERG
15                            865 SOUTH FIGUEROA STREET
                              10TH FLOOR
16                            LOS ANGELES, CALIFORNIA  90017

17                            BY:   VICTORIA F. MAROULIS
                                    KEVIN B. JOHNSON
18                            555 TWIN DOLPHIN DRIVE
                              SUITE 560
19                            REDWOOD SHORES, CALIFORNIA  94065

20

21

22

23

24

25

<u>INDEX OF WITNESSES</u>

<u>PLAINTIFF'S</u>

**JOHN HAUSER**
        CROSS-EXAM BY MR. PRICE (RES.)      P. 576
        REDIRECT EXAM BY MS. KREVANS        P. 609
        RECROSS-EXAM BY MR. PRICE           P. 611


**JUN WON LEE**
        BY VIDEOTAPED DEPOSITION            P. 613


**TIMOTHY BRENNER**
        BY VIDEOTAPED DEPOSITION            P. 615


**TODD PENDLETON**
        BY VIDEOTAPED DEPOSITION            P. 615


**JULIE DAVIS**
        DIRECT EXAM BY MS. KREVANS          P. 616
        CROSS-EXAM BY MR. PRICE             P. 710
        REDIRECT EXAM BY MS. KREVANS        P. 789
        RECROSS-EXAM BY MR. PRICE           P. 791

**PHILIP SCHILLER**
        DIRECT EXAM BY MR. MCELHINNY        P. 798

1

2                           INDEX OF EXHIBITS

3                               MARKED        ADMITTED

4       PLAINTIFF'S

5       52                                    613
        69                                    614
6       180                                   636
        25F                                   640
7       25G1                                  646
        60                                    648
8       34                                    651
        36                                    654
9       40                                    658
        181                                   689
10      3                                     788, 789

11

12      DEFENDANT'S

13      8100                     604
        572.082                               739
14      572.003                               740
        8101                     755
15      712.052                               758
        754                                   775
16      712                                   776
        754.545                               776
17      2627                                  778

18

19      JOINT

20      1500A2                                636
        1091                                  804

21

22

23

24

25

UNITED STATES COURT REPORTERS

```
 1      SAN JOSE, CALIFORNIA                    NOVEMBER 14, 2012

 2                         P R O C E E D I N G S

 3          (JURY OUT AT 8:53 A.M.)

 4              THE COURT:  GOOD MORNING AND WELCOME.  PLEASE TAKE A

 5      SEAT.

 6          WE DON'T HAVE PX 3034.  IT WASN'T LODGED WITH THE COURT IN

 7      EITHER THE EXHIBIT BINDERS OR OTHERWISE, AND IT'S NOT ON

 8      APPLE'S EXHIBIT LIST.  IT WOULD BE HELPFUL TO HAVE IT IF YOU

 9      WANT US TO RULE ON THE OBJECTIONS.

10              MS. KREVANS:  WE'LL GET IT TO THE COURT RIGHT AWAY,

11      YOUR HONOR.

12              THE COURT:  OKAY.  AND WE HAD SOME TROUBLE WITH

13      GETTING APPLE'S STUFF.  WE E-MAIL AND WE DON'T GET IT AND

14      E-MAIL AGAIN AND WE DON'T GET IT.  SO WHAT CAN YOU DO?

15          I MEAN, WE'RE TRYING TO TIMELY RULE ON THESE OBJECTIONS

16      AND WE CAN'T GET THE UNDERLYING DOCUMENTS.  SO WHAT CAN YOU DO

17      TO DELIVER THAT TO US FASTER?

18              MS. KREVANS:  SO YESTERDAY MORNING WE HAD A TECHNICAL

19      PROBLEM AND WE SHOULD HAVE CHECKED RIGHT AWAY FOR THE RECEIPT

20      TO BE SURE IT HAD GONE THROUGH, AND SO THIS MORNING WE'RE

21      CHECKING RIGHT AWAY FOR THE RECEIPT, AND IF WE CAN'T SEE THAT

22      IT WENT THROUGH RIGHT AWAY, WE'LL WALK IT OVER TO THE COURT.

23              THE COURT:  ALL RIGHT.  BECAUSE IT IS SLOWING US DOWN

24      AND THAT'S NOT APPRECIATED.

25          OKAY.  ON THE OBJECTIONS FOR MONDAY, COULD THOSE BE FILED
```

1    TOMORROW BY 2:00 O'CLOCK RATHER THAN ON SATURDAY AT 8:00 A.M.?

2              MS. MAROULIS:  YOUR HONOR, APPLE HAS NOT DISCLOSED TO

3    US YET THE DISCLOSURES FOR THE REBUTTAL CASE.

4              THE COURT:  OKAY.

5              MS. MAROULIS:  IF WE CAN GET THEM RIGHT NOW, OR VERY

6    CLOSE TO RIGHT NOW, THEN WE CAN FILE OBJECTIONS TO THAT BY THAT

7    TIME TOMORROW.

8              MS. KREVANS:  YOUR HONOR, THEY HAVE NOT STARTED THEIR

9    CASE YET, SO THERE'S NO WAY FOR US -- WE DON'T EVEN KNOW WHO

10   ALL THEIR WITNESSES ARE.

11             MS. MAROULIS:  WE HAD TO DISCLOSE OUR WITNESSES

12   BEFORE THEY STARTED THEIR CASE, EVEN THOUGH WE'RE RUNNING

13   SECOND.  SO SINCE WE DON'T HAVE THE ACTUAL WITNESS DISCLOSURE,

14   WE CANNOT FILE OBJECTIONS.  BUT WE CAN COMMIT TO DOING THAT AS

15   FAST AS WE GET THE DISCLOSURE.

16             MR. MCELHINNY:  THIS IS A LONGER ANSWER THAN YOU

17   WANT, BUT TO BE CLEAR, WE DON'T KNOW WHO THEY'RE CALLING ON

18   FRIDAY.  THEY HAVEN'T STARTED PUTTING ON THEIR CASE.

19        YOU MAY HAVE NOTICED, YOUR HONOR, THAT EVERY TIME YOU GET

20   A WITNESS BINDER, IT WEIGHS 500 POUNDS AND THEY DON'T USE ANY

21   OF THOSE EXHIBITS IN THEIR EXAMINATION.

22        SO WE LITERALLY HAVE NO IDEA WHAT THEY ARE GOING TO SAY IN

23   THEIR DEFENSE AND WHAT THEIR ISSUES ARE.

24        WE'RE GOING TO HAVE A VERY SHORT PERIOD OF REBUTTAL, BUT

25   OBVIOUSLY THAT HAS TO BE AIMED AT THE CRITICAL ISSUE THAT IS

```
 1      COMING OUT IN THEIR CASE AND WE JUST DON'T KNOW WHAT IT IS YET.

 2              THE COURT:  ALL RIGHT.  WELL, ON SATURDAY WE'RE

 3      GETTING EVIDENTIARY OBJECTIONS.  ON SUNDAY WE'RE GETTING

 4      OBJECTIONS TO I ASSUME CLOSING, AND WE ALSO HAVE TO FINALIZE

 5      THE FINAL JURY INSTRUCTIONS.

 6          SO IF YOU COULD DO SOMETHING TO HELP EXPEDITE ANY OF THESE

 7      PROCESSES, IT WOULD BE MUCH APPRECIATED.

 8              MR. MCELHINNY:  YES, YOUR HONOR.  WE WILL MEET AND

 9      CONFER AND TRY TO SPEED THE WHOLE PROCESS UP.

10              THE COURT:  IT WOULD BE HELPFUL IF WE COULD AT LEAST

11      GET SOMETHING STARTED ON FRIDAY.  MY HOPE IS THAT WE INSTRUCT

12      THIS JURY BY TUESDAY AND HAVE THE JURY INSTRUCTION CONFERENCE

13      POTENTIALLY AS EARLY AS LATE MONDAY.

14          SO MY GOAL IS, IF WE CAN, TO FILE THE FINAL JURY

15      INSTRUCTIONS EITHER MONDAY MORNING OR OVER THE WEEKEND, AND IT

16      WOULD HELP IF WE COULD THEN STACK UP THE OTHER THINGS.

17              MR. MCELHINNY:  WE ARE ALL UNITED IN YOUR GOAL.

18              THE COURT:  OKAY.  SO I WANT -- BY LUNCH I WANT A

19      PROPOSAL OF WHEN YOU'RE GOING TO EXPEDITE THE EVIDENTIARY

20      OBJECTIONS SO WE'RE NOT JUST GETTING THEM SATURDAY MORNING AT

21      8:00, SUNDAY MORNING AT 8:00, IF YOU CAN.

22              MR. MCELHINNY:  THANK YOU.

23              THE COURT:  OKAY?  PLEASE GIVE ME A PROPOSAL AT LUNCH

24      TIME.

25              ANYTHING ELSE?
```

```
 1              MS. MAROULIS:  YOUR HONOR, VERY BRIEFLY.

 2         YESTERDAY DR. HAUSER TESTIFIED AND HE TESTIFIED TO A WHOLE

 3    NUMBER OF COMPLETELY NEW OPINIONS THAT HE NEVER DISCLOSED IN

 4    HIS REPORT.

 5         SPECIFICALLY, HE TESTIFIED THAT BUT FOR CERTAIN PATENTED

 6    FEATURES, THE CUSTOMERS WOULD NOT HAVE PURCHASED THE PHONES,

 7    AND THEY PURCHASED THE PHONES BECAUSE OF THOSE FEATURES.

 8         AS MR. PRICE ELICITED DURING THE TESTIMONY, THAT'S NOWHERE

 9    IN HIS REPORT, SO WE RESPECTFULLY MOVE TO STRIKE THAT, AND ALSO

10    TO PREVENT EITHER JULIE DAVIS OR APPLE FROM RELYING ON THESE

11    OPINIONS.

12         HE BLURTED THEM OUT.  THE QUESTION DID NOT CALL FOR THOSE

13    OPINIONS, AND THEY WERE CLEARLY OUTSIDE THE SCOPE OF HIS

14    REPORT.

15         AND BECAUSE THEY WERE NOT DISCLOSED TIMELY IN DISCOVERY,

16    THEY CANNOT RELY ON THEM NOW.

17         AND SPECIFICALLY THIS GOES TO THE BUT FOR OPINIONS, WHICH

18    WAS THE FIRST TIME ANYONE HAD HEARD THOSE WORDS FROM DR. HAUSER

19    WAS YESTERDAY IN COURT.

20              MS. KREVANS:  YOUR HONOR, THESE WERE OPINIONS THAT

21    WERE ELICITED BY MR. PRICE ON CROSS.  HE DID A VERY WIDE

22    RANGING CROSS.  YOUR HONOR HAS GIVEN HIM A LOT OF SCOPE ON

23    CROSS.  AND HE DID NOT MOVE TO STRIKE THE ANSWER WHEN IT WAS

24    GIVEN.  HE HAS NOW WAIVED.  THIS IS A COMPLETELY IMPROPER LATE

25    MOTION.
```

1          THE COURT:  IS MS. DAVIS GOING TO RELY ON THIS?

2     BECAUSE I THINK THAT'S IMPROPER.  I'M NOT GOING TO STRIKE --

3     I'M NOT GOING TO STRIKE MR. HAUSER'S TESTIMONY YESTERDAY, BUT

4     IS SHE GOING TO RELY ON THAT?

5          MS. KREVANS:  MS. DAVIS IS NOT GOING TO RELY ON

6     ANYTHING MR. HAUSER SAID ABOUT MARKET SHARE.

7          MS. MAROULIS:  IT'S NOT JUST MARKET SHARE, YOUR

8     HONOR.  HE ACTUALLY ELICITED -- HE VOLUNTEERED, HE BLURTED OUT

9     THE BUT FOR OPINION.

10         AND IF YOU LOOK AT MS. DAVIS'S REPORT 19, 109, 134, AND

11    245 WHERE SHE RELIES ON DR. HAUSER, SHE NEVER THERE STATES THAT

12    HIS OPINION IS SUCH THAT CUSTOMERS WOULD NOT HAVE BOUGHT PHONES

13    BUT FOR THESE FEATURES.

14         MS. KREVANS:  MS. DAVIS IS RELYING ON DR. HAUSER'S

15    RESULTS AS EVIDENCE OF DEMAND FOR THE PATENTED FEATURES.  THAT

16    HAS ALWAYS BEEN OUR POSITION AND WE'RE NOT CHANGING IT.

17         THE COURT:  ALL RIGHT.  WELL, THERE WERE A COUPLE OF

18    POSITIONS THAT SOUNDED AS IF THEY WERE COMING OUT FOR THE FIRST

19    TIME, AND EVEN MR. HAUSER SAID THAT HE DIDN'T MAKE IT EXPLICIT

20    THAT HE PUT WILLINGNESS TO PAY THE PRICE AS WOULDN'T BUY THE

21    PRODUCT AT ALL.

22         THERE WERE A COUPLE OF THEORIES THAT HE DID ESPOUSE IT

23    SEEMED LIKE FOR THE FIRST TIME.  THOSE -- I WILL NOT STRIKE THE

24    TESTIMONY BECAUSE I THINK HE DID SUFFICIENTLY EXPLAIN HOW HE

25    THOUGHT IT WAS DISCLOSED IN THE REPORT, EVEN THOUGH HE MAY NOT

1   HAVE DEFINED ALL THE TERMS CLEARLY.

2        BUT I DON'T BELIEVE THAT MS. DAVIS SHOULD RELY ON THOSE

3   OPINIONS.

4             MS. MAROULIS:  AND, YOUR HONOR, WHAT ABOUT THE --

5             THE COURT:  WHY DON'T WE SPELL THEM OUT?  SPELL THEM

6   OUT.  WHAT DID YOU THINK WAS NEW?

7             MS. MAROULIS:  WHAT WAS NEW IS MR. HAUSER TESTIFIED,

8   "WHAT I DO KNOW IS BUT FOR THESE FEATURES, THERE'S MANY OF THEM

9   THAT WOULD NOT BUY THE SMARTPHONES."  THAT PASSAGE APPEARS IN

10  TRIAL TRANSCRIPT PAGE 547, LINE 15 THROUGH 548, LINE 3.

11       AND THE NEXT WAS IN TRIAL TRANSCRIPT 551, LINES 13 THROUGH

12  18.

13            THE COURT:  WELL, I'M MORE INTERESTED IN JUST THE

14  THEORY, THAT THEY WOULD NOT BUY THE PHONES BUT FOR THE

15  FEATURES.

16            MS. MAROULIS:  THERE ARE BASICALLY THREE OPINIONS.

17  ONE IS THAT CUSTOMERS WOULD NOT HAVE BOUGHT PHONES BUT FOR THE

18  PATENTED FEATURES.

19            THE COURT:  OKAY.

20            MS. MAROULIS:  THAT CUSTOMERS DID BUY PHONES BECAUSE

21  OF THE PATENTED FEATURES; AND THAT HE EQUATED THE MARKET DEMAND

22  WITH HIGH WILLINGNESS TO PAY.

23            MS. KREVANS:  OH, YOUR HONOR --

24            MS. MAROULIS:  AND HE SAID, "BUT DID I NOT MAKE THAT

25  TRANSLATION IN THE REPORT AND YOU ARE CORRECT."  SO HE ADMITTED

```
 1        THAT HE DID NOT ACTUALLY SAY THOSE THINGS IN HIS REPORT.

 2              THE COURT:  OKAY.  YOUR NUMBER THREE WAS HIGH

 3        WILLINGNESS TO PAY EQUATED THAT WITH DEMAND.

 4              MS. MAROULIS:  CORRECT.

 5              THE COURT:  NUMBER TWO IS CUSTOMERS DID BUY THE

 6        PHONES FOR THE FEATURES?  IS THAT YOUR POINT?

 7              MS. MAROULIS:  YES.  AND THE FIRST POINT WAS BUT FOR

 8        THESE FEATURES, THEY WOULD NOT HAVE BOUGHT THE PHONES.

 9              THE COURT:  OKAY.  I AGREE WITH THAT ONE.  I MEAN, HE

10        DID A CONJOINT SURVEY OF PRICE PREMIUMS THAT WOULD BE PAID AND

11        IN THE SURVEY DIDN'T APPEAR THAT HE INDICATED THAT, THAT THOSE

12        SAMSUNG CUSTOMERS WOULD NOT BUY THE PHONES BUT FOR THE

13        FEATURES.

14           SO WITH REGARD TO THAT, I WON'T STRIKE THE TESTIMONY, BUT

15        MS. DAVIS IS NOT GOING TO RELY ON THAT.

16              MS. KREVANS:  SHE WILL NOT RELY ON THAT SPECIFIC

17        POINT, YOUR HONOR.

18              THE COURT:  OKAY.  NOW, IS SHE GOING TO RELY ON THE

19        POINT OF EQUATING HIGH WILLINGNESS TO PAY WITH THE DEMAND?

20              MS. KREVANS:  YES, SHE IS, YOUR HONOR.

21           AND MR. HAUSER GAVE THE EXACT SAME TESTIMONY AT THE LAST

22        TRIAL WITHOUT OBJECTION.  WILLINGNESS TO PAY DOES RELATE TO

23        DEMAND.  THAT HAS BEEN DISCLOSED LONG AGO.  IT WAS TESTIFIED TO

24        BY DR. HAUSER AT THE LAST TRIAL.

25              THE COURT:  OKAY.  GIVE ME A CITATION.
```

1          MS. MAROULIS:  YOUR HONOR, WE DON'T DISPUTE THAT.

2          MR. PRICE:  THAT'S TRUE.

3          THE COURT:  OKAY.  THEN WHY, MS. MAROULIS, WHY DID

4   YOU JUST ASK ME TO STRIKE THAT?

5          MS. MAROULIS:  BECAUSE HE SAID "I DID NOT MAKE THAT

6   TRANSLATION IN THE REPORT."  HE ADMITTED THAT.  HE ADMITTED

7   THAT THAT WAS NOT IN HIS REPORT.

8          THE COURT:  ALL RIGHT.  THAT REQUEST IS DENIED.

9          MS. MAROULIS:  OKAY.  YOUR HONOR, MAY WE ALSO HAVE A

10   RULING THAT THEY CANNOT RELY ON THE STRICKEN -- OR THE

11   TESTIMONY THEY CANNOT USE WITH MS. DAVIS IN THEIR CLOSING.

12          THE COURT:  THAT THEY CAN WHAT?

13          MS. MAROULIS:  THEY CAN NOT RELY ON THESE NEW

14   OPINIONS IN THEIR CLOSING.

15          MS. KREVANS:  YOUR HONOR, WE DON'T AGREE WITH THAT.

16   THIS IS A LATE MOTION TO STRIKE.

17          THE COURT:  OKAY.  WAIT A SECOND.  IT SOUNDS LIKE

18   THERE'S AGREEMENT THAT YOU WOULD NOT BUY THE PHONES BUT FOR THE

19   FEATURES.

20      YOU'RE SAYING MS. DAVIS IS NOT GOING TO RELY ON THAT, BUT

21   YOU ARE GOING TO RELY ON IT IN CLOSING EVEN THOUGH IT WASN'T IN

22   HIS EXPERT REPORT?

23          MS. KREVANS:  IT WAS ELICITED BY MR. PRICE ON

24   CROSS-EXAMINATION.  IF YOU'RE GOING TO ALLOW THEM TO HAVE A

25   VERY BROAD SCOPE OF CROSS-EXAMINATION, THEY CAN'T COME IN THE

1    NEXT DAY, HAVING FAILED TO MAKE A MOTION TO STRIKE, AND TRY TO

2    CHANGE THE RECORD.

3         THE COURT:  TELL ME WHERE THAT'S DISCLOSED IN HIS

4    REPORT.

5         MS. KREVANS:  THAT -- THIS SPECIFIC TESTIMONY IS NOT

6    EXPLICIT IN HIS REPORT.  HE DOES MAKE -- IT WAS A CONSEQUENCE

7    IN HIS REPORT.  THIS WAS ELICITED ON CROSS.  THIS IS AN

8    IMPROPER MOTION TO STRIKE.

9         MR. PRICE:  YOUR HONOR, IF I MAY?  I DID MOVE TO

10   STRIKE ONCE AND YOU SAID NO, AND I KNOW NOT TO EMBARRASS MYSELF

11   IN FRONT OF THE JURY.  IT LOOKS LIKE I'M DESPERATE.

12        WHEN SHE SAYS I ELICITED THE TESTIMONY, HERE'S AN EXAMPLE:

13   "PARAGRAPH 96.  YOU WROTE, THIRD LINE FROM THE BOTTOM, 'I HAVE

14   NOT TESTED A MARKET FOR SMARTPHONES OR TABLETS IN WHICH

15   CONSUMERS CHOOSE AMONG BRANDS OF SMARTPHONES OR TABLETS.'"

16        THE COURT:  ALL RIGHT.  I'M SORRY.  I'M SORRY TO

17   INTERRUPT YOU.  I WANT YOU ALL TO JUST BRIEF THIS THIS MORNING.

18        I'M NOT GOING TO STRIKE IT FROM MR. HAUSER'S TESTIMONY.

19   I'M HEARING FROM MS. KREVANS THAT MS. DAVIS IS NOT GOING TO

20   RELY ON IT.  SO THE ONLY FIGHT IS WHETHER THIS IS GOING TO BE

21   IN CLOSING.

22        SO WHAT I WOULD LIKE IS ONE PAGE ON -- WHAT IS -- ARE YOU

23   STILL PUSHING THE OTHER THEORIES, CUSTOMERS DID NOT BUY THE

24   PHONES FOR THE FEATURES?  ARE YOU PUSHING THAT, OR NOT, ON YOUR

25   THIRD THEORY?  BECAUSE IT WAS WRONG, AND I WISH YOU HAD

1    CONSULTED WITH EACH OTHER BEFORE WASTING TIME RAISING A

2    FRIVOLOUS THEORY.

3         BUT WITH REGARD TO YOUR SECOND ONE, ARE YOU STILL

4    CONTENDING THAT CUSTOMERS DID BUY PHONES FOR THE FEATURES?

5              MR. PRICE:  DID NOT.  THE CUSTOMERS DID NOT BUY THESE

6    PHONES FOR THE FEATURES.  THAT'S OUR CONTENTION AND HE DOESN'T

7    ADDRESS THAT IN HIS REPORT AT ALL.

8              THE COURT:  THAT'S THE FIRST POINT.  MS. MAROULIS

9    RAISED A SECOND POINT, WHICH IS CUSTOMERS DID BUY THE PHONES

10   FOR THE FEATURES.

11             MR. PRICE:  RIGHT.

12             THE COURT:  IF I GIVE YOU BRIEFING, I JUST DON'T WANT

13   THIS TO METASTASIZE LIKE EVERYTHING ELSE IN THE CASE WHERE

14   YOU'RE NOW GOING TO SUDDENLY RAISE 35 NEW ISSUES, OKAY?

15        SO I'M TRYING TO CABIN WHAT IT IS THAT YOU'RE BRIEFING.

16   WE ALREADY AGREED YOU'RE GOING TO BRIEF THE FIRST ISSUE OF

17   WOULD NOT BUY THE PHONES BUT FOR THE FEATURES.  OKAY.

18   UNDERSTOOD.

19        SECOND ONE, CUSTOMER DID BUY THE PHONES FOR THE FEATURES.

20             MR. PRICE:  YES, IT'S THE CONVERSE IS ALL.  HE SAYS

21   IF THEY DIDN'T HAVE FEATURES, THEY WOULD LEAVE.  AND THEY WERE

22   BOUGHT FOR THE FEATURES.

23             THE COURT:  ALL RIGHT.  WITH REGARD TO THEN THOSE TWO

24   ISSUES, I JUST WANT ONE PAGE CITING WHERE IT IS, I WANT A PAGE

25   AND A LINE OR A PARAGRAPH FROM HIS EXPERT REPORT AND LINE

1     NUMBER WHERE IT WAS EITHER PREVIOUSLY DISCLOSED IN HIS EXPERT

2     REPORT, PREVIOUSLY TESTIFIED TO IN THE 2012 TRIAL.  OKAY?  AND

3     THEN IF YOU WOULD JUST CITE THE RELEVANT PORTION OF WHAT HE

4     TESTIFIED YESTERDAY.

5          BUT JUST ON THOSE ISSUES.  I DON'T WANT THIS TO EXPAND AND

6     MORPH INTO SOMETHING LARGER THAN IT REALLY IS.

7               MR. PRICE:  AND WE'LL CITE TO YOU THE QUESTION THAT

8     SUPPOSEDLY ELICITED THE OPINIONS SO YOU CAN SEE THAT.

9               THE COURT:  IF YOU JUST GIVE US THE PAGE AND LINE

10    NUMBERS, THAT WOULD BE GREAT.

11              MR. PRICE:  OKAY.

12              THE COURT:  SO I JUST WANT ONE PAGE ON THIS, AND WHEN

13    CAN YOU FILE THAT?

14              MS. MAROULIS:  THIS AFTERNOON?

15              THE COURT:  OKAY.  YOU WANT TO SAY 2:00 O'CLOCK?

16              MS. MAROULIS:  YES.

17              MR. MCELHINNY:  WE WOULD LIKE TO RESPOND TO WHAT THEY

18    SAY.

19              MS. MAROULIS:  ACTUALLY, THEY HAVE TO JUSTIFY WHERE

20    IT APPEARS IN THEIR REPORT.

21              THE COURT:  NO.  THAT WAS YOUR CROSS.  THAT WAS YOUR

22    CROSS.  THAT WAS YOUR CROSS.

23         OKAY.  WHY DON'T -- IT'S YOUR MOTION TO STRIKE ANYWAY, SO

24    YOU FILE YOUR ONE PAGE AT NOON; AND APPLE, YOU FILE YOUR ONE

25    PAGE RESPONSE BY 4:00.

1          MR. MCELHINNY:  YOUR HONOR, OUR ENTIRE TEAM IS IN THE

2     COURTROOM RIGHT NOW BECAUSE HAUSER STILL ON THE STAND.  WE

3     COULD DO IT BY 6:00.

4          THE COURT:  ALL RIGHT.  DO IT BY 6:00.

5          MR. MCELHINNY:  THANK YOU.  I WOULD LIKE TO MAKE ONE

6     THING CLEAR.

7          THE COURT:  WHAT'S THAT?

8          MR. MCELHINNY:  WE THINK IT WOULD BE VERY UNFAIR TO

9     STRIKE THE TESTIMONY AND WE -- WE WILL DO WHATEVER YOUR HONOR

10    THINKS IS FAIR.  WE'RE GOING TO ARGUE FOR WHAT WE THINK IS THE

11    APPROPRIATE, BUT IF YOUR HONOR SAYS WE CAN'T RELY ON IT IN

12    CLOSING, WE'LL DO THAT.

13        TO -- WE DON'T WANT THIS WITNESS CRITICIZED FOR ANSWERS

14    THAT HE GAVE ON CROSS, SO OUR BOTTOM LINE IS WHATEVER YOUR

15    HONOR RULES IS FAIR, WE ACCEPT.

16         THE COURT:  I'LL GIVE YOU BOTH TWO PAGES.

17         MR. MCELHINNY:  THANK YOU, YOUR HONOR.

18         MS. MAROULIS:  THANK YOU, YOUR HONOR.

19         THE COURT:  ALL RIGHT.  SO THEN WHAT WE HAVE IS WE

20    HAVE TO RULE ON THE FINAL JURY INSTRUCTIONS, THE EVIDENTIARY

21    OBJECTIONS FOR MONDAY, THE EVIDENTIARY OBJECTIONS FOR TUESDAY,

22    AND THEN THIS HAUSER ISSUE.

23        OKAY.  ANYTHING ELSE?

24         MR. LEE:  YOUR HONOR, JUST ONE INFORMAL THING SO THE

25    COURT KNOWS.  IT DOESN'T REQUIRE ANYTHING.  BUT ON THE -- THE

```
1    RESULT OF YOUR HONOR'S RULING ON THE GRAIN PROCESSING DESIGN

2    AROUND ISSUES, BEFORE -- WE NEED TO LODGE AN OFFER OF PROOF OF

3    WHAT WE WOULD HAVE PROVED.

4         IT DOESN'T REQUIRE AN ACTION BY YOUR HONOR.  IT DOESN'T

5    REQUIRE ANY ACTION BY SAMSUNG.

6         BUT WHEN WE LODGED IT, WE DIDN'T WANT YOUR HONOR TO THINK

7    WE WERE ASKING YOU TO TAKE ANY FURTHER ACTION.  WE UNDERSTAND

8    THE RULING.  WE JUST HAVE TO PUT DOWN IN THE DOCUMENT WHAT WE

9    WOULD HAVE PROVED HAD THE RULING BEEN DIFFERENT.

10         AND I JUST DIDN'T WANT THERE TO BE CONFUSION WITH ALL THE

11    PAPER FLYING AROUND.

12              THE COURT:  OKAY.  WHEN ARE YOU PLANNING TO DO THAT?

13              MR. LEE:  BY THE END OF THE DAY.  AND IT'S JUST, YOUR

14    HONOR, TO PUT DOWN ON THE RECORD WHAT THEY DID WITH HTC, TO SAY

15    WHAT WE WOULD HAVE PROVED HAD THE RULING BEEN DIFFERENT.

16    NOTHING MORE.

17              THE COURT:  THAT'S FINE.

18              MR. LEE:  OKAY.

19              THE COURT:  THAT'S FINE.  ANYTHING ELSE?

20              MS. MAROULIS:  NOT FOR SAMSUNG, YOUR HONOR.

21              MR. LEE:  NOT FOR APPLE, YOUR HONOR.

22              THE COURT:  OKAY.  THEN THANK YOU.  LET'S BRING IN

23    OUR JURY, PLEASE.

24         (JURY IN AT 9:08 A.M.)

25              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A
```

```
 1      SEAT.

 2           MR. HAUSER, OR DR. HAUSER, IF YOU WOULD PLEASE TAKE THE

 3      WITNESS STAND.

 4           SIR, YOU'RE STILL UNDER OATH.

 5                THE WITNESS:  THANK YOU.

 6                THE COURT:  MR. PRICE, ARE YOU READY?

 7                MR. PRICE:  I AM, YOUR HONOR.

 8                THE COURT:  OKAY.  TIME IS NOW 9:08.

 9           GO AHEAD, PLEASE.

10                MR. PRICE:  GOOD MORNING.

11                THE COURT:  9:09.  EXCUSE ME.

12                MR. PRICE:  EVEN BETTER.

13                    CROSS-EXAMINATION (RESUMED)

14      BY MR. PRICE:

15      Q.   DR. HAUSER, GOOD MORNING.

16      A.   GOOD MORNING.

17      Q.   SINCE WE LEFT YESTERDAY, HAVE YOU TALKED WITH ANYONE ABOUT

18      THE CASE?

19      A.   NOT ABOUT THE CASE.

20      Q.   OKAY.  HAVE YOU TALKED -- SO HAVE YOU TALKED TO ANYONE

21      ABOUT YOUR REPORT?

22      A.   NO, I HAVE NOT.

23      Q.   BY THE WAY, YESTERDAY YOU SAID, WHEN I ASKED YOU ABOUT

24      WHETHER CERTAIN OPINIONS WERE IN YOUR REPORT, YOU SAID "THE

25      WORDS 'MARKET SHARE' APPEAR IN MY REPORT" WHEN DESCRIBING
```

1    EQUILIBRIATING.  EQUILIBRATING.  I'M SORRY.

2        DO YOU RECALL THAT TESTIMONY?

3    A.   YES, I DO.

4    Q.   AND HAVE YOU HAD A CHANCE TO ACTUALLY LOOK AT YOUR REPORT

5    SINCE YOU TESTIFIED YESTERDAY?

6    A.   I HAVE NOT REVIEWED MY REPORT SINCE YESTERDAY.  WE CAN

7    CERTAINLY LOOK AT IT NOW.

8    Q.   IT'S TRUE, IS IT NOT, THAT THE WORDS "MARKET SHARE" ARE,

9    ARE NOWHERE IN YOUR REPORT, EXCEPT IN YOUR RESUME WHEN YOU

10   REFERENCE SOME ARTICLES THAT YOU'VE WRITTEN?

11   A.   WELL, WE AREN'T MATCHING THE SHARE OF TWO TELEPHONES.

12   MAYBE I DID NOT USE THE WORDS "MARKET SHARE."

13   Q.   NO, NO.  YOUR TESTIMONY WAS, "BUT THE WORDS 'MARKET SHARE'

14   APPEAR IN MY REPORT," AND SO I'M ASKING YOU WHETHER OR NOT, IN

15   FACT, THAT IS NOT TRUE.  THOSE WORDS DO NOT APPEAR IN YOUR

16   REPORT?

17   A.   WELL, CAN I JUST TAKE A LOOK AT THE REPORT?

18   Q.   WELL, I'M ON THE CLOCK.  HOW LONG WOULD IT TAKE YOU TO

19   LOOK IN YOUR REPORT TO SEE WHETHER OR NOT -- PERHAPS I CAN

20   CONTINUE AND SOMEONE CAN WORD SEARCH IT IF THAT HELPS ON YOUR

21   TEAM.

22   A.   YOUR CHOICE.

23   Q.   IS THAT FAIR?

24   A.   I KNOW WHERE THE PARAGRAPH IS, BUT THAT'S OKAY.

25   Q.   OH, YOU KNOW WHERE THE PARAGRAPH IS THAT SAYS "MARKET

1    SHARE," HAS THE WORDS "MARKET SHARE"?

2    A.   NO.  I KNOW WHERE THE PARAGRAPH IS WHERE WE TALKED ABOUT

3    EQUILIBRIUM.

4    Q.   I'M SORRY, SIR.  I'M NOT TO BE CONFUSING YOU.  YOU SAID TO

5    THE JURY THAT THE WORDS "MARKET SHARE" APPEAR IN YOUR REPORT.

6    YOU SAID IT TWICE.  I'M ASKING YOU A REALLY SPECIFIC QUESTION.

7    IS THAT TRUE OR FALSE?  DO THE WORDS "MARKET SHARE" APPEAR IN

8    YOUR REPORT?

9    A.   I'D LIKE TO LOOK AT THE PARAGRAPH ON EQUILIBRIUM TO SEE

10   WHETHER IT'S IN THERE.

11   Q.   OKAY.  IN THAT CASE, PLEASE GO AHEAD.

12   A.   WHAT EXHIBIT NUMBER WAS IT?

13   Q.   THAT'S EXHIBIT 2703.002.

14        (PAUSE IN PROCEEDINGS.)

15        THE WITNESS:  NO, THE ACTUAL WORDS "MARKET SHARE," I

16   DO NOT SEE THEM HERE.

17        THE SIMULATION DOES, THOUGH, EQUATE THE SHARES OF THE TWO

18   PRODUCTS.

19   BY MR. PRICE:

20   Q.   SO THE ANSWER IS THAT YOUR TESTIMONY YESTERDAY WAS

21   MISTAKEN?  THE WORDS "MARKET SHARE" DON'T APPEAR; CORRECT?

22   A.   THE ACTUAL WORDS "MARKET SHARE" DO NOT APPEAR HERE.  IT'S

23   THE SHARE OF TWO PRODUCTS IN A MARKET.

24   Q.   AND LET ME TALK TO YOU A LITTLE BIT ABOUT WHAT THESE

25   PEOPLE WHO TOOK THIS SURVEY DID.

```
1              AND IF WE CAN PUT UP 8004.023.

2              I THINK YOU MENTIONED THIS A LITTLE BIT.  SO WHAT THEY DID

3       IS THEY WOULD SEE SCREENS, SUCH AS THIS ONE, WHICH IS FROM YOUR

4       REPORT AT EXHIBIT F.  IS THAT RIGHT?

5       A.   YES, THIS IS CORRECT.

6       Q.   AND IT'S -- THIS HAS -- LET'S SEE IF I'VE GOT THE

7       DESCRIPTION CORRECTLY.  FOUR DIFFERENT CHOICES AT THE TOP;

8       CORRECT?

9       A.   YES.  FOUR DIFFERENT CHOICES AT THE TOP?  NO, NO.

10      Q.   AND --

11      A.   FOUR CHOICES TOTAL.  THEY -- THEY CLICK AT THE BOTTOM.

12      Q.   I SEE.  SO FOUR CHOICES, AND THEN IT HAS A CHOICE SET,

13      EACH SCREEN HAS A CHOICE SET OF 28 DIFFERENT FEATURE

14      DESCRIPTIONS; RIGHT?

15      A.   WELL, THERE'S -- THERE'S SEVEN -- WELL, SIX FEATURES PLUS

16      PRICE, AND THEY HAVE DIFFERENT LEVELS WITHIN EACH PRODUCT AND

17      THERE'S FOUR PRODUCTS THAT THEY'RE CHOOSING AMONG.  SO THEY

18      CHOOSE AMONG EACH COLUMN.

19      Q.   BUT THERE ARE, LIKE, 28 DIFFERENT SQUARES THERE; RIGHT?

20      IS THAT RIGHT?

21      A.   YES, THERE ARE 20 -- 28 DIFFERENT ICONS.

22      Q.   AND THEY EACH SEE 16 OF THESE SCREEN OR CHOICE SETS;

23      RIGHT?

24      A.   YES, THAT'S CORRECT.

25      Q.   AND IS IT CORRECT THAT THEY MAKE ABOUT 64 DIFFERENT
```

1    CHOICES?  RIGHT?

2    A.   NO.  THEY MAKE 16 CHOICES.

3    Q.   FOR THE ENTIRE, FOR THE ENTIRE SURVEY?

4    A.   YES.  THEY CHOOSE ONCE AMONG THE FOUR PRODUCTS.

5    Q.   OKAY.  AND THEN AFTER DOING THIS -- AND I THINK YOU SAID

6    IT TAKES 20 TO 25 MINUTES.

7    A.   I THINK THAT'S AN AVERAGE.  SOME PEOPLE TAKE LONGER.  SOME

8    PEOPLE TAKE LESS.

9    Q.   AND YOUR CONCLUSION THAT YOU TESTIFIED YESTERDAY IS --

10   FIRST OF ALL, YOU FOUND THAT THE AVERAGE PRICE THAT THESE

11   PEOPLE PAID FOR THEIR SMARTPHONES, WHICH WERE PHONES WHICH,

12   LIKE THE ONES THAT ARE ACCUSED, THAT HAVE THE ACCUSED FEATURES

13   IN THIS CASE, THE AVERAGE PRICE WAS $152?

14   A.   WELL, IN ADDITION TO THE TWO -- IN ADDITION TO THE $2 TO

15   $5,000 THAT THEY LIKELY PAID FOR A CONTRACT.

16   Q.   DID YOU TELL THEM HOW MUCH THEY'D LIKELY PAY FOR A

17   CONTRACT?

18   A.   NO.  BUT WE DO TELL THEM THAT THAT'S SOMETHING THAT SHOULD

19   BE CONSIDERED.  WE CAN'T GATHER THAT MONEY -- SORRY -- WE

20   DIDN'T GATHER THAT DATA.

21   Q.   WHAT YOU'D SAID IS YOU'D HAVE A TWO YEAR CONTRACT; RIGHT?

22   YOU TELL THEM THAT, ASSUME YOU HAVE A TWO YEAR CONTRACT?

23   A.   YES, ASSUME YOU HAVE A TWO YEAR CONTRACT, THAT'S CORRECT.

24   Q.   AND YOU'RE SAYING THAT THAT THEN PUT IN THE MINDS OF THESE

25   PEOPLE THAT, I'M GOING TO BE PAYING -- HOW MUCH DID YOU SAY,

1       2,000?

2       A.   WELL, IF YOU GO -- THAT'S ABOUT HOW MUCH PEOPLE PAY, YES.

3       Q.   SO YOU THINK THAT WHEN THEY READ THAT AT THE BEGINNING OF

4       THE SURVEY, ASSUME YOU'D HAVE A TWO YEAR CONTRACT, THEY'RE

5       THINKING, I'M SHELLING OUT $2,000?  YOU THINK THAT'S WHAT THEY

6       HAD IN MIND WHEN THEY DID THIS?

7       A.   WELL, MOST PEOPLE ARE AWARE THAT CELL PHONE CONTRACTS ARE

8       ROUGHLY THAT EXPENSIVE, YES.

9       Q.   SO YOU OBVIOUSLY HAD THIS AS PART OF YOUR PRE-INTERVIEW TO

10      MAKE SURE THAT THEY UNDERSTOOD THAT BECAUSE YOU EXPLAINED HOW

11      YOU TALKED TO THEM, YOUR FOLKS DID, IN-DEPTH TO MAKE SURE THAT

12      THEY UNDERSTOOD THINGS.  SO OBVIOUSLY THAT'S SOMETHING THAT

13      WOULD HAVE BEEN DONE, TO SAY, HEY, BY THE WAY, NOTICE HERE THAT

14      THIS IS A TWO YEAR CONTRACT, THEREFORE, THERE'S $2,000 OR SO IN

15      ADDITION TO THIS?

16      A.   WE WOULDN'T ASK -- REMEMBER, THESE ARE CONVERSATIONS.  WE

17      WOULDN'T ASK THAT SPECIFIC QUESTION.

18      Q.   HAVE YOU EVER HEARD OF A CAR SALESMAN ASKING, HOW MUCH DO

19      YOU WANT TO PAY PER MONTH?  BECAUSE I'LL GET YOU THAT CAR AT

20      WHATEVER THAT MONTHLY PAYMENT IS?  AND THEY KIND OF DO THAT BY

21      CHANGING THE TERMS OR INCREASING THE PRICE?  AS A MARKETER, YOU

22      KNOW THEY DO THAT; RIGHT?

23      A.   I MEAN, I'M NOT SURE I'M HERE TO PROVIDE AN EXPERT OPINION

24      ON CAR SALESMEN.

25      Q.   WELL, BUT YOU KNOW THAT.  YOU KNOW THAT IN THE MARKET,

1    THAT'S WHAT HAPPENS SO THAT THEY DISGUISE THE PRICE THAT YOU'RE

2    ACTUALLY PAYING OVER A PERIOD OF TIME BECAUSE PEOPLE DON'T

3    THINK ABOUT THAT?

4    A.   WELL, YOU KNOW, ONE OF THE THINGS THAT I HAVE LEARNED OVER

5    40 YEARS IN MARKETING IS CONSUMERS ARE REALLY PRETTY SMART.

6    AND ALTHOUGH THERE ARE WAYS THAT SOME CONSUMERS CAN BE FOOLED,

7    BY AND LARGE, CONSUMERS ARE SMART.

8         AND, YOU KNOW, I MEAN, YES, NOT EVERYBODY IS PERFECT.

9    NOBODY IS PERFECT.

10   Q.   SO --

11   A.   BUT CONSUMERS ARE SMART.

12   Q.   SO CONSUMERS ARE CERTAINLY SMART ENOUGH TO KNOW WHETHER

13   THEY'RE BUYING A SAMSUNG PHONE VERSUS AN APPLE PHONE?  YOU HAVE

14   SAMSUNG ON THE PHONE AND SAMSUNG ON THE BOX, OR WHETHER IT SAYS

15   APPLE ON THE PHONE OR APPLE ON THE BOX, THEY CERTAINLY ARE

16   SMART ENOUGH TO KNOW THAT?

17   A.   YEAH.  I BELIEVE THEY ANSWERED OUR QUESTIONS CORRECTLY TO

18   THE BEST OF THEIR ABILITY THAT THEY OWNED A SAMSUNG PHONE.

19   Q.   SO LET ME FOCUS ON THE AVERAGE PRICE OF A PHONE.  YOU SAID

20   YOU FOUND THE AVERAGE PRICE OF THE PHONE WAS $152; CORRECT?

21   A.   WELL, THE AVERAGE PRICE, PLUS ABOVE AND BEYOND THE

22   CONTRACT.

23        NOW, REMEMBER THAT --

24   Q.   I'M ASKING YOU WHAT THE AVERAGE PRICE OF THE PHONE THAT

25   YOU FOUND WAS.  IT'S SIMPLE.  I'M ON THE CLOCK HERE.  DID YOU

1    FIND THE AVERAGE PRICE OF THE PHONE WAS $152?

2    A.   THE AVERAGE PRICE THE CONSUMER IS PAYING.  BUT SOME OF

3    THAT IS ALSO -- SOME OF THE PRICE IS BUILT INTO THE CONTRACT.

4    Q.   PARDON?  I JUST COULDN'T HEAR YOU.  I APOLOGIZE.

5    A.   OH, CARRIERS, LIKE VERIZON AND OTHERS, WILL SUBSIDIZE THE

6    TELEPHONE.  IN FACT, IN MASSACHUSETTS WE HAVE TO PAY TAX ON THE

7    WHOLE COST OF THE TELEPHONE, WHICH IS -- AND MANY PEOPLE ARE

8    VERY AWARE OF THAT.

9         SO THE PRICE IS A LITTLE BIT COMPLICATED HERE.  WE'RE

10   DOING THE BEST WE CAN.

11        BUT THE PRICE THAT PEOPLE HAVE SHELLED OUT, ESSENTIALLY

12   PAID FOR THE CELL PHONE ON AVERAGE IS $152.

13   Q.   LET ME READ FROM YOUR REPORT.

14   A.   AND THAT'S, OF COURSE, MARKET PRICE.

15   Q.   LET ME READ FROM YOUR REPORT.  "ONLY AVERAGE, THE

16   RESPONDENTS TO THE SURVEY SAMPLE PAID $152 FOR A SMARTPHONE."

17   CORRECT?

18   A.   THEY PAID, YES.

19   Q.   THAT'S WHAT YOU WROTE?

20   A.   THAT'S WHAT I WROTE.

21   Q.   AND SO WHEN I ASKED YOU THAT QUESTION FIVE MINUTES AGO,

22   THE SIMPLE ANSWER WAS YES, THEY PAID -- THE PEOPLE IN THE

23   SURVEY PAID $150 ON AVERAGE FOR THE SMARTPHONE.  THE CORRECT

24   ANSWER WAS YES, NOT FOUR MINUTES OF EQUIVOCATING; RIGHT?

25             MS. KREVANS:  YOUR HONOR, MAY I ASK THAT MR. PRICE

1        ASK THE WITNESS A QUESTION RATHER THAN MAKING SPEECHES?

2                THE COURT:  ASK A QUESTION, PLEASE.

3                MR. PRICE:  YEAH.

4        Q.   I MEAN, YOU COULD HAVE ANSWERED THAT QUESTION YES BECAUSE

5        IT'S EXACTLY WHAT'S IN YOUR REPORT, THE AVERAGE THEY PAY IS

6        152?

7        A.   I'M DOING THE BEST TO ANSWER ALL YOUR QUESTIONS, SIR.

8        THANK YOU.

9        Q.   WELL, THEN LET ME ASK YOU ABOUT -- LET'S SEE IF I CAN GET

10       AN ANSWER TO THIS.

11               IF WE CAN PUT UP DEMONSTRATIVE 8004.001.

12               AND SO ON THIS $152 SMARTPHONE, YOUR SURVEY THEN ASSUMED

13       $199 BASE PRICE; CORRECT?

14       A.   YES.  WELL, IT -- 199 BECAUSE WE ONLY ASKED PEOPLE -- WE

15       HAD FOUR LEVELS OF PRICE AND SERVICE, SO WE TOOK 199 AS THE

16       CLOSEST THAT WE HAVE IN THE SURVEY TO 199, 152.

17       Q.   AND YOU SAY THAT -- YOUR CONCLUSION WAS THAT THE CONSUMERS

18       WOULD BE WILLING TO PAY AN EXTRA $100 OVER 199 FOR THE FEATURES

19       THAT YOU LIST HERE; CORRECT?

20       A.   WELL, SPECIFICALLY WHAT I SAID IS THAT FOR TELEPHONES

21       COSTING 199, CONSUMERS WOULD BE WILLING TO PAY AN ADDITIONAL

22       $100 FOR THE FEATURES ENABLED BY THESE PATENTS.

23               MR. PRICE:  I'M LEARNING HOW TO TURN THE SMARTPHONE

24       ON.

25               (PAUSE IN PROCEEDINGS.)

1     BY MR. PRICE:

2     Q.   NOW, IN ADDITION TO TESTING THESE FEATURES, YOU ALSO

3     TESTED -- COLLECTED THE DATA FOR FIVE OTHER FEATURES; CORRECT?

4     A.   YES.  THE DATA WERE COLLECTED FOR THE OTHER FIVE

5     DISTRACTION FEATURES.  WELL, ACTUALLY, THE CHOICE -- WE CAN

6     COLLECT DATA FROM WHICH ONE CAN ANALYZE THOSE FEATURES.

7     Q.   SO IF WE LOOK AT DEMONSTRATIVE 8004.004 -- NOW, YOU CALL

8     THESE DISTRACTION FEATURES, BUT YOU COLLECTED THE SAME DATA FOR

9     THESE FEATURES THAT YOU COLLECTED ON THE THREE FEATURES

10    CONCERNING THE UTILITY PATENTS?

11          MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THEY'VE TAKEN

12    ONE OF THE EXHIBITS OVER AT THE DESK AND THEY'RE WORKING ON IT

13    AND I DON'T KNOW WHAT THEY'RE DOING.

14          MR. PRICE:  TURNING IT ON.  SHE'S GETTING A WEB PAGE.

15       LET MR. MCELHINNY FOLLOW YOU.

16          MS. DUCCA:  YOU'RE WELCOME TO COME WATCH.

17          MR. MCELHINNY:  I JUST WAS WONDERING WHAT YOU WERE

18    DOING WITH IT.

19          THE COURT:  THAT'S FINE.  THAT'S FINE.  THANK YOU.

20       PLEASE CONTINUE.

21    BY MR. PRICE:

22    Q.   SO MY QUESTION WAS, YOU COLLECTED DATA FROM WHICH YOU

23    COULD HAVE CALCULATED THIS WILLINGNESS TO PAY ON EIGHT SEPARATE

24    FEATURES; CORRECT?

25    A.   YES.  WE COULD HAVE HELD EVERYTHING ELSE CONSTANT,

 1    INCLUDING THE PATENTED FEATURES, AND ONE AT A TIME WE COULD

 2    CALCULATE A WILLINGNESS TO PAY FOR A CHANGE, NOT FOR THE CAMERA

 3    PER SE, BUT FOR A CHANGE IN ONE OF THE LEVELS OF THE CAMERA.

 4    Q.   ARE YOU SAYING FROM THE DATA YOU COLLECTED, YOU COULD NOT

 5    HAVE COLLECTED -- YOU COULD NOT HAVE CALCULATED A WILLINGNESS

 6    TO PAY FOR THE CAMERA?

 7    A.   WELL, THE WAY CONJOINT WORKS, IT WORKS ON DIFFERENCE.

 8    NOTICE WHEN I GAVE THE OPINIONS, IT WAS FOR ADDING IN THE, WHAT

 9    ARE THE PATENTED FEATURES.

10         NOW, IF YOU'D LIKE TO PUT BACK UP THE DESCRIPTIONS OF THE

11    LEVEL FOR THE CAMERA, I CAN SHOW THE ANALOGY FOR THE CAMERA.

12    Q.   COULD YOU HAVE CALCULATED, IN THAT DATA, WHAT WOULD A

13    CONSUMER HAVE WILLINGLY PAID FOR HAVING A CAMERA AT DIFFERENT

14    LEVELS?

15    A.   WELL, THE CAMERA IS A DESCRIPTION OF DIFFERENT FEATURES.

16    I THINK IF WE JUST PUT THOSE UP, IT WOULD BE VERY EASY FOR ME

17    TO EXPLAIN.

18    Q.   IT'S SORT OF A YES OR NO QUESTION.  FROM THE DATA YOU HAD,

19    COULD YOU HAVE ALSO CALCULATED WILLINGNESS TO PAY FOR A CAMERA

20    WITH DIFFERENT FEATURES?  IF YOU COULD, YOU COULD.  IF YOU

21    COULDN'T, YOU COULDN'T.  BUT I DON'T HAVE MUCH TIME TO FIND OUT

22    THE ANSWER, SO --

23    A.   WELL, WHAT I CAN DO IS IF YOU REMEMBER, THESE -- IT WAS --

24    THE CAMERA VARIED.  IN SOME CASES THERE WAS A FORWARD CAMERA OR

25    A BACKWARD AS WELL.

1          WE CAN CALCULATE WILLINGNESS TO PAY FOR A CHANGE IN THE

2     QUALITY OF THE CAMERA, OKAY, WHAT WAS DESCRIBED BY THE

3     FEATURES.

4     Q.   AND YOU CAN CALCULATE, FOR EXAMPLE, FOR A CERTAIN

5     MEGAPIXEL, THIS IS A HIGHER MEGAPIXEL?

6     A.   RIGHT, AS DESCRIBED FOR THE FEATURES.

7     Q.   AND FOR THE FEATURES, THE UTILITY FEATURES, YOU DID THE

8     SAME THING.  YOU WERE SEEING HOW MUCH PEOPLE WOULD PAY OVER

9     ANOTHER ALTERNATIVE; CORRECT?

10    A.   RIGHT, THE ALTERNATIVE NOT -- YEAH, IT WAS A

11    NON-INFRINGING ALTERNATIVE.

12    Q.   OKAY.  SO YOU COULD HAVE CALCULATED WILLINGNESS TO PAY

13    DIFFERENT, WITH THE CHANGES IN CAMERA, WEIGHT AND SIZE,

14    STORAGE/MEMORY, CONNECTIVITY, AND NUMBER OF APPS?  YOU COULD

15    HAVE CALCULATED THAT?

16    A.   YES, ONE CAN CALCULATE THOSE FROM THE DATA.

17    Q.   SUCH AS HOW MUCH WOULD PEOPLE PAY FOR MORE STORAGE IN THE

18    COMPUTER?  THAT'S SOMETHING YOU COULD HAVE CALCULATED FROM THIS

19    DATA?

20    A.   YES.  AND THIS IS BY DIFFERENCES.  YES, WE CAN CALCULATE

21    SAY GOING FROM 8 MEGABYTES -- SORRY -- 8 GIGABYTES TO 64

22    GIGABYTES.

23    Q.   SO FOR EXAMPLE, IF YOU LOOK AT THESE AT THEIR HIGHEST

24    LEVEL, A CAMERA THAT'S REALLY GOOD, SMALLER WEIGHT AND SIZE,

25    BECAUSE I THINK WE THINK THAT'S BETTER FOR CAMERAS, AND MORE

1    STORAGE AND CONNECTIVITY, YOU COULD, YOU COULD CALCULATE

2    WILLINGNESS TO PAY FOR THAT KIND OF HIGH END EXPERIENCE; RIGHT?

3    A.   YES, I CAN, ALTHOUGH YOU HAVE TO BE A LITTLE BIT CAREFUL

4    WITH SIZE AND WEIGHT BECAUSE SOME PEOPLE PREFER SMALL PHONES.

5    Q.   I THINK SO.  BUT SOME PEOPLE LIKE -- WELL, IN ANY EVENT,

6    SO YOU COULD HAVE HAD, LIKE, NUMBERS HERE TO KIND OF FIGURE

7    WHAT ARE PEOPLE WILLING TO PAY FOR A FULL FEATURED SMARTPHONE;

8    RIGHT?

9    A.   LET ME MAKE SURE I UNDERSTAND YOUR QUESTION.  COULD I

10   CALCULATE ADDING ALL OF THESE UP?

11   Q.   FROM THE DATA YOU HAD, YOU COULD HAVE CALCULATED WHAT

12   PEOPLE WERE WILLING TO PAY FOR A HIGH FEATURED PHONE THAT HAD

13   THE HIGHEST LEVELS OF WHAT'S REFLECTED HERE; CORRECT?

14   A.   I COULD CALCULATE THE COMBINATION OF ALL OF THESE.

15        NOW, THE COMBINATION OF ALL OF THESE IS NOT GOING TO BE

16   EQUAL TO THE SINGLE WILLINGNESS TO PAY BECAUSE -- LET ME TRY

17   AND SAY THIS.

18        UTILITY IS ADDITIVE, BUT WHEN YOU TRANSLATE IT INTO

19   PROBABILITIES, IT'S NOT ADDITIVE.  SO THE WAY TO SEE THIS

20   INTUITIVELY, IF I GO FROM A 50/50 AND I ADD A FEATURE, I MIGHT

21   GO UP TO 60/40.

22        BUT IF I'M AT, SAY, 95 AND I ADD A FEATURE, I MAY GO FROM

23   95 TO 98.

24        SO WHEN I CALCULATE EVERYTHING, YOU KNOW, ADDING ALL THESE

25   THINGS UP, I HAVE TO PUT IT THROUGH THE SIMULATOR TO TAKE INTO

1    ACCOUNT ALL OF THESE PROBABILITIES, AND SO THE WILLINGNESS TO

2    PAY, SORT OF THE CHANGE OF -- I KNOW YOU DON'T LIKE MARKET

3    SHARE, BUT THE SHARES OF THESE TWO PRODUCTS, IT'S GOT TO BE

4    DONE IN COMBINATIONS.

5    Q.   OKAY.  AND IN ANY EVENT, HAVING THE ABILITY TO MAKE THOSE

6    CALCULATIONS, WITH THOSE LIMITATIONS YOU JUST DESCRIBED --

7    A.   IT'S --

8    Q.   -- YOU DIDN'T MAKE ANY CALCULATIONS ON THESE?

9    A.   WELL, IT'S NOT A LIMITATION.  IT'S THE WAY THE ANALYSIS

10   DOES.  ONE CAN MAKE THESE INDEPENDENTLY ADDING THEM ONE AT A

11   TIME.  ONE CAN ALSO DO IT FOR VARIOUS COMBINATIONS.

12   Q.   DO YOU HAVE ANY SUSPICION AS TO, AS TO WHAT THESE, HOW BIG

13   THESE NUMBERS WOULD BE?

14   A.   DO YOU MEAN FOR THE COMBINATION?

15   Q.   IF YOU DID A CONJOINT ANALYSIS, LET'S SAY YOU DID TEN, YOU

16   KNOW, AND ONE YOU WERE FOCUSSING ON CAMERAS, THE EFFECT OF A

17   CAMERA, AND YOU DID ANOTHER STUDY AND FOCUSSED ON WEIGHT AND

18   SIZE, AND ANOTHER STUDY FOCUSSED ON APPS, ANOTHER ON

19   CONNECTIVITY, YOU'RE GOING TO GET NUMBERS FOR WILLINGNESS TO

20   PAY IF THAT'S WHAT YOU'RE LOOKING FOR.  YOU CAN DO THOSE

21   STUDIES; RIGHT?

22   A.   WE CAN DO THINGS ONE AT A TIME AND WE CAN DO THINGS IN

23   COMBINATION, YES, THAT'S CORRECT.

24   Q.   AND YOU'RE GOING TO GET, YOU THINK, PROBABLY POSITIVE

25   NUMBERS FOR MOST OF THESE?  PEOPLE WANT MORE STORAGE, THEY WANT

1        A BETTER CAMERA; RIGHT?

2        A.   WELL, AS THEY CAN -- EXCEPT FOR SIZE AND WEIGHT --

3        Q.   SURE.

4        A.   -- WHERE THERE ARE PREFERENCES.  SOME PEOPLE LIKE SOME

5        THINGS, SOME LIKE THE OTHER.

6        Q.   I UNDERSTAND.

7        A.   YES, ABSOLUTELY, ONE AT A TIME.

8             BUT I CAN GIVE YOU, I THINK, A VERY INTUITIVE EXAMPLE AS

9        TO WHY YOU CAN'T ADD THESE UP IF YOU WOULD LIKE.

10       Q.   THAT'LL BE HIS TIME.

11       A.   OKAY.

12       Q.   OKAY?  AND YOU KNOW THAT APPLE HAS DONE STUDIES AS TO WHAT

13       PEOPLE THINK ARE IMPORTANT OR WHY THEY BUY ANDROID PHONES?  YOU

14       KNOW THAT, DON'T YOU?

15       A.   YES.  THEY'VE DONE -- THEY'VE DONE IMPORTANT STUDIES.

16       THERE ARE A LOT OF THINGS IMPORTANT IN A PHONE.  WE HAVE THE

17       SAME ISSUE THAT WE HAVE TO BE CAREFUL WHEN WE ADD THESE UP, AND

18       AGAIN I CAN GIVE YOU AN EXAMPLE IF YOU'D LIKE.

19       Q.   WELL, AND SOME OF THE THINGS THAT YOU COULD LOOK AT, IF

20       YOU WANT TO DO A CONJOINT STUDY, FOR ILLUSTRATION, 8004.006,

21       YOU COULD DO A STUDY ON SCREEN QUALITY, OPERATING SYSTEM, THE

22       BRAND, GPS LOCATION SERVICES, CARRIER, BATTERY LIFE, WHETHER IT

23       HAS 4G CONNECTIVITY.  ALL OF THESE THINGS YOU COULD DO A

24       CONJOINT STUDY ON; CORRECT?

25       A.   YES, YOU CAN CERTAINLY DESIGN A CONJOINT STUDY FOR MANY OF

1    THESE, MANY OF THESE.  YOU PROBABLY COULDN'T PUT THEM ALL IN

2    ONE STUDY.

3    Q.   AND YOU WOULD EXPECT TO GET POSITIVE NUMBERS FOR ALL OF

4    THESE?

5    A.   YES, I WOULD EXPECT TO -- AGAIN, ONE AT A TIME, I WOULD

6    EXPECT TO GET POSITIVE NUMBERS.  IF I TESTED THEM ALL TOGETHER,

7    I COULD ALSO TEST THE COMBINATIONS.

8    Q.   AND NONE OF THOSE NUMBERS WOULD REFLECT, BY THE WAY, WHAT

9    PEOPLE WOULD ACTUALLY PAY IN THE MARKETPLACE?

10   A.   OH, I'M VERY CLEAR ON THAT.  I JUST HAVE MARKET DEMAND AND

11   THAT THE, THE ACTUAL PRICE THAT YOU PAY DEPENDS UPON BOTH THE

12   DEMAND AND ALSO WHAT APPLE AND SAMSUNG WOULD BE WILLING TO

13   SUPPLY.

14        SO -- AND THEN THERE'S A FEW OTHER ISSUES AS WELL, BUT WE

15   HAVE THIS EQUILIBRIUM OF SUPPLY AND DEMAND.

16   Q.   SO LET ME ASK YOU, SO IN YOUR ANALYSIS -- AND I'M PUTTING

17   UP EXHIBIT 1011 HERE, IN YOUR ANALYSIS, THIS (INDICATING),

18   COMBINED WITH THIS (INDICATING), DO YOU SEE THAT?  DID YOU DO

19   AN ANALYSIS TO SEE WHAT CUSTOMERS WOULD BE WILLING TO PAY FOR

20   THAT FUNCTION?

21   A.   WELL, WE DID A COMBINATION -- THE $100 WE'VE BEEN DEALING

22   WITH IS HAVING ALL THREE FUNCTIONS, YES.

23   Q.   WELL, YOU HAVE A -- DO YOU HAVE A BREAKOUT FOR ONE OF

24   THEM?

25   A.   FOR ONE OF THEM, I DO.  I THINK IT'S THE '915.  CAN WE PUT

1    THAT BACK UP?

2    Q.   SO THE '915 IS THE SCROLL AND THE ZOOM?

3    A.   THE '915 IS THE --

4    Q.   IT'S THE ONE FINGER?

5    A.   -- THE AUTO SWITCH.

6    Q.   THIS (INDICATING)?  THAT (INDICATING)?

7    A.   YES.

8    Q.   OKAY.  SO HOW MUCH DID YOU FIND THAT A CONSUMER IS WILLING

9    TO PAY FOR THAT?

10   A.   I -- I BELIEVE IT WAS $39.

11   Q.   OKAY.

12   A.   OVER THE LIFETIME OF THE CONTRACT, YES.

13   Q.   OVER THE LIFETIME.  OKAY.

14   A.   SO THAT WOULD BE LESS THAN A DOLLAR A MONTH.

15   Q.   LET'S SEE.  I'M TRYING TO FIND THE PHONES.  I NEED TO FIND

16   A WEB PAGE.

17        (PAUSE IN PROCEEDINGS.)

18        MR. PRICE:  I'M TRYING TO GET A WEB PAGE.  SO LET ME

19   COME BACK TO THAT IN JUST A SECOND AND MOVE ON WHILE WE GET THE

20   PHONES STARTED AGAIN.

21   Q.   IN THE REAL WORLD, PHONES ARE SOLD IN BUNDLES OF FEATURES;

22   RIGHT?

23   A.   YES.  AND IF I DO THE CONJOINT ANALYSIS AND TRY TO GET A

24   WILLINGNESS TO PAY FOR BUNDLES, I COULD CALCULATE THAT IF I HAD

25   ALL THOSE NUMBERS AT HAND.

1    Q.   OKAY.  AND BY BUNDLES, FOR EXAMPLE, APPLE PHONES HAVE SOME

2    FEATURES THAT SAMSUNG FEATURES JUST -- SAMSUNG PHONES JUST

3    DON'T HAVE?  FOR EXAMPLE, THEY HAVE AN IOS SYSTEM, A WOMAN WITH

4    A LOVELY VOICE NAMED SIRI.

5         YOU UNDERSTAND THAT THERE ARE FEATURES THAT APPLE HAS THAT

6    SAMSUNG DOESN'T AND THAT SAMSUNG HAS THAT APPLE DOESN'T?

7    A.   YES, I -- YES, THAT'S TRUE, OF COURSE.

8    Q.   AND IN FACT, FOR EXAMPLE, A LARGER SCREEN SIZE?  SAMSUNG

9    PHONES, SOME HAVE THE LARGER SCREEN SIZE.  APPLE HAS THE ONE

10   SIZE FOR ITS CURRENT PHONE?

11   A.   YES, THAT'S CORRECT.  SAMSUNG HAS A VARIETY OF SCREEN

12   SIZES, INCLUDING I THINK THE GALAXY 3 HAS A VERY LARGE SCREEN

13   SIZE.

14   Q.   AND IF YOU -- IN FACT, I MEAN, OBVIOUSLY THE SAMSUNG

15   PHONES HAVE A DIFFERENT BRAND; RIGHT?  SAMSUNG; CORRECT?

16   A.   YES, THEY DO.

17   Q.   AND THAT'S SOMETIMES A -- IT'S SOMETHING THAT IMPACTS

18   DEMAND, THE BRAND?

19   A.   YES, THAT'S CORRECT.

20   Q.   IT'S A DIFFERENT OPERATING SYSTEM, ANDROID; RIGHT?

21   A.   OH, YES.

22   Q.   SAMSUNG?

23   A.   SAMSUNG IS ON ANDROID, YES.  TO THE BEST OF MY KNOWLEDGE,

24   I KNOW MOST OF THE SAMSUNG PHONES ARE ANDROID.

25   Q.   DIFFERENT ECOSYSTEM THAT WORKS WITH GOOGLE APPS AND STUFF?

1      IT'S A GOOGLE-BASED SYSTEM.  YOU UNDERSTAND THAT?

2      A.   YES, ALTHOUGH I THINK THE IPHONE WORKS WITH GOOGLE.

3      Q.   BUT THE SAMSUNG PHONE INTEGRATES WITH GOOGLE-BASED

4      PRODUCTS.  DO YOU UNDERSTAND THAT?

5      A.   I THINK THAT'S TRUE, YES.

6      Q.   OKAY.

7      A.   I ACTUALLY DON'T KNOW THAT.

8      Q.   THE PHONES HAVE DIFFERENT BATTERY LIVES?

9      A.   I BELIEVE THEY HAVE DIFFERENT BATTERY LIVES.

10     Q.   THEY -- IN FACT, IN MANY OF THE SAMSUNG PHONES, THE

11     BATTERY IS REMOVABLE AS OPPOSED TO THE IPHONE WHERE YOU CAN'T

12     REMOVE IT LEGALLY?

13     A.   I THINK THAT'S TRUE, YES.

14     Q.   SAMSUNG IS AN OPEN SOURCE CODE AND THE APPLE IOS IS NOT;

15     CORRECT?

16     A.   I THINK THAT'S TRUE, YES.

17     Q.   OKAY.  DO YOU KNOW WHAT OPEN SOURCE CODE IS?

18     A.   I KNOW WHAT OPEN SOURCE CODE IS.  MUCH OF THE SOFTWARE

19     I'VE WRITTEN IS OPEN SOURCE.

20     Q.   COULD YOU TELL US WHAT OPEN SOURCE CODE IS?

21     A.   WELL, OPEN SOURCE MEANS THAT NORMALLY YOU WOULD HAVE

22     WHAT'S KNOWN AS AN OPEN SOURCE LICENSE, A NEW LICENSE, AND IT'S

23     SORT OF CALLED COPY LEFT, WHICH MEANS THAT ANYBODY CAN MAKE

24     THESE CHANGES IN THE SOURCE CODE, SUBJECT, OF COURSE, TO SOME

25     RESTRICTIONS.

```
 1              AND I DON'T KNOW IF THEY USE IT IN A NEW LICENSE OR NOT ON

 2      THAT, BUT IT'S COPY LEFT BECAUSE IT SAYS YOU CAN'T THEN

 3      COPYRIGHT AND EVERYBODY CAN MAKE THESE CHANGES.

 4              THAT'S WHAT OPEN -- THAT'S MY UNDERSTANDING OF OPEN SOURCE

 5      CODE.

 6      Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHY SOME PEOPLE PREFER

 7      OPEN SOURCE CODE?

 8      A.   WHY WOULD A DEVELOPER?

 9      Q.   YES.

10      A.   WELL, AS -- I KNOW WHY MY SOFTWARE IS OPEN SOURCE, BECAUSE

11      I WANT OTHER PEOPLE TO BUILD UPON THEM.  I'M AN ACADEMIC.  AND

12      WHEN I WRITE SOFTWARE, I'M REALLY TRYING TO DO THIS TO HELP THE

13      FIELD AND HELP OTHER ORGANIZATIONS.  I'M NOT PARTICULARLY

14      INTERESTED IN MAKING IT NOT CHANGEABLE.

15              BUT THEN AGAIN, THE SOURCE CODE THAT I WRITE, THERE'S A

16      VERY SMALL DEMAND, JUST A SMALL NUMBER OF OTHER PROFESSORS.

17              (LAUGHTER.)

18      BY MR. PRICE:

19      Q.   OKAY.  SO IN ANY EVENT, IF -- IF A SAMSUNG CUSTOMER, YOU

20      KNOW, LEFT THE SAMSUNG WORLD OF PHONES TO GO TO APPLE, OKAY,

21      THEY WOULD BE GIVING UP THINGS WHICH ONLY SAMSUNG OFFERS;

22      CORRECT?

23      A.   YES.  AND THEY WOULD BE GAINING THE THINGS THAT ONLY APPLE

24      OFFERS.

25      Q.   AND THAT'S BECAUSE BOTH COMPANIES OFFER UNIQUE BUNDLES?
```

1      IF YOU LOOK AT THE ENTIRE BUNDLE, THEY'RE DIFFERENT?

2      A.   THAT'S RIGHT.  AND A PERSON CAN BE SORT OF BALANCING THESE

3      AND BE RIGHT AT THE EDGE AND THEN ONE FEATURE -- THEY CAN SORT

4      OF BE EQUALLY BETWEEN THE TWO, AND THEN ONE OR TWO FEATURES CAN

5      ACTUALLY TURN THEM ONE WAY OR THE OTHER.

6      Q.   IT DEPENDS UPON HOW THEY VALUE IT.  IT DEPENDS UPON

7      WHETHER THEY LIKE -- IF THEY CARE MORE THE SCREEN SIZE OR THE

8      ANDROID OPERATING SYSTEM OR OPEN SOURCE CODE OR WHETHER YOU

9      HAVE 4G OR NOT.  IT DEPENDS UPON HOW THEY MAKE THEIR CHOICES;

10     RIGHT?

11     A.   YEAH.  IT'S ACTUALLY, YOU KNOW, AS YOU TALKED ABOUT CAR

12     SALESMEN AND AS YOU KNOW, I'VE DONE A LOT OF WORK IN THE

13     AUTOMOBILE INDUSTRY, YOU CAN GO IN AND YOU CAN BE VERY CLOSE

14     BETWEEN A CHEVY AND A FORD, AND THEN ONE THING -- IT COULD BE

15     ANTI-LOCK BRAKES, IT COULD BE ADAPTIVE CRUISE CONTROL, IT COULD

16     BE THE STYLING -- KIND OF PUSHES YOU ONE WAY OR THE OTHER.

17          AND I'VE RECENTLY WRITTEN A PAPER WHERE THIS PERSON,

18     MARIA, WAS CHOOSING BETWEEN TWO AUTOMOBILES AND IT WAS THE

19     PRESENCE OF A SUN, OF A SUN ROOF OR NOT A SUN ROOF THAT PUSHED

20     HER BETWEEN TWO AUTOMOBILES.

21          AND SO IN THAT CASE, EVEN THOUGH THE SUN ROOF WAS ONE OF

22     MANY, MANY, MANY FEATURES IN AN AUTOMOBILE, IT WAS THE THING

23     THAT PUSHED HER ONE WAY OR THE OTHER.

24     Q.   AND YOU COULD ACTUALLY DO A STUDY TO SEE WHETHER OR NOT

25     SOMEONE WOULD BE PUSHED FROM A SAMSUNG PHONE WITH ITS UNIQUE

1    FEATURES TO AN APPLE PHONE WITH ITS UNIQUE FEATURES?  YOU COULD

2    DO THAT STUDY?

3    A.   I BELIEVE I HAVE DONE THAT STUDY.

4    Q.   YOU -- DID YOU ASK THESE SAMSUNG PEOPLE WHO HAD THEIR

5    PHONES WHETHER OR NOT THEY WOULD LEAVE APPLE IF THEY DIDN'T

6    HAVE CERTAIN FEATURES?

7    A.   WHAT I KNOW IS THEIR --

8    Q.   I'M ASKING YOU, DID YOU DO THAT?

9    A.   I DID NOT DO THAT PARTICULAR STUDY.

10   Q.   OKAY.  DID YOU ASK THEM HOW MUCH THEY VALUED, RELATIVELY

11   SPEAKING, THE FEATURES THAT ARE UNIQUE TO SAMSUNG AND ANDROID?

12   A.   NO.

13   Q.   THAT IS, HOW THEY VALUED WHAT THEY WOULD HAVE TO GIVE UP?

14   A.   NO.  EVERYBODY IN MY SAMPLE WAS A SAMSUNG USER WITH A

15   SAMSUNG PHONE.

16   Q.   I'M GOING TO SHOW YOU EXHIBIT 1009 NOW THAT WE HAVE IT ON,

17   AND DO YOU RECALL A FEATURE SUCH AS THIS THAT YOU LOOKED AT

18   (INDICATING)?

19   A.   YES.  THIS -- I'M NOT GOING TO MAKE A TECHNICAL DECISION,

20   BUT THIS SORT OF LOOKS LIKE THE BOUNCE FEATURE TO ME.

21   Q.   AND HOW MUCH IS YOUR CONCLUSION THAT CONSUMERS ARE WILLING

22   TO PAY FOR THIS (INDICATING)?

23   A.   I DON'T BREAK THAT OUT.

24   Q.   OKAY.  BUT IT'S ADDED INTO THE 100; RIGHT?

25   A.   THE -- THE THREE FEATURES TOGETHER ADD UP TO $100.

1       Q.   OBVIOUSLY I DON'T HAVE A SAMSUNG PHONE.  I HAVE A

2       BLACKBERRY.

3            LET ME ASK YOU A HYPOTHETICAL.  I THINK YOU TESTIFIED ON

4       DIRECT THAT YOU WERE ON EXPERT IN MATH.

5       A.   WELL, THERE'S SOME MATHEMATICS I KNOW AND SOME MATHEMATICS

6       I DON'T KNOW.  YES, THAT'S CORRECT.

7       Q.   BUT CERTAINLY YOU KNOW ENOUGH TO DO YOUR WORK; CORRECT?

8       A.   YES, I'VE STUDIED A LOT OF MATHEMATICS.

9       Q.   LET ME GIVE YOU A HYPOTHETICAL.  LET'S SAY -- THIS IS A

10      HYPOTHETICAL.  THE MARKET IS 40 PERCENT APPLE, 40 PERCENT

11      SAMSUNG, 20 PERCENT MOTOROLA, AND SAMSUNG AND MOTOROLA ARE

12      ANDROID PHONES.  APPLE IS IOS.

13      A.   YES.

14      Q.   SO SAY MOTOROLA LEFT THE MARKET.

15      A.   OKAY.

16      Q.   OKAY.  SO YOU JUST HAVE SAMSUNG AND APPLE.  WOULD YOU HAVE

17      ENOUGH INFORMATION TO TELL ME WHERE THOSE MOTOROLA CUSTOMERS

18      ARE GOING TO GO TO?

19      A.   NO, I WOULD NOT.

20      Q.   WHY NOT?

21      A.   IT'S A VERY SIMPLE HYPOTHETICAL.  I -- YOU KNOW, I JUST

22      WOULD NOT -- I WOULD KNOW THAT 20 PERCENT FEWER PEOPLE ARE

23      BUYING MOTOROLA PHONES.  SOME WOULD GO TO APPLE, SOME WOULD GO

24      TO SAMSUNG, BUT I COULDN'T QUANTIFY WHERE THEY WOULD GO.

25      Q.   WHAT WOULD YOU NEED TO QUANTIFY?

1    A.   WHAT WOULD I NEED?

2    Q.   WHAT INFORMATION WOULD YOU NEED TO BE ABLE TO DO A GOOD

3    QUANTIFICATION ESTIMATE OF THAT?

4    A.   WELL, IF I JUST WANTED TO DO THAT?

5    Q.   YEAH.

6    A.   THAT'S A -- THAT'S ACTUALLY A PRETTY HARD STUDY TO DO.

7    IT'S DOABLE, AND I THINK WE COULD SIT DOWN AND I COULD DESIGN

8    ONE, AND CERTAINLY I'VE DONE THIS FOR AUTOMOBILES IN SOME OTHER

9    MARKETS.

10        BUT DO YOU WANT ME TO DESIGN A STUDY NOW?

11   Q.   I'M ASKING YOU, WHAT FACTORS WOULD YOU HAVE TO TAKE INTO

12   ACCOUNT?  I MEAN, MATHEMATICALLY YOU JUST SAY -- YOU TAKE 20

13   PERCENT AND YOU DIVIDE THEM EVENLY, 10 AND 10.

14        YOU TOLD US YOU'D WANT TO LOOK AT SOME OTHER FACTORS.

15   LIKE WHAT?

16   A.   RIGHT.  I WOULDN'T DIVIDE IT EQUALLY.  I -- YOU KNOW, IF I

17   WERE TO BUILD A MARKET -- A MODEL --

18   Q.   FIRST, WHY WOULDN'T YOU DIVIDE THEM EQUALLY?

19        MS. KREVANS:  YOUR HONOR, MAY I ASK THAT THE WITNESS

20   BE PERMITTED TO COMPLETE HIS ANSWER BEFORE MR. PRICE ASKS THE

21   QUESTION?  HE WAS INTERRUPTED.

22        THE COURT:  GO AHEAD.  COMPLETE YOUR ANSWER, PLEASE.

23        THE WITNESS:  THANK YOU.

24        WELL, I THINK YOU'VE BEEN ASKING WHY WOULDN'T I DIVIDE

25   THEM EQUALLY?

1     BY MR. PRICE:

2     Q.   YEAH.

3     A.   BECAUSE I DON'T HAVE ENOUGH INFORMATION TO DECIDE HOW TO

4     DIVIDE THEM.  DIVIDING THEM EQUALLY MIGHT BE ONE OF THE

5     ANSWERS, BUT I DON'T KNOW JUST FROM THE SIMPLE EXAMPLE YOU'VE

6     GIVEN ME.

7     Q.   OKAY.  WHAT OTHER INFORMATION WOULD YOU NEED TO KNOW?

8     A.   WELL, I WOULD HAVE TO KNOW A LITTLE BIT ABOUT THE MARKET.

9     I -- I MIGHT DO AN ASSESSOR ANALYSIS OF THIS.  YOU CAN BUILD A

10    PRE-TEST MARKET.

11        AND IF YOU'VE READ SOME OF MY PAPERS ON INFORMATION

12    ACCELERATION, WE CAN BUILD AN INFORMATION ACCELERATOR FOR THIS.

13    THIS IS ONE OF THE TECHNIQUES THAT GENERAL MOTORS USES.

14        THERE ARE METHODS.  ONE CAN COLLECT DATA.

15    Q.   AND HAVE YOU DONE THOSE SORTS OF STUDIES BEFORE?

16    A.   HAVE I DONE AN INFORMATION ACCELERATION STUDY?

17    Q.   THE KIND OF STUDY THAT WOULD ALLOW YOU TO SAY THIS PERSON,

18    OR THIS GROUP IS LEAVING THE MARKET, WHERE ARE THEY GOING TO

19    GO, THAT TYPE OF STUDY?

20    A.   YES.  I AND MY CO-AUTHORS, OF COURSE, WE PUBLISHED A

21    STUDY -- IN FACT, I WON AN AWARD, BUT THAT'S BESIDE THE

22    POINT -- WE ANALYZED SOME OF THE FIRST ELECTRIC VEHICLES AND WE

23    MADE SOME FORECASTS OF THESE ELECTRIC VEHICLES THAT TURNED OUT

24    TO BE PRETTY QUITE ACCURATE.

25        MANY TIMES I WISH GENERAL MOTORS WOULD HAVE INTRODUCED THE

1    CARS EARLIER.  BUT, YOU KNOW, I JUST DO THE MARKET RESEARCH.  I

2    DON'T DO THE SUPPLY.

3    Q.   OKAY.  SO THEN YOU WEREN'T ASKED TO DO THAT STUDY IN THIS

4    CASE, WERE YOU?

5    A.   NO, I WAS NOT ASKED TO DO AN INFORMATION ACCELERATION

6    ANALYSIS, NO.

7    Q.   SO IN OTHER WORDS, IN THIS CASE, IF, YOU KNOW, SAMSUNG,

8    YOU KNOW, IS GOING TO LOSE CUSTOMERS, THAT IS, IF CUSTOMERS

9    SAY, WE'RE NOT GOING TO BUY YOUR PHONE BECAUSE THEY DON'T HAVE

10   SOME OF THESE FEATURES AND YOU WANT TO LOOK AT WHERE THEY MIGHT

11   GO, YOU COULD HAVE DONE A STUDY LIKE YOU JUST DESCRIBED TO KIND

12   OF LOOK INTO THAT?

13   A.   THERE ARE MANY STUDIES THAT I COULD DO, SURE.

14   Q.   BUT WHAT YOU WOULD NOT DO IS SIMPLY TAKE THAT 20, THAT

15   NUMBER OF PERCENTAGE THAT'S LEAVING AND JUST DIVIDE IT EQUALLY

16   AMONG THE REST OF THE MARKET?

17   A.   THAT MIGHT BE CORRECT.  BUT, YOU KNOW, I JUST CAN'T ANSWER

18   YOU ONE WAY OR THE OTHER BECAUSE I HAVEN'T COLLECTED ANY DATA

19   AS TO WHETHER OR NOT THAT'S CORRECT.

20   Q.   OKAY.  SO AS A -- AS A PROFESSIONAL IN THE MARKETING AREA,

21   YOU WOULDN'T RELY ON THAT METHOD UNLESS YOU DID RESEARCH AND

22   LOOKED AT DATA TO SEE IF IT WOULD BE APPROPRIATE JUST TO DO A

23   MATHEMATICAL DISTRIBUTION OF 50 PERCENT; RIGHT?

24   A.   ARE YOU ASKING ME WOULD I DO THAT AS A MARKET --

25   Q.   YEAH.

1      A.   WELL, NO, OF COURSE NOT.  RIGHT?  BECAUSE I'M A MARKETING

2      EXPERT.  I CAN GET DEMAND.

3           IT'S POSSIBLE THAT SOMEBODY ELSE, PERHAPS JULIE DAVIS, HAS

4      ADDITIONAL INFORMATION THAT I DON'T HAVE -- I'M SORRY --

5      MS. DAVIS HAS ADDITIONAL INFORMATION.  SHE MIGHT BE ABLE TO DO

6      THOSE ANALYSES, AND I DON'T HAVE ANY OPINION ON WHETHER OR NOT

7      SHE CAN DO THE ANALYSES.

8           BUT IT'S NOT A MARKET -- I'M ASKED TO DO MARKET RESEARCH

9      AND YOU'RE ASKING ME WHAT CAN I DO WITH MARKET RESEARCH.

10          SO I JUST CAN'T -- GIVEN A VERY SIMPLE EXAMPLE YOU'VE

11     GIVEN ME, I WANT MORE INFORMATION.

12          NOW, PERHAPS SHE HAS THAT INFORMATION.

13     Q.   AND WHAT KIND OF INFORMATION DO YOU WANT?

14     A.   OKAY.  I CAN BUILD A LOGIT MODEL.  WE CAN BUILD A FLOW

15     MODEL.  FLOW MODEL MIGHT BE ABLE TO DO SOME OF THIS.

16          I CAN COLLECT DATA ON PEOPLE'S PREFERENCES WITH RESPECT TO

17     BRAND, AND I DIDN'T COLLECT PREFERENCES WITH RESPECT TO BRAND.

18          ALL I KNOW IS THAT PEOPLE ARE WILLING TO PAY QUITE A BIT

19     FOR THESE FEATURES AND THAT THEY'RE GOING TO GO SOMEPLACE,

20     RIGHT.  I DID NOT QUANTIFY WHERE THEY'RE GOING TO GO.

21     Q.   AND I'M NOT ASKING YOU IN THIS CASE.  I'M JUST SAYING YOU

22     COULD DESIGN A STUDY TRYING TO TAKE IN FACTORS THAT COULD TELL

23     YOU WHAT'S THE APPROPRIATE METHODOLOGY TO USE?

24     A.   IF YOU WANTED A MARKET RESEARCH STUDY, SURE, I MEAN, I CAN

25     DESIGN SUCH A STUDY.

1    Q.   AND YOU'VE BEEN ASKED TO DO THAT IN THE PAST, THAT SORT OF

2    STUDY TO SEE WHERE CUSTOMERS WOULD BE DISTRIBUTED ACROSS THE

3    MARKET IF THEY WERE LOST FROM SOMEONE ELSE?

4    A.   YEAH.  NORMALLY, FOR EXAMPLE, IF I WERE --

5    Q.   I JUST WANT TO KNOW IF YOU'VE DONE THEM.

6    A.   WELL, IT'S A DIFFERENT STUDY AND THERE'S THINGS YOU'RE NOT

7    GOING TO GET OUT OF THAT STUDY.

8         AND WE'RE ALWAYS FACING THIS PROBLEM.  WE CAN ASK A

9    LIMITED NUMBER OF QUESTIONS TO CONSUMERS, SO IF I'M GOING TO DO

10   AN I.A. STUDY, IT'S GOING TO BE DIFFERENT THAN A CONJOINT STUDY

11   BECAUSE I'M JUST TRYING TO FORECAST MARKET DEMAND FOR A

12   PARTICULAR AUTOMOBILE.

13        NOW, I -- I MEAN, WHAT I TRY AND DO IS, GIVEN THE AMOUNT

14   OF TIME I CAN SPEND WITH CONSUMERS, I TRY TO GET AS MUCH

15   INFORMATION TO ANSWER THE QUESTION THAT I'VE BEEN ASKED.

16   Q.   OKAY.  LET ME --

17             THE COURT:  MR. PRICE, CAN WE MARK THAT SHEET OF

18   PAPER AS AN SDX NUMBER?

19             MR. PRICE:  SURE, ABSOLUTELY.

20             THE COURT:  JUST FOR THE RECORD.

21             MR. PRICE:  ABSOLUTELY.

22             THE COURT:  WHAT WOULD YOU LIKE TO CALL THAT?

23             MR. PRICE:  WHAT WOULD BE OUR NEXT?  CHRIS?

24             MR. GRANT:  8100.

25             MR. PRICE:  8100 YOUR HONOR.

HAUSER CROSS (RES.)

```
 1              THE COURT:  OKAY.  SO 8100.  THANK YOU.

 2         (DEFENDANT'S EXHIBIT 8100 WAS MARKED FOR IDENTIFICATION.)

 3    BY MR. PRICE:

 4    Q.  I'M GOING TO SHOW YOU EXHIBIT JX 1011 AND ASK YOU IF YOU

 5    COULD -- OKAY (INDICATING).  SO DID YOUR STUDY SAY HOW MUCH A

 6    CONSUMER IS WILLING -- WOULD BE WILLING TO PAY FOR THAT

 7    FUNCTIONALITY?

 8              MS. KREVANS:  YOUR HONOR, MAY I ASK THAT THE WITNESS

 9    BE TOLD WHAT PHONE HE'S BEING SHOWN?  I HAVE NO IDEA WHAT'S ON

10    THE SCREEN.

11              MR. PRICE:  JX 1011.

12              MS. KREVANS:  AND WHAT IS THAT?

13              MR. PRICE:  I'M ASKING ABOUT THE FUNCTIONALITY.

14              MS. KREVANS:  CAN WE HAVE THIS IDENTIFIED AS TO WHAT

15    PHONE IT IS, YOUR HONOR?

16              MR. PRICE:  NO, YOUR HONOR.  IT'S JX 1011 AND THERE'S

17    A REASON AND SHE'S JUST ALERTED THE WITNESS AS TO WHY BECAUSE

18    HE'S BEEN SITTING HERE IN COURT FOR THE ENTIRE TIME.

19              THE WITNESS:  OKAY.  YOU WENT BACK AND FORTH.  WHAT

20    ARE YOU --

21              THE COURT:  THE OBJECTION'S OVER -- IT'S IMPORTANT

22    FOR YOU NOT TO TELL HIM WHAT PHONE IT IS?

23              MR. PRICE:  YES.

24              THE COURT:  ALL RIGHT.  THEN THE OBJECTION'S

25    OVERRULED.
```

1      BY MR. PRICE:

2      Q.   JX 1011.  YOU JUST SAW THE FUNCTIONALITY.  HOW MUCH DID

3      YOUR STUDY SHOW CONSUMERS WOULD BE WILLING TO PAY FOR THAT?

4      A.   WELL, IF THIS ADEQUATELY DESCRIBES THE FUNCTIONALITY AND

5      THE BASE ALTERNATIVE, THIS IS THE AUTO SWITCH, THAT WOULD BE AN

6      ADDITIONAL $39.

7      Q.   AND WHICH PATENT WAS THAT?

8      A.   THIS IS THE '915.

9      Q.   AND YOU SAW THE FUNCTIONALITY?  THAT'S THE FUNCTIONALITY

10     YOU TESTED?

11     A.   WELL, CAN YOU JUST SHOW IT AGAIN?

12     Q.   SURE.

13     A.   I'M NOT A TECHNICAL EXPERT.

14     Q.   I'M GOING TO LET MY SURE FINGERED COLLEAGUE DO IT.

15           MS. DUCCA:  (INDICATING).

16           THE WITNESS:  OH, YES, THAT'S MY UNDERSTANDING OF THE

17     '915.

18     BY MR. PRICE:

19     Q.   ACTUALLY, THAT'S THE '163, ISN'T IT?

20     A.   I'M SORRY.  YOU'RE ABSOLUTELY CORRECT.  IT'S THE '163.

21     YES, THE '163, AND WE DID NOT BREAK OUT THE '163.

22     Q.   OKAY.  SO PROFESSOR HAUSER, I JUST SHOWED YOU THE

23     FUNCTIONALITY ON EXHIBIT 1011, WHICH IS THE CAPTIVATE, WHICH

24     THE JURY FOUND THAT THAT FUNCTIONALITY DID NOT INFRINGE APPLE'S

25     PATENT.

1          AND SO WHAT YOU'RE TELLING US IS THE CONSUMER WOULD BE

2     WILLING TO PAY AS MUCH FOR WHAT YOU SAW ON SAMSUNG'S PHONE THAT

3     DOES NOT INFRINGE AS ON A SAMSUNG PHONE THAT DID INFRINGE;

4     RIGHT?

5     A.   I UNDERSTAND THERE'S SOME TECHNICAL ISSUES THAT

6     DOCTORS SINGH AND BALAKRISHNAN WILL TALK ABOUT.  BUT WHAT'S

7     YOUR QUESTION AGAIN?

8     Q.   YOU JUST TOLD US THAT YOU WOULD CONCLUDE THAT WHAT I JUST

9     SHOWED YOU ON THIS NON-INFRINGING PHONE, THIS NON-INFRINGING

10    FUNCTIONALITY, A CONSUMER WOULD BE WILLING TO PAY AS MUCH FOR

11    THIS AS FOR THE INFRINGING TECHNOLOGY.

12    A.   WELL, WHAT I SAID WITH THE MARKET -- I MEAN -- THIS IS A

13    NON-INFRINGING PHONE.  AGAIN, I UNDERSTAND THERE'S SOME

14    TECHNICAL ISSUES AS TO WHETHER OR NOT THAT PARTICULAR

15    FUNCTIONALITY IS OR IS NOT INFRINGING.  I CAN'T -- I CAN'T

16    TESTIFY TO THAT.

17         SO WHAT I CAN TESTIFY TO IS THAT FUNCTIONALITY VERSUS NOT

18    BEING ABLE TO DO THAT IS WORTH A LOT.

19    Q.   AND BY "THAT FUNCTIONALITY," THE FUNCTIONALITY I SHOWED

20    YOU IN THE NON-INFRINGING PHONE?

21    A.   THAT IS A NON-INFRINGING PHONE.  I UNDERSTAND THERE'S SOME

22    TECHNICAL QUESTIONS ON IT.

23    Q.   AND THE FUNCTIONALITY I SHOWED YOU IS THE SAME

24    FUNCTIONALITY YOU SHOWED YOUR SURVEY RESPONDENTS?

25    A.   YES, RELATIVE TO A -- TO NOT BEING ABLE TO DO THAT.

1       ACTUALLY, BEING ABLE TO DO IT IN A DIFFERENT WAY.

2       Q.   AND YOU SAID THIS WAS THE '381 PATENT.

3            MS. KREVANS:  MAY I ASK, YOUR HONOR, THAT WHATEVER

4       MR. PRICE SUBMITTED WILL BE IDENTIFIED?

5            MR. PRICE:  I'M SORRY.

6       Q.   THIS IS EXHIBIT 1009, WHICH I ASKED YOU ABOUT BEFORE.  YOU

7       SAID THIS WAS THE SAME FUNCTIONALITY AND THAT A CONSUMER WOULD

8       BE WILLING TO PAY $100 MORE FOR THIS THAN SOME NON-INFRINGING

9       ALTERNATIVE.

10           THIS FUNCTIONALITY WAS ALSO -- ALSO DOES NOT INFRINGE THE

11      '381 PATENT.  SO A CONSUMER WOULD BE WILLING TO PAY THE SAME

12      FOR A NON-INFRINGING TECHNOLOGY THAT SHOWS THAT TO THEM AS THEY

13      WOULD AN INFRINGING; RIGHT?

14      A.   WELL, WHAT I DID SAY IS THE THREE PATENTS TOGETHER ACCOUNT

15      FOR $100.

16           BUT I -- THAT'S JUST A TECHNICAL ISSUE.  I'M SURE WE AGREE

17      ON THAT.

18      Q.   I'M NOT TALKING ABOUT THE TECHNICAL ISSUE.  YOU SHOWED

19      YOUR RESPONDENTS THE FUNCTIONALITY, NOT SOURCE CODE, NOT THINGS

20      IN THE PHONE THEY DON'T SEE.  BUT YOU SHOWED THEM THE

21      FUNCTIONALITY; CORRECT?

22      A.   YES, WE SHOWED THEM THE FUNCTIONALITY AND -- ALL I'M

23      SAYING IS A VERY SIMPLE THING, IS I HAVE A NUMBER FOR THE '915,

24      '163, AND '381 PATENTS TOGETHER.  I DID NOT BREAK OUT THE '381.

25      Q.   OKAY.  SO I KEEP USING 100 AND I SHOULDN'T BECAUSE THAT'S

1    A JOINT.

2         YOU DID BREAK IT OUT FOR THE '915, AND WE HAVE HERE AN

3    EXHIBIT 1030, WHICH IS THE ACE, AND YOU TOLD ME THAT

4    FUNCTIONALITY YOU DID BREAK IT OUT AND THAT THE FUNCTIONALITY

5    YOU SEE ON THAT PHONE, AN ADDITIONAL -- A CONSUMER WOULD PAY AN

6    ADDITIONAL -- WHAT WAS IT?

7    A.   WELL, THE ADDITION FOR THE '915 PATENT, AND AGAIN, I

8    UNDERSTAND THERE'S SOME TECHNICAL ISSUES WITH RESPECT TO THE

9    ACE THAT I CAN'T TESTIFY ABOUT BECAUSE I'M NOT A TECHNICAL

10   EXPERT, BUT WHAT MY SURVEY SHOWS IS BY HAVING THE ABILITY TO

11   MOVE BETWEEN PINCH TO ZOOM AND SCROLL VERSUS NOT BEING ABLE TO

12   MOVE BETWEEN THAT AUTOMATICALLY IS WORTH $39 TO CONSUMERS.

13   Q.   AND WHEN I SHOWED THIS TO YOU BEFORE TELLING YOU IT WAS

14   THE ACE AND WAS A PHONE WHICH A JURY HAD FOUND DID NOT INFRINGE

15   IN THAT FUNCTIONALITY, OR DOES NOT INFRINGE THAT FUNCTIONALITY,

16   YOU THOUGHT IT WAS THE SAME THING YOU SHOWED YOUR RESPONDENTS;

17   RIGHT?

18   A.   NO.  I SHOWED THEM A VIDEO, AND I THINK IF YOU ACTUALLY

19   SHOW THE ANIMATION -- BUT I AGREE THAT, YOU KNOW, IF, IN FACT,

20   THIS IS A NON-INFRINGING ALTERNATIVE, THEN IT'S PRETTY MUCH THE

21   SAME AS WHAT THE INFRINGING ALTERNATIVE IS.

22        AND WHETHER OR NOT, YOU KNOW, WHAT -- THE WHOLE REASON WHY

23   THAT PHONE IS DECIDED NON-INFRINGING, I CAN'T GO TO THAT.

24        MR. PRICE:  I WOULD LOVE TO SPEND MORE TIME WITH YOU,

25   BUT I CAN'T.  THANK YOU VERY MUCH.

```
 1                  THE WITNESS:  THANK YOU.

 2                  THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:53.

 3                       REDIRECT EXAMINATION

 4       BY MS. KREVANS:

 5       Q.   JUST A COUPLE THINGS, DR. HAUSER.

 6            FIRST OF ALL, LET'S GO BACK TO SOMETHING MR. PRICE ASKED

 7       YOU ABOUT YESTERDAY.  FOR HOW LONG -- WELL, DO YOU RECALL HE

 8       ASKED YOU SOME QUESTIONS ABOUT THE EXPLORATORY INTERVIEWS THAT

 9       WERE DONE BEFORE YOU DESIGNED YOUR SURVEY?

10       A.   YES, THAT'S CORRECT.

11       Q.   WERE THE RESULTS OF THOSE INTERVIEWS USED AT ALL IN THE

12       ACTUAL SURVEY, IN THE ANALYSIS?

13       A.   NO, THEY WERE NOT.

14       Q.   FOR HOW LONG HAS IT BEEN YOUR PRACTICE NOT TO HAVE

15       INTERVIEWERS TAKE NOTES DURING THE QUALITATIVE INTERVIEWS?

16       A.   HOW LONG?  STANDARD PRACTICE FOR THE LAST 10 YEARS, 20

17       YEARS.  FOR QUITE A WHILE.

18       Q.   IS THAT PRACTICE USUAL OR UNUSUAL IN THE INDUSTRY?

19       A.   IT'S QUITE USUAL.  IT'S REALLY JUST BACKGROUND INFORMATION

20       TO HELP ONE WRITE A SURVEY.

21       Q.   OKAY.  WITH RESPECT TO THE MATERIALS YOU ACTUALLY DID USE

22       IN THE SURVEY, THE 16 DIFFERENT QUESTIONS THAT WERE GIVEN TO

23       ALL THESE HUNDREDS OF PARTICIPANTS AND ALL OF THEIR ANSWERS,

24       DID YOU GIVE THAT DATA THAT YOU GATHERED TO SAMSUNG'S ATTORNEYS

25       IN THIS CASE?
```

1     A.   YES, I BELIEVE IT'S BEEN GIVEN TO THEM.  I THINK I GAVE IT

2     TO YOU AND YOU GAVE IT TO THEM.

3     Q.   AND HOW ABOUT THE SOFTWARE THAT YOU USED TO ACTUALLY RUN

4     THE RESULTS?  WAS THAT SOFTWARE AVAILABLE TO SAMSUNG?

5     A.   ALL SOFTWARE WAS AVAILABLE TO SAMSUNG.  THEY COULD HAVE

6     REPRODUCED ANYTHING THAT I HAD DONE.

7     Q.   OKAY.  THIS MORNING MR. HAUSER -- NOT MR. HAUSER --

8     DR. HAUSER, SORRY.  MR. PRICE ASKED YOU A NUMBER OF QUESTIONS

9     ABOUT OTHER FEATURES THAT YOU COULD HAVE TESTED.  LET ME FOLLOW

10    UP ON A COUPLE THINGS ABOUT THAT.

11         FIRST OF ALL, WHEN YOU ARE CONDUCTING CHOICE-BASED

12    CONJOINT SURVEYS FOR COMPANIES FOR WHOM YOU DO WORK, LET'S SAY

13    GENERAL MOTORS, A CAR COMPANY, DO YOU, IN THOSE SURVEYS, TEST

14    AND PUT A NUMBER, A DOLLAR VALUE ON EVERY SINGLE FEATURE OF A

15    CAR THAT YOU'RE LOOKING AT?

16    A.   OH, NO.  THAT WOULD BE INFEASIBLE.  GENERAL MOTORS SPENDS

17    A LOT OF MONEY ON CONJOINT ANALYSES AND THEY TEST FEATURE SETS

18    WITHIN THE REALM THAT YOU CAN DO, LIKE SIX TO EIGHT ATTRIBUTES.

19    Q.   MR. PRICE SHOWED YOU A VERY LONG LIST OF ATTRIBUTES, OTHER

20    ATTRIBUTES THAT CELL PHONES HAVE.  HOW LONG WOULD THAT LIST BE

21    IF IT WAS A LIST OF FEATURES THAT A CAR WOULD HAVE?

22    A.   CARS ARE VERY -- IT WOULD BE LONG.

23    Q.   AND DO -- DOES GM RELY ON CONJOINT SURVEYS THAT TEST JUST

24    ONE OR TWO FEATURES TOGETHER AND THEN HAVE SIX OR SEVEN OTHER

25    FEATURES AS DISTRACTIONS?

1    A.   WELL, YES, OF COURSE.

2    Q.   NOW, MR. PRICE ASKED YOU A COUPLE OF QUESTIONS ABOUT

3    WHETHER YOU COULD HAVE PUT A DOLLAR VALUE ON SOME OF THE OTHER

4    FEATURES, LIKE THE CAMERA OR THE SCREEN SIZE.

5         WOULD IT BE AN APPROPRIATE EXERCISE TO PUT A DOLLAR VALUE

6    ON EACH OF THOSE OTHER FEATURES AND THEN ADD THOSE, PLUS THE

7    DOLLAR VALUE THAT YOU PUT, SAY, ON THE '915 PATENTED FEATURE UP

8    AND USE THAT TOTAL FOR ANYTHING?

9    A.   NO, IT WOULD NOT.

10        SO IMAGINE YOU'RE GOING ON VACATION AND A HOTEL IS GOING

11   TO SAY, WELL, FOR AN EXTRA HUNDRED DOLLARS, YOU CAN SIT BY THE

12   BEACH, OR HAVE A HOTEL ROOM BY THE BEACH.  YOU MIGHT BE WILLING

13   TO PAY FOR THAT.

14        THEY MAY ALSO HAVE AN OPTION THAT YOU HAVE A ROOM BY THE

15   POOL, AND YOU MIGHT BE WILLING TO PAY $100 FOR THAT.

16        BUT YOU PROBABLY WOULD NOT PAY $200 TO BE ON THE BEACH AND

17   ON THE POOL.  I DON'T KNOW WHAT IT WOULD BE, 120 OR SOMETHING.

18        BUT YOU HAVE TO BE CAREFUL WHEN YOU ADD THESE THINGS UP.

19             MS. KREVANS:  THANK YOU, DR. HAUSER.

20             THE COURT:  ALL RIGHT.  TIME IS NOW 9:57.

21        ANY RECROSS?

22             MR. PRICE:  JUST ONE QUESTION.

23                        **RECROSS-EXAMINATION**

24   BY MR. PRICE:

25   Q.   DR. HAUSER, IF YOU WANTED TO DO A STUDY TO COMPARE ONE OF

1    THE UTILITY FEATURES TO UNIQUE ANDROID FEATURE, LIKE SCREEN

2    SIZE OR UNIQUE SOFTWARE, YOU'D HAVE TO INCLUDE THOSE FEATURES

3    IN THE STUDY?

4    A.   YES.

5              MR. PRICE:  NOTHING FURTHER.

6              MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  TIME IS 9:58.

8         MAY THIS WITNESS BE EXCUSED, AND IS IT SUBJECT TO RECALL

9    OR NOT?

10             MS. KREVANS:  HE MAY BE EXCUSED, NOT SUBJECT TO

11   RECALL.

12             MR. PRICE:  THAT'S CORRECT.

13             THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

14             THE WITNESS:  THANK YOU, YOUR HONOR.

15             THE COURT:  CALL YOUR NEXT WITNESS, PLEASE.

16             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17        AS OUR NEXT WITNESS, WE'RE GOING TO BE CALLING BY

18   DEPOSITION JUN WON LEE.

19        IN ADVANCE OF THE DEPOSITION, YOUR HONOR, IN THE QUOTE

20   THAT MR. LEE WILL TALK ABOUT, THERE'S A DOCUMENT THAT IS

21   IDENTIFIED AS EXHIBIT 1 TO HIS DEPOSITION.

22        THAT IS PLAINTIFF'S EXHIBIT 52, AND AT THIS TIME WE WOULD

23   OFFER PLAINTIFF'S EXHIBIT 52 INTO EVIDENCE.

24             THE COURT:  ANY OBJECTION?

25             MS. MAROULIS:  NOT AT THIS TIME, YOUR HONOR.

```
 1             THE COURT:  THAT'S ADMITTED.

 2         (PLAINTIFF'S EXHIBIT 52 WAS ADMITTED IN EVIDENCE.)

 3             MR. MCELHINNY:  THEN WE'LL PLAY THE DEPOSITION OF

 4     JUN WON LEE.

 5         AND FOR THE JURY'S -- WHEN HE SAYS EXHIBIT 1, IT'S THE

 6     DOCUMENT THAT YOU'LL SEE AS PLAINTIFF'S EXHIBIT 52.

 7             THE COURT:  WE NEED THE LIGHTS LOWERED.

 8         (THE VIDEOTAPED DEPOSITION OF JUN WON LEE WAS PLAYED IN

 9     OPEN COURT OFF THE RECORD.)

10             THE COURT:  TIME IS NOW 10:03.

11             MR. MCELHINNY:  YOUR HONOR, WE REQUEST PERMISSION TO

12     LODGE THE CLIP REPORT OF THE DEPOSITION AS PX 3038.

13             MS. MAROULIS:  NO OBJECTION, AND NO

14     COUNTER-DESIGNATIONS, YOUR HONOR.

15             THE COURT:  OKAY.

16         (PAUSE IN PROCEEDINGS.)

17             THE COURT:  GO AHEAD, PLEASE.

18             MR. MCELHINNY:  YOUR HONOR, AT THIS TIME WE WOULD

19     CALL TIMOTHY BENNER BY DEPOSITION.  MR. BENNER IS THE SENIOR

20     MANAGER IN CONSUMER INSIGHTS AND ANALYTICS FOR SAMSUNG

21     TELECOMMUNICATIONS AMERICA.

22         IN THIS DEPOSITION CLIP, THE WITNESS WILL REFER TO EXHIBIT

23     1594.  THAT HAS BEEN MARKED IN EVIDENCE IN THIS CASE AS

24     PLAINTIFF'S EXHIBIT 69, AND AT THIS TIME I WOULD LIKE TO OFFER

25     INTO EVIDENCE PLAINTIFF'S EXHIBIT 69.
```

```
 1              THE COURT:  ACTUALLY, I HAVE A QUESTION ABOUT

 2    MR. LEE.

 3         HOW IS THAT TIME TO BE CHARGED?  I DON'T -- IT'S NOT

 4    LISTED --

 5              MR. MCELHINNY:  AT THE VERY TOP OF THE TIME -- AT THE

 6    VERY TOP ON THE RIGHT-HAND SIDE -- YOU'VE GOT ACTUALLY MY

 7    COPY -- IT HAS A RUNNING TIME.  I THINK IN THAT CASE IT WAS

 8    3.51.

 9              THE COURT:  THAT IS ALL TO BE CHARGED TO YOU?

10              MR. MCELHINNY:  THAT IS ALL TO BE CHARGED TO ME, YOUR

11    HONOR.

12              THE COURT:  OKAY.

13              MR. MCELHINNY:  UNLESS YOU WOULD LIKE TO GIVE ME A

14    DISCOUNT.

15              THE COURT:  NO, I DON'T.

16         (LAUGHTER.)

17              MR. MCELHINNY:  OKAY.

18              THE COURT:  OKAY.  GO FOR IT, PLEASE.

19              MR. MCELHINNY:  IN THIS CASE -- SO WE WOULD OFFER

20    PLAINTIFF'S EXHIBIT 69 IN CONNECTION WITH MR. BENNER'S

21    TESTIMONY.

22              THE COURT:  OKAY.

23              MS. MAROULIS:  NO ADDITIONAL OBJECTIONS, YOUR HONOR.

24              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

25         (PLAINTIFF'S EXHIBIT 69 WAS ADMITTED IN EVIDENCE.)
```

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2              MR. MCELHINNY:  SO WHEN THEY TALK ABOUT EXHIBIT 1594

 3    IN THIS CLIP, THAT WOULD BE PLAINTIFF'S EXHIBIT 69 WHEN YOU GET

 4    IT.

 5              (THE VIDEOTAPED DEPOSITION OF TIMOTHY BENNER WAS PLAYED IN

 6    OPEN COURT OFF THE RECORD.)

 7              MR. MCELHINNY:  YOUR HONOR, AT THIS TIME I REQUEST

 8    PERMISSION TO LODGE THE CLIP REPORT AS PX 3039.

 9              THE COURT:  OKAY.  AND HOW MUCH TIME SHOULD BE

10    CHARGED?

11              MR. MCELHINNY:  THREE MINUTES, 20 SECONDS, 20.30

12    SECONDS.

13              MS. MAROULIS:  COUNSEL, MAY I HAVE COPIES OF THE CLIP

14    REPORT, PLEASE?

15              THE COURT:  IS THAT CHARGED -- I'M GOING TO CHARGE

16    THAT AS FOUR MINUTES.

17              MR. MCELHINNY:  EXCUSE ME?

18              THE COURT:  WELL, IT'S 10:05 TO 10:10, AND YOU'RE

19    GETTING THIS EXHIBIT IN, WHICH IS ALSO MORE TIME.

20              MR. MCELHINNY:  AS OUR NEXT WITNESS, YOUR HONOR, WE

21    CALL TODD PENDLETON BY DEPOSITION.  MR. PENDLETON IS THE CHIEF

22    MARKETING OFFICER OF WIRELESS TERMINALS AT SAMSUNG

23    TELECOMMUNICATIONS AMERICA.

24              (THE VIDEOTAPED DEPOSITION OF TODD PENDLETON WAS PLAYED IN

25    OPEN COURT OFF THE RECORD.)
```

1          MR. MCELHINNY:  YOUR HONOR, I REQUEST PERMISSION TO

2     LODGE THE CLIP REPORT AS PLAINTIFF'S EXHIBIT P 03 -- PX 3040.

3     IT SHOWS THE RUNNING TIME, YOUR HONOR, AS ONE MINUTE, 31

4     SECONDS.

5          THE COURT:  I ASSUME NO OBJECTION TO THAT LODGING OF

6     THE CLIP.

7          MS. MAROULIS:  CORRECT, YOUR HONOR.

8          THE COURT:  OKAY.  OKAY.  CALL YOUR NEXT WITNESS,

9     PLEASE.

10          MS. KREVANS:  YOUR HONOR, APPLE CALLS JULIE DAVIS.

11          (PAUSE IN PROCEEDINGS.)

12          THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

13          **(JULIE DAVIS, PLAINTIFF'S WITNESS, SWORN.)**

14          THE WITNESS:  I DO.

15          THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

16     AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT.

17          THE CLERK:  TIME IS NOW 10:15.  GO AHEAD, PLEASE.

18          THE WITNESS:  JULIE L. DAVIS.  THE FIRST NAME IS

19     J-U-L-I-E, LAST NAME IS D-A-V-I-S.

20                        **DIRECT EXAMINATION**

21     BY MS. KREVANS:

22     Q.   GOOD MORNING, MS. DAVIS.

23     A.   GOOD MORNING.

24     Q.   COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

25     A.   YOU JUST HEARD MY NAME.  I'M JULIE DAVIS AND I WORK FOR A

DAVID DIRECT

1     IF I REMEMBER DAVIS & HOSFIELD CONSULTING, H-O-S-F-I-E-L-D.

2     Q.   WHERE ARE YOU FROM, MS. DAVIS?

3     A.   I GREW UP ON A WHEAT FARM IN WESTERN KANSAS.

4     Q.   WHERE DID YOU GO TO SCHOOL?

5     A.   I WENT TO KANSAS STATE UNIVERSITY.

6     Q.   WHAT DO YOU DO NOW FOR A LIVING?

7     A.   MOST OF MY WORK NOW IS AS -- MY TRAINING IS AS A CPA, BUT

8     MOST OF MY WORK IS DAMAGES ANALYSIS IN CASES MUCH LIKE THIS

9     ONE, OFTEN INVOLVING PATENT INFRINGEMENT.

10    Q.   OKAY.  COULD WE SEE SLIDE PDX 100, PAGE 1.

11         WHAT WERE YOU ASKED TO DO IN THIS CASE, MS. DAVIS?

12    A.   I WAS ASKED TO DETERMINE THE AMOUNT OF DAMAGES THAT

13    SAMSUNG SHOULD PAY TO APPLE FOR HAVING INFRINGED THE FIVE

14    PATENTS IN THIS CASE.

15    Q.   LET'S TALK, BEFORE WE GET TO YOUR OPINIONS, ABOUT YOUR

16    BACKGROUND.

17         FIRST, COULD YOU TELL US A LITTLE BIT ABOUT

18    DAVIS & HOSFIELD CONSULTING, YOUR CURRENT FIRM.

19    A.   OUR FIRM HAS ABOUT 25 PROFESSIONALS, MOSTLY FROM

20    BACKGROUNDS IN ACCOUNTING AND FINANCE.  AND MOST OF THE WORK WE

21    DO IS IN THE CONTEXT OF LITIGATION WHERE WE ARE ASKED TO

22    DETERMINE THE AMOUNT OF DAMAGES THAT ONE PARTY SHOULD PAY TO

23    ANOTHER.

24    Q.   AND WHAT'S YOUR POSITION AT DAVIS & HOSFIELD?

25    A.   I AM ONE OF THE FOUNDING PRINCIPALS, SO I'M THE DAVIS OF

1    DAVIS & HOSFIELD.

2    Q.   AND WHAT TYPE OF WORK DO YOU DO PERSONALLY?

3    A.   MOST OF MY WORK IS IN THE CONTEXT OF PATENT INFRINGEMENT

4    LITIGATION OR OTHER TYPES OF INTELLECTUAL PROPERTY.   SO

5    INTELLECTUAL PROPERTY WOULD INCLUDE PATENTS, TRADEMARKS, TRADE

6    SECRETS, AND COPYRIGHT.

7    Q.   LET'S GO BACK AND PICK UP YOUR HISTORY BEFORE YOU FOUNDED

8    DAVIS & HOSFIELD.   WHAT KIND OF DEGREE DID YOU GET FROM KANSAS

9    STATE UNIVERSITY?

10   A.   MY DEGREE IS A BACHELOR'S DEGREE IN BUSINESS

11   ADMINISTRATION AND ACCOUNTING.

12   Q.   AND I SEE ON YOUR SLIDE IT SAYS, IN ADDITION TO GRADUATED

13   SUMMA CUM LAUDE, THAT YOU WERE INDUCTED INTO THE ACCOUNTING

14   HALL OF FAME AT KSU.   IS THAT SOMETHING YOU'RE PROUD OF?

15   A.   I AM.

16   Q.   WHAT DID YOU DO AFTER YOU GRADUATED FROM KANSAS STATE?

17   A.   AFTER I GRADUATED FROM K STATE, I JOINED ONE OF THE LARGE

18   INTERNATIONAL ACCOUNTING FIRMS AT THE TIME KNOWN BACK THEN AS

19   THE BIG 8.   THAT PARTICULAR FIRM WAS TOUCHE ROSS.   I SPENT NINE

20   YEARS THERE IN THE AUDIT PRACTICE AUDITING THE BOOKS AND

21   RECORDS OF A VARIETY OF DIFFERENT KINDS OF COMPANIES.

22       FROM THERE I MOVED ON TO ARTHUR ANDERSEN, ANOTHER ONE OF

23   THE LARGE INTERNATIONAL ACCOUNTING FIRMS, AT THE TIME, AND I

24   WAS PART OF THE ECONOMIC AND FINANCIAL CONSULTING PRACTICE.   AT

25   THE TIME I LEFT THERE, I WAS IN CHARGE OF THE WORLDWIDE

1        INTELLECTUAL PROPERTY CONSULTING PRACTICE.

2        Q.   WHAT WAS THE NATURE OF THE INTELLECTUAL PROPERTY

3        CONSULTING PRACTICE THAT YOU HEADED AT ARTHUR ANDERSEN?

4        A.   THERE WERE TWO SIDES TO THAT PRACTICE.  I WAS INVOLVED

5        WITH BOTH OF THOSE.  ONE HAD TO DO INTELLECTUAL PROPERTY

6        LITIGATION MATTERS, MUCH LIKE THIS.

7            THE SECOND HAD TO DO WITH WHAT I WOULD THINK OF AS I.P.

8        MANAGEMENT.

9            SO WE WERE WORKING WITH CLIENTS WHO WERE SEEKING TO

10       DEVELOP INTELLECTUAL PROPERTY STRATEGIES OR BETTER MANAGE THEIR

11       PATENT PORTFOLIOS.

12       Q.   WHAT KINDS OF THINGS DID YOU DO TO HELP CLIENTS BETTER

13       MANAGE THEIR PATENT PORTFOLIOS?

14       A.   I HAD AUTHORED A BOOK, CO-AUTHORED A BOOK THAT PROFILED

15       STORIES OF COMPANIES THAT WERE KNOWN TO BE MANAGING THEIR

16       PATENT PORTFOLIOS WELL, AND WE HAD IDENTIFIED THE BEST

17       PRACTICES THEY WERE USING TO DO SO.

18           SO WE WOULD WORK WITH THEM, WITH OUR CLIENTS TO HELP THEM

19       ADOPT SOME OF THOSE BEST PRACTICES.

20       Q.   AND WHAT DID YOU DO WHEN YOU LEFT ARTHUR ANDERSEN?

21       A.   I TOOK A SIMILAR POSITION AT KPMG, ANOTHER ONE OF THE

22       LARGE INTERNATIONAL ACCOUNTING AND CONSULTING FIRMS, AND THERE

23       I WAS IN CHARGE OF THE NATIONAL I.P. PRACTICE.

24       Q.   CAN YOU TELL US A LITTLE BIT ABOUT THE KINDS OF LITIGATION

25       RELATED CONSULTING WORK THAT DID YOU AT ANDERSEN AND AT KPMG

1     THAT HAD TO DO WITH INTELLECTUAL PROPERTY?

2     A.   MOST OF THE WORK I DID WAS IN THE AREA OF PATENT

3     INFRINGEMENT.  I ALSO WORKED ON A NUMBER OF TRADEMARK, TRADE

4     SECRET AND COPYRIGHT CASES.

5          BUT AS FAR AS THE PATENT CASES WENT, THEY COVERED A

6     VARIETY OF INDUSTRIES AND PRODUCTS, SO THEY RANGED FROM

7     SMARTPHONES TO KITTY LITTER, JET ENGINES, GOLF BALLS, FARM

8     TRACTORS.

9     Q.   AND WHAT SPECIFICALLY WERE YOU DOING IN CONNECTION WITH

10    THAT KIND OF PATENT LITIGATION?

11    A.   MY JOB WAS ALWAYS TO DETERMINE THE AMOUNT OF DAMAGES THAT

12    ONE PARTY SHOULD PAY TO ANOTHER FOR HAVING INFRINGED A VALID

13    PATENT.

14    Q.   AND WHEN DID YOU FOUND DAVIS & HOSFIELD?

15    A.   WE FOUNDED THE FIRM IN 2003.

16    Q.   AND WHAT HAVE YOU BEEN DOING SINCE 2003 IN CONNECTION WITH

17    INTELLECTUAL PROPERTY MATTERS?

18    A.   NEARLY ALL OF MY WORK SINCE THAT TIME HAS BEEN IN THE AREA

19    OF LITIGATION MATTERS THAT INVOLVED INTELLECTUAL PROPERTY.

20    Q.   HAVE YOU AUTHORED ANY PUBLICATIONS RELATED TO VALUATION OF

21    INTELLECTUAL PROPERTY OR DAMAGES IN PATENT CASES?

22    A.   I HAVE.  I'VE AUTHORED A NUMBER OF ARTICLES, AND AS I

23    MENTIONED, I'VE ALSO CO-AUTHORED A BOOK.  THE NAME OF THE BOOK

24    WAS "EDISON IN THE BOARDROOM."

25    Q.   EDISON AS IN THOMAS EDISON?

DAVID DIRECT

1   A.   YES.

2   Q.   OKAY.  DO YOU BELONG TO ANY PROFESSIONAL ORGANIZATIONS

3   THAT ARE RELEVANT TO YOUR TESTIMONY TODAY?

4   A.   I DO.  I BELONG TO A COUPLE OF THEM THAT WOULD BE RELEVANT

5   TO OUR DISCUSSION TODAY.  ONE IS THE IACPA, WHICH IS THE

6   AMERICAN INSTITUTE OF CPA'S.

7        AND THE SECOND ONE IS L.E.S.  THE LICENSING EXECUTIVE

8   SOCIETY.  SO THAT'S A GROUP OF PROFESSIONALS THAT ARE INVOLVED

9   IN LICENSING INTELLECTUAL PROPERTY.

10  Q.   OKAY.  I WANT TO REMIND YOU, MS. DAVIS, YOU AND I BOTH

11  NATURALLY TALK RATHER FAST, SO WHEN WE'RE IN THE COURTROOM, WE

12  HAVE TO TRY TO SLOW DOWN A LITTLE BIT SO THE COURT REPORTER CAN

13  GET DOWN EVERYTHING WE'RE SAYING.  OKAY?

14  A.   I'LL DO THAT.

15  Q.   ABOUT HOW MANY YEARS OF EXPERIENCE DO YOU HAVE ASSESSING

16  THE APPROPRIATE LEVEL OF DAMAGES IN PATENT LITIGATION?

17  A.   I THINK MY FIRST PATENT LITIGATION MATTER WAS 26 YEARS

18  AGO, SO I'VE BEEN WORKING ON SUCH MATTERS EVER SINCE.

19  Q.   AND HAVE YOU PREVIOUSLY BEEN ACCEPTED BY COURTS AS AN

20  EXPERT IN ASSESSING PATENT DAMAGES?

21  A.   I HAVE.

22  Q.   DO YOU KNOW ABOUT HOW MANY PATENTS CASES YOU'VE WORKED ON?

23  A.   I'VE WORKED ON AT LEAST 300 PATENT CASES.

24  Q.   AND BEFORE TODAY, ABOUT HOW MANY TIMES HAVE YOU TESTIFIED

25  TO A JURY ABOUT THE APPROPRIATE LEVEL OF DAMAGES IN A PATENT

1    CASE?

2    A.   THAT WOULD BE AT LEAST 40 TIMES.

3    Q.   ABOUT HOW MANY -- WHAT -- WELL, WHAT'S THE SPLIT?  HOW

4    OFTEN HAVE YOU TESTIFIED FOR THE PLAINTIFF AND HOW OFTEN HAVE

5    YOU TESTIFIED FOR THE DEFENDANT?

6    A.   I THINK IT'S PROBABLY PRETTY EVENLY SPLIT, 50-50.

7    Q.   OKAY.

8         MS. KREVANS:  YOUR HONOR, WE'D OFFER MS. DAVIS AS AN

9    EXPERT WITNESS ON THE ASSESSMENT OF THE APPROPRIATE DAMAGES FOR

10   THE PATENT INFRINGEMENT IN THIS CASE.

11        THE COURT:  ANY ADDITIONAL VOIR DIRE OR OBJECTION?

12        MR. PRICE:  NO, YOUR HONOR, NO OBJECTION.

13        THE COURT:  ALL RIGHT.  SO CERTIFIED.

14   GO AHEAD, PLEASE.

15   BY MS. KREVANS:

16   Q.   COULD YOU EXPLAIN TO THE JURY THE SPECIFIC ASSIGNMENT THAT

17   YOU WERE ASKED TO TAKE ON IN THIS CASE?

18   A.   AS I MENTIONED, I WAS ASKED TO DETERMINE THE AMOUNT OF

19   DAMAGES THAT SAMSUNG SHOULD PAY TO APPLE FOR HAVING INFRINGED

20   THE FIVE SPECIFIC PATENTS IN THIS CASE, AND FOR THE 13

21   PARTICULAR PRODUCTS IN THIS CASE.

22   Q.   AND COULD YOU SUMMARIZE WHAT YOU DID TO CARRY OUT THAT

23   ASSIGNMENT?

24   A.   WHAT I DID WAS TO REVIEW THE EVIDENCE THAT HAD BEEN

25   PRESENTED IN THE FIRST TRIAL, OR FOR THE FIRST TRIAL, AND I

1    HAVE ALSO PICKED UP WHERE ONE OF THE PRIOR EXPERTS LEFT OFF IN

2    ANALYZING THE DAMAGES FOR THESE SPECIFIC PRODUCTS.

3    Q.   AND WHO WAS THAT EXPERT?

4    A.   THAT WAS MR. TERRY MUSIKA.  SADLY, MR. MUSIKA PASSED AWAY

5    LAST DECEMBER.  I WAS ASKED TO STEP INTO HIS SHOES AND COMPLETE

6    THE CALCULATION TO PRESENT IT TO YOU TODAY.

7    Q.   AND WHAT WAS THE NAME OF THE FIRM THAT WORKED WITH

8    MR. MUSIKA?

9    A.   HIS FIRM WAS NAMED INVOTEX, AND I WORKED WITH THE SAME

10   INDIVIDUALS AT INVOTEX SINCE THEN AS HE HAD WORKED WITH IN

11   PREPARATION FOR THE FIRST TRIAL.

12   Q.   CAN YOU ESTIMATE FOR US ROUGHLY HOW MUCH TIME, IN

13   COMBINATION, INVOTEX, YOUR STAFF, AND YOU HAVE SPENT ON THIS

14   ASSESSMENT OF HOW MUCH DAMAGES SAMSUNG SHOULD PAY TO APPLE FOR

15   THE PATENT INFRINGEMENT AT ISSUE IN THIS TRIAL?

16   A.   I KNOW THAT AS OF THE FIRST TRIAL, MR. MUSIKA AND HIS

17   COLLEAGUES HAD SPENT ABOUT 7,000 HOURS PREPARING THE DAMAGES

18   CALCULATIONS AND THE DAMAGES DATABASE THAT I HAVE SINCE USED.

19        I HAVE SPENT ABOUT 400 HOURS PERSONALLY SINCE THEN

20   REVIEWING THAT DAMAGES DATABASE AND PREPARING THE CALCULATIONS

21   FOR YOU.

22        AND THEN MY COLLEAGUES AT DAVIS & HOSFIELD HAVE SPENT

23   ANOTHER 500 HOURS ASSISTING ME WITH THAT.

24   Q.   WHAT DID YOU DO TO MAKE SURE THAT YOU WERE COMFORTABLE

25   RELYING ON THE WORK THAT WAS DONE BEFORE YOU PERSONALLY GOT

DAVID DIRECT

1    INVOLVED IN THE CASE?

2    A.   I REVIEWED THE TRIAL TRANSCRIPT FROM THE FIRST TRIAL; I

3    REVIEWED THOSE EXHIBITS THAT WERE NOT CONFIDENTIAL AT THAT TIME

4    AND ULTIMATELY DECIDED THAT I WAS COMFORTABLE WITH THE OPINIONS

5    THAT WERE EXPRESSED.

6    Q.   AND WHAT DID YOU DO TO ASSURE YOURSELF THAT YOU WERE

7    COMFORTABLE WITH THE COMPUTER MODEL THAT INVOTEX HAD BUILT AND

8    THAT YOU YOURSELF ARE NOW USING?

9    A.   WELL, THE 900 HOURS THAT I AND MY COLLEAGUES AT

10   DAVIS & HOSFIELD SPENT WERE SPENT IN GREAT PART NOT ONLY TO

11   REVIEW THE EVIDENCE, BUT TO TEST THAT MODEL AND MAKE SURE IT

12   WORKED EXACTLY LIKE WE WOULD EXPECT IT TO.

13   Q.   WHY DID IT TAKE SO MUCH INVESTMENT OF TIME BY INVOTEX AND

14   BY YOUR STAFF TO DO THE DAMAGES ASSESSMENT FOR THIS PARTICULAR

15   CASE?

16   A.   THIS IS AN EXTRAORDINARILY COMPLEX CASE.  THERE ARE A LOT

17   OF PRODUCTS INVOLVED.  THERE WERE A LOT OF PATENTS INVOLVED.

18   YOU HAD TO ANALYZE DAMAGES ON A UNIT-BY-UNIT BASIS.

19        SO IT'S MUCH MORE COMPLICATED THAN MOST CASES.

20   Q.   OKAY.  COULD WE SEE SLIDE 100, PAGE 4.

21        COULD YOU EXPLAIN TO THE JURY WHAT'S SET OUT IN THIS

22   SLIDE, MS. DAVIS?

23   A.   THIS IS A PAGE FROM MY REPORT THAT I HAVE SINCE

24   HIGHLIGHTED SO I CAN TALK TO YOU ABOUT THE UTILITY PATENTS IN

25   PARTICULAR ON THIS PAGE.

1          THE 13 PRODUCTS DOWN THE SIDE ARE THE ONES THAT HAVE BEEN

2     FOUND TO INFRINGE.  THOSE ARE THE SAMSUNG PRODUCTS.  TWELVE OF

3     THEM ARE SMARTPHONES, ONE OF THEM IS A TABLET.

4          AND THE THREE UTILITY PATENTS THAT THEY HAVE BEEN FOUND TO

5     INFRINGE ARE MARKED IN THE YELLOW BOXES WITH THE X'S.

6     Q.   I WANT TO JUST GET A COUPLE PIECES OF TERMINOLOGY STRAIGHT

7     SO WE CAN ALL BE CLEAR ABOUT WHAT YOU'RE SAYING.

8          FIRST OF ALL, YOU USED THE WORD "PRODUCTS."  WHEN YOU SAY

9     "PRODUCTS," WHAT SHOULD THE JURY UNDERSTAND YOU TO MEAN?

10    A.   I WILL TRY TO USE THAT, THAT TERM TO MEAN THE, CALL IT THE

11    FAMILIES OR THE NAMES OF THOSE PRODUCTS.

12         SO, FOR INSTANCE, THE FIRST ONE ON THE LIST IS THE

13    CAPTIVATE, AND I THINK WE SAW THAT ONE USED EARLIER TODAY AS AN

14    EXAMPLE.  SO THE PARTICULAR PHONE MODEL THAT IS CALLED THE

15    CAPTIVATE, I WILL REFER TO AS A PRODUCT OR ONE OF THE

16    INFRINGING PRODUCTS.

17    Q.   OKAY.  SO A PRODUCT IS THE SAME THING AS A MODEL?

18    A.   I'LL THINK OF IT THAT WAY.

19    Q.   AND WE HAVE 13 OF THEM AT ISSUE IN THIS TRIAL?

20    A.   WE DO.

21    Q.   WHAT DID YOU MEAN WHEN YOU SAID THE WORD "UNIT"?

22    A.   UNIT, I MEAN ANY SINGLE PHONE.  SO, FOR INSTANCE, HERE'S

23    MINE.  THIS ONE HAPPENS TO BE AN IPHONE.  BUT THIS IS A UNIT

24    (INDICATING).  SO WHEN I TALK ABOUT CALCULATED DAMAGES, WE HAD

25    TO DO SO FOR EACH INDIVIDUAL UNIT.

1    Q.   WERE THE DAMAGES IN THIS CASE CALCULATED ON A, LITERALLY A

2    UNIT-BY-UNIT BASIS?

3    A.   THEY WERE, AND I THINK WE'LL PROBABLY END UP TALKING MORE

4    ABOUT THAT.

5    Q.   WHAT ARE YOU DEPICTING BY THE YELLOW HIGHLIGHTED ON SLIDE

6    4?

7    A.   THE YELLOW HIGHLIGHTING WILL BE THE PATENTS THAT THE, OR

8    THE PRODUCTS, THE 13 PRODUCTS THAT INFRINGE THE THREE UTILITY

9    PATENTS, AND YOU CAN SEE THAT FOR EACH OF THOSE PRODUCTS, I

10   HAVE MARKED WITH X'S THE SPECIFIC PATENTS THAT THOSE PRODUCTS

11   HAVE BEEN FOUND TO INFRINGE.

12   Q.   OKAY.  CAN YOU EXPLAIN TO THE JURY WHAT IS MEANT BY A

13   NOTICE DATE IN ASSESSING PATENT INFRINGEMENT DAMAGES?

14   A.   I WON'T GIVE YOU A LEGAL DEFINITION SINCE I'M NOT A

15   LAWYER, BUT MY UNDERSTANDING OF THAT TERM AND THE WAY I HAVE

16   USED THAT IS THAT IS THE DATE AT WHICH DAMAGES START, AT LEAST

17   IN THIS CASE.

18   Q.   WHAT ARE THE NOTICE DATES, THAT IS, THE DATES ON WHICH YOU

19   STARTED ASSESSING DAMAGES, FOR THE UTILITY PATENTS AT ISSUE IN

20   THIS CASE THAT ARE SHOWN IN THE HIGHLIGHTED AREAS HERE?

21   A.   I CAN TELL YOU THAT THE NOTICE DATES THAT I HAVE USED ARE

22   FOR THE '163, JUNE 16TH OF 2011, AND THAT RELATES TO THE

23   PRODUCTS HAVE X'S BELOW THAT.

24        THE NOTICE DATE FOR THE '381 THAT I HAVE USED IS

25   AUGUST 4TH OF 2010 FOR THE X'S IN THE PRODUCTS THAT ARE MARKED

1      THERE.

2           AND FOR THE '915 PATENT, I HAVE USED A NOTICE DATE OF

3      APRIL 15, 2011.

4      Q.   AND COULD WE SEE SLIDE 6, MR. LEE.

5           WHAT HAVE YOU SET OUT ON SLIDE 6, MS. DAVIS?

6      A.   THIS IS THE SAME SLIDE, EXCEPT NOW WE'RE FOCUSSED ON THE

7      DESIGN PATENTS THAT ARE ON THE RIGHT-HAND SIDE, AND I HAVE

8      HIGHLIGHTED ONLY THOSE SEVEN PRODUCTS THAT WERE FOUND TO

9      INFRINGE THOSE TWO DESIGN PATENTS.  AND YOU CAN SEE IN THOSE

10     RIGHT-HAND COLUMNS SPECIFICALLY WHICH DESIGN PATENTS ARE

11     INFRINGED BY WHICH PRODUCTS.

12     Q.   AND WHAT NOTICE DATES DID YOU USE FOR THE TWO DESIGN

13     PATENTS, THE D'305 AND THE D'677?

14     A.   FOR THE D'305 PATENT, I'VE USED A JUNE 16, 2011 NOTICE

15     DATE.

16          AND FOR THE D'677 PATENT, I HAVE USED THE APRIL 15, 2011

17     DATE.

18     Q.   OKAY.  JUST SO WE'RE CLEAR, WHAT WAS THE START DATE THAT

19     YOU USED FOR ASSESSING DAMAGES FOR EACH OF THE 13 PRODUCTS THAT

20     ARE LISTED ON THE LEFT-HAND SIDE OF YOUR SLIDE?

21     A.   THE START DATE FOR DAMAGES IS THE NOTICE DATE FOR EACH OF

22     THOSE SPECIFIC PATENTS.  THE EARLIEST START DATE OF ANY OF THEM

23     WAS THE AUGUST 4TH, 2010 DATE THAT I MENTIONED.

24     Q.   WAS THERE AN END DATE FOR THE TIME PERIOD IN WHICH YOU

25     ASSESSED WHAT DAMAGES SAMSUNG OWES TO APPLE ON THESE 13

1    PRODUCTS?

2    A.   FOR PURPOSES OF THIS TRIAL, THE DAMAGES PERIOD ENDS

3    JUNE 30TH OF 2012, BECAUSE THAT'S THE LAST DATE FOR WHICH

4    SAMSUNG HAS PROVIDED SALES INFORMATION.

5    Q.   OKAY.  COULD WE SEE SLIDE PDX 100, PAGE 2.

6         WHAT ARE THE TYPES OF DAMAGES REMEDIES THAT COULD BE

7    AWARDED BY THE JURY IN THIS CASE?

8    A.   THERE ARE THREE TYPES OF SUCH REMEDIES.  I'VE LABELED THEM

9    ON THIS SLIDE AS APPLE'S LOST PROFITS; THE SECOND ONE IS

10   SAMSUNG'S PROFITS, YOU MIGHT HEAR IT REFERRED TO AS INFRINGER'S

11   PROFITS; AND THEN THIRDLY, REASONABLE ROYALTIES.

12   Q.   COULD YOU FIRST EXPLAIN TO THE JURY, WHAT IS MEANT BY A

13   LOST PROFITS REMEDY?

14   A.   THE LOST PROFITS REMEDY IS MEANT TO ENCOMPASS THOSE UNITS

15   THAT YOU BELIEVE APPLE WOULD HAVE SOLD HAD SAMSUNG NOT BEEN

16   SELLING THE INFRINGING PRODUCTS.

17        SO HOW MUCH WOULD APPLE HAVE MADE HAD IT SOLD SOME OF

18   THOSE PRODUCTS INSTEAD?

19   Q.   WHAT IS THE TEST THAT YOU --

20        THE COURT:  EXCUSE ME.  IT'S 10:31.  LET'S GO AHEAD

21   AND TAKE OUR 15 MINUTE BREAK NOW.  SORRY TO INTERRUPT YOU.

22        OKAY.  IT'S 10:31.  AGAIN, PLEASE KEEP AN OPEN MIND AND

23   DON'T RESEARCH OR DISCUSS THE CASE.  WE'LL TAKE A 15 MINUTE

24   BREAK NOW.

25        THANK YOU.

```
 1            (JURY OUT AT 10:31 A.M.)

 2                 THE COURT:  MS. DAVIS, YOU MAY STEP DOWN.

 3                 THE WITNESS:  THANK YOU.

 4                 THE COURT:  ALL RIGHT.  THANK YOU.

 5            (RECESS FROM 10:32 A.M. UNTIL 10:55 A.M.)

 6                 THE COURT:  ALL RIGHT.  WELCOME BACK.  TAKE A SEAT,

 7       PLEASE.

 8                 MR. PRICE:  YOUR HONOR, A QUICK REQUEST, YOUR HONOR.

 9       COULD WE HAVE UNTIL 2:00 O'CLOCK FOR THIS BRIEF INSTEAD OF

10       NOON?  APPLE HAS UNTIL 6:00.

11                 THE COURT:  THAT'S FINE.

12                 MR. PRICE:  THANK YOU.

13                 THE COURT:  DO YOU NEED MORE TIME THAN FOUR HOURS?  I

14       MEAN, IS THIS GOING TO COME UP AT ALL TODAY?

15                 MR. PRICE:  NO.

16                 THE COURT:  IS THIS JUST A CLOSING ISSUE?

17                 MS. KREVANS:  I THINK THIS IS JUST A CLOSING ISSUE AT

18       THIS POINT, YOUR HONOR, BECAUSE YOU'VE DENIED THEIR MOTION TO

19       STRIKE.

20                 THE COURT:  OKAY.  SO IF IT'S PURELY A CLOSING ISSUE

21       AND IT'S NOT GOING TO COME UP TODAY, THEN I COULD GIVE YOU ALL

22       MORE TIME.  I JUST THOUGHT I NEEDED TO DECIDE IT QUICKLY IN

23       CASE IT MIGHT COME UP DURING ONE OF THESE WITNESSES --

24                 MR. PRICE:  YOUR HONOR RULED THAT IT SHOULDN'T --

25       THAT IT COULD NOT BE RELIED UPON BY MS. DAVIS, SO --
```

```
 1              THE COURT:  I UNDERSTAND.  BUT I THOUGHT THERE WAS AN
 2      ISSUE THAT CAME UP.
 3              MR. PRICE:  OKAY.  WE'RE FINE.
 4              THE COURT:  OKAY.  SO YOU WANT TO DO -- YOU CAN STILL
 5      DO 2:00, MR. PRICE?  OR DO YOU WANT MORE TIME?  OKAY.
 6              MR. PRICE:  6:00?
 7              THE COURT:  OKAY.  SO IF YOU FILE AT 6:00, YOU WANT
 8      TO FILE TOMORROW MORNING?
 9              MS. KREVANS:  THAT WOULD BE GREAT, YOUR HONOR.
10              THE COURT:  CAN YOU DO 8:00?
11              MS. KREVANS:  WE CAN.
12              THE COURT:  DID YOU COME TO ANY AGREEMENT ABOUT YOUR
13      EVIDENTIARY OBJECTIONS FOR THE MONDAY EXHIBITS?
14              MR. MCELHINNY:  NOT YET, YOUR HONOR.
15              THE COURT:  OKAY.
16              MS. KREVANS:  I'M SORRY.  I THOUGHT WE WERE SUPPOSED
17      TO DISCUSS IT AT LUNCH TIME.
18              THE COURT:  YOU CAN TELL ME -- I WAS HOPING BEFORE
19      THEN, BUT THAT'S FINE.  YOU CAN TELL ME AFTER LUNCH.  ANY
20      LITTLE HEAD START YOU CAN GIVE US WOULD BE APPRECIATED.
21          OKAY.  ANYTHING ELSE?
22              MS. KREVANS:  NOT FROM APPLE.
23              THE COURT:  OKAY.  THEN LET'S BRING OUR JURY IN.
24          AND I'M GOING TO ASK, I HAVE NOTES UP HERE, SO I WOULD
25      PREFER THAT NO ONE FROM ANY OF YOUR TEAMS COME UP.  IF YOU'VE
```

```
1    GOT BOXES, JUST LEAVE THEM HERE.  I CAN MOVE THEM OR GIVE THEM

2    TO MS. PARKER BROWN.

3              THE CLERK:  THAT WAS MY BAD.

4              THE COURT:  I DON'T WANT ANYONE COMING UP HERE AND

5    LOOKING AT MY NOTES.

6              MR. PRICE:  THAT DOES BRING UP ANOTHER THING.

7         WHEN I AM CROSS-EXAMINING MS. DAVIS, SHE'S GOT A LOT OF

8    DOCUMENTS.  I WAS WONDERING IF I COULD HAVE ONE OF OUR

9    PARALEGALS SIT UP THERE AND HAND HER THE DOCUMENTS SO THAT THEY

10   CAN BE FOUND QUICKLY RATHER THAN HAVE TO FUMBLE THROUGH THEM.

11             MS. KREVANS:  I THINK WHAT HE'S TALKING ABOUT, YOUR

12   HONOR, IS, AS MR. MCELHINNY MENTIONED YESTERDAY, THEY'VE BEEN

13   INUNDATING US WITH POTENTIAL CROSS EXHIBITS.

14        THEY'VE GIVEN US FIVE ENORMOUS BINDERS LIKE THIS OF CROSS

15   EXHIBITS FOR MS. DAVIS, SO THEY WOULDN'T EVEN FIT UP THERE.

16             MR. PRICE:  THIS MUCH IS HER REPORT.

17        SO THERE ARE A NUMBER OF BINDERS AND IT WOULD CERTAINLY

18   MOVE THINGS ALONG IF WE COULD HAVE A PARALEGAL, WHEN I SAY "CAN

19   YOU PLEASE LOOK EXHIBIT X," TO HAVE THAT HANDED TO HER RATHER

20   THAN HAVE HER FUMBLE AROUND.

21             MS. KREVANS:  I DON'T REALLY THINK WE WANT A

22   PARALEGAL HOVERING OVER THE WITNESS.

23        I THINK WE SHOULD START AND IF MS. DAVIS HAS TROUBLE

24   FINDING THINGS, THEN PERHAPS WE CAN ALTER IT.

25             THE COURT:  THAT'S FINE.
```

```
 1              (JURY IN AT 10:58 A.M.)

 2              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

 3     SEAT.

 4              TIME IS NOW 10:58.

 5              GO AHEAD, PLEASE.

 6     BY MS. KREVANS:

 7     Q.   MS. DAVIS, I THINK WHEN WE STOPPED AT THE BREAK, WE HAD

 8     JUST STARTED TALKING ABOUT THE LOST PROFITS REMEDY.  WHY DON'T

 9     WE BACK UP ONE QUESTION SO WE'RE ALL ON THE SAME PAGE.

10              COULD YOU EXPLAIN ONCE MORE TO THE JURY, WHAT IS THE

11     NATURE OF A LOST PROFITS REMEDY IN PATENT INFRINGEMENT?

12     A.   WHAT WE'RE TALKING ABOUT WHEN WE MENTION THE LOST PROFITS

13     REMEDY IS THAT IS THE AMOUNT OF MONEY THAT APPLE WOULD HAVE

14     MADE HAD IT SOLD SOME OF THE PRODUCTS THAT SAMSUNG WOULD NOT

15     HAVE BEEN ALLOWED TO SELL SINCE THEY WERE INFRINGING.

16     Q.   WHAT IS THE OVERALL TEST THAT YOU APPLY IN A PATENT CASE

17     IN DETERMINING WHETHER THE LOST PROFITS REMEDY IS APPROPRIATE?

18     A.   WE ARE TO DETERMINE WHETHER IT'S REASONABLY PROBABLE THAT

19     APPLE WOULD HAVE SOLD SOME OF THOSE PRODUCTS IF SAMSUNG HAD NOT

20     SOLD THE INFRINGING PRODUCT.

21              SOMETIMES YOU'LL HEAR THE TERM "BUT FOR" SAMSUNG'S

22     INFRINGEMENT.  SO HAD THERE NOT BEEN ANY INFRINGEMENT, WOULD

23     APPLE HAVE SOLD SOME OF ITS PRODUCTS?  AND IF SO, HOW MANY?

24     Q.   AND WHAT ARE THE KINDS OF THINGS THAT YOU LOOK TO WHEN YOU

25     ARE ASSESSING THIS LOST PROFITS TEST?  WHAT TYPE OF EVIDENCE?
```

DAVID DIRECT

1     A.    TYPICALLY ONE WOULD LOOK AT THE EVIDENCE THAT'S PROVIDED

2     BY BOTH APPLE AND SAMSUNG, AS WELL AS VARIOUS OTHER THIRD

3     PARTIES.

4          AND THEN I WOULD TYPICALLY APPLY A COMMONLY USED TEST THAT

5     HAS FOUR DIFFERENT FACTORS THAT I CONSIDER THAT WE'LL DISCUSS.

6     Q.    IS ONE OF THE ISSUES IN THE LOST PROFITS ANALYSIS WHETHER

7     THERE IS DEMAND FOR APPLE'S OWN PRODUCTS?

8     A.    YES.  DEMAND IS ONE OF THE FIRST THINGS WE CONSIDER.

9     Q.    IS ONE OF THE ISSUES THAT YOU CONSIDER WHETHER THERE IS

10    DEMAND FOR THE FEATURES OF THE PATENTS AT ISSUE IN THE CASE?

11    A.    YES, AND THAT'LL BE ONE OF THE THINGS WE DISCUSS AS WELL.

12    Q.    OKAY.  THE SECOND KIND OF REMEDY THAT YOU TALKED ABOUT WAS

13    INFRINGER'S PROFITS.  COULD YOU EXPLAIN WHAT INFRINGER'S

14    PROFITS ARE IN THE CONTEXT OF A PATENT INFRINGEMENT DAMAGES

15    TRIAL LIKE THIS.

16    A.    WELL, IN THIS CASE I'LL USE SAMSUNG'S PROFITS TO MEAN

17    INFRINGER'S PROFITS, JUST TO KEEP THE PARTIES STRAIGHT.

18         BUT WHAT WE'RE TALKING ABOUT THERE IS A SPECIAL REMEDY

19    THAT'S ALLOWED IN DESIGN PATENT CASES THAT'S NOT ALLOWED FOR

20    UTILITY PATENTS.  SO WHEN WE TALK ABOUT SAMSUNG'S PROFITS IN

21    THIS CASE, WE'RE GOING TO BE TALKING ONLY ABOUT THE PRODUCTS

22    THAT SAMSUNG SOLD THAT INFRINGE THE DESIGN PATENTS, AND THERE

23    ARE SEVEN OF THOSE.

24    Q.    OKAY.  AND THEN THE THIRD KIND OF DAMAGES YOU MENTIONED IS

25    SOMETHING CALLED A REASONABLE ROYALTY.

1          WHAT IS A REASONABLE ROYALTY IN THE CONTEXT OF PATENT

2     INFRINGEMENT DAMAGES?

3     A.   A REASONABLE ROYALTY TERM IS MEANT TO BE -- MEANT TO MEAN

4     THE AMOUNT OF MONEY THAT ONE PARTY WOULD PAY TO ANOTHER FOR THE

5     RIGHT TO USE THE OTHER'S INTELLECTUAL PROPERTY, OR SPECIFICALLY

6     IN THIS CASE, THE PATENTED TECHNOLOGY.

7          SO IT'S THE AMOUNT OF MONEY THAT SAMSUNG SHOULD PAY TO

8     APPLE FOR THE RIGHT TO USE APPLE'S PATENTS.

9     Q.   NOW, YOU TOLD US BEFORE WHAT YOU -- HOW YOU DEFINED THE

10    WORD "UNIT," ONE PARTICULAR PHONE, A SPECIFIC ONE THAT WAS

11    SOLD.

12         HOW -- CAN ANY ONE UNIT SOLD BY SAMSUNG FALL INTO MORE

13    THAN ONE OF THESE DAMAGES CATEGORIES?

14    A.   NO.  YOU HAVE TO PUT EACH UNIT INTO ONE BUCKET, BUT NOT

15    MORE THAN ONE BUCKET.

16         SO THE EXERCISE WAS TO DETERMINE, WHICH BUCKET DOES EACH

17    ONE GO INTO?  AND WE APPLIED A SERIES OF TESTS TO FIGURE THAT

18    OUT.

19    Q.   CAN ANY PRODUCT, FOR EXAMPLE, THE CAPTIVATE, COULD A

20    PRODUCT FALL INTO MORE THAN ONE DAMAGES CATEGORY?

21    A.   YES.  OVERALL, IF YOU'RE TALKING ABOUT ALL OF THE UNITS

22    THAT ARE IN THE CAPTIVATE CATEGORY, SOME OF THOSE WILL BE IN

23    LOST PROFITS FOR REASONS WE'LL DISCUSS LATER; SOME WILL BE IN

24    SAMSUNG'S PROFITS; AND SOME WILL BE IN THE REASONABLE ROYALTY

25    CATEGORY.

1    Q.   OKAY.  LET'S START WITH SOME BASIC INFORMATION THAT YOU

2    USED.

3         IS THERE ANY DISPUTE BETWEEN YOU AND SAMSUNG'S DAMAGES

4    EXPERT, MR. WAGNER, ABOUT HOW MANY INFRINGING UNITS OF EACH

5    PRODUCT SAMSUNG SOLD DURING THE DAMAGES PERIOD IN THIS CASE?

6    A.   THERE IS NOT.  WE AGREE ON THE NUMBER OF UNITS THAT BELONG

7    IN DAMAGES.

8    Q.   IS THERE ANY DISPUTE BETWEEN YOU AND MR. WAGNER ABOUT THE

9    AMOUNT OF MONEY THAT SAMSUNG MADE, THAT IS, THE DOLLARS THAT

10   THEY GOT WHEN THEY SOLD ALL OF THOSE INFRINGING UNITS?

11   A.   NO.  WE AGREE ON THE TOTAL AMOUNT OF REVENUE GENERATED BY

12   THOSE INFRINGING SALES.

13   Q.   WHERE DID YOU AND MR. WAGNER GET THOSE INFRINGING NUMBERS?

14   A.   THOSE NUMBERS CAME DIRECTLY FROM SAMSUNG'S DOCUMENTS.  ONE

15   OF THEM WAS PX 180, AND ANOTHER ONE WAS JOINT EXHIBIT 1500.

16   Q.   OKAY.  COULD WE LOOK FIRST AT PX 180 IN YOUR BINDER.

17   A.   I HAVE THAT.

18   Q.   WHAT IS PX 180?

19   A.   PX 180 IS THE SPREADSHEET THAT WAS PROVIDED BY SAMSUNG

20   THAT REFLECTS THE SALES, REVENUES, AND COSTS ASSOCIATED WITH

21   THE INFRINGING PRODUCTS IN THIS CASE.

22         MS. KREVANS:  OKAY.  AND JUST FOR THE RECORD, YOUR

23   HONOR, I WOULD NOTE THAT THE ACTUAL EXHIBIT NUMBER HERE IS

24   PX 180A, AND WE WOULD MOVE THE ADMISSION OF PX 180 INTO

25   EVIDENCE AT THIS TIME.

```
 1                THE COURT:  ANY OBJECTION?

 2                MR. PRICE:  NO OBJECTION.

 3                THE COURT:  IT'S ADMITTED.

 4          (PLAINTIFF'S EXHIBIT 180 WAS ADMITTED IN EVIDENCE.)

 5                THE COURT:  GO AHEAD, PLEASE.

 6      BY MS. KREVANS:

 7      Q.   OKAY.  COULD YOU LOOK IN YOUR BINDER AT EXHIBIT 1500A2,

 8      THE SECOND DOCUMENT YOU REFERRED TO?  WHAT IS EXHIBIT 1500A2?

 9      A.   THIS IS A SUMMARY DOCUMENT THAT REFLECTS SOME OF THE SAME

10      INFORMATION THAT IS IN PX 180A.  RATHER THAN MANY MULTIPLES OF

11      PAGES, THIS PARTICULAR SUMMARY DOCUMENT IS JUST FOUR PAGES.

12                MS. KREVANS:  YOUR HONOR, WE WOULD MOVE THE ADMISSION

13      OF JOINT EXHIBIT 1500A2.

14                MR. PRICE:  NO OBJECTION.

15                THE COURT:  IT'S ADMITTED.

16          (JOINT EXHIBIT 1500A2 WAS ADMITTED IN EVIDENCE.)

17                THE COURT:  GO AHEAD, PLEASE.

18      BY MS. KREVANS:

19      Q.   COULD YOU -- I KNOW 1500 IS VERY SMALL PRINT.

20           COULD YOU LOOK AT THE SECOND PAGE OF EXHIBIT 1500A2 AND

21      TELL US WHAT IT SHOWS AS THE TOTAL INFRINGING UNITS OF SAMSUNG

22      SMARTPHONES THAT WERE SOLD.

23      A.   I'LL HAVE MR. LEE HELP ME WITH THAT, BECAUSE ON THE FAR

24      RIGHT-HAND SIDE IS A TOTAL COLUMN AND YOU WILL SEE IN THE

25      BOTTOM RIGHT-HAND CORNER, THAT 10,716 NUMBER, UNDERSTAND THAT
```

DAVID DIRECT

```
 1        THAT IS A NUMBER THAT YOU HAVE TO ADD ZEROS TO, THREE ZEROS, SO

 2        IT'S REALLY 10,716,000 UNITS.

 3             AND THE NUMBER UNDERNEATH THAT IS THE AMOUNT OF SALES

 4        REVENUE THAT WAS GENERATED BY THAT, AND ON THAT PARTICULAR ONE,

 5        YOU HAVE TO ADD SIX ZEROS BECAUSE THAT IS $3.4 BILLION.

 6        Q.   SO THAT NUMBER THAT LOOKS LIKE IT SAYS 3,412 IS ACTUALLY

 7        3,410 -- 412,000?

 8        A.   $3,412,000,0000.

 9        Q.   $3,412,000,000?

10        A.   RIGHT.  AND UNDERSTAND THAT THE PAGE WE'RE LOOKING AT IS

11        JUST THE SMARTPHONES.

12        Q.   OKAY.  THIS IS PAGE 2 OF JX 1500A2.

13        A.   IT IS.

14        Q.   THERE'S TWO MORE PAGES TO THIS EXHIBIT.  YOU SAID IT WAS

15        FOUR PAGES.  WHAT ARE THEY ABOUT?

16        A.   THE OTHER TWO PAGES RELATE TO THE TABLET SALES --

17        Q.   OKAY.

18        A.   -- FOR THE PRODUCT THAT WAS FOUND TO INFRINGE.

19        Q.   WHAT DOES JX 1500A2 SHOW US FOR THE TOTAL INFRINGING

20        TABLET SALES IN CONNECTION WITH THIS CASE OF THE TOTAL REVENUE

21        THAT SAMSUNG MADE ON THEM?

22        A.    IF WE LOOK AT PAGE 4, WE'LL SEE THE SAME TYPE OF TOTALS.

23        ON THE LEFT-HAND SIDE IS THE GALAXY TAB LISTING, AND ON THE FAR

24        RIGHT-HAND SIDE IS THE GRAND TOTALS.

25             SO AS WE SEE HERE, IT'S 725,000 UNITS, AND IT TOTALS
```

1     $325 MILLION.

2     Q.   OKAY.  SO TAKING THE PHONES AND THE TABLETS TOGETHER, HOW

3     MANY TOTAL INFRINGING UNITS?

4     A.   IF YOU ADD THE 10.7 MILLION SMARTPHONES AND THE 700,000

5     TABLETS, THAT'S ABOUT 11.4 MILLION INFRINGING UNITS.

6     Q.   AND TOTAL REVENUE?

7     A.   THE TOTAL REVENUE, IF YOU ADD THOSE NUMBERS, THE 3.4

8     BILLION AND THE 325 MILLION, THAT'S ABOUT $3.7 BILLION OF

9     REVENUE FROM THE INFRINGING PRODUCTS.

10    Q.   WHAT WAS THE FIRST SALE OF ANY OF THE SAMSUNG SMARTPHONES,

11    INFRINGING SAMSUNG SMARTPHONES AT ISSUE IN THIS TRIAL JUST BY

12    DATE?

13    A.   BY DATE?  THE FIRST PRODUCT THAT WAS FOUND TO INFRINGE,

14    THAT WAS LAUNCHED IN JUNE OF 2010.

15    Q.   AND WHAT WAS THAT?

16    A.   ACTUALLY, THE BIGGEST ONE IS PROBABLY CAPTIVATE, WHICH WAS

17    LAUNCHED THE NEXT MONTH, OR AT LEAST THE JULY 2010 DATE.

18    Q.   OKAY.  COULD WE SEE SLIDE PDX 100, PAGE 8.

19         WHAT HAVE YOU SET FORTH ON THIS SLIDE, MS. DAVIS?

20    A.   WHAT YOU SEE HERE IS THE SAMSUNG MARKET SHARE IN THE U.S.

21    FOR SMARTPHONES.  SO ON THE LEFT-HAND SIDE, THAT BLUE LINE

22    SHOWS YOU THAT FOR THE YEARS AFTER THE APPLE IPHONE WAS

23    INTRODUCED IN 2007, 2008, 2009, SAMSUNG'S MARKET SHARE IN THE

24    SMARTPHONE MARKET WAS A LITTLE LESS THAN 10 PERCENT ACROSS THAT

25    TIME.

1          AND IN 2010, ABOUT THE TIME SAMSUNG LAUNCHED THE FIRST

2     INFRINGING PHONES, YOU SEE THERE THE GALAXY S CAPTIVATE WAS ONE

3     OF THOSE, JULY 9TH, 2010, THE MARKET SHARE INCREASED

4     DRAMATICALLY AS THAT RED LINE SHOWS.

5          THE OTHER PHONE THAT HAPPENS TO BE SHOWN ON THAT

6     PARTICULAR CHART IS THE INFUSE 4G, AND THAT WAS ANOTHER VERY

7     POPULAR PRODUCT THAT WAS LAUNCHED APRIL 30TH, 2011, AND THAT

8     CAUSED ANOTHER INCREASE IN MARKET SHARE.

9     Q.   AND IS THE INFUSE 4G ONE OF THE INFRINGING PHONES AT ISSUE

10     IN THIS TRIAL?

11    A.   IT IS.

12    Q.   ALL RIGHT.  LET'S GO BACK TO THE HIGH LEVEL.

13         WHAT OVERALL CONCLUSIONS HAVE YOU REACHED ABOUT THE AMOUNT

14    OF MONEY THAT SAMSUNG SHOULD PAY TO APPLE FOR THESE 13

15    INFRINGING PRODUCTS?

16    A.   I HAVE CONCLUDED THAT THOSE DAMAGES FALL INTO THREE

17     CATEGORIES, AND I'VE PREPARED A SLIDE THAT WILL SHOW YOU WHAT

18     THOSE AMOUNTS ARE.

19    Q.   OKAY.  AND THIS IS SLIDE 9, MR. LEE, PLEASE.

20         COULD YOU SUMMARIZE THIS FOR THE JURY, PLEASE.

21    A.   AS YOU SEE HERE, I HAVE CALCULATED APPLE'S LOST PROFITS TO

22     BE $113,777,344.

23         I'VE CALCULATED SAMSUNG'S PROFITS TO BE $231,373,554.

24         AND THE TOTAL REASONABLE ROYALTY IS $34,625,193.

25         AND THE TOTAL OF ALL THREE OF THOSE CATEGORIES TOGETHER

1      FOR ALL OF THE INFRINGING PRODUCTS DURING THE DAMAGES PERIOD IS

2      $379,776,091.

3      Q.   COULD YOU LOOK IN YOUR BINDER AT PX 25F?

4      A.   I HAVE THAT.

5      Q.   COULD YOU EXPLAIN TO THE JURY WHAT PX -- ACTUALLY, STRIKE

6      THAT.

7           WHAT IS PX 25F?

8      A.   THIS IS TITLED A SUMMARY OF APPLE'S DAMAGES CALCULATIONS.

9      IT WAS PREPARED BY ME, ALONG WITH MY COLLEAGUES AT

10     DAVIS & HOSFIELD AND THE FOLKS AT INVOTEX.

11          IT PROVIDES A SUMMARY OF SOME OF THE INFORMATION THAT'S

12     INCLUDED IN MY REPORT THAT HELPED ME ARRIVE AT THE TOTALS,

13     TOTAL DAMAGES THAT ARE SOUGHT.

14          MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

15     PX 25F.

16          THE COURT:  ANY OBJECTION?

17          MR. PRICE:  NO OBJECTION.

18          THE COURT:  IT'S ADMITTED.

19

20          THE COURT:  GO AHEAD, PLEASE.

21     BY MS. KREVANS:

22     Q.   OKAY.  COULD WE PUT -- THANK YOU, MR. LEE.  YOU'RE AHEAD

23     OF ME.

24          WE'RE LOOKING RIGHT NOW AT THE TITLE PAGE OF 25F.  COULD

25     YOU GO TO PAGE 2, MS. DAVIS, AND EXPLAIN ITS CONTENTS TO THE

1      JURY.

2      A.   WHAT YOU SEE ON PAGE 2, ON THE TOP TABLE, ARE THE SAME

3      NUMBERS WE JUST TALKED ABOUT THAT WERE IN THE LAST SLIDE, SO

4      THAT SHOWS APPLE'S LOST PROFIT, SAMSUNG PROFITS, AND REASONABLE

5      ROYALTY.

6           THE SECOND TABLE IS AN ALTERNATIVE CALCULATION SUCH THAT

7      IF YOU WERE TO DECIDE THAT APPLE DIDN'T LOSE A SINGLE SALE,

8      THEN THE DAMAGES WOULD BE JUST SAMSUNG'S PROFITS AND REASONABLE

9      ROYALTY FOR THE TOTAL THAT YOU SEE THERE.

10     Q.   WHICH OF THESE DO YOU THINK IS THE RIGHT ASSESSMENT OF

11     DAMAGES IN THIS CASE?

12     A.   I ABSOLUTELY BELIEVE APPLE LOST SALES AND I THINK THE TOP

13     TABLE IS THE RIGHT CALCULATION OF DAMAGES.

14     Q.   IS IT YOUR -- WHAT'S YOUR UNDERSTANDING OF WHAT MR. WAGNER

15     IS GOING TO TELL THIS JURY ABOUT WHETHER APPLE LOST ANY SALES

16     TO SAMSUNG AND, THEREFORE, SHOULD GET ANY LOST PROFITS IN THIS

17     CASE?

18     A.   I'M AWARE THAT MR. WAGNER BELIEVES THAT THERE WERE NO LOST

19     SALES.

20          MR. PRICE:  YOUR HONOR, I'M GOING TO OBJECT.  IT'S

21     TOO EARLY FOR REBUTTAL.

22          MS. KREVANS:  I'M JUST ASKING HER TO EXPLAIN TO THE

23     JURY WHY SHE HAS AN ALTERNATIVE CALCULATION, YOUR HONOR.  I

24     HAVE ONLY ONE MORE QUESTION ABOUT THIS.

25          THE COURT:  ALL RIGHT.  OVERRULED.

1          GO AHEAD, PLEASE.

2              THE WITNESS:  I MAY HAVE LOST YOUR QUESTION IN THAT.

3     BY MS. KREVANS:

4     Q.   WHAT IS YOUR UNDERSTANDING ABOUT MR. WAGNER'S OPINION

5     ABOUT WHETHER APPLE SHOULD BE AWARDED ANY LOST PROFITS IN THIS

6     CASE?

7     A.   I'M AWARE FROM MR. WAGNER'S REPORT THAT HE BELIEVES THAT

8     APPLE DID NOT LOSE ANY SALES.

9     Q.   IF THE JURY ACCEPTED MR. WAGNER'S PROPOSITION THAT APPLE

10    LOST NOT A SINGLE SALE BECAUSE OF SAMSUNG'S INFRINGEMENT, WHAT

11    IS YOUR ASSESSMENT OF WHAT APPLE'S PROPER DAMAGES WOULD BE?

12    A.   THEN THE DAMAGES WOULD BE THAT SECOND TABLE THAT TOTALS

13    $287 MILLION.

14    Q.   COULD YOU EXPLAIN TO THE JURY WHAT IS ON PAGE 3 OF EXHIBIT

15    25F?

16    A.   THIS IS THE SAME SLIDE THAT WE SAW EARLIER.  THIS IS A

17    PAGE FROM MY REPORT.  SO IT SHOWS THE 13 PRODUCTS AND EACH OF

18    THE PATENTS THAT THOSE 13 PRODUCTS HAVE BEEN FOUND TO INFRINGE.

19    Q.   AND COULD YOU EXPLAIN PAGE 4?

20    A.   PAGE 4 IS THE DETAILED CALCULATION OF EACH OF THE

21    CATEGORIES OF DAMAGES FOR EACH OF THE 13 PRODUCTS, AND AS YOU

22    SEE DOWN ON THE BOTTOM RIGHT-HAND CORNER, THAT'S THE SAME

23    $380 MILLION NUMBER THAT WE TALKED ABOUT EARLIER.

24    Q.   COULD YOU BRIEFLY WALK THE JURY THROUGH THE INFORMATION

25    THAT'S SET OUT IN THE REST OF EXHIBIT PX 25F.

```
 1        A.   YES.   PAGE 5 IS THE SAME TYPE OF SUMMARY CHART BY PRODUCT

 2        CATEGORY.   THIS IS FOR THE ALTERNATIVE CALCULATION IF YOU WERE

 3        TO DECIDE THAT APPLE DID NOT LOSE ANY SALES.

 4             PAGE 6 SHOWS YOU THE PRODUCTS AND WHERE THEY WERE SOLD,

 5        SPECIFICALLY WHAT CARRIER.   SO WHEN I TALK ABOUT A CARRIER, I

 6        MEAN WAS IT AT&T, VERIZON, SPRINT OR OTHERWISE?   SO THAT'LL

 7        HELP YOU KNOW WHERE EACH OF THOSE PRODUCTS WERE SOLD.

 8             AND THEN PAGES 7 --

 9        Q.   ONLY GO THROUGH -- ONLY GO THROUGH 13.   OKAY?

10        A.   I'M GOING TO STOP THERE, YES.   THANK YOU.

11             PAGES 7 THROUGH 12 PROVIDE MARKET SHARE INFORMATION THAT I

12        USED IN MY CALCULATION OF LOST PROFITS.

13             AND THEN PAGE 13 IS A DOCUMENT, OR A PAGE FROM A DOCUMENT

14        THAT I'VE ALSO USED IN MY MARKET SHARE CALCULATION THAT WE'LL

15        DISCUSS IN A LITTLE BIT.

16             AND THAT'S WHERE I'LL STOP FOR THE MOMENT.

17                  MS. KREVANS:   NOW, YOUR HONOR, PAGES 14 AND 15 HAVE

18        APPLE CAPACITY INFORMATION ON THEM THAT THE COURT HAS ORDERED

19        COULD BE SEALED.   WE WOULD REQUEST THAT THESE PAGES OF THE

20        EXHIBIT BE SEALED AND WE WILL --

21             WHEN WE SHOW THEM TO THE JURY, MR. LEE, WE NEED NOT TO

22        SHOW THEM TO ANYONE ELSE IN THE COURTROOM OTHER THAN THE JURY

23        AND THE JUDGE.

24                  THE COURT:   SO YOU'RE REQUESTING THAT 14 AND 15 BE

25        SEALED?
```

DAVID DIRECT

```
 1              MS. KREVANS:  CONSISTENT WITH THIS COURT'S PRIOR
 2     SEALING ORDERS, YOUR HONOR.
 3              THE COURT:  THAT'S GRANTED.
 4              MS. KREVANS:  OKAY.
 5     Q.   COULD YOU EXPLAIN TO THE JURY, WITHOUT SAYING ANY OF THE
 6     NUMBERS ON THE PAGES OUT LOUD, JUST THE TYPE OF INFORMATION
 7     THAT IS ON PAGES 14 AND 15?
 8     A.   AS YOU SEE AT THE TOP OF THIS SCHEDULE, IT SAYS "IPHONE
 9     CAPACITY ANALYSIS."  THAT IS PAGE 14.
10          PAGE 15 IS A SIMILAR ANALYSIS FOR IPADS.
11          THESE ANALYSES WERE PREPARED USING THE INFORMATION THAT
12     MR. BLEVINS WAS LOOKING AT YESTERDAY IN HIS TESTIMONY.
13     Q.   AND PAGE 16?
14     A.   PAGE 16 IS A SUMMARY OF THE REASONABLE ROYALTY RATES THAT
15     I USED AND THE VARIOUS REFERENCE POINTS THAT GAVE RISE TO MY
16     CONCLUSIONS THERE.
17     Q.   OKAY.  LET'S GO BACK TO PAGE 4 OF EXHIBIT 25F.  COULD YOU
18     USE AN EXAMPLE FROM YOUR CONCLUSIONS ON PAGE 4 TO EXPLAIN TO
19     THE JURY THE CONCEPT THAT A SINGLE PRODUCT COULD GET DAMAGES IN
20     MORE THAN ONE CATEGORY; THAT IS, IT COULD GET A LOST PROFITS
21     REMEDY, AS WELL AS AN INFRINGER'S PROFITS REMEDY, AND PERHAPS
22     ALSO A REASONABLE ROYALTY REMEDY?
23     A.   LET'S LOOK AT THE FIRST ONE ON THE LIST.  THE CAPTIVATE IS
24     THE ONE THAT WE SAW THE PICTURE OF ON THE TIMELINE EARLIER.
25     THAT'S THE ONE THAT WAS LAUNCHED IN JULY OF 2010.
```

1          I'VE CALCULATED THE VARIOUS DAMAGES FOR EACH OF THE THREE

2      BUCKETS.  THERE WERE OVER A MILLION OF THOSE CAPTIVATE UNITS

3      SOLD.  I HAD TO GO THROUGH THOSE ONE-BY-ONE AND DECIDE WHICH

4      BUCKET THEY FELL WITHIN.

5          SOME OF THOSE, HAD THE CAPTIVATE NOT BEEN ON THE MARKET,

6      WOULD HAVE BEEN PRODUCTS OR UNITS THAT WOULD HAVE BEEN SOLD BY

7      APPLE, SO THOSE PARTICULAR ONES FALL INTO THE APPLE LOST

8      PROFITS BUCKET.

9          CAPTIVATE HAPPENS TO BE ONE OF THE SEVEN PRODUCTS THAT

10     INFRINGES THE DESIGN PATENTS, SO THAT MEANS IT QUALIFIES FOR

11     SAMSUNG'S PROFITS, SO I'VE CALCULATED SAMSUNG'S PROFITS FOR

12     THOSE UNITS THAT QUALIFIED THAT AREN'T ALREADY IN LOST PROFITS.

13         AND THEN LASTLY, FOR THOSE UNITS THAT DIDN'T QUALIFY FOR

14     LOST PROFITS AND DIDN'T QUALIFY FOR SAMSUNG PROFITS, THEY'VE

15     BEEN PLACED IN THE REASONABLE ROYALTY.

16         SO THAT'S HOW YOU END UP WITH ALL THREE CATEGORIES OF

17     DAMAGES FOR THE CAPTIVATE PRODUCT.

18     Q.   HOW DID YOU MAKE SURE THAT YOU DIDN'T COUNT ANY SINGLE

19     UNIT SOLD BY SAMSUNG TWICE?

20     A.   THIS COMPLICATED DATABASE THAT MR. MUSIKA AND HIS

21     COLLEAGUES DEVELOPED AT INVOTEX CALCULATES EACH OF THOSE ON A

22     UNIT-BY-UNIT BASIS, AND SO IT GOES THROUGH AND TAKES EACH UNIT

23     AND DECIDES WHERE TO PUT IT BASED UPON THE VARIOUS QUALIFYING

24     FACTORS.

25     Q.   OKAY.  COULD YOU LOOK AT EXHIBIT 25G1 IN YOUR BINDER.

1    WHAT IS EXHIBIT 25G1?

2    A.   THIS IS A SUMMARY OF APPLE'S DAMAGES CALCULATIONS

3    ADDENDUM, SO THIS IS FURTHER INFORMATION THAT I HAVE PREPARED

4    RELATED TO MY DAMAGES CALCULATION THAT PROVIDES A LITTLE BIT

5    MORE DETAIL THAN 25F DID.

6              MS. KREVANS:  AND, YOUR HONOR, BETWEEN APPLE

7    CONFIDENTIAL INFORMATION AND SAMSUNG CONFIDENTIAL INFORMATION,

8    ALL OF THE PAGES OF THIS EXHIBIT HAVE INFORMATION OF THE TYPE

9    THAT THE COURT HAS ORDERED COULD BE SUBMITTED UNDER SEAL.

10         SO WE WOULD OFFER THE ADMISSION OF PX 25G1 WITH THE

11   DOCUMENT UNDER SEAL IN ITS ENTIRETY.

12             THE COURT:  ALL RIGHT.  THAT'S GRANTED.

13        (PLAINTIFF'S EXHIBIT 25G1 WAS ADMITTED IN EVIDENCE.)

14             MR. PRICE:  NO OBJECTION.

15   BY MS. KREVANS:

16   Q.   OKAY.  WE SHOULDN'T SHOW ANY PAGE FROM THIS DOCUMENT TO

17   EVERYONE IN THE ROOM.

18         WHAT ARE THE TYPES OF INFORMATION THAT THE JURORS WILL

19   FIND IN EXHIBIT 25G1, MS. DAVIS?

20   A.   WHAT YOU WILL FIND IN 25G1 IS A SUMMARY OF MY CALCULATION

21   OF LOST PROFITS FOR EACH OF THE PRODUCT CATEGORIES, AS WELL AS

22   THE SUMMARY OF SAMSUNG PROFITS AND REASONABLE ROYALTIES.

23         AND THEN YOU WILL ALSO SEE, ON THE LAST TWO PAGES, THE

24   PROFIT AND LOSS STATEMENTS FOR APPLE'S IPHONES AND APPLE'S

25   IPADS.

1    Q.   OKAY.  LET'S GO BACK TO LOST PROFITS.

2         AND CAN WE PUT SLIDE PDX 100, PAGE 9 UP.

3         HOW DID YOU DETERMINE THE NUMBER OF UNITS OF SAMSUNG

4    PRODUCTS THAT SHOULD GO INTO THIS FIRST CATEGORY, APPLE LOST

5    PROFITS DAMAGES?

6    A.   WHAT I HAVE DONE IS APPLY A COMMONLY USED TEST WHICH

7    CONSIDERS FOUR DIFFERENT FACTORS IN ORDER TO DETERMINE WHETHER

8    LOST PROFITS APPLIES AT ALL; AND IF SO, HOW MANY UNITS BELONG

9    IN THERE.

10   Q.   WHEN YOU LOOKED AT THE ISSUE OF WHETHER APPLE LOST SALES

11   TO SAMSUNG, DID YOU LOOK AT EVIDENCE ABOUT WHETHER OR NOT APPLE

12   AND SAMSUNG WERE COMPETITORS IN THE MARKET?

13   A.   YES, I DID.

14   Q.   WHAT DID YOU FIND WHEN YOU LOOKED AT THAT QUESTION?

15   A.   THERE IS NO QUESTION IN MY MIND THAT APPLE AND SAMSUNG ARE

16   COMPETITORS.  THAT IS APPARENT BOTH FROM THE APPLE DOCUMENTS

17   AND THE SAMSUNG DOCUMENTS, AND IT'S KIND OF COMMON SENSE, TOO.

18   Q.   COULD YOU LOOK AT PX 60 IN THE BINDERS IN FRONT OF YOU.

19   WHAT IS PX 60?

20   A.   PX 60 IS A DOCUMENT THAT COMES DIRECTLY FROM THE SAMSUNG

21   FILES.  IT IS TITLED "STA COMPETITIVE SITUATION" DATED

22   FEBRUARY 16TH, 2012.  AND IT'S MARKED TOP SECRET.

23         MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

24   PX 60.

25         THE COURT:  ANY OBJECTION?

```
1              MR. PRICE:  NO OBJECTION.

2              THE COURT:  IT'S ADMITTED.

3         (PLAINTIFF'S EXHIBIT 60 WAS ADMITTED IN EVIDENCE.)

4              THE COURT:  GO AHEAD, PLEASE.

5    BY MS. KREVANS:

6    Q.   WHAT DID YOU FIND RELEVANT IN THIS "STA COMPETITIVE

7    SITUATION PARADIGM SHIFT" DOCUMENT FROM FEBRUARY 2012 ABOUT THE

8    ISSUE OF WHETHER APPLE AND SAMSUNG WERE DIRECT COMPETITORS IN

9    THE DAMAGES PERIOD IN THIS CASE?

10   A.   I THINK IF WE LOOK AT PAGE 8 OF THIS DOCUMENT, WE'LL SEE

11   THAT SAMSUNG CERTAINLY BELIEVED THAT THEY WERE COMPETITORS.

12        AS YOU SEE IN THE HEADING THERE, IT SAYS "U.S. MARKET

13   BECOMING A TWO HORSE RACE BETWEEN APPLE AND SAMSUNG."

14        AND DOWN BELOW IT SAYS "THREE HORSE RACE BECOMING A TWO

15   HORSE RACE."

16        SO CLEARLY SAMSUNG BELIEVED, OR IT WAS INDICATING IN THIS

17   DOCUMENT THAT IT THOUGHT THAT APPLE WAS A COMPETITOR.

18   Q.   COULD WE LOOK AT --

19        YOUR HONOR, WE HAVE A BOARD, AND I'M A LITTLE PUZZLED AS

20   TO EXACTLY WHERE I CAN PUT IT IN THE COURTROOM WHERE THE JURORS

21   CAN SEE IT AND MS. DAVIS CAN SEE IT.  WOULD IT BE OKAY IF I PUT

22   IT RIGHT HERE?

23              THE COURT:  THAT'S FINE.  WE HAVE AN EASEL AGAINST

24   THE WALL.

25              MS. KREVANS:  WE'LL USE THE EASEL.
```

1    Q.   WHILE THEY'RE SETTING THIS UP, MS. DAVIS, WHY DON'T WE PUT

2    SLIDE 26 UP ON THE SCREEN.   AND SINCE WE'RE GOING TO REFER TO

3    THIS DOCUMENT A LOT, WE'RE GOING TO PUT IT ALSO HERE ON THE

4    BOARD.

5         AND YOU HAVE COPIES?

6            MR. PRICE:   I HAVE A CLEAN COPY.

7            MS. KREVANS:   IT LOOKS JUST THE SAME BIG.

8    Q.   CAN YOU SEE THAT, MS. DAVIS?

9    A.   I SURE CAN.

10   Q.   ALL RIGHT.   IS THAT ALL RIGHT?   OKAY.

11        WHAT FACTORS DID YOU CONSIDER, IN ADDITION TO THIS ISSUE

12   OF COMPETITION, IN YOUR OVERALL LOST PROFITS ANALYSIS?

13   A.   THE FOUR FACTORS THAT YOU SEE THERE ARE ONES THAT I

14   MENTIONED IN THE COMMONLY USED TEST FOR DETERMINING WHETHER

15   IT'S REASONABLY PROBABLE THAT APPLE WOULD HAVE MADE MORE SALES.

16        THE FIRST OF THOSE HAS TO DO WITH DEMAND; THE SECOND

17   RELATES TO MARKET ALTERNATIVES; THE THIRD IS CAPACITY; AND THE

18   FOURTH IS THE CALCULATION OF PROFITS ITSELF.

19   Q.   AND FOR WHAT -- FOR WHICH APPLE PATENTS AT ISSUE IN THIS

20   CASE HAVE YOU ASSESSED ANY LOST PROFITS DAMAGES?

21   A.   WELL, I LOOKED AT THE LOST PROFITS QUESTION FOR EVERY

22   PATENT IN THIS CASE, BUT I CONCLUDED, FOR PURPOSES OF THIS

23   TRIAL, THAT IT'S THE '915 PATENT AND THE PRODUCTS THAT INFRINGE

24   THAT THAT QUALIFY FOR LOST PROFITS IN THIS CASE.

25   Q.   OKAY.   BEFORE YOU PLUNGE INTO THE DETAILS HERE, LET ME

1    JUST ASK YOU, IS THIS ISSUE OF DEMAND RELEVANT TO ANY CATEGORY

2    OF DAMAGES OTHER THAN LOST PROFITS?

3    A.    YES.    IT'S RELEVANT TO THE DETERMINATION OF THE AMOUNT OF

4    REASONABLE ROYALTIES.

5    Q.    OKAY.    STICKING WITH LOST PROFITS FOR A MOMENT, WHY IS

6    DEMAND RELEVANT TO THE LOST PROFITS QUESTION?

7    A.    WELL, KEEPING IN MIND THAT THE QUESTION IS WHETHER IT'S

8    REASONABLY PROBABLE APPLE WOULD HAVE MADE MORE SALES, SO ONE OF

9    THE QUESTIONS THAT HAS TO BE ANSWERED IS, IS THERE ANY DEMAND

10   FOR APPLE'S PRODUCTS?    DID ANYBODY WANT TO BUY APPLE'S PRODUCTS

11   IF SAMSUNG WAS NOT SELLING THE INFRINGING PRODUCTS?

12   Q.    AND WHAT CONCLUSION DID YOU REACH ABOUT WHETHER THERE WAS

13   DEMAND FOR THE APPLE PRODUCTS THAT COMPETED WITH THE SAMSUNG

14   PRODUCTS?    THAT IS, APPLE SMARTPHONES AND APPLE TABLETS?

15   A.    I THINK THERE'S CLEARLY DEMAND FOR THE IPHONE AND THE

16   IPAD.    WE HEARD ALL ABOUT IT YESTERDAY FROM MR. BLEVINS.    YOU

17   PROBABLY ALREADY KNEW THAT APPLE HAS SOLD HUNDREDS OF MILLIONS

18   OF IPHONES AND IPADS AROUND THE WORLD, AND MR. BLEVINS MADE IT

19   CLEAR THAT THEY WERE PRETTY MUCH SELLING LIKE HOTCAKES.

20   Q.    AND WHAT ABOUT DEMAND FOR APPLE'S PATENTED FEATURES?    WHAT

21   DID YOU CONCLUDE ABOUT THAT?

22   A.    I BELIEVE THERE'S ALSO EVIDENCE OF DEMAND FOR APPLE'S

23   PATENTS FEATURES.    THAT COMES FROM INFORMATION THAT I FOUND IN

24   THE FILES OF BOTH APPLE AND SAMSUNG.

25   Q.    AND WHAT -- CAN YOU GIVE US AN EXAMPLE OF THE KIND OF

1       APPLE DOCUMENT THAT YOU EXAMINED THAT WAS RELEVANT TO DEMAND

2       FOR THE PATENTED FEATURES?

3       A.   THERE WERE A NUMBER OF SURVEYS THAT HAVE BEEN CONDUCTED BY

4       APPLE, AND I THINK YOU'LL SEE A FEW OF THOSE PROBABLY WITH

5       MR. SCHILLER, WHO WILL BE ANOTHER WITNESS IN THIS CASE.

6            AND THEY SHOW THAT THERE IS CLEARLY DEMAND FOR EASE OF USE

7       AND THE APPEARANCE AS IT RELATES TO IPHONES AND IPADS.

8       Q.   CAN YOU GIVE US AN EXAMPLE OF THE KIND OF SAMSUNG DOCUMENT

9       THAT YOU LOOKED AT THAT WAS RELEVANT TO THE DEMAND ISSUE?

10      A.   I REVIEWED A NUMBER OF SAMSUNG DOCUMENTS THAT ARE RELEVANT

11      TO DEMAND, AND I LISTED THEM IN MY REPORT, BUT I PICKED THREE

12      OF THEM THAT I THOUGHT WOULD BE USEFUL TO USE AS EXAMPLES

13      TODAY.

14      Q.   OKAY.  COULD YOU LOOK AT PX 34 IN YOUR BINDER.

15      A.   I HAVE THAT.

16      Q.   OKAY.  WHAT IS PX 34, MS. DAVIS?

17      A.   THIS IS A DOCUMENT THAT COMES FROM SAMSUNG'S FILES.  IT'S

18      TITLED "FEASIBILITY REVIEW," AND IT'S DATED SEPTEMBER OF 2007.

19           MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

20      PX 34.

21           THE COURT:  ANY OBJECTION?

22           MR. PRICE:  NO OBJECTION.

23           THE COURT:  IT'S ADMITTED.

24      (PLAINTIFF'S EXHIBIT 34 WAS ADMITTED IN EVIDENCE.)

25           THE COURT:  GO AHEAD, PLEASE.

1            MS. KREVANS:  THANK YOU, YOUR HONOR.

2      Q.   MS. DAVIS, CAN YOU PUT THE DATE OF THIS DOCUMENT IN

3      CONTEXT FOR THE JURY WITH RESPECT TO THE LAUNCH OF THE IPHONE,

4      THE FIRST IPHONE?

5      A.   RECALL THAT THE FIRST IPHONE WAS LAUNCHED EARLIER IN THE

6      YEAR 2007, SO THIS IS NOW SEVERAL MONTHS AFTER THAT LAUNCH.

7      Q.   AND WHAT IS THE, IN GENERAL, THE CONTENT OF PX 34?

8      A.   IN GENERAL, I UNDERSTAND THE CONTENT OF THIS TO BE TO

9      UNDERSTAND WHAT'S HAPPENING IN THE SMARTPHONE MARKET, AND PART

10     OF THIS PARTICULAR DOCUMENT FOCUSES ON THE EFFECT THAT THE

11     IPHONE IS HAVING IN THAT MARKET.

12     Q.   OKAY.  COULD YOU LOOK AT PAGE 13 OF PX 34?  WHAT DID YOU

13     FIND THAT YOU FOUND RELEVANT TO YOUR OPINIONS ON PAGE 13?

14     A.   AS YOU SEE, ON THIS PAGE THIS IS TITLED "SMARTPHONE

15     MARKET-PRESENT" AND IN THE MIDDLE OF THE PAGE, IT REFERS TO "4

16     MOBILE PHONE TRENDS," AND IT DETAILS A LIST OF THOSE FOUR.

17            IT SAYS, "OUR RESEARCH HAS IDENTIFIED FOUR KEY FACTORS

18     THAT WE EXPECT WILL SHAPE HANDSETS IN THE COMING FIVE YEARS."

19            THE FIRST OF THOSE FACTORS IS THE APPLE IPHONE.

20            AND UNDERSTAND THAT THIS PURPLE CIRCLE HERE WAS ON THE

21     DOCUMENT.  I DIDN'T PUT IT THERE.  THAT CAME OUT OF SAMSUNG'S

22     FILES THAT WAY.

23            SO THEY CLEARLY BELIEVED, OR THIS DOCUMENT WOULD SUGGEST

24     THAT THEY BELIEVED THAT THE APPLE IPHONE WAS IMPORTANT IN THE

25     SMARTPHONE MARKET.

DAVID DIRECT

1    Q.    OKAY.  JUST SO WE'RE CLEAR ABOUT TIME PERIOD, THIS IS A

2    2007 DOCUMENT; RIGHT?

3    A.    YES, IT IS.

4    Q.    SO WHY DOES IT SAY 2012 AT THE TOP OF THE PAGE?

5    A.    I THINK THAT, AS IT SAYS HERE, IT'S TALKING ABOUT HOW IT'S

6    GOING TO SHAPE THE MARKET FOR THE COMING FIVE YEARS.  SO IN

7    2007 THROUGH 2012, THEY THOUGHT THE IPHONE WAS GOING TO HAVE A

8    BIG IMPACT ON THE MARKET.

9    Q.    OKAY.  COULD YOU LOOK AT PAGE 38 OF THIS SAME DOCUMENT

10   FROM SAMSUNG'S FILES?

11   A.    I HAVE THAT.

12   Q.    WHAT DID YOU FIND ON PAGE 38 THAT WAS RELEVANT TO YOUR

13   ANALYSIS OF DEMAND FOR APPLE'S PRODUCTS OR THE PATENTED

14   FEATURES?

15   A.    AS YOU SEE ON THIS PAGE, IT'S TITLED "IPHONE EFFECT

16   ANALYSIS," AND IN THE MIDDLE OF THE BOTTOM, OR ON THE RIGHT, IT

17   SAYS "FACTORS THAT COULD MAKE IPHONE A SUCCESS," AND IT LISTS

18   FOUR SUCH FACTORS.  THE FIRST TWO OF THOSE ARE "EASY AND

19   INTUITIVE U/I," THAT MEANS USER INTERFACE, "THAT COVERS ALL

20   USER CLASSES."

21        AND THE SECOND ONE IS "BEAUTIFUL DESIGN."

22   Q.    OKAY.  LOOKING BACK AT YOUR SUMMARY OF THE LOST PROFITS

23   FACTORS, THE THIRD THING YOU HAVE UNDER DEMAND IS "CONJOINT

24   SURVEY."

25   A.    YES.

1    Q.   WHAT DOES THAT REFER TO?

2    A.   THAT'S REFERRING TO THE SURVEY THAT WAS PREPARED BY

3    DR. HAUSER THAT HE DISCUSSED YESTERDAY AND THIS MORNING.

4    Q.   AND HOW DID YOU USE DR. HAUSER'S RESULTS IN YOUR ANALYSIS?

5    A.   I HAVE USED HIS RESULTS AS AN INDICATOR OF DEMAND.  THE

6    FACT THAT PEOPLE WERE WILLING TO PAY MORE FOR A PRODUCT BECAUSE

7    IT HAD CERTAIN FEATURES SUGGESTED TO ME THAT THEY WANTED THOSE

8    FEATURES.  OTHERWISE THEY WOULDN'T PAY AN EXTRA $100 FOR THEM.

9    Q.   OKAY.  LET'S LOOK AT ONE MORE DOCUMENT BEFORE WE MOVE ON

10   FROM DEMAND.

11        COULD YOU LOOK AT PX 36 IN YOUR BINDER.

12   A.   I HAVE THAT.

13   Q.   WHAT IS PX 36?

14   A.   PX 36 IS ANOTHER DOCUMENT THAT COMES DIRECTLY FROM

15   SAMSUNG'S FILES.  IT IS ONE THAT WAS PREPARED BY A CONSULTANT

16   THAT WAS ENGAGED BY SAMSUNG.  THAT CONSULTANT'S NAME WAS

17   GRAVITY TANK.

18        THIS DOCUMENT IS DATED DECEMBER OF 2008.

19             MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

20   PX 36.

21             THE COURT:  ANY OBJECTION?

22             MR. PRICE:  NO FURTHER OBJECTION.

23             THE COURT:  IT'S ADMITTED.

24        (PLAINTIFF'S EXHIBIT 36 WAS ADMITTED IN EVIDENCE.)

25             THE COURT:  GO AHEAD, PLEASE.

1    BY MS. KREVANS:

2    Q.   OKAY.  WHAT IS, OVERALL, THE NATURE OF THIS DOCUMENT FROM

3    SAMSUNG'S FILES, PX 36?

4    A.   THIS IS A DOCUMENT THAT HAS 177 PAGES AND A LOT OF DETAIL

5    ABOUT THE WORK THAT THIS PARTICULAR CONSULTANT HAD DONE, BUT

6    ONE OF THE THINGS IN PARTICULAR WAS FOR THAT CONSULTANT TO HAVE

7    INTERVIEWED SAMSUNG CUSTOMERS AND SUMMARIZED THOSE RESULTS.

8    Q.   DOES PX 36 HAVE ANY CONTENT THAT, IN YOUR VIEW, SHOWS THAT

9    THERE WAS DEMAND FOR THE IPHONE AND/OR DEMAND FOR THE PATENTED

10   FEATURES IN THE IPHONE?

11   A.   YES.  THERE ARE SEVERAL PAGES IN HERE THAT ARE

12   PARTICULARLY PERTINENT.  I WOULD PROBABLY REFER YOU TO PAGE 20

13   TO BEGIN WITH.

14   Q.   OKAY.  THIS IS AN ACTUAL PAGE FROM THE DOCUMENT?

15   A.   THIS IS STRAIGHT FROM THE DOCUMENT.

16   Q.   OKAY.

17   A.   AND WHAT WE SEE HERE, AS THE TITLE SAYS, "PUNDITS TELL US

18   THAT THE IPHONE IS A REVOLUTION."

19        AND THE FIRST ONE ON THE LEFT SAYS "APPLE INC.'S IPHONE

20   HAS BEEN THE WORLD'S MOST INFLUENTIAL SMARTPHONE SINCE ITS

21   DEBUT A YEAR AGO, WIDELY HAILED FOR ITS BEAUTY AND

22   FUNCTIONALITY."

23   Q.   COULD YOU LOOK AT PAGE 31 OF THE GRAVITY TANK REPORT?

24   WHAT DO WE HAVE HERE?

25   A.   AS WE SEE ON THIS PAGE, THE PICTURE IN THE CENTER IS THE

1     IPHONE, AND I UNDERSTAND THAT THE FACE OF THAT IPHONE IS WHAT'S

2     COVERED BY THE '677 DESIGN PATENT.

3     Q.   AND WHAT DID SAMSUNG'S CONSULTANT REPORT TO IT ABOUT THE

4     DESIGN OF THE IPHONE?

5     A.   WHAT IT TALKS ABOUT, AS WE SEE IN THE HEADING, IS THE

6     "SCREEN-CENTRIC DESIGN HAS SET THE STANDARD FOR TOUCH."

7          AND IT GOES ON AND SAYS "THE STRONG SCREEN-CENTRIC DESIGN

8     HAS COME TO EQUAL WHAT'S ON TREND AND COOL FOR MANY CONSUMERS."

9     Q.   CAN YOU LOOK AT THE NEXT PAGE?  WHAT DID SAMSUNG'S

10    CONSULTANT REPORT TO IT ON THE NEXT PAGE?

11    A.   AS YOU SEE IN THE TITLE, "FOR STATE OF THE ART, APPLE HAS

12    OVERTAKEN SAMSUNG AS THE MOST STYLISH BRAND OVERALL."

13    Q.   YOU'VE ALREADY TALKED ABOUT THE DESIGN PATENT.

14         DID YOU FIND ANYTHING IN THIS DOCUMENT THAT YOU THOUGHT

15    WAS RELEVANT TO DEMAND FOR THE PATENTED FEATURES OF THE UTILITY

16    PATENTS, THE NON-DESIGN PATENTS AT ISSUE IN THIS CASE?

17    A.   YES.  IN FACT, I WOULD REFER YOU TO PAGE 36.

18    Q.   OKAY.  WHAT DID YOU FIND THERE THAT YOU THINK THE JURY

19    SHOULD PAY CLOSE ATTENTION TO?

20    A.   WELL, THIS PAGE IS TITLED "THE IPHONE ISN'T JUST EASY TO

21    USE, IT'S SEXY TO USE" AND THERE ARE THREE PICTURES ON HERE.

22    THE FIRST ONE IS LABELLED "FUN.  GESTURES LIKE THE TWO FINGERED

23    PITCH AND FLICK ADD A GAME-LIKE QUALITY TO INTERACTIONS.  THE

24    FLIP ADDS A LEVEL OF COOL."

25         I UNDERSTAND THAT PARTICULAR FUNCTIONALITY TO BE ENABLED

DAVID DIRECT

```
 1     BY THE '915 PATENT.
 2          THE SECOND PICTURE IS LABELED "WHIMSICAL."  IT SAYS "LISTS
 3     BOUNCE, ICONS FLITTER -- THE IPHONE HAS A SENSE OF WHIMSY THAT
 4     SHOWS A THOUGHTFUL CHARACTER IN THE INTERFACE."
 5          THAT BOUNCING LIST POINT I UNDERSTAND TO BE A
 6     FUNCTIONALITY THAT'S ENABLED BY THE '381 PATENT.
 7     Q.   OKAY.  CAN YOU GIVE US ONE MORE EXAMPLE OF A DOCUMENT THAT
 8     YOU FOUND RELEVANT TO THIS ISSUE OF DEMAND?
 9     A.   THE THIRD OF THE THREE EXAMPLES THAT I PULLED WOULD BE
10     PX 40.
11     Q.   OKAY.  COULD YOU TURN TO THAT IN YOUR BINDER, AND TELL US
12     WHAT IT IS.
13     A.   THIS IS AN E-MAIL EXCHANGE BETWEEN EXECUTIVES AT SAMSUNG.
14     IT'S DATED FEBRUARY 11TH OF 2010, SO THIS IS STILL SEVERAL
15     MONTHS BEFORE THE LAUNCH OF THE INFRINGING PRODUCTS.  IT'S
16     TITLED "SUMMARY OF EXECUTIVE LEVEL MEETING, SUPERVISED BY HEAD
17     OF DIVISION."
18     Q.   SO JUST SO OUR CHRONOLOGY IS CLEAR HERE, THAT FIRST
19     DOCUMENT YOU SHOWED US, THE FEASIBILITY REVIEW, THAT WAS FROM
20     SEPTEMBER OF 2007?
21     A.   THAT'S CORRECT.
22     Q.   AND THEN WE HAVE ONE FROM --
23     A.   DECEMBER OF 2008 WAS THE ONE WE JUST LOOKED AT THAT WAS
24     PREPARED BY SAMSUNG'S CONSULTANT, GRAVITY TANK.
25     Q.   AND NOW WHERE ARE WE?
```

1    A.   WE ARE NOW IN FEBRUARY OF 2010.

2              MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE THE

3    ADMISSION OF PX 40.

4              THE COURT:  ANY OBJECTION?

5              MR. PRICE:  NO FURTHER OBJECTION.

6              THE COURT:  IT'S ADMITTED.

7         (PLAINTIFF'S EXHIBIT 40 WAS ADMITTED IN EVIDENCE.)

8              THE COURT:  GO AHEAD, PLEASE.

9    BY MS. KREVANS:

10   Q.   WHAT DID YOU FIND AMONG THIS E-MAIL CHAIN AMONG SAMSUNG

11   EXECUTIVES -- AND THIS IS A TRANSLATION, OF COURSE.  WHAT DID

12   YOU FIND IN THIS DOCUMENT THAT WAS RELEVANT TO THE ISSUE OF

13   DEMAND?

14   A.   WELL, THIS DOCUMENT IS SUMMARIZING SOME OF THE THINGS THAT

15   WERE SAID AT THAT PARTICULAR MEETING, AND ON PAGE 2, I WOULD

16   REFER YOU ABOUT TWO-THIRDS OF THE WAY DOWN TO A LINE THAT

17   STARTS WITH "I HEAR THINGS LIKE THIS:  LET'S MAKE SOMETHING

18   LIKE THE IPHONE.

19        "WHEN EVERYBODY (BOTH CONSUMERS AND THE INDUSTRY) TALK

20   ABOUT THE USER EXPERIENCE, THEY WEIGH IT AGAINST THE IPHONE.

21   THE IPHONE HAS BECOME THE STANDARD.  THAT'S HOW THINGS ARE

22   ALREADY.

23        "DO YOU KNOW HOW DIFFICULT THE OMNIA IS TO USE?"

24        AND UNDERSTAND THAT THE OMNIA WAS THE SAMSUNG PRODUCT AT

25   THE TIME, OR ONE OF THE SAMSUNG PRODUCTS.

DAVID DIRECT

1      "WHEN YOU COMPARE THE 2000 VERSION OF THE IPHONE WITH OUR

2  CURRENT OMNIA, CAN YOU HONESTLY SAY THE OMNIA IS BETTER?  IF

3  YOU COMPARE THE UX WITH THE IPHONE, IT'S A DIFFERENCE BETWEEN

4  HEAVEN AND EARTH."

5  Q.   SO THIS IS A SAMSUNG EXECUTIVE IN 2010 SAYING THE 2007

6  VERSION OF THE IPHONE WAS BETTER?

7  A.   BETTER THAN THE OMNIA THAT WAS BEING SOLD IN 2010.

8  Q.   WHAT ELSE DID YOU FIND IN THIS DOCUMENT THAT YOU THOUGHT

9  WAS PARTICULARLY RELEVANT TO THE ISSUE OF DEMAND?

10  A.   PAGE 5 PICKS UP ON THE DISCUSSION ABOUT HEAVEN AND EARTH.

11  IN THE THIRD PARAGRAPH, IT SAYS, "ALL THIS TIME WE'VE BEEN

12  PAYING ALL OUR ATTENTION TO NOKIA, AND CONCENTRATED OUR EFFORTS

13  ON THINGS LIKE FOLDER, BAR, SLIDE, YET WHEN OUR USER EXPERIENCE

14  IS COMPARED TO THE UNEXPECTED COMPETITOR APPLE'S IPHONE, THE

15  DIFFERENCE IS TRULY THAT OF HEAVEN AND EARTH."

16      AND THEN IN BOLD LETTERS IT SAYS, "IT'S A CRISIS OF

17  DESIGN."

18  Q.   GOING BACK TO -- WELL, GOING BACK TO THE BOARD, LET ME ASK

19  YOU ONE OTHER QUESTION ABOUT THE CONJOINT SURVEY THAT

20  DR. HAUSER DID.

21      THERE ARE SOME DOLLAR AMOUNTS ASSOCIATED WITH THE RESULTS

22  OF HIS SURVEY.  DID YOU ACTUALLY USE THOSE DOLLAR AMOUNTS IN

23  ASSESSING DAMAGES?

24  A.   NO.  I WAS RELYING UPON HIS SURVEY AS AN INDICATOR OF

25  DEMAND.

1    Q.    OKAY.  WHAT WAS YOUR OVERALL CONCLUSION ABOUT WHETHER

2    THERE WAS DEMAND FOR APPLE'S IPHONES AND IPADS IN THE RELEVANT

3    TIME PERIOD?

4    A.    THERE WAS CLEARLY DEMAND FOR APPLE'S IPHONES AND IPADS

5    DURING THE OVERALL TIME PERIOD.

6    Q.    WHAT WAS YOUR OVERALL CONCLUSION ABOUT WHETHER THERE WAS

7    DEMAND FOR APPLE'S PATENTED FEATURES IN THAT TIME PERIOD?

8    A.    I THINK THE SAMSUNG DOCUMENTS THAT WE JUST SHOWED INDICATE

9    THAT EVEN SAMSUNG HAD A DEMAND FOR THOSE FEATURES AND

10   FUNCTIONALITIES.

11   Q.    SO I SHOULD CHECK THIS BOX?

12   A.    YOU CAN CHECK THAT OFF.

13   Q.    IT WOULD BE GOOD IF MY MARKER WORKS.

14         COULD YOU EXPLAIN THE SECOND FACTOR YOU CONSIDERED IN

15   ASSESSING WHETHER THERE SHOULD BE LOST PROFITS DAMAGES AWARDED

16   IN THIS CASE?

17   A.    GOING BACK TO THE QUESTION WE'RE TRYING TO ANSWER, WHICH

18   IS, IS IT REASONABLY PROBABLE THAT APPLE WOULD HAVE MADE MORE

19   SALES, THEN THE QUESTION BECOMES, WHAT WOULD THOSE CUSTOMERS

20   HAVE PURCHASED IF THEY COULDN'T BUY THE INFRINGING SAMSUNG

21   PHONES BECAUSE THOSE PHONES WOULDN'T HAVE BEEN ON THE MARKET?

22         SO THERE ARE 11 MILLION SUCH PHONES.  WHAT WOULD THEY HAVE

23   PURCHASED INSTEAD?

24         AND THERE ARE TWO DIFFERENT KINDS OF THINGS THEY COULD

25   HAVE PURCHASED.  ONE IS THEY COULD HAVE BOUGHT OTHER SAMSUNG

1    PHONES, AND PERHAPS SAMSUNG COULD HAVE REDESIGNED THE

2    INFRINGING PHONES TO AVOID INFRINGEMENT SO THAT IT WASN'T USING

3    THE PATENTED TECHNOLOGY AND RELAUNCHED THOSE PHONES.

4        AND I REFER TO THOSE REDESIGN PRODUCTS AS DESIGN AROUNDS

5    BECAUSE THEY DESIGNED AROUND THE PATENTS IN THIS CASE.

6        THE OTHER TYPE OF ALTERNATIVE THAT SOMEONE COULD HAVE

7    PURCHASED IF THE INFRINGING PRODUCTS WEREN'T AVAILABLE WOULD BE

8    OTHER PHONES THAT WERE ALREADY ON THE MARKET.  SO IN ADDITION

9    TO THE APPLE IPHONE, THERE WERE OTHER MANUFACTURERS OUT THERE

10   SELLING SMARTPHONES AS WELL, SO NOKIA, HTC, MOTOROLA, OTHERS.

11   SO THOSE WOULD BE SOME OF THEM THAT WOULD BE CONSIDERED BY

12   THOSE 11 MILLION CONSUMERS WHO PURCHASED THE INFRINGING PHONES.

13   Q.   HOW DID YOU DECIDE HOW TO ASSESS PROPERLY THE ISSUE OF

14   THIS DESIGN AROUND POSSIBILITY WHEN WE'RE TALKING SPECIFICALLY

15   ABOUT THE '915 PATENT NOW?

16   A.   WE ARE TALKING SPECIFICALLY ABOUT THE '915 PATENT, AND THE

17   FIRST THING I NEEDED TO UNDERSTAND WAS HOW LONG WOULD IT TAKE

18   FOR SAMSUNG TO REDESIGN THAT PRODUCT AND GET IT BACK OUT INTO

19   THE MARKETPLACE, BECAUSE FOR THAT PERIOD OF TIME, THEY'LL HAVE

20   TO TAKE THOSE INFRINGING PHONES OFF THE MARKET UNTIL THEY GET

21   REDESIGNED AND THEN THEY CAN RELAUNCH THEM.  AND SO I NEEDED TO

22   UNDERSTAND HOW LONG IT WOULD BE.

23       MR. MUSIKA HAD DETERMINED THAT LENGTH OF TIME BY

24   INTERVIEWING APPLE PERSONNEL THAT WERE RESPONSIBLE FOR THE

25   ENGINEERING OF THE IPHONE.  I DID THE SAME THING.  I SPOKE

1    DIRECTLY TO HENRI LAMIRAUX, WHO WAS THE VICE-PRESIDENT OF THE

2    IOS SYSTEMS, SO HE WAS IN CHARGE OF THE IPHONE AND IPAD'S

3    OPERATING SYSTEM SOFTWARE.

4         AND I ASKED HIM, HOW LONG WOULD IT TAKE TO DESIGN AROUND

5    THE THREE PATENTS IN THIS CASE?  IF YOU WANTED TO TAKE OUT THAT

6    FUNCTIONALITY AND DO SOMETHING DIFFERENT, HOW LONG WOULD IT

7    TAKE?

8         AND SO WE TALKED ABOUT THE '381 PATENT AND WE TALKED ABOUT

9    THE '163 PATENT, BUT THE ONE THAT BECOMES RELEVANT FOR OUR

10   DISCUSSION TODAY IS THE '915 PATENT.

11   Q.   AND WHAT WAS THE -- WHAT WAS THE CONCLUSION YOU CAME TO AS

12   A RESULT OF YOUR INVESTIGATION OF THIS QUESTION OF HOW LONG THE

13   DESIGN AROUND PERIOD WOULD BE?

14   A.   WHAT I LEARNED FROM THAT DISCUSSION WAS THE SAME THING

15   MR. MUSIKA HAD LEARNED, AND THAT IS THAT IT WOULD TAKE ABOUT

16   SIX MONTHS.

17        THIS IS A FAIRLY COMPLICATED REDESIGN.  EVEN THOUGH

18   MR. LAMIRAUX WAS THE GUY IN CHARGE OF THE SOFTWARE, IN FACT,

19   HE'D BEEN INVOLVED FROM DAY ONE IN DEVELOPING THAT SOFTWARE, HE

20   SAID THIS IS A FAIRLY DRAMATIC CHANGE AND IT WILL TAKE A LONG

21   TIME TO DO THAT.

22        BECAUSE WHAT HAS TO HAPPEN IS THERE NEEDS TO BE A CHANGE

23   MADE IN THE BASIC SOFTWARE, AND THEN THE SAME SCROLLING GESTURE

24   FUNCTIONALITY IS EMBEDDED IN MANY, IF NOT MOST, OF THE APPS

25   THAT ARE ALSO PART OF IT.  SO ONCE YOU FIX THE SOFTWARE, THEN

1    YOU ALSO HAVE TO FIX THE LINKAGE WITH ALL THOSE APPS OR IT

2    WOULD BREAK AS THE TERM WAS THAT HE USED.

3        SO THAT'S WHY IT TAKES SO LONG TO REWRITE IT, TEST IT,

4    MAKE IT WORK, FIX THE APPS, AND ULTIMATELY LAUNCH THE NEW

5    PHONE.

6    Q.   WHAT -- ON -- WHAT DID YOU ASSUME AS THE FIRST DATE ON

7    WHICH THE DESIGN AROUND, THE SIX MONTH PERIOD WOULD BEGIN?

8    A.   I ASSUMED, FOR PURPOSES OF THIS TRIAL, THAT THE DESIGN

9    AROUND WOULD BEGIN ON THE DATE OF FIRST INFRINGEMENT, AND FOR

10   THE '915 PATENT, THAT IS NOVEMBER 30TH OF 2010.

11   Q.   HAVE YOU MADE ANY OTHER ASSUMPTIONS IN CONNECTION WITH

12   THIS DESIGN AROUND ISSUE?

13   A.   YES.  I HAVE ASSUMED THAT ONCE SAMSUNG WAS ABLE TO DESIGN

14   AROUND AND LAUNCHED ITS NEW PRODUCT THAT NO LONGER USED THE

15   '915 PATENTED TECHNOLOGY, THAT IT WOULD IMMEDIATELY BECOME

16   ACCEPTABLE AND ALL THE CONSUMERS THAT WOULD HAVE OTHERWISE

17   PURCHASED THE INFRINGING PRODUCTS WOULD HAVE INSTEAD PURCHASED

18   THE NEW AND REDESIGNED PRODUCT.

19   Q.   NOW, YOU SAY "ASSUME."  I TAKE IT THIS WHOLE DESIGN AROUND

20   FOR THE '915 IS ACTUALLY A HYPOTHETICAL?

21   A.   IT'S CERTAINLY A HYPOTHETICAL BECAUSE SAMSUNG DIDN'T

22   DESIGN AROUND IN NOVEMBER OF 2010.

23   Q.   WHAT IS THE SIGNIFICANCE OF ASSUMING THAT AT THE END OF

24   THE SIX MONTHS WHEN SAMSUNG BROUGHT THIS HYPOTHETICAL DESIGN

25   AROUND BACK TO THE MARKET THAT THEIR SALES WOULD IMMEDIATELY

1        RETURN TO THE LEVEL THAT THEY WERE BEFORE?

2        A.   I THINK THAT'S A CONSERVATIVE ASSUMPTION.  I -- AS AN

3    ACCOUNTANT, I GUESS I WOULD USE THAT TERM TO MEAN THAT I WANT

4    TO BE SURE THAT THE AMOUNTS I CALCULATE ARE NOT TOO HIGH.

5            BUT IT'S CONSERVATIVE IN THE SENSE THAT PROBABLY WHAT

6    WOULD HAVE REALLY HAPPENED IS IT WOULD TAKE A WHILE FOR THOSE

7    PRODUCTS TO BECOME ACCEPTED IN THE MARKETPLACE.  SO THERE WOULD

8    BE A RAMP UP PERIOD.  THEY WOULDN'T BE INSTANTLY ACCEPTABLE AND

9    SAMSUNG WOULDN'T INSTANTLY RECOVER ALL OF ITS SALES OF THE

10   INFRINGING PRODUCTS THAT WAY.

11   Q.   OKAY.  COULD WE SEE SLIDE PDX 100.11.

12           AGAIN, JUST SO THESE DATES ARE CLEAR TO THE JURY, COULD

13   YOU RECAP FOR THEM WHAT THE RELEVANT DATES WERE THAT FED INTO

14   THIS ANALYSIS?

15   A.   THERE ARE THREE DATES HERE THAT ARE PERTINENT TO THE LOST

16    PROFITS CALCULATION.

17           FIRST OF ALL, THE 11-30-2010 DATE IS THE DATE THE '915

18   PATENT ISSUED, AND SO THAT'S THE DATE THAT I'VE ASSUMED THAT

19   SAMSUNG WOULD HAVE STARTED DESIGNING AROUND THE '915 PATENT.

20           IT TAKES THEM SIX MONTHS TO DO THAT, SO WHEN WE GET TO THE

21   NOTICE DATE OF APRIL 15, 2011, SAMSUNG IS STILL IN THE MIDDLE

22   OF THAT REDESIGN PROCESS.

23           SO DAMAGES START THEN, AND BECAUSE THOSE INFRINGING

24   PRODUCTS ARE STILL OFF THE MARKET, THEY'RE STILL IN THE

25   REDESIGN PHASE, APPLE LOST SOME SALES DURING THAT PERIOD OF

1    TIME.

2         THE SIX MONTH REDESIGN PERIOD ENDS MAY 29TH OF 2011, SO

3    THAT'S WHEN I'VE ASSUMED LOST PROFITS END, THAT APPLE, I'VE

4    ASSUMED, LOST NO FURTHER SALES AFTER THAT.

5    Q.   OKAY.  SO JUST TO BE CLEAR, THE SAMSUNG INFRINGING UNITS

6    THAT YOU LOOKED AT TO SEE, IF THEY HADN'T BEEN SOLD, WOULD

7    APPLE HAVE MADE THE SALE INSTEAD, WERE THE UNITS THAT SAMSUNG

8    SOLD IN THE PERIOD BETWEEN APRIL 15TH, 2011 AND MAY 29TH, 2011?

9    A.   THOSE ARE THE ONLY UNITS THAT I CONSIDERED AS POTENTIAL

10   FOR LOST PROFITS.

11   Q.   OKAY.  NEXT THING ON YOUR BOARD SAYS "ALLOCATION BY MARKET

12   SHARES."  HOW DID YOU ALLOCATE THE UNITS THAT SAMSUNG SOLD IN

13   THAT PERIOD FROM APRIL 15TH TO MAY 29TH BY MARKET SHARES?

14   A.   THIS IS THE ASPECT OF THE CALCULATION THAT GETS TO WHAT

15   OTHER MANUFACTURERS' PHONES WERE OUT THERE BESIDES THE IPHONE

16   THAT A SAMSUNG CUSTOMER COULD HAVE PURCHASED INSTEAD?

17        SO WHAT I HAVE DONE IS RELY UPON A THIRD PARTY RESEARCH

18   GROUP KNOWN AS IDC, WHICH COLLECTS DATA RELATED TO THE NUMBER

19   OF PHONES SOLD BY EACH CARRIER OF EACH DIFFERENT MANUFACTURER'S

20   TYPE, IN ORDER TO DETERMINE WHAT APPLE'S MARKET SHARE WOULD

21   HAVE BEEN.

22   Q.   AND DID YOU ALSO LOOK TO SEE WHAT THE MARKET SHARES OF

23   SAMSUNG AND OTHER CARRIERS WERE?

24   A.   YES, I DID.

25   Q.   OKAY.  IS -- UNDER HERE YOU SAY "CARRIER-SPECIFIC ISSUES."

DAVID DIRECT

```
1     WHAT DOES THAT REFER TO?
2     A.   WHAT I HAD DONE, AND WHAT YOU'LL SEE WHEN YOU LOOK AT THE
3     25F EXHIBIT THAT PROVIDES A LITTLE BIT MORE DETAIL, IS THAT I
4     HAVE ANALYZED MARKET SHARE BY CARRIER BECAUSE THE MARKET SHARE
5     OF APPLE IS DIFFERENT WHETHER YOU'RE TALKING ABOUT AT&T OR
6     VERIZON OR SPRINT OR SOMEONE ELSE.
7          SO DURING THE PERIOD OF TIME THAT WE WERE LOOKING AT
8     THERE, WHICH IS ABOUT SIX WEEKS, FROM APRIL 15 TO MAY 29 OF
9     2011, APPLE WAS ONLY SELLING IPHONES IN TWO CARRIERS.  THAT WAS
10    AT&T AND VERIZON.
11         SPRINT DID NOT YET HAVE APPLE IPHONES, AND THE OTHER
12    CARRIERS DIDN'T YET HAVE APPLE IPHONES.
13         SO I ANALYZED THE MARKET SHARE INDIVIDUALLY FOR EACH OF
14    THOSE CARRIERS IN ORDER TO COME TO THE CONCLUSIONS THAT WE SAW
15    EARLIER.
16    Q.   WHY DID YOU ANALYZE THE MARKET SHARE BY CARRIER RATHER
17    THAN BY THE OVERALL MARKET?
18    A.   BECAUSE THERE ARE CARRIER-SPECIFIC ISSUES.  AS WE SAID,
19    THEY'RE DIFFERENT.  SO IF WE WANT TO BE PRECISE IN DETERMINING
20    WHAT THOSE MARKET SHARES ARE, WE DO IT ON A CARRIER-BY-CARRIER
21    BASIS.
22    Q.   FOR SAMSUNG PHONES THAT WERE SOLD BY A CARRIER, LIKE
23    SPRINT OR T-MOBILE THAT DIDN'T, AT THE TIME, GIVE THEIR
24    CUSTOMERS AN OPTION OF TAKING AN APPLE IPHONE, WHAT DID YOU DO
25    FOR YOUR MARKET ALLOCATION?
```

1    A.   WHAT I HAVE DONE IS RELY UPON A STUDY.  THE PAGE THAT I

2    INCLUDED IN YOUR 25F EXHIBIT IS A PAGE FROM THAT STUDY.  IT

3    SHOWS THAT, ON AVERAGE, 26 PERCENT OF CUSTOMERS WHO ARE BUYING

4    A NEW PHONE CHANGE CARRIERS TO DO THAT.

5         SO I'VE ASSUMED THAT IF THE INFRINGING PHONES THAT SAMSUNG

6    SOLD WERE SOLD BY SPRINT, THEN ONLY 26 PERCENT OF THOSE PEOPLE

7    WOULD BE WILLING TO CHANGE CARRIERS AND POSSIBLY BE ABLE TO BUY

8    AN IPHONE AS A RESULT BECAUSE SPRINT WASN'T SELLING IPHONES.

9         SO BY DEFINITION, WHAT THAT MEANS IS THAT 74 PERCENT OF

10   THE CUSTOMERS WHO HAD PURCHASED AN INFRINGING PHONE AT SPRINT

11   JUST STAY THERE, AND MAYBE THEY BUY OTHER SPRINT PHONES, MAYBE

12   THEY BUY SOMETHING ELSE, BUT THEY DO NOT BUY, FOR PURPOSES OF

13   MY ANALYSIS, AN APPLE IPHONE.

14   Q.   SO JUST TO BE CLEAR, WHEN YOU DID YOUR MARKET ALLOCATION

15   STARTING WITH JUST THE UNITS THAT WERE SOLD IN THIS SIX WEEK

16   TIME PERIOD, IF A UNIT WAS SOLD TO A SPRINT CUSTOMER, RIGHT

17   AWAY YOU PUT 74 PERCENT OF THOSE UNITS JUST RIGHT BACK IN

18   SAMSUNG'S POCKET?

19   A.   ESSENTIALLY, YES.

20   Q.   YOU DIDN'T USE -- YOU DIDN'T REALLOCATE ANYBODY OF THAT 76

21   TO ANYBODY, INCLUDING APPLE?

22   A.   74 PERCENT, THAT'S CORRECT.

23   Q.   OKAY.  THE OTHER 26 PERCENT, DID YOU GIVE IT ALL TO APPLE?

24   A.   NO, I DIDN'T.  WHAT I THEN DID IS SAID, OKAY, FOR THOSE 26

25   PERCENT OF CUSTOMERS WHO ARE WILLING TO GO TO ANOTHER CARRIER,

1    THEN WE HAVE TO LOOK AT THE MARKET SHARE AMONG THE OTHER

2    CARRIERS.

3         SO I JUST LOOKED AT THE OVERALL MARKET SHARE AND SAID,

4    OKAY, OF THE OVERALL MARKET SHARE, APPLE HAS A PERCENTAGE OF

5    THAT, AND THAT'S THE PERCENTAGE THAT I WILL ASSUME WOULD BE

6    WILLING TO PURCHASE AN APPLE IPHONE INSTEAD OF THE INFRINGING

7    IPHONE -- OR INSTEAD OF THE INFRINGING SAMSUNG PROFITS,

8    PRODUCTS.

9    Q.   OKAY.  SO WE'RE SLICING THIS NUMBER DOWN AND DOWN AND DOWN

10   IS WHAT YOU'RE SAYING?

11   A.   WE ARE.

12   Q.   OKAY.  CAN WE LOOK AT SLIDE 12 IN PDX 100.

13        WHAT HAVE YOU SET OUT ON SLIDE 12, JUST WHAT WE SEE ON THE

14   SCREEN RIGHT NOW?

15   A.   WELL, WHAT I'M HOPING TO SHOW WITH SLIDE 12 IS HOW THAT

16   MARKET SHARE ALLOCATION WORKS.

17        SO WE ARE LOOKING SPECIFICALLY AT THE SECOND QUARTER,

18   CALENDAR QUARTER OF 2011, SO THIS IS THE PERIOD OF TIME FROM

19   APRIL 1ST TO JUNE 30TH OF 2011, AND THIS IS THE MARKET SHARE BY

20   MANUFACTURER.

21        SO YOU SEE APPLE IN THE MIDDLE IN BLUE; AND YOU SEE THE

22   GRAY BAR THAT'S ALL THE OTHER SMARTPHONE MANUFACTURES COMBINED;

23   AND THEN ON THE FAR RIGHT YOU SEE SAMSUNG, AND THAT'S THE

24   SAMSUNG SMARTPHONES SOLD IN THAT PERIOD OF TIME.

25   Q.   OKAY.  AND I TAKE IT THAT SPRINT, IN FACT, WAS THE CARRIER

DAVID DIRECT

1    THAT SOLD A NUMBER OF PHONES IN THIS TIME PERIOD?

2    A.   YES, THAT'S TRUE.

3    Q.   OKAY.  CAN YOU EXPLAIN TO US WHAT HAPPENS, THEN, TO THE

4    PORTION OF THE SAMSUNG PHONES THAT ACTUALLY FELL IN THIS SIX

5    WEEK PERIOD THAT YOU TOOK INTO CONSIDERATION?

6    A.   IF WE TAKE THE NEXT PART OF THIS SLIDE, IT'S GOING TO SHOW

7    YOU IN ORANGE THE PORTION OF THE SAMSUNG PHONES THAT END UP

8    GETTING REDISTRIBUTED.

9         THE BOTTOM PART, THE RED PART, WE DON'T NEED TO THINK

10   ABOUT BECAUSE THAT'S NOT IN THE LOST PROFITS CALCULATION FOR

11   ANY VARIETY OF REASONS.

12        SOME OF THOSE REASONS -- OR SOME OF THOSE ARE THERE

13   BECAUSE IT'S BEFORE APRIL 15TH AND WE'RE NOT ALLOWED TO ASK FOR

14   DAMAGES BEFORE APRIL 15TH.  SOME WERE THERE BECAUSE IT'S AFTER

15   MAY 29TH.

16        BUT FOR WHATEVER REASON, WE ARE LOOKING ONLY AT THE

17   INFRINGING PHONES THAT ARE IN THAT ORANGE PORTION OF THE BAR.

18   Q.   OKAY.  WHAT HAPPENS TO THOSE PHONES?

19   A.   THOSE GET REDISTRIBUTED IN THE MARKET SHARE ANALYSIS IN

20   THE WAY WE TALKED ABOUT.  SO SOME OF THEM ARE GOING TO GO OFF

21   TO THE OTHER SMARTPHONE MANUFACTURERS, SOME ARE GOING TO GO TO

22   APPLE, AND SOME ARE GOING TO GO BACK TO SAMSUNG.

23        SO AS YOU SEE, OF ALL THOSE INFRINGING PHONES, THE

24   SMALLEST SLIVER GOES TO APPLE.

25   Q.   AND THAT'S THE RESULT OF THE COMBINATION OF THE 74 PERCENT

1       YOU PUT RIGHT BACK TO SAMSUNG, AND THEN SPLITTING THE REMAINING

2       26 PERCENT ACROSS ALL THE PARTICIPANTS, NOT JUST APPLE?

3       A.   THAT'S CORRECT.

4       Q.   ON YOUR BOARD YOU HAVE SOMETHING THAT SAYS "PRICE TO

5       CONSUMERS."  WHAT DOES THAT REFER TO?

6       A.   WELL, WHEN WE TALK ABOUT PRICE IN THIS CASE, MAKE SURE

7       THAT YOU'RE FOCUSSED ON WHICH PRICE IS BEING DISCUSSED.  THERE

8       ARE TWO DIFFERENT PRICES.  FIRST IS THE PRICE THAT YOU AND I

9       PAY WHEN WE GO TO A CARRIER AND BUY A PHONE, CALL IT A COUPLE

10      HUNDRED DOLLARS.  THAT'S THE AMOUNT WE PAY THE CARRIER.

11           THAT'S NOT THE AMOUNT THE CARRIER PAID APPLE OR SAMSUNG.

12      THEY ACTUALLY PAID APPLE OR SAMSUNG MORE THAN THAT.

13           AND SO WHEN WE TALK ABOUT APPLE AND SAMSUNG'S SALES, THOSE

14      WILL BE AT PRICES HIGHER THAN YOU AND I PAY.

15           AND SO WHEN YOU TALK ABOUT WHAT THE CONSUMERS PAID AND

16      WHAT THEY WOULD BE LIKELY TO CHOOSE AS AN ALTERNATIVE, AND TO

17      THE EXTENT THAT THEIR CHOICE IS BASED PARTLY ON PRICE, AS IT

18      TYPICALLY IS, THEN WE NEED TO BE TALKING ABOUT THE PRICE THEY

19      WOULD PAY.

20      Q.   WHAT DOES THE POINT ON THE BOARD THAT SAYS "OPERATING

21      PLATFORM PREFERENCE" AND "OTHER PRODUCT FEATURES" REFER TO?

22      A.   WELL, WHAT WE'RE TALKING ABOUT HERE IS WE KNOW THERE ARE A

23      LOT OF ASPECTS THAT GO INTO A CONSUMER'S DECISION ON WHAT PHONE

24      TO BUY, SO SOME OF THEM HAVE PREFERENCES BETWEEN THE IOS APPLE

25      PLATFORM SOFTWARE, OR ANDROID, OR BLACKBERRY, OR SOMEBODY ELSE.

1        SOME OF THEM HAVE DISTINCT PREFERENCES ON OTHER PRODUCT

2    FEATURES, WHETHER IT'S THE BATTERY OR THE SCREEN SIZE OR THE

3    WEIGHT OR SOMETHING ELSE.

4        SO WHAT WE'VE DONE IS RATHER THAN TRYING TO EVALUATE ANY

5    ONE OF THOSE THINGS INDIVIDUALLY OR SEPARATELY, WE'VE LOOKED AT

6    WHAT HAPPENED IN THE REAL WORLD.  WHAT DID REAL PEOPLE, BUYING

7    REAL PHONES IN THE REAL WORLD, ACTUALLY DO?  BECAUSE THAT

8    BEHAVIOR SYNTHESIZES ALL OF THOSE DECISIONS THAT INCLUDE THINGS

9    LIKE THESE OTHER PRODUCT FEATURES.  AND SO --

10   Q.   WHAT DO YOU MEAN WHEN YOU SAY THAT BEHAVIOR SYNTHESIZES

11   ALL OF THOSE OTHER DECISIONS THAT INCLUDES ALL OF THOSE OTHER

12   PRODUCT FEATURES?

13   A.   WHAT HAPPENS IN THE REAL WORLD IS AN INDICATOR OF HOW THE

14   SALES OF THE INFRINGING PHONES WOULD HAVE BEEN ALLOCATED AMONG

15   ALL THE OTHER MANUFACTURERS BECAUSE IT'S -- WE CAN ASSUME THAT

16   THE 11 MILLION PEOPLE WHO PURCHASED A SAMSUNG INFRINGING PHONE

17   WOULD BE BEHAVE LIKE OTHER PEOPLE BEHAVE IN THE REAL MARKET AND

18   THEY WILL MAKE DECISIONS SIMILAR TO OTHER PEOPLE IN THE REAL

19   MARKET AND, THEREFORE, THE MARKET SHARES FROM THE REAL MARKET

20   ARE RELEVANT.

21   Q.   SO CAN WE CHECK OFF THIS MARKET ALTERNATIVES BOX?

22   A.   YES.

23   Q.   I FIGURED OUT HOW TO USE THE MARKER NOW.

24       THE THIRD THING YOU HAVE ON YOUR BOARD IS CAPACITY.  WHAT

25   IS THE CAPACITY FACTOR ABOUT?

1    A.   THE POINT HERE IS ONCE YOU DECIDE WHAT SHARE OF THE MARKET

2    APPLE WOULD HAVE GOTTEN, WHAT -- IN OTHER WORDS, HOW MANY UNITS

3    WOULD IT BE REASONABLY PROBABLE IT WOULD HAVE SOLD, THEN THE

4    QUESTION BECOMES, WAS APPLE CAPABLE OF SELLING, MANUFACTURING

5    AND SELLING THOSE PRODUCTS?  DID THEY HAVE THEM?  COULD THEY

6    HAVE MADE THEM?

7    Q.   IN THAT TIME PERIOD?

8    A.   DURING THAT TIME PERIOD.

9    Q.   AND REMIND US AGAIN, WHAT'S THE TIME PERIOD WE'RE TALKING

10   ABOUT?

11   A.   WE ARE TALKING ONLY ABOUT THOSE SIX WEEKS BETWEEN APRIL 15

12   OF 2011 AND MAY 29 OF 2011.

13   Q.   WHAT CONCLUSION DID YOU COME TO ABOUT WHETHER IN THAT TIME

14   PERIOD BETWEEN APRIL 15TH AND MAY 29TH APPLE HAD THE CAPACITY

15   IT NEEDED TO SELL THE NUMBER OF SMARTPHONES AND THE NUMBER OF

16   TABLETS THAT YOU DETERMINED AS A RESULT OF THE MARKET

17   ALTERNATIVES ANALYSIS APPLE WOULD HAVE SOLD IF SAMSUNG HAD NOT

18   BEEN SELLING THE INFRINGING PRODUCTS?

19   A.   HAVING STUDIED APPLE'S CAPACITY DURING THAT SIX WEEK

20   PERIOD, IT'S CLEAR TO ME THAT APPLE HAD PLENTY OF CAPACITY TO

21   SELL ADDITIONAL IPHONES AND IPADS.

22   Q.   WHAT KINDS OF INFORMATION DID YOU LOOK AT?

23   A.   I LOOKED AT THE CAPACITY INFORMATION PROVIDED DIRECTLY BY

24   APPLE, SOME OF THAT I THINK WAS DISCUSSED WITH MR. BLEVINS

25   YESTERDAY, AND I HAVE SUMMARIZED THAT IN MY REPORT.

1    Q.   OKAY.   NOW, YOU SHOWED THE JURY EARLIER WHERE THIS

2    INFORMATION IS IN PX 25F.

3         COULD WE SHOW THAT, AGAIN, ONLY TO THE JURY AND TO THE

4    COURT, MR. LEE.

5         CAN YOU POINT OUT TO THE JURY, WITHOUT SAYING THE NUMBER

6    OUT LOUD, WHERE THEY WILL FIND THE NUMBERS IN PX 25F THAT SHOWS

7    THEM HOW MANY APPLE SMARTPHONES WERE AVAILABLE DURING THE

8    RELEVANT PERIOD AND HOW MANY APPLE IPADS WERE AVAILABLE DURING

9    THE RELEVANT PERIOD?

10   A.   LET'S START WITH THE IPHONE, WHICH IS PAGE 14 OF THIS

11   DOCUMENT.

12        WITH MR. LEE'S HELP, I'M GOING TO HAVE HIM FOCUS ON THE

13   EXCESS UNUSED CAPACITY SECTION OF THIS PARTICULAR DOCUMENT, AND

14   IN PARTICULAR, I'M GOING TO HAVE HIM POINT YOU TO A COLUMN

15   THAT'S LABELED FYQ 2011.   THAT IS A FISCAL YEAR QUARTER.   APPLE

16   IS NOT ON A CALENDAR YEAR, IT'S A FISCAL BASIS.   SO THAT IS THE

17   PERIOD OF TIME THAT ENDS MARCH 31 OF 2011.

18        AND ON THAT, YOU SEE AT THE BOTTOM OF THAT COLUMN A NUMBER

19   THAT TOTALS THE IPHONE 3GS AND IPHONE 4 CAPACITY.   AND

20   UNDERSTAND THAT BECAUSE THIS NUMBER IS IN THOUSANDS THAT YOU

21   NEED TO ADD THREE ZEROS TO THAT.

22        SO I WON'T SAY THOSE NUMBERS OUT LOUD, BUT YOU CAN SEE

23   THAT THERE IS A SIGNIFICANT AMOUNT OF UNUSED CAPACITY.

24   Q.   CAN YOU SHOW THE JURY WHERE THEY WILL SEE THE UNUSED

25   CAPACITY NUMBERS FOR THE APPLE'S IPADS DURING THIS TIME PERIOD?

1    A.   YES.  WE'LL GO TO THE NEXT PAGE OF THIS DOCUMENT, AND ONCE

2    AGAIN, WITH MR. LEE'S HELP, WE'LL GO DOWN TO THE BOTTOM WHERE

3    IT SAYS EXCESS UNUSED CAPACITY, AND WE'LL TALK ABOUT THE SAME

4    QUARTER ENDED MARCH 31, AND YOU SEE THAT FOR THAT PARTICULAR

5    QUARTER, ONCE YOU ADD THE THREE ZEROS BECAUSE THOSE UNITS ARE

6    IN THOUSANDS, THERE WERE A LOT OF IPADS AVAILABLE AS WELL.

7    Q.   AGAIN, BEING CAREFUL NOT TO SAY THE ACTUAL CAPACITY

8    NUMBERS OUT LOUD, WHAT WAS THE TOTAL NUMBER OF IPHONES AND

9    IPADS THAT YOU CONCLUDED APPLE WOULD HAVE SOLD IN YOUR MARKET

10   ALTERNATIVE ANALYSIS, ASSUMING YOU HAD THE CAPACITY, AND DID

11   THAT TOTAL, IN FACT, FALL WITHIN THE CAPACITY NUMBERS THAT THE

12   JURY HAS JUST SEEN IN EXHIBIT 25F?

13   A.   I BELIEVE I CAN TELL YOU THE TOTAL OF THE ADDITIONAL

14   IPHONES AND IPADS.  THAT WOULD BE 360,000 UNITS OUT OF THE 11

15   MILLION INFRINGING UNITS THAT WE TALKED ABOUT.

16       AND SO THOSE 360,000 UNITS SHOULD BE COMPARED IN YOUR MIND

17   TO THE NUMBERS THAT YOU SAW ON THE SCREEN RELATED TO THE EXCESS

18   UNUSED CAPACITY, AND NOW YOU UNDERSTAND WHY I'VE CONCLUDED THAT

19   THERE'S PLENTY OF CAPACITY FOR APPLE TO SELL ADDITIONAL IPHONES

20   AND IPADS.

21   Q.   WASN'T THERE A BACKLOG OF ORDERS FOR THE IPHONE 4 AFTER IT

22   WAS INTRODUCED?

23   A.   THERE WAS.  BUT AS YOU HEARD YESTERDAY FROM MR. BLEVINS,

24   THAT WAS A SITUATION THAT WAS IN THE FALL OF 2010, SO

25   ESSENTIALLY BY NOVEMBER OF 2010, THAT WAS RESOLVED, AND

 1      CERTAINLY BY APRIL 15 OF 2011 THAT WAS NO LONGER A PROBLEM AT

 2      ALL.

 3      Q.   COULD YOU SHOW THE JURY ONLY, MR. LEE, PAGE -- PX 25G1,

 4      PAGE 2.

 5           MS. DAVIS, AGAIN, WITHOUT SAYING THE NUMBERS OUT LOUD, CAN

 6      YOU SHOW THE JURY WHERE IN PX 25G1 THEY WILL SEE THE ACTUAL

 7      NUMBERS OF SMARTPHONES AND OF TABLETS THAT YOU DETERMINED

 8      APPLE -- OR THE SALES APPLE WOULD HAVE MADE AS A RESULT OF YOUR

 9      MARKET ALTERNATIVES CALCULATION JUST SO THAT THEY CAN SEE HOW

10      THOSE ACTUAL NUMBERS COMPARE TO APPLE'S CAPACITY IN THAT TIME

11      PERIOD.

12      A.   LET'S LOOK FIRST AT PAGE 2 OF THIS DOCUMENT.  THIS RELATES

13      TO APPLE'S LOST PROFITS SUMMARY.  THERE'S A LINE ITEM THERE

14      THAT'S LABELED "TOTAL UNITS ELIGIBLE FOR" I.P. -- OR I'M

15      SORRY -- LOST PROFITS, LP.

16           AND THEN IN THE TOTAL CATEGORY, YOU'LL SEE THAT NUMBER

17      THAT I WILL NOT SAY OUT LOUD THAT MR. LEE CAN HIGHLIGHT FOR

18      YOU.

19           THAT IS THE TOTAL NUMBER OF INFRINGING UNITS THAT I HAVE

20      CALCULATED TO BE PART OF THE LOST PROFITS CALCULATION FOR

21      IPHONES.

22      Q.   FOR SMARTPHONES?

23      A.   SMARTPHONES.  BUT THESE WOULD HAVE BEEN ADDITIONAL SALES

24      OF IPHONES.

25      Q.   OKAY.  AND WHAT ABOUT TABLETS?

DAVID DIRECT

1    A.   TABLETS, WE'RE GOING TO DO THE SAME THING ON PAGE 3.

2         ONCE AGAIN, THERE'S A LINE ITEM LABELED "TOTAL UNITS

3    ELIGIBLE FOR LP," LOST PROFITS, AND ON THE FAR RIGHT-HAND SIDE

4    ARE THE TOTALS, SO THAT NUMBER THAT MR. LEE WILL HIGHLIGHT FOR

5    YOU ARE THE TOTAL NUMBER OF TABLETS THAT I'VE INCLUDED IN LOST

6    PROFITS, AND THAT'S AS A PORTION OF THE TOTAL NUMBER OF UNITS

7    SOLD AT THE TOP OF THAT COLUMN.

8    Q.   WHAT IS YOUR DEGREE OF CONFIDENCE, MS. DAVIS, THAT THIS

9    TOTAL OF 360,000 SMARTPHONE AND TABLET UNITS SOLD BY SAMSUNG

10   THAT INFRINGED WOULD HAVE BEEN SALES THAT APPLE WOULD HAVE MADE

11   HAD SAMSUNG NOT BEEN INFRINGING?

12   A.   I'M VERY CONFIDENT THAT THAT WOULD BE A CONSERVATIVE

13   ESTIMATE OF THOSE NUMBERS.

14   Q.   AND, AGAIN, WHAT DO YOU MEAN BY "CONSERVATIVE"?

15   A.   WELL, CONSERVATIVE MEANING THAT I'VE MADE ASSUMPTIONS THAT

16   I BELIEVE RESULT IN MAKING SURE THAT THAT NUMBER IS NOT TOO

17   HIGH.

18        MS. KREVANS:  YOUR HONOR, THIS WOULD BE A GOOD TIME

19   FOR A LUNCH BREAK, AND I SEE THAT IT'S NOON.

20        THE COURT:  IT IS ACTUALLY 12:02.

21        MS. KREVANS:  OKAY.

22        THE COURT:  OKAY.  LET'S GO AHEAD AND TAKE OUR LUNCH

23   BREAK NOW.

24        PLEASE COME BACK AT 1:05, AND IF YOU WOULD PLEASE LEAVE

25   YOUR JURY BINDERS IN THE JURY ROOM.

1           AND AGAIN, PLEASE KEEP AN OPEN MIND AND DON'T DISCUSS OR

2    RESEARCH THE CASE.

3           THANK YOU FOR YOUR PATIENCE AND SERVICE.

4           (JURY OUT AT 12:03 P.M.)

5                THE COURT:  ANY ISSUES?  NO?

6                MS. KREVANS:  NOT THAT I KNOW OF, YOUR HONOR.

7                THE COURT:  OKAY.  THANK YOU.  WE'LL TAKE OUR BREAK

8    NOW.

9           (LUNCH RECESS TAKEN FROM 12:04 P.M. TO 1:08 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2          (JURY OUT AT 1:08 P.M.)

 3              THE COURT:  ALL RIGHT.  WELCOME.  PLEASE TAKE A SEAT.

 4      CAN YOU PLEASE BRING THEM -- IS THERE AN ISSUE?

 5              MR. MCELHINNY:  YOU WANTED A REPORT, YOUR HONOR.

 6              THE COURT:  OH, YES.

 7              MS. MAROULIS:  YOUR HONOR, THE PARTIES CONFERRED AND

 8      REACHED A PROPOSAL WHERE THE COURT WOULD GET HPO BRIEFING

 9      TOMORROW BY 7:00 P.M.  WOULD THAT BE ACCEPTABLE FOR THE COURT?

10              MR. MCELHINNY:  TO BE CLEAR, IT WOULD BE ALL THE HPO

11      BRIEFING FOR EVERYTHING EXCEPT FOR ANY NEW DEMONSTRATIVES THAT

12      MIGHT BE USED IN THE REBUTTAL.  SO ALL WITNESSES, ALL REGULAR

13      EXHIBITS WOULD BE OFFERED.

14              MS. MAROULIS:  AND ALL PRIOR DEMONSTRATIVES.

15              MR. MCELHINNY:  AND ALL PRIOR DEMONSTRATIVES.

16              THE COURT:  SO IT WOULD BE EVERYTHING FOR THE WHOLE

17      CASE?

18              MR. MCELHINNY:  IT WOULD BE, EXCEPT FOR POTENTIAL NEW

19      DEMONSTRATIVES THAT COULD BE USED IN THE REBUTTAL, WHICH WE

20      WILL DISCLOSE TO THEM AT NOON ON SATURDAY, AND WE WOULD

21      ANTICIPATE YOUR HONOR WOULD USE THEM TO BE ABLE TO RULE ON THEM

22      ON THE SAME SCHEDULE AS YOU WOULD ON THE CLOSING.

23              MS. MAROULIS:  ACTUALLY, IT WOULD BE DUE ON FRIDAY.

24              MR. MCELHINNY:  FRIDAY, THAT'S RIGHT.

25              THE COURT:  ALL RIGHT.  WELL, THANK YOU.  I
```

1       APPRECIATE THAT.

2              SO TELL ME, WHAT IS COMING IN ON FRIDAY AT 7:00?

3                  MS. MAROULIS:  THOSE WOULD BE OBJECTIONS TO DIRECT

4       DISCLOSURES BY APPLE OF THEIR REBUTTAL WITNESSES AND APPLE'S

5       OBJECTIONS TO SAMSUNG'S CROSS DISCLOSURES OF THOSE REBUTTAL

6       WITNESSES.

7              AND IT WOULD INCLUDE WITNESSES, EXHIBITS, AND ANY OLD

8       PRIOR DEMONSTRATIVES.

9                  THE COURT:  OKAY.  AND THEN FOR CLOSINGS, WHEN WILL I

10      RECEIVE THAT?

11                 MS. MAROULIS:  WE HAVE NOT ACTUALLY CONFERRED ON

12      THAT, YOUR HONOR.  CAN WE GET BACK TO YOU?

13                 THE COURT:  NO, THAT'S FINE.  I'M ASSUMING THAT WE'LL

14      PROBABLY GET THOSE ON SATURDAY.

15                 MR. MCELHINNY:  I THINK SUNDAY IS -- I THINK YOU'LL

16      GET SOMETHING ON SUNDAY, YOUR HONOR.  I THINK THE DISCLOSURES

17      WILL HAPPEN ON SATURDAY.

18                 THE COURT:  OKAY.  WE'VE DONE ABOUT SIX HOURS OF

19      TESTIMONY TOTAL, SO WE COULD POTENTIALLY FINISH ON MONDAY

20      MORNING.  THERE'S ONLY EIGHT HOURS LEFT.

21                 MR. MCELHINNY:  SAMSUNG HASN'T EVEN STARTED ITS CASE

22      YET, BUT I AGREE WITH YOU.

23                 THE COURT:  YEAH.  ALL RIGHT.  WELL, THANK YOU.  I

24      APPRECIATE THAT.

25                 MR. PRICE:  YOUR HONOR, ONE OTHER THING, IF I MAY.

1        I'M IN A BIT OF A QUANDARY HERE.

2            MS. DAVIS TESTIFIED ON DIRECT THAT THE REASON THE DESIGN

3        AROUND, ONE OF THE REASONS THE DESIGN AROUND WOULD BE SO LONG

4        ON THE '915 PATENT WAS BECAUSE IT WAS ON EVERY APPLICATION.

5            APPLE ONLY ACCUSED THE BROWSER APPLICATION IN THE '915, SO

6        WE WOULD ONLY HAVE TO DESIGN AROUND THAT APPLICATION.

7            I WASN'T GOING TO BRING UP APPLICATIONS, BUT THE WITNESS

8        HAS NOW TOLD THE JURY IT WOULD TAKE SO LONG BECAUSE WE WOULD

9        HAVE TO GO THROUGH EVERY APPLICATION IN THE DESIGN AROUND.

10            THE COURT:  DO YOU WANT TO RESPOND TO THAT?

11            MS. KREVANS:  HE CAN CROSS-EXAMINE HER ABOUT WHAT SHE

12        SAID, YOUR HONOR.  I DON'T SEE WHAT THE PROBLEM IS.

13            MR. PRICE:  I JUST WANTED TO MAKE SURE THAT I COULD

14        SAY THAT THE '915 WAS ONLY ACCUSED IN THE BROWSER APPLICATION,

15        BECAUSE THAT WOULD BE THE CROSS-EXAMINATION.

16            MS. KREVANS:  YOUR HONOR, I THINK -- HERE IS THE

17        PROBLEM, IS THAT YOUR HONOR HAS MADE A RULING THAT ALTHOUGH

18        SAMSUNG CAN REFER TO PHONES THAT ARE IN THIS CASE THAT WERE

19        FOUND NOT TO INFRINGE SOME OF THE PATENTS, AND ALSO REFER TO AT

20        LEAST ONE PHONE THAT'S NOT, THAT WE ARE NOT ALLOWED TO REFER TO

21        ANY OF THE PHONES THAT WERE FOUND TO INFRINGE IN THE FIRST

22        CASE, BUT THAT ARE NOT IN THIS CASE FOR ANY PURPOSE AS FAR AS

23        WE UNDERSTAND IT.

24            AND, IN FACT, WHEN IT GETS TO WHAT APPLICATIONS WERE

25        ACCUSED, IF YOU ADD IN ALL THE PHONES THAT WERE REALLY AT ISSUE

DAVID DIRECT

1    IN THE JURY VERDICT THAT WE'RE DEALING WITH HERE, THERE ARE

2    DIFFERENT APPLICATIONS IN DIFFERENT PHONES AND IT'S A BIGGER

3    UNIVERSE.

4        AND SO I THINK THEY HAD PROPOSED A DEMONSTRATIVE TO WHICH

5    WE HAD OBJECTED, AND THAT YOU RULED THAT THEY COULD NOT USE

6    SEVERAL DAYS AGO, BECAUSE IT UNFAIRLY EXPLOITED THAT FACT AND

7    IT CREATED THIS CONFUSION ABOUT WHAT APPLICATIONS WERE ACCUSED

8    OF WHAT.

9        AND I THINK IF THIS -- I THINK THIS PROBABLY COULD BE

10   SOLVED SO LONG AS THE WITNESS WAS NOT PRECLUDED, IN ANSWERING A

11   QUESTION ON CROSS, FROM GIVING AN ANSWER THAT IS TRUTHFUL AND

12   COMPLETE WITH RESPECT TO ALL THE PHONES.

13       I THINK WE'RE JUST RUNNING INTO A PROBLEM HERE WHERE THE

14   REALITY OF THE SET OF APPLICATIONS THAT WAS ACCUSED IS

15   COLLIDING WITH THIS LIMIT OF WHICH ONES ENDED UP STILL IN THIS

16   CASE.

17       THE COURT:  WELL, I DO WANT TO CLARIFY, THOUGH.

18       ALL OF YOUR COPYING DOCUMENTS ARE NOT WITH REGARD TO THE

19   PHONES THAT ARE IN THIS CASE.  SO TO SAY THAT YOU'VE BEEN

20   LIMITED AND NOT ABLE TO TALK ABOUT ANY OTHER PHONES OTHER THAN

21   ONES THAT WERE FOUND TO INFRINGE IS NOT EXACTLY ACCURATE AND

22   ALL OF YOUR SLIDES AND OPENING BROUGHT IN PHOTOS OF A LOT OF

23   PHONES THAT WERE FOUND TO HAVE INFRINGED THAT ARE NOT SUBJECT

24   TO THIS CASE.

25       SO I THINK IT'S NOT QUITE ACCURATE TO SAY THAT YOU'VE ONLY

```
  1         BEEN LIMITED TO THESE PHONES.

  2              MS. KREVANS:  BUT WE'VE BEEN TRYING, YOUR HONOR, TO

  3         BE VERY CAREFUL WITH OUR WITNESSES NOT TO HAVE THEM TALK ABOUT

  4         SPECIFIC PHONES WITH RESPECT TO INFRINGEMENT THAT ARE NOT IN

  5         THIS CASE.

  6              THE DEVELOPMENT OF THE PHONE AS A SERIES, I ABSOLUTELY

  7         AGREE WITH YOUR HONOR, WE PRESENTED THE SERIES, AND WITHOUT

  8         DWELLING ON THINGS THAT WERE ONLY IN THE FIRST CASE, NOT IN THE

  9         SECOND.

 10              BUT WITH RESPECT TO SPECIFIC PHONES, WE HAD THIS ISSUE

 11         WHERE, FOR EXAMPLE, OUR TECHNICAL EXPERTS, MR. BALAKRISHNAN --

 12         DR. BALAKRISHNAN AND DR. SINGH FELT THAT THEY WERE NOT SUPPOSED

 13         TO TALK ABOUT THE SPECIFIC INFRINGEMENT ISSUES ABOUT THE PHONES

 14         FROM THE FIRST CASE.

 15              MR. MCELHINNY:  IF I --

 16              THE COURT:  GO AHEAD.

 17              MR. MCELHINNY:  IF I MAY, I THINK WE'RE WASTING TIME

 18         HERE.

 19              WHAT THE WITNESS WAS ASKED WAS HOW LONG IT WOULD TAKE TO

 20         DESIGN AROUND.

 21              WHAT SHE TESTIFIED WAS THAT IF YOU MAKE A CHANGE IN

 22         SOFTWARE, IT HAS TO BE COORDINATED WITH ALL THE OTHER PROGRAMS

 23         ON A PHONE, AND SHE TALKED ABOUT LINKING NEW SOFTWARE TO ALL OF

 24         THE DIFFERENT APPS IN WHICH IT MIGHT BE CALLED.

 25              THAT'S A TECHNICAL ISSUE.  IT DIDN'T GO TO THE -- THEY'RE
```

```
 1        TRYING TO USE IT TO OPEN THE DOOR, BUT IT'S SIMPLY A TECHNICAL

 2        TIMING ISSUE ABOUT YOU CAN'T JUST MAKE A CHANGE IN SOFTWARE,

 3        YOU HAVE TO MAKE SURE THAT IT'S COORDINATED WITH ALL THE OTHER

 4        PROGRAMS ON THE PHONE.

 5             IT JUST GOES TO THE TIMING OF HOW LONG IT TAKES, HOW

 6        COMPLICATED IT IS TO MAKE ANY CHANGE IN SOFTWARE ON A

 7        COORDINATED BASIS.

 8               THE COURT:  I UNDERSTOOD THE RESPONSE TO BE THAT WAY

 9         AS WELL.

10               MR. MCELHINNY:  YES.

11               THE COURT:  IT HAS TO BE HARMONIOUS WITH THE REST OF

12        THE PHONE.  I DIDN'T INTERPRET IT AS A, WELL, YOU HAVE TO FIX

13        PHOTO GALLERY AND CONTACTS VERSUS BROWSER.

14               MR. PRICE:  I THINK --

15               THE COURT:  I DIDN'T INTERPRET IT THAT WAY.

16             BUT IF YOU DO, THEN I'M GOING TO LET HER GET INTO ALL THE

17        PHONES THAT WERE ACCUSED AND FOUND TO INFRINGE BECAUSE I THINK

18        THAT IS FAIR.

19             IF WE'RE GOING TO GET INTO THIS APPLICATION, THEN IT'S

20        GOING TO BE -- TOTALLY UP THE DOOR AND GO THROUGH ALL THE

21        PHONES THAT HAVE BEEN FOUND TO INFRINGE THE '381.  OKAY?

22               MR. PRICE:  YOUR HONOR, THIS IS NOT THE '381.  THIS

23         IS THE '915.

24               THE COURT:  '915, EXCUSE ME.

25               MR. PRICE:  AND IN THE LAST TRIAL, THE ONLY
```

1    ACCUSATION WAS THAT, ON THE '915, THE ONLY ACCUSATION WAS THAT

2    WE INFRINGED IN THE BROWSER.

3          SO THERE'S NO INCONSISTENCY.  WE'RE NOT OPENING THE DOOR.

4          AND I MAY HAVE BEEN INCORRECT, SHE MAY HAVE SAID THAT THE

5    GENTLEMAN --

6          THE COURT:  SHE NEVER SAID ANYTHING ABOUT BROWSER.

7    SHE NEVER SAID ANYTHING ABOUT BROWSER.  I DON'T RECALL HER

8    SAYING ANYTHING ABOUT BROWSER.

9          MR. PRICE:  SHE SAID THAT THE '915 IS IN MANY APPS.

10   THAT'S WHAT SHE SAID, AND THAT'S WHAT I'M WORRIED ABOUT BECAUSE

11   THEY'RE GOING TO THINK WE HAVE TO CORRECT THIS IN ALL THESE

12   APPLICATIONS.

13         THE COURT:  WELL, I'M GOING TO ALLOW HER TO GIVE A

14   COMPLETE ANSWER THEN AS TO ALL THE PHONES THAT WERE FOUND TO

15   INFRINGE, OKAY, BECAUSE IT'S NOT FAIR TO JUST CORDON OFF AN

16   INCOMPLETE ANSWER.  OKAY?

17         SO IF YOU OPEN THE DOOR AND YOU WANT TO GO THERE, THEN

18   IT'S OPEN SEASON TO GET INTO ALL OF THE PHONES THAT INFRINGE

19   THAT PATENT AND ALL THE DIFFERENT APPLICATIONS THAT WERE IN

20   THERE.

21         MR. PRICE:  LET ME SAY, THE ISSUE IN THIS CASE IS

22   WHETHER -- HOW LONG IT WOULD TAKE TO RESIGN THESE PHONES.  AND

23   SAYING HOW LONG IT WOULD TAKE TO REDESIGN THESE PHONES, SHE

24   SAID YOU HAVE TO REDESIGN FOR THE '915 FOR MANY APPS FOR THESE

25   PHONES.

```
 1          SO IT'S DIRECTLY RELEVANT --

 2              THE COURT:  I DON'T RECALL WHAT.  WHAT SHE SAID IS IF

 3     YOU MAKE ONE CHANGE, YOU HAVE TO MAKE SURE THE REST OF THE

 4     PHONE IS HARMONIOUS WITH THAT CHANGE.  THAT'S WHAT SHE

 5     TESTIFIED TO.

 6          SHE DID NOT SAY YOU WOULD HAVE TO CHANGE IT FOR THE

 7     BROWSER APPLICATION AND THUS OTHER APPLICATIONS.

 8              MR. PRICE:  NO, SHE DIDN'T MENTION THAT.  SHE SAID

 9     MANY APPS WAS WHAT SHE SAID.

10              THE COURT:  BUT THAT WAS DIVORCED FROM WHEN SHE WAS

11     TALKING ABOUT THE DESIGN AROUND.  SHE SAID IF YOU MAKE A CHANGE

12     IN THE PHONE, YOU HAVE TO MAKE SURE THAT THAT CHANGE IS

13     HARMONIOUS WITH THE REST OF THE PHONE.  THAT'S JUST LOGIC.

14              MR. PRICE:  I'M NOT GOING TO ARGUE WITH YOUR HONOR,

15     BECAUSE I DON'T KNOW IF I EVEN HAD MY MACHINE WORKING AT THE

16     TIME.  IT KIND OF WENT DOWN.

17          I, AND OTHERS, HEARD THAT SHE SAID IT IN CONNECTION WITH

18     THE DESIGN AROUND AND I'LL SEE -- I'LL LOOK AT THE TRANSCRIPT

19     AND SEE IF I'M GOING DEAF OR HALLUCINATING.

20              THE COURT:  ALL RIGHT.  WELL, IF WE'RE GOING TO GET

21     INTO APPLICATIONS, THEN WE'RE GOING TO GET INTO ALL THE

22     APPLICATIONS THAT WERE ACCUSED AND ALL THE PHONES THAT WERE

23     ACCUSED BECAUSE I -- YOU KNOW, IF WE'RE GOING TO GET INTO IT,

24     THEN WE'RE GOING TO GET INTO IT.  OKAY?

25              MR. PRICE:  I UNDERSTAND.
```

1          THE COURT:  BUT I DID NOT HEAR THAT.

2      WHY DON'T WE HAVE MS. SHORTRIDGE REREAD THE TESTIMONY

3  ABOUT WHAT SHE SAID ABOUT IF YOU MAKE A CHANGE, YOU HAVE TO

4  MAKE SURE THAT ALL THE OTHER ASPECTS OF THE PHONE ARE

5  HARMONIOUS WITH THE CHANGE.

6      WOULD YOU TAKE A LOOK AT THAT, PLEASE.

7      (PAUSE IN PROCEEDINGS.)

8      (THE RECORD WAS READ BY THE REPORTER.)

9          THE COURT:  I UNDERSTOOD THAT TO MEAN YOU JUST HAVE

10  TO MAKE SURE THAT THE PHONE THEN WORKS IN ALL OF ITS DIFFERENT

11  ASPECTS AND NOT THAT YOU'RE MAKING A CHANGE TO BROWSER VERSUS

12  PHOTO GALLERY VERSUS CONTACTS.  I DIDN'T INTERPRET THAT

13  STATEMENT THAT WAY.

14          MR. PRICE:  AND BEING A PARANOID ADVOCATE, I HEARD

15  THE PART ABOUT THE FUNCTIONALITY IN APPS, AND SO THAT'S WHAT

16  I'M WORRIED ABOUT.

17          THE COURT:  THAT'S FINE.  WELL, IF YOU WANT TO OPEN

18  THE DOOR, THEN IT'S OPEN SEASON AND WE'RE GOING INTO ALL THE

19  PRODUCTS THAT WERE ACCUSED AND ALL THE APPLICATIONS THAT WERE

20  ACCUSED AND WHAT WAS FOUND TO INFRINGE AND WHAT WAS FOUND NOT

21  TO INFRINGE.  WE'RE JUST GOING TO GO INTO IT.  OKAY?

22          MR. PRICE:  I UNDERSTAND WHAT YOU'RE SAYING.

23          THE COURT:  ALL RIGHT.  ANYTHING ELSE OR SHOULD WE

24  ASK THE JURY TO RETURN?

25          MS. KREVANS:  NOTHING ELSE FROM APPLE, YOUR HONOR.

```
 1            MR. PRICE:  NOTHING ELSE, YOUR HONOR.

 2            THE COURT:  ALL RIGHT.  THANK YOU.  THEN LET'S BRING

 3    THE JURY IN.

 4         (JURY IN AT 1:20 P.M.)

 5            THE COURT:  CAN I ASK -- WELCOME BACK, PLEASE TAKE A

 6    SEAT.

 7         MY LIVENOTE IS CUTTING OUT BECAUSE OF TOO MANY MACHINES,

 8    SO IT SHUT DOWN BASICALLY AFTER ABOUT AN HOUR THIS MORNING.

 9         IF THERE IS A MACHINE THAT YOU DON'T HAVE TO HAVE ON, I

10    DON'T KNOW HOW MANY LAWYERS ON ALL OF YOUR TEAMS ALL HAVE THIS

11    GOING, BUT BECAUSE THERE'S SO MANY SYSTEMS RIGHT NOW, IT'S

12    SHORTING MINE.

13         IF THERE'S SOME WAY THAT YOU DON'T NEED THAT, YOU KNOW,

14    20TH COMPUTER ON, I JUST WOULD APPRECIATE IT.

15            MR. MCELHINNY:  WE ONLY HAVE ONE ON ON THIS SIDE.

16            THE COURT:  OKAY.

17            MR. PRICE:  WE HAVE TWO.  WE CAN SHUT DOWN ONE IF

18    THAT'S WHAT'S CAUSING IT.

19            THE COURT:  THIS IS WHAT HAPPENED AT THE LAST TRIAL

20    AS WELL, THAT THERE WAS SO MANY SYSTEMS ON THAT OUR LIVENOTE

21    KEEPS SHUTTING DOWN.

22            THE REPORTER:  IT'S PEOPLE IN THE AUDIENCE, I THINK,

23    WITH ALL THEIR DEVICES.

24            THE COURT:  WELL, ALL RIGHT.

25         LET'S GO AHEAD, PLEASE.  IT'S NOW 1:21.
```

```
 1            GO AHEAD.

 2      BY MS. KREVANS:

 3      Q.   ARE YOU -- WOULD YOU PUT THE MIKE BACK, MS. DAVIS?  GREAT.

 4      ARE YOU SITUATED?

 5      A.   I'M SITUATED.

 6      Q.   OKAY.  WHEN WE LEFT OFF BEFORE THE LUNCH BREAK, YOU HAD

 7      BEEN POINTING THE JURY TO SOME PLACES IN THE SEALED DOCUMENTS

 8      THAT GAVE NUMBERS ABOUT APPLE'S CAPACITY.  DO YOU RECALL THAT?

 9      A.   I DO.

10      Q.   WHAT IS YOUR OVERALL OPINION ABOUT CAPACITY?

11      A.   I THINK CLEARLY THERE'S PLENTY OF CAPACITY DURING THE

12      PERIOD FROM APRIL 15, 2011, THROUGH MAY 29 OF 2011, WHICH ARE

13      THE ONLY SIX WEEKS WE CARE ABOUT FOR THIS PURPOSE.

14      Q.   OKAY.  CAN I CHECK OFF CAPACITY ON YOUR BOARD?

15      A.   PLEASE DO.

16      Q.   OKAY.  WHAT'S THE LAST ITEM ON YOUR BOARD?

17      A.   THE LAST ITEM RELATES TO THE PROFITS CALCULATION ITSELF.

18            SO NOW THAT WE'VE DECIDED HOW MANY UNITS BELONG IN LOST

19      PROFITS, WE NEED TO DETERMINE HOW MUCH APPLE WOULD HAVE MADE

20      HAD IT SOLD THE 360,000 UNITS.

21      Q.   AND THAT 360 IS IPHONES AND IPADS COMBINED?

22      A.   IT IS COMBINED.

23      Q.   OKAY.  HOW DID YOU DETERMINE WHAT APPLE'S PROFITS WOULD

24      HAVE BEEN HAD IT SOLD 360,000 MORE IPHONES AND IPADS COMBINED

25      IN THAT SIX WEEK PERIOD?
```

1    A.   WHAT I DID IS RELY UPON APPLE'S OWN P&L, PROFIT AND LOSS,

2    DOCUMENTS, TWO PAGES OF WHICH ARE NOW INCLUDED IN YOUR 25G1

3    EXHIBIT.

4    Q.   OKAY.  WHAT WAS YOUR SOURCE FOR THAT INFORMATION?

5    A.   THAT COMES DIRECTLY FROM APPLE'S GAAP, GENERALLY ACCEPTED

6    ACCOUNTS PRINCIPLES, LINE OF BUSINESS STATEMENTS.  SO THOSE ARE

7    DOCUMENTS PREPARED IN THE ORDINARY COURSE OF BUSINESS AT APPLE

8    USED IN RUNNING THE BUSINESS.

9    Q.   COULD YOU LOOK AT PX 181 IN YOUR BINDER, PLEASE.  WHAT IS

10   PX 181, MS. DAVIS?

11   A.   THIS IS EXACTLY THE GAAP LINE OF BUSINESS REPORTING.  SO

12   THE FIRST PAGE HAS TO DO THE IPHONE.  THE SECOND PAGE IS IPADS.

13          MS. KREVANS:  OKAY.  THIS IS ANOTHER DOCUMENT, YOUR

14   HONOR, THAT IS TO BE SUBMITTED UNDER SEAL IN LINE WITH YOUR

15   HONOR'S PRIOR RULINGS ABOUT SEALING, AND IT APPLIES TO THE

16   ENTIRE DOCUMENT.

17       AT THIS TIME WE OFFER PX 181 FOR ADMISSION UNDER SEAL.

18          MR. PRICE:  NO OBJECTION.

19          THE COURT:  OKAY.  IT'S ADMITTED.

20       (PLAINTIFF'S EXHIBIT 181 WAS ADMITTED IN EVIDENCE.)

21          THE COURT:  GO AHEAD, PLEASE.

22   BY MS. KREVANS:

23   Q.   OKAY.  COULD WE SHOW THE JURY AND THE COURT, BUT NOT THE

24   AUDIENCE, MR. LEE, PX 181.

25       THIS IS A LOT OF NUMBERS, MS. DAVIS.  I'M NOT GOING TO ASK

DAVID DIRECT

```
 1      YOU TO GO THROUGH THEM INDIVIDUALLY, BUT COULD YOU JUST EXPLAIN
 2      TO THE JURY WHAT THE NUMBERS CONSIST OF -- WHAT IS THE NATURE
 3      OF THE NUMBERS THAT THEY'RE SEEING ON THESE PAGES?
 4      A.   WHAT WE SEE ON THESE PAGES ARE THE REVENUES AND COSTS
 5      ASSOCIATED WITH THE SALE OF THE APPLE -- IN THIS PARTICULAR
 6      CASE THE IPHONE IS WHAT WE'RE LOOKING AT OVER THOSE VARIOUS
 7      PERIODS.
 8           SO THEY'RE ORGANIZED IN COLUMNS BY QUARTER, AND THOSE ARE
 9      THE ACTUAL OPERATING RESULTS FOR THE SALE OF IPHONES IN THAT
10      QUARTER.
11      Q.   AND DID YOU -- IN CALCULATING APPLE'S LOST PROFITS, DID
12      YOU TAKE THE NUMBERS YOU USED FOR PROFITS PER UNIT FROM PX 181?
13      A.   YES, I DID.
14      Q.   OKAY.  CAN'T SAY THE NUMBERS OUT LOUD, BUT CAN I CHECK OFF
15      PROFITS NUMBER ON THIS BOARD?
16      A.   YES.
17      Q.   COULD WE PUT UP SLIDE PDX 100, PAGE 16.
18           WHAT IS SHOWN ON THIS SLIDE, MS. DAVIS?
19      A.   THESE ARE THE 360,000 INFRINGING UNITS THAT I INCLUDED IN
20      LOST PROFITS, AND ONCE YOU DO THE MATH, IT MULTIPLIES IT TIMES
21      THE PROFIT PER UNIT THAT COMES FROM THE DOCUMENT WE JUST SAW,
22      THEN YOU END UP WITH A RESULT OF $113,777,344.
23      Q.   OKAY.  LET ME JUST TAKE A MOMENT AND TAKE THIS BOARD DOWN
24      SO I'M NOT BLOCKING COUNSEL ANYMORE.
25           ALL RIGHT.  LET'S SWITCH NOW TO SAMSUNG'S PROFITS, THE
```

DAVID DIRECT

1    SECOND KIND OF REMEDY YOU ASSESSED FOR SOME OF THE UNITS THAT

2    SAMSUNG SOLD THAT INFRINGED IN THIS TRIAL.

3         WHICH PATENTS, CAN YOU REMIND US, GET A SAMSUNG PROFITS

4    REMEDY?

5         COULD WE SEE SLIDE 5.

6    A.   THESE ONLY APPLY TO THE TWO DESIGN PATENTS, SO THAT'S THE

7    D'305 AND THE D'677 PATENT.  AND WE SAW ON THE EARLIER LIST

8    THOSE PARTICULAR PHONES THAT INFRINGED THOSE TWO PATENTS.

9    Q.   OKAY.  CAN YOU EXPLAIN TO THE JURY WHAT THE TEST IS FOR

10   PURPOSES OF PATENT INFRINGEMENT DAMAGES TO ARRIVE AT AN

11   INFRINGER'S PROFITS NUMBER?

12        MR. PRICE:  OBJECTION.  THAT CALLS FOR A CONCLUSION

13   OF LAW.

14        MS. KREVANS:  I'LL REPHRASE, YOUR HONOR.

15        THE COURT:  OKAY.

16   BY MS. KREVANS:

17   Q.   CAN YOU EXPLAIN, MS. DAVIS, TO THE JURY WHAT TEST YOU

18   APPLIED IN ORDER TO DETERMINE WHAT SAMSUNG'S PROFITS WERE FOR

19   PURPOSES OF THE INFRINGER'S PROFITS DAMAGES NUMBER?

20   A.   THE TEST I USED -- AND THIS RELATES TO HOW DO YOU DECIDE

21   WHICH COSTS TO DEDUCT, BECAUSE BOTH MR. WAGNER AND I AGREE ON

22   THE REVENUE NUMBER, SO THE QUESTION BECOMES, WHAT COSTS DO YOU

23   DEDUCT FROM THAT?

24        THE TESTS I USE ARE WHICH EXPENSE AMOUNTS ARE DIRECTLY

25   ATTRIBUTABLE TO THE SALE OF THOSE INFRINGING PRODUCTS?

1     Q.   OKAY.  NOW, YOU SAID YOU AND MR. WAGNER AGREE ON THE

2     REVENUE.  HOW MANY SAMSUNG PRODUCTS THAT WERE AT ISSUE IN THIS

3     CASE INFRINGED ONE OR MORE DESIGN PATENTS?

4     A.   THERE WERE SEVEN SUCH PRODUCTS.

5     Q.   OKAY.  AND YOU MR. WAGNER AGREE ON THE AMOUNT OF REVENUE

6     ATTRIBUTABLE TO SAMSUNG'S INFRINGING SALES IN THE DAMAGES

7     PERIOD FOR THOSE SEVEN PRODUCTS?

8     A.   WE DO.

9     Q.   WHERE DID YOU GET THOSE REVENUES?

10    A.   THAT INFORMATION COMES FROM PX 180, WHICH WE ALREADY

11    LOOKED AT.

12    Q.   OKAY.  DO YOU AND MR. WAGNER AGREE ON THE AMOUNT OF

13    EXPENSES THAT ARE DIRECTLY ATTRIBUTABLE TO THE SALES OF THOSE

14    SEVEN PRODUCTS?

15    A.   WE DO NOT.

16    Q.   SO IS THAT BASICALLY THE NATURE OF THE ISSUE THE JURY HAS

17    TO DECIDE FOR SAMSUNG PROFITS?

18    A.   YES, IT IS.

19    Q.   ALL RIGHT.  THIS -- LET'S SEE SLIDE PDX 100, PAGE 17.

20         THE TOP NUMBER ON THE SLIDE IS 6 -- I'M SORRY --

21    854 MILLION.  THAT'S THE NUMBER YOU AND MR. WAGNER AGREE ON?

22    A.   YES, IT IS.  THAT IS THE REVENUE AMOUNT THAT'S

23    ATTRIBUTABLE TO THE SALE OF THE SEVEN INFRINGING PHONES DURING

24    THE DAMAGES PERIOD.

25    Q.   AND THE SECOND LINE SAYS "COSTS," "COSTS OF GOODS SOLD."

DAVID DIRECT

1      WHAT IS THAT?

2      A.   THAT IS THE TERM ACCOUNTANTS USE TO REFLECT THE

3      MANUFACTURING COSTS.  SO THAT, THAT'S THE COSTS RELATED TO THE

4      GOODS SOLD, HOW MUCH DID IT COST IN TERMS OF RAW MATERIAL AND

5      LABOR AND OVERHEAD TO MAKE THAT PRODUCT?

6      Q.   AND DO YOU AND MR. WAGNER AGREE ON THAT NUMBER?

7      A.   WE BOTH AGREE THAT COST OF GOODS SOLD SHOULD BE DEDUCTED,

8      AND THAT IS A $623 MILLION NUMBER.

9      Q.   OKAY.  SO REALLY THIS DISAGREEMENT IS EVEN NARROWER THAN

10     WHAT EXPENSES.  IT'S JUST ABOUT CERTAIN CATEGORIES OF EXPENSES?

11     A.   THAT'S CORRECT.

12     Q.   ALL RIGHT.  YOU HAVE A SLIDE ON THIS SHEET THAT SAYS

13     "OTHER EXPENSES."  DID YOU GET ANY INFORMATION FROM SAMSUNG

14     ABOUT WHETHER THEY HAD OTHER EXPENSES RELATING TO THESE SEVEN

15     PRODUCTS IN ADDITION TO COSTS OF GOODS SOLD?

16     A.   I DID.

17     Q.   WHAT WAS THE INFORMATION YOU GOT?

18     A.   THAT INFORMATION WAS THE SPREADSHEET THAT SAMSUNG PROVIDED

19     THAT IS NOW MARKED AS PX NUMBER 180A.

20     Q.   OKAY.  COULD YOU LOOK AT PX 180A IN YOUR BINDER.  IS THAT

21     THE SAMSUNG SPREADSHEET THAT WAS PROVIDED TO APPLE IN THIS

22     CASE?

23     A.   IT IS.

24          MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

25     PX 180A.

1          MR. PRICE:  NO OBJECTION.

2          THE COURT:  THAT WAS ALREADY ADMITTED.

3          MS. KREVANS:  IS IT IN?

4          THE COURT:  IT WAS IN THIS MORNING.

5          MS. KREVANS:  GOT IT.

6    Q.   HOW IS THIS SPREADSHEET ORGANIZED?

7    A.   THE WAY THIS IS ORGANIZED IS YOU'LL SEE IN THE UPPER

8    LEFT-HAND CORNER OF PAGE 1, IT SAYS "CAPTIVATE," SO THESE ARE

9    NUMBERS THAT SAMSUNG HAS SET FORTH IN THE SPREADSHEET RELATED

10   TO THE CAPTIVATE PRODUCT.

11        YOU'LL RECALL THAT THAT IS ONE OF THE SEVEN PRODUCTS THAT

12   INFRINGES THE DESIGN PATENTS IN THIS CASE.

13   Q.   SO PX 180A MARCHES THROUGH THESE SEVEN PRODUCTS ONE AFTER

14   ANOTHER?

15   A.   IT DOES.

16   Q.   ALL RIGHT.  DOES PX 180 HAVE INFORMATION IN IT ABOUT

17   EXPENSES OTHER THAN COSTS OF GOODS SOLD?

18   A.   IT DOES.

19   Q.   OKAY.  CAN WE LOOK AT THAT?

20        AND MR. LEE, CAN YOU TRY TO TAKE US TO THAT SECTION?

21   OKAY.  COULD YOU BLOW UP ENOUGH, MR. LEE, THAT WE CAN SEE AT

22   LEAST THE FIRST COLUMN OF NUMBERS?

23        OKAY.  COULD YOU EXPLAIN WHAT WE'RE LOOKING AT TO THE

24   JURY, MS. DAVIS?

25   A.   WHAT WE ARE LOOKING AT ARE THE COSTS CATEGORIES AND

1    AMOUNTS THAT SAMSUNG HAS INCLUDED ON THAT SPREADSHEET RELATED

2    TO CAPTIVATE.

3         THIS PARTICULAR MONTH WE'RE LOOKING AT IS MAY OF 2010, SO

4    IT'S NOT NECESSARILY RELEVANT TO THE PERIOD THAT WE'RE TALKING

5    ABOUT, BUT IT'S STILL GOOD FOR TALKING ABOUT THE CATEGORIES OF

6    COSTS IF YOU LIKE.

7    Q.   OKAY.  SO AT THE TOP WE SEE SALES NUMBERS AND COSTS OF

8    GOODS SOLD, AND THEN THERE'S A NUMBER OF SUBHEADINGS UNDER

9    COSTS OF GOODS SOLD.

10   A.   THAT'S CORRECT.

11   Q.   YOU INCLUDED ALL OF THOSE IN THE DEDUCTIBLE EXPENSES?

12   A.   I DID.

13   Q.   ALL RIGHT.  I SEE THREE OTHER SORT OF HIGH LEVEL TITLES

14   UNDER THAT, G&A EXPENSE, SALES EXPENSE, AND R&D EXPENSE.

15        DO YOU SEE EACH OF THOSE?

16   A.   I DO.  THOSE ARE THE THREE MAJOR CATEGORIES OF EXPENSES

17   THAT WE SHOULD TALK ABOUT TO DETERMINE WHETHER THEY SHOULD BE

18   DEDUCTED.

19   Q.   SO YOU LOOKED AT EACH OF THESE CATEGORIES?

20   A.   I DID FOR EACH OF THE INFRINGING PHONES.

21   Q.   DID YOU DEDUCT ANY AMOUNTS FROM THEM?

22   A.   I DID NOT, FOR REASONS THAT WE CAN TALK ABOUT.

23   Q.   OKAY.  WHY DON'T YOU START WITH G&A EXPENSE AND EXPLAIN TO

24   THE JURY WHAT G&A EXPENSE REFERRED TO IN THE SAMSUNG ACCOUNTS

25   SHEET?

1    A.   GA EXPENSE IS GENERAL AND ADMINISTRATIVE EXPENSE, AND THE

2    NUMBERS THAT ARE ON THIS PAGE, AS EXPLAINED BY THE SAMSUNG

3    WITNESS WHO TESTIFIED ABOUT THIS DOCUMENT, ARE AMOUNTS THAT

4    HAVE BEEN ALLOCATED FROM A GENERAL POOL OF COSTS.

5         SO THESE WOULD BE CATEGORIES THAT I WOULD THINK OF, FOR

6    EXAMPLE, AS THE HUMAN RESOURCES DEPARTMENT OR THE ACCOUNTING

7    DEPARTMENT OR SOMETHING LIKE THAT.

8         SO THEY'RE CATEGORIES NECESSARY TO RUN A BUSINESS, BUT

9    THEY WEREN'T NECESSARY TO SELL THE CAPTIVATE, OR AT LEAST

10   AMOUNTS AREN'T ATTRIBUTABLE TO THE SALE OF THE CAPTIVATE.

11   Q.   DO YOU HAVE ANY UNDERSTANDING, FROM THE TESTIMONY OF

12   SAMSUNG WITNESSES, ABOUT WHERE THE NUMBERS CAME FROM THAT

13   SAMSUNG PLACED IN THIS SPREADSHEET FOR EACH OF THESE CATEGORIES

14   G&A EXPENSE, SALES EXPENSE, AND R&D EXPENSE?

15   A.   YES.  WHAT MR. SIMS FROM SAMSUNG EXPLAINED IN HIS

16   DEPOSITIONS WOULD BE THAT THESE CATEGORIES ARE THE TOTAL COSTS

17   INCURRED FOR THAT CATEGORY OF EXPENSE FOR THE, ESSENTIALLY THE

18   MOBILE PHONE DIVISION IS THE WAY I WOULD THINK OF IT.  I DON'T

19   KNOW EXACTLY HOW THEY TITLED IT AT THE TIME.

20        BUT THOSE COSTS THEN ARE DIVIDED UP AMONG THE VARIOUS

21   CATEGORIES OF PHONES, SO CAPTIVATE GOT A SHARE OF IT BASED UPON

22   WHAT PERCENTAGE OF REVENUE IT CONTRIBUTED.

23        AND THEN SO ON FOR THE OTHER MODELS OF PHONES SOLD DURING

24   THAT PARTICULAR MONTH.

25   Q.   SO JUST SO WE'RE CLEAR, WE'RE LOOKING AT ONE MONTH HERE.

DAVID DIRECT

1    THERE WAS SOME NUMBER THAT WAS A POOL OF ALL THE G&A EXPENSE OF

2    THIS WHOLE DIVISION OF SAMSUNG FOR THAT MONTH?

3    A.   CORRECT.

4    Q.   AND THEN A SAMSUNG PERSON TOOK A PERCENTAGE AND THEY

5    MULTIPLIED TIMES THAT NUMBER, THAT BIG NUMBER, AND THEY PUT

6    THIS NUMBER WE SEE IN THE CAPTIVATE COLUMN HERE?

7    A.   YES.  THAT'S WHAT WAS EXPLAINED BY THE WITNESS.

8    Q.   SO THIS IS A PERCENTAGE OF A BIGGER NUMBER?

9    A.   IT IS.

10   Q.   DID SAMSUNG PROVIDE ANY DOCUMENTATION TO YOU, OF ANY KIND,

11   SHOWING THAT ANY OF THE EXPENSE SHOWN IN THIS COLUMN WAS

12   ACTUALLY SPENT IN SOME WAY DIRECTLY LINKED TO THE CAPTIVATE

13   PHONE?

14   A.   NONE WHATSOEVER.

15   Q.   ARE YOU AWARE OF ANY DOCUMENT THAT SHOWS THAT ANY AMOUNT

16   THAT'S PUT IN THAT COLUMN IN THIS SPREADSHEET IS DIRECTLY

17   LINKED TO THE CAPTIVATE PHONE?

18   A.   NO.

19   Q.   IS THE SAME THING TRUE FOR THE G&A EXPENSE NUMBER THAT'S

20   SHOWN IN EVERY MONTH FOR EACH OF THESE SEVEN PRODUCTS IN THIS

21   SPREADSHEET?

22   A.   YES.

23   Q.   IT WAS ALWAYS THE RESULT OF A PERCENTAGE MULTIPLIED TIMES

24   THE BIG POOL NUMBER?

25   A.   YES.

1    Q.   WHAT ABOUT THE SALES EXPENSE?

2    A.   SALES EXPENSE IS A SIMILAR CATEGORY OF EXPENSES.  THIS

3    TYPICALLY REPRESENTS THE MARKETING AND THE ADVERTISING.  SO

4    THIS WOULD BE, FOR INSTANCE, THE SALES PEOPLE THAT ARE OUT

5    TRYING TO SELL THE PHONES TO THE CARRIERS.

6         SO, FOR INSTANCE, THE CAPTIVATE WAS SOLD BY AT&T, SO THIS

7    IS AN EXPENSE ALLOCATION RELATED TO THE AT&T SALES GROUP, FOR

8    EXAMPLE.

9    Q.   AND WHERE DID THIS DOLLAR NUMBER WE SEE IN THIS COLUMN

10   HERE THAT SAYS 68,748 -- I ASSUME THAT THERE SHOULD BE ZEROS

11   AFTER THAT.

12   A.   THIS PARTICULAR DOCUMENT I DON'T THINK HAS ZEROS, NO.

13   THIS IS AN EARLY -- WE'RE LOOKING AT JUST THE FIRST MONTH OF

14   SALES.

15   Q.   OKAY.  SO WHERE DID THAT NUMBER ACTUALLY COME FROM FOR

16   SALES EXPENSE FOR CAPTIVATE IN THIS MONTH?

17   A.   LIKE THE GA EXPENSE, IT COMES FROM A LARGER POOL OF COSTS

18   WHERE THERE'S JUST AN ALLOCATION BASED UPON A PERCENTAGE OF

19   REVENUE.

20   Q.   OKAY.  IS THAT TRUE FOR ALL SEVEN OF THE PRODUCTS FOR

21   SALES EXPENSE?

22   A.   YES.

23   Q.   LET ME ASK YOU ABOUT ONE PARTICULAR NUMBER UNDER SALES

24   EXPENSE, THE ONE THAT SAYS "PAID COMMISSIONS."  DO YOU HAVE ANY

25   UNDERSTANDING OF WHAT "PAID COMMISSIONS" REFERS TO IN THIS

1    DOCUMENT?

2    A.   YES.  THE SAMSUNG WITNESS, MR. SIMS, TESTIFIED THAT THAT

3    IS A TERM THAT, AT LEAST IN KOREA, MEANS OUTSIDE HELP, OR

4    OUTSIDE SERVICES.

5         SO, FOR EXAMPLE, THE EXAMPLE THAT WAS USED IN THE

6    DEPOSITION WAS THE CLEANING SERVICE THAT COMES IN TO CLEAN THE

7    OFFICE BUILDING IS AN OUTSIDE SERVICE, AND SO THEY PAY THOSE

8    PEOPLE AND THAT'S WHERE THEY RECORD THE COST OF THAT.

9         BUT EVEN BASED ON THAT EXAMPLE, YOU CAN TELL THAT THAT IS

10   NOT DIRECTLY ATTRIBUTABLE TO THE SALE OF THE CAPTIVATE PRODUCT.

11   Q.   FOR THE CAPTIVATE, WERE ANY OF THE OTHER SIX PRODUCTS THAT

12   INFRINGED THE DESIGN PATENT, DID SAMSUNG PRODUCE ANY DOCUMENT

13   OF ANY KIND THAT SHOWED ANY MARKETING, SALES, COMMISSION,

14   INSURANCE EXPENSE, ADVERTISING EXPENSE THAT WAS DIRECTLY SPENT

15   ON ONE OF THE SEVEN PHONES?

16   A.   NO.

17   Q.   WHAT ABOUT R&D EXPENSE?  WHERE DID THE SAMSUNG WITNESSES

18   SAY THAT THE R&D EXPENSE NUMBERS IN THIS SPREADSHEET FOR EACH

19   OF THE SEVEN PHONES CAME FROM?

20   A.   R&D EXPENSE IS RESEARCH AND DEVELOPMENT, AND THE NUMBERS

21   THAT WERE PUT ON TO THIS SPREADSHEET COME FROM A SIMILAR TYPE

22   OF PROCESS.  SO IT'S THE TOTAL R&D EXPENDITURES DURING THAT

23   MONTH AT SAMSUNG FOR MOBILE PHONES, AND IT'S DIVIDED UP UNDER

24   WHATEVER PHONES ARE SOLD DURING THAT MONTH.

25        SO IT HAS THE SAME KIND OF PROBLEM WITH IT, IF YOU WILL,

1    IN THAT IT'S NOT DIRECTLY ATTRIBUTABLE TO THE CAPTIVATE.  IT'S

2    JUST AN ALLOCATION.

3        BUT EVEN MORE IMPORTANTLY, WHAT THE SAMSUNG WITNESS

4    EXPLAINED IS THAT THE COSTS THAT ARE HERE CLEARLY DO NOT RELATE

5    TO THE PRODUCTS THAT ARE ALREADY ON THE MARKET BECAUSE THEY

6    WERE DEVELOPED IN PRIOR MONTHS.

7        SO THE COSTS THAT ARE NOW BEING RECORDED ARE FOR FUTURE

8    PRODUCTS THAT HAVEN'T YET BEEN LAUNCHED.

9        SO FOR INSTANCE, WHEN WE START TALKING ABOUT THE

10   INFRINGER'S PROFITS DURING THE PERIOD THAT WE CARE ABOUT, WHICH

11   IS AFTER JUNE 16TH OF 2011, WE KNOW THAT THE CAPTIVATE HAS BEEN

12   ON THE MARKET FOR ABOUT A YEAR AT THIS POINT.  THERE IS NO

13   FURTHER RESEARCH AND DEVELOPMENT GOING ON WITH CAPTIVATE.

14       SO THERE ARE NO EXPENSES IN JUNE AND JULY AND AUGUST OF

15   2011 THAT ARE R&D EXPENSES FOR CAPTIVATE.

16   Q.   MS. DAVIS, IS THERE ANY DOCUMENT FOR ANY OF THESE

17   CATEGORIES, FOR ANY OF THE MONTHS IN THE DAMAGES PERIOD, FOR

18   ANY OF THESE SEVEN PRODUCTS SHOWING A COST IN ONE OF THESE

19   CATEGORIES THAT WERE DIRECTLY ATTRIBUTABLE TO THE PRODUCT?

20   A.   NO.

21   Q.   ARE THERE ANY DOCUMENTS OTHER THAN PX 180, OTHER SAMSUNG

22   RECORDS, THAT YOU CONSIDERED IN DECIDING WHETHER OR NOT THE

23   EXPENSES IN THIS SPREADSHEET MEET THE DIRECTLY ATTRIBUTABLE

24   TEST YOU APPLIED?

25   A.   YES, THERE WAS ANOTHER SPREADSHEET LIKE THAT.

1    Q.   AND WHAT DID YOU FIND IN THAT OTHER SPREADSHEET THAT WAS

2    RELEVANT?

3    A.   THAT IS A SPREADSHEET THAT SAMSUNG ALLOWED MR. MUSIKA AND

4    MY STAFF TO REVIEW, AND I CAN'T SHOW IT TO YOU, BUT I CAN TELL

5    YOU THAT IT HAD CATEGORIES OF EXPENSES IN IT THAT WERE LABELED

6    BY SAMSUNG AS EITHER FIXED OR VARIABLE.

7         SO, FOR EXAMPLE, IT SHOWED ADVERTISING AND SALES PROMOTION

8    TO BE FIXED COSTS, AND TO AN ACCOUNTANT, WHAT THAT MEANS IS

9    THAT IF SALES GO UP OR DOWN, THEN THAT COST DOES NOT CHANGE.

10   IT'S FIXED.

11        SO THAT WOULD TEND TO SUGGEST THAT EVEN SAMSUNG BELIEVED

12   THAT THOSE WERE NOT DIRECTLY ATTRIBUTABLE TO THE SALE OF THE

13   PRODUCTS.

14   Q.   WERE THERE ANY OTHER FACTORS, BESIDES THE LACK OF

15   DOCUMENTATION TYING ANY EXPENSES TO THE PRODUCTS THEMSELVES,

16   THAT YOU CONSIDERED IN REACHING YOUR CONCLUSION THAT NONE OF

17   THE AMOUNTS IN THIS G&A EXPENSE, SALES EXPENSE, AND R&D EXPENSE

18   CATEGORIES SHOULD BE DEDUCTED IN DETERMINING INFRINGER'S

19   PROFITS UNDER THE DIRECTLY ATTRIBUTABLE TEST?

20   A.   I DID CONSIDER THE FACT THAT THE RELIABILITY OF THE

21   SPREADSHEET WAS SOMEWHAT CONCERNING.  PX 180A THAT YOU WILL

22   EVENTUALLY SEE IS THE NINTH VERSION, AS I RECALL, OF THIS

23   SPREADSHEET.  EACH TIME SAMSUNG PROVIDED A NEW SPREADSHEET,

24   NUMBERS HAD CHANGED OR PRODUCTS HAD CHANGED OR SOMETHING HAD

25   CHANGED.

1          AND AS A FORMER AUDITOR, THAT'S CONCERNING BECAUSE YOU

2     DON'T REALLY KNOW IF YOU EVER HAVE THE RIGHT NUMBERS.

3          AND SO THAT WAS SOMETHING THAT I CONSIDERED.

4     Q.   WERE THERE ANY PARTICULAR CHANGES THAT OCCURRED, AS YOU

5     GOT THESE DIFFERENT VERSIONS, THAT CAUSED YOU SPECIAL CONCERN?

6     A.   ONE EXAMPLE THAT I CAN GIVE IS THAT ON ONE VERSION OF THIS

7     SPREADSHEET, THERE WAS $1.3 BILLION THAT HAD BEEN ADDED TO

8     COSTS OF GOODS SOLD, AND WHEN THE SAMSUNG WITNESS WAS ASKED

9     ABOUT THAT -- AND THAT'S AS COMPARED TO THE PRIOR VERSION.

10          SO WHEN THE SAMSUNG WITNESS WAS ASKED ABOUT THAT, HE

11     EXPLAINED THAT ACTUALLY THAT WAS AN AMOUNT OF PROFITS FROM THE

12     CHINESE SUBSIDIARY THAT HAD BEEN ADDED TO COSTS AT THE REQUEST

13     OF SAMSUNG'S COUNSEL.

14     Q.   AND ULTIMATELY DID THEY AGREE THAT THAT WAS WRONG AND

15     RECLASSIFY IT?

16     A.   WELL, THEY DID, BECAUSE ONCE HE TESTIFIED ABOUT THAT, THEY

17     CHANGED THE SPREADSHEET BACK TO THE WAY IT HAD BEEN, SO IT WAS

18     NO LONGER INCLUDED IN COSTS OF GOODS SOLD.

19     Q.   OKAY.  COULD WE SEE SLIDE PDX 100, PAGE 18.

20          WHAT WAS YOUR OVERALL CONCLUSION ABOUT THE AMOUNT OF

21     SAMSUNG PROFITS THAT SHOULD BE PAID BY SAMSUNG TO APPLE FOR THE

22     INFRINGEMENT OF THE DESIGN PATENTS AS YOU APPLIED THE DIRECTLY

23     ATTRIBUTABLE TEST TO THE EXPENSES?

24     A.   WELL, BECAUSE I DON'T THINK THERE'S ANY EVIDENCE FOR

25     EXPENSE AMOUNTS THAT CAN BE CONSIDERED DIRECTLY ATTRIBUTABLE TO

1       THE SALE OF THESE SEVEN PRODUCTS, OTHER THAN THE COSTS OF GOODS

2       SOLD, I THINK THE TOTAL SAMSUNG PROFIT NUMBER IS $231 MILLION

3       AS YOU SEE ON THIS SLIDE.

4       Q.   OKAY.  LET'S TURN TO REASONABLE ROYALTIES, THE THIRD

5       POSSIBLE MEASURE OF DAMAGES THAT YOU APPLIED TO THE EVIDENCE IN

6       THIS CASE.

7            FIRST, WHAT UNITS DID YOU PUT IN THE REASONABLE ROYALTY

8       CATEGORY?

9       A.   THE UNITS THAT END UP IN THE REASONABLE ROYALTY CATEGORY

10      ARE THE ONES WHO DID NOT QUALIFY FOR LOST PROFITS OR SAMSUNG

11      PROFITS, AND SO THEY'RE THE ONES LEFT FOR THE THIRD BUCKET.

12           SO I START WITH THE TOTAL -- AND I SHOULD BE CLEAR THAT

13      THE TOTAL NUMBER OF UNITS IN THE DAMAGES PERIOD IS 10.7

14      MILLION.  WE TALKED EARLIER ABOUT A NUMBER OF 11.4 MILLION.  SO

15      TO CLEAR UP ANY CONFUSION YOU MIGHT HAVE, THERE WERE, IN FACT,

16      11.4 MILLION INFRINGING UNITS SOLD OF THESE 13 PRODUCTS, BUT

17      800,000 OF THOSE ARE NOT TO BE -- 700,000 ARE NOT TO BE

18      CONSIDERED IN DAMAGES BECAUSE THEY WERE BEFORE THE NOTICE

19      DATES, SO THOSE WE DON'T WORRY ABOUT.

20           WE DEAL ONLY WITH THE 10.7 MILLION UNITS AND WE PUT THEM

21      IN ONE OF THE THREE CATEGORIES AS WE'VE DISCUSSED.

22      Q.   OKAY.  LET'S SEE PDX 100, SLIDE 21.

23           CAN YOU PLEASE EXPLAIN TO THE JURY, BECAUSE IT'S BEEN A

24      WHILE SINCE THIS MORNING WHEN YOU GAVE YOUR OVERALL DESCRIPTION

25      OF THE REASONABLE ROYALTY, WHAT IS MEANT BY A REASONABLE

DAVID DIRECT

```
 1        ROYALTY?
 2        A.   THE REASONABLE ROYALTY TERM IS SOMEWHAT UNIQUE TO PATENT
 3        LITIGATION, BUT YOU CAN THINK OF A PATENT AS A LITTLE LIKE REAL
 4        ESTATE IN THAT THEY ARE BOTH ASSETS, AND SO IF SOMEONE WANTS TO
 5        USE SOMEONE ELSE'S REAL ESTATE OR SOMEONE ELSE'S PATENT, THEY
 6        EXPECT TO PAY FOR IT.
 7             IF YOU HAVE A ROOM IN YOUR HOUSE THAT YOU WANT TO RENT
 8        OUT, THEN WHOEVER IS GOING TO RENT IT FROM YOU WILL PAY YOU FOR
 9        IT.
10             AND THE SAME THING WOULD BE TRUE IF YOU HAD A PATENT THAT
11        SOMEONE ELSE WANTED TO USE, THEY SHOULD PAY YOU FOR THAT.
12        Q.   SO I SEE ON YOUR SLIDE, UNDER THE HOUSE THAT'S YOUR
13        RENTING A ROOM ILLUSTRATION, YOU'VE GOT TWO PEOPLE SHAKING
14        HANDS.  WHAT'S THAT SIGNIFY?
15        A.   THAT JUST SIGNIFIES THAT YOU WILL HAVE REACHED AN
16        AGREEMENT AND THAT PARTY WILL PAY YOU SOME AMOUNT BASED UPON
17        YOUR AGREEMENT.
18        Q.   UNDER THE PATENT SIDE OF THE FIGURE, YOU'VE GOT A DASHED
19        LINE AND INSIDE THE WORDS "HYPOTHETICAL NEGOTIATION."  WHAT
20        DOES THAT REFER TO?
21        A.   WELL, THAT MEANS THAT THERE WAS NO SUCH NEGOTIATION.
22        THERE WAS NO SUCH AGREEMENT.
23             SO WE ARE HERE NOW TO DECIDE HOW MUCH SAMSUNG AND APPLE
24        WOULD HAVE AGREED UPON AS THAT RENTAL PAYMENT HAD THEY REALLY
25        SAT DOWN AT THE DATE OF FIRST INFRINGEMENT TO MAKE THAT
```

DAVID DIRECT

1   ARRANGEMENT.

2   Q.   SO HOW -- HOW, AS AN EXPERT, AFTER THE FACT DID YOU

3   DETERMINE WHAT WOULD HAVE HAPPENED IN THIS HYPOTHETICAL

4   NEGOTIATION IF SAMSUNG HAD ACTUALLY COME TO APPLE AND SAID,

5   WE'D LIKE TO GET A LICENSE TO THESE FIVE PATENTS FOR THESE 13

6   PRODUCTS?

7   A.   I APPLIED A COMMONLY USED TEST, WHICH HAS A NUMBER OF

8   FACTORS TO CONSIDER, AND AS PART OF THAT PROCESS, I USED THREE

9   DIFFERENT METHODS TO ARRIVE AT REFERENCE POINTS THAT I COULD

10  USE TO MAKE A CONCLUSION ON WHAT THOSE ROYALTY RATES SHOULD BE.

11  Q.   OKAY.  NOW, YOU TALKED A LITTLE BIT EARLIER TODAY ABOUT

12  THE FACT THAT DEMAND WAS RELEVANT TO THIS TEST.

13       COULD YOU TELL US WHAT THE SPECIFIC METHODS THAT YOU REFER

14  TO HERE ABOUT VALUATION APPROACHES WERE?

15  A.   THERE ARE THREE COMMONLY USED VALUATION APPROACHES.  ONE

16  IS THE COST METHOD; THE SECOND ONE IS THE INCOME METHOD; AND

17  THE THIRD ONE IS THE MARKET METHOD.

18       THE COST METHOD, FOR PURPOSES OF THIS TYPE OF ANALYSIS,

19  TAKES INTO ACCOUNT WHAT ARE THE COSTS TO SAMSUNG OF BEING OUT

20  IN THE MARKET LONG ENOUGH TO DESIGN AROUND THE PATENTS IN THIS

21  CASE?  AND SO THAT PROVIDES ONE SET OF REFERENCE POINTS.

22       THE INCOME METHOD CONSIDERS THE BENEFITS AND ADVANTAGES TO

23  SAMSUNG OF USING THE PATENTED TECHNOLOGY, SO WHAT PROFITS MIGHT

24  BE ATTRIBUTABLE TO THE USE OF THAT TECHNOLOGY.  AND THAT

25  PROVIDES ANOTHER SET OF PREFERENCE POINTS.

1           AND THEN THE THIRD METHOD IS THE MARKET METHOD, AND THAT'S

2     WHERE YOU WOULD LOOK AT OTHER LICENSES, LICENSE AGREEMENTS IF

3     THERE WERE ANY, TO SEE WHAT ROYALTIES WERE USED FOR PATENTS IN

4     THOSE CASES.

5           AND AS IT TURNS OUT, THERE AREN'T ANY LICENSE AGREEMENTS

6     HERE THAT ARE USEFUL AS BENCHMARKS AND, THEREFORE, THAT

7     PARTICULAR METHODOLOGY IS NOT USEFUL FOR THIS ANALYSIS.

8     Q.   AND YOU MENTIONED EARLIER THAT THERE WAS THIS, A CASE THAT

9     HAD A LONG LIST OF FACTORS THAT COULD BE CONSIDERED IN THIS

10    REASONABLE ROYALTY ANALYSIS.

11          CAN YOU EXPLAIN THAT JUST BRIEFLY TO THE JURY?

12    A.   YES.  I MENTIONED THAT THERE'S COMMONLY USED TESTS.  THOSE

13    OF US THAT DO DAMAGES ANALYSIS WOULD REFER TO IT AS THE

14    GEORGIA PACIFIC ANALYSIS, AND THAT'S BECAUSE BACK IN THE 1970S,

15    THERE WAS A CASE THAT INVOLVED THE GEORGIA PACIFIC CORPORATION,

16    AND THE JUDGE DETAILED A LIST OF 15 FACTORS THAT SHOULD BE

17    CONSIDERED IN DETERMINING A REASONABLE ROYALTY, AND THOSE

18    FACTORS HAVE BEEN USED EVER SINCE FOR THAT PURPOSE.

19    Q.   NOW, YOU ALREADY MENTIONED THAT DEMAND RELATED TO SEVERAL

20    OF THOSE FACTORS.

21          ARE THERE ANY OTHER GEORGIA PACIFIC FACTORS THAT YOU FOUND

22    PARTICULARLY RELEVANT TO YOUR ANALYSIS?

23    A.   ONE OF THE FACTORS HAS TO DO WITH THE RELATIONSHIP BETWEEN

24    THE PARTIES.  AND IN THIS CASE, AS YOU ALL KNOW, SAMSUNG AND

25    APPLE ARE DIRECT COMPETITORS, AND TYPICALLY ONE WOULD EXPECT A

```
 1    ROYALTY AGREEMENT, OR A LICENSE AGREEMENT TO HAVE HIGHER

 2    ROYALTIES BETWEEN COMPETITORS THAN THE ONE THAT DOES NOT

 3    BECAUSE THE OWNER OF THE PATENTS, IN THIS CASE APPLE, KNOWS

 4    THAT IF IT GIVES A LICENSE TO SAMSUNG AND ALLOWS IT TO SELL

 5    PRODUCTS THAT USE APPLE'S TECHNOLOGY, THAT IT MIGHT LOSE SALES

 6    AS A RESULT.

 7    Q.   COULD WE SEE SLIDE PDX 100, PAGE 22.

 8         WHAT HAVE YOU SET OUT ON THIS SLIDE, MS. DAVIS?

 9    A.   THESE ARE MY CONCLUSIONS AS TO THE REASONABLE ROYALTY RATE

10    AND THE BASIS THAT SHOULD BE PAID FOR EACH OF THE PATENTS.

11         SO THE '915 PATENT WOULD CARRY A ROYALTY RATE OF $3.10 PER

12    UNIT; AND THE '381 AND '163 PATENT WOULD BOTH BE $2.02 PER

13    UNIT.

14    Q.   HAD YOU DO YOU APPLY THOSE ROYALTY RATES TO PRODUCTS THAT

15    INFRINGED MORE THAN ONE OF APPLE'S UTILITY PATENTS?

16    A.   FOR ANY PRODUCT THAT INFRINGES MORE THAN ONE, YOU WOULD

17    ADD UP THE ROYALTIES FOR THE PATENT THAT DOES INFRINGE.

18         SO I'VE GOT AN EXAMPLE I CAN SHOW YOU HERE.

19    Q.   CAN WE SEE THE SLIDE THAT'S THE EXAMPLE, MR. LEE?

20    A.   THESE ARE TWO EXAMPLES.  GALAXY PREVAIL IS ONE THAT WAS

21    FOUND TO INFRINGE ALL THREE UTILITY PATENTS, SO YOU WOULD ADD

22    THE THREE ROYALTY RATES TOGETHER FOR A TOTAL OF $7.14.

23         THE NEXUS S4G WAS FOUND TO INFRINGE TWO OF THE THREE

24    PATENTS, SO YOU'D ADJUST THOSE TWO ROYALTY RATES TO GET A TOTAL

25    OF $5.12 FOR THAT ONE.
```

1    Q.   WHY DOESN'T YOUR SLIDE INCLUDE AN ASSESSMENT OF A

2    REASONABLE ROYALTY RATE FOR THE TWO APPLE DESIGN PATENTS?

3    A.   I DON'T END UP USING A ROYALTY RATE FOR THE DESIGN PATENTS

4    BECAUSE AS YOU RECALL, THE DESIGN PATENT REMEDY ALLOWS FOR

5    SAMSUNG'S PROFITS.  SO ANYTHING THAT'S NOT IN LOST PROFITS

6    FALLS INTO SAMSUNG'S PROFITS AND, THEREFORE, I NEVER NEED TO

7    USE A ROYALTY FOR THE DESIGN PATENT REMEDIES.

8    Q.   DID YOU, IN FACT, ASSESS WHAT A REASONABLE ROYALTY RATE

9    WOULD HAVE BEEN FOR THE APPLE DESIGN PATENTS IF YOU HAD NEEDED

10   TO USE ONE IN THE ANALYSIS?

11   A.   I DID.  THE METHODOLOGY THAT I DESCRIBED TO YOU EARLIER

12   CAUSED ME TO DECIDE THAT A $24 RATE WOULD BE APPROPRIATE FOR

13   THE DESIGN PATENTS.

14   Q.   AND VERY BRIEFLY, CAN YOU EXPLAIN TO THE JURY WHY YOU

15   ASSESSED A ROYALTY RATE FOR THE USE OF THE TWO DESIGN PATENTS

16   THAT WAS SO MUCH HIGHER THAN THE ROYALTY RATES FOR THE UTILITY

17   PATENTS?

18   A.   APPLE VERY MUCH VALUES ITS DESIGN AND THE LOOK OF ITS

19   PHONE AND ANYTHING THAT CONTRIBUTES TO THAT LOOK, AND SO IT IS

20   VERY CAREFUL ABOUT PROTECTING THAT AND DOESN'T WANT SAMSUNG OR

21   ANYONE ELSE TO MANUFACTURE A PHONE THAT LOOKS LIKE AN IPHONE.

22        SO TO THE EXTENT THAT A DESIGN PATENT ALLOWS A COMPETITOR

23   TO MAKE A PRODUCT THAT HAS SOME OF THE LOOK AND FEEL OF AN

24   IPHONE, THEN IT'S GOING TO HAVE TO PAY MORE FOR THE RIGHT TO DO

25   THAT, AND SO THAT LEADS ME TO CONCLUDE THAT IT'S AT THE HIGH

1       END OF THE RANGE THAT I CALCULATED USING THE OTHER

2       METHODOLOGIES.

3       Q.   OKAY.  GOING TO THE PATENTS FOR WHICH YOU DID ACTUALLY

4       ASSESS A REASONABLE ROYALTY RATE UNIT OF DAMAGES, HOW DID YOU

5       MECHANICALLY USE THOSE RATES TO ARRIVE AT AN AMOUNT OF DAMAGES

6       FOR EACH UNIT OF PHONES THAT FELL INTO THIS BUCKET?

7       A.   ONCE AGAIN, I TOOK EACH OF THOSE UNITS AND, DEPENDING UPON

8       WHICH PATENTS IT INFRINGED, I APPLIED THE APPROPRIATE ROYALTY

9       RATES TO ARRIVE AT A TOTAL.

10      Q.   OKAY.  COULD WE SEE SLIDE PDX 100, SLIDE -- PAGE 24.

11           WHAT WAS YOUR OVERALL OPINION ON THE AMOUNT OF REASONABLE

12      ROYALTIES THAT SAMSUNG SHOULD PAY TO APPLE FOR INFRINGEMENT

13      WITH THESE 13 PRODUCTS?

14      A.   WHEN YOU ADD UP ALL THOSE ROYALTIES FOR THE INFRINGEMENT

15      ON THE UTILITY PATENTS, IT'S $34,625,193.

16      Q.   OKAY.  COULD WE PUT PX 25F BACK UP, MR. LEE, AND COULD YOU

17      TAKE US TO PAGE 4.

18           COULD YOU JUST REMIND THE JURY OF YOUR OVERALL CONCLUSIONS

19      ABOUT THE TOTAL AMOUNT OF DAMAGES THAT, IN YOUR VIEW, SAMSUNG

20      SHOULD PAY TO APPLE FOR THE INFRINGEMENT BY THESE 13 PRODUCTS

21      IN THE DAMAGES TIME PERIOD IN THIS CASE.

22      A.    I THINK THE TOTAL AMOUNT OF DAMAGES IS THE NUMBER YOU SEE

23      IN THE BOTTOM RIGHT-HAND CORNER, AND IT'S DIVIDED UP AMONG THE

24      VARIOUS PRODUCTS AND THE VARIOUS CATEGORIES OF DAMAGES AS

25      YOU'LL SEE ON THIS SLIDE.

```
 1           SO THE TOTAL IS ABOUT $380 MILLION.

 2                MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

 3                THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:53.

 4                MR. PRICE:  CAN WE HAVE SOME TIME TO DO THE BINDERS?

 5                THE COURT:  PLEASE, GO AHEAD, PLEASE.

 6           (PAUSE IN PROCEEDINGS.)

 7                MR. PRICE:  YOUR HONOR, I'M READY TO GO.

 8                THE COURT:  READY, MR. PRICE?

 9                MR. PRICE:  READY TO GO, YOUR HONOR.

10                THE COURT:  ALL RIGHT.  IT'S 1:55.  LET'S STILL TAKE

11      A BREAK MAYBE IN ABOUT 15 MINUTES.

12                MR. PRICE:  THAT WOULD BE WONDERFUL.

13                THE COURT:  OKAY.  GO AHEAD, PLEASE.

14                          CROSS-EXAMINATION

15      BY MR. PRICE:

16      Q.   MS. DAVIS, GOOD AFTERNOON.  MY NAME IS BILL PRICE.

17           A LOT OF COMPLICATED NUMBERS AND CALCULATIONS THAT YOU HAD

18      TO DEAL WITH; RIGHT?

19      A.   THAT IS CORRECT.

20      Q.   SO I WANT TO TALK ABOUT SOME OF YOUR SLIDES INITIALLY SO

21      WE CAN KIND OF UNDERSTAND WHAT THE NUMBERS APPLY TO.

22           AND DO YOU RECALL YOU SHOWED A SLIDE 7?  I THINK IT WAS

23      NUMBER 7.

24           IF WE CAN PUT THAT UP, PX 7.  OR SO.

25           NO, TAKE THAT DOWN.
```

DAVID CROSS

```
 1            IT WAS -- LET ME ASK YOU THIS WAY, THEN, BECAUSE I THINK
 2    WE HAVE THE WRONG ONE UP THERE.  DO YOU RECALL YOU TALKED TO
 3    THE JURY ABOUT 3. -- WAS IT $3.4 BILLION IN REVENUES FOR SALES
 4    OF THE INFRINGING PHONES?
 5    A.   I BELIEVE THAT'S ABOUT RIGHT WHEN WE ADDED UP THE TWO
 6    NUMBERS THAT REPRESENT IPHONES AND IPADS.
 7    Q.   OKAY.
 8    A.   OR ARE YOU JUST TALKING ABOUT IPHONES?
 9    Q.   THE ONES THAT ADDED THEM UP, AND I WANT TO PUT THAT NUMBER
10    IN SOME CONTEXT.
11            WITH RESPECT -- OF COURSE, THOSE ARE SAMSUNG'S REVENUES?
12    A.   YES, OF COURSE.
13    Q.   AND WITH RESPECT TO SAMSUNG'S PROFITS THAT IT WOULD --
14    THAT APPLE IS ENTITLED TO RECEIVE, THOSE AREN'T THE REVENUES
15    YOU'RE LOOKING AT TO CALCULATE, YOU KNOW, WHAT SAMSUNG'S
16    DISGORGED PROFIT, THE INFRINGER'S PROFITS, FOR THE SEVEN PHONES
17    THAT INFRINGE THE DESIGN PATENTS; CORRECT?
18    A.   THAT'S CORRECT.  YOU WANT TO BE LOOKING AT THE SLIDE THAT
19    WE SAW EARLIER THAT HAS THE 800 AND SOME MILLION DOLLAR NUMBER
20    ON IT FOR THAT.
21    Q.   ALL RIGHT.  SO IN TERMS OF SAMSUNG'S PROFITS, THE REVENUE
22    YOU WANT TO LOOK AT IS SOMEWHERE IN THE $800 MILLION RANGE?
23    A.   IT'S MORE THAN THAT.  WOULD YOU LIKE ME TO LOOK IT UP?  OR
24    DO YOU WANT TO WORK WITH THAT FOR NOW?
25    Q.   I CAN LIVE WITH THAT FOR NOW UNTIL WE GET INTO THE
```

```
1        DETAILS.

2              YOU ALSO, IN FACT -- WITH RESPECT TO THE DESIGN PATENTS,

3        THERE'S A, THERE'S A LIMITATION ON THE DAMAGES PERIOD AS A

4        RESULT OF THE NOTES; CORRECT?

5        A.   THAT'S CORRECT.

6        Q.   AND --

7        A.   THAT'S TRUE FOR ALL OF THEM, NOT JUST THE DESIGN PATENTS.

8        Q.   AND THAT $3.4 BILLION FIGURE DOESN'T TAKE THAT INTO

9        ACCOUNT EITHER, THAT IS, THE ACTUAL PERIOD OF TIME IN WHICH

10       APPLE IS ENTITLED TO DAMAGES; CORRECT?

11       A.   FOR DESIGN PATENTS, THAT'S CORRECT.

12             BUT THE $800 MILLION NUMBER DOES TAKE THAT INTO ACCOUNT.

13       Q.   YEAH, THE $800 MILLION NUMBER DOES; RIGHT?

14             OKAY.  AND YOU SHOWED A SLIDE, AND I'M HOPING THIS IS THE

15       RIGHT ONE, SLIDE 8 -- CROSS MY FINGERS -- PX 8, AND THIS IS AT

16       THE BEGINNING OF YOUR EXAMINATION, SO IT WAS A WHILE AGO.

17             YOU SHOWED THIS SLIDE, I GUESS, TO SHOW THE CHANGING

18       MARKET SHARE OF SAMSUNG --

19       A.   YES.  I WAS SHOWING HOW SAMSUNG'S MARKET SHARE HAD

20       INCREASED AFTER THE LAUNCH OF THE INFRINGING PHONES.

21       Q.   AND ACTUALLY, IF YOU LOOK HERE -- IF WE LOOK HERE, THIS,

22       THIS SLIDE STOPS AT 25 PERCENT; RIGHT?  SEE THAT AT THE TOP

23       THERE?

24       A.   YES.

25       Q.   OKAY.  AND OBVIOUSLY IF YOU HAD STOPPED THIS SLIDE AT 20
```

1    PERCENT, YOU WOULD LITERALLY GO OFF THE PAGE, RIGHT?

2    A.   YES.

3    Q.   ALL RIGHT.  AND WHAT THIS SLIDE CAME FROM, THE SOURCE OF

4    THE SLIDE WAS A GRAPH IN YOUR REPORT, 946.151.

5         AND I'M GOING TO BE ASKING YOU A LOT ABOUT THE REPORT, SO

6    YOU MIGHT WANT TO HAVE THAT HANDY.

7    A.   OKAY.  CAN YOU TELL ME WHICH BINDER I SHOULD GO TO FIRST?

8    Q.   IT'S THE MAIN BINDERS, AND IT HAS THE NUMBERS ON THE TOP

9    THERE.  SO I THINK IT'S IN THE SECOND BINDER.

10   A.   I FOUND IT.  AT LEAST, I FOUND THE BINDER.

11   Q.   AND WHILE YOU'RE LOOKING FOR IT, IF WE CAN PUT UP 946.151.

12   IT'S EXHIBIT 11 TO YOUR REPORT.

13   A.   OKAY.

14   Q.   AND SO IF WE LOOK AT THIS REPORT, THIS IS THE REPORT THAT,

15   THAT YOU DERIVED THAT CHART FROM; CORRECT?

16   A.   WELL, ACTUALLY, PAGE 153 IS THE CHART IF YOU'D RATHER LOOK

17   AT THAT.  THAT'S REALLY WHERE THE CHART COMES FROM THAT WAS ON

18   THE GRAPHIC WE LOOKED AT.

19   Q.   BUT THE CHART COMES FROM THIS DATA; CORRECT?

20   A.   WELL, ACTUALLY, THE DATA IS ON PAGE 152.  BUT, YES, ALL

21   THIS INFORMATION COMES FROM THE SAME PLACE.

22   Q.   OKAY.  THANKS.  IF WE LOOK AT THIS CHART THAT'S IN YOUR

23   REPORT, YOU SEE THE BARS HERE DISTINGUISH BETWEEN SAMSUNG UNITS

24   SHIPPED AND APPLE UNITS SHIPPED.  DO YOU SEE THAT?

25   A.   I DO.

```
1    Q.   AND THESE LINES HERE SHOW MARKET SHARE OF SAMSUNG AND

2    APPLE FROM THE SECOND QUARTER OF 2012 TO -- I MEAN, THIS GOES

3    TO FOURTH QUARTER OF 2011; CORRECT?

4    A.   YES.

5    Q.   AND IF YOU LOOKED AT THE DATA, IF YOU LOOK AT THE LAST

6    THREE QUARTERS OF 2011, AND THOSE ARE THE QUARTERS THAT ARE

7    RELEVANT CERTAINLY TO THE LOST PROFITS PART OF THE CASE;

8    CORRECT?

9    A.   YES.

10   Q.   OKAY.  NOW, THAT IS, THAT LOST PROFITS MEANING DID APPLE

11   LOSE SALES BECAUSE OF SAMSUNG'S PRODUCTS THAT INFRINGED;

12   CORRECT?

13   A.   RIGHT.  IN FACT, I'M SORRY, I ANSWERED YOUR QUESTION

14   WRONG.  IF YOU'RE TALKING ABOUT LOST PROFITS SPECIFICALLY, ALL

15   YOU CARE ABOUT IS THE SECOND QUARTER OF 2011, NOT THE THIRD AND

16   FOURTH.

17   Q.   OKAY.  SO IF YOU LOOK AT THE LAST QUARTER OF 2011, THE

18   ACTUAL SALES OF THE PRODUCTS IN THIS CASE WENT DOWN FROM ABOUT

19   14.8 PERCENT TO 8.9 PERCENT; IS THAT RIGHT?

20   A.   I'M NOT SURE WHAT YOU'RE LOOKING AT.

21   Q.   LOOK AT 946.179.

22   A.   ALL RIGHT.  AND TELL ME AGAIN THE NUMBERS THAT YOU WERE

23   MENTIONING.

24   Q.   SURE.  LET ME FIND THEM FOR YOU.  IF YOU LOOK AT SAMSUNG

25   INFRINGING SMARTPHONE UNIT SALES, IT'S THAT SECOND BOX THERE.
```

1     A.   YES.

2     Q.   OKAY.  AND YOU SEE TOTAL MARKET?  DO YOU SEE THAT?

3     A.   YES.

4     Q.   AND IT'S GOING FROM 14.8 PERCENT TO 11.1 TO 8.9 TO 8.8

5     WITH THE ACTUAL INFRINGING ACCUSED PRODUCTS IN THIS LITIGATION;

6     CORRECT?

7     A.   IT IS.

8     Q.   AND WHEN YOU GO BACK TO THAT, TO THAT GRAPHIC 946.131, THE

9     REASON APPLE'S MARKET SHARE IS DECREASING IS BECAUSE OF ITS

10    SALES CYCLE; CORRECT?

11    A.   IN PART, YES.

12    Q.   IN OTHER WORDS, YOU KNOW, SAMSUNG HAS KIND OF A PRODUCT OR

13    A GENERAL STRATEGY OF COMING OUT WITH ABOUT A PHONE A WEEK WITH

14    DIFFERENT FEATURES; CORRECT?

15    A.   THAT IS CORRECT.

16    Q.   OKAY.  WHEREAS APPLE COMES OUT WITH A PHONE EVERY ONE TO

17    ONE AND A HALF YEARS.  CORRECT?

18    A.   YES.

19    Q.   I'M SORRY.  YOU NEED TO SAY YES.

20    A.   WELL, YOU DIDN'T HAVE A QUESTION.

21    Q.   I THOUGHT --

22    A.   I'M WAITING FOR A QUESTION.

23    Q.   I THOUGHT MAYBE MY "UH" DID IT.

24         SO IF WE LOOK AT THIS CHART, FOR EXAMPLE, THE IPHONE CAME

25    OUT -- THE IPHONE 4 CAME OUT AROUND THIS TIME PERIOD; CORRECT?

```
 1   A.   THAT'S CORRECT.

 2   Q.   AND WE SEE A SPIKE IN SALES FOR THAT BECAUSE THE IPHONE 4

 3   CAME OUT; RIGHT?

 4   A.   YES.

 5   Q.   AND THEN IF YOU LOOK AT THE FIRST QUARTER OF 2011, YOU'VE

 6   GOT THE IPHONE 4 CAME OUT ON VERIZON?

 7   A.   YES.

 8   Q.   AND SO YOU HAVE ANOTHER SPIKE; CORRECT?

 9   A.   THAT'S RIGHT.

10   Q.   AND THEN IF WE GO DOWN TO OCTOBER 2011, WE'RE IN THE THIRD

11   QUARTER, I MEAN, THERE HASN'T BEEN A NEW IPHONE IN THE MARKET

12   AT THAT TIME FOR ABOUT A YEAR AND FOUR MONTHS; RIGHT?

13   A.   THAT'S ABOUT RIGHT.

14   Q.   OKAY.  AND SO WHAT WAS HAPPENING IN THE MARKETPLACE IS

15   PEOPLE WERE EITHER HOLDING OFF ON BUYING AN IPHONE OR THEY JUST

16   WEREN'T INTERESTED IN BUYING WHAT WAS SOON TO BE AN OLD IPHONE;

17   CORRECT?

18   A.   WELL, WE CAN'T CONCLUDE EXACTLY WHAT WAS HAPPENING, BUT,

19   YES, I WOULD AGREE WITH YOU THAT THEY WERE NOT BUYING AS MANY

20   AS THEY WERE IN THE PRIOR QUARTERS.

21   Q.   OKAY.  AND SO ONE OF THE REASON FOR APPLE'S MARKET SHARE

22   WHEN YOU GET THESE PEAKS AND VALLEYS IS BECAUSE THAT'S A

23   NATURAL RESULT OF ITS BUSINESS PLAN; RIGHT?

24   A.   I DO AGREE WITH YOU.

25   Q.   AND THEN, OF COURSE, WE COME OUT WITH THE IPHONE 4S AND
```

DAVID CROSS

1    THEN IT SPIKES UP TO THE FOURTH QUARTER OF 2011; RIGHT?

2    A.   YES.

3    Q.   AND IN THE THIRD AND FOURTH QUARTER OF 2011 WHEN YOU

4    TALKED ABOUT THE RELEVANCE OF THIS GENERAL TIME FRAME, YOU'VE

5    GOT SAMSUNG RELATIVELY FLAT; CORRECT?

6    A.   YES.

7    Q.   OKAY.  AND YOU'VE GOT APPLE, SO IT'S -- IT'S ENDING UP

8    THAT APPLE HAS ABOUT 45 PERCENT OF THE MARKET?

9    A.   IF YOU'RE TALKING ABOUT THE FOURTH QUARTER OF 2011 AFTER

10   THE LAUNCH OF THE NEW IPHONE AND THE IPHONE ON SPRINT, THE

11   ANSWER IS YES.

12   Q.   OKAY.  AND IF WE LOOK AT THIS TOTAL, STARTING IN THE

13   SECOND QUARTER OF 2010, APPLE GOES FROM ABOUT 20 PERCENT OF THE

14   MARKET, A FIFTH OF THE MARKET; CORRECT?

15   A.   YES.

16   Q.   OKAY.  UP TO IN THE HIGH 40S; CORRECT?

17   A.   YES.

18   Q.   LIKE 45 PERCENT?

19        AND YOU'VE GOT -- AND THEY GAINED, LET'S SEE, SOMEWHERE

20   UNDER 10 MILLION UNITS IN THAT TIME FRAME?  IS THAT ABOUT

21   RIGHT?

22   A.   I'M NOT FOLLOWING HOW YOU GOT YOUR TEN MILLION.

23   Q.   FROM THE UNITS SHIPPED.

24   A.   I'LL TAKE YOUR WORD FOR THAT.  THAT SOUNDS ABOUT RIGHT.

25   Q.   AND SAMSUNG, IN THE SAME TIME FRAME, GAINED ABOUT 1.6

1    MILLION UNITS COMPARED TO APPLE'S 10.

2    A.   ARE WE STILL TALKING ABOUT THE DIFFERENCE BETWEEN 2010

3    QUARTER 2 AND --

4    Q.   YES.

5    A.   -- 2011 QUARTER 4?

6    Q.   YES.

7    A.   NO, I DON'T GET THE SAME NUMBERS YOU DO.  IT LOOKS TO ME

8    LIKE THE SAMSUNG UNITS SHIPPED IN QUARTER 4, AND SAMSUNG

9    SHIPPED 7,000.  I'M SORRY, MILLION.

10   Q.   THIS ONE (INDICATING)?

11   A.   AND IN THE VERY FIRST BAR, IT LOOKS MORE LIKE LESS THAN 1

12   MILLION.  WHAT NUMBER DID YOU GET?

13   Q.   WELL, LET ME ASK YOU THIS:  DID YOU KNOW WHAT THE SOURCE

14   OF THIS DOCUMENT IS?

15   A.   YEAH, IT'S THE NEXT PAGE.  YOU WANT TO LOOK AT THAT?

16   Q.   OKAY.  WELL, IT'S IN EVIDENCE, SO I'M GOING TO SAVE IT FOR

17   CLOSING BECAUSE WE'RE TALKING ABOUT NUMBERS.  I APOLOGIZE, I

18   DON'T MEAN TO BE RUDE.

19        LET ME ASK YOU, DURING THIS DAMAGES PERIOD THERE FOR LOST

20   PROFITS, WHICH IS -- THAT'S, YOU SAID, APRIL/MAY 2011; IS THAT

21   RIGHT.

22   A.   THAT'S RIGHT.

23   Q.   OKAY.  DURING THAT PERIOD, APPLE DOESN'T HAVE A NEW PHONE

24   OUT; CORRECT?

25   A.   THAT'S CORRECT.  WELL, IT DEPENDS ON WHAT YOU MEAN BY "NEW

1    PHONE."  IT HAD LAUNCHED THE IPHONE 4 EIGHT, NINE MONTHS

2    EARLIER.

3    Q.   YEAH.  IT WAS LAUNCHED IN, ABOUT THE TIME OF THIS PEAK;

4    CORRECT?

5    A.   RIGHT.

6    Q.   OKAY.  SO IT HAD BEEN OUT ABOUT A, CLOSE TO A YEAR AT THAT

7    TIME?

8    A.   NOT QUITE, BUT SOMETHING LIKE THAT.

9    Q.   SO IN YOUR -- IN YOUR DIRECT, I THOUGHT THAT I HEARD YOU

10   SAY -- AND IF WE CAN GO BACK TO SLIDE 8 -- I THOUGHT I HEARD

11   YOU SAY THAT INTRODUCING THESE PHONES IS THE REASON SAMSUNG'S

12   MARKET SHARE INCREASED.

13   A.   WELL, I KNOW THAT IN THAT FIRST QUARTER WHERE YOU SEE THE

14   JUMP IN THE RED LINE, 90 PERCENT OF THAT ARE INFRINGING PHONES.

15   SO --

16   Q.   I'M SORRY.  90 PERCENT --

17   A.   90 PERCENT OF THAT INCREASE IN 2010, IN THAT RED, RED LINE

18   THAT GOES UP --

19   Q.   UM-HUM?

20   A.   -- ARE INFRINGING PHONES.

21   Q.   BUT SAMSUNG'S MARKET SHARE IS GOING TO INCREASE IF APPLE'S

22   DECREASES BECAUSE OF ITS BUSINESS PLAN, RIGHT, BECAUSE APPLE

23   KIND OF DICTATES THE MARKET?  IF APPLE IS SELLING LESS, IF

24   THEY'RE SELLING 40 INSTEAD OF 50 AND YOU'RE SELLING 20, YOUR

25   MARKET SHARE IS GOING TO INCREASE; RIGHT?

1    A.   I DON'T THINK WE'RE TALKING ABOUT THE SAME PERIOD OF TIME.

2    IF YOU'RE STILL TALKING ABOUT 2010 WHEN THE GALAXY CAPTIVATE

3    WAS LAUNCHED IN JULY OF 2010, THAT'S ALSO ABOUT THE TIME THE

4    IPHONE, THE IPHONE 4 IS LAUNCHED.

5    Q.   OKAY.  SO YOU'RE SAYING THAT THIS INCREASE IN YOUR

6    REPORTS, WE CAN SEE THAT THAT'S ATTRIBUTED TO THE GALAXY S

7    CAPTIVE?

8    A.   NO.  90 PERCENT OF THAT FIRST INCREASE FROM THE, WHERE THE

9    BLUE LINE TURNS TO A RED LINE AND THEN GOES TO THE PEAK, 90

10   PERCENT OF THAT ARE INFRINGING PHONES.  THEY'RE NOT ALL

11   CAPTIVATES.

12   Q.   OKAY.  LET ME SEE IF I CAN REPHRASE THIS.  I THINK I SEE

13   WHERE WE'RE --

14   A.   OKAY.

15   Q.   WHERE I'M HAVING AN ISSUE.

16       IF WE LOOK AT THE INFRINGING PHONES THAT ARE IN THIS CASE

17   FOR WHICH YOU WERE CALCULATED DAMAGES --

18   A.   YES.

19   Q.   -- OKAY, IF YOU'RE LOOKING AT THOSE, I THINK YOU SAID

20   THOSE SALES DECREASED.

21   A.   ARE WE STILL TALKING ABOUT 2010?  THEY DIDN'T DECREASE.

22   THAT WAS THE FIRST MONTH OF SALES.

23   Q.   OKAY.  IS THIS THE FIRST -- 2010 GOES FROM HERE TO HERE

24   (INDICATING), YOU SEE?

25   A.   IT DOES.  BUT THAT, THAT DOTTED LINE IS JULY 9TH OF 2010.

1        DID I CONFUSE YOU?

2        Q.   NO, YOU DIDN'T.

3        A.   OKAY.

4        Q.   OKAY.  WELL, LET ME SWITCH TO -- I'LL FIGURE THIS OUT AT

5        SOME POINT, OR I'LL HAVE -- WELL, YOU HELPED ME.  THANK YOU

6        VERY MUCH.  I THINK MR. WAGNER WILL AS WELL.

7            LET ME ASK YOU ABOUT THE LOST PROFITS CALCULATION.  NOW,

8        THAT CALCULATION, AS YOU SAID, IS ONLY FOR THE '915 PATENT;

9        RIGHT.

10       A.   IT IS, YES.

11       Q.   THAT IS, APPLE IS NOT ENTITLED TO LOST PROFITS FOR ANY

12       OTHER APPLE PATENT; CORRECT?

13       A.   I HAVEN'T CALCULATED LOST PROFITS FOR THIS TRIAL FOR ANY

14       OTHER APPLE PATENT, THAT'S CORRECT.

15       Q.   THAT MEANS FOR LOST PROFITS, EVEN IF APPLE WERE ENTITLED

16       TO LOST PROFITS, THEY WOULD NOT BE ENTITLED TO LOST PROFITS ON

17       THE EXHIBIT 4G PHONE OR THE INDULGE OR THE REPLENISH; CORRECT?

18       A.   I DON'T BELIEVE THAT'S CORRECT.  YOU'RE TALKING ABOUT --

19       Q.   YEAH.

20       A.   -- PRODUCTS THAT DIDN'T INFRINGE THE '915.  THERE'S ONLY

21       ONE OF THOSE AND THAT'S THE REPLENISH.

22       Q.   TURN TO DX 946.276.  AND I THINK THIS IS YOUR CALCULATION

23       OF APPLE'S LOST PROFITS AND SAMSUNG PROFITS.  CORRECT?

24       A.   YES.

25       Q.   OKAY.  AND IF YOU LOOK AT APPLE'S LOST PROFITS, YOU'VE GOT

1    ZERO FOR EXHIBIT 4G, ZERO FOR THE INDULGE, AND ZERO FOR THE

2    REPLENISH; CORRECT?

3    A.   THAT'S RIGHT.  AND WHAT I MEANT, WHAT I WAS MENTIONING

4    THIS EARLIER, IS THE REPLENISH DOES NOT INFRINGE '915.

5         THE OTHER TWO DO AND ARE NO LONGER SOLD DURING THAT PERIOD

6    OF TIME.  THAT'S WHY THEY'RE ZERO.

7    Q.   OKAY.  SO IT'S CORRECT THAT THERE ARE NO LOST PROFITS FOR

8    THOSE PARTICULAR PHONES; CORRECT?

9    A.   THAT IS CORRECT.

10   Q.   AND YOU TALKED ABOUT THE TEST YOU'RE USING TO SEE WHETHER

11   OR NOT SALES WOULD HAVE GONE FROM SAMSUNG TO APPLE, YOU KNOW,

12   IF THESE INFRINGING FEATURES WEREN'T IN THE PHONES; CORRECT?

13   A.   IF THE INFRINGING PHONES WERE NOT ON THE MARKET?

14   Q.   WELL --

15   A.   I THINK THAT'S DIFFERENT THAN THE QUESTION YOU ASKED.

16   Q.   WELL, FOR THE TEST THAT YOU'RE LOOKING AT, DO YOU NEED TO

17   SHOW THAT CUSTOMERS BUYING THE PHONES BOUGHT THE PHONES BECAUSE

18   OF THE PATENTED FEATURE?

19   A.   I THINK -- I THINK YOU MAY BE ASKING ME A LEGAL QUESTION,

20   BUT MY UNDERSTANDING OF THE LAW IS THAT YOU HAVE TO SHOW THAT

21   THERE'S DEMAND FOR THE PATENTED PRODUCT, NOT PATENTED FEATURE.

22   Q.   OKAY.  THERE ARE TWO PARTS OF THAT TEST, RIGHT?  ONE IS,

23   IS THERE DEMAND FOR THE PRODUCT, THE IPHONE; RIGHT?

24   A.   YES.

25   Q.   NO QUESTION.  MR. WAGNER AGREES?

DAVID CROSS

```
 1        A.    UM-HUM.

 2        Q.    WE ALL AGREE, DEMAND FOR THE IPHONE.  RIGHT?

 3        A.    YES.

 4        Q.    OKAY.  THE SECOND TEST IS WHETHER OR NOT PEOPLE, CUSTOMERS

 5    BOUGHT THE PHONES BECAUSE OF THE PARTICULAR PATENTED FEATURES;

 6    RIGHT?

 7        A.    I DON'T AGREE WITH YOU.  I DON'T THINK THE TEST IS -- I

 8    DON'T THINK YOU HAVE TO PROVE THAT THEY BOUGHT THE PHONES

 9    BECAUSE THE PATENTED FEATURE.

10          I THINK YOU HAVE TO PROVE THAT IT'S REASONABLY PROBABLE

11    THAT HAD THE INFRINGING PHONES NOT BEEN ON THE MARKET, THEN

12    APPLE WOULD HAVE MADE MORE SALES.

13        Q.    OKAY.  SO YOU'VE TESTIFIED ABOUT, ABOUT LOST PROFITS

14    BEFORE?

15        A.    YES.

16        Q.    RIGHT?

17        A.    I HAVE.

18        Q.    AND I'M NOT ASKING YOU LEGAL QUESTIONS HERE.  I'M ASKING

19    YOU THE KIND OF TESTS, THE TESTS THAT YOU APPLY.  OKAY?

20        A.    OKAY.

21        Q.    AND IN OTHER CASES, THE TEST THAT YOU'VE APPLIED IS

22    WHETHER OR NOT THE CUSTOMERS BOUGHT THE PHONES FOR THE PATENTED

23    FEATURES.  THAT'S THE TEST THAT YOU'VE APPLIED IN THE PAST;

24    RIGHT?

25        A.    IT'S A TEST THAT FACTORS INTO THE SECOND OF THE FOUR
```

1    FACTORS THAT WE TALKED ABOUT RELATED TO MARKET ALTERNATIVES,

2    BECAUSE IF IT'S A SITUATION WHERE THE CUSTOMER DOESN'T CARE

3    ABOUT THE PATENTED FEATURES, THEN THERE ARE A NUMBER OF OTHER

4    ALTERNATIVES THAT MIGHT HAVE BEEN AVAILABLE.

5    Q.   MY QUESTION WAS DIFFERENT.  THE TEST THAT YOU'VE

6    APPLIED -- AND I DON'T CARE IF IT'S RELATED TO FACTOR 3, 4, OR

7    5, OKAY, ALTHOUGH I UNDERSTAND THERE ARE ONLY FOUR -- THE TEST

8    THAT YOU APPLIED IN THE PAST IN CASES WAS, YOU SAID, YOU HAVE

9    TO SHOW THAT THE CUSTOMERS WERE BUYING THE PHONES FOR THE

10   PATENTED FEATURES.  ISN'T THAT THE TEST YOU'VE APPLIED BEFORE?

11   A.   I HAVE USED A TEST RELATED TO DEMAND FOR THE PATENTED

12   FEATURES AS A CONSIDERATION RELATED PRIMARILY TO MARKET

13   ALTERNATIVES.

14        BUT YOU DO NOT HAVE TO PROVE DEMAND FOR THE PATENTED

15   FEATURES TO GET LOST PROFITS.

16   Q.   I'M SORRY.  WHEN YOU SAY "YOU DO NOT HAVE TO PROVE,"

17   YOU'RE NOT GIVING US THE LEGAL CONCLUSION, YOU'RE GIVING US THE

18   TEST THAT YOU'VE APPLIED?

19   A.   OF COURSE.  I THOUGHT IT WAS VERY CLEAR THAT I'M NOT A

20   LAWYER AND I'M NOT GOING TO BE PROVIDING YOU ANY LEGAL

21   OPINIONS.

22   Q.   OKAY.  I'D LIKE TO SHOW YOU -- THERE'S A CASE RIDDELL

23   VERSUS -- IS IT SCHUTT OR SCHUTT SPORTS?

24   A.   SCHUTT.

25   Q.   AND IN THAT CASE YOU TESTIFIED FOR WHICH SIDE?

DAVID CROSS

1    A.   I WAS TESTIFYING ON BEHALF OF SCHUTT, WHICH WAS THE

2    ALLEGED INFRINGER.   IT WAS A FOOTBALL HELMET CASE.

3    Q.   SO THEY'RE THE DEFENDANTS.   AND IN THAT CASE YOU LOOKED AT

4    DOCUMENTS AND YOU CONCLUDED THAT THERE WOULD BE NO LOST

5    PROFITS; RIGHT?

6    A.   I DID.

7    Q.   OKAY.   AND I THINK THERE'S A BINDER OF TESTIMONY IN FRONT

8    OF YOU, OR MAYBE NOT IN FRONT OF YOU.

9    A.   OKAY.   TELL ME WHICH ONE I'M LOOKING FOR.

10   Q.   SURE.   LET ME HAVE YOU LOOK FOR IT.

11             THE COURT:   IT'S 2:15.

12             MR. PRICE:   IT'S EXHIBIT 909.067.   I'M SORRY.

13   EXHIBIT 909.   I'LL GET YOU THE PAGE.

14             THE COURT:   IT'S 2:15.   WHY DON'T WE TAKE OUR BREAK

15   NOW?

16             MR. PRICE:   OKAY.

17             THE COURT:   IF YOU WANT TO ASK ONE MORE QUESTION, GO

18   AHEAD.

19   BY MR. PRICE:

20   Q.   I JUST WANT TO CALL YOUR ATTENTION, MA'AM, IF I COULD

21   TO -- IT'S GOING TO BE AT PAGE 79 --

22   A.   COULD YOU BACK UP JUST ONE STEP AND TELL ME AGAIN WHAT

23   BINDER I'M LOOKING FOR?

24   Q.   IT'S GOING TO BE EXHIBIT 909.

25             AND CHRIS, DO WE HAVE ANY IDEA WHAT BINDER THAT'S IN?

1    A.   I THINK I FOUND THE BINDER.

2    Q.   IT'S VOLUME 9 -- SORRY ABOUT THAT -- 909?

3    A.   I'M SORRY.  I THOUGHT IT WOULD BE IN A BINDER LABELED 57

4    TO 944.  IT'S NOT.

5    Q.   I'M SORRY.  IT'S 909?

6    A.   I KNOW.  IT'S NOT IN MY 57 TO 944.  WHERE SHOULD IT BE?

7         MR. PRICE:  AH, OKAY.  LET ME ASK -- YOUR HONOR,

8    LET'S TAKE THE BREAK.  THAT WAY I'M NOT BURNING MY TIME.

9         THE COURT:  OKAY.  ALL RIGHT.  ARE THESE TWO BINDERS

10   REPLACEMENTS FOR THESE SEVEN, OR THEY'RE THE SAME?

11        MR. PRICE:  THEY'RE THE ONES WE'RE GOING TO USE MOST

12   OF THE TIME SO YOU DON'T HAVE TO BE SHUFFLING.

13        THE COURT:  I SEE.  ALL RIGHT.

14      OKAY.  TIME IS NOW 2:16.  LET'S TAKE A 15 MINUTE -- LET'S

15   TAKE A 10 MINUTE BREAK.

16      AGAIN, PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS OR

17   RESEARCH THE CASE.

18      THANK YOU.

19      YOU CAN LEAVE YOUR BINDERS HERE.  IT'LL BE A SHORT BREAK.

20      THANK YOU.

21      (JURY OUT AT 2:17 P.M.)

22        THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

23   LEFT THE COURTROOM.

24      YOU CAN TAKE A SEAT.

25      SHOULD I HOLD ON TO THESE OR THESE I WON'T USE THEN?

DAVID CROSS

```
 1              MR. PRICE:  THERE'S A POSSIBILITY WE'LL USE SOME OF
 2    THEM.
 3              THE COURT:  OKAY.  I'LL HOLD ON TO THEM.
 4              MR. PRICE:  THIS IS THE ONES WE'RE GOING TO USE MOST
 5    OF THE TIME.  IN FACT, 909 IS IN THE MAIN BINDER.
 6              THE COURT:  OKAY.  LET'S TAKE A BRIEF BREAK.  THANK
 7    YOU.
 8         (RECESS FROM 2:17 P.M. UNTIL 2:29 P.M.)
 9         (JURY OUT AT 2:29 P.M.)
10         THE COURT:  ACTUALLY, I NEED TO TALK WITH THE LAWYERS
11    BEFORE WE BRING THE JURY IN.
12         PLEASE TAKE A SEAT.  WELCOME BACK.
13         OKAY.  TWO THINGS.  FIRST, WITH REGARD TO MR. PRICE'S
14    QUESTION EARLIER, I WAS CONFUSED.  I WAS THINKING WE WERE
15    REHASHING THE SAME ISSUE WITH THE '381 ABOUT, YOU KNOW, WHICH
16    APPLICATIONS WERE ACCUSED, WHICH APPLICATIONS --
17         OH, I'M SORRY.  MR. LEE IS NOT HERE YET.  ANYONE ELSE
18    THAT'S STILL MISSING?  I APOLOGIZE FOR STARTING.
19              MR. LEE:  SORRY, YOUR HONOR.
20              THE COURT:  THAT'S OKAY.
21         SO WHEN YOU RAISED YOUR ISSUE, I WAS CONFUSED AND I WAS
22    THINKING '381 AND THE SAME ISSUE WE'D BEEN TALKING ABOUT OF
23    WHICH APPLICATIONS WERE ACCUSED AND MAY OR MAY NOT HAVE BEEN
24    INFRINGED WITH REGARD TO THE '381 PATENT.
25              BUT YOU WERE RAISING A SEPARATE ISSUE AND THE BROWSER WAS
```

DAVID CROSS

```
1      THE ONLY APPLICATION THAT WAS ACCUSED OF THE '915 PATENT.
2           AND SO I SEE, YOU WANT TO MAKE THAT DISTINCTION THAT'S
3      NOT --
4                MR. PRICE:  RIGHT.
5                THE COURT:  IT'S NOT THE ISSUE THAT WE'VE BEEN
6      TALKING ABOUT SINCE LAST WEEK.
7                MR. PRICE:  NO, IT'S NOT.  I'M SORRY I WAS UNCLEAR.
8                THE COURT:  ALL RIGHT.  SO I THINK THAT'S FAIR GAME
9      TO CLEAR UP.
10          SO NOW IT CAME UP IN THE CONTEXT MS. KREVANS'S DIRECT, BUT
11     MR. PRICE'S REQUEST IS TO ASK A CLARIFYING QUESTION ON CROSS,
12     AND SO I -- I'M GOING TO ALLOW -- I DON'T WANT IT TO BE, YOU
13     KNOW, DWELT ON UNNECESSARILY, BUT I THINK JUST A CLARIFYING
14     QUESTION THAT ONLY THE BROWSER APPLICATION WAS ACCUSED IN THE
15     '915, I THINK THAT'S FAIR.
16          DO YOU WANT TO BE HEARD ON THAT, MS. KREVANS?
17               MS. KREVANS:  I'M FINE WITH THAT, YOUR HONOR.
18          I WOULD JUST LIKE TO POINT OUT THAT WE'RE RUNNING INTO
19     ANOTHER ISSUE THAT GOES TO THE SAME ISSUE OF THE VERDICT FROM
20     THE OLD, FROM THE PREVIOUS CASE AND THE PHONES THAT RUN INTO IT
21     BECAUSE MR. PRICE HAS ALREADY DONE SOME CROSS-EXAMINATION OF
22     MS. DAVIS ABOUT A GRAPH THAT SHOWS SAMSUNG MARKET SHARE --
23               THE COURT:  THAT WAS THE NEXT ISSUE I WAS GOING TO
24     RAISE.
25               MS. KREVANS:  THAT SAMSUNG MARKET SHARE THAT IS, IN
```

DAVID CROSS

1    FACT, INCREASING HAS INFRINGING PHONES IN IT THAT ARE NOT IN

2    THIS CASE, AND WE OUGHT TO BE ABLE TO FIX WHATEVER IS THE

3    IMPRESSION THAT WE'VE CREATED.

4        BUT I DID NOT WANT TO ASK HER A QUESTION ABOUT IT ON

5    DIRECT BECAUSE I DIDN'T WANT TO PUT HER IN A POSITION OF HAVING

6    TO ANSWER IN A WAY THAT WAS NOT TRUTHFUL, BY A TRUTHFUL ANSWER,

7    DEPENDING ON WHAT THE QUESTION IS, HAS TO INCLUDE THE

8    INFRINGING PHONES IN THE PREVIOUS CASE.

9        SO I THINK WE'RE ALL TRYING TO SORT OF THREAD OUR WAY

10   THROUGH THIS.

11       THE COURT:  I UNDERSTAND.  THAT WAS THE SECOND POINT

12   THAT I WAS GOING TO RAISE, BECAUSE I FELT THE SAME CONCERN

13   DURING THAT QUESTIONING ON THAT CHART, AND I THINK IT'S FAIR TO

14   CLARIFY THAT.

15       MS. KREVANS:  THANK YOU, YOUR HONOR.

16       THE COURT:  OKAY.

17       MR. PRICE:  YOUR HONOR, THEY INTRODUCED THAT.  IT'S

18   THEIR GRAPH.  THEIR GRAPH INCLUDES EVERYTHING FROM BOTH CASES

19   AND WE -- I THINK WE OBJECTED.  BUT I --

20       THE COURT:  WELL, BUT YOU WERE UNDERMINING THAT GRAPH

21   BY SAYING, OH, NO, NO, NO.  YOU CAN ONLY LOOK AT THE PHONES IN

22   THIS CASE, AND THOSE THAT THE DEMAND EITHER STAYED FLAT OR

23   DECREASED DURING THIS RELEVANT TIME PERIOD, SO THIS GRAPH IS

24   WRONG SHOWING A SPIKE.

25       AND I -- I THINK THAT IS UNFAIR AND CONFUSING AND SOMEWHAT

1          MISLEADING TO THE JURY, SO I THINK THAT SHOULD BE CLARIFIED.

2              IN ADDITION, I'M GOING TO GIVE YOU THE OPPORTUNITY TO

3          CLARIFY ON THE '915.  OKAY?

4              MR. PRICE:  OKAY.

5              MS. KREVANS:  OKAY.  AND YOUR HONOR, JUST SO I DON'T

6          OVERSTEP THE BOUNDARIES WHEN I CLARIFY, CAN I REFER TO THE FACT

7          THAT IN THE FIRST TRIAL, SOME ADDITIONAL PHONES, A NUMBER OF

8          ADDITIONAL PHONES WERE FOUND INFRINGING THAT ARE NOT INVOLVED

9          IN THIS TRIAL AND THEY ARE INCLUDED IN THERE?  I DON'T WANT TO

10         DO ANYTHING THAT YOU THINK GOES TOO FAR.

11             THE COURT:  I THINK THAT'S FINE.

12             MS. KREVANS:  THE DATA IS THE DATA.  WE CAN'T MAKE IT

13         THE FACT THAT HE DOESN'T HAVE THE DATA.

14             THE COURT:  I UNDERSTAND.  BUT NOTHING ELSE.  I MEAN,

15         JUST ONE QUICK QUESTION, HALF A SECOND, AND THAT'S IT.

16             MR. PRICE:  THAT GRAPH IS ALL PHONES.  IT'S ALL

17         SAMSUNG PHONES.

18             THE COURT:  WELL, THEN YOU CAN GET -- CLARIFY THAT

19         FURTHER ON CROSS.

20             MR. PRICE:  WELL, THAT'S WHY -- I MEAN, SHE CAN SAY

21         THOSE ARE ALL PHONES, BUT TO SAY A SUBSET OF THOSE ARE FOUNDS

22         THAT WERE FOUND TO INFRINGE IN THE FIRST TRIAL AND THERE BEEN

23         NO ANALYSIS ON HOW THAT AFFECTS MARKET SHARE AT ALL, AND THAT'S

24         WHAT THAT'S SHOWING, MARKET SHARE.

25             THE COURT:  I THINK THAT WAS THE CHART FROM THE 2012

DAVID CROSS

```
1    TRIAL.
2              MS. KREVANS:  WELL, IT --
3              MR. PRICE:  YEAH.
4              MS. KREVANS:  YOUR HONOR, THE FACTS ARE THE FACTS.
5    THAT WAS THEIR MARKET SHARE.
6         AT THE 2012 TRIAL, OF COURSE, WE DIDN'T HAVE THIS ISSUE OF
7    THE PHONES THAT WERE FOUND INFRINGED THAT ARE NO LONGER, YOU
8    KNOW, THE OLD ONES AND THE NEW ONES.
9              AND SO AT THE 2012 TRIAL, THERE WAS CROSS ABOUT THAT GRAPH
10   AND IT WENT TO THE FACT THAT THERE WERE SOME PHONES IN THERE
11   THAT WERE NOT ACCUSED AT ALL, AND THAT'S TRUE.
12        BUT THE MAJORITY OF THE PHONES IN THERE WERE THE ONES THAT
13   WERE ACCUSED, AND THAT'S STILL TRUE BECAUSE WE CAN'T ALTER THE
14   REAL DATA.  WEE COULDN'T MAKE A GRAPH THAT SHOWED FAKE DATA.
15             THE COURT:  WHY DON'T YOU JUST CLARIFY THAT THAT IS
16   ALL PHONES?
17             MR. PRICE:  OKAY.  I WILL DO THAT.
18             THE COURT:  BUT I WILL ALLOW THAT SOME OF THOSE
19   PHONES WERE ALSO FOUND TO BE INFRINGING.
20             MR. PRICE:  BUT THEIR POINT IS FOR THIS TRIAL, FOR
21   DAMAGES, THEY WANT TO SHOW THESE PHONES HAD SOME EFFECT AND
22   THEY DIDN'T.  SO I'M -- SO BEING ABLE TO SAY, "THESE PHONES
23   DIDN'T AFFECT MARKET SHARE INCREASE BECAUSE ACTUALLY" --
24             THE COURT:  I THINK YOU OPENED THE DOOR TO THIS ISSUE
25   WITH THAT LINE OF QUESTIONING SAYING HER CHART IS WRONG.
```

1           MR. PRICE:  IT DOESN'T APPLY TO THESE PHONES AND

2      THAT'S WHAT'S RELEVANT AT THIS TRIAL.

3           THE COURT:  AH, BUT THAT'S NOT WHAT YOU SAID.  THE

4      IMPLICATION WAS THAT THE CHART WAS WRONG AND THAT THERE WAS NO

5      SPIKE AT ALL.

6           MR. PRICE:  I --

7           THE COURT:  SO --

8           MR. PRICE:  I CERTAINLY DIDN'T MEAN TO SUGGEST THAT.

9      IT'S THE MARKET SHARE, THE OVERALL MARKET SHARE.

10      IT'S JUST THAT THESE PHONES -- THE QUESTION WAS, DID THESE

11      PHONES CONTRIBUTE TO IT?  BECAUSE THE TESTIMONY IS THESE PHONES

12      CONTRIBUTED TO IT.

13      SO I'M ALLOWED TO SAY, WITHOUT OPENING A DOOR, TO SAY, NO,

14      NO, THESE PHONES, THERE WAS A DECREASE IN SALES.

15           MS. KREVANS:  YOUR HONOR, WHEN HE ASKED THAT QUESTION

16      ABOUT THE DECREASE, WHAT HE WAS TRYING TO CONVEY TO THE JURY

17      WAS THAT PHONES THAT INFRINGED WERE NOT CAUSING SAMSUNG'S

18      MARKET SHARE TO GO UP, AND THAT'S JUST NOT TRUE BECAUSE WHILE

19      NOT EVERY PHONE IN THAT GRAPH INFRINGES, THE VAST MAJORITY OF

20      THEM DO.  SOME OF THOSE ARE IN THIS CASE.

21           THE COURT:  OKAY.  I'M SORRY.  I'VE MADE A RULING.

22      YOU CAN CLARIFY THAT ONLY THE BROWSER APPLICATION WAS ACCUSED

23      OF INFRINGING THE '915.

24      AND MS. KREVANS, YOU'RE ALSO LIMITED TO ONE QUESTION, JUST

25      CLARIFY THAT CHART.

```
 1              MS. KREVANS:  THANK YOU, YOUR HONOR.

 2              THE COURT:  OKAY.  THANK YOU.

 3         ALL RIGHT.

 4         (JURY IN AT 2:36 P.M.)

 5              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

 6         TIME IS NOW 2:36.  PLEASE GO AHEAD.

 7              MR. PRICE:  THANK YOU.

 8    Q.   MS. DAVIS, I THINK WE HAVE HAD TIME NOW TO LOOK AT

 9    909.079.  CORRECT?

10    A.   I CERTAINLY FOUND IT.  I DON'T KNOW WHAT PAGE YOU WERE ON.

11    Q.   909.079, LINE 16, THROUGH 910, LINE 1.  AND DO YOU RECALL

12    THE FOLLOWING QUESTION AND ANSWER:  "SO HAVING CONSIDERED ALL

13    THE DOCUMENTS WE HAVE BEEN DISCUSSING AND HAVING DONE YOUR

14    ANALYSIS, WHAT DO YOU CONCLUDE FROM THESE FACTS WITH RESPECT TO

15    LOST PROFITS?

16         "ANSWER:  WELL, I CONCLUDE THAT BECAUSE YOU CAN'T PROVE

17    THAT CUSTOMERS WERE BUYING THIS FOR THE PATENTED FEATURE AND

18    BECAUSE THOSE SAME CUSTOMERS WOULD LIKELY HAVE PURCHASED EITHER

19    FROM SCHUTT OR SOMEBODY ELSE" --

20         SCHUTT WAS YOUR CLIENT?

21    A.   YES.

22    Q.   -- "YOU CAN'T THEREFORE PROVE WITH THE APPROPRIATE DEGREE

23    OF CERTAINTY WHAT THE LOST PROFITS WOULD BE, SO ANY LOST

24    PROFITS CALCULATION WOULD BE SPECULATIVE."

25         LET ME ASK YOU, DOES THAT ACCURATELY REFLECT YOUR
```

1    TESTIMONY IN THE RIDDELL VERSUS SCHUTT TRIAL WHERE YOU WERE

2    TESTIFYING IN FAVOR OF THE DEFENDANT?

3    A.   IT DOES.

4         BUT MAKE SURE THAT YOU'RE POINTING TO THE SECOND PART OF

5    THAT, BECAUSE THE REASON THAT THE LACK OF DEMAND FOR THE

6    PATENTED FEATURE WAS IMPORTANT IS BECAUSE THOSE CUSTOMERS WOULD

7    HAVE PURCHASED FROM SCHUTT OR SOMEBODY ELSE.

8    Q.   AND I WILL ASK YOU ABOUT THAT, THAT SECOND PART.  WE'RE

9    GOING TO GET TO THAT.

10   A.   OKAY.

11   Q.   BUT THIS WAS THE TESTIMONY THAT YOU GAVE IN ANOTHER CASE

12   WHERE YOU WERE REPRESENTING THE DEFENSE, THAT THEY COULDN'T

13   PROVE THAT CUSTOMERS WERE BUYING THIS FOR THE PATENTED FEATURE.

14   THOSE WERE YOUR WORDS; CORRECT?

15   A.   ABSOLUTELY.  IT RELATES TO WHAT THEY WOULD HAVE PURCHASED

16   INSTEAD.

17   Q.   AND IF WE LOOK AT THIS CASE -- FIRST OF ALL, DID YOU DO

18   ANY ANALYSIS -- LET ME STRIKE THAT.

19        DID YOU DO ANY SURVEY TO SEE WHY PEOPLE BOUGHT SAMSUNG

20   PHONES?

21   A.   NO, I HAVE NOT PERFORMED ANY SURVEYS.

22   Q.   AND, IN FACT, YOU KNOW, HAVING REVIEWED ALL OF THE

23   DOCUMENTS IN THE CASE, THAT THERE ARE FEATURES THAT ARE

24   SPECIFIC TO SAMSUNG AND ANDROID THAT THE IPHONE DOES NOT HAVE

25   THAT FACTOR INTO WHY SOMEONE MIGHT BUY A SAMSUNG PHONE;

1       CORRECT?

2       A.   I AGREE.

3       Q.   AND ONE, FOR EXAMPLE, IS SCREEN SIZE; RIGHT?

4       A.   YES.

5       Q.   ALL RIGHT.  AND IF WE COULD LOOK AT, I THINK YOU --

6       EXHIBIT 572.082, AND IF YOU COULD LOOK AT 572, THAT'S GOING TO

7       BE, AGAIN, IN ONE OF THOSE MAIN BINDERS.  572.082.  LET'S GO TO

8       THE FIRST PAGE.

9            572 ACTUALLY, RYAN.

10           IT'S THE NEXT PAGE, I GUESS.  THERE WE GO.

11           AND DO YOU RECOGNIZE, THIS IS ONE OF THE MARKETING STUDIES

12      THAT YOU REVIEWED; CORRECT?

13      A.   YES.

14           MR. PRICE:  YOUR HONOR, I THINK I'D MOVE EXHIBIT

15      572.082 INTO EVIDENCE.

16           THE COURT:  ANY OBJECTION?

17           MS. KREVANS:  NO OBJECTION, YOUR HONOR.

18           THE COURT:  IT'S IN --

19           MR. PRICE:  ACTUALLY, THE ENTIRE --

20           THE COURT:  572?

21           MR. PRICE:  IS THAT OKAY?

22           MS. KREVANS:  I HAVE TO GET A CHANCE TO LOOK AT IT.

23           MR. PRICE:  OKAY.  I'LL GO ON WITH .082, YOUR HONOR,

24      AND SEE IF WE CAN PUT IN MORE OF THE EXHIBIT.

25      Q.   IF YOU LOOK AT PAGE 82, .082, YOU SEE -- AND BY THE WAY,

1    FROM THE FIRST PAGE YOU CAN SEE THAT THIS WAS A STUDY THAT

2    APPLE HAD; CORRECT?

3    A.   I AGREE.

4    Q.   AND IT WAS THE TOP REASONS FOR BUYING ANDROID AMONG THOSE

5    WHO CONSIDERED AN IPHONE; CORRECT?

6    A.   YES.

7    Q.   AND YOU SEE IN THIS AREA RIGHT HERE THAT ONLY 25 PERCENT

8    OF THE PEOPLE WHO RECENTLY BOUGHT ANDROID EVEN CONSIDERED AN

9    IPHONE; CORRECT?

10   A.   TELL ME AGAIN WHERE YOU'RE LOOKING.

11   Q.   IT'S ON THE RIGHT-HAND SIDE.  IF YOU LOOK UP ON THE

12   SCREEN, I'VE GOT THIS LITTLE PEN HERE WHICH IS WORKING NOW.

13   A.   I SEE THAT.  THANK YOU.

14   Q.   WE CAN BLOW THAT UP, RYAN, SO WE CAN SEE IT AS WELL.

15        OKAY.  SO ONLY 25 PERCENT OF THE RECENT PURCHASERS OF THE

16   ANDROID PHONE EVEN, ACCORDING TO THIS STUDY THAT APPLE HAD,

17   EVEN CONSIDERED BUYING AN IPHONE; CORRECT?

18   A.   I SEE THAT.

19   Q.   AND ANDROID -- BY THE WAY, IT COULD BE NOT JUST SAMSUNG,

20   BUT OTHER ANDROID MANUFACTURERS AS WELL; CORRECT?

21   A.   THAT'S RIGHT.

22   Q.   AND BY "ANDROID MANUFACTURERS," I MEAN COMPANIES THAT USE

23   THE ANDROID SOFTWARE; RIGHT?

24   A.   YES.

25   Q.   AND YOUR UNDERSTANDING IS THAT THE ANDROID SOFTWARE IS

1     PROVIDED BY GOOGLE?

2     A.   I UNDERSTAND THAT.

3     Q.   AND IF WE LOOK AT THIS, ONE IS TALKING ABOUT STAYING WITH

4     CURRENT SERVICE PROVIDER, ONE IS TRUSTING THE GOOGLE BRAND, ONE

5     IS PREFERRING A LARGER SCREEN; RIGHT?

6     A.   YES.

7     Q.   AND, IN FACT, IN YOUR LOST PROFIT CALCULATIONS, ABOUT 70

8     MILLION OUT OF THE 113 MILLION COME FROM SALES OF PHONES THAT

9     HAVE LARGE SCREENS?

10    A.   I DON'T KNOW HOW YOU GOT YOUR 70 MILLION, BUT THAT SOUNDS

11    PLAUSIBLE TO ME.

12    Q.   WELL, THE WAY I DO IT IS THIS, AND I CERTAINLY UNDERSTAND

13    THE QUESTION.

14         LET'S GO TO SDX 8002.009.  THIS WILL BE A DEMONSTRATIVE.

15         THE IPHONE 4 IS ABOUT 3.5 INCHES; CORRECT?

16    A.   THAT'S CORRECT.

17    Q.   AND THE INFUSE 4G -- IF WE CAN GO TO SLIDE 10 -- IS ABOUT

18    4.5 INCHES; RIGHT?

19    A.   IT IS.

20    Q.   AND THE DROID CHARGE -- AND THE INFUSE 4G, OUT OF THE 113

21    MILLION, IF YOU LOOK AT YOUR CALCULATIONS, THAT'S ABOUT --

22    WELL, THE ENTIRE CALCULATION IS 113 MILLION; CORRECT?

23    A.   YES.

24    Q.   AND THE INFUSE 4G IS ABOUT 44 MILLION; CORRECT?

25    A.   THAT'S CORRECT.

DAVID CROSS

1    Q.   AND THEN IF WE LOOKED AT THE DROID CHARGE, THE DROID

2    CHARGE, OUT OF THE 113 MILLION SALES, YOU'VE GOT ABOUT 25.7

3    MILLION; CORRECT?

4    A.   YES.

5    Q.   SO THAT WOULD BE A TOTAL OF ABOUT 70 MILLION?

6    A.   YES.

7    Q.   GOOD.  AND IF YOU LOOK AT THE CHARGE, IF WE LOOK AT

8    8002.11 TO 12 -- 11 AND 12, RYAN, THERE WE GO -- SO WE HAVE THE

9    IPHONE IS 3.5 AND THE CHARGE IS A BIT BIGGER; CORRECT?

10   A.   YES.

11   Q.   OKAY.  AND SO YOU KNOW THAT A SIGNIFICANT NUMBER OF THE

12   PEOPLE WHO WERE IN YOUR LOST PROFITS CATEGORY, OVER 50

13   PERCENT -- YOU CAN DO THE MATH PROBABLY IN YOUR HEAD AND I

14   CAN'T -- MAYBE 60.  YEAH, CLOSER TO 60 PERCENT ARE PURCHASERS

15   WHO BOUGHT A PHONE WITH A SIGNIFICANTLY LARGER SCREEN THAN THE

16   IPHONE; CORRECT?

17   A.   I CERTAINLY AGREE THAT THE INFUSE AND THE DROID ARE LARGER

18   THAN THE IPHONE.

19   Q.   AND THERE ARE OTHER ANDROID PRODUCTS ALSO IN THE MARKET,

20   BY THE WAY, THAT HAD LARGE SCREENS AT THE TIME, SO IF SOMEBODY

21   WANTED A LARGE SCREEN AND THEY DIDN'T WANT TO BUY A SAMSUNG,

22   THEY COULD BUY A MOTOROLA OR AN HTC; CORRECT?

23   A.   THEY COULD.

24   Q.   NOW, ANOTHER THING, WHICH IF WE CAN GO BACK TO THE

25   572.082 --

```
 1            MS. KREVANS:  I'M SORRY, MR. PRICE.  I WAS TRYING NOT

 2     TO INTERRUPT, BUT THIS DOCUMENT HAS A SEALING ISSUE WHICH YOU

 3     MAY RECALL FROM THE PRIOR TRIAL.

 4          YOUR HONOR, PER YOUR PRIOR RULINGS, APPLE HAD NO OBJECTION

 5     TO THE PAGES THAT WERE ACTUALLY SHOWN BEING PUT INTO THE RECORD

 6     WITHOUT BEING SEALED.

 7          SO LONG AS YOU'RE USING THE SAME PRICES, MR. PRICE.

 8            MR. PRICE:  YEAH, THIS IS THE SAME PAGES.

 9            MS. KREVANS:  BUT IF THE ENTIRE EXHIBIT GOES IN, IT

10     WOULD NEED TO BE SEALED.

11          SO OUR REQUEST WOULD BE THAT, CONSISTENT WITH WHAT

12     HAPPENED PREVIOUSLY, THE ADMITTED EXHIBIT ONLY BE THE FRONT

13     PAGE AND THE PAGES THAT WERE SHOWN.

14            MR. PRICE:  YOUR HONOR, WHAT WE'LL DO IS WE'LL MOVE

15     IN WHAT'S SHOWN.

16          IF THERE'S ANYTHING ELSE WE WANT TO HAVE MOVED IN, WE'LL

17     CHECK TO SEE IF IT NEEDS TO BE SEALED OR NOT.

18            THE COURT:  OKAY.  SO DX 572.082 IS ADMITTED.

19          (DEFENDANT'S EXHIBIT 572.082 WAS ADMITTED IN EVIDENCE.)

20            THE COURT:  AND IT'S NOT SEALED.

21            MR. PRICE:  AND THE FRONT PAGE IS THAT --

22            MS. KREVANS:  YOUR HONOR, WHAT YOUR RULING WAS

23     PREVIOUSLY ABOUT THIS DOCUMENT WAS THAT ONLY THE PAGES THAT

24     WERE SHOWN WOULD BE ADMITTED.

25            THE COURT:  I'VE SAID THAT .082 IS ADMITTED AND
```

DAVID CROSS

1    THAT'S JUST ONE PAGE.

2                MS. KREVANS:  YES.  THANK YOU, YOUR HONOR.

3                MR. PRICE:  AND I SHOWED THE COVER PAGE AS WELL, YOUR

4    HONOR, THAT'S 572 -- SO WE CAN SEE WHAT IT IS -- .08 -- IS IT

5    3?  YEAH, .083 SO WE CAN SEE WHAT IT IS.

6                THE COURT:  ANY OBJECTION TO THAT?

7                MS. KREVANS:  NO, THE COVER PAGE AND THE PAGE THAT

8    WAS SHOWN, PAGE 2.

9                THE COURT:  SO DX 572.003 AND DX 572.082 ARE

10   ADMITTED.

11          (DEFENDANT'S EXHIBIT 572.003 WAS ADMITTED IN EVIDENCE.)

12               MR. PRICE:  GREAT.

13   Q.   AND IF WE CAN GO TO .082 HERE AND LOOK AT SOME OF THE

14   OTHER FACTORS.  ONE IS WANTED TURN BY TURN GPS NAVIGATION.  DO

15   YOU KNOW WHAT THAT IS?

16   A.   I THINK SO.

17   Q.   OKAY.  DO YOU KNOW AT THE TIME THAT, THAT APPLE DID NOT

18   HAVE A PHONE THAT WOULD READ TO YOU THE TURN BY TURN NAVIGATION

19   ON THE PHONE?

20   A.   THAT'S GENERALLY MY RECOLLECTION.

21   Q.   YEAH.  AND THAT -- AND THAT THE ANDROID PHONES DID;

22   CORRECT?

23   A.   AT LEAST SOME OF THEM DID, SURE.

24   Q.   ALL RIGHT.  AND ANOTHER THING WHICH APPLE LOOKED AT -- IF

25   WE COULD LOOK AT EXHIBIT 712?

1          AND COUNSEL, IF WE CAN LOOK AT 0.052.

2          DO YOU RECALL THAT EXHIBIT 712, THAT APPLE DID AN ANALYSIS

3     OF ITS COMPETITORS ON VARIOUS FEATURES; CORRECT?

4     A.   I DO.

5     Q.   AND ONE OF THEM WAS, FOR EXAMPLE, BATTERY CAPACITY

6     COMPARING THE IPHONE 4 TO, FOR EXAMPLE, SAMSUNG AND BATTERY

7     CAPACITY; CORRECT?

8     A.   YES.

9     Q.   OKAY.  AND SO SOME OF THESE PHONES HAD A GREATER BATTERY

10    CAPACITY THAN THE APPLE PHONE DID; CORRECT?

11    A.   THAT'S RIGHT.

12    Q.   SOME PEOPLE MIGHT CHOSE A PHONE BASED ON THAT, HOW LONG

13    THEY CAN ACTUALLY USE IT WITHOUT CHARGING IT; RIGHT?

14    A.   SURE, I AGREE.

15    Q.   IN THESE SURVEYS THAT YOU'VE REVIEWED, I MEAN, THEY

16    GENERALLY, THEY'VE POINTED OUT FEATURES ON SAMSUNG THAT BUYERS

17    LIKE; CORRECT?  YOU'VE SEEN THOSE SURVEYS?

18    A.   I'VE SEEN PLENTY OF SURVEYS.  BUT, YEAH, IN GENERAL I

19    THINK IT'S FAIR TO SAY THAT THEY RELATE TO FEATURES THAT SAMPLE

20    CUSTOMERS LIKE AND SOME DON'T HAVE A PREFERENCE FOR.

21    Q.   OKAY.  AND I GUESS -- HAVE YOU SEEN A SURVEY ANYWHERE THAT

22    ASKS THESE CUSTOMERS WHETHER OR NOT THEY BOUGHT A SAMSUNG

23    IPHONE BECAUSE IT COULD DO TAP TO ZOOM OR TAP TO MOVE OVER OR

24    WOULD BOUNCE OR YOU COULD DO THE SCROLLING AND THE BLOWING UP?

25    DID YOU SEE ANY SURVEY TO SAY, HEY, GUYS, WOULD YOU HAVE BOUGHT

1    THIS PHONE IF THOSE AREN'T IN IT?

2    A.    NO, OF COURSE NOT.  THEY WOULDN'T HAVE ASKED THOSE KINDS

3    OF QUESTIONS IN THESE SURVEYS.

4    Q.    YOU'RE NOT A SURVEY EXPERT?  YOU ADMITTED THAT?

5    A.    I AM DEFINITELY NOT A SURVEY EXPERT.

6    Q.    AND SAMSUNG -- I MEAN, APPLE ASKS CUSTOMERS WHY THEY

7    BOUGHT AN IPHONE; RIGHT?

8    A.    YES.

9    Q.    AND SAMSUNG -- APPLE ASKED -- SAMSUNG -- APPLE ASKED

10   CUSTOMERS WHY THEY BOUGHT ANDROID; CORRECT?

11   A.    THAT'S RIGHT.

12   Q.    THEY ASKED ANDROID CUSTOMERS WHY THEY BOUGHT ANDROID;

13   RIGHT?

14   A.    THAT'S RIGHT.

15   Q.    AND SO IT WOULD BE VERY EASY FOR A SURVEY EXPERT TO ASK,

16   WHY DID YOU BUY THESE SAMSUNG PHONES?  RIGHT?

17   A.    SINCE I'M NOT A SURVEY EXPERT, I DON'T KNOW WHAT THE

18   IMPLICATIONS OF THAT WOULD BE.  YOU CAN CERTAINLY ASK THE

19   QUESTION, BUT I DON'T KNOW WHETHER YOU CAN VALUE THE RESULTS

20   MUCH.

21   Q.    OKAY.  WELL, I'M WONDERING, I THOUGHT YOU MIGHT KNOW,

22   BECAUSE I THOUGHT A FEW QUESTIONS AGO YOU SAID THAT'S NOT

23   SOMETHING A SURVEY PERSON WOULD DO, AND THAT'S WHEN I ASKED IF

24   YOU WERE A SURVEY EXPERT.

25         I MEAN, YOU DON'T KNOW IF THERE'S ANYTHING WRONG OR THERE

1    WOULD BE ANY REASON NOT TO ASK PEOPLE WHO BOUGHT SAMSUNG PHONES

2    WITH THE ACCUSED FEATURES, DID YOU BUY THESE BECAUSE OF THESE

3    FEATURES?

4    A.   WELL, I THINK THAT WOULD BE A SPECIAL SURVEY.  THAT'S NOT

5    SOMETHING THAT'S BEFORE ME IN THE ORDINARY COURSE OF BUSINESS

6    BY EITHER OF THE COMPANIES AS FAR AS I KNOW.

7    Q.   SO IT'S THE KIND OF SURVEY THAT YOU'D HAVE TO PAY FOR?

8    A.   WELL, I THINK THEY PAY FOR ALL THESE SURVEYS, BUT --

9    Q.   GOOD POINT.  IT'S THE KIND OF SURVEY THAT YOU MIGHT DO IF,

10   FOR EXAMPLE, THAT'S THE KEY QUESTION IN A LITIGATION WHERE

11   YOU'RE ASKING FOR HUNDREDS AND HUNDREDS OF MILLIONS OF DOLLARS?

12   A.   THAT COULD BE A REASON TO DO A SURVEY LIKE THAT.

13   Q.   NOW, LET ME ASK YOU ABOUT THE PERIOD THAT WE'RE TALKING

14   ABOUT ON THE LOST PROFITS, WHICH APPLIES TO THE ONE PATENT, THE

15   '915 PATENT.

16       AND IF YOU COULD PUT UP AS A DEMONSTRATIVE SDX 8002.017.

17       NOW -- OKAY.  YOU TALKED TO SOMEONE AT SAMSUNG WHO TOLD

18   YOU THAT THE DESIGN AROUND PERIOD FOR THE '915 WOULD BE ABOUT

19   SIX MONTHS; CORRECT?

20   A.   NOT EXACTLY.

21   Q.   APPLE, SORRY.

22   A.   I ONLY TALKED TO SOMEBODY AT APPLE.

23   Q.   THANK YOU.  YOU TALKED TO SOMEBODY AT APPLE THAT SAID IT

24   WOULD BE SIX MONTHS.

25       FOR THE FIRST ALMOST, WHAT, THREE AND A HALF, WHATEVER,

DAVID CROSS

```
 1    DECEMBER, JANUARY, FEBRUARY, MARCH -- FIVE, FOUR AND A HALF
 2    MONTHS OF THIS, YOU'VE GOT AN AREA WHERE THERE ARE NO LOST
 3    PROFITS, RIGHT, BECAUSE THE LAW SAYS YOU CAN'T GET LOST PROFITS
 4    IN THAT TIME PERIOD; CORRECT?
 5    A.   THERE ARE NO DAMAGES AT ALL, INCLUDING NO LOST PROFITS.
 6    Q.   AND SO IF THE DESIGN AROUND PERIOD FOR THE '915 PATENT,
 7    WHICH IS THE SCROLLING AND THE BLOWING UP, RIGHT, IF THAT
 8    DESIGN AROUND PERIOD IS SHORTER THAN -- IF IT HAPPENED BEFORE
 9    APRIL 15TH, 2001, THERE WOULD BE NO LOST PROFITS; CORRECT?
10    A.   IF YOU WERE TO ASSUME THAT WHATEVER THE DESIGNED AROUND
11    PRODUCT IS WOULD BE INSTANT STANDARDLY ACCEPTABLE TO THE
12    CONSUMERS, YES, THAT'S CORRECT.
13    Q.   AND YOUR ASSUMPTION THAT GOT YOU INTO A PERIOD WHERE YOU
14    WOULD HAVE LOST PROFITS OF SIX MONTHS WAS BASED NOT ON YOUR
15    PERSONAL EXPERIENCE, BUT UPON TALKING TO A SAMSUNG -- I DID IT
16    AGAIN -- AN APPLE ENGINEER; RIGHT?
17    A.   WELL, THE APPLE ENGINEER THAT WAS IN CHARGE OF THE
18    SOFTWARE, YES.
19    Q.   OKAY.  THE APPLE ENGINEER.
20         AND BY THE WAY, DO YOU KNOW HOW MANY PRODUCTS APPLE COMES
21    OUT WITH PER YEAR?  I THINK WE TALKED ABOUT THAT.  ONE, RIGHT?
22    A.   IF YOU'RE TALKING ABOUT --
23    Q.   PHONES.
24    A.   -- EITHER AN IPHONE OR AN IPAD, IT AVERAGES ABOUT ONE A
25    YEAR, YES.
```

1    Q.   WHEREAS SAMSUNG COMES OUT WITH DIFFERENT PHONES WITH

2    DIFFERENT FEATURES THROUGHOUT THE WORLD ABOUT ONCE A DAY;

3    RIGHT?

4    A.   I THINK I MAY BE COMPARING APPLES AND ORANGES, BUT YES, I

5    MAY BELIEVE THAT.

6    Q.   IT MAY BE APPLES AND ORANGES, BUT I'M TALKING ABOUT APPLE

7    AND SAMSUNG RIGHT NOW.

8         AND YOU THINK A COMPANY THAT, THAT COMES OUT WITH A NEW

9    PHONE WITH NEW FEATURES ONCE A DAY MIGHT BE IN A DIFFERENT

10   POSITION IN DESIGNING AROUND SOMETHING THAN A COMPANY THAT

11   COMES OUT WITH ONE PRODUCT A YEAR?

12   A.   I DON'T THINK SO.

13   Q.   WELL, YOU DIDN'T -- YOU DIDN'T DO ANYTHING TO INVESTIGATE

14   SAMSUNG'S PERSPECTIVE ON THIS?

15   A.   I DON'T KNOW WHAT YOU MEAN BY "SAMSUNG'S PERSPECTIVE."

16   Q.   WELL, YOU DIDN'T TALK TO SAMSUNG ENGINEERS, YOU DIDN'T

17   TAKE A DEPOSITION OF SOMEONE AT SAMSUNG SAYING HOW LONG WOULD

18   IT TAKE, ANYTHING LIKE THAT.

19        OF COURSE, YOU WOULDN'T TAKE IT.

20   A.   DID I TAKE A DEPOSITION?  NO, I DID NOT.

21   Q.   OF COURSE YOU DIDN'T, BUT MAYBE ONE OF THE COUNSEL.

22        DID YOU KNOW ANYTHING LIKE THAT, ANY INQUIRY INTO WHAT

23   SAMSUNG'S ENGINEERS THINK HOW LONG IT WOULD TAKE?

24             MS. KREVANS:  YOUR HONOR, MAY I ASK FIRST THAT

25   MR. PRICE WAIT FOR THE WITNESS TO FINISH HER ANSWER BEFORE

1     ASKING A QUESTION?

2          AND SECOND, THAT HE ASK ONE QUESTION AT A TIME?  THERE

3     WERE THREE IN THE LAST QUESTION.

4               THE COURT:  ALL RIGHT.

5               MR. PRICE:  I'LL ASK ANOTHER QUESTION.

6               THE COURT:  THANK YOU.

7     BY MR. PRICE:

8     Q.   DO YOU KNOW -- DID YOU READ ANYTHING ABOUT HOW LONG

9     SAMSUNG ENGINEERS THOUGHT IT WOULD TAKE IF THEY WERE GOING TO

10    START FROM SCRATCH AND DESIGN AROUND?

11    A.   ALL I READ IS WHAT MR. WAGNER CONCLUDED IN HIS REPORT.

12    Q.   AND WHAT WAS THAT CONCLUSION?

13    A.   ON THE '915 IN PARTICULAR?

14    Q.   YES.

15    A.   I THINK IT WAS A MATTER OF DAYS.

16    Q.   AND CERTAINLY IF SAMSUNG HAD ALREADY HAD A PRODUCT OUT

17    THAT VISUALLY, TO THE CONSUMER, LOOKED THE SAME AS THE '915

18    PATENT, BUT DID NOT INFRINGE, IF THEY HAD THAT PHONE OUT, OH,

19    LET'S SAY IN FEBRUARY OF 2011, THEN THAT WOULD PLACE THAT

20    DESIGN AROUND, OR THAT DESIGN, IN THE NO LOST PROFITS AREA;

21    CORRECT?

22    A.   I'M NOT FOLLOWING WHAT YOU MEAN WHEN YOU SAY VISUALLY

23    LOOKED THE SAME.

24    Q.   OKAY.  LET ME SHOW YOU.

25          THIS IS A -- THIS IS EXHIBIT 1030 (INDICATING).  IT'S THE

1    SAMSUNG ACE.  IT'S BEEN FOUND NOT TO INFRINGE THE '915 PATENT.

2    AND WHAT I MEAN BY -- IF WE CAN SWITCH TO THIS, RYAN, TO THE

3    ELMO.  OKAY.

4         WHAT I MEAN IS THAT, IS THAT IT'S A PHONE THAT HAS THE

5    FUNCTION OF SCROLLING AND ZOOMING.  THAT'S YOUR UNDERSTANDING

6    OF THE '915 PATENT; RIGHT?

7    A.   GENERALLY, YES.

8    Q.   AND YOU'VE BEEN SITTING HERE WATCHING TESTIMONY AND YOU'VE

9    SEEN THIS DEMONSTRATION BEFORE; RIGHT?

10   A.   YES.

11   Q.   SO IF WE GO TO THAT DEMONSTRATIVE, SDX 8002, AND WE'RE IN

12   FEBRUARY 2011, THEN, AGAIN, THAT WOULD PUT A NON-INFRINGING

13   ALTERNATIVE THAT LOOKED EXACTLY LIKE, VERY LIKE THE '915

14   FUNCTIONALITY SOMEWHERE BEFORE THERE WOULD BE LOST PROFITS;

15   RIGHT?

16   A.   NO, I DON'T AGREE WITH YOU BECAUSE THE ACE WOULD NOT HAVE

17   BEEN AVAILABLE FOR SALE IN THE UNITED STATES BECAUSE IT

18   INFRINGED OTHER APPLE PATENTS.

19   Q.   WELL, I'M NOT TALKING ABOUT THIS PARTICULAR PHONE.  THE

20   QUESTION IS WHETHER YOU CAN DESIGN AROUND THE TECHNOLOGY;

21   RIGHT?

22   A.   SO YOU'RE ASKING ME IF YOU CAN TAKE THE SOFTWARE OUT OF

23   THAT PHONE, THE ACE, AND PUT IT INTO AN INFRINGING PHONE, LIKE

24   THE INFUSE 4G, FOR EXAMPLE?

25   Q.   NO.  LET'S SAY, FOR EXAMPLE, YOU HAD -- I MEAN, YOUR

DAVID CROSS

1       TESTIMONY ABOUT DESIGN AROUND IN YOUR REPORT AND PREVIOUSLY WAS

2       ALL ABOUT DESIGNING AROUND THE TECHNOLOGY; CORRECT?

3       A.   DESIGNING AROUND THE PATENTS, YES.

4       Q.   THE PATENTED TECHNOLOGY.

5            AND YOUR CONCLUSION AND WHAT YOU'VE LOOKED AT AND WHAT YOU

6       ASKED THE APPLE ENGINEER WAS HOW LONG WOULD IT TAKE TO DESIGN

7       AROUND SO YOU COULD USE THAT TECHNOLOGY IN ANOTHER SAMSUNG

8       PHONE, IN THE SAMSUNG PHONE; CORRECT?

9       A.   HOW LONG WOULD IT TAKE TO DESIGN AROUND THE PATENTED

10      TECHNOLOGY.

11      Q.   THE PATENTED TECHNOLOGY, WHICH WAS THE '915; RIGHT?

12      A.   YES.

13      Q.   AND SO IF THE FACT IS THAT SAMSUNG ENGINEERS DESIGNED

14      AROUND IT, THEY JUST HAD THE SAME TECHNOLOGY THAT DID THE SAME

15      FEATURES, THEN THE, QUOTE, DESIGN AROUND TIME, AS OF THE START

16      DATE WOULD HAVE BEEN ZERO?  THE DESIGN AROUND FOR THE

17      TECHNOLOGY IN THE '915 PATENT?

18      A.   WELL, I'M NOT CLEAR ON WHAT YOU'RE ASKING ME, BECAUSE IT

19      SEEMS TO ME IT'S ONE OF TWO THINGS.  EITHER YOU'RE ASKING ME TO

20      ASSUME THAT THAT PRODUCT THERE WOULD HAVE BEEN AVAILABLE FOR

21      SALE IN THE LOST PROFITS PERIOD; OR YOU'RE TELLING ME THAT THE

22      SOFTWARE IN THAT PRODUCT WHICH DOES NOT INFRINGE COULD BE TAKEN

23      OUT AND PUT INTO THE INFRINGING PRODUCTS.

24           BUT EITHER WAY, WE NEED TO START WITH THE ASSUMPTION THAT

25      THE INFRINGING PRODUCTS ARE NOT AVAILABLE FOR SALE.

1    Q.   NO, NO.  MA'AM, IT'S A DIFFERENT QUESTION.  THE QUESTION

2    YOU ANSWERED IN YOUR DIRECT AND IN YOUR REPORT WAS WHETHER YOU

3    COULD SIMPLY DESIGN AROUND THE TECHNOLOGY.  THAT'S THE ONLY

4    THING YOU LOOKED AT FOR THE LOST PROFITS IN THE '915 PATENT;

5    CORRECT?

6    A.   IT'S NOT THE ONLY THING I LOOKED AT, BUT, YES, THAT IS ONE

7    OF THE THINGS I LOOKED AT.  I'M NOT UNDERSTANDING WHAT YOU'RE

8    ASKING ME TO ASSUME FOR A NON-INFRINGING ALTERNATIVE.

9    Q.   AND YOU TESTIFIED THAT IF YOU COULD DESIGN AROUND THAT

10   TECHNOLOGY IN -- WAS IT SIX WEEKS?

11   A.   SIX MONTHS.

12   Q.   SIX MONTHS?  BETWEEN APRIL 15 AND MAY 30?  THAT'S THE LOST

13   PROFITS.

14        SO IF YOU COULD DESIGN AROUND THAT IN SIX MONTHS, THEN

15   THAT WOULD STOP THE DAMAGES.  THAT'S WHAT YOU TESTIFIED TO;

16   RIGHT?

17   A.   WELL, THAT -- YES, BUT WHAT I WAS TALKING ABOUT WAS A

18   SITUATION WHERE YOU HAD A PRODUCT ON THE MARKET THAT HAS BEEN

19   FOUND TO INFRINGE.  YOU HAVE TO TAKE IT OFF THE MARKET AND

20   REPLACE IT EITHER WITH THE SAME PRODUCT WITH DIFFERENT SOFTWARE

21   OR A DIFFERENT PRODUCT.

22   Q.   OKAY.  LET ME ASK --

23   A.   AND I CAN'T TELL WHAT YOU'RE ASKING ME TO ASSUME IS THE

24   DESIGN AROUND.

25   Q.   LET ME ASK IT THIS WAY AND I'LL MOVE ON, OKAY?  AND THAT

1      IS, YOU NOW HAVE HEARD EVIDENCE THAT SAMSUNG HAD TECHNOLOGY,

2      SOFTWARE THAT PERFORMED THOSE PHYSICAL FUNCTIONS THAT LOOK

3      ALMOST LIKE WHAT APPLE DOES IN THE '915 PATENT.  YOU NOW HAVE

4      LEARNED THAT THEY HAD THAT PRIOR TO THE START OF THE DAMAGES

5      PERIOD; CORRECT?  YOU HEARD THAT SITTING HERE IN THE COURTROOM?

6      YOU SEE IT IN FRONT OF YOU.  YOU NOW KNOW THAT?

7      A.   I'M AWARE THAT THE SOFTWARE IN THAT PHONE IS THE SAME AS

8      THE SOFTWARE IN THE INFRINGING PHONES, AND IF YOU SIMPLY

9      REPLACE THE SOFTWARE IN THE INFRINGING PHONES WITH THE SOFTWARE

10     IN THAT PHONE, IT DOESN'T CHANGE -- I CAN'T PICTURE HOW THAT

11     WOULD FIX AN INFRINGEMENT, BUT I'M NOT A TECHNICAL EXPERT.

12     Q.   OKAY.  SO YOU'RE NOT A TECHNICAL EXPERT.  WHAT YOU CAN

13     TELL US IS VISUALLY, VISUALLY IT LOOKS SIMILAR AND YOU KNOW

14     THAT IT'S BEEN FOUND IT DOESN'T INFRINGE.  YOU KNOW THAT;

15     CORRECT?

16     A.   THAT PARTICULAR PHONE DOES NOT INFRINGE THE '915.

17          IT DOES INFRINGE OTHER PATENTS, SO THE PHONE ITSELF IS NOT

18     GOING TO BE ON THE MARKET.

19     Q.   LET ME GO ON TO SOMETHING ELSE BECAUSE I DON'T THINK WE'RE

20     GOING TO AGREE ON THIS.

21          SO IN YOUR LOST PROFITS ANALYSIS, CERTAINLY YOU'RE GOING

22     TO SAY IF THERE IS A DESIGN AROUND, THEN IT'S GOING TO HAVE TO

23     TAKE MORE THAN FOUR MONTHS FOR THERE TO BE PROFITS; CORRECT?

24     A.   THAT'S RIGHT.

25     Q.   LESS THAN FOUR MONTHS?

DAVID CROSS

```
 1      A.   AS LONG AS YOU ASSUME THAT THAT DESIGNED AROUND PRODUCT,

 2      WHATEVER THAT PRODUCT IS, WOULD BE INSTANTLY ACCEPTABLE IN THE

 3      MARKETPLACE.

 4      Q.   AND THAT IS PART OF YOUR REPORT.  YOU MADE THAT

 5      ASSUMPTION?

 6      A.   THAT IS AN ASSUMPTION I MADE.

 7      Q.   LET'S TALK ABOUT YOUR MORE FLOW ANALYSIS BECAUSE I WANT TO

 8      MAKE SURE THAT EVERYONE UNDERSTANDS HOW YOU DISTRIBUTED THOSE

 9      SAMSUNG CUSTOMERS, OKAY, WHICH YOU SAY WOULD BE FREE TO BE

10      DISTRIBUTED TO OTHER MANUFACTURERS.  OKAY?

11      A.   OKAY.

12      Q.   AND THESE ARE THE CUSTOMERS, THE UNITS WHICH INFRINGE THE

13      '915 PATENT DURING THE DAMAGES PERIOD; CORRECT?

14      A.   YES.

15      Q.   OKAY.  AND SO ABOUT HOW MANY OF THOSE WERE THERE?  WAS IT

16      11 MILLION?

17      A.   IT WAS LESS THAN THAT.  NOT ALL OF THOSE INFRINGE THE

18      '915.  I DON'T HAVE THAT NUMBER RIGHT IN FRONT OF ME, BUT --

19      Q.   I'M SAYING --

20      A.   IF YOU WANT TO USE 11 MILLION FOR YOUR EXAMPLE, I'LL

21      FOLLOW ALONG.

22      Q.   I JUST HEARD YOU SAY 11 MILLION WOULD HAVE BEHAVED LIKE

23      OTHERS BEHAVED.

24      A.   I WAS TALKING ABOUT ALL OF THE INFRINGING UNITS.

25      Q.   OKAY.  SO THEN I MAY HAVE OVERESTIMATED.
```

1        DO YOU HAVE ANY RECOLLECTION OF HOW MANY UNITS THAT YOU

2    HAD IN YOUR LOST PROFITS CALCULATION?

3    A.   FOR THE '915 ONLY?

4    Q.   YES, MA'AM.

5    A.   WELL, THE END RESULT IS 360,000.

6    Q.   OKAY.  AND IF WE CAN PUT UP A DEMONSTRATIVE, I'VE TRIED TO

7    DO A FREEZE FRAME ON THAT ANIMATION YOU HAVE.  IF WE CAN DO PDX

8    100.12.

9        AND SO I WANT TO MAKE SOME ASSUMPTIONS HERE, OKAY?  I'M IN

10   THE PART IN YOUR ANIMATION WHERE I THINK AFTER THAT YOU KIND OF

11   TAKE SOME PEOPLE OUT AND LEAVE SOME PEOPLE AT SAMSUNG.

12       DO YOU RECALL THAT?

13   A.   YES.

14   Q.   OKAY.  SO I WANT TO IMAGINE THAT YOU'RE IN THE PART OF THE

15   ANIMATION AND THE PART HERE THAT YOU'RE GOING TO DISTRIBUTE TO

16   OTHER COMPANIES -- AND SAMSUNG, RIGHT -- IS HOVERING NEAR

17   HERE (INDICATING) --

18   A.   OKAY.

19   Q.   -- IN THE ANIMATION, AND THAT YOU'RE THEN GOING TO

20   DISTRIBUTE THEM.  OKAY?

21   A.   OKAY.

22   Q.   AND LET'S ASSUME THAT'S -- LET'S GO WITH 10 MILLION EVEN

23   THOUGH WE KNOW THAT'S NOT THE NUMBER.  I JUST WANT TO MAKE IT A

24   ROUND NUMBER.  OKAY?

25   A.   I CAN GIVE YOU MORE SPECIFIC NUMBERS IF YOU WANT THEM.  DO

1    YOU WANT TO KNOW HOW MANY ARE GOING TO THE OTHER CATEGORIES?

2    Q.   I WANT TO KNOW THE AMOUNT OF PEOPLE WHO WERE ELIGIBLE TO

3    GO TO THE OTHER CARRIERS THAT YOU KIND OF HAD HOVERING UP HERE

4    IN THE AIR AND THEY'RE GOING TO BE DISTRIBUTED BETWEEN OTHER

5    SMARTPHONE MANUFACTURERS, APPLE, AND SAMSUNG.

6    A.   I CAN ADD UP THAT NUMBER.  JUST A MINUTE HERE.

7         LET'S SEE.  IT'S ABOUT A MILLION SIX.

8    Q.   OH, OKAY.  SO YOU'VE GOT A MILLION SIX HERE.

9         AND IF SOMEONE WAS COMING -- IF 1.6 MILLION PEOPLE WERE

10   COMING INTO THIS MARKET, RIGHT, AND YOU WANTED TO PREDICT WHERE

11   THEY WOULD GO, WOULD THEY BUY AN IPHONE, WOULD THEY BUY

12   SAMSUNG, WOULD THEY BUY ONE OF THE OTHER SMARTPHONE

13   MANUFACTURERS, OKAY, IT MIGHT BE REASONABLE TO ASSUME THAT,

14   WELL, LET'S JUST LOOK AND SEE HOW THE MARKET IS DISTRIBUTED AND

15   WE'LL JUST DISTRIBUTE THEM ACCORDING TO THE MARKET.  THAT WOULD

16   BE, PERHAPS, A REASONABLE ASSUMPTION; RIGHT?

17   A.   IT WOULD.  IT WOULD LEAD TO A LOT -- TO A MUCH LARGER LOST

18   PROFITS NUMBER THAN WHAT I CALCULATED.

19   Q.   WELL, LET'S GET PAST -- I THINK YOU DID THE CALCULATION OF

20   THE NUMBER WHO WOULD ACTUALLY SWITCH CARRIERS; RIGHT?

21   A.   YES.

22   Q.   SO LET'S SAY WE'RE DONE WITH THAT AND WE'RE TALKING ABOUT

23   THE PEOPLE WHO THEN ARE GOING TO BE DISTRIBUTED AMONG, AMONG

24   THE SMARTPHONE COMPANIES; RIGHT?

25   A.   OKAY.

DAVID CROSS

1    Q.   OKAY.  SO NOW WHAT NUMBER ARE WE AT?

2    A.   I'M A LITTLE LOST IN EXACTLY WHERE YOU ARE IN THIS.

3         SO OF THE MILLION EIGHT, 800 OF THEM ARE GOING TO STAY AT

4    SAMSUNG IN THE LONG RUN.

5    Q.   I WANT TO DO IT BEFORE THEN UNLESS THAT'S THE 26 PERCENT

6    CALCULATION.

7    A.   SOME OF THOSE ARE PART OF THE 74 PERCENT CALCULATION.

8    Q.   OKAY.  OKAY.

9    A.   SO WHAT ARE YOU ASKING ME TO DO INSTEAD?

10   Q.   LET ME MAKE IT SIMPLE.

11   A.   PLEASE.

12   Q.   SURE.  THE MORE FLOW ANALYSIS, YOU KNOW, AFTER YOU FILTER

13   FOR CUSTOMERS WHO ARE AT CARRIERS THAT DON'T CARRY IPHONE AND

14   YOU'RE TRYING TO FIGURE OUT HOW MANY OF THOSE WOULD SWITCH, BUT

15   IF YOU'RE LOOKING AT, IN GENERAL FOR THE MARKET THEN, PEOPLE

16   WHO YOU DON'T KNOW ANYTHING ABOUT THEM, RIGHT, YOU DON'T KNOW

17   WHAT THEIR PREFERENCES ARE, YOU JUST KNOW THERE ARE A MILLION

18   PEOPLE AND YOU'RE TRYING TO PREDICT WHAT PHONE WILL THEY BUY,

19   IT MIGHT BE REASONABLE TO SAY, WELL, SAMSUNG HAS 15 PERCENT OF

20   THE MARKET, APPLE 25, OTHERS, 60, AND THEN DISTRIBUTE THEM IN

21   THOSE NUMBERS; RIGHT?

22   A.   YOU COULD DO THAT.

23   Q.   OKAY.  BUT IF YOU KNOW SOMETHING ABOUT THE PEOPLE, IF

24   YOU'RE NOT COMPLETELY IGNORANT OF WHAT THEIR CHOICES ARE, IT

25   WOULD BE INAPPROPRIATE TO DO THAT; RIGHT?

```
 1     A.   IT DEPENDS ON WHAT YOU KNOW ABOUT THOSE PEOPLE.

 2     Q.   AND YOU'D WANT TO KNOW WHATEVER YOU COULD ABOUT THOSE

 3     PEOPLE; CORRECT?

 4     A.   WELL, NOT NECESSARILY.  I DON'T THINK YOU COULD EVER KNOW

 5     ENOUGH TO KNOW WHAT ANY ONE OF THEM IS GOING TO DECIDE TO DO

 6     BECAUSE THEY'RE GOING TO FACTOR IN LOTS OF DIFFERENT THINGS

 7     INTO THEIR DECISIONS.

 8     Q.   WELL, LET ME ASK YOU THE FOLLOWING HYPOTHETICAL, AND I

 9     APOLOGIZE FOR MY HANDWRITING.

10          BUT IF WE CAN PUT THIS ON THE ELMO, RYAN?

11          AND I'LL MARK THIS AS NEXT IN ORDER.

12          I PUT THE PERCENTAGE ON THE WRONG SIDE.  I'LL TRANSLATE.

13          SDX 8101.  THANK YOU.

14          (DEFENDANT'S EXHIBIT 8101 WAS MARKED FOR IDENTIFICATION.)

15     BY MR. PRICE:

16     Q.   SO IF YOU HAD A POLL AND YOU KNEW THAT THERE WAS AN

17     ELECTION AND, YOU KNOW, 20 PERCENT OF FOLKS WERE -- SUPPORTED

18     THE TEA PARTY LEANING REPUBLICAN AND 40 PERCENT SUPPORTED THE

19     REPUBLICAN'S INTEREST CANDIDATE AND 40 PERCENT SUPPORTED THE

20     DEMOCRATIC CANDIDATE, OKAY, ARE YOU WITH ME SO FAR?  BECAUSE

21     THIS IS A HYPOTHETICAL.

22     A.   OKAY.

23     Q.   SO IF FOR SOME REASON THE TEA PARTY CANDIDATE DROPPED OUT

24     SO THAT YOU HAD THESE 20 PERCENT NOW, YOU KNOW, WHO WERE THEY

25     GOING TO SUPPORT, RIGHT?  ARE YOU WITH ME SO FAR?
```

```
1    A.   I AM.

2    Q.   I WANT TO BE CLEAR.  SO YOU HAVE THESE 20 PERCENT, IT

3    WOULD -- AT THIS POINT, THESE WOULD BE 50/50; RIGHT?  BEFORE

4    YOU CALCULATE WHERE THESE 20 ARE GOING TO GO, YOU WOULD THEN BE

5    HAVING 50 PERCENT OF THE REMAINING POPULATION REPUBLICAN, 50

6    PERCENT DEMOCRAT; RIGHT?

7    A.   YES.

8    Q.   OKAY.  IF YOU ASSUMED THESE 20 PERCENT WERE GOING TO BE

9    DISTRIBUTED EVENLY, THEN YOU WOULD HAVE THE DEMOCRAT AT 60 AND

10   THE REPUBLICAN AT -- HOW WOULD THAT WORK?

11   A.   I DON'T KNOW WHAT YOU MEAN.  ARE YOU -- DO YOU WANT TO

12   SPLIT THE TEA PARTY IN HALF?

13   Q.   LET'S SAY IF YOU ASSUME THAT THEY'RE GOING TO BE SPLIT IN

14   HALF TO THE REPUBLICANS AND DEMOCRATS -- ACTUALLY, IF THEY'RE

15   SPLIT IN HALF, THEN IT'S STILL GOING TO BE 50/50; RIGHT?

16   A.   THAT'S RIGHT.

17   Q.   AND THAT WOULD NOT BE WHAT YOU WOULD ACTUALLY FIND IN REAL

18   LIFE, IS IT?

19   A.   I DON'T KNOW THAT I CAME HERE TO TALK ABOUT POLITICS.  I

20   THINK I WAS TAUGHT IN KANSAS THAT YOU DON'T BRING UP POLITICS

21   IN POLITE COMPANY.

22        BUT THAT SAID, I THINK IF WE'RE TALKING ABOUT POLITICS,

23   WHAT MAY DRIVE A TEA PARTY CANDIDATE OR A TEA PARTY VOTER IS

24   VERY DIFFERENT THAN WHAT DRIVES A SAMSUNG BUYER.

25        BUT I WOULD AGREE WITH YOUR ANALOGY THAT A TEA PARTY
```

1    BUYER, I MEAN A TEA PARTY VOTER MAY BE MORE LIKELY TO END UP

2    WITH A CENTRIST REPUBLICAN IF THEY'RE GOING TO VOTE AT ALL.

3    THEY MAY NOT EVEN SHOW UP AT THE POLLS.

4    Q.   SO -- AND I'M SORRY TO BE IMPOLITE WITH RESPECT TO

5    POLITICS, BUT I'M TALKING ABOUT JUST THE STATISTICAL

6    METHODOLOGY.  THAT IS, IF YOU KNOW SOMETHING ABOUT THAT 20

7    PERCENT, IF YOU KNOW THEY ALREADY MADE A CHOICE, YOU NEED TO

8    TAKE INTO ACCOUNT THE CHOICE THEY MADE; CORRECT?

9    A.   IF YOU KNOW WHY THEY MADE THE CHOICE, THAT'S CORRECT.

10   Q.   EXACTLY.  SO IT WOULD BE WRONG, INACCURATE TO ASSUME THAT

11   PEOPLE HAVING MADE THE TEA PARTY CHOICE WOULD SPLIT 50/50

12   BETWEEN REPUBLICANS AND DEMOCRATS; CORRECT?

13   A.   I DON'T HAVE A VIEW ON THAT.  I JUST DON'T KNOW.  I THINK

14   IT'S MORE LIKELY THAT THEY WOULD PROBABLY END UP WITH THE

15   REPUBLICAN PARTY, BUT I DON'T ANALYZE POLITICS.

16   Q.   LET'S PUT IT THIS WAY.  YOU WOULDN'T ASSUME THAT?  YOU

17   WOULDN'T ASSUME THAT THAT WOULD HAPPEN, THAT THEY WOULD SPLIT

18   UP EVENLY BETWEEN REPUBLICANS AND DEMOCRATS.  YOU'D NEED TO

19   LOOK AND SEE WHY THEY CHOSE THE TEA PARTY IN THE FIRST PLACE?

20   A.   I THINK THAT'S A FAIR DISCUSSION.

21   Q.   NOW, IN THIS CASE YOU KNOW THAT THE POPULATION -- IF WE

22   CAN GO BACK TO THE 100.12, SO YOU NEED TO SWITCH FROM THE ELMO?

23            THE COURT:  WHY DON'T WE MARK THAT JUST FOR THE

24   RECORD.

25            MR. PRICE:  I DID.  SDX 8101.

```
 1                    THE COURT:  WOULD YOU ALSO LIKE TO HAVE DX 712.052,

 2         THE BATTERY CAPACITY, ADMITTED?

 3                    MR. PRICE:  YES, YOUR HONOR.

 4                    THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT?

 5                    MS. KREVANS:  NO.

 6                    THE COURT:  THAT'S ADMITTED.

 7              (DEFENDANT'S EXHIBIT 712.052 WAS ADMITTED IN EVIDENCE.)

 8                    THE CLERK:  WHAT NUMBER WAS THAT?

 9                    THE COURT:  712.052.  THAT WAS THE BATTERY CAPACITY

10         CHART, ONE PAGE.

11                    THE CLERK:  THANK YOU.

12         BY MR. PRICE:

13         Q.  IN THIS CASE, THE CUSTOMERS THAT YOU'RE TALKING ABOUT

14         DISTRIBUTING, ONE FACTOR THAT YOU KNOW IS THAT THEY ALREADY

15         MADE A CHOICE.  THEY ALREADY CHOSE SAMSUNG OVER APPLE AND THE

16         OTHER MANUFACTURERS; CORRECT?

17         A.  I AGREE.  BUT THAT DOESN'T NECESSARILY MEAN THAT THEY

18         WOULD NECESSARILY CHOOSE SAMSUNG THE NEXT TIME AROUND IF THE

19         INFRINGING PHONE WASN'T AVAILABLE.

20         Q.  NO.  BUT YOU NEED TO KNOW WHY THEY CHOSE SAMSUNG, WHY THEY

21         BOUGHT THE PHONE, WHAT ATTRACTED THEM TO THIS ANDROID-BASED

22         PLATFORM INSTEAD OF AN IOS PLATFORM.  YOU'D NEED TO KNOW THAT

23         TO BE ABLE TO ACCURATELY DETERMINE WHAT PERCENTAGE, IF ANY,

24         WOULD GO TO APPLE; CORRECT?

25         A.  I DON'T AGREE WITH YOU.  I DON'T THINK YOU CAN POSSIBLY
```

1    KNOW WHAT EVERY ONE OF THOSE 10.7 MILLION CUSTOMERS WOULD HAVE

2    DONE.  WE DON'T EVEN KNOW WHO THEY ARE.

3    Q.   WELL, ACTUALLY, YOU HEARD THAT YOU CAN'T GET THEM ALL, BUT

4    THAT'S WHY YOU DO SURVEYS.  THAT'S WHY YOU DO STATISTICALLY

5    SOUND SURVEYS; CORRECT?

6    A.   THAT WOULD BE ONE REASON TO DO A SURVEY.

7    Q.   OKAY.  AND YOU CAN'T GET THEM ALL, BUT YOU CAN GET ENOUGH

8    THAT YOU CAN HAVE A LARGE ENOUGH SAMPLE SIZE THAT YOU CAN MAKE

9    CONCLUSIONS?  YOU WOULD AGREE WITH THAT?

10   A.   SURE.

11   Q.   OKAY.  AND SAY -- LET'S SAY YOU HAD 880 PEOPLE WHO HAD

12   ACTUALLY BOUGHT SAMSUNG PHONES THAT HAD, YOU KNOW, THE ACCUSED

13   FEATURES IN THEM, RIGHT?

14        YOU COULD DO A SURVEY TO FIND OUT WHY THEY WENT -- WHY

15   THEY MADE THAT CHOICE IN THE FIRST PLACE AND HOW IT WOULD

16   INFLUENCE THEM; RIGHT?

17   A.   I THINK WHAT YOU WANT TO KNOW IS WHAT THEY WOULD HAVE

18   CHOSEN INSTEAD HAD THEY NOT BEEN ABLE TO MAKE THAT CHOICE.

19   Q.   OR IF WE WANT TO GO THE WAY YOU DID IN THE PRIOR CASE, YOU

20   MIGHT WANT TO KNOW, DID THEY CHOSE THE SAMSUNG PHONE BECAUSE OF

21   THESE FEATURES RATHER THAN THE FEATURES THAT ARE ABSOLUTELY

22   UNIQUE TO SAMSUNG; RIGHT?

23   A.   WELL, THE IMPORTANCE OF THE PATENTED FEATURES LEADS TO THE

24   PANDUIT FACTOR NUMBER 2.  I'LL AGREE WITH YOU THERE.

25   Q.   AND THAT'S WHAT I'M FOCUSSING ON.  FACTOR NUMBER 1, LOT OF

```
 1        PEOPLE LOVE APPLE.  SO PANDUIT FACTOR NUMBER 1, IS THERE DEMAND

 2     FOR THE APPLE IPHONE, I'M AGREEING WITH THAT.

 3            WE'RE TALKING ABOUT FACTOR NUMBER 2 WHERE YOU WANT TO

 4     KNOW, WHY DID THEY GO TO SAMSUNG IN THE FIRST PLACE?

 5            AND YOU'RE NOT AWARE OF ANY SURVEY THAT HAS DONE -- FOR

 6     THIS TRIAL THAT HAS EXAMINED THAT; CORRECT?

 7     A.   AS FAR AS I KNOW, NEITHER APPLE NOR SAMSUNG PERFORMED SUCH

 8     A SURVEY.

 9     Q.   AND BY THE WAY, YOU KNOW WHOSE BURDEN OF PROOF IT IS TO

10     DETERMINE, TO PUT IN EVIDENCE THAT THESE SAMSUNG BUYERS WENT TO

11     SAMSUNG BECAUSE THESE PHONES HAD THESE FEATURES?  THAT'S,

12     THAT'S THE PLAINTIFF'S BURDEN?

13            MS. KREVANS:  OBJECTION, YOUR HONOR.  THIS IS

14     INQUIRING INTO A SUBJECT OF TESTIMONY THAT SAMSUNG MADE A

15     SUCCESSFUL MOTION THAT THE WITNESS COULD NOT TESTIFY ABOUT AND

16     NOW HE'S ASKING HER ABOUT IT.

17            MR. PRICE:  FOLLOWING UP ON HER ANSWER IS ALL.

18            MS. KREVANS:  THE ISSUE OF WHO HAD THE BURDENS OF

19     PROOF --

20            MR. PRICE:  I'LL WITHDRAW THE QUESTION.  LET ME

21     FOLLOW UP IN A DIFFERENT WAY.

22            THE COURT:  OKAY.

23     BY MR. PRICE:

24     Q.   OKAY.  WHAT YOU DO KNOW IS THAT APPLE HAS NOT PRESENTED

25     ANY SURVEY EVIDENCE WHERE THEY ASKED PEOPLE WHO HAD BOUGHT
```

1      PHONES, LIKE THE INFRINGING PHONES, WHY DID YOU BUY THOSE

2      PHONES?  DID YOU BUY THEM BECAUSE OF THESE FEATURES OR

3      SOMETHING ELSE?  CORRECT?

4      A.   AS FAR AS I KNOW, THERE IS NO SUCH SURVEY.

5      Q.   OKAY.  AND THE METHODOLOGY YOU USED AFTER TAKING INTO

6      ACCOUNT, YOU KNOW, WHETHER YOU'D SWITCH A CARRIER OR NOT, THE

7      METHODOLOGY YOU USED, YOU BASICALLY ASSUMED THAT ALL THOSE

8      SAMSUNG CUSTOMERS WOULD BE -- WOULD DIVIDE THEMSELVES AMONG THE

9      OTHER SMARTPHONE MANUFACTURERS BY THE PERCENT OF THE

10     MARKETPLACE MANUFACTURERS HAD, EITHER AT A CERTAIN CARRIER OR

11     OVERALL OF THE POPULATION; CORRECT?

12     A.   I AGREE.

13     Q.   SO LET ME ASK YOU NOW ABOUT THE GROSS PROFITS ANALYSIS.

14         AND LET'S GO AND KIND OF GO DIRECTLY TO -- I THINK YOU

15     SAID THE DIFFERENCE BETWEEN YOU AND MR. WAGNER IS THE DEDUCTION

16     OF OPERATING EXPENSES.

17     A.   YOU SAID THE GROSS PROFITS ANALYSIS.  I ASSUME WE'RE

18     TALKING ABOUT SAMSUNG PROFITS.

19     Q.   THANK YOU.  I WANT TO BE CLEAR.  THE SAMSUNG INFRINGER'S

20     PROFITS ANALYSIS, THE DIFFERENCE BETWEEN YOU AND MR. WAGNER IS

21     WHETHER OR NOT YOU DEDUCT SOME EXPENSES; CORRECT?

22     A.   THAT IS CORRECT.

23     Q.   AND IF WE LOOK AT THAT, THOSE WERE CALLED OPERATING

24     EXPENSES; RIGHT?

25     A.   YES.

DAVID CROSS

1    Q.   OKAY.  AND YOU'LL AGREE WITH ME THAT OPERATING EXPENSES

2    ARE REAL EXPENSES, YOU PAY THEM OUT OF YOUR POCKET, OR A

3    COMPANY DOES?

4    A.   YES.

5    Q.   OKAY.  SO LET'S SAY, FOR EXAMPLE, I WAS GOING TO START A

6    COMPANY TO SELL THESE 13 PHONES, OKAY?  I'D NEED TO EITHER HIRE

7    SOMEONE TO MANUFACTURE IT OR MANUFACTURE IT MYSELF; RIGHT?

8    A.   YES.

9    Q.   THAT WOULD LEAD TO COSTS, REAL COSTS?

10   A.   OF COURSE.

11   Q.   I'D HAVE TO GET SALES PEOPLE; CORRECT?

12   A.   YOU WOULD.

13   Q.   AND THOSE SALES PEOPLE MIGHT BE SELLING ALL 13 PHONES;

14   RIGHT?

15   A.   WELL, SO FAR IN YOUR HYPOTHETICAL THAT'S ALL THEY'RE

16   SELLING.

17   Q.   OKAY.  AND THEN I'D PROBABLY NEED A MANAGER; RIGHT?

18   A.   PROBABLY.

19   Q.   I'D PROBABLY NEED YOU SAID SOMEONE TO COME AND CLEAN THE

20   FACTORY OR THE OFFICES; CORRECT?

21   A.   YES.

22   Q.   I WOULD HAVE ALL THESE EXPENSES THAT I'M INCURRING BECAUSE

23   I AM MANUFACTURING THESE PHONES; CORRECT?

24   A.    IN YOUR HYPOTHETICAL, THAT'S ALL YOU'RE DOING.  YOU'RE

25   MAKING AND SELLING THOSE 13 PHONES AND I WOULD AGREE YOU WOULD

```
1    HAVE THOSE EXPENSES.
2    Q.   OKAY.  AND IF I WERE SELLING OTHER THINGS, LET'S SAY I WAS
3    SELLING THESE 13 PHONES AND A PANDA BEAR AND IT HAD A DIFFERENT
4    MANUFACTURING LINE, BUT THE SALES PEOPLE SOLD THE 13 PHONES AND
5    THE PANDA BEAR.  ALL RIGHT?
6         IT'S STILL A COST OF SELLING 13 PHONES AND THE PANDA BEAR?
7    A.   WELL, IT DEPENDS, IN YOUR HYPOTHETICAL, ON WHETHER YOU
8    WOULD HAVE TO FIRE ANY OF THE PEOPLE THAT ARE SELLING THE 13
9    PHONES IF YOU STOPPED SELLING THE 13 PHONES, AND IF ALL THEY'RE
10   DOING IS SELLING PANDA BEARS, THEN I SUSPECT YOU DON'T NEED
11   SOME OF THOSE PEOPLE ANYMORE AND MAYBE THOSE COSTS ARE
12   ATTRIBUTABLE TO THE PHONES BECAUSE OF THAT.
13   Q.   SAY THERE ARE TEN SALESMEN, THEY'RE SELLING PHONES AND
14   PANDA BEARS.  THAT'S MY SALESMAN, I HAVEN'T FIRED ANYBODY, I'M
15   GOING TO PAY THEM FOR SELLING ALL OF THESE, THEY'RE DIRECTING
16   THEIR EFFORTS TO ALL OF THESE.  IT'S A REAL EXPENSE; RIGHT?
17   A.   CERTAINLY YOU HAVE TO PAY THEM, YES.
18   Q.   AND IF YOU LOOK AT APPLE'S AUDITED FINANCIAL STATEMENTS --
19   IN FACT, LET'S DO THAT IF WE CAN.  IF WE LOOK AT APPLE'S
20   AUDITED FINANCIAL STATEMENTS, DX 946.017.
21        YOU'VE SEEN THAT; CORRECT?
22   A.   I HAVE.
23   Q.   AND IF WE CAN PUT THAT UP.  THAT'S NOT IT.  WAS I
24   DYSLEXIC?
25        IN ANY EVENT, WHILE WE'RE WAITING WITH BATED BREATH, APPLE
```

```
 1      DEDUCTS COSTS OF GOODS SOLD FROM ITS REVENUE; CORRECT?

 2      A.   WHEN IT'S RECORDING OPERATIONS FOR THE COMPANY IT DOES,

 3      YES.

 4      Q.   YEAH.

 5      A.   PROFITS FOR THE ENTIRE COMPANY.

 6      Q.   AND APPLE, DOES APPLE DO REPORTS THAT ARE BELOW THE LEVEL

 7      OF THE COMPANY?  DOES IT DO MANAGEMENT REPORTS THAT HAVE, HAVE

 8      COSTS AND REVENUES FOR LESS THAN THE ENTIRE COMPANY?

 9      A.   IT HAS A LINE OF BUSINESS REPORTS THAT WE CAN LOOK AT.

10      Q.   OKAY.  LET'S LOOK AT 754 -- IS THIS THE SAME PAGE NUMBER?

11      LET'S TRY .017.  AH.  545.  754.545.  AND BLOW THAT UP.

12           SO FOR APPLE, YOU'VE GOT THE COST OF SALES, WHICH IS

13      BASICALLY THE COST OF GOODS SOLD?

14      A.   YES.

15      Q.   THAT GIVES YOU A GROSS MARGIN; CORRECT?

16      A.   IT DOES.

17      Q.   AND THEN THERE ARE REAL EXPENSES ASSOCIATED WITH THAT,

18      RESEARCH AND DEVELOPMENT, SELLING, GENERAL, AND ADMINISTRATIVE;

19      CORRECT?

20      A.   RIGHT.

21      Q.   AND TOTAL OPERATING EXPENSES, WHICH IS BASICALLY WHAT WE

22      WOULD CALL -- WELL, IS THERE ANOTHER WORD FOR THAT?  I DON'T

23      WANT TO USE -- I DON'T WANT TO PUT WORDS IN YOUR MOUTH.

24      A.   OTHER THAN OPERATING EXPENSES, I DON'T THINK THERE IS, NO.

25      Q.   I MEAN, THAT'S PROFIT BEFORE YOU ADD IN OTHER TYPES OF
```

```
 1    INCOME AND OTHER TYPES OF EXPENSES THAT AREN'T ASSOCIATED WITH

 2    THE MAIN BUSINESS?

 3    A.   TRUE, AS LONG AS YOU'RE STILL TALKING ABOUT THE PROFITS

 4    FOR THE ENTIRE COMPANY, WHICH IS WHAT THIS P&L IS.

 5    Q.   I UNDERSTAND.  THIS IS PROFIT FOR THE ENTIRE COMPANY?

 6    A.   SURE.

 7    Q.   AND EVERY COMPANY IN THE UNITED STATES RECOGNIZES THESE

 8    COSTS AS BEING REAL COSTS OF THE BUSINESS; CORRECT?

 9    A.   ABSOLUTELY, WHEN THEY REPORT ON A COMPANY-WIDE BASIS.

10    Q.   AND WHEN YOU DID YOUR ANALYSIS OF APPLE'S PROFITS FOR THE

11    LOST PROFIT PART, THAT IS, WHAT PROFITS APPLE MADE, ONE OF THE

12    THINGS THAT YOU DEDUCTED WERE THINGS LIKE COST OF GOODS SOLD;

13    CORRECT?

14    A.   I DID.

15    Q.   AND YOU READ THE DEPOSITION OF A MR. BUCKLEY.  DO YOU

16    RECALL HE'S THE -- HE'S THE CHIEF FINANCIAL OFFICER, ONE OF

17    THE -- LET'S SEE.  HE WAS THE APPLE 30(B)(6) WITNESS, THE APPLE

18    WITNESS WHO CAME AND TALKED ABOUT THE FINANCIALS; CORRECT?

19    A.   YES, HE WAS.

20    Q.   OKAY.  AND HE EXPLAINED THAT SOME OF THAT THAT'S IN THAT

21    CATEGORY ARE SHARED, ALLOCATED COSTS; RIGHT?

22    A.   IN THE COST OF SALES?

23    Q.   YEAH, IN THE COST OF GOODS SOLD.

24    A.   I BELIEVE THAT'S CORRECT.

25    Q.   OKAY.  AND SO IN DOING YOUR CALCULATIONS, IN CALCULATING
```

```
 1    APPLE'S PROFIT, YOU DID DEDUCT EXPENSES WHICH WERE INCURRED BY

 2    THE COMPANY AND ALLOCATED; CORRECT?

 3    A.   FOR COST OF SALES, YES.

 4    Q.   AND THAT'S BECAUSE SOMETIMES YOU CAN'T SIT THERE AND SAY,

 5    OH, LOOK AT THIS RECEIPT, IT GOES SPECIFICALLY TO THIS

 6    ACTIVITY.  THAT IS, SOMETIMES YOU HAVE TO COME UP WITH AN

 7    ACCEPTABLE ACCOUNTING METHOD OF ALLOCATING THOSE COSTS; RIGHT?

 8    A.   UNDER GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, YOU WOULD

 9    DO THAT FOR THE COMPANY-WIDE P&L, YES.

10    Q.   AND THAT'S BEEN DONE FOR A LONG TIME WHERE YOU ALLOCATE

11    COSTS ON A COMPANY LEVEL; CORRECT?

12    A.   SURE.

13    Q.   AND WHEN YOU'RE AT A -- I UNDERSTAND THAT -- LET ME STRIKE

14    THAT.

15         AND THAT METHODOLOGY OF ALLOCATING SHARED COSTS, THAT IS,

16    YOU SHARE THE COSTS FOR MAKING PRODUCTS, FOR EXAMPLE, THAT

17    METHODOLOGY IS A METHODOLOGY THAT WASN'T CREATED FOR THIS

18    TRIAL.  IT'S A METHODOLOGY THAT'S EXISTED FOR ACCOUNTANTS AND

19    ACCOUNTING LITERATURE FOR, I DON'T WANT TO SAY FOREVER, BUT

20    IT'S WELL ESTABLISHED; CORRECT?

21    A.   SURE.  IF YOU'RE TALKING ABOUT COMPANY-WIDE PROFIT AND

22    LOSS STATEMENTS, YOU'RE RIGHT.

23    Q.   AND WITH RESPECT TO COSTS, YOU UNDERSTAND -- YOU HAVE SOME

24    UNDERSTANDING OF SAMSUNG'S FINANCIAL SYSTEM, THAT IS, YOU HAVE

25    SOME UNDERSTANDING THAT SAMSUNG HAS A SYSTEM THAT, THAT KEEPS
```

1    TRACK OF COSTS ON A DAILY BASIS; CORRECT?

2    A.   I'M AWARE THAT THEY USED THE S.A.P. ACCOUNTING SYSTEM,

3    YES.

4    Q.   OKAY.  AND THE S.A.P. ACCOUNTING SYSTEM IS A SYSTEM THAT

5    IS WIDELY USED; CORRECT?

6    A.   IT IS.

7    Q.   IT'S USED FOR -- I MEAN, APPLE USES IT, FOR EXAMPLE?

8    A.   IT DOES.

9    Q.   AND YOU USE THAT SYSTEM TO INPUT DATA AS THE DATA, YOU

10   KNOW, IS AVAILABLE RATHER THAN WAITING UNTIL, YOU KNOW, SOME

11   LATER TIME TO COLLECT THE DATA; CORRECT?

12   A.   YES.

13   Q.   AND SO THE DATA THAT YOU'VE SEEN, IT'S YOUR UNDERSTANDING

14   THAT THE DATA THAT YOU'VE SEEN THAT WAS PROVIDED BY SAMSUNG

15   ISN'T -- WAS DATA, THAT IS, THE ACTUAL DATA THAT WAS CREATED

16   YEARS AGO?

17   A.   THAT'S HARD TO SAY.  THE SPREADSHEETS THAT WERE CREATED IN

18   SPECIFICALLY PX 180A WAS A SPREADSHEET THAT WAS CREATED FOR

19   THIS LAWSUIT.  WE DON'T KNOW EXACTLY WHERE THOSE NUMBERS CAME

20   FROM, PARTICULARLY SINCE THEY CHANGED FROM ONE TO THE NEXT.

21        THE FACT THAT THEY DID CHANGE FROM ONE VERSION TO THE NEXT

22   SUGGESTS THEY DIDN'T COME RIGHT OUT OF S.A.P.

23   Q.   WELL, YOU ACTUALLY HAVE READ ALL THE TESTIMONY ABOUT WHY

24   THERE WERE VARIOUS CHANGES; CORRECT?

25   A.   I HAVE.

DAVID CROSS

1    Q.   AND YOU ACTUALLY DID AN ANALYSIS AS TO WHAT THE MAGNITUDE

2    OF CHANGES WERE; CORRECT?

3    A.   I DID.

4    Q.   AND ONE OF THE FIGURES YOU USED IN YOUR CALCULATION WAS

5    COST OF GOODS SOLD; RIGHT?

6    A.   YES.

7    Q.   AND THE BIGGEST CHANGE IN THOSE SPREADSHEETS WAS IN COSTS

8    OF GOODS SOLD; CORRECT?

9    A.   THAT WAS THE $1.3 BILLION SITUATION WE TALKED ABOUT.

10   Q.   AND THAT WAS A SITUATION WHERE IT WAS TRANSPARENT AND THEY

11   KNEW PEOPLE WERE GOING TO BE ASKED ABOUT IT AND THE QUESTION

12   WAS, BECAUSE THAT COMPANY WASN'T A PARTY TO THIS LAWSUIT,

13   SHOULD THAT REVENUE BE INCLUDED?  DO YOU UNDERSTAND THAT?

14   A.   I UNDERSTAND THAT.

15   Q.   SO THAT WAS A LEGAL QUESTION OF WHETHER OR NOT THAT

16   COMPANY WAS A PART OF THE LAWSUIT; CORRECT?

17   A.   I DON'T KNOW IF THAT WAS A LEGAL QUESTION OR NOT, BUT I

18   AGREE THAT THERE WAS SOME QUESTION ABOUT WHETHER THAT AMOUNT

19   SHOULD BE IN OR OUT.

20   Q.   OKAY.  SO ONCE THAT IS DETERMINED, WHEN YOU LOOKED AT THE

21   OPERATING EXPENSES, YOU DID AN ANALYSIS THAT SHOWED THERE WAS

22   REALLY NO SIGNIFICANT CHANGE WHATSOEVER?

23   A.   THERE WERE CHANGES, BUT THEY WEREN'T SIGNIFICANT CHANGES.

24   Q.   AND AMONG THOSE CHANGES WERE PRODUCTS WERE BROKEN DOWN

25   INTO SUBPRODUCTS; CORRECT?

 1    A.   SOME, YES.

 2    Q.   OKAY.  IN ANY EVENT, THE BIGGEST CHANGE WAS IN THE FIGURE

 3    THAT YOU USED IN YOUR CALCULATION USING COSTS OF GOODS SOLD?

 4    A.   THAT'S RIGHT.

 5    Q.   OKAY.  YOU ALSO SAID IN YOUR EXAMINATION, BY THE WAY, THAT

 6    DIRECT -- THAT YOU SAW A SHEET WHICH HAD FIXED AND VARIABLE

 7    COSTS FROM SAMSUNG.  DO YOU RECALL THAT?

 8    A.   I THINK I EXPLAINED THAT MR. MUSIKA AND MY STAFF HAD SEEN

 9    IT.  I HAVE NOT.

10    Q.   OH, OKAY.  SO YOU SAID IT HAD FIXED AND VARIABLE; CORRECT?

11    A.   YES.

12    Q.   AND YOU SAID THAT, YOU THOUGHT, MADE YOU THINK THAT

13    SAMSUNG THOUGHT THAT WAS THEN NOT A DIRECT COST?

14    A.   I DON'T THINK I LIKE TO USE THE WORD "DIRECT COST."  I

15    THINK WHAT I SAID IS BECAUSE IT'S FIXED, THE ADVERTISING AS AN

16    EXAMPLE IS A FIXED COST, THAT MEANS THAT SAMSUNG DOESN'T THINK

17    IT WOULD GO UP OR DOWN IF SALES WENT UP OR DOWN.

18         THEREFORE, IF YOU TOOK THE SALES OF THE 13 -- I'M SORRY --

19    THE SEVEN, IN THIS CASE, INFRINGING PRODUCTS OUT, THERE'S NO

20    REASON TO THINK, ACCORDING TO THE SAMSUNG SPREADSHEET, THAT THE

21    ADVERTISING COSTS WOULD CHANGE.

22    Q.   OKAY.  SO YOU WEREN'T TRYING TO MAKE A DISTINCTION BETWEEN

23    DIRECT AND INDIRECT COSTS?

24    A.   NO.

25    Q.   BECAUSE THAT'S A TOTALLY DIFFERENT CONCEPT?  DIRECT VERSUS

1    INDIRECT COSTS VERSUS FIXED AND VARIABLE SHOULD NOT BE

2    CONFUSED?  YOU AGREE WITH THAT?

3    A.   WELL, THERE'S SOME OVERLAP, BUT WE DIDN'T TALK TODAY ABOUT

4    DIRECT AND INDIRECT.  WE WERE TALKING ABOUT DIRECTLY

5    ATTRIBUTABLE.

6         MR. PRICE:  JUST A SECOND.

7         (PAUSE IN PROCEEDINGS.)

8         MR. PRICE:  I'M TRYING TO FIND OUT HOW MUCH TIME I

9    HAVE LEFT OVER HERE BECAUSE WE HAVE BUDGETS.

10   Q.   LET ME ASK ABOUT REASONABLE ROYALTY, AND I'M NOT GOING TO

11   GO INTO TOO MUCH DETAIL ON THIS BECAUSE I HAVE TEN MINUTES.

12        BUT WITH RESPECT TO YOUR REPORT, AND YOU ACTUALLY TOLD THE

13   JURY THAT ONE OF THE THINGS YOU DID WAS A REASONABLE ROYALTY

14   CALCULATION ON THE DESIGN PATENTS; RIGHT?

15   A.   I DETERMINED A REASONABLE ROYALTY AMOUNT FOR DESIGN

16   PATENTS, BUT I DON'T USE IT FOR THE REASONS THAT I DESCRIBED.

17   Q.   IT WAS USED IN YOUR REPORT, BUT YOU'RE NOT PRESENTING IT

18   TODAY?

19   A.   NO.  I DIDN'T USE IT TO CALCULATE TOTAL DAMAGES, BUT I DID

20   INCLUDE A RATE IN MY REPORT.

21   Q.   I -- JUST TO EXAMINE YOUR METHODOLOGY, BECAUSE I KNOW THIS

22   IS VERY COMPLEX, SO I'M JUST GOING TO TAKE THIS AS AN EXAMPLE

23   OF THE METHODOLOGY YOU USED.

24        I SHOWED YOU THIS, THE ACE, EXHIBIT 1030, WHICH IS FOUND

25   THAT IT DOESN'T INFRINGE THE HARDWARE PATENT, OKAY?  THAT IS,

1    THIS FACE, YOU KNOW, IS NOT WHAT APPLE OWNS.  SAMSUNG IS FREE

2    TO USE IT.

3          SO I GUESS IN A HYPOTHETICAL NEGOTIATION, YOU KNOW, IF

4    SAMSUNG WERE ASKING $24 PER PHONE FOR THE IPHONE SHAPE WHEN

5    SAMSUNG COULD USE THIS SHAPE WITH THE FACE (INDICATING), IT'S

6    YOUR TESTIMONY, YOUR OPINION, THAT SAMSUNG WOULD SAY, WE'LL PAY

7    $24 PER PHONE FOR THE IPHONE FACE?  IS THAT YOUR TESTIMONY?

8    A.   YES.

9    Q.   AND WHAT YOU NEED TO TAKE INTO ACCOUNT, OF COURSE, IS THIS

10   IS A NEGOTIATION, ALTHOUGH HYPOTHETICAL; CORRECT?

11   A.   YES.

12   Q.   AND SO ONE THING YOU TAKE INTO ACCOUNT IS WOULD THE OTHER

13   SIDE SAY, ARE YOU CRAZY?  I'VE GOT SOMETHING REALLY SIMILAR

14   THAT I CAN ALSO DO TO COMPETE WITH YOU.

15         WOULDN'T THAT PLAY A FACTOR IN WHAT SOMEONE WOULD BE

16   WILLING TO PAY FOR USING THE IPHONE FACE?

17   A.   OF COURSE.

18   Q.   AND DID YOU SPECIFICALLY TAKE INTO ACCOUNT, IN YOUR

19   ANALYSIS, THAT SAMSUNG COULD USE THIS FACE ON THE ACE, 1030,

20   WHICH HAS BEEN FOUND THAT IT DOESN'T INFRINGE?

21   A.   I DIDN'T LOOK SPECIFICALLY AT THE FACE OF THE ACE.

22   Q.   AND I KNOW YOU TALKED ABOUT WHETHER PHONES INFRINGE AND

23   STUFF, OTHER PHONES INFRINGE.

24         OBVIOUSLY THE HARDWARE, YOU KNOW, COULD BE DUPLICATED IN

25   THE MARKET, THAT IS, SAMSUNG COULD DUPLICATE THIS, THIS SHAPE,

1    THIS FACE AND PUT IT INTO THE MARKET (INDICATING)?  YOU WOULD

2    AGREE THAT THAT WOULDN'T TAKE THAT LONG IF THEY ALREADY HAD THE

3    DESIGN?

4    A.   WELL, THEY COULD PUT OUT MORE OF THAT PHONE.

5         BUT THE INFUSE 4G, WHICH INFRINGES THE '677, COULDN'T BE

6    TURNED INTO ONE OF THOSE OVERNIGHT.

7    Q.   NO.  YOU WOULD JUST PUT OUT THE PHONES THAT LOOKED LIKE

8    THIS, OR LIKE THE OTHER -- THERE ARE 13 PRODUCTS ACCUSED IN

9    THIS CASE; CORRECT?

10   A.   YES.

11   Q.   AND 12 OF THEM AREN'T ACCUSED OF, OF INFRINGING APPLE'S

12   DESIGN PATENT FOR THE SHAPE OR THE FACE; RIGHT?

13   A.   I AGREE.

14   Q.   SO YOU WOULD HAVE ALL OF THOSE ALTERNATIVES?

15   A.   WELL, NOT EXACTLY, BECAUSE IF WHAT YOU'RE TALKING ABOUT IS

16   PUTTING MORE OF THOSE PHONES INTO THE MARKETPLACE, YOU CAN'T DO

17   THAT IF THEY'RE INFRINGING OTHER PATENTS.

18   Q.   I MEAN, YOU CAN USE THOSE CASES.  THE QUESTION IS WHETHER

19   OR NOT THE INFRINGING TECHNOLOGY CAN BE, YOU KNOW, BE USED;

20   RIGHT?  AND THOSE CASES, YOU COULD USE THEM WITH NEW PHONES;

21   RIGHT?

22   A.   I AGREE THAT YOU CAN USE A CASE THAT DOESN'T INFRINGE.

23        BUT IF YOU WANT TO TAKE THE GUTS OF THE INFUSE 4G AND PUT

24   IT INTO A CASE, LIKE YOU'RE LOOKING AT THERE, THAT DOESN'T

25   INFRINGE, THAT REQUIRES A REDESIGN BECAUSE IT DOESN'T FIT.

1    Q.   BUT THE $24 PER PHONE ISN'T GOING TO PAY APPLE FOR THEIR

2    PERMISSION TO USE ANYTHING ELSE BUT THE FACE.  THAT'S ALL --

3    YOU SAID THAT'S ALL IT WOULD BE USED FOR IS JUST THE FACE;

4    RIGHT?

5    A.   I AGREE.  BUT THE INFUSE 4G WILL BE OUT OF THE MARKET

6    UNTIL IT'S CHANGED OVER TO THE NEW FACE AND THAT TAKES A WHILE

7    BECAUSE IT DOESN'T FIT.

8    Q.   THEY COULD USE THIS CASE AND PUT AN INFUSE 4G IN IT;

9    RIGHT?

10   A.   THEY CAN REBRAND THE ACE AS A 4 -- I'M SORRY -- AS AN

11   INFUSE 4G, BUT THEN THEY WOULDN'T BE ABLE TO SELL IT BECAUSE IT

12   NOW INFRINGES THOSE OTHER PATENTS.

13   Q.   AND I'M SORRY, BUT THE REASONABLE ROYALTY THAT YOU'RE

14   LOOKING AT IS HOW MUCH TO PAY JUST FOR THAT HARDWARE THAT LOOKS

15   LIKE THE IPHONE?  RIGHT?  NOT FOR USING BOUNCE -- YOU'VE GOT

16   DIFFERENT NUMBERS FOR THAT?

17   A.   NO, I AGREE.  BUT YOU'RE TELLING ME THAT YOU'RE GOING TO

18   SELL THAT PRODUCT THERE, THE ACE --

19   Q.   NO, I'M NOT.

20   A.   OKAY.

21   Q.   I'M SAYING THE HARDWARE, SAMSUNG HAS PERMISSION TO USE

22   THIS HARDWARE?

23   A.   OKAY.

24   Q.   IT DOESN'T INFRINGE.  THAT'S ALL I'M SAYING.

25   A.   OKAY.

```
1    Q.   I'M NOT SAYING THEY'RE GOING TO SELL THE PHONE.  DO YOU

2    UNDERSTAND THAT?

3    A.   NOW I UNDERSTAND, I THINK, WHAT YOUR HYPOTHETICAL IS.

4    Q.   OKAY.  AND I -- YOU KNOW, THIS AFTERNOON I'M NOT AS CLEAR

5    AS I SOMETIMES AM.

6         LET ME --

7              THE COURT:  IT'S 3:31.  WHY DON'T WE JUST TAKE OUR

8    TEN MINUTE BREAK NOW.  IS THAT OKAY?

9              MR. PRICE:  THAT'S GREAT.

10             THE COURT:  ALL RIGHT.  3:31.  SAME ADMONITION.

11   PLEASE KEEP AN OPEN MIND.  DON'T DISCUSS OR RESEARCH THE CASE.

12        THANK YOU.

13        (JURY OUT AT 3:31 P.M.)

14             THE COURT:  YOU MAY STEP DOWN.

15             THE WITNESS:  THANK YOU.

16             THE COURT:  OKAY.  THE JURORS HAVE LEFT THE

17   COURTROOM.

18        ANY ISSUES?  NO?  OKAY.  LET'S TAKE OUR BREAK.  THANK YOU.

19        (RECESS FROM 3:32 P.M. UNTIL 3:43 P.M.)

20        (JURY OUT AT 3:43 P.M.)

21             MR. LEE:  YOUR HONOR, COULD WE --

22             MR. MCELHINNY:  CAN WE HAVE ONE MORE MINUTE, YOUR

23   HONOR?

24             MR. LEE:  CAN WE WAIT FOR MS. KREVANS TO COME BACK

25   FROM THE BIOLOGY BREAK?
```

```
1              THE COURT:  OH, I'M SORRY.  OKAY.

2         (PAUSE IN PROCEEDINGS.)

3              MS. KREVANS:  I'M SORRY, YOUR HONOR.

4              THE COURT:  NOT A PROBLEM.

5              MS. KREVANS:  THERE WAS A LINE.

6              THE COURT:  SO ARE WE READY?  EVERYONE ELSE IS HERE?

7         OKAY.  LET'S BRING OUR JURY IN, PLEASE.

8         (JURY IN AT 3:44 P.M.)

9              THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

10        IT'S 3:44.  PLEASE GO AHEAD.

11             MR. PRICE:  THANK YOU, YOUR HONOR.

12        I'D LIKE TO MOVE EXHIBIT 754 INTO EVIDENCE, AND ALSO,

13        BECAUSE THERE'S NO QUESTION CONCERNING HAVING TO SEAL, EXHIBIT

14        712.

15             THE COURT:  OKAY.  GIVE ME ONE SECOND, PLEASE.  IS

16        THAT A -- THAT'S A DX; RIGHT?  DX 754?

17             MR. PRICE:  IT IS, YES.

18             THE COURT:  OKAY.  ANY OBJECTION TO THAT?

19             MS. KREVANS:  NO, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

21        (DEFENDANT'S EXHIBIT 754 WAS ADMITTED IN EVIDENCE.)

22             MR. PRICE:  AND DX 712.

23             THE COURT:  ANY OBJECTION?

24             MS. KREVANS:  WHAT WAS THE NUMBER, MR. PRICE?

25             MR. PRICE:  DX 712.
```

DAVID CROSS                                                                        776

 1                    MS. KREVANS:  I JUST NEED TO LOOK FOR A MOMENT, YOUR

 2      HONOR, AND SEE IF THERE'S A SEALING ISSUE.

 3                    THE COURT:  OKAY.

 4                    MS. KREVANS:  THAT ONE IS OKAY, YOUR HONOR.

 5                    THE COURT:  OKAY.  SO THAT'S ADMITTED.

 6            (DEFENDANT'S EXHIBIT 712 WAS ADMITTED IN EVIDENCE.)

 7                    THE COURT:  AND I HAVE DX 754.545 AS A SEPARATE ITEM.

 8      WE'LL JUST SAY THAT'S ADMITTED AS WELL.

 9            (DEFENDANT'S EXHIBIT 754.545 WAS ADMITTED IN EVIDENCE.)

10                    MR. PRICE:  THANK YOU, YOUR HONOR.

11                    THE COURT:  OKAY.

12      BY MR. PRICE:

13      Q.   SO MS. DAVIS, I WANT TO ASK YOU ABOUT A FEW PHRASES THAT

14      WERE USED AND SOME OF THE DOCUMENTS YOU LOOKED AT.

15                    AND DO YOU RECALL THERE WAS A DOCUMENT, IT WAS PX 40, THAT

16      TALKED ABOUT OMNIA AND THAT IPHONE AND -- IT WAS IPHONE AND

17      OMNIA WAS THE DIFFERENCE BETWEEN HEAVEN AND EARTH?

18      A.   I REMEMBER THAT.  I HAVE IT HERE IN FRONT OF ME.

19      Q.   AND AS YOU KNOW, THESE PHONES HERE USE THE ANDROID

20      OPERATING SYSTEM THAT GOOGLE CREATES?

21      A.   YES.

22      Q.   AND THAT OMNIA PHONE, THAT WAS A MICROSOFT WINDOWS-BASED

23      PHONE THAT REALLY WAS HORRIBLE, WASN'T IT?

24      A.   I'LL TAKE YOUR WORD FOR IT.

25      Q.   DID YOU EVER USE THE -- HAVE YOU EVER USED A -- DID YOU

```
1    USE THE OMNIA PHONE AT THAT TIME?

2    A.   I'VE NEVER USED AN OMNIA.

3    Q.   OKAY.  AND YOU'VE TALKED ABOUT THE SAMSUNG PHONES AND, YOU

4    KNOW, WHEN YOU LOOK AT COMPETITIVE ANALYSES -- I MEAN, IT'S

5    SOMETIMES THE CASE THAT, YOU KNOW, IN ORDER TO INSPIRE YOUR

6    TROOPS, YOU SAY THINGS LIKE, "OH, GOD, THAT'S BEAUTIFUL.

7    THAT'S GREAT."  CORRECT?

8    A.   I'VE NEVER BEEN A SALES MANAGER, BUT I CAN PICTURE THAT

9    TAKING PLACE.

10   Q.   YEAH, WHERE THERE -- BECAUSE YOU WANT TO INSPIRE YOUR

11   PEOPLE TO COMPETE AGAINST THE OTHER SIDE; CORRECT?

12   A.   I'LL TAKE YOUR WORD FOR IT.

13   Q.   AND, OF COURSE, THE IPHONE IS A DARN GOOD LOOKING PHONE.

14   A.   IT WAS.

15   Q.   BUT YOU KNOW THAT APPLE ALSO WOULD GO TO TRADE SHOWS AND

16   LOOK AT PHONES AND COMMENT ON THOSE; RIGHT?

17   A.   YES.

18   Q.   AND, IN FACT, ONE OF THE THINGS YOU SAW WAS EXHIBIT 2627,

19   AND I THINK IT SHOULD BE IN YOUR, IT SHOULD BE IN THE MAIN

20   BINDER AGAIN.

21   A.   I HAVE THAT.

22   Q.   OKAY.  AND YOU RECOGNIZE -- THIS IS A DOCUMENT YOU

23   REVIEWED; CORRECT?

24   A.   I BELIEVE SO.

25        MR. PRICE:  YOUR HONOR, I MOVE EXHIBIT 2627 INTO
```

DAVID CROSS                                                                778

```
 1        EVIDENCE.

 2                  THE COURT:  ANY OBJECTION?

 3                  MS. KREVANS:  NO, YOUR HONOR.

 4                  THE COURT:  IT'S ADMITTED.

 5             (DEFENDANT'S EXHIBIT 2627 WAS ADMITTED IN EVIDENCE.)

 6                  THE COURT:  GO AHEAD, PLEASE.

 7        BY MR. PRICE:

 8        Q.   AND YOU RECALL, WHEN YOU'RE LOOKING AT THIS AND READING

 9        ABOUT IT, THAT THAT DATE ACTUALLY SHOULD BE 2007?  DO YOU

10        REMEMBER THAT?

11        A.   I DON'T REMEMBER THAT.  I'LL TAKE YOUR WORD FOR IT.

12        Q.   IF I SHOW YOU SOME PAGES, MAYBE THAT'LL HELP YOU.

13             IF YOU LOOK AT THE SECOND PAGE OF THE DOCUMENT AND YOU CAN

14        SEE -- I'M SORRY, 2627.003.  I'M SORRY.  SO IF YOU LOOK AT

15        THIS, YOU SEE IT'S AN APPLE CONFIDENTIAL DOCUMENT; RIGHT?

16        A.   YES.

17        Q.   AND IT'S TALKING ABOUT CONFIDENTIAL IN BIG BOLD BLUE

18        LETTERS, FOR INTERNAL PURPOSES ONLY; RIGHT?

19        A.   YES.

20        Q.   IT HAS A PICTURE OF WHAT LOOKS LIKE A PRIVATE EYE OR

21        SOMETHING THERE.  DO YOU SEE THAT?

22        A.   I DO.

23        Q.   AND IT TALKS ABOUT DON'T LEAVE COPIES OF THE PRESENTATION

24        WITH PRESS, PARTNERS, OR CUSTOMERS; RIGHT?

25        A.   YES.
```

DAVID CROSS

1    Q.   AND PARTNERS WOULD MEAN PEOPLE THAT APPLE WAS WORKING WITH

2    ON ITS PRODUCTS; RIGHT?

3    A.   I WOULD EXPECT THAT TO BE WHAT THAT MEANS.

4    Q.   AND IT GOES ON TO SAY QUESTIONS AND REMARKS TO THE CONTENT

5    OR USE OF THE DOCUMENT SHOULD BE DIRECTED TO THE EMEA IPOD

6    PRODUCT MARKETING TEAM.  DO YOU SEE THAT?

7    A.   YES.

8    Q.   SO BASICALLY APPLE DIDN'T WANT ANYONE OUTSIDE CERTAIN,

9    EVEN CERTAIN GROUPS IN APPLE TO SEE THIS?

10   A.   THAT'S PROBABLY FAIR TO SAY.

11   Q.   AND IF YOU CAN GO AHEAD AND LOOK AT THE -- LET'S GO ALL

12   THE WAY TO PAGE 17, 2627.017?

13   A.   I HAVE THAT.

14   Q.   SO THERE'S A, THERE'S A SECTION THERE THAT TALKS ABOUT

15   MOBILE PHONES, COMPETITOR REVIEWS; CORRECT?

16   A.   YES.

17   Q.   AND THIS IS A DOCUMENT THAT -- BASICALLY WHAT HAPPENED IS

18   APPLE WENT TO A TRADE SHOW, AND THE BIGGEST TRADE SHOW IN THE

19   INDUSTRY; CORRECT?

20   A.   I DON'T REMEMBER THE TESTIMONY ABOUT THIS DOCUMENT, BUT I

21   DON'T HAVE ANY REASON TO DISPUTE WHAT YOU'RE SAYING.

22   Q.   IN ANY EVENT, THERE WERE A LOT OF COMPETITORS THERE AND

23   THEY WOULD PRESENT PHONES AND THEY WOULD DISCUSS ISSUES ABOUT

24   THE INDUSTRY IN GENERAL?  IS THAT YOUR UNDERSTANDING?

25   A.   YES.

1      Q.   OKAY.  AND APPLE WENT AND CREATED, IN THIS CASE, A

2    DOCUMENT SAYING LET'S SEE HOW OUR COMPETITORS ARE DOING; RIGHT?

3      A.   YES.

4      Q.   AND IF WE GO TO PAGE 2627.018, IT TALKS ABOUT MOBILE PHONE

5    TRENDS, AND YOU SEE IN THE THINNER PART, IT TALKS ABOUT PEOPLE

6    FIGHTING FOR THE THINNEST HANDSET; CORRECT?

7      A.   YES.

8      Q.   AND I GUESS ANOREXIA IS THE TREND, TO BE THIN.  DO YOU SEE

9    THAT?

10     A.   YES.

11     Q.   AND IT HAS A PICTURE THERE AND IT SAYS SAMSUNG IS THE

12   CLEAR WINNER; CORRECT?

13     A.   IT DOES.

14     Q.   AND THEN WE HAVE BETTER LOOKING, THE ERA OF THE HANDSET AS

15   A PURELY UTILITARIAN TOOL IS DEFINITELY OVER AND THE DEVICES

16   HAVE BECOME AN EXPRESSION OF THEIR OWNER'S FASHION SENSE AND

17   PERSONALITY; RIGHT?

18     A.   YES.

19     Q.   IT TALKS ABOUT BEAUTY AND SEX APPEAL; CORRECT?

20     A.   IT DOES.

21     Q.   AND SAYS THE NEW LG PRADA AND SHINE, MOTOROLA KRZRK3, AND

22   SAMSUNG U300 ARE PERFECT EXAMPLES.  THAT WAS APPLE'S VIEW OF A

23   SAMSUNG PRODUCT; CORRECT?

24     A.   THAT'S WHAT IT SAYS.

25     Q.   AND IF WE GO FURTHER TO 2627.025, YOU SEE THIS IS -- THIS

```
1     IS A SUMMARY OF ONE OF THE PHONES THAT WAS ANNOUNCED BY

2     SAMSUNG, THE SMART F700.  DO YOU SEE THAT?

3     A.   SHOW ME AGAIN WHERE YOU'RE POINTING.

4          I SEE THAT, YES.

5     Q.   AND YOU CAN SEE THE FRONT DESIGN; CORRECT?

6     A.   I DO.

7     Q.   AND IF WE CAN GO TO THE NEXT PAGE, THEY THEN COMPARE THIS

8     WITH THE IPHONE.  DO YOU SEE THAT?

9     A.   THEY DO.

10    Q.   IT'S A SLIGHTLY SMALLER SCREEN SIZE; RIGHT?

11    A.   THAT'S RIGHT.

12    Q.   NOW, SINCE THEY'RE COMPARING IT TO THE IPHONE -- AND YOU

13    KNOW THE IPHONE CAME OUT IN JUNE 2007?  IS THAT RIGHT?

14    A.   WELL, I THINK WE SAW THE LAUNCH IN JANUARY OF 2007 ON THE

15    VIDEO YESTERDAY.

16    Q.   THE LAUNCH WAS THE ANNOUNCEMENT, RIGHT.  I'M SAYING WHEN

17    IT ACTUALLY WAS IN MARKET.

18         SO EVEN TAKING THOSE TWO DATES TO GIVE YOU AN IDEA THAT

19    MAYBE THIS IS NOT 2007, BUT 2007.  I JUST WANTED TO REFRESH

20    YOUR MEMORY ON THAT.

21    A.   OKAY.

22    Q.   I DON'T WANT TO SUGGEST THAT SAMSUNG WAS -- HAD THE F700

23    IN THE WORKS, YOU KNOW, IN 2004 GIVEN THE DESIGN CYCLE.

24         AND THEN --

25              MS. KREVANS:  YOUR HONOR, IF I MAY, I BELIEVE THAT
```

```
 1      WHEN THIS EXHIBIT WAS USED PREVIOUSLY, THIS ISSUE AROSE ABOUT

 2      THE DATE AND THE PARTIES AGREED THAT THE CORRECT DATE OF THIS

 3      DOCUMENT, IN FACT, WAS FEBRUARY 2007, NOT FEBRUARY 2006.

 4            MR. PRICE:  THAT WAS AGREED.

 5            MS. KREVANS:  AND IT WAS PUT ON THE RECORD THAT THERE

 6      WAS A LIMITING INSTRUCTION TO THAT EFFECT.

 7            THE COURT:  THAT'S CORRECT.  THE DATE OF THIS IS

 8      FEBRUARY 2007.

 9            MR. PRICE:  THAT'S WHAT I WAS TRYING TO SUGGEST.

10      THANK YOU.

11      Q.   AND IF WE GO TO 2627.042, YOU SEE THIS IS -- THEY TALK

12      ABOUT THE LG PRADA AS BEING A SPECIFIC EXAMPLE OF SEXY, KIND OF

13      FASHIONABLE.

14            AND THEN WE CAN GO TO THE NEXT PAGE, 2627.043, AND YOU CAN

15      SEE THERE'S A DIRECT COMPARISON THEY HAVE WITH THE IPHONE

16      DESIGN; CORRECT?

17      A.   YES.

18      Q.   AND IT'S YOUR UNDERSTANDING, HAVING REVIEWED THE DOCUMENTS

19      IN THE CASE, THAT IT'S NOT UNUSUAL FOR COMPETITORS TO LOOK AT

20      WHAT'S OUT THERE IN THE MARKET AND COMPARE WHAT THEY'RE DOING

21      TO WHAT THEIR COMPETITORS ARE DOING; CORRECT?

22      A.   I AGREE IT'S NOT UNUSUAL TO SEE COMPETITIVE ANALYSIS.

23            IT IS UNUSUAL TO SEE A DOCUMENT THAT SAYS, WE NEED TO MAKE

24      A CHANGE TO OUR PRODUCT IN ORDER TO LOOK MORE LIKE SOMETHING

25      SPECIFIC.
```

1    Q.   WELL, IN FACT, THOUGH, IF YOU LOOK AT THIS DOCUMENT A

2    LITTLE FURTHER, THERE'S ACTUALLY AN ANALYSIS, IF I CAN FIND IT,

3    ABOUT ME, TOO-ISM.  HAVE YOU HEARD OF THAT PHRASE IN THIS

4    MARKET?

5    A.   YES.

6    Q.   AND THAT IS THAT WHEN A DESIGN COMES OUT THAT'S

7    ATTRACTIVE, YOU KNOW, SOMETIMES COMPETITORS COME OUT AND TRY TO

8    LOOK LIKE THAT; RIGHT?

9    A.   YES.

10   Q.   AND OF COURSE THEY'RE TRYING TO LOOK LIKE THAT WITHOUT

11   INFRINGING PATENTS, BECAUSE IF THEY DO, THEY'RE GOING TO HAVE

12   TO PAY A LOT OF MONEY; RIGHT?

13   A.   RIGHT.

14   Q.   OKAY.  AND -- LET ME SEE IF I CAN FIND THAT.

15        AND YOU DO UNDERSTAND ALSO THAT SAMSUNG, FROM READING

16   THESE DOCUMENTS, THAT SAMSUNG'S BUSINESS STRATEGY WAS TO COME

17   OUT WITH A VARIETY OF PRODUCTS WITH A VARIETY OF LOOKS IN THE

18   DIFFERENT SELLING MARKETS, THAT IS, PEOPLE WHO WOULD WANT A

19   CHEAPER PHONE, MID-PRICED PHONE, AND AN EXPENSIVE PHONE?  YOU

20   SAW THAT IN ACTUALLY THE DOCUMENTS THAT YOU LOOKED AT TODAY?

21   A.   YES.

22   Q.   NOW, IF WE COULD GO TO THE SLIDE WHERE YOU CALCULATE YOUR

23   TOTAL PROFIT -- OKAY.  LET ME --

24        IS THIS IN EVIDENCE?

25        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

DAVID CROSS

```
 1              MR. PRICE:  LET ME PUT UP PX 3.  IT WAS USED IN

 2     OPENING.

 3     Q.   AND YOU WERE ACTUALLY HERE DURING THE OPENING?

 4     A.   I WAS.

 5     Q.   AND IT'S PX 3, IT'S A DEMONSTRATIVE, I BELIEVE,

 6     PLAINTIFF'S EXHIBIT NUMBER 3.  PLAINTIFF'S EXHIBIT NUMBER 3.

 7     IF YOU CAN'T FIND IT, I'VE ALWAYS GOT MY HANDY ELMO HERE.

 8          AND YOU SAW THESE PHONES BEING SHOWN TO THE JURY PRIOR TO

 9     THE IPHONE BEING ANNOUNCED; CORRECT?

10     A.   I SAW THAT SLIDE.

11     Q.   OKAY.  AND IF YOU LOOK AT THIS DOCUMENT, 2627.024, WHICH

12     IS, YOU KNOW, IN FEBRUARY OF 2007 --

13          PUT 2627.024 UP.

14          THESE ARE THE HIGHLIGHTS THAT THEY'RE GIVING OF THE

15     SAMSUNG PRODUCTS THAT ARE AVAILABLE, OR ONLY AVAILABLE IN THE

16     MARKET; CORRECT?

17     A.   YES.

18     Q.   AND ANOREXIA WAS IN?

19     A.   SO THEY SAID, YES.

20     Q.   LET ME ASK YOU ABOUT THE MATHEMATICAL EFFECT OF YOUR

21     DECISION ABOUT THE INFRINGER'S PROFITS.  IF WE COULD LOOK AT

22     EXHIBIT PDX 100.18.

23          NOW, MR. WAGNER HAS A NUMBER IN HERE THAT'S ABOUT 200

24     MILLION PLUS; CORRECT?

25     A.   YES.
```

DAVID CROSS

1   Q.   AND YOU ACKNOWLEDGE THOSE ARE REAL OPERATING EXPENSES OF

2   SAMSUNG; CORRECT?

3   A.   I ACKNOWLEDGE THAT THOSE ARE PROBABLY AMOUNTS THAT ARE

4   EXPENDED, BUT THERE'S NO INDICATION THAT THEY ARE DIRECTLY

5   ATTRIBUTABLE TO THE SALE OF THE SEVEN PRODUCTS IN THIS CASE.

6   Q.   YOU DO KNOW THAT THERE WAS SOME ADVERTISING --

7   A.   NO.

8   Q.   -- NECESSARY TO SELL THE PRODUCTS?

9   A.   I HAVE NOT SEEN ANY EVIDENCE OF ADVERTISING FOR THESE

10   SPECIFIC PHONES DURING THE PERIOD FROM -- AFTER THE NOTICE

11   DATE.

12   Q.   WELL, LET'S ASK IT THIS WAY:  IF YOU THOUGHT THIS WAS

13   SAMSUNG'S PROFITS, WHAT YOU'D BE TALKING ABOUT IS THAT SAMSUNG,

14   SAMSUNG'S PROFITS WOULD BE ALMOST $100 A PHONE; RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   AND THIS IS A PHONE THAT -- AND IT SELLS TO CONSUMERS FOR

17   1, WHAT, 20, 30 ON AVERAGE?

18   A.   I THINK THE AVERAGE IS HIGHER THAN THAT.

19        BUT THAT'S NOT THE PRICE ALSO THAT SAMSUNG SELLS IT TO THE

20   CARRIER.

21   Q.   AND WHAT'S THE PRICE SAMSUNG SELLS IT TO THE CARRIERS?

22   A.   THAT'S IN EXCESS OF $200 AS I RECALL.

23   Q.   OKAY.  SO IN EXCESS OF $200.  SO YOUR CALCULATIONS RESULT

24   IN SAMSUNG HAVING -- WHAT'S THEIR PROFIT MARGIN?

25   A.   WELL, I THINK YOU'RE RIGHT IN YOUR CALCULATION THAT IT'S

1    ABOUT $100 A PHONE.

2    Q.   AND BASICALLY WHAT YOUR CALCULATION DOES IS ADD OPERATING

3    COSTS, ADDING IT BACK INTO THE REVENUE?

4    A.   I DON'T KNOW WHAT YOU'RE TALKING ABOUT.  I'M DEFINITELY

5    NOT ADDING OPERATING COSTS TO REVENUE.

6    Q.   WELL, IF THEY'RE REAL OPERATING COSTS AND THEY'RE REAL

7    OPERATING COSTS NECESSARY TO RUN SAMSUNG AND THEY'RE ALLOCATED

8    TO THE PRODUCTS SAMSUNG MAKES, WHAT YOU'RE DOING IN THIS CASE

9    IS, IN EFFECT, TAKING THOSE COSTS AND INCREASING THE PROFITS;

10   RIGHT?

11   A.   WELL, IF YOU WERE TO SUBTRACT OUT THOSE COSTS, IT WILL

12   REDUCE THE PROFITS, I WOULD AGREE WITH YOU THERE.

13        BUT I'VE DESCRIBED WHY I DON'T THINK THAT THOSE COSTS ARE

14   DIRECTLY ATTRIBUTABLE TO THESE PRODUCTS.

15           MR. PRICE:  LET ME CHECK MY BRAIN TRUST, YOUR HONOR.

16           THE COURT:  GO AHEAD, PLEASE.

17       (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

18           MR. PRICE:  I ALMOST FORGOT.  THANK YOU.

19   Q.   DURING YOUR DIRECT, YOU JUST MENTIONED THAT IN TALKING

20   WITH THE APPLE ENGINEER ABOUT HOW LONG IT WOULD TAKE TO DESIGN

21   AROUND THE '915 PATENT, I HEARD YOU MENTION THE WORD "APPS,"

22   AND I WANT TO MAKE SURE WE UNDERSTAND WHAT YOU WERE TALKING

23   ABOUT.

24        YOU SAID SOMETHING ABOUT MANY APPS.  DO YOU RECALL THAT?

25   A.   YES.

DAVID CROSS

1    Q.   OKAY.  SO I WANT TO BE PRETTY CLEAR HERE.  YOU UNDERSTAND

2    THAT FOR THE '915 PATENT, THE ONLY APPLICATION THAT APPLE HAS

3    ACCUSED SAMSUNG OF INFRINGING ON THAT PATENT, THE ONLY

4    APPLICATION IS THE BROWSER APPLICATION, NOT THE OTHER

5    APPLICATIONS IN THE PHONE, JUST THE ONE APPLICATION; RIGHT?

6    A.   I UNDERSTAND THAT, AND I AGREE WITH THAT.

7         BUT WHEN YOU CHANGE THE UNDERLYING SOFTWARE OF THE BASIC

8    PHONE, IT HAS TO BE MADE TO CHANGE VARIOUS SOFTWARE INTERFACES

9    WITH THE APPS, WHETHER THEY INFRINGE OR NOT, SO THAT THE APPS

10   CONTINUE TO TALK TO THE BASIC SOFTWARE.

11   Q.   IS THAT WHAT YOU WERE TRYING TO SAY WHEN YOU SAID THE '915

12   HAD CODE THAT -- I DON'T WANT TO PUT WORDS IN YOUR MOUTH, BUT

13   RELATED TO MANY APPS?  YOU WEREN'T TRYING TO SUGGEST THAT, THAT

14   THESE PHONES INFRINGE THE '915 PATENT ON ANY APPS OTHER THAN

15   THE BROWSER.  YOU WERE NOT TRYING TO SAY THAT?

16   A.   I WAS CERTAINLY NOT TRYING TO SAY THAT.

17              MR. PRICE:  YOUR HONOR, I'M DONE.

18              THE COURT:  OKAY.  TIME IS NOW 4:02.

19              MS. KREVANS:  MR. PRICE, DO YOU NEED THESE THINGS?

20              MR. PRICE:  OH, GOSH, NO.

21         DEPENDS ON WHAT YOU ASK.

22              MS. KREVANS:  CAN WE JUST GIVE HIM TIME TO TAKE HIS

23   NOTES AWAY, YOUR HONOR?

24              THE COURT:  YES.

25         (PAUSE IN PROCEEDINGS.)

```
 1              MS. KREVANS:  I THINK, I HOPE, I JUST HAVE FOUR

 2      QUESTIONS.

 3          I WANT TO START, YOUR HONOR --

 4              THE COURT:  OKAY.  WAIT ONE SECOND.

 5          4:03.  GO AHEAD, PLEASE.

 6              MS. KREVANS:  I WANT TO START BY OFFERING INTO

 7      EVIDENCE PX 3, WHICH MR. QUINN JUST SHOWED TO THE WITNESS AND

 8      QUESTIONED HER ABOUT.

 9              THE COURT:  ALL RIGHT.  ANY OBJECTION?

10              MR. PRICE:  WELL, I'M NOT MR. QUINN.

11              MS. KREVANS:  I'M SORRY.  MR. PRICE.

12              MR. PRICE:  BUT IT'S A DEMONSTRATIVE, YOUR HONOR.

13              MS. KREVANS:  IT WAS NOT A DEMONSTRATIVE, YOUR HONOR.

14      IT'S AN EXHIBIT THAT WAS ADMITTED AT THE LAST TRIAL AND THEY

15      JUST QUESTIONED ABOUT THE WITNESS ABOUT IT.

16              MR. PRICE:  I HAVE NO OBJECTION TO THE FIRST PAGE,

17      WHICH I SHOWED.

18              THE COURT:  ALL RIGHT.  SO JUST PX 3.  THAT'S

19      ADMITTED.

20          (PLAINTIFF'S EXHIBIT 3 WAS ADMITTED IN EVIDENCE.)

21              THE COURT:  GO AHEAD, PLEASE.

22              MS. KREVANS:  PX 3 HAS THREE PAGES, YOUR HONOR, AND

23      WE THINK THE WHOLE THING SHOULD COME IN.

24              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

25          (PLAINTIFF'S EXHIBIT 3 WAS ADMITTED IN EVIDENCE.)
```

1        THE COURT:  GO AHEAD, PLEASE.

2                    **REDIRECT EXAMINATION**

3    BY MS. KREVANS:

4    Q.   MS. DAVIS, YOU RECALL ON CROSS-EXAMINATION MR. PRICE ASKED

5    YOU SOME QUESTIONS ABOUT SURVEYS THAT COULD HAVE BEEN DONE

6    ABOUT VARIOUS THINGS.

7         ARE YOU AWARE OF ANY SURVEYS THAT YOU'VE SEEN IN

8    CONNECTION WITH THIS CASE THAT ASKED CONSUMERS WHETHER EASE OF

9    USE OF A SMARTPHONE WAS IMPORTANT TO THEIR PURCHASING DECISION?

10   A.   ABSOLUTELY.  THAT'S ONE OF THE KEY FACTORS IN SEVERAL OF

11   THE SURVEYS.

12   Q.   WHAT SURVEYS DO YOU HAVE IN MIND?

13   A.   IN PARTICULAR THE ONE THAT IS COME TO MIND ARE THE APPLE

14   SURVEYS THAT RATE THAT AS THE NUMBER ONE FACTOR.

15   Q.   OKAY.  SECOND QUESTION:  YOU RECALL THAT MR. PRICE ASKED

16   YOU A NUMBER OF QUESTIONS ABOUT FINANCIAL STATEMENTS, AND

17   APPLE'S FINANCIAL STATEMENTS IN PARTICULAR.

18        IS THE TEST THAT ONE APPLIES TO CONSTRUCT THE FINANCIAL

19   STATEMENTS FOR AN ENTIRE COMPANY THE SAME TEST THAT ONE APPLIES

20   IN PATENT LITIGATION TO DETERMINE INFRINGER'S PROFITS IF A

21   DESIGN PATENT IS INFRINGED?

22   A.   NO.  THEY ARE VERY DIFFERENT.

23        MR. PRICE:  I OBJECT.  THAT CALLS FOR A QUESTION OF

24   LAW, YOUR HONOR.

25        THE COURT:  OVERRULED.  YOU OPENED THE DOOR.

```
1              GO AHEAD.

2       BY MS. KREVANS:

3       Q.   WHAT IS THE DIFFERENCE BETWEEN THE TWO TESTS?

4       A.   WHEN YOU'RE CALCULATING PROFITS FOR A COMPANY, YOU INCLUDE

5       ALL REVENUES AND ALL EXPENSES.

6              WHEN YOU'RE TRYING TO CALCULATE PROFITS RELATED TO

7       SPECIFIC PRODUCTS AND YOU'RE USING A TEST THAT IS DIRECTLY

8       ATTRIBUTABLE TO THE SALE OF THOSE PRODUCTS, YOU'RE ONLY LOOKING

9       AT THE EXPENSES THAT CAN BE TIED DIRECTLY TO THE SALE OF THE

10      PRODUCTS.

11      Q.   COULD WE PUT UP SLIDE 8, MR. LEE.  PDX 100, PAGE 8.

12             MS. DAVIS, DO YOU RECALL THAT MR. PRICE ASKED YOU SOME

13      QUESTIONS ABOUT THIS GRAPH?

14      A.   YES.

15      Q.   LOOKING AT THE RED LINE PORTION OF THE GRAPH, ARE SOME OF

16      THE SALES THAT DROVE THE INCREASE IN SAMSUNG'S MARKET SHARE

17      SHOWN IN THIS GRAPH SALES OF PHONES THAT WERE FOUND TO INFRINGE

18      IN THE FIRST TRIAL, IN ADDITION TO THE 13 INFRINGING PHONES AT

19      ISSUE HERE?

20      A.   YES.

21             MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:06.

23      ANY RECROSS-EXAMINATION?

24             MR. PRICE:  YES, YOUR HONOR.

25      ///
```

|   |   |
|---|---|
| 1 | **RECROSS-EXAMINATION** |
| 2 | BY MR. PRICE: |
| 3 | Q.   YOU LEFT OUT PART OF THE STANDARD, DIDN'T YOU?  YOU SAID |
| 4 | DIRECTLY RELATED.  YOU LEFT OUT PART OF THE STANDARD? |
| 5 | A.   NOT INTENTIONALLY.  CAN YOU TELL ME WHAT IT IS YOU THINK I |
| 6 | LEFT OUT? |
| 7 | Q.   DIRECTLY RELATED, SUCH AS THERE IS A NEXUS TO THE PRODUCT. |
| 8 | YOU UNDERSTAND THAT THAT MAY BE ONE TEST? |
| 9 | A.   I THINK OF DIRECTLY ATTRIBUTABLE AND NEXUS TO BE |
| 10 | ESSENTIALLY THE SAME THING, YES. |
| 11 | Q.   EVEN THOUGH IT'S A SUCH AS, WHICH IS DEFINING THAT THERE |
| 12 | IS SOME NEXUS TO THE PRODUCT? |
| 13 | A.   YES. |
| 14 | Q.   AND HAVE YOU -- HAVE YOU EVER TESTIFIED ABOUT THAT |
| 15 | STANDARD BEFORE?  DIRECTLY ATTRIBUTABLE TO THERE'S A NEXUS TO |
| 16 | THE PRODUCT, HAVE YOU USED THAT STANDARD, THAT PHRASE BEFORE IN |
| 17 | ANY OF YOUR TESTIMONY? |
| 18 | A.   NO.  DESIGN PATENT CASES ARE VERY RARE AND I DON'T BELIEVE |
| 19 | I HAVE EVER BEEN INVOLVED IN ONE THAT MADE IT TO TRIAL WHERE I |
| 20 | HAD TO TESTIFY ABOUT INFRINGER'S PROFITS. |
| 21 | Q.   HOW ABOUT DEPOSITION TESTIMONY?  HAVE YOU BEEN DEPOSED IN |
| 22 | CASES INVOLVING DESIGN PATENTS? |
| 23 | A.   I PROBABLY HAVE, BUT THEY'RE NOT COMING TO MIND RIGHT NOW. |
| 24 | Q.   OKAY.  IN ANY EVENT, YOU DON'T CONSIDER YOURSELF AN EXPERT |
| 25 | ON THE LEGAL STANDARD FOR EVALUATING DAMAGES TO THE DESIGN |

1    PATENTS?

2    A.   CERTAINLY NOT.  I'M NOT A LAWYER.

3    Q.   AND YOU DID TALK ABOUT EASE OF USE.  YOU SAID YOU SAW

4    THAT, IN SOME OF APPLE'S SURVEYS, HOW IMPORTANT EASE OF USE IS;

5    CORRECT?

6    A.   YES.

7    Q.   AND THOSE WERE SURVEYS OF WHY APPLE CUSTOMERS BOUGHT APPLE

8    PRODUCTS; CORRECT?

9    A.   THOSE PARTICULAR SURVEYS WERE, YES.

10   Q.   AND YOU'VE SEEN TESTIMONY THAT INDICATES THAT THAT PHRASE,

11   EASE OF USE, REFERS TO HUNDREDS AND HUNDREDS OF FEATURES;

12   CORRECT?

13   A.   IT CERTAINLY REFERS TO LOTS OF FEATURES, YES.

14   Q.   WELL, YOU SAW -- YOU SAID YOU'VE READ THE TESTIMONY.

15   HUNDREDS?  WOULD YOU AGREE IT'S HUNDREDS?  YOU'VE SEEN THAT

16   TESTIMONY?

17   A.   I DON'T REMEMBER THAT SPECIFIC TESTIMONY, BUT THAT

18   WOULDN'T SURPRISE ME AT ALL.

19   Q.   AND NONE OF THOSE SURVEYS ASKED A SINGLE QUESTION ABOUT

20   TAP TO ZOOM OR FLICKING OR THE ACCUSED, THE ACCUSED FEATURES IN

21   THIS CASE?  IS THAT CORRECT?  YES OR NO?

22   A.   I THINK THAT'S CORRECT.

23           MR. PRICE:  THANK YOU.

24           THE COURT:  ALL RIGHT.  IT'S 4:09.  MAY THIS WITNESS

25   BE EXCUSED AND IS IT SUBJECT --

1          I'M SORRY.  DO YOU HAVE ANYTHING FURTHER?

2                MS. KREVANS:  I HAVE NOTHING FURTHER.  THE WITNESS

3     MAY BE EXCUSED.  SHE MAY TESTIFY AGAIN ON REBUTTAL.

4                THE COURT:  OKAY.  SHE IS SUBJECT TO RECALL?  I'M

5     SORRY.

6                MS. KREVANS:  SHE'S NOT SUBJECT TO RECALL BY SAMSUNG

7     IN THEIR CASE.

8                MR. PRICE:  SHE'S NOT SUBJECT TO RECALL BY US.

9                THE COURT:  OKAY.  ALL RIGHT.  THEN YOU ARE EXCUSED.

10               MR. MCELHINNY:  AT THIS POINT, WITH YOUR HONOR'S

11    PERMISSION, I WOULD LIKE TO READ TWO INTERROGATORIES AND

12    STIPULATED FACTS INTO THE RECORD.

13               THE COURT:  OKAY.  TIME IS NOW 4:09.  GO AHEAD,

14    PLEASE.

15               MR. MCELHINNY:  THE FIRST INTERROGATORY -- MAY I

16    BRIEFLY REFRESH THE JURY'S RECOLLECTION ABOUT WHAT AN

17    INTERROGATORY IS OR WOULD YOUR HONOR LIKE TO DO THAT?  YOU GAVE

18    IT IN THE PRELIMINARY INSTRUCTION.

19               THE COURT:  GO AHEAD.

20               MR. MCELHINNY:  THANK YOU.

21         YOU'LL REMEMBER THAT IN THE PRELIMINARY INSTRUCTION, AN

22    INTERROGATORY IS A QUESTION THAT WE ASKED TO THE OTHER SIDE

23    WHICH THEY ANSWERED UNDER OATH, SO I'M GOING TO READ TO YOU TWO

24    OF THEIR ANSWERS UNDER OATH.

25               THE COURT:  THIS IS PRELIMINARY JURY INSTRUCTION

1    NUMBER 13.

2         MR. MCELHINNY:  THANK YOU.

3         IN THE FIRST ONE, WHICH I'M ABOUT TO READ TO YOU, THERE

4    WILL BE A REFERENCE WITH A VERY LONG NUMBER AND THAT REFERENCE

5    IS TO A PARTICULAR PAGE, AND THAT PAGE YOU WILL FIND IN

6    PLAINTIFF'S EXHIBIT 52, WHICH WAS THE DOCUMENT THAT WAS

7    ADMITTED WITH MR. WONG'S TESTIMONY THIS MORNING.

8         SO AT THIS POINT, YOUR HONOR, I WOULD READ THE RELEVANT

9    PARTS -- WE HAVE AGREED WITH SAMSUNG ABOUT THE RELEVANT PARTS.

10        SO THE RELEVANT PARTS OF SAMSUNG'S OCTOBER 12TH, 2011

11   SUPPLEMENTAL RESPONSE TO INTERROGATORY NUMBER 12.  AND THE

12   QUESTION IN NUMBER 12 WAS:  "IDENTIFY THE DATE(S) ON WHICH

13   SAMSUNG FIRST BECAME AWARE OF EACH OF THE PATENTS IN SUIT, THE

14   PERSONS AT SAMSUNG WHO FIRST BECAME AWARE OF THE AFOREMENTIONED

15   PATENTS, AND THE CIRCUMSTANCES SURROUNDING THOSE INDIVIDUALS'

16   AWARENESS OF THE AFOREMENTIONED PATENTS."

17        AND THE ANSWER THAT I WOULD LIKE TO READ IS "SAMSUNG FIRST

18   BECAME AWARE OF U.S. PATENT NUMBER 7,469,381, ON OR AROUND

19   AUGUST 2010.  SAMSUNG REFERS TO THE FOLLOWING DOCUMENTS

20   PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 33(D):

21   APLNDC00001116; APLNDC00001148; APLNDC00001152 TO

22   APLNDC00001153.

23        "SAMSUNG FIRST BECAME AWARE OF DESIGN PATENT NUMBER

24   D618,677 WHEN IT WAS SERVED WITH APPLE'S COMPLAINT FOR PATENT

25   INFRINGEMENT, FEDERAL FALSE DESIGNATION OF ORIGIN AND UNFAIR

1    COMPETITION, FEDERAL TRADEMARK INFRINGEMENT, STATE UNFAIR

2    COMPETITION, COMMON LAW TRADEMARK INFRINGEMENT, AND UNJUST

3    ENRICHMENT, FILED ON APRIL 15, 2010, DOCKET NUMBER 1."

4         THE COURT:  YOU MISREAD THAT.  2011.

5         MR. MCELHINNY:  2011.  SORRY.  THANK YOU.

6    THAT'S WHY THIS IS THE MOST EXCITING PART OF THE TRIAL,

7    YOUR HONOR.

8    THE SECOND THING I WOULD LIKE TO READ IS SAMSUNG'S ANSWER,

9    FEBRUARY 29TH, 2012 RESPONSE TO INTERROGATORY NUMBER 36.  THE

10   QUESTION IS:  "IDENTIFY THE PRODUCT NAMES, MODEL NUMBERS, AND

11   U.S. RELEASE DATES FOR EACH OF THE INTERNAL CODE NAMES, PROJECT

12   NAMES, OR OTHER IDENTIFIERS OF SAMSUNG MOBILE PHONES AND TABLET

13   COMPUTERS LISTED IN EXHIBIT 1."

14   THE RELEVANT PART OF THE ANSWER IS:  THE CAPTIVATE

15   (KEPLER) WAS FIRST SHIPPED FOR SALE IN THE UNITED STATES ON OR

16   AROUND JULY 9, 2010.

17   THE CONTINUUM (GARNET) WAS FIRST SHIPPED FOR SALE IN THE

18   UNITED STATES ON OR AROUND OCTOBER 29TH, 2010.

19   THE DROID CHARGE (STEALTH) WAS FIRST SHIPPED FOR SALE IN

20   THE UNITED STATES ON OR AROUND FEBRUARY 17TH, 2011.

21   THE EPIC 4G (VICTORY) WAS FIRST SHIPPED FOR SALE IN THE

22   UNITED STATES ON OR ABOUT JULY 28, 2010.

23   THE EPIC 4G (HAWK) WAS FIRST SHIPPED FOR SALE IN THE

24   UNITED STATES ON OR AROUND JUNE 1ST, 2011.

25        THE COURT:  I THINK THAT WAS EXHIBIT 4G.

1            MR. MCELHINNY:  EXHIBIT 4G (HAWK) WAS FIRST SHIPPED

2       FOR SALE IN THE UNITED STATES ON OR AROUND JUNE 1, 2011.

3            THE GALAXY PREVAIL (VINO, SPARK2) WAS FIRST SHIPPED FOR

4       SALE IN THE UNITED STATES ON OR ABOUT AROUND APRIL 15TH, 2011.

5            THE GEM (MAX) WAS FIRST SHIPPED FOR SALE IN THE

6       UNITED STATES ON OR AROUND JANUARY 8TH, 2011.

7            THE INDULGE (FORTE) WAS FIRST SHIPPED FOR SALE IN THE

8       UNITED STATES ON OR AROUND FEBRUARY 8TH, 2011.

9            THE INFUSE 4G (DEMPSEY) WAS FIRST SHIPPED FOR SALE IN THE

10      UNITED STATES ON OR AROUND APRIL 30TH, 2011.

11           THE NEXUS S 4G (CRESPO) WAS FIRST SHIPPED FOR SALE IN THE

12      UNITED STATES ON OR AROUND APRIL 27, 2011.

13           THE REPLENISH (RANT3) WAS FIRST SHIPPED FOR SALE IN THE

14      UNITED STATES ON OR AROUND APRIL 14TH, 2011.

15           THE TRANSFORM (VITAL) WAS FIRST SHIPPED FOR SALE IN THE

16      UNITED STATES ON OR AROUND SEPTEMBER 13TH, 2010.

17           THE GALAXY TAB (P1) WAS FIRST SHIPPED FOR SALE IN THE

18      UNITED STATES ON OR AROUND MAY 3RD, 2011.

19           FINALLY, YOUR HONOR, I WOULD LIKE TO READ INTO THE RECORD

20      FOUR -- ONE, TWO, THREE, FOUR -- SIX STIPULATED FACTS FROM THE

21      PARTIES' PRETRIAL STATEMENT, STARTING WITH NUMBER 7, PLEASE.

22           "FROM AND AFTER AUGUST 2010 AND AT LEAST TO JULY 6, 2012,

23      APPLE HAS OWNED ALL RIGHTS, TITLE, AND INTEREST IN

24      UNITED STATES PATENT NUMBERS 7,469,381, 7,844,915, 7,864,163,

25      D604,305, AND D618,677.

1          "U.S. PATENT NUMBER 7,469,381 WAS FILED ON DECEMBER 14TH,

2    2007, AND ISSUED ON DECEMBER 23, 2008.

3          "U.S. PATENT NUMBER 7,844,915 WAS FILED ON JANUARY 7,

4    2007, AND ISSUED ON NOVEMBER 30TH, 2010.

5          "U.S. PATENT NUMBER 7,864,163 WAS FILED ON SEPTEMBER 4TH,

6    2007, AND ISSUED ON JANUARY 4TH, 2011.

7          "U.S. PATENT NUMBER D604,305 WAS FILED ON JUNE 23RD, 2007,

8    AND ISSUED ON NOVEMBER 17, 2009.

9          "U.S. PATENT NUMBER D618,677 WAS FILED ON NOVEMBER 18TH,

10   2008, AND ISSUED ON JUNE 29, 2010."

11         THANK YOU, YOUR HONOR.

12         AT THIS POINT, WE'RE PREPARED TO START A NEW WITNESS IF

13   THAT'S WHAT YOU WOULD LIKE TO DO.

14              THE COURT:  YES, PLEASE DO.  THE TIME IS 4:17.

15              MR. MCELHINNY:  WE'LL SET UP THE BINDERS.  JUST ONE

16   MINUTE.

17              THE COURT:  THAT'S FINE.

18         (PAUSE IN PROCEEDINGS.)

19              THE CLERK:  DID YOU GET A BINDER?

20              THE COURT:  NO, I DIDN'T.

21              THE CLERK:  DO YOU HAVE A BINDER FOR THE COURT?

22              MR. MCELHINNY:  THE JUDGE NEEDS A WITNESS BINDER.

23              THE CLERK:  OH, WE GOT IT.  THEY GAVE THEM TO THE

24   CLERKS.

25              THE COURT:  OKAY.  YOU WANT TO SWEAR HIM IN, PLEASE.

```
 1              MR. MCELHINNY:  YOUR HONOR, APPLE CALLS
 2    PHILIP SCHILLER.
 3         (PHILIP SCHILLER, PLAINTIFF'S WITNESS, SWORN.)
 4              THE WITNESS:  I DO.
 5              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.
 6              THE COURT:  TIME IS NOW 4:19.  GO AHEAD, PLEASE.
 7                      DIRECT EXAMINATION
 8    BY MR. MCELHINNY:
 9    Q.   MR. SCHILLER, WE HAVE LEARNED THROUGH TRIAL AND ERROR --
10              THE COURT:  SORRY.  HE NEEDS TO SPELL HIS NAME.
11              THE CLERK:  WOULD YOU STATE YOUR NAME, PLEASE, AND
12    SPELL IT.
13              THE WITNESS:  PHILIP WILLIAM SCHILLER, P-H-I-L-I-P,
14    W-I-L-L-I-A-M, S-C-H-I-L-L-E-R.
15              THE CLERK:  THANK YOU.
16    BY MR. MCELHINNY:
17    Q.   MR. SCHILLER, I WAS ABOUT TO SAY WE'VE LEARNED, THROUGH
18    TRIAL AND ERROR, THAT THAT IS NOT A PARTICULARLY SENSITIVE
19    MICROPHONE, SO EITHER YOU HAVE TO BOOM FOR US, OR YOU HAVE TO
20    PUT YOUR FACE VERY CLOSE TO IT.  DON'T DO BOTH.
21         BY WHOM ARE YOU EMPLOYED, SIR?
22    A.   APPLE.
23    Q.   AND WHAT IS YOUR TITLE?
24    A.   I'M THE SENIOR VICE-PRESIDENT OF WORLDWIDE MARKETING.
25    Q.   ARE YOU A MEMBER OF APPLE'S EXECUTIVE TEAM?
```

1       A.   YES, I AM.

2       Q.   AND WHAT DOES THE EXECUTIVE TEAM DO AT APPLE?

3       A.   IT IS THE GROUP OF EXECUTIVES THAT RUN EACH OF THE MAJOR

4       FUNCTIONAL AREAS OF APPLE, AND TOGETHER COLLECTIVELY WE RUN

5       APPLE.

6       Q.   AND TO WHOM DO YOU REPORT, SIR?

7       A.   THE CEO, TIM COOK.

8       Q.   HOW LONG HAVE YOU WORKED FOR APPLE?

9       A.   OVER 20 YEARS.

10      Q.   CAN YOU JUST QUICKLY GIVE US SORT OF AN IDEA OF THE

11      PROGRESSION OF YOUR EMPLOYMENT AT APPLE?

12      A.   I FIRST STARTED WORKING AT APPLE IN 1987 ON THE EAST

13      COAST, MASSACHUSETTS.  I WAS A FIELD MARKETING REPRESENTATIVE.

14           AND THEN A YEAR LATER I MOVED OUT TO CUPERTINO, CALIFORNIA

15      IN '88 FOR ANOTHER MARKETING POSITION, AND THROUGH THE YEARS I

16      PROGRESSED UP INTO MORE AND MORE MARKETING RESPONSIBILITIES

17      UNTIL I EVENTUALLY BECAME AN EXECUTIVE VICE-PRESIDENT.

18      Q.   SIR, WHAT ARE YOUR CURRENT RESPONSIBILITIES AS THE SENIOR

19      VICE-PRESIDENT FOR WORLDWIDE PRODUCT MARKETING?

20      A.   I RUN ALL OF APPLE'S MARKETING, AND THERE ARE MANY

21      MARKETING FUNCTIONS UNDER THAT, SO I HAVE AREAS SUCH AS PRODUCT

22      MARKETING, MARKETING COMMUNICATIONS, MARKET RESEARCH,

23      INTERNATIONAL MARKETING, BUSINESS MARKETING, EDUCATION

24      MARKETING, AND OTHER FUNCTIONS AS WELL.

25      Q.   I THINK WHEN WE WERE PICKING A JURY HERE, ONE OF OUR

1     PROSPECTIVE JURORS SAID THAT HE HAD SEEN YOU ON TELEVISION.  DO

2     YOU APPEAR ON TELEVISION FROM TIME TO TIME?

3     A.    FROM TIME TO TIME.

4     Q.    OKAY.  SO THAT WE HAVE A STANDARD, WHAT DO YOU MEAN WHEN

5     YOU SAY "MARKETING"?  WHAT IS MARKETING?

6     A.    OH, IT'S A COMPLEX TERM AND I LIKE TO THINK OF IT SIMPLY

7     AS THE BUSINESS OF COMMUNICATIONS.  WE COMMUNICATE THINGS SUCH

8     AS THE VALUE OF A PRODUCT, THE IDEAS OF A PRODUCT, THE STRATEGY

9     OF A COMPANY, THOSE SORTS OF THINGS.

10    Q.    SIR, THIS CASE INVOLVES TWO SEPARATE PRODUCT LINES, THE

11    IPHONE AND THE IPAD, AND I'D LIKE TO START WITH THE IPHONE.

12          CAN YOU TELL US HOW IT WAS THAT APPLE CAME TO DEVELOP THE

13    IPHONE?

14    A.    WELL, LIKE MOST PRODUCTS, THERE WERE A NUMBER OF THINGS

15    THAT HAPPENED IN PARALLEL THAT ALL LEAD UP TO DOING SOMETHING.

16          IN THE CASE OF THE IPHONE, A COUPLE OF THE BIGGEST THINGS

17    THAT HAPPENED WAS APPLE HAD BEEN KNOWN FOR PRIMARILY FOR ONE

18    BUSINESS, PERSONAL COMPUTERS, SPECIFICALLY THE MACINTOSH.

19          AND THEN WE HAD A BIG HIT WITH THE IPOD, THE IDEA OF

20    CARRYING YOUR MUSIC WITH YOU ALL THE TIME, AS WELL AS PHOTOS

21    AND MOVIES.

22    Q.    LET ME INTERRUPT.  APPROXIMATELY WHAT YEAR ARE WE TALKING

23    ABOUT WITH THE IPOD?

24    A.    OH, THAT ALL HAPPENED IN THE EARLY 2000 TIME FRAME.

25    Q.    OKAY.

1      A.   AND WE WONDERED WHAT WOULD HAPPEN, WOULD SOMETHING ONE DAY

2      REPLACE THE IPOD?  WAS THERE ANYTHING ELSE YOU WOULD CARRY YOUR

3      MUSIC AND PHOTOS AND EVEN MOVIES WITH YOU AS YOU MOVED AROUND?

4           AND IT CAME TO US THAT PERHAPS THE PHONE MIGHT WITH A

5      DEVICE THAT COULD DO THOSE THINGS AND EVENTUALLY REPLACE THE

6      IPOD.

7           AT THE SAME TIME WE HAD BEEN WORKING ON THE PRODUCT, THE

8      IPAD, AND IN THE IPAD INVESTIGATION, WE DISCOVERED THE USE OF

9      MULTITOUCH TECHNOLOGY AND HOW, IN A MOBILE DEVICE, THAT WAS A

10     BIG BREAKTHROUGH FOR SO MANY THINGS THAT YOU WANT TO DO WHEN

11     YOU DON'T HAVE A KEYBOARD AND A MOUSE AND THE THINGS WE'RE USED

12     TO WITH COMPUTING TECHNOLOGY.

13          SO THOSE IDEAS CAME TOGETHER AT THE BEGINNING TO BE THE,

14     THE GENESIS, THE START OF THE PROJECT TO CREATE THE IPHONE.

15     Q.   WHEN YOU SAY THAT YOU DISCOVERED MULTITOUCH TECHNOLOGY,

16     WHAT DO YOU MEAN BY "MULTITOUCH TECHNOLOGY"?

17     A.   WELL, I'M NOT AN ENGINEER OR DESIGNER.  I'M A MARKETING

18     PERSON, AND TO ME MULTITOUCH TECHNOLOGY IS THE ABILITY TO HAVE

19     A TOUCHSCREEN DISPLAY WHERE YOU CAN HAVE MORE THAN ONE INPUT

20     FROM YOUR FINGERS HAPPENING AT THE SAME TIME AND THAT ENABLES A

21     LOT OF NEW USES THAT WEREN'T POSSIBLE WHEN YOU ONLY HAD A

22     SINGLE TOUCH WORKING.

23     Q.   HOW -- APPROXIMATELY HOW LONG WAS THE DEVELOPMENT PROCESS

24     FOR THE IPHONE?

25     A.   WELL, PARTS OF IT -- AS ALWAYS AS IN THE CASE OF THESE

```
 1      THINGS, THINGS STARTED TAKING LONGER.  WE HAD OPERATING SYSTEM

 2      WORK GOING ON, AND AS I SAID, THE IPAD WORK GOING ON.

 3           BUT THE POINT AT WHICH WE HAD SAID LET'S MAKE A PHONE

 4      UNTIL THE MOMENT WHEN IT ACTUALLY CAME TO MARKET WAS

 5      APPROXIMATELY THREE YEARS.

 6      Q.   APPROXIMATELY HOW MANY PEOPLE WERE INVOLVED IN THIS, IN

 7      THIS DEVELOPMENT EFFORT?

 8      A.   LIKE SO MANY OF THESE THINGS, THEY START SMALL AND VERY

 9      QUICKLY GROW.  SO IT STARTED WITH HUNDREDS AND GREW TO

10      THOUSANDS.

11           AND REALLY TO THIS POINT, IT'S FAIR TO SAY THAT MOST

12      EVERYBODY AT APPLE WORKS ON IPHONE.  IT IS OUR BIGGEST PRODUCT

13      AND IT INVOLVES EVERYBODY.

14      Q.   WHAT WAS THE DEVELOPMENT PROJECT FOR THE IPHONE?  WAS IT

15      TREATED AS A CONFIDENTIAL PROJECT BY THE COMPANY?

16      A.   VERY MUCH SO.

17      Q.   AND WHERE WAS THIS WORK DONE?

18      A.   IN CUPERTINO, CALIFORNIA.

19      Q.   WERE YOU INVOLVED IN THE INITIAL DECISIONS TO BEGIN AN

20      IPHONE PROJECT?

21      A.   YES.  ALL OF OUR PRODUCTS INVOLVE A CROSS FUNCTIONAL TEAM

22      WITH MEMBERS FROM THE WHOLE COMPANY, AND I AND THE PEOPLE WHO

23      WORK FOR ME REPRESENTED MARKETING ON THE IPHONE FROM THE VERY

24      BEGINNING.

25      Q.   AT THE TIME THAT YOU MADE THE DECISION TO GO FORWARD WITH
```

1    THE IPHONE DEVELOPMENT PROJECT, HAD THE COMPANY IDENTIFIED ANY

2    RISKS INVOLVED WITH UNDERTAKING THIS PARTICULAR PROJECT?

3    A.   OH, THEY WERE HUGE RISKS.  WE HAD A SAYING INSIDE THE

4    COMPANY THAT IT WAS A YOU-BET-YOUR-COMPANY PRODUCT, MEANING

5    THAT AT THE TIME APPLE HAD, FROM HAVING NOT BEEN DOING WELL

6    EARLIER, WAS STARTING TO DO WELL AGAIN.  THE IPOD WAS HELPING

7    US TO GROW.  PEOPLE WERE THINKING GOOD ABOUT APPLE.  OUR SALES

8    WERE GROWING.

9         AND HERE WE WERE GOING TO INVEST ALL THESE RESOURCES, BOTH

10   FINANCIAL AS WELL AS PEOPLE, IN CREATING THIS PRODUCT THAT WE

11   HAD NEVER CREATED A PHONE BEFORE AND THAT WE WERE RISKING BOTH

12   OUR REPUTATION AND THE BUSINESS OF THE COMPANY IN DOING THIS.

13   Q.   WERE YOU PERSONALLY INVOLVED IN ANY WAY IN THIS

14   DEVELOPMENT PROJECT?

15   A.   ALL THROUGHOUT THE PROJECT I WAS INVOLVED WITH THE PRODUCT

16   TEAM, EVALUATING FEATURES AND IDEAS, GIVING INPUT, ALL

17   THROUGHOUT.

18   Q.   WHEN WAS THE IPHONE ANNOUNCED?

19   A.   IN JANUARY OF 2007.

20   Q.   WERE YOU PERSONALLY INVOLVED IN PLANNING THAT

21   ANNOUNCEMENT?

22   A.   YES.  I AND MY TEAM WERE RESPONSIBLE FOR THE ENTIRE LAUNCH

23   ACTIVITIES OF ALL OF OUR EVENTS, AND SO I'M RESPONSIBLE FOR

24   EVERY ELEMENT OF IT.

25   Q.   WERE YOU PERSONALLY PRESENT AT THE MOSCONE CENTER IN

1    SAN FRANCISCO DURING THE ANNOUNCEMENT?

2    A.   YES.  IN FACT, I HAVE ALWAYS BEEN PROUD THAT I WAS ABLE TO

3    TAKE PART IN THE FIRST DEMONSTRATION OF IPHONE AND ONE OF THE

4    FIRST PEOPLE THAT MR. JOBS MADE A CALL ON THE IPHONE WITH.

5    Q.   WE SAW A SHORT VIDEO.  I'M NOT GOING TO RESHOW THE VIDEO,

6    BUT YOU'RE AWARE THAT THERE WAS A VIDEO MADE OF THE ORIGINAL

7    ANNOUNCEMENT?

8    A.   YES, OF COURSE.

9            MR. MCELHINNY:  YOUR HONOR, I WOULD MOVE THE VIDEO,

10   JX 1091, INTO EVIDENCE.

11           THE COURT:  ANY OBJECTION?

12           MR. PRICE:  NO ADDITIONAL OBJECTION, YOUR HONOR.

13   BY MR. MCELHINNY:

14   Q.   WE ONLY SAW A SHORT CLIP OF THAT --

15           THE COURT:  IT'S ADMITTED.

16       (JOINT EXHIBIT 1091 WAS ADMITTED IN EVIDENCE.)

17           MR. MCELHINNY:  I'M SORRY.  I APOLOGIZE, YOUR HONOR.

18           THE COURT:  GO AHEAD.

19   BY MR. MCELHINNY:

20   Q.   WE ONLY SAW A SHORT CLIP, AND UNFORTUNATELY, WE DIDN'T SEE

21   YOUR ROLE, SO COULD YOU EXPLAIN TO US WHAT YOU ACTUALLY DID IN

22   THE ANNOUNCEMENT THAT'S IN THE LARGER CLIP OF THE VIDEO.

23   A.   YES.  WHEN PEOPLE SEE IT, THEY'LL RECALL I WAS YOUNGER

24   THEN.

25           THE MOMENT WAS WHEN STEVE JOBS UNVEILED THE PHONE TO THE

```
1    WORLD AND HE WANTED TO SHOW THAT IT'S A PHONE AND IT CAN MAKE A

2    CALL.  WE HAD NEVER MADE A PHONE BEFORE.

3         AND HE MADE HIS FIRST CALL TO JONATHAN IVE, THE HEAD

4    DESIGNER AT APPLE, AND THEY HAD A PHONE CALL.

5         AND WHILE THEY WERE SPEAKING, THEN I DIALED IN AND SPOKE

6    WITH STEVE AND MADE THE SECOND CALL.

7         AND THEN WHILE WE WERE ON THE PHONE, STEVE CONTINUED ON TO

8    SEARCH THE WEB AND LOOK FOR A MOVIE WE COULD GO TO SEE TOGETHER

9    LATER.

10        SO WE WERE SHOWING BOTH USING IT TO MAKE CALLS, TO DO

11   MULTIPLE CALL HANDLING, AND TO GO AHEAD AND DO MULTITASKING

12   WITH DATA AND VOICE AND NETWORK, WHICH WAS PRETTY NEW AT THE

13   TIME FOR PEOPLE.

14   Q.   FROM A MARKETING PERSPECTIVE, WHAT WAS APPLE TRYING TO

15   CONVEY AT THIS ORIGINAL ANNOUNCEMENT EVENT?

16   A.   THIS WAS A BREAKTHROUGH PRODUCT FOR US, AND WE THINK FOR

17   THE WORLD, AND WE WANTED TO SHOW PEOPLE HOW BEAUTIFUL THE

18   IPHONE WAS, WE CARED A GREAT DEAL ABOUT DESIGNING BEAUTIFUL

19   PRODUCTS AT APPLE, THAT IT DELIVERED SOME FUNCTIONALITY, SOME

20   USES FOR PEOPLE THAT THEY WOULD WANT TO HAVE WITH THEM ALL OF

21   THE TIME.

22        THERE WAS A LOT OF VALUE IN THIS PRODUCT AND THE THINGS IT

23   WOULD DO, AND THAT IT WOULD DO THESE THINGS IN REVOLUTIONARY,

24   NEW WAYS THAT WERE COMPLETELY INTUITIVE AND EASY TO USE.

25        AND THOSE WERE SOME OF THE THINGS WE WANTED TO DEMONSTRATE
```

1       AND GET ACROSS TO EVERYONE IN THE WORLD.

2       Q.   APPROXIMATELY HOW MANY PEOPLE WERE PRESENT AT THE MOSCONE

3       CENTER FOR THIS EVENT?

4       A.   IN THE CENTER, IT HOLDS A FEW THOUSAND.  I DON'T REMEMBER

5       THE COUNT OF THAT EXACT EVENT, BUT A FEW THOUSAND.

6       Q.   AND WHAT WAS THE -- WHAT WAS THE ATMOSPHERE LIKE?

7       A.   I ALWAYS USE THE WORD "ELECTRIC."  THAT'S HOW I RECALL IT

8       BEING.

9       Q.   AS YOU SIT HERE TODAY, DO YOU REMEMBER ACTUALLY BEING

10      THERE AT THAT EVENT?

11      A.   OH, YES.  I'LL NEVER FORGET IT.

12      Q.   WHAT WAS THE SORT OF IMMEDIATE REACTION TO THE

13      ANNOUNCEMENT OF THE IPHONE?

14      A.   WELL, HUGE REACTION.  THE WHOLE WORLD HAD BEEN WAITING FOR

15      THIS ANNOUNCEMENT.  ALL THE RUMORS WERE THAT APPLE WAS GOING TO

16      DO A PHONE.  PEOPLE HAD ALREADY CALLED IT IPHONE BEFORE WE

17      ANNOUNCED WHAT IT WAS GOING TO BE CALLED.

18          AND THERE WAS PRESS STORIES FROM EVERYWHERE IN THE WORLD,

19      AND THEY VARIED FROM ONE EXTREME, PEOPLE WHO WERE AMAZED BY IT,

20      BLOWN AWAY BY IT, JUST LOVED IT IMMEDIATELY, AND THERE WERE

21      OTHERS THAT WERE STRONG DETRACTORS AND SAID THIS IS A MISTAKE

22      AND IT WOULD FAIL AND WE WOULD FALL FLAT ON OUR FACE.

23      Q.   LET ME SEE IF WE COULD, PLEASE, IF YOU HAVE A BINDER IN

24      FRONT OF YOU, MR. SCHILLER, IF YOU WOULD TURN TO PX 133?

25              THE COURT:  IT'S ACTUALLY 4:30.

1           MR. MCELHINNY:  PERFECT.

2           THE COURT:  I'LL LET YOU ASK ONE QUICK QUESTION, OR

3   DO YOU WANT TO WAIT?

4           MR. MCELHINNY:  WE'LL START WITH THIS EXHIBIT

5   TOMORROW.  THAT WOULD BE PERFECT.

6           THE COURT:  ALL RIGHT.  IT'S 4:30.

7           MR. MCELHINNY:  MR. SCHILLER.

8           THE COURT:  I PROMISED YOU YOU'D GET OUT AT 4:30

9   EVERY DAY.

10          SO, ALL RIGHT, SAME ADMONITIONS.  THESE DON'T DISCUSS OR

11  RESEARCH THE CASE.

12          IF YOU WOULD PLEASE LEAVE YOUR JURY BINDERS IN THE JURY

13  ROOM, AND IF YOU WOULD PLEASE CONTINUE TO KEEP AN OPEN MIND.

14          THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL SEE

15  YOU TOMORROW AT 9:00 O'CLOCK.

16          (JURY OUT AT 4:30 P.M.)

17          THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

18  LEFT THE COURTROOM.

19          PLEASE TAKE A SEAT.  ANY ISSUES THAT WE NEED TO COVER?

20  OTHERWISE WE'LL GO AHEAD AND RECESS FOR THE DAY.

21          MS. MAROULIS:  CAN WE HAVE THE TIME, PLEASE, YOUR

22  HONOR?

23          THE COURT:  AH, THAT'S RIGHT.  OKAY.

24          MS. KREVANS:  YOUR HONOR, I WANTED TO ASK, BECAUSE I

25  KNOW IT'S FRUSTRATING FOR THE COURT FOR THE LIVENOTE TO GO ON

1    THE FRITZ ALL THE TIME.

2         DO YOU WANT THE TWO SIDES' TECH PEOPLE TO SEE IF THEY CAN

3    FIGURE OUT WITH THE REPORTER A WAY TO HARD WIRE THE LIVENOTE

4    FOR YOU TEMPORARILY SO IT WON'T GO OUT?  BECAUSE I THINK THE

5    PROBLEM IS TOO MUCH BLUETOOTH GOING ON AT THE SAME TIME.

6         THE COURT:  WHAT DO YOU THINK, MS. SHORTRIDGE?

7         THE REPORTER:  I DON'T KNOW.  I DON'T THINK WE HAVE

8    THE CABLES AND STUFF TO DO IT.

9         THE COURT:  WHAT I WILL DO IS I WILL ASK OUR I.T.

10   PERSON AND SEE IF, IF THAT COULD BE DONE.

11        ALTHOUGH WHEN -- WHEN WOULD THAT NEED TO BE DONE?  HE'S

12   PROBABLY LEFT FOR THE DAY.

13        THE CLERK:  I THINK HE HAS LEFT FOR THE DAY BECAUSE

14   HE JUST ASKED ME TO TURN OFF THE CAMCORDER.

15        THE COURT:  OKAY.  WHY DON'T I CHECK WITH HIM?

16        MS. KREVANS:  OKAY.  I KNOW OUR FOLKS AND SAMSUNG'S

17   I.T. PEOPLE WOULD BE HAPPY TO HELP.

18        THE COURT:  AND I'M SURE YOU ALL HAVE GREAT STUFF.

19        OKAY.  I APPRECIATE THAT OFFER.

20        ALL RIGHT.  ANY OTHER ISSUES?  OKAY.  THEN I WILL SEE

21   EVERYONE AT 8:45 TOMORROW.

22        MS. MAROULIS:  DID WE GET THE TIME?

23        THE COURT:  OH, I'M SORRY.  I'M SORRY.

24        OKAY.  GIVE ME ONE SECOND, PLEASE, TO DO THE RECENT

25   CALCULATIONS.

1           MS. MAROULIS:  THANK YOU.

2        (PAUSE IN PROCEEDINGS.)

3           THE COURT:  ALL RIGHT.  TODAY APPLE HAS USED 2 HOURS

4    AND 35 MINUTES.  SAMSUNG USED 2 HOURS AND 28 MINUTES.

5        SO YOUR OVERALL TOTAL FOR APPLE IS 4 HOURS AND 13 MINUTES;

6    AND FOR SAMSUNG IS 3 HOURS AND 57 MINUTES.

7        DO YOU WANT FURTHER BREAKDOWNS OR IS THAT SUFFICIENT?

8           MR. MCELHINNY:  THAT'S GOOD ENOUGH.

9           MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  THANK YOU.

11           MR. MCELHINNY:  THANK YOU.

12           THE COURT:  WOULD YOU LIKE TO GET TOGETHER AT 8:45

13    TOMORROW?

14           MR. MCELHINNY:  THAT WOULD BE FINE.

15           THE COURT:  OKAY.  THANK YOU.

16           MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17        (THE EVENING RECESS WAS TAKEN AT 4:33 P.M.)

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____

                LEE-ANNE SHORTRIDGE, CSR, CRR
17              CERTIFICATE NUMBER 9595

18              DATED:  NOVEMBER 14, 2013

19

20

21

22

23

24

25